**Hearing Date & Time: March 29, 2011 at 9:45 a.m. (Eastern Time)**
**Response Deadline: March 22, 2011 at 4:00 p.m. (Eastern Time)**

José Javier Bartolomei
Stephen S. LaPlante
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
101 N. Main Street, 7th Floor
Ann Arbor, Michigan 48108
734.668.8982
bartolomei@millercanfield.com

Attorneys for Kettering University

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re** | **Chapter 11 Case No.** |
| **MOTORS LIQUIDATION COMPANY,** *et al.,* **f/k/a General Motors Corp.,** *et al.,* | **09-50026 (REG)** |
| **Debtors.** | **(Jointly Administered)** |

### RESPONSE OF KETTERING UNIVERSITY
### TO DEBTORS' 208TH OMNIBUS OBJECTION TO CLAIMS

Kettering University, ("KU" or "Kettering"), by its attorneys, hereby submits this response to Debtors' 208th Omnibus Objection to Claims (Contingent Co-Liability Claims) (the "Objection") filed by Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession (collectively, the "Debtors"). In support of this Response, the Kettering respectfully states as follows:

### BACKGROUND

A.    **History Between Kettering University and the Debtors.**

1.    Kettering University is an accredited non-profit university in Flint, Michigan, offering degrees in engineering, math, science, and business.  It is a qualifying tax-exempt

corporation under Section 501(c)(3) of the Internal Revenue Code and a publicly supported organization as defined in Section 170(c)(2)(b) and 509(a)(1) of the Internal Revenue Code. KU's campus is located along the northern bank of the Flint River on property that used to be the main manufacturing location for General Motors. It is named after inventor and former head of research for General Motors, Charles Kettering.

2. The history of Kettering University is deeply tied to the development of the American automotive industry and specifically of the Debtors. The school was originally founded as The School of Automobile Trades on October 20, 1919 by Albert Sobey under the direction of the Industrial Fellowship of Flint as a night school, training individuals for careers in industry. In 1923 the school became known as the Flint Institute of Technology. General Motors acquired the school on July 12, 1926, renaming it General Motors Institute of Technology. In 1932 the name of the school was shortened to General Motors Institute ("GMI").

3. GMI and debtor General Motors, n/k/a Motors Liquidation Company ("GM" or "General Motors"), partnered in a unique educational partnership program of co-operative student hiring. The co-op program required GMI student applicants to find a GM division to be their sponsor. Because General Motors used the school to train its engineers, tuition was partially subsidized by GM.

4. After the Debtors reduced operations in Flint, General Motors and GMI separated on July 1, 1982, although General Motors continued to hire co-operative engineering students from GMI. The name of the institution became "GMI Engineering & Management Institute" although the letters "GMI" were retained to allow easy identification with the old General Motors Institute. New co-op employers other than General Motors began participating, and GMI began charging full tuition.

2

5.      On January 1, 1998 the school's name was formally changed to "Kettering University" in order to create an identity separate from General Motors and the auto industry and avoid confusion with General Motors University, a General Motors training center created in 1997.

**B.      Land Grants Between Kettering University and the Debtors.**

6.      As part of their wind-down of manufacturing operations in Flint, General Motors approached KU about donating certain land parcels in Flint to the university.  KU and General Motors entered into two separate *Agreements for Deed of Gift*, attached hereto as Exhibit A and B, respectively, in which General Motors donated parcels of real property to KU as a tax-deductible charitable donation.  The first Agreement for Deed of Gift, dated March 4, 1999 (the "March 1999 Transfer Agreement"), transferred 14.593 acres located west of Chevrolet Avenue along the Flint River in Flint Michigan. *See* Ex. A, p. 1.  The second Agreement for Deed of Gift, dated May 4, 2000 (the "May 2000 Transfer Agreement" and with the March 1999 Deed, the "Transfer Agreements"), transferred approximately 25 acres of property located east of Chevrolet Avenue along the Flint River. *See* Ex. B, p. 1.

7.      In exchange for KU accepting the parcels, KU agreed to certain restrictions on development and disturbance of the donated properties.  For example, the March 1999 Transfer Agreement, at ¶ 2.3(a), restricts KU's ability to "alter, excavate, develop or otherwise disturb these areas without [GM's] approval which will be in [GM's] sole discretion." Ex. A at ¶ 2.3(a), p. 4. *See also* Ex. B at ¶ 2.4(b), p. 4.  KU also relied on the broad indemnification and remediation agreements provided in each agreement under which GM undertook to indemnify KU from any claims generated by the environmental condition of each donated parcel.  See Ex. A, ¶ 2.4, p. 5; Ex. B, §§ 2.4 and 2.5, pp. 3-7.  KU would not have accepted the parcels without GM's undertaking

of the environmental remediation of the parcels and providing an indemnification to KU for such claims.

8.    GM presumably received a tax benefit from the donation of the parcels to KU.

9.    Since the transfer of the donated parcels to KU, KU has not developed nor disturbed the donated parcels without the express written permission of GM. Prior to the Debtors' bankruptcy filing, GM undertook all responsibility for environmental remediation on the donated parcels, to the extent that on the one occasion that KU attempted to utilize the east parcel without prior approval, GM directed KU not to do so. GM has restricted KU's access to the eastern parcel due to environmental investigations that GM has been conducting on that parcel. This behavior by GM has created confusion as to the actual ownership and control of the donated parcels.

10.    KU has not received any remediation costs estimates from GM and/or GM's environmental consultants working on the donated parcels. KU has not received any inquiries, directive or other correspondence from any federal or state level environmental regulation agency; presumably all such inquiries, demands or directives have gone to GM. Upon GM's bankruptcy, KU filed a proof of claim, claim number 64682 (the "Kettering Claim") attached hereto at Exhibit C, to protect the indemnification and environmental remediation obligations that GM has pledged to KU as part of the Transfer Agreements and by the parties' conduct since the transfer of the donated parcels. Since KU has not received any information from GM or from any state or federal environmental agencies about the estimated costs of environmental remediation on the donated parcels (whether for the past, present or future), the Kettering Claim is unliquidated. KU simply does not have enough information to provide an estimate.

**THE DEBTORS' OBJECTION**

11.    Debtors' Objection asserts that the Kettering Claim is a contribution claim pursuant to section 502(e)(1)(B) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and, as such, should be disallowed and expunged in its entirety.    See paragraph 1 of the Objection.    To establish the co-liability status, the Debtors note that the "Surviving Creditor [is the] United States Environmental Protection Agency"; see Exhibit A to the Objection.    To KU's knowledge, neither the EPA nor any state-level regulatory agency has filed a proof of claim with regard to the donated parcels.

**ARGUMENT**

**A.**    **Section 502(e)(1)(B) is not Applicable to the Kettering Claim.**

12.    Section 502(e)(1)(B) of the Bankruptcy Code provides, in relevant part:

> [T]he court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor to the extent that ...such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution . . . .

11 U.S.C. § 502(e)(1)(B). Three elements must be met in order for a claim to be subject to disallowance pursuant to § 502(e)(1)(B): "First, the claim must be for reimbursement or contribution. Second, the party asserting the claim must be liable with the debtor on the claim. Third, the claim must be contingent at the time of its allowance or disallowance." *In re Drexel Burnham Lambert Group Inc. ("Drexel I")*, 148 B.R. 982, 985 (Bankr. S.D.N.Y. 1992).

13.    The well-recognized public policy motivations behind § 502(e)(1)(B) are twofold. First, Congress sought to prevent competition between a primary and secondary creditor for the "limited proceeds in the estate." *In re Wedtech Corp.,* 85 B.R. 285, 289 n.4 (Bankr. S.D.N.Y.

1988)*("Wedtech I")*(quoting HR Rep. No. 95-595, 95th Cong., [1st] Sess. 354 (1977)).    Second,

Congress enacted § 502(e)(1)(B) to protect debtors from having to make duplicative distributions

of estate assets on the basis of contingent claims.    Neither concern is present in this case.

**(1)    Section 502(e)(1)(B) Does Not Apply to Liquidated and Incurred
Remediation Costs.**

14.    As this Court has previously noted, Section 502(e)(1)(B) does not apply "where

remediation costs were already paid by the claimant." *In re Chemtura Corp.*, No. 09-11233,

2011 WL 109081, at *1 (Bankr. S.D.N.Y. Jan. 11, 2011); *see also id* at * 14 (*"past* response

costs previously paid are non-contingent")(emphasis in the original); *In re Lyondell Chemical

Co.*, -- B.R. --, 2011 WL 11413, at *1, *12 (Bankr. S.D.N.Y. Jan. 4, 2011).

15.    KU has not spent considerable sums on the environmental remediation of the

donated parcels due to its reliance on GM's contractual obligation to undertake environmental

remediation on the donated parcels and to indemnify KU.    Remediation, maintenance and

operations costs presumably have been occurring (and possibly accumulating) during the past ten

years.    KU is unaware whether or not GM has actually paid these costs throughout the past

decade, but has witnessed environmental remediation actions conducted by GM on at least the

east parcel.    Regardless, any costs that have been incurred up until the point of this Court's ruling

on the Objection are clearly not contingent.    These incurred costs are liquidated and known[1] and

represent a tangible claim for KU that should be allowed by the Debtors and this Court.

---

[1]    KU contends that the Debtors hold information regarding both past, present and future
environmental remediation at the donated parcels.    KU has asked for such information from the
Debtors and their consultants but has yet to receive it.

