# Exhibit A

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT  SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor:<br>MOTORS LIQUIDATION COMPANY F/K/A GENERAL MOTORS CORPORATION | Case Number:<br>09-50026 (REG) |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>Flowserve Corporation f/k/a The Duriron Company | ☐ Check this box to indicate that this claim amends a previously filed claim. |
|---|---|
| Name and address where notices should be sent:<br>Jeffrey G. Hamilton, Jackson Walker L.L.P.<br>901 Main Street, Suite 6000, Dallas, TX 75202<br><br>Telephone number:<br>(214) 953-6000 | **Court Claim Number:**_____<br>*(If known)*<br><br>Filed on:_____ |
| Name and address where payment should be sent (if different from above):<br>Robert L. Roberts, Jr., Vice President, Global Litigation Counsel<br>Flowserve Corporation, 5215 N. O'Connor Blvd., Suite 2300, Irving, Texas 75039<br><br>Telephone number:<br>(972) 443-6537 | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| **1. Amount of Claim as of Date Case Filed:**    $_____1,952,731.07<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>✓ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | **5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).  If any portion of your claim falls in one of the following categories, check the box  and state the amount.**<br><br>Specify the priority of the claim. |
| **2. Basis for Claim:**   Breach of Contract *<br>(See instruction #2 on reverse side.) | ☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| **3.** Last four digits of any number by which creditor identifies debtor: _____<br><br>    **3a.** Debtor may have scheduled account as: _____<br>    (See instruction #3a on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4). |
| **4. Secured Claim** (See instruction #4 on reverse side.)<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>**Nature of property or right of setoff:**  ☐ Real Estate   ☐ Motor Vehicle   ☐ Other<br>Describe:<br><br>**Value of Property:$**_____  **Annual Interest Rate**___**%**<br><br>**Amount of arrearage and other charges as of time case filed included in secured claim,**<br><br>**if any:** $_____   **Basis for perfection:** _____<br><br>**Amount of Secured Claim:** $_____   **Amount Unsecured:** $_____ | ☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8). |
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.<br><br>**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See instruction 7 and definition of "redacted" on reverse side.)*<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain: | ☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(___).<br><br>**Amount entitled to priority:**<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |

| **Date:** | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above.  Attach copy of power of attorney, if any. | FOR COURT USE ONLY |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.



* See attached Exhibit A



EXHIBIT

A

## EXHIBIT A

Flowserve Corporation f/k/a The Duriron Company ("Flowserve") entered into a certain Settlement Agreement ("Settlement Agreement") with General Motors Corporation ("Debtor") dated August 31, 2001. A copy of the Settlement Agreement is attached hereto as Exhibit A-1.

The Valleycrest Landfill Site Group (the "VLSG") is comprised of a group of potentially responsible parties who are potentially responsible under the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended ("CERCLA") for the conditions of the North Sanitary Landfill Superfund Site (the "Site") in Dayton, Ohio. On January 21, 1995, the Ohio Environmental Protection Agency (the "Ohio EPA") issued a Director's Final Findings and Orders with respect to the Site (the "FFO"). The FFO provides for the evaluation and development of a Remedial Investigation and Feasibility Study (the "RIFS") for the Site.

In order to carry out the terms and conditions of the FFO and perform the RIFS, the original VLSG members entered in the (i) Valleycrest Landfill Site Participation Agreement, dated January 12, 1995, as amended by that certain First Amended Valleycrest Landfill Site Participation Agreement, dated May 22, 1998 (the "Original Agreement"), and (ii) the Valleycrest Landfill Site Governmental Entity Participation Agreement, dated on or about January 5, 1999 (the "Second Agreement"), and (iii) the Amendment to Valleycrest Landfill Site Governmental Entity Participation Agreement and the First Amended Valleycrest Landfill Site Participation Agreement, dated on or about May 2000 (the "Master Amendment") (the Original Agreement, the Second Agreement, and the Master Amendment herein are referred to collectively as the "Participation Agreements"). The Participation Agreements are attached hereto as Exhibit A-2.

General Motors Corporation, now known as Motors Liquidation Company ("Debtor") is a member of the VLSG and a party to the Participation Agreements. The Participation Agreements allocated a percentage share of the costs and expenses in developing the RIFS and performing the subsequent remediation to each member of VLSG.

Pursuant to the terms of the Settlement Agreement, Debtor was to assume all liabilities of Flowserve related to the Valleycrest Landfill, including the development of the RIFS and the subsequent remediation. Pursuant to the Participation Agreements and specifically, the Master Amendment, Flowserve's percentage of costs related to the Valleycrest Landfill Site is 3.375%.[1]

Debtor has breached the terms of the Settlement Agreement by failing to pay amounts due under the terms of the Settlement Agreement. Debtor's breach of the Settlement Agreement has caused and will cause damages to Flowserve.

During the term of the Participation Agreement, each of the parties were issued periodic assessments by de maximis, the VLSG Coordinator of the Site work, to cover the costs and expenses (as defined in the Participation Agreement) incurred in connection with complying with the FFO, RIFS and the Participation Agreements. Assessments have been issued to and paid by Flowserve. Specifically, Flowserve has paid $9,401.00 (invoice dated May 8, 2009), $10,588.00

---

[1] See Exhibit D to the Master Amendment.

(invoice dated July 22, 2009), and $10,085.00 (invoice dated October 28, 2009). Copies of these invoices are attached hereto as Exhibit A-3. Pursuant to the Settlement Agreement, these assessments were the responsibility of Debtor. Debtor failed and refused to pay the assessments causing damage to Flowserve in the amount of $30,074.00.

In addition, the VLSG, pursuant to the FFO, RIFS and the Participation Agreements, is required to complete the FFO, the RIFS and related work. The VLSG has estimated that this work will be completed by February of 2012 at an estimated cost from January 1, 2010 to completion of the work is $1,032,617.[2] Therefore, Flowserve's share of these costs applying the 3.375% allocation is $34,850.82. Pursuant to the Settlement Agreement, Flowserve's share of these costs is the responsibility of Debtor.

After completion of the RIFS, FFO, and related work, a remedy will be selected for the Site which will be implemented at the Site. According to the VLSG, the estimated cost of implementing a remedy at the Site will be $55,935,000 (the "Remediation Cost Estimate").[3] Flowserve's share of the Remediation Cost Estimate applying the 3.375% allocation is $1,887,806.25. Pursuant to the Settlement Agreement, Flowserve's share of these costs is the responsibility of Debtor.

Accordingly, Flowserve's actual damages for Debtor's breach of contract are $1,952,731.07 plus interest, costs, and attorneys' fees. The actual damages consist of the following components: (a) $30,074.00 for assessments paid by Flowserve, (b) $34,850.82 for Flowserve's allocation of the cost to complete the RIFS; and (c) $1,887,806.25 for Flowserve's allocation of remediation costs.

Flowserve reserves the right to amend this Proof of Claim if additional information becomes available.

5665013v.1

---

[2] The VLSG has filed a proof of claim for Debtor's share of the Valleycrest related costs. The VLSG's proof of claim contains support for the cost estimates promulgated by the VLSG which is the basis for the cost estimate for completion of the RIFS in Flowserve's proof of claim and is incorporated herein by reference.

[3] The VLSG has filed a proof of claim for Debtor's share of the Valleycrest related costs. The VLSG's proof of claim contains support for the cost estimates promulgated by the VLSG which is the basis for the cost estimate for the Valleycrest remediation in Flowserve's proof of claim and is incorporated herein by reference.

## SETTLEMENT AGREEMENT

This Agreement is made and entered into on this 31st day of August, 2001, by and among General Motors Corporation ("GM") and Flowserve Corporation (f/k/a The Duriron Company, Inc.) ("FLOWSERVE-DURIRON").

## RECITALS

WHEREAS, GM and FLOWSERVE-DURIRON have been identified as parties that may have liability under the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. §§ 9601, et seq. ("CERCLA"), the Ohio Hazardous Waste Management Act, as amended, ORC §§ 3734 et seq. ("Ohio Superfund"), and other legal authorities in connection with the alleged arrangement for disposal of substances that are or may be regulated by any federal, state or local statute, rule, regulation, or decision of any administrative agency or court, including, without limitation, CERCLA and Ohio Superfund ("Hazardous Substances"), at and from Valleycrest/North Sanitary Landfill Superfund Site in Dayton, Ohio (the "Valleycrest Site"), including any contiguous off-site areas impacted by the Valleycrest Site; and

WHEREAS, GM and other parties, including FLOWSERVE-DURIRON, are currently funding certain response activities required at the Valleycrest Site, where a removal action is underway and a remedial investigation/feasibility study is also ongoing; and

WHEREAS, GM and FLOWSERVE-DURIRON believe that, to the extent provided by this Agreement, it is in their mutual best interests to reach agreement between themselves with regard to certain responsibilities and potential liabilities relating to the Valleycrest Site, as more specifically defined below; and

WHEREAS, GM and FLOWSERVE-DURIRON acknowledge and agree that the terms of this Agreement represent a good-faith settlement and compromise of disputed claims with

1 of 10



EXHIBIT
A - 1

respect to the matters addressed herein, negotiated at arms-length, and that this settlement represents a fair, reasonable, and equitable resolution of the matters among the parties hereto.

NOW, THEREFORE, in consideration of the foregoing and the mutual undertakings set forth in this Agreement, and other good and valuable consideration contained herein, the parties hereto represent, warrant, and agree as follows:

## OBLIGATIONS

1.    Covered Matters.  This Agreement addresses and settles those liabilities and potential liabilities collectively referred to hereinafter as "Covered Matters" and defined as follows:

    a.    All liabilities, remedies, claims, duties, obligations, costs (including any claim for past costs), or penalties that FLOWSERVE-DURIRON and/or GM may or could have with respect to environmental conditions at, emanating from, or related to the Valleycrest Site, as defined herein, and which liabilities, remedies, claims, duties, obligations, costs (including any claim for past costs), or penalties are created under or by CERCLA, Ohio Superfund, the Resource Conservation and Recovery Act; 42 U.S.C. §§ 6901, et seq. ("RCRA"), or any other similar or remedial federal, state, or local statute, rule, or common law.

    b.    Notwithstanding the above, this definition of "Covered Matters" does not include any claims for natural resource damages that may be brought pursuant to statute by a federal natural resources trustee or designee, or their assignees, or any private toxic tort claims relating to the Valleycrest Site.

2.    Definition of Site.  The Valleycrest Site means the former landfill located at 200 Valleycrest Drive in Dayton, Ohio (also known as the North Sanitary Landfill site), being

approximately 100 acres in size in the aggregate, but also including any and all contiguous off-site areas impacted the landfill, as placed on the NPL by EPA.

3.    <u>Release of FLOWSERVE-DURIRON</u>.    GM and its successors and assigns hereby release and forever discharge FLOWSERVE-DURIRON and its shareholders, officers, directors, employees, agents, successors and assigns, of and from any and all actions, courses of action, suits, sums of money, accounts, reckonings, bills, covenants, controversies, agreements, obligations, liabilities, damages, claims, debts, losses, expenses, or demands which GM ever had, now has, or hereafter can, shall, or may have against FLOWSERVE-DURIRON with respect to Covered Matters, except for rights granted by this Agreement.

4.    <u>Indemnification of FLOWSERVE-DURIRON</u>.    GM hereby agrees to protect, defend, indemnify, and save harmless FLOWSERVE-DURIRON from and against all Covered Matters and all claims, demands, and actions relating to Covered Matters. GM shall have the right and duty to defend any order, claim, or suit brought against FLOWSERVE-DURIRON for Covered Matters, even if one or more of the allegations of the order, claim, or suit are groundless, false or fraudulent, and GM may make such investigation and settlement of any order, claim, or suit as GM deems expedient. FLOWSERVE-DURIRON hereby acknowledges and certifies that other than as previously disclosed, it knows of no currently pending actions, causes of action, suits, controversies, agreements, obligations, liabilities, damages, claims, debts, losses, expenses, or demands against FLOWSERVE-DURIRON and relating to Covered Matters.

5.    <u>Payment by FLOWSERVE-DURIRON</u>.    In consideration for the obligations undertaken by GM pursuant to the terms of this Agreement, FLOWSERVE-DURIRON hereby agrees to pay to GM the following amounts subject to and in accordance with the terms and procedures for such payments set forth herein:

a.    A cash amount to be paid by FLOWSERVE-DURIRON to GM of Two Hundred and Fifty-Four Thousand Dollars ($254,000.00) (the "Cash

Amount"). This Cash Amount shall be paid to GM in two equal payments. The first payment ($127,000), shall be made on or before October 15, 2001. The second payment ($127,000), shall be made on or before January 15, 2002. If either payment is made more than fifteen (15) days after its respective due date, simple interest of 0.75% shall be included per month for each month or fraction thereof that said payment is late; and

b.    All payments made by FLOWSERVE-DURIRON to date regarding the Valleycrest Site or litigation concerning Covered Matters shall be credited to GM and become the property of GM. Any recovery related to the FLOWSERVE-DURIRON share of the cost recovery litigation shall be credited to GM and become the property of GM. The prior payments and the proceeds of the cost recovery litigation (the "Credit Amount") may be paid directly to or otherwise held by GM as soon as said funds become available after the effective date of this agreement.

c.    It is the intent of GM and FLOWSERVE-DURIRON that in return for the total of the Cash Amount and the Credit Amount being paid by or on behalf of FLOWSERVE-DURIRON to GM, then GM forever releases, indemnifies, defends, protects, and replaces FLOWSERVE-DURIRON with respect to all Covered Matters for the Valleycrest Site as provided by the terms of this Agreement.

6.    GM's Activities. GM will continue, individually or together with other parties, to complete the RI/FS and perform required removal and remedial activities at the Valleycrest Site, as to be determined by GM. If it chooses to do so, GM may notify EPA and the Ohio Environmental Protection Agency ("OEPA") of the existence and effect of this Agreement, and

that FLOWSERVE-DURIRON has paid for and extinguished its potential liabilities associated with the Valleycrest Site.

7.    Assignment by FLOWSERVE-DURIRON.    FLOWSERVE-DURIRON hereby assigns to GM all claims and demands of every kind and nature that FLOWSERVE-DURIRON may possess with respect to Covered Matters against each and every other person, entity, and potentially liable party at and for the Valleycrest Site.    However, this reference to potentially liable parties is not intended to include any insurance carrier of FLOWSERVE-DURIRON, pursuant to Paragraph 18 below.    FLOWSERVE-DURIRON agrees to execute any additional documents that GM may reasonably request to give full force and effect to these assignments.

8.    Release of GM.    FLOWSERVE-DURIRON and its successors and assigns hereby release and forever discharge GM and its shareholders, officers, directors, employees, agents, successors and assigns, of and from any and all actions, causes of action, suits, sums of money, accounts, reckonings, bills, covenants, controversies, agreements, obligations, liabilities, damages, claims, debts, losses, expenses, or demands which FLOWSERVE-DURIRON ever had, now has, or hereafter can, shall, or may have against GM with respect to Covered Matters, except for rights granted by this Agreement.

9.    Transmittal of Claims.    FLOWSERVE-DURIRON will notify GM by fax and/or express delivery of the existence of any claim, demand, order, notice, summons, or other process received hereafter by FLOWSERVE-DURIRON regarding any Covered Matters, as follows:

a.    If a response is required within thirty (30) days of receipt, FLOWSERVE-DURIRON shall provide GM with written notice not later than ten (10) calendar days prior to any such response deadline for the claim, demand, order, notice, summons, or other process received by FLOWSERVE-DURIRON, provided, however, that FLOWSERVE-DURIRON itself received such claim, demand, order, notice, summons, or other process

more than ten (10) days prior to such response deadline to allow for timely compliance with this Paragraph 9.a.

b.   If FLOWSERVE-DURIRON's receipt thereof is less than ten (10) days prior to the deadline for response, then FLOWSERVE-DURIRON shall seek a thirty (30)-day extension for response and shall provide a copy of the claim, demand, order, notice, summons, or other process and an acknowledgment of the thirty (30) day extension to GM not later than ten (10) days prior to the extended deadline for response.

c.   Such notice and copies of whatever was received by FLOWSERVE-DURIRON shall be sent to GM in conformance with the notice provision set forth at paragraph 22 below.

d.   GM shall promptly notify FLOWSERVE-DURIRON that it has assumed the defense of any matter so forwarded to it by FLOWSERVE-DURIRON and covered by this Agreement. GM will then proceed to defend said claim, demand, order, notice, summons, or other process pursuant to this Agreement.

e.   If necessary and if reasonably requested by GM, FLOWSERVE-DURIRON shall reasonably cooperate in responding to discovery, allocation and information requests arising for many claim, demand, order, notice, summons, or other process sent to FLOWSERVE-DURIRON and for which GM has assumed the defense pursuant to this Agreement.

f.   The failure of FLOWSERVE-DURIRON to abide strictly by the notice provisions contained herein does not excuse GM's obligations of indemnity or defense, except to the extent that actual and substantial prejudice to GM is documented.

10.    Cooperation.    After execution of this Agreement, and only if reasonably requested by GM, FLOWSERVE-DURIRON at its own expense will make available to GM reasonably accessible, non-privileged information that may be in FLOWSERVE-DURIRON's possession or control relating to alleged arrangements for disposal at the Valleycrest Site.

## MISCELLANEOUS

11.    No Third-Party Beneficiaries.    The rights and obligations created under this Agreement shall inure solely to the benefit of the persons and entities specifically referred to as the parties to this Agreement.  Nothing herein shall create, extinguish, or in any manner alter or affect the rights or duties of any third parties not parties to, or no in privity with the parties to, this Agreement.

12.    Bankruptcy.    Upon any future bankruptcy filing by GM, or by FLOWSERVE-DURIRON, respectively, performance of the defense, indemnity, payment, and any and all other obligations, duties and actions of the bankrupt party pursuant to this Agreement shall to the extent possible be deemed to have the priority status of administrative expenses pursuant to 11 U.S.C. Sections 503(b) and 507(a)(1).    Upon the confirmation of a plan of bankruptcy reorganization for the bankrupt party, the reorganized party or any post-confirmation successor entity shall be bound by all duties created for said bankrupt party by this Agreement. The terms, benefits, and obligations of this Agreement for GM or for FLOWSERVE-DURIRON, respectively, shall not be terminated, modified, or discharged by any Chapter 11 bankruptcy resolution, and any plan of reorganization that may ever be proposed by GM or by FLOWSERVE-DURIRON respectively, in the future shall so provide.

13.    Applicable Law.  This agreement shall be interpreted and enforced according to the laws of the State of Ohio.

14.    Execution of Counterparts.    This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

15.    <u>No Admission of Liability</u>.  The execution of this Agreement shall not, under any circumstances, be construed as an admission by FLOWSERVE-DURIRON or GM of any fact or liability with respect to the Valleycrest Site, or with respect to any waste containing or constituting Hazardous Substances allegedly contributed to the site.  This Agreement shall not constitute or be used as evidence, as an admission of any liability or fact, or as a concession of any question of law by the parties hereto, nor shall it be admissible in any proceeding except in an action to seek the enforcement of any terms of this Agreement.

16.    <u>Successors and Assigns Included as Parties</u>.  Wherever in this Agreement either GM or FLOWSERVE-DURIRON is named or referred to, the legal representatives, successors, and permitted assigns of such party shall covenants and agreements contained in this Agreement by or on behalf of either of the parties hereto shall bind and inure to the benefit of the respective successors and permitted assigns, whether so express or not.

17.    <u>Assignment</u>.  GM may not assign its rights, duties, or obligations under this Agreement to any other person or entity without the express, written, and advance permission of FLOWSERVE-DURIRON, which permission may be withheld by FLOWSERVE-DURIRON in its sole and exclusive discretion.

18.    <u>Insurance</u>.  GM and FLOWSERVE-DURIRON do not hereby make any agreement or take any action that will prejudice them with regard to, nor transfer their respective rights concerning, their respective third-party insurance claims, coverages or recoveries.

19.    <u>Headings</u>.  The headings contained in this Agreement are for convenience of reference only, are not to be considered a part hereof, and shall not limit or otherwise affect any of the terms hereof.

20.    <u>Modification</u>.  Neither this Agreement, nor any provisions hereof, may be changed, waived, discharged, or terminated orally, but only by instrument in writing signed by the party against whom enforcement of the change, waiver, discharge, or termination is sought.

21.    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the parties hereto among themselves as to the Covered Matters.  As between FLOWSERVE-DURIRON and GM, any prior agreements as to Covered Matters are hereby canceled or superceded by this Agreement to the extent that they may be inconsistent herewith.

22.    <u>Notice Procedure</u>.  Notices required or otherwise given under this Agreement shall be directed as follows:

To GM:

Michelle T. Fisher, Esq.
General Motors Corporation
Legal Staff
MC 482-C24-D24
300 Renaissance Center
Detroit, MI  48243
Tel:  (313) 665-4877
Fax: (313) 665-4896

To FLOWSERVE-DURIRON:

Robert L. Roberts, Jr., Esq.
Flowserve Corporation
222 W. Las Colinas Blvd., Suite 1500
Irving, TX  75039
Tel: (972) 443-6537
Fax: (972) 443-6837

All notices or demands required or permitted under this Agreement shall be in writing and shall be effective if sent by express delivery or by registered or certified mail, postage prepaid and return receipt requested.  Notices shall be deemed received at the time delivered.  Any party may also give notice by facsimile transmission, which shall be effective upon confirmation by the party sending the notice that such facsimile transmission has been received by the party to whom the notice has been addressed.  Nothing in this Paragraph 22 shall prevent the giving of notice in such manner as prescribed by the Federal Rules of Civil Procedure for the service of legal process.  Either party may change its address by giving written notice thereof to the other party to this Agreement.

23.    <u>Remedies and Attorneys' Fees</u>.  In any action brought by a party hereto for breach of this Agreement or to enforce the rights and obligations of this Agreement, the prevailing party shall be entitled also to recover its reasonable attorney's fees.  Equitable and

injunctive relief shall also be available to either party hereto upon breach of this Agreement by the other party.

24.   Authorization.   Each of the signatories signing below on behalf of his or her respective party to this Agreement represents that he or she is fully authorized to sign on behalf of that party.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date appearing above and last written below.

GENERAL MOTORS CORPORATION

By: *Don A. Schiemann*

Name: Don A. Schiemann

Title: Attorney

Date: AUGUST 31, 2001

FLOWSERVE CORPORATION
(f/k/a/ THE DURIRON COMPANY, INC.)

By: *Robert L. Roberts*

Name: Robert L. Roberts, Jr.

Title: Associate General Counsel

Date: August 29, 2001

R082901F2

Past Costs and Oversight Costs in accordance with the FFO, and administrative costs and litigation costs of the Group.

1.3    To the extent that terms are defined within the FFO, said terms shall have the same meaning herein.

## 2.    VALLEYCREST LANDFILL SITE GROUP.

The Members hereby organize and constitute themselves as the Valleycrest Landfill Site Group (sometimes referred to as the "Group"). Each Member whose authorized representative has executed the FFO and this Agreement is a Member of the Valleycrest Landfill Site Group. Peerless Transportation Co. shall be a Member, but shall have no vote (as provided in subsection 4.3).

## 3.    PURPOSE.

3.1    General Purpose. It is the purpose of this Agreement that the terms hereof shall control the manner and means by which the Members will undertake to satisfy their obligations pursuant to, and to otherwise comply with, the terms of the FFO; including without limitation, the implementation of the RI/FS, payment of Ohio EPA's Past Response Costs and Oversight Response Costs; and further to pursue whatever rights, claims and causes of action that the Members might have against others through litigation or otherwise.

3.2    General Agreement of Members.    The Members individually and collectively agree to take all reasonably necessary actions to ensure that the obligations of the Members under the FFO shall be complied with, including the implementation of the RI/FS, and to fund all costs arising in connection with their undertakings, duties, and obligations pursuant thereto, and to fund the litigation as provided herein.

3.3    Financial Obligations and Assurances. Each Member warrants that it presently has or has the ability to obtain in a timely manner sufficient funds to satisfy its obligations under this Agreement. Upon any Member's default of an obligation hereunder, such defaulting Member shall pay the full balance of its obligations or projected obligations under this Agreement. Such payment upon default shall not terminate the Member's obligations hereunder, but rather shall constitute a non-interest bearing deposit against which future obligations shall be drawn.

3.4    Bankruptcy. Each Member agrees that in the event of its bankruptcy all obligations under this Agreement shall be entitled to an administrative expense priority for all purposes under the United States Bankruptcy Code, and each Member further agrees that it shall not object to any bankruptcy proceeding or treatment of obligations under this Agreement as an administrative expense.

-2-




EXHIBIT

---

## VALLEYCREST LANDFILL
## SITE PARTICIPATION AGREEMENT

This Agreement is between and among the parties whose authorized representatives have executed this Agreement and the Director's Final Findings and Orders described herein (hereinafter the "Members").

WHEREAS, many other companies and individuals are Potentially Responsible Parties ("PRP's") pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, and its amendments ("CERCLA") for conditions at the Valleycrest Landfill Site in Dayton, Ohio ("Site"); and

WHEREAS, the Members recognize that they desire to avoid litigation with the United States and the State of Ohio and have endeavored to arrive at an agreement with the State of Ohio and further arrive at an agreement among themselves to fund performance of necessary work at the Site; and

WHEREAS, the Members have jointly agreed to enter into Final Findings and Orders with the Ohio Environmental Protection Agency to provide for the development of a Remedial Investigation and Feasibility Study for the Site; without admitting any fact, responsibility, fault or liability in connection with the Site, and the Members wish to establish a framework for complying with the terms of the Final Findings and Orders, and to cooperate among themselves in this effort; and

WHEREAS, the Members may determine that it is in their interest to initiate litigation against some or all the PRP's which are not Members with the goal of arriving at an equitable allocation of the necessary costs of response which shall be incurred to comply with the Final Findings and Orders and to conduct any other necessary response activities in conformance with the requirements of the National Contingency Plan ("NCP").

NOW THEREFORE, in consideration of the foregoing and the promises and covenants contained herein, the Members mutually agree as follows:

## 1.    DEFINITIONS.

1.1    The term "Final Findings and Orders" ("FFO") shall mean the Director's Final Findings and Orders entered into between the Ohio Environmental Protection Agency and the Members for the purpose of the development of a Remedial Investigation and Feasibility Study for the Site.

1.2    The term "Costs" shall include all costs incurred to satisfy the obligations pursuant to, and to otherwise comply with, the terms of the FFO, or to implement the purposes of this Agreement, including without limitation, the implementation of the Remedial Investigation and Feasibility Study ("RI/FS"), payment of project management costs, payment of the Ohio EPA's

EXHIBIT

**4.5  Enumerated Powers of the Members.** The powers, duties and responsibilities of the Members shall include, not to the exclusion of other powers, duties, and responsibilities enumerated in this Agreement the following:

(a)  The Members shall negotiate with the Governments and other person with respect to all matters relating to this Agreement and the FPO;

(b)  The Members shall determine when a Member is in default of its obligations under this Agreement;

(c)  The Members shall review and, as appropriate, approve invoices and bills for payment;

(d)  The Members shall enter into contracts to achieve the purposes of this Agreement and the FPO;

(e)  The Members shall direct the preparation of invoices to the Members in accordance with the provisions of Section 5 hereto.

(f)  The Members shall direct the litigation in accordance with the provisions of Section 6 hereto.

The Members may direct that subcommittees of Members or other persons carry out or perform any activities which the Members may perform themselves.

**4.6  Separate Counsel.** Each Member reserves the right to select and retain its own counsel to represent such Member on any matter. All costs of such counsel shall be borne by the individual Member and shall not be Costs paid by the Members.

**4.7  Providing Members with Information.** Upon request from any Member, the Members shall make available to that Member any reports submitted to or by the Members in connection with the performance of the Members' obligations under this Agreement or the FPO.

**5.  FUNDING OF OBLIGATIONS UNDER THIS AGREEMENT**

**5.1  Allocation for Limited Purpose.** The funding of work to be performed pursuant to this Agreement and the FPO, or "Costs" as defined herein, shall be accomplished in accordance with the provisions of this Section. The Members acknowledge that the allocation provided for herein is only for the purposes of funding the Costs incurred pursuant to this agreement, and the Members expressly reserve their right to assert a different allocation for funding of any other work which has been or will be performed in association with the Site or any other liability, if any. The Members agree that any amounts paid by any Member pursuant to this Agreement shall be considered in any future allocation for funding of any other work or liability in association with the Site, such that, as a minimum, the amounts paid by each Member

---

**3.5  Fair Share.** Each Member agrees that in any action brought to enforce its obligations under this Agreement it shall not contest the fairness of the cost allocation or other provisions of this Agreement.

**3.6  Cooperation.** The Members shall cooperate with each other so as to effectuate the purpose of this Agreement, shall attempt to make decisions by consensus, and shall attempt to resolve any disputes among them through good faith negotiation.

**4.  ORGANIZATION AND PROCEDURES**

**4.1  Meetings.** The Members may authorize or direct actions under this Agreement only at meetings duly held and called for such purpose, which meetings shall be called from time to time as determined necessary by the Members. Meetings of the Members may be called for any purpose at any time by any other three Members. Meetings may be held by telephone conference.

