# Exhibit C

Westlaw.

--- B.R. ----, 2011 WL 11413 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 11413 (Bkrtcy.S.D.N.Y.))**

**H** Only the Westlaw citation is currently available.

United States Bankruptcy Court,
S.D. New York.
In re LYONDELL CHEMICAL COMPANY, et al.,
Debtors.

No. 09-10023 (REG).
Jan. 4, 2011.

**Background:** Chapter 11 debtors in jointly administered cases objected to private party claims for future environmental remediation costs also sought by federal government and state government entities.

**Holdings:** The Bankruptcy Court, Robert E. Gerber, J., held that:

(1) claims were "contingent" within meaning of bankruptcy statute generally disallowing co-debtor contingent claims for reimbursement or contribution;

(2) claim was premised on co-liability under bankruptcy statute;

(3) claims asserted pursuant to cost recovery statute under Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) were for "reimbursement"; and

(4) contractually-based claim was claim for "reimbursement."

Objections sustained in part and overruled in part.

West Headnotes

**[1] Bankruptcy 51 ☞2828.1**

51 Bankruptcy
    51VII Claims
        51VII(A) In General
            51k2828 Contingent or Unliquidated Claims
                51k2828.1 k. In General. Most Cited Cases

Three elements must be met for claim for reimbursement or contribution to be disallowed under statute: (1) party asserting the claim must be liable with the debtor on the claim of a third party, (2) claim must be contingent at the time of its allowance or disallowance, and (3) claim must be for reimbursement or contribution. 11 U.S.C.A. § 502(e)(1)(B).

**[2] Bankruptcy 51 ☞2830.5**

51 Bankruptcy
    51VII Claims
        51VII(A) In General
            51k2830.5 k. Environmental Claims. Most Cited Cases

Claims asserted by private parties under CERCLA for future environmental remediation costs at sites at which Chapter 11 debtors had operations were "contingent," within meaning of bankruptcy statute generally disallowing claims for reimbursement or contribution by those liable with debtor to the extent that claims were contingent, even if claim by Environmental Protection Agency (EPA) might have accrued against claimants, or claimant's liability for some environmental damage had been established, since amounts for which reimbursement was being sought had not yet been paid. 11 U.S.C.A. § 502(e)(1)(B); Comprehensive Environmental Response, Compensation, and Liability Act of 1980, §§ 107, 113(f), 42 U.S.C.A. §§ 9607, 9613(f).

**[3] Bankruptcy 51 ☞2828.1**

51 Bankruptcy
    51VII Claims
        51VII(A) In General
            51k2828 Contingent or Unliquidated Claims
                51k2828.1 k. In General. Most Cited Cases

Establishment of some liability alone is insufficient to render a claim non-contingent under bankruptcy statute generally disallowing claims for reimbursement or contribution by those liable with debtor to the extent that claims are contingent. 11 U.S.C.A. § 502(e)(1)(B).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 11413 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 11413 (Bkrtcy.S.D.N.Y.))**

**[4] Bankruptcy 51 ⌬2830.5**

51 Bankruptcy
    51VII Claims
        51VII(A) In General
            51k2830.5 k. Environmental Claims. Most
Cited Cases

Private claimant's claim against Chapter 11 debtor for future environmental remediation costs was premised on co-liability within meaning of bankruptcy statute generally disallowing claims for reimbursement or contribution by those liable with debtor to the extent that claims were contingent, even though its claim was based on cost recovery under CERCLA, rather than contribution under CERCLA, where both claimant and debtor had been designated as potentially responsible parties (PRPs) by Environmental Protection Agency (EPA) and had shared statutory obligation, under CERCLA, to provide for site's environmental cleanup, and claim relied upon theory that claimant would have to pay more if debtor paid less than its share of cleanup costs. 11 U.S.C.A. § 502(e)(1)(B); Comprehensive Environmental Response, Compensation, and Liability Act of 1980, §§ 107, 113(f), 42 U.S.C.A. §§ 9607, 9613(f).

**[5] Bankruptcy 51 ⌬2830.5**

51 Bankruptcy
    51VII Claims
        51VII(A) In General
            51k2830.5 k. Environmental Claims. Most
Cited Cases

Private claimants' claims against Chapter 11 debtors for future environmental remediation costs were for "reimbursement" under bankruptcy statute generally disallowing claims for reimbursement or contribution by those liable with debtor to the extent that claims were contingent, even though claims were asserted pursuant to CERCLA's cost recovery statute, rather than CERCLA's contribution statute. 11 U.S.C.A. § 502(e)(1)(B); Comprehensive Environmental Response, Compensation, and Liability Act of 1980, §§ 107, 113(f), 42 U.S.C.A. §§ 9607, 9613(f).

**[6] Bankruptcy 51 ⌬2830.5**

51 Bankruptcy
    51VII Claims
        51VII(A) In General
            51k2830.5 k. Environmental Claims. Most
Cited Cases

Private claimant's contractually-based claim for future environmental remediation costs against Chapter 11 debtors sought payment from debtors for money that claimant might spend in the future, and thus was claim for "reimbursement" subject to bankruptcy statute generally disallowing claims for reimbursement or contribution by those liable with debtor to the extent that claims were contingent. 11 U.S.C.A. § 502(e)(1)(B).

Cadwalader, Wickersham & Taft, LLP, by Christopher R. Mirick, Esq ., New York, NY, by David F. Williams, Esq. (argued), Douglas H. Fischer, Esq., Washington, D.C., Counsel to the Debtors.

Brown Rudnick, LLP, by John C. Elstad, Esq. (argued), Steven D. Pohl, Esq., Boston, MA, Counsel to the Official Committee of Unsecured Creditors.

Perkins Coie, LLP, by Mark. W. Schneider, Esq. (argued), Seattle, WA, Dorsey & Whitney, LLP, by James V. Parravani, Esq., New York, NY, Attorneys for Weyerhaeuser Company.

Latham & Watkins, LLP, by Mark A. Broude, Esq. (argued), Sara Orr, Esq., New York, NY, Attorneys for Georgia-Pacific, LLC.

Jones Day, by Ross S. Barr, Esq. (argued), New York, NY, Attorneys for Hamilton Beach Brands.

BENCH DECISION [FN1] ON DEBTORS' OBJECTIONS, UNDER BANKRUPTCY CODE SECTION 502(e)(1)(B), TO PRP ENVIRONMENTAL CONTRIBUTION CLAIMS
ROBERT E. GERBER, Bankruptcy Judge.
   **\*1** In this contested matter in the jointly administered chapter 11 cases of Lyondell Chemical Company and its affiliates, the Debtors object to private party claims (the "**Private Party Claims**") for future environmental remediation costs also sought by the federal government and certain state governmental entities, under section 502(e)(1)(B) of the Code,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 11413 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 11413 (Bkrtcy.S.D.N.Y.))**

which generally disallows claims (1) for reimburse-ment or contribution (2) by those liable with the debtor (3) to the extent that such claims are contin-gent.

With one exception, I conclude that these claims are of the type for which disallowance is required under section 502(e)(1)(B) and its associated case-law, and except insofar as the exception applies, the Debtors' objections are sustained. With respect to the exception (where remediation costs were already paid by the claimant), the Debtors' exceptions are over-ruled.

*Findings of Fact* [FN2]
*1. Government Environmental Claims*
  In July and August 2009, the United States, on behalf of the U.S. Environmental Protection Agency, the U.S. Department of the Interior, and the National Oceanic and Atmospheric Administration (collec-tively, the "**EPA**"), filed proofs of claim (the "**EPA Claims**") against certain of the Debtors asserting claims for, among other things, unreimbursed past and estimated future response costs for environ-mental cleanup under section 107(a) of the Compre-hensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 et seq. ("**CER-CLA**").

  Various state governments, or their environ-mental regulatory agencies, [FN3] did likewise. The governmental claims totaled approximately $5.5 bil-lion in identified amounts, in addition to contingent and unliquidated claims that were asserted in unstated amounts. [FN4] These environmental claims represented one of the largest, if not the largest, groups of unse-cured claims asserted in the Lyondell bankruptcy cases.

*2. Environmental Settlement Agreement with U.S. and Certain States*
  In April 2010, I approved a settlement agreement (the "**Settlement Agreement**") among the Debtors, the EPA, and ten state environmental agencies, re-solving their environmental claims and providing for funds for future clean-up efforts. The Settlement Agreement, in relevant part, provided for:

  (1) the allowance of over $1 billion in general unsecured claims for the benefit of the U.S. for un-reimbursed past and future response costs incurred

by the U.S. pursuant to CERCLA section 107(a);

  (2) a cash payment to the U.S. to resolve alleged injunctive obligations at a number of environ-mental sites; and

  (3) the formation and funding of an environ-mental custodial trust to take title to and to remedi-ate certain Debtor-owned properties with known or suspected environmental contamination.

  The Agreement also provided allowed claims in fixed amounts to various states' environmental au-thorities.

  The Settlement Agreement granted Millennium Holdings, LLC ("**MHLLC**") contribution protection under CERCLA section 113(f)(2) for environmental liabilities resolved by the Settlement Agreement. The implication of that contribution protection was that other "potentially responsible parties" ("**PRPs**") with respect to those environmental liabilities would not be able to seek payment from MHLLC for cleanup costs, because MHLLC would have satisfied its li-ability on account of the sites addressed in the Set-tlement Agreement.

*3. The Private Party Environmental Claims*
  **\*2** Over 70 Private Party Claims associated with the properties covered by the EPA's and/or the state government entities' proofs of claims-relying either implicitly or explicitly on CERCLA sections 107(a) and 113(f)(1), discussed below-sought an estimated $1.1 billion for both past and future cleanup costs. After having settled the EPA and state governmental claims, the Debtors objected to the Private Party Claims.

  The Debtors don't object to the Private Party Claims to the extent they are for money spent by claimants in the past. But the Debtors argue that the Private Party Claims must be disallowed under section 502(e)(1)(B) of the Bankruptcy Code to the extent they seek payment of *future* cleanup costs.

  Most of the Private Party claimants did not con-test the Objections. But some did. Objections with respect to three Orally Arguing Claimants were orally argued at the hearing on April 16, 2010-those with respect to responders Georgia-Pacific, LLC ("**Geor-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 11413 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 11413 (Bkrtcy.S.D.N.Y.))**

gia-Pacific"), Weyerhaeuser Company ("**Weyer-haeuser**"), and Hamilton Beach Brands, Inc. ("**Hamilton Beach,**" and collectively with Georgia-Pacific and Weyerhaeuser, the "**Orally Arguing Claimants**").[FN5]

*4. Georgia-Pacific and Weyerhaeuser's Claims*

Georgia-Pacific and Weyerhaeuser's claims relate to the Allied Paper/Portage Creek/Kalamazoo River Superfund Site (the "**Kalamazoo Site**") in Michigan. Paper mill operations once located on the Kalamazoo Site discharged paper residue into the environment, including the Kalamazoo River, and deposited massive amounts of polychlorinated biphenyls into waterways, surface water, soils, and sediments. On August 30, 1990, the EPA placed the Kalamazoo Site on the "National Priorities List"- EPA's list of the most serious hazardous waste sites. MHLLC, Georgia-Pacific, and Weyerhaeuser (or their respective predecessors) were all former mill operators at the Kalamazoo Site. The Site is divided into 5 "operable units" ("**OU**"s), and the EPA has stated that it believes that the cleanup of OU-5, an 80-mile long stretch of the Kalamazoo River and Portage Creek, will be the main source of costs at the Site.

The EPA filed a proof of claim against MHLLC, alleging that MHLLC is liable to the U.S. under CERCLA section 107 for $2.6 billion for response costs at the Kalamazoo Site, including all five OUs, and that other parties along with MHLLC may also be jointly and severally liable. The EPA estimates future response costs for OU-5 to be $2.4 billion-constituting by far the largest portion of the total cost.

The EPA has not issued cleanup orders to MHLLC, Georgia-Pacific, or Weyerhaeuser at this time. The EPA has entered into administrative orders on consent ("**AOCs**") and consent decrees with Georgia-Pacific and Weyerhaeuser with respect to the Kalamazoo Site, and I'll discuss the specific orders and decrees with respect to each Respondent separately below.

*A. Georgia-Pacific's Claim*

The EPA has identified Georgia-Pacific and MHLLC as PRPs with respect to the Kalamazoo Site. While Georgia-Pacific and the EPA have entered into several AOCs and one Consent Decree, the agreements covering OU-5 did not specify a final remedy

for that portion of the Kalamazoo Site.

*(1) AOCs for OU-5*

**\*3** In February 2007, Georgia-Pacific, MHLLC, the state of Michigan, and the EPA entered into an AOC to perform a removal action at an area within OU-5 ("**First AOC**"). The same month, Georgia-Pacific, MHLLC, and the EPA entered into another AOC to perform a supplemental remedial investigation and feasibility study for OU-5 and a feasibility study of OU1 (the "**Second AOC**"). In June 2009, Georgia-Pacific and the EPA entered into a third AOC to perform a removal action at an area within OU-5 ("**Third AOC**," and collectively, with First AOC and the Second AOC, the "**Georgia-Pacific AOCs**").[FN6] Although the U.S. has unreimbursed response costs, investigations at the Kalamazoo Site are still pending, and the final remedy for OU-5 has not yet been selected.

*(1) Consent Decree*

In May 2009, Georgia-Pacific entered into a proposed consent decree with the EPA (the "**Georgia-Pacific Consent Decree**"), which at the time of Georgia-Pacific's filing of its proof of claim, had not yet been approved by the District Court. In the Consent Decree, Georgia-Pacific agreed to perform and implement the EPA's remedial plan for OU-2, and to pay the related past and future response costs incurred by the EPA. MHLLC is not a party to the Consent Decree.

*(3) Allocation Agreement*

In August 1991, Georgia-Pacific and MHLLC entered into an agreement with ARCADIS of New York, Inc. ("**ARCADIS**"), under which ARCADIS would perform services including environmental investigation and remediation at the Kalamazoo Site. Under a cost sharing agreement (the **"Allocation Agreement**"), Georgia-Pacific and MHLLC agreed to share costs relating to the Kalamazoo Site-with MHLLC paying 55% and Georgia-Pacific paying 45% of the costs. ARCADIS used the Allocation Agreement when billing Georgia-Pacific and MHLLC for services performed in connection with the Kalamazoo Site. Georgia-Pacific maintains that MHLLC has failed to pay Georgia-Pacific the amounts required under the Allocation Agreement, and has failed to pay ARCADIS for its services.

Much later, in June 2009, Georgia-Pacific and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 11413 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 11413 (Bkrtcy.S.D.N.Y.))**

ARCADIS entered into an assignment agreement ("**Assignment Agreement**") under which ARCADIS assigned to Georgia-Pacific all of the ARCADIS rights against MHLLC for services ARCADIS performed at the Kalamazoo Site. Georgia-Pacific maintains that MHLLC has not paid Georgia-Pacific the amounts due under the Assignment Agreement.

Georgia-Pacific filed a proof of claim against MHLLC seeking primarily to recover:

(1) past and future response costs and natural resource damages incurred in connection with the Kalamazoo Site,

(2) amounts paid by Georgia-Pacific to satisfy the obligations of MHLLC to ARCADIS, and

(3) amounts owed by MHLLC to ARCADIS and transferred to Georgia-Pacific pursuant to the Assignment Agreement.[FN7]

Georgia-Pacific asserts its claim under CERCLA section 113, stating that the EPA's commencement of the suit that led to the Consent Decree provides the basis for a section 113(f)(1) contribution claim. Georgia-Pacific doesn't dispute that its claim is for contribution and that it is based on co-liability with MHLLC.[FN8] Georgia-Pacific argues only that its claim is not contingent.

*B. Weyerhaeuser's Claim*
**\*4** From 1963 to 1970, Weyerhaeuser operated a mill and landfill next to the Kalamazoo River, about ten miles downstream from MHLLC's facilities. Remediation is still ongoing, and is in its early stages. The EPA has listed MHLLC, Weyerhaeuser, and others as PRPs at the Kalamazoo Site. In November 2004, Weyerhaeuser entered into a consent decree (the "**Weyerhaeuser Consent Decree**") with the EPA with respect to OU-4. Weyerhaeuser filed a proof of claim against MHLLC in the amount of $9 million for past response costs, and also seeks payment on account of MHLLC's liability for future costs and liabilities.

Weyerhaeuser argues that it is not co-liable with MHLLC for the amounts sought in its proof of claim because it is seeking only to recover response costs under CERCLA section 107 that it has already in-

curred and *will incur itself.* Weyerhaeuser also argues that its claim is not contingent, or for "reimbursement or contribution" under section 502(e)(1)(B).

*5. Hamilton Beach's Claims*
Debtors MHLLC and Millenium America, Inc. ("**Millenium America**") are also the subjects of claims by the State of North Carolina for environmental cleanup of the Mt. Airy and Southern Pines sites in North Carolina (the "**Mt. Airy Site**" and the "**Southern Pines Site**"). Unlike the Kalamazoo Site, the Mt. Airy and Southern Pines sites are not covered by the Settlement Agreement with EPA.

North Carolina filed a proof of claim against MHLLC and all other Debtors for over $6 million for environmental assessment and cleanup costs of the Mt. Airy Site, asserting its claim on the basis of:

(1) state environmental law and

(2) an October 2004 administrative agreement (the "**Mt. Airy Administrative Agreement**") among Hamilton Beach, MHLLC, and North Carolina to conduct remediation at the Mr. Airy Site.

North Carolina also filed a proof of claim against Millennium America and all other Debtors for assessment and remedial costs for environmental contaminations at the Southern Pines Site. North Carolina asserts its claim on the basis of:

(1) a memorandum of understanding between North Carolina and the EPA which provides that the Southern Pines Site is to be remediated pursuant to applicable state law; and

(2) a January 1999 AOC between North Carolina, Hamilton Beach, and Millennium America, Inc. (the "**Southern Pines Order**") to investigate and remediate the Southern Pines Site.

Hamilton Beach filed substantially identical proofs of claim against MHLLC and another Debtor, seeking future costs for environmental cleanup at the Mt. Airy and Southern Pines Sites. Hamilton Beach predicates its claim on:

(1) the Mt. Airy Administrative Agreement;

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 11413 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 11413 (Bkrtcy.S.D.N.Y.))**

(2) the Southern Pines Order; and

(3) a December 2003 settlement agreement ("**2003 Settlement Agreement**") between Hamilton Beach and MHLLC, under which they agreed to assess and remediate the Mt. Airy and the Southern Pines Sites and allocated the costs between the two parties.

**\*5** Hamilton Beach adopts the legal arguments of the other Orally Arguing Claimants, and asserts that its claim is not contingent, as the environmental damage has already been done and liability has already been apportioned under the 2003 Settlement Agreement. Hamilton Beach also asserts that its claim is not based on co-liability with the Debtors-although (as the Debtors point out) in its proof of claim Hamilton Beach seemed to claim that it was jointly and severally liable with MHLLC under the 2003 Settlement Agreement and applicable non-bankruptcy law. Finally, by incorporation of the others' arguments, Hamilton Beach argues that its claim is not for reimbursement or contribution.

