Hearing Date and Time: March 29, 2011 at 9:45 a.m.
Response Date and Time: March 22, 2011[1]

ARNOLD AND PORTER LLP
Joel M. Gross
Anthony D. Boccanfuso
399 Park Avenue
New York, New York 10022-4690
Telephone: (212) 715-1000
Facsimile:  (212) 715-1399
Email: joel.gross@aporter.com

*Attorneys for Honeywell International Inc.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                        :

**In re**                      :        **Chapter 11 Case No.**
                       :

**MOTORS LIQUIDATION COMPANY,** *et al.,*  :      **09-50026 (REG)**
    **f/k/a General Motors Corp.,** *et al.*   :

             **Debtors.**    :      **(Jointly Administered)**
                       :
------------------------------------------------------------x

## RESPONSE TO DEBTORS' 208th OMNIBUS OBJECTION TO CLAIMS

      Honeywell International Inc. ("Honeywell"), by and through its counsel, hereby submits

this response (the "Response") to the Debtors' 208th Omnibus Objection to Claims (Contingent

Co-Liability Claims) (the "Objection") (Docket No. 8945) as it relates to Honeywell's proof of

claim, Claim No. 45832 (the "Honeywell Claim").  In support of this Response, Honeywell relies

upon the Declaration of John McAuliffe (the "Declaration"), which is being filed

contemporaneously herewith as <u>Exhibit A</u> and incorporated herein by reference, and respectfully

states as follows:

---

[1]      Honeywell and the Debtors negotiated a consensual extension of the time to respond to the
Objection and agreed that Honeywell could respond to the Objection on or before March 22, 2011.

## BACKGROUND

1.      On June 1, 2009 (the "Petition Date"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors' chapter 11 cases have been procedurally consolidated for administrative purposes.

2.      On June 25, 2009, the Bankruptcy Court entered an order authorizing the Debtors to retain and employ AP Services, LLC ("Alix Partners") as crisis managers and to designate Albert A. Koch as chief restructuring officer.

3.      By order of the Court on September 16, 2009, the Court set November 30, 2009 as the deadline by which proofs of claim were required to be filed in these chapter 11 cases.

*The Honeywell Claim*

4.      On November 25, 2009, Honeywell timely filed the Honeywell Claim in the amount of $34,500,000 against Debtor Motors Liquidation Company (a copy of the claim is attached hereto for reference as Exhibit B).  The basis for the Honeywell Claim is the Debtors' environmental liability under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq*., relating to the Lake Bottom Subsite of the Onondaga Lake Superfund Site (the "Lake Bottom Subsite"), at which (i) Honeywell is implementing a cleanup pursuant to a Consent Decree entered into with the State of New York; (ii) Honeywell has incurred $146,460,432 in past costs as of February 28, 2011; and (iii) the Debtor is also a liable person under CERCLA, and it has been designated a Potentially Responsible Party.

5.      A claim relating to the Lake Bottom Subsite was also filed by the United States on behalf of the United States Environmental Protection Agency ("EPA"), Claim No. 64064 (the

"EPA Claim"). The EPA Claim states: "with respect to equitable remedies that are not within the Bankruptcy Code's definition of 'claim', 11 U.S.C. § 101(5), this Proof of Claim is filed only in a protective fashion." See EPA Claim at 2. Upon information and belief, the issue of whether EPA's rights with respect to the Lake Bottom Subsite are considered "claims" within the meaning of the Bankruptcy Code has not yet been resolved.

6.      A claim relating to the Lake Bottom Subsite was also filed by the State of New York Department of Environmental Conservation ("DEC"), Claim No. 50822 (the "DEC Claim"), in the amount of $919,043.00. The DEC Claim relates to costs allegedly incurred by the State of New York "in connection with remedial activities at the Onondaga Lake NPL Site." See DEC Claim at 5.

*Lake Bottom Subsite of the Onondaga Lake Superfund Site*

7.      Onondaga Lake is located in Onondaga County, New York. The lake is 4.6 square miles, approximately 4.5 miles long and 1 mile wide, with an average water depth of 36 feet.

8.      Since the dawn of the industrial revolution, industry in central New York has been centered on Onondaga Lake and its tributaries. The lake, both directly and through its tributaries, received discharges of industrial wastewaters throughout this period. Additionally, Onondaga Lake has received and continues to receive sewage from the Onondaga County Metropolitan Sewage Treatment Plant ("Metro"). Influent to Metro includes contaminated discharges from industrial users of the sewage system. In the past, this industrial sewage was untreated or incompletely treated.

9.    As a result of the long time industrial and sewage discharges (as well as surface runoff and contaminated groundwater discharges) into Onondaga Lake, its sediments have become contaminated with a variety of hazardous substances.

10.    Numerous pollutants discharged historically to Onondaga Lake and now present in the lake sediments have been determined to contribute to risk to human and ecological receptors.  These pollutants include (among others): benzene, toluene, ethylbenzene, and xylenes ("BTEX"), cadmium, chlorinated benzenes, chromium, copper, dioxins and furans, lead, mercury, polychlorinated biphenyls ("PCBs"), polycyclic aromatic hydrocarbons ("PAHs"), and zinc.  All of these pollutants are currently present in sediments in Onondaga Lake and are being addressed by the remedial actions being undertaken by Honeywell under the oversight of DEC and EPA.

11.    On June 23, 1989, DEC added Onondaga Lake to the New York State Registry of Inactive Hazardous Waste Disposal Sites.  On December 16, 1994, EPA listed Onondaga Lake and certain upland areas on the National Priorities List established pursuant to CERCLA.

12.    On June 27, 1989, the State of New York commenced a civil action against Honeywell's predecessor, Allied-Signal Inc. ("Allied-Signal"), in the United States District Court for the Northern District of New York (the "District Court") under CERCLA (the "District Court Litigation").  In the District Court Litigation, the State of New York sought to compel Allied-Signal to investigate and remediate contamination in the sediments of Onondaga Lake and in associated upland areas.

13.    Pursuant to an interim Consent Decree entered in that action in 1992 (the "1992 Consent Decree"), Allied-Signal (and after 1999, Honeywell) undertook a comprehensive study, known as a Remedial Investigation and Feasibility Study ("RI/FS"), of the Onondaga Lake

4

Sediments under DEC oversight. The purpose of the remedial investigation phase of the RI/FS was to delineate the extent of the contamination in the lake sediments and to assess the risks posed by that contamination. The feasibility study phase of the R1/FS evaluated various options for remediating contamination deemed to pose an unacceptable risk. The RI/FS was completed in November 2004.

14.    On July 1, 2005, DEC and EPA jointly issued a Record of Decision ("ROD") for the Lake Bottom Subsite. The ROD set forth a sediment remedy that called for a mixture of sediment dredging, isolation capping, and thin layer capping. The selected remedy also called for certain other measures, including the construction of a sediment consolidation area to contain dredged sediment and the construction of a barrier wall on the southeastern portion of the lake to prevent contamination from migrating into the lake from upland sources. In addition, the ROD required the implementation of institutional controls and long-term maintenance and monitoring of the remedy.

15.    The ROD estimated the total cost of the selected remedy for the Lake Bottom Subsite at $451,000,000. This cost estimate does not include the costs Honeywell and its predecessors incurred pursuant to the 1992 Consent Decree to complete the RI/FS and other studies required by DEC to develop and document the remedy selected in the ROD, nor does it include DEC and EPA oversight costs that Honeywell is obligated to reimburse under consent decrees and orders issued in the District Court Litigation.

16.    On January 4, 2007, the District Court entered a Consent Decree (the "2007 Consent Decree") between DEC and Honeywell in which Honeywell agreed to fund and implement the remedy set forth in the ROD (a copy of the 2007 Consent Decree is attached

hereto as Exhibit C). Under the terms of the 2007 Consent Decree, Honeywell must complete

the dredging portion of the remedy by 2016.

### The Honeywell Cleanup - Remedial Work to Date

17.      Since entry of the 2007 Consent Decree, Honeywell has worked diligently to

design and implement the remedy set forth in the ROD. Honeywell remains fully committed to

fulfilling its obligations under the 2007 Consent Decree and to completing the selected remedy

within the schedule set forth in the 2007 Consent Decree.

18.      As of February 28, 2011, upon information and belief, Honeywell has incurred

$146,460,432 in costs related to the Lake Bottom Subsite. See Declaration ¶ 4.

### The Debtors' Historical Operations and Contribution to Lake Pollution

19.      As alleged in the Honeywell Claim, the Debtors and their predecessors (hereafter

referred to collectively as the "Debtors") operated at two locations that discharged to Onondaga

Lake or its tributaries: (i) 1000 Townline Road, Town of Salina, Onondaga County, New York;

(ii) 700 Marcellus Street, Syracuse, New York.

20.      The Debtors conducted their operations in Syracuse through a number of

divisions. From 1910 until 1952, the Debtors' Brown-Lipe-Chapin Division operated at 700

Marcellus Street, and from 1952 until 1961, at 1000 Townline Road. Between 1961 and 1968,

the Debtors' Turnstead Division operated out of 1000 Townline Road. From 1968-1984, the

Fisher Body Division operated out of 1000 Townline Road. In 1984, the Fisher Body Division

became Fisher Guide. In 1989, Fisher Guide became the Inland Fisher Guide. Finally, in 1993,

the Inland Fisher Guide division was incorporated into the Debtors' North American

Operations.[2]

---

[2]      Further information regarding the Debtor's historical operations and contributions to Onondaga
Lake is set forth in Honeywell Claim, attached hereto as Exhibit B.

21.    Based on historical information on contaminant concentrations, it is estimated that the Debtors discharged contaminants to Onondaga Lake in the following quantities between 1910 and 1973:

| CONSTITUENT | QUANTITY |
|---|---|
| Cadmium | 94 kg |
| Chromium | 859,600 kg |
| Copper | 492,117 kg |
| Nickel | 775,609 kg |
| Zinc | 167,877 kg |
| **TOTAL METALS** | **2,295,297 kg** |

22.    Based on this estimated mass of contaminants currently present in the Onondaga Lake sediments, the Debtors' discharge of metals account for approximately 3.38 percent of the mass of contaminants found in the Onondaga Lake sediments.

23.    In addition, it is estimated that PCBs discharged by the Debtors account for approximately one-third of the total mass of PCBs found in the Onondaga Lake sediments.

24.    The Debtors also discharged substantial quantities of BTEX and oil and grease to Onondaga Lake and its tributaries.  Discharges of oil and grease would be expected to contribute to the presence of PAHs found in the lake sediments.

25.    Based on these estimated contributions, and data relating to specific costs associated with the remediation of constituents contributed to the Lake by the Debtors, it is believed that the Debtors are responsible for 5.77% of the costs related to the Lake Bottom Subsite.

26.    As set forth above, on November 25, 2009, Honeywell filed the Honeywell Claim relating to the Lake Bottom Subsite and the aforementioned costs and expenses that the Debtors are responsible for with respect to the Lake Bottom Subsite.

7

***The Debtors' Objection to the Honeywell Claim***

27.    On January 28, 2010, the Debtors filed the Objection, contending, among other

things, that the Honeywell Claim should be disallowed and expunged in its entirety because the

Honeywell Claim was a "Contribution Claim," and alleging that: (a) the Honeywell Claim was

for reimbursement and contribution and the Debtors met the three-part criteria of disallowance of

the Honeywell Claim as set forth under section 502(e)(1)(B) of the Bankruptcy Code; (b) co-

liability existed; and (c) the Honeywell Claim was contingent.[3]

28.    Honeywell disputes the Objection and asks that the Court overrule the Objection,

because it is both premature and seeks to expunge a non-contingent claim.

## ARGUMENT AND CITATION OF AUTHORITY

***The Objection Was Not Intended to Cover Honeywell's Claim for Costs Already Incurred***

29.    In addressing the application of Section 502(e)(1)(B) in the CERCLA context,

this Court has made clear that claims for costs already incurred cannot be disallowed based on

Section 502(e)(1)(B). See In re Chemtura Corp., No. 09-11233, 2011 WL 109081, at *14

(Bankr. S.D.N.Y. Jan. 13, 2011) ("past response costs previously paid are non-contingent").

30.    In addition, and for the same reason, counsel for the Debtors has informed

counsel for Honeywell that the Objection did not intend to address, or seek to expunge or

disallow, the portion of the Honeywell Claim that relates to past costs incurred by Honeywell

with respect to remedial work undertaken at the Lake Bottom Subsite.

---

[3]    On March 9, 2011, the Court entered an Order granting the Debtors' 208th Omnibus Objection to
Claims (Contingent Co-Liability Claims), which disallowed and expunged the claims set forth on Exhibit
A attached to the Order. The Honeywell Claim was listed on Exhibit A to such Order. Based on
discussions with counsel for the Debtors, and due to issues related to notice, counsel for the Debtors
agreed to the reinstatement of the Honeywell Claim. Moreover, as part of these discussions, counsel for
the Debtors agreed that Honeywell could file a response to the Objection by March 22, 2011, and the
Debtors would seek to have the Court schedule a hearing with respect to the Objection and related
Response as part of the March 29, 2011 omnibus hearing scheduled in these chapter 11 cases.

31.    Accordingly, there is no basis for disallowance of that portion of the Honeywell Claim that is based on costs already incurred by Honeywell. As noted above, the costs incurred by Honeywell to date (through February 28, 2011) are $146,460,432, and Honeywell asserts that the Debtors' fair and reasonable allocable share of those costs are $8,450,767.

***The Objection is Premature and Should Be Deferred Until Claims Related to Onondaga Lake Are Resolved***

32.    The Debtors' Objection seeking to disallow the portion of the Honeywell Claim relating to future costs pursuant to section 502(e)(1)(B) should also be overruled, because it is premature for the Debtors to seek to have the Court address the allowance or disallowance of the Honeywell Claim at this time.

33.    Disallowance of a the Honeywell Claim under section 502(e)(1)(B) is not proper unless, inter alia, Honeywell is liable with a Debtor on "the claim of a creditor." See 11 U.S.C. § 502(e)(1)(B). In their Objection, the Debtors presumably seek to satisfy this requirements by asserting that both Honeywell and the Debtors are liable for remedial costs associated with the Lake Bottom Subsite to EPA. See Exhibit A to the Objection, at 4 (identifying EPA as the "surviving claim creditor").

34.    However, while EPA also has a "claim" with respect to the Lake Bottom Subsite, there is no need to disallow the Honeywell Claim for future costs until the EPA Claim is adjudicated or estimated.[4] In that manner, the Court can ensure that the full scope of the Debtors' liability for the Lake Bottom Subsite is allowed to at least one, and no more than one,

---

[4]    Honeywell's position is that its claim for future costs is not disallowable under section 502(e)(1)(B) because that claim is not contingent. Honeywell is fully committed by a Consent Decree entered by the District Court to perform the cleanup. While the amount of the claim may be unliquidated, it is not contingent and should not be disallowed. That said, Honeywell, without waiving or conceding its position, recognizes that prior rulings of this Court would support disallowance of future cost claims by another liable party even when those future costs will be incurred under a Consent Decree.

creditor, that the division between past and future costs claims is calculated in a consistent

manner, and that Honeywell, which has a central interest in the future costs claim as the party

obligated to perform the cleanup, remains a party to any litigation over the amount of the future

cost claim.

35.    Deferral of resolution of the Objection is supported by this Court's recent

decisions in the Lyondell and Chemtura chapter 11 cases, which are relied on by Debtors in their

Objection. See In re Chemtura Corp., No. 09-11233, 2011 WL 109081 (Bankr. S.D.N.Y. Jan.

