March 17, 2011

Honorable Judge Robert E. Gerber
U.S. Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004

SUBJECT:  GM/Motors Liquidation Company Bankruptcy
          Chapter 11 Case No. 09-50026 (REG)

REFERENCE: 1.) Order Granting Debtors' 155th Omnibus Objection to Claims
               Daniel Plouffe Claim  # 45172  $62,792
               "Grounds for Objection – Equity Interest Claim"

           2.) Order Granting Debtors' 153rd Omnibus Objection to Claims
               Daniel Plouffe Claim  # 45171  $162,320
               "Grounds for Objection – Equity Interest Claim"

Dear Judge Gerber:

I finally had the opportunity to talk to representatives of the firm representing GM/Motors
Liquidation Company (Jennifer Wine and Ed Wu) and they are still attempting to get my claims
reclassified in order to dismiss.  This is not right nor is it fair.  GM paid me for services I
rendered to them with stock RSU's and options.  My claim is for RSU's that were granted that
had not yet vested, along with incentive/non-qualified stock options for services I rendered.

Enclosed are examples of certain pages from documents that GM provided to me that supports
my contention that my claims are valid as services rendered and not equity interests.  The GM
Stock Incentive Plan (Att. "A") specifically states that "prior to the exercise of a stock option, you
have no rights to dividends and no other rights of a stockholder with respect to shares under
that option" supporting the fact that stock options are not an equity interest.  RSU's (and
options) were provided because of services I rendered and work I performed.   Please review
the highlighted areas within this plan that I have attached.

I have also attached another example of GM documentation that states I have an "acquired
right" under the GM Annual Incentive Plan (Att. "B") "to receive payments or distributions
under this Plan" and that "such right shall be no greater than the right of a general unsecured
creditor of the Corporation".  It further states, "all payments and distributions to be made
hereunder shall be paid from the general assets of the corporation".

To further support the fact that these RSU's and options were distributed for services rendered,
please also find the 2007 Executive Incentive Compensation Program Highlights (Att. "C") with
several areas again highlighted that explain that GM's executive compensation program used

stock options and RSU's for services rendered to recognize individual performance and contributions. In addition to these documents, I have also provided a copy of the Summary of Cash Based Restricted Stock Units (RSU's) (Att. "D") which states RSU's are not an equity interest. Moreover, it clearly indicates GM elected to use RSU's as long-term incentive awards "to be specifically delivered in cash". This same document states that: 1) these RSU awards will be based on "performance and contributions ensuring there is a significant differentiation based on these factors "(services rendered) and "there are no actual underlying shares"; and, 2) "Thus, cash based RSU's do not result in stock ownership or confer any voting rights".

Finally, I have attached samples of several years of personal letters received from GM's former President and Chief Executive Officer thanking me for my "hard work, leadership and personal contributions/performance. These letters also indicate that my executive compensation (salary, RSU's stock options, etc.) was based on my personal level of contributions and services I rendered for the years 2002, 2003, 2005, and 2007 (Att. "E-H"). Please note the 2007 information also includes my Executive Compensation Summary that further substantiates the fact that these RSU's were for services rendered and that they would be paid out in cash via the payroll. GM used this same overall compensation approach and philosophy related to executive compensation awarded in 2008.

It is with all due respect and gratitude that I am asking again for your help and assistance to review and consider this letter and the attachments I have provided. As my previous letter dated February 18, 2011, stated, I am one of the individuals whose life was severely and permanently affected as a result of GM's bankruptcy. I do not believe it is fair that GM should continue to harm my family. I do not have a lawyer to represent me ... and I do not have the resources to hire one. I have spent a considerable amount of time to try to present my case and related background as well as providing appropriate documentation and supporting evidence. I am once again appealing to you for your fair review of this matter.

Respectfully,

Daniel C. Plouffe

Enclosures

Attachments: "A" - General Motors 2002 Stock Incentive Plan
"B"- General Motors 2002 Annual Incentive Plan
"C" - 2007 Executive Incentive Compensation Program Highlights
"D" - Summary of Cash-Based Restricted Stock Units (RSU's)
"E" - Personal Letter/Review 2002
"F" - Personal Letter/Review 2003
"G" - Personal Letter/Review 2005
"H" - Personal Letter/Review 2007 as well as Personal Executive Compensation
          Summary

*ATTACHMENT A*

*PROSPECTUS*

This document constitutes part of a prospectus covering securities that have been registered under the Securities Act of 1933

## GENERAL MOTORS CORPORATION

## COMMON STOCK, $1-2/3 PAR VALUE

--------------------

*This Prospectus relates to shares of stock that General Motors will offer and deliver under the*

## GENERAL MOTORS 2002 STOCK INCENTIVE PLAN

----------------------

**The Securities and Exchange Commission has not approved or disapproved these securities or determined if this Prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

---------------------

General Motors Corporation has not authorized anyone to provide you with information that is different from the information contained in this Prospectus or in the documents which are part of this Prospectus through incorporation by reference.

----------------------

**The date of this Prospectus is October 1, 2002**

## GENERAL INFORMATION

The principal executive offices of General Motors Corporation ("General Motors") are located at 300 Renaissance Center, Detroit, Michigan 48265-3000, telephone number (313) 556-5000.

The stockholders of General Motors approved the General Motors 2002 Stock Incentive Plan (the "Plan") on June 4, 2002.

The Plan authorizes General Motors, within certain limits, to grant to eligible employees of General Motors and its subsidiaries options to purchase General Motors $1-2/3 par value common stock at a price which is at least equal to the fair market value of such stock on the date of grant. (We call the price at which employees may purchase stock under these options the "grant price.") In addition, the Plan authorizes General Motors to grant restricted stock units to the same individuals. In this Prospectus, references to "General Motors common stock" means General Motors $1-2/3 par value common stock. General Motors may not grant any options or restricted stock units under the Plan after May 31, 2007.

The purposes of the Plan are (1) to encourage employees of General Motors and its subsidiaries to contribute, both individually and in groups, to the creation of value for holders of General Motors common stock and (2) to enable such employees to participate in the future success of General Motors through long-term accumulation of General Motors common stock.

## DOCUMENTS INCORPORATED BY REFERENCE

The Securities and Exchange Commission (the "SEC") permits us to "incorporate by reference" information into this Prospectus. This means that we can disclose important information to you by referring you to another document that General Motors has filed separately with the SEC. You should consider the information which we have incorporated by reference to be a part of this Prospectus, except to the extent that the information actually contained in this document replaces such other information. This Prospectus incorporates by reference the documents listed below that we have previously

filed with the SEC. These documents contain important information about General Motors and its finances.

- The annual report on Form 10-K for the year ending December 31, 2001 which General Motors filed pursuant to Section 13(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

- The quarterly reports on Form 10-Q and the current reports on Form 8-K which General Motors has filed since December 31, 2001 pursuant to Section 13(e) of the Exchange Act.

- The description of General Motors common stock contained in Article Fourth of the General Motors Restated Certificate of Incorporation which General Motors filed as Exhibit 3(i) to its Current Report on Form 8-K dated June 6, 2000, filed pursuant to Section 13 of the Exchange Act, and any amendment or report which General Motors files for the purpose of updating that information.

