**Hearing Date and Time: March 29, 2011 at 9:45 a.m. (ET)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| MOTORS LIQUIDATION COMPANY, | ) Case No. 09-50026 (REG) |
| | ) |
| f/k/a/ GENERAL MOTORS CORP., | ) Jointly Administered |
| | ) |
| Debtor. | ) |
| | ) |

**UNITED STATES' STATEMENT IN SUPPORT OF DEBTORS'**
**MOTION TO APPROVE SETTLEMENT AGREEMENT**
**AMONG THE DEBTORS AND THE UNITED STATES**

PREET BHARARA
United States Attorney for the
Southern District of New York
DAVID S. JONES
NATALIE N. KUEHLER
JAIMIE L. NAWADAY
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel. No.:  (212) 637-2741
Fax No.:  (212) 637-2750

*Counsel for the United States*

# TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ........................................................................1

II.  GENERAL STATUTORY/FACTUAL BACKGROUND ................................................2

    A.  Statutory Background .........................................................................3

        1.  CERCLA......................................................................................3

        2.  RCRA...........................................................................................5

    B.  Procedural Background.........................................................................6

    C.  The Non-Owned Site Settlement Agreement.........................................7

        1.  Allowed General Unsecured Claims.............................................7

        2.  Distribution of Proceeds Received from Allowed General Unsecured
            Claims .......................................................................................16

        3.  Environmental Claims Not Resolved by the Agreements ...........9

        4   Covenants Not to Sue and Contribution Protection....................9

    D.  Public Comments .................................................................................9

        1.  Waste Management of Ohio, Inc. and Chemical Waste Management, Inc.
            (the "**Tremont PRPs**")...............................................................10

        2.  South Dayton Dump and Landfill Site PRP Group (the "**South Dayton
            Group**") ....................................................................................11

        3.  The Lammers Barrel Factory PRP Group (the "**Lammers Group**")........11

        4.  The Valleycrest Landfill Site PRP Group (the "**Valleycrest Group**") .....12

        5.  Rose Township Dump Site and Springfield Township Dump Site PRPs .13

III.  ARGUMENT....................................................................................................13

    A.  The Court Should Approve the Non-Owned Site Settlement Because It Is Fair,
        Reasonable, and Consistent With Environmental Law..........................13

        1.  The Settlement Is Fair...............................................................15

2.    The Settlement Is Reasonable ..................................................................16

3.    The Settlement Is Consistent with the Goals of CERCLA .......................16

B.    The Public Comments Do Not Indicate That the Non-Owned Site Settlement
Agreement Is Inappropriate, Inadequate, or Improper ...........................................17

1.    Distributions Are Liquidated and Applied to Site Costs Promptly and in
Accordance with EPA Policy ....................................................................17

2.    The Agreement Provides Significant and Reasonable Funding For
Cleanup .....................................................................................................19

a.    The Settlement Amount for the South Dayton Site Is
Reasonable ....................................................................................21

b.    The Settlement Amount for the Lammers Site Is Reasonable .......22

c.    The Settlement Amount for the Valleycrest Site Is Reasonable ....24

d.    The Settlement Amounts for the Rose and Springfield Dump Sites
Are Reasonable .............................................................................24

3.    Contribution Protection Is Warranted ......................................................25

4.    The Length of the Public Comment Period Was Reasonable ....................27

CONCLUSION ................................................................................................................28

# TABLE OF AUTHORITIES

**CASES**                                                                                                  **PAGES**

*B.F. Goodrich Co. v. Murtha*,
    958 F.2d 1192 (2d Cir. 1992) ............................................................................4

*Burlington Northern & Santa Fe Railway v. United States*,
    129 S. Ct. 1870 (2009) ...............................................................................20

*City of New York v. Exxon Corp.*,
    697 F. Supp. 677 (S.D.N.Y. 1988) ...............................................................5

*Consolidated Edison Co. of N.Y. v. UGI Utility, Inc.*,
    423 F.3d 90 (2d Cir. 2005) ..........................................................................20

*In re Cuyahoga Equipment Corp.*,
    980 F.2d 110 (2d Cir. 1992) ............................................................... *passim*

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.*,
    805 F.2d 1074 (1st Cir. 1986) ......................................................................3

*In re Eagle-Picher Industries, Inc.*,
    197 B.R. 260 (Bankr. S.D. Ohio 1996), *aff'd* 1997 U.S. Dist. LEXIS 15436 ..................18

*General Time Corp. v. Bulk Materials, Inc.*,
    826 F. Supp. 471 (M.D. Ga. 1993) ...............................................................27

*New York v. Shore Realty Corp.*,
    759 F.2d 1032 (2d Cir. 1985) ........................................................................3

*New York v. Solvent Chemical Corp.*,
    984 F. Supp. 160 (W.D.N.Y. 1997) ......................................................14, 17

*O'Neil v. Picillo*,
    682 F. Supp. 706 (D.R.I. 1988), *aff'd*, 883 F.2d 176 (1st Cir. 1989) ..............................3, 4

*United States v. Akzo Coatings of America, Inc.*,
    949 F.2d 1409 (6th Cir. 1991) ...................................................................2, 5

*United States v. Alcan Aluminum Corp.*,
    990 F.2d 711 (2d Cir. 1993) .........................................................................4

*United States v. Alcan Aluminum, Inc.*,
 25 F.3d 1174 (3d Cir. 1994)................................................................5

*United States v. Cannons Engineering Corp.*,
 889 F.2d 79 (1st Cir. 1990) ...................................................... *passim*

*United States v. Cannons Engineering Corp.*,
 720 F. Supp. 1027 (D. Mass. 1989) ........................................... *passim*

*United States v. Charles George Trucking Inc.*,
 34 F.3d 1081 (1st Cir. 1994) ..................................................... *passim*

*United States v. Davis*,
 261 F.3d 1 (1st Cir. 2001) ...............................................................15

*United States v. DiBiase*,
 45 F.3d 541 (1st Cir. 1995)..........................................................5, 15

*United States v. Hooker Chemical & Plastics Corp.*,
 540 F. Supp. 1067 (W.D.N.Y. 1982), *aff'd*, 749 F.2d 968 (2d Cir. 1984)..............2, 14, 17

*United States v. Monsanto*,
 858 F.2d 160 (4th Cir. 1988) ............................................................4

*United States v. Serafini*,
 781 F. Supp. 336 (M.D. Pa. 1992) ..................................................27

*United Technologies Corp. v. Browning-Ferris Industrial, Inc.*,
 33 F.3d 96 (1st Cir. 1994), *cert. denied*, 513 U.S. 1183 (1995) .........5

*Voluntary Purchasing Groups, Inc. v. Reilly*,
 889 F.2d 1380 (5th Cir. 1989) ..........................................................3

**STATUTES**

11 U.S.C. § 363.....................................................................................6

26 U.S.C. § 9507...................................................................................3

42 U.S.C. §§ 6901 - 6992, and the Clean Air Act, 42 U.S.C. §§ 7401-7671q ...............................1

42 U.S.C. §§  6921—6925.....................................................................5

42 U.S.C. §§ 6924(u) ............................................................................6

42 U.S.C. § 6925 ...........................................................................................................6

42 U.S.C. § 6926(b) .......................................................................................................5

42 U.S.C. § 6928 ...........................................................................................................5

42 U.S.C. § 6973(a) .......................................................................................................6

42 U.S.C. §§ 7401-7671q ..............................................................................................1

42 U.S.C. § 9601(24) .....................................................................................................3

42 U.S.C. § 9604(a)-(b) .................................................................................................3

42 U.S.C. §§ 9604, 9606, 9622 ......................................................................................5

42 U.S.C. § 9607(a) .......................................................................................................4

42 U.S.C. § 9613(f)(2)-(3) ....................................................................................5, 9, 26

42 U.S.C. § 9622(a) .......................................................................................................5

