# EXHIBIT B

# Brown Stone Nimeroff LLC

### Attorneys at Law

Antoinette R. Stone
(267) 861-5333
astone@bsnlawyers.com

Two Commerce Square
Suite 3420
2001 Market Street
Philadelphia, PA 19103
T (267) 861-5330
F (267) 350-9050
www.bsnlawyers.com

March 14, 2011

*via email pubcommentees.enrd@usdoj.gov*

Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

      Re:    In re Motors Liquidation Corp., et al.
              D.J. Ref. 90-11-3-08754

Dear Sir:

      This letter contains comments on the Consent Decree lodged by the U.S. Department of Justice in the above-referenced matter. The comments are submitted on behalf of Waste Management of Ohio, Inc. ("WMOH") and Chemical Waste Management, Inc. ("CWM"). WMOH and CWM have made and will continue to make substantial payments for the remediation of the Valleycrest Site and the Tremont Site, both of which are covered by the Consent Decree. However, our comments are applicable to all sites identified in the Consent Decree and all affected parties, especially where, as at Valleycrest and Tremont, a substantial orphan share results from a large allocation of responsibility to the debtors.

      The Consent Decree states that:

> "any cash distribution or the proceeds of any non-cash distribution received by EPA on account of an Allowed General Unsecured Claim **shall be deposited in a special account** within the Superfund to be retained and used **to fund response actions at the Settled Non-Owned Site** for which it received an Allowed General Unsecured Claim, or, if no further response action is required, or as otherwise required by EPA policy, transferred by EPA to the Superfund." Consent Decree, para. 48.

      It is obvious that the intent of this language is to make sure that cash and the proceeds of any non-cash distributions are (1) protected from being diverted to other uses by deposit in a special account and (2) used to fund response actions (3) at the Settled Non-Owned Sites for which EPA received an Allowed General Unsecured Claim. However, this language also raises questions that are not addressed in the Consent Decree. WMOH and CWM are concerned that

US 00356

March 14, 2011
Page - 2 -

EPA may interpret the language in a manner inconsistent with the intent of the Consent Decree, as explained below.

1. It is not clear *when* the proceeds of any cash or non-cash distribution must be deposited in the special account. Nor is it even clear *when* non-cash distributions must be liquidated. EPA has a history of delaying the liquidation of non-cash distributions, such as stock, received in a bankruptcy settlement, instead of acting expeditiously to liquidate non-cash distributions so that the proceeds may be used for remedial purposes. Even after cash and non-cash distributions are deposited in the special account, it is not clear *when* they must be used to fund response actions.

   If EPA is free to delay the deposit of distributions indefinitely, there is a risk that such funds will be diverted to other uses unrelated to remediation of the sites. If EPA is free to delay the liquidation of non-cash distributions or the application of any distributions until after the remediation is complete, the PRPs who are remediating the sites will be forced to bear the entire expense of the remedy without the benefit of the funds specifically designated as part of GM's share.

2. It is not clear *whether* EPA, at its discretion, may simply retain distributions until the remediation is complete and then transfer the distributions to the Superfund for general use at other sites or for other purposes having nothing to do with the remediation of the Settled Non-Owned Sites.

   If this were the intent, most of the language in paragraph 48 would be surplusage, because EPA would be free to use the distributions for whatever purposes it chose.

In short, WMOH and CWM are concerned that EPA may interpret paragraph 48 of the Consent Decree as a convenient means of supplementing the Superfund or funding other projects that are entirely unrelated to the remediation of the Settled Non-Owned Sites. WMOH and CWM strenuously object to such an interpretation as giving the EPA unfettered discretion to delay application of distributions to the remediation of the Settled Non-Owned Sites or even apply distributions to any Superfund use.

