**Pepper Hamilton LLP**
_____Attorneys at Law

Assistant Attorney General
Page 2
March 25, 2011

March 3, 2002, National Steel filed for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and on April 30, 2009, Chrysler LLC, et al. ("Chrysler") filed for relief under the Bankruptcy Code. National Steel's and Chrysler's liability shares were reallocated among the remaining PRPs, including GM.

On June 1, 2009, GM filed for relief under chapter 11 of the Bankruptcy Code. GM's failure to continue meeting its obligations under the Consent Decree and Participation Agreement exposed each Party to damages including, but not limited to, GM's share of the remaining remediation work and federal and State of Michigan past and future costs. The Parties are currently working with the USEPA to complete the clean up at the Site.

Based on our review of the proposed Consent Decree and Settlement Agreement (the "Non-Owned Site Settlement Agreement") in the bankruptcy matter *Motors Liquidation Corp. et al., f/k/a General Motors Corp.*, Jointly Administered Case No. 09-50026, between the USEPA and Debtors, the USEPA is proposing to settle its claim against the Debtors for past and future clean up costs and oversight costs for the Site at a significantly discounted value of $211,108.

That is, the clean up cost for the Site contained in EPA's proof of claim was $10.8 million, not including oversight costs. While the $10.8 million is consistent with the mean clean up cost estimate prepared by the Parties' environmental expert that currently is performing the clean up work at the Site, the costs could be a high as $17.5 million. Based on the Participation Agreement for the Site, GM's asserted percentage share of liability for the Site is approximately 10%. As such, the settlement amount in the Non-Owned Site Settlement Agreement for the Site should be $1,080,000 to $1,750,000, not the $211,108 proposed in Non-Owned Site Settlement Agreement. The clean up costs and apportionment of GM's liability by the USEPA appears to be arbitrary, capricious, and devoid of a rational basis.

Paragraph 48 of the Non-Owned Site Settlement Agreement provides that "proceeds of any non-cash distribution received by EPA on account of an Allowed General Unsecured Claim shall be deposited in a special account within Superfund to be retained and used to fund response actions at the Settled Non-Owned Site for which it received an Allowed General Unsecured Claim". This should in turn then reduce the Parties' liability for clean up costs at the Site by the proceeds distributed. Since USEPA would be agreeing to a significantly discounted settlement amount for the Site, this Non-Owned Site Settlement Agreement would in turn inequitably increase the Parties' future liability for clean up costs.

US 00369

## Pepper Hamilton LLP
Attorneys at Law

Assistant Attorney General
Page 3
March 25, 2011

      Further, given paragraph 59 of the Non-Owned Site Settlement Agreement, which provides the Debtors with contribution protection for "matters addressed," and the United States Bankruptcy Court, Southern District of New York's January 13, 2011 decision in *In re Chemtura Corp.* that PRPs' future cost claims are contingent and disallowed under Section 502(e)(1)(B) of the Bankruptcy Code, the Parties will be foreclosed from any other recovery from the Debtors for future costs.[1]

      The proposed Non-Owned Site Settlement Agreement is not fair, reasonable, or consistent with the purposes of CERCLA. It does not accurately account for the likely future costs at the Site or GM's share of such costs, and USEPA therefore should not settle for such a discounted amount as it would arbitrarily impose an inequitable burden upon the Parties.

      Sincerely,

      Todd C. Fracassi

Enclosures

c:    Rich Clarizio - USEPA
      Rose Township Group
      Tom Wilczak - Pepper Hamilton LLP

#14037122 v1 (136768.2)

---

[1] Each Party filed a proof of claim in the bankruptcy matter *Motors Liquidation Corp. et al., f/k/a General Motors Corp*, Jointly Administered Case No. 09-50026, in an unliquidated amount: (a) pursuant to Section 107 of CERCLA, 42 U.S.C. §9607, and (b) for GM's breach of the Consent Decree. Motors Liquidation has objected to the Parties claims.

