# GT GreenbergTraurig

Bruce R. Zirinsky
Tel 212.801.9222
Fax 212.805.5517
zirinskyb@gtlaw.com

April 5, 2011

**VIA MESSENGER**

Honorable Robert E. Gerber
United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004-1408

> Re:  In re Motors Liquidation Company, et al., 09-50026(REG): Noteholders' Response to Correspondence from Official Committee of Unsecured Creditors Regarding Discovery on Committee's First Amended Objection to Claims Filed by Green Hunt Wedlake, Inc. and Noteholders of General Motors Nova Scotia Finance Company and Motion for Other Relief [Docket Nos. 7859, 9940]

Dear Judge Gerber:

The Noteholders of General Motors Nova Scotia Finance Company ("**Noteholders**") hereby respond to the correspondence submitted to you by the Official Committee of Unsecured Creditors (the "**Committee**") on March 29, 2011 [Docket No. 9940] (the "**March 29, 2011 Correspondence**") regarding certain discovery issues that have arisen between the parties relating to discovery for the Committee's First Amended Objection to Claims Filed by Green Hunt Wedlake, Inc. and Noteholders of General Motors Nova Scotia Finance Company and Motion for Other Relief [Docket No. 7859] (the "**Objection**").

**A.  Background of the Objection and the Scope of Discovery.**

**I.  The Nature of the Committee's Objection.**

Before delving into the four specific issues raised in the Committee's March 29, 2011 Correspondence, some background information and a review of the allegations in the Committee's Objection is useful as context. The Committee describes its Objection as follows: "This objection concerns claims that arise out of an agreement between Old GM and a consortium of hedge-fund noteholders, which was entered into just minutes before Old GM filed for bankruptcy on June 1, 2009. The agreement, known as the 'Lock-Up Agreement,' was grossly one-sided, disproportionately benefiting the Noteholders and leaving Old GM's estate depleted to the detriment of its creditors." (Objection ¶ 1.)

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BERLIN*
BOSTON
BRUSSELS*
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LONDON*
LOS ANGELES
MIAMI
MILAN*
NEW JERSEY
NEW YORK
ORANGE COUNTY
ORLANDO
PALM BEACH COUNTY
PHILADELPHIA
PHOENIX
ROME*
SACRAMENTO
SHANGHAI
SILICON VALLEY
TALLAHASSEE
TAMPA
TOKYO*
TYSONS CORNER
WASHINGTON, D.C.
ZURICH

*STRATEGIC ALLIANCE

NY 241,066,875v9 4-5-11
GREENBERG TRAURIG, LLP ■ ATTORNEYS AT LAW ■ WWW.GTLAW.COM
MetLife Building ■ 200 Park Avenue ■ New York, NY 10166 ■ Tel 212.801.9200 ■ Fax 212.801.6400

Honorable Robert E. Gerber
April 5, 2011
Page 2

---

Obviously the Noteholders strenuously disagree with these allegations, but these are the Committee's own words to describe its Objection.

Additionally, throughout the Objection, the Committee attacks the terms of the Lock-Up Agreement, which was negotiated in late May 2009 and finally executed on June 1, 2009. In the Lock-Up Agreement, however, the Noteholders and certain GM subsidiaries reached an agreement that permitted GM Canada to avoid bankruptcy and constituted an important piece of Old GM's restructuring plan that facilitated the sale to New GM. The Lock-Up Agreement was an arms' length, difficult and complex transaction involving extensive negotiations between the parties with counsel from Greenberg Traurig LLP for the Noteholders and Weil, Gotshal & Manges for Old GM. As discussed below, one benefit to Old GM of the Lock-Up Agreement was the settlement of litigation. Another significant benefit to Old GM of the Lock-Up Agreement is that it permitted General Motors Nova Scotia Finance Company ("**GMNS Finance**") and General Motors of Canada Limited to avoid filing insolvency proceedings. This benefit is described in greater detail in the Response of Certain Noteholders' to the Objection, but in summary, this benefit of the Lock-Up Agreement of subsidiaries of Old GM preserved billions of dollars of value to the estate. (Noteholders' Resp. at 3-4, 13-14.)

