# <u>EXHIBIT 1</u>

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| STEVEN G. NEWMAN, Executor Under The Will of Michael Green, Deceased, | : Hon. Katharine S. Hayden, U.S.D.J. |
| | : Civil Action No. 02-135 (KSH) |
| **Plaintiff,** | : |
| -v- | : |
| | : |
| **GENERAL MOTORS CORPORATION,** | : |
| **Defendant.** | : **FINAL PRETRIAL ORDER** |
| | : |

    **THIS MATTER** having come before the Court on March 16, 2009 for a Final Pretrial Conference before the Hon. Patty Shwartz, U.S.M.J., pursuant to <u>Fed. R. Civ. P.</u> 16; Dennis J. Drasco, Esq.; Maurice J. Donovan, Esq.; and Harvey Weissbard, Esq. having appeared for plaintiff, Steven G. Newman, Executor Under the Will of Michael Green, Deceased, and Stephen F. Payerle, Esq.; W. Ray Persons, Esq.; Chilton D. Varner. Esq.; Jameson B. Carroll, Esq.; and James K. Vines, Esq. having appeared for defendant, General Motors Corporation, the following Final Pretrial Order is hereby entered.

1.    **JURISDICTION (set forth specifically)**

Jurisdiction is based on 28 U.S.C. § 1332 in that there is diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000, excluding interest and costs.  Plaintiff Steven G. Newman is the legal representative of the Estate of the Decedent, Michael Green, who was a citizen of the State of New Jersey and pursuant to 28 U.S.C. 1332(c)(2) Plaintiff is deemed a citizen of New Jersey.  Defendant General Motors Corporation is a Delaware corporation with its principal place of business in Michigan.

This action was removed from the Superior Court of New Jersey, Law Division, Essex County pursuant to 28 U.S.C. 1441.

2

2. **PENDING/CONTEMPLATED MOTIONS (Set forth all pending or contemplated motions, whether dispositive or addressed to discovery or the calendar. Also set forth the nature of the motion. If the Court indicated that it would rule on any matter at pretrial, summarize that matter. Each party's contemplated in limine motions should also be set forth.)**

## PENDING MOTIONS

A. On January 27, 2009, the Third Circuit docketed GM's appeal of this Court's adverse ruling on GM's Motion to Maintain Under Seal certain in camera hearing transcripts and court opinions. (Docket No. 09-1169.)

B. By joint letter filed February 24, 2009, plaintiff requested permission to depose J. Andrew Langan, GM's expert Neil Vidmar. and file the Fed. R. Civ. P. 26(a)(2) expert report of Lawrence Fox   An Order which is dated February 24, 2009 but was not electronically filed and received by the parties until March 10, 2009 granted permission and extended the dates to take the deposition of Neil Vidmar and J. Andrew Langan, and serve the report of Lawrence Fox.  However, given the delay in filing and service of the Order the extended dates expired before the parties were able to act. The parties request these issues be considered at the Pretrial Conference.

The deposition of Andrew Langan will take place April 24, 2009.  The deposition of Mr. Vidmar will take place April 15, 2009.

## PLAINTIFF'S CONTEMPLATED MOTIONS

*In Limine Motions Directed to Expert Witness Testimony*

A. To restrict defendant's experts to the "four-corners" of their reports and deposition testimony or relying on data or any other materials which have not been disclosed and to strike any opinion or portions thereof which relies on undisclosed data or materials.

B. To exclude or limit the testimony of Jack Lintner and Neil Vidmar experts based on Fed. R. Evid. 702 and *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1993).

C. To preclude or limit the testimony of Jack Lintner as violative of the Guidelines on the Practice of Law by Retired Judges (revised) promulgated by the Administrative Office of the Courts, Directive 7-04 Guideline 9 prohibiting a retired judge from testifying as an expert witness as to the standard of conduct by a lawyer.

D. To permit Lawrence Fox to testify as an expert on behalf of plaintiff on the defendant's newly disclosed defense of agency or in the alternative barring the defendant from relying upon such defense and precluding the testimony of all fact and expert witnesses from testifying or giving opinions related thereto.

3

Magistrate Judge Shwartz's ruling:

GRANTED: Mr. Fox will disclose his report no later than April 20, 2009 and a supplemental report addressing information received from Mr. Langan's deposition no later than April 30, 2009. Mr. Orloff shall disclose his responsive expert report no later than May 29, 2009. The depositions of Messrs. Fox and Orloff shall be completed no later than June 15, 2009.

### *In Limine Motions Directed to Fact Witness Testimony*

E.    To limit all attorney fact witnesses to factual testimony and not legal opinions on any issue.

F.    To preclude any fact witnesses named by GM after plaintiff's selection of witnesses for depositions and specifically as named in GM's Fourth Amended Supplemental Disclosures of September 30, 2008.

G.    To exclude any adverse character evidence, opinions or other prejudicial references regarding Judge Ferentz' or her handling of any other cases or matter while sitting as a Superior Court Judge.
      Magistrate Judge Shwartz's ruling:
      No later than sixty days before trial, the parties shall identify the witnesses whom they intend to call in their case-in-chief, and, if requested by the adverse party, make the individual available for a deposition for use in preparation of trial.

### *General In Limine Motions*

H.    Motion to bar GM from making reference to its current financial condition, any financial bail-out they have or may receive, the effect of any large punitive judgment on taxes, any anticipated bankruptcy and the like.

## **DEFENDANT'S CONTEMPLATED MOTIONS**

### *Dispositive Motions*

A.    Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56, seeking dismissal of all claims.
      Magistrate Judge Shwartz's ruling:
      The deadline to file the motion for summary judgment shall be set by Judge Hayden.

B.    Motion for Judgment as a Matter of Law pursuant to Fed. R. Civ. P. 50, following plaintiff's case, and if necessary, renewed before the case goes to the jury

### *Expert Witness Motions*

4

C. Motion *in limine* to limit plaintiff's experts' testimony to issues identified by in their reports and depositions.

D. Motions *in limine* to exclude or limit the testimony of plaintiff's experts based on Fed. R. Evid. 702 and *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1993).

E. Motion *in limine* to preclude plaintiff's experts from relying on data and other materials not timely disclosed and to strike opinion or portions thereof relying on such data and materials.
Magistrate Judge Shwartz's ruling:
Mr. Vidmar shall provide a supplemental expert report that discusses Mr. Eisenberg's computer print-out no later than March 30, 2009.

F. Motion *in limine* to exclude, or otherwise mitigate, prejudicial references to Sylvia Pressler's status as a retired presiding judge of the New Jersey Appellate Division and as the author of the annotations to the New Jersey Court Rules.
Magistrate Judge Shwartz's ruling:
The parties shall confer about the need for this motion and shall confer about all other in limine motions to eliminate unnecessary motion practice. The parties have no conferred pursuant to Judge Shwartz's guidance and agree this motion is not necessary at this time.

G. Motion *in limine* to preclude Sylvia Pressler, Carol Ferentz, Julio Fuentes, or any other New Jersey state court judge from opining on any character issues or any issues of attorney conduct, as prohibited by New Jersey Administrative Directive #5-08 and relevant judicial canons.

H. Motion to preclude plaintiff from introducing the testimony of Lawrence Fox or any other expert not timely disclosed under the Federal Rules of Civil Procedure and this Court's orders.
Magistrate Judge Shwartz's ruling:
This motion was resolved as set forth on Page 3, Item D.

## *Fact Witness Motions*

I. Motion *in limine* to preclude plaintiff's evidence about unrelated GM cases.

J. Motion *in limine* to exclude the testimony of any juror from either of the *Green* trials because New Jersey law prohibits contacts with jurors about their jury service.

K. Motion *in limine* to exclude Carol Ferentz's testimony because a sitting or retired judge is not competent to testify about her mental processes in reaching a judicial decision.

5

L.     If Carol Ferentz is allowed to testify, a motion *in limine* to exclude her testimony to the extent it is improper legal expert opinion, prohibited character testimony, or prohibited testimony regarding attorney conduct.

M.    If Carol Ferentz is allowed to testify, a motion *in limine* to preclude, or otherwise mitigate, any prejudicial references to her status as a former New Jersey judge.

N.    Motions to preclude plaintiff from introducing testimony by fact witnesses not timely disclosed or otherwise not disclosed by plaintiff in compliance with case management or other orders.
Magistrate Judge Shwartz's ruling:
No later than sixty days before trial, the parties shall identify the witnesses whom they intend to call in their case-in-chief, and, if requested by the adverse party, make the individual available for a deposition for use in preparation of trial.

## *Document-Related Motions*

O.    Motion *in limine* to preclude plaintiff from presenting any evidence that expands the allegedly concealed evidence beyond those listed in the complaint.

P.     Motion *in limine* to preclude plaintiff's counsel from using and attempting to elicit the term "purge memo."

Q.    Motion *in limine* to preclude plaintiff's counsel from using and attempting to elicit the phrase "figment of the imagination" as an inaccurate and prejudicial mischaracterization of the evidence.

R.    Motion *in limine* to bar plaintiff from using in trial any materials requested by GM but not produced by plaintiff in *Newman*.

S.    Motions to preclude plaintiff from introducing or offering into evidence any exhibits not timely disclosed on an exhibit list or otherwise not disclosed by plaintiff in compliance with case management or other orders.
Magistrate Judge Shwartz's ruling:
No later than March 25, 2009, the plaintiff shall produce copies of the Exhibits referred to in Stipulated Facts Nos. 87-94 and the "Top 165" or a certification that states he does not have possession, custody or control of the documents.

## *Omnibus / General Motions*

T.    Motion *in limine* to preclude Maurice Donovan from sitting at counsel's table during trial or from otherwise visibly participating as plaintiff's attorney in the presence of the jury.

U.    Motion *in limine* to preclude plaintiff from showing video deposition clips in which attorney Maurice Donovan participates as plaintiff's attorney.

V.    Motion *in limine* to preclude plaintiff from introducing, eliciting, using, or otherwise referencing – through testimony or other evidence – anything related to the Court's show-cause hearing on the crime-fraud privilege exception, except use of the documents ordered disclosed without reference to the evidentiary hearing.

W.    Motion *in limine* to exclude all references to other, allegedly similar incidents or allegedly bad acts by GM as irrelevant, confusing, and prejudicial.

X.    Motion *in limine* to bar and preclude plaintiff from referring to or presenting any evidence of unrelated corporate conduct, whether by GM or any other entity.

Y.    Motion *in limine* to exclude decedent Michael Green's "day in the life" video as irrelevant and prejudicial.

Z.    Motion *in limine* to preclude plaintiff from presenting any evidence related to decedent Michael Green's physical injuries.

AA.   Motion *in limine* to preclude plaintiff from presenting any evidence or attempting to elicit, reference, or insinuate in any way that GM's litigation conduct in *Green* or the length of the *Green* litigation exacerbated Michael Green's injuries or caused and/or accelerated the death of Michael Green.

BB.   Motion *in limine* to preclude plaintiff from presenting evidence that makes any reference to the participation of attorney Carroll Morley or his firm in the *Balian* decision.

CC.   Motion *in limine* to exclude any irrelevant and prejudicial references to GM in the public domain.

DD.   Motion *in limine* to exclude Plaintiff from presenting any evidence regarding GM's profits or net worth during the compensatory damages trial phase.

EE.   Motion *in limine* to preclude plaintiff from presenting any evidence that makes reference to the law firm of King & Spalding.
      Magistrate Judge Shwartz's ruling:
      This motion has been withdrawn based upon an agreement not to make reference to the law firm.

FF.   Motion *in limine* to preclude plaintiff from presenting any evidence regarding discovery issues in *Newman*, which are not the subject of this lawsuit.

GG.    Motion *in limine* to preclude plaintiff from presenting evidence or eliciting testimony that makes any reference to unethical attorney conduct. Plaintiff has not pled any such claims, joined any such parties, or filed any ethical complaints.

### Other Motions

II.    Motion for Judgment on the Pleadings and Dismissal because plaintiff's alleged injuries are speculative and contingent on the actions of third parties, and thus do not present a justiciable case or controversy under Art. III, § 2 of the U.S. Constitution.
Magistrate Judge Shwartz's ruling:
The deadlines to file the motion for judgment on the pleadings shall be set by Judge Hayden.

JJ.    Motion regarding trial structure, specifically requesting the Court bifurcate certain issues, order the presentation of proof to avoid or minimize jury prejudice, and to preclude plaintiff from changing course once a trial structure is determined.
Magistrate Judge Shwartz's ruling:
The parties shall confer with Judge Hayden on March 26, 2009 regarding the trial format and dates for *in limine* motions.

3. **STIPULATION OF FACTS (Set forth in numbered paragraphs all uncontested facts, including all answers to interrogatories and admission to which the parties agree.)**

1. Plaintiff Steven G. Newman is the Executor under the Will of Michael Green, who died on March 18, 2001.

2. On June 9, 1986, Michael Green sustained serious personal injuries resulting in permanent quadriplegia as the result of an accident that occurred while he was driving a 1986 Chevrolet IROC Camaro with a "T-roof" designed, manufactured and marketed by General Motors ("GM").

3. His passenger, Mark Alexander, suffered burns in the crash.

4. Michael Green was a "car jockey" for the Chevrolet dealership at the time of the accident.

5. On June 1, 1988, Green sued GM in the Superior Court of New Jersey, Law Division, Essex County, alleging that the IROC Camaro was defectively designed, not reasonably fit for its intended use and not crashworthy.

6. Green was represented by The Law Office of Benjamin M. Del Vento, P.C.. Maurice J. Donovan Esq. was the attorney from the Firm who was responsible for handling the file.

7. Green did not assert a claim for punitive damages in his complaint.

8. Green amended his complaint on February 16, 1990. This amended complaint did not include a claim for punitive damages.

9. GM answered the complaint on or about August 15, 1988.

10. From 1988 to 1993, the parties engaged in discovery pursuant to the New Jersey Rules of Court, including the exchange of interrogatories and document demands and the taking of numerous depositions.

11. Green's counsel served interrogatories and demands for production of documents on GM on September 15, 1988.

12. Arthur Damask, an accident reconstructionist retained by Green, submitted a report.

13. Green's counsel forwarded Damask's report to GM outside counsel Tom Tansey on June 26, 1989.

14. Specific interrogatory demands by Green were as follows:

     Interrogatory number 27 asked:

          Has said product or products of the same or identical design as said product been certified by any entity or examined and tested and approved by any such entity examining or testing such products? If so, then state:

9

09-135

a.   Name and address of any such entity;

b.   The date on which any certification, approval, or endorsement was given;

c.   Describe and identify any documents by whatever name called reflecting any such action.

*Note*:   Consider this a request for the production of copies of any and all writings by whatever name called that relate to or reflect the approval, endorsement, or certification of said product or products of the identical design.

1.   Interrogatory 52 requested GM "describe in detail how the design criteria were established."

2.   Interrogatory 68 asked:

Did you consider any alternative approach to the design or construction of said product?

(a)   Interrogatory 69 asked:

If you [sic] answer to the [sic] immediately preceding question is in the affirmative, then:

a.   Describe in detail each and every alternative approach;

b.   Describe in detail the objections to or reasons why you did not follow or adopt each such alternative approach.

(b)   Interrogatory 70 asked:

Describe any and all predictive analyses, studies, tests, investigations, or examinations which relate to or reflect your consideration of each alternative approach to the design or construction of said product, by stating the name of the author(s), title of the document containing or reflecting both the performance of and the results of any such predictive analysis, study, test, investigation, or examination and the date(s) on which the same was or were conducted and completed.

15.   On October 27, 1989, GM provided responses to plaintiff's interrogatories that asserted "General Objections" as to all of plaintiff's interrogatories, including the following:

GM objects to these Interrogatories as overbroad, in seeking information not reasonably calculated to lead to the discovery of

10

admissible evidence. Plaintiff's discovery is not limited to any particular parts, components or systems of the subject vehicle. Further, Plaintiff's complaint does not identify any specific parts or components allegedly defective. As there are more than fifteen thousand component parts in the subject vehicle, plaintiff's failure to limit discovery to any particular parts or components renders the discovery grossly overbroad.

16. GM's response to plaintiff's Interrogatory 27 stated in part:

> Without waiving its objections, GM states that if plaintiff would specify the components or parts at issue in this litigation, GM would respond accordingly.

> To the extent plaintiff is claiming a defect in the roof design of the 1986 Camaro Z28, General Motors states that it will produce, upon execution of an appropriate Stipulation of Confidentiality and Protective Order, FMVSS216 compliance testing materials relating to the 1986 Camaro Z28.

17. With respect to Interrogatory 52, GM responded in part as follows:

> GM objects to this Interrogatory as vague and ambiguous in that plaintiff fails to define with reasonable particularity what is meant by the term "design criteria." GM further objects to this Interrogatory as overbroad and burdensome and harassing in that plaintiff has failed to identify the component parts or system at issue in this litigation.

> To the extent plaintiff is claiming a defect in the roof design of the 1986 Camaro Z28, General Motors states that it will produce upon execution of an appropriate Stipulation of Confidentiality and Protective Order representative drawings of the roof system of the 1986 Chevrolet Camaro Z28.

18. With respect to Interrogatory 68, GM responded in part as follows:

> GM objects to this Interrogatory as vague and ambiguous in that plaintiff fails to define with reasonable particularity what is meant by any "alternative approach to the design or construction of this product." It further objects to this Interrogatory as overbroad and potentially burdensome and harassing in that it is not limited to any specific component part or system of the subject vehicle.

> Without waiving its objections, GM states that if plaintiff would

11

specify some component part or system of the vehicle in issue, it will respond accordingly.

To the extent plaintiff is claiming a defect in the roof design of the 1986 Camaro Z28, General Motors states that it will produce upon execution of an appropriate Stipulation of Confidentiality and Protective Order representative drawings of the roof system of the 1986 Chevrolet Camaro Z28.

19. GM's response to Interrogatory 69 refers the plaintiff to its response to Interrogatory 68.

20. In response to Interrogatory 70, GM's responses stated in part as follows:

GM objects to this Interrogatory on the grounds that it is overbroad, burdensome, vague and ambiguous inasmuch as the design and development of the 1986 Camaro was an evolutionary process involving many engineers over several years and 15,000 component parts.

GM further objects to this Interrogatory as potentially seeking information of a confidential or proprietary nature and/or information subject to the self-critical analysis privilege.

Without waiving its objections, GM states that if plaintiff would specify the components or parts at issue in this litigation it will identify engineering personnel knowledgeable [sic] about the components or parts in controversy. Joseph S. Rice of General Motors Engineering Staff is generally knowledgeable about certain aspects of the design of the 1986 Camaro Z28.

21. Plaintiff's counsel objected to GM's responses and requested more specific responses.

22. On March 8, 1990, GM served responses to Green's requests for more specific responses. GM also asked Green's counsel to agree to a protective order before it submitted certain documents.

23. GM originally assigned the case to Maynard Timm one of GM's Legal Staff attorneys to the *Green* case. Timm in turn hired the Lavin firm and Morley Cramer as outside counsel.

24. On April 14, 1989, the case was reassigned internally at GM to Paul Widzinski. At the time, Widzinski was the Legal Staff attorney assigned to general crashworthiness cases in New Jersey.

25. The F-Car Project Center was created to bring employees from various business units assigned to develop components of the 1982 F-Car together to work together on the

project.  Documents on the microfiche were organized by subject matter files and author files.

26.  Fisher Body was a division of GM that conducted research and development related to the bodies of GM automobiles, including the F-Car.

27.  GM again reassigned the case internally to Doug Brown on July 19, 1989.  Brown, a GM Staff Attorney was responsible for roof crush cases.  He reassigned the case from the Lavin firm to Kirkland & Ellis, a firm which GM had engaged to represent them on roof crush cases.

28.  From 1988 to 1996 various Discovery Coordinator handled the *Green* case including Darla Park, who was replaced by Susan Biluk, then Kathy Marshall who was replaced by Susan Rhodes and then Nancy Genova.

29.  The parties appeared before Judge Carol A. Ferentz for a discovery hearing on July 20, 1990.

30.  Judge Ferentz issued three written orders on August 3, 1990.

31.  One of the August 3, 1990 orders struck GM's "General Objections" and objections on the basis that the demands were "vague and ambiguous."  Judge Ferentz further ordered GM to provide more specific responses to a number of interrogatories, including Interrogatories 27, 68, 69 and 70.  Judge Ferentz's Order defined the scope of the discovery.  She also entered a protective order.

32.  On August 3, Kathy Marshall, the GM discovery coordinator arranged a meeting of GM engineers, legal staff, and outside counsel to discuss responses to the orders.

33.  The meeting was scheduled for August 8, 1990 at GM's Technical Center in Warren, Michigan.

34.  On August 8, 1990, a group consisting of Doug Brown, Joe Rice, Kathy Marshall, Susan Rhodes, Andrew Langan, and Joe Murray met in Warren.  The group went through each of the discovery requests to which GM was ordered to respond to determine where to locate responsive documents.  Joe Rice noted that the F-Car Project Center files may contain documents responsive to discovery.

35.  GM produced some responsive documents.  In its responses, it indicated it was still searching for documents responsive to interrogatories. The transmittal letter advised that GM had gathered another 1,100 pages of documents that would be produced upon execution of a protective order.

36.  On October 3, 1990, in a letter from Rhodes she indicated that she was forwarded approximately 500 additional pages of documents to outside counsel for production to plaintiff.  The transmittal letter notes that the review of F-Car Project Center documents is still ongoing.

37.  The review process involved putting sheets of microfiche on a viewer and looking at each document to see if any key words were contained in the document.  If a key word was found, the document was printed from the microfiche as a hard paper copy.

13

38. The search of the F-Car Project Center microfiche resulted in 9,868 documents being selected.

39. Among the 9,868 documents was one page of Document B and Documents D, E, F, G and H. The remainder of Document B, Document A and C were not among the documents culled from the F-Car Project Center File.

40. On October 9, 1990, GM sent three boxes of documents – including F-Car Project Center documents –to attorney Bob Rudock at the Miami office of Rumberger, Kirk, Caldwell, Cabaniss, Burke and Wechsler ("Rumberger Kirk"). The boxes contained the 9,868 pages of documents from the F-Car Project Center and 87 pages of documents from Fisher Body records.

41. Ade's handwriting is on sheets of paper in two of the three boxes sent to Rumberger Kirk.

42. The Rumberger Law Firm had represented GM in other roof crush and rollover cases and was designated as a national counsel firm in that area. The Rumberger firm was not disclosed as one of the attorneys representing GM in the *Green* case; did not enter an appearance in Green with the Court; and neither their name nor the name of any of the attorneys from the firm ever appeared in any of the documents filed with the Court or served on plaintiff in *Green*.

43. Rhodes's letter of October 9, 1990 to Attorney Rudock indicates that:

> "All of these documents need to be reviewed for the following:
> > Michael Green v. General Motors, PL-71534, specifically Interrogatories 27 (see attachments)
> > Joseph and Tammy Hassan v. General Motors, PL-97051, specifically for Requests to Produce No. 35 and Interrogatory No. 82. (see attachments)
>
> Future F Car Rollover cases
> > We would like to create a F Car Project Center File Package that would answer the plaintiff's question seeking information about the history of the roof development for the 1982 "F" body vehicle."

44. Rudock at attorney at Rumberger Kirk assigned the review to Eileen Rooney Stafford, a paralegal.

45. Stafford left Rumberger Kirk for another firm in the spring of 1991.

46. In late 1990, both Rhodes and Brown were reassigned within GM. Rhodes was replaced on *Green* by Nancy Genova. Brown's roof crush cases were reassigned to Tom Ziolkowski.

47. By letter dated July 8, 1991, Rudock sent 64 pages of documents to Ron Betman, a lawyer at Kirkland & Ellis.

48. The 64 pages were from the three boxes of 9,868 F-Car Project Center documents GM sent to Rumberger Kirk on October 9, 1990.

49. In the transmittal letter, Rudock wrote:

> "Enclosed for your review are F-car center documents which refer to or address the development of the T-roof of the 1982 to present F-car. We have not made an evaluation as to whether the enclosed documents should be produced in <u>Green v. GMC.</u> We of course are available to discuss production of the enclosed documents in <u>Green.</u>"

50. The A-H Documents were not contained in the 64 documents returned to Kirkland & Ellis by Rumberger Kirk.

51. The documents were forwarded to Dave Coulson, a Kirkland & Ellis associate assigned to *Green*.

52. The 64 documents were produced to plaintiff in response to Interrogatory 52 on August 22, 1991.

53. The A-H Documents were never produced by GM as part of the discovery in *Green v. GM.*

54. The first *Green* trial began January 20, 1993. GM was represented by John Hickey and Andrew Langan.

55. In the first *Green* trial, Arthur Damask testified as an expert for plaintiff.

56. The first *Green* trial ended in a hung jury on February 16, 1993.

57. GM requested permission from the Appellate Division for Leave to Appeal. The Appellate Division issued an order stating:

> Leave to appeal is granted. On our own motion we summarily reverse and remand for reassignment to another judge. We do not hold that the Judge exhibited actual bias. It is enough to say that the judge's conduct toward counsel and witnesses was disproportionate to whatever grievances the judge may have felt from their actions, and would create the appearance of unfairness in the mind of a reasonable person. Patience dignity and courtesy retain their value as standards of judicial communication with lawyers, parties and witnesses.

58. The case was reassigned to the Hon. Julio O. Fuentes to preside over the second trial.

59. Plaintiff's expert, Arthur Damask, who had testified in the first trial, was medically unable to testify in the second trial. Plaintiff retained Donald Phillips as his automotive engineering expert to substitute for dr. Damask.

60. After he was retained, Phillips reviewed the discovery demands and responses. Phillips served his expert report August 30, 1995.

61. The second *Green* trial began February 8, 1996 with jury selection. Langan and Tansey representing GM.

62. Phillips testified in that second trial.

63.  The trial ended March 5, 1996 with the jury voting 6-2 in favor of a plaintiff's verdict and awarding Green $17,767,175 in compensatory damage.

64.  GM filed an appeal on October 24, 1996. In its appellate brief, GM argued -- as it had in the trial court -- that Green had failed to prove "that there exists a practicable, safer alternative to the Camaro's T-roof design." GM asserted that the alternative roof design proposed by Green's expert witness was "simply an imagined concept that exists nowhere but in the mind of [Green's] expert," that "no vehicle has ever been produced or sold using this design," and that the expert's opinion was inadmissible "since this hypothetical design had never been implemented by any car manufacturer."

65.  In September of 1995, GM became a defendant in an F-car product liability litigation in a Tennessee state court case captioned Johnson v. GM. Johnson dealt with the driver of a pickup truck who sustained injury when an F-Car allegedly spun out of control hitting his pickup and a piece of the T-top's glass panel struck him in the head, causing brain damage. Plaintiff's expert in Johnson was Don Phillips, who offered alternative designs for the T-roof latching mechanism and T-roof design.

66.  In Johnson, plaintiff's counsel Pat Ardis and his staff reviewed documents at GM headquarters.

67.  GM documents in Johnson were subject to a confidentiality order entered by the Tennessee court, but by order entered December 17, 1997, that court order GM to disclosed these documents to Green's attorneys.

68.  Green's attorneys thereupon began to receive GM documents not produced in *Green* from Ardis.

69.  On January 5, 1998, plaintiff moved to supplement the *Green* appellate record on appeal with eight documents he contends should have been produced in discovery. Those documents are known as Documents A-H.

70.  The Appellate Division granted the motion to supplement over GM's opposition.

71.  Documents A-H are from the F-Car Project Center. Documents C, D, E, F, G, H and the first page of Document B were among the documents GM sent to Rumberger Kirk for review on October 9, 1990.

72.  Documents identified in this litigation as A-H are GM internal memoranda from 1978 that reference the roof design of the 1982 F-Car.

     a.  Document A is a July 24, 1978 memo from R.H. Knickerbocker, the Chief Engineer of the F-Car Project Center, calling for a meeting on the "passive restraint philosophy to be applied to the 1982 'F' Car" and stating "it appears no one is very interested in a full frame front door glass nor is there any great interest it appears in pursuing an alternative to the 'T' hatch roof."

b. Document B is dated July 31, 1978 and outlines considerations related to the T-hatch, including cost, sales price, front and rear barrier performance and impact performance.

c. Document C is a September 5, 1978 memo by Knickerbocker suggesting information to be reviewed at an October 11, 1978 Chief Engineers Project Center Review Meeting. Under the caption "Decision Items", Mr. Knickerbocker proposes a "Roof Option Review" and states "design alternatives at the present time that would probably be the T hatch and the Vista Vent designs …."

d. Document D is a preliminary handout for the October 11, 1978 meeting. In discussing "Roof Design Considerations", Document D states:

The most probable considerations would be:

- 'T' hatch (current 'F' production)
- Vista Vent (1980 'X' production)
- Modified Vista Vent (Similar to some European Offerings)

Document D describes the T-hatch as having a "most striking, macho appearance, [and] proven sales performance." The document describes the "Vista Vent" as "less striking [in] appearance" and states "increased sales volume might be anticipated because of the lower sales price." Document D also compares ride characteristics and impact and roof-crush performance of the T-roof, Vista Vent, and the Modified Vista Vent designs.

e. Document E is an October 11, 1978 memo from D.J. Agresta, administrative engineer of GM's F-Car Project Center, that summarizes the Chief Engineers Project Center Review meeting minutes. The memo stated the alternative designs were "reviewed considering the possible impacts of Marketing, Mass, Structure, Manufacturing, Reliability and Serviceability . . " and that "Fisher Body is to stop work on the design of the Modified Vista Vent."

f. Document F is dated October 17, 1978 and summarizes the results of the meeting and attaches drawings of the T-hatch, the Vista Vent, and the Modified Vista Vent.

17

g.  Document G is a one-page document dated October 30, 1978 stating the T-roof option was confirmed as the mainstream design program.

h.  Document H is a November 10, 1978 memo from Stephen Kennel and Mitchel Scherba of the F-Car Project Center. The last page of Document H illustrates the "conventional 'T' roof" and the "Lancia Spider Type Roof." The Lancia Spider Type Roof embodies the Modified Vista Vent design with a removable glass roof and two side bars whereas the T-roof has one bar in the center of the roof with two removable glass plates. The memo states, in part, that "[s]mall side rails of the Lancia type are more efficient structurally than the 'T' roof center beam. The Lancia type side rails can achieve 'T' roof performance with a structural mass savings of 4-5 Kg." the memo further states "[i]n addition to better roof crush and barrier characteristics the Lancia type should be superior for door latch and window sealing."

73.  In an Opinion filed March 19, 1998, Green v. General Motors Corp., 310 N.J. Super. 507 (App. Div. 1998), the Appellate Division affirmed the jury's liability finding, and modified and affirmed the damages verdict except for the award of post-judgment medical expenses and earnings. "[T]hat portion of the jury's verdict" was remanded with directions that the trial judge "enter a remittitur after further argument, with or without proofs, reflecting the present value of these awards." Id. at 547.

74.  In its opinion, the appeals court said the supplemented documents "should put to rest the issue of a reasonable alternative design in this case".

75.  Following the denial of certification by the New Jersey Supreme Court and the mandated remand proceedings, an amended final judgment was ultimately entered in Green's favor on May 24, 1999 in the amount of $14,126,013.83.

76.  In the late 1980s, GM's general practice when served with a Complaint alleging a defective automobile was to assign the case to a GM in-house attorney from the GM Litigation Department, Products Liability Section, who has primary responsibility for the case, including discovery. The GM attorney would be assisted by GM legal staff from the Product Discovery Group from which a Discovery Coordinator is also assigned to the case.

77.  Some GM in-house attorneys are specially assigned cases with certain allegations, such as rollover roof crush cases. Brown was assigned to the Green case because he was assigned certain cases involving allegations of roof defects.

78.  The in house attorney assigned to the case makes the ultimate decision as to what is produced to plaintiff's counsel.

18

79.   A GM engineer from Engineering Analysis was typically assigned to the case to provide technical assistance to the attorneys.

80.   Joseph Rice, an engineer from Engineering Analysis was assigned to the *Green* case. He was involved with the *Green* case from inception to conclusion and acted as one of GM's experts in the *Green* II trial.

81.   The GM in-house attorney was also responsible for selecting and retaining outside attorneys, both local counsel and regional counsel, if the claim involved certain allegations, such as roof crush or rollover claims.

82.   The firm of Morley, Cramer, Tansey, Haggerty & Fanning was selected as local New Jersey counsel to defend the *Green* case. Thomas Tansey, Esq. and Joseph Murray, Esq. handled the case for the firm.

83.   Kirkland and Ellis was one of the national specialty firms used by GM to handle rollover roof crush cases. John Hickey, Esq. and J. Andrew Langan, Esq. were attorneys assigned to the *Green* case for the Kirkland firm.

84.   When GM's local counsel received plaintiff's discovery requests, interrogatories and demands for production of documents, local counsel would typically forward them to the GM in-house attorney who would disseminate them to the Discovery Coordinator, engineer, and regional specialty counsel assigned to the matter.

85.   GM maintains documents and material, including those which are sometimes sought in discovery, in a number of locations throughout the corporation.

86.   Some documents relevant to the design of the T-roof could be found in the F-Car Project Center File. The documents had been copied onto microfiche, indexed and housed in GM's engineering library.

87.   During the course of the *Green* litigation, GM sent documents utilizing the United States Postal Service.

88.   On or about November 9, 1989, GM served its responses to plaintiff's Initial Discovery Requests ("Initial Responses"). These Initial Responses were served via United States Mail and were verified as to their truth and sworn as to their veracity by an authorized agent of GM.

89.   On or about January 22, 1990, pursuant to the direction of the Court, plaintiff served by United States Mail upon GM a request for more specific discovery responses.

90.   On or about March 8, 1990, GM served its responses to plaintiff's request for supplementary discovery responses ("Supplemental Responses"). These Supplemental Responses were served via United States Mail.

91.   On or about May 21, 1990, plaintiff again requested by United States Mail more specific responses to the Supplemental Responses served on GM on March 8, 1990.

92.   On or about June 4, 1990, GM served a response to plaintiff's request for more specific supplemental responses ("Second Supplemental Responses"). These Second Supplemental Responses were served via United States Mail.

93.    On or about September 20, 1990, GM served its supplemental responses purportedly in accordance with the August 3, 1990 Order ("Third Supplemental Responses").

94.    On or about July 23, 1991, GM served a supplemental response to plaintiff's interrogatory no. 11, which requested the names of all persons with relevant knowledge ("Fourth Supplemental Response"). This Fourth Supplemental Response was served via United States Mail and was subsequently verified by an authorized agent of GM on August 8, 1991.

95.    In accordance with the New Jersey Rules of Court and the August 3, 1990 Order, GM had a continuing and ongoing duty to supplement its discovery responses during the course of discovery.

96.    On or about August 22, 1991, September 19, 1991, December 23, 1991, January 19, 1992, December 16, 1992, and on various other dates, GM served supplemental responses to plaintiff's discovery requests via United States Mail.

97.    Steven Newman is a financial planner with MetLife.

4.    **CONTESTED FACTS (Proofs shall be limited at trial to the contested facts set forth. Failure to set forth any contested facts shall be deemed a waiver thereof.)**

   a.  **Plaintiff:**

1.    The Green jury found that Green's the injuries Green suffered were proximately caused and/or enhanced by the defective "T-roof" design of the IROC Camaro, which essentially substituted one center roof rail for a full roof structure with two or more roof rails.

2.    In the course of discovery, Green, through his attorneys, demanded, among other things, that GM identify and produce:

   (a)    All documents related to the performance and results of all studies, tests, investigations or examinations related to any malfunctions or complaints associated with the T-roof design;

   (b)    All predictive analyses, studies, tests, investigations or examinations relevant to any T-roof alternative approach or design considered by GM;

   (c)    All documents reflecting the conduct and results of any studies, tests and/or calculations performed in determining T-roof performance, specifications, design criteria, or design objections, including any predictive and/or cost analyses;

   (d)    All documents reflecting any modifications in the design, design objectives or design criteria of the T-room vehicle;

   (e)    All documents reflecting the conduct or results of any market analysis of the area or type of market in which the IROC Camaro was to compete;

   (f)    The names of all persons who have or may have information concerning the matters thus catalogued;

3.    In response to these demands, GM did not produce any documentation indicating that any alternative roof design had been considered, examined or tested; nor did GM specifically identify any persons having knowledge of any consideration given to alternative designs; nor did GM produce any market analyses assessing the sales potential of the T-roof design against that of any alternative design.

4.    Despite plaintiff's statement that the claimed defect was limited to the roof and tires and despite GM's understanding of the plaintiff's theory as explained by Damask, GM claimed it did not know the plaintiff asserted a roof defect, gave incomplete answers

21

to plaintiff's interrogatories, and provided information that was not called for by the interrogatory.

5. From 1993 to 1996, the parties engaged in additional discovery, which, under the New Jersey Rules of Court, included the required supplementation of the parties' earlier responses to discovery demands. Again, GM presented no documentation or other information with respect to any of the matters described above.

6. Phillips' review of the discovery led him to believe either that there were tests missing or GM did not do enough tests to determine crashworthiness.

7. In January, 1996, the Friday before the second Green trial commenced, Mr. Phillips received additional crash tests and ultimately found that these new materials contained112 crash tests and videotapes were not previously produced.

8. After all appellate briefs had been filed, and just before the January 27, 1998 oral argument of the appeal, Green's attorneys learned that GM documents uncovered in a similar litigation in Tennessee alleging design defect in the T-roof Camaro might belie certain of GM's assertions in the Green litigation.

9. In September of 1995, GM became a defendant in an F-car product liability litigation in a Tennessee state court case captioned Johnson v. GM. Johnson dealt with the driver of a pickup truck who sustained injury when an F-Car allegedly spun out of control hitting his pickup and a piece of the T-top's glass panel struck him in the head, causing brain damage. Plaintiff's expert in Johnson was Don Phillips, who offered alternative designs for the T-roof latching mechanism and T-roof design.

10. The Tennessee materials were subject to a confidentiality order entered by the Tennessee court, but by order entered December 17, 1997, that court permitted them to be disclosed to Green's attorneys.

11. GM uses confidentiality orders to keep none plaintiff from knowing what documents have been provided in other litigation against GM.

12. Green's attorneys thereupon began to receive what became a voluminous collection of GM documents, never disclosed in the Green litigation despite Green's demands.

13. The said documents demonstrate, among other things, that:

        (a)    GM had considered and evaluated the very alternative roof design recommended by Green's expert;

        (b)    GM was aware that the alternative design had been used in certain European production cars;

        (c)    GM found that the alternative design had better structural impact and roof crush characteristics; but

(d) GM internal memoranda reported that the more "macho appearance" of the T-roof design was important to its "proven sales performance" specifically in September 1995.

14. The A to H and related documents are "smoking guns" which show GM's knowledge of the defect and potential to cause grave injury and decision to ignore such information for a profit motive.

15. An an Opinion filed March 19, 1998, <u>Green v. General Motors Corp.</u>, 310 N.J. Super. 507 (App. Div. 1998), the Appellate Division affirmed the jury's liability finding, and modified and affirmed the damage verdict except for the award of post-judgment medical expenses and earnings. "[T]hat portion of the jury's verdict" -- and only that portion -- was remanded with directions that the trial judge "enter a remittitur after further argument, with or without proofs, reflecting the present value of these awards." Id. at 547.

16. In its Opinion, the Appellate Division commented on the discovered documents as to which the motion to supplement had been granted. Saying the supplemental documents "should put to rest the issue of a reasonable alternative design in this case."

17. Michael Green died on March 18, 2001 as a result of complications arising from his the quadriplegia he sustained as a result of GM's putting on the market a defective vehicle.

18. GM intentionally devised a protocol for providing responses to plaintiff's discovery requests which was so convoluted, confusing and protracted that its sole purpose was to permit GM to fraudulently secrete and conceal documents and discovery which were adverse or deleterious to its defense or would expose GM to potentially large verdicts while also providing plausible deniability to GM.

19. From 1988 to 1996 multiple attorneys from GM's Products Litigation section were assigned to the Green case including, Maynard Timm in 1988; Paul Widzinski in 1989; Douglas Brown from 1989 to 1990 and Thomas Ziolkowski from 1990 to 1996.

20. From 1988 to 1996 various Discovery Coordinators handled the Green case including Darla Park (1989); Susan Biluk, (1989 – 1990) Kathy Marshall (1990); Susan Rhodes (8/1990 – 1991) and Nancy Genova (1991-1992)

21. A GM engineer from Engineering Analysis – the engineering group responsible for defending products claims - is assigned to the case and provides technical expert assistance to help understand what the technical documents mean.

22. Joseph Rice, an engineer from Engineering Analysis was assigned to the Green case. He was involved with the Green case from inception to conclusion and acted as one of GM's experts in the Green II trial.

23. Joseph Rice has the responsibility to assure that a reasonable and diligent search was conducted for all material responsive to plaintiff's discovery demands and that such material were provided to plaintiff.

24. Joseph Rice and other GM employees and attorneys made a conscious decision not to produce the A-H and other relevant documents to plaintiff due to the damning nature of such materials.

25. The GM in-house attorney was also responsible for selecting and retaining outside attorneys, both local counsel and regional counsel if the claim involves a specialty such as roof crush or rollover claims.

26. At GM materials which may be responsive to plaintiff's discovery requests were located in a variety of potential locations rather than in one centralized location.

27. With respect to the F-car, responsive material might be found at the Chevrolet Car Division of GM in Warren Michigan, Fisher Body, the engineering staff's organization, Engineering Analysis, Product Investigation, the Legal Staff Safety Library, the Milford Proving Grounds; the chief engineer and his staff who would be responsible for the design, the F Car Project Center or the Engineering Library

28. GM was aware that documents relevant to the design of the T-roof could be found in the F-car Project Center File. The documents had been copied onto microfiche, indexed and housed in GM's engineering library.

29. Dr. Rice as the engineer assigned to the Green case, provided Discovery Coordinator Rhodes with key words, such a roof and T-roof, to be used to search for documents and identified places where documents responsive to plaintiff's discovery demands might be found.

30. Rhodes, the Discovery Coordinator sent correspondence to various contacts at the locations Rice had designated requesting they search for and produce materials pursuant to her written request.

31. The contact would then return the documents they found to Ms. Rhodes she would review them and organize them. After Ms. Rhodes review the would be reviewed by Dr. Rice, Mr. Brown and outside counsel to determine if they were to be provided to the plaintiff. At any stage the relevant documents could have been concealed.

32.    There was no way to independently determine whether the documents received were all of the documents from that specific location which were responsive to the request that had been made.  The procedure developed and implemented by GM to retrieve documents depended on the competence of the individual who performed the search and the blind trust of the person receiving them that that a full, comprehensive and diligent search had been undertaken.

33.    Rhodes was assigned the task of searching the microfiche of the F-Car Project Center Files to cull all of the documents which contained any of the key words provided by Dr. Rice.  Mynra Ade, who was working at GM through a temporary agency, worked with Rhodes on this project.

34.    During the course of the *Green* litigation, repeatedly sent documents utilizing the United States Postal Service to forward documents.

35.    GM engaged in a nine (9) year pattern of mail and wire fraud by intentionally, wilfully, and fraudulently concealing the existence of the evidence.  More particularly, GM and its officers, agents, employees, representatives, and attorneys engaged in a scheme and artifice to defraud plaintiff, and a scheme and artifice to perpetrate a fraud on the court, by intentionally and fraudulently concealing evidence: (a) that was relevant and material to plaintiff's personal injury claims, and (b) that GM had a continuing duty to disclose to plaintiff pursuant to the discovery rules of the New Jersey Rules of Court.

36.    In GM's Initial Responses, Supplemental Responses, Second Supplemental Responses, Third Supplemental Responses, Fourth Supplemental Responses, in all of GM's other responses and supplemental responses, and during the two personal injury trials, GM fraudulently concealed and affirmatively misrepresented the existence of the evidence even though GM had a legal duty to disclose same.

37.    On October 25, 1996, GM forwarded via United States Mail its initial appellate brief for filing with the Clerk of the Appellate Division in Trenton, New Jersey. Such brief contained affirmative misrepresentations as to the existence of evidence of alternative design in an attempt to perpetrate a fraud upon plaintiff and upon the courts.

38.     GM utilized the United States Mails, and interstate wires (i.e., telephone and facsimile), on countless other occasions that served to perpetuate its scheme and artifice to defraud plaintiff and to commit a fraud on the court.

39.     The unlawful use of the United States Mail facilities and interstate wire facilities lasted for a period of more than nine (9) years, from the time plaintiff served his Initial Discovery Requests in September of 1988 through in or about December of 1997 when plaintiff came into possession of some of the fraudulently concealed materials and information.

40.     GM had knowledge of the existence of the fraudulently concealed materials and information, as evidenced by the fact that GM produced such evidence in the Tennessee litigation.

41.     Had GM provided the A-H and related documents, plaintiff would have obtained a sizable verdict in the first Green trial and would not have to expend moneys and incur attorneys fees for the second Green trial, the appeal and this trial.

42.     Had GM provided the A-H and related documents, plaintiff would have been awarded punitive damages by the jury in addition to compensatory damages.

43.     GM's conduct in not providing the A-H and related documents was willful, wanton, fraudulent and intentional

44.     GM's conduct in not providing the A-H and related documents was negligent.

45.     The A-H documents together with the totality of the evidence prove a claim for punitive damages for GM willfully, wantonly and knowingly putting into the stream of commerce a motor vehicle knowing that it was defective and had the potential of causes grave personal injury.

46.     The conduct of GM in putting the IROC Camaro with the T-roof on the market knowing of its potential to cause grave personal injury or death was outrageous, reprehensible, malicious, wanton and in willful disregard of plaintiff's rights and warrants an award of punitive damages.

47.     The conduct of GM in concealing documents from plaintiff despite their duty to do so was outrageous, reprehensible, malicious, wanton and in willful disregard of plaintiff's rights warranting an award of punitive damages.

**b. Defendant:**

1.  None of the documents offered into evidence by plaintiff, including Documents A-H, are sufficient individually or in any combination to support a claim for punitive damages.

2.  Plaintiff cannot prove he would have amended his complaint to seek punitive damages had he obtained Documents A-H in discovery.

3.  Plaintiff cannot prove the *Green I* jury would have returned a verdict for plaintiff if plaintiff had timely obtained Documents A-H in discovery.

4.  Plaintiff cannot prove he would have been permitted to amend his complaint prior to *Green I* to seek punitive damages had he obtained Documents A-H in discovery.

5.  Plaintiff cannot prove the *Green I* jury would have awarded him punitive damages if plaintiff had timely obtained Documents A-H in discovery and had sought punitive damages.

6.  Plaintiff cannot prove he would have been permitted to amend his complaint to include a punitive damages claim between *Green I* and *Green II*.

7.  Documents A-H bear no relevance to the alternative design offered by Arthur Damask.

8.  Documents A-H do not reflect the alternative design offered by Donald Phillips.

9.  Plaintiff cannot prove the *Green II* jury would have awarded plaintiff punitive damages if plaintiff had timely obtained Documents A-H in discovery.

10. Plaintiff cannot prove either jury would have awarded him a total award greater than $22 million.

11. Plaintiff cannot prove that any punitive damages award, in whole or in part, would have been upheld by appellate courts.

12. Plaintiff cannot prove that any attempt to seek punitive damages by plaintiff would have survived pre-trial motions, such as a summary judgment motion.

13. Plaintiff cannot prove that any punitive damages award would have survived post-trial review.

14. Plaintiff cannot prove the presence of a punitive damages claim would not have led the parties to settle *Green* for an amount less than $22 million.

15. Plaintiff cannot prove he would have had lessened his costs had he timely obtained the Documents A-H in discovery.

16. No GM employee intended to conceal Documents A-H or any document offered into evidence by plaintiff.

17. No outside counsel for GM, or any person working on behalf of GM's outside counsel, intended to conceal Documents A-H or any document offered into evidence by plaintiff.

18. Joe Rice did not see any of Documents A-H prior to the second *Green* trial and never made any decision about whether to produce any of Documents A-H to plaintiff.

19. Doug Brown did not see any of Documents A-H prior to the second *Green* trial and never made any decision about whether to produce any of Documents A-H to plaintiff.

20. Tom Ziolkowski did not see any of Documents A-H prior to the second *Green* trial and never made any decision about whether to produce any of Documents A-H to plaintiff.

21. There is no evidence any GM employee considered Documents D-H and decided not to produce them to plaintiff.

22. There is no evidence outside counsel for GM, or anyone working for outside counsel for GM, considered Documents A-H and decided not to produce them to plaintiff.

23. Nothing in Documents A-H indicate that the 1986 Camaro T-top was unsafe, not crashworthy, or failed to pass any crashworthiness tests.

24. Nothing in any GM document offered into evidence by plaintiff indicates that the 1986 Camaro T-top was unsafe, not crashworthy, or failed to pass any crashworthiness tests.

25. Nothing in Documents A-H or any GM document offered into evidence by plaintiff indicates that GM was aware that the 1986 Camaro T-top was unsafe.

26. GM did not act negligently in failing to timely produce Documents A-H or any document offered into evidence by plaintiff in response to *Green* discovery.

27. Outside counsel for GM served as independent contractors.

28. As an engineer, Joe Rice's duties were to advise GM Legal Staff about locations where documents responsive to discovery might be found and, when necessary, aid in the interpretation of technical documents. He did not decide what documents to produce in discovery.

29. The *Green* case was dismissed on April 28, 1989 because Green failed to respond to GM's discovery requests. The case was reinstated in June when the responses were served.

30. Green's counsel served interrogatories and demands for production of documents on GM on September 15, 1988. The discovery requests did not identify in what way Green alleged the 1986 Camaro was defective, nor did they specifically identify the roof of the Camaro.

31. Arthur Damask, an accident reconstructionist hired by Green, submitted a report contending that Green was injured when the panels from the Camaro's T-top fell

on his head in the crash, and that the Camaro roof should have been designed with a "tent-pole" design in the T-bar, allowing the bar to separate in the event of an impact and pushing the panels away from the vehicle. Green's counsel forwarded Damask's report to GM outside counsel Tom Tansey on June 26, 1989. This is the first time GM or its counsel became aware that Green was alleging a defect with the design of the T-roof.

32. On March 8, 1990, GM served responses to Green's requests for more specific responses, but requested that Green narrow the scope of discovery requests to a particular component. GM also asked Green's counsel to agree to a protective order before it submitted confidential documents. Green, through his counsel Maurice Donovan, refused to narrow the requests or agree to the protective order.

33. In its initial production following the August 3, 1990 discovery order, GM produced approximately 2,100 pages of responsive documents. In its responses, it indicated it was still searching for documents responsive to interrogatories.

34. On October 3, 1990, Rhodes forwarded approximately 500 additional pages of documents to outside counsel for production to plaintiff. The transmittal letter notes that the review of F-Car Project Center documents is still ongoing.

35. GM selected Rumberger Kirk to review the F-Car Project Center documents because of its experience with F-Car roof crush cases -- like Kirkland & Ellis, it was regularly engaged as national counsel -- and because it had already begun a review of the F-Car Project Center file.

36. According to billing records, Eileen Rooney Stafford read a letter enclosing the documents on October 10, 1990 and then discussed the project with Rudock and Rhodes on October 15, 1990. She billed 15½ hours to the project between November 10, 1990 and March 21, 1991. Her time spent on the review was interrupted by her participation in a trial in West Virginia in early 1991.

37. Stafford left Rumberger Kirk for another firm in the spring of 1991.

38. Neither Rudock nor Stafford have any specific recollection of the F-Car Project Center document review project.

39. Rudock sent 64 pages of documents to Ron Betman, a lawyer at Kirkland & Ellis who represented GM (but was not assigned to *Green*). Rudock does not remember sending the documents. The 64 pages were forwarded to Dave Coulson, a Kirkland & Ellis associate assigned to *Green*. He reviewed them for responsiveness to *Green* discovery requests and discussed them with Langan, who also reviewed the documents.

40. On July 29, 1991, Coulson called Rudock to discuss the review. He spoke to Henry Salas, an associate at Rumberger Kirk. Coulson confirmed from Salas that Rumberger Kirk's review was targeted to capture all documents responsive to *Green* discovery, including Judge Ferentz' August 3, 1990 order, and that a trusted paralegal had completed the review.

41.    Later that day, Coulson and Langan called Ziolkowski. The decision was made to produce all 64 pages of documents. The documents were produced in response to Interrogatory 52 on August 22, 1991.

42.    In all, GM produced approximately 2,500 pages prior to the first *Green* trial. Included in that production were documents that refer to the F-Car Project Center and engineers assigned to the F-Car Project Center.

43.    Following the first *Green* trial, on its own motion, the Appellate Division recused Judge Ferentz, finding "the judge's conduct toward counsel and witnesses was disproportionate to whatever grievances the judge may have felt from their actions, and would create the appearance of unfairness in the mind of a reasonable person."

44.    In the second trial, Donald Phillips testified GM had tested his proposed alternative design. In fact, the vehicle in the test to which Phillips referred was a buck – the top of one vehicle mounted on another base for use in sled tests on an unrelated component – and the test in question did not measure the strength or crashworthiness of the roof.

45.    In his closing of the second trial, Donovan urged the jury to send a "loud and clear" message to GM that "you're mad as hell and you're not going to let them get away with it."

46.    After remand, on July 1, 1999, Judge Fuentes ordered GM to pay plaintiff an additional $14.4 million for future medical expenses, lost wages, and interest, resulting in a total final judgment of $21.8 million.

47.    The court approved more than $7 million in attorney's fees, with Donovan receiving $1.5 million and Benjamin Del Vento collecting approximately $5.9 million.

48.    Del Vento and Donovan issued written warnings to Michael Green that the large amount of the *Green* case proceeds would make him vulnerable to losses from unscrupulous advisors and counselors. Green acknowledged this advice in writing and gave Del Vento and Donovan the equivalent of a hold harmless agreement after Green told them of his intent to rely on Steven Newman for investment advice for Green's proceeds from the judgment paid by GM and the other defendants.

49.    Newman is a financial planner with MetLife who serviced life insurance policies for James Green, Michael Green's father. Newman was hired to manage Michael Green's proceeds from the *Green* judgment. Newman expects to collect 6 percent of any recovery in this litigation.

5.    **FACT WITNESSES: (Aside from those called for impeachment purpose, only the fact witnesses set forth by name and address may testify at trial. No summary of testimony is necessary.)**

   a.    **Plaintiff:**

1.    Maurice J. Donovan, Esq., 70 South Orange Avenue, Suite 150, Livingston, NJ 07039

2.    Patrick M, Ardis, Esq., Wolff Ardis, 6055 Primacy Parkway, Memphis, TN 38119

3.    Thomas V. Convery, Esq., Tansey Fanning Haggerty Kelly Convery & Tracy, 521 Green Street, Woodbridge, NJ

4.    Hon. Carol A. Ferentz, 414 Eagle Rock Avenue, West Orange, NJ 07052

5.    Hon. Julio M. Fuentes, US Court of Appeals – 3rd Circuit, 5032 Martin Luther King Jr.
      Federal Bldg & Courthouse, 50 Walnut Street , Newark, NJ 07102

6.    John T Hickey, Jr., Esq., Kirkland and Ellis. , 200 East Randolph Drive, Chicago, IL

7.    Steven Isaacson, Esq., David Rehe & Associates, 180 River Road, Summit, NJ 07902

8.    J. Andrew Langan, Kirkland and Ellis, 200 East Randolph Drive, Chicago, IL

9.    Steven G. Newman, 23 Beatrice Lane, Old Bethpage, NJ  11804

10.   James Green,  Reno Graphics, North Carolina

11.   Paul Melletz, Esq., 411 Route 70 East, Cherry Hill, NJ 08034

12.   Maureen Molloy, MD, 2184 Dorset St., Shelburne, VT.

13.   Joseph Murray, Esq., Park 80 West, Saddle Brook, NJ

14.   Donald R Phillips, P.E., 63 Tenth Ave., Hawthorne, NJ

15.   Joseph S. Rice, 30200 Mound Rd., Warren, MI

16.   Tanis Rudnisky, Esq.  Unknown

17.   Richard  Ruth, PhD, 23 E Huntington St,, Eastborough, KS 67206

18.   Lawrence Sklaw, Esq., 295 Madison Avenue, New York, NJ 10017

19.  Robert Skoblar, Esq., 53 N. Dean St., Englewood, NJ

19.  Douglas Brown, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan

20.  Thomas A. Ziolkowski, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, MI

21.  Paul Widzinski, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan

22.  Maynard Timm, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan

23.  Susan Rhodes, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

24.  Darla Park Freeman, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan

25.  Nancy Genova, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan

26.  Kathy Marshall-Lutz, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan

27.  Michael Motyka, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan

28.  Martha Smoly, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan

29.  Susan Biluk, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

30.  Myrna Ade, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

31.  Joseph Rice, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

32.  Ken Orlowski, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

33.  Donald Huelke, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan

34. Deborah Russell, c/o McGuire Woods LLP, One James Center, 901 East Cary Street, Richmond, Virginia 23219-4030.

35. William (Bud) Kirk, c/o Rumberger, Kirk & Caldwell, P.A., Lincoln Plaza, Suite 1400, 300 Orange Avenue, P.O. Box 1873, Orlando, Florida 32802.

36. E. Thomas Rumberger, c/o Rumberger, Kirk & Caldwell, P.A., Lincoln Plaza, Suite 1400, 300 Orange Avenue, P.O. Box 1873, Orlando, Florida 32802.

37. Robert Rudock, c/o Arnstein & Lehr LLP, Brickell Bayview Centre, Suite 3000, 80 Southwest 8th Street, Miami, Florida 33130-3047.

38. Henry Salas, c/o Cole, Scott & Kissane, P.A., 6301 Sunset Drive, Miami, Florida 33143.

39. Karen Cerato, c/o Rumberger, Kirk & Caldwell, P.A., Lincoln Plaza, Suite 1400, 300 Orange Avenue, P.O. Box 1873, Orlando, Florida 32802.

40. Eileen Rooney Stafford, c/o the office of the United States Attorney for the Southern District of Florida, 99 N.E. Fourth Street, Miami, Florida, 33132, (305) 961-9001.

41. Fred Rom, c/o Womble Carlyle Sandridge & Rice, 2530 Meridian Parkway, Suite 400, Durham, North Carolina, 27713.

42. Teresa Cerwin, c/o GM, 400 Renaissance Center, P.O. Box 400 Detroit, Michigan 48213.

43. Charlene Donahoe, c/o GM, 400 Renaissance Center, P.O. Box 400 Detroit, Michigan

Plaintiff reserves the right to call any witness named in the Defendant's List of Witnesses

**b. Defendant:**

1.  Douglas Brown, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

2.  Thomas A. Ziolkowski, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan.

3.  Paul Widzinski, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

4.  Maynard Timm, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

5.  Susan Rhodes, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

6.  Darla Park Freeman, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

7.  Nancy Genova, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

8.  Kathy Marshall-Lutz, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

9.  Michael Motyka, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

10. Martha Smoly, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

11. Susan Biluk, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

12. Carol Snowden, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

13. Myrna Ade, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

14. Joseph Rice, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

15. Ken Orlowski, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

16. Donald Huelke, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

17. Bob Sinke, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

18. Doug Van Sweden, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

19. Bob Knickerbocker, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

20. Ken Stack, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

21. Harold McMacken, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

22. Ed Conner, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

23. Hillie Aiello, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

24. Roland Bottiglia, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

25. Paul Mundy, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

26. Glenn Henry, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

27. R.J. O'Hara, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

28. Pete Riede, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

29. Herb Furman, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

30. Maurice Donovan, Law Office of Benjamin M. Del Vento, 70 South Orange Avenue, Suite 150, Livingston, New Jersey 07039.

31. Patrick Ardis c/o Wolf Ardis, P.C., 5810 Shelby Oaks Drive, Memphis, Tennessee 38134.

32. Donald Phillips, c/o Law Office of Benjamin M. Del Vento, 70 South Orange Avenue, Suite 150, Livingston, New Jersey 07039.

33. J. Andrew Langan, c/o Kirkland & Ellis, 200 East Randolph Drive, Chicago, Illinois.

34. David Coulson, c/o Greenberg Traurig, 1221 Brickell Avenue, Miami, Florida, 33131.

35. Ron Betman, c/o Winston & Strawn, 35 W. Wacker Drive, Chicago, Illinois.

36. John T. Hickey, c/o Kirkland & Ellis, 200 East Randolph Drive, Chicago, Illinois.

37. Doug Poland, c/o Kirkland & Ellis, 200 East Randolph Drive, Chicago, Illinois.

38. Cheryl Adle, address unknown.

39. Jerri Dassie, address unknown.

40. Teresa Rickle, c/o Kirkland & Ellis, 200 East Randolph Drive, Chicago, Illinois.

41. Christopher Heidt, c/o Kirkland & Ellis, 200 East Randolph Drive, Chicago, Illinois.

42. Mark Porter, c/o Kirkland & Ellis, 200 East Randolph Drive, Chicago, Illinois.

43. Jim Cusick, c/o Kirkland & Ellis, 200 East Randolph Drive, Chicago, Illinois.

44. Don Castle, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan.

45. Thomas F. Tansey, c/o Tansey, Fanning, Haggerty, Kelly, Convery and Tracy, 521 Green Street, P.O. Box 55555, Woodbridge, New Jersey 07095.

46. Joseph G. Murray, Park 80 West, Plaza One, Saddle Brook, New Jersey.

47. Deborah Russell, c/o McGuire Woods LLP, One James Center, 901 East Cary Street, Richmond, Virginia 23219-4030.

48. Joe Ziembo, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

49. William (Bud) Kirk, c/o Rumberger, Kirk & Caldwell, P.A., Lincoln Plaza, Suite 1400, 300 Orange Avenue, P.O. Box 1873, Orlando, Florida 32802.

50. E. Thom Rumberger, c/o Rumberger, Kirk & Caldwell, P.A., Lincoln Plaza, Suite 1400, 300 Orange Avenue, P.O. Box 1873, Orlando, Florida 32802.

51. Robert Rudock, c/o Arnstein & Lehr LLP, Brickell Bayview Centre, Suite 3000, 80 Southwest 8th Street, Miami, Florida 33130-3047.

52. Henry Salas, c/o Cole, Scott & Kissane, P.A., 6301 Sunset Drive, Miami, Florida 33143.

53. Karen Cerato, c/o Rumberger, Kirk & Caldwell, P.A., Lincoln Plaza, Suite 1400, 300 Orange Avenue, P.O. Box 1873, Orlando, Florida 32802.

54. Eileen Rooney Stafford, c/o the office of the United States Attorney for the Southern District of Florida, 99 N.E. Fourth Street, Miami, Florida, 33132, (305) 961-9001.

55. Susan Pena, c/o Rumberger, Kirk & Caldwell, P.A., Lincoln Plaza, Suite 1400, 300 Orange Avenue, P.O. Box 1873, Orlando, Florida 32802.

56. Mitchell C. Scherba, c/o GM, 400 Renaissance Center, P.O. Box 400 Detroit, Michigan 48213.

57. Fred Rom, c/o Womble Carlyle Sandridge & Rice, 2530 Meridian Parkway, Suite 400, Durham, North Carolina, 27713.

58. Bonnie Gardner, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

59. Cheyenne Diener, GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

60. Barbara Frantangelo, GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

61. D.J. Agresta, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

62. K.M. Askew, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

63. J.F. Harris, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

64. W.A. Hehs, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

65. G.M. Jenkins, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

66. Stephen Kennel, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

67. P. Lupescu, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

68. S.A. Major, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

69. E.H. Mertz, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

70. M.C. Padovini, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

71. S. Prispy, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

72. Benjamin Del Vento, c/o Law Office of Benjamin M. Del Vento, 70 South Orange Avenue, Suite 150, Livingston, New Jersey 07039.

73. James A. Green, c/o Law Office of Benjamin M. Del Vento, 70 South Orange Avenue, Suite 150, Livingston, New Jersey 07039.

74. Steven G. Newman, c/o Law Office of Benjamin M. Del Vento, 70 South Orange Avenue, Suite 150, Livingston, New Jersey 07039.

75. Barry Fields, c/o Kirkland & Ellis, 200 East Randolph Drive, Chicago, IL, (312) 861-2000.

76. Dennis Minano, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

77. William Kemp, c/o GM, 400 Renaissance Center, P.O. Box 400, Detroit, Michigan 48243.

78. Teresa Cerwin, c/o GM, 400 Renaissance Center, P.O. Box 400 Detroit, Michigan 48213.

79. Charlene Donahoe, c/o GM, 400 Renaissance Center, P.O. Box 400 Detroit, Michigan 48213.

80. Michele Durocher, c/o GM, 400 Renaissance Center, P.O. Box 400 Detroit, Michigan 48213.

GM reserves the right to call any witness named in plaintiff's witness list.

6.  **EXPERT WITNESSES:** (No expert shall be permitted to testify at trial unless identified below by name and address and unless the expert's curriculum vitae and report are attached hereto. An expert's qualifications may not be questioned unless the basis therefore is set forth herein.)* (*If the parties stipulate to an expert's qualifications there is no need to attach a curriculum vitae. In any event, however, the expert's report must be attached.)

*[handwritten margin note: The request to retain in chambers is overruled as there has been no showing that a particular witness' privacy interests will be compromised]*

a.  **Plaintiff:**

> **Hon. Sylvia B. Pressler  (P.J.A.D., Ret.)**
> 161 Brayton Street
> Englewood, NJ 07631

> **Professor Theodore Eisenberg**
> Henry Allen Mark Professor of Law
> and Adjunct Professor of Statistical Sciences
> Cornell Law School
> 104 Myron Taylor Hall
> Ithaca, NY 14853-4901

> **Lawrence J. Fox, Esq.**
> Drinker Biddle & Reath LLP
> 18th & Cherry Streets
> 1 Logan Square
> Philadelphia, PA 19103-6996

> **Donald R Phillips, P.E.**
> National Forensic Engineers, Inc.
> 1758 Allentown Road #150
> Lansdale, PA 19446

b.  **Defendant's objections to plaintiff's expert qualifications:**

*Theodore Eisenberg:  Objections to Qualifications*

GM asserts that no one, including Theodore Eisenberg, is qualified to derive a conclusion on the behavior of a particular jury from aggregate data.

*Sylvia Pressler:  Objections to Qualifications*

Sylvia Pressler is not qualified to opine on any damages allegedly caused by defendant's failure to produce documents in *Green* or the industry customs or practices of large corporations in document retention, searching, and producing.  GM also asserts that no one, including Ms. Pressler, is qualified to speculate as to the effect of additional or different evidence upon the *Green* jurors.

*Lawrence Fox: Objections*

Plaintiff has not disclosed Lawrence Fox's testimony pursuant to Fed. R. Civ. P. 26(a)(2) and this Court's scheduling orders. Accordingly, GM is not able to state objections to his qualifications. GM opposes any attempt by plaintiff to untimely disclose this testimony. Should plaintiff be permitted to do so, however, GM reserves the right to amend this pretrial order to include objections to his qualifications. This objection has been resolved as set forth on Page 3, Item D.

*Donald Phillips: Objections to Qualifications*

Donald Phillips -- as has been recognized by other federal trial and appellate courts in analogous cases -- is unqualified to opine on the crashworthiness or design of any GM vehicle, the discovery response practices of any entity or of GM in particular, or the impact of any evidence, or lack of evidence, on the outcome of a trial. GM also asserts that no one, including Mr. Phillips, is qualified to speculate as to the effect of additional or different evidence upon the *Green* jurors.

c. **Defendant:**

**Hon. Jack L. Lintner (PJAD, Ret.)**
Norris McLaughlin & Marcus, P.A.
721 Route 202-206
Bridgewater, NJ 08807

**Professor Neil Vidmar**
Russell M. Robinson II Professor of Law and Professor of Psychology
Duke University School of Law
Science Drive & Towerview Road
Box 90360
Durham, NC 27708-0360

**Lawrence B. Orloff** *
Orloff, Lowenbach, Stifelman & Siegel, P.A.
101 Eisenhower Parkway
Roseland, NJ 07068

[*GM identifies Mr. Orloff in the event plaintiff is allowed to file Mr. Fox's expert report outside the discovery period.]

**Joseph Rice**
c/o King & Spalding LLP

1180 Peachtree Street
Atlanta, GA 30309

Mr. Rice may testify as an expert only about the information contained in the expert report issued in connection with *Green II* and plaintiff may depose Mr. Rice about the documents known as A-H and any of the other documents not disclosed during the *Green* litigation. Nothing herein constitutes a ruling that Mr. Rice has been deemed a lay witness offering lay opinion about these documents. The defendant is on notice that if the United States District Judge decides that Mr. Rice is testifying as an expert about these documents under Fed. R. Evid. 702, then the plaintiff may preclude him from testifying about these documents because he did not prepare a report as required by Fed. R. Civ. P. 26.

### d. Plaintiff's objections to defendant's expert qualifications:

*Professor Neil Vidmar:  Objections to Qualifications*

Plaintiff submits that Professor Vidmar lacks the qualification to testify using the methodology he has employed because it is impossible to predict jury behavior without relying upon quantitative analysis.

*Jack L. Lintner, PJAD Ret.:  Objections to Qualification*
Judge Lintner is not qualified to give an opinion as to whether GM attorneys acted as agents or independent contractors  as a matter of law nor provide opinions as to the standard of care for any attorney.

*Joseph Rice :  Objection as to Qualification*
Joseph Rice has not served an expert report in accordance with Fed. R. Civ. P. 26(a)(2) his testimony should be limited to fact testimony surrounding his involvement in the underlying Green litigation. *See above .*

---

*If the parties stipulate to an expert's qualifications there is no need to attach a curriculum vitae. In any event, however, the expert's report must be attached.

January 22, 2009

Expert Report of Theodore Eisenberg

1. My name is Theodore Eisenberg; I am the Henry Allen Mark Professor of Law

and Adjunct Professor of Statistical Sciences at Cornell University. I also regularly teach

in a Ph.D. program on Institutions, Economics, and Law ("IEL") in Turin, Italy. I have

previously taught at UCLA Law School, Harvard Law School, Stanford Law School, and

NYU School of Law, and am scheduled to teach at the Centre for Advanced Legal

Studies at Tel-Aviv University in the spring of 2009. My C.V. is attached as Exhibit 1

and I will only describe herein my activities that most directly relate to this Report.

2. I have taught a seminar on empirical methods at Cornell Law School for many

years. I taught a similar seminar: (1) at NYU School of Law in the fall of 2007, and (2) at

the Fondazione Collegio Carlo Alberto as part of the IEL program in 2006, 2007, and

2008. I am scheduled to teach a similar course at the Centre for Advanced Legal Studies

at Tel-Aviv University in 2009.

3. As shown on my C.V., I am the author of many empirical studies, including

several empirical studies or analyses of punitive damages.[1] My empirical studies or

analyses of punitive damages span more than a decade and include: *The Relation Between

Punitive and Compensatory Awards: Combining Extreme Data With the Mass of Awards*,

in CIVIL JURIES AND CIVIL JUSTICE (B. Bornstein, R. Wiener, R. Schopp, S. Willborn eds.

Springer 2008) (with V. Hans & M. Wells); *Juries, Judges, and Punitive Damages:*

---

[1] For convenience, I refer to "my" empirical studies. Such reference of course includes
the contributions made by co-authors to each of the studies referred to.

1

*Empirical Analyses Using the Civil Justice Survey of State Courts 1992, 1996, and 2001
Data*, 3 J. EMPIRICAL LEGAL STUD. 263 (2006) (with others); *The Significant Association
Between Punitive and Compensatory Damages in Blockbuster Cases: A Methodological
Primer*, 3 J. EMPIRICAL LEGAL STUD. 169 (2006) (with M. Wells); *Reconciling
Experimental Incoherence with Real-World Coherence in Punitive Damages*, 54
STANFORD L. REV. 1239 (2002) (with J. Rachlinski & M. Wells); *Juries, Judges, and
Punitive Damages: An Empirical Study*, 87 CORNELL L. REV. 743 (2002) (with N.
LaFountain, B. Ostrom, D. Rottman & M. Wells); *Damage Awards in Perspective:
Behind the Headline-Grabbing Awards in* Exxon Valdez *and* Engle, 36 WAKE FOREST L.
REV. 1129 (2001); T. Eisenberg, *Remedies and Damages, Legal Aspects*, INTERNATIONAL
ENCYCLOPEDIA OF THE SOCIAL & BEHAVIORAL SCIENCES 13139 (N. J. Smelser & Paul B.
Baltes eds. 2001 Pergamon, Oxford); *The Predictability of Punitive Damages Awards in
Published Opinions, the Impact of* BMW v. Gore *on Punitive Damages Awards, and
Forecasting Which Punitive Awards Will Be Reduced*, 7 SUPREME COURT ECONOMIC
REV. 59 (1999) (with M. Wells); *Measuring the Deterrent Effect of Punitive Damages*, 87
GEORGETOWN L.J. 347 (1998); *Punitive Awards After* BMW, *a New Capping System,
and the Reported Opinion Bias*, 1998 WISCONSIN L. REV. 387 (with M. Wells); *The
Predictability of Punitive Damages*, 26 J. LEGAL STUDIES 623 (1997) (with J. Goerdt, B.
Ostrom, D. Rottman & M. Wells).

    4. My empirical scholarship has been funded by the National Science Foundation,
Guy Carpenter, the South Carolina Death Penalty Resource Center, Project '87 (a joint
project of the American Historical Association and the American Political Science

2

Association), and the American Bar Foundation. A current empirical project in which I am participating is funded by the Australian Research Council. The Council, a statutory authority within the Australian Government, "supports the highest-quality fundamental and applied research and research training through national competition across all disciplines, with the exception of clinical medicine and dentistry." See http://www.arc.gov.au/.

5. Based on my empirical scholarship, I am a Fellow of the Royal Statistical Society and I received a Cornell University Provost's Award for Distinguished Scholarship. Based on my empirical scholarship, I have been invited to present the endowed Rosenthal lecture as Northwestern University, a lecture currently scheduled for 2010.

6. As indicated by the list of publications on my C.V., my empirical studies of the legal system have appeared in leading law reviews and in peer-reviewed journals in several disciplines. The student-edited law reviews include Harvard Law Review, Stanford Law Review, Cornell Law Review, UCLA Law Review, University of Pennsylvania Law Review, and the University of Chicago Law Review. The peer-reviewed journals include the Journal of the Royal Statistical Society, the Journal of the American Statistical Association, the Journal of Financial Economics, the Rand Journal of Economics, the Journal of Legal Studies, the American Law and Economics Review, Law and Social Inquiry, the Journal of the American Academy of Psychiatry & the Law, Judicature, and Future Cardiology. As indicated on my C.V., I have served as a referee for many publishers and peer-reviewed journals that publish empirical scholarship.

3

7. My empirical studies have been the subject of stories in major media, including the New York Times, the Wall Street Journal, the Atlantic Monthly, and others. I have testified about law-related empirical matters before federal and state legislatures.

8. For over 20 years, Justices of the United States Supreme Court and many other courts have cited and relied on empirical studies authored or co-authored by me. Opinions of Supreme Court Justices referring to my empirical work include the majority opinion in *Exxon Shipping Co. v. Baker*, 128 S.Ct. 2605 (2008), in which the Court relied in part on one of my studies of punitive damages and the relation between punitive and compensatory damages.

9. References to or reliance on my empirical analyses extend to areas other than punitive damages. At the Supreme Court level, opinions referring to my empirical analyses appear in *Kennedy v. Louisiana*, 128 S.Ct. 2641 (2008); *Schriro v. Summerlin*, 542 U.S. 348 (2004); *Ramdass v. Angelone*, 530 U.S. 156 (2000); *O'Dell v. Netherland*, 521 U.S. 151 (1997); *Simmons v. South Carolina*, 512 U.S. 154 (1994); *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989); and *Brisco v. LaHue*, 460 U.S. 325 (1983). My empirical analyses have also been relied on by many lower courts. Opinions doing so can be identified using standard online legal database search techniques.

10. I have served as a court-appointed mediator in major federal bankruptcy litigation and as assistant to the Special Master in voting rights litigation involving statistical matters.

11. I am the founder and editor of the JOURNAL OF EMPIRICAL LEGAL STUDIES (JELS), published by Wiley-Blackwell. I also serve on the editorial board of the

4

American Law and Economics Review, and as an academic adviser to the National

Center for State Courts. I served as Chair of the Law and Social Science Section of the

Association of American Law Schools (1996-97).

12. I am the author of two legal casebooks, CIVIL RIGHTS LEGISLATION

(LexisNexis 5th ed. 2004) and BANKRUPTCY & DEBTOR-CREDITOR LAW (Foundation Press 3d

ed. 2004). In each book, I include materials on empirical studies using regression analysis and

teach this materials in my courses.

13. I serve on the board of directors of the Society for Empirical Legal Studies and

served on the organizing committees for the first three Conferences on Empirical Legal

Studies. I have also helped organize international conferences on empirical legal studies

in Taiwan, Germany, and Israel. I have served on the board of directors of the American

Law and Economics Association. I have been invited to speak about empirical legal

studies or to report the results of my own studies on over one hundred occasions. Invited

presentations in the next month or two are scheduled at Indiana, Cardozo, and Harvard

law schools. I was commissioned by the Bureau of Justice Statistics to write and present

a statistically-related paper, *The Need for a National Civil Justice Survey of Incidence

and Claiming Behavior*, presented at Bureau of Justice Statistics Users Meeting, February

12, 2008, in Washington, D.C. In connection with the pending revision of the Federal

Judicial Center's REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, I was invited to speak

on statistical issues to the Committee on the Evaluation of the Reference Manual on

Scientific Evidence. Committee on Science, Technology, and Law, The National

Academies (presentation on December 2006).

5

14. In my capacity as a faculty member at Cornell University, I regularly provide statistical expertise to law professors with and without social science training. These professors include those with doctoral degrees in economics, policy, and psychology. In my capacity as editor of JELS, I regularly provide statistical expertise and input to authors who have submitted articles to JELS. These authors often have doctoral degrees in social science disciplines.

15. I have been asked by attorneys for plaintiff in the case of *Newman v. General Motors* to opine about punitive damages issues related to that case.

16. In preparing this Report, I have reviewed: (1) the *Complaint Filed in the Superior Court of NJ, Green v. GM–Doc. # W-029370-88, Filed: June 1, 1988*, (2) *Order of the Hon. Carol A. Ferentz, J.S.C., Filed: Augsut 3, 1990, In the Matter of Green v. GM, Superior Court of New Jersey—Law Division, Essex County—Docket No. W-029370-88*, (3) *GM's Appellate Brief, Superior Court of New Jersey—Appellate Division, Docket No.: A 5756-95T2, In the Matter of: Green v. GM*, (4) *Plaintiff/Respondent's Appellate Brief, Superior Court of New Jersey—Appellate Division, Docket No.: A 5756-95T2, In the Matter of: Green v. GM*, (5) *Plaintiff's Motion to Supplement the Appellate Record and Brief in Support of Motion to Supplement the Record, Superior Court of New Jersey—Appellate Division, Docket No.: A 5756-95T2, In the Matter of: Green v. GM, Filed January 5, 1998*, (6) *Green v. General Motors, 310 N.J. Super. 507, 709 A.2d 205 (N.J. Super. A.D. 1998)*, (7) *General Motors Corporation's Brief in Support of It's Motion to Dismiss, United States District Court—District of New Jersey, Steven G. Newman, Executor vs. General Motors Corporation, Civil Action No. 02-135 (KSH-PS)*,

6

*Dated: February 21, 2002*, (8) *Plaintiff's Brief in Opposition to GM's Motion to Dismiss Plaintiff Complaint for Failure to State A Cause of Action, United States District Court—District of New Jersey, In the Matter of: Steven Newman v. GM, Civil Action No. 02-135 (KSH-PS), Filed: March 28, 2002*, (9) *General Motors Corporation's Reply in Support of It's Motion to Dismiss, United States District Court—District of New Jersey, Steven G. Newman, Executor vs. General Motors Corporation, Civil Action No. 02-135 (KSH-PS), Dated: April 8, 2002*, (10) *Opinion of the Hon. Patty Shwartz, USMJ, Piercing GM's Attorney Client Privilege and Ordering Production of Documents and Depositions of Attorneys, United States District Court—District of New Jersey, In the Matter of: Steven Newman v. GM, Civil Action No. 02-135 (KSH-PS), Filed: March 23, 2005*, (11) *Opinion of the Hon. Katherine S. Hayden, USDJ, United States District Court—District of New Jersey, In the Matter of: Steven Newman v. GM, Civil Action No. 02-135 (KSH-PS), Filed: March 30, 2006, affirming Magistrate's Decision*, (12) *Opinion of the United States Court of Appeals, Third Circuit, In the Matter of: Newman v. GM, Third Circuit Docket No.: 06-2473, affirming decision of Judge Hayden, Filed: June 20, 2007*, (13) *General Motors Corporation's Second Amended Answers to Interrogatories, Dated, December 14, 2004*, (14) *Complaint and Jury Demand, Steven G. Newman, Executor under the Will of Michael Green, Deceased v. General Motors Corporation, Essex County—Law Division, Filed November 19, 2001*, (15) *Brief in Support of Motion to Supplement the Record, Superior Court of New Jersey—Appellate Division, Docket No.: A 5756-95T2, Michael Green v. General Motors, Dated: January 5, 1998*, (16) *Deposition of Maurice J. Donovan, September 2, 2008, United States District*

7

*Court—District of New Jersey, Stephen Newman v. General Motors Corporation.*, (17) *Preliminary Report of National Forensic Engineers, Inc., Newman (Green) v. General Motors, et als, Dated September 7, 2005*, (18) a document headed *Punitive Damages—Products Liability*, relating to jury charges in cases of punitive damages. I have also reviewed a letter, dated December 16, 2008, from Sylvia B. Pressler to Maurice J. Donovan, opining about whether discovery demands in the case of *Green v. General Motors* compelled General Motors to disclose certain documents in its possession.

17. It is my understanding that plaintiff alleges that, in *Green v. General Motors*, General Motors wrongfully failed to provide information requested via discovery. Plaintiff became aware of those documents through contact with an attorney in another case against General Motors. The allegations include that the withholding of information on discovery was deliberate and that proper disclosure would have allowed plaintiff to claim punitive damages against General Motors in *Green v. General Motors*.

18. My assessment of the amount of punitive damages that one should expect to have been awarded had General Motors' alleged discovery failures not occurred is based on two components. First, is a baseline estimate using data I have worked with for over a decade, as supplemented over time by additional data. Second, is consideration of the possible award based on recognized criteria for factors that one expects to influence a punitive damages award.

19. My baseline estimate used in part data gathered as part of the *Civil Justice Survey of State Courts*, a project of the National Center for State Courts ("NCSC") and the Bureau of Justice Statistics ("BJS"). The *Civil Justice Survey* gathers data directly

8

from state court clerks' offices on tort, contract, and property cases disposed of by trial in fiscal year 1991-1992 and in calendar years 1996 and 2001. The three separate datasets cover state courts of general jurisdiction in a random sample of 46 of the 75 most populous counties in the United States.

20. The 2001 *Civil Justice Survey* data included 46 counties; the 1991-92 and 1996 data included 45. One county included in the 1991-1992 and 1996 study, Norfolk, Massachusetts, fell out the nation's 75 most populous in the 2000 census and was replaced by Mecklenburg County, North Carolina, and El Paso County, Texas. Two Maryland counties declined to participate in the 1991-92 study, and were replaced with Fairfax County for all three iterations of the Civil Justice Survey.

21. The 75 counties from which the 45 county sample was drawn included approximately 33 percent of the 1990 U.S. population; the actual 45 counties contributing data account for approximately 20 percent of the population. For a summary of the data and methodology, see *Bureau of Justice Statistics Bulletin: Civil Justice Survey of State Courts, 2001: Civil Trial Cases and Verdicts in Large Counties, 2001* (April 2004); *Bureau of Justice Statistics Bulletin: Civil Justice Survey of State Courts, 1996: Civil Trial Cases and Verdicts in Large Counties* (1996); *Bureau of Justice Statistics Special Report: Civil Justice Survey of State Courts, 1992: Civil Jury Cases and Verdicts in Large Counties* (July 1995).

22. The initial *Civil Justice Survey* dataset (1991-92) includes only jury trials. The two subsequent datasets, 1996 and 2001, include jury and bench trials. The three datasets include all completed trials in all three years in most of the counties.

9

23. I supplemented the *Civil Justice Survey* with data from two datasets with large compensatory awards: data published in a JOURNAL OF LEGAL STUDIES article by Hersch and Viscusi (H-V) and data previously made available to me by the NATIONAL LAW JOURNAL (NLJ). H-V analyzed the relation between punitive and compensatory awards in cases decided from January 1985 to June 2003. Because H-V were interested in studying large punitive awards, the cases were collected using "a detailed search to identify all cases for which there were punitive damages of at least $100 million." Joni Hersch & W. Kip Viscusi, *Punitive Damages: How Judges and Juries Perform*, 33 J. LEGAL STUD. 1 (2004).

24. The NLJ data set consists of what the NLJ has found to be the largest total (punitive plus compensatory awards) jury trial awards in the years 2001 through 2004. For the NLJ cases, as for the H-V cases, and the NCSC cases, one can explore the relation between the punitive and the compensatory award. Detailed discussion of the NLJ data appears in the NLJ articles reporting on their data. See *NLJ Verdicts 100: Top Verdicts of the Year: The Big Get Smaller*, NAT'L L. J., Feb. 4, 2002, at C3; David Hechler, *Tenfold Rise in Punitives: Total Value of 2002's 100 Largest Awards More than Triples the Previous Year's Value*, NAT'L L. J., Feb. 3, 2003, at C3; David Hechler, *The Big Drop: The Jury's Out on Why, But Punitive Awards Took a Nosedive in 2003*, NAT'L LAW J., Feb. 9, 2004, at S2; David Hechler, *Top 100 Verdicts of 2004: Smaller at the Top: Big Awards Continue to Drop, as Punitives Decline after 2003's 'State Farm,'* NAT'L L. J., Feb. 21, 2005, at S2.

25. My previous analysis of the punitive-compensatory relation using the *Civil*

10

*Justice Survey*, the H-V, and the NLJ data, has been published in my article in Bornstein

et al., *supra*. In my opinion, it is reasonable to use these data sets to evaluate punitive

damages issues in this case. The *Civil Justice Survey* data set include trials adjudicated in

1991, 1992, 1996, and 2001. The H-V data cover the time period January 1985 to June

2003. Both of these data sets therefore include the time of trial in *Green v. General*

*Motors*. The patterns of punitive damages awards in the *Civil Justice Survey* have been

shown to be reasonably stable over time. T. Eisenberg, *Remedies and Damages: Legal*

*Aspects*, INTERNATIONAL ENCYCLOPEDIA OF THE SOCIAL & BEHAVIORAL SCIENCES

13139 (N. J. Smelser & Paul B. Baltes eds. 2001 Pergamon, Oxford); Theodore

Eisenberg et al., *Juries, Judges, and Punitive Damages: Empirical Analyses Using the*

*Civil Justice Survey of State Courts 1992, 1996, and 2001 Data*, 3 J. EMPIRICAL LEGAL

STUD. 263 (2006). Analysis of the H-V data showed no statistically significant trends

over time. Theodore Eisenberg & Martin T. Wells, *The Significant Association Between*

*Punitive and Compensatory Damages in Blockbuster Cases: A Methodological Primer*, 3

J. EMPIRICAL LEGAL STUD. 169 (2006). The NLJ data included multiple years and

included years in which the editors found increasing and decreasing movement in

damages from prior years. Taken together, and given the stability in the other data sets,

the multiple years are unlikely to constitute an outlier in the pattern of awards studied.

26. The analysis appearing in Bornstein et al. is basically an analysis of the

relation between two variables, the punitive award and the compensatory award. As

stated in the FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE

134 (2d ed. 2000) (hereinafter "REFERENCE MANUAL"), "The relationship between two

11

variables can be graphed in a scatter diagram." The relation between the punitive and

compensatory awards in the data I have analyzed is summarized in the scatter diagram

consisting of the individual observations in Figure 1. (In addition to the scatter diagram

of individual cases, Figure 1 also includes a line which is discussed below.) Each point

in the Figure corresponds to a compensatory award (on the x-axis) in a case and the

corresponding punitive award (on the y-axis) in that case.



Figure 1. Punitive-Compensatory Relation, Three Data Sets

Sources: Hersch-Viscusi, 1985-2003; NCSC, 1992, 1996, 2001; NLJ top 100 awards, 2001-2004

27. Visual inspection of the scatter diagram does not reveal a random relation

between punitive and compensatory damages. Figure 1 suggests that, in the mass of cases

12

with punitive damages awards, the size of the punitive damages award is strongly
associated with the size of the compensatory damages award. The association is not
strictly linear (which would be represented by a straight line) but instead follows a pattern
that changes with the level of the compensatory award. Notice the curvature of the line at
the low and high ends of compensatory awards.

28. Figure 1 uses logarithmic scales. This is because preliminary inspection of the
data using a scatter diagram suggested the need to use such scales. "In regression
problems with one predictor and one response, the scatterplot of the response versus the
predictor is the starting point for regression analysis." Sanford Weisberg, APPLIED
LINEAR REGRESSION 1 (3d ed. 2005). A preliminary scatter diagram of the punitive and
compensatory award for the same data as presented in Figure 1, shown in Figure 2, was
not helpful in exploring the relation between punitive and compensatory awards. As
Figure 2 shows, the data points in the preliminary scatter diagram were jammed into the
lower left-hand corner of the graph with only a few data points visible elsewhere. The
hundreds of data points visible in Figure 1 are largely invisible in Figure 2 due to the
failure to properly transform the data to a logarithmic scale.

29. A pattern such as that in Figure 2 "indicates [to the statistical analyst]
immediately that some sort of transformation is required." Sanford Weisberg, APPLIED
LINEAR REGRESSION 130 (1980). Because of the variation in the punitive and
compensatory awards, "log transformations are obvious candidates." *Id.* Such
transformations have been consistently used by me and others in prior analyses of
punitive damages that have been published in both peer-reviewed and student-edited

13

journals. E.g., David A. Hyman, Bernard Black, Kathryn Zeiler, Charles Silver, and William M. Sage, *Do Defendants Pay What Juries Award? Post-Verdict Haircuts in Texas Medical Malpractice Cases*, 1988-2003, 4 J. EMPIRICAL LEGAL STUD. 3, 25 (2007) (tbl. 6 model 2); Jonathan M. Karpoff & John R. Lott, Jr., *On the Determinants and Importance of Punitive Damage Awards*, 42 J. L. & ECON. 527, 543 (1999); Erik K. Moller, Nicholas M. Pace & Stephen J. Carroll, *Punitive Damages in Financial Injury Jury Verdicts*, 28 J. LEGAL STUD. 283, 300 n.52 (1999); Margo Schlanger, *Inmate Litigation*, 116 HARV. L. REV. 1555, 1605 & n.136 (2003); Catherine M. Sharkey, *Dissecting Damages: An Empirical Exploration of Sexual Harassment Awards*, 3 J. EMPIRICAL LEGAL STUD. 1 (2006).

14



Figure 2. Punitive-Compensatory Relation, Three Data Sets

Sources: Hersch-Viscusi, 1985-2003; NCSC, 1992, 1996, 2001; NIJ top 100 awards, 2001-2004

30. For purposes of my analysis, I used a transformation of amounts to base 10 logarithms. The logarithmic transformation used simply associates each value of punitive and compensatory damages with the logarithm in base 10 of the damages amount. For example, an award of $10 can be written as $10^1$ (which is read as "10 to the first power). The logarithm of $10^1$ is 1. An award of $100 can be written as $10^2$, with an associated logarithm of 2. An award of $1,000,000 can be written as $10^6$, with an associated logarithm of 6 and an award of $10,000,000 is associated with a logarithm of 7.

31. The transformation used allows the reader to quickly observe prominent amounts on a figure's axes. For example, in Figure 1, the points on the x and y axes

15

corresponding to "6" represent 10 to the sixth power, or $1 million. Points corresponding

to "7" represent $10 million; points corresponding to "5" represent $100,000. Using

other log transformations, such as the natural logarithm based on the mathematical

constant often referred to as "*e*" does not materially change the statistical analysis.

32. The non-linear pattern suggested by Figure 1 has been explained by the

Supreme Court and by commentators. In discussing punitive damages awards in cases

with low compensatory awards, the Supreme Court stated, "heavier punitive awards have

been thought to be justifiable when . . . the value of injury and the corresponding

compensatory award are small . . .." *Exxon Shipping* v. *Baker*, 128 S.Ct. at 2622 (citing

*BMW v. Gore*). At the low end of compensatory awards, "[f]actfinders outraged enough

to award punitive damages in the face of low compensatory awards might be expected to

employ higher or less predictable multiples of compensatory awards." Theodore

Eisenberg & Martin T. Wells, *The Predictability of Punitive Damages Awards in

Published Opinions, the Impact of* BMW v. Gore *on Punitive Damages Awards, and

Forecasting Which Punitive Awards Will Be Reduced*, 7 SUPREME CT. ECON. REV. 59, 70

(1999). For example, outrageous behavior such as a failed murder attempt could result in

little or no compensatory damages. A bullet may simply miss its target. The miss does

not make the shooter non-reprehensible or make it unworthy of punishment. A nominal

compensatory award of one dollar or even $1,000 in bad behavior-low harm cases may

generate an extreme punitive-compensatory ratio when adjudicators award punitive

damages. As described in some of my publications, the data also suggest a "flattening

out" of the punitive-compensatory relation as one moves from the mass of cases to the

16

high end of compensatory awards. This flattening pattern suggests that as compensatory awards become very high, adjudicators' behavior is consistent with the belief that the amount of punitive damages awarded per unit of compensatory damages can decrease without substantially diluting the intended punishment or deterrence. The "flattening" of the punitive-compensatory relation at the top end of the compensatory award distribution is accompanied by a nonlinear relation at the low end of the compensatory award distribution.

33. While the basic punitive-compensatory relation is visually displayed by the scatter diagram aspect of Figure 1, the relation is confirmed through statistical analysis. Such statistical analysis, described below, is how the line in Figure 1 was generated and consists of widely accepted and used regression techniques, as described in my article in Bornstein et al., and in other articles. Regression analysis is widely used in statistical analysis, is often relied on by courts, and is substantially discussed in the REFERENCE MANUAL. As summarized in the REFERENCE MANUAL:

> A regression model attempts to combine the values of certain variables (the independent variables [the compensatory award variables in the context of this case]) in order to get expected values for another variable (the dependent variable [the punitive award variable in the context of this case]). The model can be expressed in the form of a regression equation. A simple regression equation has only one independent variable; a multiple regression equation has several independent variables. Coefficients in the equation will often be interpreted as showing the effects of changing the

17

corresponding variables. REFERENCE MANUAL at 144.

34. The relation between punitive and compensatory damages at the high and low ends of compensatory awards shown in Figure 1 suggests fitting a cubic regression model that includes compensatory awards (log10), such awards squared, and such awards cubed as explanatory variables. A regression model can be called "cubic" when it includes not only the "pure" value of the explanatory variable (compensatory damages in this case), but also terms that are the square and the cube of the explanatory variable. A model with a squared term allows one curve or turning point in the relation between the dependent variable and the independent variable. Such single curve lines often are referred to as parabolas. A cubic model allows two "curves" or turning points in the relation between the dependent variable (punitive damages) and the independent variable (compensatory damages). Figure 1 above shows a turn upward as the compensatory award moves from the extreme low range of compensatory awards to the middle range and a downward turn as the compensatory award moves from the middle range of compensatory awards to the high range of compensatory awards.

35. The curved line shown in Figure 1 is the best-fitting robust regression (see next paragraph) cubic model using only the compensatory award (with linear, squared, and cubed terms) as the explanatory variable. It takes no statistical training to see that the cubic model provides a reasonably good visual fit to the data.

36. As stated in my article in Bornstein et al., the line in Figure 1 is based on a robust regression model. Robust regression can be appropriate because the coefficient estimates are less influenced by individual outlying data points. E.g., Andrew Gelman &

18

Jennifer Hill, DATA ANALYSIS USING REGRESSION AND MULTILEVEL/HIERARCHICAL
MODELS 124 (2007). This model is reasonable because Figure 1 suggests obvious
outliers in the data—observations that are distant from most other observations in the data.
Outliers can distort measures of association such as correlation or regression coefficients.
E.g., REFERENCE MANUAL at 138 ("The correlation coefficient [a measure of linear
association] can be distorted by outliers."). Robust regression models automatically
assign less importance (weight) to outliers in data, but such models do not necessarily
eliminate outliers from the analysis.

37. Table 1 reports the results of the regression model underlying the solid line in
Figure 1. In regression terminology, the numbers associated with the explanatory
variables often are referred to as coefficients. Thus, the coefficient for the
"Compensatory award" variable in Table 1 is -2.423, the coefficient for the
"Compensatory award squared" variable is 0.567 and the coefficient for the
"Compensatory award cubed" variable is -0.029. Regression models usually include a
term, known as the "Constant" or intercept, see REFERENCE MANUAL at 166, which does
not vary. In this case, the constant is 6.352. See also REFERENCE MANUAL at 218
(discussion of interpreting regression output from computer programs).

Table 1. Robust Regression Model of Punitive Award
as a Function of Compensatory Award

|  | dependent variable = Punitive award (log10) |
| --- | --- |
| Compensatory award (log(10)) | -2.423 |
|  | (5.64)* |
| Compensatory award squared | 0.567 |
|  | (7.24)* |
| Compensatory award cubed | -0.029 |
|  | (6.28)* |
| Constant | 6.352 |
|  | (8.22)* |
| Observations | 683 |
| R-squared (robust) | 0.621 |
| Absolute value of t statistics in parentheses; * significant at p<.001 | |

38. The value of the dependent variable (punitive damages) can be computed using the coefficients reported in Table 1. See, e.g., the illustrations of computing the dependent variable from the independent variables in the REFERENCE MANUAL at 146-47, 210-11. For the model in Table 1, for any value of the compensatory award, the punitive award computed from the regression model equals the number resulting from the following equation:

(1)     punitive award = (-2.423 × compensatory award) + (0.567 × compensatory award squared) - (0.029 × compensatory award cubed) + 6.352

39. In statistical analysis, including regression analysis, it is common to report the probability that an observed result could occur by chance. In the context of the analysis reported here, the probability is computed based on what is referred to as a t-statistic. As explained in the REFERENCE MANUAL at 148, the t-statistics reported in Table 1 are computed from a quantity known as the standard error. The standard error measures the likely difference between the estimate of the coefficient and the unknown parameter

20

represented by the coefficient. *Id.* The t-statistic reported in Table 1 is obtained by dividing the estimate of a coefficient by its standard error. *Id.* As stated in the REFERENCE MANUAL, "Under the null hypothesis that [a parameter = 0], there is only about a 5% chance that the absolute value of t (denoted |t|) is greater than 2. A value of t greater than 2 would therefore demonstrate statistical significance." *Id.*

40. As shown by the numbers in parentheses in Table 1, all of the t-statistics in the regression model reported in the Table substantially exceed 2. The probability of observing such large t-statistics if a parameter equals zero is less than one chance in a 1,000, well beyond the threshold for labeling results statistically significant. It would be customary to state that the coefficients in the model are highly statistically significant; they are unlikely to have occurred by chance. This is confirmed by the strong visual relation between the cubic line in Figure 1 and the scatter diagram aspect of the Figure showing the individual punitive and compensatory awards. Well over half of the variation in punitive awards is explained by the model.

41. The regression model reported in Table 1 and equation (1) provides the information needed to estimate, based on the past relation between punitive and compensatory awards, the amount of punitive damages likely to have been awarded in this case. To assess the level of the punitive award that the data suggest would have been associated with the compensatory award in *Green v. General Motors*, I used the following information, supplied by counsel for plaintiff, to estimate compensatory damages: $4,000,000 pain and suffering, $312,000 past medical, $149,315 past lost income, and $13,000,000 future medical and lost income. These figures sum to a compensatory award

21

of approximately $17.5 million.

42. I used this $17.5 million figure as the compensatory award to compute the punitive award using the results reported in Table 1 as reflected in equation (1) above. (If a different figure were deemed the appropriate amount of the compensatory award in *Green v. General Motors*, equation (1) could again be used to computed the associated punitive award.) The model in Table 1 and Figure 1 is based on dollars adjusted for inflation to 2004, the time when I wrote the article published in Bornstein et al. Using the Bureau of Labor Statistics consumer price inflation index, the $17.5 million awarded in 1996 would have been, as of the end of 2004, be equivalent to (188.9/156.9) times $17.5 million, or $21.1 million. (Below, I adjust the punitive award back down to 1996 dollars.)

43. From the cubic regression line (derived from Table 1's results) in Figure 1, one can see that, for a compensatory award of $21.1 million (7.3236471 on the log10 scale used in the figure), the best-fitting line suggests a punitive award of approximately 7.5 on the log10 scale on the y-axis. The statistical model in fact results in a punitive award of 7.5886988 in the log 10 scale, which equals $38.8 million. That is, the statistical model underlying Figure 1 generates, for a compensatory award of $17.5 million in 1996 dollars ($21.1 million in 2004 dollars), a corresponding punitive award of approximately $38.8 million in 2004 dollars. Analysis using simple ordinary least squares regression, see REFERENCE MANUAL at 145 & n.211, 146, 171, 206 et. seq., which does not account as satisfactorily for outliers, does not significantly differ from the results produced by the regression model in Table 1. Nor does analysis using quantile regression, which can be

22

used to model the median award rather than the mean award. See Roger Koenker,
QUANTILE REGRESSION (Cambridge Univ. Press 2005). Analysis that includes the 2005
*Civil Justice Survey* results, referred to below, does not significantly differ from the
results in Table 1.

44. The robust regression method used in the article in Bornstein et al., while
addressing outliers visible in Figure 1, does not fully account for the sample design.
Recall that the sample is drawn from three different data sets, gathered with different
methodology and with different proportions of the universe of observations they purport
to represent. For example, the H-V data purport to be a complete sample of cases with
very large (greater than $100 million) punitive awards. The *Civil Justice Survey* data are
limited to 45 or 46 counties. To account for the sample design, one can use probability
weights, as explained in my article in Bornstein et al. Probability weights assign different
weights to observations based on the probability of an observation being in the sample
analyzed and are an appropriate was to reflect sample design. E.g., StataCorp, STATA
STATISTICAL SOFTWARE: RELEASE 10, USER'S GUIDE § 11.1.6 (StataCorp LP 2007).

45. But using models with probability weights does not automatically address the
problem of outliers, as did the robust regression model reported in equation (1) above.
Not accounting for outliers raises the question whether they exert undue influence on the
model. To address this potential problem, I used standard techniques to identify outliers
in the data. Using a preliminary model, I identified observations with large residuals
(residuals are the difference between a value estimated by a model and the actual value),
see REFERENCE MANUAL at 210, as possible outliers. I then used probability weights to

23

account for the sample design, excluded the outliers, and estimated a cubic regression

model similar to that reported in Figure 1. Figure 3 shows the resulting line.



Figure 3. Punitive-Compensatory Relation, Three Data Sets

Sources: Hersch-Viscusi, 1985-2003; NCSC, 1992, 1996, 2001; NLJ top 100 awards, 2001-2004

46. Based on the model in Figure 3, one can see that, for a compensatory award of

$21.1 million (7.5886988 on the log10 scale x-axis used in the figure), the best-fitting

line suggests a punitive award of more than 7 (from the y-axis point corresponding to

7.5886988 on the x-axis). The statistical model in fact results in a punitive award of

7.2764992 in the log 10 scale, which equals approximately $18.9 million. That is, the

statistical model underlying Figure 1 generates, for a compensatory award of $17.5

million in 1996 dollars, a corresponding punitive award of $18.9 million in 2004 dollars.

24

47. This $18.9 million punitive award is less than the punitive award based on Figure 1 and equation (1). The lower award based on the analysis underlying Figure 3 is due to the downweighting, attributable to the use of probability weights, in importance of the larger awards in the NLJ and H-V data. This downweighting of these observations yields a conservative estimate because the size of the compensatory award in this case is closer to the award sizes in the NLJ data than it is to the award sizes in the *Civil Justice Survey* data.

48. Note that in the Bornstein et al. article, we reported that a cubic model, such as that displayed in Figure 1, was somewhat superior to the simpler model reported in that article.

49. Figure 4 shows the regression lines from the models reported in Figures 1 and 3 to facilitate comparison of the results of the two models.



Figure 4. Punitive-Compensatory Relation, Three Data Sets

Sources: Hersch-Viscusi, 1985-2003; NCSC, 1992, 1996, 2001; NLJ top 100 awards, 2001-2004

50. After analyzing the *Civil Justice Survey*, the H-V data, and the NLJ data, I

considered facts (in addition to the compensatory award) as presented to me with respect

to this case. These facts include the serious personal injury, rendering Mr. Green a

quadriplegic, found to have been caused by the General Motors vehicle and the

circumstances of the failure to use an allegedly safer design. The material not revealed in

response to discovery in *Green v. General Motors* allegedly included information that

General Motors had knowledge of the defect based on its own testing. Potential injuries

were great, including quadriplegia and possible death. The material also allegedly

included information that General Motors found that an alternative design to the design

found to have caused the injury had "better structural impact and roof crush

26

characteristics" but that General Motors' internal memoranda reported that the more
"macho appearance" of the defective design was important to "sales performance."
*Complaint and Jury Demand, Steven G. Newman, Executor under the Will of Michael
Green, Deceased v. General Motors Corporation, Essex County—Law Division, Filed
November 19, 2001.* The material also included information that led to testimony at
deposition that the roof collapse of Mr. Green's car was "a result of the defect in the car
that allowed the phenomena to happen and this shouldn't have happened and . . . General
Motors we later found out even knew that was going to happen." *Deposition of Maurice
J. Donovan, September 2, 2008, United States District Court—District of New Jersey,
Stephen Newman v. General Motors Corporation,* at 49. See also *Preliminary Report of
National Forensic Engineers, Inc., Newman (Green) v. General Motors, et als, Dated
September 7, 2005* (finding that General Motors "was aware of design defects in the T-
roof structure," that General Motors had conducted testing confirming "the design defects
and the superiority of the alternative design over the T-roof," that General Motors "knew
of the existence of alternative designs, and demonstrated their increased performance in
all forms of testing and modeling," that "Despite its own design and safety concerns, GM
knowingly produced, manufactured and placed in the stream of commerce the T-top
Camaro over the more crashworthy alternative design because of the 'macho image' and
'proven sales performance' of the T-top design."

51. I did not find in the materials made available to me an argument by General
Motors that punitive damages, had they been sought, would have been below what the
amount of punitive damages might normally be expected to be. Based on these facts, I do

27

not believe that a downward adjustment in the punitive award would have been mandated in this case.

52. Based on the *Civil Justice Survey*, the H-V, and the NLJ data, the consideration of facts specific to this case, and the compensatory award in *Green v. General Motors*, it is my opinion, to a reasonable degree of scientific certainty, that the pattern of punitive awards indicates that the punitive damages award in this case would not have been less than $18.9 million in 2004 dollars (the inflation-adjusted dollars used in the article in Bornstein et al.) and could have been as high as approximately $38.8 million, as suggested by the results of the model reported in Figure 1, and the fact that the size of the compensatory award in this case is closer to the award sizes in the NLJ data than it is to the award sizes in the *Civil Justice Survey* data.

53. Using the Bureau of Labor Statistics consumer price inflation index, the $18.9 million award would, as of the end of 1996, be equivalent to (156.9/188.9) times $18.9 million, or $15.7 million. Further adjustment may be necessary to reflect the precise timing of the damage, and/or legal rules concerning interest, and/or legal rules concerning the time value of money.

54. My assessment of the likelihood whether punitive damages would have been awarded against General Motors if the alleged discovery failures not occurred is based on data gathered as part of the most recently available *Civil Justice Survey of State Courts*. Like the earlier *Civil Justice Surveys*, the 2005 Survey was a project of the NCSC and the BJS.

55. The 2005 *Civil Justice Survey* data included 156 counties. 46 counties were

28

selected to maintain backwards compatibility with the earlier *Civil Justice Surveys*. 110

counties were added to represent the rest of the nation (counties not included in the

country's 75 largest counties). For a summary of the data and methodology, see *Bureau*

*of Justice Statistics Special Report: Civil Justice Survey of State Courts, 2005: Civil*

*Bench and Jury Trials in State Courts, 2005* (Oct. 2008).

56.The 2005 *Civil Justice Survey* included a variable that reported whether

punitive damages had been sought in each case. I evaluated whether punitive damages

were awarded for those cases coded in the *Civil Justice Survey* cases in which punitive

damages had been sought. Because the award of punitive damages has been positively

associated (sometimes statistically significantly) with the size of the compensatory award,

my analysis took into account the size of the compensatory award.

57. For cases with compensatory awards in excess of $1,000,000, where punitive

damages were sought, 32 of 53 cases (60.4%) had a punitive award. For cases with

compensatory awards in excess of $10,000,000, where punitive damages were sought,

eight of nine cases (88.9%) had a punitive award. Both these results are statistically

significant in relation to cases with compensatory awards of smaller amounts in which

punitive damages were sought.

58. To further assess the likelihood of a punitive award, I employed regression

analysis. The dependent variable in analyzing whether punitive damages would have

been awarded is dichotomous or binary—it takes on only two values which are,

effectively, "yes" and "no," coded as 1 or 0. For dichotomous dependent variables, it is

customary to use regression methods suitable for such categorical data rather than to use

29

ordinary least squares regression. "Logistic regression is the standard way to model binary outcomes . . . ." Andrew Gelman & Jennifer Hill, DATA ANALYSIS USING REGRESSION AND MULTILEVEL/HIERARCHICAL MODELS 79 (2007). See also David W. Hosmer, Jr. & Stanley Lemeshow, APPLIED LOGISTIC REGRESSION (2d ed. 2000).

59. I therefore used logistic regression to model whether punitive damages were awarded in cases in which they coded as having been sought. I modeled whether punitive damages were awarded as a function of the level of the compensatory award in a case. In the primary model I used, I limited the sample to jury trials in the 2005 *Civil Justice Survey* data and to cases in which punitive damages were sought, as coded in the *Civil Justice Survey* data.

60. My analysis is therefore subject to my understanding that punitive damages would have been sought in *Green v. General Motors* had the alleged discovery failures not occurred. *Deposition of Maurice J. Donovan, September 2, 2008, United States District Court—District of New Jersey, Stephen Newman v. General Motors Corporation*, at 164-167 (especially at 167: "it was the intention of General Motors to deprive plaintiff of the discovery in this case, which would have led to an award of punitive damages. And that's how Michael Green was deprived of his ability because had those documents been available by Green 1 or Green 2 a punitive damage count would have been brought and it would have been successful"), 180 ("The fact that there was no alternative design proved to be false. We relied upon that not pursuing the punitive damage . . . .").

61. Logistic regression models enable one to associate the probability of a positive (or "yes") outcome (in this case an award of punitive damages) with each observation. I

30

used the logistic regression model results to compute the probability of a punitive award

as a function of the compensatory award. I verified that the logistic regression model fit

the data reasonably well. The model was highly statistically significant, indicating that

the results obtained were unlikely to have occurred by chance. The results are reported

graphically in Figure 5. The x-axis in the Figure is the amount of the compensatory

award in a case. As in the figures above, the x-axis employs a logarithmic scale. The y-

axis is the probability of a punitive damages award that the regression model indicated

was associated with the corresponding compensatory award.



Figure 5. Probability of Punitive Award as Function of Size of Compensatory Award

Jury trial cases in which punitive award was sought, Civil Justice Survey 2005

31

62. As Figure 5 shows, the probability of a punitive award for a compensatory award in excess of $1 million ("6" on the x-axis's logarithmic scale) exceeds 0.5. For compensatory awards greater than $10 million, the probability exceeds 0.6. As described above, the compensatory award in the *Green v. General Motors* action exceeded $10 million. These results are consistent with the results reported above based on cases with compensatory awards in excess of $1 milllion and $10 million. Analysis using probability weights to reflect the different proportions of large and small counties sampled in the 2005 *Civil Justice Survey* does not significantly differ from the results reported in Figure 5.

63. Based on my analysis of the 2005 *Civil Justice Survey*, and consideration of the allegations in this case, and the finding of liability and the compensatory award in *Green v. General Motors*, it is my opinion, to a reasonable degree of scientific certainty, that it is probable that punitive damages would have been awarded in *Green v. General Motors*.

64. In the past four years, I have served as a witness in one unrelated case: The Bank of New York and Montana Board of Investments, High Court of Justice, Chancery Division, London, United Kingdom (testified in July 2008).

65. I reserve the right to supplement this Report as additional information is made available to me.

66. My compensation for this case is expected to be $600 per hour plus expenses.

32

Ithaca, NY
January 22, 2009

Theodore Eisenberg

# C.V.
## Theodore Eisenberg
## Henry Allen Mark Professor of Law &
## Adjunct Professor of Statistical Sciences
## Cornell University
## As of January 22, 2009

**Academic Employment**
Professor & Henry Allen Mark Professor of Law, Cornell University, 1981—
Adjunct Professor of Statistical Sciences, Cornell University, 2008—
Prof., Ph.D. program: Institutions, Econ. & Law, Fondazione Collegio Carlo Alberto, Turin, 2006—
Center for Advanced Legal Studies, Tel-Aviv University (Spring 2009)
Visiting Professor of Law, NYU School of Law (Fall 2007)
Bruce W. Nichols Visiting Prof. of Law, Harvard Law School (Fall 2004)
Visiting Prof. of Law, Stanford Law School (Spring 1987)
Visiting Prof. of Law, Harvard Law School (1984-85)
Prof., Univ. San Diego's 1983 Oxford summer program (Comparative Civil Liberties)
Prof. & Acting Prof. of Law, UCLA (1977-81)

**Prior Employment**
Law Clerk to Chief Justice Earl Warren, retired (1973)
Law Clerk, U.S. Court of Appeals for the D.C. Circuit (1972-73)
Debevoise & Plimpton (1974-77)

**Professional Memberships**
Law & Soc'y Assoc.; Am. Law & Econ. Assoc.; Soc'y for Empirical Legal Studies; Am. Bankruptcy
Inst.; AAUP; Admitted, N.Y. Bar; Admitted, PA Bar (inactive status); Admitted, CA Bar (inactive
status); Am. Bar Assoc.; Assoc. of the Bar of the City of NY

**Fellowships, Grants, Awards, Endowed Lectures**
Rosenthal Lectures, Northwestern University School of Law School (to be given 2009-2010)
Fellow, Royal Statistical Society
Cornell Provost's Award for Distinguished Scholarship
Nat'l Science Found'n, 6/1985 to 12/1987 (Study of Civil Rights Cases)
Guy Carpenter (reinsur. co.) (empirical study of employment discrimination litigation)
South Carolina Death Penalty Resource Ctr., 1992 (Study of Jurors in Capital Cases)
Project '87 (joint project American Historical Association, American Political Science Association)
        (empirical study of civil rights litigation in the Central Dist. of Calif.)
American Bar Found'n (expand above study in the Central Dist. of CA and the Eastern Dist. of PA).

**Editorial Boards and Outside Committees**
Editor, Journal of Empirical Legal Studies
Editorial Board, American Law and Economics Review
Advisory Board, Social Science Research Network, Litigation & Procedure Abstracts
Advisory Board, Social Science Research Network, Negotiation & Dispute Resolution Abstracts
Board of Directors, Society for Empirical Legal Studies
Board of Directors, American Law and Economics Association (2004-2006)
AALS representative to Consortium of Social Science Associations
Investment Policy Oversight Group, Law School Admission Council
Academic Advisor, National Center for State Courts

Chair, Law and Social Science Section, Association of American Law Schools (1996-97)
Editorial Board, Law and Society Review (past service)
Editorial Board, Justice System Journal (past service)
Nominating Committee, Law and Society Association, 2007, 2008
Program Committee, Law and Society Association, 2002 Annual Meeting, Vancouver
ACLU National Committee on Alternative Dispute Resolution (past service)
Provost's Comm. of Preliminary Inquiry Concerning Computer Worm Launched on National Computer
    Network, 1988-89
April to September 1986, Chair, Planning Committee, Workshop on Civil Rights, Association of
    American Law Schools
Board of Editors, Commercial Damages (Matthew Bender)
Chair, University Review Board, 1997-1999

**Referee/Reviewer**
    Am. Econ. Rev., NSF, Law & Soc'y Rev.,  Justice System J., Rev. of Econ. & Statistics, Econ.
Inquiry, Oxford Univ. Press, Harvard Univ. Press, Cornell Univ. Press, Yale Univ. Press, Alfred P. Sloan
Found'n; Social Science & Medicine; J. Legal Studies, Internat'l Rev. Law & Econ., The Rockefeller
Found'n, Social Sciences & Humanities Research Council of Canada, J. Law & Econ., Smith Richardson
Found'n, Univ. of Chicago Press, NeuroToxicology, RAND Institute for Civil Justice; Louisiana Board
of Regents; Harvard Law Review; Harvard School of Public Health; Law & Social Inquiry; American
Political Science Review; Political Research Quarterly; Law & Society Review; Am. Law & Econ.
Review

**Books or Chapters in Books**
Editor-in-Chief, Debtor-Creditor Law (Matthew Bender's 13 volume treatise)
The Relation Between Punitive and Compensatory Awards: Combining Extreme Data With the Mass of
    Awards, in Civil Juries and Civil Justice (B. Bornstein, R. Wiener, R. Schopp, S. Willborn eds.
    2008) (with V. Hans & M. Wells)
Victim Characteristics and Victim Impact Evidence in South Carolina Capital Cases, in Wounds That Do
    Not Bind: Victim-Based Perspectives on the Death Penalty 297-321 (James R. Acker & David R.
    Karp eds. 2006) (with S. Garvey & M. Wells)
Lessons from the Capital Jury Project, in Beyond Repair? America's Death Penalty (Stephen P. Garvey
    ed. 2002).
Empirical Methods and the Law, in Statistics for the 21st Century (Chapman and Hall/CRC Press 2001)
Editor, chapter 6, in Risk Behaviour and Risk Management in Business Life (Bo Green ed. 2000) (Kluwer
    Academic Publishers: Dordrecht, The Netherlands)
Bankruptcy & Debtor-Creditor Law (3rd ed. 2004)
1986 Supplement to Debtor-Creditor Law (1st ed.)
Commercial and Debtor-Creditor Law: Selected Statutes (Foundation Press 1984) (also annual editions
    1986-2008) (Co-editor with D. Baird & T. Jackson)
Debtor-Creditor Law (revision of Chapters 7 (Fair Credit Reporting), 28 (Attachment) of Matthew
    Bender's treatise)
Konkurs eller Rekonstruktion (SNS Förlag 1995), also published in English as Creating An
    Effective Reconstruction Law, SNS Occasional Paper No. 75 (December 1995)
Should We Abolish Chapter 11?  The Evidence from Japan, in, Current Developments in International
    and Comparative Insolvency Law, (Oxford Univ. Press 1994, Jacob Ziegel ed.), also in:
    Corporate Bankruptcy: Economic and Legal Perspectives (Cambridge Univ. Press 1996, Jagdeep

S. Bhandari & Lawrence A. Weiss eds.) and in Empirical Studies on Wagi Proceeding pp. 329-359 (Aoyama ed., Commercial Law Centre, Inc.) (in Japanese).

Anthony McLeod Kennedy, in Justices of the Supreme Court of the United States (Chelsea House 1995)

Civil Rights Legislation (LexisNexis 2004) (5th ed. 2004)

2000, 1996, 1993, 1986, 1983, 1989-90, Supplements to Civil Rights Legislation

Bender's Federal Tax Service, Chapter I:19, Collapsible Corporations (1988)

Civil Rights and Employment Discrimination Law: Select Statutes and Regulations (LexisNexis 1991, 1996, 2004)

## Articles

Statins, cholesterol, women and primary prevention: evidence-based medicine or wishful thinking?, 5 Future Cardiology 1 (2009) (with M. Wells)

Plaintiphobia in State Courts? An Empirical Study of State Court Trials on Appeal, 38 J. Legal Studies (2009) (forthcoming) (with M. Heise)

What Is the Settlement Rate and Why Should We Care?, 6 J. Empirical Legal Studies 111 (2009) (forthcoming) (with C. Lanvers)

Taking a Stand on Taking the Stand: The Effect of a Prior Criminal Record on the Decision to Testify and on Trial Outcomes, 94 Cornell L. Rev. (2009) (forthcoming) (with V. Hans)

Summary Judgment Rates Over Time, Across Case Categories, and Across Districts: An Empirical Study of Three Large Federal Districts (forthcoming) (with C. Lanvers)

Statins and Adverse Cardiovascular Events in Moderate Risk Females: A Statistical and Legal Analysis with Implications for FDA Preemption Claims, 5 J. Empirical Legal Stud. 507 (2008) (with M. Wells)

The Flight to New York: An Empirical Study of Choice of Law and Choice of Forum Clauses in Publicly-Held Companies' Contracts, Cardozo L. Rev. (forthcoming) (with G. Miller)

The Market for Contracts, Cardozo L. Rev. (forthcoming) (with G. Miller)

Mandatory Arbitration for Customers But Not for Peers: A Study of Arbitration Clauses in Consumer and Non-Consumer Contracts, 92 Judicature 118 (Nov.-Dec. 2008) (with G. Miller & E. Sherwin)

Arbitration's Summer Soldiers: An Empirical Study of Arbitration Clauses in Consumer and Nonconsumer Contracts, U. Mich J. L. Reform 871 (2008) (with G. Miller & E. Sherwin), reprinted in 4 Icfai University J. of Alternative Dispute Resolution 51 (2008)

CAFA Judicata: A Tale of Waste and Politics, 156 U. Pa. L. Rev. 1553 (2008) (with K. Clermont)

Do Juries Add Value?: Evidence from an Empirical Study of Jury Trial Waiver Clauses in Large Corporate Contracts, 4 J. Empirical Legal Stud. 539 (2007) (with G. Miller)

Foreigners' Fate in America's Courts: Empirical Legal Research, Academia Sinica L.J. 237 (March 2007) (with K. Clermont)

Xenophilia or Xenophobia in American Courts? Before and After 9/11, 4 J. Empirical Legal Stud. 441 (2007) (with K. Clermont)

Comment, Evidence of the Need for Aggregate Litigation, 163 J. Institutional & Theoretical Economics 158 (2007)

The Flight from Arbitration: An Empirical Study of Ex Ante Arbitration Clauses in Publicly-Held Companies' Contracts, 56 DePaul L. Rev 335 (2007) (with G. Miller)

Ex Ante Choices of Law and Forum: An Empirical Analysis of Corporate Merger Agreements, 59 Vanderbilt L. Rev 1975 (2006) (with G. Miller), also published in 49 Corporate Practice Commentator 323 (2007)

Juries, Judges, and Punitive Damages: Empirical Analyses Using the Civil Justice Survey of State Courts 1992, 1996, and 2001 Data, 3 J. Empirical Legal Stud. 263 (2006) (with others)

Employment Arbitration and Litigation: An Empirical Comparison, in ADR & The Law 8-35 (20th ed.

2006) (with E. Hill)

Use It or Pretenders Will Abuse It: The Importance of Archival Legal Information, 75 UMKC L. Rev. 1 (2006)

Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303 (2006) (with G. Miller)

Assessing the SSRN-Based Law School Rankings, 81 Indiana L. Rev. 285 (2006)

The Significant Association Between Punitive and Compensatory Damages in Blockbuster Cases: A Methodological Primer, 3 J. Empirical Legal Stud. 169 (2006) (with M. Wells)

Expert Testimony in Capital Sentencing: Juror Responses, 33 J. Am. Acad. Psychiatry & the Law 509 (2005) (with J. Montgomery, J.R. Ciccone, and S. Garvey)

Overlooked in the Tort Reform Debate: The Growth of Erroneous Removal, 2 J. Empirical Legal Stud. 551 (2005) (with T. Morrison)

Judge-Jury Agreement in Criminal Cases: A Partial Replication of Kalven & Zeisel's *The American Jury*, 2 J. Empirical Legal Stud. 171 (2005) (with others)

The Fate of Firms: Explaining Mergers and Bankruptcies, 2 J. Empirical Legal Stud. 49 (2005) (with C. Bergström, S. Sundgren, and M. Wells)

Death Sentence Rates and County Demographics: An Empirical Study, 90 Cornell L. Rev. 347 (2005)

The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues, 57 Vanderbilt L. Rev. 1529 (2004) (with G. Miller)

Was Arthur Andersen Different?: An Empirical Examination of Major Accounting Firms' Audits of Large Clients, 1 J. Empirical Legal Stud. 263 (2004) (with J. Macey)

On the Design of Efficient Priority Rules for Secured Creditors: Empirical Evidence from A Change in Law, 18 European J. Law & Econ. 273 (2004) (with C. Bergström & S. Sundgren)

The Merciful Capital Juror, 2 Ohio St. J. Crim. L. 165 (2004) (with S. Garvey)

Attorney Fees in Class Action Settlements: An Empirical Study, 1 J. Empirical Legal Stud. 27 (2004) (with G. Miller)

Why Do Empirical Legal Scholarship?, 41 San Diego L. Rev. 1741 (2004)

Appeal Rates and Outcomes in Tried and Non-Tried Cases, 1 J. Empirical Legal Stud. 659 (2004)

Implicit Attitudes of Death Penalty Lawyers, 53 DePaul L. Rev. 1539 (2004) (with S. Johnson), also published in Critical Race Realism: Intersections of Psychology, Race, and Law (G. Parks, S. Jones, W. Card eds. 2008)

Explaining Death Row's Population and Racial Composition, 1 J. Empirical Legal Stud. 165 (2004) (with J. Blume & M. Wells).

Employment Arbitration and Litigation, 58 Dispute Resolution J. 44-55 (Nov. 2003-Jan. 2004) (with E. Hill), full version published in ADR & the Law (20th ed. 2006)

The Government as Litigant: Further Tests of the Case Selection Model, 5 Am. L. & Econ. Rev. 94-133 (2003) (with H. Farber).

The Reliability of the Administrative Office of the U.S. Courts Database: An Initial Empirical Analysis, 78 Notre Dame. L. Rev. 1455-1496 (2003) (with M. Schlanger)

Victim Impact Evidence in South Carolina Capital Cases, 88 Cornell L. Rev. 306 (2003) (with S. Garvey)

Litigation Realities, 88 Cornell L. Rev. 119-154 (2002) (with K. Clermont)

Reconciling Experimental Incoherence with Real-World Coherence in Punitive Damages, 54 Stanford L. Rev. 1239 (2002) (with J. Rachlinski & M. Wells)

Judge Harry Edwards: A Case in Point!, 80 Wash. U.L.Q. 1275 (2002) (with K. Clermont)

Plaintiphobia in the Appellate Courts: Civil Rights Really Do Differ from Negotiable Instruments, 2002 Illinois L. Rev. 947 (with K. Clermont).

Trial Outcomes and Demographics: Is There A Bronx Effect?, 80 Texas L. Rev. 1839-75 (2002) (with M. Wells)

Juries, Judges, and Punitive Damages: An Empirical Study, 87 Cornell L. Rev. 743-82 (2002) (with N.

LaFountain, B. Ostrom, D. Rottman & M. Wells)

Secured Debt and the Likelihood of Reorganization, 21 International Review of Law and Economics 359-372 (2002) (with C. Bergström & S. Sundgren)

Damage Awards in Perspective: Behind the Headline-Grabbing Awards in *Exxon Valdez* and *Engle*, 36 Wake Forest L. Rev. 1129 (2001)

Forecasting Life and Death: Juror Race, Religion, and Attitude Toward the Death Penalty, 30 J. Legal Studies 277-311 (2001) (with S. Garvey & M. Wells)

The Deadly Paradox of Capital Jurors, 74 South. Cal. L. Rev. 371 (2001) (with S. Garvey & M. Wells)

Appeal from Jury or Judge Trial: Defendants' Advantage, 3 American Law & Economics Review 125 (2001) (with K. Clermont)

State Attorney General Actions, the Tobacco Litigation, and the Doctrine of *Parens Patriae*, 74 Tulane L. Rev. 1859 (2000) (with R. Ieyoub)

Anti-Plaintiff Bias in the Federal Appellate Courts, 84 Judicature 128 (2000) (with K. Clermont)

Empirical Methods and the Law, 95 J. American Statistical Association 665 (2000)

Inbreeding in Law School Hiring: Assessing the Performance of Faculty Hired from Within, 29 J. Legal Studies 369-88 (2000) (with M. Wells)

Methodological Issues in Bankruptcy Prediction, in Risk Behaviour and Risk Management in Business Life (Bo Green ed. 2000) (Kluwer Academic Publishers: Dordrecht, The Netherlands)

Judicial Decisionmaking in Federal Products Liability Cases, 1978-1997, 49 DePaul L. Rev. 323-33 (1999)

An Important Portrait of Affirmative Action, 1 American Law and Economics Review 471-80 (1999) (review of Bowen & Bok, The Shape of the River)

The Government as Litigant: Further Tests of the Case Selection Model, NBER Working Paper Series 7296 (August 1999) (with H. Farber)

The Predictability of Punitive Damages Awards in Published Opinions, the Impact of *BMW v. Gore* on Punitive Damages Awards, and Forecasting Which Punitive Awards Will Be Reduced, 7 Supreme Court Economic Review 59-86 (1999) (with M. Wells)

Judicial Politics, Death Penalty Appeals, and Case Selection: An Empirical Study, 72 South. Calif. L. Rev. 465-504 (1999) (with J. Blume)

Shopping for Judges: An Empirical Analysis of Venue Choice in Large Chapter 11 Reorganizations, 84 Cornell L. Rev. 967-1003 (1999) (with L. Lopucki)

But Was He Sorry? The Role of Remorse in Capital Sentencing, 84 Cornell L. Rev. 1599-1637 (1998) (with S. Garvey & M. Wells)

Post-*McCleskey* Racial Discrimination Claims in Capital Cases, 84 Cornell L. Rev. 1771-1810 (1998) (with J. Blume & S. Johnson)

Measuring the Deterrent Effect of Punitive Damages, 87 Georgetown L.J. 347-357 (1998)

Larger Board Size and Decreasing Value in Small Firms, 48 J. Financial Economics 35-54 (1998) (with S. Sundgren & M. Wells)

Ranking and Explaining the Scholarly Impact of Law Schools, 27 J. Legal Studies 373-413 (1998) (with M. Wells)

Punitive Awards After *BMW*, a New Capping System, and the Reported Opinion Bias, 1998 Wisconsin L. Rev. 387 (with M. Wells)

Do Case Outcomes Really Reveal Anything About the Legal System? Win Rates and Removal Jurisdiction, 83 Cornell L. Rev. 581-607 (1998) (with K. Clermont)

Is Chapter 11 Too Favorable to Debtors? Evidence from Abroad, 82 Cornell L. Rev. 1532-1567 (1997) (with S. Sundgren)

The Predictability of Punitive Damages, 26 J. Legal Studies 623-661 (1997) (with J. Goerdt, B. Ostrom, D. Rottman & M. Wells)

The Litigious Plaintiff Hypothesis: Case Selection and Resolution, 28 RAND J. of Economics S92-S112

5

(1997) (with H. Farber)

Xenophilia in American Courts, 109 Harvard L. Rev. 1120-43 (1996) (with K. Clermont)

Jury Responsibility in Capital Cases: An Empirical Study 44 Buffalo. L. Rev. 339-380 (1996) (with S. Garvey & M. Wells)

Litigation Outcomes in State and Federal Courts: A Statistical Portrait, 19 Seattle L. Rev. 433-453 (1996) (with J. Goerdt, B. Ostrom & D. Rottman)

Trial by Jury or Judge: Which is Speedier?, 79 Judicature 176 (Jan.-Feb. 1996) (with K. Clermont)

Courts in Cyberspace, 46 J. Legal Educ. 94-100 (1996) (with K. Clermont)

Politics and the Judiciary: The Influence of Judicial Background on Case Outcomes, 24 J. Legal Studies 257-81 (1995)

Exorcising the Evil of Forum Shopping, 80 Cornell L. Rev. 1507-35 (1995) (with K. Clermont)

Negotiation, Lawyering, and Adjudication: Kritzer on Brokers and Deals, 19 Law & Social Inquiry 275-99 (1994)

Differing Perceptions of Attorney Fees in Bankruptcy Cases, 72 Wash. U.L.Q. 979-95 (1994)

Should We Abolish Chapter 11? The Evidence from Japan, 23 J. Legal Studies 111-157 (1994) (with S. Tagashira), published in Japanese in 25 Kokusai Shōji Hōmu, No. 1 (1997) (Journal of the Japanese Institute of International Business Law)

Deadly Confusion: Juror Instructions in Capital Cases, 79 Cornell L. Rev. 1 (1993) (with M. Wells)

Products Liability Cases on Appeal: An Empirical Study, 16 The Justice System Journal 117-138 (1993) (with J. Henderson)

Baseline Problems in Assessing Chapter 11, 43 Univ. Toronto L.J. 633-77 (1993)

Inside the Quiet Revolution in Products Liability, 39 UCLA L. Rev. 731-810 (1992) (with J. Henderson)

Trial by Jury or Judge: Transcending Empiricism, 77 Cornell L. Rev. 1124 (1992) (with K. Clermont), reprinted in National Trial Lawyer (January, March, May 1993)

The Effects of Intent: Do We Know How Legal Standards Work?, 76 Cornell L. Rev. 1151-1197 (1991) (with S. Johnson)

The Individual Versus Business in the Courts, in The World and 1 489-504 (June 1991) (with T. Dunworth)

The Relationship Between Plaintiff Success Rates Before Trial and At Trial, 154, Part 1, Journal of the Royal Statistical Society, Series A 111 (1991)

The Quiet Revolution in Products Liability, 20 Anglo-American L. Rev. 188-203 (1991) (with J. Henderson) (modified version of similar article in UCLA, infra)

The Quiet Revolution in Products Liability: An Empirical Study of Legal Change, 37 UCLA L. Rev. 479-553 (1990) (with J. Henderson)

Testing the Selection Effect: A New Theoretical Framework with Empirical Tests, 19 Journal of Legal Studies 337-58 (1990)

What Shapes Perceptions of the Federal Court System?, 56 U. Chicago L. Rev. 501-539 (1989) (with S. Schwab)

Litigation Models and Trial Outcomes in Civil Rights and Prisoner Cases, 77 Georgetown L.J. 1567-1602 (1989)

Comment, Bankruptcy and Bargaining, 75 Virginia L. Rev. 205 (1989)

The Importance of Section 1981, 73 Cornell L. Rev. 596-604 (1988) (with S. Schwab)

Explaining Constitutional Tort Litigation: The Influence of the Attorney Fees Statute and the Government as Defendant, 73 Cornell L. Rev. 719-784 (1988) (with S. Schwab)

The Reality of Constitutional Tort Litigation, 72 Cornell L. Rev. 641-695 (1987) (with S. Schwab)

The Reality of Constitutional Tort Litigation, in Civil Rights and Attorney Fees Annual Handbook 3-27 (J. Lobel & B. Wolvovitz eds. 1987) (with S. Schwab) (preliminary, condensed version of above Cornell article)

A Bankruptcy Machine That Would Go of Itself, 39 Stanford L. Rev. 1519-1535 (1987) (book review)

Bankruptcy in the Administrative State, 50 Law & Contemporary Problems 3-52 (Spring 1987), reprinted
in 10 Public Utilities Law Anthology (1988)

The Undersecured Creditor in Reorganizations and the Nature of Security, 38 Vanderbilt L. Rev. 931-973
(1985)

Bankruptcy Law in Perspective: A Rejoinder, 30 UCLA L. Rev. 617-636 (1983)

Section 1983: Doctrinal Foundations and An Empirical Study, 67 Cornell L. Rev. 482-556 (1982)

Bankruptcy Law in Perspective, 28 UCLA L. Rev. 953-999 (1981)

The Ordinary and the Extraordinary in Institutional Litigation, 93 Harvard L. Rev. 465-517 (1980) (with
S. Yeazell)

State Law in Federal Civil Rights Cases: The Proper Scope of Section 1988, 128 U. Pennsylvania
L. Rev. 499-543 (1980)

Disproportionate Impact and Illicit Motive: Theories of Constitutional Adjudication, 52
N.Y.U.L. Rev. 36-171 (1977)

Congressional Authority to Restrict Lower Federal Court Jurisdiction, 83 Yale L.J. 498-533 (1974)


**Encyclopedia Entries**

Article on Remedies/Damages, Legal Aspects, in "International Encyclopedia of the Social and
Behavioral Sciences" (Elsevier 2001)

Articles on Civil Rights in "Civil Rights in the United States" (MacMillan forthcoming)

Numerous (9) articles on Civil Rights and Constitutional Law in "The Oxford Companion to the Supreme
Court of the United States" (K. Hall ed. 1992)

Articles on Civil Rights in "Encyclopedia of the American Constitution" (Supplements I and II)

Numerous (approximately 80) articles on Bankruptcy, Civil Rights, and Constitutional Law in
"Encyclopedia of the American Constitution" (L. Levy, K. Karst, & D. Mahoney eds. 1986)

Articles on Civil Rights and Constitutional Law in Civil Rights in "Civil Rights and Equality" (1989)
(Intro. by K. Karst) (selections from the above Encyclopedia)


**Miscellaneous Works**

Analysis of Proposed Pennsylvania Civil Justice Reforms and Projected Economic Impact of Such
Reforms, June 7, 1999 (with S. Schwab)

Simplifying the Choice of Forum: A Reply (with K. Clermont), 75 Wash U. L.Q. 1551-1559 (1997)
A Review of the Law and Economics Literature on Creditor Priority in Bankruptcy, prepared for
Förmånsrättskommittén (Ju 1996:02), the Swedish Commission on the Priority System

The Eleventh Amendment & Section 1983 Litigation, in Update of 42 U.S.C. § 1983 Law, Institute of
Continuing Legal Education in Georgia (1996)

The Value of Obvious Empirical Results and the Omniscient Mr. Palans: Response to Mr. Palans'
Comments, 72 Wash. U.L.Q. 1001-04 (1994)

Action Under Color of Law, in Update of 42 U.S.C. § 1983 Law, Institute of Continuing Legal Education
in Georgia (1994)

Damages in Section 1983 Cases, in Update of 42 U.S.C. § 1983 Law, Institute of Continuing Legal
Education in Georgia (1994)

The Eleventh Amendment & Section 1983 Litigation, in Update of 42 U.S.C. § 1983 Law, Institute of
Continuing Legal Education in Georgia (1993)

State Law in Section 1983 Cases, in Update of 42 U.S.C. § 1983 Law, Institute of Continuing Legal
Education in Georgia (1993)

Is the Quiet Revolution in Products Liability Reflected in Trial Outcomes?, Cornell Law Forum, July
1990 (with J. Henderson)

Punitive Damages and the Constitution, Commercial Damages Reporter, Vol. 4, #6, September 1989

(Matthew Bender)

Oral comments on Commissioner Allen's Analysis of Runyon v. McCrary, 41 Rutgers L. Rev. 905-909 (1989)

Attorneys, Attorney Fees, and Prisoner Civil Rights Cases, Cornell Law Forum, June 1989, at 6 (with S. Schwab)

The Evidence is Clear: Reversing Anti-Bias Case Would Cause Hardship, Legal Times (and related newspapers), Feb. 20, 1989, at 20 (with S. Schwab) (based on § 1981 article above)

Texaco and Pennzoil Revisited, Commercial Damages Reporter, Vol. 2, #5, July-August 1987 (Matthew Bender)

The Texaco-Pennzoil Case, Commercial Damages Reporter, Vol. 1, #6, Sept. 1986, at 167 (Matthew Bender)

The Realities of Constitutional Tort Litigation, Cornell Law Forum, June 1986, at 7 (with S. Schwab)

Some Costs of Bankruptcy Reform, Cornell Law Forum, Feb. 1983, at 2

Book Review of G. McDowell, Equity and the Constitution (1982), 67 Cornell L. Rev. 1016 (1982)

Comment, Reflections on A Unified Theory of Motive, 15 San Diego L. Rev. 1147 (1978)

## Testimony & Expert Appointments

The Bank of New York and Montana Board of Investments, High Court of Justice, Chancery Division, London, United Kingdom, July 2008

"Uncertain and Certain Litigation Abuses," Oversight Hearing, "Safeguarding Americans from a Legal Culture of Fear: Approaches to Limiting Lawsuit Abuse," House Committee on the Judiciary, June 22, 2004

Court Appointed Mediator (2001-2002), Bennett Funding Group Chapter 11 Bankruptcy, Northern District of New York

State v. Simpson: Expert witness on the effect of race in homicide prosecutions in the 16th Judicial Circuit, South Carolina (Dec. 2001)

Testimony on Proposed Pennsylvania Civil Justice Reforms before Pennsylvania legislative committee (Sept. 1999)

Simpson v. City of Hampton, Court-appointed statistical expert, voting rights case (with O. Ashenfelter)

Bell v. Evatt: Expert witness on the effect of race in homicide prosecutions in Anderson County, South Carolina (January 1996)

State v. Elmore: Expert witness on the effect of race in homicide prosecutions in Greenwood County, South Carolina (February 1995)

Truesdale v. Evatt: Expert witness on the effect of race in homicide prosecutions in the Sixth Judicial Circuit of South Carolina (December 1993)

Civil Rights Act of 1990: Hearings on H.R. 4000 Before a Joint House Comm. on Education and Labor and the Judiciary, 101st Cong. 2d Sess. (March 13, 1990)

Effectiveness of the Current Product Liability System and the Potential Effect of Federal Preemption: Hearings on S. 1400 Before the Consumer Subcomm. of the Senate Comm. on Commerce, Science, and Transportation, 101st Cong. 2d Sess. (February 22, 1990) (with J. Henderson)

Bankruptcy Code Amendments: Hearings on S. 544 Before the Subcomm. on Labor of the Senate Comm. on the Judiciary, 101st Cong. 1st Sess. (March 1989) (testimony as bankruptcy expert on proposed legislation spawned by the Eastern Airlines strike)

The Human Life Bill: Hearings on S. 158 Before the Subcomm. on the Separation of Powers of the Sen. Comm. on the Judiciary, 97th Cong. 1st Sess., at 576-609 (1981), reprinted in part in P. Brest & S. Levinson, Processes of Constitutional Decisionmaking 993-99 (2d ed. 1983)

In re Application of New Orleans Public Service Inc. for an Increase of Its Electric Rates, Docket No. CD-85-1, Before the Council of the City of New Orleans, October 1986 (testimony about

8

considering bankruptcy before granting rate increases attributable to imprudently incurred costs)
In re Application of Gulf States Utilities to Change Rates, Docket No. U-17282, Before the Public Serv.
Comm. of Louisiana, May-June 1987 (testimony about considering bankruptcy before granting
rate increases attributable to imprudently incurred costs)

**Courses Taught**
Business Reorganizations Under the Bankruptcy Code
Civil Rights Legislation/Constitutional Remedies
Constitutional Law
Corporate Taxation
Bankruptcy & Debtor-Creditor Law
Federal Income Taxation
Empirical Studies of the Legal System Seminar
International and Comparative Insolvency Law
Employment Discrimination Seminar

9

## Expert Report of Neil Vidmar
### in the Matter of *Newman v. Green*

1. My name is Neil Vidmar. I am the Russell M. Robinson II Professor of Law at Duke University School of Law. I also hold a cross-appointment in the Department of Psychology at Duke University. I obtained my Ph.D. in Psychology from the University of Illinois in 1967. After receiving my Ph.D., I joined the Psychology Department at the University of Western, Ontario in 1967. In 1973, I was a Russell Sage Fellow at Yale Law School and in 1974, I was a Fellow at Battelle Seattle Research Center in Seattle, Washington. Subsequently, I held a cross-appointment in the Law School at Western Ontario and was also a visiting professor at Osgoode Hall Law School in Toronto. In 1986, Duke Law School invited me to join their faculty and after visiting for two years, I accepted a permanent appointment. I serve or have served on the editorial boards of numerous peer review journals. I review grants for funding agencies such as the National Science Foundation. Other details of my background are contained on my CV attached to this report.

2. My original interest in juries and jury behavior began in 1971, and I have continued research on juries, both civil juries and criminal juries, up to the present day. In addition to many articles and amicus briefs bearing on juries, I have written or edited the following books on juries and jury behavior: Valerie Hans & Neil Vidmar, JUDGING THE JURY (1986); Neil Vidmar, MEDICAL MALPRACTICE AND THE AMERICAN JURY (1995); Neil Vidmar, ed., WORLD JURY SYSTEMS (2000); and Neil Vidmar and Valerie P. Hans, AMERICAN JURIES: THE VERDICT (2007).

1

3. I have testified in court or submitted affidavits or reports pertaining to juries and jury behavior bearing on trials in the United States, Canada, Australia, Great Britain, New Zealand, and Hong Kong.

4. My research on juries and the jury system has involved different methodologies. For example, in MEDICAL MALPRACTICE AND THE AMERICAN JURY, I systematically interviewed actual jurors immediately or shortly after they had rendered verdicts in medical malpractice and other personal injury trials. I was co-principal investigator on a project initiated by the Supreme Court of Arizona that involved the videotaping of 50 civil trials, the jury discussions during trial recesses and the jury deliberations on the verdict. Although legal and ethical restrictions prevent showing these videotapes to anyone except the research team, we used redacted findings from this research to examine how juries deliberate. Some of these findings from this research on civil juries are reported in Vidmar and Hans, AMERICAN JURIES (2007) and in Diamond, Vidmar, Rose, Ellis, and Murphy, *Juror Discussions During Trials: Studying an Arizona Innovation*, 45 ARIZONA LAW REVIEW 1 (2003); Diamond and Vidmar, *Jury Room Ruminations on Forbidden Evidence*, 87 VIRGINIA LAW REVIEW 1857 (2001).

5. I have also conducted jury simulation experiments with real jurors as well as with college students and compared their decision-making processes with those of lawyers and judges. I have conducted public opinion surveys for use in change of venue motions in both civil and criminal cases (some of this research is described in AMERICAN JURIES at Chapter 5). I have also used databases that are similar to those compiled by the Bureau of Justice Statistics in its projects on Civil Justice Surveys of State Courts.

2

6. I have also drafted amicus briefs bearing on jury behavior that have been submitted in cases before the U.S. Supreme Court and state Supreme Courts. These briefs have been endorsed by other researchers who have signed on as amici. These briefs include: Amicus Brief submitted on behalf of Respondent in *Philip Morris v. Williams*, Supreme Court of the United States, No. 05-1256 (September 2006); *Williams v. Philip Morris*, 127 S.Cт. 1057 (2007); Eisenberg and Vidmar (drafters), *Brief Amici Curiae of Certain Leading Social Scientists and Scholars in Support of Respondents in State Farm Mutual Automobile Company v. Campbell*, Supreme Court of the United States, No. 01-1289 (October 2002); Vidmar and others, *Kumho Tire Company v. Patrick Carmichael et al.*, Supreme Court of the United States, No. 97-109 (October 1998); and *Lebron v. Gottlieb Memorial Hospital et al*, Supreme Court of Illinois, No. 2006 L. 12109 (2008).

7. My research and writings have addressed the subject of punitive damages. These writings include the amicus briefs in *Philip Morris* and *State Farm* in Paragraph 6 above, but also include Vidmar and Rose, *Punitive Damages: In Terrorum and in Reality*, 38 HARVARD JOURNAL ON LEGISLATION 489-511 (2001) and Vidmar and Wolfe, *Fairness through Guidance: Jury Instruction on Punitive Damages After Philip Morris v. Williams*, 2 CHARLESTON LAW REVIEW 307 (2008) and Chapter 15 in Vidmar and Hans, AMERICAN JURIES: THE VERDICT (2007).

8. Materials I have read for this report are as follows:
   a. Complaint filed in Superior Court of New Jersey, *Newman v. General Motors* (November 19, 2001);

3

b.  Complaints filed in Superior Court of New Jersey, *Green v. General Motors* (May 25, 1988 and February 7, 1990);

c.  Hayden, U.S. District Judge, U.S. District Court, Dist. of New Jersey, Denial of Motion to Dismiss (October 7, 2002);

d.  Shwartz, U.S. Magistrate Judge, U.S. District Court, Dist. of New Jersey, Order Regarding Show Cause Hearing (March 23, 2005);

e.  Hayden, U.S. District Judge, U. S. District Court, Dist. of New Jersey, Order Regarding Show Cause Hearing (March 30, 2006);

f.  U.S. Court of Appeals, for the Third Circuit, *Newman v. General Motors*, Order Regarding Show Cause Hearing (June 20, 2007);

g.  Documents known as, "Documents A – H;"

h.  Deposition transcripts from *Newman v. General Motors* of Ade, Ardis, Brown, Coulson, Donovan, Freeman, Murray, Rhodes, Rooney-Stafford, Tansey, Widzinski, Ziolkowski, Phillips, Newman, Rudock, and Green;

i.  Exhibit # 19 from Phillips's Deposition in *Newman v. General Motors* (November 7, 2005);

j.  *St. James v. Future Finance*, 342 N.J. Super 310 (June 18, 2001);

k.  *Green v. General Motors*, Superior Court of New Jersey (1992):

  i.  Plaintiff opening statement (January 20, 1993);

  ii.  Summations (February 4, 1993);

  iii.  Jury Charges (February 5, 1993);

  iv.  Jury Verdict Form;

l.  *Green v. General Motors*, Superior Court of New Jersey (1996):

  i.  Vol. 1, opening (February 8, 1996);

  ii.  Summations (March 4, 1996);

  iii.  Jury Charges (March 4, 1996);

  iv.  Jury Verdict Form;

4

        v.  Plaintiff's Exhibit List

    m. Judge Pressler's Expert Report (December 16 2008); and

    n. A preliminary draft of Theodore Eisenberg's Deposition
(February 11, 2009).

9. I have also read the January 22, 2009 Expert Report of Theodore
Eisenberg, concluding that (1) his analyses of the Bureau of Justice's
Civil Justice Surveys and other data support an opinion that the
punitive damages in *Green v. General Motors* "would have not been less
than $18.9 million in 2004 dollars …and could have been as high as
approximately $38.8 million…"(at page 8 paragraph 52) and (2) that "it
is probable that punitive damages would have been awarded in *Green
v. General Motors*" (at page 32, paragraph 63). It is my understanding
that Professor Eisenberg only addresses whether plaintiff would have
obtained punitive damages and the amount of those damages in the
second *Green* trial (1996). T. Eisenberg Dep. at 144-45. My opinion,
however, addresses these issues as to both *Green* trials (1993 and 1996).

10. I want to be very clear that I have great respect for Professor Eisenberg
and his work. Indeed, we are colleagues whose work overlaps in
several areas, and we frequently attend the same professional
meetings. Professor Eisenberg was one of 23 other researchers who
signed as amici on a recent amicus brief that I drafted about punitive
damages for the U.S. Supreme Court case of *Philip Morris v. Williams*,
Supreme Court of the United States, No. 05-1256 (September 2006); ✓
*Williams v. Philip Morris*, 127 S.Ct. 1057 (2007). He and I were the
principal drafters of an amicus brief in *State Farm v. Campbell: Brief
Amici Curiae of Certain Leading Social Scientists and Scholars in Support of
Respondents in State Farm Mutual Automobile Company v. Campbell,*

5

Supreme Court of the United States, No. 01-1289 (October 2002). More recently, he was one of the amici on a brief that I drafted for litigation before the Supreme Court of Illinois involving the issue of caps on non-economic damages, *Lebron v. Gottlieb Memorial Hospital et al*, Supreme Court of Illinois, Case No. 2006 L. 12109 (2008). We also recently served together as consultants for a tenure matter at Harvard University.

11. While I respect Professor Eisenberg's work in general, we often differ in our approaches to conducting quantitative and qualitative research and analyzing data. My approach to data analysis is to draw upon my experience studying real juries and their behavior. I rely on this qualitative research to inform my examination of quantitative databases. On the other hand, Professor Eisenberg's research, particularly that relating to this case, tends to rely primarily on quantitative research.

12. In this instance Professor Eisenberg and I have disagreement about the relevance of the analyses he has undertaken. It is my professional opinion that his analyses are inappropriately applied to this case, and, as such, result in unreliable predictions. Put in terms that the U.S. Supreme Court was concerned about in the *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, my disagreement involves whether the "reasoning or methodology properly can be applied to the facts at issue" (at 591, citing FRE 104a). My first disagreement revolves around the well-known concept of the "ecological fallacy," that is, "the error of assuming that inferences about individuals can be made from findings relating to

6

aggregate data."[1] In this instance, the individual unit is the jury in either of the *Green v. General Motors* trials. While the most basic problem involves the ecological fallacy, I nevertheless point out that even if the ecological fallacy is set aside for the sake of argument and it is assumed that it is possible to predict an individual jury trial outcome, there are still major problems with my colleague's analysis. Specifically, the aggregate data on which his calculations were made do not match the characteristics of the *Green* trials. I will proceed with my analysis of the problem and then explain how this bears on my disagreement with Professor Eisenberg's opinion.

13. Strikingly, I will rely heavily on the Bureau of Justice Statistics' Civil Justice Surveys that Professor Eisenberg uses in his analysis as well as some additional data that I collected for my opinion in this case. Like Professor Eisenberg (page 8, paragraph 17), my understanding of the plaintiff's allegation in *Newman v. General Motors* is this: if the plaintiff in *Green v. General Motors* had obtained the documents at issue in a timely manner, he would have recovered not only compensatory damages but also a substantial quantum of punitive damages. My understanding of the allegation is that in the first *Green* (1993) trial, plaintiff would have (a) prevailed on liability, (b) received compensatory damages, and (c) received a substantial punitive damages award. Instead, the trial resulted in a deadlocked jury when the plaintiff could not convince at least six of the eight jurors that General Motors was liable. Further, I understand that plaintiff also alleges that in *Green* (1996), plaintiff would have pied and would have been awarded a large punitive damages award.

---

[1] Alan Bryman, Social Research Methods, 3rd ed. 2008 at 307. See also Earl Babbie, The Practice of Social Research, 6th ed., (1992) at 96: "...the danger...of making assertions about individuals as the unit of analysis based on the examination of groups or other aggregations."

7

14. Whichever trial *Newman v. General Motors* is referring to, the allegation is based upon a classic "<u>But For</u>" argument: "But For the absence of the documents at issue, the case would have turned out in favor of plaintiff Green." Thus, Professor Eisenberg and I are both in a position of offering our respective opinions based on estimates of the probability of a jury verdict one way or the other about an historical event occurring more than a decade ago. In analyzing plaintiff's claim in order to offer an opinion, it is necessary to identify the specifics of this claim about that historical event.

15. Here are facts that we do know about both of the *Green* trials. They occurred in state court in Essex County, New Jersey. The jury was composed of citizens of New Jersey, more specifically, persons who were citizens of Essex County, New Jersey. The trial was carried out under New Jersey law and procedures. It was a products liability trial. It was <u>not</u> a trial involving premises liability, false arrest or imprisonment, employment discrimination, a real property dispute or other forms of tort. It was also not a product liability trial involving asbestos, breast implants, nor a pharmaceutical trial, such as a lawsuit involving Vioxx. It involved a single plaintiff. And as I will discuss below, it was also not a contract or other business dispute.

16. The What and When of the *Green v. General Motors* trials described in the preceding paragraph are important because What and When are highly relevant to any predictions of how either of the trials <u>might</u> have turned out had the plaintiff obtained the missing documents before trial.

17. The importance of my discussion in paragraphs 14 to 16 above is to indicate that making generalizations across time periods, case types,

8

demographics, local litigation cultures, and litigation patterns is fraught
with serious difficulties when attempts are made to generalize from
conclusions from nationwide databases of jury verdicts to a specific case,
namely in this instance, *Green v. General Motors* (1993) or *Green v. General
Motors* (1996). The problem is further compounded when the analyses
combine different types of trials (e.g., combining contracts with product
liability trials). In short, I return to the concern expressed in *Daubert:*
whether the "reasoning or methodology properly can be applied to the
facts at issue," and to the issue of ecological inferences about causality. [2]

18. Educated guesses are sometimes made from general databases, but they
are only guesses, and the lower the correspondence between the details of
the specific case and the cases selected for comparison on these various
dimensions, the greater the hazard in generalizing. Moreover, as I will
discuss in more detail later in this report, correlation does not necessarily
mean causation, and an ecological fallacy arises from predicting
individual outcomes from group behavior. In forming my own
professional opinion about the probability and the potential amount of a
plaintiff award in either of the two *Green* trials, I attempted to follow
these rules of logic.

19. One part of my opinion is drawn from the same Bureau of Justice
Statistics databases used by Professor Eisenberg: C. DeFrances et al., *Civil
Jury Cases and Verdicts in Large Counties, 1992,* 1995, Bureau Just. Stat., U.S.

---

[2] In the social sciences we refer to the concept of "ecological validity" to make this same
point; see, e.g. M. Brewer, *Research Design and Issues of Validity* in Harry T. Reiss &
Charles M. Judd eds., Handbook of Research Methods in Social and Personality (2000) at
3-39; Vidmar, N., *Experimental Simulations and Tort Reform: Avoidance, Error and
Overreaching in Sunstein et al.'s Punitive Damages.* 53 EMORY LAW JOURNAL 1359 (2004);
Vidmar, N., *Civil Juries in Ecological Context: Methodological Implications for Research,* in
CIVIL JURIES AND CIVIL JUSTICE (Brian Bornstein, et al., eds.) (2008).

Dept. Just., Washington, D.C; C. DeFrances & M. Litras, *Civil Trial Cases and Verdicts in Large Counties, 1996*, 1999, Bureau Just. Stat., U.S. Dept. Just., Washington, D.C; T. Cohen, *Punitive damage awards in large counties, 2001*, 2005, Bureau Just. Stat., U.S. Dept. Just., Washington, D.C; T. Cohen and S. Smith, *Civil Trial Cases and Verdicts in Large Counties, 2001*, 2004, Bureau Just. Stat., U.S. Dept. Just., Washington, D.C; and L. Langton and T. Cohen, *Civil Bench and Jury Trials in State Courts, 2005*, 2008, Bureau Just. Stat., U.S. Dept. Just., Washington, D.C. These studies involved a sample of 45 of the nation's most populous counties that can be generalized to the 75 largest counties in the United States. They were conducted in 1991-92; 1996, 2001 and 2005.

20. The 1991-2 and 1995 BJS surveys are the most relevant to our inquiry since they basically frame the time-period in which both the first (1993) and second (1996) *Green v. General Motors* trials took place. I should take note of the fact that the survey and the consequent data and data analyses were less sophisticated in 1992 than in subsequent surveys.[3] Regardless, the surveys provide useful data, which I considered in forming my professional opinion. In the sections that follow, I will report the findings as given without adjustments for inflation. I first discuss the BJS official reports, after which I turn to my own analysis of the BJS databases.

---

[3] I also need to draw attention to the fact that in unpublished analyses that I undertook for other purposes I was able to compare the sampling accuracy of the BJS data for medical malpractice cases in Cook County, Illinois and Philadelphia County, Pennsylvania by comparing the data to other sources. I discovered that as many as 20% of medical malpractice cases were missing from the BJS database. I have no information on the sampling accuracy in other sampled jurisdictions or to the product liability cases at issues in my and Professor Eisenberg's reports. Any sampling errors, if they exist, should affect both of our reports equally.

21. **Product Liability Punitive Damages Verdicts 1992** (DeFrances et al., 1992, *supra*, paragraph 18). In the first survey of state courts, there were 358 product liability trials in the sampled state courts (DeFrances at Table 5). Plaintiffs prevailed on liability in only 40.5% of those trials. There were only three punitive awards (that is 2.2% of the 358 cases) in product liability trials (DeFrances at Table 9). The median compensatory award for those three cases was $85,000, and the median punitive award was $40,000. Three New Jersey counties were among the 45 sampled counties in the 1992 survey. The reported data do not distinguish between product liability and other claims but win rates and awards tell us something about jury trial verdicts in New Jersey during 1992. The percent of trials in which plaintiffs prevailed was as follows: Essex County (158 trials 44.3% win rate); Bergen County (115 trials, 50.4% plaintiff win rate); and Middlesex County (140 trials, 40.0% win rate) (at DeFrances, Appendix: Table 2). In Essex County 3.3% of trials resulted in a total award of $1 million or more. I caution that this figure refers to all civil jury trials, not just product liability trials. For Bergen County, the total number of million dollar verdicts was 2.2 percent; in Middlesex County, 3.7 percent exceeded $1 million. The only punitive awards in New Jersey in 1992 were in Bergen County (De Frances at Appendix: Table 3). There were three awards, and the largest did not exceed $500,000.

22. **Product Liability Punitive Damages Verdicts 1996** (DeFrances and Litra, 1999, at paragraph 18, *supra*). Nationwide, excluding asbestos and breast implant cases, there were 56 product liability jury trials in which the plaintiff prevailed on liability, and 22.1% of them had a total award of $1 million or more (Table 7). There were nine non-asbestos or breast-implant product liability jury trials with punitive awards; none exceeded $1 million (DeFrances and Litra, Table 9).

11

23. In 1996, New Jersey had seven jury trial cases with punitive awards; five were in Bergen County and two were in Middlesex County. In the BJS dataset, no punitive damages were awarded in Essex County. The median punitive award in Bergen County was $156,000, and the median punitive award in Middlesex County was $12,000. (Appendix E to DeFrances and Litra report obtained online at http://www.ojp.usdoj.gov/bjs/abstract/ctcvlc96.htm). The data did not indicate the type of case in which these awards were rendered. Nevertheless, we can conclude that in New Jersey in 1996, punitive awards were infrequent, and none occurred in Essex County.

24. **Product Liability Punitive Damages Verdicts 2001** (Cohen 2005 at Paragraph 18, above). There were 126 product liability trials, and plaintiffs prevailed in 51 (40% win rate). In only one of those trials did the plaintiff receive a punitive damages award. That award was $150,000.

25. **Product Liability Punitive Damages Verdicts 2005** (Langton & Cohen, 2008 at paragraph 18 above). In this sampled year, there were 265 product liability trials involving claims other than asbestos (Table 5) and plaintiffs prevailed over defendants in only 52 cases, a win rate of only 20 percent (Table 6).

26. **Punitive Damages in New Jersey 1990-2008.** To supplement the above findings, I obtained the BJS data and codebooks (publicly available from ICPSR's website http://www.icpsr.umich.edu/) and examined all punitive damage awards in New Jersey that are available from these BJS Civil Justice Surveys. A list of these cases is available in Appendix A. In 1996, there were three cases in New Jersey that had

12

punitive damage awards. None of these cases had a punitive damage award of over $500,000. There are three New Jersey cases in the 1992 BJS dataset, 12 cases in the 1996 BJS dataset, nine in 2001, and 3 in 2005, where punitive damages are noted. None of the cases are based on a claim of product liability. In Essex County, there was a single case with punitive damages in the 2005 BJS dataset, where the plaintiff received $50,000 in an intentional tort case. In the 2001 BJS dataset, there was again a single case in Essex County, where a rental lease case resulted in $2,041 in damages.

27. Let me now ignore the ecological fallacy of predicting an individual trial's outcome from aggregate behavior for the moment and consider the data discussed above. Taken together, the data are consistent with a conclusion that the probability of obtaining a verdict for punitive damages in a single plaintiff product liability trial, such as was the case in *Green v. General Motors*, was small; and even when punitive damages were awarded the amounts were relatively modest. The data indicate that this proposition applies to trials in New Jersey. The general conclusion to be drawn from these findings so far is supported by the literature review I drafted for *Philip Morris v. Williams* (2007) that was subsequently endorsed by 23 other researchers who signed it as amici.

28. The Amicus that I wrote with other researchers in *Philip Morris* contained a section (Section C) addressing the frequency of punitive damages. Although there are redundancies with the material I presented above, I quote relevant conclusions in the next three paragraphs:

13

"The Bureau of Justice Statistics findings lead to the estimate that punitive damages are awarded in less than one percent of all civil actions commenced during each of these three periods [i.e. 1992, 1996 and 2001]. In 2001, juries awarded punitive damages in only 5.7 percent of tort and contract cases when the plaintiff prevailed at trial.

"In 1998 Professor Michael Rustad reviewed nine major empirical studies of punitive damage awards conducted up to that time. The combined data from these studies reached as far back as 1960 and covered most geographical areas of the United States. The various studies were conducted by the United States General Accounting Office ("GAO"), by prestigious, non-partisan research institutions (the American Bar Foundation; the RAND Institute of Civil Justice ("RAND"), by Professor William Landes and Judge Richard Posner, and by university-based academics....

"Every one of the above studies of actual jury verdicts has concluded that punitive damages are rarely awarded. These findings strongly indicate that juries are cautious in awarding punitive damages" (underlines added).

29. Further, the Professors' amicus specifically drew attention to the rarity of punitive damages in product liability cases as follows: "Empirical data consistently show that punitive damages are rare in product liability and medical malpractice cases" (underline added).

30. I next address the issue of the reasons for the infrequency of punitive awards in product liability cases. The criteria for receiving a punitive damages award are strict. Consider New Jersey specifically at the time of the two Green trials. New Jersey's "Punitive Damages Act" 2A:58C-5 statute regarding punitive damages in a product liability case that was in effect during the Green trials reads in part as follows:

14

a. Punitive damages may be awarded to the claimant only if the claimant proves, by a preponderance of evidence, that the harm suffered was the result of the product manufacturer's or seller's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of the safety of product users, consumers, or others who foreseeably might be harmed by the product. For purposes of this section "actual malice" means an intentional wrongdoing in the sense of an evil-minded act, and "wanton and willful disregard" means a deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences of such act or omission.

b. In determining whether punitive damages are to be awarded, the trier of fact shall consider all relevant evidence, including but not limited to, the following:

    i. The likelihood at the relevant time that serious harm would arise from the tortfeasor's conduct;

    ii. The tortfeasor's awareness of reckless disregard of the likelihood that serious harm at issue would arise from the tortfeasor's conduct;

    iii. The conduct of the tortfeasor upon learning that its initial conduct would likely cause harm; and

    iv. The duration of the conduct or any concealment of it by the tortfeasor.

15

    c. If the trier of fact determines that punitive damages should be awarded, the trier … shall consider all relevant evidence, including, but not limited to, the following:

       i. All relevant evidence relating to the factors set forth in subsection

      ii. Of this section:

         1. All relevant evidence relating to the factors set forth in subsection b. of this section;

         2. The profitability of the misconduct of the tortfeasor;

         3. When the conduct was terminated; and

         4. The financial condition of the tortfeasor.

31. New Jersey, therefore, placed high hurdles that had to be overcome in order to receive a punitive damages award in a product liability case. I draw attention to the fact that the criteria for punitive damages help probably explain the relatively low incidence of punitive damage awards in product liability cases in the State of New Jersey and in states with similar provisions. In particular, the plaintiff must: plead for punitive damages; meet the criteria for punitive damages pleadings; prevail in arguing fault for compensatory and punitive damages; win compensatory damages; and convince a jury – guided by statutory criteria – that punitive damages are appropriate. Furthermore, if the plaintiff did not initially plead for punitive damages, the pleadings must be amended and accepted by the judge before the additional criteria can be met.

32. I now turn to Professor Eisenberg's report. Putting aside the criticism of committing an ecological fallacy, I have another principle

16

disagreement with Professor Eisenberg. Professor Eisenberg's data analyses involve the mixing of "apples and oranges." As stated in paragraphs 12-17, above, my analysis of this case is based upon the *Green* products liability trials that took place in Essex County, New Jersey in 1993 and 1996. The trials were not about business disputes, premises liability, false arrest or imprisonment, employment discrimination, real property disputes or other forms of tort, nor did they involve a mass tort. Professor Eisenberg's analyses combine all punitive damages cases from a nationwide sample. That sample includes business disputes, premises liability, false arrest or imprisonment, employment discrimination, real property disputes and other forms of tort. It includes differences in state and federal laws and different legal cultures. I have already drawn attention to the fact that in the *Philip Morris* amicus brief twenty-three researchers familiar with the empirical research on punitive damages concluded that product liability cases are different, both in the frequency of awards and, perhaps excluding mass torts, in the magnitude of awards. In my opinion, the aggregated databases cannot be applied to a group of product liability cases, let alone a particular New Jersey products liability case, with any acceptable level of precision.

33. Before engaging in additional analyses, I want to reemphasize my disagreement with Professor Eisenberg and restate my opinion that his application of his findings to the *Green* case incorrectly predicts the outcome of a specific case, whether it is a future case or, as in this instance, an historical event: a trial that took place in 1993 or 1996. This problem has long been discussed in sociology and political science as "the ecological fallacy." Dating at least as far back as 1950, William Robinson drew attention to the methodological difficulties with drawing causal inferences from Emile Durkheim's classic study of

17

suicide, see William Robinson, Ecological *Variables and the Behavior of Individuals,* 15 AMERICAN SOCIOLOGICAL REVIEW 351 (1950) and, subsequently, Hanan Selvin, *Durkheim's Suicide and Problems of Empirical Research,* 63 AMERICAN JOURNAL OF SOCIOLOGY 607. It is a continuing issue also in the field of epidemiology, see G. Taubes, Epidemiology Faces Its Limits, 269 SCIENCE 164 (July 1995). Even in instances in which there are control groups and experimental groups, epidemiologists cannot make predictions about specific individual cases. D. Kaye and D. Freedman, *Reference Guide on Statistics,* REFERENCE GUIDE ON SCIENTIFIC EVIDENCE, Federal Judicial Center (1994) also discuss this problem at pages 346-352. As mentioned earlier in my report (at paragraph 12), this problem is also discussed in elementary textbooks on methodology.

34. Setting the ecological fallacy aside, there are a number of additional problems with Professor Eisenberg's analyses. As mentioned earlier in this report, his primary focus is on the probable magnitude of an award, assuming that the plaintiff would have prevailed on liability and overcome the hurdles to have the jury consider a punitive award. Only in the end of his report does he turn to the probability of an award. While this seems to be getting the cart before the horse, I will begin with projections about the relationship between punitive and compensatory damages.

35. For his analysis Professor Eisenberg (Eisenberg Report, Paragraph 23) has merged the BJS databases with two other databases, one developed by Hersch and Viscusi (2005), (hereinafter H-V) and another by *The National Law Journal* (hereinafter NLJ).

18

36. An important element to consider is the bias in the H-V and NLJ
databases. Each of these databases do not consist of random samples of
trials, but instead were chosen because they involved "large punitive
awards" (Eisenberg Report paragraph 23). Thus, Hersh and Viscusi (2005
at 4-5) stated "...we undertook a detailed search to identify all cases in
which there were punitive damages of at least $100 million." Thus, rather
than a full sample of cases, or even a random sample of cases, the
database was constructed only from (a) trials in which the plaintiff
prevailed on liability, (b) the plaintiff carried the burden for proving
liability and punitive damages, and (c) especially noteworthy, trials that
were specifically and intentionally confined to so-called "blockbuster"
cases involving over $100 million in punitive damages. Thus, a
substantial part of the projection estimate about the range of the punitive
award is, in my opinion, skewed by selecting cases in which the plaintiff
prevailed on punitive damages and selecting only large awards that
resulted when the plaintiff did prevail on punitive damages. While use of
this database was proper for the issues addressed in the original H-V
study and in the Eisenberg and Wells study, it is not appropriate to apply
a biased sample of cases to estimate the outcome of the *Green* trials. To be
sure, Professor Eisenberg has attempted to take this problem into
consideration by down weighting his estimates, but the initial data
analysis portrayed in Figure 1 at paragraph 26 shows a combined
database that includes the extreme awards as well as the more
representative BJS data.

37. Of even greater concern to me is the fact that Professor Eisenberg's
analyses mixed product liability cases with cases that (a) have nothing to
do with product liability; and (b) occurred in jurisdictions in other states
and in federal courts. In short, his analyses lump all cases together, no

19

matter what the cause of action.[4] I offer the opinion that the analyses cannot be applied to either of the *Green v. General Motors* trials. Consider just some of the cases reported in Table 1 of Hersch and Viscusi. *City of West Allis v. WI Electric Power* (1999) involved landowners suing the defendant for depositing oxide box waste on their property. *Goodrich v. Aetna* (1999) involved a dispute over insurance coverage. *Carroll v. Interstate Brands* (2000) involved employment discrimination. *Micro/Vest v. Computerland* (1985) involved a business dispute. *Campbell v. State Farm* (1996) involved allegations of fraud in insurance coverage. *Broussard v. Meineke* (1996) involved a franchise dispute. *O'Keefe v. Lowen* (1995) was an insurance business dispute. *Mitchell v. Bartlett* (1996) was an environmental dispute. *In re the Exxon Valdez* (1992) was a trial in federal court under maritime law. I need not elaborate further. The vast majority of the trials did not involve product liability issues. In fact, many were business against business disputes and involved issues of financial fraud or related matters. Some were claims carried out under federal statutes or maritime law. Others involved environmental claims. Some involved racial, age, or gender discrimination claims. I did not have time to conduct a full survey of these cases because of the deadline to complete this report, but from the characteristics of the parties involved and a quick search of some of them, I estimate that at least half of the 60 jury awards listed in Table 1 in the HV data are business disputes. Other trials involved mass torts and/or had multiple plaintiffs. Thus, Professor Eisenberg's analyses included many trials involving lawsuits unrelated to product liability.

---

[4] Eisenberg et al., The Relation between Punitive and Compensatory Damages: Combining Extreme Data With the Mass of Awards, in B. Bornstein et al, eds., CIVIL JURIES AND CIVIL JUSTICE, 105-115 (2008) acknowledge the problem of atypicality with respect to the extreme awards: "Studying awards in isolation naturally distorts the picture of punitive damages. As seductive as extreme awards are, they are, by their nature atypical." (at page 108). Professor Eisenberg and I concur on this point but I submit that the problem applies equally to generalizing across causes of action.

20

38. Moreover, punitive damages in some of the cases in the H-V sample were reduced, vacated or remitted to lower figures. Allow me to illustrate with examples from the cases H-V describe in their Table 1.[5] *Mosley v. General Motors* (1993) was reversed on other grounds, vacating the $101 million punitive award (213 Ga. App.875). In *Carroll v. Interstate Brands* (1991), the $121 million punitive award was reduced to $24 Million. In *Proctor v. Davis* (1991), the $124.57 million punitive award was reduced to $35 million (275 Ill App.3rd 593). In *Micro/Vest v. Computerland* (1985), involving a $125 million punitive award, an appeals court concluded that no punitive verdict was warranted (150 Cal. App.3d 1085).

39. In light of the above analysis, I first reexamined the BJS data from 1992 and 1996 that involved product liability jury trials only. I limited my first analyses to these two time-periods because they basically frame the times at issue in the *Green* trials that are the focus in *Newman*. The later time-periods of 2001 and 2005 may contaminate analysis because product liability trials in these later periods may have been different in the scope of liability under the law. The *Restatement of Torts, 3rd* that was published in 1998 (http://www.ali.org/ali_old/promo6081.htm) clarified, broadened, and restricted issues in products liability law with regard to liability, manufacturing defects, design defects and instructions. Trials after this period might well be affected in unknown ways by changes in the law that affect the probability of a jury finding liability,

---

[5] *BMW v. Gore* (1996), *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001) and *State Farm v. Campbell* (2003) were decisions by the Supreme Court requiring de novo review of punitive awards. Therefore, I have chosen examples that predate these decisions. They show that trial and appellate judges were engaging in scrutiny prior to 2001.

21

as well as rendering punitive damages awards and the magnitude of those awards.

40. I therefore reexamined the original BJS 1992 and 1996 data focusing only on product liability awards. The 1992 data do not distinguish asbestos and other mass torts from other product liability trials, potentially affecting plaintiff win rates so a caution is needed. I found that, of the 202 jury trials, plaintiffs prevailed on liability in 79 cases, a 39% win rate, or approximately 4 times out of ten. For the 1996 data, after eliminating asbestos and some apparent miscoding, I found there were 123 product liability jury trials that did not involve asbestos or breast implants. Plaintiffs prevailed in 53 cases, a win rate of 43 percent; in other words, slightly above four chances in 10 of prevailing on liability and obtaining compensatory damages.

41. I also found only two punitive damages awards in product liability cases in 1992. Thus, if we consider all product liability trials, the chances of a plaintiff prevailing on punitive damages were 2 out of 202, or slightly less than one case out of a hundred. If we consider only the instances in which plaintiffs prevailed on liability, the chances of receiving a punitive award were 2 out of 79, or about 2.5 cases out of a hundred. In 1996, there were seven punitive damages awards listed, but one of these had no details and may have been misclassified. Erring on the conservative side, I still considered that a punitive damages case. Thus, out of 123 jury trials the probability of a plaintiff prevailing on liability and receiving a punitive damages award was about six chances out of 100 (5.6%). If we calculate only cases involving plaintiff winners, we can calculate that even those who

22

prevailed on liability the chances of a punitive award were only about 13 out of a hundred (13.2%).

42. Now consider the magnitude of the nine punitive awards in 1992 and 1996 and their relation to compensatory awards. These data are presented in Table 1.

**Table 1: Punitive Damage Awards In Product Liability Trials 1992 & 1996 (BJS)**

| Year | No Ps | Compensatory | Punitive | Final |
|------|-------|--------------|----------|-------|
| 1992 | 2 | $52,744 | $8,400 | $52,744 |
| 1992 | 2 | $36,948 | $22,370 | $41,567 |
| 1996 | 2 | $750,000 | $750,000 | $1,500,000 |
| 1996 | 2 | $968,800 | 28,375 | $997,175 |
| 1996 | 1 | 15,000 | $300,000 | $315,000 |
| 1996 | 1 | Unknown | Unknown | Unknown |
| 1996 | 1 | $9,896 | $5,000 | $14,896 |
| 1996 | 2 | $1,737,558 | $1,100,000 | $2,837,558 |
| 1996 | 1 | $1,825 | $471,343 | $378,899 |

43. Table 2 shows that (a) there was only one punitive award exceeding $1 million and (b) in only two of the cases did the punitive award exceed the compensatory award.

44. Although I put my focus on the 1992 and 1996 data, I nevertheless also examined the BJS data for 2001 and 2005 in the same fashion, namely identifying only product liability cases. In total, there were 106 product liability trials in 2001 but 26 involved asbestos, one was a breast implant trial and one was a tobacco trial. This left 78 cases, but I then eliminated three "restaurant food poisoning trials" resulting in 75 product liability trials. Plaintiffs prevailed in 30 of these trials, a win rate of 40 percent. There was not a single punitive damages award when plaintiffs did prevail.

23

45. In the 2001 data, I was able to further ascertain that there were 13 product liability trials involving an automobile or truck. Plaintiffs prevailed in only eight of the trials and there were <u>no punitive damages</u> awarded. The data are as follows:

**Table 2: Automobile and Truck Product Liability Cases in 2001**

| City | Compensatory Award | Punitive Award | Final Award |
|---|---|---|---|
| Oakland , CA | $22,000 | $0 | $16,500 |
| San Bernardino, CA | $25,700,000 | $0 | $10,280,000 |
| Miami, FL | $30,713,134 | $0 | $15,356,567 |
| Miami, FL | $1,810,000 | $0 | $1,810,000 |
| Philadelphia, PA | $80,960 | $0 | $80,960 |
| Seattle, WA | $5,101,830 | $0 | $5,101,830 |
| Seattle, WA | $1,371,158 | $0 | $1,371,158 |
| Pittsburgh, PA | $18,695 | $0 | $18,695 |

46. In the 2005 BJS data, I eliminated asbestos trials, breast implant trials, drug trials such as fen fen and four restaurant food poisoning cases, thus leaving 97 product liability cases. There were 20 automobile or truck liability cases among these remaining cases, but two of the cases were coded "NA" and had no data associated with them, leaving 18 trials. Only 38 cases resulted in plaintiffs prevailing, a win rate of 38%. There were no punitive damage awards in any of the cases.

47. Considering only the 18 automobile and truck product liability cases, plaintiffs prevailed in only five trials. The compensatory and final awards were as follows:

24

Table 3: Automobile and Truck Product Liability Cases in 2005

| City | Compensatory award | Punitive Award | Final Award |
|---|---|---|---|
| Dade, FL | $33,945.00 | $0 | $33,945.00 |
| Philadelphia, PA | $1,400,000.00 | $0 | $1,400,000.00 |
| Philadelphia, PA | $7,441,200.00 | $0 | $7,441,200.00 |
| San Bernardino, CA | $22,298,326.00 | $0 | $22,298,326.00 |
| Dade, FL | $61,200,000.00 | $0 | $61,200,000.00 |

48. In considering all of the above discussion, I have reached the following conclusions to a reasonable degree of scientific certainty. It is inappropriate to apply generalized database analyses to predict one specific trial's outcome in 1993 or 1996. Using aggregate databases, it is not possible to predict how a jury might have returned a verdict if documents, for whatever reason, were unavailable at the time of trial: the ecological fallacy. Prediction is even more hazardous when the aggregate data are based primarily on trials that were different in causes of action, substance, venue, place and time. Thus, even when I accepted Professor Eisenberg's assumptions (ignoring the ecological fallacy) and used data that more closely matched the circumstances of the *Green* trials, I found no support for predicting a punitive award in the *Green* trials. In fact, there were few instances of punitive damages awards in products liability cases in general in the BJS data for 1992, 1996, 2001 and 2005. When I could specifically identify automobile and truck product liability cases, as in 2001 and 2005, I found no punitive damages awards at all. It is, therefore, my opinion that the chances that the plaintiff in either of the *Green v. General Motors* trials would have received a punitive award are extremely remote. Furthermore, it is my opinion that, based on the analysis presented in Professor's Eisenberg's report, there is no way to predict what the punitive award might have been.

25

49. I reserve the right to amend my expert report.

50. My fee for writing this report is $500 per hour plus expenses.

51. In the past four years I served as an expert in a New Zealand case, *Solicitor General of New Zealand v. Fairfax Publications* (2008), a contempt of court proceeding. I have tendered affidavits in several cases, but I have not testified in – or been deposed for – those cases. These include *United States v. Sami Al Arian* (2005) a criminal matter; *DiLoretto v. Pepper Hamilton* (Philadelphia, 2007), a legal malpractice matter; and the following two cases involving medical malpractice litigation: *Miller v. Johnson* (Kansas, 2007), and *Klotz v. St. Anthony's Medical Center* (Missouri, 2008). All writings from the previous 10 years are available in my CV, which is available in Appendix B.

Durham, North Carolina

February 13, 2009

Neil Vidmar

26

## Appendix A: Cases with Punitive Damages in New Jersey, from the BJS Database

| Year | County | Plaintiff Claim | Compensatory Damages | Punitive Damage | Final Amount |
|------|--------|-----------------|----------------------|-----------------|--------------|
| 2005 | Essex, NJ | Intentional tort | 175000 | 50000 | 225000 |
| 2005 | Middlesex, NJ | Employment- discrimination | 938000 | 12000 | 950000 |
| 2005 | Union, NJ | Intentional tort | 110000 | 100000 | 210000 |
| 2001 | Bergen, NJ | Intent tort | 1771357 | 108500 | 1879857 |
| 2001 | Bergen, NJ | Other tort | 0 | 75000 | 75000 |
| 2001 | Bergen, NJ | Slander/libel | 569925 | 105000 | 674925 |
| 2001 | Bergen, NJ | Intent tort | 29422 | 50000 | 79422 |
| 2001 | Essex, NJ | Lease | 20001 | 2041 | 22042 |
| 2001 | Middlesex, NJ | Auto tort | 35000 | 16707 | 59507 |
| 2001 | Middlesex, NJ | Employment contract | 300000 | 500000 | 800000 |
| 2001 | Middlesex, NJ | Slander/libel | 7500 | 37500 | 45000 |
| 2001 | Middlesex, NJ | Medical malpractice | 8500 | 1110 | 9610 |
| 1996 | Bergen, NJ | Fraud | 248000 | 75000 | 323000 |
| 1996 | Bergen, NJ | Buyer plaintiff | 4444 | 1481 | 5925 |
| 1996 | Bergen, NJ | Other real property | 0 | 225000 | 225000 |
| 1996 | Bergen, NJ | Fraud | 22431 | 156491 | 178922 |
| 1996 | Bergen, NJ | Other employment dispute | 47536 | 1 | 47537 |
| 1996 | Bergen, NJ | Buyer plaintiff | 2700000 | 300000 | 2875158 |
| 1996 | Bergen, NJ | Buyer plaintiff | 27500 | 75000 | 102500 |
| 1996 | Middlesex, NJ | Fraud | 5902 | 3016 | 8918 |
| 1996 | Middlesex, NJ | Intentional tort | 65579 | 18000 | 83579 |
| 1996 | Middlesex, NJ | Intentional tort | 59902 | 85000 | 144902 |
| 1996 | Middlesex, NJ | Premises liability | 24536 | 150000 | 174536 |
| 1996 | Middlesex, NJ | Buyer plaintiff | 15000 | 5000 | 20000 |
| 1992 | Bergen, NJ | Contract fraud: buyer plaintiff | 12799 | 10000 | 22799 |
| 1992 | Bergen, NJ | Other real property | 145000 | 85000 | 230000 |
| 1992 | Bergen, NJ | Other tort | 714789 | 500000 | 1214789 |

All data contained in this table is from the 1992, 1996, 2001, and 2005 BJS *Civil Justice Surveys*. "Year" refers to the year of the report, not the year of the trial. "County" refers to the county in New Jersey in which the trial took place. "Plaintiff Claim" is the term used by the BJS to categorize the plaintiffs' claims. In 1992 and 1996, this information was coded into one of 21 categories of case type and is the primary information about the claims in the case. "Compensatory damages" refers to the full amount awarded for economic and non-economic compensatory damages awarded in the case. "Punitive damages" refers to the real dollar amount (not adjusted for inflation) of punitive damages awarded in the case. "Final amount" refers to all damages and fees awarded, minus any adjustments made by the court.

### Supplemental Expert Report of Neil Vidmar

1.  My name is Neil Vidmar.  On February 13, 2009, my expert report was served on

    Plaintiff's counsel in *Newman v. General Motors.*

2.  Earlier today I newly recalled that within the last four years I testified in one case

    not mentioned in my February 13 report.  That case is *Alabama v. Exxon*

    *Corporation,* Civ. Act. No. CV-99-2368, Montgomery Circuit Court, Alabama,

    April 11, 2004.  It was a breach of contract and fraud case.

    Durham, North Carolina

    February 17, 2009

    Neil Vidmar

# CURRICULUM VITAE

**NEIL JOSEPH VIDMAR**
**Russell M. Robinson, II Professor of Law**
**Professor of Psychology, Duke University**
Duke University School of Law, Box 90360
Towerview Road and Science Drive, Room 3183
Durham, North Carolina 27708-0360

February, 2009

Telephone (919) 613-7090 • Facsimile (919) 613-7231
E-mail: vidmar@law.duke.edu • Home: (919) 489-7729

## EDUCATION

**Ph.D.**   Social Psychology, University of Illinois. Urbana, Illinois, June, 1967
Secondary study in: Sociology and Experimental Psychology.

**M.A.**   Psychology, University of Illinois. Urbana, Illinois, October, 1965.

**A.B.**   Psychology, *cum laude*, MacMurray College, Jacksonville, Illinois June, 1962, Minor
in Sociology.

## AREAS OF SPECIALIZATION

My early research was on conflict and group decision-making. Since about 1970, my scholarly efforts have been directed primarily at the interface of social science and law. I conducted a three-year field study of dispute resolution in a small claims court, undertook a number of in-depth field studies of grievance and dispute behavior, and conducted a study of the Ontario Business Practice Act. For almost two decades I have been studying medical malpractice litigation and continue with that subject. I was co-principal investigator of the Arizona Jury Project that taped and analyzed the actual deliberations of 50 civil juries. Additionally, I have conducted research on procedural justice and the social psychological dynamics of justice behavior. A special interest is the social psychology of retribution. Other projects have involved experts, the empirical behavior of the tort system and research bearing on the accuracy of eyewitness identification. I am starting research on legal malpractice.

My scholarly interests also extend to criminal law. I have published articles pertaining to the death penalty and on jury behavior in criminal cases and have drafted amicus briefs on criminal matters before the U.S. Supreme Court and elsewhere. I have conducted research and published articles in leading journals on the topic of pre- and mid-trial prejudice in the United States, England, New Zealand and Australia. I have also edited *World Jury Systems* (2000), a book that involves a comparative study of the jury systems of Australia, Canada, England, Ireland, New Zealand, Russia, Scotland, Spain, the United States and other countries.

## TEACHING INTERESTS

Social Science Evidence in Law, Negotiation and Mediation, Psychology of the Litigation Process, American Jury, Social and Psychological Context of Law (Law and Society), Conflict and Dispute Resolution, Social Psychology.

## POSITIONS/EXPERIENCE

| | |
|---|---|
| 1989- | Russell M. Robinson, II Professor of Law, Duke University School of Law and Professor of Psychology, Duke University, Durham, North Carolina. |
| 1987-1988 | Visiting Professor of Law and Social Science, Duke University School of Law, Durham, North Carolina. |
| 1989-1996 | Professor of Social Science and Law, Duke University School of Law; Vice President and Research Director, the Private Adjudication Center, Durham, North Carolina. |
| 1986-1987 | Vice President for Research, Private Adjudication Center of Duke University School of Law, Durham, North Carolina. |
| 1986 | Visiting Professor of Law, Osgoode Hall Law School, York University, Downsview, Ontario, Canada. |
| 1984 | On leave as Visiting Professor, Osgoode Hall Law School, York University, Downsview, Ontario, Canada. |
| 1981-1990 | Professor of Psychology and Professor of Law, University of Western Ontario, London, Canada. |
| 1974-1975 | On leave as Visiting Research Fellow, Battelle Seattle Research Center, Seattle, Washington. |
| 1973-1974 | On leave as Russell Sage Resident in Law and Social Science, Yale Law School, New Haven, Connecticut. |
| 1971-1980 | Associate Professor, Department of Psychology, University of Western Ontario, London, Canada. |
| 1967-1971 | Assistant Professor, Department of Psychology, University of Western Ontario, London, Canada. |
| 1967 *(Summer)* | Research Associate, Danville Veterans Administration Hospital, Danville, Illinois. |
| 1966-1967 | Research Associate, Department of Psychology, University of Illinois, Urbana. |
| 1963-1966 | Teaching and/or Research Assistant, Department of Psychology, University of Illinois, Urbana. |
| 1962-1963 | USPHS Fellow, University of Illinois Illinois. |
| 1962 | Certificate of Competency of Coal Miner, State Miner's Examining Board, Department of Mines and Minerals, State of Illinois, March 1962. |

2

## FELLOW

Fellow of the American Psychological Society

## ACADEMIC SERVICE

LAW AND SOCIETY REVIEW, Editorial Board

JOURNAL OF EMPIRICAL LEGAL STUDIES, Academic Advisory Board

Roscoe Pound Foundation, Academic Advisory Board

Grant Sawyer Center for Justice Studies, University of Nevada Advisory Board

PSYCHOLOGY, PUBLIC POLICY AND LAW, Editorial Board

Section Chair: Law and the Social Sciences, Association of American Law Schools

LAW & SOCIAL INQUIRY, Editorial Board

LAW AND HUMAN BEHAVIOR, Editorial Board

LEGAL AND CRIMINOLOGICAL PSYCHOLOGY, Editorial Board

PSYCHOLOGY, CRIME, AND LAW, Editorial Board

CANADIAN JOURNAL OF LAW AND SOCIETY, Advisory Board

National Research Council, Law and Justice Committee

Law and Society Association Treasurer

Law and Society Association Trustee

JOURNAL OF APPLIED SOCIAL PSYCHOLOGY Editorial Board

Canadian Law and Society Association, Board of Directors

## LEGAL CONSULTING AND TESTIMONY

Law and Justice Committee of the National Research Council, Washington, D.C.

Law Reform Commission of Ontario; Ontario Ministry of the Attorney General

Consultant for Solicitor General of Canada on Firearms Control Legislation Implementation

Ontario Ministry of the Attorney General: Access to Justice Project ; Ontario Ministry of Consumer and Commercial Relations: Expert Panel on Guiding Principle for Consumer Protection/Business Practices Strategies; Consultant for Canadian Law Information Council ; Consultant for Committee on Statistics in the Courts: (U.S.) National Academy of Sciences; Consultant for Police Powers Project, Law Reform Commission of Canada; Advisory Committee on the Jury, Law Reform Commission of Canada; NAACP Legal Defense Fund's Capital Punishment Project (U.S.)

### *Expert Testimony and Consulting on Juries:*

United States of America: Supreme Court of the United States, California, Connecticut, Florida, Illinois, Indiana North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, West Virginia ; and also re North American Free Trade Agreement dispute.

Canada: Supreme Court of Canada, British Columbia, New Brunswick, Newfoundland, Ontario, Prince Edward Island, Saskatchewan.

New Zealand; Australia; England and Wales; Hong Kong

3

## RESEARCH GRANTS

National Science Foundation; Robert Wood Johnson Foundation; State Justice Institute;

Russell Sage Foundation; Ontario, Ministry of the Attorney General;  Social Sciences and
Humanities Research Council of Canada; Ontario Ministry of Transportation and
Communication; Solicitor General of Canada ; The Donner Canadian Foundation; Social
Sciences and Humanities Research Council of Canada;  Law and Society Association;
Canada Council.

## PUBLICATIONS

*Books:*

Vidmar, N. and Hans, V. P., AMERICAN JURIES: THE VERDICT , Prometheus Books ( 2007).

Vidmar, N. (Ed.) WORLD JURY SYSTEMS, Oxford England: Oxford University Press (2000).
[Translated into the Korean language with a foreword by Vidmar, 2007.]

Vidmar, N. MEDICAL MALPRACTICE AND THE AMERICAN JURY:  CONFRONTING THE MYTHS
ABOUT JURY INCOMPETENCE, DEEP POCKETS, AND OUTRAGEOUS DAMAGE AWARDS,
University of Michigan Press (1995).

Hans, V, and Vidmar, N. JUDGING THE JURY. Plenum Press (1986). [Translated into Japanese,
(2000).]

Bermant, G., Nemeth, C. and Vidmar, N. (Eds.) PSYCHOLOGY AND THE LAW: RESEARCH
FRONTIERS: Lexington, Massachusetts: Lexington Books (1976).

4

***Articles and Legal Submissions:***

Michaels, D. and Vidmar, N., eds., *Conventions in Law and Science*, LAW & CONTEMPORARY PROBLEMS (forthcoming,winter 2009)

Saks et al. Amicus brief supporting Petition for Writ of Certiorari in *Gonzalez v. Florida*, No. 08-6833, United States Supreme Court ( November 9, 2008).

Vidmar, N., Affidavit and Testimony (via video-link) on behalf of Solicitor General in *Solicitor-General of New Zealand v. Fairfax New Zealand Publications and Pankhurst,* High Court of New Zealand, Wellington Registry, September 16, 2008.

Vidmar, N. Affidavit on behalf of Plaintiff in *Klotz v. St Anthony's Medical Center* , in the Circuit Court of the County of St. Louis, Division No.:13,Cause No.:06CC-4826, September 15, 2008.

Vidmar , N, principal drafter, and 23 other signatories: Amicus brief on behalf of plaintiff in *Lebron v. Gottlieb Memorial Hospital et al*, Supreme Court of Illinois , Case No. 2006 L. 12109 (2008) ( regarding claims of doctor flight from Illinois).

Vidmar, N., *Comment: Juries and Testimony from Medical Experts*, in John Spandorfer et al., PROFESSIONALISM IN MEDICINE: THE CASE-BASED GUIDE FOR MEDICAL STUDENTS (forthcoming, Cambridge University Press) .

Vidmar, N., *Juries and Medical Malpractice: Facts versus Claims* , CLINICAL ORTHOPAEDICS AND RELATED RESEARCH , Springer Open Access DOI 10.1007/s11999-008-0608-6 (published November 2008). Available at http://dx.doi.org/10.1007/s11999-008-0608-6

Hans, N. and Vidmar, N., *The Verdict on Juries* ,91 JUDICATURE 226 (2008).

Vidmar, N., *Civil Juries in Ecological Context: Methodological Implications for Research* , in CIVIL JURIES AND CIVIL JUSTICE (Brian Bornstein, et al., eds.) (2008).

Vidmar, N. and Wolfe, M.W., *Fairness through Guidance: Jury Instruction on Punitive Damages After* Philip Morris v. Williams, 2 CHARLESTON LAW REVIEW 307 (2008). ( Reprinted in M.N. Bhavani, ed., PUNITIVE DAMAGES: NEW DIMENSIONS, Amicus Books , India (2008))

Vidmar, N., Beale, S., Chemerinsky, E. & Coleman, J.E., Jr. , *Was He Guilty as Charged? An Alternative Narrative Based on Circumstantial Evidence from* Twelve Angry Men, 82 CHICAGO-KENT LAW REVIEW 691 (2007).

Vidmar et al. Amicus Brief on behalf of Respondent in *Mason. v. Home Hardware* CASE NO. S07A1486 before the Supreme Court of Georgia (December 2007)

5

Vidmar, N. et al., Amicus Brief (regarding juries and punitive damages) submitted on behalf of Respondent in *Philip Morris v. Williams,* Supreme Court of the United States, No. 05-1256 ( September 2006); *Williams v. Phillip Morris*, 127 S.CT. 1057 (2007).

Vidmar, N. Affidavit submitted *in Fowler v. Dowland*, Case # S07A0342, in the Supreme Court of Georgia, March 29, 2007)

Vidmar, N., MacKillop, K. and Lee, P. *Million Dollar Medical Malpractice Cases in Florida: Post-verdict and Pre-suit Settlements,* 59 VANDERBILT LAW REVIEW 1343 (2006).

Vidmar, N. and MacKillop, K. *"Judicial Hellholes," Medical Malpractice Claims, Verdicts and the "Doctor Exodus" in Illinois,* 59 VANDERBILT LAW REVIEW 1309 (2006).

Vidmar, N. *Trial by Jury Involving Persons Accused of Terrorism or Supporting Terrorism,* in Belinda Brooks Gordon and Michael Freeman, (Eds.), LAW AND PSYCHOLOGY, page 318, Vol. 9, Oxford University Press (2006).

Vidmar,N. et al., Amicus Brief ( regarding eyewitness identification) on behalf of petitioner in *LaQuan Ledbetter v. State of Connecticut,* on petition for Writ of Certioriai to the Supreme Court of Connecticut , No. 05-9500. *Ledbetter v. Connecticut*, 126 S.CT. 1798 (2006).

Vidmar, N. *Medical Malpractice Litigation in Pennsylvania*, Pennsylvania Bar Association, (May 2006).

Vidmar, N. *Expert Evidence, The Adversary System, and the Jury.* 95 American Journal of Public Health S137-S143 (Suppl. 1, July 2005). (Reprinted in V. Raghuram, ed., EXPERT OPINION: EVIDENTIARY VALUE (Amicus Books, 2007).

Vidmar, N. *Medical Malpractice and the Tort System in Illinois*. 93 Illinois Bar Journal 340 (2005).

Vidmar, N. *When Jurors Talk About their Verdict*. In John Kleinig, (Ed.), JURY ETHICS, Paradigm Press (2005).

Vidmar, N. *Medical Malpractice Lawsuits: An Essay on Patient Interests, the Contingency Fee System, Juries and Social Policy.* 38 Loyola Los Angeles Law Review 1217 (2005).

Vidmar, Lee, MacKillop, McCarthy and McGwinn. *Uncovering the "Invisible" Profile of Medical Malpractice Litigation: Insights from Florida.* 54 DePaul Law Review 315 (2005).

Vidmar, N. *First, Do No Harm: The Cure for Medical Malpractice* (Book Review). 352 The New England Journal of Medicine 521 (February 2005).

Vidmar, N. *Juries Around the Globe.* 5 ABA Insights on Law and Society 7 (2005).

Vidmar, N. *Experimental Simulations and Tort Reform: Avoidance, Error and Overreaching in Sunstein et al.'s Punitive Damages*. 53 Emory Law Journal 1359 (2004).

Hans, V. and Vidmar, N. *Jurors and Juries.* In Sarat (Ed.) THE BLACKWELL COMPANION TO LAW AND SOCIETY, 195-211. Blackwell Publishing, Malden, Massachusetts (2004).

Diamond, Vidmar, Rose, Ellis and Murphy. *Inside the Jury Room: Evaluating Juror Discussions During Trial.* 87 Judicature 54 (September-October 2003). [Reprinted in V. Hans (Ed.) THE JURY SYSTEM: CONTEMPORARY SCHOLARSHIP, Ashgate (in press).]

Vidmar, N. *When All of Us Are Victims: Juror Prejudice and "Terrorist" Trials.* 78 Chicago-Kent Law Review 1143 (2003).

Saks and Vidmar. *Asserted but Unproven: A Further Response to the Lindgren Study's Claim that the American Bar Association's Ratings of Judicial Nominees Are Biased.* 19 Journal of Law and Politics 177 (2003).

Diamond, Vidmar, Rose, Ellis and Murphy. *Juror Discussions During Trials: Studying an Arizona Innovation.* 45 Arizona Law Review 1 (2003).

Vidmar, N. *The American Civil Jury for Auslander (Foreigners).* 13 Duke Journal of Comparative and International Law 92, Special Issue honoring Herbert Bernstein (2003).

Vidmar, N. *Case Studies of Pre-and Midtrial Prejudice in Criminal and Civil Litigation.* 26 Law and Human Behavior, 73 (2002). http://www.law.duke.edu/pub/vidmar/pretrialpublicity.pdf [Reprinted in V. Hans (Ed.) THE JURY SYSTEM: CONTEMPORARY SCHOLARSHIP, Ashgate Publishing, Aldershot, United Kingdom (in press).]

Vidmar, N. and Brown, L. A. *Tort Reform and the Medical Liability Insurance Crisis in Mississippi: Diagnosing the Disease and Prescribing a Remedy.* 22 Mississippi College Law Review 9-46 (2002).

Eisenberg and Vidmar (drafters). *Brief Amici Curiae of Certain Leading Social Scientists and Scholars in Support of Respondents in State Farm Mutual Automobile Company v. Campbell.* Supreme Court of the United States, No. 01-1289 (October 2002).

Vidmar, N. *Listening to Jurors and Asking Them Questions.* Trial Briefs 9 (August 2002).

Rose and Vidmar. *"Bronx Juries": A profile of jury awards in New York counties.* 80 Texas Law Review 1889 (2002).

Sanders, Diamond and Vidmar. *Legal Perceptions of Science and Expert Knowledge.* 8 Psychology, Public Policy and Law 139 (2002).

Diamond, Vidmar, et al. *Juror Discussion During Civil Trials: A study of Arizona's Rule 39(f) innovation.* American Bar Foundation (April 2002). Available at: http://www.law.duke.edu/pub/vidmar/Arizonacivildiscussions.pdf.

Vidmar, N. *Juries.* In Kritzer (Ed.) LEGAL SYSTEMS OF THE WORLD: A POLITICAL, SOCIAL, AND CULTURAL ENCYCLOPEDIA. ABC-CLIO, Santa Barbara, California (2002)

Vidmar, N. *Juries and Lay Assessors in the Commonwealth of Nations.* 13 Criminal Law Forum 385 (2002).

Vidmar, N. and Diamond, D. *Juries and Experts.* 66 Brooklyn Law Review 1123-1182 (2001).

Saks and Vidmar. *A Flawed Search for Bias in the American Bar Association's Ratings of Judicial Nominees: A Critique of the Lindgren / Federalist Society Study.* 17, No. 2 Journal of Law and Politics 219-254 (2001).

Vidmar, N. *Review of Jury Systems Abroad Can Provide Helpful Insights Into American Practices.* 73 New York State Bar Association Journal 23 (2001).

Vidmar, N. *Retributive Justice: Its Social Context.* In M. Ross and D.T. Miller (Eds.) THE JUSTICE MOTIVE IN EVERYDAY LIFE, 291 Cambridge University Press (2001).

Vidmar and Rose. *Punitive Damages; In Terrorem and in Reality.* 38 Harvard Journal on Legislation 489-511 (2001).

Diamond, S. and Vidmar, N. *Jury Room Ruminations on Forbidden Evidence.* 87 Virginia Law Review 1857 (2001).

Vidmar and Schuller. *The Jury: Selecting Impartial Peers.* In R. Schuller and J. Ogloff (Eds.) PSYCHOLOGY AND LAW: CANADIAN PERSPECTIVES. University of Toronto Press, Toronto, ON, Canada (2001).

Vidmar, N. *Retribution and Revenge.* In J. Sanders and V. L. Hamilton (Eds.) HANDBOOK OF JUSTICE RESEARCH IN LAW. Springer Press, New York, New York (2001).

Vidmar, N. *Jury's Comprehension of Scientific Evidence.* In NATIONAL CONFERENCE ON SCIENCE AND THE LAW NCJ 179630. United States Department of Justice and National Institute of Justice (July, 2000).

Vidmar, N. *The Origin and Outcome of the Kumho Amicus Brief* (plus brief itself) 24 Law and Human Behavior 383-400 (2000).

Corbin, R. M. and Vidmar, N. *Survey Research Goes to Court.* In C. Chakrapani (Ed.) MARKETING RESEARCH: STATE OF THE ART PERSPECTIVES. American Marketing Association, Chicago, Illinois (2000).

Vidmar, N. *Juries don't make legal decisions! And other problems: A critique of Hastie et al. on punitive damages.* 23 Law and Human Behavior 705 (1999).

Vidmar, N. *Maps, Gaps, Socio-legal Scholarship and the Tort Reform Debate.* In Sarat, A. et al. (Eds.) SOCIAL SCIENCE, LEGAL SCHOLARSHIP AND THE LAW. Russell Sage Foundation, New York, New York (1999).

Vidmar, N., Gross, F. and Rose, M. *Jury Awards for Medical Malpractice and Post-verdict Adjustment of Those Awards.* 48 DePaul Law Review 265 (1998). [Partially reprinted in S. Salvin et al., CIVIL PROCEDURE: DOCTRINE, PRACTICE, AND CONTEXT, 2nd Ed. Aspen Publishers, New York, New York (2004).]

Vidmar, N. Principal author, amicus brief on behalf of respondent in *Kumho Tire Company v. Patrick Carmichael et al.* No. 97-109 Supreme Court of the United States, October 1998 (on the subject of how juries evaluate expert testimony).

Vidmar, N. *The Performance of the American Civil Jury: An empirical perspective.* 40 Arizona Law Review 849 (1998).

Vidmar, N., Beale, S., Rose, M. and Donnelly, L. *Should We Rush to Reform the Criminal Jury? Consider Conviction Rate Data.* 80 Judicature 286-290 (May-June 1997).

Vidmar, N. *Generic Prejudice and the Presumption of Guilt in Sex Abuse Trials.* 21 Law and Human Behavior 5 (Feb 1997).

Vidmar, N. *Pap and Circumstance: What jury verdict statistics can tell us about jury behavior and the tort system.* XXVII Suffolk University Law Review 1205 (1994/1996).

Vidmar, N. *Pretrial Prejudice in Canada: A comparative perspective on the criminal jury.* 79 Judicature 249 (1996).

Vidmar, N. *Making Inferences About Jury Behavior from Jury Verdict Statistics: Cautions about the Lorelei's lied.* 18 Law and Human Behavior 599 (1994).

Ogloff, James R. P. and Vidmar, N. *The Impact of Pretrial Publicity on Jurors: A study to compare the relative effects of television and print media in a child sex abuse case.* 18 Law and Human Behavior 507 (1994).

Vidmar, N. *An Antidote To Anecdotes* (Book review of Frank A. Sloan, et al., SUING FOR MEDICAL MALPRACTICE, 1993) 77 Judicature 330 (1994).

Vidmar, N. *Are Juries Competent to Decide Liability in Tort Cases Involving Scientific/ Medical Issues? Some Data from Medical Malpractice.* 43 Emory Law Journal 885 (1994).

Ellis, R., Ravindra, G., Vidmar, N. and Davis, T. *The Reversal Arbitration Board: An ADR model for resolving intra-corporate disputes.* 93 Journal of Dispute Resolution (1994).

Vidmar, Lee, Cohen, and Stewart. *Damage Awards and Jurors' Responsibility Ascriptions in Medical vs. Automobile Negligence Cases.* 12 Behavioral Sciences and the Law 149 (1994).

Vidmar, N. *The Unfair Criticism of Medical Malpractice Juries.* 76 Judicature 118 (1992). [Reprinted in 27 Trial Lawyers Forum 5 (1993); 42 Trial Talk 5 (1993); 23 Trial Lawyers Quarterly 9 (1993).]

Vidmar, N. *Empirical Evidence on the "Deep Pockets" Hypothesis: Jury awards for pain and suffering in medical malpractice cases.* 43 Duke Law Journal 217 (1993).

Fischer, Vidmar and Ellis. *The "Culture of Battering" and the Role of Mediation in Domestic Violence Cases.* 46 Southern Methodist University Law Review 2117-2174 (1993).

Vidmar, N. and Rice, J. *Assessments of non-economic damage awards in medical negligence: a comparison of jurors with legal professionals.* 78 Iowa Law Review 883 (1993).

Ellis, Ravindra, Vidmar, and Davis. *Toyota's Arbitration Board: A conflict resolution model for intra-corporate disputes.* 11 Alternatives 44 (1993).

Vidmar, N. *Verfahrensgerechtigkeit und Alternative Konfliktbewältigung.* 14 Zeitschrift für Rechts-Soziologie 35-46 (1993).

Vidmar, N. *How Many Words for a Camel? A Perspective on Judicial Evaluation of Social Science Evidence.* Canadian Institute for the Administration of Justice (Ed.), FILTERING AND ANALYZING EVIDENCE IN AN AGE OF DIVERSITY (1993).

Vidmar, N. *Comparative Lessons from the Hong Kong Jury Study.* (Book Review), 2 Asia Pacific Law Review 110 (1993).

Vidmar, N. *Procedural Justice and Alternative Dispute Resolution.* 3 Psychological Science 224 (1992).

Schuller, R. and Vidmar, N. *Battered Woman Syndrome Evidence in the Courtroom: A review of the literature.* 16 Law and Human Behavior 273 (1992).

Kritzer, H., Vidmar, N. and Bogart, W.A. *To Confront or Not to Confront: Measuring claiming rates in discrimination grievances.* 25 Law and Society Review 875 (1991).

Kritzer, H., Bogart, W.A. and Vidmar, N. *The Aftermath of Injury: Cultural factors in compensation seeking in Canada and the United States.* 25 Law and Society Review 499 (1991).

Hans, V. and Vidmar, N. *The American Jury: Twenty-five years later.* 16 Law and Social Inquiry, 401 (1991).

Vidmar, N. and Rice, J. *Jury Determined Settlements And Summary Jury Trials: Observations about ADR in an adversary culture.* 19 Florida State Law Review 89 (1991). (reprinted in E. Wendy Trachte-Huber, & Stephen K. Huber, Mediation and Negotiation: *Reaching Agreement in Law and Business*, LexisNexus, 2007).

Vidmar, N. and van Koppen, P. J. *Gedraqswetenschappelijk bewijs: een overzicht.* In P. J. van Koppen and H. F. M. Crombag (Eds.) DE MENSELIJKE FACTOR: PSYCHOLOGIE VOOR JURISTEN. Gouda Quint BV, Arnhem, Netherlands (1991).

Vidmar, N. *Social Science Evidence and Data.* In G. M. Chayko, E. D. Gulliver and D. V. MacDougall (Eds.) FORENSIC EVIDENCE IN CANADA. Canada Law Book, Aurora, ON, Canada (1991).

Vidmar, N. *Medical Malpractice Juries.* 8 Duke Law Magazine 8 (1991).

Vidmar, N. *The Origins and Consequences of Procedural Fairness* (Book Review and Essay) 15 Law and Social Inquiry. 877-892 (1990).

Bogart, W.A. and Vidmar, N. *Problems and Experience with the Ontario Civil Justice System.* In A. Hutchinson (Ed.) ACCESS TO JUSTICE: BRIDGES AND BARRIERS. Carswell, Toronto, ON, Canada (1990).

Vidmar, N. and Feldthusen, B. *Exemplary Damages in Ontario: An empirical study.* 16 Canadian Business Law Review 262-268 (1990).

Vidmar, N. (Editor/Author) *Is The Jury Competent? Law and Contemporary Problems.* 52 Whole Issue 4 (1989).

Vidmar, N. *The Impact of Statistical Evidence in the Legal System.* In THE EVOLVING ROLE OF STATISTICAL ASSESSMENTS AS EVIDENCE IN THE COURTS. National Research Council, Commission on Behavioral and Social Science and Education. Springer-Verlag, New York, New York (1989).

Vidmar, N. and Shuller, R. *Juries and Expert Evidence: Social Framework Testimony.* 52 Law and Contemporary Problems 133-176 (1989).

Rowe, T. and Vidmar, N. *Empirical Research on Offers of settlement: A preliminary report.* 51 Law and Contemporary Problems 13-39 (1988).

Vidmar, N. *Seeking and Finding Justice: An empirical map of Canadian consumer problems and responses.* 26 Osgoode Hall Law Journal 757-798 (1988).

Vidmar, N. (Ed.) *The Common Law Jury.* 62 Law and Contemporary Problems (1988) [Issue translated into Georgian (2005).]

Vidmar, N. *Assessing the Contributions of Case Characteristics and Settlement Forums on Dispute Outcomes and Compliance.* 21 Law and Society Review 155-164 (1987).

Samuels, J. and Vidmar, N. *Consumer Complaints and the Ontario Business Practices Act: An empirical study.* 24 University of Western Ontario Law Review 83-101 (1987).

Vidmar, N. and Schuller, R. A. *Individual Differences and the Pursuit of Legal Rights: A preliminary inquiry.* 11 Law and Human Behavior 299-317 (1987).

Vidmar, N. *The Mediation of Small Claims Disputes: A critical perspective.* In M. Bazerman, R. Lewicki, and B. Sheppard (Eds.), RESEARCH ON NEGOTIATION IN ORGANIZATIONS, VOL. 1. JAI Press, Greenwich, Connecticut (1986).

Vidmar, N. *The Legal System as Social: A review of Lempert and Sanders' "An Invitation to Law and Social Science."* 234 Science 93-94 (1986).

Vidmar, N. and Flaherty, D. *Concern for Personal Privacy in an Electronic Age.* 35 Journal of Communication 91-103 (1985).

Vidmar, N. *An Assessment of Mediation in a Small Claims Court.* 41 Journal of Social Issues 127-144. Also in Earn, B., and Towson, S. (Eds.), READINGS IN SOCIAL PSYCHOLOGY: CLASSIC AND CANADIAN CONTRIBUTIONS. Broadview Press Ltd., Peterborough, Canada (1985).

Vidmar, N. and Melnitzer, J. *Juror Prejudice: An empirical study of a challenge for cause.* 22 Osgoode Hall Law Journal 487-511 (1984).

Vidmar, N. *The Small Claims Court: A reconceptualization of disputes and an empirical investigation.* 18 Law and Society Review 515-550 (1984.)

Vidmar, N. *Social Psychology and the Legal Process.* In Kahn, A. S. (Ed.) SOCIAL PSYCHOLOGY. W. C. Brown and Co., Dubuque, Iowa (1984.)

Vidmar, N. and Short, J. *Social Psychological Dynamics in the Settlement of Small Claims Court Cases.* In D. Muller, D. Blackman, and A. Chapman (Eds.) PERSPECTIVES IN PSYCHOLOGY AND LAW. John Wiley & Sons, London, England (1984).

Vidmar, N. and Laird, N. *Adversary social roles: Their effects on witnesses' communication of evidence and the assessments of adjudicators.* 44 Journal of Personality and Social Psychology 888-898 (1983).

Saunders, D., Vidmar, N. and Hewitt, E. *Eyewitness Testimony and the Discrediting Effect.* In S. Lloyd-Bostock and B. Clifford (Eds.) EVALUATING WITNESS EVIDENCE. John Wiley & Sons, London, England (1982).

Vidmar, N. and Miller, D. T. *Social Psychological Motives Underlying Punishment Reactions.* In H. Hiebsch (Ed.) SOCIAL PSYCHOLOGY: XXII^{ND} INTERNATIONAL CONGRESS OF PSYCHOLOGY 195-202. VEB DeutscherVerlag, Berlin, Germany (1982).

Vidmar, N. *Justice motives and other psychological factors in the development and resolution of disputes.* In M. Lerner and S. Lerner (Eds.) THE JUSTICE MOTIVE IN SOCIAL BEHAVIOR. Plenum, New York, New York (1981).

Miller, D. T. and Vidmar, N. *The Social Psychology of Punishment Reactions.* In M. Lerner and S. Lerner (Eds.) THE JUSTICE MOTIVE IN SOCIAL BEHAVIOR. Plenum, New York, New York (1981).

11

Vidmar, N. and Judson, J. *The Use of Survey Research in a Change of Venue Motion: A case study.* 59 Canadian Bar Review 76-102 (1981).

Hans, V. and Vidmar, N. *Jury Selection.* In N. Kerr and R. Bray (Eds.) THE PSYCHOLOGY OF THE COURTROOM 39-82. Academic Press, St. Louis, Mossouri (1981).

Vidmar, N. and Dittenhoffer, A. *Canadian Public Opinion and the Death Penalty: The effects of knowledge on attitudes.* 23 Canadian Journal of Criminology 43-56 (1981).

Vidmar, N. *Observations on dispute dynamics and resolution hearing outcomes in a small claims court.* In S. Lloyd-Bostock (Ed.) LAW AND PSYCHOLOGY. Oxford University Centre for Socio-legal Studies Proceedings, Oxford, United Kingdom (1980).

Sheppard, B. and Vidmar, N. *Adversary Pretrial Procedures and Testimonial Evidence: Effects of lawyers' role and Machiavellianism.* 39 Journal of Personality and Social Psychology 320-332 (1980).

Vidmar, N. and Miller, D. T. *Social Psychological Processes Underlying Attitudes Toward Legal Punishment.* 14 Law and Society Review 401-438 (1980).

Vidmar, N. *The Other Issues in Jury Simulation Research: A commentary with particular reference to defendant character studies.* 3 Law and Human Behavior 95-106 (1979).

Vidmar, N. *Social Science and Jury Selection.* In PSYCHOLOGY AND THE LITIGATION PROCESS. Law Society of Upper Canada, Springer, Netherlands (1977).

Vidmar, N. *Choosing, Finding and Evaluating Methods of Obtaining Legal Justice: A review of Thibaut and Walker's Procedural Justice.* 21 Contemporary Psychology 773-774 (1976).

Sarat, A. and Vidmar, N. *Public Opinion, the Death Penalty, and the Eighth Amendment: Testing the Marshall hypothesis.* Wisconsin Law Review 171-206 (1976). [Reprinted in H. Bedau and C. Pierce (Eds.) CAPITAL PUNISHMENT IN THE UNITED STATES. AMS Press, New York, New York (1976); V. Streib (Ed.) A CAPITAL PUNISHMENT ANTHOLOGY. Anderson, Springfield, Illinois (1993).]

Berg, K. and Vidmar, N. *Authoritarianism and recall of Evidence About Criminal Behavior.* 9 Journal of Research in Personality 147-157 (1975). [Reprinted in R. Krivoshey (Ed.) READINGS IN TRIAL ADVOCACY AND THE SOCIAL SCIENCES. Garland Publishing, New York, New York (1993).]

Vidmar, N. and Ellsworth, P. *Public opinion and the death penalty.* 26 Stanford Law Review, 1245-1270 (1974). [Reprinted in H. Bedau and C. Pierce (Eds.) CAPITAL PUNISHMENT IN THE UNITED STATES. AMS Press, New York, New York (1976); H. Bedau (Ed.) THE DEATH PENALTY IN AMERICA (3rd Ed.) Oxford, New York, New York (1982).]

Vidmar, N, *Retributive and Utilitarian Motives and Other Correlates of Canadian Attitudes Toward the Death Penalty.* 15 Canadian Psychologist 337-356 (1974).

Sorrentino, R., Vidmar, N. and Goodstadt, M. *Opinion Change in a Crisis: Effects of the 1970 Canadian kidnapping crisis on political and ethnic attitudes.* 6 Canadian Journal of Behavioural Science 199-218 (1974). [Reprinted in W. E. Mann and L. Wheatcroft (Eds.) CANADA; A SOCIOLOGICAL PROFILE. Copp Clark, Toronto, ON, Canada (1976).]

12

Sorrentino, R. and Vidmar, N, *Research Note: The short-term and long-term effects of a crisis.* 38 Public Opinion Quarterly 271-279 (1974).

Vidmar, N. and Crinklaw, L. *Attributing Responsibility for an Accident: A methodological and conceptual critique.* 6 Canadian Journal of Behavioural Science 113-130 (1974).

Vidmar, N. and Rokeach, M. *Archie Bunker's Bigotry: A study in selective perception and exposure.* 24 Journal of Communication 36-47 (1974). [Reprinted in A. Wells (Ed.) MASS MEDIA AND SOCIETY (1975); C. Wilson (Ed.) MIND OVER MESSAGE (1976); P. Adler (Ed.) ALL IN THE FAMILY: A CRITICAL APPRAISAL (1979).]

Vidmar, N. *Effects of Group Discussion on Category Width Judgments.* 29 Journal of Personality and Social Psychology 187-195 (1974).

Rokeach, M. and Vidmar, N. *Testimony Concerning Possible Jury Bias in a Black Panther Murder Trial.* 3 Journal of Applied Social Psychology 19-29 (1973).

Vidmar, N. *Effects of Decision Alternatives on the Verdicts and Perceptions of Simulated Jurors.* 22 Journal of Personality and Social Psychology 211-218 (1972). [Reprinted in Kaufmann and Solomon (Eds.) READINGS IN SOCIAL PSYCHOLOGY (1973).]

Jackson, D., Hourany, L. and Vidmar, N. *A Four-Dimensional Interpretation of Risk Taking.* 40 Journal of Personality 483-501(1972).

Vidmar, N. and Burdeny, T.C. *Effects of Group Size and Item Type in the "Group Shift" Effect.* 4 Canadian Journal of Behavioral Science 393-407(1971).

Vidmar, N. and Hackman, J.R. *Inter-Laboratory Generalizability of Small Group Research: An experimental study.* 83 Journal of Social Psychology 129-139 (1971).

Vidmar, N. *Effects of Representational Roles and Mediators on Negotiation Effectiveness.* 17 Journal of Personality and Social Psychology 48-58 (1971).

Ferguson, D.A. and Vidmar, N. *Effects of Group Discussion on Estimates of Culturally Appropriate Risk Levels.* 20 Journal of Personality and Social Psychology 436-445 (1971).

Vidmar, N. and McGrath, J. E. *Forces Affecting Success in Negotiation Groups.* 15 Behavioral Science 154-163 (1970).

Vidmar, N. *Group Composition and the Risky Shift.* 6 Journal of Experimental Social Psychology 153-166 (1970).

Hackman, J.R. and Vidmar, N. *Effects of Size and Task Type on Group Performance and Member Reactions.* 33 Sociometry 37-54 (1970). [Reprinted in Ofshe, INTERPERSONAL BEHAVIOR IN SMALL GROUPS. Prentice Hall (1973); Marlowe, BASIC TOPICS IN SOCIAL PSYCHOLOGY. Holbrook Press (1972); Cummings and Scott READINGS IN ORGANIZATIONAL BEHAVIOR AND HUMAN PERFORMANCE (1973); Cathcart, Samovar, and Lustig. SMALL GROUP COMMUNICATION: A READER, 4TH ED. (1978).]

**Papers and Conferences:**

Vidmar, N.  Jury Selection in the  Canadian Context, Criminal Lawyers Association , Toronto, Canada, November 29, 2008.

Vidmar, N.  Panelist on "The Social Costs of Dangerous Products," Conference on Dangerous Products: From Lead Toys to Tainted Drugs,  American University Washington College of Law, Washington, DC Nov 14, 2008.

Vidmar, N. and Hans, V. How Juries Decide Civil Cases, Conference on Successful Strategies for Jury Trials, Thomas Lambert Conference, Suffolk Law School Boston MA, Oct 24, 2008.

Ellis, L. and Vidmar, N. Trial Consultants: What They Can and Cannot Do, Conference on Successful Strategies for Jury Trials, Thomas Lambert Conference, Suffolk Law School Boston MA, Oct 24, 2008.

Vidmar, N. Holman , M . and Lee, P. Trends in Medical Malpractice Litigation: Claims Arising from Surgical Treatment in Outpatient Offices, Conference on Empirical Legal Studies , Cornell Law School, Ithaca , NY , August 12, 2008.

Vidmar, N. Legal Behavior: Free Will, Witnesses and Decision-makers, Workshop on "From Brain to Society," Duke Institute for Brain Sciences , Duke University ,May 7, 2007.

Vidmar, N. The Role of the Jury in Medical Malpractice Litigation, Conference on Shaping the Future of Medical Malpractice: Legal and Ethical Considerations, Temple University School of Law, Philadelphia , PA, February 22, 2008

Vidmar, N and Holman, M. Juries in Asbestos Cases: 2001 and 2006. Conference on Perspectives on Asbestos Litigation, Southwestern University Law School, Los Angeles, CA, January 18, 2008.

Vidmar, N. Jury Guidance following *Philip Morris v. Williams*, presented at conference on "Punitive Damages, Due Process, and Deterrence: The Debate after *Philip Morris v. Williams*, Charleston School of Law, Charleston , SC, September 7, 2007.

Vidmar, N., How Juries Decide: Expert Evidence, Presentation to Joint Meeting of the Australian and New Zealand Association of Psychiatry, Psychology and Law; The Australian and New Zealand Forensic Science Society and the Criminal Lawyers Association of WA, Inc., Perth Australia, June 28, 2007.

Vidmar, N. Judging the Jury: What We Know and What Might be Done, Lecture to the Biannual Conference of Australian and New Zealand County and District Court Judges Conference, Freemantle, Western Australia , June 27, 2007.

Vidmar, N. Judging the Jury. Presentation to Supreme Court Judges of Western Australia, Perth,Australia, June 26, 2007.

Vidmar, N. Participant, Conventions in Science and the Law, Coronado Conference IV, Mt. Washington Resort, Bretton Woods, NH, May 3-4, 2007.

Vidmar, N., Discussant, Symposium on Genuine Tort Reform, Papitto School of Law, Roger Williams University, Bristol Rhode Island, April 20, 2007.

Vidmar, N., Theory, Data , and Ecological Validity, Conference on Law and Mind Sciences, Harvard Law School, Cambridge ,MA, March 10, 2007.

Vidmar, N., Juries and Punitive Damages, presentation to the AEI-Brookings First Annual Judicial Symposium on Civil Justice Issues , Washington DC, Georgetown Law School , December 7, 2006.

MacKillop, K. and Vidmar, N., Legal Malpractice: A Preliminary Inquiry, presented at First Annual Conference on Empirical Legal Studies, U. of Texas School of Law , Austin TX, Oct 27-28, 2006.

Vidmar, N., Discussant on Avraham and Schanzenbach,Tort Reform and Private Health Insurance Coverage, at First Annual Conference on Empirical Legal Studies , U. of Texas School of Law , Austin TX, Oct 27-28, 2006.

Vidmar, N. Participant, Panel on *Philip Morris v. Williams* sponsored by American Constitution Society at National Press Club, Washington , D.C. October 24, 2006

Vidmar, N. Participant, Citizen Participation in East Asian Legal Systems, Cornell Law School, Ithaca , N.Y., Sept 21-22, 2006.

Vidmar, N. Testimony before The Senate Committee on Health, Education, Labor and Pensions; Hearing on Medical Liability: *New Ideas for Making the System Work Better for Patients*. Washington, DC, June 22, 2006.

Vidmar, N. Participant, Conference: *Truth and Advocacy: The Quality and Nature of Regulation and Regulatory Science*. Coronado Conference III, San Diego, March 9-10, 2006.

Vidmar, N. Comments on *Duncan v. Louisiana*. Conference on Criminal Procedure Stories, Harvard Law School, April 21-22, 2006.

15

Vidmar, N. Participant, Conference: *Medical Malpractice: Has the Research Helped or Hindered Our Search for Solutions?* Invitational meeting sponsored by Robert Wood Johnson Foundation, Washington , DC, May 3, 2006.

Vidmar, N. Presented: *Civil Juries in Ecological Context: Methodological Implications for Research.* Conference on Civil Juries and Civil Justice, University of Nebraska, Lincoln, May 15-17, 2006.

Vidmar, N. Presented: *Medical Malpractice Litigation in Pennsylvania.* Pennsylvania Bar Association, May 2006

Vidmar, N. Presented: *The Promise and Perils of Archival Data for Tort Reform Research.* Annual Meeting of the Association of American Law Schools. Washington, DC, January 5, 2006.

Vidmar, Lee and MacKillop, Presented: *Million Dollar Medical Malpractice Cases in Florida: Post-Verdict Adjustments and Pre-Suit Settlements.* Conference on Medical Malpractice, Vanderbilt Law School. Nashville, Tennessee, October 21, 2005.

Vidmar, N. Presented: *Jury Reforms and Jury Performance.* Annual Conference of the American Judges Association, Anchorage, Alaska September 20, 2005.

Vidmar, N. Presented: *A Transnational Perspective on Pretrial Prejudice.* Conference on Psychology and Law, Law and Psychology Colloquium, Faculty of Law, University of London. London, England, July 14-15, 2005.

Vidmar, N. Responses to Session: *A Ten-year Perspective on Vidmar Medical Malpractice and the American Jury (1995).* Annual Law and Society Meeting. Las Vegas, Nevada, June 3, 2005.

Vidmar, N. Presented: *Medical Malpractice and the Tort System in Illinois.* Annual Law and Society Meetings, Las Vegas, Nevada, June 3, 2005.

Vidmar, N. Testimony: *Research on Medical Malpractice Litigation in the United States and Tort Reform.* Before the Committee on the Judiciary of the Connecticut General Assembly. Hartford, Connecticut, April 8, 2005.

Vidmar, N. Testimony: *Medical Malpractice Litigation and Tort Reform: The Tort System and the Missing Discussion of Negligently Injured Patients.* Before the Maryland Senate Special Commission on Medical Malpractice Liability Insurance Briefing. Annapolis, Maryland, October 27, 2004.

Vidmar, N. Presented: *Medical Malpractice Litigation: Doctors, Lawyers, Patients and Insurers.* Conference on Access to Justice: Can Business Co-exist with the Civil Justice System? Loyola, Law School. Los Angeles, California, October 1-2, 2004.

Vidmar, N. Presented: *Sequestered Science: The Consequences of Undisclosed Knowledge.* Coronado Conference 2, Project on Scientific Knowledge and Public Policy. New York, New York, October 14-15, 2004.

Vidmar, N. Presented: *Medical Malpractice Litigation: An Empirical Rather than Anecdotal Perspective.* Maryland State Bar Association Annual Meeting. Ocean City, Maryland, June 17, 2004.

Vidmar, N. Presented: *Potential Jury Prejudice: A Cross-National Perspective.* Colloquium, School of Psychology, University of New South Wales. Sydney, Australia, May 5, 2004.

16

Vidmar, N. Presented: *Coffee Spill at McDonalds: The American Civil Jury for Foreigners.* Colloquium, Department of Law, University of New South Wales. Sydney, Australia, May 25, 2004.

Vidmar, Lee and McGwin, Presented: *Seeking the "Invisible" Profile of Medical Malpractice Litigation: Insights from Florida.* Tenth Annual Clifford Symposium: "Starting Over? Redesigning the Medical Malpractice System," DePaul University School of Law. Chicago, Illinois, April 15-16, 2004.

Vidmar, N. Presented: *Experimental Simulations and Tort Reform: Avoidance, Error and Over-reaching in Sunstein et al.'s Punitive Damages (2002).* 2004 Randolph W. Thrower Annual Symposium: The Future of Tort Reform: Reforming the Remedy, Re-balancing the Scales, Emory Law School. Atlanta, Georgia, February 19, 2004.

Vidmar, N. Presented: *Potential Jury Prejudice in Criminal (and Civil) Litigation.* 19th Annual Criminal Law Update Seminar of the South Carolina Bar, Charleston, South Carolina, January 23, 2004.

Vidmar, N. Testimony: *Tort reform and medical malpractice.* North Carolina House Blue Ribbon Task Force on Medical Malpractice. Raleigh, North Carolina, January 7, 2004.

Vidmar, N. Presented. *Research meeting on Implications of Daubert in Practice.* Sponsored by Tellus Institute. Washington, DC November 20, 2003.

Vidmar, N. Participant/commentator, *Conference on Jury Ethics: Juror Conduct and Jury Dynamics.* John Jay College of Criminal Justice. New York, New York, September 12–13, 2003.

Vidmar, N. Panelist, (with Steve Penrod) *Sources of Variability in the Relations between Pre-trial Publicity and Pre-trial Bias.* International Interdisciplinary Conference on Psychology and Law. Edinburgh, Scotland, July 7-12, 2003.

Vidmar, N. Panelist. *Application of Jury Research: A Debate on the Selection of Research Questions and Methods.* International Interdisciplinary Conference on Psychology and Law. Edinburgh, Scotland, July 7-12, 2003.

Vidmar, N. Presented: *Medical Malpractice Litigation in North Carolina.* North Carolina Senate Select Committee on Insurance and Civil Justice. Raleigh, North Carolina, May 13, 2003.

Vidmar, N. Expert Evidence: *The Adversary System and the Jury.* The Coronado Conference on Scientific Evidence and Public Policy. San Diego, California, March 13-14, 2003.

Vidmar and Brown, Presented: *Tort Reform and the Medical Malpractice Crisis in Mississippi: Diagnosing the Disease and Prescribing a Remedy.* Symposium on Tort Reform, Mississippi College of Law. Jackson, Mississippi, November 15, 2002.

Vidmar, N. Presented: *Medical Malpractice and the Tort System.* Governor's Select Task Force on Healthcare Professional Liability Insurance, University of Miami Medical Center. Miami, Florida. November 4, 2002.

Vidmar, N. Panelist: *Something New Under the Sun: Innovations in Civil Jury Trials.* Annual Meeting of the American Bar Association. Washington, DC August 11, 2002.

Vidmar, N. Organizer/Panelist: *Studying Real Juries—The Arizona Civil Jury Videotaping Project.* Annual Law and Society Association Meetings. Vancouver, BC, Canada, May 30-June 1, 2002.

17

Vidmar, N. Organizer/Panelist: *Jury Trials in Inuit and Other Aboriginal Communities: Conversations with a Canadian Judge.* Annual Law and Society Association Meetings. Vancouver, BC, Canada, May 30-June1 2002.

Vidmar, N. Organizer/Panelist: *The Arizona Jury Project.* Presented at the American Psychology and Law Society Bi-Annual Meeting. Austin, Texas, March 9, 2002.

Vidmar, N. Panelist: *Symposium on the Criminal Jury.* St. Louis University School of Law. St. Louis, Missouri, February 8, 2002.

Vidmar, N. Participant: *Juries, Judges and Civil Justice.* Roscoe Pound Institute's 2001 Forum for State Court Judges. Montreal, QC, Canada, July 14, 2001.

Vidmar, N. Presented: *Lay Participation in the Administration of Justice in the Commonwealth of Nations.* Law and Society Association Meetings. Budapest, Hungary, July 5, 2001.

Vidmar, N. Keynote Speaker: *Pre-trial and Mid-trial Prejudice.* American Society of Trial Consultants. Williamsburg, Virginia, June 2, 2001.

Vidmar and Rose, Participants: *Punitive Damages: In Terrorrum and In Reality.* Conference: Reforming Punitive Damages. Harvard Law School. Cambridge, Massachusetts, March 13, 2001.

Diamond and Vidmar, Participants. *Jury Room Ruminations on Missing Evidence.* Conference on New Perspectives on Evidence. University of Virginia School of Law. Charlottesville, Virginia, February 23-24, 2001.

Vidmar, N. Lecture: *World Jury Systems.* Jury Summit 2001 conference sponsored by New York State Unified Court System and National Center for State Courts, New York, New York, January 31-February 3, 2001.

Vidmar, N. Presentation: *Problems of Jury Bias, Jury Selection, Jury Competence: A Cross-National Perspective.* New Zealand Ministry of Justice. Wellington, New Zealand, November 22, 2000.

Vidmar, N. Presentation: *Problems of Jury Bias, Jury Selection, Jury Competence: A Cross-National Perspective.* Victoria University of Wellington. Wellington, New Zealand, November 21, 2000.

Vidmar, N. Presentation: *Problems of Jury Bias, Jury Selection, Jury Competence: A Cross-National Perspective.* University of Auckland School of Law and New Zealand Legal Research Foundation. Auckland, New Zealand, November 7, 2000.

Vidmar and Diamond, Participants: *Juries and Expert Evidence.* The Jury in the Twenty-first Century: An Interdisciplinary Conference. Brooklyn Law School. Brooklyn, New York, October 6, 2000.

Vidmar, N. Participant: *Assessing Civil Jury Reforms in Arizona.* Annual Conference of Chief Justices of State Supreme Courts and State Supreme Court Administrators. Rapid City, South Dakota, July 31, 2000.

Vidmar, N. Participant: *Performance of the American Civil Jury.* Bench Bar Conference of the Supreme Court of Delaware. Wilmington, Delaware, June 7, 2000.

Vidmar, N. and Mary Rose. Participants: *Product Liability Awards and Post-Verdict Adjustment of Those Awards.* Law and Society Association, Miami Beach, Florida, May 28, 2000.

18

Joseph Sanders, Shari Diamond and Neil Vidmar, Participants: *Trial Lawyers' Perceptions of Science.* Law and Society Association. Miami Beach, Florida, May 28, 2000.

Vidmar, N. Presented: *Judging Social Science.* Judging Science Program, Duke University. Durham, North Carolina, May 25, 2000.

Vidmar and Diamond, Presented: *Preliminary findings of the Pima County civil jury project,* Continuing Legal Education Course, Tucson, Arizona, April 24, 2000.

Vidmar, N. Presented: *The "Scandalized" American jury.* Grant Sawyer Center for Justice Studies. Reno, Nevada, April 20, 2000.

Vidmar, N. Presented: *Jury systems around the world: a comparative perspective.* Grant Sawyer Center for Justice Studies, Reno, Nevada, April 20, 2000.

Vidmar, N. Presented: *Procedural Justice and Pro Se Claimants in Dalkon Shield Trust Resolution Hearings.*

Vidmar, N. Presented: *Retribution in Law and Life.* Colloquium, University of California Law School. Los Angeles, California, December 3, 1999.

Vidmar, N. Instructor: *The Performance and functioning of juries in medical malpractice cases.* ALI and ABA Course: Litigating Medical Malpractice Claims. San Francisco, California, November 11-13, 1999.

Vidmar, N. Lecture: *Evaluating scientific expert evidence.* Invited lecture, Supreme Court of British Columbia Education Seminar. Vancouver, BC Canada, November 5, 1999. Also posted on the Judicial Affairs Information Network (JAIN) and Provincial Judges Net (PJPNet)].

Vidmar, N. Presented: *Witnesses in Adversary versus Inquisitorial modes of criminal procedure.* International Conference on Psychology and Law. Dublin, Ireland, July 6-9, 1999.

Vidmar, N. Panel Chair: *Designating evidence as science, technical or specialized knowledge.* International Conference on Psychology and Law. Dublin, Ireland, July 6-9, 1999.

Vidmar, N. Presented: *Civil jury verdicts v. judgments and other post-verdict adjustments.* International Conference on Psychology and Law. Dublin, Ireland July 6-9, 1999.

Vidmar, N. Presented: *The Canadian Jury System: Attempting to Balance Conflicting Goals and Seek Legitimacy in a Complicated World.* Lay Participation in the Criminal Trial in the 21st Century Conference, International Institute of Higher Studies in Criminal Sciences. Siricusa, Italy, May 26-29, 1999.

Vidmar, N. Presented: *Expert Evidence and the Jury: An Overview.* National Conference on Science and Law, Sponsored by National Institute of Justice and other institutions. San Diego, California, April 15-16, 1999.

Vidmar, N. Lecture: *Roberta Williams Lecture.* Psychology and Law Program. University of Nebraska. Lincoln, Nebraska, March 8, 1999.

Vidmar, N. Presented: *Pretrial Prejudice: A Comparative Perspective on Common Law Jury Systems.* School of Law, University of Nebraska. Lincoln, Nebraska, March 8, 1999.

Vidmar, N. Panelist: *Research Examining Scientific Evidence: Daubert and Beyond.* Annual Meeting, Law and Society Association. Aspen, Colorado, June 4-7, 1998.

Vidmar, N. Panelist: *Lay Participation in Courts.* Annual Meeting, Law and Society Association. Aspen, Colorado, June 4-7, 1998.

Vidmar, N. Workshop Participant: *Teaching Judges About Science.* Planning Conference, National Judicial College. Reno, Nevada. April 7-8, 1998.

Vidmar, N. Presented: *The Performance of the American Civil Jury: An Empirical Perspective.* Courts on Trial Conference, University of Arizona College of Law. Tucson, Arizona, April 17-18, 1998.

Vidmar, Gross and Rose, Presented: *Jury Awards in Medical Malpractice: A profile of Awards, Proportions for General Damages, and Post-Verdict Adjustments.* Fourth Annual Clifford Symposium on Tort Law and Public Policy, DePaul University College of Law. Chicago, Illinois, April 3-4, 1998.

Vidmar, N. Presented: *Peremptory Challenges.* Jury Reform: Making Juries Work Symposium, University of Michigan Journal of Law Reform. Ann Arbor, Michigan, March 20-21, 1998.

Vidmar, N. Presented: *Retribution, Revenge and Aggression.* Annual Meeting of the Law and Society Association. St. Louis, Missouri, May 29, 1997.

Vidmar, N. *Gaps, Maps, Socio-legal Scholarship and the Tort Reform Debate: Medical Malpractice Litigation.* Social Science, Legal Scholarship and the Law: A Symposium in Honor of Stanton Wheeler, Yale Law School. New Haven, Connecticut, April 11-12, 1997.

Vidmar, N. Response to keynote address and panelist: *Arbiters or Arbitrary? Redefining the Role of the Jury.* Cornell Journal of Law and Public Policy Symposium, Cornell Law School. Ithaca, New York, March 7-8, 1997.

Vidmar, N. Presented: *Medical malpractice, frivolous litigation, jury verdicts, and settlement.* Georgetown University Law Center. Washington, DC, February 5, 1997.

Vidmar, N. Presented: *Empirical research on the Jury.* Improving Jury Selection and Juror Comprehension Workshop, Co-sponsored by the Federal Judicial Center and the NYU Institute of Judicial Administration. New York University School of Law. New York, New York, December 11-13, 1996.

Vidmar, N. Presented: *A comparative perspective on the Canadian criminal jury.* Law and Society Association Annual Meeting. Glasgow, Scotland, July 13, 1996.

Vidmar, N. Presented: *Claims about medical malpractice in Illinois' tort reform amendments (1995): a reality check.* Law and Society Association Annual Meeting. Glasgow, Scotland, July 11, 1996.

Vidmar, N. Presented: *Generic prejudice and the presumption of guilt in sex abuse trials: some data from Canada.* Law and Society Association Annual Meeting. Glasgow, Scotland, July 10, 1996.

Vidmar, N. Presented: *Understanding Social Science Evidence.* Nova Scotia Judicial Education Seminar of the National Judicial Institute. Halifax, NS, Canada, June 6, 1996.

Vidmar, N. Presented: *Survey Evidence.* Judging Science Workshop, Duke Law School. Durham, North Carolina, May 24, 1996.

Vidmar, N. Presented: *Survey Evidence.* Judging Science Conference, Texas Center for the State Judiciary. Dallas, Texas, May 16, 1996.

20

Vidmar, N. Moderator/Participant: *Planning meeting on terrorism, hate crime, and anti-governmental violence.* Committee on Law and Justice: National Academy of Sciences and National Research Council. Washington, DC, March 20, 1996.

Vidmar, N. Presented: *Symposium on Empirical Research on the Tort System.* National Press Club; at U.S. Capitol briefing of legislative aids. Washington, DC, March 12, 1996.

Vidmar, N. Participant: *Forum: Juries, Justice and the Media - After O. J.* Annenberg Washington Program. Washington, DC, January 23, 1996.

Vidmar, N. Presented: *Empirical Research on Juries: A Very Critical Perspective.* "The Role of the Jury in a Democratic Society Conference, Georgetown University Law Center. Washington, DC, October 28, 1995.

Vidmar, N. Presented: *Medical Malpractice Litigation,"* Conference on Consumers in the Civil Justice System, Suffolk University Law School. Boston, Massachusetts, October 20, 1995.

Vidmar, N. Participant: *Planning Conference on Scientific Experts.* Duke University, Private Adjudication Center. Durham, North Carolina, September 15-16, 1995.

Vidmar, N. Presented: *Six versus Twelve and All versus Some: Considerations in Changes to The Jury System.* Commission for the Future of Justice and the Courts in North Carolina, Pinehurst, North Carolina, September 14, 1995.

Vidmar, N. Faculty Presentation: *Judging Psychological Predictions.* The Intensive Study Program, 1995 of the National Judicial Institute. Cornwall, ON, Canada, May 9, 1995.

Vidmar, N. Testimony: *Common Product and Legal Reform Act of 1995.* Hearing on the Costs of the Legal System, Subcommittee on Administrative Oversight and the Courts of the Committee of the Judiciary, United States Senate. Washington, DC, May 2, 1995.

Vidmar, N. Presented: *Medical Malpractice and The American Jury.* Colloquium, DePaul University School of Law. Chicago, Illinois, March 15, 1995.

Vidmar, N. Panelist: *Jury Selection in the Post-Parks era.* Criminal Lawyers Association of Ontario, Canada. Toronto, ON, Canada, November 11-13, 1994.

Vidmar, N. Panelist: *Law, State and Society in India.* Symposium, North Carolina State University. Raleigh, North Carolina, October 29-30, 1994.

Vidmar, N. Participant: *Medical Malpractice Juries and the Tort Reform Debate.* Colloquium, Department of Psychology and the Woodrow Wilson School of Public and International Affairs, Princeton University. Princeton, New Jersey, September 16, 1994.

Vidmar and Landau, Presented: *How do juries and legal professionals treat corporate and individual defendants?* Law and Society Association. Phoenix, Arizona, June 15-19, 1994.

Vidmar, N. Panelist: *Gender, Voice and Legal Consciousness.* Law and Society Association. Phoenix Arizona, June 15-19. 1994.

Vidmar, N. Lecturer: *Judging Psychological Predictions.* National Judicial Institute, Canada: Intensive Study Program. Cornwall, ON, Canada, May 9, 1994.

Vidmar, N. Panelist: *Cross-examining the Sex Abuse Expert.* Criminal Lawyers Association, Ontario. Toronto, ON, Canada, April 9, 1994.

21

Vidmar, N. Organizer and Presented: *Are They Competent? New Research on Major Issues Involving Contemporary Criminal and Civil Juries.* American Psychology and Law Association Symposium. Santa Fe, New Mexico, March 10-12, 1994.

Vidmar, N. Panelist: *The Impact of Science and Technology on the Courts.* Emory University Law School. Atlanta, Georgia, February 24, 1994.

Vidmar, N. Panelist: *Human Memory and Sex Abuse Cases: The Misuse and Abuse of Science.* Criminal Lawyers Associations Conference. Toronto, ON, Canada, November 5-7, 1993.

Vidmar, N. Presented: *How Many Words for a Camel? A Commentary on Judicial Evaluation of Social Science Evidence.* Canadian Institute for the Administration of Justice Conference: Filtering and Analyzing Evidence in an Age of Diversity. Vancouver, ON, Canada, October 13-16, 1993.

Vidmar, N. Participant: *Broadening the Tort Liability Debate: Toward a Research Agenda.* Conference sponsored by NSF and Rand Corporation: Santa Monica, California, October 10-12, 1993.

Vidmar, N. Presented: *Juries and The "Deep Pockets" Hypothesis in Medical Malpractice.* Annual Meeting of the Law and Society Association. Chicago, Illinois May 26-30, 1993.

Fischer, Vidmar, and Ellis, Presented: *The Culture of Battering and the Role of Mediation in Domestic Violence Cases.* Annual Meeting of the Law and Society Association. Chicago, Illinois, May 26-30, 1993.

Vidmar, N. Faculty Presentation: *Juries and Alternative Dispute Resolution in Medical Malpractice.* Fourth Annual Risk Management Symposium, East Carolina School of Medicine. Greenville, North Carolina, March 17, 1993.

Vidmar, N. Round Table Participant: *The Courtroom and Public Culture,* Duke University Department of History. Durham, North Carolina, November 13-14, 1992.

Vidmar, N. Lecturer: *Juries and Medical Negligence.* University of North Carolina School of Law. Chapel Hill, North Carolina, November 12, 1992.

Vidmar, N., Bogart, W.A. and Kritzer, H. Presented: *Complaining and Compensation Seeking in Three Modern Cultures.* International Congress of Psychology. Brussels, Belgium, July 20, 1992.

Vidmar, N. Presented: *Procedural Justice and Alternative Dispute Resolution.* Conference on Procedural Justice, International Institute for the Sociology of Law. Onati, Spain, June 8-11, 1992.

Vidmar, N. Round Table Discussion Participant: *Methodological Approaches to Jury Research.* Law and Society Association. Philadelphia, Pennsylvania, May 30, 1992.

Vidmar, N., Rice, J. and Ellis, R. Presented: *Jury Determined Settlements and Alternative Dispute Resolution.* Law and Society Association Meeting. Philadelphia, Pennsylvania, May 29, 1992.

Vidmar, N. Faculty Member: Second Annual Conference on Resolving Commercial Disputes Without Trial, School of Law, University of Texas at Austin. Houston, Texas, March 28-29, 1992.

Vidmar, N. Presented: *Medical malpractice litigation: Jury awards for non-economic damages*. American Psychology-Law Society Biennial Meeting. San Diego, California, March 1992.

Ogloff, J.R. P., Vidmar, N. and Green, J.D. Presented: *The impact of pretrial publicity on jurors: a study to compare the relative effect of print and video pretrial publicity*. American Psychology-Law Society Biennial Meeting. San Diego, California, March 1992.

Kritzer, H., Vidmar, N., Bogart, W. and Zahorik, K. Presented: *Legal Mobilization in Canada and the United States: Consumer Problems in North America*. Presented at the Midwest Political Science Association. Chicago, Illinois, April 18-20, 1991.

Rice, J. A. and Vidmar, N. Presented: *Assessing Non-economic Damages: Lawyers versus Laypersons*. Annual Law and Society Meeting. Amsterdam, Netherlands, June 26-29, 1991.

Kritzer, A., Vidmar, N. and Bogart, W. Presented: *Context, Context, Context: Claiming Behavior in Two Countries*. Annual Law and Society Meeting. Amsterdam, Netherlands, June 26-29, 1991.

Vidmar, N. Participant: *Towards a Research Agenda for the 1990's and Beyond*. Conference on Civil Discovery, Federal Judicial Center. Washington, DC, September 20, 1991.

Kritzer, H., Vidmar, N. and Bogart, W.A. Presented: *The genesis of discrimination litigation: Comparing Canada and the United States*. Southern Political Science Association. Atlanta, Georgia, November 8-10, 1990.

Vidmar, N. Panelist: *The Use of Psychology in the Teaching of Trial Advocacy*. ABA Conference on Trial Advocacy Training in the '90s. Chicago, Illinois, October 26-27, 1990.

Bogart, W.A. and Vidmar, N. Presented: *Independent Paralegals in Ontario*. Annual Law and Society Meeting. Berkeley, California, June 1990.

Kritzer, H., Bogart, W.A. and Vidmar, N. Presented: *The Aftermath of Injury: Compensation Seeking in Canada and the United States*. Annual Law and Society Association Meeting. Berkeley, California, June 1990.

Vidmar, N. Panelist: *Empirical Research on Juries*. Ad Hoc Committee of the National Science Foundation. Washington, DC, May 12, 1990.

Vidmar, N. Panelist: *Juries and Pre-Trial Prejudices*. Northwestern University, Annenberg Washington Conference on Juries and Prejudice. Washington, DC May 11, 1990.

Vidmar, N. Presented: *An Update on the Jury*. Judicial Administration Program, University of Nevada-Reno. Reno, Nevada, January 18, 1990.

Vidmar, N. Presented: *An Empirical Profile of Punitive Damages in Ontario*. International Symposium on Remedies, University of Windsor Law School. Windsor, ON, Canada, October 1989.

Vidmar, N. Presented: *The Role of the Jury in Medical Malpractice Cases in North Carolina*. Conference on Medical Malpractice, Duke University. Durham, North Carolina, September 15, 1989.

Vidmar, N. and Donnelly, L. Presented: *Implementation of the North Carolina Pre-Trial Management Statute*. Conference on Medical Malpractice, Duke University. Durham, North Carolina, September 15, 1989.

23

Metzloff, T. and Vidmar, N. Presented: *The Dynamics of Litigation Settlement in Medical Malpractice.* Annual Law and Society Meeting. Madison, Wisconsin, June 9, 1989.

Vidmar, N. Presented: *Claim Making and Outcomes in Ontario.* Annual Law and Society Meeting. Madison, Wisconsin, June 9, 1989.

Vidmar, N. Presented: *An Empirical Perspective on Procedure in Medical Malpractice Cases.* Kellog Center for Dispute Resolution and Program on Social Science and Law, Northwestern University. Evanston, Illinois, May 5, 1989.

Vidmar, N. Presented: *Integrating Social Science.* Transforming the Law School Curriculum Conference, Osgoode Hall Law School. Toronto, ON, Canada, April 6, 1989.

Vidmar, N. Panelist: *Can They Prosper in Law School?* Can Social Scientists Survive in Law School? Panel, Social Science and Law Section, Association of American Law Schools. New Orleans, Louisiana, January 7-9, 1989.

Vidmar, N. and Bogart, W. A. Presented: *Access to Justice in Canada.* Institute for Legal Studies, University of Wisconsin. Madison, Wisconsin, December 2, 1988.

Bogart, W.A. and Vidmar, N. Presented: *Problems and Experience with the Ontario Civil Justice System.* Ontario Ministry of the Attorney General, Conference on Access to Justice, Toronto, June 20-22, 1988.

Vidmar, N. Invited Speaker: *Jury Decision-making.* Cleveland-Marshall College of Law. Cleveland, Ohio, November 2, 1987.

Vidmar, N. Conference Consultant: *Legal Education and Work in a Changing Society.* University of Windsor Law School. Windsor, ON, Canada, September 9, 1987.

Schuller, R. and Vidmar, N. Presented: *Determinants of Procedural Choice.* Annual Meeting, Canadian Psychological Association. Vancouver, BC, Canada June 18-21, 1987.

Vidmar, N. and Schuller, R. Presented: *Individual differences and the pursuit of legal rights: A preliminary inquiry.* Law and Society Association Meeting. Washington, DC, June 11, 1987.

Vidmar, N. Presented: *On libel and civil juries.* Law and Society Association Meeting, June 10-14, 1987.

Vidmar, N. Presented: *Conceptualizing the data problem in medical malpractice cases.* Developing Information Bases for Medical Malpractice Claims Studies Conference, Duke University. Durham, North Carolina, May 29, 1987.

Vidmar, N. Presented: *Understanding dispute resolution: An empirical approach to problems of law.* Theoria Seminar of Windsor Law School, Windsor, ON, Canada, April, 1987.

Vidmar, N. Presentation: *Social science and juries in Canada.* Canadian Criminal Lawyers' Association, Toronto, ON, Canada, November 1986.

Vidmar, N. Presented: *A critique of "scientific jury selection."* Litigation Section of the American Bar Association, October, 1986.

Vidmar, N. Presented: *Claims Consciousness: Individual Differences in the Pursuit of Justice.* Law and Society Association Meeting. Chicago, Illinois, May 28-June 1, 1986.

Vidmar, N. Presented: *Jury Experts: A Critical Perspective.* Association of American Law Schools. New Orleans, Louisiana, January 6, 1986.

● Vidmar, N. Invited Panelist: *Future directions of procedural justice research*. Procedural Justice Symposium, Law and Society Association. San Diego, California, June 6, 1985.

Vidmar, N. and Samuels, J. Presented: *Unfair trade practices legislation: A study of compliance, administrative response, and impact*. Law and Society Association, San Diego, California, June 6, 1985.

Vidmar, N. Presented: *An empirical map of minor dispute behavior in Canada*. Canadian Law and Society Association, Montreal, QC, Canada, May 31, 1985.

Samuels, J. and Vidmar, N. Presented: *Unfair trade practices legislation: A study of impact*. Canadian Law and Society Association, Montreal, QC, Canada, May 31, 1985.

Vidmar, N. Presented: *Mediation of small claims disputes*. Conference on Negotiation in Organizations, Duke University. Durham, North Carolina, March 21, 1985.

Vidmar, N. Presented: *Dispute resolution in a small claims court*. University of Waterloo. Waterloo, ON, Canada, November 1984.

Saunders, D. and Vidmar, N. Presented: *Liability insurance, judicial admonitions, and the verdicts of mock juries*. Canadian Psychological Association Meeting. Ottawa, ON, Canada, June 1, 1984.

Vidmar, N. Presented: *Assessing household problems, claims and disputes: A Canadian survey*. Law and Society Association Meeting. Boston, Massachusetts, June 1984.

Vidmar, N. Presented: *Some myths about the small claims court*. Department of Psychology, York University. Toronto, ON, Canada, April 1984.

● Vidmar, N. Presented: *The expert witness in court*. Symposium on the Expert Witness, London Psychiatric Hospital. London, ON, Canada November 1983.

Vidmar, N. Invited Lecturer: *Myth and reality about "everyman's court": An empirical investigation of the small claims process*. American Psychology-Law Society. Chicago, Illinois, October 6, 1983.

Vidmar, N. Presented: *Recent developments in our understanding of the disputing process*. Psychology-Law Research Center, St. Louis University. St. Louis, Missouri, June 1983.

Vidmar, N. Presented: *Consumers avoid it; defendants lose--and other myths about the small claims court*. Law and Society Association Meeting. Denver, Colorado, June 2-5, 1983.

Vidmar, N. Presented: *Jury selection: Two Canadian cases*. Department of Psychology, University of Windsor, Windsor, ON, Canada, March 1983.

Vidmar, N. Presented: *Jury selection: Two Canadian cases*. Institute for Criminology, University of Toronto. Toronto, ON, Canada, February 1, 1983.

Vidmar, N. Presented: *Jury selection: Two Canadian cases*. Department of Psychology, University of Guelph. Guelph, ON, Canada, January 1983.

Vidmar, N. and Short, J. Presented: *Changes in disputant motives and perceptions in a Canadian small claims court*. International Congress on Psychology and Law. Swansea, Wales, July 19-23, 1982.

● Vidmar, N. and Short, J. Presented: *Social psychological aspects of the small claims resolution*. International Conference on Psychology and Law, Swansea, Wales, July 1982.

25

Vidmar, N. Presented: *Dispute resolution in a small claims court.* Law and Society Association. Toronto, ON, Canada, June 1982.

Vidmar, N. Presented: *Alternatives to judges: Referees in a small claims court.* Canadian Psychological Association Symposium. Montreal, QC, Canada, June 11, 1982.

Vidmar, N. Presented: *A research perspective on evaluation of community mediation.* Institute of Public Affairs, Dalhousie University. Halifax, NS, Canada, June 10, 1982.

Vidmar, N. Presented: *A limited defense of simulation research.* American Psychology-Law Association Meeting. Boston, Massachusetts, October 16, 1981.

Vidmar, N. Presented: *Jury selection in Canada.* American Psychology-Law Association Meetings. Boston, Massachusetts, October 15, 1981.

Saunders, D., Hewitt, E. and Vidmar, N. Presented: *Discredited eyewitness testimony, judicial instructions, and juror decisions.* Canadian Psychological Association. Toronto, ON, Canada, June 1981.

Sheppard, B. and Vidmar, N. Presented: *Comparative procedure: A psychological perspective.* Law and Society Association Meetings, Amherst, Massachusetts, June 1981.

Saunders, D. and Vidmar, N. Presented: *Discredited eyewitness testimony and mock jury deliberations.* Midwestern Psychological Association. Detroit, Michigan, May 1981.

Sheppard, B. and Vidmar, N. Presented: *A taxonomy of procedure.* Annual Law and Psychology Conference, Centre for Socio-legal Studies, Oxford University. Oxford, England, April 1981.

Vidmar, N. Presented: *Legal applications of survey research in the U.S. and Canada.* Law Seminar, University of Osnabruck. Osnabruck, West Germany, July 11, 1980.

Vidmar, N. and Miller, D. T. Presenters: *Social psychological motives underlying punishment reactions.* XXII International Congress of Psychology. Leipzig, East Germany, July 9, 1980.

Vidmar, N. Presented: *Social psychological considerations in the development and resolution of small claims disputes.* SSRC Law and Psychology Seminar, Oxford University. Oxford, England, March 25-26, 1980.

Vidmar, N. Presented: *The transformation of disputes in a small claims court.* Law and Society Association. May 11, 1979.

Vidmar, N. Presented: *Creating access: Alternative dispute forums, conflict, and justice.* American Psychological Association Symposium "How the law affects us: Entrapping problems and liberating possibilities." Toronto, ON, Canada, August 28, 1978.

Vidmar, N. Presented: *Effects of adversary versus non-adversary investigative procedures on testimonial evidence.* Law and Society Association, Minneapolis, Minnesota, May 19, 1978.

Vidmar, N. Chair: *The role of psychology in the criminal justice system.* Law and Society Association Symposium. Minneapolis, Minnesota, May 18, 1978.

Vidmar, N. Presented: *Outcome, offense type, and retribution as factors in punishment reactions.* Eastern Psychological Association, Washington, DC, April 30, 1978.

Vidmar, N. Presented: *Effects of degree of harm and retribution motives on punishment reactions.* Canadian Psychological Association. Vancouver, BC, Canada, June 8, 1977.

Vidmar, N. Testimony: *Medical Malpractice Litigation.* Field Hearing of Energy and Commerce Committee: Oversight and Investigation Subcommittee of U.S. House of Representatives. Langhorne Pennsylvania, February 10, 2003.

Sarat, A. and Vidmar, N. Presented: *Knowledge, retribution, and death penalty attitudes: a survey experiment.* Eastern Psychological Association. New York, New York, April 22-24, 1976.

Stirrett, K. and Vidmar, N. Presented: *Authoritarianism and recall of evidence in formal sanctioning settings.* Eastern Psychological Association Convention. Philadelphia, Pennsylvania, April 18, 1974.

Vidmar, N. Presented: *Retribution and utility as motives in Canadian attitudes toward the death penalty.* Canadian Psychological Association Convention, Victoria, BC, Canada, June 10, 1973.

Vidmar, N. and Crinklaw, L. D. Presented: *Retribution and utility as motives in sanctioning behavior.* Mid-Western Psychological Association Convention. Chicago, Illinois, May 10-12, 1973.

Vidmar, N. and Rokeach, M. Presented: *Archie Bunker's bigotry: perceptions in the eye of the beholder.* Eastern Psychological Association Convention. Washington, DC, May 3-5, 1973.

Vidmar, N. Presented: *Effects of decision alternatives on the verdicts and social perceptions of simulated jurors.* Eastern Psychological Association Convention. New York, New York, April 1972.

Vidmar, N. Presented: *Effects of group discussion on category width judgments.* Eastern Psychological Convention. Boston, Massachusetts, April 1972.

Vidmar, N. and Crinklaw, L. D. Presented: *Attributing responsibility for an accident: some integrative attempts.* Conference on Attribution of Responsibility, William and Mary College. Williamsburg, Virginia, July 1971.

Vidmar, N. Symposium Paper: *Student reactions to the 1970 Canadian political crisis.* Canadian Psychological Association Convention. St. John's, NL, Canada, June 1971.

Crinklaw, L. D. and Vidmar, N. Presented: *Attributing responsibility for an accident: More empirical confusion but methodological insights.* Mid-Western Psychological Association Convention. Detroit, Michigan, May 1971.

Hourany, L., Jackson, D. and Vidmar, N. Presented: *A four-dimensional interpretation of risk taking.* Mid-Western Psychological Association Convention. Detroit, Michigan, May 1971.

Vidmar, N. Presented: *Group induced shifts in simulated jury decisions.* MidWestern Psychological Association. Cleveland, Ohio, 1970.

Ferguson, D. A. and Vidmar, N. Presented: *Familiarization-induced risky and cautious shifts: a replication of sorts.* Midwestern Psychological Association Convention. Cincinnati, Ohio, May 1970.

27

Vidmar, N. and Burdeny, T. C. Presented: *Effects of item type and group size in the "group shift" effect.* Mid-western Psychological Association Convention. Cincinnati, Ohio, May 1970.

Ferguson, D. A. and Vidmar, N. Presented: *Effects of group discussion on estimates of culturally appropriate risk levels.* Eastern Psychological Association Convention, Atlanta City, New Jersey, April 1970.

Vidmar, N. Presented: *Group composition and risk taking.* Eastern Psychological Association Convention, New York, April, 1968.

Vidmar, N. and Hackman, J. R. Presented: *Effects of group size, task type and subject population on group satisfaction.* Canadian Psychological Association Convention. Calgary, AB, Canada, June 1968.

Vidmar, N. and McGrath, J. E. Presented: *Role conflict and leadership in negotiation and other decision-making groups.* Midwestern Psychological Association Convention. Chicago, Illinois, May 1967.

McGrath, J. E. and Vidmar, N. Presented: *Role assignment and conflict in decision-making groups: partial test of a model of negotiation.* Midwestern Psychological Association Convention. Chicago, Illinois, May 1966.

## SELECTED RESEARCH REPORTS:

Vidmar, N., Donnelly, L., Metzloff, T. and Warren, D. *An Empirical Examination of a Legislated Procedural Reform: Court-based Management of Medical Malpractice Litigation.* The Private Adjudication Center, Inc., Duke University School of Law, Durham, North Carolina (1992).

Kritzer, H., Bogart, W.A. and Vidmar, N. *The Aftermath of Injury: Compensation Seeking in Canada and the United States.* Institute of Legal Studies, University of Wisconsin Law School, Madison, Wisconsin (1990).

Vidmar, N. and Lawrence, C. *The Impact of Statistical Evidence on the Legal System.* U.S. National Research Council of the National Academy of Sciences (1985).

Vidmar, N. *Privacy and Two-way Cable Television: A Study of Canadian Public Opinion.* Ontario Ministry of Transportation and Communication (1983).

Vidmar, N. and Short, J. A. *The Effects of Criminal Justice Issues on Voting Behavior.* Federal Ministry of the Solicitor General of Canada (1982).

Vidmar, N. *Implementing the information/education campaign on firearms control: A literature review.* Ministry of the Solicitor General of Canada (1978).

Crinklaw, L. and Vidmar, N. *Inferential Sets, Locus of Control and Attribution of Responsibility for an Accident.* University of Western Ontario Research Bulletin #246 (1972).

Crinklaw, L. and Vidmar, N. *Attribution of Responsibility for an Accident.* University of Western Ontario Research Bulletin #186 (1971).

McGrath, J. E. Vidmar, N. and Weidemann, S. *Social and Psychological Factors in Human Stress.* Program Report: Phase I. AFOSR Conference on Human Stress, Monticello, Illinois (1967).

28

Vidmar, N. *Perceptions of Patient Behavior and Effects of Environmental Change.* .Report #601 Danville, Illinois: Danville Veterans Administration Hospital (1969).

## SYLVIA B. PRESSLER
### Presiding Judge for Administration, Superior Court of New Jersey, Appellate Division (Ret.)
### 161 BRAYTON STREET
### ENGLEWOOD, NEW JERSEY 07631

December 16, 2008

Maurice J. Donovan, Esq.
70 South Orange Avenue - Suite 150
Livingston, New Jersey 07039

Dear Mr. Donovan:

You have asked me to express an opinion as to whether, under the New Jersey Rules of Court, plaintiff's various demands for pretrial discovery served upon defendant General Motors (GM) in the case of Green v. Newman[1] compelled GM to disclose documents in its possession identified as Addenda A through H (A-H), inclusive, annexed to plaintiff's Motion to Supplement the Record filed in the Superior Court, Appellate Division, on January 5, 1998.

In responding to your request, I have reviewed the documents listed in the Appendix to this report, and I have considered them in the light of the text of the discovery rules and the judicial authority interpreting them. Based on the foregoing, I have concluded that the obligation of GM to have disclosed A-H to plaintiff during the discovery process was clear, unequivocal, and beyond any reasonable dispute. My reasons for this conclusion follow:

### I. The Discovery Rules: Purpose and Policies

Pretrial discovery is the mechanism by which each party to litigation is entitled to learn, to the maximum

---

[1] Superior Court of New Jersey, Law Division - Essex County, Docket No. W-029370-88, affirmed as modified, 310 Super. 507 (App. Div. 1998), certif. denied, 156 N.J. 381 (1998).

1

possible extent, all the facts involved in and relevant to the issues in controversy within the knowledge of the adverse party, including the identity of persons having knowledge of relevant facts, statements made by such persons, relevant documents and their location, facts in support of articulated legal theories, and, in sum, all potentially material information bearing on the issues in dispute.

Thus, R. 4:10-2 provides that:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, electronically stored information, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence; nor is it ground for objection that the examining party has knowledge of the matters as to which discovery is sought.

The purpose and policy of the discovery rules are well understood and have been consistently articulated by the New Jersey courts since the inception of the present judicial system in 1948 under Article 6 of the New Jersey Constitution and the implementing procedural rules then adopted by the New Jersey Supreme Court under its exclusive rule-making authority. Illustratively, in 1951 then Chief Justice Vanderbilt explained that "[l]iberal procedures for discovery in preparation for trial are essential to any modern judicial system in which the search for truth in aid of justice is paramount and in which concealment and surprise are not to be tolerated." Lang v. Morgan's Home Equipment Corp., 6 N.J. 333, 338 (1951). Noting that the New Jersey discovery rules were patterned on the federal rules in both text and purpose, Chief Justice Vanderbilt further explained that the federal discovery rules

2

constituted one of the most significant innovations of the
federal practice, intended to

> "…invest the deposition-discovery process with a
> vital role in the preparation for trial. The
> various instruments of discovery now serve (1) as
> a device, along with the pre-trial hearing under
> Rule 16, to narrow and clarify the basic issues
> between the parties, and (2) as a device for
> ascertaining the facts, or information as to the
> existence or whereabouts of facts, relative to
> those issues. Thus civil trials in the federal
> courts no longer need be carried on in the dark.
> The way is now clear, consistent with recognized
> knowledge of the issues and facts before
> trial." Lang, supra (quoting Hickman v. Taylor,
> 329 U.S. 495, 500-501 (1947)).

Thus, Chief Justice Vanderbilt concluded, New Jersey's
discovery rules as well "are designed to insure that the
outcome of litigation in this State shall depend on its
merits in the light of all of the available facts, rather
than on the craftiness of the parties or the guile of their
counsel." Ibid.

These principles have been regularly and uniformly
reaffirmed since. As recently as last year the New Jersey
Supreme Court in Liguori v. Elmann, 191 N.J. 527, 551
(2007), summarized them by saying:

> We have previously reiterated the underlying
> purposes of our discovery rules. "The discovery
> rules `were designed to eliminate, as far as
> possible, concealment and surprise in the trial
> of law suits to the end that judgments therein be
> rested upon the real merits of the causes and not
> upon the skill and maneuvering of counsel.'"
> Wymbs v. Twp. of Wayne, 163 N.J. 523, 543 (2000)
> (quoting Evtush v. Hudson Bus Transp. Co., 7 N.J.
> 167, 173 (1951)).

See also Jenkins v. Rainner, 69 N.J. 50, 56 (1976) ("Our
court system has long been committed to the view that
essential justice is better achieved when there has been
full disclosure so that the parties are conversant with all
the available facts."). And see, in accord, Abtrax
Pharmaceuticals. Inc. v Ekinson, 139 N.J. 499, 512(1982);
Buckley v. Estate of Pirolo, 101 N.J. 68, 79 (1985);

3

Olivieri v. Porter Hayden Co., 241 N.J. Super. 381, 387 (App. Div. 1990); Shanley & Fisher, P.C. v. Sisselman, 215 NJ.Super. 200, 215-216 (App. Div. 1987).

Accordingly, "New Jersey's discovery rules are to be construed liberally in favor of broad pretrial discovery." Payton v. New Jersey Turnpike Authority, 148 N.J. 525, 535 (1997), citing Jenkins v. Rainier, 69 N.J. 50,56 (1976).

## II. Modes of Discovery: Interrogatories and Document Production

R. 4:10-1 prescribes the available modes of discovery, namely, depositions on written or oral questions; written interrogatories; production of documents or things; permission to enter upon land or other property, for inspection or other purposes; physical and mental examinations; and requests for admissions. The discovery modes here relevant are written interrogatories and demands for document production. Defendant's obligation to comply with the plaintiff's discovery demands is governed by the rules applicable to these modes and the case law interpreting them considered in the context of the overarching purpose and policies of the discovery process.

### A. Interrogatories

The interrogatory practice is governed by R. 4:17-1 to -8, inclusive. R. 4:17-1 provides that any party may serve upon any other party written questions relating to any matter in controversy, including, as provided by R. 4:10-2, questions designed to elicit information not itself admissible in evidence but which may lead to admissible evidence.

These questions, i.e., the interrogatories, may include a request for "a copy of any paper," the propounder to bear the copying cost. The request for a paper is not, however, intended to include voluminous documents. If the response would so require and the documents requested constitute business records of the answering party, the answering party need not supply them with the answers to the interrogatories but may, in lieu thereof, as provided by R. 4:17-4(d),

> specify the records from which the answer may be derived or ascertained and … afford to the party serving the interrogatory reasonable opportunity to examine, audit or inspect such records and to

4

make copies, compilations, abstracts or
summaries. A specification shall be in sufficient
detail to permit the interrogating party to
locate and to identify, as readily as can the
party served, the records from which the answer
may be ascertained.

Alternatively or in addition, the propounder may
pursue document discovery pursuant to R. 4:18-1, discussed
hereafter.

As to those questions not involving document
production, R. 4:17-4(a) requires that "[e]ach question
shall be answered separately, fully and responsively." The
answering party's obligation does not end there. R. 4:17-7
mandates that "if a party who has furnished answers to
interrogatories thereafter obtains information that renders
such incomplete or inaccurate, amended answers shall be
served not later than 20 days prior to the end of the
discovery period…" There is no question but that this
continuing obligation applies to all modes of discovery.
See, e.g., McKenney, 167 N.J. 359, 371 (2001). Moreover, if
the propounder regards an answer as insufficiently
responsive to the question, a more specific answer can be
sought by application to the court for an order requiring
the answering party to provide a more specific answer.
Although the rules do not expressly provide for an order
directing more specific answers, that is a well-recognized
and commonly resorted to technique. See, e.g., Zimmerman
v. United Services Auto., 260 N.J. Super. 368. 377 (App.
Div. 1992).

R. 4:17-4(a) also addresses the signing of the answers
to the interrogatories. With respect to the issue of who
signs the interrogatories, the rule provides that if the
answering party is a corporation, the interrogatories must
be signed "by an officer or agent who shall furnish all
information available to the party." Although the rule
does not expressly so provide, it is accepted practice that
the court has the power to require the answering
corporation to designate an officer or agent who will
assume full responsibility for gathering all the relevant
information available to the corporation and to coordinate
the search of corporate records to the end that the
interrogatory answers will be full and responsive. Under
this circumstance, the designated officer or agent is
obviously the person who should sign the answers to
interrogatories.

5

The rule also requires that the answers be under oath.
More commonly, as permitted by R. 1:4-4(b), a certification
in lieu of oath is used.  The language of the
certification, required by the rule is that "I certify that
the foregoing statements made by me are true.  I am aware
that if any of the foregoing statements made by me are
willfully false, I am subject to punishment."  A caveat
must be added when the certification form is used for
interrogatory answers.  Because the answers may include
hearsay, the answering party is unable to vouch for the
truth of the information.  Therefore, unlike the customary
affidavit, it is understood that the certification includes
reference to information that the answering party believes
is true.  It should be noted that the rule was recently
amended to require the answering party to note which of the
answers contain information not within the signatory's
personal knowledge and to state the source of that
information.  Of course, if the oath is used, what the
person signing the answers is swearing to is that the
information therein contained is true to best of his
information, knowledge and belief.

### B. Document Production

Document production is governed by R. 4:18. R. 4:18-
1(a), in relevant part, provides that:

> Any party may serve on any other party a request
> (1) to produce and permit the party making the
> request, or someone acting on behalf of that
> party, to inspect, copy, test, or sample any
> designated documents …that constitute or contain
> possession, custody or control of the party on
> whom the request is served…

R. 4:18-1(b) further provides, in relevant part, that the
demand for production of documents "shall set forth the
items to be inspected either by individual item or by
category, and describe each item and category with
reasonable particularity."  Moreover, the rule requires
that "[t]he response shall state, with respect to each item
or category, that inspection and related activities will be
permitted as requested, unless the request is objected to…"
As a matter of practice, parties upon whom a document-
production demand is made have the option of simply
supplying copies of the requested material to the demanding
party without the need for the demanding party to inspect

6

and copy the documents at the responding party's designated location.

Finally, as noted, in response to an interrogatory asking for attachment of documents constituting part of a business record, the responding party, pursuant to R. 4:17-4(b), has the option to respond by

> specify[ing] the records from which the answer may be derived or ascertained and to afford to the party serving the interrogatory reasonable opportunity to examine, audit or inspect such records and to make copies, compilations, sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained.

The sanctions provided for in R. 4:23 apply as well to non-compliance with document production.

### III. The Obligation of Compliance

The corollary of a party's right to demand discovery is the unequivocal obligation of the party on whom the discovery demand is made to respond fully and truthfully unless there is a legitimate claim of privilege or work-product protection asserted pursuant to R. 4:10-2(e) or unless a protective order under R. 4:10-3 has been sought and granted.

The responsive obligation continues throughout the litigation, requiring the responding party to correct, modify, and supplement information already given and to disclose additional information should new or different information come or should have come to the responding party's knowledge during the course of the proceedings. See, e.g., R. 4:17-7; McKenney v. Jersey City Med. Ctr., supra; Wymbs v. Township of Wayne, supra, 163 N.J. at 553; Moreover, counsel as well as the party has "an obligation of candor to each other and to the judicial system, which includes a duty of disclosure to the court and opposing counsel." Liguori v. Elmann, supra, 191 N.J. 527 (quoting McKenny, supra).

The obligation of compliance requires the answering party to use good faith and diligence in responding to discovery demands, Thus, the answering party must diligently search the available records in order to comply

7

with an adequately specific request for information or documents. If the answering party believes that the request imposes an undue burden, then that party must seek a protective order pursuant to R. 4:10-3. But unless that relief is sought from the court and granted by it, the answering party has no alternative but to take all reasonable available measures from searching memory to searching records that are calculated to produce a full and truthful response to the discovery demand. The obligation of full and truthful disclosure cannot be avoided either by willful withholding or concealment or simply by failing to conduct a diligent search for the requested information.

By definition, an evasive answer does not meet the requirement of a fully responsive answer. Indeed, in respect of the imposition of sanctions, R. 4:23-1(b) declares that "an evasive or incomplete answer is to be treated as a failure to answer." The prime offending technique for framing an evasive answer is an abusive practice that has gained currency known as "General Objections." This is an introductory statement to the answers to an entire set of interrogatories, irrespective of the relevance and specificity of the individual question, asserting that the questions as a whole are improper because they are not calculated to lead to admissible evidence; and/or they are ambiguous, vague, harassing, and/or overbroad; and/or that the information sought is protected by the attorney-client privilege, and/or the work-product privilege, and/or the privilege of self-critical analysis, and/or some other privilege. Nevertheless the answering party then undertakes to answer at least some of the questions, reserving, however, the General Objections and thus rendering the answers that follow unreliable because the propounder cannot know which questions are subject to which objections and, in any event, must take action to have the objections stricken. Rarely, if ever, is the General Objection statement legitimately applicable to the set of interrogatories as a whole, and the device, which is disingenuous and evasive, compromises, if not defeats, the purpose of the interrogatory practice, namely, the disclosure of relevant information. While the discovery rules do not at present directly address this practice, it has come to be generally so widespread and abusive as to require regulatory attention, and it is now under consideration by the Supreme Court Committee on Civil Practice.

8

In the same vein, answers to specific questions may
be preceded by one or more of the objections stated in the
General Objections, rendering whatever information is then
given unreliable, lacking in integrity, and enabling the
answering party to give as little responsive information as
possible by relying on the disingenuous objection.
Responses of this nature result in imposing on the
propounding party the need to move for more specific
answers and/or to pursue other discovery modes, such as
depositions, which are more burdensome and expensive.

### IV. Sanctions for Non-Compliance

Compliance with the discovery obligation, including
the continuing obligation of correction, modification and
supplementation, is so critical to the litigation process
that the rules prescribe a variety of sanctions for non-
compliance. R. 4:23-1 to -6, inclusive. As long ago
explained by Chief Justice Vanderbilt in Lang, supra, 6
N.J. at 338:

> As with all rules it is necessary that there be
> adequate provisions for the enforcement of the
> rules [of] discovery against those who fail or
> refuse to comply. Sanctions are peculiarly
> necessary in matters of discovery and the power
> to invoke them is inherent in our courts.

These sanctions are of varying degrees of severity
depending both on the egregiousness of the non-complying
conduct, whether willful or negligent, and the degree of
prejudice the demanding party has suffered. They range
from such measures as a continuance or mistrial, an award
of counsel fees to the aggrieved party, exclusion of the
undisclosed evidence, adverse inferences against the non-
complying party, and the ultimate sanction of dismissal of
the complaint or striking of the answer and entry of
default against the offending party defendant. As explained
by the Supreme Court in Wymbs v. Township of Wayne, supra,
163 N.J at 543, "trial courts have 'wide discretion in
deciding the appropriate sanction for a breach of discovery
rules,' as long as the sanction is 'just and reasonable,'"
(quoting Mauro v. Owens-Corning Fiberglas Corp., 225
N.J.Super. 196, 206, (App.Div.1988), aff'd sub nom., Mauro
v. Raymark Indus., Inc., 116 N.J. 126 (1989)}.

Moreover, if the responding party has withheld
properly demanded information that was within its

possession and that information, by reason of loss, destruction or concealment is not available to the aggrieved party, the aggrieved party is entitled at trial to the spoliation inference. The spoliation inference "essentially allows a jury in the underlying case to presume that the evidence the spoliator destroyed or otherwise concealed would have been unfavorable to him or her." Rosenblitt v. Zimmerman, 166 N.J 391, 401-402 (2001), noting that "[s]ince the seventeenth century, courts have followed the rule "omnia praesumuntur contra spoliatorem," which means "all things are presumed against the destroyer."

If, however, the non-compliance has not but should have come to light before the conclusion of trial and cannot, therefore, be remedied within the litigation itself and if the aggrieved party's right to a fair trial was prejudiced by the non-compliance, then the aggrieved party, under New Jersey law, has a separate cause of action against the offending party fraudulent concealment. See Viviano v. CBS Inc., 251 N.J.Super. 113 (App. Div. 1991), certif. denied, 127 N.J (1992), endorsed by Rosenblitt v. Zimmerman, supra, 166 N.J. at 405-406.

The foregoing notwithstanding, not every failure fully and responsively to answer interrogatories is appropriately dealt with by sanctions. Occasionally there are bona fide disputes between the parties as to whether the answers meet the fully-responsive standard or are vague, incomplete, or ambiguous. In that situation, the propounding party has the option of moving the court for an order requiring the answering party to provide more specific answers. R. 4:17-5(c). See also Zimmerman v. United Services Auto., 260 N.J. Super. 368, 377 (App. Div. 1992)("If the set of answers as a whole lies within the area of bona fide dispute as to adequacy, both parties have adequate recourse for testing both the propriety of specific questions and the adequacy of specific answers. The opposing party may move to strike specific questions. R. 4:17-5. The propounder may move for an order requiring more specific answers. R. 4:23-1."). The motion for more specific answers is thus designed to ensure that the propounding party receives the information to which the discovery rules deems him to be entitled.

## V. Plaintiff's Discovery Demands and GM's Responses

Plaintiff suffered catastrophic injuries following a collision of the GM automobile he was driving with a school

10

bus. The GM automobile was a new 1986 Camaro IROC Z28
sports coupe with a so-called T-Top roof, also called the
T-Hatch and T-roof. As described by the Appellate Division
opinion, <u>Green v General Motors Corp.</u>, 310 <u>N.J.Super</u>. 507
(App. Div.) <u>certif. den.</u> 156 <u>N.J.</u> 381 (1998), "there was a
steel 'center T-bar' welded into the center of the front
windshield header and the rear window header. The roof
design is called a 'T-roof' or 'T-top' because the T-bar is
the only connection between the A and B pillars. Removable
glass panels were supported by the front and rear headers
and the T-bar, and provided a convertible-like feeling and
driving experience when they were removed." 310 <u>N.J.Super.</u>
at 312. When the Camaro and the school bus collided, the T-
bar collapsed, striking plaintiff on the head and
resulting in a compression fracture of the spine that left
him a quadriplegic.

As framed during the course of discovery and as set
forth in the expert report of plaintiff's first automotive
engineering expert, Dr. Arthur Damask, annexed to
plaintiff's answers to defendant's interrogatories served
on June 20, 1989, plaintiff's product-liability cause of
action against GM was premised on the assertion, inter
alia, that the T-top was based on a defective and unsafe
design.  More particularly, plaintiff asserted that there
were available feasible alternate roof designs which would
have rendered the vehicle significantly more crashworthy,
indeed, sufficiently crashworthy as to have spared
plaintiff any significant injury as a result of this
collision. (This assertion was further supported by
plaintiff's automotive engineering expert for the second
trial, Don Phillips, who opined that such crashworthiness
would have resulted had the roof been designed with the
addition of "two stabilizing [side] bars, one connecting
the left corners of the A (front) and B (rear) pillars and
the second connecting the right corners of these pillars."
310 <u>N.J.Super.</u> at 524.)

GM did not serve answers to plaintiff's initial
set of interrogatories until November 9, 1989, several
months after it was in receipt of Dr. Damask's expert
report, which had identified the T-top roof system as a
causative defective design. Thus, although there might have
been some imprecision in the original set of
interrogatories, any ambiguity had been cured by Dr.
Damask's report. Nevertheless, as also noted in the opinion
of Magistrate Judge Patty Shwartz, GM's response was to
assert General Objections, claims of harassment and/or

11

overbreadth and/ambiguity, and/or vagueness, and,
stunningly, the claim that plaintiff had failed to specify
the "component parts or systems at issue in this
litigation." However, in answer to question 52, which asked
for a statement of GM's design criteria, GM further
responded that to the extent plaintiff claimed a roof-
design defect, it would "produce upon execution of an
appropriate Stipulation of Confidentiality and Protective
Order representative drawing of the roof system of the 1988
Chevrolet Camaro Z28." In response to Question 70, which
asked for information regarding alternative design
approaches, GM, again asserting that it had not been
apprised of the "components or parts in issue in this
litigation," stated in full as follows:

> GM objects to this interrogatory on the grounds
> that it is overbroad, burdensome, vague and
> ambiguous inasmuch as the design and development
> of the 1986 Camaro was an evolutionary process
> involving many engineers over several years and
> 15,000 component parts.
>
> GM further objects to this Interrogatory as
> potentially seeking information of a confidential
> or proprietary nature and/or information subject
> to the self-critical analysis privilege.
>
> Without waiving its objections, GM states that if
> plaintiff would specify the components or parts
> in issue in this litigation it will identify
> engineering personnel knowledgeable about the
> component or parts in controversy. Joseph F.
> Rice of General Motors Engineering Staff is
> generally knowledgeable about certain aspects of
> the design of the 1986 Camaro Z28.

GM's responses to questions 68 and 69, also asking for
alternative design information, against asserted, in
addition to the usual litany of specious objections, that
plaintiff had not specified the component or part in issue
but, in respect of the roof system, would supply
information in the future subject to protective order.

This set of answers was signed by a person named
Charlyne Donahoe, identified only as "Authorized Agent,"
without any specification of her position with GM, if any,
or the basis of her knowledge, if any, of any of the facts
in controversy. Rather than using the familiar

12

certification form authorized by R. 1:4-4(b) in which the
person signing the interrogatories states that the
statements made are true,[2] Ms. Donahoe, whose jurat was
taken, used a so-called verification stating that she was
authorized to verify the answers and that they are "hereby
verified on behalf of General Motors Corporation in this
litigation." Obviously that statement does not constitute
compliance with R. 4:17-4(a) because a conclusionary
"verification" unsupported by the assertion that the
statements are true or based on information and belief does
not meet the requirement of answers under oath. See
Lippmann v. Hydro-Space Technology, Inc., 77 N.J.Super. 497
504 (App. Div. 1962)(making clear that the oath must
expressly assert the truth of the statements sworn to).
Clearly, the mere use of an oath cannot bind the affiant to
a lesser commitment to the truth of the facts stated than
does the certification in lieu. The status of the
"authorized agent" was clarified but not justified in terms
of the oath requirement by the deposition testimony of GM's
general counsel, Douglas Brown, Esq., who explained that
this is a person designated by the company to verify
interrogatory answers when instructed to do so by the legal
staff on whose word the agent relies.

Thereafter, and under the direction of Superior Court
Judge Carol Ferentz, to whom the case had been assigned for
pretrial management and trial, plaintiff continued his
attempts to secure information regarding the T-top roof
system by serving a demand on GM for more specific answers.
Thus question 52, by way of the request for more specific
answers, requested details regarding how design criteria
for the T-roof structure were established. Question 68, by
way of the request for more specific answers, asked if GM
had considered any alternative approach to the design or
construction of the T-top roof. Question 69, by way of the

---

[2] Unlike a certification in lieu of an affidavit which
requires that the information included therein be based on
the certifier's personal knowledge, the accepted practice
with respect to interrogatory answers is that the person
signing the interrogatories may include information based
on "information and belief." R. 4:17-4 was amended,
effective September 2006, to require the person answering
the interrogatories to state which answers are based on
information and belief rather than personal knowledge and
to state the source of the information and belief.

request for more specific answers, asked, if question 68 were answered in the affirmative, for a description in detail of every alternative approach and the objection to or reasons for rejection of each alternative approach. Finally, question 70, by way of the request for more specific answers, asked, in respect of the T-Top roof system, for a description "of any and all predictive analyses, studies, tests, investigations or examinations which relate to or reflect your consideration of each alternative approach to the design or construction of said product, by stating the name of the author(s), title of document containing or reflecting both the performance of and the results of any such predictive analysis, study, test, investigation, or examination and the date(s) on which the same was or were conducted and completed."

Plaintiff's initial document demands, together with his request for more specific answers, served on the same date as the request for more specific answers to the interrogatories, likewise included demands for documents having anything to do with the T-Top roof system.

GM's responses to the request for more specific answers to both the interrogatories and the document demands were signed not by a person claiming to be an agent in fact for GM but rather by GM's attorney by way of a letter. This response reiterated the overbreadth objection even though by this time the roof design had long since been unequivocally identified as the defective design on which the suit was based. In any event the response to question 52 was an undertaking to produce the information in the future subject to a protective order. The response to question 68 was the same after a general objection that the question was "improper in form, argumentative, and not reasonably calculated to lead to the discovery of admissible evidence." The response to question 69 was "See response to interrogatory number 68."

Faced with these answers in light of GM's certain knowledge of the components or parts claimed to be defective, plaintiff moved the court for an order requiring more specific answers, and an order granting the motion was entered by Judge Ferentz on August 3, 1990, following a hearing. The order struck GM's general objections to both the interrogatories and document demands and required more specific answers to 51 designated questions and twenty designated document demands. More specifically, it required that the information to be provided by GM be

14

responsive to plaintiff's claim of a defectively designed
T-roof as well as his claim, thereafter abandoned, of
defective tires.  In regard to the roof, the order required
"information and documentation relating to the roof
system/structure and any connected related parts, including
the left rear portion of the 1982 through 1986 model years
Chevrolet Camaro manufactured with T-roof."  Although not
appearing in the order but among the directions orally
issued by the court at the hearing on the motion was the
requirement that GM name the person with knowledge,
information and expertise to take responsibility for the
answers and to coordinate and direct the methodology by
which the answers and document production would be
provided. GM designated Dr. Joseph Rice.[3] That designation
was confirmed by GM's counsel's letter to plaintiff's
counsel dated August 1, 1990, which include the following
statement:

> The court insists that someone with hands-on
> personal knowledge of the matter be responsible
> for obtaining the discovery on behalf of General
> Motors and in the event the court is dissatisfied
> with the response be prepared to testify with
> respect to all efforts to produce discovery. In
> that regard it is our recommendation that we
> shortly have a conference on this matter so that
> the discovery can be reviewed and coordinated and
> we can insure that we have fully complied with
> the court's direction.  Also, it is our
> recommendation that Mr. Rice personally supervise
> and review the discovery requests and responses
> inasmuch as he may be called to testify to
> General Motors' effort to respond to discovery.

GM purported to provide more specific answers as
ordered by the court by way of supplemental answers and
supplemental response to document demand dated September
20, 1990.  With regard to the critical question, No. 68,

---

[3] As indicated in Magistrate Judge Shwartz' opinion, at page
19, note 11, the transcript of the hearing on the motion,
directed by Judge Ferentz to be obtained by GM and served
on plaintiff  was ordered by it but never obtained.  I
therefore rely on GM's counsel's letter of August 1, 1990
sand the fact that all parties agree with respect to Dr.
Rice's designation.

regarding GM's consideration of alternative roof designs, GM's supplemental answer stated that the engineering process "inevitably involves the considerations, analysis and rejection of different approaches to a roof design. In particular, GM considered and adopted another alternate structure, i.e., the hard top model, in addition to the T-top. For detail on the design process, see the documents GM is producing in response to interrogatories Nos. 27 and 52." The answers to both No. 27 and 52 were general in nature, the latter stating, however, that the design drawings of the evolution of the roof design for the T-top would be produced pursuant to a protective order and, more significantly, that "GM is conducting a review of design-related documents on microfiche and will produce hard copies of available documents responsive to this interrogatory, if any, as soon as practicable." No such documents were, however, ever produced that showed any alternate design and thus no alternate design of the type suggested by Mr. Phillips, plaintiff's second automotive engineering expert, referred to, as noted above, in the Appellate Division decision. These answers and document-demand response were again "verified" by an unidentified person named Theresa L. Cerwin, Authorized Agent, in precisely the same form and verbiage as previously used by Charlyne Donahoe.

### VI. Post-discovery Disclosures

The case was eventually tried to a hung jury, and before the second trial, commenced in February 1996, Judge Julio Fuentes presiding, there was some additional discovery respecting the parties' experts. Although GM had declined voluntarily to provide any additional documentation, it was ordered, just prior to trial, to provide additional crash-test material.

Although by way of its answers to interrogatories and response to document demands, GM denied that any alternate roof designs other than the hard-top model had ever been considered, the now undisputed fact, as demonstrated by A-H, is that consideration had indeed been given to two alternate roof designs, designated by GM as the Vista Vent and Modified T-Hatch. Both show support bars connecting the A and B pillars on both the driver and passenger side, the basic configuration testified to by Mr. Phillips. Moreover, the Modified T-Hatch was in actual production in Europe, used on a Lancia model, the Lancia Beta Spyder, although in GM's appellate brief, that roof design was referred to as

16

an untried, untested figment of Mr. Phillips's imagination.
As the A-H documents show, and as further explained by Mr.
Phillips in his deposition in the Newman case, the relative
merits and costs of these alternate roof designs were given
significant consideration by GM prior to its decision to
reject them and to manufacture the vehicle with the T-Top
despite GM's recognition of the significantly greater
safety provided by the two other designs.

Documents A-H were located in what GM refers to as the
F-Car Project Center files. During the period from initial
conception to actual production, each GM model is the
subject of voluminous materials, including research,
designs, analysis, and executive decisions, contributed to
by representatives of the various divisions of the company
and coordinated in a single place known as the Project
Center. The F-Car Project Center was devoted to what may be
referred to as the planning phase of the Camaro Z28, the
so-called third generation of that model, which went into
production in 1982. Typically, once a car goes into
production, the Project Center is disbanded, but the
written materials generated by it are preserved in the
Project Center files, in this case, the F-Car Project
Center files. The files are eventually microfiched and
indexed. As explained by Dr. Rice in his October 21, 2008,
deposition, the files are indexed by writer and subject and
can be searched by key words. According to plaintiff's
attorney, and apparently undisputed, is the fact that
neither the existence of the F-Car Project Center files nor
any of its documents addressing alternate roof design was
ever disclosed to plaintiff although it is perfectly clear
that the A-H documents were directly responsive to the
interrogatory demands and rendered the answer given to
Questions 68 incorrect, incomplete and, ultimately, false.

The circumstances pursuant to which A-H came to light
are set forth generally in the motions papers filed in the
Appellate Division in support of the motion for leave to
supplement the record and are further detailed in the
testimony of Patrick Ardis, Esq. In brief, a similar Camaro
T-top roof case, Johnson v. General Motors, was pending in
Tennessee. Mr. Phillips was the plaintiff's expert in that
case as well. The plaintiff's attorney, Mr. Ardis,
obtained an order from the Tennessee court authorizing him
to go to Detroit to examine GM's records as he had been
unable to obtain satisfactory production either in that
case or in another case involving a J-car. While his team
was there early in 1997 inspecting the J-Car Project Center

17

files, Mr. Ardis instructed it to determine if there was a
similar file for the Camaro. The F-Car Project Center files
were thus discovered. Eventually Mr. Ardis was able to
obtain a large number of documents from the F-Car Project
Center file, which, according to Mr. Phillips conclusively
demonstrated that in opting for the T-Top roof system,
General Motors was well aware both of the available
alternatives and of their substantially greater
crashworthiness. The documents known as A-H were among the
documents Mr. Ardis ultimately obtained from GM.

        Mr. Ardis shared these documents with Mr. Phillips,
who knew that they had never been disclosed in the New
Jersey litigation.  Mr. Ardis then obtained an order from
the Tennessee court modifying the protective order there
entered permitting him to apprise Mr. Donovan, Green's
attorney, of their existence. The motion to the Appellate
Division to supplement the record, above referred to,
ensued. It was Mr. Phillips who selected A-H from among the
materials eventually produced from the F-Car Project Center
files as demonstrating, graphically and in terms readily
accessible to a layman, GM's knowledge of the alternative
roof systems and their superior crashworthiness. Mr.
Phillips also selected from the mass of material ultimately
produced what he referred to as the top 165 documents,
extensively reviewed at his deposition, which demonstrated,
in highly technical engineering terms, GM's knowledge of
the essential flaw in the T-Top and the available
alternatives. Significantly, Mr. Phillips also discovered
that prior to opting for the T-Top roof design, GM had
performed a "Mona Lisa" review of a Lancia Beta Spyder,
which he described as taking apart the entire vehicle in
order to study each of its component parts. Again, none of
these materials and information was disclosed by GM in the
Green case although they were directly responsive to
plaintiff's interrogatories and document demands.

## VII. Analysis

    The question is whether the required good faith and
diligence in providing fully responsive answers to
interrogatories and responding to a demand for document
production could have been exercised by GM without
disclosure of A-H and the technical documents described by
Mr. Phillips.  Based on all the materials I have reviewed
and assuming the essential accuracy of the facts as therein
stated, I conclude that this question must be answered in
the negative.

18

It appears beyond question, and GM so acknowledged in its above-quoted letter, that Judge Ferentz intended GM to designate one person with the responsibility to search for, direct the search for, assemble and cause the transmission to plaintiff of information in the possession of GM which would constitute full and truthful answers to the interrogatories and document demands, particularly those relating to the roof design. Dr. Rice was designated by GM as that person. Nevertheless Dr. Rice himself denied that that was his role. In his 2004 testimony and 2008 deposition, he asserted that while he had no independent recollection of any of the specifics of his involvement in the Green discovery response, his role in that case was no different than it customarily was as a senior member of the Engineering Analysis department of GM, that is, the engineering forensic arm of GM which worked with the legal staff, both in-house and outside counsel, when a GM product was the subject of litigation. In general terms, Dr. Rice claimed that his function was to give engineering advice in respect of technical questions raised by the discovery demands, to advise the legal staff, particularly the so-called discovery coordinators, where the requested information would likely be found, and to review the proposed discovery responses to ascertain their responsiveness to the request. He did not himself undertake to determine whether the proposed responses were complete. He did, however, testify that he advised the people actually searching for the roof information that the likely sources would be the records of the former, now disbanded, Fisher Body Division, in which he had been a structural analysis engineer prior to his position in Engineering Analysis, and in the F-Car Project Center Files of whose existence he was well aware. With respect to the latter, he said, he would have provided the discovery coordinator what he would regard as productive key words, including roof, hatch, rails, T-top and the like, although he had no recollection of actually having done so.

What is, however, most telling is his assertion that in any case these documents were not responsive to the discovery demands, particularly Question 68, and therefore did not require disclosure. Again, Question 68 asked if GM had "considered any alternative approach to the design or construction of the T-top roof." In Dr. Rice's testimony before Magistrate Judge Shwartz in 2004, he took the tack that the Vista Vent and Modified T-hatch alternatives were not "designs" but only "concepts," apparently having chosen

19

to define "design" as limited to "something that can be
built on," rather than in its usual and significantly
broader connotation.

In his 2008 deposition, Dr. Rice tried a more
sophisticated but no less specious and casuistical
justification for non-discoverability. This time he claimed
that the A-H documents were not responsive to Question 68
because of the manner in which the question was framed.
Again defining words to mean what he said they meant rather
than as they are commonly understood, he asserted that
"approach" means "process," and in explaining what a
process is, he claimed that it is only necessary to
indicate that by selecting one alternative, other
alternatives, which need not be identified, were
necessarily rejected. Therefore, having selected the T-Top
during the planning stage of the Camaro, GM was not
required to identify the alternative rejected roof designs
because doing do would not be responsive to the question of
whether GM had considered an alternative "process", i.e.,
"approach". This circuitous explanation is contrary to
logic, semantics, and common sense. The import of the
question was perfectly clear - were any other roof designs,
or concepts if you will, considered? And A-H leaves no
doubt of the consideration and rejection of the Vista Vent
and Modified T-Hatch.

It is also to be noted that whoever was responsible
for providing the supplemental answers as ordered by Judge
Ferentz did not share Dr. Rice's idiosyncratic
interpretation of the question and had no difficulty in
understanding what the import of Question 68 was. The
answer, albeit incomplete, admitted that "in particular, GM
considered and adopted another alternate structure, i.e.,
the hard top model, in addition to the T-top." The answer
simply omitted the Vista Vent and Modified T-Hatch
alternatives that were rejected.

## VIII. Conclusion

The F-Car Project Center files were adequately
indexed. They were identified by Dr. Rice to the persons
actually conducting the search as a potential source of the
roof-development information, and the appropriate key words
for searching them had been provided. And, in a September
12, 1990 letter from the Product Discovery Coordinator to
outside counsel, marked as Exhibit 20 at the Rice
deposition, the Coordinator declared that among the items

20

which "will take time to review and produce" are [t]he
responsive documents from the F Car Project Center Files
(Interrogatories 24, 52, and 68)." On August 22, 1991, by
way of a supplemental answer to question 52 (but, pointedly
not 68), GM provided a large number of documents culled
from the F-Car Project Center files relating to the T-top
but none of the documents relating to the rejected
alternatives. Obviously, they were there, were readily
accessible, and should have been produced.

Based on the foregoing, it is my opinion that the A-H
documents, as well as the supporting technical material,
were clearly responsive to Question 68 and the other
related discovery demands, that they were readily
accessible to GM during the discovery phase of the Green
litigation, that a reasonable and diligent search would
have disclosed them, and that they were, therefore,
required to be disclosed both before the first trial and,
without any question, before the second trial, which was
preceded by Mr. Phillips's unequivocal and unambiguous
expert report suggesting a version of the rejected roof
system alternatives. GM's failure of disclosure constituted
a clear breach of its discovery obligations. The record
amply supports the conclusion that the relevant documents
were intentionally withheld by GM's personnel and agents[4]
whose duty it was to discover and transmit the requested
information.

Respectfully submitted,

Sylvia B. Pressler

---

[4] Dr. Rice testified that at some point a number of
documents including a portion of A-H were reviewed by
outside counsel, Rumberger & Kirk, of Orlando for
transmission to Kirkland Ellis, who was to submit them to
plaintiff. None of the A-H documents were so submitted.

21

## Appendix

In preparing this report, I reviewed and analyzed the
following documents:

### Green v. General Motors
### Superior Court of New Jersey

Complaint filed June 1, 1988
Green initial interrogatories, September 15, 1988
Green response to General Motors interrogatories with Dr.
    Damask's report annexed, June 20, 1989
General Motors initial response to interrogatories,
    November 9, 1989
General Motors initial response to demand for production
    Of documents, November 9,1989
Green's request for more specific answers, January 22, 1990
Green's request for more specific response to demand for
    document production, January 22, 1990
Green's supplemental interrogatories, January 23, 1990
General Motors verification to interrogatories, February
    26,1990
General Motors response to demand for more specific answers
    and document production, March 3, 1990
General Motors response to supplemental interrogatories,
    April 5, 1990
Green's second request for more specific answers, May 21,
    1990
General motors response to May 21 , 1990 second request
General Motors amended answers re expert report, June 24,
    1990
Green's letter to Judge Ferentz, July 16, 1990
Order dated August 3, 1990, compelling more specific
    answers
General Motors response as ordered by the court, September
    12, 1990
General Motors responses as ordered by the court, September
    20, 1990
General Motors amended answer re Interrogatory 52, August
    22, 1991

General Motors, Miscellaneous amended answers, July 21,
    1991 to December 16, 1992
General Motors supplemental expert reports. October 9, 1995
Green demand re GM's supplemental expert reports, November
    10, 1995
Kirkland and Ells letter, November 29, 1995
Green motion to Judge Fuentes, December 16, 1995
Partial transcript of hearing before Judge Fuentes, January
    5, 1996
General Motors supplemental expert reports, January 18,
    1996
Judge Fuentes order compelling production, January 18,1996
General Motors appellant's brief filed in the Appellate
    Division
Green's respondent's brief filed in the Appellate Division
Green's motion in the Appellate Division to Supplement the
    Record with supporting documents
Opinion, Green v. General Motors, 310 N.J.Super. 507 (1998)

Newman v. General Motors
United States District Court
District of New Jersey

Plaintiff Newman's brief in opposition to motion to dismiss
Transcript of Unsealed testimony of Donald Phillips,
    December 20, 2004
Transcript of testimony of Dr. Joseph Rice, December 20,
    2004
Transcript of testimony of Patrick Ardis, December 20, 2004
Redacted Opinion of Magistrate Judge Shwartz, March 23,
    2005
Expert opinion of Donald Phillips, September 2, 2005
Opinion of Judge Hayden, March 30, 2006
Opinion of Third Circuit, June 20, 2007
General Motors Second Amended Answers to Interrogatories,
    December 14, 2004
Transcript of testimony of Dr. Joseph Rice, December 20,
    2004
Transcript of deposition of Donald Phillips. Commenced on
    November 7, 2005 (three volumes)
Excerpted transcript of deposition of Douglas Brown,
    September 15, 2008
Transcript of deposition of Dr. Joseph Rice, October
    21,2008

CURRICULUM VITAE
SYLVIA B. PRESSLER

**Judicial:**

Retired, April 2004, on recall through August 2004
Judge of the New Jersey Superior Court, Appellate
     Division, 1977-2004
          Presiding Judge, Part E – 1984-2004
          Presiding Judge for Administration
               1997-2004
Temporarily assigned to Appellate Division –
     November 1976
Appointed to Superior Court of New Jersey – September
     1976
Appointed to Bergen County Court – October 1973

Supreme Court Committee on Civil Practice
     Chair – 1988 to date
     Vice Chair – 1987
     Member since 1965

Supreme Court Committee on Rules of Evidence
     Member and Vice Chair – 1982 to date

Co-Chair – Special Committee on RPC 4.2
           Special Committee on fresh complaint
           Special Committee on municipal court rules

**Post-Judicial:**

Chair – Supreme Court Committee on Civil Practice
Vice-Chair – Supreme Court Committee on Evidence
Chair– Council on Local Mandates
Commissioner – New Jersey Law Revision Commission
Member – Joint Legislature Committee on Ethical
     Standards
Member –Supreme Court Commission on Judicial
     Evaluation
Member –Supreme Court Committee on Salaries and
     Pensions
Member –Supreme Court Ad Hoc Committee on Judicial
     Ethics

Author – New Jersey Court Rules Annotated
Adjunct Professor – Rutgers Law School, Newark
Lecturer – Continuing Legal Education Programs
          New Jersey Judicial College

Mediation, arbitration, appellate consultation

**Pre-Judicial:**

Partner, Okin & Pressler and successor firms,
1960-1973

Hearing Examiner - New Jersey Division on Civil Rights
-1966-1973

City Solicitor - City of Englewood - 1969 to 1973

First Assistant Bergen County Counsel - 1967 to 1968

Lecturer, Rutgers Law School, 1968-1970

Associate Editor, New Jersey Law Journal, 1968-1973

Reporter, New Jersey Rules Revision of 1969

Law Clerk of Hon. Milton B. Conford, P.J.A.D., 1959-
1960

Research Assistant to Professor Thomas A Cowan, 1958

Research Assistant to Schnitzer & Wildstein, 1961

**Education:**

Rutgers Law School, Newark, J.D. 1959 (high honors)

Queens College, New York City, 1952-1954

Boston University, B.A. in Philosophy, 1954-1955

**Associations:**

American Law Institute - life member

ABA Conference of Chief Judges

American Bar Association

New Jersey State Bar Association

National Association of Women Judges

Women Lawyers in Bergen County

Pashman Inn of Court

**Honors:**

Rutgers University Hall of Distinguished Alumni

Boston University Collegium of Distinguished Alumni

New Jersey Bar Association Medal of Honor

Legal Services of New Jersey - Richard J. Hughes
Career Public Service Award

Weintraub Lecturer - Rutgers Law School

Alice Paul Equality Award



**Norris
McLaughlin
& Marcus, P.A.**
ATTORNEYS AT LAW

February 12, 2009

Jameson B. Carroll, Esq.
King & Spalding
1180 Peachtree Street
Atlanta, GA 30309-3421

Re: NEWMAN V. GENERAL MOTORS CORP.
02-135 (KSH-PS)

Dear Mr. Carroll:

I enclose a copy of my report in the Newman matter. As previously indicated to you, RPC 1.12 of our Rules of Professional Conduct provides the following:

(a) Except as stated in paragraph (c), a lawyer shall not represent anyone in connection with a matter in which the lawyer participated . . . substantially as a judge . . . unless all parties to the proceeding have given consent, confirmed in writing.

(b) If a lawyer is disqualified by paragraph (a), no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in the matter unless:

(1) the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom, and

(2) written notice is promptly given to the parties and any appropriate tribunal to enable them to ascertain compliance with the provisions of this Rule.

As you know, former Judge William Drier, the judge who authored the opinion in <u>Green v. General Motors</u>, is a member of my firm. From the first time you contacted me with the potential of being an expert witness, except to inform him that I may be an expert in this case, he and his Legal Assistant have been totally screened from my involvement and any documents that have been forwarded to my office. The other persons in my office who will have knowledge of this matter will be confined to my Legal Assistant, Ruth Nolan, and an Associate, Erin Welsh. They have been instructed not to speak to Judge Drier or his Assistant about this matter or provide him with any of the documents. Should I confer with any other persons in the firm, I will instruct them not to divulge any information to Judge Drier. Judge Drier's office is located on a different floor then mine.



NJ: 721 Route 202-206 Bridgewater, NJ 08807 • Mailing: P.O. Box 5933 Bridgewater, NJ 08807-5933 • P: (908) 722-0700 • F: (908) 722-0755
NY: 875 Third Avenue, 18th Floor New York, NY 10022 • P: (212) 808-0700 • F: (212) 808-0844
www.nmmlaw.com E: info@nmmlaw.com

NORRIS, MCLAUGHLIN & MARCUS, P.A.

February 12, 2009
Page 2

It was not until Friday January 30, 2009, that you gave me the green light to prepare a report. I began reading the voluminous transcripts and other relevant material. Prior to that time, my involvement was confined primarily to our initial meeting, a reading of the relevant opinions, a recent Law Journal article, and Judge Pressler's report. Moreover, Judge Drier commenced a ten-day vacation to Florida on January 31 and is not due back in the office until February 13. As of the present time, it is my understanding that you have not named me as an expert and will not do so until you have read my report.

The RPC speaks in terms of representation or continued representation, not serving as an expert witness. However, given the fine line between serving as a legal expert and representation, I believe that the spirit of the rule requires me to inform both the Court and the Plaintiff of my relationship with Judge Drier and what we have done to comply with the screening requirements of the rule. I would, therefore, ask that you forward this letter to Judge Swartz and your adversary, should you choose to use me as an expert.

Very truly yours,

JACK L. LINTNER, P.J.A.D. (retired)

## RULE 26 (a)(2)(B) DISCLOSURE

(i)     Written Report (18 Pages) – Attachment A

(ii)    Data and Information Considered – Attachment B

(iii)   Exhibits – No exhibits other than those referred to in
        depositions and testimony set forth in ii.

(iv)    Witness's Qualification and Publications

   a. Qualifications – Curriculum Vitae – Attachment C

   b. Publications – List of published opinions – Attachment D

(v)     Previous Cases Testified in as Expert: None

(vi)    Compensation to be Paid:   $500.00 per hour.

1

Attachment A

**REPORT TO KING AND SPALDING**

**IN THE MATTER OF**

**NEWMAN v. GENERAL MOTORS INVOLVING GREEN v. GENERAL MOTORS**

**FEBRUARY 12, 2009**

**JACK L. LINTNER, P.J.A.D. (ret.)**

Norris McLaughlin & Marcus, P.A.
721 Route 202-206, P.O. Box 5933
Bridgewater, New Jersey  08807

Pursuant to your request, the following report is rendered by me in response to Judge Pressler's report of December 16, 2008, which I received via e-mail from your office on January 26, 2009. After reviewing the voluminous record in the Newman case, I have come to the following conclusions. I agree with Judge Pressler's findings that, under our discovery rules there was a clear obligation on the part of General Motors (GM) to produce documents Addenda A through H (A-H), during discovery in Green v. General Motors (Green). However, I part company with her statement that "the record supports the conclusion that the relevant documents were intentionally withheld by GM's personnel whose duty it was to discover and transmit the requested information."

Indeed, a reading of the record supports the conclusion that the pertinent documents contained in A-H, supporting plaintiff's contention that GM considered the reasonable alternative design suggested by Dr. Phillips,[1] were not intentionally withheld from plaintiff. Instead, notwithstanding some missteps in the discovery process by employees of GM, the record establishes that the relevant documents were provided by GM to independent outside counsel for review. Thus, the non-

---

[1] The alternative design, consisting of two side rails, found in the A-H documents was determined by the panel in Green v. General Motors, 310 N.J. Super. 507, 525 (App. Div. 1998) to be "akin to the one suggested by plaintiff, thus supporting the existence of a reasonable alternative design."

production of the significant A-H documents did not result from any intentional wrongdoing on the part of GM, its employees or agents.

### Green v. General Motors

On June 9, 1986, Michael Green was involved in an automobile accident while operating a 1986 Chevrolet Camaro IROC "T-roof" coupe, designated as a third-generation F-Car design. The accident rendered him a quadriplegic. He filed suit on February 10, 1990, naming GM as one of the defendants, alleging negligence and strict liability. According to the description provided in the Appellate Division opinion, Green v. GM, 310 N.J. Super. 507, certif. denied 156 N.J. 381 (Green opinion), the Camaro was designed with a center T-bar. The T-bar was welded in place and extended from the front windshield header to the rear window header. A "convertible-like feeling" was provided by removable glass panels supported by the T-bar and the front and rear headers. Id. at 514. According to plaintiff's proofs in the second trial, the collision caused the rear portion of the T-bar and rear header (B-pillar) to deform downward onto the back of plaintiffs head, causing compression factures of C5, C6, and C7. Ibid.

The first trial resulted in a hung jury in January 1993. At that trial, plaintiff presented expert testimony from Dr.

3

Arthur Damask.  Dr. Damask testified, "The T-roof which was
glass came down with high velocity and struck [Green's] head . .
. caus[ing] crushing of the vertebra."  Describing the alternate
design that would have prevented Green's injuries, he opined (1)
"if it had a solid roof it would have distorted the windshield
header somewhat but it would not have pulled . . . down" and (2)
"instead of a T-bar which goes from the windshield header to the
rear," a "tent pole design" would "pull out" causing the rear
header to "distort" thus not allowing the header to pull down
into the passenger compartment.

Following the first trial, Damask was no longer available
to testify.  Plaintiff retained the services of Donald Phillips
sometime in 1994.  Phillips, on an overall basis, had serious
reservations about Dr. Damask's opinion.  As noted in the Green
opinion, Phillips presented two reasonable alternative designs.
The first, "challenging the fundamental safety of the T-bar
configuration itself . . . claim[ing] that the basic Camaro
design with a standard full sheet-metal roof provided sufficient
stability to maintain the integrity of the passenger
compartment," and the second, positing the use of "two
stabilizing bars, connecting the left corners of the A (front)
and B (rear) pillars and the second connecting the right corners

of these pillars."[2]  The jury returned a verdict in plaintiff's

favor for compensable damages of $17,767,175.35.[3]  According to

the verdict sheet question number 3, the jury determined that

Green had proven "that the alternate design would have prevented

his accident."

GM appealed.  While the appeal was pending, the A-H

documents were discovered by attorney Patrick Ardis who

represented plaintiffs in two pending Tennessee cases involving

GM.  Ardis entered into a consent order with GM to examine

certain files.  On January 6, 1997, while in Detroit, his team

of lawyers and paralegals were given access to the F-Car Project

Center.  Documents A-H were among the documents Ardis found as a

result of his team's review of files located at the F-Car

Project Center.  After seeing the A-H documents, Phillips, who

was being used as an expert by Ardis, told Ardis about the Green

case.  Ardis then obtained a protective order from the Tennessee

court, allowing him to share A-H with Green's attorney.  Citing

the A-H documents in his motion, Green's attorney, Maurice

Donovan, moved to supplement the appellate record, pointing out

that the documents had not been produced in discovery and

established that GM evaluated the alternative similar to that

---

[2] It is noted that in Phillips' report rendered on August 30,
1995, he only mentions the first alternative design.
[3] On remand, the Law Division remitted the verdict and entered a
judgment of $14,126,013.83.

proffered by Phillips. The motion was granted and the panel determined that the design consisting of two side rails, found in A-H, was "akin to the one suggested by plaintiff," thus supporting the existence of a reasonable alternative design. Green at 525.

Newman v. General Motors

On November 19, 2001, Green's Estate filed a complaint seeking compensatory and punitive damages alleging in the first two counts intentional and negligent concealment of evidence.

Discovery in Newman reveals the following events in Green. On August 3, 1990, Judge Ferentz issued an order requiring GM to produce more specific answers to interrogatories and more specific responses to plaintiff's requests for production of documents by September 26, 1990. The order further provided, in pertinent part, that the more specific responses to be supplied "shall be limited to the information and documentation relevant to plaintiff's . . . alleged claim of . . . defectively designed T-roof . . . ."

On August 8, 1990, a meeting was held at GM offices in Michigan. In-house products liability attorney Douglas Brown, Local New Jersey Counsel Joe Murray, Regional Special Counsel Andrew Langan, In-house Engineer Joseph Rice and Discovery Coordinators, Kathy Marshall and Susan Rhodes were present.

6

They reviewed Judge Ferentz's order. Brown, who was assigned roof crush cases including the Green case, was responsible to assure compliance with Judge Ferentz's order. At the time, Eileen Rooney, a paralegal employed by the Orlando, Florida law firm of Rumberger and Kirk (Rumberger), had been involved in searching for documents at the F-Car Project Center for Hassan v. GM a contemporaneous roof crush case assigned to Brown. The Rumberger firm was also involved in other F-Car roof crush cases, Irvin, Bishop, and Wickham. Because Rumberger was involved in several F-Car roof crush cases, Brown decided that it would be most efficient for Rumberger to review F-Car documents.

As the engineer assigned to the case, Rice had to direct where the search for documents should be conducted. Various project centers were created by GM to bring people together, including engineers, with expertise on specific car platforms. Rice directed the search to take place at Fisher Body and the F-Car Project Center. At the time, prior to the development of today's computer search engines, documents regarding particular vehicles were kept on microfiche. It appears from Brown's deposition that there may have been as many as 50,000 to 60,000 pages of documents in the F-Car Project Center file.

Discovery coordinator Susan Rhodes, who held a Masters in Library Science, was assigned to coordinate the discovery.

Rhodes had held the position of discovery coordinator since
January 1990 and was transitioned into the case following Kathy
Marshall. As discovery coordinator, Rhodes was charged with the
duty of conducting a search within the parameters that the
engineers or attorney assigned. She would send letters to the
various locations where documents were kept and ask that a
search be conducted in accordance with the criteria set up by
Brown and Rice. Myrna Ade pulled microfiche for two boxes of
the three boxes containing the documents selected for review.

On October 9, 1990, Rhodes sent the three boxes, containing
9,953 pages copied from microfiche compiled from the F-Car
Project Center and Fisher Body to Rumberger.[4] Her letter asked
that they be reviewed for <u>Green</u> "specifically interrogatories
27." Additionally there were directions to review the documents
for <u>Hassan</u>. Finally, the letter directed for "future rollover
cases" that "[w]e would like to create an F-Car Project Center
File Package that would answer the plaintiff's question seeking
information about the history of the roof development for the
1982 'F' body vehicle." In November 1990, Rhodes was assigned
to the Comptroller's staff ending her involvement with <u>Green</u> and
<u>Hassan</u>. Significantly, Rhodes explained that it was her normal

---

[4] The files included 9,191 pages of F-Car Project Center Subject
files, 676 pages of F-Car Project Center Writer's files, and 86
Fisher Body Records.

policy to retain copies of all document sent out for review to outside counsel.

William Kirk, a partner with the Rumberger firm testified that, after the Wickham case, Douglas Brown asked him if his firm would be interested in being specialty counsel dealing with discovery in F-Car cases. According to Kirk, his partner, Robert Rudock, would handle the assignment out of their Miami office. Rumberger has a ten-year case file retention policy. Both the Wickham and Hasson files were closed in March 1992.[5] Although a search of the firm's records showed that it had not opened a file for Green, Kirk acknowledged that his office did work on the Green case.

Kirk spoke with both Rudock and paralegal Rooney both of whom indicated that they did not have any recollection of the work done on Green. According to Rumberger time records and billing for September 7, 1990 on the Irvin[6] case, Rooney spent time reviewing approximately 1,100 pages of potentially responsive material to roof crush and T-top case and 900 additional copies of microfiche documents produced by the Project Center. Hasson was being handled by Ronald Betman at the Kirkland and Ellis law firm (Kirkland). The billing records

---

[5] The ten-year period elapsed just prior to the request for production of documents in Newman.

[6] The billing time was shared with Hasson.

9

indicate that Rooney spent 23 hours over two days reviewing records for Hasson from July 4 to July 26, 1990. Rumberger's time sheet for Hasson revealed that 19 hours were spent reviewing the record for Hasson in Detroit in May 1990.

The time records also showed that Rooney participated in an October 15, 1990, telephone conference with Rhodes, and an intro-office conference with Rudock after receipt of the October 9 transmittal. They also show that Rooney spent five hours reviewing the documents sent by Rhodes. She logged an additional two-and-one-half hours reviewing documents on November 11 and February 25 1991.[7] Rooney then left Rumberger to work for another firm.[8] The next Rumberger record identified by Kirk is a letter dated, July 8, 1991 (exhibit 166) from Rudock to Ronald Betman. Identifying the subject matter as: "Re: F-Car Center Documents," Rudock wrote:

> Enclosed for your review are F-Car center documents which refer to or address the development of the T-roof of the 1982 to present F-Car. We have not made an evaluation as to whether the enclosed documents should be produced in Green v. GMC. We of course, are available to discuss production of the enclosed documents in Green.

---

[7] Between November 10 and February 25 Rooney was with Kirk preparing for and attending the trial of the Bishop case.

[8] Kirk thought Rooney went to work for a judge. Rooney testified she went to another law firm after leaving Rumberger before working for a judge.

10

Should you have any questions or
concerns, please do not hesitate to contact
us.

The letter was copied to Thomas A. Ziolkowski at GM and contains
64 pages of documents. According to Kirk, the Bates numbers on
the 64 pages came from the 1100 documents reviewed by Rooney.
He testified "We only looked at 1,100." He conceded "I'm
embarrassed to say" that his firm had not reviewed the three
boxes of file sent by Rhodes.

Andrew Langan, a partner at Kirkland, was the lead attorney
on the Green case. He assigned his associate David Coulson to
review the Green documents received from Rumberger. Langan had
told Coulson, sometime after returning from the August 8
meeting, that another firm was going to review the documents.
Coulson obtained the documents from Betman. After conferring
with Langan, Coulson called Rudock "to ask some follow up
questions so that we would have comfort that the scope of the
review conducted by the Rumberger firm would encompass the body
of responsive documents requested by the plaintiff as . . .
qualified by the August 3rd discovery order." Henry Salas, an
attorney at Rumberger, returned Coulson's call. Coulson
questioned Salas to determine whether the documents sent
complied with paragraph 5 of the August 3 Order requiring
production of documents "related to roof systems/structures and
any connected or related parts . . . ."

11

Coulson testified that he wanted to make sure that the scope and criteria for production of the documents were broad. He stated that he referenced the judge's production order with Salas and believed that if all the documents produced dealt with roof and roof components it would be responsive to the discovery requests. He testified that he "may have looked back at the document requests or interrogatories before [he] spoke with [Salas] but certainly, if there are any documents dealing with the roof and if the question is if there is some alternative design to the roof, that's the document that relates to the roof." He added "[s]o, I would have assumed that any alternative design documents would have been sent, would have been what was included."

Following his conversation with Salas, Coulson and Langan reviewed the documents and decided that all 64 should be produced. On July 29, 1991, Coulson sent the documents to Nancy Genova, a Discovery Coordinator at the GM Product Discovery Group asking that she arrange with local New Jersey counsel for the production in Green. The letter concluded "please note that, for inventory purposes, these documents are being produced as part of General Motor's response to Interrogatory No. 52 and they are confidential documents being produced pursuant to protective order."

Thomas Ziolkowski replaced Brown on the Green file in
November 1990. He was under the impression when he started that
all the F-Car documents had been sent out for review. After the
Discovery Group received the 64 pages of documents, Ziolkowski
accepted Langan's assurance that they had satisfied the August 3
Order. The 64 documents were then sent to local counsel and
provided to Green's attorney as an amendment to Interrogatory 52
indicating that they were supplied based upon a review of
microfiche and that they "relate to the roof system/structure
and any connected or related part, including the left rear
portion of the 1982 through 1986 model years Chevrolet Camaro
manufactured with a T-roof . . ." It was also Ziolkowski's
understanding that the discovery coordinator who sent the
documents to Rumberger kept a copy on file of all the documents
she sent.

### Opinion

When viewed in its entirety the facts suggest that the non-
production of documents A-H, insofar as they support
consideration of an alternate design, was not the result of any
intentional concealment on the part of GM's employees or agents.

A reading of A-H reveals that the "Modified Vista-Vent," a
design with bars connecting the right and left front corners of
the A pillar with the corresponding corners of the B pillar, is
first mentioned in addendum D. It is again mentioned in E with

13

a drawing provided in F.  H, mentions for the first time, the
Lancia Spider and has a drawing depicting an F-Car with a roof
consisting of bars on each side, next to one with a T-bar.  At
his deposition Phillips said that if he had had H in the second
Green trial it would have supported his opinion.

Plaintiff's interrogatory 52 stated: "Describe in detail
how the design criteria was established; question 68 asked
whether GM "consider[ed] any alternative approach to the design
or construction of said product.  Moreover, Judge Ferentz's
Order made it clear, after listing the several interrogatories
and document requests, that the information and documentation
requested and to be supplied "shall be limited to the
information and documentation relevant to Green's . . .
defectively design roof claim."

Langan, Coulson, and Murray all testified that documents A-
H were responsive to the several discovery requests and would
have been provided had they known of their existence.  They also
testified that they were never told by GM personnel to conceal
any documents and would never have withheld information.
Likewise GM's in-house lawyers Brown and Ziolkowski testified
that they have never told anyone to conceal documents.

Dr. Rice testified that although there was no design for
the Vista-Vent and Modified Vista-Vent, that "configuration was
considered."  More importantly, he explained that, as an

14

engineer, he would provide his judgment concerning what should
be produced but it was the attorneys who determined what was to
be produced. It was his "job to assist them to understand and
help them find documents." He explained that "discovery is a
legal issue[,] [t]he engineer isn't responsible, doesn't have
responsibility for discovery."

Rice is correct. It is the attorney, not the engineer, who
is familiar with the discovery rules. As pointed out by Judge
Pressler, our rules provide that inadmissibility is not grounds
for objection so long as the "information sought appears
reasonably calculated to lead to discovery of admissible
evidence." R. 4:10-4. As officers of the court attorneys have
the duty to provide discoverable information that is asked for
whether it is favorable or unfavorable to their client. It is
that requirement that is the essence of professionalism and
distinguishes the lawyer from the client.

"When the answer to an interrogatory may be derived or
ascertained from . . . annexation of business records, . . . it
is a sufficient answer to . . . specify the records from which
the answer may be derived . . . ." R. 4:17-4. The client finds
and supplies the material. Ultimately it is the lawyer who
determines whether the material supplied by the client is
responsive to an adversary's interrogatories and document
requests. Here, A-H should have been included in GM's response

15

to 52. Had they been so provided, a reference to them in the answer to 68 would have been sufficient.

It is apparent from Rooney's time records that she could not possibly have reviewed the almost 10,000 pages of documents sent by GM in October 1990. A reading of Rudock's July 8 transmittal leads to the conclusion that it may have been apparent to Rudock that his firm had not completed its assignment to put together information about the history of the roof development for the "1982 'F' body vehicle" as it might have applied to Green. Documents A-H were clearly relevant to the historic development of the third generation F-Car. Coulson apparently questioned Salas, in light of the limitation in Rudock's letter, to satisfy himself that the document production covered the intent of the discovery order.

As outside independent counsel, both the Rumberger and Kirkland firms are independent contractors. See Baldasarre v. Butler, 132 N.J. 278, 291 (1993). A client is not vicariously liable for the tortious actions of the attorney, so long as the client "did not advise, consent to, participate in and which was not justified by any authority [the client] had given." Ibid.; see also Clients' Security Fund v. Security Title and Guaranty Co., 257 N.J. Super. 18, 31 (App. Div. 1992). "Attorneys generally are not subject to their clients' actual control or direction." Ibid. "As professionals, attorneys are deemed

16

responsible for their own acts and . . . most clients have legal recourse against the attorney and his law firm for their actions." Ibid.[9]

Here, the copies contained in the three boxes retained by GM's Discovery Group, pursuant to policy, establish that the most significant documents, D, E, F, and H, were sent to Rumberger by GM.[10] Those documents show that the Modified Vista-Vent and Lancia Spider (with the applicable side bar design) figured into and was part of the historical process in the development of the third generation F-Car. They were selected by GM's staff and included in 10,000 documents sent to independent outside counsel for review. Thus, it is apparent that GM's agents and employees did not intentionally conceal nor participate in outside counsels' failure to review and select the most relevant alternative design documents.

The foregoing conclusion comports with the testimony of the witnesses connected with the production and selection of the documents. Although the Newman discovery establishes that there were instances of neglect on the part of GM's employees, the evidence supports the conclusion that the non-production of the

---

[9] For an attorney's liability to third parties see Barsotti v. Merced, 346 N.J. Super. 504, 517-18 (App. Div. 2002).

[10] See also GM's amended answers to Newman interrogatory 8, December 14, 2004, indicating one page of B and D through H were sent to Rumberger.

17

significant A-H documents did not result from any intentional

wrongdoing on the part of GM, its employees or agents.

Respectfully submitted,

JACK L. LINTNER

FEBRUARY 12, 2009

## Newman v. General Motors

1. Complaint, November 19, 2001.

2. Transcript and Argument re GM's Motion to Dismiss, October 7, 2002.

3. Opinion Judge Shwartz, March 23, 2005.

4. Opinion Judge Hayden, June 20, 2007.

5. Opinion Third Circuit, May 21, 2007.

6. Unsealed testimony Andrew Langan, November 9, 12 and December 2, 2004.

7. Unsealed testimony David Coulson, November 10, 2004.

8. Unsealed testimony Douglas Brown, November 11, 2004.

9. Unsealed testimony Thomas Ziolkowski, December 2, 2004.

10. Unsealed testimony Joseph Murray, December 6, 2004.

11. Unsealed testimony of William Kirk, December 9, 2008.

12. Unsealed testimony of Myrna Aide, December 20, 2004.

13. Unsealed testimony of Joseph Rice, December 20, 2004.

14. Unsealed testimony of Patrick Ardis, December 20, 2004.

15. Plaintiff's original and supplemental interrogatory responses, April 22, 2003 and October 29, 2004.

16. GM's original and supplemental interrogatory responses, September 18, 2003; September 16, 2004; and December 14, 2004.

15. Discovery Depositions with exhibits:
    a. Myrna Ade, September 17, 2008
    b. Patrick Ardis, August 8, 2008
    c. Douglas Brown, September 15, 2008
    d. David Coulson, August 21, 2008
    e. Joseph Murray, August 12, 2008
    f. Donald Phillips, November 11, 2005
    g. Robert Rudock, October 1, 2008

h. Susan Rhodes, September 17, 2008
i. Thomas Tansey, August 13, 2008
j. Thomas Ziolkowski, September 16, 2008
k. Joseph Rice, October 21, 2008, December 5, 2008.

16. Twelve documents contained in the 165 identified by
Phillips purportedly not included in the three boxes sent
to Rumberger.

17. Scheduling Order, December 23, 2008.

18. Deposition of Sylvia Pressler, February 5, 2009.
19.

## Applicable Cases Reviewed

Rosenblitt v. Zimmerman, 166 N.J. 391 (2001)

Baxt v. Liloia, 155 N.J. 190 (1998)

Baldasarre v. Butler, 132 N.J. 278 (1993)

Viviano v. CBS, Inc., 251 N.J. Super. 113 (App. Div. 1991)

Gilleski v. Community Medical Center, 336 N.J. Super. 646
(App. Div. 2001)

Swick v. The New York Times Co., 357 N.J. Super. 371 (App.
Div. 2003)

Barsotti v. Merced, 346 N.J. Super. 504 (App. Div. 2002)

Hewitt v. Allen Canning Co., 321 N.J. Super. 178 (App. Div.
1999)

Clients' Security Fund of the Bar of N.J. v. Security Title
and Guaranty Co., 257 N.J. Super. 18 (1992)

Attachment C

# CURRICULUM VITAE
# JACK L. LINTNER

Office:
Norris McLaughlin & Marcus, P.A.
721 Route 202-206, P.O. Box 5933
Bridgewater, New Jersey 08807
908-252-4354

Home:
155 East Mountain Road
Hillsborough, New Jersey 08844
908-369-3684 (home)
908-507-6029 (cell)

## LEGAL PROFILE:

Admitted to the New Jersey Bar - December 1, 1970
Appointed to the Superior Court of New Jersey - July 1, 1988

Sept. 2008-present – Member in the law firm of Norris McLaughlin & Marcus
         - Specializing in alternative dispute resolution, insurance coverage issues,
           and appellate advocacy consultation.

1999-Sept. 2008 - Appellate Division
         Presiding - Part D - 2007-08
         Presiding - Part G - 2006-07

1988-2000 - Trial Division - Middlesex County
         1997-2000    - Chancery-General Equity
                 Presiding 1998-00
         1988-90; 1992-97 - Civil
                 Presiding 1995-97
         1991-92     - Chancery-Family Part
         1990-91     - Criminal

1970-1988 - Senior partner in the law firm of Golden, Lintner, Rothschild, Spagnola & DiFazio
         - Concentrated on civil litigation in State and Federal courts, specializing in tort,
           products liability, construction, and insurance coverage litigation.

January 11, 1983 - Certified Civil Trial Attorney

## EDUCATION:

Washington & Lee University School of Law - J.D. 1970
Lexington, Virginia

Rutgers University - B.S. 1966
New Brunswick, New Jersey

## COMMITTEES:

New Jersey Commission on Professionalism in the Law
Trial Attorneys of New Jersey Board of Trustees
New Jersey Bar Association Civil Trial Bar Section Executive Committee

Served on:
New Jersey Supreme Court Civil Practice Committee
Appellate Division Standing Committees:
      Appellate Attorney Standards
      Appellate Division/Assignment Judges Liaison

## ASSOCIATIONS:

Member of :
New Jersey Bar Association
Middlesex County Bar Association
Middlesex County Trial Lawyers Association
Somerset County Bar Association
American Bar Association
Trial Attorneys of New Jersey

## CONTINUING LEGAL EDUCATION
## LECTURER/PANELIST:

2008 - Judicial College – "Recognizing & Responding to Possible Misconduct."

2002-2007- Newly appointed Superior Court Judge lecture on pofessionalism

2005, 2006 - Judicial College- "Professionalism"

1997, 1998, 1999, 2000 - Judicial College: "Civil Case Review"

1996, 1997, 1998, 1999, 2000 - New Jersey Institute for Continuing Legal Education:
      "New Jersey Civil Case Law Update"

January 1995 - Trial Attorneys of New Jersey and New Jersey Institute for Continuing
      Legal Education: "Experts by Experts"

December 1994 - ATLA Seminar: "Title 59"

November 1993 - Judicial College: "Adjudication of Verbal Threshold Cases"

Spring 1993 - New Jersey Defense Association: "Trial Procedures"

January 1993 - Trial Attorneys of New Jersey and New Jersey Institute for Continuing
      Legal Education: "Experts by Experts"

December 1990 - New Jersey Institute for Continuing Legal Education: "Mastering the
Craft of Opening Statements and Closing Arguments"

Spring 1990 - State Bar Association Mid Term Convention Seminar: "Discovery Techniques"

January 1990 - Middlesex County Trial Lawyers: "New Developments Regarding Expert
Witnesses"

## PROFESSIONAL HONORS:

2008 James J. McLaughlin Award – given for civility, legal competence, and professionalism in
the practice of civil trial law by the Civil Trial Bar Section,
New Jersey State Bar Association.

2001 Distinguished Service Award – given for professionalism in the practice of law by the New
Jersey Institute for Continuing Legal Education .

Fellow of the American Bar Association

## SIGNIFICANT TRIAL COURT CASES:

Presided over the State tobacco litigation and the dissolution of HIP of New Jersey.

Attachment D

## PUBLISHED APPELLATE DIVISION OPINIONS

**2008**

**Golden v. GMAC Ins. Co.**, 401 N.J. Super. 198; Argued May 27, 2008; Decided June 23, 2008.

> **OVERVIEW:** Plaintiff's UM claim against her insurer accrued as of the date of the insolvency of the alleged tortfeasor's insurance carrier, rather than at the date of the accident. Thus, the six-year statute of limitations, N.J.S.A. § 2A:14-1, began to run upon insurance carrier's liquidation and plaintiff's UM claim was timely.

**Clorox Prods. Mfg. Co. v. Dir., Div. of Taxation**, 2008 N.J. Tax 15; Argued May 19, 2008; Decided June 19, 2008.

> **OVERVIEW:** While the parent corporation was allowed to take an excess depreciation deduction at the time it transferred assets to its subsidiary, such deduction was not required by the plain language of the governing administrative regulation. Therefore, the subsidiary was entitled to use the same depreciable basis in the assets it received as its parent had used just prior to the transfer.

**Sanders v. Langemeier**, 401 N.J. Super. 125; Argued May 19, 2008; Decided, June 19, 2008.

> **OVERVIEW:** A trial court properly granted an uninsured passenger, who received emergency personal injury protection benefits under his driver's special automobile insurance policy, personal injury protection coverage from the Unsatisfied Claim and Judgment Fund for his non-emergency medical treatment, pursuant to N.J.S.A. § 9:6A-3.3.

**Lancos v. Silverman**, 400 N.J. Super. 258; Argued April 14, 2008; Decided May 14, 2008.

> **OVERVIEW:** Home owners, who were sued by persons injured when a deck at the home collapsed, sued their insurance broker for professional negligence in not acquiring personal liability coverage for home. Evidence that 18 persons were injured in the deck collapse was properly excluded under N.J.R.E. 403 as it was unduly prejudicial to the broker.

**Penn Nat'l Ins. Co. v. Costa**, 400 N.J. Super. 147; Argued April 14, 2008; Decided April 29, 2008.

> **OVERVIEW:** As a third parties' injuries on an insured's driveway were the direct consequence of his head hitting a bumper jack the insured was using to change a tire on his pickup truck, accident fell within clause in policy of homeowner's insurer that excluded bodily injuries "arising out" of the "maintenance, ownership, or use" of insured's motor vehicles.

**Nieschmidt Law Office v. Leamann**, 399 N.J. Super. 125; Submitted March 3, 2008; Decided March 24, 2008.

> **OVERVIEW:** Fact that the imminent running of the six-year statute of limitations prevented a law firm from sending its former client a 30-day pre-action notice of the right to arbitrate a fee dispute, as required by R. 1:20A-6, did not absolve the firm because it waited until the notice could not be filed in a timely manner.

**State v. Matthews**, 398 N.J. Super. 551; Submitted February 4, 2008; Decided March 10, 2008.

> **OVERVIEW:** A handgun recovered during a warrantless search of a car had to be suppressed, because an anonymous tip, standing alone, did not provide the police with an independent basis for the stop, frisk of the occupants, or search of the vehicle under the Fourth Amendment or Terry v. Ohio.

**Saunders v. Capital Health Sys. at Mercer**, 398 N.J. Super. 500; Argued January 28, 2008; Decided March 5, 2008.

> **OVERVIEW:** The dismissal of a mother's professional negligence suit against a health care system and a licensed midwife for failing to file an Affidavit of Merit under N.J.S.A. 2A:53A-27 was in error as the midwife was not a licensed person under N.J.S.A. 2A:53A-26, and the trial court failed to hold a required accelerated case management conference.

**In re Estate of Quarg**, 397 N.J. Super. 559; Submitted December 17, 2007; Decided January 23, 2008.

> **OVERVIEW:** As a decedent, who never divorced his wife, lived with his companion as husband and wife for 43 years, there was sufficient evidence of his implied promise to ensure that the companion received adequate provisions during remainder of her life to allow her to assert a claim against his intestate estate based on an implied contract.

## 2007

**Rosenberg v. State Dept. of Law and Public Safety, Div. of Criminal Justice**, 396 N.J. Super. 565; Argued October 29, 2007; Decided November 30, 2007.

> **OVERVIEW:** Appellant, pursuant to common law "right to know" doctrine, sought documents compiled by New Jersey Division of Criminal Justice in investigation of alleged attempt to remove him from office. As court failed to specific factual findings in denying request, appellate court was unable to determine if it abused its discretion; remand was required.

**Mercer Mut. Ins. Co. v. Proudman**, 396 N.J. Super. 309; Argued October 1, 2007; Decided October 22, 2007; certif. denied, 194 N.J. 270 (2008).

> **OVERVIEW:** The dismissal of a third-party products liability complaint premised on a cigarette left burning and causing a fire was upheld on appeal as the absolute defense under the New Jersey Products Liability Act, N.J.S.A. 2A:58C-3(a)(2), barred the action because a self-extinguishing cigarette only reduced and did not eliminate the danger of fire.

**Shuster v. Board of Review, Dept. of Labor**, 396 N.J. Super. 240; Submitted September 24, 2007; Decided October 18, 2007.

> **OVERVIEW:** A former employee was not disqualified from receiving unemployment compensation benefits under N.J.S.A. 43:21-5(a) for voluntarily leaving as she established that she was compelled to resign because of a real, imminent, and substantial risk of losing her job after being advised by the employer to leave.

**State v. Laboo**, 396 N.J. Super. 97; Argued September 10, 2007; Decided September 28, 2007.

>**OVERVIEW:** An order suppressing evidence was reversed as no violation of defendants' Fourth Amendment or N.J. Const. art. I, para. 7, rights occurred from the warrantless search of an apartment as exigent circumstances, although police created, justified entry based on the police tracking a cell phone as a result of reasonable investigative conduct.

**In re Camden County Prosecutor**, 394 N.J. Super. 15; Argued and Submitted May 21, 2007; Decided June 18, 2007.

>**OVERVIEW:** As assistant prosecutors did not perform police services within the scope of the New Jersey Police and Fire Public Interest Arbitration Reform Act, because, inter alia, they were not vested with statutory police powers, associations representing them could not compel county prosecutors to arbitrate contracts under N.J.S.A. 34:13A-16 of the Act.

**Progressive Group v. Hurtado**, 393 N.J. Super. 517; Argued May 21, 2007; Decided June 14, 2007.

>**OVERVIEW:** Car owner's failure to provide an odometer reading, as required by N.J.A.C. 13:21-5.9(a), rendered her purported assignment of the certificate of title incomplete and thus did not legally serve to transfer title to the car. Therefore, an insurer's policy covering the car was not automatically terminated and coverage remained with the insurer.

**State v. Kearns**, 393 N.J. Super. 107; Submitted April 23, 2007; Decided May 15, 2007.

>**OVERVIEW:** In the State's appeal, defendant's sentence imposed after revocation of probation was illegal because a No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, parole disqualifier should have been imposed since defendant was originally convicted for robbery, which was an offense that carried a mandatory period of parole ineligibility under NERA.

**State v. Breslin**, 392 N.J. Super. 584; Argued April 23, 2007;
Decided May 9, 2007; certif. denied, 192 N.J. 477 (2007).

> **OVERVIEW:** Defendant was properly treated as second offender
> under N.J.S.A. 39:4-50.4a, as there was no reason to
> nullify his prior refusal conviction based upon lesser
> burden of proof from being considered in determining his
> status under § 39:4-50.4a as second offender after second
> conviction of same offense based on the criminal standard
> of proof.

**New Jersey Mfrs. Ins. Co. v. Varjabedian**, 391 N.J. Super. 253;
Argued March 5, 2007; Decided March 22, 2007; certif. denied,
192 N.J. 295 (2007).

> **OVERVIEW:** When faced with liability for damages sustained
> by an innocent third-party claimant, a carrier's default
> liability on a standard automobile policy subject to
> retroactive revocation was held to be equal to the
> $15,000/$30,000 limits mandated by the Automobile
> Insurance Cost Reduction Act, N.J.S.A. 39:6A-29(n) and -3.

**Muise v. GPU, Inc.**, 391 N.J. Super. 90; Argued February 5, 2007;
Decided March 7, 2007.

> **OVERVIEW:** As the decisions in Thiedemann v. Mercedes-Benz
> USA, LLC, and Dabush v. Mercedes-Benz USA were confined to
> an interpretation of the term "ascertainable loss" as used
> in the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -
> 20, these decisions were inapplicable to electrical
> consumers' class action suit against utilities.

## 2006

**Allstate New Jersey Ins. Co. v. Cherry Hill Pain & Rehab.
Institute**, 389 N.J. Super. 130; Argued November 6, 2006; Decided
December 7, 2006; certif. denied, 190 N.J. 254 (2007).

> **OVERVIEW:** Where health care facility's suit against
> insurers had been dismissed for lack of standing, insurers'
> later suit against facility for violating New Jersey
> Insurance Fraud Prevention Act was not precluded by entire
> controversy doctrine, as there had been no determination of
> merits of parties' claims and insurers' complaint involved
> separate claims.

**S.T. Hudson Engineers, Inc. v. Pennsylvania Nat. Mut. Cas. Co.**, 388 N.J. Super. 592; Argued October 10, 2006; Decided November 16, 2006; certif. denied, 198 N.J. 647 (2007).

> **OVERVIEW:** With regard to a declaratory judgment appeal, an appellate court upheld the determination that an insurer was obligated to defend the insured and, since the insureds were the successful claimants, they were entitled to counsel fees and costs incurred in prosecuting the initial litigation, pursuant to Rule 4:42-9(a)(6).

**Lodato v. Evesham Tp.**, 388 N.J. Super. 501; Argued October 3, 2006; Decided November 1, 2006.

> **OVERVIEW:** Summary judgment granted to a township was reversed in plaintiff's personal injury suit arising from a fall on a sidewalk slab raised by a tree root because plaintiff established a question of fact as to whether the township had constructive notice of the dangerous condition under N.J.S.A. 59:4-3(b), as prior repairs had been made.

**State v. Keon Milledge**, 386 N.J. Super. 233; Argued May 8, 2006; Decided June 15, 2006; certif. denied, 188 N.J. 355 (2006).

> **OVERVIEW:** Where a police officer was accosted by defendant during a short interval between two interrogations and defendant re-acknowledged that Miranda warnings had been given prior to the first interrogation, Miranda warnings did not have to be repeated before the second interrogation.

**Selective Ins. Co. v. National Continental Ins. Co.**, 385 N.J. Super. 62; Argued April 3, 2006; Decided April 27, 2006; certif. denied, 188 N.J. 218 (2006).

> **OVERVIEW:** Where plaintiff insurer filed an arbitration claim for PIP benefits against defendant insurer under N.J. Stat. Ann. § 39:6A-9.1, defendant's failure to defend itself by taking the proper steps to confine its liability to the limits of its policy rendered it liable to plaintiff for the balance of arbitration award that was beyond its policy limits.

**In the Interest of M.C.**, 384 <u>N.J. Super.</u> 116; Submitted February 27, 2006; Decided March 20, 2006.

    **OVERVIEW:** Juvenile court did not err in imposing suspended sentences; while New Jersey Code of Juvenile Justice <u>N.J.S.A.</u> 2A:4A-20 to -91, was silent on the issue, its provisions were sufficiently flexible to permit New Jersey courts to impose suspended sentences as a viable disposition, given Code's fundamental rehabilitative and penal objectives.

**State v. Dispoto**, 383 <u>N.J. Super.</u> 205; Argued January 9, 2006; Decided February 17, 2006; <u>certif. granted</u>, 186 <u>N.J.</u> 358 (2006).

    **OVERVIEW:** Miranda warnings given, albeit pre-arrest, were insufficient to carry over to the time defendant was arrested, approximately one and one-half hours later, and had to be repeated. As a search warrant relied on defendant's suppressed admission for probable cause, recovered drugs and drug paraphernalia were fruits of the poisonous tree.

**Wood v. Jackson Twp.**, 383 <u>N.J. Super.</u> 250; Argued January 30, 2006; Decided February 17, 2006.

    **OVERVIEW:** After claimant died, employer was required to pay widow the full compensation rate because widow was entitled to a modification of the workers' compensation award to make up for the social security benefits no longer received where the social security benefits offset under <u>N.J. Stat. Ann.</u> § 34:15-95.5 did not continue after the claimant's death.

**Pellettieri, Rabstein & Altman v. Protopapas**, 383 <u>N.J. Super.</u> 142; Submitted January 17, 2006; Decided February 10, 2006.

    **OVERVIEW:** The trial court erred in granting partial summary judgment to the former client because the law firm's complaint was filed approximately five years and ten months after the attorney-client relationship ceased, which was within the six-year statute of limitations, <u>N.J.S.A.</u> 2A:14-1, for attorney fees arising from a retainer agreement.

6

**State ex rel. L.R.**, 382 N.J. Super. 605; Submitted December 5, 2005; Decided January 30, 2006; certif. denied, 189 N.J. 642 (2007).

> **OVERVIEW:** Juvenile defendant was properly ordered to submit DNA sample under DNA Database and Databank Act, N.J.S.A. 53:1-20.20, without violating U.S. Const. amend. IV or N.J. Const. art. I, para. 7, rights; statute was not penal, so Ex Post Facto Clauses of U.S. Const. art. I, § 10, cl. 1, or N.J. Const. art. IV, § VII, para. 3, were inapplicable.

**State v. Miller**, 382 N.J. Super. 494; Argued December 19, 2005; Decided January 27, 2006.

> **OVERVIEW:** Where jury acquitted defendant of charged offenses but deadlocked on lesser-included offense for which jury trial was not available, court erred by deciding case de novo on evidence presented. Trial court should have granted a new trial, thus returning the parties to original position and allowing defendant to present evidence in different manner.

**In re Patterson**, 382 N.J. Super. 366; Argued December 12, 2005; Decided January 17, 2006; certif. granted, 186 N.J. 364 (2006).

> **OVERVIEW:** An administrative board erred in denying a police officer's application for accidental disability benefits under N.J.S.A. 43:15A-43, as the incidents of psychological harassment by a superior officer was sufficient to constitute a traumatic event which caused the officer's disabling depression and post- traumatic stress disorder.

## 2005

**Nat'l Union Fire Ins. Co. v. Jeffers**, 381 <u>N.J. Super.</u> 13; Argued
September 26, 2005; Decided October 18, 2005.

> **OVERVIEW:** Because UIM coverage provided to a claimant by
> his personal Pennsylvania auto insurance policy was not
> similar to that provided by his New Jersey employer's
> commercial auto policy, but the personal policy provided
> excess coverage, a step-down provision in the commercial
> policy, which limited coverage to its claimants, was not
> triggered.

**Visiting Homemaker Serv. v. Bd. of Chosen Freeholders**, 380 <u>N.J.</u>
<u>Super.</u> 596; Argued Telephonically September 15, 2005; Decided
October 7, 2005.

> **OVERVIEW:** Trial court reversed because a county ordinance
> directing contractors to provide their employees an
> increased minimum wage and mandatory health benefits did
> not violate a provider's equal protection rights under U.S.
> Const. amend. XIV, § 1 and N.J. Const. art. I, para. 1 as
> the ordinance rationally related to a legitimate government
> purpose.

**Allstate Ins. Co. v. Sabato**, 380 <u>N.J. Super.</u> 463; Submitted
September 12, 2005; Decided October 3, 2005.

> **OVERVIEW:** A doctor's acceptance of a policy requiring
> submission of Personal Injury Protection claims to dispute
> resolution carried with it a truly voluntary acceptance of
> the Alternative Procedure for Dispute Resolution Act,
> <u>N.J.S.A.</u> 2A:23A-1 to -30, with the insurer having the
> power to choose it over the doctor's choice.

**Lopez v. Colombo**, 379 <u>N.J. Super.</u> 96; Argued June 6, 2005;
Decided June 23, 2005.

> **OVERVIEW:** Trial court erred in denying an accident
> victim's motion to reinstate a case, after the dismissal of
> the case because an automatic stay was imposed after the
> driver of the vehicle filed for bankruptcy, as the
> dismissal of the case was without prejudice under <u>Rule</u>
> 4:37-2(d), and the court erred in applying <u>Rule</u> 4:50 to
> deny the motion.

**Weinstock v. Weinstock**, 377 <u>N.J. Super.</u> 182; Argued March 14, 2005; Decided April 27, 2005.

> **OVERVIEW:** Appellate court lacked jurisdiction to consider parties' appeals from arbitrator's ruling as both The Alternative Procedure for Dispute Resolution Act, <u>N.J.S.A.</u> 2A:23A-1 to 2A:23A-30, and the Arbitration Act, <u>N.J.S.A.</u> 2A:24-1 to 2A:24-11, required that the chancery court first review the arbitrator's ruling.

**Morag v. Cont'l Ins. Co.**, 375 <u>N.J. Super.</u> 56; Submitted January 10, 2005; Decided February 1, 2005.

> **OVERVIEW:** Insurer's letter requesting that its insured advise it when the appropriate complaint was filed, which the insurer would accept in lieu of service of process, sufficed as a demand for a jury trial. Thus, a damages trial on the merits was ordered.

**Longo v. Aprile**, 374 <u>N.J. Super.</u> 469; Submitted December 13, 2004; Decided January 31, 2005.

> **OVERVIEW:** Summary judgment was properly awarded to defendants in personal injury action because fact that plaintiff, defendants' neighbor, was performing benefit by washing defendants' aluminum siding did not raise his status to that of business invitee.

**Troxclair v. Aventis Pasteur, Inc.**, 374 <u>N.J. Super.</u> 374; Submitted November 29, 2004; Decided January 21, 2005.

> **OVERVIEW:** Failure to follow the prerequisites of the National Childhood Vaccine Injury Act required dismissal of tort action against a vaccine manufacturer, but not against manufacturer of the preservative used in the vaccine.

**2004**

**Triffin v. Am. Int'l Group, Inc.**, 372 N.J. Super. 517; Argued October 12, 2004; Decided November 3, 2004.

> **OVERVIEW:** Insurers were properly granted summary judgment in an action involving forged check, where an assignee of that check failed to show that the insurers were negligent in issuing or by mailing the check to the recipient's incorrect mailing address.

**Plainfield-Park Madison Site; In re Petition for a Declaratory Ruling**, 372 N.J. Super. 544; Argued September 20, 2004; Decided October 15, 2004; certif. denied, 182 N.J. 630 (2005).

> **OVERVIEW:** Amendment to New Jersey's conservation statute explicitly addressed a city's right to redevelop land that had been acquired with urban commercial development in mind without obtaining environmental agency approval or providing replacement site.

**State v. Abdullah**, 372 N.J. Super. 252; Submitted September 13, 2004; Decided October 12, 2004; aff'd in part; rev'd in part; remanded, 184 N.J. 497 (2005).

> **OVERVIEW:** Evidence showing murder under heinous circumstances would not support instruction on manslaughter, defendant lacked standing to seek to suppress evidence seized in victim's apartment, and life sentence for murder did not violate Apprendi and Blakely.

**Raleigh Ave. Beach Ass'n v. Atlantis Beach Club, Inc.**, 370 N.J. Super. 171; Argued May 19, 2004; Decided June 3, 2004; aff'd, 185 N.J. 40 (2005).

> **OVERVIEW:** A beach club could not limit vertical or horizontal public access to its dry sand beach area, but could charge a reasonable fee, subject to New Jersey Department of Environmental Protection approval, for services it provided to beach users.

**Edwards v. McBreen**, 369 <u>N.J. Super.</u> 415; Argued May 5, 2004;
Decided May 27, 2004.

> **OVERVIEW:** There was insufficient information in the record
> to support the imposition of a duty for a rear seat
> passenger to wear a seatbelt so as to avoid injury to a
> front seat passenger after the rear seat passenger was
> thrown forward in a car wreck.

**Labas v. Esquivel-Molina**, 369 <u>N.J. Super.</u> 331; Argued May 5,
2004; Decided May 27, 2004.

> **OVERVIEW:** An injured driver had transferred any rights he
> had in his stolen car to an insurer. Thus, he was not
> required to maintain PIP coverage. Nor was he bound as an
> insured by the lawsuit option selected by his father. Thus,
> he could bring suit.

**Serrano v. Serrano**, 367 <u>N.J. Super.</u> 450; Argued February 25,
2004; Decided March 17, 2004; <u>rev'd and remanded in part</u>, 183
N.J. 508 (2005).

> **OVERVIEW:** As passenger's soft tissue sprains and strains,
> even if permanent, were non-serious, and his carpal tunnel
> syndrome did not limit his activities, they were not
> serious enough to qualify for tort exemption under New
> Jersey's amended verbal threshold. Questions whether AICRA
> required a showing of significant life impact.

**Cox v. Russell**, 367 <u>N.J. Super.</u> 121; Argued January 30, 2004;
Decided February 23, 2004.

> **OVERVIEW:** An injured party was eligible for uninsured
> motorist coverage as the only evidence was that the injured
> party's friend took the car without permission and
> subsequently hit the injured party. Thus, the facts showed
> a theft or the like.

**McDonald v. Lederle Labs.**, 366 N.J. Super. 555; Argued January 14, 2004; Decided February 18, 2004; certif. granted, 180 N.J. 455 (2004). See McDonald v. Lederle Labs., 341 N.J. Super. 369 (remand).

> **OVERVIEW:** A mother's claim for loss of the services of her minor child was not preempted by a federal vaccine action, because it was a completely separate action and trial court erred in granting summary judgment to drug manufacturers.

**Christy v. Salem**, 366 N.J. Super. 535; Argued December 10, 2003; Decided February 17, 2004.

> **OVERVIEW:** Order requiring full disclosure of a peer review committee report in a medical malpractice case was error, however, disclosure of purely factual portions of the report was discoverable.

**State v. Beckler**, 366 N.J. Super. 16; Argued December 3, 2003; Decided January 16, 2004; certif. denied, 180 N.J. 151 (2004).

> **OVERVIEW:** Convictions were reversed, and the case was remanded for new trial because the spontaneous statements defendant made while he was being processed for arrest, after cessation of questioning, were improvidently admitted into evidence.

**MetLife Auto & Home v. Palmer**, 365 N.J. Super. 293; Argued November 13, 2003; Decided January 6, 2004.

> **OVERVIEW:** Antique automobile insurance policies that limited the use of an insured vehicle and were offered at a significantly reduced premium were valid and were not subject to New Jersey's automobile insurance anti-stacking provision.

## 2003

**Atalese v. Long Beach Twp.**, 365 N.J. Super. 1; Argued November 6, 2003; Decided December 15, 2003.

> **OVERVIEW:** A three-quarter inch depression in a pedestrian/bicycle lane, which spanned a block, could have been found to be a dangerous condition that created a "substantial risk of injury"; accordingly, summary judgment dismissal of the complaint was error.

**McMahon v. N.J. Mfrs. Ins. Co.**, 364 N.J. Super. 188; Argued October 9, 2003; Re-argued November 6, 2003; Decided November 18, 2003.

> **OVERVIEW:** Because the consequences of an insurer's non-acceptance of an insured's offer of judgment were mandatory, the trial court properly awarded interest, attorney's fees, and litigation expenses to the insured.

**J. Roberts & Son, Inc. v. Hillcrest Mem. Co.**, 363 N.J. Super. 485; Argued October 1, 2003; Decided October 29, 2003; certif. denied, 179 N.J. 309 (2004).

> **OVERVIEW:** The good cause provision of the rule on dismissal of civil cases for lack of prosecution applied to attempts to reinstate an original complaint. The rule did not prevent filing a second complaint with the same claims after administrative dismissal.

**Leopardi v. Twp. of Maple Shade**, 363 N.J. Super. 313; Argued September 10, 2003; Decided October 14, 2003; certif. granted, 179 N.J. 370 (2004); dismissed while pending.

> **OVERVIEW:** Private citizen wrongly arrested in a prostitution solicitation sting by New Jersey police officers raised triable issues of officers' individual liability for civil rights violations, false arrest, and related torts.

**Cokus v. Bristol-Myers Squibb Co.**, 362 N.J. Super. 245; Argued
June 2, 2003; Decided July 10, 2003; certif. denied, 178 N.J. 32
(2003).

> **OVERVIEW:** New Jersey employee failed to show that she had
> been driven from her former employment by conduct that was
> extreme enough to be the basis for liability under either a
> whistleblowing statute or common law infliction of
> emotional distress.

**Secure Heritage, Inc. v. City of Cape May**, 361 N.J. Super. 281;
Argued May 12, 2003; Decided June 24, 2003; certif. denied, 178
N.J. 32 (2003).

> **OVERVIEW:** To the extent an ordinance banned the transfer
> of seasonable beach tags by innkeepers, but not by
> individuals, it was not rationally related to the
> legislative intent and violated the equal protection
> provisions of federal and state constitutions.

**Christafano v. N.J. Mfrs. Ins. Co.**, 361 N.J. Super. 228; Argued
June 2, 2003; Decided June 17, 2003.

> **OVERVIEW:** Step-down provision in insurer's policy was
> valid and limited insurer's exposure to its prorated share
> of $25,000, as injured party was not named insured under
> insurer's policy, but was named insured under policy that
> provided lesser coverage.

**Nextel of N.Y., Inc. v. Borough of Englewood Cliffs Bd. of
Adjustment**, 361 N.J. Super. 22; Argued April 28, 2003; Decided
June 3, 2003.

> **OVERVIEW:** Local zoning board properly based its denial of
> a variance for telecommunications towers on the provider's
> failure to present credible expert testimony in support of
> its application and on advertising materials boasting of
> complete local coverage.

**Velez v. City of Jersey City**, 358 N.J. Super. 224; Argued
January 27, 2003; Decided March 11, 2003; aff'd, 180 N.J. 284
(2004).

> **OVERVIEW:**  Summary judgment order dismissing employee's
> discrimination claims against city was reversed.  Question
> of fact existed concerning reasonableness of city's
> dissemination, implementation, monitoring, and enforcement
> of its sexual harassment policy.

**State v. Perkins**, 358 N.J. Super. 151; Submitted February 18,
2003; Decided March 10, 2003.

> **OVERVIEW:**  Trial court properly suppressed a rifle seized
> from defendant's home during defendant's trial for unlawful
> possession of an assault weapon; the rifle was seized to
> prevent domestic violence, and could not be used in a
> criminal prosecution, due to lack of probable cause
> justifying a criminal search.

## 2002

**Taylor v. Int'l Maytex Tank Terminal Corp.-Bayonne**, 355 N.J.
Super. 482; Argued November 12, 2002; Decided December 5, 2002.

> **OVERVIEW:**  An employee's non-economic and punitive damages
> claims, arising from allegations of racial discrimination,
> were not limited by the after-acquired evidence doctrine,
> as precluding all recovery would contravene the laws
> intended to stop such conduct.

**Berberian v. Lynn**, 355 N.J. Super. 210; Argued October 21, 2002;
Decided November 20, 2002; Concurring; aff'd in part; modified
in part; concurrence adopted, 179 N.J. 290 (2004).

> **OVERVIEW:**  Plaintiff nurse cannot sue an Alzheimer's
> patient under her care at a long-term care facility for
> personal injuries she received as a result of the
> incompetent actions of the Alzheimer patient.

**Beadling v. William Bowman Assocs.**, 355 N.J. Super. 70; Argued
September 23, 2002; Decided November 14, 2002.

> **OVERVIEW:** Products liability claim, alleging that the
> methanol supplier improperly placed a warning label on a
> 55-gallon drum, was not preempted by Hazard Communication
> Standard of Occupational Safety and Health Act or by
> Federal Hazardous Substances Act.

**First Union Nat'l Bank v. Nelkin**, 354 N.J. Super. 557; Submitted
September 23, 2002; Decided October 25, 2002.

> **OVERVIEW:** Trial court properly held that bank's mortgage
> lien was subordinate to mortgage held by mortgagee, as the
> prerequisites for imposing equitable subrogation were not
> present; bank had knowledge of mortgagee's mortgage when it
> conducted title search.

**Salemke v. Sarvetnick**, 352 N.J. Super. 319; Argued May 29, 2002;
Decided June 27, 2002.

> **OVERVIEW:** In wrongful death action, the trial court
> properly granted summary judgment in favor of drinking
> establishment where there were insufficient facts to
> establish genuine issue of material fact that establishment
> served a visibly intoxicated person.

**Rosario v. Haywood**, 351 N.J. Super. 521; Argued May 7, 2002;
Decided June 17, 2002.

> **OVERVIEW:** School board that was not named as an additional
> insured in a school bus company's insurance policy could
> nonetheless look to the insurer for indemnity as provided
> by the policy and for broader provision of a defense.

**T.K. v. Landmark W.**, 353 N.J. Super. 223; Argued April 23, 2002;
Decided May 17, 2002.

> **OVERVIEW:** The record supported the trial court's
> determination that a landlord arbitrarily and unfairly
> rejected a prospective tenant's application to rent an
> apartment because of her dependence on government
> assistance rather than her creditworthiness.

**Humenik v. Gray**, 350 N.J. Super. 5; Argued February 5, 2002; Decided April 10, 2002.

> **OVERVIEW:** Court's indirect references to insurer's ability to pay did not have same prejudicial effect in coverage case as it would in negligence case, and were harmless errors.

**State v. Cohen**, 347 N.J. Super. 375; Submitted December 4, 2001; Decided February 5, 2002.

> **OVERVIEW:** Driving while intoxicated conviction was affirmed where appellate court was satisfied that officer's belief that darkly-tinted windows represented significant obstruction was sufficient reason to implicate community caretaking function.

**Pace v. Kuchinsky**, 347 N.J. Super. 202; Argued November 27, 2001; Decided February 4, 2002.

> **OVERVIEW:** Adverse ruling in arbitration proceeding, by physician for treatment of lumbar injuries, against injured party's PIP insurer, did not preclude injured party from seeking additional damages for pain and suffering in civil action.

**Freeman v. State**, 347 N.J. Super. 11; Argued December 18, 2001; Decided January 23, 2002; certif. denied, 172 N.J. 178 (2002).

> **OVERVIEW:** Malicious prosecution action would not lie where jury convictions were reversed on appeal for failure to suppress evidence, as suppression of evidence did not impugn validity of jury's determination of guilt.

**Shaw v. City of Jersey City**, 346 N.J. Super. 219; Argued October 23, 2001; Decided January 3, 2002, rev'd & remanded, 174 N.J. 567 (2002).

> **OVERVIEW:** The trial court correctly concluded that the determination of whether an accident occurred had to be viewed from the standpoint of the tortfeasor in order to trigger uninsured motorist coverage.

**2001**

**W.L. Goodfellows & Co. of Turnersville, Inc. v. Wash. Twp. Planning Bd.**, 345 N.J. Super. 109; Submitted October 2, 2001; Decided November 14, 2001.

> **OVERVIEW:** Preliminary site plan should have been conditionally granted pending procurement of drainage easement. Applicant was entitled to benefit of statutory protection against subsequent change in use requirements.

**Watts v. Camaligan**, 344 N.J. Super. 453; Argued September 17, 2001; Decided October 24, 2001.

> **OVERVIEW:** In a car collision case, the appropriate remedy, where the injured party failed to provide certification of his injuries from a treating physician as was required under insurance laws, is a dismissal without prejudice.

**Shelcusky v. Garjulio**, 343 N.J. Super. 504; Submitted July 30, 2001; Decided August 9, 2001.

> **OVERVIEW:** Since injured person did not know that material he was loading with forklift was flammable, manufacturer's failure to warn that forklift he was using was not rated for flammable material was not proximate cause of injured person's harm.

**Exxon Research & Eng'g Co. v. Indus. Risk Insurers**, 341 N.J. Super. 489; Argued April 25, 2001; Decided June 27, 2001.

> **OVERVIEW:** Under comity doctrine, litigation arising out of Venezuelan refinery fire was properly pursued in courts of that country; dismissal of New Jersey suit was without prejudice, to assure enforceability of any foreign rights.

**State v. Pierrevil**, 341 N.J. Super. 266; Submitted May 23, 2001; Decided June 22, 2001.

> **OVERVIEW:** Recusal of attorney was reversed and remanded, as there was no inquiry into the nature of any potential or actual conflict as the result of attorney's former representation of one of the murder suspects and defendant.

**McDonald v. Lederle Labs.**, 341 N.J. Super. 369; Argued May 2, 2001; Decided June 18, 2001; (Appeal after remand at 366 N.J. Super. 555; 181 N.J. 336 (2004)).

> **OVERVIEW:** Failure to comply with time limits on federally mandated childhood vaccine liability proceedings resulted in subsequent claims brought by parent in a representative capacity was time-barred; but claims for herself may not have been.

**Rogers v. Jordan**, 339 N.J. Super. 581; Argued April 4, 2001; Decided May 1, 2001.

> **OVERVIEW:** An appellate court reversed a trial court's order that held that a city was liable under the doctrine of respondeat superior for a police officer's negligent operation of an automobile when he was on lunch break.

**Sears Roebuck & Co. v. Nat'l Union Fire Ins. Co.**, 340 N.J. Super. 223; Argued March 21, 2001; Decided April 26, 2001.

> **OVERVIEW:** The trial court erred in holding that defendants, insurance companies, had a duty to defend plaintiff; no substantial nexus existed between parts manufactured by defendants' insureds and the auto accident which triggered the underlying suit.

**State v. Munoz**, 340 N.J. Super. 204; Argued and Submitted March 14, 2001; Decided April 26, 2001.

> **OVERVIEW:** Armed robbery convictions were affirmed because prosecutor's comment alone was not sufficiently egregious to result in deprivation of right to fair trial. Sentence was not manifestly excessive or unduly punitive.

**State v. Cullum**, 338 N.J. Super. 458; Submitted March 14, 2001; Decided March 29, 2001.

> **OVERVIEW:** Defendant's conviction for drug-induced death was a violent crime as defined under the No Early Release Act and the eighty-five percent parole ineligibility provision was properly applied to the defendant's sentence.

**O'Loughlin v. Nat'l Cmty. Bank**, 338 <u>N.J. Super.</u> 592; Submitted February 28, 2001; Decided March 29, 2001.

> **OVERVIEW:** The trial court did not err in dismissing appellant's action for failing to re-file a new complaint within the 15-day time period set forth in a consent order; the trial court did not prevent appellants from filing in a timely fashion.

**Howard v. Univ. of Med. & Dentistry**, 338 <u>N.J. Super.</u> 33; Argued January 18, 2001; Decided March 13, 2001; <u>aff'd in part; rev'd in part; remanded</u>, 172 <u>N.J.</u> 537 (2002).

> **OVERVIEW:** In medical negligence action, denial of motion to amend complaint was reversed where record failed to disclose undue prejudice and interest of justice required joinder because claims of negligence and fraud arose out of same controversy.

**Viviani v. Borough of Bogota**, 336 <u>N.J. Super.</u> 578; Submitted December 20, 2000; Decided February 7, 2001; <u>rev'd and remanded</u>, 170 <u>N.J.</u> 452 (2002).

> **OVERVIEW:** A position held by an exempt volunteer firemen, who has achieved a tenure status as a public employee, cannot be abolished for good faith economic reasons, rather can only be abolished in circumstances of widespread economic depression or mandatory retrenchment.

**Saldana v. Michael Weinig**, 337 <u>N.J. Super.</u> 35; Argued November 15, 2000; Decided January 31, 2001.

> **OVERVIEW:** The court reversed and remanded a judgment for a manufacturer and distributor of a machine, alleged to be defectively designed and to have caused a worker's injury. Photos of the machine with a warning label could produce an unjust jury decision.

**Wnuck v. N.J. DMV**, 337 N.J. Super. 52; Submitted December 20, 2000; Decided January 30, 2001.

> **OVERVIEW:** The decision of an administrative department to assess an insurance surcharge to a petitioner who was convicted of his third DWI was one to be afforded deference by a reviewing trial court.

**McCoy v. McCoy**, 336 N.J. Super. 172; Submitted November 15, 2000; Decided January 5, 2001.

> **OVERVIEW:** Mother presented a good faith reason to move her daughter and the move was not motivated by a desire to adversely affect father's visitation rights. Thus, judgment denying mother the right to permanently move her child was reversed.

## 2000

**Laidlow v. Hariton Mach. Co.**, 335 N.J. Super. 330; Argued September 20, 2000; Decided December 6, 2000 *dissenting*; Dissent adopted 170 N.J. 602 (2002).

> **OVERVIEW:** Employee did not demonstrate that injury he suffered was within "intentional wrong" exception to workers' compensation immunity and appellee broker was not sufficiently connected to workplace to impose liability.

**Frankel v. St. Paul Fire & Marine Ins. Co.**, 334 N.J. Super. 353; Argued September 20, 2000; Decided October 17, 2000.

> **OVERVIEW:** Despite past relationship between insurer and lawyer with medical malpractice claim, there was no evidence of bad faith payment of lawyer's claim, and thus JNOV was proper in doctor's claim against insurer.

**Tynan v. Curzi**, 332 <u>N.J. Super.</u> 267; Argued May 10, 2000;
Decided June 28, 2000.

> **OVERVIEW:** Parent could not maintain an action for per quod
> damages, including loss of society and companionship, as a
> result of injuries sustained by her child after the child
> reached the age of majority.

**Mitchell v. Charles P. Procini, D.D.S., P.A.**, 331 <u>N.J. Super.</u>
445; Argued April 12, 2000; Decided June 12, 2000.

> **OVERVIEW:** In medical malpractice action, sanction of
> preclusion was not warranted where dentist's ability to
> mount a defense was not substantially prejudiced by
> plaintiff's non-disclosure of claim; thus, judgment of
> dismissal was reversed.

**Oltremare v. ESR Custom Rugs, Inc.**, 330 <u>N.J. Super.</u> 310; Argued
March 22, 2000; Decided April 25, 2000.

> **OVERVIEW:** Judgment reversed because entire controversy
> doctrine held inapplicable to two actions involving rug
> defects by the same defendant manufacturer, and court
> remanded defendant's sanctions award for factual
> reconsideration.

**Rocco v. N.J. Transit Rail Operations**, 330 <u>N.J. Super.</u> 320;
Argued March 1, 2000; Decided April 25, 2000.

> **OVERVIEW:** Based on public entity's duty to make premises
> safe or warn of dangerous conditions, facts existed to
> establish a prima facie case of liability based on
> respondeat superior, but not to support a res ipsa loquitur
> inference.

**1999**

**Burns v. Belafsky**, 326 N.J. Super. 462; Argued October 19, 1999; Decided December 20, 1999; aff'd, 166 N.J. 466 (2001).

> **OVERVIEW:** Plaintiffs' counsel's neglect to timely file affidavit of merit qualified as good cause permitting extension because the affidavit filed set forth threshold showing of malpractice and was filed within extension time period.

**Keegan v. Keegan**, 326 N.J. Super. 289; Submitted October 25, 1999; Decided December 8, 1999.

> **OVERVIEW:** Appellant was required to reimburse appellee for their daughters' college expenses; anti-retroactive support statute was limited to prevent retroactive modifications decreasing or vacating orders allocated for child support.

**State v. Jones**, 326 N.J. Super. 234; Submitted October 4, 1999; Decided December 3, 1999.

> **OVERVIEW:** Defendants' convictions were reversed because the mere smell of alcohol with an admission of consumption could not, by itself, warrant a search of a vehicle for open containers.

## PUBLISHED TRIAL COURT OPINIONS

**Lavecchia v. Hip of N.J.**, DOCKET NO. C-275-98, SUPERIOR COURT OF NEW JERSEY, CHANCERY DIVISION, MIDDLESEX COUNTY, 324 N.J. Super. 85; Decided March 5, 1999; Approved for Publication July 12, 1999.

> **OVERVIEW:** Plaintiff commissioner was entitled to order of liquidation where defendant health maintenance organization was insolvent for the foreseeable future and the court could not partially forgive defendant's pre-rehabilitation debt.

**Thornton v. GM Corp.**, DOCKET NO. L-16904-89, SUPERIOR COURT OF NEW JERSEY, LAW DIVISION, MIDDLESEX COUNTY, 280 N.J. Super. 295; Decided October 27, 1994; Approved for Publication March 7, 1995.

> **OVERVIEW:** Burden to show that injuries from an underlying collision were capable of being apportioned and what those injures were fell upon defendant in case where plaintiff's conduct did not causally relate to enhanced injuries.

**Gilhooly v. Zeta Psi Fraternity**, Docket No. W-027693-87, Superior Court of New Jersey, Law Division, Middlesex County, 243 N.J. Super. 201; Decided April 20, 1990; Approved for Publication August 10, 1990.

> **OVERVIEW:** Fraternity, while in part a residential owner, was also a commercial landowner because the property was used for social events for members, alumni, and guests, and it had a duty as a commercial landowner to maintain abutting sidewalks.

**Lee v. Travelers Ins. Cos.**, Docket No. W-15249-88, Superior
Court of New Jersey, Law Division, Middlesex County, 241 <u>N.J.</u>
<u>Super.</u> 293; Decided March 9, 1990; Approved for Publication May
25, 1990.

> **OVERVIEW:**  In an insured's action for uninsured motorist
> benefits on her infant daughter's behalf, parties' summary
> judgment motions were denied where there was genuine issue
> of material fact as to whether the vehicle was designed for
> use off public roads.

**Cuevas v. Allstate Ins. Co.**, Docket Nos. W-44818-88, W-50628-88,
Superior Court of New Jersey, Law Division, Middlesex County,
234 <u>N.J. Super.</u> 461; Decided November 10, 1988; Approved for
Publication January 31, 1989.

> **OVERVIEW:**  Plaintiffs, driver and passengers, could recover
> the full amount of their claims under two uninsured
> motorist policies because the claims did not exceed the
> individual or aggregate amounts of the policies.

# NATIONAL FORENSIC ENGINEERS, Inc.

### ENGINEERS, SCIENTISTS AND ARCHITECTS

DONALD R. PHILLIPS, P.E.
DENNIS C. DEEGAN, PH.D.
PAUL H. REIMER, JR., P.E.
JAMES E. DETWILER, P.E., C.I.H.
R. ANDREW FLETCHER, III, R.A. NCARB
LAURA M. GILL

1758 ALLENTOWN ROAD #150
LANSDALE, PA 19446-4053

(215) 703-0600
FACSIMILE (215) 703-0640
E-MAIL: NFEngineers@AOL.COM

ROBERT H. SMITH, PH.D., P.E.
RAYMOND A. HAWK
GEORGE A. SNYDER
JACK WOODS, P.E.
DONALD G. LANGROCK, P.E.
RICHARD PEDERSON, B.E.

Maurice J. Donovan, Esq.
Law Offices of Benjamin M. Del Vento
405 Northfield Avenue
Suite LL-1
West Orange, NJ 07052-3087

September 7, 2005

Re: Newman (Green) v. General Motors, et als
Our File No.: FEW92129H
Date of Incident: June 9, 1986
Docket No.: 02-135 (KSH)
PRELIMINARY REPORT

Dear Mr. Donovan,

You have asked **National Forensic Engineers, Inc.** to review file materials in its capacity as an automotive engineering expert and provide opinions with regard to an automobile/bus accident which occurred on June 9, 1986 while Michael Green was driving a 1986 IROC Camaro equipped with a T-roof.

In authoring this preliminary report, the undersigned, Donald R. Phillips, P.E., reviewed the following file materials from the pending *Newman v. GM* case: plaintiff's answers to interrogatories and response to GM's demand for production of documents including the 165 documents identified by plaintiff as the Top 100 Documents; GM's answers to interrogatories and responses to plaintiff's demands for production of documents; available testimony from the privilege hearing conducted before the Hon. Patty Shwartz, U.S.M.J., and the March 23, 2005 opinion of Judge Shwartz. In addition, I have reviewed or was already familiar with the following materials: GM's entire F-Car Project Center Files; multiple associated crash tests as produced by GM in various litigations; the C/F IV Engineering Notebook, and GM80 project center files as produced by GM. Through my participation as plaintiff's automotive engineering expert in the

# National Forensic Engineers, Inc.

ENGINEERS, SCIENTISTS AND ARCHITECTS

Maurice J. Donovan, Esq.
September 7, 2005
Page 2

*Green, Johnson, Harris, Barile, Zaremba, Ewing, McCullough,* and *Peterson* matters, all involving T-roof

litigation against GM, I am familiar with the discovery materials and documents exchanged in those cases. I

have also reviewed the appellate briefs exchanged in *Green vs. GM.* I plan to rely upon those documents,

and possibly others in addition to my expertise and experience in automotive engineering and particularly

crashworthiness litigation involving GM and the T-roof, in formulating my opinions in this matter.

In *Green v. GM,* I authored a report dated August 30, 1995. I was also twice deposed and testified at

trial. I also was deposed in the *Johnson* case for one day in July 1998. I was deposed in the *Harris* case on

September 4 and 5, 2002, October 8, 2002, May 6, 7 and 17, 2003 and June 19, 2003; I also wrote four

reports and/or affidavits and testified at a telephonic discovery hearing conducted by Judge Bookbinder. In

*Zaremba,* I was deposed twice and testified at a pretrial hearing. All of this work was related T-top litigation

and my research into the produced documents and is incorporated into my opinions herein.

In the *Green* case, I was asked to evaluate and offer my opinion as to whether the IROC Camaro

equipped with a T-roof was crashworthy. I concluded that (1) the IROC Camaro with the T-roof driven by

Mr. Green was not crashworthy; (2) a design defect in the T-roof permitted the roof to collapse downward

during a side/rear impact; (3) an alternative design consisting of two side-rails would have prevented the roof

collapse; and (4) GM had performed insufficient tests to determine if the T-roof option provided less

occupant protection than would a solid roof or roof with side rails. GM asserted in discovery (and later in its

# *National Forensic Engineers, Inc.*

ENGINEERS, SCIENTISTS AND ARCHITECTS

Maurice J. Donovan, Esq.
September 7, 2005
Page 3

appellate brief) that it had never considered any alternative designs for the T-roof.    After my second

deposition in *Green* and on the eve of trial, GM produced 112 additional crash test videos. The crash testing

of T-roof F-cars (Camaros and Firebirds) showed a problem with carrying barrier impact forces through the

upper rail components (or lack thereof in T-roofs) of the T-roof structure. Even from the limited test results

produced, GM could and should have recognized a design problem, but GM asserted that these results were

not relevant from an engineering perspective. However, at that time GM had not produced the Chief

Engineers Meeting Minute Notes, the Engineer's Writers Files, the Items of Concerns Lists, or the Long

Term Durability Studies that showed GM was both aware of and attempting to address structural problems

with the CC1 (T-roof) optioned F-Cars.

After the *Green* trial, I was retained by Patrick Ardis, Esq. to work on the *Johnson v. Hunter* case.  It

was then that I first became aware of the existence of what was called the F-Car Project Center File.   An

analysis of the F-Car Project Center File, and particularly the 100 Top Documents, reveals the following:

(1)     GM was aware of design defects in the T-roof structure from the very outset of the project. By

way of example, early computer modeling testing showed durability testing concerns, beaming

weaknesses as compared to hard top models, torsional weaknesses as compared to hard top models,

questions raised concerning barrier performance as a function of roof option, and the like. In addition,

long term durability studies showed the T-roof vehicles were cracking.

(2)     GM conducted alternative design testing starting in 1978 which confirmed the design defects

and the superiority of the alternative design over the T-roof. The testing and documents show that

# *National Forensic Engineers, Inc.*

ENGINEERS, SCIENTISTS AND ARCHITECTS

Maurice J. Donovan, Esq.
September 7, 2005
Page 4

GM knew of the existence of the alternative design, and demonstrated its increased performance in all forms of testing and modeling. Long term durability testing showed the CC1 (T-roof) optioned cars were cracking at the sail panel to roof joint, exactly the top of the area that failed in the *Green* accident. In fact, T-roofs were delayed until the 1984 model year instead of the 1982 release because of cracking and durability concern. Side by side comparison of the Generation III '82 F design to the preceding design in the Generation II vehicle further disclosed that GM had done evaluation and testing. Documents also disclose testing of the Lancia Beta Spyder, a European production vehicle, which utilized the alternative design. Yet as late as its appellate brief in *Green,* GM continued to assert that my alternative design with two permanent side rails was theoretical at best and had never been tested. GM's own documents show that it knew since 1978 that the alternative design was better.

See M. C. Sherba Memo - 5/23/78 (Hot Doc 147) ; 1982 F-Car Project Center - Chief Engineers Project Center Review Meeting, October 11, 1978 (Hot Doc 18)

(3)    GM attempted to resolve design defects and engineering problems inherent in the T-roof Camaro throughout its production and up until production of the car was discontinued in 2003. Efforts to correct the design defect over the years included, without limitation, changing the design of the T-top latches: changing the size, location, and design of the T-top hatches; the GM80 vehicle platform which was the scheduled replacement for the Generation III '82F Camaro and Firebird which was intended to fix all of the structural issues by designing a space frame type vehicle, and testing permanent rails over the doors in preparation of design of the fourth Generation F-Car, the C/F IV.

# *National Forensic Engineers, Inc.*

ENGINEERS, SCIENTISTS AND ARCHITECTS

Maurice J. Donovan, Esq.
September 7, 2005
Page 5

GM never retested the T-roof F-Cars after the latch design was changed in 1986. Yet in late 1986 and early 1987 GM was still pursuing the side rail design, as evidenced by the testing done by Steve Sibal and Jayne Sabourin in a memo dated January 20, 1987. In fact, GM instituted an entire program, the GM80 program, to overcome the T-top flexing problems; however, that program was never completed as only 6 structural crash tests were completed.

(4)     Despite its own design and safety concerns, GM knowingly produced, manufactured and placed in the stream of commerce the T-top Camaro over the more crashworthy alternative design because of the "macho image" and "proven sales performance" of the T-top design.

Had that discovery been available to me at the time of the *Green* trial I would have: (1)   modified certain opinions which I expressed in the *Green* case; (2) utilized empirical data and test results to support the opinions I had expressed;   (3)  been able to rebut challenges to my opinions advanced by GM experts and defense counsel on cross examination; (4) I would also have been able to demonstrate GM's knowledge of the defects and dangers of its T-top design together with their knowledge of the superior alternative design as confirmed by their own testing.

I have seen a similar pattern of withholding relevant information in the *Zaremba, Johnson, Harris* and other cases in which I have been involved.   I also note that Joseph Rice, Ph D., a GM engineer, acted as both as the defense expert and fact witness in the *Green* and *Johnson*.    In each case GM failed to disclose the documents that showed GM's full knowledge of the design defect in defending claims to the T-Top defects and crashworthiness.

# *National Forensic Engineers, Inc.*

ENGINEERS, SCIENTISTS AND ARCHITECTS

Maurice J. Donovan, Esq.
September 7, 2005
Page 6

    With a reasonable degree of engineering and scientific probability, based on the observations and analysis contained herein, it is the preliminary opinion of *National Forensic Engineers, Inc.* that GM was aware that there was a design defect with the T-Top F-Cars, and GM put it on the market despite knowledge of the design flaws and deficiencies. GM knew of and tested alternative designs in an attempt to identify and fix the problems with the T-top optioned cars. That testing continued throughout the *Green* litigation and was unsuccessful in fixing the problems. GM failed to disclose documents, testing, and design history from the plaintiff in the *Green* litigation. Those documents would have supported my opinions in the *Green* case and would have been the basis of additional *opinions*.

    If and when additional information becomes available, we reserve the right to supplement and amend this report.

    Attached to this report is my curriculum vitae, which includes a list of publications, professional affiliations, education, experience, and background. Also attached is a list of cases in which I have testified either at trial or at deposition over the last four years. *National Forensic Engineers, Inc.* is billing professional time at $240 per hour. This report was written in compliance with ASTM E620-97, Reporting Opinions for Technical Experts.

                                      Very truly yours,
                                      *National Forensic Engineers, Inc*

                                      Donald R. Phillips, P.E.

# NATIONAL FORENSIC ENGINEERS, INC.

### ENGINEERS, SCIENTISTS AND ARCHITECTS

1758 ALLENTOWN ROAD #150
LANSDALE, PA 19446-4053

(215) 703-0600
FACSIMILE (215)-703-0640
EMAIL NFENGINEERS@AOL.COM

## DONALD R. PHILLIPS, PE
*Automotive Engineer*     *Mechanical Engineer*
*Accident Reconstruction Engineer*     *Certified Home Inspector*
*Safety Engineer*

**Experience:**

**1993**
**to**
**Present**    **NATIONAL FORENSIC ENGINEERS, INC.,** Lansdale, PA
*Consultant*
Consultant in accident reconstruction, automotive engineering and crashworthiness, product and premises liability involving machines and equipment, and residential construction issues. Specialties include: vehicle product, and building equipment maintenance practices; engineering of vehicle brakes, steering, suspensions, engine, drivetrains, occupant restraints, air bags, and vehicle fires; nip point/barrier guard machine safety features, and residential construction practices.

**1990**
**to**
**1993**    **KENT, VADNAIS, AND WOOD,** Atlanta, GA
*Consultant*
Consultant in the areas of accident reconstruction, building construction, and product or premises liability involving mechanical equipment; performed independent crash testing; assisted in the design and development of an in-car dynamic handling data acquisition unit.

**1986**
**to**
**1990**    **BREED AUTOMOTIVE CORP.,** Boonton, NJ
*Project Engineer*
Retrofit automobiles with airbag systems; designed knee bolsters; performed crash tests; computer modeled crash testing sensor performance; and determined crash sensor locations. Assisted in airbag system design of all 1992 Ford platforms and 1988 to 1989 GM airbag programs. Designed, tested, validated the 1992 Ford Aerostar airbag system.

**1984**
**to**
**1986**    **COLGATE-PALMOLIVE COMPANY,** Jersey City, NJ
*Industrial Engineer*
Implemented cost reduction programs and time studies; supervised union employees; managed production machine maintenance programs. Troubleshot sensor problems in production and warehouse operations.

**1978**
**to**
**1984**    **DON PHILLIPS CONSTRUCTION,** Oakland, NJ
Residential construction including plumbing, electrical, masonry and roofing installation.

---

**ACCIDENT RECONSTRUCTION INVESTIGATIONS**

*Phillps 6*
*11/7/05*

*I-75 Multi-vehicle accident, Calhoun, TN:* One of the largest accident reconstructions performed in the country, 115 vehicles. Determine "who hit who" and speeds at impact.

*Intersection:* Determined impact speed of car that ran stop sign proving the vehicle could not have stopped before entering the intersection.

*Failure to Yield:* Vehicle entered four-lane road failing to yield right of way, reconstruction determined speeds and actions of both vehicles prior to impact.

*Intersection:* Proved that defendant was not speeding and did not cause the accident.

*Two Vehicle Collision:* Investigate an accident and vehicles to reconstruct the accident.

*Intersection:* Aided in the defense of truck driver in a vehicular homicide case.

*Failure to Yield:* Vehicle entered roadway from shopping center parking lot, struck by oncoming truck. Reconstruction determined speed of truck and whether or not the car failed to yield right of way.

*Overtaking Accident:* Truck passing a car on a two-lane highway when car suddenly turned left in front of truck. Determine if car was signaling for the turn and speed of truck at impact.

*Uncontrolled Highway Crossing:* Car crossing road in front of truck, hit and pushed off roadway. Speeds of both vehicles determined from the damage profiles and post-impact positions.

*Crash Simulation:* Reconstruct rear-end collision and perform a crash test to verify results. Showed crash pulse was no more severe than everyday driving.

*Pedestrian Auto Collision:* A girl attempted to cross the street after being let out of her school bus. A car going in the opposite direction struck the girl on the side of the road.

*Tow Dolly Failure:* A tow dolly separated from a tractor-trailer coming to rest in the middle of I-285 beltway. A commuter auto struck the dolly. Causes of separation and speed at impact were determined.

*Bridge Collapses:* Speeding truck lost control and struck bridge support, knocking bridge down onto the southbound lanes of interstate. A car struck the fallen structure, a truck hit the bridge and car.

*Motorcycle Accident:* Newspaper delivery person pulled out from behind bushes to cross a four-lane highway in the path of an oncoming motorcycle. Speeds and reactions of both drivers were determined.

*Passenger Ejection:* Driver lost control of vehicle and truck guardrail. Car rebounded and crossed into the oncoming lane of travel. Passenger ejected and struck by delivery truck.

## MACHINE AND CONSTRUCTION INVESTIGATIONS

***Forklift Accident:*** Proved that actions of forklift driver could not have caused injuries to the truck driver standing in the trailer.

***Crane Collapse:*** Demonstrated that a missing or damaged cotter pin allowed an anchoring pin to fall out of the boom hoist clutch.

***Boat Explosion:*** Determined the source of the explosion and showed that faulty equipment and/or carelessness was the reason for the injury.

***Tower Collapse:*** Demonstrated that the general contractor did not follow instructions in using specialized handling equipment to erect preformed concrete walls.

***Steel Roll Former:*** Worker attempting to counter roll forming dies with guards out of position and was pulled into machine. Machine should have had guard interlocks to prevent operation while guards were out of place.

***Cardboard Corrugator:*** Worker was pulled into machine during line start-up while attempting to clear path of bad stock. No guard interlocks or safety shut offs near area where worker was cleaning.

***Saw Mill Accident:*** Determined if safety interlocks were installed on point of operation guards, and that a board could not have been ejected thus impaling a mill worker.

***Mower Accident:*** Demonstrated that the improper placement of pedal controls caused the operator's feet to become tangled and caused his fall from the platform.

***Vehicle Handling Testing:*** Determined that a compact space was not the cause of a loss of control in a fatal accident.

***Brake Failure:*** Determined if faulty brakes caused a loss of control of a vehicle which struck a parked car.

***Bicycle Accident:*** Determined that a rear-axle failure on a mountain bike caused severe injuries to the rider. Recreated the failure through a video demonstration.

***Sweeper Accident:*** Determined that improper routing of hydraulic hoses caused the operator's foot to become trapped on gas pedal effecting an out-of-control motion that resulted in a rollover accident.

***Education:*** B.S. Mechanical Engineering, Lehigh University, Bethlehem, PA 1984.
M.B.A., Seton Hall University, South Orange, NJ, 1990.
Graduate specialty in computer data management, analysis and analog/digital interfacing.

**Professional**  Society of Automotive Engineers (SAE)
**Associations:**  Vice Chairman of Membership, 1991-1993;
Vice Chairman of Company Representatives, 1991-1993.
American Society of Mechanical Engineers (ASME)
National Company Representative Committee Member (SAE), 1998
American Academy of Certified Consultants & Experts (AACCE), 2000

## Awards, Interviews & Noteable Engagements:

Lehigh University, Theodore B. Wood Academic Prize, 1981
SAE Outstanding Younger Member of the Year, 1992
SAE Achievement in Membership Award, 1993
Airbag Consultant for Fox News 6, Birmingham, AL, 1998
Seat Belt Defense NYSBA Summer Seminar Speaker, 2002
Accident Reconstruction Interview for The Sunday Republican Newspaper, 2002
AIEG Air Bag Summit VI Speaker, Dallas, TX, 2003
Lorman Education Services, Product Liability Seminar Speaker, Birmingham, AL, 2004
Alfred University, The Role of Automotive Glazing Seminar Speaker, Alfred, NY, 2005

## Professional Education:

Motor Vehicle Accident Reconstruction, SAE, 1991
Injury Causation , AAAM/IRCOB, 1994
Certified Home Inspector, 1995
Injury Causation and FMVSS Standards, SAE, 1997
Fundamental of Vehicle Dynamics, SAE, 1998
Crash Sensing in Automotive Occupant Restraint Systems, SAE, 1999
Engineers & Managers Can Learn from a Forensic Engineer Seminar, CBU, 2001
Identifying Risk Factors in Machinery, PDHcenter, 2002
Assessing Risk Factors in Machinery, PDHcenter, 2002
OSHA Cranes, Derricks, Hoists, Elevators & Conveyors, RedVector, 2002
Basic Concepts of Photogrammetry, RedVector, 2002
Engineering Safety Specifications: Designing for Safety, SAE, 2003
Automotive Glazing Materials, SAE, 2003
Designing with Glass, SAE, 2005
Fracture Analysis of Glass & Ceramics, Alfred University, 2005
Automotive Glazing Materials, SAE, 2005

## Publications:

"*The Use of Orthopaedic Surgeons and Engineers Can Make Your Case: Proximate Cause in Complex Personal Injury and Product Liability Cases*" The Vermont Bar Journal & Law Digest, Vol. 24, No. 1, March 1998.
"*Forensic Engineering Analysis Assisted By Orthopaedic Observations*" Journal of the National Academy of Forensic Engineers, Vol. XV, No. 2, December 1998.
"*Alternate Automotive Glass Reference List*" National Forensic Engineers, Inc., 2003.
" *Biomechanical Analysis of Headform Impacts into Automobile Side Glazing*",
ASME Summer Bioengineering Conference, Vail, CO, June 2005.

# NATIONAL FORENSIC ENGINEERS, INC.

ENGINEERS, SCIENTISTS AND ARCHITECTS

# DONALD R. PHILLIPS, P.E.

## TRIAL AND DEPOSITIONS – LAST 4 YEARS
### PAGE 1

| September 2005 | Pruitt v GM | Deposition | Memphis, TN |
| September 2005 | Jones v GM | Deposition | Memphis, TN |
| September 2005 | Harris v Ford | Deposition | Memphis, TN |
| August 2005 | Cangelosi v GM | Deposition | Montgomery, AL |
| July 2005 | Phillips/Frazier v Ford | Deposition | Memphis, TN |
| July 2005 | Breen v Ford | Deposition | Memphis, TN |
| July 2005 | Tarsio v Chubb | Deposition | Union, NJ |
| June 2005 | Fox v McClain | Deposition | Memphis, TN |
| May 2005 | Burke v GM | Deposition | Memphis, TN |
| May 2005 | Disque v Ford | Deposition | Memphis, TN |
| May 2005 | Ortiz v Ford | Trial | Orlando, FL |
| February 2005 | Lam v Toyota | Trial | Mobile, AL |
| December 2004 | Berg v Chrysler | Trial | Reading, PA |
| December 2004 | Viapiano v Chrysler | Deposition | Jersey City, NJ |
| November 2004 | Benson v Penske | Deposition | Memphis, TN |
| November 2004 | Turner v National Seating | Deposition | Oxford, MS |
| November 2004 | Flores v Ford | Deposition | Memphis, TN |
| October 2004 | Shirley v Mitsubishi | Deposition | Memphis, TN |
| October 2004 | Billingsley v Whit-Log | Deposition | Memphis, TN |
| October 2004 | Breen v Ford | Deposition | Memphis, TN |
| October 2004 | Ellis v Ford | Deposition | Memphis, TN |
| October 2004 | Tuttle/Diamond v Kia | Deposition | Memphis, TN |
| September 2004 | Marrero v Raritan Bay | Deposition | West Orange, NJ |
| September 2004 | D'Anna v Barry Construction | Deposition | Cherry Hill, NJ |
| August 2004 | Ellis v Ford | Deposition | Memphis, TN |
| August 2004 | Galvan v Ford | Deposition | Memphis, TN |
| August 2004 | Lam v Toyota | Deposition | Montgomery, AL |
| July 2004 | Jackson v GM | Deposition | Chatham, NJ |
| June 2004 | Graham v Hyundai | Trial | Montgomery, AL |
| May 2004 | Harris v GM | Trial | Mount Holly, NJ |
| April 2004 | Disque v Ford | Deposition | Newark, NJ |
| April 2004 | Guzman v Ford | Trial | Zapata, TX |
| March 2004 | Guzman v Ford | Deposition | Zapata, TX |
| February 2004 | Ortiz v Ford | Deposition | Memphis, TN |
| February 2004 | Gant v Masterson | Trial | Memphis, TN |

# NATIONAL FORENSIC ENGINEERS, INC.

ENGINEERS, SCIENTISTS AND ARCHITECTS

## DONALD R. PHILLIPS, P.E.

## TRIAL AND DEPOSITIONS – LAST 4 YEARS
### PAGE 2

| | | | |
|---|---|---|---|
| February 2004 | Fuschich v GM | Deposition | Los Angeles, CA |
| January 2004 | Guzman v Ford | Deposition | Memphis, TN |
| January 2004 | Gant v Masterson | Deposition | Memphis, TN |
| January 2004 | Kurzke v Nissan | Deposition | Chatham, NJ |
| January 2004 | Gregorio v GM | Deposition | Woodbridge, NJ |
| December 2003 | Ortiz v Ford | Deposition | Memphis, TN |
| December 2003 | Gregorio v GM | Deposition | Woodbridge, NJ |
| November 2003 | Maxwell v Ford | Deposition | Memphis, TN |
| November 2003 | Gregorio v GM | Deposition | Woodbridge, NJ |
| October 2003 | Gregorio v GM | Deposition | Woodbridge, NJ |
| October 2003 | D'Elia v Billotti | Deposition | Florham Park, NJ |
| September 2003 | Gregorio v GM | Deposition | Woodbridge, NJ |
| August 2003 | Roher v Ford | Deposition | Woodbury, NJ |
| August 2003 | Gregorio v GM | Deposition | Woodbridge, NJ |
| August 2003 | Botcho v Elmwood Pk Boro | Deposition | Florham Park, NJ |
| July 2003 | Graham v Hyundai | Trial | Montgomery, AL |
| July 2003 | Davis v Kawasaki | Deposition | Memphis, TN |
| June 2003 | Gilmore v Ford | Deposition | Montgomery, AL |
| June 2003 | Harris v GM | Deposition | Woodbridge, NJ |
| May 2003 | Harris v GM | Deposition | Woodbridge, NJ |
| May 2003 | Gregorio v GM | Deposition | Woodbridge, NJ |
| April 2003 | Moore v Pretty Products | Trial | Greenville, MS |
| March 2003 | Lozada v Western Railway | Trial | Patterson, NJ |
| March 2003 | Berg v DPL Trucking | Deposition | West Orange, NJ |
| February 2003 | Baldwin v Peoples | Trial | Columbia, SC |
| January 2003 | Forbis v Ford, et al | Trial | Naples, FL |
| November 2002 | Journey v Crown Equipment | Deposition | Succasunna, NJ |
| October 2002 | Graham v Hyundai | Deposition | Montgomery, AL |
| October 2002 | Ezzet v Flushmaster | Deposition | Florham Park, NJ |
| October 2002 | Harris v GM | Deposition | Cherry Hill, NJ |
| September 2002 | Harris v GM | Deposition | Cherry Hill, NJ |
| August 2002 | Gregorio v GM | Deposition | Springfield, NJ |
| July 2002 | Moore v Pretty Products | Deposition | Memphis TN |
| July 2002 | Lee v PCS | Deposition | Philadelphia, PA |
| July 2002 | Buckley v GM | Deposition | Memphis, TN |

# NATIONAL FORENSIC ENGINEERS, INC.

ENGINEERS, SCIENTISTS AND ARCHITECTS

## DONALD R. PHILLIPS, P.E.

## TRIAL AND DEPOSITIONS – LAST 4 YEARS
### PAGE 3

| | | | |
|---|---|---|---|
| July 2002 | Ziemer v Nissan | Trial | Morristown, NJ |
| June 2002 | Moore v Pretty Products | Deposition | Memphis TN |
| June 2002 | Grace v City of Weirton | Deposition | Memphis, TN |
| June 2002 | Forbis v Ford, et al | Deposition | Memphis, TN |
| April 2002 | Grimm v Chrysler | Deposition | Memphis, TN |
| April 2002 | Acevedo v Scag | Trial | Patterson, NJ |
| March 2002 | Gregorio v GM | Deposition | Springfield, NJ |
| March 2002 | Hunterton v Kirkwood | Deposition | New Brunswick, NJ |
| March 2002 | Gregorio v GM | Deposition | Springfield, NJ |
| March 2002 | Baker v Drone | Trial | New Brunswick, NJ |
| November 2001 | Ziemer v Nissan | Deposition | Short Hills, NJ |
| October 2001 | Hurd v GM | Deposition | Montgomery, AL |
| October 2001 | Petroski v Custom Bandag | Trial | New Brunswick,NJ |

Attachment A

## REPORT TO KING AND SPALDING

### IN THE MATTER OF

### NEWMAN v. GENERAL MOTORS INVOLVING GREEN v. GENERAL MOTORS

### FEBRUARY 12, 2009

JACK L. LINTNER, P.J.A.D. (ret.)

Norris McLaughlin & Marcus, P.A.
721 Route 202-206, P.O. Box 5933
Bridgewater, New Jersey  08807

Should you have any questions or concerns, please do not hesitate to contact us.

The letter was copied to Thomas A. Ziolkowski at GM and contains 64 pages of documents. According to Kirk, the Bates numbers on the 64 pages came from the 1100 documents reviewed by Rooney. He testified "We only looked at 1,100." He conceded "I'm embarrassed to say" that his firm had not reviewed the three boxes of file sent by Rhodes.

Andrew Langan, a partner at Kirkland, was the lead attorney on the Green case. He assigned his associate David Coulson to review the Green documents received from Rumberger. Langan had told Coulson, sometime after returning from the August 8 meeting, that another firm was going to review the documents. Coulson obtained the documents from Betman. After conferring with Langan, Coulson called Rudock "to ask some follow up questions so that we would have comfort that the scope of the review conducted by the Rumberger firm would encompass the body of responsive documents requested by the plaintiff as . . . qualified by the August 3rd discovery order." Henry Salas, an attorney at Rumberger, returned Coulson's call. Coulson questioned Salas to determine whether the documents sent complied with paragraph 5 of the August 3 Order requiring production of documents "related to roof systems/structures and any connected or related parts . . . ."

11

Coulson testified that he wanted to make sure that the
scope and criteria for production of the documents were broad.
He stated that he referenced the judge's production order with
Salas and believed that if all the documents produced dealt with
roof and roof components it would be responsive to the discovery
requests. He testified that he "may have looked back at the
document requests or interrogatories before [he] spoke with
[Salas] but certainly, if there are any documents dealing with
the roof and if the question is if there is some alternative
design to the roof, that's the document that relates to the
roof." He added "[s]o, I would have assumed that any
alternative design documents would have been sent, would have
been what was included."

Following his conversation with Salas, Coulson and Langan
reviewed the documents and decided that all 64 should be
produced. On July 29, 1991, Coulson sent the documents to Nancy
Genova, a Discovery Coordinator at the GM Product Discovery
Group asking that she arrange with local New Jersey counsel for
the production in <u>Green</u>. The letter concluded "please note
that, for inventory purposes, these documents are being produced
as part of General Motor's response to Interrogatory No. 52 and
they are <u>confidential</u> documents being <u>produced pursuant to
protective order</u>."

12

to 52. Had they been so provided, a reference to them in the answer to 68 would have been sufficient.

It is apparent from Rooney's time records that she could not possibly have reviewed the almost 10,000 pages of documents sent by GM in October 1990. A reading of Rudock's July 8 transmittal leads to the conclusion that it may have been apparent to Rudock that his firm had not completed its assignment to put together information about the history of the roof development for the "1982 'F' body vehicle" as it might have applied to <u>Green</u>. Documents A-H were clearly relevant to the historic development of the third generation F-Car. Coulson apparently questioned Salas, in light of the limitation in Rudock's letter, to satisfy himself that the document production covered the intent of the discovery order.

As outside independent counsel, both the Rumberger and Kirkland firms are independent contractors. <u>See</u> <u>Baldasarre v. Butler</u>, 132 <u>N.J.</u> 278, 291 (1993). A client is not vicariously liable for the tortious actions of the attorney, so long as the client "did not advise, consent to, participate in and which was not justified by any authority [the client] had given." <u>Ibid.</u>; <u>see also</u> <u>Clients' Security Fund v. Security Title and Guaranty Co.</u>, 257 <u>N.J. Super.</u> 18, 31 (App. Div. 1992). "Attorneys generally are not subject to their clients' actual control or direction." <u>Ibid.</u> "As professionals, attorneys are deemed

16

7.      **DEPOSITION:** Not later than <u>to be set by Judge Hayden</u>, any party seeking to offer evidence by deposition shall so advise the opposing parties. Within 14 days thereof, all parties are directed to prepare a joint agreed statement, in narrative form, of the testimony which would be given by the deponent if called under oath. No colloquy between counsel shall be included. The agreed statement is not a concession of the factual accuracy of the deponent's testimony. Absent prior leave of Court, no deposition testimony may be offered except as provided herein.

Within 14 days of the first date above, the parties shall simultaneously exchange and submit to the Court any objections to the deposition testimony proposed above. The objections shall note, separately as to each such challenged portion of the deposition, applicable cases or rules which underlie the objection. If a party fails to comply with this paragraph, the challenged deposition testimony shall be deemed admitted.

8.  **EXHIBITS** (Except for exhibits the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list attached hereto may be introduced at trial. Objections to authenticity are deemed waived unless such objections are set forth).*
    (*The exhibit lists should follow this page.)

A.  **Plaintiff:**

See Plaintiff's Trial Exhibit List attached.

The annexed list is a partial listing of plaintiff's proposed Exhibits. See 10A MISCELLANEOUS #2 of this Pretrial.

Magistrate Judge Shwartz's ruling:

(1) the plaintiff shall provide his exhibit list to the defendant before March 23, 2009; (2) the parties shall review the adverse party's exhibits to determine if there are authenticity objections; (3) list such exhibits in the joint revised final pretrial order and (4) include the exhibit lists as part of the Final Pretrial Order. If the parties need additional time to review the documents to determine whether or not there are going to be authenticity objections, then the parties shall set forth the date by which they will submit a list of documents to which authenticity objections will be preserved.

B.  **Defendant's objections to authenticity:**

GM does not yet have any objections because plaintiff has not yet disclosed his exhibit list. GM objects to plaintiff's untimely disclosure of his exhibits. Should plaintiff be permitted to disclose exhibits, however, GM reserves the right to amend this pretrial order with any objections to same.

*Plaintiff shall make available copies of his exhibits for inspection no later than March 31, 2009*

C.  **Defendant:**

See Defendant's Trial Exhibit List attached

D.  **Plaintiff's objections to authenticity:**

Plaintiff has yet to review all of the 724 Exhibit submitted by GM, some of which are hundreds of pages each. Plaintiff request the right to supplement this Pretrial Order to object to the authenticity of any document submitted by GM.

GM timely submitted its exhibit list and exhibits to plaintiff in accordance with this Court's scheduling orders. GM objects to any objections as to authenticity of GM's exhibits after entry of this Final Pretrial Order.

*Ruling: All authenticity objections shall be presented in a proposed order amending this portion of the final Pretrial order no later than April 27, 2009*

43

Defendant's exhibit list:

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

STEVEN G. NEWMAN, executor
under the last will of MICHAEL
GREEN, deceased,

        Plaintiff(s),
Shwartz

      v.

GENERAL MOTORS CORPORATION,
    Defendant(s).

Civil Action No. 02-135(KSH)

Hon. Katherine S. Hayden/Magistrate Judge

U.S.D.J.

FINAL PRETRIAL ORDER

Trial Date: _____

| No. | Description of Exhibit | ID. | EV. |
|-----|------------------------|-----|-----|
| 1 | Notice of Motion for Leave to Appeal Trial Court's Denial of GM's Motion for Recusal (October 29, 1993) | | |
| 2 | Notice of Motion for Stay of Proceedings in the Trial Court Pending Motion for Leave to Appeal Trial Court's Denial of GM's Motion for Recusal (October 28, 1993) | | |
| 3 | Order (October 14, 1993) | | |
| 4 | Order (May 21, 1993) | | |
| 7 | GM's Trial Brief in Support of the Admissibility of T-Top Roof Testing (January 27, 1993) | | |
| 8 | GM's Motion to Quash Plaintiff's January 18 "Notice in Lieu of Subpoena" (January 25, 1993) | | |
| 9 | GM's Proposed Charge to Jury (January 19, 1993) | | |
| 10 | GM's List of Witnesses It May Call at Trial (January 19, 1993) | | |
| 11 | GM's First Amended List of Trial Exhibits (January 19, 1992 (sic)) | | |
| 12 | Trial Brief of Defendant GM (January 19, 1993) | | |
| 15 | Case Management Order (October 30, 1995) | | |
| 16 | Letter from Tom Tansey to Judge Fuentes re: Michael Green v. General Motors (October 9, 1995) | | |
| 17 | GM's Notice of Motion to Preclude Plaintiff's Expert (October 9, 1995) | | |
| 18 | Plaintiff's Notice of Motion (October 6, 1995) | | |
| 19 | Letter from Tom Tansey to Judge Fuentes re: Michael Green v. General Motors (September 29, 1995) | | |
| 20 | Order (June 20, 1995) | | |
| 21 | Plaintiff's Notice of Motion (June 19, 1995) | | |

| 22 | Notice of Motion (on Short Notice) to Dismiss the Complaint or in the Alternative, for Other Relief (June 13, 1995) | | |
|----|----|----|----|
| 23 | Letter from Judge Fuentes to Maurice Donovan re: Green v. General Motors (June 8, 1995) | | |
| 24 | Case Management Order (March 13, 1995) | | |
| 25 | Notice of Motion (February 9, 1995) | | |
| 26 | Notice of Motion for an Order Precluding Plaintiff's Reliance on Any New Expert at Trial or, in the Alternative, to Require Immediate Production of Expert Report and Deposition (August 18, 1994) | | |
| 27 | Order (October 7, 1994) | | |
| 28 | Subpoenas for Dolores Parmentier, Joseph Dugan, James D. Jones, Mark Springer, Angelo Margino, Tom Sumner, & Mark Alexander (September 7, 1994) | | |
| 29 | Order (September 9, 1994) | | |
| 30 | Letter from Maurice Donovan to Judge Fuentes re: Green v. GM (August 31, 1994) | | |
| 31 | Notice of Motion Precluding Plaintiff's Reliance on Any New Expert at Trial or, in the Alternative, to Require Immediate Production of Report and Deposition (August 18, 1994) | | |
| 32 | Notice of Motion to Adjourn Trial Date or, in the Alternative, Place on Inactive List Pursuant to Rule: 1:6-2 (August 15, 1994) | | |
| 33 | Letter from Judge Fuentes to Maurice Donovan and John Hickey re: Green v. General Motors (June 16, 1994) | | |
| 34 | Order (December 7, 1993) | | |
| 35 | Letter from Andrew Langan to Judge Fuentes re: Michael Green v. General Motors (December 22, 1995) | | |
| 36 | GM's List of Re-Trial Exhibits (January 5, 1996) | | |
| 37 | GM's List of Witnesses It May Call at Trial (January 5, 1996) | | |
| 38 | GM's Requested Voir Dire of Jury (January 5, 1996) | | |
| 40 | Order (Undated) | | |
| 41 | Plaintiff's Requested Voir Dire of the Jury (January 15, 1996) | | |
| 42 | Plaintiff's Witness List (January 15, 1996) | | |
| 43 | Response to Plaintiff's Claimed Summary of FMVSS Compliance Testing Documents Produced by GM January, 1996 (undated) | | |
| 44 | Plaintiff's Exhibit List (undated) | | |
| 45 | Affidavit of Joseph Rice (January 3, 1996) | | |
| 46 | Report of Joseph S. Rice, PhD (June 18, 1991) | | |
| 47 | Supplemental Report of Joseph S. Rice (January 18, 1996) | | |
| 48 | FMVSS Compliance Reports Produced by GM January 1996 (undated) | | |
| 52 | Order (undated) | | |
| 53 | Order (January 19, 1996) | | |
| 54 | Order (January 19, 1996) | | |

| 55 | Memorandum of Respondent General Motors Corporation in Opposition to Plaintiff's Emergent Appeal (January 18, 1996) | | |
|----|----|----|----|
| 56 | Order (January 18, 1996) | | |
| 57 | Report of Kenneth Orlowski (June 19, 1991) | | |
| 58 | GM's Supplemental Trial Brief in Support of its Motion to Exclude References to Plaintiff's Consumer Expectations Related to Crashworthiness (February 8, 1996) | | |
| 59 | Brief and Appendix for Defendant-Appellant, GM (October 25, 1996) | | |
| 60 | Letter from [illegible] to Andrew Langan re: 1996 Pro Hac Vice (August 16, 1996) | | |
| 61 | Revised Final Judgment (June 26, 1996) | | |
| 62 | Notice of Cross Appeal (July 8, 1996) | | |
| 63 | Letter from Thomas Tansey to Judge Fuentes re: Michael Green v. General Motors (June 12, 1996) | | |
| 64 | GM's Reply Memorandum in Support of its Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for a New Trial or Remittitur of Damages (April 25, 1996) | | |
| 65 | Amended Complaint and Jury Demand (February 7, 1990) | | |
| 66 | Letter from Joe Murray to Maurice Donovan re: Green v. General Motors (February 5, 1990) | | |
| 67 | Notice to Take Oral Deposition of Joseph Rice, JJ Graybush, Claire Arcaro, and Douglas Van Sweden on March 7, 1990 (January 23, 1990) | | |
| 68 | Plaintiff's Supplemental Interrotatories (sic) to Defendant GM (undated) | | |
| 69 | Request for More Specific Answers to Plaintiff's Interrogatories Answered by Defendant General Motors Corporation (undated) | | |
| 70 | Plaintiff's Response to Defendant's General Motors Response to Plaintiff's Demand for Production of Documents (undated) | | |
| 71 | Case Management Order (January 9, 1990) | | |
| 72 | Pro Hac Vice Materials for John Hickey and Andrew Langan (multiple dates) | | |
| 73 | Notice to Take Oral Depositions (November 13, 1989) | | |
| 74 | Response of General Motors Corporation to Plaintiff's Notice to Produce Documents (undated) | | |
| 75 | Responses of General Motors Corporation to Plaintiff's Interrogatories (undated) | | |
| 76 | Plaintiff's Answers to Interrogatories Served by Defendant, General Motors (undated) | | |
| 77 | Products Liability Interrogatories Plaintiff to Defendant (undated) | | |
| 78 | Notice to Produce Documents (September 15, 1988) | | |
| 79 | Notice to Take Oral Depositions (September 15, 1988) | | |
| 80 | Interrogatories (undated) | | |
| 81 | Answer to Complaint and Jury Demand on Behalf of General Motors Corporation (August 15, 1988) | | |

| 82 | Summons (July 18, 1988) | | |
|---|---|---|---|
| 83 | Complaint (Products Liability) and Jury Demand (May 25, 1988) | | |
| 84 | Report on Coefficient of Friction of Goodyear High-Performance Tire (March 5, 1991) and Letter Enclosing Same | | |
| 85 | Case Management Order (February 14, 1991) | | |
| 86 | Letter from Thomas Chappell to Maurice Donovan re: Green v. General Motors (April 11, 1990) | | |
| 87 | Amended Protective Order (October 19, 1990) | | |
| 88 | Supplemental Response of General Motors Corporation to Plaintiff's Notice to Produce Documents in Response to Court's August 3, 1990 Order (undated) | | |
| 89 | Supplemental Responses of General Motors Corporation to Plaintiff's Supplemental Interrogatories in Response to Court's August 3, 1990 Order (undated) | | |
| 90 | Supplemental Response of General Motors Corporation to Plaintiff's Interrogatories in Response to the August 3, 1990 Order (undated) | | |
| 91 | Order (August 3, 1990) | | |
| 92 | Order (August 3, 1990) | | |
| 93 | Protective Order (August 3, 1990) | | |
| 94 | Plaintiff's Memorandum of Law in Opposition to GM's Motion for a Protective Order (June 31, 1990) | | |
| 95 | GM's Memorandum in Support of Its Motion for Protective Order (undated) | | |
| 96 | Case Management Order (May 17, 1990) | | |
| 97 | Responses of General Motors Corporation to Plaintiff's Supplemental Interrogatories (undated) | | |
| 98 | GM's Response to: (1) Plaintiff's Request for More Specific Response to Demand for Production of Documents and (2) Plaintiff's Request for a More Specific Response to Interrogatories (undated) | | |
| 99 | GM's List of Trial Exhibits (January 7, 1992) | | |
| 100 | Defendant GM's Opposition to Plaintiff's Motion in Limine to Exclude Evidence of Plaintiff's Pre-Accident Activity (January 5, 1993) | | |
| 101 | Letter from Maurice Donovan to Judge Ferentz re: Green v. General Motors (January 4, 1992) | | |
| 102 | GM's Supplemental Answers to Plaintiff's Interrogatories (December 16, 1992) | | |
| 103 | Letter from Judge Ferentz to Maurice Donovan re: Green v. General Motors (June 8, 1992) | | |
| 104 | Supplemental Responses of GM to Plaintiff's Interrogatory re: Experts (undated) | | |
| 105 | Supplemental Responses of GM to Plaintiff's Interrogatory re: Experts (undated) | | |
| 106 | GM's Supplemental Responses to Plaintiff's Interrogatories (undated) | | |
| 107 | GM's Supplemental Responses to Plaintiff's Interrogatories (undated) | | |
| 108 | GM's Supplemental Responses to Plaintiff's Interrogatories (undated) | | |

| 109 | GM's Supplemental Responses to Plaintiff's Interrogatories (undated) | | |
|---|---|---|---|
| 110 | Letter from Fred Rom to Maynard Timm re: Green v. General Motor Corporation (October 26, 1988) | | |
| 111 | Letter from Paul Widzinski to Tom Tansey re: Michael Green v. GMC (March 29, 1989) | | |
| 112 | Letter from Paul Widzinski to Tom Tansey re: Michael Green v. General Motors Corporation (July 19, 1989) | | |
| 113 | Letter from Joe Murray to Doug Brown re: Green v. General Motors Corporation (January 30, 1990) | | |
| 114 | Letter from Andrew Langan to Doug Brown and Tom Tansey re: Michael Green v. General Motors (May 20, 1990) | | |
| 116 | Letter from Joe Murray to Andrew Langan and Doug Brown re: Green v. General Motors Corporation (August 1, 1990) | | |
| 117 | Memorandum from Kathy Marshall re: Michael Green (August 3, 1990) | | |
| 118 | Letter from Kathy Marshall to Andrew Langan and Joe Murray re: Michael Green v. General Motors Corporation (August 6, 1990) | | |
| 119 | Handwritten Notes from August 8, 1990 Meeting (August 8, 1990) | | |
| 120 | Discovery Search Request (August 14, 1990) | | |
| 121 | Discovery Search Request (August 14, 1990) | | |
| 122 | Discovery Search Request (August 14, 1990) | | |
| 123 | Discovery Search Request (August 14, 1990) | | |
| 124 | Discovery Search Request (August 14, 1990) | | |
| 125 | Discovery Search Request (August 22, 1990) | | |
| 126 | Discovery Search Request (August 22, 1990) | | |
| 127 | Memorandum from Harold Wallin to David Coulson (August 23, 1990) | | |
| 128 | Memorandum from Ron Betman to James Cusick and Ronald Weitzman re: Hasson v. GM: F-Car Project Center Files (August 24, 1990) | | |
| 129 | Draft Copy: Supplemental Response of General Motors Corporation to Plaintiff's Notice to Produce Documents in Response to the Court's August 3, 1990 Order (September 12, 1990) | | |
| 130 | Letter from David Coulson to Doug Brown re: Michael Green v. General Motors Corporation (September 18, 1990) | | |
| 131 | Memorandum from Joe Murray to File re: Green v. GMC Discovery and Tel Conferences with Plaintiff's Atty (September 25, 1990) | | |
| 132 | Letter from Susan Rhodes to Joe Murray re: Michael Green v. General Motors (October 3, 1990) | | |
| 133 | Letter from Susan Rhodes to Robert Rudock re: Review of F Project Center Files (October 9, 1990) | | |
| 134 | Memorandum from David Coulson to File re: Michael Green v. General Motors (October 11, 1990) | | |
| 135 | Memorandum from David Coulson to File re: Michael Green v. GM (January 2, 1991) | | |

| 136 | Letter from David Coulson to Nancy Genova re: Michael Green v. General Motors (January 4, 1991) | | |
|-----|-------------------------------------------------------------------------------------------------|--|--|
| 138 | Letter from Nancy Genova to David Coulson re: Michael Green v. General Motors (January 18. 1991) | | |
| 139 | Letter from Andrew Langan to Tom Ziolkowski re: Michael Green v. General Motors (March 23, 1991) | | |
| 140 | Letter from Andrew Langan to Tom Ziolkowski re: Michael Green v. General Motors (March 23, 1991) | | |
| 141 | Letter from Robert Rudock to Ron Betman re:  F-Car Center Documents (July 8, 1991) | | |
| 142 | Letter from Joe Murray to Andrew Langan re:  Green v. General Motors Corporation (July 23, 1991) | | |
| 143 | Memorandum from David Coulson to Andrew Langan re:  F-Car Center Documents (July 24, 1991) | | |
| 144 | Letter from David Coulson to Nancy Genova (July 29, 1991) | | |
| 145 | Document Copy Request (July 30, 1991) | | |
| 146 | Letter from Joe Murray to Tom Ziolkowski re: Green v. General Motors Corporation (July 30, 1991) | | |
| 147 | Letter from Nancy Genova to Joe Murray re: Michael Green v. General Motors (July 31, 1991) | | |
| 148 | Letter from Tom Ziolkowski to Joe Murray re: Michael Green v. General Motors Corporation (August 8, 1991) | | |
| 149 | Fax from Joe Murray to Andrew Langan sending General Motors's Supplemental Responses to Plaintiff's Interrogatories (August 14, 1991) | | |
| 150 | Document Copy Request (August 22, 1991) | | |
| 151 | Letter from Nancy Genova to Henry Salas re: Michael Green v. General Motors (August 22, 1991) | | |
| 152 | Letter from Joe Murray to Tom Ziolkowski: Green v. General Motors Corporation (August 22, 1991) | | |
| 153 | Letter from David Coulson to Joe Murray re: Michael Green v. General Motors Corporation (August 22, 1991) | | |
| 154 | Letter from Tom Ziolkowski to Joseph Murray re: Michael Green v. General Motors Corporation (August 29, 1991) | | |
| 155 | Letter from Joseph Murray to Tom Ziolkowski re: Green v. General Motors Corporation (September 23, 1991) | | |
| 157 | Document Copy Request (January 22, 1992) | | |
| 158 | Letter from Nancy Genova to David Coulson re: Michael Green v. General Motors (January 23, 1992) | | |
| 162 | Letter from Andy Langan to Tom Ziolkowski, Tom Tansey, and Joe Rice re: Michael Green v. General Motors (November 16, 1995) | | |
| 163 | Letter from Martha Smoly to Andrew Langan re: F Car FMVSS 214 Request (November 28, 1995) | | |
| 164 | Fax from Andrew Langan and Tom Tansey to Tom Ziolkowski and Martha Smoly (January 18, 1996) | | |
| 165 | Discovery Chronology (January 18, 1996) | | |
| 166 | GM's Supplemental Document Production (February 1, 1996) | | |

| 167 | Fax from Edward Deutsch to Andrew Langan re: Green v. GM (October 7, 1996) | | |
|---|---|---|---|
| 168 | Fax from Douglas Poland to Paul Cappuccio and Richard Cordray (October 15, 1996) | | |
| 169 | Typed Notes (undated) | | |
| 170 | Billing Records (multiple dates) | | |
| 171 | Documents sent by GM to Rumberger Kirk (October 9, 1990) | | |
| 172 | Project Center Files Review (multiple dates) | | |
| 173 | Letter from Kathy Marshall to Robert Campbell and Robert Rudock re: Tina Irvin v. General Motors Corporation (August 16, 1990) | | |
| 174 | Letter from Maurice Donovan to Tom Tansey re: Michael Green v. General Motors Corporation (September 15, 1988) | | |
| 175 | Notice to Produce Documents (September 15, 1988) | | |
| 177 | Phone Message from Donald Phillips (September 3, 1997) | | |
| 178 | Fax from Alison Poindexter to Maurice Donovan (December 18, 1997) | | |
| 180 | Harris v. GM Appellate Opinion (March 2, 2007) | | |
| 181 | Letter from Joe Murray to Judge Ferentz re: Green v. General Motors Corporation (July 31, 1990) | | |
| 182 | Zaremba v. GM Appellate Opinion (February 13, 2004) | | |
| 184 | Zaremba Appellate Opinion (February 13, 2004) | | |
| 187 | Zaremba Documents (undated) | | |
| 188 | Phillips Report in Harris v. General Motors (June 4, 2000) | | |
| 190 | Report of Joseph S. Rice in Harris v. General Motors (September 11, 2003) | | |
| 191 | Supplemental Report of Donald Phillips in Harris v. General Motors (April 9, 2001) | | |
| 192 | Harris v. General Motors Verdict Form (undated) | | |
| 194 | Transcript Request (July 31, 1990) | | |
| 200 | Microfilm Index (undated) | | |
| 202 | Sled Test Reports (undated) | | |
| 204 | Johnson - General Motors Corporation's Response to Plaintiffs' Fifth Set of Request of Production of Documents (May 12, 1997) | | |
| 205 | Order on Plaintiffs' Motion for Sanctions Against Defendant General Motors Corporation for Failure to Identify and Produce Proper Deponents and Plaintiffs' Motion for Sanctions Against Defendant General Motors Corporation for Failure to Cooperate in Discovery (May 29, 1998) | | |
| 206 | Letter from Pat Ardis to Deborah Russell re: Johnson v. Hunter (December 13, 1996) | | |
| 207 | Letter from Deborah Russell to Pat Ardis re: Johnson v. General Motors Corporation (December 31, 1996) | | |
| 208 | Letter from Pat Ardis to Deborah Russell re: Johnson v. Hunter (December 31, 1996) | | |

| 209 | Letter from Deborah Russell to Pat Ardis re: Johnson v. General Motors Corporation (January 6, 1997) | | |
|---|---|---|---|
| 210 | Letter from Pat Ardis to Deborah Russell re: Johnson v. Hunter (January 7, 1997) | | |
| 211 | Letter from Deborah Russell to Pat Ardis re: Johnson v. General Motors Corporation (January 14, 1997) | | |
| 212 | Letter from Deborah Russell to Pat Ardis re: Johnson v. General Motors Corporation (January 24, 1997) | | |
| 213 | Letter from Deborah Russell to Mary Wolff re: Richard Johnson v. General Motors (June 2, 1997) | | |
| 214 | Letter from Deborah Russell to Pat Ardis re: Richard Johnson v. General Motors Corporation (December 10, 1997) | | |
| 215 | Agreed Amendment to the Confidentiality Protective Order (December 12, 1997) | | |
| 216 | Letter from Olivia Biss to Pat Ardis re: Richard Johnson v. General Motors (October 11, 1996) | | |
| 217 | Documents Produced by GMC in Johnson v. GMC Pursuant to Protective Order (undated) | | |
| 218 | Photo of 1979 Lancia Beta Spider (undated) | | |
| 220 | Program Content and Objectives Manual (undated) | | |
| 221 | Drawing (March 19, 1991) | | |
| 222 | Drawing (January 18, 1993) | | |
| 223 | Report of Don Phillips (August 30, 1995) | | |
| 224 | Drawing (November 7, 1995) | | |
| 225 | Drawing (November 7, 1995) | | |
| 226 | Resume of Don Phillips (undated) | | |
| 227 | Drawing (November 7, 1995) | | |
| 228 | Photos (undated) | | |
| 229 | Photos (undated) | | |
| 230 | Photos (undated) | | |
| 231 | Report of Arthur Damask (June 16, 1989) | | |
| 232 | Notes (July 13, 1990) | | |
| 233 | Photos (undated) | | |
| 236 | Letter from Maurice Donovan to Arthur Damask re: Green v. General Motors (September 13, 1990) | | |
| 238 | Drawing (January 6, 1993) | | |
| 241 | Supplemental Report of Ken Orlowski (October 6, 1995) | | |
| 242 | Supplemental Report of Kenneth F. Orlowski (undated) | | |
| 243 | Supplemental Responses of General Motors Corporation to Plaintiff's Interrogatories Regarding Experts (undated) | | |
| 246 | Supplemental Report of Dr. Donald F. Huelke (undated) | | |
| 249 | Supplemental Report of Joseph S. Rice (October 9, 1995) | | |
| 254 | Transcript of Pre-Trial Motions (pp. 32-37) (January 18, 1996) | | |

| | | | |
|---|---|---|---|
| 258 | Letter from Judge Fuentes to Maurice Donovan and John Hickey re: Green v. General Motors (June 16, 1994) | | |
| 259 | NJ Law Journal, "Think She's Tough? Tough!" (September 25, 1995) | | |
| 260 | NJ Law Journal, "Essex Judge in Ethics Juggernaut" (June 2, 1997) | | |
| 261 | NJ Law Journal, "Bar Seeks Probe of Ethics Leak" (June 23, 1997) | | |
| 262 | The Star Ledger, "Justices Fault Demeanor of Superior Court Judge" (July 1, 1997) | | |
| 263 | The Star Ledger, "Essex Judge Will Abide By Reprimand" (July 2, 1997) | | |
| 264 | NJ Law Journal, "They Really Socked It To Her" (July 7, 1997) | | |
| 265 | Associated Press, "Appeals Court: Judge Appeared to be Biased Against Automaker" (June 4, 2003) | | |
| 266 | NJ Lawyer, "Essex Judge Removed from Remanded Case for Bias" (June 9, 2003) | | |
| 267 | Docket from Hinton v. East Orange Police Department (undated) | | |
| 268 | Typed Notes (undated) | | |
| 269 | Handwritten Notes (undated) | | |
| 270 | Agreement to Provide Legal Services (July 17, 1986) | | |
| 271 | Closing Statement (July 13, 1993) | | |
| 272 | Letter from Michael Green to Benjamin Del Vento (April 3, 1998) | | |
| 273 | Letter from Maurice Donovan to Tom Tansey re: Green v. GM (October 9, 1998) | | |
| 274 | Order Fixing Attorney's Fees (December 4, 1998) | | |
| 275 | Letter from Benjamin Del Vento to Michael Green re: Michael Green v. General Motors (December 14, 1998) | | |
| 276 | Closing Statement (December 14, 1998) | | |
| 277 | Check No. 24291651 (July 15, 1999) | | |
| 278 | Letter from Benjamin Del Vento to Michael Green re: Michael Green v. General Motors (August 6, 1999) | | |
| 279 | Closing Statement (August 6, 1999) | | |
| 280 | Last Will and Testament of Michael Green (July 24, 2000) | | |
| 281 | Qualification (April 6, 2001) | | |
| 282 | Agreed Amendment to the Preliminary Confidentiality Protective Order (December 17, 1997) | | |
| 285 | Zaremba Opinion (February 13, 2004) | | |
| 286 | Maxwell Opinion & Order (May 24, 2004) | | |
| 287 | Maxwell Opinion (December 8, 2005) | | |
| 295 | Notice to Take Oral Depositions (March 6, 1991) | | |
| 296 | Letter from Tom Tansey and Andrew Langan to Judge Ferentz re: Green v. General Motors Corporation (March 20, 1992) | | |
| 297 | Order (March 23, 1992) | | |

| 298 | Notice of Motion to Supplement the Record (January 5, 1998) | | |
|---|---|---|---|
| 299 | Amended Revised Final Judgment - Post Appeal (September 24, 1998) | | |
| 300 | Third Amended Revised Final Judgment Post-Appeal (July, 1999) | | |
| 301 | Order on Remand (February 26, 1999) | | |
| 302 | Plaintiff's Agreement to Remittitur (February 26, 1999) | | |
| 303 | Warrant to Satisfy Amended Revised Final Judgment - Post Appeal (September 29, 1998) | | |
| 304 | Warrant to Satisfy Second and Third Amended Revised Final Judgments - Post Appeal (July 16, 1999) | | |
| 305 | 1982 "F" Body Division Meeting Minutes (September 28, 1979) | | |
| 306 | Executive Summary: F Car Project Center (December, 1981) | | |
| 307 | Maxwell v. Ford, 2005 U.S. LEXIS 26545 (N.D. Miss. October 21, 2005) | | |
| 308 | NJ Products Liability Act, N.J.S.A. 2A:58C-5 (Effective 1987) | | |
| 309 | NJ Rules Governing Civil Practice 4:17-1 (2009) | | |
| 310 | NJ Rules Governing Civil Practice 4:17-5 (2009) | | |
| 311 | NJ Rules Form A(2) (2009) | | |
| 312 | NJ Rules Form C(4) (2009) | | |
| 313 | Excerpt of Trial Transcript (February 8, 1996) | | |
| 314 | Excerpt of Trial Transcript (February 8, 1996) | | |
| 315 | Excerpt of Trial Transcript (February 9, 1996) | | |
| 316 | Excerpt of Trial Transcript (February 13, 1996) | | |
| 317 | Excerpt of Trial Transcript (February 13, 1996) | | |
| 318 | Excerpt of Trial Transcript (February 13, 1996) | | |
| 319 | Excerpt of Trial Transcript (February 13, 1996) | | |
| 320 | Excerpt of Trial Transcript (February 14, 1996) | | |
| 321 | Excerpt of Trial Transcript (February 14, 1996) | | |
| 322 | Excerpt of Trial Transcript (February 15, 1996) | | |
| 323 | Excerpt of Trial Transcript (February 21, 1996) | | |
| 324 | Excerpt of Trial Transcript (February 21, 1996) | | |
| 325 | Excerpt of Trial Transcript (February 21, 1996) | | |
| 326 | Excerpt of Trial Transcript (February 21, 1996) | | |
| 327 | Excerpt of Trial Transcript (February 22, 1996) | | |
| 328 | Excerpt of Trial Transcript (February 22, 1996) | | |
| 329 | Excerpt of Trial Transcript (February 23, 1996) | | |
| 330 | Excerpt of Trial Transcript (February 23, 1996) | | |
| 331 | Excerpt of Trial Transcript (February 23, 1996) | | |
| 332 | Excerpt of Trial Transcript (February 23, 1996) | | |
| 334 | Excerpt of Trial Transcript (February 23, 1996) | | |
| 335 | Excerpt of Trial Transcript (February 26, 1996) | | |
| 336 | Excerpt of Trial Transcript (February 26, 1996) | | |
| 337 | Excerpt of Trial Transcript (February 26, 1996) | | |
| 338 | Excerpt of Trial Transcript (February 26, 1996) | | |
| 339 | Excerpt of Trial Transcript (February 26, 1996) | | |
| 340 | Excerpt of Trial Transcript (February 26, 1996) | | |
| 341 | Excerpt of Trial Transcript (February 26, 1996) | | |

| 342 | Excerpt of Trial Transcript (February 26, 1996) | | |
|---|---|---|---|
| 343 | Excerpt of Trial Transcript (February 26, 1996) | | |
| 344 | Excerpt of Trial Transcript (February 26, 1996) | | |
| 345 | Excerpt of Trial Transcript (February 27, 1996) | | |
| 346 | Excerpt of Trial Transcript (February 28, 1996) | | |
| 347 | Excerpt of Trial Transcript (February 28, 1996) | | |
| 348 | Excerpt of Trial Transcript (February 28, 1996) | | |
| 349 | Excerpt of Trial Transcript (February 28, 1996) | | |
| 350 | Excerpt of Trial Transcript (February 28, 1996) | | |
| 351 | Excerpt of Trial Transcript (February 29, 1996) | | |
| 352 | Excerpt of Trial Transcript (February 29, 1996) | | |
| 353 | Excerpt of Trial Transcript (February 29, 1996) | | |
| 354 | Excerpt of Trial Transcript (March 4, 1996) | | |
| 355 | Excerpt of Trial Transcript (March 4, 1996) | | |
| 356 | Excerpt of Trial Transcript (March 4, 1996) | | |
| 357 | Excerpt of Trial Transcript (March 4, 1996) | | |
| 358 | Excerpt of Trial Transcript (March 4, 1996) | | |
| 359 | Excerpt of Trial Transcript (January 20, 1993) | | |
| 360 | Excerpt of Trial Transcript (January 20, 1993) | | |
| 361 | Excerpts of Trial Transcript (January 20, 1993) | | |
| 362 | Excerpt of Trial Transcript (January 21, 1993) | | |
| 363 | Excerpts of Trial Transcript (January 21, 1993) | | |
| 364 | Excerpts of Trial Transcript (January 21, 1993) | | |
| 365 | Excerpt of Trial Transcript (January 21, 1993) | | |
| 366 | Excerpt of Trial Transcript (January 21, 1993) | | |
| 367 | Excerpt of Trial Transcript (January 21, 1993) | | |
| 368 | Excerpt of Trial Transcript (January 25, 1993) | | |
| 369 | Excerpt of Trial Transcript (January 25, 1993) | | |
| 370 | Excerpt of Trial Transcript (January 25, 1993) | | |
| 371 | Excerpt of Trial Transcript (January 27, 1993) | | |
| 372 | Excerpts of Trial Transcript (January 27, 1993) | | |
| 373 | Excerpt of Trial Transcript (January 28, 1993) | | |
| 374 | Excerpt of Trial Transcript (January 28, 1993) | | |
| 375 | Excerpt of Trial Transcript (January 28, 1993) | | |
| 376 | Excerpt of Trial Transcript (January 28, 1993) | | |
| 377 | Excerpt of Trial Transcript (January 29, 1993) | | |
| 379 | Excerpt of Trial Transcript (January 29, 1993) | | |
| 380 | Excerpt of Trial Transcript (January 29, 1993) | | |
| 381 | Excerpts of Trial Transcript (January 29, 1993) | | |
| 382 | Excerpt of Trial Transcript (January 29, 1993) | | |
| 383 | Excerpt of Trial Transcript (January 29, 1993) | | |
| 384 | Excerpt of Trial Transcript (January 29, 1993) | | |
| 385 | Excerpt of Trial Transcript (January 29, 1993) | | |
| 386 | Excerpts of Trial Transcript (January 29, 1993) | | |
| 387 | Excerpt of Trial Transcript (January 29, 1993) | | |
| 388 | Excerpts of Trial Transcript (February 1, 1993) | | |
| 389 | Excerpt of Trial Transcript (February 1, 1993) | | |
| 390 | Excerpts of Trial Transcript (February 1, 1993) | | |
| 391 | Excerpts of Trial Transcript (February 2, 1993) | | |
| 392 | Excerpt of Trial Transcript (February 2, 1993) | | |
| 393 | Excerpt of Trial Transcript (February 3, 1993) | | |
| 394 | Excerpts of Trial Transcript (February 3, 1993) | | |
| 395 | Excerpts of Trial Transcript (February 3, 1993) | | |

| 396 | Excerpts of Trial Transcript (February 3, 1993) | | |
|---|---|---|---|
| 397 | Excerpt of Trial Transcript (February 3, 1993) | | |
| 398 | Excerpts of Trial Transcript (February 3, 1993) | | |
| 399 | Excerpt of Trial Transcript (February 4, 1993) | | |
| 400 | Excerpts of Trial Transcript (February 4, 1993) | | |
| 401 | Excerpt of Trial Transcript (February 4, 1993) | | |
| 402 | Excerpt of Trial Transcript (February 4, 1993) | | |
| 404 | Excerpt of Trial Transcript (February 5, 1993) | | |
| 405 | Excerpt of Trial Transcript (February 5, 1993) | | |
| 406 | Excerpt of Trial Transcript (February 8 and 9, 1993) | | |
| 407 | Fisher Body Documents (undated) | | |
| 408 | Final Test Report 216-MGA-86-015 (March 14, 1986) | | |
| 409 | Notice of Video Deposition of Mr. Theodore Eisenberg (February 4, 2009) | | |
| 410 | *Bureau of Justice Statistics Special Report: Civil Justice Survey of State Courts, 2005: Civil Bench and Jury Trials in State Courts, 2005* (October, 2008) | | |
| 411 | *Bureau of Justice of Statistics Bulletin: Civil Justice Survey of State Courts, 2001: Civil Trial Cases and Verdicts in Large Counties, 2001* (April, 2004) | | |
| 412 | *Bureau of Justice Statistics Bulletin: Civil Justice Survey of State Courts, 1996: Civil Trial Cases and Verdicts in Large Counties* (1996) | | |
| 413 | *Bureau of Justice Statistics Special Report: Civil Justice Survey, 1992: Civil Jury Cases and Verdicts in Large Counties* (1995) | | |
| 414 | T. Eisenberg, V. Hans, and M. Wells, *The Relation Between Punitive and Compensatory Awards: Combining Extreme Data with Mass of Awards* (March 30, 2007) | | |
| 415 | J. Hersch & W. K. Viscusi, *Punitive Damages: How Judges and Juries Perform*, 33 J. Legal Stud. 1 (2004) | | |
| 416 | *NLJ Verdicts 100: Top Verdicts of the Year: The Big Get Smaller*, Nat'l L. J. (February 3, 2003) | | |
| 417 | David Hechler, *The Big Drop: The Jury's Out on Why, But Punitive Damages Took a Nosedive in 2003*, Nat'l L. J. (February 9, 2004) | | |
| 418 | David Hechler, *Top 100 Verdicts of 2004: Smaller at the Top: Big Awards Continue to Drop, as Punitives Decline after 2003's 'State Farm*, Nat'l L. J. (February 21, 2005) | | |
| 419 | CV of Theodore Eisenberg (January 22, 2009) | | |
| 420 | Expert Report of Theodore Eisenberg (January 22, 2009) | | |
| 421 | Amicus Brief of N. Vidmar, et al. (including T. Eisenberg) in Philip Morris USA v. Williams (undated) | | |
| 422 | T. Eisenberg and M. Wells, *The Significant Association Between Punitive and Compensatory Damages in Blockbuster Cases: A Methodological Primer*, J. Empirical Legal Stud. (March 2006) | | |
| 423 | Excerpt of Trial Transcript (March 4, 1996) | | |

| 424 | Excerpts of Trial Transcript (March 4, 1996) | | |
|---|---|---|---|
| 425 | T. Eisenberg, J. Goerdt, B. Ostrom, D. Rottman, and M. Wells, *The Predictability of Punitive Damages* 26 J. Legal. Stud. 623 (June 1997) | | |
| 426 | T. Eisenberg, P. Hannaford-Agor, M. Heise, N. LaFountain, G. T. Munsterman, B. Ostrom, and M. Wells, *Juries, Judges, and Punitive Damages Empirical Analyses Using the Civil Justice Survey of State Courts 1992, 1996, and 2001 Data*, J. Empirical Leg. Stud. (July 2006) | | |
| 427 | T. Eisenberg and M. Wells, *The Predictability of Punitive Damages Awards in Published Opinion, the Impact of BMW v. Gore on Punitive Damages Awards, and Forecasting Which Punitive Damages Awards Will be Reduced*, 7 Sup. Ct. Econ. Rev. 59 (1999) | | |
| 428 | T. Eisenberg, J. Rachlinski & M. Wells, *Reconciling Experimental Incoherence with Real-World Coherence in Punitive Damages*, 54 Stan. L. Rev. 1239 (June 2002) | | |
| 429 | T. Eisenberg, *Damages Awards in Perspective: Behind the Headline-Grabbing Awards in Exxon Valdez and Engle*, 36 Wake Forest L. Rev. 1129 (2001) | | |
| 430 | T. Eisenberg, *Why Do Empirical Legal Scholarship*, 41 San Diego L. Rev. 1741 (2004) | | |
| 432 | Expert Report of Neil Vidmar (February 13, 2009) | | |
| 433 | Excerpt of N.Vidmar and V. Hans, *American Juries: The Verdict* (2007) | | |
| 434 | S. Diamond, N. Vidmar, M. Rose, L. Ellis, and B. Murphy, *Juror Discussions During Civil Trials: Studying an Arizona Innovation*, 45 Ariz. L. Rev. 1 (2003) | | |
| 435 | Williams v. Philip Morris, 127 S. Ct. 1057 (February 20, 2007) | | |
| 436 | T. Eisenberg and N. Vidmar (drafters), *Brief of Amici Curiae of Certain Leading Social Scientists and Legal Scholars in Support of Respondents in State Farm Automobile Company v. Campbell*, Supreme Court of the United States, No. 01-1289 (October 18, 2002) | | |
| 437 | Supplemental Expert Report of Neil Vidmar (February 17, 2009) | | |
| 438 | N. Vidmar and M. Rose, *Punitive Damages in Florida; In Terrorum and in Reality*, 38 Harv. J. on Legis. 487 (2001) | | |
| 439 | N. Vidmar and M. Wolfe, *Fairness Through Guidance: Jury Instructions on Punitive Damages After Philip Morris v. Williams*, 2 Charleston L. Rev. 307 (2008) | | |
| 440 | St. James v Future Finance, 342 N.J. Super 310 (June 18, 2001) | | |
| 442 | Excerpt of Trial Transcript (February 5, 1993) | | |
| 443 | Verdict Sheet (undated) | | |
| 445 | Excerpt of Trial Transcript (March 4, 1996) | | |

56

| 446 | Verdict Sheet (undated) | | |
|---|---|---|---|
| 447 | Report of Sylvia B. Pressler (December 16, 2008) | | |
| 448 | Unofficial Draft Transcript of Mr. Theodore Eisenberg's Deposition (February 11, 2009) | | |
| 449 | Excerpt of A. Bryman, *Social Research Methods*, 3rd ed. (2008) | | |
| 450 | Excerpt of E. Babbie, *The Practice of Social Research*, 6th ed.(1992) | | |
| 451 | M. Brewer, "Research Design and Issues of Validity" in Handbook of Research Methods of Social and Personality Psychology (2000) | | |
| 452 | N. Vidmar, *Civil Juries in Ecological Context; Methodological Implications for Research, in Civil Juries and Civil Justice* (2008) | | |
| 453 | Bureau of Justice Data and Codebook (multiple dates) | | |
| 454 | Excerpt of W. Robinson, *Ecological Variables and the Behavior of Individuals*, 15 American Sociological Rev. 351 (1950) | | |
| 455 | Excerpt of H. Selvin, *Durkheim's Suicide and Problems of Empirical Research*, 63 American Journal of Sociology 607 (May 1958) | | |
| 456 | G. Taubes, *Epidemiology Faces Its Limits*, 269 Science 164 (July 1995) | | |
| 457 | Excerpt of D. Kaye and D. Freedman, *Reference Guide on Statistics* (1994) | | |
| 463 | V. Hans and N. Vidmar, *The Verdict on Juries*, 91 Judicature 226 (2008) | | |
| 466 | S. Diamond, M. Rose, N. Vidmar, L. Ellis and B. Murphy, *Inside the Jury Room: Evaluating Juror Discussions During Trial*, 87 Judicature 54 (September-October 2003) | | |
| 467 | M. Rose and N. Vidmar, *Bronx Juries: A Profile of Civil Jury Awards in New York Counties*, 80 Tex. L. Rev. 1889 (2002) | | |
| 468 | S. Diamond and N. Vidmar, *Juror Discussion During Civil Trials: A Study of Arizona's Rule 39(f)* Innovation, American Bar Foundation (April 2002) | | |
| 469 | S. Diamond and N. Vidmar, *Jury Room Ruminations on Forbidden Topics*. 87 Va. L. Rev. 1857 (2001) | | |
| 470 | N. Vidmar, *Juries Don't Make Legal Decisions! And Other Problems: A Critique of Hastie et al. on Punitive Damages*, 23 Law and Human Behavior 705 (1999) | | |
| 471 | N. Vidmar, *The Performance of American Civil Jury: An Empirical Perspective*, 40 Ariz. L. Rev. 849 (1998) | | |
| 473 | N. Vidmar, *Empirical Evidence on the "Deep Pockets" Hypothesis: Jury Awards for Pain and Suffering in Medical Malpractice Cases*, 43 Duke L. J. 217 (November 1993) | | |
| 475 | T. Eisenberg and M. Wells, *Trial Outcomes and Demographics: Is There a Bronx Effect?*, 80 Tex. L. Rev. 1839 (2002) | | |

| 476 | T. Eisenberg, *Juries, Judges, and Punitive Damages: An Empirical Study*, 87 Cornell L. Rev. 743 (2002) | | |
|-----|------|---|---|
| 477 | T. Eisenberg, *Measuring the Deterrent Effect of Pnnitive* (sic) *Damages*, 87 Geo. L.J. 347 (1998) | | |
| 479 | T. Eisenberg and M. Wells, *Punitive Awards After BMW, a New Capping System and the Reported Opinion Bias*, 1998 Wisc. L. Rev. 397 (1998) | | |
| 480 | Exxon Shipping Co. v. Baker, 128 S. Ct. 2605 (2008) | | |
| 481 | Kennedy v. Louisiana, 128 S. Ct. 2641 (2008) | | |
| 482 | Schiro v. Summerlin, 124 S. Ct. 2519 (2004) | | |
| 483 | Ramdass v. Angelone, 120 S. Ct. 2113 (2000) | | |
| 484 | O'Dell v. Netherland, 117 S. Ct. 1969 (1997) | | |
| 485 | Simmons v. South Carolina, 114 S. Ct. 2187 (1994) | | |
| 486 | Patterson v. McLean Credit Union, 109 S. Ct. 2363 (1989) | | |
| 487 | Briscoe v. LaHue, 102 S. Ct. 1108 (1983) | | |
| 489 | Statistical Calculations of T. Eisenberg (undated) | | |
| 490 | Letter from Maurice Donovan to Theodore Eisenberg re: Newman v. General Motors - Punitive Damages (September 22, 2008) | | |
| 491 | Invoice (February 2, 2009) | | |
| 492 | N. Vidmar, *Experimental Simulations and Tort Reform: Avoidance, Error and Overreaching in Sunstein et al's. Punitive Damages*, 53 Emory L. J. 1361 (2004) | | |
| 493 | Neil Vidmar's CV (February 2009) | | |
| 494 | Plaintiff's Exhibit 4 to Robert Rudock's Deposition (October 2, 2008) | | |
| 495 | Plaintiff's Exhibit 5 to Robert Rudock's Deposition (October 2, 2008) | | |
| 496 | Plaintiff's Exhibit 3 to Joe Murray's Deposition (August 12, 2008) | | |
| 497 | Plaintiff's Exhibit 4 to Joe Murray's Deposition (August 12, 2008) | | |
| 498 | Plaintiff's Exhibit 5 to Joe Murray's Deposition (August 12, 2008) | | |
| 499 | Plaintiff's Exhibit 6 to Joe Murray's Deposition (August 12, 2008) | | |
| 500 | Plaintiff's Exhibit 1 to Joe Rice's Deposition (October 21, 2008) | | |
| 501 | Plaintiff's Exhibit 2 to Joe Rice's Deposition (October 21, 2008) | | |
| 502 | Plaintiff's Exhibit 3 to Joe Rice's Deposition (October 21, 2008) | | |
| 503 | Plaintiff's Exhibit 4 to Joe Rice's Deposition (October 21, 2008) | | |
| 504 | Plaintiff's Exhibit 5 to Joe Rice's Deposition (October 21, 2008) | | |
| 505 | Plaintiff's Exhibit 6 to Joe Rice's Deposition (October 21, 2008) | | |
| 506 | Plaintiff's Exhibit 7 to Joe Rice's Deposition (October 21, 2008) | | |
| 507 | Plaintiff's Exhibit 9 to Joe Rice's Deposition (October 21, 2008) | | |

| 508 | Plaintiff's Exhibit 10 to Joe Rice's Deposition (October 21, 2008) | | |
|---|---|---|---|
| 509 | Plaintiff's Exhibit 11 to Joe Rice's Deposition (October 21, 2008) | | |
| 510 | Plaintiff's Exhibit 12 to Joe Rice's Deposition (October 21, 2008) | | |
| 511 | Plaintiff's Exhibit 13 to Joe Rice's Deposition (October 21, 2008) | | |
| 512 | Plaintiff's Exhibit 14 to Joe Rice's Deposition (October 21, 2008) | | |
| 513 | Plaintiff's Exhibit 15 to Joe Rice's Deposition (October 21, 2008) | | |
| 514 | Plaintiff's Exhibit 17 to Joe Rice's Deposition (October 21, 2008) | | |
| 515 | Plaintiff's Exhibit 18 to Joe Rice's Deposition (October 21, 2008) | | |
| 516 | Plaintiff's Exhibit 20 to Joe Rice's Deposition (October 21, 2008) | | |
| 517 | Plaintiff's Exhibit 22 to Joe Rice's Deposition (October 21, 2008) | | |
| 518 | Plaintiff's Exhibit 24 to Joe Rice's Deposition (October 21, 2008) | | |
| 519 | Plaintiff's Exhibit 25 to Joe Rice's Deposition (October 21, 2008) | | |
| 520 | Defendant's Exhibit 1 to Maurice Donovan's Deposition (September 12, 2008) | | |
| 521 | Defendant's Exhibit 6 to Maurice Donovan's Deposition (September 12, 2008) | | |
| 522 | Defendant's Exhibit 7 to Maurice Donovan's Deposition (September 12, 2008) | | |
| 523 | Defendant's Exhibit 9 to Maurice Donovan's Deposition (September 12, 2008) | | |
| 524 | Defendant's Exhibit 10 to Maurice Donovan's Deposition (September 12, 2008) | | |
| 525 | Defendant's Exhibit 11 to Maurice Donovan's Deposition (September 12, 2008) | | |
| 526 | Defendant's Exhibit 14 to Maurice Donovan's Deposition (September 12, 2008) | | |
| 527 | Defendant's Exhibit 17 to Maurice Donovan's Deposition (September 12, 2008) | | |
| 528 | Defendant's Exhibit 18 to Maurice Donovan's Deposition (September 12, 2008) | | |
| 529 | Defendant's Exhibit 19 to Maurice Donovan's Deposition (September 12, 2008) | | |
| 530 | Plaintiff's Exhibit 1 to Myrna Ade's Deposition (September 17, 2008) | | |
| 531 | Exhibit 2 to Pat Ardis's Deposition (August 4, 2008) | | |
| 532 | Exhibit 3 to Pat Ardis's Deposition (August 4, 2008) | | |
| 533 | Exhibit 4 to Pat Ardis's Deposition (August 4, 2008) | | |
| 534 | Plaintiff's Exhibit 1 to Doug Brown's Deposition (September 15, 2008) | | |
| 535 | Plaintiff's Exhibit 3 to Doug Brown's Deposition (September 15, 2008) | | |
| 536 | Plaintiff's Exhibit 4 to Doug Brown's Deposition (September 15, 2008) | | |

| 537 | Plaintiff's Exhibit 5 to Doug Brown's Deposition (September 15, 2008) | | |
|-----|----------------------------------------------------------------------|---|---|
| 538 | Plaintiff's Exhibit 6 to Doug Brown's Deposition (September 15, 2008) | | |
| 539 | Plaintiff's Exhibit 7 to Doug Brown's Deposition (September 15, 2008) | | |
| 540 | Plaintiff's Exhibit 8 to Doug Brown's Deposition (September 15, 2008) | | |
| 542 | Plaintiff's Exhibit 11 to Doug Brown's Deposition (September 15, 2008) | | |
| 543 | Plaintiff's Exhibit 12 to Doug Brown's Deposition (September 15, 2008) | | |
| 545 | Letter from Tom Tansey to Maurice Donovan re: Green v. General Motors Corporation (January 10, 1992) | | |
| 546 | Letter from Tom Tansey to Maurice Donovan re: Green v. General Motors Corporation (January 10, 1992) | | |
| 547 | Letter from Andrew Langan to Maurice Donovan re: Michael Green v. General Motors (January 11, 1993) | | |
| 548 | Letter from Maurice Donovan to Tom Tansey re: Michael Green v. General Motors Corporation (January 13, 1992) | | |
| 549 | Letter from Joe Murray to Judge Ferentz re: Green v. General Motors Corporation (January 16, 1992) | | |
| 550 | Letter from Maurice Donovan to Judge Fuentes re: Green v. General Motors (January 21, 1994) | | |
| 551 | Letter from Maurice Donovan to Joe Murray re: Michael Green v. General Motors (January 23, 1996) | | |
| 552 | Letter from Joe Murray to Maurice Donovan re: Michael Green v. General Motors (February 1, 1996) | | |
| 553 | Letter from Joe Murray to Maurice Donovan re: Green v. General Motors Corporation (February 3, 1992) | | |
| 554 | Letter from Maurice Donovan to Tom Tansey re: Michael Green v. General Motors (February 3, 1992) | | |
| 555 | Letter from Tom Chappell to Maurice Donovan re: Michael Green v. General Motors (February 3, 1992) | | |
| 556 | Letter from Tom Tansey to Maurice Donovan re: Green v. General Motors Corporation (February 3, 1992) | | |
| 558 | Letter from Andrew Langan to Judge Fuentes re: Michael Green v. General Motors (February 20, 1995) | | |
| 559 | Letter from Maurice Donovan to Judge Fuentes re: Green v. General Motors (March 1, 1994) | | |
| 560 | Letter from Joe Murray to Maurice Donovan re: Green v. General Motors Corporation (March 8, 1990) | | |
| 561 | Letter from Maurice Donovan to Joe Murray and others re: Green v. General Motors (March 13, 1991) | | |
| 562 | Letter from Andrew Langan to Maurice Donovan re: Michael Green v. General Motors (April 2, 1992) | | |

| 563 | Letter from Andrew Langan to Maurice Donovan re: Michael Green v. General Motors (April 15, 1992) | | |
|-----|------|---|---|
| 564 | Letter from Tom Tansey to Maurice Donovan re: Green v. General Motors Corporation (May 18, 1990) | | |
| 565 | Letter from Maurice Donovan to Judge Fuentes re: Green v. General Motors (May 19, 1994) | | |
| 566 | Letter from Maurice Donovan to Judge Fuentes re: Green v. GM (May 30, 1995) | | |
| 567 | Letter from Maurice Donovan to Tom Tansey re: Green v. General Motors (June 20, 1989) | | |
| 568 | Microfiche of F-Car Project Center Files | | |
| 569 | Letter from Maurice Donovan to Tom Tansey and others re: Michael Green v. General Motors (June 26, 1992) | | |
| 570 | Letter from Andrew Langan to Maurice Donovan re: Michael Green v. General Motors (June 30, 1992) | | |
| 572 | Message from Doug Brown to Andrew Langan re: Green (July 22, 1990) | | |
| 573 | Letter from Joe Murray to Maurice Donovan re: Green v. General Motors Corporation (July 23, 1991) | | |
| 574 | Letter from Joe Murray to Maurice Donovan re: Green v. General Motors Corporation (July 23, 1991) | | |
| 575 | Letter from Joe Murray to Maurice Donovan re: Green v. General Motors Corporation (July 31, 1990) | | |
| 576 | Letter from Joe Murray to Doug Brown re: Green v. General Motors Corporation (August 13, 1990) | | |
| 577 | Letter from Maurice Donovan to Judge Weiss re: Michael Green v. General Motors (August 15, 1994) | | |
| 580 | Notice to Produce Documents (September 15, 1988) | | |
| 581 | Letter from Tom Tansey to Maurice Donovan re: Michael Green v. General Motors (September 15, 1995) | | |
| 582 | Letter from Maurice Donovan to Tom Tansey re: Green v. General Motors (September 18, 1995) | | |
| 583 | Letter from Tom Tansey to Maurice Donovan re: Green v. General Motors Corporation (September 20, 1990) | | |
| 584 | Letter from Joe Murray to Maurice Donovan re: Michael Green v. General Motors Corporation (August 23, 1993) | | |
| 585 | Letter from Joe Murray to Maurice Donovan re: Green v. General Motors Corporation (October 23, 1992) | | |
| 586 | Letter from Andrew Langan to Maurice Donovan re: Michael Green v. General Motors (December 1, 1995) | | |
| 587 | Letter from Tom Tansey to Maurice Donovan re: Green v. General Motors Corporation (December 2, 1991) | | |
| 589 | Letter from Andrew Langan to Maurice Donovan re: Michael Green v. General Motors (December 15, 1992) | | |
| 590 | Letter from Tom Chappell to Maurice Donovan re: Michael Green v. Goodyear (December 17, 1992) | | |

61

| 591 | Letter from Maurice Donovan to Andrew Langan re: Green v. GM (December 21, 1995) | | |
|---|---|---|---|
| 592 | Letter from Tom Tansey to Judge Fuentes re: Michael Green v. General Motors (June 5, 1996) | | |
| 595 | Third Amended Revised Final Judgment - Post Appeal (July 16, 1999) | | |
| 596 | Revised Final Judgment (June 26, 1996) | | |
| 598 | Second Amended Revised Final Judgment - Post Appeal (May 24, 1999) | | |
| 599 | Certification in Support of Third Amended Revised Final Judgment - Post Appeal (July 15, 1999) | | |
| 600 | Handwritten Notes (July 15, 1999) | | |
| 601 | Post Judgment Interest Calculator (July 12, 1999) | | |
| 602 | Letter from Judge Fuentes to Tom Tansey and Maurice Donovan re: Green v. General Motors et al (May 24, 1999) | | |
| 604 | Letter from Tom Tansey to Superior Court of New Jersey re: Michael Green v. General Motors Corporation (July 21, 1999) | | |
| 605 | Letter from Tom Tansey to Benjamin Del Vento re: Michael Green v. General Motors (July 20, 1999) | | |
| 606 | Letter from Tom Tansey to Benjamin Del Vento re: Michael Green v. General Motors (July 20, 1999) (with handwritten note) | | |
| 607 | Fax from Tom Tansey to Benjamin Del Vento (July 20, 1999) | | |
| 608 | Letter from Maurice Donovan to Tom Tansey re: Green v. GM (July 19, 1999) | | |
| 610 | Letter from Benjamin Del Vento to Tom Tansey re: Michael Green v. General Motors (July 16, 1999) | | |
| 611 | Certification as to Outstanding Liens (July 15, 1999) | | |
| 612 | Letter from Tom Tansey to Judge Fuentes re: Michael Green v. General Motors (July 16, 1999) | | |
| 613 | Letter from Benjamin Del Vento to Tom Tansey re: Michael Green v. General Motors (July 16, 1999) | | |
| 614 | Letter from Tom Tansey to Benjamin Del Vento re: Michael Green v. General Motors (July 15, 1999) | | |
| 615 | Fax from Benjamin Del Vento to Tom Tansey re: Green v. GM (July 15, 1999) | | |
| 616 | Letter from Maurice Donovan to Tom Tansey re: Green v. GM (July 14, 1999) | | |
| 617 | Letter from Maurice Donovan to Tom Tansey re: Green v. GM (July 12, 1999) | | |
| 618 | Notes (undated) | | |
| 620 | Letter from Judge Fuentes to Tom Tansey and Maurice Donovan re: Green v. General Motors (May 24, 1999) | | |
| 621 | Statement of Reasons (undated) | | |
| 622 | Fax Cover Sheet from Judge Fuentes to Maurice Donovan (May 24, 1999) | | |
| 624 | Letter from M. Donovan to T. Tansey re: Green v. GM (October 9, 1998) | | |
| 627 | Letter from Michael Green to Benjamin Del Vento (April 3, 1998) | | |
| 630 | Handwritten Notes (undated) | | |

| 631 | Receipt (undated) | | |
|---|---|---|---|
| 632 | Handwritten Notes (August 6, 1999) | | |
| 635 | Business Card of Vincent Maggio (undated) | | |
| 636 | Handwritten Notes (undated) | | |
| 637 | Phone Message from Steven Newman to Benjamin Del Vento re: Michael Green (December 30) | | |
| 640 | Letter from Tom Tansey to Maurice Donovan re: Michael Green v. General Motors (August 10, 1999) | | |
| 641 | Order Dismissing Appeal (August 5, 1999) | | |
| 642 | Letter from Benjamin Del Vento re: Michael Green v. General Motors (December 14, 1998) | | |
| 643 | Closing Statement (July 13, 1993) | | |
| 644 | Handwritten Notes (December 14, 1998) | | |
| 645 | Handwritten Notes (December 11, 1998) | | |
| 649 | Green Disbursements (undated) | | |
| 650 | Deposition Notes for Joseph S. Rice, PhD (May 11, 1992) | | |
| 651 | GM Production (undated) | | |
| 652 | Letter from Tom Tansey to Judge Ferentz re: Michael Green v. General Motors Corporation (July 13, 1990) | | |
| 653 | General Motors' Reply Memorandum in Support of Its Motion for a Protective Order (July 13, 1990) | | |
| 654 | Letter from Tom Tansey to Judge Ferentz re: Michael Green v. General Motors Corporation (August 1, 1990) | | |
| 655 | Letter from Joe Murray to Maurice Donovan re: Green v. General Motors Corporation (October 22, 1990) | | |
| 656 | Letter from Joe Murray to Maurice Donovan re: Green v. General Motors Corporation (September 24, 1990) | | |
| 657 | Letter from Maurice Donovan to Judge Ferentz re: Green v. General Motors (July 27, 1990) | | |
| 658 | Letter from Tom Tansey to Judge Ferentz re: Green v. General Motors Corporation (July 25, 1990) | | |
| 660 | Letter from Andrew Langan to Judge Fuentes re: Michael Green v. General Motors (February 10, 1995) | | |
| 661 | Order (October 7, 1994) | | |
| 662 | Letter from Maurice Donovan to Judge Weiss re: Michael Green v. General Motors (August 15, 1994) | | |
| 663 | Letter from Judge Walls to Andrew Langan re: Green v. General Motors (December 22, 1993) | | |
| 664 | Letter from Andrew Langan to Judge Fuentes re: Michael Green v. General Motors (February 20, 1995) | | |
| 665 | Notice of Motion (February 9, 1995) | | |
| 667 | Handwritten Notes (January 5, 1990) | | |
| 668 | Case Management Order (May 17, 1990) | | |
| 669 | Case Management Order (January 9, 1990) | | |
| 670 | Letter from Joe Murray to Clerk of Superior Court re: Michael Green v. General Motors Corporation (December 21, 1989) | | |

| 671 | Letter from Maurice Donovan to Judge Ferentz re: Green v. General Motors (July 16, 1990) | | |
|---|---|---|---|
| 672 | Transcript Request (undated) | | |
| 673 | Letter from Joe Murray to Judge Ferentz re: Green v. General Motors Corporation (July 31, 1990) | | |
| 674 | Letter from Joe Murray to Maurice Donovan re: Green v. General Motors Corporation (August 7, 1990) | | |
| 675 | Abstract of Driver History Record (January 6, 1993) | | |
| 676 | Letter from Maurice Donovan to Judge Ferentz re: Michael Green v. General Motors Corporation (December 10, 1991) | | |
| 677 | Letter from Tom Tansey to Maurice Donovan re: Michael Green v. General Motors Corporation (December 26, 1991) | | |
| 678 | Notice of Motion to Compel Deposition of Michael Green (December 6, 1991) | | |
| 679 | Employees Withholding Allowance Certificate (May 30, 1986) | | |
| 680 | Notice to the Bar (October 24, 1997) | | |
| 682 | Letter from Maurice Donovan to Tom Tansey re: Green v. General Motors (May 21, 1990) | | |
| 683 | Order (July 7, 1989) | | |
| 684 | Notice of Motion to Compel Plaintiff to Produce Expert Witnesses for Depositions and for Sanctions (January 25, 1991) | | |
| 685 | Letter from Maurice Donovan to Judge Ferentz re: Green v. General Motors (February 7, 1990) | | |
| 686 | Notice of Motion Pursuant to Rule 1:6-2 (June 6, 1989) | | |
| 687 | Order Amending Plaintiff's Complaint (February 16, 1990) | | |
| 688 | Order (August 5, 1988) | | |
| 689 | Order (May 21, 1993) | | |
| 690 | Order for Judgment (June 8, 1993) | | |
| 691 | Check No. 03514589 (July 23, 1993) | | |
| 692 | Check No. 03514589 (with receipt) (July 23, 1993) | | |
| 693 | Handwritten Notes (undated) | | |
| 694 | Letter from S. Isaacson to Clerk of Superior Court re: Green v. Parmentier (July 28, 1993) | | |
| 695 | Letter from W. J. Cunningham to Benjamin Del Vento re: Insured: Breza Bus Service, Inc. (July 22, 1993) | | |
| 696 | Letter from Benjamin Del Vento to W. J. Cunningham re: Michael Green v. Breza Bus Service, Inc. (July 20, 1993) | | |
| 697 | Letter from W. J. Cunningham to Maurice Donovan re: Insured: Breza Bus Service Inc. (July 16, 1993) | | |
| 698 | Letter from Maurice Donovan to Steven Isaacson re: Green v. Dolores Parmentier and Breza Bus Service Inc. (July 13, 1993) | | |
| 699 | Typewritten and Handwritten Notes (undated) | | |
| 700 | Letter from Judge Ferentz to Maurice Donovan, Joe Murray and others re: Green v. General Motors (August 20, 1991) | | |

| 702 | Letter from Maurice Donovan to Paul Stephens re: Michael Green (June 8, 1993) | | |
|---|---|---|---|
| 703 | Handwritten Notes (undated) | | |
| 704 | Checkbook Disbursements (undated) | | |
| 705 | Checkbook Disbursements Ledger 1990 (undated) | | |
| 708 | Expenses (Handwritten Notes) (undated) | | |
| 709 | Michael Green Disbursements Folder (undated) | | |
| 710 | Handwritten Notes (undated) | | |
| 711 | Handwritten Notes (undated) | | |
| 712 | T. Eisenberg, V. Hans, and M. Wells, *The Relation Between Punitive and Compensatory Awards: Combining Extreme Data With the Mass of Awards in Civil Juries and Civil Justice* (undated) | | |
| 713 | T. Cohen, *Civil Justice Survey of State Courts, 2001 Punitive Damage Awards in Large Counties, 2001* (March 2005) | | |
| 714 | NJ Law Journal, "Ferentz in Her Own Words" (June 9, 1997) | | |
| 715 | Acknowledgement of Preliminary Confidentiality Protective Order (December 18, 1997) | | |
| 716 | Letter from Maurice Donovan to Tom Tansey re: Green v. GM (January 6, 1992) | | |
| 717 | Letter from Tom Chappell to Maurice Donovan, Tom Tansey, and Steven Isaacson re: Michael Green v. GM (January 9, 1992) | | |
| 718 | Letter from Judge Fuentes to Maurice Donovan and John Hickey re: Green v. General Motors (February 15, 1994) | | |
| 719 | Letter from Joe Murray to Maurice Donovan re: Green v. General Motors Corporation (July 23, 1991) | | |
| 720 | Documents Produced by General Motors Corporation in Wendy Harris v. GMC (multiple dates) | | |
| 722 | General Motors' Memorandum in Support of Its Motion for Protective Order (June 4, 1990) | | |
| 724 | Letter from Tom Chappell to Judge Ferentz re: Michael Green v. General Motors (January 18, 1993) | | |
| 725 | Letter from Donovan to All Counsel of Record re: Michael Green v. General Motors (July 2, 1992) | | |
| 726 | Answer to Amended Complaint and Jury Demand (April 24, 1990) | | |
| 727 | Answer to Amended Complaint, Cross Claim, and Jury Demand on Behalf of General Motors Corporation (May 10, 1990) | | |
| 728 | Answer to Complaint and Jury Demand on Behalf of General Motors Corporation (August 15, 1988) | | |
| 729 | Letter from Maurice Donovan to General Motors Corporation re: Michael Green v. General Motors Corporation (June 16, 1988) | | |
| 730 | Letter from Tom Chappell to Maurice Donovan re: Michael Green v. General Motors (January 29, 1993) | | |
| 731 | Order for Judgment (June 8, 1993) | | |
| 733 | Order (April 28, 1989) | | |

| 734 | Letter from Joe Murray to Maurice Donovan re: Green v. General Motors Corporation (February 26, 1990) | | |
|-----|------|------|------|
| 735 | Letter from Joe Murray to Maurice Donovan re: Green v. General Motors Corporation (February 5, 1990) | | |
| 736 | Responses of General Motors Corporation to Plaintiff's Interrogatories (undated) | | |
| 738 | Letter from Tom Tansey to Maurice Donovan re: Green v. General Motors Corporation (January 7, 1992) | | |
| 739 | Letter from Tom Tansey to Maurice Donovan re: Green v. General Motors Corporation (December 23, 1991) | | |
| 740 | Letter from Joe Murray to Maurice Donovan re: Green v. General Motors Corporation (September 19, 1991) | | |
| 741 | General Motors' Supplemental Responses to Plaintiff's Interrogatories (undated) | | |
| 742 | Letter from Joe Murray to Maurice Donovan re: Green v. General Motors Corporation (August 22, 1991) | | |
| 743 | Letter from Joe Murray to Maurice Donovan re: Green v. General Motors Corporation et al. (August 26, 1991) | | |
| 745 | Letter from Maurice Donovan to Tom Tansey re: Green v. General Motors (January 22, 1990) | | |
| 746 | Letter from Joe Murray to Maurice Donovan re: Green v. General Motors Corporation (June 26, 1991) | | |
| 747 | Letter from Joe Murray to Maurice Donovan re: Green v. General Motors Corporation (June 24, 1991) | | |
| 748 | Letter from Maurice Donovan to Joe Murray re: Green v. General Motors (July 18, 1991) | | |
| 749 | Letter from Tom Tansey to Benjamin Del Vento re: Michael Green v. General Motors (July 19, 1999) | | |
| 752 | Handwritten Notes (undated) | | |
| 753 | Handwritten Notes (undated) | | |
| 754 | Crashworthiness ATLA Anthology Series (1989) | | |
| 755 | Motion to Bar (undated) | | |
| 756 | Letter from Andrew Langan to Maurice Donovan re: Michael Green v. General Motors (February 6, 1995) | | |
| 757 | General Motors's Supplemental Answers to Plaintiff's Interrogatories (undated) | | |
| 758 | Supplemental Interrogatories (undated) | | |
| 759 | Acknowledgment of Service (January 24, 1990) | | |
| 760 | Letter from Maurice Donovan to Tom Tansey re: Green v. General Motors (January 23, 1990) | | |
| 761 | Letter from Joe Murray to Maurice Donovan re: Green v. General Motors (December 16, 1990) | | |
| 763 | Responses of General Motors Corporation to Plaintiff's Supplemental Interrogatories (March 23, 1990) | | |

| 764 | Notice of Motion to Dismiss the Complaint for Failure to Answer Interrogatories (undated) | | |
| 765 | Order (April 28, 1989) | | |
| 771 | GM's *Green* production, Bates numbers: 1-1569; 1580-1586; 1622-1707; 1709-1804; 1806-1816; 1818-1946; 1953-2286; 2288-2297 (Bates nos. 1798, 2055, and 2298–2300 are not included in copy, but were produced to plaintiff in *Green*) | | |
| 772 | Expert Report of Jack Lintner | | |
| 773 | Certificate of Authenticity (October 23, 1990) | | |
| 774 | Microfilm Index of F-Car Project Center Files | | |

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

STEVEN G. NEWMAN, Executor under the
Will of MICHAEL GREEN, deceased,
          Plaintiff(s),

    v.

GENERAL MOTORS CORPORATION,
          Defendant(s).

Civil Action No. 02-135(KSH)

    Hon. Katherine S. Hayden U.S.D.J
    Hon. Patty Shwartz, U.S.M.J

**FINAL PRETRIAL ORDER**

Trial Date: _____

### PLAINTIFF'S EXHIBIT LIST

| # | EXHIBIT DESCRIPTION | DATE | ID | EVID |
|---|---|---|---|---|
| 1 | Plaintiff's Complaint in *Green v. GM* | 6/1/88 | | |
| 2 | Defendant GM's Answer to Plaintiff's Complaint | 8/15/88 | | |
| 3 | Plaintiff's Demand for Production of Documents served on GM | 9/15/88 | | |
| 4 | Plaintiff's Interrogatories served on GM | 9/15/88 | | |
| 5 | Report of Arthur Damask, PhD | 6/16/89 | | |
| 6 | Letter to Tansey from Donovan serving Plaintiff's Answers to GM's Interrogatories | 6/20/89 | | |
| 7 | Letter to Donovan from Murray serving GM's Initial Answers to Plaintiff's Interrogatories with Verification by Charlyne A. Donahoe (10/27/89) | 11/9/89 | | |
| 8 | GM's Initial Answers to Plaintiff's Demand for Production of Documents | 11/9/89 | | |
| 9 | Documents Produced [Bates # 0001 – 0102] with GM's Initial Respond to Plaintiff's Demand for Production of Documents | 11/9/89 | | |
| 10 | Affidavit of James Murray, Esq. | 12/21/89 | | |
| 11 | Case Management Order by Judge Ferentz | 1/9/90 | | |
| 12 | Letter to Tansey from Donovan serving Plaintiff's Request for More Specific Answers to Interrogatories | 1/22/90 | | |
| 13 | Plaintiff's Request for More Specific Answers to Demand to Produce | 1/22/90 | | |
| 14 | Letter to Tansey from Donovan serving Supplemental Interrogatories on GM | 1/23/90 | | |
| 15 | GM's Amended Answers to Interrogatories per Judge Ferentz at CMC to name manufacturer of tires. | 2/5/90 | | |
| 16 | Letter to Donovan from Murray serving GM Verification to Amended Answers to Interrogatories by Theresa L. Curwin (2/21/90) | 2/26/90 | | |
| 17 | Letter to Donovan from Murray containing GM's Response to Plaintiff's 1/22/90 Request for More Specific Answer to Interrogatories and Demand to Produce | 3/8/90 | | |

68

| | | EXHIBIT DESCRIPTION | DATE | ID | EVD |
|---|---|---|---|---|---|
| 18 | Documents Provided in GM's Response to Plaintiff's 1/22/90 Request for More Specific Answers to Interrogatories and Demand to Produce | 3/8/90 | | |
| 19 | Letter to Donovan from Tansey enclosing GM's Response to Supplemental Interrogatories | 4/5/90 | | |
| 20 | Letter to Tansey from Donovan serving Plaintiff's Second Request for More Specific Answers to Interrogatories | 5/21/90 | | |
| 21 | Letter to Donovan from Tansey providing GM's response to Plaintiff's Second Request for More Specific Answers to Interrogatories | 6/4/90 | | |
| 22 | Letter to Judge Ferentz from Donovan Regarding GM's Failure to Respond to Plaintiff's Interrogatories and Demand to Produce for Discovery Hearing on 7/20/90 | 7/16/90 | | |
| 23 | Donovan's Notes Regarding Hearing before Judge Ferentz | 7/20/90 | | |
| 25 | Order of Judge Ferentz compelling GM to provide More Specific Answers | 8/3/90 | | |
| 26 | Letter to Donovan from Tansey Enclosing Supplemental Responses of GM to Plaintiff's Interrogatories in Response to Court's Order of August 3, 1990 | 9/20/90 | | |
| 27 | Supplemental Response of GM to Plaintiff's Notice to Produce in Response to Court's Order of August 3, 1990 | 9/20/90 | | |
| 28 | Documents annexed to GM's Supplemental Response to Plaintiff's Notice to Produce in Response to Court's Order of August 3, 1990 | 9/20/90 | | |
| 29 | Supplemental Responses of GM to Plaintiff's Supplemental Interrogatories in Response to Court's Order of August 3, 1990 | 9/20/90 | | |
| 30 | Letter to Donovan from Murray serving Expert Report of Joseph S. Rice, PhD (6/18/91) | 6/24/91 | | |
| 31 | Letter to Donovan from Murray serving Expert Report of Donald F. Huelke (5/22/91) | 6/24/91 | | |
| 32 | Letter to Donovan from Murray serving Expert Report of Peter Riede (6/17/91) | 6/24/91 | | |
| 33 | Letter to Donovan from Murray serving Expert Report of Kenneth F. Orlowski (6/19/91) | 6/26/91 | | |
| 34 | Letter to Murray from Donovan objecting to reports of Experts and requesting more specific answers to interrogatories | 7/18/91 | | |
| 35 | Letter to Donovan from Murray Supplementing GM's Responses to Plaintiff's Interrogatory #11 | 7/23/91 | | |
| 36 | Letter to Donovan from Murray supplementing Answer to Interrogatory #52 and providing documents pursuant to the Protective Order of 10/19/90 related to the T-hatch roof design and F-car roof construction. | 8/22/91 | | |
| 37 | Documents Produced by GM pursuant to the Letter of 8/22/91- Bates #2379 to 2443 (64 pgs) | 8/22/91 | | |
| 38 | Letter to Donovan from Murray Supplementing GM's Responses to Plaintiff's Interrogatory #11, 22 and Supplemental Interrogatory #1 with Verification | 8/26/91 | | |
| 39 | Letter to Donovan from Murray supplementing Answer to Interrogatory #52 with Verification NOTE: Same documents as above | 9/19/91 | | |
| 34 | Letter to Donovan from Tansey Supplementing Responses of GM to | 1/10/92 | | |

| | EXHIBIT DESCRIPTION | DATE | ID | EVID |
|---|---|---|---|---|
| | Plaintiff's Expert Interrogatories | | | |
| 35 | Letter to Donovan from Murray Supplementing GM Answers to Interrogatories to name person with relevant knowledge | 12/16/92 | | |
| 36 | Letter to Donovan from Murray Supplementing GM Answers to Interrogatories to name person with relevant knowledge as to damages | 12/16/92 | | |
| 37 | GM Amends Answers to Interrogatories to Name and Serve Supplemental Expert Reports of Kenneth Orlowski, Joseph Rice and Donald F. Huelke | 10/9/95 | | |
| 38 | Letter from Donovan to Langan Requesting More Specific Answers to Interrogatories and Demand to Produce and Serving Notice to Produce Documents re: Experts | 11/10/95 | | |
| 39 | Letter from Langan to Donovan providing GM's Response to Donovan Letter of 11/10/95 | 11/29/95 | | |
| 40. | Plaintiff's Notice of Motion Seeking GM to Produce Documents - Returnable before Judge Fuentes 1/5/96 | 12/16/95 | | |
| 41 | GM's Opposition to Plaintiff's Motion with Affidavit of Joseph Rice | 1/4/96 | | |
| 42 | Transcript of Hearing before Judge Fuentes on Additional Discovery | 1/5/96 | | |
| 43 | Letter to Donovan from Langan serving Supplemental Report of Rice, Orlowski and Huelke | 1/18/96 | | |
| 44 | Certification of Donovan in Support of Notice of Motion for Leave to Appeal if Trial Adjournment Not Granted – Not Filed | 1/18/96 | | |
| 45 | Boxes of Documents containing 4559 New Pages of Testing; 1237 Photographs of Testing; 117 Sled Tests; 49 Crash Tests; and 11 Videos of Crash Tests | 1/20/96 | | |
| 46 | Application to Judge Fuentes to Adjourn Trial Date to Review Documents | 1/22/96 | | |
| 47 | Order of Judge Fuentes compelling GM to Produce Documents GM Experts Relied Upon and Denying Application for Adjournment of Trial | 1/28/96 | | |
| 48 | Appellate Division Opinion in Green v. GM | 3/18/98 | | |
| 49 | Plaintiff's Notice of Motion to Supplement the Appellate Record | | | |
| 50 | GM's Opposition to Plaintiff's Notice of Motion to Supplement the Record | | | |
| 51 | GM's Brief and Appendix on Appeal | 10/26/96 | | |
| 52 | Plaintiff's Brief on Appeal | | | |
| 53 | A - H Addendum Documents | | | |
| 54 | GM's Drafts of Interrogatory Answers | | | |
| 55 | Documents sent to RK for review | | | |
| 56 | Microfiche of F Car Project Center File | | | |
| 57 | 165 Top Docs | | | |
| 58 | GM Purge Memo and List of Documents to be Destroyed | 12/1/81 | | |
| 59 | Day in the Life Video of Michael Green | | | |
| 60 | Verdict Sheet from Green I | | | |
| 61 | Verdict Sheet from Green II | | | |
| 62 | Order Permitting Document Sharing entered in Johnson by Judge in TN | | | |
| 63 | Johnson's Notice of Motion to Modify Protective Order to allow Sharing of Documents from Johnson with Attorney for Green to be | 12/4/97 | | |

| | EXHIBIT DESCRIPTION | DATE | | |
|---|---|---|---|---|
| | heard on 12/19/97 | | | |
| 64 | Confidentiality Order entered in Johnson v. GM | 8/18/97 | | |
| 65 | Amendment to Confidentiality Order entered in Johnson v. GM | 12/17/97 | | |
| 66 | Charts from Eisenberg's Report | | | |
| 67 | New Jersey Rules of Court - Pressler Edition | | | |
| 68 | Deposition and Video Testimony of all deposed Witnesses in Newman | | | |
| 69 | Testimony of all Witness who testified at the Privilege Hearing | | | |
| 70 | Letter to Tansey from Widzinski<br>PHD# 16 | 4/14/89 | | |
| 71 | Letter to Widzinski from Tanscy<br>PHD# 18 | 7/10/89 | | |
| 72 | Letter from Widzinski to Tansey<br>PHD#19 | 7/19/89 | | |
| 73 | Letter from Brown to Hickey<br>PHD#20 | 8/1/89 | | |
| 74 | Letter from Brown to Tansey<br>PHD#21 | 8/1/.89 | | |
| 75 | Langan Status Memo<br>PHD#28 | 8/29/89 | | |
| 76 | Langan Status Memo<br>PHD#29 | 8/30/89 | | |
| 77 | Fax to Langan from Park with annexed draft of Notice of Produce<br>PHD#30 | 8/30/89 | | |
| 78 | Letter from Rom to Langan with annexed Notice to Produce and Interrogatories<br>PHD#31 | 9/6/89 | | |
| 79 | Draft Responses of GM to Plaintiff's Interrogatories by Rom<br>PHD#32 | 12/13/88 | | |
| 80 | Letter from Langan to Brown and Park<br>PHD#34 | 10/11/89 | | |
| 81 | GM Draft Answers to Plaintiff's Interrogatories<br>PHD#35 | 10/11/89 | | |
| 82 | GM Draft Answers to Plaintiff's Notice ot Produce<br>PHD#36 | 10/11/89 | | |
| 83 | Letter from Coulson to Park and Brown<br>PHD#39 | 10/20/89 | | |
| 84 | GM's Revised Draft to Plaintiff's Request for Production of Documents<br>PHD#39 | 10/20/89 | | |
| 85 | Revised Draft of GM's Answers to Plaintiff's Interrogatories<br>PHD#40 | 10/20/89 | | |
| 86 | Letter from Coulson to Park and Brown<br>PHD#42 | 10/26/89 | | |
| 87 | Letter from Park and Rice to Tansey<br>PHD#43 | 10/27/89 | | |
| 90 | Letter from Brown to Coulson<br>PHD#44 | 10/27/89 | | |

| No. | EXHIBIT DESCRIPTION | DATE | ID | EVID |
|---|---|---|---|---|
| 91 | Letter from Coulson to Murray with Verification PHD#45 | 10/30/89 | | |
| 92 | Letter from Coulson to Park and Brown PHD#46 | 11/2/89 | | |
| 93 | Letter from Brown to Coulson with Verifications PHD#47 | 11/8/89 | | |
| 94 | Memo from Rickle to Biluk PHD#58 | 1/23/90 | | |
| 95 | Letter from Murray to Brown PHD#59 | 1/24/90 | | |
| 96 | Letter from Coulson to Murray PHD#70 | 3/1/90 | | |
| 97 | Draft of Letter from Murray to Donovan responding to request for more specific answers to discovery PHD#70 | 3/1/90 | | |
| 98 | Letter from Coulson to Biluk PHD#71 | 3/5/90 | | |
| 99 | Letter from Murray to Brown PHD#72 | 3/5/90 | | |
| 100 | Letter from Brown to Coulson PHD#74 | 3/5/90 | | |
| 101 | Letter form Murray to Donovan PHD#74 | 3/8/90 | | |
| 102 | Draft Supplemental Response to Plaintiff's Supplemental Interrogatories PHD#76 | 3/21/90 | | |
| 103 | Letter from Coulson to Murray PHD#77 | 3/22/90 | | |
| 104 | Agenda for Technical Conference 5/15/90 PHD#80 | 5/15/90 | | |
| 105 | Langan's handwritten notes from 5/15/90 Conference PHD#81 | 5/15/90 | | |
| 106 | Letter from Langan to Brown & Tansey PHD#82 | 5/20/90 | | |
| 107 | Letter Coulson to Tansey with Brief PHD#83 | 5/21/90 | | |
| 108 | Langan's handwritten corrections to Tansey's Letter of 5/31/90 PHD#86 | 5/31/90 | | |
| 109 | Marshall's requests to Drake and G. Brown PHD#87 | 5/31/90 | | |
| 110 | Marshall letter to Murray and Langan PHD#92 | 6/6/90 | | |
| 111 | Marshall and Rice Letter to Murray and Langan PHD#93 | 6/6/90 | | |
| 112 | Discovery Inventory Sheet PHD#94 | 6/7/90 | | |

| | FEATURE DESCRIPTION | DATE | | |
|---|---|---|---|---|
| 113 | Discovery Inventory Sheet PHD#95 | 6/7/90 | | |
| 114 | Murray Memo to File PHD#101 | 6/19/90 | | |
| 115 | Murray Letter to Brown PHD#107 | 7/5/90 | | |
| 116 | Memo from Brown to Langan PHD#111 | 7/22/90 | | |
| 117 | Murray Letter to Langan PHD#115 | 8/1/90 | | |
| 118 | Murray Letter to Langan with Rice Handwritten Notes PHD#115a | 8/1/90 | | |
| 119 | Marshall Memo to Brown PHD#116 | 8/3/90 | | |
| 120 | Handwritten revisions to GM's Interrogatories by Coulson and Langan   PHD#119 | 8/6/90 | | |
| 121 | Brown Memo to Langan PHD#120 | 8/7/90 | | |
| 122 | Murray's Handwritten Notes of Discovery Meeting PHD#122 | 8/8/90 | | |
| 123 | Browns's Handwritten Notes of Discovery Meeting PHD#123 | 8/8/90 | | |
| 124 | Rhode's Memo to Stack PHD#127 | 8/14/90 | | |
| 125 | Rhode's Memo to McMacken PHD#128 | 8/14/90 | | |
| 126 | Rhode's Memo to Conner PHD#129 | 8/14/90 | | |
| 127 | Rhode's Memo to Bottiglia PHD#130 | 8/14/90 | | |
| 128 | Rhode's Memo to Aiello PHD#131 | 8/14/90 | | |
| 129 | Rhode's Request to Mundy PHD#132 | 8/14/90 | | |
| 130 | Rhode's Request to Henry PHD#133 | 8/14/90 | | |
| 131 | Betman Memo to Cusick & Weitzman PHD#135 | 8/24/90 | | |
| 132 | Rhodes Letter to Langan PHD#138 | 8/29/90 | | |
| 133 | GM's Draft Supplemental Responses to Plaintiff's Interrogatories pursuant to the 8/3/90 Order | 9/90 | | |
| 134 | GM's Draft Supplemental Responses to Plaintiff's Interrogatories pursuant to the 8/3/90 Order | 9/8/90 | | |
| 135 | GM's Draft Supplemental Answers to Interrogatories  with Murray's Handwritten Notes | 9/8/90 | | |

| | EXHIBIT DESCRIPTION | DATE | ID | EVID |
|------|-----------------------------------------------------------------------------------------------|----------|------|------|
| 136 | GM's Draft Supplemental Answers to Interrogatories with Tansey's Handwritten Notes PHD#145 | 9/8/90 | | |
| 137 | Murray Memo to File to Interrogatories with Tansey's Handwritten Notes | 9/11/90 | | |
| 138 | Rhodes Letter to Murray PHD#149 | 9/12/90 | | |
| 139 | Draft of GM's Supplemental Response to Plaintiff's Demand to Produce with Handwritten Notes PHD#150 | 9/12/90 | | |
| 140 | Draft of GM's Supplemental Response to Plaintiff's Interrogatories with Handwritten Notes | 9/13/90 | | |
| 141 | Billing of Robert O'Hara PHD#153 | 9/13/90 | | |
| 142 | Cerwin Verifications PHD#154 | 9/13/90 | | |
| 143 | Draft of GM's Supplemental Response to Notice to Produce Documents after Order 8/3 | 9/14/90 | | |
| 144 | Inventory of Discovery Documents PHD#157 | 9/18/90 | | |
| 145 | Coulson letter to Brown PHD#158 | 9/18/90 | | |
| 146 | Tansey letter to Brown PHD#161 | 9/24/90 | | |
| 147 | Rhodes Letter to Murray w/Inventory Sheets PHD#164 | 10/3/90 | | |
| 148 | Murray Memo to File PHD#165 | 10/3/90 | | |
| 149 | Rhodes Letter to Rudock PHD#166 | 10/9/90 | | |
| 150 | Document Copy Request PHD#171 | 10/15/90 | | |
| 151 | Rhodes Letter to Murray with Inventory Sheets PHD#174 | 10/17/90 | | |
| 152 | Brown Letter to Coulson with Verification PHD#179 | 10/27/90 | | |
| 153 | Coulson Memo to File PHD#187 | 1/2/91 | | |
| 154 | Coulson Letter to Genova PHD#188 | 1/4/91 | | |
| 155 | Tansey Memorandum PHD#199 | 3/20/91 | | |
| 156 | Rudock Letter to Betman with Enclosures PHD#216 | 7/8/91 | | |
| 157 | Coulson Memo to Langan with Annexations PHD#218 | 7/24/91 | | |
| 158 | Coulson Letter to Genova PHD#219 | 7/29/91 | | |

| | EXHIBIT DESCRIPTION | DATE | ID | EVID |
|---|---|---|---|---|
| 159 | Document Copy Request<br>PHD#220 | 7/30/91 | | |
| 160 | Genova Letter to Murray with Inventory List<br>PHD#222 | 7/31/91 | | |
| 161 | Murray Fax to Langan with enclosure<br>PHD#224 | 8/14/91 | | |
| 162 | Genova Letter to Salas<br>PHD#226 | 8/22/91 | | |
| 163 | Murray Letter to Ziolowski<br>PHD#227 | 8/22/91 | | |
| 164 | Coulson Letter to Murray with Enclosure<br>PHD#228 | 8/22/91 | | |
| 165 | Tansey Memo to Murray<br>PHD#237 | 12/10/91 | | |
| 166 | Genova Letter to Coulson with Inventory<br>PHD#243 | 1/23/92 | | |
| 167 | Murray Letter to Ziolkowski<br>PHD#247 | 4/16/92 | | |
| 168 | Ziolkowski Memo to Cerwin with annexations<br>PHD#248 | 4/28/92 | | |
| 169 | Langan Memo to File<br>PHD#256 | 5/12/92 | | |
| 170 | Hickey/Langan Letter to Ziolkowski<br>PHD#259 | 6/23/92 | | |
| 171 | Memo re: Trial Projects<br>PHD#261 | 11/3/92 | | |
| 172 | Langan Letter to Ziolkowski<br>PHD#272 | 12/21/92 | | |
| 173 | Langan Letter to Tansey, Ziolkowski and Rice<br>PHD#279 | 11/16/95 | | |
| 174 | Smoly Letter to Langan with Inventory Sheets and attachments<br>PHD#280 | 11/28/95 | | |
| 175 | Langan Letter to Ziolkowski<br>PHD#281 | 12/19/95 | | |
| 176 | Langan Letter to Tanseyt, Ziolkowski and Rice with Inventory Sheets<br>and Affidavit | 12/29/95 | | |
| 177 | Smoly Letter to Murray<br>PHD#284 | 1/16/96 | | |
| 178 | Smoly Letter to Poland<br>PHD#286 | 1/17/96 | | |
| 179 | Judge Fuentes Order of 1/18/96<br>PHD#288 | 1/18/96 | | |
| 180 | Fax and Inventory Lists from Poland to Rice<br>PHD#289 | 1/18/96 | | |
| 181 | Discovery Chronology<br>PHD#290 | 1/18/96 | | |

| | DESCRIPTION | DATE | I.D. | RVCD |
|---|---|---|---|---|
| 182 | Smoly Letter to Murray<br>PHD#291 | 1/19/96 | | |
| 183 | Smoly Letter to Murray<br>PHD#292 | 1/19/96 | | |
| 184 | Documents Produced to Plaintiff on 1/20/96<br>PHD#293 | 1/20/96 | | |
| 185 | Langan Letter to Ziolkowski<br>PHD#294 | 1/23/96 | | |
| 186 | Smoly Letter to Poland<br>PHD#295 | 1/22/96 | | |
| 187 | Smoly Letter to Poland<br>PHD#296 | 1/22/96 | | |
| 188 | Smoly Letter to Poland<br>PHD#297 | 1/23/96 | | |
| 189 | GM Supplemental Document Production<br>PHD#301 | 2/1/96 | | |
| 190 | GM Memo<br>PHD#305 | 2/3/96 | | |
| 191 | Murray Memo to File<br>PHD#307 | 2/5/96 | | |
| 192 | Poland Letter to Smoly<br>PHD#308 | 2/5/96 | | |
| 193 | Smoly Fax to Poland with Inventory Sheets<br>PHD#309 | 2/5/96 | | |
| 194 | Poland Memo to Langan<br>PHD#310 | 2/6/96 | | |
| 195 | Poland Fax to Smoly and Rice<br>PHD#311 | 2/6/96 | | |
| 196 | Smoly to Poland<br>PHD#312 | 2/23/96 | | |
| 197 | Langan Letter to William Martin (Royal Ins)<br>PHD#314 | 3/8/96 | | |
| 198 | Poland Letter to Ziolkowski<br>PHD#321 | 9/19/96 | | |
| 199 | Deutsch Letter to Langan<br>PHD#322 | 10/7/96 | | |
| 200 | Deutsch Letter to Langan with handwritten notes<br>PHD#323 | 10/7/96 | | |
| 201 | Poland Letter to Ziolkowski<br>PHD#325 | 10/15/96 | | |
| 202 | Poland Letter to Tansey<br>PHD#329 | 10/24/96 | | |
| 203 | Status of Computer Inventory Report<br>PHD#333 | Undated | | |
| 204 | List of GM Drawing Designs<br>PHD#335 | Undated | | |

| ITEM | EXHIBIT DESCRIPTION | DATE | ID | EVID |
|------|---------------------|------|-----|------|
| 205 | List of FMVSS Test Reports<br>PHD#336 | Undated | | |
| 206 | List of Production Materials<br>PHD#341 | Undated | | |
| 207 | Notes Regarding Plaintiff's Expert<br>PHD#344 | Undated | | |
| 208 | Typed Notes from 8/8/90 Discovery Meeting<br>PHD#346 | 9/11/90 | | |
| 209 | Murray's Handwritten Notes Re: Discovery<br>PHD#247 | 8/8/90 | | |
| 210 | Rice Handwritten Notes Re: Meeting<br>PHD#349 | 5/5/90 | | |
| 211 | Invoice for Legal Services<br>PHD#350 | Various | | |
| 212 | Documents GM alleges to have sent to Rumberger Kirk<br>PHD#351 | Various | | |
| 213 | Ade's Handwritten Notes<br>PHD#351a | Various | | |
| 214 | Review Sheets by Stafford<br>PHD#352 | Various | | |
| 215 | Testimony and Videos of all Persons Whose Deposition Has Been Taken in this Matter | | | |
| . | ADDITIONAL DOCUMENTS TO BE SUPPLEMENTED | | | |

The only additional documents
That may be added are the
transcripts from the privilege hearing

9. **SINGLE LIST OF LEGAL ISSUES (All issues shall be set forth below. The parties need not agree on any issue. Any issue not listed shall be deemed waived.)**

1. Is negligent spoliation recognized as a viable cause of action under New Jersey case law?

2. Is a claim for spoliation recognized where plaintiff has collected the compensatory damages sought in the underlying case?

3. Whether an intentional violation of court rules is sufficient to create a cause of action.

4. Is plaintiff's evidence sufficient as a matter of law to prove:

   a. GM intentionally or negligently concealed documents from plaintiff in the Green case with purpose to disrupt the litigation.

   b. That plaintiff could not have reasonably obtained access to the materials, or something functionally equivalent from another source readily available to plaintiff.

   c. Plaintiff was damaged in the underlying action by having to rely on an evidentiary record that did not contain the evidence defendant allegedly concealed

   d. The quantum of damages allegedly to have been sustained.

   e. Whether GM had a legal obligation to provide the undisclosed discovery material relating to the T-roof Camaro (undisclosed discovery materials) in connection with the Green litigation.

5. Whether the alleged injuries asserted by plaintiff are too speculative to warrant any relief.

6. Whether the failure to obtain punitive damages is a legally cognizable injury.

7. Whether any litigant ever has an entitlement, right, or other vested legal interest in punitive damages, such that the failure to obtain them can form the basis of a litigant's compensatory damages claim.

8. Whether plaintiff's claim that lost punitive damages are his compensatory damages is consistent with the distinct purposes of punitive damages under New Jersey law.

9. Whether New Jersey law permits a cause of action for spoliation when plaintiff won all damages sought in the underlying action.

10. To what extent, if any, and how, is the New Jersey Punitive Damage Act, N.J.S.A. 2A:15-5.9 to 5-17 (1995) to be applied.

11. Is plaintiff entitled to recover as compensatory damages here in the *Newman* case the punitive damages that he was foreclosed from pursuing in the underlying *Green* litigation.

12. Whether plaintiff is entitled to further damages, both compensatory and punitive, arising out of GM's litigation misconduct in the underlying *Green* litigation.

78

13. Under New Jersey law, is the Newman case precluded:

    a. by the doctrine of res judicata;

    b. by the frivolous litigation doctrine;

    c. by the court's interest in finality of litigation;

    d. by plaintiff's inability to prove causation or proximate causation of his alleged injuries;

    e. because plaintiff's exclusive remedy is discovery sanctions.

14. Whether it is too speculative for any factfinder to determine what effect, if any, additional or different evidence may have had on jurors in *Green*.

15. Whether the documents at issue can, as a matter of law, be sufficient to demonstrate defendant maliciously, willfully, and wantonly designed the vehicle.

16. Is the defendant entitled to assert comparative fault by the plaintiff for

    a. failing to seek and obtain punitive damages Green;

    b. failing to try Green I to a plaintiff verdict;

    c. using certain language in his *Green II* summation;

    d. any portion of the damages attributable to plaintiff or plaintiff's counsel.

17. Whether plaintiff's evidence is sufficient to prove, as a matter of law, the existence of an enterprise under the New Jersey civil RICO statute.

18. Whether plaintiff's evidence is sufficient to prove, as a matter of law, the existence of an enterprise separate from GM.

19. Whether plaintiff's evidence is sufficient to prove, as a matter of law, that an enterprise separate from GM engaged in, or its activities affected, trade or commerce.

20. Whether plaintiff's evidence is sufficient to prove, as a matter of law, GM was employed by, or associated with an enterprise.

21. Whether plaintiff's evidence is sufficient to prove, as a matter of law, GM participated in the affairs of an enterprise.

22. Whether plaintiff's evidence is sufficient to prove, as a matter of law, GM participated in an enterprise through an ongoing pattern of racketeering activity, rather than an isolated incident of racketeering activity.

23. Whether plaintiff's evidence is sufficient to prove, as a matter of law, he suffered injury to his property as a result of defendant's participation in an enterprise through a pattern of racketeering activity.

24. Whether plaintiff's evidence is sufficient to prove, as a matter of law, the occurrence of racketeering activity, namely the predicate acts of federal wire fraud and federal mail fraud, as alleged in plaintiff's complaint.

25. Whether RICO is properly applied to a civil fraud case premised on alleged discovery violations.

26. Whether RICO treble damages must be heavily discounted when punitive damages also are awarded because under New Jersey law, the two awards have overlapping purposes and allowing both awards is duplicative recovery.

27. Whether the alleged litigation misconduct of GM in the underlying *Green* litigation constitutes a violation of the New Jersey Racketeering Influenced and Corrupt Organization Act ("RICO").

28. Are outside counsel, as a matter of law, independent contractors of GM?

29. Are outside counsel, as a matter of law, agents of GM?

30. Whether the Seventh Amendment to the U.S. Constitution is violated by a jury re-examining and considering evidence and issues already decided in *Green*.

31. Whether the alleged injuries asserted by plaintiff are speculative and contingent upon the unknowable and discretionary acts of third parties so as to deprive plaintiff of Article III standing to pursue this lawsuit.

32. Whether any necessary inferences to be drawn by the jury – *e.g.*, inferences of defendant's intent to conceal – are adequately supported by evidence in the record.

33. Whether GM had a legal obligation to provide the discovery material relating to the T-roof Camaro in connection with the *Green* litigation.

34. Can/must the *Newman* jury be asked to make its own judgment as to the award and amount of punitive damages?

35. Must plaintiff prove fraudulent concealment in order to recover the aforesaid damages?

36. What is the burden of proof as to each of the above?

## 10. CONCLUSION

a. **MISCELLANEOUS: (Set forth any matters which require action or should be brought to the attention of the Court.)**

    i.  Due to the voluminous nature of the documents in this case required as trial exhibits and due to the pendency of GM's appeal to the Third Circuit, plaintiff requests leave to supplement and amend the terms of this Final Pretrial Order as follows: (1) Plaintiff shall serve defense counsel with pre-marked copies of the exhibits on Plaintiff's Trial Exhibit List ~~within ____ days hereof~~ no later than March 31, 2005; and (2) the parties shall supplement and amend § 8 of the Final Pretrial Order and serve any objections as to authenticity of exhibits ~~within ____ days hereof.~~ later than April 15, 2005 ~~GM objects to any disclosure of plaintiff's exhibits and exhibit list, or any objections as to authenticity of GM's exhibits, after entry of this Final Pretrial Order. Should plaintiff be permitted to untimely disclose exhibits, however, GM reserves the right to amend this Final Pretrial Order to add objections as to the authenticity of plaintiff's exhibits.~~

    ii.  Plaintiff requests the right to supplement and amend its witness list, exhibits list, *in limine* motions, stipulated and contested facts, expert reports and other items in the Final Pretrial Order after final disposition of the appeal presently pending in the 3rd Circuit, depositions, dispositive motions herein and determination of the "trial structure" to be applied. GM requests any accommodation granted to plaintiff.

**b.**  **TRIAL COUNSEL:**  (List the names of trial counsel for all parties.)

*Attorneys for Plaintiff*

**Dennis J. Drasco**
Lum Drasco & Positan LLC
103 Eisenhower Parkway
Roseland, NJ 07068
(973) 403-9000

**Maurice J. Donovan**
Law Office of Benjamin M. Del Vento, P.C.
70 South Orange Avenue
Livingston, NJ 07039
(973) 758-1801

**Harvey Weissbard**
Frieman, Kaplan Seiler & Adelman, LLC
One Gateway Center
25th Floor
Newark, NJ 07102
973 877-6400

*Attorneys for Defendant General Motors Corp.*

**Stephen F. Payerle**
McElroy, Deutsch, Mulvaney, & Carpenter, LLP
Three Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-7711

**W. Ray Persons**
**Chilton D. Varner**
**Jameson B. Carroll**
**James K. Vines**
King & Spalding LLP
1180 Peachtree Street, N.E
Atlanta, Georgia 30309
(404) 572-4600

c.  **JURY TRIALS:**

Not later than <u>to be set by Judge Hayden</u>

i. Each party shall submit <u>to the District Judge and to opposing counsel</u> a trial brief in accordance with Local Civil Rule 7.2(b) with citations to authorities and arguments in support of its position on all disputed issues of law.  THE BRIEF SHALL ALSO ADDRESS ANY ANTICIPATED EVIDENCE DISPUTE.  In the event a brief is not submitted, the delinquent party's pleading may be stricken.

ii. Any hypothetical questions to be put to an expert witness on direct examination shall be submitted <u>to the District Judge and to opposing counsel.</u>

iii. Each party shall <u>submit to the District Judge and to opposing counsel</u> proposed <u>voir dire.</u>

iv. Plaintiff shall <u>submit to opposing counsel,</u> proposed jury instructions.  Each instruction shall be on a <u>separate</u> sheet of <u>legal sized paper</u> and shall be numbered in sequence.  Each instruction shall include citations to authorities, if any.

Within 7 days of the above, opposing counsel shall, on the face of the instructions submitted by plaintiff, set forth any objections to the proposed jury instructions and/or proposed counter-instructions.

d.  **NON-JURY TRIALS:**

Not later than     **not applicable**

1.   Each party shall submit <u>to the District Judge and to opposing counsel</u> a trial brief in accordance with Local Civil Rule 7.2(b) with citations to authorities and arguments in support of its position on all disputed issues of law.  THE BRIEF SHALL ALSO ADDRESS ANY ANTICIPATED EVIDENCE DISPUTE.  In the event a brief is not submitted, the delinquent party's pleading may be stricken.

2.   Any hypothetical questions to be put to an expert witness on direct examination shall be submitted <u>to the District Judge and to opposing counsel.</u>

3.   Proposed Findings of Fact and Conclusions of Law shall be submitted <u>to the District Judge and to opposing counsel after the close of evidence.</u>   These shall include annotations to trial transcripts and exhibits.

e.     **BIFURCATION (When appropriate, liability issues shall be severed and tried to verdict. Thereafter, damage issues will be tried to the same jury.)**

This case presents many unique legal issues and proof difficulties, which may create jury confusion and/or undue prejudice to the litigants. *See* Fed. R. Evid. 403. The parties request the District Judge tailor the trial structure to manage these potential difficulties. *See, e.g.*, Fed. R. Civ. P. 16 (allowing special procedures for complex proof problems, separate trials for any claim or issue, and strategic ordering of proof), Fed. R. Civ. P. 42 (allowing separate trials). The parties shall discuss trial structure with Judge Hayden on March 24, 2009 at 2 p.m.

The parties invite discussion with the Court on the trial structure issue.

f.     **ESTIMATED LENGTH OF TRIAL**

___10-20_____ **days for liability and**

_____ **days for damages.**

g.     **TRIAL DATE:** _____to be scheduled_____

**AMENDMENTS TO THIS PRETRIAL ORDER SHALL NOT BE PERMITTED UNLESS THE COURT DETERMINES THAT MANIFEST INJUSTICE WOULD RESULT IF THE AMENDMENT IS DISALLOWED. THE COURT MAY FROM TIME TO TIME SCHEDULE CONFERENCES AS MAY BE REQUIRED EITHER ON ITS OWN MOTION OR AT THE REQUEST OF COUNSEL.**

___/s/ Maurice J. Donovan_____
**MAURICE J. DONOVAN, ESQ.**

___Stephen F. Payerle_____
**STEPHEN F. PAYERLE, ESQ.**

**HON. PATTY SHWARTZ**
United States Magistrate Judge

DATED: March 23, 2009

84