## EXHIBIT 2

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CIVIL ACTION NO.  02-135

STEVEN G NEWMAN, Executor
under the Will of Michael
Green,

     Plaintiff,

-vs-

GENERAL MOTORS CORPORATION,

     Defendant.

_____/

VIDEOTAPED

DEPOSITION

OF

DAVID COULSON

1221 Brickell Avenue
22nd Floor
Miami, Florida
August 21, 2008
Scheduled for 10:00 a.m.
Commencing at 10:36 a.m. to 2:50 p.m.

Page 2

1       APPEARANCES:

2           On behalf of the Plaintiff:
            MAURICE J. DONOVAN, Esquire
3           BENJAMIN M. DEL VENTO, P.C.
            70 South Orange Avenue
4           Livingston, New Jersey 07039
            (973) 758-1801
5
            On behalf of the Defendant:
6           JAMES K. VINES, Esquire
            KING & SPALDING, LLP
7           1700 Pennsylvania Avenue, NW
            Washington, D.C. 20006
8           (202) 383-8921

9           On behalf of the Defendant:
            WILLIAM A. FIXEL, Esquire
10          KING & SPALDING, LLP
            1180 Peachtree Street, N.E.
11          Atlanta, Georgia  30309

12       ALSO PRESENT:

13          George Thomas, Videographer

14                        –  –  –

15                    I N D E X

16    WITNESS:                                    PAGE
      DAVID COULSON
17
      DIRECT EXAMINATION     BY MR. DONOVAN          3
18    CROSS-EXAMINATION      BY MR. VINES           92
      REDIRECT EXAMINATION   BY MR. DONOVAN        101
19    RECROSS-EXAMINATION    BY MR. VINES          109

20
                       E X H I B I T S
21
22    NO.                 DESCRIPTION             PAGE

23    PLAINTIFF'S          ORDER                    48
      EXHIBIT NO. 1
24

25

1          (The following proceedings were had.)

2          THE VIDEOGRAPHER:  In the matter of Newman

3     versus General Motors, case number 02-135.  This is

4     the videotaped deposition of David Coulson.  This

5     deposition is being taken at the Law Offices of

6     Greenberg Traurig in Miami, Florida.

7          Today's date is August the 21st, 2008.  The

8     time on the video monitor is 10:36 a.m.

9          Would counsel please state their appearances

10    for the record?

11         MR. DONOVAN:  Good morning, Maurice J. Donovan

12    of the Law Offices of Benjamin M. Del Vento,

13    appearing on behalf of the plaintiff, Newman.

14         MR. VINES:  Jim Vines of King & Spalding

15    appearing for defendant General Motors.

16    Thereupon,

17                        DAVID COULSON

18    was called as a witness and, having been duly sworn, was

19    examined and testified as follows:

20         THE WITNESS:  I do.

21                   DIRECT EXAMINATION

22    BY MR. DONOVAN:

23         Q.   Mr. Coulson, I want to thank you for being

24    here this morning.  We are here, as you know, for the

25    purpose of taking your deposition.  As an attorney, I am

Page 4

1    sure you know what a deposition is.  You have probably

2    been on the other side of the table from where you are

3    sitting.  So, unless you need me to do so, I will

4    dispense with the normal preamble.

5         Is that okay with you?

6    A.    That's okay.

7    Q.    Okay.  As you know, my name is Maurice

8    Donovan.  We met at a proceeding earlier in the case.

9    We are here for the purpose of taking this deposition in

10   the Newman versus General Motors case because you were

11   an associate with Kirkland & Ellis way back in 1990,

12   1991 when some of the events that we are looking at

13   transpired.  Is that true?

14   A.    True.

15   Q.    Let me just get some background for this

16   record.  I know you testified in another hearing so it's

17   on there, but let's get it here.

18        You are presently a partner at Greenberg

19   Traurig in Miami, Florida, which is where we are now

20   taking the deposition.  Correct?

21   A.    I am a shareholder.  The way our firm is

22   structured from a corporate perspective, we have

23   shareholders instead of partners.

24        MR. VINES:  Can we go off the record?

25        (A recess was taken from 10:41 a.m. to

1    10:45 a.m.)

2    BY MR. DONOVAN:

3        Q.    All right.   You were explaining something of

4    the corporate status of Greenberg Traurig that you are a

5    shareholder and not a partner.   I think that's okay.   We

6    understand that.

7             Where were you before Greenberg Traurig?

8        A.    Well, I was -- if you don't mind, could I just

9    narrate?   After law school, I served as a law clerk for

10   Federal District Court Judge Stanley Marcus in the

11   Southern District of Florida, down here in Miami.   I did

12   that for about one year, and then I went to Kirkland &

13   Ellis starting in September of 1989.   I left Kirkland

14   either the end of August or early September of 1999.

15       Q.    Okay.

16       A.    I came to Greenberg Traurig as a shareholder

17   at that time, and then I left Greenberg Traurig and

18   became a partner in the firm of Morgan, Lewis and

19   Bockius in their Miami office, and I don't remember

20   exactly when that was.   I think it was 2001.   I then --

21   in about July 2001 and then in, approximately, April --

22   or it may have been -- no, that was 2002.   In July 2002

23   I accepted an offer from Morgan Lewis to join them as a

24   partner and then I returned to Greenberg Traurig again

25   as a shareholder about eight months later around late

1   March or early April in 2003, if I have my years right.

2   Then I've been with Greenberg Traurig continuously since

3   then.

4        Q.   So, the period of time which we're concerned

5   about is the period of time you were with Kirkland &

6   Ellis.  So, that would have been September of 1989

7   through June of 1999.

8        A.   I left Kirkland at the end of August of -- if

9   I remember right, it was the end of August of 1999.

10        Q.   So, about ten years you were at Kirkland &

11   Ellis?

12        A.   Yes.

13        Q.   And when you first came into Kirkland & Ellis,

14   you came in as an associate?

15        A.   Yes.

16        Q.   Right after your clerkship with Judge Marcus?

17        A.   Yes.

18        Q.   And at that time is when you began working

19   with product liability cases?

20        A.   Yes.

21        Q.   Is that what you did for the ten years you

22   were there, basically defense of product liability

23   cases?

24        A.   Defense of product liability cases was part of

25   my practice with Kirkland & Ellis.  The percentage of

4f6db2b3-2b92-461b-8501-293918535e64

1    time devoted to that area varied year by year.  Probably

2    some years it was between 10, 20 percent.  Other years

3    it may have been 40 percent, maybe even 50 percent, but

4    I doubt that it was ever more than 50 percent of my

5    practice.

6         Q.   And of the 50 percent which was defense of

7    product liability cases was General Motors one of the

8    clients which you did work for there?

9         A.   Yes, and when you said 50 percent, there may

10   have been one year if I had, say, a major trial where it

11   may have been close to 50 percent, but I am pretty sure

12   that more than 50 percent every year was commercial

13   cases which are non product liability cases.

14        Q.   Okay.  Of the percentage which was product

15   liability, was the majority of that for defense of

16   General Motors cases?

17        A.   Yes.

18        Q.   Was it all of it or was there other defendants

19   also in that mixture?

20        A.   I defended -- almost all my products liability

21   experience at Kirkland was in the defense of General

22   Motors.  I may have worked on a case for Nissan.  I just

23   have a vague memory of that, and I know I did a couple

24   of cases for a Pfizer subsidiary that involved

25   completely different products.

Page 8

1          Q.    Okay.   You came on board in Kirkland & Ellis

2     in 1989.   The Green complaint, Green versus General

3     Motors was filed 1988 so it was a new case or a

4     relatively new case at that point when you came to

5     Kirkland & Ellis.   Is that one of the first cases you

6     started to work on when you got there?

7          A.    Yes.

8          Q.    When you got there in 1989, was that the only

9     case you were working on for a while or was that

10    intermixed with other cases?

11         A.    It was intermixed with other cases.   It was --

12    Green was never a high percentage of my time overall.

13         Q.    Okay.   So, were you called in for certain

14    specific projects on Green rather than some kind of

15    continuity with the case throughout.   Would that be a

16    fair statement?

17         A.    Probably the way to describe it would be I was

18    a young associate working under the supervision of Andy

19    Langan and I don't remember at that point whether Andy

20    Langan was a partner or a senior associate but I would

21    do whatever tasks he asked me to do.   I don't recall

22    that -- I was probably the only young associate on the

23    case for a period of time and then they substituted

24    Barry Fields to take my place at a certain point in

25    time, which was before the first trial.

1    Q.   So, by the time we call it Green One came

2    about, you were already not working on the case.   Is

3    that ---

4    A.   Yeah, I phased off of the Green case sometime

5    before the first trial.

6    Q.   And did you come back to it at any point in

7    time after that or that was the end of your involvement

8    with Green?

9    A.   After the first trial which resulted in, is it

10   a mistrial after a deadlocked jury, there was a motion

11   to recuse the trial judge.   I think her name was Judge

12   Ferentz.   I believe the trial judge denied the motion

13   and then General Motors appealed it.   I worked on the

14   appellate brief, and then I don't recall having any

15   other involvement on Green at that point.

16   Q.   Okay.   You were not involved in the Green two

17   trial?

18   A.   Correct, not at all.

19   Q.   And you weren't involved in any document

20   production after the Green One case?

21   A.   Correct.

22   Q.   Now, if I understand what your involvement

23   with Green was is that you drafted some interrogatories,

24   you responded to some document requests and as you just

25   told us you were involved in that one motion.   Does that

Page 10

1    basically encompass what you did?

2        A.   I did some other projects in the case.  I

3    recall reviewing investigators' statements about

4    witnesses or potential witnesses in the case and perhaps

5    summarizing them.  I recall helping John Hickey or I

6    think it was for John directly with respect to Arthur

7    Damask, who was your expert witness on liability.  I

8    helped him, perhaps, for the deposition and possibly

9    even for a trial cross examination outline.

10       Q.   Okay.  Now, when you came to Kirkland and

11   started working on Green, I assume you had no real prior

12   experience in working on the defense of automotive crash

13   worthiness cases.  Correct?

14       A.   Yes.  There was -- I was a law clerk for a

15   Federal judge and I recall we did have a products

16   liability case involving a car crash that actually went

17   to trial while I was a law clerk but I don't think --

18   no, the defendant was not the manufacturer.

19       Q.   Your education in defending automobile

20   manufacturers and specifically General Motors came from

21   your on-the-job training at Kirkland?

22       A.   Yes.

23       Q.   Was there any training that you got

24   specifically from General Motors where you went there

25   for any kind of seminar or any kind of instruction on

1   their discovery, how they keep files, anything of that

2   nature?

3       A.   No, I don't recall.

4       Q.   Do you remember whether there was any type of

5   handbook which described how General Motors liked things

6   done in the defense of their case and specifically with

7   respect to discovery and production of documents?

8       A.   I don't recall one.

9       Q.   So, basically, whatever format was adopted for

10  handling that was that of Kirkland & Ellis?

11      A.   I don't quite understand your question.

12      Q.   Well, I mean, whatever, however you would go

13  about addressing discovery responses, Kirkland & Ellis

14  had a procedure for doing that which they explained to

15  you what to do and that's what you did?

16      A.   I am not sure if it's Kirkland & Ellis had a

17  procedure.  I was a young lawyer working with Andy

18  Langan and so I would take Andy Langan's guidance.

19      Q.   So, if Mr. Langan was doing that in accordance

20  with whatever procedures he knew of ---

21      A.   Whatever -- I'm not sure you call it

22  procedures, whatever his practices were.

23      Q.   But you never saw any written protocols or any

24  template answers to interrogatories or anything which,

25  you know, you got a booklet or were instructed, here,

Page 12

1        this is what we use to answer interrogatories?

2            A.   No, nothing like that that I recall.

3            Q.   Were the interrogatories that you were

4        involved in drafting in Green, they contained a lot, the

5        first set at least, contained a lot of objections.  Were

6        you involved in that?

7            A.   You're talking about the plaintiff's

8        interrogatories on General Motors?

9            Q.   Yes, the plaintiffs on General Motors?

10           A.   In terms of responding?

11           Q.   Yes.

12           A.   I was involved under Andy's supervision in

13       responding to interrogatories and document requests, as

14       I recall.

15           Q.   Okay.  There are a number of preamble which

16       look like kind of form objections, languages were used

17       over and over again.  It's also seen in other

18       litigation, too.  Where does that language come from, do

19       you know?

20           A.   It comes typically from something that someone

21       has done before and it's used.  Again, you may look at

22       another case you had.  In the Green case, I am just

23       trying to remember whether the lab -- it seemed to me

24       there was a law firm before Kirkland & Ellis and they

25       may have started the drafts of responses and we may have

Page 13

1    just simply carried over what they did.  If not, we

2    would have looked to responses, you know, from another

3    case just to use as a guide.

4        Q.   My understanding is that this Green case was

5    your only involvement with an F-Car.  Is that correct?

6        A.   Yes, I am pretty sure throughout my time with

7    Kirkland or with General Motors that's the only F-Car,

8    yes.

9        Q.   Did you work on other General Motors roof

10   cases after Green?

11       A.   Yes.

12       Q.   But none of them were F-Car cases?

13       A.   Correct.

14       Q.   Were you aware of something which we've called

15   the F-Car Project Center?

16       A.   I became aware of that term.

17       Q.   Did you become aware of that during your

18   handling of the discovery aspect of Green back in the

19   early nineties?

20       A.   Well, it would have been -- let's see, I

21   started in '89.  It would not have been '89.  I'd have

22   to be refreshed whether it was -- it was after -- the

23   first time I would have even heard that term would have

24   been after there was an order issued by the trial judge

25   after which I believe ---

4f6db2b3-2b92-461b-8501-293918535e64

Page 14

1      Q.    Just to give you a time, that was in August of

2   1990?

3      A.    August '90, right.  So, yeah, somewhere there

4   in August or September 1990 I would have heard of the

5   term F-Car Project Center.

6      Q.    Okay.  So, with respect to the -- that order

7   was to get more specific answers to interrogatories

8   which had previously been answered by General Motors and

9   served on plaintiff.  Correct?

10     A.    Yes.

11     Q.    Okay.  So, you had no -- were you involved in

12  drafting the first set of interrogatories and which

13  became the final set which was served before Judge

14  Ferentz's order in August of 1990?

15     A.    By interrogatories you mean the answers to

16  interrogatories?

17     Q.    Yes.  Yes, I'm sorry.

18     A.    You know, my time sheets reflect my

19  involvement, but I think I was involved in helping Andy.

20  You know, basically Andy would have given me guidance on

21  approaches and I may have helped with some language or I

22  may have revised them.  I think I did have some

23  involvement, but I'd have to refresh by my time records

24  or if I looked at the timing of the responses.

25     Q.    We can do that in a while.

1        So, when you were involved in the first

2   service of interrogatory answers before Judge Ferentz's

3   order in August of 1990 you had no awareness that there

4   was an F-Car Project Center File?

