**<u>EXHIBIT 3</u>**

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY


STEVEN NEWMAN,

      Plaintiff,

   -vs-                      CIVIL ACTION NO. 02-135 (

KSH)


GENERAL MOTORS CORPORATION,

      Defendant.

_____ /


PAGES 1 TO 60


The Videotaped Deposition of MYRNA ADE

Taken at 400 Renaissance Center

23rd Floor

Detroit, Michigan

Commencing at 4:33 p.m.

Wednesday, September 17, 2008

Before Anne H. Chilton, RMR, RPR, CSR-3669

## Page 2

1    APPEARANCES OF COUNSEL:
2    MAURICE J. DONOVAN, ESQUIRE
3    Benjamin M. Del Vento, P.C.
4    70 South Orange Avenue
5    Livingston, New Jersey 07039
6    (973) 758-1801
7         Appearing on behalf of the Plaintiff.
8
9    JAMESON B. CARROLL, ESQUIRE
10   MICHAEL WEISS, ESQUIRE
11   King & Spalding, LLP
12   1180 Peachtree Street, N.E.
13   Atlanta, Georgia 30309-3521
14   (404) 572-4600
15   -and-
16   RONALD C. PORTER, ESQUIRE
17   General Motors Legal Staff
18   MC 482-02-205
19   PO Box 400
20   Detroit, Michigan 48265
21   (313) 665-7421
22        Appearing on behalf of the Defendant.
23
24   ALSO PRESENT:
25        MARC MYERS, VIDEOGRAPHER

## Page 3

1    Detroit, Michigan
2    September 17, 2008
3    About 4:33 p.m.
4         VIDEOGRAPHER: We are now on the
5    record.
6         This is the videotaped deposition of
7    Myrna Ade being taken in Detroit, Michigan.
8         Today is Wednesday, September 17th,
9    2008. The time is now 4:33 and 13 seconds p.m.
10        And can the attorneys please state
11   their appearances for the record and the court reporter
12   please swear in the witness.
13        MR. DONOVAN: Good afternoon.
14   Maurice J. Donovan of the law firm of Benjamin M. Del
15   Vento appearing on behalf of Steven Newman, executor
16   under the will of Michael Green, deceased.
17        MR. CARROLL: Jamie Carroll for GM.
18        MR. WEISS: This is Mike Weiss for
19   GM.
20        MR. PORTER: Ronald Porter from the
21   GM legal staff.
22        MYRNA ADE,
23   having first been duly sworn, was examined and
24   testified on her oath as follows:
25        MR. DONOVAN: Do you prefer Ms.,

## Page 4

1    Mrs., or Miss?
2         THE WITNESS: It doesn't matter.
3         MR. DONOVAN: Doesn't matter?
4         THE WITNESS: No.
5         MR. DONOVAN: Okay.
6    EXAMINATION BY MR. DONOVAN:
7         Q.   Ms. Ade, my name is Maurice Donovan.
8         A.   Okay.
9         Q.   I'm an attorney. I represent the plaintiff
10   in a lawsuit which has been filed in the Superior Court
11   of New Jersey in Essex County, which was filed there
12   and then it got transferred to the Federal Court for
13   the District of New Jersey. We're here today for the
14   purpose of taking your deposition. It's a little
15   similar to the testimony you gave previously in this
16   case a few years ago, but, obviously, there's no judge
17   here, you know --
18        A.   Um-hum.
19        Q.   -- in order to preside over the testimony.
20             Basically this is a question and
21   answer session. I and maybe Mr. Carroll are going to
22   ask you some questions and I hope you're going to give
23   us the answers to those questions.
24             Do you understand the nature of the
25   proceeding?

## Page 5

1         A.   I do.
2         Q.   Have you been deposed before in any other --
3         A.   Yes.
4         Q.   You have.
5         A.   Um-hum.
6         Q.   And you're not talking about the testimony
7    you gave --
8         A.   No.
9         Q.   Okay. Is that part of your -- was that part
10   of your personal business or part of your business as
11   an employee of the company?
12        A.   One was personal and one was employee.
13        Q.   Okay. So you know generally what we're
14   going to do here.
15        A.   Um-hum.
16        Q.   Okay. You know that you've been sworn to
17   tell the truth and the testimony you give --
18        A.   Right.
19        Q.   -- has to be the truth.
20        A.   Um-hum.
21        Q.   Okay. One thing I'm going to tell you is
22   because we're talking at the same time, and people
23   normally do that, but in a deposition we can't do that
24   because otherwise the court reporter gets really upset
25   because she can't take down -- she's really good, but

Page 6

1  she can't take down two people at the same time.
2      A.  Okay.
3      Q.  And sometimes then it'll get confused and
4  I'll be saying what you're saying and you'll be saying
5  what I'm saying or there won't be any answer at all.
6  Okay?  So I'll try to stop talking, which is very
7  difficult, but -- and then I'll let you talk and we'll
8  trade back and forth.  Okay?
9      A.  Um-hum.  Yes.
10     Q.  The next instruction I'm going to give you
11 is you have to answer verbally.
12     A.  Yes.
13     Q.  You have to say yes, you have to say no, and
14 I know it's tempting because there's a camera here, so
15 you know everything's being recorded by the camera, but
16 she still has to have words in order to put in the
17 transcript, which is really the official documentation
18 of what went on here today.  So you got to say yes, you
19 got to say no.  If you're going to point, you got to
20 tell us where you're pointing.  Okay?
21     A.  Okay.
22     Q.  All right?  If you don't understand my
23 question because it's unintelligible, you don't
24 understand the words, you lose your train of thought,
25 any reason whatsoever, you got to tell me that before

Page 7

1  you answer the question, and that's important because
2  once you put your answer on the record and it's taken
3  down by the court reporter and it's taken down by the
4  camera, you can't go back and erase it.  All right?
5      A.  All right.
6      Q.  It's part of the record and you can try to
7  explain it, but it's much better if you ask me to
8  rephrase my question or reword my question and then you
9  answer a question that you fully understand rather than
10 guessing what you think my question means.  Okay?  So
11 promise me you'll do that if you don't understand my
12 question?
13     A.  I promise.
14     Q.  Okay.  We're here only to find out what you
15 know.  As -- was it Lt. Friday used to say, the facts,
16 ma'am, just the facts.  If you don't know something I'm
17 going to ask you, you're perfectly free to say "I don't
18 know", and if you don't remember something I ask you,
19 you're perfectly free to say "I don't remember".  Just
20 because I ask the question doesn't mean you have to
21 have an answer to it.  Okay?
22     A.  Okay.
23     Q.  If, in fact, you don't remember and if you
24 don't -- or if you forget.
25          If you do know the answer to the

