**<u>EXHIBIT 4</u>**

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY


STEVEN NEWMAN,

       Plaintiff,

   -vs-                      CIVIL ACTION NO. 02-135 (

KSH)


GENERAL MOTORS CORPORATION,

       Defendant.

_____ /


PAGES 1 TO 302


     The Videotaped Deposition of DOUGLAS E. BROWN

     Taken at 400 Renaissance Center

     23rd Floor

     Detroit, Michigan

     Commencing at 12:16 p.m.

     Monday, September 15, 2008

     Before Anne H. Chilton, RMR, RPR, CSR-3669

2  (Pages 2 to 5)

## Page 2

```
 1    APPEARANCES OF COUNSEL:
 2    MAURICE J. DONOVAN, ESQUIRE
 3    Benjamin M. Del Vento, P.C.
 4    70 South Orange Avenue
 5    Livingston, New Jersey  07039
 6    (973) 758-1801
 7        Appearing on behalf of the Plaintiff.
 8
 9    W. RAY PERSONS, ESQUIRE
10    JAMESON B. CARROLL, ESQUIRE
11    King & Spalding, LLP
12    1180 Peachtree Street, N.E.
13    Atlanta, Georgia  30309-3521
14    (404) 572-4600
15    -and-
16    RONALD C. PORTER, ESQUIRE
17    General Motors Legal Staff
18    MC 482-02-205
19    PO Box 400
20    Detroit, Michigan  48265
21    (313) 665-7421
22        Appearing on behalf of the Defendant.
23
24    ALSO PRESENT:
25        MARC MYERS, VIDEOGRAPHER
```

## Page 3

```
 1    Detroit, Michigan
 2    September 15, 2008
 3    About 12:16 p.m.
 4            VIDEOGRAPHER:  We are now on the
 5    record.
 6            This is the videotaped deposition of
 7    Douglas Brown being taken in Detroit, Michigan.
 8            Today is Monday, September 15th,
 9    2008.  The time is now 12:16 and 45 seconds p.m.
10            And can the attorneys please state
11    their appearances for the record and the court reporter
12    please swear in the witness.
13            MR. DONOVAN:  Good afternoon.
14    Maurice J. Donovan with the law firm of Benjamin M. Del
15    Vento appearing on behalf of Newman.
16            MR. PERSONS:  Ray Persons, King &
17    Spalding, appearing on behalf of General Motors.
18            MR. CARROLL:  Jamie Carroll of King
19    & Spalding, GM.
20            MR. PORTER:  Ronald Porter, General
21    Motors Legal Staff.
22            DOUGLAS E. BROWN,
23    having first been duly sworn, was examined and
24    testified on his oath as follows:
25    EXAMINATION BY MR. DONOVAN:
```

## Page 4

```
 1        Q.    Mr. Brown, my name is Maurice Donovan.  I'm
 2    an attorney.  I represent Steven Newman, the executor
 3    of the estate of Michael Green.  We're here today for
 4    the purpose of taking what's known as a deposition.  A
 5    deposition, at least in New Jersey is what it's called,
 6    is nothing more than a question and answer session
 7    which I and maybe some of the other attorneys seated
 8    here are going to ask you some questions and hopefully
 9    you're going to give us the answer to those questions.
10            Have you ever been deposed before?
11        A.    Yes.
12        Q.    Okay.  On numerous occasions?
13        A.    No.
14        Q.    No.  On --
15            Give me an approximation.
16        A.    Two times.
17        Q.    Two times.  Okay.
18            Would you like me to go through
19    all -- I know you're an attorney.  So would you like me
20    to go through all of the rules or shall I just
21    highlight the ones that are most salient?
22        A.    You can highlight them.
23        Q.    Okay.
24        A.    That will be fine.
25        Q.    You have just been sworn to tell the truth,
```

## Page 5

```
 1    so all the testimony you give here has to be the truth,
 2    and even though we're in an office, in an attorney's
 3    office, this proceeding has the same solemnity as if
 4    you were testifying before a judge and a jury.  Do you
 5    understand that?
 6        A.    Yes, I do.
 7        Q.    Do you promise you'll tell me the truth to
 8    the questions I ask?
 9        A.    Certainly.
10        Q.    Okay.  If you don't understand my question
11    for any reason, you have to tell me that.  Once you
12    answer the question, obviously it's being videotaped
13    and being taken down by the stenographer and once you
14    give an answer, the answer is memorialized for all of
15    time, you can't go back and change it.  Okay?  So the
16    time to tell me you don't understand my question is
17    before you answer it.  Do you understand that
18    instruction?
19        A.    Yes.
20        Q.    Do you promise you'll tell me if you don't
21    understand my question?
22        A.    Yes.
23        Q.    Okay.  You have to answer orally because
24    court reporters take down verbal utterances.  If you
25    nod your head or gesture, it'll pick it up on the
```

**Page 6**

1  video, but it won't pick it up on the transcript. So
2  you have to say yes, you have to say no, and if you're
3  going to point in a direction, you have to say that
4  that's left or right or whatever other description may
5  be applicable. Do you understand that?
6      A.  Yes, I do.
7      Q.  Okay. If at any point in time one of the
8  attorneys for General Motors interposes an objection,
9  you should stop answering my question if you started
10  it, let us discuss whatever it is we need to do on the
11  record or off the record, and then await further
12  instructions with respect to whether you'll answer the
13  question or not. Do you understand that?
14      A.  Yes, I do.
15      Q.  Okay. Do you have any questions about the
16  nature of the proceeding before we begin?
17      A.  No.
18      Q.  Okay. You testified at a privilege hearing
19  or an order to show cause back in New Jersey a couple
20  of years ago; is that correct?
21      A.  Yes.
22      Q.  You gave sworn testimony at that time?
23      A.  Yes.
24      Q.  Okay. So a lot of the things I'm going to
25  run through real quickly because some of it is in there

**Page 7**

1  and I don't really need to reiterate it. Stop me if
2  anything I say is incorrect or you need to supplement
3  it. Okay?
4      A.  Yes.
5      Q.  Okay. You went to William and Mary College
6  in Virginia?
7      A.  Yes, I did.
8      Q.  You got a B.A. there as well as a J.D.?
9      A.  Yes.
10      Q.  Okay. And what year was that?
11      A.  For which degree?
12      Q.  Either or both.
13      A.  1971 for the B.A. and 1974 for the J.D.
14      Q.  Okay. And did you take the New Jersey bar
15  after that?
16      A.  Yes, I did.
17      Q.  And passed that in what year?
18      A.  1974.
19      Q.  Okay. And my understanding is that's not
20  still an active bar admission.
21      A.  No, it is not.
22      Q.  Okay. When did you give up the New Jersey
23  bar?
24      A.  I wasn't current in the dues, my dues
25  payment, and I can't tell you exactly when that date

**Page 8**

1  was.
2      Q.  '80s? '90s?
3      A.  I'd be guessing. Probably in the '90s.
4      Q.  '90s? Okay.
5          I understand then after you got your
6  juris doctor degree you went to work for the firm of
7  Shanley & Fisher in Newark?
8      A.  Yes, I did.
9      Q.  Okay. How long did you work for them?
10      A.  From summer 1974 through December 1976, as I
11  recall.
12      Q.  And I would assume that would be as an
13  associate at that time?
14      A.  Yes, it was.
15      Q.  Okay. Did you work with anyone in
16  particular? Was there any other senior attorney who
17  was your supervisor or who you did assignments for?
18      A.  I worked with a variety of partners and
19  associates at the firm.
20      Q.  Okay. Do you recall the names of anybody?
21      A.  Sure. Tom Campion, Ray Tierney, Frank Bate,
22  Dick Brennan.
23      Q.  Some of the legends of New Jersey trial law.
24      A.  If you say so.
25      Q.  Okay. And you left there in 1976 to start

**Page 9**

1  working with General Motors?
2      A.  Yes, I did.
3      Q.  And was that in January of 1977?
4      A.  Yes, it was.
5      Q.  Okay. I also understand that in between
6  there was a short stint in the Army reserves
7  after Shanley & Fisher?
8      A.  Yes. That was in the fall of '76, I
9  believe.
10      Q.  Okay. So that was in --
11      A.  No. Excuse me. The fall of '74, not '76.
12      Q.  Okay. So that's before you went to Shanley
13  & Fisher.
14      A.  I started the firm and then I had to take a
15  brief Army leave of absence after I started at the
16  firm.
17      Q.  Okay. Now, what type of work did you do at
18  Shanley & Fisher? Was it one type of -- can it be
19  categorized or was it varied?
20      A.  I did a variety of things. Mostly
21  concentrated on insurance defense litigation, medical
22  malpractice defense primarily.
23      Q.  Did you do any defense of product liability
24  cases?
25      A.  Yes. I think we had a couple of product

4 (Pages 10 to 13)

Page 10

1  liability cases that I worked on.
2    Q.  What type of products were involved in that?
3    A.  I really don't remember that.
4    Q.  Okay.  Were any of them automobiles?
5    A.  No.
6    Q.  So before you went to work for General
7  Motors in 1977 is it safe to say that you had not
8  worked on automobile crashworthiness cases...
9    A.  I don't remember doing any of that kind of
10  work at Shanley & Fisher, no.
11    Q.  Okay.  Now, as part of your training or
12  background or experience at Shanley & Fisher, did you
13  become familiar with the New Jersey Rules of Court with
14  respect to discovery practice?
15    A.  Yes.
16    Q.  Okay.  Was that something that was -- that
17  you had learned in law school or something that they
18  taught you there or just something that you got by
19  experience?  How is that did you become familiar with
20  them?
21    A.  Well, we were practicing in New Jersey and I
22  was a member of the New Jersey bar and so we had to be
23  familiar with the New Jersey rules.
24    Q.  Okay.  And you were familiar with the rules
25  with respect to production of documents and

Page 11

1  interrogatories and depositions?
2    A.  I would have been generally familiar with
3  them, yes.
4    Q.  Okay.  As part of your duties at Shanley &
5  Fisher were you ever involved in the document
6  production for any of the product liability cases that
7  you worked on?
8    A.  I don't remember that.
9    Q.  Okay.  As part of your duties at Shanley &
10  Fisher did you ever have to draft or review a set of
11  interrogatories in a products liability case?
12    A.  I don't remember.
13    Q.  In 1977 when you started working for General
14  Motors, is there a specific department that you became
15  engaged to?
16    A.  The legal staff.
17    Q.  Now, from some document, and I'm not going
18  to go find it --
19        Is there more than one legal staffs
20  within the General Motors corporate framework?
21    A.  Well, you mean then or now?
22    Q.  Well, then.
23    A.  GMAC I believe had its own set of lawyers.
24    Q.  Was there a breakdown of the legal staff
25  within GM at that time in different departments?

Page 12

1    A.  Oh, yes.  You mean functional areas?
2    Q.  Yes.
3    A.  Yes.
4    Q.  Okay.  And what type of functional areas did
5  the legal department break down into?
6    A.  Well, product litigation, general
7  litigation, which was class action type work, and I
8  think we had an environmental group at that time, tax,
9  labor.
10    Q.  I know regulatory was one of the things you
11  might --
12    A.  Regulation, yep.  Product regulation.
13  Um-hum.
14    Q.  Okay.  And which group did you start
15  working?
16    A.  Product liability litigation.
17    Q.  Okay.  Is that the group you maintained your
18  relationship with throughout your employment with
19  General Motors?
20    A.  There was a brief period of time when I was
21  in the product regulatory group, but, basically, yes.
22    Q.  When you say a brief time, are we talking
23  months or years?
24    A.  Months.
25    Q.  So when you went to work for General Motors

Page 13

1  in 1977, you immediately went to the product liability
2  litigation group.
3    A.  Yes, I did.
4    Q.  Okay.  Now, you got your Michigan bar in
5  July of 1977?
6    A.  Yes.
7    Q.  Any other bars besides Michigan and New
8  Jersey at that time?
9    A.  No.
10    Q.  Are you still active in the Michigan bar?
11    A.  Yes.
12    Q.  Do you still work for General Motors?
13    A.  Yes.
14    Q.  Okay.  Same group, product liability
15  litigation?
16    A.  We call -- it's a different name now, but...
17    Q.  What do they call it now?
18    A.  Commercial and product litigation.
19    Q.  Did it expand and now encompass commercial
20  litigation, too, or did they just change the name?
21    A.  The two groups were brought together.  There
22  was a -- the general litigation practice and the
23  product litigation practice were sort of consolidated
24  into one group.
25    Q.  Okay.

Page 14

1  A.  Commercial and product litigation.
2  Q.  Did they add commercial to your repertoire
3  of assignments or did you stick with products
4  liability?
5  A.  Products liability.
6  Q.  Okay.  When did that merger of the two
7  groups take place?
8  A.  I want to say three, maybe four years.
9  Q.  I'm going to give you one other instruction.
10  If I ask you a question and the answer would be an
11  outright guess, tell me that and we'll move on to
12  something else.  If you can approximate or give me a
13  reasonable estimate --
14  A.  Okay.  Three to four years is an
15  approximate.
16  Q.  Okay.  Just let me know it's an
17  approximation --
18  A.  Sure.
19  Q.  -- so we know to give you some wiggle room
20  on that.
21  Tell me what the litigation
22  department in the product liability section does.
23  A.  Well, we manage the product litigation cases
24  as in-house counsel for General Motors and we work with
25  outside firms and with our technical expert engineering

Page 15

1  resources within General Motors to evaluate the various
2  lawsuits and claims that are made and hopefully manage
3  them to an appropriate resolution.
4  Q.  Okay.  And is that all things that you do or
5  is that broken down by different attorneys or different
6  departments within the product liability section?
7  A.  I'm not sure I understand that question.
8  Q.  Okay.  You listed a bunch of things.  You
9  said you manage the in-house processing of litigation
10  management, you deal with outside counsel, there was a
11  bunch of things, you look at the case and evaluate it,
12  you try to bring it to a successful resolution one way
13  or the other.
14  Does every attorney in the
15  litigation -- product liability litigation group do
16  that or do some people have responsibility for
17  settlement and some people have responsibility for
18  discovery or does one person have that whole range of
19  activities assigned to them?
20  A.  I'm not sure I understand that one either.
21  Q.  Okay.
22  A.  I'm sorry.
23  Q.  Okay.
24  A.  Does one person have the whole range of
25  activities?

Page 16

1  Q.  Well, I'm saying with respect to any one
2  case --
3  A.  Okay.
4  Q.  -- are there -- is there one attorney who
5  takes care of the gamut of those things or is -- are
6  there multiple attorneys, one dealing with settlement,
7  one dealing with discovery, one dealing with something
8  else involved in the same one case?
9  A.  There is one -- one attorney is assigned to
10  the case and would have primary responsibility for
11  discovery, although that person would be assisted
12  perhaps by other resources within the legal staff, and
13  with respect to settlement, there might be some
14  assistance from other resources in the legal staff
15  about evaluating settlement --
16  Q.  Okay.
17  A.  -- issues.
18  Q.  So there would be one general attorney who
19  was assigned to manage the entire ball of wax, so to
20  speak, and then he may solicit help from other
21  departments, other attorneys or other people.  Is that
22  a fair statement?
23  A.  Well, no.  What I said was there's one
24  attorney who's assigned to the case with responsibility
25  to managing the overall case and would have various

Page 17

1  people working with him or her to manage it.
2  Q.  Okay.  Is that attorney at the top of the --
3  if we were to do a flowchart of the management of
4  people involved in a case, would that be the top of the
5  chart, the attorney assigned to it?
6  A.  The top of the flowchart?
7  Q.  Yes.
8  A.  I'm not sure I understand what you mean by
9  flowchart.
10  Q.  Well, if you were to do a management
11  breakdown, you know, president, vice president, you
12  know -- you know how they do those like charts with one
13  at the top.
14  A.  Okay.  Um-hum.
15  Q.  Would the attorney be at the top of that or
16  are there people above that?  And I'm not talking about
17  reporting to just for general.  I mean, obviously, it's
18  a big corporation, there are a lot of people on top,
19  but I'm talking about for a specific case does the
20  attorney who's assigned it have primary responsibility
21  for the supervision of all the other people who are
22  underneath it?
23  A.  Yes, although the attorney, of course,
24  reports to a managing attorney who manages the overall
25  practice area who reports on up the legal staff chain

6 (Pages 18 to 21)

Page 18

1  of command. So I believe --
2      Q.   Okay. Maybe we should do it this way.
3  Let's say you have to bring in engineers to consult
4  with with respect to document production. Who is the
5  boss, the attorney or the engineer who's brought in
6  with respect to any particular case?
7      A.   The implication of your question is that
8  there's one person who makes the technical and then one
9  person who makes the legal decisions. Is that what
10  you're suggesting?
11     Q.   No. What I'm suggesting is who gets the
12  veto power. If there's -- if you have an engineer
13  who's coming to help you on a case and the engineer
14  says I think we should do this and you as the attorney
15  say no, I don't think so, who wins?
16     A.   You mean the engineer is giving legal advice
17  now or suggesting legal --
18     Q.   No. The engineer is giving advice on
19  anything. The engineer has an opinion.
20     A.   Well, including legal matters?
21         I don't understand your question.
22  I'm sorry.
23     Q.   Let's just -- let's say the engineer says
24  that he believes that these documents are responsive to
25  a discovery request and you don't believe they are.

Page 19

1  Who wins?
2      A.   Well, let me explain. I don't think you
3  understand how the process works.
4      Q.   Not really.
5      A.   We rely -- we rely on the engineers to give
6  us technical expert assistance to help us understand
7  what the technical documents mean.
8      Q.   Um-hum.
9      A.   And certainly they would review them.
10     Q.   Um-hum.
11     A.   And then we would make a legal judgment
12  about whether -- the legal staff in conjunction with
13  our outside counsel would make a legal judgment about
14  whether they are legally called for in response to the
15  particular discovery request using the technical expert
16  advice that we have gotten from the engineers, but the
17  engineers are not making the legal decisions. Is that
18  what you're suggesting?
19     Q.   Okay. So the final decision with respect to
20  that would be from legal counsel.
21     A.   It would be a collaborative decision.
22     Q.   Well, is there ever a dispute between the
23  engineer or someone else that the attorney doesn't
24  agree with?
25         MR. PERSONS:  Objection, vague.

Page 20

1         MR. DONOVAN:  I'll rephrase it.
2  BY MR. DONOVAN:
3      Q.   With respect to discovery, who gets the
4  final word as to what is produced and what is not
5  produced? Is it the attorney or the engineer?
6      A.   Okay. I'm going to repeat the answer again
7  that I gave you a minute ago.
8         The engineers give us the expert
9  technical advice that we need to understand the
10  technical documents whether or not it's technically
11  responsive from a technical point of view based upon
12  the allegation that's being made in the case. The
13  lawyers then take that advice and decide from a legal
14  point of view if it's responsive to the discovery
15  request that's being asked for, and we get our
16  collaborative advice from our outside counsel.
17     Q.   Okay. So it is an attorney who has the last
18  word with respect to what actually goes to plaintiff's
19  counsel?
20     A.   Okay. I see what you mean. After all of
21  this is digested and the process is completed?
22     Q.   Yes.
23     A.   Yes.
24     Q.   Okay. And that would be either --
25         Let me ask it this way. Is it

Page 21

1  outside counsel or is it in-house counsel for GM that
2  has the final word?
3      A.   It's a collaborative process. I -- you
4  know --
5      Q.   Okay.
6      A.   I don't think there's any --
7         Your assumption is that there's one
8  person sort of directing this thing.
9      Q.   Well, no, that's not my assumption. My
10  assumption is that if there's a dispute, someone has to
11  have the final word and make a decision. Now, there
12  are only two possibilities. Either there are never any
13  disputes and, therefore, that never happens because
14  it's collaborative and everybody always agrees or at
15  some point in time there's a disagreement, you know,
16  and someone has to make the final decision whether
17  something is produced or not.
18     A.   You mean from a legal point of view?
19     Q.   From any point of view.
20     A.   Well, from a legal point of view the -- we
21  as a legal staff would work with our -- in
22  collaboration with our outside counsel and take their
23  advice and reach a consensus judgment about whether
24  it's to be produced. I guess if there's some kind of a
25  legal dispute between the two, the legal staff would

Page 22

1 have the ultimate decision.
2    Q.   The General Motors legal staff.
3    A.   Yes.
4    Q.   Okay.  General Motors' legal staff is
5 responsible for retaining outside counsel?
6    A.   Yes.
7    Q.   In the particular case they're working on?
8    A.   That's correct.
9    Q.   Okay.  And how do they do that?  Is there a
10 list of counsel?  Is it -- you know, where does the
11 information -- how do you know in New Jersey to pick
12 Tom Tansey or how do you know in another state to pick,
13 you know, Joe Blow?
14    A.   There is a list which we could refer to, and
15 we also have the benefit of experience in the
16 jurisdiction with firms that we work with over the
17 years, so we know without having necessarily to refer
18 to the list.
19    Q.   Okay.  Who promulgates that list?
20    A.   I guess I would describe it as sort of a
21 living document.  It's iterated over many years and
22 with a lot of people inputting into it.  It's tweaked
23 and adjusted, you know, at different times by different
24 people.  I'm not sure there's somebody who promulgates
25 it.

Page 23

1    Q.   Okay.  Who has input into who is on that
2 list?
3    A.   I think any staff lawyer who's worked with
4 the firm could input.
5    Q.   Okay.  So you could say, listen, I would
6 like so and so added to this --
7    A.   Yeah.  Yes.
8    Q.   Okay.  Is there any type of quality review
9 in-house at GM with respect to how that law firm
10 functions or what type of job they're doing?
11    A.   Oh, yes.  Of course.
12    Q.   And is that contained within your department
13 or is that a different department altogether?
14    A.   The process of evaluating the performance of
15 our outside retained counsel is an ongoing process and
16 one that would invite comment from knowledgeable
17 in-house lawyers who have worked with the firm or
18 particular lawyers in the firm.  So I think anyone --
19 any lawyer who has worked with a particular firm could
20 voice some view as to how they're performing.
21    Q.   Okay.  And voices that view to who?
22    A.   Oh.  Other peers, colleagues.
23    Q.   In your products liability group?
24    A.   In my group or in the commercial group.
25 Whoever wants the information.

Page 24

1    Q.   Okay.  Who would make the decision to remove
2 someone from that list for whatever reason?
3    A.   Probably the managing attorney or his
4 designee I would think.
5    Q.   Okay.  Is there a managing attorney for the
6 product liability litigation section?
7    A.   Yes.
8    Q.   Okay.  Is there a managing attorney for all
9 of the litigation sections and the regulatory and the
10 tax, the labor, all the other subdivisions you gave me?
11    A.   There is not one managing attorney for all
12 of them together.  I think each one has its own
13 managing attorney.
14    Q.   Okay.  And what would be one step above that
15 managing attorney for the individual groups?
16    A.   In the org chart now you're talking about?
17    Q.   Yes.
18    A.   The general counsel.
19    Q.   Now, from reading your testimony I think you
20 said something to the effect that cases are assigned by
21 geographic area and specialty assignments.  Is that
22 true?
23    A.   Yes.
24    Q.   Okay.  What do you mean when you say they're
25 assigned by geographic area?

Page 25

1    A.   By state, a particular state.
2    Q.   So each of the attorneys in the products
3 liability litigation group has a series of states to
4 which they are assigned?
5    A.   I'm not certain if every single one does,
6 but most do.
7    Q.   Okay.  And by specialty assignment, does
8 that mean some expertise in some type of product
9 liability claim?
10    A.   Yes.
11    Q.   Okay.  So what states do you have or what
12 states did you have back then?
13    Well, let me ask it this way.  Let's
14 not waste time.  Were you given this case because of a
15 geographic assignment or because of a speciality
16 assignment?
17        MR. PERSONS:  And "this case"
18 being --
19        MR. DONOVAN:  Yes.  Green versus
20 General Motors.  Not --
21        THE WITNESS:  Well, my memory is
22 that I got assigned this case because of the specialty
23 assignment.
24 BY MR. DONOVAN:
25    Q.   Okay.  And that specialty was?

8 (Pages 26 to 29)

Page 26

1      A.   Roof crush.
2      Q.   Do you have any other specialties other than
3   roof crush? I'm not meaning to suggest that's not
4   enough, but...
5      A.   Do you mean 30 years ago or do you mean now?
6      Q.   Well, at that time. Let's stick to that
7   time.
8      A.   Oh. 1970 – late 70s timeframe?
9      Q.   The complaint was filed in 1988, I think.
10         MR. PERSONS:  Yes.
11         THE WITNESS:  The answer is, yes, I
12   did, but I can't -- I'm not sure I can recall exactly
13   which ones. It's -- a lot of time has passed.
14   BY MR. DONOVAN:
15      Q.   Okay. Then give me the ones you have now
16   which may or may not have been the ones back then.
17      A.   Okay. Now I handle airbag non-deployment
18   litigation, airbag litigation generally involving joint
19   venture products, I have Alabama, Tennessee, half of
20   Texas, and the lack of rear seat shoulder belt
21   litigation.
22      Q.   Lack of rear seat shoulder --
23      A.   Yes. I think that's it.
24      Q.   So by specialty now you have the lack of
25   rear seat belt -- lack of shoulder in the rear seat,

Page 27

1   roof crush, and airbag cases.
2      A.   I don't have roof crush.
3      Q.   I'm sorry. Roof -- you don't have roof
4   crush now?
5      A.   No.
6      Q.   Okay. You did back then.
7      A.   Well, what do you mean by "back then"?
8      Q.   Back in 1988 when the Green case was around.
9      A.   I believe I did in 1988, yes.
10      Q.   Okay. You gave up that assignment at some
11   point in time?
12      A.   I did.
13      Q.   Okay. When was that?
14      A.   Fall of 1990. September, October 1990.
15   Approx- -- you asked for approximate. Approximate.
16      Q.   Yes.
17         And why was it that you didn't
18   continue to handle roof cases?
19      A.   We had a change of responsibilities. Just
20   shuffling -- moving cases to different assignments.
21      Q.   Did somebody else become the roof person?
22      A.   Yes.
23      Q.   Who was that?
24      A.   My colleague, Thomas Ziolkowski.
25         MR. PERSONS:  You need the spelling.

Page 28

1         THE WITNESS:  You want the spelling?
2   Z-i-o-l-k-o-w-s-k-i.
3         BY MR. DONOVAN:
4      Q.   When did you first start handling roof
5   cases, any kind of roof cases?
6      A.   Let me think about that one.
7         I think it was either late 1978 or
8   early 1979, somewhere in there.
9      Q.   Okay. And I understand it was a rollover
10   case involving a Blazer.
11      A.   We had some rollover cases involving
12   Blazers.
13      Q.   Okay. Is that your recollection? Does that
14   comport with your recollection that those were the
15   cases you started handling in late 1978, 1979 which
16   were the first roof cases you became involved in?
17      A.   You didn't state that quite right.
18         I took over the speciality
19   litigation for the roof related -- roof litigation and
20   Blazer rollover roof cases were included among that
21   group of cases and there were a few of those, yes.
22      Q.   Okay. Was that a transition where you had
23   been handling a little bit and more and more and then
24   you were given the whole roof assignment with the
25   Blazers or was it something which was one day they

Page 29

1   said, you know, you're going to be the roof guy?
2      A.   Let me think how that happened.
3         We had another lawyer on the staff,
4   was already handling roof rollover cases and I took
5   over his -- I took over the speciality from him and I
6   believe it was all the cases.
7      Q.   Okay.
8      A.   Again, I'm not 100 percent certain.
9      Q.   So it was a more rapid assignment than a
10   gradual over the years you got one, you got two, you
11   got three.
12      A.   Rapid in what sense?
13      Q.   In the sense that one day somebody said
14   you're going to take over somebody else's workload with
15   respect to roof cases.
16      A.   There was a period of transition. I didn't
17   just jump into it the next day. There was a period of
18   transition --
19      Q.   Had you --
20      A.   -- when I worked with him and, you know, we
21   compared notes and consolidated and so on.
22      Q.   Okay. But that was after you found out that
23   this was going to be your specialty assignment that you
24   worked with him and --
25      A.   Well, he was the person I was taking the

Page 30

1  cases from, so you would expect, I think, that you
2  would transition with that person.
3      Q.  Okay.
4      A.  So --
5      Q.  What I'm trying to get at is --
6      A.  Okay.
7      Q.  -- were you working with him all along on
8  roof cases and then one day they said you're going to
9  take over the whole caseload or did they say you're
10  going to take over the caseload and then you worked
11  with him so he could bring you up to speed with respect
12  to what was being done on the roof cases?
13      A.  This particular lawyer was a peer in the
14  product litigation group when I was in -- first started
15  at GM and we were -- we would consult and collaborate
16  as colleagues and peers do from time to time about
17  claims and lawsuits.  So I was not unaware of the roof
18  crush litigation specialty before I took it over, if
19  that's what you mean.
20      Q.  Were you handling any roof crush or roof
21  specialty cases before you took it over?
22      A.  No, not that I recall.
23      Q.  Okay.  Did you have any particular expertise
24  in roof crush or roof cases before you took it over in
25  late '78 and '79?

Page 31

1      A.  What kind of expertise?
2      Q.  By handling a case.  By doing the discovery.
3  By reviewing discovery.  Any expertise that you had
4  developed.  Or maybe I should say any experience.
5  How's that?
6      A.  Well, certainly.  I had worked at GM for a
7  period of time and I knew the GM processes, I knew most
8  of the engineers, I knew the lawyers, I knew many of
9  the outside counsel and I had developed a rapport and a
10  relationship with all of those groups before I took
11  over the roof crush.
12      Q.  But you had not handled a roof case before
13  that.
14      A.  I don't know.  Not that had been assigned to
15  me, no.
16      Q.  Okay.  Can you recall what type of cases had
17  been assigned to you by way of allegation of parts of
18  the vehicle before you got involved in the roof cases?
19      A.  When I first started in the group, I think I
20  had mostly geographic cases.  I had the battery
21  explosion -- the so-called battery explosion cases.  I
22  believe I had, I think -- at some point in there I had
23  one or two asbestos claims.
24      Q.  Asbestos in the vehicle or --
25      A.  The early ones were related to brake

Page 32

1  linings.
2      Q.  Okay.  So from approximately late 1978, 1979
3  through October of 1990 you handled all of the roof
4  cases?
5      A.  I certainly would have handled most of them
6  because most of them would have been included in the
7  speciality.
8      Q.  Okay.
9      A.  It's possible that a case here and there
10  might not have been included in the speciality for some
11  reason.
12      Q.  Okay.  I'm talking where roof complaints was
13  the primary allegation, not that there was a primary
14  allegation and roof happened to be thrown in.
15      A.  Yes.  If roof was the primary allegation,
16  then it was in the speciality and then I would have
17  handled it --
18      Q.  Okay.
19      A.  -- and been responsible for it, yes.
20      Q.  Over that period of time, '78 through '90,
21  had you ever been involved in any case similar to the
22  Green case where someone claimed the roof collapsed or
23  came down as a result of a side collision?
24      A.  As a result of a side collision?
25      Q.  Yes.  Not a rollover.

Page 33

1      A.  We had roof-related claims being made in
2  different types of crashes, it didn't necessarily have
3  to be a rollover crash.  So I can't remember a specific
4  case to answer your question, but my expectation is
5  that there were probably claims -- or cases making that
6  kind of claim, roof-related allegations without it
7  necessarily being a rollover accident.
8      Q.  Okay.
9      A.  Yes.  So we had some.
10      Q.  Okay.  Was that before the Green case or
11  after the Green case or contemporaneously with?
12      A.  Probably all three.  Probably --
13          You know, I can't tell you exactly
14  that.
15      Q.  Okay.  So these would have been non --
16      A.  Contemporaneous with.
17      Q.  I'm sorry.
18      A.  Contemporaneously with it probably would be.
19      Q.  Okay.  So these would have been non-rollover
20  cases where there was some kind of collision to some
21  part of the car where the injury causation mechanism
22  was the roof?
23      A.  Well, let me repeat it again.  We had some
24  cases where there were roof-related claims on the
25  vehicle whether there was a collision with another

10  (Pages 34 to 37)

Page 34

1   vehicle or not. We had some where there was no
2   collision with another vehicle where there was no
3   rollover and there was some allegation being made about
4   the crashworthiness or lack of crashworthiness with the
5   roof, and those kinds of cases would have been included
6   in the roof crush specialty, yes.
7       Q.   Okay. I understand that, but that's not my
8   question. My question is --
9       A.   Um-hum.
10      Q.   -- were there -- can you recall handling any
11  cases either before or after or during the Michael
12  Green case where there was not a rollover where there
13  was some type of collision with some part of the car,
14  but the cars remained on the ground and the claim was
15  that the roof came down and was the injury-causing
16  mechanism for the particular plaintiff involved in that
17  suit?
18      A.   Yes.
19      Q.   Okay. How many of those cases do you think
20  there were around --
21      A.   I can't remember. I can't remember the
22  numbers.
23      Q.   Less than ten?
24      A.   I don't know.
25      Q.   More than ten?

Page 35

1       A.   I said I don't remember.
2       Q.   Okay. So you can't quantify that for me or
3   bracket that for me at all.
4       A.   No.
5       Q.   All right. Do you recall the names of any
6   specific cases where the allegation I just posited was
7   made?
8       A.   Yes. We had a case in Maine called
9   Pelletier versus General Motors where the claim was
10  that a tire had been knocked off a truck and the tire
11  came down and impacted the roof and crushed in --
12  crushed the roof in and injured the driver.
13      Q.   Okay. That's not -- that wouldn't have been
14  within my criteria because my criteria was where there
15  was a collision between two vehicles.
16      A.   Between two vehicles.
17      Q.   Yes.
18           Want me to run through it one
19  more -- one time?
20      A.   Yeah. Give it to me again.
21      Q.   Number one, not a rollover.
22      A.   Okay.
23      Q.   Okay? Number two, some type of collision or
24  impact between two vehicles to any part of the car, the
25  sides, the front, the back, okay, where the allegation

Page 36

1   is that the roof came down, collapsed, so to speak --
2       A.   Um-hum.
3       Q.   -- and that that collapse was the injury
4   causation mechanism that the plaintiff -- by which the
5   plaintiff sustained injury. So that's the criteria
6   within I'm working.
7            So do you want to go back to your
8   other answer that you said you couldn't quantify how
9   many cases fell within that criteria because,
10  obviously, if Pelletier was a roof crush because a tire
11  hit it, then -- and you included that in the list,
12  then, obviously, that's not what I was looking for?
13      A.   I can't recall a case like that at the
14  moment using that criteria that you just gave me.
15      Q.   Okay. And what I did not include which I
16  want you to understand is I'm not just talking about
17  F-cars. I'm talking about any cars at that point.
18      A.   Let me think about that a minute.
19           I just can't recall the name of any
20  specific case that fits that exact criteria. My
21  expectation is we probably had some, but I'm guessing.
22      Q.   Okay.
23      A.   So I'm speculating.
24      Q.   And so if I put one more criteria on that
25  list, which was that it was an F-car, would that

Page 37

1   refresh any of your recollection with respect to
2   whether you had that kind of allegations in meeting
3   those criteria?
4       A.   We had several F-car cases, but you're
5   asking me about something that was 20 years ago and --
6       Q.   Well, I said before --
7       A.   -- I can't recall the specific facts of all
8   of them.
9       Q.   I said before or after Michael Green or
10  contemporaneously with.
11      A.   Well, again, when these cases got filed,
12  when they ended, when they were pending, I can't
13  remember that from 25 years ago.
14      Q.   Okay. I'm not sure I understand you.
15           Are you telling me that you recall,
16  sitting here, an F-car non-rollover body collision
17  between two-vehicle case where the roof came down and
18  that was the injury causation mechanism?
19      A.   We had several F-car roof-related cases.
20  Some of them --
21           What I'm struggling with is I can't
22  remember a specific one where there was a collision
23  with another vehicle. There was also a roof-related
24  claim and there was no rollover. That's, I think, what
25  you're asking, and I don't recall a specific one.

**Page 38**

1    Q.   So sitting here right now you really can't
2  recall any case that meets all of those criteria.
3    A.   Not off the --
4              No, I can't.  Not involving an
5  F-car.
6    Q.   Would you agree with me that the Green case
7  and the contentions which were made with respect to the
8  crashworthiness of the vehicle was relatively novel at
9  that point in time?
10   A.   What exactly were the contentions in the
11  case?
12   Q.   A non-rollover, F-car, T-roof, now a T-roof
13  to make it even more restrictive, T-roof, side
14  collision, roof comes down and that causes the injury
15  plaintiff contends.
16   A.   I wouldn't agree that that's novel, no.
17   Q.   Okay.  But you cannot recall any other cases
18  like that.
19   A.   I can't recall any other cases with that
20  specific set of factual criteria, but the claim that
21  you're talking about is certainly not novel.
22   Q.   Okay.  Would you agree with me that rollover
23  roof collapse cases were much more common back in the
24  late '80s, early '90s than side impact roof collapse
25  cases?

