**<u>EXHIBIT 5</u>**

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY


STEVEN NEWMAN,

      Plaintiff,

   -vs-                   CIVIL ACTION NO. 02-135 (

KSH)


GENERAL MOTORS CORPORATION,

      Defendant.

_____ /


PAGES 1 TO 235


    The Videotaped Deposition of THOMAS A. ZIOLKOWSKI

    Taken at 400 Renaissance Center

    23rd Floor

    Detroit, Michigan

    Commencing at 9:34 a.m.

    Tuesday, September 16, 2008

    Before Anne H. Chilton, RMR, RPR, CSR-3669

2 (Pages 2 to 5)

**Page 2**

1  APPEARANCES OF COUNSEL:
2  MAURICE J. DONOVAN, ESQUIRE
3  Benjamin M. Del Vento, P.C.
4  70 South Orange Avenue
5  Livingston, New Jersey 07039
6  (973) 758-1801
7     Appearing on behalf of the Plaintiff.
8
9  JAMES K. VINES, ESQUIRE
10 JAMESON B. CARROLL, ESQUIRE
11 MICHAEL WEISS, ESQUIRE
12 King & Spalding, LLP
13 1180 Peachtree Street, N.E.
14 Atlanta, Georgia 30309-3521
15 (404) 572-4600
16 -and-
17 RONALD C. PORTER, ESQUIRE
18 General Motors Legal Staff
19 MC 482-02-205
20 PO Box 400
21 Detroit, Michigan 48265
22 (313) 665-7421
23    Appearing on behalf of the Defendant.
24 ALSO PRESENT:
25    MARC MYERS, VIDEOGRAPHER

**Page 3**

1  Detroit, Michigan
2  September 16, 2008
3  About 9:34 a.m.
4        VIDEOGRAPHER: We are on the record.
5  This is the videotaped deposition of
6  Thomas Ziolkowski being taken in Detroit, Michigan.
7        Today is Tuesday, September 16th,
8  2008. The time is now 9:34 and 14 seconds a.m.
9        And can the attorneys please state
10 their appearances for the record and the court reporter
11 please swear in the witness.
12        MR. DONOVAN: Good morning. Maurice
13 J. Donovan of the law office of Benjamin M. Del Vento
14 appearing on behalf of the plaintiff, Steven Newman,
15 executor under the will of Michael Green.
16        MR. VINES: I'm Jim Vines appearing
17 on behalf of the defendant, General Motors.
18        MR. WEISS: I'm Michael Weiss also
19 on behalf of General Motors.
20        MR. CARROLL: Jamie Carroll for GM.
21        MR. PORTER: Ronald Porter, General
22 Motors Legal Staff.
23        THOMAS A. ZIOLKOWSKI,
24 having first been duly sworn, was examined and
25 testified on his oath as follows:

**Page 4**

1        MR. DONOVAN: Just for the record,
2  because we're videotaping the deposition, General
3  Motors' four counsel are sitting to the witness's
4  right, the court reporter and myself on behalf of the
5  plaintiff are sitting to the witness's left.
6        Is that correct, Mr. Ziolkowski?
7        THE WITNESS: That's correct.
8        MR. DONOVAN: Okay. It's
9  Ziolkowski?
10       THE WITNESS: Correct.
11       MR. DONOVAN: Okay.
12 EXAMINATION BY MR. DONOVAN:
13    Q.   Mr. Ziolkowski, my name is Maurice Donovan.
14 I'm on attorney. I represent Mr. Newman, the executor
15 of the estate of Michael Green. I know you're familiar
16 with Michael Green. Michael Green passed away and
17 Steven Newman is now the executor of his estate.
18       We're here today for the purpose of
19 taking a deposition, or that's what it's called in New
20 Jersey. I know they're called different things in
21 different jurisdictions, but basically it's a question
22 and answer session which I and maybe some of the other
23 attorneys are going to ask you some questions and
24 hopefully you're going to give us the answers to those
25 questions.

**Page 5**

1        Have you ever been deposed before?
2     A.   Yes.
3     Q.   On how many occasions before today,
4  approximately?
5     A.   Approximately twice.
6     Q.   Twice. Okay. Is that in a representational
7  capacity for General Motors or in some personal
8  business?
9     A.   Representative capacity for General Motors.
10    Q.   Okay. And has that been relatively recently
11 that you were deposed?
12    A.   Three or four years ago.
13    Q.   Okay. The reason why I ask that is there's
14 a bunch of rules we can rattle through. I know you're
15 an attorney, so I assume you're generally familiar with
16 the proceedings, so I will just highlight them unless
17 you want me to go through the whole gamut of them.
18    A.   Yes, please.
19    Q.   Okay. This is a sworn proceeding. You have
20 been sworn to tell the truth, so all your answers to
21 these questions should be the truth. Even though we're
22 sitting in a law office, this proceeding has the same
23 solemnity as if you were testifying before a court and
24 a jury. Do you understand that?
25    A.   Yes.

**Page 6**

1    Q.   Do you promise to tell me the truth to all
the questions I ask you?
3    A.   Yes.
4    Q.   Okay. If you don't understand my question,
5  you have to tell me that. It'll be assumed if you
6  answer the question, that you understood it. The time
7  to tell me you don't understand my question is after
8  the question is asked because once you say something,
9  the court reporter and, of course, the video will take
10  that down and we can't go back and erase that. So if
11  you have any questions, I speak too quickly, you don't
12  understand my language, you lose your train of thought
13  or the question is unintelligible, which I do many
14  times, you've got to let me know and then we'll do
15  whatever we have to do to correct that. Do you
16  understand the instruction?
17    A.   Yes.
18    Q.   Do you promise to tell me if you don't
19  understand my question?
20    A.   Yes.
21    Q.   Okay. You have to answer verbally because
22  court reporters take down verbal utterances. You can't
23  nod your head or gesture. Even though the video will
24  pick it up, there still will be a transcript of this
25  proceeding and we need to have words on the

**Page 7**

1  transcripts, not uh-huhs or uh-uhs or pointing or
2  gestures. Do you understand that?
3    A.   Yes.
4    Q.   Okay. The attorneys who are seated to your
5  right, if any of them makes an objection to the
6  question I ask, please discontinue your answer if you
7  have started it and allow them to put their objection
8  on the record, let us discuss it, and then you'll
9  probably be given further instructions on what to do
10  with that question. Understood that?
11    A.   Yes.
12    Q.   Okay. We're here to get information which
13  you know. You know, they used to say the facts and
14  nothing but the facts. If you don't know the answer to
15  my question, it's perfectly acceptable to say "I don't
16  know" or "I don't remember," however, if you can give
17  me a reasonable approximation or a reasonable estimate
18  which is not just an outright guess, you can do that,
19  just let me know you are approximating, and if you're
20  guessing, let us know that, too, and we'll probably
21  move on to something else. I'm really only interested
22  in what you know, not any assumptions you might make or
23  any hypothesis you make might based upon any other
24  individual considerations other than what you know. Do
25  you understand that?

**Page 8**

1    A.   Yes.
2    Q.   Okay. Any questions of me before we begin?
3    A.   No.
4    Q.   Okay. I'm going to go through this rather
5  quickly because you gave testimony at a privilege
6  hearing or an order to show cause back in New Jersey a
7  few years ago and there's transcripts of that, so I
8  just want to get on the record some of the background
9  and some of this information that is in that record.
10  If any of this is incorrect, stop me and, you know,
11  give me the correct information. Okay?
12    A.   Yes.
13    Q.   Okay. You graduated from Northwestern
14  University in 1969?
15    A.   Correct.
16    Q.   And then you went to the Detroit College of
17  Law?
18    A.   Correct.
19    Q.   And you graduated there in February of 1974.
20    A.   It's either '73 or '74, but...
21    Q.   Okay.
22    A.   Yeah, it's close enough, I think.
23    Q.   Okay. Did you go there nights?
24    A.   I started in night school.
25    Q.   Okay.

**Page 9**

1    A.   Finished in day school.
2    Q.   All right. How many years did you go nights
3  and how many years did you go day?
4    A.   I went one semester nights and the rest day
5  school.
6    Q.   Okay. And at some point in time after
7  getting -- was it a juris doctor degree?
8    A.   Yes.
9    Q.   You took the Michigan bar?
10    A.   Yes.
11    Q.   What year was that?
12    A.   It was 7 -- I thought it was '73 right
13  after I graduated, but maybe it was '74. I can't
14  remember.
15    Q.   So '73, '74?
16    A.   Yes.
17    Q.   Okay. Is that the only bar admission you
18  applied to?
19    A.   Correct.
20    Q.   Is that the only bar admission you hold?
21    A.   Correct.
22    Q.   Okay. And you continue to hold that?
23    A.   Yes.
24    Q.   And it's in good standing?
25    A.   Yes.

4 (Pages 10 to 13)

| Page 10 |
|---|
| 1   Q.   All right. After you passed the bar you |
| 2   went to work for the Wayne County Prosecutor's Office? |
| 3   A.   Correct. |
| 4   Q.   And you were a trial attorney there for nine |
| 5   years? |
| 6   A.   Correct. |
| 7   Q.   And then you went to the U.S. -- |
| 8   A.   Excuse me. I also worked in the appellate |
| 9   section for a while. |
| 10  Q.   For the prosecutor's office? |
| 11  A.   Yes. |
| 12  Q.   Was that doing legal research and writing |
| 13  briefs? |
| 14  A.   Correct. |
| 15  Q.   And is that encompassed in the nine years? |
| 16  A.   Yes. |
| 17  Q.   All right. So you were either a trial |
| 18  attorney or an appellate attorney for the nine years |
| 19  you were at the Wayne County Prosecutor's Office? |
| 20  A.   Correct. |
| 21  Q.   All right. Then you went to the U.S. |
| 22  Attorney's Office for the Eastern District of Michigan? |
| 23  A.   Correct. |
| 24  Q.   All right. And that was the substance abuse |
| 25  unit? |

| Page 11 |
|---|
| 1   A.   Control substance abuse. Yes. Right. |
| 2   Q.   All right. And you were there for six |
| 3   years? |
| 4   A.   Correct. |
| 5   Q.   And was that all trial work? |
| 6   A.   Correct. |
| 7   Q.   And if I understand correctly, you left |
| 8   there sometime in August of 1989 and went to work for |
| 9   General Motors? |
| 10  A.   That's correct. |
| 11  Q.   All right. Any other career history which I |
| 12  haven't covered? |
| 13  A.   Legal or non-legal? |
| 14  Q.   Well, I'm not interested in summer jobs you |
| 15  had as a kid. |
| 16  A.   How about teaching job? |
| 17  Q.   Okay. |
| 18  A.   Okay. After I graduated in '69, the first |
| 19  year I was a school teacher. |
| 20  Q.   Oh. What grade? |
| 21  A.   High school. |
| 22  Q.   What subject? |
| 23  A.   History, social studies type of stuff. |
| 24  Q.   Okay. How long did you do that for? |
| 25  A.   One year. |

| Page 12 |
|---|
| 1   Q.   All right. Anything else? |
| 2   A.   That's it. |
| 3   Q.   Okay. You currently work for General |
| 4   Motors? |
| 5   A.   Correct. |
| 6   Q.   Okay. So you've been here what, about 19 |
| 7   years? |
| 8   A.   Nineteen years. |
| 9   Q.   Almost 20 years? |
| 10  A.   Nineteen. |
| 11  Q.   Okay. Now, when you came in here, were you |
| 12  assigned to any particular department within the legal |
| 13  system of General Motors? |
| 14  A.   The products liability group. |
| 15  Q.   Okay. And what is the products liability |
| 16  group? |
| 17  A.   Made up of lawyers, legal assistants working |
| 18  defending General Motors in personal injury product |
| 19  liability work. |
| 20  Q.   Okay. And did you have any -- |
| 21       That's a civil -- |
| 22  A.   Correct. |
| 23  Q.   -- function. Okay. |
| 24       Your previous history was, if not |
| 25  all, certainly substantially in the criminal end. |

| Page 13 |
|---|
| 1   A.   Correct. |
| 2   Q.   All right. Other than when you first came |
| 3   to General Motors, did you have any other background or |
| 4   experience in handling civil cases? |
| 5   A.   No. |
| 6   Q.   Okay. So you didn't do any of that in the |
| 7   attorney general's office? |
| 8   A.   No. |
| 9   Q.   Okay. And -- so they put you to work in the |
| 10  products liability group. Did they assign you to an |
| 11  attorney? Did they give you a caseload right away? |
| 12  How do they work that here at GM or how did they work |
| 13  that back in 1989? |
| 14  A.   If I remember correctly, they gave me a |
| 15  caseload when I first joined the office. That would |
| 16  have been in August of 1989. I was -- |
| 17       I'm sorry. What was your other part |
| 18  of that question? |
| 19  Q.   I don't know if there was another part of |
| 20  the question. |
| 21  A.   Okay. Yes. |
| 22  Q.   Why don't we move on to another one. |
| 23  A.   The answer is, yes, I got a caseload. |
| 24  Q.   Okay. And about how many cases did they |
| 25  give you when you first got here? |

Page 14

1    A.   I would say probably about 100.
2    Q.   Okay. That's a nice thing to walk into.
3    A.   Well...
4    Q.   And were those all automobile crashworthy,
5  personal injury type cases?
6    A.   Correct.
7    Q.   All right. So it wasn't any subrogations or
8  anything of that, it was all –
9    A.   Well, I can't remember if there were, but,
10  you know, there have been a lot of suit matters. I
11  don't think I had any subrogation claims.
12    Q.   I'm saying anything other than that.
13    A.   Right.
14    Q.   Small claims, warranty cases, you know,
15  stuff like that.
16    A.   I think at that time we -- I may have
17  handled some breach of warranty cases.
18    Q.   But certainly predominantly personal injury.
19    A.   Predominantly personal injury.
20    Q.   Okay.
21    A.   Correct.
22    Q.   Was there any kind of a training course or
23  seminars or did they give you some handouts or, you
24  know, how did they bring you up to speed other than
25  saying here's 100 cases, good luck?

Page 15

1    A.   Yes, they did all of the above, everything
2  you mentioned. There was training in-house. I worked
3  with other lawyers on staff that would assist me and
4  answer my questions. My supervisor was always
5  available to answer my questions. I had some training
6  outside the office, two -- I think at least two
7  seminars dealing with crashworthiness, I believe it was
8  two, and it was kind of continuous education. Some of
9  the law firms around town had training seminars on
10  specific issues.
11    Q.   Anything else you can think of?
12    A.   No, not at this time.
13    Q.   Okay. Let's talk about the training
14  in-house. Was that basically working with another
15  attorney here or was it more formal, let's go into a
16  conference room and sit down and let's lecture or give
17  you other materials?
18    A.   It was more informal.
19    Q.   Okay.
20    A.   Working with other attorneys, getting their
21  advice, asking questions.
22    Q.   The outside seminars you took, under whose
23  auspices was that?
24    A.   What do you mean by that?
25    Q.   Who gave the courses? Was it the National

Page 16

1  Traffic Safety Institute? Was it --
2    A.   No. It was --
3         You know, I'm not sure. I can't
4  remember.
5    Q.   Okay. Were they over at Northwestern?
6    A.   No. No. They weren't accident
7  reconstruction courses or anything like that.
8    Q.   Okay.
9    A.   They were general crashworthiness type
10  cases.
11    Q.   I'm sorry. They were not given by GM, it
12  was somebody other than GM, a third party, so to speak?
13    A.   Third party, correct.
14    Q.   All right. One of the things in my question
15  which you didn't address was whether you were given any
16  type of manuals or handouts or form books or anything
17  like that to help you along with your --
18    A.   Yeah, I was. Yes.
19    Q.   Okay. What exactly were you given?
20    A.   Manuals.
21    Q.   Okay. What kind of manuals?
22    A.   Just procedure and practice at General
23  Motors. Kind of rules to live by.
24    Q.   Okay. Did those manuals have to do with the
25  handling of the personal injury cases or -- I mean, I

Page 17

1  don't want to know whether you have your -- you know, I
2  don't want your health and benefits manual or anything
3  like that.
4    A.   No. They were product liability, legal
5  staff specific materials about issues about handling
6  cases.
7    Q.   Okay. Was it -- did it provide direction
8  and guidance on like a step-by-step basis about what to
9  do with the case?
10    A.   I don't remember.
11    Q.   Okay.
12    A.   No, I don't think it was that -- I don't
13  think it was that, I mean, step --
14         Like a cookbook type of approach?
15    Q.   Yeah. Recipe type.
16    A.   No, I don't think it was that specific.
17    Q.   Do you remember -- I mean, was it --
18  obviously it was more general, but in what sense?
19    A.   Just in a sense of working with outside
20  counsel, responsibility, things that we were to do and
21  not -- you know, I mean, issues that -- that was
22  expect -- you know, work that was expected of us, how
23  we were to go about investigating cases, handling those
24  matters, discovery, what the expectations were from --
25  that we had for outside counsel.

6 (Pages 18 to 21)

Page 18

1    Q.   Okay.  In the section on discovery was that
2 one of the sections in --
3    A.   I think it was just a proced- -- a process
4 of how discovery was -- how we were going to be
5 notified about discovery questions, where it came from,
6 who initiated the discovery as far as the notification
7 that discovery was served on General Motors, how that
8 process was going to be handled.
9    Q.   Okay.  Do you still maintain any of those
10 manuals or materials?
11    A.   No.  They're obsolete.
12    Q.   Okay.  Was there anything contained in there
13 about how you would go about searching for documents
14 responsive to discovery requests?
15    A.   I don't believe so.
16    Q.   Okay.
17    A.   That was other training I received as far as
18 the process of discovery, answering discovery,
19 obtaining documents.
20    Q.   Okay.  Now, was that part of the on job
21 training that you spoke about earlier?
22    A.   That's correct.
23    Q.   Rather than there being any materials or
24 something that was given to you?
25    A.   Right.  Right.

Page 19

1    Q.   Okay.  Were you ever provided with, in any
2 form, computer, written, even, you know, an outline
3 handwritten which provided guidance if someone told you
4 that this is the car we're dealing with and this is the
5 part of the car we're dealing with, these are the most
6 likely places you would search in order to find
7 documents relevant to that particular vehicle and that
8 particular issue?
9    A.   You talk about computers.  We're talking
10 about 1989?
11    Q.   Yes.
12    A.   Okay.
13    Q.   Well, I'm talking about late '80s, early
14 '90s.
15    A.   Okay.  As far as --
16         If I understand your question,
17 you're asking me to --
18         Maybe I don't understand your
19 question.  Was there a process in place where you push
20 one button for if you're doing discovery for a Cadillac
21 and another -- push another button if you're doing
22 discovery for a Corvette?  Is that kind of what the
23 approach --
24    Q.   That would be one aspect.  It also could be
25 a chart, a written chart, a flowchart where you would

Page 20

1 say, ah-ha, Cadillac roof documents are, search here
2 or --
3    A.   It's not that -- it's never that --
4    Q.   -- a flow sheet?
5    A.   Never that simple.
6    Q.   Okay.
7    A.   That's a very simplistic approach to
8 discovery.
9    Q.   Well, when you got here in 1989 with limited
10 if no experience in handling civil matters and you got
11 your first discovery request which contained a demand
12 for production of documents, how did you know how to go
13 about finding the documents that were being asked for?
14    A.   I would ask the discovery coordinator, the
15 engineer that was assigned to the case --
16    Q.   Okay.
17    A.   -- outside counsel that was experienced.  We
18 would meet, discuss the issue, how to -- what we're
19 looking for, what the scope of the vehicle was, what
20 the scope of the search was going to be, how we were
21 going to find the documents, who we were going to ask
22 for the documents.  It was pretty much verbal.
23    Q.   Okay.  So it was more them telling you where
24 to go, where -- where they would go or just assigning
25 it to them and they knew where to go rather than you

Page 21

1 telling them I want you to search here, here, or here?
2    A.   Initially.  That's correct.
3    Q.   Initially.  Okay.
4    A.   Yes.
5    Q.   And as you, obviously, got more and more
6 experience, you knew the repositories of information
7 with respect to various vehicles or various component
8 parts or things of that nature.  Is that a fair
9 statement?
10    A.   I wouldn't say it was -- I knew where the
11 repositories were.  I was more of -- more familiar with
12 the documents themselves.
13    Q.   And how about where they came from?
14    A.   I would -- yes.  I would say I became more
15 familiar where our coordinators asked, whom they asked
16 for the documents.
17    Q.   I'm not sure I understand that.  The
18 coordinator asks --
19    A.   Well, I'm not sure what your question is, I
20 guess.
21    Q.   All right.  What I asked you was as you
22 became more and more experienced --
23    A.   Okay.
24    Q.   -- could you say I want a search conducted
25 of X, Y, and Z repository of information or did you

Page 22

1  always rely upon either the discovery coordinator or
2  the engineer to tell you where the documents were most
3  likely to be found?
4      A.  A little of both.
5      Q.  All right.  Were you able --
6          If you got a stack of documents from
7  either the discovery coordinator or the engineer which
8  were responsive to your requests or the discovery
9  requests, were you able to look at them and figure out
10  where they came from?
11      A.  In some instances.
12      Q.  Okay.
13      A.  I mean -- yes.  In some instances if it
14  was -- if we were talking about crash tests, I would
15  assume the documents came from Milford Proving Ground.
16  If they were drawings, I would assume they came from
17  engineering staff.  If they were research writing, I'd
18  assume they came from the library.  So I guess the
19  answer would be yes.
20      Q.  Okay.  After a period of time could you look
21  at a document production which you had requested and
22  was given to you and say, ah-ha, I think they missed --
23  where are the documents from X place or Y place?  Was
24  that something which you were able to pick up on?
25      A.  I'm not sure if I could -- with experienced

Page 23

1  -- well, yeah, if they miss something obvious like a
2  drawing or a crash test maybe, but other material, I'm
3  not sure if I could have.
4      Q.  Okay.  I guess another way of asking was
5  were you able to independently cross-reference those
6  documents with either something you knew about or some
7  other type of document and make a determination
8  independently whether everything was contained in that
9  production for you by the engineer or the discovery
10  coordinator?
11      A.  Well, that's a pretty general question.  I
12  don't know if I can answer that question.
13      Q.  Would you like to try or do you want me to
14  move on to another question?
15      A.  You can -- yeah, I think maybe we ought to
16  move on.
17      Q.  Okay.  Let me ask it another way.
18          Did you rely upon the discovery
19  coordinator and the engineer with respect to the
20  completeness of the documents which were produced for
21  you or were you able to independently verify whether
22  what you got was everything that was necessary?
23      A.  Both.
24      Q.  Both.  Okay.
25      A.  I would rely on the engineer, the

Page 24

1  coordinator, the outside counsel, myself.  That's why
2  we conducted the conference -- conference call, trying
3  to make sure that we located all the documents, that we
4  asked all the right people in the corporation for the
5  documents that, you know, were applicable to the
6  discovery requests that we got in.
7      Q.  Okay.  I guess what I'm curious about is
8  whether there was any kind of checklist you had where
9  you would get a box of documents or a bunch of
10  documents and say, okay, now I want to make sure I have
11  everything and you looked at something else and said,
12  okay, here's that, here's this, here's this.
13      A.  No.  The checklist was the discovery itself.
14  See, I guess that's where I'm confused with your
15  questions.
16          The discovery comes in.  That is
17  the --
18      Q.  The discovery requests.
19      A.  The request.  That is the moving factor in
20  the whole discovery process.
21          We met as a team to try to respond
22  to the discovery to the best of our ability.  We would
23  look at the discovery -- we would look at the
24  requests -- the questions and then move forward in
25  saying, okay, for drawings we've got -- this question

Page 25

1  asks for drawings, we're going to request drawings.
2  This question asks for crash tests, we're going to ask
3  for crash tests.  I guess --
4          That's the best I can answer your
5  question.
6      Q.  Okay.  Okay.  Within that context in that
7  framework.
8      A.  Right.
9      Q.  So you say you ask for drawings and you go
10  to the engineer and you say we need all the drawings
11  for whatever car we're talking about.  How do you know
12  when he gives you those drawings that you've got all
13  the drawings and that there isn't five more back
14  someplace else that either weren't pulled for some
15  reason or were misfiled or were -- how -- is there any
16  cross-reference in the system designed to make sure you
17  have everything, all of the drawings or all of the
18  crash tests?
19      A.  Well, I think the nature of the request that
20  goes out asks for everything.  The engineers on board
21  because of his or her expertise and understanding of
22  the drawing process -- you know, it's not a convoluted
23  process, it's a straightforward -- you ask for this
24  type of drawing.  You might ask for a layout drawing.
25  You may ask for a seating position drawing.

8 (Pages 26 to 29)

Page 26

1    You're asking for specific drawings
2  to answer the discovery that's been requested. When
3  they come in, the engineers look at it and outside
4  counsel look at it to make sure that they -- the
5  responses comply with what our requests were that will
6  respond to the discovery.
7    Q.  I understand that. What I'm getting at is
8  do you necessarily have to rely upon the memory of the
9  engineers and the discovery coordinator to remember
10 where these things are or where they go looking at them
11 rather than having some type of checklist which one
12 would look at and so as to verify that everything had
13 been checked?
14   A.  If your question is was there a checklist --
15   Q.  And I'm using that in the broadest sense.
16   A.  Yeah. I mean, a piece of paper that has
17 go -- I don't -- no. I don't remember a checklist,
18 check the boxes.
19   I think my response -- and if I
20 didn't make myself clear, I'll try to do it again. We
21 were responding to the discovery. The discovery asked
22 for specific items. We would ask within the
23 corporation for those specific items.
24   Now, your earlier questions were did
25 I participate in that searching for the documents or at

Page 27

1  least putting together the request to the corporation
2  for the documents. The answer is yes. Of course, I
3  got better at it, more experience. The answer is yes.
4  And so we would gather the documents, the engineer
5  would review the documents to make sure that they --
6  that they responded to the discovery and then we
7  produced those -- that material.
8    Q.  Okay. So you would rely upon the engineer
9  and his recollection of where documents would be found
10 responsive to the discovery task --
11   A.  No, no.
12   Q.  -- that you had given him.
13   A.  No. I think that's the disconnect here in
14 this.
15   It's not where the documents were
16 at, it was the type of documents. The drawings -- the
17 crash tests were at the proving ground, there's no
18 mystery to that, but it's what you're looking for. The
19 scope is what -- the engineer would help us set up the
20 scope. So, in other words, if we're talking about the
21 first generation of a vehicle or the second generation
22 of a vehicle or the third generation of a vehicle,
23 that's what the scope is, that's what we're talking
24 about when we talk about scope, what are we looking
25 for, and then the discovery question says give us

Page 28

1  all -- give me all the crash tests. So the engineer
2  says here's the scope. The coordinator writes the
3  letter to Milford Proving Grounds. They are the
4  repository for all the documents. You say to them give
5  us the crash tests for the 1999 Blazer. They turn the
6  documents -- produce the documents, our engineer looks
7  at them, turns them over to the coordinator who then
8  turns them over to counsel who produces them.
9    Q.  Okay. How does the coordinator know that
10 there has been compliance with the requests for, using
11 your examples, all of the crash tests from the Milford
12 Proving Grounds?
13   A.  Through the assistance and review of the
14 engineer and through outside counsel and their
15 expertise and in-house counsel, their expertise, to
16 make sure that we have produced the documents.
17   Q.  But that process is more a mental process of
18 review rather than there being some kind of
19 quantitative or actually something to cross-reference
20 that to other than the independent memory of the
21 engineer or the coordinator or the person who pulls the
22 document. Is that a fair statement?
23   A.  Well, it's a fair statement, but it's kind
24 of out of context of the process. I mean, you've got
25 it compartmentalized as to just a checklist. It's not

Page 29

1  a checklist situation. It is a -- it is a -- more of a
2  request and then a reliance on the response to the
3  request and a review that there was not something in
4  there that shouldn't be there as far as out of scope or
5  whatever. I'm using that as an example. I mean,
6  you've got it compartmentalized like it's -- you put
7  two teaspoons of flour and a cup of water and you make
8  a cake. I guess that's the disconnect --
9    Q.  Okay.
10   A.  -- between your question and my answer.
11   Q.  Let me ask it this way then. Tell me
12 everything that you rely upon other than your
13 experience and your memory when you review the
14 documents that have been produced pursuant to your
15 request that everything is contained in that document
16 request that you asked for.
17   A.  We rely on the --
18   We rely on our memory. You say
19 beyond that, but we -- again, we rely on our --
20   We rely on the request from the
21 plaintiff, the discovery request as to the --
22   Q.  Well, how does the discovery request tell
23 you that you got everything other than the fact that
24 requested it?
25   A.  I'm getting there.

