Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 09-50026(REG)

5  - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  MOTORS LIQUIDATION COMPANY, et al.,

9  f/k/a General Motors Corp., et al.

10          Debtors.

11

12  - - - - - - - - - - - - - - - - - - - - -x

13

14              U.S. Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              April 15, 2011

19              8:47 AM

20

21  B E F O R E:

22  HON. ROBERT E. GERBER

23  U.S. BANKRUPTCY JUDGE

24

25

1

2    Telephonic Hearing re Discovery Dispute.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Penina Wolicki

Page 3

1

2   A P P E A R A N C E S :   (TELEPHONICALLY)

3   GREENBERG TRAURIG, LLP

4          Attorneys for The Noteholders

5          77 West Wacker Drive

6          Suite 3100

7          Chicago, IL 60601

8

9   BY:   KEVIN D. FINGER, ESQ.

10

11  GREENBERG TRAURIG, LLP

12         Attorneys for The Noteholders

13         MetLife Building

14         200 Park Avenue

15         New York, NY 10166

16

17  BY:   BRUCE ZIRINSKY, ESQ.

18

19  BUTZEL LONG, P.C.

20         Attorneys for Official Committee of Unsecured Creditors

21         380 Madison Avenue

22         22nd Floor

23         New York, NY 10017

24

25  BY:   ERIC FISHER, ESQ.

**Page 4**

1

2   ALSO PRESENT:   (TELEPHONICALLY)

3        DENNIS A. PRIETO, Aurelius Capital Management

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1                    P R O C E E D I N G S
 2        (Audio begins mid-sentence)
 3            THE COURT:  -- on the phone, please?
 4            MR. FISHER:  Good morning, Your Honor.  This is Eric
 5     Fisher from Butzel Long for the creditors' committee.
 6            THE COURT:  Okay.
 7            MR. ZIRINSKY:  Bruce Zirinsky and Kevin Finger, Your
 8     Honor, from Greenberg for the noteholders.
 9            THE COURT:  Fair enough.
10            All right, gentlemen, I've read your letters.  I
11     gather from the Akin Gump letter that that issue is now off the
12     table.  But I sense that unless you've resolved something since
13     the time of Mr. Fisher's March 29th, letter, we still have four
14     of the five remaining issues.
15            Mr. Fisher, I'll hear from you.  You can assume
16     familiarity with both your letter and Mr. Zirinsky's or Mr.
17     Ticoll's letter.
18            MR. FISHER:  Thank you, Your Honor.  I appreciate that
19     the Court does not enjoy having to get involved in discovery
20     disputes.  And we've been working hard -- I think all sides
21     have been working hard to try to at least narrow the dispute.
22     And so I think that as opposed to four issues to present to
23     Your Honor, I can narrow it down and say that we have two and a
24     half issues to present.
25            So to quickly jump right in, the first issue is a
```

1    question about the relevant time period for responsive

2    documents to be produced by the noteholders.  The noteholders'

3    position is that they only need to give up documents that

4    relate to a seven-month period, from January 2009 to July 2009.

5    And the stated rationale for that is that the lockup agreement

6    was entered into in June, and they insist on restricting

7    discovery to a pretty narrow band of time just right around the

8    lockup agreement.

9            And we think that that's too narrow.  And the time

10   frame that we propose is that it ought to go back to June 2008.

11   And Your Honor, although my letter says that it ought to go to

12   July 2010, based on documents that we've seen even just in the

13   past few days, we actually think that the time period ought to

14   go to the end of 2010.

15           And the reason for our time frame is as follows.

16   First I want to explain why I think it needs to go beyond July

17   2009, why the end date, that's too restrictive.  There are very

18   significant events that happened after July 2009 that relate

19   directly to our objection.  For example, a key event here is GM

20   Nova Scotia Finance's own filing for insolvency proceedings in

21   Nova Scotia.  That didn't happen until October 2009.  Part of

22   why that didn't happen until October 2009, is because they were

23   strategizing around when that filing would take place, and the

24   noteholders wanted to time that filing in order to insulate as

25   best they could from some actions in Nova Scotia, a 369 million

1   dollar consent fee that they were paying in mid-2009.  So we

2   think that October 2009 is a relevant event.

3          December 2009, we've now seen e-mails between and

4   among the noteholders and the trustee that seem to suggest that

5   there's concern that the swap claim, which is an important part

