Statement and BRIEF

NHSTA would become IRRELEVANT if Laws That Congress Make Do not mean

ANYTHING and BURDEN the SSA just so GM is NOT HELD ACCOUNTABLE

Section 1102(b)(1) requires that the committee members be representative of the different

types of unsecured claims. The creditors' committee works on behalf of and owes a fiduciary

duty to all unsecured claims.

1. In this case I have never been Contacted

2. the Case in My Opinion could have been Bifurcated into two Claims and GM should have

at least Replaced my Car,(property transferred in satisfaction of DEFECTIVE PROPERTY

3."Most consumers have no idea that their rights and the rights of their family members (COULD BE) have been eliminated should something happen as a result of a defect in one of these cars," says Joanne Doroshow, executive director of the Center for Justice & Democracy in New York.

4.Lynn M. Lopucki, a bankruptcy law professor at the University of California, Los Angeles, says courts have allowed the process to be overly favorable to companies trying to shed their obligations.

5.Ron Bloom, an adviser to the U.S. Treasury and one of the most influential members of the Obama Administration's auto industry task force assisting GM and Chrysler through bankruptcy. Bloom testified that the process is designed specifically to remove liabilities from companies

6.preference laws require property be transferred in satisfaction of an antecedent or past debt. SO in Smalleys Claim there should at least be a CAR made by either GM (old GM or New GM ) to replace the Car that was Defective and the creditors' committee on behalf of unsecured claims list its argument for Injuries.

Why In the world did we even hold Tobacco companies Liable


Senator Specter
If state law is preempted and lawsuits or claims are dismissed, public safety and health may

be affected. In the past, some tort cases have unearthed industry secrets and safety shortcuts

that manufacturers have taken. Information obtained in tort suits has turned out to be very

useful to regulators seeking to protect the public. In addition, the unearthing of this information

has caused manufacturers to improve the safety of their products, or make other changes that protect the public.

WYETH v. LEVINE
See United States v. Dotterweich, 320 U.S. 277, 280, 282 (1943) ("The purposes of this legislation thus touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection").

See H.R. Rep. No. 73-6110, pt. 1, § 25 (1933) ("Liability for Personal Injuries - a right of action for damages shall accrue to any person for injury or death proximately caused by a violation of this Act.").

# THE STRUGGLE FOR AUTO SAFETY

By Jerry L. Mashaw[1] and David L. Harfst.[2]
Cambridge, Massachusetts: Harvard University Press. 1990.
Pp. xi, 285. $29.95.

In 1965, over fifty thousand Americans died in traffic related accidents (p. 2). Less than one hundred years after its invention, the automobile had become the leading cause of death in the United States population below age forty-four (p. 3). Yet, until passage of the National Traffic and Motor Vehicle Safety Act[3] in 1966, there was no federal agency responsible for overseeing automobile safety. The Act led to the creation of the National Highway Traffic Safety Administration ("NHTSA"), whose role it was to "establish 'appropriate federal motor vehicle safety standards' that were to 'meet the need for motor vehicle safety'" (p. 47).

In *The Struggle for Auto Safety*, Jerry L. Mashaw and David L. Harfst trace the development of NHTSA from its inception to the present. The story they tell reveals a beleaguered agency involved in one failure after another. They argue that the agency, hindered by its legal environment and internal divisiveness, lost sight of its original technology-forcing goal and chose, instead, to regulate through forced automobile recalls. The result today, Mashaw and Harfst contend, is an agency entwined in red tape, incapable of dictating anything to powerful automobile manufacturers and unwilling even to try.

Mashaw and Harfst demonstrate that Congress in 1966 did not intend for NHTSA to become an anemic and ineffectual organization. Far from it. Congress wanted an agency capable of radically altering the automobile. Supporters of the Motor Vehicle Safety Act envisioned an "engineering utopia" in which cars would be safe despite their drivers (p. 52). Congressional faith in automotive engineering was part of a general American infatuation with technology that permeated the 1960s. As one participant in the Congressional auto safety hearings asked, "If we can send a man to the moon and back ... why can't we design a safe automobile here on Earth?" (p. 64). Congress answered resoundingly, "We can!" Politically backed by both the Johnson administration and consumer advocacy heavyweight Ralph Nader, the Motor Vehicle Safety Act passed unanimously in both the House and the Senate, "a political

---

1. William Nelson Cromwell Professor of Law, Yale University.
2. Covington & Burling, Washington, D.C.
3. Ch. 38, 80 Stat. 718 (1966) (codified at 15 U.S.C.A. §§ 1381–1431 (1988)).

consensus of rare proportions" (p. 50).

