**Page 1**

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 09-50026

5   - - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   MOTORS LIQUIDATION COMPANY, et al.,

9   f/k/a General Motors Corp., et al.

10           Debtors.

11

12   - - - - - - - - - - - - - - - - - - - - - -x

13

14                U.S. Bankruptcy Court

15                One Bowling Green

16                New York, New York

17

18                April 26, 2011

19                9:51 AM

20

21   B E F O R E:

22   HON. ROBERT E. GERBER

23   U.S. BANKRUPTCY JUDGE

24

25

 1

 2    HEARING re Debtors' 137th Omnibus Objection to Claims (Eurobond

 3    Deutsche Debt Claims).

 4

 5    HEARING re Debtors' 138th Omnibus Objection to Claims (Eurobond

 6    Deutsche Debt Claims).

 7

 8    HEARING re Debtors' 141st Omnibus Objection to Claims (Eurobond

 9    Deutsche Debt Claims).

10

11    HEARING re Debtors' 143rd Omnibus Objection to Claims (Eurobond

12    Deutsche Debt Claims) Schwake - Adj. to 5/17/2011 at 9:45 a.m.

13

14    HEARING re Debtors' 217th Omnibus Objection to Claims

15    (Duplicate Claims Filed by Individual Members of the Dex-Cool

16    Class).

17

18    HEARING re Debtors' 218th Omnibus Objection to Claims

19    (Duplicate Claims Filed by Individual Members of the Dex-Cool

20    Class).

21

22    HEARING re Debtors' Objection to Proof of Claim No. 28231 Filed

23    by Isaac Oliva.

24

25

Page 3

1    HEARING re Motion of Debtors for Entry of Order Pursuant to

2    Fed. R. Bankr. P. 9019 and Fed. R. Civ. P. 23 Approving

3    Agreement Resolving Proof of Claim No. 51095 and Implementing

4    Modified Dex-Cool Class Settlement.

5

6    HEARING re Debtors' Objection to Proof of Claim Nos. 00136,

7    00552, 07020, 09072, 14901, 19246 and 19247 Filed by Sharyl L.

8    Carter.

9

10   HEARING re Motion of Debtors for Entry of Order Pursuant to

11   Fed. R. Bankr. P. 9019 and Fed. r. Civ. P. 23 Approving

12   Agreement Resolving Proof of Claim No. 51093 and Implementing

13   Modified Class Settlement.

14

15   HEARING re Motion of David Irwin for Relief from Automatic Stay

16   to Conduct Limited Intrusive Testing of Debtors' Property.

17

18   HEARING re Debtors' Objection to Claim Nos. 67121 and 67122.

19

20   HEARING re Debtors' Objection to Proof of Claim No. 70285 Filed

21   by Stanley R. Stasko.

22

23   HEARING re Motion for Relief from Stay Filed by Dave Shostack.

24

25   Transcribed by:  Pnina Eilberg

Page 4

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Debtors and Motors Liquidation

5            Company GUC Trust

6         767 Fifth Avenue

7         New York, NY 10153

8

9    BY:   JOSEPH N. SMOLINSKY, ESQ.

10

11

12   GIRARD GIBBS LLP

13        Attorneys for Anderson Class, Dex-Cool Class

14        601 California Street

15        14th Floor

16        San Francisco, CA 94108

17

18   BY:   A.J. DE BARTOLOMEO, ESQ.

19

20

21   SMITH & ALSPAUGH, P.C.

22        505 20th Street N.

23        Birmingham, AL 35203

24

25   BY:   WILLIAM CONE OWEN, JR., ESQ.

Page 5

1

2    BAXTER BRUCE & SULLIVAN P.C.

3         Attorneys for Larry Compton, Trustee

4         Professional Plaza

5         9309 Glacier Highway

6         Suite A-201

7         Juneau, AK 99803

8

9    BY:   DANIEL G. BRUCE, ESQ. (TELEPHONICALLY)

10

11

12   ARNSTEIN & LEHR LLP

13        Attorneys for Sentry Insurance and

14           Sentry Select Insurance Company

15        120 South Riverside Plaza

16        Suite 1200

17        Chicago, IL 60606

18

19   BY:   DAVID ALAN GOLIN, ESQ. (TELEPHONICALLY)

20

21

22

23

24

25

Page 6

1

2    GOLDBERG SEGALLA LLP

3         Attorneys for Quaker Oats Company

4         665 Main Street

5         Suite 400

6         Buffalo, NY 14203

7

8    BY:   BRUCE W. HOOVER, ESQ. (TELEPHONICALLY)

9

10

11   PEPPER HAMILTON LLP

12        100 Renaissance Center

13        Suite 3600

14        Detroit, MI 48226

15

16   BY:   KAY STANDRIDGE KRESS, ESQ. (TELEPHONICALLY)

17

18

19   ALSO PRESENT:

20        SHERIF R. KODSY, Pro Se

21        SHARYL Y. CARTER, In Pro Per/Pro Se (TELEPHONICALLY)

22        DAVID A. RADKE, In Pro Per/Pro Se (TELEPHONICALLY)

23        STANLEY R. STASKO, In Pro Per/Pro Se (TELEPHONICALLY)

24        SARAH THOMPSON, Barclays Capital, Inc. (TELEPHONICALLY)

25

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 7 of 105

Page 7

P R O C E E D I N G S

1

2          THE COURT:  Good morning.  Okay.  We're here on Motors

3  Liquidation.  We have quite a number of claims matters, I

4  believe.  Is my microphone working?  You can hear me okay?

5      (No response)

6          THE COURT:  All right.  I have your agenda letter, I

7  don't know if that's the order in which you want to proceed or

8  not, whatever you prefer Mr. Smolinsky.

9          MR. SMOLINSKY:  Thank you, Your Honor.  Good morning.

10  Joe Smolinsky of Weil, Gotshal & Manges.  We appear before you

11  this morning not only as counsel for the debtors and post-

12  effective date debtors but also as counsel to the Motors

13  Liquidation Company GUC Trust, that's the entity that is the

14  successor to the debtors for purpose of reconciling claims and

15  distributing property to holders of allowed claims.

16          THE COURT:  Is this the first hearing in which you've

17  appeared in this capacity?

18          MR. SMOLINSKY:  For me it is, Your Honor.  I believe

19  it is my first.

20          THE COURT:  The plan has now gone effective?

21          MR. SMOLINSKY:  Yes.  It went effective on the 31st of

22  last month.

23          THE COURT:  Uh-huh.  Okay.

24          MR. SMOLINSKY:  Your Honor, I have no problem going

25  through the calendar as it appears.  The first matter is the

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 8 of 105

Page 8

1   debtors' objections to seven proofs of claim filed by Sharyl

2   Carter.  I would ask if Sharyl Carter is on the phone?

3           THE COURT:  Ms. Carter, are you on the phone?  Ms.

4   Carter?

5       (No response)

6           THE COURT:  My log shows that she was going to

7   participate, Mr. Smolinsky.

8           MR. SMOLINSKY:  And Your Honor.

9           OPERATOR:  Ms. Carter, please unmute your line.

10          THE COURT:  I beg your pardon?

11          OPERATOR:  Ms. Carter is online.  I think she has her

12  phone muted.

13          THE COURT:  Okay.  Muted by CourtCall or she muted it?

14          OPERATOR:  Hello Ms. Carter.

15          MS. CARTER:  Hello.  My line is not muted.

16          THE COURT:  Okay.  Ms. Carter, this is the Judge.  Can

17  you hear me now?

18          MS. CARTER:  Yes, I can hear you.

19          THE COURT:  Okay.  All right.  Go ahead, Mr.

20  Smolinsky.

21          MR. SMOLINSKY:  Your Honor, in the case of Ms.

22  Carter's claims we need the Court's assistance in sorting them

23  out.

24          We received seven proofs of claim filed by Ms. Carter.

25  They all appear to be substantially similar, if not identical.

Page 9

1          As we always do, we attempted to reach out to Ms.

2     Carter to better assess if the claims are duplicative or to

3     also assess the nature of the claims.  But in those

4     discussions, unfortunately, we were unable to get further

5     detail on the claims or an agreement that the claims are

6     duplicative.

7          Ms. Carter has subsequently submitted many letters to

8     this Court, to the Clerk of the Court, to debtors' counsel and

9     those letters, if you parse through them, hint at a variety of

10    potential claims.  We've pulled out a reference to employment

11    claims for hostile working environment but those appear to be

12    claims that were asserted against her employer, Delphi

13    Corporation, which as Your Honor knows is the subject of a

14    separate Chapter 11 case that was pending in the Southern

15    District of New York and unrelated to the General Motors case

16    other than the fact that Delphi, at one point, was a spinoff

17    from General Motors.

18         There's also a reference to a Workers' Compensation

19    claim, also we believe that any such claim would be against

20    Delphi.  There was a reference to employee benefits, that claim

21    would also be a claim properly submitted against Delphi.  And

22    then there was a reference to a car warranty claim and finally

23    there was a reference to a class action claim relating to Dex-

24    Cool, which is actually on the calendar later today for the

25    approval of a settlement.  But it was unclear whether Ms.

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 10 of 105

Page 10

1    Carter was alleging that she was a member of that class.

2           So there were also references in the papers to, or

3    attempts to work with counsel for Delphi and to pursue her

4    claim in the Delphi case, but she may be a bit confused about

5    whether or not GM and Delphi are part and parcel of the same

6    proceeding.  But they are not and if these claims are properly

7    against Delphi then the claims should be expunged.

8           So at this point, without the ability to go any

9    further, we'd like to give Ms. Carter the opportunity to

10   explain to this Court what the nature of her claims are and

11   whether there are, in fact, seven different claims or whether

12   they're duplicative of one another.

13          THE COURT:  Okay.  Ms. Carter can I hear from you,

14   please?  I take it you understand that Motors Liquidation

15   Company, which we refer to as Old GM and which you may have

16   thought of as simply GM, is a different company than Delphi and

17   I only have the power to allow claims against Old GM.  Any

18   rights you have against Delphi aren't within my power to deal

19   with, one way or the other.  So help me, if you would please,

20   Ms. Carter.

21          MS. CARTER:  Yes.  I do understand that.  My question

22   -- Okay.  When I first put in these claims I don't know, okay,

23   it started out with Delphi and the claim that I had against

24   them was in another bankruptcy court under another judge.  And

25   then I was receiving letters from General Motors stating that I

Page 11

 1    had to file these proof of claims and then it got separated to

 2    all these different numbers.

 3            Now, as I was telling their attorney, I can't say what

 4    is a duplicate claim if I do not know what are they talking

 5    about.  And that's why I ask Your Honor if you would be able to

 6    decide what a duplicate claim of my proof of claim that the

 7    attorneys, General Motors' attorneys was referring to.

 8            THE COURT:  And I take it you don't have a lawyer to

 9    help you, Ms. Carter, am I correct?

10            MS. CARTER:  No, because in the beginning I had

11    lawyers which started out with the Delphi and then I was

12    misrepresented and papers got destroyed and lost and no contact

13    was ever done about it.

14            THE COURT:  I hear you and I understand the

15    difficulties you've been encountering.  But Ms. Carter, my law

16    clerk and I looked at the various things that were troubling

17    you and while we could see that there might have been stuff

18    involving Delphi, we couldn't see any rights you would have

19    against GM, especially any claims that would still be timely

20    because we have under the law what's called a statute of

21    limitations that says that if you go too far without bringing a

22    claim your claim is barred under the law.

23            I want go back over my notes for a second but frankly,

24    Ms. Carter, it looked to me like whatever rights you had were

25    against Delphi and that you didn't have any timely claims

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 12 of 105

Page 12

1    against Old GM.  And one thing I should say, even though I'm

2    not allowed to give you legal advice, is it's very common for

3    debtors to send out notice to people so that they can take

4    action to protect their rights in case they might have a claim.

5    But the fact that they sent you a notice doesn't mean that

6    you've got a claim.  In fact, if they thought you had a claim

7    they probably would have scheduled it in the first place.

8            So go ahead, Ms. Carter, see if you have any further

9    thoughts you want to share with me.

10           MS. CARTER:  Okay.  So as far as these claims that he

11    was talking about, the employment hostile, Workers' Comp,

12    employers' benefit and the class action, Dex-Cool that's all

13    under Delphi?

14           THE COURT:  Well, in one case I think the class action

15    settlement, you may be a member of the class but somebody else

16    has gone to bat for you on that, a class action representative.

17    Although I would invite Mr. Smolinsky to correct me if I'm

18    mistaken in that regard.

19           MR. SMOLINSKY:  Your Honor, there is a class counsel.

20    She's actually in the courtroom today.  She's probably not here

21    with knowledge as to whether Sharyl Carter has filed a timely

22    claim under the class.

23           THE COURT:  Class action-wise.

24           MR. SMOLINSKY:  That's correct, Your Honor.

25           THE COURT:  In other words, to participate in the

Page 13

1   class action settlement.

2          MR. SMOLINSKY:  Correct, Your Honor.  And there was a

3   deadline in which to file claims against that pool or you would

4   be time barred from that claim as well.  We could certainly

5   endeavor to look to see whether Ms. Carter filed a timely claim

6   against the class.

7          THE COURT:  Okay.  Back to you, Ms. Carter.  Do you

8   have further thoughts to share with me because I want to give

9   you a fair shake here but -- even though I'm not supposed to be

10  looking out for individual claimants and doing their work for

11  them, I did want to make sure that because you had no lawyer

12  the court was treating you fairly and I'm having trouble seeing

13  any claims that you might have here.

14         MS. CARTER:  Okay.  Yes, I understand.  Yes, I would

15  just like to know if I -- if I am participating in the two

16  claims that they were talking about, otherwise, I mean, I

17  wasn't aware of them or notified as far as the class action,

18  even though I responded back to them and gave them information

19  with the car, the Dex-Cool, that was considered my car

20         THE COURT:  Uh-huh.  Any further thoughts you want to

21  share with me, Mr. Smolinsky?

22         MR. SMOLINSKY:  No, Your Honor.  We're happy to look

23  at both the list of class action claimants as well as those who

24  submitted timely opt outs.  If she's in one of those groups her

25  claims could be preserved, otherwise they would be barred.

Page 14

```
 1              We're happy to look into that and send Ms. Carter a

 2       letter to that effect, within a week.

 3              THE COURT:  Uh-huh.  Okay.  Any other thoughts by

 4       anybody before I rule on this?

 5          (No response)

 6              THE COURT:  Okay.  All right.  Folks, I have a

 7       decision that I could dictate, it will take me a while to do

 8       it.  I think what might be better for all concerned is for me

 9       to summarize it and then if you would like me, Ms. Carter, to

10       dictate the full decision; I'll do that at the end of today's

11       calendar.

12              But basically the situation is this, Ms. Carter, as we

13       understand it you filed seven separate proofs of claim.  Six of

14       the seven appear to be duplicative but apart from that your

15       claims suggest that with one potential exception to -- if they

16       have merit they're claims against Delphi rather than General

17       Motors.

18              I will say, so there can be no doubt, that whatever I

19       say here has nothing to do with your claims against Delphi.

20       But because, after our review of your claims, we can't see -- I

21       can't see any timely claims against GM, I'm going to have to

22       disallow them.  I imagine you might want a more detailed

23       explanation and I'll give you a full explanation at the end of

24       today's calendar.

25              Do you want to stay on the line and just wait for
```

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 15 of 105

Page 15

1    that, Ms. Carter?

2              MS. CARTER:  Yeah.

3              THE COURT:  Of course.  I understand.  Okay.

4              MR. SMOLINSKY:  Your Honor, what I would suggest is to

5    look into the Dex-Cool situation before submitting or settling

6    an order on Ms. Carter.  And as normally, the appeal period

7    would run from the entry of the order as opposed to this

8    decision.

9              THE COURT:  That's correct.  I think that's a good

10   idea, Mr. Smolinsky.  Let's do that.

11        (Phone interference)

12              THE COURT: I'm sorry.

13        (Phone interference).

14              THE COURT:  I think somebody's speaking but it's

15   inaudible to me but it didn't sound like Ms. Carter.  Was it

16   somebody else?

17              MS. CARTER:  It wasn't on my line.

18              THE COURT:  Yeah, I understand, Ms. Carter.  Okay.

19   Ms. Carter, if you would just wait, please.

20              By the way, are the debtors -- is this call at Ms.

21   Carter's expense?

22              MR. SMOLINSKY:  I don't know.  I received the letter

23   that she was having trouble and we called her yesterday.  I

24   believe she said that she had already paid for participation.

