

AlaFile E-Notice

16-CV-2009-900138.00

Judge: C ROBERT MONTGOMERY

To:  UNITES STATES BANKRUPTCY COURT (PRO SE)
SOUTHERN DISTRICT OF N Y
NEW YORK, NY 10000

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF CLARKE COUNTY, ALABAMA

LEANNE E. CLARK ET AL v. GENERAL MOTORS CORPORATION ET AL
16-CV-2009-900138.00

The following matter was FILED on 4/27/2011 3:32:07 PM

**D002 TAKATA CORPORATION**

**D004 TK HOLDINGS, INC.**

MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56

[Filer: BROWN DAVID LEE JR.]

Notice Date:    4/27/2011 3:32:07 PM

JAY DUKE
CIRCUIT COURT CLERK
CLARKE COUNTY, ALABAMA
117 COURT STREET
GROVE HILL, AL 36451

251-275-3363
jay.duke@alacourt.gov

| **STATE OF ALABAMA** Unified Judicial System | **Revised 3/5/08** | Cas | ELECTRONICALLY FILED 4/27/2011 3:31 PM CV-2009-900138.00 CIRCUIT COURT OF CLARKE COUNTY, ALABAMA JAY DUKE, CLERK |
|---|---|---|---|
| 16-CLARKE | ☐ District Court  ☑ Circuit Court | CV2 | |

**CIVIL MOTION COVER SHEET**

| LEANNE E. CLARK ET AL V. GENERAL MOTORS CORPORATION ET AL | Name of Filing Party: D004 - TK HOLDINGS, INC. |
|---|---|

| *Name, Address, and Telephone No. of Attorney or Party. If Not Represented.* | ☐ Oral Arguments Requested |
|---|---|
| DAVID LEE BROWN JR.  2801 HWY 280 S, SUITE 200  BIRMINGHAM, AL 35223  *Attorney Bar No.:* BRO205 | |

## TYPE OF MOTION

| Motions Requiring Fee | Motions Not Requiring Fee |
|---|---|
| ☐ Default Judgment ($50.00) | ☐ Add Party |
| ☐ Joinder in Other Party's Dispositive Motion (i.e. Summary Judgment, Judgment on the Pleadings, or other Dispositive Motion not pursuant to Rule 12(b)) ($50.00) | ☐ Amend |
| | ☐ Change of Venue/Transfer |
| | ☐ Compel |
| ☐ Judgment on the Pleadings ($50.00) | ☐ Consolidation |
| ☐ Motion to Dismiss, or in the Alternative Summary Judgment($50.00) | ☐ Continue |
| | ☐ Deposition |
| ☐ Renewed Dispositive Motion(Summary Judgment, Judgment on the Pleadings, or other Dispositive Motion not pursuant to Rule 12(b)) ($50.00) | ☐ Designate a Mediator |
| | ☐ Judgment as a Matter of Law (during Trial) |
| | ☐ Disburse Funds |
| ☑ Summary Judgment pursuant to Rule 56($50.00) | ☐ Extension of Time |
| | ☐ In Limine |
| ☐ Motion to Intervene ($297.00) | ☐ Joinder |
| | ☐ More Definite Statement |
| ☐ Other _____ | ☐ Motion to Dismiss pursuant to Rule 12(b) |
| pursuant to Rule _____ ($50.00) | ☐ New Trial |
| | ☐ Objection of Exemptions Claimed |
| _____ | ☐ Pendente Lite |
| | ☐ Plaintiff's Motion to Dismiss |
| *Motion fees are enumerated in §12-19-71(a). Fees pursuant to Local Act are not included. Please contact the Clerk of the Court regarding applicable local fees. | ☐ Preliminary Injunction |
| | ☐ Protective Order |
| | ☐ Quash |
| | ☐ Release from Stay of Execution |
| ☐ Local Court Costs $ _____ | ☐ Sanctions |
| | ☐ Sever |
| | ☐ Special Practice in Alabama |
| | ☐ Stay |
| | ☐ Strike |
| | ☐ Supplement to Pending Motion |
| | ☐ Vacate or Modify |
| | ☐ Withdraw |
| | ☐ Other _____ |
| | pursuant to Rule _____ (Subject to Filing Fee) |

| Check here if you have filed or are filing contemporaneously with this motion an Affidavit of Substantial Hardship or if you are filing on behalf of an agency or department of the State, county, or municipal government. (Pursuant to §6-5-1 Code of Alabama (1975), governmental entities are exempt from prepayment of filing fees) ☐ | Date:  4/27/2011 3:27:32 PM | Signature of Attorney or Party:  /s/ DAVID LEE BROWN JR. |
|---|---|---|

*This Cover Sheet must be completed and submitted to the Clerk of Court upon the filing of any motion. Each motion should contain a separate Cover Sheet.

**Motions titled 'Motion to Dismiss' that are not pursuant to Rule 12(b) and are in fact Motions for Summary Judgments are subject to filing fee.

ELECTRONICALLY FILED
4/27/2011 3:31 PM
CV-2009-900138.00
CIRCUIT COURT OF
CLARKE COUNTY, ALABAMA
JAY DUKE, CLERK

## IN THE CIRCUIT COURT FOR CLARKE COUNTY, ALABAMA

LEANNE E. CLARK AND      \*
CHRISTOPHER D. CLARK; et al.,      \*
     \*
     **Plaintiffs,**      \*
     \*
**vs.**      \*      **CIVIL ACTION NO. CV-2009-900138**
     \*
**GENERAL MOTORS CORPORATION;** \*
**et al.,**      \*
     \*
     **Defendants.**      \*

### MOTION FOR SUMMARY JUDGMENT

**COME NOW** Defendants, TAKATA CORPORATION and TK HOLDINGS INC. ("Takata") and moves this Court for full and final summary judgment pursuant to Ala. R. Civ. P. 56. The Takata Defendants state that there is no genuine issue of material fact or law and that the Defendants are entitled to judgment as a matter of law. As grounds for this Motion, the Takata Defendants state and show unto the Court as follows:

1.    This is a product liability action arising from a single-vehicle rollover crash involving a 1999 Pontiac Grand Am passenger vehicle that occurred on <u>February 6, 2008</u>. Though Plaintiffs have failed to identify a specific defect, they generally allege that the subject seatbelt buckle in the 1999 Pontiac Grand Am was defective in design and manufacture under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"). Plaintiffs also bring claims of common law negligence, wantonness and breach of warranty. Each of Plaintiffs' claims is due to fail.

2.    In support of their sole defect allegation, Plaintiffs offer Ken Brown as a restraints (seatbelt) expert. Brown provided the opinions that the subject buckle is defective and unreasonably dangerous and that his proposed alternative designs are safer than the subject

1

seatbelt buckle and would have prevented the injuries suffered by Ms. Clark. However, Brown's "opinions" are nothing more than mere conjecture and speculation, and they cannot satisfy the requirements of Alabama law and Defendants are entitled to summary judgment.

3.    Plaintiffs have not met their burden of proof under the AEMLD, thus those claims are due to fail as a matter of law. In an AEMLD action, the plaintiff must affirmatively show that the product was sold with a specific defect or in a defective condition. See, e.g., Tanksley v. Prosoft Automation, Inc., 982 So. 2d 1046, 1051 (Ala. 2007). Proof of an accident and injury is **not** in itself sufficient to establish liability under the AEMLD; a defect in the product must be affirmatively shown. Id. Additionally, a manufacturer is liable for injuries resulting from a defectively designed product only if "a safer, practical, alternative design was available to the manufacturer at the time it manufactured the vehicle." Townsend v. Gen. Motors Corp., 642 So. 2d 411, 418 (Ala. 1994).

In an attempt to establish the subject seatbelt's defective design or manufacture caused her injuries, Plaintiffs proffer Ken Brown as a proposed restraints expert who contends that the subject seatbelt is defective merely because the subject accident occurred. Brown's proffer is legally insufficient for three specific reasons: (1) Plaintiffs' evidence, presented through Brown, cannot prove there was a defect in the subject seatbelt at the time it left Takata's hands; (2) Plaintiffs cannot meet their legal burden to prove there was a safer, more practical alternative design that would have prevented or lessened Leanne Clark's injuries; and (3) Brown has failed to test his proposed alternative designs in the same or similar circumstances in which the accident occurred. Any one of these deficiencies is sufficient to warrant a granting of summary judgment in favor of Takata. See, e.g., 982 So. 2d at 1051. The presence of all three (3)

2

deficiencies in the present case mandates that summary judgment is proper in favor of the Takata Defendants.

4.      Plaintiffs' claims for common law negligence and wantonness must also fail.  "In any negligence case, the plaintiff bears the burden of proving the existence of a duty owed by the defendant, a breach of that duty, causation, and damage." DGB, LLC v. Hinds, 55 So.3d 218, 234-35 (Ala. 2010). Plaintiffs have provided **absolutely no evidence** of any negligent manufacturing or design by Takata. In fact, Plaintiffs' expert Ken Brown testified that he does not know Takata's design and manufacturing processes.

Thus, it is clear if Brown does not know Takata's manufacturing or design processes, certainly any argument that Takata was negligent in design or manufacturing could not rise to anything beyond mere speculation or conjecture. Under Alabama law, a guess is not sufficient to rise to the level of "sufficient evidence" required to defeat summary judgment. See, e.g., State Farm Fire and Cas. Co. v. Shady Grove Baptist Church, 838 So. 2d 1039 (Ala. 2002). There has not been any evidence presented that Takata did not act as a reasonably prudent manufacturer when it designed and manufactured this buckle.

5.      Finally, Plaintiffs' claim for breach of warranty is also due to be dismissed. It is well established that whether a product is "unreasonably dangerous" is not a question properly addressed in a claim alleging breach of warranty. Yarbrough v. Sears, Roebuck & Co., 628 So. 2d 478, 483 (Ala. 1993). More importantly, under Alabama law, implied warranties are applicable only to the seller of goods, not their manufacturers. See Rose v. General Motors Corp., 323 F. Supp. 2d 1244, 1248 (N.D. Ala. 2004); Ex parte General Motors Corp., 769 So. 2d 903, 910 (Ala. 1999). Also, Alabama law is clear in that there is no right of action on an implied warranty theory against a manufacturer without privity of contract. Wellcraft Marine v. Zarzour,

3

577 So. 2d 414 (Ala. 1990). Thus, because the Takata Defendants are the manufacturer of the subject seatbelt but were not the "seller" of the subject product, Plaintiffs' breach of warranty claim is due to fail.

