Elihu Inselbuch
Rita C. Tobin
CAPLIN & DRYSDALE, CHARTERED
375 Park Avenue, 35th Floor
New York, New York 10152-3500
Telephone: (212) 319-7125
Facsimile: (212) 644-6755

Trevor W. Swett III
Ronald E. Reinsel
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, N.W.
Suite 1100
Washington, D.C. 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301

*Attorneys for Mark Buttita, personal representative of Salvatore Buttita*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------x
In re                                          :
MOTORS LIQUIDATION COMPANY, et al.,            :        Chapter 11 Case No.
            f/k/a General Motors Corp., et al. :
                                               :        09-50026 (REG)
                                               :
                                               :        (Jointly Administered)
                                               :
                                               :
                                               :
-----------------------------------------------------------x
```

**APPLICATION OF MARK BUTTITA PURSUANT TO 11 U.S.C. § 503(B) FOR
ALLOWANCE OF ADMINISTRATIVE EXPENSES INCURRED IN MAKING
A SUBSTANTIAL CONTRIBUTION IN THIS CHAPTER 11 CASE FROM
JUNE 4, 2009 THROUGH JULY 15, 2009**

Mark Buttita, in his capacity as the personal representative of Salvatore Buttita

("**Buttita**"), by and through his undersigned attorneys, hereby submits this interim and final

477133

application (the "**Application**") pursuant to sections 503(b)(3)(D) and (b)(4) of Title 11 of the

United States Code (the "**Bankruptcy Code**") and Rule 2016 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"), and Rule 2016-1 of the Local Rules of the United States

Bankruptcy Court for the Southern District of New York (the "**Local Rules**") for the allowance

of administrative expenses for actual, necessary expenses incurred by Buttita and for reasonable

compensation of expenses in connection with professional services rendered by Caplin &

Drysdale, Chartered ("**Caplin & Drysdale**") as counsel to Buttita, from June 4, 2009 through

July 15, 2009 (the "**Compensation Period**") in making a substantial contribution in the above-

captioned bankruptcy case.  In support of this Application, Buttita relies on the declarations of

John Cooney and Elihu Inselbuch, attached hereto as Exhibits A and B, respectively.  In further

support thereof, Buttita respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The bankruptcy filing of General Motors Corporation and its various affiliates

(collectively, the "**Debtors**" now known as Motors Liquidation Corporation "**MLC**"), including

the immediately proposed sale of essentially all of their assets and on-going business enterprise

to an entity sponsored, financed and directed by the United States government, represented one

of the largest and most complex proceedings under the Bankruptcy Code with broad and far

reaching effect not only on its hundreds of thousands of creditors, employees, customers and

suppliers, but also on the economy of the nation as a whole.

2.      At the time of its filing, the Debtors' business was on the brink of collapse and

was being maintained on life support only by significant financial contributions and active

intervention by the federal government which had conditioned any further financial support on

the rapid consummation of a sale of what it considered be the Debtors' viable assets and business

operations. Inherent in that proposed sale were the government-sponsored buyer's proposed assumption of certain selective liabilities based upon decisions driven in part by economics and undoubtedly in part by political considerations. The favored assumed liabilities would be assured payment in full or other agreed consideration backed by the strength of the federal government. The vast majority of other creditors would be left, at best, to find their minimal prospective recoveries from whatever might result from the proceeds of the sale and the value of the remaining non-viable assets. Moreover, certain prospective creditors whose potential recourse against the Debtors had not yet ripened into cognizable bankruptcy claims faced both the substantial likelihood that the estates' assets would be fully administered and distributed before their claims ripened and being enjoined from pursuing the purchaser as the successor of the Debtors' on-going business enterprise and thus left with no possible recovery whatsoever.

3.      Due to both the economic and political pressure to move the sale proceeding to an expeditious resolution and the profound effect that the sale would have on all later developments in these cases, the first weeks after the filing of the Debtors' petitions were an incredibly intensive period devoted to primarily addressing the issues presented by the proposed sale.

4.      Within days after the filing of these cases, the United States Trustee formed an Official Committee of Unsecured Creditors to act as a fiduciary for the interests of all unsecured creditors in these cases. Buttita, acting through his state court counsel John Cooney, a member of the law firm of Cooney and Conway, was appointed as one of the members of that committee, and the only member of that committee who represented the interests of asbestos tort victims.

