# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                      :

In re                        :      Chapter 11
                                      :

DELPHI CORPORATION, et al.,      :      Case No. 05-44481 (RDD)
                                      :

             Debtors.      :      (Jointly Administered)
                                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER APPROVING MODIFICATIONS UNDER 11 U.S.C. § 1127(b) TO
(I) FIRST AMENDED JOINT PLAN OF REORGANIZATION OF DELPHI
CORPORATION AND CERTAIN AFFILIATES, DEBTORS AND
DEBTORS-IN-POSSESSION, AS MODIFIED AND
(II) CONFIRMATION ORDER (DOCKET NO. 12359)

("PLAN MODIFICATION ORDER")

Upon the Court's Findings of Fact, Conclusions of Law, And Order Under

11 U.S.C. §§ 1129(a) And (b) And Fed. R. Bankr. P. 3020 Confirming the First Amended

Joint Plan Of Reorganization Of Delphi Corporation ("Delphi") And Certain Affiliates,

Debtors And Debtors-In-Possession (each, a "Debtor"), As Modified (the "Confirmed

Plan"), dated January 25, 2008 (Docket No. 12359) (the "Confirmation Order"); and

Upon the Debtors' Motion for Order (I) Approving Modifications to

Debtors' First Amended Plan of Reorganization (as Modified) and Related Disclosures

and Voting Procedures and (II) Setting Final Hearing Date to Consider Modifications to

Confirmed First Amended Plan of Reorganization (Docket No. 14310), dated October 3,

2008, (the "Plan Modification Approval Motion"); and

Upon the Debtors' (A) Supplement to Motion for Order (I) Approving

Modifications to Debtors' First Amended Plan of Reorganization (as Modified) and

Related Disclosures and Voting Procedures and (II) Setting Final Hearing Date to

Consider Modifications to Confirmed First Amended Plan of Reorganization and (B)

Request to Set Administrative Expense Claims Bar Date and Alternative Sale Hearing

Date (Docket No. 16646) , dated, June 1, 2009 (the "Supplemental Plan Modification

Approval Motion"); and

     Upon the Court's Order (A)(I) Approving Modifications to Debtors' First

Amended Plan of Reorganization (as Modified) and Related Disclosures and Voting

Procedures and (II) Setting Final Hearing Date to Consider Modifications to Confirmed

First Amended Plan of Reorganization and (B) Setting Administrative Expense Claims

Bar Date and Alternative Transaction Hearing Date (Docket No. 17032), dated June 16,

2009 (the "Modification Procedures Order"), setting a final hearing date on approval of

the Debtors' proposed plan modifications, setting a bar date for filing proofs of

administrative expense for postpetition claims arising before June 1, 2009, and approving

Supplemental Procedures For Evaluating Non-Solicited Alternative Transactions (the

"Supplemental Procedures"); and

     Upon the Court's Order Amending and Supplementing (i) Order (A)(I)

Approving Modifications to Debtors' First Amended Plan of Reorganization (as Modified)

and Related Disclosures and Voting Procedures and (II) Setting Final Hearing Date to

Consider Modifications to Confirmed First Amended Plan of Reorganization and (B)

Setting Administrative Expenses Claims Bar Date and Alternative Transaction Hearing

Date (Docket No. 17032) and (ii) the Protective Order Governing Production and Use of

Confidential and Highly Confidential Information in Connection with (A) Supplement to

Plan Modification Approval Motion and (B) Supplement to GM Arrangement Fourth and

1

Fifth Amendment Approval Motion (Docket No. 16920) (Docket No. 17376), dated June 29, 2009 (the "Supplemental Modification Procedures Order"); and

Upon the Court's Order Amending and Supplementing Modification Procedures Order (Docket No. 17032) and Supplemental Modification Procedures Order (Docket No. 17376), dated July 17, 2009 (the "Second Supplemental Modification Procedures Order"); and

Upon the Court's Order Amending and Supplementing Modification Procedures Order (Docket No. 17032), Supplemental Modification Procedures Order (Docket No. 17376), and Second Supplemental Modification Procedures Order (Docket No. 18352), dated July 21, 2009 (the "Third Supplemental Modification Procedures Order"); and based upon the Court's review of:

(a)      the Master Disposition Agreement among Delphi, Motors Liquidation Company, General Motors Company ("GMCo."), GM Components Holdings, LLC, DIP Holdco 3, LLC and Other Sellers and Other Buyers Party thereto (such parties other than Delphi, collectively, the "Purchasing Entities"), dated as of July 26, 2009 (the "Master Disposition Agreement" and together with all agreements or other documents entered into or to be entered into in connection therewith, the "MDA Documents"), which was designated by the Debtors as the Successful Bid under the Supplemental Procedures, but the acceptance of which by the Debtors is subject to this Court's approval;

(b)      the Affidavit Of Service with respect to service of resolicitation materials of Evan Gershbein, Senior Managing Consultant of Kurtzman Carson Consultants LLC, sworn to June 23, 2009 (Docket No. 17267) (the "Gershbein Affidavit"), the Affidavit Of Service Of Financial Balloting Group LLC Of Solicitation

Packages On Holders Of Public Securities of Jane Sullivan, Executive Director of

Financial Balloting Group LLC, sworn to June 24, 2009 (Docket No. 17268) (the

"Sullivan Affidavit"), the Declaration of Evan Gershbein Regarding Tabulation Of

Ballots With Respect To Vote On First Amended Joint Plan Of Reorganization (As

Modified) of Delphi Corporation And Certain Of Its Subsidiaries And Affiliates (the

"Gershbein Voting Declaration") (Docket No. 18462), executed on July 20, 2009, the

Supplemental Declaration Of Evan Gershbein Regarding Tabulation Of Ballots With

Respect To Vote On First Amended Joint Plan Of Reorganization (As Modified) Of

Delphi Corporation And Certain Of Its Subsidiaries And Affiliates (the "Supplemental

Gershbein Voting Declaration) (Docket No. 18577), executed on July 22, 2009, and the

Second Supplemental Declaration of Evan Gershbein Regarding Tabulation of Ballots

with Respect to Vote on First Amended Joint Plan of Reorganization (as Modified) of

Delphi Corporation and Certain of Its Subsidiaries and Affiliates (Docket No. 18684)

executed on July 28, 2009, and the Declaration of Jane Sullivan Certifying Tabulation Of

Ballots Regarding Vote On First Amended Plan Of Reorganization (As Modified) Of

Delphi Corporation And Certain Of Its Subsidiaries And Affiliates (the "Sullivan Voting

Certification") (Docket No. 18464), executed on July 20, 2009;

       (c)    the Memorandum Of Law (A) In Support Of Modifications To The

First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain

Affiliates, Debtors And Debtors-In-Possession Under 11 U.S.C. § 1127 And, In The

Alternative, The Sale Of Substantially All Of The Debtors' Assets Under 11 U.S.C. § 363

And (B) In Response To Certain Objections Thereto;

(d)      the modifications to the First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified), including the modifications set forth on <u>Exhibit A</u> hereto (as modified and confirmed hereby, the "Modified Plan");[1]

(e)      the Declarations of Randall S. Eisenberg, Senior Managing Director of FTI Consulting, Inc., executed on July 20, 2009 (the "Eisenberg Declaration"), Robert S. Miller, Chairman of the board of directors of Delphi, executed on July 20, 2009 (the "Miller Declaration"), Craig Naylor, member and lead independent director of the board of directors of Delphi executed on July 19, 2009 (the "Naylor Declaration"), William R. Shaw, Managing Director of Rothschild Inc., executed on July 18, 2009 (the "Shaw Declaration"), John D. Sheehan, Vice President and Chief Financial Officer of Delphi, executed on July 19, 2009 (the "Sheehan Declaration"), and Keith D. Stipp, Executive Director of Delphi in charge of restructuring, executed on July 18, 2009 (the "Stipp Declaration"), in support of the Modified Plan, and the Declaration of John D. Sheehan, executed on July 19, 2009 (the "Sheehan Diligence Declaration"), in support of the Modified Plan in respect of the Debtors' due diligence efforts;

(f)      the transcript of the auction commenced on July 26 and completed on July 27, 2009, as set forth in Joint Exhibit 575;

(g)      all of the evidence proffered or adduced at, objections filed in connection with and the responses filed thereto, and arguments of counsel made at, the Final Modification Hearing (as defined below), including Joint Exhibits 1 through 636 that were admitted into evidence at the Final Modification Hearing; and

---

[1]      Capitalized terms not defined herein shall have the meanings ascribed to them in the Modified Plan.

(h)     the entire record of these Chapter 11 Cases; and after due

deliberation thereon, and good and sufficient cause appearing therefor

THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:[2]

A.     <u>Entry Of Confirmation Order</u>.  On January 25, 2008 (the "Confirmation

Date"), the Court entered the Confirmation Order.  The Confirmation Order has not been

revoked, withdrawn, or vacated and remains in full force and effect, except as may be

modified by this order.  No parties sought to revoke the Confirmation Order except the

official committee of unsecured creditors (the "Creditors' Committee") and Wilmington

Trust Company ("WTC"), each of which filed adversary complaints seeking revocation

of the Confirmation Order but did not prosecute them, and both of which shall be deemed

to have withdrawn such complaints.  Since the Confirmation Date, the Debtors have

operated their businesses and managed their properties as debtors-in-possession in

accordance with the Confirmation Order.

B.     <u>Modifications To Confirmed Plan And Confirmation Order</u>.  The Debtors

are properly seeking to modify the Confirmed Plan and the Confirmation Order pursuant

to section 1127(b) of the Bankruptcy Code and Article 14.3 of the Confirmed Plan.

C.     <u>Exclusive Jurisdiction; Venue; Core Proceeding (28 U.S.C. §§ 157(b)(2)</u>

<u>and 1334(a))</u>.  The Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C.

§§ 157 and 1334 and Article XIII of the Confirmed Plan.  Venue is proper pursuant to 28

U.S.C. §§ 1408 and 1409.  Confirmation of the Modified Plan is a core proceeding under

28 U.S.C. § 157(b)(2), and the Court has exclusive jurisdiction to determine whether the

---

[2]     Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as
findings of fact when appropriate.  Fed. R. Bankr. P. 7052.

Modified Plan complies with the applicable provisions of the Bankruptcy Code and
should be confirmed.

      D.    <u>Filing Of Modified Plan And Disclosure Statement Supplement</u>.  On June
16, 2009, the Debtors filed the Modified Plan and the Supplement To First Amended
Disclosure Statement With Respect To First Amended Joint Plan Of Reorganization Of
Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (As
Modified) (as transmitted to parties-in-interest, the "Disclosure Statement Supplement").

      E.    <u>Modification Procedures Order</u>.  On June 16, 2009, the Court entered the
Modification Procedures Order which, among other things, (i) approved the Disclosure
Statement Supplement as containing adequate information within the meaning of sections
1127 and 1125 of the Bankruptcy Code and Fed. R. Bankr. P. 3017 and 2002(c)(3), (ii)
fixed July 23, 2009 as the date for the final approval of the modifications to the
Confirmed Plan (the "Modification Approval Hearing"), (iii) approved the form and
method of notice of the Modification Approval Hearing (the "Modification Approval
Hearing Notice"), (iv) established certain procedures for resoliciting and tabulating votes
with respect to the Modified Plan, and (v) approved the Supplemental Procedures; and on
June 29, 2009, the Court entered the Supplemental Modification Procedures Order,
amending and supplementing the Modification Procedures Order and setting forth,
among other things, procedures for a Pure Credit Bid (as defined in the Supplemental
Modification Procedures Order) by the Administrative Agent for the DIP Lenders (in
each case as defined in the Supplemental Modification Procedures Order)

      F.    <u>Compliance With Modification Procedures Order</u>.

1.      <u>Transmittal Of Resolicitation Package</u>.  On or before June 20, 2008,

in accordance with Fed. R. Bankr. P. 3017(d), (e), and (f) and the Modification

Procedures Order, the Debtors caused Kurtzman Carson Consultants LLC ("KCC") and

Financial Balloting Group LLC ("FBG") or their agents to transmit (i) the Modification

Approval Hearing Notice, (ii) a CD-Rom containing (1) the Modification Procedures

Order (without exhibits), (2) the Disclosure Statement Supplement and publicly filed

materials appended thereto, (3) the Modified Plan and publicly filed materials appended

thereto, and (4) the December 10, 2007 Solicitation Procedures Order (without exhibits),

(iii) paper copies of the Creditors' Committee Letter, (iv) as to Classes 1A-1, 3A-1, 1A-1,

1C-1 through 12C-1, 1C-2 through 12-C2, and 1D through 12D (collectively, the "Voting

Classes"), a paper ballot and return envelope (such ballot and envelope being referred to

as a "Ballot"), all as set forth in the Gershbein Affidavit and Sullivan Affidavit.  In

addition, and in accordance with Fed. R. Bankr. P. 3017(d), (e), and (f) and the

Modification Procedures Order, the Debtors transmitted additional notices as described in

the Gershbein Affidavit.

2.      <u>Publication Of Confirmation Hearing Notice</u>.  The Debtors

published the Modification Approval Notice in the <u>Detroit Free Press</u>, the <u>New York</u>

<u>Times</u> (national edition), the <u>Wall Street Journal</u> (national, European, and Asian editions),

and <u>USA Today</u> (worldwide) on or before June 26, 2009 as evidenced by the affidavits of

publication, filed by individuals on behalf of each of the listed publications.[3]

3.      <u>Transmittal And Mailing Of Materials; Notice</u>.  Due, adequate, and

sufficient notice of the Disclosure Statement Supplement and Modified Plan and of the

_____

[3]      The affidavits are found at docket numbers 17407-17415.

Modification Approval Hearing, as well as all deadlines for voting on or filing objections

to the Modified Plan, has been given to all known holders of Claims and Interests in

accordance with Fed. R. Bankr. P. 2002(b), 3017(d), (e), and (f) and the procedures set

forth in the Modification Procedures Order.  The Disclosure Statement Supplement,

Modified Plan, Ballots, Modification Procedures Order, Modification Approval Hearing

Notice, Unimpaired Creditors Notice, Notice of Non-Voting Status, and Creditors'

Committee Letter were transmitted and served in substantial compliance with the

Modification Procedures Order and the Bankruptcy Rules, and such transmittal and

service were adequate and sufficient.  Adequate and sufficient notice of the Modification

Approval Hearing, injunctions and third party releases, bar dates, and other hearings

described in the Modification Procedures Order was given in compliance with the

Bankruptcy Rules and the Modification Procedures Order, and no other or further notice

is or shall be required.

   4. <u>Resolicitation</u>.  Votes for acceptance or rejection of the Modified

Plan were resolicited in good faith in compliance with sections 1125, 1126, and 1127 of

the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, the Disclosure Statement

Supplement, the Modification Procedures Order, all other applicable provisions of the

Bankruptcy Code, and all other applicable rules, laws, and regulations.

   5. <u>Notice Of Supplemental Procedures</u>.  As evidenced by the

affidavits of service and publication previously filed with the Court, and based on the

representations of counsel at the Modification Approval Hearing, (i) proper, timely,

adequate, and sufficient notice of the Auction, the sale under the MDA Documents, and

the Final Modification Hearing has been provided in accordance with Bankruptcy Rules

2002, 6004(a), and 6006(c) and in compliance with the Modification Procedures Order,

(ii) such notice was good and sufficient, and appropriate under the particular

circumstances, and reasonably calculated to reach and apprise all parties in interest of the

Procedures (defined below), the Auction, and the sale under the MDA Documents, and

(iii) no other or further notice of the Auction, the sale under the MDA Documents, or the

Final Modification Hearing is necessary.

       G.      <u>Supplemental Procedures And Pure Credit Bid</u>.

       1.      <u>Supplemental Procedures</u>.  At the June 10, 2009 hearing on the

approval of the Supplemental Plan Modification Approval Motion, the Court directed that

certain procedures be followed to facilitate the Debtors' consideration of potential

alternative transactions to the proposed disposition agreement among Delphi, GM

Components Holdings, LLC, Parnassus Holdings II, LLC, and Other Sellers and Other

Buyers Party thereto, dated as of June 1, 2009.  Subsequently, the Court approved

procedures for such a process, as documented in the Supplemental Procedures (Exhibit N

to the Modification Procedures Order) and the Supplemental Modification Procedures

Order (collectively, the "Procedures").  Pursuant to the Procedures, three third-party

bidders were qualified to submit potential alternative transactions.  The DIP Agent acting

on behalf of the Required Lenders was deemed qualified to submit potential alternative

transactions under the Procedures, and a Pure Credit Bid (as defined in the Supplemental

Modification Procedures Order) was deemed to be a qualified alternative transaction

under the Procedures.  The Procedures' qualified alternative transaction proposal deadline

passed on July 10, 2009 without the submission of any potential third-party alternative

transactions.  On July 17, 2009, the Court entered the Second Supplemental Modification

Procedures Order adjourning the auction from July 17, 2009 to July 21, 2009. On July 21,

2009, the Court entered the Third Supplemental Modification Procedures Order further

adjourning the auction from July 21, 2009 to July 24, 2009. The auction subsequently

commenced on July 26, 2009 and concluded on July 27, 2009. The Debtors, the DIP

Agent, and the DIP Lenders have complied with the Procedures in all respects and the

Creditors' Committee has discharged its duties under the Procedures.

   2. <u>DIP Loan</u>. The Debtors are indebted to the DIP Lenders under that

certain Amended and Restated Revolving Credit, Term Loan and Guaranty Agreement,

dated as of May 9, 2008 (as such agreement has been and may be amended, modified or

supplemented from time to time, the "DIP Credit Agreement") with JPMorgan Chase

Bank N.A. as Administrative Agent (the 'DIP Agent') in the aggregate amount of

approximately $3,478,522,903.03, as of July 30, 2009, inclusive of principal and interest

but excluding fees, expenses and certain other amounts due thereunder (the "DIP Loan").

