TOGUT, SEGAL & SEGAL LLP           **HEARING DATE:  TO BE DETERMINED**
One Penn Plaza
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Albert Togut
Frank A. Oswald
Scott E. Ratner
*Conflicts Counsel for the Reorganized Debtors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                          :
In re:                                    :      Chapter 11
                                          :
MOTORS LIQUIDATION COMPANY, *et al.*,     :      Case No. 09-50026 (REG)
f/k/a General Motors Corp., *et al.*,     :
                                          :
                            Debtors.      :      (Jointly Administered)
                                          :
---------------------------------------------------------------x

## THIRD AND FINAL APPLICATION OF TOGUT, SEGAL & SEGAL LLP AS CONFLICTS COUNSEL FOR THE DEBTORS FOR ALLOWANCE OF COMPENSATION FOR SERVICES (I) RENDERED FOR THE PERIOD OCTOBER 1, 2010 THROUGH MARCH 29, 2011, (II) PREVIOUSLY APPROVED BY THE COURT ON AN INTERIM BASIS, AND (III) FOR REIMBURSEMENT OF EXPENSES

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

Togut, Segal & Segal LLP (the "**Togut Firm**"), as conflicts counsel for

Motors Liquidation Company (f/k/a General Motors Corporation) ("**MLC**") and the

other above-captioned reorganized debtors (collectively, the "**Debtors**"), respectfully

makes this third and final application (the "**Application**") for (i) the allowance of

compensation for professional services rendered for the period October 1, 2010 through

March 29, 2011, the Confirmation Date (as defined herein), (the "**Third Interim Period**")

and for reimbursement of expenses incurred in connection with such services, (ii) the

allowance of compensation previously approved by the Court on an interim basis and

(iii) reimbursement of expenses on a final basis and respectfully shows this Honorable Court that:

**PRELIMINARY STATEMENT**

The bankruptcy of General Motors was a historic event.  The Togut Firm was retained as conflicts counsel in December 2009 to handle certain post-sale transaction matters because of its experience and expertise as conflicts counsel and in other complex automotive chapter 11 cases.

During the pendency of the Debtors' chapter 11 cases, the Togut Firm, among other things:  (a) challenged and resolved a $24 million setoff against the Debtors;  (b) achieved over $137 million in savings related to various lease and contract rejection claims asserted against the Debtors;  (c) settled a motion filed by New GM (defined herein) to rescind the Debtors' alleged assumption and assignment to New GM of a sublease;  and (d) conducted an investigation and made recommendations concerning whether there were any potential claims against the Debtors' former officers and directors existing prior to confirmation of the Plan on March 29, 2011 (the "**Confirmation Date**").

We respectfully submit that, as detailed in the interim fee applications previously filed with this Court as summarized below, and reflected in the detailed time records filed with this Court as part of its monthly fee statements, the Togut Firm has rendered beneficial services to the Debtors during the pendency of the Debtors' bankruptcy cases in an efficient and economical manner.

**I.    FEES AND EXPENSES FOR
WHICH ALLOWANCE IS SOUGHT**

1.    This Application is made pursuant to sections 330 and 331 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 2016(a) of the Federal

Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), this Court's Order

Establishing Procedures for Interim Monthly Compensation for Professionals (Docket

No. 1334) (the "**Interim Compensation Order**") and this Court's Order confirming the

Plan, dated March 29, 2011 (Docket No. 9941), (a) for interim allowance of interim

compensation for services rendered to the Debtors during the Third Interim Period in

the amount of $439,982.50[1] and for reimbursement of expenses in connection with such

services in the amount of $2,453.94 and (b) for the allowance on a final basis of

compensation and reimbursement of expenses in the Prior Interim Applications (as

defined herein) which have been paid pursuant to Orders of this Court subject to a 10%

holdback, as detailed below.

2.      The Togut Firm's attorneys and paraprofessionals expended a total

of 886.2 hours during the Third Interim Period for which compensation is requested.

A schedule setting forth the number of hours expended by the partners, counsel,

associates and paraprofessionals of the Togut Firm, their respective hourly rates and

the year in which each attorney was admitted to practice is attached as Exhibit "1."

A schedule specifying the type of expenses for which the Togut Firm is seeking

reimbursement and the total amount for each category is attached as Exhibit "2."

3.      The Togut Firm maintains computerized records of the daily time

slips completed by all attorneys and paraprofessionals.  Preceding the time entries is a

chart listing the names, billing rates and time spent by each of the attorneys and

paraprofessionals rendering services on behalf of the Debtors.  In support of this

Application, copies of these computerized records, together with a computer generated

---

[1]     In accordance with this Court's prior order concerning professional fee statements, the Togut Firm
has reduced its fees related to the preparation of monthly fee statements by 50%, for an aggregate
reduction of $1,156.50 in compensation sought during the Third Interim Period.

detailed itemization of the expenses incurred by the Togut Firm for which reimbursement is sought, have been furnished to the Notice Parties (as defined in the Interim Compensation Order).

4.      On or about August 5, 2010, the Togut Firm filed its first interim application for compensation and reimbursement of expenses for the period December 21, 2009 through May 31, 2010 (the **"First Interim Period"**) for fees in the amount of $529,364 and expenses of $3,107.43 (the "**First Interim Application**").  In response to certain issues raised by the Fee Examiner, the Togut Firm voluntarily reduced its fees by $1,989.  Following a hearing held on October 26, 2010, this Court allowed the Togut Firm's fees, subject to a 10% holdback of $52,737.50, plus full reimbursement of expenses.

5.      On November 15, 2010, the Togut Firm filed its second interim application for compensation and reimbursement of expenses for the period June 1, 2010 through September 30, 2010 (the "**Second Interim Period**") for fees in the amount of $113,600 and expenses of $581.46 (the "**Second Interim Application**" and, together with the First Interim Application, the "**Prior Interim Applications**").  In response to certain issues raised by the Fee Examiner, the Togut Firm voluntarily reduced its fees by $805.  Following a hearing held on December 15, 2010, this Court allowed the Togut Firm's fees, subject to a 10% holdback of $11,279.50, plus full reimbursement of expenses.

