Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 09-50026(REG)

5  - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  MOTORS LIQUIDATION COMPANY, et al.

9  f/k/a General Motors Corporation, et al.,

10

11            Debtors.

12

13  - - - - - - - - - - - - - - - - - - - - -x

14

15            United States Bankruptcy Court

16            One Bowling Green

17            New York, New York

18

19            May 17, 2011

20            9:48 AM

21

22

23  B E F O R E :

24  HON. ROBERT E. GERBER

25  U.S. BANKRUPTCY JUDGE

Page 2

1

2    HEARING re Status Conference - NCR Corporation v. General

3    Motors Corporation, et al., Adv. Proc. No. 11-09400 (REG)

4

5    HEARING Debtors' Objection to Administrative Claim No. 70792

6    Filed by John Mealer

7

8    HEARING re Motion of Post-Effective Date Debtors for Entry of

9    Order Pursuant to 11 U.S.C. § 365 Authorizing Debtors to Assume

10   and Assign Certain Dealer-Related Agreements to General Motors

11   LLC

12

13   HEARING re Debtors' 219th Omnibus Objection to Claims

14   (Contingent Co-Liability Claims)

15

16   HEARING re Debtors' 220th Omnibus Objection to Claims

17   (Contingent Co-Liability Claims)

18

19   HEARING re Debtors' Objection to Claim Nos. 67121 and 67122

20

21   HEARING re Debtors' Fifteenth Omnibus Objection to Claims

22   (Amended and Superseded Claims)

23

24

25   Transcribed by:  Lisa Bar-Leib

Page 3

1

2   A P P E A R A N C E S :

3   WEIL GOTSHAL & MANGES LLP

4        Attorneys for the Debtors and Debtors-in-Possession

5        767 Fifth Avenue

6        New York, NY 10153

7

8   BY:   JOSEPH H. SMOLINSKY, ESQ.

9

10   WEIL GOTSHAL & MANGES LLP

11        Attorneys for the Debtors and Debtors-in-Possession

12        1300 Eye Street, NW

13        Suite 900

14        Washington, DC 20005

15

16   BY:   BRIANNA N. BENFIELD, ESQ.

17

18

19

20

21

22

23

24

25

Page 4

```
 1

 2   ARNSTEIN & LEHR LLP

 3        Attorneys for Sentry Insurance & Sentry Select Insurance

 4         Company

 5        120 S. Riverside Plaza

 6        Suite 1200

 7        Chicago, IL 60606

 8

 9   BY:  DAVID A. GOLIN, ESQ.

10        (TELEPHONICALLY)

11

12   HANGLEY ARONCHICK SEGAL & PUDLIN

13        Attorneys for NCR Corporation

14        One Logan Square

15        18th & Cherry Streets

16        27th Floor

17        Philadelphia, PA 19103

18

19   BY:  MATTHEW A. HAMERMESH, ESQ.

20        (TELEPHONICALLY)

21

22

23

24

25
```

Page 5

1

2    HONIGMAN MILLER SCHWARTZ & COHN LLP

3         Special Counsel to the Debtors and Debtors-in-Possession

4         660 Woodward Avenue

5         2290 First National Building

6         Detroit, MI 48226

7

8    BY:  SETH A. DRUCKER, ESQ.

9         (TELEPHONICALLY)

10

11   ALSO APPEARING:

12   JOHN L. MEALER, CREDITOR/CLAIMANT

13        6333 Gardenia Lane

14        Show Low, AZ 85901

15

16   BY:  JOHN MEALER, PRO SE

17        (TELEPHONICALLY)

18

19

20

21

22

23

24

25

Page 6

1              P R O C E E D I N G S

2          THE COURT:  Morning.  Have seats, please.  Okay.

3  We're here on GM, Motors Liquidation Corporation.  Mr.

4  Smolinsky, good morning.  How would you like to proceed?

5          MR. SMOLINSKY:  Good morning, Your Honor.  Joseph

6  Smolinsky of Weil Gotshal & Manges for the debtors and post-

7  reorganization debtors -- post-confirmation debtors, I should

8  say.  We have a fairly short calendar today.  I think the first

9  matter on the calendar is a status conference for the NCR

10  adversary proceeding.  We're happy to start there.  And my

11  colleague, Brianna Benfield, will address those matters.

12          THE COURT:  Okay.  Ms. Benfield?

13          MS. BENFIELD:  Good morning, Your Honor.  Brianna

14  Benfield from Weil Gotshal & Manges on behalf of the debtors

15  and post-confirmation debtors, Motors Liquidation Company.  As

16  Your Honor is aware, the parties have already entered into a

17  scheduling order in the NCR adversary proceeding.  The debtors

18  agreed to the terms of that scheduling order setting forth

19  various discovery deadlines in fulfillment of our obligations

20  under the federal rules --

21          THE COURT:  Pause, please, Ms. Benfield.  I need to

22  keep the air conditioning on to keep the courtroom comfortable.

23  But you're talking over a fan that's right behind you or at

24  least between you and me.  Can you speak very loudly into the

25  microphone, please?

Page 7

1          MS. BENFIELD:  Yes.  Is this better?

2          THE COURT:  Much.

3          MS. BENFIELD:  Okay.

4          THE COURT:  You can angle that microphone.  Maybe

5     that'll meet you halfway.  Continue.

6          MS. BENFIELD:  Okay.  As I was saying, the debtors

7     entered into the scheduling order in fulfillment of their

8     obligations under the federal rules but the debtors also have

9     to fulfill their obligations as fiduciaries of the estate and

10    to conserve estate resources.  And so, for that reason, we'd

11    like to discuss the appropriate scope of discovery in this

12    matter with you today.

13         It's the debtors' --

14         THE COURT:  Well -- pause, please.  You have an

15    adversary?  I mean, where is your adversary on this?

16         MS. BENFIELD:  I believe NCR's counsel is on the

17    phone, Mr. Hamermesh.

18         THE COURT:  Mr. Hamermesh, are you on the phone?

19         MR. HAMERMESH (TELEPHONICALLY):  Hello, Your Honor.

20    Yes.

21         THE COURT:  Okay.  Go ahead.

22         MS. BENFIELD:  Okay.

23         THE COURT:  Ms. Benfield, back to you, please.

24         MS. BENFIELD:  It's the debtors' hope that the full

25    six months of discovery contemplated under the scheduling order

09-50026-mg   Doc 10293   Filed 05/19/11   Entered 05/20/11 15:39:10   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 8 of 61

Page 8

1    won't be necessary in this case because the debtors think that

2    the relevant issues in this case are relatively narrow and

3    straightforward.  So what I'd like to do this morning in this

4    pretrial conference is just briefly discuss the relevant issues

5    to the debtors, some of the issues relating to discovery, and

6    then we would welcome Your Honor's views as to the appropriate

7    scope of discovery in this matter.

8            So first, as to the relevant issues in this case,

9    this is really just a dispute about the priority of payment.

10   NCR Corporation claims that they're owed approximately 2.3

11   million dollars for past environmental remediation costs that

12   they paid relating to a site called the Valleycrest Landfill in

13   Dayton, Ohio.  And NCR overpaid its fair share of those costs

14   and then, back in 2007, GM reached an agreement with NCR

15   whereby to compensate NCR for its past overpayment, GM would

16   pay NCR's fair share of the cleanup costs going forward.

17           The debtors don't dispute that GM made that agreement

18   or that promise to pay NCR's past overpayments.  But the

19   debtors don't see this as anything more than a mere promise to

20   pay giving rise to a standard debtor/creditor relationship and

21   a general unsecured claim.

22           NCR's counsel -- or NCR in their complaint, however,

23   contends that this gives rise to a constructive trust or an

24   expressed trust in the amount of the overpayment.  The debtors

25   view the trust issue really as a question of law and one about

Page 9

1    which extensive discovery isn't really necessary.  As to the

2    constructive trust, the debtors view this as an issue of law

3    because there's significant case law in this circuit and in

4    others to the effect that constructive trusts are a disfavored

5    remedy in liquidating bankruptcy cases because the creation of

6    a constructive trust really wreaks havoc on the distribution

7    scheme and really ends up depriving other deserving creditors

8    of their share of the estate proceeds.

9            Additionally, there is a requisite element to

10   establish a constructive trust whereby it must be shown that

11   the purported trustee, the party obtaining the property, did so

12   with some sort of wrongful conduct or fraudulent conduct.  And

13   that element isn't present here nor is it claimed to be present

14   here.  The debtors simply failed to pay NCR's share of the

15   cleanup costs going forward because of the bankruptcy, that

16   that's certainly not fraudulent or wrongful conduct; it was

17   required under the Bankruptcy Code.

18           So the debtors think that, as a matter of law, they

19   would prevail on the constructive trust claim and there really

20   isn't any need for extensive discovery on that issue.

21           As for the express trust issue, an essential element

22   to establish an express trust, and also a constructive trust as

23   well, is that there must be the existence of a trust race.

24   Here, the debt -- and that trust race must have been conveyed

25   to the purported trustee.

MOTORS LIQUIDATION COMPANY, et al.

Page 10

1          Here, the debtors, from our initial investigation,

2   don't think that that element is satisfied as a matter of law

3   either because the way this payment system worked, NCR had been

4   paying its cleanup costs to an outside consultant and then

5   later in 2007, the parties agreed that going forward, GM would

6   pay NCR's cleanup costs.  But there was never any money or

7   property conveyed to GM for that purpose.  GM just paid the

8   cleanup costs out of its general account.

9          Certainly, some discovery as to the existence of a

10  trust race would probably be helpful in this case.  But the

11  debtors really think that that's the sole issue on which

12  discovery is needed in this case.