(2)    **KU is not "Co-Liable" with the Debtors for Purposes of Section 502(e)(1)(B).**

16.    The second prong of 502(e)(1)(B) asks whether a debtor is "liable with" the claimant. *In re GCO Services, LLC,* 324 B.R. 459, 465 (Bankr. S.D.N.Y. 2005). The public policy rationale for disallowing a claim that is subject to joint liability is to prevent double payment by the debtors on account of the same liability. *See, e.g., In re Lyondell Chemical Company,* 2011 Bankr. LEXIS 10, at *45 (Bankr. S.D.N.Y., January 4, 2011); *In re Chemtura Corporation,* 2011 Bankr. LEXIS 88, at *49-64 (Bankr. S.D.N.Y., January 13, 2011). In *Chemtura,* the Private Party Claims were premised on joint liability under the cost recovery aspect of CERCLA section 107(a), as opposed to the requirements of contribution under section 113(f) of CERCLA. *Id.* at *49. As the Debtors in *Lyondell* and *Chemtura* had agreements with the EPA and state authorities in which there existed allowed claims for environmental liabilities, and the Private Parties in those cases sought contribution on the full amount of their claims, the claims of the Private Parties would subject the Debtors to the type of double payment that section 502(e)(1)(B) was created to prevent. *Id.* at *54.

17.    As mentioned above, the donated parcels are not, to KU's knowledge, included in the EPA's proofs of claim filed in these cases. As a result, the EPA cannot recover any portion of the cleanup costs incurred by the Debtors at the donated parcels. Therefore, there is no risk of double payment from the Debtors. KU's claim is a direct claim against the Debtors for a contractual obligation to provide remediation services and indemnification, not for contribution as part of a broader potentially responsible group or other typical environmental cleanup arrangement. As such, KU is not co-liable with the Debtors for any remediation costs involving the donated parcels, and the Kettering Claim should not be disallowed under §502(e)(1)(B).

(3)    **KU's Claim is Not for Reimbursement or Contribution; It's for Enforcement of Contractual Rights.**

18.    The Debtors rely on section 502(e)(1)(B) of the Bankruptcy Code for the proposition that, over ten years after execution of the Transfer Agreements, this bargained for exchange should be terminated. Such a result would violate section 502(e)(1)(B), would alter the incentives to negotiate settlements among parties at risk of environmental liabilities, and would result in a windfall for the Debtors.

19.    The first prong of the 502(e)(1)(B) test requires the Debtors to show that the claim is for reimbursement or contribution. "Contribution refers to the ability of one joint tort feasor against whom a judgment is rendered to recover a proportional share of the judgment from another joint tort feasor also liable to the plaintiff." *In re GCO Services, LLC,* 324 at 465 *(citing Wedtech I,* 85 B.R. at 289). Reimbursement "is a broad word which encompasses whatever claims a co-debtor has which entitles him to be made whole for monies he has expended on account of a debt for which he and the debtor are both liable." *In re Wedtech,* 87 B.R. 279, 287 (Bankr. S.D.N.Y. 1988)*("Wedtech II").* The requirement that the claim be for contribution or reimbursement addresses the Congressional intent in 502(e)(1)(B) to prevent competition between a primary and secondary creditor.

20.    KU is not, however, asking for reimbursement or contribution. Rather, KU is making a claim to enforce the contractual rights it negotiated with the Debtors in accepting the donated parcels. KU and the Debtors entered into the Transfer Agreements expressly for the purpose of providing KU an ability to shoulder the burdens associated with the donated parcels. GM received a benefit from transferring the ownership of the donated parcels to its former educational subsidiary, including a corporate tax deduction. The only way that KU would even consider accepting the donated parcels was with the express promise the GM would cover

environmental remediation efforts and indemnify KU.    As a result of the terms of the Transfer Agreement, the Debtors assumed all of KU's obligations for environmental remediation for these donated parcels and accepted all responsibility for paying any related environmental claims.

21.    If the Court finds that the Kettering Claim is subject to disallowance under § 502(e)(1)(B), KU will have to undertake an environmental remediation liability that it is in no way prepared to undertake.  KU is a non-profit university that does not have a budget that could meet the costs of remediating what could be close to one-hundred years' worth of manufacturing pollution on the donated parcels.  The Debtors will, on the other hand, enjoy a windfall not only in the tax benefits they booked from donating the parcels to KU a decade ago, but in essentially avoiding their contractual obligations using §502(e)(1)(B) in a way that isn't consistent with its application nor Congress' intent.  As such, the Kettering Claim should be upheld.

## CONCLUSION

WHEREFORE, for all the foregoing reasons, Kettering University respectfully requests that the Court (i) overrule the Objection with respect to Claim Number 64682, and (ii) grant Kettering University such other and further relief as this Court deems just, proper and equitable.

Dated: March 21, 2010                    Respectfully Submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ José J. Bartolomei
     José Javier Bartolomei
     Stephen S. LaPlante
     101 North Main Street, 7th Floor
     Ann Arbor MI 48104-1400
     Phone: 734.668.8982

Fax: 734.747.7147
Email:  bartolomei@millercanfield.com
Attorneys for Kettering University

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing *Response of Kettering University to Debtors' 208th Omnibus Objection to Claims* was served via overnight mail on March 21, 2011 to counsel listed below:

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
Weil, Gotshal & Manges, LLP
767 Fifth Ave.
New York, NY 10153

Thomas Morrow
c/o Motors Liquidation Company
401 South Old Woodward Ave., Suite 370
Birmingham, MI 48009

Lawrence S. Buonomo
General Motors, LLC
400 Renaissance Center
Detroit, MI 48265

John J. Rapisardi
Cadwalader, Wickersham & Taft, LLP
One World Financial Center
New York, NY 10281

Joseph Samarias
United States Department of the Treasury
1500 Pennsylvania Ave., NW
Room 2312
Washington, DC 20220

Michael J. Edelman
Michael L. Schein
Vedder Price, P.C.
1633 Broadway, 47th Floor
New York, NY 10019

Thomas Moers Mayer
Robert Schmidt
Lauren Macksoud
Jennifer Sharret
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Tracy Hope Davis
Office of the United States Trustee
for the Southern District of New York
33 Whitehall Street, 21st Floor
New York, NY 10004

David S. Jones
Natalie Kuehler
U.S. Attorney's Office, S.D.N.Y.
86 Chambers Street, 3rd Floor
New York, NY 10007

Elihu Inselbuch
Rita C. Tobin
Caplin & Drysdale, Chartered
375 Park Ave., 35th Floor
New York, NY 10152-3500

Trevor W. Swett III
Kevin C. Maclay
Caplin & Drysdale, Chartered
One Thomas Circle, N.W., Suite 1100
Washington, DC 20005

Sander L. Esserman
Robert T. Brousseau
Stutzman, Bromberg, Esserman & Plifka, P.C.
2323 Bryan Street, Suite 2200
Dallas, TX 75201

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ José J. Bartolomei
          José J. Bartolomei
101 North Main Street, 7th Floor
Ann Arbor MI 48104-1400
Phone: 734.668.8982
Fax: 734.747.7147
Email:  bartolomei@millercanfield.com
Attorneys for Kettering University

**EXHIBIT A**

Agreement for Deed of Gift, dated March 4, 1999, by and between
Kettering University and General Motors Corporation

## AGREEMENT FOR DEED OF GIFT

**AGREEMENT** made this 4th day of March, 1999, by and between GENERAL MOTORS CORPORATION, a Delaware corporation, with its principal address at 3044 West Grand Boulevard, Detroit, Michigan 48202, hereinafter referred to as Grantor, and KETTERING UNIVERSITY, a Michigan non-profit corporation, with its principal offices at 1700 West Third Avenue, Flint, Michigan 48504-4898, hereinafter referred to as Grantee,

## W I T N E S S E T H:

**WHEREAS** Grantor owns land totaling approximately 14.593 acres located on Chevrolet Avenue and along the Flint River in Flint, Michigan, as more particularly shown on Exhibit "A" attached hereto and made a part hereof and hereinafter referred to as the "Property" and described as follows:

> Part of Block "A" of the "Wilcox Plat" as recorded in Liber 54 of Deeds on Page 6, Genesee County Records, and part of Lots 12 and 13, Section 3, of "The Plat of Sections 2, 3, 4, 5, 6 and 8 being part of the reserve at near the Grand Traverse on the Flint River", all being located in the City of Flint, Genesee County, Michigan, and being more particularly described as follows: Beginning at a point on the Easterly line of Block "A" of said "Wilcox Plat" (Liber 54, Deeds, Page 6, Genesee County Records), distant South 32 degrees 29 minutes 50 seconds East, 835.76 feet, as measured along the Easterly line of said Block "A" from the Northeasterly corner thereof; proceeding thence from said point of beginning South 32 degrees 29 minutes 50 seconds East, along the Easterly line of said Block "A", a distance of 89.83 feet to the Southeasterly corner of said Block "A"; Thence North 66 degrees 31 minutes 18 seconds East, along the Westerly extension of and along the Southerly line of Lots 29 and 30 of said "Wilcox Plat", a distance of 284.10 feet to a point on the Westerly line of Chevrolet Avenue, as widened

(width varies); Thence South 32 degrees 00 minutes 29 seconds East, along the Westerly line of said Chevrolet Avenue, as widened, a distance of 381.81 feet to a point; Thence South 59 degrees 16 minutes 55 seconds West, a measured distance of 348.23 feet (described 346.63 feet) to a point; Thence South 32 degrees 05 minutes 35 seconds East a distance of 126.53 feet to a point on the Northerly face of the retaining wall at the Flint River; Thence the following courses and distances along the Northerly face of said retaining wall at the Flint River, South 59 degrees 25 minutes 05 seconds West 265.26 feet; Thence along the arc of a curve, concave to the North, radius 364.08 feet, a measured arc distance of 151.59 feet (described 152.45 feet) (chord bears South 71 degrees 20 minutes 46 seconds West, measures 150.50 feet, described 151.34 feet); Thence South 83 degrees 16 minutes 27 seconds West, a measured distance of 198.67 feet (described 201.34 feet); Thence along the arc of a curve, concave to the North, radius 566.48 feet, a measured arc distance of 248.16 feet (described 246.77 feet), (Chord bears North 84 degrees 10 minutes 33 seconds West, measures 246.18 feet, described 244.82 feet); Thence North 71 degrees 37 minutes 33 seconds West a measured distance of 31.82 feet (described 30.25 feet) to a jog in said retaining wall; Thence North 18 degrees 22 minutes 27 seconds East, along said jog, a distance of 3.00 feet to a point; Thence North 71 degrees 37 minutes 33 seconds West, along the Northerly face of said retaining wall at the Flint River, a distance of 396.77 feet to a point; Thence North 18 degrees 22 minutes 27 seconds East, a distance of 30.00 feet to a point; Thence North 57 degrees 46 minutes 48 seconds East, a measured distance of 1099.79 feet (described 1127.22 feet) to the point of beginning, containing 635,660 square feet or 14.593 acres, more or less, of land in area; and