**4.2  Notice of Meetings.** Whenever feasible, written notice of the time, place and purpose of any meeting of the Members shall be given to each Member entitled to vote at such meeting. In the event a meeting is called on less than five (5) days written notice, the Members calling the meeting shall make a reasonable effort to provide notice in fact to every Member.

**4.3  Voting.** Each Member shall have a vote ("Voting Power") as follows:

(a)  Each Member shall have a vote weighted in accordance with the Member's obligation to fund the activities contemplated under this Agreement;

(b)  No Member may vote unless that Member has paid all financial contributions assessed, due and owing as of the last assessment made pursuant to this Agreement prior to such meeting. Any Member having an assessment due and owing that remains unpaid at the time of the meeting may not vote until such time as the Member makes payment of the full assessment and any penalties; and

(c)  Unless otherwise specified herein, all issues shall be decided by a majority of the voting power of the Members as defined in this Section.

(d)  Peerless Transportation Co. shall have no vote.

**4.4  Voting by Proxy.** A Member eligible to vote at a meeting may assign in writing its vote to another Member eligible to vote at the meeting.

-3-

shall be credited against such Member's share pursuant to a final allocation of the costs of work performed at the Site or any other liability. The Members further agree that the funding shall be modified in accordance with the procedures set forth in Section 6 hereto.

**5.2   Obligations Of The Members.** The Members shall be severally liable for their respective percentage share, as set forth in Appendix A hereto, of the Costs. Within twenty (20) days of the effective date of this Agreement, the Members shall establish an Escrow Account to receive and hold monies from the Members, in accordance with their obligations. Within sixty (60) days of the effective date of this Agreement, each Member shall pay an amount equal to its "First Year Payment" as set forth in Appendix A into the Escrow Account. The Members shall approve additional assessments and issue additional invoices to the individual Members as necessary to assure that the Escrow Account always has sufficient funds in it to finance the work to be performed in the next ninety (90) days.

**5.3   Obligation of Peerless Transportation Co.**   Peerless Transportation Co. shall within sixty (60) days of the effective date of this Agreement pay twenty-five thousand dollars ($25,000.00) into the Escrow Account established under sub-section 5.2. In addition, Peerless agrees to cooperate with the Members to provide such information to the Members as the Members deem appropriate to assist the Members in the identification of additional PRP's or to identify information regarding any PRP's' nexus with the Site, including without limitation, access to business records and documents, and present and past employees who might have information relevant to any PRPs' nexus to the Site.

**5.4   Late Payments.** Each Member shall have no less than thirty (90) days to make timely payment of any invoice or other obligation hereunder. The Members may declare in default any Member that has failed or refused to make timely payment of any invoice or other obligation hereunder. Upon such default (which shall include any Member's failure to pay the full balance of its "share of $3,000" as set forth in Appendix A hereunder). Any Member may, at its sole option and in its sole discretion, choose not to participate in any such action and, in such instance, shall not be required to fund any Costs generated herein. In the event that any Member or refuses to make timely payment of any obligation (including any amount due upon default), such Member shall be liable for interest on the amount due at the rate of 12% per annum, compounded monthly, with said interest being due on the first day after said payment is due, and on each monthly anniversary thereafter.

**5.5   Enforcement Indemnity.** In the event that the Members deem it appropriate to initiate action to enforce a Member's obligations under this Agreement, including without limitation litigation, and the position of the initiating Members is substantially sustained, such other Member shall indemnify and hold harmless the Members for any and all costs, fees or expenses, including without limitation, attorneys fees and court costs, which the Members might incur in pursuing such action.

**5.6   Accounting for Funds.** The Members shall prepare, or shall cause to be prepared, on at least an annual basis, an accounting of monies received into the Escrow Account, spent and obligated, and a final accounting upon the termination of this Agreement.

**5.7   Purpose of Funds.** All monies provided by Members pursuant to this Agreement shall be used solely for the purposes of this Agreement and shall not be considered as payment for any fines, penalties, or monetary sanctions.

**6.   ASSIGNMENT OF CLAIMS AND LITIGATION BY MEMBERS AGAINST OTHER PERSONS**

**6.1   Assignment of Claims Against Others.** The Members (individually) hereby assign to the Members (collectively) all rights, claims or causes of action arising from this Agreement or the PPO's or associated with the incurrence of response costs related to the Site, including without limitation, claims or causes of action for contribution; except that each Member shall retain whatever rights, claims or causes of action it may have with respect to its own insurance coverage or claims for contractual indemnity, whether by way of insurance contract or otherwise. No such retained insurance or contractual indemnity claim shall in any way impair the ability of the Members to seek against parties to this agreement. The assignment hereunder shall not be affected by any Member's choice to opt-out of any litigation under sub-section 6.2 of this Agreement.

**6.2.   Litigation Against Other Persons.** The Members may initiate, pursue or settle any litigation or claim they deem appropriate to preserve, assert or defend any and all rights, claims, or causes of action (whether or not assigned). The Members may have against any other entity, including, without limitation, claims for response costs or natural resource damages against entities not parties to this Agreement, or to enforce the obligations of a Member under this Agreement. The cost of any such action by the Members shall be Costs as provided herein. Any Member may, at its sole option and in its sole discretion, choose not to participate in any such action and, in such instance, shall not be required to fund any Costs generated herein. In the event that any Member or refuses to participate in such action, the remaining Members may, but need not, arrive at a separate agreement in such action, opt-out Member regarding such Member's participation in the litigation and the costs and benefits thereof.

**6.3   Waiver of Conflict Interest.** In the event that the Members' determined that it would be in their interest to retain common counsel to initiate and pursue litigation as provided in Section 6 hereto, each Member agrees that: (i) it will not claim or assert that, conflict of interest in permitting common counsel to represent the Members and consistent with the Member's powers, duties and legal services authorized by the Members and counsel has a on said counsel's representation of the Members, (2) it will not claim or assert that, based solely has a conflict of interest in connection with any representation of the Members, said counsel in claim or assert that, based solely on said counsel's representation of the Members under the a matter pending as of the date of receiving notice of intent to hire said counsel; (3) it will not term of this Agreement, said counsel has a conflict of interest in any future representation of any person or entity, including representation of the Members in litigation against a Member to enforce the provisions of this Agreement or in a subsequent action to recover costs or pursue

claims for contribution; (4) in the event that any conflict develops in the performance of work authorized by the Members by said counsel and the legal services authorized by any Member that has retained that counsel, the Member consents to that counsel's continued performance of the work authorized by the Members.

7. CONFIDENTIALITY.

7.1 Shared Information. From time to time, the Members may elect to disclose or transmit to each other, directly or through counsel, such information as each Member, counsel or technical consultant retained for the Group deems appropriate for the sole and limited purpose of coordinating activities that are necessary and proper to carry out the purposes of this Agreement. Shared information may be disclosed to the Members orally or in writing or by any other appropriate means of communication. The Members intend that no claim of work product privilege or other privilege be waived by reason of participation or cooperation pursuant to this Agreement.

7.2 Preservation of Privilege. Information disclosed by the Members to counsel may be disclosed to any other Member, and each Member hereby expressly consents to treat such disclosure to it as being for the sole purpose of effectuating the purposes of this Agreement. Such disclosure shall not be deemed a waiver of the attorney-client privilege or work product immunity or any other privilege.

7.3 Confidentiality of Shared Information.

(a) Each Member agrees that all shared information received from any other Member or its counsel, or technical consultant pursuant to this Agreement shall be held in strict confidence by the receiving Member and by all persons to whom confidential information is revealed by the receiving Member pursuant to this Agreement, and that such information shall be used only in connection with conducting such activities as are necessary and proper to carry out the purposes of this Agreement. In addition, Members agree to disclose shared information to insurers, to the extent requested by insurers and pursuant to the terms of the insurance contract, and so long as the insurers agree to maintain the confidentiality of the information in conformance with the provisions of this Agreement. In addition, Members may also disclose shared information to auditors or other accounting personnel, to the extent such disclosure is necessary and appropriate for the Members and the auditor or other accounting personnel to satisfy obligations of the Securities and Exchange Commission.

(b) Shared information that is exchanged in writes or in document form and is intended to be kept confidential may, but need not, be marked "Confidential" or with a similar legend. If such information becomes the subject of an administrative or judicial order requiring disclosure of such information by a Member, where the information will be unprotected by

-7-

confidentiality obligations, the Member may satisfy its confidentiality obligations hereunder by notifying the Member that generated the information or, if the information was generated by a technical consultant, by giving notice to said consultant and to the Members.

(c) Each Member shall take all necessary and appropriate measures to ensure that any person who is granted access to any confidential information or who participates in work on common projects or who otherwise assists any counsel or technical consultant in connection with this Agreement, is familiar with the terms of this Agreement and complies with such terms as they relate to the duties of such person.

(d) The Members intend by this Section to protect from disclosure all confidential information and documents shared among any Members or between any Member and counsel, or any technical consultant to the greatest extent permitted by law regardless of whether the sharing occurred before execution of this Agreement and regardless of whether the writing or document is marked "Confidential."

(e) The confidentiality obligations of the Members under this Section shall remain in full force and effect, without regard to whether actions arising out of the Site are terminated by final judgment, and shall survive the termination of this Agreement. The provisions of this Section shall not apply to information which is now or hereafter becomes public knowledge without violation of this Agreement, or which is sought and obtained from a Member pursuant to applicable discovery procedures and not otherwise protected from disclosure.

8. DENIAL OF LIABILITY.

This Agreement shall not constitute, be interpreted, construed or used as evidence of any admission of liability, law or fact, a waiver of any right or defense, nor an estoppel against any Member, by Members or among themselves or by any other person not a Member. However, nothing in this Section is intended or should be construed to limit, bar, or otherwise impede the enforcement of any term or condition of this Agreement against any party to this Agreement.

9. INSURANCE.

The Members do not intend hereby to make any agreement that will prejudice any Member with respect to its insurers and, by entering into this Agreement, anticipate that the actions taken pursuant to this Agreement will benefit such insurers.

-8-

**10. SUCCESSORS AND ASSIGNS.**

This Agreement shall be binding upon the successors and assigns of the Members. No assignment or delegation of the obligation to make any payment or reimbursement hereunder will release the assigning Member without the prior written consent of the other Members.

**11. ADVICE OF COUNSEL.**

Each Member represents that it has sought and obtained any appropriate legal advice it deems necessary prior to entering into this Agreement.

**12. NOTICE.**

All notices, bills, invoices, reports, and other communications with a Member shall be sent to the representative designated by the Member on and Member's Valleycrest Landfill Site Participation Agreement Signatory Page. Each Member shall have the right to change its representative upon submission of written notice to the other Members.

**13. EFFECTIVE DATE.**

The effective date of this Agreement shall be the same as the effective date of the FFO.

**14. TERMINATION.**

This Agreement shall terminate and have no further effect upon completion of all obligations of the Members pursuant to the FFO or such other time as a Court may establish.

**15. AMENDMENTS.**

This Agreement may be amended only by a vote of at least two-thirds of the Voting Power of the Members at a meeting called for the purpose of considering such an amendment. Such amendment must be in writing. However, Sections 3, 4.3, 5.1 and 5.2 of this Agreement may be amended only by a unanimous vote of 100% of the Voting Power of the Members.

**16. ADDITIONAL MEMBERS.**

The Members may approve the entry into this Agreement of additional entities as Members after the effective date of the Agreement. The terms and conditions of participation of such additional entities shall be determined by the Members.

**17. SEPARABILITY.**

If any provision of this Agreement is deemed invalid or unenforceable, the balance of this Agreement shall remain in full force and effect.

**18. ENTIRE AGREEMENT.**

This Agreement constitutes the entire understanding of the Members with respect to its subject matter.

**19. APPLICABLE LAW.**

For purposes of enforcement or interpretation of the this Agreement, the Members agree that the laws of the State of Ohio shall be applicable, and further agree not to contest personal jurisdiction in any State or Federal Court in Ohio with respect to litigation brought to enforce or interpret this Agreement.

**20. SEPARATE DOCUMENTS.**

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**21. NO THIRD PARTY BENEFICIARIES.**

This Agreement is made solely for the benefit of the parties hereto. Nothing herein expressed or implied is intended to or shall be construed to confer upon or give to any person or entity, other than the parties hereto, any rights or remedies under or by reason of this Agreement.

IN WITNESS WHEREOF, the Members hereto, which may be by and through their appointed counsel, enter into this Agreement by execution of the Valleycrest Landfill Site Participation Agreement Signatory Page. Each person signing the Valleycrest Landfill Site Participation Agreement Signatory Page represents and warrants that he or she has been duly

## VALLEYCREST LANDFILL SITE
## PARTICIPATION AGREEMENT SIGNATORY PAGE

General Motors Corp. hereby enters into and shall participate in the Valleycrest Landfill
(Member)
Site Participation Agreement:

Dated: _January 12, 1995_

Member: _General Motors Corp._

Signature: _Elizabeth A. Zotian_

Name: _Elizabeth A. Zotian_

Title: _Attorney_

Said Member hereby designates the following Representative for receipt of notice and invoices:

Name: _____

Title: _____

Address: _____

Telephone: _____

Facsimile: _____

-12-

---

authorized to enter into this Agreement by the company or entity on whose behalf it is indicated
that the person is signing. Each Member shall signify its consent and intent to enter into this
Agreement by delivery of a completed and signed "Valleycrest Landfill Site Participation
Agreement Signatory Page" to:

Karen Konicki, Esq.
AT&T Global Information Solutions Co.
1700 S. Patterson Blvd.
Dayton, OH 45479

-11-

## VALLEYCREST LANDFILL SITE
## PARTICIPATION AGREEMENT SIGNATORY PAGE

Doyton Walther hereby enters into and shall participate in the Valleycrest Landfill
(Member)
Site Participation Agreement: (as distributed December 22, 1994, with modifications
discussed January 11, 1995)

Dated: __January 12, 1995__

Member: __Doyton Walther__

Signature: __[signature]__

Name: __W.H. White__

Title: __President__

Said Member hereby designates the following Representative for receipt of notice and invoices:

Name: __John A. Maschinski__

Title: __Manager Environmental Engineering__

Address: __11878 Hubbard__
__Livonia, MI 48150__

Telephone: __313-513-4472__

Facsimile: __313-513-4460__

-14-

10/30/97  THU 10:50  [TX/RX NO 8018]

---

## VALLEYCREST LANDFILL SITE
## PARTICIPATION AGREEMENT SIGNATORY PAGE

The Durbron Co. or Dr. hereby enters into and shall participate in the Valleycrest Landfill
(Member)
Site Participation Agreement:

Dated: __January 13, 1995__

Member: __The Durbron Company, Inc.__

Signature: __[signature]__

Name: __Ronald E. Shuff__

Title: __Vice President Secretary and General Counsel__

Said Member hereby designates the following Representative for receipt of notice and invoices:

Name: __Roger J. Reagers Jr.__

Title: __Associate Counsel__

Address: __3100 Research Blvd.__
__Kettering Ohio 45420__

Telephone: __(513) 476-6139__

Facsimile: __(513) 476-6204__

-12-

10/30/97  THU 10:50  [TX/RX NO 8018]

## EXHIBIT C

Waste Management and Danis agree that their collective share of costs pursuant to the terms of this first Amended Site Agreement shall be 46% ("The New Members' Share").

As of November 21, 1997, the VLSG has paid $1,898,150 in past Costs at this site excluding the costs incurred in pursuing Waste Management and Danis as PRP's and certain other agreed upon excluded costs.

Accordingly, Waste Management and Danis agree to pay their 46% share of such past costs or $873,149, which amount will be due and payable on or before 30 days from the date of the execution of this Agreement.

Furthermore, Waste Management and Danis agree to pay The New Members' Share of 46% of all future costs as pursuant to the terms of this Amended Site Agreement.

20

---

## VALLEYCREST LANDFILL SITE
## PARTICIPATION AGREEMENT SIGNATORY PAGE

CARGILL, INCORPORATED hereby enters into and shall participate in the Valleycrest Landfill Site Participation Agreement:
(Member)

Dated:        JANUARY 13, 1995

Member:       CARGILL, INCORPORATED

Signature:    _Leloy M. Osborn_

Name:         LaRaye M. Osborne

Title:        Senior Attorney

Said Member hereby designates the following Representative for receipt of notice and invoices:

Name:         LaRaye M. Osborne

Title:        Senior Attorney

Address:      Cargill, Incorporated
              Law Department/MS 24
              P. O. Box 5624
              Minneapolis, MN 55440-5624
              612/742-6574

Telephone:    612/742-6574

Facsimile:    612/742-6369 or 612/742-7503

Street Address: 15407 West McGinty Road
                Wayzata, MN 55391

-12-

**EXHIBIT B**

**First Amended VLSG Participation Agreement**

---

### FIRST AMENDED
### VALLEYCREST LANDFILL
### SITE PARTICIPATION AGREEMENT

This First Amended Valleycrest Landfill Site Participation Agreement ("Amended Site Agreement) is between and among the parties whose authorized representatives have executed this Amended Site Agreement and the Director's Final Findings and Orders described herein (hereinafter the "Original Members"), and Waste Management Inc. Waste Management Of Ohio, Inc. and SCA Services of Ohio, Inc. (collectively "Waste Management") and Danis Industries Corporation, (hereinafter the "New Members"). The Original Members and the New Members shall be collectively referred to herein as the Valleycrest Landfill Site Group ("VLSG" or "VLSG Members").

**WHEREAS,** many other companies and individuals are Potentially Responsible Parties ("PRPs") pursuant to the Comprehensive Environmental Response Compensation and Liability Act of 1980, and its amendments ("CERCLA") for conditions at the Valleycrest Landfill site in Dayton, Ohio, as defined in the Final Findings and Orders dated January 31, 1995 with the OEPA ("Site"); and

**WHEREAS,** the VLSG recognizes that they desire to avoid litigation with the United States, the State of Ohio, and among themselves, and therefore arrive at an agreement among themselves to fund performance of necessary work at the Site; and

**WHEREAS,** the Original Members jointly agreed to enter into Final Findings and Orders dated January 31, 1995 with the Ohio Environmental Protection Agency to provide for the development of a Remedial Investigation and Feasibility Study for the Site; without admitting any fact, responsibility, fault or liability in connection with the Site; and

**WHEREAS,** the Original Members on or about January 12, 1995 jointly entered into the VLSG Site Participation Agreement to establish a framework for complying with the terms of the Final Findings and Orders, and to cooperate among themselves in this effort and now wish to amend said agreement to add Waste Management and Danis as New Members.

**WHEREAS,** the VLSG Members may determine that it is in their interest to initiate litigation against some or all the PRPs which are not Members of the VLSG with the goal of arriving at an equitable allocation of the necessary costs of response which shall be incurred to comply with the Final Findings and Orders and to conduct any other necessary and agreed upon response activities in conformance with the requirements of the National Contingency Plan ("NCP");

**NOW THEREFORE,** in consideration of the foregoing and the promises and covenants contained herein, the VLSG Members mutually agree as follows:

6

# 1. DEFINITIONS.

1.1   The term "Final Findings and Orders" ("FFO") shall mean the Director's Final Findings and Orders entered into between the Ohio Environmental Protection Agency and the Original Members for the purpose of the development of a Remedial Investigation and Feasibility Study for the Site attached hereto as Exhibit A.

1.2   The term "Valleycrest Site Agreement" shall mean the Agreement entered into on or about January 12, 1995 attached hereto as Exhibit B.

1.3   The term "Costs" shall include all past and future costs incurred to satisfy the obligations pursuant to, and to otherwise comply with, the terms of the FFO, or to implement the purposes of the Valleycrest Site Agreement and this Amended Site Agreement, including without limitation, the implementation of the Remedial Investigation and Feasibility Study ("RI/FS"), payment of project management costs, payment of the Ohio EPA's Past and Future Response Costs and Oversight Costs in accordance with the FFO, and administrative costs including attorneys fees and litigation costs of the VLSG.

1.4   To the extent that terms are defined within the FFO, said terms shall have the same meaning herein.

# 2. VALLEYCREST LANDFILL SITE GROUP

The Original and New Members hereby organize and constitute themselves as the Valleycrest Landfill Site Group (sometimes referred to as the "VLSG"). Each Member whose authorized representative has executed this Amended Site Agreement is a Member of the VLSG. Peerless Transportation Co. shall be a VLSG Member, but shall have no vote (as provided in subsection 4.3).

# 3. PURPOSE.

3.1   General Purpose. It is the purpose of this Amended Site Agreement that the terms hereof shall control the manner and means by which the VLSG will undertake to satisfy their obligations pursuant to, and to otherwise comply with, the terms of the FFO; including without limitation, the implementation of the RI/FS, payment of Ohio EPA's Past and Future Response Costs and Oversight Costs; and further to pursue whatever rights, claims and causes of action that the Original or New Members might have against other companies or individuals responsible or potentially responsible for conditions at the Valleycrest Landfill Site through litigation or otherwise.

3.2   General Agreement of Members. The Original and New Members individually and collectively agree to take all reasonably necessary actions to ensure that the obligations of the Original Members under the FFO and the Valleycrest Site Agreement shall be complied with, including the implementation of the RI/FS, and to fund all costs arising in connection with their undertakings, duties, and obligations pursuant thereto, and to fund litigation as provided herein.

3.3   Financial Obligations and Assurances. Each Original and New Member warrants that it presently has, or has the ability to obtain in a timely manner, sufficient funds to satisfy its obligations under this Amended Site Agreement. Upon any VLSG Member's default of an obligation hereunder, such defaulting VLSG Member shall pay the full balance of its past unpaid obligations and any current unpaid obligations under this Amended Site Agreement. Such payment upon default shall not terminate the VLSG Member's future obligations hereunder.

3.4   Bankruptcy. Each VLSG Member agrees that in the event of its bankruptcy all obligations under this Amended Site Agreement shall be entitled to an administrative expense priority for all purposes under the United States Bankruptcy Code, and each VLSG Member further agrees that it shall not object in any bankruptcy proceeding to treatment of obligations under this Amended Site Agreement as an administrative expense.

3.5   Fair Share. Each VLSG Member agrees that in any action brought to enforce its obligations under this Amended Site Agreement it shall not contest the fairness of the cost allocation or other provisions of this Amended Site Agreement.

3.6   Cooperation. The VLSG Members shall cooperate with each other to effectuate the purposes of this Amended Site Agreement, shall attempt to make decisions by consensus, and shall attempt to resolve any disputes among themselves through good faith negotiation.

3.7   Amended FFOs. The New Members shall execute an Amendment to the Final Findings and Orders in which they agree to be retroactively bound by the terms thereof.

# 4. ORGANIZATION AND PROCEDURES

4.1   Meetings. The VLSG Members may authorize or direct actions under this Amended Site Agreement only at meetings duly held and called for such purpose, which meetings shall be called from time to time as determined necessary by the VLSG Members. Meetings of the VLSG Members may be called for any purpose at any time by any three VLSG Members or any Member or Members holding 40% or more of the voting shares under this Agreement. Meetings may be held by telephone conference.

4.2 **Notice of Meetings.** Written notice of the time, place and purpose of any meeting of the VLSG Members shall be given to each VLSG Member entitled to vote at such meeting. In addition, in the event a meeting is called on less than five (5) days written notice, the VLSG Member calling the meeting shall make a reasonable effort to provide notice in fact to every VLSG Member. "Reasonable Efforts" may include, but are not limited to, fax, phone or e-mail notification of the date, time, location and subject matter of such meeting.

4.3 **Voting.** Except as specifically stated otherwise in paragraph (d) below, each VLSG Member shall have a vote ("Voting Power") as follows:

(a) Each VLSG Member shall have a vote weighted in accordance with the VLSG Member's obligation to fund the activities contemplated under this Amended Site Agreement;

(b) No VLSG Member may vote unless that VLSG Member has paid all financial contributions assessed, due and owing as of the last such meeting. Any VLSG Member having an assessment due and owing that remains unpaid at the time of the meeting may not vote until such time as the VLSG Member makes payment of the full assessment and any penalties; and

(c) Unless otherwise specified herein, all issues shall be decided by a majority of the voting power of the VLSG Members as defined in this Section.

(d) Peerless Transportation Co. shall have no vote.

4.4 **Voting by Proxy.** A VLSG Member eligible to vote at a meeting may assign in writing its vote to another VLSG Member eligible to vote at the meeting.

4.5 **Enumerated Powers of the VLSG Members.** The powers, duties and responsibilities of the VLSG Members shall include, not to the exclusion of other powers, duties, and responsibilities enumerated in this Amended Site Agreement, the following:

(a) The VLSG Members shall negotiate with the OEPA, the U.S. EPA and/or any other governmental entity having jurisdiction regarding this Site and other persons with respect to all matters relating to the Amended Site Agreement and the FFO;

(b) The VLSG Members shall determine when a VLSG Member is in default of its obligations under this Amended Site Agreement;

(c) The VLSG Members shall review and, as appropriate, approve invoices and bills for payment;

(d) The VLSG Members shall enter into contracts to achieve the purposes of this Amended Site Agreement and the FFO;

(e) The VLSG Members shall direct the preparation of invoices to the Members in accordance with the provisions of Section 5 hereto.

(f) The VLSG Members shall direct the litigation in accordance with the provisions of Section 6 hereto.

The VLSG Members may direct that subcommittees of VLSG Members or other persons to carry out or perform any activities which the VLSG Members may perform themselves.

4.6 **Separate Counsel.** Each VLSG Member reserves the right to select and retain its own counsel to represent such VLSG Member on any matter. All costs of such counsel shall be borne by the individual VLSG Member and shall not be Costs paid by the VLSG Members.

4.7 **Providing Members with Information.** Upon request from any VLSG Member, the VLSG Members shall make available to that VLSG Member any reports submitted to or by the VLSG Members in connection with the performance of the VLSG Members' obligations under this Amended Site Agreement or the FFO.

5. **FUNDING OF OBLIGATIONS UNDER THIS AMENDED SITE AGREEMENT**

5.1 **Original Members Allocation for Limited Purpose.** As among the Original Members, the funding of "work" to be performed pursuant to this Amended Site Agreement and the FFO, or "Costs" as defined in Subsection 1.3, shall be accomplished in accordance with the provisions of this Section. The Original Members acknowledge that as among the Original Members, the allocation provided for herein is only for the purposes of funding the Costs incurred pursuant to the FFO, the Valleycrest Site Agreement and this Amended Site Agreement, and the Original Members expressly reserve the right to assert a different allocation among the Original Members for funding of any other work which has been or will be performed in association with the Site or other liability, if

any, beyond the FFO, the Valleycrest Site Agreement and this Amended Site Agreement. The Original Members agree that any amounts paid by any Original Member pursuant to the FFO, the Valleycrest Site Agreement and the Amended Valleycrest Site Agreement shall be considered in any future allocation for funding of any other work or liability in association with the Site, such that, at a minimum, the amounts paid by each Original Member shall be credited against such Original Member's share pursuant to a final allocation of the costs of work performed at the Site or any other liability. The Original Members further agree that the funding shall be modified in accordance with the procedure set forth in Section 5.2(e)(ii) and Section 6 hereto.

**5.2    Allocation for New Members.**

(a)    The New Members agree to be retroactively bound by the FFO, and the Amended Valleycrest Site Agreement. Accordingly, the New Members agree to pay The New Members' Share of past Costs incurred by Original Members pursuant to the FFOs and the Valleycrest Site Agreement within thirty days of the execution of this Agreement. The amount of said past Costs and The New Members' Share thereof is set forth in Exhibit C.

(b)    The New Members further agree to pay The New Members' Share as shown in Exhibit C for any future Costs incurred at the Site pursuant to the FFOs, the Valleycrest Site Agreement and this Amended Site Agreement.

(c)    In the future,

(i)    If one, some or all of the original VLSG Members enter(s) into an agreement to do additional work beyond that required by the FFO, (hereinafter "Additional Work Participating Original VLSG Member") including but not limited to, RD/RA work and any implementation of a remedy at the Site, and/or any additional removal action with (A) the Ohio EPA, (B) the U.S. EPA, (C) any other federal, state, or local government or government agency, (D) any other corporation, partnership, person, association, corporations, or entity, or (E) any combination of said agencies, corporations, partnerships, persons, or entities, or enter into an agreement to jointly defend against, settle, and/or satisfy any claims emanating from this Site and if, excluding the voting interest(s) of any New Member(s) that might be a party to such agreement, the Additional Work Participating Original VLSG

6

Member(s) possess(es) a majority voting interest under such future agreement (i.e., if the Additional Work Participating Original VLSG Member(s) excluding New Members, possess a majority voting interest under such future agreement), then the Additional Work Participating Original VLSG Members and the New Members agree that the New Members shall be liable for the costs of such additional work or of defending against, settling, and/or satisfying such claims in the amount of the New Members currently agreed upon percentage share as set forth in Exhibit C and without any adjustment except as specifically stated herein.