### Discussion

All parties agree that section 502(e)(1)(B) of the Bankruptcy Code determines whether the Private Party Claims should be disallowed. As noted above, the Orally Arguing Claimants argue, for various reasons, that their claims should not be disallowed because they fail to satisfy one or more of the elements of section 502(e)(1)(B), as laid out in the statute or the interpretive caselaw-that the claims be for reimbursement or contribution, that they be contingent, or be based on co-liability with the Debtors.

### I.
### The Statutory Environment

[1] Though the Code doesn't define all of the terms that ultimately are important here, and many of the gaps have been filled by caselaw, I nevertheless start with textual analysis.[FN9] Section 502(e) provides, in relevant part, that notwithstanding provisions of section 502 under which claims would otherwise be allowable:

(e)(1) ... the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on ... the claim of a creditor, to the extent that-

...

(B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution....

Thus, by section 502(e)(1)(B)'s terms, three elements must be met for a claim to be disallowed under section 502(e)(1)(B):

(1) the party asserting the claim must be liable with the debtor on the claim of a third party;

(2) the claim must be contingent at the time of its allowance or disallowance; and

(3) the claim must be for reimbursement or contribution.

But textual analysis here is of limited utility. None of the terms or expressions "reimbursement," "contribution," "contingent" or "liable with the debtor" is defined in the Bankruptcy Code, nor does the Code articulate standards for their application.[FN10] Thus a court construes section 502(e)(1)(B)'s requirements based on caselaw. Section 502(e)(1)(B)'s requirements have been interpreted in a fair body of relevant caselaw, most of which has disallowed claims for contribution and indemnification by those who are liable, along with a debtor, to others for amounts to be determined only in the future-including a decision of mine a few months ago, where I sustained objections, on 502(e)(1)(B) grounds, to claims for contribution and/or indemnification for liability in connection with pending or threatened lawsuits by plaintiffs alleging injuries from exposure to the chemical Diacetyl, where the claimants, along with Chemtura, might be liable for the plaintiffs' Diacetyl injury.[FN11] The issue here, whether a different rule should apply to claims by PRPs who, along with a Debtor, are liable for environmental remediation costs, requires consideration of the relevant environmental statutes-most significantly provisions in CERCLA.

**\*6** Section 106 (captioned "Abatement Actions") provides, its subsection (a):

In addition to any other action taken by a State or local government, when the President determines

--- B.R. ----, 2011 WL 11413 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 11413 (Bkrtcy.S.D.N.Y.))**

that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States *to secure such relief as may be necessary to abate such danger or threat,* and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The President may also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and welfare and the environment.[FN12]

Section 106's subsection (b) then provides for fines for failure to comply with an order issued under subsection (a), and, for those who have received and complied with an order issued under subsection (a), reimbursement from the Hazardous Substance Superfund for the reasonable costs of such action. [FN13]

Then, CERCLA Section 107 (captioned "Liability") provides, in relevant part:

(a) ... Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section-

  (1) the owner and operator of a vessel or a facility,

  (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

  (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

  (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites

selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for-

  (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

  (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

  (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

  (D) the costs of any health assessment or health effects study carried out under [CERCLA section 104].[FN14]

**\*7** Thus, CERCLA section 107(a) imposes liability for environmental cleanup costs, natural resource damages, and certain other categories of recovery on PRPs-including, as relevant here, (1) the current "owner or operator" of a site contaminated with hazardous substances, and (2) any person who previously owned or operated a contaminated site at the time of a hazardous waste disposal.

Then, CERCLA Section 113 (captioned "Civil Proceedings") provides in its subsection (f) (captioned "Contribution"), in relevant part:

(1) Contribution

Any person *may seek contribution from any other person who is liable or potentially liable under [section 107(a) ],* during or following any civil action under [section 106] or under [section 107(a) ]. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 11413 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 11413 (Bkrtcy.S.D.N.Y.))**

bring an action for contribution in the absence of a civil action under [section 106] or [section 107].

(2) Settlement

A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

(3) Persons not party to settlement

(A) If the United States or a State has obtained less than complete relief from a person who has resolved its liability to the United States or the State in an administrative or judicially approved settlement, the United States or the State may bring an action against any person who has not so resolved its liability.

(B) A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in paragraph (2).

(C) In any action under this paragraph, the rights of any person who has resolved its liability to the United States or a State shall be subordinate to the rights of the United States or the State. Any contribution action brought under this paragraph shall be governed by Federal law.[FN15]

Thus 113(f)(1) provides that PRPs who fund response actions can seek contribution from other PRPs "during or following any civil action" instituted under CERCLA section 106 or 107. And CERCLA section 113(f)(3)(B) permits private parties to seek contribution after they settle their liability with the EPA or a state in an administrative or judicially approved settlement. Conversely, section 113(f)(2) protects PRPs who have settled from contribution claims

by other PRPs.

*II.*

*Satisfaction of Section 502(e)(1)(B) Elements*

**\*8** While acknowledging that its claim is for contribution and that it is based on co-liability with MHLLC, Georgia-Pacific argues that its claim is not contingent. Weyerhaeuser and Hamilton Beach, like Georgia-Pacific, argue that their claims are not contingent, and further contend that they are not co-liable with MHLLC for the amounts sought in their proofs of claim, and that their claims are not for "reimbursement or contribution."

Because the three Orally Arguing Claimants' positions overlap to such significant degrees, and because they assert, in many respects, similar deficiencies with respect to 502(e)(1)(B)'s three elements, for purposes of analysis I group the objections by the 502(e)(1)(B) elements.

*A.*

*"Contingency" Element*

[2] Each of Georgia-Pacific, Weyerhaeuser[FN16] and Hamilton Beach contends that its claim is not contingent. I must disagree.

In my recent decision in *Chemtura*,[FN17] I ruled, among other things, that the claims then before me were contingent. There, as I've noted, five corporate entities had filed claims against Chemtura for contribution and/or indemnification with respect to amounts they might pay in the future in litigation against them. I found that except to the extent they sought contribution for amounts already paid to tort litigants, their claims were contingent.[FN18] While in some instances the potential for payment by any of the Orally Arguing Claimants is more advanced than it was in *Chemtura*, similar principles apply, and key facts remain the same. The most significant of these is that except for remedial action accomplished in the past, for which the right to reimbursement or contribution is unchallenged (or should be), Georgia-Pacific, Weyerhaeuser, and Hamilton Beach are similarly seeking reimbursement for amounts that have not yet been paid.

Though neither is squarely on point, two decisions from the Second Circuit have discussed contingency in deciding whether or not a creditor held a "claim." [FN19] In *Chateaugay,* the EPA argued that "it

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 11413 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 11413 (Bkrtcy.S.D.N.Y.))**

does not have a 'claim' within the meaning of the Bankruptcy Code ... for reimbursement of CERCLA response costs until those costs have been incurred.[FN20] Therefore, the EPA argued, any future response costs that the EPA might incur would pass though the bankruptcy organization as non-discharged liabilities. The Second Circuit rejected this argument, holding that the future costs were pre-petition "claims." The Circuit stated, as part of its rationale, that:

> [T]he location of these sites, the determination of their coverage by CERCLA, and the incurring of response costs by the EPA are all steps that may fairly be viewed, in the regulatory context, as rendering the EPA's claim "contingent," rather than as placing it outside the Code's definition of "claim."[FN21]

Similarly, in *Manville Forest,* the Second Circuit decided that a party's liability constitutes a "claim" against the debtor, albeit contingent. It stated:

> **\*9** the fact that [claimant] Olin did not know the specific parameters of its liability does not place that liability outside of the definition of "claim" *but rather is precisely what made the claim contingent.* Under this specific combination of circumstances, we find that future environmental liability was actually or presumably contemplated by the parties upon their signing of the indemnification agreements and constitutes a valid *contingent claim.*[FN22]

The Debtors cite *Chateauguay* for the proposition that claims are contingent until costs for remediation work are actually expended or paid.[FN23] I don't read *Chateauguay,* which of course is not a 502(e)(1)(B) case, to go that far-to *hold* that a claim for reimbursement or contribution is contingent until an underlying payment (here, costs for remediation) is actually made.[FN24] But I do find it instructive that in both *Chateauguay* and *Manville Forest,* it was undisputed that the debtors faced *some* environmental liability, but the Second Circuit nevertheless described those claims as contingent because the scope, amount, and form of that liability was undetermined.[FN25]

But other authority, including three decisions by other bankruptcy judges in this very district,[FN26] another by a district judge in this district,[FN27] and another a thoughtful decision from Delaware[FN28]-all

502(e)(1)(B) determinations-supports the conclusion that until and unless amounts *are actually paid,* the claims for reimbursement or contribution with respect to those amounts remain contingent for 502(e)(1)(B) purposes.[FN29] For instance, in *Alper Holdings,* in this district, Judge Lifland disallowed claims for indemnification for future liability in environmental contamination litigation, finding that they were

> properly categorized as "contingent as of the time of allowance or disallowance" as the amounts and ultimate liability are presently unknown.[FN30]

Likewise, in *Drexel Burnham,* in this district, it was observed that "[t]he Claimants' claim is contingent until their liability is established *and the co-debtor has paid the creditor....* One who is secondarily liable may only secure distribution rights by paying the amount owed the creditor."[FN31]

Similarly, in *APCO,* Judge Shannon disallowed a claim for the costs of remedial activities filed by the City of Wichita, which like the debtor there, was a PRP with respect to a site with groundwater contamination. Significantly, the City had agreed not just to perform a remedial investigation and feasibility study of the contaminated site; it had agreed to undertake the remedial activities identified in the study to clean up the site,[FN32] and had prevailed in a trial at which the *APCO* debtors were determined to be responsible for 1.72% of the City's past and future costs for the remediation, and for 100% of the City future source control costs to be incurred at a different site,[FN33] securing a judgment for the future cleanup costs of which a portion was unpaid.[FN34]

**\*10** Among other things, Judge Shannon ruled that "because the City has not yet incurred any future source control costs" at one of the sites,[FN35] the claim was contingent, even though "the parties' liability has been established."[FN36] Quoting, among other decisions, *Drexel Burnham,* he observed that

> The law is clear that '[t]he contingency contemplated by [section] 502(e)(1)(B) relates to both payment *and* liability." ... Therefore, a claimant's "claim is contingent until their liability is established ... *and* the co-debtor has paid the creditor."[FN37]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 11413 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 11413 (Bkrtcy.S.D.N.Y.))**

I've stated many times that the interests of pre-dictability in this district are of great importance, and that where there is no controlling Second Circuit authority, I follow the decisions of other bankruptcy judges in this district in the absence of clear error.[FN38] But to say that these decisions, in this district and elsewhere, should be followed under that standard would be faint praise here. In my view, the conclusions in those cases were plainly correct. That is so because even though the need for remediation of the underlying environmental site might be obvious, the EPA or state environmental agency might have a multitude of different ways of getting the remediation done, and any one of those means might or might not call for-or result in-payment by the separate PRP that is asserting the claim against the debtor. And the PRP might or might not wind up actually making the payment for which it then would be seeking reimbursement or contribution.

Thus, in my view, the fact that an EPA claim may have accrued against any of Georgia-Pacific, Weyerhaeuser, or Hamilton Beach does not mean that any of their separate claims against the Debtor are no longer contingent. We don't know whether either of them will lay out the funds necessary to engage in the curative action, and, if so, to what extent.

In arguing that its claim for future response costs is not contingent, Georgia-Pacific contends that a claim is contingent only when it has not yet *accrued* (in contrast to *paid* ), and Georgia-Pacific maintains that its claim for contribution under section 113 has accrued. As support, Georgia-Pacific cites the Supreme Court's *Aviall Services* decision,[FN39] a case that did not involve section 502(e)(1)(B), wherein the Supreme Court held that a private party can bring a CERCLA section 113(f)(1) action for contribution only after it has been sued under CERCLA section 106 or 107(a).

However, *Aviall Services* can properly be read as going only to the requirements for bringing a claim under CERCLA section 113(f); it cannot be extended to deciding whether a claim by a PRP is or is not "contingent" within the meaning of section 502(e)(1)(B), which *Aviall Services* quite obviously did not address. Georgia-Pacific incorrectly assumes that the requirements for bringing a section 113(f)(1) contribution claim under CERCLA are the same as the requirements for having *non-contingent* 113(f)(1)

claim under section 502(e)(1)(B) of the Code.

**\*11** Additionally, Georgia-Pacific and Weyerhaeuser argue that the Debtors are conflating contingency and liquidation. While I fully understand that "unliquidated" and "contingent" are not the same thing[FN40] (and suspect that the Debtors do too), here I find that the claims of each of Georgia-Pacific, Weyerhaeuser, and Hamilton Beach are *both*. The claims at issue here are for future cleanup costs that might or might not actually be incurred, and then might or might not actually be paid, by any of them.[FN41]

Though I ultimately decide the issue on the statutory language and the caselaw, I note, to the extent it matters, that this ruling advances not just bankruptcy policy, but environmental policy as well. Disallowance of Georgia-Pacific's claims here advances CERCLA's policy goal of encouraging expeditious cleanup, because claimants are encouraged to remediate promptly by the threat of disallowance of claims that have not been fixed.[FN42] As Judge Shannon observed in *APCO:*

> It may appear that the Court's ruling is a harsh result for the City, and that may be true. Nevertheless, the Court's decision is mandated by the express language of the Code and is entirely consistent with the principles animating CERCLA. At bottom, CERCLA and similar state and federal environmental statutes create a scheme whereby parties are incentivized to promptly clean up contaminated sites. The prospect of the potential disallowance of contingent contribution claims under section 502(e)(1)(B) offers a further incentive to undertake the cleanup: if the work is done (or at least underway), the contribution claim is not contingent as to amounts incurred by the contribution claimant. Thus, if the City had commenced or completed source control remediation at 1001 E. Lincoln in connection with its work on the G & M Site as a whole, the City's claim would be allowed to the extent of the amounts incurred.[FN43]

[3] Similarly, Hamilton Beach relies on the fact that the environmental damage at the Mt. Airy and Southern Pines Sites has already occurred to support its argument that its claim is not contingent. I explained above that the establishment of some liability alone is insufficient to render a claim non-contingent. Similarly, the fact that Hamilton Beach is liable for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 11413 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 11413 (Bkrtcy.S.D.N.Y.))**

environmental damage is also by itself insufficient to render a claim non-contingent, as *APCO* makes quite clear. Although Hamilton Beach has entered into a settlement agreement in which the parties allocated the liability with respect to the two sites, there is no indication that money has been spent. For the same reasons that I determined that Georgia-Pacific's claim is contingent, I determine that Hamilton Beach's claim is contingent as well.

Finally, Weyerhaeuser argues that it has already incurred over $11 million in response costs, in addition to amounts it may have to pay in the future. I believe that with respect to these *past* response costs, the Debtors have now acknowledged that they are non-contingent. To the extent the Debtors haven't conceded the point, I agree with Weyerhaeuser. But with respect to payments Weyerhaeuser hasn't made yet, I must find that the amounts are contingent, for the reasons stated above.

*B.*
*"Co-Liability" Element*

**\*12** Making three principal arguments, Weyerhaeuser and Hamilton Beach [FN44] also contend that the co-liability element has not been satisfied. Once more I cannot agree.

*1. The Atlantic Research Contentions*

[4] Weyerhaeuser's first argument is that its claim is not premised on co-liability because its claim is based on cost recovery under CERCLA section 107(a), and not contribution under section 113(f).[FN45] In that connection, Weyerhaeuser notes that in *U.S. v. Atlantic Research Corp.,* [FN46] the Supreme Court held that a private party may recover under CERCLA section 107(a) without any establishment of liability to a third party. Because it is asserting a section 107(a) claim, therefore, Weyerhaeuser argues, the basis for finding co-liability is lacking.

But Weyerhaeuser's reliance on *Atlantic Research* is flawed. The issue in *Atlantic Research,* a non-bankruptcy case, was whether a PRP could sue to recover voluntarily incurred cleanup costs under section 107(a), rather than relying solely on section 113(f).[FN47] Section 107(a)(4)(A) expressly authorizes the federal government, the states, and Indian tribes to sue for cost recovery under section 107(a), and section 107(a)(4)(B) gives the same right to sue to "any other person." Specifically, the Court was asked to determine whether a PRP is included in the phrase "any other person" in 107(a)(4)(B).

The Supreme Court held that the operator's status as a PRP did not preclude the operator from suing under section 107(a), as section 107(a)(4)(B) covers any person not identified in subparagraph (A), and that a PRP was not limited to relief under section 113(f).[FN48] Nevertheless, the Supreme Court highlighted the "complementary yet distinct" nature of the rights established under section 107(a) and 113(f)-specifically, that a private party may sue under section 107(a) without any establishment of liability to a third party, something it could not do under section 113(f).[FN49] The Supreme Court allowed the claimant to recover from other PRPs costs that it had incurred by voluntary cleanup-or in other words, by cleanup or payments not prompted by a government action under sections 106 or 107.

On the issue of co-liability, Weyerhaeuser erroneously assumes that only claims under section 113(f) are premised on co-liability with the defendant (in this case, the Debtor), and that cost recovery claims under section 107(a) are all direct claims, and not claims for either reimbursement or contribution. The *Atlantic Research* court held that a claim under section 107(a) *need not* be based on co-liability to a third-party (e.g. a governmental entity). But it did not hold that a claim under 107(a) *cannot* be based on co-liability. If a PRP undertakes "voluntary" clean up (as opposed to cleanup pursuant to government action under section 106 or 107)-and sues under 107(a) to seek recovery for that cleanup from another PRP-that has no effect on, and certainly does not nullify, the fact that the two may still be co-liable to the Government.