13, 2011); In re Lyondell Chem. Co., 422 B.R. 236 (Bankr. S.D.N.Y. Jan. 4, 2011). In each of

those cases, the underlying claims by the United States and state governments regarding the

environmental sites at issue had been resolved and allowed by the time that the Court sustained

objections with respect to the claims of private parties relating to those same sites. See In re

Chemtura Corp., 2011 WL 109081, at *2; In re Lyondell Chem. Co., 422 B.R. at 239. Here, no

such resolution has been reached with the United States or the State of New York. As a result, it

is not possible at this time to determine with finality the extent to which the Honeywell Claim

will be redundant with any claims asserted by the United States or the State of New York. As

this Court has recognized, the primary purpose of section 502(e)(1)(B) is to eliminate the

likelihood of redundant recoveries. But disallowing Honeywell's future costs claim now is not

necessary to avoid the risk of redundant recoveries. By deferring consideration of the

502(e)(1)(B) issues until the Governmental claims are before the Court, the Court can still assure

that there will be no redundant recoveries, while at the same time assuring that the Debtors do

not use section 502(e)(1)(B) to escape liability altogether.

36.    In addition, deferral of the Objection is particularly appropriate here, where

Honeywell has already incurred significant past costs at the Lake Bottom Subsite totaling nearly

$150,000,000. As the Debtors have recognized, the Honeywell Claim is not contingent with respect to those portions of the Honeywell Claim that relate to past costs, and the Debtors will be required at the very least to address and resolve that portion of the claim with Honeywell. That process, whether through negotiation or litigation, will require participation of both the United States and the State of New York, and will concern many of the same issues of law and fact that will be addressed in resolving the portion of the Honeywell Claim that relates to future costs. Deferring resolution of the Objection at this time, would permit Honeywell, the United States, the State of New York and the Debtors to address and resolve the claims in a single, unified process and avoid unnecessary litigation and is consistent with the goals of chapter 11.

37.    In the Objection, the Debtors state that they "are objecting to Contribution Claims for future cleanup costs that may or may not actually be incurred, and then may or may not actually be paid by any of the claimants." See Objection at pp. 14-15. However, this assertion has no applicability to the Honeywell Claim; the Debtors do not and cannot dispute that Honeywell is obligated under the Consent Decree to, at a minimum, perform the work and incur the costs set forth in the ROD, which are estimated by EPA and DEC at $451,000,000. The 2007 Consent Decree also contains penalties and other provisions that allow the State of New York to enforce its terms against Honeywell should it fail to perform the work required thereunder. Debtors also argue that 502(e)(1)(B) is intended, in the CERCLA context, to encourage parties to make their claims non-contingent by agreeing to perform and then performing work. See Objection ¶ 9 ("section 502(e)(1)(B) of the Bankruptcy Code furthers the objectives of CERCLA . . . by encouraging private parties first to perform prompt remedial activities at contaminated sites and then seek reimbursement for their expenses"). Honeywell has done just that — it has

11

committed hundreds of millions of dollars to this effort, and seeks to make sure that the Debtors liability for that cleanup is accurately measured.

38.     For all of the aforementioned reasons, the Objection should be overruled as to the Honeywell Claim, as the Objection is not applicable as to the claim for Honeywell's past costs and is premature as to Honeywell's claim for future costs.

**WHEREFORE**, Honeywell respectfully requests that the Court (i) deny and overrule the Objection with respect to the Honeywell Claim, and (ii) grant Honeywell such other and further relief as is just and equitable.

Dated: March 22, 2011

Respectfully submitted,

ARNOLD AND PORTER LLP

/s/ Joel M. Gross
Joel M. Gross
Anthony D. Boccanfuso
399 Park Avenue
New York, New York 10022-4690
Telephone: (212) 715-1000
Facsimile:  (212) 715-1399

*Counsel for Honeywell International Inc.*

**EXHIBIT A**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                              :

| | |
|---|---|
| **In re** | Chapter 11 Case No. |
| **MOTORS LIQUIDATION COMPANY**, *et al.*,<br>    f/k/a General Motors Corp., *et al.* | 09-50026 (REG) |
| **Debtors.** | (Jointly Administered) |

------------------------------------------------------------x

## DECLARATION OF JOHN P. MCAULIFFE IN SUPPORT OF HONEYWELL'S RESPONSE TO THE DEBTORS' 208TH OMNIBUS OBJECTION TO CLAIMS

    I, John P. McAuliffe, declare as follows in support of Honeywell's Response to the Debtors' 208th Omnibus Objection to Claims (Contingent Co-Liability Claims) (Docket No. 8945) as it relates to the Honeywell Claim 45832.[1]

    1.    I am employed by Honeywell International Inc. ("Honeywell"), and am the Program Director of Honeywell's remedial activities in Syracuse, New York, including those at the Onondaga Lake Superfund Site.

    2.    As the result of my duties, I have specific knowledge with respect to the past costs incurred by Honeywell at the Onondaga Lake Superfund Site and the Lake Bottom Subsite. In particular, Honeywell's past costs at the Lake Bottom Subsite include, but are not limited to, investigation, study, design and planning costs incurred in undertaking the Remedial Investigation and Feasibility Study ("RI/FS") of the Onondaga Lake Sediments, and in implementing the Consent Decree (the "2007 Consent Decree") entered by the United States District Court for the Northern District of New York on

---

[1]    Any capitalized terms not defined herein shall have the meaning ascribed to them in the Response.

January 4, 2007 between the New York Department of Environmental Conservation and

Honeywell, under which Honeywell agreed to fund and implement the remedy set forth in

the Record of Decision ("ROD") for the Lake Bottom Subsite.  Honeywell has and

continues to work diligently to design and implement the remedy set forth in the ROD, and

remains fully committed to fulfilling its obligations under the 2007 Consent Decree and to

completing the selected remedy within the schedule set forth in the 2007 Consent Decree.

    3.      On November 25, 2009, Honeywell timely filed the Honeywell Claim in the

amount of $34,500,000 against Debtor Motors Liquidation Company.

    4.      Upon information and belief, as of February 28, 2011, Honeywell had

incurred $146,460,432 in costs associated with the Lake Bottom Subsite.

    5.      I declare under penalty of perjury under the laws of the that the foregoing is

true and correct.

Executed on March 22, 2011.

John P. McAuliffe

2

**EXHIBIT B**

7013526

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | | PROOF OF CLAIM |
|---|---|---|

**UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**PROOF OF CLAIM**

Your Claim is Scheduled As Follows

| Name of Debtor (Check Only One) | Case No |
|---|---|
| ☑ Motors Liquidation Company (f/k/a General Motors Corporation) | 09-50026 (REG) |
| ☐ MLCS, LLC (f/k/a Saturn, LLC) | 09-50027 (REG) |
| ☐ MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation) | 09-50028 (REG) |
| ☐ MLC of Harlem, Inc (f/k/a Chevrolet-Saturn of Harlem, Inc ) | 09-13558 (REG) |

NOTE This form should not be used to make a claim for an administrative expense arising after the commencement of the case but may be used for purposes of asserting a claim under 11 U S C § 503(b)(9) (see Item # 5) All other requests for payment of an administrative expense should be filed pursuant to 11 U S C § 503

Name of Creditor (the person or other entity to whom the debtor owes money or property)   HONEYWELL INTERNATIONAL INC

Name and address where notices should be sent

HONEYWELL INTERNATIONAL INC

ATTN  THOMAS BYRNE, CHIEF ENVIRONMENTAL COUNSEL
101 COLUMBIA ROAD
MORRISTOWN NJ 07962

(973) 455-2775
Telephone number
Email Address  tom.byrne@honeywell.com

☐ Check this box to indicate that this claim amends a previously filed claim

Court Claim Number_____
(If known)

Filed on _____

Name and address where payment should be sent (if different from above)

**FILED - 45832
MOTORS LIQUIDATION COMPANY
F/K/A GENERAL MOTORS CORP
SDNY # 09-50026 (REG)**

Telephone number

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim  Attach copy of statement giving particulars

☐ Check this box if you are the debtor or trustee in this case

THE GARDEN CITY GROUP, INC.
NOV 25 2009

If an amount is identified above, you have a claim scheduled by one of the Debtors as shown (This scheduled amount of your claim may be an amendment to a previously scheduled amount ) If you agree with the amount and priority of your claim as scheduled by the Debtor and you have no other claim against the Debtor you do not need to file this proof of claim form, EXCEPT AS FOLLOWS If the amount shown is listed as DISPUTED, UNLIQUIDATED or CONTINGENT, a proof of claim MUST be filed in order to receive any distribution in respect of your claim  If you have already filed a proof of claim in accordance with the attached instructions, you need not file it again

1. **Amount of Claim as of Date Case Filed,** June 1, 2009     $  34,500,000.00

If all or part of your claim is secured, complete item 4 below, however, if all of your claim is unsecured, do not complete item 4  If all or part of your claim is entitled to priority, complete item 5  If all or part of your claim is asserted pursuant to 11 U S C § 503(b)(9), complete item 5

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim  Attach itemized statement of interest or charges

2. **Basis for Claim**  Environmental liability - see attached.
(See instruction #2 on reverse side )

3. **Last four digits of any number by which creditor identifies debtor** _____

   3a  Debtor may have scheduled account as _____
   (See instruction #3a on reverse side )

4. **Secured Claim** (See instruction #4 on reverse side )
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information

Nature of property or right of setoff  ☐ Real Estate  ☐ Motor Vehicle  ☐ Equipment  ☐ Other
Describe

Value of Property $_____  Annual Interest Rate____%

Amount of arrearage and other charges as of time case filed included in secured claim, if any: $_____

Basis for perfection _____

Amount of Secured Claim $_____  Amount Unsecured $_____

6. **Credits**  The amount of all payments on this claim has been credited for the purpose of making this proof of claim

7. **Documents**  Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements You may also attach a summary  Attach redacted copies of documents providing evidence of perfection of a security interest  You may also attach a summary  (See instruction 7 and definition of "redacted" on reverse side )

DO NOT SEND ORIGINAL DOCUMENTS  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING

If the documents are not available, please explain in an attachment

5. **Amount of Claim Entitled to Priority under 11 U S C § 507(a).**  If any portion of your claim falls in one of the following categories, check the box and state the amount

Specify the priority of the claim

☐ Domestic support obligations under 11 U S C § 507(a)(1)(A) or (a)(1)(B)

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U S C § 507(a)(4)

☐ Contributions to an employee benefit plan – 11 U S C § 507(a)(5)

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U S C § 507(a)(7)

☐ Taxes or penalties owed to governmental units – 11 U S C § 507(a)(8)

☐ Value of goods received by the Debtor within 20 days before the date of commencement of the case - 11 U S C § 503(b)(9) (§ 507(a)(2))

☐ Other – Specify applicable paragraph of 11 U S C § 507(a)(__)
Amount entitled to priority:

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment

| Date: 11/23/09 | Signature  The person filing this claim must sign it  Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above  Attach copy of power of attorney, if any    *Thomas Byrn* | FOR COURT USE ONLY |
|---|---|---|

Penalty for presenting fraudulent claim  Fine of up to $500,000 or imprisonment for up to 5 years, or both  18 U S C §§ 152 and 3571
Modified B10 (GCG) (12/08)



5986708947

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances such as bankruptcy cases not filed voluntarily by the debtor there may be exceptions to these general rules. The attorneys for the Debtors and their court-appointed claims agent The Garden City Group Inc are not authorized and are not providing you with any legal advice*

### A SEPARATE PROOF OF CLAIM FORM MUST BE FILED AGAINST EACH DEBTOR

PLEASE SEND YOUR ORIGINAL, COMPLETED CLAIM FORM AS FOLLOWS  IF BY MAIL THE GARDEN CITY GROUP, INC , ATTN  MOTORS LIQUIDATION COMPANY CLAIMS PROCESSING, PO  BOX 9386, DUBLIN, OH 43017-4286  IF BY HAND OR OVERNIGHT COURIER  THE GARDEN CITY GROUP INC    ATTN  MOTORS LIQUIDATION COMPANY CLAIMS PROCESSING, 5151 BLAZER PARKWAY, SUITE A, DUBLIN, OH 43017  PROOFS OF CLAIM MAY ALSO BE HAND DELIVERED TO  THE UNITED STATES BANKRUPTCY COURT  SDNY, ONE BOWLING GREEN, ROOM 534, NEW YORK, NEW YORK 10004  ANY PROOF OF CLAIM SUBMITTED BY FACSIMILE OR E-MAIL WILL NOT BE ACCEPTED

**THE GENERAL AND GOVERNMENTAL BAR DATE IS NOVEMBER 30, 2009 AT 5 00 PM  (PREVAILING EASTERN TIME)**

**Court, Name of Debtor, and Case Number**
These chapter 11 cases were commenced in the United States Bankruptcy Court for the Southern District of New York on  June 1, 2009  You should select the debtor against which you are asserting your claim
A SEPARATE PROOF OF CLAIM FORM MUST BE FILED AGAINST EACH DEBTOR

**1  Amount of Claim as of Date Case Filed**
State the total amount owed to the creditor on the date of the bankruptcy filing  Follow the instructions concerning whether to complete items 4 and 5  Check the box if interest or other charges are included in the claim

**2  Basis for Claim**
State the type of debt or how it was incurred  Examples include goods sold or loaned, services performed  personal injury/wrongful death, car loan, mortgage note, and credit card  If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information  You may be required to provide additional disclosure if the debtor, trustee or another party in interest files an objection to your claim

**3  Last Four Digits of Any Number by Which Creditor Identifies Debtor**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor if any

**3a  Debtor May Have Scheduled Account As**
Use this space to report a change in the creditor's name, a transferred claim  or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor

**4  Secured Claim**
Check the appropriate box and provide the requested information if the claim is fully or partially secured  Skip this section if the claim is entirely unsecured  (See DEFINITIONS, below )  State the type and the value of property that secures the claim  attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing

**5  Amount of Claim Entitled to Priority Under 11 U S C § 507(a)**
If any portion of your claim falls in one or more of the listed categories  check the appropriate box(es) and state the amount entitled to priority (See DEFINITIONS, below )  A claim may be partly priority and partly non-priority  For example, in some of the categories, the law limits the amount entitled to priority

For claims pursuant to 11 U S C § 503(b)(9), indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before June 1, 2009, the date of commencement of these cases (See DEFINITIONS, below)  Attach documentation supporting such claim

**6  Credits**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the Debtor credit for any payments received toward the debt

**7  Documents**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt  You may also attach a summary  You must also attach copies of documents that evidence perfection of any security interest  You may also attach a summary  FRBP 3001(c) and (d)  If the claim is based on the delivery of health care goods or services, see instruction 2  Do not send original documents, as attachments may be destroyed after scanning

**Date and Signature**
The person filing this proof of claim must sign and date it  FRBP 9011  If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature  Print the name and title  if any, of the creditor or other person authorized to file this claim  State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices  Attach a complete copy of any power of attorney  Criminal penalties apply for making a false statement on a proof of claim

---

## DEFINITIONS

**Debtor**
A debtor is the person  corporation, or other entity that has filed a bankruptcy case
The Debtors in these Chapter 11 cases are

| | |
|---|---|
| Motors Liquidation Company | |
| (f/k/a General Motors Corporation) | 09-50026 (REG) |
| MLCS, LLC | |
| (f/k/a Saturn, LLC) | 09-50027 (REG) |
| MLCS Distribution Corporation | |
| (f/k/a Saturn Distribution Corporation) | 09-50028 (REG) |
| MLC of Harlem, Inc | |
| (f/k/a Chevrolet-Saturn of Harlem  Inc ) | 09-13558 (REG) |