In addition, this Prospectus incorporates by reference all documents and reports which General Motors files after the date of this Prospectus pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act prior to the time that General Motors files a post-effective amendment which indicates that it has sold all securities offered by this Prospectus or which deregisters all remaining unsold securities.

If you are eligible to participate in the Plan and you would like a copy of any of the documents listed above, General Motors will provide them (without exhibits) to you at no charge. To request any of these documents, you should write or telephone the person indicated below:

Secretary of the Executive Compensation
    Committee
General Motors Corporation
Mail Code 482-C32-C66
300 Renaissance Center
Detroit, Michigan 48265-3000
Telephone number: (313) 665-3021

and under what circumstances, you have terminated employment for purposes of the Plan.

Stock Option Terms. The Committee determines whether the stock options it grants under the Plan are incentive stock options or non-qualified stock options and what restrictions apply to such options. Incentive stock options are exercisable for a term of up to 10 years from the date of grant. Non-qualified stock options are exercisable for a term of up to 10 years and two days from the date of grant. Both types of stock options become exercisable in full or in part after one year (or such other period as the Committee determines).

Incentive stock options shall not be awarded to you in any calendar year in an amount which exceeds $100,000 in aggregate market value of the stock with respect to the stock option granted. (The dollar limit may be adjusted by the Committee to comply with the Code.) The terms of any incentive stock option shall comply with all provisions of Section 422 of the Code.

Stock Option Grant Price. The stock option grant price generally must be no less than 100% of the fair market value of General Motors common stock at the time the Committee grants the stock option. For this purpose, fair market value is the mean of the highest and lowest sales prices reported for General Motors common stock in *The Wall Street Journal* for the grant date.

Vesting and Exercise. Except in the case of death, no stock option shall vest or become exercisable prior to the option grant's first anniversary. Beginning on the option grant's first anniversary, the stock option will become exercisable in one-third increments. Subject to provisions of Paragraph 5(d) of the Plan covering termination of employment, the first increment becomes exercisable on or after the first anniversary date of the option grant while the second and third increments may be exercised on or after the second and third anniversaries of the option grant, respectively.

Certain employees may be required to enter into such agreements as are considered by the

Committee to be appropriate and in the best interests of General Motors prior to being able to exercise a stock option. You can exercise your stock options only if you are in compliance with the conditions precedent contained in Paragraph 5(c) of the Plan and as summarized below.

Payment of Stock Option Grant Price. You must pay the stock option grant price in full in cash, through delivery of shares of General Motors common stock, or a combination of such stock and cash. If you wish to use shares of General Motors common stock to pay the grant price, you must have held the shares for at least six months if you use stock previously obtained from the exercise of a stock option; however, if you use stock previously obtained from the exercise of an incentive stock option, you must have held the shares for one year in order to avoid a "Disqualifying Disposition." See Federal Income Tax Considerations below. General Motors will determine the number of shares needed to pay the grant price by valuing each share delivered at an amount equal to the mean of General Motors common stock's highest and lowest sales prices as reported in *The Wall Street Journal* for the stock option exercise date.

At the time you exercise a stock option, you must pay any required federal, state, and/or local withholding taxes in connection with the exercise. You must pay these taxes either in cash or by delivering General Motors common stock or by directing General Motors to withhold the appropriate number of shares from the proceeds resulting from the exercise of the stock option.

General Motors may authorize you to exercise a stock option in accordance with a cashless exercise program. Prior to the exercise of a stock option, you have no rights to dividends and no other rights of a stockholder with respect to shares under that option.

*[handwritten margin note: Stock options are not an equity interest]*

Grant of Restricted Stock Units. The Committee may grant restricted stock units, each of which represents the potential right to receive one share of General Motors common stock (the

"corresponding share") or cash in an amount equal to the fair market value of a corresponding share. If the Committee grants you a restricted stock unit award, your right to receive shares of General Motors common stock or cash with respect to the restricted stock units will vest according to a vesting schedule which the Committee will determine and shall establish the vesting increments (including their number, amounts and timing). The Committee may impose other limitations and restrictions on your award. A restricted stock unit shall only be payable to you if you are in compliance with the conditions precedent contained in Paragraph 6(d) of the Plan and as summarized below. The Committee may impose different terms and conditions on any particular grant of restricted stock units made to any particular employee.

Performance Vesting. The Committee may establish performance vesting criteria with respect to all or any portion of a restricted stock unit grant. In that case, your vesting will depend upon the extent to which, if at all, General Motors or the unit of General Motors where you work satisfies specific goals that the Committee determined at the time of such restricted stock unit grant. Performance vesting criteria is contained in Paragraph 6(c) of the Plan. If the Committee grants you a restricted stock unit award that is subject to performance vesting, the Committee will establish a range of performance levels related to General Motors and/or the unit of General Motors where you work at which 100% of the award may be earned and a range (which need not be the same for all awards) within which greater and lesser percentages may be earned.

If General Motors and/or the unit of General Motors achieve the maximum level of performance under the goal(s), then your right to receive stock or cash with respect to the total number of restricted stock units under the award will vest.

If the performance of General Motors and/or the unit of General Motors does not meet the maximum performance level but is at least equal to the minimum level, then your rights with respect to a proportionate number of the

restricted stock units will vest and you will forfeit the remainder of the restricted stock units.

Payment Upon Vesting of Restricted Stock Units. Upon the vesting of any portion of a particular grant of restricted stock units, you become entitled to receive from General Motors a proportional number of corresponding shares of stock or cash of equivalent value. The Committee decides whether the restricted stock units are paid in stock, cash or a combination of stock and cash. The Committee will determine the proportional number of corresponding shares by multiplying the total number of corresponding shares subject to the award on the grant date by the percentage of the award which vests on the vesting date.

You will not be required to pay any consideration, other than the rendering of services (including meeting any performance vesting criteria), in connection with the grant or vesting of restricted stock units or in connection with the delivery of any corresponding shares of stock or cash upon the vesting of such restricted stock units. The Committee may authorize current or deferred payments, or additional restricted stock unit credits to reflect dividends or other distributions on unvested restricted stock units. The Corporation will withhold applicable withholding taxes on the payment of any restricted stock units to you.

Conditions Precedent for Stock Option Exercises and/or Payment of Restricted Stock Units. If the Committee grants you a stock option or a restricted stock unit award, you must satisfy certain requirements in order to exercise the stock option (as described in Paragraph 5(c) of the Plan) or receive a distribution or payment under the restricted stock unit award (as described in Paragraph 6(d) of the Plan). These requirements must be met even if you have satisfied any required periods of active employment and have subsequently left General Motors employment.

*[handwritten annotation:] RSU's (and options) were provided because of services rendered and work performed*

*Once again "render services"*

These requirements and conditions precedent include the following:

- You must continue to render services to General Motors or its subsidiaries (unless the Committee waives this requirement).

- You must refrain from engaging in any activity which in the opinion of the Committee, is competitive with any activity of General Motors or its subsidiaries.