1986 U.S.C.C.A.N. 2862 ...............................................................................................5

1986 U.S.C.C.A.N. 2862 ...............................................................................................5

## RULES AND REGULATIONS

69 Fed. Reg. 20641 (Apr. 16, 2004) ............................................................................27

71 Fed. Reg. 31214 (June 1, 2006) ..............................................................................27

71 Fed. Reg. 38660 (July 7, 2006) ...............................................................................27

75 Fed. Reg. 17160-01 (April 5, 2010) ........................................................................27

76 Fed. Reg. 47 at 13208 (March 10, 2011) ..................................................................2

76 Fed. Reg. 51 at 14427 (March 16, 2011) ..................................................................2

131 Cong. Rec. 34,646 (Dec. 5, 1985) .........................................................................26

1986 U.S. Code Cong. & Ad. News 3042 (emphasis added) .......................................26

H.R. Rep. No. 99-253 .....................................................................................................5

H.R. Rep. No. 253, 99th Cong., 1st Sess .......................................................................................26

S. Rep. No. 96-848, 96th Cong., 2d Sess. at 17-18 (1980), *reprinted in* 1 Sen. Comm. on
Env't & Pub. Works, Legislative History of CERCLA 305, 324-25 (1983) ................................3

## I.    PRELIMINARY STATEMENT

The United States of America (the "**United States**"), on behalf of the United States Environmental Protection Agency ("**EPA**") respectfully submits this memorandum of law in support of Debtors' Motion for an Order Approving the Consent Decree and Settlement Agreement between the United States of America and the Debtors (the "**Non-Owned Site Settlement Agreement**" or "**Settlement Agreement**") and responds to public comments received in connection with the Settlement Agreement lodged with the United States Bankruptcy Court for the Southern District of New York (the "**Court**") on March 4, 2011.

The proposed Settlement Agreement resolves environmental liabilities of the Debtors asserted by the United States on behalf of EPA, under, *inter alia*, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("**CERCLA**"), 42 U.S.C. §§ 9601 – 9675, the Resource Conservation and Recovery Act ("**RCRA**"), 42 U.S.C. §§ 6901 – 6992, and the Clean Air Act, 42 U.S.C. §§ 7401-7671q, for response costs and civil penalties in connection with fifty-six hazardous waste sites and facilities (the "**Settled Non-Owned Sites**").    Under the Agreement, the United States, on behalf of EPA, will receive an allowed general unsecured claim in the total amount of $36,290,270.  In addition, the United States, on behalf of EPA, will receive a total cash amount of $4,613,322 from fully-collateralized bonds,[1] and work up to the amount of $10.5 million in accordance with bond requirements.  Finally, certain private parties (groups of potentially responsible parties or "**PRPs**") will receive allowed general unsecured claims totaling $3,020,539.

The proposed Settlement Agreement requires the Court to approve its fairness,

---

[1]    The United States notes that the Non-Owned Site Settlement Agreement lodged with this Court on March 4, 2011, incorrectly stated that the United States received cash in the amount of $122,000 from a bond at the 68th Street Dump Site, when in fact the United States received cash in the amount of $112,000 for this site.

reasonableness, and consistency with environmental law.  A public notice of the proposed

Settlement Agreement was published in the Federal Register, 76 Fed. Reg. 47 at 13208 (March

10, 2011), (the "**Federal Register Notice**"), and an addendum to the notice, which clarified that

all public comments must be received by March 25, 2011, was published in the Federal Register,

76 Fed. Reg. 51 at 14427 (March 16, 2011).  The United States received a total of six comments.

After reviewing the comments received, the United States has determined that the

proposed Settlement Agreement is fair, reasonable and consistent with environmental law.  The

settlement was reached after lengthy negotiation of its terms among sophisticated counsel.  In

addition, the parties weighed the merits, costs, risks and delays that litigation would entail

against the value of settlement.

The function of the Court in reviewing such motions is not to substitute its judgment for

that of the parties to the proposed Agreement, but to confirm that the terms of the proposed

Agreement are "fair and adequate and are not unlawful, unreasonable, or against public policy."

*United States v. Hooker Chem. & Plastics Corp.*, 540 F. Supp. 1067, 1072 (W.D.N.Y. 1982),

*aff'd*, 749 F.2d 968 (2d Cir. 1984).  The Court should also confirm that the proposed Settlement

Agreement is consistent with CERCLA's goals.  *United States v. Akzo Coatings of Am., Inc.*, 949

F.2d 1409, 1426 (6th Cir. 1991).   Finally, in conducting its review, the Court should be

deferential to the United States' determination that the settlement is in the public interest.  *United

States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990).  Accordingly, for the reasons set

forth herein, the United States respectfully requests that this Court approve and enter the

proposed Non-Owned Site Settlement Agreement lodged with this Court on March 4, 2011.

## II.    GENERAL STATUTORY/FACTUAL BACKGROUND

The environmental liabilities that are resolved by the Settlement Agreement derive

2

primarily from three federal statutes.  The first of these, CERCLA, is generally directed at cleaning up sites contaminated with hazardous substances as a result of releases of such substances into the environment.  The second, RCRA, in part, addresses cleanup of hazardous constituents and hazardous wastes at operating facilities, as well as any migration of hazardous constituents from such facilities, resulting from the generation, treatment, storage, disposal, or transport of hazardous wastes.  The third, the Clean Air Act, in part, prohibits automotive engine manufacturers from introducing or delivering for introduction into commerce any new automotive vehicle engine unless it is covered by a certificate of conformity issued by the EPA pursuant to Section 206 of the Clean Air Act, 42 U.S.C. § 7525, attesting that the engine complies with all applicable CAA regulations.

**A.      Statutory Background**

   1.      <u>CERCLA</u>

   CERCLA was enacted to provide a framework for cleanup of the nation's worst hazardous waste sites.  The primary goal of CERCLA is to protect and preserve public health and the environment from the effects of releases or threatened releases of hazardous substances into the environment.  *See* 42 U.S.C. § 9601(24); *Voluntary Purchasing Groups, Inc. v. Reilly*, 889 F.2d 1380, 1386-87 (5th Cir. 1989); *O'Neil v. Picillo*, 682 F. Supp. 706, 726 (D.R.I. 1988), *aff'd*, 883 F.2d 176 (1st Cir. 1989); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir. 1986); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1040 n.7 (2d Cir. 1985).

   The Hazardous Substance Superfund, commonly known as the Superfund, was established pursuant to 26 U.S.C. § 9507 to finance federal response actions undertaken pursuant to section 104(a) of CERCLA, 42 U.S.C. § 9604(a).  Although CERCLA authorizes cleanup of

3

sites contaminated with hazardous substances using money provided by the Superfund, the

Superfund is a limited source of funding intended for use only when responsible parties are not

available to conduct or finance a site's cleanup. *See* S. Rep. No. 96-848, 96th Cong., 2d Sess. at

17-18 (1980), *reprinted in* 1 Sen. Comm. on Env't & Pub. Works, Legislative History of

CERCLA 305, 324-25 (1983). The Superfund cannot finance cleanup of all of the many

contaminated sites nationwide, so replenishment of expended Superfund monies is crucial to the

continuing availability of funds for future cleanups. Thus, the United States is tasked with

seeking to ensure that PRPs perform site cleanups, or, when Superfund monies are expended by

the federal government in response to a release or threatened release of hazardous substances,

that those monies are recovered from PRPs through the liability scheme set forth in section 107

of CERCLA. *See B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1197-98 (2d Cir. 1992) (one

statutory purpose of CERCLA is to hold responsible parties liable for the costs of the cleanup).

Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), permits the United States to recover its

costs of responding to releases of hazardous substances from PRPs. Pursuant to section 107(a),

PRPs include the owners and operators of Superfund sites at the time of the disposal of

hazardous substances at the sites, the current owners and operators of Superfund sites, as well as

the generators and transporters of hazardous substances sent to Superfund sites. *See United*

*States v. Alcan Aluminum Corp.*, 990 F.2d 711, 722 (2d Cir. 1993) (describing potential liability

for generating hazardous wastes found at a Superfund site); *O'Neil*, 883 F.2d at 178

(distinguishing waste generators from waste transporters); *United States v. Monsanto*, 858 F.2d

160, 168-171 (4th Cir. 1988) (laying out the distinction between owner liability and generator

liability).

Sections 104(a) and (b) of CERCLA, 42 U.S.C. § 9604(a)-(b), authorize EPA to use

4

Superfund monies to investigate the nature and extent of hazardous substance releases from

contaminated sites and to clean up those sites.  Moreover, EPA may also issue unilateral

administrative orders to PRPs that require them to clean up sites, may seek injunctive relief

through a civil action to secure such relief, or may seek to reach agreements with PRPs through

which one or more PRPs agree to perform the necessary cleanup of sites.  *See* 42 U.S.C. §§

9604, 9606, 9622.

Having created the liability system and enforcement tools to allow EPA to pursue

responsible parties for Superfund cleanups, Congress expressed a strong preference that the

United States settle with responsible parties in order to avoid spending resources on litigation

rather than on cleanup.  42 U.S.C. § 9622(a).[2]  CERCLA encourages settlements, *inter alia*, by

providing parties who settle with the United States protection from contribution claims for

matters addressed in the settlement.  42 U.S.C. § 9613(f)(2).  This provision was designed to

provide settling parties "with a measure of finality in return for their willingness to settle."[3]

2.    RCRA

RCRA regulates generators and transporters of hazardous waste and owners and

operators of facilities that treat, store, or dispose of hazardous wastes.  Pursuant to 42 U.S.C. §

6926(b), EPA has authorized certain states to administer portions of the RCRA hazardous waste

management programs.  The United States retains the authority to enforce an authorized State's

regulations as well as the federal portion of the program still being administered by the United

---

[2]    *See also United States v. DiBiase*, 45 F.3d 541, 545-46 (1st Cir. 1995); *United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174, 1184 (3d Cir. 1994); *In re Cuyahoga Equip.Corp.*, 980 F.2d 110 (2d Cir. 1992) (citing *City of New York v. Exxon Corp.*, 697 F. Supp. 677, 693 (S.D.N.Y. 1988)); *Akzo Coatings*, 949 F.2d at 1436; *Cannons Eng'g*, 899 F.2d at 92; H.R. Rep. No. 99-253, pt. 1, at 80 (1985), *reprinted in* 1986 U.S.C.C.A.N. 2862.

[3]    *Cannons Eng'g*, 899 F.2d at 92; *see also United Techs Corp. v. Browning-Ferris Indus., Inc.*, 33 F.3d 96, 103 (1st Cir. 1994), *cert. denied*, 513 U.S. 1183 (1995); H.R. Rep. No. 99-253, pt. 1, at 80 (1985), *reprinted in* 1986 U.S. C.C.A.N. 2862.

States.  42 U.S.C. § 6928.

RCRA regulations impose obligations on the owners and operators of hazardous waste

generation, treatment, storage, disposal, and/or transportation facilities regarding the manner in

which such owners and operators deal with solid and hazardous wastes.  *See* 42 U.S.C. §§

6921—6925; 40 C.F.R. Parts 260-279.  In addition, owners and operators of hazardous waste

treatment, storage, or disposal facilities must obtain either a permit or "interim status" in order to

operate legally.  42 U.S.C. § 6925.  Under RCRA, the United States and authorized states have

the authority to order the owner or operator of a permitted or interim status facility to conduct

closure, corrective action, or other response measures as necessary to protect human health and

the environment.  *See* 42 U.S.C. §§ 6924(u), (v); 6928(h).  Where EPA determines that handling,

storage, treatment, transportation, or disposal of solid or hazardous waste may present an

"imminent and substantial endangerment to health or the environment," it can also issue a

cleanup order or seek injunctive relief against any person who has contributed or is contributing

to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste

anywhere that such solid or hazardous waste is located.  42 U.S.C. § 6973(a).

3.    The Clean Air Act

The Clean Air Act was enacted "to protect and enhance the quality of the Nation's air

resources so as to promote the public health and welfare and the productive capacity of its

population."  42 U.S.C. § 7401(b)(1).  Towards this end, the Clean Air Act prohibits automotive

engine manufacturers from introducing or delivering for introduction into commerce any new

automotive vehicle engine unless it is covered by a certificate of conformity issued by the EPA

pursuant to Section 206, 42 U.S.C. § 7525, attesting that the engine complies with all applicable

Clean Air Act regulations.  42 U.S.C. § 7522(a)(1).  The Clean Air Act also prohibits

6

manufacturers of new motor vehicle engines from selling, shipping or otherwise introducing into commerce any shipments of engines covered by the Clean Air Act that do not contain all parts or components specified in the certificate of conformity issued by the EPA for those engines. *Id.* Finally, the Clean Air Act requires emission control information labels to be permanently affixed to all new automotive engines and indicate the certificate of conformity by which the engines are covered and contain certain additional emission control information. 42 U.S.C. § 7522(a)(4). Any person who violates these provisions is subject to a civil penalty with respect to each non-conforming motor vehicle or motor vehicle engine. 42 U.S.C. § 7524(a).

**B.    Procedural Background**

On June 1, 2009, General Motors Corp. ("**Old GM**") and three wholly-owned direct or indirect subsidiaries (collectively the "**Debtors**") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, and on October 9, 2009, REALM and ENCORE each also filed voluntary chapter 11 petitions. The Debtors' cases are being jointly administered in this Court. On June 1, 2009, Old GM also filed a motion to approve the sale of substantially all of its assets pursuant to 11 U.S.C. § 363. On July 5, 2009, the Bankruptcy Court approved the sale of assets to NGMCO, Inc. (a/k/a Newco), now known as General Motors Company ("**New GM**"). Following the sale of assets, Old GM was renamed MLC, and it has continued to own and manage the real property assets excluded from the sale to New GM.

On November 28, 2009, the United States timely filed proof of claim No. 64064, asserting environmental liabilities against the Debtors (the "**U.S. Proof of Claim**"). The U.S. Proof of Claim alleges that the Debtors are liable to the United States for costs relating to liabilities at numerous non-debtor-owned sites and for violations of CERCLA, RCRA, and the Clean Air Act. The U.S. Proof of Claim also protectively set forth, *inter alia*, claims or causes of action for future

work as well as past and/or future costs with respect to properties owned by Debtors (the

"**Owned Sites**") and properties at which MLC is under a judicial or administrative order to

perform cleanup and is the sole viable PRP to carry out that cleanup (the "**Priority Order**

**Sites**").

The United States and Debtors negotiated extensively for over one year to reach a

number of significant settlements.  First, the parties reached consensus on the Environmental

Response Trust Consent Decree and Settlement Agreement, approved by this Court on March 3,

2011 (the "**ERT Settlement Agreement**"), which primarily addressed environmental liabilities

at the Owned Sites.  Second, the parties reached consensus on the Priority Order Site Settlement

Agreements, also approved by this Court on March 3, 2011, which addressed environmental

liabilities at the Priority Order Sites.  Third, the parties reached consensus on Debtors' liabilities

under the Clean Air Act and at numerous non-Debtor-owned sites where MLC is not the sole

viable, responsible party to perform the cleanup (the "**Non-Owned Sites**").  The United States

lodged the Non-Owned Site Settlement Agreement with this Court on March 4, 2011.