We respectfully request that paragraph 48 be amended to make it clear that:

1. All cash distributions shall be deposited in the special account upon receipt;

2. All non-cash distributions shall be liquidated as promptly as reasonably possible;

3. All cash distributions and the proceeds of any non-cash distributions shall be applied to the remediation of the Settled Non-Owned Sites as promptly as reasonably possible, and, in all events, while the remediation is underway, in order to make sure

March 14, 2011
Page - 3 -

      that the entire distribution for each Settled Non-Owned Site is applied to the remediation of that Site;

4. All cash distributions and the proceeds of all non-cash distributions shall be applied to the remediation of the Settled Non-Owned Sites unless, at the time of receipt, the remediation at a Settled Non-Owned Site is complete.

      Without such amendment, EPA will be free to use distributions intended for the remediation of the Settled Non-Owned Sites for purposes never intended by the Consent Decree. Such a result would impose an unfair burden on the PRPs who are funding the remediation of the Settled Non-Owned Sites.

Very truly yours,

Antoinette R. Stone

cc:    *(via email)*
       Diana Embil, Esquire embil.diana@epa.gov
       Nicole Wood, Esquire wood.nicole@epa.gov

US 00358

**GONZALEZ SAGGIO HARLAN**

March 22, 2011

<u>VIA EMAIL</u>
pubcomment-ees.enrd@usdoj.gov

Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044–7611

Re:  *In re Motors Liquidation Corp., et al.,* D.J. Ref. 90–11–3–09754
     Comments on Proposed Consent Decree and Settlement Agreement
     South Dayton Dump & Landfill Superfund Site (the "Site")

To whom it may concern,

The South Dayton Dump and Landfill Site PRP Group (the "Group") is hereby submitting comments on the proposed Consent Decree and Settlement Agreement (the "Proposed Settlement") between the United States and Motors Liquidation Company ("MLC") to resolve the United States' Proof of Claim against MLC, dated November 28, 2009, with respect to the above-referenced Site (the "Proof of Claim"). The current members of the Group are NCR Corporation, Hobart Corporation and Kelsey-Hayes Company, and the Group's comments in regard to the Proposed Settlement are included below.

### 1) The Proposed Settlement is Unreasonably Low Based on Current Future Cost Estimates and MLC's Assumed Share of Future Site Costs.

The Proposed Settlement for the Site is unreasonably low, and the United States should demand a higher settlement from MLC. MLC's share of liability for future site costs is higher than the Proposed Settlement reflects. Under the Proposed Settlement, the United States would receive an Allowed General Unsecured Claim in the amount of **$4 million**. Proposed Settlement, par. 10. However, the Proof of Claim states that the U.S. Environmental Protection Agency ("U.S. EPA") "estimates that future response action at the South Dayton Site will cost **at least $75 million**." Proof of Claim, par. 386 (emphasis added).

**GONZALEZ SAGGIO & HARLAN LLP**
Attorneys at Law

www.gshllp.com

Milwaukee
225 E. Michigan Street
Fourth Floor
Milwaukee, WI 53202
Tel (414) 277-8500
Fax (414) 277-8521

Cincinnati
Chicago
Cleveland
Indianapolis
Las Vegas
New York
Washington D.C.
West Des Moines

Affiliated with Gonzalez, Saggio and Harlan, L.L.C. and Gonzalez Saggio Harlan LLC

US 00359

Assistant Attorney General
March 22, 2011
Page 2

The Group understands that U.S. EPA's $75 million estimate is an estimate of total, future site costs, not MLC's individual share. As a result of communication with the U.S. Department of Justice ("U.S. DOJ"), the Group is aware that for purposes of settling this matter, the United States assumed that MLC's share of future site costs is roughly **25%**. Assuming that MLC is responsible for at least 25% of future site costs, MLC's share of U.S. EPA's $75 million estimate of future site costs would be **$18.75 million**. The Proposed Settlement, however, is for $4 million, which is only **5.3%** of estimated future site costs, and the proposed Settlement does not include any details regarding the basis for a $4 million settlement amount. The United States' settlement with MLC should be at least $18.75 million based on MLC's assumed share of estimated future costs and considering that the United States' actual recovery (based on projected value of shares to be distributed in lieu of cash as payment on the unsecured claims) will be a fraction of the settlement amount. For these reasons, the Group objects to the Proposed Settlement.