# Pepper Hamilton LLP
#### Attorneys at Law

Suite 3600
100 Renaissance Center
Detroit, MI 48243-1157
313.259.7110
Fax 313.259.7926

Todd C. Fracassi
direct dial: 313.393.7404
fracasst@pepperlaw.com

March 25, 2011

*Electronic Mail*

Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC 20044-6711

      Re:  <u>In re Motors Liquidation Corp., et al., D.J. Ref. 90-11-3-09754</u>
<u>Public Comments - Proposed USEPA Consent Decree and Settlement Agreement</u>
<u>("Non-Owned Site Settlement Agreement")</u>
<u>Springfield Township Site in Oakland County, Michigan</u>

Dear Assistant Attorney General:

      These public comments to the above referenced Non-Owned Site Settlement Agreement are being filed on behalf of Akzo Nobel Coatings, Inc.; Detrex Corporation; Federal Screw Works, Inc.; Ford Motor Company; CNA Holdings, LLC f/k/a CNA Holdings, Inc. (successor to Hoechst Celanese Corporation); Michelin North America, Inc. (successor to Uniroyal Goodrich Tire Company, Inc.); and TRW Automotive U.S. LLC (individually, "Party", collectively, the "Parties"). The Parties object to the Non-Owned Site Settlement Agreement for the reasons discussed below.

      In December 1997 the Parties, along with Chrysler Corporation, General Motors Corporation ("GM"), and Great Lakes Division of National Steel Corporation (n/k/a United States Steel Corporation) (collectively, the potential responsible parties or "PRPs") entered into a Consent Decree with the U.S. Environmental Protection Agency ("USEPA") for remediation at the Springfield Township Site in Oakland County, Michigan (the "Site"). The Consent Decree with the USEPA provided that the PRPs are jointly and severally liable under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C §9601, *et seq.* ("<u>CERCLA</u>") for remediation of the Site.

| Philadelphia | Boston | Washington, D.C. | Detroit | New York | Pittsburgh |
| Berwyn | Harrisburg | Orange County | Princeton | | Wilmington |

www.pepperlaw.com

US 00371

# Pepper Hamilton LLP
### Attorneys at Law

Assistant Attorney General
Page 2
March 25, 2011

      In December 1997, the PRPs also entered into a Participation Agreement among themselves whereby the PRPs agreed to share the costs associated with the remediation of the Site. On March 3, 2002, National Steel filed for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and on April 30, 2009, Chrysler LLC, et al. ("Chrysler") filed for relief under the Bankruptcy Code. National Steel's and Chrysler's liability shares were reallocated among the remaining PRPs, including GM.

      On June 1, 2009, GM filed for relief under chapter 11 of the Bankruptcy Code. GM's failure to continue meeting its obligations under the Consent Decree and Participation Agreement exposed each Party to damages including, but not limited to, GM's share of the remaining remediation work and federal and State of Michigan past and future costs. The Parties are currently working with the USEPA to complete the clean up at the Site.

      Based on our review of the proposed Consent Decree and Settlement Agreement (the "Non-Owned Site Settlement Agreement") in the bankruptcy matter *Motors Liquidation Corp. et al., f/k/a General Motors Corp.*, Jointly Administered Case No. 09-50026, between the USEPA and Debtors, the USEPA is proposing to settle its claim against the Debtors for past and future clean up costs and oversight costs for the Site at a significantly discounted value of $211,108.

      That is, the clean up cost for the Site contained in EPA's proof of claim was $10.8 million, not including oversight costs. Based on the Participation Agreement for the Site, GM's asserted percentage share of liability for the Site is approximately 10%. As such, the settlement amount for the Site should be approximately $1,080,000, not the $211,108 proposed in the Non-Owned Site Settlement Agreement. The clean up costs and apportionment of GM's liability by the USEPA appears to be arbitrary, capricious, and devoid of a rational basis.

      Paragraph 48 of the Non-Owned Site Settlement Agreement provides that "proceeds of any non-cash distribution received by EPA on account of an Allowed General Unsecured Claim shall be deposited in a special account within Superfund to be retained and used to fund response actions at the Settled Non-Owned Site for which it received an Allowed General Unsecured Claim". This should in turn then reduce the Parties' liability for clean up costs at the Site by the proceeds distributed. Since USEPA would be agreeing to a significantly discounted settlement amount for the Site, this Non-Owned Site Settlement Agreement would in turn inequitably increase the Parties' future liability for clean up costs.

      Further, given paragraph 59 of the Non-Owned Site Settlement Agreement, which provides the Debtors with contribution protection for "matters addressed," and the United States

US 00372

## Pepper Hamilton LLP
Attorneys at Law

Assistant Attorney General
Page 3
March 25, 2011

Bankruptcy Court, Southern District of New York's January 13, 2011 decision in *In re Chemtura Corp.* that PRPs' future cost claims are contingent and disallowed under Section 502(e)(1)(B) of the Bankruptcy Code, the Parties will be foreclosed from any other recovery from the Debtors for future costs.[1]

The proposed Non-Owned Site Settlement Agreement is not fair, reasonable, or consistent with the purposes of CERCLA. It does not accurately account for the likely future costs at the Site or GM's share of such costs, and USEPA therefore should not settle for such a discounted amount as it would arbitrarily impose an inequitable burden upon the Parties.