Following the Court-approved procedures for the assumption and assignment of executory contracts, the Lock-Up Agreement was assigned to New GM. The Assumption Order approved the sale to New GM, a sale which the Committee supported in June and July 2009. One year later, the Committee reversed course and sought to contest the provisions of the Lock-Up Agreement.

The complained-of conduct involving the Noteholders, by the Committee's own allegations, began "[d]uring 2009." (Objection ¶ 26.) The Objection then describes litigation commenced by the Noteholders in Nova Scotia against Old GM and certain subsidiaries in March 2009 and assails the terms of the Lock-Up Agreement executed by the Noteholders and certain subsidiaries of Old GM on June 1, 2009. (*Id.* ¶¶ 26-43.) It is the events of early-to-mid 2009 and the terms of the Lock-Up Agreement upon which the Committee bases its Objection.

### II.   The Scope of Discovery Agreed to by the Noteholders Is More than Sufficient Regarding the Objection.

At the December 15, 2010 Hearing at which the Committee's counsel requested discovery regarding its Objection, Mr. Fisher succinctly described the Objection as follows: "The claims that we're challenging arise out of something called a lockup agreement. The lockup agreement was entered into hours and maybe minutes before GM filed its bankruptcy petition on June 1, 2009." (Dec. 15, 2009 Hearing Tr. at 29.) Mr. Fisher then described the Committee's need for discovery as follows: "I think that part of the arrangements behind the lockup agreement and the choreography that followed the lockup agreement was to try to have the agreement escape this court's scrutiny. And we want to make sure that we have a full and fair opportunity to kick the tires and to test the legitimacy

Honorable Robert E. Gerber
April 5, 2011
Page 3

---

of these claims. And so, I think what we envision is document discovery from the parties to the lockup agreement." (*Id.* at 31.) As described *infra*, this is exactly what the Noteholders have agreed to produce, and the Committee's request for more is nothing more than over-reaching.[1]

After requesting discovery for its Objection, the Committee served the Noteholders with 23 separate document requests. In response to these requests, the Noteholders will produce voluminous records to the Committee, including but not limited to the following documents:

- All documents concerning the Lock-Up Agreement;

- All documents concerning the litigation commenced in Nova Scotia against Old GM and certain subsidiaries ("**Nova Scotia Proceeding**");

- All documents concerning any transfers referred to in the Nova Scotia Proceeding;

- All documents concerning a Bond Exchange Offer offered in April 2009 to the Noteholders;

- All documents concerning currency swaps between Nova Scotia Finance and Old GM;

- All documents relating to any prior or potential defaults under the Fiscal and Paying Agency Agreement or the Notes;

- All documents concerning Intercompany Loans from Nova Scotia Finance to GM Canada;

- All documents concerning a potential reorganization or bankruptcy, insolvency, liquidation or other winding-up event of Nova Scotia Finance or GM Canada;

- All documents concerning the financial condition of Nova Scotia Finance;

- All documents concerning the $450 Million Loan from Old GM to GM Canada on May 29, 2009;

- All documents concerning any fee paid to any person in connection with the Notes;

---

[1] It is simply incorrect to state, as the Committee has done, that the Noteholders refused to provide any discovery from the time it filed the initial objection. Each time counsel met, all counsel agreed to defer discovery until such time as the parties were able to participate in a hearing before the Court on the question of whether the parties should proceed with discovery or file summary judgment papers and, to the extent discovery was ordered, to agree on a workable schedule. The Committee said in the meantime it was working to amend its Objection, a process that took months. It is completely disingenuous for the Committee to imply that the Noteholders unilaterally decided to not respond to its discovery requests. (March 29, 2011 Correspondence at 2.)

*NY 241,066,875v9 4-5-11*

GREENBERG TRAURIG, LLP ■ ATTORNEYS AT LAW ■ WWW.GTLAW.COM

09-50026-mg    Doc 10045-1    Filed 04/05/11    Entered 04/05/11 16:49:39    Letter To
Honorable Robert E. Gerber    Pg 4 of 9

Honorable Robert E. Gerber
April 5, 2011
Page 4

---

- All documents concerning the process by which a trustee was selected for Nova Scotia Finance;

- Documents sufficient to show the identities of the Noteholders' attorneys for their claims filed in this Court, the Notes, the Lock-Up Agreement and the Nova Scotia Proceeding;

- All documents concerning the ULC structure of Nova Scotia Finance; and

- All communications with certain individuals at GM identified by the Committee.