5        A.    Yes.

6        Q.    And you became aware of that after Judge

7   Ferentz entered her order and was requiring more

8   specific answers to many of the questions which she

9   considered to be unresponsive previously.  Correct?

10       A.    Yes.

11       Q.    And how is it you came to learn that there was

12   such a thing as an F-Car Project Center?

13       A.    I believe there was a meeting in Michigan

14   where Andy Langan was present but I was not.  And I

15   believe after Mr. Langan came back from that meeting we

16   talked about revising the responses in response to the

17   judge's order and so it would have been either in that

18   first conversation or a conversation after that that I

19   would have learned of the term F-Car Project Center.

20       Q.    And at that point in time what was your

21   understanding of what the F-Car Project Center was?

22       A.    I didn't have much of an understanding.  I

23   just -- it was some kind of -- there had been some kind

24   of engineering work that produced some documents about

25   the F-Car but I would have only -- I think I only had a

Page 16

1    vague understanding of what it was.

2        Q.   Okay.  Did you come to have a more or less

3    vague understanding of what it was as time came to pass?

4        A.   Not in the Green case.  I mean, I -- later in

5    other cases or actually in one specific case I came to

6    learn of another project center for a different car.

7        Q.   What kind of car was that?

8        A.   It was -- the car involved in my case was

9    called the H-Car but it was a relative of the C-Car.

10   So, there was a C-Car Project Center.

11       Q.   Okay.  And based upon what you know about the

12   F-Car Project Center File and now what you know about

13   the H-Car Project, were they basically the same concept

14   in terms of what they were?

15       A.   I don't know.

16       Q.   You don't know.  You had no ability to compare

17   in your own mind the two of whether one was the same as

18   the other?

19       A.   I put no thought to it.  I was just -- I was

20   defending General Motors in a case involving the H-Car.

21   There was a discovery request specifically for the

22   documentation from the C-Car or what was called the

23   C-Car Project Center dealing with specific topics and in

24   that case we produced those documents.

25       Q.   So, okay.  Based upon putting together what

1    you know about C-Car Project Center file and what you

2    learned about the F-Car Project Center, what are these

3    project center files?

4         A.   I don't have a real good memory about it.  It

5    was not anything that had a lot of focus in the case I

6    was involved in but I believe ---

7         Q.   Which case, the Green case or the H-Car case?

8         A.   The other case, the H-Car case.  The H-Car,

9    there was not a lot of focus on it.  I don't remember it

10   being noteworthy at all.  It was a case that had a lot

11   of discovery.  I believe it's -- there was a center -- I

12   am not sure if it's a physical place called a center.  I

13   just know there was a group of engineers who worked on

14   the design and development of a vehicle or vehicle line

15   and whatever work product they produced and kept in the

16   ordinary course of business would be in those files.

17        Q.   Okay.  Have you ever seen the entire F-Car

18   Project Center File in any form, microfiche, hard copy,

19   just where someone said there it is, that's the F-Car

20   Project Center File?

21        A.   No.

22        Q.   Do you have any conception as to how many

23   documents are contained within the file?

24        A.   No.

25        Q.   Do you have any understanding as to where the

1    file is or files are maintained and it could be one or

2    more places?

3         A.   No.  I understood that at least a copy -- I am

4    not sure if it's the original file or a copy of the file

5    had been sent from Michigan to Florida to the Rumberger

6    Kirk firm.

7         Q.   And it was your understanding that that was

8    the entire F-Car Project Center File?

9         A.   I don't know if it was the entire F-Car

10   Project Center File or a portion of it.  That I don't

11   know.

12        Q.   Do you know if there were other files which

13   had information with respect to the design and

14   manufacture of the F-Car or other than the F-Car Project

15   Center File?

16        A.   I believe so.  There is design documents, for

17   example, which we produced in the Green case.

18        Q.   When you say design documents, what do you

19   mean?

20        A.   These drawings that show designs of different

21   aspects of the car.

22        Q.   Is it your understanding that the F-Car

23   Project Center File did not contain design drawings or

24   blueprints?

25        A.   I don't know whether it did one way or the

1   other.

2        Q.   You were involved with two documents,

3   basically two document production requests, one in 1990

4   and one in 1991.  Is that correct?

5        A.   I don't know the numbers of them but there was

6   two periods of time when I was involved with responding

7   to either interrogatories or request for production or

8   both.

9        Q.   Okay.  And I guess at least from what I know

10  one was the review of CPIRs accident report information

11  documents.  Is that your understanding?

12       A.   I think there was -- yeah, I might not have

13  understood your question before but I remember being

14  involved in reviewing the collision, the Collision

15  Performance Injury Reports.  I think that's what they're

16  called.

17       Q.   That was -- were you involved in something

18  before that?  Was that the second of your, you know,

19  major involvement in producing documents?

20       A.   I mean, I was involved in the process of

21  assisting Mr. Langan and I may have assisted him in

22  other ways that may or may not be reflected on my time

23  sheets.  I am not trying to give you trouble but maybe

24  you can rephrase the question.

25       Q.   Yes.  My understanding based upon reading your

Page 20

1   testimony is that you spent one full day reviewing

2   documents in Detroit in the Fall of 1990.

3        A.   Yes.

4        Q.   And then at another point in time you spent

5   some time reviewing these CPRIS and maybe some project

6   center files with the help of Bob O'Hara after Judge

7   Ferentz's order came down in August of 1990?

8             MR. VINES:  I'm sorry, Maurice, just for the

9             record, you are referring to the show cause hearing

10            transcript?

11            MR. DONOVAN:  Yes, also known as the privilege

12            hearing.

13       A.   I thought the day I spent in Detroit -- I

14  think it was Detroit or it may have been Warren,

15  Michigan.  I know I spent a day at the General Motors

16  facility in Michigan.  I believe the whole day was spent

17  reviewing CPIRs.  Then I may have received other

18  documentation from General Motors that Mr. Langan or

19  Andy Langan asked me to look at.  It seems to me there

20  was maybe some research materials or research literature

21  it seems like.  And there may have been others I just

22  don't remember.  Then the only F-Car Project Center

23  Files that I actually reviewed were ones that were sent

24  to Kirkland & Ellis by Bob Rudock from Rumberger Kirk.

25            With respect to what Bob O'Hara was reviewing,

Page 21

1      I never -- I don't believe I saw what he reviewed.  I

2      mean, he was hired to assist the attorneys and he did

3      reviews and I don't recall now whether his reviews

4      resulted in documents being produced or not but if he

5      did review he picked out documents that were responsive,

6      those may have been sent directly to General Motors and

7      then produced in the case.

8          Q.   Was that the first time that you had been

9      involved with Bob O'Hara in handling production request?

10         A.   Yes.

11         Q.   What did you know about him?

12         A.   I knew he was a retired engineer who spent a

13     lot of time with General Motors.  I think he worked in

14     what had been called the Fisher Body Division of General

15     Motors.

16         Q.   With respect to this F-Car Project Center,

17     other than it was some compilation of documents having

18     to do with design of the F-Car, is there anything else

19     you knew about that, you know, how it was maintained,

20     what format it was maintained in, who kept it, where it

21     came from, what its origins were, what it consisted of,

22     any information at all other than what you just told us?

23         A.   I think it was a microfiche, but I am not sure

24     it was.  My memory kind of tells me it was microfiche.

25         Q.   Did you ever review the microfiche of what's

4f6db2b3-2b92-461b-8501-293918535e64

Page 22

1    purported to be the Project Center File?

2        A.    No.

3        Q.    So, just going backwards now, the first full

4    day you spent in Detroit in the Fall of 1990, which is

5    when you were going through these CPIRs forms --

6        A.    Right.

7        Q.    -- were they hard copy documents?

8        A.    Yes, I think they were.  They were in boxes.

9        Q.    Okay.  How many boxes?

10       A.    I don't remember.

11       Q.    Do you have any clue as to how many documents

12   were encompassed, ten, a hundred, a thousand, a million?

13       A.    More than -- not a million.  More than -- my

14   guess is more than a hundred.  I mean, it took me all

15   day.

16       Q.    And you were going through these documents one

17   at a time?

18       A.    Yes.

19       Q.    Who provided you with the documents?

20       A.    I don't remember whether it was -- is it Jerri

21   Dassie or Nancy Genova, Susan Rhodes.  It was somebody

22   who was a Product Discovery Group coordinator, if I

23   remember the titles right.

24       Q.    Was that the first time you had been

25   introduced to anybody over at General Motors who had

Page 23

1      that title of project or Production Discovery Group or

2      whatever it was called?

3          A.    Yeah, probably in person.

4          Q.    You had dealt with them by phone?

5          A.    Yes.

6          Q.    Do you recall whether you were handling any

7      other General Motors cases in or around the same time?

8          A.    Yes, I am sure I did.

9          Q.    Okay.  And you were also involved in document

10     production in those cases?

11         A.    God, I am trying to remember the ones that

12     would have been, yes.

13         Q.    All right.  So, you had boxes of these

14     accident documents and what were they?  What was your

15     understanding of what those documents were?

16         A.    If I remember right, these were documents that

17     were generated by a General Motors subsidiary called

18     Motors Insurance Corporation or Motors Insurance

19     Company, and after an accident that they were, that the

20     insurance company became aware of and an investigator

21     would go to the scene and inspect the car -- I don't

22     remember if they inspected the accident scene or not,

23     they may have.  And they would just gather information

24     about the collision and the performance.

25         Q.    So, would it tell you what kind of car was

Page 24

1    involved in the accident?

2         A.   Yes.  Yes.

3         Q.   Would it tell you the date of the accident?

4         A.   Yes.

5         Q.   The location of the accident?

6         A.   Yes.

7         Q.   Would it tell you what parts of the vehicle

8    were damaged in the accident?

9         A.   Yes.

10        Q.   Would it tell you roughly how the accident

11   happened, who collided with who and what form?

12        A.   Yes.

13        Q.   What other information ---

14        A.   I don't think -- I am not sure how much detail

15   we had on that but ---

16        Q.   Rear-end collision, side impact collision,

17   something like that?

18        A.   Right.  Yeah, you could tell what kind of

19   collision.  Yeah.

20        Q.   Anything else other than the information ---

21        A.   If I saw one, it would refresh my memory.

22        Q.   Anything significant that stands out in your

23   mind?

24        A.   No.

25        Q.   Okay.  Were all of the documents you were

Page 25

1    reviewing all F-Cars?

2         A.   Yes, I am pretty sure.

3         Q.   So, these were all accidents having to do with

4    F-Cars?

5         A.   Yes.

6         Q.   And what was your purpose in reviewing those

7    documents?

8         A.   To determine if any of them were, if any of

9    those CPIRs were responsive.

10        Q.   Responsive to what?

11        A.   To document requests in the case as ordered

12   by, as clarified by the judge's order.

13        Q.   Well, the judge said between, I think it was

14   1982 and 1988 F-Cars.  Is that what you're talking

15   about?

16        A.   Yeah, there was some period of time, some

17   scope, '82 to '85, '82 to '86, something like that.

18        Q.   And was there any particular component part of

19   the vehicle that you were looking for?

20        A.   The roof or the attachments to the roof.

21        Q.   Okay.  At that point in time did you have an

22   understanding as to basically what the plaintiff was

23   claiming the defect was in the Camaro which Michael

24   Green was driving?

25        A.   Well, there was a report or interrogatory

Page 26

1   answer from Arthur Damask, where he had this theory that

2   Michael Green was injured by the glass plate of the

3   T-top hitting him on his head during the collision.  So,

4   that was a theory.  And there was also a theory about

5   the tires, maybe there was some kind of silicone or

6   other substance on the tire and when Michael Green took

7   the car, you know, from his employer and went speeding

8   around I guess the claim is that the car, the tire would

9   have been slicker than a normal tire.  But I know that

10  claim dropped out of the case at some point, so I don't

11  remember if that was in the case or not or if that was

12  the kind of thing we were looking for was the situation

13  where the tire was too slick or something.  I don't

14  remember -- I know that the tire claim fell out of the

15  case at some point.  I just don't remember when.

16       Q.   You are aware that the plaintiff was claiming

17  that there was some kind of a defect with the roof

18  structure which allowed it or caused it to come down

19  onto Michael's head and causing his injury?

20       A.   Yeah, that was it.

21       Q.   And were you aware that it was a side impact

22  or an angle side impact I guess more accurately?

23       A.   Yeah, I knew that Green had -- he was like --

24  if I remember right, he was speeding through a

25  residential neighborhood and then he sort of fishtailed,

Page 27

1    lost control of the car and fishtailed and there was an

2    oncoming school bus with handicapped children.  But I

3    don't think it was a gigantic school bus.  I think it

4    was one of the shorter school busses and I believe the

5    side of the Camaro perhaps more toward the rear struck

6    the left front corner of the school bus.  And then after

7    that there were some witnesses who believed that the car

8    had rolled over, and I don't remember the accident

9    reconstruction whether there was, the accident

10   reconstruction said it actually rolled over, whether it

11   flipped, whether it spun.  That part I don't remember.

12        Q.   Okay.  And by that point in time you had the

13   benefit of plaintiff's answers to interrogatories and at

14   least to your recall either a report or an interrogatory

15   question which set forth Dr. Damask's opinions as to

16   what the defects were.  Correct?

17        A.   Of what he was claiming the defects were.

18        Q.   So, was it with that in mind that you were

19   going through these documents to see if there were any

20   similar accidents in any of these pieces of paper in the

21   boxes that you were looking for?

22        A.   That would have been part of the analysis.  In

23   this -- I believe I had a memo that set forth my

24   thinking and criteria that I was using.

25        Q.   Okay.  Can you recall what the criteria was

Page 28

1   that you were looking for?

2        A.   Not without looking at the memo.

3        Q.   Would it have to do with -- you were looking

4   basically for roof and tires -- and I am going to forget

5   about the tires because that never materialized but you

6   were looking for accidents which had something to do

7   with the roof, I assume.

8        A.   Yeah, if there was some kind of collision or

9   accident that involved the roof or the components of the

10  roof, that's something I would have given particular

11  attention to.

12       Q.   Okay.  Now, my understanding is you went

13  through all of these documents, no matter how many there

14  were, and however number of boxes there were and you

15  didn't find one document which had anything to do with

16  the roof which you thought was responsive to any of the

17  interrogatories or any of the questions which were asked

18  in the demand for production of documents.  Is that

19  correct?

20       A.   Correct.

21       Q.   Was that because there were no accidents

22  involving roofs at all or there were some accidents

23  involving roofs?

24       A.   If I had -- I dictated that memo which

25  reflected -- at the time I was doing the review, I had

4f6db2b3-2b92-461b-8501-293918535e64

1    notes on a note pad and probably a legal pad.  I would

2    have taken notes as I went through and then when I got

3    back to the office I dictated a memo to reflect what my

4    thinking was.  I would have been happy to have produced

5    documents.  If I thought something was a close call, I

6    would have produced it, but at the end of the day I

7    thought none of them were responsive and therefore

8    nothing needed to be produced.