Page 8

1  question, then I'd appreciate it if you tell me.  Okay?
2      A.  Okay.
3      Q.  All right.  If you don't know exactly the
4  answer to my question, but pretty reasonably can
5  estimate especially with a date or a time period or how
6  long something took, if you can reasonably estimate or
7  approximate, then I'd ask you to do that, too, but just
8  tell me that it's not an exact number or not an exact
9  time, it's an approximation so we'll know that there's
10 a little wiggle room around it.  Okay?  Do you
11 understand that?
12     A.  I understand.
13     Q.  All right.  Is there anything about the
14 nature of these proceedings you'd like to ask me to
15 explain before we begin?
16     A.  I can't think of anything.
17     Q.  Okay.  And if you do, you can ask me at any
18 time, and if you want to take a break at any time, we
19 can do that, too, because we're -- even though this is
20 a very serious proceeding, we're rather informal here
21 as you can see by the number of cans of soda and juice
22 and everything else we've consumed all day.  Okay?
23     A.  Okay.
24     Q.  All right.  I have the benefit of your
25 transcript, so I'm going to zip through this a little

Page 9

1  quickly.  Stop me if anything I say is incorrect or
2  needs to be changed.  Okay?
3      A.  Okay.
4      Q.  You went to Central Michigan University?
5      A.  Yes.
6      Q.  What year did you graduate?
7      A.  '57.
8      Q.  And did you get a degree, a B.A.?
9      A.  No.  I -- actually I got a special teaching
10 certificate.  I was a month late getting back to school
11 my senior year and so I lacked a few credits.
12     Q.  Okay.
13     A.  So at that time they needed teachers, so I
14 was awarded a special teaching degree or a certificate.
15     Q.  So you could go right out to work.
16     A.  Went right out to work.
17     Q.  Okay.  And that work would have been in
18 Belleville High School as an English teacher from 1957
19 to 1960?
20     A.  Yes.
21     Q.  All right.  And then after that you worked
22 as a reference librarian in a public library?
23     A.  Yes, in Lansing.
24     Q.  Okay.  What years were that, do you
25 remember?

4 (Pages 10 to 13)

## Page 10

1    A.  It would have been maybe '61 to '62. That's
2  a guess. I --
3    Q.  Okay.  You worked there about a year, maybe
4  a little more?
5    A.  As reference.
6    Q.  As a reference librarian.
7      And then you went to Kelly
8  Temporary?
9    A.  No.
10   Q.  No.  Tell me where you went after that then.
11   A.  After that I went into a junior high school
12 as a library assistant in Lansing.
13   Q.  Okay.  And that was after you were a
14 reference librarian in the public library?
15   A.  Right.
16   Q.  Okay.  How long did you stay with the junior
17 high school?
18   A.  I'm guessing a year, year and a half.
19   Q.  Okay.  Are you guessing or are you
20 approximating?
21   A.  I'm guessing.
22   Q.  Outright guess.  No facts whatsoever to
23 support it.
24   A.  Well, I'm just going by the age of my
25 children and I was there --

## Page 11

1      In Lansing at that time you couldn't
2  be in the school system, which all libraries were in
3  the school system reference and the junior high, if you
4  had a child under a year old.  So that --
5    Q.  Oh.
6    A.  Um-hum.  And so that's why I'm con -- I'm
7  trying to think and that's why it's a guess.
8    Q.  Okay.  Did you take some time off for child
9  raising?
10   A.  Yes.
11   Q.  Okay.  How long were you out of commission?
12   A.  Out of commission until -- well, in the '70s
13 I subbed in school libraries in Northville.
14   Q.  Okay.
15   A.  Was raising a family.  Stay-at-home mom.
16   Q.  Okay.  And every once in a while if they
17 needed a --
18   A.  Right.
19   Q.  -- substitute librarian, you'd pitch in;
20 right?
21   A.  Um-hum.
22   Q.  Okay.  When did you go back into the
23 workforce on a more permanent or a daily basis?
24   A.  In '81 I went back to school to get a degree
25 as legal assistant at Madonna University --

## Page 12

1    Q.  Okay.
2    A.  -- being divorced and I had to get back out
3  in the working field, and teachers couldn't buy a job
4  at that time.
5    Q.  I didn't know Madonna had a university.
6    A.  Madonna University now, but I never saw her.
7    Q.  Okay.  And you got a degree there as a legal
8  assistant?
9    A.  Yes.
10   Q.  Is that the same thing as a paralegal?
11   A.  Yes.
12   Q.  All right.  And is that kind of like a
13 certification you get?
14   A.  With a B.S. degree.
15   Q.  Okay.  What kind of things did they teach
16 you to be a legal assistant?
17   A.  Actually we were taught by attorneys and
18 Judge Schnelz, Oakland County circuit judge, you know,
19 we could take real estate discovery.  All those classes
20 were offered, plus regular classes, you know, nat sci,
21 and then, of course, being Madonna, religion classes --
22   Q.  Okay.
23   A.  -- and things like that.
24   Q.  Dance, too?
25   A.  Didn't dance.

## Page 13

1    Q.  No.  Okay.
2      How about --
3      And I understand that was from 1981
4  to 1985?
5      We're getting a little punchy here.
6    A.  Right.
7    Q.  We've been going all day.
8    A.  Yeah.
9    Q.  All right.  So you graduated in 1985.
10   A.  Correct.
11   Q.  All right.  And did you go back to work full
12 time after that?
13   A.  Yeah.  Before I graduated I heard from GM
14 and they asked me to come down and interview.
15   Q.  Okay.
16   A.  And I did.  So actually I was there and, you
17 know, I think from March and then graduated in June.
18   Q.  This is of '85; right?
19   A.  Right.
20   Q.  Okay.  Now, I have something about working
21 for Kelly Temporary Services.  Is that how you got to
22 work for GM, through Kelly?
23   A.  Yes.  They hired me as a Kelly temp.
24 Um-hum.
25   Q.  All right.  But you interviewed right at

Page 14

1  General Motors.
2       A.   Right.
3       Q.   All right.  How long did you stay at General
4  Motors?
5       A.   Until I retired in '99.
6       Q.   Was that always through Kelly --
7       A.   No.  No.
8       Q.   -- Temporary Services or did they take you
9  on --
10      A.   After I finished that project, and I don't
11  remember the years, how long it took, it was going to
12  be a two-month, but it went on much longer than that,
13  and then they asked me was I interested in setting up
14  an airbag library.
15      Q.   I'm sorry.  The what library?
16      A.   A little library for airbags, getting ready
17  for that.
18      Q.   Airbag library.
19      A.   Yeah.  Documents.
20      Q.   Okay.  And you can't give me an
21  approximation about what year that was?
22      A.   I'm guessing that probably not quite two
23  years was I Kelly, and then when I started on airbag,
24  they had hired me on as per diem.
25      Q.   Okay.  So that would have been around '87?