**Page 39**

1    A.   What do you mean by "common"?  I'm sorry
2  to --
3    Q.   That there were more of them.  If we were to
4  take an inventory of all our cases --
5    A.   Um-hum.
6    Q.   -- and count how many F-car roof collapse
7  side impact cases we had as compared to roof collapse
8  rollover cases --
9    A.   I see what you mean.
10   Q.   -- that we would have more rollover cases
11  than we would have side impact roof collapse cases.
12   A.   We would have to go through and look at the
13  facts of each one and come up with a list and then make
14  that kind of inventory before I could agree with you
15  because we had a number of roof-related claims being
16  made in connection with vehicles that didn't roll over.
17  It wasn't that uncommon.  Now, how many they -- whether
18  this more common or more were pending in any given
19  time, I couldn't possibly answer that without doing
20  some pretty in-depth research.
21   Q.   So are you telling me that the side
22  collision roof collapse cases back in that era of the
23  late '80s, early '90s were as common as rollover roof
24  collapse cases?
25   A.   Well, again, I don't mean to argue with you,

**Page 40**

1  but I don't know exactly what you mean by "common".
2              Certainly roof -- T-roof related
3  claims on F-cars were not uncommon is the way I put it.
4    Q.   Okay.  But I'm not talking about T-roof
5  related claims.
6    A.   Okay.
7    Q.   I'm talking about --
8    A.   Isn't that along the Green case?
9    Q.   Yes, but I was much more restrictive than
10  that.  I'll do it one more time.
11   A.   Okay.
12   Q.   Non-rollover.
13   A.   Um-hum.
14   Q.   T-roof, side impact collision, roof collapse
15  and that being the injury causation mechanism of the
16  plaintiff's damages.
17   A.   The alleged injury causation mechanism.
18   Q.   Yes, and you told me you cannot recall --
19   A.   Well, I can't recall a single one.
20   Q.   Okay.
21   A.   So I guess that suggests that it's -- by
22  your definition, that it's not common.
23   Q.   Okay.  Fair enough.
24   A.   That set of facts with all the criteria.
25   Q.   Fair enough.

**Page 41**

1              How about if I was to ask you that
2  question with respect to can you recall any rollover
3  cases during that period of time, late '80s, early
4  '90s, where there was a roof collapse and that was the
5  cause of the plaintiff's injury or alleged cause?  Is
6  that something you can recall?
7    A.   Involving F-cars or generally?
8    Q.   Let's do it general and then you can tell me
9  about F-cars.
10   A.   Yes.  We had a number of rollover-related
11  cases, sure.
12   Q.   Okay.
13   A.   F-cars and non-F-cars.
14   Q.   And if I was to ask you to give me the names
15  of them, could you do that?
16   A.   Cynthia Meyer versus General Motors.
17   Q.   Okay.
18   A.   We had a big case called Schmidt, Jurgen
19  Schmidt versus General Motors.
20   Q.   Okay.
21   A.   There was one called Rollo versus General
22  Motors.  Rollo, R-o-l-l-o, I believe.  Let me think
23  here.  Wickham versus General Motors.  I can't recall
24  if it was a rollover.  Might not have been.  Wooten
25  versus General Motors.

12 (Pages 42 to 45)

**Page 42**

1    Q.   Okay.
2    A.   F-car.  Probably a few others.
3    Q.   Okay.  Correct me if I'm wrong, but, you
4  know, you're obviously able to give me various names of
5  rollover cases where there was a roof collapse injury
6  claim, but you can't give me the name of any cases
7  which involved the scenario involved in Michael Green
8  where there was a side collision and a roof collapse as
9  the injury causation mechanism.
10    A.   Well, that's a very restrictive set of facts
11  and you're asking me to remember something from 25
12  years ago, so no.
13    Q.   Well, I just asked.  You were able to give
14  me the names of cases in one category, but not the
15  other.
16    A.   Well, the category of rollover general is a
17  much easier category to recall than this very
18  specific -- fact specific set of circumstances that you
19  posited in the earlier question.
20    Q.   How about if I just say side collision roof
21  collapse injury causing mechanism?  Can you tell me the
22  names of any?
23    A.   No.  I've already said that I can't
24  remember --
25    Q.   Oh, okay.  So then --

**Page 43**

1    A.   -- that level of specific --
2    Q.   Is that less restrictive in your genre than
3  just a rollover roof collapse, a side impact roof
4  collapse?  It would seem to me that those are pretty
5  comparable.
6    A.   I'm sorry.  Comparable in what sense?
7    Q.   Comparable that each of them defines an
8  accident and a result.
9    A.   I'm sorry.  What is the question?
10    Q.   The question is --
11    A.   Um-hum.
12    Q.   -- that -- it's very simple, we've spent a
13  lot of time doing this, is that side impact collisions
14  with a roof collapse causing the plaintiff's injuries
15  were rather unique and uncommon in terms of being
16  defended by General Motors back in the '80s and '90s;
17  is that a fair statement?
18    MR. PERSONS:  Objection, asked and
19  answered --
20    MR. DONOVAN:  Well, I don't think it
21  has been.
22    MR. PERSONS:  Let me finish.  Let me
23  finish, please.  I let you speak without interruption.
24  Show me the same courtesy.
25    Objection, asked and answered.

**Page 44**

1    Subject to the objection, you may
2  answer it again.
3    THE WITNESS:  Okay.  The premise of
4  your question is not right in the sense that the --
5    You're assuming that the collapse
6  caused the injury?  Is that what you're suggesting?
7  BY MR. DONOVAN:
8    Q.   Am I assuming --
9    A.   Some allegation -- some roof performance was
10  related to the injury?
11    Q.   I think that's what the jury found, yes, in
12  the Green case.
13    A.   Okay.  Could you restate your question then?
14  I'm sorry.
15    Q.   My question was, is it fair to say that
16  cases where there was a side impact which caused the
17  roof to come down and collapse causing injury to a
18  plaintiff were rather unique and novel back in the late
19  '80s, early '90s?
20    A.   Where that allegation was being made?
21    Q.   Yes.
22    A.   Well, you know, I'll just repeat what I said
23  before.  We had a number of roof-related claims that
24  didn't necessarily involve rollover accidents.  Now,
25  whether there was a side impact component to any of

**Page 45**

1  those particular cases whether involving F-cars or
2  others is a level of detail that's pretty hard for me
3  to remember 25 years later.  So I would be hesitant to
4  say -- to agree that this is novel or uncommon as you
5  seem to want me to say.  You would really need to do an
6  analysis of the facts of all of those cases and take a
7  look at them, otherwise you would just be speculating.
8    Q.   Okay.  But you can't remember any sitting
9  here.
10    A.   I've said that.  No.
11    Q.   Okay.  When the Green complaint was filed in
12  1988, did that come to you first or was it handled by
13  somebody else initially in the GM legal department?
14    A.   It did not come to me first.
15    Q.   Um-hum.  Who did it go to?
16    A.   It was either Paul Widzinski or Maynard
17  Timm.
18    Q.   Okay.
19    A.   It might have been Paul Widzinski.
20    Q.   And were those peer attorneys in your group?
21    A.   Yes.
22    Q.   Did --
23    I think you testified, you know,
24  Maynard Timm was the one in your privilege hearing, if
25  I'm not mistaken, but Mr. Timm, did he have a certain

Page 46

1  specialty?
2      A.  At that time?
3      Q.  Yes.
4      A.  I'm not certain.
5      Q.  If I said that my understanding is that
6  General Motors classified this as a fuel fed fire case,
7  would that refresh your recollection as to whether Mr.
8  Timm had expertise in that particular specialty?
9      A.  I think so.  I think he did have fuel fed
10  fire cases.  I believe that may be right, yes.
11      Q.  The Wickham case you referred to before, was
12  that an F-car?
13      A.  I believe so.
14      Q.  Was it a T-roof?
15      A.  I can't be certain.
16      Q.  Was it a roof claim?
17      A.  It was a roof related claim, yes.
18      Q.  Was it a collision roof related claim?
19      A.  I just don't remember.  That's more than 20
20  years ago.
21      Q.  Was it a rollover related claim?
22      A.  I can't remember.
23      Q.  This is a case where you were involved in
24  supervising the production of documents?
25      A.  It was a case that was in the rollover --

Page 47

1  excuse me -- in the roof crush specialty, it would have
2  been my -- it would have been assigned to me, and so
3  the document -- the discovery documents would have been
4  gathered under my supervisor, my general supervision.
5      Q.  Would have been or was?
6      A.  Well, I can't at the moment recall that we
7  produced -- exactly what we produced in discovery.  I'd
8  have to go back and search the file.
9          Certainly if there were discovery
10  documents produced in the case, if it was assigned to
11  me, then I would have been responsible for it, yes.
12      Q.  Okay.  But you have no -- you don't
13  recollect -- have a recollection whether it was
14  assigned to you or who produced documents?
15      A.  I remember the case was assigned to me.
16  I -- you know, again, without looking at the file, I
17  can't tell you how many documents were produced or
18  whether documents were produced.
19      Q.  Is that file still available?
20      A.  I don't know.
21      Q.  During your search for documents to be
22  produced in that case, did you go into the F-car
23  Project Center file to retrieve documents?
24      A.  The Wickham case?
25      Q.  Yes.

Page 48

1      A.  I don't remember.
2      Q.  Okay.  Were you familiar with the existence
3  of the F-car Project Center file during the period of
4  time in which you handled the Wickham case?
5      A.  I don't remember that.
6      Q.  Okay.
7      A.  That's 25 years ago.
8      Q.  Okay.  Can you tell me when it was you first
9  became aware that there was an F-car Project Center
10  file?  And you know what I'm talking about when I say
11  that, don't you?
12      A.  Yes.
13      Q.  Okay.
14      A.  No, I really can't.
15      Q.  Okay.  Do you know whether it was before or
16  after your involvement in the Michael Green case?
17      A.  It would have been while I was handing, I
18  think --
19          Certainly while I handled the
20  Michael Green case we knew about the F-car Project
21  Center file.
22      Q.  Okay.  But you can't remember --
23      A.  Exactly when that knowledge came into being,
24  I can't remember.
25      Q.  But you can't recall whether you were aware

Page 49

1  of it before the Michael Green case.
2      A.  Before the Michael Green case.  I don't
3  remember.
4      Q.  Okay.  Bishop versus General Motors, do you
5  recall that case?
6      A.  I recall the name.
7      Q.  Okay.  Do you recall any of the facts about
8  it, what kind of car, whether it was a rollover?  Same
9  questions that I asked you about the Wickham case.
10      A.  I don't remember.
11      Q.  Do you remember anything about it?
12      A.  I think it was an F-car case, but I can't
13  recall.  I'm speculating.
14      Q.  Do you know what era that was from?
15      A.  What -- I'm sorry?
16      Q.  What era it was from?
17      A.  Era?
18      Q.  Era.
19      A.  No.
20      Q.  No.
21      A.  I don't.
22      Q.  70s?  80s?  90s?
23      A.  You mean when the case was filed?
24      Q.  Well, when it was being handled I'm going to
25  say.  So it gives you a longer window.

14 (Pages 50 to 53)

Page 50

1    A.   Longer window.
2         I really don't remember precisely.
3  I'm going to -- I would speculate and say approximately
4  the '80s. That's a ten-year period, so...
5    Q.   Sours versus General Motors.
6    A.   Okay.  Yes.
7    Q.   Ohio federal court.
8    A.   I remember that one.
9    Q.   F-car?
10   A.   That was a Camaro.
11   Q.   T-roof?
12   A.   T-roof.  That I don't remember.
13   Q.   Rollover?
14   A.   You know, I remember the name of the case.
15 It was handled in Cleveland, Ohio.  The facts of the
16 accident I just can't remember.
17   Q.   A roof claim?
18   A.   Yes, there was a roof claim.
19   Q.   Do you know how the roof -- what the roof
20 claim was?
21   A.   Not at this time, no.  I can't remember.
22   Q.   Anything about it?
23   A.   The case was tried.  When it was tried?
24 Early '80s, I think.  Federal court in Cleveland, I
25 believe, and we did not get a very good result, that I

Page 51

1  remember.
2    Q.   And the not very good result was?
3    A.   I can't remember that.
4    Q.   I assume that means the plaintiff won.
5    A.   It was a plaintiff's verdict, yes.
6    Q.   Okay.
7    A.   One of the few.
8    Q.   I won't respond to that.  I will move to
9  strike it from the record, though.
10        Can you tell me the names of any
11 cases where you have a specific recollection of
12 accessing documents in the F-car Project Center file in
13 order to provide discovery to the plaintiff?
14   A.   You mean me personally accessing the
15 documents?
16   Q.   No.  You know, where the file was accessed
17 by either you or a designee or an engineer, but you
18 were involved in the case.
19   A.   It came up in the Green case.
20   Q.   That I know.
21   A.   And for purposes of this deposition and also
22 my privilege testimony I reviewed some meeting notes
23 that I made I think in August of 1980 -- or 1990.
24 Excuse me, I'm getting my years mixed up here.  Based
25 upon that review of those notes, there was a reference

Page 52

1  to an earlier case called Hossan or Hassan where, I
2  believe, the F-car Project Center files had also been
3  discussed.  Beyond those two cases that were assigned
4  to me I don't recall any others.
5    Q.   So Hassan and Green.
6    A.   That's based on the notes that I took at the
7  time when I had the most knowledge about this, yes.
8    Q.   And with respect to your personal
9  recollection right now, those are the only two cases
10 you can think of.
11   A.   There was a case referenced in my notes
12 called Lehman McBride.  Was not assigned to me, it was
13 assigned to a colleague, and I believe, if you look in
14 the notes, you'll see there is some reference there to
15 the F-car Project Center documents in connection with
16 that case.  Whether they were turned over in that case,
17 I don't know.
18   Q.   Okay.  Do you know what kind of case Lehman
19 McBride was?
20   A.   Not off the top of my head.
21   Q.   Was it a roof case?  Probably not since you
22 didn't get it.  I mean, is that --
23   A.   Yeah.  It was not a roof case that I
24 remember.
25   Q.   Does General Motors have any written

Page 53

1  materials that one -- if one was a novice lawyer coming
2  into the products liability litigation section, that
3  one could consult as such -- as a type of handbook for
4  how we do this, how we produce documents, where we
5  look, what phraseology do we use to answer
6  interrogatories, anything of that nature?
7         MR. PERSONS:  Object to the extent
8  it calls for the disclosure of something that may be
9  work product or otherwise afforded a privilege.
10        Subject to that objection, you can
11 answer.
12        THE WITNESS:  Um-hum.  You mean --
13        MR. DONOVAN:  Mr. Persons, I think
14 the existence of it is certainly not a privilege issue,
15 but -- and if the answer is no, then we're finished.
16 If the answer is yes, though, then I think we need to
17 revisit that.
18        MR. PERSONS:  We're on the same
19 page.
20        MR. DONOVAN:  Okay.  Okay.
21        MR. PERSONS:  I just didn't want to
22 waive anything.
23        MR. DONOVAN:  Okay.
24        MR. PERSONS:  Go ahead.
25        THE WITNESS:  Are you talking about

Page 54

1  now or 30 years ago or what?
2      BY MR. DONOVAN:
3      Q.   Either or.
4      A.   Either or.
5           We have all sorts of resources, we
6  had them then, we have them now, that are helpful to us
7  in how to manage the litigation, discovery, source
8  locations, contact people, things like that.
9      Q.   Okay.  What about like, for instance,
10  instructions on how to answer interrogatories?
11      A.   What do you mean "instructions on how to
12  answer interrogatories"?
13      Q.   Well, that there's -- is there stock phrases
14  for objections?  Are there stock phrases for, you know,
15  when something is not being produced?  Are there stock
16  phrases for when a protective order is going to be
17  required?  Are there -- you know, anything -- anything
18  of that nature where if I was answering -- if I was
19  either in-house or outside counsel --
20      A.   Um-hum.
21      Q.   -- and I want -- I was answering a question
22  and I didn't know exactly and I didn't want to rely
23  upon my own memory to draft something, you know, from
24  scratch, that I could say, okay, here's the GM manual
25  on interrogatory forms, you know, and let me take a

Page 55

1  look at that?
2      A.   We have template initial disclosure
3  responses, for example, today and template protective
4  orders that we've used.  Certainly we have -- I
5  mentioned source locations for like electronic
6  discovery locations which is implicated much today.
7      Q.   Okay.
8      A.   And we would have the benefit of existing
9  sets of interrogatory answers and proposed objections
10  from other cases that we could access.
11      Q.   Okay.  You used the word "today" in your
12  answer.
13           How about if we go back to late
14  '80s, early '90s?  What did we have?
15      A.   We had a few things, but it wasn't anywhere
16  nearly as well organized as we are now because the
17  discovery demands are much more sophisticated today.
18      Q.   Okay.  What did you have that wasn't as
19  well organized?
20      A.   There was a -- I'm not sure if it was called
21  a manual.  There was a booklet that had some
22  discovery -- standard sort of discovery responses and
23  it suggested discovery responses I remember.
24      Q.   Okay.
25      A.   But this is many years ago.

Page 56

1      Q.   All right.  How about some kind of manual or
2  guidebook to putting together responses to discovery
3  demands?  Discovery demands meaning production of
4  document demands.  I'm sorry.
5      A.   Are we talking now years ago or --
6      Q.   Well, tell me now, tell me then.
7      A.   Well, I'll just repeat what I said.  We had
8  a variety of different types of resources, and we do
9  today, to deal with the increasingly sophisticated
10  discovery requests that are being made, electronic
11  discovery, privilege disclosure requirements, suggested
12  objections, protective orders.
13      Q.   Okay.
14      A.   The whole gamut.  I mean, it's not --
15           If you're suggesting that is there
16  one sort of rule book or something, that I'm not
17  familiar with.
18      Q.   Okay.  So there are multiple rule books, is
19  that what you're implying?
20      A.   No.  I said there are multiple resources
21  available to help the staff lawyer working with counsel
22  and the engineers meet our obligations.
23      Q.   And what is the repository for that
24  information?  Is it on-line?  Is it computer?
25      A.   Today we have a lot of that on-line.  We

Page 57

1  have what are called quick place -- quick places
2  on-line which we have some discovery resources in
3  there.  We have, of course, our pleadings and discovery
4  responses in pending litigation and protective orders
5  already on-line.  We can go and access those and get
6  ideas for templates to follow.  Of course, you have to
7  tailor the discovery response, as you know, to what's
8  asked for in the particular case.  It's not a one size
9  fits all type of situation.
10      Q.   Okay.  Again, let's go back to '80s, '90s.
11      A.   Okay.
12      Q.   What existed then?
13      A.   We had -- well, we had a lot of the same
14  kinds of resources available to us, but they weren't in
15  electronic format.  I mean, if we wanted to see a
16  discovery response in a case, we might have to go to a
17  paper file somewhere and take a look at that particular
18  response from the paper file.  It's a lot easier to do
19  it now because a lot of it's in electronic means.
20      Q.   Would General Motors back in that era, you
21  know, actually save discovery responses from various
22  cases, and I'm not talking about in the file whence it
23  was being, you know --
24           That's a really bad question.  Let's
25  start again.  Let's start again.

16  (Pages 58 to 61)

Page 58

1      A.   That era.  You're making me feel old.
2      Q.   Okay.  If you have document demands,
3   obviously you're going to save in the file itself for
4   that particular case whatever it is that's generated in
5   that case; correct?
6      A.   I'm sorry.  Say that again.
7      Q.   Let's do it one more time.
8      A.   Okay.
9      Q.   Does General Motors take and put separately
10  from the actual file for a particular accident or case
11  the discovery for later reference?  Does that do it?
12     A.   Discovery for later reference.
13     Q.   Do you understand what I'm asking because --
14     A.   No, I'm not sure I do.  I'm sorry.
15     Q.   Okay.  I want to make sure you do.
16     A.   Okay.
17     Q.   We have a case.
18     A.   Okay.
19     Q.   Smith case.
20     A.   Um-hum.
21     Q.   And we're particularly proud of our
22  discovery responses in that particular case.
23     A.   Okay.
24     Q.   And, obviously, we maintain a copy of that
25  in the Smith file, you know, which was --

Page 59

1      A.   Okay.
2      Q.   But now the Smith case is over, but we want
3   to hold onto those because those are really good
4   responses.
5      A.   Um-hum.
6      Q.   Okay?
7           Is there some place where we take
8   that and, you know, maybe the same thing with the Jones
9   case and maybe the same thing with other cases where we
10  have particularly good discovery responses and say,
11  okay, this will -- we're going to pull them out of that
12  file, we're going to close that Jones file or that
13  Smith file, but we're going to keep this discovery
14  package together so in case, you know, two years down
15  the road we want to use that same response because we
16  liked it so much?
17     A.   It's hard to give a general answer to that
18  question.
19          Certain specialty lawyers in
20  managing the requirements of a particular speciality
21  litigation might have developed very good discovery
22  responses so we wouldn't have to go back and repeat the
23  wheel and we would have a nice template to look at for
24  this case.  That kind of thing could have been done as
25  a part of work product.

Page 60

1      Q.   Did you do that with respect to roof cases?
2      A.   I don't remember.
3           We had a series of regional national
4   counsel who were -- we worked with and we had a number
5   of projects that they worked on.  If some of that
6   include harvesting, if you will, really robust examples
7   of discovery responses, we probably did that, but
8   details, I don't remember.  You're talking 25 years
9   ago.
10     Q.   Did you have a harvested form file that you
11  kept with discovery responses before it went on
12  computers or --
13     A.   You mean me personally?
14     Q.   Yes.  Um-hum.
15     A.   I think in the roof crush program we did
16  have some of our -- some of our -- some of our
17  discovery responses available so that we could go back
18  and check them, as you're suggesting, to avoid having
19  to reinvent the wheel every time.  Whether they were --
20  you know, the details of that and the extent to which
21  we included various types of cases, I don't remember
22  that level of detail.
23     Q.   Okay.  And I assume you still don't maintain
24  that.
25     A.   I don't have those cases anymore.

Page 61

1      Q.   Okay.  How about for discovery document
2   responses?  Did you have any kind of list or it could
3   have been more than a list, it could have been a whole
4   book, I don't know, where you would say, okay, we need
5   to find the documents with respect to a roof and we
6   need to find documents with respect to this car and
7   maybe even a particular kind of roof and you would look
8   that up and you would say, okay, here's a list of the
9   repositories of information related to those particular
10  issues?
11     A.   I'm not sure I followed all of that.  Could
12  you be a little more succinct?
13     Q.   Sure.
14          A case comes in.  It involves a roof
15  allegation in a C-car.
16     A.   Okay.
17     Q.   Okay?
18          Was there some resource you could go
19  to -- again, I'm talking back in late '80s, early
20  '90s --
21     A.   Okay.
22     Q.   -- where you could say, okay, let's see,
23  here's all the cars General Motors produced, you know,
24  for a period of time and go through and say, okay,
25  here's C-car, here's the tab for C-car, let's see,

Page 62

1  tires, fenders, bumpers, ah, roofs, okay, and documents
2  related to roof would be contained, you know, in a pile
3  in, you know, Engineer Brown's office and would be
4  contained in a file cabinet over in the east wing of
5  the old building? I mean, anything which would direct
6  you to where all this stuff was by car or by part or by
7  allegation.
8      A.  Well, we had available our engineering
9  experts to --
10     Q.  I'm talking about before you go to the
11  engineers, something you could refer to.
12     A.  I'm not sure I understand something I could
13  refer to.
14           You mean like a collection of
15  material or --
16     Q.  No, no, no.  Like an index.
17     A.  On a particular car line?
18     Q.  Particular car line or a particular part of
19  the car which was involved.
20     A.  An index.  An engineering document now or --
21     Q.  No, no, no.  I don't care who put it
22  together.  Maybe you put it together, you know, just
23  from your knowledge of doing --
24     A.  Well, you have to understand, there are
25  14,000 or so parts in the typical automobile.  So you

Page 63

1  could say each part would be indexed somewhere and we
2  could just go to the index for the F-car and there's
3  all the F-car documents?
4      Q.  I don't know if each part would be indexed,
5  but maybe general -- general categories, roofs,
6  bumpers.
7      A.  If there were engineering documents
8  available that had that kind of indexed information in
9  them, then we would have to get -- we would ask for, as
10  we should, the assistance of our engineering resources
11  to help us identify those to make sure that we were
12  able to find the search locations in the corporation
13  where we would expect to find responsive material, and
14  I believe that's our requirement under the rules, and
15  certainly we would have followed that.
16     Q.  Okay.  Did you ever put together, based upon
17  your experience in dealing with roof cases, your own
18  cross-reference list for cases maybe you had dealt with
19  as to where you had previously found documents and
20  where you might want to look for them in the future if
21  you had a case involving a similar allegation?
22     A.  You're going to have to restate that one.
23  I'm sorry.
24     Q.  I figured I would.
25         What I'm asking you is if a new case

Page 64

1  comes in and it involves a roof --
2      A.  Okay.
3      Q.  -- and you want to do a great job on
4  discovery production, did you compile your own list of
5  where one would go looking for all of the roof
6  documents in order to make sure you had covered all of
7  them?
8      A.  Compile in what sense?  I mean, write it
9  down?  Is that what you mean?
10     Q.  Write it down.  Put it on index cards.  If
11  you're very adept in your mind, you know.
12     A.  As a matter of attorney work product I might
13  make notes maybe about going through discovery requests
14  and say we probably want to go here for this -- these
15  types of documents and maybe over here for those types
16  of documents, but as lawyers, we would need the
17  assistance of the experts to help us --
18     Q.  Okay.
19     A.  -- locate the technical repositories where
20  we need to go.
21     Q.  Okay.
22     A.  And then we would bring the engineering
23  resources on to help us confirm that, yes, you need to
24  go to Fisher Body or wherever it is to find that
25  particular type of document, but over a period of time

Page 65

1  as you work at GM, you -- in a particular specialty
2  type of litigation, you develop some experience and
3  knowledge about what general locations are likely to
4  have materials, certainly.  That's what you would
5  expect.
6      Q.  But that was not reflected in any kind of
7  documentation that you had?
8      A.  I might have made notes, you know, about
9  particular requests and where to go, where I thought
10  maybe we ought to go.
11     Q.  And how about the engineers?  Did they have
12  lists that they would go to to search for all of the
13  documents related to a particular part or structure of
14  a vehicle?
15     A.  Well, you know, the implication of your
16  question is that there's these pre-formatted rule books
17  or something out there that the engineers then look for
18  so they know where to go.  You would --
19         A particular engineer might have
20  work product stuff that they would do on a particular
21  case in response to the lawyer's direction.  You go to
22  CPC for this, Chevrolet for that, Fisher Body for this,
23  powertrain.  I mean --
24     Q.  Yeah.
25     A.  And primarily there you're relying on the

18 (Pages 66 to 69)

Page 66

1  expertise and knowledge of the individual engineer or
2  engineers who were working on the case.
3      Q.  Let me try it a different way.
4      A.  Okay.
5      Q.  As an attorney who does a lot of personal
6  injury litigation --
7      A.  Um-hum.
8      Q.  Okay? If I write a brief on a particular
9  point, okay, in my computer, and before that it was
10  actually hardcopies and folders, I had a form file,
11  okay, of briefs so that if I had an issue, say, with
12  notice in a fall down case, I would go to my brief
13  forms, you know, which was actually in a file cabinet
14  and I'd look for fall down and I'd look under fall
15  down, a subcategory of notice, and in that file
16  would be a copy of the brief I had done on notice in
17  fall down cases. Today it's on computers. I go to
18  briefs, I go to fall down, I go to notice cases, okay,
19  and I can do that for pretty much any brief I've ever
20  written, you know -- you know, over time.
21      A.  Okay.
22      Q.  Okay? Do you -- I'm looking for something
23  similar to that.
24          You have a case that comes in that
25  involves a roof, okay, or a tire or a fender. Do you

Page 67

1  have a similar methodology either in hardcopy form,
2  which is where you can say, okay, I have -- this is an
3  F-car, so here's my F-car prior experience with that
4  and here's the sub breakdown of that and last time when
5  I did that I found documents in a pile in this corner
6  and I found them in this warehouse and I found them on
7  this computer and there's some microfiche or wherever
8  else, you know, they're going to be? Did you have some
9  kind of methodology back in the '80s and '90s for
10  flushing out the whereabouts of all the documents
11  pertaining to a specific part and even more
12  specifically in this case involving a roof?
13      A.  I think I've answered this already. I'll do
14  it again.
15          We certainly would have had work
16  product, notes, things like that as we were going
17  through the discovery requests, based upon our
18  experience where we would expect to find responsive
19  materials, you know from experience that this kind of
20  thing we think would be found here.
21          Whether I made specific notes on
22  particular cases, I probably did. I can't recall now
23  this -- this -- years ago. It was certainly my
24  practice to consider the discovery requests very
25  carefully and work with counsel and make the notes that

Page 68

1  I needed to make to do the -- to prepare GM's defense.
2      Q.  Okay.
3      A.  And we would have brought in the
4  knowledgeable technical people, engineers mostly, to
5  help us confirm that, if we were looking for a roof
6  related document, where would we need to go to get that
7  and exactly what is it we need to ask for. We would
8  need some technical expertise to make sure we did that
9  the right way.
10      Q.  Okay.
11      A.  And were notes made in that process?
12  Certainly. You've got my notes from this case. We had
13  a meeting to do just exactly that.
14      Q.  Did you save them from other cases?
15      A.  I'd have to look in the files. If they're
16  still around, I don't know.
17          THE WITNESS: And can we take a
18  short --
19          MR. DONOVAN: Absolutely.
20          THE WITNESS: -- short break?
21          MR. PERSONS: Certainly.
22          MR. DONOVAN: It's not a marathon.
23          THE WITNESS: Okay.
24          VIDEOGRAPHER: Going off the record
25  at 1:25 and 31 seconds p.m.

Page 69

1          (Recess)
2          VIDEOGRAPHER: We're back on the
3  record at 1:38 and 1 seconds p.m.
4      BY MR. DONOVAN:
5      Q.  Mr. Brown, we were talking about how one
6  would go about finding documents --
7      A.  Okay.
8      Q.  -- to respond to a document production
9  request.
10          Based upon what I've read, I assume
11  back in the late '80s, early '90s GM did not have a
12  stock, and I'm making quotes around that, roof set of
13  documents for the F-car.
14      A.  Stock roof set of documents for the F-car.
15      Q.  And I can define it a little more if that's
16  not helpful to you.
17      A.  Well, you know, do you mean for litigation
18  or engineering or --
19      Q.  For litigation. I'm sorry.
20      A.  For litigation?
21          We would have had --
22          The productions that had been made
23  in particular F-car cases and as I had testified before
24  the break, we would have had those discovery responses
25  and the productions available as a potential resource

**Page 70**

1  to look for --
2      Q.   Okay.
3      A.   -- to help us manage the request that's
4  being made now.
5      Q.   At that point in time do you know whether
6  anybody had taken the time and effort to go through
7  wherever documents related to the F-car might be
8  located and produced a file in any format which
9  contained every document which had something to do with
10  the roof structure?
11     A.   For litigation you're talking about?
12     Q.   Yes.
13     A.   We dealt with the discovery in the
14  particular cases as it was presented to us, which we
15  were required and, of course, obligated to do as a good
16  corporate citizen. We want to look for the
17  locations -- those search locations where we would
18  expect to find documents and the accident type, the
19  particular claim about the roof structure, the
20  component involved with the roof structure, the
21  engineering allegation. We would want to be sure that
22  we were looking for technical roof related documents in
23  the places where we would expect to find them. And so
24  we would bring together the group of engineers that
25  worked -- that were our resource for those kinds of

**Page 71**

1  cases to help direct us to find the particular
2  documents that were responsive to the discovery
3  requests. That would have been our obligation at that
4  time as it is our obligation today.
5      Q.   Okay. Thank you for that explanation, but I
6  don't think that answers my question.
7      A.   Okay.
8      Q.   My question is, was there a stack or a pile
9  or boxes or microfiche which contains a compilation of
10  all of the documents related to the F-car roof?
11     A.   You mean every conceivable document?
12     Q.   In one location. Yes.
13     A.   From all over the General Motors
14  Corporation?
15     Q.   Yes.
16     A.   That could conceivably relate to an F-car
17  roof?
18     Q.   Yes.
19     A.   Not aware of that, no.
20     Q.   Okay. So how many places -- if it wasn't in
21  one place, how many places around General Motors would
22  one have to look if one wanted to compile every
23  document related to the F-car that had anything to do
24  with the roof?
25     A.   Had anything to do with the roof in any

**Page 72**

1  respect.
2      Q.   Yes.
3      A.   At this timeframe or now?
4      Q.   No. Back in late '80s, early '90s.
5      A.   Well, it's hard to answer that because --
6  and that's why we would get together and discuss the
7  request with the engineers who were knowledgeable about
8  where the documents would have been located so that we
9  could identify the search locations that might have
10  potential documents and do a very thorough search.
11  That's what we were trying to do here and my meeting
12  notes from 1990, I think, reflect that.
13     Q.   Okay. So you had that discussion about the
14  various places where these F-car roof documents would
15  be. And how many places did you come up with where
16  they might be?
17     A.   I'd have to review the notes. More than
18  one, as I can recall.
19     Q.   Okay. If I was to say back in late '80s,
20  early '90s, you know, Doug, I want -- and I'm a real
21  bigwig of General Motors and I said, Doug, I want all
22  of the documents which have anything to do with the
23  F-car roof and I want them all in my office, you know,
24  within the next month, would you have known where to go
25  to get all those documents without the assistance of

**Page 73**

1  any engineer?
2      A.   I could certainly make an educated -- could
3  have made, excuse me, an educated judgment about that
4  based upon my own experience and knowledge from what I
5  knew about GM and how it maintains documents, but
6  certainly to be thorough and complete, which is, of
7  course, what we want it to be, we would bring in the
8  experts who really are knowledgeable from a technical,
9  as I've said now several times, point of view about who
10  had engineering responsibility for the particular
11  documents that relate to the roof claim that's being
12  made --
13     Q.   Um-hum.
14     A.   -- and where these documents are most likely
15  to be found. It would save us time and conserve the
16  resources of the team.
17     Q.   Okay. So let's get back to my question
18  again.
19     A.   Okay.
20     Q.   Doug, I want you to go get me all the roof
21  documents pertaining to the F-car, and you've told me
22  that you had a general understanding from your
23  experience where one might start the process of looking
24  for them. Where do you go?
25     A.   Well, you would want to figure out which

20 (Pages 74 to 77)

Page 74

1  engineering organization had overall responsibility for
2  the vehicle design, where we would expect to find
3  products if it were --
4      Q.   You went through this process in the Green
5  case; correct?
6      A.   My notes reflect --
7      Q.   So what I'm asking you is to tell me what --
8  tell me where these places were, where one would
9  physically go to look for this stuff. Where was it?
10     A.   There's -- it wouldn't just --
11          I think you're misunderstanding the
12 process. There isn't just one place like they're all
13 in a --
14     Q.   I understand that.
15     A.   -- they're all in a basement location
16 somewhere.
17     Q.   I understand that. You told me that.
18     A.   That's not the case.
19     Q.   Okay. Well, is it 100 places?
20     A.   No, it's probably not 100 places.
21          You would go to the car division
22 that is the -- has responsibility for the vehicle. For
23 instance, Chevrolet, you'd go to Chevrolet, CPC at that
24 time.
25     Q.   Let's talk about the F-car, the Camaro.