Page 30

1    Q.   Okay.
2        A.   So we know what we're looking for and then
3    we submit a request.  When the material comes in, we
4    rely on the source of the information as having
5    gathered all the information and with the expertise --
6    I mean, if you ask for a donut and you get a steak, you
7    know you got something you didn't ask for.  So we rely
8    on the parties that provide us the information and we
9    rely on our expertise.
10       Q.   Okay.  So there's no other independent
11   cross-reference to check it.
12       A.   Not that I can think of at this time.
13       Q.   Okay.  So it's a system that relies upon
14   memory and expertise and reliance upon people's memory
15   and expertise as you move up the chain from where the
16   documents are to the ultimate production.
17       A.   Correct.
18       Q.   Thank you.
19            Let's go back because that was kind
20   of a tangent.
21            When you're assigned a case, a
22   personal injury products liability case, are you the
23   head honcho, so to speak, in terms of managing that
24   case and making decisions relative to that case?
25            MR. VINES:  Maurice, just to

Page 31

1    clarify, are you talking about back in the time of the
2    Green case?
3            MR. DONOVAN:  Yes.  Yes.
4            MR. VINES:  Okay.
5            THE WITNESS:  When I was assigned
6    the Green case?
7            BY MR. DONOVAN:
8        Q.   Not just the Green case.  Any case back in
9    the late '80s, early '90s.  Were you the person in
10   charge of managing and making decisions relative to
11   that case?
12       A.   Correct.
13       Q.   All right.  And did you have the ultimate
14   veto power with respect to decisions which were being
15   made about the case and what to do and what not to do?
16       A.   I would say yes.  I mean, me or my
17   supervisor.  If counsel disagreed with my decision on a
18   veto power issue, he or she could always go up and talk
19   to my supervisor or his supervisor.  So I think you
20   could --
21            Did I have the ultimate?  No.  I had
22   veto power or I helped make decisions or I assisted in
23   making decisions relying on the expertise of our trial
24   counsel, and I may add, our experienced trial counsel
25   who I relied on, and so it was kind of a mutual thing,

Page 32

1    but I would say ultimately I probably had veto power.
2        Q.   Okay.  So there was veto power, but there
3    was an appellate process kind of if you needed to.
4        A.   Okay.
5        Q.   Were you responsible for retaining the
6    outside counsel in cases where they weren't already
7    assigned?
8        A.   Correct.
9        Q.   Okay.  Did you have the authority to pick
10   who you wanted to assign to any particular case?
11       A.   Correct.
12       Q.   Okay.
13       A.   Within the scope of people approved to
14   represent General Motors.
15       Q.   Right.  There was an approved list of people
16   that you could pick from.
17       A.   Right.
18       Q.   How about local counsel?  Was that also
19   something which came off an approved list?
20       A.   I don't think so.  I don't remember.  I
21   think we -- I think that was pretty much the discretion
22   of the trial counsel.
23       Q.   Okay.
24       A.   His or her choice who the local counsel
25   would be.

Page 33

1        Q.   And when you're talking about trial counsel,
2    is that the same as specialty counsel or --
3        A.   Trial counsel.
4        Q.   Okay.  We used the words yesterday that
5    there was -- different firms had different specialties
6    and --
7        A.   Oh, okay.  I see.  I wasn't here yesterday,
8    so I didn't --
9            Okay.  So -- I'm sorry.  Go ahead.
10       Q.   Are you familiar with that concept of
11   specialty firms?
12       A.   Specialty firms.
13       Q.   Yes.
14       A.   Firms that handle specialty cases.
15       Q.   In other words, it is my understanding, and
16   correct me if I'm wrong, but the Rumberger firm --
17            Are you familiar with that firm in
18   Florida?
19       A.   Yes.
20       Q.   -- handled roof and rollover cases and that
21   the Lavin firm down in south Jersey handled fire type
22   cases and --
23       A.   Exclusively?
24       Q.   Not exclusively, but they, you know --
25       A.   Okay.  See, that's where I misunderstood

10  (Pages 34 to 37)

Page 34

1   your question. I'm sorry.
2           Firms handled across the board a
3   multitude of type of issues. Did they handle some
4   specialties like rollovers or fires? Yes. Did they do
5   other work? Yes.
6       Q.   Okay. Was that a concept that was
7   developing, you know, more and more that different
8   national firms should handle different types of
9   situations or claims?
10      A.   Do you mean in 1989, 1990?
11      Q.   Late '80s, early '90s.
12      A.   Was it developing?
13      Q.   Yes.
14      A.   Don't think so.
15      Q.   No. Okay.
16          Were you also involved in making
17  decisions with respect to which cases to settle or
18  which cases to try?
19      A.   Correct.
20      Q.   Now, from your testimony at the privilege
21  hearing it's my understanding that you were assigned
22  cases either by geographic area, such as you were
23  assigned Massachusetts at one point in time and
24  Michigan at one point in time.
25          MR. VINES:  Maurice, I'm sorry, can

Page 35

1   you refer us to where in that testimony you're getting
2   it from?
3           MR. DONOVAN:  I really can't and I
4   don't think it's that important that I'm going to spend
5   my time going through it to find it, so I'm just going
6   to ask the question. I can ask it this way.
7       BY MR. DONOVAN:
8       Q.   Were you ever assigned Massachusetts as one
9   of the geographic areas where you handled?
10      A.   Yes.
11      Q.   Were you ever assigned Michigan as one of
12  the geographic areas that you handled?
13      A.   Correct.
14      Q.   Okay. And in addition to geographic areas,
15  were you assigned cases by specialty?
16      A.   Correct.
17      Q.   Okay. And your specialty at one point in
18  time was tire and wheel cases?
19      A.   Correct. Multi-piece wheels and tire and
20  wheel mismatch.
21      Q.   So that's when you first started?
22      A.   Right.
23      Q.   Okay. How many of the cases --
24          You told me you got about 100 cases
25  when you walked in the door. How many of those cases

Page 36

1   were geographic assignments and how many of those cases
2   were specialty wheel and tire cases?
3       A.   I can't remember.
4       Q.   Half and half?
5       A.   No. I can't remember. I couldn't even
6   venture a guess.
7       Q.   Okay. And is that basically what you
8   handled from 1989 till November of 1990?
9       A.   I handled tire and wheel mismatch, ingress,
10  egress, which was a specialty. I handled Michigan,
11  geographic, and I believe I handled Massachusetts
12  during that time period.
13      Q.   Okay. In the geographic cases you handled
14  what type of -- what type of cases were you handling in
15  '89 up till November of 1990?
16      A.   Everything that wasn't a specialty.
17      Q.   Okay. Like what wasn't a speciality?
18      A.   Some brake issues or parking brakes, window
19  controls, door -- some door latches, although there was
20  -- there were some seat belts, padding issues, glazing
21  issues. That's about all I can remember.
22      Q.   Okay. All right.
23      A.   A myriad type of --
24      Q.   In November of 1990 you took over the
25  caseload of Doug Brown with respect to rollover and

Page 37

1   roof cases; correct?
2       A.   Correct.
3       Q.   All right. And my understanding is that was
4   about 75 cases that you got from Doug Brown, give or
5   take?
6       A.   Yeah. Best of my recollection.
7       Q.   Was that in addition to the 100 cases you
8   already had?
9       A.   Correct.
10      Q.   So now you were managing 175 cases?
11      A.   The cases I got from Doug were either --
12  yeah, 50 to --
13          All right. I would not disagree.
14  Somewhere in that 150 to 175 range, I think.
15      Q.   Okay. Just give me a ballpark back in late
16  '80s, '90s. How many attorneys were -- in-house
17  attorneys from General Motors were handling product
18  liability litigation involving crashworthiness?
19      A.   I think there were about 22 maybe, give or
20  take a few.
21      Q.   Okay.
22      A.   Maybe -- I'd say anywhere between 18 and 20,
23  22. I don't remember exactly.
24      Q.   And was there an average caseload per
25  attorney?

Page 38

1    A.  I don't know.
2    Q.  You don't know.
3        Do you know whether the other
4  attorneys were handling approximately the same number
5  of cases as you were, about 175?
6    A.  I would -- I would think so.
7    Q.  Okay.  Now, that was your -- in November of
8  1990 was that your first experience in handling roof
9  crush and/or rollover cases?
10   A.  Correct.
11   Q.  Okay.  And these 75 cases you got from Doug
12 Brown, they would have included rollover and roof crush
13 related to rollover and roof crush unrelated to
14 rollover?
15   A.  Correct.  Roof crush and rollover.
16   Q.  Okay.  Well, roof crush can also be caused
17 by rollover.
18   A.  Correct.
19   Q.  Or do you classify those as two different?
20   A.  Could be classified as two different -- two
21 different.  Roof crush, whether the vehicle rolled over
22 or not, as you indicated in one of your questions, and
23 also rollover, whether the vehicle was alleged to have
24 a propensity to roll over.
25   Q.  Okay.  I'm trying to figure out the lexicon

Page 39

1  here.
2        Is the category roof crush and under
3  that we have rollover and non-rollover or is the
4  category rollover and underneath that we have roof
5  crush and non-roof crush?
6    A.  Now you've confused me.
7    Q.  Okay.  That's because you confused me.
8    A.  It's rollover -- it's rollover, roof crush.
9    Q.  Two separate categories.
10   A.  Well, yes.
11   Q.  Okay.
12   A.  Sometimes they blend together, sometimes
13 they could be separate.
14   Q.  So in rollover cases you can have roof crush
15 or not have roof crush?
16   A.  Rollover case you can --
17       Right.  I mean -- okay.  The -- the
18 terminology is --
19       In rollover -- in rollover cases you
20 could have the issue as why the vehicle rolled over or
21 how the vehicle rolled over, what the allegation of the
22 rollover was.  Could you have roof crush?  Yes.  Could
23 you not have roof crush?  Yes.  Could you have a
24 crashworthiness claim?  Yes.  Could you not have a
25 crashworthiness claim?  Yes.

Page 40

1        So you're getting into a situation
2  where if you focus on the vehicle rolling over, that
3  was -- if it was alleged that there were some
4  instability to the vehicle, that -- I handled those
5  cases.
6    Q.  Okay.  And --
7    A.  If the vehicle rolled over and there was no
8  allegation of crashworthiness, I wouldn't handle the
9  case.
10   Q.  So if the allegation was a certain vehicle
11 just had a propensity to roll over, that wouldn't be
12 your case.
13   A.  Yes, it would.
14   Q.  That would be your case.
15   A.  Correct.  If the vehicle rolled over, but
16 the claim was the airbag didn't go off, I wouldn't
17 handle the case.
18   Q.  I see.  I see.
19       So it was more geared to what the
20 injury causation mechanism was.  In other words, if it
21 was claimed that the airbag caused the injury --
22   A.  Or first collision or second collision.  We
23 can talk about it that way.
24   Q.  Okay.
25   A.  I mean, was it why did the vehicle roll

Page 41

1  over.  If that was the issue, why the vehicle rolled
2  over, if it was because of alleged instability of the
3  vehicle, I would handle the case.
4    Q.  Okay.  That would -- and that would have
5  been starting in November of 1990.
6    A.  Correct.
7    Q.  Okay.  You hadn't handled any --
8    A.  Well, November --
9        It was either -- I started handling
10 those cases late November, early December to the best
11 of my -- after Thanksgiving before Christmas holiday,
12 somewhere, I think, in that area.
13   Q.  In the roof crush non-rollover cases.
14   A.  Roof crush.  Okay.
15   Q.  Okay?  What kind of allegations were there
16 that you handled with respect to the roof crush
17 causation?  And I think those words are out of order,
18 but --
19   A.  Yeah.  Let me --
20   Q.  Want me do it --
21   A.  Yeah.  Do it again, if you could.
22   Q.  Taking rollover out of it.  In the roof
23 crush cases which were not rollovers what was the
24 causation mechanism for the roof crush?
25   A.  Could be a tree falling on it.

12 (Pages 42 to 45)

|  | Page 42 |
|---|---|

1    Q.   Okay.
2    A.   Could be a car hitting a horse or a deer.
3    Q.   Did you handle those cases?
4    A.   Yes. Yes.
5    Q.   I'm asking specifically what cases you
6    handled.
7    A.   Yes. Yes.
8    Q.   Okay. Anything else you can think of?
9    A.   Which caused the roof other than --
10   Q.   Yeah.
11   A.   -- it rolling --
12   Q.   Yes.
13   A.   -- crushing other than it rolling over.
14   Q.   Yes.
15   A.   That's basically complete, I think.
16   Q.   So that category would be something
17   colliding with the roof itself.
18   A.   Correct.
19   Q.   All right.
20   A.   Correct.
21   Q.   And were the allegations the roof should
22   have been able to withstand whatever the forces were of
23   whatever this object were coming into contact and
24   colliding with the roof?
25   A.   Yes, but more so depending on what the roof

|  | Page 43 |
|---|---|

1    collided with. If it collided with a horse or a deer
2    or a moose, it was sometimes more than just the roof
3    should have withstood the forces. There could have
4    been an issue about the porthole of intrusion into the
5    vehicle and the design of the roof and kind of a
6    combination of roof glass, roof hood design allowed the
7    deer to slide up into the windshield and penetrate the
8    vehicle. So there was a combination of factors.
9    Q.   Okay.
10   A.   So it wasn't just roof crushing, et cetera.
11   It's more broad. It's broader than that.
12   Q.   The Green case, Michael Green versus General
13   Motors was one of the cases you received in that 75
14   cases you received from Doug --
15   A.   Yeah.
16   Q.   Green.
17   A.   50 to 75.
18   Q.   Okay.
19   A.   I hate to be -- because I can't. Okay.
20   We'll go with 75.
21   Q.   In the cases you received from Doug Brown
22   back in November of 1990 was the Michael Green case;
23   correct?
24   A.   Correct.
25   Q.   All right. Before that had you ever handled

|  | Page 44 |
|---|---|

1    any F-car cases?
2    A.   Before I received the Michael Green case as
3    part of the assignment of defending General Motors in
4    rollover roof crush cases.
5    Q.   Yes.
6    A.   Did I handle any other F-car cases --
7    Q.   Yes.
8    A.   -- prior to that. I've got to think about
9    that.
10                I don't remember.
11   Q.   Okay. You don't remember handling any or
12   you have no recollection one way or the other?
13   A.   I have no recollection one way or the other.
14   Q.   Okay. How about T-roof cases before
15   November of 1990?
16   A.   I don't -- I don't have a recollection.
17   Q.   One way or the other.
18   A.   Right.
19   Q.   Okay. Do you still handle rollover and roof
20   crush cases?
21   A.   Correct.
22   Q.   Okay. So you've been doing that since 1990?
23   A.   Yeah, 1990. Late 1990, early 1991. Yes.
24   Q.   Any other specialties that you also adopted
25   during the years you've been here?

|  | Page 45 |
|---|---|

1    A.   Oh. We have enough time? Yeah. Yes.
2    Specialties, geographic.
3    Q.   Well, I'm not concerned about the
4    geographic. I'm interested in the specialties.
5    A.   Yes.
6    Q.   What -- give me the top three.
7    A.   Door latches. I handled inertial unlatch
8    seat belt allegation, and I handled -- I believe I
9    handled comfort feature cases for a while, some seat
10   belt allegations.
11   Q.   I want to talk a little bit about your
12   experience with the F-car, the Camaros and Firebirds.
13   A.   Okay. You know, let me -- I'm not sure if I
14   handled comfort feature cases.
15   Q.   I don't even know what that is, so it's
16   okay.
17   A.   I think it -- yeah. I think it was just --
18   yeah. Okay. I just wanted to make sure. It may have
19   just been a pass-through assignment that I -- I
20   baby-sat some of those cases until they were assigned
21   to another person on staff.
22   Q.   Okay. We established that you can't recall
23   whether you had ever handled F-car cases or T-roof
24   cases before November of -- November, December of 1990.
25   You've handled them since then.

Page 46

1    A.    Correct.
2    Q.    Okay. How many cases have you handled
3 involving F-car?
4    A.    F-car itself? Any part of the F-car or
5 F-car roof?
6    Q.    Well, if you can break it down, okay, if you
7 can't, then tell me which one you're giving me.
8    A.    Okay. As far as the roof claims. Let's
9 see. Five or six with roof claim cases.
10        Non-roof claim, non-rollover roof
11 crush cases on an F-car, I can't tell you.
12    Q.    Okay.
13    A.    I know there were some, but, I mean, I don't
14 know what -- I couldn't put a number to some. I
15 remember handling some, but --
16    Q.    The five or six cases you just mentioned,
17 that includes rollover F-car cases or not?
18    A.    Yes. The five cases -- five, six cases I
19 handled that I mentioned were rollover roof crush
20 cases.
21    Q.    Okay. But you couldn't subdivide that down
22 into non-rollover F-car roof cases such as the Green
23 case.
24    A.    No. The Green case was a rollover case.
25    Q.    It was?

Page 47

1    A.    Yeah.
2    Q.    Sure.
3    A.    That's what, I believe, that some of the
4 witnesses said, that the vehicle rolled over and caught
5 on fire, from the best of my recollection.
6    Q.    Do you know whether the Green case was tried
7 as a rollover case?
8    A.    Which trial?
9    Q.    Either, one or two.
10    A.    Yeah. I thought -- if I remember correctly,
11 I believe one was. The vehicles hit the school bus and
12 the rear spun out and rolled over and during the
13 rollover Mr. Green was ejected and hit his head on the
14 concrete and the vehicle continued to roll and then
15 caught on fire. I believe that was General Motors' --
16 I think that's the facts.
17    Q.    Okay. That's your best recollection.
18    A.    Yes.
19    Q.    Okay. How about either rollover or
20 non-roller F -- non-rollover F-car cases with T-roofs?
21        MR. VINES: I'm sorry. I didn't
22 hear the last part of that.
23        THE WITNESS: Yeah.
24        MR. DONOVAN: With T-roofs.
25        THE WITNESS: Rollover or

Page 48

1 non-rollover.
2        BY MR. DONOVAN:
3    Q.    F-car.
4    A.    Roof crush cases with T-roofs.
5    Q.    Correct, other than Michael Green,
6 obviously, from that category.
7    Q.    Okay. Okay. So other than Michael Green
8 how many did I handle?
9    Q.    If you did.
10    A.    Okay. With T-roofs. Rollover cases with
11 T-roofs.
12        I think, to the best of my
13 recollection, there were two.
14    Q.    Two in addition to Michael Green?
15    A.    No. One -- I think one in addition to
16 Michael Green.
17    Q.    Okay. Do you remember the name of that
18 case?
19    A.    I believe it was Wendy Harris.
20    Q.    That was after the Michael Green case.
21    A.    Correct.
22    Q.    And that was a case coming from New Jersey?
23    A.    Correct.
24    Q.    So would Michael Green's case have been the
25 first T-roof case where there was an allegation of roof

Page 49

1 crush that you handled?
2    Q.    Rollover roof crush?
3    A.    (Nodded).
4    A.    Yes. Yes.
5    Q.    I'm just trying to find something, which I'm
6 having a little difficulty doing, so just give me
7 another minute, and if I can't --
8    A.    Okay.
9    Q.    -- we'll just move on.
10        Do you have any recollection of
11 reviewing the accident reconstruction which was done by
12 GM's expert, Mr. Orlowski?
13    A.    I have no recollection.
14    Q.    Okay. Are you familiar with the Bishop
15 versus General Motors case?
16    A.    Yes.
17    Q.    That was a case handled by Rumberger Kirk?
18    A.    Correct.
19    Q.    And that was an F-car hardtop case?
20    A.    Correct.
21    Q.    And I think that was the first case of yours
22 to ever go to trial?
23    A.    No.
24    Q.    No?
25    A.    That was, I believe, the second rollover

14  (Pages 50 to 53)

Page 50

1   roof crush case to go to trial.
2       Q.   Were you involved in the document production
3   in that case?
4       A.   In the Bishop case?
5       Q.   Yes.
6       A.   No.
7       Q.   Okay.  Had that been accomplished before you
8   were assigned that?
9       A.   Correct.
10      Q.   So, in other words, that was a case which
11  was already started before November of 1990.
12      A.   Right.  It was a mature case when I took
13  over and they started the trial and, in fact, started
14  the trial in the new year, January of 1991, and that
15  was the second trial that -- that was going when -- we
16  already had one trial going and then the Bishop case
17  was the second trial, and then there was a third trial
18  in that month that spilled over into February of 1991.
19  So we had three trials going at the same time.
20      Q.   Three cases that you were involved -- that
21  you were handling?
22      A.   Yes.  Yes.
23      Q.   Okay.  Do you know the name of the first
24  case that was already ongoing?
25      A.   I believe it was a case in Texas.  It was --

Page 51

1   it wasn't an F-car.  I think it was a Blazer case.
2       Q.   Okay.  Rollover?
3       A.   Yes.  Rollover roof crush.
4       Q.   Okay.
5       A.   And then the Bishop case.
6       Q.   Was an F-car?
7       A.   Yes.  Correct.
8       Q.   And then what about the third one?
9       A.   The third case was a case that was tried in
10  Carolinas, and I forget whether it was North Carolina
11  or South Carolina.  The case was not an F-car case.
12      Q.   Okay.  In the Bishop case, which was an
13  F-car case, were you familiar with the discovery that
14  was produced in that case, did you ever review it?
15      A.   I don't remember.
16      Q.   You don't remember one way or the --
17      A.   I don't -- I don't --
18      Q.   Would that --
19      A.   I don't think I --
20           I don't remember, but I don't
21  think -- the best of my recollection, I don't think I
22  looked at any discovery in that case, but, again, I
23  don't remember.  It's been about 20 years now.
24      Q.   So if I asked you whether you had a
25  recollection as to whether there were any F-car Project

Page 52

1   Center documents produced in the discovery in that
2   case, you couldn't tell me one way or the other?
3       A.   I couldn't tell you one way or another.
4       Q.   Okay.  Are you familiar with what we call
5   the A through H documents?
6       A.   A through -- yes.
7       Q.   Yes.  Those are the documents that were
8   supplemented in the appellate record in Green?
9       A.   Correct.
10      Q.   Okay.  So I assume you also couldn't answer
11  whether those documents, A through H, or any one of
12  them had ever been produced in the Bishop case.
13      A.   Correct.
14      Q.   You don't know one way or the other.
15      A.   I don't know.
16      Q.   Okay.  Harris was tried in 2004?
17      A.   That sounds right.
18      Q.   And Green was tried -- at least Green II was
19  tried in 1996.  So Harris was about eight years after
20  Green?
21      A.   Correct.
22      Q.   How about Cox versus General Motors?
23      A.   That was tried in 1991.
24      Q.   Okay.  Was that one of those ongoing -- one
25  of the three cases you spoke about earlier, third case

Page 53

1   specifically?
2       A.   That wasn't a -- that wasn't a --
3            That was an F-car, but it wasn't a
4   T-top.  It was a --
5       Q.   Was it rollover?
6       A.   It was a rollover, correct.  Rollover roof
7   crush.
8       Q.   Are you familiar with the discovery which
9   General Motors provided in the Cox case?
10      A.   My limited --
11           No.  The answer is no.
12      Q.   Okay.  So, again, if I asked you --
13      A.   Let me -- let me rephrase it.
14           Yes, to some extent.  It was more
15  the discovery about the aftermarket modification on the
16  vehicle.
17      Q.   Was there an aftermarket modification on
18  that car?
19      A.   The best of my recollection, yes.
20      Q.   So the roof was not a GM roof?
21      A.   I believe it was not.
22      Q.   Is this the case where the roof was cut out
23  of the --
24      A.   That's correct.
25      Q.   Do you know with whatever familiarity you

Page 54

1  are with the discovery which was exchanged in that case
2  whether there were any documents produced from the
3  F-car Project Center file?
4      A.   No, not to my recollection. My main
5  recollection was focusing on the aftermarket
6  modification work, and that was -- that's basically
7  what I remember in that case.
8      Q.   Okay. I just want to be clear. There were
9  no F-car Project Center documents in there or you don't
10  recall whether there were F-car Project Center
11  documents in there?
12      A.   Oh, I don't recall.
13      Q.   You don't recall. Okay. I thought you said
14  there weren't, so I --
15      A.   No.
16      Q.   -- just wanted to get that clear.
17      A.   No. Well, I -- okay. No, I don't recall.
18      Q.   Okay. And how about the A through H
19  documents? Any recollection of whether those documents
20  were produced in the Cox case?
21      A.   No.
22      Q.   Do you recall any other -- any case that you
23  handled ever where -- with an F-car and a T-roof where
24  the allegation was made that a side angle collision
25  caused the roof to collapse in the absence of a

Page 55

1  rollover?
2      A.   No.
3      Q.   Now, as part of your role as the in-house
4  attorney for General Motors handling products liability
5  crashworthy claims, do you get involved in answering
6  interrogatories?
7      A.   Yes.
8      Q.   Okay. Do you ever get involved in drafting
9  the answers or is that something that you just do in a
10  review capacity after they've been answered by someone
11  else?
12      A.   A review capacity pretty much.
13      Q.   Okay. And is it the outside counsel who
14  actually drafts the responses to them?
15      A.   They do the first draft, provide me with the
16  draft, the engineer will take a look at them, the
17  draft, see if it's correct. That's pretty much my
18  role.
19      Q.   Okay. Does GM have any form phrases or form
20  responses or form objections that are provided to
21  outside counsel to provide specific responses to
22  specific kinds of questions?
23          MR. VINES: To clarify, Maurice, do
24  you mean in the Green case?
25          MR. DONOVAN: No. In any case.

Page 56

1          MR. VINES: Now?
2          MR. DONOVAN: Well, back in '80s --
3  late '80s, early '90s.
4          THE WITNESS: Did we have form
5  objections that we --
6      BY MR. DONOVAN:
7      Q.   Form objections, form answers.
8      A.   Could you give me an example?
9      Q.   I can only think of the ones I use.
10          Well, you know what a form answer
11  is, or is that where we're having the problem?
12      A.   No form objection. I mean, form answer --
13  form objection is where we're having a problem.
14      Q.   All right.
15      A.   That's an example.
16      Q.   Do you have form objections?
17      A.   No.
18      Q.   No.
19          Okay. Here's the response that GM
20  gave to number 7 of plaintiff's answers to
21  interrogatories. I don't know what version it was, but
22  I just want -- I'm just concerned about the language.
23  GM objects to this interrogatory --
24          MR. VINES: Mr. Donovan, can you
25  just identify that document a little bit more?

Page 57

1          MR. DONOVAN: Yeah. It's -- I'm
2  looking at privilege document 119. I'm looking at
3  Bates number page 581, which is the second page of this
4  document. It's supplemental responses of General
5  Motors Corporation to plaintiff's interrogatories and
6  I'm looking at answer to interrogatory number 7.
7          MR. VINES: Thank you.
8      BY MR. DONOVAN:
9      Q.   In C of that it says, GM objects to this
10  interrogatory. It's seeking information not reasonably
11  calculated to lead to the discovery of admissible
12  evidence. If further objects this interrogatory is
13  vague and ambiguous and that plaintiff fails to define
14  with reasonable particularity what is meant by the
15  following terms, and then they give a whole bunch of
16  terms.
17          Okay. That to me sounds like pretty
18  much form stock language. Would you agree?
19      A.   No.
20      Q.   No. You think that specifically was
21  tailored to answer this interrogatory?
22      A.   In the law of the state and --
23      Q.   Okay.
24      A.   Per civil procedure. All the rules. I
25  would say that...

16 (Pages 58 to 61)

Page 58

1    Q.   So that response would have been drafted by
2  outside counsel without General Motors providing any
3  kind of format or wording for that.
4    A.   That's a dif- -- that question -- I'm sorry.
5         If I understand your question, that
6  response would have been -- would have been drafted by
7  outside counsel and reviewed by in-house counsel and
8  agreed upon and provided. Would there have been a form
9  respo-- -- no.
10   Q.   Okay. Do you have form responses that when
11 you review them, you insert with respect to any
12 specific type of question?
13        MR. VINES:  And I'll object if
14 you're asking about whether he does that now. I take
15 it you mean back in the day.
16        MR. DONOVAN:  Late '80s, early '90s.
17        THE WITNESS:  Would that be for
18 answering them or objecting to them?
19 BY MR. DONOVAN:
20   Q.   Either or.
21   A.   Answering? Yes.
22   Q.   Okay. And is this language that you have
23 put together over the years?
24   A.   Language that was fact-based language
25 regarding issues like insurance coverage, the date of

Page 59

1  incorporation and location, where General Motor is
2  incorporated, their main place of business, things like
3  that. Factually-based information that is form drafted
4  and goes into the answers to interrogatories.
5    Q.   Okay. And that would be in response to
6  probably a question that comes very often, which is set
7  forth the name of this defendant, where they were --
8    A.   Sure.
9    Q.   -- incorporated, what their address is --
10   A.   Exactly.
11   Q.   -- da, da, da, da, da.
12   A.   So that would be -- that's a form answer.
13   Q.   Okay. I'm talking about like more -- well,
14 strike that.
15        Now, you received the Green case in
16 November of 1990 and you handled that case through its
17 conclusion?
18   A.   Correct.
19   Q.   Okay. That would be through the appeal up
20 to the appellate division back down to the remand
21 hearing?
22   A.   Correct.
23   Q.   All right. And when I say the remand
24 hearing, you're familiar with that?
25   A.   Right.