6   of the claim that we're disputing, is overstated.  The swap

7   claim, Your Honor, is 564 million dollars worth of claims

8   asserted in the Old GM bankruptcy case.  And in December 2009,

9   there are e-mails saying that that claim may be overstated.

10  And when I stay overstated, not by a trivial amount, but by an

11  amount in excess of 100 million dollars.

12         It's not until November 2009 that the actual claims

13  that we're disputing were filed in the Old GM bankruptcy case.

14  Talking about the 2010 period, for just a moment.  In September

15  2010, we've seen correspondence between New GM and noteholders

16  in which there's disagreement about what the lockup agreement

17  means and the extent to which it does or does not allow claims

18  in the Old GM case.  And into 2 -- right up through the end of

19  2010, there are communications between the GM Nova Scotia

20  Finance trustee and the noteholders and other bondholders about

21  filing claims in the Nova Scotia proceeding that relate to --

22  the same claims the various -- in the Old GM case.

23         So we've seen -- we've already seen documents, I

24  think, that indicate very clearly that the relevant time frame,

25  at least, you know, in terms of the end date, should extend

Page 8

1    until the end of 2010.  It --

2             THE COURT:  Pause, please, Mr. Fisher.

3             MR. FISHER:  Yes, Your Honor.

4             THE COURT:  I see, based on what you argued, why it

5    should go at least through October 2009, but help me better

6    understand why it should go through either July 2, 2010 or to

7    the end of 2010.  Which of the events that you described would

8    cause me to want to extend it to any of those later dates?

9             MR. FISHER:  Well, in terms of an actual event, Your

10   Honor, November 2009 is when the claims were filed in this

11   case.  What I described happening in 2010, the events I would

12   describe are the filing claims in the GM Nova Scotia Finance

13   proceedings that relate to the notes and the same claims that

14   are before Your Honor in the Old GM proceeding.

15           But then we've also seen already, because we have the

16   benefit of the trustee's production, extensive communications

17   in 2010 about the -- between and among the relevant parties,

18   about the calculation of the swap amount, certain claims in the

19   Nova Scotia proceedings, whether or not the swap was properly

20   terminated and if so, how to calculate the swap amount.  So

21   we've already seen communications going until the end of 2010

22   that bear on how this claim ought to properly be calculated and

23   whether or not it be allowed.

24             THE COURT:  All right.  Continue, please.

25             MR. FISHER:  In terms of why we think the time frame

Page 9

1    ought to go back to June 2008, the lockup agreement that is at

2    the heart of our objection is an agreement that settled

3    litigation that had been commenced by the noteholders in

4    Canada.  And they commenced the litigation in March of 2009.

5    But the litigation concerned transfers that had happened

6    between GM Nova Scotia Finance and GM Canada, as far back as

7    May 2008.  And so, we'd like to -- the notes here were

8    purchased -- most of them were purchased in 2008.  Some notes

9    were purchased before then.  We'd like to go back to that

10   period of time in order to find out what it is that these

11   noteholders knew about those transfers at the time that they

12   purchased the notes.  And we think that that's relevant.

13           In sensing whether lockup agreement was truly an

14   arm's-length and fair settlement of the Nova Scotia litigation,

15   we need to get to the bottom of the merits of that litigation.

16   And that litigation, again, concerns May 2008 transfers, and

17   the notes were purchased in 2008.  So we think it's fair to go

18   back to June 2008 as a starting period of time.

19           THE COURT:  All right.  Continue, please.

20           MR. FISHER:  Okay.  That's issue number one, Your

21   Honor, the time period.

22           Issue number two is, we've sought documents concerning

23   the noteholders' decision to purchase the notes.  What did they

24   know about Nova Scotia Finance at the time that they purchased

25   the notes?  How did they analyze this investment?  How did they

Page 10

1     imagine this investment playing out?  What were their

2     expectations?  What did they expect to realize on this

3     investment?  We think that those questions are critical to

4     determining whether they behaved equitably here.  And we think