Nevertheless, NHTSA's momentum did not last long. The first rules it proposed were weak modifications of existing industry and government standards. Even so, they were opposed at every step by auto and equipment manufacturers, and were revised to be virtually useless. The courts only worsened the agency's problems. NHTSA's first major legal defeat was handed down by the Sixth Circuit in *Chrysler Corp. v. Department of Transp.*[4] In that case, Chrysler challenged the legality of the agency's proposed Standard 208. The standard required that automobiles be equipped with "passive" restraints that would protect anthropomorphic dummies from injury in frontal collisions of thirty miles per hour (p. 86). NHTSA experts hoped that the standard would force manufacturers to adopt airbag technology, an expensive but effective technology they estimated would save ten to twelve thousand lives each year (p. 85). The court upheld the legality of Standard 208 on all grounds but one. Under the Motor Vehicle Safety Act, an objective measure for determining compliance to the standard is required. The court found that the test dummy of Standard 208 did not provide such objectivity (p. 89).

Mashaw and Harfst contend that this seemingly innocuous decision in *Chrysler* had three disastrous effects on NHTSA's rulemaking power: It critically delayed the implementation date of the passive restraint requirement, it generated the perception that manufacturers were being subjected to the "costly interventions of a technically incompetent bureaucracy," and, most importantly, it increased the perceived burden of standard setting (p. 92).[5]

Subsequent cases continued to challenge procedural aspects of NHTSA's rulemaking. In *Paccar, Inc. v. NHTSA*,[6] the Ninth Circuit invalidated a standard governing air brakes on trucks, buses, and trailers (p. 101). Standard 121 specified stopping distances for vehicles on roads with "skid coefficients" of seventy-five and thirty (dry and wet, respectively). Manufacturers complained that it was impossible to maintain a testing surface at precisely one coefficient of slipperiness, so they would be forced to overcompensate to ensure compliance. Though NHTSA claimed that it would allow a margin for surface variances, the court

---

4. 472 F.2d 659 (6th Cir. 1972).
5. The passive restraint saga, detailed extensively by Mashaw and Harfst, eventually resulted in a final rule being issued on July 17, 1984, fifteen years after the original proposal was made. The final rule required "automatic occupant protection in all passenger automobiles" by September 1, 1989, unless two thirds of the States were covered by mandatory-use seatbelt laws by that time (p. 211).
6. 573 F.2d 632 (9th Cir. 1978), *cert. denied*, 439 U.S. 862 (1978).

found that such "informal assurances" were not enough to provide a practicable testing standard (p. 101).

Thus, the agency found itself in a catch-22. Courts would not approve rules unless they were highly specific. Yet NHTSA could not make specific rules unless it had a large body of data concerning the technology it sought to regulate. Without a rule requiring the addition of new safety equipment, auto manufacturers would not introduce new equipment, and NHTSA would never have sufficient data to make new rules.

While the agency floundered with technology forcing regulations, it flourished with another strategy of auto regulation: the recall of defective vehicles. Under the 1974 amendments to the Motor Vehicle Safety Act, Congress gave NHTSA broad new power to enforce recall decisions. These powers included new reporting requirements, increased penalties for noncompliance, and subpoena and plant inspection authority (p. 110).

The courts also supported the recall strategy. In two cases against General Motors, the D.C. Circuit gave life to NHTSA's "per se defect" theory.[7] The court held that so long as an equipment failure leading to a safety risk had occurred in a significant number of vehicles, a recall was justified (p. 151).

This shift from rules to recalls indicated, as Mashaw and Harfst term it, "a reorientation of auto safety regulation, from science and planning to crime and punishment" (p. 111). The shift "signalled the abandonment of [NHTSA's] safety mission," according to the authors, who argue further that recalls are only marginally useful in preventing accidents and have little effect on manufacturer behavior (p. 167).[8] Recalls, however, won out over technology forcing rules because they were politically popular, easy for consumers to understand, and formulated along lines familiar from product liability law.