25              THE COURT:  And the more I make her wait the more

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 16 of 105

Page 16

```
 1    she's going to have to pay?

 2            MS. CARTER:  Yeah.

 3            THE COURT:  All right.  I would like to see, since I'm

 4    making her wait, that we could not make her bear the expense.

 5    What's your recommendation, Mr. Smolinsky?  That you could ask

 6    CourtCall to re-bill the debtor for this or that I just dictate

 7    the full decision now, or what?

 8            MR. SMOLINSKY:  We would be happy to pick up the cost

 9    of the call.

10            THE COURT:  Okay.  Ms. Carter, we're going to have

11    CourtCall bill the debtor for this instead of you, so that it

12    doesn't cost you any money to stay on the line.

13            MS. CARTER:  Okay.

14            THE COURT:  All right.  Go on to your next matter,

15    please, Mr. Smolinsky.

16            MR. SMOLINSKY:  Your Honor, item number 2 on the

17    agenda is a motion to expunge the claim of Stanley Stasko.  Is

18    Mr. Stasko on the phone or in the courtroom?

19            MR. STASKO:  On the line.

20            THE COURT:  Okay.  I hear you, Mr. Stasko.  Stand by

21    and I'm going to invite you to speak in a moment.

22            THE COURT:  Your Honor, the sum and substance of Mr.

23    Stasko's claim is that he was discriminated by General Motors

24    Corporation during his tenure as a General Motors engineer

25    between 1983 and 1995 because he was not hired initially at the
```

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 17 of 105

Page 17

1    right level and did not receive promotions as quickly as he

2    believes he should have, due to alleged religious persecution.

3         Mr. Stasko did not assert a claim in any judicial

4    forum until December of 2009 when he filed an action in the

5    United States District Court in Michigan, asserting violations

6    under 42 U.S. 1983.

7         Your Honor will recall that a belated motion to lift

8    the stay was filed by Mr. Stasko which was denied by this

9    Court, and that ruling is presently on appeal to the district

10   court.

11        After the appeal was filed and approximately six

12   months after the bar date, Mr. Stasko filed a single proof of

13   claim against the debtors with this court.  As the

14   representative of the Motors Liquidation Company, GUC Trust who

15   is the successor, as I said earlier --

16        THE COURT:  Just a minute, please, Mr. Smolinsky.  I

17   need everybody on the phone to stay totally quiet.  If I get

18   more noise in my courtroom I'm going to tell CourtCall to

19   silence everybody except Mr. Stasko.

20        Continue please, Mr. Smolinsky.

21        MR. SMOLINSKY:  Thank you.  Is it okay if I use GUC

22   Trust?  I know you don't like shorthand.

23        THE COURT:  You know I had acronyms but I'm used to

24   GUC Trust enough so you can use GUC trust.

25        MR. SMOLINSKY:  Thank you, Your Honor.  So on behalf

09-50026-mg   Doc 10140   Filed 04/28/11   Entered 04/29/11 15:56:15   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 18 of 105

Page 18

1   of the GUC Trust we seek to expunge this claim.

2          Putting aside, for a moment, the merits of the claim,

3   the debtors have taken the position that this claim is time

4   barred, not only because the claim was filed after the bar date

5   but because the facts and circumstances giving rise to the

6   claim occurred between 1983 and 1995, well outside of any

7   recognized statute of limitations that would apply under these

8   circumstances.

9          Under 42 U.S. 1983, which is the legal foundation and

10  basis for his claim, the Supreme Court in Wilson vs. Garcia

11  found that the appropriate statute of limitations was a federal

12  statute of three years for any claim under that statute.

13         Of course, as indicated in our papers, we don't

14  believe that this statute is applicable to this case because we

15  believe it only applies to actions taken under federal or state

16  authority or color of law.  But nevertheless, in our papers we

17  cited to other Michigan statutes of limitations relating to

18  such claims as employment discrimination and those claims would

19  likewise carry a three-year statute of limitations.

20         So more than fourteen years have now passed since the

21  resignation of Mr. Stasko from GM and the filing of the

22  Michigan action.  So how does Mr. Stasko address this obstacle

23  to his claim?  He claims that he lost his memory and did not

24  get back his memory until 2005.  Therefore, under general

25  reasons of insanity he believes that the statute of limitations

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 19 of 105

Page 19

1    was tolled as to the claim until 2005.

2            Mr. Stasko, although he provides in excruciating

3    detail, the facts and circumstances leading up to the alleged

4    discrimination, but he doesn't describe the nature of the loss

5    of the memory or the precipitating event or the timing of that

6    event, nor does he provide medical support for his claim.

7            To the contrary, during the period after 1995 Mr.

8    Stasko graduated with a college degree from a seminary, got

9    married, held several jobs.  He even wrote two books that are

10   now available on amazon.com.

11           But even assuming that this was true and he lost his

12   memory for the entire period from --

13           THE COURT:  Pause please, Mr. Smolinsky.  When did Mr.

14   Stasko do all of that stuff?

15           MR. SMOLINSKY:  If you look at the materials that he

16   submitted with his claim, he gives details about what happened

17   after he left General Motors.  So he talks about his marriage,

18   that coincided with his ten year anniversary of his high school

19   graduation.  You have to piece things together but he does talk

20   about jobs that he held after he left General Motors and other

21   details about his life.  I'm sure he can speak in greater

22   detail about this period.

23           But even assuming that this was true, he lost his

24   memory and he lost his memory for the entire period from 1995

25   to 2005, the statute of limitations for any possible claim

Page 20

1    would have run in 2008.  Despite Mr. Stasko's assertions that

2    there is an applicable six year statute of limitations, we

3    don't believe that that's the case in any claim that's been

4    asserted.

5            Moreover, Mr. Stasko alleges in his complaint that the

6    discrimination started immediately when he joined General

7    Motors when he was asked to join at a level that was too low

8    and a lot of the discrimination happened in the early part of

9    his career.  What's interesting is the statute would have been

10   running during the time that he was actually working at General

11   Motors, unless he takes the position that he was incapacitated

12   during the time he was working at GM and that would have been

13   inconsistent with the notion that he was entitled and should

14   have earned various promotions in that state.

15           Mr. Stasko's additional argument as to why the statute

16   of limitations would be tolled is based on discovery abuses.

17   He claims that he asked for his employment records and they

18   weren't delivered.  Now those records were not requested during

19   the period of time -- during any pending court hearing so it

20   was simply a request for information and any information that

21   was in his employment records would not give rise to the action

22   he already knew what his potential claims were, all that those

23   employment records would do is provide evidence supporting his

24   claim.

25           So I don't think that any statute of limitations would

Page 21

1    be tolled as a result of any delay, even if it was -- even if

2    it occurred during litigation.

3        THE COURT:  Pause, Mr. Smolinsky.  I thought some

4    documents were given to him?

5        MR. SMOLINSKY:  They were ultimately given but he

6    claims that it was tolled for a period of time after 2005.  So

7    he got his memory back in 2005, he then started requesting the

8    information.  And I just want to be clear that if he got the

9    information within three years, that he still doesn't have a

10    valid claim under applicable statute of limitations.

11        He also asserts that there was fraudulent concealment

12    in the failure, initially, to deliver those documents.  And

13    again, those documents would only support his claim, would

14    not -- would not give rise to his claim.

15        At this point, rather than delve into the merits of

16    the case and I know this is not an evidentiary hearing today,

17    we believe that based on the law and the statute of

18    limitations, this claim could be expunged.  But I think at this

19    point it makes sense to sit and let Mr. Stasko address the

20    statute of limitations issue.

21        THE COURT:  Okay.  Mr. Stasko?

22        MR. STASKO:  I would like to address several issues,

23    because there's, I believe, some errors on General Motors'

24    part.  Just from what General Motors said, my memory did not

25    come back in calendar year 2005.  I was not able to represent

Page 22

1    myself in court until approximately October of 2009.  That's

2    where the marriage, an unconsummated marriage, that took place

3    between 1985 and 1990.

4             I will get into my oral arguments now.  I have about -

5    - I will begin -- Stanley R. Stasko's proof of claim was filed

6    in the U.S. Bankruptcy Court, Southern District of New York via

7    U.S. mail on April the 28th, 2010, approximately 149 days after

8    the bar date of November 30th, 2009.

9             Reason number one -- I'm going to be giving ten

10   reasons why my proof of claim should be accepted because I know

11   that the delay for filing seems insignificant.

12            This delay seems insignificant considering Stanley R.

13   Stasko is a pro se litigant and Title 28 of the U.S.C., section

14   1554 states implicit in right to self representation is

15   obligation, emphasis on the word obligation, on the part of the

16   Court to make reasonable allowance to protect pro se litigants

17   from inadvertent forfeiture of important rights because of

18   their lack of legal training.

19            The U.S. Court of Appeals, Second Circuit, made a

20   similar statement in Triestman vs. Federal Bureau of Prisons,

21   470 F.3d 471.  Additional references can be found in Stanley R.

22   Stasko's response to the debtors' objection to proof of claim

23   number 70285, case filing number 9250, Exhibit 4, paragraphs

24   83, 84, 85, 86,87 and 88.

25            Second reason; of the actual notification of bar dates

Page 23

1    by General Motors not typical information avenues for Stanley

2    R. Stasko.  In the debtors' objection to proof of claim number

3    70285, electronic case filing 9095, the debtor states the

4    debtor published notice of the bar dates in nine publications

5    including, without limitation, "The Financial Times", "The Wall

6    Street Journal", "The New York Times National", "USA Today",

7    "Detroit Free Press" and "Detroit News".

8           The U.S. Bankruptcy Court should be informed that

9    Stanley R. Stasko does not subscribe to these publications like

10   the "Financial Times", "The Wall Street Journal", "The New York

11   Times National", "USA Today", "Detroit Free Press", "Detroit

12   News".  Therefore, these publications would not be typical

13   avenues for Stanley R. Stasko to be informed regarding bar

14   dates associated with General Motors Corporation.  Further,

15   Stanley R. Stasko does not own what is commonly known as a

16   television, nor has he for years.

17          Now I'll get into the -- what I consider the

18   applicable statutes of limitation.  In the debtors' reply to

19   Stanley R. Stasko's response to debtors' objections to proof of

20   claim 70285, debtor states on page 3, paragraph 4, "As this

21   Court recently noted in rulings on a similar claim objection in

22   these Chapter 11 cases, a claim must be allowed before it is

23   barred under the statute of limitations, B, electronic case

24   filing 9598."

25          In my opinion this is an obvious reference to the

Page 24

1    hearing and the U.S. Bankruptcy Court Southern District of New

2    York on March the 1st, 2011.  From what I remember, this

3    quotation is from a product liability claim where the claimant

4    alleges is a sudden loss of power in his vehicle.

5            Reason three; there are two differences between this

6    claim that's on March 1st, 2001 and Stanley R. Stasko's claim.

7    The first difference is that Stanley R. Stasko worked for

8    General Motors Corporation in the State of Michigan while the

9    other claim occurred in another state.

10           The second difference is that the bankruptcy judge

11   pointed out the fact that the claimant received actual

12   notification by the debtors while Stanley R. Stasko did not

13   receive any actual notification.

14           Further, Stanley R. Stasko did not receive actual

15   notification even though General Motors Corporation was

16   informed of a possible lawsuit in calendar year 2005.  For

17   additional details see Stanley R. Stasko's response to debtors'

18   objection to proof of claim number 70285, electronic case

19   filing 9250, Exhibit 4.

20           THE COURT:  Pause please, Mr. Stasko.  Did you bring a

21   lawsuit in 2005?

22           MR. STASKO:  I tried to but a lawyer would not accept

23   my case and I was nowhere near -- my memory was nowhere near

24   where I could even come close to representing myself.

25           May I continue on?

1          THE COURT:  No.  I'm thinking.  Just a minute, please.

2     (Pause)

3          THE COURT:  What -- you say a lawyer wouldn't take on

4     your case, did either you or the lawyer who ultimately decided

5     not to take case tell GM that you wanted to sue them then?

6          MR. STASKO:  No.  Once they found out that I left

7     General Motors in 1995, at this time it was, like, calendar

8     year 2005, they didn't even want to hear the case.  And when I

9     would call them back they wouldn't even return my phone calls.

10          THE COURT:  The they being the lawyer?

11          MR. STASKO:  That is correct.  The lawyer wouldn't

12     even return my phone call.  They showed no interest in the case

13     whatsoever.  And I was in no condition, mentally, to represent

14     myself in any way, shape and form in 2005.

15          THE COURT:  Go on, please.

16          MR. STASKO:  Okay.  For additional details see Stanley

17     R. Stasko's response to debtors' objection to proof of claim

18     number 70285, electronic case filing 9250, Exhibit 4,

19     paragraphs 23 through 33 with an emphasis on paragraphs 29 to

20     32.

21          Now I'll give my position regarding what I think the

22     statute of limitations are for a civil suit, Stasko versus

23     General Motors Corporation in the U.S. District Court in the

24     Eastern District of Michigan.

25          THE COURT:  Well pause please, Mr. Stasko, because I

Page 26

1    thought that was in violation of the automatic stay and I told

2    you you had to bring that lawsuit to a full stop.

3         MR. STASKO:  And the judge in the Eastern District of

4    Michigan, he did not accept your ruling and he administratively

5    closed the case so the case can be reopened at any time by

6    either party at the end of the bankruptcy proceeding itself.

7         THE COURT:  Go on.

8         MR. STASKO:  Okay.  Okay.  The civil suit was filed

9    under Title 42, U.S.C. Section 1983 in the U.S. District Court

10   Eastern District of Michigan.  Paragraphs 58, 59 and 60 of the

11   original suit complaint filed on December 11, 2009 concluded by

12   stating that the plaintiff, Stanley R. Stasko, requests the

13   Court to award the plaintiff approximately 2.7 million dollars

14   for estimated loss by the plaintiff for actual work performed,

15   emphasis added, at General Motors Corporation from

16   approximately July 1983 to August 1995.  I've got to flip the

17   page.

18        Plaintiff requests the Court to award the plaintiff an

19   unspecified amount for unique solutions accomplished by the

20   plaintiff, emphasis on unique solutions, while working at

21   General Motors Corporation from approximately July 1983 to

22   August 1995.

23        Plaintiff requests the Court to award the plaintiff an

24   unspecified amount for major accomplishments by the plaintiff,

25   emphasis added, while working at General Motors Corporation

09-50026-mg   Doc 10140   Filed 04/28/11   Entered 04/29/11 15:56:15   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 27 of 105

Page 27

1    from approximately July 1983 to July 1995.

2         And the last point was, the plaintiff requests the

3    Court to award the plaintiff an unspecified amount in punitive

4    damages for hostile work environment by General Motors

5    Corporation against Stanley Stasko from approximately July 1983

6    to July 1995.

7         Therefore the Court can see that three out of four

8    concluding paragraphs of the civil suit summarize actual loss

9    by the plaintiff, Stanley R. Stasko.  Since Title 42, U.S.C.

10   Section 1983 does not specify a statute of limitations for

11   recovery of damages by an employee from an employer;

12   nevertheless we can look to the State of Michigan for statutes

13   of limitations in Stanley R. Stasko who worked his entire

14   career for General Motors Corporation in the State of Michigan.

15        In the State of Michigan, MCLA 600.5807(a) states that

16   the period of limitations is six years for all other actions to

17   recover damages, emphasis added, for sums due for breach of

18   contract.

19        Now I'll get into the tolling of the statute of

20   limitations.  Reason number four, tolling of statute of

21   limitations or discovery delays.  In the State of Michigan

22   discovery rule postpones beginning, the beginning, emphasis

23   added to the word beginning, of the limitations period from the

24   date when the plaintiff is wronged to the date when he

25   discovers he has been injured.  Therefore, since Stanley R.

Page 28

1    Stasko first began discovery of an injury and loss he incurred

2    by General Motors on September 1st, 2005, therefore the statute

3    of limitation does not expire on September 1, 2011.  And

4    emphasis needs be added that September 1, 2011 is nearly two

5    years later than the bar date of November 30th, 2009

6    established by the U.S. Bankruptcy Court.

7              Reason number 5, tolling of statute of limitations for

8    mental disability.  In the State of Michigan, MCLA 600.5851,

9    paragraph -- (5) states, shall count the year of grace from the

10   termination of the last disability since Stanley R. Stasko's

11   loss of memory was cleared up enough for him to represent

12   himself as a pro se litigant approximately October 2009.

13   Therefore, since the statute of limitations does not expire

14   until October 2010, the emphasis needs to be added that October

15   2010 is nearly one year later from the bar date of November

16   30th, 2009.