6.     Plaintiffs have failed to present sufficient evidence in support of any of their claims to create a genuine issue of fact for trial.

7.     This Defendant expressly adopts its simultaneously filed Memorandum Brief in Support of Motion for Summary Judgment, including all exhibits and attachments thereto as set out herein.

**WHEREFORE, PREMISES CONSIDERED,** the Takata Defendants respectfully request this Honorable Court to enter an Order granting Full and Final Summary Judgment on all of Plaintiffs' claims.

Respectfully submitted this the 27th day of April, 2011.

BY: /s/ David L. Brown, Jr.
De Martenson **(MAR010)**
David L. Brown, Jr. **(BRO205)**
John Isaac Southerland **(SOU010)**
HUIE, FERNAMBUCQ & STEWART, LLP
Three Protective Center - Suite 200
2801 Highway 280 South
Birmingham, Alabama   35223-2484
Telephone: (205) 251-1193
Facsimile:  (205) 251-1256
dm@hfsllp.com
jis@hfsllp.com

- and -

Ronnie E. Keahey, Esquire
George M. 'Marc' Keahey, Esquire
KEAHEY LAW OFFICE
Post Office Box 934
Grove Hill, Alabama 36451

4

Attorneys for Defendants Takata Corporation
and TK Holdings Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of April, 2011, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing and/or by depositing a copy of same in the United States Mail, postage prepaid and properly addressed on the following:

LaBarron N. Boone, Esq.
J. Greg Allen, Esq.
Jere L. Beasley, Esq.
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
Post Office Box 4160
Montgomery, AL   36104

Joseph C. McCorquodale, III
McCorquodale & McCorquodale
Post Office Drawer 1137
Jackson, Alabama 36545

Stewart Howard, Esq.
Jonathan Festa, Esq.
Howard & Owens
Attorneys at Law
411 St. Francis Street
P. O. Box 1903
Mobile, Alabama 36633
(For Sheffield Motors)

/s/ David L. Brown, Jr.
Of Counsel

ELECTRONICALLY FILED
4/27/2011 3:31 PM
CV-2009-900138.00
CIRCUIT COURT OF
CLARKE COUNTY, ALABAMA
JAY DUKE, CLERK

## IN THE CIRCUIT COURT FOR CLARKE COUNTY, ALABAMA

| | | |
|---|---|---|
| LEANNE E. CLARK AND<br>CHRISTOPHER D. CLARK; et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| vs. | * | CIVIL ACTION NO. CV-2009-900138 |
| | * | |
| GENERAL MOTORS CORPORATION;<br>et al., | * | |
| | * | |
| Defendants. | * | |

## MEMORANDUM BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

**COME NOW** Defendants, TAKATA CORPORATION and TK HOLDINGS INC. ("Takata Defendants") and respectfully file this Memorandum Brief in Support of Motion for Summary Judgment. In support of the simultaneously filed Motion for Summary Judgment, the Takata Defendants show unto the Court as follows:

### I.    Introduction.

This is a product liability action arising from a single-vehicle rollover crash involving a 1999 Pontiac Grand Am passenger car that occurred on <u>February 6, 2008</u>. Though Plaintiffs have failed to identify a specific defect, they generally allege that the subject seatbelt buckle in the 1999 Pontiac Grand Am was defective in design and manufacture under the Alabama Extended Manufacturer's Liability Doctrine. Plaintiffs also bring claims under theories of common law negligence, common law wantonness, and breach of warranty. In support of their claims, Plaintiffs offer Ken Brown as a restraints (seatbelt) expert. Brown provided the opinions that the subject buckle is defective and unreasonably dangerous and that his proposed alternative designs are safer than the subject seatbelt buckle and would have prevented the injuries suffered

1

by Ms. Clark. However, as will be discussed more fully below, Brown's "opinions" are nothing more than mere conjecture and speculation, and they cannot satisfy the requirements of Alabama law and Defendants are entitled to summary judgment.

## II.    Summary Judgment Standard

Rule 56 of the Alabama Rules of Civil Procedure sets forth a two-tiered standard for granting a Motion for Summary Judgment. Ala. R. Civ. P. 56. The trial court must determine: (1) that there is no genuine issue of material fact, and (2) that the moving party is entitled to judgment as a matter of law. Ala. R. Civ. P. 56(c)(3). This standard is applied in conjunction with the substantial evidence rules as set out in §12-21-12 of the Code of Alabama (1975); Lollar v. Poe, 622 So.2d 902 (Ala. 1993). The substantial evidence rule dictates that in order to defeat a properly supported Motion for Summary Judgment, the party opposing the motion must present "substantial evidence" in support of it s claim. Jonovski v. Greer, 588 So.2d 885 (Ala. 1991). The Supreme Court of Alabama has defined substantial evidence as "evidence of such weight and quality that fair minded persons in the exercise of such impartial judgment can reasonably infer the existence of the facts sought to be proved." Quimby v. Mem'l Parks, 667 So.2d 1353, 1355 (Ala. 1995); West v. Founders Life Assurance Co., 547 So.2d 870, 871 (Ala. 1989); Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794 (Ala. 1989); Economy Fire and Cas. Co. v. Goar, 551 So.2d 957 (Ala. 1989). The failure to produce such evidence leaves the trial court with no choice but to grant summary judgment in favor of the moving party. West, 547 So.2d at 871.

## III.    Plaintiffs Cannot Establish a Viable Claim Under the Alabama Extended Manufacturers Liability Doctrine

### A. Plaintiffs' Burden of Proof under the AEMLD.

2

Under the AEMLD, the Plaintiffs must prove that the product was defective when it left the manufacturer's control. Indeed, it is well established that a specific defect in the product "must be affirmatively shown," and this showing must be made before the analysis even considers whether the product reaches the consumer without substantial change. See, e.g., Taylor v. General Motors Corp., 707 So. 2d 198 (Ala. 1997); Verchot v. General Motors Corp., 812 So.2d 296, 300-03 (Ala. 2001); Townsend v. General Motors Corp., 642 So. 2d 411, 415 (Ala. 1994); Evers v. General Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985); McPhail v. Mitsubishi Motor Manufacturing of America, Inc., 80 F.Supp. 2d 1309, 1313-18 (S.D.Ala. 1997); Thompson v. Lee, 439 So.2d 113, 116 n. 1 (Ala. 1983); Jordan v. General Motors Corporation, 581 So. 2d 835, 837-38 (Ala. 1991); Beam v. Tramco, Inc., 655 So. 2d 979, 980-81 (Ala. 1995); Donnelly v. Club Car, Inc., 724 So. 2d 25 (Ala. 1998). The Alabama Supreme Court more recently addressed a Plaintiffs' burden under the AEMLD in the context of establishing a **specific defect** in the product. See Tanksley v. Prosoft Automation, Inc., 982 So. 2d 1046 (Ala. 2007). In Tanksley, the defendant successfully argued that the plaintiff could produce no evidence, expert or otherwise, identifying a specific defect or sufficient alternative design to the subject product. Id.

The Court's analysis in Tanksley regarding the Plaintiffs' burden for an AEMLD claim is identical to that applied here for purposes of the instant motion, and, as such, is directly applicable to this matter:

> In an AEMLD action, "the plaintiff must affirmatively show that the product was sold with a defect or in a defective condition." Jordan v. General Motors Corp., 581 So.2d 835, 836-37 (Ala.1991). "Without evidence to support the conclusion that the product was defective and/or unreasonably dangerous when it left the hands of the seller, the burden is not sustained." Jordan, 581 So.2d at 837. **"Proof of an accident and injury is not in itself sufficient to establish liability under the AEMLD; a defect in the product must be affirmatively shown."**

_Townsend v. General Motors Corp._, 642 So.2d 411, 415 (Ala.1994). _Tanksley_, 982 So. 2d at 1051 (emphasis added) (upholding the trial court's grant of summary judgment as to one defendant because the plaintiff's expert could produce no evidence of specific defect in the subject product).

Thus, "the burden of proof rests with the injured consumer to prove that the product left the Defendant's control in an unreasonably dangerous condition not fit for its expected use, and that, _the thing which rendered the product in such an unfit condition in fact caused the injury. The Plaintiffs' burden will not be sustained without evidence to support the conclusion that the product is defective._" _Taylor_, 707 So.2d at 202 (emphasis in original). Despite the existence of this duty, the AEMLD does <u>not</u> make a manufacturer or designer an insurer against all harm that might be caused by the use of the product; the manufacturer or designer is not obligated to produce an accident-proof or injury-proof product. _Id._; see also, _Kirk v. Garrett Ford Tractor, Inc._, 650 So. 2d 865, 867 (Ala. 1994); _Martines v. Dixie Carriers_, 529 F. 2d 457, 465 (5th Cir. 1976).

In an attempt to establish the subject seatbelt's defective design or manufacture caused her injuries, Plaintiffs proffer Ken Brown as a proposed restraints expert who contends that the subject seatbelt is defective merely because the subject accident occurred. Brown is the Plaintiffs' only seatbelt expert. As discussed more fully below, Brown's proffer is legally insufficient for three specific reasons: (1) Plaintiffs' evidence, presented through Brown, cannot prove there was a defect in the subject seatbelt at the time it left Takata's hands; (2) Plaintiffs cannot meet their legal burden to prove there was a safer, more practical alternative design that would have prevented or lessened Leanne Clark's injuries; and (3) Brown has failed to test his proposed alternative designs in the same or similar circumstances in which the accident occurred.

4

<u>Any one</u> of these deficiencies is sufficient to warrant a granting of summary judgment in favor of Takata.  In the present case, Plaintiffs are deficient in all of these areas.  As such, Plaintiffs' claims brought pursuant to the AEMLD are due to fail as a matter of law.