5.      Given the overwhelming importance of the proposed sale, its effect on the interests of the asbestos tort victims, the rapid pace of the sale proceedings, as well as the wide variety of other interests otherwise represented on the committee as a whole, Mr. Cooney

determined that he required the assistance of counsel experienced both in complex bankruptcies and most particularly in the unique circumstances presented in the context of asbestos-related bankruptcy issues to assist him in protecting the distinctive interests of the asbestos victims in these cases in connection with the sale. On behalf of Buttita, Mr. Cooney selected Caplin & Drysdale to provide that assistance.

6.      In addition to his official role on the larger creditors committee, through Caplin & Drysdale, Buttita effectively acted as a fiduciary for all asbestos victims of the Debtors. He conducted discovery specific to the Debtors' asbestos liabilities and actively opposed the proposed sale to the extent that it proposed to impermissibly affect the interests of all asbestos victims, including the due process rights of those yet unknown victims whose right to seek recovery against the purchaser as the Debtors' successor was sought to be improperly enjoined.

7.      While the official creditors committee initially filed a limited objection to the sale which also asserted certain other bases for objection also asserted by Buttita, the committee withdrew its objection at the beginning of the sale hearing, thus leaving Buttita to advance all such objections himself.

8.      Only slightly more than a month after the commencement of these cases, and after a multi-day, highly contested hearing, the Court ordered that the sale would be approved. That approval was, however, conditioned on certain reservations strenuously sought by Buttita for the benefit of all present and future asbestos creditors in these cases. Those reservations had significant effect on the subsequent developments in these cases that substantially benefitted the estate and its creditors.

9.      In its ruling to approve the sale, the Court in part adopted Buttita's objections by specifically conditioning the sale on the inclusion of language in the approval order, applicable

only with respect to asbestos claims and demands, which limited the effect of the enforceability

any resulting injunction with respect the due process rights of the asbestos tort victims.

10.    The result of Buttita's efforts in obtaining that restriction provided a substantial

contribution to these cases and was the material impetus for the subsequent appointment of an

Official Committee of Unsecured Creditors Holding Asbestos-Related Claims as well as a  legal

representative for future asbestos personal injury claimants in these cases and ultimately the

negotiation of a plan, overwhelmingly supported by the asbestos constituency, that provided for

the separate classification of asbestos claims and the treatment of both present asbestos claims

and future asbestos demands through a separate trust.

11.    In recognition of that substantial contribution, Buttita seeks entry of an order,

pursuant to section 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code, allowing as

administrative expenses the aggregate amount of $187,245.79 consisting of  (i) $173,272.50 for

compensation for professional services rendered by, and (ii) $13,973.29 for reimbursement for

actual, necessary expenses incurred by, Caplin & Drysdale during the Compensation Period.

## SUMMARY OF APPLICATION

### Caplin & Drysdale, Chartered

12.    In late May 2009, Caplin & Drysdale was retained as counsel to Buttita, by and

through his state court counsel Mr. Cooney, in connection with the anticipated bankruptcy filing

of GM and Buttita's service as a member of the UCC. *See* Inselbuch Declaration, ¶ 3.

Following its retention, Caplin & Drysdale was specifically charged with representing Buttita

with respect to the interests of asbestos victims of the Debtors in regard to the proposed Sale

Motion. *See id.*, ¶ 4. All services performed by Caplin & Drysdale during the Compensation Period were performed for and on behalf of Buttita. *See id.*, ¶ 5.

13.　　In connection with its representation of Buttita during the Compensation Period, Caplin & Drysdale incurred total fees of $259,908.50 and expenses of $13,973.29. *See Id.*, ¶ 6. As a professional courtesy to Buttita and Mr. Cooney and as a service to the constituency which they represented, Caplin & Drysdale voluntarily agreed to discount its total aggregate professional fees by thirty-three percent (33%). *See id.*, ¶ 7.

14.　　In addition to this discount, Caplin & Drysdale's charges to Cooney did not include any professional fees incurred prior to Buttita's appointment to the UCC as well as any potentially duplicative time charges when more than one attorney was involved in attending meetings or hearings. *See id.*, ¶ 7.

15.　　After applying these discounts and write downs, the resulting billing to Buttita was $187,245.79, consisting of (i) $173,272.50 in fees and $13, 973.29 in expenses (the "**Compensation Amount**"). *See id.*, ¶ 7.

16.　　Buttita, through Mr. Cooney has paid the entire Compensation Amount and there is no outstanding balance owed to Caplin & Drysdale. *See id.*, ¶ 8.