   3. <u>DIP Agent Notices</u>. The DIP Agent timely delivered to the

Debtors all documents required under the Modification Procedures Order, as amended

and supplemented by the Supplemental Modification Procedures Order. On July 9, 2009,

the DIP Agent, as instructed by the Required Lenders, transmitted a Notice Of Intent To

Credit Bid to the Debtors. On July 14, 2009, the DIP Agent, as instructed by the

Required Lenders, transmitted a Notice Of Rejection And Disapproval Of The Master

Disposition Agreement By the Required Lenders. On July 15, 2009, the DIP Agent, as

instructed by the Required Lenders, transmitted a Notice Of Intent To Exercise Remedies.

On July 16, 2009, the DIP Agent, pursuant to a direction delivered by the Required

Lenders, and in accordance with the Procedures, submitted Pure Credit Bid Support

Letter (as defined in the Supplemental Procedures Order).

        4.     <u>Auction Proceedings And Selection Of Highest Or Otherwise Best</u>

<u>Offer</u>.  On July 26, 2009, the Debtors conducted the Auction in accordance with the

Procedures.  At the Auction, pursuant to a direction of the Required Lenders, the DIP

Agent on behalf of the DIP Lenders made a credit bid (the "DIP Lenders' Bid") for the

Acquired Assets (as defined in the Master Disposition Agreement) and Sale Securities (as

defined in the Master Disposition Agreement) on behalf of the DIP Lenders, which was

submitted in conformity with the Supplemental Modification Procedures Order and

section 363(k) of the Bankruptcy Code, in an amount equal to 100% of the principal and

interest due and owing in respect of the DIP Loan under the DIP Credit Agreement, after

giving effect to the application of any cash collateral to the amount of the DIP Loans.

The DIP Agent, pursuant to the direction of the Required Lenders, submitted the DIP

Lenders' Bid, which constituted a Pure Credit Bid as defined in the Procedures, in

accordance with the Procedures.  The DIP Lenders' Bid complied with the provisions of

section 363(k) of the Bankruptcy Code, and was duly authorized under the DIP Credit

Agreement and the other Loan Documents (as defined in the DIP Credit Agreement), and

was a valid and good faith exercise by the DIP Agent of the DIP Agent's rights,

responsibilities, and obligations under the DIP Credit Agreement and the other Loan

Documents.  In compliance with the Procedures and the Supplemental Order, on July 27,

2009, the Debtors' board of directors met and selected the DIP Lenders' Bid as the highest

or otherwise best offer and designated the DIP Agent as the Successful Bidder (as defined

in the Supplemental Procedures).  The Successful Alternative Transaction (as defined in

the Supplemental Procedures) shall be consummated as set forth in the Modified Plan and

the MDA Documents and as authorized in this order.  The Debtors have demonstrated

compelling circumstances and a good, sufficient and sound business purpose and

justification for the sale under the MDA Documents under section 363(b) and (f) of the

Bankruptcy Code.

     5.    <u>Good Faith Of Purchasing Entities</u>.  The MDA Documents and the

transactions contemplated thereby were negotiated, proposed and entered into by the

Debtors and the Purchasing Entities, and the Pure Credit Bid was made by the DIP Agent,

without collusion, in good faith, and from an arm's-length bargaining position.  None of

the Debtors, the Purchasing Entities, or the DIP Agent has engaged in any conduct that

would cause or permit the MDA Documents to be avoided under 11 U.S.C. § 363(n).

The Purchasing Entities (and, to the extent applicable, the DIP Agent) are purchasers of

property in good faith under section 363(m) of the Bankruptcy Code or similar applicable

state law and, as such, are entitled to all of the protections afforded thereby with respect

to all of the transactions contemplated by the Pure Credit Bid and the MDA Documents.

The Purchasing Entities  and the DIP Agent are not "insiders" of any of the Debtors, as

that term is defined in section 101 of the Bankruptcy Code.

     6.    <u>Highest Or Otherwise Best Offer</u>. The terms and conditions set

forth in the Master Disposition Agreement, and the transactions contemplated thereby,

including the amount of the purchase price, represent fair and reasonable terms and

conditions, constitute the highest or otherwise best offer obtainable for the Acquired

Assets and Sale Securities, and are fair and adequate.  The Debtors' methodology for

valuing the Pure Credit Bid was reasonable and appropriate, and such methodology was

applied consistently and fairly. Further, the Auction was duly noticed and conducted in a

noncollusive, fair, and good faith manner, and, pursuant to the Procedures, a reasonable

opportunity has been given to any party to make a higher or otherwise better offer. The

Successful Alternative Transaction was the highest or otherwise best bid at the Auction,

and the Debtors' decision to accept such Pure Credit Bid as the Successful Alternative

Transaction, approval of the Master Disposition Agreement, and consummation of the

transactions contemplated in the Master Disposition Agreement and the exhibits thereto

are appropriate under the circumstances of these cases and are in the best interests of the

Debtors, their creditors, their estates, and other parties in interest. The Hearing

constituted the hearing to approve entry of either an order confirming the Modified Plan

or approving an alternative sale transaction, and no further hearing is needed.

       7.   <u>Required Lenders</u>. Pursuant to Section 7.01 of the DIP Credit

Agreement, Section 15 of the Security and Pledge Agreement and applicable law, DIP

Lenders holding Tranche A Loans (as defined in the DIP Credit Agreement) and LC

Exposure (as defined in the DIP Credit Agreement) and a portion of the Tranche B Loan

(as defined in the DIP Credit Agreement) representing in the aggregate more than 50% of

the sum of the Tranche A Total Commitment Usage (as defined in the DIP Credit

Agreement) and the principal amount of the Tranche B Loan (as defined in the DIP

Credit Agreement) outstanding constitute "Required Lenders" as that term is used in the

DIP Credit Agreement. The Pure Credit Bid was made at the direction of the Required

Lenders, including the following lenders, who together constitute Required Lenders

under the DIP Credit Agreement: (i) Anchorage Capital Master Offshore, Ltd.; (ii)

Anchorage Crossover Credit Finance, Ltd.; (iii) Anchorage Crossover Credit Offshore

Master Fund, Ltd.; (iv) Bennett Management; (v) Black Diamond Offshore Ltd.; (vi)

Double Black Diamond Offshore Ltd.; (vii) Blackrock Financial Management, Inc. on

behalf of various clients and accounts; (viii) GCOF SPV I; (ix) GCP II SPV I; (x) Geer

Mountain Financing, Ltd.; (xi) Greywolf Capital Management LP; (xii) Greywolf Capital

Overseas Master Fund; (xiii) Greywolf Capital Partners II LP; (xiv) Greywolf CLO I,

Ltd.; (xv) Greywolf Structured Products Master Fund, Ltd.; (xvi) Kensington

International Limited; (xvii) Knighthead Capital Management; (xviii) Knighthead Master

Fund, L.P.; (xix) Marathon CLO I; (xx) Marathon CLO II; (xxi) Marathon Finance I BV;

(xxii) Marathon Special Opportunity Master Fund; (xxiii) Manchester Securities Corp.;

(xxiv) Maw Capital Fund, L.P.; (xxv) Monarch Master Funding Ltd.; (xxvi) Newstart

Factors Inc.; (xxvii) Oaktree Fund GP I, L.P.; (xxviii) Ore Hill Credit Hub Fund Ltd.;

(xxix) Pentwater Event Fund, Ltd.; (xxx) Pentwater Growth Fund, Ltd.; (xxxi) Redwood

Master Fund Ltd.; (xxxii) Seneca Capital; (xxxiii) SPCP Group, LLC; (xxxiv) Springfield

Associates, LLC; and (xxxv) Teak Hill Master Fund L.P.

        8.    <u>Authority For Pure Credit Bid</u>. The terms of the DIP Credit

Agreement and the Security and Pledge Agreement empower the Required Lenders to

direct the DIP Agent to credit bid the entire amount of the DIP Loans of all of the DIP

Lenders on the DIP Lenders' behalf following an event of default.  Section 8.01 of DIP

Credit Agreement authorizes the DIP Agent to take "such actions on its behalf and to

exercise such powers as are delegated to such Agent by the terms [thereof], together with

such actions and powers as are reasonably incidental thereto."  Those actions and powers

include credit bidding under section 363(k) of the Bankruptcy Code and specifically the

making of the Pure Credit Bid as described in this order.  Under section 7.01 of the DIP

14

Credit Agreement, following an event of default, the Required Lenders can direct the DIP

Agent to exercise any and all remedies "under the Loan Documents and applicable law"

on behalf of the DIP Lenders. Applicable law for this purpose includes section 363(k) of

the Bankruptcy Code. Under section 15(a) of the Security and Pledge Agreement, the

DIP Agent may exercise remedies under the agreements or remedies "otherwise available

to it," including "all the rights and remedies of a secured party on default under the

Uniform Commercial Code" and the right to "sell the Collateral or any part thereof in one

or more parcels at public or private sale." Section 10.07 of the DIP Credit Agreement

provides that remedies under the DIP Credit Agreement are cumulative "and not

exclusive of any other remedies provided by law." Section 7.01 of the DIP Credit

Agreement provides that, upon an event of default, the DIP Agent may, and at the request

of the Required Lenders shall, "exercise any and all remedies under the Loan Documents

and under applicable law available to the [DIP Agent] and the Lenders." Pursuant to and

in accordance with the foregoing authority of the DIP Agent and in conformity with the

Procedures: (i) by letter dated July 9, 2009, the DIP Agent, on behalf of itself and the

DIP Lenders, properly notified the Debtors and other interested parties of the DIP

Lenders' intention to submit a credit bid in connection with the sale by the Debtors of

their property pursuant to section 363(b); (ii) by letter dated July 16, 2009, the DIP Agent,

on behalf of itself and the DIP Lenders, properly submitted a Pure Credit Bid Support

Letter (within the meaning of the Supplemental Procedures Modification Order), (iii) on

July 26, 2009 the DIP Agent duly submitted on behalf of itself and all of the DIP Lenders

a Pure Credit Bid that was duly authorized by all necessary action of the DIP Lenders and

that became the Successful Alternative Transaction, and (iv) the DIP Agent has entered

15

into an Assignment Agreement by and among DIP Holdco 3, LLC, the DIP Agent, and

GM Components Holdings LLC pursuant to which the Agent has assigned the right to

receive certain assets purchased pursuant to the Pure Credit Bid to DIP Holdco 3, LLC

and other assets to GM Components Holdings LLC in exchange for certain consideration

to be distributed by the DIP Agent to the DIP Lenders pursuant to the DIP Distributions

(as defined below).

      H.     Disposition Transactions.

      1.     No Fraudulent Transfer.  The consideration provided by the

Purchasing Entities (including, for this purpose, by the DIP Agent in connection with the

DIP Lenders Bid) pursuant to the MDA Documents (i) is fair and reasonable, (ii) is the

highest or otherwise best offer for the Acquired Assets and Sale Securities, and (iii)

constitutes reasonably equivalent value (as those terms are defined in each of the

Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and section 548

of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under the

laws of the United States, any state, territory, or possession thereof, or the District of

Columbia.  No other persons or entity or group of entities has offered to purchase the

Acquired Assets or the Sale Securities for greater economic value to the Debtors' estates

than the Purchasing Entities.  Approval of the Modified Plan and the MDA Documents

and the consummation of the transactions contemplated thereby is in the best interests of

the Debtors, their estates, creditors, and other parties-in-interest.

      2.     Purchasing Entities Not Successors To Estates.  None of the

Purchasing Entities is a mere continuation of the Debtors or their estates.  The Purchasing

Entities are a separate and distinct group from the Debtors, and there is no continuity of

ownership or enterprise between any of the Purchasing Entities and the Debtors following the Effective Date of the Modified Plan. None of the Purchasing Entities is holding itself out to the public as a continuation of the Debtors. None of the Purchasing Entities is a successor to the Debtors or their estates and neither the consummation of the Modified Plan, nor the completion of the transaction contemplated under the MDA Documents, amounts to a consolidation, merger, or de facto merger of any of the Purchasing Entities and the Debtors.

        3.    <u>Validity Of Transfer</u>. Each Seller (as defined in the Master Disposition Agreement) has full corporate power and authority to execute (or cause to be executed) the MDA Documents and all other documents contemplated thereby, and the sale of the Acquired Assets and the Sale Securities in accordance with the MDA Documents by the Sellers (as defined in the Master Disposition Agreement) and related matters have been duly and validly authorized by all necessary corporate action of each of the Sellers (as defined in the Master Disposition Agreement). Each Seller (as defined in the Master Disposition Agreement) has all of the corporate power and authority necessary to consummate the transactions contemplated by the MDA Documents and has taken all corporate action necessary to authorize and approve the MDA Documents and the consummation by such Seller (as defined in the Master Disposition Agreement) of the transactions contemplated thereby. No consents or approvals, other those expressly provided for in the MDA Documents, are required for the Sellers (as defined in the Master Disposition Agreement) to consummate such transactions in connection with implementation of the Modified Plan.

17

4.    <u>Effect Of Transfer</u>.  On the Effective Date, the transfer of the

Acquired Assets and the Sale Securities to the Purchasing Entities will be a legal, valid,

and effective transfer of the Acquired Assets and the Sale Securities, and will vest,

effective as of the Closing (as defined in the Master Disposition Agreement), (i) the

Purchasing Entities with all right, title, and interest of the Sellers (as defined in the

Master Disposition Agreement) to the Acquired Assets and the Sale Securities free and

clear (with the exception of the Assumed Liabilities, any other liabilities specifically

assumed under the Master Disposition Agreement or assumed and assigned pursuant to

paragraphs 38 and 61 of this order, and Permitted Encumbrances) of liens, claims,

encumbrances, and other interests (collectively, the "Property Interests"), including, but

not limited to, (1) those that purport to give to any party a right or option to effect any

forfeiture, modification, right of first refusal, or termination of the Purchasing Entities'

interest in the Acquired Assets or the Sale Securities, or any similar rights, (2) those

relating to taxes arising under or out of, in connection with, or in any way relating to the

operation of the Debtors' assets prior to the Closing, and (3) (a) those arising under all

mortgages, deeds of trust, security interests, conditional sale or other title retention

agreements, pledges, liens, judgments, demands, encumbrances, rights of first refusal, or

charges of any kind or nature, if any, including, but not limited to, any restriction on the

use, voting, transfer, receipt of income, or other exercise of any attributes of ownership,

and (b) all debts or obligations arising in any way in connection with any agreements,

acts, or failures to act, of any of the Debtors or any of the Debtors' predecessors or

affiliates, Claims (as that term is defined in the Bankruptcy Code), obligations, liabilities,

demands, guaranties, options, rights, contractual or other commitments, restrictions,

interests, and matters of any kind and nature, whether known or unknown, contingent or

otherwise, whether arising prior to or subsequent to the commencement of the Chapter 11

Cases, and whether imposed by agreement, understanding, law, equity or otherwise,

including, but not limited to, Claims otherwise arising under doctrines of successor

liability and related theories; any liability or obligation calculable with reference to the

Debtors' businesses or operations; except as otherwise set forth herein or in the MDA

Documents, any pension, welfare, compensation, or other employee benefit plans,

agreements, practices, and programs, including, without limitation, any pension plan of a

Debtor, any other employee, worker's compensation, occupational disease, or

unemployment or temporary disability related Claim, any products liability or similar

Claims, whether pursuant to any state or federal laws or otherwise, including, without

limitation, asbestos Claims, including those in any way relating to any manufacturing,

sales or distribution of asbestos-containing products prior to the Effective Date, or

exposure to asbestos in any of the Debtors' facilities or premises prior to the Effective

Date; any bulk sales or similar law; any brokerage commissions or similar claims relating

to any of the Debtors' assets; tort Liabilities, including all Liabilities relating to personal

injury and other tort claims of any nature and related matters, of Debtors and their

Affiliates, or relating to the Business (as such term is defined in the Master Disposition

Agreement) or any assets or properties of Debtors and their Affiliates; and any tax

statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986,

as amended, in each case, to the fullest extent permitted by law.  The Purchasing Entities

would not have entered into the MDA Documents and would not consummate the

transactions contemplated thereby, thus adversely affecting the Debtors, their estates, and

19

their creditors, if the sale of the Acquired Assets and the Sale Securities to the Purchasing

Entities, the assignment of the Acquired Contracts to the Purchasing Entities, the

assumption of the Assumed Liabilities, and any other liabilities specifically assumed

under the Master Disposition Agreement or assumed and assigned pursuant to paragraphs

38 and 61 of this order, by the Purchasing Entities and the Company Sale Securities were

not free and clear of all Property Interests or if the Purchasing Entities would, or in the

future could, be liable for any of the Property Interests, other than Assumed Liabilities,

any other liabilities specifically assumed under the Master Disposition Agreement or

assumed and assigned pursuant to paragraphs 38 and 61 of this order, and Permitted

Encumbrances.  The Purchasing Entities shall not be required or deemed to purchase any

Excluded Assets (as defined in the Master Disposition Agreement).  Without limiting the

generality of the foregoing, the DIP Agent shall not be a transferee of any of the

Acquired Assets or the Sale Securities, nor shall it be responsible for any liabilities or

obligations relating thereto or any obligations or representations of the Purchasing

Entities with respect to the Master Disposition Agreement, the Acquired Assets, the Sale

Securities, or otherwise.

5.    <u>Operation Of Facilities</u>.  The Purchasing Entities are entitled to

operate the facilities being acquired after the Closing (as defined in the Master

Disposition Agreement) under the current Permits (as defined in the Master Disposition

Agreement) held by the applicable Seller (as defined in the Master Disposition

Agreement) until such Permits are assigned to the Purchasing Entities or the Purchasing

Entities obtain similar Permits in their own name.

I.    <u>Plan Exhibits</u>.  In accordance with the Modification Procedures Order, on July 2, 2009, the Debtors filed certain plan exhibits to the Modified Plan.  Plan Exhibit 8.1 was supplemented on July 20, 2009 and the PBGC Settlement Agreement was filed on July 21, 2009 and subsequently supplemented.