6.      Pursuant to the terms of the Interim Compensation Order, the Togut Firm submitted six monthly invoices during the Third Interim Period:  (i) for the period from October 1, 2010 through October 31, 2010 in the amounts of $250,637 for fees and $926.96 for expenses;  (ii) for the period November 1, 2010 through November 30, 2010 in the amounts of $98,884.50 for fees and $932.85 for expenses;

(iii) for the period December 1, 2010 through December 31, 2010 in the amount of $24,001 for fees and $96.24 for expenses; (iv) for the period January 1, 2011 through January 31, 2011 in the amount of $57,410 for fees and $210.98 for reimbursement of expenses; (v) for the period February 1, 2011 through February 28, 2011 in the amount of $3,219 for fees and $100.70 for expenses; and (vi) for the period March 1, 2011 through March 29, 2011 in the amount of $5,831 for fees and $186.21 for expenses.

7.    In accordance with the Interim Compensation Order, the Togut Firm has received payment, as of the date of this Application, in the amount of 80% of its fees and 100% of its expenses for the Third Interim Period.  Pursuant to the Interim Compensation Order, the Debtors maintain a 20% holdback of the Togut Firm's fees sought for the Third Interim Period, which amount aggregates $87,996.50 (the "**Third Interim Holdback**").

8.    The Togut Firm did not receive a retainer and, other than the payments described above made in accordance with the terms of the Interim Compensation Order, the Togut Firm has not received payment of any compensation or reimbursement of expenses in these chapter 11 cases.

9.    As confirmed by the Certification of Frank A. Oswald, a member of the Togut Firm, attached as Exhibit "3," all of the services rendered by the Togut Firm during the case for which compensation is sought were rendered for and on behalf of the Debtors in connection with their chapter 11 cases.

## II.    RETENTION OF THE TOGUT FIRM

10.    The Debtors retained the Togut Firm on December 21, 2009 to serve as conflicts counsel.  At the time the Togut Firm was retained, the Debtors, represented by Weil, Gotshal & Manges LLP ("**WG&M**"), were engaged in complicated disputes

involving third parties with which WG&M had potential or actual conflicts. Because of those conflicts, the Debtors sought to retain the Togut Firm as conflicts counsel to handle then existing matters where WG&M had conflicts and any future matters which the Debtors may encounter that are not appropriately handled by WG&M or other professionals because of a potential or actual conflict of interest or, alternatively, which could more efficiently handled by the Togut Firm.

11.    The Togut Firm is a highly specialized "boutique." For more than 30 years, the Firm's practice has been limited, almost exclusively, to insolvency and bankruptcy matters pending in this Court. The Togut Firm has considerable experience in representing high-profile chapter 11 debtors, and has acted in a professional capacity in hundreds of cases representing the interests of debtors, creditors' committees, secured creditors and trustees.

12.    The Togut Firm has been actively involved in major chapter 11 cases, and has represented debtors in many cases in this Court and others including, without limitation: *In re Ambac Financial Group, Inc.*, Case No. 10-15973 (SCC); *In re Neff Corp., et al.*, Case No. 10-12610 (SCC); *In re Saint Vincents Catholic Medical Centers of New York, et al.*, Case No. 10-11963 (CGM); *In re Loehmann's, et al.*, Case No. 10-16077 (REG); *In re AbitibiBowater Inc., et al.*, Case No. 09-11296 (KJC); *Finlay Enterprises, Inc., et al.*, Case No. 09-14873 (JMP); *In re Old Carco LLC (f/k/a Chrysler LLC), et al.*, Case No. 09-50002 (AJG); *In re Charter Communications, Inc., et al.*, Case No. 09-11435 (JMP); *In re Tronox Inc., et al.*, Case No. 09-10156 (ALG); *In re Neff Corp., et al.*, Case No. 10-12610 (SCC); *In re Frontier Airlines Holdings, Inc., et al.*, Case No. 08-11298 (RDD); *In re Delphi Corp., et al.*, Case No. 05-44481 (RDD); *In re Enron Corp., et al.*, Case No. 01-16034 (AJG); *In re Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, et al.*, Case No. 05-14945 (PCB); *In re Tower Auto., Inc.*, Case No. 05-

6

10578 (ALG);  *In re Allegiance Telecom, Inc.*, Case No. Case No. 03-13057 (RDD);  *In re Guilford Mills, Inc.*, Case No. 02-40667 (BRL);  *In re Ames Department Stores*, Case No. 01-42217 (REG);  *In re Loews Cineplex Entertainment Corp.*, Case No. 01-40346 (ALG);  *Onsite Access, Inc.*, Case No. 01-12879 (RLB);  *Daewoo International (America) Corp.*, Case No. 00-11050 (BRL);  *Contifinancial Corp.*, Case No. 00-12184 (ALG);  *Lois/USA, Inc.*, Case No. 99-45910 (REG);  and *Rockefeller Center Properties*, Case No. 95-420789 (PCB).

13.     Each of the members, as well as many counsel and associates, of the Togut Firm have been practicing bankruptcy law, almost exclusively, since their graduation from law school.  Certain of the Togut Firm's members, counsel and associates have clerked for Bankruptcy Judges, and all of them are members in good standing of the bar of the State of New York and the United States District Court for the Southern District of New York.

14.     The paraprofessionals employed by the Togut Firm are all college graduates.  Paraprofessionals are billed based upon their experience.  Recent graduates are billed at lower hourly rates than those with a year or more experience.

15.     The work encompassed by this Application and for which the Togut Firm seeks interim and final compensation was performed efficiently and at the lowest cost to the estates.  The manner in which staffing has been done has enabled the Togut Firm to bill fewer hours than would have otherwise been possible.

16.     All of the work summarized in this Application was performed in a manner to ensure minimal duplication of services in an effort to keep the administration expenses to a minimum.