13         It's important for the debtors to really focus on the

14  key dispositive issues here because extensive discovery would

15  significantly burden the estate given that MLC, the debtors,

16  are in possession of approximately 3 to 4,000 boxes of

17  documents that were transferred to them from what's now New GM

18  relating to environmental liabilities.  These are in a

19  warehouse out in Pontiac, Michigan.  And to require the debtors

20  to search through all of these documents for anything that

21  might be related to this Valleycrest Landfill site, or NCR,

22  would really be an unnecessary burden given that the majority

23  of the case can be disposed of as a matter of law.

24         THE COURT:  Pause, please, Ms. Benfield.  If NCR were

25  asking for an unsecured claim instead of asserting claims of

09-50026-mg    Doc 10293    Filed 05/19/11    Entered 05/20/11 15:39:10    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 11 of 61

Page 11

1    trust, constructive or express, would GM be still contesting

2    this claim?

3            MS. BENFIELD:  No, not really, Your Honor.  I

4    think -- in conversations with counsel, we've essentially

5    indicated to them that we would be open to allowing this as a

6    general unsecured claim.  We think that we're very close on the

7    numbers.  We may be essentially in complete agreement on the

8    numbers.  We would, of course, now have to consult with the GUC

9    trust, the general unsecured claims trust, as to whether or not

10   we could allow this claim.  But that's essentially been our

11   position in the past.  We don't contend that this is a debt

12   that the debtors owed.

13           THE COURT:  You don't contend that -- say that again.

14           MS. BENFIELD:  We don't dispute that this is a debt

15   that the debtors owed --

16           THE COURT:  Okay.

17           MS. BENFIELD:  -- that they have this obligation to

18   pay NCR's cleanup costs going forward and, but for the

19   bankruptcy, they would have.

20           So, in conclusion, we would just welcome Your Honor's

21   views as to what the key dispositive issues here would be that

22   are appropriate for the scope of discovery.  The debtors

23   propose that discovery be limited solely to the issue of

24   whether or not there is the existence of a trust race.  And

25   what we would propose is that the parties begin discovery as to

MOTORS LIQUIDATION COMPANY, et al.

1   appropriate issues under the scheduling order that's currently

2   in place and that maybe we then set this matter for another

3   status conference in forty-five days or so.  And we can revisit

4   any discovery issues at that time and we can discuss whether or

5   not summary judgment might be appropriate at that point after a

6   bit of discovery has been completed.

7          THE COURT:  All right.  Mr. Hamermesh, do you want to

8   be heard?

9          MR. HAMERMESH:  Yes, Your Honor.  I don't disagree

10  with a lot of what Ms. Benfield said.  I think there isn't a

11  great need to dig through 3,000 or how ever many boxes out in

12  Pontiac.  In our view, there are really a couple of issues.  I

13  don't know if Your Honor had a chance to look at the complaint.

14  But the basic issue is there was a settlement agreement and a

15  consent order issued by the Court in Ohio who was presiding

16  over the case.  Our position is that -- well, the documents say

17  themselves that there's something called the total overage

18  which is the amount of the overpayment.  And it says that that

19  is something that it belongs to NCR but it's held by GM.  Our

20  position, first of all, is that's dispositive on our claim that

21  there is something held in trust.

22          And really, I think the two odd areas of discovery

23  that we think need to be pursued are, one, this issues Ms.

24  Benfield points out about a trust race; and, second of all,

25  generally the negotiations of and drafting of the settlement

09-50026-mg   Doc 10293   Filed 05/19/11   Entered 05/20/11 15:39:10   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 13 of 61

Page 13

1    agreement and consent order I mentioned.  I don't think if

2    those were principally, as I understand it, negotiated between

3    outside counsel for NCR and outside counsel for GM then we

4    would want documents from them and depose them.  I think that's

5    maybe four or five depositions total.

6            And then, I think really the bigger part of discovery

7    is discovery concerning whether there's a trust race.  So I

8    don't agree that that's a dispositive issue.  But obviously,

9    it's one we would need to look into and I don't think Ms.

10   Benfield disagrees with that.  And as I outlined to her

11   previously, I think the germane issues we would be looking at

12   on that are bank records relating to GM's account and

13   accounting records concerning this total overage.  You know,

14   those are a substantial number of documents but I think they're

15   different documents than the boxes that are out in Pontiac.

16   And I think that, by their nature, they're documents, I would

17   hope, that the debtor would have ready access to and, if not

18   the debtors then New GM who, I understand, we may need to seek

19   discovery from.

20           THE COURT:  Pause, please, Mr. Hamermesh.

21           MR. HAMERMESH:  Yes.

22           THE COURT:  I understand the point that you made

23   about not needing to see all those boxes in Michigan.  But I'm

24   puzzled about the discovery as to whether or not there's a

25   trust race.  It would have seemed to me that if there were a

Page 14

1    trust race, your client would already know about it.

2            MR. HAMERMESH:  Your Honor, I would have hoped that

3    would be the case and that would make the case a lot easier for

4    us.  But the fact of the matter is that we just don't know.  We

5    entered into an agreement with GM and then they went off and

6    did what they did.  And now we're trying keep that -- to

7    enforce that position.  Given that, we need productive

8    discovery to find out what money -- how the account was formed

9    for this, whether there was a separate account set up, whether

10   there was a specific account from which the payments were made.

11   And, frankly, Your Honor, our position would be that, for

12   example, if there were payments that were made on this overage

13   before the bankruptcy -- not a lot, a couple of hundred

14   thousand dollars maybe.  So, for example, I think if the

15   debtors, as part of their deficiency, had paid -- made all of

16   those payments from a specific account and that account always

17   has more money in it than the amount of the overage than the

18   amount of the overage, I think that would be strong evidence in

19   our support.  But we just don't know that.  That's what we need

20   to look into.

21           THE COURT:  All right.  Ms. Benfield, do you wish

22   to -- or, forgive me.  Mr. Hamermesh, did you finish?

23           MR. HAMERMESH:  (No audible response)

24           THE COURT:  Mr. Hamermesh?

25           MR. HAMERMESH:  I'm sorry.  I didn't -- hello?

1            THE COURT:  Yes.  Did you finish -- did you have

2      further comments?

3            MR. HAMERMESH:  No.  I was done.

4            THE COURT:  Okay.  Ms. Benfield, any further

5      thoughts?

6            MS. BENFIELD:  I think that the parties are

7      essentially in agreement that some discovery as to the

8      existence of a trust race and the accounting records is

9      reasonable.  We think that these can probably be obtained from

10     New GM, General Motors LLC.

11           As to the depositions of four or five individuals

12     involved in the past negotiations of this, I don't see how

13     that's particularly relevant and it imposes somewhat of a

14     burden because this happened years ago, these counsel are no

15     long with their firms and whatnot.  And it just doesn't seem

16     highly relevant.  The settlement agreement and the district

17     court judgment essentially entering the settlement agreement

18     speak for themselves.  So I think that the debtors would

19     just --

20           THE COURT:  Ms. Benfield, didn't what the two lawyers

21     said to each other -- isn't that classic material that is at

22     least potentially relevant to the construction of a document if

23     a Court finds any ambiguities in it?

24           MS. BENFIELD:  Yes, I think so.  But I think that we

25     would say that the absence of a trust race here would be

09-50026-mg    Doc 10293    Filed 05/19/11    Entered 05/20/11 15:39:10    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 16 of 61

Page 16

1    dispositive anyway, regardless of the parties' intent to create

2    a trust.  If there's no trust race, there cannot be a trust.

3              THE COURT:  Well, you may win on that when summary

4    judgment is determined.  But each side is entitled to get the

5    evidentiary underpinnings for trying its case as it wants to,

6    isn't it?

7              MS. BENFIELD:  I think that we can -- what we should

8    do is what I propose which is allow discovery to begin and

9    then, if we could come back in forty-five days or thereabouts

10   and discuss whether or not summary judgment would be

11   appropriate at that time with the idea that perhaps the parties

12   could move for summary judgment before full blown, you know,

13   six months of discovery and a number of depositions.

14             THE COURT:  All right.  Both sides had a chance to

15   now be heard fully?

16             MR. HAMERMESH:  Yes, Your Honor.

17             THE COURT:  All right.  We're going to slice and dice

18   the issues in this way.  I see no need at this point, if ever,

19   to have any discovery on the underlying environmental

20   violations or cured-of efforts.  I think you're aware, Mr.

21   Hamermesh, of the difficulty of establishing a constructive

22   trust and, for that matter, an express trust in the southern

23   district of New York --

24             MR. HAMERMESH:  Yes, Your Honor.

25             THE COURT:  -- and in the Second Circuit.  But you're

MOTORS LIQUIDATION COMPANY, et al.

Page 17

1    entitled to your opportunity to get any evidence that you need

2    to lay out your position satisfactorily.

3            I am strongly inclined to allow a motion for summary

4    judgment on this.  But I do believe that, consistent with what

5    used to be Rule 56(f) -- I think the numbering has been

6    changed -- you're entitled to the usual stuff that might be

7    relevant to the summary judgment issue.

8            So you and Ms. Benfield are to come together to

9    arrange for discovery on each of the two general areas for

10   which you want discovery and which I haven't carved out, those

11   being the existence vel non of a trust race and the negotiation

12   and drafting of the document which provides the underpinnings

13   for your claims.  Attorneys may be deposed.  The fact that

14   they're attorneys, by that alone, does not give them a

15   get-out-of-jail-free card from the duty to be deposed.  But, of

16   course, they will have the usual rights to assert privilege.

17   It seems to me that what is potentially important, assuming you

18   get past the issue of whether or not there's ambiguity, is what

19   each attorney said to the other side rather than what he or she

20   was secretly thinking or communicated to the client.  This is

21   freshman contracts.  But I am not closing the door to

22   depositions or to attorney depositions at this point.

23           I want you guys to make it happen, get the discovery

24   complete.  And then I will permit a motion for summary judgment

25   and consider the requirement for a pre-motion conference on

09-50026-mg   Doc 10293   Filed 05/19/11   Entered 05/20/11 15:39:10   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 18 of 61

Page 18

1    summary judgment waived or satisfied.