**WHEREAS** Grantee is a non-profit corporation organized for scientific and educational purposes and qualifying as a non-profit tax exempt corporation under the Internal Revenue Code of 1986 as amended and the Regulation Promulgated thereunder; and

**WHEREAS** Grantee has requested Grantor to donate by Deed of Gift said Property as a charitable contribution; and

- 2 -

**WHEREAS** Grantor is agreeable to making said contribution in accordance with the terms and conditions of this Agreement:

**NOW THEREFORE,** in consideration of these presents, Grantor and Grantee agree as follows:

1.    Grantor agrees to donate and Grantee agrees to accept the Property as a charitable contribution which meets the requirements of the Internal Revenue Code of 1986 as amended.

2.    2.1(a)  Except as provided in this Section, Grantee agrees to accept the Property in an "AS IS" condition and acknowledges that Grantor has made no representation, statement, or assurance regarding the fitness, condition, or suitability of the Property for Grantee's intended use.

2.1(b)   Grantor shall have access to the Property to undertake the following activities at the Property by December 31, 1999, or as soon thereafter as reasonably practicable:

(i)   The floor slabs, the outside drive, and the yard area slabs will be thoroughly cracked and perforated, covered with fill sand and top soil, and will then be seeded.

(ii)   The catch basin structures and monitoring well structures will be modified as required to accommodate changes in elevation of the fill and top soil.

(iii)  Steel guard rails and yard lighting poles will be removed.

- 3 -

(iv)    The fence along the North side of the railroad spur will be removed and a fence with a gate will be installed at the West end of the main yard area of the Property.

2.1(c)  Grantor will provide Grantee with a copy of the engineering plans for the above work when they are finalized by the Grantor's engineers.

2.2  Grantee shall comply with any and all applicable federal, state, or local laws, regulations, and ordinances, including all environmental laws and including without limitation the due care requirements under Michigan Act 451, Part 201 consistent with the Section 7A Compliance Analysis for the Building 2A Property Located at the Delphi Flint West Facility in Flint, MI, November 1998, attached hereto as Exhibit "G", in connection with its ownership and/or use of the Property.

2.3(a)  Grantee acknowledges that there are certain areas of the Property, shown as shaded areas in Exhibit "F" hereof, which, due to existing conditions, may not be altered, developed, or otherwise disturbed.  Grantee agrees that it shall not alter, excavate, develop, or otherwise disturb these areas without Grantor's approval which will be in Grantor's sole discretion.  Grantee shall not disturb or cover any monitoring wells shown on Exhibit "F" and shall not interfere with Grantor's access to such wells.  Grantor shall have a continuing right of access to the Property, which Grantor shall reasonably exercise, for any well monitoring, Property inspection, or other actions which Grantor deems necessary at the Property.

2.3(b)  Grantee shall be responsible for maintaining the current condition of such areas.  Grantee shall not install any production or irrigation wells at the Property. In the event Grantee is required to install any utilities on the Property, Grantee shall notify Grantor prior to such installation and Grantee shall comply with any laws applicable to such installation.  In the event Grantee damages or otherwise

- 4 -

disturbs a monitoring well or any shaded area of the Property shown on Exhibit "F", Grantee shall promptly notify Grantor and Grantee shall, at Grantee's cost, comply with Grantor's instructions on repair/restoration of such well or area.

2.4  Grantor shall indemnify and hold Grantee harmless from and against any and all liabilities, damages, costs, penalties, and fines to which Grantee may be subjected in a claim by any third party which claim relates to the environmental condition of the Property as it exists at the time of this Agreement for Deed of Gift, unless such claim relates to or arises from Grantee's breach of any of its covenants herein.

3.      Grantee upon the execution of the "Right of Access" and "Confidentiality Agreements", attached hereto as Exhibits "B" and "C", shall have the right, at its sole expense and prior to the date of closing, to perform a physical inspection and to satisfy itself as to the condition of the Property, including without limitation, the environmental state of the Property.  Grantor has attached as Exhibit "D" a copy of the environmental inspection reports of the Property.  It is understood and agreed that the terms and conditions of the "Confidentiality Agreement" shall apply to the Grantee's use of said Exhibit "D".  Any subsequent reports prepared will be provided when available under the Confidentiality Agreement as part of Exhibit "D".

4.      Grantee shall, at its sole expense and prior to closing, have the right to obtain a title insurance commitment.  Grantor shall provide Grantee a boundary survey of the property.  In the event Grantee has reason to object to the condition of the title or to those matters disclosed by a survey or environmental inspection of the Property, Grantee shall advise Grantor in writing and at the option of Grantor, the closing shall be delayed for a reasonable time in order for Grantor to cure such objections, or Grantor may, at its option upon ten (10) days prior written notice, terminate this Agreement in which event neither party shall have any obligation to the other.

- 5 -

5.    The closing shall occur on or before _____, 1999, at a mutually agreeable location, and title shall be conveyed by a Deed of Gift in recordable form as shown on the attached Exhibit "E".  Grantor shall pay all 1998 County and City real estate taxes and assessments.  Grantee shall pay all 1999 County and City real estate taxes and all such taxes thereafter, if any.

6.    <u>GRANTOR'S REPRESENTATIONS AND WARRANTIES</u>:    As a material inducement for Grantee to enter into this Agreement and to consummate the closing, Grantor makes the following representations and warranties to and covenants with Grantee.  These representations, warranties, and covenants shall be true and correct on the date of the closing as though made at and as of the date of the closing.  Except as otherwise provided in this Agreement, all of the covenants, agreements, representations, and warranties set forth in this Agreement shall survive the closing and shall not merge into any deed or other instrument executed or delivered pursuant to this Agreement.

(a)    Grantor has the full power and authority to execute and deliver this Agreement and all other documents or instruments that this Agreement obligates Grantor to execute or deliver (collectively the "Grantor's Documents") and to perform and carry out all covenants and obligations arising under this Agreement and Grantor's documents.

(b)    This Agreement and Grantor's documents will each constitute the legal, valid, and binding obligation of Grantor, enforceable against Grantor in accordance with their respective terms, covenants, and conditions, subject to bankruptcy, insolvency, and similar laws or equitable principles relating to or affecting the enforcement of creditors' rights generally.

- 6 -

(c)    There are no present claims, personal or otherwise, or other defenses, or offsets to the validity or enforceability of this Agreement or of Grantor's documents against Grantor.

(d)    Grantor is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware and has all the requisite corporate power and authority to enter into this Agreement and into Grantor's documents and to carry out the transactions contemplated by this Agreement. The persons signing this Agreement and Grantor's documents on behalf of Grantor have full power and authority to bind Grantor.

(e)    Grantor has duly authorized (i) the execution and delivery of this Agreement and Grantor's documents; (ii) donation to Grantee of the Property pursuant to this Agreement; and (iii) the performance of the other covenants and obligations to be performed by Grantor under this Agreement. All consents, approvals, or actions by the officers of Grantor in connection with this Agreement have been properly and validly obtained and taken.

(f)    The execution, delivery, and performance of this Agreement and Grantor's documents by Grantor do not and will not result in any violation of, conflict with, or constitute a default under any provision of Grantor's Articles of Incorporation or Bylaws.

(g)    This Agreement and Grantor's documents do not and will not conflict with or contravene any provision of any present judgment, order, decree, writ, or injunction, or any provision of any currently applicable law or regulation affecting Grantor or the Property. The conveyance of the Property and the delivery of the Agreement and Grantor's documents will not result in a breach of, constitute a default under, interfere with, or require consent pursuant to any credit agreement, lease, indenture, mortgage, deed of trust,

- 7 -

purchase agreement, guaranty, security agreement, or other instrument to which Grantor is presently a party or by which Grantor or Grantor's assets are presently bound or affected.

7.    GRANTEE'S REPRESENTATIONS AND WARRANTIES:   As a material inducement for Grantor to enter into this Agreement and to transfer the property by gift and charitable donation, Grantee makes the following representations and warranties to and covenants with Grantor.  Except as otherwise provided in this Agreement, all of the covenants, agreements, representations, and warranties set forth in this Agreement shall survive the closing and shall not merge into any deed or other instrument executed or delivered pursuant to this Agreement.

(a)    Grantee has the full power and authority to execute and deliver this Agreement and all other documents or instruments that this Agreement obligates Grantee to execute or deliver (collectively the "Grantee's Documents") and to perform and carry out all covenants and obligations arising under this Agreement and Grantee's documents.

(b)    This Agreement and Grantee's documents will each constitute the legal, valid, and binding obligation of Grantee, enforceable against Grantee in accordance with their respective terms, covenants, and conditions, subject to bankruptcy, insolvency, and similar laws or equitable principles relating to or affecting the enforcement of creditors' rights generally.

(c)    There are no present claims, personal or otherwise, or other defenses, or offsets to the validity or enforceability of this Agreement or of Grantee's documents against Grantee.