(ii)    If one, some or all of the VLSG Members enter(s) into an agreement to do additional work beyond that required by the FFO, including but not limited to, RD/RA work and any implementation of a remedy at the Site and/or any additional removal action with (A) the Ohio EPA, (B) the U.S. EPA, (C) any other federal, state, or local government or government agency, (D) any other corporation, partnership, person, association, or entity, or entities, or enter into an agreement to jointly defend against, settle, and/or satisfy any claims emanating from this Site or (E) any combination of said agencies, corporations, partnerships, persons, or entities, and if for any reason, excluding the voting interest(s) of any New Member(s) that might be a party to such an agreement, the Additional Work Participating Original VLSG Member(s) do not possess a majority voting interest under such future agreement (i.e., if for any reason the Original Members do not possess a majority voting interest under such future agreement), then the Additional Work Participating Original VLSG Members and the New Members agree that the New Members liability share for such additional work of defending against, settling, and/or satisfying such claims shall be negotiated in good faith and agreed to at the time that such future agreement is executed. Under the provisions of this section, any participating VLSG member agrees that any amounts paid by such VLSG member pursuant to the FFO, the Valleycrest Site Agreement and the Amended Valleycrest Site Agreement shall be considered in any future allocation for funding of any other work or liability in association with the Site under this section, such that, at a minimum, the amounts paid by

7

any such VLSG Member shall be credited against such VLSG Member's share pursuant to a final allocation of the costs of work performed at the Site or any other liability pursuant to this Section.

5.3   **Obligations Of The Members.** The VLSG Members shall be severally liable for their respective percentage of Costs as set forth in Appendix A hereto. The Original Members have established an Escrow Account to receive and hold monies from the VLSG Members in accordance with their obligations. The VLSG Members shall approve assessments which shall represent their payment of Costs accrued pursuant to this Amended Site Agreement, and issue additional invoices to the individual VLSG Members as necessary to assure that the Escrow Account always has sufficient funds in it to finance the work that is scheduled to be performed within the next ninety (90) days.

5.4   **Obligation of Peerless Transportation Co.** Peerless Transportation Co. ("Peerless") has paid twenty-thousand dollars ($20,000.00) into the Escrow Account established under subsection 5.3. It is agreed that this $20,000 payment by Peerless shall accrue solely to the benefit of the Original Members. In addition, Peerless agrees to cooperate with the VLSG Members to provide such information to the VLSG Members as the VLSG Members deem appropriate to assist the Original Members in the identification of additional PRP's and/or to identify information regarding any PRP's' nexus with the Site by, without limitation, providing access to business records and documents, and providing access to present and past employees who might have information relevant to any PRP or any PRP's nexus to the Site.

5.5   **Late Payments.** Each VLSG Member shall have no less than thirty (30) nor more than 60 days to make timely payment of any invoice or other obligation hereunder. The VLSG Members may declare in default any VLSG Member that has failed or refused to make timely payment of any invoice or other obligation hereunder. In addition, in the event a VLSG Member fails or refuses to make timely payment of any obligation hereunder (including any amount due upon default), such VLSG Member shall be liable for interest on the amount due at a rate of 12% per annum, compounded monthly, with said interest being due on the first day after said payment is due, and on each monthly anniversary thereafter.

5.6   **Enforcement of the Amended Site Agreement.** In the event that the VLSG Member(s) deem it appropriate to initiate action, including but not limited to filing a lawsuit, to enforce a VLSG Member's obligations under this Amended Site Agreement, and the position of the enforcing VLSG Member(s) is substantially sustained, the defaulting VLSG Member shall indemnify and hold harmless the enforcing VLSG Member(s) for any and all costs, fees or expenses, including without limitation, attorneys fees and court costs, which the enforcing VLSG Members might incur in pursuing such action.

8

5.7   **Accounting for Funds.** On at least an annual basis, the VLSG Members shall prepare or shall cause to be prepared an accounting of monies received into the Escrow Account, spent and obligated. Upon the termination of this Amended Site Agreement, the VLSG Members shall prepare or shall cause to be prepared a final accounting statement..

5.8   **Purpose of Funds.** All monies provided by the VLSG Members pursuant to this Amended Site Agreement shall be used solely for the purposes of the Valleycrest Site Agreement and this Amended Site Agreement and shall not be considered as payment for any fines, penalties, or monetary sanctions.

6.   **ASSIGNMENT OF CLAIMS AND LITIGATION BY MEMBERS AGAINST OTHER PRPS**

6.1   **Assignment Of Claims Against Other Generators.** Excepted as stated herein, the New Members (individually) hereby assign to the Original Members (individually and collectively) all rights, claims or causes of action arising from the incurrence of response costs, pursuant to the FFO, the Valleycrest Site Agreement and this Amended Site Agreement, including without limitation, claims or causes of action for contribution against any third party who is potentially responsible for response costs at the Site as a generator of hazardous substances disposed of at the Site, pursuant to Section 107(a)(3) of CERCLA, 42 U.S.C. §9607(a)(3) (hereinafter "Generator PRPs"). It is further agreed that whether or not the Original Members are alleged to be liable for response costs at the Site on a basis other than as a Generator PRP, they shall be treated as a Generator PRP for all purposes under this Section 6. In addition, it is specifically agreed that any governmental PRP, whether it is allegedly liable as a Generator PRP and/or as a "Transporter" under Section 107(a)(4) of CERCLA, 42 U.S.C. §9607(a)(4), or any other basis, shall be treated as a Generator PRP for all purposes under this Section 6. In addition, it is specifically agreed that Peerless shall be treated as a transporter and operator PRP for all purposes under this Section 6. Notwithstanding the above, each VLSG Member shall retain whatever rights, claims or causes of action it may have with respect to its own insurance coverage or claims for contractual indemnity, whether by way of insurance contract or other contract. No such retained insurance or contractual indemnity claim shall in any way impair the ability of the VLSG Members from pursuing whatever rights, claims or causes of action the Members may have against entities not parties to this Amended Site Agreement other than the insurers of the VLSG Members. However, nothing contained herein shall preclude any VLSG member from pursuing whatever rights, claims or causes of action the Member may have against its own insurer or co-insurer, irrespective of whether that insurer is also the insurer or co-insurer for a different VLSG Member as well. The assignment hereunder shall not be affected by any VLSG Member's choice to opt out of any litigation under subsection 6.2 of this Amended Site Agreement.

9

6.2    Litigation Against Other Generator PRPs.    Except as specifically stated otherwise, the Original Members may originate, pursue, or settle any litigation or claim they deem appropriate to preserve or defend any and all rights, claims or causes of action that the Original Members may have against any third-party Generator PRP, including without limitation, claims for response costs or contribution. The cost of any such action brought by the Original Members against third-party Generator PRPs shall be shared costs as among the Original Members only.  The New Members shall not share in any costs incurred by the Original Members in pursuing the third-party Generator PRP costs, nor shall they obtain any of the proceeds derived therefrom. Any Original Member may at its sole discretion choose not to participate in any action to pursue any third-party Generator PRP, and, in such instance, shall not be obligated to fund any costs associated with such action or entitled to share in any proceeds derived therefrom.  In the event that any Original Member chooses not to participate in such Generator PRP action, the remaining Original Members may, but need not, arrive at a separate agreement with such an opted-out Original Member regarding such an Original Member's participation in the litigation and the costs and benefits thereof.

6.3    Assignment Of Claims Against Other Owner/Operator/Transporter PRPs.  The Original Members (individually) hereby assign to the New Members (individually and collectively) all rights, claims or causes of action arising from the incurrence of response costs, pursuant to the FFO, the Site Agreement and this Amended Site Agreement, including without limitation claims or causes of action for contribution, as against any third-party who is potentially responsible for response costs at the site as an owner or operator of the Site or as a transporter of hazardous substances to the Site, pursuant to Sections 107(a)(1), (a)(2), and (a)(4) respectively of CERCLA, 42 U.S.C. §§9607(a)(1), (a)(2), and (a)(4) (hereinafter "Owner/Operator/Transporter PRPs"). It is further agreed that whether or not the New Members are allegedly Generator PRPs as well as Owner/Operator/Transporter PRPs, the New Members will be treated as Owner/Operator/Transporter PRPs for all purposes under this Section 6.  Notwithstanding the above, each VLSG Member shall retain whatever rights, claims or causes of action it may have with respect to its own insurance coverage or claims for contractual indemnity, whether by way of insurance contract or other contract. No such retained insurance or contractual indemnity claim shall in any way impair the ability of the VLSG Members, from pursuing whatever rights, claims or causes of action the VLSG Members may have against entities not parties to this Amended Site Agreement other than the insurers of the VLSG Members. However, nothing contained herein shall preclude any VLSG member from pursuing whatever rights, claims or causes of action the Member may have against its own insurer or co-insurer, irrespective of whether that insurer is also the insurer or co-insurer for a different VLSG Member as well. The assignment hereunder shall not be affected by any VLSG Member's choice to opt out of any litigation under subsection 6.4 of this Amended VLSG Site Agreement.  In addition, this provision shall apply only to Danis, Waste Management and its subsidiaries and affiliate companies as of the date of execution of this Amended VLSG Site Agreement and their successors and assigns but shall not apply

10

to any company acquired or obtained in any fashion by Danis or Waste Management after the execution date hereof.

6.4    Litigation Against Other Owner/Operator/Transporter PRPs.  The New Members may originate, pursue, or settle any litigation or claim they deem appropriate to preserve or defend any and all rights, claims or causes of action that the New Members may have against any other third-party Owner/Operator/Transporter PRP, including without limitation, claims for response costs or contribution. The cost of any such action brought by the New Members against such third-party Owner/Operator/Transporter PRPs shall be shared costs as among the New Members only.  The Original Members shall not share in the third-party Owner/Operator/Transporter PRP costs, nor shall they obtain any of the benefits derived therefrom.  Any New Member may at its sole discretion choose not to participate in any such Owner/Operator/Transporter PRP action, and, in such instance, shall not be obligated to fund any costs associated with such action or share in the proceeds derived therefrom.

6.5    Except as otherwise specifically stated in paragraph 6, if a third-party PRP is determined to be a Generator PRP and a Owner, Operator, and/or Transporter PRP at this Site, the parties hereto shall agree on an appropriate allocation of responsibility as to each category under Subsections 6.1 and 6.3

To the extent applicable, the provisions of paragraph 5(2)(x) shall apply to the rights created in paragraphs 6.3, 6.4 and 6.5.

6.6    Assignment Of Claims Against Others.  The Original and New Members (individually) hereby assign to the VLSG Members (collectively) all rights, claims or causes of action arising from this Amended Site Agreement or the FFOs or associated with the incurrence of response costs related to the Site, including without limitation, claims or causes of action for contribution as modified in this Section 6, except that each VLSG Member shall retain whatever rights, claims or causes of action it may have with respect to its own insurance coverage or claims for contractual indemnity, whether by way of insurance contract or other contract.  No such retained insurance or contractual indemnity claim shall in any way impair the ability of the VLSG Members to pursue whatever rights, claims or causes of action the VLSG Members may have against entities not parties to this Amended Site Agreement other than the insurers of the VLSG Members. However, nothing contained herein shall preclude any VLSG member from pursuing whatever rights, claims or causes of action the Member may have against its own insurer or co-insurer, irrespective of whether that insurer is also the insurer or co-insurer for a different VLSG Member as well.  The assignment hereunder shall not be affected by any member's choice to opt-out of any litigation under Subsection 6.7.

11

**6.7     Litigation Against Other Persons.** The VLSG Members may initiate, pursue, or settle any litigation or claim they deem appropriate to preserve, assert or defend any and all rights without limitation, claims for response costs or contribution against entities not parties to this Amended Site Agreement, except as stated otherwise in Section 6 herein, or to enforce the obligations of any VLSG Member under this Amended Site Agreement. The cost of any such action by the VLSG Members shall be Costs as provided in Subsection 1.3 except as otherwise stated herein. Any VLSG Member may, at its sole option and in its sole discretion, choose not to participate in any such action and, in such instance, shall not be obligated to fund any Costs associated with such action or entitled to share in any of the proceeds derived therefrom. In the event that any VLSG Member chooses not to participate in such action, the remaining VLSG Members may, but need not, arrive at a separate agreement with such opt-out VLSG Member regarding such VLSG Member's participation in the litigation and the costs and benefits thereof.

**6.8** It is specifically agreed by each VLSG Member that it will cooperate with the other VLSG Members in regard to providing information including, but not limited to, documents and witnesses in regard to identifying, investigating and pursuing any potentially responsible party at this Site, irrespective of whether or not such VLSG Member will share in the proceeds derived from the pursuit of such PRPs under Paragraph 6.

**6.9     Waiver of Conflict of Interest.** In the event that the VLSG Members collectively determined that it would be in their interest to retain common counsel to initiate and pursue litigation as provided in Section 6 herein, each VLSG Member agrees that: (1) it will not claim or assert that, based solely on said counsel's past or present representation of an Original Member or New Member, said counsel has a conflict of interest in performing legal services authorized by the VLSG Members and consistent with the individual VLSG Member's powers, duties and responsibilities; (2) it will not claim or assert that, based solely on said counsel's representation of the VLSG Members under the terms of the FFO, the Valleycrest Site Agreement, and this Amended Site Agreement, said counsel has a conflict of interest in connection with any representation of any other person or entity in a matter pending as of the date of receiving notice of intent to hire said counsel; (3) it will not claim or assert that, based solely on said counsel's representation of the VLSG Members under the terms of the Valleycrest Site Agreement and this Amended Site Agreement, said counsel has a conflict of interest in any future representation of any person or entity, including representation of the VLSG Members in litigation, against a VLSG Member and this Amended Site Agreement to enforce the provisions of the Valleycrest Site Agreement and this Amended Site Agreement or in a subsequent action to recover costs or pursue claims for contribution; (4) in the event that any conflict develops in the performance of work authorized by the VLSG Members by said counsel and the legal services authorized by any VLSG Member has retained that counsel, the VLSG Member consents to that counsel's continued performance of the work authorized by the VLSG Members.

12

# 7.     CONFIDENTIALITY.

**7.1     Shared Information.** From time to time, the VLSG Members may elect to disclose or transmit to each other, directly or through counsel, such information as each VLSG Member, counsel or technical consultant retained by the VLSG deems appropriate for the sole and limited purpose of coordinating activities that are necessary and proper to carry out the purposes of this Amended Site Agreement. Shared Information may be disclosed to or transferred among the VLSG Members orally or in writing or by any other appropriate means of communication. The VLSG Members intend that no claim of attorney-client privilege, work product privilege or other privilege or immunity be waived by reason of participation or cooperation pursuant to this Amended Site Agreement.

**7.2     Preservation of Privilege.** Information disclosed by the VLSG Members to counsel may be disclosed to any other VLSG Member, and each VLSG Member hereby expressly consents to treat such disclosure to it as being for the sole purpose of effectuating the purposes of this Amended Site Agreement. Such disclosure shall not be deemed a waiver of the attorney-client privilege or work product immunity or any other privilege,

**7.3     Confidentiality of Shared Information.**

(a)     Each VLSG Member agrees that all shared information received from any other VLSG Member or its counsel or technical consultant pursuant to the Valleycrest Site Agreement or this Amended Site Agreement shall be held in strict confidence by the receiving VLSG Member and by all persons to whom confidential information is revealed by the receiving VLSG Member pursuant to the Valleycrest Site Agreement or this Amended Site Agreement, and that such information shall be used only in connection with conducting such activities as are necessary and proper to carry out the purposes of this Amended Site Agreement. In addition, VLSG Members may also disclose shared information to insurers, to the extent requested by insurers and required under the terms of the insurance contract and so long as the insurers agree to maintain the confidentiality of the information in conformance with the provisions of this Amended Site Agreement. In addition, VLSG Members may also disclose shared information to auditors or other accounting personnel to the extent such disclosure is necessary and appropriate for the VLSG Members and the auditor or other accounting personnel to satisfy obligations of the Securities and Exchange Commission.

13

(b)  Shared information that is exchanged in written or in document form and is intended to be kept confidential may, but need not, be marked "Confidential" or with a similar legend. If such information becomes the subject of an administrative or judicial order requiring disclosure by a VLSG Member of such information in a manner that will render the confidentiality of the information unprotected, the VLSG Member may satisfy its confidentiality obligations hereunder by notifying the VLSG Member that generated the information or, if the information was generated by a technical consultant, by giving notice to said consultant and to the other VLSG Members.

(c)  Each VLSG Member shall take all necessary and appropriate measures to ensure that any person who is granted access to any shared information or who participates in work on common projects or who otherwise assists any counsel or technical consultant in connection with this Amended Site Agreement is familiar with the terms of this Amended Site Agreement and complies with such terms as they relate to the duties of such person.

(d)  The VLSG Members intend by this Section to protect from disclosure all confidential information and documents shared among any VLSG Members or between any VLSG Member and counsel or any technical consultant to the greatest extent permitted by law regardless of whether the sharing occurred before execution of this Amended Site Agreement and regardless of whether the writing or document is marked "Confidential."

(e)  The confidentiality obligations of the VLSG Members under this Section shall remain in full force and effect, without regard to whether actions arising out of the Site are terminated by final judgment, and shall survive the termination of this Amended Site Agreement. The provisions of this Section shall not apply to information which is now or hereafter becomes public knowledge without violation of this Amended Site Agreement, or which is sought and obtained from a VLSG Member pursuant to applicable discovery procedures and not otherwise, protected from disclosure.

8.  **DENIAL OF LIABILITY.**

The original Site Agreement, this Amended Site Agreement and the FFOs shall not constitute, be interpreted, construed or used by any VLSG Members or by any other person

---

not a VLSG Member as evidence of any admission of liability, law or fact, a waiver of any right or defense, nor an estoppel against any VLSG Member. However, nothing in this Section is intended or should be construed to limit, bar, or otherwise impede the enforcement of any term or condition of this Amended Site Agreement against any party to this Amended Site Agreement.

9.  **INSURANCE**

The VLSG Members do not intend hereby to make any agreement that will prejudice any VLSG Member with respect to its insurers and, by entering into this Amended Site Agreement, anticipate that the actions taken pursuant to this Amended Site Agreement will benefit such insurers.

10.  **SUCCESSORS AND ASSIGNS.**

This Amended Site Agreement shall be binding upon the successors and assigns of the VLSG Members. No assignment or delegation of the obligation to make any payment or reimbursement hereunder will release the assigning VLSG Member without the prior written consent of the other VLSG Members.

11.  **ADVICE OF COUNSEL**

Each VLSG Member represents that it has sought and obtained the legal advice it deems necessary prior to entering into this Amended Site Agreement.

12.  **NOTICE.**

All notices, bills, invoices, reports, and other communications with a VLSG Member shall be sent to the representative designated by the VLSG Member on said VLSG Member's Valleycrest Landfill Site Participation Amended Site Agreement Signatory Page. Each VLSG Member shall have the right to change its representative upon submission of written notice to the other VLSG Members.

13.  **EFFECTIVE DATE.**

The effective date of this Amended Site Agreement shall be the same as the effective date of the FFO.

## 14.  TERMINATION.

Except as stated otherwise herein, this Amended Site Agreement shall terminate and have no further effect upon completion of all obligations of the VLSG Members pursuant to the FFO or such other time as a Court may establish.

## 15.  AMENDMENTS.

This Amended Site Agreement may be further amended only by a vote of at least two-thirds of the Voting Power of the VLSG Members at a meeting called for the purpose of considering such an amendment.  Such amendment must be in writing.  However, Section 3, and 6 and Subsections 4.3, 5.1, 5.2, 5.3, 5.4, and 22 of this Amended Site Agreement may be further amended only by a unanimous vote of 100% of the Voting Power of the VLSG Members.

## 16.  ADDITIONAL MEMBERS.

The VLSG Members may approve the entry into this Amended Site Agreement of additional entities as VLSG Members after the effective date of the Amended Site Agreement.  The terms and conditions of participation of such additional entities shall be determined by the VLSG Members.

## 17.  SEPARABILITY.

If any provision of this Amended Site Agreement is deemed invalid or unenforceable, the balance of this Amended Site Agreement shall remain in full force and effect.

## 18.  ENTIRE AGREEMENT.

This Amended Site Agreement constitutes the entire agreement and understanding of the VLSG Members with respect to its subject matter and no modification shall be effective unless it is in writing executed by an authorized representative of each VLSG Member.

## 19.  APPLICABLE LAW.

For purposes of enforcement or interpretation of this Amended Site Agreement, the members agree that the laws of the State of Ohio shall be applicable, and further agree not to contest personal jurisdiction in any State or Federal Court in Ohio with respect to litigation brought to enforce or interpret this Amended Site Agreement.

## 20.  SEPARATE DOCUMENTS.

This Amended Site Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

## 21.  NO THIRD PARTY BENEFICIARIES.

This Amended Site Agreement is made solely for the benefit of the parties hereto. Nothing herein expressed or implied is intended to or shall be construed to confer upon or give to any person or entity, other than the parties hereto, any rights or remedies under or by reason of this Amended Site Agreement.

## 22.  COVENANT NOT TO SUE.

In consideration of the mutual undertakings in this Agreement, each VLSG Member covenants not to sue the other VLSG Members or their officers, directors, shareholders, subsidiaries, affiliates, employees or agents with respect to any claims relating to matters covered by this Amended Site Agreement only except for (a) any claims relating to the enforcement of this Amended Site Agreement or (b) any claims among the VLSG Members expressly reserved pursuant to the FFOs and/or this Amended Site Agreement.  The VLSG Members expressly reserve the right, jointly and severally, to take such actions as may be necessary to collect or compel the payment by any other VLSG Member of any amounts due and payable pursuant to this Amended Site Agreement.  Until this Amended Site Agreement is amended to provide otherwise, the VLSG Members expressly reserve, jointly and severally, all claims or causes of action among the VLSG Members that are outside the scope of the covenant not to sue in this Paragraph 22.  In addition, this provision shall apply only to Danis, Waste Management and its subsidiaries and affiliate companiesas of the date of execution of this Amended VLSG Site Agreement and their successors and assigns but shall not apply to any company acquired or obtained in any fashion by Danis or Waste Management after the execution date hereof.  It is specifically understood that Danis and Waste Management are not waiving any claims they now have or may have in the future against Peerless for any matters not covered by the January 12, 1995 VLSG Site Participation Agreement.

IN WITNESS WHEREOF, the VLSG Members hereto, which may be by and through their appointed counsel, enter into this Amended Site Agreement by execution of the Valleycrest Landfill Site Participation Amended Site Agreement Signatory Page.  Each person signing the Valleycrest Landfill Site Participation Amended Site Agreement Signatory Page represents and warrants that he or she has been duly authorized to enter into this Amended Site Agreement by the company or entity on whose behalf it is indicated that the person is signing.  Each VLSG Member shall signify its consent and intent to enter into

17

**Appendix A**

| Participant | % Share |
| --- | --- |
| Danis WMX | 46 |
| Inland | 13.932 |
| Delco | 6.966 |
| Frigedaire | 1.728 |
| Cargill | 6.966 |
| Dayton Walther | 6.966 |
| NCR | 6.966 |
| Standard Register | 6.966 |
| Duriron | 3.483 |

this Amended Site Agreement by delivery of a completed and signed "Valleycrest Landfill
Site Participation Amended Site Agreement Signatory Page" to:

Vincent B. Stamp
Dinsmore & Shohl
1900 Chemed Center
255 East Fifth Street
Cincinnati, Ohio 45202

## VALLEYCREST LANDFILL SITE
### PARTICIPATION AMENDED SITE AGREEMENT SIGNATORY PAGE

Danis Industries Corporation _____ hereby enters into and shall participate in the
(Member)
Valleycrest Landfill Site Participation Amended Site Agreement:

Dated:     May 22, 1998

Member:    Danis Industries Corporation

Signature: _____

Name:      Gregory L. McCann

Title:     Senior Vice President, General Counsel and Secretary

Said Member hereby designates the following Representative for receipt of notice and invoices:

Name:      Gregory L. McCann

Title:     Senior Vice President, General Counsel and Secretary

Address:   P.O. Box 725, Dayton, OH 45401-0725.

Telephone: (937) 220-4904

Facsimile: (937) 228-1194

19

---

## VALLEYCREST LANDFILL SITE
### PARTICIPATION AMENDED SITE AGREEMENT SIGNATORY PAGE

Flowserve Corporation
(Formerly Duriron) _____ hereby enters into and participate in the
(Member)
Valleycrest Landfill Site Participation Amended Site Agreement:

Dated:     May 22, 1998

Member:    Flowserve Corporation (Heretofore (c,Ic.)

Signature: Robert L Roberts Jr.

Name:      ROBERT L. ROBERTS JR.
           Associate General Counsel
           Flowserve Corporation

Title:

Said Member hereby designates the following Representative for receipt of notice and invoices:

Name:      ROBERT L. ROBERTS JR.
           Associate General Counsel
           Flowserve Corporation

Title:

Address:   222 Las Colinas Blvd, Suite 1500
           Irving, TX 75039

Telephone: (972) 443-6537

Facsimile: (972) 443-6637

19

## VALLEYCREST LANDFILL SITE
## PARTICIPATION AMENDED SITE AGREEMENT SIGNATORY PAGE

__Cargill, Incorporated__ hereby enters into and shall participate in the
(Member)
Valleycrest Landfill Site Participation Amended Site Agreement:

Dated:       June 10, 1998

Member:      Cargill, Incorporated

Signature:   _LaRaye M. Osborne_

Name:        LaRaye M. Osborne

Title:       Senior Attorney

Said Member hereby designates the following Representative for receipt of notice and invoices:

Name:        LaRaye M. Osborne

Title:       Senior Attorney

Address:     15407 McGinty Road West, Law/24

             Wayzata, MN 55391

Telephone:   (612) 742-6374

Facsimile:   (612) 742-6349

:CONAPCOCCCCOC03585AM

19

---

## VALLEYCREST LANDFILL SITE
## PARTICIPATION AMENDED SITE AGREEMENT SIGNATORY PAGE

__The Standard Register Company__ hereby enters into and shall participate in the
(Member)
Valleycrest Landfill Site Participation Amended Site Agreement:

Dated:       May 27, 1998

Member:      The Standard Register Company

Signature:   

Name:        Peter S. Redding

Title:       President and Chief Executive Officer

Said Member hereby designates the following Representative for receipt of notice and invoices:

Name:        Kathryn A. Lamme

Title:       Corporate Vice President, Secretary and Deputy General Counsel

Address:     600 Albany Street, Dayton OH 45408

Telephone:   (937) 443-1540

Facsimile:   (937) 443-3431

:CONAPCOCCCCOC03585AM

19

**VALLEYCREST LANDFILL SITE**
**PARTICIPATION AMENDED SITE AGREEMENT SIGNATORY PAGE**

__NCR Corporation__ hereby enters into and shall participate in the
(Member)
Valleycrest Landfill Site Participation Amended Site Agreement:

Dated:         June 5, 1998

Member:        NCR Corporation
(Member)

Signature:     _[signature]_

Name:          Paul H. Samson

Title:         Senior Attorney


Said Member hereby designates the following Representative for receipt of notice and
invoices:

Name:          Paul H. Samson

Title:         Senior Attorney

Address:       101 W. Schantz Avenue, ECO2

               Dayton, OH 45479

Telephone:     937.445.2908

Facsimile:     937.445.1933

19

---

**VALLEYCREST LANDFILL SITE**
**PARTICIPATION AMENDED SITE AGREEMENT SIGNATORY PAGE**

__General Motors Corporation__ hereby enters into and shall participate in the
(Member)
Valleycrest Landfill Site Participation Amended Site Agreement:

Dated:         June 15, 1998

Member:        General Motors Corporation

Signature:     _[signature]_

Name:          Don A. Schiemann

Title:         Attorney


Said Member hereby designates the following Representative for receipt of notice and
invoices:

Name:          Don A. Schiemann

Title:         Attorney

Address:       Legal Staff
               General Motors Building
               MC: 482-112-149
               3044 W. Grand Blvd.
               Detroit, MI 48202

Telephone:     (313) 556-2175

Facsimile:     (313) 974-5467

19

**VALLEYCREST LANDFILL SITE**
**PARTICIPATION AMENDED SITE AGREEMENT SIGNATORY PAGE**

Waste Management (as defendant)
(Member) hereby enters into and shall participate in the
Valleycrest Landfill Site Participation Amended Site Agreement:

Dated:      3/31/98

Member:     Waste Management (as defendant)      judgt/insur

Signature:  Kate Mosby

Name:       Kate Mosby

Title:      Litigation Counsel

Said Member hereby designates the following Representative for receipt of notice and
invoices:

Name:       Waste Management, Inc.