**\*13** Weyerhaeuser and MHLLC, who have both been designated as PRPs by the EPA, have a shared statutory obligation, under CERCLA, to provide for the cleanup of the Kalamazoo Site, by one means or another. That Weyerhaeuser might satisfy its own obligations by voluntary cleanup, rather than by waiting for a government action, is laudable, but not relevant to the 502(e)(1)(B) determination. Weyerhaeuser's claims rely on the theory that if the Debtors pay less than their share of cleanup costs, Weyerhaeuser will have to pay more. That is the essence of co-liability.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 11413 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 11413 (Bkrtcy.S.D.N.Y.))**

*2. The Allegheny Contentions*

Weyerhaeuser further asserts that co-liability is lacking based on a district court decision in the *Allegheny* bankruptcy case.[FN50] In *Allegheny,* the owner of the site filed a claim for past and future response costs against a debtor that had sold the site to the claimant prior to filing for bankruptcy. Applying the three-part test described on page 10 above, the *Allegheny* court ruled that section 502(e)(1)(B) did not exclude the claimant's direct claims for future response costs under CERCLA section 107(a).[FN51] While the *Allegheny* debtor argued that there was a possibility that the creditor might never be required to expend any funds if the EPA were subsequently to order the debtor to perform the remediation, the *Allegheny* court reasoned that this risk of double liability could be avoided by having the creditor's claim paid into a trust to be expended on remediation of the waste sites.[FN52]

I find the claims at issue in *Allegheny* to be distinguishable from Weyerhaeuser's claims,[FN53] but more fundamentally, I must join the other courts that have disagreed with the *Allegheny* decision.[FN54]

As we all know, section 502(e)(1)(B) serves the important purpose of avoiding redundant recoveries.[FN55] The situation here, where both Weyerhaeuser and MHLLC were named as PRPs, presents precisely the danger of double recovery from the Debtors on account of the same liability, ultimately to the EPA.[FN56] Because the EPA already has an allowed claim against the Debtors for the Kalamazoo site, allowing Weyerhaeuser's claim would be setting up precisely the redundant recoveries section 502(e)(1)(B) was created to prevent.

The *Allegheny* court acknowledged that its decision not to disallow the claimant's claim under section 502(e)(1)(B) left the debtors vulnerable to multiple recoveries. What the *Allegheny* court failed to realized, however, is that this risk of duplicative recoveries arose *because* the debtors and claimant were co-liable. For that reason, several cases have rejected *Allegheny's* logic.[FN57]

In *Cottonwood Canyon,* for instance, the court stated that the fact that the *Allegheny* court found it necessary to establish a trust shows that the debtor and the claimant share a common liability against which the claimant sought to protect itself.[FN58] The

*Cottonwood Canyon* court stated:

> **\*14** CSI argues that it is asserting a direct claim against Kaiser under Section [107(a) ] and not a claim for reimbursement or contribution. It would clearly appear that a claim for reimbursement or contribution under either the California statute, CERCLA or the indemnification provisions of the contract is, by definition, a claim to recover costs incurred by reason of CSI's liability for cleanup as the "owner" of the site, which is the same liability Kaiser has for cleanup as the party which deposited the hazardous substances in the first instance. Such a claim would necessarily be one for liability for which both Kaiser and CSI are responsible and would fall within the ambit of 11 U.S.C. § 502(e).[FN59]

Similarly, in *Eagle-Picher,*[FN60] the court rejected *Allegheny's* logic for similar reasons, and disallowed the creditors' reimbursement claims (which were under section 113(f)) for future response costs under CERCLA. The *Eagle-Picher* court stated that "[d]ouble liability could occur under the circumstances of this case since EPA remains free to pursue [the debtor] for remediation costs should the claimants fail to fulfill their cleanup obligations."[FN61]

Here, we have a situation similar to *Eagle-Picher.* The Debtors here do not dispute Weyerhaeuser's claims for costs it already incurred from voluntary remediation; the claims at issue are for *future* remediation costs. *Both the Debtors and Weyerhaeuser are liable for cleanup at the Kalamazoo Site.* Here, in fact, the EPA has already entered into the Settlement Agreement with the Debtors for remediation of the Kalamazoo Site. Allowing Weyerhaeuser's claim would not only expose the Debtors to-but would actually result in-paying multiple recoveries on account of the same liability.[FN62]

*3. The Burlington Northern Contentions*

Finally, Weyerhaeuser asserts that even if I should find that there is no difference, for the purpose of co-liability, between recovery under section 107 or 113(f), Weyerhaeuser should still prevail on this element because CERCLA does not always require joint and several liability for superfund sites. Weyerhaeuser cites the Supreme Court's decision in *Burlington Northern and Santa Fe Railway Co. v. U.S.*[FN63] for the point that "in the superfund context,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 11413 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 11413 (Bkrtcy.S.D.N.Y.))**

liability will not be joint and several if there's a reasonable basis for apportionment." [FN64] In *Burlington Northern,* the Supreme Court decided that joint and several liability would not apply because the defendant in that case owned some, but not all, of the property at issue. Weyerhaeuser then makes an argument by analogy, asserting that apportionment is also appropriate in this case because, based on the laws of gravity, Weyerhaeuser cannot be held liable for any damage upstream of where it owned or used property. Therefore, Weyerhaeuser argues, any cleanup costs that it will incur in the future over and above those for its own liability are costs for which it is not co-liable with MHLLC.

**\*15** But there is a fundamental flaw in Weyerhaeuser's argument on this point. If the Debtors and Weyerhaeuser are not jointly and severally liable, then Weyerhaeuser would have not a claim against the Debtors in the first place, as Weyerhaeuser would never be required to pay more than its fair share. [FN65] This issue arose at the hearing:

> THE COURT: If there is no joint liability, either joint and several or in some other proportion, then what's the basis for your client filing a claim in the first place? What's the nexus between your guys writing out a check and the debtors reimbursing you?

> MR. SCHNEIDER: We've spent money that's attributable to them and not to us. And that happens all the time in superfund cases where you have parties who will undertake environmental investigations or cleanups because the contamination is not attributable to your activities. And that's the situation here. [FN66]

The problem with Weyerhaeuser's response to the Court's question is that it addressed expenses that it had incurred *in the past,* not future expenses. Claims for past expenses, not disputed by the Debtors, are not at issue here. If, by means of technology or techniques described by Weyerhaeuser's counsel during the Hearing [FN67] (or by some other means), Weyerhaeuser can establish that it is liable to the EPA for less than had previously been assumed, that merely underscores why its claim should be limited to amounts it actually pays.

*C.*

*"Reimbursement or Contribution" Element*

**[5]** Weyerhaeuser also relies on its contention that it seeks a claim for cost recovery under section 107(a), rather than a claim for contribution under section 113(f), to argue that its claim is not one for "reimbursement or contribution" under section 502(e)(1)(B). But whether the Weyerhaeuser claim is one for cost recovery under section 107(a), or contribution under 113(f)(1), I must find that it still is covered by section 502(e)(1)(B).

CERCLA section 113(f), by its terms, directly provides for "contribution"; therefore, quite indisputably, any recovery under section 113 must be considered contribution for the purposes of 502(e)(1)(B). [FN68] Section 107(a), under which Weyerhaeuser asserts that its claims are brought, provides for "recoverable costs," but does not contain the words "contribution" or "reimbursement." But I do not find this distinction to be dispositive, and I find that the claims of Weyerhaeuser, [FN69] even if premised on section 107(a), are in substance still claims for "reimbursement" for the purposes of 502(e)(1)(B).

Section 502(e)(1)(B) states that "the court shall disallow *any* claim for reimbursement or contribution ..." [FN70] As I noted above, [FN71] section 502(e)(1)(B) imposes no requirements as to the means or reason by which co-liability exists. Although "reimbursement" is not defined in the Bankruptcy Code, Black's Law Dictionary defines "reimbursement" as "1. Repayment. 2. Indemnification." [FN72] In *Wedtech II,* Chief Judge Brozman, in this district, explained that "[t]he use of the word 'reimbursement' in the statute cannot be viewed as accidental. It is a broad word which encompasses whatever claims a co-debtor has which entitle him to be made whole for monies he has expended on account of a debt for which he and the debtor are both liable." [FN73]

**\*16** Similarly, in *Chemtura,* wherein I rejected the notion that the "liable with" prong requires that the Debtors establish that "the successful prosecution of a claim of [a Tort Plaintiff] against [a Corporate Claimant] would *automatically* result in the Debtors being liable to such underlying tort plaintiff as well," [FN74] I noted that Congress clearly meant to include all situations wherein indemnitors or contributors could be liable with the debtor within the scope of § 502(e)(1)(B). [FN75]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 11413 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 11413 (Bkrtcy.S.D.N.Y.))**

Other courts similarly focused on substance over form when addressing this issue, and I find their reasoning and conclusions to be persuasive. In *Cottonwood Canyon,* discussed above, the court disallowed, as "contribution or reimbursement," claims asserted under CERCLA 107(a). The risk, both there and in *Allegheny,* that the Debtors would make duplicative payments for the same liability, revealed that "the clear character of the claim" was that "debtor was not being asked to satisfy a [direct] claim for injury to the claimants property" but rather was being sought for reimbursement.[FN76]

Looking at substance over form here, the claims at issue plainly are for "reimbursement" as that term is used in section 502(e)(1)(B). Weyerhaeuser seeks repayment of money that it alleges it will spend on environmental remediation, and the Debtors and Weyerhaeuser, all PRPs, are co-liable for environmental cleanup. There is a substantial risk that if these private party claims are allowed, the Debtors will pay twice for the same liability. In light of these facts, Weyerhaeuser's claims, even if brought for cost recovery under section 107(a), are claims for reimbursement under 501(e)(1)(B).

Weyerhaeuser's reliance on the distinctions between sections 107(a) and 113(f) noted in *Atlantic Research* and *Aviall Services* is misplaced. As explained above, *Atlantic Research* merely holds that co-liability is not required for cost recovery under 107(a). Weyerhaeuser's claim may not be one for contribution, and may in fact be "cost recovery" under 107(a). But *Atlantic Research* and *Aviall* do not address section 502(e)(1)(B) (or, more specifically "reimbursement") at all, and do not affect earlier decisions, such as *Cottonwood Canyon,* which found that direct claims for cost recovery under CERCLA section 107 are claims for "reimbursement" under 502(e)(1)(B).

Weyerhaeuser also argues that if this Court were to create a trust account for payment of future costs like in *Allegheny,* the payment of funds into the trust account could be considered something other than reimbursement, because the money wouldn't be spent until the future.[FN77] I find this argument unpersuasive. The money would be paid to return money expended by Weyerhaeuser. That is reimbursement.

[6] In its one unique contention, Hamilton Beach

also maintains that its claim is a direct contractual claim, and not one for contribution. Contractual claims are similarly disallowed under 502(e)(1)(B) when they are, in substance, claims for reimbursement.[FN78] Like Weyerhaeuser, Hamilton Beach seeks payment from the Debtors for money it might spend in the future. That is a claim for reimbursement.

*Conclusion*

**\*17** For the foregoing reasons, I conclude that the Orally Arguing Claimants' claims, to the extent they are on account of future costs, are contingent claims for reimbursement or contribution of an entity that is liable with the debtor to a third party creditor. Except for the amounts that the Orally Arguing Claimants already actually paid, the Objections to the Orally Arguing Claimants' claims are sustained.

FN1. I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where the circumstances do not permit more leisurely drafting or more extensive or polished discussion. Because they often start as scripts for decisions to be dictated in open court, they typically have a more conversational tone.

FN2. Pursuant to the parties' agreement and the provisions of Case Management Order # 1, all of the facts (but not necessarily arguments and conclusions) in the declarations submitted to me have been taken as true. To shorten this Decision, I've limited factual citations and detail to the most significant matters.

FN3. For simplicity, I ignore this distinction going forward, and refer to such claims simply as being asserted by the respective states.

FN4. The proofs of claim filed by the U.S. and state governmental agencies totaled approximately $5.5 billion, with the federal claims totaling approximately $5 billion, and the state claims representing the remainder.

FN5. Other claimants (the "**Other Claimants**") filed timely responses but did not orally argue: Arkema Incorporated, Certain

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 11413 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 11413 (Bkrtcy.S.D.N.Y.))**

Teed Corporation, Marvin Jonas Transfer Station Site Orally Arguing Claimants Group, Ashland, Inc., Givaudan Fragrances Corporation, ISP Environmental Services Inc., LPRSA Site Cooperating Parties, Mallinckrodt, Inc., Teval Corp., The Dial Corporation, The Stanley Works, and Wolff & Sampson Group/Wolff & Sampson PC. Based on the papers and on the oral arguments from those who sought to orally argue, I believe that the analysis that follows requires disallowing the Other Claimants' claims as well, and to avoid lengthening this decision further, I won't discuss their particular facts. But if any of them believes that I overlooked circumstances that might make its situation distinguishable, I will permit any such entity to move for reargument, based on matters not addressed here.

FN6. Under the AOCs, Georgia-Pacific and MHLLC are obligated to pay the costs necessary to perform-as well as the future response costs incurred by EPA in connection with-the First and Second AOCs. Georgia-Pacific alone is also obligated to pay the costs necessary to perform-as well as the future response costs incurred by EPA in connection with-the Third AOC.

FN7. Georgia-Pacific maintains that as of the time of the filing, it had incurred approximately $7 million in response costs at the Kalamazoo Site, and that MHLLC owes Georgia-Pacific approximately $3 .87 million of this amount under the Allocation Agreement. Georgia-Pacific further states that MHLLC owes Georgia-Pacific an additional $3.12 million by reason of MHLLC's obligations to pay for ARCADIS' prior services at the Kalamazoo Site. It is worth noting that these are past costs, or costs that have already been incurred by Georgia-Pacific. As noted above, Georgia-Pacific's claim also seeks future costs.

FN8. *See* 4/16/2010 Hr'g Tr. at 118:7-12 ("Georgia-Pacific is asserting only a 113 claim. So issues of contribution or reimbursement ... we're not arguing that these-that we don't have claims for contribution or

reimbursement. We're simply arguing that our claims are not contingent.").

FN9. *See, e.g.,* Alta Partners Holdings LDC v. *Credit Suisse First Boston LLC ("In re Global Crossing Ltd."),* 385 B.R. 52, 66 (Bankr.S.D.N.Y.2008); *In re General Motors Corp.,* 407 B.R. 463, 486 (Bankr.S.D.N.Y.2009)* ("**GM-Sale Decision**"), appeal dismissed and aff'd,* 428 B.R. 43 (S.D.N.Y.2010), and 430 B.R. 65 (S.D.N.Y.2010); *In re Motors Liquidation Co.,* No. 09-50026, 2010 WL 3219506, *5 (Bankr.S.D.N.Y. Jul.16, 2010); *In re Adelphia Communications Corp.,* No. 02-41729, ---B.R. ----, 2010 WL 4791795, *3 & n. 17 (Bankr.S.D.N.Y. Nov.18, 2010).

FN10. It should be noted, however, while focusing on textual analysis, that section 502(e)(1)(B) imposes no requirements as to *how* or *why* the party asserting the claim potentially subject to section 502(e)(1)(B) must be liable with the debtor on the claim of the third party. There is no statutory requirement, for example, that the debtor and the party asserting the claim be liable on the claim of the third party in the same action, under a common statute, or on the same legal theory.

FN11. *See In re Chemtura Corp.,* 436 B.R. 286 (Bankr.S.D.N.Y.2010) ("**Chemtura** ").

FN12. CERCLA § 106(a), 42 U.S.C. § 9606(a) (emphasis added).

FN13. *See* CERCLA § 106(b), 42 U.S.C. § 9606(b).

FN14. CERCLA § 107, 42 U.S.C. § 9607.

FN15. CERCLA § 113(f), 42 U.S.C. § 9613(f).

FN16. Weyerhaeuser addresses contingency with respect to both past costs incurred, and future costs. I think the Debtors have now acknowledged that past costs incurred by Weyerhaeuser are not contingent, and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 11413 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 11413 (Bkrtcy.S.D.N.Y.))**

cannot be disallowed for that reason, but to the extent the Debtors continue to argue otherwise, I reject their position in that regard.

FN17. *See* n. 11 above, 436 B.R. at 286.

FN18. *See Chemtura,* 436 B.R. at 297.

FN19. *See In re Chateaugay Corp.,* 944 F.2d 997 (2d Cir.1991) ( "*Chateaugay* "); *Olin Corp. v. Riverwood Int'l Corp. (" In re Manville Forest Products Corp."),* 209 F.3d 125 (2d Cir.2000) ("*Manville Forest* ").

FN20. *Chateaugay.*

FN21. *Id.* at 1005.

FN22. *Manville Forest,* 209 F.3d at 129 (emphasis added).

Other caselaw-again in the context of determining the existence of a claim, rather than in deciding whether or not it was "contingent"-likewise describes a situation where the need for remediation is known, but the amount, if any, to be paid for the remediation is not, as giving rise to a "contingent claim." *See Cal. Dep't of Health Services v. Jensen (" In re Jensen"),* 995 F.2d 925, 930-31 (9th Cir.1993) (*per curiam* ) ("We conclude that the state had sufficient knowledge of the Jensens' potential liability to give rise to a contingent claim for cleanup costs before the Jensens filed their personal bankruptcy petition on February 13, 1984"); *In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co.,* 974 F.2d 775, 786 (7th Cir.1992) (in context of a former Bankruptcy Act § 77 railroad reorganization, to same effect: "when a potential CERCLA claimant can tie the bankruptcy debtor to a known release of a hazardous substance which this potential claimant knows will lead to CERCLA response costs, and when this potential claimant has, in fact, conducted tests with regard to this contamination problem, then this potential claimant has, at least, a contingent CER-

CLA claim for purposes of Section 77.").

FN23. *See* Debtors Reply Br. at ¶ 8.

FN24. Somewhat earlier in the *Chateaugay* decision, also as part of its analysis as to whether the EPA had a claim at all, the Circuit dealt with the easy case. It stated, with respect to the EPA's incurrence of CERCLA response costs:

> When such costs are incurred, EPA will unquestionably have what can fairly be called a "right to payment." That right is currently unmatured and will not mature until the response costs are incurred.

944 F.2d at 1004.

FN25. *See Chateaugay,* 944 F.2d at 1005.

FN26. *See In re Alper Holdings USA,* No. 07-12148, 2008 WL 4186333,*6-*7 (Bankr.S.D.N.Y. Sept.10, 2008) (Lifland, C.J.) ("*Alper Holdings* ") (disallowing future environmental indemnification costs "as the amounts and ultimate liability are presently unknown," and finding contingency on the ground that amounts for which indemnification was sought were undetermined and unpaid); *In re Drexel Burnham Lambert Group, Inc.,* 148 B.R. 983, 986-90 (Bankr.S.D.N.Y.1992) (Conrad, J.) ("*Drexel Burnham* ") (disallowing indemnity claims of co-underwriters for potential liability in pending fraud suits, because claimants had not yet paid judgments or settlements); *In re Wedtech Corp.,* 85 B.R. 285, 290 (Bankr.S.D.N.Y.1998) (Buschman, J.) ("*Wedtech I* ") (disallowing debtor's officers' contingent indemnification claims).

FN27. *See Aetna Casualty and Surety Company v. Georgia Tubing Corp. ("In re Georgia Tubing Corp."),* No. 93 Civ. 3659, 1995 WL 429018,*3 -*4 (S.D.N.Y. July 20, 1995) (Preska, C.J.), *aff'd,* 93 F.3d 56 (2d Cir.1996) (disallowing an insurance company's claim regarding hazardous waste bonds where primary creditor was a state

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 11413 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 11413 (Bkrtcy.S.D.N.Y.))**

environmental agency, stating that a surety claim was contingent until the claimant "pays the principal creditor and fixes his own right to payment from the debtor" (quoting 3 Collier on Bankruptcy ¶ 502.05 at 502-88 (15th edition 1995)).