**Creditor**
A creditor is the person  corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the Debtor on the date of the bankruptcy filing  See 11 U S C § 101(5)  A claim may be secured or unsecured

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing  The creditor must file the form with The Garden City Group, Inc  as described in the instructions above and in the Bar Date Notice

**Secured Claim Under 11 U S C § 506(a)**
A secured claim is one backed by a lien on property of the debtor  The claim is secured so long as the creditor has the right to be

paid from the property prior to other creditors  The amount of the secured claim cannot exceed the value of the property  Any amount owed to the creditor in excess of the value of the property is an unsecured claim  Examples of liens on property include a mortgage on real estate or a security interest in a car  A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding  In some states, a court judgment is a lien  A claim also may be secured if the creditor owes the debtor money (has a right to setoff)

**Section 503(b)(9) Claim**
A Section 503(b)(9) claim is a claim for the value of any goods received by the debtor within 20 days before the date of commencement of a bankruptcy case in which the goods have been sold to the debtor in the ordinary course of such debtor's business

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim  A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien

**Claim Entitled to Priority Under 11 U S C § 507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information  A creditor should redact and use only the last  four digits of any  social-security, individual's

## INFORMATION

tax-identification  or financial-account number, all but the initials of a minor's name and only the  year of any person's date of birth

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing from The Garden City Group, Inc , please provide a self-addressed, stamped envelope and a copy of this proof of claim when you submit the original claim to The Garden City Group, Inc

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims  One or more of these entities may contact the creditor and offer to purchase the claim  Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor  These entities do not represent the bankruptcy court or the debtor  The creditor has no obligation to sell its claim  However, if the creditor decides to sell its claim  any transfer of such claim is subject to FRBP 3001(e) and any applicable provisions of the Bankruptcy Code (11 U S C § 101 et seq ), and any applicable orders of the bankruptcy court

**Additional Information**
If you have any questions with respect to this claim form, please contact Alix Partners at 1 (800) 414-9607 or by e-mail at claims@motorsliquidation com

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re. | Chapter 11 |
| Motors Liquidation Company, et al | Case No. 09-50026 |
| Debtors | Jointly Administered |

**ATTACHMENT TO PROOF OF CLAIM OF HONEYWELL INTERNATIONAL INC.
REGARDING THE ONONDAGA LAKE SUPERFUND SITE**

1      This proof of claim is filed by Honeywell International Inc pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq., ("CERCLA") to recover Debtor's equitable share of Honeywell's costs of investigating and remediating the Onondaga Lake Superfund Site.

**FACTS MATERIAL TO HONEYWELL'S PROOF OF CLAIM**

***Onondaga Lake***

2      Onondaga Lake is located in Onondaga County, New York.  The lake is a 4 6 square mile, 3,000 acre lake, approximately 4 5 miles long and 1 mile wide, with an average water depth of thirty-six feet

3.      The area around Onondaga Lake is the most urban in central New York State The City of Syracuse is located at the southern end of Onondaga Lake, and numerous towns, villages, and major roadways surround the lake

4.      Since the dawn of the industrial revolution, industry in central New York has been centered on Onondaga Lake and its tributaries.  The lake, both directly and through its tributaries, received discharges of industrial wastewaters throughout this period.  Additionally,

1

Onondaga Lake has received and continues to receive sewage from the Onondaga County Metropolitan Sewage Treatment Plant ("Metro"). Influent to Metro includes contaminated discharges from industrial users of the sewage system. In the past, this industrial sewage was untreated or incompletely treated

5    As a result of receiving industrial and sewage discharges (as well as surface runoff and contaminated groundwater discharges), sediments in Onondaga Lake have become contaminated with a variety of hazardous substances

6    Numerous pollutants discharged historically to Onondaga Lake and now present in the lake sediments have been determined to contribute to risk to human and ecological receptors  These pollutants include (among others): benzene, toluene, ethylbenzene, and xylenes ("BTEX"), cadmium, chlorinated benzenes, chromium, copper, dioxins and furans, lead, mercury, polychlorinated biphenyls ("PCBs"), polycyclic aromatic hydrocarbons ("PAHs"), and zinc. All of these pollutants are currently present in sediments in Onondaga Lake and are being addressed by the remedial actions being undertaken by Honeywell under the oversight of New York State Department of Environmental Conservation ("DEC") and the United States Environmental Protection Agency ("EPA")

### *Cleanup by Honeywell*

7.    On June 23, 1989, DEC added Onondaga Lake to the New York State Registry of Inactive Hazardous Waste Disposal Sites  On December 16, 1994, EPA listed Onondaga Lake and certain upland areas on the National Priorities List pursuant to CERCLA, thereby designating Onondaga Lake as a Superfund Site.

8       From 1881 until 1986, Honeywell's predecessors operated manufacturing

facilities in the Village of Solvay and the Town of Geddes. These manufacturing facilities

discharged wastewaters to Onondaga Lake, including wastewaters containing mercury

9.      On June 27, 1989, the State of New York commenced a civil action against

Honeywell's predecessor Allied-Signal Inc. in the United States District Court for the Northern

District of New York under CERCLA ("Litigation")   In its suit, the State sought to compel

Allied-Signal to investigate and remediate contamination in the sediments of Onondaga Lake and

in associated upland areas.

10.     Pursuant to an interim Consent Decree entered in that action in 1992, Allied-

Signal (and after 1999, Honeywell) undertook a comprehensive study of the Onondaga Lake

Sediments known as a Remedial Investigation and Feasibility Study ("RI/FS")under New York

State Department of Environmental Conservation ("DEC") oversight   The purpose of the

Remedial Investigation phase of the study was to delineate the extent of contamination in the

lake sediments and to assess the risks posed by that contamination. The Feasibility Study

evaluated various options for remediating contamination deemed to pose an unacceptable risk.

The RI/FS was completed in November 2004.

11      On July 1, 2005, DEC issued a Record of Decision ("ROD") for the Lake Bottom

Subsite of the Onondaga Lake Superfund Site   In the ROD, DEC selected a sediment remedy

that called for a mixture of sediment dredging, isolation capping, and thin layer capping   The

selected remedy also called for certain other measures, including the construction of a sediment

consolidation area to contain dredged sediment and the construction of a barrier wall on the

southeastern portion of the lake to prevent contamination from migrating into the lake from

3

upland sources. In addition, the ROD required the implementation of institutional controls and long-term maintenance and monitoring of the remedy

12. The ROD estimated the total cost of the selected remedy at $451,000,000. This cost estimate does not include the costs Honeywell and its predecessors incurred pursuant to the 1992 Consent Decree to complete the RI/FS and other studies required by DEC to develop and document the remedy selected in the ROD, nor does it include DEC and EPA oversight costs that Honeywell is obligated to reimburse under consent decrees and orders issued in the Litigation

13. The ROD identified Allied-Signal as a "major contributor" of contamination to the sediments of Onondaga Lake, but also noted that "other industries in the area have contributed contamination." The ROD specifically identifies several such sources, including "industrial facilities and landfills along Ley Creek" The ROD noted Debtor's Townline Road facility's discharges of PCBs, including the migration of PCBs from that site into Ley Creek, and the need to stop the intermittent discharge of PCBs and other contaminants from the Townline Road facility that occur during storm events.

14 On January 4, 2007, the U S District Court entered a Consent Decree between DEC and Honeywell in which Honeywell agreed to fund and implement the remedy set forth in the ROD Under the terms of the Consent Decree, Honeywell must complete the dredging portion of the remedy by 2016.

15 Since entry of the 2007 Consent Decree, Honeywell has worked diligently to design and implement the remedy set forth in the ROD. Honeywell remains fully committed to fulfilling its obligations under the Consent Decree and to completing the selected remedy within the schedule set forth in the Consent Decree.

### *Debtor's Historical Operations and Contribution to Lake Pollution*

16.    Debtor and its predecessors operated at two locations that discharged to
Onondaga Lake or its tributaries: (i) 1000 Townline Road, Town of Salina, Onondaga County,
New York; (ii) 700 Marcellus Street, Syracuse, New York.

17.    One of Debtor's corporate predecessors, the Brown-Lipe Gear Co, appears to
have operated a third facility on Geddes Street in Syracuse from 1895 to 1910. The Geddes
Street facility was a 65,000 sq ft five story factory that operated as a machine shop,
manufacturing and supplying gears to the automobile industry. Investigation of discharges of
pollutants from the Geddes Street facility is ongoing

18.    Debtor conducted its operations in Syracuse through a number of divisions. From
1910 until 1952, Debtor's Brown-Lipe-Chapin Division operated at 700 Marcellus Street, and
from 1952 until 1961, at 1000 Townline Road. Between 1961 and 1968, Debtor's Turnstead
Division operated out of 1000 Townline Road. From 1968-1984, the Fisher Body Division
operated out of 1000 Townline Road. In 1984, the Fisher Body Division became Fisher Guide.
In 1989, Fisher Guide became the Inland Fisher Guide. Finally, in 1993, the Inland Fisher Guide
division was incorporated into Debtor's North American Operations.

### *Townline Road*

19    The plant at 1000 Townline Road was located on 85 acres of land. Ley Creek
borders the northern edge of the facility, and discharges to Onondaga Lake, which is
approximately 3.2 miles downstream. There were two landfills located on the site. One was 235
feet long and 75 feet wide, the second was 60 feet by 50 feet. The second landfill was built in
1979 to capture oil and other contaminants escaping in storm water runoff from the site. Both
landfills were closed in 1986

5

20.    The plant manufactured metallic automobile parts until 1973. Industrial processes included copper-nickel-chromium and double nickel-chromium plating, and buffing, forming and finishing of metal vehicle parts. From the early 1970's until 1992, the plant's operations included the manufacturing of plastic body and trim parts for vehicles. These processes included injection molding, painting, and assembly of the components. Manufacturing operations ceased in 1994.

21    At the Townline Road facility, various metals, including nickel, copper, and chromium were used in plating operations from 1953 until 1973. From 1973 until 1992, approximately 80 million pounds of plastics were used each year. Other hazardous substances, such as chromic acid, cyanide, aluminum sulfate, and sulfuric acid were used as part of the wastewater treatment plant operations. In addition, paint, paint thinner, trichloroethylene ("TCE"), tetrachloroethylene ("PCE"), xylene, ethylbenzene, and oil, including PCB-containing oil, were used at the Townline Road facility.

22    Wastes discharged from the Townline Road facility were contaminated with cyanide, chromium, copper, nickel, zinc, and PCBs. These wastes were generated through the manufacture of metal vehicle parts. Buffing sludges were generated between 1956 and 1973, from the manufacture of wheel discs, and from 1956 until 1972 from the manufacture of castings. After 1972, injection molding and painting of plastic parts generated PCB-contaminated paint sludge. Wastes containing ash, grease, TCA, TCE, xylene, toluene, and ethylbenzene were also generated at the site.

23    Storm sewers installed in 1952 discharged contaminated runoff directly to Ley Creek until approximately 1985, when the discharges were diverted to interceptor sumps, which were part of the on-site waste water treatment system. The discharge from these storm sewers

6

was untreated  New storm sewers were built around 1985, but still discharged directly to Ley

Creek as recently as 1996.  Portions of the storm sewers were found to be contaminated with oil

containing PCB Aroclor 1242 at concentrations as high as 1400 ppm

24.    Sampling conducted in 1959 indicated that wastewater effluent contained cyanide

in concentrations of 17 5 ppm, chromium in concentrations of 16.1 ppm, copper in

concentrations of 9.4 ppm, nickel in concentrations of 14 5 ppm, and zinc in concentrations of

3.1 ppm.  These concentrations were orders of magnitude in excess of applicable standards (0.1

ppm cyanide, 0.2 ppm copper, 0 3 ppm zinc)  In addition, "the presence of suspended solids in

the waste effluent was great enough to cause a material increase in the suspended solids content

in [Ley Creek ]" *See* Grossman, P E. Water Pollution Control Engineer, Onondaga Lake

Drainage Basin—Special Stream Pollution Survey—Brown Lipe Chapin (Sept 10, 1959).  The

"green discoloration in the stream resulted from the excessive discharge of chromium wastes "

*Id*  At the time, the plant discharged approximately 496,000 gallons of water per day  *Id*

25    In 1963, an industrial waste sump and waste water treatment plant was installed to

treat metal plating waste water.  This sump received the process water that had formerly been

discharged directly to Ley Creek  Until 1985, however, overflow from the sump discharged to a

lagoon adjacent to Ley Creek and from which wastes discharged to the Creek.  The sump was

later determined to be a "major source of PCB Aroclor 1248 releases to the environment " *See*

TAMS, 104(e) Site Summary Report (1996)    As of December 1986, the facility discharged

treated wastewater from the on-site wastewater treatment plant to Metro.

26    Contaminants such as volatile organic compounds, metals, and PCBs migrated via

ground, surface, and storm water to Ley Creek. The presence of solvents in the groundwater

likely enhanced the migration of PCBs in the ground water. Ley Creek discharges to Onondaga Lake, approximately 3 2 miles downstream of the Townline Road facility

27.     Violations of Debtor's SPDES permit were common. In December 1984, Debtor discharged an indeterminable amount of xylene in violation of its SPDES permit into Ley Creek In 1986, Debtor entered into a consent order requiring it to pay $1,900 for these SPDES violations and to conduct a groundwater investigation for solvent contamination. In November 1991, samples of waste water showed that Debtor was discharging waste water with concentrations of PCBs at 0.53 ug/L and 1 9 ug/L, which were in violation of the discharge limit of 0.30 ug/L. In December 1991, waste water discharges again exceeded the applicable PCB limits. In 2000, sampling of effluent still showed the presence of PCBs and TCE at concentrations greater than the effluent limit In 2002, on numerous occasions, Debtor's facility discharged waste water in violation of SPDES discharge limits for PCBs (April, May, June, September, December), xylene (May), and 1,2-cis-dichloroethene (July, November). In 2003, there were similar violations for PCBs (January, February, March, May, June, July, September, October, and December), and aluminum (February) Some of these violations resulted from the release of built-up sediment. There were seven SPDES violations for PCB discharges in 2004, and at least one violation in 2005

28.     In addition to discharging contaminated industrial waste water, the Townline Road facility suffered from leaks and spills. In 1986, an employee who had worked at the plant for 14 years stated that PCB-contaminated oil would leak onto the floor from 110 injection molding machines According to the same witness, the fittings on the hydraulic hoses would rupture approximately once every six months, leading to hundreds of gallons of spilled oil on the

floor  *See* NYS Department of Environmental Conservation, Memorandum re Interview of Gordon Darrow, Fisher Body Division (March 19, 1986)

29.    In 1980, oil was released from the plant and collected upstream adjacent to Ley Creek. The spill, covering approximately 35-40 square feet, dissipated into Ley Creek before plant workers could clean it up  An investigation into the source of the leak revealed that the underground sumps were leaking hydraulic oil.  Fisher Body Division, Syracuse Plant, A review of Consent Order Investigative Engineering Studies (Oct 15, 1981).  The leaking sumps "result[ed] in a significant accumulation of oil beneath the building." *See* TAMS, 104(e) Site Summary Report (1996)

30.    In September 1983, Debtor improperly discharged PCB contaminated water into Ley Creek from two waste water ponds.  This matter was settled by Consent Agreement, pursuant to which Debtor agreed to pay $75,000 00 in civil penalties

31.    Underground tanks at the facility and abandoned thinner lines held xylene, toluene, and ethylbenzene.  An excavation in 1985 revealed that a thinner tank had ruptured

32.    In January, 1986, an unknown amount of toluene was discharged, and in April, 1986 an unknown amount of hydraulic oil containing PCBs was spilled into Ley Creek.