- You must refrain from otherwise acting in any manner inimical or in any way contrary to the best interests of General Motors.

- You must furnish information with respect to the satisfaction of the above requirements as the Committee shall request.

In addition, you must pay to General Motors within 30 days of your employment termination date in breach of the covenants and conditions precedent described above and contained in Paragraph 5(c) of the Plan, an amount equal to the gain realized from any stock option exercise occurring in the twelve months prior to such termination of employment from General Motors. The amount of the gain will be determined in accordance with the provisions of Paragraph 5(e) of the Plan. Where permitted by law, General Motors will deduct such amount owed by you from any money General Motors owes you, including, but not limited to, amounts owed as wages or other compensation, fringe benefits or vacation pay. By accepting an option grant under the Plan, you consent, to the extent permitted by law, to such deduction.

Termination of Employment. Paragraphs 5(d) and 6(d), respectively, contain a complete description of what happens to your stock options and restricted stock units when you terminate employment with General Motors. In general, subject to the terms and conditions of the Plan:

- If you quit, without the prior written consent of General Motors, or are terminated for cause, all your stock options and restricted stock units are forfeited and terminated.

- If you retire at age 62 or older with ten or more years of credited service, your vested stock options remain exercisable for the full remaining term.

- If you die, your stock options shall immediately vest and remain exercisable until the earlier of their expiration date or the third anniversary of your death.

- If you become disabled, your unvested stock options will continue to vest while you are on disability leave, while vested stock options remain exercisable for their remaining term.

- If your employment terminates for any reason other than as set forth above at any time on or after the first anniversary of the date of grant of a stock option, all vested stock options will remain exercisable until the earlier of their expiration date or the third anniversary of the date of termination of employment.

- If your employment terminates for any reason other than death prior to the first anniversary of the option grant, the stock option shall be forfeited and terminated on your date of termination of employment.

- If your termination of employment is for any reason not provided in the first condition described above, the Committee shall in its discretion decide what percentage of the unvested portion of any restricted stock unit shall be made available to you.

- If you take a qualifying leave of absence this does not constitute a termination of employment; however, you cannot exercise a stock option or have a restricted stock unit vest during a leave of absence granted for government service.

Transferability. Other than transfers resulting from your death, none of your stock options or restricted stock options may be transferred or assigned by you. This means that no stock option may be exercised by anyone other than

*ATTACHMENT B*

## GENERAL MOTORS 2002 ANNUAL INCENTIVE PLAN

1. The purposes of the General Motors 2002 Annual Incentive Plan (this "Plan") are to reward performance and provide incentive for future endeavor to employees who contribute to the success of the business by making them participants in that success.

2(a). The Executive Compensation Committee of the General Motors Board of Directors (the "Committee"), as from time to time constituted pursuant to the by-laws of General Motors Corporation (the "Corporation"), may, prior to June 1, 2007, authorize the granting to employees of the Corporation of annual target awards. The Committee, in its sole discretion, shall determine the performance levels at which different percentages of such awards shall be earned, the collective amount for all awards to be granted at any one time, and the individual annual grants with respect to employees who are officers of the Corporation. The Committee may delegate to the Chief Executive Officer responsibility for determining, within the limits established by the Committee, individual award grants for employees who are not officers of the Corporation. All such awards shall be denominated and paid in cash (U.S. dollars or local currency equivalent).

2(b). Prior to the grant of any target award, the Committee shall establish for each such award performance levels related to the enterprise (as defined below) at which 100% of the award shall be earned and a range (which need not be the same for all awards) within which greater and lesser percentages shall be earned. The term "enterprise" shall mean the Corporation and/or any unit or portion thereof, and any entities in which the Corporation has, directly or indirectly, a substantial ownership interest.

2(c). With respect to the performance levels to be established pursuant to paragraph 2(b), the specific measures for each grant shall be established by the Committee at the time of such grant. In creating these measures, the Committee may establish the specific goals based upon or relating to one or more of the following business criteria: asset turnover, cash flow, contribution margin, cost objectives, cost reduction, earnings per share, economic value added, increase in customer base, inventory turnover, market price appreciation of one or more of the Corporation's common stocks, market share, net income, net income margin, operating profit margin, pre-tax income, productivity, profit margin, quality, return on assets, return on net assets, return on capital, return on equity, revenue, revenue growth, and/or total shareholder return. The business criteria may be expressed in absolute terms or relative to the performance of other companies or to an index.

2(d). If any event occurs during a performance period which requires changes to preserve the incentive features of this Plan, the Committee may make appropriate adjustments.

2(e). Except as otherwise provided in paragraph 6, the percentage of each target award to be distributed to an employee shall be determined by the Committee on the basis of the performance levels established for such award and the performance of the applicable enterprise or specified portion thereof, as the case may be, during the performance period. Following determination of the final payout percentage, the Committee may, upon the recommendation of the Chief Executive Officer, make adjustments to awards for officers of the Corporation to reflect individual performance during such period, which for covered officers will involve only negative discretion. A covered officer is any individual whose compensation in the year of expected payment of an award will be subject to the provisions of Section 162(m) of the Internal Revenue Code, as determined by the Committee. Adjustments to awards to reflect individual performance for employees who are not officers of the Corporation may be made by the Chief Executive Officer. Any target award, as determined and adjusted pursuant to this paragraph 2(e) and paragraph 6, is herein referred to as a "final award." The total aggregate final award paid to any employee for any one year shall not exceed $7.5 million. The Committee shall certify the final awards earned by covered officers in writing prior to any award payments.

3. Subject to such additional limitations or restrictions as the Committee may impose, the term "employees" shall mean persons (a) who are employed by the Corporation, or any subsidiary (as such term is defined below), including employees who are also directors of the Corporation or any such subsidiary, or (b) who accept (or previously have accepted) employment, at the request of the Corporation, with any entity not described in 3(a) above but in which the Corporation has, directly or indirectly, a substantial ownership interest. For purposes of this Plan, the term "subsidiary" shall mean (i) a corporation of which capital stock having ordinary voting power to elect a majority of the board of directors of such corporation is owned, directly or indirectly, by the Corporation, or (ii) any unincorporated entity in respect of which the Corporation can exercise, directly or indirectly, comparable control. The Committee shall, among other things, determine when and to what extent individuals otherwise eligible for consideration shall become or cease to be, as the case may be, employees for purposes of this Plan and shall determine when, and under what circumstances, any individual shall be considered to have terminated employment for purposes of this Plan. To the extent determined by the Committee, the term employees shall be deemed to include former employees and any beneficiaries thereof.

4(a). Target awards which have become final awards may be subject to a vesting schedule established by the Committee. Except as otherwise provided in this Plan, no final award (or portion thereof) subject to a vesting schedule shall be paid prior to vesting, and the unpaid portion of any final award shall be subject to the provisions of paragraph 6. The Committee shall have the authority to modify a vesting schedule as may be necessary or appropriate in order to implement the purposes of this Plan. As a condition to the vesting of all or any portion of a final award the Committee may, among other things, require an employee to enter into such agreements as the

Committee considers appropriate and in the best interests of the Corporation, except for awards that vest pursuant to paragraph 12 of this Plan.