## C.    The Non-Owned Site Settlement Agreement[4]

### 1.    Allowed General Unsecured Claims

Pursuant to Section V of the Non-Owned Site Settlement Agreement, the United States,

on behalf of EPA, will receive an allowed general unsecured claim totaling $36,290,270 to

resolve Debtors' liabilities for (i) contamination at twenty-seven sites; and (ii) alleged violations

of RCRA and the Clean Air Act.  The amount of the allowed claim for contamination at each site

---

[4]    This memorandum of law contains an abbreviated summary of the terms and provisions
of the Non-Owned Site Settlement Agreement, which is attached hereto as Exhibit A.  If there is
any conflict between the description of the settlement contained in this memorandum and the
terms and provisions of the Settlement Agreement, the terms and provisions of the Settlement
Agreement are controlling.

was determined, for settlement purposes, on a site-by-site basis taking into account: (1) estimated

total past and future response costs; (2) the Debtors' estimated percentage allocation or fair share

of liability for the site; and (3) litigation considerations.

In addition, to address contamination at six sites, the United States, on behalf of EPA, will

receive a total cash amount of $4,613,322 from fully-collateralized bonds, and work up to the amount of

$10.5 million in accordance with bond requirements.  Three PRP groups who filed proofs of claim

against Debtors will also receive allowed general unsecured claims in connection with three sites:  the

Operating Industries Steering Committee will receive an Allowed General Unsecured Claim in the

amount of $2,300,000, the Casmalia Resources Site Steering Committee will receive an Allowed

General Unsecured Claim in the amount of $344,039, and the Chemclene PRP Group at the Malvern

TCE Site will receive an Allowed General Unsecured Claim in the amount of $376,500.  The Settlement

Agreement further provides that the United States may file a new proof of claim related to those sites in

the U.S. Proof of Claim that were not settled and that the Debtors must reserve no less than

$250,000,000 for such proof of claim.

2.    Distribution of Proceeds Received from Allowed General Unsecured Claims

Paragraph 48 of the Settlement Agreement further requires that, with the exception of

distributions received on account of penalty claims, any cash distribution or the proceeds thereof

received by EPA be deposited in a special account within the Superfund to be "retained and used

to fund response actions at the Settled Non-Owned Site for which it received an Allowed

General Unsecured Claim, or, if no further response action is required, or as otherwise required

by EPA policy, transferred by EPA to Superfund."  *See* Settlement Agreement ¶ 48.  The carve-

out language in Paragraph 48 allows for circumstances in which EPA policy dictates against the

creation or use of a special account.  Distributions received on account of penalty claims are to

9

be processed in accordance with applicable law.  *Id.*  Finally, under the Settlement Agreement, only the amount or value that the United States receives from the Debtors, not the total amount of the allowed claim, will be credited by EPA to its account for a particular site, which credit will reduce the liability of non-settling PRPs for the particular site by the amount of credit.  *Id.* at ¶ 49.

> 3.    Environmental Claims Not Resolved by the Agreements

EPA reserves all rights against Debtors with respect to all matters not specifically settled by the Non-Owned Site Settlement Agreement, including (i) all rights with respect to any site that is not a Settled Non-Owned Site; (ii) any claims for natural resource damages; (iii) any criminal liability; and (iv) any action to enforce the agreement.

> 4.    Covenants Not to Sue and Contribution Protection

The Non-Owned Site Settlement Agreement provides Debtors with covenants not to sue from EPA with respect to the Settled Non-Owned Sites.  The Agreement also provides reciprocal covenants not to sue from Debtors for EPA.  Finally, the Agreement provides the Debtors with contribution protection for matters addressed therein as provided for by section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2).

**D.    Public Comments**

The United States received six comments, all from PRPs at the Settled Non-Owned Sites, which are described below and attached hereto as Exhibit B.

> 1.    Waste Management of Ohio, Inc. and Chemical Waste Management, Inc. (the
> "Tremont PRPs")

On March 14, 2011, the Tremont PRPs submitted comments applicable to all sites, which are attached hereto as Exhibit B at US00356-58.  Specifically, the Tremont PRPs raise two concerns about the language in Paragraph 48, which provides that "any cash distribution or the

10

proceeds of any non-cash distribution received by EPA . . . shall be deposited in a special

account within the Superfund to be retained and used to fund response actions at the Settled Non-

Owned Site for which it received an Allowed General Unsecured Claim, or, if no further

response action is required, or as otherwise required by EPA policy, transferred by EPA to the

Superfund." *Id.* at US00356. First, the Tremont PRPs state that it is not clear (i) when the

proceeds must be deposited in a special account; (ii) when non-cash distributions must be

liquidated; and (iii) when the distributions must be used to fund response actions. *Id.* at

US00357. They further state that if EPA is "free to delay" the deposit of distributions, there is a

risk that such funds could be diverted to other uses unrelated to remediation, and that if EPA is

free to delay the liquidation of non-cash distributions, or the application of distributions, the

PRPs "who are remediating the sites will be forced to bear the entire expense of the remedy

without the benefit of the funds specifically designated as part of GM's share." *Id.* Second, the

Tremont PRPs state that it is unclear whether EPA, "at its discretion, may simply retain

distributions until the remediation is complete and then transfer the distributions to the

Superfund for general use at other sites or for other purposes having nothing to do with the

remediation of the Settled Non-Owned Sites." *Id.*

The Tremont PRPs express concern that EPA has discretion to use the distributions for

whatever purposes it chooses. Accordingly, they request that Paragraph 48 be amended to

provide that: (i) all cash distributions be deposited in the special account upon receipt; (ii) non-

cash distributions be liquidated as promptly as reasonably possible; and (iii) cash distributions

and the proceeds of any non-cash distributions shall be applied to the remediation of the Non-

Owned Sites as promptly as reasonably possible and while the remediation is underway; and (iv)

cash distributions and the proceeds of any non-cash distributions shall be applied to the

11

remediation of the Non-Owned Sites unless, at the time of receipt, the remediation at the Non-

Owned Site is complete.  *Id.* at US00357-58.

2.  South Dayton Dump and Landfill Site PRP Group (the "**South Dayton Group**")

On March 22, 2011, the South Dayton Group submitted two comments concerning the

South Dayton Dump and Landfill Site (the "**South Dayton Site**").[5]  *See* Ex. B at US00359-67.

First, the South Dayton Group commented that the proposed settlement is unreasonably low

based on future cost estimate and Debtors' share of future site costs.  Specifically, the South

Dayton Group assumes that future costs at the site are $75 million and that Debtors' equitable

share is at least 25%.  *See* Ex. B at US00359-60.  The South Dayton Group therefore contends

that the settlement should be at least $18.75 million for the South Dayton Site.  *Id.*  The South

Dayton Group adds that the United States should have obtained a higher settlement amount

because: (i) Debtors' share may be even greater than 25% based on certain documentary

evidence attached to its comments; and (ii) the actual recovery will be a fraction of the settlement

amount, resulting in a significant "orphan share."  *Id.* at US00360-61.  Second, the South Dayton

Group states that the settlement agreement does not adequately explain how settlement proceeds

will be allocated to the PRP Group and requests additional details on such allocation.  *Id.* at

US00361.

3.  The Lammers Barrel Factory PRP Group (the "**Lammers Group**")

On March 25, 2011, the Lammers Group submitted several comments contending that the

settlement amount for the Lammers Barrel Factory Superfund Site (the "**Lammers Site**") was

unreasonable and unfair.  First, the Group contends that the settlement amount for the Lammers

Site is unreasonably low and that Debtors are not paying their equitable share of future costs,

---

[5] The South Dayton Group's submission lists four separate comments, but the first three
are essentially that the settlement amount is unreasonably low.

12

which the Group believes to be in the range of 20-30%. *Id.* at US00374-84. As a related point, the Lammers Group comments that the United States has not made a reasonable effort to estimate Debtor's equitable share because it believes the United States has not prepared a "total waste-in volume for Old GM" at the site, while admitting that a fire at a portion of the site in 1969 destroyed "existing on-site documents," resulting in "limited documentation concerning the customers of the former site owners and operators." *Id.* at US00378.