### 2) MLC's Share of Future Site Costs Are Likely Greater than 25%.

The Group, U.S. EPA, Ohio EPA, and U.S. DOJ have site records, which provide evidence that MLC is responsible for a large share of cleanup costs at the site as a result of the activities of MCL's predecessors in interest (General Motors Corporation and Delphi Automotive Systems, LLC (f/k/a Delco Moraine)) arranging for transportation and disposal of hazardous wastes at the Site. Hundreds of manifests for waste sent to the Site show that MLC's predecessors in interest sent various hazardous wastes to the Site, including asbestos, fly ash, oil and grease, sludge, old light fixtures and paint waste, from at least sometime in the 1970s to 1993. *See* Proof of Claim, par. 381; *see also* Delphi Automotive Systems, LLC Response to U.S. EPA Region V 104(e) Request for Information South Dayton Dump, Moraine, Ohio (May 31, 2002), Attachments 1 and 2; Inter-Organization memos from Delco Moraine regarding improper disposal asbestos waste at the Site (February 11 and 26, 1976) (enclosed); Notice of Solid Waste Disposal Facility Violation, Ohio EPA (April 21, 1982) (enclosed); Letter from Montgomery County Combined General Health District to Alcin S. Grillot (January 11, 1980) (enclosed); Affidavit of Horace J. Boesch, Jr. (August 25, 2005) ("GM had a key [to the Site] allowing it to dump at night.") (enclosed). Based on the records cited above and other records regarding solid and hazardous wastes sent to the Site, the Group believes that MLC's share of liability for future site costs will likely be greater than 25%. If MCL's share of future site costs is greater than 25% (or at least greater than 5.3%), MCL's share of future site costs will most likely become a significant orphan share as a result of the Proposed Settlement, as discussed in the following section.

US 00360

Assistant Attorney General
March 22, 2011
Page 3

### 3) MLC's Share of Future Site Cost Will Most Likely Become a Significant Orphan Share as a Result of the Proposed Settlement.

Under the U.S. EPA's Orphan Share Policy and the Supreme Court's recent decision in *Burlington Northern and Santa Fe Railroad Company*, U.S. EPA often assumes, or is forced to assume, responsibility for site costs attributed to potentially responsible parties ("PRPs"), like MLC, who become insolvent. *See* U.S. EPA Memorandum, *Revised Orphan Share Compensation Reform Questions and Answers* (February 2, 2001); *see also* 129 S.Ct. 1870 (2009) (holding that apportionment of cleanup costs is appropriate when there is a reasonable basis for apportioning liability). Considering that the Proposed Settlement is roughly 5.3% of estimated future site costs and that the United States' actual recovery (expressed in terms of shares distributed in lieu of cash) will be only a fraction of the settlement amount (currently estimated at 25% to 35%), MLC's share of future site costs will most likely become a significant orphan share, which the U.S. EPA may be forced to assume going forward. As such, the Group urges the United States to demand a substantially higher settlement from MLC to avoid or mitigate future orphan share liability.

### 4) The Proposed Settlement Does Not Adequately Explain How Settlement Proceeds Will Be Allocated to the Group.

Paragraphs 48 and 49 of the Proposed Settlement state generally that settlement distributions received by U.S. EPA will be deposited in a special account to be retained and used to fund response actions, and that only the amount of cash received by U.S. EPA will be used to "reduce the liability of non-settling potentially responsible parties…by the amount of the credit."

It is not clear under paragraphs 48 and 49, however, how settlement proceeds will be allocated specifically to the members of the Group to fund pending and future site costs. The Group requests that U.S. DOJ provide additional details to the Group regarding how settlement proceeds for the Site will be allocated to the current members of the Group, who are signatories to the Administrative Settlement Agreement and Order on Consent for Remedial Investigation/Feasibility Study for the Site, dated August 2006.

We look forward to receiving U.S. DOJ's responses to the Group's comments. If you have any questions, please contact me at Natalia_Minkel@gshllp.com or (414) 755-8151.