Sincerely,

Todd C. Fracassi

Enclosures

c:  Rich Clarizio - USEPA
    Springfield Township Group
    Tom Wilczak - Pepper Hamilton LLP

#14048447 v1 (107861.2)

---

[1] Each Party filed a proof of claim in the bankruptcy matter *Motors Liquidation Corp. et al., f/k/a General Motors Corp.*, Jointly Administered Case No. 09-50026, in an unliquidated amount: (a) pursuant to Section 107 of CERCLA, 42 U.S.C. §9607, and (b) for GM's breach of the Consent Decree. Motors Liquidation has objected to the Parties claims.

US 00373

**NIJMAN · FRANZETTI**

10 South LaSalle Street · Suite 3600 · Chicago, Illinois 60603
312.251.5250 · fax 312.251.4610 · www.nijmanfranzetti.com

Jennifer T. Nijman
jn@nijmanfranzetti.com

Susan M. Franzetti
sf@nijmanfranzetti.com

March 25, 2011

**VIA ELECTRONIC MAIL**

Assistant Attorney General
Environmental and Natural Resources
  Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
pubcomment-ees.enrd@usdoj.gov

Re:  *In re Motors Liquidation Corp., et al.*, Ref. 90-11-3-09754
     Lammers Barrel Factory PRP Group

To:  Assistant Attorney General, Environmental and Natural Resources Division

On behalf of the Lammers Barrel Factory PRP Group (the "Lammers Group"), we are submitting these comments regarding the Consent Decree which the United States Environmental Protection Agency ("EPA") proposes to have entered in the bankruptcy matter, *Motors Liquidation Corp, et al., f/k/a General Motors Corp., et al.,* Jointly Administered Case No. 09–50026 (REG), which is pending in the United States Bankruptcy Court for the Southern District of New York ("MLC Bankruptcy"). The proposed Consent Decree settlement agreement includes, *inter alia*, settlement terms for multiple federal Superfund Sites, including the Lammers Barrel Factory Superfund Site in Beavercreek, Greene County, Ohio (the "Lammers Site" or "Site"). These comments address, and make certain objections to, the proposed settlement terms applicable to the Lammers Site.

The Lammers Group submits that the proposed Consent Decree should not be approved because it is not substantively fair or reasonable, and consistent with CERCLA's goals. *United States v.Cannons Eng'g Corp.*, 899 F.2d 79, 85 (lst Cir. 1990); *United States v. SEPTA*, 235 F.3d 817, 823 (2000). Briefly summarizing the Lammers Group's comments, the lack of disclosure of the underlying basis and relevant facts relied upon by EPA to enter into this settlement severely prejudices the Lammers Group's ability to provide informed comment on the settlement agreement. The only available EPA future cost estimates for the Lammers Site are contained in its Proof of Claim filed in the MLC Bankruptcy. Using the Proof of Claim cost estimates, the Lammers Allowed Claim amount is less than twenty percent of what the Lammers Group estimates is Debtors' fair share of the Site costs. Applying significantly reduced Site cost

US 00374

Assistant Attorney General
Environmental and Natural Resources
 Division
March 25, 2011
Page 2

estimates determined by the Lammers Group's expert, the Allowed Claim amount is still no more than about half of the Debtors' fair share. Under either analysis, the discount the Government is proposing to afford to the Debtors goes well beyond what could be considered reasonable or necessary to provide an incentive to settle, and hence, is not consistent with CERCLA's goals.

If regardless of these objections, the Government nevertheless proceeds with this settlement, then in order to provide some substantive fairness, the settlement agreement should at least include a covenant not to sue by the Debtors to other PRPs. Alternatively, because the Debtors also will receive broad contribution protections, the Settlement Agreement should also state that they are not paying more than their "fair share" of the Site response costs. The Settlement Agreement should further provide that any orphan share created by its terms will not be the responsibility of the other Lammers Site PRPs. Finally, the Settlement Agreement should be revised to provide clear and sufficiently detailed information concerning the non-cash distributions to be received by U.S. EPA.