None of these subject matters requires information which was created by the Noteholders or came into any Noteholder's possession before January 1, 2009. The production of these documents will provide more than sufficient documents related to the claims made in the Committee's Objection. The Noteholders have committed an inordinate amount of time and resources going through thousands of records and expect to produce thousands of individual records to the Committee. Indeed, the Noteholders have already produced over 15,000 pages of material and expect to produce many thousands pages more.

**B.    The Committee is Not Entitled to the Discovery It Seeks.**

Against this background, the Noteholders now turn to the four specific issues raised in the Committee's March 29, 2011 Correspondence. The Committee's request for the production of documents should be denied for each of the four categories, as each of the four goes well outside the bounds of the allegations in the Objection, is not reasonably likely to lead to the discovery of admissible evidence for the Objection, and imposes an undue burden on the Noteholders. *See, e.g.,* Federal Rule of Civil Procedure 26(b)(2)(B) (providing that a party "need not produce discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost").

**I.    The Relevant Timeframe Is Not Broader than the First Half of 2009.**

As an initial matter, the issue of the timeframe is a false one. The important consideration regarding discovery on the Committee's Objection is the production of documents relevant to the subject matters of interest to the Committee, which are enumerated above. While it is true that extracting potentially responsive information from the Noteholders' systems requires the determination of a relevant time frame, it is not the determining factor as to whether the Noteholders have produced all information responsive to the subject matters. The effect of an overly broad timeframe is to significantly increase the burden to the Noteholders of capturing information unlikely to produce documents that are potentially responsive to the Committee's discovery requests. From this perspective, the Noteholders will produce documents responsive to the subject matters in order to provide the Committee with the discovery its counsel requested of the Court on December 15, 2010.

*NY 241,066,875v9 4-5-11*

GREENBERG TRAURIG, LLP ■ ATTORNEYS AT LAW ■ WWW.GTLAW.COM

Honorable Robert E. Gerber
April 5, 2011
Page 5

---

An examination of the Committee's Objection shows that the relevant timeframe is, at most, from May 1, 2009 - July 15, 2009. The crux of the Committee's Objection is whether the Committee is entitled to any of the relief requested based on allegations that the Court should not enforce, in whole or in part, the terms of the Lock-Up Agreement. The Lock-Up Agreement was executed on June 1, 2009 after negotiations in a short period in late May 2009. Because the contested actions all took place in mid-2009, in order to be more than adequate, the Noteholders have agreed to provide responsive documents (subject to other objections particular to specific requests) from January 1, 2009 through July 31, 2009 (a seven-month period).

The Committee provides only two purported reasons for suggesting that the timeframe should be expanded from June 1, 2008 to July 2, 2010 or from the date each Noteholder first purchased notes to July 2, 2010. (Mar. 29, 2011 Correspondence at 2-3.) The Committee attempts to expand the timeframe to prior to January 1, 2009 by attacking the validity of litigation commenced by certain Noteholders in Nova Scotia for an oppression claim, only one of the claims asserted by certain Noteholders in Nova Scotia in addition to claims for unfair prejudice, unfair disregard and unjust enrichment. The litigation sought the recovery for the benefit of GMNS Finance of over $500,000,000 (Canadian) resulting from improper transfers to Old GM. The Committee suggests that the relevant inquiry is to essentially try the Nova Scotia Proceeding in this Court under Nova Scotia law, resulting in a determination of whether the oppression and other claims asserted by the Noteholders would have resulted in a judgment in favor of the Noteholders. (*Id.* at 3.) The Committee's position is inappropriate.