9        Q.   Did anybody else review those documents other

10   than yourself to make a second opinion, so to speak, as

11   to whether any of those documents were responsive?

12       A.   Not that I know of.

13       Q.   So, this decision as to what was produced and

14   what was not produced ended solely upon your judgment?

15           MR. VINES:  I'm sorry, Maurice, can we go off

16       the record for one second?

17           THE VIDEOGRAPHER:  Off the video record.

18           (A recess was taken from 11:15 a.m. to

19       12:38 p.m.)

20           THE VIDEOGRAPHER:  Back on the video record.

21   BY MR. DONOVAN:

22       Q.   Mr. Coulson, when we took a little break we

23   were talking about your review of -- let's try that

24   again.  Mr. Coulson, when we took our break we were

25   talking about your inspection of CPIRs, Collision

Page 30

1    Performance and Injury Report documents for the F-Car

2    and you had made reference to a memo you had prepared at

3    that time reflecting your thoughts and reflecting what

4    you had done with respect to that investigation.  It's

5    Privilege Document 169.  It has Bates numbers but they

6    are so small.  It's Bates number 91 in the privilege

7    hearing.  I am going to show you that so you can take a

8    look at it.

9          A.    Do you want me to read it?

10         Q.    No.  Well, have you read it before?  Do you

11   need to do that right now?

12         A.    The last time I saw it was when we had that

13   hearing.  This may be an exhibit.

14         Q.    Do you want to read the whole thing first, do

15   you want to just ---

16         A.    What are your questions?

17         Q.    First of all, you didn't seem to know how many

18   boxes of stuff there.  It says four file boxes so I

19   assume that's an accurate representation of how much you

20   had reviewed?

21         A.    Yes.

22         Q.    Okay.  It says, my search was limited to

23   documents which provided predictive analyses in quotes

24   and, quote, investigations or examinations, end of

25   quotes.  How was that criteria determined or did you

Page 31

1    determine it, did somebody else determine it?

2         A.   Well, it's in quotes so it came out of either

3    document request, interrogatory or the Court's order.

4         Q.   And that was -- did you pick that out for

5    something to search for or was that given to you as

6    something to search for?

7         A.   It's possible that out of the -- this is

8    criteria that Andy Langan and I may have discussed

9    before I went to conduct the review.

10        Q.   Okay.  But your best recollection is you would

11   have gone to the discovery request documents either the

12   interrogatories or demand for production of documents

13   and either you in conjunction with Andy Langan or Andy

14   Langan by himself picked out this as the basis for the

15   search for these documents.  Correct?

16        A.   Yes, but we would have looked at the judge's

17   order as well.

18        Q.   Okay.  Do you recall at any time any

19   discussion of alternative design being utilized as a

20   criteria for searching for any documents just as the

21   words predictive analyses were, you know, quoted here

22   that alternative design was a specific focus?

23        A.   Well, the CPIRs, that would have no ---

24        Q.   I understand ---

25        A.   CPIRs would not involve alternative designs.

1      Q.   I understand that.  I am asking you if at any

2      time in any of the document inspections that you recall

3      doing that was one of the search criteria which was

4      discussed?

5      A.   Well, the topic of alternative designs would

6      have been discussed in the process of answering

7      interrogatories or document requests.

8      Q.   Okay.  Do you recall that being selected out

9      as terminology to conduct a search for, specifically?

10     A.   You mean in terms of what I did with the CPIRs

11     or something else?

12     Q.   In terms of your hearing it assigned to

13     anybody to do, in terms of it being something that had

14     to be done, should have been done, was done, anything

15     concerning discovery on this where someone said, you

16     know, alternative design is something we need to search

17     for?

18     A.   Well, it was one of the -- if I remember

19     right, it was a document request or an interrogatory

20     that asked about alternative designs and we had an

21     answer that we had drafted.

22     Q.   Okay.  Do you recall that being discussed

23     specifically as predictive analyses was picked out as

24     two key words in this particular instance?

25     A.   I am not understanding the connect or the

1    relationship you are trying to establish.

2        Q.   Okay.  Well, specifically, someone picked out

3    certain words from the interrogatories so as to define a

4    search of the CPIR documents.  Correct?

5        A.   Well, yeah, I think they were document

6    requests or interrogatories or both, and it may have

7    been as clarified by the judge's order -- I'd have to go

8    back and review the order -- that called for the

9    identification or production of documents that involved

10   predictive analyses or investigations or examinations.

11   I would have been told probably by Andy Langan that

12   CPIRs may possibly be responsive to those particular

13   requests.  Therefore, we asked General Motors to get all

14   the CPIRs together for the '82 to '86 F-Cars and that's

15   why I went to Michigan to review them.

16       Q.   I understand that, and I'm saying, did that

17   same process of picking out certain descriptive terms

18   from the discovery document requests, do you recall that

19   ever happening with respect to the words alternative

20   design being taken out of the interrogatories or demand

21   for production and a similar search of any documents

22   being conducted specifically by someone looking for

23   responses to those terms?

24       A.   I don't know.  It's possible that it was,

25   whether it was Bob O'Hara or Joe Rice or somebody else

1    but, you know, could have looked for documents for

2    alternative designs, but I don't recall myself having

3    reviewed documents where there was a specific criteria

4    of alternative designs.

5         Q.    Okay.  And do you recall discussing it with

6    respect to an assignment to anybody else to do?

7         A.    It's possible.  I don't remember.

8         Q.    You don't remember one way or the other?

9         A.    Right.

10         Q.    Now, you went through all these four boxes of

11   documents and you determined that none were responsive

12   to that search criteria for predictive analyses and

13   investigation or examination that reflect any and all

14   hazard associated with the defects?

15         A.    Correct.

16         Q.    But from reading this, and correct me if I'm

17   wrong, there were documents which referred to damage to

18   the roof as a result of an accident.  Correct?

19         A.    Yes.

20         Q.    Okay.  And you decided for whatever reason is

21   set forth in this memo that they were not responsive and

22   would not be produced because they didn't identify

23   hazards associated with that accident.  Is that a fair

24   reading of that?

25         A.    Hold on.  Let me read it first.

4f6db2b3-2b92-461b-8501-293918535e64

1     MR. VINES:  I'm sorry, Maurice, what number

2     document is that?

3     MR. DONOVAN:  It's -- Dave, if you look in the

4     lower right hand corner for the number on the

5     back ---

6     THE WITNESS:  It's Bates number ---

7     MR. DONOVAN:  No, there is a written pen

8     number on the back.  I'm sorry, it's 169.

9     A.    Oh, 169.  I mean, the best way is to read

10    this.  Let's see, the descriptive comments regarding

11    damages were not an attempt to reflect hazards nor were

12    they related to roof or tire defects.  The mere fact

13    that damage to the roof occurred cannot constitute facts

14    related to roof defects unless some commentary or other

15    information points to something being wrong with the

16    roof.  Now, that doesn't mean that the person had to

17    write that, whoever filled this out, the investigator

18    had to write down there is something wrong with the

19    roof.  It means, I'm reviewing these and could someone

20    infer that something might be wrong with the roof based

21    on what I am seeing there, that's the criteria that I

22    would have used.

23    Q.    Okay.  So, there were documents among there,

24    there were these CPIRs where roof damage was circled as

25    part and parcel of the happening of the accident.

4f6db2b3-2b92-461b-8501-293918535e64

Page 36

1    Correct?

2         A.    I believe there were.

3         Q.    And you made a judgment that those would not

4    be produced to the plaintiff because they didn't meet

5    the criteria of identifying hazards or roof defects

6    because there wasn't anything specifically on that form

7    which said that the damage was as a result of a defect

8    or the damage was as a result of a hazard or ---

9         A.    Well, it wouldn't have to be defects.  It

10   would be like claimed defects or where someone might

11   assert a defect.  My memory of this is that where the

12   roof, where there was some indication of damages to the

13   roof it was because of just sort of incidental damage.

14   It was not a situation -- they were not ones where the

15   roof was, you know, any kind of significant component of

16   the accident.

17            For example, if you crash a car into a tree at

18   a pretty decent rate of speed, there is going to be a

19   little bit of damage to the roof.  I mean, if you take

20   the car to the body shop, they're going to have to --

21   there might be -- you know, the A pillar might be

22   damaged a little bit, for example.  So, there may be

23   some body work done to it but, Jesus, a frontal

24   collision it's like nothing that's possibly like the

25   Green accident or even close to it where you could have

1   any kind of theory that was being asserted by the

2   plaintiffs.

3       Q.   Okay.  Would you have pulled from those

4   documents where there was circled roof damage and it was

5   a side impact?

6       A.   Yeah, I think if it was -- I believe if there

7   was any kind of accident that was like close to Green's

8   accident where either the car is hit, hit something on

9   the side or is hit by another vehicle or something else

10  and there was damage to the roof, yeah, that's something

11  that I probably would have picked out.

12      Q.   So, what you're saying is among these

13  documents there were no side impact collisions where

14  there was damage to the roof because you would have

15  picked them?

16      A.   I don't remember.

17      Q.   Okay.  Well, you didn't pick any documents.

18  Correct?

19      A.   Correct.  I remember thinking I would like to

20  produce documents out of this.  I have spent the whole

21  day here.  I have gone through four boxes, and in my

22  judgment none were responsive.  And that's why I

23  dictated this memo as -- because I had a lot of notes as

24  I went through the day.  And if I recall, I put like a

25  Post-it on or something saying, okay, I am going to go

Page 38

1   back to that report later after I see more and more of

2   these things.  And at the end of the day, I determined

3   nothing was responsive.  And I thought, well, geeze, if

4   anyone asked me like, Coulson, why didn't you produce

5   any of those documents, I wanted to reflect what my

6   thinking was.  And my thinking at the time is reflected

7   in this October 11, 1990 memo.

8        Q.   Were there any rollover collisions on any of

9   the documents you reviewed?

10       A.   I don't think there were.

11       Q.   If there were rollovers and there was damage

12  to the roof, would you have pulled that document as one

13  that was responsive?

14       A.   I probably would have but we are speculating.

15       Q.   But it would have -- but right now if you were

16  given those documents you would consider that to be

17  among the criteria identified in your search?

18       A.   Most likely because someone, if there is a

19  roll -- I have done a lot of rollover roof crush cases

20  and the plaintiff's lawyer may claim that there is some

21  defect in the roof.

22       Q.   So from ---

23       A.   Can I just finish the rest for a second?

24       Q.   Sure.

25            Okay.  So, just in some, there were probably

4f6db2b3-2b92-461b-8501-293918535e64

1     documents there that had roof damage circled but you did

2     not produce them because it was either insignificant or

3     didn't meet this criteria you had established.  Correct?

4          A.   Right.

5          Q.   And you don't believe there were rollover

6     documents because you probably would have pulled them if

7     they were.  Correct?

8          A.   Right.

9          Q.   And you would have pulled any documents which

10    were side impacts which they were roof damage?

11         A.   Yeah, it would depend.  I mean, it would be

12    side impacts similar to Green's accident.  It's possible

13    if it was side impact let's say the front -- I'm

14    forgetting my vehicle terminology now but is that the

15    fender out front?  And also something like in the engine

16    compartment kind of thing, well, that's not even close

17    to the Green situation.

18         Q.   So you would have weeded that out?

19         A.   I would have probably thought, well, that kind

20    of side impact has nothing to do with the Green

21    accident, but we are kind of speculating here because I

22    would have to go back and review the documents.  But I

23    did this memo to try to reflect my thinking.

24         Q.   And after spending a whole day reviewing all

25    of these documents, that was the last time you were

Page 40

1    involved in going through the CPIRs documents?

2         A.   That I recall.

3         Q.   And, again, I think I may have asked this but

4    I am forgetting.  No one else then reviewed them again

5    to, you know, see if your judgment was correct in

6    analyzing it?

7         A.   To my knowledge, no one went back through

8    those four boxes.  I am just thinking it's possible that

9    -- you'd have to look at my billing records, but maybe

10   some additional CPIRs came in that I was asked to review

11   later but that would not have involved a trip to

12   Michigan.

13        Q.   And you didn't pull any documents out of that

14   which you were concerned might meet the criteria to ask

15   anybody else's opinion?

16        A.   Correct.

17        Q.   My understanding of -- strike that.  Somewhere

18   in your other testimony you talk about reviewing an

19   index of documents to make a determination as to what to

20   produce and not to produce.  Do you recall that?

21        A.   What I said earlier today?

22        Q.   No, in your earlier testimony, I'm sorry, at

23   the privilege hearing.

24        A.   Yeah, it seems to me I did mention something

25   about this earlier this morning, maybe not, but it seems

1    to me there was an index relating to maybe research

2    materials or research articles or some kind of technical

3    literature and I tend to think it was in the Green case

4    that I reviewed that and based on whatever title or

5    abstract was provided I may have made judgments whether

6    something was responsive or not.

7        Q.   Okay.  Your best recollection is those were

8    not technical documents.  Those were more papers or

9    publications?

10       A.   Well, they would have -- well, they all would

11   have been technical issues about automotive.

12       Q.   I mean, they weren't design documents or

13   blueprints or, you know, test documents?  That's what

14   I'm talking about when I say technical documents.

15       A.   Right.  Exactly.

16       Q.   And then at some point after that somewhere in

17   1991 you say you recall reviewing documents which had

18   come from the Rumberger office.  Correct?

19       A.   Yes.

20       Q.   Were you aware before that that Rumberger's

21   office was reviewing documents for the Green case?

22       A.   Yes.

23       Q.   You were.  How did you get that knowledge?

24   Where did that come from?

25       A.   After Mr. Langan or Andy Langan returned from

1    Michigan, I believe he told me that there were some

2    documents on microfiche, I thought he said it was

3    microfiche that another law firm would be reviewing

4    for -- that -- my memory was there was already a project

5    under way with another law firm and it made more sense

6    from the efficiency standpoint to have that law firm do

7    the search for the Green case as well and that firm

8    would handle it and that was how it was going to be

9    handled.

10       Q.   Do you know whether that firm was ever

11   provided with the discovery request themselves, the

12   interrogatories and the demand for production of

13   documents?

14       A.   I don't believe I provided that firm with

15   them.  My memory was I had no communication with that

16   firm about the Green case --

17       Q.   That was my next question.

18       A.   -- until we get into July of 1991.

19       Q.   Okay.  Well, that's what we're talking about,

20   sometime in July of 1991.  Did you have communications

21   with them directly about these documents then?

22       A.   I think it was July.  Maybe it was August of

23   1991.  It was in the summer sometime of 1991 Andy Langan

24   told me that Kirkland, I think it was Ron Betman

25   perhaps, who was another associate at Kirkland -- he did

Page 43

1    not work on the Green case.  He worked on a different

2    case -- that he had received a batch of documents from

3    the Rumberger firm and that he wanted me to review them.