Page 15

1       A.   I'm guessing.
2       Q.   Okay.
3       A.   I'm terrible on years --
4       Q.   Okay.
5       A.   -- when it comes to me.
6       Q.   Okay.  So you worked on a certain project as
7  an employee of Kelly Services who was assigned to work
8  at General Motors starting sometime in 1985 and
9  probably for a couple of years.
10      A.   Um-hum.
11      Q.   Correct?
12      A.   Maybe not quite a couple years, and it was
13  March of '85.
14      Q.   What was that assignment, do you remember?
15      A.   Summarizing documents at that time for a new
16  thing to be put into a computer.
17      Q.   Okay.  What kind of documents?
18      A.   Well, you mean case-wise, subject-wise?
19      Q.   Well, were they a specific car?  Were they a
20  specific part of a car?
21      A.   They weren't products related.
22      Q.   Oh, okay.  So it had nothing to do with
23  cars.
24      A.   Nothing to do with cars.
25      Q.   It was more like corporate records and

Page 16

1  things like that?
2       A.   It was a litigation case, but it was nothing
3  with cars.  It was not from the product staff.
4       Q.   Oh, okay.
5       A.   It was a different legal staff.
6       Q.   Okay.  So it was some other claim involving
7  General Motors.
8       A.   Yes.
9       Q.   Not having to do with somebody injured in an
10  accident.
11      A.   Yes.
12      Q.   All right.
13      A.   That's correct.
14      Q.   When you were brought on after that, was
15  that as a per diem?
16      A.   For --
17      Q.   GM.
18      A.   Yeah, for the airbag.
19      Q.   And how long did you work on the airbags?
20      A.   Again, I'm guessing a year or two.  I -- I
21  -- that is such a guess.
22      Q.   Okay.  I'm trying to get you up to like
23  1989, 1990 when this case we're involved in kind of
24  gets active.
25      A.   Okay.  Well, the way that happened was when

Page 17

1  litigation slowed down on airbags and I was no longer
2  needed for that, they just moved me over to products
3  and that's when I started.
4       Q.   Okay.  And that was in the discovery group?
5       A.   Yes.
6       Q.   All right.  Did you have any experience
7  in -- other than, you know, what you got in General
8  Motors at any time dealing with discovery documents in
9  product liability litigation?
10      A.   Other than airbag, no, not that I recall.
11      Q.   Your work in the airbags, was that also
12  within the discovery group?
13      A.   That was as a --
14           Well, I was working to supply
15  documents for litigation for a law firm that was
16  handling these cases for GM.
17      Q.   Airbag cases.
18      A.   And I had three people working for me.  So
19  all it was was getting the request for documents,
20  supplying the law firm with these documents.  We had
21  our little production room down there and the people
22  were copying and pulling documents.
23      Q.   Now, where were you getting these documents
24  from?
25      A.   We collected them for the library, anything

09-50026-mg   Doc 10047-3   Filed 04/05/11   Entered 04/05/11 18:59:43   Exhibit 3 .

Pg 7 of 17

6  (Pages 18 to 21)

**Page 18**

1  related to airbag.

2     Q.   And these were the various libraries at
3  General Motors?

4     A.   There was a sweep -- I'm sorry. There was a
5  sweep done for the documents before I even got
6  involved.

7     Q.   I see. I see.

8     A.   I had nothing to do with the sweep. So
9  where they got all of them, I have no idea.

10    Q.   Okay. So when you started work on it, there
11  was already a large amount of documents that you were
12  doing what with?

13    A.   Having people pull the documents according
14  to the requests from the printout, taking them to
15  whoever was on the copy machine that day and then
16  getting them ready and then they would be picked up and
17  taken to the --

18    Q.   Okay. So you were sorting them by question
19  or by request?

20    A.   By request.

21    Q.   Okay. And then you were making enough
22  copies so --

23    A.   Right.

24    Q.   -- they would go around.

25    A.   Yes.

**Page 19**

1     Q.   All right. When you left airbags and were
2  kind of picked up by the discovery group, was there any
3  particular kind of cases you worked on or did you just
4  float where needed?

5     A.   Float where -- I floated where I was needed.

6     Q.   Okay. Now, were you given any training or
7  instruction about where to find documents within
8  General Motors' confines?

9     A.   I never search for documents.

10    Q.   Okay. So you were kind of after the --
11  after documents were pulled you got involved in copying
12  or sorting or boxing and that kind of stuff.

13    A.   Well, boxing, no, you know.

14    Q.   Okay.

15    A.   I worked basically -- you know, they would
16  bring me microfiche, microfilm, and sometimes they
17  would say this is down in the engineering library, and
18  so I would go down to the engineering library and it
19  would be marked and then I would start searching on
20  that.

21    Q.   What kind of -- what thing were you
22  searching? Were you searching hardcopy paper documents
23  or microfiche or --

24    A.   No. I was searching on microfiche mostly.
25  Once in a while microfilm.

**Page 20**

1     Q.   Okay. Are you familiar with the Green case
2  by name?

3     A.   No.

4     Q.   No. Okay.

5          Are you familiar with the Green case
6  by what kind of car it was or what kind of allegations
7  were made?

8     A.   I know what kind of car it was.

9     Q.   What kind of car?

10    A.   It was an F-car.

11    Q.   All right. Do you know what kind of F-car?

12    A.   I don't know if it was a Trans Am or a
13  Camaro.

14    Q.   But you know that those were two kinds of --

15    A.   Those were the -- um-hum.

16    Q.   -- of F-cars.

17    A.   Um-hum.

18    Q.   All right. Do you know what kind of roof it
19  had?

20    A.   No.

21    Q.   Do you know there were different roofs that
22  they had for the cars?

23    A.   I did not know it, but I can see that. I
24  mean, I guess some have a thing that opens, but --

25    Q.   Okay.

**Page 21**

1     A.   -- did I know a different --

2     Q.   But that wasn't part of your official need
3  to know in your job.

4     A.   Anything roof related would have been pulled
5  by me because I'm not an engineer.

6     Q.   Okay. Let's get into that.

7          When did you start pulling documents
8  related to the roof?

9     A.   I have no idea.

10    Q.   Okay. But at some point in time after you
11  finished with airbags and you went to the discovery
12  group you were given an assignment to pull documents
13  pertaining to the roof.

14    A.   I was probably pulling other documents
15  before then. I mean, there's always all kinds of
16  projects and it's always what was needed.

17    Q.   Okay.

18    A.   But I'm -- I don't recall pulling the roof
19  documents. I don't recall, but that was the first time
20  I had ever done anything like that.

21    Q.   Do you recall what other categories of
22  documents you were assigned to pull?

23         MR. CARROLL:  In the Green case?
24  I'm sorry.

25         MR. DONOVAN:  No. Just generally.

Page 22

1      MR. CARROLL: Okay.
2      THE WITNESS: Yeah, but basically I
3  would -- as -- this case, I never knew the case.
4      BY MR. DONOVAN:
5      Q.   Right.
6      A.   The engineer would give me the directions.
7      Q.   Right.
8      A.   Yeah, I remember one in particular, Fisher
9  Body.
10     Q.   Okay. Do you remember what kind of
11 documents you were pulling from Fisher Body?
12     A.   I don't.
13     Q.   No.
14     A.   I truly don't.
15     Q.   Can you tell me what kind of cars? Like you
16 knew the F-car. Can you tell me what other kind of
17 cars you may have pulled documents for?
18     A.   Not offhand, I can't remember any, and I did
19 other things also, you know. It was -- I did what --
20     Q.   What you were told; right?
21     A.   Actually, yes, and I can't remember any
22 specifics, I truly can't, and I just liked doing that,
23 so...
24     Q.   All right. You retired in 1999?
25     A.   Yes.