Page 75

1          MR. PERSONS:  Well, the F-car
2  includes more than just --
3          MR. DONOVAN:  I said --
4          THE WITNESS:  The F-car is --
5          MR. DONOVAN:  -- the Camaro.
6          THE WITNESS:  -- the Firebird and
7  the --
8  BY MR. DONOVAN:
9      Q.   Right.
10     A.   -- and the F-car and the Firebird are the
11 F-cars.
12     Q.   Okay.
13     A.   That would have -- you know, if it was in
14 the mid '80s, certainly it could have been Fisher Body
15 implicated in the design. They would have had
16 responsibility for a good part of the interior and also
17 the structural components of the vehicle.
18     Q.   Okay.
19     A.   So you would go to Fisher Body. You would
20 go to Chevrolet. You might go to Pontiac.
21     Q.   I'm sorry.
22     A.   You might go to the -- well, let me finish
23 my answer, please.
24     Q.   I'm trying --
25     A.   You might go to the General Motors proving

Page 76

1  ground where the vehicle was tested where crash and
2  regulatory testing was done, where durability testing
3  was done. So there are a variety of potential
4  locations within GM where you might go to find
5  documents that are responsive.
6          The reason this isn't real
7  susceptible to what I think you're suggesting, which is
8  that there's some kind of a cookbook out there, is
9  because every design is a complex thing with multiple
10 parts and you have to bring in experts and know where
11 to go --
12     Q.   Okay.
13     A.   -- to find this stuff. That's why you do
14 it.
15     Q.   Believe me, I do understand that. Okay?
16     A.   Um-hum.
17     Q.   Okay? Now, Doug Brown has been asked to
18 produce for the CEO of General Motors all of the
19 documents related to the F-car roof. Okay?
20     A.   Um-hum.
21     Q.   And your job is on the line and so is your
22 pension. All right?
23     A.   Okay.
24     Q.   So you don't want to actually have to do the
25 work, so you ask Maurice to go actually get those

Page 77

1  documents for you, and you're going to give Maurice
2  like a shopping list of the places where he needs to go
3  and make inquiries based upon your experience, and I'm
4  not up to the engineers because they may add to my
5  list. I'm just interested in the place that Doug Brown
6  knows based upon his experience in dealing with General
7  Motors and his experience dealing with roof cases --
8      A.   Um-hum.
9      Q.   -- and his experience being here for a long
10 time. Where does Maurice start to go and what -- he's
11 going to write down a list of the places he's going to
12 go and what he's going to look for when he gets there.
13 Okay? So now if I want to make that list -- I got my
14 yellow sheet here, I got my -- I got my pencil, and I
15 want to do a good job because your job and your pension
16 is on the line. So you tell me where I'm going. One.
17          MR. PERSONS:  And with one
18 clarification, Maurice. We're talking about the
19 1986 --
20          MR. DONOVAN:  Yes.
21          MR. PERSONS:  -- F-car Camaro.
22          THE WITNESS:  Well, if my job and my
23 pension are on the line, I would want to have the
24 expert help that I need to do --
25 BY MR. DONOVAN:

Page 78

1    Q.   No, no, no, no, no.
2    A.   -- to do the job right.
3    Q.   No.  No.
4    A.   But if you're just asking me based on what
5    would --
6         MR. DONOVAN:  Would you please
7    instruct your witness to answer my question instead of
8    the question he keeps wanting to answer.
9         MR. PERSONS:  To the extent you can
10   answer.
11        THE WITNESS:  All right.  You would
12   certainly go to the car division to see if they have
13   responsive material.  At that time we had a -- I
14   believe we had engineering staff.  You probably would
15   go there to find --
16   BY MR. DONOVAN:
17   Q.   Which car divisions would I go to?
18   A.   Well, if it were Chevrolet -- if it was a
19   Camaro, you would go to Chevrolet.
20   Q.   It was a Firebird, I'd go to?
21   A.   Pontiac.
22        If it were --
23        In that timeframe you probably would
24   go to Fisher Body.  You might go to the engineering
25   staff's organization.  You might go to the Milford

Page 79

1    Proving Ground where the vehicle's tested, durability
2    testing.
3    Q.   I can't write that fast, so hold on.
4    A.   Oh.
5    Q.   Proving grounds.
6    A.   Yeah.
7    Q.   Go ahead.
8    A.   You might try to identify the chief
9    engineer, whoever was the chief engineer, and his staff
10   that was responsible for the design of the roof and you
11   could possibly talk to them if you felt it was
12   necessary.  Those are probably the main places.
13   Q.   That's where you'd start.  Okay.  Now --
14   A.   For technical documents.  Is that what
15   you're asking for?
16   Q.   Yes.
17   A.   Okay.
18   Q.   So I'm going to the Chevy car division, and
19   what do I -- what am I expecting and what am I looking
20   for there?
21   A.   Well, it depends on what the question is
22   that you're --
23   Q.   I want the roof documents.
24   A.   Like drawings or --
25   Q.   Anything that -- anything that has to do

Page 80

1    with roof.  I want to make sure I got everything.
2    A.   You would try to figure out who has custody
3    of the engineering drawings --
4    Q.   Um-hum.
5    A.   -- for the roof and its component parts.
6    Whether that's the car division or Fisher Body, I'm not
7    sure at this point because I don't remember, but
8    whoever the custodian of the engineering drawings would
9    be, Fisher Body or the car division or someone else.
10   Q.   Okay.
11   A.   Then you -- then you would start there.
12   Q.   Okay.
13   A.   And say here are the drawings that I want.
14   Q.   Okay.
15   A.   If there are change requests that were
16   referenced on the drawings, you could ask them for
17   copies of those.
18        If it was a Project Center vehicle
19   like the F-car was, then certainly then you knew that
20   you had the F-car Project Center files available, then
21   you probably would want to look at those.
22        So it's a variety of -- you would
23   certainly make a thorough and -- a thorough search of
24   the locations, as I said before, where you would find
25   material, but, again, I would not undertake such a

Page 81

1    thing as a lawyer only.  You need the help from the
2    people who really understand the technical documents
3    and where they're likely to be.
4    Q.   Okay.
5    A.   And that's why we bring engineers into the
6    process.
7    Q.   I understand that.
8    A.   Okay.
9    Q.   Okay.  So I go over to the car -- the Chevy
10   car division.  Where is that physically located?
11   A.   At that time it would have been at the
12   General Motors Technical Center.
13   Q.   And where was that?
14   A.   In Warren.  In Warren, Michigan.
15   Q.   Okay.  And I would go in and I would go --
16        Is there a location where documents?
17   Is there a file room?  Is there a --
18   A.   No.  You would identify the custodian --
19   what it is you're looking for, who the custodian is and
20   you would send that person a request.
21   Q.   Um-hum.
22   A.   Okay.  If it's -- if the custodian of the
23   engineering drawings is somebody at the Chevrolet
24   division, then you would send -- you'd identify who
25   that is, or actually in that time I believe we had, as

22 (Pages 82 to 85)

## Page 82

1  we do today, we had a series of discovery contacts --
2      Q.   Um-hum.
3      A.   -- at the various divisions.  It might not
4  necessarily be the engineer, but there would be a
5  discovery contact representative there and that's the
6  person we would say what we needed them to search.
7      Q.   Okay.
8      A.   Otherwise you'd be pestering the Chevrolet
9  engineer every other day.
10     Q.   Now, Fisher Body.  Why would we go to Fisher
11 Body?
12     A.   Well, until 1984, I believe was when the
13 reorganization was, Fisher Body had responsibility for
14 the interiors and I believe also certain components of
15 the structure such as the roof components, I believe.
16 I believe that's right.
17     Q.   Okay.  So we would expect to find roof
18 documents there --
19     A.   We might.
20     Q.   -- for that car.
21          Who at the engineering staff would
22 we contact?  Is that a separate -- well, let me ask
23 you.  Car division, Fisher Body.  Is engineering staff
24 a separate category?
25     A.   In that timeframe there was a corporate

## Page 83

1  engineering staff, yes.
2      Q.   Okay.
3      A.   If they had done any, you know, any
4  particular analysis or work, engineering work on that
5  particular car or the component, then you might ask
6  them, but you wouldn't do it unless you had somebody
7  knowledgeable about the process tell you to look there.
8      Q.   Okay.
9      A.   At least I wouldn't, otherwise you'd be
10 wasting your -- spinning your wheels.
11     Q.   Okay.  And what would they have at the
12 proving ground that would be relevant to the roof and
13 the F-car?
14     A.   They might have tests, crash and sled tests,
15 durability tests, things like that, test incident
16 reports that are generated during a test if there's an
17 issue with the performance of a product.
18     Q.   So that's where the crash and sled test
19 reports and the videos would be?
20     A.   In that timeframe now?
21     Q.   Yes.
22     A.   Well, certainly the testing was done there.
23 Whether they were housed there, you know, you're
24 talking 25 years ago, I'm not sure.  I think some of
25 them.  I'm not sure.  I'm speculating.

## Page 84

1      Q.   Okay.  Would they have anything else other
2  than tests -- tests and reports and videos and pictures
3  of tests?
4      A.   You know, I just don't recall specifically.
5  If they had a proving ground project related to the
6  vehicle in some way, they might have a file on that.
7      Q.   Okay.  You said you'd go to the chief
8  engineer and staff.  What is the chief engineer?  Who
9  is it?
10     A.   I said that the chief engineer might be a
11 potential location -- or the engineer responsible for
12 the design that's in issue is really what I meant to
13 say.
14     Q.   Okay.
15     A.   You're talking about roofs.  So you would
16 say, well, who was -- who was -- who had responsibility
17 for the roof design.
18     Q.   Okay.
19     A.   You can probably identify that person from
20 the drawing.
21     Q.   Okay.  And who was that in the F-car?
22     A.   I don't remember.
23     Q.   Okay.
24     A.   Too many years ago.
25     Q.   That wasn't Mr. Knickerbocker, was it?

## Page 85

1      A.   I just don't remember.
2      Q.   Okay.  Is there a document anywhere that you
3  saw during the privilege hearing which I could show you
4  which would help us identify who the engineer
5  responsible for the design in question was so you could
6  contact him to see what kind of documents may have been
7  generated?
8      A.   I'm happy to look at any document you want
9  to show me and see if it refreshes my memory, but
10 you're talking about an engineering function here, not
11 a legal staff function --
12     Q.   Okay.
13     A.   -- and it's more than 25 years ago, so don't
14 know.
15     Q.   Is there any document which reflects your
16 contacting this chief engineer or the engineer
17 responsible for the design to make inquiries about
18 where documents may have been or what kind of documents
19 were generated?
20     A.   Are you talking about in the Green case?
21     Q.   Yes, I am.
22     A.   I'll answer that in two ways.  Number one, I
23 don't remember specifically and, number two, the
24 premise of your question is a bit incorrect in that
25 you're assuming that we would necessarily contact that

Page 86

1   person in every case and we might not. Again, we would
2   bring in our engineering staff. Our engineering
3   analysis expert engineers would tell us where to go.
4   If that individual is someone who would be likely to
5   have responsive material, then we might go there, or we
6   might go to the discovery contact for that individual's
7   division rather than bother that engineer.
8         So the purpose of the way this is
9   organized is to make this manageable so that you're not
10  tasking the vehicle line engineers more than you need
11  to with requests.
12    Q.   Yeah. I can see how it makes it very
13  manageable.
14    A.   But it's a judgment thing. You have to look
15  at everyone.
16    Q.   So you can't tell me whether you identified
17  this chief engineer or this engineer responsible for
18  design in the Green case with roof?
19    A.   In the Green – I don't remember that, no.
20    Q.   Okay.
21    A.   Could be a --
22    Q.   You said that sometimes you do, sometimes
23  you don't.
24         Just based upon your experience,
25  given that Judge Ferentz in New Jersey was breathing

Page 87

1   down local counsel's neck and was a little concerned
2   that every stone be unturned and every document be
3   uncovered with the sanction of death at her hands,
4   would this be the type of case, Green, where you would
5   have tried to figure out who the chief engineer was or
6   the engineer responsible for the design in question?
7         MR. PERSONS: Object to the
8   question, the form of the question.
9         Go ahead, you could answer it, Doug.
10        THE WITNESS: This case, reviewing
11  my notes from when we had our meeting --
12    BY MR. DONOVAN:
13    Q.   Um-hum.
14    A.   -- we've talked about was one where we were
15  trying to understand the parameters of what the judge
16  had ordered and trying to identify the locations where
17  we would expect to find responsive material, and I
18  think my notes are pretty detailed on what we were
19  going to do. Whether there was a need to identify and
20  contact the particular engineer responsible for the
21  roof component or not, I don't remember. Possibly
22  there was and possibly there wasn't, I just don't
23  recall.
24         If you would like me to review my
25  notes, I'll be happy to do that.

Page 88

1    Q.   That's exactly what I'm getting right now.
2   BROWN EXHIBIT NO. 1
3   WAS MARKED BY THE REPORTER
4   FOR IDENTIFICATION
5   BY MR. DONOVAN:
6    Q.   We've marked a document as Brown 1. It's
7   document 123 in the privilege log and it's Bates
8   number -- I think it's 844 through 851.
9         Mr. Brown, I've given you Brown 1.
10  My understanding is these are your notes of a meeting
11  which was held back in August of 1990 pertaining to the
12  discovery request order by Judge Ferentz in the Green
13  versus General Motors case; is that accurate?
14    A.   Yes.
15    Q.   Okay. And these were notes that you took
16  contemporaneously with that meeting or something that
17  you took after the meeting?
18    A.   Just make sure everything is here.
19         These were handwritten notes that I
20  made during the meeting.
21    Q.   Okay. And tell me generally what the
22  purpose was of making the handwritten notes? What were
23  you doing? What were you trying to do? What was your
24  goal?
25    A.   Oh. Our goal here was to, as I said I think

Page 89

1   before, to take a very careful review and analysis of
2   this court order that had been entered, make sure that
3   we had the right people in the meeting to guide us in
4   identifying the places where we would expect to find
5   material responsive to the court order --
6    Q.   Okay.
7    A.   -- and recording what we decided to do to
8   further search for responsive documents to the court
9   order consistent with our intent to certainly give a
10  thorough and good faith compliance with what the court
11  had -- what the judge had ordered.
12    Q.   Okay.
13    A.   And as I recall -- well, go ahead.
14    Q.   If you would look through that document and
15  see if you can answer the question that I started this
16  with is was there any effort made to identify the chief
17  engineer or the engineer responsible for the design of
18  the F-car roof, and if his name is in there, please let
19  me know who that was.
20         MR. CARROLL: While he's looking, I
21  think it's 644 to 651 instead of 8 only because I put
22  my glasses on.
23         MR. DONOVAN: Maybe I should do the
24  same.
25         MR. PERSONS: That does look like an

24 (Pages 90 to 93)

Page 90

1    8. My glasses on, it looks like an 8 to me.
2           MR. DONOVAN:  You are correct.  So
3    we're actually talking about 644 through 51.
4           THE WITNESS:  Can you repeat your
5    question?
6    BY MR. DONOVAN:
7       Q.  Yes.  I asked you to review Brown 1 --
8       A.  Okay.
9       Q.  -- and see if you can show me or tell me or
10   point me to anything having to do with designating or
11   contacting the chief engineer or the engineer
12   responsible for the design of the roof in question as a
13   contact person to provide documents relevant to the
14   F-car roof.
15      A.  There is on page 6 a reference here to CE of
16   Project Center, which I believe --
17      Q.  Excuse me one minute, Mr. Brown.  Is that
18   Bates number 650?
19          MR. CARROLL:  Page 6.
20          THE WITNESS:  Is that an 8 or a 6?
21          MR. PERSONS:  No, 649.
22   BY MR. DONOVAN:
23      Q.  I'm sorry.
24      A.  649.  Excuse me.
25      Q.  I'm sorry.

Page 91

1       A.  Yes.  It says id to present, 86 to present,
2    CE of Project Center - Don Armstrong names off
3    drawings.  Do you see that?
4       Q.  Yes.
5       A.  Then it says design responsible, 86 plus
6    present.
7           I don't have that particular
8    interrogatory or request for production in front of me,
9    but I believe that's a reference to identifying the
10   design responsible engineers.  I'd have to look at the
11   interrogatory to be certain.  That certainly would have
12   been our -- it doesn't surprise me that that reference
13   is in there.
14      Q.  Okay.
15      A.  As I said before, we were trying to be
16   thorough here.
17      Q.  Do you know whether anyone ever contacted
18   Don Armstrong and had a discussion with respect to
19   documents?
20      A.  It certainly would have been our process to
21   do that.  Whether I specifically remember that 25 years
22   later, 28 years later, I guess, or -- excuse me.  How
23   many years later is it?  Eighteen years?
24          MR. PERSONS:  Twenty.
25          THE WITNESS:  Eighteen years later.

Page 92

1    No, I don't.
2    BY MR. DONOVAN:
3       Q.  Okay.  I didn't see any documents in the
4    privilege hearing documents which I was provided with
5    which had Mr. Armstrong's name on it at all other than
6    your notes.
7           Do you know of any correspondence
8    that was exchanged or memos exchanged with Mr.
9    Armstrong requesting that he provide some assistance in
10   identifying the documents in this case?
11      A.  No, I don't.  You'd have to look in the
12   Green file and see if such a thing was there.
13   Armstrong, as I recall, was one of our discovery
14   contacts that I mentioned before I believe at Fisher
15   Body or maybe Chevrolet.
16      Q.  Was he an engineer?
17      A.  I'm not certain.
18      Q.  Okay.  Was he the chief engineer of the
19   Project Center?
20      A.  No, I don't believe so.
21      Q.  Okay.  So then do you know whether he was
22   somehow affiliated with the chief engineer of the F-car
23   Project Center?
24      A.  Affiliated in what respect?
25      Q.  His designee.  His associate.  His helper.

Page 93

1    His --
2       A.  I think he was a discovery contact person
3    that had been identified by either CPC or Fisher Body,
4    one of those two.
5       Q.  Well, you said names -- names off drawings.
6           Do you know whether Armstrong came
7    off of a drawing or whether that was named
8    independently?
9       A.  Well, we would expect to find the names of
10   the engineers who were responsible for the particular
11   design on the drawings.
12      Q.  Okay.  So were you looking at a design
13   drawing when you made this note and you saw Don --
14          Is it Don or Dan?
15      A.  I think it's Don.
16      Q.  -- Don Armstrong's name and you wrote it
17   down in your notes?
18      A.  I don't remember.  I'd have to look at this
19   question 53 to see the contacts.
20      Q.  Do you --
21          I don't know if I have that.
22          Do you have any specific
23   recollection of how Don Armstrong's name got into this
24   or how he was identified?
25      A.  Well, I think I testified my memory is that

Page 94

1    he was a contact person for us on discovery.
2        Q.    Contact person where?
3        A.    Well, in this timeframe, 1990? It might
4    have been CPC. I'm really vague on that.
5        Q.    What's CPC?
6        A.    At that time it was Chevrolet, Pontiac,
7    Canada. I can't be certain of that, though.
8        Q.    Interrogatory number 53 asks: State the
9    name, address, and relationship to you of the person or
10   persons who defined or described the design criteria
11   for said product.
12       A.    Okay.
13       Q.    Does that help you?
14       A.    May I see it, please?
15       Q.    Sure, and I'm showing -- I just picked
16   out --
17           This is one of the -- this has
18   questions on it. I don't know which generation --
19       A.    Yep.
20       Q.    -- of responses it is just for the question.
21       A.    Okay. That's a very general question, and
22   what we would probably -- what we would have done
23   there -- let's see what we said here.
24       Q.    And I don't know if this was your last
25   response, your first response, or one of the middle

Page 95

1    responses, so...
2        A.    Well, we identified an engineer with
3    engineering staff who was knowledgeable.
4        Q.    Was that Mr. Rice?
5        A.    Joseph Rice.
6        Q.    Okay. Does Mr. Armstrong's name appear
7    anywhere in that answer?
8        A.    No, because you wouldn't expect it to appear
9    here. He would have been the person, the contact
10   individual we would have gone to to tell us more
11   specifically, and I think my notes are indicating that
12   we were trying to identify the chief engineer --
13       Q.    Okay.
14       A.    -- and who those people were. That's what I
15   think we're trying to do here.
16       Q.    So that really doesn't have anything to do
17   with compiling roof documents. It has to do with
18   identifying people's names, number 52 -- 53.
19       A.    Well, I think that's what the question asked
20   us for and that's -- yes. This question doesn't ask us
21   for documents.
22       Q.    Okay.
23       A.    It asks us to identify the name, address,
24   and relationship.
25           See, we try to answer these

Page 96

1    questions as they're written.
2        Q.    I understand. I understand.
3            So you were going to contact Mr.
4    Armstrong as the contact person to provide the names of
5    individuals who were involved in this design process so
6    as to answer that question, correct, not to get
7    documents per se?
8        A.    I believe that's -- yes. That's roughly --
9    yes.
10       Q.    Okay. So then my question was, which then
11   you didn't answer, was tell me --
12       A.    I'm sorry. Was there a question?
13       Q.    -- where in your notes there is a reference
14   to someone being assigned the task of speaking to the
15   chief engineer or the engineer responsible for the
16   design in question so as to inquire about what
17   documents might be available.
18       A.    It wouldn't be a need to speak with that
19   person necessarily. What we would want to do here --
20           So the premiss of your question is
21   not correct. We would want to identify who these --
22   the people were for this question, which is asking us
23   not for documents, but to identify the names, and
24   that's what we were trying to do here.
25       Q.    Okay. Did you ever get names for that

Page 97

1    because I understand the only name Mr. Rice?
2        A.    I'd have to review the discovery responses
3    in the case and I -- you know, I haven't done that and
4    you haven't given them to me.
5        Q.    Okay. Have you --
6            Do you recall ever speaking to any
7    of the engineers who were responsible for the design in
8    your effort to get all these documents together?
9        A.    Well, certainly Mr. Rice was discussed. He
10   attended the meeting.
11       Q.    He wasn't the chief engineer --
12       A.    No. No.
13       Q.    -- for the roof and he wasn't the --
14       A.    But he was a very knowledgeable person about
15   the design.
16       Q.    Excuse me. Excuse me. Let me just finish.
17       A.    Yes.
18       Q.    And he wasn't the person responsible for the
19   design in question, was he?
20       A.    I don't believe so.
21       Q.    Okay. He was an engineer associated with
22   your litigation group who testified both as an expert
23   and had some kind of involvement as an engineer at one
24   point in time in General Motors; isn't that a fair
25   characterization?

26 (Pages 98 to 101)

Page 98

1       A.   He was an engineer who is part of our
2  engineering analysis group, which is part of our
3  corporate engineering staff at that time who assisted
4  in analyzing field performance of vehicles whether they
5  were involved in litigation or not. Joe was brought in
6  to work on Fisher -- or F-car in particular because he,
7  as I recall, he had worked at Fisher Body and so he had
8  a lot of knowledge about roof related issues in cars
9  and was an acknowledged expert on that subject and
10 that's why he was given this particular assignment.
11      Q.   Acknowledged by who?
12      A.   Well, we felt he was.
13      Q.   The --
14           Do you know whether he ever
15 worked -- Mr. Rice ever worked on the F-car roof
16 directly? I'm not talking about that he was in the
17 department, but he actually worked on the design or
18 modifications or anything having to do with the design
19 of the roof.
20      A.   You know, no, I don't.
21      Q.   Okay.
22      A.   You'd have to ask him that.
23      Q.   I have.
24      A.   He came to us from Fisher Body. He had a
25 lot of knowledge on the subject.

Page 99

1       Q.   Okay. Do you know exactly what knowledge he
2  had with respect to the design of the F roof and
3  specifically the T-roof on the F-car?
4       A.   He was certainly knowledgeable about how the
5  roof was designed, how it was made and where we could
6  go in GM to find documents of the type that were asked
7  for in the discovery. That's why we had him involved.
8       Q.   And if he wasn't part of the actual persons
9  involved in the design of the T-roof or the F-car roof,
10 how did he obtain that knowledge that made him an
11 expert in that field?
12           MR. PERSONS: Object to the form of
13 the question.
14           You may answer it.
15           THE WITNESS: Okay. He worked at
16 Fisher Body for a number of years, as I recall.
17      BY MR. DONOVAN:
18      Q.   So then anybody who worked at Fisher Body
19 for a number of years was an expert in the T-roof and
20 the F-car roof?
21      A.   He developed -- no. He worked on F-car
22 designs, whether it was roof or not, I can't remember,
23 you'd have to ask him, but I know that he had a great
24 deal of knowledge about the Fisher Body design process
25 and engineering process --

Page 100

1       Q.   Okay. Wouldn't there --
2       A.   -- because he worked there for many years.
3       Q.   Wouldn't there have been someone at Fisher
4  Body who actually worked on the F-car roof at Fisher
5  Body or even the T-roof at Fisher Body?
6       A.   Your premise is that Joe Rice did not do
7  that and I don't know that, so...
8       Q.   Okay. You think, though, Joe Rice did?
9       A.   He may have. I don't remember. You'd have
10 to ask him.
11      Q.   How about somebody else? Was there other
12 people there who worked directly on the design of the
13 roof at Fisher Body for the F-car or the T-roof
14 specifically?
15      A.   My expectation is that there would have
16 been, sure.
17      Q.   Did you ever contact any of those people?
18      A.   The contacts that were made through our
19 discovery process here were made by these individuals
20 who are identified in my notes. Now, whether Don
21 Armstrong actually contacted any of those engineers at
22 Fisher Body or CPC at that time, I don't know. We
23 would have framed the request for him as our discovery
24 contact with the expectation that he would have done --
25 he would have followed our instructions to do a

Page 101

1  thorough search. If that required contacting
2  particular engineers whose names appeared on these
3  drawings, he may very well have done that. I don't
4  know --
5       Q.   Okay.
6       A.   -- at this point.
7       Q.   So you were the attorney assigned to this
8  case, and you told me many times it was your
9  responsibility to assure compliance with Judge Ferentz'
10 order --
11      A.   Um-hum.
12      Q.   -- and do a good search and you don't really
13 know whether anybody ever contacted the direct
14 designers from Fisher Body having to do with the T-roof
15 or the F-car roof?
16      A.   From what I can see on these notes --
17      Q.   Please answer my question.
18      A.   Okay.
19      Q.   Do you or do you not know whether anybody
20 ever contacted any of the actual engineers who worked
21 on the design of the T-roof at Fisher Body or the F-car
22 roof? Do you know that? It's a yes or no question.
23           MR. PERSONS: Objection.
24           You don't have to restrict your
25 answer to a yes or no. Do the best you can to answer



Page 102

1    the question.
2         THE WITNESS: It's really not
3    susceptible to a yes or no answer and here's why. From
4    what I can tell looking at these notes we followed our
5    process, which was very thorough, which was designed to
6    find and identify the locations where we would expect
7    to find responsive material.
8         Now, whether Joe Rice followed up --
9    whether there was a need for Joe Rice to follow up on a
10   particular technical issue with the chief engineer or
11   his designee or somebody whose name appeared on the
12   drawing or Don Armstrong whose name appeared on the
13   drawing for what it is we were asking for to find, I
14   don't know that, it may not have been necessary. We
15   knew what we were looking for and we knew where to go
16   to get it, and that's apparently what we did here. We
17   certainly had a -- what I -- looks like a pretty
18   thorough review of everything that was ordered to be
19   produced.
20        MR. DONOVAN: You know, I'm going to
21   move to strike about half of this -- half of these
22   responses and in about two minutes I think we need to
23   get Judge Schwartz on the phone because that was a
24   simple yes or no question, do you know whether anybody
25   contacted someone or not, and I get a three-minute

Page 103

1    dissertation throwing in all the key and catchwords
2    that we're supposed to throw in in answers to these
3    questions and, quite frankly, I'm getting a little
4    annoyed at it, you know. And the other problem is is
5    that I'm never going to finish this in seven hours if
6    we keep getting three- and four-minute answers to
7    questions that require a yes or no answer and then
8    we're going to have to go back to Judge Schwartz and do
9    this deposition for another seven hours.
10        So I don't know if you want to talk
11   to your client or not or whether you want to continue
12   in this manner, but, as I say. I -- that's a simple
13   question, did you -- do you know if anybody contacted
14   any of the engineers. It's either yes or no. It's a
15   personal question.
16        MR. PERSONS: Well, obviously I take
17   issue with your protestations. I don't disagree that
18   the answer to the question from the standpoint of his
19   personal knowledge of the extent of the search can be
20   responded in a yes or no fashion. I think the witness
21   has been quite compliant in attempting to answer your
22   questions, many of them which could be subject to an
23   objection because of the nature of them being broad,
24   and we've refrained from doing that.
25        Mr. Brown, of your own personal

Page 104

1    knowledge can you state yes or no whether someone, in
2    fact, spoke with the design engineers alluded to --
3         THE WITNESS: In this response?
4         MR. PERSONS: -- including the chief
5    engineer? Yes.
6         THE WITNESS: No, I can't. I don't
7    remember that.
8         MR. PERSONS: Okay.
9         MR. DONOVAN: Thank you, Mr.
10   Persons.
11        MR. PERSONS: Yes, sir.
12        THE WITNESS: Are we done with these
13   notes now?
14   BY MR. DONOVAN:
15   Q.   No. You can just hold on to them because I
16   think you're probably going to need to refer to them
17   some more.
18   A.   Thank you.
19   Q.   Is there a reference in Brown 1 to someone
20   or more than one assigned to go through the Project
21   Center file to determine whether there are any roof
22   documents contained in that area?
23   A.   There's a reference -- I see a reference in
24   here to --
25        MR. PERSONS: What page are we on?

Page 105

1         THE WITNESS: I'm sorry. Page 0645.
2    BY MR. DONOVAN:
3    Q.   That's page 2 of your notes?
4    A.   Page 2, yeah.
5    Q.   Okay.
6    A.   There is a reference to --
7    Q.   What question are you on, Mr. Brown?
8    A.   I believe it's number 27 there.
9    Q.   Okay.
10   A.   In the middle of the page.
11        There's a reference to a writer's
12   file.
13   Q.   It starts 82 writer's file?
14   A.   Yes.
15   Q.   Okay. Could you read that entry for me up
16   to the arrow?
17   A.   Looks like 82 writer's file - Eileen has
18   completed. Let's see. JR, that would be Joe Rice,
19   says they'll -- they'll be a list of material on roof
20   development - compare roof sections and joint.
21   Q.   Why don't you read to the bottom of the page
22   because I see another reference to Project Center file.
23   A.   Looks like ES did writer's portion file
24   review of Project Center file. Need to go back to
25   Fisher Body for work not -- I'm not sure I can read the

Page 106

1  next part. Repaired by -- reported maybe or repaired,
2  I'm not sure, by Fisher Body. I'm not quite sure. It
3  looks like part of my -- my copy isn't very good there.
4      Q.   And then go on to page 3. What does that
5  say? Something searching entire file --
6      A.   Looks look we're searching entire file for
7  Hassan.
8      Q.   Okay. What is the next line?
9      A.   Engineering library, I think that is,
10  maintains microfiche.
11      Q.   Microfiche of what?
12      A.   I can't be sure, but I think it would be the
13  Project Center microfiche possibly being referenced
14  here. Looks like every PC fiche is being examined.
15  That's in the left part.
16      Q.   PC meaning Project Center?
17      A.   Yes.
18      Q.   Okay.
19      A.   BLG and Myrna Ade reviewed the PC files for
20  Lehman McBride.
21      Q.   Do you know whether that was both the writer
22  files and the subject files?
23      A.   I don't know.
24      Q.   Okay. How do you know that, because that
25  wasn't your case, was it?

Page 107

1      A.   No.
2      Q.   So how did you know that piece of
3  information?
4      A.   How did I know it here --
5      Q.   Yes.
6      A.   -- to write it down here? Somebody probably
7  mentioned in the meeting.
8      Q.   Okay. Who's BLG?
9      A.   BLG? Oh, that would have been a discovery
10  coordinator named Bonnie Gardener.
11      Q.   Okay. So when you made that note there, you
12  really didn't know what -- what portion of the Project
13  Center file was reviewed for Lehman McBride, did you?
14      A.   It seems to say that every PC fiche was
15  being examined. I don't know exactly, no.
16      Q.   Does that note refer to the Lehman case?
17      A.   It says Lehman McBride right here.
18      Q.   No, no, no. I'm saying that note which says
19  every PC fiche is being examined, is that referenced to
20  the line which says BLG and Myrna Ade reviewed --
21      A.   Yes.
22      Q.   -- the PC files at -- for Lehman McBride?
23      A.   I believe so.
24      Q.   Okay. And did you know that of your own
25  personal knowledge or is that something somebody is

Page 108

1  telling you?
2      A.   Well, I thought I answered that already. I
3  think that was just simply reported during the
4  meeting --
5      Q.   Okay.
6      A.   -- that we had.
7      Q.   Go back to page 2 for me and Joe Rice's
8  comment. JR says they're --
9      A.   You're looking right here?
10      Q.   Yes. Right under the 82.
11      A.   JR says they'll be a lot of material on roof
12  development.
13      Q.   Okay. Now you said a lot. I think you said
14  list last time.
15      A.   I think that's lot, l-o-t.
16      Q.   Okay. Okay. That's just what I wanted to
17  clarify.
18          What was the discussion around that?
19  What do you mean, a lot of material on roof?
20      A.   Well, again, we had Mr. Rice at the meeting
21  to ensure we had technical expertise.
22      Q.   Was that the only engineer you had at that
23  meeting?
24      A.   Yes.
25      Q.   Okay. How come you didn't invite any of the

Page 109

1  design engineers from Fisher Body who might have been
2  involved with the actual design of the roof?
3      A.   Because we were trying to use our time and
4  resources most efficiently, and for purposes of this
5  kind of a review meeting to identify where we were
6  going to go, we wouldn't necessarily need to have --
7      Q.   Okay.
8      A.   -- those people at that meeting.
9      Q.   Were there subsequent review meetings,
10  discovery review meetings?
11      A.   I don't -- you know, I'm -- I don't know
12  because I --
13      Q.   You don't recall?
14      A.   Well, no. I got -- I transferred out of the
15  case, actually, in September, October shortly after
16  this was reviewed.
17      Q.   Okay. Now, Rumberger Kirk down in Florida
18  was reviewing the F-car Project Center file or at least
19  a portion of it; is that correct?
20      A.   Yes. They were doing that for -- that was a
21  discrete assignment for -- I believe for the Hassan
22  case.
23      Q.   What do you mean a discrete assignment?
24      A.   I mean a particular project assignment that
25  we gave them, I gave them.

Page 110

1    Q.   And a woman by the name of Eileen Rooney was
2  a paralegal there who was going through the documents;
3  correct?
4    A.   I belive so.
5    Q.   Okay.  Do you know what her assignment --
6    A.   I think her name changed, though.  I think
7  her --
8    Q.   Yeah.  Stafford or -- Rooney Stafford or
9  whatever.
10    A.   I think in here I say ES.  I think that
11  means Stafford.
12    Q.   Okay.  Do you know what her specific
13  assignment was with respect to review of those
14  documents?
15    A.   For this case or for --
16    Q.   Well, she got the documents before this
17  case, didn't she?
18    A.   I think she got some of them before --
19              Well, she was reviewing the writer's
20  file portion of the Project Center file, I think, for
21  the Hassan case.
22    Q.   Okay.
23    A.   I think that's what these notes are saying.
24    Q.   Do you know what she was looking for?
25    A.   I can't remember much about the Hassan case,

Page 111

1  so I'm not certain.
2    Q.   Was that your case?
3    A.   I think so, but I don't remember very many
4  details about it.
5    Q.   Did you give Eileen Rooney or the Rumberger
6  firm the assignment of going through the F-car Project
7  of the F-car Project Center to determine whatever she
8  was supposed to determine?
9    A.   I don't have a specific memory of doing
10  that, but if the project was undertaken while I had
11  responsibility for the roof crush program and that
12  Hassan case was included in the program, then I would
13  have done that, yes.
14    Q.   And you have no recollection what you
15  assigned her to do with the writer's file?
16    A.   We knew there was an F-car Project Center
17  file out there that related to the F-car, obviously,
18  the project, and generally speaking at this time,
19  whether it was for the Hassan case or the Green case
20  specifically, I think they both pended
21  contemporaneously at the same period of time.  We would
22  have been interested in getting a -- getting those
23  Project Center materials reviewed for potentially
24  responsive roof related discovery documents.
25    Q.   Reviewed or was she supposed to actually

Page 112

1  pick out the documents which pertained to the roof?
2    A.   Her assignment would have been to review the
3  microfiche and identify potentially responsive roof
4  related material.
5    Q.   Okay.  Was she provided with all of the
6  documents contained within the writer's file or some
7  subset of that?
8    A.   I don't remember that specifically.
9    Q.   Do you recall whether the entire writer's
10  file was on microfiche?
11    A.   I don't remember that.
12    Q.   Do you recall whether the microfiche she was
13  reviewing was specifically created for her review or it
14  was the original microfiche pertaining to the writer's
15  file?
16    A.   I don't remember that.
17    Q.   Do you recall whether anybody went through
18  the writer's file and only sent her a portion of what
19  was contained in the writer's file?
20    A.   Did somebody do what now?  I'm sorry.
21    Q.   Did anybody review the writer's file before
22  it was sent to her and cull down documents which were
23  sent to her?
24    A.   I don't remember -- I don't remember what
25  subset was sent or who sent them to them.

Page 113

1    Q.   Okay.  If I recall your testimony from the
2  privilege hearing correctly, you said that there was
3  about 50 to 60,000 documents contained I think is that
4  within the whole F-car Project Center file.  Is that
5  accurate?
6    A.   You know, I don't remember that.
7    Q.   You don't remember testifying to that?
8    A.   No, I don't.  Do you have my testimony here?
9    Q.   Do you not recall testifying to it or you
10  think that's not correct?
11    A.   I don't remember testifying to that.  Maybe
12  I did.
13    Q.   Okay.  If I was to ask you do you know how
14  many documents the F-car Project Center file consists
15  of, would that number be 50 to 60,000 documents?
16    A.   As I sit here today, I don't really
17  remember.  If you've got my testimony, I'd be happy to
18  review it.
19    Q.   I do, but I -- you know, I've got to find
20  it.  That's --
21    A.   Okay.
22              MR. DONOVAN:  Why don't we go off
23  the record.
24              THE WITNESS:  Can we take a short --
25              MR. DONOVAN:  Sure.