Page 60

1    Q.   All right. When you got the case from Mr.
2  Brown who had been handling it up to that point in
3  time, did you review the file?
4    A.   Yes.
5    Q.   Did you make any type of independent
6  determination whether the discovery was intact and
7  completed and done with or was there still work that
8  needed to be done on that?
9    A.   No. I think -- best of my recollection, I
10 believe that the discovery, as far as I knew, was
11 completed. I believe that our trial counsel had
12 indicated a couple times that they thought the
13 discovery was answered. I don't know if Doug Brown
14 told me that or it was -- I think it was outside
15 counsel informed me that -- that -- because we were
16 ready to go to trial in the case and then it got
17 adjourned.
18   Q.   It actually didn't go to trial for another
19 couple years.
20   A.   Couple more years, right. If I remember
21 correctly, '93, I think. That was the first --
22   Q.   Yeah. That was the first --
23        Did you make any effort to look at
24 the discovery when you received the file and make a
25 determination as to whether you thought it was

Page 61

1  complete? And I'm talking about when you got the file.
2    A.   Oh, when I got the file.
3    Q.   Any time. Yeah.
4    A.   No.
5    Q.   Would you even have been able to do that
6  given your limited experience in dealing with these
7  type of cars up to that point in time?
8    A.   I'm sorry. Would I have --
9         Could you repeat that question?
10   Q.   Yeah.
11        Given your limited experience in
12 defending roof crush cases, would you have been able to
13 look at the discovery and say independently you think
14 something was missing or wasn't contained there?
15   A.   Oh. I think I -- I could have taken a shot
16 at it. I think I could have -- as far as documents and
17 drawings, tests, I think I could have. That's it,
18 period.
19   Q.   Okay. The first piece of correspondence I
20 have you copied on the privilege log is document 192,
21 which is a letter dated January 18th, 1991, from a
22 Nancy Genova copied to you.
23        Do you know who Nancy Genova is?
24   A.   She was discovery coordinator.
25   Q.   Okay. She was handling the Green file at

Page 62

1  that time?
2      A.  Best of my recollection.
3      Q.  Okay.  And the correspondence indicates,
4  it's copied to you, it's a letter which -- and I can
5  show it to you, but unfortunately I have to show it to
6  you on the computer rather than in hardcopy.  It's
7  actually a letter to Dave Coulson, you're copied on it
8  and it's forwarding certain discovery, Bates numbers
9  100247 through 100264, it's also copied to Mr. Rice,
10  and the description of those documents are An Analysis
11  of the National Crash Severity Study Data, Injury
12  Frequency and Severity in Rollover Car Crashes as
13  Related to Occupant Ejection, Contacts and Roof Damage,
14  and then the second document is Determination of
15  Effective Surface Coefficients For Use in Acceleration
16  Performance Simulations.
17          Any recollection of either of those
18  two documents?
19      A.  No.
20      Q.  No.
21          Do you know what type of documents
22  those are or where they come from?
23      A.  It sounds like the kind of documents that
24  would come from the GM library.
25      Q.  These are kind of research documents --

Page 63

1      A.  Right.
2      Q.  -- rather than, you know, design or
3  manufacture --
4      A.  Right.
5      Q.  -- documents?
6      A.  Right.
7      Q.  Okay.  Were you at all involved in December
8  of 1991 with requesting that those documents be
9  produced in Green?
10      A.  December of '91?
11      Q.  I'm sorry.  January of '91.  I'm sorry.
12      A.  I was not involved in the production of
13  those documents.
14      Q.  Okay.  Do you recall those documents being
15  produced in other F-car rollover cases?
16      A.  I don't know.
17      Q.  Were you aware when you took over that case
18  that Judge Ferentz from Essex County had entered an
19  order in August of 1990 requiring GM to provide more
20  specific answers to insert in interrogatories and
21  demand for production of documents?
22      A.  I became aware of it.
23      Q.  Okay.  Did you ever have the opportunity to
24  review that order?
25      A.  I believe I did.

Page 64

1      Q.  And was that just part of your general
2  review of the file or was there some other reason why
3  you were going through that?
4      A.  I don't -- I don't know if I can answer that
5  question --
6      Q.  Okay.
7      A.  -- the way it's asked.
8          MR. DONOVAN:  Why don't we mark
9  this.  We didn't mark it yesterday, so we'll do it
10  today so we have some Z documents.
11      ZIOLKOWSKI EXHIBIT NO. 1
12      WAS MARKED BY THE REPORTER
13      FOR IDENTIFICATION
14          MR. VINES:  Do you have any more
15  copies?
16          MR. DONOVAN:  It's the Judge Ferentz
17  order.
18          MR. VINES:  Okay.
19          MR. CARROLL:  Mike has one.
20          MR. DONOVAN:  I can find you one if
21  you want it.
22      BY MR. DONOVAN:
23      Q.  I'm going to show you what's been marked
24  Ziolkowski 1, and is it your understanding that that's
25  the order?

Page 65

1          MR. DONOVAN:  I have one here, Mike.
2      BY MR. DONOVAN:
3      Q.  Is that the order we were just speaking
4  about that you reviewed?
5      A.  Yes.
6      Q.  That look familiar?
7      A.  Yes.
8      Q.  Okay.  And I think the question I'd asked
9  you was in what context had you reviewed that order.
10  Was it just part of your general review of the whole
11  file or was there a more specific reason for reviewing
12  it?
13      A.  I think -- the best of my recollection is
14  that I reviewed this order in relationship to my
15  attention being brought to documents that were being
16  produced in response to this order, documents that were
17  located by the Rumberger firm in July of '91.  I
18  specifically went back and reviewed this order.
19          I don't have -- I remember either
20  reviewing the order or Doug Brown telling me that there
21  was an order to produce documents prior to that, but I
22  don't remember, but it was my understanding that that
23  order -- this order had already been met.
24          MR. VINES:  Can we go off the record
25  for one second?

18  (Pages 66 to 69)

Page 66

1          MR. DONOVAN: Sure.
2          MR. VINES: Just want to get my
3  colleague back so he can help me.
4          MR. DONOVAN: Yeah. He's only got a
5  couple minutes left on that tape, so we might as well
6  take a break now.
7          VIDEOGRAPHER: Going off the record
8  at 10:54 and 59 seconds a.m.
9          (Recess)
10          VIDEOGRAPHER: We're back on the
11  record at 11:06 and 9 seconds a.m.
12  BY MR. DONOVAN:
13      Q.  Do you recall the first discovery response
14  you were involved in or had some personal involvement,
15  the one I just discussed with those other two reference
16  documents, you kind of got copied, but you weren't
17  particularly involved in?  Do you recall what the next
18  discovery response was that you were involved in?
19      A.  Yes. I believe it was on the Green case.
20      Q.  Yes.
21      A.  Filing -- filed supplemental response in
22  July. Once we obtained those documents, we supplemented our
23  prior responses with those documents.
24      Q.  Okay. Were those the documents from
25  Rumberger Kirk?

Page 67

1      A.  Correct.
2      Q.  Okay. And those were 64 documents in
3  number? They were Bates numbers 2379 through 2442?
4      A.  That sounds right.
5      Q.  I know you probably don't remember those
6  numbers, but I'm reading off of a letter which contains
7  them.
8      A.  Yeah, that's right.
9      Q.  Okay. Where did you get those documents
10  from, or did you?
11      A.  I think I received those, boy, eventually.
12  I think I received those from our coordinator, but I
13  can't remember. It was either coordinator or Andy
14  Langan sent me the documents, I can't remember. I
15  think my first awareness that there were these
16  documents was I was copied on a letter from Rumberger's
17  firm to Andy and copied me on it, I think. That was
18  the first I was aware of those documents.
19      Q.  Okay. I'm looking at a letter which is
20  privilege hearing document 216, it's Bates number 1142,
21  and it's a letter from Robert Rudock to actually Ron
22  Betman at Kirkland & Ellis.
23          Do you know who Ron Betman is?
24      A.  I remember the name.
25      Q.  Okay.

Page 68

1      A.  I don't know if I've ever met Ron.
2      Q.  And it references F-car center documents and
3  it says Dear Mr. Betman: Enclosed for your review are
4  the F-car center documents which refer to or address
5  the development of the T-roof of the 1982 to present
6  F-car. We have not made an evaluation as to whether
7  the enclosed documents should have been produced in
8  Green versus GMC. We are, of course, available to
9  discuss productions of the enclosed documents in Green.
10  If you have any questions or concerns, please do not
11  hesitate to contact us, and you're copied on that
12  without enclosures.
13          Is that the letter you're referring
14  to?
15          MR. VINES: I'd like to ask the
16  witness if he'd like to see that letter to be able to
17  answer it. Would that help?
18          MR. DONOVAN: I don't think I have a
19  copy of the letter, so we have to put my computer over
20  there or --
21          MR. CARROLL: I believe we've got
22  one.
23          MR. DONOVAN: Or if you have one,
24  that would be great.
25          THE WITNESS: I believe that's the

Page 69

1  letter.
2  BY MR. DONOVAN:
3      Q.  Okay. Is that the first awareness you had
4  of there being documents reviewed by the Rumberger firm
5  in connection with the Green case?
6      A.  Best of my recollection, yes.
7      Q.  Okay. Were you given any information with
8  respect to what was going on in that review of
9  documents by the Rumberger firm?
10          Let me ask that a different way.
11  When you -- when the files were transferred, you
12  inherited them from Doug Brown, did he give you any
13  kind of verbal explanation of the fact that there were
14  documents being reviewed by Rumberger?
15      A.  Not to my recollection.
16      Q.  Okay. So this is pretty much the first time
17  you knew about that?
18      A.  This --
19      Q.  This letter of July 8th.
20      A.  Reading this letter and then talking to Andy
21  Langan --
22      Q.  Okay.
23      A.  -- at Kirkland & Ellis asking them pretty
24  much what the letter consisted of, what was the
25  background of the letter.

Page 70

1    Q.   Okay.  So when you got this letter, you had
2  a conversation with Andy Langan over at Kirkland &
3  Ellis?
4    A.   Correct.
5    Q.   Okay.  And what was the nature of that
6  conversation?
7    A.   Just asked him what the -- why we were
8  getting these documents, where they came from and what
9  we were going to do with them.
10    Q.   Okay.  What did he say with respect to what
11  the documents were and where they came from?
12    A.   It's my understanding that -- recollection
13  is that he told me that the documents came from
14  Rumberger & Kirk, that they did a review and that these
15  documents were deemed responsive to the court order.
16    Q.   Okay.  Did he give you any indication of
17  where Rumberger had gotten the documents from?
18    A.   Not to my recollection.
19    Q.   Did he give you any indication of what the
20  Rumberger firm had reviewed in order to cull these
21  documents, these 64 documents?
22    A.   Other than the fact that the letter itself
23  talks about F-car project -- or F-car center documents
24  and -- F-car center documents, I probably discussed
25  that they were General Motors documents.

Page 71

1    Q.   Okay.  Do you know more specifically what
2  documents from the F-car Project Center, if not all of
3  the documents from the F-car Project Center that
4  Rumberger had reviewed and from which these documents
5  came?
6    A.   No.
7    Q.   So you had no role in selecting these 64
8  documents; correct?
9    A.   That's correct.
10    Q.   And you had no role in determining from what
11  larger body of documents, if there was a larger body of
12  documents, these documents came from.
13    A.   Correct.
14    Q.   Did you have any understanding that they did
15  come from a larger body of documents, that these 64
16  were not all of the documents that Rumberger reviewed?
17    A.   Well, I believe -- the fact that they were
18  F-car center documents led me to believe, and I believe
19  Andy confirmed that, that these were a collection of
20  documents and that these documents -- some documents
21  came from that collection.
22    Q.   Okay.  And did you have any discussion of
23  what the criteria was going to be to evaluate whether
24  these documents, these 64 documents were going to be
25  produced in Green versus General Motors?

Page 72

1    A.   What the criteria?
2    Q.   Yes.
3    A.   Yeah.  The court order.
4    Q.   Okay.  Anything specific about the court
5  order, any particular interrogatory number, any --
6    A.   Well, it was the court order and -- which
7  caused -- yeah.  It was a response to paragraph 5 of
8  the court order, the order to -- T-top design
9  documents.
10    Q.   Okay.  Were you aware whether there was any
11  specific number in that paragraph?
12    A.   Not in paragraph 5 it doesn't look like, but
13  in paragraph 4 and 3 we're talking about General Motors
14  is to provide more specific responses to certain
15  interrogatories and certain requests for production of
16  documents.
17    Q.   Okay.  Did you ever --
18         I know you didn't get them with that
19  letter.  Did you ever get them subsequently, the actual
20  64 documents which were referenced in that letter?
21    A.   Did I ever receive them?  I don't believe I
22  did.  I think I saw them, though.  I believe it was at
23  the -- with the discovery coordinator at that time.
24    Q.   Okay.
25    A.   They were in her possession.

Page 73

1    Q.   Do you --
2    A.   And I looked at them, if I remember
3  correctly, I think.
4    Q.   Was that pretty much your involvement in
5  supplementing the interrogatories with those 64
6  documents?
7    A.   From a discovery standpoint?
8    Q.   Yes.  At that point in time.  I'm not
9  looking to go any further than that.
10    A.   Yeah, in the fact that these 64 documents
11  once provided to plaintiffs' counsel satisfied -- was
12  my understanding it satisfied the court order.
13    Q.   In whose opinion was that?
14    A.   I believe that was Mr. Langan's opinion.
15    Q.   It wasn't the Court's opinion necessarily.
16  This was something --
17    A.   Well, I didn't hear anything from the Court
18  to say it didn't, so I'm assuming -- I'm assuming it
19  did.  That's kind of a guess.
20    Q.   Okay.  Where might these documents that
21  Rumberger reviewed have come from?  I mean, if you were
22  to say -- if you were to be providing documents in an
23  F-car case, is there one repository where all of those
24  documents are or multiple repositories where they might
25  be?

20 (Pages 74 to 77)

Page 74

1   A.   Well, the letter indicated and it was my
2   understanding that the documents that Rumberger looked
3   at came from the F-car center documents, which is what
4   it says in this letter, F-car center documents.
5        So to answer your question, where
6   the documents came that Rumberger reviewed, seems to be
7   answered by this letter that they were F-car center
8   documents.
9   Q.   Okay. Other than documents which come from
10  the F -- well, strike that.
11       Do all the documents -- are all of
12  the documents with respect to the F-car contained in
13  the F-car Project Center?
14  A.   I don't believe so.
15  Q.   Okay. What documents are contained in the
16  F-car Project Center?
17  A.   Meeting minutes, probably design -- design
18  material, design drawings. No. I don't know about the
19  drawings.
20       I believe pretty much the design --
21  the Project Center brought in all the groups to work on
22  and develop the vehicle, the F-car, under one umbrella,
23  so to speak. So the documents, the meeting minutes,
24  test reports, things of that nature would have been in
25  the F-car center project files.

Page 75

1   Q.   Okay. When did you first become aware that
2   the F-car Project Center was a repository for at least
3   some of the documents having to do with the design and
4   manufacture of the F-car?
5   A.   Probably in July of 1991.
6   Q.   Contemporaneously with that letter?
7   A.   Yes.
8   Q.   Okay. None of the engineers had discussed
9   with you prior to your receipt of that letter that
10  there was an F-car Project Center file which contained
11  documents with respect to the F-car development,
12  design, and manufacture?
13  A.   No, I don't think F-car. Maybe W-car, but
14  not -- I think there was a Project Center on -- or
15  N-car. It was another vehicle.
16       There were only a couple Project
17  Center file -- project centers dealing with vehicles,
18  one was the F-car and one, I think, was the NL -- I
19  can't remember the other initial, but they were -- I
20  believe that was a project center. So I was aware of
21  project centers. Your question about the F-car, this
22  may have been the first time that I focused on the
23  F-car Project Center.
24  Q.   Okay. So not every car which General Motors
25  manufactures has a project center associated with it.

Page 76

1   A.   Correct. Correct.
2   Q.   And some do and some don't.
3   A.   Correct.
4   Q.   Okay. Again, was there -- other than an
5   engineer telling you about that, was there any way --
6   any other way you could find -- coincidently because
7   someone sent you a letter referencing it, is there any
8   way you could have found out? Is there a list of what
9   cars that had project center or --
10  A.   Well, I don't --
11       In the context of this case,
12  discovery was over, or I thought it was over, so there
13  was -- I don't know if this answers your question, but
14  it -- and if it doesn't, please let me know, but it
15  just seemed like when this flag -- red flag went up
16  about more documents, documents retrieved from F-car
17  center document files, that was -- that I had asked
18  questions as to what that was all -- you know, what
19  that was all about, and to answer your question, I
20  think, is, yes, I became aware of the F-car center
21  documents at that time.
22  Q.   Did you make any request to review the F-car
23  Project Center documents?
24  A.   No.
25  Q.   Did you make any request to be provided with

Page 77

1   an index or a summary of what kind of documents were
2   contained in there?
3   A.   No.
4   Q.   Now, you had other F-car cases pending at
5   this time, didn't you?
6   A.   At that time?
7        Bishop had been tried. This one
8   was -- in '91 was active. By July I think we had tried
9   the Cox case. I don't know of any cases pending at
10  that time.
11  Q.   Okay. In future cases after this July '91
12  letter was the F-car Project Center file somewhere
13  where you would go to look for document responses if it
14  was an F-car?
15  A.   Yes.
16  Q.   But obviously before that, since you didn't
17  know about it, you couldn't make a request that you
18  look there.
19  A.   Me personally?
20  Q.   Yes.
21  A.   No. That was already done by Doug Brown and
22  the engineers and this was already set up before I took
23  over. So the answer is I didn't, but people who were
24  very experienced and well versed in F-car project files
25  did take a look at them.

Page 78

1    Q.   So it was your understanding that before you
2   became engaged in this case in November of 1990 that
3   there had been a search conducted of the F-car Project
4   Center files so as to see if there was anything in
5   there responsive to the discovery demands or the order
6   of Judge Ferentz; true?
7    A.   No.
8    Q.   All right.  Correct that for me.
9         MR. VINES:  I'm sorry.  Would you
10   say that again?  I didn't quite follow it myself.
11        MR. DONOVAN:  Sure.
12   BY MR. DONOVAN:
13    Q.   Was it your understanding when you took over
14   this file in November of 1990 from Doug Brown that
15   there had already been a search of the F-car Project
16   Center files and any documents which were responsive to
17   the discovery demands and the order of Judge Ferentz
18   had already been provided to plaintiff?
19    A.   No, that's not what I'm saying.
20    Q.   Okay.  What's wrong about what I said?
21    A.   When I took over the file in late November,
22   early December of 1990, it was my understanding that
23   discovery was complete.
24    Q.   Okay.
25    A.   And it was my understanding that our

Page 79

1   obligation was met and the court order was satisfied.
2   It wasn't until July of '91 that it was -- became
3   apparent that we didn't review all the documents, and
4   that was -- it was after I took over the file that the
5   F-car center documents were reviewed and the 64
6   documents were produced in response to the court order.
7    Q.   Okay.  I understand.
8         Do you know --
9         So it was your understanding that
10   this search of the F-car Project Center was the first
11   search being conducted to provide responsive documents
12   from the F-car Project Center in Green?
13    A.   I have no knowledge.
14    Q.   Okay.
15    A.   All I know is that 64 more documents -- 64
16   documents were found.  I don't know if there was an
17   earlier search.  All I know is in July of 1991 64
18   documents -- I was made aware of 64 documents that may
19   have been responsive, and it was my position as staff
20   attorney to turn all those documents over to plaintiff.
21    Q.   Okay.  Were you aware these documents had
22   come from about 10,000 documents which had been
23   reviewed by a paralegal at the Rumberger firm?
24    A.   I wasn't aware at that time as to the number
25   of documents that were being -- that were reviewed.

Page 80

1    Q.   Tell me what else, if anything, you did to
2   familiarize yourself with what was in the F-car Project
3   Center file and -- just that for now.  Tell me what you
4   did, if anything, to familiarize yourself.
5    A.   After I found out about --
6    Q.   Yes.
7    A.   -- the F-car.
8    Q.   Um-hum.
9    A.   Or specifically the July 8th, 1991, where it
10   was brought to my attention that --
11    Q.   Yes.
12    A.   -- there were F-car --
13         I talked to the engineer.
14    Q.   Okay.
15    A.   I believe it was Joe Rice, and I asked
16   around the office about the project files and it was
17   explained to me that -- a little bit more completely
18   than my understanding of the project -- the F-car
19   Project Center or Project Center files were all about.
20   So I looked into the issue and I tried to educate
21   myself about the Project Center files.
22    Q.   Okay.  Were you aware that there was -- at
23   any point in time after you got that letter that there
24   was an index to the Project Center files on microfiche?
25    A.   Sometime --

Page 81

1         Before this?
2    Q.   No, after that.
3    A.   Oh, yeah.  After, yes.
4    Q.   Did you ever review that?
5    A.   No.  That was -- it wasn't immediately
6   after.  It was years after.
7    Q.   Oh, years after.  Okay.
8    A.   Yeah.  Best of my recollection.
9         About the index?
10    Q.   Yes.
11    A.   Yes.
12    Q.   After Green was finished?
13    A.   I can't answer that.
14    Q.   So --
15    A.   It may have been --
16         Well, Green didn't get finished
17   until 199 --
18    Q.   I think 1998.
19    A.   8?
20         So I've got to -- I got to believe
21   that I looked at that index before Green was
22   finished --
23    Q.   Okay.
24    A.   -- in 1998.
25    Q.   And did you do that with the intent of

Page 82

1 cross-referencing what had been provided in Green with
2 what was on that index to make sure that there wasn't
3 anything else other than the 64 documents?
4     A.   No.
5     Q.   Did you ask anybody else to do that?
6     A.   No.
7     Q.   Was it your assumption that that's what
8 Rumberger had done?
9     A.   No.   We're talking about a timeframe that --
10 the trial was over.
11     Q.   The first trial.
12     A.   Both.
13     Q.   Both trials.
14     A.   So it was after the fact.
15     Q.   Oh, okay.  Okay.
16     A.   So it was -- the Rumberger/GM relationship
17 about F-car project files I think was -- was -- had
18 already ceased to exist.
19     Q.   Okay.  Let me ask that a different way.
20          When you found out there was an F --
21          When you fortuitously found out that
22 there was an F-car Project Center file because you were
23 copied on this letter, did you do anything to review
24 the F-car Project Center or any summary of what was in
25 there or any indexes to cross-reference whether there

Page 83

1 was anything else other than the 64 documents which
2 Rumberger's firm provided that may have been responsive
3 to any discovery demands?
4          MR. VINES:  I'll object.  You used
5 the term fortuitous in your question, but go ahead.
6          THE WITNESS:  No.
7 BY MR. DONOVAN:
8     Q.   Okay.  Did you instruct anybody else to do
9 anything with respect to review of the F-car Project
10 Center file, any indexes, summaries or listing of
11 documents in there to determine whether there was
12 anything else responsive to discovery demands in Green?
13     A.   No, because I believe that the review was
14 complete.  As I learned in July of 1991 that the
15 project files were reviewed by -- were in the
16 possession of and reviewed by the Rumberger firm, that
17 there was direction to them as to what to look for,
18 that they were a very responsible law firm, and that
19 once these documents were turned over and I was assured
20 that the -- this discovery met and satisfied the court
21 order, at least parts of it, I was satisfied that the
22 people that we rely on did their work and I was
23 satisfied that our obligation was met.
24     Q.   Okay.  Where did those assurances come from?
25     A.   Working with these people.  The assurance

Page 84

1 that they have experience, training, engineers,
2 engineer, discovery coordinator, outside counsel.
3 Everyone has the -- chips in on this situation, but in
4 this specific case the assurance came from our trial
5 counsel, Andy Langan, who I believe at that time had
6 discussed this production with Rumberger & Kirk firm
7 and the assurance that we have satisfied the court
8 order.
9     Q.   Did you ever speak to anybody from the
10 Rumberger firm about this assignment?
11     A.   No.
12     Q.   Okay.  Were you aware of what the assignment
13 was to Rumberger, what they were supposed to look for
14 in the documents they were provided?
15     A.   Yes.  In July, August of 1991, yes.
16     Q.   Okay.  What was -- what were they looking
17 for in the documents?
18     A.   Specifically response to the court order and
19 also I believe put together a roof -- the documents
20 involving the development of the F-car roof.
21     Q.   Okay.
22     A.   Kind of multitasking to -- specifically for
23 this case and more general, and I don't know if it was
24 for a specific case, but more general kind of the
25 history of the F-car roof.

Page 85

1     Q.   Was Hassan a case that you were working on?
2     A.   Not that I remember.
3     Q.   All right.
4     A.   I don't think it was.
5     Q.   Do you know whether anybody at the Rumberger
6 firm was provided with either a copy of Judge Ferentz's
7 order or the discovery demands in Green so it was to be
8 able to comply with the directive you just indicated?
9     A.   I don't know.
10     Q.   Would you think that would have been a good
11 idea if they were going to try to pick out all the
12 documents to respond to the court order and to respond
13 to the discovery demands that they be provided with
14 that or some kind of summary of it?
15     A.   Or communication somehow either over the
16 phone -- like you're reading to me documents.  I assume
17 they could read, you know, questions over the phone and
18 people take notes.
19     Q.   And you would assume that happened at some
20 point.
21     A.   I -- yes, I guess, but I have no knowledge
22 whether it did or didn't.
23     Q.   Now, I think you told me that the F-car
24 Project Center was one repository of documents
25 pertaining to the F-car.

Page 86

1      Was it all of the documents within
2 the total lifespan of the F-car? Was it started when
3 the F-car first was put into production or starting to
4 designing or was it just any period of time?
5     A. I don't remember. I'm not sure if it was --
6 it started with first generation and ceased to exist
7 after the third generation. I don't have an -- I don't
8 have a recollection as to when the F-car Project Center
9 started. I think it ceased to exist after the -- after
10 the third generation, which was, I think, ended in
11 1992, if I'm not mistaken.
12     Q. Where was -- where were these files actually
13 maintained?
14     A. I believe they were in the Fisher Body
15 building basement.
16     Q. And do you know what format they were in?
17     A. I think they were in microfiche.
18     Q. Okay. Do you know whether all of the
19 documents of the F-car Project Center file were in
20 microfiche?
21     A. I have no idea.
22     Q. Did you ever physically go and even if not
23 related to a case, just happened to be there and
24 actually see the files or the boxes containing the
25 files or however they were kept?

Page 87

1     A. No. I think I was there once and saw the
2 project files.
3     Q. Okay. And what did you see? Were they
4 boxes? Were they --
5     A. No. I think they were -- I think they were
6 in file drawers. I can't remember.
7     Q. Do you know whether the documents were ever
8 scanned and put on computer?
9     A. I don't know.
10     Q. Do you know whether the files still exist in
11 the basement of the Fisher Body division?
12     A. Well, there's no Fisher Body division
13 anymore.
14     Q. Okay. Do you know where the --
15     A. Where they're located, I'm not real -- I'm
16 not sure.
17     Q. Does you still have people review the F-car
18 Project Center file if you have a case --
19     A. Yes.
20     Q. -- with an F-car?
21     Okay. So, obviously, somebody knows
22 where they are.
23     A. Somebody. Right. Exactly.
24     Q. Somebody knows where they are.
25     A. Yes.