5     that at least some of the noteholders are poised to get more

6     than a hundred percent recovery.

7            And so we think the circumstances of the purchase of

8     the notes as an investment decision is just critically

9     relevant.  And I appreciate that they consider that

10    commercially sensitive information.  And that's why we have a

11    protective order.  And we think that we're entitled to that

12    information.  We're not asking for information about any notes

13    or any investment decisions other than the decision to purchase

14    the very notes that are at issue in this case.

15           THE COURT:  Pause, please, Mr. Fisher.  Because what

16    you just said seems to be a potential narrowing of your

17    contentions from your earlier letter.  At this point you're

18    only looking for stuff on the buy side, you're no longer

19    looking for stuff on the sell side?

20           MR. FISHER:  Your Honor, I think that what -- in

21    reading the noteholders' response, when it comes to calculating

22    their profits, I think that based on publicly available

23    information and 2019 statements, that they're correct, that it

24    would be possible for us to calculate profits, in other words,

25    to look at the sell side, based on that kind of information.

1    So, yes, we're focused on the buy side, Your Honor.

2           THE COURT:  All right.  Continue, please.

3           MR. FISHER:  Issue number two, which I would just

4    describe generally as the decision to purchase these notes.

5    And then what I've described as the half issue is we'd like to

6    know what other Nova Scotia unlimited liability company

7    investments these noteholders have made, because at this point,

8    this is a niche investment strategy.  This is something that

9    this group of noteholders is not just doing in this case, but

10   has done in multiple cases.  And we'd like to understand how --

11   what positions they've taken in other cases that are similar to

12   this one to determine whether those positions are consistent or

13   inconsistent.

14          And we appreci -- we're not looking to open up

15   discovery and take discovery about all the documents that have

16   been exchanged in all those other proceedings.  We just want --

17   we just ask for a list of those other ULC investments.  We

18   would use the list to probe, you know, publicly available

19   information, to look at dockets.  And then if there were

20   further information that we thought we needed, we would try to

21   ask for that in a very focused way.

22          But that's why I describe it as a half issue.  Because

23   we're not even asking for the production of documents.  We're

24   just asking for them to identify other unlimited liability

25   company investments that this group of noteholders have been

MOTORS LIQUIDATION COMPANY

1    involved with.

2           THE COURT:  All right.  Now, pause, please, Mr.

3    Fisher.  The way I heard that, that seems to be either exactly

4    the same or pretty much the same as what you were asking for in

5    your letter.  Am I correct in that understanding?

6           MR. FISHER:  Yes, Your Honor.

7           THE COURT:  Okay.  All right.

8           MR. FISHER:  And, Your Honor, the fourth issue in our

9    letter relates to documents that support the 2019 statements

10   that have been filed by Greenberg with respect to the

11   noteholder group.  And having thought about it further and

12   having read Greenberg's letter, we have no reason to doubt the

13   integrity of those filings.  And for that reason, I don't think

14   that there's discovery that we need with respect to the backup

15   to the 2019 statements.  And since submitting the letter, I

16   think we've decided to back off of that particular request,

17   which is why I said at the outset that I only have two and a

18   half issues to present to Your Honor.

19          THE COURT:  Okay.  Anything else, Mr. Fisher?

20          MR. FISHER:  Unless the Court has questions about the

21   letter.

22          THE COURT:  No, you took care of them as we went

23   along.

24          Mr. Zirinsky?

25          MR. ZIRINSKY:  Yes, Your Honor.  Your Honor, I'd like

MOTORS LIQUIDATION COMPANY

1    to introduce my partner, Kevin Finger, who has been handling

2    the discovery on behalf of the noteholders.

3             THE COURT:  Okay.

4             MR. ZIRINSKY:  And he will respond and argue whatever

5    points need to be argued and to answer any of Your Honor's

6    questions.

7             THE COURT:  Okay.  Mr. Finger?

8             MR. FINGER:  Good morning, Your Honor.  It is Kevin

9    Finger.  It's my pleasure to appear before this Court for the