Mashaw and Harfst draw several lessons from the failures of

---

7. *See* United States v. General Motors Corp. (Wheels), 518 F.2d 420 (D.C. Cir. 1975) (court agreed with NHTSA in accepting wheel failures as evidence of defects, even if the failures occurred when the vehicles were being operated properly); United States v. General Motors Corp. (Pitman arms), 561 F.2d 923 (D.C. Cir. 1977) (upholding a NHTSA recall of Cadillacs with defective steering linkages despite the fact that General Motors received no complaints from failures that had occurred).

8. Mashaw and Harfst argue that under a cost-benefit analysis, auto manufacturers would almost surely prefer to absorb the cost of a recall than implement new safety features in their cars. First, the actual cost of repair is almost trivial in relation to overall expenses. Second, recalls have not been shown to affect significantly the share prices of auto companies. Third, a manufacturer's reputation is not affected by a recall if all manufacturers are undergoing recalls more or less concurrently. Even if a particularly dangerous defect is identified, such as the unexpected acceleration in the Audi 5000S, most reputational damage is done by news reports predating a recall (pp. 169–71).

NHTSA. First, they point to the importance of politics, even in a field of technological regulation:

> The image of top-down, rational-technocratic regulation that danced before the eyes of reformers in 1966 was an illusion. . . . [T]wenty-plus years' experience reveal that understanding the regulation game by attending to its technical underpinnings is about as effective as trying to give foreign visitors a feel for American football by introducing them to the NCAA rulebook. Regulatory agencies are in politics. They must pursue their objectives by political means . . . (p. 247).

They find that NHTSA ignored its political environment and concentrated, instead, on the technical aspects of its rulemaking.[9]

Mashaw and Harfst fault the agency for failing to cooperate with its greatest potential ally: the automotive industry. They note that the agency and the industry "occupy the same policy space . . . both want safer cars" (p. 250). Nonetheless, the agency succeeded only in alienating the auto industry. In 1972, General Motors was the industry's greatest proponent of airbag technology. By 1980, however, GM had become its greatest opponent. The authors credit the auto giant's defection to NHTSA's failure to reward innovation and disregard for industry concerns (pp. 250–51).

Mashaw and Harfst also fault NHTSA for failing to work with its other political bedfellows, namely Congress, the Office of Management and Budget, and the courts. Had there been more communication between these bodies, they contend, NHTSA's rules might have been less frequently derailed (p. 253).

Despite the improvements that could be wrought by making political amends, Mashaw and Harfst believe that more substantive reforms are needed to solve the vehicle safety dilemma. They review avenues of reform such as direct Congressional standard setting (p. 232), use of the products liability system (p. 236), and no-fault insurance (p. 242), but

---

9. They note that of all the 1974 amendments to the Motor Vehicle Safety Act, none were more popular or successful than certain amendments relating to school bus safety. Though the amendments addressed safety features that would save only an estimated 30 lives per year at an exorbitant cost, school buses were politically hot in 1974. In 1971, the Supreme Court had handed down a controversial decision upholding school busing as a means of ending racial segregation in the schools. Swann v. Charlotte-Mecklenberg Bd. of Educ., 402 U.S. 1 (1971). Congress used the safety amendments to console the angry parents of bused children. If the children were forced to ride, at least the ride would be safe (pp. 141–46).

09-50026-mg Doc 10096 Filed 03/31/11 Entered 04/19/11 10:19:14 Main Document Pg 7 of 8

find each lacking in some way.[10] As an alternative, they propose that judicial review of NHTSA rules occur only after rules are implemented, so-called "enforcement review" (p. 245). The proposal would delay judicial consideration of a safety rule until the safety feature was already installed in vehicles, giving the court and agency sufficient data to analyze the rule's actual effectiveness. Removal of the courts from the early stages of rulemaking would also result in more negotiation between manufacturers and the agency during rule development. In the case of litigation, the issue presented to the court would be focused, preventing courts from making erratic decisions, as in *Chrysler*.