17             Reason number 6, tolling of statute of limitations for

18   fraudulent concealment.  In the State of Michigan, MCLA

19   600.5855 states if a person who is or may be liable for any

20   claim fraudulently concealed the existence of a claim or the

21   identity of any person who is liable for the claim, and the

22   knowledge of the person entitled to sue on the claim, the

23   action may be commenced at any time within two years after the

24   person who is entitled to bring the action discovers or should

25   have discovered the existence of a claim or the identity of the

Page 29

1    person who is liable for the claim.

2         Although the action would have otherwise been barred

3    by the period of limitation, since Stanley R. Stasko was first

4    able to represent himself as a pro se litigant to explain the

5    depth of the fraudulent concealment by General Motors, and

6    began to be able to explain that fraudulent concealment in

7    October 2009, therefore the statute of limitations does not

8    expire until October of 2011.  An emphasis needs to be added

9    that October 2011 is nearly two years after the bar date of

10   November the 30th, 2009.

11        Excusable neglect.  In the debtors' objection to proof

12   of claim 70285, electronic case filing 9095, page 10, paragraph

13   21, the debtor states whether excusable neglect exists in any

14   particular case hinges on five factors.  I will be addressing

15   each of these factors.

16        The first factors is the degree of prejudice to the

17   debtors.  This factor is so much of the argument made by

18   General Motors Corporation in the appellee's legal brief filed

19   in the U.S. District Court, Southern District of New York in

20   which they state that the burden imposed on the debtor in terms

21   of time, financial resources and have pledged, if necessary, to

22   defend against the Michigan action, far outweighs any potential

23   gain to Stanley R. Stasko in proceeding with the Michigan

24   action against the debtors.  Given that the appellant did not

25   file a timely proof of claim against the debtor and therefore

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 30 of 105

Page 30

1  is barred from seeking any recovery from the debtors for

2  referencing Stanley R. Stasko's response to debtors' objection

3  to proof of claim 70285, electronic case filing 9250, Exhibit

4  5, paragraph 21.

5          The bankruptcy court can find Stanley R. Stasko's

6  detailed reply and Stanley R. Stasko's response to debtors'

7  objection to proof of claim 70285, electronic case filing 9250,

8  Exhibit 5, paragraphs 22 through 36.

9          But in summary I'll just state that Stanley R.

10  Stasko's position is that there's no prejudice to the debtors

11  because at the time financial resources and intention necessary

12  to defend against the Michigan action was self-inflicted by

13  General Motors when General Motors Corporation purposefully,

14  fraudulently concealed Stanley R. Stasko's accomplishments from

15  approximately July 1983 to August 1995.

16          Reason number eight, the length of the delay and the

17  reason for the delay.  First, Stanley R. Stasko did not know

18  that a proof of claim -- what a proof of claim is.  The Court

19  can reference his comments at the bankruptcy court transcript

20  on April 8, 2010, electronic case filing 5509, page 38, lines

21  number 15.  I'll just read the first line, I'm quoting what I

22  said, "What I want to ask the Court is this, is that this proof

23  of claim is some sort of form that I could have obtained

24  online.  I didn't even know what a proof of claim was."

25          Second, the bankruptcy court was informed of the

MOTORS LIQUIDATION COMPANY, et al.

Page 31

1    reasons for the length of delay when Stanley R. Stasko motioned

2    for the U.S. Bankruptcy Court, Southern District of New York

3    for relief from automatic stay, when he submitted to the

4    bankruptcy court a copy of 500-plus pages of the original

5    complaint in Stasko versus General Motors explaining in detail

6    the delay of a civil suit including mental disability,

7    discovery delay and fraudulent concealment by General Motors.

8           Reason nine, whether claimant acted in good faith.

9    Stanley R. Stasko's position is that he acted in good faith by

10   filing civil suit, Stasko vs. General Motors Corporation on

11   December 11th, 2009 as his memory just cleared up enough to

12   defend himself in calendar 2009.

13          The bankruptcy court needs to understand that the

14   majority of the original complaint, the majority of the work

15   that I've done in all these cases occurred after my memory

16   started to clear up in calendar year 2009, and I've submitted

17   to the U.S. Bankruptcy Court Southern District of New York.

18          Also, if I had skipped all the details and all the

19   legal arguments of civil suit Stanley R. Stasko vs. General

20   Motors Corporation and submitted a simple summons in complaint,

21   could have been filed -- I could have submitted a simple

22   summons and complaint in the U.S. District Court in mid-October

23   2009 to mid-November 2009, but that would have just been a

24   simple summons and complaint.

25          Without the details behind the discovery delay, the

Page 32

1   mental disability, the fraudulent concealment by General Motors

2   and legal arguments for tolling the appropriate statutes of

3   limitation one could argue why the U.S. District Court Eastern

4   District of Michigan might not even have heard Stasko vs.

5   General Motors.

6           And reason number 10, under excusable neglect, if the

7   claimant had counsel, Stanley R. Stasko has been a pro se

8   litigant and in the civil suit, Stasko vs. General Motors,

9   Stanley R. Stasko has been a pro se litigant and the U.S.

10  Bankruptcy Court Southern District of New York.  And Stanley R.

11  Stasko is a pro se litigant in the U.S. District Courts and the

12  appeal itself.

13          Thank you very much.

14          THE COURT:  All right.  Thank you, Mr. Stasko.  Mr.

15  Smolinsky, do you wish to reply?

16          MR. SMOLINSKY:  Joe Smolinsky, Your Honor.

17          I don't really know where to start, there's a lot

18  here.  The one thing that I didn't hear, which is Mr. Stasko's

19  burden, is to take us through the mental incompetency, when it

20  began.  We still have fourteen years to deal with in terms of

21  tolling of the statute of limitations and that's Mr. Stasko's

22  burden.

23          At this point I don't feel I need to get into the

24  merits.  The essay, which is attached to the papers, I think

25  lays out a lot of the factual background.  I have no way of

Page 33

1   verifying its truth but I think -- I do think it speaks a lot

2   as to the ultimate merits of his claims.

3          But maybe the place that we should start is the

4   statute of limitations and maybe take this in baby steps.  And

5   to the extent that Your Honor is not prepared to expunge the

6   claim today, to have a trial on the statute of limitations

7   issue and get into the facts of as to why he believes that the

8   statute of limitations has been tolled for so long.

9          I don't know how else to deal with that issue up

10  front, because I haven't heard the basis for that tolling.

11         THE COURT:  Okay.  Anything else, Mr. Smolinsky?

12         MR. SMOLINSKY:  No, Your Honor.  Only to say that the

13  other issue that I think is missed by Mr. Stasko is when the

14  incapacity began.  And looking back at all the different

15  claims, he noticed the unique solutions claim which is

16  developments that were made at some point during his career, to

17  the extent, again, that the time -- the statute of limitations

18  tolled or expired before his mental incapacity that he's

19  alleging, those claims would be time barred.

20         You need to get into the weeds here but I think the

21  preliminary gating item, gating issue, for me is whether the

22  statute of limitations has been tolled by virtue of the mental

23  incapacity.

24         THE COURT:  All right.  Thank you.

25         MR. SMOLINSKY:  Thank you.

1          THE COURT:  All right.  Everybody sit in place for a

2     minute.

3          (Pause)

4          THE COURT:  In this contested matter in the jointly

5     administered Chapter 11 cases of debtor, Motors Liquidation

6     Company, formerly General Motors Corporation, which I refer to

7     as Old GM and its affiliates, the debtors object to the proof

8     of claim filed by Stanley Stasko.

9          His proof of claim seeks recovery on a cause of action

10    that he asserted against the debtors in the Eastern District of

11    Michigan under 42 U.S.C. Section 1983, and I underscore that

12    particular statutory provision, in a lawsuit that was brought

13    in violation of the automatic stay and where I ordered that

14    relief from the stay not be granted and indeed that Mr. Stasko

15    bring that lawsuit to a halt.

16         The debtors object to Mr. Stasko's proof of claim on

17    multiple grounds, some of which are before me today.  First,

18    that the proof of claim was filed after the bar date and Mr.

19    Stasko failed to seek leave to file a late proof of claim.

20         Second, that the cause of action underlying his proof

21    of claim is barred by the applicable statute of limitations.

22    And third, that the complaint and cause of action underlying

23    his proof of claim failed to state a claim upon which relief

24    could be granted.

25         Mr. Stasko asserts that due to mental problems he did

Page 35

1   not discover the alleged injury that he incurred until

2   September 2005 and that he was not able to represent himself in

3   court until October 2009.  As a result, Mr. Stasko argues, the

4   statute of limitations for a Section 1983 cause of action was

5   tolled and his complaint was timely filed.

6        He also asserts that he never received actual notice

7   of the bar date in this case and that his memory and mental

8   problems establish excusable neglect such that he should be

9   permitted to file a late proof of claim.

10       Folks, I rule that to the extent, if any, to which Mr.

11   Stasko at one time had valid claims against the debtors, a

12   matter as to which I now express no opinion, the statute of

13   limitations for any such claims expired, at the latest, in 2008

14   which was two years before he filed that 1983 complaint against

15   the debtors.

16       Therefore, the debtors' request for an order

17   disallowing and expunging that claim is granted.  The objection

18   to the claim is sustained.

19       My findings of fact and conclusions of law in

20   connection with this determination follow, turning first to my

21   findings of fact.  Mr. Stasko resigned as an employee of

22   General Motors on August 25, 1995, that's sixteen years ago.

23   Beginning in 2005, Mr. Stasko contacted General Motors numerous

24   times by mail seeking a complete copy of his employment records

25   pertaining to his work for Old GM.

09-50026-mg   Doc 10140   Filed 04/28/11   Entered 04/29/11 15:56:15   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 36 of 105

Page 36

1        In his third request for his employment records, sent

2   on August 24, 2005, Mr. Stasko stated that he was requesting

3   the information to "Look for possible discrimination by General

4   Motors against Stanley R. Stasko (it is Stanley R. Stasko's

5   opinion that he can compile a reasonable argument that he

6   should have been one or more levels higher than he was at the

7   time of his departure)."

8        Mr. Stasko sent a copy of that letter to one of GM's

9   attorneys which, as Mr. Stasko explained in his papers, was to

10  inform General Motors legal staff of a possible lawsuit.  In

11  response to these requests, in September 2005, Mr. Stasko

12  received a package containing some or all of his employment

13  records from General Motors.

14       On September 16, 2009 I entered an order establishing

15  November 30, 2009 as the bar date, that is the deadline for

16  proofs of claim in this case.  The debtors published notice of

17  the bar date in nine publications, including the "Detroit Free

18  Press", "Detroit News", "New York Times", "USA Today",

19  "Financial Times" and "The Wall Street Journal".  Mr. Stasko

20  did not file a proof of claim before the November 30, 2009 bar

21  date.

22       In December 2009, without seeking relief from the

23  automatic stay in this court, Mr. Stasko filed a lawsuit in the

24  Eastern District of Michigan against General Motors alleging a

25  cause of action under 42 U.S.C. Section 1983 for "Deprivation

MOTORS LIQUIDATION COMPANY, et al.

Page 37

1    of rights" and seeking monetary compensation of at least 2.7

2    million dollars "For the estimated loss by the plaintiff for

3    actual work performed at General Motors Corporation from

4    approximately July 1983", July 1983 being almost twenty-eight

5    years ago, to August 1985, being almost sixteen years ago and

6    "Punitive damages for a hostile work environment."

7              Mr. Stasko attached as an exhibit to the complaint an

8    essay which recounts, among other things, experiences that he

9    allegedly had while working at General Motors including

10   numerous alleged incidents of discrimination and harassment.

11             His Michigan complaint further stated that "The events

12   giving rise to this complaint occurred at what is commonly

13   known as the General Motors Technical Center, Warren, Michigan,

14   Macomb County, from approximately September 7, 1978 to

15   approximately August 14, 1979 and from approximately July 18,

16   1983 to approximately August 25, 1995.  The 1983 civil action

17   was the only cause of action asserted in Mr. Stasko's complaint

18   in the Eastern District of Michigan.

19             On February 19, 2010, Mr. Stasko filed a motion in

20   this court to lift the automatic stay and proceed with the

21   Michigan District Court litigation.  After hearing oral

22   argument, I denied Mr. Stasko's motion to lift the stay and

23   ordered Mr. Stasko to withdraw his lawsuit in Michigan entirely

24   and not allow it merely to be stayed.  That, of course, being a

25   material part because this was not a pre-petition lawsuit that

Page 38

1   lingered after the filing of the bankruptcy case but was as

2   blatant a violation of the stay as I have seen in more than ten

3   years on the bench.

4         On April 12, 2010 Mr. Stasko appeared at a hearing in

5   the Eastern District of Michigan seeking entry of an order of

6   default against General Motors.  Upon receiving notice of my

7   decision denying Mr. Stasko's motion to lift the automatic

8   stay, the Eastern District of Michigan court dismissed the

9   lawsuit but advised Mr. Stasko that once the bankruptcy stay

10  had been lifted he could reinstate his case.  The Eastern

11  District of Michigan court subsequently issued an order to that

12  effect.

13        On May 3rd, 2010, Mr. Stasko appealed my ruling

14  denying his motion for relief from the automatic stay to the

15  district court.  So far as I'm aware, no ruling on that appeal

16  has yet been issued.

17        On May 12th, 2010, without seeking leave from this

18  Court, Mr. Stasko filed a proof of claim seeking nearly 2.8

19  million dollars in damages in the "Amount of claims" box on his

20  proof of claim form Mr. Stasko wrote, "Final amount by U.S.

21  District Court, Eastern District of Michigan." And in the

22  "Basis for claims" box, Mr. Stasko wrote "Civil lawsuit case

23  number 2:09-cv-14827:  Eastern District Michigan."  Attached to

24  the proof of claim was his complaint and exhibits from the

25  Eastern District of Michigan 1983 action.

Page 39

1          Turning now to my conclusions of law.  Section

2     502(b)(1) of the Code states that when an objection has been

3     made to a proof of claim the court, after notice and a hearing,

4     shall allow the claim "Except to the extent that such claim is

5     unenforceable against the debtor and property of the debtor

6     under any agreement or applicable law for a reason other than

7     because such claim is contingent or unmatured."

8          In order to determine whether claims are enforceable

9     for bankruptcy purposes, we bankruptcy judges and Section 502

10    look to non-bankruptcy law.  See, for example, In re Combustion

11    Engineering, Inc., 391 F.3d, 190-245, note 66, (3rd Cir. 2005)

12    citing Collier (ph.).  "A claim against the bankruptcy estate

13    will not be allowed in a bankruptcy proceeding if the same

14    claim would not be enforceable against the debtor outside of

15    bankruptcy" id.

16          "This district has recognized the authority of the

17    bankruptcy court to apply statute of limitations and related

18    dispositive legal defenses in the disallowance of claims."  In

19    re U.S. Lines, Inc., 262 B.R. 223, 234, (S.D.N.Y. 2001).

20          Mr. Stasko's proof of claim seeks recovery for, and

21    only for, the claims in the Eastern District of Michigan

22    action.  Therefore, if the claims asserted by Mr. Stasko in

23    that action would be barred by the applicable statute of

24    limitations under non-bankruptcy law, then Mr. Stasko's proof

25    of claim must be disallowed in this court.

1       Any claims that Mr. Stasko would have would be subject

2   to a three-year statute of limitations, at the most.   Mr.

3   Stasko asserts that his claim or claims against GM arise under

4   42 U.S.C. 1983.   The statute he invoked and under which those

5   claims arise raises its own issues, which form the basis for

6   the debtors' motion or objection based on failure to state a

7   claim upon which relief can be granted.   But now I need look

8   only at the statute of limitations issues arising from a claim

9   under that statutory provision.

10      Because 42 U.S.C. Section 1983 does not contain its

11  own statute of limitations period the Supreme Court has

12  directed the federal courts to apply statutes of limitations

13  and tolling principles to determine the timeliness of claims

14  asserted under 1983.   See Wilson vs. Garcia, 471 U.S. 261, 276-

15  280.

16      The events alleged in Mr. Stasko's complaint all

17  occurred in Michigan.   He is a resident of Michigan.   Michigan

18  is the state which has the most important interest in

19  determining the issues here before me.

20      The Sixth Circuit has held that the "Appropriate

21  statute of limitations to be borrowed for Section 1983 actions

22  arising in Michigan is the state's three year limitations

23  period for personal injury claims", Drake vs. City of Detroit,

24  Michigan, 266, Fed. App. 444, 448, (6th Cir. 2008).

25      Even if Mr. Stasko's complaint were to state claims

MOTORS LIQUIDATION COMPANY, et al.

Page 41

1   arising out of other federal or state statutes or state common

2   law claims, any such possible claims would also be subject to a

3   three year statute of limitations at most, at the longest.  To

4   the extent Mr. Stasko's complaint alleges any causes of action

5   under Michigan employment discrimination statutes; the statute

6   of limitations for those causes of action is also three years.