### B.  <u>Plaintiffs' AEMLD Claims are due to Fail Because they Cannot Prove there was a Defect in the Subject Seatbelt at the Time It Left Takata's Hands.</u>

In Alabama, the mere fact that someone was injured while using a product does <u>not</u> establish the presence of a defect, or, in other words, it does not establish the fact that a product was unreasonably dangerous when put to its intended use.  <u>See</u> <u>Thompson v. Lee</u>, 439 So. 2d 113 (Ala. 1983).  In <u>Jordan v. General Motors</u>, 581 So.2d 835 (Ala. 1991), the Supreme Court of Alabama addressed this very issue.  In <u>Jordan</u>, an automobile driver sued the seatbelt manufacturer (GM) under the AEMLD after she sustained injuries in a motor vehicle accident. GM moved for summary judgment.  In support of the motion, GM provided affidavits and depositions of experts stating that the belt was designed, manufactured, and sold in such a way to be reasonably safe for its intended use.  <u>Id.</u> at 837.  In opposition to the motion for summary judgment, plaintiff presented the affidavit of an expert witness which stated:

> I have inspected the vehicle which Ms. Joann Jordan was driving at the time of her accident and have also inspected the seat belt for the driver's seat of that vehicle. Damage to the steering wheel and the windshield of the vehicle indicates that Ms. Jordan was not properly restrained by her lap and shoulder belts in that she went forward in a minor impact and contacted the items in front of her.

> Examination of the tongue portion of the buckle assembly revealed marks that show a high-use rate. Additional examination of the D-ring and teeth of the belt-locking mechanism revealed marks that would be consistent with the seat belt being in use at the time of the accident.

> Thus, it is my engineering opinion that if the seat belt were in use at the time of Ms. Jordan's accident, the unit failed to restrain her in a proper manner."

<u>Id</u>.

In affirming the trial court's grant of summary judgment in favor of GM, the Alabama Supreme Court reiterated the plaintiff's burden of proving the product was in a defective condition when it left the defendant's control. Id. "[M]ere proof that an accident occurred with resulting injuries is insufficient to establish fault under the AEMLD. Rather, because the AEMLD is a fault-based cause of action, the plaintiffs must affirmatively show that the product was sold with a defect or in a defective condition." Id. at 836-37 (citing Sears, Roebuck & Co. v. Haven Hills Farm, Inc., 395 So.2d 991 (Ala. 1991)). Importantly, the Court explained that "[b]ecause [plaintiff] presented **no evidence other than evidence that she received injuries as a result of an automobile accident while wearing a GM seat belt, we hold that she did not present substantial evidence to support a claim under the AEMLD.**" Id. at 837. (emphasis added).

The Alabama Supreme Court has also clarified that general testimony that a defect may exist is not sufficient. Instead, Plaintiffs must prove the existence of a **specific defect** in order to prevail in an AEMLD claim. See Taylor v. General Motors Corp., 707 So.2d 198 (Ala. 1997). In Taylor, a plaintiff brought claims under the AEMLD after he was injured in a single vehicle accident. At the end of trial, the jury found in favor of the defendant manufacturer. The plaintiff appealed and argued, et al., the trial court erred in refusing to give one of plaintiff's proposed jury charges. The proposed charge instructed the jury that Alabama law does not require proof of a specific defect in order to sustain an AEMLD claim. Id. at 201. The Alabama Supreme Court, in holding there was no reversible error in refusing the charge, reasoned:

> The *Casrell* Court held that 'if a product is unreasonably dangerous, it is necessarily defective, and the consumer should not be required to prove defectiveness as a separate matter.' Taken alone, this excerpt might lead to the conclusion that a plaintiff in an AEMLD action need not prove the existence of a specific defective condition as a prerequisite to recovering damages. **However, a**

6

> **closer examination of this statement in the proper context shows that such a conclusion would be mistaken.**

Id. at 202 (emphasis added, internal citations omitted).  The Court continued by explaining that under the AEMLD, the plaintiff's burden of proving negligent conduct is relieved, however, the plaintiff "still must prove the existence of a defective condition and prove that the defect proximately caused his injuries." Id.  Finally, the Court explained that "allowing a jury to infer that a product is defectively solely from the fact that it failed on some manner does not square" with prior holdings of the Alabama Supreme Court. Id.

Like Jordan, here, Plaintiffs' expert Brown testified that merely because Ms. Clark was wearing her seatbelt and was injured in the subject accident, the seatbelt is defective.  Under Jordan and Taylor, that evidence is legally insufficient to "support a claim under the AEMLD." See 581 So.2d at 837; 707 So.2d at 202.  Specifically, in Brown's sworn testimony he stated:

Q:    Okay. Is your opinion that, because the buckle broke, it must be -- it must be defective in this case?

A:    Well, it's evidence of the defect in this case, yes.

Q:    Okay.

A:    It's clear evidence that it's defective, because the forces were not great enough to have caused a disruption and an -- and an -- an opening up of this restraint system.

Q:    **Okay. So simply because the buckle broke, you're saying that is evidence that it was defective?**

A:    **In this crash, yes.**

(See Deposition of Ken Brown, at pp. 249:20 – 250:8, attached hereto as Exhibit "A")(emphasis added).  Brown provided additional testimony explaining that he **cannot identify a specific defect** in the subject buckle.  More specifically, he **does not even know what caused the alleged failure**.  Thus, under Taylor, Plaintiffs have failed to meet their burden of proof to support an AEMLD claim. See, Taylor, 707 So.2d at 202.  Brown testified:

Q:    You're saying the system, itself –

A:    The buckle system is defective, yes.

Q:    Okay. Why is it defective?

A:    Because it didn't hold foreseeable crash loads as required by the federal standards, and when looking at it, it's obviously disrupted post crash.

Q:    Okay. Why did it not hold the loads -- foreseeable loads during the crash?

A:    Because the latch disengaged with the latch plate during the crash.

Q:    But **what part of the latch, what is the condition of the assembly of the system that did not allow it to hold the loads during the crash?**

A:    **What caused the failure, I don't know.**

(See Ex. "A" at p. 253:2-15)(emphasis added).

Q:    **If -- if -- if it is just manufactured and produced as it was designed, is the design a non defective and reasonably safe design?**

A:    I don't know, because I don't know all the design of the -- of the -- of the manufacturing processes. Sometimes a design defect, as I've seen in other buckle cases, has to do with, there's problems with the design of the die that stamps the parts, there's problems with the machine that aligns the parts. **I don't know if that's part of the design problem, or it's simply a manufacturing problem, or, possibly, even a materials problem.**

Q:    Right.

A:    **I don't know, as I sit here.**

(Ex. "A" at p. 254:1-14)(emphasis added).

Q:    Okay. And that's what I'm saying, the very basic design, the -- the material specs, the components, the way that the system works together, that very basic design that is -- is that a defective and an unreasonably dangerous design in and of itself, or does it take something more? Does it take some problem with the die stamping, or some problem in the manufacturing, does it take something like that? **The design, itself, is it a defective design?**

A:    The design of the buckle, not of -- not the design of the manufacturing processes --

Q:    Yes?

8

A:    -- is that what you're asking me?

Q:    Yes.

A:    The design of the buckle on the passenger side, I was able to get to partially engage. It may be indicative of defects within the buckle. It may also be indicative of corrosion and long-term problems with that particular buckle.

Q:    I understand.

A:    **So I don't know. So I have some evidence that the buckle may be defective, but -- by design, but, in this case, I'm telling you, either, the design or the manufacture of it was the problem, and it manifested itself by breaking during the crash.**

(Ex. "A" at pp. 254:19 – 255:19)(emphasis added).

Q:    Okay. **Is there anything in the inherent design of that buckle that you believe contributed to or caused the buckle to fail in this crash?**

A:    **I don't know, because I don't know, specifically, what caused it to fail.** I know that the system failed, but I can't tell you, as I'm sitting here, that one part -- it's not like I have the -- the lock bar in multiple pieces.

(Ex. "A" at p. 256:1-8)(emphasis added).

Like <u>Jordan</u>, Plaintiffs have failed to meet their requirement to show that a defect existed at the time it left the hands of Takata. Furthermore, <u>Taylor</u> provides that Plaintiffs have additionally failed to meet their burden of proof because they have not shown that a "**specific**" defect existed in the subject seatbelt. 707 So.2d at 202. Brown admitted repeatedly in his deposition that he cannot identify a specific defect or tell whether the defect is a manufacturing or a design defect: "**I DON'T KNOW SPECIFICALLY WHAT CAUSED IT TO FAIL.**" He testified that it is his opinion that because an accident occurred and Ms. Clark was injured, the seatbelt is defective. However, under Alabama law, "[M]ere proof that an accident occurred with resulting injuries is insufficient to establish fault under the AEMLD." See <u>Jordan</u>, 581 So.2d at 836-37; <u>Taylor</u>, 707 So.2d at 202. In fact, Brown said "I don't know" over **100** times in response

9

to questions during his deposition. By providing only evidence that Ms. Clark "received injuries

as a result of an automobile accident while wearing a [Takata] seatbelt" Plaintiffs have not

presented "substantial evidence to support a claim under the AEMLD." Id. at 837. The Takata

Defendants are due summary judgment.

### C. Plaintiffs' AEMLD Claims are due to Fail because Plaintiffs Cannot Meet their Burden of Proving a Safer, More Practical Alternative Design that would have Reduced or Eliminated Leanne Clark's Injuries.

The Takata Defendants are also entitled to judgment on Plaintiffs' design defect claims

due to the absence of competent evidence demonstrating that an alternative design would have

prevented the injuries at issue. Even taking Plaintiffs' expert's testimony at face value, they

have offered no evidence of a safer, practical, alternative design as it is defined under Alabama

law.

Plaintiffs expert Brown argues that two proposed alternative designs, specifically, the

TRW RNS 4G and '90s Ford Taurus buckle, were feasible at the time of this accident. (See Ex.

"A" at p. 338-340). However, Plaintiffs must additionally demonstrate through qualified expert

testimony that an alternative design would have reduced or eliminated her injuries **and** that the

theory has been tested under the same or similar circumstances presented herein. Neither of

these burdens has been met.

To that point, a manufacturer is liable for injuries resulting from a defectively designed

product only if "a safer, practical, alternative design was available to the

manufacturer at the time it manufactured the vehicle." Townsend v. Gen. Motors Corp., 642

So. 2d 411, 418 (Ala. 1994); see also, Haney v. Eaton Elec., Inc., 528 F. Supp. 2d 1262, 1269

(N.D. Ala. 2007); Vines v. Beloit Corp., 631 So.2d 1003, 1006 (Ala. 1994) (summary

judgment granted to defendants when plaintiffs failed to show reasonable alternative

10

design for machine that processes pulp wood into paper).  To prove that a safer, practical, alternative design existed, plaintiffs must show **both** that: "(a) the plaintiffs' injuries would have been eliminated or in some way reduced by use of the alternative design; and that (b) taking into consideration such factors as the intended use of the vehicle, its styling, cost, and desirability, its safety aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect, the utility of the alternative design outweighed the utility of the design actually used." Beech v. Outboard Marine Corp., 584 So.2d 447, 450 (Ala. 1991); see also Richards v. Michelin Tire Corp., 21 F.3 d 1048, 1056 (11th Cir. 1994).  This proof is required "whether plaintiffs' defective design claim arises from AEMLD, negligence or wantonness." Connally v. Sears Roebuck & Co., 86 F. Supp. 2d 1133, 1137 (S.D. Ala. 1999). "No matter which theory a plaintiff proceeds under, he must prove a safer alternative design." Id. (citations omitted); see also, Phillips v. American Honda Motor Co., Inc., 438 F. Supp. 2d 1328, 1339 (S.D. Ala 2006)(same).