17.　　In support of this Application, (i) a schedule setting forth the number of hours expended by each of the partners, associates and paraprofessionals of Caplin & Drysdale who rendered services charged to Buttita during the Compensation Period, their respective hourly rates, and the year of bar admission for each Caplin & Drysdale is attached hereto as Exhibit C; (ii) detailed descriptions of the expenses for which reimbursement is sought during the Compensation Period are attached hereto as Exhibit D; and (iii) detailed time records for Caplin & Drysdale professionals for the Compensation Period are attached hereto as Exhibit E.

**Certification of Compliance with Applicable Guidelines**

18.    In preparing this Application, Buttita has complied with the Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases adopted by the Court on November 26, 2009 (the **"Local Guidelines"),** the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expense Filed Under 11 U.S.C. § 33 adopted on January 30, 1996 (the **"UST Guidelines"),** and Court's Sixth Amended Order Pursuant to 11 U.S.C. § 105(a) and 331 Establishing Procedures For Interim Compensation and Reimbursement of Expenses of Professionals (entered 8/7/2009) (Dkt. No. 3711) **(the "Administrative Order")** (together, the Local Guidelines, UST Guidelines and the Administrative Order, the **"Guidelines"**).  *See* Cooney Declaration, ¶ 9.

**MLC's Ability to Satisfy Requested Payment**

19.    Upon information and belief and relying on MLC's most recent Monthly Operating Report (the **"MOR"**) and the Disclosure Statement filed in connection with its recently confirmed liquidating plan (the **"Disclosure Statement"**), MLC has approximately $254,701.00 in assets.  *See* MLC Monthly Operating Report For The Month Ended March 31, 2011, p. 5 (Filed 05/11/2011; Dkt. No. 10222); Cooney Declaration, ¶ 14.  According to the MOR, MLC owes $1,342,339.00.  *See id.*  Upon information and belief, MLC has paid all quarterly fees to the United States Trustee and all monthly operating reports have been filed.  *See* MOR, p 21; Cooney Declaration, ¶ 16.

20.    The MOR further states that (i) the amended and restated DIP Facility with the U.S. Treasury and the Export Development of Canada, which was approved by the Bankruptcy Court, dated July 5, 2009 (Dkt. No. 29269); and (ii) the proceeds that the Debtor recover from

their remaining assets will be sufficient to pay the administrative expenses of winding down their estates and administering a chapter 11 plan. *See id.* p.12 (Note 3); Cooney Declaration, ¶ 15.

21.    Upon information and belief, based on the MOR and the Disclosure Statement, MLC has more than sufficient assets to satisfy the Application in full. *See* Cooney Declaration, ¶ 17, MOR, pp. 5, 12 (Note 3).

## JURISDICTION AND VENUE

22.    The Court has jurisdiction to consider the Application pursuant to 28 U.S.C. §§ 157 and 1334, and the Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). Consideration of the Application is a core proceeding pursuant to 28 U.S.C. § 157.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

23.    The statutory bases for the relief sought herein are sections 503(b)(3)(D) and (b)(4) of the Bankruptcy Code.

## BACKGROUND

24.    Commencing on June 1, 2009 (the "**Petition Date**") and periodically thereafter, the Debtors filed with this Court their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Thereafter, the Debtors continued to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) 1108 of the Bankruptcy Code.

25.    Buttita is the son of Salvatore ("**Sam**") Buttita, an automobile mechanic who died in 2008 as a result of asbestos induced mesothelioma.  His trade required that Sam Buttita worked with and around various asbestos-containing products, including brakes, clutch head gaskets, valve gaskets, transmission parts, and other asbestos-containing automobile and truck parts and equipment marketed and sold by General Motors Corporation ("**GM**").  As of the

Petition Date, a lawsuit for his wrongful death was pending against GM in the Circuit Court of Cook County, Illinois. Buttita is represented in that matter by his state court counsel, John Cooney ("**Cooney**").

26.    Asbestos, as contained in various products marketed and sold by the Debtors, is an insidious and deadly health risk resulting in pneumo-pulmonary impairments, a variety of cancers and, in its most virulent form, invariably fatal mesothelioma.  There is an extremely long, multi-decade, latency period between initial exposure to asbestos and the manifestation of asbestos-related diseases. As a result, many, if not most, individuals exposed to GM's asbestos – containing products will not manifest their diseases for many years to come.

27.    As a result of its production, manufacturing, and sales of numerous asbestos-containing products, GM had been, and as of the Petition Date remained, a significant defendant in asbestos personal injury litigation.  Based upon its Form 10-K Disclosure filed most recent to the Petition Date, GM estimated its potential exposure for present and future asbestos-related claims as at least $648 million. *See* General Motors Corp. Form 10-K filed March 5, 2009, pp. 206-07.