J.    <u>Resolicitation On Modified Plan</u>.

1.    <u>Bankruptcy Rule 3018(a) Motions</u>.  Prior to the Modification Approval Hearing, three motions were filed for temporary allowance of claims for voting purposes pursuant to Bankruptcy Rule 3018(a).  The motions were filed by the International Union of Operating Engineers Locals 832S, 18S, and 101S, the International Brotherhood of Electrical Workers and its Local 663, and the International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78 (Docket No. 17528), Hyundai (Docket No. 17481), and Fiduciary Counselors, Inc. (Docket No. 17539) (the "3018(a) Motions").  The 3018(a) Motions were granted at the hearing on July 23, 2009, and did not affect the acceptance of the Modified Plan by holders of claims in subclasses 1A-1 and Classes 1C-2 through 12C-2, and 1D through 12D.

2.    <u>Ballots</u>.  All procedures used to distribute resolicitation materials to the applicable holders of Claims and Interests and to tabulate the Ballots were fair and conducted in accordance with the Modification Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, the local rules of the Bankruptcy Court for the Southern District of New York, and all other applicable rules, laws, and regulations.

3.    <u>Voting Reports</u>.  On July 20, 2009, in accordance with the Solicitations Procedures Order, the Debtors filed the Gershbein Voting Declaration

(Docket No. 18462, as supplemented on July 22, 2009, at Docket No. 18557) and

Sullivan Voting Certification (Docket No. 18464) (together, the "Voting Reports"),

certifying the method and results of the Ballot tabulation for each of the Voting Classes

voting to accept or reject the Modified Plan.

        4.     <u>Impaired Classes That Have Voted To Accept The Modified Plan</u>.

As evidenced by the Voting Reports, which certified both the method and results of the

voting, pursuant to the requirements of sections 1124 and 1126 of the Bankruptcy Code,

at least one Impaired Class of Claims, determined without including any acceptance by

an insider of any of the Debtors, has voted to accept the Modified Plan.

        5.     <u>Classes Deemed To Have Rejected The Modified Plan</u>. Holders of

Claims and Interests in Classes 1E, 1G-1, 1G-2, 1H, 8H, and 1I are not entitled to receive

any distribution under the Modified Plan on account of their Claims or Interests.

Pursuant to section 1126(g) of the Bankruptcy Code, Classes 1E, 1G-1, 1G-2, 1H, 8H,

and 1I are conclusively presumed to have rejected the Modified Plan, and votes from

those interest holders therefore were not resolicited.

      K.     <u>Debtors' Compliance With Section 1127</u>.  The Debtors have satisfied the

necessary standards under section 1127 of the Bankruptcy Code with respect to the

Modified Plan.

      L.     <u>Modified Plan Compliance With Bankruptcy Code (11 U.S.C. §</u>

<u>1129(a)(1))</u>.  The Modified Plan complies with the applicable provisions of the

Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code, as made

applicable by section 1127 of the Bankruptcy Code.

1.      <u>Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1))</u>.  In addition to Administrative Claims and Priority Tax Claims (which are not required to be classified), Article III of the Modified Plan designates Classes of Claims and Classes of Interests.  The Claims and Interests placed in each Class are substantially similar to other Claims or Interests in each such Class.  Valid business, factual, and legal reasons exist for classifying the various Classes of Claims and Interests in the manner set forth in the Modified Plan, and such Classes do not unfairly discriminate between holders of Claims or Interests.  Thus, the Modified Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

2.      <u>Specification Of Unimpaired Classes (11 U.S.C. § 1123(a)(2))</u>. Article 4.1 of the Modified Plan specifies the Classes of Claims that are Unimpaired. Thus, the Modified Plan satisfies section 1123(a)(2) of the Bankruptcy Code.

3.      <u>Specification Of Treatment Of Impaired Classes (11 U.S.C. § 1123(a)(3))</u>.  Article 4.2 of the Modified Plan specifies the Classes of Claims and Interests that are Impaired under the Modified Plan.  Article V of the Modified Plan specifies the treatment of Claims and Interests in all such Classes.  Thus, the Modified Plan satisfies section 1123(a)(3) of the Bankruptcy Code.

4.      <u>No Discrimination (11 U.S.C. § 1123(a)(4))</u>.  The Modified Plan provides for the same treatment for each Claim in each respective Class unless the holder of a particular Claim has agreed to less favorable treatment with respect to such Claim. Thus, the Modified Plan satisfies section 1123(a)(4) of the Bankruptcy Code.

5.      <u>Implementation Of Modified Plan (11 U.S.C. § 1123(a)(5))</u>.  The Modified Plan provides adequate and proper means for implementation of the Modified

Plan, including, without limitation, (i) the continued corporate existence of Reorganized

DPH Holdings, (ii) the corporate constituent documents that will govern the Reorganized

Debtors after the Effective Date, including, without limitation, the Certificate of

Incorporation and Bylaws, (iii) consummation of the Master Disposition Agreement in

connection with, among other things, the Pure Credit Bid, (iv) assumption and

assignment of the collective bargaining agreements, as may be required by the Master

Disposition Agreement, (v) consummation of the Restructuring Transactions and the

transactions contemplated by the Master Disposition Agreement, and (vi) the execution,

delivery, filing, or recording of all contracts, instruments, releases, indentures, and other

agreements or documents related to the foregoing.  Thus, the Modified Plan satisfies

section 1123(a)(5) of the Bankruptcy Code.

      6.    <u>Prohibition Against Issuance Of Non-Voting Equity Securities
And Provisions For Voting Power Of Classes Of Securities (11 U.S.C. § 1123(a)(6))</u>.

Article 7.4 of the Modified Plan provides that the articles of incorporation of the

Reorganized Debtors will comply with section 1123(a)(6) of the Bankruptcy Code.  Such

statutory provisions have been incorporated into the articles of incorporation of

Reorganized DPH Holdings, as set forth in Plan Exhibit 7.4(a).

      7.    <u>Selection Of Officers, Directors, And The Trustee (11 U.S.C. §
1123(a)(7))</u>.  In Article 7.5 and Article 7.9 of the Modified Plan, as announced at the

Modification Approval Hearing, the Debtors properly and adequately disclosed or

otherwise identified the procedures for determining the identity and affiliations of all

individuals or entities proposed to serve on or after the Effective Date as officers or

directors of the Reorganized Debtors and as trustee of the Post-Confirmation

Reorganized DPH Holdings Share Trust. The appointment or employment of such

individuals or entities and the proposed compensation and indemnification arrangements

for officers and directors are consistent with the interests of Claim and Interest holders

and with public policy. Thus, section 1123(a)(7) of the Bankruptcy Code is satisfied.

8.    Additional Plan Provisions (11 U.S.C. § 1123(b)). The Modified

Plan's provisions are appropriate and consistent with the applicable provisions of the

Bankruptcy Code, including, without limitation, provisions for (i) distributions to holders

of Claims, (ii) the disposition of executory contracts and unexpired leases, (iii) approval

of and authorization for entrance into the Master Disposition Agreement, (iv) amendment,

assumption, and assignment of the Union Settlement Agreements, (v) the retention of,

and right to enforce, sue on, settle, or compromise (or refuse to do any of the foregoing

with respect to) certain claims or causes of action against third parties, to the extent not

waived and released under the Modified Plan, (vi) resolution of Disputed Claims, (vii)

allowance of certain Claims, (viii) indemnification obligations, (ix) releases by the

Debtors of certain parties, (x) releases by holders of Claims and Interests, as approved

herein, (xi) releases by Unions, (xii) releases of GM-Related Parties (as defined in the

Delphi-GM Global Settlement Agreement) by the Debtors and third parties, and (xiii) the

exculpation of certain parties.

9.    Fed. R. Bankr. P. 3016(a). The Modified Plan is dated and

identifies the entities submitting it, thereby satisfying Fed. R. Bankr. P. 3016(a).

M.    Debtors' Compliance With Bankruptcy Code (11 U.S.C. § 1129(a)(2)).

The Debtors have complied with the applicable provisions of the Bankruptcy Code,

thereby satisfying section 1129(a)(2) of the Bankruptcy Code as made applicable by

section 1127 of the Bankruptcy Code.  Specifically, the Debtors are proper debtors under

section 109 of the Bankruptcy Code and proper proponents of the Modified Plan under

section 1121(a) of the Bankruptcy Code.  The Debtors have complied with the applicable

provisions of the Bankruptcy Code during the Chapter 11 Cases, including as provided or

permitted by orders of the Court.  The Debtors have complied with the applicable

provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Modification

Procedures Order in transmitting the Modified Plan, the Disclosure Statement

Supplement, the Ballots, and related documents and notices, and in resoliciting and

tabulating votes on the Modified Plan.

      N.    <u>Modified Plan Proposed In Good Faith (11 U.S.C. § 1129(a)(3))</u>.  The

Debtors have proposed the Modified Plan in good faith and not by any means forbidden

by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code as made applicable

by section 1127 of the Bankruptcy Code.  In determining that the Modified Plan has been

proposed in good faith, the Court has examined the totality of the circumstances

surrounding the filing of the Chapter 11 Cases, the events after the entry of the

Confirmation Order, and the formulation of the Modified Plan.  <u>See</u> Bankruptcy Rule

3020(b).  The Debtors, GM, the DIP Agent, and the DIP Lenders, and their respective

Affiliates, shareholders, partners, directors, officers, employees, and advisors, among

others, and each of their respective professionals negotiated the Modified Plan in good

faith and participated in the Modified Plan formulation process in good faith.  The

Chapter 11 Cases were filed, and the Modified Plan was proposed, with the legitimate

and honest purpose of reorganizing and maximizing the value of each of the Debtors and

the recovery to holders of Claims and Interests under the circumstances of these cases.

26

O.    Payments For Services Or Costs And Expenses (11 U.S.C. § 1129(a)(4)).

Any payment made or to be made by the Debtors for services or for costs and expenses in

connection with the Chapter 11 Cases, including all administrative expense and

substantial contribution claims under sections 503 and 507 of the Bankruptcy Code, and

pursuant to any expense side letter entered into with the Debtors to the extent such

expense side letter has been approved by the Bankruptcy Court, or in connection with the

Modified Plan and incident to the Chapter 11 Cases, has been approved by, or is subject

to the approval of, the Court as reasonable, thereby satisfying section 1129(a)(4) of the

Bankruptcy Code as made applicable by section 1127 of the Bankruptcy Code.  Without

limiting the generality of the foregoing, all payments for services or for costs or expenses

the payment of which is provided to be paid in the Modified Plan, the Master Disposition

Agreement, the Loan Documents, or any expense side letter approved by the Bankruptcy

Court are hereby (or have heretofore been) so approved.  Any amounts allocated by the

Debtors for the payment of such services, costs, and expenses, or any recoveries or

disgorgements subsequently ordered by the Court on account of payments to

professionals prior to final allowance of such amounts shall constitute assets owned

exclusively by the Reorganized Debtors except as otherwise provided in Section 10.3(c)

of the Modified Plan.  Accordingly, the requirements of section 1129(a)(4) of the

Bankruptcy Code have been met.

P.    Directors, Officers, And Insiders (11 U.S.C. § 1129(a)(5)).  The Debtors

have complied with section 1129(a)(5) of the Bankruptcy Code as made applicable by

section 1127 of the Bankruptcy Code.  Specifically, the Debtors have disclosed the

identity and the affiliation of all of the initial officers of the Reorganized Debtors and the

27

directors (as applicable) of all Reorganized Debtors. Accordingly, the requirements of
section 1129(a)(5) of the Bankruptcy Code have been met.

Q.    No Rate Changes (11 U.S.C. § 1129(a)(6)). Section 1129(a)(6) of the
Bankruptcy Code, as made applicable by section 1127 of the Bankruptcy Code, is
satisfied because the Modified Plan does not provide for any change in rates over which a
governmental regulatory commission has jurisdiction.

R.    Best Interests Test (11 U.S.C. § 1129(a)(7)). The Modified Plan satisfies
section 1129(a)(7) of the Bankruptcy Code as made applicable by section 1127 of the
Bankruptcy Code. With respect to each impaired class of claims or interests under the
Modified Plan, the liquidation analysis in Appendix C to the Disclosure Statement
Supplement, the Eisenberg Declaration, and other evidence proffered or adduced at the
Modification Approval Hearing (1) are persuasive, credible, and accurate as of the dates
such evidence was prepared, presented, or proffered, (2) either have not been
controverted by other persuasive evidence or have not been challenged, (3) are based
upon reasonable and sound assumptions, (4) provide a reasonable estimate of the
liquidation values of the Debtors upon conversion to a case under chapter 7 of the
Bankruptcy Code, and (5) establish that each holder of a Claim or Interest in an Impaired
Class that has not accepted the Modified Plan will receive or retain under the Modified
Plan, on account of such Claim or Interest, property of a value, as of the Effective Date of
the Modified Plan, that is not less than the amount that it would receive if the Debtors
were liquidated under chapter 7 of the Bankruptcy Code on such date.

S.    Acceptance By Impaired Classes (11 U.S.C. § 1129(a)(8)). Three
subclasses in Class 1A-1, Classes 1C-2 through 12C-2, and Classes 1D through 12D have

voted to accept the Modified Plan. All other classes have voted to reject or have been deemed to reject the Modified Plan; provided, however, Classes 3A-1, 4A-1, 2C-1, 7C-1, and 9C-1, in which no votes were cast, shall be deemed to have accepted the Modified Plan. Accordingly, confirmation is sought pursuant to 11 U.S.C. § 1129(b) as made applicable by section 1127 of the Bankruptcy Code.

T.      Treatment Of Administrative And Priority Tax Claims (11 U.S.C. § 1129(a)(9)). The treatment of Administrative Claims under the Modified Plan satisfies the requirements of section 1129(a)(9)(A) and (B) of the Bankruptcy Code as made applicable by section 1127 of the Bankruptcy Code, and the treatment of Priority Tax Claims under the Modified Plan satisfies the requirements of section 1129(a)(9)(C) of the Bankruptcy Code as made applicable by section 1127 of the Bankruptcy Code.

U.      Acceptance By Impaired Class (11 U.S.C. § 1129(a)(10)). Three subclasses in Class 1A-1, Classes 1C-2 through 12C-2, and Classes 1D through 12D have voted to accept the Modified Plan and, to the best of the Debtors' knowledge, do not contain "insiders," as such term is defined in 11 U.S.C. § 101(31). Additionally, Classes 3A-1, 4A-1, 2C-1, 7C-1, and 9C-1, in which no votes were cast, shall be deemed to have accepted the Modified Plan. Thus, the Modified Plan satisfies section 1129(a)(10) of the Bankruptcy Code as made applicable by section 1127 of the Bankruptcy Code.

V.      Feasibility (11 U.S.C. § 1129(a)(11)). The Modified Plan satisfies section 1129(a)(11) of the Bankruptcy Code as made applicable by section 1127 of the Bankruptcy Code. The Sheehan Declaration, the Stipp Declaration, and other evidence proffered or adduced at the Modification Approval Hearing (1) are persuasive and credible, (2) have not been controverted by other evidence or sufficiently challenged in

29

any of the objections to the Modified Plan, (3) establish that subject to, and upon

consummation of, the transactions set forth as conditions to the Effective Date in Article

12.2 of the Modified Plan, the Modified Plan is feasible and that confirmation of the

Modified Plan is not likely to be followed by the liquidation or the need for further

financial reorganization of the Debtors or the Reorganized Debtors.

W.    Payment Of Fees (11 U.S.C. § 1129(a)(12)).  The Debtors have paid, or

pursuant to Sections 1.2, 2.1, and 14.2 of the Modified Plan will pay by the Effective

Date, fees payable under 28 U.S.C. § 1930 plus accrued interest under 31 U.S.C. § 3717.

Thus, the Modified Plan satisfies section 1129(a)(12) of the Bankruptcy Code as made

applicable by section 1127 of the Bankruptcy Code.

X.    Continuation Of Retiree Benefits (11 U.S.C. § 1129(a)(13)).  Article 7.18

of the Modified Plan provides that all retiree benefits (as defined in section 1114 of the

Bankruptcy Code) that were established pursuant to sections 1114(e)(1)(B) or 1114(g) of

the Bankruptcy Code at any time prior to the entry of this order will continue at the levels

so established for the period that the Debtors have obligated themselves to provide such

benefits.  This provision satisfies section 1129(a)(13) of the Bankruptcy Code as made

applicable by section 1127 of the Bankruptcy Code.  To the extent that the Debtors

during the Chapter 11 Cases modified retiree benefits solely in accordance with the terms

of the existing retiree benefit plans, they were not required to seek such modifications

under sections 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code, and, therefore, section

1129(a)(13) has no application to such modifications.

Y.    Confirmation Of The Plan Over Nonacceptance Of Impaired Classes

(11 U.S.C. § 1129(b)).  Three subclasses of Class 1A-1, Classes 1C-2 through 12C-2, and

1D through 12D voted to accept the Modified Plan. Pursuant to section 1129(b) of the

Bankruptcy Code, the Modified Plan may be confirmed notwithstanding that not all

Impaired Classes have voted to accept the Modified Plan. All of the requirements of

section 1129(a) of the Bankruptcy Code with respect to such Classes, other than section

1129(a)(8), have been met. The Modified Plan is fair and equitable and does not

discriminate unfairly against the holders of claims that have rejected or that have been

deemed to reject the Modified Plan. With respect to Classes 1E, 1G-1, 1G-2, 1H, 8H,

and 1I, no holders of Claims or Interests junior to the holders of such Class will receive

or retain any property under the Modified Plan on account of such Claims or Interests,

and, as evidenced by the estimates contained in the Disclosure Statement and admitted

into evidence at the Modification Approval Hearing, no Class of Claims or Interests

senior to such Class is receiving more than full payment on account of such Claims or

Interests. Accordingly, the Modified Plan is fair and equitable and does not discriminate

unfairly, as required by section 1129(b) of the Bankruptcy Code, and section 1129(b) of

the Bankruptcy Code therefore is satisfied as made applicable by section 1127 of the

Bankruptcy Code. In addition, the Creditors' Committee has withdrawn its objection and

supports cramdown of the Modified Plan on nonconsenting Classes of Claims under

section 1129(b) of the Bankruptcy Code, as it is incorporated by section 1127 of the

Bankruptcy Code.

       Z.    <u>Principal Purpose Of Modified Plan (11 U.S.C. § 1129(d))</u>. The principal

purpose of the Modified Plan is not the avoidance of taxes or the avoidance of the

application of section 5 of the Securities Act of 1933 (15 U.S.C. § 77e). Accordingly, the

Modified Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code as
made applicable by section 1127 of the Bankruptcy Code.