### III.   SERVICES RENDERED BY THE TOGUT FIRM DURING THE CHAPTER 11 CASES AND THE THIRD INTERIM PERIOD IN PARTICULAR

17.    The following is a summary description of the primary services rendered by the Togut Firm during the chapter 11 cases, including the Third Interim Period, which highlights the benefits conferred upon the Debtors and their estates as a result of the Togut Firm's efforts.  The Togut Firm respectfully refers the Court to its Prior Interim Applications, which are incorporated herein by reference.  All of the professional services rendered by the Togut Firm are set forth in the computerized time records maintained by the Togut Firm, and the Court is respectfully referred to those records for the details of all of the work performed.

18.    The Togut Firm has rendered extensive professional services on behalf of the Debtors and their estates in fulfilling its professional responsibilities during the chapter 11 cases.  These large and highly complex chapter 11 cases have required thoughtful effort by the members, counsel, associates and paraprofessionals of the Togut Firm.  Whenever possible, potential disputes have been resolved without resort to the Court.  When necessary, the Togut Firm has actively represented the Debtors' interests before the Court.

19.    In its representation of the Debtors, the Togut Firm has coordinated its efforts with WG&M, as general bankruptcy counsel to the Debtors, to avoid duplication of effort.  The Togut Firm has achieved this goal in an efficient manner, always mindful of the costs to the Debtors' estates.

### A.   Airplane Lease Termination Issues

20.    During the First Interim Period, the Togut Firm was asked to handle certain aircraft lease rejection claim matters and reached agreements in principle

to reduce claims asserted by SunTrust Leasing and Equipment Co. ("**SunTrust**") and AVN Air, LLC ("**AVN**"), aggregating in excess of $200 million, which arose from the rejection of certain aircraft leases (the "**Leases**").  The Togut Firm was successful in concluding favorable settlements concerning these rejection claims during the Second Interim Period.

21.    At the outset of the claims process, the Togut Firm conducted an in depth review of Lease terms, with a particular emphasis on liquidated damage provisions and payment schedules.  The SunTrust claim arose from two separate Leases (the "**SunTrust Leases**").  The AVN claim arose from the rejection of five separate Leases (the "**AVN Leases**").

22.    The AVN claim was not supported by complete documentation so the Togut Firm worked closely with Alix Partners, the Debtors' restructuring advisors ("**Alix**"), to identify and collect all relevant documents and contracts between the parties.  Once assembled, the Togut Firm was able to conduct a comprehensive review and analysis of AVN's rejection damage claims.

23.    Prior to engaging AVN's counsel in settlement discussions, the Togut Firm identified several key issues central to the dispute.  With Alix's assistance, the Togut Firm was able to calculate the stipulated loss values of the airplanes and compare them to the fair market value of the airplanes.  Once the difference in these respective values was determined, the Togut Firm was able to focus on more nuanced issues related to the Leases and the rejection claims.

24.    Mitigation of losses was identified as a key element regarding the Leases' true value.  Through an in-depth review of the lease terms and consultation with Alix, the Togut Firm was able to determine the aircraft lessors' rights and

obligations regarding the commercially reasonable disposition of the aircrafts, contract discount rates and the Debtors' rights concerning lease termination claims and conduct.

25.     After these factual issues were determined, the Togut Firm began the process of identifying and examining the relevant legal issues.  Through legal research, the Togut Firm counseled the Debtors regarding the enforcement and validity of stipulated loss values and liquidated damage provisions in the Leases.  The legal analysis of recent decisions within this jurisdiction dealing specifically with liquidated damages in the context of aircraft leases proved integral in assessing the Debtors' liability and establishing a negotiation strategy.

26.     Once that strategy was in place, the Togut Firm conducted negotiations with claimants' counsel that included an exchange of additional documents and information.  These negotiations commenced with discussions regarding the alternative dispute resolution procedures established by the Debtors and approved by this Court.  The Togut Firm reviewed the alternate dispute resolution processes and commenced discussions with opposing counsel about the execution of "capping letters," whereby the parties would agree to cap the claims at a certain amount.  Ultimately these letters proved unnecessary, as settlement discussions proved to be productive.

27.     With regard to the AVN Leases, the parties initially focused on the terms of a confidentiality agreement covering proprietary post rejection aircraft sale/disposition information.  The Togut Firm negotiated the terms of the agreement with counsel for AVN and counsel for the Creditors' Committee.  Once the agreement was finalized and executed, the Togut Firm was able to engage in meaningful settlement negotiations with AVN's counsel concerning the value of the aircrafts, the stipulated loss provisions of the Leases, AVN's mitigation of lease rejection damages

and its ancillary rejection claim damages (*i.e.*, attorneys fees, etc.).  The AVN rejection

claim was ultimately compromised and settled and, thereby, reduced by approximately

$95 million.

28.     With regard to the SunTrust leases, negotiations focused on the fair

market value of the underling aircraft, which had not yet been sold to mitigate Sun

Trust's damages.  After an exchange of information and a number of settlement

conferences, the Togut Firm was able to obtain a $42 million reduction of the SunTrust

claim which was well within the parameters acceptable to the Debtors and the

Creditors' Committee.

29.     Upon the completion of these successful discussions, the Togut

Firm negotiated, prepared and finalized a settlement agreement memorializing the

SunTrust claim reduction.  The Togut Firm coordinated with counsel for the Creditors'

Committee to comply with the requirements of this Court's claims settlement

procedures order.

**B.**     **Motion to Rescind Assumption**

30.     During the First Interim Period, the Togut Firm was asked to

handle a matter concerning New GM's motion to rescind the alleged assumption and

assignment of a sublease agreement with the Knowledge Learning Corporation

("**KLC**").  This matter was successfully concluded in the Debtors' favor during the

Second Interim Period, as discussed below.