2              Not by way of reargument, are there any questions,

3    either side?

4              MR. HAMERMESH:  No, Your Honor.

5              MS. BENFIELD:  No, Your Honor.

6              THE COURT:  All right.  Let's make it happen, folks.

7              MS. BENFIELD:  Thank you.

8              THE COURT:  Right.

9              MR. HAMERMESH:  Thank you very much.

10             THE COURT:  Mr. Hamermesh, if you want to get off the

11   phone, you're free to do that.

12             MR. HAMERMESH:  Thank you, Your Honor.

13             THE COURT:  Mr. Smolinsky?

14             MR. SMOLINSKY:  Thank you, Your Honor.  Again, Joseph

15   Smolinsky.  May I ask, Your Honor, if Mr. Mealer is now on the

16   phone?

17             THE COURT:  Mr. Mealer?

18             MR. MEALER (TELEPHONICALLY):  Yes.  Yes, it is, Your

19   Honor.

20             THE COURT:  Okay.

21             MR. SMOLINSKY:  Your Honor, this matter is an

22   objection to Mr. Mealer's 230 million dollar administrative

23   expense claim under theories of respondeat superior asserting

24   various related causes of action including defamation of

25   character, trade libel and interference with Mr. Mealer's

Page 19

1    prospective advantage.

2           I know that, as usual, Your Honor has reviewed the

3    entire record of this matter which is quite voluminous.  So I

4    won't burden the Court with going through all of the facts.

5    But I think it would be helpful to highlight a bit of the

6    chronology here.

7           Mr. Mealer set up a website, I believe in 2009, for

8    the purpose of touting his new automotive technology and his

9    dream of a future automotive company that could rival the

10   current OEMs, Ford, General Motors and Chrysler.  His website

11   contained a blog.  Mr. Mealer is very knowledgeable about blogs

12   and he spends quite a bit of his time in that activity.  On his

13   website, he invites comments to his statements and his vision.

14          In June 2009, just nine days after the bankruptcy was

15   filed, Kris Kordella, who is a former General Motors employee,

16   posted a comment in reaction to some negative comments

17   allegedly made by Mr. Mealer in Automotive News on Mr. Whitaker

18   who had recently become the CEO of GM.

19          The comments could only be described as drivel and

20   the type of nonsense that one often sees on the internet.

21   Since it is so important to this, I just want to read the

22   comment that is at the center of this dispute.  The posting by

23   Mr. Kordella says to JL -- John L. Mealer, "What a funny guy re

24   your senseless blog to the Automotive News article on Whitaker.

25   Mealer Automobiles?  America's next major automobile company??

09-50026-mg   Doc 10293   Filed 05/19/11   Entered 05/20/11 15:39:10   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 2o of 61

Page 20

```
 1    Hah!  And then maybe twelve or fifteen exclamation points.

 2    You're a legend in your own head.  And notice, I didn't say

 3    mind because it's obvious you don't have one.  Anyway, I wish

 4    you all the worst the world can give to such a self-serving

 5    pathetic moron.  Good riddance, clown.  Sincerely, Kris K." --

 6    and then in parentheses -- " a real engineer of real

 7    automobiles."  That is the single post by Mr. Kordella.

 8            Mr. Kordella never identifies himself in the posting

 9    by name other than to say Kris K.  He uses a moniker, Money01.

10    Mr. Mealer suggests that Mr. Kordella professes to be a

11    financial guru and that's why he used that moniker, although

12    his posting certainly doesn't leave one with the impression

13    that he's a financial guru.

14            Furthermore, Mr. Kordella never identifies himself as

15    a GM engineer.  He simply says that he's an engineer.

16            To the contrary, Mr. Mealer then goes out and

17    investigates Mr. Kordella's ISP, which, I guess, is the

18    internet locator, to determine that it was sent from a GM

19    location which could have been at home or office.  And Mr.

20    Mealer himself then identifies Mr. Kordella as a General Motors

21    employee and engineer.

22            The posting, as I think Your Honor would agree,

23    contains no factual falsehoods or makes any statements about

24    the viability of Mr. Mealer's technology or the viability of

25    his company.  It is simply filled with nonsensical personal
```

Page 21

1    attacks, it would appear.

2              Interestingly, in subsequent pleadings in his reply,

3    Mr. Mealer admits that by highlighting Mr. Kordella's

4    involvement that he was attempting to use the attention of a

5    corporate giant GM -- this is a quote -- "to inspire others to

6    potentially invest in the underdog".  So it's clear that Mr.

7    Mealer was using this posting in order to gain interest in his

8    company.

9              Subsequent to that, Mr. Kordella submitted an apology

10   apologizing for his comments and Mr. Mealer put that up on his

11   site and made some comments that this issue is behind us.

12             Despite the fact that Mr. Mealer is obviously very

13   computer savvy, he never removes the offending remarks.  Those

14   remarks remained on the site throughout 2010 and they may very

15   well still be there.  So to the extent that Mr. Mealer believed

16   that these remarks were having a negative impact on his

17   financing activities, he clearly could have mitigated that.

18   And he, in fact, had sole control over his website.  It's not

19   as if this was posted on a third party's website.

20             Over the next several months, Mr. Mealer continues to

21   make postings on his blog through January 2010 where he posts

22   rosy predictions about his ability to raise capital, that money

23   and financing is right around the corner.  And in our papers,

24   we cite to those posts.

25             In October 2009, Mr. Mealer files personal bankruptcy

09-50026-mg    Doc 10293    Filed 05/19/11    Entered 05/20/11 15:39:10    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 22 of 61

Page 22

```
 1    in Arizona.  He never lists a claim against General Motors in

 2    his papers, in his schedules of assets and liabilities.  And

 3    the trustee, who was aware of these claims through subsequent

 4    proceedings, never pursues the claim against GM.

 5              Mealer then files an ad --

 6              THE COURT:  Pause, Mr. Smolinsky.  He didn't schedule

 7    the potential claim at the outset.  I had thought, rightly or

 8    wrongly, that when the deficiency was noted, he amended his

 9    schedules.

10              MR. SMOLINSKY:  That's possible, Your Honor.  I don't

11    recall that but you may be correct.

12              THE COURT:  All right.  Go on.  But your point is

13    that the trustee knew about the claim and determined that the

14    trustee did not want to pursue it.

15              MR. SMOLINSKY:  Correct.  Whether it was ultimately

16    scheduled or not, this presumably was an estate action and the

17    trustee could have pursued the action but elected not to.

18              Mr. Mealer then files an adversary proceeding in his

19    bankruptcy case against MLC, Motors Liquidation Company, New GM

20    and GMAC.  And in that complaint, he seems to be alleging that

21    the conspiracy is that Motors Liquidation Company assisted GMAC

22    in destroying Mr. Mealer's company in order to be able to

23    foreclose on his house.  That conspiracy has obviously now

24    shifted.  GMAC is no longer in the picture in terms of his

25    claims.  And now he's alleging that it was a GM instigated
```

Page 23

1   conspiracy to destroy his business.

2          Of course, Your Honor, that action in the bankruptcy

3   court was dismissed.  After an unsuccessful filing of a motion

4   in this case in order to establish procedures for pursuing his

5   claim -- and I believe Your Honor may have dismissed that on

6   procedural grounds for failure to state a claim in the way that

7   it was postured -- Mr. Mealer then commenced an action in state

8   court in Arizona against the same parties alleging the same

9   facts as are part of his claim in this court.

10          The procedural history of that is set out in our

11   papers.  But ultimately, that action was removed from state

12   court in Arizona to district court in Arizona and the action

13   was dismissed.  An appeal now sits with the Ninth Circuit Court

14   of Appeals of that dismissal.  And the Ninth Circuit recently

15   issued an order denying Mr. Mealer's request to proceed in

16   forma pauperis because of a finding by that Court that the

17   appeal was frivolous.  The Court also required Mr. Mealer to

18   show cause why the appeal should not be summarily affirmed.

19          The bottom line is that it is obvious that there is

20   no conspiracy here.  There's simply a nonsensical posting on a

21   blog.  There's no specific allegations as to what funding was

22   on the verge of being obtained and then was lost as a result of

23   this posting.  And it's ludicrous to conclude that a potential

24   investor looking at Mr. Mealer's plan which shows, according to

25   his papers, that by 2018 his company was going to be generating

09-50026-mg    Doc 10293    Filed 05/19/11    Entered 05/20/11 15:39:10    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 24 of 61

Page 24

1    sixty-three billion dollars of revenue and showing positive net

2    income of over sixty billion dollars.  It's ludicrous to assume

3    that an investor serious in investing in a business of that

4    type would draw its interest as a result of this specific blog

5    posting which, as I said, is totally nonsubstantive.

6           Our reply sets forth various cases which talk about

7    defamation.  And we would suggest that those cases clearly

8    indicate that this type of blog posting, particularly on the

9    internet with the typos and the hyperbole, could never be used

10   as a basis for defamation under Arizona law or could it

11   never -- and it could never be taken as a serious statement of

12   fact to be relied upon.

13          As the district court found in dismissing the claim

14   against Mr. Kordella in the district court action, the Court

15   found that Mr. Kordella could not have known that this harm was

16   likely to be suffered in Arizona because it is simply not

17   likely that any blog posting could cause such a response from

18   serious investors especially if Mr. Mealer's automobile is

19   truly revolutionary.

20          Equally failing, Your Honor, is Mr. Mealer's

21   assertion of respondeat superior.  It is simply not plausible

22   that if GM wanted to destroy Mr. Mealer's company that this is

23   the way that it would go about doing that.