(d)    Grantee is a non-profit corporation duly organized, validly existing, and in good standing under the laws of the State of Michigan, and has all the

- 8 -

requisite corporate power and authority to enter into this Agreement and into Grantee's documents and to carry out the transactions contemplated by this Agreement.    The persons signing this Agreement and Grantee's documents on behalf of Grantee have full power and authority to bind Grantee.

(e)    Grantee is a qualifying tax-exempt corporation under Section 501(c)(3), and a publicly supported organization as defined in Section 170(c)(2)(b) and 509(a)(1) of the Internal Revenue Code of 1986 as amended.    Charitable contributions to it are tax deductible to the extent permitted by law.

(f)    Grantee has no information or knowledge which would lead it to reasonably believe that the transfer of the Property from Grantor to Grantee as contemplated in this Agreement would not qualify as a charitable contribution under said Code.

(g)    Grantee shall comply at all times with the requirements of said Code concerning tax exempt organizations and charitable contributions, and shall do nothing that would cause the contribution of the Property to be disqualified as a charitable contribution under Section 170 of said Code.

(h)    Grantee shall complete and execute all documents or forms which, in Grantor's reasonable opinion, are required in order to satisfy said Code requirements concerning charitable contributions.

(i)    Grantee's Board of Directors has duly authorized or will duly authorize (i) the execution and delivery of this Agreement and Grantee's documents; (ii) the donation to Grantee of the Property pursuant to this Agreement; and (iii) the performance of the other covenants and obligations to be performed by Grantee under this Agreement.    All consents, approvals, or actions by the

- 9 -

officers and directors of Grantee in connection with this Agreement have been properly and validly obtained and taken.

(j)    The execution, delivery, and performance of this Agreement and Grantee's documents by Grantee do not and will not result in any violation of, conflict with, or constitute a default under any provision of Grantee's Articles of Incorporation or Bylaws.

(k)    This Agreement and Grantee's documents do not and will not conflict with or contravene any provision of any present judgment, order, decree, writ, or injunction, or any provision of any currently applicable law or regulation affecting Grantee.    The gift of the Property and the delivery of this Agreement and Grantee's documents will not result in a breach of, constitute a default under, interfere with, or require consent pursuant to any credit agreement, lease, indenture, mortgage, deed of trust, purchase agreement, guaranty, security agreement, or other instrument to which Grantee is presently a party or by which Grantee or Grantee's assets are presently bound or affected.

8.    <u>NOTICES</u>:  All notices or other communications provided for under this Agreement shall be in writing, signed by the party giving the same, and shall be personally delivered, sent by certified or registered mail, return receipt requested, or sent by a reputable national overnight delivery service.  Such notices shall be deemed properly given and received upon the earlier of receipt or refusal to accept receipt and shall be sent to the following addresses:

If to Grantor:              General Motors Corporation
                           c/o Worldwide Real Estate
                           485 West Milwaukee Avenue
                           MC 482-309-939
                           Detroit, Michigan 48202
                           Attention:  General Director

- 10 -

If to Grantee:       Kettering University
1700 West Third Avenue
Flint, Michigan 48504-4898
Attention: David J. Doherty, Ph.D
Vice President, International
Programs and Governmental Affairs

Each party shall have the right to designate other or additional addresses or addressees for the delivery of notices, by giving notice of the same to the other party hereto (such other or additional addresses or addressees being effective from and after the date of receipt of notice of the same by the other party).

9.    ENTIRE AGREEMENT: This Agreement and the attached exhibits represent the entire understanding between the parties with respect to the subject matter of this Agreement, and all prior agreements and understandings between the parties with respect to the subject matter of this Agreement shall be deemed merged in this Agreement.

10.    NO ORAL AMENDMENT OR MODIFICATION: No amendments, waivers, or modifications of this Agreement shall be made or deemed to have been made unless in writing executed by both Grantor and Grantee.

11.    ASSIGNABILITY: Neither this Agreement nor the rights of Grantee under this Agreement may be assigned or transferred, in whole or in part, to any other party without the prior written consent of Grantor, which consent may be withheld for any reason or for no reason.

12.    APPLICABLE LAW: This Agreement shall be interpreted and enforced according to the laws of the state in which the Property is located.

**IN WITNESS WHEREOF**, the Grantor has signed and sealed this instrument this _____

- 11 -

day of _____, 1999, and the Grantee has signed and sealed this instrument

this _29th_ day of _March_____, 1999.


In the presence of:                                    GENERAL MOTORS CORPORATION

_____                    BY_____


_____                    ATTEST_____

                                                               Assistant Secretary

FORM APPROVED
BY R.D. HERRINGTON, ATTORNEY


In the presence of:                                    KETTERING UNIVERSITY

_David J. Doherty_                               BY_James E.A. John_____

                                                                              President

_Celia Band_                                        ATTEST_Joanne Dunham_____

                                                                              Secretary


- 12 -

**EXHIBIT B**

Agreement for Deed of Gift, dated as of May 4, 2000, by and between
Kettering University and General Motors Corporation.

*Property*
*Former Bldg 2*

## AGREEMENT FOR DEED OF GIFT

**AGREEMENT** made this _9_ day of ~~April~~ *May* 2000, by and between **GENERAL MOTORS CORPORATION,** a Delaware corporation, with its principal address at 100 Renaissance Drive, Detroit, Michigan 48265, hereinafter referred to as "Grantor," and **KETTERING UNIVERSITY,** a Michigan nonprofit corporation, with its principal offices at 1700 West Third Avenue, Flint, Michigan 48504-4898, hereinafter referred to as "Grantee."

### W I T N E S S E T H :

**WHEREAS,** Grantor owns land totaling approximately 25 acres located between Chevrolet and Stevenson Avenue, South of Bluff Street and North of the Flint River, in Flint, Michigan as more particularly shown on Exhibit "A" and described on Exhibit "B" attached hereto and made a part hereof and hereinafter referred to as the "Property"; and

**WHEREAS,** Grantee is a non-profit corporation organized for scientific and educational purposes and qualified as a non-profit tax exempt corporation under the Internal Revenue Code of 1986 as amended and the Regulation promulgated thereunder, and

**WHEREAS,** Grantee has requested Grantor to donate by Deed of Gift the Property as a charitable contribution; and

**WHEREAS,** Grantor is agreeable to make said contribution in accordance with the terms and conditions of this Agreement:

**NOW THEREFORE,** in consideration of these presents, Grantor and Grantee agree as follows:

1.   **Donation of Property to Grantee.**

   (a)   Grantor agrees to donate and Grantee agrees to accept the Property as a charitable contribution which meets the requirements of the Internal Revenue Code of 1986 as amended.

   (b)   At closing, Grantee shall execute and deliver to Grantor Part IV, Donee Acknowledgment section of IRS Form 8283 relating to a charitable contribution of Four Hundred Forty Thousand Dollars ($440,000.00) relating to the Property and a written acknowledgment of the contribution by Grantor to Grantee and that Grantee has not provided any goods or services in consideration, in whole or in part, for the contribution of the Property. Grantor shall prepare such acknowledgment.

2.1   **Condition of Property.**

   (a)   Grantee agrees to accept the Property in an "AS IS," "WHERE IS" condition without any right of action, **except as provided in this Section 2,** under contract, under any applicable Environmental Laws, or under common law or equity against Grantor regarding the physical nature and condition, including the environmental condition, of the Property. This representation shall survive the Closing.

(b)    Grantee acknowledges that Grantor has made no representation, statement, or assurance regarding the fitness, suitability of the Property for Grantee's intended use, or the condition, including, without limitation, the physical nature or condition, including the environmental condition, of the Property.

## 2.2    Environmental Report.

(a)    Upon execution of the Confidentiality Agreement attached hereto as Exhibit "C", Grantor shall, under the terms of the Confidentiality Agreement, provide Grantee with a copy of the environmental assessment reports of the Property listed in section 2.2(b) hereof.   These assessment reports shall be referred to herein as the "Environmental Report."

(b)    The following is a list of the environmental assessment reports which comprise the Environmental Report hereunder:

    (i)      Building 1 Phase I ESA (CRA, 1995)

    (ii)     Building 3 Phase I ESA (SSOE, 1994))

    (iii)    Building 2 Phase I ESA (BBL), Building 2 Phase II ESI (BBL)

    (iv)    Building 7 Phase 1 ESA (BBL), Building 7 Phase II ESI (BBL), Building 7 Supplemental Phase II ESI (BBL)

    (v)     Building 11 Phase I ESA (BBL), Building 11 Phase II ESI (BBL), Building 11 Supplemental Phase II ESI (BBL)

    (vi)    Building 13 Phase I ESA (BBL), Building 13 Phase II ESI (BBL)

    (vii)   Building 17 Phase I ESA (BBL)

    (viii)  Building 29 Phase I ESA (BBL)

    (ix)    Building 36 Phase I ESA (BBL)

    (x)     The following reports are currently being prepared and will be provided to Grantee when finalized and available:

        (A)    Building 2 Supplemental Phase II ESI (BBL)

        (B)    Building 17 Phase II ESI (BBL)

## 2.3    Restrictions on Uses of or at the Property.

The following warranties and covenants related to uses and restrictions on uses of or at the Property shall be included in: (1) any agreement transferring complete or partial possession or ownership of the Property through sale, lease, or otherwise to any successor, assign,

2

purchaser, or tenant, and (2) any deed or conveyance transferring complete or partial ownership of the Property as restrictions which will run with the Property and be binding upon all subsequent owners, tenants, and users:

(a)     Grantee warrants and agrees that it shall not "treat", "store" or dispose of any "hazardous substances," "hazardous wastes" or "toxic substances" as those terms are defined under CERCLA, 42 U.S.C. 9601 et. seq., RCRA, 42 U.S.C. 6901 et. seq., or TSCA, 15 U.S.C. 2601 et. seq., or under similar Michigan law, on, at or below the Property, and shall maintain generator-only status; provided, however, that Grantee may: (i) accumulate such substances or wastes as allowed under applicable laws and regulations for off-site treatment, off-site storage, or off-site disposal, and (ii) use commercial products on-site which may contain such substances.