Title:      General Counsel

Address:    3003 Butterfield Rd
            Oak Brook, IL 60523

Telephone:  630-572-8800

Facsimile:  630-572-9130

19

---

**VALLEYCREST LANDFILL SITE**
**PARTICIPATION AMENDED SITE AGREEMENT SIGNATORY PAGE**

Dayton Walther/Kelsey Hayes
(Member) hereby enters into and shall participate in the
Valleycrest Landfill Site Participation Amended Site Agreement:

Dated:      6.12.96

Member:     Dayton Walther a/k/a Kelsey Hayes

Signature:  Susan C. Ingston

Name:       Susan C. Ingston

Title:      Attorney

Said Member hereby designates the following Representative for receipt of notice and
invoices:

Name:       Susan C. Ingston

Title:      Attorney t Counsel

Address:    6327 Cherbourg Dr.
            Indianapolis IN 46220

Telephone:  317. 254. 0294

Facsimile:  317. 254. 0278

19

EXHIBIT A
Governmental Entity Agreement

## VALLEYCREST LANDFILL SITE
## GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT

This Valleycrest Landfill Site Governmental Entity Participation Agreement ("Agreement") is entered between and among: (1) the parties to the Valleycrest Landfill Site Participation Agreement ("Original Members"); (2) West Management Inc., Waste Management of Ohio, Inc., SCA Services of Ohio, Inc., and Danis Industries Corporation ("New Members"); and (3) members thereof, as set forth in Exhibit A ("Governmental Entity Members"). The Original Members, New Members and Governmental Entity Members shall be collectively referred to as the Valleycrest Landfill Site Group ("VLSG") or VLSG Members.

WHEREAS, many additional companies and individuals are Potentially Responsible Parties ("PRPs") pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), for conditions at the Valleycrest Landfill Site in Dayton, Ohio ("Site"), as described in the Ohio Environmental Protection Agency's ("Ohio EPA") January 31, 1995 Final Findings and Orders ("FFO") concerning the Site (attached hereto as Exhibit B);

WHEREAS, the parties desire to avoid litigation with the United States, the State of Ohio, and among themselves, and therefore enter this Agreement to fund performance of certain necessary work at the Site;

WHEREAS, without submitting any fact, responsibility, fault or liability in connection with the Site the Original Members jointly agreed to the FFO for the purpose of conducting a Remedial Investigation and Feasibility Study ("RI/FS") for the Site;

WHEREAS, on or about January 12, 1995 the Original Members jointly entered into the Valleycrest Landfill Site Participation Agreement to establish a framework for complying with the terms of the FFO, and to cooperate among themselves in that effort;

WHEREAS, on or about May 22, 1998 the Original Members and New Members entered into the First Amended Valleycrest Landfill Site Participation Agreement, pursuant to which the New Members were added to the VLSG; and

WHEREAS, the VLSG Members, or certain of them, may determine that it is in their interest to initiate litigation against some or all of the PRPs that are not VLSG Members with the goal of arriving at an equitable allocation of the necessary costs of response which shall be incurred to comply with the FFO and conduct any other necessary and agreed upon response activities in conformance with the requirements of the National Contingency Plan ("NCP");

5

NOW THEREFORE, in consideration of the foregoing and the promises and covenants contained herein, the VLSG Members mutually agree as follows:

1.    DEFINITIONS

1.1    The term "Valleycrest Site Agreement" shall mean the agreement entered into on or about January 12, 1995, a copy of which is attached hereto as Exhibit C.

1.2    The term "First Amended Valleycrest Site Agreement" shall mean the agreement entered into on or about May 22, 1998, a copy of which is attached hereto as Exhibit D.

1.3    The term "Costs" means all expenses incurred on and after January 12, 1995 to satisfy obligations pursuant to the FFO or to otherwise comply with the terms of the FFO, to implement the purposes of this Agreement, including without limitation implementing the RI/FS for the Site, to reimburse the Ohio EPA's past and future response costs and oversight costs in accordance with the FFO, and to reimburse related project management and administrative costs under this agreement, including attorneys fees of a similar nature, but excluding fees or expenses of attorneys or other persons which relate to litigation, efforts to search for and identify additional PRPs or efforts to add Members to the VLSG.

1.4    To the extent that other terms used in this Agreement are defined within the FFO, such terms shall have the same meaning herein.

2.    VALLEYCREST LANDFILL SITE GROUP

The Original Members, New Members and Governmental Entity Members hereby organize and constitute themselves as the VLSG. Each entity whose authorized representative has executed this Agreement is a VLSG Member. Peerless Transportation Company shall be a VLSG Member, but shall have no vote (as provided in Subsection 4.3 hereof).

3.    PURPOSE

3.1    General Purpose. This Agreement shall control: (a) the manner and means by which the VLSG Members will undertake to satisfy their obligations pursuant to the FFO and to otherwise comply with the terms of the FFO, including without limitation the implementation of the RI/FS and payment of Ohio EPA's past and future response costs and oversight costs; and (b) the manner in which the VLSG Members, or certain of them, will pursue through litigation or other means whatever such rights, claims and causes of action that the Original, New or Governmental Entity Members might have against other companies or individuals responsible or potentially responsible for conditions at the Site.

3.2    Financial Obligations and Assurances. Each VLSG Member warrants that it presently has, or has the ability to obtain in a timely manner, sufficient funds to satisfy its obligations under this Agreement, the Valleycrest Site Agreement or the First Amended Valleycrest Site Agreement (collectively "the Three Agreements"). Upon any VLSG Member's default of an obligation hereunder, such defaulting VLSG Member shall pay the full balance of its past unpaid obligations and any current unpaid obligations under this Agreement. Such payment upon default shall not terminate the VLSG Member's future obligations hereunder.

3.3    Bankruptcy. Each VLSG Member agrees that in the event of its bankruptcy all obligations under this Agreement shall be entitled to an administrative expense priority for all purposes under the United States Bankruptcy Code, and each VLSG Member further agrees that it shall not object in any bankruptcy proceeding to treatment of obligations under this Agreement as an administrative expense.

3.4    Fair Share. Each VLSG Member agrees that in any action brought to enforce its obligations under any of the Three Agreements it shall not contest the fairness of the underlying cost allocation or other provisions thereof.

3.5    Cooperation. The VLSG Members shall cooperate with each other to effectuate the purposes of this Agreement, shall attempt to make decisions by consensus, and shall attempt to resolve any disputes among themselves through good faith negotiation.

3.6    Amended FFO. The Governmental Entity Members agree to execute an amendment to the FFO, the effect of which will be to bind them to the terms of the FFO.

4.    ORGANIZATION AND PROCEDURE

4.1    Meetings. The VLSG Members may authorize or direct actions under this Agreement only at meetings duly held and called for such purpose, which meetings shall be called from time to time as determined necessary by the VLSG Members. Any three VLSG Members or any Member or Members holding 40% or more of the voting shares under this Agreement may call such a meeting, which may be held by telephone conference. The Governmental Entity Members shall constitute a single VLSG Member for purposes of this Agreement.

4.2    Notice of Meetings. Written notice of the time, place and purpose of any meeting of the VLSG shall be given to each VLSG Member entitled to vote at such meeting. In addition, in the event a meeting is called no less than five (5) days written notice, the VLSG Member(s) calling the meeting shall make a reasonable effort to provide notice in fact to every VLSG Member. A "reasonable effort" may include, but is not limited to, facsimile, telephone or electronic-mail notification of the date, time, location and subject matter of such meeting.

**4.6** **Separate Counsel.** Each VLSG Member reserves the right to select and retain its own counsel to represent such VLSG Member in any matter. All fees and expenses of such counsel shall be borne by the individual VLSG Member and shall not be Costs paid by the VLSG Members.

**4.7** **Providing Members with Information.** Upon the request of any VLSG Member, the VLSG shall make available to that Member any reports submitted to or by the VLSG Members in connection with the performance of the VLSG's obligations under any of the Three Agreements or the FFO.

## 5. FUNDING OBLIGATIONS

**5.1** **Governmental Entity Members.** The Governmental Entity Members' liability for payment of the Costs is as follows:

(a) The Governmental Entity Members shall pay seven (7) percent of the Costs as defined in Subsection 1.3 of this Agreement, up to and not exceeding seven (7) percent of Costs in the amount of $4,000,000, such that the collective maximum liability of the Governmental Entity Members for the Costs shall not exceed $280,000. The Original Members and New Members expressly waive any right to seek Costs from the Governmental Entity Members in excess of $280,000 and will not contend in any legal proceeding that the liability of the Governmental Entity Members exceeds $280,000.

(b) The provisions of Subsection 5.1(a) are subject to the following additional terms and conditions:

(i) The allocation provided in Subsection 5.1(a) is only for the purpose of funding the Costs and does not address allocation of liability, if any, for other costs of response concerning the Site ("Future Costs"), including, but not limited to, costs of response incurred in complying with any U.S. EPA administrative order on consent or under 42 U.S.C. § 9606 regarding the Site (as used herein, the terms "response costs" and "costs of response" have the same meaning as in 42 U.S.C. §§ 9601(25) and 9607).

(ii) If after the date of this Agreement the percentage share of the Costs of one or more Original or New Members is reduced due to a reallocation of liability for the Costs, the Governmental Entity Members shall receive a credit or refund against amounts due or paid hereunder. By way of example only, if, after the date of this Agreement, liability for a share of the Costs is agreed to or imposed upon a PRP who as of such date was not a party to any of the Three Agreements, and as a result thereof the respective percentage share of the Costs of one or more Original or New Members is reduced, the

5

---

**4.3** **Voting.** Except as specifically stated otherwise in paragraph (d) of this Subsection 4.3, at VLSG meetings each VLSG Member shall have a vote as follows:

(a) Each VLSG Member shall have a vote weighted in accordance with the VLSG Member's percentage-based obligation to pay the Costs as defined in Subsection 1.3 hereof;

(b) A Member may not vote if it has a past due assessment hereunder or has failed to pay the interest due as a result of such a past due assessment.

(c) All matters brought before the VLSG for decision shall be decided by a majority vote of the VLSG Members, weighted in the manner specified in paragraph (a) of this Subsection 4.3.

(d) Peerless Transportation Company shall have no vote.

**4.4** **Voting by Proxy.** A VLSG Member eligible to vote at a meeting may by written instrument assign its right to vote to another VLSG Member eligible to vote at the meeting.

**4.5** **Enumerated Powers of the VLSG Members.** In addition to other powers, duties and responsibilities enumerated in this Agreement, the VLSG Members shall have authority to:

(a) Negotiate with the Ohio EPA, the U.S. Environmental Protection Agency ("U.S. EPA"), any other governmental entity having jurisdiction regarding the Site and other persons with respect to all matters relating to this Agreement and the FFO;

(b) Determine when a VLSG Member is in default of its obligations under any of the Three Agreements;

(c) Review and, as appropriate, approve payment of invoices and bills for services to the VLSG;

(d) Enter into contracts to achieve the purposes of this Agreement and the FFO;

(e) Prepare invoices to the VLSG Members in accordance with the provisions of Section 5 hereof; and

(f) Initiate and direct litigation in accordance with the provisions of Section 6 hereof.

The VLSG may establish subcommittees of VLSG Members to carry out or perform activities arising under this Agreement.

4

Governmental Entity Members' seven (7) percent share of the Costs (up to but not exceeding $280,000) shall not be diminished.

(iii)     The parties expressly reserve the right to assert any positions they deem appropriate regarding allocation of liability for Future Costs to any party or other entity. By way of example, but not limitation, nothing in this Agreement shall prejudice any position the Governmental Entity Members may assert regarding: (A) application of U.S. EPA's Announcement and CERCLA Settlements at NPL Co-Disposal Sites, 63 Fed. Reg. 8197 (Feb. 18, 1998) ("Municipal Settlement Policy") to determine the extent of their liability, if any, for Future Costs; or (B) the manner in which the Governmental Entity Members' payment of the Costs pursuant to the percentage-based allocation method otherwise provided herein should be credited if a unit cost-based allocation method, such as the method underlying the Municipal Settlement Policy, were applied to determine the Governmental Entity Members' liability, if any, for Future Costs; provided that the Governmental Entity Members' expressly waive application of the Municipal Settlement Policy to determine their share of the Costs, which is instead determined as specified in Subsection 5.1(e). By way of further example, but not limitation, nothing in this Agreement shall prejudice any position the Original Members or New Members may assert regarding the inapplicability of the Municipal Settlement Policy in determining the Governmental Entity Members' liability for costs of response or the manner in which the Governmental Entity Members' payments pursuant to the percentage-based allocation method provided herein would be credited in the event that the Governmental Entity Members' liability for Future Costs is determined using a unit cost-based allocation method.

(iv)     The Original Members and New Members agree to use their best efforts to include in all future settlements with other PRPs a covenant not to sue the Governmental Entity Members for contribution due to the payment of Costs by such other PRPs.

(c)     Within thirty (30) days of execution of this Agreement, the Governmental Entity Members agree to pay $132,536.00, which is the Governmental Entity Members' share of the Costs incurred from January 12, 1995 through November 21, 1997.

(d)     With respect to Costs incurred after November 21, 1997 and prior to the effective date of this Agreement, the Governmental Entity Members shall pay their respective share within forty-five (45) days of receipt of a statement regarding such Costs.

6

(e)     With respect to Costs incurred on and after the effective date of this Agreement, the Governmental Entity Members agree to pay their share thereof according to the scheduling provisions of this Agreement.

(f)     The Governmental Entity Members agree that all amounts paid by any Original or New Member pursuant to the FFO, the Valleycrest Site Agreement or the First Amended Valleycrest Site Agreement shall be considered in any future allocation concerning costs of response at the Site, insofar as such allocation includes the Costs, such that the amounts paid by each Original and New Member pursuant to the FFO, the Valleycrest Site Agreement or the First Amended Valleycrest Site Agreement shall be credited against such Original or New Member's share pursuant to a final allocation of such costs of response.

5.2     Original Members and New Members. The Original Members and New Members shall be severally liable for their respective percentage shares of the Costs as set forth in Exhibit E.

5.3     Peerless Transportation Company ("Peerless"). Peerless has paid twenty-thousand dollars ($20,000) into the Escrow Account referred to in Subsection 5.4. It is agreed that this $20,000 payment by Peerless shall accrue solely to the benefit of the Original Members. In addition, Peerless agrees to cooperate by providing to the VLSG Members such information as they deem appropriate to assist the VLSG in the identification of additional PRPs and/or to identify information regarding any PRP's usage of, involvement with or other relationship to the Site. Such cooperation shall include, by way of example and without limitation, access to business records and documents and past and present employees.

5.4     Assessments. The Original Members have established an Escrow Account to receive and hold monies provided by the VLSG Members. The VLSG Members shall approve assessments which shall represent their respective obligations for payment of Costs pursuant to this Agreement and/or other agreements that apply variously to them and which taken together comprise the Three Agreements, and issue additional invoices to the individual VLSG Members as necessary to assure that the Escrow Account always has sufficient funds to finance the work that is scheduled to be performed during the next ninety (90) days under the FFO and the Three Agreements.

5.5     Late Payments. Except where otherwise specified, each VLSG Member has sixty (60) days to make timely payment of any invoice or other obligation hereunder. The VLSG Members may declare in default any VLSG Member that has failed or refused to make timely payment of any such invoice or other obligation. In addition, in the event a VLSG Member fails or refuses to make timely payment of any obligation hereunder (including any amount due upon default), such VLSG Member shall be liable for interest on the amount due at a rate of 12 ¾ per annum, compounded monthly, with such interest being due on the first day after the payment is due, and on each monthly anniversary thereafter.

7

5.6 **Enforcement.** In the event that the VLSG deems it appropriate to initiate measures to enforce a VLSG Member's obligations under any of the Three Agreements, including but not limited to litigation, and the position of the VLSG is substantially sustained as a result of such enforcement measures, the defaulting VLSG Member shall indemnify the VLSG and hold it harmless for any and all costs, fees or expenses, including without limitation attorneys fees and court costs, which the VLSG Members might incur.

5.7 **Accounting for Funds.** On at least an annual basis, the VLSG shall prepare or cause to be prepared an accounting of monies the VLSG received, disbursed and obligated. Upon termination of this Agreement, the VLSG Members shall prepare or shall cause to be prepared a final accounting statement.

5.8 **Purpose of Funds.** All monies provided by the VLSG Members pursuant to the Three Agreements shall be used solely for the purposes thereof, and shall not be considered as payment of any fines, penalties or monetary sanctions.

6. **ASSIGNMENT OF CLAIMS AND LITIGATION BY MEMBERS AGAINST OTHER PRPS**

6.1 **Assignment Of Claims Against Other PRPs.** Except as stated herein, the Governmental Entity Members (individually) hereby assign to the other VLSG Members (individually and collectively) all rights, claims or causes of action arising from the incurrence of Costs pursuant to the Three Agreements and the FFO, including without limitation claims or causes of action for contribution against any third party who is potentially responsible for Costs at the Site, and that assignment, together with similar assignments under any of the Three Agreements, shall be deemed to have been made for the benefit of all VLSG Members so that all VLSG Members (individually and collectively) are the assignees of all such third-party claims of all VLSG Members. Notwithstanding the immediately preceding sentence, the Governmental Entity Members shall retain all rights, claims or causes of action they may have with respect to insurance coverage or contractual indemnity, as against any party other than a VLSG Member, whether by way of insurance contract or other contract, or for costs of response other than the Costs. The assignment hereunder shall not be affected by any VLSG Member's choice to opt out of any litigation under Subsection 6.2 of this Agreement.

6.2 **Litigation Against Other PRPs.** Except as specifically stated otherwise, the Original Members and New Members may, as they deem appropriate, originate, pursue, defend or settle any litigation or claim that they may have against any third-party PRP, including claims for Costs assigned under Subsection 6.1 above. The Governmental Entity Members shall not share in any expense incurred in connection with such litigation or claims, nor shall they obtain any of the proceeds derived therefrom.

8

6.3 **VLSG Member Cooperation.** Each VLSG Member agrees to cooperate with the other VLSG Members for the purpose of identifying, investigating and pursuing any PRP at the Site, including providing access to pertinent documents and witnesses, irrespective of whether such VLSG Member will share in the proceeds derived from the pursuit of such PRPs under Subsection 6.2.

6.4 **Waiver of Conflict of Interest.** In the event that the VLSG Members collectively determine that it would be in their interest to retain common counsel for matters arising under this Agreement, each VLSG Member agrees that it will not claim or assert, based solely on said counsel's past, present or future representation of the VLSG or any Original, New or Governmental Entity Member, that said counsel has a conflict of interest: (1) in performing legal services authorized by the VLSG; (2) in representation of any other person or entity in a matter pending as of the date of receiving notice of intent to hire said counsel; (3) in representation of the VLSG in litigation against a VLSG Member to enforce the provisions of any of the Three Agreements; or (4) in litigation to recover costs of response or pursue claims for contribution regarding the Site. In the event that any conflict develops in the performance of such common counsel's legal services for the VLSG and the legal services for which an individual VLSG Member has retained the same counsel, such VLSG Member consents to common counsel's continued performance of the work authorized by the VLSG.

7. **CONFIDENTIALITY**

7.1 **Preservation of Privilege.** The VLSG Members may jointly coordinate activities that are necessary and proper to carry out the purposes of this Agreement, including without limitation prosecution or defense of claims related to the Site (herein "Joint Efforts"). In connection with the Joint Efforts, the VLSG Members may conduct a mutual exchange of certain information, pool certain individual attorney work product as each VLSG Member may elect, and coordinate research, investigation and discovery. Each VLSG Member affirms that conversations, documents, interview memoranda, results of research or investigations, and compilations of data or documents, created or undertaken by the VLSG Members or their respective counsel in connection with the Joint Efforts are subject to the attorney/client, work product, joint defense, and other privileges. Each VLSG Member agrees that it will assert all such privileges in opposition to any discovery request propounded by any person or entity not a party to this Agreement, who seeks information that such VLSG Member has received or developed in the Joint Efforts.

7.2 **Confidentiality of Shared Information.** The following provisions apply to all shared information regardless of whether particular shared information is privileged from disclosure by the attorney/client, work product, joint defense or other privileges:

   (a) Each VLSG Member agrees that all shared information received from any other VLSG Member or its counsel or technical consultant pursuant to any of the Three Agreements shall be held in strict confidence by the receiving VLSG Member and all persons to whom the receiving VLSG Member

9

8.    **DENIAL OF LIABILITY**

Nothing in the Three Agreements or the FFO shall constitute or be interpreted, construed or used by any VLSG Member or by any other person as evidence of an admission of liability, law or fact, waiver of any right or defense, or as an estoppel against any VLSG Member, provided that nothing in this Section is intended or should be construed to limit, bar or otherwise impede enforcement of any term or condition of any of the Three Agreements.

9.    **INSURANCE**

Nothing herein is intended to prejudice any VLSG Member with respect to its insurers and the VLSG Members anticipate that the actions taken pursuant to the Three Agreements will benefit such insurers.

10.    **SUCCESSORS AND ASSIGNS**

This Agreement shall be binding upon the successors and assigns of the VLSG Members. No assignment or delegation of the obligation to make any payment or reimbursement hereunder will release the assigning VLSG Member without the prior written consent of the other VLSG Members.

11.    **ADVICE OF COUNSEL**

Each VLSG Member represents that it has sought and obtained the legal advice it deems necessary prior to entering this Agreement.

12.    **NOTICE**

All notices, bills, invoices, reports and other communications with a VLSG Member shall be sent to the representative designated by the VLSG Member on said Member's signatory page. Each VLSG Member shall have the right to change its representative upon submission of written notice to the other VLSG Members.

13.    **EFFECTIVE DATE**

This Agreement shall be effective as of December 21, 1998.

11

reveals such confidential information, and that such information shall be used only in connection with activities necessary and proper to carry out the purposes of this Agreement. In addition, VLSG Members may disclose shared information to insurers to the extent requested by insurers and required under the terms of the applicable insurance contracts, provided that such insurers agree to maintain the confidentiality of the information in conformance with the provisions of this Agreement. In addition, VLSG Members may also disclose shared information to auditors or other accounting personnel as necessary to satisfy obligations arising under federal, state or local law.

(b)    Shared information that is exchanged in written or document form and intended to be kept confidential may but need not be marked "Confidential" or with a similar legend. If such information becomes the subject of an administrative or judicial order requiring disclosure by a VLSG Member in a manner that will render the confidentiality of the information unprotected, the VLSG Member may satisfy its confidentiality obligations hereunder by providing timely notice of such order to the VLSG Member that generated the information or, if the information was generated by a technical consultant for the VLSG, by providing timely notice of the order to said consultant and the VLSG Members.

(c)    Each VLSG Member shall take all necessary and appropriate measures to ensure that any person who is granted access to any shared information, participates in work on common projects or otherwise assists any counsel or technical consultants in connection with matters arising under this Agreement, is familiar with the terms hereof and complies with such terms as they relate to the duties of such person.

(d)    The VLSG Members intend by this Section to protect from disclosure all confidential information and documents shared among any VLSG Members, or between any VLSG Member and counsel or technical consultants, to the maximum extent permitted by law regardless of whether particular shared information was marked "Confidential" or was exchanged before execution of this Agreement.

(e)    The confidentiality obligations of the VLSG Members under this Section shall remain in full force and effect and survive termination of this Agreement. The provisions of this Section shall not apply to information which is now or hereafter becomes public knowledge without violation of this Agreement, or which is sought and obtained from a VLSG Member pursuant to applicable discovery procedures and not otherwise protected from disclosure.

10

14.   **TERMINATION**

Except as stated otherwise herein, this Agreement shall terminate and have no further effect upon completion of all obligations of the VLSG Members pursuant to the FFO.

15.   **AMENDMENTS**

This Agreement may be amended only by a written instrument approved by an affirmative vote of at least two-thirds of the VLSG Members at a meeting called for the purpose of considering such an amendment; provided that no such amendment approved by less than a unanimous vote of all VLSG Members can result in the imposition of any obligation not otherwise provided for in this Agreement or the elimination of any right arising from or preserved by this Agreement; and further provided that Sections 3, 5, 6, 15 and 22 and Subsections 1.3 and 4.3 of this Agreement may be amended only by a written instrument executed by the authorized representative of each VLSG Member.

16.   **ADDITIONAL MEMBERS**

The VLSG Members may approve the entry into this Agreement of additional entities as VLSG Members after the effective date hereof. The terms and conditions of participation by such additional entities shall be determined by the VLSG Members.

17.   **SEVERABILITY**

If any provision of this Agreement is deemed invalid or unenforceable, the balance hereof shall remain in full force and effect.

18.   **ENTIRE AGREEMENT**

This Agreement constitutes the entire agreement and understanding of the VLSG Members with respect to its subject matter and no modification shall be effective unless made in conformance with Section 15.

19.   **APPLICABLE LAW**

For purposes of enforcement or interpretation of this Agreement, the VLSG Members agree that the laws of the State of Ohio shall be applicable, and further agree not to contest personal jurisdiction in any state or federal court in Ohio with respect to litigation brought to enforce or interpret this Agreement.

12

20.   **EXECUTED IN COUNTERPARTS**

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

21.   **NO THIRD PARTY BENEFICIARIES**

This Agreement is made solely for the benefit of the parties hereto. Nothing herein expressed or implied is intended to or shall be construed to confer upon or give any rights or remedies to any person or entity other than the parties hereto.

22.   **COVENANT NOT TO SUE**

In consideration of the mutual undertakings in this Agreement, and subject to the exceptions set forth below, each VLSG Member covenants not to sue the other VLSG Members or their officers, directors, shareholders, subsidiaries, affiliates, employees or agents with respect to any claims relating to matters covered by this Agreement. The foregoing covenant does not apply to: (a) any claims relating to the enforcement of this Agreement, and the VLSG Members expressly reserve the right, jointly and severally, to take such actions as may be necessary to collect or compel the payment by another VLSG Member of any amounts due and payable pursuant to any of the Three Agreements; (b) any claims among the VLSG Members that are otherwise expressly reserved pursuant to this Agreement; (c) any claims or causes of action among the VLSG Members that are outside the scope of the foregoing covenant; and (d) any company acquired in any fashion by either (i) Danis Industries Corporation ("Danis") or (ii) Waste Management, Inc., Waste Management of Ohio, Inc., or SCA Services of Ohio, Inc. (collectively "Waste Management") after the date of execution of the First Amended Site Agreement. It is specifically understood that Danis and Waste Management are not waiving any claims they now have or may have in the future against Peerless for any matters not covered by the January 12, 1995 Valleycrest Site Participation Agreement.

IN WITNESS WHEREOF, the parties enter into this Agreement by executing the "Valleycrest Landfill Site Governmental Entity Participation Agreement Signatory Page", including execution thereof by and through their appointed counsel. Each person executing this Agreement represents and warrants that he or she has been authorized to do so by the company or entity on whose behalf it is indicated that the person is signing. Each VLSG Member shall signify its consent and intent to enter into this Agreement by delivering a completed and signed "Valleycrest Landfill Site Governmental Entity Participation Agreement Signatory Page" to:

Vincent B. Stamp
Dinsmore & Shohl
1900 Chemed Center
255 East Fifth Street
Cincinnati, Ohio 45202

13

## Exhibit E

### ORIGINAL AND NEW MEMBERS' PERCENTAGE SHARES

The Original and New Members' respective percentage liability shares with respect to the Costs are as follows:

| | |
|---|---|
| Waste Management Inc., Waste Management of Ohio, Inc., SCA Services of Ohio, Inc., and Danis Industries Corporation | 46% |
| General Motors Corporation | 19.70977% |
| Cargill, Incorporated | 6.0645% |
| Dayton Walther Corp. | 6.0645% |
| NCR Corporation | 6.0645% |
| Standard Register Company | 6.0645% |
| Dariron Company, Inc. | 3.03225% |

1003-037-702-endline

## Exhibit A

### MONTGOMERY COUNTY SOLID WASTE MANAGEMENT DISTRICT

The following local government entities comprise the Montgomery County Solid Waste Management District:

Montgomery County, Ohio

City of Centerville
City of Dayton
City of Englewood
City of Huber Heights
City of Kettering
City of Miamisburg
City of Moraine
City of Oakwood
City of Riverside[1]
City of Trotwood[2]
City of Union
City of Vandalia
City of West Carrollton
Village of Brookville
Village of Clayton[3]
Village of Farmersville
Village of Germantown
Village of New Lebanon
Village of Phillipsburg[4]
Butler Township
Clay Township
German Township
Harrison Township
Jackson Township
Jefferson Township
Miami Township
Perry Township
Washington Township

---

1/ Effective January 1, 1994, the Village of Riverside and Mad River Township merged and became the City of Riverside.

2/ Effective January 1, 1996, Madison Township merged into the City of Trotwood.

3/ Effective January 1, 1998 Randolph Township merged into the Village of Clayton.

4/ Effective January 1, 1996, the Village of Phillipsburg became a member of the Montgomery County Solid Waste Management District.

**VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY
PARTICIPATION AGREEMENT SIGNATORY PAGE**

Danis Industries Corporation _____ hereby enters into and shall participate in the Valleycrest
(Member)

Landfill Site Governmental Entity Participation Agreement:

Dated:        January 5, 1999 _____

Member:        Danis Industries Corporation _____

Signature:    _Vincent B. Stamp for authority Greg McCann_

Name:        Vincent B. Stamp _____

Title:        Attorney _____

Said Member hereby designates the following Representative for receipt of notice and invoices:

Name:        Gregory McCann _____

Title:        Attorney _____

Address:    Danis Environmental Management Co. _____

            2 Riverplace, Suite 411 _____

            Dayton, OH  45405 _____

Telephone:    (937) 220-4904 _____

Facsimile:    (937) 228-1194 _____

---

**VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY
PARTICIPATION AGREEMENT SIGNATORY PAGE**

General Motors Corporation _____ hereby enters into and shall participate in the Valleycrest
(Member)

Landfill Site Governmental Entity Participation Agreement:

Dated:        January 5, 1999 _____

Member:        General Motors Corporation _____

Signature:    _Vincent B. Stamp for authority of Don Schumann_

Name:        Vincent B. Stamp _____

Title:        Attorney _____

Said Member hereby designates the following Representative for receipt of notice and invoices:

Name:        Don A. Schumann _____

Title:        Attorney _____

Address:    General Motors Legal Staff _____

            M.C. 482 112 149 _____

            3044 West Grand Blvd. _____

            Detroit, Michigan 48202 _____

Telephone:    (313) 556-2175 _____

Facsimile:    (313) 974-5467 _____

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY
### PARTICIPATION AGREEMENT SIGNATORY PAGE

Dayton Walther Corp._____ hereby enters into and shall participate in the Valleycrest
(Member)

Landfill Site Governmental Entity Participation Agreement:

Dated:        January 5, 1999

Member:       Dayton Walther Corp.

Signature:    _____

Name:         Vincent B. Stamp

Title:        Attorney

Said Member hereby designates the following Representative for receipt of notice and invoices:

Name:         Susan Nystrom

Address:      6339 Cherbourg Drive

              Indianapolis, Indiana 46220

Telephone:    (317) 254-0297

Facsimile:    (317) 254-0298

---

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY
### PARTICIPATION AGREEMENT SIGNATORY PAGE

Cargill Incorporated_____ hereby enters into and shall participate in the Valleycrest
(Member)

Landfill Site Governmental Entity Participation Agreement:

Dated:        January 5, 1999

Member:       Cargill Incorporated

Signature:    _____

Name:         Vincent B. Stamp

Title:        Attorney

Said Member hereby designates the following Representative for receipt of notice and invoices:

Name:         LaRayne Osborne

Title:        Attorney

Address:      Cargill, Inc.

              15407 McGinity Road, West

              Wahzata MN 55391-2399

Telephone:    (612) 742-6374

Facsimile:    (612) 742-6349

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY
### PARTICIPATION AGREEMENT SIGNATORY PAGE

Standard Register Company _____ hereby enters into and shall participate in the Valleycrest
(Member)

Landfill Site Governmental Entity Participation Agreement:

Dated: January 5, 1999
Member: Standard Register Company
Signature: [signature]
Name: Vincent B. Stamp
Title: Attorney

Said Member hereby designates the following Representative for receipt of notice and invoices:

Name: Kathryn Lamme
Title: Attorney
Address: The Standard Register Company
600 Albany Street
P.O. Box 1167
Dayton, Ohio 45401-1167
Telephone: (937) 443-1540
Facsimile: (937) 443-3431

---

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY
### PARTICIPATION AGREEMENT SIGNATORY PAGE

NCR Corporation _____ hereby enters into and shall participate in the Valleycrest
(Member)

Landfill Site Governmental Entity Participation Agreement:

Dated: January 5, 1999
Member: NCR Corporation
Signature: [signature]
Name: Vincent B. Stamp
Title: Attorney

Said Member hereby designates the following Representative for receipt of notice and invoices:

Name: Paul Samson
Title: Attorney
Address: NCR Corporation
101 W. Schantz Avenue, ECD-2
Dayton, Ohio 45479
Telephone: (937) 445-2908
Facsimile: (937) 445-1933

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT SIGNATORY PAGE

The Montgomery County Solid Waste Management District and the Board of County Commissioners of Montgomery County, Ohio hereby enter into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated: December 22nd 1998

Members: The Montgomery County Solid Waste Management District and the Board of County Commissioners of Montgomery County, Ohio

Signatures: _[signed]_ / _[signed]_ / _[signed]_

| Name: | Charles J. Curran | Don Lucas | Vicki D. Pegg |
|---|---|---|---|
| Title: | County Commissioner and District Trustee | County Commissioner and District Trustee | County Commissioner and District Trustee |

Said Members hereby designate the following Representatives for receipt of notice and invoices:

| Name: | Victor T. Whisman | Scott M. DuBoff |
|---|---|---|
| Title: | Assistant Prosecuting Attorney, Montgomery County, Ohio | Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney |
| Address: | Dayton-Montgomery County Courts Bldg. 301 West Third Street Dayton, Ohio 45402 | Wright & Talisman, P.C. 1200 G St., NW Suite 600 Washington, D.C. 20005 |
| Telephone: | (937) 225-5760 | (202) 393-1200 |
| Facsimile: | (937) 225-3470 | (202) 393-1240 |

Montgomery\1003-037-702\Whisman.doc

---

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT SIGNATORY PAGE

Duriron Company, Inc. (Member) hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated: January 5, 1999

Member: Duriron Company, Inc.

Signature: _[signed]_

Name: Vincent B. Stamp

Title: Attorney

Said Member hereby designates the following Representative for receipt of notice and invoices:

Name: Robert L. Roberts

Title: Attorney

Address: Flowserve Corporation
222 Las Colinas Boulevard Suite 1500
Irving, Texas 75039-5421

Telephone: (972) 443-6537

Facsimile: (972) 443-6837

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT SIGNATORY PAGE

The City of Centerville, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated:          December 22, 1998

Member:      City of Centerville, Ohio

Signatures:  _____

Name:        Victor T. Whisman

Title:          Assistant Prosecuting Attorney, Montgomery County, Ohio

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name:        Victor T. Whisman

Title:          Assistant Prosecuting Attorney, Montgomery County, Ohio

Address:     Dayton-Montgomery County Courts Bldg.
                301 West Third Street
                Dayton, Ohio  45402

Telephone:  (937) 225-5760

Facsimile:   (937) 225-3470

Name:        Scott M. DuBoff

Title:          Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Signature:   _____

Name:        Scott M. DuBoff

Title:          Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Address:     Wright & Talisman, P.C.
                1200 G St., NW  Suite 600
                Washington, D.C.  20005

Telephone:  (202) 393-1200

Facsimile:   (202) 393-1240

Montgovnt1003-037-702

---

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT SIGNATORY PAGE

The City of Dayton, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated:          December 22, 1998

Member:      City of Dayton, Ohio

Signatures:  _____

Name:        Victor T. Whisman

Title:          Assistant Prosecuting Attorney, Montgomery County, Ohio

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name:        Victor T. Whisman

Title:          Assistant Prosecuting Attorney, Montgomery County, Ohio

Address:     Dayton-Montgomery County Courts Bldg.
                301 West Third Street
                Dayton, Ohio  45402

Telephone:  (937) 225-5760

Facsimile:   (937) 225-3470

Name:        Scott M. DuBoff

Title:          Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Signature:   _____

Name:        Scott M. DuBoff

Title:          Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Address:     Wright & Talisman, P.C.
                1200 G St., NW  Suite 600
                Washington, D.C.  20005

Telephone:  (202) 393-1200

Facsimile:   (202) 393-1240

Montgovnt1003-037-702

**VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY**
**PARTICIPATION AGREEMENT SIGNATORY PAGE**

The City of Englewood, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated:        December 22, 1998

Member:       City of Englewood, Ohio

Signatures:   _____

Name:         Victor T. Whisman

Title:        Assistant Prosecuting Attorney,
              Montgomery County, Ohio

              _____

              Scott M. DuBoff

              Special Legal Counsel, Office of the
              Montgomery County Prosecuting
              Attorney

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name:         Victor T. Whisman

Title:        Assistant Prosecuting Attorney,
              Montgomery County,
              Ohio

Address:      Dayton-Montgomery County
              Courts Bldg.
              301 West Third Street
              Dayton, Ohio 45402

Telephone:    (937) 225-5760

Facsimile:    (937) 225-3470

Name:         Scott M. DuBoff

Title:        Special Legal Counsel, Office of the
              Montgomery County Prosecuting
              Attorney

Address:      Wright & Talisman, P.C.
              1200 G St., NW  Suite 600
              Washington, D.C.  20005

Telephone:    (202) 393-1200

Facsimile:    (202) 393-1240

Montgomc01003-037-702

---

**VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY**
**PARTICIPATION AGREEMENT SIGNATORY PAGE**

The City of Huber Heights, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated:        December 22, 1998

Member:       City of Huber Heights, Ohio

Signatures:   _____

Name:         Victor T. Whisman

Title:        Assistant Prosecuting Attorney,
              Montgomery County, Ohio

              _____

              Scott M. DuBoff

              Special Legal Counsel, Office of the
              Montgomery County Prosecuting
              Attorney

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name:         Victor T. Whisman

Title:        Assistant Prosecuting Attorney,
              Montgomery County,
              Ohio

Address:      Dayton-Montgomery County
              Courts Bldg.
              301 West Third Street
              Dayton, Ohio 45402

Telephone:    (937) 225-5760

Facsimile:    (937) 225-3470

Name:         Scott M. DuBoff

Title:        Special Legal Counsel, Office of the
              Montgomery County Prosecuting
              Attorney

Address:      Wright & Talisman, P.C.
              1200 G St., NW  Suite 600
              Washington, D.C.  20005

Telephone:    (202) 393-1200

Facsimile:    (202) 393-1240

Montgomc01003-037-702

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT SIGNATORY PAGE

The City of Miamisburg, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated:          December 22, 1998

Member:      City of Miamisburg, Ohio

Signatures:  _____

Name:         Victor T. Whisman

Title:           Assistant Prosecuting Attorney, Montgomery County, Ohio

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name:         Scott M. DuBoff

Title:           Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Name:         Victor T. Whisman

Title:           Assistant Prosecuting Attorney, Montgomery County, Ohio

Address:     Dayton-Montgomery County Courts Bldg.
                    301 West Third Street
                    Dayton, Ohio  45402

Telephone:  (937) 225-5760

Facsimile:   (937) 225-3470

Name:         Scott M. DuBoff

Title:           Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Address:     Wright & Talisman, P.C.
                    1200 G St., NW  Suite 600
                    Washington, D.C.  20005

Telephone:  (202) 393-1200

Facsimile:   (202) 393-1240

Montgomt1003-037-702

---

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT SIGNATORY PAGE

The City of Kettering, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated:          December 22, 1998

Member:      City of Kettering, Ohio

Signatures:  _____

Name:         Victor T. Whisman

Title:           Assistant Prosecuting Attorney, Montgomery County, Ohio

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name:         Scott M. DuBoff

Title:           Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Name:         Victor T. Whisman

Title:           Assistant Prosecuting Attorney, Montgomery County, Ohio

Address:     Dayton-Montgomery County Courts Bldg.
                    301 West Third Street
                    Dayton, Ohio  45402

Telephone:  (937) 225-5760

Facsimile:   (937) 225-3470

Name:         Scott M. DuBoff

Title:           Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Address:     Wright & Talisman, P.C.
                    1200 G St., NW  Suite 600
                    Washington, D.C.  20005

Telephone:  (202) 393-1200

Facsimile:   (202) 393-1240

Montgomt1003-037-702

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT SIGNATORY PAGE

The City of Oakwood, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated:        December 22, 1998

Member:       City of Oakwood, Ohio

Signatures:   _[signature]_

Name:         Victor T. Whisman

Title:        Assistant Prosecuting Attorney, Montgomery County, Ohio

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name:         Scott M. DuBoff

Title:        Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Name:         Victor T. Whisman

Title:        Assistant Prosecuting Attorney, Montgomery County, Ohio

Address:      Dayton-Montgomery County Courts Bldg.
              301 West Third Street
              Dayton, Ohio 45402

Telephone:    (937) 225-5760

Facsimile:    (937) 225-3470

Montgen011003-037-702

---

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT SIGNATORY PAGE

The City of Moraine, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated:        December 22, 1998

Member:       City of Moraine, Ohio

Signatures:   _[signature]_

Name:         Victor T. Whisman

Title:        Assistant Prosecuting Attorney, Montgomery County, Ohio

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name:         Scott M. DuBoff

Title:        Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Name:         Victor T. Whisman

Title:        Assistant Prosecuting Attorney, Montgomery County, Ohio

Address:      Dayton-Montgomery County Courts Bldg.
              301 West Third Street
              Dayton, Ohio 45402

Telephone:    (937) 225-5760

Facsimile:    (937) 225-3470

Montgen011003-037-702

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY
### PARTICIPATION AGREEMENT SIGNATORY PAGE

The City of Trotwood, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated:      December 22, 1998

Member:     City of Trotwood, Ohio

Signatures: _____

Name:       Victor T. Whisman

Title:      Assistant Prosecuting Attorney, Montgomery County, Ohio

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name:       Victor T. Whisman

Title:      Assistant Prosecuting Attorney, Montgomery County, Ohio

Address:    Dayton-Montgomery County Courts Bldg.
            301 West Third Street
            Dayton, Ohio  45402

Telephone:  (937) 225-5760

Facsimile:  (937) 225-3470

Name:       Scott M. DuBoff

Title:      Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Name:       Scott M. DuBoff

Title:      Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Address:    Wright & Talisman, P.C.
            1200 G St., NW  Suite 600
            Washington, D.C.  20005

Telephone:  (202) 393-1200

Facsimile:  (202) 393-1240

Montgmwt1003-037-702

---

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY
### PARTICIPATION AGREEMENT SIGNATORY PAGE

The City of Riverside, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated:      December 22, 1998

Member:     City of Riverside, Ohio

Signatures: _____

Name:       Victor T. Whisman

Title:      Assistant Prosecuting Attorney, Montgomery County, Ohio

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name:       Victor T. Whisman

Title:      Assistant Prosecuting Attorney, Montgomery County, Ohio

Address:    Dayton-Montgomery County Courts Bldg.
            301 West Third Street
            Dayton, Ohio  45402

Telephone:  (937) 225-5760

Facsimile:  (937) 225-3470

Name:       Scott M. DuBoff

Title:      Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Name:       Scott M. DuBoff

Title:      Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Address:    Wright & Talisman, P.C.
            1200 G St., NW  Suite 600
            Washington, D.C.  20005

Telephone:  (202) 393-1200

Facsimile:  (202) 393-1240

Montgmwt1003-037-702

VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY
PARTICIPATION AGREEMENT SIGNATORY PAGE

The City of Union, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated:          December 22, 1998

Member:        City of Union, Ohio

Signatures:    [signature]

Name:          Victor T. Whisman

Title:         Assistant Prosecuting Attorney, Montgomery County, Ohio

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name:          Victor T. Whisman

Title:         Assistant Prosecuting Attorney, Montgomery County, Ohio

Name:          Scott M. DuBoff

Title:         Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Address:       Dayton-Montgomery County Courts Bldg.
               301 West Third Street
               Dayton, Ohio  45402

               Wright & Talisman, P.C.
               1200 G St., NW  Suite 600
               Washington, D.C.  20005

Telephone:     (937) 225-5760
               (202) 393-1200

Facsimile:     (937) 225-3470
               (202) 393-1240

Montgomerl/1003-037-702

---

VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY
PARTICIPATION AGREEMENT SIGNATORY PAGE

The City of Vandalia, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated:          December 22, 1998

Member:        City of Vandalia, Ohio

Signatures:    [signature]

Name:          Victor T. Whisman

Title:         Assistant Prosecuting Attorney, Montgomery County, Ohio

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name:          Victor T. Whisman

Title:         Assistant Prosecuting Attorney, Montgomery County, Ohio

Name:          Scott M. DuBoff

Title:         Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Address:       Dayton-Montgomery County Courts Bldg.
               301 West Third Street
               Dayton, Ohio  45402

               Wright & Talisman, P.C.
               1200 G St., NW  Suite 600
               Washington, D.C.  20005

Telephone:     (937) 225-5760
               (202) 393-1200

Facsimile:     (937) 225-3470
               (202) 393-1240

Montgomerl/1003-037-702

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT SIGNATORY PAGE

The Village of Brookville, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated:    December 22, 1998

Member:    Village of Brookville, Ohio

Signatures:    _Vic T. Whisman_

Name:    Victor T. Whisman

Title:    Assistant Prosecuting Attorney, Montgomery County, Ohio

_Scott M. DuBoff_

Scott M. DuBoff

Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name:    Victor T. Whisman

Title:    Assistant Prosecuting Attorney, Montgomery County, Ohio

Scott M. DuBoff

Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Address:    Dayton-Montgomery County Courts Bldg.
301 West Third Street
Dayton, Ohio 45402

Wright & Talisman, P.C.
1200 G St., NW  Suite 600
Washington, D.C. 20005

Telephone:    (937) 225-5760    (202) 393-1200

Facsimile:    (937) 225-3470    (202) 393-1240

Montgmnt1003-571-702

---

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT SIGNATORY PAGE

The City of West Carrollton, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated:    December 22, 1998

Member:    City of West Carrollton, Ohio

Signatures:    _Vic T. Whisman_

Name:    Victor T. Whisman

Title:    Assistant Prosecuting Attorney, Montgomery County, Ohio

_Scott M. DuBoff_

Scott M. DuBoff

Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name:    Victor T. Whisman

Title:    Assistant Prosecuting Attorney, Montgomery County, Ohio

Scott M. DuBoff

Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Address:    Dayton-Montgomery County Courts Bldg.
301 West Third Street
Dayton, Ohio 45402

Wright & Talisman, P.C.
1200 G St., NW  Suite 600
Washington, D.C. 20005

Telephone:    (937) 225-5760    (202) 393-1200

Facsimile:    (937) 225-3470    (202) 393-1240

Montgmnt1003-571-702

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT SIGNATORY PAGE

The Village of Farmersville, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated: December 22, 1998

Member: Village of Farmersville, Ohio

Signatures: _Victor T. Whisman_

Name: Victor T. Whisman

Title: Assistant Prosecuting Attorney, Montgomery County, Ohio

Signatures: _Scott M. DuBoff_

Name: Scott M. DuBoff

Title: Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name: Victor T. Whisman

Title: Assistant Prosecuting Attorney, Montgomery County, Ohio

Address: Dayton-Montgomery County Courts Bldg. 301 West Third Street Dayton, Ohio 45402

Telephone: (937) 225-5760

Facsimile: (937) 225-3470

Name: Scott M. DuBoff

Title: Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Address: Wright & Talisman, P.C. 1200 G St., NW Suite 600 Washington, D.C. 20005

Telephone: (202) 393-1200

Facsimile: (202) 393-1240

Montgomer01003-037:702

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT SIGNATORY PAGE

The Village of Clayton, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated: December 22, 1998

Member: Village of Clayton, Ohio

Signatures: _Victor T. Whisman_

Name: Victor T. Whisman

Title: Assistant Prosecuting Attorney, Montgomery County, Ohio

Signatures: _Scott M. DuBoff_

Name: Scott M. DuBoff

Title: Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name: Victor T. Whisman

Title: Assistant Prosecuting Attorney, Montgomery County, Ohio

Address: Dayton-Montgomery County Courts Bldg. 301 West Third Street Dayton, Ohio 45402

Telephone: (937) 225-5760

Facsimile: (937) 225-3470

Name: Scott M. DuBoff

Title: Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Address: Wright & Talisman, P.C. 1200 G St., NW Suite 600 Washington, D.C. 20005

Telephone: (202) 393-1200

Facsimile: (202) 393-1240

Montgomer01003-037:702

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY
## PARTICIPATION AGREEMENT SIGNATORY PAGE

The Village of New Lebanon, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated: December 22, 1998

Member: Village of New Lebanon, Ohio

Signatures: _[signature]_

Name: Victor T. Whisman

Title: Assistant Prosecuting Attorney, Montgomery County, Ohio

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name: Scott M. DuBoff

Title: Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Name: Victor T. Whisman

Title: Assistant Prosecuting Attorney, Montgomery County, Ohio

Address: Dayton-Montgomery County Courts Bldg. 301 West Third Street Dayton, Ohio 45402

Telephone: (937) 225-5760

Facsimile: (937) 225-3470

Address: Wright & Talisman, P.C. 1200 G St., NW Suite 600 Washington, D.C. 20005

Telephone: (202) 393-1200

Facsimile: (202) 393-1240

Montgomel1003-637-702

---

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY
## PARTICIPATION AGREEMENT SIGNATORY PAGE

The Village of Germantown, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated: December 22, 1998

Member: Village of Germantown, Ohio

Signatures: _[signature]_

Name: Victor T. Whisman

Title: Assistant Prosecuting Attorney, Montgomery County, Ohio

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name: Scott M. DuBoff

Title: Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Name: Victor T. Whisman

Title: Assistant Prosecuting Attorney, Montgomery County, Ohio

Address: Dayton-Montgomery County Courts Bldg. 301 West Third Street Dayton, Ohio 45402

Telephone: (937) 225-5760

Facsimile: (937) 225-3470

Address: Wright & Talisman, P.C. 1200 G St., NW Suite 600 Washington, D.C. 20005

Telephone: (202) 393-1200

Facsimile: (202) 393-1240

Montgomel1003-637-702

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT SIGNATORY PAGE

Butler Township, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated: December 22, 1998

Member: Butler Township, Ohio

Signatures: _____

Name: Victor T. Whisman

Title: Assistant Prosecuting Attorney, Montgomery County, Ohio

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name: Victor T. Whisman

Title: Assistant Prosecuting Attorney, Montgomery County, Ohio

Name: Scott M. DuBoff

Title: Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Address: Dayton-Montgomery County Courts Bldg.
301 West Third Street
Dayton, Ohio 45402

Wright & Talisman, P.C.
1200 G St., NW Suite 600
Washington, D.C. 20005

Telephone: (937) 225-5760    (202) 393-1200

Facsimile: (937) 225-3470    (202) 393-1240

Montgreal\1003-037-702

---

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT SIGNATORY PAGE

The Village of Phillipsburg, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated: December 22, 1998

Member: Village of Phillipsburg, Ohio

Signatures: _____

Name: Victor T. Whisman

Title: Assistant Prosecuting Attorney, Montgomery County, Ohio

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name: Victor T. Whisman

Title: Assistant Prosecuting Attorney, Montgomery County, Ohio

Name: Scott M. DuBoff

Title: Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Address: Dayton-Montgomery County Courts Bldg.
301 West Third Street
Dayton, Ohio 45402

Wright & Talisman, P.C.
1200 G St., NW Suite 600
Washington, D.C. 20005

Telephone: (937) 225-5760    (202) 393-1200

Facsimile: (937) 225-3470    (202) 393-1240

Montgreal\1003-037-702

**VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY
PARTICIPATION AGREEMENT SIGNATORY PAGE**

German Township, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated:          December 22, 1998

Member:         German Township, Ohio

Signatures:     _[signature]_

Name:           Victor T. Whisman

Title:          Assistant Prosecuting Attorney, Montgomery County, Ohio

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name:           Victor T. Whisman

Title:          Assistant Prosecuting Attorney, Montgomery County, Ohio

Address:        Dayton-Montgomery County Courts Bldg.
                301 West Third Street
                Dayton, Ohio 45402

Telephone:      (937) 225-5760

Facsimile:      (937) 225-3470

Name:           Scott M. DuBoff

Title:          Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Address:        Wright & Talisman, P.C.
                1200 G St., NW  Suite 600
                Washington, D.C. 20005

Telephone:      (202) 393-1200

Facsimile:      (202) 393-1240

Montgene\1003-037-702

---

**VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY
PARTICIPATION AGREEMENT SIGNATORY PAGE**

Clay Township, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated:          December 22, 1998

Member:         Clay Township, Ohio

Signatures:     _[signature]_

Name:           Victor T. Whisman

Title:          Assistant Prosecuting Attorney, Montgomery County, Ohio

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name:           Victor T. Whisman

Title:          Assistant Prosecuting Attorney, Montgomery County, Ohio

Address:        Dayton-Montgomery County Courts Bldg.
                301 West Third Street
                Dayton, Ohio 45402

Telephone:      (937) 225-5760

Facsimile:      (937) 225-3470

Name:           Scott M. DuBoff

Title:          Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Address:        Wright & Talisman, P.C.
                1200 G St., NW  Suite 600
                Washington, D.C. 20005

Telephone:      (202) 393-1200

Facsimile:      (202) 393-1240

Montgene\1003-037-702

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT SIGNATORY PAGE

Jackson Township, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated:       December 22, 1998

Member:      Jackson Township, Ohio

Signatures:  _[signature]_

Name:        Victor T. Whisman

Title:       Assistant Prosecuting Attorney, Montgomery County, Ohio

Signatures:  _[signature]_

Name:        Scott M. DuBoff

Title:       Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name:        Victor T. Whisman

Title:       Assistant Prosecuting Attorney, Montgomery County, Ohio

Name:        Scott M. DuBoff

Title:       Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Address:     Dayton-Montgomery County Courts Bldg.
             301 West Third Street
             Dayton, Ohio  45402

             Wright & Talisman, P.C.
             1200 G St., NW  Suite 600
             Washington, D.C.  20005

Telephone:   (937) 225-5760       (202) 393-1200

Facsimile:   (937) 225-3470       (202) 393-1240

Montgomal/1003-037-702

---

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT SIGNATORY PAGE

Harrison Township, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated:       December 22, 1998

Member:      Harrison Township, Ohio

Signatures:  _[signature]_

Name:        Victor T. Whisman

Title:       Assistant Prosecuting Attorney, Montgomery County, Ohio

Signatures:  _[signature]_

Name:        Scott M. DuBoff

Title:       Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name:        Victor T. Whisman

Title:       Assistant Prosecuting Attorney, Montgomery County, Ohio

Name:        Scott M. DuBoff

Title:       Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Address:     Dayton-Montgomery County Courts Bldg.
             301 West Third Street
             Dayton, Ohio  45402

             Wright & Talisman, P.C.
             1200 G St., NW  Suite 600
             Washington, D.C.  20005

Telephone:   (937) 225-5760       (202) 393-1200

Facsimile:   (937) 225-3470       (202) 393-1240

Montgomal/1003-037-702

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT SIGNATORY PAGE

Miami Township, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated: December 22, 1998

Member: Miami Township, Ohio

Signatures: _[signature]_

Name: Victor T. Whisman

Title: Assistant Prosecuting Attorney, Montgomery County, Ohio

Name: Scott M. DuBoff

Title: Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name: Victor T. Whisman

Title: Assistant Prosecuting Attorney, Montgomery County, Ohio

Name: Scott M. DuBoff

Title: Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Address: Dayton-Montgomery County Courts Bldg. 301 West Third Street Dayton, Ohio 45402

Wright & Talisman, P.C. 1200 G St., NW Suite 600 Washington, D.C. 20005

Telephone: (937) 225-5760   (202) 393-1200

Facsimile: (937) 225-3470   (202) 393-1240

Montgovel1/003-037-702

---

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT SIGNATORY PAGE

Jefferson Township, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated: December 22, 1998

Member: Jefferson Township, Ohio

Signatures: _[signature]_

Name: Victor T. Whisman

Title: Assistant Prosecuting Attorney, Montgomery County, Ohio

Name: Scott M. DuBoff

Title: Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name: Victor T. Whisman

Title: Assistant Prosecuting Attorney, Montgomery County, Ohio

Name: Scott M. DuBoff

Title: Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Address: Dayton-Montgomery County Courts Bldg. 301 West Third Street Dayton, Ohio 45402

Wright & Talisman, P.C. 1200 G St., NW Suite 600 Washington, D.C. 20005

Telephone: (937) 225-5760   (202) 393-1200

Facsimile: (937) 225-3470   (202) 393-1240

Montgovel1/003-037-702

09-50026-mg    Doc 9857-1    Filed 03/22/11    Entered 03/22/11 14:53:52    Exhibit A -
Proofs of Claim    Pg 62 of 133

**VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY**
**PARTICIPATION AGREEMENT SIGNATORY PAGE**

Perry Township, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated:          December 22, 1998

Member:         Perry Township, Ohio

Signatures:     _____

Name:           Victor T. Whisman

Title:          Assistant Prosecuting Attorney, Montgomery County, Ohio

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name:           Victor T. Whisman

Title:          Assistant Prosecuting Attorney, Montgomery County, Ohio

Address:        Dayton-Montgomery County Courts Bldg.
                301 West Third Street
                Dayton, Ohio  45402

Telephone:      (937) 225-5760

Facsimile:      (937) 225-3470

Name:           Scott M. DuBoff

Title:          Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Address:        Wright & Talisman, P.C.
                1200 G St., NW  Suite 600
                Washington, D.C.  20005

Telephone:      (202) 393-1200

Facsimile:      (202) 393-1240

Montgene01003-037-702

---

**VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY**
**PARTICIPATION AGREEMENT SIGNATORY PAGE**

Washington Township, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated:          December 22, 1998

Member:         Washington Township, Ohio

Signatures:     _____

Name:           Victor T. Whisman

Title:          Assistant Prosecuting Attorney, Montgomery County, Ohio

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name:           Victor T. Whisman

Title:          Assistant Prosecuting Attorney, Montgomery County, Ohio

Address:        Dayton-Montgomery County Courts Bldg.
                301 West Third Street
                Dayton, Ohio  45402

Telephone:      (937) 225-5760

Facsimile:      (937) 225-3470

Name:           Scott M. DuBoff

Title:          Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Address:        Wright & Talisman, P.C.
                1200 G St., NW  Suite 600
                Washington, D.C.  20005

Telephone:      (202) 393-1200

Facsimile:      (202) 393-1240

Montgene01003-037-702

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT SIGNATORY PAGE

Perry Township, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated: December 22, 1998

Member: Perry Township, Ohio

Signatures:

Name: Scott M. DuBoff

Title: Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name: Victor T. Whisman

Title: Assistant Prosecuting Attorney, Montgomery County, Ohio

Address: Dayton-Montgomery County Courts Bldg. 301 West Third Street Dayton, Ohio 45402

Telephone: (937) 225-5760

Facsimile: (937) 225-3470

Montgomer1060-637-702

---

## VALLEYCREST LANDFILL SITE GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT SIGNATORY PAGE

Washington Township, Ohio hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement:

Dated: December 22, 1998

Member: Washington Township, Ohio

Signatures:

Name: Victor T. Whisman

Title: Assistant Prosecuting Attorney, Montgomery County, Ohio

Name: Scott M. DuBoff

Title: Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Said Member hereby designates the following Representatives for receipt of notice and invoices:

Name: Scott M. DuBoff

Title: Special Legal Counsel, Office of the Montgomery County Prosecuting Attorney

Address: Wright & Talisman, P.C. 1200 G St., NW Suite 600 Washington, D.C. 20005

Telephone: (202) 393-1200

Facsimile: (202) 393-1240

Montgomer1060-637-702

# AMENDMENT TO
# VALLEYCREST LANDFILL SITE
# GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT
# AND THE FIRST AMENDED VALLEYCREST LANDFILL SITE
# PARTICIPATION AGREEMENT

This Amendment (hereinafter the "TRW/Valleycrest Amendment") to the Valleycrest Landfill Site Governmental Entity Participation Agreement and the First Amended Valleycrest Landfill Site Participation Agreement is entered into between and among: (1) the entities who are parties to either or both the Valleycrest Landfill Site Governmental Entity Participation Agreement, attached hereto and made a part hereof as Exhibit A (hereinafter the "Governmental Entity Agreement"), and to the First Amended Valleycrest Landfill Site Participation Agreement, attached hereto and made a part hereof as Exhibit B (hereinafter the "First Amended Valleycrest Agreement"); and (2) TRW Inc./Globe Motors Division (hereinafter "TRW").