FN28. *See In re APCO Liquidating Trust,* 370 B.R. 625 (Bankr.D.Del.2007) (Shannon, J.) ("**APCO** ").

FN29. Similarly, *Collier* expressly identifies claims for contribution arising under CERCLA as examples of claims that are contingent. *See* 4 *Collier* ¶ 502.06[2][d] (16th ed.). *Collier* provides:

In addition to codebtor situations created by contract, section 502(e)(1)(B) applies to disallow contingent reimbursement or contribution claims created by statute. For example, a claim for contribution arising under the Comprehensive Environmental Response, Compensation and Liability Act may be a contingent claim subject to disallowance under section 502(e)(1)(B).... In such a case, the government is the primary obligee that may seek satisfaction of its claim against the debtor from third parties who, under the statute, are obligated with the debtor to the government on the same debt. The statute under which the third-party liability is created, however, must provide for a reimbursement or contribution claim against the debtor.

(footnote omitted).

FN30. 2008 WL 4186333 at *6.

FN31. 148 B.R. at 987 (emphasis added; internal citations omitted).

FN32. *See* 370 B.R. at 629.

FN33. *Id.*

FN34. *Id.* at 630.

FN35. *Id.* at 636.

FN36. *Id.*

FN37. *Id.* (emphasis in original; internal citations omitted).

FN38. *See, e.g., In re Adelphia Communications Corp.,* 359 B.R. 65, 72 n. 13 (Bankr.S.D.N.Y.2007) ("This Court has been on record for many years as having held that the interests of predictability in this District are of great importance, and that where there is no controlling Second Circuit authority, it follows the decisions of other bankruptcy judges in this district in the absence of clear error."); *GM-Sale Decision,* 407 B.R. at 487 & n. 19 (same).

FN39. *Cooper Industries, Inc. v. Aviall Services, Inc.,* 543 U.S. 157, 125 S.Ct. 577, 160 L.Ed.2d 548 (2004) ("**Aviall Services** ").

FN40. *See, e.g., Chemtura,* 436 B.R. at 297 ("Thus, while we all understand and agree that there is a distinction between "contingent" and unliquidated, that distinction isn't material here. The unliquidated but non-contingent costs of defense here still result in a potentially allowable claim, but the claims for contribution in the event that a Tort Claimant succeeds against Corporate Claimants are still contingent, and satisfy this prong of the 3-part test for establishing 502(e)(1)(B) disallowance.").

FN41. Weyerhaeuser cites Judge Sontchi's decision in *In re RNI Wind Down Corp.,* 369 B.R. 174 (Bankr.D.Del.2007) ("**RNI**") in support of this contention. But as I noted in *Chemtura,* see 436 B.R. at 296-97, the claimant in *RNI* waived any claims he might have for amounts he might have to pay on the underlying claims (there, by the SEC). The right to payment that Judge Sontchi found to be "unliquidated but not contingent" was the right to the *advancement of those costs of defense,* and not the right to *contribution or indemnity for amounts ultimately paid to a third party*-the circumstance that was relevant there and here.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 11413 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 11413 (Bkrtcy.S.D.N.Y.))**

Judge Sontchi merely found (understandably, given appropriate analysis) that the right to advancement was a then-existing right (under the certificate of incorporation, by-laws, and Delaware law), subject only to uncertainty at the time as to just how much the defense costs would turn out to be. I observed, in fact, that Judge Sontchi had actually used claims for contribution as an example of what would satisfy the contingency elements. See *Chemtura*, 436 B.R. at 297.

FN42. *See In re Eagle-Picher Indus. Inc., 164 B.R. 265, 272 (S.D.Ohio 1994)* ("**Eagle-Picher** ") ("502(e)(1)(B) fosters the primary objective of CERCLA by requiring those who seek contribution to incur the expenses relating to cleanup before stating an allowable claim."); *APCO*, 370 B.R. at 636 (same, quoting *Eagle-Picher* ).

FN43. 370 B.R. at 636-37.

FN44. Having incorporated all of the others' arguments, Hamilton Beach also argues that its claim is not based on co-liability. But with only one exception (discussed at page 33 below), Hamilton Beach doesn't articulate any theories or authority distinct from those asserted by Weyerhaeuser, and its situation is governed by the analysis that follows.

FN45. Weyerhaeuser makes a secondary argument that joint and several liability is not required by CERCLA for all superfund sites. See sub-section 3.

FN46. *U.S. v. Atlantic Research Corp., 551 U.S. 128, 127 S.Ct. 2331, 168 L.Ed.2d 28 (2007)* ("**Atlantic Research** "). Contrasting CERCLA section 107(a) with section 113(f), the Supreme Court stated the following: " § 107(a) permits recovery of cleanup costs but does not create a right to contribution. A private party may recover under § 107(a) without any establishment of liability to a third party." *Atlantic Research*, 551 U.S. at 139.

FN47. The PRP was the owner of the facil-

ity and filed a suit against the U.S. under CERCLA section 107 to recover cleanup costs.

FN48. *Atlantic Research*, 551 U.S. at 135.

FN49. *Id.* at 139.

FN50. *In re Allegheny Int'l, Inc., 126 B.R. 919 (W.D.Pa.1991)*, *aff'd without opinion*, 950 F.2d 721 (3d Cir.1991) ("**Allegheny** ").

FN51. *See Allegheny*, 126 B.R. at 923.

FN52. *See id.* at 924.

FN53. In *Allegheny*, the claimant's cleanup was entirely voluntary; no environmental government agency had taken any action with regard to the claimant's property. Here, however, the EPA has listed Weyerhaeuser as a PRP at the Kalamazoo Site and Weyerhaeuser has entered into a Consent Decree with the EPA with regard to a portion of the Site.

FN54. *See Eagle-Picher*, 164 B.R. at 271; *Drexel Burnham*, 148 B.R. at 988; *In re Cottonwood Canyon Land Co., 146 B.R. 992, 996 (Bankr.D.Colo.1992)* ("**Cottonwood Canyon** ").

FN55. *See APCO*, 370 B.R. at 634 ("[T]he sole purpose served by section 502(e)(1)(B) is to preclude redundant recoveries...."); *Wedtech I*, 85 B.R. at 289 & n. 4 (noting that Congress enacted the provision, in part, to prevent competition between primary and secondary creditors for the "limited proceeds of the estate" (quoting H.R.Rep. No. 95 595, 95th Cong., 1st Sess. 354 (1977))).

FN56. It is not possible to maintain that the cost recovery claim does not involve an obligation that both the Debtor and Weyerhaeuser owe to a third party, given that the EPA has specified that both parties are PRPs at the Kalamazoo Site.

FN57. Weyerhaeuser also cites *In re Har-*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 11413 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 11413 (Bkrtcy.S.D.N.Y.))**

*vard Indus., Inc.,* 138 B.R. 10 (Bankr.D.Del.1992) (Balick, J.) ("*Harvard Industries* "), which follows *Allegheny's* logic. In *Harvard Industries,* Judge Balick distinguished between claims by a PRP for a cleanup performed by the PRP and claims for where the EPA performed the cleanup, and ruled, *inter alia,* that where the party sought to recover funds it would expend in the future, section 502(e)(1)(B) does not apply. She acknowledged that double liability could occur if the PRP recovered for personal expenditures but then failed to cleanup the site and the EPA brought an action against the debtor, and, as in *Allegheny,* set up a trust to resolve that potential problem. But since, as in *Allegheny, Harvard Industries* subjects debtors to the risks of duplicative recoveries, I believe that *Harvard Industries* is subject to the same criticism that has been raised with respect to *Allegheny.*

FN58. *Cottonwood Canyon,* 146 B.R. at 996. *See also Drexel Burnham,* 148 B.R. at 989 ("The *Cottonwood* court insisted that this is demonstrated by the solution devised by the *Allegheny* court in response to the concern that the allowance of the claim might lead to multiple recoveries against the debtor. The debtor would be subject to multiple recovery if the claimant failed to take remedial action to remove the hazard after it had received a distribution from the debtor, leaving the debtor liable to a claim by the Government for remediation of the plants."). The *Allegheny* court even noted that "both debtor and [claimant] are liable for the waste remediation...." *Allegheny,* 126 B.R. at 923.

FN59. *Cottonwood Canyon,* 146 B.R. at 996.

FN60. Weyerhaeuser criticizes the Debtors for relying on *Eagle-Picher* and *Cottonwood Canyon,* which are pre-*Atlantic Research* cases, and argues that they were overruled by *Atlantic Research.* The *Eagle-Picher* court, citing circuit court decisions, had found that the claims asserted there (a PRP against another PRP) could only be brought under CERCLA § 113, and not § 107, and

*Weyerhaeuser* is correct that *Atlantic* overruled *Eagle-Picher* in this respect-since *Atlantic Research* now allows a PRP to seek recovery from another PRP under § 107. But that distinction does not matter here. I rely on *Eagle-Picher* for its narrower (and I believe undisputable) finding that the Debtor and claimant were co-liable. Because the *Atlantic Research* decision did not reach that issue, the portion of *Eagle-Picher* upon which I rely was not overruled. And because *Atlantic Research* did not decide issues under Bankruptcy Code section 502(e)(1)(B), it had no effect on *Cottonwood Canyon.* Thus I find Weyerhaeuser's criticism unpersuasive.

FN61. *Eagle-Picher,* 164 B.R. at 271.

FN62. The fact that Debtors settled their claims with the EPA is not necessary to my decision here, though, it is worth noting that the contribution protection in the Settlement Agreement protects the Debtors from duplicative payments on account of the same liabilities, a risk that exists because the Debtors are co-liable with the Private Party Claimants. As the Debtors correctly explained, that provision "plays into the central purpose of 502(e)(1)(b), which is to avoid double dipping for duplicate claims asserted by more than one creditor." 4/16/2010 Hr'g Tr. at 63.

FN63. --- U.S. ----, 129 S.Ct. 1870, 173 L.Ed.2d 812 (2009) ( "*Burlington Northern* ").

FN64. 4/16/2010 Hr'g Tr. at 92.

FN65. Or if it was required, Weyerhaeuser could make this same argument in the appropriate forum to avoid having to pay a full judgment.

FN66. 4/16/2010 Hr'g Tr. at 92.

FN67. *See* 4/16/2010 Hr'g Tr. at 91-92.

FN68. Georgia-Pacific, who asserts that it

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 11413 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 11413 (Bkrtcy.S.D.N.Y.))**

has an allowable claim under section 113(f),
does not dispute that its claim is for "contri-
bution   or   reimbursement"   under
502(e)(1)(B).

FN69. And other similarly situated private
party claimants, such as Hamilton Beach

FN70. 11 U.S.C. § 502(e)(1)(B) (emphasis
added).

FN71. *See* n. 10 above.

FN72. *Black's Law Dictionary* 1399 (9th
ed.2009).

FN73. *In re Wedtech,* 87 B.R. 279, 287
(Bankr.S.D.N.Y.1988)   (Brozman,   C.J.)
("***Wedtech II*** ).

FN74. *Chemtura,* 436 B.R. at 293.

FN75. *See* *id.* at 295-96.

FN76. *Cottonwood Canyon,* 146 B.R. at
996.

FN77. *See* 4/16/2010 Hr'g Tr., at 106:5-10.

FN78. *See* *Fine Organic Corp. v. Hexcel
Corp. ("In re Hexcel Corp."), 174 B.R. 807,
810 (Bankr.N.D.Cal.1994)* (Tchaikovsky, J.)
(disallowing as reimbursement claims aris-
ing out of asset purchase agreement between
debtors and claimant in which debtor prom-
ised to perform remediation, even though
claimant was not jointly liable with debtor).

Bkrtcy.S.D.N.Y.,2011.
In re Lyondell Chemical Co.
--- B.R. ----, 2011 WL 11413 (Bkrtcy.S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

**H**Only the Westlaw citation is currently available.

United States Bankruptcy Court,
S.D. New York.
In re CHEMTURA CORPORATION, et al., Debtors.

No. 09-11233(REG).
Jan. 13, 2011.

**Background:** Chapter 11 debtors in jointly administered cases objected to private party claims for future environmental remediation costs also sought by federal government and state governmental entities.

**Holdings:** The Bankruptcy Court, Robert E. Gerber, J., held that:

(1) private party claims were contingent within meaning of bankruptcy statute generally disallowing co-debtor contingent claims for reimbursement or contribution;

(2) claims were premised on co-liability with debtors within meaning of statute generally disallowing co-debtor contingent claims for reimbursement or contribution;

(3) claim of trust that was to receive environmental remediation payments did not satisfy co-obligor requirement under statute generally disallowing co-debtor contingent claims for reimbursement or contribution;

(4) claims asserted pursuant to cost recovery statute under Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) were for reimbursement; and

(5) claims under agreements with debtors requiring payments proportional to parties' liability to be paid into trust fund were claims for contribution.

Objections sustained in part and overruled in part.

West Headnotes

**[1] Bankruptcy 51 ⚏2828.1**

51 Bankruptcy
    51VII Claims
        51VII(A) In General

51k2828 Contingent or Unliquidated Claims
            51k2828.1 k. In General. Most Cited Cases

Three elements must be met for claim for reimbursement or contribution to be disallowed under statute: (1) party asserting claim must be liable with debtor on claim of third party, (2) claim must be contingent at time of its allowance or disallowance, and (3) claim must be for reimbursement or contribution. 11 U.S.C.A. § 502(e)(1)(B).

**[2] Bankruptcy 51 ⚏2830.5**

51 Bankruptcy
    51VII Claims
        51VII(A) In General
            51k2830.5 k. Environmental Claims. Most Cited Cases

Claims asserted against Chapter 11 debtors under CERCLA for environmental remediation costs that had already been paid by claimants were no longer "contingent" within meaning of bankruptcy statute generally providing for disallowance of claims for reimbursement or contribution by those liable with debtor to the extent that claims were contingent. 11 U.S.C.A. § 502(e)(1)(B); Comprehensive Environmental Response, Compensation, and Liability Act of 1980, §§ 107(a), 113(f)(1), 42 U.S.C.A. §§ 9607(a), 9613(f)(1).

**[3] Bankruptcy 51 ⚏2830.5**

51 Bankruptcy
    51VII Claims
        51VII(A) In General
            51k2830.5 k. Environmental Claims. Most Cited Cases

Claims for reimbursement or contribution asserted against Chapter 11 debtors by private parties under CERCLA, seeking future environmental remediation costs, were "contingent" within meaning of bankruptcy statute generally providing for disallowance of contingent claims for reimbursement or con-

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

tribution by those liable with debtor, even if amount of future costs was known or fixed, since claimants sought reimbursement for amounts that had not yet been paid. 11 U.S.C.A. § 502(e)(1)(B); Comprehensive Environmental Response, Compensation, and Liability Act of 1980, §§ 107(a), 113(f)(1), 42 U.S.C.A. §§ 9607(a), 9613(f)(1).

**[4] Bankruptcy 51 ☞2830.5**

51 Bankruptcy
   51VII Claims
      51VII(A) In General
         51k2830.5 k. Environmental Claims. Most Cited Cases

Claims for reimbursement or contribution asserted against Chapter 11 debtors by private parties under CERCLA, seeking future environmental remediation costs, were both "unliquidated" and "contingent," for claims allowance purposes, where claims were for future cleanup costs that might or might not actually be incurred, and then might or might not actually be paid by claimants. 11 U.S.C.A. § 502(e)(1)(B); Comprehensive Environmental Response, Compensation, and Liability Act of 1980, §§ 107, 113(f), 42 U.S.C.A. §§ 9607, 9613(f).

**[5] Bankruptcy 51 ☞2830.5**

51 Bankruptcy
   51VII Claims
      51VII(A) In General
         51k2830.5 k. Environmental Claims. Most Cited Cases

Claims asserted by private claimants against Chapter 11 debtors for future environmental remediation costs were premised on co-liability with debtors within meaning of bankruptcy statute generally disallowing co-debtor contingent claims for reimbursement or contribution, even though claims were based on cost recovery under CERCLA, rather than contribution under CERCLA, where both claimants and debtors had been designated as potentially responsible parties (PRPs) by Environmental Protection Agency (EPA) and had shared statutory obligation to provide for environmental cleanup of designated sites, and claims rested on theory that claimants would have to pay more than their share of cleanup

costs if debtors paid less than their share. 11 U.S.C.A. § 502(e)(1)(B); Comprehensive Environmental Response, Compensation, and Liability Act of 1980, §§ 107(a), 113(f)(1), 42 U.S.C.A. §§ 9607(a), 9613(f)(1).

**[6] Bankruptcy 51 ☞2830.5**

51 Bankruptcy
   51VII Claims
      51VII(A) In General
         51k2830.5 k. Environmental Claims. Most Cited Cases

Co-liability requirement of bankruptcy statute generally disallowing co-debtor contingent claims for reimbursement or contribution was satisfied where Chapter 11 debtors and claimant both denied liability for cleanup of environmental contamination under CERCLA but any recovery action that would be brought by claimant, after it was found liable and paid remediation costs, would be premised on debtors' co-liability. 11 U.S.C.A. § 502(e)(1)(B); Comprehensive Environmental Response, Compensation, and Liability Act of 1980, §§ 107(a), 113(f)(1), 42 U.S.C.A. §§ 9607(a), 9613(f)(1).

**[7] Bankruptcy 51 ☞2828.1**

51 Bankruptcy
   51VII Claims
      51VII(A) In General
         51k2828 Contingent or Unliquidated Claims
            51k2828.1 k. In General. Most Cited Cases

Co-liability requirement of bankruptcy statute generally disallowing co-debtor contingent claims for reimbursement or contribution does not require that debtor and claimant have already been found liable in underlying lawsuit, and, instead, requires a finding that causes of action in underlying lawsuit assert claims upon which, if proven, debtor could be liable but for automatic stay. 11 U.S.C.A. §§ 362, 502(e)(1)(B).

**[8] Bankruptcy 51 ☞2830.5**

51 Bankruptcy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

51VII Claims
    51VII(A) In General
        51k2830.5 k. Environmental Claims. Most Cited Cases

Co-liability required under bankruptcy statute generally disallowing co-debtor contingent claims for reimbursement or contribution existed where environmental liability of Chapter 11 debtors and claimant was one and the same, even though debtors were not parties to claimant's consent decree with state agency. 11 U.S.C.A. § 502(e)(1)(B).