33.    In April 1987, an unknown amount of hydraulic oil and xylene was released

34.    In October, 1989, sump #2 overflowed onto the roadway, releasing approximately 1000-15000 gallons of waste.

35.    PCBs were stored onsite in drums that were not secured properly. A visual inspection by the U S  Environmental Protection Agency of the site in 1984 indicated that there were over 400 drums that either contained or had contained PCB-contaminated debris  The drums were stored outdoors, and some had been emptied into large tanks. Spillage from the

9

transport of the PCB contaminated wastes was stored in an unmarked, open-topped tank. At least 14 of 20 drums containing PCB sludges were not sealed, but were simply covered with plastic *See* Memo, U.S. EPA, PCB Inspection General Motors Corp. Fisher Body Works (Feb 13, 1984).

36.    These releases resulted in the contamination of soil, groundwater, and surface water at the site. The contaminated surface water runoff and ground water flow contributed to contamination of the Lake.

37.    PCBs were detected in soil samples collected in the vicinity of Debtor's Outfall 003 at concentrations as high as 8,000 parts per million.

38.    Chlorinated solvents have been detected in groundwater at the site at concentrations as high as 13,000 parts per billion. In groundwater samples collected at the facility, PCBs were detected at concentrations as high as 3.7 parts per billion and metals were detected at various concentrations. Groundwater flow in the shallow aquifer moves in the direction of Ley Creek.

39.    Ley Creek was dredged in the 1970s and 1980s in an effort to control periodic flooding. The 100,000 cubic yards of dredge spoils, which were dumped along the shore of Ley Creek, were found to be contaminated with PCBs originating from Debtor's facility *See* TAMS, 104(e) Site Summary Report (1996) Debtor entered into several Consent Orders to complete an Interim Remedial Measure Plan and conduct Remedial Investigations that would provide for the removal of the PCB contaminated soils and address the concern over PCB contamination of groundwater.

40.    In 1990, Debtor's facility at Townline Road was considered to be Onondaga County's eighth largest polluter. *See* Syracuse Herald-Journal, *State cracking down on GM*

*pollution violations* (Dec 4, 1992)  In 1993, the plant was considered to be the seventh largest

toxic chemical polluter in Onondaga County. *See Syracuse Herald-Journal, Industries in*

*Onondaga County rank 4th among state polluters* (Jan. 29, 1993)

### *Marcellus Street*

41.    The Brown-Lipe-Chapin division of General Motors Corporation operated at 700

Marcellus Street between 1910 and 1952, where it conducted electro-plating and manufacturing

operations.  The building front is located on Marcellus Street and runs through to West Fayette

Street, occupying close to seven acres of land   At some point during the plant's history, it

conducted defense work.

42    Although detailed information has not been located to date, the manufacturing

processes that occurred at the Marcellus Street facility were similar to those that took place at the

Townline Road facility, and thus similar wastes would have been produced and similar

discharges would have occurred.

### *Debtor's Relative Share of Lake Pollution*

43    The Record of Decision states.

> ***Elevated levels of cadmium, chromium, copper, lead, nickel, and***
> ***zinc are found in the lake sediments.*** The pattern of contamination
> suggests sources other than, or in addition to, Honeywell for many
> of these metals. In part because of their longevity in the
> environment, these metals can be found at levels above
> background throughout the sediments of the lake bottom
> (Emphasis supplied.)

Debtor has discharged substantial quantities of each of these metals

44    Although the data are not sufficiently complete to allow a precise quantification

of the amount of contaminants discharged by Debtor, the amount can be estimated using

historical information on discharge rates and historical analyses of that discharge   Information

on discharge rates for the Townline Road facility is available beginning in 1952   Analyses

11

quantifying the amount of contamination in Debtor's discharge are available from historical

sampling by the New York State Department of Health and discharge monitoring reports

submitted to DEC.

45      Based on historical information on contaminant concentrations, it is estimated that

Debtor discharged contaminants to Onondaga Lake in the following quantities between 1910 and

1973:

| CONSTITUENT | QUANTITY |
|---|---|
| Cadmium | 94 kg |
| Chromium | 859,600 kg |
| Copper | 492,117 kg |
| Nickel | 775,609 kg |
| Zinc | 167,877 kg |
| **TOTAL METALS** | **2,295,297 kg** |

46      Based on this estimated mass of contaminants currently present in Lake

sediments, Debtor's discharges of metals account for approximately 3.38 percent of the mass of

contaminants found in the Lake sediments.

47.      In addition, it is estimated that PCBs discharged by Debtor account for

approximately one-third of the total mass of PCBs found in the Lake sediments.

48.      In addition, Debtor discharged substantial quantities of BTEX and oil and grease

to Onondaga Lake and its tributaries   Discharges of oil and grease would be expected to

contribute the presence of PAHs found in the lake sediments.

### CERCLA PROOF OF CLAIM

49.      Debtor is a "person" and the plants at Townline Road and Marcellus Street are

"facilities" within the meaning of CERCLA.  42 U.S.C. §§ 101(21),(8).  There have been

"releases" of "hazardous substances" at and from the Townline Road and Marcellus Street

facilities as those terms are defined in CERCLA  42 U.S.C. § 101(8), (9), (14)  These releases have contributed hazardous substances to the Onondaga Lake Superfund Site and more specifically have contributed hazardous substances to the Lake Bottom Subsite of the Onondaga Lake Superfund Site.

50    Section 107(a)(2) of CERCLA, 42 U.S C  § 9607(a)(2), provides in pertinent part that any "person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of" shall be liable "for . . . any necessary costs of response by any other person consistent with the national contingency plan." Debtor is the current owner and operator of the Townline Road facility and owned and operated the Townline Road and Marcellus Street facilities at the time hazardous substances from those facilities were disposed of in Onondaga Lake.

51.    Honeywell is a "person" within the meaning of CERCLA  42 U.S.C. § 101(21) Honeywell has incurred, and will in the future incur, "necessary costs of response . . . consistent with the national contingency plan" in the course of its investigation and cleanup of contamination in the Onondaga Lake sediments and fulfillment of its obligations under the 1992 and 2007 Consent Decrees.  42 U.S C  § 9607(a)(2)  Accordingly, Debtor is liable to Honeywell under Section 107 of CERCLA, jointly and severally with all other responsible parties, for the necessary costs of response incurred by Honeywell consistent with the national contingency plan.

52    Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), provides in pertinent part that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 .   . or under section 9607(a)      "  Additionally, section 113(f)(3)(B) of CERCLA, 42 U.S.C.

§ 9613(f)(3)(B), provides that "[a] person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not a party to [the] settlement "

53.     New York State brought suit against Honeywell's predecessor Allied-Signal under sections 104 and 106 of CERCLA on June 27, 1989  Honeywell has replaced Allied-Signal as the defendant in that litigation

54     As set forth above, Debtor is a person liable under section 107 of CERCLA with respect to hazardous substances released from the Townline Road and Marcellus Street facilities to Onondaga Lake

55.     In the 1992 and 2007 Consent Decrees, Honeywell resolved its liability to the State of New York for some or all of the costs of RI/FS and the ROD remedy, both of which constitute response actions within the meaning of CERCLA  42 U S C  § 9601(25)  Both of the 1992 and 2007 Consent Decrees constitute judicially-approved settlements. Debtor was not a party to either Consent Decree.

56.     As set forth in the ROD, the estimated cost of implementing the Lake Bottom Remedy is $451,000,000

57.     Although an exact percentage is impossible to quantify, Honeywell conservatively estimates that at least ten percent of the costs of implementing the Lake Bottom Remedy are attributable to remediation of PCBs.

58.     In addition to the estimated costs of implementing the Lake Bottom Remedy, Honeywell and its predecessors have incurred tens of millions of dollars in response costs pursuant to the 1992 Consent Decree to perform the RI/FS and other investigations required by

14

DEC to develop and document the remedy set forth in the ROD  Honeywell has also paid

several million dollars to reimburse DEC and EPA for their costs in overseeing the investigation

and cleanup of Onondaga Lake.

59.    Based on the mass of contaminants discharged by Debtor into Onondaga Lake,

the portion of costs attributable to PCBs, and the overall estimated cost of the Lake Bottom

Remedy, Honeywell conservatively estimates Debtor's equitable share of the necessary costs of

response that have been or are being incurred by Honeywell to be $34,500,000.

60.    The foregoing estimate of Debtor's equitable share is conservative in that it only

considers Debtor's discharges of metals and PCBs.  It does not consider Debtor's extensive

documented discharges of oil and grease, which contributed to the PAH contamination currently

observed in the lake sediments, or Debtor's documented discharges of BTEX  This estimate is

also conservative in that it does not consider likely discharges from Debtor's Geddes Street

facility

61.    In addition, Honeywell's estimate of Debtor's equitable share is conservative in

that it is based solely on the ROD cost estimate for the Lake Bottom Remedy and does not

include any adjustment for the possibility that the Lake Bottom Remedy will exceed the

estimated costs.

62.    Finally, Honeywell's estimate of Debtor's equitable share is conservative in that it

does not include any adjustment for Debtor's bad acts and other culpable behavior, including

frequent and recurring leaks, spills, and violations of its SPDES permit.

## CONCLUSION

63    For the foregoing reasons, Honeywell asserts a general unsecured claim against

the Debtor in the amount of $34,500,000 for past and future response costs Honeywell has and

15

will incur as required by the 1992 and 2007 Consent Decrees entered by the United States

District Court for the Northern District of New York in investigating and remediating

contamination at the Onondaga Lake Superfund Site.

64.     Debtor has made no payments to Honeywell for the costs that are the subject of

this proof of claim, and no judgments have been rendered against Debtor on any of the claims

described in this proof of claim

65      This proof of claim is without prejudice to any right of Honeywell under 11

U.S.C. § 553 to set off, against any claim described herein, debts (if any) that Honeywell may

owe to the Debtor

66      Except to the extent of any trust interests in actual or potential proceeds of

liability insurance policies of the Debtor, no security interests are held for the claims described in

this proof of claim

67.     Honeywell does not intend, in filing this Amended Proof of Claim, to submit to

the jurisdiction of this Court with respect to any matter other than for determination and

allowance of this claim

68.     In executing and filing this proof of claim, Honeywell does not waive any of its

rights and remedies against any other person or entity who may be liable for all or part of the

claims against the Debtor set forth herein, whether as an affiliate, assignee, guarantor or

otherwise.

69.     Honeywell reserves the right to amend, modify, and supplement this Proof of

Claim at any time for whatever reason, including, without limitation, for the purpose of filing

additional claims, whether arising from the transactions or claims described in this Proof of

Claim or otherwise, and to revise the amount of Honeywell's Claim as additional facts become

16

known. By filing this Proof of Claim, Honeywell does not waive, and expressly reserves, its

right to pursue claims (including, but not limited to, the claims described herein) against Debtor

based upon additional or alternative legal theories.

70.    All notice and communications concerning this Proof of Claim should be

addressed as follows:

Honeywell International Inc.
101 Columbia Road
Morristown, NJ 07962
Attn:   Thomas Byrne,
        Chief Environmental Counsel

and

Brian D. Israel
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004



**EXHIBIT C**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X
                           :

STATE OF NEW YORK and DENISE M. SHEEHAN as
Trustee of the Natural Resources,          :

                    Plaintiffs,      :        89-CV-815

      -against-                  :        ~~Senior~~ Senior
                                 ~~Chief~~ Judge Scullin

HONEYWELL INTERNATIONAL INC.,     :

                    Defendant.     :

----------------------------------------------------------------X

U.S. DISTRICT COURT - N.D. OF N.Y.
**FILED**
JAN - 4 2007
AT_____O'CLOCK
Lawrence K. Baerman, Clerk - Syracuse

## CONSENT DECREE BETWEEN THE STATE OF NEW YORK AND HONEYWELL INTERNATIONAL INC.

DATED: OCTOBER 11, 2006

# CONTENTS

                                                                                    **Page**

REPRESENTATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

JURISDICTION (¶¶ 18-19) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

HONEYWELL'S OBLIGATIONS (¶¶ 20-43 ) . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

    Remedial Design Workplan (¶¶ 22-27) . . . . . . . . . . . . . . . . . . . . . . . . .6

    Remedial Design Contents (¶¶ 28-29) . . . . . . . . . . . . . . . . . . . . . . . . . .8

    Remedial Action ("Construction") and Reporting (¶¶ 30-35) . . . . . . . . . 11

    Modification of the Remedial Program (¶¶ 36-37) . . . . . . . . . . . . . . . . . . 13

    Progress Reports (¶¶ 38-39) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

    Review of Submittals (¶¶ 40-43) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

DISPUTE RESOLUTION (¶¶ 44-52) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VIOLATIONS OF THE CONSENT DECREE (¶¶ 53-59) . . . . . . . . . . . . . . . . . 20

    Stipulated Penalties (¶¶ 55-56) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    Force Majeure (¶¶ 57-58) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    Upland Sources (¶ 59) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

ENTRY UPON SITE (¶ 60) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

PAYMENT OF COSTS INCURRED BY THE STATE (¶¶ 61-67) . . . . . . . . . . . 24

FINANCIAL ASSURANCE (¶¶ 68-73) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

RESERVATION OF RIGHTS (¶¶ 74-79) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

INDEMNIFICATION (¶ 80) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

i

COMMUNICATIONS (¶¶ 81-86) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

ENVIRONMENTAL EASEMENTS (¶ 87) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

COMPLIANCE WITH LEGAL REQUIREMENTS (¶¶ 88-89) . . . . . . . . . . . . . . . 38

CONTRIBUTION PROTECTION (¶ 90) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

COVENANT NOT TO SUE (¶¶ 91-92) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

CITIZEN PARTICIPATION (¶ 93) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

LODGING AND OPPORTUNITY FOR PUBLIC COMMENT (¶ 94) . . . . . . . . . . 41

MISCELLANEOUS (¶¶ 95-104) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

CONSENT DECREE CONTROLS (¶ 105) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

TERMINATION OF CONSENT DECREE (¶ 106 ) . . . . . . . . . . . . . . . . . . . . . . . . . 44

COURT'S CONTINUING JURISDICTION (¶ 107) . . . . . . . . . . . . . . . . . . . . . . . . 44

The State of New York, Denise M. Sheehan, as Commissioner of Environmental

Conservation, the Department of Environmental Conservation ("DEC") (collectively, the "State")

and Honeywell International Inc. ("Honeywell"), a corporation organized and existing under the

laws of the State of Delaware, represent as follows:

1. On June 27, 1989, the State filed this lawsuit against Allied-Signal Inc., pursuant to

the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42

U.S.C. § 9601 et seq., and state law, *inter alia*, to compel a cleanup of Onondaga Lake, its

tributaries and related upland areas, to recover all response costs incurred and to be incurred by

the State in responding to the contamination, and to recover natural resource damages.

Honeywell is the successor to Allied-Signal Inc.