4(b). With respect to target awards which have become final awards as provided in paragraph 2(e), the Committee may, in its discretion, pay to the participant interest on all portions thereof which are unvested. No holder of a target award shall have any rights to interest prior to such target award becoming a final award. Any interest payable with respect to such unvested final awards shall be paid at such times, in such amounts, and in accordance with such procedures as the Committee shall determine.

5(a). An employee shall be eligible for consideration for a target award based on such criteria as the Committee shall from time to time determine.

5(b). No target award shall be granted to any director of the Corporation who is not an employee at the date of grant.

6(a). Payment of any final award (or portion thereof) to an individual employee shall be subject to the satisfaction of the conditions precedent that such employee: (i) continue to render services as an employee (unless this condition is waived by the Committee), (ii) refrain from engaging in any activity which, in the opinion of the Committee, is competitive with any activity of the Corporation or any subsidiary (except that employment at the request of the Corporation with an entity in which the Corporation has, directly or indirectly, a substantial ownership interest, or other employment specifically approved by the Committee, shall not be considered to be an activity which is competitive with any activity of the Corporation or any subsidiary) and from otherwise acting, either prior to or after termination of employment, in any manner inimical or in any way contrary to the best interests of the Corporation, and (iii) furnish to the Corporation such information with respect to the satisfaction of the foregoing conditions precedent as the Committee shall reasonably request. Except as otherwise provided under paragraph 6(c) below, the failure by any employee to satisfy such conditions precedent shall result in the immediate cancellation of the unvested portion of any final award previously made to such employee and such employee shall not be entitled to receive any consideration in respect of such cancellation.

6(b). If any employee is dismissed for cause or quits employment without the prior consent of the Corporation, the unvested portion of any final award previously made to such employee shall be canceled as of the date of such termination of employment, and such employee shall not be entitled to receive any consideration in respect of such cancellation.

6(c). Upon termination of an employee's employment for any reason other than as described in (b) above, the Committee may, but shall not in any case be required to, waive the condition precedent relating to the continued rendering of services in respect of all or any specified percentage of the unvested portion of any final award, as the Committee shall determine. To the extent such condition precedent is waived, the Committee may accelerate the vesting of all or any specified percentage of the unvested portion of any final award.

6(d). For purposes of this Plan, a qualifying leave of absence, determined in accordance with procedures established by the Committee, shall not constitute a termination of employment, except that a final award shall not vest during a leave of absence granted an employee for local, state, provincial, or federal government service.

6(e). If employment of an employee is terminated by death, all final awards not currently vested shall immediately vest.

7. Subject to paragraph 6, all final awards which have vested in accordance with the provisions of this Plan shall be paid as soon as practicable following the end of the related vesting period. If the Corporation shall have any unpaid claim against an employee arising out of or in connection with the employee's employment with the Corporation, such claim may be offset against awards under this Plan. Such claim may include, but is not limited to, unpaid taxes, the obligation to repay gains pursuant to paragraph 5(e) of the General Motors 2002 Stock Incentive Plan, or Corporate business credit card charges.

8. To the extent that any employee, former employee, or any other person acquires a right to receive payments or distributions under this Plan, such right shall be no greater than the right of a general unsecured creditor of the Corporation. All payments and distributions to be made hereunder shall be paid from the general assets of the Corporation. Nothing contained in this Plan, and no action taken pursuant to its provisions, shall create or be construed to create a trust of any kind or a fiduciary relationship between the Corporation and any employee, former employee, or any other person.

9. The expenses of administering this Plan shall be borne by the Corporation.

10. Except as otherwise determined by the Committee, with the exception of transfer by will or the laws of descent and distribution, no target or final award shall be assignable or transferable and, during the lifetime of the employee, any payment in respect of any final award shall be made only to the employee. An employee shall designate a beneficiary or beneficiaries to receive all or part of the amounts to be distributed to the employee under this Plan in case of death. A designation of beneficiary may be replaced by a new designation or may be revoked by the employee at any time. A designation or revocation shall be on forms prescribed by and filed with the Secretary of the Committee. In case of the employee's death, the amounts distributable to the employee under this Plan with respect to which a designation of beneficiary has been made (to the extent it is valid and enforceable under applicable law) shall be distributed in accordance with this Plan to the designated beneficiary or beneficiaries. The amount distributable to an employee upon death and not subject to such a designation shall be

# 2007 Executive Incentive Compensation Program Highlights

The portion of this document entitled "Stock Options" constitutes part of the prospectus dated October 1, 2002 for the "General Motors 2002 Stock Incentive Plan" covering securities that have been registered under the Securities Act of 1933.

Each year Global Compensation, in conjunction with Senior Leadership and the Executive Compensation Committee of the Board of Directors, reviews the effectiveness of the global executive compensation program to ensure it continues to 1) support GM's ability to attract and retain executive talent, 2) support GM's pay for performance philosophy, and 3) exhibit sound corporate governance practices. In support of maintaining these important principles and in response to input obtained from the 2006 Global Executive Compensation survey, we made some changes for 2007. This document is a summary of major changes being implemented this year.

## Annual Incentive Plan (All Executives)

*GM's executive compensation uses stock options and RSU's for services rendered to recognize individual performance and contributions*

- A new "basic" funding component has been incorporated into the plan. This funding provides the opportunity to recognize individual performance and contributions even when the Corporate financial and operational results may not meet threshold performance.

- As a result of the new basic funding component, new weights have been assigned to the performance metrics. The Corporate financial metrics now comprise 50% of payout funding. Operational measures (previously referred to as "regional") continue to comprise 20% of the funding with 30% generated by the new basic component.

  - The performance and payout funding matrix for Corporate financial metrics will also be used for the operational metrics. This will provide threshold or minimum funding at 40% of target and maximum funding will be at 250% of target. The basic funding component is fixed at 30%.

  - Summary of these changes for 2007:

| | 2007 (New) | | | | 2006 | |
|---|---|---|---|---|---|---|
| | **Weight** | **Funding** | | | **Weight** | **Funding** |
| **Corporate Financial (50%)** | | | | **Corporate Financial (80%)** | | |
| Net Income | 25% | | | Net Income | 40% | 40%- |
| Operating Cash Flow | 25% | | | Operating Cash Flow | 40% | Uncapped |
| | | 40%-250% | | | | |
| **Operational (20%)** | | | | **Operational (20%)** | | |
| Market Share | 10% | | | Market Share | 10% | |
| Quality/Warranty | 10% | | | Quality/Warranty | 10% | 50%-150% |
| **Basic (30%)** | 30% | | | | | |
| **Total** | **100%** | | | **Total** | **100%** | |

- In addition, the Original Equipment Manufacturers (OEM) adjustment may be applied to the funding generated by the Corporate financial metrics based on GM performance relative to key competitors. The adjustment can range from plus or minus 10 points (20% of 50%), formerly +/- 16 points (20% of 80%).

# 2007 Executive Compensation Incentive Program Highlights

- With the divestiture of GMAC, going forward:

  - The corporate financial metrics will exclude GMAC.