Second, the Lammers Group comments that the settlement unfairly provides contribution protection to Debtors and that any orphan share created by the Agreement should not be the responsibility of the other Lammers Barrel PRPs. *Id.* at US00382. Third, the Lammers Group requests that the Agreement provide that the settlement proceeds received for each site be allocated to a special account and available to PRPs on an ongoing basis, and include more detailed information concerning how EPA will "handle the receipt of non-cash distributions, their conversion into cash, and how the cash amount to be credited to the Lammers Site will be determined." *Id.* at US00382. Finally, the Lammers Group comments that providing less than a thirty-day comment period was unreasonable and placed an undue burden of the PRP Group to review and provide comment on the proposed Agreement. *Id.* at US00383.

4. The Valleycrest Landfill Site PRP Group (the "**Valleycrest Group**")

Also on March 25, 2011, the Valleycrest Group submitted a comment stating that the settlement amount at the Valleycrest Landfill Superfund Site (the "**Valleycrest Site**") is unreasonably low. *See* Ex. B at US00385-89. The Valleycrest Group comments that the United States should have assumed a higher amount for oversight costs, a lower "net present value" discount, and assigned a higher percentage likelihood to a "worst case" possibility in implementing and carrying out the remedy that the PRP Group presented to EPA, thereby adding

13

tens of millions of dollars to the projected cost of the remedy. *Id.* at US00387-88.[6]  Because the

Valleycrest Group assigns a higher likelihood to the "worst case scenario" contingency, it

contends that the remedial cost estimate used by the United States was too low and that the

settlement should be renegotiated using the values it provided to EPA. *Id.*

     5.  Rose Township Dump Site and Springfield Township Dump Site PRPs

     Finally, the PRPs at the Rose Township Dump Site (the "**Rose Site**") and Springfield

Township Dump Site (the "**Springfield Site**") submitted comments stating that the settlement

amounts at these two sites are unreasonably low. *Id.* at US00368-73.  The PRPs point out that,

for each of these sites, the U.S. Proof of Claim set forth an estimated cleanup up cost of $10.8

million, and that Debtors' equitable share for each site should be 10%. *Id.* at US00368;

US00371.  The PRPs therefore contend that the allowed general unsecured claim for each site

should be for an amount of at least $1,080,000, rather than for the amount of $211,108 that is set

forth in the Agreement. *Id.* at US00368; US00371.  The Rose and Springfield PRPs add that the

United States should seek a higher settlement amount because the PRPs' claims will be

disallowed under Section 502(e)(1)(B) of the Bankruptcy Code and they will be foreclosed from

any further recovery for future costs. *Id.* at US00368-69; US00371-72.

## III.    ARGUMENT

**A.    The Court Should Approve the Non-Owned Site Settlement Because It Is Fair,
Reasonable, and Consistent With Environmental Law**

     Approval of a settlement agreement is a judicial act committed to the informed discretion

of the Court. *In re Cuyahoga.*, 908 F.2d at 118; *Cannons Eng'g*, 720 F. Supp. at 1035.  Judicial

review of a settlement negotiated by the United States to protect the public interest is subject to

---

[6] The Valleycrest Group was not party to the negotiations at the site or privy to the exact
figures used by the United States, but bases its assumptions on estimates used by EPA
throughout the feasibility study process.

special deference; the Court should not engage in "second-guessing the Executive Branch."

*Cannons Eng'g*, 899 F.2d at 84; *In re Cuyahoga*, 980 F.2d at 118 (noting the "usual deference

given the EPA"); *New York v. Solvent Chem. Corp.*, 984 F. Supp. 160, 165 (W.D.N.Y. 1997)

("This Court recognizes that its function in reviewing consent decrees apportioning CERCLA

liability is not to substitute its judgment for that of the parties to the decree but to assure itself

that the terms of the decree are fair and adequate and are not unlawful, unreasonable, or against

public policy.") (internal quotation marks omitted).  An evidentiary hearing is not required in

order to evaluate a proposed CERCLA consent decree because such hearings would frustrate the

statutory goal of expeditious settlement; hearing requests are therefore routinely and properly

denied.  *United States v. Charles George Trucking Inc.*, 34 F.3d 1081, 1085 (1st Cir. 1994);

*Cannons Eng'g*, 899 F.2d at 94.  This "limited standard of review reflects a clear policy in favor

of settlements."  *Solvent Chem. Corp.*, 984 F. Supp. at 165.

For the reasons discussed below, the Court should approve the Non-Owned Site

Settlement Agreement because it is fair, reasonable, in the public interest, and furthers the goals

of CERCLA, RCRA, and the Clean Air Act.  *See Charles George Trucking*, 34 F.3d at 1084;

*Cannons Eng'g*, 899 F.2d at 85; *Solvent Chem. Corp.*, 984 F. Supp. at 166; *Hooker Chem.* 540 F.

Supp. at 1073 ("the task has been to examine the proposal and determine whether it is a fair and

adequate settlement and whether its implementation will reflect concern for the problems for

which Congress has enacted the various environmental statutes.").

1.    The Settlement Is Fair

The fairness criterion of a CERCLA settlement integrates both procedural fairness and

substantive fairness.  *Cannons Eng'g*, 899 F.2d at 86-88.  To measure procedural fairness, the

Court "should ordinarily look to the negotiation process and gauge its candor, openness, and

15

bargaining balance." *Id.* at 86. The proposed Agreement is procedurally fair because it was negotiated at arm's length over many months, with good faith participation by governmental actors and parties who were represented by experienced counsel, and involved assistance by technical experts on matters such as estimating the cost of future response actions. *See id.* at 87 (finding a CERCLA settlement procedurally fair based on criteria including an arms-length negotiation, experienced counsel, and good faith participation by EPA).

To measure "substantive" fairness, the Court considers whether the settlement is "based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability . . . according to rational (if necessarily imprecise) estimates of how much harm each PRP has done." *Id.* at 87; *see also United States v. Davis*, 261 F.3d 1, 24 (1st Cir. 2001); *Charles George Trucking*, 34 F.3d at 1087; *DiBiase*, 45 F.3d at 544-45. The proposed Agreement is substantively fair because the amount of the allowed claim for each site was determined by considering total response costs and Debtors' estimated percentage allocation or fair share of liability for the site. Debtors' liability at the Settled Non-Owned Sites formed the backdrop for lengthy negotiations between the parties regarding the nature, extent, and cost of the cleanup that will be required at the Settled Non-Owned Sites, and the estimates of future response costs were determined after extensive discussions with environmental experts and/or EPA technical personnel overseeing the cleanup of the sites. The amount of the allowed claim for each site therefore represents a substantively fair resolution of the Debtors' liabilities taking into account the uncertainties and litigation risks involved.

2.    The Settlement Is Reasonable

Courts evaluating the reasonableness of CERCLA settlements have considered three factors: (i) technical adequacy of the cleanup work to be performed; (ii) satisfactory

16

compensation to the public for response costs; and (iii) the risks, costs, and delays inherent in litigation.  *See Charles George Trucking*, 34 F.3d at 1085; *Cannons*, 899 F.2d at 89-90.

Although the first prong of the reasonableness inquiry is not at issue in this settlement, as the Debtors are not performing any cleanup, the Agreement satisfies the other, necessarily intertwined, considerations relevant to reasonableness.  As discussed above, the United States will receive an Allowed General Unsecured Claims totaling more than $36 million, cash in the amount of approximately $4.6 million from bonds, and work up to the amount of $10.5 million in accordance with performance bond requirements.

These settlement terms satisfactorily compensate the public while reasonably balancing the strength of the United States' case against the Debtors, the Debtors' bankruptcy, and the need to recover funds for cleanup and minimize the expense and potential delay of protracted litigation.  Accordingly, the proposed Settlement Agreement is reasonable.