Sincerely,

Natalia Minkel-Dumit

US 00361



**Delco Moraine**

Inter-Organization

Subject: Asbestos Waste Disposal

From: R. D. Parker

Date: February 11, 1976

Attention: R. E. Brumfiel

cc: R. Hanes
    S. J. Lovas

Plant Engineering recommends that Delco Moraine immediately change its asbestos waste disposal site to:

> Sanitary Landfill Company
> 1855 Cardington Road

Delco Moraine presently disposes of its asbestos waste material at the South Dayton Dump and Landfill. After random visits last year and subsequent visits these past two (2) weeks it has been determined by Plant Engineering that South Dayton Dump is not adhering to the attached EPA National Emission Standards for Asbestos. Large quantities of uncovered asbestos dust has been seen by Plant Engineering on each of the above mentioned visits. A waiver of compliance from the National Emission Standards will be required should we continue to use the South Dayton Dump.

Sanitary Landfill Company complies to the National Emission Standards by immediately covering asbestos with non-contaminated trash and fill dirt. This was observed by Plant Engineering on February 9, 1976.

Ronald D. Parker
Plant Engineering

Arnold L. Boyce
Superintendent Plant
Engineering & Layout

/sh
Attachment

Delco Moraine Division General Motors Corporation 1420 Wisconsin Boulevard Dayton, Ohio 45401

Brako Systems • Engine Bearings • Powder Metal Parts • Friction Materials

US 00362


**Delco Moraine**

Inter-Organization

Subject: ASBESTOS WASTE

From: R. E. Brumfiel

Date: February 26, 1976

Attention: J. D. Roush

cc: T. E. Miller         G. T. Allen
    A. L. Boyce         H. W. Peters
    M. W. Smith, Jr.    R. D. Parker
    R. W. Border        R. Hanes

In accordance to the recommendations of the Plant Engineering letter dated February 11, 1976 Purchasing has issued a purchase order #MN-15301 to Sanitary Landfill Company, 1855 Cardington Road, for the disposal of all Delco Moraine waste containing asbestos.

Effective immediately no asbestos waste should be taken to the South Dayton Dump and Landfill at 1975 Springboro.

R. E. Brumfiel,
Manager
Non-Product Purchasing

REB/fj

Copy attached:
  Purchase Order
  Letter
  Federal Register

Delco Moraine Division General Motors Corporation 1420 Wisconsin Boulevard Dayton, Ohio 45401

Brake Systems • Engine Bearings • Powder Metal Parts • Friction Materials

US 00363

## SOLID WASTE DISPOSAL FACILITY VIOLATION NOTICE

Health District: **Montgomery County**    Phone: **225-4446**
Name of Facility: **South Dayton Landfill**    Location: **1975 Springboro Road**
Name of Operator: **Mr. Alcine Grilliot**    Address: **2708 Kreitzer Road**
Operating License Number: **01**    **Dayton, Ohio 45439**
OEPA District: **Southwest**    Phone: **461-4670**

Items marked by (X) are in violation of the Solid Waste Disposal Rules.

**3745-27-05 Prohibited Disposal Methods**
(B) Open Burning
(C) Open Dumping

**3745-27-06 Approvals**
(A) Submission of Detail Plans

**3745-27-08 Operation of Facility**
(A) Operated in compliance to approved plans    **X**
(B) Construction and maintenance of access roads
(C) Limited access to facility
(D) Site preparation
(E) Confined unloading
(F) Control of scattered litter
(G) Control of noise, dust and odor
(H) Control of vectors
(I) Nuisance, health hazard or water pollution
(J) Improper salvaging
(K) Exclusion of animals
(L) Fire control
(M) Keeping of daily log
(N) Trained employees
(O) Copy of plans available
(P) Operable equipment
(Q) Excessive clearing of vegetation

**3745-27-09 Sanitary Landfill Operation**
(A) Construction and maintenance of temporary roads
(B) Inclement weather preparation
(C) Acceptance of sewage wastes, semi solids, liquids or hazardous wastes
(D) Unloading, spreading and compacting
(E) Separation and control of highly flammable waste
(F) Cover Material
   (1) daily cover not less than six inches
   (2) intermediate cover not less than one foor
   (3) final cover not less than two feet and seeded
   (4) suitable cover material
(G) Construction and sampling of monitor wells
(H) Control of leachate
(I) (1) surface water diversion
    (2) ponding and erosion
(J) Operational report