### A.    Background

The Lammers Site was the former location of a manufacturing facility for paints, lacquers and related products prior to 1953. (Deposition of Anthony Kohnen, Aug. 5, 2003, Tr. at p. 11) From approximately 1953 to 1969, the Site was a solvent reclamation and drum reconditioning facility that was operated by Anthony Kohnen and/or Paul Lammers under various corporate names from approximately 1953 to 1969. (*See* U.S. MLC Bankruptcy Proof of Claim at p. 53) The Lammers Group is an association of private parties that is conducting the Remedial Investigation/Feasibility Study ("RI/FS") at the Lammers Site. A list of the members of the Lammers Barrel Group is attached as Exhibit A. All of the members of the Lammers Group are parties to an Administrative Order on Consent for Remedial Investigation/Feasibility Study, dated April 1, 2002, entered into with the United States Environmental Protection Agency Region 5 ("EPA"), and as amended by written amendment dated December 18, 2008 ("Amended Administrative Order on Consent"), regarding the Lammers Site. (*See* U.S. MLC Bankruptcy Proof of Claim at p. 54, para. 261)

Pursuant to the terms of the Amended Administrative Order on Consent, since 2002, the Lammers Group has performed and paid the costs to date of the RI/FS and continues to do so to the present. Since 2002, and also as part of its obligations under the Amended Administrative Order on Consent, the Lammers Group also has reimbursed the U.S. EPA's RI/FS oversight costs at the Site and will continue to do so consistent with its obligations. To date, the Lammers Group has fully cooperated with the EPA in conducting the RI/FS work. Its performance record on the RI/FS is excellent.

In 2010, the EPA decided to divide future remedial activities at the Lammers Site into two separate operable units, called "Operable Unit 1" (OU1) and Operable Unit 2 (OU2). OU1 will address impacts to on-site soil and groundwater. OU2 will address off-site groundwater. At

US 00375

Assistant Attorney General
Environmental and Natural Resources
  Division
March 25, 2011
Page 3

present, for OU1, the RI has been completed and the FS is nearing completion. For OU2, the EPA has advised the Lammers Group that it will require additional RI groundwater monitoring work, including the installation of additional off-site groundwater monitoring wells and additional monitoring events, to be completed before the Lammers Group will be allowed to proceed to complete the FS for OU2. In 2010, the EPA advised that more details concerning the required scope of this additional RI work will be forthcoming, but this information has not yet been provided. The EPA has not provided the Lammers Group with any cost estimates for the completion of the OU2 RI work or disclosed how long it expects this additional work will continue before EPA approves its completion.

In order to protect its interests in, and potential responsibilities for, the costs already incurred and to be incurred at the Lammers Site, the Lammers Group submitted an unsecured claim in the MLC Bankruptcy on November 23, 2009, which was designated as Claim #36699, for past and future costs relating to the RI/FS and the implementation of Remedial Design/Remediation Action (RD/RA). One of the Debtors, General Motors Corporation ("Old GM"), was a member of the Lammers Group up until the time the MLC Bankruptcy was filed. Old GM had entered into a contractual agreement with the Lammers Group to pay its allotted share of the RI/FS costs incurred. Upon the filing of the MLC Bankruptcy, Old GM ceased making any further payments to the Lammers Group. (*See Debtors' 208th Omnibus Objection to Claims* at p. 4, para. 7, "Debtors have ceased paying into and otherwise participating in PRP Groups for sites that they do not own.")

Since the MLC Bankruptcy was filed and Old GM ceased making payments, the Lammers Group members have paid $300,000 more to fund the costs of the RI/FS work. The Group will continue to incur costs until the RI/FS work is completed. GM has not contributed and will not be contributing its fair share of these costs. Further, in the *Debtors' 208th Omnibus Objection to Claims* filed in MLC Bankruptcy, the Lammers Group's Claim #36699 is among the claims the Debtors seek to have the bankruptcy court disallow. (*See Debtors' 208th Omnibus Objection to Claims* at Exhibit A, page 20) The Lammers Group filed a response in opposition to the Debtors' 208th Omnibus Objection to Claims on February 22, 2011, which is currently set for hearing before the bankruptcy court on March 29, 2011.

**B.    The Proposed U.S. EPA/MLC Settlement**

A "Notice of Lodging of Proposed Non-Owned Site Settlement Agreement" was filed in the MLC Bankruptcy on March 4, 2011. Exhibit A to that notice contained the proposed Consent Decree between the United States of America, on behalf of the U.S. EPA, and certain of the Debtors, including Old GM. The Notice requested that the bankruptcy court wait to approve the settlement until it was published in the *Federal Register* and after public comment closes. The settlement was published in the *Federal Register* on March 10, 2011 and public comment closes on March 25, 2011. *See* 76 Fed. Reg. 13209 (March 10, 2011). Subsequently, a revised

US 00376

Assistant Attorney General
Environmental and Natural Resources
  Division
March 25, 2011
Page 4

Federal Register notice was published on March 16, 2011 which stated that any public comment must be filed no later than March 25, 2011. *See* 76 Fed. Reg. 13209 (March 16, 2011).