As supported by the documents filed in this case and uncontroverted by the Committee, the Nova Scotia Proceeding was settled by the Lock-Up Agreement. The merits of the Nova Scotia Proceeding and the Noteholders' expectations when they purchased the Notes are not at issue in this case.[2] The Committee does not cite any case law to support its effort, instead citing only to a report submitted in a bankruptcy proceeding in Delaware as if it were some sort of legal authority. (March 29, 2011 Correspondence at 3 (citing *Report of the Special Advisor to Bowater Canada Finance Corp. at 18, In re AbitibiBowater, Inc., et al.*, No. 09-11296(KJC) (Bankr. D. Del. Sept. 20,

---

[2] Contrary to the Committee's assertions (March 29, 2011 Correspondence at 3-4), most Canadian courts would not preclude the claims asserted by certain Noteholders in the Nova Scotia Proceeding even if they did in fact know of the transfers prior to investing in the Notes. *See, e.g., Re BCE, Inc.* (2008) 3 S.C.R. 560, CarswellQue 12595 at para. 66 and 70; *UPM-Kymmene Corp. v. UPM-Kymmene Miramichi Inc.* (2002), 27 B.L.R. (3d) 53, *aff'd by* (2004), 42 B.L.R. (3d) 34 (Ont. C.A.) at paras. 10-11; *Palmer v. Carling O'Keefe Breweries of Canada Ltd.* (1989), 67 O.R. (2d) 161 (Div. Ct.). In the one case cited by the Committee, *Harbert Distressed Investment Master Fund, Ltd. v. Calpine Canada Energy Finance II ULC, et al.*, 7 B.L.R. (4th) 276 (2005 N.S.S.C. 211), the trial court noted that the case law on the question of whether prior knowledge would preclude an oppression claim was not fully developed. Subsequent case law from the Court of Appeal of Ontario followed the position taken in the *UPM-Kymmemene* case suggesting that appellate courts in Canada would not bar claims brought for the benefit of the corporation based on any prior knowledge of a bondholder. *See Ford Motor Co. of Canada v. Ontario Municipal Employees Retirement Bd.* (2006), 79 O.R. (3d) 81 (C.A.).

NY 241,066,875v9 4-5-11

Honorable Robert E. Gerber
April 5, 2011
Page 6

---

2010)).) Not only does that report have no legal weight at all, the report involving the recharacterization of certain intercompany transfers has absolutely no relevance to the question of whether the Noteholders here must produce documents prior to January 1, 2009. The Committee's attempt to seek overbroad discovery is improper.[3]

After seeking irrelevant documents prior to January 1, 2009, the Committee next tries to find a basis to expand the relevant timeframe past July 31, 2009 to July 2, 2010. (*Id.*) In doing so, the Committee ignores the allegations of its Objection, which is limited to the propriety of the terms of the Lock-Up Agreement and whether the payments and obligations called for thereunder should not be upheld by this Court. (*Id.*) Subsequent events on unrelated matters are not relevant to the inquiry at hand regarding the propriety of the Lock-Up Agreement. For instance, whether the Noteholders were trading the Notes in 2009 and 2010 has no bearing on any of the issues raised in the Committee's Objection. (*Id.*) Nor do the assumption of the swaps by New GM, the subsequent bankruptcy of Nova Scotia Finance or contact with the Fiscal Agent. (*Id.*) Perhaps most egregious, even though the Committee states that the cutoff date for its discovery requests should be July 2, 2010, the Committee claims that a July 21, 2010 letter is somehow relevant. (*Id.*) Like all of its other efforts to find some way for post-July 31, 2009 documents to be relevant, this correspondence cannot possibly be so even under the Committee's own position.

Based on the issues raised by the Committee's Objection, and the responses provided by the Noteholders and the Trustee, the relevant timeframe is May and June 2009. Out of an abundance of caution, the Noteholders intend to use as its applicable timeframe January 1, 2009 and July 31, 2009 (a seven-month period), which will allow them to produce all documents even potentially relevant to the Objection. The extensive timeframe requested by the Committee is overly broad, burdensome, and not reasonably likely to lead to the discovery of admissible evidence. *See, e.g., In re International Bus. Machines Corporate Sec. Litig.*, 163 F.3d 102 (2d Cir. 1998) (affirming the trial court's decision to limit discovery to a time period before the dividend cut at issue, recognizing that discovery after that date would be irrelevant to the question of the representations at issue before the dividend cut); *Fuller v. Interview, Inc.*, No. 07 Civ. 5728(RJS)(DF), 2011 WL 724533 (S.D.N.Y. Feb. 25, 2011) (denying a plaintiff's motion in an employment discrimination suit for the defendant's corporate finances for two years after the conduct underlying the complaint because such information was overbroad and intrusive).