4    So, he had a copy made for me and I reviewed them.

5         Q.   Okay.  So, it's your understanding that these

6    were documents that had been produced for another

7    associate in the office on another case and you were

8    being asked to review them for the Green case?

9         A.   I am not sure about produce.  I mean, they

10   were copies made available or sent to Ron Betman for

11   Kirkland.

12        Q.   Do you know what the scope of the documents

13   the Florida firm, the Rumberger firm was reviewing out

14   of which the selected documents came?

15        A.   I am not sure I understand your question.

16        Q.   You received from Mr. Betman a series of

17   documents which had been culled from, I assume, a larger

18   selection of documents?

19        A.   Yes, that was my understanding.

20        Q.   Do you know what the larger selection of

21   documents was from which those documents were culled?

22        A.   I thought it was the F-Car Project Center

23   File.

24        Q.   Do you know if it was the whole F-Car Project

25   Center File, every document contained in it?

Page 44

1        A.    I did not have such knowledge but my

2    understanding was that the F-Car Project Center Files,

3    being all of them, were sent to the Rumberger firm by

4    General Motors for its review.

5        Q.    Okay.  And that was in conjunction with just a

6    review of those files or was it in conjunction with

7    another case, if you know?

8        A.    Well, I believe there was a need to review

9    them because of another case and since that firm was

10   undertaking that effort, the thought was -- it wasn't my

11   thought, it was decided in that meeting, I believe in

12   Michigan, that the Rumberger firm would review these

13   documents for the Green case, as well.

14       Q.    All right.  Do you know what, if anything, the

15   Rumberger firm was provided by way of document requests

16   from the Green case in order to conduct such a search?

17       A.    I did not provide anything or any

18   documentation to the Rumberger firm.

19       Q.    Okay.

20       A.    It's my understanding that General Motors was

21   going to.

22       Q.    Okay.  But you don't know that one way or the

23   other?

24       A.    No.

25       Q.    Did you ever have any conversations with

Page 45

1    anybody from the Rumberger firm specifically about Green

2    and what the discovery criteria were?

3        A.   No, not until -- I did not in 1990 but around

4    July or August 1991 I had discussions with somebody from

5    Rumberger.

6        Q.   Do you remember who?

7        A.   I put in a call to Bob Rudock --

8        Q.   Okay.

9        A.   -- and I received a call back from Henry

10    Salas.

11        Q.   Okay.  What was the nature of that call?

12        A.   He was returning my call and I told him why I

13    was calling.

14        Q.   Why was that?

15        A.   I told him that we had received these

16    documents.  I'm pretty sure I read him the letter that

17    Mr. Rudock had sent up to Ron Betman.  I then asked him

18    about what the scope of the review was that was

19    conducted by the Rumberger firm.

20        Q.   Okay.  What did he tell you?

21        A.   I wanted to get confirmation, one way or the

22    other, whether the scope of the review was broad enough

23    to encompass what I thought would be adequate to

24    encompass the responsive documents for the Green case.

25        Q.   Now, in your mind were you working with any

1    specific questions or specific design criteria or

2    language or is it your understanding that these

3    documents would be responsive to any of the questions or

4    any of the demands to produce in Green?

5        A.    Yeah, I was broader.  It was -- I was not

6    specific -- if I recall, I looked at the judge's order

7    in the case and -- which I have to -- I'd like to -- I'd

8    prefer to get my memory refreshed by looking at -- I

9    think there are some documents, maybe a letter I sent to

10   Joe Murray, maybe my time sheets.  I think there are

11   some documents.  I just remember seeing -- when we were

12   up in New Jersey for the hearing I remember seeing some

13   documents that refresh my memory on the scope, but in

14   general I wanted to find out if all the documents

15   pertaining to the roof or the sort of the component

16   parts of the roof was, constituted the scope of the

17   review and that would include the T-roofs.

18       Q.    Did Mr. Salas indicate to you that he had a

19   copy of the Green discovery request that he was working

20   off of?

21       A.    No, I don't think we talked about that.  I

22   wanted to know -- I believe he told me that a paralegal

23   reviewed it and I asked if he had confidence in the

24   paralegal, which he said he did.  And I asked him what

25   the sort of, if the scope or criteria was broad enough

1    to encompass what I thought would encompass the

2    documents that would be responsive in Green and he

3    confirmed that it did.  The reason I called was to get

4    that confirmation because if not then either the

5    Rumberger firm had to do another search or myself or

6    someone else would, from Kirkland & Ellis, needed to go

7    down there and review the documents.

8        Q.   But -- and maybe I am just confused here --

9    how would Mr. Salas know what would fully encompass a

10   search to provide responsive documents in Green unless

11   he knew what those discovery requests were?

12       A.   Because if all the documents relating to the

13   roof or, you know, the components of the roof were

14   gathered then that necessarily will include the

15   documents that would be responsive for Green.

16       Q.   So, your understanding was that this search

17   which was conducted by Rumberger's firm and produced to

18   you were all the documents having anything to do with

19   the roof or any of the component parts which were

20   contained anywhere within the F-Car Project Center File?

21       A.   Component parts to the roof, yes.

22       Q.   And were attacked, like the A pillars ---

23       A.   Right the A pillars, the header, etcetera.

24       Q.   Right.  And that that would be both with

25   respect to the hard roof and with respect to T-roofs?

1       A.   Yes.

2       Q.   All right.

3       A.   You have to keep in mind, my understanding was

4    that Rumberger had reviewed these documents for a roof

5    crush case.  So, in reviewing documents for a roof crush

6    case, you are going to, you know, pick out the documents

7    relating to the roof and the component parts of the

8    roof.

9       Q.   Was there any specific discussion about

10   whether documents were pulled which reflected

11   alternative designs for the T-roof?

12      A.   I may have asked about that.

13      Q.   Okay.  Do you recall doing that?

14      A.   Not specifically.  I'd need to look back at

15   the judge's order, which I know was something that I

16   referenced and had in hand when I talked to Mr. Salas.

17           MR. DONOVAN:  Mark this as Coulson 1.

18           (Plaintiff's Exhibit No. 1, Order, was marked

19   for identification.)

20   BY MR. DONOVAN:

21      Q.   Mr. Coulson, I am going to show you what was

22   just marked as Coulson 1, which I believe is the order

23   you keep referring to as needing to look at to refresh

24   your recollection as to whether you might have

25   specifically discussed alternative design or not.

1    A.   Yeah, I remember this language, "Documentation

2    relating to the roof system/structure and any connected

3    or related parts including the left rear portion of the

4    '82 through '86 model years Camaro manufactured with a

5    T-roof," and so that's what I would have -- in terms of

6    the questioning I had with Mr. Salas I for sure was

7    referencing this order.  Now, I may have also looked

8    back at document request or interrogatories before I

9    spoke with him, but, certainly, if there is any

10   documents dealing with the roof and if the question is,

11   if there is some alternative design to the roof, that's

12   the document that relates to the roof.  So, I would have

13   assumed that any alternative design documents would have

14   been sent, would have been what was included.

15   Q.   That's an assumption which you are making or

16   you have a recollection of having that kind of

17   discussion with respect to alternative design with

18   Mr. Salas?

19   A.   I may have asked him specifically about

20   alternative designs but through the logic of my thinking

21   it was sort of like, did you pull out -- out of the

22   containers did you pull out all the vegetables and if

23   we're concerned with broccoli, well broccoli is a

24   vegetable, and if he told me, yes, we pulled out all

25   vegetables then, you know, broccoli should have come

Page 50

1      along with it, just to give you an analogy.

2           Q.    Okay.  I am going to show you a document which

3      was Document 46 -- I think that may be my numbering of

4      something.  It's interrogatory number 68 from ---

5                MR. VINES:  Just for the record, you think

6           it's Document 46 from the hearing?

7                MR. FIXEL:  I don't believe that it was

8           marked.

9                MR. DONOVAN:  We used this.

10               MR. VINES:  You are making it an exhibit now?

11               MR. DONOVAN:  It's part of the motion to

12          supplement.  It's the questions which we believe

13          were not answered appropriately.  That's what it

14          is.  It was interrogatory number 68.

15     BY MR. DONOVAN:

16          Q.    Do you recall seeing number 68 from the set of

17     interrogatories served upon General Motors in the Green

18     case?

19          A.    Right.

20          Q.    Do you recall specifically any discussion or

21     any work being done to respond to that question dealing

22     with alternative design number 68?

23          A.    You mean in my discussion I had with Henry

24     Salas from the Rumberger firm?

25          Q.    Discussion at any time in any discovery

1    meetings with Mr. Langan where you specifically sat down

2    and said, now let's sit down and deal with this

3    alternative design issue?

4        A.   Well, I remember we did specifically discuss

5    how to answer interrogatory number 68 and we had some --

6    an answer.  I am trying to -- thinking back, I am not

7    sure if there was a convertible F-Car or not.  There was

8    certainly a hard, a regular hardtop F-Car.  I mean, that

9    was -- I think the majority of F-Cars sold I'm assuming

10   probably had the hard top so that's -- I suppose you can

11   call that an alternative.  And I don't remember if our

12   response referenced it or not, but I remember we

13   definitely had discussions about answering interrogatory

14   number 68 as we did about all the interrogatories.

15       Q.   Okay.  Do you recall back then being aware of

16   other alternative designs such as a design called a

17   Vista Vent or a modified Vista Vent?

18       A.   No.

19       Q.   Do you recall that language even up until

20   today?

21       A.   I don't -- the first time I heard of that

22   language was when we were up in New Jersey or -- you

23   know, I take that back.  I think Jim Feeney, who was the

24   trial attorney for General Motors earlier in this Newman

25   case had told me about those terms.  That's, I think,

Page 52

1    the first time I ever heard of them.

2         Q.   So, nowhere during your handling of the Green

3    case when you were at Kirkland & Ellis did the terms

4    Vista Vent or modified Vista Vent come up?

5         A.   I don't recall it at all.

6         Q.   Okay.  Do you recall ever discussing at any

7    point in time while you were at Kirkland & Ellis dealing

8    with the Green case, any kind of design or testing or

9    studies which were done on a Lancia Spider?

10        A.   No.

11        Q.   Were you aware now that there was some testing

12   done on a Lancia Spider by General Motors way back when?

13        A.   I am not sure if that's part of the documents

14   that I would have looked at for that hearing at New

15   Jersey or not.  It sort of rings a bell, but I'm not

16   familiar with the Lancia Spider.

17             MR. VINES:  Let me just make a quick

18        objection.  I am not sure in this deposition we

19        have evidence in the file that General Motors did

20        testing on a Lancia Spider.

21   BY MR. DONOVAN:

22        Q.   So that would have been -- if it was true,

23   that was something you learned as a result of this case,

24   not something that you knew previously?

25        A.   Correct, this case being this Newman matter

Page 53

1    that's in Federal court.

2        Q.   Right.

3        A.   I have never heard of the car make Alancia

4    except for a Fiat Spider, but I have never heard of an

5    Alancia Spider in just every day life.

6             Is Fiat still in business?

7             MR. VINES:  I don't know.  I haven't seen a

8        Fiat in a long time.

9    BY MR. DONOVAN:

10       Q.   I am going to show you a document which comes

11   from the privilege hearing.  It's number is 143 and also

12   another document which is 119.

13            MR. VINES:  These are document numbers from

14       the show cause hearing?

15            MR. DONOVAN:  Let's start again because I took

16       out more than I want to.  I actually only want this

17       document, Privilege Hearing 19, which starts with a

18       document cover sheet from Kirkland & Ellis.  Let me

19       ask you to take a look at that, please.

20            MR. VINES:  I'm sorry, before you get into

21       that, do you mind describing what that document is?

22   BY MR. DONOVAN:

23       Q.   It's a cover sheet and then there is draft

24   answers to interrogatories.

25       A.   Okay.

Page 54

1    Q.    There is a lot of handwriting on that draft

2    copy.  Do you know whose handwriting that is or if you

3    don't I guess I can ask, is it your handwriting, number

4    one?

5    A.    It does not look like mine.  I am guessing

6    it's Andy Langan's but that's a pure guess.

7    Q.    Is that typically how interrogatories would be

8    answered?  There would be a draft and then they were

9    circulated among the various attorneys who were involved

10    in the case and they would cross out things and write in

11    things and change them and then pass them along to

12    someone else to review and that may go through a bunch

13    of cycles of drafts and redrafts?

14    A.    In a very broad sense that process would

15    happen sometimes but, typically, within Kirkland &

16    Ellis, I would -- between Andy and I, we would draft

17    answers and once we were comfortable with them or

18    thought we were pretty far along, then we may solicit

19    New Jersey counsel, for example, in this case, a Mr. Joe

20    Murray or Tom Tansey and get their input and then at

21    some point we would send it to the client for the

22    client's input.

23    Q.    Who over at the client would you send it to,

24    attorneys or engineers?

25    A.    It could be all three.  It could be -- it

Page 55

1    definitely would include the attorney, the Product

2    Discovery Group coordinator, typically, and sometimes

3    the engineer such as -- in this case it was Joe Rice so

4    it's possible.  But when you get to that point the

5    interrogatories are usually or the answers are pretty

6    far along and we always want the client's input before

7    we finish.

8        Q.   And after the client has his input then it

9    would come back to Kirkland & Ellis for it to be typed

10   in final form?

11       A.   Or revised.  I don't remember whether we were

12   using typewriters then or personal computers.  My memory

13   of when the computers came in is a little fuzzy.

14       Q.   Then the final copy would be sent to local

15   counsel to serve on to plaintiff's counsel?

16       A.   In this case, that's the best of my memory how

17   we did it.

18           MR. VINES:  Maurice, sorry to interrupt, just

19       to clean the record up, the document we just

20       finished looking at appears to be Privilege Hearing

21       Document 119.

22           MR. DONOVAN:  Right, 119.  Isn't that what I

23       said?

24           MR. VINES:  I thought you said 19.

25           MR. DONOVAN:  Sorry, 119.

Page 56

1    BY MR. DONOVAN:

2         Q.   We had some discussion about, you know, the

3    various law firms involved in the Green case and other

4    General Motors defense cases and we certainly all know

5    what local counsel is.  That's the counsel who appears

6    in whatever state or locality the action is filed in and

7    some, I don't know if it's dual states -- I know New

8    Jersey requires local counsel or they have pro hoc vice

9    counsel come in and that was Tansey's firm with Joe

10   Murray.  What was Kirkland & Ellis' role in the Green

11   case?

12        A.   It was to defend the company working with New

13   Jersey counsel.

14        Q.   Okay.  Were they a specialty firm or were they

15   regional counsel?  Were they national counsel?  Why were

16   they brought in?  Why wasn't it just left to Tansey's

17   firm to defend?

18        A.   I am not sure what you mean by -- I think you

19   said a specialty firm.