Page 23

1      Q.   Did you continue to do the document pulling
2  from microfiche from -- during the whole period of time
3  you were at General Motors?
4      A.   No.
5      Q.   Okay.
6      A.   No.
7      Q.   After you did the microfiche document
8  pulling did you go someplace else?
9      A.   Yes. We went down to New Center One and
10 then they -- and then I was a legal assistant on a
11 team, and they changed the way of doing things, so...
12     Q.   Was it, again, a discovery --
13     A.   Yes.
14     Q.   -- pulling documents?
15     A.   It was still in products.
16     Q.   Okay.
17     A.   No. It was a different thing entirely. I
18 was in products, but as a legal assistant I never did a
19 document search or pull or anything in products.
20     Q.   Again.
21     A.   Again.
22     Q.   What year was that that you went over to the
23 legal assistant's position?
24     A.   Can I ask Ron when our group moved down to
25 the Ren Cen?

Page 24

1      I don't remember.
2      Q.   '90s by guess?
3      A.   It doesn't seem to me that we were down at
4  the Ren Cen for nine years, but --
5      Q.   The Renaissance Center is where we are now?
6      A.   Not the Ren Cen. New Center One.
7      Q.   Okay.
8      A.   I'm sorry. I misspoke myself. I never
9  worked in the Ren Cen. I was always -- I retired
10 before the group moved down here.
11     Q.   Okay. Is that what you did the rest of your
12 career with General Motors is work as a legal
13 assistant?
14     A.   Yes.
15     Q.   In that same group you just described for
16 me?
17     A.   Yes.
18     Q.   All right. Was that group defending
19 products liability cases?
20     A.   Yes.
21     Q.   Were you doing a specific car or a specific
22 allegation or a specific part of a car?
23     A.   No. Now, there, that was case related and I
24 would be gathering discovery from different groups, you
25 know, that the engineers would request, and that was

Page 25

1  through ordering it through contacts.
2      Q.   Sending out letters to other people --
3      A.   Yes. Yes.
4      Q.   -- within General Motors --
5      A.   Right.
6      Q.   -- and then feeding it back to you?
7      A.   And then, yes, getting it ready to go to the
8  law firm.
9      Q.   Okay. I know you don't remember the Green
10 case or maybe were never even told it was the Green
11 case.
12     A.   I probably wasn't.
13     Q.   Okay. Because that -- you didn't need to
14 know that.
15     A.   It did not matter.
16     Q.   But do you remember pulling roof documents
17 for F-cars?
18     A.   Vaguely. Vaguely.
19     Q.   I told you that --
20          Did you know the last witness who
21 just left here?
22     A.   Yes.
23     Q.   Okay. Susan Rhodes?
24     A.   Yes.
25     Q.   All right. Do you remember working with

## Page 26

1  Susan Rhodes on a project involving roofs sometime in
2  the '90s?
3     A.  No, I don't remember that in particularly.
4     Q.  No.
5     A.  But I could have been and not known it.  If
6  an engineer brought something in to me, I wouldn't
7  know.  I would just know what I was looking for.
8     Q.  Okay.
9     A.  And it could have been one case that she was
10 working on, but I wouldn't know.
11    Q.  She was a discovery coordinator.
12    A.  Yes.
13    Q.  And sometimes you would work for her in
14 compiling documents?
15    A.  Not directly that I recall.  I could have
16 done something for her, but I don't recall.  Usually it
17 was not given to me by a coordinator, if I recall.
18       I'm sorry, my memory is just
19 terrible, so...
20    Q.  Okay.  Do you remember Joe Rice?
21    A.  Yes.
22    Q.  He was an engineer?
23    A.  Yes.
24    Q.  Did you ever work with Joe Rice?
25    A.  (No response).

## Page 27

1     Q.  Did he ever give you any of those
2  assignments you talked about?
3     A.  Not directly, no.  No.
4     Q.  Okay.  So how did you know him?  In and
5  around the office or was that later on when you became
6  a legal assistant?
7     A.  Oh, in a group that size everybody knows
8  everybody.
9     Q.  How big a group was it?  Ten people?  A
10 hundred people?  A thousand people?
11    A.  I won't even take a guess on that.
12    Q.  Really?  Okay.
13    A.  But you're all working in the same area and
14 you just know everybody.
15    Q.  And the engineers work with the legal
16 assistants and the legal assistants work with the
17 attorneys and everybody kind of worked together?
18    A.  That's correct.
19    Q.  Okay.  Do you remember something called an
20 F-car Project Center file?
21    A.  Yes.  It was referred to as that.  Yes.
22    Q.  Okay.  Was that one of the groups of
23 documents on microfiche you were reviewing to pull roof
24 documents?
25    A.  I'm assuming it was.  I mean, if --

## Page 28

1     I've heard the term and I don't know
2  if it was that specific, but I'm assuming that
3  everything would be in that.
4     Q.  Okay.  Were all of the searches for
5  documents you did related to the F-car on microfiche or
6  microfilm?
7     A.  Best of my recollection, yes.
8     Q.  Okay.  You never went down to like
9  somebody's file cabinet and started looking through?
10    A.  No.  Never went through any file cabinets.
11    Q.  Okay.
12    A.  The file cabinets in the engineering library
13 which were open to everyone.
14    Q.  All right.  These microfiche, they would be
15 pictures like negatives of actual hardcopy documents?
16    A.  Yes.
17    Q.  Like they start out as documents and then
18 through some process they develop them onto these
19 microfiche sheets?
20    A.  Yes.  It could be, you know, a -- it was all
21 written.  I wasn't looking at drawings or anything like
22 that, I couldn't, but the written -- it was all
23 written.
24    Q.  8 1/2 by 11 sheets of paper.
25    A.  That -- if that was relative, I hit the

## Page 29

1  button and it copied and yes.
2     Q.  Okay.
3     A.  That size paper.
4     Q.  And when you were doing the roof documents,
5  how did you determine whether to pick this document or
6  and not pick that document?  What were you looking for?
7     A.  Well, they would usually be year specific
8  between this model and that model.
9     Q.  Okay.
10    A.  And it would -- anything related to roof and
11 F-car.
12    Q.  Okay.
13    A.  And if it was in doubt, I copied it anyway.
14    Q.  All right.  So you would look at the
15 document and you'd say, let's see, is F-car
16 mentioned -- written anywhere in this document?
17    A.  Well, it would be in the document because it
18 was an F-car collection.
19    Q.  Okay.  So then you would look through the
20 document and see if the word roof --
21    A.  I would look for the word roof, anything
22 relating to rollover, roof crush.
23    Q.  Were you provided with like a bunch of terms
24 that you would look for?
25    A.  Probably, but that was pretty specif- --- you



Page 30

1 know, pretty obvious with the roof car and the year
2 model and the car.
3    Q.   So are you familiar with computers now?
4    A.   Yeah.
5    Q.   Do you ever do a Google search?
6    A.   Yes.
7    Q.   So you were doing manually what a Google
8 search does now by computer.  It looks for specific
9 words in documents and then brings them up.
10    A.   Right.  Right.
11    Q.   Okay.
12    A.   And, actually, all I was doing was making a
13 first broad cut to save the engineers time.  I mean, if
14 it wasn't anything relevant, of course, it wasn't
15 copied.
16    Q.   Okay.  So you call that a sweep.  You did
17 the preliminary sweep for documents?
18    A.   No.  A sweep is getting all the documents
19 together.
20    Q.   Oh, okay.  And then they're reviewed?
21    A.   I didn't get them together.  I don't know
22 who got them together, you know.
23    Q.   Oh.  A sweep is after the review?
24    A.   A sweep is before.  They do a sweep of
25 documents to get them.  Sweep them up.  These are all