30 (Pages 114 to 117)

## Page 114

1       MR. PERSONS: Yeah.
2       VIDEOGRAPHER: Going off the record
3   at 2:26 and 49 seconds p.m.
4       (Recess)
5       VIDEOGRAPHER: We're back on the
6   record at 2:36 and 20 seconds p.m.
7   BY MR. DONOVAN:
8       Q.   Okay, Mr. Brown, when we broke you had asked
9   me to find for you reference to 10,000 documents being
10  sent to the Rumberger firm from the F-car Project
11  Center file for the review by their paralegal.
12      This is the -- this is the -- it was
13  the redacted version of your testimony that I was not
14  present at, and there's page 22 of that. Ask you to
15  take a look at that, and after you're finished with
16  that -- that's by way of a question from at that time
17  Mr. Feeney.
18      A.   This entire page?
19      Q.   Number 17 says: Okay. And it all adds up
20  to about 10,000.
21      A.   Oh, I see. Okay.
22      Q.   Okay? And --
23      A.   Wait a minute. Let me read it.
24      Q.   Um-hum.
25      A.   Bates numbers are all provided and it adds

## Page 115

1   up to about 10,000. That seems to be what it's saying,
2   yes.
3       Q.   Okay. And if you look again on page 124,
4   you adopt that 10,000 pages as part of your answer
5   starting at line 7.
6       A.   The lines aren't shown on here, but...
7       Q.   I'm sorry. It's after -- about halfway down
8   the page in the middle. It says, 10,000 pages is a
9   fairly large number of documents, a fairly large --
10      A.   I see that. Yes.
11      Q.   Okay.
12      A.   Um-hum. That's correct.
13      Q.   Does that help to refresh your
14  recollection --
15      A.   Yes, that --
16      Q.   -- that you testified that 10,000 documents
17  were sent to the Rumberger firm in order to review in
18  connection with finding roof documents?
19      MR. PERSONS: And I would just point
20  out that the question that was pending before we broke
21  had to do with some 60,000 documents on microfiche as
22  opposed to what was produced to Rumberger Kirk.
23      Do you remember the question, Mr.
24  Brown?
25      THE WITNESS: I need to refresh

## Page 116

1   this, so just a second.
2       This is referring to a letter that
3   says she's sending three boxes of documents to
4   Rumberger Kirk. I'm looking now on page 122. Do you
5   have that letter in front of you?
6   BY MR. DONOVAN:
7       Q.   I do.
8       A.   Okay. What I'm -- well --
9       Q.   Are you ready, Mr. Brown?
10      A.   Yes.
11      Q.   Okay. My question was, does that refresh
12  your recollection about testifying that there were
13  10,000 documents, approximately, sent to Rumberger Kirk
14  to review?
15      A.   This refreshes my memory. It says there
16  were three boxes of documents.
17      Q.   Um-hum.
18      A.   They included certain, let's see, Project
19  Center subject matter files, certain Project Center
20  writer's files, Fisher Body records, and there were
21  Bates numbers provided. That's what it seems to be
22  saying, yes.
23      Q.   Okay.
24      A.   Adds up to about 10,000.
25      Q.   Okay. Do you know how those 10,000

## Page 117

1   documents were selected?
2       A.   Let's see.
3       I don't specifically recall who did
4   the engineering review to tell. This was apparently
5   being sent by -- you haven't shown me the letter yet,
6   but I think this was being sent by Miss Rhodes. Is
7   that correct?
8       Q.   Yes.
9       A.   Okay. There would have been an engineering
10  review of those materials to ensure that they were
11  potentially responsive so we weren't wasting people's
12  time, you know, in looking at things that weren't
13  necessary. Who did that particular engineering review,
14  I don't remember, but that was certainly the process.
15      Q.   Do you know what was contained in those
16  10,000 documents, I mean, by either category or by
17  description or --
18      A.   Yes. It would have been the Project Center
19  subject files, and what it says here, certain documents
20  from the writer's file and Fisher Body records. That
21  would have been -- it's probably an outgrowth of the
22  decisions that were made in this meeting --
23      Q.   Okay.
24      A.   -- where we had input from our expert
25  engineer to tell us what portions of these various

Page 118

1  collections or documents would have been likely to have
2  responsive material. That's what we were trying to do.
3  That's what would have happened.
4        BROWN EXHIBIT NO. 2
5        WAS MARKED BY THE REPORTER
6        FOR IDENTIFICATION
7  BY MR. DONOVAN:
8    Q.   We just marked Brown 2, which is privilege
9  document log 166. Its Bates numbers --
10        MR. DONOVAN:  Do you have your
11  glasses on, Jim? Another one of those.
12        MR. CARROLL:  987, I think.
13        MR. DONOVAN:  Is that 9? Okay.
14  Yes.
15  BY MR. DONOVAN:
16    Q.   987 through 988. It is a letter of October
17  9th, 1990 to Mr. Rudock from Susan Rhodes, and I didn't
18  want to withhold that, you know, in the sense that --
19  but this letter confirms the three boxes of documents
20  sent to Ms. Rhodes?
21    A.   Sent by Miss Rhodes you mean?
22    Q.   Yeah.
23    A.   Yeah. Sent by Miss Rhodes, yes. I think
24  that is -- I think -- I believe that that -- that this
25  reference in the testimony is to -- is to this letter.

Page 119

1    Q.   Okay. And if we do a rough head count of
2  the Bates numbers for the three categories of documents
3  which were sent, we come up with roughly 10,000;
4  correct?
5    A.   Rough head count. Yes.
6    Q.   Okay.
7    A.   Roughly.
8    Q.   And the documents which were in those three
9  boxes were Car Project Center Subject Files,
10  approximately -- well, exactly 9,191 documents;
11  correct?
12    A.   Yes.
13    Q.   And Car Project Center Writers' File,
14  approximately -- not approximately -- exactly 676
15  documents.
16    A.   Well, let me say, I think this copy has -- I
17  think there's an F in front of that. There should be
18  an F, but it looks like it's smeared off here on this
19  copy. You say car, but I think it says F-car.
20    Q.   Okay.
21    A.   F-car Project.
22    Q.   I'm sorry. I'm reading from the list, the
23  bulleted list, which -- the indented list.
24    A.   Yeah, and I'm saying as part of that bullet
25  on the list I think there should be an F there.

Page 120

1    Q.   Okay. Fine.
2    A.   I think.
3    Q.   So we have 676 documents from the F-car
4  Project Center writers' files?
5    A.   Yes.
6    Q.   And we have --
7    A.   I'm sorry. 300,000? Oh, no. 676, is that
8  what you're --
9    Q.   676.
10    A.   Okay. Um-hum.
11    Q.   And we have 86 documents of Fisher Body
12  records; correct?
13    A.   That's what it says, yes.
14    Q.   Okay. Do the first two categories, the
15  subject files and the writers' file, are those all of
16  the documents contained within the F-car Project Center
17  file?
18    A.   I don't know.
19    Q.   You don't know.
20    A.   No.
21    Q.   So it could be all of them or it might not
22  be all of them.
23    A.   I said I don't know.
24    Q.   Do you know whether those 86 documents -- 86
25  documents from the Fisher Body records are all of the

Page 121

1  documents pertaining to the F-car contained within the
2  Fisher Body records?
3    A.   I don't know.
4    Q.   Can you give me a hunch? Do you think there
5  were more than 86 documents?
6    A.   Well, my expectation --
7        No. My expectation is that this is
8  following on to the decisions that we made when we
9  looked at these discovery requests back in August to
10  try to comply with the court order, and so these are
11  the -- our material that were gathered in response to
12  that effort that were considered to be responsive.
13  Whether that's every document at Fisher Body that
14  related to an F-car, I highly doubt it.
15    Q.   Do you know whether there were other
16  documents being reviewed by Ms. Rooney down at
17  Rumberger Kirk?
18    A.   Other documents for this case?
19    Q.   Yeah. Any case.
20    A.   Any case?
21    Q.   Yes. F-car.
22    A.   I don't know what her assignments were by
23  the law firm, but I can tell you that for purposes of
24  the F-car projects that I asked her to do, I think it's
25  pretty well described in this letter, for the Green

32 (Pages 122 to 125)

Page 122

1  case, the Hassan case, and then we were trying to
2  create a package of material.
3      Q.  Right.
4          And you can't tell me whether these
5  are all of the F-car Project Center files, subject and
6  writers' files.
7      A.  I don't know that.
8      Q.  Okay.  And you can't tell me, if they
9  weren't all of them, who culled these specific
10 documents, can you?
11     A.  Well, I'm repeating myself now.
12     Q.  Well, just answer my question, please.
13     A.  Okay.
14     Q.  Can you tell me who the person was who
15 culled the documents if this was not all of the
16 documents?
17     A.  Culled them.  You mean -- what do you mean
18 by "culled them"?
19     Q.  If they were not all of the documents in the
20 F-car Project Center file, who selected these that's
21 referred to in the letter as compared to the rest of
22 the documents which were left behind?
23     A.  I don't know.
24     Q.  Can you tell me who that person is?
25     A.  I do not know.

Page 123

1      Q.  Okay.  That's the answer.  You don't know.
2      A.  But I can tell you what the process was.
3      Q.  I don't want to know what the process is.  I
4  want to know if you know the person, and you answered
5  that.  Thank you.
6      A.  Are we done with this now?
7      Q.  No.
8      A.  Okay.
9      Q.  What are the writers' files as compared to
10 the subject files?
11     A.  Well, I --
12     Q.  In reference to the F-car Project Center
13 file.
14     A.  Um-hum.
15         I really am not 100 percent certain
16 about that.  I can give you what I think they are or
17 were, I should say, because I didn't work at Fisher
18 Body, I'm not an engineer, but I can give you my
19 understanding, if you will.
20     Q.  Please.
21     A.  I think the writers' files were documents
22 written by particular engineers in the Project Center
23 who were preparing maybe specific notes or minutes
24 about issues and the subject matter were more broadly
25 like meeting minutes and things of that nature.

Page 124

1      Q.  Okay.  And who would the subject matter
2  documents have been authored by?
3      A.  I don't know.  You'd have to read them.  The
4  people involved in the particular aspect of the F-car
5  project that they were working on.
6      Q.  Okay.
7      A.  Groups of engineers probably.
8      Q.  Well, wouldn't the documents in the subject
9  file be duplicative of the documents in the writers'
10 file?
11     A.  I don't know that.
12     Q.  Okay.  Well, you have to have a writer for
13 the document; right?
14     A.  Correct.
15     Q.  Presumably?
16     A.  I don't exactly know where the breakoff
17 began with writers and subject matter, I don't know.
18     Q.  Okay.  So you don't know whether they're
19 just duplicative one file by subject and one file by
20 writer's name.
21     A.  I don't know if they're duplicative.
22     Q.  The F-car Project Center, the concept for
23 it, when was that created?
24     A.  Well, you said before approximates is okay.
25         I think it came about in about the

Page 125

1  late '70s, early '80s time period.
2      Q.  Okay.  And just --
3      A.  Roughly.
4      Q.  Just so we're on the same ball field, you're
5  talking about the F-car Project Center file; correct?
6      A.  Yes.
7      Q.  Okay.  Were there other Project Center files
8  before that?
9      A.  There were other project centers.
10     Q.  Okay.  Is there a difference between a
11 Project Center and a Project Center file?
12     A.  Project Center and a Project Center file.
13         The file would have documents
14 generated in the Project Center.
15     Q.  Okay.  So the Project Center is the place?
16     A.  Yes.
17     Q.  Okay.  And the Project Center files are the
18 documents created at that place?
19     A.  That is my understanding.
20     Q.  Okay.
21     A.  Or was my understanding.
22     Q.  So when a Project Center was going to be
23 created, there was a specific location out of which the
24 design of that particular platform of cars was going to
25 be performed using all of the various people involved

Page 126

1  from General Motors?
2       A.  I'm sorry to ask you to repeat that again.
3       Q.  Not a problem.
4       A.  Go ahead.  Would you repeat it, please.
5       Q.  Why don't I ask it this way.
6            Tell me what a Project Center is.
7       A.  Well, you're asking a lawyer on the legal
8  staff to describe a function of engineering
9  organization that existed nearly 30 years or so ago.
10           My understanding is it was an effort
11  to bring centers of expertise, knowledgeable people
12  within the various car divisions and engineering staff,
13  it was the creation of engineering staff, as I recall,
14  together to work on a particular vehicle design.  So
15  you would have people, representatives, in this case
16  from maybe Chevrolet, Pontiac, Cadillac possibly,
17  Buick, engineering staff, powertrain, together to
18  devote their engineering expertise to one particular
19  vehicle project.
20      Q.  Okay.  And was this -- these people who came
21  from the other divisions, did they physically relocate
22  themselves to the Project Center to work on the
23  particular platform of car which the Project Center
24  represented?
25      A.  I don't know.

Page 127

1       Q.  Or was it more of a theoretical concept
2  that, you know, these engineers are all working on
3  this, but not necessarily in the one place?
4       A.  It wasn't a theoretical concept.  It was an
5  organizational reality of a way that they organized
6  themselves to design and develop particular vehicles.
7  Whether they were physically located all together in
8  one room as you're suggesting, I don't know.
9       Q.  Well, did they -- I mean, was there a
10  location for the F-car Project Center?  I mean, did it
11  have an address?
12      A.  You know, I really don't know.
13      Q.  Was it a building?
14      A.  I don't remember, frankly.  I don't know.
15      Q.  Okay.
16      A.  That's a good question, though, but I can't
17  remember.
18      Q.  Did they -- did they specifically pick
19  engineers in a different division and say, Bob Smith,
20  you're now working on the F-car Project Center?
21      A.  You know, I don't know.  I'm on the legal
22  staff.  I don't know how the engineers selected or what
23  criteria they used.  All I know is generally what it
24  was, and I can't tell you how they went about picking
25  people.

Page 128

1       Q.  Okay.  But people who normally would have
2  worked in other divisions would come together either
3  physically or however else one can and they would work
4  on a particular platform of a car.
5       A.  I think that's correct.  I believe some of
6  them may have retained their divisional
7  responsibilities while they did F-car Project Center
8  responsibilities.  I mean, it wasn't quite as -- it was
9  more fluid, I think, than your question suggests.
10      Q.  Okay.
11      A.  At least that's my understanding.
12      Q.  So they didn't all like report to a
13  different location after they were assigned to the
14  F-car Project Center.
15      A.  Well, again, you know, Mr. Donovan, I don't
16  know because I wasn't in engineering at that time.
17      Q.  I don't know either.  That's why I'm asking.
18      A.  I don't know the details.  If you want
19  those -- that level of detail, you should probably ask
20  someone who was there.
21      Q.  Now, a C-car Project Center would have been
22  before an F-car Project Center?
23      A.  Before in what respect?
24      Q.  Timeframe.
25      A.  Oh, I don't know.

Page 129

1       Q.  You don't know?
2       A.  No.
3            I mean, because of the alphabetical?
4       Q.  Um-hum.
5       A.  I don't believe so.
6       Q.  Okay.  General Motors didn't -- it's not
7  like hurricanes, that they name them alphabetically, A,
8  B, C, D?
9       A.  That -- I don't remember that, no.
10      Q.  All right.  So we could have jumped around
11  through letters?
12      A.  Well, you know, you're asking a lawyer to
13  talk about engineering organizational issues from 30
14  years ago.  Okay?  I wasn't in the engineering
15  organization at that time and I -- I'm not now and I
16  can only give you what my understanding was.
17      Q.  Does GM still use project centers?
18      A.  I don't believe we do now, no.
19      Q.  Okay.  Do you know when they stopped using
20  them?
21      A.  When they stopped?  No.  Not specifically,
22  no.
23      Q.  Now -- okay.  So now you're an engineer who
24  has been assigned to the F-car Project Center to do
25  whatever your particular expertise is, seat belts,

34  (Pages 130 to 133)

Page 130

1  roofs, tires, whatever it is, on the new platform of
2  F-cars.
3      A.  Okay.
4      Q.  Okay?
5      A.  Um-hum.
6      Q.  And you generate some kind of document about
7  what you're working on.  All right?
8      A.  Um-hum.
9      Q.  Is that a -- does that go into the writer's
10  file or does that go into the subject file?
11      A.  You know, I don't know how they --
12      Q.  Who would know?  Who would know all this?
13      A.  You should find someone who worked in the
14  Project Center at that time.
15      Q.  Who?  Give me a name.
16      A.  Well, I think -- I think Joe Rice might have
17  some knowledge of it.
18      Q.  So Joe Rice is the person who would know how
19  these processes --
20      A.  No.  I said he might have.  I don't know.
21      Q.  Okay.
22      A.  You could ask.  You could start there and
23  see if he could give you some leads to more
24  knowledgeable people.
25      Q.  Okay.  Can you -- you cannot give me any

Page 131

1  names of anybody who worked in the F-car Project Center
2  who would be able to give me the information about how
3  these documents that were generated by the individual
4  engineers were stored or kept or --
5      A.  You're asking me to remember names of
6  specific individual job assignments from more than 30
7  years ago in the engineering field and, no, I can't do
8  that.
9      Q.  Okay.
10      A.  I don't remember.
11      Q.  Is there any document in any of these
12  documents we have that I could help you with?
13      A.  I'm happy to look at any document you'd like
14  to show me to review.
15      Q.  Well, did you review any documents before
16  you came into your deposition this morning?
17      A.  Yes.
18      Q.  Okay.
19      A.  I reviewed -- well, I took a look at my
20  notes, as I recall, and --
21      Q.  Okay.
22      A.  -- a couple other documents that Mr. Carroll
23  showed me.
24      Q.  So three documents were all you reviewed?
25      A.  I don't remember the number.

Page 132

1      Q.  Okay.  Did you review the documents which
2  you introduced into the privilege hearing?
3          MR. CARROLL:  Maurice, if you would
4  like us to identify them, we're glad to so you can
5  question him about them, the ones he looked at.
6          MR. DONOVAN:  No.
7          MR. CARROLL:  Okay.
8          THE WITNESS:  You mean before this
9  deposition.
10      BY MR. DONOVAN:
11      Q.  Um-hum.
12      A.  You know, Mr. -- I met with Mr. Carroll, of
13  course, to prepare here for the deposition and we
14  looked at two or three or four documents.  I don't
15  remember if it was every one from the privilege hearing
16  or not, it probably wasn't.  I'm happy to look at any
17  document you'd like to show me.
18      Q.  Okay.  Did you do any independent review of
19  documents other than the documents that Mr. Carroll
20  showed you?
21      A.  You mean for this deposition?
22      Q.  Yeah.  Did you go back to your file or did
23  you ask for any documents to be produced so you could
24  do your own thorough review?
25      A.  My file for this case?

Page 133

1      Q.  Any documents whether it's in your file, not
2  in your file.
3      A.  No.  I limited my preparation to the
4  evidence and the material that he showed me that's been
5  produced in this case.
6      Q.  Okay.  Was it the concept behind a Project
7  Center that all of the documentation with respect to
8  the development and design of a specific platform of
9  car be kept in one central repository, the Project
10  Center?
11      A.  You know, again, I don't know how they
12  organized and what their intent was with respect to the
13  custodianship of the Project Center documents.  It was
14  an engineering business decision that was being made by
15  the people who were working there in that Project
16  Center at the time, and how they organized it, as you
17  would expect, is a business decision that they would
18  have made.  I was never asked my advice about it, and,
19  you know, I never -- I never gained any particular
20  knowledge of it because I didn't work there.
21      Q.  Okay.  So you necessarily had to rely upon
22  their representations to you when they said they
23  searched the F-car Project Center file that they had,
24  in fact, searched all of the documents contained within
25  the F-car Project Center file; correct?

Page 134

1    A.   Well, our expec- --
2    Q.   It's a yes or no question, Mr. Brown.
3    A.   Repeat it again.
4    Q.   I said then you had to necessarily rely upon
5  the representations of these engineers when they told
6  you that they had reviewed all of the documents
7  contained in the F-car Project Center file because you
8  could not independently verify that because you didn't
9  know what was in there and had never seen it; is that
10 fair?
11   A.   Well, we had the Project Center file on
12 microfiche here.
13   Q.   Did you ever review that?
14   A.   Did I personally review it?
15   Q.   Yes.
16   A.   No.
17   Q.   Okay.  So if I was the engineer and I told
18 you, Mr. Brown, I've reviewed every document in the
19 F-car Project Center, you would have to rely upon me
20 telling you that because you would have no independent
21 basis by which to confirm it.
22   A.   We would rely on the collection as the
23 complete collection and has been told to us by our
24 knowledgeable engineering people, in this case Joe
25 Rice.

Page 135

1    Q.   So then I guess the answer to that question
2  is yes.  If Mr. Rice said that they reviewed all the
3  documents, you would rely upon that; correct?
4    A.   Mr. Rice would tell us whether or not the
5  collection was complete to his knowledge and we would
6  rely on that, certainly.
7    Q.   Do you recall any conversation with Mr. Rice
8  in which he said to you specifically that he reviewed
9  all of the F-car Project Center file in preparation for
10 complying with Judge Ferentz' order?
11   A.   We had a meeting here of which Joe Rice was
12 there and I don't find reflected in my notes of that
13 meeting a specific statement that he reviewed every
14 document in there.  He certainly was knowledgeable
15 about the Project Center files and, generally speaking,
16 what was in them, otherwise we wouldn't have asked him
17 to attend this meeting.  That's why he was there.
18   Q.   Does General Motors have some kind of policy
19 whereby when an engineer reviews documents for the
20 purpose of providing them in response to a court order,
21 that they have to sign something saying I, Mr.
22 engineer, have reviewed the documents X, Y, and Z in
23 their entirety and produced the documents which I
24 believe are responsive to whatever?
25   A.   You mean back in this timeframe or today

Page 136

1  or --
2    Q.   Yes, back in that timeframe.
3    A.   I don't recall we required engineers to sign
4  things like that.
5    Q.   Okay.  So they --
6    A.   We wouldn't need to.
7    Q.   Why wouldn't you need to?
8    A.   Because we would rely on their knowledge and
9  expertise and what they told us.
10   Q.   So you would rely upon them telling you that
11 they had reviewed all the documents.
12   A.   I would rely on them telling us that the
13 material that we had in front of us was responsive to
14 what was being asked for.  Now, if we asked them
15 specifically did they review every document and they
16 said yes or no, certainly we would rely on what they
17 told us, but it may be in a situation like this not
18 necessary to read every one of these 10,000 pages to
19 know that we had the complete Project Center collection
20 here.
21   Q.   Was it your assumption that they would have
22 reviewed all of the responsive documents in all of the
23 areas which they might have been contained?
24   A.   Well, I mean, if you're asking me if you
25 have a 10,000-page collection and would we assume that

Page 137

1  they would -- the engineer, in this case Joe Rice,
2  would have looked at every single document in there?
3    Q.   Um-hum.
4    A.   Probably not.  Probably not necessary for
5  him to do that.  We knew we had the complete
6  collection.  We were doing a further review of them to
7  identify the stuff that was potentially responsive to
8  the order in this Green case.
9    Q.   But you don't even know whether those 10,000
10 documents sent to Rumberger Kirk were all of the
11 documents or a portion of the documents contained in
12 the F-car Project Center file, do you?
13   A.   I don't know that, no.
14   Q.   You don't know that.
15   A.   I don't remember whether or not.
16   Q.   So if that was a reduction from the total
17 number of documents in the F-car Project Center file,
18 when you signed off on your document response being
19 complete, you had to rely upon the fact that someone
20 had done that accurately and in good faith and with a
21 full review of it.
22   A.   We had an engineering review, as I indicated
23 before, and that would have been done before we
24 produced any documents and we would have relied on the
25 thoroughness and accuracy of that review, sure.

36 (Pages 138 to 141)

Page 138

1    Q.    So the legal staff relies upon the
2    engineering staff?
3    A.    Okay.  Mr. Donovan, we've been through this
4    before and I'll say it again.
5    Q.    Well, you don't want to answer my question.
6    A.    I do.
7    Q.    You want to answer your question with the
8    appropriate spin, and, you know, we can do this --
9            MR. PERSONS:  Objection,
10   argumentative.
11   BY MR. DONOVAN:
12   Q.    We can do this --
13   A.    Okay.  I don't want to argue with you.
14   Q.    -- as long as you want.
15   A.    But we don't want -- I mean, you wouldn't
16   want --
17           To be a responsible good corporate
18   citizen in answering discovery as we're obligated to do
19   under the rules, and we take that very seriously, we
20   want to make sure that we have more than just lawyers
21   looking at these technical documents because we're not
22   engineers.  That's why we would bring in experts like
23   Joseph Rice to tell us that what we've got seems to be
24   and is complete, it's what he would expect to be
25   complete, and it's responsive to the discovery requests

Page 139

1    that are being asked.
2    Q.    So --
3    A.    We would not undertake just as lawyers to do
4    that.  We would want to have expert help.
5    Q.    Okay.  Do you know in what form the F-car
6    Project Center documents were maintained?
7    A.    It says microfiche.
8    Q.    Do you know whether all the documents were
9    on microfiche?
10   A.    I do not know.
11   Q.    Do you know whether any of the documents
12   were on computer?
13   A.    I don't know.
14   Q.    Do you know whether there were any documents
15   which were in boxes in hardcopy?
16   A.    There's a reference here to three boxes
17   being sent.
18   Q.    Do you know whether that's three boxes of
19   microfiche or that's three boxes of documents?
20   A.    It says three boxes of documents copied from
21   the microfiche.
22   Q.    Okay.
23   A.    Okay.
24   Q.    I'm talking about whether -- before they
25   were microfiche.

Page 140

1            Those, obviously, were --
2    A.    Um-hum.
3    Q.    -- because they use the term blown off.  Is
4    that --
5    A.    I don't see that word phrased in here.
6    Q.    Someone used that.  Blown off.  I didn't
7    know what that meant either.
8            Do you know whether there were
9    documents that were part of the F-car Project Center
10   file that were not contained on microfiche?
11   A.    No, but I know from reviewing the history
12   here that as of the time we met in this case, I believe
13   we had already produced several hundred discovery
14   documents in the case, I think, in August or September
15   timeframe, in fact, maybe in the thousands.
16   Q.    I don't think that answers my question.
17           Do you know --
18   A.    I'm sorry.  What's your question, please?
19   Q.    Do you know whether all of the documents
20   were on microfiche as contained in the F-car Project
21   Center file or whether there were other documents which
22   were not on microfiche?
23   A.    You mean Project Center documents that were
24   not on microfiche that were not in the file?  Is that
25   what you're suggesting?

Page 141

1    Q.    No.
2    A.    All right.  I don't get it.
3    Q.    Let's try it one more time.
4    A.    Go slower.
5    Q.    Obviously there were documents from the
6    F-car Project Center file which were on microfiche;
7    correct?
8    A.    Yes.
9    Q.    Okay.  Do you know whether all of the
10   documents in the F-car Project Center file were on
11   microfiche?
12   A.    I do not know that.
13   Q.    Thank you.
14           Do you know whether the F-car
15   Project Center file is still maintained anywhere within
16   the confines of General Motors?
17   A.    I don't know.
18   Q.    Have you ever looked at the F-car Project
19   Center file?
20   A.    No.
21   Q.    Okay.  Other than the documents which may
22   have been produced by way of discovery, would you be
23   familiar with the entire contents of the F-car Project
24   Center file?
25   A.    No.

Page 142

1    Q.   Other than the writer files and the subject
2  files are you aware of any other category of files
3  which are contained within the F-car Project Center
4  file?
5    A.   No.
6    Q.   Are you familiar with the microfiche index?
7    A.   To the Project Center files?
8    Q.   Yes.
9    A.   I think I've seen it.
10   Q.   Okay.  Have you seen it in microfiche or
11 have you seen it in hardcopy?
12   A.   Can't remember.
13   Q.   When did you see it?
14   A.   It seems like I saw it sometime in and
15 around when I handled this case.  I think I remember --
16   Q.   Late '80s, early '90s?
17   A.   Somewhere in there.
18   Q.   Okay.  What was the index?
19       MR. PERSONS:  Exploding pen.
20       THE WITNESS:  Just a --
21       MR. PORTER:  Let's go off for just a
22 sec.
23       VIDEOGRAPHER:  We're going off the
24 record at 3:06 and 50 seconds p.m.
25       (Off the record)

Page 143

1        VIDEOGRAPHER:  We're back on the
2  record at 3:08 and 4 seconds p.m.
3        THE WITNESS:  You were asking about
4  the index?
5  BY MR. DONOVAN:
6    Q.   Yes, I was.
7    A.   I have a vague memory of seeing what I
8  thought was an index.  I don't remember details about
9  what was on it.  I just don't remember.
10   Q.   Okay.  Do you know who created it?
11   A.   No.
12   Q.   Do you know what its purpose was?
13   A.   No.
14   Q.   Do you know whether it contained a reference
15 to all of the documents within the F-car Project Center
16 file?
17   A.   I don't know that.  I don't remember.
18   Q.   Was it --
19       Was its purpose so that the
20 documents could be more readily searched and produced?
21   A.   I don't know.
22   Q.   Now, if I understand correctly, the F-car
23 Project Center file was formed somewhere in 1978 for
24 the purpose of working on what was going to be the
25 third generation F-car, the '82 through '92; is that

Page 144

1  correct?
2    A.   That sounds right.  I don't know the -- I
3  don't really remember that level of detail, but...
4    Q.   Okay.  Well, you did when you testified at
5  the privilege hearing.  That's a quote from you.
6    A.   Do you have a particular reference to what
7  my testimony was?
8    Q.   No.  I'm not going to get -- waste time on
9  that.
10       Was -- what --
11       Where were the documents with
12 respect to the second generation car?
13   A.   Before the Project Center documents?
14   Q.   Yes.
15   A.   I'm not sure.  Probably Fisher Body and the
16 car division possibly.
17   Q.   Well, Wickham was a second generation car;
18 correct?
19   A.   Wickham.
20       You know, I can't remember the model
21 year of Wickham.  Early '80s, I think.
22   Q.   Did you review any of your testimony from
23 the privilege hearing before coming here?
24   A.   No.
25   Q.   No.  Might have helped.

Page 145

1        Was there a first generation F-car?
2    A.   I assume so.  There was a third -- second
3  and third, so...
4    Q.   Do you know where those documents are?
5    A.   What?
6    Q.   Do you know where those documents are?
7    A.   Do I know where the documents are.
8    Q.   Yeah.
9    A.   No.
10   Q.   I mean, there were documents.
11   A.   I don't even know that they still would
12 exist.  I don't know.
13   Q.   Okay.  Do you know whether the documents
14 which were generated during the development and design
15 of the first generation car and the second generation
16 F-car became part of the F-car Project Center file?
17   A.   I do not know.
18   Q.   Okay.  Did you look through any of the -- or
19 did you or did you assign anybody or were you aware of
20 anybody looking through the second generation documents
21 to see if there was anything responsive to the
22 discovery demands in Green?
23   A.   That is reflected to some extent in the
24 notes here.
25   Q.   Okay.

38 (Pages 146 to 149)

Page 146

1  A.  Whether there are references here to
2  potential material at Fisher Body that Joe Rice pointed
3  out, whether that included second, first generation, I
4  don't remember, don't know.  The reference is here.
5  Actually it's on -- well, actually here on page 646 it
6  looks like check 4 79-82 FB documents.
7  Q.  Um-hum.
8  Do you know whether those documents
9  would have been in the F-car Project Center file or
10  whether they would have been someplace else?
11  A.  I don't know.
12  Q.  Okay.
13  A.  We certainly were aware of the potential --
14  potentially responsive and we were checking.
15  Q.  Did you consider it relevant to search
16  through the earlier documents for the earlier
17  generation cars in order to respond to the discovery
18  requests?  I guess so because that's what that says,
19  doesn't it?
20  A.  It says -- well, let me look at it again.
21  Well, if you -- if you look at 0646
22  here --
23  Q.  Um-hum.
24  A.  -- there's a note on the side that says 82
25  equals the frame integral car with no stub frame.

Page 147

1  Q.  Right.
2  A.  So that's telling me that there was a change
3  in the basic configuration of the frame.
4  Q.  Right.  Would that have affected the roof?
5  A.  Just let me finish my answer --
6  Q.  Sorry.
7  A.  -- if I may.
8  There was a reference here to check
9  4 79-82 FB docs, Fisher Body documents with O'Hara and
10  Castle.  Those were the two engineers at Fisher Body
11  who were the contact people that I mentioned before
12  that we would have gone to for our, you know, threshold
13  question, where do we -- here's what they're asking
14  for, where do we go in Fisher Body to find this
15  material, and then you'll see here, actually it goes on
16  for nearly two pages, a reference for fairly specific
17  types of documents and tests, joint tests in addition
18  to 216, Joe Rice probably told us that we're done,
19  okay, and then they're listed here, if you can read my
20  notes.  The joint between the windshield pillar and the
21  body hinge pillar and cowl, windshield pillar to roof
22  rail up to windshield header, sail roof panel, that's
23  the seat panel, roof joint, backlight header,
24  windshield pillar cross-sections, the quarter outer,
25  the quarter inner, the sail reinforcement.

Page 148

1  So also we were checking -- we were
2  checking for T-top development tests, side barrier
3  impacts, T-top latch tests.  Okay?  The initiative had
4  been responsive here.
5  Q.  Um-hum.
6  A.  So it looks like we were pretty specific in
7  identifying the engineering documents that we thought
8  might be responsive to the claims in this case, and the
9  way I read this it looks like that's in the context of
10  the 79 to 82 vehicle.
11  Q.  Right.
12  A.  Yeah.
13  Q.  And that's because you wanted to be a good
14  corporate citizen and respond to all the document
15  requests which Judge Ferentz had ordered; right?
16  A.  Our --
17  Q.  Are you going to disagree with that?  I
18  can't believe it.
19  A.  No.  Of course not.  That's what we always
20  try to do, particularly when we have a court order, we
21  want to be fair and give good documents that are
22  properly called for.
23  Q.  If the purpose of the Project Center was to
24  incorporate everyone in their various disciplines in
25  one place, not the physical necessary place, but to

Page 149

1  work on one platform of car, why would Fisher Body
2  still have documents with relation to the third
3  generation F-car, or would they?
4  A.  Well, again, you're asking a lawyer 30 years
5  later to talk about an engineering organization, but I
6  can tell you that there may have been carryover
7  componentry from Fisher Body that was relevant to the
8  third generation.  There may have been history and
9  designs built upon another design, earlier drawings and
10  tweaks to the componentry that would have been done by
11  Fisher Body.
12  Q.  So once the F-car Project Center file was
13  created would there have been documents still being
14  generated and going to Fisher Body or no?
15  A.  Well, Fisher Body continued to exist up till
16  the 1984 re-organization, so certainly.
17  Q.  So even though they were working on the
18  F-car through the Project Center, there would still be
19  documents there?
20  A.  Documents at Fisher Body?
21  Q.  Yeah, having to do with the F-car third
22  generation.
23  A.  I believe potentially, yes.
24  Q.  Oh, okay.
25  A.  That's why we identified -- I believe that's

Page 150

1  why we identified Fisher Body here as the -- another
2  source to look for.
3      Q.   How many years have you worked for General
4  Motors?
5      A.   Thirty-one.
6      Q.   Thirty-one.
7      A.   And a half.
8      Q.   And all that time you've defended product
9  liability litigation involving automobiles?
10     A.   Most of it, yes.
11     Q.   And you don't even know what it means to
12  have the documents blown back?
13     A.   I think that means --
14          Blown back?  You didn't ask me that.
15  I think that means taking -- take the microfiche and
16  reproduce --
17          MR. PERSONS:  He didn't ask you
18  that.  I object to that.  Go ahead.
19          THE WITNESS:  -- reproduce the
20  physical from the mic- -- the pre-computer days, from
21  the microfiche copy and make a hardcopy.  That's what I
22  think it means.
23          Where is there a reference to blown
24  back, by the way?
25          MR. PERSONS:  Well, Mr. Donovan's

Page 151

1  statement was blown up I believe it was.
2          MR. CARROLL:  Blown out.
3          MR. PERSONS:  Blown out I think is
4  what he said.
5      BY MR. DONOVAN:
6      Q.   What do the uniform product classification
7  codes have to do with this F-car Project Center file?
8      A.   I don't know if there's a reference in the
9  Project Center file to uniform product classification
10  codes or not.  If there is a specific reference, I
11  could try to answer that.  Do you have a document in
12  front of you there that explains that?
13     Q.   Do you know if there was a UPC code for the
14  roof?
15     A.   No.  There probably was, but I don't know.
16     Q.   Do you know how many documents are contained
17  within the whole F-car Project Center file?
18     A.   I only know what's reflected in this letter
19  that you showed me.  Number 2.
20     Q.   Yes.  And that would be?
21     A.   It talks about the subject files and the
22  writers' files and it suggests that there are 9,191 and
23  676, so roughly 10,000.
24     Q.   And is your understanding that represents
25  the whole Project Center file?