Page 88

1     Q. Okay. And do you know what method that they
2 use now to review it? Is it on computer or is it still
3 on microfiche?
4     A. I have -- I don't know.
5     MR. VINES: I'm going to object to
6 that.
7     BY MR. DONOVAN:
8     Q. Other than the F-car Project Center file
9 where else would we find documents related to the
10 design or manufacture of F-cars?
11     A. At the Milford Proving Ground.
12     Q. Okay. What would we find there?
13     A. Crash tests, sled tests, handling and
14 stability tests.
15     Q. Alien?
16     A. Handling and --
17     Q. Oh, handling. I thought you said alien.
18     A. Handling and stability tests at the
19 engineering center, probably at the tech center.
20     Q. Where is that?
21     A. In Warren, Michigan.
22     Q. What kind of documents would we find there?
23     A. Engineers' notes perhaps and drawings. I'm
24 not sure where the drawings would be housed now, or
25 were housed then. Any treatise on the F-car, any

Page 89

1 scientific reports in writing would have been in the GM
2 library, research library. That's all that comes to
3 mind at this time.
4     Q. Okay. So if we went to all of those places
5 and did a conscientious search for any document
6 pertaining to the F-car Project Center file, would we
7 have exhausted, at least to anybody's knowledge, all of
8 the searching places for those documents?
9     A. Then.
10     Q. Yes.
11     A. Back in 1989 --
12     Q. Yes.
13     A. -- 1990. I would assume so.
14     Q. I'm not talking about some engineer who may
15 have had his personal file in a drawer somewhere, but
16 I'm talking about all the -- the official sources for
17 information would have been in one of -- any one of
18 those one, two, three, four places that you gave me.
19     A. When I talk about the engineers at the tech
20 center, I guess I am kind of talking about their
21 material maybe in a file drawer or something, but
22 specifically the F-car center documents were kind of
23 the core documents about the development of the F-car.
24     Q. Okay. Now, was it your understanding that
25 in order to comply with plaintiff's discovery requests

24 (Pages 90 to 93)

Page 90

1  in Green and Judge Ferentz's order, that there had been
2  a search conducted of the Milford Proving Grounds so as
3  to identify and produce crash tests, sled tests, and
4  handling and stability tests?
5      A.   That's my understanding.  Right.
6      Q.   Okay.  And that would be something, if you
7  had handled the case from the beginning, you would
8  have -- you would have instructed to be done or would
9  have made sure was done?
10     A.   Right.  I had enough experience at that time
11  to -- and I'm sure the engineer had a lot more
12  experience than I did to direct those kind of searches
13  and reviews of documents and document center files.
14     Q.   Okay.  And the engineer we would have been
15  talking about would have been Dr. Rice in the Green
16  case?
17     A.   I believe so.  Correct.
18     Q.   And was it your understanding that there had
19  been a search conducted of the engineering center in
20  Warren so as to produce any engineering notes or
21  drawings which may have been responsible for discovery
22  requests in the order of Judge Ferentz?
23     A.   I believe so.
24     Q.   Okay.  And you would have expected that to
25  be done.  Again, had you been handling this case from

Page 91

1  the beginning, that would be something you would have
2  looked for or instructed somebody to do?
3      A.   If asked.  See, you're --
4          If requested by the discovery that
5  was put forward to General Motors.  Whether those type
6  of --
7          We would have responded to the
8  discovery that was asked.  You're asking two -- apples
9  and oranges here.  Where do we think documents would
10  be?
11     Q.   Um-hum.
12     A.   And I'm ballparking where I think maybe
13  documents would have been other than the F-car center.
14  Now you're asking me would we have produced those
15  documents.  We would have produced those documents if
16  they were asked for.
17     Q.   Okay.  That's fair enough.  That's fair
18  enough.
19          And you would have also expected,
20  had they been asked for if there was a question
21  pertaining to scientific documents, research documents,
22  publications concerning the F-car, that there would
23  have been a search conducted of the research library of
24  General Motors so as to provide that information.
25     A.   Library search.  Correct.

Page 92

1      Q.   And it was your understanding that that had
2  been done in Green?
3      A.   It's my understanding the discovery was
4  satisfied.
5      Q.   And that is something that had there been a
6  question in those interrogatories or demand to produce
7  which was propounded requesting scientific literature,
8  you would have expected that search to be conducted.
9      A.   Correct.
10     Q.   Now, again, you would not physically have
11  done that search, but you would have relied upon
12  someone, either a discovery coordinator, to instruct
13  someone else to do it or you would have expected the
14  engineer to do that.
15     A.   Correct.
16     Q.   All right.  And when they reported back to
17  you and said here's the stuff responsive to this, you
18  would rely upon the fact that they had done a diligent
19  and comprehensive search so as to respond to whatever
20  discovery demand there was.
21     A.   Correct.
22     Q.   Are you familiar with the writer files and
23  the subject files as it pertains to the F-car Project
24  Center file?
25     A.   No.

Page 93

1      Q.   You've never heard those two terms?
2      A.   Writer file?
3      Q.   Writer, w-r-i-t-e-r, files.
4      A.   Or subject files.
5      Q.   Or subject files or subject matter files.
6      A.   No, it doesn't ring a bell.
7      Q.   All right.  Would it refresh your
8  recollection if I told you that these were subdivisions
9  within the F-car Project Center file, the documents
10  were either part of the writer files or the subject
11  files or they might have been part of both?
12     A.   Would the writer files be the meeting
13  minutes?
14     Q.   I don't know.
15     A.   Well, I can't answer your question.
16     Q.   Okay.  Were you familiar with UPC codes with
17  reference to the F-car Project Center file or the use
18  of UPC codes?
19     A.   Right.
20     Q.   And what was the -- what was the UPC codes
21  and what did they have to do with the Project Center
22  file?
23     A.   I believe, if I remember correctly, the
24  vehicle and the parts in the vehicle, components of the
25  vehicle were coded under the UPC code, and those were a

Page 94

1   way of searching the Project Center file for documents
2   related to that UPC code.
3       Q.   Okay.  Was there a UPC code for component
4   parts of the roof?
5       A.   I can't remember.
6       Q.   Okay.  So it was a tool one could utilize to
7   search the F-car Project Center file so as to identify
8   certain documents pertaining to whatever part we
9   were talking about.
10      A.   Part.  Exactly.
11      Q.   Okay.
12      A.   Part we're looking for.
13      Q.   So if there was a UPC code for the roof
14  hatches, the glass roof hatches, okay, we could
15  actually go and that would provide us with a way to
16  look for documents pertaining to that?
17      A.   If there -- yes.  If there was.  I don't
18  know if --
19      Q.   Okay.
20      A.   But if there was, yes, you -- right.
21      Q.   Okay.  Do you know whether anybody in
22  providing the discovery prior to you're taking over the
23  case in November of 1990 did a UPC code search of the
24  F-car Project Center index to determine whether there
25  were any documents there responsive to the discovery

Page 95

1   demands or the order of Judge Ferentz?
2       A.   I do not.
3       Q.   Would you expect somebody to have done that?
4       A.   The U --
5           Look at the UPC code on the
6   hardcopies that Rumberger had.
7       Q.   No.  I'm talking about -- I'm not talking
8   about who would do it, I'm just talking, would you
9   expect that kind of search to be done?
10      A.   Well, I don't know if it could be done if it
11  wasn't on the microfiche.
12      Q.   Okay.  But I'm not -- I'm losing you.
13      A.   Well, I thought --
14          I don't know if you could do a UPC
15  code check if it was just hardcopy.  This is paper.
16  So, I mean, I suppose you can and I suppose there was a
17  UPC code on the paper, but I don't understand the
18  benefit of doing a UPC code when you have a hardcopy.
19      Q.   Wouldn't utilizing the UPC code direct you
20  to a section of the F-car Project Center file for the
21  purpose of --
22      A.   It may have.
23      Q.   Okay.  Have you ever used the UPC codes to
24  engage in that kind of a process?
25      A.   Not with the F-car center.

Page 96

1       Q.   With other project centers?
2       A.   No.  With other vehicle component parts and
3   allegations, defect allegations.
4       Q.   Okay.  So getting back to my question.  Is
5   this something you would expect someone to do in order
6   to find documents responsive to discovery demands in
7   Green or not?
8       A.   I don't think I can answer the question as
9   you've asked it.
10      Q.   It's something that could have been done,
11  though.
12      A.   Well, you told me not to -- early on you
13  told me not to --
14      Q.   Not to guess?
15      A.   -- guess.
16      Q.   All right.
17      A.   So I'm not going to guess.
18      Q.   After Green versus General Motors were
19  documents from the F-car Project Center file provided
20  in other F-car cases and specifically in roof cases?
21      A.   Yes.
22           Oh.  Specifically?
23      Q.   Yes.
24      A.   I know documents were provided in other
25  F-car cases.

Page 97

1       Q.   Such as the Harris case?
2       A.   Yes.
3       Q.   Are you familiar with the Johnson case out
4   of Tennessee?
5       A.   It was a -- vaguely.  It was a glass case.
6       Q.   Was that a case you handled?
7       A.   No.
8       Q.   Do you know who Pat Artis is?
9       A.   A plaintiff's lawyer.
10      Q.   Okay.  Have you ever handled any cases in
11  which Mr. Artis was the plaintiff's attorney?
12      A.   Yes, I have.
13      Q.   Okay.  Rollover cases?
14      A.   Yes.
15      Q.   F-car cases?
16      A.   Not to my recollection.
17      Q.   Are you familiar with the case Saturday
18  versus General Motors?
19      A.   Saturday.  No.
20      Q.   Okay.  Do you have any --
21           Did you have any involvement in any
22  search of General Motors' databases by Mr. Artis or any
23  of his representatives for documents contained in the
24  F-car Project Center file?
25      A.   Did I personally?

26 (Pages 98 to 101)

Page 98

1    Q.    Yes.
2    A.    No.
3    Q.    Were you aware of such an event taking
4    place?
5    A.    Yes.
6    Q.    And do you know when that was?
7    A.    That was 1997, 6.
8    Q.    And what was your understanding about what
9    occurred?
10   A.    That review of the F-car project files was
11   made by General Motors in the presence of a
12   representative or Mr. Artis himself, I'm not sure who,
13   looking for documents responsive to a request made in
14   the Johnson case.
15   Q.    And was that conducted in Warren?
16   A.    I have no idea.
17   Q.    And do you know whether that search was
18   conducted utilizing computers or was that a manual
19   search through documents or a review of microfiche?
20   A.    I think it was just through the microfiche
21   review, microfiche reader.
22   Q.    Did Mr. Brown at all speak with you or give
23   you any direction or guidance with respect to what
24   occurred at an August 8th meeting, August 8th, 1990
25   meeting, discovery meeting?

Page 99

1    A.    No. I have no recollection of that.
2    Q.    Do you know that there was a meeting which
3    took place in which the attorneys and the engineers all
4    got involved in order to discuss and review Judge
5    Ferentz's order and what was required of General Motors
6    to comply with it?
7    A.    Yes, now retroactively, yes.
8    Q.    Okay. You didn't know that at the time you
9    took over the file or --
10   A.    No.
11   Q.    -- thereafter?
12   A.    No.
13   Q.    I may have asked you this, but just to
14   clarify. Is your understanding that the F-car
15   Project Center file had documents both -- with respect
16   to both the first generation, second generation, third
17   generation F-car?
18   A.    I don't know. I have no idea.
19   Q.    Do you know approximately how many documents
20   are contained within the F-car Project Center file?
21   A.    I assume it's thousands. If we -- you
22   mentioned we produced to Rumberger firm 10,000 and if
23   that had to do with roof and roof structure, I mean,
24   there's other components to the vehicle, so I would
25   assume it had to be thousands.

Page 100

1    Q.    Do you know for certain or did you just say
2    that, that the documents Rumberger got, the $10,000
3    were -- $10,000 -- the 10,000 documents were roof
4    documents?
5    A.    I heard you say that earlier I thought, so
6    that's why I --
7    Q.    Okay.
8    A.    I'm sorry if I'm wrong. I just repeated
9    what you mentioned earlier.
10   Q.    If I said it, then I was wrong, too.
11   A.    Well, I would assume they were documents
12   dealing with roof and structure, and I say that based
13   on -- based on what you've said and what I'm led to
14   believe.
15   Q.    Are you familiar with the concept of
16   alternative design as part of plaintiff's proofs in a
17   product liability crashworthiness case?
18   A.    I've -- yes. I'm familiar with that.
19   Q.    Tell me your understanding of what that
20   means and what the requirements of that are.
21        MR. VINES:  I'm going to object to
22   that to the extent that it goes to cases outside of the
23   group that we are focused on here because that could
24   get into trial strategy in other cases and --
25        MR. DONOVAN:  I'll rephrase it so we

Page 101

1    don't have to go there.
2         MR. VINES:  Okay.
3         THE WITNESS:  Can I take a break?
4         MR. DONOVAN:  Sure.
5         THE WITNESS:  Thanks.
6         VIDEOGRAPHER:  Going off the record
7    at 11:53 and 30 seconds a.m.
8         (Recess)
9         VIDEOGRAPHER:  We're back on the
10   record at 12:02 and 36 seconds p.m.
11        BY MR. DONOVAN:
12   Q.    When we took the break, we were talking
13   about alternative design and there was an objection
14   posed by Mr. Vines and I'm going to try to rephrase
15   that question.
16        You're familiar with alternative
17   design being part of plaintiff's proofs in a product
18   liability case?
19   A.    Some instances, yes.
20   Q.    Okay. One of the requirements in Green in
21   New Jersey was that an alternative design be advanced;
22   correct? Did you know that?
23   A.    I believe so. Yes.
24   Q.    Okay. Did you do anything specific to
25   assure that any requests pertaining to alternative

Page 102

1  designs were complied with?
2      A.    On -- are we talking about the case itself,
3  I mean, trial one and trial two or just in general?
4      Q.    At any time.
5      A.    That -- yes, that the -- there was an issue
6  on alternative design and the first trial with -- I
7  believe we looked at the T-top and the fasteners to
8  hold the T-top in place, so yes. I remember focusing
9  somewhat on the latching mechanism of the T-top.
10     Q.    Okay.
11     A.    Because I think the allegation was that the
12  T-top fell down and hit Mr. Green on the head.
13     Q.    Okay. Anything else other than looking for
14  documents pertaining to the latching mechanism, having
15  to do with the latching mechanism?
16     A.    Well, I think that was the main allegation
17  in that first case. That's the best of my recollection
18  what we looked at or what I looked at.
19     Q.    Now, right before the Green II trial in
20  January of 1996 there was a rather large production of
21  documents where you -- do you remember that?
22  Documents, crash videos, photographs.
23     A.    Oh, crash -- the crash -- yes. The crash --
24     Q.    Sled tests.
25     A.    Yes. Correct.

Page 103

1      Q.    All right.
2      A.    I do remember that.
3      Q.    Were you involved in that process?
4      A.    The response to that, yes.
5      Q.    Okay.
6      A.    As the engineer was and counsel and the
7  whole team.
8      Q.    Do you know why those doc -- all of those
9  crash tests and sled tests and all the stuff that was
10  produced then had not been produced previous to the
11  start of the second trial and, in fact, was produced
12  two days before it was scheduled to begin?
13     A.    The second trial?
14     Q.    Yes.
15     A.    No.
16          MR. VINES: I'll object to that
17  because I don't think we've established in the
18  deposition that they hadn't been produced earlier.
19          MR. DONOVAN: Well, up to that point
20  I only received 1,000 documents and then right before
21  the trial I received 5,000 documents. I don't know
22  what other assumption you can make.
23          MR. VINES: Okay. Go ahead.
24  BY MR. DONOVAN:
25     Q.    Was it your understanding that these were

Page 104

1  new documents that were being sent or new crash tests
2  or videos or photographs?
3      A.    I have no recollection.
4      Q.    Okay. Do you recall anything about how this
5  influx of 5,000 new documents became -- developed?
6      A.    What the request was?
7      Q.    Yeah. Do you know --
8      A.    No. I don't remember.
9      Q.    Okay. Do you recall --
10          If I refresh your recollection by
11  telling you that you served amended experts' reports
12  the week before trial which then refer to additional
13  testing, does that refresh your recollection?
14     A.    No.
15     Q.    Okay. Do you --
16     A.    No. All I remember was that you amended --
17  plaintiff amended their claim on -- defect claim and we
18  amended a response to that. I think there was some
19  issue that we amended our defense, and I think those
20  were the tests that were responsive to our defense of
21  the case that were being relied upon by our experts, if
22  I'm not mistaken.
23     Q.    Do you recall Judge Fuentes entering an
24  order in January of 1996 requiring General Motors to
25  produce all of the crash testing and documents which

Page 105

1  General Motors' experts had relied upon and mentioned
2  in the reports which were served right before Green II?
3      A.    Vaguely. Yeah. I don't remember the
4  specifics, particularly the timeline issue. I'm not
5  sure exactly when material was produced.
6      Q.    I'm going to represent to you -- and if I --
7  again, if I had copies of these documents, I would
8  certainly give them to you to look at, and if you need
9  them, we'll have to figure out a way to do that, but --
10          MR. VINES: If you ask him about
11  whether he knows about a document, that's one thing.
12  If you want him to respond to the content, we're going
13  to need to get out copies somehow.
14          MR. DONOVAN: Okay. Let me just do
15  it this way first and then we'll see how that works.
16  BY MR. DONOVAN:
17     Q.    Privilege document 291, which is a January
18  19th, 1996 letter from a woman by the name of Smoly.
19  Do know who that is, Martha Smoly?
20     A.    Martha Smoly, yes.
21     Q.    She was a discovery coordinator?
22     A.    Discovery coordinator of General Motors.
23     Q.    Okay. She forwards for service in Green 46
24  documents pursuant to Judge Fuentez's order. In
25  document number 292, again, Miss Smoly provides 300 --

## Page 106

1   3,016 documents represented to be the '82 through '86
2   F-car crash tests. In document 295 on January 22nd,
3   1996 she forwards an additional 143 documents. On --
4   in document 296, January 22nd, 1996, four more
5   documents consisting of crash and sled tests are
6   forwarded. In document 297 on January 23rd, 1996,
7   three different sets of documents are sent in groups of
8   five documents, 425 documents, and 368 documents. That
9   was the enumerated response right before Green II as
10  contained in the privilege hearing.
11          Do you know where any of those
12  documents came from?
13      A.   You mean where they're housed?
14      Q.   Yeah, and my next question --
15      A.   I believe the Milford Proving Ground.
16      Q.   Okay. These all came from the Milford
17  Proving Ground?
18      A.   I can't say all of them because I don't have
19  them in front of me, but from what you read, you're
20  referencing crash and sled tests, the videos, those are
21  housed at the Milford Proving Ground.
22      Q.   Okay. Do you know why those documents had
23  not been produced earlier in response to discovery
24  demands?
25      A.   I don't know if they haven't been.

## Page 107

1           MR. VINES:  Can we go off the record
2   for one second?
3           MR. DONOVAN:  Sure.
4           VIDEOGRAPHER:  Going off the record
5   at 12:11 and 1 seconds p.m.
6           (An off-the-record
7           discussion was held)
8           VIDEOGRAPHER:  We're back on the
9   record at 12:13 and 40 seconds p.m.
10      BY MR. DONOVAN:
11      Q.   Mr. Vines has been nice enough to hand you
12  actual hardcopies of the documents, so I don't have to
13  rely upon my computer to generate a document.
14          Does that give you a general
15  familiarity with what was produced back in January of
16  1996?
17      A.   Yes. Thank you.
18      Q.   Okay. Were you involved in the process of
19  culling those documents from whatever source or asking
20  someone else to produce them?
21      A.   Yes.
22      Q.   Okay. Do you know --
23      A.   Well, let me answer -- you've asked two
24  questions.
25          I was -- I was involved in having --

## Page 108

1   and how did you put it -- requesting the documents, not
2   actually culling them out of a repository. So my
3   involvement was putting it in motion to request these
4   documents.
5       Q.   And of whom did you make that request?
6       A.   I believe it was Martha Smoly.
7       Q.   Okay. And --
8       A.   After discussion with outside counsel, trial
9   counsel involved in the case and Mr. -- both Mr. Tansey
10  and Mr. Langan, we made the request.
11      Q.   Okay. And what was it that you were looking
12  for or what was it you were responding to?
13      A.   I believe it was the Court telling us to
14  produce some documents that our engineers mentioned or
15  relied on in their expert reports, I believe. I don't
16  think there -- expert reports, I think.
17      Q.   Okay. And based upon that you directed
18  Martha to go look in certain areas for other documents
19  or was it just a general request to look anywhere?
20      A.   No, no. General -- it was a request to send
21  a request to the area where these documents are housed.
22      Q.   And I know we're using documents, but this
23  also --
24      A.   Tests.
25      Q.   The production also consisted of videos?

## Page 109

1       A.   Right.
2       Q.   And consisted of photographs and documents,
3   you know, summarizing the results of the tests.
4       A.   Right.
5       Q.   So -- but we're just going to use that
6   documents --
7       A.   Yeah.
8       Q.   -- so --
9       A.   Okay.
10      Q.   -- we don't have to talk about all of those.
11      A.   Where they're housed.
12      Q.   Okay. Was it your direction as to where
13  these searches should take place?
14      A.   Where?
15      Q.   What location these documents were housed
16  at.
17      A.   It was understood.
18      Q.   Okay.
19      A.   It was my recollection that she sent the
20  request out to where these documents are maintained.
21      Q.   Okay. So you said to Martha, I need crash
22  tests, I need sled tests, I need whatever other kind of
23  tests, I need whatever documents the experts were
24  provided with, and she would have disseminated requests
25  to wherever they had to go in order to comply with

Page 110

1  that.
      A.   That's true.
3     Q.   Do you know why these documents, and, again,
4  documents meaning videos and pictures, had not been
5  provided previously in response to GM discovery
6  demands?
7     A.   I don't know if they weren't provided
8  previously, but assuming they weren't, based on your
9  question, other than the fact that --
10          No, I have no idea.
11    Q.   Why would you provide them again if they had
12 already been provided?
13    A.   I think we had an order where the judge
14 ordered us to provide them a second time, specifically
15 called for these documents, so we produced them.  Just
16 an abundance of caution, I guess.  My recollection is
17 just we produced what we were asked to produce.
18    Q.   I'm looking at privilege document 288, which
19 starts with a fax transmittal sheet to you and Martha
20 Smoly from Andy Langan and Tom Tansey and it says,
21 Attached is a copy of the order with respect to
22 discovery, and the order which is annexed to that is
23 the order of Judge Fuentes filed on -- I can't read the
24 date, but entered on January 18th, 1996.
25          Is that the order that you were

Page 111

1  responding to when you produced the additional
2  documents in January or February of 1996?
3     A.   Give me a second here.
4           This is dated January 18th, 1996.
5  It's -- it's an answer --
6           I believe you asked an earlier
7  question as to why we produced them when we produced
8  them as far as timing.  In compliance with this order I
9  believe they were produced, and it was -- there was an
10 issue here about continuance of trial.  The trial was
11 to start on January 22 and we had what, four days to
12 produce these documents, so we produced them asap, I
13 believe, if I remember correctly, as soon as possible,
14 humanly possible.  And I guess my answer to your last
15 question is that these were relied on by our experts,
16 Don Huelke, Joe Rice, and Ken Orlowski, and they're
17 supplemental expert reports.
18    Q.   Served on plaintiff on January 18th, 1996,
19 four days before trial.  That's what the order says.
20 I'm reading from the order.  It says, Defendant -- and
21 this is in paragraph C -- Defendant General Motors is
22 to produce forthwith any and all documents, videos,
23 photographs or other information which may be relied
24 upon, reviewed or specifically or inferentially made
25 reference to in the supplemental expert reports of

Page 112

1  Donald F. Huelke, Joseph S. Rice, and Kenneth F.
2  Orlowski served on plaintiff on January 18th, 1996.
3     A.   That's what it says.
4     Q.   Okay.  So four days before trial General
5  Motors serves supplemental reports and that's -- the
6  order of the Court required General Motors to produce
7  the documents that they relied upon, and those
8  documents consisted of crash tests, sled tests, and
9  other documents.  Correct so far?
10    A.   Correct.
11    Q.   Okay.  And my question to you was --
12          And the Court denied adjournment of
13 the trial date, which was set for January 22nd, 1996.
14    A.   Okay.
15    Q.   And I will represent to you since I was the
16 one who received them that those documents were
17 received at 3 o'clock on Saturday, which would have
18 been the 20th, in my office they started to be
19 delivered.
20    A.   In compliance with the order.
21    Q.   Yes.
22    A.   As soon as possible.
23    Q.   Right.
24    A.   So we did a magnificent job of providing you
25 the documents as soon as possible.

Page 113

1     Q.   Okay.  Can you tell me something about what
2  the process was of finding those documents?
3     A.   Initiating the search through a letter, I
4  believe, requesting the documents be produced, and then
5  since you got them on a Saturday, we must have worked
6  -- if you got them at 3 o'clock on Saturday, I don't
7  know when they were found, they must have been shipped
8  out as soon as we found them --
9     Q.   Okay.
10    A.   -- by Fed Ex or whatever.
11    Q.   Well, these were documents that your experts
12 had reviewed already in order to author these
13 supplemental reports; correct?
14    A.   It seems that way based on this order.
15    Q.   So, obviously, at some point in time these
16 documents, these videos, these crash tests, these sled
17 tests were pulled from the file and given or shown to
18 your experts in order for them to come to some
19 conclusions as expressed in these supplemental reports;
20 correct?
21    A.   Not necessarily.
22    Q.   Well, the order asks for anything relied
23 upon in the supplemental reports.
24    A.   Right.  I don't know if they pulled them
25 from where they were stored or they went to where they

Page 114

1  were stored -- or where they were stored and reviewed
2  them, I mean, that whole sequence there.
3      Q.  Okay.  Okay.  I mean, that's it.
4      A.  But, I mean, you raise that as far as your
5  question.
6           The fact that they reviewed them is
7  obvious based on the order if the order speaks for
8  itself.
9      Q.  So they had to either review them in the
10 file or they had to take them out of the file; correct?
11     A.  No.  They weren't --
12          They reviewed them at -- where they
13 were housed.  It was at the proving grounds.  So they
14 would have had to have gone there, and then we would
15 have had to retrieve them and then Bates stamp them and
16 identify them and then make copies of them and send
17 them out to you.  So it's not a, you know -- a slow
18 process.  So, therefore, you ask -- or my statement
19 earlier is that it sounded like there was a lot of real
20 effort to get these turned around in just a day or so
21 and a half.
22     Q.  And, again, my question is, why weren't they
23 produced earlier?  If they were crash tests of the
24 F-car which had been requested in discovery, why
25 weren't they produced when discovery was --

Page 115

1      A.  Well, I don't know if they were --
2      Q.  Excuse me.  Let me finish my question,
3  please.
4      A.  Okay.  Sorry.
5      Q.  Why weren't they produced in 1991?
6      A.  Don't know if they were asked for in 1991.
7      Q.  Okay.  Did you review any of the documents
8  or discovery requests to see whether these were asked
9  for previously?
10     A.  I don't have any independent recollection of
11 what was asked for.
12          Did I review -- did I review the
13 documents that were asked for in 1991, did I review the
14 discovery requests?  The answer was yes.  When I
15 reviewed them, it was years prior to what you're
16 talking about.
17     Q.  Is it your position that these newly found
18 documents were not responsive to the discovery
19 requests?
20     A.  No, I'm not saying --
21          MR. VINES:  I'm going to object to
22 the characterization as newly found.  We haven't
23 established that they were newly found.
24          MR. DONOVAN:  Newly served.
25 BY MR. DONOVAN:

Page 116

1      Q.  These newly served discovery documents in
2  January of 1996, is it your position that they weren't
3  produced previously because they weren't responsive to
4  discovery demands?
5      A.  I have two positions, two points.
6      Q.  Okay.
7      A.  First of all, I don't know if we didn't
8  produce them the first time and, second of all, I don't
9  remember if they were asked for in 1989, 1990 in your
10 discovery request.
11     Q.  So you don't know why they weren't produced
12 previously.  I mean, sitting here today you can't tell
13 me why they weren't produced previously?
14          MR. VINES:  Well, I'll object to
15 that again.  I don't know that it's been established
16 here or in the witness's testimony that they hadn't
17 been produced before.
18 BY MR. DONOVAN:
19     Q.  Privilege document 279 --
20          MR. VINES:  It's a thick one.
21 BY MR. DONOVAN:
22     Q.  -- is a letter to you and several other
23 people from Andy Langan, among other documents, there
24 were actually several documents in there, but it
25 encloses an inventory sheet of everything that was

Page 117

1  provided by way of Green discovery up through the
2  documents served in January of 1990 -- I'm sorry, 1996,
3  and if you look at page 2 of Mr. Langan's letter, it
4  says, General Motors has produced almost 2500 pages of
5  documents to plaintiff in this case.
6           Do you see that?
7      A.  Oh, okay.
8      Q.  Okay?  So if you produced 5,000 documents in
9  January of 1996 and had only produced 2500 documents
10 prior to that, some of the 5,000 documents have got to
11 be new.  Does my logic hold through?
12     A.  Makes sense.
13     Q.  Okay.  So, I mean, even assuming 2500
14 documents were duplicative, 2500 documents had to be
15 new, correct, by process of elimination?
16          MR. VINES:  Let me --
17          THE WITNESS:  True.
18          MR. VINES:  -- get an objection on
19 the record and I'll let you proceed with the line of
20 questioning.
21           There's a bit of a characterization
22 afoot here that the later supplemented discovery was
23 wrong or wrongful in some way, and I don't think
24 there's anything in the record indicating that Judge
25 Fuentes held that that supplemented discovery was



Page 118

1  wrongful. I'm not sure there's any evidence any
2  motions were made to characterize them as wrongful. So
3  I just want to make an objection for the record that to
4  the extent that evidence is being put on here about
5  that supplemented discovery, we're not conceding or
6  stipulating, the witness isn't, that that discovery was
7  anything other than justifiable supplemented discovery.
8          MR. DONOVAN: Noted.
9  BY MR. DONOVAN:
10     Q.   Okay. So we've established that at least
11  some of the materials which were supplemented in
12  January of 1996 had to be new materials not previously
13  served; correct?
14     A.   Correct.
15     Q.   Okay. So do you know where the rest of
16  these documents came from? And, again, I should have
17  called them materials. So we're talking about videos
18  and all.
19     A.   I'm kind of working in a vacuum.
20          The rest of the materials, we're
21  talking about the crash tests, the sled tests,
22  documents that are above and beyond roof structure
23  tests, they probably came from Milford Proving Ground
24  where those tests were housed, or at that time I
25  believe they were housed at the Milford Proving Ground.