10   first time.

11            With respect to the discovery that's been ongoing,

12   with respect to the objection, as the Court is aware, the

13   discovery rules dictate that the discovery must be relevant to

14   the issues presented in the litigation.  In this case, in this

15   contested matter, it's the committee's objection to the

16   noteholders' claims.  And in that objection, the committee

17   describes the basis for its objection as related to the

18   circumstances surrounding a lockup agreement.

19            And they claim -- the committee claims that the

20   noteholders have acted inequitably with respect to that lockup

21   agreement.  And I think, and a fair inference is, that the

22   committee is alleging either some sort of coercion by the

23   noteholders with respect to the negotiations with Old GM and

24   their counsel, Weil Gotshal, or some sort of collusion with

25   them; and that that somehow renders this apparently arm's-

1    length negotiated transaction somehow unfair.

2         And as we've said in our letter, clearly this was a

3    hard-fought negotiation conducted by very sophisticated parties

4    with incredibly competent counsel.  And the result was the

5    lockup agreement and ultimately the bankruptcy petition filed

6    by Old GM.  And the discovery issues that we're discussing

7    today, Your Honor, are completely unrelated to the fundamental

8    premise of the objection, the lockup agreement.

9         And I should point out that the letter lists on page 3

10   and going on to page 4, a number of significant substantive

11   areas for which the noteholders agreed to produce all relevant

12   documents, including the lockup agreement, the litigation that

13   was commenced in Nova Scotia in 2009, documents relating to

14   those transfers, and a variety of other topics that ultimately

15   led up to the negotiations of the lockup agreement and the

16   filing of a bankruptcy petition by Old GM.

17        So when Mr. Fisher asks for information going back

18   before 2009, that's at odds with the allegations in the

19   objection.  Paragraph 26 says quite clearly, "During 2009, the

20   lockup noteholders became concerned about collecting the

21   principal amount of the notes upon maturity."  That's

22   absolutely accurate.  And that is basically the premise of the

23   objection and that's what caused us to expand the time frame,

24   not just beyond May of 2009, but going all the way back through

25   January 1st, all the way through July 31st, to pick up anything

1   that may have transpired in that time frame that ultimately led

2   to the lockup agreement.

3           That would be, the noteholders have agreed to produce

4   thousands and thousands of pages of information from this time

5   frame that's related to all those subject matters listed on

6   page 3 and 4 of the noteholders' letter.

7           THE COURT:  Keep going.

8           MR. FINGER:  There's nothing about the purchase

9   decision to buy those bonds that informs the negotiations about

10  the lockup agreement.  And the committee can't point to

11  anything that's presented in the objection that renders it so

12  other than just some sort of interest in that information.  But

13  there's nothing tied to the objection as required by the

14  discovery rules.

15          The time frame after July 31, 2009, again, we view,

16  June 25th, really is the -- June 25, 2009, is really the last

17  act with respect to the lockup agreement, but expanded it

18  beyond June to be overly broad, in fact.  Nothing really in the

19  objection -- there's a heading called "post-petition

20  implementation of the lockup agreement".  They talk about the

21  June 25th date, and they don't know there's an agreement by

22  that date.  Even the assumption by New GM of the lockup

23  agreement is in July of 2009.  And the only reference to

24  something after that time period is, in fact, the filing of the

25  claims in this particular case.

1          So there's no real basis here to contest the

2     fundamental issue, which is the committee claims that a lockup

3     agreement is unfair, and somehow the noteholders acted

4     inequitably and somehow old GM was not fairly represented by

5     counsel and didn't negotiate properly.  Nothing after the July

6     31, 2009 time frame informs any of that issue in this case.

7     And the noteholders submit that they've agreed to produce, in

8     an overbroad way, as much information as possible to permit the

9     committee to pursue its objection and contest the claims if

10    there's any grounds to do so.

11         Going beyond that time frame would impose a