As a whole, Mashaw and Harfst's account of NHTSA's troubled past is both scholarly and thorough. Their reform proposal is well reasoned and plausible. However, *The Struggle for Auto Safety* suffers in several regards. First, the book, in its narrow focus on NHTSA, ignores or only briefly mentions many areas of traffic safety law which directly bear on the subject matter of the book. For example, the authors briefly mention the massive Ford Pinto recall three times, yet provide no explanation of the circumstances surrounding that recall. Similarly, they mention speed limits, but neglect to explain adequately how or by what bodies limits are set, and what, if any, voice the federal government, the Department of Transportation, or NHTSA has in setting them. Clearly, this book is intended for a reader already well-versed in both administrative and automobile law. However, the omission of so much background material creates a rather incomplete picture even for an educated reader. After all, the real "struggle for auto safety" involves more than just one administrative agency.

Moreover, the book suffers from a general lack of thematic unity. The authors begin their second chapter, "The Law of a Mobile Society,"

---

10. Congress has had little success with direct motor vehicle regulation. The authors cite its failures in the areas of emissions control and fuel economy, noting that the small benefits created by these programs were gained at disproportionately high costs (pp. 234–35).

The products liability system is unsuitable for regulation of the automobile for a number of reasons. The authors contend that "fear of liability provides only a modest additional incentive [to make safer vehicles] to those that already exist because of marketplace concerns" (p. 240). They also point out that financial exposure in liability suits represents only a small percentage of the auto manufacturers' revenues (about one half of one percent) (p. 240). Finally, they argue that there are not enough liability cases to send clear messages to the manufacturers, since about half of the liability cases are one-of-a-kind cases. As such, there is too much "noise" to use liability cases as a source of design information (p. 241). Despite possible advantages, no-fault insurance is also an unlikely avenue for motor vehicle regulation. It causes "safe drivers" to pay for unsafe ones, cuts off rights to collect full compensation for emotional distress, requires passage on a state-by-state basis, and benefits no major organized economic interest (p. 244).

with a caption entitled "The Four Commandments of Automobile Law" (p. 27). These "Commandments" are over-arching principles that dictate the form of automobile law in the United States.[11] They are the result of custom, economic interests, and the shape of other areas of the law.[12]

Mashaw and Harfst contend that one of the failures of the Motor Vehicle Safety Act was its attempt to replace this preexisting regime of deeply ingrained "automobile law" with something radically different. The Act went against the Commandments, and was thus likely to fail from the start (p. 248). Despite this assertion, the authors pay relatively little attention to their Commandments throughout most of the book. In fact, they fail to analyze their own proposal in terms of the Commandments. Likewise, the authors initially seem to demonstrate a tension between the freedom of the public to act and regulations for public safety. In their preface, they colorfully assert that:

> The private motor car is more than just another "consumer durable." It has permitted an impatient people to conquer space and time and to display individual taste and social status while maintaining maximum personal privacy. That the automobile was, and should be, preeminently a "freedom machine" was not a notion easily tossed aside. Legislation can emphasize, even exalt, new ideas. But it cannot repeal history, nor can it suppress deeply held social values (p. ix).

As Mashaw and Harfst progress through NHTSA's twenty-four year history, however, they lose sight of this struggle for freedom. Their conclusion, far from echoing the melodramatic rhetoric of the preface, is pragmatic and "pedestrian." One is left with the feeling that *The Struggle for Auto Safety*, like NHTSA itself, has simply run out of gas.

*Jorge L. Contreras*

---

11. The Commandments are:
   1. Automobiles are America: Legal rules should facilitate automotive travel (pp. 27–28);
   2. Safety is Job One: The law should make safety a central preoccupation (pp. 28–29);
   3. The Intelligence in the Machine: Legal controls should be designed to promote good driver behavior and discourage bad (p. 29); and
   4. Don't Argue with Success: Federal power should be used to support, not challenge, the auto manufacturers' technical mastery of their product and the states' control over motorists and roadways (pp. 29–31).

12. For example, since Oliver Wendell Holmes' influential "Common Law" lectures in 1881, tort law has been perceived as unified by the principle of negligence. The idea that liability should be based on individual fault permeates automobile law (pp. 35–36).