7   See, for example, McGee vs. Daimler Chrysler Corp., 693 N.W.2d,

8   166, 167 (MI 2005).

9          To sustain a claim under the federal employment

10  discrimination statute a party must file a charge of

11  discrimination with the Equal Employment Opportunity Commission

12  within 300 days of the last act of unlawful discrimination.

13  See 42 U.S.C. Section 2000(e)(5)(E)(i).

14         And finally, to the extent Mr. Stasko's complaint

15  asserts tort claims under Michigan law; the statute of

16  limitations for those claims would also be, at most, three

17  years.  See Michigan Comp law and Section 600.5805.

18         The claims that Mr. Stasko asserts arose out of events

19  that occurred during his employment with General Motors.  That

20  employment ended in August 1995, almost sixteen years ago.

21  Therefore, absent any applicable tolling, if Mr. Stasko had any

22  valid claims against GM he had to bring them by August 1998 at

23  the latest, thirteen years ago.

24         But Mr. Stasko argues that for various reasons the

25  statute of limitations for his claims was tolled.  He first

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
Pg 42 of 105
MOTORS LIQUIDATION COMPANY, et al.

Page 42

1    asserts a tolling for mental disability.  Mr. Stasko provided

2    medical records showing that he was treated for mental illness

3    in 2003.  Michigan law provides that "If the person first

4    entitled to make an entry or bring an action under this act is

5    under eighteen years of age or insane at the time the claim

6    accrues, the person or those claiming under the person, shall

7    have one year after the disability is removed, through death or

8    otherwise, to make the entry or bring the action, although the

9    period of limitations has run, MCLA Section 600.5851.

10        The term "insane" is defined as "a condition of mental

11    derangement such as to prevent the sufferer from comprehending

12    rights he or she is otherwise bound to know and is not

13    dependent on whether or not the person has been judicially

14    declared insane," id.

15        But I find that even if Mr. Stasko suffered from a

16    mental incapacity that would qualify as an insanity under

17    Michigan law at some point in time, the statute of limitations

18    on his claims asserted here, nevertheless, expired.

19        First, and importantly, Mr. Stasko did not establish

20    when his mental illness began.  Unless Mr. Stasko's mental

21    illness began in or before 1998 his condition would be

22    insufficient to toll the statute of limitations at all because

23    the statute of limitations would have already expired in that

24    year.  A later developed mental illness cannot "revive" an

25    already expired statute of limitations.  See O'Neil vs. Remus

1    (ph.), 09-14, 661, 2010 Westlaw, 1463011 at *2, (E.D.M.I.

2    2010).

3            Second, the facts asserted by Mr. Stasko, both in the

4    complaint and again in his response to this motion, clearly

5    establish that his "insanity" as defined under Michigan law

6    ended in 2005 at the latest.  Mr. Stasko stated that in 2005

7    his memory cleared up and that he sought legal representation

8    in connection with his claims against GM that same year.

9            The year 2005 was also the year in which Mr. Stasko

10   requested his employment records from GM for the stated purpose

11   of looking into possible discrimination claims he believed that

12   he had against GM.  As noted above, he expressed these

13   intentions in a letter sent to General Motors.  For these

14   reasons it is clear that Mr. Stasko recognized possible legal

15   claims that he had in 2005.  Obviously he could no longer have

16   had mental illness that "prevented him from comprehending his

17   rights" at that time he thought he had rights.

18           Mr. Stasko also asserts in his papers that his memory

19   would not clear up enough for him to be able to represent

20   himself until October 2009.  However, whether or not Mr. Stasko

21   was able to represent himself is irrelevant with respect to the

22   tolling for mental disability under Michigan law, which turns

23   on insanity, as previously noted.  The tolling for insanity

24   only applies for as long as the person cannot comprehend his

25   legal rights.  And in light of the fact that Mr. Stasko himself

Page 44

1    provided -- excuse me, the facts that he himself provided, he

2    was no longer insane in 2005.  Therefore, the statute of

3    limitations began running in 2005, at the latest, and his

4    claims expired three years later, in 2008.

5           Mr. Stasko also asserts that the statute of

6    limitations was tolled for his claims because General Motors

7    fraudulently concealed the facts underlying his causes of

8    action.  Under Michigan law if a person who is or may be liable

9    for any claim fraudulently conceals the existence of the claim

10   or the identity of any person who is liable for the claim from

11   the knowledge of the person entitled to sue on the claim, the

12   action may be commenced at any time within two years after the

13   person who is entitled to bring the action discovers or should

14   have discovered the existence of the claim or the identity of

15   the person who is liable for the claim, although the action

16   would otherwise be barred by the period of limitations, MCLA

17   600.5855.

18          First, I do not believe that General Motors failure to

19   immediately provide employment records to Mr. Stasko upon his

20   request is sufficient to show fraudulent concealment.  As

21   stated in his letters to General Motors, Mr. Stasko was

22   requesting the documents because he already thought he might

23   have valid causes of action against General Motors.  Therefore,

24   Mr. Stasko already had knowledge of and had discovered the

25   existence of a potential claim and GM's delay in providing the

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 45 of 105

Page 45

1   records did not conceal the existence of potential claims but

2   it only delayed his receipt of evidence that conceivably might

3   support those claims if and to the extent the claims that he

4   thought he had or might have already had merit.

5        Even if General Motors delay in giving Mr. Stasko his

6   employment records is sufficient to establish fraudulent

7   concealment, GM provided him with the requested documents in

8   September 2005.  Michigan's tolling for fraudulent concealment

9   provides for a two year tolling once the claim is discovered.

10  Therefore his causes of action expired, at the latest, in

11  September 2007.

12       Finally, Mr. Stasko asserts that the statute of

13  limitations for his claim was tolled because of the common law

14  discovery rule.  However, in a 2007 decision the Michigan

15  Supreme Court explained that Michigan does not recognize that

16  common law discovery rule tolling.  It stated "Since the

17  legislature has exercised its power to establish tolling based

18  on discovery under particular circumstances but has not

19  provided for a general discovery rule that tolls or delays the

20  time of accrual if a plaintiff fails to discover the elements

21  of a cause of action during the limitations period, no such

22  tolling is allowed", Trent Adieu vs. Buckler Lawn Sprinkler,

23  471 MI 378, 393, 2007.  Therefore, this tolling agreement

24  argument fails as well.  And even if Michigan did recognize the

25  discovery rule, it would not help Mr. Stasko since, as I've

Page 46

1    noted above, to the extent Mr. Stasko had claims against

2    General Motors, he discovered those claims in 2005 at the

3    latest.

4           For all of these reasons I find that even if Mr.

5    Stasko had valid claims against GM the statute of limitations

6    for any such claims expired, at the latest, in 2008, two years

7    before Mr. Stasko filed his complaint against General Motors in

8    the Eastern District of Michigan.

9           Because I so determine, I need not also address his

10    failure to file a timely proof of claim and whether he

11    established excusable neglect in that connection or whether his

12    1983 suit against GM states a claim on which relief can be

13    granted.

14           The debtors' motion to disallow and expunge the proof

15    of claim is granted.  The debtors are to settle an order in

16    accordance with that ruling.  The time to appeal this

17    determination will run from the time of the entry of the

18    resulting order and not from the time of this dictated

19    decision.

20           All right.  Mr. Smolinsky, what's the next matter on

21    your agenda?

22           MR. SMOLINSKY:  Your Honor, just on the last matter,

23    would Your Honor consider a provision given the pendency of the

24    district court action to a provision in the order that would

25    bar Mr. Stasko from pursuing any claims against the debtors

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 47 of 105

Page 47

1    without first seeking leave of the bankruptcy court?

2           THE COURT:  Well at this point the claims allowance

3    process is the only place in which he can bring any claim

4    against Old GM and that's your point I take it?

5           MR. SMOLINSKY:  Yes, Your Honor.  And I think the --

6    perhaps the thought by Mr. Stasko that the district court has

7    given him leave, as soon as this proceeding is over, to

8    continue to litigate against Motors Liquidation Company6.

9           THE COURT:  Mr. Stasko, why shouldn't I grant Mr.

10   Smolinsky's request?

11          MR. STASKO:  I don't understand his request.

12          THE COURT:  He's saying that your one and only one

13   place where you can obtain any recovery on your claim is here

14   in the United States Bankruptcy Court for the Southern District

15   of New York.  And that while the district judge dismissed your

16   Michigan action without prejudice to your bringing a new one,

17   pending further developments in this court, Mr. Smolinsky's

18   saying this is the one and only place where you should be

19   bringing this claim as a matter of bankruptcy law.  And my

20   question to you is, is he wrong as a matter of bankruptcy law?

21          MR. STASKO:  My response is that the U.S. District

22   Court of the Eastern District of Michigan did not dismiss the

23   case itself.  All they did was administratively close the case

24   itself so that after this bankruptcy proceeding is completed,

25   that one or both parties can motion for the case to be

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 48 of 105

Page 48

1    reinstated.  So the case has not been dismissed it has been

2    administratively closed so that they don't have to account for

3    it on an accounting basis.

4           THE COURT:  Assuming that to be true, Mr. Stasko, I

5    think Mr. Smolinsky's point is that if you were to make such a

6    petition you would be in further contempt of court.

7           MR. STASKO:  I don't know how the U.S. District Court

8    Eastern District of Michigan would rule on that.

9           THE COURT:  The U.S. District Court for the Eastern

10   District of Michigan doesn't rule on that, I rule on that.

11          MR. STASKO:  I see.  I'm not a judge, I don't know

12   how -- I don't know how to distinguish between -- I don't know

13   how the Eastern District of Michigan would interpret your

14   ruling itself.  They did not agree -- my interpretation is that

15   they did not agree that you had the authority to order me to

16   withdraw the case itself so I don't know how they would

17   interpret this so I can't respond, I really can't respond.

18          THE COURT:  Well, the Eastern District of Michigan did

19   not consult me and it did not provide me with a statement of

20   its ruling or its rationale.  But I think that it is hornbook,

21   basic, fundamental bankruptcy law that bankruptcy judges have

22   the ability to enforce the automatic stay with respect to cases

23   on their watch.

24          Mr. Smolinsky, your request is granted.

25          MR. SMOLINSKY:  Thank you, Your Honor.

09-50026-mg   Doc 10140   Filed 04/28/11   Entered 04/29/11 15:56:15   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 49 of 105

Page 49

1          The next matter on the calendar is the debtors' motion

2     to object to --

3          THE COURT:  Pause, please.

4          MR. SMOLINSKY:  Yes.

5          THE COURT:  Mr. Stasko, you're free to stay on the

6     line as long as you do it quietly, or to drop off, whichever

7     you prefer.

8        (No response)

9          THE COURT:  I hear no response.  You may continue, Mr.

10    Smolinsky.

11         MR. SMOLINSKY:  Thank you, Your Honor.

12         The next motion on the calendar is the debtors' 98th

13    omnibus objection to claims which seeks to reclassify claims

14    from secured or priority status to general unsecured status.

15    Most of this motion has been administered.  The remaining claim

16    is a claim filed by Sherif Kodsy and I would ask if he's here

17    today.

18         THE COURT:  Do you want to come on up to the table

19    please, sir?

20         MR. KODSY:  How you doing, Your Honor.

21         THE COURT:  Have a seat and pull the microphone close

22    to you.  I'm going to waive the requirement that you have to

23    stand when you speak, just speak into the microphone when it's

24    your turn.

25         MR. KODSY:  Thank you, Your Honor.

Page 50

1           THE COURT:  Your Honor, this claim asserts damages

2     caused by an alleged product defect in a Hummer truck,

3     allegedly manufactured by General Motors Corporation.  As a

4     result of this alleged defect Mr. Kodsy asserts claims for

5     personal injury, fraud, gross negligence, discrimination, bad

6     faith, perjury and bribery, among other claims.

7           The debtors have not yet fully evaluated the claim,

8     the merits of the claim or decided on an appropriate course of

9     action.  But given the fact that this is, in part, a personal

10    injury claim, it would be appropriate to utilize the ADR

11    procedures that this Court has approved and has been working

12    successfully in these cases.

13          In order to have an effective mediation, both parties

14    need to understand the status and nature of the claim from a

15    priority perspective under the bankruptcy code.  And there is

16    no doubt to the debtors and to the GUC Trust that this is a

17    general unsecured claim and that Mr. Kodsy, if he was able to

18    prevail on the merits of his claim, would not be entitled to a

19    cash payment equal to the amount of his damages but rather

20    entitled to a general unsecured claim that would allow him the

21    ability to share with similarly situated creditors in the stock

22    and warrants of New GM that have been made available under the

23    plan to general unsecured creditors.

24          Your Honor, Section 506 of the Bankruptcy Code is

25    entitled a determination of secured status.  And just reading

09-50026-mg   Doc 10140   Filed 04/28/11   Entered 04/29/11 15:56:15   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 51 of 105

Page 51

1   Section 506(a)(1) it says, "An allowed claim of a creditor

2   secured by a lien on property in which the estate has an

3   interest or that is subject to setoff under Section 553 of this

4   title, is a secured claim to the extent that the value of such

5   creditors interest in the estate's interest in such property or

6   to the extent of the amount subject to setoff, as the case may

7   be, and as an unsecured claim to the extent of the value of

8   such creditors' interest or the amount so subject to setoff, is

9   less than the amount of such allowed claim."

10         So Your Honor, Mr. Kodsy after discussions with us,

11   continues to assert that his claim is entitled to secured

12   status but he provides no basis for the assertion that he has

13   an interest in the estate's interest in any property.

14         It's important to note that under the debtors' plan

15   the only treatment of a secured claim is not the payment in

16   full and cash of the claim, but the debtors are given the

17   option to abandon the debtors' property that secures the

18   creditors' claim.  Here, to the extent there is no property so

19   it would be easy to abandon whatever interest he has in estate

20   property and the remainder of his claim would be a general

21   unsecured claim.

22         So Your Honor, we don't think there's any basis for

23   secured claim.  We'd like this issue addressed now so that we

24   could proceed in evaluating the claim and trying to liquidate

25   the claim, not under this Court's jurisdiction but pursuant to

09-50026-mg   Doc 10140   Filed 04/28/11   Entered 04/29/11 15:56:15   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 52 of 105

Page 52

1    the ADR procedures that have been established.

2            THE COURT:  Okay.  Do you want to save the rest of

3    your remarks for reply?

4            MR. SMOLINSKY:  Sure.  Thank you.

5            THE COURT:  Okay.  Mr. Kodsy, you needn't stand up.

6    No, you can sit down if you choose to.

7            MR. KODSY:  No, I'll stand, Your Honor.

8            THE COURT:  Okay.  Come to the main microphone if you

9    feel okay about standing.  Mr. Kodsy, I'm meaning you no

10   disrespect, do you know what a secured claim is?

11           MR. KODSY:  I've done some research, Your Honor, and

12   it is a lien on an estate.

13           THE COURT:  Okay.  What is the lien that you claim

14   exists?

15           MR. KODSY:  Well, my claim -- I have a six-count

16   complaint against the estate.  I have a fraud --

17           THE COURT:  Bear with me please, Mr. Kodsy.  What is

18   the lien that you claim exists that turns your complaint into a

19   secured claim as contrasted to an unsecured claim?  Because if

20   I heard Mr. Smolinsky right he's not quarreling that you may

21   have an unsecured claim, although he says that should be

22   determined at another day.  But he's saying that whatever you

23   have doesn't have the required lien and therefore you have an

24   unsecured claim rather than a secured claim.

25           MR. KODSY:  Yes, Your Honor.  That's his argument.  I

MOTORS LIQUIDATION COMPANY, et al.

Page 53

1    did find some case law, due to the fraud, the nature of the

2    non-disclosed -- the concealments, it becomes, more or less, a

3    lien, a secured lien, just on the fraud and the concealment

4    factors.  The malicious -- intentional malicious acts, I could

5    quote Folger Adam Sec., I guess, Inc. vs. DeMatteis/MacGregor,

6    JV, 209 F.3d 252, 258, 259-60 (3rd Cir. 2000) stating under the

7    rule of ejusdim generis, the term other interests would

8    ordinarily be limited to interests of the same kind as those

9    enumerated, examples liens, mortgages, security interests,

10   encumbrances, liabilities and claims that mortgages, security

11   interests, encumbrances and liability possess characteristics

12   similar to a lien and that a lien is distinct from the

13   obligation to secureds.