For purposes of the present Motion, it is not enough for Plaintiffs to prove that their proposed alternative design, i.e., two different seatbelt buckles, were feasible alternatives of the subject Takata seatbelt.  Instead, they must also prove that implementing the designs would have reduced or prevented the injuries Ms. Clark received in this crash.  In turn, a manufacturer is entitled to summary judgment if the plaintiffs fail to present evidence of a practical and tested alternative design. See Connally, 86 F. Supp. 2d at 1137-39; McPhail v. Mitsubishi Motor Mfg. of Am., Inc., 80 F. Supp. 2d 1309, 1314-16 (S.D. Ala. 1997), aff'd 141 F.3d 1190 (11th Cir. 1998). In addition, the alternative design must be "tested on the incident [vehicle] or similar machines under the same or similar circumstances presented," or summary judgment is

appropriate. <u>Phillips</u>, 438 F. Supp. 2d at 1339 (emphasis added).

In this case, while Plaintiffs' expert has offered his "opinion" that the TRW RNS 4G and '90s Ford Taurus buckle would have prevented Plaintiffs' injuries in this accident, <u>he has not tested this opinion at all</u>, much less under the same or similar circumstances as those present in the subject accident. He simply offers a general opinion on the matter, which is certainly not sufficient to defeat summary judgment. Their expert has done NO analysis whatsoever of these proposed alternative designs. How can he say that those buckles would have prevented these injuries when he doesn't know the specific problem with the subject vehicle?

In an analogous situation to the current matter, the Alabama Supreme Court affirmed summary judgment on design defect claims where plaintiffs' primary expert failed to opine "as to whether the injuries suffered by [plaintiffs] would have been less severe if at the time of the accident they had been riding on platforms behind the cab" of a garbage truck's compaction unit—the alternative design. <u>Townsend</u>, 642 So.2d at 419. Plaintiffs' expert further "was not qualified to render an expert opinion as to whether the alternative design proposed by [plaintiffs] would be any safer than the design challenged in this action." <u>Id.</u> at 423. The expert's "assumption" that the injury would have been prevented was "nothing more than speculation or conjecture on his part as to the relative safety of the alternative design." <u>Id.</u>

In <u>Yarbrough v. Sears, Roebuck & Co.</u>, 628 So. 2d 478 (Ala. 1993), the trial court granted summary judgment in favor of the manufacturer of a kerosene heater which was alleged to be defective and unreasonably dangerous under the AEMLD. The plaintiffs appealed contending that substantial evidence had been presented under the AEMLD. In support of their contention that substantial evidence had been presented to the trial court, the plaintiffs pointed to the affidavit of an expert witness. The affidavit indicated that the fuel system in the heater was

defective and that a "simple design modification" would have prevented the fire. Id. at 482. The

Alabama Supreme Court found that the expert's Affidavit was insufficient and concluded that

the trial court had properly entered summary judgment. Id.

> In so doing, the Court reasoned:
>
>> There was no detail or explanation provided; there was no evidence to prove that
>> "a simple design modification" was safer or more practical or would have reduced
>> or prevented the Yarbroughs' injuries and loss; and there was no evidence to
>> show that the utility of an alternative design outweighed the utility of the design
>> actually used.

Id. at 482 (emphasis added).

The strict nature of this standard is also shown in Elliott v. Brunswick, 903 F.2d 1505

(11th Cir. 1990) cert. denied, 498 U.S. 1048 (1991). In Elliott, the Eleventh Circuit reversed an

AEMLD verdict against a manufacturer of a boat motor, the alleged defect being a lack of a

guard around the motor's propeller. The Court held that the plaintiff had failed to demonstrate

that his proposed alternative design was practical, as required by Alabama law. Id. at 1507. In

its analysis, the Court noted that, although the plaintiff had established that an experimental

propeller guard existed at the time of the accident, there was no duty on the manufacturer to

"adapt and refine that design into one feasible for use." Id. at 1508.

In Elliot, plaintiff's expert showed the jury a working alternative design actually being

used on the subject boat -- a ring guard that attached to the motor's propeller and reduced boat

speed by only five miles per hour. Id. at 1509. Even though the expert there demonstrated a

working model of this prototype actually being used on the subject product, the Court still held

that plaintiff failed to demonstrate the existence of a practical design. Id. In doing so, the Court

specifically pointed to the fact that the plaintiff's demonstration showed only that it was possible

to equip the motor with an alternative design, not that the design was "practical" or that it would

have reduced or eliminated the alleged injuries in question. Id.

Here, there similarly is no evidence to show that Plaintiffs' proposed alternative design would have reduced the chance of, or prevented, the alleged injuries; quite simply, Plaintiffs' expert has offered nothing more than a speculative opinion, without being tested, to support the theory that the proposed alternative designs would have prevented the injury. More specifically, Brown testified that merely because the proposed alternative designs were different from the subject seatbelt buckle, they were valid alternative designs. In his deposition, he testified:

> Q:    Tell me, specifically, what's different about the RNS 4G buckle that would -- that you believe would make it so that it would not have released in this case?
>
> A:    The overall design. The entire design is different from this (indicating) buckle. There's not one component of the buckle that's the same as this (indicating) buckle. The assembly of it and the way it's -- it's built, and the way I've seen it tested, and the way I've tested it and the way it performs, I don't believe it would have disrupted like this (indicating)buckle.

(See Ex. "A" at p. 341: 7-17). Like Yarbrough, merely noting that a design modification could exist is not sufficient under Alabama law to support a claim of defect under the AEMLD. See Yarbrough,628 So. 2d at 482.

Thus, Plaintiffs have failed to meet their burden of proving a safer, practical alternative design as is required under the AEMLD and summary judgment as a matter of law is due to be granted.

**D.  Plaintiffs' AEMLD Claims are due to Fail because Ken Brown has Not Tested his Alternative Design Under the Same or Similar Circumstances as the Subject Accident.**

Ken Brown has not tested his alternative design "under the same or similar circumstances presented [herein]." Phillips v. American Honda Motor Co., Inc., 438 F. Supp.

2d 1328, 1339 (S.D. Ala. 2006). This is a very strict standard; as such, simply stating that it is feasible or possible to incorporate a certain proposed alternative design in the subject product does not prove that it was actually practical. In other words, simply because another feasible alternative design was in existence at the time this seatbelt was manufactured does not, standing alone, establish it was a safer, more practical configuration than the one used on the subject product. See Elliott v. Brunswick Corporation, 903 F.2d 1505 (11th Cir. 1990), cert. denied, 498 U. S. 1048 (1991)(evidence showed only that it was feasible to equip the subject boat motor with an alternative design, not that the design was "practical."); see also Beech v. Outboard Marine, 584 So.2d at 450 (Ala. 1991)(Court "decline[d] to hold, as a matter of law, that simply because a feasible 'propeller guard could have been designed by a proper use of the manufacturer's resources' that an `alternative design' existed.") (italics emphasis in original; underline emphasis added).

When questioned in his deposition as to why his proposed alternatives would be safer and would have performed differently than the subject buckle, Brown could only testify, generally, that the proposed alternatives are a "good design" because of the absence of field data showing problems with the buckle. He also explained that he has seen testing of the overall design of his proposed alternatives. Importantly, absent from his deposition is any testimony that he has tested his proposed alternative designs "under the same or similar circumstances" which were involved in this accident. See, e.g., Phillips, 438 F. Supp. 2d 1328, 1339 (S.D. Ala. 2006). Specifically, Brown testified:

Q:    Okay. Tell me **every single reason why you believe those two buckles would not have performed the same way that the subject Takata AB buckle performed in this crash?**

A:    Well, RNS 4G, because I know that buckle a lot better.

15

Q:    Okay.

A:    I've seen extensive testing of that buckle; I've seen extensive discovery relating to the assembly, the design, the changes to the design, the problems with the design, the problems with the materials that they used to build it, the problems with the alignment of the materials, and all these problems that TRW said, here's why this buckle was bad and why it was defective and why it was defective and why they recalled it. When I looked at the overall design and the testing of the -- of the actual design, the RNS 4G built as they intended to build it, I think it's a good buckle. I don't think it's prone to inertial release; I don't -- don't think it's prone to partial engagement; I don't -- I think it's well protected from inadvertent release, and I've never seen a case field data that shows me that one of these has failed. It doesn't mean that it's never failed, I just don't see anything in the design that -- that shows a propensity for it. And having worked in this field for a long time, and I tend to see problems -- when problems with buckles arise, I tend to get a call on them.[1]

Q:    Okay.

A:    And I haven't seen any evidence of it from the RNS 4G when it's built right.

Q:    All right.

A:    The -- the Taurus buckle, same thing. What they did with the Taurus buckle is they -- they -- TRW being the "they," came up with a buckle to counter some of the problems that were evident in the field, and that was, specifically, with inertial release and partial engagement. So they came up with a new design and implemented it in the mid '90s, and that also seems to be a reasonably good design of a buckle.

(See Ex. "A", at pp. 339:14 - 341:5). From this testimony, it is clear that although Brown claims to have a broad understanding of his proposed alternatives, his knowledge is only general. More specifically, he has failed to test his alternatives, in any way which resembles the subject accident. In fact, he has just flat out failed to test them at all. Instead, he merely proposes that the alternative designs are better because they are different. In short, this is insufficient under Alabama law to meet the requirements of an AEMLD case.

It is also relevant to note that, as discussed *supra*, Brown admitted that he does not know

---

[1] Though Brown makes the conclusion that his alternative designs are safer because they do not have problems with "partial engagement" or "inertial release", he admitted in his deposition that neither of those problems is present in this case. (See Ex. "A" at pp. 240:6-23: 335: 15-19).