28.    On June 3, 2009, Buttita, in his capacity as the personal representative of Salvatore Buttita, was appointed by the United States Trustee to serve on the Official Committee of Unsecured Creditors (the "**UCC**") in these cases.[1]  In that capacity, Buttita served as a representative of the interests of all asbestos victims of the Debtors and acted as a fiduciary for all unsecured creditors in these cases.

29.    On the Petition Date, the Debtors also filed their Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), (k), (m), and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006, to (I) Approve

---

[1] Buttita continued to serve as a member of the UCC until March 2, 2010 at which time he was appointed by the United States Trustee to serve as a member of the Official Committee of Unsecured Creditors Holding Asbestos-Related Claims (the "**ACC**") in these cases.

(A) the Sale Pursuant to the Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, a U.S. Treasury-Sponsored Purchaser, Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Other Relief; and (II) Schedule Sale Approval Hearing (the "**Sale Motion**") (Dkt. No. 92).

30.     Given its importance to the asbestos victims in these cases, including both all present asbestos tort claimants as well as all potential, but yet unknown, future claimants, Buttita, through his state court counsel Mr. Cooney, retained the services of Caplin & Drysdale to provide representation of those interests in connection with proceedings in connection with the Sale Motion.

31.     Through the Sale Motion, the Debtors ("**Old GM**") proposed the sale (the "**Sale**") of substantially all of their assets to Vehicle Acquisition Holdings LLC ("**New GM**"), an entity sponsored by the United States Treasury established for the purpose of acquiring the on-going GM enterprise.  The terms of the Sale were set forth in the Master Sale and Purchase Agreement, dated as of June 1, 2009, (including as thereafter modified and amended, the "**MPA**").

32.     Under the terms of the MPA, New GM was to acquire all properties, assets and rights of Old GM, with the exception of a limited number of excluded assets (respectively, the "**Purchased Assets**" and the "**Excluded Assets**"), existing management and employees of Old GM would become the management and employees of New GM which would continue to manufacture and sell essentially the same automobile product lines through the essentially same dealer network under the same GM banner and brand names.

33.     Pursuant to the proposed Sale, New GM would selectively assume certain of the Debtors' existing and prospective future liabilities (the "**Assumed Liabilities**").  However, as

originally proposed, it would assume only product liability claims with respect to products

delivered at or after closing of the Sale transaction. Indeed, most liabilities would remain with

Old GM (the "**Retained Liabilities**"), including specifically, (i) all product liability claims

arising out of products delivered prior to the closing; (ii) all liability to third parties for death,

personal injury, other injury to persons or damage to property arising out of asbestos exposure;

(iii) all liabilities to third parties based upon contract, tort or any other basis; and (iv) all

liabilities related to any implied warranty or other implied obligation under law without necessity

of an express warranty or allegation, statement or writing by or attributable to GM.

34.     In their memorandum of law in support of the Sale Motion (the "**Memorandum
in Support**") (Dkt. No. 105), the Debtors requested that the Court authorize the Sale free and

clear of all "liens, claims, encumbrances and other interests, including specifically, "all successor

liability claims." Memorandum in Support pp. 21-22. Similarly, the proposed order with respect

to the Sale (the "**Proposed Sale Order**") also contained several provisions directed at cutting off

New GM's prospective successor liability under applicable state laws and enjoining creditors

from pursuing such claims against it. *See, e.g.*, Proposed Sale Order at ¶¶ 8 and 27.

35.     Buttita individually objected to the Sale Motion on numerous grounds, including

that the proposed Sale impermissibly sought to affect the rights of both present asbestos

claimants and future asbestos demand holders who did not yet hold "claims" within the meaning

of the Bankruptcy Code, because it improperly exceeded the scope of Section 363 of the

Bankruptcy Code, including by seeking an illegal injunction against future successor liability

including with respect to prospective claims which will arise only after the proposed Sale closed.