AA.    Modifications To The Plan.  The modifications to the Modified Plan
described and/or set forth beginning on Exhibit A hereto constitute non-material or
technical changes and/or changes with respect to particular Claims or Interests, and do
not materially adversely affect or change the treatment of any Claims or Interests.
Accordingly, these modifications do not require additional disclosure under section 1125
of the Bankruptcy Code or resolicitation of votes under section 1126 of the Bankruptcy
Code, nor do they require that holders of Claims or Interests be afforded an opportunity
to change previously cast acceptances or rejections of the Modified Plan.

BB.    Good Faith Resolicitation (11 U.S.C. § 1125(e)).  The Debtors and their
agents, representatives, attorneys, and advisors, and other Persons involved in the
resolicitation process, have resolicited votes on the Modified Plan in good faith and in
compliance with the applicable provisions of the Bankruptcy Code and the Modification
Procedures Order and are entitled to the protections afforded by section 1125(e) of the
Bankruptcy Code and the exculpation provisions set forth in Section 11.11 of the
Modified Plan.

CC.    Executory Contracts.  The Debtors have exercised reasonable business
judgment in determining whether to assume, assume and assign, or reject each of their
executory contracts and unexpired leases as set forth in Article VIII of the Modified Plan.
Each assumption, assumption and assignment, or rejection of an executory contract or
unexpired lease as provided in Article 8.1 of the Modified Plan shall be legal, valid, and
binding upon the applicable Reorganized Debtor and all non-Debtor parties to such

executory contract or unexpired lease, all to the same extent as if such assumption or

rejection had been effectuated pursuant to an appropriate authorizing order of the Court

entered before the Modification Approval Date under section 365 of the Bankruptcy

Code.

DD.    Adequate Assurance.  The Debtors or the Buyers have cured, or provided

adequate assurance that the Reorganized Debtors or the Buyers will cure, defaults (if any)

under or relating to each of the contracts and leases which are being assumed by the

Debtors or the Buyers pursuant to the Modified Plan and the MDA Documents (the

"Assumed Contracts and Leases" provided that any contracts or leases subject to the

August 17, 2009 hearing process described in paragraph 28 of this Order shall not

become Assumed Contracts and Leases except pursuant to such process).

EE.    Conditions To Consummation.  The conditions to the Effective Date are

set forth in Article 12.2 of the Modified Plan.  Certain conditions to the Effective Date set

forth in Article 12.2 of the Modified Plan may be waived as set forth in section 12.3 of

the Modified Plan, without any further notice to parties-in-interest or the Court and

without a hearing except as otherwise provided in section 12.3 of the Modified Plan.

FF.    Retention Of Jurisdiction.  The Court properly may retain jurisdiction over

the matters set forth in Article XIII of the Modified Plan.

GG.    Agreements And Other Documents.  The Debtors have made adequate and

sufficient disclosure of:  (1) the adoption of new or amended and restated certificates of

incorporation and bylaws or similar constituent documents for Reorganized DPH

Holdings and the Reorganized Debtors, (2) the distributions to be made pursuant to the

Modified Plan, (3) the Master Disposition Agreement, (4) the adoption, execution,

delivery, and implementation of all contracts, leases, instruments, releases, and other

agreements or documents related to any of the foregoing, and (5) the other matters

provided for under the Modified Plan involving the Reorganized Debtors.

HH.    <u>Master Disposition Agreement</u>.  The Master Disposition Agreement is an

essential element of the Modified Plan and entry into and consummation of the Master

Disposition Agreement is in the best interests of the Debtors, their estates, and their

creditors and is approved in all respects.  The Purchasing Entities, and their Affiliates,

shareholders, partners, directors, officers, employees, and advisors, have acted in good

faith in connection with the Chapter 11 Cases, the formulation of the Master Disposition

Agreement, and the formulation and confirmation of the Modified Plan.

II.    <u>Support Of Unsecured Creditors</u>.  The Creditors' Committee and WTC

have withdrawn their objections to the Modified Plan and support its confirmation under

section 1127(b) of the Bankruptcy Code, as it incorporates section 1129(b) of the

Bankruptcy Code.

JJ.    <u>Releases And Discharges</u>.

1.    <u>In General</u>.  The discharge, release, indemnification, and

exculpation provisions of the Modified Plan and the MDA Documents as approved by

this order constitute good faith compromises and settlements of the matters covered

thereby.  Such compromises and settlements are made in exchange for consideration and

are in the best interests of the Debtors, their Estates, and holders of Claims, are fair,

equitable, reasonable, and are integral elements of the restructuring and resolution of the

Chapter 11 Cases in accordance with the Modified Plan.  Each of the discharge, release,

indemnification, and exculpation provisions set forth in the Modified Plan, as approved in

this order:

(a)    is within the jurisdiction of the Court under 28 U.S.C. §§

1334(a), (b), and (d),

(b)    is an essential means of implementing the Modified Plan

pursuant to section 1123(a)(5) of the Bankruptcy Code,

(c)    is an integral element of the settlements and transactions

incorporated into the Modified Plan,

(d)    confers material benefit on, and is in the best interests of,

the Debtors, their estates, and the holders of Claims,

(e)    is important to the overall objectives of the Modified Plan

to finally resolve all Claims among or against the parties-in-interest in the Chapter 11

Cases with respect to the Debtors, their organization, capitalization, operation, and

reorganization, and

(f)    is consistent with 11 U.S.C. §§ 105, 1123, and 1129, and

other applicable provisions of the Bankruptcy Code.

The failure to effect the discharge, release, indemnification, and exculpation provisions

set forth in the Modified Plan and MDA Documents, as approved by this order, would

seriously impair the Debtors' ability to confirm and implement the Modified Plan and

consummate the Master Disposition Agreement.

2.    Releases Of GM-Related Parties and GMCo..  The releases of GM-

Related Parties (as defined in the Delphi-GM Global Settlement Agreement) and GMCo.

by the Debtors and third parties (collectively, the "GM Releases") pursuant to Sections

11.7 and 11.8, respectively, of the Modified Plan, which are described in Article IV of the

Delphi-GM Global Settlement Agreement, (i) are fair and equitable, reasonable, and in

the best interests of the Debtors' estates and holders of Claims, (ii) are supported by truly

unusual circumstances that render the release terms important to the process of the

Modified Plan, and (iii) are integral elements of the restructuring and resolution of the

Chapter 11 Cases.  More specifically, factors which support the approval of the GM

Releases include, without limitation:

       (a)    As acknowledged by the Debtors in section 4.01(l) of the

Delphi-GM Global Settlement Agreement, the consideration GM provided and will

provide pursuant to the Delphi-GM Definitive Documents, the Union Settlement

Agreements, and other agreements entered into as part of the Debtors' reorganization

constitutes a material, substantial contribution to the Debtors' estates;

       (b)    GM's contribution is necessary to the success of the

Modified Plan because GM's consideration provides a substantial source of funds to the

Debtors' estates and allows substantial distributions to be made to the holders of Claims

and Interests;

       (c)    The GM Releases are an important part of the Modified

Plan because, as set forth in section 4.01(l) of the Delphi-GM Global Settlement

Agreement, and as acknowledged by the Debtors, GM would not have agreed to make

these substantial contributions to the Debtors' estates without obtaining the GM Releases;

       (d)    The breadth of the GM Releases is necessary to the

Modified Plan and bears a reasonable relationship to the protection of the Debtors' estates;

and

36

(e)      Absent the Delphi-GM Global Settlement Agreement and

the GM Releases, as a result of existing indemnification agreements and GM's filed

claims for indemnification and contribution, the third-party claims that are being released

thereby may have indirectly impacted the Debtors and /or Reorganized Delphi.

Accordingly, the GM Releases, including the third-party releases, are

consistent with sections 105, 1123, and 1129 of the Bankruptcy Code and the law in the

Second Circuit, and should be, and hereby are, approved.

KK.      PBGC Settlement.  The Debtors have demonstrated good, sufficient, and

sound business purposes and justification for entering into the Delphi-PBGC Settlement

Agreement, which was executed by Delphi and the PBGC on July 21, 2009.  The PBGC

Settlement Agreement was filed with the Bankruptcy Court on July 21, 2009 (Docket No.

18559).  The record reflects that the Debtors would be unable to reorganize under the

Modified Plan so long as the Debtors' liability under the Pension Plans covered by the

Delphi-PBGC Settlement Agreement exists.  The record also reflects, for purposes stated

by the Court in its bench ruling at the Final Modification Hearing, that clear grounds exist

under Section 4042 of ERISA, 29 U.S.C. § 1342, for the PBGC to initiate involuntary

terminations of the Pension Plans, for the Debtors to enter into termination and

trusteeship agreements with the PBGC, and that the PBGC has determined to seek

involuntary terminations to reduce the PBGC's risk of loss of recovery relating to own

exposure under the Pension Plans.  The consideration provided to the Debtors under the

Delphi-PBGC Settlement Agreement is fair and reasonable, and is in the best interests of

the estate, in light of the potential amount of a PBGC claim arising out of plan

termination and the need to obtain releases from the PBGC to effectuate the sale pursuant

to this Modified Plan and under the MDA Documents.  For the reasons set forth in the

Debtors' Omnibus Reply and by the Court in its bench ruling at the Final Modification

Hearing, the Court finds that neither (1) the Delphi-PBGC Settlement Agreement, (2) the

potential involuntary termination of the Delphi HRP, nor (3) the Debtors' consent to a

termination and trusteeship agreement with the PBGC as a result of the PBGC having

decided to implement an involuntary termination of the Delphi HRP or the Packard

Hughes Bargaining Interconnect Bargaining Retirement Plan violates (a) the Labor

MOUs,[4] or any modifications thereto, (b) the orders of this Court pursuant to 11 U.S.C.

§§ 363, 1113, and 1114 approving each of the Labor MOUs on terms and conditions

described in those orders (the "Union 1113/1114 Settlement Approval Orders"), (c) the

Local Agreement Between Delphi Connection Systems (formerly Packard-Hughes

Interconnect) And Electronic And Space Technicians Local 1553, or (d) section 1113(f)

of the Bankruptcy Code.  Upon the effectiveness of the Delphi-PBGC Settlement

Agreement, all liabilities relating to unpaid contributions to the Pension Plans will be

released or discharged as provided herein.

LL.    Preservation Of Causes Of Action.  It is in the best interests of the holders

of Claims and Interests that the Retained Actions that are not expressly released under the

Modified Plan be retained by the Reorganized Debtors pursuant to Article 7.19 of the

Modified Plan to maximize the value of the Debtors' Estates.  It is also in the best

---

[4]    "Labor MOUs" means the UAW-Delphi-GM Memorandum of Understanding, the IUE-CWA-Delphi-GM Memorandum of Understanding, the USW-Home Avenue Memorandum of Understanding, the USW-Vandalia Memorandum of Understanding, the IUOE Local 832S Memorandum of Understanding, the IUOE Local 18S Memorandum of Understanding, the IUOE Local 101S Memorandum of Understanding, the IBEW E&S Memorandum of Understanding, the IBEW Powertrain Memorandum of Understanding, and the IAM-Delphi Memorandum of Understanding, each as defined in the Modified Plan.

interests of holders of Claims and Interests that Avoidance Actions shall not be retained

by the Reorganized Debtors unless specifically listed on Exhibit 7.19 of the Modified

Plan.  For the avoidance of doubt, the Appaloosa Claim (as defined in the Master

Disposition Agreement) shall be assigned to the applicable Purchasing Entity pursuant to

the terms of the Master Disposition Agreement.

MM.    Judicial Notice.  The Court takes judicial notice of the docket of the

Chapter 11 Cases maintained by the Clerk of the Court and/or its duly-appointed agent,

including, without limitation, all pleadings and other documents filed, all orders entered,

and all evidence and arguments made, proffered, or adduced at the hearings held before

the Court during the pendency of the Chapter 11 Cases.

NN.    Burden Of Proof.  The Debtors, as proponents of the Modified Plan, have

met their burden of proving the elements of sections 1129(a) and (b) of the Bankruptcy

Code, as made applicable by section 1127 of the Bankruptcy Code, by a preponderance

of the evidence, which is the applicable evidentiary standard in the Court.  The Court also

finds that the Debtors have satisfied the elements of sections 1129(a) and (b) of the

Bankruptcy Code, as made applicable by section 1127 of the Bankruptcy Code, under the

clear and convincing standard of proof.

IT IS ORDERED, ADJUDGED, AND DECREED THAT:

1.    Confirmation.  The Modified Plan, which consists of the Modified

Plan (and all exhibits and supplements thereto) and the modifications set forth in

Exhibit A hereto and as otherwise provided herein, which are hereby incorporated into

and constitute a part of the Modified Plan, is hereby approved and confirmed under

section 1127(b) as it incorporates section 1129 of the Bankruptcy Code.  The exhibits to

39

the Modified Plan (as may be modified pursuant to the terms of the Modified Plan and/or

such exhibit, as applicable) are incorporated by reference into and comprise an integral

part of the Modified Plan and this order.

    2.  Objections.  All Objections to confirmation of the Modified Plan

that have not been withdrawn, waived, or settled, and all reservations of rights included

therein, are overruled on the merits.

    3.  Modifications To The Confirmation Order.  The findings and

rulings contained in the Confirmation Order were necessary and appropriate as of the

Confirmation Date, and nothing in this order shall otherwise be deemed a vacation or

revocation of the Confirmation Order, which remains in full force and effect as to those

provisions of the Confirmed Plan that have not been modified pursuant to, and are not

inconsistent with, this order or the Modified Plan.  To the extent that certain provisions of

the Confirmation Order are no longer applicable to the Modified Plan, they shall not be

construed as superseding the Modified Plan or this order.  Specifically, the transactions

that were contemplated by the Confirmed Plan and the Confirmation Order, but are no

longer the means for implementation of the Modified Plan, including, but not limited to,

the Investment Agreement, the Exit Financing Arrangements, the Rights Offering, the

Registration Rights Agreement, the IRC Section 414(l) Transfer, and releases and

exculpation related to the Plan Investors, shall be deemed non-binding upon the Debtors

and Reorganized Debtors, as the case may be, and shall have no force and effect upon the

Debtors and Reorganized Debtors when construing the Confirmation Order.  The

provisions of the Modified Plan, this order, and the Confirmation Order shall be

construed in a manner consistent with each other so as to effect the purposes of each;

provided, however, that if there is determined to be any inconsistency between the MDA

Documents, any Modified Plan provision, or this order, on the one hand, and any

provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then,

solely to the extent of such inconsistency, the applicable provisions of the MDA

Documents, the Modified Plan, and this order shall govern; provided further, that if there

is determined to be any inconsistency between the Modified Plan and this order that

cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of

this order shall govern; provided further, that if there is determined to be any material

inconsistency between the Master Disposition Agreement and this order, and the

restatement of any Modified Plan provisions in this order, that cannot be so reconciled,

then, solely to the extent of such inconsistency, the provisions of the Master Disposition

Agreement shall govern, except with respect to findings of fact, other than findings of

fact that describe the Master Disposition Agreement, or unless such application of the

provision of the Master Disposition Agreement would violate the Bankruptcy Code.  For

the avoidance of doubt, the Master Disposition Agreement that was submitted as part of

the Pure Credit Bid (as such term is defined in the Second Supplemental Modification

Procedures Order) on July 26, 2009 and filed at Docket No. 18658 on July 27, 2009, and

no other documents that were submitted as part of the Pure Credit Bid, shall be deemed

the governing version of the Master Disposition Agreement for the purposes of this

paragraph (unless superseded by the filing by the Debtors on the docket of a fully

executed Master Disposition Agreement).  Notwithstanding any other provision of the

Master Disposition Agreement or this order, paragraphs 16, 38, 39, 40, 60, 61, 63, and 64

of this order shall govern the provisions of the Master Disposition Agreement in all respects.

4.    <u>Provisions Of Modified Plan And Order Nonseverable And Mutually Dependent</u>.  The provisions of the Modified Plan and this order, including the findings of fact and conclusions of law set forth herein, are nonseverable and mutually dependent.  Subsequent to Closing, the Purchasing Entities shall be entitled to all of the protections of section 363(m) of the Code that would prevent the unwinding of the transactions.

5.    <u>This Order And The MDA Documents Are Binding</u>.  This order and the MDA Documents shall be binding in all respects upon all creditors of and holders of Interests (whether known or unknown), agents, trustees, and collateral trustees, any holders of Property Interests, all non-Debtor parties to the Acquired Contracts, all successors and assigns of the Purchasing Entities, each Debtor and their Affiliates and subsidiaries, the Acquired Assets, and any subsequent trustees appointed under any chapter of title 11 of the U.S. Code, and shall not be subject to rejection.

6.    <u>Modified Plan Classification Controlling</u>.  The classification of Claims and Interests for purposes of the distributions to be made under the Modified Plan shall be governed solely by the terms of the Modified Plan.  The classifications set forth on the Ballots tendered to or returned by the Debtors' creditors or interest holders in connection with voting on the Modified Plan (a) were set forth on the Ballots solely for purposes of voting to accept or reject the Modified Plan, (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims or Interests under the Modified Plan for distribution purposes, (c) may not

be relied upon by any creditor or interest holder as representing the actual classification

of such Claims or Interests under the Modified Plan for distribution purposes, and (d)

shall not be binding on the Reorganized Debtors, the Estates, or the Debtors.

7.    Effects Of This Order; Immediate Effectiveness; Successors And

Assigns.  The stay provided by Bankruptcy Rule 3020(e) shall not apply to this order.

Immediately upon the entry of this order, this order and the terms of the Modified Plan

(subject to the provisions of Articles 12.2 and 12.3 of the Modified Plan) shall be deemed

binding upon (a) the Debtors, (b) the Reorganized Debtors, (c) GM, (d) the DIP Lenders,

(e) all holders of Claims against and Interests in the Debtors, whether or not Impaired

under the Modified Plan and whether or not, if Impaired, such holders accepted the

Modified Plan, (f) each Person acquiring property under the Modified Plan, (g) any other

party-in-interest, (h) any Person making an appearance in these Chapter 11 Cases, and (i)

each of the foregoing's respective heirs, successors, assigns, trustees, executors,

administrators, affiliates, officers, directors, agents, representatives, attorneys,

beneficiaries, or guardians.