31.     Prior to the Petition Date, KLC subleased property from the

Debtors on which it provided subsidized childcare for unionized employees at the

Saturn Spring Hill manufacturing facilities (the "**Sublease**").  Additionally, MLC and

KLC were parties to a 2010 Model Year Competitive Assistance Program Agreement

(the "**CAP Agreement**"), pursuant to which KLC was to receive discounts on GM-brand vehicles during the 2010 model year.

32. New GM argued that it was entitled to a declaratory judgment that the CAP Agreement – not the Sublease – was assumed by the Debtors and assigned to New GM. In the alternative, New GM asserted that it was entitled to relief under Rule 60(b)(1) to obtain relief from an order on the basis of mistake, inadvertence, surprise or excusable neglect. New GM also maintained that the cure agreement which had been executed as part of the assumption and assignment process should be rescinded on the basis of mutual mistake of fact.

33. Initially, the Togut Firm reviewed the various contracts underlying the motion, including the Sublease and the CAP Agreement.

34. The Togut Firm then investigated the facts leading up to the assumption and assignment of the Sublease, and spent significant time communicating with representatives of MLC and New GM concerning the assumption and assignment to determine whether a mistake had been made.

35. Additionally, legal research was conducted by the Togut Firm regarding, *inter alia*, Federal Rule 60(b), which allows a court to relieve a party from final judgment order or proceeding for mistake inadvertence, surprise or excusable neglect, and the applicable case law regarding same.

36. Prior to engaging in settlement discussions with opposing counsel, the Togut Firm identified several key issues relating to the potential administrative expense claims that might be asserted against the Debtors' estates if New GM's motion was granted. Following in-depth due diligence and consultation with Alix, as well as with counsel for the Creditors' Committee, the Togut Firm was able to quantify the

amount of any post assumption and assignment administrative expense claims that might arise.

37.    Consequently, it was determined that so long as the Debtors' estates were indemnified and held harmless as to any such post assumption and assignment claims, the Debtors and the Creditors' Committee would not oppose New GM's motion. Ultimately, a settlement was reached between New GM and KLC which provided for such indemnification in favor of the Debtors.  The Togut Firm reviewed and commented on a draft settlement agreement which was finalized and approved by this Court on September 3, 2010, thereby eliminating at least $1.3 million in claims against the Debtors' estates.

## C.    Deutsche Bank AG Setoff

38.    During the Third Interim Period and Prior Interim Periods, the Togut Firm expended substantial time representing the Debtors' concerning Deutsche Bank AG's Motion for Relief from Automatic Stay to Effect Setoff (the "**Motion**").  The Motion sought to set off approximately $24 million that Deutsche Bank ("**DB**") admitted it owed to GM as a result of terminated interest rate swap transactions against an equivalent amount of MLC's public indebtedness.

39.    Prior to responding to the Motion, the Togut Firm engaged in discussions with New GM concerning the respective rights of MLC and New GM to the $24 million DB owed GM and responsibility for any sums that DB was properly permitted to set off.  New GM initially maintained that it was entitled to receive all of DB's $24 million swap payment and that MLC was responsible to pay DB any sums it was entitled to set off.  If that position were accepted, MLC would have been $24 million out of pocket if DB was permitted to effectuate a setoff.  On the other hand,

if MLC were to prevail against both DB and New GM, it would obtain a $24 million

payment from DB and not owe anything by way of setoff.  Consequently, up to

$48 million was potentially at stake from MLC's perspective.

      40.    At the request of New GM's counsel, the Togut Firm prepared a

formal written position statement and negotiated with New GM concerning the parties'

respective rights.  Responding to New GM's arguments required the Togut Firm to

analyze the lengthy and complex sale agreement between MLC and New GM, its later

supplements, communications concerning assumption of contracts, and the Court's sale

order.  The Togut Firm was also required to examine the facts concerning the parties'

treatment of similar rights and disputes.  In addition, the Togut Firm was required to

analyze ISDA Master Agreements and conduct research concerning novel legal issues

raised by certain of their terms because some of New GM's arguments were based on

the relevant Master Agreement's terms.

      41.    After the Togut Firm began negotiating with New GM and briefed

MLC concerning the issues in dispute, the two parties reached a tentative agreement

resolving their relative rights and responsibilities with respect to DB's Motion.

      42.    The Togut Firm also expended considerable effort investigating a

series of novel issues concerning setoff rights that were implicated by DB's Motion.  The

Togut Firm prepared an extensive and detailed Response to the Motion and spent

significant amounts of time in coordinating with the Creditors' Committee, New GM and

others concerning it.

      43.    The Motion and Response raised novel and complex issues of law.

These issues included whether a swap transaction terminated after the petition date

yields a pre- or post-petition claim and whether setoffs can properly be executed

against a debtor's bond obligations.  Researching those issues required evaluation of,

among other things, multiple ISDA Master Agreements and Schedules, trade confirmations, U.S.-issued bonds and bond indentures, Euro bonds, fiscal and paying agency agreements, cases, and other materials analyzing the issues at stake.

44.    The Debtors' Response, which was filed on June 18, 2010, presented three main independent bases for denying DB the right to set off all or part of the $24 million it owes:  an argument that DB's swap obligation to MLC cannot be set off because it is post-petition;  an argument that the setoff provision in the parties' ISDA Master Agreement bars setoff, and an argument that the indentures governing the MLC bonds at issue preclude setoff.  Because these arguments were novel, extensive research was required to develop them and determine their validity.  Also, the Togut Firm was required to monitor recent decisions in this jurisdiction relevant to issues relating to the nature of swap claims and potential setoff rights presented by DB's Motion.

45.    The Togut Firm coordinated extensively with other parties-in-interest in preparing the Response, and expanded the Togut Firm's research to evaluate arguments suggested by other parties-in-interest for possible inclusion in the Response. The Togut Firm also had discussions with Wilmington Trust concerning the possibility of its filing a joinder, and when Wilmington Trust agreed, the Togut Firm reviewed and commented on drafts of the joinder.

46.    DB filed its reply brief on July 12, 2010.  The Togut Firm reviewed DB's brief and began researching the issues raised.  In addition, because MLC had cross-moved for immediate payment in responding to DB, MLC drafted a substantial portion of the reply it was entitled to file in support of the cross-motion.