24          Finally, Your Honor, on the issue of respondeat

25   superior, I would just note -- and I know this has been

09-50026-mg    Doc 10293    Filed 05/19/11    Entered 05/20/11 15:39:10    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 25 of 61

Page 25

1    addressed in other Courts.  But to the extent that it is

2    respondeat superior and Mr. Kordella was acting in the ordinary

3    course of his employment, that would actually be a claim that

4    New GM had assumed as part of the master sale and purchase

5    agreement.  I don't think that we necessarily need to get to

6    that issue today.  But I just wanted to note for the record

7    that if this was in the ordinary course of GM's business, it

8    would not be the debtors' liability.

9           My only other point -- and then I'll sit and let Mr.

10   Mealer have his time to argue.  When looking at whether this is

11   an administrative expense claim and looking at Section 503 of

12   the Bankruptcy Code, I would just suggest that a finding that

13   these damages are an actual necessary cost and expense of

14   preserving the estate has no basis in the law.  Typically, I

15   would understand an argument that if a tort is committed in the

16   course of a business and there's benefit to running that

17   business that that could give rise to an administrative expense

18   claim, certainly.  But I don't think that this blog posting is

19   the kind of activity that is tied to the preservation of the

20   debtors' automotive business.  Thank you, Your Honor.

21           THE COURT:  All right.  Mr. Mealer?

22           MR. MEALER:  Yes, sir.  Yes, Your Honor.

23           THE COURT:  I'll hear your argument now.

24           MR. MEALER:  Okay.  I could barely make out anything

25   that the opposing counsel said but I'll assume it's the same

Page 26

1    arguments they've been using the entire time.

2          The incident that occurred on June 9th with Mr.

3    Kordella entering my website with two other GM employees that

4    was goading him on because they were simultaneously on the

5    website --

6          THE COURT:  Just a minute, please, Mr. Mealer.  Adi

7    (ph.), turn -- just a minute, please.  Turn off that blower.

8       (Pause)

9          THE COURT:  Continue, please, Mr. Mealer.

10          MR. HAMERMESH:  Oh, yes, sir.  Your Honor, as seen on

11   our website that was clearly outlined in his website, was for

12   my prospective funding.  Mr. Kordella's comments were a direct

13   attack upon me to interfere with my prospective funding in such

14   a manner as to tell my prospective investors and clients that I

15   was insane or without a mind, a moron.  Later on, he followed

16   up with e-mails saying I could not be trusted.  I was a liar; I

17   was a fraud.  And this was all done through GM's equipment

18   where -- that was assigned specifically to Mr. Kordella where

19   he was trained.

20          I've provided plenty of case law that shows that

21   GMAC -- or GM -- sorry -- is liable because of the type of

22   equipment and the agreement that Mr. Kordella made with GM or

23   GM made with Mr. Kordella.  And any such private apology such

24   as he sent to me by e-mail that I had cut and paste and put on

25   my website in trying to patch up with my prospective investors

1    that has received Mr. Kordella's comments through the RSS feed

2    which even your Court allows RSS feed.

3          The damage was done immediately and I tried to patch

4    it up by pretending and playing it off like, oh, Mr. Kordella

5    and I -- hey, we've worked it out.  But the damage had already

6    been done.  There was nothing I could do to take back what

7    damage was already caused.  I believe GM's counsel, Mr. --

8          THE COURT:  Is there a reason -- pause, please, Mr.

9    Mealer.  Is there a reason if you believe that the damage had

10   already been caused that you said what you said instead of

11   saying it's too late for apologies or words to that effect?

12         MR. MEALER:  Well, no.  The damage has been done.

13   But I was attempting to undo any damage that would have

14   continued from this from -- by, you know, posting Mr.

15   Kordella's private apology.  What I wanted was a GM public

16   apology.  And GM, of course, refused that.  I just believe that

17   if I played it off as if it was, you know, company to company

18   banter, I might be able to salvage some of my investors.  But

19   some of Mr. Kordella's comments combined with whatever natural

20   effects chased them away.

21         THE COURT:  Go on.

22         MR. MEALER:  It's not like I made this up where I

23   could make him do this to me.  This is what happened.  And the

24   result is my company is dead.  And essentially, this was just

25   not what I intended.  I'd rather be building automobiles than

Page 28

1    arguing with General Motors, a company that I admire.

2              THE COURT:  Further points, Mr. Mealer?

3              MR. MEALER:  And whether I was building, you know,

4    the tri -- the three-wheel vehicles or was able to get the full

5    scale manufacturing which is what I was going for, my business

6    would exist.  My name would not be blackened out, would not be

7    known as the moron and the non-engineer to everyone because GM

8    told them I was.  In fact, my engineers -- a couple of them

9    actually came from GM.  And they have threatened to take this

10   out on me.  I hope they weren't referring to legal matters

11   because I promised them we're going to be going full steam here

12   in the full of 2009 when funding was settled in the summer of

13   2009.

14             And everybody's waiting to watch the outcome of this

15   and, I don't know.  I just wish I had a lawyer to do this for

16   me because I'm lost here in court.  I tried to put together

17   good documents for you.  I apologize if they weren't smooth

18   flowing but --

19             THE COURT:  All right.  Anything else?

20             MR. MEALER:  And as I said, I could barely make out

21   any of the words that GM was just saying.

22             THE COURT:  Well, I heard him okay, Mr. Mealer.  Is

23   there a reason why, if you couldn't hear him or if he sounded

24   mumbled, you didn't say something at the time?

25             MR. MEALER:  The telephonic conference information

09-50026-mg    Doc 10293    Filed 05/19/11    Entered 05/20/11 15:39:10    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 29 of 61

Page 29

1    says do not interrupt so I did not want to interrupt him and

2    step out of line.  It says don't interrupt when somebody else

3    is talking.  So I was really just trying to listen carefully.

4            THE COURT:  All right.

5            MR. MEALER:  I'm going to assume that it's just the

6    same thing they've been telling me or telling the Court which

7    has all been argued in my complaint and all the other documents

8    I attached and sent to the Court, emergency addition, response

9    and clarification.

10           You know, the signed confession from Mr. Kordella, of

11   course, with Mr. Burgel and Ms. Garwood -- obviously, I

12   couldn't charge them or say anything because they were only on

13   the website at the exact same time as Kordella was and on the

14   same pages that he was on.  But they didn't actually type the

15   claim themselves as the real engineer of real automobiles.

16   Probably didn't do the typing.

17           And I don't know who was standing next to Mr.

18   Kordella, I don't know if it was a -- I don't know who was

19   standing next to him goading him or discussing any of this

20   'cause I can't get disclosure one way or the other from GM.  I

21   guess it's all moot because they probably threw away all their

22   old equipment.  Not meaning to sound rude but I don't know what

23   they've done, subsequent site, that is.

24           THE COURT:  All right.  Mr. Mealer, we've had a lot

25   of pauses.  Do you have any -- and this is just the most recent

Page 30

1    of them.  Do you have any further comments?

2        (Pause)

3            THE COURT:  Mr. Mealer?

4            MR. MEALER:  I'm trying to -- we're breaking up, too.

5    I thought you were -- somebody else was talking.  I believe I

6    spelled out everything in my complaint fairly clearly.  I

7    believe my case law is there.  I'm not a lawyer.  I'm not

8    familiar with pressing a federal case or even a local case.  I

9    just hope this stands on what was done to me, relieve some of

10   the damages that were done to me, to my company, and that GM is

11   held accountable for what they've done.  Other than that, I

12   have nothing else to say except I appreciate your time.

13           THE COURT:  Okay.  Thank you.

14           MR. MEALER:  Thank you, Your Honor.

15           THE COURT:  Mr. Smolinsky, reply?

16           MR. SMOLINSKY:  Thank you, Your Honor.  Mr. Mealer

17   has obviously gone through some difficult times of late and we

18   certainly sympathize with his difficulties.  But it doesn't --

19           THE COURT:  Pause, please, Mr. Smolinsky.  Mr.

20   Mealer, I assume you can now hear Mr. Smolinsky?

21           MR. MEALER:  I can hear you, yes.

22           THE COURT:  No.  Did you hear Mr. Smolinsky when he

23   was speaking?

24           MR. MEALER:  Oh, no.  No, I did not hear him, Mr.

25   Smolinsky.

09-50026-mg   Doc 10293   Filed 05/19/11   Entered 05/20/11 15:39:10   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 31 of 61

Page 31

1           THE COURT:  Well, I heard you fine, Mr. Smolinsky,

2     but take that microphone, bring it close to your mouth and I'm

3     giving you permission to scream.

4           MR. SMOLINSKY:  Mr. Mealer, can you hear me now?

5           MR. MEALER:  Yes.  Now I can.

6           MR. SMOLINSKY:  Okay. Mr. Mealer has obviously had

7     some difficult times of late and we're certainly sympathetic

8     with that.  But I just want to reiterate that it was Mr. Mealer

9     who called Mr. Kordella out as a GM employee.  Mr. Mealer

10    posted subsequent postings after this where he indicated that

11    financing was right around the corner.  In his response papers,

12    he suggests that he only did that to try to rekindle the

13    interest that was lost.  But to the extent that he was

14    falsifying his e-mail postings to reflect the fact that there

15    was financing when, in fact, there wasn't, these are the same

16    types of falsehoods that he's alleging GM committed.

17           Nowhere in Mr. Mealer's comments did he talk about

18    any specific financing, any letter of intent, any financing

19    proposal that was pulled off the table as a result of this

20    comment.  And again, I find it hard to believe that that would

21    ever happen in our current -- the current financial world in

22    which we live where almost every new idea is criticized.  Here,

23    the idea wasn't even criticized; it was just a personal attack.

24    We just don't see how that could possible have led to the

25    damage that is alleged.  And I just want to reiterate the fact

09-50026-mg   Doc 10293   Filed 05/19/11   Entered 05/20/11 15:39:10   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 32 of 61

Page 32

1    that there are no specific facts about any financing that was

2    lost as a result of this.  Thank you.