(b)     Grantee shall comply with any and all applicable federal, state, or local laws, regulations, and ordinances, including all environmental laws and including without limitation the requirements, if any, under Michigan Act 451, Part 201, in connection with the use of or operations at the Real Property, including any current or future development, improvements, structures, utilities, facilities, renovations, modifications, parking lots, or storage areas.

(c)     Grantee acknowledges and agrees that the Property shall only be used for industrial use and the following commercial uses:  those commercial uses specified in subcategories II, II and IV of the MDEQ Environmental Response Division Staff Operational Memorandum #14 (revision 2), dated June 6, 1995.

(d)     Grantee acknowledges and agrees that use of groundwater at, in, or under the Property by any person or entity for any purpose, including potable and non-potable uses shall be precluded.

(e)     Grantee shall be solely responsible for the proper maintenance of the Property, including:  (i) any and all current or future structures, facilities, parking lots and storage areas, and, (ii) any maintenance issues related to any future development, excavation, demolition, or construction activities at the Property.

(f)     Grantee acknowledges and agrees that any and all soil and/or debris management and surface water and/or groundwater management required or necessary because of excavation or soil disturbance related to future use, development, or construction at or of the Property, is the sole obligation and liability of Grantee or the owner of the Property at the time of such activities. Such soil and/or debris management and surface water and/or groundwater management may include in-place management, excavation, sediment and erosion control, disposal or other management options which are allowed or required under applicable federal, state, or local environmental laws, regulations, or ordinances, including the requirements imposed upon Grantee under Section 20107(a) of Michigan Public Act 451, Part 201.

2.4    **Grantor's Access.**

(a)     At any time after the Closing, upon reasonable notice to Grantee, Grantor reserves the right, but not the obligation, for Grantor and its representatives to come upon the Property to undertake and complete cleanup, remediation, investigation, monitoring, inspection, evaluation, construction or other actions (herein "Response Activities") which Grantor determines, in its sole

APR-10-2000 16:30        HMS C                                    13132567673    P.06/13

discretion and judgement, should or must be conducted under specifically applicable federal, state, or local environmental laws, regulations, or ordinances as existing and in effect at Closing, unless a less stringent standard applies at the time the Response Activities are conducted in which case the less stringent standard will govern (herein "Environmental Laws") to address the findings of the Environmental Reports.

(b)    Grantee will exercise its reasonable efforts to avoid interfering with Grantor's Response Activities. Grantor shall use reasonable efforts to avoid unreasonably interfering with Grantee's use of the Property; however, Grantee acknowledges that due to the nature of the Response Activities, some interference may occur.  Grantee acknowledges that Response Activities may result in temporary restriction on Grantee's use of certain areas of the Property. Grantee further acknowledges that Response Activities may also require certain equipment, such as investigation, construction and remediation equipment, to be temporarily located in areas of the Property.  Grantor shall remove any equipment brought on-site to conduct the Response Activities.  In no event, however, will Grantor be liable or responsible for any consequential damages or costs such as, by way of example and not limitation, loss of profits, loss of business opportunity, or costs related to construction/development delay in connection with its Response Activities hereunder.

(c)    Grantee shall reasonably cooperate with Grantor by reasonably considering modifications to its development plans to reasonably accommodate Grantor's Response Activities. Grantee agrees to cooperate with Grantor and its representatives, if such cooperation is reasonably required, in obtaining any requisite governmental approvals, consents, waivers, or permits, or in filing any required deed notices or restrictions which may be reasonably required by Grantor, and which will be obtained at Grantor's sole expense, to conduct its Response Activities hereunder.

(d)    Any such Response Activities shall be performed in a good and workmanlike manner and in accordance with applicable laws governing safety and construction, and Grantor shall not permit any construction liens to be filed against the Property in connection therewith.

(e)    Grantor may use the following factors in determining and implementing the particular Response Activities, if any, to be undertaken to address an Environmental Condition: (i) specific requirements, if any, under applicable Environmental Laws, (ii) technical feasibility of the Response Activities, (iii) economic reasonableness of the Response Activities, (iv) continued industrial use or allowable commercial use, as more specifically described in Section 2.3 hereof, of the Property as it is configured at the time of this Agreement, (v) any deed notifications/restrictions related to allowable future use as provided under Section 2.3 hereof or required under Section 2.4(c) hereof, and (vi) the following human health and environmental risk-based factors; likely exposure pathways consistent with such industrial or commercial use and any deed restrictions as described in Section 2.3 hereof or required under Section 2.4(c) hereof, typical simulated exposure distributions consistent with such exposures, fate and transport characteristics, local geology and hydrogeology, and toxicity of the material(s) in question. In conducting sampling and analysis of any data collected, Grantee acknowledges that Grantor may utilize: (1) statistical evaluation of environmental data to determine true contaminant concentrations, and (2) acceptable methods for determining and evaluating the reasonable and relevant exposure pathways including consideration of any land-use based criteria.

4

(f)    Grantor shall provide Grantee with documentation detailing the Response Activities taken by Grantor. Such documentation shall be considered part of the Environmental Report.

(g)    Response Activities hereunder may result in contamination existing or remaining at the Property in excess of the relevant MDEQ generic industrial/commercial subcategories II, III and IV cleanup criteria provided the factors outlined in Section 2.4(e) hereof are utilized. In no event will Grantor be obligated to conduct any Response Activities to address contamination at the Property which meets the relevant MDEQ generic industrial/commercial subcategories II, III and IV cleanup criteria and in no event will Grantor's obligation to conduct Response Activities include achieving levels of contamination more stringent than the relevant MDEQ generic industrial/commercial subcategories II, III and IV cleanup criteria.

(h)    Response Activities by Grantor may include reporting, submitting or discussing environmental issues related to the Property with appropriate governmental agencies. Grantor shall, in its sole discretion, determine if such reports, submittals or discussions should or must be initiated with or provided to such governmental agencies.

(i)    Unless specifically requested by Grantor, Grantee shall have no right to participate in any discussions or negotiations with any governmental agency(ies) and shall not independently engage in any discussions or negotiations with such agency(ies) regarding Response Activities or any other issues related to the environmental condition of the Property as disclosed in the Environmental Report or Grantee's inspection. Grantor shall, if requested by Grantee, keep Grantee reasonably apprised of the status of any such discussions or negotiations.

(j)    Grantee will promptly notify Grantor of any contact, whether written, verbal or in person, by or with any governmental agency, agency representative or any other party, regarding Response Activities or any other issues related to the environmental condition of the Property, as disclosed in the Environmental Report or Grantee's inspection.

(k)    The Deed will provide Grantor an easement for Grantor's access to the Property for any such Response Activities to be conducted by Grantor.

## 2.5    Grantor's Indemnity of Grantee.

Grantor shall indemnify and hold Grantee harmless from and against any and all liabilities, damages, costs, penalties, and fines, but in no event shall Grantor's indemnity include consequential damages including, by way of example and not limitation, loss of profits, loss of a business opportunity, or costs relating to construction/development delays, to which Grantee may be subjected in a claim by a third party which claim relates to an Environmental Condition as defined herein. The foregoing indemnity is subject to the following terms and conditions:

(a)    The term "Environmental Condition" is defined as: contamination in, at, or of the soils, surface waters, or groundwater which Grantee can demonstrate through sound and generally accepted engineering and scientific judgment and credible evidence: (i) was due to, occurred during, or caused by Grantor's use of or operations at the Property prior to Closing, (ii) exists at levels above the relevant MDEQ generic industrial/commercial subcategories II, III

5

and IV cleanup criteria, (iii) was not caused by, significantly or materially contributed to, or significantly or materially exacerbated by Grantee or its tenants, licensees, agents, employees, contractors, or the acts of any other third party after Closing, and (iv) requires Response Activities under applicable Environmental Laws to address such contamination which requirement does not arise due to Grantee's excavation, construction, development, or any other action which disturbs or alters such contamination from the condition it was in at the time of this Agreement.

(b)     Grantee shall promptly, but in no event later than ten (10) business days from the date of discovery, notify Grantor in writing of any potential Environmental Condition for which Grantor may be responsible under this Section 2.5 but, subject to Section 2.5(c) hereof, Grantee's failure to give such notice shall not negate Grantor's obligations under this Section 2.5. This written notice shall specify in detail the particular facts regarding such potential Environmental Condition.

(c)     Grantor's obligations under this Section 2.5 to undertake Response Activities shall be apportioned to the extent that Response Activities result from or Grantor's expenses related thereto are increased by Grantee's failure to provide timely notice as required hereunder. No obligation to conduct Response Activities exists if, without the prior written approval of Grantor, which is within Grantor's sole discretion, Grantee has engaged in any discussions with any agency(ies) or other third parties (not including Grantee's consultants, attorneys or other agents or employees) regarding Response Activities necessary to address such Environmental Condition; provided, however, that Grantee may, if required under applicable environmental laws related to release reporting, properly notify the appropriate agency(ies) of such Environmental Condition. If such notice occurs, Grantee shall notify Grantor in writing of the agency(ies) so notified and the content of the notification. Grantee shall use reasonable best efforts to limit any such release notification to the chemical constituents and amount or volume of the release at issue. In the event such notification would trigger Grantor's obligations hereunder, Grantee shall, to the maximum extent possible under the circumstances without interfering with Grantee's obligation to comply with reporting requirement under applicable environmental Law, provide Grantor with notice prior to such release notification being submitted or reported to the agency(ies).

(d)     Grantor shall undertake Response Activities which Grantor determines, in its sole judgment, should or must be conducted under Environmental Laws to address such Environmental Condition.