WHEREAS, on or about January 12, 1995 the Original Members jointly entered into the Valleycrest Landfill Site Participation Agreement to establish a framework for complying with the terms of the Final Findings and Orders (hereinafter "FFO"), and to cooperate among themselves in that effort;

WHEREAS, on or about May 22, 1998 the First Amended Valleycrest Agreement was executed by the signatories thereto and on or about December 21, 1998, the Governmental Entity Agreement was executed by the signatories thereto;

WHEREAS, TRW and the signatories to the Governmental Entity Agreement and/or the First Amended Valleycrest Agreement, without admitting any fact, responsibility, fault or liability in connection with the Valleycrest Landfill Site (hereinafter the "Site"), in Dayton, Ohio, desire that TRW, pursuant to the terms of this TRW/Valleycrest Amendment, become a member of the Valleycrest Landfill Site Group (hereinafter "VLSG") and agree to fund the performance of certain necessary work at the Site in order to avoid litigation with the United States, the State of Ohio, and among the members of the VLSG themselves;

WHEREAS, Dayton Walther Corporation (hereinafter "Dayton Walther") was one of the signatories to the Governmental Entity Agreement and the First Amended Valleycrest Agreement and an Original Member of the VLSG. Dayton Walther was subsequently merged into Kelsey-Hayes Company (hereinafter "Kelsey-Hayes"). TRW recently acquired Lucas Varity plc (hereinafter "Lucas Varity") of which Kelsey-Hayes was a wholly owned, indirect subsidiary. Pursuant to the terms of this TRW/Valleycrest Amendment, TRW wishes to assume the obligations and rights of Kelsey-Hayes and Dayton Walther under the Governmental Entity Agreement and the First Amended Valleycrest Agreement;

**WHEREAS,** TRW, through its Globe Motors Division, independent of its acquisition of Lucas Varity, is alleged to have disposed of hazardous substances at the Site;

**NOW THEREFORE,** the signatories to the Governmental Entity Agreement, the First Amended Valleycrest Agreement, and TRW, in consideration of the foregoing and the promises and covenants contained herein, mutually agree as follows (unless otherwise indicated, terms used herein have the same meaning as in the Governmental Entity Agreement and the First Amended Valleycrest Agreement):

1.      TRW hereby agrees to be responsible for all of the obligations and obtain all of the rights of Kelsey-Hayes and Dayton Walther under the Governmental Entity Agreement and the First Amended Valleycrest Agreement. Nothing contained herein is intended to extinguish the obligations of Kelsey-Hayes or Dayton Walther under the Governmental Entity Agreement and the First Amended Valleycrest Agreement if TRW for any reason defaults on any obligations of Kelsey-Hayes or Dayton Walther under the Governmental Entity Agreement or the First Amended Valleycrest Agreement.

2.      In regard to the allegation, which is totally independent of TRW's assumption of the liability of Kelsey-Hayes and Dayton Walther pursuant to this TRW/Valleycrest Amendment, that TRW's Globe Motors Division disposed of hazardous substances at the Valleycrest Site, TRW agrees to pay the percentage set forth in Exhibit C of future assessments issued after January 7, 2000 for the Costs incurred pursuant to the FFO, the First Amended Valleycrest Agreement and the Governmental Entity Agreement.

3.      Within thirty days of the execution of this TRW/Valleycrest Amendment, TRW agrees to pay Ninety-Four Thousand, Four Hundred Eight-Nine Dollars ($94,489.00) which represents TRW's share of past member assessments for the Costs from January 12, 1995 to January 7, 2000.

4.      Upon the execution of this TRW/Valleycrest Amendment, TRW shall be deemed an Original Member and a VLSG Member under the Governmental Entity Agreement and the First Amended Valleycrest Agreement, as long as it is in compliance therewith, with all rights and obligations of such including the responsibility for the total percentage share of the Costs (as shown in Exhibit D) which combines the percentage shares of TRW and Kelsey-Hayes/Dayton Walther. Except for proportionately adjusting the Original Members' allocated percentage shares of the Costs, nothing herein is intended to affect the rights and obligations of the Original Members relative to each other under the First Amended Valleycrest Agreement.

5.      TRW agrees that it shall be bound by all of the terms and conditions of the Governmental Entity Agreement, attached hereto as Exhibit A, and the First Amended

2

Valleycrest Agreement, attached hereto as Exhibit B, except to the extent that such terms
have been modified pursuant to this TRW/Valleycrest Amendment.

6.    The VLSG members who are parties in *Cargill, Inc., et al. v. ABCO
Construction, et al.,* United States District Court, Southern District of Ohio, Western
Division, Case No. C-3-98-36 agree to, as soon as practicable under the Federal Rules of
Civil Procedure, (a) voluntarily dismiss TRW without prejudice as a defendant in such action
and (b) use their best efforts to add TRW as a party plaintiff in such action.

7.    This TRW/Valleycrest Amendment may be executed in separate counterparts,
each of which shall be deemed an original, but all of which together shall constitute one and
the same instrument.

3

# EXHIBIT A
## Governmental Entity Agreement

**EXHIBIT B**
**First Amended VLSG Participation Agreement**

**EXHIBIT C**

| Participant | Generator Unit Share | New Share Percentage Before Munic. Cap | After Cap |
|---|---|---|---|
| Danis/WMX | | 46.00 | 46% |
| Municipalities | | 7.00* | 0% |
| Inland (GM) | 8 | 11.75 | 13.50% |
| Delco (GM) | 4 | 5.875 | 6.75% |
| Frigedaire (GM) | 1 | 1.46875 | 1.6875% |
| Cargill | 4 | 5.875 | 6.75% |
| Kelsey Hayes/ Dayton Walther (TRW) | 4 | 5.875 | 6.75% |
| NCR | 4 | 5.875 | 6.75% |
| Standard Register | 4 | 5.875 | 6.75% |
| Duriron | 2 | 2.9375 | 3.375% |
| Globe/TRW | 1 | 1.46875 | 1.6875% |
| | | | |
| **Total:** | **32** | **100.00** | |

\* Subject to the cap set forth in Section 5.1 of the Agreement

7

**EXHIBIT D**
**VLSG MEMBER PERCENTAGE SHARES**

The VLSG Members' respective percentage liability shares with respect to the costs are as follows:

|  | Before Muni Cap | After Muni Cap |
|---|---|---|
| Waste Management, Inc., Waste Management of Ohio, Inc., SCA Services of Ohio, Inc., and Danis Industries Corporation | 46% | 46% |
| Municipalities | 7%* | 0% |
| General Motors Corporation | 19.09375% | 21.9375% |
| TRW Inc. | 7.34375% | 8.4375% |
| Cargill, Inc. | 5.875% | 6.75% |
| NCR Corporation | 5.875% | 6.75% |
| Standard Register Company | 5.875% | 6.75% |
| Duriron Company, Inc. | 2.9375% | 3.375% |

* Subject to the cap set forth in Section 5.1 of the Agreement
::ODMA\MHODMA\CINTI;535240;1

8

# AMENDMENT TO
## VALLEYCREST LANDFILL SITE
## GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT
## AND THE FIRST AMENDED VALLEYCREST LANDFILL SITE
## PARTICIPATION AGREEMENT

### SIGNATURE PAGE

Diversified Environmental Management Co., formerly known as Danis Industries Corporation _____ hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement and the First Amended Valleycrest Landfill Site Participation Agreement as amended by this TRW/VLSG Amendment.

Dated:        May 18, 2000

Member:       Diversified Environmental Management Co., formerly known as Danis Industries Corporation

Signature:    _Gregory L. McCann (signature)_

Name:         Gregory L. McCann

Title:        President

Said Member hereby designates the following Representative for the receipt of notice and invoices:

Name:         _____

Title:        _____

Address:      _____

              _____

              _____

Telephone:    _____

FAX:          _____

4

# AMENDMENT TO
## VALLEYCREST LANDFILL SITE
## GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT
## AND THE FIRST AMENDED VALLEYCREST LANDFILL SITE
## PARTICIPATION AGREEMENT

### SIGNATURE PAGE

*NCR Corporation* hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement and the First Amended Valleycrest Landfill Site Participation Agreement as amended by this TRW/VLSG Amendment.

Dated:      May 23, 2000
Member:     NCR Corporation
Signature:  *Paul M. Samson*
Name:       Paul M. Samson
Title:      Senior Attorney

Said Member hereby designates the following Representative for the receipt of notice and invoices:

Name:       Paul M. Samson
Title:      Senior Attorney
Address:    101 W. Schantz Avenue, ECD2
            Dayton, OH 45479

Telephone:  937.445.2908
FAX:        937.445.1933

4

# AMENDMENT TO
## VALLEYCREST LANDFILL SITE
## GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT
## AND THE FIRST AMENDED VALLEYCREST LANDFILL SITE
## PARTICIPATION AGREEMENT

## SIGNATURE PAGE

THE STANDARD REGISTER COMPANY hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement and the First Amended Valleycrest Landfill Site Participation Agreement as amended by this TRW/VLSG Amendment.

Dated:      May 12, 2000
Member:     The Standard Register Company
Signature:  
Name:       Kathryn A. Lamme
Title:      Corporate Vice President, Secretary & Deputy General Counsel

Said Member hereby designates the following Representative for the receipt of notice and invoices:

Name:       Kathryn A. Lamme
Title:      Corporate Vice President, Secretary & Deputy General Counsel
Address:    600 Albany Street, Dayton, Ohio 45408

Telephone:  937.221.1540
FAX:        937.221.3431

4

535240_1.WPD                                                                            Page

# AMENDMENT TO
## VALLEYCREST LANDFILL SITE
### GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT
### AND THE FIRST AMENDED VALLEYCREST LANDFILL SITE
### PARTICIPATION AGREEMENT


## SIGNATURE PAGE

General Motors Corporation hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement and the First Amended Valleycrest Landfill Site Participation Agreement as amended by this TRW/VLSG Amendment.

Dated:         March 22, 2000
Member:        General Motors Corporation
Signature:     Don A. Schiemann
Name:          Don A. Schiemann
Title:         Attorney

Said Member hereby designates the following Representative for the receipt of notice and invoices:

Name:          Don A. Schiemann
Title:         Attorney
Address:       MC 482-C24-D24, 300 Renaissance Center
               P.O. Box 300
               Detroit, MI  48265-3000
Telephone:     (313) 665-4885
FAX:           (313) 665-4896

# AMENDMENT TO
# VALLEYCREST LANDFILL SITE
# GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT
# AND THE FIRST AMENDED VALLEYCREST LANDFILL SITE
# PARTICIPATION AGREEMENT

### SIGNATURE PAGE

_____ hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement and the First Amended Valleycrest Landfill Site Participation Agreement as amended by this TRW/VLSG Amendment.

Dated: _____

Member: _____

Signature: _____

Name: OLIVER K. STANLEY

Title: ENVIRONMENTAL MANAGER

Said Member hereby designates the following Representative for the receipt of notice and invoices:

Name: _____

Title: _____

Address: _____

_____

Telephone: _____

FAX: _____

# AMENDMENT TO
# VALLEYCREST LANDFILL SITE
# GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT
# AND THE FIRST AMENDED VALLEYCREST LANDFILL SITE
# PARTICIPATION AGREEMENT

## SIGNATURE PAGE

_Flowserve Corp._ hereby enters into and shall participate in the Valleycrest Landfill Site Governmental Entity Participation Agreement and the First Amended Valleycrest Landfill Site Participation Agreement as amended by this TRW/VLSG Amendment.

Dated: _MAY 8, 2000_
Member: _FLOWSERVE CORPORATION (F/K/A DURIRON)_
Signature: _Robert L. Roberts_
Name: _ROBERT L. ROBERTS, JR._
Title: _ASSOCIATE GENERAL COUNSEL_

Said Member hereby designates the following Representative for the receipt of notice and invoices:

Name: _ROBERT L. ROBERTS, JR._
Title: _ASSOCIATE GENERAL COUNSEL_
Address: _FLOWSERVE CORPORATION_
_222 W. LAS COLINAS BLVD., SUITE 1500_
_IRVING, TX 75039_
Telephone: _(972) 443-6537_
FAX: _(972) 443-6837_

4

## AMENDMENT TO
## VALLEYCREST LANDFILL SITE
## GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT
## AND THE FIRST AMENDED VALLEYCREST LANDFILL SITE
## PARTICIPATION AGREEMENT

### SIGNATURE PAGE

TRW Inc.                          hereby enters into and shall participate in the Valleycrest Landfill
Site Governmental Entity Participation Agreement and the First Amended Valleycrest
Landfill Site Participation Agreement as amended by this TRW/VLSG Amendment.

Dated:          3/10/00
Member:         TRW Inc
Signature:      David B. Goldston
Name:           David B. CGoldston
Title:          Assistant Secretary

Said Member hereby designates the following Representative for the receipt of notice and
invoices:

Name:           Valerie M. Hanna
Title:          Counsel — Environment
Address:        TRW Inc., 1
                1900 Richmond Road
                Cleveland, OH 44124
Telephone:      (216) 291-7512
FAX:            (216) 291-7874

4

# AMENDMENT TO
## VALLEYCREST LANDFILL SITE
## GOVERNMENTAL ENTITY PARTICIPATION AGREEMENT
## AND THE FIRST AMENDED VALLEYCREST LANDFILL SITE
## PARTICIPATION AGREEMENT

## SIGNATURE PAGE

TRW Inc. _____ hereby enters into and shall participate in the Valleycrest Landfill
Site Governmental Entity Participation Agreement and the First Amended Valleycrest
Landfill Site Participation Agreement as amended by this TRW/VLSG Amendment.

Dated:      3/10/00
Member:     TRW Inc
Signature:  David B Goldston
Name:       David B. CGoldston
Title:      Assistant Secretary

Said Member hereby designates the following Representative for the receipt of notice and
invoices:

Name:       Valerie M. Hanna
Title:      Counsel - Environment
Address:    TRW Inc., J.
            1900 Richmond Road
            Cleveland, OH 44124
Telephone:  (216) 291-7512
FAX:        (216) 291-7874

4



# *de maximis, inc.*

450 Montbrook Lane
Knoxville, TN 37919
(865) 691-5052
(865) 691-6485 FAX
(865) 691-9835 ACCT. FAX

# INVOICE

(PAYMENT DUE WITHIN 30 DAYS)

<u>VIA OVERNIGHT COURIER</u>

May 8, 2009

Jim Walle
General Motors Corporation
Mail Code 482-C24-D24
P.O. Box 300
Detroit, Michigan  48265-3000

**Reference:**   **Invoice for Funds**
**Cash Call, 2nd Quarter 2009**
**North Sanitary Landfill (a.k.a. Valleycrest) Site**

Dear Mr. Walle:

Pursuant to Paragraph 5 of the Valleycrest Landfill Site Group Participation Agreement ("Agreement") for funding of expenses associated with implementation of work at the Valleycrest Landfill Site ("Site"), this letter serves as an invoice for the amount listed below. This assessment is consistent with the May 8, 2009 Final Total Project Forecast Update and Assessment Funding Projection . The intent of this assessment is to supplement the Group's Fund and cover the expenses associated with activities at the Site through 2nd quarter 2009.

GM Share associated with VLSG:

| | | |
|---|---|---|
| associated with (GM) | = | 61,106.00 |
| associated with (Durion) | = | 9,401.00 |
| associated with (TRW) | = | 4,700.00 |
| associated with (K-H) | = | 18,802.00 |
| associated with (Cargill) | = | 18,802.00 |
| associated with (SR) | = | 18,802.00 |
| | | |
| GM Share associated with VRAC | = | 0.00 |
| | | |
| **PLEASE PAY THIS AMOUNT** | = | **$131,613.00** |



EXHIBIT

A - 3

Allentown, PA • Clinton, NJ • Greensboro, GA • Knoxville, TN • Farmington Hills, MI • Riverside, CA
Cortland, NY • Wheaton, IL • Sarasota, FL • Houston, TX • Windsor, CT • Waltham, MA

PAPER

*de maximis*

Invoice for Funds-GM
Cash Call, 2nd Quarter 2009
North Sanitary Landfill (a.k.a. Valleycrest) Site
May 8, 2009
Page 2 of 2

Please send a check in the above amount, made payable to:

Valleycrest Landfill Site Group RI/FS Fund
c/o *de maximis, inc.*
1041 Parrott's Cove Road
Greensboro, GA 30642

Be advised that this assessment is due and payable upon receipt. **Payment is due no later than June 8, 2009.**

If there are any questions concerning this matter, please do not hesitate to contact me at (865) 691-5052 or Mike Percival at (706) 467-3362. Thank you.

Sincerely,
*de maximis, inc.*

Michael H. Samples
Alternate Project Coordinator

MHS/car

Enclosure

cc:    Jerome Maynard
       William Schikora
       Jim Campbell
       Vince Stamp
       Mike Percival



### *de maximis, inc.*

**450 Montbrook Lane**
**Knoxville, TN 37919**
**(865) 691-5052**
**(865) 691-6485 FAX**
**(865) 691-9835 ACCT. FAX**

RECEIVED

JUL 24 2009

Flowserve Corporation
Legal Department

## INVOICE
### (PAYMENT DUE WITHIN 30 DAYS)

<u>VIA OVERNIGHT COURIER</u>

July 22, 2009

Robert L. Roberts, Jr.
Associate General Counsel
Flowserve Corporation
5215 N. O'Connor Blvd., Suite 2300
Irving, TX 75039

**Reference:**   **Invoice for Funds**
**Cash Call, 3rd Quarter 2009**
**North Sanitary Landfill (a.k.a. Valleycrest) Site**

Dear Mr. Roberts:

Pursuant to Paragraph 5 of the Valleycrest Landfill Site Group Participation Agreement ("Agreement") for funding of expenses associated with implementation of work at the Valleycrest Landfill Site ("Site"), this letter serves as an invoice for the amount listed below. This assessment is consistent with the July 21, 2009 Final Total Project Forecast Summary and Assessment Funding Projection. The intent of this assessment is to supplement the Group's Fund and cover the expenses associated with activities at the Site through 3rd quarter 2009.

|  |  |  |
|---|---|---|
| VLSG Member Share | = | $ 10,588.00 |
| **PLEASE PAY THIS AMOUNT** | = | **$ 10,588.00** |

Please send a check in the above amount, made payable to:

Valleycrest Landfill Site Group RI/FS Fund
c/o *de maximis, inc.*
1041 Parrott's Cove Road
Greensboro, GA 30642

*det*
*pay*
*(?)*
*08/14/09*

*(CHARGE TO VALLYCREST RESERVE )*

F:\PROJECTS\3098\2009 Correspondence\3Qtr 2009 CashCall July 21 2009.doc

**Allentown, PA · Clinton, NJ · Greensboro, GA · Knoxville, TN · Farmington Hills, MI · Riverside, CA**
**Cortland, NY · Wheaton, IL · Sarasota, FL · Houston, TX · Windsor, CT · Waltham, MA**

PAPER

*de maximis*

Invoice for Funds-Flowserve/Duriron
Cash Call, 3rd Quarter 2009
North Sanitary Landfill (a.k.a. Valleycrest) Site
July 22, 2009
Page 2 of 2

Be advised that this assessment is due and payable upon receipt.    **Payment is due no later than August 21, 2009.**

If there are any questions concerning this matter, please do not hesitate to contact me at (865) 691-052 or Mike Percival at (706) 467-3362.    Thank you.

Sincerely,
*de maximis, inc.*

Michael H. Samples
Alternate Project Coordinator

MHS/dlb

Enclosure

cc:    Vince Stamp
       Mike Percival

F:\PROJECTS\3098\2009 Correspondence\3Qtr 2009 CashCall July 21 2009.doc



# *de maximis, inc.*

450 Montbrook Lane
Knoxville, TN 37919
(865) 691-5052
(865) 691-6485 FAX
(865) 691-9835 ACCT. FAX

# INVOICE
## (PAYMENT DUE WITHIN 30 DAYS)

<u>VIA OVERNIGHT COURIER</u>

October 28, 2009

**RECEIVED**

OCT 29 2009

Flowserve Corporation
Legal Department

Robert L. Roberts, Jr.
Associate General Counsel
Flowserve Corporation
5215 N. O'Connor Blvd., Suite 2300
Irving, TX 75039

**Reference:**    **Invoice for Funds**
**Cash Call, 4th Quarter 2009**
**North Sanitary Landfill (a.k.a. Valleycrest) Site**

Dear Mr. Roberts:

Pursuant to Paragraph 5 of the Valleycrest Landfill Site Group Participation Agreement
("Agreement") for funding of expenses associated with implementation of work at the Valleycrest
Landfill Site ("Site"), this letter serves as an invoice for the amount listed below.  This assessment
is consistent with the October 28, 2009  Final Total Project Forecast Summary and Assessment
Funding Projection.  The intent of this assessment is to supplement the Group's Fund and cover the
expenses associated with activities at the Site through 4th quarter 2009.

VLSG Member Share    =    10,085.00

**PLEASE PAY THIS AMOUNT**    =    **$10,085.00**

Please send a check in the above amount, made payable to:

Valleycrest Landfill Site Group RI/FS Fund
*c/o de maximis, inc.*
1041 Parrott's Cove Road
Greensboro, GA 30642

Allentown, PA · Clinton, NJ · Greensboro, GA · Knoxville, TN · Farmington Hills, MI · Riverside, CA
Cortland, NY · Wheaton, IL · Sarasota, FL · Houston, TX · Windsor, CT · Waltham, MA

*de maximis*

Invoice for Funds-Flowserve/Duriron
Cash Call, 4th Quarter 2009
North Sanitary Landfill (a.k.a. Valleycrest) Site
October 28, 2009
Page 2 of 2

Be advised that this assessment is due and payable upon receipt. **Payment is due no later than November 28, 2009.**

If there are any questions concerning this matter, please do not hesitate to contact me at (865) 691-052 or Mike Percival at (706) 467-3362. Thank you.

Sincerely,
*de maximis, inc.*

Michael H. Samples
Alternate Project Coordinator

MHS/dlb

Enclosure

cc:    Vince Stamp
       Mike Percival

F:\PROJECTS\3098\2009 Correspondence\4Qtr 2009 CashCall Oct 28 2009.wpd

COPY

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT  SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor:<br>MOTORS LIQUIDATION COMPANY F/K/A GENERAL MOTORS CORPORATION | Case Number:<br>09-50026 (REG) |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>Flowserve Corporation f/k/a The Duriron Company | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br><br>Jeffrey G. Hamilton, Jackson Walker L.L.P.<br>901 Main Street, Suite 6000, Dallas, TX 75202<br><br>Telephone number:<br>(214) 953-6000 | **Court Claim Number:**_____<br>*(If known)*<br><br>Filed on:_____ |
| Name and address where payment should be sent (if different from above):<br><br>Robert L. Roberts, Jr., Vice President, Global Litigation Counsel<br>Flowserve Corporation, 5215 N. O'Connor Blvd., Suite 2300, Irving, Texas 75039<br><br>Telephone number:<br>(972) 443-6537 | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

*Stamp: THE GARDEN CITY GROUP, INC. NOV 25 2009*

| | |
|---|---|
| 1. **Amount of Claim as of Date Case Filed:**  $           33,178.84<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>✓ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | 5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**<br><br>Specify the priority of the claim. |
| 2. **Basis for Claim:** Breach of Contract *<br>(See instruction #2 on reverse side.) | ☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| 3. **Last four digits of any number by which creditor identifies debtor:** _____<br><br>  3a. Debtor may have scheduled account as: _____<br>  (See instruction #3a on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4). |
| 4. **Secured Claim** (See instruction #4 on reverse side.)<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>**Nature of property or right of setoff:** ☐ Real Estate   ☐ Motor Vehicle   ☐ Other<br>**Describe:**<br><br>**Value of Property:**$_____  **Annual Interest Rate**___%<br><br>**Amount of arrearage and other charges as of time case filed included in secured claim,**<br>if any: $_____  Basis for perfection: _____<br><br>**Amount of Secured Claim:** $_____  **Amount Unsecured:** $_____ | ☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8). |
| 6. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | ☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__). |
| 7. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See instruction 7 and definition of "redacted" on reverse side.)*<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain: | **Amount entitled to priority:**<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |

| | | |
|---|---|---|
| Date: *11/20/09* | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>*[signature]*<br><br>ROBERT L. ROBERTS<br>Vice President<br>Global Litigation Counsel<br>Flowserve Corporation | FOR COURT USE ONLY |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

* See attached Exhibit A

## Exhibit A

Flowserve Corporation f/k/a The Duriron Company ("Flowserve") entered into a certain Settlement Agreement ("Settlement Agreement") with General Motors Corporation ("Debtor") dated March 2, 2001. A copy of the Settlement Agreement is attached hereto as Exhibit A-1.

Pursuant to the terms of the Settlement Agreement, Debtor was to assume all liabilities of Flowserve related to the Cardington Road Landfill. Pursuant to the Site Participation Agreement ("Site Participation Agreement") dated March 15, 1996, Flowserve's percentage of costs for the Cardington Road Landfill Site remediation is 0.6451%. A copy of the Site Participation Agreement is attached hereto as Exhibit A-2.

Debtor has breached the terms of the Settlement Agreement by failing to pay amounts due under the terms of the Settlement Agreement. Debtor's breach of the Settlement Agreement has caused and will cause damages to Flowserve. The estimated cost for the completion of the Cardington Road Landfill Site remediation from 2009 going forward is $5,143,209.00. See spreadsheet entitled Cardington Road Post Closure Operations and Maintenance Estimated Cost Schedule attached hereto as Exhibit A-3. Applying Flowserve's percentage of costs as set out in the Site Participation Agreement to the future costs of remediation for the Cardington Road Landfill, results in a damage valuation of $33,178.84.

Accordingly, Flowserve's damages for Debtor's breach of contract are $33,178.84 plus interest, costs, and attorneys' fees.

Flowserve reserves the right to amend this Proof of Claim if additional information becomes available.

## SETTLEMENT AGREEMENT

This Agreement is made and entered into on this _____day of March 2001, by and among General Motors Corporation ("GM") and Flowserve Corporation (f/k/a The Duriron Company, Inc.) ("FLOWSERVE - DURIRON").

## RECITALS

WHEREAS, GM and FLOWSERVE - DURIRON (as alleged successor in interest to the The Duriron Company, Inc. have been identified as parties that may have liability under the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. §§ 9601, et seq. ("CERCLA"), the Ohio Hazardous Waste Management Act, as amended, ORC §§ 3734 et seq. ("Ohio Superfund"), and other legal authorities in connection with the alleged arrangement for disposal of substances that are or may be regulated by any federal, state or local statute, rule, regulation, or decision of any administrative agency or court, including, without limitation, CERCLA and Ohio Superfund ("Hazardous Substances"), at and from the Cardington Road/Sanitary Landfill Company Superfund Site in Moraine, Ohio (the "Cardington Road Site") including any contiguous off-site areas impacted by the Cardington Road Site; and

WHEREAS, GM and FLOWSERVE - DURIRON and other parties have previously funded certain environmental response activities required at the Cardington Road Site, where remedial construction has been completed and long-term operation and maintenance have begun; and

WHEREAS, GM and FLOWSERVE - DURIRON believe that, to the extent provided by this Agreement, it is in their mutual best interests to resolve current and potential litigation and to reach agreement between themselves with regard to certain responsibilities and potential liabilities relating to the Cardington Road Site, as more specifically defined below; and

1 of 10



EXHIBIT

A - 1

WHEREAS, GM and FLOWSERVE - DURIRON acknowledge and agree that the terms of this Agreement represent a good-faith settlement and compromise of disputed claims with respect to the matters addressed herein, negotiated at arms-length, and that this settlement represents a fair, reasonable, and equitable resolution of the matters among the parties hereto.