**[9] Bankruptcy 51 ☞2830.5**

51 Bankruptcy
    51VII Claims
        51VII(A) In General
            51k2830.5 k. Environmental Claims. Most Cited Cases

Trust which was to receive payments for environmental remediation, but which faced no environmental liability itself, was not obligor or co-obligor, and therefore trust's CERCLA claim against Chapter 11 debtor for future remediation costs did not satisfy co-liability requirement of bankruptcy statute generally providing for disallowance of contingent claims for reimbursement or contribution by those liable with debtor, regardless of whether trust was regarded as collection agent for Environmental Protection Agency (EPA) or mechanism by which debtor was meeting its obligations to EPA. 11 U.S.C.A. § 502(e)(1)(B); Comprehensive Environmental Response, Compensation, and Liability Act of 1980, §§ 107(a), 113(f)(1), 42 U.S.C.A. §§ 9607(a), 9613(f)(1).

**[10] Bankruptcy 51 ☞2830.5**

51 Bankruptcy
    51VII Claims
        51VII(A) In General
            51k2830.5 k. Environmental Claims. Most Cited Cases

Claims of private claimants against Chapter 11 debtors for future environmental remediation costs were for "reimbursement" under bankruptcy statute generally providing for disallowance of contingent

claims for reimbursement or contribution by those liable with debtor, even though claims were asserted pursuant to CERCLA's cost recovery statute, rather than CERCLA's contribution statute. 11 U.S.C.A. § 502(e)(1)(B); Comprehensive Environmental Response, Compensation, and Liability Act of 1980, §§ 107(a), 113(f), 42 U.S.C.A. §§ 9607(a), 9613(f).

**[11] Bankruptcy 51 ☞2830.5**

51 Bankruptcy
    51VII Claims
        51VII(A) In General
            51k2830.5 k. Environmental Claims. Most Cited Cases

Claims brought pursuant to CERCLA's contribution provision seek "contribution" within meaning of bankruptcy statute generally providing for disallowance of claims for reimbursement or contribution by those liable with debtor, to the extent that claims were contingent. 11 U.S.C.A. § 502(e)(1)(B); Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 113(f), 42 U.S.C.A. § 9613(f).

**[12] Bankruptcy 51 ☞2828.1**

51 Bankruptcy
    51VII Claims
        51VII(A) In General
            51k2828 Contingent or Unliquidated Claims
                51k2828.1 k. In General. Most Cited Cases

Contractual claims are disallowed under bankruptcy statute generally providing for disallowance of contingent claims for reimbursement or contribution by those liable with debtor when they are, in substance, claims for reimbursement or contribution. 11 U.S.C.A. § 502(e)(1)(B).

**[13] Bankruptcy 51 ☞2830.5**

51 Bankruptcy
    51VII Claims
        51VII(A) In General
            51k2830.5 k. Environmental Claims. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

Claims of private claimants against Chapter 11 debtors under agreements which required claimants and debtors to make payments proportional to their liability for environmental remediation costs into trust funds, out of which money would be paid for remediation, were claims for "contribution" within meaning of bankruptcy statute generally providing for disallowance of contingent claims for reimbursement or contribution by those liable with debtor, since claims sought payment for cleanup costs beyond claimants' fair share of such costs that might be incurred in the future, and trust was merely mechanism used for contributions. 11 U.S.C.A. § 502(e)(1)(B).

Kirkland & Ellis LLP by M. Natasha Labovitz, Esq., Craig A. Bruens, Esq., Brian T. Stansbury, Esq., (argued), Richard M. Cieri, Esq., New York, NY, and by Nader R. Boulos, P.C., Esq., Alyssa A. Qualls, Esq., Chicago, IL, for Debtors and Debtors-in-Possession.

Duane Morris LLP, by Gerard S. Catalanello, Esq., New York, NY, and by Lawrence J. Kotler, Esq., Philadelphia, PA, Conflicts Counsel for the Debtors.

Bingham McCutchen LLP by Milissa A. Murray, Esq. (argued), Washington, DC, for ILCO Site Redemption Group, the Cooper Drum Parties Group, and the BKK Joint Defense Group.

Dilworth Paxon LLP by Scott J. Freedman, Esq. (argued), Cherry Hill, NJ, for Dow Chemical Co.

Pepper Hamilton LLP by Michael H. Reed, Esq. (argued), Philadelphia, PA, for BASF Corporation.

Saul Ewing LLP by Adam H. Isenberg, Esq. (argued), Philadelphia, PA, for Delaware Sand & Gravel Remedial Trust Centre Square West.

Sebring & Associates by William E. Otto, Esq. (argued), Monroeville, PA, for Flabeg Technical Glass U.S. Corporation.

Thompson Hine LLP by Jeremy M. Campana, Esq. (argued), Cleveland, OH, for Akzo Nobel, Inc.

BENCH DECISION [FN1] ON THE DEBTORS' OB-JECTIONS UNDER BANKRUPTCY CODE SECTION 502(e)(1)(B), TO PRP ENVIRONMENTAL CONTRIBUTION CLAIMS

ROBERT E. GERBER, Bankruptcy Judge.

**\*1** In this contested matter in the jointly administered chapter 11 cases of Chemtura Chemical Company and its affiliates, the Debtors object to private party claims (the "**Private Party Claims**" and "**Claimants**") [FN2] for future environmental remediation costs also sought by the federal government and certain state governmental entities, under section 502(e)(1)(B) of the Code, which generally disallows claims (1) for reimbursement or contribution (2) by those liable with the debtor (3) to the extent that such claims are contingent.

With two exceptions, I conclude that these claims are of the type for which disallowance is required under section 502(e)(1)(B) and its associated caselaw. Except insofar as the exceptions apply, the Debtors' objections are sustained. With respect to the exceptions:

(a) where remediation costs were already paid by the claimant and

(b) the claim by the Delaware Sand & Gravel Trust,

the Debtors' exceptions are overruled.

*Findings of Fact* [FN3]

*1. Government Environmental Claims*

In October 2009, the United States, on behalf of the United States Environmental Protection Agency ("**EPA**") and the National Oceanic and Atmospheric Administration (collectively, the "**U.S.**") [FN4] filed proofs of claim against certain of the Debtors asserting, *inter alia,* more than $2 billion in liabilities for response costs pursuant to section 107(a) the Comprehensive Environmental Response, Compensation, and Liability Act ("**CERCLA**"),[FN5] civil penalties, and natural resource damages and assessment. More specifically, the U.S. claims asserted, in part, that certain Debtors are jointly and severally liable, along with other responsible parties, for approximately $49.6 million in past response costs, an estimated $2 billion in future response costs, and approximately $1.2 million in natural resources damages and assessment costs.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

Though smaller in dollar amount, similar claims were filed by the state environmental agencies [FN6] for the states of California, Connecticut, and Texas, among others.

*2. Environmental Settlement Agreement with U.S. and Certain States*
Since the briefing and the hearing on these Objections, the status of some of the Debtors' environmental liabilities has changed.

In September 2010, I approved a settlement agreement among the Debtors, the U.S., and Connecticut, resolving the regulators' environmental claims and providing funds for future clean-up efforts. That settlement agreement, among other things, provided for:

(1) the allowance of approximately $16 million in general unsecured claims for the benefit of the U.S. for unreimbursed past and future response costs incurred by the U.S. pursuant to CERCLA section 107(a);

(2) cash payments to the U.S. of approximately $9 million the U.S. to resolve alleged injunctive obligations at a number of environmental sites;

(3) the allowance of environmental claims of approximately $830,000 for the benefit of the U.S. for sites still owned or operated by the Debtors; and

**\*2** (4) the allowance of environmental claims by Connecticut of about $1.1 million.

In addition, that settlement agreement provided that other, non-debtor, potentially responsible parties ("**PRPs**") would receive a reduction in their liability equal to the amounts paid by the Debtors pursuant to the settlement, as provided for by CERCLA. The settlement agreement also contained broad covenants not to sue, and granted the Debtors contribution protection under CERCLA section 113(f)(2) for environmental liabilities resolved by the Agreement.

The implication of the contribution protection in these settlements was that other PRPs with respect to those environmental liabilities would not be able to come after the Debtors for costs of cleanup, because

the Debtors would have satisfied their liability on account of the sites addressed in the Agreement.

In addition, I approved settlement agreements between the Debtors and California and Texas with respect to sites for which Private Party Claims at issue here were also filed. Like the U.S. and Connecticut settlement agreement, these settlements provided the Debtors with both covenants not to sue and contribution protection in exchange for allowed environmental claims of fixed amounts (in the case of Texas), or cash payments of fixed amounts (in the case of California).

*3. Private Party Environmental Claims*
In May 2010, the Debtors objected to 59 Private Party Claims pursuant to 502(e)(1)(B) of the Code. The Private Party Claims-relying either implicitly or explicitly on CERCLA sections 107(a) and 113(f)(1)-sought hundreds of millions of dollars for both past and future cleanup costs.

The Debtors' objections to the Private Party Claims "do[ ] not relate to any past costs actually spent by these claimants." [FN7] But the Debtors argue that the Private Party Claims must be disallowed under 502(e)(1)(B) of the Bankruptcy Code to the extent they seek payment of *future* cleanup costs, because such claims are: (1) for reimbursement or contribution, (2) based on the claimant's co-liability with the Debtors to a federal or state environmental agency, and (3) contingent.

No responses were submitted by the claimants for 23 of those objections, and those 23 claims were either resolved by stipulation and order [FN8] or disallowed by orders of this Court either (a) in their entirety or (b) to the extent that they sought future costs.[FN9] One claim-that of Agrico Chemical Company-was expunged as late-filed under section 502(b) of the Code. Objections to 32 claims went forward on a contested basis at a hearing on the objections.[FN10] Since the hearing, one claim has been resolved by stipulation and order,[FN11] and the Debtors have reached settlements, in principle but without documentation, with regard to two others.[FN12] This decision applies to the remaining 29 section 502(e)(1)(B) objections to claims of Private Party Claimants.[FN13]

The 29 Private Party Claims at issue here were filed on the basis of the Debtors' alleged liabilities at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

certain environmental sites. With respect to each of these claims, overlapping claims, in terms of the underlying environmental site, were filed by the U.S., Connecticut, California, or Texas. And as mentioned above, all of those governmental claims were since resolved by settlement.

**\*3** I lay out the facts as to the 29 Claims at issue by Private Party Claimant or group of Claimants, and have organized them based on similar factual positions.

*A. Claims for Remediation Pursuant to a Consent Decree or Intent to Comply to which a Debtor Was Not a Party*

Some of the Claimants are private entities that agreed to provide and fund remediation at certain environmental sites by either (a) submitting statements of "intent to comply" with "Unilateral Administrative Orders" or "Administrative Orders on Consent" issued by state or federal environmental agencies or (b) entering into consent decrees with state or federal environmental agencies. None of the Debtors was a party to these consent decrees or a signatory to these statements of intent to comply. The Claimants assert that they are entitled to payment from the Debtors for costs they are incurring because, under CERCLA or other environmental law, the Debtors are responsible for remediation at these sites.

*(1) BKK Joint Defense Group*

The BKK Joint Defense Group filed claims against certain of the Debtors for past and future remediation costs associated with the BKK Class I Landfill in California, which is a waste landfill and associated treatment and control facility currently owned and operated by the BKK Corporation. California's Department of Toxic Substances Control issued an "Imminent and Substantial Endangerment Order" for several entities, excluding the Debtors, which led to consent decrees between members of the BKK Joint Defense Group and California. Members of the BKK Joint Defense Group have performed and will continue to perform operation, maintenance, and monitoring activities at the BKK site, and have paid and will continue to pay for California's costs in overseeing the remediation activities at the facility.

Although none of the Debtors was issued an order by California with respect to the BKK Site (or entered into a consent decree with California with

respect to it), the BKK Joint Defense Group contends that certain of the Debtors are potentially responsible parties under CERCLA and/or other state or federal environmental laws because of their status as prior owners or operators of the BKK facility, or because those Debtors arranged for the disposal of materials at the facility. Future costs to remediate the Site are estimated by California to be in excess of $600 million.

*(2) BASF Sparks*

In 2000, the EPA placed the Landia Site in Florida on the Superfund List, conducted a Remedial Investigation and Feasibility Study ("**RI/FS**"), and later approved RI/FS Reports for the Site.

In 2007, the EPA executed a final Record of Decision, which provided for the plan of remedial action to be implemented at the Landia Site. In 2008, the EPA sent "Special Notice" letters to a Debtor, BASF, and other parties notifying them of their status as PRPs that were responsible for the costs of cleaning up that site.

In response to the Letters, BASF and other private entities-not including any of the Debtors-entered into a consent decree with the EPA pursuant to which they agreed to pay for the cleanup work. Since that consent decree became effective in 2009, BASF and the other parties to the consent decree have paid environmental consultants to perform and oversee the requisite remedial work. BASF filed a claim against the Debtors seeking payment for its share of these past costs, and for costs of cleanup that BASF will incur in the future under the consent decree.

*(3) Cooper Drum Cooperating Parties Group*

**\*4** The Cooper Drum Cooperating Parties Group ("**Cooper Drum Group**") filed a claim against the Debtors for costs incurred in the remediation of a former drum recycling facility in California.

In 2008, the EPA issued "Special Notice" letters identifying various entities, including one or more of the Debtors, as PRPs under CERCLA and/or other state and federal environmental laws. In 2009, the EPA issued a Unilateral Administrative Order to 43 potentially responsible parties, including the members of the Cooper Drum Group and Chemtura, requiring the recipients to conduct the remedy identified in an EPA Record of Decision. Later in 2009, the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

Cooper Drum Group submitted a letter to the EPA indicating its intent to comply with that order, and has since been performing its obligations under it.

None of the Debtors identified as PRPs has participated in any of these efforts at the Cooper Drum Site. The Cooper Drum Group asserts that past recoverable costs, including EPA oversight costs, exceed $12 million, and that future recoverable costs will exceed $25 million.

*(4) Malone Cooperating Parties Group*
In 2003, members of the Malone Cooperating Parties Group ("**Malone Group**") entered into an Administrative Order on Consent with the EPA for, among other things, the performance of a RI/FS at the Malone Service Company Superfund Site in Texas. The Malone Group completed the RI/FS in 2008 and is continuing to take other actions at the site pursuant to the Administrative Order on Consent.

In 2009, the EPA issued a proposed plan for remedial action, which estimates that the total costs of the remedy will be $54.6 million, not including future EPA oversight costs, natural resource damage claims, and past EPA response costs. The Malone Group members plan to enter into a consent decree with the U.S. for the performance of the remedial action at the site, and they assert that they will pay at least a portion of the EPA's past and future response costs.

The Malone Group filed a claim for unpaid response and other costs "in an amount estimated to equal or exceed $109,000." Using the EPA's calculation of the percentage of waste by volume sent to the site by the Debtors, and the EPA's estimated costs of remediation pursuant to the plan, the Malone Group asserts that Debtors are responsible for approximately $109,000 for future response costs. The Malone Group also alleges that the Debtors are liable for a share of additional costs, including future EPA oversight costs and future natural resource damage claims.

*B. Claims arising from Debtors' consent decree and allocation agreement with Claimants*
Some of the Claimants are private entities (or groups of private entities) that both

(a) entered into a consent decree with a Debtor and state or federal environmental agency to per-

form or pay for environmental remediation and

(b) subsequently entered into a contract with a Debtor to allocate responsibilities for coordination of work and funding of response costs required by the consent decree.

*(1) Interstate Lead Company ("ILCO") Site Remediation Group*
**\*5** Witco Corporation (a predecessor to Chemtura) and members of the ILCO Site Remediation Group (with Witco, the "**ILCO Settling Defendants**") entered into a consent decree with the EPA in 1997, which required each Settling Defendant to finance and perform remediation of the ILCO Superfund Site and related areas in Alabama, with EPA oversight.

To organize the implementation and funding of this remediation, the Settling Defendants, including Witco, entered into a remediation contract. That contract included a formula for determining each party's share of costs for the remediation, and using this formula, periodic assessments were made and allocated to each of the parties.

Consultants hired by the ILCO Remediation Group estimate future response costs to be over $31 million. Pursuant to the contractual formula, the Debtors' share of those future costs would be $732,973.

*(2) Beacon Heights Coalition and Goodrich Corp./Coltec Inc.*
Members of the Beacon Heights Coalition and the Debtors entered into a consent decree with the EPA in 1987, which provided that the members of that coalition (including the Debtors) would jointly and severally finance and perform remedial action, including operation and maintenance, at the Beacon Heights Landfill in Connecticut-and that in the event of insolvency of one of the members, the remaining members of the coalition would complete the remediation.

To comply with the provisions of that consent decree, and to provide for an equitable apportionment of their obligations, the members of the coalition, including the Debtor, entered into a sharing agreement in 1986. The Debtors' apportioned liability pursuant to that sharing agreement is 42%.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

In addition to filing claims for over $100,000 in *past* costs incurred by the coalition members, the coalition and certain of its members also asserted claims against the Debtors for the Debtors' allocated share of *future* operation, maintenance, cleanup, and other costs. The Coalition estimates that total Site costs are projected to be over $16 million, with the Debtors' share of these future costs at nearly $7 million.

*(3) Lower Passaic River Study Area Cooperating Parties Group, and certain of its members (Ashland Inc., Givaudan Fragrances Corp., Mallinckrodt Inc.)*

The EPA issued "General Notice" letters to Chemtura and other entities notifying them of their potential liability for environmental response expenses and response actions at the "Lower Passaic River Study Area" portion of the Diamond Alkali Superfund Site in New Jersey. The Lower Passaic River Study Area Cooperating Parties Group ("**LPRSA Group**") was formed to respond to the EPA, and in 2004, certain LPRSA Group members, including Chemtura, entered into a settlement agreement with the EPA through which they contractually agreed to pay a fixed sum to the EPA to fund a RI/FS at the site.

In 2007, the EPA entered into another settlement agreement with certain LPRSA Group members, including Chemtura (the "**RI/FS Settlement Agreement**" and "**RI/FS Agreement Settlers**"), which contractually obligated those parties to, among other things,

**\*6** (a) implement and perform certain RI/FS tasks,

(b) make a $700,000 initial payment to the EPA,

(c) establish and maintain a trust fund in the initial amount of $37.45 million to ensure funds are available to perform the RI/FS work, and

(d) pay all EPA oversight costs.

The LPRSA Group and certain of its members assert that the Debtors are contractually obligated to pay an allocated share of the expenses pursuant to an agreement among the Debtors and other RI/FS

Agreement Settlers. The LPRSA Group has filed claims against the Debtors for Chemtura's allocated share of:

(a) $9.45 million payment to the RI/FS trust fund,

(b) $512,427 in EPA oversight costs,

(c) continuing EPA oversights costs,

(d) any changes in cost related to the RI/FS, and

(e) other administrative project costs.

*(4) Laurel Park Coalition and certain of its members (Cadbury Beverages Inc., CR USA Inc., Kerite Company, Unisys Corp.)*

In 1992, the Debtors and other PRPs (also members of the Laurel Park Coalition) entered into a consent decree with the EPA which provided that the PRPs would jointly and severally finance and perform remedial action, operations, and maintenance at the Laurel Park Landfill in Connecticut.