2. The complaint alleges, *inter alia*, that there have been releases and that there is a threat

of further releases of hazardous substances, as that term is defined by section 101(14) of

CERCLA, 42 U.S.C. § 9601(14), and other waste substances from Honeywell's industrial

facilities which have contaminated the sediments and surface water of Onondaga Lake and its

tributaries and upland areas.

3. On March 16, 1992, this Court entered an interim consent decree ("RI/FS Consent

Decree") which provided, *inter alia*, for the performance of a Remedial Investigation and

Feasibility Study ("RI/FS"), performed in accordance with federal and state laws and regulations,

to address contamination and the threat of further contamination of Onondaga Lake, its

tributaries and related upland areas (collectively, "Onondaga Lake site"). The RI/FS Consent

Decree specified the various investigations, studies and reports that were required, and

established a schedule for their completion.

1

4. The RI/FS Consent Decree, as subsequently amended, provided that, based on the studies and reports generated by the RI/FS process, as well as other information available to it, the State would develop and make available for public comment proposed plans for remedial actions at sites related to the Onondaga Lake site, *e.g.*, the Onondaga Lake Bottom subsite (alternatively, "Lake Bottom subsite") and the Geddes Brook/Ninemile Creek site, and that after considering the public comments on the proposed plans, the Commissioner of Environmental Conservation would adopt a final remedy for each site in a Record of Decision ("ROD").

5. On September 30, 1993, the United States Environmental Protection Agency ("EPA") and DEC entered into a cooperative agreement ("Cooperative Agreement") pursuant to section 104(d) of CERCLA, 42 U.S.C. § 9604(d), which agreement provides, in relevant part, that DEC will be the lead agency with respect to the Onondaga Lake site and will prepare draft RODs for subsites, subject to EPA approval, and take the lead in all enforcement actions to ensure that responsible parties commit to undertake necessary work to investigate and remediate subsites.

6. On December 16, 1994, EPA listed Onondaga Lake, its tributaries, and those upland sites which have contributed or are contributing hazardous substances to the Lake and its tributaries on the National Priorities List ("Onondaga Lake NPL site") pursuant to section 105(a)(8)(B) of CERCLA, 42 U.S.C. § 9605(a)(8)(B). 59 Fed. Reg. 65209 (December 16, 1994).

7. The RI/FS for the Onondaga Lake Bottom subsite (a discrete portion of the Onondaga Lake NPL site) was completed in November 2004 in accordance with the schedule set by this Court.

8. Based on information obtained during the RI/FS process, the State has determined that

2

the Onondaga Lake Bottom subsite is contaminated with hazardous substances, within the meaning of section 101(14) of CERCLA, 42 U.S.C. § 9601(14), and hazardous wastes, within the meaning of the New York State Environmental Conservation Law ("ECL") § 27-1301, generated by Honeywell's industrial facilities. The State has also determined that there have been releases and there are threats of additional releases of hazardous substances and hazardous wastes from the Lake Bottom subsite.

9. Pursuant to ECL § 27-1305, the Onondaga Lake Bottom, referred to herein as a subsite, is listed as a Class 2 site on the New York State Registry of Inactive Hazardous Waste Disposal Sites as site number 7-34-030. A Class 2 site is one that poses a significant threat to the environment.

10. On November 29, 2004, in accordance with the schedule set by this Court, the State released the "Proposed Plan" for remedial action at the Lake Bottom subsite for the purpose of soliciting and considering public comment. The Proposed Plan described the remedial alternatives considered for the Onondaga Lake Bottom subsite, identified the preferred remedy and set forth the rationale for this preference. The public comment period closed on March 1, 2005. A subsequent public comment period commenced on April 1, 2005 and concluded on April 30, 2005.

11. As part of the review procedure, the Proposed Plan was also submitted to EPA's National Remedy Review Board.

12. On July 1, 2005, in accordance with the schedule set by this Court, and after duly considering the public's comments, Denise M. Sheehan, acting Commissioner of Environmental Conservation, and Kathleen C. Callahan, acting Regional Administrator for EPA Region 2,

3

jointly selected a remedy in a ROD for the Lake Bottom subsite and released their responses to the comments received from the public on the Proposed Plan. A copy of the July 1, 2005 ROD without appendices is attached hereto as Appendix A. On December 14, 2006, the State and EPA jointly issued an Explanation of Significant Differences ("ESD") documenting certain modifications to the remedy. A copy of the ESD is attached hereto as Appendix B. The July 1, 2005 ROD as modified by the December 14, 2006 ESD is hereinafter referred to as the "ROD."

13. In order to address the threat to public health, welfare and the environment posed by the contamination of the Lake Bottom subsite, the selected remedy, broadly described, provides for: (i) dredging and proper disposal of as much as approximately 2,653,000 cubic yards of contaminated sediments and wastes; (ii) construction of an isolation cap over an estimated 425 acres in the shallower areas (littoral zone); (iii) construction of a thin-layer cap over an estimated 154 acres in the deeper areas (profundal zone); (iv) performance of a pilot study which involves the introduction of oxygen into the profundal zone; (v) re-establishment of habitat injured by implementation of the remedy and enhancement of habitat in certain near-shore areas; (vi) monitored natural recovery in areas of the profundal zone; (vii) implementation of institutional controls; and (viii) long-term operation, maintenance and monitoring.

14. Pursuant to ECL Article 27, Title 13; ECL Article 71, Title 27; and ECL § 3-0301, the State has the responsibility and authority to establish the terms and conditions under which Honeywell will design and implement the remedy selected in the ROD for the Onondaga Lake Bottom subsite, and Honeywell would be obligated pursuant to ECL § 27-1313 to design and implement the selected remedy in compliance with the terms and conditions established by the State.

4

15. Pursuant to ECL article 27, the State can implement the selected remedy for the Lake Bottom subsite and, pursuant to CERCLA, 42 U.S.C. §§ 9607(a), 9613(g)(2), can recover all related response costs incurred or to be incurred by the State from Honeywell, or, alternatively, the State and Honeywell can resolve the State's claims for response costs incurred and to be incurred in designing and implementing the selected remedy pursuant to a settlement agreement which obligates Honeywell to design and implement the selected remedy for the Onondaga Lake Bottom subsite under agreed upon terms and conditions.

16. The State and Honeywell are desirous of avoiding potentially costly and time-consuming litigation, and therefore have agreed to the terms and conditions pursuant to which Honeywell will design, subject to State approval, and implement, under State oversight, the remedy selected in the ROD for the Onondaga Lake Bottom subsite, which terms and conditions are set forth below. The State and Honeywell have further agreed to the entry of this agreement as an order of the Court.

17. The State has determined that the settlement agreement embodied in this Consent Decree is in the public interest.

**NOW, THEREFORE**, it is **ORDERED, ADJUDGED and DECREED** as follows:

### JURISDICTION

18. The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1367(a) and 42 U.S.C. § 9613(b), and has jurisdiction over the parties to this Consent Decree. The Court does not have jurisdiction pursuant to this Consent Decree over any claims of the United States pursuant to Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607.

**19.** The undersigned representative of each party certifies that he or she is fully authorized to enter into this Consent Decree and to execute and bind the party to its terms. Honeywell hereby waives any right it may have to a hearing under the ECL for Matters Addressed by this Consent Decree as that term is defined in paragraph 90, below.

## HONEYWELL'S OBLIGATIONS

**20.** Honeywell is permanently enjoined and directed to comply with the terms and conditions set forth herein.

**21.** Honeywell shall:

    **A.** Develop and implement, in accordance with the ROD for the Onondaga Lake Bottom subsite (hereinafter, alternatively, the "Site") and this Consent Decree, including in all respects the Statement of Work ("SOW") attached hereto as Appendix C, pursuant to the ECL, CERCLA, and the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. Part 300 ("NCP"), an inactive hazardous waste disposal site remedial program that shall consist of the design, implementation, operation, maintenance and monitoring of the remedy selected by DEC and EPA and documented in the ROD ("Remedial Program" or "Remedial Design/Remedial Action program" or "RD/RA program"), as set forth below; and

    **B.** Reimburse all costs incurred by the State as and to the extent set forth below.

**Remedial Design Work Plan**

**22.** Within 150 days after the entry of this Consent Decree, Honeywell shall prepare and submit to the State for review and approval a Remedial Design Work Plan ("RDWP") concerning the implementation of the remedy that is selected and documented in the ROD.

6

**23.** The RDWP shall, *inter alia*, propose activities that are to precede remedial design including, but not limited to, sampling and pilot testing. The RDWP shall be prepared in accordance with relevant EPA and DEC guidance documents and the attached SOW.

**24.** The RDWP shall include, but not be limited to, the following elements:

**A.** A Site-specific description of Remedial Design ("RD") activities, which activities may be broken down into one or more distinct projects or modules, together with a schedule for the performance of these activities;

**B.** A summary of the field activities that were performed as part of the Fall 2005 and 2006 Pre-design Investigation pursuant to DEC Administrative Consent Order Index No. D7-0002-05-08, which became effective August 19, 2005;

**C.** A discussion of the need to perform further Pre-design Investigative activities. This shall state the need to submit a Pre-design Investigation Work Plan and a schedule for doing so. The Work Plan shall include a Sampling and Analysis Plan ("SAP"), which shall include:

**i.** A quality assurance project plan that describes the quality assurance and quality control protocols necessary to achieve the initial data quality objectives. This plan shall designate a data validation expert and must describe such individual's qualifications and experience;

**ii.** A field sampling plan that defines sampling and data gathering methods in a manner consistent with the *Compendium of Superfund Field Operations Method* (EPA/540/P-87/001, OSWER Directive 9355.0-14, December 1987) as amended, and supplemented by DEC;

**D.** A plan to secure physical security and posting of the Site;

7

E. A health and safety plan ("HASP") to protect persons at and in the vicinity of the Site during the RD described herein, during implementation of the RDWP, and during and after completion of remedial construction. The updated HASP shall be prepared in accordance with 29 CFR § 1910 by a certified health and safety professional. Honeywell shall provide supplements to the HASP as necessary to ensure the health and safety of all persons at and in the vicinity of the Site;

F. A narrative description of the RD, including a description of the remedial goals for the Site, as stated in the ROD, and the means by which each element of the selected remedial alternative will be implemented to achieve those goals; and

G. A schedule for the submission of each of the RD documents that together with the pre-design documents will form the RD Contents pursuant to paragraph 28. The submission due dates for certain RD documents, as determined by the State, will be triggered by State approval of prior submissions.

25. Within 30 days after the State approves the RDWP, Honeywell shall commence the activities authorized therein.

26. Honeywell shall perform the RDWP activities in accordance with the State-approved RDWP.

27. During the performance of field activities pursuant to the RDWP, Honeywell shall have on-site a full-time representative who is qualified to supervise the work done.

**Remedial Design Contents**

28. In accordance with the schedule for RD submissions contained in the approved RDWP, Honeywell shall prepare and submit to the State for review and approval remedial design

8

document(s) for the implementation of the remedy that was selected by DEC and EPA in the ROD for the Site, in accordance with this Consent Decree and the attached SOW. The RD shall be prepared by and have the signature and seal of a professional engineer who shall certify that the RD was prepared in accordance with this Consent Decree. The RD may consist of a series of documents in accordance with the approved RDWP, in which case each design document shall be so certified.

29. The RD shall include the following:

A. A detailed description of the remedial goals for the Site, as set forth in the ROD;

B. A detailed description of each element of the remedy and the means by which each element will be implemented to achieve the remedial goals for the Site, including, but not limited to:

i. A summary of findings concerning each pre-design project identified and completed pursuant to the RDWP of this Consent Decree. Each such summary of findings shall:

a. include all data generated and all other information obtained during the performance of the RDWP activities;

b. identify any additional data that must be collected in order to design the relevant aspect of the remedy pursuant to the ROD and this Consent Decree;

c. include a certification by the individual or firm with primary responsibility for the day-to-day performance of the

9

RDWP that all activities that comprised the RDWP were performed in full accordance with the State-approved RDWP; and

d. include a reference to the geographic location of the sample point for all sample data supplied. Such location information must be referenced to either the New York Transverse Mercator or New York State Plane Coordinate System. All vertical data shall be referenced to the National Geodetic Vertical Datum, 1929 adjustment;

ii. The construction and operation of any structures;

iii. The containment, collection, destruction, treatment, and/or disposal of hazardous substances and wastes, their constituents, and any related degradation products, and of any soil, sediments or other materials contaminated thereby;

iv. The containment, collection, destruction, treatment, and/or disposal of contaminated water, dredge effluent, porewater, groundwater, leachate, and air;

v. The quality control and quality assurance procedures and protocols to be applied during implementation of the RD; and

vi. Monitoring which integrates needs that are present on-site and off-site during and subsequent to the implementation of the selected remedial alternative;

C. "Biddable Quality" documents for the RD including, but not limited to,

10

documents and specifications prepared, signed, and sealed by a professional engineer. These plans shall be consistent with all applicable local, state and federal laws, rules and regulations;

      **D.**  A detailed time schedule to implement the RD;

      **E.**  The parameters, conditions, procedures, and protocols to determine the effectiveness of the RD, including a schedule for periodic sampling of all relevant environmental media, on-site and off-site;

      **F.**  A description of operation, maintenance, and monitoring ("OM&M") activities to be undertaken at and in the vicinity of the Site, which details the operation and maintenance procedures to be employed during system startup as well as on a long-term basis, and which describes the long-term OM&M strategy and schedule;

      **G.**  A contingency plan to be implemented if any element of the RD, when implemented, fails to achieve any of its objectives or otherwise fails to protect human health or the environment, to ensure that such objectives and protections are achieved ("Remedial Program Contingency Plans"); and

      **H.**  A citizen participation plan which incorporates appropriate activities outlined in the DEC's publication, *Citizen Participation in New York's Hazardous Waste Site Remediation Program -- A Guidebook*, dated June, 1998, and any subsequent revisions thereto, and 6 NYCRR Part 375.

**Remedial Action ("Construction") and Reporting**

      **30.**  Honeywell shall commence construction of the State-approved RD in accordance with the schedule set forth therein.

      **31.**  Honeywell shall implement remedial construction activities ("Remedial Action" or

"Remedial Construction") in accordance with the approved RD.

32. During implementation of all Remedial Construction activities, Honeywell shall have available a full-time representative who is qualified to supervise the work done. A representative shall be physically on-site during normal business hours and otherwise shall be easily accessible by telephone.

33. Upon completion of Remedial Construction or any State-approved module, Honeywell shall accompany State personnel or their representatives on a pre-final inspection to ensure compliance with the ROD and approved RD. Following the pre-final inspection, the State will, in writing, either specify the corrective measures necessary to comply with the approved RD, as appropriate, or will determine that construction is complete. If the State requires corrective measures, Honeywell shall undertake the corrective measures according to a schedule approved by the State, subject to the dispute resolution provisions of this Consent Decree.

34. Within 90 days after the State determines in writing that the Remedial Construction for the Site, or any approved module thereof, is complete, Honeywell shall submit to the State "as-built" drawings and a final engineering report (each including any changes made to the RD during construction), and a certification by a professional engineer that the RD was implemented and all construction activities were completed in accordance with the State-approved RD. The "as built" drawings, final engineering report, and certification shall be hereinafter referred to as the Remedial Construction Certification Report. The Remedial Construction Certification Report(s) shall be prepared, signed, and sealed by a professional engineer and shall fulfill the requirements of a Remedial Action Report in accordance with *Closeout Procedures for National Priority List Sites*, EPA 540-R-98-016, OSWER Directive 9320.2-09A-P, January 2000 and any

12

revisions thereto. After receipt of the Remedial Construction Certification Report(s), the State

will notify Honeywell in writing whether all related construction activities have been completed

in compliance with the approved RD.