  - There will only be one (Global Automotive) versus three (Global Automotive, Corporate Staffs, and GMAC) payouts applicable to the entire GM executive group globally. Payout funding on the operational metrics is a simple average of performance for all the regional operational metrics (North America, LAAM, Europe, and Asia Pacific).

- Similar to 2006, given GM's current position of not providing earnings guidance, 2007 net income and operating cash flow targets will not be disclosed. Operational metrics and targets are available on ExecuNet in the "2007 Incentive Compensation Target Setting" presentation.

- The following is an example of how 2007 AIP funding will work when the threshold Corporate financial/operational metrics are achieved.

Base Pay
Individual AIP Target Opportunity (% of Base)          $100,000
Individual AIP Target Award                        x      25%
                                                      $25,000

| Corporate Financial Funding | Weight | x | Perf / Payout | = | Payout Funding | |
|---|---|---|---|---|---|---|
| Net Income | 25% | x | 175% | = | 44% | |
| Operating Cash Flow | 25% | x | 40% | = | 10% | |
| **Total** | **50%** | | | | **54%** | |
| **Operational Funding** | | | | | | |
| Market Share | 10% | x | 80% | = | 8% | |
| External Quality | 5% | x | 140% | = | 7% | |
| Warranty | 5% | x | 40% | = | 2% | 106% |
| **Total** | **20%** | | | | **17%** | |
| **Basic Funding** | **30%** | x | **100%** | = | **30%** | |
| **Year-end OEM Adjustment** (Maximum adjustment +/- 10 Points) | | | | | **+5%** | |

**Total Individual Funding**

                                                      **$26,500**

- In this example, if the threshold Corporate financial and operational metrics did not generate funding, the basic funding component could still generate $7,500 (30% of the $25,000 target AIP award).

- An executive's actual final award may be more or less than the individual funded amount based on individual performance and contribution.

## Cash-Based Restricted Stock Units (CRSUs) (All Executives)

*My claim is for RSU's that did not pay ... but were awarded for services I rendered*

- Cash-Based RSUs vest and are paid in cash in equal installments on each of the three anniversary dates following grant.

- *Applicable for CRSUs granted in 2006:*

  If retiring at age 62 or older with ten or more years of credited service or under an approved retirement, you will retain the grant if actively employed through the first anniversary date of the grant and it will be delivered in accordance with the original vesting schedule.

## 2007 Executive Compensation Incentive Program Highlights

- *Applicable for CRSUs granted beginning in 2007:*

  Beginning with 2007, if you retire at age 55 or older with ten or more years of credited service or under an approved retirement and you were actively employed through December 31 of the grant year, the current year installment will be prorated based on time worked during the vesting period (i.e. may not retain the entire grant).

- The following is an example of the treatment for outstanding 2006 and 2007 CRSUs for an executive retiring May 1, 2008 who is 62 with ten or more years of credited service:

  Assumptions:

  - 3,000 CRSUs granted on February 23, 2006 of which the following installments have already been delivered:
    - 1st installment (1,000 units) in March, 2007.
    - 2nd installment (1,000 units) in March, 2008.
  - 3,300 CRSUs granted on March 13, 2007 of which the following installment has already been delivered:
    - 1st installment (1,100 units) in March, 2008.

| Outstanding CRSU Installments | # of CRSUs to be Delivered | Payment Timing |
|---|---|---|
| Final (third) installment of February 23, 2006 grant | 1,000 | Scheduled payment date in 1st Quarter of 2009 |
| Second installment of March 13, 2007 grant | 183 (2/12 of 2nd installment [March & April]) | Scheduled payment date in 1st Quarter of 2009 |
| Third installment of March 13, 2007 grant | Forfeited | Not Applicable |

Note: Units to be converted to local currency at time of payment.

## Stock Options (LTI Executives)

*Also for services rendered*

- *Applicable for options granted prior to 2007:*

  Stock options granted prior to 2007 vest on the first anniversary of the grant date and are exercisable in equal installments over three years. If retiring at age 62 or older with ten or more years of credited service or under an approved retirement, vested options may be retained and are exercisable for the full remaining option term in accordance with the original grant terms. If either of these conditions is not met, all unexercised stock options are forfeited.

- *Applicable for options granted beginning in 2007:*

  Beginning in 2007, options will vest and become exercisable in one-third increments on each of three anniversary dates following the grant date as shown below:

| Options Granted on March 13, 2007 | | | | Options Granted on February 23, 2006 | | | |
|---|---|---|---|---|---|---|---|
| Vest | % | Exercisable | % | Vest | % | Exercisable | % |
| March 13, 2008 | 33.3% | March 13, 2008 | 33.3% | Feb. 23, 2007 | 100% | Feb. 23, 2007 | 33.3% |
| March 13, 2009 | 67% | March 13, 2009 | 67% | | | Feb. 23, 2008 | 67% |
| March 13, 2010 | 100% | March 13, 2010 | 100% | | | Feb. 23, 2009 | 100% |

- If retiring at age 55 or older with ten or more years of credited service and you were actively employed through December 31 of the grant year, all options will immediately vest and all vested options will be immediately exercisable for the full remaining option term.



# 2007 Incentive Compensation Target Setting

## March 2007



1



# 2007 Corporate Measures



Given GM's current position of not providing earnings guidance, the 2007 net income and operating cash flow targets will not be disclosed at this time

To increase the likelihood of a payout, executives should focus on areas they can influence which will have a positive impact on net income and cash flow like:

– Meeting or exceeding your department budgets

– Using "Find it and fix it" approaches

– Ensuring no unnecessary expenditures (cut waste)

– Increasing vehicle sales (improve quality, product promotion, brand ambassadors)

– Reducing inventories where possible

– Proactively supporting GM's turnaround and growth initiatives

– Supporting other key profit and cash generating initiatives

*Serious [illegible]*

4

*ATTACHMENT D* — GM Main Web Site — 2/27/06

## Summary of Cash-Based Restricted Stock Units (RSUs)

*RSU's are not an equity interest*

### Overview

A Restricted Stock Unit (RSU) grant is a long-term incentive award denominated in units, each representing the value of a share of GM $1-2/3 Common stock. The number of units multiplied by the stock price at grant represents the value of the RSU grant. RSU grants may be delivered in the form of cash or stock. GM has elected to use cash-based RSUs.

### Vesting and Delivery

Cash-based RSUs will vest in equal installments on each of the first three anniversary dates following the grant date and will be delivered in cash. When the RSUs vest, a cash value is calculated equal to the number of units vested multiplied by the stock price at that time. As a result of changes in GM's stock price over the three-year vesting period, the actual value delivered may be more or less than the value at the time of grant. The cash amount will be delivered through the local payroll and reflect the appropriate tax withholding based on local tax requirements.

### Dividend Equivalents

Another feature of cash-based RSUs is the payment of dividend equivalents on all unvested units when dividends are declared for stockholders of GM $1-2/3 Common stock. The payment would be equal to the number of unvested units multiplied by the dividend amount and would be made through the local payroll. Payment would occur following the declared dividend payment date (usually at the end of a quarter) and reflect the appropriate tax withholding based on local tax requirements.