      3.      <u>The Settlement Is Consistent with the Goals of CERCLA and the Clean Air Act</u>

The primary goals of CERCLA are to "encourage prompt and effective responses to hazardous waste releases and to impose liability on responsible parties," and to "encourage settlements that would reduce the inefficient expenditure of public funds on lengthy litigation." *In re Cuyahoga*, 980 F.2d at 119.  The Settlement Agreement furthers these statutory goals.  As discussed above, the proposed Agreement accounts for past and estimated future response costs at non-debtor-owned sites.  The settlement further meets CERCLA's statutory goal of providing final resolution of liability for settling parties.  Moreover, the proposed Settlement Agreement serves CERCLA's goal of reducing, where possible, the litigation and transaction costs associated with response actions, as well as the public policy favoring settlement to reduce costs to litigants and burdens on the courts.  *See Solvent Chem. Corp.*, 984 F. Supp. at 165; *Hooker*

17

*Chem.*, 540 F. Supp. at 1072.  Finally, the settlement includes a Clean Air Act civil penalty designed to deter the Debtors and other similarly situated parties from violating the Clean Air Act in the future.

**B.    The Public Comments Do Not Indicate That the Non-Owned Site Settlement Agreement Is Inappropriate, Inadequate, or Improper**

The United States has considered the comments received and, as set forth below, determined that none of them indicates that the Non-Owned Site Settlement Agreement is inappropriate, inadequate or improper.

1.    <u>Distributions Are Liquidated and Applied to Site Costs Promptly and in Accordance with EPA Policy</u>

The concerns raised by the Tremont PRPs that EPA somehow has unfettered discretion to delay application of distributions to the remediation of Settled Non-Owned Sites or to apply them to any Superfund site use are misplaced and overlook EPA policy concerning settlement proceeds and special accounts.  Further, the concerns raised by the Tremont PRPs appear primarily to seek clarification as to EPA's practice and provide no basis to question the fairness or reasonableness of the settlement.  To the extent that any commenters, such as the Lammers Group, request that the Agreement be revised to provide that proceeds obtained be placed in a special account and made available to PRPs on an ongoing basis, no such revisions are warranted.

EPA's policy is to apply settlement proceeds to site costs as soon as is practicable.  As for non-cash distributions, EPA guidelines require that they be liquidated in a timely manner. Specifically, "[w]hen EPA receives marketable securities, they will be recorded as a collection at their fair market value on the day they are received."[7] Such securities are then to be promptly

_____

[7] "Resources Management Directive Systems 2550D," Chapter 14, Superfund Accounts Receivable and Billings, at 19.  Note, however, that, as provided in Paragraph 49 of the

sold, and the proceeds directed for distribution as provided in the Settlement Agreement. *Id.* at 20-21. EPA intends to follow its guidelines in this case and have all non-cash distributions liquidated as promptly as possible.

Cash proceeds from the sale of any securities will be deposited in a special account for use at the specific site for which EPA received an allowed general unsecured claim or, if EPA policy so directs, transferred to the Superfund. *See* Settlement Agreement at ¶ 48. The parties included a carve-out permitting EPA to deposit proceeds in the Superfund because EPA policy provides that "special account funds may be used only for CERCLA-authorized response actions that are consistent with the agreement under which the funds were received."[8] At the same time, EPA's policy favors the placement of proceeds in special accounts to fund site cleanup where doing so is consistent with other EPA guidelines.[9] Although EPA anticipates that proceeds

---

Settlement Agreement, only the amount of net proceeds received by EPA will be credited to the account for the Settled Non-Owned Site for which EPA received an allowed general unsecured claim. *See also In re Eagle-Picher Industries, Inc.,* 197 B.R. 260, 272 (Bankr. S.D. Ohio 1996), *aff'd* 1997 U.S. Dist. LEXIS 15436 (July 14, 1997 S.D. Ohio) (observing that if other PRPs were credited with *more* than the actual cash received by the United States, this "would tend to cause the U.S. not to proceed to settlements with bankrupt debtors," and instead proceed to collect fully from other viable liable parties who are jointly and severally liable).

[8] *See* Memorandum from Barry Breen, EPA Office of Site Remediation Enforcement, "Consolidated Guidance on the Establishment, Management, and Use of CERCLA Special Accounts," at 6 (Oct. 4, 2002) (the "Consolidated Guidance Memo") (*available at* www.epa.gov/compliance/resources/ policies/cleanup/ superfund /congui-estmgt-specacct.pdf); *see also* Memorandum from James E. Wollford, Director, EPA Office of Superfund Remediation and Technology Innovation, "Guidance on the Planning and Use of Special Account Funds," (Sept. 28, 2010), ("Special Account Guidance"), (*available at* www.epa.gov/compliance /resources/policies /cleanup/superfund/plan-use-specacct.pdf).

[9] *See* Memorandum from Sandra L. Connors, Director, Regional Support Division, EPA Office of Site Remediation Enforcement, "Placement of Proceeds from CERCLA Settlements in Special Accounts," (January 27, 2000) (setting forth "several advantages to placing settlement proceeds in a special account that will be used to conduct or finance response actions at a site") (*available at* www.epa.gov/compliance/resources/policies/cleanup/superfund/proc-settle-mem.pdf).

received from the sale of securities can be deposited in special accounts for each of the Non-

Owned Sites for which it is receiving an allowed general unsecured claim, as EPA policy

provides limits on the use of special account funds, EPA must retain the right to deposit

settlement proceeds in the Superfund.[10]

Finally, EPA policy also sets forth the circumstances under which special account funds

can be disbursed to a PRP, directing that "disbursements of special account funds [be made] to a

PRP only when the PRP agrees to conduct a response action as part of a settlement agreement,"

and that such disbursements should not be made where "a PRP [is] performing the response

action under a unilateral administrative order."  Consolidated Guidance Memo at 7-8.  Where

EPA disburses funds from a special account to a PRP, those disbursements occur as remedial

work milestones are met.  *Id*. at 10.  In short, EPA intends to follow its policy guidelines as to the

liquidation of non-cash distributions, the transfer of proceeds into special accounts, and the

disbursement of funds to PRPs, and EPA's practice provides no basis to question the fairness or

reasonableness of the settlement.

      2.      The Agreement Provides Significant and Reasonable Funding For Cleanup

The comments submitted by the various PRPs stating that the settlement amounts are

unreasonably low do not alter the United States' position that the proposed Agreement is fair and

reasonable.  These comments fail to consider the nature of Debtors' bankruptcy and the

significant risk that the United States would recover less for the Settled Non-Owned Sites at

issue if the settlement were not approved.  Some of the PRPs also suggest that because

investigative work at a site is ongoing or a remedy has not yet been selected, either Debtors'

---

[10] While EPA retains the right to deposit the funds it receives from the settlement in site-specific accounts or the general Superfund, the outcome of EPA's decision on this issue will have no impact on PRPs' realization of a credit.  PRPs will receive the credit to which they are entitled under CERCLA § 113(f)(2) regardless of where EPA ultimately applies the funds.

equitable share or future cleanup costs (or both) may be higher than is currently known.

However, it is not possible to delay resolution of the settlement amount until after all

investigative work is complete and a remedy is selected at each of the sites, which may be years

from now.  Moreover, while some of the submissions purport to set forth specific evidence on

cleanup costs or equitable share that the commenters contend warrant a higher settlement

amount, all of this evidence was previously presented to the United States or already within its

possession and considered in the course of the settlement negotiations.  The United States

utilized the best information available at the time to arrive at a settlement amount for each site

that is fair, reasonable, and consistent with CERCLA's goals.