**3745-37-01 License**
(A) Valid license
(B) License posted

Description of violations and recommendations for corrections: **An inspection of the facility on April 21, 1982, indicated the following violation:**

Scrap cardboard, paper litter, cardboard boxes, and cardboard drums were being stored outside which is in violation of your permit to operate (3745-27-08-A).

All cardboard shall be removed from the property or stored in enclosed trucks or containers at the end of each day's operation and all blown waste paper, plastic, etc. shall be cleaned up at the end of each day's operation.

Two drums containing a white powder from Delco were labelled "hazardous waste". Mr. Randy Marshall, OEPA, was consulted and a joint reinspection was conducted on 4/23/82. Mr. Robert Young, Delco, was contacted that day and I later met him to locate the drums at the site. Although the material was identified as non-hazardous, the material should not have been there. The drums were removed.

You are hereby notified of the above violations. Failure to correct these violations within _____ days may result in the revocation, suspension or denial of your solid waste disposal license or other legal action.

If assistance in correcting these violations is desired, contact your Local Health Department and/or district office of the Environmental Protection Agency.

Inspection Made By: Name **Terry L. Wright, M.P.H.**    Title **Supervisor Bureau of General Services**    Date **4/21/82**

OEPA 60-9 (7/77)

US 00364

ROBERT A. VOGEL, M.D.
HEALTH COMMISSIONER

MONTGOMERY COUNTY
COMBINED GENERAL HEALTH DISTRICT

COUNTY GOVERNMENT PLAZA
451 WEST THIRD STREET
DAYTON, OHIO 45422

BOARD OF HEALTH
DAVID ULRICH, D.D.S. - PRESIDENT
MRS. MARTHA CARRICK - VICE-PRESIDENT
HERMAN ABROMOWITZ, M.D.
MRS. MARIE DAUGHERTY
JOHN DOAN
MRS. VERDREE HARRIS
W. J. LEWIS, M.D.
EDWARD RAUSCH
CHARLES F. WILCHER, JR., D.O.

DIVISION OF ENVIRONMENTAL HEALTH
DAVID B. PEDEN, M.P.H., DIRECTOR
513 - 225-4443

E.
1/11/

January 11, 1980

Mr. Alcin S. Grillot
2708 Kreitzer Road
Moraine, Ohio 45439

Re: South Dayton Landfill, 1975 Springboro Rd., Moraine, Ohio

Dear Mr. Grillot:

This letter will confirm our recent reinspection of your landfill on January 8, 1980. We were pleased to note that many of the 55 gallon drums and plastic chemical containers had been moved since our previous inspection in late November, 1979. You should continue to store these containers neatly until they are sold.

During our recent phone conversation you informed us that you sold all used chemical drums and plastic containers. This is satisfactory.

However, if you plan on burying any of these containers that are labeled hazardous or poisonous we must have written confirmation from the last user of the container that it has been washed or cleaned of all hazardous or poisonous contents. (Although all the containers we checked appeared to be empty we noted many were labeled poison - lead Floroborate). *from Delph;*

Your removal or burying of other odds and ends around the fill site (including the old trailer) should continue.

Sincerely,

John H. Bindeman
Systems Analyst

JHB/bab

US 00365

US 00366

## AFFIDAVIT OF HORACE J. BOESCH, JR.

STATE OF OHIO              )
                           ) SS:
COUNTY OF MONTGOMERY       )

Horace J. Boesch, being first duly sworn, deposes and says that he has knowledge of all of the facts contained in this Affidavit and that he is competent to testify to the matters stated herein.

Affiant further states:

1. From the time period 1948 to 1954 I frequented and worked on the South Dayton Dump ("SDD") site sorting metal and other recyclable materials. During that time, I was on the site approximately 1 day per week.