For the Lammers Site, the proposed Consent Decree provides that in settlement and satisfaction of the U.S. Proof of Claim, the United States, on behalf of the U.S. EPA, shall have an Allowed General Unsecured Claim in the amount of $1,200,000, classified in Class 3 under the Plan of Liquidation (the "Allowed Claim Amount"). No explanation is provided in the proposed Consent Decree, or in any other publicly available document, as to how this Allowed Claim Amount was determined. There is no disclosure of the allocated share of Old GM or of the past and estimated future costs on which the Allowed Claim Amount is based.

Accordingly, absent these facts, it is impossible for the Lammers Group to evaluate and comment on the relevant facts relied upon by the EPA to accept the Allowed Claim Amount as a reasonable settlement of its claim. The complete lack of disclosure of the underlying basis on which the Allowed Claim Amount was determined severely prejudices the Lammers Group's ability to provide informed comment on the settlement agreement, contrary to the meaning and intent of the notice and comment provision of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. 9601 *et seq*. This is particularly true here because the EPA has not provided any allocation information (*e.g.,* waste-in volumes and allocated percentage shares) for any potentially responsible parties ("PRPs") for the Lammers Site. As further discussed below, the only future cost estimates for the Lammers Site that the EPA has provided are contained in the Proof of Claim filed in the MLC Bankruptcy, which does not contain a specific claim amount for the Lammers Site. Accordingly, the Lammers Group has, in part, relied upon the cost estimates provided in that Proof of Claim to prepare these comments.

C.    **MLC/Old GM Is Not Paying Its Fair Share of the Lammers Site Costs**

For all of the following reasons, the Lammers Group submits that the proposed settlement is not substantively fair and reasonable because the Allowed Claim amount does not represent MLC/Old GM's fair share of past and future costs for the Lammers Site. The $1.2 million Allowed Claim Amount does not represent either the comparative fault of Old GM or a rational estimate of the harm it caused at the Site. See, *United States v. SEPTA*, 235 F.3d at 823. The substantial discount being provided to the Debtors, apparently to incentivize them to settle this matter, goes well beyond what is consistent with CERCLA's goal of encouraging PRP settlements in lieu of litigation.

1. **EPA has not made a reasonable effort to estimate MLC/Old GM's "Fair Share" of the Site Costs.**

Because the EPA has not conducted the necessary review and effort to determine MLC/Old GM's "fair share" of the Lammers Site past and future costs, it has not shown that the

US 00377

Assistant Attorney General
Environmental and Natural Resources
 Division
March 25, 2011
Page 5

proposed settlement is reasonable and justified by the relevant facts. Since at least 2002, the EPA has had in its possession the relevant nexus information on which to identify PRPs for the Lammers Site. Admittedly, the available nexus information here is more limited than is typically the case for CERCLA sites. A fire destroyed the on-site facility at the Lammers Site in September 1969. The fire also destroyed existing on-site documents. Accordingly, the EPA has limited documentation concerning the customers of the former site owners and operators. However, due largely to the efforts of the Lammers Group, with the support of the U.S. EPA, in 2003, extensive deposition testimony was obtained from two individuals, Anthony Kohnen, a former owner and operator, and a long term employee who worked at the site, Cecil Brown, pursuant to Rule 27 of the Federal Rules of Civil Procedure (the "Deposition Testimony"). The EPA was represented at these depositions by counsel for both the U.S. Department of Justice and the United States Environmental Protection Agency Region V. The Deposition Testimony provides a significant amount of information concerning the identity of PRPs and the nature and volume of hazardous substances each PRP allegedly sent to the Lammers Site. Further, included within the deposition exhibits to the Deposition Testimony was an extensive chart prepared by Mr. Kohnen which listed the names of customers, the nature of the waste each sent to the site, and the years of each customer's waste shipments to the site, among other information. (*See* Kohnen Deposition, Exhibit 7)