For these reasons, the Noteholders request that the Court deny the Committee's request to compel the Noteholders to produce responsive documents outside of the timeframe of January 1, 2009 through July 31, 2009.

---

[3] It is also important to recognize, as expressed previously in this Letter and in the Noteholder's Responses and Objections to the Committee's Requests for Documents, the Noteholders agreed to produce all documents related to the Nova Scotia Proceeding, which commenced on March 2, 2009. These documents will include those relating to the May 2008 transfers that are the basis of the Nova Scotia Proceeding.

NY 241,066,875v9 4-5-11

Honorable Robert E. Gerber
April 5, 2011
Page 7

---

### II. The Noteholders Should Not Be Compelled to Provide Any Documents Regarding Their Respective Decisions to Purchase, Hold or Sell the Notes.

The Noteholders should not be compelled to provide any documents regarding their respective decisions to purchase, hold or sell the Notes. (*Id.* at 3-4.) The primary reason given by the Committee for seeking such information is, once again, to litigate the merits of the oppression claim in the Nova Scotia proceeding. (*Id.*) As discussed above, the *Calpine Canada Energy Finance* decision is inapposite, and the Committee's position is invalid. The Committee's Objections alleges that the Noteholders improperly coerced Old GM and certain subsidiaries to enter into the Lock-Up Agreement. Any reason that a Noteholder decided to purchase, hold or sell any Notes does not have any effect on the rights of that Noteholder and is wholly irrelevant to the Objection.

Contrary to the Committee's assertions, the only relevant inquiry is whether the terms of the Lock-Up Agreement represent an arm's length transaction between the Noteholders and the Old GM entities that was fairly negotiated between the parties. The Committee is wrong when it states that "historical information about profits already realized by the Noteholders in connection with their investment in the Notes is relevant to assessing the fairness of the transactions giving rise to the Claims." (*Id.* at 4.) Historical profits (or lack thereof) are of no importance. The fact of the matter is that Old GM and certain subsidiaries had clearly-defined obligations to the Noteholders in early 2009 and that the Noteholders had clearly-defined rights with respect to their investments in the Notes. Those are the obligations and rights that are at issue in the Objection, not past profits. Once it became clear that Old GM and its subsidiaries would not be in a position to fulfill their obligations in 2009, the Noteholders sought to protect their rights. This included the filing of the Nova Scotia Proceeding by certain Noteholders and the negotiations that culminated in the Lock-Up Agreement. Any "historical information about profits already realized by the Noteholders" is completely irrelevant to the inquiry at hand. Moreover, based on the information regarding the trading history of the Notes set forth in Greenberg Traurig's 2019 Statement, the profits or losses on any transaction can be calculated with publicly known information. While the information is irrelevant to the Objection, the Committee already has sufficient information to make the calculations and obtain the information it seeks. Its request for more information, therefore, should be denied.[4]

### III. Noteholders' Investments in Other Unlimited Liability Companies Is Irrelevant.

The Committee fails to articulate any basis for its request that the Court compel the Noteholders to list any investments they have in any unlimited liability companies or

---

[4] In addition, the Committee's request for "documents sufficient to show any counter-party with whom the Notes were transacted" is an impossible request. (*Id.* at 3.) The Notes were traded blindly through brokers, and the Noteholders would not and do not have that information.

NY 241,066,875v9 4-5-11

Honorable Robert E. Gerber
April 5, 2011
Page 8

---

unlimited companies organized under the laws of Canada ("ULCs") and any legal proceedings involving ULCs. (*Id.*) Despite only asking for lists about involvement with other ULCs, the Committee "reserve[s] [its] rights to seek further information" with respect to other ULCs. (*Id.*) None of this information is relevant.