20        Q.   Someone else used that terminology.  It's not

21   mine.  It was defined as a firm who has handled a lot of

22   the specific kind of case like the Rumberger firm was

23   known to be the specialty firm in roof cases and there

24   were other firms which had specialties in fire cases.

25        A.   You have kind of like in the medical field the

1    world specialty is used but not so much in the legal

2    field.  Well, let's put it this way, John Hickey from

3    Kirkland & Ellis is a phenomenal trial lawyer and back

4    then he represented General Motors in a lot of rollover

5    roof crush cases and that -- I'm just speculating, that

6    may have been a reason why Kirkland & Ellis was asked to

7    be involved in the defense of the Green case because at

8    least there is a roof related theory by the plaintiffs,

9    although this is not a classical roof crush case.  So,

10   that's very possible as to why Kirkland & Ellis was

11   asked to take part in the defense.

12        Q.   Now, is it typical, based upon your experience

13   in dealing with these cases, that there would also be

14   another outside firm such as Rumberger who would be used

15   simply to review documents or is that an anomaly?

16        A.   No, that happened relatively frequently on

17   cases that were more involved with document productions.

18        Q.   That there would be three different firms

19   handling them?

20        A.   There could be more than that.

21        Q.   In the case -- in those cases, are those firms

22   disclosed of record or do they work behind the scenes?

23        A.   No, they're working to assist the counsel that

24   are on the record appearing in the case.

25        Q.   Okay.  And they can either be identified or

4f6db2b3-2b92-461b-8501-293918535e64

Page 58

1    not identified?

2         A.   Right.

3         Q.   So, you wouldn't consider it unusual that the

4    Rumberger firm was not known to the plaintiff until this

5    litigation was commenced?

6         A.   No, not unusual at all.  It's not just General

7    Motors.  I represent a lot of -- over the years I

8    represent a lot of corporations and that's not unusual

9    because for efficiency sake if you have attorneys who

10   have reviewed documents and they're familiar with them

11   you don't want to have another firm reinvent the wheel.

12   It's costly.

13        Q.   Doesn't it make it a little more complicated

14   to handle these litigation, having all these different

15   hands in the pot?  You know, the old expression, too

16   many chefs boil broth, that doesn't apply here?

17        A.   No.  No, it's pretty common that we work as a

18   team and just because you have one other firm it just

19   means that instead of your firm doing it somebody else

20   is doing it and the whole, everyone's goal is to

21   represent their client, General Motors.  So, typically

22   there is a good amount of collegiality among the firms

23   and it works to the benefit of efficiency.

24        Q.   I am going to show you a document which was

25   marked 218 at the privilege hearing.  It's a memo.  It

Page 59

1    starts as a memo from Andy Langan to you, July 24th,

2    1991 and it refers to the F-Car center documents which

3    were sent to Ron Betman by Robert Rudock.  I think you

4    might have mentioned that.

5          A.   Right.

6               MR. DONOVAN:  I'm sorry, what number did I say

7          that was?

8               MR. FIXEL:  218.

9    BY MR. DONOVAN:

10         Q.   Is that the totality -- next to that memo, is

11   that the totality of the documents which were reviewed

12   and culled by the Rumberger firm and sent to Kirkland &

13   Ellis after their review of the F-Car Project Center

14   File?

15         A.   I would have to see what was sent to me for my

16   review.  Looking at this, my inference is no because I

17   state in this July 24th, 1991, memo to Andy -- at the

18   end I state, "The attached documents are possibly

19   responsive and merit closer review.  So, my inference is

20   that these documents which were attached to this memo

21   are a subset of what I reviewed."

22         Q.   Okay.  So, Rumberger has the big set of

23   documents.  You review a subset of those documents and

24   these documents represent the subset of the subset?

25         A.   Right.  This is the subset that I believe are

Page 60

1    possibly responsive and merit further review, which is a

2    way of asking Andy for his input on it.

3         Q.   Okay.  So, all of the documents which

4    Rumberger sent to Kirkland & Ellis after their review

5    were not considered for submission to the plaintiff?

6         A.   No, I think that Andy and I discussed these

7    documents, and after discussing it we both agreed that

8    we are going to -- we decided to produce to the

9    plaintiffs all the documents we got from the Rumberger

10   firm.

11        Q.   Okay.

12        A.   That's my memory but I have to look at the

13   documents.

14        Q.   So, you think it was more documents than that

15   which was actually produced?

16        A.   I'd have to go back and look at the documents.

17   Do you have a memo to me which attaches the documents

18   received from Rumberger?

19        Q.   No.

20        A.   What about is there a letter from -- what

21   about the letter from Rudock to Betman, does that have

22   attach to it documents?

23        Q.   No, but I do have, which might be helpful,

24   Privilege Hearing Document 219, which is a July 29th,

25   1991, letter from you to Nancy Genova telling her that

1    these documents we want Bates stamped and appropriately

2    privileged marked for submission to the plaintiff.

3          A.   I need to do a document by document review,

4    but it certainly seems that there are more pages in this

5    July 29th, 1991, letter attachment than there are in the

6    memo.  I mean, you can just like compare.  This is a

7    thick -- this is a thicker document than this, I'm

8    guessing.  This consists of the documents we received

9    from Rudock.

10         MR. VINES:  I'm sorry, just to make the record

11         cleaner, can we refer to that document as 219 and

12         that one as 218?

13         A.   Yeah, 219 is thicker than 218 and appears to

14    include more additional documents than what are attached

15    to my July 24th, '91 memo, which was 218.

16   BY MR. DONOVAN:

17         Q.   Okay.  And I would concede that that one is a

18    larger package than the other.  So, your recollection is

19    that the 219 documents, which is a larger set of

20    documents, was the totality of the documents which

21    Rumberger sent to Betman after his review of the F-Car

22    Project Center File for roof-related documents?

23         A.   Right, that's my memory is that we decided to

24    produce everything we received from Rumberger.

25         Q.   So, you not only produced the documents which

Page 62

1    are in the memo to you, which is document --

2              MR. FIXEL:  218.

3         A.   218.

4         Q.   -- 218, but you went back and pulled the rest

5    of the Rumberger documents and submitted them also?

6         A.   Yes.

7              MR. VINES:  I'm sorry, Maurice, 218 is from

8         Mr. Coulson to Mr. Langan.  You said it was to him

9         but from him.

10   BY MR. DONOVAN:

11        Q.   You are right.  The documents which you got

12   from Mr. Langan, which were potentially responsive, were

13   increased to the full, which was a subset to the

14   Rumberger documents to Mr. Betman ---

15        A.   I'm a little confused.  I guess the bottom

16   line is that my memory is that Andy and I decided to

17   produce to the plaintiffs --

18        Q.   Right.

19        A.   -- all documents we received from the

20   Rumberger firm in, approximately, July of 1991.

21        Q.   Okay.  Let me just see if I can make that more

22   confusing.  There was the F-Car Project Center File

23   which Rumberger reviewed?

24        A.   Correct.

25        Q.   Then there is the subset of documents which

1    Rumberger said these are the roof-related documents

2    which he sent to Betman?

3         A.   Right.

4         Q.   Then Betman gave those documents to Andy

5    Langan.  He created another subset of those documents,

6    which is the 218 document, which he gave to you for

7    review to see if they were responsive?

8         A.   No.  No.  No.  Andy gave me everything that

9    Rudock had sent to Betman.

10        Q.   Okay.  With that first memo?

11        A.   The first memo was from me to Andy Langan

12   after I had reviewed the documents we received from

13   Rumberger.

14        Q.   I'm sorry.  I'm sorry.  I don't have it in

15   front of me.  So, you created a subset of the Rumberger

16   documents which is 218 --

17        A.   Right.

18        Q.   -- which you gave to Andy Langan?

19        A.   Right.

20        Q.   Okay.  And you said these are the documents I

21   think are responsive to plaintiff's demand to produce

22   and interrogatory questions?

23        A.   Right.

24        Q.   Okay.  And that was a lesser number of

25   documents than the Rumberger set of documents which they

Page 64

1    had pulled?

2         A.   Right.

3         Q.   So you had taken documents that Rumberger sent

4    related to the roofs and pulled out documents and said

5    no, these are not responsive?

6         A.   Right.

7         Q.   And then, after discussing them with Andy

8    Langan you put those documents back in so we were back

9    to the Rumberger subset of documents from the F-Car

10   Project Center File?

11        A.   Right.

12        Q.   And that's what plaintiff eventually got?

13        A.   Right.

14        Q.   Okay.  Why did you decide to pull certain

15   documents out of there only to then go back and decide

16   to submit them?  What was your rationale for pulling the

17   documents out?

18        A.   Well, I reviewed all the documents to

19   determine which, if any, were responsive to document

20   requests or interrogatories as clarified by the judge's

21   order.  The ones I attached to this memo to Andy were

22   the ones I thought were and I sent it to him so he can

23   review them.  And then we discussed them and in the

24   discussions, I'm not sure if it was myself who

25   recommended that we produce everything or Andy suggested

1    it but we were in a consensus with it.

2        Q.   Okay.  But your first view of what was

3    responsive was more restrictive than your later view

4    after discussing it with Mr. Langan?

5        A.   No, I think we sent you some nonresponsive

6    documents.  We said, look, let's just send all of them.

7    I did not change my mind as to whether something was

8    responsive or not.  We just said, look, let's just send

9    all of them.

10       Q.   Do you know the terminology we have been

11   using, the A through H documents, do you know what I am

12   referring to?

13       A.   I think so, based on the hearing we had up in

14   New Jersey.

15       Q.   Just so we are on the same page, I used these

16   yesterday, the A through H documents were addendums to a

17   motion filed to supplement the record before the

18   Appellate Division in New Jersey in the Green versus

19   General Motors cases, which were documents which came to

20   our attention after the trial.  And they were actually

21   addendum A through H, and that's how they became known.

22           This is the motion which was filed which has

23   the original addendum A through H documents exactly as

24   they were submitted to the Appellate Division to review.

25   So, why don't you take a minute and just take a look at

Page 66

1    those?

2         A.   How thoroughly would you like me to read them?

3              Well, I will just look at them briefly and if

4    I need to go back through them to answer a question ---

5         Q.   I am not going to ask you whether you know

6    what word, what specific word on the 12th line of the H

7    document.  Actually, what I should say is you just

8    review them for as much time as necessary to answer the

9    question, have you ever seen these documents before?

10        A.   I may have seen these documents as part of the

11   preparation for this Newman case.

12        Q.   Before that?

13        A.   No, before that I had never seen them.

14        Q.   So, these weren't any of the documents which

15   were in the Rumberger selection from the F-Car Project

16   Center File?

17        A.   That were sent to Kirkland & Ellis?

18        Q.   Yes.

19        A.   Right.  You're right.  These documents of A

20   through H were not included in what Rumberger sent to

21   Kirkland & Ellis in July of 1991.

22        Q.   And you never reviewed these documents to make

23   a decision as to whether they should be produced or were

24   responsive to plaintiff's discovery demand?

25        A.   Correct.  I never reviewed these documents.

1    Q.   Did you ever hear of anybody discussing these

2    alternative design documents which if you go to the end

3    specifically start talking about the Vista Vent and the

4    modified Vista Vent as being two alternative designs?

5    A.   No.

6    Q.   Were you aware that General Motors had

7    considered at any point during the development of the

8    T-roof two additional designs known as the Vista Vent or

9    the modified Vista Vent?

10   A.   No.  Here is a drawing.  I remember seeing

11   this drawing in preparation for the hearing up in New

12   Jersey.

13   Q.   And you had never heard of that before?

14   A.   No.  Well, here it is.  It has the T-hatch,

15   which maybe that's the same exact thing as what's on the

16   F-Cars as sold.  I am not sure, but just looking at

17   this, this Vista Vent, modified T-hatch, no, I've never

18   seen this.  Now, I think there are some cars that have

19   something similar to this like a Porsche 911 Targa has

20   some kind of design that's similar to that.

21   Q.   I just want to show you something else.  I am

22   going to show you what's the addendum H, which is a

23   November 10th, 1978, letter or memo, I don't know which

24   it is, called structural performance of Lancia Spider

25   type roof versus conventional T-roof and at least

Page 68

1    purports to be some kind of comparison between the

2    T-roof and the roof on the Lancia Spider.

3        A.    That's funny.  When you were saying -- I

4    thought you were saying Alancia, not Lancia but in any

5    event, it doesn't really matter because I had not heard

6    of this before.

7        Q.    And you were aware, not -- strike that.

8        A.    Yes, sir, I thought you were saying Alianza,

9    which that's an airline.

10       Q.    Al Italia.

11       A.    Yeah.  Anyway, I had never heard of a Lancia

12   Spider type roof before or even such a thing as a Lancia

13   Spider car.

14       Q.    And you were, obviously, not unaware that GM

15   had conducted some kind of testing for the structural

16   integrity of one versus the other?

17       A.    I want to see if this talks about testing or

18   not.

19            MR. VINES:  The document speaks for itself as

20        to what test was used.

21       A.    I was not aware of the November 10th, 1978,

22   document or the contents of it.

23   BY MR. DONOVAN:

24       Q.    And anything that's referred in there, which

25   may be a subset of documents from there ---

Page 69

1    A.    Okay.  Here is a drawing of a Lancia Spider

2    top roof.  Basically -- this is not a T-top at all.  You

3    have a rail on each side.

4        Q.    That's not the question I asked.  I asked were

5    you aware of any other documents which reflected any

6    type of testing done on a Lancia Spider?

7        A.    No.

8        Q.    Having now looked at those documents, if those

9    documents were among the documents which Rumberger Kirk

10   had sent to you and Mr. Langan gave to you for your

11   review to make a determination as to whether they were

12   responsive to Green discovery demands, would you have

13   considered them to be responsive and put them in a pile

14   of paper to be sent to the plaintiff?

15       A.    Yes.

16       Q.    Why is that?

17       A.    They -- first of all, they related to the roof

18   structure of the F-Car and -- I never looked for years

19   but I am assuming it's '82 to '86, so -- yeah, '82.  I

20   have to look for the scope.  Assuming that these all

21   apply to the '82 to '86 F-Car, some of them talk about

22   alternative designs.  So, certainly, I think you said

23   number 68, which you showed me, dealt with alternative

24   designs.  Some of these would have been responsive to

25   68.  Others may have been responsive to other ones

Page 70

1    dealing with the roof.  If these documents had been part

2    of what was sent to me or sent to the Kirkland & Ellis

3    by the Rumberger firm and if I had reviewed them, I

4    believe that I would have marked them to be produced.

5        Q.    Okay.   And whether they got to plaintiff would

6    not have been your ultimate decision.  It would have to

7    go through the review process we discussed earlier going

8    to higher attorneys at Kirkland & Ellis and then you and

9    going back to General Motors for an engineering review

10   and go back to General Motors for a legal review?