Page 31

1 the -- they --
2        I don't know how they do that, so I
3 really don't even be talking about this.  These are
4 just terms, and that means they're getting the
5 documents together and you're going to have a
6 collection of them.
7    Q.   So that occurs before you get involved.
8    A.   Yeah.
9    Q.   Then they give you that -- those documents
10 and most of the time it would have been on microfiche
11 or microfilm and then you're going to make a smaller
12 pile from the bigger pile?
13    A.   Yeah, but not a real small pile.  The
14 engineers --
15        Understand, I was just eliminating a
16 lot of totally irrelevant --
17    Q.   Right.
18    A.   -- things.
19    Q.   And when in doubt, pull it out.
20        MR. CARROLL:  Object.
21        THE WITNESS:  When in doubt, pull --
22 no.
23 BY MR. DONOVAN:
24    Q.   When it doubt, print it out.
25    A.   When in doubt, print it out.  Yeah.

Page 32

1    Q.   Okay.  And then those documents that you
2 pulled would then go to someone else and they would
3 make more decisions and maybe cut documents and then it
4 went to somebody else?
5    A.   I was done with them.
6    Q.   You were done.  All right.
7    A.   And bear in mind, that isn't all I did.  I
8 mean, I wasn't doing that continually.  I think --
9    Q.   I got it.
10    A.   You know, and I don't know if anyone else
11 did it, so...
12    Q.   Do you remember whether there was an index
13 for this F-car Project Center file?
14    A.   I'm -- I have no idea.  I wouldn't have --
15    Q.   Did you also search through Fisher Body
16 files?
17    A.   I remember doing some work on Fisher Body
18 files.
19    Q.   For F-cars and roofs?
20    A.   That I don't recall.
21    Q.   Okay.  Do you know anything about, you know,
22 documents being sent to a law firm in Florida called
23 Rumberger Kirk?
24    A.   I know Rumberger Kirk, and I'm sure
25 documents would have been sent to them for the cases,

Page 33

1 but I -- I never --
2    Q.   You don't know which ones or whether you
3 were ever involved with that.
4    A.   No.  I was never involved with Rumberger
5 Kirk as a legal assistant, or if I was involved with
6 them, it was in getting the review ready, but I
7 wouldn't have known who that was for.  So I might have
8 been doing something that was going to Rumberger Kirk,
9 but I wouldn't have been aware of it.
10        MR. DONOVAN:  Do you have these, the
11 350 something documents, 351?
12        MR. CARROLL:  We have some of them.
13        MR. DONOVAN:  I'm slowly glomming
14 your associate.  I told you I needed one.
15        MR. WEISS:  Are you talking about
16 the sheets with the numbers on them?
17        MR. DONOVAN:  Yeah.
18        MR. WEISS:  Okay.  Yeah.  I have
19 just 351A.
20        MR. DONOVAN:  351A, right.
21        MR. CARROLL:  You want us to give
22 those to her?
23        MR. DONOVAN:  If you don't mind.
24        MR. CARROLL:  It's open where you
25 need to start, Myrna.

Page 34

1          THE WITNESS: Okay.
2     BY MR. DONOVAN:
3     Q.   Okay. I'm looking at, just so we're on the
4  same page --
5     A.   Um-hum.
6     Q.    -- a big gray rectangle with a number in the
7  upper right-hand corner which looks like it's on some
8  kind of sticky stickem, if I had the real document,
9  that says 351 2. Is that what you got in front of you?
10          MR. WEISS: No.
11          MR. DONOVAN: No?
12          MR. WEISS: No. I start with --
13          THE WITNESS: Good. I thought I'd
14  gone blind.
15          MR. DONOVAN: What's that? I can't
16  read that.    MR. CARROLL: I think it's 411.
17          MR. CARROLL: I think it's 411.
18          MR. DONOVAN: So how come I have 351
19  2? What's the Bates number on that?
20          MR. CARROLL: 8257A.
21          MR. DONOVAN: Oh, yeah. They're all
22  8257A.
23          MR. WEISS: Do you want the page
24  number?
25          MR. DONOVAN: 559240?

Page 35

1          THE WITNESS: Yes.
2          MR. DONOVAN: Is what you have?
3          MR. CARROLL: Yes.
4          THE WITNESS: I have that. That's
5  below the 825257A.
6          MR. CARROLL: Look at ours and see
7  what difference there is.
8          MR. WEISS: I think that's the
9  document number that you --
10          MR. CARROLL: That's your document
11  number. See 351A.
12          MR. WEISS: Yeah. I think that's
13  your Post-It.
14          MR. CARROLL: That you -- that's
15  foliation?
16          MR. DONOVAN: No, because you can
17  remove it. It's just a sticky. It's called a
18  disguise.
19          All right. Well, let's see. Let's
20  see if we have a 4 -- here's 413. Is that the document
21  after that?
22          MR. CARROLL: Um-hum.
23          THE WITNESS: Yes.
24          MR. DONOVAN: Okay.
25          MR. WEISS: No, no. I've got

Page 36

1  that -- it's two pages after that.
2          MR. DONOVAN: There's a blank
3  document?
4          MR. CARROLL: There's a 412.
5          MR. WEISS: It's 412.
6          MR. CARROLL: But it's also blank.
7          MR. DONOVAN: That doesn't have the
8  grey square on it.
9          MR. CARROLL: Um-um.
10          MR. WEISS: No.
11          MR. DONOVAN: And it's kind of like
12  very light in the upper right-hand corner?
13          MR. CARROLL: Um-hum. Um-hum.
14          MR. DONOVAN: Okay. All right.
15  Then we're -- so that my 351 2 covers 411.
16          MR. CARROLL: Um-hum.
17          MR. DONOVAN: The number 411?
18          MR. WEISS: I'm guessing it's an A
19  because that's the number of the document.
20          MR. DONOVAN: Oh. Okay.
21     BY MR. DONOVAN:
22     Q.   That first document, which we now know to be
23  411.
24     A.   Okay.
25     Q.   All right? From reading your testimony that

Page 37

1  we televised across the country last time you testified
2  I think I understand that what you would do is you
3  would get a sheet of microfiche or film, you would go
4  through all those documents, and then to segregate that
5  you were moving on to a new microfiche sheet or a new
6  film you would put a piece of paper with the number of
7  the microfiche to divide one set of documents from the
8  other.
9     A.   Yeah. A slip sheet dividing one --
10     Q.   A slip sheet.
11     A.   Um-hum.
12     Q.   Okay. So if you ever had to go back and see
13  whether you got anything, you would know that that set
14  of documents came from that particular microfiche.
15     A.   Yeah, but actually once I was doing that, I
16  had no reason to go back to it, I was done.
17     Q.   Okay. But if anybody else wanted to go back
18  to it for some reason, that's how they would find it.
19     A.   That's how they would find it.
20     Q.   Okay. So you start with microfiche number
21  411? Is that how it was designated because that's the
22  first sheet?
23     A.   I don't know. I don't remember that.
24  I'm --
25     Q.   Okay. Assuming that that's the first sheet