Page 152

1      A.   Well, I'm not sure --
2      Q.   Oh.
3      A.   -- about that.
4      Q.   Because my question was, do you know how
5  many documents total there are in the F-car Project
6  Center file?
7      A.   Well, I answered that and I said I only know
8  what's on this letter.
9      Q.   So then you do not know how many documents
10  there are in the whole F-car Project Center file.
11          MR. PERSONS:  Yes or no.
12          THE WITNESS:  I've answered that
13  already.  I don't know.
14     BY MR. DONOVAN:
15     Q.   That sounds like a yes.
16     A.   Yes.  Or no.
17          I don't know.  I know what the
18  letter says.
19     Q.   But you don't know what the letter means in
20  terms of the total documents.
21     A.   Is that a question or a statement?
22     Q.   No, that is a question.  I could add "do
23  you" at the end.
24     A.   I think you're asking me if -- do I know
25  whether or not the universe of Bates numbered documents

Page 153

1  here for subject and writers' files is the complete set
2  of the entire F-car Project Center file.  Is that what
3  you're asking?
4      Q.   If that will get me an answer to the
5  question, sure.
6      A.   No, I don't know that for sure.
7      Q.   Was it you who assigned the Lavin firm in
8  south Jersey to start representing GM in this case?
9      A.   Let me think now.
10          No.  It would have been the -- I
11  wasn't the original lawyer on the case, so no.
12     Q.   Do you know who the Lavin firm is?
13     A.   Yes.
14     Q.   Okay.  Do you recall using any portion of
15  the interrogatory answers which they drafted when you
16  got involved in this case?
17     A.   Help me out with that question.  I don't
18  know what you mean.  Do I recall using them?
19     Q.   Yes.
20     A.   Well, they would have been filed.  They
21  would have been on file; right?
22     Q.   What would have been on file?
23     A.   The interrogatory responses.  There was a
24  motion -- or there was an order that related to the --
25     Q.   They weren't answered when the Levin firm

40  (Pages 154 to 157)

Page 154

1  was in.
2      A.  Oh.  See, I don't know that.
3      Q.  Okay.  Did you pick Tom Tansey as the local
4  counsel?
5      A.  Well, I didn't assign the case to the --
6              Wait a minute.  Slow down a minute.
7  Let me think now.  Started off with the Lavin firm.
8              Actually, no, I think it's a bit
9  more complicated than that.  I think --
10             It started off with the Lavin firm
11  as a fire case and then I think it went to -- before it
12  got to me I think it -- I think it went into our
13  geographic assignment to another colleague of mine
14  named Widzinski, Paul Widzinski, and then I believe
15  sometime after that it migrated to -- it came to me as
16  a roof case, and I think Tansey's firm probably was
17  assigned by Paul.  I think there were actually two
18  lawyers ahead of me on this case.
19             MR. PERSONS:  Do you want some
20  more --
21             THE WITNESS:  Yeah.  Can I just get
22  another Coke?
23             MR. PERSONS:  Sure.
24             MR. CARROLL:  I'll get it for you.
25             THE WITNESS:  Can you?

Page 155

1              MR. CARROLL:  Um-hum.
2  BROWN EXHIBIT NO. 3
3  WAS MARKED BY THE REPORTER
4  FOR IDENTIFICATION
5              THE WITNESS:  Do you want me to look
6  at this?
7  BY MR. DONOVAN:
8      Q.  Sure.  Let me just identify it.
9              We've marked as Brown 3 privilege
10  document number 19, Bates number 39, July 19th, 1989
11  letter from Paul Widzinski to Tom Tansey, and I gave
12  you that because I just didn't want to --
13      A.  Yeah.  Okay.
14      Q.  -- leave you confused.
15      A.  Um-hum.
16      Q.  Does that help ref- --
17      A.  Yes.
18      Q.  -- refresh your recollection as to what was
19  going on back in July of 1989?
20      A.  Yes, this does.  I believe this is telling
21  us that, okay, apparently a roof related claim at that
22  point had surfaced in this case and so my colleague was
23  telling me that it was going to be transferred to me,
24  but I believe my colleague would have assigned the
25  Tansey firm to the case.

Page 156

1      Q.  Okay.  Because that letter is to them, so it
2  makes sense if he's sending them a letter telling them
3  about the change, then they were already in it.
4      A.  Yes, but I believe there was an earlier
5  colleague involved for the fire part.
6      Q.  Okay.
7      A.  Maynard, Mr. Timm.
8      Q.  So sometime in around July of 1989 you took
9  over responsibility for the legal in-house part of this
10  case; correct?
11      A.  Yes.  Looks that way.
12      Q.  All right.  And do you know why at that
13  point in time the Lavin firm would have been in it as
14  well as the Tansey firm, which were both New Jersey
15  attorneys?
16      A.  I think the Lavin firm would have been
17  assigned by Maynard Timm as a fire claim, a fire case.
18      Q.  Yeah, but if they already had a New Jersey
19  attorney, why would there be another assignment to a
20  New Jersey firm?  If you don't know, you don't know.
21  I'm just curious.
22      A.  I think -- I'm not 100 percent certain, but
23  I believe what happened here is the Lavin firm was
24  handling some of our fire litigation at that point and
25  then the fire claim apparently receded or went out of

Page 157

1  the file.  So it was transferred into our -- to a
2  geographic assignment, and the Tansey firm handled our
3  geographic cases, and so it was probably transferred to
4  them for that reason, and then at some later time here
5  it looks like it became a roof related claim and so it
6  was transferred to me.
7      Q.  So when you got the claim in July of 1989,
8  you were already aware that at least the allegations
9  plaintiff were claiming or some of them were related to
10  a roof crush?
11      A.  I was --
12              Certainly.  It was based on this
13  letter.
14      Q.  So you knew that the roof was involved and
15  that's why it went to your specialty; correct?
16      A.  Yes.
17      Q.  Okay.  I'm not going to mark all these, but
18  do you recall you assigning Kirkland & Ellis and
19  specifically John Hickey as the specialty counsel on
20  this?
21      A.  Yes.  We would -- it would have been in the
22  region that was being handled by Kirkland in the roof
23  crush specialty national counsel program.
24      Q.  Okay.  So Kirkland & Ellis was specifically
25  assigned this by you?

Page 158

1   A.  Yes.
2   Q.  Okay. And that was because of their
3 expertise in roof crush cases?
4   A.  Yes.
5   Q.  Okay. Did they have all kinds of roof crush
6 experience or just rollover experience?
7   A.  Well, as I -- as I think I mentioned
8 earlier, we didn't limit the speciality just to
9 rollover cases.
10   Q.  Um-hum.
11   A.  We had, you know, all sorts of different
12 roof related claims being made in litigation. Some
13 cases involved rollovers, others did not. Apparently
14 the Green case did not. The Pelletier case that I
15 mentioned involved a tire coming down and hitting the
16 roof.
17   Q.  Okay.
18   BROWN EXHIBIT NO. 4
19   WAS MARKED BY THE REPORTER
20   FOR IDENTIFICATION
21   BY MR. DONOVAN:
22   Q.  We've marked Brown 4 --
23   A.  Okay.
24   Q.  -- which is -- let me just -- which is
25 privilege document number 20, it's Bates number 40

Page 159

1 through 41, and it's an August 1st, '89 letter from
2 you, Mr. Brown, to John T. Hickey --
3   A.  Um-hum.
4   Q.  -- an attorney at Kirkland & Ellis.
5   A.  Yes. This refreshes my memory.
6   Q.  Okay.
7   A.  Um-hum.
8   Q.  At the time --
9   The purpose of this letter was to
10 formally, I guess, bring on board Mr. Hickey as the
11 defense attorney for General Motors because of their
12 specialty in roof cases?
13   A.  Yes. The expectation here was that the case
14 would been included in our roof crush national program
15 with Kirkland & Ellis, John Hickey and his team
16 handling national counsel -- as the national counsel,
17 then we would keep the Tansey firm as our New Jersey
18 counsel.
19   Q.  Okay. And had you spoken to Mr. Hickey
20 before this or is this letter his first introduction to
21 this case?
22   A.  No, I don't remember. If I knew about it
23 before the letter, I may have had a phone call with
24 him, I don't remember.
25   Q.  Would it have been your general policy to

Page 160

1 call up the attorney first and say I'm going to refer
2 this case to you?
3   A.  Oh, I don't know that I necessarily had a
4 policy. We were in conversation about cases all the
5 time, and if I knew about it before I sent the formal
6 letter, I might have had a conversation with him, I
7 don't remember.
8   Q.  Had you worked with Mr. Hickey or the
9 Kirkland & Ellis firm before on a roof case?
10   A.  Yes, I believe so.
11   Q.  Before August of 1989.
12   A.  I believe so.
13   Q.  Okay. Had you worked on an F-car roof case
14 with Mr. Hickey or Kirkland & Ellis before August of
15 '89?
16   A.  I don't remember.
17   Q.  Don't remember.
18   Had you worked on a T-roof case with
19 Mr. Hickey or Kirkland & Ellis?
20   A.  Can't remember that one either.
21   Q.  All right. Well, as of August 1st, 1989,
22 you were aware that the car that was involved in this
23 accident, the one which was being alleged to be
24 defective was a 1986 Chevy Camaro Z28; correct?
25   A.  Yes. That's what it says here.

Page 161

1   Q.  Okay. Did you know at that point in time
2 whether it was a T-roof or not from that description?
3   A.  Well, the letter indicates that that's what
4 the plaintiff's expert was claiming, so --
5   Q.  Okay.
6   A.  -- yes.
7   Q.  So as of August 1st, 1989, you were aware as
8 legal counsel in-house for GM that this was also a
9 T-roof case.
10   A.  Yes. That's what it says in the letter.
11   Q.  Okay. And you were also aware, you know, at
12 least to some degree how the accident had occurred;
13 correct?
14   A.  Well, the second paragraph has a very brief
15 three-sentence description of the accident, so yes.
16   Q.  Okay. All right. You knew it was a side
17 collision?
18   A.  Yes.
19   Q.  The left rear of the Camaro was struck by
20 the 1983 Chevy bus; correct?
21   A.  Well, I don't want to quibble too much here,
22 but it says left rear. Whether that's the side or not,
23 left rear is -- when I think of the side, I'm thinking
24 more of the door area, but...
25   Q.  You knew in August of 1989 that Green had

42 (Pages 162 to 165)

Page 162

1  sustained spinal injuries causing paraplegia?
2      A.   It certainly appears that way from this
3  letter, yes.
4      Q.   Okay.  And at that point in time you also
5  had plaintiff's expert report by Dr. Arthur Damask and
6  also Green's answers to interrogatories; true?
7      A.   That's what the letter says, yes.
8      Q.   Okay.  And you knew that one of the claims
9  being made by plaintiff was that the T-bar design and
10 the construction was unreasonable and defective causing
11 the roof of the car to come down onto Green's head;
12 correct?
13     A.   That's what the letter says.  Yes.
14     Q.   And you knew this all as of August 1st,
15 1989.
16     A.   Yes.
17     Q.   I may have asked you this, but I've jumped
18 around now.  There was no stock roof discovery at that
19 point in time where you just put that together and sent
20 that out in response to the plaintiff's demands, was
21 there?
22     A.   Well, you know, I think I answered this.
23 I'm going to go through it one more time.  Okay?  I
24 don't mean to be -- I don't mean to be argumentative
25 with you, but we would have had discovery responses

Page 163

1  that were filed in other pending litigation and we
2  would have had to use potentially as a resource and we
3  would have had documents produced in other cases to use
4  potentially as a resource, but we -- our practice then
5  and now is to carefully review the specific questions
6  that are being asked in the case before us to make sure
7  we've done the necessary searches to find the documents
8  that are being asked for.  So if you're suggesting that
9  we just had a -- some collection of can of documents
10 that we serve in response to discovery in this case,
11 no, would not have done that.
12     Q.   When we look at Brown 2, isn't that what you
13 were trying to create when you referred the $10,000 to
14 Rumberger Kirk specifically in the category where it
15 says future F-car rollover cases, we would like to
16 create an F-car Project Center file package?
17     A.   Yes.
18     Q.   That would answer the plaintiff's questions
19 seeking information about the history of the roof
20 development for the 1982 F body vehicle?
21     A.   Yes.
22          MR. PERSONS:  And that's 10,000
23 documents, not dollars.
24          MR. DONOVAN:  Did I say dollars?
25          MR. PERSONS:  Yeah.

Page 164

1          THE WITNESS:  Yeah, 10,000
2  documents, yeah.
3          MR. PERSONS:  Got money on your
4  mind.
5          THE WITNESS:  Absolutely.  We were
6  trying to set up -- have a package as a resource, not
7  as an exclusive can production, but as a resource, and
8  if it was --
9          BY MR. DONOVAN:
10     Q.   And did you do that?
11     A.   Wait a minute.
12          If the package was responsive in a
13 particular future case, we might produce it in addition
14 to whatever else we would produce that was asked for in
15 that case.
16     Q.   Did you ever do that?
17     A.   You know, again, I got out of the -- I
18 transferred this case myself in or about this time, so
19 I'm not sure whether that was done or not.
20     Q.   This is completely out of order, but so I
21 can cross off this page.  I read that you lecture to GM
22 engineers about the litigation process.
23     A.   I've done a lot of lecturing over the years,
24 yes.
25     Q.   How long have you done that?

Page 165

1      A.   Oh, let's see.  Probably more than half my
2  career on and off at various times.
3      Q.   Okay.  Is this -- are these lectures
4  contained on any type of storage material, video, CD?
5      A.   I don't --
6          There's no videotape, no.
7      Q.   CD?
8      A.   No.
9      Q.   Nothing.
10     A.   Not that I know of.
11     Q.   So nobody ever said, you know, let's get
12 Doug on film so he doesn't have to waste any time
13 giving these lectures again, we'll just play it for
14 them.
15     A.   I don't recall that being done, no.
16     Q.   Okay.  Is there handout materials that goes
17 along with these litigation lectures?
18     A.   In history I think things may have been
19 handed out.  I don't do these lectures in recent years.
20     Q.   How long?
21     A.   Oh, it's probably been three, four years
22 since I've done one.
23     Q.   Okay.  And what kind of things do you tell
24 them about the litigation process?
25     A.   Well, we try to -- in the product liability

Page 166

1  seminar thing that I did we tried to basically acquaint
2  them with what's involved in the process, how they
3  might be involved as engineers, what kinds of support
4  we need to defend the product properly. We might
5  answer questions about discovery generally, what
6  discovery is, what kinds of documents they might be
7  called upon to search for at some point in the case
8  perhaps, if they might be deposed, what the deposition
9  is, things like that, really basic stuff.
10     Q.   And what do you tell them is their role in
11 the discovery process in litigation?
12     A.   Well, we would explain basically the process
13 and tell them that if they were asked for help from the
14 legal staff or from one of our field performance
15 analysis engineers like Joe Rice, that we certainly
16 expect them to provide it and to work with us to give
17 us the responsive material we need, and obviously if
18 they testify, if they are asked to testify about the
19 performance of the product or a particular design that
20 they worked on, to -- you know, to be thorough and
21 complete and answer the questions and really basic
22 things like that.
23     Q.   Okay.
24     A.   It's more of a -- just a session to explain
25 kind of what product liability litigation is about and

Page 167

1  how the case gets filed and really basic fundamental
2  things like that that non-lawyers wouldn't necessarily
3  think about.
4      Q.   So in the Green case after you appointed
5  Kirkland & Ellis as your specialty counsel and Tom
6  Tansey was already in as your local counsel, at some
7  point in time they would have sent to you copies of the
8  plaintiff's interrogatories served on General Motors
9  and their demand for production of documents; correct?
10     A.   Yes. I don't remember timing-wise whether
11 we already had that in this case from the Tansey firm
12 or whether it came from John's firm. I don't remember
13 that.
14     Q.   Okay. But at some point you would have
15 gotten it as the --
16     A.   Yes.
17     Q.   -- in-house attorney involved in this;
18 correct?
19     A.   Yes, I would have.
20     Q.   And you would have reviewed it; correct?
21     A.   Yes.
22     Q.   And you would have attempted to comply with
23 it before there was a court order entered because you
24 had an obligation to do that even without a court
25 order; correct?

Page 168

1      A.   Certainly. We would have been -- we would
2  have analyzed the questions and tried in good faith to
3  produce the documents at that point that we thought
4  were reasonable and responsive.
5      Q.   Okay.
6      A.   Yeah.
7      Q.   So before Judge Ferentz ever entered an
8  order requiring more specific answers, did you go to
9  the car divisions, Chevy and Pontiac, to find out
10 whether they had any document responsive to the
11 original discovery demands?
12     A.   You know, I don't have those original
13 questions in front of me and I don't know the extent
14 that we searched for them. If you've got them here,
15 I'll be happy to try to remember.
16     Q.   So you don't know.
17     A.   Our practice would have been to have
18 answered them, yes, and go ahead and done those
19 searches, yes.
20     Q.   Did you go to Fisher Body and make a search
21 for all of the engineering drawings and roof documents
22 which Fisher Body might have had pertaining to the
23 questions which were asked in the demand for
24 production?
25     A.   Well, see, I don't have them in front of me,

Page 169

1  so I can't tell you exactly what it is we searched for
2  and produced. I think at the time of this meeting in
3  August of 1990 we had produced several hundred pages
4  already, and I think --
5      Q.   And what did -- do you know what those pages
6  consisted of?
7      A.   Not without looking at a log of the
8  documents. If you have them, I'll be happy to look at
9  them.
10     Q.   Do you recall whether you consulted with any
11 engineering staff or the representative who was
12 responsible for the design or the chief engineer so as
13 to provide reasonable and thorough responses to the
14 first set of interrogatories and demand for production
15 of documents before Judge Ferentz entered her order?
16     A.   I don't remember that specifically, but you
17 haven't shown me any notes or any letters from that
18 before the order was entered, so I'm not --
19     Q.   Do you know whether you ever searched the
20 proving grounds to see whether there were any crash or
21 sled tests or reports or videos pertaining to the roof
22 of the Camaro?
23     A.   If you'll show me the questions that
24 describes what we produced in the original responses, I
25 mean, it will refresh my memory, but sitting here

44  (Pages 170 to 173)

Page 170

1  without that in front of me I don't specifically
2  recall, I haven't seen them.
3      Q.  How many hours did you prepare for this
4  deposition?
5      A.  How many hours?
6      Q.  Yeah.
7      A.  Well, we met for three, four hours, I think.
8      Q.  On one occasion?
9      A.  No. Let me think now.
10          We had a couple of meetings, as I
11  recall.
12      Q.  Each of them three or four hours?
13      A.  Roughly.
14      Q.  Okay. So you had three or four meetings of
15  three or four hours each?
16      A.  For this specific deposition I think we met
17  twice probably three to four hours each time.
18      Q.  Okay. Did you pull any documents from the
19  Project Center file when you tried to respond to the
20  first set of interrogatories before Judge Ferentz
21  entered her order?
22      A.  I would have to review the responses to see
23  what we produced and you haven't shown them to me.
24      Q.  Okay. Do you know whether there were any
25  F-car Project Center documents produced with that first

Page 171

1  couple of hundred documents which was provided as part
2  of first response to plaintiff's demand for production
3  of documents?
4      A.  Well, again, I'd have to review the answers.
5  I can't remember that many years ago off the top of my
6  head.
7      Q.  Okay. That's fair enough.
8      A.  Talking almost 20 years here.
9          (An off-the-record
10          discussion was held)
11  BROWN EXHIBIT NO. 5
12  WAS MARKED BY THE REPORTER
13  FOR IDENTIFICATION
14  BY MR. DONOVAN:
15      Q.  I've given you privilege document 42, Bates
16  number 337, a letter from Mr. Coulson to you, October
17  26th, 1989.
18          I just want to -- the purpose of
19  this letter is to give us a timeframe.
20      A.  Okay.
21      Q.  Okay? This letter indicates that you are
22  being sent a final draft of the written discovery
23  responses and that you're then going to send them to
24  Mr. Tansey with the appropriate verification.
25      A.  Right.

Page 172

1      Q.  So given the timeframe, it's my
2  understanding, and if you think differently -- that
3  this is the first response of General Motors to the
4  interrogatories because Judge Ferentz hasn't entered
5  her order yet because that's not until August of '90.
6      A.  Well, you know, I don't know that for sure.
7  It doesn't say first discovery response here, so I
8  don't know for sure. If you've got the discovery
9  response, I'll be happy to look at it.
10      Q.  Well, let me just -- before I just go crazy
11  marking all of these and you're not going to know
12  anything, let me just give them to you and ask if any
13  of these help.
14          This is privilege document 43.
15          MR. PERSONS:  Maurice, do you want
16  to mark these or --
17          MR. DONOVAN:  No. I want him to
18  take a look at them first.
19          MR. PERSONS:  All right.
20  BY MR. DONOVAN:
21      Q.  44 -- I'm sorry. 46 and 48.
22      A.  Okay. I've looked at them.
23      Q.  Does that help us timeframe the
24  interrogatory answers to the first set which was
25  propounded and answered and sent back, and if so, just

Page 173

1  tell me which document, then we'll mark that.
2      A.  It gives more context to it. What it
3  doesn't tell me is if this was the first set of
4  documents produced in response to that, that first set.
5      Q.  Okay.
6      A.  This seems to say here set 1 and set 1 on
7  the inventory. What it doesn't say is --
8      Q.  Interrogatory set number 1, request for
9  production set number 1?
10      A.  That's what this seems to say, the
11  attachment seems to say, but it doesn't tell me that
12  that's the first set of materials that were produced.
13  That I don't see here. In fact, I don't see that in
14  the letter either.
15      Q.  Does it refresh your recollection as to what
16  documents were contained in the first production of
17  documents by General Motors to plaintiff?
18      A.  It identifies certain documents that
19  apparently were contained here, FMVSS 216, maintenance
20  schedule, an owner's manual and an advertisement, but
21  what it doesn't tell me is what I'm trying to explain
22  is that this was -- that there wasn't additional
23  material produced, I don't know that from this, and, in
24  fact, my understanding has been that there were five or
25  six or even 1600 or something documents produced.

Page 174

1    Q.   In the first round?
2    A.   I don't -- I'm not sure the timing. Several
3    thousand pages.
4    Q.   That's your understanding?
5    A.   Or at least 1,000, I think.
6    Q.   That's your understanding?
7         And that's before Judge Ferentz's
8    order?
9    A.   You know, I don't know the timing of when
10   they were produced. If you have the documents that
11   show when they were produced, then I'd be happy to
12   refresh my memory with those.
13   Q.   We received your response to plaintiff's
14   demand for production of documents with documents
15   numbered Bates 001 through 0102 on November the 9th,
16   1989, and I will represent that to you, and that's the
17   first set?
18   A.   Yeah. That's what this is?
19   Q.   Okay?
20   A.   Okay.
21   Q.   So does that refresh your recollection of
22   how many and what documents were sent with the first
23   round of documents?
24   A.   It tells me that you -- that this 001 to
25   0102 were sent.

Page 175

1    Q.   Okay.
2    A.   It doesn't tell me if that was everything.
3    Q.   Okay.
4    A.   That I don't know.
5    Q.   Do you have any recollection as to whether
6    any more documents were sent before Judge Ferentz's
7    order?
8    A.   No. I'd have to see the production.
9    Q.   Okay. Would you have her -- why doesn't she
10   mark all of those in -- put them in date order for me,
11   please, so that the top one will be the next --
12   A.   This one here?
13   Q.   Yeah. The October 26th letter will be the
14   next document, October 27th will be the one after that,
15   November the 2nd will be the one after that.
16        BROWN EXHIBIT NOS. 6 - 8
17        WERE MARKED BY THE REPORTER
18        FOR IDENTIFICATION
19   BY MR. DONOVAN:
20   Q.   Looking at the identification of the
21   documents which were sent in response by General Motors
22   to the first round of production of documents in
23   answers to interrogatories, can you tell me where those
24   documents came from?
25   A.   Just based on this inventory?

Page 176

1    Q.   Yes.
2    A.   No, I really can't. It's not really -- it's
3    not really indicated on here.
4    Q.   Okay. Can you tell me by your knowledge
5    whether any of those documents came from the F-car
6    Project Center file?
7    A.   The F-car Project Center file was not
8    identified on here.
9    Q.   Okay.
10   A.   So I don't believe so.
11   Q.   Okay. Can you tell me whether any of those
12   documents come from Fisher Body?
13   A.   This is an inventory and it doesn't say
14   where the documents came from. FMVSS 216 is a federal
15   safety standard. Certainly Fisher Body would have been
16   aware of it. Engineering staff would have been aware
17   of it.
18   Q.   Now, Judge Ferentz enters her order in
19   August of 1990 and then you have a meeting August 8th;
20   correct?
21   A.   Well, I don't have the order in front of me.
22   Do you have that in front of you? I don't know when it
23   was entered.
24   Q.   I have the order. Sure do.
25   A.   Is it attached somewhere here? Think so.

Page 177

1    Q.   This has been marked previously, so I'm not
2    going to mark it again. It's the August 3rd, 19 -- it
3    says 89, but I think it's '90, or I can't read it, the
4    order of Judge Ferentz.
5         MR. PERSONS:  It's '90.
6         MR. DONOVAN:  I think the stamp says
7    '89, but --
8         MR. PERSONS:  But we know it was
9    '90.
10        THE WITNESS:  Okay. Should this be
11   marked?
12   BY MR. DONOVAN:
13   Q.   No.
14   A.   Okay.
15   Q.   You said you wanted the order, so --
16   A.   Okay.
17   Q.   -- I'm giving it to you.
18   A.   Okay. It looks like it's filed on August
19   3rd.
20   Q.   Right. So you have a meeting after that
21   when?
22   A.   Well, my notes and my memory are that we met
23   on August 8.
24   Q.   Okay. What was the purpose of that meeting?
25   A.   The purpose of the meeting was to take a

46 (Pages 178 to 181)

Page 178

1    look at this court order and figure out what additional
2    searches we needed to do to comply with it.
3        Q.    Okay.  Did you consider this to be an
4    onerous order?
5        A.    I think I did, yes.
6        Q.    Okay.  And why was it onerous?
7        A.    Well, it's enumerated a number of
8    supplemental -- a number of interrogatories and
9    requests for production I think each of which probably
10   had some parts to it.
11       Q.    Okay.
12       A.    I'm not sure about that, but I think so.
13       Q.    And is it your under---
14       A.    Excuse me.  Let me finish.
15       Q.    I'm sorry.  I thought you were finished.
16       A.    And the other thing that was potentially
17   onerous about it was the timeframe here that we were
18   being asked to comply, which is by September 14th.
19   That would have been just, what, less than a month,
20   well, a little over a month, I guess, from the date the
21   order was entered.  So potentially there could be a lot
22   of work that was going to need to be -- going to be
23   necessary here to gather the responsive materials.
24       Q.    In fact, you thought it was so onerous to
25   have to produce all those documents that you thought

Page 179

1    maybe looking to see if you could settle the case for a
2    reasonable amount was a viable alternative to that.
3        A.    Is that an e-mail message that I wrote?
4        Q.    Yes.
5        A.    Could I take a look at that?
6        Q.    Sure.  You don't remember it?
7        A.    I remember -- yeah.  Mr. Carroll showed it
8    to me, but I have to take another look at it, if you
9    don't mind.
10       Q.    No, not at all.
11       A.    I remember writing that.
12       Q.    Have plenty of time.
13   BROWN EXHIBIT NO. 9
14   WAS MARKED BY THE REPORTER
15   FOR IDENTIFICATION
16           THE WITNESS:  I think I use the term
17   onerous in there maybe, I'm not sure.  Yeah, onerous.
18   Okay.
19       BY MR. DONOVAN:
20       Q.    Um-hum.
21       A.    Yes, that's what I said, onerous.
22       Q.    But my question was, you considered it so
23   onerous that you thought that maybe trying to settle
24   the case right then and there before discovery had
25   really even been totally exchanged; correct?

Page 180

1        A.    I made that -- I raised a sort of a
2    rhetorical question in the end there in which I
3    suggested that we -- I just asked is there any
4    possibility of settling the case for a --
5        Q.    Who is this directed to?
6        A.    Who is it directed to?
7        Q.    Is it Andy Langan?
8        A.    Yes, Langan, and Murray would have been Joe
9    Murray --
10       Q.    Right.
11       A.    -- from the Tansey firm.
12       Q.    What is that Failurea?  Do you know what
13   that is?
14       A.    Oh, you mean the suffix there?
15       Q.    Yeah.
16       A.    That --
17       Q.    21LANGAN - F-A-I-L-U-R-E-A.
18       A.    Okay.  That is the -- that's a reference to
19   Failure Analysis Associates, which was the vendor that
20   was providing us with our e-mail server --
21       Q.    Oh, okay.
22       A.    -- at that point.
23       Q.    Okay.
24       A.    It's a good question, though.
25       Q.    Now, when -- was this -- you talked about --

Page 181

1    what was it?  Weedham?  No.  Which one was it?
2        A.    Wickham?
3        A.    Wickham.
4        A.    Yeah.
5        Q.    -- Wickham being a pretty intensive
6    discovery production.
7        A.    You know, Mr. Donovan, yes, I think so.
8    You're talking -- that was a case from, I think, the
9    early '80s.  I mean, we're talking 25 years.  There was
10   a lot of discovery in the case as I remember.
11       Q.    Okay.  Would you consider this to be now
12   involving an extensive discovery search?
13       A.    Well, you know, the reason that I tried to
14   move so quickly here -- and if you'll notice, the date
15   of this is August 7, and we met the very next day,
16   August 8th, which means we got the knowledgeable people
17   together pretty quickly by my standards, okay, one day
18   later, to me, to go through with it was because, based
19   upon my experience in handling these kinds of cases
20   with the timeframe that is apparently being ordered
21   here, I knew that it was a potentially onerous project
22   and I wanted to make sure we got started on it as
23   quickly as we possibly could and that's why we met the
24   very next day.
25           Now, the extent to which it was

Page 182

1　going to be burdensome, we needed to flush that out in
2　our meeting after we had a chance to review these
3　specific questions and see exactly what it was we were
4　going to have to do to ensure we complied, and that's
5　why we did that on August 8th.
6　　Q.　So, I don't know, it was extensive or it
7　wasn't extensive?
8　　A.　I'm sorry.　What was extensive?
9　　Q.　Your answer was extensive, but was the
10　request that Judge Ferentz had now made of you, did you
11　consider that to be extensive?
12　　A.　Yes, both potentially in terms of the
13　documents we were asking -- we were going to have to
14　look for and also the timeframe that was involved, yes.
15　　Q.　Okay.　If you'd answered them and provided
16　the answers the first time, you wouldn't be involved in
17　having to answer them more specifically; isn't that
18　true?
19　　A.　Well, I don't think they were asked for the
20　first time.　We had -- our initial answers put forward
21　certain objections that we had to the scope of what was
22　being asked for.
23　　Q.　Um-hum.
24　　A.　And so at that point we had -- as of the
25　first time, we had produced certainly what we thought

Page 183

1　was properly responsive at that time.
2　　Q.　But you didn't even look for all of the
3　documents which you encompass in your memorandum of the
4　August 8th meeting when you answered the
5　interrogatories the first time, did you?
6　　A.　Well, you haven't shown me, again, what we
7　produced totally in response to the discovery.
8　　Q.　Do you recall doing that?
9　　A.　Say again.
10　　Q.　Do you recall doing that?　Do you recall
11　doing that, doing the same type of search you did after
12　Judge Ferentz's order that you did before Judge
13　Ferentz's order?
14　　A.　I don't recall a -- I don't recall that we
15　did a -- we had a meeting like we did in response to
16　the order.　The time urgency was a lot different.　We
17　were trying to respond to the order here.　That's why
18　we met so quickly.
19　　Q.　It just stands to reason, if you'd already
20　done all these searches enumerated in your memo, you
21　wouldn't have to do them again after the order.
22　　A.　Not necessarily because the plaintiff's
23　counsel might have complained about something we
24　produced initially and gotten another order.　It's not
25　up to us to decide what to complain about in discovery.

Page 184

1　I mean, the plaintiff's lawyer is the one who brings
2　the motion.
3　　Q.　Okay.
4　　　　MR. DONOVAN:　Are we good?
5　　　　THE WITNESS:　And then we also say,
6　too --
7　　　　MR. DONOVAN:　He's finished with his
8　tape.
9　　　　VIDEOGRAPHER:　Going off the record
10　at 4:00 and 49 seconds p.m.
11　　　　(Recess)
12　　　　VIDEOGRAPHER:　We're back on the
13　record at 4:12 and 10 seconds p.m.
14　　BY MR. DONOVAN:
15　　Q.　The onerous document.
16　　A.　I'm sorry?
17　　Q.　Is that the one with onerous on it?
18　　A.　Yes.　This is the onerous -- e-mail message
19　that says onerous.
20　　Q.　Okay.　I was asking you before we broke --
21　　A.　Um-hum.
22　　Q.　-- whether you considered in your realm of
23　experience in dealing with discovery requests in cases
24　whether you considered the Green discovery request as
25　modified by Judge Ferentz's order to be extensive.

Page 185

1　　A.　Certainly potentially extensive.　That's why
2　we needed to get together to review the specific
3　paragraphs that she articulated here in the order to
4　make sure that we were able to figure out just how
5　extensive it was going to be, and --
6　　　　Actually, if I may just put this
7　into more context having reviewed this a little bit
8　more, I'm not even certain here that there was actually
9　a motion to compel filed here.　I think this came up at
10　a status conference hearing, if I'm not mistaken, where
11　the judge decided to deal with the discovery issues at
12　a status conference hearing.　I don't recall that there
13　was a motion to compel filed, and I think the tone of
14　this e-mail which I wrote, since I wrote it, suggested
15　a little bit of frustration on my part here because I
16　don't remember that we -- that an actual motion to
17　compel was filed.　So I asked some questions about did
18　we file an affidavit in opposition to the motion.
19　Apparently at that time I didn't -- I didn't know and
20　it was my understanding after, you know, we got
21　together it was that there was no actual motion to
22　compel filed.　So we didn't have an opportunity to
23　present evidence in opposition to the -- to the
24　request.
25　　Q.　Were you made privy to the whole sequence of

48 (Pages 186 to 189)

Page 186

1  correspondence which preceded the entry of that order
2  back and forth between myself and Mr. Murray or Mr.
3  Tansey?
4     A.   I don't remember. If you've got copies of
5  it, I can tell you if I saw it.
6     Q.   Well, see, one of the problems with me
7  coming all the way to Detroit to take a deposition is
8  that I can't bring my whole file with me.
9     A.   Okay.
10     Q.   It's a physical impossibility. This file --
11     A.   But you can bring what's important to you;
12  right?
13     Q.   Well, I don't know whether it's important
14  because --
15           I don't think that's important, but
16  obviously you do. So unless I was able to read your
17  mind --
18     A.   Well, you know, what I'm trying to do is
19  give you the answer. I don't remember.
20     Q.   Okay.
21     A.   I probably -- I mean, if it was relevant to
22  the issues in the case, I'm sure counsel copied me on
23  it.
24     Q.   And all I can ask you for is your best
25  recollection, and if I don't have the document to

Page 187

1  refresh your recollection with, it's not intentional. I
2  just don't have my whole file here. If you'd like to
3  stop and go back to my office and take this deposition
4  and I'll have all the documents and I'll produce
5  whatever it is you like, but I'm one person with a very
6  big suitcase, which was filled with more documents than
7  clothes and it was already over 70 pounds, so...
8     A.   Well --
9     Q.   The airline wouldn't give me any more.
10     A.   Certainly our practice in this timeframe, as
11  it is now, was that our counsel kept us apprised of
12  what was going on in the cases.
13     Q.   Okay. But -- and I understand it's a long
14  time ago, you know, you don't have any recollection of
15  a whole bunch of letters going back and forth between
16  Mr. Murray, myself, and Judge Ferentz which ended up
17  with the entry of that order.
18     A.   I do not remember that, no.
19     Q.   Okay. That's fair enough.
20           Now, question number 68 -- and I
21  think you have the interrogatories there.
22     A.   Here. Yeah.
23     Q.   I'm pretty sure it's the one that deals with
24  alternative design. Am I correct?
25     A.   Yes.

Page 188

1     Q.   Okay.
2     A.   Um-hum.
3     Q.   In your experience with product liability
4  automobile crashworthy cases is alternative design
5  information something a plaintiff routinely requests by
6  way of discovery?
7     A.   Yes, they often ask for that.
8     Q.   Okay. And is it your understanding of that
9  because an alternative design is one of plaintiff's
10  burdens, if he's going to claim a defect, he's got to
11  come up with something better that would be safer?
12     A.   Well, it depends on the law in the state,
13  but --
14     Q.   Okay.
15     A.   -- many states, that's right.
16     Q.   Okay. Well, you come from New Jersey.
17     A.   Yes.
18     Q.   You were at Shanley & Fisher.
19           Do you understand that to be the
20  status of the law in New Jersey, that an alternative
21  design --
22     A.   I haven't practiced in New Jersey in more
23  than 30 years, so...
24     Q.   But you handled cases out of New Jersey.
25     A.   Yes. Okay.