Page 119

1      Q.   Okay. So -- I'm sorry.
2      A.   No. Go ahead.
3      Q.   I didn't mean to interrupt you.
4      A.   Go ahead. No. I'm sorry.
5      Q.   And, again, now that we've established that
6  at least some of these materials were new, do you know
7  why they weren't produced previously? Do you have a
8  position on that?
9      A.   Well, I can tell you, looking at this
10  exhibit -- or this letter and inventory, that
11  apparently the, if I'm reading this correctly, in Green
12  I or the first trial which dealt with the -- some of
13  the roof issues, we produced 216 compliance tests. So
14  there may have been a little overlap or redundancy
15  because I saw in the list that Martha Smoly had put
16  together that she also produced, again, the 216
17  compliance package.
18          So I guess your question is why
19  weren't sled tests and frontal barrier tests produced
20  earlier, and I will -- I will -- I don't have an
21  official position on it, but I can only speculate that
22  -- that the documents were not called for because in
23  Green I the allegation was roof design -- roof --
24  excuse me, was fastener design and Green II the actual
25  allegation changed to, I believe, the defective

Page 120

1  B-pillar and sail panel, which was totally a different
2  allegation from allegation in the first case and,
3  therefore, material was supplemented in Green II to
4  meet and defend General Motors regarding the second
5  allegation.
6      Q.   So is it your position that General Motors'
7  obligation to respond to discovery requests is somehow
8  linked to what plaintiff's expert claims by way of
9  alternative design?
10     A.   Well, there was no discovery in Green II.
11  There was -- as I remember, the Court ordered that
12  there would be no further discovery. The only order
13  that I remember was this order to produce to you prior
14  to trial or as soon as possible the new material relied
15  upon by our experts to defend against your new design
16  allegation that your expert raised.
17     Q.   And you believe that was the only purpose of
18  these new documents.
19     A.   Well, it kind of says that in the court
20  order, if I read it correctly, that the new documents
21  were the -- and, again, I'm paraphrasing. I don't have
22  the order in front of me. If someone has the order, I
23  would -- but it, I think, clearly says right in there
24  what the -- what Judge Fuentes had ordered us and why
25  he ordered us to produce this material because, as you

Page 121

1  pointed out in paragraph C, videos, photographs and
2  other information relied upon in the supplemental
3  expert reports filed by Don Huelke, Joe Rice, and Ken
4  Orlowski.
5          MR. DONOVAN: All right. We're down
6  to the last few minutes on the videotape, so why don't
7  we take a break. And want to grab some lunch?
8          THE WITNESS: You want to take -- or
9  just keep going?
10         MR. VINES: Well, he needs to change
11  the tape no matter what we do.
12         THE WITNESS: Okay.
13         MR. DONOVAN: I think they might
14  want some sustenance.
15         VIDEOGRAPHER: Going off the record
16  at 12:37 and 32 seconds p.m.
17         (Lunch recess)
18         VIDEOGRAPHER: We're back on the
19  record at 1:27 and 20 seconds p.m.
20  BY MR. DONOVAN:
21     Q.   I think when we stopped we were talking
22  about the January 1996 production of documents by
23  General Motors in the Green case.
24          I had an opportunity over the break
25  to do some evaluation, and I will represent to you

32 (Pages 122 to 125)

Page 122

1  that -- and see if this helps refresh your
2  recollection, that prior to January of 1996 General
3  Motors had produced 2400 documents, two videos, and
4  less than 100 photographs as part of their total
5  discovery produced up to that point in time. On
6  January 20th, 1996 General Motors delivered 4,559 new
7  pages of testing documents, 1,237 photographs of
8  testing, 117 sled tests and 49 crash tests and 11
9  videotapes. Okay. So there was, obviously, a
10  substantial increase in the amount of discovery as of
11  January 20th, 1996.
12       Do you have any recollection as to
13  why there was so much produced right before the second
14  Green trial which was scheduled to begin on January
15  22nd, 1996?
16    A.   You've asked two questions there.
17    Q.   Okay.
18    A.   Why it was produced when it was pursuant to
19  the court order. Why there were more documents
20  produced prior to the Green II trial than Green I
21  trial, or that allegedly weren't produced in the Green
22  I trial is because, from my recollection, your
23  allegation changed.
24    Q.   Okay. So --
25    A.   And that was met by a response by General

Page 123

1  Motors to meet your change in allegation with facts
2  that would support our defense, our position.
3    Q.   Okay. So, for instance, if there's a
4  discovery request which asks for all crash tests and
5  only two were provided prior to that and 49 were
6  provided, it's your position that there was no
7  obligation to provide the other 46 crash tests
8  previously because it wasn't plaintiff's contention at
9  that point in time?
10       MR. VINES: Can you -- sorry to
11  interrupt.
12       THE WITNESS: Yeah.
13       MR. VINES: Can you say in the
14  record where that comes from?
15       MR. DONOVAN: Where what comes from?
16       MR. VINES: The numbers that you're
17  reciting about the numbers of the crash tests.
18       MR. DONOVAN: I could, but it would
19  take us several hours to do that.
20       MR. VINES: I'll object to the --
21       MR. DONOVAN: Okay.
22       MR. VINES: -- form of the question
23  and lack of foundation.
24       MR. DONOVAN: You can research it
25  and it will bear out, I guarantee you.

Page 124

1       BY MR. DONOVAN:
2    Q.   Are you saying that there was no obligation
3  on the part of General Motors to produce any of that
4  material delivered on January 20th, 1996 before the
5  supplementation of the expert reports because it was
6  not responsive to discovery previously served?
7    A.   I don't know why it wasn't produced prior.
8  As we've talked about all morning, when I inherited the
9  file, I was told discovery was complete. As far as I
10  understood, discovery was complete. I was more
11  involved in the second trial when we were ordered to
12  supplement our discovery because of what was raised by
13  our experts. We did that.
14       Was that material that was produced
15  prior to Green trial II produced in Green trial I? I
16  pointed out before the break it looked like -- if
17  you're talking about 216 compliance tests, it looked
18  like those were produced for Green I and also
19  apparently we reproduced them for Green II, although I
20  don't have copies. I haven't seen the videos and, well,
21  19 years or 14 years, so I really can't respond to more
22  than that.
23    Q.   Okay. Even with that massive discovery
24  production in January of 2006, the documents which
25  we've referred to as the A through H documents were not

Page 125

1  contained in that material. Do you agree with that?
2    A.   It's my understanding that's correct. Yes.
3    Q.   Okay. Do you know where the A through H
4  documents were all that time?
5    A.   I think they're in microfiche.
6    Q.   Okay. Were they --
7    A.   At General Motors.
8    Q.   Okay. Were they part of any particular file
9  or files?
10    A.   The F-car -- F-car Project Center files.
11    Q.   Okay. So it's your understanding that all
12  the documents, A through H, were in the F-car Project
13  Center file; correct?
14    A.   It's my understanding. Correct.
15    Q.   Okay. And it was also your understanding
16  that a search had been made of the entire F-car Project
17  Center file in order to produce documents responsive to
18  the discovery and Judge Ferentz's order; correct?
19    A.   That's my understanding now presently.
20    Q.   Do you know why those documents were not
21  flushed out as part of the discovery produced in
22  compliance with the order in the discovery demanded?
23    A.   I have no idea.
24    Q.   Okay. Did you ever make any type of an
25  inquiry as to why they weren't produced?

Page 126

1    A.    For Green I or Green II trial?
2    Q.    Yes.
3    A.    Yes, Green I trial or Green II trial?
4    Q.    Either or.
5    A.    Oh, okay.
6          Didn't know about them at the Green
7    I trial. Didn't know about them at the Green II trial
8    until after the trial was over.
9    Q.    Okay.
10   A.    I asked -- discussed that with Mr. Langan,
11   asked him what -- did he know why these documents were
12   not produced or found or located, and he said that he
13   did not know.
14   Q.    Okay. Did you ask Mr. Rice if he knew of
15   the existence of these documents? Or Dr. Rice.
16   A.    When I first found out about the documents A
17   through H?
18   Q.    At any time. Obviously after you found out
19   about them, but at any time. You know.
20   A.    Yeah. Right. That's -- you got me on that
21   one. A through H.
22   Q.    Would you like to see them? I have them.
23   A.    No. I'm familiar with those.
24   Q.    Okay.
25   A.    Did I ask Dr. Rice why we didn't produce

Page 127

1    them?
2    Q.    Yes.
3    A.    I don't believe I had a conversation with
4    Dr. Rice about that issue.
5    Q.    Okay. Did you have a conversation with any
6    of the discovery coordination people who had been
7    instructed to search through the F-car Project Center
8    file to make a selection of documents as to why these
9    documents were not in the documents selected?
10   A.    No.
11   Q.    Okay. Did you have any conversations with
12   any other engineer as to why these documents were not
13   provided?
14   A.    No.
15   Q.    Didn't you think it would be important for
16   your future quality assurance that you find out why
17   such important documents in a case were not produced?
18   A.    No.
19   Q.    You didn't think that was important.
20   A.    No, because when we found out about the
21   documents, the process of locating F-car documents
22   changed. The process of relying on our trusted outside
23   counsel, Rumberger & Kirk, had been changed. The
24   process now was to search the microfiche on our own and
25   also to invite outside counsel in to take a look at the

Page 128

1    microfiche --
2    Q.    Okay.
3    A.    -- to see if it complied with the discovery
4    that they were requesting.
5    Q.    Was there any kind of investigation
6    internally so as to try to figure out who had missed
7    the culling of these documents during whatever search
8    processes they were engaged in?
9    A.    No. No. It was obvious that the documents
10   were located, they were in the microfiche, and pointing
11   blame at someone was little of no value at that time.
12   Q.    It wasn't of value in order to assure that
13   it didn't happen again?
14   A.    We knew where the documents were. We had
15   located the documents and we had produced the documents
16   subsequently to that -- to their finding, therefore all
17   of that other material would be moot as to pointing
18   fingers at people.
19   Q.    Did you come to any conclusion in your own
20   mind as to who had dropped the ball with respect to
21   culling these documents for production?
22         MR. VINES: Object to the form of
23   the question.
24         THE WITNESS: You're talking about
25   human error?

Page 129

1    BY MR. DONOVAN:
2    Q.    No. I'm talking about --
3    A.    Or who made the human error --
4    Q.    Talking about responsibility.
5    A.    -- in missing the documents?
6    Q.    Talking about responsibility.
7    A.    The human error issue was one that we had
8    looked at now recently because of this litigation, and
9    it appears, at least to my knowledge, it's not
10   satisfactory. I don't have a conclusion as to who made
11   the human error not to produce these documents.
12   Q.    Okay. If it was human error.
13   A.    It was human error.
14   Q.    How do you know that?
15   A.    Because we produced documents all the time
16   and, obviously, someone missed these documents.
17   Q.    Either purposely or not intentionally.
18   A.    No. I disagree.
19   Q.    Okay.
20   A.    It was unintentional.
21   Q.    How do you know that someone didn't know
22   about the existence of these documents and just decided
23   not to produce them?
24   A.    At the Green case?
25   Q.    Yes.

34 (Pages 130 to 133)

Page 130

1        Tell me every fact you rely upon to
2   come to the conclusion that these documents were not
3   intentionally not provided.
4        A.   The documents were searched. The microfiche
5   was searched. The documents were collected and given
6   to the Rumberger firm who was then responsible for
7   reviewing the material. It is our understanding that a
8   fact that we knew was that the Rumberger firm was a
9   reliable firm, that they were responsible, they had
10  provided numerous documents in numerous cases, defended
11  GM very well and that it would have been nothing
12  intentional for them to miss these documents. Also
13  there was a question of whether the documents were even
14  relevant in the first Green I, but beside that point,
15  it was an issue where it had to be human error because
16  there was no indication on my watch that these
17  documents were told -- or someone was told not to
18  produce these documents.
19       Q.   Okay. That you're aware of.
20       A.   Absolutely.
21       Q.   But you weren't even involved in this case
22  before November of 1990; correct?
23       A.   Right, but I was involved with Green I trial
24  and Green II trial.
25       Q.   You -- I think we went over this, but you

Page 131

1   don't even know what documents Rumberger Kirk were
2   provided with from which the document -- the 64
3   documents they returned came from.
4        A.   We found out that they were and you pointed
5   out they were provided 10,000 documents, micro -- the
6   blow back of the microfiche in the F-car project.
7        Q.   Was that the entire F-car Project Center
8   file?
9        A.   It's my understanding that it was not.
10       Q.   It was not.
11            So somebody reduced the entire F-car
12  Project Center file into 10,000 documents which were
13  sent to Rumberger Kirk; correct?
14       A.   That is correct.
15       Q.   Okay. Who did that?
16       A.   It is my --
17            MR. VINES:  If you know.
18            THE WITNESS:  No. I don't know.
19            I do know that they received the
20  documents, they were, as you pointed out earlier --
21  and, again, I'm going to speculate a little bit, but
22  they were probably produced to them by the UPC code.
23  BY MR. DONOVAN:
24       Q.   Well, I don't want you to speculate.
25       A.   Okay.

Page 132

1        Q.   Don't speculate for me.
2             So you don't know who reduced the
3   total universe of F-car Project Center files down to
4   the 10,000 or so documents which Rumberger Kirk then
5   reviewed; correct?
6        A.   I don't know a person by name.
7        Q.   Okay.
8        A.   It must have been a GM person because we had
9   access to the documents.
10       Q.   Do you know what criteria was used to reduce
11  the whole universe of documents in the F-car Project
12  Center file down to the 10,000 documents that Rumberger
13  Kirk reviewed?
14       A.   I don't understand your question. The whole
15  universe of F-car documents.
16       Q.   Yes.
17       A.   To the 10,000 -- the subpart of the --
18       Q.   Right.
19       A.   -- F-car.
20       Q.   What was the criteria used for --
21       A.   I don't know. I wasn't involved in that
22  process --
23       Q.   Okay.
24       A.   -- in that decision.
25       Q.   Now, one of the privilege documents, and I

Page 133

1   don't remember -- it's one of the really big ones,
2   purports to contain the documents sent to Rumberger
3   Kirk. It's 352. 351. No. I'm sorry. It's 352. 352
4   is all of the documents which purportedly were sent to
5   Rumberger Kirk for review.
6             Did you review those documents to
7   see whether the A through H documents were in there?
8             MR. VINES:  At what point in time,
9   Maurice?
10            MR. DONOVAN:  Any point in time.
11            THE WITNESS:  I'm sorry?
12  BY MR. DONOVAN:
13       Q.   Any point in time. Obviously after he found
14  out that there were A through H documents.
15       A.   Did I contact Rumberger & Kirk? I don't --
16       Q.   No, no, no. For the purpose of even this
17  litigation now did you ever go through those documents
18  to assure yourself that the A through H documents had
19  been provided to Rumberger so that they could pick them
20  for the Green case?
21       A.   I did not, but I asked Andy Langan at
22  Kirkland & Ellis if he had done that and he said yes.
23       Q.   Okay. Where did those documents which
24  purportedly were sent to Rumberger Kirk for their
25  review, where did you find those documents for the

Page 134

1   production in this case, if you know? It may not have
2   been you.
3       A.   The microfiche?
4       Q.   Well, there's a bunch of documents which
5   we're being told were -- are copies of --
6       A.   Yeah.
7       Q.   -- the documents which were sent to
8   Rumberger Kirk totaling some 10,000 documents in
9   number.
10      A.   Right.
11      Q.   Where did GM find those documents in order
12  to be able to say that? How do we know that those were
13  the documents sent to Rumberger Kirk? Did somebody
14  save them? Were they in a box? Were they -- was there
15  --
16      A.   No. The documents were on microfiche and
17  they were blown back to hardcopy, and either that
18  original, and I assume it wasn't -- someone made a copy
19  of the blown back documents and sent them off to
20  Rumberger & Kirk.
21      Q.   No. I'm talking about how do we know the
22  documents we have now are the same documents Rumberger
23  Kirk had back then?
24          MR. VINES: I think he's testified
25  he doesn't have personal knowledge of that.

Page 135

1           MR. DONOVAN: I don't think he said
2   that. I mean, if he says that, I'm happy to move on.
3           THE WITNESS: Are we --
4           Which documents are we talking
5   about, the A through H or the 10,000?
6           BY MR. DONOVAN:
7       Q.   No, no, no. The 10,000 documents.
8       A.   Right.
9       Q.   As part of the privilege hearing 352 are the
10  documents which GM says were the same documents which
11  were sent to Rumberger Kirk or copies of the same
12  documents or blow offs or blow ons or whatever they are
13  from microfiche.
14      A.   Blow back.
15      Q.   Blow backs.
16          Do you have any knowledge as to how
17  that was determined that these documents, privilege
18  document 352, were the same documents that Rumberger
19  Kirk was provided with way back when?
20      A.   I'm totally missing your question and I
21  apologize.
22      Q.   Okay.
23          MR. VINES: Yeah. Maurice, it may
24  help to clean up the record a little bit.
25          The 10,000 documents you're

Page 136

1   referring to are contained in tab number 352 of the
2   show cause hearing, and that particular tab would have
3   approximately 10,000 documents in it, and they were
4   introduced then in the show cause hearing --
5           MR. DONOVAN: Right.
6           MR. VINES: -- as the documents that
7   were sent to Rumberger Kirk.
8           MR. DONOVAN: Right.
9           BY MR. DONOVAN:
10      Q.   And I'm trying to get from you whether you
11  have any idea how those documents produced for the
12  privilege hearing were identified as the same documents
13  that were produced way back when for Rumberger Kirk.
14          MR. VINES: If you know.
15          THE WITNESS: I don't -- I don't
16  know.
17          BY MR. DONOVAN:
18      Q.   Okay.
19      A.   I don't know.
20      Q.   Okay. So if I gave you all of the documents
21  contained in 352 and asked you if you can identify
22  these documents as the same documents which were sent
23  to Rumberger Kirk, you couldn't do that.
24      A.   Well, wouldn't I take the documents that you
25  gave me and look at 352 as an index of those

Page 137

1   documents --
2       Q.   No, no, no. I think we're on a different
3   track.
4       A.   -- and just marry up the two and say, okay,
5   this is document 1 and this is document 3 -- you know
6   what I mean? Just match what's on the list of the
7   index.
8           MR. VINES: I think, to clarify,
9   he's saying if he gave you tab 352, which is the
10  10,000, and gave that to you.
11          THE WITNESS: Oh, the tab.
12          MR. VINES: Is that correct,
13  Maurice?
14          MR. DONOVAN: Right.
15          BY MR. DONOVAN:
16      Q.   If I gave you --
17      A.   So we're not talking about this.
18      Q.   No, no, no.
19      A.   Okay.
20      Q.   We're talking about the 10,000 documents --
21      A.   Okay. Okay. I'm sorry.
22      Q.   -- which are contained in tab 352. If I put
23  them -- if I had brought them with me and I put them on
24  the table in front of you and said can you authenticate
25  and identify these documents as the identical documents

Page 138

1  which were produced for Rumberger Kirk's review back in
2  1990, could you do that?
3      A.  I don't think – no. I don't think I could.
4      Q.  Okay. Because you don't know what documents
5  specifically Rumberger Kirk got.
6      A.  Correct.
7      Q.  Okay.
8      A.  Without an index, and I don't have access to
9  that. You may have, but I don't.
10     Q.  Is there some other way to verify that those
11 documents are the same documents?
12     A.  That Rumberger -- that we sent to Rumberger?
13     Q.  Yes.
14     A.  I can't think of one right now.
15     Q.  Do you know whether these 10,000
16 documents were contained somewhere in the, quote, Green
17 file?
18     A.  I thought they were at the coordinator's
19 file, the coordinator who sent them out to Rumberger &
20 Kirk. I thought that person kept a file of -- or a
21 copy of the documents.
22     Q.  Okay. Would you agree with me, though, even
23 though there may have been a copy here of what was
24 supposed to be in the Rumberger file, we have no idea
25 whether Rumberger actually got all of those numbers --

Page 139

1  all of those documents in the file which they got?
2      A.  I can't answer that question.
3      Q.  Okay. Well, is it possible that some of the
4  documents which were in the discovery coordinator's
5  file which were intended to be sent to Rumberger Kirk
6  were not in the collection of documents which Rumberger
7  Kirk actually got?
8          MR. VINES: I'm sorry. I had
9  trouble following that. I don't know if the witness
10 did or not. Could you try it again?
11         MR. DONOVAN: Okay.
12     BY MR. DONOVAN:
13     Q.  What I'm trying to do very simply, or maybe
14 not so simply, is figure out where the possible --
15 possible loss -- I mean, that's not really a good
16 word -- where it's possible these documents went
17 astray. Okay? So we start with the F --
18         If these documents were all in the
19 F-car Project Center file, A through H, initially --
20     A.  A through H. Right.
21     Q.  Okay. Someone reduced the F-car Project
22 Center file down to 10,000 documents. We know that.
23     A.  Right.
24     Q.  And those were the documents sent to
25 Rumberger Kirk.

Page 140

1          So it's possible that at that point
2  these documents were not among the 10,000.
3          MR. VINES: Could you --
4      MR. DONOVAN:
5      Q.  True?
6          MR. VINES: -- define "these"?
7          MR. DONOVAN: The A through H
8  documents.
9          MR. VINES: Okay.
10         THE WITNESS: No, I thought they
11 were a part of the 10,000.
12     BY MR. DONOVAN:
13     Q.  What I'm trying to get is how do we know
14 that? Because we don't have -- we don't have --
15     A.  I don't know.
16     Q.  -- Rumberger's original 10,000 documents, do
17 we?
18     A.  I don't know.
19     Q.  Okay. So even if we assume that those
20 documents were within the 10,000 which were culled from
21 the F-car Project Center file, they would have gone to
22 the discovery coordinator next; true?
23     A.  Yes.
24     Q.  And the discovery coordinator would have
25 made a copy of those documents for her file and would

Page 141

1  have sent a copy of those documents to Rumberger.
2      A.  I believe so.
3      Q.  Okay.
4      A.  Correct.
5      Q.  But we don't know whether the Rumberger
6  10,000 documents was identical to the discovery
7  coordinator's 10,000 documents unless we sat and went
8  page by page; correct?
9      A.  But it's unlikely that they were not.
10     Q.  It's unlikely, but possible.
11     A.  Unlikely.
12     Q.  Okay. And when they got to Rumberger where
13 they were reviewed by Eileen Rooney, we don't know
14 whether the A through H documents were in the documents
15 that Eileen Rooney reviewed; correct?
16     A.  As I sit here right now, I have to say
17 correct.
18     Q.  Okay. But what we do know is that these
19 documents were not sent back from Rumberger's office to
20 General Motors or Kirkland & Ellis, the A through H
21 documents.
22     A.  I have no idea.
23     Q.  You don't know that?
24     A.  No. I know that they were not --
25         No, I do not know what Rumberger did

## Page 142

1    with those 10,000 documents.
2        Q.    Okay.  So you don't know whether the
3    documents pulled by Eileen Rooney at the Rumberger
4    office were the identical documents which Rudock sent
5    to Kirkland & Ellis to Ron Betman.
6        A.    I don't know.
7        Q.    You don't know one way or the other.
8        A.    Right.
9        Q.    Okay.  And we do know because we presumably
10    have the documents that Rudock sent to Betman at
11    Kirkland & Ellis that none of the A through H documents
12    were contained there.  Is that your understanding?
13        A.    That is my understanding.
14        Q.    Okay.  Now, document Addendum A was not even
15    among the documents sent to Rumberger Kirk for review.
16    Is that your understanding?
17        A.    I don't know how you know --
18            MR. CARROLL:  Asked and answered.
19            THE WITNESS:  I don't know.
20            MR. DONOVAN:  Not of this witness.
21            MR. CARROLL:  I think you asked
22    that.
23            MR. DONOVAN:  No.  He may have
24    answered it, but I didn't ask it.  I asked it
25    yesterday.

## Page 143

1        BY MR. DONOVAN:
2        Q.    Do you know whether all of the documents
3    contained in A through H were sent to -- were -- strike
4    that.
5            Do you know whether all the A
6    through H documents were among the documents sent to
7    Rumberger Kirk?
8        A.    I don't know.
9        Q.    Okay.  It has been indicated in General
10    Motors' answers to interrogatory that Addendum A, the
11    first document, was not in the documents sent to
12    Rumberger Kirk.  Are you familiar with that?
13        A.    No.
14        Q.    Okay.  It is also contended by General
15    Motors that only one page of document Addendum B was
16    part of the documents sent to Rumberger Kirk.  Do you
17    have any knowledge of that?
18        A.    No.
19        Q.    And that documents C through H in their
20    entirety are among the documents sent to Rumberger
21    Kirk.  Do you have any knowledge of that?
22        A.    And how do we know that?
23        Q.    This is by way of an answer to
24    interrogatory.
25        A.    Okay.  Filed by General Motors.

## Page 144

1        Q.    In this case.
2        A.    Okay.
3        Q.    It's -- it's actually an amended response to
4    interrogatory number 2, which reads as follows:  One
5    page of document B and document D through H were part
6    of a larger group of F-car Project Center and Fisher
7    Body documents that General Motors sent to the law firm
8    of Rumberger, Kirk & Caldwell for review in October of
9    1990.  Okay?
10            So document A wasn't sent, every --
11    only one page of B, C wasn't sent, and D through H
12    were.
13            MR. VINES:  I'm going to get an
14    objection on the record.  He's not a 30(b)(6) witness,
15    so he's just answering from his own personal knowledge
16    on this.  He doesn't have a responsibility to vouch for
17    everything in that file.
18            MR. DONOVAN:  Okay.  I'm just asking
19    if he has any personal knowledge of the information I
20    just relayed to you.
21            THE WITNESS:  No.
22            BY MR. DONOVAN:
23        Q.    Okay.  So if I was to ask you why -- if
24    these documents were all contained in the F-car Project
25    Center file, why certain documents were picked and why

## Page 145

1    certain documents weren't picked to send to Rumberger
2    Kirk, you wouldn't have the answer for me.
3        A.    That's correct.
4        Q.    Prior to the motion to supplement the record
5    in Green -- do you know what I'm talking about?
6        A.    Yes.
7        Q.    And that was in the appellate division --
8        A.    Correct.
9        Q.    -- in the A through H documents?
10        A.    Right.  Just before -- we filed it just
11    before -- a day or two before oral argument.
12        Q.    Well, I don't know about that, but it was
13    before oral argument in the appellate division.
14        A.    Yeah.  I think it was a day or two.
15        Q.    Okay.  Is that the first time you learned
16    that there was an allegation that certain documents had
17    not been provided as part of General Motors' response
18    to discovery demands in the order of Judge Ferentz?
19        A.    No.
20        Q.    Okay.  When was the first time you learned
21    that there was an allegation that certain documents had
22    not been provided?
23        A.    Best of my recollection, the first time was
24    when our negotiator came back from trying to resolve
25    this case with your firm and was told that your firm

38  (Pages 146 to 149)

Page 146

1  had some documents that we didn't produce during the
2  second trial and that if we didn't settle up with you
3  and pay a premium, that you were going to file a
4  lawsuit against us.
5    Q.   Okay.
6    A.   And --
7    Q.   I'm sorry.
8    A.   And that person came back and, I believe,
9  reported that, if I remember correctly, and asked what
10  that was all about. I had no idea. He didn't have a
11  name of a case. I called Mr. Langan, asked him if he
12  knew anything about what that issue was and he said no,
13  and I had no clue and there was no leads to figure out
14  what anybody was talking about.
15    Q.   Okay. If he didn't give you a case, how did
16  you know to call Mr. Langan?
17    A.   To ask about the documents.
18    Q.   Okay. But --
19    A.   That if he knew or had any idea of what the
20  heck was going on, if he had heard anything, if he knew
21  what was going on.
22    Q.   Well, you knew it was in reference to the
23  Green case.
24    A.   Yeah.
25    Q.   Oh, okay. I thought you said he didn't have

Page 147

1  a case name for you.
2    A.   No. The investigator, or the --
3    Q.   Negotiator.
4    A.   The negotiator didn't have a case name.
5    Q.   Do you know who that was?
6    A.   I believe it was Mike Rezmerski.
7    Q.   Okay. And do you know when that alleged
8  meeting took place?
9    A.   It was right after, I believe, we filed our
10  appellate brief.
11    Q.   Okay.
12    A.   And I don't remember what year. '96 maybe.
13  I don't have a clue as to what year that was.
14    Q.   Okay. And that was after Green II and there
15  was at that time a multimillion dollar verdict against
16  General Motors.
17    A.   Correct.
18    Q.   Okay. And do you know the purpose why Mr.
19  Rezmerski, if it was Mr. Rezmerski, came to New Jersey
20  to discuss the verdict?
21    A.   Try to resolve the case.
22    Q.   Okay. Other than what Mr. Rezmerski said
23  about those conversations, were you aware of anything
24  else which was discussed at that time?
25    A.   No.