12    significant burden on the noteholders.  There's a lot of

13    information.  These -- particular financial institutions watch

14    this industry, watch GM.  Going back to collect all its

15    information and sift the chaff from the wheat is a time-

16    consuming, costly and burdensome exercise that frankly, without

17    any relation to the objection, is unfair to the noteholders to

18    have to go through this.

19         And again, as cited in the letter, nothing about what

20    the committee has claimed, really informs their objection.

21    Unless the Court has questions on that particular issue here of

22    the time frame, I can move to the noteholders' decision to

23    purchase.

24         THE COURT:  Go ahead.

25         MR. FINGER:  Your Honor, nothing about their decision

MOTORS LIQUIDATION COMPANY

Page 17

1    to purchase, again, informs the objection.  It's -- there's no

2    allegation in the objection that says the noteholders knew

3    something or knew something special that wasn't otherwise

4    available to anyone in the market about this particular issue.

5    The noteholders' specific rationale for purchasing is going to

6    be different for each one.  It's going to be highly

7    proprietary.  It goes to the heart of any financial

8    institution's decisions to invest.

9              To the extent that the committee claims that the

10   profit and loss information somehow informs that, as Mr. Fisher

11   has said, that's already available to them.  That's presented

12   with publicly available information as well as the information

13   present in Greenberg Traurig's 2019.  So nothing about profit

14   and loss informs that issue.

15             And again, the fundamental issue here is, the

16   noteholders have publicly defined rights as provided by the

17   offerings circular set forth in their memo which has been

18   produced.  And whatever rights either party has are clearly set

19   forth in documents.  And what the noteholders' subjective

20   belief about those rights vis-a-vis what GM Canada or GM Nova

21   Scotia's subjective belief about those rights is, is

22   irrelevant.

23             Further, Mr. Fisher, in this call as well as in his

24   letter, said that he's trying to get to the bottom of or get to

25   the merits of the litigation in Nova Scotia, and frankly cites

1    Canadian law on various issues regarding that.  And

2    notwithstanding our disagreement as to what the Canadian law

3    actually holds, asking this Court to retry or to relitigate the

4    Nova Scotia litigation, simply has no place here.  The

5    litigation was filed.  The information that was discussed or

6    contemplated in the first half of 2009 about that litigation

7    will be provided to the committee.  But trying to relitigate

8    that case is, I think, beyond the bounds of what this Court has

9    been asked to do with respect to the objection.

10          What the noteholders' belief about what those rights

11   were that ultimately led them to file that proceeding, is not

12   relevant to the proceeding, which is clearly set forth in the

13   pleadings that were filed and the motions that were filed and

14   contested by both sides.

15          Again, the fair inference of the objection is that

16   there's some sort of coercion or collusion with respect to the

17   lockup agreement.  None of that is informed by whatever the

18   noteholders believed at the time that they purchased the notes.

19          THE COURT:  All right.

20          MR. FINGER:  If the Court has no further questions on

21   that, I can move to the ULC investment issue.

22          THE COURT:  Go ahead.

23          MR. FINGER:  Similarly, there's nothing about the

24   decision to purchase -- to make investments in other vehicles

25   that relates to the decision -- to the issues related to the

1   lockup agreement.  So it's even one step further removed.

2   We're not even talking about a decision to invest in the GM

3   Nova Scotia notes, we're talking about some other vehicle which

4   is -- in Mr. Fisher's letter, it's clearly -- he has an idea of

5   what those are, because he identifies docket entries.  But to

6   go back and ask the noteholders to review prior investments

7   that may involve ULCs for the purpose of this, has no rational

8   connection to this objection.  This is simply another burden

9   that the noteholders shouldn't have to bear in his case.

10          THE COURT:  All right.  Anything further, Mr. Finger?

11          MR. FINGER:  No, Your Honor.

12          THE COURT:  All right.  Mr. Fisher, do you want to

13   reply?

14          MR. FISHER:  Yes.  Just briefly, Your Honor.  If --