14        Basically, Your Honor, it so that, you know, it's

15   depending on the issues the lien can be placed not just because

16   it's a structure or an actual property.  The bankruptcy --

17   everything is a liquidated property; it's not just an actual,

18   physical object.  That was my understanding of it.  It's

19   quoting, you know, exceptions on 523.  "It says for willful and

20   malicious injury by the debtor to another entity or to the

21   property of another entity, false pretenses, a false

22   representation, actual fraud, other than a statement respecting

23   the debtors or an insider's financial condition."

24        And subchapter 1104, Your Honor, which is the

25   discharge for the bankruptcy or 1141, effect of confirmation --

Page 54

1    it quotes 363 "And the entity asserting an interest in property

2    has the burden of proof of validity."

3            So it's basically what I have, Your Honor.  It was a

4    design defect and it was totally -- it's just been a fight with

5    them, you know, for the fraud and the concealment and -- which

6    did cause personal injury to the extent where surgery is

7    needed.  They actually did the concealment prior to even

8    selling the vehicle; they totally misrepresented the vehicle

9    before even selling it, and after.

10           That's all I have, Your Honor.

11           THE COURT:  Okay.  Mr. Smolinsky, do you wish to

12   reply?

13           MR. SMOLINSKY:  Your Honor, not much.  I just rise to

14   advise the Court what the Court already knows with respect to

15   the discharge, 1141.  The debtors are not entitled under our

16   plan to a discharge, it's a liquidating case.

17           THE COURT:  Because it's a liquidating plan.

18           MR. SMOLINSKY:  That's correct, Your Honor.  And it

19   doesn't speak as to interests; it speaks as to whether certain

20   claims are accepted from the discharge that would otherwise be

21   granted to a Chapter 11 debtor.  But we did not ask for one, we

22   did not get one.

23           The Folger Adams case, I think, is a 363 case, as to

24   whether someone -- whether an interest under 363(f) can be sold

25   free and clear of.  I'm not a hundred percent, my memory

MOTORS LIQUIDATION COMPANY, et al.

Page 55

1    doesn't serve me fully on that but it's not a case as to

2    whether someone with a general claim, like Mr. Kodsy is

3    entitled to an interest in the debtors' property, for purposes

4    of plan distributions.

5            Thank you, Your Honor.

6            THE COURT:  Mr. Kodsy, I'm going to have to grant the

7    debtors' motion to reclassify your claim from a secured claim

8    to an unsecured claim.  And although this is very easy from a

9    matter of bankruptcy law, I'm going to burden everybody in the

10   courtroom by taking a few minutes to explain the rationale.

11           In general terms, the Bankruptcy Code recognizes

12   claims of different types depending, in significant part, on

13   whether the creditors underlying rights against the debtor come

14   from a contract that gives it a lien or other secured interest.

15   A lien and security interest are generally the same thing.  A

16   mortgage is one kind of a lien or security interest.  And the

17   Latin phrase that you quoted, ejusdem generis, in fact, talks

18   about different things being thought of together such as liens,

19   mortgages and security interests.

20           But the doctrine upon which you relied does not turn

21   an unsecured claim into a secured claim unless there is a basis

22   in either contract law or statutory law to give the claimant a

23   security interest.  The underlying rationale for that, even

24   though it's not strictly relevant to my legal decision, just

25   helps you understand why the Code is put together this way, is

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 56 of 105

Page 56

1    because a claim of lien gives one creditor a leg up against the

2    remainder of the creditor community.  Without understanting the

3    importance of your claims, there are lots of creditors in the

4    GM case who contend, sometimes more than contend with some

5    basis for their contentions, that they were hurt in GM vehicles

6    by reason of GM's fault or that they got defective cars by

7    reason of GM's fault or even that GM or its dealers or agents

8    lied to them when they acquired their vehicles.  I don't make

9    any findings as to whether or not any of those claims are valid

10   or not.  My guess is some are and some aren't and some are in

11   between.  But the point is that none of them is a secured

12   claim.  They're all unsecured claims.  If you claim a security

13   interest, you have to show that entitlement by contract such as

14   a mortgage, which you haven't alleged here, or by a statute,

15   which mainly exist to give state taxing authorities liens or

16   federal taxing authorities liens which you don't have here.  I

17   don't want to understate the importance of what's bugging you,

18   but whatever you have, it's an unsecured claim.  It's not a

19   secured claim because you don't have a lien.

20          GM is not asking to disallow your claim in its

21   entirety.  They're asking that it be reclassified as an

22   unsecured claim which is the right thing for them to ask for.

23   And your rights vis-à-vis your unsecured claim will be

24   litigated as we go forward, initially, through alternate

25   dispute resolution which is sometimes referred to in slang as

Page 57

1    ADR.  So I'm sustaining the debtors' objection granting its

2    motion to reclassify.  And, Mr. Smolinsky, you are to settle an

3    order in accordance with that ruling.  The time to appeal this

4    determination, Mr. Kodsy, is going to run from the time that

5    the Court dockets the underlying order not from the date of

6    today's explanation and ruling.  Have a good day.

7           MR. KODSY:  Thank you, Your Honor.

8           THE COURT:  Very well.  Mr. Smolinsky?

9           MR. SMOLINSKY:  Thank you, Your Honor.  The next

10   series of matters on the agenda will be handled by my

11   colleague, Angela Zambrano.

12          THE COURT:  Sure.  Ms. Zambrano, you want to come on

13   up, please?

14          MS. ZAMBRANO:  Thank you, Your Honor.  The next

15   matters on the agenda are objections to individual claims that

16   we've asked to be expunged.  The reason we've asked them to be

17   expunged is that they're duplicate of class claims.  And so

18   what I'd like to do to put those in context is actually present

19   the class settlement.  And that'll make sense as to why they're

20   duplicative.

21          THE COURT:  Sure.  Pause for a second and allow class

22   counsel to come on up.

23          MS. DE BARTOLOMEO:  Thank you, Your Honor.

24          MS. ZAMBRANO:  Thank you.

25          THE COURT:  Get your papers organized down on the

Page 58

1  table.  Give me an appearance so I know you by name and then

2  I'll permit you folks to go tag team if that helps in terms of

3  presenting stuff to me.

4       MS. ZAMBRANO:  Thank you, Your Honor.

5       MS. DE BARTOLOMEO:  Good morning, Your Honor.  I'm

6  A.J. De Bartolomeo from Girard Gibbs in San Francisco and we

7  are class counsel in the matter.

8       THE COURT:  Okay.  Thank you.

9       MS. ZAMBRANO:  And to be clear, we're going to be

10  presenting class settlements in two matters both of which

11  Gerard Gibbs is class counsel.  I'd like to start with what is

12  known as the Anderson or "piston slap" claim.  That is a class

13  claim that was based on a California action, class action, that

14  was certified in November of 2006.  Class members in that case

15  alleged that GM, the Old GM, had violated California unfair

16  competition law by offering an adjustment program to certain

17  consumers who complained about the piston slap problem but not

18  offering it to all consumers and therefore violating California

19  law.  And this related to certain Silverado trucks with model

20  years 1999 to 2003.

21       The case was eventually -- was quite heavily litigated

22  and was eventually settled in November 2008.  The Court

23  preliminarily approved the settlement in November 2008 and then

24  sent extensive notice to the class members.  Approximately a

25  quarter of a million class notices were mailed out.

Page 59

1    Publication notice in English and Spanish was also provided.

2    The settlement was finally approved by the California court in

3    March of 2009.  Well, at that point, as Your Honor knows, the

4    process to begin receiving claims begins.  So class members

5    were required to submit claims to GM by May 11th, 2009.  And

6    the reason it was GM is that GM was acting as the class claims

7    administrator in the Anderson settlement.  That was part of the

8    settlement agreement.

9            Approximately 6,000 claims were received by GM from

10   class members who believed that they had a claim based on the

11   piston slap allegations.  MLC, of course, filed for

12   bankruptcy -- the Old GM, now MLC, filed for bankruptcy

13   protection on June 1st, 2009.  At that time, nothing had been

14   done with those 6,000 claims forms that we're aware of.  And

15   so, essentially, the class was completely unadministered.

16   Class counsel then at that point, after Your Honor issued a

17   ruling setting a bar date for claims, approached --

18            THE COURT:  In this court as contrasted --

19            MS. ZAMBRANO:  In this court --

20            THE COURT:  -- as a matter of class action law.

21            MS. ZAMBRANO:  Excuse me.  Yes.  Class counsel reached

22   out to the debtors' counsel in the fall of 2009 and, unlike

23   some of the other class action claims that I have been before

24   Your Honor on, asked Mr. Smolinsky if an agreement could be

25   reached such that they could file a class claim on behalf of

09-50026-mg   Doc 10140   Filed 04/28/11   Entered 04/29/11 15:56:15   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 60 of 105

Page 60

1    the class because they had been certified and there had been a

2    settlement.

3         THE COURT:  In this case, in contrast, for example, to

4    the apartheid claims, there actually had been a class

5    certification pre-petition.  And now the request was that it be

6    implemented in this court.

7         MS. ZAMBRANO:  Correct.  At that time, the request was

8    simply that class counsel be permitted to file on behalf of all

9    class members one class claim.  You can imagine that that was

10   administratively convenient to the debtors and to the Court and

11   so we agreed to that.  And then Your Honor issued an order

12   approving that stipulation.

13        After that period of time, we have been negotiating

14   with class counsel to determine an appropriate amount from the

15   debtors' perspective as well as class counsel's perspective for

16   that class claim.  There were three main issues that I need to

17   address with you to understand the nature of the settlement.

18   First was the class consideration itself.  There are a number

19   of different buckets, if you will, of class consideration that

20   class members could apply for and obtain in the claims process.

21   One of those buckets was if the person had not actually had a

22   diagnosis, if you will, from a mechanic that they had the

23   piston slap problem, GM agreed as part of the settlement that

24   the class member could go to an authorized dealer, have this

25   evaluation.  If they had the piston slap problem, GM would then

1    pay for the appropriate repairs.  That was part of the

2    settlement.  Obviously, in this context, we can't provide that

3    type of consideration.  So the question was -- and this is

4    similar to another class action that I appeared before Your

5    Honor last year on -- what to do with those class members who

6    had been part of the class, had released their claims according

7    to the settlement agreement but couldn't get the consideration

8    that we had agreed to provide.

9            THE COURT:  Not from Old GM because Old GM doesn't

10   service cars anymore.

11           MS. ZAMBRANO:  Correct.  So we negotiated with class

12   counsel to come up with a dollar value for those type of

13   claims.  And then we aggregated that with the other claims that

14   were out there with one exception.  And that is the next

15   problem with the class -- with the class claim and how to come

16   up with an appropriate value.  And that was, we had these 6,000

17   claims forms that no one had what we call in class action

18   law -- no one had vetted them.  No one had gone through and

19   said this person has made a claim for the GMPP part of the

20   settlement.  I won't bore you with the details unless you'd

21   like, but that was one of the types of consideration that a

22   class member could get.  Someone has to do that so that each

23   claimant can get their appropriate amount under the settlement.

24   And so the question was how do we value the total proof of

25   claim if no one had looked at each of those pieces of paper.

Page 62

1    And obviously, that was burdensome to the debtors.

2         What we ultimately agreed to do is class counsel

3    evaluated a sample of those claims, approximately a thousand of

4    them, and determined from those thousand how many fell into

5    each of the buckets and then extrapolated that out for the

6    6,000 or so class members that had submitted claims forms to

7    get a total value of the class settlement that they believed

8    was appropriate.  We evaluated that and discussed it,

9    challenged it with class counsel and ultimately arrived at a

10   class settlement -- class proof of claim amount of

11   approximately 8.8 million dollars.  And that was, by the way,

12   using the number that we came up with when the first aspect of

13   the settlement -- when the repairs -- every repair that we --

14   or, excuse me, the evaluation of repair, we factored in that

15   dollar value, that 1800 dollars per class member as well as all

16   the other buckets to come up with the 8.8.

17        So at that point, we had an amount, the 8.8 million

18   dollars that the debtors would agree to with respect to the

19   class claim.  But the third problem being we don't have a class

20   administrator in Old GM.  And the debtors were not willing to

21   undertake the expense of that as well.  So as part of this

22   settlement, class counsel has agreed to do just that,

23   administer these 6,000 claims forms appropriately, monetize the

24   claim, first of all, to the extent that it's permitted and

25   approved by this Court, and then administer for each of those

Page 63

1    6,000 claims forms the pro rata share that is appropriate for

2    each claim -- class member who submitted a claims form.

3          So we are then before Your Honor asking this Court to

4    approve the settlement both under Bankruptcy Rule 9019 as well

5    as under Federal Rule of Civil Procedure 23.  I know Your Honor

6    is familiar with Federal Rule of Civil Procedure 23 -- both

7    rules, for that matter.  But I won't belabor the Rule 23

8    factors except to say that we are expressly asking Your Honor

9    to rely on or adopt the findings that the California court made

10   with respect to the class.  I will note that, and class counsel

11   can also elaborate on this, there was extensive discovery and

12   full briefing on the class certification prior to that ruling.

13   So we respectfully request that the Court certify the class and

14   approve the settlement under Rule 23.

15         Now, the only footnote here -- and again, this is

16   similar to one of the class actions that I appeared before you

17   last year on -- regards notice.  And that is, should there be a

18   renoticing of the class members here to inform them about the

19   changes that occurred -- the modifications in the settlement

20   that occurred between the time the California court approved it

21   and Your Honor is approving the settlement.  And with respect

22   to that, the debtors submit that no addition notice is

23   necessary.  There are a few cases out there -- and, in fact,

24   it's been recognized in the class action treatise that in

25   certain circumstances, and we believe this is one of them,

Page 64

1    notice is not appropriate of a modification; in fact,

2    counterproductive.  Here, there's been no collusion, no

3    evidence of collusion, no allegations of collusion between

4    counsel.   The expense of additional notice would be burdensome

5    and, in fact, would probably cause the settlement here to fall

6    apart.  The agreement provides such.  And the class is arguably

7    better off.  In the example that I gave you -- well, first of

8    all, every one that is in -- had a right to consideration under

9    the settlement before is basically getting the same thing.  It

10   just would be their pro rata share of the class claim except

11   for the class members who are getting the evaluation and the

12   repair.  And with respect to those class members, one could

13   argue that perhaps they may be even better off because even if

14   they don't have the problem after an examination, they still

15   get the proof of claim -- their pro rata share of the proof of

16   claim.

17            THE COURT:  This would be in the currency of New GM

18   stock and warrants?

19            MS. ZAMBRANO:  What the agreement provides for is that

20   class counsel actually monetize that -- those stock and

21   warrants.

22            THE COURT:  Oh, in other words, creates -- gets it

23   initially but then creates a pot of money roughly corresponding

24   to the value of that less the cost of monetizing it and that's

25   divvied up pro rata amongst the claimants?

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 65 of 105

Page 65

1        MS. ZAMBRANO:  Exactly.  So, in sum, then we ask the

2    Court to approve it -- the settlement, not approve the

3    additional notice.  And then I'm going to turn to the -- there

4    was an objection that was filed with respect to one duplicative

5    claim.  But before I do that, I want to just make sure class

6    counsel doesn't have any comments about the settlement itself.

7        THE COURT:  Okay.  Ms. De Bartolomeo, do you want to

8    be heard?

9        MS. DE BARTOLOMEO:  Thank you, Your Honor.  It's

10    always a pleasure to come to New York because this is one of

11    the few places in the country that many people can actually say

12    my name.

13        THE COURT:  I had a high school teacher with the same

14    name.

15        MS. DE BARTOLOMEO:  Really?  Oh, I'll have to check

16    the records.  It might a long lost relative.

17        Your Honor, I just would like to supplement what

18    bankruptcy counsel said to kind of emphasize the fact that the

19    settlement that's before your court in bankruptcy court had as

20    its origin the underlying terms of the original settlement in

21    California.  That was, as counsel has said, approved by the

22    Court through the normal course of a class action settlement

23    process.  And it is important to note that the class

24    certification in the underlying case was a very hard fought

25    battle.  It was certified under California law and then General

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 66 of 105

Page 66

1    Motors actually took a writ up to the court of appeal to

2    challenge that certification and the notice procedure.  That

3    was denied and the notice was approved as the parties had

4    finally presented to the Court.

5            That I would also say to reiterate bankruptcy

6    counsel's request that no additional notice is required here.

7    The notice was found by the underlying California court during

8    the court of preliminary approval and the final approval to be

9    adequate under due process.  And constitutional adequacy is one

10   of the premises of approval of that settlement.