16

the specific defect in this case. Without this knowledge, he does not have the ability to test his proposed alternative designs based upon the circumstances of the accident because he does not understand them fully. As a concise basis for Brown's opinions as related to this specific accident, he testified:

> Q:     But if you don't know exactly what -- **if you don't know exactly why the subject buckle failed in this crash, how can you know that the RNS 4G buckle would not have failed in this crash?**
>
> A:     From the work that I've done, the discovery I've seen on this buckle, the time I've spent at TRW evaluating this buckle in their facility, the measurements I've taken of this specific buckle in their facility, with their high-tech equipment to -- to check all their parts, the field data I've seen on this buckle. I think, when the buckle's built well, it's a good design, and -- and I don't see that based upon the field data I have for the AB, where I have four cases already where ABs have opened.

(Ex. "A" at pp. 341:24 -- 342:13).

As explained above, Plaintiffs must prove by way of reliable and qualified expert testimony that their proposed alternative design would have been feasible, safer, reasonable and that it would have, in fact, reduced or prevented his injuries in the subject February 6, 2008, accident. Alabama product liability law also mandates that Plaintiffs' proposed alternative design must have been underlined tested on the same or similar product, *i.e.* the 1999 Pontiac Grand Am, under the same or similar circumstances as those present in the subject crash in order to prove that it would have, indeed, made a difference. Defendants have shown that Plaintiffs cannot rely on Brown's testimony to support his claim that the proposed alternative designs would be safer in light of the facts of this case. Under the strict standards set forth by relevant cases such as Emody, Beech and Elliot, the plaintiffs cannot satisfy their burden of establishing a safer, practical, reasonable alternative design to that which was used by Takata in the design and

17

manufacturing of the subject seatbelt.    As such, pursuant to Alabama product liability law,

Defendants are entitled to summary judgment.

### IV.    Plaintiffs Cannot Establish a Viable Claim Under Common Law Negligence and Wantonness.

In addition to claims under the AEMLD, Plaintiffs also make unsupported claims of

negligence and wantonness against Takata.    Because Plaintiffs have failed to establish the

essential elements of negligence and wantonness claims against Takata, summary judgment is

due as to these claims.

"In any negligence case, the plaintiff bears the burden of proving the existence of a duty

owed by the defendant, a breach of that duty, causation, and damage." DGB, LLC v. Hinds, 55

So.3d 218, 234-35 (Ala. 2010). See also Brushwitz v. Ezell, 757 So. 2d 423, 432 (Ala. 2000)

citing Albert v. Hsu, 602 So. 2d 895, 897 (Ala. 1994). Negligence is the "[f]ailure to do what a

reasonably prudent person would have done under the same or similar circumstances or the

doing of something that a reasonably prudent person would not have done under the same or

similar circumstances." Ford Motor Co. v. Burdeshaw, 661 So. 2d 236 (Ala. 1995).  Importantly,

the Alabama Supreme Court has recognized that the **plaintiffs' burden for a negligence claim**

**is almost impossible to meet.** See Casrell v. Altec Indus., Inc., 335 So. 2d 128 (Ala. 1976)

(warning that a product liability "plaintiff has an almost impossible burden of meeting the due

care test required in traditional negligence cases.").

It is "axiomatic that proof of negligence requires the establishment of a breach of a duty

flowing from the defendant to the plaintiff which proximately causes damage to plaintiff."

Thompson v. Lee, 439 So. 2d 113 (Ala. 1983) (emphasis added) citing Sloss-Sheffield Steel &

Iron Co. v. Allred, 25 So. 2d 179 (Ala. 1945); Williams v. Wicker, 179 So. 250 (Ala. 1938). And

"[p]roof of an accident and injury alone is [] insufficient to establish negligence." Mobile Press

18

Register, Inc. v. Padgett, 233 So. 2d 472 (Ala. 1970). Alabama law requires all four elements to be established by plaintiff, and where one element is absent, the cause of action fails. "If the nonmovant cannot produce sufficient evidence to prove each element of its claim, the movant is entitled to summary judgment, for a trial would be useless." Robinson v. Baptist Health Sys., Inc., 24 So. 3d 1119 (Ala. Civ. App. 2009) citing Ex parte Gen. motors Corp., 769 So. 2d 903, 909 (Ala 1999).

The evidence "must conform to the requirements of Rule 56(e) and be admissible." See Welch, 502 So. 2d at 342 citing Griffin v. Little, 451 So. 2d 284, 286 (Ala. 1984); Day v. Merch. Nat'l. Bank of Mobile, 431 So. 2d 1254 (Ala. 1983). Likewise, "[e]vidence supporting nothing more than speculation, conjecture, or a guess does not rise to the level of substantial evidence." State Farm Fire & Cas. Co. v. Shady Grove Baptist Church, 838 So. 2d 1039, 1041 (Ala. 2002) (quoting McGinnis v. Jim Walter Homes, Inc., 800 So. 2d 140, 145 (Ala. 2001) quoting in-turn Brushwitz v. Ezell, 757 So. 2d 423, 432 (Ala. 2000)). In other words, "[s]peculation and conclusory allegations are insufficient to create a genuine issue for trial." Best v. Houtz, 541 So. 2d 8, 10 (Ala. 1989).

As explained more fully *supra* Plaintiffs have failed to meet their "almost impossible" burden to sustain a common law negligence claim in this action. Like their claims under the AEMLD, mere proof that an accident occurred cannot sustain Plaintiffs' negligence action. Padgett, 233 So. 2d 472. Furthermore, Plaintiffs have provided **absolutely no evidence** of any negligent manufacturing or design by Takata. In fact, Plaintiffs' expert Ken Brown testified that he does not know Takata's design and manufacturing processes. He testified:

Q:    If- - if - - if it is just manufactured and produced as it was designed, is the design a nondefective and reasonably safe design?

19

A:    I don't know because I don't know all the design of the - - of the - - of the manufacturing processes. Sometimes a design defect, as I've seen in other buckle cases, has to do with, there's problems with the design of the die that stamps the parts, there's problems with the machine that aligns the parts. I don't know if that's part of the design problem, or it's simply a manufacturing problem, or, possibly, even a materials problem.

(Ex. "A" at p. 254:1-12).

Thus, it is clear if Brown does not know Takata's manufacturing or design processes, certainly any argument that Takata was negligent in design or manufacturing could not rise to anything beyond mere speculation or conjecture. Under Alabama law, a guess is not sufficient to rise to the level of "sufficient evidence" required to defeat summary judgment. See, e.g., Shady Grove Baptist Church, 838 So. 2d 1039. Furthermore, because Plaintiffs have presented **no evidence** of Takata's alleged negligence, that claim is due to be dismissed.

Correspondingly, even sufficient evidence of negligence is not adequate to warrant submission of wantonness claim to the jury. Glover v. Cason, 600 So.2d 245, 246 (Ala. 1992). Specifically, a finding of wanton conduct depends upon circumstances, and must be based upon facts beyond mere negligence. Rommell v. Automobile Racing Club of America, Inc., 964 F.2d 1090 (11th Cir. 1992) (citing Alabama Supreme Court cases). Further, wantonness and negligence cannot exist in the same act. Tombrello v. McGhee, 211 So.2d 900 (Ala. 1968). Wantonness is statutorily defined as '[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others.' George v. Alabama Power Co., 13 So.3d 360, 367 (Ala. 2008). As noted *supra*, Plaintiffs have presented **absolutely no** evidence of any alleged negligent conduct, thus, they clearly have shown no conduct by Takata which could be allegedly wanton. Furthermore, Plaintiffs have not presented any evidence of any reckless acts or those which illustrate a conscious disregard for the rights and safety of others. Thus, like Plaintiffs' negligence claims, their wantonness claims are due to fail.

20

V.    **Plaintiffs have Presented Insufficient Evidence to Prove the Seatbelt Buckle was in an Unreasonably Dangerous Condition at the Time it Left the Hands of Takata**

Not only have the Plaintiffs failed to present sufficient evidence of a defect in the subject buckle and evidence of an alternative design, but Plaintiffs have also failed to present substantial evidence sufficient to prove the seatbelt buckle was in an unreasonably dangerous condition at the time it left the hands of Takata. "Without evidence to support the conclusion that the product was defective and/or unreasonably dangerous **when it left the hands**" of Takata, the Plaintiffs' burden under the AEMLD cannot be met. Jordan, 581 So.2d at 837. As explained above, Plaintiffs' expert Brown can only testify that because the accident occurred and Ms. Clark sustained injuries, then it is his opinion the buckle is defective. This is insufficient to meet the Plaintiffs' burden under the AEMLD. Tanksley, 982 So. 2d at 1051. Plaintiffs have presented **no evidence** whatsoever that the buckle was unfit for its ordinary use or unreasonably dangerous in any way at the time it left Takata's hands.

Plaintiffs may attempt to point to the buckle's present, broken state as evidence that it was defective at the time it left Takata's hand. However, by merely stating the buckle is presently damaged does not equate to evidence the buckle was defective when it left Takata's control. In stark contrast, Takata's expert Eddie Cooper testified that the buckle was likely broken by tampering with the buckle with a tool or instrument. He stated:

Q:    You didn't -- do you have any evidence to in -- do you believe somebody at some time put a tool of that type and nature in that buckle to create marks that you've shown us?

A:    It's certainly one explanation for the damage to the buckle.

Q:    What other explanations could it be?

A:    I can't come up with one.

(See deposition of Eddie Cooper at p. 121: 4-11, attached hereto as Ex. "B").[2] Cooper continued by explaining the marks/broken nature of the buckle in its current state were not part of the manufacturing process Takata used.

> Q:    Okay. Looking at Ms. Clark's buckle, how -- how would you describe those marks we just showed on Plaintiffs' Exhibit 13? Would you call those a manufacturing mark outside some other marks are created at some other time by somebody else? How would you ultimately describe Plaintiffs' Exhibit 12, the marks you -- you showed me?
>
> A:    Well, they're certainly not part of the injection mold because they're clearly not on other exemplars. They appear to me to be a very local bit of damage created by some external object. The latch plate tongue itself does not come in contact with this area and does not have any feature that would make that type of mark. **So my only conclusion can be that it's some external object, tool that's been inserted into the mouth.**

(See Ex. "B" at pp. 124:8 – 125:1)(emphasis added).  He further testified:

> Q:    Do -- do you have any information that would lead you to believe that they occurred during the assembly process?
>
> A:    No.
>
> Q:    So you all have -- you have no idea how to explain them other than they appear to be from a -- some external source?
>
> A:    Correct.