*See* Joinder and Further Objection of Mark Buttita to Debtors' Motion Pursuant to 11 U.S.C. §§

105, 363(b), (f), (k), (m), and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006, to (I) Approve

(A) the Sale Pursuant to the Master Sale and Purchase Agreement with Vehicle Acquisition

Holdings LLC, a U.S. Treasury-Sponsored Purchaser, Free and Clear of Liens, Claims,

Encumbrances, and Other Interests; (B) the Assumption and Assignment of Certain Executory

Contracts and Unexpired Leases; and (C) Other Relief; and (II) Schedule Sale Approval Hearing

(the "**Buttita Objection**") (Dkt. No. 2818).[2]

36.    As asserted *inter alia* in the Buttita Objection, personal injury resulting from

latent defects in GM products may not occur, and thus no "claim" for bankruptcy purposes may

arise, until long after Old GM completed the proposed Sale.  Similarly, and particularly with

respect to its asbestos tort victims, due to the long latency period between exposure to the

asbestos-containing product and the ultimate manifestation of asbestos-related disease, many if

not most of the victims who have been exposed to asbestos as a result of GM's products or in its

facilities will not manifest their resulting asbestos-related disease until many years after these

cases are fully administered, thus they would not presently have a "claim" that may be

discharged, treated or otherwise dealt with in these cases.  Indeed, in crafting Bankruptcy Code §

524(g) to deal with the unique circumstances presented by the delayed manifestation of asbestos-

related diseases, Congress defined the term "demand" to refer to such future arising asbestos

injuries which it expressly recognized did not yet constitute a "claim" for bankruptcy purposes.

*See* 11 U.S.C. § 524(g)(5).

37.    Moreover, in light of Congress' enactment of § 524(g), the only proper and

effective way to enjoin asbestos victims from pursuing their claims is to conform to the

substantive and procedural protections incorporated in § 524(g), which the proposed Sale did

not. *See* Buttita Objection, pp. 7-12.

_____

[2] Related objections were also filed by the Ad Hoc Committee of Asbestos Personal Injury Claimants (the ("**Ad Hoc Committee**") and by the UCC.  The UCC, however, withdrew its objection at the commencement of the Sale Hearing.

38.    Further, and absent compliance with the requirements of § 524(g), attempting to

permanently bar future asbestos demands from seeking recovery against New GM as successor

to the Debtors would violate basic notions of adequacy of notice and due process in that no form

of present notice could be effective as to not yet existing claimants who may hold claims only in

the future. *Id.*

39.    Buttita strenuously pursued his objection, including by directing discovery,

including both requests for production of documents and depositions to the Debtors, New GM,

the United States Treasury, and the Debtors' Bondholders. *See* Dkt. Nos. 2379, 2384, 2387,

2390, 2609.  These discovery requests ultimately resulted in the production and review of

hundreds of thousands of pages of documents and the deposition of Mr. Harry Wilson as the

designee of New GM.

40.    Buttita also participated extensively in the Court's multi-day hearing on the Sale

Motion, including in the questioning of Mr. Fredrick (Fritz) Henderson, Old GM's Chief

Executive Officer, during which Buttita elicited testimony concerning Old GM's knowledge of

the existence and extent of its potential asbestos liability and acknowledgement of the

ineffectiveness of the notice of the Sale with respect to future asbestos demand holders.   In

addition, Buttita also presented extensive oral argument with respect to the issues raised in the

Buttita Objection.

41.    In its ruling approving the Sale Motion, the Court overruled objections asserted

by various other present tort claimants, including the Consumer Victims Committee and the

Individual Accident Litigants, which were also asserted by Buttita with respect to the scope of

proposed protection to be afforded to New GM regarding successor liability regarding presently

asserted claims. *See* Decision on Debtors Motion for Approval of (1) Sale of Assets to Vehicle

- 13 -

Acquisition Holdings LLC; (2) Assumption and Assignment of Related Executory Contacts; and

(3) Entry into UAW Retiree Settlement Agreement (the "**Sale Opinion**") (Dkt No. 2967) at 50-

61.

42.     However, as urged by Buttita, the Court separately addressed the issues

concerning future asbestos-related personal injury claims "in light of the reality that those

ailments may take many years to be discovered, during which asbestos victims would not know

that they should be filing claims." *Id*. at p 61.

43.     As the Court stated in the Sale Opinion:

> Where there is a separate issue is claims for future injuries
> that people exposed to asbestos might suffer when they don't
> yet know of their ailments and the need to sue or assert a claim.
> The Court refers to those as "Future Claims," while noting that
> they are not yet "claims" as defined in the Bankruptcy Code.
> Efforts to deal with such circumstances led to the enactment of
> section 524(g) of the Code, which inter alia authorizes
> injunctions, under a plan of reorganization, to enjoin actions
> against nondebtors by those who have a right of recovery from a
> trust created to address their claims, in accordance with more
> detailed provisions set out in section 524(g). (Those provisions
> also include the appointment of a future claims representative.)