8.    Approval Of MDA Documents And Related Actions.  The MDA

Documents are hereby approved.  The Successful Alternative Transaction was the highest

or otherwise best bid at the Auction for the Acquired Assets and Sale Securities set forth

in the MDA Documents.  Pursuant to sections 363(b) and 1123(b) of the Bankruptcy

Code, the Debtors are authorized to perform their obligations under and comply with the

terms of the MDA Documents, and the Sellers are authorized to consummate the sale

under the MDA Documents, pursuant to and in accordance with the terms and conditions

of this order and the MDA Documents.  The Successful Alternative Transaction satisfies

the requirements of sections 363(k) and 1129 of the Bankruptcy Code and constitutes a Pure Credit Bid in accordance with the Procedures in an amount equal to 100% of the principal and interest due and owing in respect of the DIP Loan under the DIP Credit Agreement, after giving effect to the application of any cash collateral to the DIP Loan, and consummation of the transactions contemplated by the Master Disposition Agreement and the Assignment Agreement, and the making of the DIP Distributions (as defined below) comply with and have been fully authorized under the DIP Credit Agreement and the Loan Documents.

9.     Sale Of Assets To The Purchasing Entities.  Pursuant to the terms of the MDA Documents, sections 363 and 1123(a)(5) of the Bankruptcy Code, as applicable, and this order, on the Effective Date the Debtors shall consummate the transfer, free and clear of any Property Interests, Claims, liens, and encumbrances pursuant to the terms of the MDA Documents and this order to the Purchasing Entities of the Acquired Assets, the Sale Securities, and the Assumed Contracts, except for the Permitted Encumbrances, the Assumed Liabilities, any other liabilities specifically assumed under the Master Disposition Agreement or assumed and assigned pursuant to paragraphs 38 and 61 of this order, in accordance with the MDA Documents.

10.     Transfer Of Acquired Assets And Sale Securities Free And Clear.

(a)     On and after the Effective Date the Purchasing Entities, except for the Assumed Liabilities specifically assumed, any other liabilities specifically assumed under the Master Disposition Agreement or assumed and assigned pursuant to paragraphs 38 and 61 of this order, or the Permitted Encumbrances expressly allowed in the MDA Documents, and the DIP Agent shall have no liability or responsibility for any

44

liability or other obligation of the Debtors arising under or related to the Debtors or their

assets, in each case to the extent permitted by applicable law.  Without limiting the

generality of the foregoing, the DIP Agent, and except as otherwise specifically provided

in this order or in the MDA Documents, following consummation of the Modified Plan

on the Effective Date, the Purchasing Entities shall not be liable for any Property

Interests or Claims against the Debtors or any of their predecessors or Affiliates, and the

Purchasing Entities shall have no successor or vicarious liability of any kind or character

including, but not limited to, any theory of antitrust, environmental, successor or

transferee liability, labor law, de facto merger, substantial continuity, or product line,

whether known or unknown as of the Closing (as defined in the Master Disposition

Agreement), now existing or hereafter arising, whether fixed or contingent, with respect

to the Debtors or any obligations of the Debtors arising prior to the Closing.

> (b)    Except for the Assumed Liabilities specifically assumed,

any other liabilities specifically assumed under the Master Disposition Agreement or

assumed and assigned pursuant to paragraphs 38 and 61 of this order, or the Permitted

Encumbrances expressly allowed in the MDA Documents, in connection with the

consummation of the Modified Plan and the Master Disposition Agreement, the Debtors

may sell the Acquired Assets and Sale Securities free and clear of all Property Interests

because one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy

Code have been satisfied.  The sale, transfer, assignment, and delivery of the Acquired

Assets and Sale Securities shall not be subject to any Property Interests, and Property

Interests of any kind or nature whatsoever shall remain with, and continue to be

obligations of, the Debtors, except as expressly provided in the MDA Documents.  Upon

the Closing (as defined in the Master Disposition Agreement), all Persons holding

Property Interests against or in the Debtors, the Acquired Assets, or the Sale Securities of

any kind or nature whatsoever  shall be, and hereby are, forever barred, estopped, and

permanently enjoined from asserting, prosecuting, or otherwise pursuing such Property

Interests of any kind or nature whatsoever against the Purchasing Entities, their property,

their successors and assigns, or the Acquired Assets, the Sale Securities, or any Person

who holds the Sale Securities, as an alleged successor or otherwise, with respect to any

Property Interest of any kind or nature whatsoever such Person or entity had, has, or may

have against or in a Debtor, a Debtor's estate, their respective officers, directors,

shareholders, the Acquired Assets, or the Sale Securities, other than as specifically set

forth herein, including, without limitation, the right to enforce Assumed Liabilities under

the MDA Documents.  Upon the Closing, other than with respect to Assumed Liabilities

and Permitted Encumbrances, no holder of a Property Interest in the Debtors shall

interfere with the Purchasing Entities' title to or use and enjoyment of the Acquired

Assets or any Person's title to or use of the Sale Securities based on or related to such

Property Interest or otherwise.

    11.    <u>Financing Statements And Related Actions</u>.

        (a)    Except with respect to Assumed Liabilities, Permitted

Encumbrances, and any other liabilities specifically assumed under the Master

Disposition Agreement or assumed and assigned pursuant to paragraphs 38 and 61 of this

order, if any Person or entity which has filed financing statements, mortgages, mechanic's

liens, lis pendens, or other documents or agreements evidencing Property Interests in the

Debtors or the Acquired Assets and Sale Securities shall not have delivered to the

Debtors prior to the Closing (as defined in the Master Disposition Agreement), in proper

form for filing and executed by the appropriate parties, termination statements,

instruments of satisfaction, or releases of all Property Interests which the Person or entity

has with respect to the Debtors or the Acquired Assets and Sale Securities or otherwise,

then, effective upon the Closing, (a) the Debtors are hereby authorized and directed to

execute and file such statements, instruments, releases, and other documents on behalf of

the Person or entity with respect to the Debtors or the Acquired Assets and Sale

Securities and (b) the Purchasing Entities are hereby authorized to file, register, or

otherwise record a certified copy of this order, which shall constitute conclusive evidence

of the release of all Property Interests in the Debtors or the Acquired Assets and Sale

Securities of any kind or nature whatsoever.  The foregoing provision notwithstanding,

the provisions of this order authorizing the sale and assignment free and clear shall be

self-executing, and notwithstanding the failure of Debtors, the Purchasing Entities, or any

other party to execute, file or obtain release, termination statements, assignments, or other

instruments to effectuate, consummate, and/or implement the provisions hereof or the

Agreement with respect to the sale and assignment of the Acquired Assets and Sale

Securities, all Claims and liens against and Property Interests (other than the Assumed

Liabilities and Permitted Encumbrances) in the Acquired Assets and Sale Securities shall

be deemed released as provided herein.

(b)      Except with respect to the Assumed Liabilities, Permitted

Encumbrances, and any other liabilities specifically assumed under the Master

Disposition Agreement or assumed and assigned pursuant to paragraphs 38 and 61 of this

order, on the Closing (as defined in the Master Disposition Agreement), each of the

47

Sellers' creditors and any other holder of a Property Interest is authorized and directed to execute such documents and take such other actions as may be necessary to release its Property Interests in the Acquired Assets and Sale Securities, if any, as such Property Interests may have been recorded or may otherwise exist.

12.    <u>Fair Value</u>.  The consideration provided by the Purchasing Entities for the Acquired Assets and the Sale Securities under the Master Disposition Agreement is fair and reasonable, and the Disposition Transactions may not be avoided under section 363(n) of the Bankruptcy Code.  The consideration provided by the Purchasing Entities for the Acquired Assets and the Sale Securities under the MDA Documents constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

13.    <u>Good Faith</u>.  The transactions contemplated by the MDA Documents and the Modified Plan are undertaken by the Purchasing Entities, and to the extent applicable, the DIP Agent, without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Disposition Transactions shall not affect the validity of the Disposition Transactions (including the assumption and assignment of any of the Acquired Contracts), unless such authorization is duly stayed prior to Closing (as defined in the Master Disposition Agreement) pending such appeal.  The Purchasing Entities, and to the extent applicable, the DIP Agent, are entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

14.    <u>Possession Of Acquired Assets</u>.  All entities who are in possession of some or all of the Acquired Assets or Sale Securities on the Closing (as defined in the

Master Disposition Agreement) are hereby directed to surrender possession or acknowledge ownership of the Acquired Assets or Sale Securities to the Purchasing Entities at Closing.

15. <u>Permits</u>.  Applicable permitting authorities shall allow the Purchasing Entities to operate the facilities being acquired after the Closing (as defined in the Master Disposition Agreement) under the current Permits (as defined in the Master Disposition Agreement) held by the applicable Seller (as defined in the Master Disposition Agreement) until such Permits are assigned to Purchasing Entities or Purchasing Entities obtain similar Permits in their own name.

16. <u>Discharge of DIP Loan And Cancellation Of Liens</u>.  Upon the occurrence of the Closing (as defined in the Master Disposition Agreement) and the making of the distributions to the DIP Agent, the DIP Lenders and the Hedging Counterparties as contemplated by the Master Disposition Agreement and the schedule of proposed DIP Lender distributions delivered by the DIP Agent to the Debtors (the "DIP Distributions"), except as explicitly set forth in the Master Disposition Agreement , (i) the DIP Loan shall be fully discharged, released, terminated, and if necessary, deemed waived, (ii) all Claims, liens, security interests, and obligations related thereto on Collateral wherever located shall be fully discharged, released, terminated, and if necessary, deemed waived without need for any further action, (iii) the Debtors and the Reorganized Debtors shall be fully discharged and released of all obligations of any kind relating to the DIP Loan, and the Debtors and Reorganized Debtors shall have no further obligation to the DIP Lenders under and relating to the DIP Loan, and (iv) the DIP Lenders shall be deemed to be bound to the provisions of Article XI of the Modified Plan,

49

as approved herein, and this order; provided, however, that notwithstanding the above, (w)

the letters of credit under the DIP Facility shall receive the treatment set forth in the

Master Disposition Agreement, (x) the Reorganized Debtors shall be obligated on an

unsecured basis (i) in respect of the indemnity to the DIP Agent to the extent

contemplated under the Credit Agreement and section 13(d) of the DIP Facility Order

and (ii) for post-Effective Date reasonable fees and out-of-pocket expenses of the DIP

Agent related to the DIP Documents, including, without limitation, all reasonable fees

and out-of-pocket expenses incurred in connection with the cancellation and/or

extinguishment of all publicly-filed liens and/or security interests as described below, (y)

DIP Lender professional fees that have accrued prior to the Effective Date shall be treated

as set forth in the Master Disposition Agreement, and (z) the Assumed Hedging

Agreements (as defined in the Master Disposition Agreement) shall be paid or assumed

by the GM Buyer as set forth in the Master Disposition Agreement.  To the extent that the

DIP Lenders or the DIP Agent have filed or recorded publicly any liens and/or security

interests to secure the Debtors' obligations under the DIP Facility, the DIP Lenders or the

DIP Agent, as the case may be, shall take any and all commercially reasonable steps

requested by the Company Buyer, GM Buyer, or Reorganized Debtors as may be

necessary to cancel and/or extinguish such publicly filed liens and/or security interests.

Notwithstanding anything to the contrary contained in this order, the Modified Plan, or

the Master Disposition Agreement, all obligations and liens under the DIP Credit

Agreement and the Loan Documents shall remain in full force and effect and shall be

enforceable in accordance with their terms until the Closing (as defined in the Master

Disposition Agreement) shall have occurred and the DIP Distributions have been made,

and the DIP Agent is hereby authorized, as an appropriate discharge of its duties and

responsibilities under the Loan Documents, to take such actions as it may deem necessary

or appropriate in connection with consummation of the transactions contemplated by

Master Disposition Agreement and the Assignment Agreement, and effecting the DIP

Distributions, and the DIP Agent shall not be liable to any party for taking any such

action.

17.    <u>Continued Corporate Existence; Vesting Of Assets</u>.  Except as

otherwise provided in the Modified Plan or the MDA Documents, each Reorganized

Debtor shall continue to exist after the Effective Date as a separate corporate or other

legal entity, with all the powers of a corporation or legal entity under applicable law in

the jurisdiction in which each applicable Debtor is incorporated or otherwise formed and

pursuant to its certificate of incorporation and bylaws or other organizational documents

in effect prior to the Effective Date, except to the extent such certificate of incorporation

and bylaws or other organizational documents are amended by the Modified Plan.

Except as otherwise explicitly provided in the Modified Plan, the MDA Documents, or

this order, including, without limitation, Articles 9.6 and 11.1 of the Modified Plan and

the modifications set forth in <u>Exhibit A</u> to this order, on the Effective Date, all property

comprising the Estates (including Retained Actions, but excluding property that has been

abandoned pursuant to the Modified Plan or an order of the Court or that is the subject of

any of the Disposition Transactions) shall revest in each of the Reorganized Debtors that

owned such property or interest in property as of the Effective Date, free and clear of all

Claims, liens, charges, encumbrances, rights, and interests of creditors and interest

holders except as provided in the Modified Plan.  As of and following the Effective Date,

the Reorganized Debtors may operate their businesses and use, acquire, and dispose of

property and settle and compromise Claims or Interests without supervision of the Court,

free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those

restrictions expressly imposed by the Modified Plan, the Master Disposition Agreement,

or this order.

18.    Release Of Liens.  Except as otherwise provided in the Modified

Plan, the MDA Documents, or this order, or in any contract, instrument, release, or other

agreement or document entered into or delivered in connection with the Modified Plan,

including the MDA Documents, on the Effective Date and/or concurrently with the

applicable distributions made pursuant to the Modified Plan, all mortgages, deeds of trust,

liens, or other security interests against the property of any Estate are fully released and

discharged (except as provided under the Modified Plan), and all right, title, and interest

of any holder of such mortgages, deeds of trust, liens, or other security interests,

including any rights to any collateral thereunder, shall revert to the applicable

Reorganized Debtor and its successors and assigns.

19.    Retained Assets. To the extent that the succession to assets of the

Debtors by the Reorganized Debtors pursuant to the Modified Plan constitute "transfers"

of property, such transfers of property to Reorganized Debtors (a) are or shall be legal,

valid, and effective transfers of property, (b) vest or shall vest the Reorganized Debtors

with good title to such property, free and clear of all liens, charges, Claims,

encumbrances, or Interests, except as expressly provided in the Modified Plan, the MDA

Documents, or this order, (c) do not and shall not constitute avoidable transfers under the

Bankruptcy Code or under applicable nonbankruptcy law, and (d) do not and shall not

subject the Reorganized Debtors to any liability by reason of such transfer under the

Bankruptcy Code or under applicable nonbankruptcy law, including, without limitation,

any laws affecting successor or transferee liability.

20.    Discharge, Releases, Limitations Of Liability, And

Indemnification.  Pursuant to applicable law, including sections 105(a) and 1123(b)(3)

and (6) of the Bankruptcy Code, the discharge of the Debtors and any of their assets or

properties provided in Article 11.2 of the Modified Plan, as approved herein, the releases

set forth in Articles 11.4, 11.5, 11.6, and 11.7 of the Modified Plan, and the exculpation

and limitation of liability provisions set forth in Article 11.11 of the Modified Plan, are

deemed incorporated in this order as if set forth in full herein and are hereby approved as

an integral part of the Modified Plan and are fair, equitable, reasonable and in the best

interests of the Debtors, their estates, and holders of Claims and Interests; provided,

however, notwithstanding anything in this order, the exculpation provisions or releases

provided pursuant to Article 11 of the Modified Plan shall have no effect on the liability

of any entity that otherwise would result from any action or omission to the extent that

such action or omission is determined in a final order to have constituted intentional fraud

or willful misconduct.

21.    Limitation on Releases.  None of the releases provided in the

Modified Plan, as modified herein, shall be applicable with respect to any of the Plan

Investors or their affiliates with respect to their obligations under the Investment

Agreement, the transactions contemplated thereby, or any litigation related thereto,

including any and all defendants to such actions.

22.    <u>Injunction</u>.  Except as otherwise specifically provided in the

Modified Plan, the MDA Documents, or this order and except as may be necessary to

enforce or remedy a breach of the Modified Plan, the Debtors and all Persons shall be

precluded and permanently enjoined on and after the Effective Date from (a)

commencing or continuing in any manner any Claim, action, employment of process, or

other proceeding of any kind with respect to any Claim, Interest, Cause of Action, or any

other right or Claim against the Reorganized Debtors, which they possessed or may

possess prior to the Effective Date, (b) the enforcement, attachment, collection, offset,

recoupment, or recovery by any manner or means of any judgment, award, decree, order,

or otherwise with respect to any Claim, Interest, Cause of Action, or any other right or

Claim against the Reorganized Debtors, which they possessed or may possess prior to the

Effective Date, (c) creating, perfecting, or enforcing any encumbrance of any kind with

respect to any Claim, Interest, Cause of Action, or any other right or Claim against the

Reorganized Debtors, which they possessed or may possess prior to the Effective Date,

and (d) asserting any Claims, Interests, or Causes of Action that are satisfied, discharged,

released, or subject to exculpation hereby or by the Modified Plan.

23.    <u>Automatic Stay</u>.  The stay in effect in the Chapter 11 Cases

pursuant to section 362(a) of the Bankruptcy Code shall continue to be in effect until the

Effective Date, and at that time shall be dissolved and of no further force or effect,

subject to the injunction set forth in the preceding paragraph and/or sections 524 and

1141 of the Bankruptcy Code and Article 11.14 of the Modified Plan; <u>provided</u>, <u>however</u>,

that nothing herein shall bar the filing of financing documents (including Uniform

Commercial Code financing statements, security agreements, leases, mortgages, trust

54

agreements, bills of sale, and applications for aircraft registration) or the taking of such

other actions as are necessary to effectuate the transactions specifically contemplated by

the Modified Plan, the MDA Documents, or this order prior to the Effective Date.