47.    While the Togut Firm was working on MLC's reply, MLC and New GM asked the Togut Firm to arrange to extend the due date for MLC's reply until after MLC and New GM had finalized a settlement relevant to the setoff issue.  The Togut

Firm negotiated a stipulation extending the due date as requested and coordinated with other parties concerning it.

48.     On December 28, 2010, after the Court had approved the settlement between MLC and New GM and after a further extension requested by DB, the Togut firm finalized and filed its reply memorandum.  The reply memorandum was lengthy, addressed a large number of legal issues, and required substantial research.  The reply memorandum also analyzed numerous legal precedents in detail and required research concerning new developments relevant to the novel issues of law that the Togut Firm had raised in opposing DB's proposed setoff.

49.     A few days before the scheduled oral argument concerning the Motion and MLC's cross-motion, DB initiated settlement negotiations, and the parties were ultimately able to reach an agreement.  The essential terms of the settlement, which was negotiated in consultation with New GM and the Creditors' Committee, were that DB would pay MLC $14 million in cash, and DB would be permitted to retain its bonds.  In addition, $2.5 million of the $14 million due to MLC would be paid to New GM under the Court-approved settlement between MLC and New GM, leaving MLC with $12.5 million.

50.     On January 11, 2011, the date on which oral argument had been scheduled, the parties appeared before the Court to report on their settlement.  The Togut Firm informed the Court of the settlement's essential terms, which were embodied in a negotiated term sheet, and DB requested that the Court approve the settlement on an expedited basis.  In addition, Wilmington Trust withdrew its partial joinder in MLC's arguments in light of the settlement, and New GM and the creditors' committee indicated their consent to the settlement.

51.    In response to DB's request, the Court approved the settlement at the January 11 hearing for reasons stated on the record.  The Court stated, "[A]s I read the papers, I well understood the potential risk the debtors' conflicts counsel was dealing with when it was resisting Deutsche Bank's claim of setoff.…It was a bundle of tough issues."

52.    The Court further stated that the parties' settlement was "well within the range of reasonableness," and "very possibly the kind of result that I would have tried to recommend to a client if I had been in the shoes of either of the settlement parties."  The Court added that, "a settlement at this level is one of which no non-Deutsche Bank creditor could reasonably complain."  The Court concluded by authorizing the parties to submit their final settlement agreement, which had not yet been negotiated, for Court approval by notice of presentment.

53.    After the Court hearing on January 11, 2011, the Togut Firm negotiated the final settlement agreement with DB on MLC's behalf, in consultation with Wilmington Trust, the Creditors' Committee and New GM.  The settlement agreement, as directed by the Court, was submitted for approval on January 18, 2011 and was "So Ordered" by the Court on January 28, 2011 (Docket No. 8919).  Shortly thereafter the settlement was consummated.

**D.    Investigation Concerning Potential
       Claims Against Former Officers and Directors**

54.    During the Third Interim Period, the Togut Firm was asked to conduct an investigation and make recommendations to the Debtors concerning whether there were potential claims (the "**Potential Claims**") assertable against its former officers and directors that were neither:  (a) transferred to New GM as part of the Debtors' sale of substantially all of its assets to New GM (the "**Sale**") pursuant to the

17

Bankruptcy Court's Order dated July 5, 2009 (the "**Sale Order**"); nor (b) subject to being released pursuant to Debtors' proposed joint chapter 11 plan (the "**Plan**"). The Togut Firm was also asked to provide advice on the fiduciary duties that MLC's current directors (the "**Current Board**") and officers (together with the Current Board, the "**Current Ds&Os**," and together with the Former Ds&Os, the "**Ds&Os**") may have to investigate or pursue any such Potential Claims.

55.     The Togut Firm's investigation and analysis of the Potential Claims was conducted in an extremely compressed time frame. The project commenced on or about October 13, 2010 when the Togut Firm immediately undertook an independent investigation and analysis of certain issues raised in a preliminary draft memorandum of the same date prepared by WG&M regarding the Potential Claims (the "**WG&M Memorandum**"), as well as certain related issues, as discussed below. The Togut Firm was asked to complete its investigation prior to approval of the proposed Disclosure Statement, which was noticed for hearing on October 21, 2010.

56.     In assessing Potential Claims, our first step was to review the WG&M Memorandum. The Togut Firm carefully considered the legal arguments and factual statements presented in the WG&M Memorandum and sought to confirm them through independent research.

57.     Next, the Togut Firm obtained documents from the Debtors and certain public sources in an effort to verify and supplement the WG&M Memorandum and identify Potential Claims not addressed in the WG&M Memorandum. The following documents, among others, were reviewed in the course of the Togut Firm's work: (i) MLC Board minutes for the period from June 1, 2006 through February 18, 2010 (the "**Board Minutes**"); (ii) materials distributed to MLC's Board in advance of its meetings during the period from January 1, 2007 through July 8, 2009 (the "**Board**

**Materials**");  (iii) MLC's Form 10-K Annual Statements for the years 2006, 2007, 2008

and 2009 (the "**10-K Statements**");  (iv) MLC's Form 8-K Statements for the years 2006,

2007, 2008 and 2009 that make reference to agreements with or payments to Former

Ds&Os;  (v) certain press reports and court filings, including complaints and responsive

pleadings, from lawsuits in which Former Ds&Os were named defendants for the years

2006 through 2009;  (vi) certain press reports and court filings, including complaints and

responsive pleadings, from lawsuits that were referenced in the Board Minutes or 10-K

Statements and were related to the Retained Liabilities and Excluded Assets (as defined

in the Sale documents);  (vii) insurance policies that were identified to us as MLC's

primary director and officer liability policies (the "**D&O Policies**") and that provided

coverage to MLC based on allegations of misconduct by Former Ds&Os;  (viii) certain of

MLC's corporate governance documents, including MLC's Certificate of Incorporation

and By-laws;  (ix) objections to the Sale and transcripts of the hearing concerning

approval of the Sale;  (x) the Sale Order;  (xi) MLC's Proposed Disclosure Statement and

Plan;  (xii) any separation agreements with Former Ds&Os entered into during the

period June 1, 2006 through May 31, 2009, of which we were informed there were none;

and (xiii) claims made and notices filed against the D&O Policies during the period June

1, 2006 through May 31, 2009.