3          THE COURT:  All right.  We're going to take a recess

4    until approximately a quarter to 11.  And that's a quarter to

5    11 Eastern time.  And, Mr. Mealer, you just stay on the phone.

6    We're in recess.

7          (Recess from 10:33 a.m. until 11:01 a.m.)

8          THE COURT:  Have seats, please.  I apologize for

9    keeping you all waiting.  Mr. Mealer, are you still with us?

10          MR. MEALER:  Yes, sir, Your Honor.

11          THE COURT:  Okay.

12          MR. MEALER:  Your Honor, if I may?

13          THE COURT:  Mr. Mealer, I'm about to rule.  Do you

14    have some comment you want to make before I do?

15          MR. MEALER:  Yes, sir.  Sorry.  Yes, sir, Your Honor.

16    I heard the opposing counsel mention that I falsified

17    something.  To be clear, I falsified nothing and not quite

18    certain what he was referring to.  I just want to make it clear

19    that honesty is all I've got.  I do not falsify anything.

20          THE COURT:  What Mr. Smolinsky's point, Mr. Mealer,

21    is that when you filed your petition and the schedules and

22    statements upon which you are required to show your assets that

23    you failed to show the right to sue GM as a result of

24    Kordella's actions.  And I think the facts are undisputed that

25    you didn't show the existence of that cause of action in your

Page 33

1    schedules.  Is it your position that there should be a dispute

2    as to that or that you cured that deficiency later or what?

3               MR. MEALER:  Oh, Your Honor, I did mention that.

4    That was ruled upon by the Arizona district -- or the Arizona

5    bankruptcy court because it was an abandoned claim once I

6    listed it.

7               THE COURT:  Once you listed it.

8               MR. MEALER:  Of course, I don't have the document in

9    front of me because I wasn't prepared for this.  That was

10   listed and the trustee abandoned that claim and it reverted

11   back to me --

12              THE COURT:  All right.

13              MR. MEALER:  -- what was ruled upon.

14              THE COURT:  All right.  Mr. Mealer, I'm now ready to

15   rule if you'll allow me to.

16              In this contested matter in the jointly administered

17   Chapter 11 cases of Motors Liquidation Company, formerly

18   General Motors Corporation, which I'll refer to as Old GM or

19   the debtors, the debtors object to the 230 million dollar

20   administrative proof of claim filed by John M. Mealer.  Mr.

21   Mealer's claim seeks recovery on underlying causes of action

22   against the debtors for negligent entrustment defamation,

23   intentional interference with business relations and trade

24   libel arising out of actions taken by Kris Kordella, an

25   employee of General Motors.

09-50026-mg   Doc 10293   Filed 05/19/11   Entered 05/20/11 15:39:10   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 34 of 61

Page 34

1          The debtors assert that Mr. Mealer's proof of claim

2     must be disallowed because the debtors cannot be held liable

3     for Mr. Kordella's actions under a theory of respondeat

4     superior because Mr. Mealer's proof of claim and the underlying

5     complaint failed to state a claim upon which relief can be

6     granted because his claim is barred by the doctrine of accord

7     and satisfaction and because any liability of the debtors for

8     these claims was assumed by New General Motors if, in fact,

9     they had been ordinary course activities.

10          While all of these defendants might well have --

11     excuse me.  While all of these defenses might well have merit

12     if ultimately addressed, even without considering how the

13     showing made here could justify an award of 230 million

14     dollars, I need address only a few of them.  I find that the

15     debtors cannot be held vicariously liable for defamation,

16     intentional interference with business relations and trade

17     libel or for any other tort claim that Mr. Mealer might assert

18     arising out of Mr. Kordella's actions at issue here.

19          In addition, I find that Mr. Mealer has failed to

20     state a claim for negligent entrustment, a tort that would be

21     associated with or result from a direct liability.

22          I also find that the claims failed to meet the

23     plausibility requirements imposed by the United States Supreme

24     Court in its Bell Atlantic v. Twombly and Ashcroft v. Iqbal

25     decisions.  My findings of fact and conclusions of law follow.

09-50026-mg   Doc 10293   Filed 05/19/11   Entered 05/20/11 15:39:10   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 35 of 61

Page 35

1          Turning first to my findings of fact.  Mr. Mealer is

2    the principal of Mealer Companies LLC, an alternative fuel

3    automobile manufacturing company.  In 2009, Mr. Mealer began

4    soliciting funding for his company to begin production of

5    alternative fuel automobiles.  In May of that year, he mailed

6    the Mealer Companies' "funding request summary" to various

7    prospective investors and set up the website

8    mealerscompanies.com to garner funding and support for his

9    company.

10          On June 1st, 2009, the debtors filed Chapter 11

11   petitions in this court.  Sometime after the commencement of

12   the Chapter 11 cases, in early June 2009, Mr. Mealer commented

13   about Old GM's bankruptcy filing on an Automotive News blog.

14   Kris Kordella, an engineer employed by GM at the time, saw Mr.

15   Mealer's comments and, on June 9, posted a response on

16   mealercompanies.com.  Mr. Kordella's post said, and I'm

17   quoting, "To JL, What a funny guy re: your senseless blog to

18   the Automotive News article on Whitaker.  Mealer Automobiles?

19   America's next major automobile company??  HAH!"-- and then

20   about a dozen exclamation points. "You're a legend in your own

21   head.  And notice I didn't say mind because it's obvious you

22   don't have one.  Anyway, I wish you ALL the worst the world can

23   give to such a self-serving pathetic MORON.  Good riddance,

24   clown.  Sincerely, Kris K." (a real engineer of real

25   automobiles)."

Page 36

1            I note, in connection with the language I just quote,

2    that Mr. Kordella did not say that he was acting in any way on

3    behalf of GM or even mention GM.

4            According to Mr. Mealer, this post was made using a

5    General Motors computer.  Mr. Mealer also states that the post

6    was sent out to anyone who subscribed to the

7    mealercompanies.com RSS feed.  Mr. Mealer also alleges that Mr.

8    Kordella sent e-mails from within GM offices "via inter-

9    corporate secured ISP equipment to Mealer's prospective

10   advantageous parties".

11           On June 15, 2009, Mr. Kordella sent an apology to Mr.

12   Mealer explaining that as an employee of General Motors, he was

13   upset by the recent bankruptcy and by Mr. Mealer's posts on the

14   Automotive News blog.  Furthermore, Mr. Kordella stated, "The

15   bottom line is I shouldn't have resorted to the knucklehead

16   name-calling in my blog and inferring your auto company isn't

17   legit, because I'm sure it is.  Please consider this my apology

18   for the aforementioned actions.  Additionally, I wish you and

19   your company great success in the future as any company that

20   can help the United States get more GREEN is a noble company

21   and should be commended for their work.  Wishing you the best

22   of luck in the future."

23           That same day, June 15, Mr. Mealer acknowledged Mr.

24   Kordella's apology on his website, stating, and I'm quoting,

25   "Finally, GM's senior engineer, Kris Kordella allowed this

09-50026-mg   Doc 10293   Filed 05/19/11   Entered 05/20/11 15:39:10   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 37 of 61

Page 37

1   final comment and we can mend fences....we are good to go and I

2   wish GM and Mr. Kordella luck in all aspects."

3          Mr. Mealer did not say, although he argued today that

4   the damage was already done.  And that the apology was

5   insufficient in any way.

6          On August 22, 2009, Mr. Mealer posted a website -- a

7   notice on his website responding to and soliciting interest in

8   employment with his company.  He wrote, and I'm quoting, "Quite

9   a few people have inquired about opportunity with Mealer

10  Companies, LLC.  Funding is not one hundred percent yet.  But

11  as we get to that point, we will need hundreds of people for

12  immediate help within the company plus the hundreds in the

13  construction industry as well as thousands more in the

14  companies related to our manufacturing end products."

15         On September 26th and again on October 24, 2009, Mr.

16  Mealer posted notices on his website indicating that the

17  business had been progressing rapidly, that "If all goes well,

18  you will see our bridge vehicle hitting the market in the next

19  eighteen months" and that "We expect to begin making major

20  advances to bringing our product to manufacturing and to market

21  by fall 2010."

22         Then on January 1, 2010, Mr. Mealer posted on his

23  website that "Mealer Companies, LLC has a quite (sic) a bit

24  going for the company this year.  Funding is just around the

25  corner...."

09-50026-mg   Doc 10293   Filed 05/19/11   Entered 05/20/11 15:39:10   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 38 of 61

Page 38

1          According to Mr. Mealer, he was, at some point, in

2     discussions with several prospective investors interested in

3     providing 200 million of funding and with prospective dealers

4     interested in purchasing about thirty million dollars worth of

5     automobiles.  Those two numbers presumably provide the basis

6     for the 230 million dollars he now wishes to recover from Old

7     GM and its creditors.

8          On October 4, 2009, Mr. Mealer filed a voluntary

9     Chapter 7 petition in the United States Bankruptcy Court for

10    the District of Arizona.  It is alleged that the Chapter 7

11    trustee, in his individual Chapter 7 case in Arizona, who would

12    otherwise have the ability to assert those claims on behalf of

13    Mr. Mealer's Chapter 7 estate, abandoned those claims.  Of

14    course, we know as a matter of Chapter 7 law, that a Chapter 7

15    trustee is entitled to abandon claims that the trustee deems to

16    be of negligible value to the estate.  And I assume for the

17    purpose of this analysis that the claims thus reverted back to

18    Mr. Mealer.

19         On March 12, 2010, Mr. Mealer filed with this Court a

20    motion to approve procedures for administering claims under

21    Section 503 of the Code seeking tort relief from the debtors.

22    I denied that motion for failure to show a prima facie

23    entitlement to relief.