(e)     The provisions of Section 2.4(b), (c), (d), (e), (f), (g), (h), (i), (j), and (k) hereof shall apply to any obligation of Grantor under this Section 2.5 to undertake Response Activities to resolve any claim of indemnity by Grantee.

(f)     Grantor and Grantee shall use best efforts to resolve promptly any disputes regarding any potential claim related to an Environmental Condition hereunder.

(g)     Grantor's indemnity of Grantee is personal to Grantee and is not available or assignable to any successor, buyer, transferee, or assignee of Grantee. Grantor's indemnity of Grantee shall terminate upon transfer or conveyance by Grantee to any successor, buyer, transferee, tenant, or assignee of Grantee.

6

(h)    Notwithstanding the foregoing, Grantee acknowledges and agrees that except as specifically provided in this Section 2.5, Grantor shall have no obligation to undertake or conduct any Response Activities with respect to any Environmental Condition(s) of or at the Property.

3.    **Title Insurance.**

Grantor has heretofore supplied Grantee with a title insurance commitment issued by Lawyers Title Insurance Corporation. Grantee shall have the right at or subsequent to closing, to obtain, at its sole cost and expense, a title insurance policy. In the event Grantee has reason to object to the condition of the title or to those matters disclosed by a survey, Grantee shall advise Grantor in writing and at the option of Grantor, the closing shall be delayed for a reasonable time in order for Grantor to cure such objections, or Grantor may, at its option upon ten (10) days prior written notice, terminate this Agreement in which event neither party shall have any obligation to the other.

4.    **Closing.**

(a)    The closing shall occur on or before _____, 2000, at a mutually agreeable location, and title shall be conveyed by a Deed of Gift in recordable form as shown on the attached Exhibit "D."

(b)    All real estate taxes which have become a lien upon the Property upon the date of closing and all current installments of special assessments shall be paid by Seller. Current taxes and installments of special assessments shall be prorated and adjusted as of the closing date in accordance with the due date basis of the municipality or taxing unit in which the Property is located. Purchaser shall be responsible for the payment of all future installments of special assessments.

5.    **Grantor's Representations and Warranties.**

As a material inducement for Grantee to enter into this Agreement and to consummate the closing, Grantor makes the following representations and warranties to and covenants with Grantee. These representations, warranties, and covenants shall be true and correct on the date of the closing as though made at and as of the date of the closing. Except as otherwise provided in this Agreement, all of the covenants, agreements representations, and warranties set forth in this Agreement shall survive the closing and shall not merge into any deed or other instrument executed or delivered pursuant to this Agreement.

(a)    Grantor has the full power and authority to execute and deliver this Agreement and all other documents or instruments that this Agreement obligates Grantor to execute or deliver (collectively the "Grantor's Documents") and to perform and carry out all covenants and obligations arising under this Agreement and Grantor's Documents.

(b)    This Agreement and Grantor's Documents will each constitute the legal, valid, and binding obligation of Grantor, enforceable against Grantor in accordance with their

7

respective terms, covenants, and conditions, subject to bankruptcy, insolvency, and similar laws or equitable principles relating to or affecting the enforcement of creditors' rights generally.

(c)      There are no present claims, personal or otherwise, or other defenses, or offsets to the validity or enforceability of this Agreement or of Grantor's Documents against Grantor.

(d)      Grantor is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware and has all the requisite corporation power and authority to enter into this Agreement and into Grantor's Documents and to carry out the transactions contemplated by this Agreement. The persons signing this Agreement and Grantor's Documents on behalf of Grantor have full power and authority to bind Grantor.

(e)      Grantor has duly authorized (i) the execution and delivery of this Agreement and Grantor's Documents; (ii) donation to Grantee of the Property pursuant to this Agreement; and (iii) the performance of the other covenants and obligations to be performed by Grantor under this Agreement. All consents, approvals, or actions by the officers of Grantor in connection with this Agreement have been properly and validly obtained and taken.

(f)      The execution, delivery, and performance of this Agreement and Grantor's Documents by Grantor do not and will not result in any violation of, conflict with, or constitute a default under any provision of Grantor's Articles of Incorporation or Bylaws.

(g)      This Agreement and Grantor's documents do not and will not conflict with or contravene any provision of any present judgment, order, decree, writ, or injunction, or any provision of any currently applicable law or regulation affecting Grantor or the Property. The conveyance of the Property and the delivery of the Agreement and Grantor's documents will not result in a breach of, constitute a default under, interfere with, or require consent pursuant to any credit agreement, lease, indenture, mortgage, deed of trust, purchase agreement, guaranty, security agreement, or other instrument to which Grantor is presently a party or by which Grantor or Grantor's assets are presently bound or affected.

7.      **Grantee's Representations and Warranties.**

As a material inducement for Grantor to enter into this Agreement and to transfer the Property by gift and charitable donation, Grantee makes the following representations and warranties to and covenants with Grantor. Except as otherwise provided in this Agreement, all of the covenants, agreements, representations, and warranties set forth in this Agreement shall survive the closing and shall not merge into any deed or other instrument executed or delivered pursuant to this Agreement.

(a)      Grantee has the full power and authority to execute and deliver this Agreement and all other documents or instruments that this Agreement obligates Grantee to execute or deliver (collectively the "Grantee's Documents") and to perform and carry out all covenants and obligations arising under this Agreement and Grantee's documents.

(b)      This Agreement and Grantee's documents will each constitute the legal, valid, and binding obligation of Grantee, enforceable against Grantee in accordance with their respective

8

other instrument to which Grantee is presently a party or by which Grantee or Grantee's assets are presently bound or affected.

8.    **Notice.**

All notices or other communications provided for under this Agreement shall be in writing, signed by the party giving the same, and shall be personally delivered, sent by certified or registered mail, return receipt requested, or sent by a reputable national overnight delivery service. Such notices shall be deemed properly given and received upon the earlier of receipt or refusal to accept receipt and shall be sent to the following addresses:

|  |  |
|---|---|
| If to Grantor: | General Motors Corporation |
|  | c/o Worldwide Real Estate |
|  | 485 West Milwaukee Avenue |
|  | MC 482-309-939 |
|  | Detroit, Michigan 48202 |
|  | Attention:    General Director |
|  |  |
| If to Grantee: | Kettering University |
|  | 1700 West Third Avenue |
|  | Flint, Michigan 48504-4898 |
|  | Attention:    David J. Doherty, Ph.D. |
|  | Vice President, International |
|  | Programs and Governmental Affairs |

Each party shall have the right to designate other or additional addresses or addressees for the delivery of notices, by giving of the same to the other party hereto (such other or additional addresses or addressees being effective from and after the date of receipt of notice of the same by the other party).

9.    **Entire Agreement.**

This Agreement and the attached exhibits represent the entire understanding between the parties with respect to the subject matter of this Agreement, and all prior agreements and understandings between the parties with respect to the subject matter of this Agreement shall be deemed merged in this Agreement.

10.    **No Oral Amendment or Modification.**

No amendments, waivers, or modifications of this Agreement shall be made or deemed to have been made unless in writing executed by both Grantor and Grantee.

11.    **Assignability.**

Neither this Agreement nor the rights of Grantee under this Agreement may be assigned or transferred, in whole or in part, to any other party without the prior written consent of Grantor, which consent may be withheld for any reason or for no reason.

10

12.    **Applicable Law.**

This Agreement shall be interpreted and enforced according to the laws of the state in which the Property is located.

**IN WITNESS WHEREOF,** the Grantor has signed and sealed this instrument this 4 day of _____May_____, 2000, and the Grantee has signed and sealed this instrument this 4 day of _____May_____, 2000.

In the presence of:                          **GENERAL MOTORS CORPORATION**

_____          By _____

                                             CONRAD P. SCHWARTZ
                                                  DIRECTOR
_____          WORLDWIDE REAL ESTATE


In the presence of:                          **KETTERING UNIVERSITY**

_____          By _____
                                                  Vice - President

_____          ATTEST _____
                                                         Secretary


DET_C\329865.2
WJZ 4/10/00

11

Exhibit A



## Exhibit B

# LEGAL DESCRIPTION

PART OF WILCOX'S REPLAT OF BLOCK SEC A SEC MCFARLAN & CO'S RIVER ADDITION & PART OF MCFARLAN & CO'S COTTAGE GROVE ADDITION & PART OF MCFARLAN &CO'S RIVER ADDTION & PART OF SEC PLAT OF SECTIONS 2, 3, 4, 5, 6 AND 8 BEING PART OF THE RESERVE AT NEAR THE GRAND TRAVERSE ON FLINT RIVER DESC AS: BEG AT INT OF SLY LINE OF BLUFF ST WITH WLY LINE OF FROST STREET EXTENDED SLY; TH S 56 DEG 06' 30 SEC W, 82.0 FT; TH S 38 DEG 30' W, 59.0 FT; TH S 25 DEG 30' W, 122 FT; TH S 10 DEG 28' 58 SEC W, 135.04 FT; TH S 32 DEG 01' 19 SEC E, 35 FT; TH N 66 DEG 19'14 SEC E, 54.51 FT; TH S 7 DEG 19' 58 SEC W, 306.08 SF; TH S 4 DEG 58' 44 SEC W, 250.67 FT; TH S 31 DEG 24' 28 SEC W, 122.33 FT; TH S 51 DEG 09' 24 SEC W, 169.52 FT; TH S 32 DEG 55' 43 SEC E, 11.83 FT; TH S 57 DEG 04' 17 SEC W, 183.80 FT; TH S 60 DEG 42' 26 SEC W, 118.57 FT; TH S 58 DEG 08' 03 SEC W, 79.5 FT; TH S 70 DEG 37' 18 SEC W, 83 FT; TH S 58 DEG 18' 05 SEC W, 60.8 FT TO ELY LINE OF CHEVROLET AVE; TH NELY ALG SD ELY LINE TO SLY LINE OF BLUFF ST; TH ELY ALG SD SLY LINE 66 FT; TH SLY = WITH SD ELY LINE 132 FT; TH ELY = WITH SD SLY LINE 130 FT; TH ·NLY = WITH SD ELY LINE 132 FT TO SD LINE; TH ELY ALG SD SLY LINE TO BEG.