NOW, THEREFORE, in consideration of the foregoing and the mutual undertakings set forth in this Agreement, and other good and valuable consideration contained herein, the parties hereto represent, warrant, and agree as follows:

## OBLIGATIONS

1.    Covered Matters. This Agreement addresses and settles those liabilities and potential liabilities collectively referred to hereinafter as "Covered Matters" and defined as follows:

a.    All liabilities, remedies, claims, duties, obligations, costs (including any claim for past or future costs), or penalties that FLOWSERVE - DURIRON and/or GM may or could have with respect to environmental conditions at, emanating from, or related to the Cardington Road Site, as defined herein, and which liabilities, remedies, claims, duties, obligations, costs (including any claim for past or future costs), or penalties are created under or by CERCLA, Ohio Superfund, the Resource Conservation and Recovery Act; 42 U.S.C. §§ 6901, et seq. ("RCRA"), or any other similar or remedial federal, state, or local statute, rule, or common law.

b.    Notwithstanding the above, this definition of "Covered Matters" does not include any claims for natural resource damages that may be brought pursuant to statute by a federal natural resources trustee or designee, or their assignees, or any toxic tort claims relating to the Cardington Road Site.

2.    Site Definition.  The Cardington Road Site means the former landfill located at 1855 Cardington road in Moraine, Ohio (also known as the Sanitary Landfill Company site), being approximately 50 acres in size, but also including any and all contiguous off-site areas impacted by the landfill, as placed on the CERCLA National Priorities List ("NPL) by the United States Environmental Protection Agency ("EPA).

3.    Release of FLOWSERVE - DURIRON.  GM and its successors and assigns hereby release and forever discharge FLOWSERVE - DURIRON and its shareholders, officers, directors, employees, agents, successors and assigns, of and from any and all actions, courses of action, suits, sums of money, accounts, reckonings, bills, covenants, controversies, agreements, obligations, liabilities, damages, claims, debts, losses, expenses, or demands which GM ever had, now has, or hereafter can, shall, or may have against FLOWSERVE - DURIRON with respect to Covered Matters, except for rights granted by this Agreement.

4.    Indemnification of FLOWSERVE - DURIRON.  GM hereby agrees to protect, defend, indemnify, and save harmless FLOWSERVE - DURIRON from and against all Covered Matters and all claims, demands, and actions relating to Covered Matters.  GM shall have the right and duty to defend any order, claim, or suit brought against FLOWSERVE - DURIRON for Covered Matters, even if one or more of the allegations of the order, claim, or suit are groundless, false or fraudulent, and GM may make such investigation and settlement of any order, claim, or suit as GM deems expedient.  Other than those previously disclosed to GM, FLOWSERVE - DURIRON hereby acknowledges and certifies that it knows of no currently pending actions, causes of action, suits, controversies, agreements, obligations, liabilities, damages, claims, debts, losses, expenses, or demands against FLOWSERVE - DURIRON and relating to Covered Matters.

5.    Payment by FLOWSERVE - DURIRON.  In consideration for the obligations undertaken by GM pursuant to the terms of this Agreement, FLOWSERVE - DURIRON hereby agrees to pay to GM a cash amount of Twenty-Four Thousand Five Hundred Seventy Eight

Dollars ($24,578.00) (the "Cash Amount"). It is the intent of GM and FLOWSERVE - DURIRON

that in return for the total of the Cash Amount being paid by or on behalf of FLOWSERVE -

DURIRON to GM, then GM forever releases, indemnifies, defends, protects, and replaces

FLOWSERVE - DURIRON with respect to all Covered Matters for the Cardington road site as

provided by the terms of this Agreement.

      6.    <u>GM's Activities</u>. GM will continue, individually or together with other parties, to

carry out operation and maintenance activities at the Cardington Road Site. If it chooses to do

so, GM may notify EPA and the Ohio Environmental Protection Agency ("OEPA") of the

existence and effect of this Agreement, and that FLOWSERVE - DURIRON has paid for and

extinguished its potential liabilities associated with the Cardington Road Site.

      7.    <u>Assignment by FLOWSERVE - DURIRON</u>. FLOWSERVE - DURIRON hereby

assigns to GM all claims and demands of every kind and nature that FLOWSERVE - DURIRON

may possess with respect to Covered Matters against each and every other person, entity, and

potentially liable party at and for the Cardington Road Site. However, this reference to

potentially liable parties is <u>not</u> intended to include any insurance carrier of FLOWSERVE -

DURIRON, pursuant to Paragraph 17 below. FLOWSERVE - DURIRON agrees to execute any

additional documents that GM may reasonably request to give full force and effect to these

assignments.

      8.    <u>Release of GM</u>. FLOWSERVE - DURIRON and its successors and assigns

hereby release and forever discharge GM and its shareholders, officers, directors, employees,

agents, successors and assigns, of and from any and all actions, causes of action, suits, sums

of money, accounts, reckonings, bills, covenants, controversies, agreements, obligations,

liabilities, damages, claims, debts, losses, expenses, or demands which FLOWSERVE -

DURIRON ever had, now has, or hereafter can, shall, or may have against GM with respect to

Covered Matters, except for rights granted by this Agreement.

9.    <u>Transmittal of Claims</u>. FLOWSERVE - DURIRON will notify GM by fax and/or express delivery of the existence of any claim, demand, order, notice, summons, or other process received hereafter by FLOWSERVE - DURIRON regarding any Covered Matters, as follows:

a.    If a response is required within thirty (30) days of receipt, FLOWSERVE - DURIRON shall provide GM with written notice not later than ten (10) calendar days prior to any such response deadline for the claim, demand, order, notice, summons, or other process received by FLOWSERVE - DURIRON, provided, however, that FLOWSERVE - DURIRON itself received such claim, demand, order, notice, summons, or other process more than ten (10) days prior to such response deadline to allow for timely compliance with this Paragraph 9.a.

b.    If FLOWSERVE - DURIRON's receipt thereof is less than ten (10) days prior to the deadline for response, then FLOWSERVE - DURIRON shall seek a thirty (30)-day extension for response and shall provide a copy of the claim, demand, order, notice, summons, or other process and an acknowledgment of the thirty (30)-day extension to GM not later than ten (10) days prior to the extended deadline for response.

c.    Such notice and copies of whatever was received by FLOWSERVE - DURIRON shall be sent to GM in conformance with the notice provision set forth at paragraph 21 below.

d.    GM shall promptly notify FLOWSERVE - DURIRON that it has assumed the defense of any matter so forwarded to it by FLOWSERVE - DURIRON and covered by this Agreement. GM will then proceed to defend said claim, demand, order, notice, summons, or other process pursuant to this Agreement.

e.    If necessary and if reasonably requested by GM, FLOWSERVE -
DURIRON shall reasonably cooperate in responding to discovery,
allocation and information requests arising for many claim, demand,
order, notice, summons, or other process sent to FLOWSERVE -
DURIRON and for which GM has assumed the defense pursuant to this
Agreement.

f.    The failure to FLOWSERVE - DURIRON to abide strictly by the notice
provisions contained herein does not excuse GM's obligations of
indemnity or defense, except to the extent that actual and substantial
prejudice to GM is documented.

## MISCELLANEOUS

10.   <u>No Third-Party Beneficiaries</u>.  The rights and obligations created under this Agreement shall inure solely to the benefit of the persons and entities specifically referred to as the parties to this Agreement. Nothing herein shall create, extinguish, or in any manner alter or affect the rights or duties of any third parties not parties to, or not in privity with the parties to, this Agreement.

11.   <u>Bankruptcy</u>.  Upon any future bankruptcy filing by GM, or by FLOWSERVE - DURIRON, respectively, performance of the defense, indemnity, payment, and any and all other obligations, duties and actions of the bankrupt party pursuant to this Agreement shall to the extent possible be deemed to have the priority status of administrative expenses pursuant to 11 U.S.C. Sections 503(b) and 507(a)(1). Upon the confirmation of a plan of bankruptcy reorganization for the bankrupt party, the reorganized party or any post-confirmation successor entity shall be bound by all duties created for said bankrupt party by this Agreement. The terms, benefits, and obligations of this Agreement for GM or for FLOWSERVE - DURIRON, respectively, shall not be terminated, modified, or discharged by any Chapter 11 bankruptcy

resolution, and any plan of reorganization that may ever be proposed by GM or by FLOWSERVE - DURIRON respectively, in the future shall so provide.

12.    Applicable Law.  This agreement shall be interpreted and enforced according to the laws of the State of Ohio.

13.    Execution of Counterparts.   This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

14.    No Admission of Liability.  The execution of this Agreement shall not, under any circumstances, be construed as an admission by FLOWSERVE - DURIRON or GM of any fact or liability with respect to the Cardington Road Site, or with respect to any waste containing or constituting Hazardous Substances allegedly contributed to the site.  This Agreement shall not constitute or be used as evidence, as an admission of any liability or fact, or as a concession of any question of law by the parties hereto, nor shall it be admissible in any proceeding except in an action to seek the enforcement of any terms of this Agreement.

15.    Successors and Assigns Included as Parties.  Wherever in this Agreement either GM or FLOWSERVE - DURIRON is named or referred to, the legal representatives, successors, and permitted assigns of such party shall  bind and inure to the benefit of the respective successors and permitted assigns, whether so express or not.

16.    Assignment.  GM may not assign its rights, duties, or obligations under this Agreement to any other person or entity without the express, written, and advance permission of FLOWSERVE - DURIRON, which permission may be withheld by FLOWSERVE - DURIRON in its sole an exclusive discretion.

17.    Insurance.  GM and FLOWSERVE - DURIRON do not hereby make any agreement or take any action that will prejudice them with regard to, nor transfer their respective rights concerning, their respective third-party insurance claims, coverages or recoveries.

18.    <u>Headings</u>.  The headings contained in this Agreement are for convenience of reference only, are not to be considered a part hereof, and hall not limit or otherwise affect any of the terms hereof.

19.    <u>Modification</u>.    Neither this Agreement, nor any provisions hereof, may be changed, waived, discharged, or terminated orally, but only by instrument in writing signed by the party against whom enforcement of the change, waiver, discharge, or termination is sought.

20.    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the parties hereto among themselves as to the Covered Matters.  As between FLOWSERVE - DURIRON and GM, any prior agreements as to Covered Matters are hereby canceled or superceded by this Agreement to the extent that they may be inconsistent herewith, including without limitation any Consent Decree duties entered into by FLOWSERVE - DURIRON for the Cardington Road Site, and that certain Site Participation Agreement for the Cardington Road Site entered into by and among GM, FLOWSERVE - DURIRON, and certain other parties, dated March 15, 1996.

21.    <u>Notice Procedure</u>.  Notices required or otherwise given under this Agreement shall be directed as follows:

To GM:            Don A. Schiemann, Esq.
                  General Motors Corporation - Legal Staff
                  MC 482-C24-D24
                  300 Renaissance Center
                  P.O. Box 300
                  Detroit, MI  48265-3000
                  Tel:  (313) 665-4885
                  Fax: (313) 665-4896

To FLOWSERVE - DURIRON:
                  Robert L. Roberts, Jr.
                  Flowserve Corporation
                  222 West Las Colinas Blvd.
                  Suite 1500
                  Irving, TX  75039
                  Tel: (972) 443-6537
                  Fax: (972) 443-6837
                  e-mail: rroberts@flowserve.com

All notices or demands required or permitted under this Agreement shall be in writing and shall be effective if sent by express delivery or by registered or certified mail, postage prepaid and return receipt requested. Notices shall be deemed received at the time delivered. Any party may also give notice by facsimile transmission, which shall be effective upon confirmation by the party sending the notice that such facsimile transmission has been received by the party to whom the notice has been addressed. Nothing in this Paragraph 21 shall prevent the giving of notice in such manner as prescribed by the Federal Rules of Civil Procedure for the service of legal process. Either party may change its address by giving written notice thereof to the other party to this Agreement.

24.    Remedies and Attorneys' Fees. In any action brought by a party hereto for breach of this Agreement or to enforce the rights and obligations of this Agreement, the prevailing party shall be entitled also to recover its reasonable attorney's fees. Equitable and injunctive relief shall also be available to either party hereto upon breach of this Agreement by the other party.

25.    Authorization. Each of the signatories signing below on behalf of his or her respective party to this Agreement represents that he or she is fully authorized to sign on behalf of that party.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date appearing above and last written below.

GENERAL MOTORS CORPORATION

By: _____
Name: _____

Title: _____

Date: _____

FLOWSERVE CORPORATION

By: _____

Name: _____

ROBERT L. ROBERTS JR.
Associate General Counsel
Flowserve Corporation

Title: _____

Date: _MARCH 2, 2001_____

R020701F2

10 of 10

## SITE PARTICIPATION AGREEMENT

This Agreement is made and is effective as of this 15th day of March, 1996, between and among the entities listed in Appendix A to this Agreement (hereinafter the "Members") whose authorized representatives have executed this Agreement.

WHEREAS, the Members have entered into a Consent Decree with the United States for performance of Remedial Action and payment of response costs with respect to the Sanitary Landfill Company (IWD) Superfund Site (aka Cardington Road Landfill Site) in Moraine, Ohio (the "Site"), subject to approval by the United States District Court;

WHEREAS, without admitting any fact, responsibility, fault or liability in connection with the Site, the Members wish to perform their obligations under the Consent Decree and share past and future response costs at the Site;

WHEREAS, to perform the Remedial Action, the Members must fund the Cardington Road Custodial Fund ("Custodial Fund"), which Custodial Fund will be established to fund performance of the obligations set forth in the Consent Decree and to organize payments to be made by the Members and others pursuant to the Consent Decree;

WHEREAS, the Members desire to avoid litigation and agree among themselves to pay for past Site-related costs and the funding of the Consent Decree obligations in accordance with this Agreement;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants hereinafter made by each Member to the others, it is mutually agreed as follows:



EXHIBIT

A - 2

1. **Cardington Road Site Group.**

The Members hereby organize and constitute themselves as the Cardington Road Site Group (hereinafter "Group"). Each Member whose authorized representative has executed this Agreement is a member of the Group.

2. **Purpose and Payments.**

    **2.1**    **Purpose.** It is the purpose of this Agreement that the terms hereof shall control the manner and means by which the Members will undertake to satisfy their obligations pursuant to. and to otherwise comply with. the terms of the Consent Decree. and to share past and future costs at the Site.

    **2.2**    **Payments.** The Members agree to take all reasonably necessary actions to ensure that they comply with the Consent Decree, and agree to fund all costs arising in connection with their undertakings, duties, and obligations pursuant to the Consent Decree and this Agreement, including without limitation:

    (a)    funding of the Work in accordance with the Consent Decree:

    (b)    payment of sums required by the Custodian pursuant to the Cardington Road Custodial Fund Agreement (the "Custodial Fund Agreement") entered into pursuant to the Consent Decree and this Agreement;

    (c)    payment of project management costs, the Governments' oversight costs in accordance with the Consent Decree. any stipulated penalties imposed pursuant to the Consent Decree. administrative costs of the Group. and any other costs necessary to effectuate the purposes of this Agreement. by making payments in accordance with the provisions of Sections 6 and 7 hereof:

2

(d)   payment of each Member's percentage share. in accordance with Section 6 and Exhibit A, of past costs spent to date for response activities at the Site. with full credit for obligations previously satisfied by such Member under other agreements regarding the Site; and

(e)   costs determined by the Group to be necessary and appropriate to take legal action against non-members. subject to and in accordance with Subsection 4.10 herein.

**2.3   Financial Assurances.**  Each Member warrants that it presently has or has the ability to obtain in a timely manner sufficient funds to pay its share of all costs and payments required pursuant to the Consent Decree and to make payments as and when required pursuant to the Consent Decree. the Custodial Fund Agreement and this Agreement.

**2.4   Cooperation.**  The Members shall cooperate with each other to effectuate the purposes of this Agreement, shall attempt to make decisions by consensus. and shall attempt to resolve any disputes among them through good faith negotiation.

**3.   Organization and Procedures.**

**3.1   Committees.**  In order to carry out the purposes of this Agreement. the Members hereby establish two Committees. the Steering Committee and the Technical Committee. Each Member and any individual serving on behalf of any Member. agrees by virtue of such service. to maintain the privileged nature and confidentiality of all communications and proceedings of such committees or subcommittees; such obligation shall continue in the event such individual should leave the employ of or cease to represent such Member.

**3.2   Authority to Decide.**  Except as otherwise provided herein. the Members shall act by and through the Steering Committee. provided that the Group reserves to itself the right at any

3

time directly to authorize action to be undertaken pursuant to this Agreement in accordance with the voting requirements set forth in this Agreement.

**3.3    Meetings.** The Members may authorize or direct actions under this Agreement only at meetings duly held and called for such purpose. which meetings shall be called from time to time as determined necessary by the Steering Committee.  Meetings of the Group may be called for any purpose at any time.  Meetings may be held by telephone conference.

**3.4    Notice of Meetings.** Reasonable notice of the time. place and purpose of any meeting of the Group shall be timely given to each Member entitled to vote at such meeting.

**3.5    Voting.** Each Member shall have a vote ("Voting Power") as follows:

(a)    Each member shall have a vote weighted in accordance with the percentage share of the Member with respect to the Site as set forth in Appendix A hereto;

(b)    No Member may vote unless that Member has paid all financial contributions assessed. due and owing as of the last assessment made pursuant to this Agreement or the Custodial Fund Agreement prior to such meeting.  Any member having an assessment due and owing that remains unpaid at the time of the meeting may vote only upon payment of the full assessment and any penalties prior to the voting process; and

(c)    Unless otherwise specified herein, all issues shall be decided by a majority of the voting power of the Members as defined in this section.

**3.6    Voting by Proxy.** A Member eligible to vote at a Group meeting may assign in writing, using the form in Appendix B to this Agreement. its vote (in accordance with Section 3.5 of this Agreement) to another Member eligible to vote at the meeting.

4

3.7    **Quorum.** Fifty percent (50%) of the eligible voting power (as defined in Section 3.5 of this Agreement) and at least four (4) Members of the Group shall be present in person or represented by proxy at any Group meeting.

4.    **Steering Committee.**

4.1    **Steering Committee Members.** The Steering Committee shall consist of at least three (3) Members. Any Member may join the Steering Committee.

4.2    **Powers of the Steering Committee.** The Steering Committee shall undertake such activities as the Steering Committee deems necessary and proper to carry out the purposes of this Agreement and the obligations of the Members under the Consent Decree.

4.3    **Shared Costs.** Those activities authorized by the Steering Committee or the Group to be undertaken on behalf of the Group shall be funded by the Members as Shared Costs. These costs include, but are not limited to, payments assessed by the Custodian or the Steering Committee pursuant to Section 6 of this Agreement, administrative costs, common counsel fees and costs, technical costs, and other costs necessary to further the purposes of this Agreement, the Custodial Fund Agreement, and the Consent Decree.

4.3.1    **Past Costs.** Past Costs shall be defined as those costs billed through December 31, 1995 for response activities, responsible party investigations, and similar activities relating to the Site, which amount to $5,434,489.

4.4    **Reports to the Group and Call for Group Meetings.** The Steering Committee shall periodically report its actions to the Group as may be necessary to keep the Group fully informed of matters covered by this Agreement, and shall call meetings of the Group as

determined necessary by the Steering Committee and refer to such meetings for a vote any matters which in the judgment of the Steering Committee should be referred.

**4.5     Quorum.** Three members of the Steering Committee and at least 50% of the Voting Power shall be present in person or represented by proxy at any Steering Committee meeting.

**4.6     Voting.** All issues shall be decided by a majority of the Voting Power of the Members. A member of the Steering Committee may assign its vote to another member of the Steering Committee to vote at the meeting using the form in Appendix B to this Agreement.

**4.7     Compensation of Steering Committee.** The members of the Steering Committee shall serve as volunteers without compensation from the Group.

**4.8     Call for, and Notice of, Meetings.** The Steering Committee may authorize and direct actions only at meetings duly held and called for such purpose. which meetings shall be regularly called with reasonable notice given. Meetings may be held by telephone conference. The meetings of the Steering Committee shall be open to any Member.

**4.9     Providing Members with Information.** Upon request from any Member. the Steering Committee shall make available to that Member at that Member's expense copies of any reports submitted to or by the Steering Committee in connection with the Work or pursuant to the Custodial Fund Agreement or the Consent Decree.

**4.10    Litigation Against Other Persons.** The Members of the Group other than Tremont Landfill Company and Waste Management of Ohio ("Generator Members") who are on the Steering Committee may recommend to the Group that a claim be asserted on behalf of the Members against other persons who arranged for the disposal of waste at the Site. No such claim

6

may be asserted by Common Counsel under this Agreement without the consent of a majority of

the Voting Power of the Group, excluding the voting power of Tremont Landfill Company,

Waste Management of Ohio, Inc., and their successors and assigns who shall not participate in

such litigation. Any Member may elect to decline participation in any such suit and may, but

need not, in lieu of such participation assign its claims to the other Generator Members. Any

Member that does not participate in such litigation shall not fund the costs of or share in any

proceeds from such litigation. Tremont Landfill Company, and no other Member, may elect to

pursue a claim on behalf of the Members against the owners/operators of the Site. Tremont

Landfill Company shall fund the costs of and retain the proceeds of such litigation. Except as

expressly provided in this Agreement, nothing in this paragraph shall affect or impair the right of

any Member to assert any claim in its own name and right against any person.

**4.10.1  Litigation Recoveries.**  Any sums recovered through a settlement or

judgment, as a result of the litigation discussed in Section 4.10, shall inure to the benefit of only

those Members that funded the litigation under Section 4.10, in proportion to each Member's

contribution to such funding. Any funding prior to September 1, 1995, shall be disregarded for

purposes of this Section 4.10.1.

## 5.  Technical Committee.

**5.1  Technical Committee Members.**  The Technical Committee shall consist of at

least two technically qualified representatives of Members who agree to participate actively on

the Committee.

**5.2  Powers of the Technical Committee.**  The powers and duties of the Technical

Committee shall include:

7

(a)    assisting the Steering Committee in overseeing the activities of any persons

retained for the Group in connection with implementation of the Work;

(b)    making recommendations to the Steering Committee concerning issues relating to

the implementation of the Work at the Site;

(c)    recommending to the Steering Committee remedial action contractors and an

oversight contractor; and

(d)    review of documents and monthly reports prior to submission to EPA.

**5.3    Compensation of Technical Committee Members.**  The members of the

Technical Committee shall serve as volunteers without compensation from the Group.

**5.4    Call for, and Notice of, Meetings.**  The Technical Committee may authorize and

direct actions only at meetings duly held and called for such purpose, which meetings shall be

regularly called with reasonable notice given.  Meetings may be held by telephone conference.

The meetings of the Technical Committee shall be open to any Member.

**6.    Allocation of Expenses and Credit for Payment.**

**6.1    Past Cost Payments.**  Each Member shall pay its share of Past Costs within 30

days of the Court's entry of the Consent Decree, said payment to be equal to the amount shown

in Appendix A under the heading "Past Cost Payment." Unless otherwise agreed by a vote of the

Group, and except as provided in the next sentence, all payments of Past Costs, all payments by

Premium Settling Defendants under the Consent Decree, and all payments by other Consent

Decree signatories who have elected to cash out of further response action and response cost

liability at the Site, will be appropriately applied against subsequent assessments of NCR

Corporation, Bridgestone/Firestone, Inc., and General Motors Corporation.  All payments under

8

the Consent Decree and a separate settlement agreement relating to the Site by the Montgomery

County Solid Waste District and its member entities, totaling $1,000,000.00, shall be credited to

each Member of this Agreement in accordance with its percentage share as listed in Appendix A

and applied against subsequent assessments of each Member.

**6.2    Payments.**  Shared Costs, as defined in Paragraph 4.3 herein, shall be assessed by

the Steering Committee or the Custodian in accordance with the percentage shares as set forth in

Appendix A.  All assessments shall be due and payable within 45 days after receipt of notice

thereof unless said notice provides otherwise.

**6.3    Accounting for Funds.**  The Steering Committee shall provide to the Members

from time to time, and at least annually, informal accountings of monies received, spent, and

obligated, and a final accounting upon the termination of the Agreement.

**6.4    Purpose of Funds.**  All monies provided by Members pursuant to this Agreement

shall be used solely for the purposes of this Agreement and shall not be considered as payment

for any fines, penalties, or monetary sanctions.  To the extent the Governments assess stipulated

penalties, said penalties shall be a Shared Cost and allocated in accordance with Section 6 of this

Agreement.  Any such penalties shall be paid separately by the Members and shall not be placed

in the Custodial Fund.

**7.    The Cardington Road Site Custodial Fund.**

**7.1    Establishment of the Custodial Fund.**  Each Member shall act to establish the

Cardington Road Custodial Fund ("Custodial Fund") by promptly executing the Custodial Fund

Agreement when it is presented in final form.

**7.2    Payments.** Each Member shall periodically fund the Custodial Fund in accordance with Section 6.2.

**7.3    Termination.** The Custodial Fund shall terminate upon termination of the Consent Decree and distribution of the proceeds in the Fund pursuant to the Custodial Fund Agreement, or as agreed by the Members pursuant to this Agreement.

**8.    <u>Common Counsel.</u>**

**8.1    Initial Common Counsel.** It is agreed that as of the effective date of this Agreement and until otherwise determined under the provisions of this Agreement, Common Counsel shall be the law firm of Beveridge & Diamond, P.C. Each Member agrees that: (1) it will not claim or assert that, based solely on its past or present representation of a Member, Beveridge & Diamond, P.C. has a conflict of interest in performing legal services authorized by the Steering Committee and relating to the Site; (2) it will not claim or assert that, based solely on Beveridge & Diamond's representation of the Group under the terms of this Agreement, Beveridge & Diamond has a conflict of interest in connection with any representation of any other person or entity in a currently pending matter; and (3) it will not claim or assert that, based solely on Beveridge & Diamond's representation of the Group under the terms of this Agreement, Beveridge & Diamond has a conflict of interest in any future representation of any person or entity unless the subject matter relating to said representation arises out of or its connected to the Cardington Road Site and involves or could involve any facts or information obtained from the Member during the term of this Agreement. Each Member agrees that if this Agreement is terminated, the Member will not raise any objection to or assert any conflict of interest regarding the continued representation by Beveridge & Diamond of any other Members

10

in connection with any legal services arising out of the Site, including, but not limited to, cost

recovery or contribution litigation on behalf of such Members. The terms of this section shall

survive the termination of this Agreement.

**8.2    Separate Counsel.** Notwithstanding that the Steering Committee may request

Common Counsel to undertake discrete tasks common to the Group effort, each Member

reserves the right to select and retain its own counsel to represent such Member on any matter.

**8.3    Waiver of Conflict of Interest.** Upon engagement of common counsel by the

Steering Committee other than Initial Common Counsel as designated in Section 4.4, each

Member agrees that: (1) it will not claim or assert that, based solely on said counsel's past or

present representation of a Member, said counsel has a conflict of interest in performing legal

services authorized by the Steering Committee and arising out of the Site, unless the Member

notifies the Steering Committee of the claimed conflict within twenty (20) days of receiving

notice of intent to hire said counsel; (2) it will not claim or assert that, based solely on said

counsel's representation of the Group under the terms of this Agreement, said counsel has a

conflict of interest in connection with any representation of any other person or entity in a matter

pending as of the date of receiving notice of intent to hire said counsel, unless the Member

notifies the Steering Committee of the claimed conflict within twenty (20) days of receiving said

notice; (3) it will not claim or assert that, based solely on said counsel's representation of the

Group under the terms of this Agreement, said counsel has a conflict of interest in any future

representation of any person or entity unless the subject matter relating to said representation

arises out of or is connected to the Cardington Road Site and involves or could involve any facts

or information obtained from the Member during the term of this Agreement; (4) in the event that

11

any conflict develops between the performance of work authorized by the Steering Committee by

said counsel and the legal services authorized by any Member that has retained that counsel, the

Member consents to that counsel's continued performance of the work authorized by the Steering

Committee.

**9.** **Confidentiality.**

    **9.1**    **Shared Information.** From time to time, the Members may elect to disclose or

transmit to each other, directly or through common counsel, such information as each Member,

counsel or technical consultant retained for the Group deems appropriate for the sole and limited

purpose of coordinating activities that are necessary and proper to carry out the purposes of this

Agreement. Shared information may be disclosed to or transferred among the Members orally or

in writing or by any other appropriate means of communication. The Members intend that no

claim of work product privilege or other privilege be waived by reason of participation or

cooperation pursuant to this Agreement.