Members of the Laurel Park Coalition, including the Debtors, entered into a sharing agreement in 1991 to secure equitable participation and funding for compliance with the consent decree. Under that sharing agreement, the Debtors' apportioned liability for the site is 86.24%.

The Laurel Park Coalition and certain of its members have filed claims against the Debtors seeking payment of the Debtors' allocated share of fixed costs incurred in the *past* by the Laurel Park Coalition's members since the Debtors filed for chapter 11 and then ceased contributing funds for ongoing cleanup operations. They also assert claims for the Debtors' share of *future* operations and maintenance costs, and any other liabilities at the Laurel Park Site, pursuant to the sharing agreement.

The Coalition estimates that the total future costs at the Laurel Park Site will be over $7.7 million, and asserts that the Debtors are therefore liable for $6.6 million of those costs.

*(5) Delaware Sand and Gravel Remedial Trust*

In 1981, the EPA designated the Delaware Sand

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

& Gravel Landfill as a Superfund site, and in 1984, the EPA incurred removal costs at the Site. In 1990, Debtor Witco and other PRPs entered into a consent decree with the U.S., under which the defendants agreed to reimburse an aggregate $600,000 of the EPA's 1984 removal costs.

One year later, in 1991, Witco and other PRPs entered into an agreement to allocate responsibility among the PRPs for the cost of remediating the site, which was later incorporated into a settlement agreement. That settlement agreement created a mechanism for reimbursing the EPA's response costs, and provided for the funding of the Delaware Sand & Gravel Remedial Trust (the "**DS & G Trust**") to pay for remedial work at the Site. Under that settlement agreement, Witco is responsible for 7.76% of the costs associated with remediating the Delaware Sand & Gravel Landfill site.

**\*7** Witco and other PRPs also entered into another consent decree with the U.S., pursuant to which they agreed to reimburse the EPA for a portion of its response costs and to implement the remedial measures specified in an EPA "Record of Decision."

The DS & G Trust filed a proof of claim seeking over $100,000 in past-due amounts, and for about $470,000 of additional amounts that the Debtors had committed to pay for the future. Significantly (for reasons discussed below), these sums are said to be due to the DS & G Trust, and not to other PRPs who are likewise obligated to make payments into the DS & G Trust.

*(6) Givaudan Flavors Corporation*

One of the Debtors and other PRPs entered into a consent decree with the EPA in 2007 regarding the cleanup of the LWD Facility Site in Kentucky.

A group of these PRPs (the "**LWD PRP Group**") filed claims against the Debtors. The Debtors objected to the LWD PRP Group's claims on 502(e)(1)(B) grounds. After no responses to those objections were filed by the LWD PRP Group, I disallowed its claims.

But Givaudan filed a separate proof of claim against the Debtors for "the amount, as it ultimately may be determined, to which Givaudan is entitled from the Debtor based upon the Debtor's liability as

set forth in the proof of claim ... filed in this case by the [LWD] PRP Group."

*C. Other claims*

*(1) Passaic Valley Sewerage Commission*

The Passaic Valley Sewerage Commission filed a claim against Chemtura alleging that Chemtura is liable for unliquidated contribution claims related to the Diamond Alkali Site (discussed above) [FN14] (and other environmental sites) for cleanup, investigation, and natural resource damage costs related to the environmental contamination. Its claim also asserted unliquidated contribution claims based on various agreements and orders. [FN15]

In December 2005, New Jersey brought an action against various parties for cleanup costs and damages relating to the environmental contamination of the Passaic River and surrounding areas at the Diamond Alkali Site. Some of the defendants in that action filed complaints against third-party defendants, including one of the Debtors and the Passaic Valley Sewerage Commission. The Passaic Valley Sewerage Commission's claim seeks an indeterminate amount to the extent a Debtor [FN16] or the Passaic Valley Sewerage Commission is or may be liable for contamination alleged in the third-party complaint.

*(2) Dow Chemical Company*

In 1998, California initiated litigation against six defendants, including Debtor Witco and Dow Chemical, for environmental damage at San Joaquin Drum Company Site in Bakersfield, California.

Witco and Dow Chemical agreed to work cooperatively with California to address the release of hazardous substances at the San Joaquin Drum Company Site, and entered into separate tolling agreements with California. As a result, in 2006, California dismissed the litigation against those two defendants without prejudice.

**\*8** In 2008, the Debtors executed an agreement with California pursuant to which the Debtors agreed to remit certain costs and complete certain tasks with respect to the San Joaquin Drum Company Site. And in 2009, California approved a "Remedial Investigation Work Plan" proposed by the Debtors in accor-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

dance with that agreement. After the Debtors' chapter 11 filing (and after California filed a claim for the San Joaquin Site in this case), Dow Chemical and California entered into an agreement pursuant to which Dow Chemical agreed to finalize and implement that work plan and pay California oversight costs, since the Debtors were no longer doing so.

Dow Chemical estimates that future costs in connection with that work plan will be approximately $188,500; future costs necessary for complete remediation will be approximately $268,000; and the cost of operating and maintain such measures over the next 20 years will total $460,000. Dow Chemical filed a claim against the Debtors for these costs.

*Discussion*

All parties agree that section 502(e)(1)(B) of the Bankruptcy Code determines whether the Private Party Claims should be disallowed. As noted above, the Claimants argue, for various reasons, that their claims should not be disallowed because they fail to satisfy one or more of the elements of section 502(e)(1)(B), as laid out in the statute or the interpretive caselaw-that the claims be for reimbursement or contribution, that they be contingent, or be based on co-liability with the Debtors.

*I.*

*The Statutory Environment*

Though the Code doesn't define all of the terms that ultimately are important here, and many of the gaps have been filled by caselaw, I nevertheless start with textual analysis.[FN17] Section 502(e) provides, in relevant part, that notwithstanding provisions of section 502 under which claims would otherwise be allowable:

(e)(1) ... the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on ... the claim of a creditor, to the extent that-

...

(B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution....

[1] Thus, by section 502(e)(1)(B)'s terms, three elements must be met for a claim to be disallowed under section 502(e)(1)(B):

(1) the party asserting the claim must be liable with the debtor on the claim of a third party;

(2) the claim must be contingent at the time of its allowance or disallowance; and

(3) the claim must be for reimbursement or contribution.[FN18]

But textual analysis here is of limited utility. None of the terms or expressions "reimbursement," "contribution," "contingent" or "liable with the debtor" is defined in the Bankruptcy Code, nor does the Code articulate standards for their application.[FN19] Thus a court construes section 502(e)(1)(B)'s requirements based on caselaw.

*9 Section 502(e)(1)(B)'s requirements have been interpreted in a fair body of relevant caselaw, most of which has disallowed claims for contribution and indemnification by those who are liable, along with a debtor, to others for amounts to be determined only in the future-including a decision of mine a few months ago, where I sustained objections, on 502(e)(1)(B) grounds, to claims for contribution and/or indemnification for liability in connection with pending or threatened lawsuits by plaintiffs alleging injuries from exposure to the chemical Diacetyl, where the claimants, along with Chemtura, might be liable for the plaintiffs' Diacetyl injury.[FN20] The issue here-whether a different rule should apply to claims by PRPs who, along with a Debtor, are liable for environmental remediation costs-requires consideration of the relevant environmental statutes, most significantly provisions in CERCLA.

Section 106 (captioned "Abatement Actions") provides, its subsection (a):

In addition to any other action taken by a State or local government, when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

States *to secure such relief as may be necessary to abate such danger or threat,* and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The President may also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and welfare and the environment.[FN21]

Section 106's subsection (b) then provides for fines for failure to comply with an order issued under subsection (a), and, for those who have received and complied with an order issued under subsection (a), reimbursement from the Hazardous Substance Superfund for the reasonable costs of such action. [FN22]

Then, CERCLA Section 107 (captioned "Liability") provides, in relevant part:

(a) ... Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section-

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

**\*10** (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for-

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under [CERCLA section 104].[FN23]

Thus, CERCLA section 107(a) imposes liability for environmental cleanup costs, natural resource damages, and certain other categories of recovery on PRPs-including, as relevant here, (1) the current "owner or operator" of a site contaminated with hazardous substances, and (2) any person who previously owned or operated a contaminated site at the time of a hazardous waste disposal.

Then, CERCLA Section 113 (captioned "Civil Proceedings") provides in its subsection (f) (captioned "Contribution"), in relevant part:

(1) Contribution

Any person *may seek contribution from any other person who is liable or potentially liable under [section 107(a) ],* during or following any civil action under[section 106] or under [section 107(a) ]. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under [section 106] or [section 107].

(2) Settlement

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

(3) Persons not party to settlement

(A) If the United States or a State has obtained less than complete relief from a person who has resolved its liability to the United States or the State in an administrative or judicially approved settlement, the United States or the State may bring an action against any person who has not so resolved its liability.

(B) A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in paragraph (2).

**\*11** (C) In any action under this paragraph, the rights of any person who has resolved its liability to the United States or a State shall be subordinate to the rights of the United States or the State. Any contribution action brought under this paragraph shall be governed by Federal law.[FN24]

Thus 113(f)(1) provides that PRPs who fund response actions can seek contribution from other PRPs "during or following any civil action" instituted under CERCLA section 106 or 107. And CERCLA section 113(f)(3)(B) permits private parties to seek contribution after they settle their liability with the EPA or a state in an administrative or judicially approved settlement. Conversely, section 113(f)(2) protects PRPs who have settled from contribution claims by other PRPs.

### II.

*Satisfaction of Section 502(e)(1)(B) Elements*
In *Lyondell,*[FN25] the debtors similarly objected to private party claims for future environmental remediation costs under section 502(e)(1)(B) of the Code,

and in response, the claimants there made arguments nearly identical to those made by the Claimants here. This Decision relies heavily on reasoning set forth in my recent decision on these same issues in *Lyondell,* but of course I also address unique facts and arguments in this case.

As in *Lyondell,* because the various Claimants' positions overlap to such significant degrees, and because they assert, in many respects, similar deficiencies with respect to 502(e)(1)(B)'s three elements, for purposes of analysis I group the objections by the 502(e)(1)(B) elements.

### A.

*"Contingency" Element*
[2][3] Several of the Claimants assert that their claims are not contingent because (a) they have been fixed by contracts, settlements, consent decrees, or administrative orders; or (b) the right to payment has accrued and is not dependent on a future event. As in *Lyondell,* I agree that claims for remediation costs already paid by the Claimants are no longer contingent. But I find that claims for *future* remediation costs, not already paid for, are contingent, and satisfy the "Contingency" Element of section 502(e)(1)(B) doctrine.

In another recent decision, the *Chemtura-Diacetyl* decision in these chapter 11 cases,[FN26] I ruled, among other things, that the claims then before me were contingent. There, as I've noted, five corporate entities had filed claims against the Debtors for contribution and/or indemnification with respect to amounts they might pay in the future in litigation against them. I found that except to the extent they sought contribution for amounts already paid to tort litigants, their claims were contingent.[FN27] While in some instances the potential for payment by some of the Claimants here is more advanced than it was in the Diacetyl situation, similar principles apply, and key facts remain the same. The most significant of these is that except for remedial action accomplished in the past, for which the right to reimbursement or contribution is unchallenged (more clearly than it was in *Lyondell* ),[FN28] claimants here are similarly seeking reimbursement for amounts that have not yet been paid.

**\*12** As discussed in *Lyondell,*[FN29] though neither is squarely on point, two decisions from the Second

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

Circuit have discussed contingency in deciding whether or not a creditor held a "claim." [FN30] In *Chateaugay,* the EPA argued that "it does not have a 'claim' within the meaning of the Bankruptcy Code ... for reimbursement of CERCLA response costs until those costs have been incurred." [FN31] Therefore, the EPA argued, any future response costs that the EPA might incur would pass though the bankruptcy organization as non-discharged liabilities. The Second Circuit rejected this argument, holding that the future costs were pre-petition "claims." The Circuit stated, as part of its rationale, that:

> [T]he location of these sites, the determination of their coverage by CERCLA, and the incurring of response costs by the EPA are all steps that may fairly be viewed, in the regulatory context, as rendering the EPA's claim "contingent," rather than as placing it outside the Code's definition of "claim." [FN32]

Similarly, in *Manville Forest,* the Second Circuit decided that a party's liability constitutes a "claim" against the debtor, albeit contingent. It stated:

> the fact that [claimant] Olin did not know the specific parameters of its liability does not place that liability outside of the definition of "claim" *but rather is precisely what made the claim contingent.* Under this specific combination of circumstances, we find that future environmental liability was actually or presumably contemplated by the parties upon their signing of the indemnification agreements and constitutes a valid *contingent claim.* [FN33]

As noted in *Lyondell,* [FN34] I don't read *Chateaugay* and *Manville Forest Products,* neither of which is a 502(e)(1)(B) case, to go so far as to *hold* that a claim for reimbursement or contribution is contingent until an underlying payment (here, costs for remediation) is actually made. [FN35] But I do find it instructive that in both *Chateaugay* and *Manville Forest Products,* it was undisputed that the debtors faced *some* environmental liability, but the Second Circuit nevertheless described those claims as contingent because the scope, amount, and form of the environmental liability was undetermined. [FN36]

But other authority, including my decision in *Lyondell* [FN37] and the authority upon which I there relied, including three decisions by other bankruptcy

judges in this very district, [FN38] another by a district judge in this district, [FN39] and another a thoughtful decision from Delaware [FN40]-all 502(e)(1)(B) determinations-supports the conclusion that until and unless amounts *are actually paid,* the claims for reimbursement or contribution with respect to those amounts remain contingent for 502(e)(1)(B) purposes. [FN41] For instance, in *Alper Holdings,* in this district, Judge Lifland disallowed claims for indemnification for future liability in environmental contamination litigation, finding that they were

**\*13** properly categorized as "contingent as of the time of allowance or disallowance" as the amounts and ultimate liability are presently unknown. [FN42]

Likewise, in *Drexel Burnham,* in this district, it was observed that "[t]he Claimants' claim is contingent until their liability is established *and the co-debtor has paid the creditor* .... One who is secondarily liable may only secure distribution rights by paying the amount owed the creditor." [FN43]

Similarly, in *APCO,* Judge Shannon disallowed a claim for the costs of remedial activities filed by the City of Wichita, which like the debtor there, was a PRP with respect to a site with groundwater contamination. Significantly, the City had agreed not just to perform a remedial investigation and feasibility study of the contaminated site; it had agreed to undertake the remedial activities identified in the study to clean up the site, [FN44] and had prevailed in a trial at which the *APCO* debtors were determined to be responsible for 1.72% of the City's past and future costs for the remediation, and for 100% of the City future source control costs to be incurred at a different site, [FN45] securing a judgment for the future cleanup costs of which a portion was unpaid. [FN46]

Among other things, Judge Shannon ruled that "because the City has not yet incurred any future source control costs" at one of the sites, [FN47] the claim was contingent, even though "the parties' liability has been established." [FN48] Quoting, among other decisions, *Drexel Burnham,* he observed that

> The law is clear that '[t]he contingency contemplated by [section] 502(e)(1)(B) relates to both payment *and* liability." ... Therefore, a claimant's "claim is contingent until their liability is established ... *and* the co-debtor has paid the creditor."

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

FN49

I stated in *Lyondell*[FN50] and many times before it [FN51] that that the interests of predictability in this district are of great importance, and that where there is no controlling Second Circuit authority, I follow the decisions of other bankruptcy judges in this district in the absence of clear error. But as I also stated in *Lyondell*,[FN52] I believe that the conclusions in those cases were plainly correct. That is so because even though the need for remediation of the underlying environmental site might be obvious, the EPA or state environmental agency might have a multitude of different ways of getting the remediation done, and any one of those means might or might not call for-or result in-payment by the separate PRP that is asserting the claim against the debtor. And the PRP might or might not wind up actually making the payment for which it then would be seeking reimbursement or contribution.

Thus, as I held in *Lyondell*,[FN53] the fact that an EPA claim may have accrued against any of the Claimants does not mean that any of their separate claims against the Debtors are no longer contingent. We don't know whether any of the Claimants will lay out the funds necessary to engage in the curative action, and, if so, to what extent.

[4] Here, as in *Lyondell*, some of the Claimants argue that the Debtors are conflating contingency and liquidation. While I fully understand that "unliquidated" and "contingent" are not the same thing [FN54] (and suspect that the Debtors do too), here I find that the claims at issue here are *both*. The claims at issue here are for future cleanup costs that might or might not actually be incurred, and then might or might not actually be paid, by any of them.[FN55]

***14** Though I ultimately decide the issue on the statutory language and the caselaw, I note, as I did in *Lyondell*,[FN56] that this ruling advances not just bankruptcy policy, but environmental policy as well. Disallowance of reimbursement claims for amounts not yet paid by the claimant advances CERCLA's policy goal of encouraging expeditious cleanup, because claimants are encouraged to remediate promptly by the threat of disallowance of claims that have not been fixed.[FN57] As Judge Shannon observed in *APCO*:

It may appear that the Court's ruling is a harsh result for the City, and that may be true. Nevertheless, the Court's decision is mandated by the express language of the Code and is entirely consistent with the principles animating CERCLA. At bottom, CERCLA and similar state and federal environmental statutes create a scheme whereby parties are incentivized to promptly clean up contaminated sites. The prospect of the potential disallowance of contingent contribution claims under section 502(e)(1)(B) offers a further incentive to undertake the cleanup: if the work is done (or at least underway), the contribution claim is not contingent as to amounts incurred by the contribution claimant. Thus, if the City had commenced or completed source control remediation at 1001 E. Lincoln in connection with its work on the G & M Site as a whole, the City's claim would be allowed to the extent of the amounts incurred.[FN58]

Very few of the contentions made here raise issues not addressed in *Lyondell*. In one slight variant here, the Malone Cooperating Parties assert that their claim is non-contingent because the EPA has approved a remediation plan, with costs, and has apportioned liability. But the fact that the amount of future costs is known or fixed does not render the claim non-contingent where the costs have not yet been incurred and paid by the claimant.

As previously noted,[FN59] the Debtors here acknowledge, as they must, that *past* response costs previously paid are non-contingent. When they acknowledged that, the Debtors did not flesh out what they meant by that, or what kinds of past payments they would agree then qualify. Subject to rights to be heard, I would think that it's at least arguable that qualifying payments could be of many different types-including, by way of example, not just payments to the EPA, a state, or to a company hired to perform the cleanup, but also those made into a trust or a fund previously established for environmental remediation.[FN60] But if the Debtors contend otherwise, I'll hear more as to the facts concerning the trust and the payments that were made to it-such as the circumstances under which the trust or fund was established, its purpose, the use of any funds paid to it, and the extent, if any, to which any PRP could get money back from the trust. Plainly, however, I will not find on motion (and in the absence of an evidentiary hearing) that sums already paid by claimants in

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

this case to such trusts or funds fail to qualify as sums paid in the past.