35. In accordance with the schedule submitted in the State-approved RD, Honeywell

shall submit a detailed post-remedial OM&M plan to the State for review and approval. The

OM&M Plan shall conform with EPA guidelines contained in *Considerations for Preparation of*

*Operation and Maintenance Manuals*, EPA 68-01-0341 and any revisions thereto. Upon the

State's approval of the OM&M Plan, Honeywell shall implement the approved OM&M Plan in

accordance with its requirements.

**Modification of the Remedial Program**

36.    The State may in writing request Honeywell to modify any element of the

Remedial Program, including any submittal, and to perform any corresponding additional work if

the State determines, as a result of reviewing data generated by an activity required under this

Consent Decree or as a result of reviewing any other data or facts, that such modification is

necessary in order to implement the remedy or meet the goals established in the ROD.

Honeywell shall be obligated to take such action as the State determines necessary pursuant to

this paragraph, subject to the dispute resolution provisions of paragraphs 44-52, and provided

that the State's requirements are consistent with the scope of the remedy selected in the ROD, do

not materially expand the scope of the remedy selected in the ROD, and are consistent with the

SOW. For purposes of this paragraph, the term "materially expand" shall mean a modification

that results in: (1) a fundamentally new technical approach to the remedy; or (2) the addition of a

significant component to the scope of the remedy. A modification which Honeywell is obligated

13

to implement pursuant to this paragraph is hereinafter referred to as an "Included Modification." Included Modification shall also include within its meaning any modification that the parties have agreed to in writing. Nothing in this Consent Decree shall affect the State's right, in conjunction with EPA, to modify or amend the ROD. However, references to the ROD in this Consent Decree are to the ROD adopted by the State and EPA in July 2005 as modified by the December 14, 2006 ESD.

37.     In the event that the State requires a modification pursuant to paragraph 36 and Honeywell believes that the proposed modification is not an Included Modification, then Honeywell may invoke the Dispute Resolution procedures set forth in paragraphs 44-52. If the modification is determined either by agreement in writing of the parties or pursuant to the Dispute Resolution procedures set forth in paragraphs 44-52 not to be an Included Modification, then, as regards such modification, the parties reserve all claims, rights and defenses as provided in paragraph 78.

**Progress Reports**

38. Honeywell shall submit to the State (see paragraphs 81-83 for recipients and number of copies to be distributed) written monthly progress reports that:

A. Describe the actions which have been taken toward achieving compliance with this Consent Decree during the previous month;

B. Include the raw data received by Honeywell during the previous month concerning sampling undertaken and test results generated pursuant to this Consent Decree, and all other raw data and/or validated data received or generated by Honeywell or Honeywell's contractors, laboratories or other agents during the previous month, including quality

14

assurance/quality control information that has become available during the previous month, whether conducted pursuant to this Consent Decree or conducted independently by Honeywell;

**C.** Identify all work plans, reports, and other deliverables required by this Consent Decree that were completed and submitted during the previous month;

**D.** Describe all actions, including, but not limited to, data collection and implementation of work plans, that are scheduled for the next month and provide other information relating to the progress at the Site;

**E.** Include information regarding percentage of completion, unresolved delays encountered or anticipated that may affect the future schedule for implementation of the Honeywell's obligations under the Consent Decree, and efforts made to mitigate those delays or anticipated delays;

**F.** Include any modifications to any work plans that Honeywell has proposed to the State or that the State has approved; and

**G.** Describe all activities undertaken in support of the Citizen Participation Plan during the previous month and those to be undertaken in the next month.

**H.** Honeywell shall submit these progress reports to the State by the tenth day of every month following the effective date of this Consent Decree; provided, however, that the State may allow a reduced schedule (such as quarterly) after completion of remedial construction.

39. Honeywell shall allow State and EPA representatives to attend, and shall provide the State at least 14 days advance written notice of the following: pre-bid meetings; pre-construction meetings; job progress meetings; substantial completion meeting(s); substantial completion inspection(s); final inspection and meeting(s); and OM&M meetings.

15

**Review of Submittals**

40. The State will review each of the submittals Honeywell makes pursuant to this Consent Decree to determine whether it was prepared, and whether the work done to generate the data and other information in the submittal was done, in accordance with this Consent Decree and generally accepted technical and scientific principles. The State shall notify Honeywell in writing of its approval or disapproval of each submittal, except for the Health and Safety Plan submittals discussed in paragraph 24.E. All State-approved submittals shall be incorporated into and become an enforceable part of this Consent Decree.

41. Because the Site has been designated as a subsite of the Onondaga Lake NPL site, the State shall provide EPA with a reasonable opportunity for review and shall seek EPA's written comments on all submittals required under this Consent Decree.

42. If the State disapproves a submittal, it shall so notify Honeywell in writing and shall specify the reasons for its disapproval. Within 60 days after receiving written notice that Honeywell's submittal has been disapproved, Honeywell shall make a revised submittal to the State that addresses and resolves all of the State's stated reasons for disapproving the first submittal; provided, however, that this time frame may be extended by the State if the parties agree that additional time is necessary and appropriate in order to resolve any issues related to the submittal. All remedial design submissions by Honeywell, including revised submittals, shall be consistent with this Consent Decree, including the appendices thereto including the SOW.

43. After receipt of the revised submittal, the State shall notify Honeywell in writing of its approval or disapproval. If the State approves the revised submittal, it shall be incorporated into and become an enforceable part of this Consent Decree. If the State disapproves the revised

16

submittal, unless Honeywell invokes Dispute Resolution as provided in paragraph 44, Honeywell

shall be in violation of this Consent Decree and the State may take any action or pursue whatever

rights it has pursuant to this Consent Decree; provided, however, that the State may allow

Honeywell to submit an additional revised document if the State determines that an additional

submission by Honeywell will likely resolve its concerns.

### DISPUTE RESOLUTION

**44.** The State's disapproval of a submittal or a final revised submittal under paragraphs

40, 42- 43, and determinations made by the State under paragraphs 33 (completion of

construction and corrective measures), 34 ( construction complete certification), 35 (OM&M

Plan), 36-37 (Remedial Program modifications), 43 (modification, amplification and expansion

of a submittal and performance of corresponding additional work), 54 (takeover), 57 (force

majeure), 59 (upland sources) and 69, 71-73 (financial assurance) of this Consent Decree are

subject to dispute resolution pursuant to this paragraph, provided that (i) within 10 business days

of receipt of the State's notice of disapproval of a submittal or a revised submittal or notice of an

above-listed determination, Honeywell requests in writing that the matter in dispute be resolved

by the DEC's Deputy Commissioner for Air/Waste Management ("Deputy Commissioner") and,

(ii) within 30 business days of receipt of the State's notice of disapproval of a submittal or a

revised submittal or notice of an above-listed determination, Honeywell submits a written

statement of the issues in dispute, which shall include the facts upon which the dispute is based,

the factual data, analysis or opinion supporting Honeywell's position, and all supporting

documentation on which it relies, including, if applicable, affidavits and/or declarations

(hereinafter, "Statement of Position"). The State shall serve its Statement of Position, and all

17

supporting documentation, including, if applicable, affidavits and/or declarations no later than 30 business days after receipt of Honeywell's Statement of Position. Honeywell shall have 10 business days after receipt of the State's Statement of Position within which to serve a reply to the State's Statement of Position, and in the event Honeywell serves such a reply, the State shall have 10 business days after receipt of Honeywell's reply within which to serve the State's sur-reply. In the event that Honeywell does not timely comply with the requirements of this paragraph, then the State's disapproval or determination at issue shall be deemed final and binding on Honeywell. The time periods for the exchange of Statements of Position and replies may be modified upon agreement in writing of the parties. An administrative record of any dispute under this paragraph shall be maintained by the State. The record shall include the Statement of Position served by each party and any relevant information submitted by a party to the dispute. The record shall be available for review by Honeywell and the public, consistent with the Freedom of Information Law (New York Public Officers Law Article 6).

45. Upon review of the administrative record as developed pursuant to paragraph 44, the Deputy Commissioner shall issue a final decision resolving the dispute.

46. If the subject of the dispute was a written submittal, except as provided in paragraph 51, Honeywell shall submit a revised submittal in accordance with the Deputy Commissioner's decision within 15 business days of such decision, unless the decision provides for a longer period.

47. After receipt of the revised submittal, the State shall notify Honeywell in writing of its approval or disapproval of the revised submittal.

48. If the revised submittal fails to comply with the Deputy Commissioner's decision, and

18

the State disapproves the revised submittal for this reason, Honeywell shall be in violation of this Consent Decree.

**49.** If the subject of the dispute is a determination made by the State, except as provided in paragraph 51, and Honeywell fails to abide by the final decision of the Deputy Commissioner within 15 business days of such decision or such longer period as the Deputy Commissioner may prescribe in the final decision, Honeywell shall be in violation of this Consent Decree.

**50.** The invocation of formal dispute resolution procedures under paragraph 44 shall not stay or excuse the performance of work required pursuant to the disputed State determination, or the transmission of a revised submittal required by the disputed State disapproval, except by written agreement of the State or by the Deputy Commissioner upon written application from Honeywell. Honeywell shall have the burden of establishing the necessity and appropriateness of such a stay or excuse based on the likelihood of success on the merits with respect to the matter in dispute and a balancing of the equities. The Deputy Commissioner's decision to not grant an extension is subject to judicial review pursuant to paragraph 51.

**51.** The decision of the Deputy Commissioner shall be final and binding upon Honeywell unless within 30 days of receipt of the Deputy Commissioner's decision, Honeywell petitions this Court for review by motion filed pursuant to the Federal Rules of Civil Procedure and the rules of this Court. The filing of a motion by Honeywell pursuant to this paragraph shall not stay or excuse the performance of work or the transmission of submittals required by the Deputy Commissioner's decision with respect to the disputed matter, except by written agreement of the State or by order of the Court upon Honeywell's application. Honeywell shall have the burden of establishing, before the Court, the necessity and appropriateness of such a stay or excuse based

19

on the likelihood of success on the merits with respect to the matter in dispute and a balancing of the equities.

**52.** In the event that Honeywell invokes the dispute resolution provisions of paragraph 51, the State's position shall not be set aside or revised by the Court unless Honeywell proves that the State's position is arbitrary, capricious or not in accordance with law.

## VIOLATIONS OF THE CONSENT DECREE

**53.** In the event that Honeywell violates any provision of this Consent Decree, in addition to the payment of stipulated penalties as provided in paragraphs 55-56, the State may also seek an enforcement order from this Court to compel Honeywell to comply with its obligations.

**54.** In addition to the provisions in paragraph 53, in the event the State determines Honeywell has failed to perform any substantial portion of its obligations pursuant to this Consent Decree, the State retains its rights under CERCLA, 42 U.S.C. § 9614(a) and the ECL § 27-1313(5)(a) to conduct the complete RD/RA program at the Onondaga Lake Bottom subsite and Honeywell shall be liable to the State for all costs incurred or to be incurred by the State including any costs previously incurred by the State while overseeing Honeywell's RD/RA efforts. The State will provide Honeywell 60 days written notice, where reasonable under the circumstances, of its intent to conduct the RD/RA program. If the State conducts such work, Honeywell shall preserve any records pertaining to site work and/or RD/RA work already conducted. Honeywell may invoke the Dispute Resolution procedures set forth in paragraphs 44-52 to dispute DEC's determination that takeover of the RD/RA program is warranted under this paragraph.

<div align="center">20</div>

**Stipulated Penalties**

55. Honeywell's failure to comply with any term of this Consent Decree that is not otherwise subject to dispute resolution under paragraph 44 of this Consent Decree, or Honeywell's failure to comply with any provision of this Consent Decree that is subject to dispute resolution, but as to which Honeywell has not timely invoked dispute resolution or has failed to abide by the final decision of the Deputy Commissioner or an order of the Court concerning a submittal or a determination, shall constitute a violation of this Consent Decree. Notwithstanding the preceding sentence, any failure of any element of the Remedial Program shall not constitute a violation of this Consent Decree to the extent that Honeywell is complying with the Remedial Action Contingency Plan and any modification required by the State pursuant to paragraph 36, provided that such modification is an Included Modification within the meaning of that term as set forth in paragraph 36.

56. Unless Honeywell has invoked dispute resolution pursuant to paragraph 44, Honeywell shall be liable for payment to the State of the sums set forth below as stipulated penalties for each day or part thereof that Honeywell is in violation of any term of this Consent Decree. For each violation, penalties begin to accrue on the first day Honeywell is in violation of the terms of this Consent Decree and continue to accrue through the final day of correction of such violation. Violations which are determined on a rolling four-week average basis shall constitute a violation on each day of such four week period provided, however, that no penalty shall be assessed for any day for which a penalty has already been assessed as part of a prior four week period. Such sums shall be due and payable within 15 days after receipt of notification from the State assessing the penalties. If such payment is not received within 15 days after

21

Honeywell receives such notification from the State, interest shall be payable at the annual rate of 9% on the overdue amount from the day on which it was due through, and including, date of payment. Penalties shall be paid by certified check or money order, made payable to the "New York State Department of Environmental Conservation" and shall be delivered personally or by certified mail, return receipt requested, to the Director, Division of Environmental Enforcement, NYSDEC, 625 Broadway, Albany, New York 12233-5500 with a copy to the Attorney of Record at the Office of the Attorney General, Environmental Protection Bureau, 120 Broadway, New York, NY, 10271. Payment of the penalties shall not in any way alter Honeywell's obligation to complete performance under the terms of this Consent Decree. Stipulated penalties shall be due and payable under this paragraph pursuant to the following schedule:

| Period of Non-Compliance | Penalty Per Day |
| --- | --- |
| First through 15th day | $ 1,000 |
| 16th through 30th day | $ 5,000 |
| 31st day and thereafter | $ 10,000 |

**Force Majeure**

57. Except as otherwise provided, Honeywell's failure to comply with any term of this Consent Decree constitutes a violation of this Consent Decree. Notwithstanding the foregoing, Honeywell shall not suffer any penalty if it cannot comply with any requirement hereof because of an act of God, war, riot, or an event (including prohibitively severe or extraordinary weather conditions which materially interfere with implementation of the Remedial Program) beyond the control of Honeywell or its agents in carrying out Honeywell's obligations under this Consent Decree which cannot be overcome by their due diligence ("Force Majeure Event"). A Force

22

Majeure Event specifically excludes a lack of sufficient financial resources. In the event of a

Force Majeure, Honeywell shall be obligated to perform the affected activities within a time

period which shall not exceed the time period of the delay reasonably attributed to the Force

Majeure. In the event of a dispute, Honeywell shall bear the burden of proving that any delay

results from circumstances which constitute a Force Majeure, that the delay could not have been

overcome by due diligence, and that the proposed length of the delay is reasonably attributed to

the Force Majeure.

**58.** Honeywell shall notify the State in writing within five days of when it obtains

knowledge of any condition which may delay performance of its obligations under this Consent

Decree. Honeywell shall include in such notice the measures taken and to be taken by

Honeywell to prevent or minimize any delays and shall request an appropriate extension or

modification of this Consent Decree. Failure to give such notice within such five-day period

constitutes a waiver of any claim that a delay is attributable to a Force Majeure event.