**Note:** As the first quarter dividend was declared prior to the 2006 RSU grant date, the grant will be eligible for dividend equivalent payments beginning with the second quarter, when declared.

**The following is an illustration for RSUs granted annually, their payment at vesting and dividend equivalents delivered on the unvested units:**

| | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| **Number of cash-based RSUs granted** | 200 | 160 | 125 | 100 |
| Stock price at grant | $20 | $25 | $32 | $40 |
| **Value at grant** | $4,000 | $4,000 | $4,000 | $4,000 |
| | | | | |
| **VESTED RSUs** | | | | |
| 2006 Grant | | 67 | 67 | 66 |
| 2007 Grant | | | 54 | 53 |
| 2008 Grant | | | | 42 |
| 2009 Grant | | | | |
| Total number of vested RSUs | - | 67 | 121 | 161 |
| Stock Price at vesting | - | $25 | $32 | $40 |
| **Cash delivered for vested RSUs** | - | $1,675 | $3,872 | $6,440 |
| | | | | |
| **UNVESTED RSUs** | | | | |
| 2006 Grant | 200 | 133 | 66 | - |
| 2007 Grant | | 160 | 106 | 53 |
| 2008 Grant | | | 125 | 83 |
| 2009 Grant | | | | 100 |
| Total number of unvested RSUs | 200 | 293 | 297 | 236 |
| **Annualized dividend equivalents @ $1 per share (paid quarterly)** | $200 | $293 | $297 | $236 |
| | | | | |
| **Total Cash Delivered (vested RSUs + annualized dividend equivalents)** | $200 | $1,968 | $4,169 | $6,676 |

Summary of Cash-Based Restricted Stock Units (RSUs)

**Impact of certain events on your cash-based RSU grant:**

|  | Impact on your RSU Grant |
|---|---|
| Disability | Retain grant and payment based on vesting schedule |
| Leave of Absence | Retain grant and payment based on vesting schedule |
| Normal Retirement (62 or older with 10 or more years of credited service) and Total and Permanent Disability Retirement | Retain grant, if made at least one year prior to retirement, and payment based on vesting schedule |
| Quit | Grant is forfeited |
| Death | Grant is prorated for time worked and paid immediately based on value at time of death |

Information regarding the treatment of your cash-based RSUs in other situations may be found in the 2006 Cash-Based RSU Plan Language.

This long-term incentive is governed by the 2006 Cash-Based Restricted Stock Unit Plan language as approved by the Executive Compensation Committee of the Board of Directors.

General Motors reserves the right to amend, modify, suspend, increase, decrease or terminate any of its employee benefit or compensation programs.

# Cash-Based RSUs — Questions & Answers

## 1) Why are RSUs granted?

GM's compensation philosophy includes the use of incentive plan goals that comprehend business performance as well as stock market returns. Historically, the stock-based component of executive compensation was comprised of stock options, and for LTI executives, Stock Performance Program (SPP) grants. On a competitive level, the practice of granting stock options has declined in favor of granting restricted stock, both in an effort to reduce dilution (shares granted as a percent of total shares outstanding) and as a means to provide value to the executive that mirrors stockholder return over the same period.

## 2) How was the number of RSUs I received in my grant determined and will the number change from year to year?

There are a number of considerations in determining an individual's grant level. First, competitive grant *values* for each level of responsibility are established for each country based on benchmarking. A Corporate pool of cash-based shares is developed for RSU grants based on the total competitive value divided by GM's current stock price. This means that the value of the pool may stay relatively stable over time, with some adjustments for changes in competitive grant values, but the *number of shares* used for grants will change based on GM's stock price. In other words, if GM's stock price doubles, the number of shares provided for grants will generally be halved so that the same overall *value* is being provided.



The Corporate pool of cash-based shares is then allocated based on the levels of responsibility and each home country of the executives in the leader's group. The leader uses the shares provided as the basis for determining the individual grants, taking into account each executive's performance and contributions ensuring there is significant differentiation in grant levels based on these factors.

## 3) Will I own shares of GM stock during the vesting period?

While RSU awards are denominated in units, each representing the value of a share of GM $1-2/3 Common stock, there are no actual underlying shares. Thus, cash-based RSUs do not result in stock ownership or confer any voting rights (and do not apply toward stock ownership guidelines for LTI executives).

## 4) Why aren't we receiving shares of GM stock rather than the cash equivalent?

The GM 2002 Stock Incentive Plan, approved by stockholders, provides for 27.4 million shares to be granted as stock options, and up to one million of those shares to be allocated to restricted stock units that may be delivered in either cash or stock. Through 2005, the balance of remaining shares available to grant under this Plan is insufficient to continue to make option and/or RSU grants (in the form of stock) to the broad executive group.

G. RICHARD WAGONER, JR.
President and Chief Executive Officer

**GM  General Motors**

*Stock Options and RSU's are compensation for Services Rendered*

January 22, 2002

Mr. Daniel C. Plouffe
VSSM-Saturn
Detroit, Michigan

Dear Dan:

I want to start out by thanking you for your efforts and support in 2001. While it was a challenging year in many respects, we all can be proud of our progress in a number of key areas; my own personal favorite is our growth in market share in three regions, and in many important markets. We were recognized for our exciting new products; we improved our quality performance; and we continued to improve our manufacturing productivity. In the financial services arena, GMAC had another record year of earnings. And these are just some of the important advances that were inspired by our GM leadership team.

But, with challenges such as competitive pressures, price reductions and heavy incentive costs, the challenging European market, and economic turmoil in Argentina, our net income of $2.0 billion (excluding Hughes) and RONA of 6.2% were well below our recent performance levels, and below the threshold level of performance required for payment of the Annual Incentive Plan. So, no bonus can be paid for our 2001 results.

Nevertheless, with the support of the GM Board of Directors, we wanted to send a message of thanks to recognize our progress in 2001 and, specifically, our significant improvement relative to key competitors. So, in February, we will award a special, one-time stock option grant to executives. The total shares allocated for this grant will be roughly half of our annual option grant level. While obviously not the same as cash, this special option grant does provide significant financial opportunity for each of us, if we can continue to improve GM's business performance and see it reflected in stock price appreciation. Specific details on your special option grant will be provided in mid-February.

As we move into 2002, I ask you to build on the foundation of improvement that we laid with our 2001 performance, by driving for improved market share in every region of the world; successfully launching our new products; continuing our quality improvement activities; and focusing even more intently on eliminating waste, cutting costs, and generating cash, which will improve our financial performance. What we are striving for is to improve not only our absolute results, but also our relative competitive position.

The attached package provides detailed information about your regular (annual) 2002 stock option grant, and other compensation information. Please remember that, as with all your compensation, the size of your annual stock option is heavily dependent on your individual contribution, and your performance on your annual objectives. Your leader will personally review your performance relative to your 2001 objectives, and also finalize your 2002 objectives for our Performance Management Plan (PMP). I want to stress how important this PMP process is in ensuring that our individual, business unit, and Corporate objectives are integrated and aligned. Using the PMP process, if we all as individuals achieve our objectives, as a group we will achieve GM's Corporate objectives.