       The purpose of CERCLA is to "promote the timely cleanup of hazardous waste sites and

to ensure that the costs of such cleanup efforts are borne by those responsible for the

contamination."  *Burlington Northern & Santa Fe Ry. v. United States,* 129 S. Ct. 1870, 1874

(2009) (quoting *Consol. Edison Co. of N.Y. v. UGI Util., Inc.,* 423 F.3d 90, 94 (2d Cir. 2005)).

In addition, CERCLA aims to "encourage settlements that would reduce the inefficient

expenditure of public funds on lengthy litigation."  *In re Cuyahoga*, 980 F.2d at 119.  To

facilitate settlement, CERCLA allows for settlement amounts that are based not on joint and

several liability, but rather "some acceptable measure of comparative fault, apportioning liability

. . . according to rational (if necessarily imprecise) estimates of how much harm each PRP has

done."  *Cannons Eng'g*, 899 F.2d at 86-88.

       The United States has negotiated a settlement that seeks to further CERCLA's goals by

securing substantial settlement awards that reflect the Debtors' proportionate share of liability

and efficiently and expeditiously resolve the United States' proofs of claim.  In so doing, the

United States took into account, for every site or facility, the nature of the United States' claims

21

in the bankruptcy; whether the Debtors had outstanding work obligations at the site or facility;

total past and estimated future response costs; the applicable Debtor's equitable share or

allocation of fault or liability; the existence of other PRPs who can perform cleanup and/or

reimburse the United States' response costs; litigation risk, including defending cleanup costs

and equitable share through an estimation proceeding; and considerations of preserving resources

through settlement without protracted litigation.

      a.   <u>The Settlement Amount for the South Dayton Site is Reasonable</u>

      The South Dayton Group's submission requesting that Debtors be assigned a higher

equitable share of cleanup costs at the South Dayton Site loses sight of the fact that an

appropriate equitable share determination rests on a connection to *hazardous* waste.  In

attempting to utilize the best information available concerning Debtors' equitable share at the

South Dayton Dump Site,[11] the United States communicated with the South Dayton Group over

a period of several months and requested any information in its possession concerning Debtors'

equitable share.  In the course of those communications, the South Dayton Group provided the

United States with the same documents it attaches to its submission; however, these documents

fail to support the 20-30% equitable share suggested by the South Dayton Group because the

only hazardous waste substance identified is asbestos.[12]  At the same time, the primary

_____

      [11] The South Dayton Group suggests that the United States assumed a 25% equitable
share for Debtors at the site, and states both that the settlement amount is too low in light of that
25% share, and that the share may be even greater than currently known.  However, the 25%
share was a figure provided by the South Dayton Group itself, although the United States
considered this share allocation along with all other information available, as well as the
litigation risks associated with its claim.

      [12] Specifically, these documents demonstrate only that (i) Debtors *stopped* disposing of
asbestos waste at the South Dayton Dump Site on February 11, 1976 (*see* US00362-63); (ii)
Debtors were issued a Solid Waste Disposal Facility Violation because Debtors stored
cardboard, "paper litter," and drums containing material "identified as non-hazardous" in
violation of their permit to operate (*id*. at US00364); and (iii) that Debtors stored or sent

contaminants identified in the soil and groundwater are vinyl chloride, trichloroethylene, and polychlorinated biphenyls ("PCBs").  *See* NPL Site Narrative for South Dayton Dump & Landfill (*available at* www.epa.gov/superfund/ sites/npl/nar1730.htm).  Asbestos, in fact, is not even listed among the "threats and contaminants" identified at the site based on sampling conducted to date.  *See* South Dayton Dump & Landfill Fact Sheet (Dec. 2010) (*available at* www.epa.gov/R5Super/npl/ohio/OHD980611388.htm); Public Health Assessment for South Dayton Dump & Landfill, at 22-24 (Sept. 30, 2008) (available at www.epa.gov/region5/sites/sodayton/index.htm).  The South Dayton Group's submission therefore provides no basis to question the reasonableness of the settlement amount for the Site.[13]

b.  The Settlement Amount for the Lammers Site Is Reasonable[14]

The Lammers Group acknowledges that limited information is available concerning equitable share at the Lammers Site but nevertheless contends that the United States failed to make a reasonable estimate of Debtors' equitable share.  Specifically, the Lammers Group states that the "available nexus information here is more limited than is typically the case for CERCLA sites" because of a fire at the site that destroyed documentary evidence, leaving "limited documentation concerning the customers of the former site owners and operators."  Ex. B at

---

unidentified materials to the site (*id*. at US00365-67).

[13] Although the South Dayton Group also contends that the amount is too low because EPA's claim will be paid out at a substantially reduced rate and will result in an unpaid orphan share attributable to the Debtors for the Site, this comment provides no basis for rejecting the settlement.  EPA's allowed general unsecured claim will be paid out at a reduced rate as a function of the bankruptcy, which applies to all general unsecured creditors.  It would be neither fair nor reasonable for the United States to pursue a larger-than-equitable share against Debtors simply because, as a function of the bankruptcy, general unsecured claims will be paid at a reduced rate.

[14] As with the South Dayton Group, the United States communicated with the Lammers Group over a period of several months in attempting to evaluate all available information and considered the specific information discussed in the Group's submission.

23

US00378.  At the same time, the Lammers Group states that the United States failed to make a

reasonable effort to estimate Debtors' equitable share at this site simply because it believes that

the United States failed to prepare a chart calculating "waste-in volume" for the site.  *Id*.  The

Group does not state whether its members themselves prepared such a chart, nor does it explain

why a failure to do so suggests a lack of reasonable effort to estimate equitable share.  In any

event, the United States had indeed prepared such a waste-in volume for the site based on the

same deposition testimony discussed in the Lammers Group's submission—that of Anthony

Kohnen, a former owner and operator of the site, and of Cecil Brown, a long term employee of

the site owner.  *Id*. at US00378-79.  The United States determined that the settlement amount

was reasonable in light of its prepared estimate of equitable share.

Moreover, and as acknowledged by the Lammers Group, EPA has significantly reduced

its cost estimate since the U.S. Proof of Claim was filed.  As a result, although the Lammers

Group's submission discusses the U.S. Proof of Claim estimate in an attempt to show that the

settlement amount is too low, the outdated estimate it discusses did not form the basis for the

United States' settlement position.  As discussed the Lammers Group's submission, EPA has

recently indicated its support for an "in-situ treatment method for site soils" that costs

significantly less than the remedy it supported at the time the U.S. Proof of Claim was filed.  Ex.

B. at US00380 (discussing EPA letter).  Accordingly, because a significantly less expensive

remedy appears increasingly likely, the United States adjusted its future cost estimate.  Based on

the revised cost estimate and the equitable share analysis conducted, the United States

determined that the settlement amount is reasonable.

    c.  <u>The Settlement Amount for the Valleycrest Site is Reasonable</u>

The Valleycrest Group contends that the settlement amount is unreasonably low

primarily because it uses a higher value for agency oversight costs, a lower percentage for net

present value discount, and assigns a greater likelihood to a "worst case" possibility in

implementing and performing the remedy.  Ex. B at US00386-88.  The "worst case" would arise,

as the comment explains, if contaminated groundwater could not be discharged into the

municipal water treatment plant and instead had to be transported and disposed of farther away.