2. From 1960 to 1967 I maintained a real estate office located near the entrance of the site. During that time I was on the site approximately 5 times per week.

3. From 1967 to 1972 I visited the site approximately every other week.

4. During the time I was on the site, I would regularly observe people coming in to dispose of materials at the site.

5. The following companies regularly dumped industrial materials at the site:

   a. Dayton Steel Foundry
      i. Dayton Steel Foundry had its own key, allowing it to dump at night
      ii. Dayton Steel Foundry disposed of its foundry cores in the landfill
      iii. This occurred from approximately 1960 to at least 1967.

   b. Frigidaire
      i. Frigidaire would bring approximately ½ truck load (2½ ton trucks) of metal shavings and other materials every other day.
      ii. Frigidaire's material would be dumped over the bank.
      iii. Some of the Frigidaire material would be burned prior to 1955.
      iv. Residue remained at the site.

   c. Inland (GM)
      i. Materials were brought from the Abby and W. Third location.

   d. GM
      i. Materials were brought from the Wisconsin Blvd. location.
      ii. GM had a key, allowing it to dump at night.

  e. Monsanto
    i. Nicholas Road location, own trucks, once or twice a week.
    ii. plastic residue

  f. Harris SeBold Co.

FURTHER AFFIANT SAYETH NAUGHT

_____
Horace J. Boesch

Sworn to and subscribed in my presence by the said Horace J. Boesch this 15th day of August, 2005.

_____
Notary Public

TIMOTHY D. HOFFMAN, ATTORNEY AT LAW
NOTARY PUBLIC, STATE OF OHIO
My Commission Has No Expiration Date,
Sec. 147.03 R.C.

S:\Wdox\Client\001302\00401\00227279.Doc

# Pepper Hamilton LLP
###### Attorneys at Law

Suite 3600
100 Renaissance Center
Detroit, MI 48243-1157
313.259.7110
Fax 313.259.7926

Todd C. Fracassi
direct dial: 313.393.7404
fracasst@pepperlaw.com

March 25, 2011

*Electronic Mail*

Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC 20044-6711

   Re: <u>*In re Motors Liquidation Corp., et al.*, D.J. Ref. 90-11-3-09754</u>
     <u>Public Comments - Proposed USEPA Consent Decree and Settlement Agreement</u>
     <u>("Non-Owned Site Settlement Agreement")</u>
     <u>Rose Township Site in Oakland County, Michigan</u>

Dear Assistant Attorney General:

   These public comments to the above referenced Non-Owned Site Settlement Agreement are being filed on behalf of Akzo Nobel Coatings, Inc.; Detrex Corporation; Federal Screw Works, Inc.; Ford Motor Company; CNA Holdings, LLC f/k/a CNA Holdings, Inc. (successor to Hoechst Celanese Corporation); Michelin North America, Inc. (successor to Uniroyal Goodrich Tire Company, Inc.); and TRW Automotive U.S. LLC (individually, "Party", collectively, the "Parties"). The Parties object to the Non-Owned Site Settlement Agreement for the reasons discussed below.

   In 1989 the Parties, along with Chrysler Corporation, General Motors Corporation ("GM"), RPM International Inc., and Great Lakes Division of National Steel Corporation (n/k/a United States Steel Corporation) (collectively, the potential responsible parties or "PRPs") entered into a Consent Decree with the U.S. Environmental Protection Agency ("USEPA") for remediation at the Rose Township Site in Oakland County, Michigan (the "Site"). The Consent Decree with the USEPA provided that the PRPs are jointly and severally liable under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §9601, *et seq.* ("<u>CERCLA</u>") for remediation of the Site.

   In 1988, the PRPs also entered into a Participation Agreement among themselves whereby the PRPs agreed to share the costs associated with the remediation of the Site. On

| Philadelphia | Boston | Washington, D.C. | Detroit | New York | Pittsburgh |
| --- | --- | --- | --- | --- | --- |
| Berwyn | Harrisburg | Orange County | Princeton | | Wilmington |

www.pepperlaw.com

US 00368