Since 2003, a period of approximately seven years, the EPA has had all of this relevant nexus information for PRPs of the Lammers Site. However, to the best of the Lammers Group's information, neither the EPA nor the U.S. Department of Justice ("DOJ") has used this available information to prepare an estimated total waste-in volume for the Lammers Site. To the best of the Lammers Group's information and belief, based on prior inquiries of both EPA and the United States Attorney's Office, neither the EPA nor the DOJ has prepared an estimated total waste-in volume for Old GM. Similarly, there is no evidence that the EPA or the DOJ has prepared any information concerning the PRP "orphan share" for the Lammers Site. Accordingly, while the underlying basis for the $1.2 million Allowed Claim has not been disclosed, it is known that the proposed settlement was negotiated without the benefit of a careful and reasoned determination concerning the estimated percentage share of the total waste shipments sent to the Site by Old GM. As a result, there is no known reasonable basis for the proposed settlement amount. As further discussed below, from the extensive review performed by the Lammers Group, the proposed settlement allows MLC/Old GM to pay less than its proportionate and fair share of past and future costs at the Lammers Site.

   2.   **MLC/Old GM is not paying its "Fair Share" of the Lammers Site Costs.**

The proposed $1.2 million Allowed Claim is unreasonably low because it is significantly less than MLC/Old GM's "fair share" of the Lammers Site past and future costs. The U.S. Proof of Claim for the Lammers Site describes unreimbursed past costs and estimated future costs for the site. (*See* U.S. MLC Bankruptcy Proof of Claim at p. 55, paras. 263-264) In that Proof of Claim, the EPA states it has unreimbursed past costs of $1,926,132. (*Id.* at p. 55, para. 263) It further provides that the USEPA estimates "it will incur an additional $5 million in future

Assistant Attorney General
Environmental and Natural Resources
  Division
March 25, 2011
Page 6

oversight costs" for the final remedy and that "future response action at the Lammers Site will cost at least $25 million." (*Id.* at p. 55, paras. 263-264) Thus, the total past and future costs identified by the EPA for the Lammers Site are approximately $32 million. Under the proposed Consent Decree's terms, the U.S. EPA's Allowed Claim for the Lammers Site will be only $1.2 million. The proposed Allowed Claim equates to a MLC/Old GM percentage share of past and future costs of approximately 3.8%. This percentage share of the Site costs is far too low based on the evidence provided in the sworn Deposition Testimony.

In the Deposition Testimony, Old GM was identified by Anthony Kohnen, a former site owner and operator, as the facility's "longest term customer." (Kohnen Deposition, Tr. at p. 970) Mr. Kohnen testified at length about the shipments of hazardous substances sent to the Lammers Site from at least five different Old GM facilities in Ohio. (*Id.,* Tr. at pp. 24, 34-40, 230, 257, 264, 266, 357-367 and 481-482; *see also* Kohnen Deposition Ex. 7) Just one of these Old GM facilities, a former GM manufacturing complex now known as "MLC Moraine," covered an area of 465 acres and consisted of millions of square feet of manufacturing operations. (*See* EPA February 10, 2011 Press Release No. 11-OPA013) Each of these Old GM facilities was a customer of the Lammers facility for at least two years and as long as six years. (*Id.*) They sent waste solvents, chlorinated and aliphatic solvents and waste acetone, among other wastes, to the Site. (*Id.*) For most of the Old GM facilities, each of its hazardous waste shipments to the Lammers Site was typically in the range of 30-40 drums, with one Old GM facility (*i.e.,* Inland Mfg. in Dayton, Ohio) sending tanker loads of typically 6,000 to 7,000 gallons per month. (*Id.*) Based on all of the Deposition Testimony and available documentation, the totality of the volume Old GM hazardous waste shipments to the Lammers Site is significantly larger than any other generator. This evidence strongly supports the conclusion that MLC/Old GM is not paying its "fair share" of the Lammers Site past and future costs.

Moreover, the proposed $1.2 million Allowed Claim is still too low even if the estimated future site costs are significantly reduced based on more recent information and applying very conservative future cost estimates. Such a revised estimate of future oversight and remedy costs for the Lammers Site is presented below in anticipation of EPA's response that it revised and reduced its Proof of Claim estimates since that claim was filed in the MLC bankruptcy.