The only reason that the Committee provides for seeking this information is that because the Trustee and the Noteholders have been involved in other bankruptcy proceedings with "wind-up claims," this somehow makes this information relevant. (*Id.*) The Committee fails to explain, however, why the mere involvement with other bankruptcy proceedings involving ULCs renders information regarding investments in other ULCs or proceedings involving other ULCs relevant to the issues raised in the Committee's Objection. Nothing in the three cases cited by the Committee informs this Court's analysis of the issues raised by the Committee's Objection in this case. *See, e.g., Grynberg v. BP, P.L.C.*, No. 08 Civ. 6494(RJH)(RLE), 2008 WL 4450277 (S.D.N.Y. Oct. 1, 2008) (limiting discovery to information regarding the two investments in Kazahkstan at issue and declining request for all documents relating to any interests in a large geographic area).

Failing to find a legitimate reason why such information could possibly be relevant, the Committee states in a most conclusory manner that the "Noteholders' knowledge concerning ULCs and their involvement in other proceedings asserting 'wind-up' claims are highly relevant to the Committee's fraudulent transfer and equitable subordination allegations," but provides no reason why this would be true. (*Id.*) A ULC is a corporate structure created and governed by applicable law. The rights afforded a noteholder of any ULC is a question of law coupled with an analysis of the documents relating to the investment in that particular ULC. This is the case here as well. The involvement of any of the Noteholders in any other ULC or proceeding involving a ULC is not relevant to the Committee's Objection, and the Committee's request to compel such information should be denied.

IV.    **Documents Relied Upon in Connection with the Rule 2019 Statements Filed by Greenberg Traurig Have No Bearing on the Issues in the Committee's Objection.**

The fourth and final category of documents the Committee seeks to compel the Noteholders to produce are documents relied upon in the Rule 2019 statements filed by Greenberg Traurig. (*Id.*) There is no relevance to any such information. The Rule 2019 Statements at issue were filed by Greenberg Traurig on its behalf because it represents more than one creditor. [Docket Nos. 4413, 4569, 7319.] Rule 2019 governs the information that must be provided, and Greenberg Traurig complied with those obligations as well as the directive of this Court as expressed in the Hearing on November 20, 2009. Accordingly, Greenberg Traurig filed the requisite verified statement, which included purchase and sale information of its clients. There is no contention that the Rule 2019 statement is inaccurate or that any additional statement is required.

Honorable Robert E. Gerber
April 5, 2011
Page 9

---

The cases cited by the Committee are inapplicable and provide no basis for this Court to compel the production of documents relied upon in the Rule 2019 Statements filed by Greenberg Traurig. In the first, a group of noteholders opposed filing a Rule 2019 statement at all, an argument that the bankruptcy court rejected and required the group to file one. (*Id.* (citing *In re Washington Mut., Inc.*, 419 B.R. 271, 278-80 (Bankr. D. Del. 2009).) *Contra In re Premier Int'l Holdings, Inc.*, 423 B.R. 58, 73-76 (Bankr. D. Del 2010) (disagreeing with *In re Washington Mutual* and not requiring group of noteholders to file Rule 2019 statement). In the second, a self-identified "ad hoc committee" of equity security holders was required to supplement its Rule 2019 statement. (*Id.* (citing *In re Northwest Airlines Corp.*, 363 B.R. 701, 703 (Bankr. S.D.N.Y. 2007).) The *Northwest Airlines* court expressly recognized that in cases "where a law firm represents several individual clients," the law firm "is the only entity required to file a Rule 2019 statement, on its own behalf." *Id.*

The issues raised by the Committee's Objection do not implicate in any way a need for the Committee to "determine the economics of each Noteholder's investment in the Notes" or to "test the credibility of the Noteholders' positions." (*Id.* at 5.) The Committee is in possession of the appropriate information with respect to the Noteholders' respective positions, and its efforts to impose obligations on parties over and above the requirements of Rule 2019 for no justifiable reason should be denied.

For the reasons discussed in this Letter, the Noteholders respectfully request that the Court deny the Committee's requests to compel the Noteholders to produce documents in the four categories discussed above. In accordance with Local Rule 7007-1(b), the Noteholders would appreciate a conference with the Court to address these issues.

Respectfully submitted,

Bruce Zirinsky / GT w/p

Bruce R. Zirinsky

cc:   Barry Seidel (via e-mail)
Eric Fisher (via e-mail)
Katie Cooperman (via e-mail)
Daniel Golden (via e-mail)
Philip Dublin (via e-mail)
Sean O'Donnell (via e-mail)