11       A.    Well, I would have run them by Andy Langan and

12   then Andy Langan would have made the decision perhaps

13   with the client, but I don't think -- they would have

14   been produced.  I would have showed them to Andy and

15   they would have been part of the package that we sent on

16   to General Motors to have Bates stamped and marked

17   confidential and then General Motors sent the documents

18   to be produced to New Jersey counsel who would produce

19   them to you.

20       Q.    Let's ask then the million dollar question.

21   Do you know why they were not produced in the Green

22   versus General Motors litigation in response to

23   interrogatory number six or any other discovery demands

24   which may have been responsive?

25       A.    No.

1      Q.   You have no idea?

2      A.   No. I mean, I'm a lawyer myself.  This is

3  based on personal knowledge.  I don't have knowledge.

4      Q.   You are going to tell me it's human error?

5      A.   Pardon me?

6      Q.   You are going to tell me human error?

7      A.   I'm sorry?

8      Q.   You are going to tell me human error?

9      A.   Well, it was not done by computer.

10      Q.   So, if these documents were part of the

11  package of documents in the F-Car Project Center File

12  which Rumberger was to review, your conversation with

13  Mr. Salas to confirm that they had produced everything

14  relevant to the T-roof and the roof structures as

15  required under either Judge Ferentz's order or the

16  document production or the interrogatories, that would

17  not have proved to be true.  Is that correct?

18      A.   Apparently.  I am making the assumption here

19  that these are all from the, that all these documents,

20  the A through H documents, are from the F-Car Project

21  Center Files.  Under that assumption then, yes.

22      Q.   Well, then we will say, if they were part of

23  the documents reviewed by Rumberger's office --

24      A.   Right.

25      Q.   -- when they said they had produced everything

Page 72

1     to you, that would not be a true statement --

2          A.   Right.

3          Q.   -- for whatever reason?

4          A.   Right.

5          Q.   I guess what you are telling me is you don't

6     know whether these documents were part of that F-Car

7     Project Center File because you never reviewed the full

8     F-Car Project Center File.  Correct?

9          A.   Correct.

10         Q.   So, then independently when you received

11    documents which purport to be all the documents related

12    to whatever it was in the F-Car Project Center File, you

13    have no independent way of verifying that one way or the

14    other?

15         A.   Well, we relied on the other firm doing the

16    work.

17         Q.   Okay.  You have no independent way of testing

18    that because you never saw the full lot of documents?

19         A.   Correct.

20         Q.   So, this is dependent upon your trusting

21    another law firm who in turn has to trust that they have

22    got all the documents from General Motors?

23         A.   Right, which is a pretty common thing.  Just

24    last week in a case I have, we did that.  We worked --

25    often outside counsel for various companies work as a

Page 73

1    team.

2             MR. DONOVAN:  We are close to the end of this

3        tape.

4             THE VIDEOGRAPHER:  We are going off the video

5        record.

6             (A recess was taken from 1:38 p.m. to

7        1:45 p.m.)

8    BY MR. DONOVAN:

9        Q.    Mr. Coulson, I am going to show you a document

10   which was marked at the privilege hearing as 228, which

11   is a letter to Joe Murray from you and I think it just

12   comports with what we have been talking about is your

13   confirming for Mr. Murray that the document search

14   conducted by Rumberger's office was broad enough to

15   encompass what had to be produced in Green.  Is

16   that right?  I don't know what the other side is,

17   though.

18       A.    Right, here is this language that we were

19   talking about earlier.

20       Q.    Okay.  In saying that, though, you necessarily

21   had to rely on the fact that General Motors had sent to

22   Rumberger's firm the full compendium of the F-Car

23   Project Center documents.  Correct?

24       A.    Correct.

25       Q.    Okay.  And were you aware that there were

1    documents which were related to the design or

2    manufacture of the T-roof F-Car, which weren't contained

3    within the F-Car Project Center File?

4         A.   I'm not sure I understand the question.  You

5    know, of course there is going to be some design

6    documents that are not in the F-Car -- well, may or may

7    not be in the F-Car Project Center Files but would be

8    maintained at General Motors in a different location.

9         Q.   Was your understanding that Fisher Body may

10   have maintained documents related to the development and

11   design of the F-Car, separate and apart from the F-Car

12   Project Center File?

13        A.   That was possible.

14        Q.   Okay.  Do you know whether anybody ever went

15   through all Fisher Body documents to determine whether

16   there were any roof-related documents?

17        A.   My memory was that Bob O'Hara was engaged to

18   do a review of Fisher Body microfiche which may or may

19   not contain responsive documents.

20        Q.   Were you ever aware of any documents being

21   produced that came out of Mr. O'Hara's search of

22   documents?

23        A.   I don't recall any sitting here.  I am not

24   sure that if he did pick out documents they necessarily

25   went by me, but I'd have to look at my time sheets or

Page 75

1   any other records to remember.

2        Q.   Okay.   Other than possible Fisher Body files,

3   other than the F-Car Project Center File, were you aware

4   of any other repository for F-Car Project Center, F-Car

5   -- strike that.   Other than the Fisher Body and the

6   F-Car Project Center File itself, were you aware of any

7   other body of documents maintained anywhere else that

8   related to the F-Car or the T-roof?

9        A.   Yeah, I was not that familiar with where

10  General Motors would actually maintain the documents but

11  I'm pretty sure we produced design drawings, compliance

12  testing for Federal Motor Vehicle Safety Standards and

13  probably other documents which were maintained at

14  General Motors apart from Fisher Body or the F-Car

15  Project Center.

16       Q.   This August 22nd, 1991 letter, is this with

17  reference to the documents we spoke about earlier, which

18  were the Rumberger documents?

19            MR. VINES:   Which letter is that, Maurice?

20            MR. DONOVAN:   This is the August 22nd, 1991,

21       228.

22            MR. VINES:   Who is it from and to?

23            MR. DONOVAN:   It's from David Coulson to Joe

24       Murray.

25            MR. VINES:   Joe, okay.   Thank you.

1       A.    I am assuming that the letter that you are

2   holding in your hand from August contains the Bates

3   stamped versions of the documents which were attached to

4   my July 29th, 1991, letter to Nancy Genova.

5   BY MR. DONOVAN:

6       Q.    No.  To my knowledge, the microfiche search

7   was broad enough to encompass the judge's specific

8   directions.  The microfiche search we're talking about,

9   is that the Rumberger search?

10      A.    Yes.

11      Q.    Not the O'Hara search?

12      A.    Correct.  It was only the Rumberger.

13      Q.    After your involvement in doing the

14  supplements.  I know that I am not going to go over all

15  of them because they really speak for themselves but

16  there was a point in time where you were drafting

17  interrogatories, answers, then answers responsive to

18  Judge Ferentz's order and then it was supplemental

19  interrogatories and you drafted responses back and forth

20  to that.  Were you involved in any more document

21  production or document review for the Green case?

22      A.    I don't recall.  I'd have to look at my

23  billing records to know.

24      Q.    Okay.  I am going to show you a letter which

25  is Privilege Document 243, Bates ---

1        A.    Can we go back to that?  The timeframe of

2   doing the supplemental responses was after the judge's

3   order.  Right?  So, that would have been in the fall of

4   1990 so I would have been -- I am not sure -- let's put

5   it this way.  After the production in August of 1991 of

6   these documents which were -- I am not sure if this is a

7   supplemental -- after August 22nd, 1991, I don't recall

8   being involved in any further document reviews or

9   document productions.

10       Q.    Just to give you a timeframe, I am going to

11  show you Privilege Document 143, which makes reference

12  to the supplemental interrogatory.  That letter is what,

13  in September of 1990?

14       A.    Right.

15       Q.    And it refers to them being due by November

16  of 1990?

17       A.    Right.

18       Q.    So, those were the supplement to answers to

19  interrogatories?

20       A.    Right.  So, after the interrogatories were

21  supplement -- I want to make sure this is clear on the

22  record, after the interrogatories were supplemented in

23  the fall of 1990, I think I was involved to some extent

24  in document review such as I went to General Motors in

25  October of 1990.  We talked about that.  I may have

Page 78

1    reviewed some research material or technical literature.

2    We talked about that.

3         Q.   In June?

4         A.   Yes, things like that.  And then, of course,

5    in July of '91 and August '91 we received the batch of

6    documents from the Rumberger firm which we ended up

7    producing.

8         Q.   Okay.  I am not asking that to confuse you or

9    trick you --

10        A.   I just got off on the dates.

11        Q.   -- but I want to show you Privilege

12   Document 243, which is a January 23rd, 1992, letter from

13   Nancy Genova to you which makes reference to another set

14   of documents.  So, we're finished with the Rumberger

15   documents in '91.

16        A.   This could be -- I don't remember this but it

17   could be that we had additional documents that were

18   being produced as a supplement.  I just don't remember.

19        Q.   Okay.  That letter refers to documents being

20   sent to you from Nancy Genova?

21        A.   Yes.

22        Q.   And Nancy Genova is one of the, what is it, a

23   project discovery?

24        A.   Product Discovery Group coordinator.

25        Q.   Okay.  She is one of the people who pulls

1    documents in response to discovery demand?

2        A.    It's part of her job.

3        Q.    And she has sent you I don't know how many

4    documents within that Bates numbering.  Can you do a

5    quick math?

6        A.    It's 100,265 through 100,385, so you are

7    talking about 120 pages.

8        Q.    All right.  And you have no recollection

9    whatsoever of what those documents were?

10       A.    It says here, Dan Stacker reply F production

11   figures and then FMVSS 206 compliance documents 82

12   through 92 F-body vehicles.  No, I don't remember this.

13          206 was -- I used to know all the Federal

14   Motor Vehicle Standards.  I forgot now.

15       Q.    216 is roof crush.

16       A.    Right.  214 is side impact.  206 I thought was

17   related to restraint systems, but I don't remember.

18       Q.    I thought it was angle barrier, 206, but I can

19   be ---

20       A.    I don't remember anymore.

21       Q.    With that said, you have no recollection of

22   what these documents were other than just reading this

23   just now?

24       A.    Correct.

25       Q.    Do you have any recollection of why they were

Page 80

1      sent to you?

2          A.   No.

3          Q.   Do you have any recollection of whether they

4      were responsive to anything being sent to you?

5          A.   I'd have to look at my time sheets and any

6      correspondence or memos I had around the timeframe.

7          Q.   And do you know why it says that these

8      documents are not being submitted for production to

9      plaintiff even though they seem to refer to ---

10         A.   No, I think what she is saying is don't take

11     these and send them to the plaintiff's counsel without

12     them going through the General Motors process of putting

13     on unique Bates stamp numbers and confidentiality

14     markings and so forth.  That's how I interpret those.  I

15     don't think she is saying don't give these to

16     plaintiff's attorney.  She is just saying ---

17         Q.   Well, let's read it so we don't have to have

18     an interpretation.  It says, "We understand that the

19     documents are not intended for production to plaintiff's

20     counsel.  Should any of the documents be required for

21     production at a later date, we request that you return

22     them to this office for Bates numbering."

23         A.   Right.

24         Q.   So ---

25         A.   There's two ways of interpreting this.

1    Q.   Well, let me tell you how I interpret it and

2    see if you disagree with it.

3    A.   Okay.

4    Q.   My interpretation is you are getting a set of

5    documents.  She is telling you, don't give these to the

6    plaintiff, at least not yet, and if you have to at some

7    point in time, these are not General Motors stamped and

8    Bates and have the lines through them documents so you

9    got to send them back for the official stamping of them

10   but as it reads right now, we are not producing them now

11   and we don't know if we are producing them at a later

12   date.  Is that a fair reading of that?

13   MR. VINES:  I object to the form of the

14   question.

15   A.   There is a lot in that question.  I'd have to

16   know more context.  It's possible that Andy Langan

17   wanted to see this information for some reason like, for

18   example, this one says Dan Stacker reply, and I don't

19   remember who -- the name sounds familiar but I don't

20   remember who he was.  It says F production figures.

21   Maybe Mr. Langan or one of our expert witnesses wanted

22   to see what were our production figures, how many F-Cars

23   were sold, how many of them were T-roofs.  I don't know.

24   I am just speculating.  That could be something and then

25   I'd want to know what the 206 compliance documents are

4f6db2b3-2b92-461b-8501-293918535e64

Page 82

1    as to why, you know, that would want to be, why anyone

2    would want to review those.

3        Q.   Okay.  Do you have any familiarity with the

4    Johnson versus General Motors case?

5        A.   No.

6        Q.   Okay.  Do you know or -- I am not talking as a

7    result of these hearings but do you know who Mr. Ardis

8    is, Patrick Ardis from Wolf Ardis in Tennessee?

9        A.   No.

10       Q.   Did you have anything to do with any document

11   production to him in that case with Johnson versus

12   General Motors?

13       A.   No.

14       Q.   Okay.  I am going to show you Privilege

15   Document 354, which is a ---

16       A.   I'm assuming that's the Tenn -- my

17   understanding is only from being involved here as a

18   witness in this Federal action that there was a case in

19   Tennessee where documents were produced by General

20   Motors which are those A through H documents and those

21   were given to you and that's -- you filed them with the

22   appellate court.  That's my assumption but I only know

23   that from the preparation for this case.

24       Q.   Let me show you Privilege Document 354.  It's

25   a July 23rd, 1991, memo from the firm of Kirkland &

1    Ellis.  It's to a bunch of people at Kirkland & Ellis --

2    did I see your name on it?  Yes, your name is on it and

3    it's from Jerri Dassie.

4          Do you know who Jerri Dassie is?

5          A.   My understanding is she was a paralegal at

6    Kirkland & Ellis.

7          Q.   Okay.  And it's announcing that you are now in

8    possession of F-Car documents relative to T-roofs.

9          A.   Okay.  What is your question?

10          Q.   Okay.  Do you recall anything about that memo?

11          A.   I would have already -- this is a list of

12    attorneys who worked with John Hickey in General Motors'

13    defense and I probably did receive it.  I don't

14    independently remember it.

15          Q.   Okay.  Do you know whether those documents in

16    that form which they are described in that letter were

17    ever produced to plaintiff in Green?

18          A.   These are the -- I'm pretty sure these are the

19    documents that we received from Rudock at Rumberger,

20    Kirk, which we produced.

21          Q.   The documents which are attached to the 218?

22    Look on the back, please.

23          A.   Right, this ---

24          Q.   Let me just get the number for the record.

25    Turn that one over.

Page 84

1    A.   219.

2    Q.   219.

3    A.   Which one is 218?

4    Q.   218 is the smaller subset.

5    A.   Right.  This July 23rd, 1991, memo from Jerri

6    Dassie was referencing the documents which were attached

7    to the July 29th, 1991, letter I sent to Nancy Genova.

8    Q.   So you believe those are the same set of

9    documents that now was going to become the documents

10   which were served in T-roof cases were the same set of

11   documents as next to 219?

12   A.   I believe that you said something about served

13   in T-roof type cases.  I am not sure what you are

14   talking about as far as that goes, but this Jerri Dassie

15   memo is referencing a set of documents which are

16   attached to my July 29th, 1991, letter to Nancy Genova

17   of General Motors.