Page 38

1   and assuming that that's the first number --
2       A.  Yeah, it could be.
3       Q.  -- that's your handwriting --
4       A.  Um-hum.  Um-hum.
5       Q.  -- that would correspond to a microfiche
6   sheet or a film which had that number on it.
7       A.  Somewhere I got that number.  It would have
8   been written.
9       Q.  Okay.  Do you know what that number
10  represented?
11      A.  I have no idea.
12      Q.  Do you know whether there was a 410, a 49,
13  48, 47, 46, all the way down to 1?
14      A.  I don't know that and I just started with
15  what was relevant.
16      Q.  And that would have been something someone
17  gave you.
18      A.  Right.
19      Q.  Okay.  So they would have said, Myrna,
20  here's what you're going to start with, here's the
21  first one and the first one is 411.
22      A.  Well, they wouldn't have even mentioned
23  numbers.
24      Q.  Okay.
25      A.  They would know, and anything I would do now

Page 39

1   would be guessing.  That's been a long time ago.
2       Q.  Okay.
3       A.  And it was just kind of routine and you did
4   it and I don't know where the other 400 and --
5       Q.  Okay.
6       A.  I don't know where they were or I -- you
7   know.  I could guess, but I'm not going to do that.
8       Q.  I don't want you to guess because otherwise
9   then we'll just get more confused than we already are.
10      A.  That's right.  So I just --
11      Q.  All right.  So each of these pieces of paper
12  represents a slip that you placed to designate the end
13  of one microfiche and the beginning of the next one.
14      A.  Yeah.
15      Q.  All right.  I'm scrolling down because I'm
16  trying to look for --
17          And that's your handwriting, right,
18  those numbers?
19      A.  Yeah.  I think that would be, but --
20          413, that looks like mine.
21      Q.  Okay.
22      A.  And I'm sure the 411 looks like -- but I can
23  see it more clearly.
24      Q.  I'm going down to a document which -- at
25  least mine does not have a number on it except that it

Page 40

1   says 0A8 and it's Bates number, on this, 9565 on the
2   Newman versus GM Bate number.  Got that?
3       A.  Okay.  Um-hum.
4       Q.  Okay.  Now, the number before that --
5           MR. WEISS:  Hang on a second.
6   BY MR. DONOVAN:
7       Q.  The number before that is --
8           MR. WEISS:  9565?
9           MR. CARROLL:  Um-hum.
10          MR. DONOVAN:  Bates number?  I'm
11  talking about number --
12          MR. CARROLL:  Okay.
13          MR. DONOVAN:  The fiche number is
14  444.
15          MR. CARROLL:  Um-hum.
16          THE WITNESS:  Okay.
17  BY MR. DONOVAN:
18      Q.  And then the following -- that following
19  one -- oh, it doesn't have a number, but it says OA
20  Program Contents and Objectives Manual OA 8 and then
21  NA.  Is that also your writing?
22      A.  NA is.
23      Q.  Okay.  Does that mean not applicable?
24      A.  Yes.
25      Q.  Does that mean that there was no --

Page 41

1           Well, first let me establish this.
2   Does this sheet represent an identification of a sheet
3   of microfiche or --
4           I'm not going to keep saying it.
5   I'm going to say microfiche and if it was microfilm, so
6   be it.  Okay?
7       A.  I have no idea.
8       Q.  You have no idea what the OA 8 is?
9       A.  No, I don't.
10      Q.  Do you have any idea what the OA Program
11  Contents and Objectives Manual is?
12      A.  No, I don't.
13      Q.  Do you have any idea why you were using what
14  looked like blank sheets and then you just wrote a
15  number on, now all of a sudden this seems to have a
16  printed thing?
17      A.  I didn't write a number.  That's -- that's
18  not my 8.  The NA looks like mine, not applicable, and
19  I don't know why I did the -- I can't remember.
20      Q.  All right.  And then the one following that
21  I don't think has anything on mine.  Oh, 446.  So we
22  went from 444, then that OA 8 and then to 446.
23      A.  Um-hum.
24      Q.  And can't help us why.
25      A.  No.

### Page 42

1    Q.   Okay.  Then after 446 we go back to the 0A,
2  we have OA 9 and, again, NA.
3    A.   Right.
4    Q.   Okay.  The NA is yours.
5    A.   NA is mine and I have no idea what the other
6  means.  I'm sure I did at -- I probably did at the
7  time, but right now nothing's coming.
8    Q.   And the 0A 9 is not your handwriting?
9    A.   No, sir.
10    Q.   And you don't know why you would have used a
11  sheet with a printed top on it.
12    A.   My guess is I copied the sheet.  This is
13  from the fiche I copied, and then maybe I meant the
14  whole -- I'm not guess -- no, but that would be my
15  guess and assumption.  This is not my writing other
16  than the NA and I did not put the 0A 9 on there and
17  I -- that is a copy I'm guessing from the fiche.
18    Q.   Okay.  So if I asked you about any of these
19  OAs, because then there's an OA 10 --
20         It seems every time you put NA
21  somebody put in OA.
22    A.   I'm assuming the OA was already there for me
23  and I don't know what it means, but I just put not
24  applicable and I don't -- and I don't know why it's
25  that way because I can't remember.

### Page 43

1    Q.   But you're positive the NA means that there
2  were no documents in that fiche --
3    A.   Not applicable.
4    Q.   -- that you thought were applicable.
5    A.   Yes.
6    Q.   No documents that said roof.
7    A.   Roof.
8    Q.   Or whatever these --
9    A.   Whatever.
10    Q.   Okay.  Also in here is a -- is one -- and
11  I'll see if I can find it in a minute.  It had like
12  crossing offs.  It was towards the end.  There's one --
13         Before we do that.  483, which is
14  Bates 11113.
15    A.   Whoops.
16         MR. CARROLL:  Need some help?
17         THE WITNESS:  Well, these just came
18  out.
19         MR. CARROLL:  That's all right.
20         MR. WEISS:  We'll fix it.
21         THE WITNESS:  Okay.
22         MR. CARROLL:  I think you're a
23  little far.
24         THE WITNESS:  What is it?  1113?
25  13 -- 1133?

### Page 44

1         MR. CARROLL:  Look at the top right
2  and it'll say 483.
3         THE WITNESS:  483.  Okay.
4         MR. CARROLL:  Yeah.
5         THE WITNESS:  Oh, here's all those.
6  BY MR. DONOVAN:
7    Q.   Yeah.  It says 483, 484, 485, NA.
8    A.   Okay.
9         MR. CARROLL:  That's it.
10  BY MR. DONOVAN:
11    Q.   Okay?  See that?
12    A.   Yes.
13    Q.   That's all your handwriting?
14    A.   Yes.
15    Q.   Okay.  Is this you went through fiche 483,
16  484 and 485 and there was nothing on anything, so
17  rather than use three sheets of paper you used one
18  sheet of paper?
19    A.   That would be my -- I would assume that.
20    Q.   Okay.
21         MR. DONOVAN:  You okay?
22         THE WITNESS:  Just a minute.  We're
23  a little out of line here.  I don't know where this --
24         MR. DONOVAN:  Just throw it in.
25  Don't worry.