Page 189

1     Q.   Okay. Do you have an understanding one way
2  or the other whether alternative design is one of the
3  requisite elements a plaintiff must prove in order to
4  prevail in a products liability case?
5     A.   No, I really don't know right now because
6  I'm not up on New Jersey law.
7     Q.   Okay.
8     A.   I haven't practiced there in more than 30
9  years.
10     Q.   All right. Well, whether it is a burden or
11  it's not a burden, certainly question number 68 asks --
12     A.   Yes.
13     Q.   -- for information --
14     A.   It does.
15     Q.   -- pertaining to alternative design;
16  correct?
17     A.   Um-hum. Yes.
18     Q.   And do you understand what it means to ask
19  for information related to alternative design?
20     A.   I understand that plaintiff's lawyers such
21  as yourself often ask these kinds of questions in
22  discovery often under sort of the simplistic impression
23  that when you say, for example, words like the product,
24  that there might -- there must be some alter- -- simple
25  off-the-shelf alternative design that was considered

Page 190

1   and rejected and, therefore, you can just show it and,
2   you know, that helps us. I understand that.
3       Q.   Okay.  And is it your understanding that
4   when this first -- when these interrogatories were
5   first answered, that some attempt was made in order to
6   comply with that request and provide whatever documents
7   were necessary to comply with that request?
8       A.   Well, this is 68.  Is this our first set of
9   responses here?  Is that what this is?  This says
10  supplemental responses to plaintiff's interrogatories.
11  So I don't know if this was our first set of responses
12  or not.  It says supplemental in the front, but if you
13  look at this question, it's extremely broad.
14      Q.   Um-hum.
15      A.   It's not defined what exactly is meant by
16  the product.  It does not define what --
17      Q.   Well, Mr. Brown, Mr. Brown, Mr. Brown, you
18  knew --
19      A.   It does not -- let me finish my answer.  It
20  does not define --
21           MR. PERSONS:  Yeah, let him finish.
22  Go ahead.
23           THE WITNESS:  It does not define
24  what is alleged to be defective in the case other than
25  roof.  Okay?

Page 191

1           Now -- so knowing that there are
2   many parts involved in a complex product like an F-car
3   and not really knowing what it is the plaintiff lawyer
4   is asking for here, what we tried to do, and I think it
5   was entirely appropriate, is state that we would
6   produce representative drawings of the roof system for
7   the vehicle and then hopefully the plaintiff's lawyer
8   could tell us -- well, actually we said that.  GM
9   states if plaintiff will specify, we will respond
10  accordingly.
11      BY MR. DONOVAN:
12      Q.   Mr. Brown.
13      A.   So --
14      Q.   -- on August the 1st --
15      A.   -- when you have a very general question
16  like that, you're making a good faith effort to give
17  something that is going to be responsive and help move
18  the discovery process along and that's what we were
19  trying to do.
20      Q.   Mr. Brown, you just said you didn't know
21  what the product was.  Did you just say that?
22      A.   I said I didn't know what you meant by the
23  term said product, whether you were talking about the
24  car or the roof or some component of the roof.
25      Q.   Did you not know that we were dealing with a

Page 192

1   1986 Chevy Camaro Z28?
2       A.   Yes.  Oh, of course.  I knew that.
3       Q.   Okay.  Did you know that the allegations
4   were the T-bar design of that roof?
5       A.   Based on that letter, I was reading from the
6   report from the plaintiff's expert that we had at that
7   time.
8       Q.   Um-hum.
9       A.   But that doesn't tell us the --
10           Let's see if I can find this letter
11  here.  Yeah, here it is.  This one from Number 4.
12      Q.   Um-hum.
13      A.   That doesn't really tell us with a great
14  deal of specificity, at least this question does not
15  tell us that, it doesn't say T-bar design, roof
16  inserts.
17      Q.   But you knew that.
18      A.   We knew that that's what was in -- that was
19  what was being stated in this expert report that we
20  had, but we could -- we were trying to answer the
21  discovery requests that's served on us here.
22      Q.   You knew that was the allegation way back on
23  August 1st, 1989 when in Brown 4 you wrote to Mr.
24  Hickey and you explained to him not only what the
25  product was, but what the allegation was.  That was

Page 193

1   more than a year before Judge Ferentz entered that
2   order.
3       A.   This -- this question, though, doesn't
4   tell -- doesn't ask us about this.  This asks us more
5   generally about the product.
6       Q.   Well, what is the product, Mr. Brown?
7       A.   It doesn't -- it doesn't specify the
8   particular component part or system that is -- that
9   is at issue.
10      Q.   You didn't know -- you didn't --
11           You tell me in good faith you didn't
12  know that was the roof we were talking about?
13      A.   We knew it was the roof --
14      Q.   Okay.
15      A.   -- and what we were trying to do here was
16  give you the representative drawings of the roof that
17  you would need so that you could flush it out more
18  specifically for us and we could do a more focused
19  search to respond.
20      Q.   Okay.  But you didn't produce anything other
21  than those 104 documents the first time.
22      A.   Well, you know, you say that, but you
23  haven't shown me the entire production log from prior
24  to the time that this was entered.  I've asked for it
25  and you haven't shown it.

50 (Pages 194 to 197)

Page 194

1    Q.  Hey, either I'm right or I'm wrong.
2    A.  Well, I don't know.
3    Q.  Now --
4    A.  That may be right.  I don't know.
5    Q.  -- at your meeting on August 8th --
6    A.  Um-hum.
7    Q.  -- did you have any specific discussion with
8  respect to producing documents regarding question 68,
9  the alternative design?
10    A.  Let me see here.
11    Q.  Page 8.
12    A.  Page 8?  Yes.
13    Q.  Okay.  Tell me what all that says with
14  reference at 68, 69 you have.
15    A.  Let me see if this was one that was covered
16  in a court order.  Was it?
17    Q.  I believe it is.
18    A.  Okay.  Yeah.
19       What my notes say?
20    Q.  Um-hum.
21    A.  Okay.  See development work documents.  That
22  would have been a reference to what was discussed
23  earlier in the notes in that long list that I gave you
24  before.
25    Q.  Um-hum.

Page 195

1    A.  Latch was changed from hook method, looks
2  like 82 to part of 83.  Change to old bayonet design.
3  I believe the bayonet design was a push rod thing that
4  pushed into a receiving hole in the side on the pillar.
5    Q.  Um-hum.
6    A.  Looks like roof made at fab plant.
7    Q.  What's the fab plant?
8    A.  Fabrication plant.
9    Q.  Oh.
10    A.  A supplier plant.
11       So what the thought here was
12  having -- having covered all of what we would expect to
13  find the responsive material earlier in the meeting in
14  response to other questions, we had basically what we
15  would refer to for 68 and 69.
16    Q.  So it was your position -- strike that.
17       What additional work is contemplated
18  in order to respond to the alternative design question
19  as envisioned or reflected in your note on page 8 for
20  68 and 69, which is Brown 1?
21    A.  Well, I think this is suggesting that the
22  work has been done, and we have covered that already in
23  the extensive discussions that were taken before we
24  even got to the end to 68 and 69 --
25    Q.  Okay.

Page 196

1    A.  -- and identified them here, as I pointed
2  out to you before.
3    Q.  So is it my understanding -- is my
4  understanding correct that you were going to do no
5  additional work with respect to answering that question
6  because you believed it had already been answered?
7    A.  Well, in the context of this is at the -- on
8  the last page of the meeting minute notes.
9    Q.  Right.
10    A.  So this, obviously, came up toward the end
11  of the meeting.
12    Q.  Um-hum.
13    A.  I think what this is suggesting is that we
14  have covered all of that and all of the responsive
15  documents in response to several other questions, and
16  so I'm referring really to material that we've already
17  agreed to produce.
18    Q.  But you didn't feel it was necessary to
19  focus in on any specific person going out and looking
20  for alternative design documents; correct?
21    A.  We focused in on the documents that we
22  thought were necessary that would include information
23  about alternative designs.
24       Would it be necessary for me to
25  repeat and rewrite what I wrote in the earlier part of

Page 197

1  the notes here at the end?  Is that what you're
2  suggesting?
3    Q.  Your notes -- I'm just curious.  Your notes
4  end at 68 and 69, although Judge Ferentz' order goes on
5  to order a response to 70, 72, 74, 80, 82, 83, 84, 85,
6  86, 88, 91 -- I'll give you this -- 98, 99, 100, 101.
7       Is there any reason why you have no
8  notes with respect to any of those questions?
9    A.  I think I may have had to leave the meeting
10  is what I think.
11    Q.  You may have what?
12    A.  I may have had to have excused myself from
13  the meeting.
14    Q.  Oh.  So you weren't even involved in --
15    A.  Well, I don't -- I, frankly, don't remember.
16  I'm just giving you -- because my expectation is
17  that --
18       This does end at 80.  I really don't
19  remember.  I may have had to leave the meeting.  I'm
20  not sure.
21    Q.  Do you recall whether there were notes
22  beyond 80 or whether --
23    A.  I only recall what's here, but I will say
24  this, that certainly, given our procedures at that
25  time, the bulk of the work and certainly the important

Page 198

1 document locations would have been identified here.
2    Q. Okay. Was any particular person assigned to
3 look for alternative design documents?
4    A. Beyond what we're already agreeing to look
5 here?
6    Q. Um-hum.
7    A. Well, I think we identified the people who
8 were going to do -- going to look for the documents
9 here. Joe Rice is telling us that there's a lot of
10 material on roof development. Compare roof sections,
11 joints. This is on page 2. We know we have Eileen
12 Rooney Stafford doing some ongoing searching. There's
13 a note here to Kirkland & Ellis checking for field 216
14 tests for NCAP. Looks like --
15    Q. Would alternative design be in that
16 documents?
17    A. It's possible in this roof development
18 material that Rice was referring to there could be
19 alternative material in there. There's a very long
20 list of very specific technical areas that I read to
21 you before --
22    Q. Does the word alternative design --
23    A. -- that were directed to us by Joe Rice that
24 we were searching for.
25    Q. Does the word alternative design appear in

Page 199

1 any of those requests?
2    A. It doesn't need to appear. That's --
3 it's --
4    Q. That's not my question, Mr. Brown.
5    A. If it were included, it would be there.
6    Q. My question was does the word appear. I
7 can't read your handwriting. I just want to make sure
8 that the word does not appear, alternative design.
9    A. Does the word alternative appear in here?
10    Q. Yes.
11    A. Let me look. I don't know. I don't know.
12 Let me see.
13    I don't see the word alternative
14 here. That's a --
15    Well, there's close --
16    Let's see. Hold the phone.
17    Okay. Roof development. Compare
18 roof sections --
19    Q. What page are you reading?
20    A. I'm looking at page 0645, page 2.
21    So certainly if a comparison of roof
22 sections and joints was part of the roof development
23 effort in the F-car Project Center, then alternatives
24 would have been included in that.
25    Q. Okay. But the word alternative doesn't

Page 200

1 appear; correct?
2    A. I'm looking. I don't see it.
3    Q. So the alternative design search for
4 documents was going to be done not separately, but in
5 conjunction with these other projects assigned in your
6 memo.
7    A. Knowing how technical documents are
8 maintained at GM, what we were doing here in getting
9 drawings and searching these development files for
10 information that compared roof sections and joints
11 would have brought -- would have picked up any
12 alternative design documents.
13    Q. Now, Rumberger Kirk had either started on or
14 were shortly going to start on reviewing those 10,000
15 documents which had been sent to them for review of the
16 writer's file, the subject files, and the Fisher Body
17 files, correct, in and about the same period of time?
18    A. That's based on number 2?
19    Q. Based upon your memory or whatever else you
20 want to look at.
21    A. I'm looking at number 2. It looks like
22 10,000 or so pages were sent down there, too.
23    Q. And so this was --
24    And you were aware, based upon your
25 notes, that there was some kind of review of those

Page 201

1 documents going on down in Florida; correct?
2    A. It says here in my notes, yes, that for the
3 Hassan case, and I can't remember what was involved
4 exactly in the Hassan case, but it looks like Eileen
5 Stafford Rooney or Rooney Stafford was doing or had
6 done some kind of a review.
7    Q. Why wasn't there someone --
8    If they were doing some of the
9 document search, why wasn't someone from Rumberger Kirk
10 at that meeting?
11    A. Why weren't they at the meeting.
12    Because they were not counsel of
13 record in this particular case and it looks like we
14 called the meeting together the very next day and so
15 there wouldn't have been a need to have -- to have them
16 at the meeting. We could tell them what they needed to
17 follow up on.
18    Q. Don't you think it would have been helpful
19 to give them some direction as to what it is that they
20 should look for with respect to the Green case in those
21 10,000 documents that they were going through?
22    A. We gave them that direction. They didn't
23 have to be at the meeting to get the direction. They
24 got the direction in this letter.
25    Q. Is that letter the only direction given to

52 (Pages 202 to 205)

Page 202

1  them as to what to look for in the 10,000 documents
2  thought they were looking at?
3      A.  Excuse me.
4          Well, it's the only letter you've
5  shown me.  I may have had conversation with them.  I
6  probably did.
7      Q.  Do you recall having conversations with
8  them?
9      A.  Not specifically, but we had conversations
10 daily about various issues in the litigation, and this
11 is 18 years ago, so no.  I probably did.
12     Q.  Now, this October 9th letter, which is Brown
13 what?  Mr. Brown, what number is that?
14     A.  Number 2.
15     Q.  Okay.  Brown 2.
16     A.  Um-hum.
17     Q.  Annexes, it says that Mr. Rudock of
18 Rumberger Kirk, with respect to Michael Green versus
19 General Motors, the documents should be reviewed for,
20 and it says, quote, specifically interrogatories 27,
21 see attachments.  Am I reading that correctly?
22     A.  Yes.
23     Q.  Okay.  So this letter doesn't ask them to
24 look for alternative design documents, does it?
25     A.  Let's see what 27 says.  Hold the phone

Page 203

1  here.
2      Q.  27 says, Has said product or products of the
3  same or identical design as said product been certified
4  by any entity or examined and tested and approved by
5  any such entity examining or testing such product, if
6  so, then state, and then it goes on from there.
7      A.  Yes, it does.  It talks here about doing a
8  complete review for a Project Center file package for
9  roof development, and that would have included any
10 alternative design stuff that was in those files,
11 certainly.
12     Q.  Doesn't this question ask for certifications
13 by entities?
14     A.  Which question are you talking about?
15     Q.  27, which is the question you directed
16 Rumberger Kirk to look at in reviewing the 10,000
17 documents that were being sent to them.
18     A.  Well, it asks for 27, but it also says for
19 future F-car rollover cases.  We would like a review of
20 everything in there relating to roof development, and
21 certainly that's what we would -- and we would have
22 produced it for the Green case.
23     Q.  Mr. Brown, was the Rumberger firm given any
24 direction to specifically look through the documents
25 that they had to determine whether there were design

Page 204

1  documents reflective of alternative design?
2      A.  Let me see if I understand your question
3  now.  You're suggesting that despite what this letter
4  says, their only direction for the Green case was
5  related to interrogatory 27?  Is that what you're
6  suggesting?
7      Q.  That's my reading of the letter.
8      A.  That's not correct.
9      Q.  That's not correct.
10     A.  No.
11         What we were doing here was sending
12 them nearly 10,000 or so pages for three discrete tasks
13 and we wanted them specifically to take a look at 27 in
14 the Green case, but we also wanted them to review -- to
15 prepare a file package of the material, presumably
16 everything in these three categories that was related
17 to roof development, which would have included, if
18 there was any, any alternative design information in
19 it.
20     Q.  Okay.
21     A.  Because that's what Joe Rice specifically
22 suggested we do in this meeting where he said compare
23 roof development, compare roof sections and joints, and
24 then we specifically went through in detail and listed
25 exactly what joints and areas we were talking about.

Page 205

1  It's right there.
2          I mean, if we had done what
3  you're -- I think what you're suggesting, all right, we
4  would have sent -- the letter would have just been
5  maybe on the Green case or something and said look at
6  interrogatory 27, but that is not what this is doing,
7  and I was responsible for this, so I can tell you what
8  the intent was.
9      Q.  Well, I thought Susan Rhodes was responsible
10 for that letter.
11     A.  She was working under my direction.
12     Q.  Okay.  So these were your directions?
13     A.  Yes.
14     Q.  Okay.  How come you didn't send along with
15 this a copy of Judge Ferentz's order so they would know
16 exactly what it was that you had to comply with?
17     A.  Because we had already met with counsel, our
18 regional -- our national counsel and our local counsel.
19 We had what we thought was a very good understanding of
20 what the order required, that's reflected in the notes,
21 and so we had a specific follow-up task for them to do,
22 the Rumberger firm to do for us.
23     Q.  But the Rumberger firm wasn't at that
24 meeting.
25     A.  Didn't need to be.

Page 206

1    Q.   Oh. So you don't think this letter just
2  asked them, with respect to Green, to look for things
3  responsive to interrogatory number 27, you think it's
4  broader than that.
5    A.   Well, yes.
6    Q.   Okay.
7    A.   I mean, this was -- this -- I'm copied on
8  the letter, it was written under my supervision. The
9  Rumberger firm was one of our three regional firms and
10  we wanted a package. Certainly if there were material
11  in the -- in these 10,000 pages that were responsive to
12  Green, we would have produced it in Green. I think we
13  did, in fact, produce it in Green, I believe. In
14  fact -- well, I don't know exactly, but I think several
15  thousand pages were ultimately produced in Green in
16  response to your request.
17    Q.   That's your recollection?
18    A.   I believe that's -- don't hold me to the
19  exact number, but it was quite a lot.
20    Q.   If I told you that during the deposition of
21  Ms. Rooney she couldn't remember what it was she was
22  supposed to be looking for in those documents and
23  specifically didn't recall having any obligation to
24  look for alternative design documents in the documents
25  she had been provided, would that surprise you?

Page 207

1    A.   I'd have to read the context of the question
2  and the answer. I can't testify for Miss Rooney. I
3  can tell you that what we were asking them to do is
4  clearly stated in this assignment letter. It says
5  we're looking for roof development documents.
6  Certainly if there are any alternative design documents
7  in that category, it would have been flagged.
8          We wanted to do this. When you do a
9  general search like this, you want to state the search
10  more broadly, so you pick up and you err on the side of
11  picking up everything that's possibly roof related. If
12  you say just look for alternative -- documents to talk
13  about alternatives to the roof, then you're narrowing
14  the search request and you run the risk of missing
15  responsive material. If you do a broader search like
16  we were doing here, you're going to cover the
17  waterfront and hopefully get all the responsive
18  material, and that's what we were trying to do.
19    Q.   Did you get documents back from Ms. Rooney
20  or the Rumberger Kirk firm in response to what you
21  considered to be broad requests set forth in the letter
22  of October 9th, 1990?
23    A.   As I indicated before, I left this case in
24  about this timeframe, so I don't know what was produced
25  later.

Page 208

1    Q.   You don't recall seeing the documents that
2  were sent back by Rumberger's office?
3    A.   No, because I -- this file went to my
4  colleague in about October -- September, late --
5  September, October, might have been November.
6    Q.   When was the first time you had, if you
7  have, heard of a design called a modified vista vent or
8  a vista vent in connection with this litigation?
9    A.   I don't remember that at all.
10    Q.   You don't remember ever?
11    A.   I remember the name vista vent, but I can't
12  remember where I heard it, whether it was in the
13  context of this case or somewhere else.
14    Q.   So you may have heard it in connection with
15  another case?
16    A.   Possibly.
17    Q.   Who took over for you after October of 1990?
18    A.   Well, you know, with respect -- I think
19  that's already been testified to. It was Thomas
20  Ziolkowski.
21    Q.   Just making sure.
22    A.   Okay.
23    Q.   Have you ever seen what we call the A
24  through H documents?
25    A.   A through H documents. I don't think I

Page 209

1  have.
2    Q.   Ever?
3    A.   Well, let me think now.
4          I've reviewed a lot of documents
5  before the privilege hearing.
6          If you show them to me, I can maybe
7  refresh my memory.
8    Q.   Sure. It's one of the stuff I brought.
9  BROWN EXHIBIT NO. 10
10  WAS MARKED BY THE REPORTER
11  FOR IDENTIFICATION
12  BY MR. DONOVAN:
13    Q.   Brown 10.
14    A.   Okay. Do you want me to read every one of
15  them?
16    Q.   No. Just look at them generally and see if
17  it refreshes your recollection as to whether you've
18  seen these documents before.
19    A.   Okay. You know, I might have been shown
20  these before the privilege hearing, but I really don't
21  remember.
22    Q.   Okay. Do you recall seeing --
23    A.   If you got testimony there that --
24    Q.   Do you recall seeing them at any time before
25  the privilege hearing?

54 (Pages 210 to 213)

Page 210

1    A.   Well, if I -- if they were -- if I was shown
2  these as part of my preparation for the privilege
3  hearing, then I saw them then, but I can't -- I don't
4  really remember if I did or not.
5    Q.   Okay.  Other than in connection with the
6  privilege hearing had you ever seen those documents
7  before?  And the privilege hearing was in 2007?  6?
8    A.   No, it was 4, wasn't it, or --
9    Q.   4?  Time flies.
10       MR. PERSONS:  I wasn't on the case.
11       THE WITNESS:  Was it 2004?  Yeah,
12  it's four years ago.
13       You know, I don't remember, no.  I
14  can't remember that I did.
15    BY MR. DONOVAN:
16    Q.   Okay.  Look at the -- do you see the
17  diagrams in there, the modified vista vent and the
18  vista vent?
19    A.   Which particular diagrams?  There are
20  several.
21    Q.   The ones that said modified vista vent and
22  vista vent.  There's only one set of documents with --
23  diagrams with that on it.
24    A.   Okay.  Hold on.
25    Q.   Look like this.

Page 211

1    A.   Oh.  At the very end here?
2    Q.   It's kind of in the middle.  It's Bates
3  number 17781.
4    A.   Okay.  This one here?
5    Q.   Yes.  That's the one.
6    A.   Okay.  Yep, I see it.
7    Q.   Had you ever seen those documents before
8  becoming involved in the privilege hearing?
9    A.   You know, I don't remember specifically that
10  I did.
11    Q.   Do you remember unspecifically?
12    A.   I just -- it looks sort of -- it's the kind
13  of thing that you would see.  I mean, it's not an
14  unusual looking document.  I may have seen it.  I don't
15  know.  I can't remember.
16    Q.   Okay.  At any time while you were involved
17  in handling the discovery in the Green case up till
18  October of 1990 were you ever made aware that there
19  were alternative designs for the T-roof consisting of a
20  vista vent or a modified T-hatch also known as a
21  modified vista vent?
22    A.   I don't remember that and it's not reflected
23  in these notes.
24    Q.   Okay.  So you never heard of that in around
25  the time you were dealing with the Green discovery.

Page 212

1    A.   Well, I don't remember hearing it then, no.
2    Q.   So you might have heard of it, but you don't
3  remember right now.
4    A.   It's -- you know, it's --
5       We had a lot of litigation going on,
6  a lot of discovery requests, a lot of conversations 20
7  years ago.  Possibly I did, but I don't recall it.
8    Q.   Okay.  Might that be what's contained in the
9  rest of the pages of your handwritten notes pertaining
10  to the meeting?
11    A.   The rest of the pages?
12    Q.   Yeah, after question 80.
13    A.   No.  There are no additional handwritten
14  notes, if that's what you're asking.
15    Q.   Okay.  Okay.  I just wanted to make sure.
16    A.   I did not --
17       You have my complete notes, I assure
18  you.
19    Q.   Okay.  Were you aware back in 1989, '90 when
20  you were handling the Green case that General Motors
21  had been involved in testing a Lancia Spider which had
22  a roof similar to the vista vent or the modified vista
23  vent?
24    A.   A Lancia what?
25    Q.   A Lancia Spider.  L-a-n-c-i-a.  Spider like

Page 213

1  the insect.
2    A.   Um-hum.  Okay.
3    Q.   And you can look if you need to.  Go to the
4  last four pages of that document and you'll see a memo,
5  November the 10th, 1978.
6    A.   November the --
7    Q.   To Mr. Mertz.
8    A.   Oh, okay.  The very end here?
9       Looks like they were doing some
10  analysis of a Lancia Spider here.
11    Q.   Um-hum.  I'm asking if you'd ever heard of
12  it before this privilege hearing in this Newman case.
13    A.   No.
14    Q.   No.
15    A.   I don't recall that.
16    Q.   Did you ever hear of a Lancia Spider before
17  today?
18    A.   I think it's an Italian made product.
19    Q.   Do you know what kind of roof it has?
20    A.   No, I don't.
21    Q.   Okay.  So you had no idea that GM had done
22  some testing to compare it with the conventional
23  T-roof.
24    A.   Is that what this says, the testing was
25  done?

Page 214

1    Q.    Well, it says structural performance of
2  Lancia Spider type roof versus conventional T-roof and
3  it says results.  The objective was to provide a
4  performance comparison of the Lancia type hatch roof --
5    A.    I see that.  Yeah.  Um-hum.
6    Q.    -- to the conventional T-roof design from a
7  structural integrity and vibration standpoint, and then
8  it says results.
9    A.    I see that.
10   Q.    So do you interpret that as being that GM
11 did some testing with respect to comparison of the
12 Lancia Spider versus the T-roof?
13        I know.  You're not an engineer, so
14 you don't know.
15   A.    I think.  It suggests testing was done.
16 Whether it was testing or some kind of an engineering
17 analysis of some sort --
18   Q.    Okay.
19   A.    -- I don't know.
20   Q.    You never heard of that before getting
21 involved in this Newman case?
22   A.    No.  I don't remember that.  I didn't know
23 about that.
24        Let me make one comment, though.
25 Where were the alternative design documents that you

Page 215

1  were mentioning?
2        MR. PERSONS:  Let's see.  What page
3  here?  I don't remember.
4        THE WITNESS:  What you were calling
5  an alternative design.  Is that this page here?
6  BY MR. DONOVAN:
7    Q.    The drawings?
8    A.    Yeah.  That?
9    Q.    Yes.
10   A.    That's not a design.
11   Q.    That's not a design?
12   A.    Well, no.  That looks like sort of a concept
13 drawing.  I'm not sure we would consider that an
14 engineering design.
15   Q.    Okay.
16   A.    You'd have to ask our experts, but to me
17 that looks more like a concept -- conceptual drawing.
18   Q.    Really.
19   A.    You kept referring to it as an alternative
20 design.  A design is a full-fledged --
21   Q.    Well, does question 68 ask for designs?
22   A.    I've forgotten what it asks for.
23   Q.    Why don't you look it up.  You have all the
24 documents now.
25   A.    It says alternative approach to the design

Page 216

1  or construction.
2    Q.    Okay.
3    A.    This is -- I see it as an alternative
4  approach.  Perhaps you could say maybe that's what it
5  is.
6    Q.    So you would consider that to be an
7  alternative approach?
8    A.    It looks like a -- sort of a conceptual
9  drawing to me.
10   Q.    Well --
11   A.    You'd have to ask one of our engineering
12 experts.
13   Q.    So you have no opinion on that one way or
14 the other whether it's an alternative approach or not?
15   A.    It looks like an alternative configuration
16 or approach that was evaluated here or looked at.
17   Q.    Okay.  Well, let me ask it this way.
18   A.    Okay.
19   Q.    You have question number 68 in front of you.
20   A.    Okay.
21   Q.    And you have a judge in New Jersey who
22 enters an order requiring a more specific answer to
23 that question and many, many others.
24   A.    Um-hum.
25   Q.    And your new fledgling associate comes to

Page 217

1  you and says, Mr. Brown, I was given these documents A
2  through H, should we send these in response to these
3  questions or not.
4    A.    Um-hum.
5    Q.    What do you advise him?
6    A.    You mean as part of the Project Center
7  files?
8    Q.    No.  As part of your discovery obligation
9  pursuant to Judge Ferentz's order and the demand for
10 production of documents and interrogatories which were
11 served upon General Motors in the Green versus GM case.
12   A.    I haven't read every single page in here,
13 but it looks like it would be -- some of them would
14 be -- some would be broadly responsive to alternative
15 approach.  That's what you're getting at?
16   Q.    Okay.
17   A.    This one, for example, doesn't talk -- seems
18 to be talking about passive restraint considerations.
19   Q.    Well, you know what.  Why don't you go
20 through those documents for me and by letter tell me
21 each of the letters of the documents you would say,
22 yes, produce this because it's responsive to the
23 discovery demands in Green in Judge Ferentz's order.
24   A.    Okay.  I can read them.  If they're roof
25 related, they would probably be broadly --

56 (Pages 218 to 221)

Page 218

1    Well, this first document really is
2 driven by passive belt analysis. There isn't reference
3 to the hatch roof here.
4    Q.  In or out?
5    A.  I would probably include that.
6    Q.  Okay. So that's document Addendum A.
7    A.  Yeah.
8    Q.  B.
9    A.  B. Yeah.
10    Q.  Accessory roof options.
11    A.  You know, I would want to have some advice
12 on this one. I think so, but I don't know what is
13 meant really here by accessory roof. Is that an
14 aftermarket thing that they're talking about?
15    That's why when we do this, we don't
16 rely just on lawyers to do it, we have engineers to
17 help us.
18    Q.  Okay. So you would have to defer on this
19 one?
20    A.  Well, I would want to have some advice from
21 our knowledgeable engineering people about it, but it's
22 roof related, that's for sure.
23    Q.  Okay. And if they told us it was not an
24 aftermarket accessory, should it be included?
25    A.  It's unclear to me whether this is really

Page 219

1 talking about an alternative or a standard option.
2 That would need to be clarified, I think. If it's like
3 an accessory roof option that is already in production,
4 then it's not something that was considered maybe and
5 rejected. I just don't know. I'd have to --
6    Q.  Okay.
7    A.  -- understand the context a little bit.
8    Q.  Need more information.
9    How about C?
10    MR. PERSONS:  Before you go to the
11 next question, Maurice, let me transfer to Jamie. Can
12 we go off a moment? Just kind of swap.
13    VIDEOGRAPHER:  Going off the record
14 at 4:51 and 20 seconds p.m.
15    (Recess)
16    VIDEOGRAPHER:  We're back on the
17 record at 5:01 and 12 seconds p.m.
18    BY MR. DONOVAN:
19    Q.  My question to you, Mr. Brown, was which of
20 the A through H documents do you believe should have
21 been produced as part of Green --
22    My question was what documents do
23 you believe should have been produced as part of the
24 Green discovery from those A through H documents you're
25 looking at. I think we got through A and B. A was a

Page 220

1 yes and B was a --
2    A.  You have -- well, yes. I don't mean to --
3    All you've shown me are
4 interrogatory answers. Is there a request for
5 production of documents as well?
6    MR. CARROLL:  I don't believe there
7 is.
8    THE WITNESS:  This is
9 interrogatories.
10    BY MR. DONOVAN:
11    Q.  I'm looking at the A through H documents.
12    A.  At these?
13    Q.  Yes.
14    A.  I'd like to --
15    Q.  What do you think should have been
16 produced --
17    A.  Well, wait a minute. What --
18    Q.  -- by way of Green discovery?
19    A.  Show me the Green discovery request that
20 asked for it.
21    Q.  You had the Green discovery when you
22 answered those questions, didn't you?
23    A.  That's this, isn't it?
24    Q.  Those are part of them.
25    A.  I'd like to read the request for -- this is

Page 221

1 not a -- this refers to -- let's see here.
2    Q.  Well, you seem to have understood my
3 question before we took a break. Now you don't seem to
4 understand my question.
5    A.  Okay. Well, I'm just trying to make sure I
6 understand it so I can answer it correctly.
7    Q.  Well, you seemed to understand it. So
8 whatever you understood before the break, continue, you
9 were doing fine.
10    A.  Hold the phone.
11    I'm not quite sure which request for
12 production you're talking about, but if you're
13 referring to this interrogatory 68, alternative
14 approach design and construction, is that what you want
15 me to respond to?
16    Q.  Sure.
17    A.  Okay. Well, this refers to accessory roof
18 options, and I would want to get some clarification
19 from engineers about whether that is -- what that's
20 referring to, whether it's a production item or an
21 alternative --
22    Q.  I think we established that.
23    A.  -- design. Okay.
24    And I think these follow-on
25 documents seem to follow on that in B. Those all seem

Page 222

1  to go together.
2         Okay. C. This seems to be talking
3  about a chief engineer's project review where a vista
4  vent was considered as a -- or discussed as a possible
5  alternative. What's unclear to me about this is what
6  product they were talking about for that. This is
7  dated in 1978.
8    Q.  I represent to you it was an F-car.
9    A.  F-car, but what generation because this is
10  asking -- this interrogatory is asking for the said
11  product, which is, I think, an '86 Camaro, wasn't it?
12   Q.  So, Mr. Brown, why don't you just tell me.
13  Should it have been produced or shouldn't it have been
14  produced?
15   A.  Well, I'd want some clarification here about
16  what car they're talking about.
17   Q.  Um-hum.
18   A.  And that's, again, why we would ask our
19  engineers --
20   Q.  And what kind of clarification would you
21  want?
22   A.  What was it -- was it referencing the said
23  product that you're talking about in the interrogatory
24  question here?
25   Q.  Well, I'm not just referring to question

Page 223

1  number 68. I'm referring to all of the questions which
2  are contained in that.
3    A.  Well, you haven't shown me all the
4  questions.
5    Q.  Well, you've got all 100 and something of
6  the interrogatories.
7    A.  Well, I don't have the request for --
8         You don't produce documents in
9  response to interrogatories typically.
10   Q.  Sometimes you do.
11   A.  You usually have a request for production of
12  documents.
13   Q.  In fact, you talked about the super
14  interrogatories.
15   A.  If you have a -- if you have a question -- a
16  request for production of documents is what the court
17  order talks about, I'll be happy to look through that.
18   Q.  Okay. Do you not want to answer my
19  question, Mr. Brown?
20   A.  I want to make sure I answer it correctly.
21         The court order actually identifies
22  a whole series of requests for document production. So
23  if you have one in mind, I'll be happy to look at that
24  and give you a better answer, but these are
25  interrogatories.

Page 224

1    Q.  Okay. So are you saying you're unable now
2  after the break to answer my question?
3    A.  I'm saying I would like to know from the
4  engineers -- if you're talking about this as an
5  alternative design document, I would like to know what
6  vintage of F-car it is they're talking about in this
7  meeting in 1978 and it's unclear to me from this
8  whether it relates to the '86 F-car or not.
9    Q.  Okay.
10   A.  I don't know.
11   Q.  Go on to the next document.
12   A.  Well, this seems to be talking about the
13  '80 --
14   Q.  Which one are you talking about?
15   A.  I'm sorry. This is number --
16   Q.  They're letters.
17   A.  D. Addendum D.
18   Q.  Um-hum.
19   A.  This seems to be talking about the '82 F,
20  and they're considering an H -- a T-hatch and a vista
21  vent and a modified vista vent looks like.
22   Q.  So should that have been produced as part of
23  the Green discovery or not?
24   A.  If it's -- if it's -- if the '82 --
25         I've forgotten the vintages of the

Page 225

1  F-car family here, but if that was part of the F-car
2  family, then it probably would be relevant to the '86.
3    Q.  Okay.
4    A.  Again, I'd want to make sure that we have
5  some engineering judgment to help us with that
6  decision, and it looks like the rest of these in D all
7  build on that.
8    Q.  So if they were of the correct vintage year,
9  you would produce them, if not, you wouldn't; is
10  that --
11   A.  Well, no. That's not what I said. I said I
12  would want to know -- for example, on the very first
13  one that we talked about, B, not the first one, the
14  second one, this is talking about some kind of an
15  accessory option. I don't know if that's an
16  alternative design or some in-production option.
17   Q.  I thought we had gotten to D. Why are we
18  back on B?
19   A.  Because you asked me a general question and
20  I tried to answer it.
21   Q.  I was asking that with respect to what you
22  said about document D. If it was of the correct
23  vintage, you would produce it.
24   A.  I think --
25         Yes, if it were the correct vintage.

58 (Pages 226 to 229)

Page 226

1  It looks to me like it does discuss -- this is B -- D?
2  I'm sorry.
3     Q.   D.
4     A.   D?  It looks like it talks about
5  alternative -- three configurations, yes.
6     Q.   Okay.  And you would consider that to be an
7  alternative design configuration?
8     A.   You know, it says RPO roof design
9  considerations, but I don't see any real designs in
10  here.  These seem to be concepts of ideas more than
11  designs.
12          When I think of an engineering
13  design, I think of something that's supported by
14  blueprints and drawings and in-depth structural
15  analysis, cost, weight, those kinds of things.  I don't
16  see that there's --
17     Q.   Mr. Brown, we can talk about --
18          Produce it or don't produce it.  I
19  think you said, yes, it was of the right vintage.
20  Is that not your answer?
21     A.   I think that's right for D.
22     Q.   Okay.  Now, look at that D for a minute for
23  me.
24     A.   Okay.
25     Q.   It starts out 1982 F-car Project Center.

Page 227

1     A.   Okay.
2     Q.   Chief Engineers Project Center Review
3  Meeting, October 11, 1978.  Do you see that?
4     A.   Um-hum.
5     Q.   Okay.  Do you know whether this document
6  came out of the F-car Project Center documents?  The
7  F-car Project Center file I mean.
8     A.   No, I don't know that.
9     Q.   You don't know that?
10     A.   It says F-car Project Center on it, so...
11     Q.   I'm asking.  Would you know that -- if it
12  has that designation, whether that means it was in the
13  F-car Project Center file or not?
14     A.   What I don't know and I think I testified to
15  earlier is I don't know that everything on this
16  microfiche that you've been referring to necessarily
17  had all the F-car Project Center material in it.  I
18  don't know that.
19     Q.   That's not the question I'm asking you, Mr.
20  Brown.
21          The question I'm asking you is, did
22  documents which came from the F-car Project Center,
23  whether they were part of the 10,000 or not, is that
24  what they bore as a designation to designate them as
25  Project Center file documents?