Page 148

1    Q.   Were you aware --
2    A.   Other than the fact that the case didn't get
3  resolved, but that's about it --
4    Q.   Okay.
5    A.   -- as to what else was discussed.
6    Q.   Did you --
7         Did he tell you anything about the
8  offer which was made at that time to resolve the case
9  by General Motors?
10    A.   I'm not -- I'm not --
11         Did he tell me about the offer as to
12  how much --
13    Q.   Yeah.
14    A.   -- the dollar figure? No. I don't remember
15  what the amount of the dollar figure.
16         MR. VINES:  I'm going to put an
17  objection on the record to this line of questioning
18  because it goes to settlement negotiations, it would be
19  excludable as evidence, and it's improper to be asking
20  witnesses about the content of settlement negotiations.
21         MR. DONOVAN:  Well, I don't -- that
22  may be true, but it has another admissibility angle to
23  it, which is I think Mr. Ziolkowski just accused my
24  firm of trying to coerce a settlement as a premium to
25  the 18 million dollars which was by then a 30 million

Page 149

1  dollar verdict. So I think the credibility of those
2  contentions of what Mr. Rezmerski represented and did
3  not represent and what he was told about that
4  conference and not told about that conference are
5  certainly now admissible.
6         MR. VINES:  I'm not instructing him
7  not to answer, but I --
8         MR. DONOVAN:  Okay. I just want you
9  to understand that there is --
10         MR. VINES:  We move that it be
11  struck from this record and we'll preserve it for
12  movement at trial, if necessary, to exclude it.
13         MR. DONOVAN:  There is a method to
14  the madness.
15         MR. CARROLL:  Go off for a sec,
16  please.
17         MR. VINES:  Off the record, please.
18         VIDEOGRAPHER:  Going off the record
19  at 2:01 and 40 seconds p.m.
20         (Recess)
21         VIDEOGRAPHER:  We're back on the
22  record at 2:42 and 20 seconds p.m.
23         MR. CARROLL:  During a break we --
24  the lawyers left the witness and agreed -- and tell me,
25  Mr. Donovan, if I state this correctly -- that the line

Page 150

1  of questioning we were discussing you will hold in
2  abeyance for the time being. The only way that we will
3  come back to this line of questioning regarding Mr.
4  Rezmerski's actions and what he may have reported to
5  Mr. Ziolkowski is if we name Mr. Rezmerski, add him to
6  GM's witness list, and if we do that, we've agreed that
7  we will make Mr. Ziolkowski available for a limited
8  deposition, of course, not waiving any objections we
9  may have for the judge, but just the very fact that we
10  will make him available voluntarily at a time
11  convenient for you prior to trial if we add Mr.
12  Rezmerski as a witness.
13       Is that a fair statement?
14            MR. DONOVAN: It is subject to a
15  couple caveats. One, we're assuming Mr. Rezmerski is
16  not on the witness list now, which I think is accurate,
17  but if he's on the witness list some obscure place,
18  then, you know, you've agreed not to call him as a
19  witness in light of the waiver of questioning on the
20  Rezmerski issue at this time.
21            MR. CARROLL: That's fair.
22            MR. DONOVAN: Okay.
23            MR. CARROLL: And I will represent
24  to you that if Mr. Rezmerski is on the witness list, it
25  was -- it was inadvertent and we will agree to your

Page 151

1  limitation that if he's on the list already, he will
2  not be called.
3            MR. DONOVAN: Okay. So just, I
4  mean, generally you have no intention of using Mr.
5  Rezmerski as a witness at time of trial right now.
6            MR. CARROLL: At this time we do
7  not.
8            MR. DONOVAN: But if you do, then we
9  may have to explore this issue further.
10            MR. CARROLL: Fair enough.
11            MR. DONOVAN: And in light of that,
12  we can proceed with something else.
13            MR. VINES: We may want to give the
14  court reporter a spelling of that last name.
15            MR. CARROLL: R-e-z-m-e-r-s-k-i.
16            MR. DONOVAN: Okay. With that...
17  BY MR. DONOVAN:
18       Q.   Other than your conversation with Andy
19  Langan about the potential of there being unproduced
20  documents, did you speak to anybody else about that?
21  And I'm talking before you actually got the motion or,
22  you know --
23       A.   Not at that time.
24       Q.   Okay.
25       A.   Yeah. I spoke to Andy about the documents,

Page 152

1  what these documents were or could have been, if he had
2  any idea, and that was the only person I spoke to.
3       Q.   Okay. And no one at that time was aware
4  that the documents in question were at least
5  represented by the A through H documents; true?
6       A.   That's correct.
7       Q.   Okay. Were you -- prior to the actual
8  receipt of the motion to supplement the record and
9  which had annexed to it the Addendum A through H
10  documents, had you ever heard of a design which was
11  considered in the F-car called a vista vent or a
12  modified vista vent?
13       A.   Prior to receiving A through H?
14       Q.   Yes.
15       A.   No.
16       Q.   Okay. Did anybody indicate to you that they
17  had known of a design or a design concept, whatever you
18  want to call it, which consisted of a vista vent or a
19  modified vista vent before receipt of the actual motion
20  to supplement the record in the appellate division?
21       A.   No.
22       Q.   Okay. So nobody came out of the woodwork
23  and said, oh, I know all about those documents, I've
24  known about them for years.
25       A.   No.

Page 153

1       Q.   Nothing like that. Okay.
2       A.   No.
3       Q.   Were you surprised that these documents were
4  found, you know, in Tennessee, but weren't produced in
5  Green?
6       A.   I don't think they were found in Tennessee.
7  They were found up here in Michigan.
8       Q.   Okay.
9       A.   Was I surprised that they were found? No.
10  No. I mean, initially they were just A through H. Had
11  no -- the documents themselves to me had no real
12  relevance. After reading your motion and reading the
13  documents I had a question as to the documents
14  themselves as to, you know, where they were and how we
15  inadvertently missed them.
16       Q.   Okay. Did you ever find out where they
17  were?
18       A.   In the microfiche.
19       Q.   Okay. And did you ever find out how you
20  missed them?
21       A.   No.
22       Q.   No. Even up to this day.
23       A.   Just human error.
24       Q.   Okay. Now, do you agree that the A through
25  H documents are relevant to the discovery demands

40 (Pages 154 to 157)

---

Page 154

1  served upon General Motors by the plaintiff and as
2  ordered by Judge Ferentz?
3     A.  Judge Ferentz was the first judge?
4     Q.  Yes.
5     A.  I have a question whether some of those are
6  relevant, that they were ordered by the judge to
7  produce, but --
8     Q.  Okay.  Why don't you take a look at them and
9  see if you can pinpoint for me which ones do you think
10  should not have been produced because they weren't
11  relevant to the discovery demands which had been
12  served.  And just in case, I don't want to be unfair to
13  you, I'm going to hand to you what's been previously
14  marked Exhibit 1 through 5, which are the discovery
15  demands which we claimed before the appellate court and
16  the appellate court agreed to supplement based upon
17  that presentation discovery demands which we believe
18  those documents are responsive to.  So I don't want you
19  to be using the discovery demands and --
20        MR. VINES:  Hang on just one second,
21  Maurice.
22        MR. DONOVAN:  Um-hum.  That was an
23  annexation to the motion to supplement the record.  I
24  think it was my affidavit.  First came the addendum
25  documents A through H and then right behind that came

---

Page 155

1  that Exhibit 1 through 5.  I think the first one is a
2  selected demand to produce, which we believe was not
3  complied with by General Motors, and the second one I
4  think is the interrogatories which we believe was not
5  complied with and which we believe the A through H
6  documents should have been produced pursuant to those
7  requests.
8        MR. VINES:  So what you just handed
9  us are exhibits to your motion.
10        MR. DONOVAN:  Yes.
11        MR. VINES:  So these are documents
12  that you have created or your office created or
13  assembled.
14        MR. DONOVAN:  But those -- but the
15  interrogatories and demand to produce were in the
16  original set of interrogatories and demand to produce
17  with General Motors' answer.
18        MR. WEISS:  So these are you -- your
19  firm retyping --
20        MR. DONOVAN:  Yes.
21        MR. WEISS:  -- the request that you
22  propounded on General Motors.
23        MR. DONOVAN:  Retyping the ones
24  we --
25        MR. WEISS:  The ones that you

---

Page 156

1  thought these may be -- maybe not be responsive to, or,
2  I guess, you thought maybe were responsive to.
3        MR. DONOVAN:  We thought were
4  responsive.
5        MR. WEISS:  Okay.
6        MR. VINES:  And one last question.
7  The first exhibit is titled Selected Request to Produce
8  Documents Propounded by Plaintiff Michael Green Upon
9  General Motors.  The selected part was your selection?
10        MR. DONOVAN:  Correct.
11        MR. VINES:  Okay.
12        MR. DONOVAN:  And the ones presented
13  to the appellate division in New Jersey with our
14  request that these documents did not -- were not
15  produced even though they were asked for in those
16  questions and those demands.
17        MR. VINES:  Okay.  So if we hunt
18  through the record of the Green case, we'll find this
19  set of exhibits attached to your motion.
20        MR. DONOVAN:  Yes.
21        MR. VINES:  Just as it is right
22  here.
23        MR. DONOVAN:  Yep.
24        MR. VINES:  Okay.  But these weren't
25  introduced in the show cause hearing, were they, or --

---

Page 157

1        MR. DONOVAN:  Yeah, because they
2  were annexed to --
3        MR. VINES:  Part of something else.
4        MR. DONOVAN:  -- the motion to
5  supplement the record.
6        MR. VINES:  Okay.
7        MR. DONOVAN:  So they're in there.
8  I think they were one of our exhibits.
9        MR. VINES:  Thank you.
10        And just to clarify the record even
11  further, that motion and these exhibits were filed
12  approximately in the fall of '97.  We could find the
13  record when you filed that.
14        MR. DONOVAN:  January of -- January
15  of '98.
16        This may help you.  This is my only
17  copy of the motion to supplement the record, but if you
18  look for the document, that's what it's annexed to.
19        THE WITNESS:  It's going to take me
20  more than just 30 seconds to review this.
21        MR. DONOVAN:  We can go off the
22  record.
23        MR. VINES:  Can we go off the record
24  for a couple minutes?
25        VIDEOGRAPHER:  Going off the record

Page 158

1   at 2:55 and 28 seconds p.m.
2          (Recess)
3          VIDEOGRAPHER: We're back on the
4   record at 3:14 and 24 seconds p.m.
5          BY MR. DONOVAN:
6      Q.   Mr. Ziolkowski, when we took the break, you
7   were going to look at those documents a little more
8   thoroughly and tell me which of the addendum documents
9   A through H do you not believe should have been
10  provided with as part of discovery in the Green case.
11  I think that is a double negative, but...
12     A.   Most of them.
13     Q.   Okay.
14     A.   But specifically A and possibly B and
15  anything else that didn't refer to the T-top.
16     Q.   Well, why don't you go document by document
17  for me. I don't know which ones you're talking about
18  which --
19          You said not A, not B.
20     A.   Right.
21     Q.   So how about C?
22          MR. CARROLL: I think he said
23  possibly B.
24          BY MR. DONOVAN:
25     Q.   Possibly B.

Page 159

1      A.   I'm sorry?
2      Q.   You're right. You said possibly B. I don't
3   know what that means, but possibly B.
4          Possibly B should be included or
5   possibly it shouldn't be included?
6      A.   Okay. Let me go back to B.
7          B talks about just bullet points,
8   cost sales, price volume. It doesn't really focus on
9   any roof design issue except for the second bullet
10  point where it says removable center section, retaining
11  roof rails, and I'm not sure what that means. So I
12  say -- if I had a better explanation for that second
13  line, I could probably tell you yes or no, but as it
14  stands right now, probably no.
15          My understanding, the removable
16  center section, retaining roof rails. This is a T-top
17  and my understanding of a roof rail, it runs along the
18  side of the vehicle and there's no roof rail in the
19  vehicle, so we're looking at a T-top issue.
20          Green I dealt with the court order
21  talking about limiting the discovery to T-tops. So --
22  so when we get into the C, D, E, F, G, and H parts that
23  deal with vista vents and other designs of that nature,
24  it's questionable whether the Court ordered that
25  discovery.

Page 160

1          Focusing on the order by Judge
2   Ferentz, paragraph 5, it says it shall -- documents --
3   documentation requested to be supplied, it shall be
4   limited to the information and documentation relevant
5   to plaintiff's two alleged claims of defect --
6   defectively designed T-tops and defective tires, and I
7   don't believe A and B deal with either one of those
8   issues. C deals with -- on its face the language talks
9   about design alternatives. That would probably be the
10  T-hatch and the vista vent designs. We're focusing
11  more on the design of the F-car roof as opposed to
12  alternative designs as far as the design of the T-top.
13          The -- D. I think D talks about
14  mass of the T-top, et cetera. So there may be some
15  issue as to would this document have been produced if
16  we had it. The answer is yes.
17     Q.   So D should have been produced?
18     A.   Well, these discovery responses -- or these
19  discovery requests are so vague, I've got to go by the
20  court order, and -- so I'm looking for a defectively
21  designed T-roof and issues about the T-roof.
22     Q.   With all due respect, Mr. Ziolkowski, if you
23  go down, it says (1) -- it says, In connection with
24  providing more specific requests to plaintiff's
25  interrogatories, supplemental interrogatories and

Page 161

1   request for production of documents --
2          MR. VINES: Maurice, where are you
3   reading from so we can follow?
4          MR. DONOVAN: This is from Judge
5   Ferentz's order which Mr. Ziolkowski was just reading
6   from.
7          BY MR. DONOVAN:
8      Q.   The information and documents requested and
9   to be supplied shall be limited to the information and
10  documents relevant to plaintiff's two alleged claims of
11  defect, (1) defective designed roof and (2) defective
12  tires and specifically limited to the information and
13  documentation related to the roof system/structure and
14  any connected or related parts, including the left rear
15  portion of the 1982 and 1986 (sic) model year Chevy
16  Camaro manufactured with a T-roof and the Goodyear
17  P-245/50VR-16 tires.
18     A.   Okay. So --
19     Q.   Actually, I mean, I read this as saying
20  there you have to provide it with respect to the
21  defective T-roof, all documents related to the roof
22  system and any connected parts which includes, but not
23  necessarily limited to, as we would say in the legal
24  business, the T-roof. You don't read it that way?
25          MR. VINES: I'm going to object to

42 (Pages 162 to 165)

Page 162

1  the form of the question. I think you should ask him
2  whether he thinks the documents were responsive to the
3  discovery requests and not debate with him the proper
4  legal interpretation of the discovery requests.
5          MR. DONOVAN: I did, but he didn't
6  read the whole discovery request, and I want to make
7  sure that he's incorporated the last part in his
8  analysis.
9  BY MR. DONOVAN:
10   Q.   Or do you just reject that as not being
11  relevant?
12          MR. VINES: Object to the form of
13  that question. You can ask him whether he studied the
14  discovery requests in the court order and then ask him
15  whether they were responsive to those.
16  BY MR. DONOVAN:
17   Q.   Did you understand my question?
18   A.   I read the whole -- I followed this
19  paragraph 5 as you read it.
20   Q.   Okay.
21   A.   I'm not totally disregarding the language.
22  The Court keeps talking about T-roofs and that's what I
23  look at. It's not...
24   Q.   So you believe your obligation under this
25  order was only to provide documentation with respect to

Page 163

1  T-roofs?
2   A.   I had nothing to do with the production of
3  documents in this case.
4   Q.   Do you believe that this order only requires
5  you to produce - you meaning General Motors - documents
6  related to the T-roof?
7   A.   That was on Green I?
8   Q.   On the discovery requests which were served
9  by the plaintiff on General Motors.
10          MR. VINES: I'll object to that
11  question because he's answering from his own
12  standpoint, not as a representative in a 30(b)(6)
13  sense.
14          THE WITNESS: We could differ in our
15  interpretation of this language. I'm looking at this
16  and what I'm viewing is the broadest sense, they're
17  talking about T-roofs, defectively designed T-roofs.
18  BY MR. DONOVAN:
19   Q.   That's my question. I'm just trying to
20  understand what you're saying.
21          Your reading of the same paragraph 1
22  just read, your understanding is that it only requires
23  you to produce documents related to the T-roof and
24  nothing else.
25   A.   I'm not saying that.

Page 164

1   Q.   Oh. I thought you were.
2          So what else besides the T-roof does
3  it require you to produce?
4   A.   We're tying this order with these -- with A
5  through H. One has nothing to do with roof of any
6  kind. They're talking about door, glass, seat belts.
7  In fact, the memo is entitled 1982 F Passive Restraint
8  Consideration.
9   Q.   Um-hum.
10   A.   Door frame. That has nothing to do with the
11  -- with the -- either the discovery as written or the
12  court order.
13          B, as I indicated --
14   Q.   Let's just stay with A for a minute.
15          So are you discounting the sentence
16  in the middle of the page that says, however, it
17  appears that no one is very interested in a full frame
18  glass door, nor is there any great interest, it
19  appears, in pursuing an alternative to the T-hatch
20  roof? Doesn't that make reference to the T-hatch roof
21  and an alternative design, that there was no interest
22  in it?
23   A.   That's what it says.
24   Q.   Okay. So that wouldn't qualify this
25  document for production under the Court's order or the

Page 165

1  discovery requests in your opinion?
2          I'm just asking -- it's not a trick
3  question.
4   A.   It is a trick question because it --
5   Q.   How is it a trick question, Mr. Ziolkowski?
6   A.   Well, I don't want to argue with you and
7  debate it. I'm just saying that it's my opinion that
8  this first document doesn't -- isn't requested in
9  either the court order or your discovery --
10   Q.   Okay.
11   A.   -- request.
12   Q.   Because it has nothing to do with T-roofs or
13  another reason?
14   A.   That it is not -- it doesn't respond to any
15  one of these requests.
16   Q.   Okay.
17   A.   The fact that it uses the word
18  alternative --
19          Your request, interrogatory 28,
20  says, Did you consider any alternative approach to the
21  design or construction of said product? 69 deals with,
22  Describe in detail each and every alternative design.
23  That doesn't cover that.
24   Q.   It doesn't.
25   A.   No.

Page 166

1    Q.  Okay.
2    A.  At least in my opinion --
3    Q.  Okay.  That's -- that's --
4    A.  -- speaking.
5    Q.  That's whose opinion I'm asking for, so...
6    A.  Okay.
7    Q.  There's no right or wrong here.
8    A.  Now --
9    Q.  Document B.
10    A.  Again, I pointed out the removable center
11  section, retaining roof rails.  I don't know what that
12  means.  It's inconsistent with what I understand a
13  T-top to be.  So if it --
14          I'm working in a vacuum with that
15  line.
16    Q.  Okay.
17    A.  But other than that, there doesn't seem to
18  be anything else that is asked for in your request.
19    Q.  Would you want to get some kind of
20  engineering input into what that meant before you made
21  a final decision?
22    A.  Sure.
23    Q.  Okay.  So you put a question mark on B.
24    A.  That's what I did.
25    Q.  Okay.  C.

Page 167

1    A.  C?  If you look at your discovery, you're
2  talking about -- and if you read it literally, you're
3  talking about alternative designs.  If that's the way
4  we're going to go by your understanding of what the
5  court order says, then C apparently talks about an
6  alternative design, vista vent design.
7    Q.  So does that mean it's in?
8    A.  Yes.
9    Q.  Okay.  D.
10    A.  D is -- I saw somewhere in here where it was
11  in -- oh.  I think the most probable configuration is
12  page 2.  I would say if going, again, by number 68 to
13  mean any alternative design for the F-car roof, then
14  that would be in.
15    Q.  In.  Okay.  E.
16    A.  Again, if -- as I stated before, if 68 and
17  69 mean any alternative designs for the F-car roof and
18  not limited to T-top, then that one's in because you
19  talk about vista vent, modified vista vent, and
20  T-hatch.
21    Q.  Okay.  F.
22    A.  Again --
23          Well, other than the drawings of the
24  modified hatch, vista vent, and T-hatch, it's vague,
25  but it probably fits into -- into -- it kind of ties

Page 168

1  in.  It says here several alternatives were reviewed,
2  and I'm assuming that this attachment talks about
3  alternatives that were reviewed.
4    Q.  Okay.  Had you ever seen that diagram
5  before, the -- before you got the motion to supplement?
6    A.  The 3?
7    Q.  Yes.
8    A.  No.
9          G.  As I'm reading this material, I
10  don't see where that's -- this talks about the
11  windshield angle.  I don't know if that one's -- I
12  think that one's more a no than a yes.
13          And H.  Okay.  I would say since
14  they're -- performance comparison.  I would say H is a
15  yes.
16    Q.  Before getting this document were you
17  familiar with the roof configuration of the Lancia
18  Spider?
19    A.  I don't believe so.
20    Q.  Okay.  Had you ever heard anything about
21  testing being done by General Motors on a Lancia Spider
22  roof?
23    A.  No.
24    Q.  Did you ever look to see whether there were
25  any more documents in the F-car Project Center file

Page 169

1  which made reference to these Spider testing, Lancia
2  Spider testing?
3    A.  Did I?  No.
4    Q.  Have you ever come across any more documents
5  referencing the Lancia Spider testing?
6    A.  No.
7    Q.  Would you agree with me that, with respect
8  to Addendum H, this is kind of the results of testing
9  which was done rather than the actual test results?
10          MR. VINES:  Could you restate that?
11  I didn't follow that one.
12          MR. DONOVAN:  Yeah.
13          BY MR. DONOVAN:
14    Q.  This document reflects conclusions which was
15  drawn from certain testing rather than being the
16  testing itself.
17    A.  I don't --
18          It's a report based on testing
19  apparently that was done, and I think the testing --
20          Give me one second, please.
21    Q.  Sure.
22    A.  I think they were comparing the Lancia, the
23  T-top as far as structural integrity and vibration
24  standpoint.
25    Q.  Okay.

44 (Pages 170 to 173)

Page 170

1  A.  I think --
2       I'm sorry.  What was the question?
3  Did I see any –
4  Q.  The question was, would you agree with me
5  that this document reflects the conclusions of testing
6  rather than the raw data or the testing itself?
7  A.  That is correct.
8  Q.  Okay.
9  A.  And it's a report based on some analysis
10 someone did, a Mr. Kennel, K-e-n-n-e-l, and Mitchell
11 Scherba, S-c-h-e-r-b-a.
12 Q.  So at some point in time they were documents
13 reflective of the actual raw data for the testing, may
14 have been some pictures of the testing, may have been
15 some videos of the testing?
16      MR. VINES:  That calls for
17 speculation, I think.
18      THE WITNESS:  For this?
19 BY MR. DONOVAN:
20 Q.  Yes.  Based upon --
21 A.  This here?
22 Q.  Yeah, reading that.
23 A.  If it was -- if it was raw data, pictures,
24 and real data.
25      Well, depending on how they did this

Page 171

1  testing.
2  Q.  Okay.
3  A.  If they did this testing with a computer
4  simulation, the answer would be no.  If they did real
5  vehicle testing, the answer would be probably yes.
6  Q.  Okay.  Can you tell from that document
7  whether this is real vehicle testing or computer
8  testing?
9  A.  Can't tell.  I can't tell.
10 Q.  Okay.  If the A through H document were
11 contained among the 10,000 documents which Rumberger
12 Kirk was going to review, would you have wanted them to
13 be culled from the 10,000 documents irrespective of
14 whether they ultimately made the cut to go as Green
15 discovery or not?
16 A.  The answer is yes.
17 Q.  Now --
18 A.  I don't know about --
19      The answer is yes.
20 Q.  Okay.  Now, you dealt --
21      Did you deal with Joe Rice in --
22 during the period of time you were responsible as the
23 in-house attorney for the Green matter?
24 A.  I spoke to him about the case, yes.
25 Q.  Okay.  Had you dealt with Mr. Rice before

Page 172

1  the Green case on other cases which you had handled?
2  A.  I believe so.  Yes.
3  Q.  Okay.  And those would have been cases other
4  than roof cases, but you weren't handling roof cases up
5  until October of '90 or November of '90?
6  A.  I don't have any independent recollection of
7  any specific case other than the fact that he sat at
8  field performance analyses and I would have met him,
9  talked with him.  I don't know if it was case related
10 or just on a personal basis.  I don't remember.
11 Q.  Okay.  Did you ever use him as an expert in
12 any of the other cases which were non-roof crush cases
13 or rollover cases?
14 A.  I don't remember.
15 Q.  You don't remember.
16      Do you know what experience Joe Rice
17 had as an engineer at General Motors?
18 A.  He was --
19      I don't know his resume' by heart,
20 but I think he was an engineer working at Fisher Body.
21 Q.  Do you know what years?
22 A.  I don't have -- I don't have any
23 recollection.
24 Q.  Do you know what car programs would have
25 been around while he was working at Fisher Body?

Page 173

1  A.  Fisher Body was kind of a -- for lack of a
2  better way of saying it, it was kind of a catchall
3  institution where they worked on a lot of different
4  vehicles, different components of different vehicles.
5  I don't know if they ever -- I don't know about
6  specific vehicles he worked on.  I know he had an
7  aeronautics background, I believe.
8  Q.  Mr. Rice?
9  A.  Yes.
10 Q.  Okay.  Do you know what cars specifically he
11 worked on during his tenure at Fisher Body?
12 A.  No, I don't.
13 Q.  Do you know whether he ever worked directly
14 on the F-car?
15 A.  He either worked on --
16      Okay.  I don't know.  It was either
17 the F-car or the Corvette, but I'm not sure.  It was
18 one or the --
19      I don't know.
20 Q.  Okay.
21 A.  I don't know the answer to that question.
22 Q.  Do you know whether he ever worked directly
23 on the T-roof?
24 A.  No.  I don't know.
25 Q.  Okay.  Do you know whether he was ever

Page 174

1   involved in any type of testing of alternative designs
2   for the F-car?
3       A.   I don't know.
4       Q.   Okay.  Tell me what experience Mr. Rice
5   would have as an engineer assigned to the Green file
6   dealing with a roof crush case, non-rollover.
7       A.   What type of experience?
8       Q.   Yeah.  What expertise did he bring to that
9   table?
10      A.   He had extensive amount of experience in
11  metal - I don't want to call it metallurgy - finite
12  element analysis.  He had extensive amount of
13  experience measuring and determining roof metal
14  strength, fatigue.  He had a large amount of knowledge
15  in glass, particularly laminated versus tempered glass,
16  weight of glass.  So he would have been extremely
17  important source of information on Green I where it was
18  indicated that the glass came off, separated from the
19  vehicle and hit Mr. Green on the head.  He was also,
20  from my understanding, familiar with roof strength
21  testing, 216 testing.  I think he had experience in
22  welds.  So I think he had a lot of experience.
23      Q.   Okay.  Do you know where he got his
24  experience in finite metal analysis?
25      A.   I think that was with the -- he worked for

Page 175

1   the aerospace aero manufacturer because I cannot
2   pronounce aero -- whatever.
3       Q.   Okay.
4       A.   You get -- you get the picture.
5       Q.   Right.
6            Was any finite metal analysis done
7   in the Green case?
8       A.   I think there was -- there was computer
9   modeling done on the F-car.  So the answer would have
10  been yes.
11      Q.   Okay.  How about, where did he get his
12  experience on roof metal strength and fatigue?
13      A.   I think that's all pretty much the same
14  issue, but also I think at Fisher Body I think he was
15  involved, if I remember correctly, again, I haven't
16  memorized his resume', but I would -- I think he had
17  some -- did some work on the 216 -- FMVSS 216, which --
18      Q.   That's the rollover testing?
19      A.   Roof strength testing.
20      Q.   Roof strength.  I'm sorry.
21           That's where you push --
22      A.   Yes.
23      Q.   -- the A-pillar down with a weight?
24      A.   Not with a weight.  With a platen.
25      Q.   Okay.  Tell me where he got his glass

Page 176

1   experience from.
2       A.   I don't know, but he has it.
3       Q.   But you knew he had it.
4       A.   Yes.
5       Q.   Okay.
6       A.   I believe he testified as an expert witness
7   on glass, so he would have had to have been qualified.
8       Q.   Do you know when he did this 216 testing?
9       A.   No.
10      Q.   Do you know whether it was in conjunction
11  with the F-car?
12      A.   I have no idea.  I don't know.
13      Q.   But yet not knowing all of that you still
14  considered him an expert and he was assigned to the
15  Green case as the technical expert in that -- in the
16  discovery production?
17      A.   Correct.
18      Q.   You said in the privilege hearing that Joe
19  Rice would have done a technical review of the
20  documents.  What does that mean, technical review of
21  the documents?
22      A.   He would have looked at the documents,
23  evaluated the documents that were to be produced and
24  made sure that they were responsive to the requests
25  from a technical standpoint.