15   Mr. Finger referred to the page 3 of the noteholders' letter to

16   the Court.  And I indicated that there are a whole bunch of

17   bullet point categories where the noteholders have agreed to

18   produce documents.  What I think is -- we're not quite complete

19   about that presentation, is that with respect to many of those

20   topics, the relevant time frame is before the time frame being

21   proposed by the noteholders and goes later than the time frame

22   being proposed by the noteholders.

23          And so if -- it's not quite right to say that they've

24   agreed to provide us with all relevant documents about these

25   topics.  There are very significant exclusions that are built

1   into their position.  And just by the way of example, the

2   second bullet point refers to all documents concerning the

3   litigation commenced in Nova Scotia against Old GM and certain

4   subsidiaries.  Well, that litigation was commenced in March

5   2009, but it concerned events that happened in 2008.

6         All documents concerning any transfers referred to in

7   the Nova Scotia proceeding.  Those are 2000 -- those are May

8   2008 transfers that we're talking about.  So I'm certainly

9   going to be deprived of relevant information if I'm not getting

10  information before January 2009.

11        All documents concerning currency swaps between Nova

12  Scotia Finance and Old GM.  Well, the swaps weren't assumed

13  until August 2009, which is after the time frame that's

14  proposed by the noteholders.  And as I indicated, well into

15  2010 there is discussion whether those swaps are being properly

16  calculated for purposes of the claim in this case.

17        All documents concerning intercompany loans from Nova

18  Scotia Finance to GM Canada.  That's not a 2009 event.  That's

19  a 2008 and earlier event.  All documents concerning a potential

20  reorganization or bankruptcy insolvency liquidation or winding

21  up event of Nova Scotia Finance or GM Canada.  That didn't

22  happen, Your Honor, until October 2009.

23        So there's a list of categories, and the noteholders

24  are telling the Court that they've agreed to give up all

25  documents concerning those categories.  But that sort of evades

 1   the fundamental issue, which is, what's the relevant period of

 2   time in order for the committee to be sure that it's getting

 3   the relevant documents concerning those topics.  So that's why

 4   I think the time frame is such a critical issue here.

 5         Issue number two, which is the noteholders' decision

 6   to purchase notes.  All we're trying to see is whether

 7   discovery bears out our theories of the case.  But if it

 8   doesn't then we're not going to be able to press those

 9   theories.  But based on what we know about what happened here,

10   when the noteholders purchased these notes in 2008, they knew

11   about the intercompany transfers that they then later, in March

12   2009, challenged in litigation commenced in Nova Scotia.

13         So essentially, when they purchased their notes, they

14   were buying an oppression claim against Nova Scotia that they

15   were then going to use for maximum leverage to try to get as

16   much as they could on these notes.  And so, you know, I

17   don't -- the committee does not believe that this is a campaign

18   that started sometime in 2009.  This is a deliberate investment

19   strategy that started in 2008 when they purchased the notes and

20   thought through how they could take advantage of the ULC

21   structure and projected distress for GM and its Canadian

22   subsidiaries.

23         With respect to the list of the ULC investments,

24   again, I think how they are able to gain the ULC structure in

25   order to maximize their return on investment is a relevant part

Page 22

1    of the puzzle. But I'm mindful of the burden, and therefore

2    we've restricted it to a list.

3            And on the topic of burden, Your Honor, in the

4    noteholders' letter, they talked about -- they quote Rule

5    26(b)(2)(B). And this to suggest that this information is not

6    reasonably accessible to them. And that's just not true. Not

7    reasonably accessible is, of course, a term of art, and it

8    refers to electronic data that is not searchable, that exists

9    in backup servers that are difficult to access. I have every

10   reason to believe, and I have not been told to the contrary,

11   this is all live electronic data that can be collected,

12   searched and produced.

13           So I do appreciate that it's more data that needs to

14   be collected, searched and produced. But I don't think it's