11           Based on the notices that went out, the claims that

12   were received were consistent also with the percentage of

13   people that, through the discovery in that case, we had

14   expected to actually come in and say I have this problem.  We

15   knew that all 250,000 of the class members were not going to

16   have experienced the problem.  But through the discovery with

17   General Motors, we knew that a certain percentage would.  And

18   the claims numbers were consistent with that.  So we feel very

19   comfortable about the people who are now before the Court in

20   our class proof of claim.  Those are the ones that had the

21   problem that are standing there saying please address my

22   situation.  And they've also released their claims against

23   General Motors.

24           In terms of the point of monetizing the claim, the

25   order that's before Your Honor gives us the option of doing

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 67 of 105

Page 67

1    that.  And I will advise the Court that what our plan is is to

2    assess the situation, see what we believe is best for the

3    class, present Your Honor's order, if you so sign it, to the

4    underlying class -- sorry -- the underlying Court in California

5    to advise that Court and then present that Court with our plan

6    to monetize the relief and then proceed with the pro rata

7    distribution to the claimants as defined under the plan.

8            THE COURT:  So, in other words, what you're saying is

9    I would give like what you might call a phase 1 approval.  And

10   then if the California court was comfortable with that, it

11   could then approve it?

12           MS. DE BARTOLOMEO:  No, Your Honor.  I didn't mean to

13   mislead you.  We really don't want to give the California court

14   any leeway.  What we really want to do is present to them what

15   the bankruptcy court, Your Honor, has found as fair, reasonable

16   and adequate to the class and simply advise that Court this is

17   how we're going to proceed.  Based on our experience with that

18   Court following the class -- sorry -- the approval of the --

19   final approval of the settlement, we do not anticipate that

20   Court to challenge Your Honor's order at all.  In fact, he has

21   just been monitoring what's been going on.  We've been

22   providing status updates.  And he knows that at this point we

23   have negotiated with bankruptcy counsel to reach a resolution.

24   It's really more of a procedure that we had included in our

25   process to make sure that all the courts that are involved in

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 68 of 105

Page 68

1    this class action are aware of what's going on.

2              THE COURT:  Okay.  Continue, please.

3              MS. DE BARTOLOMEO:  The only additional fact that I

4    would add is that the Anderson class action in the settlement

5    agreement, because it had not reached the stage where claims

6    administration had proceeded and any further recovery had been

7    provided to the class, we wanted the class representative, Mr.

8    Anderson, to review and sign off on the settlement agreement.

9    He was appointed by the underlying Court to be the class

10   representative and had a duty as such.  Mr. Anderson did review

11   the settlement agreement carefully with class counsel, who was

12   also appointed by the underlying Court, and did sign off on the

13   settlement agreement.  And we respectfully submit that the

14   signature of class counsel and of the class representative

15   indicates our -- not just agreement but our approval of this

16   agreement, that we do believe it's in the best interest of the

17   class represented by the class proof of claim.

18             The underlying settlement was negotiated in

19   excruciatingly detailed timing, who got paid, when they got

20   paid, what claims were submitted, as bankruptcy counsel has

21   presented, the different types of claims.  Those have all been

22   incorporated into this settlement that's before Your Honor and,

23   again, we believe, in a fair and reasonable way.  That

24   settlement was reached with General Motors' counsel on the eve

25   of the trial, essentially.  And as they presented to us, that

09-50026-mg   Doc 10140   Filed 04/28/11   Entered 04/29/11 15:56:15   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 69 of 105

Page 69

1   was part of their ordinary course of how they proceed before

2   trial is to attempt to settle with cases because it's in the

3   best interest of their shareholders to attempt to settle and

4   avoid the uncertainty of a trial and the cost of a trial.

5          So everything that happened below was perfectly

6   consistent with proper procedures.  And we submit that this

7   settlement is consistent with that and good for the class and

8   good for the debtor because it avoids the unnecessary

9   administrative expense and red tape of, basically, 6,000

10  individual claims.

11         THE COURT:  Okay.

12         MS. DE BARTOLOMEO:  Thank you, Your Honor.

13         THE COURT:  Thank you.  Come on back up.  Refresh my

14  recollection on the terrain upon which I'm ruling on this.

15  It's my impression that there was an issue as to whether a

16  parallel claim could be asserted individually.  But I'm not

17  aware of anybody who says that this is an unfair settlement.

18         MS. ZAMBRANO:  That's correct.  There have been no

19  objectors or -- to the settlement at all.  What you may be

20  thinking of is when we went to file this motion, we also looked

21  in the claims register to see if there were any claims,

22  individual claims of people who would have been included as

23  being represented.

24         THE COURT:  And we have one of that character?

25         MS. ZAMBRANO:  We have one of that character.  We

Page 70

1    filed an objection on that basis to that claim.  His name is

2    Mr. Oliva, O-L-I-V-A.  Mr. Oliva has not filed any response or

3    any papers and we have been checking that regularly.  We have

4    not received any --

5                THE COURT:  To either the underlying --

6                MS. ZAMBRANO:   in counsel's office.

7                THE COURT:  -- settlement or to the motion to expunge

8    it as duplicate?

9                MS. ZAMBRANO:  Correct.

10               THE COURT:  Okay.

11               MS. ZAMBRANO:  So then I'd like to turn to the --

12   unless you'd like to hear any other argument on that --

13               THE COURT:  No.  But --

14               MS. ZAMBRANO:  -- particular issue.

15               THE COURT:  -- I wonder if I should give threshold

16   ruling on the approval of the settlement.

17               MS. ZAMBRANO:  Thank you, Your Honor.

18               THE COURT:  And this is, of course, an easy

19   determination both because it is unopposed and because the case

20   management order requires people to come forward.  But apart

21   from that, because it makes good sense on the merits.  This is

22   one of a number of settlements that I've been called upon to

23   approve from a double barrel perspective, one under Bankruptcy

24   Rule 9019, where my principal focus is to ensure that the

25   estate isn't giving away the store; and conversely, from the

Page 71

1    perspective of Civil Rule 23, which requires a like inquiry

2    from the perspective of the plaintiff's side of the litigation

3    to ensure that its class representative and the class counsel

4    are likewise not giving away the store.

5           Like most settlements that are the result of arm's

6    length litigation and then negotiation, this is a case that can

7    easily be found to satisfy both standards.  And I do so find.

8    Of course, my confidence in that is bolstered by the procedure

9    that took us up to this point.  And in the absence of there

10   actually being any objection to the settlement, I'm not going

11   to burden the record further by more extensive analysis.

12          You may, if you wish, put any further findings in that

13   are supported by the record, if you wish.  But I am approving

14   the settlement from both the points of view.

15          MS. ZAMBRANO:  Thank you, Your Honor.

16          MS. DE BARTOLOMEO:  Thank you, Your Honor.

17          THE COURT:  Okay.  Let's move on then.

18          MS. ZAMBRANO:  The next motion then that would be set

19   for today is the motion to expunge the claim of Mr. Oliva

20   because such claim is then duplicative.  He is a class member

21   that is represented by class counsel and he doesn't have an

22   individual claim.  And unless there are any questions about

23   that --

24          THE COURT:  And he did not opt out at any earlier

25   stage?

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 72 of 105

Page 72

1              MS. ZAMBRANO:  He did not opt out.

2              THE COURT:  Right.  That's granted for the obvious

3      reasons that it is, in fact, duplicative.  If he wanted to

4      assert something independent of the class, he had to opt out.

5              MS. ZAMBRANO:  That's correct.  Thank you, Your Honor.

6              THE COURT:  Okay.

7              MS. ZAMBRANO:  I'm going to turn now to what we refer

8      to as the Dex-Cool class claim.  And again, Gerard Gibbs is

9      also counsel to the class in the Dex-Cool class.

10             Like the Anderson claim that Your Honor just approved

11     for class settlement, this claim is based on a pre-bankruptcy

12     class action that was certified by nonbankruptcy court --

13     actually, two nonbankruptcy courts -- and settlement with --

14     and settled with the approval of that settlement happening by,

15     again, a California court and this time also a Missouri court.

16             The Dex-Cool class plaintiffs allege that the Old GM

17     had used a factory fill coolant in certain vehicles named "Dex-

18     Cool" that was supposed to benefit cooling systems and engines

19     of such vehicles but it, in fact, caused damage to engines and

20     cooling systems in certain cars.

21             For our purposes, the big differences between Anderson

22     and Dex-Cool is that the administration of the class settlement

23     had -- it was substantially completed at the time of the

24     filing.  So here are the specifics and I'll put the filing in

25     the timeline here.

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 73 of 105

Page 73

1           The settlement was finally approved by the Courts in

2      Missouri and in California in the fall of 2008.  Garden City

3      was appointed in this case.  It was agreed that they would act

4      as the claims administrator.  And after the fall of 2008

5      approval, Garden City received approximately 68,000 claims

6      forms.  Forty of those -- approximately 40,000 of those claims

7      forms were determined to be valid and timely submitted

8      according to Garden City and they requested, under the

9      settlement, that GM fund approximately six million dollars to

10     pay those claims and GM did so, all pre-petition.

11           With respect to the remaining 28,000 or so claims,

12     Garden City sent out which is commonly referred to in class

13     action practice as deficiency letters.  And that was provided

14     for in the agreement because this thing happens all the time.

15     People forget to sign it.  People just don't do it exactly

16     correctly.  And so, GM had agreed and class counsel had agreed

17     on a procedure that would be followed in the case of deficient

18     claims.  Garden City initiated that process by sending out

19     those 28,000 deficient claims notices -- or deficiency letters.

20           Approximately 11,000 claimants supplied corrected

21     claims forms and -- to Garden City in an attempt to cure their

22     deficient claim such that they could receive consideration

23     under the Dex-Cool class settlement.  Of that approximately

24     11,000 claims, Garden City had started on the administration of

25     them and they had determined that about 6,600 were valid and

Page 74

1    they had determined that for those 6,600, approximately

2    1,300,000 was due by GM to pay those claims.  Now, they hadn't

3    dealt with the other 4,600 claims that were part of that 11,000

4    deficient claims.

5                 THE COURT:  That latter number being where people had

6    tried to clean up their acts and tried to cure but were still

7    deficient?

8                 MS. ZAMBRANO:  Exactly.  So you've got 11,000 claims

9    that people had resubmitted and were trying to be paid under

10   the agreement.  This was all under the agreement.  And GM had

11   processed about 6600.  They hadn't processed it all -- or,

12   excuse me, not GM -- Garden City had processed about 6600 and

13   asked GM for payment of 1.3 million dollars for those claims.

14   They hadn't at all processed the 4600.  So -- and at that time

15   then GM filed for bankruptcy.  So it's sort of -- the work was

16   sort of half done with respect to these 11,000 claims.

17                Class counsel then in the bankruptcy again sought a

18   stipulation with Mr. Smolinsky that would permit them to file a

19   class claim on behalf of the class to make sure that the

20   remaining class members -- in particular, the class members who

21   had tried to cure their deficient claims -- were provided

22   consideration under the settlement agreement.  And they filed a

23   claim for approximately three million dollars as a class -- as

24   class counsel.  Again, the debtors had agreed with the

25   stipulation and the Court had ordered that they could file a

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 75 of 105

Page 75

1    class claim on behalf of the entire class.

2         We then, just like in Anderson case, negotiated a

3    settlement with class counsel.  This time it was a little bit

4    easier because of those 11,000, 6600 of them had actually been

5    vetted.  It was the other 4600 that hadn't been touched by

6    Garden City or anyone else, for that matter, to be processed

7    that we needed to deal with to come up with an allowed proof of

8    claim value that we would be willing to agree to as part of a

9    settlement and present to Your Honor.

10         Again, the class counsel reviewed a sample of those

11    4600 claims and determined an appropriate amount based on an

12    extrapolation of that sample for the entire 4600.  They added

13    that to the 1.3 that Garden City had already determined were

14    for the 6.6 million.  Collectively, they came up -- we came up

15    with a value of 2.2 million dollars for this proof of claim.

16    And that encompasses all members that had submitted the

17    deficient claims but cured them and the about 11,000 deficient

18    notices.

19         Again, the settlement agreement provides for the

20    allowed claim of 2,200,000 dollars to be monetized by class

21    counsel and then distributed on a pro rata basis.  This time,

22    we don't have anything that's different or unusual that

23    couldn't be administered as a pro rata share of the class

24    settlement.  Basically, the amount that someone would be

25    entitled to is the same under the settlement.  It's just that

Page 76

1    they will get a pro rata share of that monetized -- the

2    monetized claim value.  There aren't any other intricacies

3    involved.

4           So we again ask that the Court approve this

5    settlement, the modification of this settlement under both

6    bankruptcy rules, Federal -- excuse me -- Federal Rule of Civil

7    Procedure 23 and Bankruptcy Rule 9019.

8           And then again, for the same reasons, we ask that no

9    additional notice be provided.  I guess I would say with

10   respect to notice that this is probably even a more egregious

11   case for notice not being necessary.  I would argue that it

12   would, in fact, hopelessly obscure things for claimants who had

13   received consideration years ago on the primary Dex-Cool claim

14   before the bankruptcy and then to get a second notice about

15   what's happening here.  So provided that we -- that class is

16   approved -- this settlement is approved then we do have some

17   objections not to the settlement but to the motion to expunge

18   individual claims that are related to that that I'll take up in

19   a moment.  But again, I'd like to give class counsel an

20   opportunity to speak about the settlement if she would like.

21           THE COURT:  Okay.  Ms. De Bartolomeo?

22           MS. DE BARTOLOMEO:  De Bartolomeo again.  Your Honor,

23   there's only one thing I'd like to add and it's just a slight

24   correction to a detail.  As to that second group of claims that

25   were first given the deficiency notices, the group that

Page 77

1    remained to be administered were actually -- Garden City did

2    start it.  But what these people were were under the terms of

3    the settlement, if you had the Dex-Cool in your car and you had

4    a problem with it, some people had to get multiple repairs.

5    They had their engine flushed out and fixed.  And then they had

6    a recurring problem.

7            THE COURT:  Is this like a bad antifreeze or --

8            MS. DE BARTOLOMEO:  Essentially, that's what it did.

9    It was supposed to be really good clean antifreeze but for some

10   reason, and I have to remember the science here, the way it

11   mixed with a certain gasket formulation would create a sludge

12   problem that was not a good thing in a car engine apparently.

13           But the second group of people -- they're what we

14   refer to as the multiple repairs on a single claim form.  And

15   the claim form specifically said if you had multiple repairs,

16   submit multiple claim forms.  We anticipated some people would

17   not get that instruction correctly and actually had

18   specifically negotiated with GM's counsel that that would be a

19   deficiency that somebody could cure.  This last group that

20   hadn't been fully administered and, essentially, had only been

21   started to be administered were those group of people for

22   obvious reasons.  They were the most complicated of the claims

23   because they had multiple repairs.  And you had to submit

24   documentation in this particular settlement for your -- to

25   identify what the cost was of the repair so we'd know how much

MOTORS LIQUIDATION COMPANY, et al.

Page 78

1    to pay you under the settlement.  So they were complicated.

2    And that's the last group.

3         We did have Garden City do a -- essentially, kind of a

4    quick sampling prior to the final negotiation with Mr.

5    Smolinsky over the value of my class proof of claim because I

6    knew about the 1.3 million but I just didn't know what quite to

7    do with the other group.  So we had looked at what they

8    initially did and extrapolated off of that.  Later on, in the

9    negotiations with bankruptcy counsel to try to reach an agreed

10   amount on the class proof of claim, my firm took on the claims

11   administration of that group.  Garden City sent us big all hard

12   drive with all the documents and all the claims and all the

13   detail that you have to deal with for this kind of thing.  And

14   then we did that further real statistically significant

15   sampling and extrapolated off of that.

16        So, other than that, I concur with everything

17   bankruptcy counsel said.  The Dex-Cool litigation, like the

18   Anderson one, was very hard fought.  It was actually fought in

19   Missouri, California and in an MDL in East St. Louis.  And

20   actually, this settlement, like the Anderson settlement,

21   happened on literally the courtroom steps the night before

22   trial was supposed to start.  And very arm's length

23   negotiation.  You don't litigate that long against a company

24   like General Motors without it being a pretty hard fought

25   battle.  But we believe that the underlying settlement was

MOTORS LIQUIDATION COMPANY, et al.

Page 79

1    constitutionally sufficient -- sorry -- constitutionally -- the

2    notice was constitutionally sufficient.  And we believe that

3    the remedy under the settlement was clearly fair, reasonable

4    and adequate to the class members.  This settlement that's

5    proposed before Your Honor basically incorporates those terms

6    under the bankruptcy process.  But it's still fair, reasonable

7    and adequate to the remaining class members.  And we

8    respectfully request Your Honor to approve it.