(See Ex. "B" at p. 126: 2-9).  Though Cooper cannot state whether the damage occurred before or after the accident, he explained that if the damage occurred before the accident then Ms. Clark could not have been belted during the accident. (See. Ex. "B" at p. 135:2-10).  Thus, assuming *arguendo* the Plaintiffs' allegations of belt use at the time of the accident are correct, then the damage to the buckle must have occurred after the accident.

Because Plaintiffs have produced no evidence that the subject seatbelt buckle was defective when it left the hands of Takata, Plaintiffs have failed to meet their burden of proof

---

[2] Importantly, Cooper also testified that he did not damage the subject buckle during his inspections. (See Ex. "B" at p. 121: 1-3).

required under the AEMLD and summary judgment is proper. See, e.g., Jordan, 581 So.2d at 837.

## VI.    Plaintiffs Have No Viable Claim for Breach of Warranty

Plaintiffs' claim for breach of warranty is similarly due to be dismissed.  It is well established that whether a product is "unreasonably dangerous" is not a question properly addressed in a claim alleging breach of warranty. Yarbrough v. Sears, Roebuck & Co., 628 So. 2d 478, 483 (Ala. 1993). Such an argument ignores the clear distinction between causes of action arising under tort law and those arising under Alabama's U.C.C.  See Shell v. Union Oil Co., 489 So. 2d 569, 571 (Ala. 1986)("the standards of quality of a product, with the attendant risk of the bargain, are entirely distinct from its standards of safety, with a possible unreasonable risk of harm").

Here, Plaintiffs have presented no separate evidence regarding a particular deficiency -- separate and apart from the claimed design defect.  See Shell, *supra* (holding that an implied warranty, as prescribed by §7-2-314 is "one of commercial fitness and suitability, and a private right of action is afforded only where the user or consumer is injured by a breach of that warranty.").   Thus, under well settled Alabama law, Plaintiffs are not asserting a legally separate warranty claim, but, rather, a products claim under the AEMLD.

Regardless of that point, Plaintiffs' implied warranty claim should be dismissed because, under Alabama law, implied warranties are applicable only to the seller of goods, not their manufacturers.  See Rose v. General Motors Corp., 323 F. Supp. 2d 1244, 1248 (N.D. Ala. 2004); Ex parte General Motors Corp., 769 So. 2d 903, 910 (Ala. 1999); see also Rhodes v. General Motors Corp., 621 So. 2d 945, 947 (Ala. 1993); Ala. Code §§7-2-314, -315. Moreover, Alabama law is clear in that there is no right of action on an implied warranty theory against a

manufacturer without privity of contract. <u>Wellcraft Marine v. Zarzour</u>, 577 So. 2d 414 (Ala. 1990); <u>Rhodes</u>, *supra*.

The <u>Zarzour</u> case outlines the requirements of §7-2-318 of the Alabama Code, which provides, "a seller's warranty, whether express or implied, extends to any natural person...." "Seller" is defined as a "person who sells or contracts to sell goods." §7-2-103(1)(d). The <u>Zarzour</u> Court further noted that under §7-2-314 (Implied Warranty of Merchantability section), §7-2-315 (Implied Warranty of Fitness for a Particular Purpose) both apply to the "seller." In <u>Zarzour</u>, the plaintiff argued that the written express warranty provided by the manufacturer did not disclaim implied warranties, and, thus, the defendant was liable under those implied warranty theories. However, the court stated that the plaintiff overlooked the fact that the defendant was not the Seller, and, thus, was under no obligation to disclaim the implied warranties which were inapplicable to the manufacturer.

The plaintiff also contended that the express warranty itself created privity of contract, and, therefore, his implied warranty claim should have been allowed to go to a jury. The Alabama Supreme Court rejected that proposal, and, in doing so, recognized that the plaintiffs cited no authority for this proposition and specifically held <u>that an express warranty does not convert a manufacturer into a "seller" for the purposes of the commercial code's implied warranty provisions</u>. <u>Id.</u> at 419. The Court went even further, stating that "regardless of any express warranty that a manufacturer may wish to give with a product, by their very language the commercial code's implied warranty sections apply to the seller of the product." <u>Id.</u> Ultimately, the court held that the defendant, <u>as the manufacturer of a boat</u>, <u>not the seller</u>, was not in privity with the ultimate purchaser and affirmed a directed verdict in the defendant's favor on the implied warranty claims. <u>Id.</u> at 419; <u>see also</u> Rhodes v. General Motors Corp., *supra* (like here,

24

plaintiffs filed suit alleging, among other things, a breach of implied warranty claim; however, the court held that the plaintiff's claim for breach of implied warranties against the manufacturer did not state a cause of action as the plaintiffs lacked privity with the manufacturer General Motors).

Like <u>Zarzour</u>, because Takata is the subject seatbelt's manufacturer and not the "seller", Plaintiffs have no viable breach of warranty claim under Alabama law. <u>See</u> 577 So. 2d 414. Thus, summary judgment as a matter of law should be granted as to Plaintiffs' breach of warranty claims.

## VII.    Conclusion

Plaintiffs cannot meet the requirements of their AEMLD/negligence claims because they have presented **no evidence** that there was a defect in the subject seatbelt at the time it left Takata's hands; they have not proved that there was a safer, more practical alternative design that would have prevented or lessened Leanne Clark's injuries; and Brown has failed to test his proposed alternative designs in the same or similar circumstances in which the accident occurred. Additionally, Plaintiffs have not met their burdens of proof to sustain their common law negligence, common law wantonness, or breach of warranty claims. Thus, Plaintiffs have failed to present sufficient evidence to create a genuine issue of fact for trial and Takata is entitled to judgment as a matter of law.

**WHEREFORE, PREMISES CONSIDERED,** the Takata Defendants respectfully request this Honorable Court to enter an Order granting Full and Final Summary Judgment on all claims.

Respectfully submitted this the 27th day of April, 2011.

BY: /s/ David L. Brown, Jr.
    De Martenson  **(MAR010)**
    David L. Brown, Jr.  **(BRO205)**
    John Isaac Southerland **(SOU010)**
    HUIE, FERNAMBUCQ & STEWART, LLP
    Three Protective Center - Suite 200
    2801 Highway 280 South
    Birmingham, Alabama  35223-2484
    Telephone: (205) 251-1193
    Facsimile:  (205) 251-1256
    dm@hfsllp.com
    jis@hfsllp.com

    - and -

    Ronnie E. Keahey, Esquire
    George M. 'Marc' Keahey, Esquire
    KEAHEY LAW OFFICE
    Post Office Box 934
    Grove Hill, Alabama 36451

    Attorneys for Defendants Takata Corporation
    and TK Holdings Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of April, 2011, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing and/or by depositing a copy of same in the United States Mail, postage prepaid and properly addressed on the following:

LaBarron N. Boone, Esq.
J. Greg Allen, Esq.
Jere L. Beasley, Esq.
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
Post Office Box 4160
Montgomery, AL   36104

Joseph C. McCorquodale, III
McCorquodale & McCorquodale
Post Office Drawer 1137
Jackson, Alabama 36545

Stewart Howard, Esq.
Jonathan Festa, Esq.
Howard & Owens
Attorneys at Law
411 St. Francis Street
P. O. Box 1903
Mobile, Alabama 36633
(For Sheffield Motors)

/s/ David L. Brown, Jr.
Of Counsel

ELECTRONICALLY FILED
4/27/2011 3:31 PM
CV-2009-900138.00
CIRCUIT COURT OF
CLARKE COUNTY, ALABAMA
JAY DUKE, CLERK

# Exhibit A

# FREEDOM COURT REPORTING

```
 1          IN THE CIRCUIT COURT OF CLARKE COUNTY, ALABAMA
 2                      - - -
 3   LEANNE E. CLARK AND            : CIVIL ACTION NO.
     CHRISTOPHER D. CLARK, et al.,  : CV-2009-900138
 4       Plaintiffs,                :
                                    :
 5       vs.                        :
                                    :
 6   GENERAL MOTORS CORPORATION, et al., :
         Defendants.                :
 7
                         - - -
 8
 9          Videotape Deposition of KENNETH BROWN, taken
10   pursuant to Notice, at the offices of Forensic Safety
11   Group, 543 Davisville Road, Willow Grove, Pennsylvania
12   on Friday, December 3, 2010, beginning at approximately
13   10:11 a.m., before Janene L. Lenox, Registered
14   Professional Reporter, Certified Court Reporter (License
15   No. 30XI00232700) and Notary Public.
16                      - - -
17
18
19
20
21
22
23
24
```

**FREEDOM COURT REPORTING**

1        Are there any loads, other than tensile loads,

2    that would have been ali -- applied to this buckle

3    during this crash to cause that damage to that latch?

4        A.   No, not that should have caused that, but

5    something did cause that.

6        Q.   And that's what I'm asking you, what is it?

7    You nee -- you tell me that, tell me what caused that

8    damage.

9        A.   The forces of the crash, and I can't specify

10   which of the forces of the crash caused it to break, but

11   I can tell you that the evidence lead -- led me to the

12   conclusion that it broke during the crash, because it

13   was fastened, the belt was loaded, and then it was

14   unfastened and she was ejected.  And I've considered

15   other modes by which this can open up.

16        I don't see an inertial mechanism to open up

17   this buckle; I didn't see a partial engagement due to

18   the amount of force that was into the latch plate, so I

19   concluded that it opened for some other reason, and when

20   I looked at the buckle inside, it was disrupted.  So

21   whether it was built out of spec, or it was a design

22   problem, or a materials problem, I can't think tell you

23   as I sit here.

24        Q.   Okay.

# FREEDOM COURT REPORTING

1    there's a problem with the dimensions of the latch, I'll

2    call them, the wings of the latch, itself --

3       Q.    Okay.

4       A.    -- where it interacts with the frame.

5       Q.    What are the dimensions as that frame -- as

6    that latch -- strike that.

7            What -- what are the design dimensions for

8    those latch wings?

9       A.    Well, if you go to -- to drawing 14072 --

10      Q.    Um-hum.

11      A.    -- you can see the dimensions for any number

12   of -- of the properties of that component that they call

13   the lock bar.

14      Q.    All right.

15      A.    And I'm calling it the latch.

16      Q.    Okay.  Have you made any determination that

17   the wings of the latch are out of spec or out of

18   dimension?