> The Debtors ask for findings that New GM will not be
> deemed to be a successor of Old GM, and ask for an injunction
> barring those holding Future Claims, like others, from pursuing
> New GM,   The Asbestos Litigants contend that such an
> injunction would walk, talk and quack like a section 524(g)
> injunction…

> *Id.* at 62.

44.     The Court went on to note that, while the Asbestos Litigants counsel asserting the

objection represented only individuals with present asbestos ailments and did not represent future

claimants, the Court fully recognized that the notice given on this motion was not fully effective,

- 14 -

since without knowledge of an ailment that had not yet manifested itself, any recipient would be

in no position to file a present claim. Accordingly, the Court determined that:

> This objection raises classic standing and ripeness issues… The
> Court is doubtful that it should be erecting barriers to GM's
> ability to reorganize by creating hurdles at the behest of people
> who lack standing, but at the same time, is not of a mind to do
> anything that might be constitutionally suspect. The Future
> Claims issue, in the Court's view, are best addressed here by
> adding language to the injunction paragraph to which the
> objection has been made, applicable (only) to asbestos claims
> and demands, making the injunction enforceable "to the fullest
> extent constitutionally permissible." That limitation should
> address both sides' legitimate future claims concerns. The
> Court's order will read accordingly.

> *Id.* at 62-63.

45.    While the ordered modification to the Sale Order may have seemed minor, it

created a significant prospective overhang of potential liability for New GM and had a major

impact on these cases for the ultimate benefit of all asbestos victims, including both present

claimants and future demand holders.

46.    Specifically, after the closing of the transactions contemplated in the Sale Motion,

in October 2009, counsel for the Debtors and counsel for the UCC proposed to Mr. Cooney that

he, as counsel for Buttita, serve as a subcommittee of the UCC for the purpose of representing

the interests of the constituency of creditors holding asbestos-related personal injury or wrongful

death claims against the Debtors, and that the approval of the United States Trustee and this

Court would be sought for the formation of such a subcommittee and its retention of separate

counsel. Ultimately, the United States Trustee decided not to appoint such a subcommittee, but

instead, on March 5, 2010 constituted an entirely separate Official Committee of Unsecured

Creditors Holding Asbestos-Related Claims (the "**ACC**") to represent the interests of present

asbestos claimants. *See* Dkt. No. 5206. Mr. Cooney, as Buttita's counsel, served as Chair of the ACC which retained the services of Caplin & Drysdale as committee counsel.[3]

47.    On March 9, 2010, the Debtors filed a motion for an order appointing Dean M. Tafelet as legal representative for future asbestos personal injury claimants (the "**FCR**"). *See* Dkt. No. 5214. That application was approved by an order of the Court on April 8, 2010. *See* Dkt. No. 5459.

48.    Following their respective appointments, the ACC and FCR engaged in extensive negotiations with respect to the treatment of present and future asbestos claims in connection with the Debtors' development of a liquidating plan of reorganization as well as discovery, litigation, and ultimately consensual agreement regarding the estimation of the amount of the Debtors' present and future asbestos liabilities.

49.    The result of those efforts was the formulation of a liquidating plan of reorganization (the "**Plan**") which, substantially conforming to the procedures and protections incorporated in § 524(g), separately classified asbestos-related claims and provided for the establishment and funding of a separate asbestos trust for the treatment of both present and future asbestos personal injury claims pursuant to Trust Distribution Procedures for the processing, assessment and payment of those claims. The resulting plan was overwhelmingly accepted by the ballots cast by the asbestos constituency and will assure fair and equitable treatment of all such present and future asbestos claimants.

50.    The Plan was confirmed by the Court on March 29, 2011 (*see* Dkt. No. 9941) and recently has been substantially consummated (*see* Dkt. No. 10151).

---

[3] Upon his appointment as a member of the ACC, Buttita resigned as a member of the UCC.

## ARGUMENT

### I.    Legal Basis For The Relief Requested

51.     Section 503(b) of the Bankruptcy Code provides that where a creditor has made a "substantial contribution" to a chapter 11 case, such creditor shall receive an administrative expense claim equal to its actual and necessary expenses, including the reasonable fees and expenses of its attorneys. See 11 U.S.C. §§ 503(b)(3)(D) and 503((b) (4).   Such an award can be made, even where the creditor claiming substantial contribution has incurred no expenses other than attorneys' fees. *See Salomon N. Am. V. Knupfer (In re Wind N' Wave)*, 328 B.R. 176 (B.A.P. 9th Cir. 2005) (as long as substantial contribution has been made, petitioning creditors claiming substantial contribution need not have any expense other than attorneys' fees as a prerequisite to an award under section 503(b)).