        24.    <u>Matters Relating To Implementation Of The Modified Plan;</u>

<u>General Authorizations</u>.  The approvals and authorizations specifically set forth in this

order are nonexclusive and are not intended to limit the authority of any Debtor or

Reorganized Debtor or any officer thereof to take any and all actions necessary or

appropriate to implement, effectuate, and consummate any and all documents or

transactions contemplated by the Modified Plan, the MDA Documents, or this order

pursuant to section 1142(b) of the Bankruptcy Code or otherwise.  In addition to the

authority to execute and deliver, adopt, assign, or amend, as the case may be, the

contracts, leases, instruments, releases, and other agreements to effectuate the Modified

Plan and the MDA Documents specifically granted in this order, the Debtors and the

Reorganized Debtors are authorized and empowered, without necessity of action of their

respective stockholders or boards of directors, to take any and all such actions as any of

their executive officers may determine are necessary or appropriate to implement,

effectuate, and consummate any and all documents or transactions contemplated by the

Modified Plan, the MDA Documents, including, without limitation, section 9.14, 9.15,

9.31, and 9.32 of the Master Disposition Agreement, or this order.  Pursuant to section

1142 of the Bankruptcy Code, no action of the stockholders or boards of directors of the

Debtors or the Reorganized Debtors shall be required for the Debtors or the Reorganized

Debtors to (a) enter into, execute and deliver, adopt, or amend, as the case may be, any of

the contracts, leases, instruments, releases, and other agreements or documents and plans

to be entered into, executed and delivered, adopted, or amended in connection with the

Modified Plan or the MDA Documents, and, following the Effective Date, each of such

contracts, leases, instruments, releases, and other agreements shall comprise a legal, valid,

and binding obligation of the applicable Reorganized Debtor and enforceable against

such Reorganized Debtor in accordance with its terms, (b) issue the common stock of

Reorganized DPH Holdings (upon such issuance, all such shares shall be duly and validly

authorized, issued, and outstanding, fully paid, nonassessable, free and clear of any

mortgage, lien, pledge, security interest, or other encumbrance of any kind, and not

subject to pre-emptive or similar rights of third parties) in accordance with the terms of

the Modified Plan, or (c) authorize the Reorganized Debtors to engage in any of the

activities set forth in this paragraph or otherwise contemplated by the Modified Plan or

the MDA Documents.  Each of the Chief Executive Officer and President, Chief

Financial Officer, Executive Directors—Restructuring, and General Counsel of the

Debtors, or their respective designees, as appropriate, shall be authorized and empowered

to execute, deliver, file, or record such contracts, instruments, releases, indentures, and

other agreements or documents, and take such actions as may be necessary or appropriate

to effectuate and further evidence the terms and conditions of the Modified Plan, the

MDA Documents, this order, and any and all documents or transactions contemplated by

the Modified Plan, the MDA Documents, or this order, all without further application to

or order of the Court and whether or not such actions or documents are specifically

referred to in the Modified Plan, the Disclosure Statement Supplement, the Modification

Procedures Order, this order, or the exhibits or appendices to any of the foregoing, and

the signature of such officer on a document shall be conclusive evidence of the officer's

determination that such document and any related actions are necessary and appropriate

to effectuate or further evidence, and are not in contravention of, the terms and conditions

of the Modified Plan, the MDA Documents, this order, or other documents or

transactions contemplated by the Modified Plan, the Master Disposition Agreement, or

this order.  The secretary or any assistant secretary of each Debtor or Reorganized Debtor,

as appropriate, is authorized and empowered, when required, to certify or attest to any of

the foregoing actions.

25.    <u>Directors And Officers Of Reorganized Reorganized DPH</u>
<u>Holdings</u>.  The Court approves the appointment of the initial director of Reorganized

DPH Holdings, as disclosed at the Modification Approval Hearing.

26.    <u>Approval Of Compensation Programs for Reorganized DPH</u>
<u>Holdings</u>.  Pursuant to section 1142(b) of the Bankruptcy Code, without further action by

the Court or the stockholders or board of directors of Reorganized DPH Holdings, and

without limiting the power or authority of Reorganized DPH Holdings, following the

Effective Date to take any and all such actions as may be permitted or required by

applicable nonbankruptcy law, Reorganized DPH Holdings shall be authorized, as of the

Effective Date, to effectuate the Management Compensation Plan.

27.    <u>Exemption From Certain Taxes And Recording Fees</u>.  Pursuant to

section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of any

security, or the making, delivery, filing, or recording of any instrument of transfer under,

or in connection with, the Modified Plan, including the MDA Documents, shall not be

taxed under any law imposing stamp tax or similar tax.  Furthermore, and without

limiting the foregoing, any transfers from a Debtor to a Reorganized Debtor or to any

other Person pursuant to the Modified Plan (including without limitation pursuant to the

MDA Documents), as contemplated by the Modified Plan or pursuant to the MDA

Documents or any agreement regarding the transfer of title to or ownership of any of the

Debtors' property in the United States, shall not be subject to any document recording tax,

stamp tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code

filing or recording tax, or other similar tax or governmental assessment to the fullest

extent provided in section 1146(c) of the Bankruptcy Code and the Modified Plan.  All

filing or recording officers (or any other Person with authority over any of the foregoing),

wherever located and by whomever appointed, shall comply with the requirements of

section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or

governmental assessment, and shall accept for filing and recordation any of the foregoing

instruments or other documents without the payment of any such tax or governmental

assessment.  The Court shall retain specific jurisdiction with respect to these matters.

28.    <u>Assumptions And Assignments.</u>  The executory contract and

unexpired lease provisions of Article VIII of the Modified Plan are approved.  Except

with respect to those executory contracts and unexpired leases relating to objections (the

"Section 365 Objections") to be adjourned to the hearing scheduled for August 17, 2009

as set forth herein, all executory contracts and unexpired leases as to which any of the

Debtors is a party shall be deemed automatically assumed or assumed and assigned in

accordance with the provisions and requirements of sections 365 and 1123 of the

Bankruptcy Code as of the Effective Date, unless such executory contracts or unexpired

leases (i) shall have been previously rejected by the Debtors by Final Order of the

Bankruptcy Court, (ii) shall be the subject of a motion to reject, or that otherwise seeks

rejection, filed on or before the Modification Approval Date, (iii) shall be rejected or

assumed pursuant to a motion to sell or transfer property or assets filed by the Debtors

prior to the Effective Date, (iv) shall have expired or terminated on or prior to the

Effective Date (and not otherwise extended) pursuant to their own terms, (v) are listed on

the schedule of rejected contracts on Plan Exhibit 8.1(a), as amended or supplemented, or

(vi) are otherwise rejected pursuant to the terms of Modified Plan and/or upon the

direction of either Buyer pursuant to the MDA Documents.  Each of the Assumed

Contracts and Leases shall be assumed or assumed and assigned only to the extent that

any such contract or lease constitutes an executory contract or unexpired lease.  Listing a

contract or lease on Plan Exhibit 8.1(a), as amended or supplemented, shall not constitute

an admission by a Debtor or Reorganized Debtor that such contract or lease is an

executory contract or unexpired lease or that a Debtor or Reorganized Debtor has any

liability thereunder.

29.    <u>Material Supply Agreement Cure Procedures</u>.

(a)    This order shall constitute an order approving the

assumptions described in Article 8.1 and 8.2(a) of the Modified Plan, pursuant to section

365 of the Bankruptcy Code, which assumption shall be effective as of the Effective Date.

With respect to reconciling the amount of Cure, the procedures set forth in the

Solicitation Procedures Order, as modified by the Confirmation Order and subsequently

modified by the Modification Procedures Order, and implemented in accordance

therewith, shall control and accordingly, Cure shall be equal to (i) subject to modification

by written agreement between the Debtors and the applicable counterparty to reduce the

allowed Cure amount, the amount set forth on the Cure Amount Notice, to the extent that

no proper and timely objection was filed in accordance with the procedures approved by
this Court, unless the Debtors sent an Amended Cure Amount Notice (as defined in the
Modification Procedures Order) to an applicable counterparty in which case Cure shall be
determined pursuant to the procedures set forth in the Modification Procedures Order, or
(ii) to the extent a proper and timely objection to the Cure Amount Notice and Cure
Amount Proposal was filed in accordance with the procedures approved by this Court, (a)
the amount agreed to between the Debtors or Reorganized Debtors and the applicable
counterparty or, (b) to the extent no such agreement was or is reached, such other amount
as ordered by the Bankruptcy Court. Counterparties shall assert any claims for defaults of
Material Supply Agreements accruing after June 1, 2009 and shall file and serve such
claims before the Administrative Claims Bar Date in accordance with this order and as
otherwise set forth in Articles 10.2 and 10.5 of the Modified Plan.

(b)    If the counterparty responded to the Cure Amount Notice in
accordance with the procedures set forth in the Solicitation Procedures Order, as
modified by the Confirmation Order, or if the counterparty responded to the Amended
Cure Amount Notice in accordance with the procedures approved in the Modification
Procedures Order, and the counterparty asserted a dispute regarding (x) the nature or
amount of any Cure, (y) the ability of the Reorganized Debtor or any assignee to provide
"adequate assurance of future performance" (within the meaning of section 365 of the
Bankruptcy Code) under the contract to be assumed, or (z) any other matter pertaining to
assumptions, then the Cure shall be paid, honored, or otherwise occur following the later
of a reasonable period of time following the Effective Date if the dispute is resolved
consensually between the applicable counterparty and the Debtors or Reorganized

60

Debtors, or a reasonable period of time following the entry of a Final Order adjudicating

the dispute and approving the assumption and assignment of such Material Supply

Agreement; provided that if there is a dispute as to the amount of Cure or adequate

assurance that cannot be resolved consensually among the applicable counterparty and

the Debtors, Reorganized Debtors, or the Purchasing Entities then notwithstanding

anything to the contrary herein, in the Confirmation Order, or in the Modification

Procedures Order, the Debtors or Reorganized Debtors, shall have the right (and shall do

so if directed by a Purchasing Entity pursuant to the terms of the MDA Documents) to

reject the contract or lease for a period of six days after entry of a Final Order

establishing (a) a Cure amount in excess of that provided by the Debtors or (b) adequate

assurance on terms not reasonably acceptable to the Debtors or Reorganized Debtors and

the assignee, if applicable, of such Material Supply Agreement.  To the extent disputed

Cure amounts have not been resolved prior to the Effective Date, each Purchasing Entity

shall establish an escrow account funded with Cash sufficient to pay the face amount of

the disputed Cure asserted with respect to any Material Supply Agreement to be assigned

to such Purchasing Entity pursuant to the MDA Documents.  Any delay in approval of

the assignability of the contracts to be assumed or the amount of Cure shall not affect the

closing of the Disposition Transactions or the Effective Date of the Modified Plan.  If the

non-Debtor counterparty to the Material Supply Agreement did not respond to the Cure

Amount Notice in accordance with the Solicitation Procedures Order, or even if

responded, did not dispute the Cure amount set forth in the Cure Amount Notice or did

not dispute the Cure amount set forth in the Amended Cure Amount Notice, then Cure

shall be paid in the amount set forth in the Cure Amount Notice or Amended Cure

Amount Notice, as applicable, within a reasonable period of time following the Effective

Date.

30.     <u>Form Of Cure Payments</u>.  Notwithstanding anything to the

contrary in the Solicitation Procedures Order, as modified by the Confirmation Order,

and supplemented by the Modification Procedures Order, or other prior orders of this

Court, absent a consensual agreement between the Debtors and the applicable

counterparty, each counterparty to a Material Supply Agreement shall be paid in cash for

the Cure of monetary defaults under a Material Supply Agreement assumed pursuant to

the Modified Plan and the MDA Documents.

31.     <u>Payments Related To Assumption Of Other Executory Contracts</u>

<u>And Unexpired Leases</u>.

(a)     This order shall constitute an order approving the

assumptions described in Articles 8.1 and 8.2 of the Modified Plan, pursuant to section

365 of the Bankruptcy Code, as of the Effective Date.  All Cure payments will be made

in connection with the procedures adopted by the Confirmation Order as modified herein.

The provisions (if any) of each Other Executory Contract or Other Unexpired Lease to be

assumed under the Modified Plan which are or may be in default shall be satisfied solely

by Cure.  Pursuant to Article 8.2(b) of the Modified Plan, as confirmed on January 25,

2008, any counterparty to an Other Executory Contract or Other Unexpired Lease who

wished to assert that Cure is required as a condition to assumption must have filed and

served a proposed cure proposal (a "Cure Proposal") so as to be received by the Debtors

and their counsel at the address set forth in Article 14.8 of the Modified Plan by March

10, 2008 (the "Cure Proposal Submission Deadline"), after which the Debtors had until

April 24, 2008, to file any objections thereto (the "Cure Proposal Objections").

(b)    The Debtors or Reorganized Debtors shall have the right to

amend, modify, or supplement the Cure Proposal Objections.  Counterparties to an Other

Executory Contract or Other Unexpired Lease which failed to file and serve a Cure

Proposal by the Cure Proposal Submission Deadline in accordance with the procedures

set forth in the Confirmed Plan, shall each be deemed to have waived its right to assert a

default requiring Cure and any default existing as of January 25, 2008 shall have been

deemed cured as of the day following the Cure Proposal Submission Deadline and such

party shall forever be barred from asserting against the Debtors or the Reorganized

Debtors, as applicable, a claim that arose on or prior to the Cure Proposal Submission

Deadline; provided, however, that with respect to Cure amounts owed to counterparties

whose Cure would have received the treatment set forth in Class B (Flow Through

Claims) in the Confirmed Plan and such counterparties objected to the Modified Plan or

to the assumption and assignment related notices received, then such counterparties shall

have the right to prosecute their objection at a subsequent hearing scheduled to address

the Section 365 Objections as provided herein.  Counterparties shall assert any claims for

defaults of Other Executory Contracts or Other Unexpired Leases accruing after the Cure

Proposal Submission Deadline as Administrative Claims and shall file and serve such

claims before the Administrative Claims Bar Date in accordance with this order and as

otherwise set forth in Articles 10.2 and 10.5 of the Modified Plan.  If a counterparty

included an assertion in its timely filed and served Cure Proposal disputing (i) the nature

or amount of any Cure, (ii) the ability of any Reorganized Debtor, or any assignee to

provide "adequate assurance of future performance" (within the meaning of section 365

of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other

matter pertaining to assumption, or if there is a Cure Proposal Objection, then the

disputed matter shall be set for hearing in the Bankruptcy Court, which hearing shall be

scheduled for an available claims hearing date following 20 days' notice provided by the

Debtors or the Reorganized Debtors, as applicable, to the applicable counterparty, or such

other date as may be agreed upon, subject to the Debtors' right to adjourn the hearing

upon three days' written notice to the Court and the applicable counterparty, and Cure, if

any, shall be paid, honored, or otherwise occur following the earlier of a consensual

resolution or the entry of a Final Order of the Bankruptcy Court resolving the dispute and

approving the assumption or assumption and assignment, as the case may be; provided,

however, that if there is a dispute as to the amount of Cure or regarding adequate

assurance that cannot be resolved consensually among the parties, notwithstanding

anything to the contrary herein or in the Confirmation Order, the Debtors shall have the

right (and shall do so if directed by a Purchasing Entity pursuant to the terms of the MDA

Documents) to reject the contract or lease for a period of six days after entry of a Final

Order establishing (a) a Cure amount in excess of that asserted by the Debtors or (b)

adequate assurance on terms not reasonably acceptable to the Debtors or the Reorganized

Debtors, as the case may be, and the assignee of such contract or lease.  To the extent the

disputed Cure amounts have not been resolved prior to the Effective Date, each

Purchasing Entity shall establish an escrow account funded with Cash sufficient to pay

the face amount of the disputed Cure asserted with respect to any Other Executory

Contract or Other Unexpired Lease to be assigned to such Purchasing Entity pursuant to

the MDA Documents.  Any delay in approval of the assignability of the contracts to be

assumed or the amount of Cure shall not affect the closing of the Disposition

Transactions or the Effective Date of the Modified Plan.

(c)     Except as otherwise provided in Article VIII of the

Modified Plan, to the extent a Cure Proposal was timely filed and served and is not

disputed, the Debtors or Reorganized Debtors, as the case may be, shall pay the Cure

Proposal, if any, to the counterparty within a reasonable period of time following the

Effective Date.  Disputed Cure Proposals or any other disputes regarding Cure or the

assumption or assumption and assignment of an Other Executory Contract or Other

Unexpired Lease that are resolved consensually or by agreement or Final Order shall be

paid or otherwise honored by the Debtors or the Reorganized Debtors, as applicable, by

the later of a reasonable period of time following the Effective Date and a reasonable

period of time following such agreement or Final Order.

32.     Other Executory Contracts And Unexpired Leases Assigned To

Buyers.  Counterparties to Other MDA Assumed Contracts which failed to file and serve

an objection to the MDA Assumption and Assignment Notice by the deadline set forth in

the Modification Procedures Order, or those that failed to object to adequate assurance of

the Purchasing Entity within 10 days of service of the notice that certain contracts will be

assumed by the Debtors and assigned to the Purchasing Entity (the "New Purchaser

Assumption and Assignment Notice"), shall each be deemed to have waived their right to

challenge the Debtors' or the Reorganized Debtors' assignment of such contract or lease

and shall be barred from challenging the ability of any Debtor or Reorganized Debtor, as

the case may be, or the respective Purchasing Entity or its assignee to provide "adequate

assurance of future performance" (within the meaning of section 365 of the Bankruptcy

Code) under the contract or lease to be assumed and assigned, and shall be barred from

making any other challenge pertaining to assumption and assignment.  If there is an

objection to the MDA Assumption and Assignment Notice or an adequate assurance

objection to the New Purchaser Assumption and Assignment Notices (other than an

objection cast by any of the Debtors' unions) and the parties cannot consensually resolve

their dispute, then the disputed matter shall be set for hearing on August 17, 2009, at

10:00 a.m. (prevailing Eastern time), subject to further adjournment by the Debtors at

least three days prior to such hearing upon notice to the Court and the applicable

counterparty.  Once adjourned, such objection shall be scheduled for an available hearing

date following 20 days' notice provided by the Debtors or the Reorganized Debtors, as

applicable, to the applicable counterparty, or such other date as may be agreed upon,

subject to further adjournment by the Debtors at least three days prior to such hearing

upon notice to the Court and the applicable counterparty and Cure, if any, shall be paid,

honored, and otherwise occur following the entry of a Final Order of the Bankruptcy

Court resolving the dispute and approving the assumption or assumption and assignment,

as the case may be; provided, however, notwithstanding anything to the contrary herein

or in the Confirmation Order, the Debtors or Reorganized Debtors, as the case may be,

shall have the right to reject the contract or lease for a period of six days after entry of a

Final Order establishing Cure (and shall if directed by a Purchasing Entity pursuant to the

terms of the MDA Documents) or adequate assurance on terms not reasonably acceptable

to the Debtors or Reorganized Debtors, as applicable, and the assignee.  To the extent the

disputed Cure amounts have not been resolved prior to the Effective Date, each

Purchasing Entity shall establish an escrow account funded with Cash sufficient to pay

the face amount of the disputed Cure asserted with respect to any other MDA Assumed

Contracts to be assigned to such Purchasing Entity pursuant to the MDA Documents.