        58.    In addition to reviewing and analyzing the materials described in

the preceding paragraph, the Togut Firm conducted legal research to identify and

analyze Potential Claims.  Specifically, the Togut Firm identified and analyzed three

categories of Potential Claims:  (i) claims for breach of fiduciary duty that might be

asserted in connection with Retained Liabilities and Excluded Assets based on conduct

during the three-year period prior to the Petition Date;[2] (ii) avoidance actions under Chapter 5 of the Bankruptcy Code against Former Ds&Os; and (iii) claims that might arise from the Former Ds&Os' authorization of dividends, stock purchases or stock redemptions.

59.    Considering the time constraints under which it had to operate, the Togut Firm assigned a group of attorneys and paraprofessionals to the project with a wide range of skills and levels of expertise and tasked each team member with one or more appropriate discrete categories of materials for review and analysis.  Once the initial diligence was complete, a core group of attorneys was then tasked with analyzing and making a recommendation to MLC in the form of a memorandum regarding the Potential Claims.  Additionally, the Togut Firm coordinated with WG&M and Alix in the drafting of a supplemental memorandum addressing the costs and benefits of a further investigation concerning the Potential Claims.  This carefully coordinated review and analysis of the Potential Claims enabled the Togut Firm to complete the project as efficiently and thoroughly as possible, without causing delay to the reorganization process.

60.    In the short time allotted and based upon our investigation and the information provided, the Togut Firm did not identify any Potential Claims against the Former Ds&Os that appeared to be meritorious.  More specifically, the Togut Firm did not identify any Potential Claims for breach of fiduciary duty that appeared likely to overcome the hurdles, such as the business judgment rule, that must be addressed

---

[2]    The statute of limitations for a breach of fiduciary duty claim under Delaware law is three years and begins to run at the time the alleged wrongful act is committed.  *See Shandler v. DLJ Merchant Banking, Inc.*, C.A. No. 4797-VCS, 2010 WL 2929654, at *9 n. 88 (Del. Ch. July 26, 2010) (citing 10 Del. C. § 8106).

under Delaware law.  Also, the Togut Firm did not identify any bankruptcy avoidance actions that could be asserted against the Former Ds&Os on account of payments under severance, separation or other agreements.  All payments to Former Ds&Os appear to have been made under the General Motors Severance Program for Salaried Employees in the United States and the General Motors Executive Severance Program for Salaried Employees in the United States, the General Motors Executive Retirement Plan and the General Motors Supplemental Retirement Plan and the General Motors Deferred Compensation Plan in the ordinary course.  Finally, given the careful analysis presented in the relevant Board Minutes and Materials, the Togut Firm was unable to identify viable Potential Claims against the Former Ds&Os regarding dividends, stock purchases or stock redemptions.

61.    In arriving at conclusions relating to Potential Claims, the Togut Firm relied exclusively on its independent legal research and on the group of relevant documents described above.  Based upon the Togut Firm's independent factual investigation and legal research, the WG&M Memorandum and the Togut Firm's understanding that the Current Board was not aware of any information suggesting that MLC's Retained Liabilities are attributable to improper actions by the Former Ds&Os, the Togut Firm concluded and advised MLC that the Current Board could reasonably determine that there do not exist any Potential Claims against the Former Ds&Os warranting further investigation and/or prosecution.

**E.    Miscellaneous Matters Addressed by the Togut Firm**

62.    During the chapter 11 cases, the Togut Firm was required to provide services in a variety of miscellaneous matters:

- Communicated with WG&M, lead counsel to the Debtors, concerning, among other things, coordination of the Togut

21

Firm's role in the Debtors' chapter 11 cases and delegation of projects to promote coordination and avoid duplication of effort;

• Participated in calls, meetings, e-mails and correspondence with parties in interest as needed, including counsel for the Creditors' Committee, representatives of the Debtors, and the United States Trustee;  and

• Reviewed various motions and related pleadings filed with the Court regarding case and project strategy, and potential issues of concern.

## IV.    THE COMPENSATION REQUESTED

63.    There are numerous factors to be considered by the Court in determining allowances of compensation.  *See, e.g.*, *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir. 1977);  *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974);  *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13 (Bankr. S.D.N.Y. 1991).  *See also In re Nine Associates, Inc.*, 76 B.R. 943 (S.D.N.Y. 1987);  *In re Cuisine Magazine, Inc.*, 61 B.R. 210 (Bankr. S.D.N.Y. 1986).

64.    The perspective from which an application for an allowance of compensation should be viewed in a reorganization case was aptly stated by Congressman Edwards on the floor of the House of Representatives on September 28, 1978, when he made the following statement in relation to section 330 of the Bankruptcy Code:

> [B]ankruptcy legal services are entitled to command the same competency of counsel as other cases.  In that light, the policy of this section is to compensate attorneys and other professionals serving in a case under title 11 at the same rate as the attorney or other professional would be compensated for performing comparable services other than in a case under title 11.  Contrary language in the Senate report accompanying S.2266 is rejected, and *Massachusetts Mutual Life Insurance Company v. Brock*, 405 F.2d 429, 432 (5th Cir. 1968) is overruled.  Notions of economy

> of the estate in fixing fees are outdated and have no
> place in a bankruptcy code.

124 Cong. Rec. H11,092 (daily ed. Sept. 28, 1978).  *See also In re McCombs*, 751 F.2d 286

(8th Cir. 1984);  *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13 (Bankr. S.D.N.Y.