24         On March 30, 2010, Mr. Mealer commenced an adversary

25    proceeding against both Old GM and New GM in his Arizona

Page 39

1    Chapter 7 case.  The complaint filed in that proceeding alleged

2    causes of action for, among other things, intentional

3    interference with prospective economic advantage and

4    defamation, claims similar to those that Mr. Mealer asserts

5    here.

6            On April 29, 2010, the debtors filed a motion in the

7    Arizona bankruptcy case to dismiss the adversary complaint on

8    the grounds that (1)it violated the automatic stay as to Old

9    General Motors; (2)Mr. Mealer lacked standing to bring the

10   adversary proceeding because a standing was transferred to an

11   appointed trustee when he filed his Chapter 7 case and the

12   trustee had not then abandoned the claims; and (3)that

13   adversary complaint failed to state a claim on which relief

14   could be granted.

15           New GM also filed a motion to dismiss arguing that it

16   didn't assume liability for those claims under the sale

17   agreement and that my court, the Chapter 11 Court with

18   jurisdiction over GM's -- Old GM's Chapter 11 case, retained

19   jurisdiction to determine all issues related to the sale

20   agreement.

21           On June 2, 2010, the Arizona bankruptcy court granted

22   both motions to dismiss without leave to amend "based on the

23   orders entered by the bankruptcy court and the injunctions or

24   retention of jurisdiction provisions therein".

25           On June 8, 2010, Mr. Mealer then filed a complaint in

Page 40

1    Arizona state court against the debtors, New General Motors and

2    Mr. Kordella.  The complaint in state court was never served on

3    the debtors.  New GM removed the action to federal court.  And

4    both New GM and Mr. Kordella filed motions to dismiss.

5    Notwithstanding my court's exclusive jurisdiction to enforce

6    and implement the sale order and sale agreement, the Arizona

7    federal district court ruled on the motion, that New GM's

8    motion to dismiss was granted because GM did not assume

9    successor liability.  The Court also granted Mr. Kordella's

10   motion to dismiss.

11            In that connection, the Arizona district court ruled

12   "Mr. Mealer believes that Mr. Kordella's comments intimidated

13   numerous potential investors and ultimately kept his 200

14   million dollar stream from materializing.  Mr. Kordella could

15   not have known that this harm was likely to be suffered in

16   Arizona because it is simply not likely that any blog posting

17   could cause such a response from serious investors, especially

18   if Mr. Mealer's automobile is truly revolutionary."

19            On February 5th, 2011, Mr. Mealer then filed an

20   administrative proof of claim in the Chapter 11 cases before me

21   seeking 230 million dollars for a defamation of character,

22   trade libel and intentional interference with Mr. Mealer's

23   prospective advantage.  His proof of claim and attached

24   documents state that his claims are for "respondeat superior"

25   and allege that "General Motors Corporation engineering

1   employee, Mr. Kris J. Kordella" visited claimant's website

2   "using a GM computer and IP address...and posted various

3   injurious falsehoods about Mr. Mealer and the Mealer automobile

4   thus unlawfully destroying growth funding and the 'rival'

5   business of Mealer's Companies, LLC."

6          Mr. Mealer asserts that Mr. Kordella's actions caused

7   him "to lose prospective funding to the tune of 200 million

8   dollars" and "prospective sales [worth] 30 million dollars".

9          I turn now to my conclusions of law.  As a

10  preliminary matter, I find that the Court has subject matter

11  jurisdiction to hear this matter and that this matter is a core

12  proceeding under which a bankruptcy judge in contrast to a

13  district judge can decide not only disputed issues of law but

14  also disputed issues of fact.

15         28 U.S.C. Section 1334 vests in the district court a

16  broad grant of subject matter jurisdiction over all bankruptcy

17  related matters.  And it's fundamental that a motion for

18  allowance of administrative expense invokes all three of the

19  arising-in, arising under and related-to prongs of 28 U.S.C.

20  1334.  District courts may, as the district court in this

21  district has under Judge Ward's well known order, refer all

22  matters to which it -- the district court has jurisdiction to,

23  under 1`334, to bankruptcy courts and that is the basis upon

24  which we bankruptcy judges, in lieu of district judges, decide

25  claims allowance matters.

MOTORS LIQUIDATION COMPANY, et al.

Page 42

1          Generally, under 28 U.S.C. Section 157(b), a

2    bankruptcy judge may only hear and finally determine core

3    bankruptcy proceedings.  Including in the list of such core

4    proceedings is the allowance or disallowance of claims against

5    the estate.  However, the list of core proceedings under

6    157(b)(2) specifically excludes personal injury, tort and

7    wrongful death claims.  It further provides, that is, 157

8    provides in its subsection (b)(5) that district courts shall

9    order that personal injury, tort and wrongful death claims

10   should be tried in the district court rather than in the

11   bankruptcy court.

12          As my colleague, Judge Lorraine Weil from the

13   bankruptcy court in the district of Connecticut explained,

14   "Personal injury tort claim" is not defined in either the

15   Bankruptcy Code, Title 11, or the Judicial Code, Title 28, and

16   there's almost no helpful legislative history.  See her

17   decision in In re Ice Cream Liquidation Ltd., 281 B.R. 154, 160

18   (Bankr. Dist. Conn. 2002).

19          Further, she noted, Courts have adopted two different

20   definitions of the term.  The broad view is that the term

21   "personal injury tort claim" applies to "any injury which is an

22   invasion of personal rights."  Id.

23          Judge Schwartzberg, the late Judge Schwartzberg of

24   this court, adopted the broad view in deciding that a

25   defamation claim brought by a preschool bus driver alleging

MOTORS LIQUIDATION COMPANY, et al.

Page 43

1    that the debtors told other parents that the driver has

2    molested their child was a personal injury tort claim.  See In

3    re Goidel, 150 B.R. 885 (Bankr. S.D.N.Y. 1993).  Judge

4    Schwartzberg determined that it was appropriate to abstain from

5    deciding whether the defamation claim fell within the exception

6    to discharge for willful and malicious injury until after the

7    state court had rendered judgment in the defamation proceeding.

8    Thus, he lifted the automatic stay to allow the defamation

9    claim to proceed in state court.

10            The narrow view of "personal injury tort claim" is

11   that the term only applies to torts involving trauma or bodily

12   injury.  Late Judge Charles Brieant of this court adopted the

13   narrow position in concluding that state ante discrimination

14   law claims were not personal injury tort claims.  See In re

15   Cohen, 107 B.R. 453 (S.D.N.Y. 1989), that being a decision of

16   the district court in the Southern District of New York.

17            Neither Judge Brieant's decision nor Judge

18   Schwartzberg's decision, which tend to cut in opposite

19   directions, is binding on me.  But for reasons I'll state, it

20   doesn't matter.  Ultimately, I agree with Judge Weil's

21   analysis.

22            In the Ice Cream Liquidation decision, Judge Weil

23   criticized the narrow view and eventually concluded that the

24   sexual harassment claims at issue were personal injury tort

25   claims even though no physical bodily injury was involved.

Page 44

1    However, she also declined to fully accept the broad view

2    explaining that in enacting 157(b)(5), "Congress cannot have

3    intended...that financial business or property tort

4    claims...could be withdrawn from the bankruptcy system."  281

5    B.R. at 161.  She explained that "In cases where it appears

6    that a claim might be a personal injury tort claim under the

7    broader view but has earmarks of a financial, business or

8    property tort claim, or a contract claim," it would be

9    appropriate for a Court "to resolve the personal injury tort

10   claim issue by (among other things) a more searching analysis

11   of the complaint."  Id.  See also Harwood's v. Alloy Automotive

12   Company, 992 F.2d 100, 103 (7th Cir. 1993) (noting that

13   "business torts" should not be "shoehorned" into the category

14   of "personal injury tort claim" under Section 157(b).

15          Using Judge Weil's analysis as a guide, analysis that

16   I find thoughtful and persuasive, I find that the claims that

17   Mr. Mealer asserts here are not personal injury tort claims.

18   Mr. Mealer alleges that Mr. Kordella made defamatory statements

19   about Mealer Companies and about Mr. Mealer in a professional

20   capacity and that Mr. Kordella intentionally interfered with

21   Mealer Companies' prospective business relations.

22          He further asserts that General Motors, a potential

23   competitor of Mealer Companies is liable for the actions of Mr.

24   Kordella, Old GM's employee.  These claims are clearly

25   financial or business tort claims.  Although in Goidel, Judge

Page 45

1    Schwartzberg determined that the defamation claims at issue

2    were personal injury tort claims.  The alleged defamatory

3    statements in Goidel involved accusations of sexual molestation

4    whereas the alleged defamatory statements here are alleged to

5    have had a negative effect on Mealer Companies' business acumen

6    and potential for financial success.  The defamation claim here

7    is therefore distinguishable.

8            In addition, unlike the plaintiff in Goidel, Mr.

9    Mealer is also asserting claims for trade libel and intentional

10   interference with prospective business relations which a

11   traditional economic or business torts.

12           For these reasons, I find that Mr. Mealer's claims

13   are not personal injury tort claims as that term is used in 28

14   U.S.C. Section 157(b).  Therefore, the adjudication of Mr.

15   Mealer's claims in the bankruptcy court is a core proceeding.

16           I also note that although, in noncore matters, a

17   bankruptcy court may not enter final judgment, it still has

18   authority to issue proposed findings of fact and conclusions of

19   law which are reviewed de novo by the district court.  See

20   Marshall v. Marshall, 547 U.S. 293 at 302 (2006) citing

21   157(c)(1).

22           Moreover, because the debtors' claims objection is

23   treated as a motion to dismiss, all of the facts alleged by Mr.

24   Mealer are taken to be true and I'm not making findings on

25   disputed issues of fact.  My rulings, rather, are on matters of

MOTORS LIQUIDATION COMPANY, et al.

Page 46

1    law which are reviewed de novo anyway.  Therefore, even if Mr.