<u>Exhibit C</u>

**GM**

General Motors Corporation

## <u>CONFIDENTIALITY AGREEMENT</u>

Kettering University
1700 West Third Avenue
Flint, Michigan, 48504

Gentlemen:

Re:    **GM Property – Delphi Flint West**
       **Flint, MI**

In conjunction with the proposed donation of the General Motors property located between Chevrolet & Stevenson Avenue, south of Bluff Street and north of the Flint River, Flint, Michigan    (the "Project"), you have requested information regarding the environmental report of the Project to which we will grant you access under the following terms of this Confidentiality Letter Agreement:

(1)    <u>Kettering University</u> (hereinafter referred to as "Grantee") acknowledges and agrees that any and all information, whether written or verbal, regarding the environmental status of the Project provided to Grantee under this Agreement shall be considered the sole and exclusive property of General Motors Corporation (hereinafter referred to as "Grantor") and is considered and will be kept confidential by Grantee in perpetuity and will not be discussed with or provided to any third party, other than those employees or agents of Grantee who are essential to completing the donation and/or financing of the Project, without the prior written consent of Grantor, which consent shall not be unreasonably withheld.  Grantor makes no representations or warranties regarding the information contained in such report and such report is not intended to be relied upon by Grantee or as a substitute for the complete and thorough investigation of the Project by Grantee.

(2)    Grantee acknowledges and agrees that any and all information regarding the environmental status of the Project provided to Grantee, essential employees or agents of Grantee, or other acceptable third parties under this Agreement shall be

General Motors Building   3044 West Grand Boulevard  Detroit, Michigan 48202

Page 2

promptly turned over to Grantor as directed in writing by Grantor's counsel in the event Grantee does not proceed with the purchase of the Project. Grantor shall be entitled to injunctive relief if Grantee fails to so deliver such information to Grantor.

(3)     Grantee agrees to have any attorneys, employees, agents, or other acceptable third parties who are provided access to information under this Confidentiality Letter Agreement sign the attached "Acknowledgment of Confidentiality" and will promptly provide copies of such signed acknowledgments to Grantor.

(4)     Notwithstanding anything herein contained to the contrary, in the event Grantee is required to disclose any such information to any governmental entity pursuant to applicable law, prior to disclosing the same, Grantee shall notify Grantor in writing and provide Grantor with copies of all information which Grantee intends to so disclose. Such notice and information shall be provided to Grantor by Grantee in writing at least five (5) business days prior to the disclosure of the same to any such governmental authority.

(5)     Grantee acknowledges and agrees that it is only being provided access to this information, and Grantor is under no obligation whatsoever to provide Grantee with written copies of any information or to update or review such information.

(6)     If Grantee, its employees, agents, or other acceptable third parties disclose information in violation of the provisions of this Agreement, then Grantee agrees that it shall be liable to Grantor for liquidated damages in the amount of TEN THOUSAND DOLLARS ($10,000) for each such disclosure. Grantee acknowledges that Grantor will suffer substantial damages if such information is wrongfully disclosed, but the determination of the exact amount of such damages would be difficult or impossible. The setting of the TEN THOUSAND DOLLARS ($10,000) liquidated damage amount is reasonable in light of all relevant facts now available to the parties. Grantor shall also be entitled to injunctive relief in order to prevent disclosure of any such information in violation of this Confidentiality Letter Agreement.

(7)     Any notice required to be given hereunder shall be sent by certified or registered mail, return receipt requested, to the Grantor at Mail Code 482-309-939, 485 West Milwaukee Avenue, Detroit, Michigan 48202, or to the Grantee at the above noted address, or at such other address as either of the parties may notify the other in writing. A copy of any notice to Grantor shall also be sent to the same address, Attention: General Director of Worldwide Real Estate. All such notices shall be deemed effective upon receipt.

**Page 3**

If the foregoing is acceptable to you, please so indicate by signing this letter in the space provided below, and return it to me as soon as possible. The enclosed duplicate copy is for your records.

Very truly yours,

GENERAL MOTORS CORPORATION

BY _____

David G. Spencer

RECEIPT AND ACCEPTANCE ACKNOWLEDGED

BY David J. Doering

TITLE Vice President

DATE May 4, 2000

rev.3/96

## ACKNOWLEDGMENT OF CONFIDENTIALITY

I, _____, hereby acknowledge and agree that I have read the Confidentiality Letter Agreement entered into by General Motors Corporation and _____. I understand the terms of the Agreement; that I acknowledge and agree to keep confidential any and all information, whether written or verbal, provided to me under the Confidentiality Letter Agreement; and further, that I will promptly return any and all information I have received as directed by _____.

RECEIPT AND ACCEPTANCE ACKNOWLEDGED

_____

BY_____

TITLE_____

DATE_____

Exhibit D

## COVENANT DEED

THIS INDENTURE, made this _____ day of _____, between **GENERAL MOTORS CORPORATION**, a Delaware corporation, with its principal place of business at 100 Renaissance Center Drive, Detroit, Michigan 48265 (hereinafter referred to as "Grantor"), and **Kettering University**, a Michigan non-profit corporation, with its principal place of business at 1700 West Third Avenue, Flint, Michigan 48504-4898 (hereinafter referred to as "Grantee").

## WITNESSETH:

The Grantor for and in consideration of the sum of One Dollar ($1.00) in hand paid by Grantee, the receipt of which is hereby acknowledged, has granted, bargained, sold, remised, released, aliened and confirmed, and by these presents does grant, bargain, sell, remise, alien and confirm unto Grantee and Grantee's successors and assigns, forever, all of that certain parcel of land, situate, lying and being in the City of Flint, County of Genesee, State of Michigan, described on Exhibit A hereto (hereinafter referred to as the "Real Property"); TOGETHER with all and singular the hereditaments and appurtenances thereunto belonging or in anywise appertaining, and the reversion or reversions, remainder or remainders, rents, issues and profits thereof; and all the estate, right, title, interest, claim or demand whatsoever, of Grantor, either in law or equity, of, in and to the above bargained Real Property, with the said hereditaments and appurtenances; TO HAVE AND TO HOLD the Real Property as before described, with the appurtenances, unto Grantee, its successors and assigns, FOREVER, subject to the matters set forth on Exhibit B hereto. And Grantor, for itself, its successors and assigns, does covenant, grant, bargain, and agree to and with Grantee, its successors and assigns, that Grantor has not heretofore done, committed or wittingly or unwittingly suffered to be done or committed any act, matter or thing whatsoever, whereby the Real Property hereby granted, or any part thereof, is, or shall or may be charged or encumbered in title, estate or otherwise howsoever, except as may be hereinabove stated.

Deed Restrictions:

(a)     All owners, tenants and other occupants of the Real Property hereby covenant and agree for themselves and those persons claiming by, through or under such parties that during the period of their respective ownership and/or occupancy, they shall not treat, store, accumulate or dispose of any "hazardous substances", "hazardous waste" or "toxic substance", as those terms are defined and regulated under CERCLA, 42 U.S.C. §9601 et seq., RCRA, 42 U.S.C. §6901 et seq., or TSCA, 15 U.S.C. §2601 et seq., or similar statutes, on or below the Real Property; and shall maintain generator-only status; provided, however, that Grantee may: (i) accumulate such substances or wastes as allowed under applicable laws and regulations for off-site treatment, off-site storage, or off-site disposal, and (ii) use commercial products on-site which may contain such substances.

(b)     Grantee shall comply with any and all applicable federal state, or local laws regulations, and ordinances, including all environmental laws and including without limitation the requirements, if any under Michigan Act 451, Part 201, in connection with the use of or

operations at the Real Property, including any current or future development, improvements, structures, utilities, facilities, renovations, modifications, parking lots, or storage areas.

(c)     Grantee acknowledges and agrees that the Real Property shall only be used for industrial use and the following commercial uses: those commercial uses specified in subcategories II, II and IV of the MDEQ Environmental Response Division Staff Operational Memorandum #14 (revision 2), dated June 6, 1995.

(d)     Grantee acknowledges and agrees that use of groundwater at, in, or under the Real Property by any person or entity for any purpose, including potable and non-potable uses shall be precluded.

(e)     Grantee shall be solely responsible for the proper maintenance of the Real Property, including: (i) any and all current or future structures, facilities, parking lots and storage areas, and, (ii) any maintenance issues related to any future development, excavation, demolition, or construction activities at the Real Property.

(f)     Grantee acknowledges and agrees that any and all soil and/or debris management and surface water and/or groundwater management required or necessary because of excavation or soil disturbance related to future use, development, or construction at or of the Real Property, is the sole obligation and liability of Grantee or the owner of the Real Property at the time of such activities.  Such soil and/or debris management and surface water and/or groundwater management may include in-place management, excavation, sediment and erosion control, disposal or other management options which are allowed or required under applicable federal, state, or local environmental laws, regulations, or ordinances, including the requirements imposed upon Grantee under Section 20107(a) of Michigan Public Act 451, Part 201.

(g)     The foregoing provisions shall run with the Real Property and be binding on subsequent owners, tenants and users and shall be for the benefit of the adjoining property owners, including Grantor;  provided, however, that no negative reciprocal restriction or other obligation is intended or shall be implied with respect to the properties benefited by these restrictions.