    **9.2**    **Preservation of Privilege.** Information disclosed by the Members to counsel

appointed by the Steering Committee to perform specified work may be disclosed to any other

Member, and each Member hereby expressly consents to treat such disclosure to it as being for

the sole purpose of effectuating the purposes of this Agreement. Such disclosure shall not be

deemed a waiver of the attorney-client privilege or work product immunity or any other

privilege.

    **9.3**    **Confidentiality of Shared Information.** (a) Each Member agrees that all shared

information received from any other Member or its counsel, technical consultant, or common

counsel pursuant to this Agreement shall be held in strict confidence by the receiving Member

12

and by all persons to whom confidential information is revealed by the receiving Member

pursuant to this Agreement, and that such information shall be used only in connection with

conducting such activities as are necessary and proper to carry out the purposes of this

Agreement.

(b) Shared information that is exchanged in written or in document form and is intended

to be kept confidential may, but need not, be marked "Confidential" or with a similar legend. If

such information becomes the subject of an administrative or judicial order requiring disclosure

of such information by a Member, where the information will be unprotected by confidentiality

obligations, the Member may satisfy its confidentiality obligations hereunder by notifying the

Member that generated the information or, if the information was generated by counsel appointed

by the Steering Committee to perform specified work or by a technical consultant, by giving

notice to said counsel or consultant and to the Steering Committee:

(c)     Each Member shall take all necessary and appropriate measures to ensure that any

person who is granted access to any shared information or who participates in work on common

projects or who otherwise assists any counsel or technical consultant in connection with this

Agreement, is familiar with the terms of this Agreement and complies with such terms as they

relate to the duties of such person:

(d)     The Members intend by this Section to protect from disclosure all confidential

information and documents shared among any Members or between any Member and counsel

appointed by the Steering Committee or any technical consultant to the greatest extent permitted

by law regardless of whether the sharing occurred before execution of this Agreement and

regardless of whether the writing or document is marked "Confidential":

13

(e)    The confidentiality obligations of the Members under this Section shall remain in full force and effect, without regard to whether actions arising out of the Site are terminated by final judgment, and shall survive the termination of this Agreement.  The provisions of this Section shall not apply to information which is now or hereafter becomes public knowledge without violation of this Agreement, or which is sought and obtained from a Member pursuant to applicable discovery procedures and not otherwise protected from disclosure.

10.    **Denial of Liability.**  This Agreement shall not constitute, be interpreted, construed or used as evidence of any admission of liability, law or fact, a waiver of any right or defense, nor an estoppel against any Member, by Members as among themselves or by any other person not a Member.  However, nothing in this Section 10 is intended or should be construed to limit, bar, or otherwise impede the enforcement of any term or condition of this Agreement against any party to this Agreement.

11.    **Insurance.**  The Members do not intend hereby to make any agreement that will prejudice any Member with respect to its insurers and, by entering into this Agreement, anticipate that the actions taken pursuant to this Agreement will benefit such insurers.

12.    **Successors and Assigns.**  This Agreement shall be binding upon the successors and assigns of the Members.  No assignment or delegation of the obligation to make any payment or reimbursement hereunder will release the assigning Member without the prior written consent of the Steering Committee.

13.    **Allocation in the Event of Default.**  The Steering Committee shall have the authority to declare any Member to be in default under this Agreement where said Member has failed to satisfy any financial obligation in a timely manner after written notice has been provided to the

14

alleged defaulting Member. The unpaid balance of any defaulting Member's share may be

assessed by the Steering Committee against the other Members hereto (without waiving any

rights such Members may have against the defaulting Member or its successors or assigns) in the

same proportion as the other Members would have been obligated to pay if the defaulting

Member had not been a signatory to this Agreement.

14.    **Advice of Counsel.** No Member, or representative or counsel for any Member, has acted

as counsel for any other Member with respect to such Member entering into this Agreement,

except as expressly engaged by such Member with respect to this Agreement, and each Member

represents that it has sought and obtained any appropriate legal advice it deems necessary prior to

entering into this Agreement.

No Member or its representative serving on any committee or subcommittee shall act as

legal counsel or legal representative of any other Member, unless expressly retained by such

Member for such purpose, and except for such express retention, no attorney/client relationship

or fiduciary relationship is intended to be created between representatives on the Steering

Committee or Technical Committee and the Members.

15.    **Waiver and Release of Liability.**

**15.1    Waiver and Release.** No Member or its representative serving on any committee

or subcommittee shall be liable to any Member for any claim, demand, liability, cost, expense,

legal fee, penalty, loss or judgment incurred or arising as a result of any acts or omissions taken

or made pursuant to this Agreement. However, nothing in this Paragraph shall constitute a

waiver or release of any contribution or indemnification claim or potential claim by one Member

15

against any other Member which is reserved within the scope of the Consent Decree or made

pursuant to any future contract entered into by any Member outside this Agreement.

    **15.2    Survival.** This Section 15 shall survive the termination of this Agreement.

## 16.    Indemnification.

    **16.1    Indemnification.** Each Member agrees to indemnify, defend and hold harmless

any member and its representative(s) from and against any claim, demand, liability, cost,

expense, legal fee, penalty, loss or judgment (collectively "liability") which in any way relates to

the good-faith performance of any duties under this Agreement by any Member or its

representative(s) on behalf of the Steering Committee, Technical Committee, or the Group,

including, but not limited to, any liability arising from any contract, agreement or instructions to

the Custodian signed by the Member or its representative(s) at the request of the Steering

Committee or the Group. This indemnification shall not apply to any liability arising from a

criminal proceeding where the Member or its representative(s) had reasonable cause to believe

that the conduct in question was unlawful.  However, nothing in this Paragraph shall constitute a

waiver or release of any contribution or indemnification claim or potential claim by a Member

which is reserved within the Consent Decree or made pursuant to any future contract entered into

by any Member outside this Agreement.

    **16.2    Montgomery County Solid Waste District.** Each Member agrees to indemnify

the Montgomery County Solid Waste District and its member entities (collectively the

"MCSWD") for or from any and all claims, demands, causes of action, liabilities, suits, and

judgements under Sections 107 or 113 of the Comprehensive Environmental Response,

Compensation and Liability Act, 42 U.S.C. §§ 9607 and 9613, or Sections 7002 or 7003 of the

Resource Conservation and Recovery Act, 42 U.S.C. §§ 6972 and 6973, arising from or relating

to the Site. This indemnification is in consideration of a payment by the MCSWD of $1,000,000

to settle its response liability at the Site. In accordance with Section 6.1 hereof, each Member

will benefit from the MCSWD payment in proportion to its percentage set forth in Appendix A.

    **16.3    Shared Cost.** Payments under this section shall be a Shared Cost in accordance

with Section 4.3 hereof, and shall be allocated among the Members.

    **16.4    Survival.** This Section 16 shall survive the termination of this Agreement.

**17.    <u>Covenant Not To Sue.</u>**

    **17.1    Covenant.** In consideration of the mutual undertakings in this Agreement, each

Member covenants not to sue the other Members or their officers, directors, shareholders,

subsidiaries, affiliates, employees or agents with respect to any claims or liability under any

provision of law or past or present contract (other that this Agreement) concerning "matters

addressed" in the Consent Decree, as that term is defined in Paragraph 90 of the Consent Decree,

except for any claims relating to the enforcement of this Agreement or any claims among the

Members expressly reserved pursuant to the Consent Decree. The Members expressly reserve

the right, jointly and severally, to take such actions as may be necessary to collect or compel the

payment by any other Member of any amounts due and payable pursuant to this Agreement, the

Custodial Fund Agreement, or the Consent Decree. Until this Agreement is amended to provide

otherwise, the Members expressly reserve, jointly and severally, all claims or causes of action

among the Members that are outside the scope of the covenant not to sue in this Paragraph 17.1,

notwithstanding any language in Paragraph 88 of the Consent Decree to the contrary. The

Members agree not to raise Paragraph 88 of the Consent Decree as a defense to any claim or

action among any of the Members regarding matters outside the scope of the covenant not to sue

set forth in this Paragraph 17.1.

    **17.2    Survival.** This Section 17 shall survive the termination of this Agreement.

**18.    Notice.** All notices, bills, invoices, reports, and other communications with a Member

shall be sent to the representative designated by the member of said Member's signature page of

this Agreement. Each Member shall have the right to change its representative upon written

notice to the Chairperson of the Steering Committee.

**19.    New Members.** A person or entity that becomes a Member by execution of this

Agreement subsequent to the effective date of this Agreement shall be deemed a Member ab

initio and will make all payments which it would have been required to make had it been a

Member ab initio, in proportion to the Members' Percentage as determined by the transactional

database developed by the Cardington Road Coalition, except that the Members, through the

Steering Committee may, for good cause, impose different terms and conditions upon any person

or entity seeking to enter this Agreement after its effective date.

**20.    Effective Date.** The effective date of this Agreement shall be the date first stated above.

**21.    Termination.** This Agreement shall terminate at the time that the United States District

Court for the Southern District of Ohio rejects or otherwise declines to enter the Consent Decree

or when the Consent Decree terminates.

**22.    Excess Funds.** If, after termination of this Agreement and payment of all administrative

costs and consent decree expenses, a positive balance remains in the Custodial Fund, the balance

will be distributed to each Member in proportion to the percentages listed in Appendix A. At

such time, any Member who has contributed more than its percentage share will receive an

amount equal to this overpayment before a distribution to the Members is calculated. Any
Member who is in default under Section 13 shall not receive any distribution under this
provision.

23.   **Amendments.** This Agreement may be amended only by a vote of at least two-thirds of
the Voting Power of the Members present in person or by proxy at a Group meetings called for
the purpose of considering such an amendment. However, Section 3.5, 4.10, 6.2, 9, 13, and 23 of
this Agreement may be amended only by a unanimous vote of 100% of the Voting Power of the
Members. In any event, the provisions of Sections 15, 16, 17 and 23 cannot be amended to limit
the effect of Sections 15, 16 or 17 with respect to acts or omissions taken or made prior to such
amendment.

24.   **Separability.** If any provision of this Agreement is deemed invalid or unenforceable, the
balance of this Agreement shall remain in full force and effect.

25.   **Entire Agreement.**

25.1   This Agreement constitutes the entire understanding of the Members with respect
to its subject matter and supersedes any previous written or oral agreements entered into with
respect to the Cardington Road Site.

25.2   Notwithstanding Paragraph 25.1 above, nothing herein prevents or is intended to
prevent some of the Members hereto from agreeing to reallocate between or among themselves,
on a basis other than as provided in this Agreement, the costs required to be paid by each of those
Members under the terms of this Agreement. Similarly, this Agreement does not supersede and
is not intended to supersede any existing agreements allocating among some of the Members to

this Agreement. on a basis other than as provided in this Agreement. the costs required to be paid by each of those Members under the terms of this Agreement.

26.    **Applicable Law.**  For purposes of enforcement or interpretation of the provisions of the Agreement. the Members agree that the laws of the State of Ohio shall be applicable. and further agree not to contest personal jurisdiction in the State or Federal Court of Ohio with respect to litigation brought for such purposes.

27.    **Separate Documents.**  This Agreement may be executed in two or more counterparts. each of which shall be deemed an original. but all of which together shall constitute one and the same instrument.

28.    **Nature of Agreement.**  Nothing herein shall be deemed to create a partnership or joint venture and/or principal and agent relationship between or among the Members.

## APPENDIX A

| Member | Share of Total Site Costs | Past Cost Payment |
|---|---|---|
| Tremont Landfill Co. | 40.00000% | $0 |
| Waste Management of Ohio, Inc. | 6.00000% | $326,069.34 |
| Duriron | .6451% | $35,059.95 |
| TRW, Inc. | .4925% | $26,766.71 |
| Manchester Tank Equipment | .2229% | $12,117.06 |
| Danis Industries Corp. | .6064% | $32,953.85 |
| **Subtotal** | **47.9669%** | **$432,966.91** |
| General Motors, NCR 8.531 37.660<br>Bridgestone/Firestone 5.842 | 52.0331% | $0 |
| **Total** | **100%** | **$432,966.91** |

O:\CLIN03\82\2462\MISC\2462RWC.65

APPENDIX B

## Cardington Road Site Group Proxy

I, the duly authorized representative of _____. (hereinafter the

"Member") do hereby grant the Proxy of the Member to _____ for the

_____ meeting to be held on the _____ day of _____;

_____ is hereby authorized and empowered to vote for said Member and in said

Member's name and stead at such meeting (and at any adjournment thereof) on any issue. except

for those issues listed below. put to a vote in accordance with the Cardington Road Site

Participation Agreement. For those issues noted below, _____ has no

authority on behalf of the Member and must abstain from voting on the Member's behalf.


Signature: _____

Title/Position: _____

On Behalf Of: _____
                (Company/Entity Name)

Date Signed: _____


Issues for which this proxy is not granted:

1. _____

2. _____

3. _____

IN WITNESS WHEREOF, the Members hereto, which may be by and through their appointed counsel, enter into this Agreement. Each person signing this Agreement represents and warrants that he or she has been duly authorized to enter into this Agreement by the company or entity on whose behalf it is indicated that the person is signing.

Signature: _____

Name: _____Gregory L. McCann_____

Title/Position: ___Vice President, General Counsel and Secretary___

On Behalf Of: ____DANIS INDUSTRIES CORPORATION____
(Company/Entity Name)

Date Signed: _____March 13, 1996_____


Designated Representative for Receipt of Notices and Invoices:

Name: _____Gregory L. McCann_____

_____Vice President, General Counsel and Secretary___

Address: _____Danis Industries Corporation___
2 Riverplace, Suite 400
Dayton, OH 45405

_____

_____

Telephone No. ___513-228-1225_____

Facsimile No. ____513-228-1217_____

21

IN WITNESS WHEREOF, the Members hereto, which may be by and through their
appointed counsel, enter into this Agreement. Each person signing this Agreement represents
and warrants that he or she has been duly authorized to enter into this Agreement by the
company or entity on whose behalf it is indicated that the person is signing.

Signature: _____

Name: _____Steven B. Stanley_____

Title/Position: _____Vice President_____

On Behalf Of: _____Tremont Landfill Company_____
(Company/Entity Name)

Date Signed: _____3 / 13 / 96_____


Designated Representative for Receipt of Notices and Invoices:

Name: _____Gregory L. McCann – Secretary_____

_____Tremont Landfill Company_____

Address: _____2 Riverplace, Suite 400_____

_____Dayton, OH   45405_____

_____

Telephone No. _____513/228-1225_____

Facsimile No. _____513/228-1217_____


21

IN WITNESS WHEREOF, the Members hereto, which may be by and through their appointed counsel, enter into this Agreement. Each person signing this Agreement represents and warrants that he or she has been duly authorized to enter into this Agreement by the company or entity on whose behalf it is indicated that the person is signing.

Signature: _____

Name: __L. DeWayne Layfield__

Title/Position: __Senior Counsel--Litigation__

On Behalf Of: __Bridgestone/Firestone, Inc.__
(Company/Entity Name)

Date Signed: __March 13, 1996__

Designated Representative for Receipt of Notices and Invoices:

Name: __L. DeWayne Layfield__

__Bridgestone/Firestone, Inc.__

Address: __3000 One Shell Plaza - 910 Louisiana Room 2929__

__Houston, Texas 77002-4995__

_____

Telephone No. __(713) 222-0382__

Facsimile No. __(713) 229-1522__

21

IN WITNESS WHEREOF, the Members hereto, which may be by and through their appointed counsel, enter into this Agreement. Each person signing this Agreement represents and warrants that he or she has been duly authorized to enter into this Agreement by the company or entity on whose behalf it is indicated that the person is signing.

Signature: David B. Goldston

Name: David B. Goldston

Title/Position: Assistant Secretary, TRW Inc.

On Behalf Of: TRW Inc.
(Company/Entity Name)

Date Signed: March 13, 1996

Designated Representative for Receipt of Notices and Invoices:

Name: F. David Trickey

Senior Counsel

Address: TRW Inc.

1900 Richmond Road

Cleveland, OH 44124

Telephone No. 216.291.7359

Facsimile No. 216.291.7874 or 7070

21

IN WITNESS WHEREOF, the Members hereto, which may be by and through their

appointed counsel, enter into this Agreement.  Each person signing this Agreement represents and

warrants that he or she has been duly authorized to enter into this Agreement by the company or

entity on whose behalf it is indicated that the person is signing.

Signature: _____

Name: _____Robert E. Leininger_____

Title/Position: _Senior Environmental Counsel_____

On Behalf Of: ____Waste Management of Ohio, Inc.___
            (Company/Entity Name)

Date Signed: ____3/13/96_____


Designated Representative for Receipt of Notices and Invoices:

Name: _Robert E. Leininger_____

        _Senior Environmental Counsel_____

Address: _17250 Newburgh Road, Suite 100_____

        _Livonia, MI 48152_____

        _____

Telephone No. __(313) 462-6900_____

Facsimile No. ___(313) 462-6286_____

21

IN WITNESS WHEREOF, the Members hereto, which may be by and through their

appointed counsel, enter into this Agreement. Each person signing this Agreement represents and

warrants that he or she has been duly authorized to enter into this Agreement by the company or

entity on whose behalf it is indicated that the person is signing.

Signature: _Robert L. Roberts_

Name: _ROBERT L ROBERTS_

Title/Position: _ASSOCIATE COUNSEL_

On Behalf Of: _THE DURIRON COMPANY INC._
(Company/Entity Name)

Date Signed: _MARCH 14, 1996_

**Designated Representative for Receipt of Notices and Invoices:**

Name: _ROBERT L. ROBERTS, JR
ASSOCIATE COUNSEL_

Address: _THE DURIRON CO., INC.
P.O. BOX 8820
DAYTON, OHIO 45401-8820_

Telephone No. _(513) 476-6139_

Facsimile No. _(513) 476-6204 OR 6256_

IN WITNESS WHEREOF, the Members hereto, which may be by and through their appointed counsel, enter into this Agreement.  Each person signing this Agreement represents and warrants that he or she has been duly authorized to enter into this Agreement by the company or entity on whose behalf it is indicated that the person is signing.

Signature: _Don A. Schiemann_

Name: __Don A. Schiemann__

Title/Position: __Attorney__

On Behalf Of: __General Motors Corporation__
                       (Company/Entity Name)

Date Signed: __March 15, 1996__


Designated Representative for Receipt of Notices and Invoices:

Name: __Don A. Schiemann, Esq.__

           __General Motors Corporation__

Address: __3044 West Grand Boulevard__

           __MC # 482-112-149__

           __Detroit, MI  48202__

Telephone No. __(313) 556-2175__

Facsimile No. __(313) 974-5467__

21

IN WITNESS WHEREOF, the Members hereto, which may be by and through their
appointed counsel, enter into this Agreement. Each person signing this Agreement represents and
warrants that he or she has been duly authorized to enter into this Agreement by the company or
entity on whose behalf it is indicated that the person is signing.

Signature: _David D. Reifschneider_

Name: _DAVID D. Reifschneider_

Title/Position: _Environmental Director_

On Behalf Of: _Manchester Tank & Equipment Co_
(Company/Entity Name) _For Buckeye Boiler_

Date Signed: _3/20/96_

Designated Representative for Receipt of Notices and Invoices:

Name: _DAVID D. Reifschneider_
_Environmental Director_

Address: _Manchester Tank & Equipment Co._
_1749 Mallory Ln, Suite 400_
_Brentwood, TN 37027_

Telephone No. _615-370-6124_

Facsimile No. _615-370-6285_

21

IN WITNESS WHEREOF, the Members hereto, which may be by and through their appointed counsel, enter into this Agreement. Each person signing this Agreement represents and warrants that he or she has been duly authorized to enter into this Agreement by the company or entity on whose behalf it is indicated that the person is signing.

Signature: _____

Name: _____Paul M. Samson_____

Title/Position: _____Attorney_____

On Behalf Of: _____NCR Corporation_____
        (Company/Entity Name)

Date Signed: _____November 5, 1996_____


Designated Representative for Receipt of Notices and Invoices:

Name: _____Paul M. Samson_____

_____Attorney, Corporate Section_____

Address: _____NCR Corporation_____

_____101 W. Schantz Avenue, ECD-2_____

_____Dayton, OH 45479-0001_____

Telephone No. _____937/445-2908_____

Facsimile No. _____937/445-1933_____

21

PRELIMINARY FOR DISCUSSION PURPOSES ONLY

Cardington Road Post Closure Operations and Maintenance
Estimated Cost Schedule



EXHIBIT A-3

The page contains a large rotated cost-schedule table ("Estimated Cost Schedule") with columns for Line Item, Unit of Measure, Unit Cost, Quantity, Equipment Annual Cost, and annual cost figures for years 2007 through 2017 (columns numbered 9 through 19). Section groupings include: Pneumatic Pump System, Groundwater Monitoring System, Laboratory Analysis, Explosive Gas Sampling (6 wells), and a Chemical/Disposal section. The figures are not legible at sufficient resolution to transcribe reliably.

Cardington Road Post Closure Operations and Maintenance
Estimated Cost Schedule

PRELIMINARY FOR DISCUSSION PURPOSES ONLY

| Line Item | Unit of Measure | Unit Cost | Quantity | Equivalent Annual Cost | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cap Repair** | | | | | | | | | | | | | | | |
| Dr Dozer | per | $2,500 | 1 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 |
| Sod | sy | $20 | 250 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 |
| Insert & Mulch | acre | $2,500 | 1.5 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| Silt Fence | lf | $10 | 300 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 |
| Photographs | ls | $250 | 1 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 |
| **Sediment Basin Cleaning** | | | | | | | | | | | | | | | |
| Basin Drawdown | hour | $130 | 20 | $2,600 | | | | $1,100 | | | | $1,100 | | | |
| Sediment Removal | hour | $130 | 40 | $5,200 | | | | $5,200 | | | | $5,200 | | | |
| **Project Preparation** | | | | | | | | | | | | | | | |
| Facility Inspection w/Photos | ea | $2,500 | 4 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| Groundwater | ea | $5,000 | 4 | $20,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $5,000 | $5,000 | $5,000 |
| Explosive Gas | ea | $1,750 | 4 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 |
| Condensate | ea | $1,500 | 4 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 |
| Flare System | ea | $1,500 | 4 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 |
| Perimeter Construction | hour | $130 | 100 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 |
| Misc. Expenses | ls | $2,500 | | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 |
| | | | Annual Totals | | $187,295 | $194,795 | $187,295 | $201,995 | $197,295 | $194,795 | $197,295 | $143,590 | $151,295 | $134,295 | $151,295 |
| | | | Contingency 10.00% | | $18,729.50 | $19,479.50 | $18,729.50 | $20,199.50 | $19,729.50 | $19,478.50 | $19,729.50 | $14,359.00 | $15,129.50 | $13,429.50 | $15,129.50 |
| | | | Total | $5,574,569 | $317,025 | $314,375 | $317,025 | $221,295 | $317,025 | $314,271 | $317,025 | $154,049 | $196,419 | $147,719 | $166,419 |

20 Year NP Value @ 8% $2,379,546.61    $2,422,652
22 Year NP Value @ 8% $2,422,652

Cardington Road Post Closure Operations and Maintenance
Estimated Cost Schedule

PRELIMINARY FOR DISCUSSION PURPOSES ONLY

## Post Closure Year

| Line Item | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Line Item | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| **Pneumatic Pump System** | | | | | | | | | | | |
| Air Compressor Bldg. Inspection | $220 | $220 | $220 | $220 | $220 | $220 | $220 | $220 | $220 | $220 | $220 |
| Inspect Compressor/Lubricate | $550 | $550 | $550 | $550 | $550 | $550 | $550 | $550 | $550 | $550 | $550 |
| Inspect Moisture Separator/Drain | $220 | $220 | $220 | $220 | $220 | $220 | $220 | $220 | $220 | $220 | $220 |
| Inspect Dryer | $220 | $220 | $220 | $220 | $220 | $220 | $220 | $220 | $220 | $220 | $220 |
| Inspect Bldg Heater/On-Off | $220 | $220 | $220 | $220 | $220 | $220 | $220 | $220 | $220 | $220 | $220 |
| Compressor Motor | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 |
| Desiccant | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 |
| Oil Water Separators | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 |
| Compressor Valve Replacement | $160 | $160 | $160 | $160 | $160 | $160 | $160 | $160 | $160 | $160 | $160 |
| Air line Leaks | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 |
| Pump Replacement | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 |
| Compressor Maintenance | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 |
| **Groundwater Monitoring System** | | | | | | | | | | | |
| Inspect Well Casing | $55 | $55 | $55 | $55 | $55 | $55 | $55 | $55 | $55 | $55 | $55 |
| Record CH4 Concentration | $55 | $55 | $55 | $55 | $55 | $55 | $55 | $55 | $55 | $55 | $55 |
| Record Water Level | $55 | $55 | $55 | $55 | $55 | $55 | $55 | $55 | $55 | $55 | $55 |
| pH/Conductivity Measurement | $83 | $83 | $83 | $83 | $83 | $83 | $83 | $83 | $83 | $83 | $83 |
| Purge Well | $413 | $413 | $413 | $413 | $413 | $413 | $413 | $413 | $413 | $413 | $413 |
| Collect Samples | $2,200 | $2,200 | $2,200 | $2,200 | $2,200 | $2,200 | $2,200 | $2,200 | $2,200 | $2,200 | $2,200 |
| Purge Water Disposal-Non-Hazardous | $225 | $225 | $225 | $225 | $225 | $225 | $225 | $225 | $225 | $225 | $225 |
| Misc. Supplies/Gloves, PVC | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 |
| Field Filters | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 |
| **Laboratory Analysis** | | | | | | | | | | | |
| TCL Volatiles | $2,700 | $2,700 | $2,700 | $2,700 | $2,700 | $2,700 | $2,700 | $2,700 | $2,700 | $2,700 | $2,700 |
| Semi-Volatiles | $5,400 | $5,400 | $5,400 | $5,400 | $5,400 | $5,400 | $5,400 | $5,400 | $5,400 | $5,400 | $5,400 |
| TAL Metal (dissolved) | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 |
| TAL Metals (total) | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 |
| Herbicides | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 |
| Pesticides | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 |
| Container Prep/Custody Forms | $220 | $220 | $220 | $220 | $220 | $220 | $220 | $220 | $220 | $220 | $220 |
| Shipping & Handling | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 |
| **Explosive Gas Sampling (8 wells)** | | | | | | | | | | | |
| Probe Inspection | $4,680 | $4,680 | $4,680 | $4,680 | $4,680 | $4,680 | $4,680 | $4,680 | $4,680 | $4,680 | $4,680 |
| CH4 Sampling | $14,040 | $14,040 | $14,040 | $14,040 | $14,040 | $14,040 | $14,040 | $14,040 | $14,040 | $14,040 | $14,040 |
| PID Sampling | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Condensate Disposal** | | | | | | | | | | | |
| Laboratory Analysis | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 |
| Load Charge | $80 | $80 | $80 | $80 | $80 | $80 | $80 | $80 | $80 | $80 | $80 |
| Shipping | $80 | $80 | $80 | $80 | $80 | $80 | $80 | $80 | $80 | $80 | $80 |
| Reconditioning | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 |

PRELIMINARY FOR DISCUSSION PURPOSES ONLY

Cardington Road Post Closure Operations and Maintenance
Estimated Cost Schedule

## Post Closure Year

| Line Item | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cap Repair** | | | | | | | | | | | |
| D4 Dozer | | | $2,500 | $2,500 | | $2,500 | | $2,500 | | $2,500 | |
| Soil | | | $5,000 | $5,000 | | $5,000 | | $5,000 | | $5,000 | $5,000 |
| Seed & Mulch | | | $3,750 | $3,750 | | $3,750 | | $3,750 | | $3,750 | $3,750 |
| Silt Fence | | | $3,000 | $3,000 | | $3,000 | | $3,000 | | $3,000 | $3,000 |
| Photographs | | | $250 | $250 | | $250 | | $250 | | $250 | $250 |
| **Sediment Basin Cleaning** | | | | | | | | | | | |
| Basin Dewatered | $1,100 | | | | $1,100 | | | | $1,100 | | |
| Sediment Removal | $5,200 | | | | $5,200 | | | | $5,200 | | |
| **Project Preparation** | | | | | | | | | | | |
| Facility Inspection w/Photos | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| Groundwater | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 |
| Explosive Gas | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 |
| Condensate | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 |
| Flare System | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 |
| Project Coordinator | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 |
| Misc. Exposure | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 |
| | $140,680 | $151,290 | $134,290 | $151,290 | $140,380 | $151,290 | $134,290 | $151,290 | $140,380 | $151,290 | $134,290 |
| | $14,088.00 | $15,129.00 | $13,429.00 | $15,129.00 | $14,038.00 | $15,129.00 | $13,429.00 | $15,129.00 | $14,038.00 | $15,129.00 | $13,429.00 |
| | $154,648 | $166,419 | $147,719 | $166,419 | $154,648 | $166,419 | $147,719 | $166,419 | $154,648 | $166,419 | $147,719 |