**\*15** But with respect to payments the Claimants have not made yet, and that are only to be made in the future (if at all), I must and do find that the amounts are contingent, for the reasons stated above.

*B.*

*"Co-Liability" Element*

The Claimants also contend that the co-liability element has not been satisfied. For the most part, I must disagree. But with respect to the claim of the DS & G Trust, the co-liability element hasn't been met, and I therefore rule that the DS & G Trust's claim isn't disallowable under section 502(e)(1)(B) grounds.[FN61]

*1. The Atlantic Research Contentions*

[5] Some of the Claimants' also argue that their claims aren't premised on co-liability, because their claims are based on cost recovery under CERCLA section 107(a), and not contribution under section 113(f). In that connection, they note that in *U.S. v. Atlantic Research Corp.,*[FN62] the Supreme Court held that a private party may recover under CERCLA section 107(a) without any establishment of liability to a third party. Because they are asserting section 107(a) claims, therefore, those claimants argue, the basis for finding co-liability is lacking.

But this reliance on *Atlantic Research* is flawed. The issue in *Atlantic Research,* a non-bankruptcy case, was whether a PRP could sue to recover voluntarily incurred cleanup costs under section 107(a), rather than relying solely on section 113(f).[FN63] Section 107(a)(4)(A) expressly authorizes the federal government, the states, and Indian tribes to sue for cost recovery under section 107(a), and section 107(a)(4)(B) gives the same right to sue to "any other person." Specifically, the Court was asked to determine whether a PRP is included in the phrase "any other person" in 107(a)(4)(B).

The Supreme Court held that the operator's status as a PRP did not preclude the operator from suing under section 107(a), as section 107(a)(4)(B) covers any person not identified in subparagraph (A), and that a PRP was not limited to relief under section 113(f).[FN64] Nevertheless, the Supreme Court highlighted the "complementary yet distinct" nature of the

rights established under section 107(a) and 113(f)-specifically, that a private party may sue under section 107(a) without any establishment of liability to a third party, something it could not do under section 113(f).[FN65] The Supreme Court allowed the claimant to recover from other PRPs costs that it had incurred by voluntary cleanup-or in other words, by cleanup or payments not prompted by a government action under sections 106 or 107.

On the issue of co-liability, the Claimants relying on *Atlantic Research* erroneously assume that only claims under section 113(f) are premised on co-liability with the defendant (in this case, a Debtor), and that cost recovery claims under section 107(a) are all direct claims, and not claims for either reimbursement or contribution. The *Atlantic Research* court held that a claim under section 107(a) *need not* be based on co-liability to a third-party (e.g. a governmental entity). But it did not hold that a claim under 107(a) *cannot* be based on co-liability. If a PRP undertakes "voluntary" clean up (as opposed to cleanup pursuant to government action under section 106 or 107)-and sues under 107(a) to seek recovery for that cleanup from another PRP-that has no effect on, and certainly does not nullify, the fact that the two may still be co-liable to the Government.

**\*16** Where a Debtor and a claimant have both been designated as PRPs by the EPA, they have a shared statutory obligation, under CERCLA, to provide for the cleanup of the environmental site, by one means or another. That a claimant might satisfy its own obligations by voluntary cleanup, rather than by waiting for a government action, is laudable, but not relevant to the 502(e)(1)(B) determination. The claims here are still expressly or impliedly premised on the theory that if any of the Debtors pay less than its share of cleanup costs, the claimant will have to pay more. That is the essence of co-liability.

*2. The Allegheny Contentions*

Some of the Claimants also assert that co-liability is lacking based on a district court decision in the *Allegheny* bankruptcy case.[FN66] In *Allegheny,* the owner of the site filed a claim for past and future response costs against a debtor that had sold the site to the claimant prior to filing for bankruptcy. Applying the three-part test described on page 16 above, the *Allegheny* court ruled that section 502(e)(1)(B) did not exclude the claimant's direct claims for future

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

response costs under CERCLA section 107(a).[FN67] While the *Allegheny* debtor argued that there was a possibility that the creditor might never be required to expend any funds if the EPA were subsequently to order the debtor to perform the remediation, the *Allegheny* court reasoned that this risk of double liability could be avoided by having the creditor's claim paid into a trust to be expended on remediation of the waste sites.[FN68]

As in *Lyondell,*[FN69] I join the other courts that have disagreed with the *Allegheny* decision.[FN70]

As noted in *Lyondell,*[FN71] section 502(e)(1)(B) serves the important purpose of avoiding redundant recoveries.[FN72] The situation here, where both Debtors and claimants are PRPs under CERCLA, state law, or both, presents precisely the danger of double recovery from the Debtors on account of the same liability, ultimately to the EPA and state authorities. Because the EPA and state environmental authorities already have allowed claims against Debtors for the all of the sites covered by the claims at issue here, allowing these Private Party Claims would be setting up precisely the redundant recoveries section 502(e)(1)(B) was created to prevent.

Indeed, the *Allegheny* court acknowledged that its decision not to disallow the claimant's claim under section 502(e)(1)(B) left the debtors vulnerable to multiple recoveries. What the *Allegheny* court failed to realized, however, is that this risk of duplicative recoveries arose *because* the debtors and claimant were co-liable.

For that reason, several cases have rejected *Allegheny's* logic.[FN73] In *Cottonwood Canyon,* for instance, the court stated that the fact that the *Allegheny* court found it necessary to establish a trust shows that the debtor and the claimant share a common liability against which the claimant sought to protect itself .[FN74] The *Cottonwood Canyon* court stated:

**\*17** CSI argues that it is asserting a direct claim against Kaiser under Section [107(a) ] and not a claim for reimbursement or contribution. It would clearly appear that a claim for reimbursement or contribution under either the California statute, CERCLA or the indemnification provisions of the contract is, by definition, a claim to recover costs incurred by reason of CSI's liability for cleanup as

the "owner" of the site, which is the same liability Kaiser has for cleanup as the party which deposited the hazardous substances in the first instance. Such a claim would necessarily be one for liability for which both Kaiser and CSI are responsible and would fall within the ambit of 11 U.S.C. § 502(e).[FN75]

Similarly, in *Eagle-Picher,*[FN76] the court rejected *Allegheny's* logic for similar reasons, and disallowed the creditors' reimbursement claims (which were under section 113(f)) for future response costs under CERCLA. The *Eagle-Picher* court stated that "[d]ouble liability could occur under the circumstances of this case since EPA remains free to pursue [the debtor] for remediation costs should the claimants fail to fulfill their cleanup obligations."[FN77]

Here, we have a situation similar to *Eagle-Picher.* The Debtors here do not dispute claims for costs the Claimants have already incurred from voluntary remediation; the claims at issue are for *future* remediation costs. The Private Party Claimants and the Debtors are both liable for cleanup at the same sites. And the EPA and state authorities have already entered into settlement agreements with the Debtors for remediation of every site for which a Private Party Claim was filed. Allowing the Private Party Claims would not only expose the Debtors to-but would actually result in-paying multiple recoveries on account of the same liability.[FN78]

*3. Other Contentions*

*A. Passaic Valley Sewerage Commission*

[6] The Passaic Valley Sewerage Commission argues that because the Debtors and the Passaic Valley Sewerage Commission both deny liability for contamination of the Newark Bay Complex, the Passaic Valley Sewerage Commission claim cannot be disallowed. But this argument-premised on a state of affairs that exists in many, if not most, instances in which multiple defendants are named in actions where one or more may turn out to be liable, on the one hand, or exonerated, on the other-is overly simplistic, and contrary to existing authority.

First, if the Passaic Valley Sewerage Commission turns out not to be liable, then the Passaic Valley Sewerage Commission would have nothing to claim

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

against any of the Debtors in the first place, as the Passaic Valley Sewerage Commission wouldn't be required to pay any money for remediation of the Newark Bay Complex.[FN79]

[7] Second, as explained in *Wedtech I*, the co-liability requirement doesn't require that the debtor and claimant have already been found liable in the underlying suit. Rather, "the co-liability requirement is to be interpreted to require a finding that the causes of action in the underlying lawsuit assert claims upon which, *if proven*, the debtor could be liable but for the automatic stay."[FN80] If the Passaic Valley Sewerage Commission were found to be liable, then paid remediation costs, and then sought to recover costs from the Debtors, that recovery action would be premised on the co-liability of the Debtors and the Passaic Valley Sewerage Commission. That is all that section 502(e)(1)(B) requires.

*B. BKK*

**\*18** [8] BKK similarly argues that because none of the Debtors is a party to BKK's consent decree with California, there is no co-liability to a primary creditor. Of course, the fact that none of the Debtors entered into the consent decree doesn't mean that none is liable to California; both Debtor entities and the BKK are PRPs under CERCLA.

More to the point, the environmental liability for which one or more of the Debtors and BKK are liable is one and the same, regardless of whether it is enforced by California (under California law) or the EPA (under CERCLA).

*C. Dow Chemical*

Dow Chemical argues that it is not co-liable with the Debtors because it is not liable for the San Joaquin Site at all, and is "voluntarily" undertaking and paying for an investigation of the Site.[FN81]

While it might ultimately turn out that Dow Chemical has no liability for the San Joaquin Site, there is now insufficient evidence in the record for me to issue rulings premised on the assumption that Dow Chemical is undertaking this investigation merely as a Good Samaritan-and I don't need to rule on how I'd deal with a situation if a claimant ever turned out to be such. As Dow Chemical acknowledges in its papers, California initiated litigation against Dow Chemical in 1998, and California dis-

missed that litigation, without prejudice, only after Dow Chemical entered into tolling and other agreements with California. Even now, Dow Chemical is conducting an investigation of the Site pursuant to an agreement with California.

In addition, while Dow Chemical states that it is conducting only an investigation, Dow Chemical's claim also seeks payment for future remediation costs. As I've repeatedly stated, the claims of Dow Chemical (and of all of the other Claimants) for past costs will not be disallowed under section 502(e)(1)(B). With respect to future costs, if it true that Dow Chemical has no liability for the site and any future acts would be undertaken solely as a Good Samaritan, then Dow Chemical can stop paying for the investigation at any time, and will thereby stop incurring costs for which it will be ineligible to receive reimbursement from the Debtors.[FN82]

*D. DS & G Trust*

[9] The claim filed by the DS & G Trust was filed by an entity that was supposed to *receive* payments for remediation, and not (as in the case of the Lower Passaic River Study Area Cooperating Parties), by others who might have to make contributions to a trust or fund. The DS & G Trust argues that because the trust itself faces no environmental liability, its claims cannot be disallowed as premised on "co-liability" with the Debtors. I agree.

Whether the DS & G Trust is regarded as a *collection agent* for the EPA, or the *mechanism* by which Chemtura itself was meeting its obligations to the EPA, its role is still as a recipient of payments for remediation-rather than as an obligor, much less a co-obligor. With respect to the DS & G Trust, the Co-liability Element is not satisfied.[FN83] I therefore decline to disallow its claim on section 502(e)(1)(B) grounds.[FN84]

*C.*
*"Reimbursement or Contribution" Element*

**\*19** [10] Some of the Claimants also contend that because their claims are for cost recovery under section 107(a), rather than for contribution under section 113(f), their claims are not for "reimbursement or contribution" under section 502(e)(1)(B). But whether the claims are for cost recovery under section 107(a), or contribution under 113(f)(1), I must find that they still are covered by section

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

502(e)(1)(B).

[11] CERCLA section 113(f), by its terms, directly provides for "contribution"; therefore, quite indisputably, any recovery under section 113 must be considered contribution for the purposes of 502(e)(1)(B). Section 107(a), under which many of the Claimants assert that their claims are brought, provides for "recoverable costs," but does not contain the words "contribution" or "reimbursement." But as in *Lyondell,*[FN85] I don't find this distinction to be dispositive, and I find that the claims at issue here, even if premised on section 107(a), are in substance still claims for "reimbursement" for the purposes of 502(e)(1)(B).

Section 502(e)(1)(B) states that "the court shall disallow *any* claim for reimbursement or contribution ..."[FN86] As I noted above,[FN87] section 502(e)(1)(B) imposes no requirements as to the means or reason by which co-liability exists. Although "reimbursement" is not defined in the Bankruptcy Code, Black's Law Dictionary defines "reimbursement" as "1. Repayment. 2. Indemnification."[FN88] In *Wedtech II,* Chief Judge Brozman, in this district, explained that "[t]he use of the word 'reimbursement' in the statute cannot be viewed as accidental. It is a broad word which encompasses whatever claims a co-debtor has which entitle him to be made whole for monies he has expended on account of a debt for which he and the debtor are both liable."[FN89]

Similarly, in the *Chemtura-Diacetyl* decision, wherein I rejected the notion that the "liable with" prong requires that the Debtors establish that "the successful prosecution of a claim of [a Tort Plaintiff] against [a Corporate Claimant] would *automatically* result in the Debtors being liable to such underlying tort plaintiff as well,"[FN90] I noted that Congress clearly meant to include all situations wherein indemnitors or contributors could be liable with the debtor within the scope of § 502(e)(1)(B).[FN91]

Other courts similarly focused on substance over form when addressing this issue, and I find their reasoning and conclusions to be persuasive. In *Cottonwood Canyon,* discussed above, the court disallowed, as "contribution or reimbursement," claims asserted under CERCLA 107(a). The risk, both there and in *Allegheny,* that the Debtors would make duplicative payments for the same liability, revealed that the

clear character of the claim" was that "debtor was not being asked to satisfy a [direct] claim for injury to the claimants property" but rather was being sought for reimbursement."[FN92]

Looking at substance over form here, the claims at issue plainly are for "reimbursement" as that term is used in section 502(e)(1)(B). The Claimants seek repayment of money that they allege that they will spend on environmental remediation, and the Debtors and the Claimants, all PRPs, are co-liable for environmental cleanup. There is a substantial risk that if these private party claims are allowed, the Debtors will pay twice for the same liability. In light of these facts, these claims, even if brought for cost recovery under section 107(a), are claims for reimbursement under 501(e)(1)(B).

**\*20** Some Claimants argue that if this Court were to create a trust account for payment of future costs like in *Allegheny,* the payment of funds into the trust account could be considered something other than reimbursement, because the money wouldn't be spent until the future.[FN93] I find this argument unpersuasive. The money would be paid to return money expended by the Claimants. That is reimbursement.

[12][13] Certain Claimants, such as the LPRSA Group members, entered into agreements with the Debtors to make payments proportional to their liability into a trust fund, out of which the money would then be used to pay for remediation. These Claimants maintain that their claims are direct contractual claims, and not for contribution. But contractual claims are similarly disallowed under 502(e)(1)(B) when they are, in substance, claims for reimbursement or contribution.[FN94] The Claimants assert that they will be forced to pay more than their fair share of the cleanup costs (or more than their fair share of money into the trust), and therefore, seek payment for cleanup costs that might be incurred in the future. But these are in substance claims for contribution. The trust into which the contributions will be made is merely the mechanism for their contributions.

*Conclusion*

For the foregoing reasons, I conclude that claims before me here (other than that of the DS & G Trust), to the extent they are on account of future costs, are contingent claims for reimbursement or contribution

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

of an entity that is liable with the debtor to a third party creditor. Except for the amounts that the Claimants already actually paid, and the claim of the DS & G Trust, the Debtors' objections to the claims listed on Appendix B are sustained.

> FN1. I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where the circumstances do not permit more leisurely drafting or more extensive or polished discussion. Because they often start as scripts for decisions to be dictated in open court, they typically have a more conversational tone.

> FN2. Although the Debtors originally objected to more claims on the same grounds, some have since been resolved, disallowed, or expunged. *See* Findings of Fact, Section 3. At this point, 29 proofs of claim remain subject to this objection. *See* n. 13 and Appendix B.

> FN3. Pursuant to the parties' agreement and the provisions of Case Management Order # 1, all of the facts (but not necessarily arguments and conclusions) in the declarations submitted to me have been taken as true. To shorten this Decision, I've limited factual citations and detail to the most significant matters.

> FN4. For the sake of simplicity, I refer to the claims filed by the Federal Agencies as "U.S. claims" or "EPA claims," and I use the terms "U.S." and "EPA" interchangeably.

> FN5. *See* 42 U.S.C. §§ 9601 *et seq.*

> FN6. For simplicity, going forward, I refer to such claims as simply being asserted by the respective states.

> FN7. *See* 8/4/2010 Hr'g Tr. at 119.

> FN8. Claims filed by Sensient were resolved by stipulation and order on the date of the hearing. *See* ECF # 3486.

> FN9. *See* Appendix A.

> FN10. Three contested claims (those of Maxus Energy Corp., Tierra Solutions Inc., and Stony Creek Technologies LLC) weren't addressed at the argument on these issues by reason of pending settlement negotiations: Accordingly, this decision doesn't apply to those claims for the purpose of disallowance, *res judicata* or collateral estoppel. Of course, it does have *stare decisis,* or precedential, significance if settlements are not finalized.

> FN11. The claim of Akzo Nobel Chemicals, Inc. was resolved by stipulation and order disallowing the claim to the extent the claim sought future environmental costs, and establishing an allowed claim for costs already incurred. *See* ECF # 4269.

> FN12. The Debtors reached a settlement in principle, but without documentation, with respect to the claims of Flabeg Technical Glass U.S. Corp. Accordingly, this decision doesn't apply to those claims for the purpose of disallowance, *res judicata* or collateral estoppel. Of course, it does have *stare decisis,* or precedential, significance if either side justifiably fails to proceed with the settlement.

> FN13. *See* Appendix B. The Debtors are in settlement negotiations with some of these claimants, but only in connection with the non-502(e) portions of their claims. Therefore, those settlements, even if ultimately approved by the Court, are irrelevant to this decision.

> FN14. *See* page 10 above.

> FN15. It isn't clear from the proof of claim and response filed by Passaic Valley Sewerage Commission whether the Passaic Valley Sewerage Commission is a party to any of those agreements or orders.

> FN16. The Court has some difficulty seeing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

how a *Debtor's* liability would be relevant (as contrasted to the claimant's), but this is what the proof of claim says.

FN17. *See, e.g., Alta Partners Holdings LDC v. Credit Suisse First Boston LLC ("In re Global Crossing Ltd."),* 385 B.R. 52, 66 (Bankr.S.D.N.Y.2008); *In re General Motors Corp.,* 407 B.R. 463, 486 (Bankr.S.D.N.Y.2009) ("*GM-Sale Decision* "), *appeal dismissed and aff'd,* 428 B.R. 43 (S.D.N.Y.2010), and 430 B.R. 65 (S.D.N.Y.2010); *In re Motors Liquidation Co.,* 438 B.R. 365, 372 (Bankr.S.D.N.Y.2010); *In re Adelphia Communications Corp.,* --- B.R. ----, 2010 Bankr.LEXIS 3915, *12 & n. 17, 2010 WL 4791795, *3 & n. 17 (Bankr.S.D.N.Y. Nov.18, 2010).