**Upland Sources**

**59.** Honeywell's failure to achieve a Remedial Action Objective ("RAO") or, if

applicable, Preliminary Remediation Goal ("PRG") set forth in the ROD in any area of the Lake

shall not constitute a violation of this Consent Decree provided that Honeywell demonstrates that

the failure is caused solely by hazardous substance(s) that migrated into Onondaga Lake from an

upland source ("upland hazardous substance") after the State approved the Remedial Action

portion of the Remedial Program for that area of the Lake. As used in this paragraph, the term

"caused solely" shall mean that Honeywell would have achieved the RAO(s) or PRG(s) in the

area of the Lake in issue but for the presence of the upland hazardous substance(s) in that area;

and the term "upland source" shall mean a source of hazardous substances which is outside the

boundaries of Onondaga Lake, *e.g.*, upstream from the mouth of Ley Creek, that is not owned or

controlled by Honeywell and where hazardous substances generated by Honeywell were not

disposed. Any dispute arising under this paragraph shall be subject to the dispute resolution

provisions in paragraphs 44-52.

## ENTRY UPON SITE

60. Honeywell hereby consents to the entry at all reasonable times upon the Site or areas

in the vicinity of the Site which may be under the control of Honeywell, upon notice which is

reasonable under the circumstances, presented by any duly designated employee, consultant,

contractor, or agent of the State or EPA for purposes of oversight, including but not limited to

inspection, sampling, and testing activities and otherwise ensuring Honeywell's compliance with

this Consent Decree. Honeywell shall provide the State with suitable office space at the Site,

including a telephone and high-speed internet cable access, and shall permit the State full access

to all Site-related data including Site-related data contained in privileged records and non-

privileged records relating to matters addressed by this Consent Decree, and job meetings.

## PAYMENT OF COSTS INCURRED BY THE STATE

61. Honeywell shall reimburse the State for all response costs incurred by the State

related to the Site within 30 days of receipt of an invoice itemizing such costs. Such costs shall

include response costs incurred by the State prior to the entry of this Consent Decree that have

not been reimbursed by Honeywell, including without limitation, costs incurred by the State

related to the remedial investigation/feasibility study ("RI/FS") for the Site, as well as costs to be

incurred subsequent to the entry of this Consent Decree.

24

**62.** Honeywell shall reimburse the State in accordance with itemized invoices for all response costs incurred by the State, including, but not limited to, direct labor, fringe benefits, indirect costs, travel, analytical costs, and contractor costs incurred by the State for work related to the Site, including, without limitation, all costs related to reviewing and revising submittals made pursuant to this Consent Decree, overseeing activities conducted pursuant to this Consent Decree, collecting and analyzing samples, enforcement and dispute resolution (including attorney's time), and administrative costs associated with this Consent Decree. The State's response costs do not include response costs incurred by EPA in overseeing response actions with respect to the Site.

**63.** Personal service costs shall be documented by reports of Direct Personal Service, which shall identify the employee name, title, bi-weekly salary, and time spent (in hours) on the project during the billing period, as identified by an assigned time and activity code. Approved agency fringe benefit and indirect cost rates shall be applied. Non-personal service costs shall be summarized by category of expense (*e.g.*, supplies, materials, travel, contractual) and shall be documented by expenditure reports.

**64.** Invoices shall be sent to Honeywell at the following address:

> Honeywell International Inc.
> 5000 Brittonfield Parkway, Suite 700
> East Syracuse, NY 13057
> Attn: John P. McAuliffe

**65.** Payments to the State shall be made by certified check payable to the "New York State Department of Environmental Conservation" and shall be sent to:

> Bureau of Program Management

25

Attn: Bureau Director
Division of Environmental Remediation
New York State DEC of Environmental Conservation
625 Broadway, 12th Floor
Albany, NY 12233-7016

A copy of all correspondence including any certified checks shall be sent to:

Norman Spiegel
Andrew J. Gershon
Assistant Attorneys General
Environmental Protection Bureau
120 Broadway
New York, NY 10271-0332

66. Each party shall notify the other in writing within 90 days of any change in the foregoing addresses.

67. Honeywell may contest, in writing, invoiced costs if it believes (i) the cost documentation contains clerical, mathematical, or accounting errors; (ii) the costs are not related to the State's activities with respect to the Remedial Program for the Site; or (iii) the State is not entitled to recover such costs from Honeywell under the ECL, the New York State Finance Law, CERCLA, the Cooperative Agreement or any other statutory, regulatory or common law provision. If Honeywell objects to an invoiced cost, Honeywell shall pay all costs not objected to within the time frame set forth above, and shall, within 30 days after its receipt of an invoice, identify in writing all costs objected to and state the basis of the objection. The objection shall be submitted to the Director of the Bureau of Program Management of the Division of Environmental Remediation ("BPM Director"). The BPM Director or the BPM Director's designee shall have the authority to relieve Honeywell of the obligation to pay invalid costs. The State's determination resolving the objection shall be final and binding upon Honeywell and

26

Honeywell shall pay the amount which the BPM Director or the BPM Director's designee

determines Honeywell is obligated to pay within 45 days of Honeywell's receipt of the State's

determination unless Honeywell petitions this Court for review within the above-described

45-day period. The State's determination shall not be set aside or revised by the Court unless

Honeywell proves that the State's position is arbitrary, capricious or not in accordance with law.

### FINANCIAL ASSURANCE

**68.** Based upon financial representations and assurances made by Honeywell to the State,

the State has no reason to believe that Honeywell presently does not have the financial ability to

complete the Remedial Program. On the first anniversary of the entry of this Consent Decree,

Honeywell shall demonstrate its financial ability to complete the Remedial Program, by

submitting to the State a copy of Honeywell's most recent Annual Report. Each year thereafter,

until the termination of the Consent Decree as provided in paragraph 106, Honeywell shall

submit its most recent Annual Report to the State within 30 days of publication of such report.

**69.** In the event that the State determines that the financial representations and assurances

provided by the Annual Report and/or other information available to the State do not demonstrate

Honeywell's ability to complete the Remedial Program, then Honeywell shall establish and

maintain financial security in the amount then needed to complete the Remedial Program, in one

or more of the following forms:

**A.** A surety bond guaranteeing performance of RD/Remedial Construction and

post-implementation OM&M;

**B.** One or more irrevocable letters of credit, payable to or at the direction of the

State, equaling the total estimated cost of the RD/Remedial Construction and OM&M;

27

**C.** A trust fund established for the benefit of the State;

**D.** A guarantee to perform the RD/Remedial Construction and OM&M by one or more parent corporations or subsidiaries, or by one or more unrelated corporations that have a substantial business relationship with Honeywell;

**E.** A policy of insurance that provides the State with acceptable rights as a beneficiary thereof and that is issued by an insurance carrier whose operations are subject to regulation and examination by a State agency; or

**F.** A demonstration that Honeywell satisfies the requirements of 40 CFR § 264.143(f).

70. Honeywell may invoke the dispute resolution procedures in paragraphs 44-52, to dispute a State determination under paragraph 69 that Honeywell's Annual Report or other information available to the State does not demonstrate the company's financial ability to complete the Remedial Program.

71. If Honeywell seeks to demonstrate the ability to complete the work through a guarantee by a third party pursuant to subparagraph 69.D. of this Consent Decree, Honeywell shall demonstrate that the guarantor satisfies the requirements of 40 C.F.R. Part 264.143(f). If Honeywell seeks to demonstrate its ability to complete the work by means of the financial test or the corporate guarantee pursuant to subparagraph 69.D. or 69.E., it shall resubmit sworn statements conveying the information required by 40 C.F.R. Part 264.143(f) annually, on the anniversary of the entry date of this Consent Decree. In the event that the State determines at any time that the financial assurances provided pursuant to this section are inadequate, Honeywell shall, within 30 days of receipt of notice of the State's determination, obtain and present to the

State for approval one of the other forms of financial assurance listed in paragraph 69 of this

Consent Decree. Honeywell may invoke the dispute resolution procedures in paragraphs 44 - 52,

to dispute a State determination under this paragraph that Honeywell's financial assurances

provided pursuant to this Section are inadequate. Honeywell's inability to demonstrate financial

ability to complete the RD/Remedial Construction and post-implementation OM&M shall not

excuse performance of any activities required under this Consent Decree.

72. In the event that Honeywell demonstrates that the estimated cost to complete the

remaining RD/Remedial Construction and post-implementation OM&M has diminished below

the amounts that may be established pursuant to paragraph 69 above (if applicable), Honeywell

may, with State approval, on any anniversary date of entry of this Consent Decree, or at any other

time agreed to by the State, reduce the amount of the financial security provided under this

Consent Decree to the estimated cost of the remaining RD/Remedial Construction and post-

implementation OM&M to be performed. Honeywell shall submit a proposal for such reduction

to the State in accordance with the requirements of this Consent Decree, and may reduce the

amount of the security upon the State's written approval. In the event that Honeywell disputes

the State's determination and invokes the dispute resolution provisions of paragraphs 44-52, then

Honeywell shall maintain the amount of financial security as provided in the final administrative

or judicial decision resolving the dispute.

73. Honeywell may change the form of the financial assurance provided herein at any

time, with the written approval of the State, provided that the new form of assurance meets the

requirements of this Consent Decree. In the event of a dispute, Honeywell may change the form

of the financial assurance only in accordance with the final administrative or judicial decision

resolving the dispute pursuant to paragraphs 44-52.

## RESERVATIONS OF RIGHTS

74. This Consent Decree resolves only the State's claims against Honeywell for the

"Matters Addressed" by this Consent Decree as defined in paragraph 90, below. All other claims

raised in this action including without limitation the State's claims for natural resource damages

pursuant to CERCLA, 42 U.S.C. § 9607(a)(4)(C), for restitution and damages for the loss of or

injury to the State's natural resources pursuant to the State's common law of public nuisance, for

the remediation of other sites and subsites, and for the reimbursement of all response costs

incurred or to be incurred by the State with respect to activities, not addressed by this Decree,

conducted or to be conducted at, or concerning, the Onondaga Lake NPL site, and any defenses

that Honeywell may have thereto, are reserved for later resolution in this action.

75. Nothing in this Consent Decree or the ROD including, without limitation, provisions

for the design and implementation of habitat reestablishment or habitat enhancement projects,

shall be construed as barring, adjudicating, or in any way resolving any claim, cause of action, or

right that the State may have under CERCLA or the State's common law arising from injuries to

or loss of natural resources. In the event that Honeywell asserts any defense to, or entitlement to

an offset or other credit against, any such claim, cause of action, or right based upon the

provisions of this Consent Decree or the ROD or upon work performed pursuant to such

provisions, then, with respect to such defense or claim of entitlement, the provisions of the

Consent Decree and ROD and the fact that the work was performed pursuant to such provisions

shall not create any presumptions including any presumption that the work constitutes or does

not constitute: (a) a restoration of natural resources that may be damaged or destroyed at the Site;

30

(b) an enhancement of natural resources at the Site; or (c) mitigation for the loss of natural resources caused by the implementation of the remedy selected in the ROD.

76.  Nothing contained in this Consent Decree shall be construed as barring, adjudicating, or in any way resolving any other claim, cause of action, right or defense that the parties may have under state or federal law as against each other or as against any third party, including, but not limited to: (a) the State's right to bring criminal charges against any person or entity, and (b) the State's right to gather information and enter and inspect property and premises.  Nothing contained in this Consent Decree shall be construed as an intention to resolve any claims of the United States.

77.  Honeywell is entering into this Consent Decree as a compromise of disputed claims and in doing so Honeywell does not admit, accept, or intend to acknowledge any liability, wrongdoing or fault.

78.  The State reserves all claims and rights to institute proceedings in this action, or in a new action filed under federal or state law, or to issue an Administrative Order pursuant to state law, *e.g.*, ECL § 27-1301 *et seq.*, seeking to compel Honeywell to implement a modification to the Remedial Program which is not an Included Modification within the meaning of paragraph 36 and/or to reimburse the State for additional response costs incurred by the State in implementing such modifications.  Honeywell reserves all defenses to such claims.

79.  The State reserves all powers and rights it may have against Honeywell or any other person or entity to protect public health and the environment from an imminent hazard, nor shall this Consent Decree be construed so as to prohibit the commissioners of Environmental Conservation and Health and their duly authorized representatives from exercising any summary

31

abatement powers against Honeywell or any other person or entity, either at common law or as granted by statute or from requiring Honeywell or other person or entity to take further response actions at the Site upon a determination by one of said commissioners or their duly authorized representatives that the Remedial Program is not protective of human health and the environment. Honeywell reserves all defenses to any such efforts by the State and this Consent Decree shall not be construed to require Honeywell to perform any action in response to such a proceeding instituted by the State.

## INDEMNIFICATION

**80.** Honeywell shall indemnify and hold the State and its representatives and employees harmless for all claims, suits, actions, damages, and costs of every name and description arising out of or resulting from the fulfillment or attempted fulfillment of this Consent Decree by Honeywell and/or any of Honeywell's directors, officers, employees, servants, contractors, agents, successors, and assigns, provided, however, that Honeywell shall not be required to indemnify and hold the State, its representatives, and employees harmless regarding any liability arising as a result of the gross negligence or recklessness, wanton or intentional misconduct or any criminal act by the State and its representatives and employees during the course of any activities conducted pursuant to this Consent Decree.

## COMMUNICATIONS

**81.** All written communications required by this Consent Decree shall be transmitted by United States Postal Service or by private courier service, or shall be hand delivered.

**82.** Written communication from Honeywell including progress reports, communications containing or pertaining to data, engineering or technical reports or other engineering or technical

32

deliverables or pertaining to field work shall be sent as follows:

<div style="margin-left: 2em">

Seven copies to:  Mr. Timothy Larson, Project Manager
Division of Environmental Remediation
New York State Department of Environmental Conservation
625 Broadway, 12th Floor
Albany, New York 12233-7016

</div>

Of the seven copies one shall be an unbound hard copy with associated figures, and one shall be an electronic copy on compact disk(s) or DVD(s) and five shall be bound hard copies. The electronic copy shall contain all text, tables, figures and appendices both in the Honeywell's original format and in Portable Document Format (PDF). In the event a DEC-approved RDWP or RD developed pursuant to this Consent Decree allows for the use of computer software that is not in the possession of the State, two such original software packages shall be provided by Honeywell upon request by the State.

All analytical data shall be provided in both a hard copy format, as specified in the DEC-approved Sampling and Analysis Plan, as well as an electronic format. The electronic format shall be consistent with the latest version of the DEC's Electronic Data Deliverable ("EDD") format.