Remember -- in 2002, let's all keep building the momentum; let's get off to a fast start in sales and market share, quality, product launches, and cost savings. Let's continue to accelerate past our competitors in 2002. And, let's lead by example with our cultural priorities: act as one company, embrace stretch targets, move with a sense of urgency, and enhance our product and customer focus.

Thanks again for your hard work and leadership. 2002 will not be an easy year for the world economy or the auto industry; but, with your personal commitment, we can make it the year that GM becomes the recognized industry leader!

Sincerely,

*Rick*

Attachment

*Stock options and RSU's are compensation for Services Rendered*

General Motors Corporation

300 Renaissance Center
Mail Code 482-C39-B50        Detroit, MI 48265-3000        313-667-3505
Fax 313-667-3133

ATTACHMENT F

RICHARD WAGONER, JR.
President and Chief Executive Officer

 **GM** General Motors

January 21, 2003

Mr. Daniel C. Plouffe
VSSM-Saturn
Detroit, Michigan

*Services Rendered*

"Focus ... effort — leadership ... achieving stretch goals — sense of urgency"

Dear Dan:

In a fairly tough global economic and auto environment, GM performed quite well in 2002. Let me thank you, as a General Motors' executive, for your important role in making that happen.

We achieved impressive results in a number of areas — strong launches of well-received cars and trucks, continued improvements in cost and quality, and much better-than-expected income and cash flow. And, maybe most important for our ongoing success, we gained market share in three out of four regions, in some very challenging market conditions. In fact, the biggest single factor in our earnings and cash flow performance was stronger-than-expected North America industry sales volume; I think it's fair to say that GM's aggressiveness in the marketplace had a lot to do with that.

As a result, I'm pleased to advise that we overachieved our net income and RONA objectives, and generated a 191% bonus payout for those measures, which represent 70% of our bonus formula. The remaining 30%, determined by regional market share and quality for most executives, also generated solid performance in most cases. And, we also benefited from the newly introduced "competitive adjustment," based on our relative performance versus competitors. Overall, these results generated an excellent bonus payout for 2002.

Through your focus and effort, we also achieved the 2002 Leadership Challenge Grant structural cost and cash flow targets. As a result, 50% of your original target (denominated in GM shares) will be accrued and paid out subject to plan terms in early 2004. To earn the remaining 50% of this award, we need to focus on achieving the cumulative $1 billion target reduction in structural cost and generating $4 billion in positive operating cash flow this year.

As we move into 2003, my request of you is simple — let's stay focused and keep it going. And that means we continue the same formula for success: keep the great products coming, be aggressive in the market place, set new benchmarks in quality improvement and cost reduction, and generate lots of cash and income. It's true that we face some challenges this year, including continuing economic uncertainty and increased costs associated with a weaker-than-desirable balance sheet. But, we need to stay focused on what we can control and influence — just as we did in 2002 — and not let these other matters overwhelm or discourage us.

Finally, I want to thank you all for your help in delivering a consistent leadership message to our people, especially on our four cultural priorities — one company, stretch, sense of urgency, product and customer focus. Also, you've provided great leadership for *GoFast!*, and you've helped to institutionalize our Performance Management Process (PMP). All these are really making a difference; they're helping us grow together as a global team, and they're improving our business results. In 2003, besides continuing our strong and consistent leadership message in these areas, I'd also like your help in delivering our consistent message on stretch. You'll be hearing more on that.

Thanks for your efforts in 2002. I'm extremely pleased that they resulted in an excellent and well-deserved bonus payout opportunity. In 2003, let's stay focused, and, with the confidence that comes from our successes in 2002, move even faster and more aggressively this year.

Sincerely,

*Rick*

Attachment

General Motors Corporation

300 Renaissance Center
Mail Code 482-C39-B50

Detroit, MI 48265-3000

313-667-3505
Fax 313-667-3133

**GM**



G. **Richard** Wagoner, Jr.
Chairman &
Chief Executive Officer

*ATTACHMENT G*

**January 19, 2005**

Mr. Daniel C. Plouffe
Vehicle Brand Marketing
Detroit, Michigan

*Services Rendered*
*" Work performed ... effort ... /leadership*
*.... commitment "*

Dear Dan:

I want to start by thanking you for your hard work on GM's behalf in 2004. When it comes to effort, I don't think I could ask for any more from our leadership group.

On the results side, however, I do expect more. 2004 was a challenging year in many ways ... more so than I expected. We had some real successes, for sure. I can't list them all here, but several stand out in my mind: GMAC's record earnings for the sixth year in a row; GMLAAM's return to profitability; solid results at GMAP; and some real wins with several of our products and brands, among others.

On the other hand, GM Europe's financial performance was disappointing, as were our market share in key markets like the U.S. and Australia and the large number of recalls we experienced in the U.S. These, combined with ever tougher competitive and pricing conditions and rising health care costs, resulted in disappointing Corporate financial results in the second half of the year.

Thanks to our strong first-half, we were able to generate a payout of 86% on the Corporate portion (70%) of our bonus formula, which is based on net income and cash flow. The remaining 30% of the bonus fund, which is determined by regional / business unit performance in market share and quality, generally paid out between threshold and target levels, although some units did better. The final payout also reflects a positive "competitive factor" adjustment of 3 points (out of a maximum of 14), which is based on our modest relative improvement versus several competitors.

Our "wins" in 2004 show what GM is really capable of doing. Overall, though, 2004 was for me a disappointing year ... one in which we did not make the step forward that I was anticipating. We need to correct this in 2005. So, my request of you for this year is simple. Let's stay focused on our strategy -- great products; being smart and aggressive in the marketplace; driving to world class cost and quality; generating lots of cash. Let's learn from our successes and from our mistakes in 2004. Let's recalibrate our efforts on "Becoming the Best ... Right Now." And, let's get back on a winning track in 2005.

Thanks for your personal commitment, and your leadership.

*Rick*

**Rick Wagoner**

E52 1802 LANEV

**General Motors Corporation**        Mail Code 482-C39-B50          300 Renaissance Center       Detroit, MI 48265-3000
                                      Tel 313-667-3505                Fax 313-667-3133             grwjr@gm.com

# GENERAL MOTORS CORPORATION

**Name: DANIEL C PLOUFFE**

Date: Jan-14-2005

---

**ANNUAL SALARY**

[redacted]

**ANNUAL INCENTIVE AWARDS**



2004 Award Target: [redacted]

2004 Perf. Adj. Target: [redacted]

2004 Award Payout: [redacted]

Total Cash Compensation: [redacted]
( 2004 Award Payout +  Current Base)

2005 Award Target: [redacted]

Target as % Salary: [redacted]

New Target Cash Comp.: [redacted]
( 2005 Award Target + 2005 Base)

---

*Example of 1year of options grant*

**Stock Options:**

Jan-24-2005 Grant: 2,100 shares        2003    2300 shares

---

Incentive award targets represent the award that an executive who substantially achieves individual performance objectives could expect to earn if Corporate and Region performance is 100% of targeted levels. Incentive awards are prorated to reflect time in executive group and positions held. The performance adjusted target for AIP reflects Corporate and Regional results and for SPP reflects Corporate results.  Final award payouts also reflect individual performance.  Annual incentive awards are payable in late January or February, 2005, according to local payroll schedules and taxes will be withheld as applicable. *Implementation of any proposed salary increase and associated AIP target subject to possible revision based on business conditions and individual performance.*

Personal and Confidential



G. Richard Wagoner, Jr.
Chairman &
Chief Executive Officer

*ATTACHMENT H*

March 19, 2007

Mr. Daniel C Plouffe
VSSM Field Operations
Detroit, Michigan

*Services Rendered ... "work performed, leadership etc."*

Dear Dan:

Thanks so much for your hard work, support, and leadership in 2006, as we took major actions to restructure and grow our business globally. Overall, we achieved dramatic, and much needed, improvement in GM's financial performance. And, importantly, we did so by taking actions that will help further improve and grow our business in the future.