*Id.*  The transport and off-site disposal of a large volume of contaminated groundwater thus

greatly increases overall cleanup costs, and the Valleycrest Group assigned a high percentage to

this possibility, resulting in a higher cost estimate than what the United States determined was

reasonable.[15]  The United States used the available information to assess what is most likely to

occur in the implementation and performance of a remedy, as it would be neither reasonable nor

fair to assume "worst case" scenario numbers in settlement negotiations.  The Valleycrest

Group's comment therefore provides no basis to question the fairness or reasonableness of the

settlement.

      d.   <u>The Settlement Amounts for the Rose and Springfield Dump Sites Are
Reasonable</u>

The PRPs at the Rose Dump and Springfield Dump Sites set forth no evidence that the

United States failed to consider concerning either their cost estimates or Debtors' equitable

share.  As with the Lammers Site, the PRPs discuss the cost estimates set forth in the U.S. Proof

of Claim to suggest that the settlement amounts at these sites are unreasonably low, but updated

cost information resulted in reductions from the United States' earlier estimates.  As for

equitable share, the United States considered the strength of the evidence connecting Debtors to

the hazardous waste at the two sites, including testimonial evidence from transporters of waste,

and the likelihood that any share estimate could survive a litigation challenge.  Finally, counsel

---

[15] As the Valleycrest Group states, the information contained in its submission was
previously presented to the United States.

for the United States contacted counsel for the Rose and Springfield PRPs following the

submission of their comments and inquired whether they preferred that these two sites be

withdrawn from the proposed Settlement Agreement.  The PRPs advised counsel for the United

States that they do not wish to have the sites withdrawn.  The PRPs' comments therefore do not

alter the United States' position that the proposed Agreement is fair and reasonable.

> 3.    Contribution Protection Is Warranted

The Lammers Group commented that the settlement is unfair because it provides Debtors

with contribution protection from PRPs, but provides no reciprocal protection for PRPs should

Debtors attempt to claim they paid more than their "fair share" in this settlement.[16]  Ex. B. at

US00382.  As a related comment, the Lammers Group suggests that the proposed Agreement

should provide that any "orphan share" created by the Agreement would not be the responsibility

of other PRPs.  These comments provide no reason to reject the proposed Agreement.

As discussed above, CERCLA affords contribution protection in order to encourage

settlements by providing settling parties finality.  *See* Section II.A, *supra*.  Finality is precisely

what the proposed Agreement provides here.  Specifically, CERCLA Section 113(f)(2) states:

"A person who has resolved its liability to the United States or a State in an administratively or

judicially approved settlement shall not be liable for contribution for matters addressed in the

settlement.  Such settlement does not discharge any of the other potentially responsible persons

unless its terms so provide, but it reduces the potential liability of the others by the amount of the

settlement."  42 U.S.C. § 9613(f)(2).

CERLCA also makes clear that the United States can pursue non-settling PRPs if settling

---

[16] The Lammers Group's concern that Debtors could assert a claim for contribution is misplaced.  Given the Group's position that the settlement amount for the Lammers Site is unreasonably low, Debtors would not have a strong claim for contribution because they have not paid more than their fair share.  Accordingly, the Lammers Group's position entails that it is sufficiently protected from any claim for contribution.

parties have not made the United States whole, as will frequently be the case where PRPs file for bankruptcy. *See* 42 U.S.C. § 9613(f)(3) ("If the United States . . . has obtained less than complete relief from a person who has resolved its liability to the United States . . . in a[] . . . judicially approved settlement, the United States . . . may bring an action against any person who has not so resolved its liability."). As CERLCA's legislative history indicates, nonsettling persons "remain potentially liable for the amounts not received by the government through the settlement." *See* 131 Cong. Rec. 34,646 (Dec. 5, 1985) (remarks of Rep. Glickman incorporating House Judiciary Committee explanations of amendments to CERCLA); H.R. Rep. No. 253, 99th Cong., 1st Sess., pt. 3, at 19 (1985), *reprinted in* 1986 U.S. Code Cong. & Ad. News 3042 (emphasis added). This also furthers the fundamental Congressional purposes in enacting CERCLA: responsible persons bear the costs for remedying the harmful conditions they created. *Cannon's Eng'g*, 899 F.2d at 90-91.

Pursuing other PRPs for any orphan share is not unfair because PRPs are potentially jointly and severally liable under CERCLA and could be required to pay all of the United States' response costs. While PRPs are losing their right of contribution against Debtors for future costs, such a right of contribution is worth no more than the PRPs' claim in bankruptcy for contribution. The PRPs' general unsecured claims for contribution would be paid out at the same percentage as that of the United States. Indeed, as stated *supra*, n.5, the Lammers Group's would provide a disincentive against the United States to pursue debtors for CERCLA liabilities where there are other non-bankrupt PRPs.

In any event, a discussion of orphan shares as they pertain to the Lammers Site is premature. To the extent that EPA in the future enters into settlements with other PRPs at the site, only then will it be able to determine whether and how to consider any orphan share that

27

may be attributable to the Debtors as a result of this settlement.  Under applicable EPA policy,

the particular formula used to determine the orphan share would depend, in part, on the nature

the liabilities being resolved in the settlement with other PRPs at the site (e.g., past costs, future

costs, and/or performance of remedial work).  *See* "EPA Orphan Share Superfund Reform

Questions and Answers," (Jan. 2001), (*available at* http://www.epa.gov/superfund/programs

/reforms/docs/mm_QA101.pdf).

 4. The Length of the Public Comment Period Was Reasonable

 Although the Lammers Group commented that the 15-day comment period placed an

undue burden on them to review and comment on the proposed settlement, particularly because it

was not included in the settlement negotiations,[17] it does not suggest that the United States

violated any applicable authority in providing a 15-day comment period.  *See* Ex. B at US00383.

Indeed, the United States is permitted to establish a 15-day comment period and has done so

repeatedly in bankruptcy settlements where circumstances warrant.  *See* 75 Fed. Reg. 17160-01

(April 5, 2010) (15-day comment period for Lyondell settlement); 71 Fed. Reg. 31214 (June 1,

2006) (15-day comment period for W.R. Grace settlement); 71 Fed. Reg. 38660 (July 7, 2006)

(14 day comment period for the Eagle-Picher settlement); 69 Fed. Reg. 20641 (Apr. 16, 2004)

(15-day comment period for GenTek settlement).  Here, the United States elected to establish a

15-day comment period in order to permit the parties sufficient time to reach consensus on

---

[17] Although, as stated previously, counsel for the United States had multiple telephone calls with counsel for the Lammers Group concerning a potential settlement and the available, relevant information concerning the site, the law is clear that non-parties such as the Lammers Group have no right to participate in, or be kept aware of, the United States' settlement negotiations with other parties.  *See, e.g., United States v. Cannons Eng'g,* 889 F.2d 79, 93 (1st Cir. 1990) ("In the CERCLA context, the government is under no obligation to telegraph its settlement offers, divulge its negotiating strategy in advance, or surrender the normal prerogatives of strategic flexibility which any negotiator cherishes."); *General Time Corp. v. Bulk Materials, Inc.,* 826 F. Supp. 471, 477 (M.D. Ga. 1993); *United States v. Serafini,* 781 F. Supp. 336, 339 (M.D. Pa. 1992).

nearly all of the Non-Owned Sites in the U.S. Proof of Claim, while allowing for the possibility

that the proposed settlement would be approved before March 31, 2011, the effective date of

Debtors' Plan of Liquidation.  Accordingly, the 15-day comment period does not render the

proposed Settlement Agreement inappropriate, inadequate or improper.

## CONCLUSION

For the reasons stated above, the Court should approve and enter the proposed Non-

Owned Site Settlement Agreement.


Dated:       New York, New York
             March 28, 2011

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York
                                        Attorney for the United States of America

                              By:        */s/  Jamie L. Nawaday*_____
                                        DAVID S. JONES
                                        NATALIE N. KUEHLER
                                        JAIMIE L. NAWADAY
                                        Assistant United States Attorneys
                                        86 Chambers Street, 3rd Floor
                                        New York, New York 10007
                                        Telephone:  (212) 637-2528
                                        Facsimile:  (212) 637-2750
                                        Email: jaimie.nawaday@usdoj.gov


                                        ALAN S. TENENBAUM
                                        National Bankruptcy Coordinator
                                        PATRICK CASEY
                                        Senior Counsel
                                        Environment and Natural Resources Division
                                        Environmental Enforcement Section
                                        U.S. Department of Justice