With respect to U.S. EPA's future oversight costs at the Site, a reasonable approach is to estimate future oversight costs taking into account the actual EPA oversight costs to date for the RI/FS work the Lammers Group is performing. The Lammers Group has paid the EPA a total of approximately $1 million for RI/FS oversight costs covering an eight year time period from April 2002 to April 2010, which amount still does not include the past year of oversight costs not yet billed by EPA and the future oversight costs for RI/FS work not yet completed. In particular, it is expected that the additional groundwater monitoring work for OU2, once the EPA determines its scope, will extend the OU2 RI/FS work for at least another one to two years, with commensurate additional EPA future oversight costs. Thus, there are probably at least three additional years of RI/FS oversight costs that the Lammers Group will incur. Given the EPA's average annual rate of oversight costs at this site to date is approximately $125,000 ($1 million/8

US 00379

Assistant Attorney General
Environmental and Natural Resources
  Division
March 25, 2011
Page 7

years = $125,000), the additional three years of RI/FS oversight costs are estimated to be at least $300,000. Further, it is reasonable to assume that the U.S. EPA's future oversight of the RD/RA work at the site will be significantly higher than the total RI/FS oversight costs. The U.S. EPA's RD/RA oversight will extend over a longer period of time and involve more work because of the need to review and approve design and remedial action plans, to oversee the implementation of the remedy at the site and post-remedy construction inspections and then long-term monitoring, which alone is estimated to extend ten years beyond remedy construction based on the current Revised Draft Feasibility Study. Therefore, using a fifteen year time period of future RD/RA oversight costs and the U.S. EPA's average annual oversight cost amount of $125,000, the estimated total future RD/RA oversight costs amount is $1,875,000. With the addition of the estimated $300,000 of additional RI/FS oversight costs, the total estimated EPA future oversight costs for the Lammers Site is $2,175,000.

The most recent Lammers Site communication from the EPA to the Lammers Group indicates that the EPA may support a remedy for OU1 that includes an in-situ treatment method for site soils, along with Enhanced Reductive Dechlorination (ERD) treatment for onsite groundwater. (*See* March 18, 2011 letter from Timothy J. Fischer, Remedial Project Manager, EPA Region 5, to Jack Kratzmeyer, ARCADIS U.S. Inc.) Based on the U.S. EPA's review and comments of the OU1 Revised FS Report submitted by the Lammers Group, it appears that at least 10 years of long-term monitoring after implementation of this remedy over a two to four year estimated time period would be required. As part of its review of the proposed settlement terms, the Lammers Group requested that its RI/FS contractor, ARCADIS US, Inc. ("ARCADIS") prepare cost estimates for the future sites costs. ARCADIS is a highly qualified CERCLA RI/FS and RD/RA contractor with years of experience in performing federal Superfund site response actions and estimating future costs. ARCADIS provided cost estimates prepared to a level of detail to reflect accuracy in the range of -30% to +50%, in accordance with EPA guidance for the preparation of FS cost estimates. These ARCADIS cost estimates are provided below.

The estimated (based on present worth), future capital cost of implementing the in situ soil mixing remedy is $3,750,000 and the in situ ERD groundwater treatment estimate is $1,500,000. The estimated cost of ten years of groundwater monitoring is $600,000. Thus, the total ARCADIS cost estimate for future OU1 RD/RA costs is $5,850,000.

The potential remedy for OU2 is more difficult to predict because neither the RI nor FS has been completed. For purposes of this comment, estimated future costs are based on a proposed remedy of monitored natural attenuation, which is one of the least costly potential remedies that could be selected for OU2. The ARCADIS preliminary estimate of the OU2 RD/RA costs, based on present net worth, is $1,425,000

US 00380

Assistant Attorney General
Environmental and Natural Resources
  Division
March 25, 2011
Page 8

In summary, the lowest reduced past and future costs estimate that the EPA may have used as its basis for the proposed settlement with MLC is approximately $11.4 million, calculated as follows:

| | |
|---|---|
| Past Costs: | $1,926,132 |
| Future Oversight Costs: | $2,175,000 |
| Future OU1 RD/RA Costs: | $5,850,000 |
| Future OU2 RD/RA Costs: | $1,425,000 |
| Total Estimated Past & Future Costs: | $11,376,132 |

Further, even this "best case" reduced past and future costs estimate for the Lammers Site is too low. Given that the remedies have not yet been selected for either OU1 or OU2, it would be reasonable to include some additional contingency percentage to the OU1 and OU2 estimated future RD/RA costs. Further, the reduced cost estimate may also be incomplete because, if the MLC 208th Omnibus Objection is granted by the bankruptcy court, MLC will not pay any amount to the Lammers Group for the costs it will incur to complete the RI/FS work for OU1 and OU2. ARCADIS provided a cost estimate of $300,000 for completion of the OU2 RI/FS work. The approximately $11.4 million reduced total site cost estimate does not include the additional $250,000 of future OU2 RI/FS costs.