18   Q.   What letter is that, 350?

19   MR. FIXEL:  354.

20   MR. VINES:  Which one?

21   MR. DONOVAN:  354.

22   A.   You see, it says -- the last sentence of Jerri

23   Dassie's memo states in parenthesis, Andy Langan and

24   Dave Coulson have each received a set for their review

25   in Michael Green versus General Motors.  This is

1    probably where it's possible Jerri Dassie sent me this

2    memo at the same time -- she may have sent me this memo

3    with the documents attached whereas everybody else just

4    simply received the memo without documents.  That's

5    probably what happened.

6        Q.   She doesn't make reference in this to them

7    being Rumberger documents but that's your recollection

8    that these were the Rumberger selected documents from

9    the F-Car Project Center File?

10       A.   Yes.

11       Q.   And your recollection is that this set of

12   documents referred to in the 354 privilege hearing

13   document is the same set of documents referred, attached

14   to 219 of the privilege documents?

15       A.   Yes.

16       Q.   Do you have any familiarity with General

17   Motors' document retention policies?

18       A.   It's possible I did at one time, but I don't

19   remember.

20       Q.   Sitting here now, you have no specific

21   recollection?

22       A.   At one time I am sure I did.  I don't now.

23       Q.   Did you ever factor into their

24   document retention -- did you ever factor into

25   consideration whether all documents had been reviewed,

4f6db2b3-2b92-461b-8501-293918535e64

1    the fact that there is a document retention policy which

2    may have destroyed certain documents?

3         A.   Well, that's a very broad question.  I am not

4    sure how to answer that.  That would depend on the

5    contents.

6         Q.   When you produce documents like in the letter

7    here said you believe that the search encompassed all

8    which was asked for by way of discovery, did you ever go

9    and say, well, let me see if there was a document

10   retention letter or a purged letter or a destroyed

11   documents letter which may have interfered with the

12   ability to review all the documents because they no

13   longer existed?

14        A.   I am not sure I understand your question.  Are

15   you referring to the F-Car Project Center Files?

16        Q.   I am talking in any discovery that you did for

17   General Motors during the course of your career.

18        A.   Well, the obligation is to produce documents

19   in the company's possession, custody or control.

20        Q.   Okay.

21        A.   If those documents have been destroyed through

22   the normal process or otherwise, obviously, they are not

23   there to be reviewed or produced.  I am not sure I

24   understand your question.  I mean, that's -- in every

25   case we you're producing documents there is always a

1   possibility the documents were not retained.

2        Q.   Okay.  But do you specifically look to see

3   whether documents might have been destroyed which might

4   have contained relevant information?

5        A.   There could be particular times when, yeah,

6   you would make that inquiry but I can't talk about it in

7   the abstract.

8        Q.   But do you relate that to plaintiff's counsel

9   that we are going to be unable to produce these series

10   of documents because they have been purged, they have

11   been destroyed under our retention policy or General

12   Motors' document retention policy when you find that to

13   be the case?

14        A.   It depends on the context.  If plaintiffs are

15   asking for particular documents -- suppose there is --

16   here is an example.  Suppose a document is produced

17   which references another document, let's say an

18   engineering report dated a certain date, let's say

19   August 1st, 1995.  The plaintiff's counsel comes back

20   and says we'd like to see that engineering report from

21   August 1st, 1995.  And then we go search for it and that

22   search may determine that those were in files that

23   belonged to Joe Smith who used to work at General Motors

24   but he retired and generally when someone retires their

25   documents are not retained or -- that's just an example.

1    That could happen.  And then you tell a plaintiff's

2    lawyers, no, look, these were documents maintained by an

3    engineer who is no longer with General Motors and we

4    believe the documents no longer exist.  That could

5    happen.

6           But, in general, when you are just simply

7    producing documents to, document requests for

8    interrogatories, there is no investigation to recreate

9    every document that could have existed in time and then

10   figure out the life history of the document.

11        Q.   Or in the normal case any identification that

12   it might be destroyed in a certain series of documents

13   referable to that car year or that car description or

14   that car letter?

15        A.   I mean, to do a investigation like that would

16   just be time insensitive and expensive, and I don't

17   think it's required by rules that I'm aware of to do it.

18   It's not something typically done.

19        Q.   Wouldn't you just have to look at the purge

20   letter that describes what is to be destroyed, what

21   years and identifies what it is?

22        A.   Like I said, for a particular document or

23   something that's very specific you may go through an

24   investigation like that, but in general, no, that's not

25   done in any litigation that I am aware of.

1        Q.    Did you ever participate in attendance at a

2    discovery meeting in the Green case?

3        A.    No.  Well, what you do mean?  Where?

4        Q.    Yes.

5        A.    At General Motors, no.

6        Q.    Not internally at Kirkland & Ellis?

7        A.    Right.  Internally at Kirkland & Ellis

8    obviously I would have been part of telephone

9    conferences that included Joe Murray, perhaps Tom

10   Tansey, Joe Rice, whoever the product discovery

11   coordinator was and whoever the attorney was at General

12   Motors.  Not all of them but some of them I would have

13   attended.

14       Q.    Did -- I'm sorry, I asked that question a long

15   time ago.  You never had another F-Car Project Center

16   case so I guess you never produced those documents that

17   they gave you for those?

18       A.    Right, I never dealt with the F-Car again.

19       Q.    Did you have any discussion or communication

20   with Joe Rice?

21       A.    After Green?

22       Q.    In the Green case, I'm sorry?

23       A.    Within the Green case, yes, I did have

24   discussions with Joe Rice.

25       Q.    What were they with reference to?

Page 90

1          A.    I went out to the vehicle ---

2          Q.    Let me ask you a different way.  Did those

3    discussions have anything to do with production of

4    discovery?

5          A.    Yes.  Well, it was -- I went out with Mr. Rice

6    for the vehicle inspection in New Jersey.  I recall

7    seeing the accident scene and the car itself, and then I

8    would have been in telephone conferences where Joe Rice

9    was on the conference call where we discussed responding

10   to interrogatories and document request and what

11   documents we may want to search for and so forth.  It's

12   possible that I had some one-on-one conversations with

13   Joe Rice during the course of discovery in the Green

14   case.  That's what I remember.

15         Q.    You were not at all involved in any of the

16   appeal work or writing of the brief on appeal or

17   reviewing the brief on appeal in the Green case, were

18   you?

19         A.    Correct, except as involved with the appeal of

20   the decision to deny the motion to recuse.

21               Putting the recusal appeal aside, as to the

22   appeal that occurred after this Green Two trial, I had

23   zero involvement.

24         Q.    Were you ever provided with a copy of the

25   brief to read?

1    A.    No.

2         MR. DONOVAN:  I had a question that went just

3    right out of my head.  Maybe that's a good thing.

4         MR. VINES:  Brain cramp.

5         MR. DONOVAN:  I think I am done.

6         MR. VINES:  Do you want to take a minute to

7    think about it?

8         MR. DONOVAN:  Well, do you want to ask him

9    questions?

10        MR. VINES:  I need to kind of study my notes

11   for a minute or two.

12        MR. DONOVAN:  I can ask your questions if you

13   want.

14        MR. VINES:  You have heard them enough now.

15        MR. DONOVAN:  I can answer them for you, too.

16        MR. VINES:  Let's just go off the record

17   briefly and we will be ready to go.

18        THE VIDEOGRAPHER:  Going off the video record.

19        (A recess was taken from 2:11 p.m. to

20   2:24 p.m.)

21        THE VIDEOGRAPHER:  We are back on the video

22   record.

23        MR. DONOVAN:  We took a little break,

24   Mr. Coulson.  I reviewed my notes and I have no

25   further questions for you at this time, but I'd

1    like to thank you for your courtesies and the use

2    of your office and everybody has been very

3    hospitable.

4          THE WITNESS:  You are welcome.

5          MR. DONOVAN:  All yours.

6          MR. VINES:  Just a little bit of homework or

7    housekeeping right at the beginning.  We'd just

8    like to preserve our objection to the use of this

9    deposition at trial in the basis that Mr. Donovan

10   is in the dual role of attorney and witness in the

11   case.  It's perfectly appropriate for him to be

12   participating in pretrial activities under the

13   Court's previous orders but he is not permitted to

14   appear in attorney capacity at trial so we will

15   preserve that objection for later.

16                    CROSS-EXAMINATION

17   BY MR. VINES:

18   Q.   Mr. Coulson, if you would take another look at

19   this document that you looked at earlier which was

20   Privilege Hearing or Show Cause Hearing Document Number

21   243 and if you would, read the first sentence of the

22   record, please.

23   A.   "The Product Discovery Group is providing a

24   set of documents for attorney review bearing Bates

25   numbers 100,265 -- 100,385."

Page 93

1    Q.   Is it fair to say that that's Ms. Genova

2    sending you that letter transmitting those documents for

3    you or the Kirkland & Ellis firm to do that review?

4    A.   That's what I would assume.

5    Q.   Is that your best knowledge of what that

6    letter is instructing you to do as outside counsel?

7    A.   Right.   These are sent for an attorney review,

8    meaning General Motors would like an attorney to review

9    these.

10   Q.   So, is it your understanding ---

11   A.   But I don't think -- Nancy Genova being a

12   Product Discovery Group coordinator does in fact do

13   that.   She coordinates.   She is not someone who is

14   giving instruction, giving some kind of strategic

15   instruction to me.   She is just simply passing the time

16   saying, you know, for attorney review means this is to

17   be reviewed by an attorney before production.

18   Q.   Right.   So, what I am really driving at is the

19   documents that accompany that letter would it be your

20   understanding that you or Kirkland & Ellis were to

21   review those documents for discovery purposes in the

22   Green case?

23   A.   For discovery purposes or purposes related to

24   the case for sure.

25   Q.   So, is it possible that she was -- strike

1    that.  Walk us through the letter again, if you would,

2    from the standpoint that those were documents being

3    transmitted to you for the purpose of you or Kirkland &

4    Ellis doing a review of them.  What do you think that

5    letter tells you to do following your review?

6        A.    She is saying that if the decision is made to

7    produce these documents that they be returned to her

8    office for Bates numbering and then there is this

9    confidentiality type of stamp that would typically be

10   put on them if they are confidential.

11       Q.    So, is it fair to say that the documents that

12   you received with that transmittal weren't in a format

13   that were suitable for production, even if they were

14   deemed to be responsive?

15       A.    That's my assumption.  What makes it difficult

16   for me to determine that is these lines that are going

17   crisscross across the paper, I don't know if that's, if

18   those lines were there in the original that was received

19   in January 23rd, 1992, or whether these were

20   subsequently placed on this document because they were

21   produced, for example, in this Newman case.  That makes

22   it hard.

23       Q.    Okay.  Is it fair to say that she is asking

24   you to return to General Motors the documents you deem

25   responsive so that they can put proper notations on the

1       documents before they are produced to opposing counsel?

2               MR. DONOVAN:  Object to the form of the

3           question.  You are asking Mr. Coulson to interpret

4           somebody else's intent.  The document speaks for

5           itself and Mr. Coulson has provided whatever

6           understanding he has of it and now he is just

7           interpreting something that you are interpreting

8           for him.

9       A.   I am not trying to be difficult.  I am just

10      confused by the document because in the lower left

11      corner it states for attorney review only in Green

12      Second Action versus GM, and I am not sure what that

13      refers to.

14      BY MR. VINES:

15      Q.   Okay.

16      A.   Like I said, I am not sure these are -- these

17      simply may have been documents that either outside

18      counsel or an expert witness wanted to consider and they

19      may not have been documents that were possibly

20      responsive to a document request.  But I am not sure if

21      the plaintiff's request for production figures, for

22      example, or if that would be responsive.  I'd have to

23      look at all the requests.

24      Q.   Okay.  Earlier we were looking or you were

25      looking at documents that were referred to commonly in

Page 96

1    this litigation as A through H.  Do you recall that?

2         A.   Yes.  I saw them earlier today.

3         Q.   Mr. Donovan asked you if you were aware why A

4    through H weren't produced in the Green litigation to

5    the Green plaintiffs.  Do you recall that?

6         A.   I don't remember his exact question but he was

7    asking about the documents.

8         Q.   Do you remember roughly that he asked you why

9    they weren't produced?

10        A.   Yeah, I don't remember the exact question but

11   I think my answer is I don't know.

12        Q.   Okay.  Is it possible that if they weren't

13   produced to the plaintiffs that it was due to human

14   error?

15             MR. DONOVAN:  Object to form of the question.

16        A.   That's possible.  When I say it's possible, I

17   mean, there was nothing intentionally done to not

18   produce documents that someone would have thought was

19   responsive.

20   BY MR. VINES:

21        Q.   There were some questions earlier relating to

22   document retention policies.  Do you recall those?

23        A.   Yes.

24        Q.   Are document retention policies common in

25   large corporations?

1          MR. DONOVAN:  Objection.  You are asking for

2     an expert opinion.

3  BY MR. VINES:

4     Q.   In your experience in working as counsel for

5  large corporations?

6     A.   In my experience, yes, most corporations have

7  document retention policies.

8     Q.   In your experience, what do companies do to

9  reconcile their document retention policies with the

10  need to retain documents for discovery purposes in

11  litigation?

12          MR. DONOVAN:  Object to the form of the

13     question.  It calls for expert testimony.

14          MR. VINES:  I am asking him in the capacity as

15     a practicing attorney whose practice commonly

16     includes litigation defense for large corporations.

17          MR. DONOVAN:  We have not established that

18     unless you want to qualify him as an expert.

19     A.   If documents are scheduled to be -- typically,

20  if documents are scheduled to be purged or destroyed in

21  the normal course of business but then there is a

22  litigation action that arises where the documents may be

23  responsive or relevant in that litigation, then often

24  times there will be a hold placed on the destruction of

25  the documents.

Page 98

1    Q.   And can you describe what a hold means?

2    A.   It means there is, the company puts out

3    instructions to not throw away or destroy documents.

4    Q.   So, would it be fair to say that means that

5    the company is instructing it's employees to suspend

6    operation of the document retention policy with respect

7    to the documents that are responsive to that litigation?

8    A.   I am not sure if I'd actually say suspend the

9    document retention policy because I think a lot of

10   document retention policies contemplate there could be

11   holds placed on the destruction of documents but I think

12   the gist of your question is would that mean if there is

13   a hold placed would that stop the normal process of

14   destroying documents.  The answer to that is yes.

15   Q.   Just to be clear what I'm asking, to the

16   extent that a document retention policy operates to

17   cause the destruction of documents under the normal

18   operation of the policy, do holds stop that destruction

19   with respect to documents relative to litigation?

20   A.   Yes.

21   Q.   Was it your experience in working with General

22   Motors that they followed proper hold procedures

23   relative to lawsuits that they faced?