### Page 45

1         (Off the record)
2  BY MR. DONOVAN:
3    Q.   Go to 11133.
4    A.   11133?
5    Q.   I think that would be --
6         Keep going the way you were going.
7    A.   Well, I'm at 12443 here.
8    Q.   Oh, okay.
9    A.   11133?
10    Q.   33.
11    A.   Okay.
12    Q.   All right.  It says UPC 13.  See that?
13    A.   Yes.
14    Q.   Do you know what that means?
15    A.   No.
16    Q.   Okay.
17    A.   And that's not my writing.
18    Q.   I can't find one.  Maybe it's in the other
19  stack, but there's certain ones where you wrote a
20  number and then you crossed it out.  Do you remember
21  what the significance of that was?
22    A.   Maybe if I saw --
23         I don't know.
24    Q.   Yeah.  That's why I was trying to find you
25  one so it would be easier, but I'm not having a whole

Page 46

1  lot of --
2     A.  Well, here's one I've crossed out, 543, but
3  then it's over here on this page.
4     Q.  Okay.
5     A.  And then I have 544.  I just crossed off the
6  543.  I probably wrote down --
7     Q.  So that was probably just a mis-numbering on
8  your part?
9     A.  Right, because here's 543 right here.
10         MR. CARROLL:  Maurice, if you go up
11  to 13716, you'll find one.
12         MR. DONOVAN:  13 -- okay.  I knew it
13  was towards the end.  I have this in two different --
14         MR. CARROLL:  Yeah.  There are other
15  ones, I just happened to find that one.
16         MR. DONOVAN:  Okay.  I also have one
17  at 13402.
18         MR. CARROLL:  Okay.
19  BY MR. DONOVAN:
20     Q.  Can you find that for me?  Do you have that?
21     A.  I have it.
22     Q.  Okay.  Do you see how it says -- it's got
23  585 is scribbled out.
24     A.  Yeah.
25     Q.  Then you got 587, 588, which is crossed out

Page 47

1  with an X, and then you got 589 and 590, which is
2  intact.
3     A.  Okay.  585 is over here on this page.
4     Q.  Okay.  So that's a mis-numbering.
5     A.  And 586.  And I don't know why -- I don't
6  know why 87 and 88 are crossed off.
7     Q.  Okay.  Now, do you remember when you
8  testified at that hearing by camera there were three
9  boxes of documents?
10     A.  Um-hum.
11     Q.  Yes?
12     A.  Yes, I do.
13     Q.  And I think you said two of them you
14  recognize by these sheets as being work that you did.
15     A.  It was my number.
16     Q.  And the other one was not work that you did.
17     A.  It was not my writing.
18     Q.  Okay.  And you didn't know who did that.
19     A.  No.
20     Q.  Okay.  Do me -- see if you can get to 13716.
21     A.  My numbers are all mixed up.
22         MR. CARROLL:  It's 638 at the top,
23  Myrna.  There it is, in your left hand.
24         THE WITNESS:  Okay.
25  BY MR. DONOVAN:

Page 48

1     Q.  Okay.  Do you see that it starts at 638 and
2  then it goes all the way down to 645?  No, you got it.
3     A.  I know, but I was trying to figure out why
4  these numbers are all out of whack here.  Okay.
5     Q.  And those are all crossed out.
6     A.  Yes.
7     Q.  Do you know why?
8     A.  I have no idea.
9     Q.  Is it possible that, you know, you were not
10  supposed to look at these and they weren't within your
11  list of things to review?
12     A.  No.  I would have -- no.
13     Q.  And you have no recollection --
14     A.  I had no list of things to review.
15     Q.  Okay.
16     A.  I reviewed everything that was brought to
17  me.
18     Q.  Okay.  But you have no idea why you would
19  have crossed out all these numbers.
20     A.  I have no idea, no recollection.
21     Q.  And if it was nothing in those, you would
22  have put NA?
23     A.  I don't know why I did that sometimes and
24  sometimes I didn't.  I have no idea.
25     Q.  Okay.  I know.  It was a long time ago.

Page 49

1  Okay.
2         MR. DONOVAN:  I have no further
3  questions.  I'm done.
4         THE WITNESS:  We're done?
5         MR. DONOVAN:  I'm done.
6         MR. CARROLL:  I may have a question.
7  Just a sec, Myrna.
8  EXAMINATION BY MR. CARROLL:
9     Q.  Ms. Ade, I wanted to ask you very briefly
10  about your testimony.  There was a portion of it --
11  there was a portion of it that Mr. Donovan was present
12  for, and I know you were on video conference, so you
13  weren't in the room.
14     A.  Um-hum.
15     Q.  There was a portion of it that he was not
16  present for.  There is now information that he has that
17  at the time he did not hear, that may be confusing, but
18  he had to step out, I'll tell you, he had to step out
19  for certain portions of the transcript of the hearing
20  and he now has some of those pages.  I wanted to go
21  over just one page that he did not have access to
22  during the hearing and it just relates to the Bates
23  numbers that were on the boxes.  Okay?  So what I'd
24  like to do is if I can turn -- pull one page out for
25  you.

## Page 50

1       MR. CARROLL: Page 21 of what was
2   sealed, Maurice.
3       MR. DONOVAN: I have it.
4       MR. CARROLL: Yeah. I just want to
5   make sure before that you have the whole one before I
6   show it to her because I think you do. Yeah. Perfect.
7   Okay.
8       BY MR. CARROLL:
9       Q.   Ms. Ade, would you just take a moment and
10  look at that page, and I will represent to you that you
11  are the witness. I can give you the front page if you
12  wanted to see it.
13      A.   No.
14      Q.   Okay.
15      A.   Oh, I see. I'm just reading on what's on
16  the outside of the box.
17      Q.   Yes, ma'am.
18      A.   Is that correct?
19      Q.   Um-hum.
20      A.   Okay. Okay.
21      Q.   And just tell me when you've had a chance to
22  read it.
23      A.   Okay.
24      Q.   All right. All I wanted to ask you was, and
25  I'll mark this after we're through, does this page 21

## Page 51

1   of the transcript, does it accurately reflect your
2   testimony before Judge -- or Magistrate Judge Schwartz
3   on December 20th, 2004?
4       A.   I'm reading the case name, Green, and the
5   Bates numbers. I remember doing that.
6       Q.   Okay. And from reading that testimony, does
7   that -- do you recall if that transcript accurately
8   reflects what you testified to?
9       A.   I have -- the numbers don't mean any --
10          I have to assume --
11      Q.   Okay.
12      A.   -- that I read it correctly, but the
13  numbers, I -- you know.
14      Q.   You were never informed that you read it
15  incorrectly?
16      A.   No, I never was.
17      Q.   Okay. And were you ever contacted about
18  some -- or did you ever come to learn that there was an
19  error in the transcript?
20      A.   No.
21      Q.   Okay.
22          MR. CARROLL: We're going to have to
23  get another copy of 22.
24          And then I'm going to ask her to
25  look at page 22 as well, Mr. Donovan.