Page 228

1     A.   Well, I can't -- I haven't reviewed them
2  all, so I don't know, but this clearly says F-car
3  Project Center.
4     Q.   Okay.  So by that can we assume that this
5  document came out of the F-car Project Center file?
6     A.   Are you talking about what's on the
7  microfiche and referred to before?  Is that what you
8  mean?
9     Q.   No.
10     A.   I think I already testified that I don't
11  know that everything on this microfiche for the subject
12  matter -- subject files or the writer files --
13     Q.   I'm not talking about the microfiche, Mr.
14  Brown.
15     A.   -- has everything involved from the F-car
16  Project Center in it.  I said I didn't know that.
17     Q.   Mr. Brown, I'm not talking about the F-car
18  Project Center microfiche.
19     A.   Okay.
20     Q.   I'm asking you a very simple question.
21  Based upon the designation of this document as a 1982
22  F-car Project Center document --
23     A.   Um-hum.
24     Q.   -- did it or didn't it come out of the F-car
25  Project Center file?  Whether it was one of the 10 --

Page 229

1  I'm not asking whether it was one of the 10,000
2  documents or not.  I'm asking you whether it was ever
3  in the F-car Project Center file.
4     A.   You know, I'm going to have to say this
5  again.  I don't really know how the engineers organize
6  these materials because if you look under here, it says
7  Chief Engineers Project Center Review Meeting.  For all
8  I know there might have been a separate chief engineers
9  Project Center file somewhere where these kinds of
10  things were kept.  Okay?  I really don't know.  You'd
11  have to ask the people who were responsible for the
12  documents.
13     Q.   Do you know who the person was who was
14  responsible for this document?
15     A.   Well, it says Chief Engineer Project Center
16  Review Meeting.
17     Q.   Do you happen to know who that was?
18     A.   Doesn't it say it in here?
19     Q.   No, it doesn't.
20     A.   Let me see it.  Well, hold on.  I think I
21  saw it.
22          Well, all right.  The very first
23  piece of paper here from July of 78 says H. R.
24  Knickerbocker.
25     Q.   Chief engineer, F Project Center.

Page 230

1    A.   Looks like that was the guy.
2         Now, did H. R. Knickerbocker have
3    his own separate chief engineer meeting minute files
4    that he kept that were separate and distinct from these
5    Fisher Body Project Center files?  I don't know.
6    Q.   Okay.  Did anybody ever go ask Mr.
7    Knickerbocker whether he had any documents which might
8    have been responsive to the Court's order in the Green
9    document and interrogatory request?
10   A.   Well, again, looking at my notes, it looks
11   like we made an effort to identify with the pos--
12   with the responsible people at Fisher Body where we'd
13   expect to find the material, additional documents
14   relating to the roof comparison.
15   Q.   Okay.  But Mr. --
16   A.   Now, whether Don O'Hara and Castle went to
17   R. H. Knickerbocker separately or Don Armstrong, the
18   other fella we talked about, whether they did that, I
19   don't remember, I don't recall.
20   Q.   Mr. Armstrong is mentioned in that first
21   document as coming from Fisher Body.
22   A.   Okay.
23   Q.   Do you see that?
24   A.   Yes, but keep in mind this is 1978.  This is
25   before the reorganization in 1984, and I believe in '84

Page 231

1    when Fisher Body was broken up, I think Armstrong went
2    to -- Mr. Armstrong went to CPC, I think.
3    Q.   Addendum D --
4    A.   Okay.
5    Q.   -- should be produced; correct?
6    A.   Okay.  Hold the phone here.  Let me read it.
7    Addendum D or E?  I'm sorry.
8    Q.   I was just concluding D.
9    A.   Oh, you're concluding D?
10        Well, this appears to relate to
11   possible roof configurations --
12   Q.   Um-hum.
13   A.   -- that were being considered it looks like
14   in 1978 --
15   Q.   Um-hum.
16   A.   -- for the 82 F.
17   Q.   Yes.
18   A.   So in a broad -- you know, my view, again,
19   we'd want to have some engineering review, but based on
20   my own lawyer review, I would expect that would be
21   broadly responsive to alternative approach.
22   Q.   Okay.  Addendum E.
23   A.   Say again.
24   Q.   Addendum E.  Now, these look like minutes of
25   that same meeting referred to in the previous document.

Page 232

1    Would you agree with that?
2    A.   Well, this appears -- this seems to me to be
3    a short memo summarizing the review that they were
4    talking about on October 11th, and it looks like this
5    is making the decision that the mainstream design
6    direction for the '82 F is the T-hatch based on current
7    production.  So I don't see that this is really -- it
8    looks like it's rejecting, if anything, the vista vent
9    idea or -- for the '82 program.
10   Q.   Should it have been produced as an
11   alternative concept or not?
12   A.   Well, was the '82 F program part of the said
13   product that you're talking about in this question?  If
14   it was, then I guess broadly it sort of shows a
15   decision with respect to the T-roof.
16   Q.   Okay.
17   A.   I don't see anything in here about design
18   analysis of the vista vent as an alternative design,
19   though.
20   Q.   Okay.  So, again, in or out?
21   A.   It appears to be related to the '82 F roof
22   decision as I read it.  So I suppose, broadly speaking,
23   very broadly, it probably would be discoverable, but
24   it's not an alternative design document.
25   Q.   Okay.  F.

Page 233

1    A.   Are you talking now about this?
2    Q.   I'm talking about document F.
3    A.   The whole thing?
4    Q.   Addendum F.
5    A.   Okay.
6    Q.   That's the one that has the little pictures.
7    A.   Okay.  This does talk about alternatives
8    that were reviewed to the roof.
9    Q.   Um-hum.
10   A.   Again, looks like for the '82 F.  '82 F-car.
11   Well, actually -- all right.  Yes.  October of '78
12   again.  Yes.
13   Q.   These should be produced?
14   A.   It looks like it's stuff that relates to
15   alternatives that were considered.  So in the broadest
16   sense, yes, probably.
17   Q.   It would be responsive.
18   A.   Well, I would --
19        Again, you haven't shown me the
20   question that you're talking about.
21   Q.   Just stick with 68.
22   A.   As generally alternatives, is that what
23   you're suggesting?
24   Q.   Stick with 68.
25   A.   Well, 68, again, is an interrogatory.  It

60  (Pages 234 to 237)

## Page 234

1    doesn't ask for documents.
2    Q.    Okay.
3    A.    Alternative approach.  It's a discussion of
4    some alternatives that were apparently reviewed at that
5    time.
6    Q.    And rejected.
7    A.    It looks like they did.  They kept going
8    with the T-roof.
9    Q.    But that's the first diagram in the diagram
10   T-hatch.
11   A.    Yes, but I don't -- there's no analysis in
12   here that I can find of any alternative design as such.
13   Q.    Okay.  How about Addendum G?
14   A.    Addendum G.  Okay.
15   Q.    Chief Engineers Coordination Meeting.
16   A.    Um-hum.  Okay.  That doesn't seem to talk
17   about an alternative design.
18   Q.    Okay.  How about just generally with respect
19   to production pertaining to roof?
20   A.    This is talking about the T-hatch roof
21   option.
22   Q.    Right.
23   A.    The development of test vehicle schedules
24   and timing was discussed.  I don't see anything in here
25   about an alternative design.

## Page 235

1    Q.    Well, how about just general roof documents?
2    A.    It talks about the roof.  Sure.
3    Q.    Would it be produced under that general
4    umbrella of roof documents?
5    A.    Well, this is talking about alternative
6    approaches to the design and construction in 68, the
7    one that you focused me on here.  So, you know, I don't
8    see that this talks about alternative roof designs.
9    You've got something else that shows it does, then
10   maybe.  I mean, there's nothing in here about the vista
11   vent or any --
12         MR. CARROLL:  Just wait for a
13   question.
14         THE WITNESS:  Okay.
15   BROWN EXHIBIT NO. 11
16   WAS MARKED BY THE REPORTER
17   FOR IDENTIFICATION
18   BY MR. DONOVAN:
19   Q.    Okay.  Let's do it the hard way.
20         I want you to review Brown 11, the
21   four selected requests to produce, which I will
22   represent to you were contained within the demand to
23   produce documents --
24   A.    Okay.
25   Q.    -- in the Michael Green case, and Exhibit 2

## Page 236

1    which are interrogatories number 11, 39, 58, 68, 69,
2    and 70, which, again, I will represent to you were part
3    of the interrogatories, and you can cross-reference
4    them yourself if you'd like because they're part of the
5    document you have in front of you.
6          Referring to Exhibit Addendum E,
7    would that document have to be produced in compliance
8    with any of those requests either by way of
9    interrogatory or by way of demand to produce, and if
10   not, why not?
11   A.    This is -- which one now?  E?
12   Q.    E.
13   A.    Well, 11 seems to be asking for studies,
14   calculations, or tests talking about performance
15   specifications, as I read it, although it's pretty
16   wordy and hard to understand.
17   Q.    Mr. Brown, you don't have to explain it to
18   me.  Just answer my question.  Should it be in or out,
19   and if it's not -- if it doesn't go in as part of the
20   discovery, then you can tell me why it doesn't go in,
21   but if it's in, then we can just move on to the next
22   one.  We don't have to go through a real big analysis.
23   A.    I don't see how it's responsive to 11,
24   frankly.  This is simply describing what the decision
25   was.  I don't see that there's any study or calculation

## Page 237

1    or test described here.
2          Wait a minute.  Oh, wait a minute.
3    Hold the phone.
4          Well, there's some discussion of the
5    windshield angle.  It looks like a build program was --
6    it looks like the results of a test -- pre-prototype
7    build and test program were reviewed.  It doesn't
8    really describe what the test results were, so it's
9    hard -- it's a little unclear as to whether or not
10   that would be a study or calculation reflecting the
11   conduct and results of any test.
12         Probably if you were interpreting it
13   very broadly, you would produce it, but I don't see
14   that it's telling us anything at all about the
15   alternative design for the vista vent.
16   Q.    Okay.
17   A.    Probably argue that one either way.
18   Q.    So your final decision would be since you're
19   the guy who makes the final decision?
20   A.    I would want to see -- I would want a little
21   bit more about what -- well, let's see.  Content.
22         It's basically only telling us that
23   this test program was reviewed for timing, content, and
24   cost.  It's not telling me that there's any sort of
25   analysis here of studies or calculations that were done

Page 238

1    at least in this document that I can find. So I really
2    don't know that that's responsive. I'd want to have,
3    again, our engineers take a look at it and give me
4    some --
5        Q.   So you're going to punt and ask your
6    engineers to make the decision.
7        A.   I'm not punting. I'm getting the kind of
8    expert input that we bring to bear on these matters so
9    that we can make the correct decision.
10       Q.   Okay. But if these documents were brought
11   to you as the ones responsive, would you pull it out or
12   would you leave it in?
13       A.   I just answered that. You know, it's a
14   little unclear to me what the engineers here -- this is
15   a group of engineers that are meeting -- what exactly
16   it is they're referring to. Are they talking about
17   studies and calculations and tests with respect to this
18   pre-prototype build and test program --
19       Q.   Okay. So you have no --
20       A.   -- that's reviewed? It's unclear to me.
21   I'd want to know more.
22       Q.   Okay.
23       A.   I can tell you -- just as a lawyer I can
24   tell you that this does not show any sort of
25   alternative design with respect to a vista vent roof,

Page 239

1    if that's what you're suggesting.
2        Q.   Okay. We expanded the criteria to all of
3    those questions set forth in Brown 11.
4        A.   Is that -- okay. That's this?
5            Well, 12 talks about quality
6    assurance procedures. I don't see any discussion of
7    that in here. Let's see. There's something here about
8    veiling glare.
9            MR. CARROLL: Let me just ask a
10   question. Did you mean, Maurice, to attach 68 and 69
11   to the second page?
12           MR. DONOVAN: Is that not -- they're
13   not in there?
14           MR. CARROLL: No. I just wanted to
15   ask you if you did because they are.
16           MR. DONOVAN: Oh, yes. Yes.
17           MR. CARROLL: Okay. Just let me
18   help just a minute.
19           I think, Doug, you have already
20   answered about Addendum E with respect to 68 and 69.
21   So I think what Maurice is trying to do is give you 68,
22   69, plus about six other questions.
23           THE WITNESS: That's these?
24           MR. CARROLL: Yeah. Um-hum.
25           THE WITNESS: Okay.

Page 240

1            MR. CARROLL: But I think E and F
2    you have responded to, unless you wanted to change your
3    opinion, which is, obviously, fine, with respect to
4    looking at 68 and 69, and they're still part of what
5    we're to look at.
6            THE WITNESS: Okay. I understand.
7            Well, I mean, this is talking about
8    three alternatives that were discussed in the meeting.
9    Okay? I don't see these as design -- design documents.
10   It says, Did you consider an alternative approach to
11   design or construction. Obviously they did and they
12   rejected it here, but there's no analysis of the
13   design, the alternative design.
14       BY MR. DONOVAN:
15       Q.   So because there's no analysis, you would
16   not include it?
17       A.   I would say that I would want to know if --
18   I would want to get some engineering thought about
19   whether or not they would consider this discussion to
20   be an alternative approach to design and consideration
21   of the product or merely the discussion that describes
22   what the decision was for the mainstream design, and to
23   me it looks like the latter.
24       Q.   Is it your position that alternative
25   approach to a design is an engineering concept totally

Page 241

1    and not a legal concept, I mean, that the only person
2    who can figure out whether something is an alternative
3    approach to a design is an engineer, not an attorney?
4            MR. CARROLL: Let me just -- I
5    object to the form, but subject to that, you can
6    answer. The reason I object is it's an either or and
7    there might be third, fourth options.
8        BY MR. DONOVAN:
9        Q.   Or third, fourth options?
10       A.   You know, this is not -- this is a
11   collaborative process. It's much more of an art than a
12   science, if you will. Judgment needs to be brought to
13   bear on these decisions, and that's why we bring a
14   group of experts, lawyers, and engineers into the
15   process and discuss these things.
16           What you might consider responsive
17   is not necessarily what our engineers will tell us or
18   the lawyers that represent us or me as an in-house
19   lawyer would consider to be responsive. We would want
20   to make an informed judgment of the issue, and that's
21   what we were trying to do here.
22       Q.   Okay.
23       A.   I don't know how else to answer that.
24       Q.   Let me approach it a little differently.
25           If this document was among the

62 (Pages 242 to 245)

Page 242

1 10,000 documents which Eileen Rooney Stafford was going
2 through down in Florida, should she have pulled this
3 out? Because she doesn't have engineers or lawyers or
4 anybody. She was just assigned the task in that letter
5 to produce whatever it is you think that letter says.
6 So you tell me since it's your letter and your
7 direction --
8    A.   Right.
9    Q.   -- whether this document should have been
10 produced or not.
11   A.   It would have been a document that discussed
12 the roof and we would have wanted to look at it, yes.
13   Q.   You would have wanted it pulled.
14   A.   I think so.
15   Q.   Okay.
16   A.   Um-hum.
17   Q.   Next document.
18   A.   Next one?
19   Q.   But you don't know whether it would make the
20 cut to get to Green discovery or not.
21   A.   Well, you know, I haven't -- you're showing
22 me these for the first time in many years and I'm
23 looking -- I'm trying to interpret this alternative
24 approach to the design and construction language that
25 you have in 68 --

Page 243

1    Q.   Um-hum.
2    A.   -- as fairly as I can.
3    Q.   Um-hum.
4    A.   And just tell you, based on my own lawyerly
5 review, I don't see that this is -- this discusses
6 alternatives that were rejected. I don't see it as an
7 analysis or really a discussion of the approach to a
8 particular design. It's not a design document.
9    Q.   So, in other words, something which was
10 rejected, doesn't make the cut is something which was
11 considered.
12   A.   No. I said it was considered.
13   Q.   Okay.
14   A.   They list here the three things that they
15 considered and they decided to maintain the mainstream
16 direction, but what you're -- what this seems to be
17 asking for, excuse me, is an alternative approach to
18 the design or construction. This doesn't set forth a
19 real design, it just describes what it was.
20   Q.   Okay. Let's go on to E. No, I'm sorry, H.
21   MR. CARROLL: F. F.
22   MR. DONOVAN: F.
23   MR. CARROLL: Well, we've done F.
24 Can we go to G?
25   THE WITNESS: Go to G?

Page 244

1    MR. CARROLL: Yeah.
2    THE WITNESS: Is g the last one?
3    MR. CARROLL: We've already talked
4 about A through F, I believe.
5    MR. DONOVAN: I thought we were
6 doing G.
7    MR. CARROLL: He went back to E,
8 unfortunately.
9    THE WITNESS: Oh, I'm sorry. I
10 circled back.
11   MR. CARROLL: I think you did say E.
12   THE WITNESS: I'm sorry. Okay. G.
13 No. He asked for E, didn't he?
14   MR. CARROLL: He asked for E.
15   THE WITNESS: Okay.
16   MR. DONOVAN: Did I? Okay.
17   THE WITNESS: All right. You know,
18 G, Mr. Donovan, I don't see any reference in here at
19 all to a vista vent roof, an alternative roof, any
20 alternative design analysis of any kind. If I'm
21 missing something --
22   BY MR. DONOVAN:
23   Q.   All right. Just, Mr. Brown, all I want to
24 know is, one, is it a document that should have been
25 pulled by Eileen Rooney in her review of the 10,000

Page 245

1 documents if it was in there?
2    A.   Probably. It does reference the roof
3 option.
4    Q.   You don't have to tell me why.
5    A.   Just T-roof option. Okay.
6    Q.   Okay. And would it have made the cut to
7 become Green discovery based upon the demands served?
8    A.   I don't think it's responsive to what you
9 were asking for here in 68.
10   Q.   Okay. That's fine. That's fine. You don't
11 have to explain it to me why.
12   A.   Now, there's other stuff. Let me see.
13 These other ones you want me to look at quickly?
14        Well, it doesn't describe test
15 results, which is what you seem to be asking for in 11.
16 I don't see that it describes quality control
17 procedures, your assurance procedures you seem to be
18 asking for in 12. It doesn't -- 13 seems to be asking,
19 again, for test and inspection results. I don't see
20 that that is discussed here. Then 14, let's see,
21 you're asking here for performance specs, design
22 objectives and so on. It's hard for me to see how it's
23 responsive to that.
24        All this is saying is that the --
25        Apparently at this coordination

## Page 246

1  meeting it was simply confirming that the T-roof option
2  and the 62-degree windshield angle were confirmed as
3  the mainstream approach. It mentions a T-roof. If
4  that's the criteria, then I guess it's responsive.
5      Q.  Mr. Brown, all I want is your conclusion. I
6  don't need the analysis. Does it go in the Green
7  documents for production or not?
8      A.  I wouldn't think so based upon --
9      Q.  Okay. Okay.
10     A.  -- what you've asked for here.
11     Q.  That's fine. That's fine. That's an
12 answer. l wouldn't think so. I'll take that. I'll
13 take that as a no.
14          Last document.
15     A.  This is H?
16     Q.  H.
17          Let me ask you something first. See
18 the top, it says Project Center?
19     A.  Yes.
20     Q.  Little logo?
21     A.  Yes.
22     Q.  Okay. Do you recognize that as signifying
23 the document which comes out of a Project Center file?
24     A.  That's what it says.
25     Q.  Okay. I mean, do you know that as a fact

## Page 247

1  one way or the other?
2      A.  Well, do these other documents have that on
3  it? Let me see. Yeah. This has got it on it, too.
4      Q.  Okay.
5      A.  Okay. I guess they had their own
6  stationery.
7      Q.  Did you know that back then that that's what
8  they put on them?
9      A.  I don't remember if I knew it then or not.
10 If it came up in discovery in other cases, I probably
11 knew it. I knew there was a Project Center and the
12 fact that they would have their own stationery is not
13 surprising to me.
14     Q.  Okay. So then it would be fair to assume
15 that this document came out of the F-car Project Center
16 file.
17     A.  Well, let me see.
18          You know, not quite, and I'll have
19 to -- and I'll tell you why.
20          If you look at the way this thing is
21 signed --
22     Q.  Um-hum.
23     A.  -- it says F-car Project Center/CPE.
24     Q.  Well, it says F Project Center/CPE.
25     A.  F Project Center/CPE, and I believe -- I

## Page 248

1  don't know Mr. Kennel, but I believe Mr. Scherba was
2  part of current product engineering at that time --
3      Q.  Um-hum.
4      A.  -- I think. He may have been assigned to
5  work in the Project Center. Again, I'm not sure. It's
6  possible that he generated this from CPE and perhaps it
7  came -- he was using Project Center stationery to
8  generate it. So whether it was included in the Project
9  Center file or not, I'm not sure.
10     Q.  Okay. And even though it says at the last
11 line there, file, at the bottom, and a number or a
12 date, that doesn't mean it's from the Project Center
13 file?
14     A.  Well, it doesn't say Project Center file.
15 It looks like it's an OC something.
16     Q.  Do you know what that's indicative of?
17     A.  No, I don't. I'm sorry.
18     Q.  Okay.
19     A.  You'd have to ask the fellas that wrote it.
20     Q.  Okay. Was this -- if this was in the
21 documents which Eileen Rooney was reviewing, would you
22 expect her to pull this?
23     A.  This -- this appears to talk about a
24 comparison done of this Lancia roof that you're talking
25 about and the conventional T-roof. Again, it's unclear

## Page 249

1  to me what T-roof it is and what vintage F-car they're
2  talking about here. I don't see that it is identified
3  as the second generation F-car. It is not identified
4  that way here. You're assuming, I think, that's what
5  it is.
6      Q.  I'm not assuming anything. I'm asking for
7  your guidance --
8      A.  Well, I --
9      Q.  -- as to whether this document would be
10 produced as part of, number one, by Miss Rooney, which
11 I think you said yes, and, number two, whether it would
12 make the cut to be in the Green discovery pile.
13     A.  Yes for Miss Rooney, but whether it would be
14 responsive in Green, we would need to know if they were
15 talking about the product that you were asking us
16 about.
17     Q.  Okay.
18     A.  And it's unclear to me from this because it
19 doesn't say what vintage F-car they were talking about.
20     Q.  Okay. Do you have any independent way of
21 knowing which of these documents were sent to Rumberger
22 Kirk as part of the 10,000 -- $10,000 -- the 10,000
23 documents or not?
24     A.  No, I don't. It's shortly after, as I said,
25 testified already, shortly after this October letter.

64 (Pages 250 to 253)

Page 250

1  in fact, possibly even before. I'm not sure, but when
2  these documents were sent down there, my colleague took
3  over the case.
4      Q.   Okay.  And you have no knowledge as to what
5  documents came back from Miss Rooney's search.
6      A.   I didn't have the case at that time, so no.
7      Q.   And I'm told by -- in answers to
8  interrogatories in the Newman case that the A document
9  was not among the documents -- Addendum A was not among
10  the documents sent to Ms. Rooney as part of the 10,000
11  documents.  Do you know why that might have been?
12      A.   The A document?  You mean that --
13      Q.   Yes.
14      A.   -- A through H thing?  Oh, this one?
15      Q.   Yes.  Because it appears to be -- has that
16  Project Center logo at the top.
17      A.   Oh, yes.  Um-hum.
18      Q.   So if the Project Center documents were sent
19  to her --
20      A.   You say this was not sent to her?
21      Q.   That's what I'm told in answers to
22  interrogatories. I'm sure Mr. Carroll could verify
23  that.
24          MR. CARROLL:  That's correct.
25          THE WITNESS:  Well, I'm not sure.

Page 251

1  It does mention the roof.  I don't see that it's an
2  analysis of any alternative design for the roof.
3      BY MR. DONOVAN:
4      Q.   Okay.  Look at Addendum B for me.  I'm told
5  that only one page of that document was sent to
6  Rumberger Kirk for analysis.
7          First, do you know what page was
8  sent?
9      A.   I'm sorry.  This is B again?
10      Q.   Yes.  Addendum B.
11      A.   I don't know what page.
12          Oh, this is the one that we were
13  trying to figure out whether or not the accessory roof
14  was referring to a production roof or some --
15      Q.   You were trying to figure that out.  I was
16  listening.
17      A.   Well, it's unclear to me from this --
18      Q.   Okay.
19      A.   -- what it is.
20      Q.   So you don't know what one page was sent.
21          Do you know why the remainder of the
22  pages were not sent as part of the documents to be
23  reviewed by Rumberger Kirk in Florida?
24      A.   Let's see.  Well, they don't appear to
25  relate to alternative designs.

Page 252

1      Q.   Do you think that --
2          So that's why?
3      A.   I don't know.  The answer is I don't know,
4  but they don't appear to relate to an alternative
5  design.
6      Q.   The rest of the documents were sent to Miss
7  Rooney as part of the 10,000 documents sent to her for
8  review.
9      A.   This is C through H now?
10      Q.   Yes.
11      A.   Um-hum.
12      Q.   However, none of these documents were pulled
13  in compliance with her directive to produce certain
14  documents as you defined from the 10,000 documents she
15  received.  Are you following that because I'm not --
16      A.   I'm not really.  I'm sorry.
17      Q.   Okay.  Ms. Rooney got 10,000 documents --
18      A.   Okay.
19      Q.   -- to review from the F-car Project Center
20  file and from Fisher Body, both writer files and
21  subject files.
22      A.   Okay.
23      Q.   I've represented to you that with the
24  exception of one page of B and A the rest of these
25  documents were all sent and were contained within the

Page 253

1  10,000 documents that she received.
2      A.   Okay.
3      Q.   Following me so far?
4      A.   I think so.
5      Q.   Okay.  You were the one who gave her the
6  mandate with respect to what it is she was supposed to
7  pick from that file both with respect to interrogatory
8  number 27 and also to put together this pile of
9  documents pertaining to the F-car roof development.
10      A.   Well, that was the instruction to the firm.
11  I don't --
12      Q.   Okay.
13      A.   -- specifically recall speaking to her.
14      Q.   These documents were not pulled from those
15  10,000 documents and were not sent back to --
16      A.   Okay.
17      Q.   -- GM or Kirkland & Ellis or anybody else as
18  responsive to the request which you gave her to pull
19  the roof documents.
20      A.   This is C through H?
21      Q.   Yes.
22          Were you aware of that?
23      A.   Yes, I think I was.  I knew generally that
24  there were some documents turned over in a later case
25  that were not turned over here.  Is that what you're --

Page 254

1    Q.   Is that the Johnson case you're talking
2  about?
3    A.   Yeah, Johnson I think was the name of it,
4  yeah.  Is that what you're talking about here?
5    Q.   No.  You mentioned the later case.  I wasn't
6  mentioning any case.  I'm just saying that these
7  documents were not produced, did not come back in
8  response to your letter requesting that she produce
9  certain documents.
10   A.   Yeah.  That may be.  I wasn't responsible
11 for the case at that point, so...
12   Q.   Okay.  Do you --
13            So you didn't know what came back or
14 what didn't come back.
15   A.   No.
16   Q.   We already established that.
17            We've also established that, based
18 upon your review, these documents -- some of these
19 documents, if not all of them, should have come back as
20 part of your re -- the request you made to the
21 Rumberger firm.
22   A.   Broadly speaking, it looks like -- it looks
23 like they all at least either mention the roof or have
24 some discussion of a roof.
25   Q.   Okay.

Page 255

1    A.   So if that's the criterion, then yes.
2    Q.   Do you know why these documents were not
3  selected by the Rumberger firm in response to your
4  directive as contained in -- I don't know what document
5  that is, Brown...
6    A.   This one here, Number 2?
7    Q.   Is that -- yes.  Brown...
8    A.   Well, again --
9    Q.   What number it is?  Just give me the number.
10   A.   Number 2.
11   Q.   Brown 2.  Okay.
12   A.   Okay.
13   Q.   Do you know why these documents -- did
14 anybody ever tell you we didn't pick these documents
15 because the dog ate them, they got stuck in the
16 photocopier?  Did anybody ever tell you why?
17   A.   Not that I recall.  I mean, I wasn't
18 responsible for the file at that point.
19   Q.   I understand that.
20   A.   So...
21            This was sometime later after
22 October of '90, wasn't it?
23   Q.   Maybe somebody told you in the bathroom or
24 walking through the halls, guess what?  You don't
25 recall any of that?

Page 256

1    A.   In the bathroom or walking through the hall?
2    Q.   Well, I'm using that as a --
3    A.   You mean like a watercooler conversation or
4  something like that?
5    Q.   Yes.
6    A.   We've had -- we've had watercooler
7  discussion about this situation about the case, but in
8  terms of the details of what I know she did and the
9  criteria that she used when she did this review, I
10 don't know that because I wasn't involved -- I wasn't
11 responsible for the case at that point.
12   Q.   I understand that.  I'm asking you what --
13   A.   It could be.  Now, if you want me to
14 speculate --
15   Q.   Well, I don't want you to speculate.
16   A.   I could certainly --
17   Q.   I don't want you to speculate.  I want you
18 to use your best educated guess based upon your -- 30
19 years?
20   A.   Yes.
21   Q.   -- 30 years of experience in dealing with
22 General Motors and outside counsel and discovery in
23 products cases and everything else, your best educated
24 guess as to why these documents didn't come back as
25 those selected by Ms. Rooney or the Rumberger firm.

Page 257

1            MR. CARROLL:  If you have an
2  educated estimate, you certainly can offer it.  Just
3  don't speculate.
4            THE WITNESS:  You know, looking
5  through what you've shown me here, it seems to me that
6  other than the fact that they're broadly related to the
7  roof, it's not immediately clear to me that they're
8  responsive to what you -- to the request that you asked
9  for.
10   BY MR. DONOVAN:
11   Q.   The request?  I'm talking about your
12 request.  It was your request that Ms. Rooney produce
13 certain documents from the 10,000 documents.
14   A.   Oh.  You're suggesting as to why they
15 weren't produced in the case or in the --
16   Q.   No, no, no.  Why they weren't produced --
17 why they didn't come back from Florida.
18   A.   I don't -- you know, I don't know.  I -- I
19 can't speculate.  It would be speculation on my part.
20 I really don't --
21   Q.   And you don't have an educated guess.
22   A.   No, not really.
23   Q.   Okay.
24   A.   Really don't.  You could ask Miss Rooney.
25   Q.   I did.

66 (Pages 258 to 261)

Page 258

1    A.    Okay.
2    Q.    She doesn't know either.
3    A.    Or ask Mr. Rudock who was the lawyer
4  responsible.
5          VIDEOGRAPHER:  Going off the record
6  at 5:46 and 46 seconds p.m.
7          (Recess)
8          VIDEOGRAPHER:  We're back on the
9  record at 6:02 and 1 seconds p.m.
10         BROWN EXHIBIT NO. 12
11         WAS MARKED BY THE REPORTER
12         FOR IDENTIFICATION
13         BY MR. DONOVAN:
14    Q.   Brown 12 is privilege document 149, Bates
15  number 926, it's a letter of September 12th, 1990 to
16  Joe Murray from Susan Rhodes.
17         First let me ask, do you know who
18  Susan Rhodes is?
19    A.    Yes.
20    Q.    Who is Susan Rhodes?
21    A.    Susan was a coordinator in our product
22  discovery group working under my supervision at that
23  time.
24    Q.    Okay.  Was she working with you on the Green
25  case?

Page 259

1    A.    Yes, she was.
2    Q.    Okay.  And what kind of background does
3  Susan have?
4    A.    I guess I can't answer that.
5    Q.    Okay.  I guess I'll ask her then.
6    A.    She's certainly an experienced GM employee.
7    Q.    Okay.  The letter, Brown 12, you were copied
8  on that.
9    A.    Um-hum.
10    Q.    Do you have any recollection of that letter?
11    A.    At some point, you know, before the
12  privilege charge I think I looked -- probably looked at
13  it. I don't recall looking at it more recently with
14  Mr. Carroll --
15    Q.    Okay.
16    A.    -- preparing for this deposition.
17    Q.    You don't recall us that you do recall?
18    A.    This was not one that we looked at.
19          MR. CARROLL:  You may have looked at
20  it for the privilege hearing.
21          BY MR. DONOVAN:
22    Q.    Look on page 2 for me where it says
23  Production For a Later Date, and it says, The following
24  items will take time...
25          (Off the record)

Page 260

1          THE WITNESS:  Oh.  Production for a
2  later date. Okay.
3          BY MR. DONOVAN:
4    Q.    Do you see where I'm looking?  On the second
5  page it says, Production For a Later Date, The
6  following items will take time to review and produce.
7    A.    I see that.  Yes.
8    Q.    And then the first item is Collision
9  Performance Injury Reports and the second item is
10  responsive documents from the F-car Project Center
11  files, interrogatories 24, 52, and 68, and then crash
12  test reports and videos, interrogatory 27.
13    A.    Um-hum.
14    Q.    Do you see that?
15    A.    Yes, I do.
16    Q.    Do you know what documents --
17          Well, let me ask it this way first.
18  At the time this letter was drafted on September 12th,
19  1990, were there already documents which had to be
20  reviewed which had not been produced previously?  Is
21  that what this letter refers to?
22    A.    This letter is telling us that the documents
23  that are identified on the first page there and up to
24  that point on page 2 that you mentioned were to be
25  reviewed by Joe Rice on -- were to be reviewed by Joe

Page 261

1  Rice and produced for delivery the day after -- or two
2  days after this letter was written.
3    Q.    Right.
4    A.    Okay.  That's the first part.
5          Now, the second part is telling us
6  that there were additional documents that still needed
7  to be reviewed.
8    Q.    Okay.
9    A.    Is that your question?  I'm sorry.
10    Q.    So there were documents which were pulled
11  from the F-car Project Center files at least at that
12  point somehow responsive to interrogatories 24, 52 and
13  68 and 27, or maybe just 24, 52, and 68, and then there
14  were crash videos and reports answering 27 which you
15  had at the time of this letter pulled but had not yet
16  produced for plaintiff.
17    A.    That's a little unclear to me here.
18          It's a little unclear whether Susan
19  meant in that second part where it says the responsive
20  documents that were to be pulled from the Project
21  Center file because we had just discussed, remember, in
22  this meeting the review of those.  And so it's a little
23  unclear whether she was thinking about documents that
24  are going to be responsive that will come forward in
25  the Project Center files will need to be reviewed or

Page 262

1 whether there were already responsive things produced
2 that needed to be reviewed. Following my distinction?
3    Q.   Yes, and that was my -- that was my question
4 with respect to the language here.
5         Do you have an understanding of that
6 one way or another whether there was a --
7    A.   I don't really, no. I really don't.
8    Q.   -- whether there was a body of documents and
9 they needed to be reviewed to see if they were going to
10 be produced or whether we had to still review the F-car
11 Project Center file to see more documents?
12    A.   I'm not sure.
13    Q.   You're not sure. Okay.
14         Now, with respect to all of these
15 responses to interrogatories that GM served, they serve
16 a verification -- verification.
17    A.   Right.
18    Q.   Are you familiar with that?
19    A.   Yes.
20    Q.   And is that one of your responsibilities to
21 have the interrogatory answers verified by someone?
22    A.   Yes.
23    Q.   Okay. And the first verification I have,
24 which goes back to September 13th, 1990, is by a
25 Theresa L. Cerwin, C-e-r-w-i-n.

Page 263

1    A.   Cerwin.
2    Q.   Cerwin?
3    A.   Cerwin.
4    Q.   Okay. So then I assume you know who Theresa
5 Cerwin is.
6    A.   Yes.
7    Q.   Who's Theresa Cerwin?
8    A.   At that time she was the designated
9 authorized agent for purposes of answering verified
10 discovery responses on behalf of GM.
11    Q.   Okay. Who authorized her?
12    A.   Oh. The authorization, I believe, comes
13 from secretary.
14    Q.   The secretary of the corporation?
15    A.   I believe so.
16    Q.   Okay. And the secretary of the corporation
17 says, Theresa, you're going to verify interrogatories?
18    A.   Well, I'll direct you to sign these
19 verifications and by -- as an authorized agent, yes.
20    Q.   Okay. And why was Theresa picked?
21    A.   Probably for -- based upon her knowledge of
22 the company and her knowledge of GM documentation and
23 her experience with the corporation and things like
24 that.
25    Q.   Other than authorized agent does she have

Page 264

1 another function around here?
2    A.   I think she's retired, so I --
3    Q.   Oh. What -- did she have a --
4    A.   She probably did. You know, I don't
5 remember. This --
6         For some of these authorized agents
7 I believe they were additional duties assigned to their
8 regular --
9    Q.   Okay.
10    A.   -- duties.
11    Q.   Well, I'm trying to figure out like what --
12 why didn't -- she was designated as compared to -- I'm
13 sure there are thousands of people that work in this
14 building.
15    A.   I don't know. I didn't designate her.
16    Q.   Okay.
17    A.   So I can't answer that.
18    Q.   Are you told who the designated agent is?
19    A.   We know who to go to to sign the
20 verifications, yes.
21    Q.   Okay. Are they provided with a copy of all
22 of the discovery which is going to plaintiff's counsel
23 before they sign the verification?
24    A.   I believe so.
25    Q.   Okay. Do they review all the pages?