Page 177

1       Q.   Okay.  So before any documents or tests or
2   videos were sent out to plaintiff, he would have
3   reviewed them somewhere in the sequence of review?
4       A.   It's my understanding, yes.
5       Q.   Okay.  Would he have had the final review?
6       A.   From --
7            Review goes on constantly.
8            Would he have had final review?
9   Counsel -- outside counsel would have also had an
10  opportunity to look at what we would have produced, and
11  if they had any independent -- if they had any
12  question, they would have raised it.  So from a
13  standpoint of in-house review, Joe Rice would have had,
14  I guess, arguably the final review.
15      Q.   Okay.  Did you speak to any other engineers
16  about the document or production of documents?
17      A.   I can't --
18           I know I spoke to Mr. Orlowski about
19  the case.
20      Q.   Okay.  Mr. Orlowski was an outside expert;
21  correct?
22      A.   He was in-house retired from General Motors
23  and so he was familiar with the discovery process, but
24  did I speak to him about the discovery process in this
25  case?  I don't think so.

46 (Pages 178 to 181)

Page 178

1    Q.   Okay.  Did you speak --
2    A.   I don't have any recollection of speaking to
3  him.
4    Q.   Did you speak to any of the actual frontline
5  design engineers who had been involved in the design or
6  manufacture of the roof?
7    A.   I don't have any recollection.  I may have
8  --
9         No, I don't have any recollection of
10  speaking to any frontline -- as you call them,
11  frontline engineers.
12    Q.   Wouldn't a frontline engineer be a more
13  primary source of information pertaining to the design
14  and development and manufacture of the T-roof?
15    A.   Not necessarily.  I mean, that's -- that's
16  what was so unique about the F-car project files.
17    Q.   What was so unique?
18    A.   The fact that engineering reports and notes
19  would have been captured in the F-car project file.  So
20  a person who looked at -- it would have been -- I don't
21  think it would have been that useful to talk to
22  frontline engineers about the design of the T-top roof
23  or any more important to do that than to talk to Mr.
24  Rice.
25    Q.   So the frontline hands-on people would have

Page 179

1  been less valuable to you than Mr. Rice?
2    A.   I'm not saying less valuable.  I don't see
3  where they would be more valuable.  It would be equal
4  value.
5    Q.   Okay.  Let's talk for a minute about the
6  process of verifying answers to interrogatories.
7         One of the sets of interrogatories
8  is verified by a Theresa Cerwin as authorized agent.
9         Do you know Theresa?
10    A.   She was an authorized agent.  She's retired.
11    Q.   Okay.  Do you know who she was authorized
12  by?
13    A.   By the corporation.
14    Q.   Who?  The authorization can't authorize,
15  people have to authorize; right?
16    A.   You're right.
17    Q.   Okay.  Who within the corporation would have
18  authorized her?
19    A.   I don't know.
20    Q.   And what were her qualifications to be
21  authorized as an agent?
22    A.   I don't know.  She was already an authorized
23  agent when I got here.
24    Q.   Okay.  Did she have any kind of engineering
25  background to your understanding?

Page 180

1    A.   Not to my -- I don't know.
2    Q.   Okay.  How about Charlyne Donahoe who
3  substituted later as an authorized agent for Theresa
4  Cerwin?  Do you know who she is?
5    A.   No.  The name's not ringing a bell.
6    Q.   Okay.  Do the authorized agents who sign off
7  on the verification such as Theresa Cerwin, do they
8  actually get a full copy of the discovery to review?
9    A.   No.
10    Q.   Do they get any of it?
11    A.   They get the -- they get the responses,
12  written responses and the -- they don't get the
13  documents.
14    Q.   Okay.
15         MR. DONOVAN:  We need to stop
16  because we only have two minutes left on the tape.
17  Have to put in a new tape.
18         VIDEOGRAPHER:  Going off the record
19  at 3:48 and 1 seconds p.m.
20         (Short recess)
21         VIDEOGRAPHER:  We're back on the
22  record at 3:52 and 50 seconds p.m.
23         BY MR. DONOVAN:
24    Q.   We were talking about the verification
25  process for interrogatories and document productions.

Page 181

1         In New Jersey we don't really talk
2  about a verification, we usually talk about a
3  certification.  Were you aware of that?
4    A.   No.
5    Q.   Okay.  Do you know where the verification as
6  compared to a certification comes in?
7    A.   No.
8    Q.   Do you think there's a difference between
9  the two?  Did you ever look to see?
10    A.   Didn't know there was a difference.
11    Q.   Okay.
12    A.   I didn't know New Jersey had certification.
13  I didn't know that.
14    Q.   You were starting to tell me what the
15  authorized agent, I think we were talking about
16  Theresa, would review before she would sign a
17  verification.
18    A.   To the best of my recollection, going back
19  19 years, there would have been the final draft
20  response that was ultimately filed or served and with
21  an indication by the responsible in-house lawyer that
22  he or she review the documents -- or he or she review
23  the responses and they were accurate and to the best,
24  you know, best of their ability.
25    Q.   Okay.  Privilege document 248 is an

Page 182

1  inter-organizational memo from you, re Michael Green,
2  to Theresa Cerwin, 4/28/92, and on it says the
3  following: The attached response has been approved by
4  all appropriate divisions or staff(s) and has been
5  reviewed for legal sufficiency by the undersigned. It
6  is an order for your signature.
7        Was this the common way in which
8  something which needed verification was forwarded to
9  the appropriate authorized agent?
10  A.  Yes.
11  Q.  Was this a form of yours?
12  A.  This was a corporate form.
13  Q.  Okay. And you would have sent that document
14  with whatever the response was being referenced in
15  there to Theresa or whoever?
16  A.  Correct.
17  Q.  And then would you -- would you go with
18  that? Would she send it back to you? How would you
19  get the verification back because the next document is
20  sending the executed verification to Mr. Murray the
21  same day, April 28th, 1992?
22  A.  It would have probably been returned to my
23  administrative assistant and who would have then
24  forwarded it on to Mr. Murray.
25  Q.  Okay. And the verification which Theresa

Page 183

1  signed on April 28th, 1992 says: Comes now, Theresa L.
2  Cerwin, being first duly sworn, deposes and says that
3  she is authorized pursuant to applicable law.
4        What applicable law are we talking
5  about there? Is that Michigan law? Is that federal
6  law? Is that the state of the jurisdiction which the
7  case is pending law? Is it --
8  A.  I think it's Michigan law.
9  Q.  Do you have any references or citations that
10  you know of to that --
11  A.  No.
12  Q.  -- law?
13  A.  No.
14  Q.  Do you know whether there is a Michigan law
15  on authorization for signing or verifying discovery
16  responses?
17  A.  Yeah, I think there is. I couldn't give
18  that to you off the top of my head.
19  Q.  Okay. And what does it mean to be -- it
20  says, and the foregoing answers, which was supplemental
21  answers to plaintiff's interrogatories, are verified on
22  behalf of General Motors.
23        What does it mean to be verified as
24  used in that sentence?
25  A.  That these are approved authorized answers

Page 184

1  to the -- supplemental answers to the plaintiff's
2  interrogatories as referred here.
3  Q.  They are the -- I'm sorry. You used the
4  words approved --
5  A.  Right.
6  Q.  -- authorized.
7  A.  They've been approved by all the divisions
8  and staffs and legal -- for legal sufficiency by the --
9  by Theresa.
10  Q.  Approved for legal sufficiency. Is that
11  what the verification means?
12  A.  I believe so.
13  Q.  Okay.
14  A.  I'm not really an expert on the
15  verifications.
16  Q.  Okay. Is it -- is contained in there any
17  type of certification or representation or verification
18  that the answers are accurate to the best of General
19  Motors' knowledge?
20  A.  I think that assumes they are.
21  Q.  So you think that's an assumption when you
22  sign a verification.
23  A.  Right.
24  Q.  Okay. Is it -- is it also one of the
25  assumptions that a verification includes an

Page 185

1  acknowledgment or a certification that the discovery
2  that's provided is as a result of a complete and
3  thorough search of all the applicable documents so as
4  to respond?
5  A.  The --
6        What's being verified?
7  Q.  Um-hum.
8  A.  The -- the responses?
9  Q.  Um-hum.
10  A.  Yes. That the parties -- appropriate
11  parties all got together and responded to the best of
12  their ability that these responses are true and
13  accurate.
14  Q.  And complete?
15  A.  And complete.
16  Q.  And that a thorough search has been made
17  for -- in all the places where one might reasonably
18  expect responses to discovery to be had?
19  A.  Are we talking about the verification for
20  the answers to the interrogatories and requests to
21  produce or are we talking about the search? I think
22  we're mixing apples and oranges here.
23  Q.  I'm asking whether the verification goes so
24  far as to be a representation or certification that
25  there has been a thorough and complete search of all of

48 (Pages 186 to 189)

Page 186

1  General Motors' records where reasonably -- where one
2  might reasonably expect to find documents responsive to
3  the discovery demand.
4        MR. VINES: Before you answer, the
5  verification speaks for itself.
6        MR. DONOVAN: Well, I didn't hear
7  it speaking.
8        MR. VINES: Well, I mean, the face
9  of the document is what it is and, you know, no amount
10  of questioning of him is going to expand what the
11  language in the document says or doesn't say.
12        MR. DONOVAN: Well, I think it's
13  important to know when one takes an oath what they're
14  taking an oath to say, and he's the one that gave it to
15  her and said it was okay to sign. So she should know
16  what it is that he thinks she's signing.
17        MR. VINES: You know, you've made
18  objections yourself before. This is delving into lots
19  of different legal issues as to what verifications like
20  this mean and I'm not sure he's in a good position on
21  his own to answer it and so I would go back to what I
22  said originally. The document speaks for itself and is
23  grounded in whatever law supports it or doesn't support
24  it.
25        MR. DONOVAN: Okay. Are you

Page 187

1  instructing him not to answer my question?
2        MR. VINES: No, I'm not instructing
3  him not to answer your question.
4  BY MR. DONOVAN:
5    Q.  Okay. Do you remember my question?
6    A.  It says on the face of the document that the
7  foregoing answers are verified.
8        You're trying to -- you're saying
9  that not only are the foregoing answers verified, but
10  you're taking it a step farther to indicate that
11  somehow there was search -- you're taking it to the
12  search mode. The foregoing answers were verified.
13    Q.  So all that means is that they've been
14  approved for legal sufficiency.
15    A.  If that's what the law in New Jersey is. I
16  don't know what the law in New Jersey is, what a
17  verification means in New Jersey.
18    Q.  Well, you understood that you were sending
19  these to New Jersey; right?
20    A.  Yes, sir.
21    Q.  And you understood that this case was venued
22  in New Jersey; correct?
23    A.  Correct.
24    Q.  And you understood that the applicable rules
25  of court which govern the courts in New Jersey would

Page 188

1  apply to this.
2    A.  Absolutely.
3    Q.  And you had local counsel who I assume you
4  hired because you assumed they were familiar with the
5  local rules of New Jersey.
6    A.  True, and these were sent to our local
7  counsel, received and accepted, and this verification
8  was served. Assume, therefore, that 19 years ago this
9  met all the requirements of the New Jersey law,
10  otherwise we would have been told otherwise and it
11  would have come back and we would have made
12  modifications or alterations to meet the law of the
13  state of New Jersey.
14    Q.  Are you assuming that or --
15    A.  I can't speak to any more than that.
16    Q.  Are you assuming that --
17    A.  No.
18    Q.  -- or do you know what the law of the state
19  of New Jersey requires?
20        MR. VINES: I'm not going to
21  instruct him not to answer, but I think he's answered
22  just about everything you've asked him about that to
23  the extent of his ability.
24  BY MR. DONOVAN:
25    Q.  Are you assuming that this was in compliance

Page 189

1  with the laws of the state of New Jersey or do you know
2  that from some type of outside -- either by reviewing
3  the law yourself or someone telling you that this
4  complies?
5    A.  I mean, we've -- I'm taking -- I'm taking
6  the kind of logical approach that you took earlier.
7  You know, on Green I you got 3,000 documents, on Green
8  II you got 5,000 documents, therefore the math is real
9  simple that there were 2,000 other documents.
10        The verification went out. The
11  verification was approved and went to our local counsel
12  who was knowledgeable in New Jersey law. Therefore I
13  think it's a reasonable conclusion that this
14  verification met all requirements of New Jersey law and
15  otherwise we would have -- there would have been
16  something in the record, obviously, that we would have
17  reacted to.
18    Q.  Okay. Well, why don't you try answering my
19  question. My question was, did you do any independent
20  legal research to satisfy yourself that this
21  verification complied with New Jersey law?
22    A.  That wasn't your other question.
23    Q.  Well, I'm asking it now.
24    A.  The answer --
25        MR. VINES: Hang on a second.

Page 190

1    I think he's answered that he relied
2  on outside qualified New Jersey counsel on him -- on
3  this issue, and it's kind of a stretch to ask him if he
4  did his own independent legal review of that legal
5  advice, and that starts to get into privilege issues
6  and lawyer agency stuff that I just don't think is
7  proper to ask him about.
8          MR. DONOVAN:  Okay.
9       BY MR. DONOVAN:
10      Q.   Did you do any independent legal research to
11  determine whether this verification was in compliance
12  with New Jersey law?
13          MR. VINES:  Just answer it.
14          THE WITNESS:  I didn't see any
15  necessity to do it since our local counsel from New
16  Jersey had no problem with the document.
17      BY MR. DONOVAN:
18      Q.   So the answer to my question is no?
19      A.   I don't remember.
20      Q.   You don't remember whether you ever did any
21  legal research --
22      A.   Right.  Right.
23      Q.   -- to determine the sufficiency of the
24  verification under New Jersey law?
25      A.   I just -- I don't remember, but the fact is

Page 191

1  that our local counsel had no problem with the
2  verification, therefore that --
3          I may have done legal research, I
4  don't remember, but I'm relying on the fact that our
5  local counsel had no problem with it, therefore I had
6  no problem with it and I assumed it complied with the
7  requirements of New Jersey law.
8      Q.   Did you ever have a discussion with local
9  counsel as to the sufficiency of the verification?
10      A.   That -- the answer to that is no, and the
11  fact that I didn't supports my position that I believe
12  that the verification was proper and -- under New
13  Jersey law.  If there was some problem --
14      Q.   If you just said no, we'd be done with this
15  questioning already.
16          Do you provide a verification in all
17  of the cases you're handling in various states or is
18  there a difference or --
19      A.   There's a difference.
20      Q.   Back in -- and I'm talking back in late '80s
21  and the early '90s.
22      A.   I believe -- best of my recollection it was
23  different.  Some states require it, some don't.  Some
24  require only further interrogatories, some require RFPs
25  and interrogatories and requests to admit.  Pretty much

Page 192

1  each state is different and I rely on the local
2  counselor or counsel of that state to advise me if we
3  need a verification or not.
4      Q.   Okay.  Do you ever certify the answers to
5  interrogatories or the requests for production of
6  documents as being true and accurate and complete?
7      A.   The responses and the production of
8  documents?
9      Q.   Yes.
10      A.   No.
11      Q.   Okay.  Does Joe Rice ever certify the
12  interrogatories or demand for production of documents
13  as to their truth and accuracy and completeness?
14      A.   Is certification a term of law?  I mean,
15  what does that mean?
16      Q.   I'm sorry?
17      A.   What does certification mean, or certify
18  that they're -- I mean, you keep asking cer-- what --
19  is that a New Jersey term, a legal term that I'm not
20  familiar with?  I don't understand what --
21      Q.   I didn't know you were not familiar with it.
22  I thought it was a legal term not indigenous just to
23  New Jersey, but --
24      A.   Well, verification is.
25      Q.   Okay.  Does Mr. --

Page 193

1      A.   Are we talking about verification or
2  certification?
3      Q.   I'm not looking to argue with you, Mr.
4  Ziolkowski.
5          MR. VINES:  Let him ask the
6  questions, then answer them.
7      BY MR. DONOVAN:
8      Q.   Does Joe Rice ever sign certifications or
9  verifications to interrogatories and demand for
10  production of documents?
11      A.   Not to my knowledge.
12      Q.   Okay.  Is it always done by the court
13  authorized agent whoever that may be at a particular
14  point in time?
15      A.   Correct.
16      Q.   Is it always a verification rather than any
17  other form of swearing or affirming?
18      A.   The truthfulness of the answers?
19      Q.   Yes.
20      A.   It's my understanding it's called
21  verification.
22      Q.   The word truthfulness is not used in there.
23  You're saying that that's subsumed under the word
24  verified?  It means that they're truthful?
25      A.   Depending on what the definition of

Page 194

1   verification is in certain -- in each and every state.
2              I assume truthfulness is part of it.
3   Some states may have language that talk about what a
4   verifi- -- what the definition of verification is or
5   not.
6              I would -- I would think that it
7   would be -- also be the truthfulness of the responses,
8   the written responses.
9       Q.   Were you involved in the appellate process?
10      A.   Yes.
11      Q.   Okay. Did you have any responsibility for
12  reviewing the appellate brief which was going to be
13  filed in New Jersey?
14      A.   Yes.
15      Q.   Okay. Did you author any of it or was it
16  simply a review capacity?
17      A.   Just reviewed it.
18      Q.   Who is Mr. Poland?
19      A.   He was a lawyer for Kirkland & Ellis, if I'm
20  not mistaken.
21      Q.   Is he an appellate attorney, do you know?
22      A.   He's an attorney for Kirkland & Ellis. I
23  don't know if he's an appellate attorney or not.
24      Q.   Okay. Did you author any of the points of
25  the brief?

Page 195

1       A.   No.
2       Q.   Okay. Did you provide any language that was
3   incorporated into the brief?
4       A.   No.
5       Q.   Did you suggest any of the arguments which
6   were to be made in support of the appeal?
7       A.   I'm sorry. Could you ask me that again?
8       Q.   Yes. Did you suggest any of the arguments
9   which were made in the appeal?
10      A.   No.
11      Q.   No?
12              Who did that?
13      A.   I believe it was Mr. Langan.
14      Q.   You also hired McElroy Deutsch, a New Jersey
15  firm?
16      A.   I believe ESIS hired McElroy Deutsch.
17      Q.   Who hired?
18      A.   The -- ESIS, the -- or Royal Insurance, the
19  insurance carrier.
20      Q.   Okay. Were you involved in any of that
21  hiring?
22              MR. VINES: "Any of that" meaning of
23  McElroy Deutsch?
24              MR. DONOVAN: Yes.
25              THE WITNESS: I -- well, I don't

Page 196

1   remember if I --
2              I probably was told about it, but --
3              No. I think the answer would be no.
4   I wasn't involved in the hiring of them.
5       BY MR. DONOVAN:
6       Q.   Okay. Do you know whether you contributed
7   to or what the source of the following paragraph was,
8   and this I'm reading from page 38 of General Motors'
9   brief filed in the Green appeal.
10              MR. VINES: Excuse me. Could you
11  give us a second to pull it out so we can have it?
12              MR. DONOVAN: Sure.
13              MR. WEISS: Did you say page 38?
14              MR. DONOVAN: Yes. It's --
15              MR. VINES: Are you going to do more
16  than one page or --
17              MR. DONOVAN: -- C. You good?
18              MR. VINES: We're good. Thanks.
19              MR. DONOVAN: Okay.
20      BY MR. DONOVAN:
21      Q.   The topic under C, as you can see, is
22  plaintiff failed to sustain his prima facie burden of
23  proving a safer, practicable alternative design to the
24  Camaro T-roof. Do you see that?
25      A.   Yes, I do. Yes.

Page 197

1       Q.   Okay. Skipping the first paragraph. We're
2   talking about -- we're talking about Don Phillips'
3   alternative design. Do you understand that to be what
4   we're talking about here?
5       A.   Yes.
6       Q.   All right. And the paragraph says: One
7   proposal was a hypothetical roof design propounded by
8   Phillips that would incorporate a channel connecting
9   the tops of the A and B pillars. But Phillips' naked
10  suggestion of this design concept and its claimed
11  crashworthiness did not satisfy the first element of
12  the Huddell analysis. The proposed design is simply an
13  imagined concept that exists nowhere but in the mind of
14  plaintiff's expert. No vehicle has ever been produced
15  or sold using this design; Phillips never conducted any
16  testing of this design; and Phillips never even
17  produced any engineering drawings showing what his
18  proposed design would look like. Continuing at page
19  39. His trial opinion that this supposed alternative
20  is a safer and more crashworthy design than the
21  Camaro's T-roof was, accordingly, an inadmissible net
22  opinion that was not competent evidence to prove that
23  this alternative roof design was safer than the one
24  used on the Camaro.
25              And my question was, do you know

Page 198

1  where that language came from or did you contribute to
2  it?
3      A.   No.  It was in the -- it was in the brief
4  when I reviewed it.
5      Q.   Okay.  Were you in agreement that that was
6  one of the points which should be raised on appeal?
7      A.   Yes.
8      Q.   Okay.  Do you agree that that point was
9  belied by the A through H documents?
10          MR. VINES:  Just so I can make an
11  objection for the record, I'm not instructing the
12  witness not to answer, but it's -- any inferences to be
13  drawn in connection to the tort claims that you've made
14  in this suit arising from this brief we believe are
15  covered by the litigation privilege, and we reserve the
16  right to argue that later on, but you can ask the
17  witness your questions.
18          MR. DONOVAN:  I don't think fraud is
19  covered by the litigation privilege, but we'll see.
20          MR. VINES:  We can debate that
21  later, but I wanted to make my objection on the record.
22          THE WITNESS:  I'm sorry.
23  BY MR. DONOVAN:
24      Q.   There was a question.
25      A.   I --

Page 199

1          Could you repeat it, please?
2      Q.   Yes.
3          When you received the A through H
4  document, do you agree that that contention was belied
5  by the presence of those documents?
6      A.   A through H.
7      Q.   Yes.
8      A.   Or C through H.
9          Since the documents A through H, if
10  you have it handy, I think some of them talk about a
11  roof that has kind of a tantamount of a hardtop roof.
12  So if you're talking about that being an alternative
13  design roof, then yes.  It was apparently an
14  alternative design that may have been considered for
15  the F-car.
16      Q.   Okay.
17      A.   Not as an alternative to the T-top.  Not as
18  an improvement for the T-top.
19      Q.   Okay.  After the Court permitted the
20  supplementation of the record to include the A through
21  H documents, were you involved in any conversations
22  with anybody with respect to what to do about GM's
23  assertion in point -- in that point of their brief?
24      A.   I don't remember having any conversation
25  about --

Page 200

1          To answer your question, I don't
2  remember having any conversation with anyone.
3      Q.   Do you remember there being any type of
4  concern, investigation, exchange of correspondence,
5  anything about that?
6      A.   You filed a supplemental brief with the
7  court of appeals.  Does that --
8      Q.   No.  I'm asking you.  You have these
9  documents, A through H, which we've talked about all
10  day --
11      A.   Okay.
12      Q.   -- and you said, you know, at least with
13  respect to C through H should have been provided, okay,
14  and you've agreed with me that this -- those documents
15  belie the contention that this was a figment of Mr.
16  Phillips' imagination, it had never been tested or had
17  never been considered.  Okay.
18          Was there any discussion about that
19  and what to do about the position you had taken in the
20  appellate division of New Jersey Supreme Court?
21          MR. VINES:  Object to the form of
22  that question.
23          THE WITNESS:  Not that I remember.
24  BY MR. DONOVAN:
25      Q.   Okay.  There was no strategy planned on how

Page 201

1  to deal with this that you were involved in?
2      A.   I think the only thing that I -- the only
3  thing I can remember is the -- we did not raise this
4  issue in front of the New Jersey Court of Appeals, that
5  -- that they failed -- that plaintiffs failed to
6  sustain a prima facie burden of proving a safer,
7  practical alternative design.
8      Q.   Okay.  Was there a discussion that led to
9  that strategy or that decision?
10      A.   I don't remember.
11      Q.   You don't remember.  Okay.
12          Plaintiff had asserted that General
13  Motors, in their brief in support of the motion to
14  supplement, that General Motors had committed a fraud
15  on the courts of the state of New Jersey by the filing
16  of this brief and you're telling me you don't remember
17  whether there were any discussions about that?
18      A.   Before the -- before the argument in the --
19  oh, I see.  Okay.  When we got -- after we had your
20  supplemental.
21      Q.   Right.
22          I assume General Motors doesn't get
23  accused of fraud everyday; right?
24      A.   That's correct.
25      Q.   That would be something unusual?

52 (Pages 202 to 205)

Page 202

1    A.   Yes.
2    Q.   And yet you can't recall any conversations
3 about it?  Anybody say?
4    A.   I did have a conversation with Andy
5 Langan --
6    Q.   Okay.
7    A.   -- and asked him what he thought, what he
8 made of this motion and the allegations raised.
9    Q.   Okay.
10   A.   And he --
11   Q.   Why don't you tell me about that.
12   A.   Well, best I can remember is that he said
13 that he thought these were false and frivolous
14 allegations.
15   Q.   Okay.
16   A.   Something of that effect.
17   Q.   And did you have any discussion after the
18 appellate division decided to supplement the record
19 with him?
20   A.   No.
21   Q.   Okay.  Did you have any conversation at all
22 with respect to General Motors withdrawing this point
23 of their brief when they started to argue before the
24 New Jersey appellate division?
25   A.   No.

Page 203

1    Q.   Did you --
2         Do you know Brett Cavanaugh?  Brett
3 Cavanaugh?
4    A.   No.
5    Q.   Do you know that Brett Cavanaugh was the
6 attorney who argued the appeal of Green versus General
7 Motors before the Superior Court of New Jersey,
8 Appellate Division?
9    A.   I don't remember that.
10   Q.   So then I guess you wouldn't remember
11 whether you ever spoke to him or not.
12   A.   (No response).
13   Q.   I didn't hear an answer.  I'm sorry.
14   A.   I didn't know if that was a question.  It
15 seemed more like a statement.  Was that a question?
16   Q.   Did you ever speak to Mr. Cavanaugh?  Do you
17 recall ever speaking to him?
18   A.   No, I don't remember.
19   Q.   Do your duties and responsibilities as the
20 in-house counsel responsible for a case extend to the
21 appellate stages of the case?
22   A.   Sometimes.
23   Q.   Okay.  Did they in Green?
24   A.   Yes.
25   Q.   Were you at all involved in the remand

Page 204

1 hearing in the selection of experts?
2    A.   I don't remember.
3    Q.   Do you know what I'm talking about when I
4 say a remand hearing?
5    A.   Vaguely.  Can you refresh my recollection?
6    Q.   Okay.  You didn't know that the appellate
7 division remanded the case back to the trial division
8 so a determination can be made as to whether the jury
9 appropriately discounted the 13 million dollars and
10 future medicals to present value?
11   A.   Yes.
12   Q.   Does that refresh your recollection?
13   A.   Yes.
14   Q.   Okay.  Were you involved in the selection of
15 experts for that?
16   A.   I probably was, but I don't have an
17 independent recollection.
18   Q.   Do you have any independent of what went on
19 during that period at all?
20   A.   In -- about the case?
21   Q.   Yes.  Anything you --
22   A.   Yeah.  I believe the Court remanded -- or we
23 had a remittitur of some multimillion or several
24 hundred thousands of dollars, I believe, and there was
25 some favorable ruling for us.