15   fair to say that it's an unreasonable burden. We tried to

16   restrict the time frame to that time frame that we think is

17   necessary to give us information that is going to lead to

18   admissible evidence in the ultimate hearing on this objection,

19   Your Honor.

20           THE COURT: All right. Gentlemen, everybody sit in

21   place. There's going to be a few moments of silence, of dead

22   air. So don't be surprised or upset if don't hear anything for

23   a couple of minutes.

24       (Pause)

25           THE COURT: All right, gentlemen. On the remaining

Page 23

1    issues before me, the documents will be produced for the period

2    from June 1, 2008 through the end of 2010.  The documents in

3    the second category will be produced to the extent they deal

4    with the decision to purchase, but the request is denied

5    without prejudice with respect to documents that solely relate

6    to sell or hold decisions.  It being understood, of course,

7    that if a document refers to both, or some combination of those

8    three things, it still has to be produced.  And the request

9    that a list be provided with respect to investments in other

10   ULCs is granted.  My bases for the exercise of my discretion

11   follow.

12          First, in my view, after hearing argument from both

13   sides, it's no big deal to add a few months on each end to the

14   requested time coverage of the discovery request.  There has

15   been no real showing of burden other than the ipse dixit claim

16   that adding these few months of discovery on each end is

17   significant.

18          The requested expansion of the time coverage for the

19   request does not require production of documents of a different

20   character.  And frankly, gentlemen, we're talking about a claim

21   which, at least by some people's count, is 2.67 billion

22   dollars -- perhaps I should say claim or aggregate claims.  And

23   when you're trying to get that much money from an estate, to

24   which of course you may be fully entitled, but the incremental

25   cost of a little extra production and a few extra months,

MOTORS LIQUIDATION COMPANY

Page 24

1    cannot be considered unfair or oppressive in the context of the

2    extraordinary amounts of money for which recovery is sought.

3           Then, gentlemen, that while I express no view on the

4    merits of the case or even whether anything that the creditors'

5    committee wishes to obtain is ultimately going to be

6    admissible, everybody knows what the standard is for discovery

7    vis-a-vis it being reasonably calculated to lead to admissible

8    evidence or potentially admissible evidence.  And I think that

9    the request easily passes muster on that standard.

10          At this stage in the case, I'm not going to let either

11   side's views as to the merits or what its views are concerning

12   what the legal issues are to be determinative of the scope of

13   discovery.  Each side is going to be allowed to make its best

14   case based on evidence that may turn out to be relevant with

15   respect to issues as to the merits which have yet to be

16   decided.

17          The creditors' committee has made a number of claims

18   or contentions vis-a-vis the Nova Scotia noteholders,

19   including, without attempting to characterize either side's

20   positions inappropriately or to bind either side to the

21   contentions, that the Nova Scotia noteholders had created a

22   cottage industry to get increased distributions, and to confer

23   an advantage over other creditors.  They've used the expression

24   "to buy oppression claims".  And they've made accusations of

25   gaming the system.

Page 25

1          I don't know if those allegations are true or not.  I

2     don't know if even if those allegations are true, there's

3     necessarily anything wrong with it, or if there is something

4     wrong with it, if whatever's wrong with it is legally

5     actionable or legally cognizable as a basis for relief.  But

6     we're going to get to the facts.  We're going to get the facts.

7     And I won't decide the ultimate issues in this case in a

8     factual vacuum.

9          It is for that reason -- or those reasons -- that I

10    think the requests in both category number 2 and number 3 are

11    appropriate, subject to the limitations that I articulated

12    before.  While I think that those limitations' rationale is

13    obvious, I think I can and should clarify why I think the

14    purchase decisions are relevant, but that decisions as to sell

15    and hold should be denied without prejudice at this time.

16         The various contentions that the creditors' committee