9            THE COURT:  Okay.  Thank you.

10           MS. DE BARTOLOMEO:  Thank you.

11           THE COURT:  Anything else from anybody before I rule

12   on the settlement's propriety?  All right.  I'm approving this

13   one as well for essentially the same reasons as I approved the

14   last.  It passes muster under both 9019 and Rule 23 for

15   different reasons.  On 9019, the estate plainly is not giving

16   away the store.  But equally importantly, neither are the class

17   representatives.  So that settlement is approved.  And then you

18   can deal with the consequences of that approved settlement.

19           MS. ZAMBRANO:  Thank you, Your Honor.  The

20   consequences of that approved settlement are that we have

21   had -- Your Honor is aware of two of them.  And we received

22   yesterday a third letter from one of the individual claimants

23   who is objecting, again, not to the settlement but to their

24   individual claim being expunged.  All of these claimants have -

25   - or, excuse me -- did fail to opt out in the underlying Dex-

MOTORS LIQUIDATION COMPANY, et al.

Page 80

1    Cool settlement.  And so, they are part of the class.  They

2    were appropriately represented by class counsel in these

3    proceedings and their individual claims are duplicative.  And

4    so we ask that they be expunged.

5         I do want to note to the Court, though, that we did

6    try to reach out and explain the process because, frankly, I

7    would think to a nonbankrupt -- to a nonlawyer let alone a

8    bankruptcy or class action lawyer that it was confusing what we

9    were trying to do and that, in fact, if they were entitled to

10   anything under the settlement, they would receive it as part of

11   the administration of the class settlement by class counsel but

12   that they weren't entitled to anything more as an individual.

13   Unfortunately, we were not able to resolve any of those

14   responses to our objection to their claims.  I also asked class

15   counsel to communicate with those class members and she,

16   unfortunately, was also not successful.  However, because their

17   claims are duplicative and they are represented by class

18   counsel who has obtained a settlement on their behalf, we

19   respectfully request that those two omnibus objections that the

20   debtors made including with respect to the respondents -- and

21   for the record, their names are Joan Waldrop, Theresa McHugh

22   and the letter we received yesterday was from William

23   Abraham -- that those claims be expunged from the claims --

24        THE COURT:  Can I assume --

25        MS. ZAMBRANO:  -- register.

09-50026-mg   Doc 10140   Filed 04/28/11   Entered 04/29/11 15:56:15   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 81 of 105

Page 81

1         THE COURT:  -- these claimants will either share in

2    the settlement that I just approved or, if they can't, it'll be

3    because of some deficiency that would have also caused their

4    claim to be disallowed?

5         MS. ZAMBRANO:  That's correct, Your Honor.  I think

6    one of them would be entitled to relief under the

7    administration of the -- the normal administration of the

8    class.  I think Mr. -- excuse me -- Ms. McHugh has submitted a

9    claim for a warranty that wasn't covered by the settlement.

10   And I think Mr. Abraham had submitted a claim for a repair that

11   was outside the class recovery period.  He's part of the class

12   but his repair came too late in the process.  But he's still

13   part of the class and part of the negotiated settlement.  So

14   the answer to your question is yes.  If they're entitled to any

15   consideration, it will be received as part of class members.

16   And if they're not then they won't.

17        THE COURT:  Okay.  All right.  I'm going to expunge

18   those claims as duplicative for the reasons that were discussed

19   in colloquy.

20        MS. ZAMBRANO:  That is all I have.  Thank you, Your

21   Honor.

22        THE COURT:  Okay.  Mr. Smolinsky?

23        MR. SMOLINSKY:  Thank you, Your Honor.  Joe Smolinsky.

24   And just for the record, those were omnibus claim objection 218

25   and 219.  We'll be submitting orders.

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 82 of 105

Page 82

1        The next matter is number 4 on the uncontested

2    calendar.  That's a motion of David Irwin for relief from the

3    stay to conduct limited intrusive testing on a vehicle.  We

4    have signed a stipulation resolving that motion and we'll

5    submit it to the Court.

6        THE COURT:  Okay.

7        MR. SMOLINSKY:  Number 5 is the motion for relief from

8    the automatic stay by David Shostack.  You may recall this was

9    a claim for automobile warranty repairs that he was arguing was

10   a post-petition administrative expense claim.  I'm happy to

11   report that we resolved that claim.  And under the settlement,

12   the GUC trust will be providing Mr. Shostack with a general

13   unsecured claim in the amount of 3,000 dollars.  And New GM is

14   going to provide Mr. Shostack with 3,000 dollars in cash.  And

15   that will resolve the claim, resolve the motion.  And we just

16   need one more signature on the stipulation, then we'll be

17   submitting it to Your Honor.

18       (Pause)

19       MR. SMOLINSKY:  The next matter is debtors' objection

20   to claim number 67121 and 67122.  This is Superior Industries.

21   We have a stipulation.  We believe that it's going to be

22   finalized in the next couple of days and we'll submit it with

23   the court.  If there are any hiccups then it would be adjourned

24   to May 17th but we think that we're going to be in a position

25   to deliver that to chambers.

09-50026-mg   Doc 10140   Filed 04/28/11   Entered 04/29/11 15:56:15   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 83 of 105

Page 83

1          Item number 7 is the debtors' fifteenth omnibus

2    objections to claim.  There was one response that was still

3    remaining from Richard and Elise Birdsall.  We have an

4    agreement in principle for the resolution of that response and

5    we will be submitting a stipulation to Your Honor for

6    consideration.

7          Matter number 8 is the debtors' 137th omnibus

8    objection to claims.  That's Eurobond claims.  The matter is

9    now able to go forward on an uncontested basis with respect to

10   Horn -- Guntbert Horn.  And the matter is going to be adjourned

11   with respect to one remaining claim and it's Gerhard Vogt.

12         Number 9, debtors' 138th omnibus objection to claims,

13   that's also a Eurobond motion.  The matter can now go forward

14   on an uncontested basis with respect to Ingrid Herzele and this

15   will resolve in full the 138th omnibus objection.

16         THE COURT:  Help me on the claims of this character,

17   Mr. Smolinsky, because I thought the essence of the objection,

18   unless I'm confusing it with something else was that these were

19   Eurobond holders whose claims were covered by some combination

20   of the debtors having scheduled the obligation and the

21   representative.  It may not have been an indenture trustee; a

22   paying agent --

23         MR. SMOLINSKY:  It's a fiscal agent.

24         THE COURT:  -- or something -- having filed on their

25   behalf.  So what is there left to continue?

Page 84

1          MR. SMOLINSKY:  We've been trying to do this

2     consensually and to explain to the claimants.  Sometimes it

3     takes a while.  Sometimes there's a foreign language involved

4     often with the Eurobonds.  So we have Italian-speaking lawyers

5     and German-speaking lawyers who ultimately get in touch with

6     these people.  And usually after a conversation or two, they're

7     fine just going forward.

8          THE COURT:  So you're, in essence, just allowing that

9     dialogue to continue?

10         MR. SMOLINSKY:  That's correct, Your Honor.

11         THE COURT:  Okay.

12         MR. SMOLINSKY:  We assume that Your Honor would prefer

13    to resolve them consensually.

14         THE COURT:  Yeah.  As a matter of fact, I would.  I'm

15    just trying to keep up.

16         MR. SMOLINSKY:  Item number 10, the debtors' 143rd

17    omnibus objection to claims, also a Eurobond -- we can now go

18    forward on an uncontested basis with Lemcke and the matter is

19    adjourned with respect to Paul Schwake.  Your Honor raises a

20    fair point.  We're not looking to spend a lot of the estate's

21    money continuing to call these responders.  And at some point

22    in the very near future, we're just going to send them notice

23    that we're going forward on a particular date, give them plenty

24    of notice, file a reply and go forward.

25         THE COURT:  I understand.  But I don't quarrel with

Page 85

```
 1   you trying to make a phone call to help people understand that

 2   you're not trying to bully them or anything like that.

 3           MR. SMOLINSKY:  The last item is the debtors' 141st

 4   objection to claims.  It's also a Eurobond claim.  We can now

 5   go forward with respect to the Baderschneider response.  And

 6   that will resolve in full the 141st omnibus objection to

 7   claims.

 8           THE COURT:  Okay.  So that takes care of everything

 9   except my issuing a lengthier ruling on Ms. Carter?

10           MR. SMOLINSKY:  That's correct, Your Honor.

11           THE COURT:  All right.  Ms. Carter, are you still on

12   the line?  Ms. Carter?

13           MS. CARTER:  Yes.  I'm still on the line.

14           THE COURT:  Okay.  Would you like me to issue the full

15   ruling, more fully explaining my rulings on your claim?

16           MS. CARTER:  Yes.

17           THE COURT:  Okay.  I just need to get a glass of

18   water.

19       (Pause)

20           THE COURT:  In this contested matter in the jointly

21   administered Chapter 11 cases of debtor, Motors Liquidation

22   Company, formerly General Motors Corporation, or Old GM, the

23   debtors object to the seven proofs of claim filed by Sharyl

24   Carter against Old GM in this Chapter 11 case.  The debtors

25   assert that all seven of Ms. Carter's claims must be disallowed
```

MOTORS LIQUIDATION COMPANY, et al.

Page 86

1    and expunged because Ms. Carter has failed to set forth any

2    factual or legal basis for those claims and because, despite

3    their efforts, the debtors have been unable to ascertain the

4    nature and validity of those claims.  In the alternative, the

5    debtors assert that six of the seven claims that Ms. Carter

6    filed against Old GM should be disallowed because they're

7    duplicative of claim number 136, Ms. Carter's original proof of

8    claim against Old GM.

9         Ms. Carter had also filed proofs of claim in the

10   bankruptcy case of Delphi which was a former subsidiary of

11   General Motors that was spun off in 1988 and that filed its own

12   bankruptcy case in this district in 2005.  Delphi's case is

13   currently before Judge Drain of this court.  Ms. Carter states

14   that the claims that she filed against Delphi may or may not be

15   the same claims as the claims that she filed against Old GM.

16   She asked me to determine whether her proof of claim should be

17   in the GM case or in the Delphi case and to consolidate them

18   and put them in the correct case.  That request, I will say

19   parenthetically, is one that's beyond my power to do.  I can't

20   give legal advice.  I can only rule on issues that are before

21   me.  But I can and will clarify that I'm dealing with only

22   claims in the Old GM case and I'm not dealing with any claims

23   in the Delphi case.

24        The debtors take no position as to Ms. Carter's claims

25   against Delphi.  For the sake of clarity, their argument about

MOTORS LIQUIDATION COMPANY, et al.

1    duplicative claims is that six of the seven proofs of claims

2    that Ms. Carter filed against Old GM are duplicative of the

3    first proof of claim that she filed against Old GM not that the

4    claims that she filed against Old GM are duplicative of claims

5    that she filed against Delphi.

6         Whether Ms. Carter has valid claims against Old GM is

7    wholly unrelated to whether she has valid claims against

8    Delphi.  The Delphi case and the GM case are two separate cases

9    involving two separate debtors.  I cannot determine whether Ms.

10   Carter has valid claims against Delphi.  And as I noted,

11   despite her request, I can't determine whether the proofs of

12   claim that she filed in the Delphi case are duplicative of the

13   proofs of claim that she filed here.  The only issue that I can

14   decide is whether Ms. Carter has any valid claims against Old

15   GM.  And I find that she's failed to show that she has any

16   valid claims against Old GM or any of the other Motors

17   Liquidation debtors.  Thus, the debtors' motion will be granted

18   and all seven of Ms. Carter's claims must be disallowed in this

19   case.  And my findings of fact and conclusions of law as to

20   that determination follow.

21        I begin with my findings of fact.  On June 18, 2009,

22   and periodically thereafter, Ms. Carter filed proofs of claims

23   against the Old GM debtors each in an unliquidated amount.

24   None of the proofs of claim provided a basis for the claim and

25   each stated that the amount was unknown.  At some point, Ms.

09-50026-mg   Doc 10140   Filed 04/28/11   Entered 04/29/11 15:56:15   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 88 of 105

Page 88

1    Carter received a request by mail from the debtors to provide a

2    liquidated amount for her claims.  In response, she filled out

3    the enclosed forms and stated that the liquidated amount for

4    each of her proofs of claim was five million dollars.

5            Ms. Carter also sent numerous letters to this Court

6    stating that she objects to the disallowance of her claims.

7    This Court has tried to extract potential bases for her claims

8    from her various letters.

9            The Court deduces from some of Ms. Carter's letters

10   that she believes that she's owed supplemental unemployment

11   benefits from Delphi that she's been unable to collect.  The

12   documents attached to her letters reveal that she filed an

13   application for these benefits with the Delphi Supplemental

14   Unemployment Benefit Center in September 2010 which was denied.

15   In correspondence with Delphi and her union representative,

16   which Ms. Carter provided to the Court, she explained that she

17   was unable to properly complete the supplemental unemployment

18   benefits application because she didn't have all of the

19   necessary information and that she then requested that

20   information from both Delphi and her union representative.

21   Another attached document reveals that Ms. Carter received a

22   letter from the Ohio office of unemployment compensation

23   notifying her that unemployment benefits from the state of Ohio

24   expired in March 2010.

25           Ms. Carter also states that the debtors canceled her

1    health insurance and life insurance in November 2009 even

2    though she was told that it was not to be canceled until

3    December 31st, 2009 and that, as a result, she was unable to

4    get some treatments and medications that she needed.  And in

5    other papers, Ms. Carter states that she won a small settlement

6    that was placed into Delphi/General Motor stock which she's

7    been unable to withdraw.

8         The debtors assert that neither the debtors nor the

9    GUC trust have ever offered to settle Ms. Carter's proofs of

10   claim and that the settlement she's referring to is likely with

11   the debtors in the unrelated Chapter 11 cases of Delphi.  The

12   debtors also state that they've reviewed their books and

13   records and have found no support for Ms. Carter's claims.

14        Turning now to my conclusions of law, Section

15   502(b)(1) of the Code states that when an objection has been

16   made to a proof of claim, the Court, after notice and a

17   hearing, shall allow the claim "except to the extent that such

18   claim is unenforceable against the debtor and property of the

19   debtor under any agreement or applicable law for a reason other

20   than because such claim is contingent or unmatured."

21        In order to determine whether claims are enforceable

22   for bankruptcy purposes, Section 502 relies upon nonbankruptcy

23   law.  See In re Combustion Engineering, Inc., 391 F.3d 190, 245

24   n.66 (3d Cir. 2005) citing Collier.  "A claim against the

25   bankruptcy estate will not be allowed in a bankruptcy

09-50026-mg   Doc 10140   Filed 04/28/11   Entered 04/29/11 15:56:15   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 90 of 105

Page 90

1     proceeding if the same claim would not be enforceable against

2     the debtor outside of bankruptcy."  Id.

3          A motion to disallow a claim under Section 502(b)(1)

4     is treated as a motion to dismiss.  And when a Court considers

5     such a motion, the Court accepts as true all well pleaded

6     factual allegations by the claimant which, in this case, is Ms.

7     Carter.  See In re G-I Holdings, Inc., 443 B.R. 645, 664

8     (Bankr. D. N.J. 2010), a decision by Bankruptcy Judge

9     Gambardella.

10         If Ms. Carter has pleaded facts that, if assumed to be

11    true, would constitute a claim against the debtors then so the

12    motion to disallow that claim will be denied, at least at that

13    point in time, and the issues of fact are resolved by the Court

14    at a later time after an evidentiary hearing has been held.

15    But by the same token, if there aren't even enough facts in the

16    claim to show a basis for recovery then the Court must look at

17    it differently because there hasn't been the requisite showing.

18         So in the Lehman Brothers case, In re Lehman Brothers

19    Holdings Inc., Judge Peck of this court explained that where

20    proofs of claim are so lacking in supporting evidence and

21    logical linkage to the debtor's case, they're not entitled to

22    any presumption that they're prima facie valid and the burden

23    of proof shifts to the claimant.  See 2010 WL 4818173 at *2

24    (Bankr. S.D.N.Y. 2010).

25         Here, Ms. Carter's proofs of claim lack any

Page 91

1    explanation of the basis for her claims and lack any supporting

2    evidence.  Therefore, Ms. Carter's proofs of claim don't get

3    that presumption that they're prima facie valid and she has the

4    burden of demonstrating that she has valid claims against the

5    Old GM estate.

6         Of course, the fact that Ms. Carter may have received

7    notice of the bankruptcy case and/or notice of the bar date and

8    the fact that she filed proofs of claim against the debtors

9    doesn't mean that she has valid claims against the debtors.

10   What the bar date notice states, in effect, is that if Ms.

11   Carter had claims against the debtors in the first place, she

12   needed to file a proof of claim.  The fact that she received a

13   notice was not an admission by the debtors and did not in any

14   way imply that she did, in fact, hold valid claims against Old

15   GM or any of the other Old GM debtors.  And filing a proof of

16   claim did not give her a claim against Old GM if she didn't

17   already have one.