19      A.    No, I just know the buckle broke.

20      Q.    Okay.  Is your opinion that, because the

21   buckle broke, it must be -- it must be defective in this

22   case?

23      A.    Well, it's evidence of the defect in this

24   case, yes.

# FREEDOM COURT REPORTING

1    Q.    Okay.

2    A.    It's clear evidence that it's defective,

3 because the forces were not great enough to have caused

4 a disruption and an -- and an -- an opening up of this

5 restraint system.

6    Q.    Okay.  So simply because the buckle broke,

7 you're saying that is evidence that it was defective?

8    A.    In this crash, yes.

9    Q.    Okay.

10    A.    It's demonstrative of it.

11    Q.    Is this a manufacturing or a design defect

12 case?

13    A.    Not sure.  Don't have the -- we don't have the

14 specs on it to -- and the measurements of this -- these

15 parts to match up.  I don't know.

16    Q.    What part of -- what is the defective

17 condition of the buckle?

18    A.    That the components are disrupted, that the

19 load bearing components did not stay engaged as required

20 to safely restrain her during the crash.

21    Q.    Can -- are -- do you have any other opinion

22 that's more specific than that?

23    A.    Well, it's -- it's what they call the lock bar

24 and what I've been calling the latch.

# FREEDOM COURT REPORTING

1        A.    The buckle.

2        Q.    You're saying the system, itself --

3        A.    The buckle system is defective, yes.

4        Q.    Okay.  Why is it defective?

5        A.    Because it didn't hold foreseeable crash loads

6    as required by the federal standards, and when looking

7    at it, it's obviously disrupted post crash.

8        Q.    Okay.  Why did it not hold the loads --

9    foreseeable loads during the crash?

10       A.    Because the latch disengaged with the latch

11   plate during the crash.

12       Q.    But what part of the latch, what is the

13   condition of the assembly of the system that did not

14   allow it to hold the loads during the crash?

15       A.    What caused the failure, I don't know.

16       Q.    Okay.  What -- is there any particular

17   component part that you can point to and say, this is

18   what didn't hold, or this is why -- this is where the --

19   the system's defective, is there any part of that?

20       A.    Yes.

21       Q.    Okay.

22       A.    Yes.  The engagement of the lock bar with the

23   frame.

24       Q.    All right.

# FREEDOM COURT REPORTING

1          If -- if -- if it is just manufactured and

2     produced as it was designed, is the design a non

3     defective and reasonably safe design?

4          A.    I don't know, because I don't know all the

5     design of the -- of the -- of the manufacturing

6     processes.  Sometimes a design defect, as I've seen in

7     other buckle cases, has to do with, there's problems

8     with the design of the die that stamps the parts,

9     there's problems with the machine that aligns the parts.

10    I don't know if that's part of the design problem, or

11    it's simply a manufacturing problem, or, possibly, even

12    a materials problem.

13         Q.    Right.

14         A.    I don't know, as I sit here.

15         Q.    Okay.  If it's -- you know what the material

16    specs of the internal components of the buckle were

17    supposed to be; don't you?

18         A.    As well as they've been produced in discovery.

19         Q.    Okay.  And that's what I'm saying, the very

20    basic design, the -- the material specs, the components,

21    the way that the system works together, that very basic

22    design that is -- is that a defective and an

23    unreasonably dangerous design in and of itself, or does

24    it take something more?  Does it take some problem with

## FREEDOM COURT REPORTING

1    the die stamping, or some problem in the manufacturing,

2    does it take something like that?  The design, itself,

3    is it a defective design?

4          A.    The design of the buckle, not of -- not the

5    design of the manufacturing processes --

6          Q.    Yes?

7          A.    -- is that what you're asking me?

8          Q.    Yes.

9          A.    The design of the buckle on the passenger

10   side, I was able to get to partially engage.  It may be

11   indicative of defects within the buckle.  It may also be

12   indicative of corrosion and long-term problems with that

13   particular buckle.

14         Q.    I understand.

15         A.    So I don't know.  So I have some evidence that

16   the buckle may be defective, but -- by design, but, in

17   this case, I'm telling you, either, the design or the

18   manufacture of it was the problem, and it manifested

19   itself by breaking during the crash.

20         Q.    Okay.  And I understand that you may have some

21   opinions about the design of the buckle that may not

22   have occurred in this crash, like part -- you said you

23   don't believe it partially engaged in this case; right?

24         A.    Correct.

# FREEDOM COURT REPORTING

1      Q.    Okay.  Is there anything in the inherent

2  design of that buckle that you believe contributed to or

3  caused the buckle to fail in this crash?

4      A.    I don't know, because I don't know,

5  specifically, what caused it to fail.  I know that the

6  system failed, but I can't tell you, as I'm sitting

7  here, that one part -- it's not like I have the -- the

8  lock bar in multiple pieces --

9      Q.    Right.

10      A.    -- where I can say the lock bar definitely

11  broke.

12      Q.    Okay.

13      A.    So I don't have that kind of evidence here.

14      Q.    Okay.

15      A.    What I have is, is that something came apart,

16  the assembly came apart in a way that it should never

17  have come apart.

18      Q.    All right.

19      A.    And that there's -- there -- you know,

20  maybe -- you said Takata's going to come in and say that

21  should happen, but I read the corporate designee from

22  Takata who wasn't going to go anywhere near any opinions

23  regarding how this thing was supposed to be.

24      Q.    And I'm sorry if you misconstrued what I said

# FREEDOM COURT REPORTING

1   to a point where fabric, or something, would fail before

2   the metal.

3       Q.   Okay.

4       A.   So I've considered those, but I didn't see any

5   evidence that -- that the Takata AB in question could do

6   those.

7       Q.   Okay.  In this crash?

8       A.   In your crash, yes.

9       Q.   Okay.  But you believe that there's a

10  possibility they could do those in other crashes?

11      A.   No, not -- not all of those.  You asked me

12  hypothetically --

13      Q.   Right.

14      A.   -- about buckles.

15      Q.   You said that you believe that there's a

16  possibility that a Takata AB buckle could part -- could

17  be subject to partial engagement and release in that

18  way?

19      A.   It's possible.  I haven't tested it for that.

20      Q.   Okay.

21      A.   So I don't -- I reserve judgment.  If -- if

22  your experts want to come in and say it's prone to

23  partial engagement, then I might -- might go and test it

24  for that.

# FREEDOM COURT REPORTING

1      A.   No.   The only way I could determine that these

2    were OSIs is I found substantial evidence from my work

3    that they were.   There was a number of other cases I've

4    discussed with Mr. Boone.   My understanding is that Dr.

5    Burton has seen a number of Takata AB buckles that he

6    believes are OSIs, but I can't speak for their work or

7    their discovery process, I can only speak for the ones

8    that I have personal knowledge of, so I brought those

9    in.

10     Q.   Right.   In other words, the -- there are some

11   other ones, other than these three, and those are ones

12   that you don't have personal knowledge of?

13     A.   That's my understanding, is that there are

14   other ones.   These are the three I have personal

15   knowledge of.

16     Q.   Okay.   And you believe Dr. Burton, perhaps,

17   has personal knowledge of the other ones?

18     A.   That's what I was told, yes.

19     Q.   Okay.   What's your alternative design; what

20   should Takata have done in this case to prevent this

21   accident and injuries?

22     A.   Well, I have two alternative designs.   One

23   buckle that was interesting, we talked about it already,

24   is the TRW RNS 4G.

# FREEDOM COURT REPORTING

1        Q.    Right.

2        A.    Because, when you build it well, it's actually

3    a good buckle.

4        Q.    Okay.

5        A.    The other one that I brought is the -- the mid

6    '90s Taurus buckle, and I just call it the Taurus buckle

7    because I don't know the designation.   It's made by TRW,

8    they used it in the Grand Prix and in the Taurus, both,

9    in 1994.   It looks like some of these documents were

10   rearranged.   It looks like somebody shuffled the deck a

11   little bit during some process here.   Okay.   I see what

12   happened, this -- this (indicating) one document covers

13   both buckles.

14       Q.    Okay.   Tell me every single reason why you

15   believe those two buckles would not have performed the

16   same way that the subject Takata AB buckle performed in

17   this crash?

18       A.    Well, RNS 4G, because I know that buckle a lot

19   better.

20       Q.    Okay.

21       A.    I've seen extensive testing of that buckle;

22   I've seen extensive discovery relating to the assembly,

23   the design, the changes to the design, the problems with

24   the design, the problems with the materials that they

## FREEDOM COURT REPORTING

1    used to build it, the problems with the alignment of the

2    materials, and all these problems that TRW said, here's

3    why this buckle was bad and why it was defective and why

4    they recalled it.

5         When I looked at the overall design and the

6    testing of the -- of the actual design, the RNS 4G built

7    as they intended to build it, I think it's a good

8    buckle.  I don't think it's prone to inertial release; I

9    don't -- don't think it's prone to partial engagement; I

10   don't -- I think it's well protected from inadvertent

11   release, and I've never seen a case field data that

12   shows me that one of these has failed.

13        It doesn't mean that it's never failed, I just

14   don't see anything in the design that -- that shows a

15   propensity for it.  And having worked in this field for

16   a long time, and I tend to see problems -- when problems

17   with buckles arise, I tend to get a call on them.

18        Q.    Okay.

19        A.    And I haven't seen any evidence of it from the

20   RNS 4G when it's built right.

21        Q.    All right.

22        A.    The -- the Taurus buckle, same thing.  What

23   they did with the Taurus buckle is they -- they -- TRW

24   being the "they," came up with a buckle to counter some

## FREEDOM COURT REPORTING

1    of the problems that were evident in the field, and that

2    was, specifically, with inertial release and partial

3    engagement.  So they came up with a new design and

4    implemented it in the mid '90s, and that also seems to

5    be a reasonably good design of a buckle.

6        Q.    All right.

7            Tell me, specifically, what's different about

8    the RNS 4G buckle that would -- that you believe would

9    make it so that it would not have released in this case?

10       A.    The overall design.  The entire design is

11   different from this (indicating) buckle.  There's not

12   one component of the buckle that's the same as this

13   (indicating) buckle.  The assembly of it and the way

14   it's -- it's built, and the way I've seen it tested, and

15   the way I've tested it and the way it performs, I don't

16   believe it would have disrupted like this (indicating)

17   buckle.

18           So there's nothing that's the same as this

19   buckle, other than some of -- maybe, some of the metals

20   and some of the plastics are the same, but there's

21   nothing alike, so it's hard to say what part -- you

22   know, the latch is different, the springs are different,

23   the ejector is different, the press button's different.