52.     To receive such a claim, a creditor must show that it rendered a substantial contribution by a preponderance of the evidence, demonstrating a credible connection between its efforts and the reorganization process. *See In re Granite Partners*, 213 B.R. 440, 446 (Bankr. S.D.N.Y. 1997) ("the substantial contribution test is applied in hindsight, and scrutinizes the actual benefit to the case.  Accordingly, the application must show a "causal connection" between the service and the contribution.") (*citing In re DP Partners Ltd. P'ship*, 106 F.667, 673 (5th Cir. 1997) (citations and quotations omitted).

53.     Further, to be compensable, the service rendered must lead to "an actual and demonstrable benefit to the debtor's estate, the creditors and, to the extent relevant, the stockholders." *See id. (quoting in re Jensen-Farley Pictures, Inc.*, 47 B.R. 557, 569 (Bankr. Utah 1985); *In re McLean Industries, Inc.*, 88 B.R. 36, 39 (Bankr. S.D.N.Y. 1988).  Compensable services "foster and enhance – rather than retard and interrupt – the progress of

reorganization." *See id.* (citations omitted).   Generally, a substantial contribution award is

made where there has been "extraordinary creditor actions which lead directly to tangible

benefits to the creditors." *In re Bayou Group, LLC*, 431 B.R. 549, 560-61 (Bankr. S.D.N.Y.

2010); *In re Dana Corp.*, 390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008) (substantial contribution

test satisfied when an "actual and demonstrable benefit" is shown).

54.    Factors which courts have considered in determining whether a substantial

contribution has been made, include the following:  (1) whether the services were provided to

benefit solely the client or all the parties in the case; (2) whether the services conferred a direct,

significant and demonstrably positive benefit upon the estate; and (3) whether the services were

duplicative of services performed by others. *See In re Best Prods. Co., Inc.*, 173 B.R. 862, 865

(Bankr. S.D.N.Y. 1994).   Although extensive participation in a case is not alone sufficient to

compel compensation, services that confer a significant and demonstrable benefit upon the

reorganization process which have not been rendered solely on behalf of a creditor's own interest

should be compensated. *See id.* (*citing GATX Terminals Corp. v. Tarricone (In re Tarricone,
Inc.)*, 83 B.R. 253, 255 (Bankr. S.D.N.Y. 1988).

55.    Nor does providing a substantial contribution require that a creditor's efforts must

lead to confirmation of a plan.  A substantial contribution may exist where the contribution

results in the denial of confirmation, the discovery of fraud or a liquidation.  *See In re Food
Workshop, Inc.*, 70 B.R. 962, 967 (Bankr. S.D.N.Y. 1987) (citations omitted); *Ex parte Roberts*,

93 B.R. 442,n.2 (D.S.C. 1998) ((*quoting Pierson & Gaylen v. Creel & Atwood (Matter of
Consolidated Bancshares., Inc.*), 785 F.2d 1249, 1253 (5th Cir. 1986) (*citing H.R. Rep. No. 595,
95th Cong., 1st Sess. 355, Reprinted in 1978 U.S. Cong. & Ad. News 5787, 6311.)*).

56.    In addition, although the amount to be allowed as an administrative expense must
be measured in dollars and cents, the question whether the estate had been benefitted cannot be
so narrowly confined; the estate may receive "other less readily calculable benefits," *In re Am.
Plumbing & Mech., Inc.*, 327 B.R. 273, 282-83 (Bankr. W.D. Tex. 2005) (*quoting In re*
TransAmerican *Natural Gas Corp.,* 979 F.2d 1409, 1420 (5th Cir. 1992), including by providing
the functions normally performed by a committee appointed under section 1102 of the
Bankruptcy Code, *In re General Electrodynamics Corp.*, 368 B.R. 543, 554-56 (Bankr. N.D. Tex
2007) (finding the applicant's actions as a surrogate creditors' committee that policed the debtors
a substantial contribution); *see also, In re Texaco, Inc.*, 90 B.R. 622, 626-630 (Bankr. S.D.N.Y.
1988) (finding the work performed by shareholder attorneys, which resulted in adequate
disclosure to the shareholders and elucidation of the facts, was a substantial contribution to the
debtors' chapter 11 cases).