Any delay in approval of the assignability of the contracts to be assumed or the amount of

Cure shall not affect the closing of the Disposition Transactions or the Effective Date of

the Modified Plan.  Notwithstanding anything to the contrary in Article 8.2(c) of the

Modified Plan, Article 8.2(b)(ii) of the Modified Plan shall control with respect to Cure

amounts related to Other MDA Assumed Contracts.

        33.     <u>Settlement of Cure Amounts</u>.  Notwithstanding anything to

contrary herein, for settlements of disputed Cure amounts following entry of this order

where the settlement amount agreed to between the Debtors or the Reorganized Debtors,

as applicable, and the applicable counterparty is (a) greater than $200,000 and (b) the

agreed settlement amount is greater than or equal to 110% of the amount set forth on the

applicable Cure notice, then the Debtors or the Reorganized Debtors, as applicable, shall

serve by fax or electronic mail a written notice (the "Notice") of the agreed settlement

upon the designated representative of the applicable Buyer (the "Buyer Cure Designee").

If no written objection to the Notice (served by fax or electronic mail) is received by the

Debtors or the Reorganized Debtors, as applicable, within four business days after service

of the Notice, the Debtors or the Reorganized Debtors, as applicable, shall be authorized

to consummate the proposed settlement without further order of the Court or consent of

any other party.  Each Buyer shall designate its Buyer Cure Designee by serving a written

notice by fax or electronic mail upon the Debtors within three business days after this

order is entered by the Court.

34.    <u>Payments Related To Assumption Of Intercompany Executory Contracts And Intercompany Unexpired Leases</u>.  Any Claim relating to and outstanding at the time of assumption of an Intercompany Executory Contract or an Intercompany Unexpired Lease shall be Reinstated or shall be otherwise satisfied in a manner to be agreed upon by the relevant Debtors and/or non-Debtor Affiliates or Purchasing Entity.

35.    <u>Assignment Pursuant To Restructuring Transactions</u>.  To the extent that a Debtor that is party to an executory contract or unexpired lease is to be merged or liquidated as part of a Restructuring Transaction, the non-Debtor parties to such executory contract or unexpired lease shall, upon assumption as contemplated in the Modified Plan, be deemed to have consented to the assignment of such executory contract or unexpired lease to the Reorganized Debtor that is the surviving entity after such Restructuring Transaction.

36.    <u>Rejections</u>.  As provided in Article 8.1 of the Modified Plan, all executory contracts or unexpired leases shall be assumed or assumed and assigned by the Reorganized Debtors; <u>provided</u>, <u>however</u>, that any contract or lease set forth on Plan Exhibit 8.1(a), as amended or supplemented, (the "Rejected Contracts and Leases") shall be rejected pursuant to section 365 of the Bankruptcy Code.  All of the Rejected Contracts and Leases shall be rejected only to the extent that any such contract or lease constitutes an executory contract or unexpired lease.  This order shall constitute an order approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

37.    <u>Assignment Of Postpetition Contracts, Leases, And Purchase Orders To Buyers</u>.  The Debtors' postpetition contracts, leases, and purchase orders shall

remain in full force and effect and shall be assignable pursuant to their terms and under

applicable law.  To the extent postpetition contracts, leases, or purchase orders supersede

or replace expired or otherwise terminated prepetition contracts, leases, or purchase

orders, the non-Debtor parties to such postpetition contracts, leases, or purchase orders

shall not be entitled to Cure for defaults arising under the expired or otherwise terminated

prepetition contract, lease, or purchase order, regardless of whether such postpetition

contract, lease, or purchase order is identified by the same reference number or contract

number as the expired or otherwise terminated prepetition contract, lease, or purchase

order.

        38.   <u>Unscheduled Contracts and Leases</u>. Notwithstanding anything to

the contrary in the Master Disposition Agreement, in addition to those prepetition

executory contracts and unexpired leases that are identified on Schedule 9.3 to the Master

Disposition Agreement, the following executory contracts and unexpired leases, subject

to the dispute procedures set forth herein (including, without limitation, the rejection

rights), are being assumed and assigned to the applicable Buyer:  (a) all executory

prepetition contracts and unexpired leases that are the subject of an objection based upon

a Notice of Non-Assumption (as defined in the Modification Procedures Order) if it is

ultimately determined that, as of the Effective Date, such (i) contracts are executory and

prepetition or (ii) leases are unexpired and prepetition; and (b) all executory contracts that

are, or become, the subject of an objection based upon an MDA Assumption and

Assignment Notice or New Purchaser Assumption and Assignment Notice and that are

ultimately determined, as of the Effective Date, to be executory and prepetition.

39.    For the avoidance of doubt, the claims that are the subject of the objections described in paragraph 38 hereof shall be treated as disputed and shall be subject to the procedures for resolution, adjudication, and/or rejection, as applicable, and as set forth herein.

40.    <u>Objections To Assumption And Assignment Not Addressed At Final Modification Hearing</u>.

(a)    Assumption, or assumption and assignment, of the executory contracts and unexpired leases covered by the Section 365 Objections, except to the extent that any objection was expressly considered and ruled on at the Plan Modification Hearing, shall be subject to further approval by the Court. The hearing on the Section 365 Objections, objections to the notices sent to counterparties pursuant to the Modification Procedures Order, including without limitation the Amended Cure Amount Notice and the Notice of Non-Assumption and any objections to the New Purchaser Assumption and Assignment Notice not addressed by this order shall be held on August 17, 2009, at 10:00 a.m. (prevailing Eastern time), subject to further adjournment by the Debtors at least three days prior to such hearing upon notice to the Court and the applicable counterparty. Once adjourned, such objection shall be scheduled for an available hearing date following 20 days' notice provided by the Debtors or the Reorganized Debtors, as applicable, to the applicable counterparty, or such other date as may be agreed upon, subject to further adjournment by the Debtors at least three days prior to such hearing upon notice to the Court and the applicable counterparty.

(b)    Notwithstanding any outstanding Section 365 Objections, the Debtors are hereby authorized and directed in accordance with sections 105(a), 363(b)

70

and 365 of the Bankruptcy Code and the terms of the MDA Documents to (a) assume and

assign to the Purchasing Entities, upon the Effective Date, the Acquired Contracts free

and clear of all Property Interests of any kind or nature whatsoever other than the

Assumed Liabilities and any other liabilities specifically assumed under the Master

Disposition Agreement or assumed and assigned pursuant to paragraphs 38 and 61 of this

order, and (b) execute and deliver to the Purchasing Entities such documents or other

instruments as the Purchasing Entities deem may be necessary to assign and transfer the

Acquired Contracts and Assumed Liabilities to the Purchasing Entities.

        (c)      For the avoidance of doubt, the assertion of an outstanding

Cure amount or a challenge to adequate assurance by a counterparty to a prepetition

executory contract or unexpired lease who did not receive any Cure and/or assumption

and assignment related notice prior to the Modification Approval Date, and  provided that

such asserted Cure amount or challenge is not otherwise barred by this order or a prior

order of this Court, shall be treated as disputed and shall be subject to the procedures for

resolution, adjudication, and/or rejection, as applicable, and as set forth herein.

        41.    <u>Freely Assignable</u>.  Any provisions in any Acquired Contract that

prohibit or condition the assignment of such Acquired Contract or allow the non-Debtor

party to such Acquired Contract to terminate, recapture, impose any penalty, condition

renewal or extension, or modify any term or condition upon the assignment of such

Acquired Contract, constitute unenforceable anti-assignment provisions which are void

and of no force and effect; <u>provided</u>, <u>however</u> if any contract, permit, or other asset of the

Department of Defense, the General Services Administration, the Department of Energy

or any other department or agency of the United States designated by the President,

which by the terms of the Modified Plan is intended to be included in the GM Acquired

Assets or Company Acquired Assets, is determined under 41 U.S.C. § 15 incapable of

being assigned or transferred (whether pursuant to Sections 363 or 365 of the Bankruptcy

Code) to the Purchasing Entities upon the Effective Date without the consent of another

party thereto, the issuer thereof or any third party, the Modified Plan shall not constitute

an assignment thereof, or an attempted assignment thereof, unless and until any such

consent is obtained.

42.    <u>Assignment Of Real Property Leases</u>.  Upon the Effective Date, in

accordance with sections 363(b) and 365 of the Bankruptcy Code, the Purchasing Entities

shall be fully and irrevocably vested in all right, title and interest of each Acquired

Contract.  Notwithstanding any outstanding Section 365 Objections, any portions of the

property leases with respect to any of the Leased Real Property (as defined in the Master

Disposition Agreement) which purport to permit the landlords thereunder to cancel the

remaining term of any of such leases if Sellers (as defined in the Master Disposition

Agreement) discontinue their use or operation of the Leased Real Property are void and

of no force and effect, and shall not be enforceable against the Purchasing Entities, its

assignees and sublessees, and the landlords under such leases shall not have the right to

cancel or otherwise modify such leases or increase the rent, assert any Claim, or impose

any penalty by reason of such discontinuation, Sellers' cessation of operations, the

assignment of such leases to the Purchasing Entities, or the interruption of business

activities at any of the leased premises.

43.    <u>No Defaults</u>.  Following the Effective Date, each non-Debtor party

to an Acquired Contract will be forever barred, estopped, and permanently enjoined from

asserting against the Debtors or the Purchasing Entities, or the property of any of them,

any default, counterclaim, defense, setoff, or any other Claim asserted or assertable

against the Debtors (a) arising prior to or existing as of the Effective Date with respect to

any prepetition periods, except for Cure, (b) arising after the commencement of the

chapter 11 cases but on or prior to June 1, 2009, except for such defaults as were asserted

in an administrative expense claim filed against the Debtors on or prior to July 15, 2009

in accordance with the administrative claims procedures set forth in the Modification

Procedures Order, and (c) arising after June 1, 2009 but on or prior to the Effective Date,

except for such defaults as are asserted in an administrative claim filed in accordance

with Article 10.5 of the Modified Plan.  The failure of the Debtors or the Purchasing

Entities to enforce at any time one or more terms or conditions of any Acquired Contract

shall not be a waiver of such terms or conditions or of the Debtors' and the Purchasing

Entities' rights to enforce every term and condition of the Acquired Contracts.

44.    <u>Bar Date For Rejection Damage Claims And Related Procedures</u>.

If the rejection by the Debtors, pursuant to the Modified Plan or otherwise, of an

executory contract or unexpired lease results in a Claim, then such Claim shall be forever

barred and shall not be enforceable against either the Debtors, the Reorganized Debtors,

or such entities' properties unless a proof of claim is filed with the Claims Agent and

served upon counsel to the Debtors and the Creditors' Committee within 30 days after the

later of (a) entry of this order or (b) notice that the executory contract or unexpired lease

has been rejected, unless otherwise ordered by the Court.

45.    <u>Record Date For Claims Distributions</u>.  The Reorganized Debtors,

the Disbursing Agent, the Indenture Trustees (as agent or Servicer as described in Section

9.5 of the Modified Plan), and the Servicers shall have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after June 8, 2009 (the "Claims Record Date"), and shall be entitled for all purposes herein to recognize and distribute only to those holders of Allowed Claims who are holders of such Claims, or participants therein, as of the Claims Record Date.  The Reorganized Debtors, the Disbursing Agent, the Indenture Trustees (as agent or Servicer as described in Section 9.5 of the Modified Plan), and the Servicers shall instead be entitled to recognize and deal for all purposes under the Modified Plan with only those record holders stated on the official claims register or the transfer ledger, as the case may be, as of the Claims Record Date.  On the Claims Record Date, the transfer ledgers of the Indenture Trustees or other agents or Servicers shall be closed, and there shall be no further changes in the record holders of securities.  The Reorganized Debtors, the Disbursing Agent, the Indenture Trustees (as agent or Servicer as described in Section 9.5 of the Modified Plan), and the Servicers shall have no obligation to recognize any transfer of the Senior Notes, the TOPrS, or the Subordinated Notes occurring after the Claims Record Date.  The Reorganized Debtors, the Disbursing Agent, the Indenture Trustees (as agent or Servicer as described in Section 9.5 of the Modified Plan), and Servicers shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the Claims Record Date, provided, however, that with respect to deceased record holders, the Indenture Trustee (as agent or Servicer as described in Section 9.5 of the Modified Plan) shall be authorized, but not directed, to recognize transfers to the appropriate heir, executor, or otherwise, following provision of notice together with such evidence of the transfer to the appropriate Indenture Trustee as is

reasonably satisfactory to the applicable Indenture Trustee. Such notice shall be effective

only as to distributions due at least 60 days after such notice is accepted as satisfactory by

the applicable Indenture Trustee. Nothing in this paragraph shall be applicable with

respect to any claims held by the DIP Lenders or the DIP Agent.

46.    <u>Substantial Contribution Compensation And Expenses Bar Date</u>.

Any Person (including the Indenture Trustees) who requests compensation or expense

reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to

sections 503(b)(3), (4), and (5) of the Bankruptcy Code shall file an application with the

Court on or before the 45th day after notice of the Effective Date is filed on the docket of

the Chapter 11 Cases (the "503 Deadline"), and serve such application on counsel for the

Debtors, the Creditors' Committee, the United States Trustee for the Southern District of

New York, and such other parties as may be directed by the Court and the Bankruptcy

Code on or before the 503 Deadline, or be forever barred from seeking such

compensation or expense reimbursement.

47.    <u>Other Administrative Claims</u>. All other requests for payment of an

Administrative Claim (other than as set forth in the Modified Plan or otherwise

contemplated by the Master Disposition Agreement, i.e., for such claims arising on or

after June 1, 2009) must be filed, in substantially the form of the Administrative Claim

Request Form attached as Exhibit 10.5 to the Modified Plan, with the Claims Agent and

served on counsel for the Debtors and the Creditors' Committee no later than 30 days

notice of after the Effective Date is filed on the docket of the Chapter 11 Cases. Any

request for payment of an Administrative Claim pursuant to this paragraph that is not

timely filed and served shall be disallowed automatically without the need for any

objection from the Debtors or the Reorganized Debtors.  The Debtors or the Reorganized

Debtors may settle an Administrative Claim without further Bankruptcy Court approval.

Unless the Debtors or the Reorganized Debtors object to an Administrative Claim within

180 days after the Administrative Claims Bar Date (unless such objection period is

extended by the Bankruptcy Court), such Administrative Claim shall be deemed allowed

in the amount requested.  In the event that the Debtors or the Reorganized Debtors object

to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of

such Administrative Claim.

      48.    Substantive Consolidation.  For the reasons described in IV.C. of

the Supplemental Disclosure Statement and the evidence and arguments made, proffered,

or adduced at the Confirmation Hearing, certain of the Debtors' estates shall be

substantively consolidated as set forth in Article III of the Modified Plan, solely for the

purposes of voting on the Modified Plan and making distributions to holders of Claims

and Interests under the Modified Plan.

      49.    Restructuring Transactions.  The Restructuring Transactions

contemplated by Article 7.3 of the Modified Plan and described in Exhibit 7.3 to the

Modified Plan are approved. The Debtors and Reorganized Debtors and their officers are

authorized to take, on and after the Modification Approval Date, such actions as may be

necessary and appropriate to effectuate the relevant Restructuring Transactions, including,

without limitation, executing such documents as may be reasonably required in order to

effectuate the Restructuring Transactions.  Each and every federal, state, and local

governmental agency or department is hereby directed to accept for filing and recording

any and all documents and instruments necessary or appropriate to consummate the transactions contemplated by the Restructuring Transactions.

50.    <u>Resolution Of Claims</u>.  Except as otherwise ordered by the Court, any Claim that is not an Allowed Claim shall be determined, resolved, or adjudicated in accordance with the terms of the Modified Plan.  The Debtors or Reorganized Debtors, as the case may be, may (a) until 120 days after the Effective Date (unless extended by order of the Court for cause) file objections to the allowance of any Claim (whether or not a proof of Claim has been filed) and/or (b) amend their Schedules at any time before their Chapter 11 Cases are closed.

51.    <u>Distribution Reserve</u>.  In accordance with the Modified Plan, the Debtors shall establish one or more Distribution Reserves for the purpose of effectuating distributions to holders of Disputed Claims pending the allowance or disallowance of such claims or interests.

52.    <u>Authorization To Consummate Modified Plan</u>.  Notwithstanding Bankruptcy Rule 3020(e), but subject to Articles 12.2 and 12.3 of the Modified Plan, the Court authorizes the Debtors to consummate the Modified Plan upon entry of this order. The Debtors are authorized to execute, acknowledge, and deliver such deeds, assignments, conveyances, and other assurances, documents, instruments of transfer, Uniform Commercial Code financing statements, trust agreements, mortgages, indentures, security agreements, and bills of sale and to take such other actions as may be reasonably necessary to perform the terms and provisions of the Modified Plan, all transactions contemplated by the Modified Plan, and all other agreements related thereto.