1991);  *In re Carter*, 101 B.R. 170 (Bankr. D.S.D. 1989);  *In re Public Service Co. of New*

*Hampshire*, 93 B.R. 823, 830 (Bankr. D.N.H. 1988);  *In re White Motor Credit Corp.*, 50 B.R.

885 (Bankr. N.D. Ohio 1985).

    65.    The philosophy underlying the adoption of section 330 of the

Bankruptcy Code is equally applicable to interim compensation.  The Bankruptcy Code

provides that the same considerations apply to making interim awards of compensation

under section 331 as to final allowances under section 330.  *See In re Public Service Co. of*

*New Hampshire*, 93 B.R. at 826;  *In re International Horizons, Inc.*, 10 B.R. 895 (Bankr. N.D.

Ga. 1981).  Section 331 of the Bankruptcy Code provides:

> A trustee, an examiner, a debtor's attorneys, or any
> professional person employed under section 327 or
> 1103 of this title may apply to the court not more than
> once every 120 days after an order for relief in a case
> under this title, or more often if the court permits, for
> such compensation for services rendered before the
> date of such an application or reimbursement for
> expenses incurred before such date as is provided
> under section 330 of this title.  After notice and a
> hearing, the Court may allow and disburse to such
> application such compensation or reimbursement.

11 U.S.C § 331.

    66.    In awarding compensation pursuant to sections 330 and 331 of the

Bankruptcy Code to professional persons employed under section 327, the Court must

take into account, among other factors, the cost of comparable non-bankruptcy services.

Section 330 of the Bankruptcy Code provides, in pertinent part, for payment of:

- reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional persons employed by such person;  and

- reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).

   67. As the court in *In re Drexel Burnham Lambert Group Inc.* stated:

> With due recognition of the historical position of Bankruptcy Courts in compensation matters, we recognize that creditors have agreed to pay rates for retained counsel of their choice because of the needs of the particular case.  One could posit other situations or cases where a presumption of prior informed judgment might not be as strong.  Here, however, we have a multi-debtor, multi-committee case involving sophisticated creditors who have determined that the rates charged and tasks undertaken by attorneys are appropriate.  We should not, and will not, second guess the determination of those parties, who are directed by Congress, under the Bankruptcy Code, to shape and resolve the case, and who are in fact bearing the cost.  To do so, of course, would be to continue what Congress specifically intended to stop in 1978:  Courts, instead of markets, setting rates, with the inevitable consequence that all the legal specialists required by the debtor or official committees would demur to participate.

133 B.R. at 20-21.

   68. The Togut Firm respectfully submits that the professional services rendered during the chapter 11 cases, and during the Third Interim Period in particular, were actual and necessary to ensure an efficient and effective administration of the Debtors' estates.  The Togut Firm managed its work well and staffed it tightly with professionals and paraprofessionals with appropriate experience and billing rates.  It handled every type of matter efficiently and expertly.

69.     Time and labor devoted is only one of many factors to be considered in awarding attorney compensation.  The number of hours expended must be considered in light of:  (i) the amount involved and the results achieved to date; (ii) the novelty and difficulty of the questions presented;  (iii) the skill requisite to perform properly the legal services;  (iv) the preclusion of other employment on behalf of other clients;  (v) the customary fee charged to a private client for the services rendered;  (vi) awards in similar cases; (vii) time constraints required by the exigencies of the case, including the frequency and amount of time required to be devoted other than during regular business hours;  (viii) the experience, reputation and ability of the attorneys rendering services;  and (ix) the nature and length of the professional relationship with the client (the "**Johnson Factors**").  *See Johnson v. Georgia Highway Express*, 488 F.2d at 717-19 (enumerating factors to be considered in awarding attorneys' fees in equal employment opportunities cases under Title VII);  *In re First Colonial Corp. of America*, 544 F.2d at 1294 (applying the Johnson Factors in bankruptcy cases).

70.     The majority of the Johnson Factors are codified in section 330(a) of the Bankruptcy Code, and have been applied by various courts in making determinations that requested attorneys' fees constitute reasonable compensation. It is well settled that the "lodestar method,"[3] as opposed to an application solely of the Johnson Factors, is the best means of determining attorney fees in bankruptcy

---

[3]     Application of the "lodestar method" involves multiplying the number of hours reasonably expended on the case by the reasonable hourly rate of compensation for each attorney.  *See Shaw v. Travelers Indemnity Co. (In re Grant Assocs.)*, 154 B.R. 836, 843 (S.D.N.Y. 1993).  This method of calculating attorney fees is appropriate in light of section 330(a) of the Bankruptcy Code, which serves as a starting point, permitting bankruptcy courts, in their own discretion, to consider other factors, such as the novelty and difficulty of the issues, the special skills of counsel, and their results obtained.  *See In re Copeland*, 154 B.R. 693, 698 (Bankr. W.D. Mich. 1993).

cases.[4]  The Supreme Court, however, has clearly articulated that the "lodestar method" is presumed to subsume the Johnson Factors, as does section 330(a) of the Bankruptcy Code.  *Delaware Valley I*, 478 U.S. at 563;  *Cena's Fine Furniture*, 109 B.R. at 581.

71.    The Togut Firm respectfully submits that application of the foregoing criteria more than justifies the compensation requested in this Application.

72.    The Togut Firm has encountered novel and difficult legal problems during the course of the chapter 11 cases, involving several areas of legal expertise in bankruptcy and litigation.  The professional services rendered in these chapter 11 cases have been performed by attorneys with broad expertise and high levels of skill in their practice areas or specialty.

73.    Pursuant to the criteria normally examined in bankruptcy cases, and based upon the factors to be considered in accordance with sections 330 and 331 of the Bankruptcy Code, the results that have been achieved during the Third Interim Period more than substantiate charges in that amount.  The services that the Togut Firm has rendered have produced benefits that have inured to the Debtors, their estates and creditors.