2    Mealer's claims were deemed to be personal injury tort claims

3    and this were deemed not to be a core proceeding, I'd still be

4    empowered to make the legal determinations that I'm making

5    here.

6         I now turn to the merits.  Mr. Mealer asserts that

7    Mr. Kordella's actions give rise to claims for defamation,

8    trade libel and intentional interference.  His claims against

9    the debtors present two theories of liability.  First, he

10   asserts a direct claim that the debtors are directly liable for

11   the tort of negligent entrustment.  Second, he asserts that the

12   debtors are vicariously liable for any tort for which Mr.

13   Kordella might have been liable based on the doctrine of

14   respondeat superior.

15        First, I find that Mr. Mealer has failed to state a

16   claim for negligent entrustment.  Section 502(b)(1) of the Code

17   states that when an objection has been made to a proof of

18   claim, the Court, after notice and a hearing, shall allow the

19   claim "except to the extent that such claim is unenforceable

20   against the debtor and property of the debtor under any

21   agreement or applicable law for a reason other than because

22   such claim is contingent or unmatured".  Section 502 instructs

23   Courts to rely on nonbankruptcy law to determine whether claims

24   are enforceable for bankruptcy purposes.  See In re Combustion

25   Engineering, Inc., 391 F.3d 190, 245, note 66 (3rd Cir. 2005)

1    citing Collier.  "A claim against the bankruptcy estate will

2    not be allowed in a bankruptcy proceeding if the same claim

3    would not be enforceable against the debtor outside of

4    bankruptcy."  Id.

5            A motion to disallow a claim under Section 502(b)(1)

6    is treated as a motion to dismiss and the Court must accept as

7    true all well-pleaded factual allegations by the claimant.  See

8    In re GI Holdings, Inc., 443 B.R. 645, 664 (Bankr. Dist. N.J.

9    2010).  But that requirement still requires the allegations to

10   be well pleaded invoking the doctrine of Bell Atlantic v.

11   Twombly, 550 U.S. 544, that the factual allegations must be

12   sufficient to raise a right to relief above the speculative

13   level.  Also, they are subject to the plausibility requirements

14   of Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009).

15           I'll come back to the plausibility requirements of

16   those cases, especially those of Iqbal, momentarily.  But now I

17   turn to the underlying deficiencies that appear whether or not

18   the allegations pass muster under the plausibility test.

19           A federal court sitting in New York will apply New

20   York's choice of law rules to determine which state's

21   substantive law applies.  See In re OPM Leasing Services, Inc.,

22   40 B.R. 380, 398 (Bankr. S.D.N.Y. 1984).  Courts applying New

23   York choice of law rules have generally held that laws

24   regarding defamation and similar torts are "governed by the law

25   of the place where the tort occurred, which is the place where

09-50026-mg   Doc 10293   Filed 05/19/11   Entered 05/20/11 15:39:10   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 48 of 61

Page 48

1    plaintiff's injuries occurred."  (See Hitchcock v. Woodside

2    Literary Agency, 15 F.Supp. 2nd 246, 251 (E.D.N.Y. 1998)) and

3    that "when the defendant's negligent conduct occurs in one

4    jurisdiction and the plaintiff's injuries are suffered in

5    another...the locus in this case is determined by where the

6    plaintiff's injuries occurred."  Schultz v. Boy Scouts of

7    America, Inc., 480 N.E.2d 697 (N.Y. 1985).

8            Mr. Mealer resides in Arizona and his company, Mealer

9    Companies, LLC, is registered and operated in Arizona.  Any

10   alleged injury occurred in Arizona and Arizona law applies.

11           Under Arizona law, "It is negligence to use an

12   instrumentality whether a human being or a thing which the

13   actor knows or should know to be so incompetent, inappropriate

14   or defective that its use involves an unreasonable risk of harm

15   to others."  Quinonez v. Andersen, 144 Ariz. 193, 197 quoting

16   Section 307 of Restatement (Second) of Torts.  However, "an

17   employer will not be liable for an act of an employee that was

18   not foreseeable."  Pruitt v. Pavelin, 141 Ariz. 195, 202.

19   Generally, when an employer is found liable for negligent

20   entrustment or hiring, the employer knew or could have learned

21   through reasonable investigation something about the employee

22   or the employee's past that made the employee's harmful conduct

23   foreseeable.  For example, in a case cited in Pruitt, the

24   Minnesota Supreme Court found that a tenant who had been raped

25   by the manager of an apartment had a cause of action against

MOTORS LIQUIDATION COMPANY, et al.

Page 49

1    the owner of the apartment because the owner had trusted the

2    manager with pass keys without first investigating his

3    background.

4              Here, Mr. Mealer does not allege anything about Mr.

5    Kordella's or Mr. Kordella's past that, if known, would have

6    made it foreseeable that Mr. Kordella would use his computer to

7    post disparaging remarks about Mr. Mealer or his company.  And

8    if Mr. Mealer did have a record of using computers to post

9    disparaging remarks on the internet, Mr. Mealer does not allege

10   that Old GM knew or should have known that.  It was entirely

11   unforeseeable to Old GM, based on this date of the record, that

12   Mr. Kordella would use his computer to post comments on Mr.

13   Mealer's website and Old GM has not been alleged to have been

14   shown to be negligent in entrusting him with a computer under

15   the facts as pleaded here.  Therefore, Mr. Mealer's claim for

16   negligent entrustment fails as a matter of law.

17             Next, I find that even if Mr. Kordella's actions gave

18   rise to legally cognizable claims, that is, if Mr. Kordella

19   himself had taken action which gave rise to legally cognizable

20   claims, the debtors cannot be held vicariously liable for any

21   such causes of action, again, as a matter of law.

22             Vicarious liability or respondeat superior is a rule

23   of loss allocation under New York choice of law rules.  See,

24   for example, Zatuchny v. Doe, 825 N.Y. Supp. 2d 458, 459 (1st

25   Dep't 2006).  Here, the alleged tortious action, the internet

MOTORS LIQUIDATION COMPANY, et al.

Page 50

1   posting by Mr. Kordella occurred in Michigan and the alleged

2   harm from such action occurred in Arizona where Mr. Mealer

3   resides and where his business is registered.  Because the

4   doctrine of respondeat superior under Arizona law and Michigan

5   law is sufficiently similar, the Court needn't undertake a

6   choice of law analysis as to the respondeat superior

7   determination.

8            Under the doctrine of respondeat superior in both

9   Michigan and Arizona, an employer may be vicariously liable for

10  an employee's intentional or unintentional torts committed

11  within the scope of his employment.  However, an employer is

12  not liable for acts committed by an employee outside the scope

13  of employment.  See Rogers v. J.B. Hunt Transport, Inc., 466

14  Mich. 645, 651 (2002); Faul v. Jelco Inc., 122 Ariz. 490, 492.

15           Under Arizona law, "An employee is acting within the

16  scope of his employment while he is doing any reasonable thing

17  which his employment expressly or impliedly authorizes to do or

18  which may reasonably be said to have been contemplated by that

19  employment as necessarily or probably incidental to the

20  employment."  Ray Korte Chevrolet v. Simmons, 117 Ariz. 202,

21  207.

22           Similarly, under Michigan law, "Vicarious liability

23  may arise even where the employee's action was not specifically

24  authorized if the act is nevertheless so similar to or

25  incidental to the conduct that is authorized taking into

09-50026-mg    Doc 10293    Filed 05/19/11    Entered 05/20/11 15:39:10    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 51 of 61

Page 51

1    consideration such matters as to whether the act is commonly

2    done by the employee."  Bryant v. Brannen, 180 Mich App 87,

3    98-99.

4          While the issue of whether the employee was acting

5    within the scope of his employment is generally, for the tryer

6    of fact, "where the facts are not in dispute and where no

7    conflicting inferences may reasonably be drawn therefrom, the

8    determination of whether the employee was acting within the

9    scope of his employment is for the Court."  Rowe v. Colwell, 67

10   Mich App 543, 550.  See also Olson v. Staggs-Bilt Homes, Inc.,

11   23 Ariz. App. 574, 577 (finding that the employee was acting

12   outside the scope of his employment as a matter of law).

13         In this case, I find that even if all of the facts

14   alleged by Mr. Mealer are true, Mr. Kordella was not acting in

15   the scope of his employment as a matter of law and that Mr.

16   Mealer has failed to allege facts establishing that the web

17   post was engaged in -- within the scope of Mr. Kordella's

18   employment.

19         He was employed by GM as an engineer to work on the

20   design and manufacture of vehicles.  He was not employed by

21   General Motors in a communications capacity.  Nor was he

22   employed for the purpose of making posts on the internet.

23   Posting on the internet or disseminating his own or anyone

24   else's views was not a task that he was asked or authorized to

25   perform as a part of his engineering employment nor was it

Page 52

1    incidental or in any way similar to any task he was authorized

2    to do as part of his employment.  Therefore, even assuming

3    arguendo that Mr. Kordella's actions gave rise to an actionable

4    tort, finding that is itself negated if not wholly foreclosed

5    by the Arizona district court's findings, the debtors cannot be

6    held liable for any such torts because his actions weren't

7    alleged, or at least satisfactorily alleged, to be within the

8    scope of his employment.

9            Mr. Mealer argues that the debtors are vicariously

10   liable for Mr. Kordella's conduct because GM "trained", "had

11   the right to control", and "supplied the computer equipment"

12   that Mr. Kordella used.  Even if true, these facts do not

13   establish that Mr. Kordella was acting in the scope of his

14   employment when he posted on Mr. Mealer's website.

15           Then I further determine that the claims here fail to

16   meet the requirements of Bell Atlantic v. Twombly and Ashcroft

17   v. Iqbal.  While over the years, I have rarely invoked the

18   plausibility requirement to find claims insufficient to state

19   claims upon which relief can be granted, this case is a poster

20   child for Iqbal relief.  The notion that the childish name-

21   calling that went on here would have resulted in the 230

22   million dollars in damages that underlie this administrative

23   claim is wholly implausible, as noted in the Arizona action.