## EXHIBIT C

Proof of Claim Number 64682
(Attached)

**UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK** | **PROOF OF CLAIM**

| | |
|---|---|
| Name of Debtor<br>MOTORS LIQUIDATION COMPANY (f/k/a General Motors Corporation) | Case Number 09-50026 |

Your Claim is Scheduled As Follows

NOTE *This form should not be used to make a claim for an administrative expense arising after the commencement of the case All other requests for payment of an administrative expense may be filed pursuant to 11 U S C § 503*

Name of Creditor (the person or other entity to whom the debtor owes money or property) KETTERING UNIVERSITY, and its subsidiaries and affiliates and all successors and assigns thereof

☐ Check this box to indicate that this claim amends a previously filed claim

Name and address where notices should be sent
José J Bartolomei
Miller Canfield
Attorneys and Agents for Kettering University
101 N Main Street, 7th Floor
Ann Arbor, MI 48104
Telephone number 734 668 8982
Email Address bartolomei@millercanfield com

Court Claim Number:
*(If known)*

Filed on

Name and address where payment should be sent (if different from above)
[Same as above]

**FILED - 64682
MOTORS LIQUIDATION COMPANY
F/K/A GENERAL MOTORS CORP
SDNY # 09-50026 (REG)**

Telephone number [Same as above]

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim Attach copy of statement giving particulars

☐ Check this box if you are the debtor or trustee in this case

If an amount is identified above, you have a claim scheduled by one of the Debtors as shown Please review the Bar Date Notice to determine whether you must file a proof of claim to preserve your rights The Bar Date Notice is available upon request at the address on the back of this form

THIS SPACE IS FOR COURT USE ONLY

1 Amount of Claim as of Date Case Filed.  $ **CURRENTLY UNLIQUIDATED AND UNKNOWN (See attached)**

If all or part of your claim is secured, complete item 4 below, however, if all of your claim is unsecured, do not complete item 4

If all or part of your claim is entitled to priority, complete item 5

☒ Check this box if claim includes interest or other charges in addition to the principal amount of claim Attach itemized statement of interest or charges

2 Basis for Claim. **SEE ATTACHED**
(See instruction #2 on reverse side )

3 Last four digits of any number by which creditor identifies debtor. _____
    3a  Debtor may have scheduled account as' _____
    (See instruction 3a on reverse side )

4 Secured Claim (See instruction #4 on reverse side )

Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information

Nature of property or right of setoff    ☐ Real Estate    ☐ Motor Vehicle    ☐ Equipment    ☒ Other

Value of Property $ **Unknown (see attached for description of possible setoff rights of claimant)** Annual Interest Rate **Unknown**%

Amount of arrearage and other charges as of time case filed included in secured claim, if any $ **N//A**

Basis for perfection **Possible Setoff Rights** Amount Unsecured $ **Unknown (see attached)**

6 Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim

7. Documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements You may also attach a summary Attach redacted copies of documents providing evidence of perfection of a security interest You may also attach a summary *(See instruction 7 and definition of "redacted" on reverse side )* **See attached summary**

DO NOT SEND ORIGINAL DOCUMENTS ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING

If the documents are not available, please explain  **Voluminous and contain confidential/sensitive information**

5. Amount of Claim Entitled to Priority under 11 U.S.C §507(a)
If any portion of your claim falls in one of the following categories, check the box and state the amount

Specify the priority of the claim

☐ Domestic support obligations under 11 U S C §507(a)(1)(A) or (a)(1)(B)

☐ Wages, salaries, or commissions (up to $10,950) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U S C §507 (a)(4)

☐ Contributions to an employee benefit plan – 11 U S C §507 (a)(5)

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U S C §507 (a)(7)

☒ Taxes or penalties owed to governmental units – 11 U S C §507 (a)(8)

☐ Other – Specify applicable paragraph of 11 U S C §507 (a)( )

Amount entitled to priority:

**$UNKNOWN (See attached)**

| Date:<br>Nov 27, 2009 | Signature: The person filing this claim must sign it Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above Attach copy of power of attorney, if any<br><br>By *[signature]*<br>Name  José J Bartolomei<br>Title  Attorney and Agent for Kettering University | FOR COURT USE ONLY |

*Penalty for presenting fraudulent claim* Fine of up to $500,000 or imprisonment for up to 5 years, or both 18 U S C §§ 152 and 3571

Founded in 1852
by Sidney Davy Miller

# MILLER CANFIELD

José J. Bartolomei
TEL (734) 668-8982
FAX (734) 747-7147
E-MAIL bartolomei@millercanfield.com

**Miller, Canfield, Paddock and Stone, P.L.C.**
101 North Main Street, Seventh Floor
Ann Arbor, Michigan 48104
TEL (734) 663-2445
FAX (734) 747-7147
www.millercanfield.com

MICHIGAN  Ann Arbor
Detroit • Grand Rapids
Kalamazoo • Lansing
Saginaw • Troy

FLORIDA  Naples
ILLINOIS  Chicago
NEW YORK  New York
OHIO  Cincinnati

CANADA  Toronto • Windsor
CHINA  Shanghai
MEXICO  Monterrey
POLAND  Gdynia
Warsaw • Wroclaw

**VIA FEDERAL EXPRESS**                November 27, 2009

The Garden City Group, Inc.
Attn  Motors Liquidation Company Claims Processing
5151 Blazer Parkway, Ste. A
Dublin OH 43017

        RE        Proof of Claim to be filed in Case No. 09-50026

To Whom It May Concern:

        Please be advised that this office represents Kettering University   Please find enclosed
one (1) proof of claim to be filed on behalf of Kettering University in the *In re Motors
Liquidation Company (f/k/a General Motors Corporation)* bankruptcy case, case no  09-50026
currently venued in the United States Bankruptcy Court for the Southern District of New York

        Should you have any questions, please do not hesitate to contact me at (734) 668-8982

                        Very truly yours,

                        Miller, Canfield, Paddock and Stone, P.L.C.

                        José Javier Bartolomei

JJB/srd
Enclosures

DISCLOSURE UNDER TREASURY CIRCULAR 230  The United States Federal tax advice contained in this
document and its attachments, if any, may not be used or referred to in the promoting, marketing or recommending
of any entity, investment plan or arrangement, nor is such advice intended or written to be used, and may not be
used, by a taxpayer for the purpose of avoiding Federal tax penalties  Advice that complies with Treasury Circular
230's "covered opinion" requirements (and thus, may be relied on to avoid tax penalties) may be obtained by
contacting the author of this document

ATTACHMENT TO PROOF OF CLAIM

1. Kettering University ("KU") has an unliquidated claim against Debtor relating to various indemnity agreements by and between Debtor and KU related to certain property transfers made by Debtor to KU, including, but not limited to, the following generally described real property parcels

    a  Land totaling approximately 25 acres located between Chevrolet and Stevenson Avenue, South of Bluff Street and North of the Flint River, in Flint Michigan, deeded to KU by Debtor pursuant to that certain Agreement for Deed of Gift, dated as of May 9, 2000 (the "May 9, 2000 Deed of Gift"), by and between Debtor and KU; and

    b  Land totaling approximately 14 593 acres located on Chevrolet Avenue and along the Flint River in Flint, Michigan, deeded to KU by Debtor pursuant to that certain Agreement for Deed of Gift, dated March 4, 1999 (the "March 4, 1999 Deed of Gift" and with the May 9, 2000 Deed of Gift, the "Deeds of Gift Agreements"), by and between Debtor and KU

2 Each Deed of Gift Agreement contains specific ongoing indemnity provisions by which Debtor agrees to indemnify KU for certain liabilities related to each real property parcels. Without limiting the generality of the claims and requests for payment, Debtor is obligated to KU with respect to unpaid pre-petition unsecured amounts in an amount that is currently unknown. The potential amount of Debtor's obligation to KU that may be secured or entitled to unsecured priority treatment is also currently unknown.

3. KU specifically reserves the right to add additional sites and claims as they are discovered and to otherwise amend this proof of claim ("Claim").

4. To the extent that Debtor asserts a claim against KU of any kind, KU reserves the right to assert that Debtor's claims are subject to rights of setoff and/or recoupment ("Setoff Rights"), which rights are treated as secured claims under title 11 of the United States Code (the "Bankruptcy Code"). At the time of the filing of this Claim, KU does not assert, but reserves its right to assert, Setoff Rights regarding any claim asserted by the Debtor.

5 KU expressly reserves the right to amend, modify, and/or supplement this Claim at any time for whatever reason, including, without limitation, for the purpose of filing additional claims and requests for payment and/or to specify the amount of KU's contingent (to the extent that any of KU's claims are contingent), unmatured, and/or unliquidated claims as they become non-contingent, matured and/or liquidated By filing this Claim, KU does not waive and expressly reserves its right to pursue claims and requests for payment, including the claims and requests for payment described in this Claim against the Debtor based upon alternative legal theories

6. To the extent any of the claims set forth in this Claim, in whole or in part, or any

components of the Claims, arise or relate in any manner to the period on or after the date of Debtor's bankruptcy petition, KU asserts that such claims (or any portion thereof) are entitled to priority under Section 503 and 507 of the Bankruptcy Code.

7. By filing this Claim, KU does not consent to the jurisdiction of this Court to hear any proceeding, motion, or other matter related to the Claim or any other rights of KU not related to the Claim.

8. KU reserves all rights at law, in equity, or otherwise, including rights under all pre-petition agreements related to Debtor.

9. The documentation supporting this Claim is voluminous, contains confidential and sensitive information, and portions of such documentation may be subject to a confidentiality agreement between Debtor and KU. To preserve the confidentiality of this information and to avoid any harm to Debtor and KU, the documentation is not attached to this Claim. KU presumes that the Debtor, as counterparty to the underlying agreements, is in possession of its own copies and is familiar with the agreements' terms. If Debtor does not have copies of any relevant agreements and requires copies of them to fulfill its statutory duties in this bankruptcy proceeding, then KU will provide Debtor copies upon request and upon implementation of acceptable procedures to protect the confidentiality of the agreements and the information contained in them.

17494016 1\088888-02725
DRAFT 11/25/09 1 04 PM