FN18. *See In re Lyondell Chemical Co.,* --- B.R. ----, 2011 Bankr.LEXIS 10, 2011 WL 18975 (Bankr.S.D.N.Y. Jan.4, 2011) ("*Lyondell* "). *Lyondell* dealt with claims that, with few exceptions, were identical to those here, and *Lyondell* (along with the earlier caselaw upon which it relied, much of which is controlling in its own right) is on point and controlling in most respects here. To balance needs to provide necessary context in this decision and to make it freestanding, to issue this decision as promptly as practicable, and to avoid making this decision unduly repetitive, this decision repeats more than a little, but less than all, of the analysis in *Lyondell.* Many elements of the discussion that follows will have obvious similarities to *Lyondell,* and the conclusions with respect to similar types of claims are of course identical.

FN19. It should be noted, however, while focusing on textual analysis, that section 502(e)(1)(B) imposes no requirements as to *how* or *why* the party asserting the claim potentially subject to section 502(e)(1)(B) must be liable with the debtor on the claim of the third party. There is no statutory requirement, for example, that the debtor and the party asserting the claim be liable on the claim of the third party in the same action,

under a common statute, or on the same legal theory.

FN20. *See In re Chemtura Corp.,* 436 B.R. 286 (Bankr.S.D.N.Y.2010) ("*Chemtura-Diacetyl* ").

FN21. CERCLA § 106(a), 42 U.S.C. § 9606(a) (emphasis added).

FN22. *See* CERCLA § 106(b), 42 U.S.C. § 9606(b).

FN23. CERCLA § 107, 42 U.S.C. § 9607.

FN24. CERCLA § 113(f), 42 U.S.C. § 9613(f).

FN25. *See* n. 18 above.

FN26. *See* n. 20 above, 436 B.R. at 286.

FN27. *See Chemtura-Diacetyl,* 436 B.R. at 297.

FN28. *See* n. 7 above ("The Debtors' objections to the Private Party Claims "do[ ] not relate to any past costs actually spent by these claimants.").

FN29. *See* --- B.R. at ----, 2011 Bankr.LEXIS at *25-*28, 2011 WL 18975 at *8-*9.

FN30. *See In re Chateaugay Corp.,* 944 F.2d 997 (2d Cir.1991) ( "*Chateaugay* "); *Olin Corp. v. Riverwood Int'l Corp. (" In re Manville Forest Products Corp."),* 209 F.3d 125 (2d Cir.2000) ("*Manville Forest Products* ").

FN31. *Chateaugay,* 944 F.2d at 1000.

FN32. *Id.* at 1005.

FN33. *Manville Forest Products,* 209 F.3d at 129 (emphasis added).

Other caselaw-again in the context of de-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

termining the existence of a claim, rather than in deciding whether or not it was "contingent"-likewise describes a situation where the need for remediation is known, but the amount, if any, to be paid for the remediation is not, as giving rise to a "contingent claim." *See Cal. Dep't of Health Services v. Jensen* (" *In re Jensen"), 995 F.2d 925, 931 (9th Cir.1993)* (*per curiam* ) ("We conclude that the state had sufficient knowledge of the Jensens' potential liability to give rise to a contingent claim for cleanup costs before the Jensens filed their personal bankruptcy petition on February 13, 1984"); *In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co., 974 F.2d 775, 786 (7th Cir.1992)* (in context of a former Bankruptcy Act § 77 railroad reorganization, to same effect: "when a potential CERCLA claimant can tie the bankruptcy debtor to a known release of a hazardous substance which this potential claimant knows will lead to CERCLA response costs, and when this potential claimant has, in fact, conducted tests with regard to this contamination problem, then this potential claimant has, at least, a contingent CERCLA claim for purposes of Section 77.").

FN34. *See* --- B.R. at ----, 2011 Bankr.LEXIS 10 at *28, 2011 WL 18975 at *9.

FN35. Somewhat earlier in the *Chateaugay* decision, also as part of its analysis as to whether the EPA had a claim at all, the Circuit dealt with the easy case. It stated, with respect to the EPA's incurrence of CERCLA response costs:

When such costs are incurred, EPA will unquestionably have what can fairly be called a "right to payment." That right is currently unmatured and will not mature until the response costs are incurred.

944 F.2d at 1004.

FN36. *See Chateaugay, 944 F.2d at 1005.*

FN37. *See* --- B.R. at ----, 2011 Bankr.LEXIS 10 at *29, *33-*34, 2011 WL 18975 at *9, *10.

FN38. *See In re Alper Holdings* USA, No. 07-12148, 2008 WL 4186333,*6-*7 (Bankr.S.D.N.Y. Sept.10, 2008) (Lifland, C.J.) ("*Alper Holdings* ") (disallowing future environmental indemnification costs "as the amounts and ultimate liability are presently unknown," and finding contingency on the ground that amounts for which indemnification was sought were undetermined and unpaid); *In re Drexel Burnham Lambert Group, Inc., 148 B.R. 983, 986-90 (Bankr.S.D.N.Y.1992) (Conrad, J.) ("*Drexel Burnham* ") (disallowing indemnity claims of co-underwriters for potential liability in pending fraud suits, because claimants had not yet paid judgments or settlements); *In re Wedtech Corp., 85 B.R. 285, 290 (Bankr.S.D.N.Y.1998)* (Buschman, J.) ("*Wedtech I* ") (disallowing debtor's officers' contingent indemnification claims).

FN39. *See Aetna Casualty and Surety Company v. Georgia Tubing Corp. ("In re Georgia Tubing Corp."), No. 93 Civ. 3659, 1995 WL 429018,*3-*4 (S.D.N.Y. July 20, 1995)* (Preska, C.J.), *aff'd, 93 F.3d 56 (2d Cir.1996)* (disallowing an insurance company's claim regarding hazardous waste bonds where primary creditor was a state environmental agency, stating that a surety claim was contingent until the claimant "pays the principal creditor and fixes his own right to payment from the debtor" (quoting 3 *Collier on Bankruptcy* ¶ 502.05 at 502-88 (15th ed.1995)).

FN40. *See In re APCO Liquidating Trust, 370 B.R. 625 (Bankr.D.Del.2007)* (Shannon, J.) ("*APCO* ").

FN41. Similarly, *Collier* expressly identifies claims for contribution arising under CERCLA as examples of claims that are contingent. *See* 4 *Collier on Bankruptcy* ¶ 502.06[2][d] (16th ed.2010). *Collier* provides:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

In addition to codebtor situations created by contract, section 502(e)(1)(B) applies to disallow contingent reimbursement or contribution claims created by statute. For example, a claim for contribution arising under the Comprehensive Environmental Response, Compensation and Liability Act may be a contingent claim subject to disallowance under section 502(e)(1)(B).... In such a case, the government is the primary obligee that may seek satisfaction of its claim against the debtor from third parties who, under the statute, are obligated with the debtor to the government on the same debt. The statute under which the third-party liability is created, however, must provide for a reimbursement or contribution claim against the debtor.

(footnote omitted).

FN42. 2008 WL 4186333 at *6.

FN43. 148 B.R. at 987 (emphasis added; internal citations omitted).

FN44. *See* 370 B.R. at 629.

FN45. *Id.*

FN46. *Id.* at 630.

FN47. *Id.* at 636.

FN48. *Id.*

FN49. *Id.* (emphasis in original; internal citations omitted).

FN50. *See* --- B.R. at ----, 2011 Bankr.LEXIS 10 at *33, 2011 WL 18975 at *10.

FN51. *See, e.g., In re Adelphia Communications Corp.,* 359 B.R. 65, 72 n. 13 (Bankr.S.D.N.Y.2007) ("This Court has been on record for many years as having held that the interests of predictability in this District are of great importance, and that

where there is no controlling Second Circuit authority, it follows the decisions of other bankruptcy judges in this district in the absence of clear error."); *GM-Sale Decision,* 407 B.R. at 487 & n. 19 (same).

FN52. *See* --- B.R. at ----, 2011 Bankr.LEXIS 10 at *33, 2011 WL 18975 at *10.

FN53. *See id.* at ----, 2011 Bankr.LEXIS 10 at *34, 2011 WL 18975 at *10.

FN54. *See, e.g., Chemtura-Diacetyl,* 436 B.R. at 297 ("Thus, while we all understand and agree that there is a distinction between "contingent" and unliquidated, that distinction isn't material here. The unliquidated but non-contingent costs of defense here still result in a potentially allowable claim, but the claims for contribution in the event that a Tort Claimant succeeds against Corporate Claimants are still contingent, and satisfy this prong of the 3-part test for establishing 502(e)(1)(B) disallowance.").

FN55. Some of the claimants cite Judge Sontchi's decision in *In re RNI Wind Down Corp.,* 369 B.R. 174 (Bankr.D.Del.2007) ("**RNI** ") in support of this contention. But as I noted in my *Chemtura-Diacetyl* decision, see 436 B.R. at 296-97, the claimant in *RNI waived* any claims he might have for amounts he might have to pay on the underlying claims (there, by the SEC). The right to payment that Judge Sontchi found to be "unliquidated but not contingent" was the right to the *advancement of those costs of defense,* and not the right to *contribution or indemnity for amounts ultimately paid to a third party*-the circumstance that was relevant there and here. Judge Sontchi merely found (understandably, given appropriate analysis) that the right to advancement was a then-existing right (under the certificate of incorporation, bylaws, and Delaware law), subject only to uncertainty at the time as to just how much the defense costs would turn out to be. I observed, in fact, that Judge Sontchi had actually used claims for contribution as an example of what would satisfy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

the contingency elements. *See* *Chemtura - Diacetyl,* 436 B.R. at 297.

FN56. *See* --- B.R. at ----, 2011 Bankr.LEXIS 10 at *37-*38, 2011 WL 18975 at * 11.

FN57. *See* *In re Eagle-Picher Indus. Inc.,* 164 B.R. 265, 272 (S.D.Ohio 1994) ("***Eagle-Picher*** ") ("502(e)(1)(B) fosters the primary objective of CERCLA by requiring those who seek contribution to incur the expenses relating to cleanup before stating an allowable claim."); *APCO,* 370 B.R. at 637 (same, quoting *Eagle-Picher* ).

FN58. 370 B.R. at 636-37.

FN59. *See* n. 28 above.

FN60. Allowing reimbursement for money paid into a trust or fund in accordance with a contractually established payment schedule, even though the money may not have actually been spent on cleanup yet, furthers environmental policy, as I discussed earlier, by incentivizing parties to make their payments as soon as possible.

FN61. I don't decide any other issues as to the DS & G Trust claim, as to which both sides' rights will be reserved.

FN62. *U.S. v. Atlantic Research Corp.,* 551 U.S. 128, 127 S.Ct. 2331, 168 L.Ed.2d 28 (2007) ("***Atlantic Research*** "). Contrasting CERCLA section 107(a) with section 113(f), the Supreme Court stated the following: " § 107(a) permits recovery of cleanup costs but does not create a right to contribution. A private party may recover under § 107(a) without any establishment of liability to a third party." *Atlantic Research,* 551 U.S. at 139.

FN63. The PRP was the owner of the facility and filed a suit against the U.S. under CERCLA section 107 to recover cleanup costs.

FN64. *Atlantic Research,* 551 U.S. at 135.

FN65. *Id.* at 139.

FN66. *In re Allegheny Int'l, Inc.,* 126 B.R. 919 (W.D.Pa.1991), *aff'd without opinion,* 950 F.2d 721 (3d Cir.1991) ("***Allegheny*** ").

FN67. *See Allegheny,* 126 B.R. at 923.

FN68. *See id.* at 924.

FN69. *See* --- B.R. at ----, 2011 Bankr.LEXIS 10 at *44, 2011 WL 18975 at * 13.

FN70. *See* *Eagle-Picher,* 164 B.R. at 271; *Drexel Burnham,* 148 B.R. at 988; *In re Cottonwood Canyon Land Co.,* 146 B.R. 992, 996 (Bankr.D.Colo.1992) ("***Cottonwood Canyon*** ").

FN71. *See* --- B.R. at ----, 2011 Bankr.LEXIS 10 at *45, 2011 WL 18975 at * 13.

FN72. *See* *APCO,* 370 B.R. at 634 ("[T]he sole purpose served by section 502(e)(1)(B) is to preclude redundant recoveries...."); *Wedtech I,* 85 B.R. at 289 & n. 4 (noting that Congress enacted the provision, in part, to prevent competition between primary and secondary creditors for the "limited proceeds of the estate" (quoting H.R.Rep. No. 95, 595, 95th Cong., 1st Sess. 354 (1977))).

FN73. Some of the claimants also cite *In re Harvard Indus., Inc.,* 138 B.R. 10 (Bankr.D.Del.1992) (Balick, J.) ("***Harvard Industries*** "), which follows *Allegheny's* logic. In *Harvard Industries,* Judge Balick distinguished between claims by a PRP for a cleanup performed by the PRP and claims for where the EPA performed the cleanup, and ruled, *inter alia,* that where the party sought to recover funds it would expend in the future, section 502(e)(1)(B) does not apply. She acknowledged that double liability could occur if the PRP recovered for personal expenditures but then failed to clean

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

up the site and the EPA brought an action against the debtor, and, as in *Allegheny,* set up a trust to resolve that potential problem. But since, as in *Allegheny, Harvard Industries* subjects debtors to the risks of duplicative recoveries, I believe that *Harvard Industries* is subject to the same criticism that has been raised with respect to *Allegheny.*

FN74. *Cottonwood Canyon,* 146 B.R. at 996. *See also Drexel Burnham,* 148 B.R. at 989 ("The *Cottonwood* court insisted that this is demonstrated by the solution devised by the *Allegheny* court in response to the concern that the allowance of the claim might lead to multiple recoveries against the debtor. The debtor would be subject to multiple recovery if the claimant failed to take remedial action to remove the hazard after it had received a distribution from the debtor, leaving the debtor liable to a claim by the Government for remediation of the plants."). The *Allegheny* court even noted that "both debtor and [claimant] are liable for the waste remediation...." *Allegheny, 126 B.R. at 923.*

FN75. *Cottonwood Canyon, 146 B.R. at 996.*

FN76. *Eagle-Picher* and *Cottonwood Canyon* are both pre-*Atlantic Research* cases. The *Eagle-Picher* court, citing circuit court decisions, found that the claims asserted there (a PRP against another PRP) could only be brought under CERCLA § 113, and not § 107. *Atlantic Research* did overrule *Eagle-Picher* in this respect-since *Atlantic Research* now allows a PRP to seek recovery from another PRP under § 107. But that distinction does not matter here. I rely on *Eagle-Picher* for its narrower (and I believe undisputable) finding that the debtor and claimant were co-liable. Because the *Atlantic Research* decision did not reach that issue, the portion of *Eagle-Picher* upon which I rely was not overruled. And because *Atlantic Research* did not decide issues under Bankruptcy Code section 502(e)(1)(B), it had no effect on *Cottonwood Canyon.*

FN77. *Eagle-Picher, 164 B.R. at 271.*

FN78. The fact that Debtors settled their claims with the EPA is not necessary to my decision here, though, it is worth noting that the contribution protection in the Settlement Agreement protects the Debtors from duplicative payments on account of the same liabilities, a risk that exists because the Debtors are co-liable with the Private Party Claimants.

FN79. This underscores, of course, the significance of the Contingency Element, discussed above.

FN80. *Wedtech I, 85 B.R. at 290* (emphasis added).

FN81. *See* 8/4/10 Hr'g Tr. at 156 ("We voluntarily undertook investigation with respect to our location, which is in Bakersfield, California, it's the San Joaquin Dum Site. I mean, we claim and assert we have absolutely no liability.... We are voluntarily conducting an investigation only, and have agreed to do so because Chemtura did not fulfill their obligation by virtue of the bankruptcy to complete the investigation.").

FN82. Dow Chemical also argues that California's claim did not include the costs of operating and managing the remedial measures and therefore, part of Dow Chemical's claim is not duplicative of the California claim. The content of the California claim or settlement agreement is irrelevant, because Dow Chemical's claims, to the extent they seek repayment for future costs, fall squarely within 502(e)(1)(B). *See APCO, 370 B.R. at 625* ("[T]he failure of KDHE to file a claim does not alter the co-liability of the Debtors and the City to KDHE. As other courts have observed, "section 502(e) does not require that a proof of claim be filed in the proceeding to be liable with the debtor. Application of [section 502(e)(1)(B) ] 'is not premised on the actual filing of multiple claims but, rather, on the existence of such claims.' " (quoting *In re Lull Corp., 162 B.R. 234, 238 (Bankr.D.Minn.1993)*; *Cottonwood Canyon, 146 B.R. at 997)*).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2011 WL 109081 (Bkrtcy.S.D.N.Y.))**

FN83. The Debtors argue that "the Trust cannot assert a claim on behalf of its members while simultaneously using its institutional identity to short-circuit consideration of whether this claim is actually allowable under section 502(e)(1)(b)." This argument confuses the beneficiaries of the trust. No evidence was submitted that the DS & G Trust is for the benefit of its "members." To the extent there was any evidence, it suggested that the DS & G Trust was created for the benefit of the EPA, and/or the necessary remediation effort.

FN84. I once more do not now decide whether this claim is disallowable for other reasons.

FN85. --- B.R. at ----, 2011 Bankr.LEXIS 10 at *54, 2011 WL 18975 at *15.

FN86. 11 U.S.C. § 502(e)(1)(B) (emphasis added).

FN87. *See* n. 19 above.

FN88. *Black's Law Dictionary* 1399 (9th ed.2009).

FN89. *In re Wedtech,* 87 B.R. 279, 287 (Bankr.S.D.N.Y.1988) (Brozman, C.J.) ("**Wedtech II** ").

FN90. *Chemtura-Diacetyl,* 436 B.R. at 293.

FN91. *See id.* at 295-96.

FN92. *Cottonwood Canyon,* 146 B.R. at 996.

FN93. *See* 8/4/2010 Hr'g Tr. at 149:10-12.

FN94. *See Wedtech II,* 87 B.R. at 287 (finding accounting firm's alleged breach of contract claims to be claims for reimbursement because claims sought repayment for monies to be expended in satisfying liability to third parties); *Fine Organic Corp. v. Hexcel*

*Corp. ("In re Hexcel Corp".),* 174 B.R. 807, 810 (Bankr.N.D.Cal.1994) (Tchaikovsky, J.) (disallowing as reimbursement claims arising out of asset purchase agreement between debtors and claimant in which debtor contractually agreed in purchase agreement to perform remediation even where but for purchase of assets, claimant would not be liable for the site).

Bkrtcy.S.D.N.Y.,2011.
In re Chemtura Corp.
--- B.R. ----, 2011 WL 109081 (Bkrtcy.S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.