Five bound copies and one electronic copy (PDF) shall be sent to:

<div style="margin-left: 4em">

Mr. Robert Nunes, Project Manager
United States Environmental Protection Agency
Region II
290 Broadway, 20th Floor
New York, NY 10007-1866

</div>

Two bound copies and two electronic copies (original format and PDF) to each of the following:

Mr. Michael Spera
Earth Tech Inc.
1 World Financial Center
200 Liberty Street, 25th Floor
New York, NY 10281

Mr. Robert Montione
Earth Tech Inc.
40 British American Boulevard
Latham, NY 12110

One bound copy and one electronic copy (PDF) to:

Ms. Henriette M. Hamel
New York State Department of Health
217 South Salina Street, 3rd Floor
Syracuse, NY 13202

Mr. James Burke, Regional Hazardous Waste Engineer
New York State Department of Environmental Conservation
Region 7
615 Eric Blvd. West
Syracuse, NY 13204-2400

One bound copy to:    Mr. Kenneth Lynch, Regional Director
New York State Department of Environmental Conservation
Region 7
615 Eric Blvd. West
Syracuse, NY 13204-2400

Copy of cover letters only to:

Norman Spiegel
Assistant Attorney General
Environmental Protection Bureau
120 Broadway
New York, NY 10271-0332

Andrew J. Gershon
Assistant Attorney General
Environmental Protection Bureau
120 Broadway
New York, NY 10271-0332

34

Carol Conyers, Esq.
New York State Dept. of Environmental Conservation
625 Broadway, 14th Floor
Albany, NY 12233-5500

George A. Shanahan, Assistant Regional Counsel
United States Environmental Protection Agency
Region II
290 Broadway, 17th Floor
New York, NY 10007-1866

**83.** While an electronic copy of all correspondence is to be provided to Mr. Larson at the above address, unless otherwise directed in this Consent Decree, only one copy of written communications from Honeywell is to be sent to the individuals listed above in paragraph 82 where such communications do not enclose or pertain to data, technical or engineering reports or deliverables and/or do not pertain to field work.

**84.** Honeywell shall transmit each document that is subject to State approval, within 14 days of its final approval, to the six public repositories and the representative of the Onondaga Nation listed below. Each approved document, delivered to the public repositories, shall contain the State's approval letter relating to the respective document.

NYSDEC, Region 7
Attn: James Burke, P.E.,
Regional Hazardous Waste Remediation Engineer
615 Erie Blvd. West
Syracuse, NY 13204
(315) 426-7551

Onondaga County Public Library
Syracuse Branch at the Galleries
Attn: Jean Palmer, Head of Local History Department
447 South Salina St.
Syracuse, NY 13204
(315) 435-1840

35

Atlantic States Legal Foundation
Attn: Samuel Sage, Director
658 West Onondaga St.
Syracuse, NY 13204
(315) 475-1170

Liverpool Public Library
Attn: Judy Rossoff, Coordinator of Local History
310 Tulip Street
Liverpool, NY 13088
(315) 457-0310

Camillus Town Hall
Attn: Town Supervisor
4600 West Genesee Street, Room 100
Syracuse, NY 13219
(315) 488-1335

Moon Library
SUNY ESF
Attn: Director
1 Forestry Drive
Syracuse, NY 13210
(315) 470-6712

Joseph Heath, Esq.
716 East Washington Street, Suite 104
Syracuse, NY 13210-1502
(315) 475-2559

85. Communication to be made from the State to Honeywell shall be sent to:

Thomas Milch, Esq.
Arnold & Porter, LLP
555 Twelfth Street, NW
Washington, DC 20004-1202

Honeywell International Inc.
5000 Brittonfield Parkway, Suite 700
East Syracuse, NY 13057
Attn:  Mr. John P. McAuliffe, Project Manager

86. The State and Honeywell reserve the right to designate additional or different

36

addressees for communication upon providing written notice to the other.

## ENVIRONMENTAL EASEMENTS

**87.** Because the ROD for the Site relies upon one or more institutional and/or engineering controls, Honeywell shall execute one or more environmental easements for those portions of the Site which Honeywell owns pursuant to the requirements and processes set forth in ECL Article 71, Title 36, which easement(s) shall be substantially similar in format to Appendix D. Honeywell shall execute one or more appropriate environmental easements within 45 days of Honeywell's receipt of a notification from the State under paragraph 34 herein that all Remedial Construction for the Site or for any State-approved module thereof has been completed in compliance with the approved RD, or no fewer than 45 days before Honeywell may convey any portion of the Site which it currently owns. Honeywell shall then cause such instrument(s) to be recorded with the recording officer of the county(ies) wherein the Site is located within 30 days of the State's approval of such instrument. Honeywell shall provide the State with a copy of such instrument(s) certified by the recording officer to be a true and faithful copy(ies) within 60 days after such recording. Concerning those portions of the Site that are not owned by Honeywell and whereon institutional and/or engineering controls are relied upon, Honeywell shall obtain one or more appropriate Environmental Easement(s) from all such owners within the 45-day time frame specified above, whether through purchase or otherwise, in accordance with law. All such environmental easement(s) addressed in this paragraph shall run with the land; grant access for the purposes set forth in paragraph 60, above; and grant the State the right to enforce any use restrictions on subject properties necessary to implement, ensure non-interference with, or ensure the protectiveness of remedial measures to be performed pursuant to this Consent Decree. If

37

Honeywell does not cause all such environmental easement(s) addressed in this paragraph to be timely recorded, Honeywell shall be in violation of this Consent Decree.

## COMPLIANCE WITH LEGAL REQUIREMENTS

88. **(a)** Honeywell shall conduct all activities under this Consent Decree in compliance with all applicable federal, state and local laws and regulations.

**(b)** Honeywell shall obtain all permits, easements, rights-of-way, rights-of-entry, approvals, or other authorizations necessary to perform Honeywell's obligations under this Consent Decree. If Honeywell fails to obtain any access required to perform its obligations under this Consent Decree, despite all reasonable efforts to do so, Honeywell shall promptly notify the State, and shall include in that notification a summary of the steps Honeywell has taken to attempt to obtain access, within 45 days after (i) the submission of any draft work plan pursuant to this Consent Decree which is reasonably expected to require such access, and (ii) the date, if any, upon which the scope of the RD/RA changes with the State's approval, where such change causes Honeywell to require access from one or more additional owners. The State may, as it deems appropriate, assist Honeywell in obtaining access. Honeywell shall reimburse the State, in accordance with the procedures in paragraphs 61-67, for all costs incurred by the State in obtaining access, including, but not limited to, attorneys fees.

**(c)** The activities conducted pursuant to this Consent Decree, if approved by the State, are deemed and shall be considered by the State to be consistent with the NCP and ROD.

89. Notwithstanding the provisions of paragraph 88.(b), DEC may exempt Honeywell from the requirement to obtain a permit issued by DEC for any activity that is conducted on the Site and that DEC determines satisfies all substantive technical requirements applicable to a like

38

activity conducted pursuant to a permit.   In addition, DEC may exempt Honeywell from the

requirement to obtain any other State permit or local permit where there is a demonstration that

obtaining such a permit will substantially delay the project or present a hardship, provided:

> A.  the remedial program or activity is conducted on the Site or on premises that
>
> are under common control or are contiguous to or physically connected with
>
> the Site and the activity exclusively relates to contamination which DEC
>
> or Honeywell is handling as part of the site remedial program; and
>
> B.  all substantive technical requirements applicable to a like activity conducted
>
> pursuant to a permit are complied with, as determined by DEC; and
>
> C.  the activity is a component of a program selected by a process complying with
>
> the public participation requirements of section 6 N.Y.C.R.R. Part 375-1, to the
>
> extent applicable.

## CONTRIBUTION PROTECTION

**90.**  To the extent authorized under 42 U.S.C. § 9613, New York General Obligations

Law § 15-108, and any other applicable law, Honeywell shall be deemed to have resolved its

liability to the State for purposes of contribution protection provided by CERCLA Section

ll3(f)(2) for "Matters Addressed" pursuant to and in accordance with this Consent Decree.

"Matters Addressed" in this Consent Decree shall mean all response actions, within the meaning

of CERCLA, 42 U.S.C. § 9601(25), taken by Honeywell to implement this Consent Decree

including the investigation, design, implementation, and post-implementation OM&M of the

Remedial Program for the Lake Bottom subsite and all response costs within the meaning of

CERCLA, 42 U.S.C. § 9607(a), incurred and to be incurred by the State in connection with the

work performed under this Consent Decree, which costs have been reimbursed by Honeywell,

including reimbursement of the State's costs pursuant to this Consent Decree. Furthermore, to

the extent authorized under 42 U.S.C. § 9613 (f)(3)(B) or other provisions of CERCLA, by

entering into this judicial settlement of liability for the Matters Addressed herein, Honeywell may

seek contribution from any person except those who are entitled to contribution protection under

42 U.S.C. § 9613 (f)(2).

## COVENANT NOT TO SUE

91. In consideration of, and contingent upon Honeywell's compliance with the

provisions of this Consent Decree, and subject to the reservation of claims and defenses set forth

in paragraphs 74-79, the State covenants not to sue, execute judgment, or take any civil, judicial

or administrative action under any federal, state, local or common law (other than enforcement of

this Consent Decree) against Honeywell, or its affiliates, subsidiaries, related entities,

predecessors, successors and assigns, and their past, present and future employees, officers and

directors, for Matters Addressed by this Consent Decree, including without limitation, any claims

or causes of action for costs, damages, enforcement costs, interest, contribution or attorneys'

fees.

92. Subject to the reservation of claims and defenses set forth in paragraphs 74-79,

Honeywell covenants not to assert any claims or causes of action under any federal, state, local or

common law against the State, or its employees, agencies or departments, or to seek against the

State any costs, damages, contribution or attorneys' fees arising out of or related to any Matters

Addressed by this Consent Decree.

40

## CITIZEN PARTICIPATION

93.  Honeywell shall assist the State in its implementation of a citizen participation program. Honeywell shall cooperate with the State in providing information regarding the Remedial Program to the public and preparing such information for dissemination to the public and in public meetings which may be held or sponsored by the State to explain activities at or relating to the Site.

## LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

94.  This Consent Decree shall be lodged with the Court for a period of 30 days for public notice and comment. The State reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations which indicate that the Consent Decree is inappropriate, improper, or inadequate. Honeywell consents to the entry of this Consent Decree without further notice. This Consent Decree shall not be entered if the State withdraws or withholds its consent from any portion of this Consent Decree as lodged, including the appendices.

## MISCELLANEOUS

95.  Honeywell shall retain professional consultants, contractors, laboratories, quality assurance/quality control personnel, and data validators to perform the technical, engineering, and analytical obligations required by this Consent Decree. The experience, capabilities, and qualifications of the firms or individuals selected by Honeywell shall be submitted to the State within 30 days after the entry of this Consent Decree and within 30 days of any relevant change in personnel. The responsibility for the performance of the professionals retained by Honeywell shall rest solely with Honeywell.

41

**96.** All data gathered for utilization during the RDWP, RD and Remedial Construction and OM&M are to be provided in both a hard copy format, as specified in the State-approved Sampling and Analysis Plan, as well as in electronic format, consistent with the latest version of the DEC's Electronic Data Deliverable format.

**97.** The State shall have the right to obtain split samples, duplicate samples, co-located samples, or any combination of the three, of all substances and materials sampled by Honeywell, and the State shall have the right to take its own samples. Honeywell shall have the right to obtain split samples, duplicate samples, or co-located samples, or any combination of the three of all substances and materials sampled by the State. Honeywell shall make available to the State the results of all sampling and/or tests or other data generated by Honeywell with respect to implementation of this Consent Decree and shall submit these results with the scheduled monthly Progress Report which next follows receipt of the results by Honeywell from the relevant laboratory and otherwise in accordance with the Progress Report requirements in paragraph 38 of this Consent Decree.

**98.** Honeywell shall notify the State in writing at least 10 days in advance of any field activities to be conducted pursuant to this Consent Decree.

**99.** Honeywell and its officers, directors, agents, servants, employees, successors, and assigns shall be bound by this Consent Decree. Any change in ownership or corporate status of Honeywell including, but not limited to, any transfer of assets or real or personal property shall in no way alter Honeywell's responsibilities under this Consent Decree.

**100.** Honeywell shall provide written notice and a copy of this Consent Decree to each contractor and subcontractor hired to perform any portion of the work required by this Consent

42

Decree and to each person representing Honeywell with respect to the Site and shall condition all

contracts entered into to carry out the obligations identified in this Consent Decree upon

performance in conformity with the terms of this Consent Decree. Honeywell shall nonetheless

be responsible for ensuring that Honeywell's contractors and subcontractors perform the work in

satisfaction of the requirements of this Consent Decree.

101. All references to "professional engineer" in this Consent Decree are to an individual

registered as a professional engineer in accordance with Article 145 of the New York State

Education Law.

102. All references to "days" in this Consent Decree are to calendar days unless

otherwise specified.

103. The section headings set forth in this Consent Decree are included for convenience

of reference only and shall be disregarded in the construction and interpretation of any of the

provisions of this Consent Decree.

104. With the exception of the administrative consent order entered into between DEC

and Honeywell concerning certain specified pre-design work to be completed at the Site (Index

No. D7-0002-05-08, effective August 19, 2005), the terms of this Consent Decree shall constitute

the complete and entire Consent Decree between Honeywell and the State concerning the

implementation of the remedy selected for the Lake Bottom subsite in the ROD. No term,

condition, understanding, or agreement purporting to modify or vary any term of this Consent

Decree shall be binding unless made in writing and subscribed by the party to be bound and,

unless specifically otherwise provided for herein, approved by the Court. No informal advice,

guidance, suggestion, or comment by the State regarding any report, proposal, plan, specification,

43

schedule, or any other submittal shall be construed as relieving Honeywell of Honeywell's

obligation to obtain such formal approvals as may be required by this Consent Decree.

### CONSENT DECREE CONTROLS

105. In the event there is a conflict or inconsistency between the terms of this Consent

Decree and the terms of the Statement of Work or any work plan required under this Consent

Decree then the terms of the Consent Decree shall control.

### TERMINATION OF CONSENT DECREE

106. This Consent Decree shall terminate upon the State's written determination,

transmitted by the attorney of record for the State to the attorney of record for Honeywell, that

Honeywell has completed all phases of the Remedial Program, including OM&M.

Notwithstanding the foregoing, the provisions contained in paragraphs 61-67 (costs), 80

(indemnification), and 90-92 (covenants not to sue and contribution protection) shall survive the

termination of this Consent Decree and any violation of such surviving provisions shall be a

violation of this Consent Decree subjecting Honeywell to injunctive relief and stipulated

penalties as provided under paragraphs 53-56.

### THE COURT'S CONTINUING JURISDICTION

107. The Court retains continuing jurisdiction over this action for purposes of enforcing

or interpreting this Consent Decree according to its terms and for resolving the other claims

raised in this action which are not resolved by this Consent Decree.

44

**SO AGREED:**
Dated: October  *11* , 2006

**FOR THE PLAINTIFFS:**

**ELIOT SPITZER**
**Attorney General**
**State of New York**

**PETER LEHNER**
**Chief, Environmental Protection Bureau**

_____
**NORMAN SPIEGEL**
**Assistant Attorney General**
**120 Broadway**
**New York, New York 10271**
**(212) 416-8454**
**Attorney of Record, Bar Roll Number 102652**

_____
**DENISE M. SHEEHAN**
**Commissioner**
**New York State Department of**
**Environmental Conservation**
**625 Broadway**
**Albany, New York 12233-5500**

FOR THE DEFENDANT:

**KATE ADAMS**
Vice President & General Counsel - Specialty Materials
Honeywell International Inc.
101 Columbia Road
Morristown, New Jersey  07962

**THOMAS H. MILCH**
Arnold & Porter LLP
555 12th Street, NW
Washington, D.C. 20004

46

**FOR THE DEFENDANT:**

_____

**KATE ADAMS**
Vice President & General Counsel - Specialty Materials
Honeywell International Inc.
101 Columbia Road
Morristown, New Jersey  07962

_____

**THOMAS H. MILCH**
Arnold & Porter LLP
555 12th Street, NW
Washington, D.C. 20004

**IT IS SO ORDERED.**

**January 4, 2007**
**Syracuse, New York**

Frederick J. Scullin, Jr.
Senior United States District Court Judge