While there were many more important accomplishments than I can list here, it's certain that none were more important than our new cars and trucks around the globe. Our commitment to product excellence and design leadership is beginning to pay real dividends, and I appreciate everyone's hard work and continued focus on that ... it's critical to our future success. I'd also like to highlight the tremendous progress that we've made in running our business globally. Virtually every one of us has been impacted by this, and we're all beginning to see the benefits -- in our products, powertrains, quality, competitiveness, systems and much more. I appreciate your continued leadership in these important initiatives.

At the regional level, a number of important milestones were achieved. GMNA's $9 billion cut in structural cost, revamped sales and marketing strategy, and new product launches led to a $5 billion improvement in adjusted net income. GME moved back into profitability for the first time since 1999, on the strength of its product renaissance, record unit sales, and structural cost actions. GMLAAM achieved all-time sales records, and tremendous profitability and cash flow, and GMAP continued its rapid growth and solid financial results. I'm especially pleased with our progress in a number of key developing markets in AP and LAAM, and Russia, too. Finally, completing the GMAC transaction was a major accomplishment, fundamental to GMAC's future business growth and GM's improved liquidity position.

Based on this progress, I'm pleased that we were able to generate a 66% global automotive payout under our annual incentive plan formula. This was driven by our adjusted net income performance, as we did not achieve our cash flow minimum objective, and regional quality and market share performance was, on average, between threshold and target. Beyond this, GM's stock price improved by 64% during 2006, which will favorably impact the first installment value of the 2006 Restricted Stock Units that are being delivered to you in cash this month.

*RSU's paid out in cash not stock*

We can all be proud of our tremendous progress in 2006; frankly, we did far more than people expected. With that under our belt, we can drive our strategies in 2007 with even greater confidence and speed. We've got plenty more to do to achieve product and brand leadership, steady revenue growth, and solid earnings. And, generating positive cash flow remains a critically important challenge. I'm confident that, with your continued leadership, we'll again surprise people at how fast we can achieve these objectives.

Thanks again for all your efforts in 2006, and congratulations on your accomplishments. Let's make 2007 another huge year of progress for GM.

Sincerely,

*Rick*

General Motors Corporation

Mail Code 482-C39-B5C
Tel 313-667-3505

300 Renaissance Center
Fax 313-667-3133

Detroit, MI 48265-3000
grwjr@gm.com

# GENERAL MOTORS CORPORATION
### Executive Compensation Summary

Daniel C Plouffe

2-Oct-06
Currency: US

| | Target Cash Opportunity | |
|---|---|---|
| **Current** | | **1-Nov-06** |
| **Salary:** ▉ | | **Salary:** ▉ |
| | | Change %: |
| **AIP Target Opportunity** ▉ | | **AIP Target Opportunity:** ▉ |
| Target as % Salary: ▉ | | Target as % Salary: |
| **Target Cash Opportunity:** ▉ | | **Target Cash Opportunity:** ▉ |
| *(Salary + AIP Target)* | | *(Salary + AIP Target)* |

| 2006 Long-Term Incentive Opportunity | | | |
|---|---|---|---|
| **At Grant** | | **1-Nov-06** | |
| **Cash-Based RSUs*:** | 1,430 | **Cash-Based RSUs*:** | 1,430 |
| Grant Value at $20.90 US/Share: | 29,887 | Current Value at $32 US/Share: | 45,760 |
| | | *Granted 23 Feb 06 | |

| 2006 Total Target Compensation Opportunity* | | |
|---|---|---|
| **Prior to 01 Nov 06:** ▉ | | **01 Nov 06:** ▉ |
| *Target Cash Opportunity + Cash-Based RSU Value* | | |

The RSU grant will vest in equal installments on each of the first three anniversary dates following the grant date and will be delivered in cash via the payroll. When the RSUs vest, a cash value is calculated equal to the number of units vested multiplied by the stock price at that time. Quarterly dividend equivalents, when declared, will also be paid in cash on the unvested RSUs via the payroll. Additional information regarding RSUs is located on Execunet on mySocrates.

For the specific terms and conditions of your 2006 awards, refer to the applicable plan language located on Execunet on mySocrates.

Note: AIP Target opportunity will be prorated to reflect time in the executive group.



**GENERAL MOTORS CORPORATION**
**2008 Executive Compensation Summary**

Daniel C Plouffe

10Mar08
Currency: US Dollar

### 2007 Compensation

| | |
|---|---|
| Salary: | ████ |
| AIP Target Opportunity: | ████ |
| Corporate Performance Adjusted AIP Target: | ████ |
| **Annual Incentive Program Payout:** | ████ |
| **2006 Cash-Based RSU Grant** (1st installment) **Units:** | 477 |
| CRSU Installments & Dividend Payments Delivered in 2007: | 19,078 |
| **Total Cash Compensation:** | ████ |

### 2008 Compensation Structure

| | |
|---|---|
| Salary (As of 6/1/2008): | ████ |
| Base Salary Increase Amount / Increase %: | ████ |
| AIP Target Opportunity: | ████ |
| Target as % Salary: | ████ |
| **05-Mar-08 Cash-Based RSU Grant:** | 2,318 |
| Value (at $27.18 US/Share): | 63,003 |
| **Total 2008 Target Compensation:** | ████ |

### Vesting Schedule or Outstanding Awards (as of 12/31/07)

**Cash-Based RSUs**

| Grant Date: | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|
| 23-Feb-06: | 477 | 476 | | |
| 20-Mar-07: | 702 | 701 | 701 | |
| 5-Mar-08: | | 773 | 773 | 772 |

Total 1950   TBD 09   TBD 09

TBD 10

Quarterly dividend equivalents, when declared, are paid on unvested CRSUs via the payroll.

This is a summary only. All terms and conditions of the applicable plan apply. To the extent anything in this summary conflicts with the terms and conditions of the applicable plan, the terms and conditions of the plan will control.

You can access your total stock options outstanding by logging into your account at Smith Barney's website at www.benefit.access.com.

If you do not have your logon id and/or password, you may contact Smith Barney's Customer Service Center (in the U.S.) at 1-877-368-4646 or 212-615-7836 from 8 a.m. through 6 p.m. (Eastern time) Monday through Friday.