Applying the $1.2 million Allowed Claim to the $11.4 million reduced past and future costs estimate for the Lammers Site, the revised MLC/Old GM allocated percentage share is 10.5%. As stated above, the Deposition Testimony and other available information concerning Old GM supports the conclusion that it is the largest generator PRP of the Lammers Site. Further, there does not appear to have been any consideration given to MLC/Old GM's responsibility for its proportionate share of the "orphan" PRP liability for the Lammers Site. Clearly, a higher percentage share for MLC/Old GM should have been used as the basis for the settlement of the U.S. EPA's Proof of Claim. MLC is simply not paying its proportionate, fair share of the Lammers Site past and future costs.

### 3.    The Proposed Settlement Terms are unreasonable and should be revised.

Based on the above analysis, the proposed $1.2 million Allowed Claim does not equate to MLC/Old GM's "fair share" of the Lammers Site past and future costs. The EPA should not proceed with the proposed settlement until it has performed the work necessary to more accurately determine Old GM's percentage share of the Lammers Site costs based on the available Deposition Testimony and other site nexus documents. The Lammers Site Group submits that based on its preliminary review of that information, Old GM's allocated percentage share should be in the range of at least 20% to 30%. As shown above, the proposed settlement appears to be based on an Old GM percentage share of only 10.5%, which is only half of the lowest actual share MLC/Old GM should be paying to settle the U.S. Proof of Claim for the Lammers Site.

US 00381

Assistant Attorney General
Environmental and Natural Resources
 Division
March 25, 2011
Page 9


Further, the proposed settlement terms are unfair because they provide the Debtors with both a covenant not to sue by the United States and full contribution protection against any claims by the Lammers Group. No similar protections are afforded to other PRPs for the orphan Old GM share created by this settlement or for any future contributions claims on behalf of Old GM should it attempt to claim that it paid more than its "fair share" in this settlement. (*See* Proposed Consent Decree at pp. 19-22, paras. 53-55, 59) The proposed Consent Decree provides the Debtors with CERCLA Section 113(f)(2) contribution protection for all "matters addressed" which is broadly defined to include claims by EPA or PRPs "for response costs at or in connection with the Settled Non-Owned Sites." (Proposed Consent Decree at pp. 21-22, para. 59) Given the unjustifiably beneficial settlement terms afforded the Debtors, to treat other PRPs fairly, the settlement agreement should include a covenant not to sue by the Debtors to PRPs at the Settled Non-Owned Sites. Alternatively, at the least, if the Debtors are to be given such broad protections, the Settlement Agreement should expressly state that they are not paying more than their "fair share" of the response costs at each of the Settled Non-Owned Sites.

Finally, the Settlement Agreement should provide that any Old GM orphan share created by the terms of this Settlement Agreement will not be the responsibility of the other PRPs. Such a condition is particularly justified for the Lammers Site because the EPA has not yet determined either the site remedies or any proportionate ranking list for the PRPs. Consequently, this settlement involves a higher degree of uncertainty concerning both the proportionate responsibility of Old GM and the total site costs than is typically the case. If in the future, when the EPA has determined the site remedies and the proportionate shares of liability of PRPs, it is revealed that Old GM's share was significantly greater than the assumptions used for this settlement, the remaining PRPs should not bear the burden of assuming the Old GM "orphan share" of the Lammers Site.

### 4. The Proposed Settlement Agreement does not provide clear and detailed information concerning the non-cash distributions received by U.S. EPA.

Paragraph 48 of the proposed Settlement Agreement summarily provides, in relevant part, that "any non-cash distribution received by EPA on account of an Allowed General Unsecured Claim shall be deposited in a special account within the Superfund to be retained and used to fund response actions at the Settled Non-Owned Site for which it received an Allowed General Unsecured Claim." (Proposed Consent Decree at p. 17, para. 48) Paragraph 49 further provides, in relevant part, that "[o]nly the amount of cash received by EPA (and net cash received upon sale of any non-cash distributions) pursuant to this Settlement Agreement for any Allowed General Unsecured Claim…shall be credited by EPA to its account for the Non-Owned Site for which it received an Allowed General Unsecured Claim, and shall reduce the liability of non-settling potentially responsible parties for that site by the amount of the credit." (Proposed Consent Decree at p. 18, para. 49) These provisions do not provide sufficient detail to allow the Lammers Group to understand clearly how the EPA will handle the receipt of non-cash distributions, their conversion into cash, and how the cash amount to be credited to the Lammers Site will be determined.

US 00382