24   A.   In all the cases I had for General Motors, I

25   never ran into an issue of General Motors having not

1    appropriately held documents or stopped the destruction

2    of documents that were scheduled to be destroyed.  I

3    have never had an issue or anything like that in any of

4    the cases where I represented General Motors.

5        Q.   Let me tell you that the three claims in the

6    case brought by the plaintiff in this -- by this case I

7    mean the Newman litigation -- are grounded in negligence

8    fraud in the New Jersey State R.I.C.O. statute.

9          In your working with General Motors in the

10    Green case, did you ever witness any conduct on the part

11    of General Motors' employees, in-house counsel,

12    etcetera, that struck you as being unreasonable or

13    negative behavior relative to discovery practices in the

14    case?

15        A.   No.

16        MR. DONOVAN:  Object to the form of the

17    question.

18        A.   No.

19    BY MR. VINES:

20        Q.   With respect to the same case and the same

21    people and the discovery in those cases, did you ever

22    witness any conduct that struck you personally as being

23    evident of any intentionally fraudulent behavior in

24    their part?

25        MR. DONOVAN:  Object to the form of the

1       question.

2           A.   No, absolutely not.

3       BY MR. VINES:

4           Q.   To the extent that the New Jersey R.I.C.O.

5       statute is predicated on an enterprise formed to commit

6       fraudulent conduct for the benefit of the malfeasance

7       did you see any evidence of that sort of behavior on the

8       part of any General Motors ---

9               MR. DONOVAN:  Object to the question.  It

10              doesn't define R.I.C.O. accurately and this witness

11              has not been established as an expert in R.I.C.O.,

12              especially New Jersey R.I.C.O.

13          A.   No.  I have handled many R.I.C.O. cases under

14      Federal R.I.C.O. and under the R.I.C.O. statutes of

15      various states.  I don't recall a case under a New

16      Jersey R.I.C.O., but, typically, the state laws are

17      modeled under Federal law.

18          Q.   Just in terms of your understanding of those

19      terms, I also should ask you, did you see anything that

20      you would characterize as racketeering conduct on the

21      part of General Motors?

22              MR. DONOVAN:  Note my objection.

23          A.   Absolutely not.

24              MR. VINES:  That's all I've got.

25

1                      REDIRECT EXAMINATION

2      BY MR. DONOVAN:

3          Q.   I've just got a couple.  You said it was

4      possible that it was human error that the A through H

5      and perhaps other documents were not produced by way of

6      discovery in Green versus General Motors by General

7      Motors because it was human error possible.  Correct?

8          A.   Yes.

9          Q.   I would assume it would be just as possible

10     that someone intentionally pulled those documents to

11     deprive the plaintiff of those documents by way of

12     discovery in Green versus General Motors.  Isn't that

13     just as possible?

14         A.   No.  I got to tell you, I can't conceive of

15     that having happened.  I cannot conceive that anyone at

16     General Motors, the Rumberger firm, Kirkland, Tansey's

17     firm intentionally withheld documents or engaged in

18     other intentional conduct related to those documents.

19         Q.   Do you know every person who has ever had

20     access to or handled the documents in question in this

21     case or in the Green case, I'm sorry?

22         A.   No.

23         Q.   Okay.  So, you can't vouch for the reputation

24     or you can't rule out -- you can't vouch for the

25     integrity or the ethics of all the people who may have

1   come in contact and handled these documents, can you,

2   because you don't know them all?

3        A.   I can vouch for the integrity of Tom Sokowski

4   (phonetic) and John Brown and General Motors, for Nancy

5   Genova and Susan Rhodes at General Motors.

6        Q.   That's not my question.  My question was, you

7   just said you don't know everyone who handled these

8   documents.  I am asking you whether you can vouch for

9   the reputation and integrity of everyone -- that you

10   can't vouch for the reputation and integrity of everyone

11   because you don't know everyone who handled these

12   documents.  Is that correct?

13        A.   That is correct.

14        Q.   Okay.  And you are certainly aware, being

15   involved with corporate defense work and just being a

16   normal person who probably reads the paper, that there

17   are corporations who hide documents so as to avoid

18   potential exposure in lawsuits.  Correct?

19        A.   I have read about it in some cases and you see

20   some articles about it.

21        Q.   Enron comes to mind as a case where documents

22   were not produced which should have been produced?

23        A.   I'm not familiar.  I haven't read any of the

24   books in Enron.  I know Enron was a controversial

25   situation but I don't -- in terms of documents, I have

Page 103

1  no idea.

2      Q.   And as you testified earlier, your ability to

3  confirm the full compliance in document production is

4  based upon things other people told you about what they

5  did and your reliance on that?

6      A.   Yes.

7      Q.   I think you told us you never handled a case

8  under New Jersey R.I.C.O.

9      A.   I don't recall one.  It's possible but none

10 come to my memory.

11     Q.   And you say the law is usually modeled after

12 Federal law but you don't really know that, do you?

13     A.   No, it's just an assumption in all the cases

14 where I've handled -- in all the R.I.C.O. cases I've had

15 which have involved state R.I.C.O. statutes, typically

16 they are modeled on the Federal statute.

17     Q.   But that is an assumption about New Jersey on

18 your part?

19     A.   Yes, just an assumption.  I am not even making

20 that assumption really.

21     Q.   And if you are familiar with R.I.C.O., you

22 certainly are aware that in different states different

23 courts interpret their R.I.C.O. statute, even if it's

24 modeled after the Federal law, in different ways?

25     A.   Yes.

1    Q.   And there is a great deal of discussion in the

2    law about what constitutes a conspiracy to commit

3    racketeering, wouldn't you agree with that?

4    A.   I haven't researched the conspiracy law in New

5    Jersey so I can't answer the question.

6    Q.   And there is a great deal of legal and

7    scholarly writing and difference in terms of what

8    constitutes the entity involved in the racketeering.

9    Would you agree with that?

10   A.   You mean the enterprise?

11   Q.   I'm sorry, the enterprise.  There are

12   different legal scholars who take very different

13   positions on what constitutes an entity -- not an

14   entity, an enterprise.

15   A.   Right.  There is a lot of case law on what's

16   an enterprise.  The case law is evolving still.

17   Q.   Have you looked at New Jersey case law on what

18   New Jersey defines an enterprise to be?

19   A.   No, but it just reminded me that I am familiar

20   with one case that involved in May -- I can't remember

21   if it involved -- it was in New Jersey in Federal court,

22   but I can't remember if it was only a Federal R.I.C.O.

23   or whether there was a state component with it either,

24   but I wasn't that familiar with it so it really doesn't

25   change my answers.

4f6db2b3-2b92-461b-8501-293918535e64

1     Q.   Let's go back to my question.  You have not

2    researched New Jersey case law with respect to what

3    constitutes an enterprise for the purpose of

4    establishing a R.I.C.O. claim?

5     A.   Correct.

6     Q.   Do you know how many predicate acts one has to

7    have in New Jersey in order to qualify as a R.I.C.O.

8    claim?

9     A.   I'd have to look at the statute.

10     Q.   And that differs from place to place?

11     A.   Usually predicate acts is two or more but I'd

12    have to look.  I mean, there's the continuity

13    requirement.

14     Q.   There is a whole bunch of case law on this?

15     A.   Right.

16     Q.   Are you familiar with the case law in New

17    Jersey as to what constitutes a fraud under New Jersey

18    law either statutory or case law interpretation?  Have

19    you studied that?

20     A.   Oh, I may have in the past under New Jersey

21    law.  It's possible I have researched that in the past,

22    but based on any notion of fraud that I'm aware of, no

23    fraud occurred here.

24     Q.   Okay.  Let me ask you the question again

25    because you seem to want to answer your questions not my

1  questions.  I am asking you whether you have any

2  knowledge sitting here, because today is when you

3  answered the question that GM was not guilty of fraud,

4  sitting here today do you have any knowledge of what

5  would constitute a fraud in New Jersey under New Jersey

6  statutes and New Jersey case law?

7      A.   My assumption is that it requires an

8  intentional misrepresentation of material fact that was

9  reasonably relied upon.

10     Q.   I am asking you if you know the law in New

11 Jersey.  I am asking you if you know the law in New

12 Jersey.  I know the general law.  I am asking you if you

13 are familiar with the New Jersey law.  Have you looked

14 at it recently?

15     A.   Let's put it this way; I haven't looked at the

16 law previously in New Jersey.

17     Q.   Do you know the magistrate in this case has

18 found a prima facie case of fraud on behalf of General

19 Motors in this case?

20     MR. VINES:  That assumes facts not in evidence

21     in this deposition.

22     A.   There was a crime of fraud finding but that's

23 not fraud in the sense of a cause of action.

24     MR. VINES:  That doesn't go to the ultimate

25     question of law in the case.

Page 107

1    BY MR. DONOVAN:

2         Q.    I'm not so sure.   I'm not so sure.

3              Were you aware that the magistrate has found a

4    prima facie cause in order to strike attorney-client

5    privileges?

6         A.    She found that the crime fraud exception

7    applied but that's a much fuzzier concept sort of like

8    fraudulent transfers is another sort of more fuzzy

9    concept than what I am familiar with is the cause of

10   action for fraud.   When I said there's no fraud here I'm

11   talking about a cause of action for fraud.

12        Q.    She found much more than just a basis to

13   strike attorney-client privilege on the basis of crime

14   of fraud, didn't she?

15             MR. VINES:   Object to the form of the

16        question.   Assumes facts not in evidence.

17   BY MR. DONOVAN:

18        Q.    She found it on a number of bases.   Are you

19   aware of that?

20             MR. VINES:   Object to the form of the

21        question.   Assumes facts not in evidence.

22        A.    I read the order.   It may have been a redacted

23   version.   It was some time ago and I don't remember it

24   specifically.

25        Q.    The order or the opinion?

1       A.   Isn't an opinion an order?  I thought it was

2  an order also.  It was the order and opinion or opinion.

3       Q.   Did you read Judge Hayden's opinion affirming

4  Judge Shwartz?

5       A.   No.

6       Q.   Did you read the Third Circuit's opinion

7  confirming Judge Hayden and confirming Judge Shwartz?

8       A.   No.

9       Q.   Are you familiar with what constitutes

10  spoliation of evidence in New Jersey under various case

11  law?

12       A.   No.

13       Q.   I don't know what my question was way back

14  then when I couldn't remember.  Do you know whatever

15  happened to those documents referred to in, I think it

16  was 352, that document in front of you, which were the

17  documents sent by Nancy Genova?

18       A.   You mean in 243?

19       Q.   243.

20       A.   No.  No.  Let's see, which one are you talking

21  about?

22       Q.   Is that the one that -- let me see.

23       A.   Why don't you just go by the date?

24       Q.   Yes, it's a January 23rd, 1992, letter to you

25  from Nancy Genova.  It's Privilege Hearing Document 243

Page 109

1   Bates number 1357.  Do you know whatever happened to

2   those documents?

3       A.   Sitting here today, I have no independent

4   recollection, but if I looked at my time sheets that

5   would help.  There might be other correspondence or

6   memos between Mr. Langan and me for all I know.

7       Q.   Do you know whether that document, those

8   documents were ever turned over to the plaintiff or not?

9       A.   I don't know.  I don't remember, but you

10  should be able to tell if you look in the -- I am sure

11  there is a log of all the documents that were produced.

12          MR. DONOVAN:  I have nothing further.  Thank

13      you.

14          MR. VINES:  I just have a couple.

15                  RECROSS-EXAMINATION

16  BY MR. VINES:

17      Q.   Respecting the people involved in the

18  discovery process in the Green litigation you had

19  personal familiarity with and within your understanding

20  of the word conspiracy, did you witness any conduct

21  among that group that would strike you as the acts of a

22  conspiracy to commit wrongdoing in discovery in the

23  Green litigation?

24          MR. DONOVAN:  Object to the form of the

25      question.

1        A.    No, absolutely not.  There was no conspiracy.

2    BY MR. VINES:

3        Q.    Okay.  With respect to that same group in the

4    litigation in Green and the discovery in the Green

5    litigation and in your understanding as an experienced

6    counsel, defense counsel in this area and your

7    understanding of the word spoliation, did you ever

8    witness any conduct by that group that constituted in

9    your mind spoliation of evidence?

10        A.    No, not under any laws of spoliation that I am

11    aware of.

12            MR. VINES:  Thank you.  That's all I have.

13            MR. DONOVAN:  I have nothing further.

14            THE VIDEOGRAPHER:  Going off the video record.

15            (The deposition was concluded at 3:00 p.m.)

16

17                              -   -   -

18

19

20

21

22

23

24

25

1                      CERTIFICATE OF OATH

2


3      STATE OF FLORIDA
       COUNTY OF MIAMI-DADE
4


5


6            I, the undersigned authority, certify that

7      DAVID COULSON personally appeared before me and was duly

8      sworn.

9            WITNESS my hand and official seal this

10     25th day of August, 2008.

11

12

13

14     _____
                     Patricia Benedit, FPR
15                   Notary Public - State of Florida
                     My Commission No. DD538979
16                   My Commission expires 4/17/2010

17

18

19

20

21

22

23

24

25

Page 112

1                    REPORTER'S CERTIFICATE

2

3          STATE OF FLORIDA
           COUNTY OF MIAMI-DADE

4

5

6                    I, Patricia Benedit, Florida Professional
           Reporter and Notary Public in and for the State of
           Florida at large, do hereby certify that DAVID COULSON
7          was by me first duly sworn to testify the whole truth;
           that I was authorized to and did report said deposition
8          in stenotype; and that the foregoing pages, numbered
           from 1 to 114, inclusive, are a true and correct
9          transcription of my shorthand notes of said deposition.

10                   I further certify that said deposition was
           taken at the time and place hereinabove set forth and
11         that the taking of said deposition was commenced and
           completed as hereinabove set out.

12

13                   I further certify that I am not an attorney or
           counsel of any of the parties, nor am I a relative or
           employee of any attorney or counsel of party connected
14         with the action, nor am I financially interested in the
           action.

15

16                   The foregoing certification of this transcript
           does not apply to any reproduction of the same by any
           means unless under the direct control and/or direction
17         of the certifying reporter.

18                   IN WITNESS WHEREOF, I have hereunto set my
           hand this 25th day of August, 2008.

19

20

21                   _____
                     Patricia Benedit, FPR

22

23

24

25

1                        E R R A T A   S H E E T

2       IN RE:  STEVEN NEWMAN V. GENERAL MOTORS
        DEPOSITION OF:  DAVID COULSON TAKEN:  August 20, 2008
3            DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
        PAGE #   LINE #    CHANGE                  REASON
4       _____

5       _____

6       _____

7       _____

8       _____

9       _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19      _____

20      _____

21      _____
        Please forward the original signed errata sheet to this
22      office so that copies may be distributed to all parties.

23      Under penalty of perjury, I declare that I have read my
        deposition and that it is true and correct subject to
24      any changes in form or substance entered here.