## Page 52

1   BY MR. CARROLL:
2       Q.   And then would you just look at page 22, and
3   I'm also going to ask you only about the Bates numbers.
4   Not page 23, but just page 22.
5       A.   Okay. Here's your 21. Okay.
6       Q.   All right. Did she accurate -- does the --
7          To your knowledge, does the
8   transcript accurately reflect what you testified to
9   that day?
10      A.   To the best of my knowledge, but that was a
11  while back.
12      Q.   It was a long time ago.
13      A.   Yes.
14      Q.   I understand.
15          And I understand that these Bates
16  numbers reflect the Bates numbers -- the Bates ranges
17  that are on the three boxes and you --
18          Is that correct from the testimony?
19      A.   Yes.
20      Q.   Okay.
21      A.   Yes.
22      Q.   And then you reviewed two of these boxes,
23  but not the third; is that correct?
24      A.   That's correct.
25      Q.   All right.

## Page 53

1       A.   Um-hum.
2       Q.   Without having you go through the entire
3   testimony, do you recall which of the three Bates
4   ranges you did not review? And I'll, for the record,
5   say that the Bates ranges on page 21 and 22 of the
6   transcript are 200,000 through 202,800, the second
7   range is 300,000 through 300,676, and the third range
8   is 400,000 through 400,086.
9          Do you recall which of the two as we
10  sit here you reviewed?
11      A.   No.
12      Q.   Okay. Do you have any reason to think that
13  if you identified those two boxes during the hearing,
14  that your identification was incorrect?
15      A.   I wouldn't think so.
16      Q.   All right. Did you ever come to learn after
17  the hearing that the two boxes that you identified for
18  the magistrate judge were not the two boxes you
19  reviewed?
20      A.   No.
21      Q.   Okay.
22      A.   No.
23          MR. CARROLL: I think that's all I
24  have. I will mark pages 21 and 22 as Exhibit 1 to Ms.
25  Ade's deposition. That's all I have.

Page 54

RE-EXAMINATION BY MR. DONOVAN:
1
2      Q.   When you looked at those boxes, the two
3 boxes, and, again, I know now even that's a while ago,
4 did you see a name Hassan on any of those boxes,
5 H-a-a-s-a-n, something like that?
6      A.   Doesn't ring a bell.
7      Q.   Okay.
8      A.   No.
9      Q.   Do you think that if it was on there you
10 would have read it in conjunction with --
11      A.   If they told me to read what was on the
12 box --
13      Q.   Okay.
14      A.   -- I would have.
15      Q.   So if it said case name Green/Hassan, you
16 would have read the Hassan, you wouldn't have just
17 ignored that; correct?
18      A.   Yes.
19      Q.   And at least from my reading of page 21 of
20 your transcript, Magistrate Schwartz says, Is there any
21 other markings on the box other than what you've just
22 read from the label, and you say, Just a moment, and
23 you say, No.  There's no writing on this box on the
24 outside, no, and you would believe that to be accurate
25 because you were looking at the box at that time and

Page 55

1 the only thing you saw was the label; correct?
2      A.   I'm assuming.  Yeah.
3      Q.   Okay.  I mean, if the judge had asked you to
4 read what else was on the box, you would have done
5 that; right?
6      A.   Of course.
7      Q.   Okay.  You wouldn't have lied to her and
8 said --
9      A.   I would not do that.
10      Q.   -- there's nothing on there and you saw
11 something.
12      A.   No, I wouldn't have -- I would not do that.
13      Q.   You wouldn't have done that.  No.
14      A.   No.
15      Q.   And if we go to page 22, you do find
16 something on one side of the box, which is a label that
17 says Green, and it says on the back is written Johnston
18 02-332.
19           So on that box there was a label
20 which said Green and there was also a label that said
21 Johnston; correct?
22      A.   Yes, and I was just reading what was on the
23 box.
24      Q.   And then you say, And no writing on the
25 other side.

Page 56

1      A.   Yeah.
2      Q.   So I assume you were looking at it and there
3 was no writing there.
4      A.   Yes.  I would assume.
5      Q.   So it's safe to assume that Hassan was not
6 on that box either.
7      A.   If Hassan was on the box --
8      Q.   You wouldn't have read it.
9      A.   -- I don't remember seeing it and I would
10 have read it.
11      Q.   Okay.
12           MR. DONOVAN:  Nothing further.
13 Thanks.
14           MR. CARROLL:  All right.  That's it.
15           THE WITNESS:  That's it?
16           MR. DONOVAN:  We're done.
17           MR. CARROLL:  We'll read and sign.
18           THE WITNESS:  Okay.
19           VIDEOGRAPHER:  This concludes the
20 deposition and we're going off the record at 5:29 and
21 57 seconds p.m.
22           (Signature having been reserved, the
23 deposition was concluded at 5:29 p.m.)
24      ADE EXHIBIT NO. 1
25 WAS MARKED BY THE REPORTER

Page 57

1 FOR IDENTIFICATION
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

16 (Pages 58 to 60)

---

**Page 58**

1   I have reviewed the above transcript

2   and have listed corrections, if any, on the attached

3   errata sheet,

4

5   this_____day of_____, 20_____.

6

7

8

9

10   SIGNATURE OF MYRNA ADE

11

12   SUBSCRIBED AND SWORN to before me this_____day of

13   _____, 20_____.

14

15

16

17   NOTARY PUBLIC

18   My Commission expires:                    .

19

20

21

22

23

24

25

---

**Page 59**

1   CERTIFICATE OF NOTARY

2   STATE OF MICHIGAN   )

3                       ) SS

4   COUNTY OF WAYNE     )

5   I, Anne H. Chilton, Certified Shorthand Reporter,

6   a Notary Public in and for the above county and state,

7   do hereby certify that the above deposition was taken

8   before me at the time and place hereinbefore set forth;

9   that the witness was by me first duly sworn to testify

10   to the truth, and nothing but the truth, that the

11   foregoing questions asked and answers made by the

12   witness were duly recorded by me stenographically and

13   reduced to computer transcription; that this is a true,

14   full and correct transcript of my stenographic notes so

15   taken; and that I am not related to, nor of counsel to

16   either party, nor interested in the event of this

17   cause.

18

19

20   _____

21   Anne H. Chilton, CSR, RPR, RMR

22   Notary Public,

23   Wayne County, Michigan

24   My Commission expires:  August 09, 2013

25

---

**Page 60**

1   INDEX TO EXAMINATIONS

2

3   Witness                    Page

4   MYRNA ADE

5

6   EXAMINATION BY MR. DONOVAN:        4

7   EXAMINATION BY MR. CARROLL:        49

8   RE-EXAMINATION BY MR. DONOVAN:     54

9

10

11

12

13   INDEX TO EXHIBITS

14

15   Exhibit                    Page

16

17   (Exhibit attached to transcript)

18

19   ADE EXHIBIT NO. 1              56

20   Hearing transcript excerpt, pages 21-22

21

22

23

24

25