Page 265

1    A.   I -- you know, I -- I'm not sure. I think
2 they -- they rely on the legal staff's advice that
3 they're appropriate to be verified. Whether they
4 review every single page, I'm not sure.
5    Q.   What does that mean, they're appropriate to
6 be verified?
7    A.   Somebody has to sign --
8         When you have documents, Mr.
9 Donovan, coming from a variety of sources within
10 General Motors, engineering documents, non-engineering
11 documents, all sorts of things, advertising materials,
12 sales and service materials, the kinds of extensive
13 documentation that plaintiff's counsel will always ask
14 us for, okay, you and others, it's impracti-- in
15 fact, probably impossible to find one person at General
16 Motors who has knowledge about the source and custody
17 of every single batch of those documents, but yet you
18 do have to bind the corporation that the responses are
19 accurate to the best of our knowledge and that we're
20 meeting our requirement.
21         So we have an authorized agent, sort
22 of a generalist appointed to sign the verification
23 after the legal staff represents to that person, as was
24 done here, that these have been gathered and reviewed
25 and that the responses, to the best of our knowledge,

68 (Pages 266 to 269)

Page 266

1 are accurate, are appropriate to be signed. That's
2 basically what we say to them. We don't know another
3 way to do that.
4     Q.   And in the context of the Green case did you
5 go to Miss Cerwin and tell her that you were making
6 that representation with respect to it?
7     A.   I would not have had to go to her to do
8 that. We had a procedure with a note. I think in that
9 timeframe before we had computers doing this, much of
10 this we had maybe just a note saying these are okay to
11 verify.
12     Q.   Okay to verify?
13     A.   Yeah. It was a procedure.
14     Q.   Like a little stickem?
15     A.   I don't know if it was a stickem or --
16 something. There was some kind of a transmittal note.
17     Q.   Okay. And, I mean, did she just like sign
18 these things all day long or like does she do --
19     A.   I don't know. I'm sure it would vary
20 depending on what the requirement of the workload would
21 be.
22     Q.   Now, does she -- do you know if she
23 undertakes -- she or any of the other verifiers
24 undertake any independent cross-referencing of
25 documents?

Page 267

1     A.   You mean would the verifier go back and
2 double check all the documents him or herself?
3     Q.   Yes.
4     A.   Several thousand pages that you're talking
5 about --
6     Q.   Um-hum.
7     A.   -- and review them individually without
8 having any knowledge or experience really or expertise
9 in the area that you're talking about? Is that what
10 you're suggesting?
11     Q.   Are you saying that they have no expertise
12 in the area?
13     A.   They have expertise, but I'm talking about
14 all the various areas that I described to you, you
15 would expect a verified agent to undertake that task
16 every time a discovery response is to be verified?
17 Surely not.
18     Q.   Well, I'm asking you. I'm not -- you know.
19     A.   No. Of course not.
20     Q.   Why doesn't --
21     A.   They would rely on the legal staff.
22     Q.   Why don't you break it down with respect to
23 like technical documents and have Mr. Rice or one of
24 the engineers sign off on that?
25     A.   We do that already. That's -- I tried to

Page 268

1 explain to you already in these meetings that we've
2 talked about such as the one that we had here. We
3 brought the technical and knowledgeable people to bear
4 to bring -- to get their expertise and tell us if these
5 were the responsive materials.
6          At the time later on when we're
7 sending this verification in, it is counterproductive
8 and not necessary to then drag Mr. Rice back in and
9 then say, hey, we're getting ready to sign the
10 verification now, will you come look at these again.
11     Q.   No, no, no. I'm talking about actually
12 signing the verification and bind him to the fact the
13 documents --
14     A.   Because he's an engineer. He's only --
15 that's only one --
16          MR. CARROLL: Wait for him to finish
17 his question now.
18          THE WITNESS: Finish your question.
19     BY MR. DONOVAN:
20     Q.   Okay. To bind that he has reviewed,
21 especially in light of Judge Ferentz's order which
22 specifically designated that there should be one person
23 responsible and to be held responsible for --
24     A.   Okay.
25     Q.   -- non-production.

Page 269

1     A.   Let me explain it to you again. There are
2 documents in response to discovery coming from various
3 sources --
4     Q.   I understand that, Mr. Brown.
5     A.   -- within General Motors, not just
6 engineering documents.
7     Q.   I said technical --
8     A.   Please let me finish.
9          Here we produced several thousand
10 pages in response to your discovery request. They were
11 not all engineering documents, some of them were, many
12 of them weren't.
13          You would want to have a generalist
14 who can sign -- appointed by the secretary who can sign
15 these on the representation of the legal staff. That's
16 what happened here. You would not select Mr. Rice or
17 any engineer to be that general because they're an
18 engineer. That's not how it works.
19     Q.   Well, you said -- I would like -- no. I
20 would like to have someone who I can depose and ask if
21 they reviewed all these documents and could swear under
22 oath that they were responsive and they constituted all
23 of the documents and that everything was reviewed.
24     A.   I think --
25     Q.   I can't do that with Miss Cerwin, can I?

Page 270

1    A.  No.  Of course not.
2    Q.  Okay.
3    A.  And we wouldn't expect to be able to.
4    Q.  Now --
5    A.  What you're suggesting, I think -- let me
6    finish.
7    Q.  No, no, no.  The question was asked -- is
8    answered.
9        So Miss Cerwin verifies the truth
10   and accuracy of the documents and answers that are
11   being provided by General Motors to plaintiff's
12   counsel.  She relies upon you or other legal staff like
13   you to represent to her that these are full and
14   accurate responses to discovery and legal counsel
15   relies upon someone like Joe Rice, who is an engineer,
16   to -- at least with respect to the technical documents,
17   to represent that they are clear -- to represent that
18   they are accurate and true responses and all consuming
19   responses to the discovery requests, and Joe Rice
20   relies upon someone at discovery coordination, you
21   know, such as Susan Rhodes to review the documents and
22   represent to him that she has reviewed the documents
23   and they are, in fact, true and responsive.
24        Is that a fair analysis --
25   A.  No.

Page 271

1    Q.  -- of how the chain of command works with
2    respect to getting interrogatories or demand to produce
3    verified?
4    A.  No.  That's simplistic.  It's not correct.
5    Q.  It's more complicated than that.
6    A.  Well, we have different inputs that we need
7    to have.  I mean, Joe Rice would review the technical
8    documents for sufficiency and we always have an
9    engineering review of the documents, as I think I've
10   said several times now.  We don't rely just on lawyers
11   or lawyers' agents to do these technical reviews.  If
12   we had something from a non-engineering source such as
13   an owner's manual or, you know, a brochure, something
14   that is obviously applicable to the vehicle, we
15   wouldn't need a specialized review of something like
16   that.
17   Q.  Okay.
18   A.  You know, so it's not an either or sort of
19   process as you're suggesting.
20   Q.  Let's break it down.
21        Ms. Cerwin relies upon you to tell
22   her that the answers to interrogatories and production
23   requests are true and accurate and responsive; correct?
24   A.  Yes.
25   Q.  Okay.

Page 272

1    A.  For purposes of signing the verification,
2    that's right.
3    Q.  Okay.  And you to whatever degree, I'm not
4    saying it's 100 percent, there may be other people who
5    also interject, but to some degree relied upon Joe Rice
6    in the Green case to tell you that his review of the
7    document was all encompassing and whatever he produced
8    or whatever he answered was true and accurate.
9    A.  Well, there would have been an engineering
10   review, okay, and whether it was Joe Rice, I don't
11   remember, and he was at the meeting.  It certainly
12   looks like it probably was him, but I don't remember.
13   Q.  Okay.  But my question is, though, you rely
14   upon the engineers to tell you that they're responsive
15   and they've conducted the search, yes or no?
16        MR. CARROLL:  Wait till he's
17   finished.  Go ahead.
18        THE WITNESS:  Yes.  I've answered
19   that already, I think.
20        BY MR. DONOVAN:
21   Q.  And they, in turn, rely upon other
22   individuals who are neither attorneys nor engineers to
23   actually go and pull the documents from whatever source
24   they're coming from.
25   A.  No.  I mean, it could be that the engineer

Page 273

1    would help pull the documents.
2    Q.  Okay.
3    A.  I don't know that that didn't occur here.
4    Q.  Okay.  Is there any time that the documents
5    are pulled by the discovery coordinators and given to
6    Mr. Rice or to you in response to whatever request you
7    made of them?
8    A.  If it's -- if the discovery contact that the
9    coordinator was going to ask for, for example, Don
10   Armstrong or Bob O'Hara, one of these people in Fisher
11   Body, was an experienced discovery contact, himself or
12   herself an engineer, in that case they were, then our
13   coordinator would typically describe for getting from
14   -- maybe from Joe Rice some direction about what kinds
15   of stuff we would want to ask them for.  We would send
16   it to them and they would do that.
17   Q.  Have you ever relied --
18   A.  Then Joe Rice would get -- whatever came
19   back from that search would be reviewed by Joe Rice to
20   confirm it's responsive.
21   Q.  Have you ever relied upon a discovery
22   coordinator such as Susan Rice (sic) telling you that I
23   reviewed a certain group of documents and I'm telling
24   you that these are responsive and I've pulled the
25   documents you asked me to?

70 (Pages 274 to 277)

Page 274

1    A.   Yeah. If it's routine sort of stuff that it
2  doesn't -- you know, it's an owner's manual or it's
3  something like a warranty service history or an
4  invoice, I mean, you know, it doesn't require
5  specialized -- real specialized technical knowledge,
6  you could certainly rely on them.
7    Q.   So the answer is yes.
8    A.   Yes.
9    Q.   Okay. Do you know why it's a verification
10 rather than as required under New Jersey rule as a
11 certification?
12   A.   I don't remember that.
13   Q.   You don't know why one is picked over the
14 other?
15   A.   I don't recall why we use -- that's
16 probably --
17        I don't know what you're looking at,
18 you haven't shown it to me, but I think that's probably
19 our standard -- standard verification.
20   Q.   It says Verification, State of Michigan,
21 County of Wayne.
22   A.   It's probably a standard form.
23   Q.   Now, were you involved in this case at
24 all -- strike that.
25        Were you at all involved in the

Page 275

1  Johnson versus General Motors case?
2    A.   I don't remember having been involved in
3  that case.
4    Q.   Okay. Do you recall having any dealings
5  with a Pat Artis, an attorney from Tennessee?
6    A.   Mr. Artis has filed -- has been the
7  plaintiff's counsel in several product liability cases
8  that have been assigned to me, but I don't recall that
9  Johnson was one of them.
10   Q.   Okay. And were these --
11        I'm going to assume these were roof
12 cases.
13   A.   Well, we have one right now. It's a glass
14 related case --
15   Q.   Okay.
16   A.   -- Pat Artis is involved in.
17   Q.   Okay. Johnson involved the allegation that
18 the T-roof flew off the Camaro and struck Mr. Johnson
19 who was driving behind in a truck, struck him in the
20 head causing brain damage.
21   A.   Yeah. Um-hum.
22   Q.   Does that refresh your recollection as to
23 whether the Johnson case was a case you were handling?
24   A.   I don't remember the case, so -- and it
25 was -- I think it occurred after I had already

Page 276

1  transitioned out of the roof crush specialty.
2    Q.   Okay. Do you have any information or
3  knowledge with respect to Mr. Artis coming -- Mr. Artis
4  or his representative, Mr. Lewis, coming to General
5  Motors document -- coming to Detroit -- not Detroit --
6  coming to Michigan and reviewing documents directly
7  where they're maintained by General Motors?
8    A.   Is this in connection with this Johnson case
9  that you're talking about?
10        MR. CARROLL: Yeah. I object to the
11 factual predicate because I don't think that's what
12 happened, but subject to that, you can answer.
13        THE WITNESS: I said I don't know
14 what happened in the Johnson case. I know there was a
15 Johnson case. I don't know -- it wasn't my case.
16        BY MR. DONOVAN:
17   Q.   Okay. Do you know who Mr. Lewis is?
18   A.   No.
19   Q.   No. Never had any dealings with him?
20   A.   I think --
21        I've never met him. I never had any
22 dealings with him. I think -- I think what he -- I
23 think he's a discovery consultant or something like
24 that. I don't know.
25   Q.   Are you familiar with any plaintiff's

Page 277

1  attorney or their designated, you know, personnel
2  coming to General Motors to search for documents
3  directly where the files are opened up to plaintiff?
4    A.   Where the original client files and take
5  them into the assembly plant and say, here, start
6  looking through these drawers or something like that?
7    Q.   Wherever they're compiled.
8    A.   We have had on-site reviews that we've
9  conducted for plaintiff's counsel where we've taken
10 copies of documents that have been requested and made
11 them available in a room somewhere for the plaintiff's
12 lawyer to look at them and then in an effort to
13 cooperate and get the, you know -- make the thing
14 manageable rather than have the plaintiff's lawyer
15 walking around the factory.
16   Q.   But that's where you make the copies
17 available to them.
18        Do you ever allow them direct access
19 to the original documents to search through them to
20 find what they want to find?
21   A.   The original documents.
22   Q.   Yes.
23   A.   Do you mean like in the office of the chief
24 engineer who's assigned to the --
25   Q.   No. Like the microfiche involved in...

## Page 278

1    A.    We have had -- I think we have had
2  microfiche reviews.  Whether they reviewed the copy of
3  the microfiche or the original microfiche, I don't
4  know.  We've had reviews where they've looked at stuff
5  like that, yes.
6    Q.    Back in --
7    A.    Generally -- let me just answer generally.
8  We try to -- we try to make duplicate copies of things
9  that people review because you don't want -- you don't
10  want to send your original client documents outside of
11  your control because you may lose them.
12    Q.    Um-hum.
13          In the timeframe of the late '80s,
14  early '90s was any of the searching for documents
15  undertaken by computer?
16    A.    In what timeframe?
17    Q.    Late '80s, early '90s when this case was
18  ongoing.
19    A.    I don't really remember.
20    Q.    Okay.  Is that currently how searches are
21  done?
22    A.    Well, we have access to many resources now,
23  the computer, e-mail, and we can send e-mail requests
24  to search locations and ask them to turn things back.
25  We sometimes produce responsive materials on CDs and

## Page 279

1  give them to the other side saving a lot of copying
2  time and paper, so...
3    Q.    Okay.  But I would assume that the ability
4  to do that is dependent upon those documents being
5  stored in some kind of electronic computer database.
6    A.    Well, yes, but you can also scan them.  If
7  they've never been -- if they're not in a database,
8  then you can scan them in to a database, and we've done
9  that sort of thing.
10    Q.    Okay.  How much of -- if you can tell me,
11  how much of GM's documents pertaining to the design and
12  manufacture of automobiles is now in computer or
13  electronic media?
14    A.    I could only give you a very general answer
15  to that.
16    Q.    Okay.
17    A.    A lot.
18    Q.    A lot.
19    A.    GM's moved and all manufacturers have moved
20  to CAD/CAM, computer-aided design and manufacturing --
21    Q.    Okay.
22    A.    -- in which, you know, we're using a lot of
23  database analysis and storage.
24    Q.    So I assume it would be --
25    A.    Much more so than in previous years.

## Page 280

1    Q.    It would be easier to search for that stuff
2  now than it was back in 1989, '90?
3    A.    The method of searching would be different.
4    Q.    Was there any protocol with respect to
5  depositing all of the documentation pertaining to the
6  design and manufacture of a vehicle in one central
7  repository once that generation or that era of cars had
8  been discontinued?
9    A.    Any protocol.
10          Well, again, you know, you're asking
11  me to talk about how engineers organize their
12  documents.
13          I know in the case of the F-car
14  Project Center there was a central repository, it was
15  called the F-car Project Center files that we've been
16  talking about.  There were other Project Center files
17  in this timeframe.  So my expectation would be that
18  they probably had similar files.  That is not
19  exhaustive of everything necessarily relating to the
20  F-car, as I've explained, because there might be other
21  places that would have relevant material like the
22  proving ground, like Chevrolet, like corporate staffs,
23  like Fisher Body.  So you would have to get the
24  knowledge of people together, which is what we tried to
25  do here, and identify those places and go get them.

## Page 281

1          MR. DONOVAN:  I'm done.
2          MR. CARROLL:  Okay.  Take a deep
3  breath because I've got a short direct.
4          THE WITNESS:  Okay.
5  EXAMINATION BY MR. CARROLL:
6    Q.    Mr. Brown, you and I know each other and
7  have for a number of years; is that correct?
8    A.    Yes.
9    Q.    We've worked on cases together, have we not?
10    A.    We have.
11    Q.    All right, sir.  I want to ask you, Mr.
12  Brown, in your 31 years on legal staff whether you have
13  ever been presented with a document that you thought to
14  be responsive yet refused to produce it.
15    A.    No.  We try to produce responsive materials.
16    Q.    Are you -- Mr. Brown, are you aware of any
17  situation whether it was a case involving roof crush or
18  a case involving non-deployment of airbags, anything
19  you have been involved in, has anyone under your
20  direction ever failed to produce a document that you
21  believed to be responsive yet you decided to withhold?
22    A.    You mean did the person under my direction
23  decide to withhold?
24    Q.    Yes, sir.  You or anyone at your direction.
25    A.    No.

72 (Pages 282 to 285)

| Page 282 |
| --- |

1    Q.  Mr. Brown, are you aware of the claims that
2  plaintiff is making in this case?
3    A.  I'm aware generally of what they're
4  claiming, yes.
5    Q.  All right, sir. Let me enumerate them for
6  you and then let's go through them individually.
7    A.  Okay.
8    Q.  Plaintiff is claiming that documents were
9  negligently concealed, that documents were fraudulently
10  concealed, and that civil RICO was committed.
11    A.  Um-hum.
12    Q.  Let's look at each of those claims
13  individually.
14          MR. DONOVAN:  Let me just object to
15  the form of the question. Whether those are
16  plaintiff's allegations or not will be determined by
17  the ultimate litigation in the case.
18          MR. CARROLL:  Fair enough.
19  BY MR. CARROLL:
20    Q.  What I'm representing, Mr. Brown, is a
21  reading of the complaint. The complaint speaks for
22  itself. If I have incorrectly stated those, then I'm
23  sure that at the appropriate time Mr. Donovan or the
24  Court will correct me, but I want you to assume for the
25  purposes of my question that -- or questions that I

| Page 283 |
| --- |

1  have correctly stated them.
2    A.  Okay.
3    Q.  All right, sir. As to the negligent
4  concealment, in the Green case are you aware of anyone
5  negligently concealing documents from production?
6    A.  No.
7    Q.  All right, sir. I'm not going to ask you
8  what all the requisite elements of negligent
9  concealment under New Jersey law would be, but do you
10  believe you have an understanding of what the term
11  negligent concealment connotes as a lawyer?
12    A.  I think so, yes.
13    Q.  All right, sir. And do you want to change
14  your testimony now that you have thought about
15  negligent concealment? Do you still believe that no
16  one negligently concealed documents in the Green case?
17    A.  Well, I don't know what happened after the
18  documents were sent from here to Rumberger Kirk, so...
19    Q.  And just relying only on your knowledge, Mr.
20  Brown.
21    A.  Um-hum. I really --
22          Once they left here with the
23  direction of what review was done or wasn't done by
24  Rumberger Kirk, I don't really know --
25    Q.  All right, sir.

| Page 284 |
| --- |

1    A.  -- because I wasn't responsible for the case
2  at that time.
3          As of the time that I had
4  responsibility with the case and as of this meeting, I
5  don't see anything in here to indicate any concealment
6  of any documents, negligent or otherwise --
7    Q.  All right, sir.
8    A.  -- at this time.
9    Q.  Well, let me ask that specifically.
10          I'm not asking you what the
11  requisite elements of fraudulent concealment under New
12  Jersey law may be, but do you believe as a lawyer who
13  practiced for over 30 years that you have some idea of
14  what the term fraudulent concealment would mean?
15    A.  Yes.
16    Q.  All right, sir. Do you believe in the Green
17  case that anyone attempted by fraud to conceal
18  documents from production?
19    A.  By intentional --
20          MR. DONOVAN:  Excuse me. Let me
21  object to the form of the question.
22          THE WITNESS:  The intentional act of
23  fraud intentionally? No.
24  BY MR. CARROLL:
25    Q.  I will let you try to parse the term, sir.

| Page 285 |
| --- |

1    A.  No, I don't.
2    Q.  All right, sir. Now, do you believe you
3  have got -- and this is the hardest of the three, Mr.
4  Brown. Do you believe you have an understanding of
5  what civil RICO may be?
6          MR. DONOVAN:  Object to the form of
7  the question. Are you asking civil RICO under New
8  Jersey law?
9          MR. CARROLL:  Under New Jersey law.
10          THE WITNESS:  That is not my area of
11  legal expertise, so only in the most general sense.
12  BY MR. CARROLL:
13    Q.  All right, sir. Do you understand that --
14  what -- well, strike that.
15          I will represent to you that an act
16  of conspiring is part of civil RICO under New Jersey
17  law.
18    A.  Okay.
19    Q.  Accepting my representation, are you aware
20  of anyone conspiring to withhold or delay production of
21  documents in the Green case?
22    A.  No.
23    Q.  All right, sir. Now, the same three sets of
24  questions let me ask for any case in which you are
25  aware. It may have been a case that was supervised by

Page 286

1  you or it may be a case about which you have personal
2  knowledge.
3      A.  Okay.
4      Q.  I don't want opinions. I only want your
5  personal knowledge.
6          During your time on the GM legal
7  staff, Mr. Brown, do you have personal knowledge of
8  anyone in any case negligently concealing documents?
9      A.  Negligently concealing documents?  No.
10     Q.  All right, sir.  Same question with respect
11  to fraudulent concealment.  During your time on the GM
12  legal staff, are you aware of anyone either in a case
13  in which you were involved or otherwise fraudulently
14  concealing documents from production?
15     A.  No.
16     Q.  All right, sir.  Then, lastly, are you aware
17  during your time on the GM legal staff of anyone in a
18  case in which GM was a defendant conspiring across
19  state lines by mail or phone to attempt to withhold
20  documents from production?
21     A.  No.
22     Q.  All right, sir.  Mr. Brown, if you did know
23  that -- or if you did have a suspicion that someone on
24  GM legal staff was failing to produce documents that
were called for in a case responsive to discovery, what

Page 287

1  would you do?
2          MR. DONOVAN:  Object to the form.
3  Calls for speculation.
4          THE WITNESS:  Well, if my -- I think
5  we would have a duty to bring it to the attention of
6  our supervision, our managing counsel and discuss the
7  issue, certainly.
8  BY MR. CARROLL:
9      Q.  And if you were aware of such actions, would
10  you bring it to your managing counsel's attention?
11     A.  Absolutely.
12     Q.  All right, sir.  Mr. Donovan has asked you
13  most of these questions so aptly, the direct is getting
14  shorter.
15          Mr. Brown, during the time that you
16  were in charge of the Green case, is it correct to say
17  that Rumberger Kirk had some involvement in the case?
18     A.  Yes.
19     Q.  All right, sir.  I want to ask you a few
20  questions about your work with the Rumberger Kirk firm
21  in this case.
22          I understand -- or let me strike
23  that.
24          Your testimony has been that they
25  were asked to review some documents; is that correct?

Page 288

1      A.  Yes.
2      Q.  All right, sir.  In asking Rumberger Kirk to
3  review documents, did you provide guidance on how to
4  review documents, what you were looking for?
5      A.  We would have --
6          Susan Rhodes sent a letter
7  indicating in -- I think it was the one in 1990,
8  October there, indicating what we wanted them to do in
9  the F-car Project Center file review, so that would
10  have been the guidance, and I may have had a
11  conversation with Bob Rudock about it.
12     Q.  Did you, sir, in providing that guidance
13  tell Rumberger Kirk who should review the documents?
14     A.  I don't remember that I did.
15     Q.  All right, sir.  Would it be your normal
16  practice to allow the firm to assign whomever it
17  thought most capable to --
18     A.  Yes.
19     Q.  -- complete an assignment?
20     A.  Yes, it would have been.
21     Q.  All right, sir.  Would you have instructed
22  someone reviewing documents exactly how they should
23  conduct their review?
24     A.  Probably not.  We would rely on the
25  expertise and knowledge that they as professionals

Page 289

1  would have, and in this case Rumberger Kirk had been
2  working on F-car roof crush cases for us and had some
3  knowledge about the issues.
4      Q.  All right, sir.  I understand that there may
5  have been budgetary issues involved in any -- any piece
6  of work done for you, but would you tell Rumberger
7  exactly how many people to use or Rumberger or any firm
8  exactly how many people to use in a document review?
9      A.  Typically not.  We would leave that to the
10  discretion of the -- professional judgment of the firm.
11     Q.  Why did you pick Rumberger Kirk for a review
12  in this case?
13     A.  Because Rumberger Kirk was one of our
14  national counsel firms along with the Kirkland & Ellis
15  firm and they had handled at least one other F-car roof
16  case, that was the Wickham case that I testified about
17  before, and so they had some knowledge of discovery on
18  F-car documents and issues, and so it seemed like a
19  good fit to ask them to take on as a project this
20  particular project.
21     Q.  All right, sir.  So is it fair to say that
22  they had some expertise and prior experience in
23  reviewing documents?
24     A.  Yes.
25     Q.  All right.  Did you choose the firm in part

74 (Pages 290 to 293)

Page 290

1  to take advantage of this experience?
2      A.   Yes.
3      Q.   Did the firm exercise -- in conducting this
4  review did the firm exercise any independent judgment
5  to your knowledge?
6      A.   Well, you always want to have -- that's why
7  you retain the law firm, to get the benefit of their
8  professional expertise and judgment, and certainly they
9  bring professional judgment to whatever task you assign
10  them to do. Here we gave them the broad outline of
11  what it was we wanted them to do and basically relied
12  on them to complete it.
13     Q.   And so did you expect them to use their
14  professional expertise and judgment in this review?
15     A.   Yes.
16     Q.   Do you believe that GM acted reasonably in
17  its efforts in discovery in this case, Mr. Brown?
18          MR. DONOVAN:  Object to the form of
19  the question.
20          THE WITNESS:  Well, from what I see
21  based on the documents that have been shown to me and
22  the extensive meeting that we had, the day after I sent
23  my note out it looks like we brought to bear what I
24  would consider to be a very thorough effort with the
25  right people to get the appropriate searches started

Page 291

1  and produce the material that we could find that was
2  responsive and I think knowing, based upon what I've
3  been told, we produced several thousand pages here in
4  this case, it looks to me like a pretty thorough
5  effort, yes.
6          MR. CARROLL:  I have nothing further
7  for Mr. Brown at this time.
8  RE-EXAMINATION BY MR. DONOVAN:
9      Q.   Mr. Brown, you gave some rather broad brush
10  generalizations about the conduct of people during the
11  course of General Motors being involved in the Green
12  case. You testified that you did not see any evidence
13  of anybody negligently concealing documents or
14  fraudulently concealing documents or being engaged in
15  civil RICO as defined by New Jersey law; correct?
16     A.   Well, not as of the time I was responsible
17  for this case.
18     Q.   Okay. That's what you testified to
19  generally.
20     A.   Yeah.
21     Q.   Okay. That would only apply to, number one,
22  the period of time you were involved in this case,
23  which is August of '89 through October of '90; correct?
24     A.   I can only testify from my own personal
25  knowledge of when I was involved in the file.

Page 292

1      Q.   And that would have only been with respect
2  to people who you were dealing with; correct?  If there
3  were other people outside of your office and outside of
4  your purview of control, you wouldn't know what they
5  did or didn't do; is that correct?
6      A.   Well, no. Of course not.
7      Q.   Okay. You wouldn't know.
8      A.   No.
9      Q.   Okay. And even with respect to the people
10  who were within your purview --
11     A.   Um-hum.
12     Q.   -- and control, you wouldn't know what they
13  did when you were not present and weren't there to
14  supervise or view or control that; correct?
15     A.   No one would.
16     Q.   Okay. And I think I went through this, and
17  I don't mean to beat a dead horse, but a lot of the way
18  General Motors engages in discovery is by way of
19  delegating the responsibility for things, for finding
20  things, to making a decision as to whether to produce
21  it, whether it's responsive to other people. There's
22  not one person who does all of that.
23          MR. CARROLL:  Object to form.
24          You can answer.
25          THE WITNESS:  You know, Mr. Donovan,

Page 293

1  I have to take issue with the "a lot" part of that.
2          We have to delegate certain tasks in
3  order to make it a manageable process because, as you
4  know, plaintiff's counsel served very extensive
5  discovery requests that required us to hunt in many
6  different locations. One person can't possibly do all
7  of those things. So we have to bring several -- a team
8  of people to bear to make sure that we are acting
9  responsibly in getting the stuff that we would be --
10  expect to be responsive, in this case, several thousand
11  pages.
12     BY MR. DONOVAN:
13     Q.   Okay.
14     A.   So of course not. You wouldn't expect one
15  person to do everything.
16     Q.   And as a corollary to that, you must
17  necessarily rely on the good faith, the expertise, the
18  diligence, the work ethic, the competence of various
19  other people in order to achieve your objective; is
20  that correct?
21     A.   Anytime you have a team working -- a
22  professional team working on an important process like
23  this, of course you rely on their competence and
24  expertise.
25     Q.   Okay. Now, that same line of questioning

Page 294

1 with respect, you also testified generally in your 31
2 years whether you had ever seen any evidence of
3 negligent concealment or fraudulent concealment or
4 civil RICO conspiracy.
5          Again, you can only say that within
6 the purview of things you know, the people you know and
7 the time in which you actually had control or authority
8 over them; correct?
9     A.    Well, and generally, sure. I mean, if
10 you're asking me have I ever seen a mistake made in
11 terms of a document not produced that should have been
12 produced or something like that, we've had situations
13 like that and we've fixed them and they're brought to
14 our attention and we're aware of them.
15          If you're asking me have there been
16 situations of intentional concealment or fraud or
17 outright active negligence on the part of anybody on
18 our team, if we're aware of it, we certainly fix it.
19 Active concealment and intentional fraud, I'm not
20 aware -- we wouldn't see that. If we did, we would get
21 it fixed.
22    Q.    Is active negligence different than passive
23 negligence?
24    A.    Any --
25          MR. CARROLL: Object to form,

Page 295

1 argumentative.
2          MR. DONOVAN: I'll withdraw it.
3          THE WITNESS: Any mistake -- if
4 we -- if a mistake is made, it's brought to --
5          MR. CARROLL: He withdrew it. He
6 withdrew it. You don't have to answer.
7          THE WITNESS: All right.
8 BY MR. DONOVAN:
9    Q.    And specifically in the Green case you were
10 not around overseeing what Rumberger Kirk was doing in
11 Florida; correct?
12    A.    No, I was not.
13    Q.    Okay. However, you provided them with the
14 documents to review; correct?
15    A.    Well, people under my direction did, yes.
16    Q.    Okay. And you provided them with the
17 guidance as to what it is they were to do with that
18 document by way of review.
19    A.    Susan Rhodes' letter basically summarized
20 it, yes.
21    Q.    Okay. And if they needed further guidance,
22 you or Susan Rhodes or somebody else up here in Detroit
23 was available for them to call and discuss that with;
24 correct?
25    A.    After -- yes, but after October I would have

Page 296

1 transitioned off the case.
2    Q.    Okay.
3    A.    So it would have been my successor.
4    Q.    Your next in line.
5    A.    Yes.
6    Q.    Okay. Would have been available to discuss
7 it with them.
8    A.    Absolutely.
9    Q.    So if they had any questions, they could
10 call you up or one of your, you know, successors or
11 someone else in the discovery group.
12    A.    Well, actually it would have been Tom
13 Ziolkowski who took ever the case for me.
14    Q.    Okay. And you -- not you personally, but
15 General Motors, in order to comply with discovery
16 requests served upon them in the Green case, was to be
17 the recipient of their work product down in Florida.
18 That was the goal for them, to send the stuff back to
19 GM.
20    A.    Are you talking now about this project that
21 Eileen Rooney worked on?
22    Q.    Um-hum. Yes.
23    A.    Well, certainly. That was our work product
24 and they were undertaking the task at our direction.
25 That's right.

Page 297

1    Q.    Okay. And in return for compensation for
2 doing that, they worked for General Motors in
3 accomplishing that task; correct?
4    A.    They were our retained outside counsel.
5    Q.    Okay. And within certain parameters, even
6 though you wouldn't, say, have one person review them
7 or two people, if they decided to use their judgment
8 and have 300 people review these documents, I assume GM
9 would have been a little upset because of the billing
10 involved in that; correct?
11    A.    Well, I mean, when you develop a
12 relationship with a law firm and they see issues like
13 that where they think there's going to be a lot of -- a
14 need to have a lot of people involved, it's going to be
15 an expensive thing and budgets are an issue, they
16 probably would discuss it with us. We would rely on
17 their judgment to bring that to our attention.
18    Q.    Okay. So if there was a question as to how
19 much time and how many people and what the expenditure
20 was going to be because it was going to be large, they
21 would have to come back to someone at GM and kind of
22 run that past them and get some kind of feedback.
23    A.    You would certainly expect that.
24    Q.    Okay. So you weren't free to use as many
25 people as they wanted for as long a period of time as

76 (Pages 298 to 301)

Page 298

1   they wanted and bill whatever it is they wanted for
2   that document review, were they?
3       A.   They were working under our general guidance
4   with respect to billing and budgeting, and if it was
5   going to be something that was an extraordinary
6   expense, they would probably tell us about it and say
7   it's going to be an extraordinary expense.
8       Q.   They would probably -- you would have
9   expected that from them.
10      A.   Would expect them to, yes.
11      Q.   Yes.  Okay.
12          MR. DONOVAN:  I have nothing
13   further.  Thanks.
14          MR. CARROLL:  No further questions
15   for Mr. Brown.  He'll read and sign.
16          THE WITNESS:  Okay.  Thanks.
17          MR. DONOVAN:  Thank you, Mr. Brown.
18   It's been a long day.
19          VIDEOGRAPHER:  This concludes the
20   deposition and we're going off the record at 6:46 and
21   25 seconds p.m.
22          (Signature having been reserved, the
23   deposition was concluded at 6:46 p.m.)
24
25

Page 299

1            I have reviewed the above transcript
2   and have listed corrections, if any, on the attached
3   errata sheet.
4
5   this_____day of_____, 20_____.
6
7
8
9
10      SIGNATURE OF DOUGLAS E. BROWN
11
12   SUBSCRIBED AND SWORN to before me this_____day of
13   _____, 20_____.
14
15
16
17          NOTARY PUBLIC
18   My Commission expires:                .
19
20
21
22
23
24
25

Page 300

1           CERTIFICATE OF NOTARY
2   STATE OF MICHIGAN   )
3                    ) SS
4   COUNTY OF WAYNE     )
5       I, Anne H. Chilton, Certified Shorthand Reporter,
6   a Notary Public in and for the above county and state,
7   do hereby certify that the above deposition was taken
8   before me at the time and place hereinbefore set forth;
9   that the witness was by me first duly sworn to testify
10   to the truth, and nothing but the truth, that the
11   foregoing questions asked and answers made by the
12   witness were duly recorded by me stenographically and
13   reduced to computer transcription; that this is a true,
14   full and correct transcript of my stenographic notes so
15   taken; and that I am not related to, nor of counsel to
16   either party, nor interested in the event of this
17   cause.
18
19
20          _____
21          Anne H. Chilton, CSR, RPR, RMR
22          Notary Public,
23          Wayne County, Michigan
24   My Commission expires:  August 09, 2013
25

Page 301

1           INDEX TO EXAMINATIONS
2
3   Witness                        Page
4   DOUGLAS E. BROWN
5
6   EXAMINATION BY MR. DONOVAN:                3
7   EXAMINATION BY MR. CARROLL:              281
8   RE-EXAMINATION BY MR. DONOVAN:           291
9
10          INDEX TO EXHIBITS
11
12   Exhibit                        Page
13
14   (Exhibits attached to transcript)
15
16   BROWN EXHIBIT NO. 1              88
17   Copy of handwritten notes. 8-8-90
18   BROWN EXHIBIT NO. 2              118
19   October 9, 1990 letter
20   BROWN EXHIBIT NO. 3              155
21   July 19, 1989 letter
22   BROWN EXHIBIT NO. 4              158
23   August 1, 1989 letter
24   BROWN EXHIBIT NO. 5              171
25   October 26, 1989 letter

Page 302

1    BROWN EXHIBIT NOS. 6 - 8          175
2    6- October 27, 1989 letter
3    7- November 2, 1989 letter
4    8- November 13, 1989 letter
5    BROWN EXHIBIT NO. 9              179
6    08/07/90 e-mail
7    BROWN EXHIBIT NO. 10            209
8    Re:  Green v. GM  Addendums A - H
9    BROWN EXHIBIT NO. 11            235
10   Re:  Green v. GM  Exhibits 1 & 2
11   BROWN EXHIBIT NO. 12            258
12   September 12, 1990 letter
13
14
15
16
17
18
19
20
21
22
23
24
25