Page 205

1    Q.   On damages.
2    A.   On damages.
3    Q.   Yeah.  The Court said we were not entitled
4 to prejudgment interest on future medicals.
5    A.   Okay.  I mean, I don't remember the
6 specifics.
7    Q.   But we were entitled --
8         But you were not entitled to a
9 credit for the settlement with the bus company.
10   A.   Well, I don't -- I don't remember.
11        MR. VINES:  Is that a question?
12        THE WITNESS:  Yeah.  I don't
13 remember.
14        MR. DONOVAN:  Well, I'm trying to
15 see if any of this rings a bell for Mr. Ziolkowski so I
16 can answer his question.
17        THE WITNESS:  The answer is no.
18 BY MR. DONOVAN:
19   Q.   If you have no recollection of this period,
20 then --
21   A.   The answer's no.
22   Q.   Okay.
23   A.   It doesn't ring a bell.
24   Q.   You don't recall anything you did or didn't
25 do during the remand stage of the case?

Page 206

1    A.   Other than the fact we argued it and got a
2  favorable ruling, that's all.
3    Q.   In the remand?
4    A.   On the damages part of it.
5    Q.   By Judge Fuentes?
6    A.   I believe so.
7    Q.   Okay.  Do you know what that favorable
8  ruling was?
9    A.   I mean, it was a money issue.
10   Q.   And how did that money issue benefit General
11 Motors?
12   A.   We had to pay less.
13   Q.   And what was that as a result of?
14   A.   I don't remember.
15   Q.   Okay.
16         MR. DONOVAN:  Okay.  I'm done.
17         MR. VINES:  Done?
18         MR. DONOVAN:  You can ask your
19 questions now.
20         MR. VINES:  I'd like to go off the
21 record for a few minutes to get my notes together.
22         MR. DONOVAN:  Sure.
23         VIDEOGRAPHER:  Going off the record
24 at 4:24 and 43 seconds p.m.
25         (Recess)

Page 207

1         VIDEOGRAPHER:  We're back on the
2  record at 4:37 and 52 seconds p.m.
3  EXAMINATION BY MR. VINES:
4    Q.   Okay.  Mr. Ziolkowski, let me ask you just a
5  few questions about your relationship with the law
6  firms you worked with in the Green case.
7         Can you tell me something about
8  those law firms, how you came to work with them, what
9  the relationship was with General Motors generally?
10   A.   My involvement with Kirkland & Ellis
11 primarily grew out of a relationship when I was working
12 on rollover roof crush cases.
13         Rumberger & Kirk I believe -- I
14 don't remember any involvement I had with them prior to
15 doing rollover roof crush cases.  Rumberger & Kirk
16 worked on two of my first three trials, so I got to
17 know and familiarize myself with them quickly early on
18 in my career.
19         Tom Tansey and that firm, again, I
20 believe the Green case may have been my first contact
21 with them, although I'm not sure if they had any
22 multi-piece or tire and wheel mismatch case.  They may
23 have had one of those.  I may have dealt with them
24 prior to the Green case.
25   Q.   Now, does General Motors have a

Page 208

1  long-standing relationship with each of those law
2  firms?
3    A.   They have through the last 19 years that
4  I've been here, but also prior to my coming they had a
5  long working relationship with both -- all three firms.
6  They were already approved counsel.
7    Q.   And what's your view as to the reputation of
8  those law firms?
9    A.   Fine lawyers.  Fine law firms.  They were --
10 they do our work, other manufacturers' defense work.
11 They have a very good reputation.
12   Q.   How extensively do you delegate the
13 day-to-day tasks in litigation to those law firms?
14   A.   Quite extensively.  I rely on them for their
15 advice, their support, their knowledge of the issues,
16 and working together as a team we try to represent and
17 defend General Motors to the best of our ability.
18   Q.   And does that extensive delegation relate to
19 all aspects of the lawsuits or just certain aspects?
20         MR. DONOVAN:  Objection to the form
21 of the question.  I don't think that's what he
22 testified to.
23         THE WITNESS:  The -- all aspects of
24 litigation.  I don't delegate every -- all my
25 responsibility, if that's what the question is.

Page 209

1  BY MR. VINES:
2    Q.   No.  I'm sorry.  I mean with respect to
3  discovery versus trial versus appellate work.  Do they
4  play a heavy role in each of those phases of
5  litigation?
6    A.   Oh, absolutely.  From discovery, as we've
7  talked about today, there was -- they are intimately
8  involved in the discovery process along with the
9  coordinators and the engineers.  From a trial
10 standpoint they are the go-to people that try the case.
11 In the appellate work, again, their knowledge of the
12 law and the venue we're in, I rely on them quite
13 extensively.
14   Q.   And to your knowledge in the processing of
15 discovery materials, when materials go from firm to
16 firm, do they coordinate that themselves or do you get
17 heavily involved in the firm to firm transmittal of
18 discovery materials?
19         MR. DONOVAN:  Object to the form of
20 the question.
21         THE WITNESS:  There is an
22 involvement from --
23         My involvement in that type is to
24 make sure that all the avenues are covered, that
25 everything is -- that the trans -- that the transfer of

Page 210

1 responsibility is seamless and that they respond and
2 that each one has their own -- has knowledge of their
3 own responsibilities. So, again, working as a team who
4 are to reach a common goal.
5 BY MR. VINES:
6 Q. And do you typically dictate to them how to
7 do each discrete task involved in the litigation?
8 MR. DONOVAN: Object to the form of
9 the question.
10 THE WITNESS: No. There's not
11 enough -- no, I do not do that. I rely on them, their
12 expertise, and, again, we try to get the job done.
13 BY MR. VINES:
14 Q. Would you say that the workload involved in
15 litigation requires that level of delegation?
16 MR. DONOVAN: Object to the form of
17 the question. He's not an expert in delegation of
18 litigation responsibilities.
19 MR. VINES: Actually I think he
20 probably is, but I note your objection.
21 MR. DONOVAN: Well, no. His
22 viewpoint is necessarily one sided, necessarily General
23 Motors.
24 THE WITNESS: Well, I believe that
25 my --

Page 211

1 Could you repeat that question?
2 BY MR. VINES:
3 Q. Yeah, if I can remember the way I asked it.
4 I think it was does the level of the workload involved
5 in product liability litigation require that level of
6 delegation to these outside law firms?
7 MR. DONOVAN: And are you limiting
8 that to his experience with General Motors or are you
9 talking about that as a general absolute rule for every
10 law firm and every products liability case in the
11 entire universe?
12 MR. VINES: No. In his experience
13 at General Motors.
14 MR. DONOVAN: Okay.
15 THE WITNESS: My experience at
16 General Motors, workload requires some delegation of
17 responsibility in all facets of the case, the
18 preparation, the trial and the -- of course the trial
19 and the appellate work.
20 My knowledge of other car
21 manufacturers is that there is some similar type of
22 delegation of responsibility, but as far as my
23 practice, I believe that there is room for other points
24 of view, other approaches, other people's input and
25 it's requested and in some instances required.

Page 212

1 BY MR. VINES:
2 Q. Do you find that it's frequently the case
3 that you can rely on the representation those outside
4 firms make to you about how they've handled your legal
5 work?
6 A. I have no reason not to rely on their
7 representations, their -- we've discussed that some of
8 the firms, our local counsel, they know the law, they
9 know the issues much better than I do, so I, of course,
10 rely on them.
11 Q. And do you typically double check the
12 day-to-day legal work those law firms do on your behalf
13 or GM's behalf?
14 A. No, I do not. I mean, I have confidence in
15 them, they do the work, they have experience and I
16 accept it, that they have -- we have delegated
17 responsibilities and everybody picks up an oar and we
18 row in together.
19 Q. Okay. Now, let me turn to asking you about
20 the specific claims that the plaintiff has made in this
21 case, the first being that an allegation that General
22 Motors fraudulently concealed materials that should
23 have been disclosed in discovery to the plaintiff in
24 the Green litigation, and let me first ask you that as
25 a lawyer working for GM on the Green case, do you have

Page 213

1 any personal knowledge or do you have an opinion as to
2 whether anyone working at GM or working as an agent for
3 GM withheld, altered, destroyed, otherwise hid
4 documents from the plaintiff in the Green case?
5 MR. DONOVAN: I object to the
6 question with respect to the opinion evidence. I have
7 no problem with respect to the factual.
8 THE WITNESS: There is -- I have no
9 knowledge of anyone intentionally destroying, altering
10 or intentionally not producing documents, and it's my
11 opinion that that wasn't done in this case.
12 BY MR. VINES:
13 Q. Are you aware of anyone in the chain of
14 command giving anyone instructions to withhold, alter,
15 destroy, hide documents, et cetera?
16 A. No. Absolutely not.
17 Q. Okay. Has anyone either in this case or
18 otherwise in your experience in the GM law department
19 ever told you to commit any of that kind of conduct?
20 A. Never.
21 Q. Let me next say to you that one of the other
22 of the three claims in the case is for negligent
23 concealment of the documents that we've discussed
24 today, and, first of all, sort of the same premise, do
25 you have any firsthand knowledge that anyone at General

Page 214

Motors or any of the General Motors agents in this
matter negligently withheld, altered, destroyed or
otherwise kept plaintiff from getting the documents
owed in discovery?

A. No. Absolutely not.

Q. Okay. Do you have any knowledge or opinion
as to whether General Motors' systems for producing
materials in discovery is competently designed and
competently executed?

MR. DONOVAN: Object to the form of
the question with respect to opinions.

THE WITNESS: It is --

MR. DONOVAN: Let me just -- is your
question with respect to how it existed back --

MR. VINES: I'm sorry. yeah, how it
existed --

MR. DONOVAN: -- in 1989, '90?

MR. VINES: Yes. Fair comment.

BY MR. VINES:

Q. Not today. How did it exist back in the
time of the Green litigation?

A. It was very complete and very thorough with
good teamwork, coordination amongst all parties relying
on people's expertise, relying on the expertise of the
subject matter, and expertise of handling other cases.

Page 215

So there was a very good working relationship, a very
thorough, complete process set up to locate and produce
responsive information.

Q. Now, given the state of technology at the
time and the various sources of the documents involved
in the Green production, do you have knowledge or a
belief as to whether General Motors and its agents
acted reasonably in attempting to get responsive
materials to the plaintiff in the Green case?

MR. DONOVAN: Object to the form of
the question, calls for an opinion and it calls for an
expert's opinion.

THE WITNESS: I would say, based on
my understanding of what went on, the work that was
done by all parties, we did the best -- we tried to
accomplish the goal and produce all documents that were
requested.

BY MR. VINES:

Q. At the time of the Green litigation did you
have any knowledge that General Motors had a process or
a system in place for purging documents that would be
harmful to the company in litigation?

A. There was no such purging of harmful
documents. There was no plan, no policy, no process to
do that.

Page 216

Q. And no one ever asked you to purge any
documents related to the Green litigation?

A. No one ever asked me to.

Q. Okay. And, finally, let me ask you about
the claim that's been made with respect to civil RICO,
a claim under the New Jersey civil RICO statute. And
let me represent to you that that statute and the
claims made allege that an enterprise was engaged in by
General Motors and its agents and that members of the
General Motors law department associated with that
enterprise and that that enterprise through a pattern
of racketeering activity injured the plaintiff, Mr.
Green, specifically through the commission of
fraudulent concealment of the documents.

Now, having represented that to you,
do you have any knowledge or opinion as to whether
General Motors or any of its agents in the litigation
engaged in any of that sort of behavior?

A. No.

MR. DONOVAN: Object to the form of
the question. It improperly characterizes plaintiff's
cause of action under RICO. The question is not
specific with respect to New Jersey RICO. This witness
is not an expert in New Jersey RICO.

BY MR. VINES:

Page 217

Q. Okay. Let me finish up by asking, your view
in a lay capacity of the term racketeering and fraud
and enterprises convened to commit fraud, in that
capacity do you have any knowledge of any conduct that
would fit those characteristics?

A. No.

MR. DONOVAN: Again, object to the
form of the question.

MR. VINES: That's all I have.

RE-EXAMINATION BY MR. DONOVAN:

Q. Your opinion or your view of the world that
GM did not engage in negligent concealment of
documents, that would apply to those people's
conduct which you had observed or had been involved in
supervising; isn't that true?

A. The answer is yes.

Q. Okay.

A. To --

Q. You can't tell me what --

A. But there is no policy or there was no
process or there was no -- ever any inference or
suggestion to destroy documents or alter documents or
not produce documents.

Q. Okay. You have no idea as a matter of fact,
not opinion, not inference, not assumption, that

56 (Pages 218 to 221)

Page 218

1 somebody may have found the A through H documents and
2 for whatever reason decided not to produce them, do
3 you?
4 A. Correct.
5 Q. Okay. Again, with respect to your opinion
6 that General Motors did not engage in fraudulent
7 concealment of the documents -- or did I do that
8 already? Did I do -- of negligent concealment of the
9 documents, again, this can only be based upon the
10 people that were either under your control and that you
11 were observing and you were handling; correct?
12 A. Correct.
13 Q. You can't speak for every single person who
14 may have in some way, shape, or form come in contact
15 with these documents, can you, as a matter of fact, not
16 opinion or inference or assumption?
17 A. Well, I could speak to the fact that the
18 documents were not produced, so, therefore, I would
19 take it to mean that the documents were not found
20 because, as I indicated, there was no intent or attempt
21 to destroy, alter, or not produce documents.
22 Q. Does GM have a sign-out system for when they
23 look at documents? Do you have to like, you know, like
24 a library, if you take something out, you know, sign it
25 out or if you're going to review something, you have to

Page 219

1 indicate that you were there and reviewed it? I'm
2 talking back in late '80s, early '90s.
3 A. You mean once it's been collected as far as
4 discovery process or documents that are in the
5 corporation?
6 Q. I'm talking -- yeah. I'm talking about
7 documents in the corporation. You assign me to go look
8 at Fisher Body for documents related to whatever. Do I
9 have to like sign in? Do I have to like get
10 authorization? Do I need a pass? Do I need to, you
11 know, stick my retina in a --
12 A. No.
13 Q. -- in a scope in order to get access?
14 A. I'm not -- I'm not totally sure. I think
15 there was -- for some documents you had to get approval
16 to review them be it -- and those kind of documents you
17 didn't take out of the company or take out of the
18 building, but I'm not sure about all the documents that
19 were produced in the Green case.
20 Q. Okay. So over the course of time when the
21 F-car project center files were compiled, you would not
22 know every single person who had access to those files
23 or may have touched them or handled them, reviewed
24 them; true?
25 A. I would say, based on my knowledge, yes,

Page 220

1 that would be -- that would be accurate.
2 Q. Okay. The defense of a product liability
3 lawsuit, at least in your description, is a team
4 effort?
5 A. That's correct.
6 Q. Okay. It involves yourself and a team of
7 inside lawyers and document discovery people and
8 engineers as well as outside lawyers and their
9 expertise and sometimes even third party which are
10 hired; correct?
11 A. Engineers or lawyers, yes.
12 Q. Okay. And the common goal in defending the
13 action is what? Because you kept using that they --
14 we're all working towards a common goal.
15 A. Common goal was to provide a best defense
16 for the corporation, our client. Also to make sure
17 that all the Court's requirements and the requirements
18 of law were met and adhered to.
19 Q. I notice absent from what you just told me
20 was any reference to doing justice to the person who
21 might have been injured. Is that not one of the goals
22 of General Motors in pursuing the defense of
23 litigation?
24     MR. VINES: Object to the form of
25 that question.

Page 221

1     THE WITNESS: Doing justice?
2 BY MR. DONOVAN:
3 Q. Justice to the person who might --
4 A. To the person or for the --
5 Q. For the person who claims to be injured,
6 achieving justice.
7     MR. VINES: That assumes that the
8 goals that he's already articulated are in conflict
9 with that goal and I don't think you've established
10 that.
11     MR. DONOVAN: No. I didn't hear him
12 use those words.
13     THE WITNESS: Right, and to meet the
14 requirements of the law and to meet the requirements of
15 procedures of the state you happen to be in, it meets
16 that justice will be done for all parties.
17 BY MR. DONOVAN:
18 Q. Okay. But I'm talking about if General
19 Motors is responsible either negligently or
20 intentionally for causing injury to someone, do you
21 believe that it's General Motors' responsibility to do
22 justice by settling that matter or some other way
23 dealing with that person or is it only to win cases?
24 A. No. I didn't say just to win cases.
25 Q. I'm asking you a question. I didn't say you

Page 222

1 said it. I'm saying -- I'm asking you the question.
2     A.   The answer is we follow the law, follow the
3 procedures of the court, respond to matters, treat
4 people fairly and justice will be done.  If we win, we
5 in.  If we lose, we lose.
6     Q.   Do you have any specific expertise in New
7 Jersey RICO?
8     A.   No.  Not New Jersey RICO.
9     Q.   Have you ever read the New Jersey RICO
10 statute?
11     A.   Have I read the New Jersey RICO statute?  I
12 don't remember ever reading the New Jersey RICO
13 statute.
14     Q.   Okay.  Now, you testified that --
15     A.   You know, excuse me, I may have when I was
16 at the U.S. attorney's office, New Jersey, New York,
17 but I don't -- I may have.
18     Q.   Okay.  Since you were with the attorney
19 general's office have you followed up on all the
20 caselaw interpreting New Jersey RICO?
21     A.   No.
22     Q.   Okay.  You would agree with me that the
23 courts have done a lot of interpretation of RICO over
24 the years.
25     A.   Oh, absolutely.  Yes.

Page 223

1     Q.   And not every court has come out with the
2 same conclusion with respect to whatever legal issue
3 was involved.
4     A.   I understand that.
5     Q.   Okay.  And each state's RICO was a little
6 different than every other state's RICO.
7     A.   That's why we have local counsel.
8     Q.   Okay.
9     A.   To work us through that maze.
10     Q.   Now, you testified that GM had a competent
11 system for the retrieval of documents back in 1989, '90
12 timeframe; correct?
13     A.   Correct.
14     Q.   Okay.  And if I understand from all the
15 testimony you've given us today, that document
16 retrieval process involves someone being directed to go
17 do a manual search at various places which were
18 depositories of documents; is that correct?
19     A.   Well, just not someone.  Someone who had an
20 expertise in the document or the document collections
21 that were in place.  So if there was, say, for
22 instance, a truck case, you would send a letter to the
23 representative from the truck division to assist our
24 engineers and our coordinator to locate the documents.
25     Q.   Okay.

Page 224

1     A.   So it wasn't just a willy-nilly person off
2 the street doing this work.
3     Q.   It was a manual search and recover process.
4     A.   I don't know about that, if it was manual or
5 not.  I think in the early '90s -- I can't -- I can't
6 speak to that.  I don't remember.
7     Q.   Okay.  Well, it wasn't as easy as doing,
8 say, like a Google search for something where you would
9 put in the words roof and collapse and T-roof and you
10 would get a list of all the documents anywhere within
11 the General Motors organization which might be
12 responsive to that request, was it?
13     A.   Well, in some instances it was.
14     Q.   Back in '89, '90?
15     A.   I believe in lawsuit searches and meeting
16 minute documents.
17     Q.   Meeting minute documents were among the
18 computer?
19     A.   Maybe not back in '89, '90.
20          I don't remember when that came in
21 effect.
22          Yes.  The answer is, yes, it wasn't
23 as simple as typing in in Google roof crush, et cetera,
24 documents.
25     Q.   And to some degree you had to rely upon the

Page 225

1 engineering's expertise and his recollection as to
2 where documents with respect to any particular car or
3 any particular part might be housed?
4     A.   Engineer and the person that the
5 communication went to -- person or persons that the
6 communication went to.
7     Q.   Okay.
8     A.   Albeit may have contacted the chief
9 engineer, et cetera.  Any -- as you indicated, the
10 lowly person -- I forgot how -- the lowly person
11 working designing the roof or whatever part of the
12 vehicle, but, yes, it was a -- it was an all out
13 full-blown attempt to locate responsive documents.
14     Q.   If that's true, then why wasn't the first
15 place which was searched for responsive documents the
16 F-car Project Center file and whatever documents were
17 in there which would have included the 64 documents
18 produced by Rumberger Kirk later on in 1991 received as
19 part of the initial discovery request?
20          MR. VINES:  Object to the form of
21 the question, and only answer that if you know the
22 answer to it.
23          THE WITNESS:  Well, I don't know the
24 answer as to why someone didn't look there, but if
25 we're talking about roof documents on the F-car, they

58 (Pages 226 to 229)

Page 226

1  were blown back and Rumberger Kirk had them and it was
2  the -- the effort was now to bring in another counsel
3  to assist us, other party, other law firm to assist us
4  in meeting the discovery requirements, the discovery
5  requests that were made in this case and another -- I
6  believe another F-car case. You said Hussan or Hoisson
7  or something of that nature. I think they were brought
8  in to assist in locating documents for those two cases.
9    BY MR. DONOVAN:
10    Q.  Was Rumberger Kirk involved in the Green
11  case because they already had documents that they were
12  reviewing for another case or were they brought into
13  the case specifically to address issues in Green?
14    A.  I don't know. I think it was --
15        I don't know, but I think there's
16  communication in the file that would indicate that they
17  had expertise with F-cars and they were already working
18  on the Bishop case and the Hussan or Hoisson case, and
19  so I believe they were the party -- they were the law
20  firm of choice to assist.
21    Q.  Didn't Kirkland & Ellis also have an
22  expertise in handling roof crush rollover cases?
23    A.  Yes, they did.
24    Q.  Okay. And since Kirkland & Ellis were
25  already attorneys in this file, why didn't they review

Page 227

1  the documents to come up with a production from it?
2    A.  I believe that the Rumberger firm had
3  already had, you know, kind of expertise in the F-car
4  rollover litigation, roof structure litigation, so,
5  therefore, it made more sense, I assume, to send it to
6  them and not to Kirkland & Ellis to reinvent the wheel
7  and to incur all those extra expenses.
8    Q.  Is that an assumption you're making or is
9  that -- do you know that based on fact?
10    A.  Well, based on -- yeah, it makes --
11        Yes, that's an assumption. Well,
12  it's assumption based on fact.
13        MR. DONOVAN: Nothing further.
14        MR. VINES: You said nothing
15  further?
16        MR. DONOVAN: Nothing further.
17        MR. VINES: Oh. One more question.
18  RE-EXAMINATION BY MR. VINES:
19    Q.  You spent some time going through the
20  documents A through H earlier analyzing them for
21  whether you believed them to be responsive or not. Do
22  you recall that?
23    A.  Responsive. Right.
24    Q.  At the time that the Green litigation was
25  going on, had those documents been brought to your

Page 228

1  attention, would you have instructed Mr. Langan to have
2  produced all of them?
3    A.  Absolutely.
4    Q.  All of them.
5    A.  Yes.
6    Q.  Okay. That's all I have.
7    A.  And the reason was -- I'm sorry.
8    Q.  No. Go ahead. Give your reason.
9    A.  Because I believe that if you look at the
10  production that we made in July of '91 when it was
11  brought to our attention that there were 60 some
12  documents that Rumberger & Kirk had located, when it
13  was brought to my attention, even though there was a
14  question, and I believe one of the letters suggest that
15  some of these weren't relevant or applied, we produced
16  them all. We had a practice of producing more, not
17  less.
18  RE-EXAMINATION BY MR. DONOVAN:
19    Q.  Now you got me confused, Mr. Ziolkowski. I
20  thought before the break and, you know, everybody went
21  to the bathroom and mulled around in the hallway for a
22  while you told me that there were certain documents in
23  the Addendum A through H document that you would not
24  have produced and now you're telling me --
25    A.  No, no.

Page 229

1    Q.  -- you would have produced all of them.
2    A.  That were relevant or responsive. That
3  doesn't mean I wouldn't have produced them.
4        I produced documents in 1991. July
5  of 1991 that were arguably not responsive, but we
6  produced them. These were documents that talked about
7  trunk lids and backlights.
8    Q.  I'm not asking you about those documents.
9  I'm asking you about these documents, the A through H
10  document.
11        Did we not spend time infinitum
12  going through these and I specifically, with respect to
13  each of the documents after you gave your conclusions
14  and your reasons and your analysis and you went on and
15  on and on about that, said not produce or produce?
16    A.  Well, if I did, I was mistaken.
17    Q.  Okay.
18    A.  Because --
19    Q.  So you wish to now after the break correct
20  your testimony --
21    A.  No. Wait a minute.
22    Q.  -- that all of the documents --
23        MR. VINES: Object to that.
24        THE WITNESS: I sat here during the
25  whole break except for going to the men's room.

Page 230

BY MR. DONOVAN:

Q.   Well, I'm just using a time.

A.   Well --

Q.   The testimony that you gave that some of the documents should not have been produced was before the break. The testimony you're giving now --

A.   There was a question --

MR. VINES:  Let me make an objection.

I believe it's very clear in the record that he has testified that he found those documents to be responsive or not responsive. What he's testifying now is, not withstanding whether he might have considered them non-responsive, he would have instructed outside counsel to produce them anyway.

MR. DONOVAN:  Well --

MR. VINES:  And that's the only distinction he's making here, and I think that's clear in the record.

MR. DONOVAN:  Mr. Vines, the record will speak for itself unlike what I'm doing with respect to whether that was true or not, so -- then I won't belabor the point any further. I have nothing further.

MR. VINES:  Sir, I have one more

Page 231

question, a very specific one.

RE-EXAMINATION BY MR. VINES:

Q.   There was a question raised earlier about why Rumberger Kirk was used to review the F-car project center documents versus Kirkland & Ellis who also was familiar with the documents engaged in litigation in which they were involved.

Is it possible that in addition to the fact that Rumberger Kirk was already working on that project, that they were also in their fees somewhat cheaper than Kirkland & Ellis?

A.   That's --

Primarily, in my opinion, it was the fact that they had been working on these matters, F-car cases, they were familiar with the documents more so than Kirkland & Ellis, although I don't want to minimize Kirkland & Ellis's understanding and appreciation for the documents in this procedure, but it was the situation where -- you ask a good question and that is there is always reinventing the wheel and incurring costs that were already paid for, and I believe that that's one of the reasons that Kirkland -- or, excuse me, that Rumberger & Kirk continued to do the review.

MR. VINES:  I have nothing further.

Page 232

MR. DONOVAN:  I have nothing further either. That's a wrap.

VIDEOGRAPHER:  This concludes the deposition and we're going off the record at 5:11 and 34 seconds p.m.

(Signature having been reserved, the deposition was concluded at 5:11 p.m.)

Page 233

I have reviewed the above transcript and have listed corrections, if any, on the attached errata sheet.

this_____ day of _____, 20_____.


SIGNATURE OF THOMAS A. ZIOLKOWSKI

SUBSCRIBED AND SWORN to before me this_____day of _____, 20_____.


NOTARY PUBLIC

My Commission expires:

60 (Pages 234 to 235)

Page 234

```
 1          CERTIFICATE OF NOTARY
 2   STATE OF MICHIGAN   )
 3              ) SS
 4   COUNTY OF WAYNE    )
 5      I, Anne H. Chilton, Certified Shorthand Reporter,
 6   a Notary Public in and for the above county and state,
 7   do hereby certify that the above deposition was taken
 8   before me at the time and place hereinbefore set forth;
 9   that the witness was by me first duly sworn to testify
10   to the truth, and nothing but the truth, that the
11   foregoing questions asked and answers made by the
12   witness were duly recorded by me stenographically and
13   reduced to computer transcription; that this is a true,
14   full and correct transcript of my stenographic notes so
15   taken; and that I am not related to, nor of counsel to
16   either party, nor interested in the event of this
17   cause.
18
19
20      _____
21      Anne H. Chilton, CSR, RPR, RMR
22      Notary Public,
23      Wayne County, Michigan
24   My Commission expires:  August 09, 2013
25
```

Page 235

```
 1       INDEX TO EXAMINATIONS
 2
 3   Witness                    Page
 4   THOMAS A. ZIOLKOWSKI
 5
 6   EXAMINATION BY MR. DONOVAN:        4
 7   EXAMINATION BY MR. VINES:     207
 8   RE-EXAMINATION BY MR. DONOVAN:      217
 9   RE-EXAMINATION BY MR. VINES:  227
10   RE-EXAMINATION BY MR. DONOVAN:      228
11   RE-EXAMINATION BY MR. VINES:  231
12
13
14
15       INDEX TO EXHIBITS
16
17   Exhibit                    Page
18
19   (Exhibit attached to transcript)
20
21   ZIOLKOWSKI EXHIBIT NO. 1        64
22   August 3rd, 1990 court order
23
24
25
```