17    made, make buy decision, purchase decisions, plainly relevant.

18    But at least on this state of the record, the amount of money

19    that various Nova Scotia noteholders might be making off this

20    investment, is not now relevant, if it ever will be.  The issue

21    isn't so much how much money they're going to make off this.  I

22    think it may be argued or inferred that they wouldn't have made

23    the investment unless they wanted to make a profit.  But the

24    issue isn't so much -- at least on this state of the record --

25    exactly how much of a profit they're going to make, it's much

Page 26

1    more the underlying rationale and the effect on the creditor

2    community and the various other allegations which provide the

3    basis underlying this controversy.

4         Lastly, gentlemen, for the avoidance of doubt,

5    anything produced will be at least initially subject to

6    coverage under a confidentiality order.  And to deal with an

7    issue which probably didn't need stating, but I will, only

8    documents that actually exist or are known need to be produced.

9         All right, gentlemen, not by way of reargument, are

10   there any open issues?

11        MR. ZIRINSKY:  Your Honor, it's Bruce Zirinsky.

12        THE COURT:  I'm sorry, I couldn't hear that.

13        MR. ZIRINSKY:  I'm sorry, Your Honor.  It's Bruce

14   Zirinsky.  I have a frog in my throat.  I was just clearing it.

15        I don't think it's relevant to today's discussion, but

16   I did want to inform the Court and Mr. Fisher that we were

17   informed this week that two of the noteholders we represent

18   have sold their claims and are no longer creditors of GM.  It's

19   our intention to file an amended 2019 statement as soon as we

20   can obtain the relevant information.  And we'll attempt to file

21   it by next week.

22        THE COURT:  Very well.  Anything else, anybody?

23        MR. FISHER:  Your Honor, this is something I'll take

24   up with Mr. Zirinsky, certainly.  But I just want to ensure

25   that Your Honor's discovery rulings would apply to discovery of

MOTORS LIQUIDATION COMPANY

Page 27

1   information in the files of those two noteholders that seem to

2   have withdrawn from Mr. Zirinsky's group.

3              MR. ZIRINSKY:  Well --

4              THE COURT:  Well, the issue, at least warrants an

5   opportunity for Mr. Zirinisky or Mr. Finger to be heard before

6   I express a view on that.

7              MR. ZIRINSKY:  Understood, Your Honor.  Your Honor, I

8   would suggest that we have a conversation with Mr. Fisher and

9   attempt to work things out.  And if we can't, we'll come back

10  to Your Honor on that.

11             It is our clients' understanding that they are still

12  going to have to produce discovery.  Whether that's in the

13  capacity, now, as a party or as a third-party witness, it may

14  be a distinction without a difference.  But they do understand

15  that they will be required to produce discovery.

16             THE COURT:  Well, I think you may be right, Mr.

17  Finger.  And that's my tentative.  But I like the idea of you

18  having a dialogue with Mr. Fisher on that.  And if you later

19  somehow can't come to an agreement, you can call me up again.

20             MR. ZIRINSKY:  Thank you, Your Honor.  It's Bruce

21  Zirinsky, by the way, that made that comment.

22             THE COURT:  I'm sorry.  That's fine.

23             MR. ZIRINSKY:  That's okay.  Thank you, Your Honor.

24  We appreciate your time.

25             THE COURT:  All right, gentlemen.  Have a good

MOTORS LIQUIDATION COMPANY

Page 28

1    weekend.  We're adjourned.

2            MR. ZIRINSKY:  Thank you, Your Honor.  We appreciate

3    it.

4        (Whereupon these proceedings were concluded at 9:28 AM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 29

1

2                                **I N D E X**

3

4                                  RULINGS

5                                                    Page      Line

6    Documents will be produced for period of        23         1

7    6/1/08 to 12/31/10

8    Documents in category 2 will be produced         23         2

9    regarding buy but not sell or hold decisions

10   Request for list of ULC investments, granted     23         8

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 30

1

2                    C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8    _____

9    PENINA WOLICKI

10   AAERT Certified Electronic Transcriber CET**D-569

11

12   Veritext

13   200 Old Country Road

14   Suite 580

15   Mineola, NY 11501

16

17   Date:  April 18, 2011

18

19

20

21

22

23

24

25