18        Now, none of the arguments that Ms. Carter made in her

19   letters or other correspondence with the Court state any claim

20   against Old GM as a matter of law.  First, some of her claims

21   seem to arise out of employment but Ms. Carter has not

22   established that she ever worked for Old GM.  Her

23   correspondence, especially that regarding her request for

24   supplemental unemployment benefits from Delphi actually suggest

25   that she was employed by Delphi and not by the debtors.  Delphi

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 92 of 105

Page 92

1    was spun off from General Motors in 1998.  Therefore, Ms.

2    Carter could only have employment related claims against Old GM

3    if those claims accrued before 1998 when Delphi was still an

4    affiliate of General Motors.  But the statute of limitations on

5    any employment claim that she may have had in 1998 had

6    certainly run by 2009 when Old GM filed for bankruptcy.

7    Recognizing, Ms. Carter, that you're not a lawyer, I'll say

8    that the statute of limitations is a statute that says that

9    when you have a claim you have to bring it within a certain

10   period of time.  And if you don't do that, even if you don't do

11   that even if it might have otherwise been legitimate under the

12   law, it can't be asserted.

13           In sum, because Ms. Carter failed to establish that

14   she ever worked for GM and if it was -- the claim relates to a

15   time back when Delphi was GM, the statute of limitations has

16   run and therefore the claim must be disallowed for that reason,

17   Ms. Carter can't assert any employment related claims against

18   the Old GM estate.

19           Ms. Carter also stated that the General Motors estate

20   canceled her health insurance and life insurance in November

21   2009 even though she was told that it was not to be canceled

22   until December 31st, 2009.  And she alleges that, as a result,

23   she was unable to get treatments and medications that she

24   needed.  But again, Ms. Carter has failed to establish that she

25   ever worked for GM and failed to establish that she ever

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 93 of 105

Page 93

1    received or was entitled to receive these insurance benefits

2    from the debtors.

3         With respect to Ms. Carter's argument that she won a

4    small settlement that was placed into Delphi and/or General

5    Motors stock, Ms. Carter has failed to explain or provide any

6    evidence of this alleged settlement.  And even if she did, in

7    fact, get such a settlement, she only alleged that she was

8    entitled to receive or did receive Old GM's stock as part of

9    the settlement.  But sadly, as we who have been following this

10   case know, holders of stock in Old GM were not entitled to any

11   recovery under the Old GM Chapter 11 plan because Old GM's

12   creditors didn't get paid in full.  And stockholders can't

13   recover until creditors are taken care of.  Therefore, even if

14   Ms. Carter was a stockholder of Old GM, she isn't entitled to

15   any relief or claim against Old GM on that basis either.

16        This Court has attempted unsuccessfully to ascertain

17   the basis for Ms. Carter's claims against Old GM.  It was Ms.

18   Carter's burden, rather than the debtors' or the Court's, to

19   determine whether she has claims against GM or Delphi and to

20   provide some explanation or support for those claims.  She

21   filed a proof of claim against the debtors -- actually, she

22   filed seven of them -- and responded to the debtors' objections

23   to her claims but she still hasn't articulated any claims that

24   she has against Old GM or any of its affiliates.  Therefore,

25   her proofs of claim must be disallowed.  And upon the entry of

MOTORS LIQUIDATION COMPANY, et al.

Page 94

1      an order implementing this ruling, they will be disallowed.

2            For the avoidance of doubt, so there isn't any

3      misunderstanding, my ruling here does not affect any claims

4      that Ms. Carter may have filed in the Delphi case.  She may

5      have claims against Delphi or she may not.  But here, I

6      determine only that Ms. Carter has no claims against the Motors

7      Liquidation debtors, the Old GM debtors.

8            Mr. Smolinsky, you're to settle an order in accordance

9      with this ruling.  It should provide, in addition to

10     disallowing these claims, words that say in substance that this

11     ruling has nothing to do or no effect on her claims, if any,

12     against Delphi.  The time to appeal from that order will run

13     from the time of the entry of that order and not from the date

14     that is today that I am dictating these rulings.

15           Ms. Carter, you can't reargue the legal basis but do

16     you understand, in essence why I ruled the way I did?

17           MS. CARTER:  Yes, I do.

18           THE COURT:  Thank you very much.

19           MS. CARTER:  Your Honor -- Your Honor?

20           THE COURT:  Yes.  Go ahead.

21           MS. CARTER:  Yes.  Can I ask one question that we was

22     talking about earlier even though you made your ruling

23     already -- is the one about the claim for the car in the class

24     action one?  Did they find out if I was in that claim or not?

25           THE COURT:  Mr. --

Page 95

1          MS. CARTER:  Did counsel find that out?

2          THE COURT:  Mr. Smolinsky, can you help me on that?

3          MR. SMOLINSKY:  Your Honor, that reference is to the

4    Dex-Cool class action.  And we will send a letter to Ms. Carter

5    indicating whether or not she had filed a claim in the Dex-Cool

6    class action or whether she had filed an opt out.  And we'll do

7    that before we serve the order on her.

8          THE COURT:  Okay.  Fair enough.  So that's going to be

9    clarified in the next days or weeks, Ms. Carter.  And before an

10   order is finally entered that deals with your claims, we're

11   going to get an answer to that inquiry.

12         MS. CARTER:  Okay.

13         THE COURT:  All right.

14         MS. CARTER:  Okay.  Thank you.

15         THE COURT:  Okay.  That should take care of that.  To

16   what extent do we have any further bus -- yes.  Do you want to

17   come on up, please?

18         MR. OWEN:  May I approach, Your Honor?

19         THE COURT:  Yes.

20         MR. OWEN:  I have one -- I think this is probably

21   better directed to Mr. Smolinsky.  Cone Owen, Smith and

22   Alspaugh, Birmingham.  I'm here on --

23         THE COURT:  Birmingham, Alabama?

24         MR. OWEN:  Birmingham, Alabama.  I'm here under the

25   111th omnibus objection that was adjourned on February 3rd and

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 96 of 105

Page 96

1    was supposed to be taken up today.  I just wanted to record my

2    appearance, Your Honor.  I was here at significant expense to

3    me anyway.  I didn't get any notice that the hearing had been

4    adjourned again -- the 111th.  There were five folks that --

5    it's the bar date omnibus objection, Your Honor.  The lawyers

6    had messed up.  I think there were five folks that filed

7    responses to the debtors' objection.  And Your Honor adjourned

8    those February 3rd due to the weather to be heard today.  And I

9    didn't -- I don't know.  I may just be wrong.  I don't know.

10            THE COURT:  Let's see if we can sort this out.  Why

11   don't you stay up at counsel table, please, sir?

12            MR. OWEN:  Oh, thank you.

13            THE COURT:  And could I impose on you to repeat your

14   name?

15            MR. OWEN:  Cone Owen, Your Honor, C-O-N-E.

16            THE COURT:  That's your first name?

17            MR. OWEN:  Yes, sir.

18            THE COURT:  And Owen is your last name?

19            MR. OWEN:  Yes, sir.

20            THE COURT:  Okay, Mr. Owen.  Go ahead, Mr. Smolinsky.

21            MR. SMOLINSKY:  Your Honor, this is the 111th omnibus?

22            MR. OWEN:  Yes.

23            MR. SMOLINSKY:  I believe it's been adjourned several

24   times already.  This happens very rarely, as you know, that

25   people don't get notice.  We sent out the agenda, as we always

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 97 of 105

Page 97

1    do, two days before.  And it's item number 28 on the agenda

2    which shows that it is adjourned to May 17th at 9:45.  I don't

3    believe with respect to this claim that we yet filed our

4    responses, our replies, to any remaining claims.  This is an

5    example of one of the claim objections that we were going to

6    continue to work with to try to understand why the claim was

7    filed late and whether there is an excusable neglect before we

8    start litigating.

9            THE COURT:  Okay.  Well, obviously, I feel terrible

10   that you came up from Birmingham because of this

11   misunderstanding.  And obviously, you've noted your appearance

12   and you're still in the ballpark.  What I would confirm my

13   willingness to do, Mr. Owen, is that if you want to appear

14   telephonically and save the cost of a further call, I'm going

15   to permit you to do that for anything other than an evidentiary

16   hearing.

17           MR. OWEN:  Thank you, Your Honor.

18           THE COURT:  I encourage you to continue any exchange

19   of facts or dialogue that you have with the debtors.  I can't

20   require either side to give in on the merits of the position

21   or, for that matter, to settle, but I'd encourage both you

22   folks to continue your dialogue.  And if you have to agree to

23   disagree on May 17th, if it's a legal argument, I'll permit

24   you to appear by telephone.  And under the circumstances, I'll

25   direct that the debtors pick up the cost of your CourtCall

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 98 of 105

Page 98

1    participation since I don't know what caused the breakdown in

2    communication.  Even if it's that unfair to the debtors, Mr.

3    Smolinsky, they can pick up the cost of the call.  And if it

4    requires an evidentiary hearing later on then that's what we'll

5    have to do.

6              MR. SMOLINSKY:  Thank you, Your Honor.  And I'll note

7    my apology for the record as well.

8              THE COURT:  Okay.  Thank you very much.

9              MR. OWEN:  And I think what happened, Your Honor, is

10   the last time this happened, they actually -- my secretary

11   called because of the weather and then we were notified of the

12   adjournment.  But it's a two-day mailing and, unfortunately,

13   didn't get to Birmingham in two days.  So what I'll do is call

14   first which is a bit smarter thing to do, I guess.  But I

15   apologize for taking up the Court's time.

16             THE COURT:  No.  That's all right.  You never have to

17   apologize for protecting your client.

18             Okay.  We're adjourned.

19             MR. SMOLINSKY:  Thank you, Your Honor.

20             THE OPERATOR:  Attorney Alfredo Cardona.

21             MR. CARDONA (TELEPHONICALLY):  Thank you.

22             THE COURT:  Mr. Smolinsky, can you come to a

23   microphone, please?  CourtCall, can you repeat the name of the

24   attorney who wants to be heard?

25             THE OPERATOR:  Alfredo Cardona.

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 99 of 105

Page 99

1          THE COURT:  Okay.  Mr. Cardona, are you appearing on

2     one of the matters before me today?

3          MR. CARDONA:  Yes.

4          THE COURT:  Can you tell me what you're appearing on?

5          MR. CARDONA:  We are appearing for the (indiscernible)

6     Sales in this case.

7          THE COURT:  I had some trouble following that.  Mr.

8     Smolinsky, did you follow what he said?

9          MR. SMOLINSKY:  No, Your Honor.  I didn't.

10          THE COURT:  Mr. Cardona, could you repeat yourself,

11     please?

12          MR. CARDONA:  Yeah.  We represent the (indiscernible).

13          MR. SMOLINSKY:  Is that a claim objection?

14          MR. CARDONA:  Yeah.  The claim number, 69135.

15          THE COURT:  And do you understand it to be objected to

16     and before me today?

17          MR. CARDONA:  Yes, sir.

18          MR. SMOLINSKY:  What claim motion was that?

19          MR. CARDONA:  Hold on one second.  It was notice of

20     debtors' objection to claims, late-filed bar date.

21          THE COURT:  Late-filed claims?

22          MR. CARDONA:  Yeah.

23          THE COURT:  Is this the same objection that Mr. Owen

24     was talking about?

25          MR. SMOLINSKY:  I don't see the name, Your Honor.

09-50026-mg    Doc 10140    Filed 04/28/11    Entered 04/29/11 15:56:15    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 100 of 105

Page 100

1          MR. CARDONA:  I'm sorry?

2          THE COURT:  We're trying to get the facts, Mr.

3     Cardona.  Stand by for a second.

4          MR. CARDONA:  Not at all.

5          THE COURT:  If you hear silence, it'll be okay.  If I

6     feel like we're going too long with silence, I'll just let you

7     know that --

8          MR. SMOLINSKY:  That's --

9          THE COURT:  -- the line is still alive.

10         MR. SMOLINSKY:  I'm sorry, Your Honor.  That's Sandra

11    Carcoma?

12         THE COURT:  Mr. Cardona, did you hear Mr. Smolinsky's

13    question?

14         MR. CARDONA:  No.  Say it again.

15         MR. SMOLINSKY:  What was the name of your client?

16         MR. CARDONA:  Aruvind Arasels (ph.).

17         MR. SMOLINSKY:  What I would recommend, sir, is to

18    give me a call in my office and I will work things out with

19    you.

20         MR. CARDONA:  Sure.  No problem.

21         MR. SMOLINSKY:  And if you provide us with a copy of

22    your e-mail address, we can e-mail all of the agendas to you so

23    you know what matters are going forward.

24         MR. CARDONA:  Okay.  No problem.  And what's your

25    number?

09-50026-mg   Doc 10140   Filed 04/28/11   Entered 04/29/11 15:56:15   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 101 of 105

Page 101

1            MR. SMOLINSKY:  You can call me, (212)310-8767.

2            MR. CARDONA:  8767.  Okay.  And is there any extension

3    on that?  Or --

4            MR. SMOLINSKY:  No.  Just ask for Mr. Smolinsky.

5            MR. CARDONA:  Smolinsky?

6            MR. SMOLINSKY:  Yes.

7            THE COURT:  And, Mr. Cardona, perhaps stating the

8    obvious, we will note that you were on the call today and

9    that -- I don't think anything was intended to affect your

10   client's rights today.  But if it did, I will note that you

11   appeared and your client's rights will be protected.

12           MR. CARDONA:  Okay, Your Honor.

13           THE COURT:  Okay.

14           MR. CARDONA:  Thanks.

15           THE COURT:  Okay.  Is there anybody else on the phone

16   whose needs and concerns haven't been addressed?

17           THE OPERATOR:  That's all on the phone with CourtCall

18   except Ms. Sharyl Carter.

19           THE COURT:  I beg your pardon?

20           THE OPERATOR:  Ms. Sharyl Carter.  She's still on the

21   line.  I think you all had her.

22           THE COURT:  Okay.  Well, we dealt with Ms. Carter's

23   situation.

24           MS. CARTER:  So I can hang up now?

25           THE COURT:  Okay.  CourtCall, do you reflect anybody

MOTORS LIQUIDATION COMPANY, et al.

Page 102

1    else still on the line at this point besides Mr. Cardona and

2    Ms. Carter?

3              THE OPERATOR:  No, Your Honor.

4              THE COURT:  Okay.  Thank you very much for your help,

5    Ms. Carter and CourtCall as well.  Okay.  We're adjourned.

6    Bye-bye.

7              MR. SMOLINSKY:  Thank you.

8              THE OPERATOR:  Good-bye.

9         (Whereupon these proceedings were concluded at 12:36 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 103

**I N D E X**

**RULINGS**

| | Page | Line |
|---|---|---|
| Claims by Ms. Carter, Disallowed | 14 | 23 |
| Debtor's Request to Disallow and Expunge | 35 | 18 |
| Claim of Stanley R. Stasko, Granted | | |
| Debtors' 98th Omnibus Objection To Claims, | 57 | 2 |
| Sustained as to Sherif Kodsy's Claim | 71 | 14 |
| Granting Debtors Request to Reclassify Claim; | | |
| Debtors are to Settle an Order | | |
| Anderson "Piston Slap" Class Deemed Certified | 72 | 3 |
| Pursuant to Bankr. Rule 9019 and Fed. R. Civ. | | |
| Proc. 23 and Class Settlement, Approved | | |
| Debtors' Motion to Expunge Claim of Anderson | 79 | 14 |
| Class Member, Mr. Oliva, Granted as Being | | |
| Duplicative of the Class Claim | | |
| Dex-Cool Class Settlement Approved Pursuant | 81 | 19 |
| To Bankr. Rule 9019 and Fed. R. Civ. Proc. 23 | | |
| Debtors' motion to expunge claims of Dex-Cool | 87 | 19 |
| class members, Joan Waldrop, Theresa McHugh | | |
| and William Abraham, granted as being | | |
| Duplicative of the Class Claim | | |

Page 104

1

2                        R U L I N G S (cont.)

3

4                                                    Page      Line

5    Debtors' Objection to Proof of Claim Numbers       92        13

6    00136, 00552, 07020, 09072, 14901, 19246, and

7    19247 Filed by Sharyl L. Carter Sustained and

8    All Seven Claims to be Disallowed

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T I O N

3

4    I, Pnina Eilberg, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8    _____

9    PNINA EILBERG

10   AAERT Certified Electronic Transcriber CET**D 488

11

12   Veritext

13   200 Old Country Road

14   Suite 580

15   Mineola, NY 11501

16

17   Date:  April 27, 2011

18

19

20

21

22

23

24

25