24       Q.    But if you don't know exactly what -- if you

# FREEDOM COURT REPORTING

1    don't know exactly why the subject buckle failed in this

2    crash, how can you know that the RNS 4G buckle would not

3    have failed in this crash?

4         A.   From the work that I've done, the discovery

5    I've seen on this buckle, the time I've spent at TRW

6    evaluating this buckle in their facility, the

7    measurements I've taken of this specific buckle in their

8    facility, with their high-tech equipment to -- to check

9    all their parts, the field data I've seen on this

10   buckle.  I think, when the buckle's built well, it's a

11   good design, and -- and I don't see that based upon the

12   field data I have for the AB, where I have four cases

13   already where ABs have opened.

14        Q.   How many AB buckles have been produced and

15   sold since its inception?

16        A.   I don't know.  I've seen millions, but I don't

17   know what the exact number is.

18             THE VIDEOGRAPHER:  Excuse me.

19             MR. SOUTHERLAND:  We need to change tapes?

20             THE VIDEOGRAPHER:  Yeah.

21             This is the end of tape 6.  The time is 5:35,

22   we're going off the record.

23             (Whereupon, a brief recess was taken at 5:35.)

24             (Whereupon, the deposition resumed at 5:42.)

# Exhibit B

**Witness: EDDIE COOPER**                                           02/04/2011

Page 1

```
 1                    IN THE CIRCUIT COURT
                    CLARKE COUNTY, ALABAMA
 2

 3      LEANNE E. CLARK and              )
        CHRISTOPHER D. CLARK, et al.)
 4                                       )
                 Plaintiffs,            )
 5                                       )
        v.                               )  CV-2009-900138
 6                                       )
        GENERAL MOTORS CORPORATION; )
 7      TAKATA CORPORATION; et al.,  )
                                         )
 8               Defendants.            )
        _____)
 9

10

11

12

13

14

15

16           VIDEOTAPED DEPOSITION OF EDDIE COOPER
17                    Phoenix, Arizona
18                   February 4, 2011
19

20

21

22
                         Prepared by:

23
                    CINDY MAHONEY, RPR, RMR
24                  Certified Court Reporter
                    Certificate No. 50680
25
```

**Witness: EDDIE COOPER**                    **02/04/2011**

```
 1   11:04:15        Q   You didn't do anything like that in

 2   11:04:16   case, did you?

 3   11:04:16        A   No.

 4   11:04:19        Q   You didn't -- do you have any evidence

 5   11:04:23   to in -- do you believe somebody at some time

 6   11:04:27   put a tool of that type and nature in that

 7   11:04:30   buckle to create marks that you've shown us?

 8   11:04:32        A   It's certainly one explanation for the

 9   11:04:33   damage to the buckle.

10   11:04:35        Q   What other explanations could it be?

11   11:04:36        A   I can't come up with one.

12   11:04:38        Q   Using that tool, did you -- were you

13   11:04:41   able to -- and I think we've answered it.

14   11:04:43            But using that tool, did you -- were

15   11:04:46   you able to get the wings, I would call it --

16   11:04:48   why don't you turn it -- hold the buckle up so

17   11:04:50   we can see what I'm talking about -- the wings

18   11:04:52   to -- to get into the same position as

19   11:04:53   Ms. Clark's?

20   11:04:56        A   No, as I said, I have not attempted to

21   11:04:59   break a buckle in the same fashion.

22   11:04:59        Q   All right.

23   11:05:02        A   But you can certainly apply forces in

24   11:05:04   the proper direction to do all of that damage.

25   11:05:06        Q   Do you know if you could get the wings
```

**Witness: EDDIE COOPER**                                    **02/04/2011**

Page 124

| | | |
|---|---|---|
| 1 | 11:07:46 | Q    And -- and what -- what you're telling |
| 2 | 11:07:49 | me is you -- you would think you could do it if |
| 3 | 11:07:50 | you tried? |
| 4 | 11:07:51 | A    I believe if I tried long enough, I |
| 5 | 11:07:54 | could probably produce some similar damage.   I |
| 6 | 11:07:56 | don't know that I could ever produce exactly the |
| 7 | 11:08:03 | damage. |
| 8 | 11:08:09 | Q    Okay.  Looking at Ms. Clark's buckle, |
| 9 | 11:08:12 | how -- how would you describe those marks we |
| 10 | 11:08:14 | just showed on Plaintiffs' Exhibit 13? |
| 11 | 11:08:17 | Would you call those a manufacturing |
| 12 | 11:08:21 | mark outside some other marks are created at |
| 13 | 11:08:23 | some other time by somebody else?  How would you |
| 14 | 11:08:26 | ultimately describe Plaintiffs' Exhibit 12, the |
| 15 | 11:08:29 | marks you -- you showed me? |
| 16 | 11:08:31 | A    Well, they're certainly not part of |
| 17 | 11:08:32 | the injection mold because they're clearly not |
| 18 | 11:08:36 | on other exemplars.  They appear to me to be a |
| 19 | 11:08:41 | very local bit of damage created by some |
| 20 | 11:08:43 | external object. |
| 21 | 11:08:44 | The latch plate tongue itself does not |
| 22 | 11:08:47 | come in contact with this area and does not have |
| 23 | 11:08:49 | any feature that would make that type of mark. |
| 24 | 11:08:52 | So my only conclusion can be that it's some |
| 25 | 11:08:56 | external object, tool that's been inserted into |

**Witness: EDDIE COOPER**                                    **02/04/2011**

| | | |
|---|---|---|
| 1 | 11:08:57 | the mouth. |
| 2 | 11:09:00 | Q   And do you have any idea when that -- |
| 3 | 11:09:03 | assuming that that is the case, do you have any |
| 4 | 11:09:05 | idea when that occurred? |
| 5 | 11:09:07 | A   No.  I can't tell you if it's before |
| 6 | 11:09:08 | or after. |
| 7 | 11:09:10 | Q   You just know at some point something |
| 8 | 11:09:12 | may have got inside the buckle to cause that? |
| 9 | 11:09:12 | A   Yes. |
| 10 | 11:09:15 | Q   And do you know if Sheffield Motors at |
| 11 | 11:09:18 | any time had anything to do with those markings? |
| 12 | 11:09:19 | MR. FESTA:  Object to the form. |
| 13 | 11:09:19 | THE WITNESS:  I do not. |
| 14 | 11:09:20 | Q   BY MR. BOONE:  Do you know if anybody |
| 15 | 11:09:21 | had anything to do with those markings -- know |
| 16 | 11:09:24 | of any evidence to support who may have |
| 17 | 11:09:28 | allegedly created such markings? |
| 18 | 11:09:31 | A   I don't know who would have done that. |
| 19 | 11:09:35 | Q   Or do you know if it happened in the |
| 20 | 11:09:37 | manufacturing process? |
| 21 | 11:09:40 | A   I do not.  I don't -- don't know. |
| 22 | 11:09:42 | Q   Do you know exactly how and what tools |
| 23 | 11:09:44 | are used to assemble this buckle? |
| 24 | 11:09:45 | A   No. |
| 25 | 11:09:48 | Q   Do you know where it was assembled? |

**Witness: EDDIE COOPER**                                    **02/04/2011**

Page 126

```
 1    11:09:51        A    In Mexico, Acuña?

 2    11:09:54        Q    Do -- do you have any information that

 3    11:09:55    would lead you to believe that they occurred

 4    11:09:57    during the assembly process?

 5    11:09:58        A    No.

 6    11:10:00        Q    So you all have -- you have no idea

 7    11:10:04    how to explain them other than they appear to be

 8    11:10:05    from a -- some external source?

 9    11:10:05        A    Correct.

10    11:10:07        Q    And that could have happened in the

11    11:10:09    manufacturing process or sometime thereafter?

12    11:10:10            MR. SOUTHERLAND:  Object to form.

13    11:10:10            THE WITNESS:  I would be -- be very

14    11:10:12    surprised if it's part of the manufacturing

15    11:10:13    process.  I would say sometime after that.

16    11:10:15        Q    BY MR. BOONE:  Do you have any way to

17    11:10:17    exclude whether or not a piece of tool or

18    11:10:20    something got into that buckle and the

19    11:10:21    manufacturing process that could have caused

20    11:10:23    that?

21    11:10:25        A    No.

22    11:10:30        Q    Now, let's -- let's talk about the

23    11:10:34    buckle in any other -- I would call it, based on

24    11:10:37    what you just said, external source -- any other

25    11:10:38    damage that you observed on the buckle that was
```

**FREEDOM COURT REPORTING    877-373-3660**

**Witness: EDDIE COOPER**                    **02/04/2011**

| | | |
|---|---|---|
| 1 | 11:19:47 | being inserted into the mouth of the buckle. |
| 2 | 11:19:49 | Q   And do you believe whatever -- do you |
| 3 | 11:19:51 | have any opinion when it was, before or after |
| 4 | 11:19:52 | the wreck? |
| 5 | 11:19:55 | A   I cannot determine that.  If it was -- |
| 6 | 11:19:58 | if it is a consistent set of evidence, the |
| 7 | 11:20:02 | damage to the interior and this evidence, if it |
| 8 | 11:20:04 | was before the accident, obviously it couldn't |
| 9 | 11:20:07 | have been used in the accident.  If it was |
| 10 | 11:20:09 | after, I can't tell. |
| 11 | 11:20:13 | Q   And -- and what I mean is, just by |
| 12 | 11:20:15 | looking at that damage doesn't tell you that the |
| 13 | 11:20:17 | buckle was not operational, does it? |
| 14 | 11:20:18 | A   That's correct.  That's why I said if |
| 15 | 11:20:20 | all this evidence is consistent. |
| 16 | 11:20:25 | Q   Okay.  Any other evidence external to |
| 17 | 11:20:31 | the -- to the buckle that you found on the -- |
| 18 | 11:20:34 | I'm sorry, I think you know where I'm going -- |
| 19 | 11:20:37 | but external on the buckle or internal that is |
| 20 | 11:20:41 | inconsistent with damage from a -- a wreck but |
| 21 | 11:20:42 | from some other external source like we've been |
| 22 | 11:20:45 | talking about before like next to the six, the |
| 23 | 11:20:47 | mouth of the buckle, anything else like that? |
| 24 | 11:20:48 | A   With the limitations we've already |
| 25 | 11:20:49 | discussed. |