## II.    Caplin & Drysdale's Services On Behalf Of Buttita Conferred A Direct And Demonstrable Positive Benefit Upon The Estate

57.    Caplin & Drysdale's services on behalf of Buttita in connection with the Sale
Motion conferred a number of important and undeniably positive benefits on the estate.  In the
first instance, Buttita was acting not merely on his own behalf as a present claimant or as a
fiduciary for  unsecured creditors generally as a member of the UCC, rather he was acting  in
support of the asbestos constituency as a whole, including both present asbestos creditors and yet
unknown future claimants. *See In re General Electrodynamics Corp.*, 554-56 (the applicant's
actions as a surrogate creditors committee provided a substantial contribution).

58.    At the time of the Court's consideration of the Sale Motion, no official fiduciary
for the interests of the asbestos tort victims had yet been appointed.  Indeed, the Court had
expressly denied a motion to appoint a legal representative with respect to future claims.

59.     Notwithstanding, Buttita acted to represent and preserve the rights of the entire universe of asbestos tort victims in vigorously objecting to those portions of the proposed sale which threatened to adversely and improperly affect their interests, particularly with respect to the over-reaching injunction sought to insulate the purchaser from prospective liability in violation of the asbestos victims' due process rights.

60.     Despite the Court's questioning of his standing to do so, Buttita succeeded in convincing the Court to modify the proposed Sale Order by the addition of a qualifying clause to preserve the asbestos victim's constitutional due process rights. At minimum, that modification created potential uncertainty and the prospect of substantial future litigation as to the purchaser's prospective continuing liability for the Debtors' asbestos liabilities, particularly with respect to future claims.

61.     Rather than leaving the enforceability of the injunction contained Sale Order in question, thus jeopardizing the finances of New GM and placing the Debtors' liquidation in limbo, the protections sought and obtained by Buttita instead quickly lead to the opening of discussions with the Debtors and the UCC concerning the establishment official representation of the present and future asbestos victims in these cases, and eventually to the appointment of the ACC and the FCR as the official fiduciaries for those constituencies.

62.     The ultimate result of Buttita's opposition to the Sale Motion was a negotiated resolution of the treatment of both present and future asbestos claims in these cases that was developed and incorporated in the Debtors' Plan. That resolution effectively adopted the design of § 524(g) by separately classifying and treating all asbestos victims, both present and future, pursuant to a negotiated estimate of total asbestos tort liability, through a separate trust established and funded to equitably administer and pay all such claims. That resolution also

obtained the overwhelming support of the asbestos creditors who voted to accept the Plan and benefitted not only the asbestos claimants but all of the Debtors' creditors by advancing an expeditious confirmation of the Plan and distributions to all creditors with respect to their claims.

63.    Buttita's contributions can not be precisely measured in dollars and cents.  Rather, as recognized by the court in *In re Am. Plumbing & Mech., Inc.*, the question of whether the estate had been benefitted cannot be so narrowly confined and the estate may receive other less readily calculable benefits.  Here those benefits to the estate included not only the preservation of essential constitutional rights but also resulted in  the avoidance of costly and years-long litigation and the to the Debtors' successful liquidation in a manner that fairly and equitably respected the rights of all of creditors.

64.    Finally, although certain other parties also advance certain other objections that were also asserted by Buttita, it was Buttita who stood alone to directly focus his efforts to defend the due process rights of all asbestos victims in these cases and successfully garnered the essential modifications to the proposed Sale Order.  In short, Buttita's efforts were not duplicative of the work of other parties and were essential to the ultimate formulation of the Debtors' Plan with respect to the asbestos claimants.

## CONCLUSION

For all of the reasons set forth herein, this Court should, pursuant to 11 U.S.C. §§ 503(b)(3)(D) and (b)(4), enter an order, in the form attached to as Exhibit F, allowing an administrative claim in the amount of $187,245.79 in favor of Buttita on account of the fees and costs incurred by Buttita in making a substantial contribution in these chapter 11 cases.

Dated:  New York, New York
       May 13, 2011

By: _____

Elihu Inselbuch  (EI-2843)
Rita C. Tobin (RCT-5413)
**CAPLIN & DRYSDALE, CHTD.**
375 Park Avenue, 27th Floor
New York, New York 10152-3500
Telephone:  (212) 319-7125
Facsimile:  (212) 644-6755

Trevor W. Swett III
Ronald E. Reinsel
**CAPLIN & DRYSDALE, CHTD.**
One Thomas Circle, N.W.
Suite 1100
Washington, D.C. 20005
(202) 862-5000

*Attorneys for Official Committee of Unsecured Creditors Holding Asbestos-Related Claims*

John Cooney
**Cooney & Conway**
120 N. La Salle Street -- Suite 3000
Chicago, IL 60602-2415 | 888 651-850
(888) 651-1850

*Attorneys for Mark Buttita, as personal representative of Salvatore Buttita*