53.    <u>Dismissal Of Complaints</u>.  Upon the Effective Date of the

Modified Plan, the proceedings initiated by the Creditors' Committee and the Senior

Notes Indenture Trustee for the revocation of the Confirmation Order shall be closed and

the complaints seeking relief therefor shall be dismissed as moot.

54.    <u>MDL Settlements</u>.  Notwithstanding paragraph 50 of the

Confirmation Order, nothing in this order shall be construed to render null and void or

otherwise affect the force and effect of any settlements or orders approving the Multi-

District Litigation Settlements entered by the United States District Court for the Eastern

District of Michigan.

55.    <u>Extension Of Voting Deadline</u>.  Pursuant to the Modification

Procedures Order, as it incorporates paragraph 31(i) of the December 10 Solicitation

Procedures Order, the Debtors were authorized to extend the Voting Deadline for holders

of claims in Class C-2 and Class D until Monday, July 20, 2009 at 10:00 a.m. prevailing

Eastern time.  The votes cast by holders of claims in Class C-2 and Class D were timely

submitted in accordance with the procedures approved by this Court.

56.    <u>Retention Of Jurisdiction</u>.  Pursuant to sections 105(a) and 1142 of

the Bankruptcy Code, and notwithstanding the entry of this order or the occurrence of the

Effective Date, but subject to the jurisdiction provisions of the MDA Documents, the

Court shall retain exclusive jurisdiction as provided in the Modified Plan over all matters

arising out of, and related to, the Chapter 11 Cases and the Modified Plan to the fullest

extent permitted by law, including, among other items and matters, jurisdiction over

those items and matters set forth in Article XIII of the Modified Plan.  This Court retains

jurisdiction to enforce and implement the terms and provisions of this order, the MDA

78

Documents, all amendments thereto, any waivers and consents thereunder, and of each of

the agreements executed in connection therewith in all respects including, but not limited

to, retaining jurisdiction to (a) compel delivery of the Acquired Assets and Sale Securities

to the Purchasing Entities, (b) compel delivery of the purchase price or performance of

other obligations owed by or to the Debtors, (c) resolve any Section 365 Objections, (d)

resolve any disputes arising under or related to the MDA Documents, (f) interpret,

implement, and enforce the provisions of this order, and (f) protect the Purchasing

Entities against the assertion of any Property Interests against the Acquired Assets and

Sale Securities of any kind or nature whatsoever.

       57.    <u>References To Modified Plan Provisions</u>.  The failure to include or

specifically reference any particular provision of the Modified Plan in this order shall not

diminish or impair the effectiveness of such provision, it being the intent of the Court that

the Modified Plan be confirmed in its entirety.  The provisions of the Modified Plan and

of this order shall be construed in a manner consistent with each other so as to effect the

purposes of each; <u>provided</u>, <u>however</u>, that if there is determined to be any inconsistency

between any Modified Plan provision and any provision of this order that cannot be so

reconciled, then, solely to the extent of such inconsistency, the provisions of this order

shall govern and any such provision of this order shall be deemed a modification of the

Modified Plan and shall control and take precedence.  Notwithstanding the foregoing, in

the event there are any conflicts between the terms and provisions of the Modified Plan

or this order and the Delphi-GM Global Settlement Agreement, the terms of the Delphi-

GM Global Settlement Agreement shall govern.

58.    <u>Separate Modification Approval Orders</u>.  This order is and shall be deemed a separate Order with respect to each of the Debtors in each Debtors' separate Chapter 11 Case for all purposes.  The Clerk of the Court is directed to file and docket this order in the Chapter 11 Case of each of the Debtors.

59.    <u>Notice Of Modification Approval Order And Occurrence Of Effective Date</u>.  On or before the fifth Business Day following the occurrence of the Effective Date, the Debtors shall serve notice of this order and occurrence of the Effective Date pursuant to Bankruptcy Rules 2002(f)(7), 2002(k), and 3020(c) on all holders of Claims and Interests, the United States Trustee for the Southern District of New York, and other parties-in-interest, by causing a notice of this order and the occurrence of the Effective Date in substantially the form of the notice annexed hereto as <u>Exhibit B</u>, which form is hereby approved (the "Notice of Effective Date"), to be delivered to such parties by first class mail, postage prepaid; <u>provided</u>, <u>however</u>, that notice need not be given or served under the Bankruptcy Code, the Bankruptcy Rules, or this order to any Person to whom the Debtors mailed a notice of the Bar Date or Modification Approval Hearing, but received such notice returned marked "undeliverable as addressed," "moved - left no forwarding address," "forwarding order expired," or similar marking, unless the Debtors have been informed in writing by such Person of that Person's new address.  The notice described herein is adequate under the particular circumstances of the Chapter 11 Cases, and no other or further notice is necessary. Notwithstanding the foregoing, pursuant to Bankruptcy Rule 2002(l), the Debtors shall be deemed to have satisfied the requirements of Bankruptcy Rule 2002(f)(7) with respect to any Claimholder who does not reside in the United States by publishing the Notice of

80

Effective Date in the Wall Street Journal (national, European, and Asian editions), the

New York Times (National Edition), and USA Today (worldwide), within 15 Business

Days of the Effective Date.

        60.     PBGC Settlement Agreement.

        (a)     The Delphi-PBGC Settlement Agreement is hereby

authorized and approved pursuant to section 1123(b)(3) of the Bankruptcy Code.  The

Debtors are authorized, but not directed, to enter into the Delphi-PBGC Settlement

Agreement and to perform in accordance with its terms, including to enter into or cause

the entry into such other documentation as may be reasonably necessary to effectuate the

terms of the Delphi-PBGC Settlement Agreement, including the execution and delivery

of termination and trusteeship agreements and any and all waivers, releases, discharges,

exculpations, or other agreements or documents.  Section 4042 of ERISA, 29 U.S.C. §

1342, authorizes PBGC to seek termination of a pension plan upon making certain

findings notwithstanding the provisions of a collective bargaining agreement and further

permits the PBGC and the plan administrator to agree to termination of a plan without an

adjudication.  Section § 4041(a)(3) of ERISA, 29 U.S.C. § 1341(a)(3).  Upon the

effectiveness of the Delphi-PBGC Settlement Agreement, all liabilities relating to unpaid

contributions to the Pension Plans shall be released or discharged as set forth therein.

        (b)     The Court finds that the Debtors may enter into such

agreements with respect to the Delphi HRP or the Bargaining Plan (as defined in the

Delphi-PBGC Settlement Agreement) without violating the Labor MOUs or other

applicable collective bargaining agreements, the Union 1113/1114 Settlement Approval

Orders, section 1113(f) of the Code or any other applicable law, and the Court expressly

authorizes the Debtors to do so. Nothing in this order prohibits employees or unions

adversely affected by any plan termination from (a) seeking to intervene in any district

court action filed by the PBGC under section 4042 of ERISA, 29 U.S.C. § 1342, to

terminate the plans or (b) pursuing any independent action against the PBGC regarding

the termination of the plan under section 4003(f) of ERISA, 29 U.S.C. § 1303(f).

      61.    <u>Labor MOUs</u>.

      (a)    <u>GM Buyer</u>. Pursuant to the Modified Plan, upon the

Effective Date and notwithstanding any other provisions of the Master Disposition

Agreement, the applicable Labor MOUs (which shall include all related collectively

bargained agreements and obligations, including grievances), shall be assumed and

assigned to the GM Buyer, and shall not be in conflict with any federal or state law;

provided, however, that if the Delphi HRP is terminated pursuant to section 4042 of

ERISA, 29 U.S.C. § 1342, there shall be no obligation by the Debtors to assume or cure

any obligations claimed to exist under the HRP or any related provision of the collective

bargaining agreements. Further, regardless of whether the Delphi HRP is terminated, the

GM Buyer shall not be deemed to have assumed, and shall have no obligations with

regard to, the Delphi HRP or any related provision of the collective bargaining

agreements.

      (b)    <u>Company Buyer</u>. Upon the Effective Date, the Company

Buyer will assume the terms and conditions of the applicable Labor MOUs (which shall

include all related collectively bargained agreements and obligations), as well as liability

for pre-closing grievances and accrued wages and benefits (including vacation and sick

pay), but not including any liability under the Retained Plans, as such term is defined in

section 2.3.3 of the Master Disposition Agreement) and the Debtors shall assume and

assign the applicable Labor MOUs to the Company Buyer, which Labor MOUs shall not

be in conflict with any federal or state law; provided, however, that if the Delphi HRP

and/or Packard-Hughes Interconnect Bargaining Retirement Plan is terminated pursuant

to section 4042 of ERISA, 29 U.S.C. § 1342, there shall be no obligation by the Debtors

to assume or cure any obligations claimed to exist under the HRP, the Packard-Hughes

Interconnect Bargaining Retirement Plan, or any related provision of the collective

bargaining agreements. Further, regardless of whether the Delphi HRP or Packard-

Hughes Interconnect Bargaining Retirement Plan is terminated, the Company Buyer shall

not be deemed to have assumed, and shall have no obligations with regard to, the Delphi

HRP, Packard-Hughes Interconnect Bargaining Retirement Plan, or any related provision

of the collective bargaining agreements.

62.    28 U.S.C. § 157(d).  Nothing in this order or the Modified Plan is

intended to modify or violate 28 U.S.C. § 157(d).

63.    Resolution Of Modified Plan Objections.

(i)    WTC.  The reasonable fees and expenses of
WTC, including fees and disbursements of its counsel, shall be reimbursed
up to $3.5 million in accordance with the mechanics previously approved
by the Bankruptcy Court in paragraph 39 of the Confirmation Order.

(ii)    New York Department Of Environmental
Conservation and Michigan Department Of Environmental Quality.

(1)    Nothing in this order or the Master
Disposition Agreement releases, nullifies, or enjoins the enforcement of
any Liability to a governmental unit under Environmental Laws (as the
term is defined in the Master Disposition Agreement) or regulations (or
any associated Liabilities for penalties, damages, cost recovery, or
injunctive relief) that the Buyers would be subject to as the owner, lessor,
or operator of property after the date of entry of this order.
Notwithstanding the foregoing sentence, nothing in this order shall be
interpreted to deem the Buyers to be the successors to the Debtors under

83

any state law successor liability doctrine with respect to any Liabilities under Environmental Laws or under regulations for penalties for days of violation prior to entry of this order.

(2)    GM Components, as Buyer of the Delphi Automotive Systems Site located at 1000 Lexington Avenue, Rochester, New York, identified in the New York State Department of Environmental Conservation ("NYSDEC") Environmental Site Remediation Database as Site Code 828064 (the "Rochester Facility"), and the Delphi Thermal Systems Facility located at 200 Upper Mountain, Lockport, New York, identified in the NYSDEC Environmental Site Remediation Database as Site Codes C932138, C932139, C932140, and 932113 and in the NYSDEC Spill Incidents Database as Site Code 0651261 (collectively, the "Lockport Facility"), acknowledges that it shall be responsible for conducting investigation and remediation of the Rochester Facility and the Lockport Facility in accordance with applicable Environmental Laws.

(3)    GM Components and NYSDEC shall confer in good faith to identify the remaining investigation and remediation required under applicable Environmental Laws for the Rochester and Lockport Facilities.

(4)    GM Components and GM Global Steering Holdings LLC, as Buyers of certain Michigan facilities of Delphi under the Master Disposition Agreement, both acknowledge that they shall be responsible for conducting investigation and remediation of the Delphi Michigan facilities acquired by them under the Master Disposition Agreement in accordance with applicable Environmental Laws.

(5)    GM Components, GM Global Steering Holdings LLC, and the Michigan Department of Environmental Quality (MDEQ) shall confer in good faith to identify the remaining investigation and remediation required under applicable Environmental Laws with respect to the Delphi Michigan facilities GM Components and GM Global Steering Holdings LLC are acquiring under the Master Disposition Agreement

(6)    Neither GM Components nor GM Global Steering Holdings LLC will assert any defense to liability under Michigan Compiled Laws (MCL) 324.20126(1)(c)(i) and (ii) with respect to the Delphi facilities each is acquiring under the Master Disposition Agreement.

(iii)    New York State Workers' Compensation Board.  The objection filed by the New York State Workers' Compensation Board (the "Board") has been resolved based upon an

agreement entered into between the General Motors Company and the Board, dated July 28, 2009, providing for, among other things, the assumption by the General Motors Company, upon the closing of the Master Disposition Agreement, of all of the past, present and future New York workers' compensation law liabilities of Delphi Corporation for the facilities located in Lockport, New York and Rochester, New York.  In the event said assumption fails to occur and/or the Master Disposition Agreement fails to close, the Board reserves its right to file pre petition proofs of claim against the Debtors,  prosecute already filed administrative expense claims and other administrative expense claims to be filed against the Debtors, and pursue any and all bases for liability and/or relief set forth in it's objection, while the Debtors, Motors Liquidation Company, and General Motors Company reserve their rights to object to same.

(iv)    Objecting Plan Investors.  Nothing in this order, the Modified Plan, the MDA Documents, or any supporting papers shall (i) foreclose or otherwise prejudice or impair any claims, defenses or positions that any Plan Investors (the "Objecting Plan Investors") have or may have in the Adversary Proceedings No. 08-01232 and 08-01233 (the "Plan Investor Litigation"), including, without limitation, any alleged right of setoff against any party asserting claims against the Objecting Plan Investors (collectively, the "Potential Defenses"), or (ii) foreclose or otherwise prejudice GMCo. and GM Buyer's rights to object to any such Potential Defense.  This paragraph is not intended to, nor shall it, create liability on the part of Motors Liquidation Company, GMCo., or the GM Buyer with respect to any counterclaims that the Objecting Plan Investors have asserted or may assert in the Plan Investor Litigation against any of the Debtors.

64.    Miscellaneous.

(a)    The transactions set forth herein are exempt from any bulk sales or similar laws, each of which is expressly overridden.

(b)    Any disclosed payments to be made by the Purchasing Entities or their affiliates to Platinum are hereby approved pursuant to section 1129(a)(4) of the Bankruptcy Code.

(c)    The transfer of the Acquired Assets and the Sale Securities to the Purchasing Entities pursuant to the MDA Documents constitutes a legal, valid, and effective transfer of the Acquired Assets and the Sale Securities, and shall vest the

85

Purchasing Entities with all right, title, and interest of the Sellers in and to the Acquired

Assets and the Sale Securities free and clear of all Property Interests other than the

Assumed Liabilities, any other liabilities specifically assumed under the Master

Disposition Agreement or assumed and assigned pursuant to paragraphs 38 and 61 of this

order, and Permitted Encumbrances.

(d)    Except as provided in the MDA Documents or this order,

after the Closing (as defined in the Master Disposition Agreement), the Sellers (as

defined in the Master Disposition Agreement)  and their estates shall have no further

liabilities or obligations with respect to any Assumed Liabilities and all holders of such

Claims are forever barred and estopped from asserting such Claims against the Debtors,

their successors or assigns, their property or their assets or estates.  The Purchasing

Entities shall only be liable for such liabilities to the extent set forth in the MDA

Documents.  All holders of Claims are forever barred and estopped from asserting Claims

against the Purchasing Entities and the Acquired Assets and the Sale Securities related to

the Excluded Assets (as defined in the Master Disposition Agreement).

(e)    This order (a) shall be effective as a determination that,

except for the Assumed Liabilities, any other liabilities specifically assumed under the

Master Disposition Agreement or Assumption and Assignment pursuant to paragraphs 38

and 61 of this order, and Permitted Encumbrances, at the Closing (as defined in the

Master Disposition Agreement), all Property Interests of any kind or nature whatsoever

existing as to the Acquired Assets and Sale Securities prior to the Closing have been

unconditionally released, discharged, and terminated, and that the conveyances described

herein have been effected, and (b) shall be binding upon and shall govern the acts of all

86

entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other Persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets and Sale Securities.

(f)      Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Modified Plan and MDA Documents.

(g)      Prior to the Effective Date, the MDA Documents may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement is consented to by the Debtors and does not have a material adverse effect on the Debtors' estates or creditors or result in a material, substantive modification of the Master Disposition Agreement.  After the Effective Date, the MDA Documents may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court; provided, however, that neither prior to or after the Effective Date shall any provision in the Master Disposition Agreement or Company Buyer Operating Agreement regarding distributions to holders of general unsecured claims of the Debtors be amended, modified, or waived to reduce, eliminate, or otherwise affect such distributions.  Any such modification,

amendment, or supplement prior to the Effective Date shall promptly be filed with the

Court, and shall be marked to indicate any such change unless such change is obvious.

(h)     Notwithstanding anything contained herein to the contrary,

nothing in this order shall in any way prejudice the rights, claims, causes of action,

counterclaims, defenses, affirmative defenses, or remedies of the Debtors or Computer

Sciences Corporation regarding the matters pending in Adversary Proceeding No. 09-

01271 (RDD), and nothing in this order shall in any way provide any preclusive relief

with respect to the same.

(i)     Nothing in this order or the Modified Plan:  (i) discharges,

releases, or precludes any environmental liability that is not a claim (as that term is

defined in the Bankruptcy Code), or any environmental claim (as the term "claim" is

defined in the Bankruptcy Code) of a governmental unit that arises on or after the

Effective Date; (ii) releases the Debtors or Reorganized Debtors from liability under

environmental law as the owner or operator of property that such persons own or operate

after the Effective Date; (iii) releases or precludes any environmental liability to a

governmental unit on the part of any Persons other than the Debtors and Reorganized

Debtors; or (iv) enjoins a governmental unit from asserting or enforcing, outside this

Court, any liability described in this paragraph.

(j)     Allowed prepetition Secured Claims and prepetition

Priority Tax Claims on account of real and personal property taxes shall be assumed, on

the payment terms set forth in the Modified Plan not taking into account the last proviso

of the Article 2.2 thereof, by the applicable Buyer purchasing the related property under

the Master Disposition Agreement.

65.    <u>Modifications To The Modified Plan</u>.  At the request of the

Debtors, the Modified Plan is hereby modified pursuant to section 1127 of the

Bankruptcy Code and as modified herein and as set forth on <u>Exhibit A</u> hereto.


Dated: New York, New York
       July 30, 2009


                                        <u>/s/ Robert D. Drain</u>
                                        UNITED STATES BANKRUPTCY JUDGE