74.    In view of the foregoing, the Togut Firm respectfully requests that it be allowed reasonable interim compensation in the amount of $438,826.00 for services rendered in connection with the Debtors' chapter 11 cases during the Third Interim

---

[4]    See, *e.g.*, Pennsylvania v. Delaware Valley Citizens Counsel for Clean Air, 483 U.S. 711 ("Delaware Valley II"), on remand, 826 F.2d 238 (3d Cir. 1987);  Pennsylvania v. Delaware Valley Citizens Counsel for Clean Air, 478 U.S. 546 (1986) ("Delaware Valley I");  United States Football League v. National Football League, 887 F.2d 408, 413 (2d Cir. 1989), cert. denied, 493 U.S. 1071 (1990);  Lindy Bros. Builders Inc. v. American Radiator and Standard Sanitary Corp., 487 F.2d 161 (3rd Cir. 1973), vacated on other grounds, 540 F.2d 102 (3d Cir. 1976);  In re Cena's Fine Furniture, Inc., 109 B.R. 575 (E.D.N.Y. 1990);  In re Drexel Burnham Lambert Group Inc., 133 B.R. 13, 21 (Bankr. S.D.N.Y. 1991).

Period, and that the compensation approved on an interim basis for the Prior Interim Periods be allowed on a final basis.

75.     In view of the policy underlying sections 330 and 331 of the Bankruptcy Code that attorneys in bankruptcy cases be compensated on parity with attorneys practicing in other fields, it is respectfully submitted that the compensation should be allowed as requested.

## V.     DISBURSEMENTS

76.     As set forth in Exhibit "2", the Togut Firm incurred $2,453.94 in expenses in providing professional services during the Third Interim Period.

77.     For photocopying expenses, the Togut Firm charges all of its clients $.10 per page.  For facsimile expenses, the Togut Firm excludes charges for incoming facsimile transmissions, and includes charges for long distance outgoing facsimiles at the actual cost charged to the Togut Firm by its telephone carrier (there are no local fax charges included in the Togut Firm's disbursements).  These charges are intended to cover the Togut Firm's direct operating costs for photocopying and facsimile facilities, which costs are not incorporated into the Togut Firm's hourly billing rates.  Only clients who actually use photocopying, facsimile, and other office services of the types set forth in Exhibit "2" are separately charged for such service.  The effect of including such expenses as part of the hourly billing rates would impose that cost upon clients who do not require extensive photocopying, facsimile, and document production facilities and services.  The amount of the standard photocopying and facsimile charge is intended to allow the Togut Firm to cover the related expenses of its photocopying and telecopying service.  A determination of the actual expenses per page for photocopying and

telecopying, however, is dependent on both the volume of copies and the total expenses attributable to photocopying and telecopying on an annual basis.

78.     The time constraints imposed by the circumstances of these cases has required the Togut Firm's attorneys and other employees at times to devote time during the evenings and on weekends performing legal services on behalf of the Debtors.

79.     Consistent with firm policy, attorneys and other employees of the Togut Firm who worked late into the evenings were reimbursed for their reasonable meal costs and their cost for transportation home.  The Togut Firm's regular practice is not to include components for those charges in overhead when establishing billing rates and to charge its clients for these and all other out-of-pocket disbursements incurred during the regular course of providing services.  In addition, due to the exigent nature of the Debtors' chapter 11 cases, same day and overnight delivery of documents and other materials was required as a result of deadlines and/or emergencies necessitating the use of such express services.  These disbursements are not included in the Togut Firm's overhead for the purpose of setting billing rates.  The Togut Firm has made every effort to minimize its disbursements in these cases.  The actual expenses incurred in providing professional services were absolutely necessary, reasonable and justified under the circumstances to serve the needs of the Debtors, their estates and creditors.

80.     None of the travel-related expenses of the Togut Firm 's attorneys were for first-class airfare, luxury accommodations, or deluxe meals.

## VI.    CONCLUSION

81.     The legal services summarized by this Application and rendered by the Togut Firm to the Debtors during the chapter 11 cases, including, without

limitation, the Third Interim Period, were substantial, professional, and beneficial to the Debtors' chapter 11 cases. They were reasonable and necessary to the preservation and maximization of the Debtors' estates.

82.    In light of: (a) the complexity of these chapter 11 cases; (b) the results achieved; (c) the significant contributions made and time devoted, often under severe time constraints and to the preclusion of other matters; (d) awards of compensation in similar cases, and (e) other factors pertinent to the allowance of compensation, it is respectfully submitted that the compensation sought is fair and reasonable and is authorized under the relevant provisions of the Bankruptcy Code.

83.    All services for which compensation is sought were performed for and on behalf of the Debtors and their estates, and not on behalf of any other creditor or party in interest. The Togut Firm is charging its standard hourly rate for professionals performing services. Other than payments made in connection with Orders of this Court, no payments have been made or promised to the Togut Firm for services rendered, or to be rendered, in connection with these cases. The Togut Firm has not entered into any agreement, express or implied, with any other party in interest for the purpose of fixing or sharing fees or other compensation to be paid for professional services rendered in these cases.

**WHEREFORE,** the Togut Firm respectfully requests that this Court enter an order: (a) awarding to the Togut Firm (i) interim compensation and reimbursement of actual and necessary expenses in the amount of $438,826.00 and $2,453.94, respectively, for the Third Interim Period; (b) allowing, on a final basis, all interim compensation and reimbursement of expenses previously awarded to the Togut Firm pursuant to orders of the Court; (c) directing payment of the foregoing amounts to the extent not already paid

29

pursuant to the Interim Compensation Order;  and (d) granting such other and further

relief as this Court deems just and proper.

Dated:   New York, New York
        May 16, 2011

                             TOGUT, SEGAL & SEGAL LLP
                             Conflicts Counsel for the Reorganized
                              Debtors
                             By:

                             /s/Frank A. Oswald
                             ALBERT TOGUT
                             FRANK A. OSWALD
                             Members of the Firm
                             One Penn Plaza, Suite 3335
                             New York, New York  10119
                             Telephone:    (212) 594-5000
                             Facsimile:     (212) 967-4258