24   It simply is not likely that any blog posting could cause such

25   a response from serious investors especially if Mr. Miller's

09-50026-mg    Doc 10293    Filed 05/19/11    Entered 05/20/11 15:39:10    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 53 of 61

Page 53

1    automobile were truly revolutionary.

2            Moreover, there were no credible -- not credible --

3    satisfactorily pleaded of investor action based on the name-

4    calling either before or after the retraction.  They were

5    insufficient allegations of what was in the wings that was lost

6    as a consequence of the post.  Moreover, it is not plausible

7    that the words that were used by Mr. Korella (sic) would be

8    those upon which any otherwise serious prospective investors

9    would rely.  There is no showing that investor interest rose to

10   the level at which the alleged statements could be found to

11   have chilled that interest nor that the requisite causation,

12   the statements chilling investor interest that otherwise was in

13   place, was established under the allegations here.

14           For the foregoing reasons, the debtors are to settle

15   an order disallowing the claim.  The time to appeal this

16   determination will run from the time of the entry of the

17   resulting order and not from the time of this dictated

18   decision.  We're adjourned.

19           MR. SMOLINSKY:  Your Honor, we have additional

20   matters on the calendar.

21           THE COURT:  Oh.  You have the undisputed matters.

22   Very well.  Mr. Mealer, you're free to stay on the phone or

23   leave, as you prefer.

24           MR. MEALER:  Thank you, Your Honor.

25           MR. SMOLINSKY:  Your Honor, Joe Smolinsky for the

09-50026-mg    Doc 10293    Filed 05/19/11    Entered 05/20/11 15:39:10    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 54 of 61

Page 54

1    debtors.  The first uncontested matter is a motion seeking

2    authorization to assume and assign approximately forty-five

3    contracts to New GM.  This will be the last motion to assume or

4    assume or assign contracts.  We were permitted under the plan

5    for a period of time after the effective date to continue to

6    utilize 365 to assign contracts.  And we are doing so with the

7    request of New GM.

8             These forty-five contracts all relate to dealer

9    agreements that were assumed and assigned much earlier in this

10   case.  New GM realized that these ancillary agreements were

11   critical to continuing the dealer relationship and they asked

12   us to assume and assign those contracts.  MLC nor the GUC trust

13   have any need for these agreements nor do they want to take the

14   risk of any rejection damage claims caused by an unexpected

15   rejection.

16            We received no objection to the relief requested and

17   we'd ask that the Court approve the assumption and assignment

18   of these contracts.

19            THE COURT:  Of course.  It's approved.

20            MR. SMOLINSKY:  Thank you, Your Honor.  The next

21   matter is debtors' 219th omnibus objection to claims.  These

22   are contingent co-liability claims.  We received five responses

23   which, as usual, we will try to continue to work out

24   consensually.  We received no other responses and we'd request

25   that the motion be granted -- or the objection be granted with

Page 55

1    respect to the defaulting parties.

2              THE COURT:  Yes.  Granted.

3              MR. SMOLINSKY:  Next, Your Honor, is an objection on

4    the same grounds.  It's the debtors' 220th omnibus objection.

5    Again, we received five responses which we will adjourn.  And

6    we'd ask for disallowance of the claims that have not

7    responded.

8              THE COURT:  Yes.  Granted.

9              MR. SMOLINSKY:  The next matter is debtors' objection

10   to claim number 67121 and 67122.  These claims were filed by

11   Superior Industries.  We are now at the point that we have a

12   stipulation which we will be able to submit to the Court for

13   approval.  And that stipulation would expunge the claims.

14             THE COURT:  Sure.

15             MR. SMOLINSKY:  Next we have the debtors' fifteenth

16   omnibus objection to claims.  The last remaining claim on that

17   objection is the Birdsall claim.  We have a stipulation

18   resolving that claim as well which we can submit for

19   consideration.

20             THE COURT:  Okay.

21             MR. SMOLINSKY:  That takes care of the uncontested

22   matters for this morning.  I know that there's a matter this

23   afternoon with respect to New GM.  We don't anticipate

24   appearing.

25             Just as one housekeeping matter, we have, as Your

MOTORS LIQUIDATION COMPANY, et al.

Page 56

1    Honor knows, a number of omnibus claim objections where we have

2    one or two remaining claims and we've been unable to resolve

3    those consensually.  I think we're at the point now where we

4    need to start bringing those to Your Honor for your

5    consideration.  Typically, we contact your chambers and figure

6    out what Your Honor has time to address in any particular

7    hearing.  With respect to these motions -- or objections that

8    have been carried time and time again, I think we have to take

9    on this a little bit more proactively so we give other parties

10   a sufficient amount of time to prepare for the hearings.  We

11   think we should give them at least a week or more to notify

12   them that their objection is now going forward.  So we'll be

13   speaking to chambers unless Your Honor has any ideas on how we

14   can manage the calendar to meet your needs and our needs to

15   start moving forward on more of these remaining matters.

16            THE COURT:  Do they involve disputed issues of fact,

17   matters of law or some combination?

18            MR. SMOLINSKY:  I think it's a mixed bag, Your Honor.

19   There are some that we believe should be very easily disposed

20   of such as objections to equity claims.  And then there are

21   others that we'll have disputes.

22            THE COURT:  Well, if they're objections to equity

23   claims, you could to it with a one-page piece of papers.  If

24   you're talking about something where facts are in dispute,

25   you're going to have to agree with your opponent on providing

09-50026-mg   Doc 10293   Filed 05/19/11   Entered 05/20/11 15:39:10   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 57 of 61

Page 57

1    either side with any desired discovery.  And then if it really

2    involves issues of fact, you're going to have to do direct

3    testimony affidavits.  If it involves expert testimony, I'm

4    going to need expert reports, the whole drill on a disputed

5    issue of fact, evidentiary hearing on contested matters.  So

6    don't expect to get those resolved without you guys having done

7    all your homework first.  And only then would it be appropriate

8    to set it for trial.

9           If it involves an agreed upon set of facts and a

10   determination of law then you got to agree with your opponent

11   on a briefing schedule.  This isn't the kind of thing you do on

12   ten days' notice.

13          MR. SMOLINSKY:  Would it be better for Your Honor,

14   unless it's a very simple straightforward matter, that we use

15   the next hearing date during one of our omnibus hearings to

16   kind of stage it and determine whether a separate trial date

17   should be set?

18          THE COURT:  You can use the next hearing date as a

19   status conference to talk about the procedures for teeing them

20   up.  But if it's anything major, you're going to have to allow

21   sufficient lead times to get it teed up.

22          MR. SMOLINSKY:  Well, we'll work with chambers, Your

23   Honor.  But we're going to have to speak well before the

24   hearings in order to make sure that Your court -- the Court has

25   time to address what we need.

Page 58

1              THE COURT:  Yes, you will, because although my

2      largest cases now have confirmed plans, I am astounded by the

3      continuing litigiousness on claims matters and adversaries that

4      seems to be lingering on in each of them.  And at this point,

5      each of GM, Lyondell, BearingPoint, Chemtura, not to mention

6      some of the older blasts from the past, such as Ames and

7      Adelphia, has issues that at least seemingly are not going

8      away.

9              MR. SMOLINSKY:  We will do our best to ease your

10     burden, Your Honor.

11             THE COURT:  All right.

12             MR. SMOLINSKY:  Thank you.

13             THE COURT:  Okay.  We're adjourned.

14         (Whereupon these proceedings were concluded at 12:02 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Page 59

1

2                              **I N D E X**

3

4                          **R U L I N G S**

5     DESCRIPTION                                    PAGE      LINE

6     Ruling on discovery issues re adversary         17        17

7     proceeding 11-09400, NCR v. GMC is as

8     follows:

9     No need for discovery on underlying

10    environmental violations but discovery is to

11    take place re existence of a trust race and

12    negotiation and drafting of the settlement

13    documents via attorney depositions which may

14    then be followed by a motion for summary

15    judgment

16    Debtors' objection to Mr. Mealer's 230          53        14

17    million dollar administrative expense claim

18    under doctrine of respondeat superior

19    asserting various related causes of action

20    including defamation of character, trade libel

21    and interference with Mr. Mealer's prospective

22    advantage sustained; debtors to settle an order

23    disallowing the claim

24

25

Page 60

1

2                          I N D E X,  cont'd

3

4                            R U L I N G S

5    DESCRIPTION                                    PAGE      LINE

6    Debtors' motion seeking authorization to        54        18

7    assume and assign approximately forty-five

8    contracts to New GM granted

9    Debtors' 219th omnibus objection to claims      55         1

10   (contingent co-liability claims) sustained

11   with respect to defaulting parties

12   Debtors' 220th omnibus objection to claims      55         7

13   sustained with respect to parties who

14   have not responded

15   Debtors' objection to claim numbers 67121       55        13

16   and 67122 filed by Superior Industries

17   sustained; claims will be expunged

18   pursuant to stipulation reached between

19   the parties

20   Debtors' fifteenth omnibus objection to claims  55        19

21   sustained as to the Birdsall claim which was

22   resolved by stipulation

23

24

25

Page 61

1

2                          C E R T I F I C A T I O N

3

4       I, Lisa Bar-Leib, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6           Lisa Bar-Leib    Digitally signed by Lisa Bar-Leib
                              DN: cn=Lisa Bar-Leib, c=US
7       ————————————————————— Reason: I am the author of this document
                              Date: 2011.05.19 15:39:50 -04'00'

8       LISA BAR-LEIB

9       AAERT Certified Electronic Transcriber (CET**D-486)

10

11      Veritext

12      200 Old Country Road

13      Suite 580

14      Mineola, NY 11501

15

16      Date:  May 19, 2011

17

18

19

20

21

22

23

24

25