Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 09-50026(REG)

5    - - - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    MOTORS LIQUIDATION COMPANY, et al.,

9        f/k/a General Motors Corp., et al.

10           Debtors.

11

12   - - - - - - - - - - - - - - - - - - - - - -x

13

14              U.S. Bankruptcy Court

15              One Bowling Green

16              New York, New York

17              May 17, 2011

18              2:02 PM

19

20   B E F O R E:

21   HON. ROBERT E. GERBER

22   U.S. BANKRUPTCY JUDGE

23

24

25

Page 2

1

2     HEARING re Jurisdictional issue with respect to the motion of

3     General Motors LLC (f/k/a General Motors Company) to enforce

4     sale order.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25     Transcribed by:   Penina Wolicki

```
 1

 2    A P P E A R A N C E S :

 3

 4    JONES DAY

 5            Attorneys for New GM

 6            901 Lakeside Avenue

 7            Cleveland, OH 44114

 8

 9    BY:   HEATHER LENNOX, ESQ.

10

11

12    CLEARY GOTTLIEB STEEN & HAMILTON LLP

13            Attorneys for UAW

14            One Liberty Plaza

15            New York, NY 10006

16

17    BY:   DEBORA M. BUELL, ESQ.

18            LUKE A. BAREFOOT, ESQ.

19

20    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

21            Attorneys for DPH Holdings

22            155 North Wacker Drive

23            Chicago, IL 60606

24

25    BY:   RON E. MEISLER, ESQ.
```

```
 1

 2   BREDHOFF & KAISER, P.L.L.C.

 3          Attorneys for UAW

 4          805 Fifteenth Street NW

 5          Washington, DC 20005

 6

 7   BY:   ANDREW D. ROTH, ESQ.

 8

 9

10

11   ALSO PRESENT: (TELEPHONICALLY)

12          SARAH THOMPSON, Barclays Capital

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

 1                    P R O C E E D I N G S

 2            THE COURT:  Good afternoon.  Have seats, please.

 3            All right.  We're here on GM.  I want to get

 4    appearances, then I want everybody to sit down.  I have

 5    preliminary comments.

 6            MS. LENNOX:  Good afternoon, Your Honor.  For the

 7    record, Heather Lennox of Jones Day --

 8            THE COURT:  I'm having some trouble hearing you.  I

 9    think you said Lennox?

10            MS. LENNOX:  Yes, Your Honor.

11            THE COURT:  Okay, Ms. Lennox.

12            MS. LENNOX:  On behalf of New GM.

13            THE COURT:  All right.

14            MR. ROTH:  Andrew Roth at the law firm of Bredhoff &

15    Kaiser, on behalf of the UAW, Your Honor.

16            THE COURT:  Right.

17            MS. BUELL:  Deborah Buell; Cleary, Gottlieb, Steen &

18    Hamilton, LLP; co-counsel for the UAW.

19            THE COURT:  All right, Ms. Buell.

20            MR. MEISLER:  Ron Meisler; Skadden Arps, on behalf of

21    DPH Holdings.  Good afternoon, Your Honor.

22            THE COURT:  Okay, Mr. Meisler.

23            Folks, I have problems with both of your positions.

24    And while I'm not going to put a sock in anybody's mouth, I

25    want to hear principally about discretionary abstention.  My

Page 6

1    reaction -- it's subject to your rights to be heard, but a lot

2    of this is based on documents, on review of the papers -- is

3    that Mr. Roth, Ms. Buell, I have some questions in my mind as

4    to whether the UAW is right that New GM's position on this

5    controversy is so frivolous as not to be colorable.  If I stick

6    with that tentative view, then I do have, in the first

7    instance, subject-matter jurisdiction, exclusive jurisdiction

8    over this controversy, and I would have a basis, if I chose to

9    exercise it, for displacing the Eastern District of Michigan.

10        But with that said, I think that on the facts

11   presented here, the issues as to discretionary abstention are

12   pretty close, and I have some concerns as to what I would be

13   bringing to the table -- appropriately bringing to the table,

14   that Judge Cohn wouldn't be bringing to the table in the

15   Eastern District of Michigan.

16        Both sides are free to talk about exclusive

17   jurisdiction, but I think it's mainly about discretionary

18   abstention.  I want you, when you're making your presentations,

19   to focus on the underlying issues on the merits, which are not

20   before me today, except to set the table for your future

21   controversy, that either I, or Judge Cohn, or if I were to

22   accept the Skadden view, Judge Drain, would ultimately be

23   dealing with.  And I want you to focus in particular on the

24   distinction or whether a distinction should be made, between us

25   judges enforcing orders where we had some intention of our own

Page 7

1    as to what we thought we were trying to accomplish.

2         Sometimes we write our own orders.  More commonly we

3    sign whatever is put in front of us, either as offered or as

4    revised.  Orders, on the one hand, and the underlying documents

5    which we approve as part of those orders, on the other.

6    Because the amount of judicial input into the underlying

7    agreement, which ultimately the judge is just deciding whether

8    he or she wants to approve, doesn't rise to the level of

9    judicial input that we put into an order that we either draft

10   or sign.

11        Now, when matters as to abstention are before me, when

12   I'm construing my own orders, especially those where I was

13   pretty specific in what the order was trying to accomplish, I

14   rarely abstain.  But it appears to me from your briefs that

15   what you're mainly talking about are issues of contractual

16   construction in the underlying documents that I approved, in

17   particular the 2009 agreement, as contrasted to the language in

18   the order -- the sale order itself.  And to the extent Judge

19   Drain's intention would make a difference, I would think that

20   that might be true there as well.

21        But if there is something -- and this is a question

22   aimed mainly at you, Ms. Lennox, I guess -- if you think

23   there's something important that I said in the order where my

24   insights as to what I was trying to accomplish make a

25   difference, I need you to help me on that.

Page 8

1          I well understand the difference, folks, between the

2     old VEBA and the new VEBA.  But there seems to be a point in

3     time in which the parties came to the view or intent that

4     whatever was in the old VEBA would be poured into the new VEBA,

5     kind of like I rolled over my 401-K into my rollover IRA.  It

6     could made a difference on the merits as to what people's

7     intentions were at that time in terms of whether the underlying

8     obligation for the 450 million bucks would be erased as part of

9     that transaction or not.  But subject to your rights to be

10    heard, that seems to be a classic matter of contractual

11    interpretation, if documents are ambiguous, by bringing in

12    parol evidence.  And that's the kind of thing that bankruptcy

13    judges and district judges both do all the time, with no

14    apparent difference in skill, in my view, amongst the folks who

15    do that kind of thing.

16         One last thing.  Ms. Lennox, in your papers, I forgot

17    whether it was your first brief or your second or both, you

18    talk about me bringing stuff to the table in terms of an

19    arguably superior ability to analyze these issues.  I want both

20    sides to address whether that's true; and if it were true,

21    whether it would be appropriate for me to use it.  Because

22    we're not talking about a matter of discretion here, where what

23    I bring to the table in the way of knowing cases on my watch

24    makes a difference.  We're talking about making findings of

25    disputed fact or potentially so, or drawing conclusions of law,

Page 9

1    as to which I don't know if either side wants me to bring to

2    the table anything that's not already in the record or about to

3    be in the record on this particular controversy.

4            In fact, I would think that most lawyers don't like

5    judges pulling in stuff from outside the record, and therefore,

6    I have some concerns as to whether, if I had any special

7    insights here, I'd appropriately be invoking them or not.

8            Lastly, on the Skadden side and Delphi's needs and

9    concerns.  It seems to me that on the issues of what happened

10   in this court, Delphi may care about the result, but it really

11   doesn't have a dog in the fight.  I also noticed nobody

12   complained about Delphi's standing, so I'm going to allow

13   Delphi to be heard here.  And then if people think that I

14   should take what Delphi says with a grain of salt, I'll hear

15   whatever's said in that regard.

16           But I didn't see that much relevance to what happened

17   in the Delphi case as applicable here.  The Delphi case led to

18   my colleague, Judge Drain, approving an MOU and I think a

19   settlement agreement as well, which created the obligation.

20   But once that happened, the obligation was there.  And it seems

21   to me, your principal bone of contention is how I or Judge Cohn

22   should deal with whatever happened after Judge Drain did what

23   he did.

24           And by the way, I think, subject to your rights to be

25   heard, that what Judge Drain did is what I thought I was doing,

Page 10

1    which was approving agreements; and that the substance of the

2    orders that Judge Drain entered, doesn't give that -- result in

3    that much of a need for him to construe orders any more than it

4    imposes that duty on me.

5         So that's where I need help from you guys.  You know,

6    I have two briefs from each of you.  I guess the first brief

7    came from the union, but ultimately New GM is asking me to

8    exercise jurisdiction and to keep it.  So I'll hear from new GM

9    first.  Then I'll hear from the union, then I'll permit reply,

10   and then I'll permit surreply.  If you guys had worked out some

11   alternate deal, I don't muchly care.

12        MR. ROTH:  I think we did, Your Honor.  And since we

13   were essentially the moving party in terms of saying that there

14   is no jurisdiction, we had agreed among ourselves that we would

15   go first, if Your Honor doesn't mind.

16        THE COURT:  I don't mind.  Either way, I'm going to

17   give each of you two chances to talk.

18        MR. ROTH:  And, Your Honor, we further agreed among

19   ourselves that I was going to address the issue of jurisdiction

20   over the preclusion dispute, the colorability argument, and

21   that Ms. Buell would argue the point of discretionary

22   abstention.  And since you have signaled very clearly that you

23   would like to hear primarily from her, I'm going to be very

24   brief.

25        THE COURT:  That's good.  It's going to take Tom Brady

Page 11

1    to complete the Hail Mary to convince me that --

2         MR. ROTH:  Well, I --

3         THE COURT:  -- that the contentions as to jurisdiction

4    aren't even colorable and that there isn't a starting

5    jurisdiction here.  But have at it.

6         MR. ROTH:  -- well, let me -- we did brief the issue,

7    and I'll be very brief in my argument in terms of the Hail

8    Mary.

9         Parties don't waive or release 450 million dollars

10   claims willy-nilly.  They generally put words in the agreement

11   that can plausibly or colorably be construed.  And there is

12   not -- GM has -- they've thrown out dozens of provisions in

13   this 2009 agreement, but they have not cited a single word in

14   this very voluminous agreement, that could possibly be

15   construed as a waiver or release of this 450 million dollar

16   obligation to the DC VEBA, not a word in that agreement.  It's

17   all inferential on their part.

18        And what is the basis for their inference?  The basis

19   for the inference is that the 2009 agreement applies to the DC

20   VEBA.  It applies in the way that Your Honor indicated.  It

21   provides that as of January 16, 2010, the assets of the DC VEBA

22   will be poured into the new VEBA.  That -- I'll just say two

23   things then I'll sit down.  That provision takes the assets of

24   the DC VEBA as a given.  It doesn't say claims, obligations,

25   whatever, that might end up being assets are extinguished.

Page 12

1        The parties knew, obviously, about the DC VEBA.  They

2   made provision for the DC VEBA.  If they had intended that that

3   450 million no longer be an asset, that claim no longer be an

4   asset that would be poured into the new VEBA, Your Honor, they

5   would have said something to that effect, and they said

6   absolutely nothing.

7        And I want to add that that provision in the -- New GM

8   wants you to believe that this agreement sort of sprung out

9   out -- this 2009 settlement agreement sprung up out of a vacuum

10   in 2009 before His Honor.  That's not the truth.  The agreement

11   was basically word-for-word the same agreement that the UAW and

12   New GM -- and Old GM signed outside of bankruptcy court in

13   2008.  It had all these fixing and capping provisions.  It had

14   the same provision about the DC VEBA being melded into the new

15   VEBA in 2008.  That was February 2008.

16        In September of 2008, more than half a year later, the

17   parties signed what's referred to in the briefs as the

18   implementation agreement.  And the implementation agreement

19   specifically recognized -- explicitly recognized the continuing

20   validity of the 450 million dollar obligation.  It said, "that

21   shall remain payable subject to the conditions set forth in the

22   2007 agreement."  So there you have it.  The same words about

23   pouring it in, about fixing and capping, were there in 2008,

24   and the parties recognized that far from extinguishing -- those

25   did not have the function of extinguishing it.  Those had the

Page 13

1   function of keeping it intact, and the parties recognized that

2   specifically in writing in September of 2008.

3          THE COURT:  I hear you, Mr. Roth.  In substance,

4   you're making a parol evidence argument that by reason of the

5   surrounding circumstances, I or Judge Cohn should ultimately

6   say you win.  And I well understand the argument.  But you got

7   to do more than that to keep this away from being within my

8   jurisdiction at all.  You've got to in essence say that they're

9   not even making colorable claims, and you know, you're more

10  diplomatic and more polite than that, but you're almost like

11  saying they're not meeting Rule 11 standards.

12         MR. ROTH:  Well, I don't think the cases impose that

13  frivolous Rule 11 standard.  Some of the cases speak in terms

14  of frivolous.  I think some are more diplomatic and speak of

15  "wholly insubstantial".  I think it is fair to say, when the

16  Court reserves jurisdiction over disputes, I think it's

17  implicit that it's bona fide disputes, that are really serious

18  disputes that are worthy of -- that the parties could

19  reasonably be understood to have carved out for the bankruptcy

20  court.

21         I just don't think this meets that standard, Your

22  Honor.  I think -- and it's not -- I want to say, it is not a

23  parol evidence.  It's supported by parol evidence, but the main

24  argument is not a parol evidence rule argument at all.  It's on

25  the face of that document --

MOTORS LIQUIDATION COMPANY

Page 14

```
 1              THE COURT:  You're saying that you win by the

 2    unambiguous text of the --

 3              MR. ROTH:  Absolutely, Your Honor.

 4              THE COURT:  -- document.  And I understand your

 5    position, but forgive me.  But you being the lawyer that I

 6    sense you are, if either I or Judge Cohn says these documents

 7    aren't as clear as either side contends they are, then you're

 8    going to be bringing the exact same facts to the attention of

 9    whoever is deciding this issue on the merits, I assume.

10              MR. ROTH:  Yes.  And the fact -- let me respond to

11    that.  That's true, but let me respond in two ways.  First of

12    all, the buttressing argument about the September 2008

13    implementation agreement, that's not a parol evidence argument

14    either.  That's a subsequent contract that is indicative of the

15    parties' intent, that that obligation -- 450 million dollar

16    obligation, it says on the face of that contract -- this is not

17    parol evidence -- that obligation remains payable.

18              And the parties said that six months after they signed

19    an agreement creating the new VEBA, containing the same exact

20    language about fixing and capping the obligations to the new

21    VEBA, about pouring the old VEBA assets into the new VEBA.

22    Every word -- every word in that 2009 agreement was repeated in

23    haec verba in the 2009 agreement.  And the parties, six months

24    after that, evinced unmistakably their intent that they had not

25    extinguished that obligation pursuant to the 2008 agreement.
```

Page 15

1    It is untenable, Your Honor, uncolorable, frivolous, however

2    you want to characterize it, to argue in front of this Court

3    that language in a 2008 agreement that by the parties' own

4    recognition did not have effect X, all of a sudden magically

5    has that effect -- same effect X when repeated word-for-word in

6    a subsequent agreement that was approved by this Court.

7          I'm not going to belabor the point, Your Honor,

8    because I see you don't agree with me.  But I wholeheartedly

9    believe that that is an untenable, uncolorable argument --

10         THE COURT:  Where I don't agree with you is not

11   necessarily that I don't necessarily think that you will not

12   ultimately win.  I'm just not as persuaded that it's as one-

13   sided as you contend that it is.

14         MR. ROTH:  Well, we also -- we did put in parol

15   evidence.  We put in a declaration from Dan Sherrick, who was

16   the negotiator of both the 2008 and 2009 agreement.  New GM in

17   their brief says, you know, Your Honor, just be patient.  We're

18   going to show you.  We're going to show you we have more --

19   we're just giving you the tip of the iceberg here.  We're going

20   to -- there's nothing to preclude them from putting in a

21   counter-declaration saying -- that declaration in paragraph 18

22   recites the discussions in two thousand -- not only the

23   discussions in 2008 leading up to the 2008 agreement and then

24   the implementation agreement, but the 2009 agreement.  That

25   there were discussions -- the UAW did seek the removal of that

Page 16

1    contingency as part of this agreement before this Court, and

2    New GM said no, we're not going to agree to that.  But we'll

3    keep the -- you know, we're going to keep the contingency

4    going.  That's in paragraph 18 of the Sherrick declaration.

5            Where's the responsive declaration from New GM

6    saying -- from their negotiator, saying that's not accurate?  I

7    mean, there's nothing further to be had.  You know, this is

8    clear on the face of the agreement.  Whatever parol evidence

9    that they might have had on the other side of that -- and

10   frankly, the parol evidence rule, I think, would absolutely

11   preclude somebody from coming in and contradicting the clear

12   terms of an agreement which don't have a word about

13   extinguishing a 450 million dollar obligation.

14           Even if somebody in the UAW had made a comment that

15   they would want to try to construe, as a comment that that was

16   the intention, that could not possibly carry the day, Your

17   Honor.  How could that possibly be that parol evidence could

18   override the absence of any language pointing the direction of

19   a waiver of a 450 million dollar obligation?

20           So by every light, Your Honor, it is our firm

21   submission that that is not a colorable position.  If they had

22   anything, if they had an item of parol evidence to even cast a

23   shadow of a doubt on that, where is it?  We haven't seen it.

24   And I don't know what they're holding back for.

25           So, Your Honor, I'm not going to belabor the point,

Page 17

1    although I do think that obviously, if there is jurisdiction,

2    if it is colorable, it's by a fraction of an inch.  And that

3    argues strongly in favor of discretionary abstention.  If they

4    want to proceed on this argument in front of Judge Cohn as a

5    defense to the claim, they're welcome to do that.  Nothing --

6    if Your Honor declined jurisdiction on that ground, they

7    certainly wouldn't be precluded from raising it.

8         But, you know, so I think the fact that if there is

9    jurisdiction, if there is a colorable argument, based on what's

10   been -- the contract language and the parol evidence that we

11   put before this Court, if it's there, it's -- you need a

12   magnifying glass to see it.  And in that regard, I think that

13   points ineluctably to discretionary abstention at a minimum.

14   But I'm going to let Ms. Buell pick up on that point.

15        THE COURT:  Fair enough.  But, you know, folks, I

16   think I want to change one thing I said.  Since I heard you on

17   jurisdiction, Mr. Roth --

18        MR. ROTH:  Yes.

19        THE COURT:  -- Ms. Lennox, I'd like to hear whatever

20   you have to say at jurisdiction.  Then I'm going to button up

21   the jurisdictional point and then we'll turn to the separate

22   discretionary abstention point.  And conversely, to the extent

23   you want to be heard on jurisdiction after she speaks, Mr.

24   Roth, I'll let you.  And then I'll let her have a sur-reply on

25   that issue as well.

                                                          Page 18

1              MS. LENNOX:  Good afternoon, Your Honor.  On your

2     exclusive jurisdiction point, I would say a couple of things,

3     some of which are in our papers.  But we rest on two primarily

4     documentary --

5              THE COURT:  Do you mind pulling the microphone closer

6     to you, please?

7              MS. LENNOX:  Certainly.  Is that better, Your Honor.

8              THE COURT:  Somewhat.

9              MS. LENNOX:  Okay.  We rest on two primary preces for

10    jurisdiction.  One is the parties' agreement in Section 26(b)

11    of the 2009 agreement that this Court would have exclusive

12    jurisdiction over the enforcement, implementation, application

13    or interpretation of that agreement.  And that's buttressed by

14    paragraph 71 of the sale order in which the Court retains

15    exclusive jurisdiction to implement the terms and provisions of

16    the order, the MPA and each of the agreements executed in

17    connection therewith.

18             Our position, as Your Honor has stated, is that our

19    entry into that 2009 agreement forecloses any contention that

20    New GM has a contractual obligation to make the payment at

21    issue.  And we elucidate several reasons for that that we put

22    in our briefs.  But whatever the merits of our arguments will

23    be, Your Honor, and we're not arguing merits here, which is why

24    there's no counter-declaration on the merits -- once we argue

25    the merits, we will present all of our arguments on the merits.

1    But what -- whether we win or lose, it's self-evident that we

2    are talking about questions regarding the application,

3    interpretation and enforcement of the 2009 agreement.

4        What the UAW, Your Honor, is arguing, is that -- with

5    respect to colorability -- what they're trying to argue is that

6    the additional VEBA payment that they would like is entirely

7    unrelated to both the new VEBA and the 2009 agreement; that

8    they've got absolutely nothing to do with each other.

9        Essentially, Your Honor, what they're arguing is that

10   a 450 million dollar payment to be made by New GM that will be

11   deposited directly into the new VEBA for the sole benefit of

12   the UAW represented retirees, is entirely unrelated to the 2009

13   agreement, when that was the agreement, that was the

14   comprehensive agreement, on all UAW-related retiree benefits.

15       THE COURT:  Doesn't Mr. Roth make the point, which I

16   will confess I read as a parol evidence point, rather than a

17   colorability point, but if you wanted to erase an obligation of

18   450 million bucks, you might have said so.

19       MS. LENNOX:  Well, Your Honor, I think that goes the

20   other way.  And our position is if you wanted to retain an

21   obligation of 450 million dollars, you would have said so.  And

22   nobody said so.  Nobody said so in court; nobody said so in the

23   papers; in the notice that the UAW sent to the retirees about

24   what was going to be put into the new VEBA that wasn't

25   mentioned.  And so I would argue the reverse of that, Your

Page 20

1    Honor.  If you wanted to retain that kind of obligation that

2    New GM would have to pay a half a billion dollars, when

3    everything else that New GM was putting into this VEBA was

4    clearly delineated, you would say so.  And that wasn't said.

5    And so I would argue the reverse, Your Honor.

6           So we -- given all that, Your Honor, we do think that

7    on the merits, there is -- there clearly is a dispute.  And it

8    involves the interpretation of the 2009 agreement and the

9    papers that surrounded it and what was said in court.  And we

10   think, Your Honor, that the parties agreed to your exclusive

11   jurisdiction, and they did it for a reason.  They did it

12   because this agreement was so important to the sale that the

13   sale would not have happened without it.

14          And in fact, the UAW mentions that in their reply to

15   the objections that were filed to the sale.  They basically

16   said that without this agreement there would be no 363

17   transaction.  And so that's why Your Honor retained exclusive

18   jurisdiction, and that's why the parties agreed to Your Honor's

19   exclusive jurisdiction.

20          THE COURT:  Suppose I were allowed to break the rule

21   that I just said in my opening remarks I thought I shouldn't

22   break, and added my own knowledge to this, and suppose it were

23   the case that I never even read the new VEBA agreement, the

24   2009 one, and that I was totally preoccupied with whether GM

25   would survive and whether I'd keep a couple of hundred thousand

Page 21

1    jobs alive at GM and another 800,000 in the supplier chain.

2    And I was focused solely on the legal argument that were put

3    before me, and I didn't think about that at all?  Tie that

4    assumption to what my role in life would be in interpreting an

5    agreement that I never saw or focused on.

6              MS. LENNOX:  Okay.  Your Honor, we're getting a little

7    into preclusion, but I'm happy to address that here.  I think

8    Your Honor's role in that is twofold, okay?  First, with

9    respect to the agreement itself, in the sale order, paragraph

10   20 of the sale order -- you've got two paragraphs in that sale

11   order that specifically approve the 2009 agreement.  And in

12   particular, in paragraph 20 of that order, Your Honor

13   references specific provisions of the retiree settlement

14   agreement.

15             On page 28 of your order in Roman III, you

16   specifically order things to happen under that agreement, and

17   you speci --

18             THE COURT:  In paragraph 20?

19             MS. LENNOX:  20, yes, sir.

20             THE COURT:  Um-hum.

21             MS. LENNOX:  Page 28 -- maybe seven or eight lines --

22             THE COURT:  Well, I have the key language in a

23   separate document, so just talk about the paragraph number.

24             MS. LENNOX:  Okay, so paragraph 20.  You specifically

25   reference one of our key arguments that says, "In accordance

MOTORS LIQUIDATION COMPANY

Page 22

```
 1    with Section 5(d) of the UAW retiree settlement agreement, all

 2    provisions of the purchaser's plan relating to retiree medical

 3    benefits shall terminate as of the implementation date or

 4    otherwise be amended so as to be consistent with the UAW

 5    retiree settlement agreement."

 6            Your Honor, that's a decretal paragraph of your order,

 7    and that's one of our key arguments -- one of our key arguments

 8    on the merits.  And so it has made its way into this order.

 9            The second thing I would say, Your Honor, is that the

10    hearing lasted several days, and there were some --

11            THE COURT:  The 363 hearing?

12            MS. LENNOX:  Yes, Your Honor, the 363 hearing lasted

13    several days.  And one of the key struts for approving the 363

14    sale was this agreement.  Old GM had to be relieved of its

15    retiree liabilities; New GM had to come to some agreement with

16    the UAW as an employer going forward.  And this was a key

17    provision of this sale.

18            Your Honor heard lots and lots of testimony about that

19    sale.  Your Honor heard lots and lots of evidence about how

20    people were objecting to what they perceived to be the UAW's

21    unfair treatment, unfairly favorable treatment, under the sale.

22    Your Honor heard three days of testimony on that.  And it

23    sounds from what Mr. Roth is saying and certainly from some

24    arguments I've made, that parol evidence regarding what

25    happened at the sale hearing, the documents that were
```

1    introduced at the sale hearing, the documents that went out in

2    connection with the sale hearing, are going to have some

3    bearing on the merits of this dispute, should Your Honor or

4    should some court determine that the language of the agreement

5    is ambiguous.

6           And there -- Your Honor, Judge Cohn in Michigan, could

7    try to wade through three days of that and try to remember the

8    import of what was happening and the tone and the demeanor of

9    what was happening at that time, Your Honor.  But that would be

10   a monumental hurdle to climb.  I'm sure Judge Cohn is up to the

11   task, but it doesn't make any sense for somebody without

12   that --

13          THE COURT:  Which witness' tone and demeanor do you

14   think is relevant to this controversy?

15          MS. LENNOX:  I'm sorry, Your Honor?

16          THE COURT:  Now, you're ahead on this point.  I don't

17   know if you want to blow it.  But I sat through that hearing

18   and I remember it pretty well.  It's one of the more important

19   cases I've had over the last eleven years, and --

20          MS. LENNOX:  Exactly.

21          THE COURT:  -- I cannot for the life of me remember

22   any tone and demeanor that I could think of as being

23   potentially relevant to this controversy at all.

24          MS. LENNOX:  Your Honor, maybe that is an

25   overstatement.  But certainly the papers that were filed in

MOTORS LIQUIDATION COMPANY

Page 24

1    connection with this, the arguments that were made, the import

2    that people put on certain things, which may not be reflected

3    in the record -- people emphasize things, they gesture for

4    certain things that Your Honor may remember in terms of their

5    import, that may not come across on paper.  Not everything

6    comes across on paper.

7          And there are so many things that are related to this

8    hearing that are so critical to this particular point, which

9    was an unwaivable condition for the sale to go forward, that it

10   just doesn't make any sense to have a judge who was uninvolved

11   in the proceedings continue with this.  And so, Your Honor,

12   that's what I would say with respect to your exclusive

13   jurisdiction.

14         THE COURT:  Okay.  Mr. Roth, I'll take brief reply.

15         MR. ROTH:  Your Honor, I'm sorry, but that was -- this

16   stuff about the centrality of the three days of hearing and the

17   critical nature of the 2009 agreement, that's all true, but

18   what was at stake in the 2009 agreement?  What was at stake was

19   the twenty billion dollar obligation that New GM had undertaken

20   in 2008 in that agreement, they couldn't pay it anymore.  They

21   didn't have the cash to pay the twenty billion, as this Court

22   well knows.

23         So all the dispute -- the thing that this Court was

24   wrestling with was, how to restructure that twenty billion so

25   it would go into equity and other -- that was what was the nub

MOTORS LIQUIDATION COMPANY

Page 25

```
 1    of the matter.  That was the big fish to fry.  450 million is a

 2    lot of money.  But 20 billion is a lot more.  And that's what

 3    the parties were wrestling with.

 4           As with respect to the DC VEBA, the 450 million and

 5    all, the parties just carried forward everything else from the

 6    2008 agreement.  The fact that the DC VEBA assets would be

 7    folded in; the fixing and capping; all those provisions.  Those

 8    were not controversial in 2009.  That was all settled.

 9           The parties, as set forth in the Sherrick declaration,

10    they used the same -- section 2 became -- section 2 from the

11    2008 agreement became section 2 from the 2009 agreement.

12    Everything was repeated except for the one big piece which was

13    the restructuring of that twenty billion, which Your Honor is

14    exactly right, has nothing to do with the present dispute.

15    Everything that has to do with the present dispute was just

16    carried over without controversy, into the 2009 agreement.

17           Therefore, it's dispositive that when those same

18    provisions were agreed to in 2008, nobody thought for a second

19    that those provisions had the effect of extinguishing the 450

20    million dollar obligation.  They said so explicitly in

21    September of 2008 in the implementation agreement.  They said

22    that 450 remains payable.  If that pouring provision, those

23    fixing and capping provisions had the effect that New GM now

24    says it does, that implementation agreement makes absolutely no

25    sense.
```

Page 26

1          It is just un -- it is not colorable, it's untenable,

2     it's frivolous, however you want to characterize it.  It is

3     just not an argument that this Court could possibly accept.

4          As far as paragraph 20 of the sale order, what the

5     Court -- and we briefed this very carefully.  What the Court

6     was addressing was Section 5(d).  And what the Court said was,

7     pursuant to the 2009 agreement, New GM is not going to be

8     providing health benefits anymore.  Those benefits are going to

9     come exclusively out of the new VEBA.  That didn't address

10    payment obligations to the new VEBA much less the DC VEBA.

11    That was a provision just setting forth a concept that was

12    settled in 2008 and carried forward into 2009, which is that

13    GM's getting out of the business of providing health benefits.

14    The UAW VEBA is taking over.  That's all that that paragraph 20

15    says.  Again, it has nothing whatsoever to do with this dispute

16    over the payment obligation into the DC VEBA.

17          THE COURT:  Mr. Roth, to what extent was first Old

18    GM -- I guess we're really talking about Old GM here -- as of

19    June of 2009, paying benefits directly for retirees as

20    contrasted to putting money into a VEBA and then the payments

21    to the VEBA being deemed to be its obligation to take care of

22    those retirees?  In other words, after --

23          MR. ROTH:  Yes.

24          THE COURT:  -- the 2008 agreement and before --

25          MR. ROTH:  Yes.

MOTORS LIQUIDATION COMPANY

Page 27

1           THE COURT:  -- or maybe 2007, and before 2009, were

2   there employees where GM was still direct taking care of their

3   retiree benefits, or --

4           MR. ROTH:  Absolutely.  Absolutely, Your Honor.

5   Through the implementation date, that was the understanding

6   that they would -- you know, it would be a gradual process that

7   they would turn it over as of January 2010.  This was decided

8   back in 2008, reaffirmed in 2009, that GM would continue paying

9   health benefits, and the DC VEBA would continue paying -- you

10  know, the DC VEBA was a mitigation VEBA.  It paid -- since New

11  GM had lessened the retiree health benefits back in 2006, the

12  DC VEBA was established at that time to mitigate the added

13  costs to the retirees from the lowering of retiree health

14  benefits.

15          So New GM continued to do it out of their own coffers,

16  supplemented by the DC VEBA.  And that's a critical point, Your

17  Honor.  Pursuant to the 2008 agreement and the 2009 agreement,

18  the DC VEBA continued in existence, continued to pay claims --

19  the mitigation claims -- up through the implementation date in

20  January 2010.

21          The Delphi plan -- we say the condition was satisfied

22  because the Delphi plan was con -- the condition to the

23  obligation to pay the 450 was satisfied in October of 2009 when

24  Judge Drain confirmed -- when the approved plan was

25  consummated.  The UAW sent out a demand letter in October 2009.

Page 28

1    That was reje -- for the 450 million dollar payment.  It said

2    pay it into the DC VEBA, still in existence.  New GM rejects

3    it.  We say that's a breach of contract, because the obligation

4    had not been extinguished and it was, we allege, contingent on

5    the consummation of the Delphi plan, and that contingency was

6    satisfied, and the UAW made a demand.

7         If that -- so that's a breach according to the

8    allegations of our complaint.  They've asserted an affirmative

9    defense of extinguishment, so those allegations of the

10   complaint have to be accepted as true.  Therefore, under the

11   allegations of our complaint in the Eastern District of

12   Michigan, if they had not breached the contract, that money

13   would have gone into the DC VEBA which was still in existence.

14        Now, they want to take advantage of their own contract

15   breach and say wait, Your Honor, I think -- I'm quoting Ms.

16   Lennox -- that we're seeking a payment that would be deposited

17   solely into the new VEBA.  That's true by virtue of the asset

18   transfer and the extinguishment of the DC VEBA.  But it wasn't

19   true at the time that the UAW made the demand and the demand

20   was unlawfully rejected, according to the allegations of our

21   complaint.

22        So again, nothing -- there is absolutely nothing that

23   they can hang their hat on in terms of that obligation being

24   extinguished.  They said exactly the opposite with respect to

25   the exact same contract language in September of 2008.  And if

Page 29

1    they had not breached the contract, that obligation would have

2    been satisfied and we wouldn't be here today, I don't believe.

3    They're trying to take advantage of their own breach by saying

4    now we're seeking what they characterize as an additional VEBA

5    payment, in violation of the fixing and capping provisions that

6    say no additional payments to the new VEBA.  That's too cute,

7    Your Honor.  I think that is frivolous.  I think that's not

8    colorable.  And that's our position.

9              THE COURT:  Okay.  Let's go right to you, Ms. -- well,

10   pause.  I said I'd give you sur-reply on jurisdiction if you

11   want it, Ms. Lennox.

12             MS. LENNOX:  Just a couple brief -- very brief points,

13   Your Honor.

14             THE COURT:  Okay.

15             MS. LENNOX:  Your Honor, I just want to rise to dispel

16   the impression that Mr. Roth would like to leave that the 2008

17   agreement was substantially similar to the 2009 agreement.

18   It's not.  If you black-line those two agreements, they're

19   actually quite substantially different, including, most

20   importantly, as to the parties to whom -- the parties to each

21   of the agreements:  Old GM in 2008 and New GM in 2009.  And why

22   does that matter?

23             Because New GM wasn't negotiating on its own in 2009.

24   New GM had a sponsor.  It was called the U.S. government that

25   had restrictions about what it was going to let New GM assume

Page 30

1    and let New GM pay and what was going to happen vis-a-vis this

2    VEBA.  And that's an important -- notwithstanding the language

3    changes, which are quite different, that's an important game-

4    changing event that happened between the 2008 and 2009

5    agreements.

6           THE COURT:  Well, I take that point.  But by the same

7    token, the 2008 agreement seems to say in paragraph 8, fixed

8    and capped, just as the 2009 agreement in its paragraph 8 seems

9    to also have fixed and capped language.  Am I correct in that

10   regard?

11          MS. LENNOX:  It has -- in that respect it uses the

12   same language, Your Honor.  But I would say the intervening

13   events that happened -- Old GM went bankrupt in the middle of

14   that.  Everything was on the table.  Everything was supposed to

15   be resolved with finality.  Everything was renegotiated.  And

16   it was renegotiated with the government in the room.  So just

17   because the words are the same, doesn't mean that the import

18   was the same, Your Honor.  And we will certainly be prepared to

19   get into this in the merits phase of this argument.

20          And the only other point I wanted to make, Your Honor,

21   is Mr. Roth is right.  Paragraph 20 does rely on Section 5(d)

22   of the agreement.  And it's part of your order.  And that just

23   reemphasizes our point that Your Honor should be the one to

24   interpret and enforce your own order.

25          THE COURT:  Okay.  Thank you.  Let's go right to

Page 31

1    abstention, now, folks.

2         Ms. Buell?

3         MS. BUELL:  Good afternoon, Your Honor.  Deborah

4    Buell, Cleary Gottlieb, co-counsel to the UAW.

5         The parties obviously cited a great many cases on the

6    abstention point, and as I was going through them, in addition

7    to remarking on the number of cases in this area, jurisdiction

8    and abstention, authored by this Court, which was an

9    interesting aspect in the preparation for this argument, as

10   well as a little humbling, it seemed to me that Longacre,

11   decided by this Court, and NTL decided by Judge Gropper, are

12   perhaps the most on point with the case that we have before us

13   today.

14        And as the Court will recall, both of those cases

15   involved nondebtor disputes that bore some connection to the

16   underlying bankruptcy cases, but which in neither case was the

17   order of the bankruptcy court itself a part of the disputed

18   facts.  It was a relevant fact in each of those disputes, but

19   the parties did not take issue with whether the orders were

20   ambiguous, what they meant, or what they had accomplished.

21        Now, as Your Honor said in Longacre, which was the

22   claims trading dispute, that case was procedurally but not

23   substantively core.  Procedurally core in that if there had not

24   been a Chapter 11 case, there wouldn't have been a Chapter 11

25   claim; there wouldn't have been a trading dispute, and

Page 32

1    therefore, not an underlying dispute.

2            But the issue was not substantively core in the

3    Court's judgment, because the issue was a good, old-fashioned,

4    state law breach of contract claim.  And on that basis, while

5    the Court noted that the sale order in that case was of

6    relevance, it did not cause this Court to conclude that the

7    other factors that supported discretionary abstention should be

8    overlooked.

9            In NTL, Judge Gropper had another interesting

10   situation where he issued an order modifying a plan.  There was

11   litigation for holders and traders in the when-issued market.

12   And Judge Gropper concluded in that case that, again, even

13   though his plan modification order was an important fact in

14   those disputes, the parties were not disputing what his order

15   meant.  No one needed interpretation of his order.  It was a

16   relevant fact, but the issue really was, what was its effect on

17   the private contracts and what did those contracts mean in

18   light of the judge's order.

19           So these cases, I think, are very much on point with

20   what we have here, where while there is certainly plenty of

21   disagreement going on between the UAW and New GM, there's no

22   disagreement as to what the terms of this Court's sale order

23   are; there is no allegation of ambiguity in this Court's sale

24   order; there is no request for interpretation of this Court's

25   sale order.  And I think that Ms. Lennox had it right when she

Page 33

1    was describing in her remarks, that there is absolutely a

2    dispute regarding the interpretation and construction of the

3    2009 retiree settlement agreement.  That is in dispute.

4         Now, when we look at the factors that this Court and

5    others have identified on the abstention front, I think that

6    each of those either militate in favor of abstention or are at

7    least neutral.  And the first that I want to address is the

8    effect on estate administration.  I think it's well-understood

9    by everyone here, but let's state the obvious, that there is no

10   claim against the Old GM estate.

11        The other potential effect on the administration of

12   the estate that New GM has raised is that there will be an

13   opening of the floodgates and objectors to the sale order will

14   reemerge arguing that UAW got too good of a deal, if it turns

15   out that the 450 million dollar payment is actually due and

16   owing.  And they're referring the Court to the situation that

17   we've seen recently in the Lehman case.

18        First of all, Your Honor, I think that there is no

19   factual basis to think that the objectors are going to come out

20   of the woodwork here in this case.  And two, Lehman is really

21   not an apt example, because what you had in Lehman were people

22   saying after the fact, gee, the buyer took too much from the

23   estate; the buyer got too good of a deal.  Here, there's no

24   question that UAW was taking from the estate.

25        The question is, in the agreement, which was assigned

Page 34

1    from Old GM to New GM, and the obligations that New GM got as a

2    result of that assignment, what were the liabilities that Old

3    GM transferred.  Did they include this 450 million or not?  And

4    that is the issue that goes to the underlying agreement, Your

5    Honor, and not to the sale order itself.

6             Another factor that is looked at in these decisions is

7    the degree of relatedness to the main bankruptcy.  And here I

8    want to just point out, Your Honor, that while I certainly --

9             THE COURT:  Before you get off that --

10            MS. BUELL:  Yes.

11            THE COURT:  -- Ms. Buell, refresh my recollection on

12   what 60(b) imposes in the way of the requisite showing for

13   undoing an old order, and also in terms of establishing a time

14   limit.  I remember something about a one-year rule, but I --

15            MS. BUELL:  Yes, Your Honor.  It's --

16            THE COURT:  -- may have it confused.

17            MS. BUELL:  -- one year.  And I believe it's, you

18   know, newly discovered evidence or a mistake in law, neither of

19   which, I think, could be said to be the case with respect to an

20   objection here.  And in fact, Judge Peck, in the Lehman case,

21   readily disposed of those objections in Lehman where, of

22   course, there was a more significant issue in terms of whether

23   the estate had given up more than it should have.

24            THE COURT:  Go on, please.

25            MS. BUELL:  Okay.  So the degree of relatedness to the

MOTORS LIQUIDATION COMPANY

Page 35

1  main bankruptcy.  We've heard a lot about the preclusion

2  dispute so far today.  But of course, the claim that the UAW

3  has is what we've described in the papers, both sides, as the

4  MOU dispute; whether under the terms of the Delphi MOU, the

5  conditions precedent to the 450 million dollar payment have

6  been satisfied or not.  And certainly New GM expects to defend

7  on that in addition to the preclusion defense that has focused

8  this Court on its jurisdictional scope.

9         New GM, in their briefing, argued that this Court did

10 not have jurisdiction exclusively over the MOU dispute.  Right?

11 That's in their brief, page 18 of their February 7th brief.  So

12 I was a little surprised to hear the discussion today.  But I

13 understand where this Court is coming from, which I take it,

14 that based on the preclusion issue, based on the issue under

15 the 2009 retiree agreement, you've concluded that that is a

16 sufficient basis for this Court's exclusive jurisdiction, based

17 on the sale order.

18        But I just want to point out that New GM is on record

19 saying they don't think any court has exclusive jurisdiction

20 over the MOU dispute, not this Court and not Judge Drain.  So I

21 think at a minimum, Your Honor, that the argument as to the

22 degree of relatedness of this dispute to the main bankruptcy is

23 attenuated under the particular facts of this case.

24        THE COURT:  Weave into that Skadden's point on behalf

25 of Delphi.  I think Skadden said in its second brief, in

Page 36

1    substance, that the controversy between New GM and the UAW

2    sprung up at a time in which Bob Drain still did have exclusive

3    jurisdiction.

4            MS. BUELL:  Your Honor, I think there is no dispute

5    between the parties that the order that Judge Drain entered in

6    2007, approving the Delphi MOU, retained only nonexclusive

7    jurisdiction through plan confirmation.  Right?  That, I think,

8    there's no dispute by any party here.  Delphi is taking the

9    position that in the retention of jurisdiction provisions of

10   the plan, somehow that nonexclusive jurisdiction got morphed

11   into exclusive jurisdiction over the Delphi MOU agreement

12   itself.

13           We think that that is, you know, a very objectionable

14   and indefensible reading of those provisions.  We don't think

15   that Judge Drain went from nonexclusive jurisdiction during the

16   course of the case to decide that only he could then exercise

17   jurisdiction over a contractual dispute, after the fact, even

18   after it was assigned from Delphi to GM.

19           So I think that the Delphi issue is a little bit of a

20   red herring, Your Honor.  I think that it need not detain this

21   Court today, if you conclude that you will abstain.  And I

22   suppose we could leave for another day among the parties, if

23   necessary, to address this before Judge Drain as part of this

24   jurisdictional saga.  But it's an extremely weak position.

25           And I did note certainly with interest the Court's

1    suggestion that we could have objected to Delphi making their

2    view known.  And if it's not too late, we do object.  But we

3    also felt that as a matter of respect among the judges of this

4    Court, that if there was some kind of an argument that Judge

5    Drain had jurisdiction, that this Court would want to hear

6    about it in the overall context of this dispute.

7              THE COURT:  Would I be talking out of school if I were

8    to say in this open courtroom that if I thought I were stepping

9    on Judge Drain's toes, a matter of that type would get my

10   attention, whoever's raising it?

11             MS. BUELL:  Thank you, Your Honor.

12             THE COURT:  So I'm looking at you when I say that.  I

13   guess I should be looking at everybody when I say that.

14             I do have an interest in how much, if at all, this

15   steps on Judge Drain's toes.  Right now I don't see that it

16   does.  But anybody who feels differently should tell me so.

17             Go on.

18             MS. BUELL:  Thank you.  So I think the point on

19   abstention, right, is this question of the relatedness of the

20   dispute to the main proceeding.  And we think that the record

21   here clearly indicates that it is not central to the main

22   proceeding, both because of the lack of the claim against the

23   estate, and based on what you've heard, the colloquy between

24   counsel, regarding the issues that are going to be of debate on

25   the 2009 retiree agreement.  It's basically what did the

Page 38

1     parties negotiate before they got into this court.

2            There is an additional factor, Your Honor.  Jury trial

3     right.  We think that does militate strongly in favor of

4     abstention in favor of Judge Cohn.  There is --

5            THE COURT:  I saw that Ms. Buell.  I didn't regard

6     that as one of your strongest points.  You don't have a jury

7     trial here.  And whether -- if I do send it to Judge Cohn, he

8     decides that, it's his decision and not mine.

9            But the biggest fight that we have here is the one I

10    just heard from Mr. Roth and Ms. Lennox, are threshold

11    decisions that are made by a judge long before you get to a

12    jury.  Because first, whether an agreement is ambiguous or not,

13    it's plainly a matter for the judge.  And I've forgotten what

14    the applicable law is as to how the parol evidence is dealt

15    with, if there is deemed to be an ambiguity.  But I mean, the

16    notion that a jury is going to be deciding issues of this

17    complexity strikes me as first an assumption that may not have

18    factual support, and second, if I really thought that a jury

19    would be deciding it, that would actually cut against your

20    point, because I would be -- you know, the underlying basis on

21    which I abstain in a federal abstention analysis is the

22    interest of justice.  And throwing this controversy into the

23    hands of a jury may or may not be in the interests of justice.

24            MS. BUELL:  Understood, Your Honor.  The point is that

25    unlike the 2009 retiree settlement agreement, where there is a

1    jury trial waiver, under the Delphi MOU there is no such

2    waiver.  So understanding that the case has a lot of procedural

3    steps to go, including the type of motion practice that you've

4    described, that is at the end of the day, a point of

5    consideration, and I think it relates also to another factor

6    which is, you know, in the conventional case, is it state law,

7    is it unsettled state law.

8         You know, here, the law that governs the Delphi MOU is

9    federal common law with respect to labor law contracts.

10   Certainly no question that this Court could capably handle that

11   if it were called on to do so, as it has -- bankruptcy judges

12   have to handle a huge myriad of types of substantive law.  But

13   I think the question is not whether the Court could, but

14   whether there's a reason for the Court to do so in this case

15   where we also have a court of general jurisdiction which is

16   available to do so in lieu of this Court if abstention is

17   appropriate.

18        The last thing I wanted to address, Your Honor --

19   well, I think, two things, if I may.  Just quickly, you had

20   talked about your role and whether there was any kind of

21   special insight that you would be bringing to the table that

22   would militate against abstention.  And you know, I think that

23   we've heard some of that in the colloquy with counsel so far.

24   But I do think that what we have here is, on balance, a breach

25   of contract action dealing with the Delphi MOU, dealing with

MOTORS LIQUIDATION COMPANY

Page 40

1    the meaning of fixed and capped, which was the subject of

2    negotiations which preceded the time the parties came into this

3    Court and which were not, themselves, the subject of testimony

4    before this Court during the sale hearing, and also did not

5    work their way in any specific shape or form into the sale

6    order which this Court was presented with.

7          And I think that that leads me to the last point,

8    which is, to what extent would there be prejudice to New GM if

9    this Court were to abstain.  And I read certainly with great

10   interest your more recent decision on this topic in the Rally

11   case, in this very matter.  And I think that the question of

12   prejudice to a Chapter 11 asset buyer is an important one,

13   deserves more thought in the context of this case, but frankly,

14   with a different outcome here.

15         I think no bankruptcy lawyer could stand here and say

16   that in the Chapter 11 sale process it is not important for a

17   buyer to be able to rely on a bankruptcy court order and to

18   have a bankruptcy court forum where that order needs

19   interpretation or construction.  But that is very different

20   than saying that in every instance where a sale order may be a

21   relevant fact to a post-sale post-assignment dispute, the

22   bankruptcy court must take jurisdiction.

23         And here, I have to go back to the point that New GM

24   has taken the position in the papers before this Court that

25   this Court does not have exclusive jurisdiction over the MOU

Page 41

1    itself, over the MOU dispute, the contractual dispute, which

2    was, of course the basis for the UAW's complaint in Michigan.

3    It's not a case where the language of the sale order is in

4    contention, as in NTL, as in Longacre.  It's the situation

5    where the fact of the sale order is a relevant fact.  But it's

6    not in dispute.  What's in dispute is the terms of the Delphi

7    MOU, the term in the 2009 fixed and capped, what does that

8    mean, in light of the facts that we have here today.

9            And I think it's important, obviously, to recognize

10   that buyers have a legitimate interest in bankruptcy court

11   jurisdiction, but they don't have a legitimate interest in

12   every case.  And in this case, particularly when they're on

13   record in the way that they are, I think it's an appropriate

14   case for this Court to exercise its powers of discretion to

15   abstain.

16           THE COURT:  Thank you.

17           MS. BUELL:  Thank you.

18           THE COURT:  Ms. Lennox?

19           MS. LENNOX:  Thank you, Your Honor.  Before I would

20   get into the seven-factor standard for discretionary or

21   permissive abstention, I thought it would be a good idea to go

22   through some threshold principles that I think are crucial to

23   the Court's consideration of the matter as to whether Your

24   Honor should abstain.

25           And the first of these principles is that where the

MOTORS LIQUIDATION COMPANY

Page 42

1   grounds for federal court's jurisdiction exist, permissive

2   abstention is the exception and not the rule.  Courts have held

3   that where a court does have jurisdiction, they should be quite

4   loathe to refrain from exercising it.

5        The second of these overarching principles -- and we

6   think one that applies with special force here, is that

7   abstention is particularly inappropriate where a dispute

8   involves the interpretation or the enforcement of a bankruptcy

9   court sale order.  Ms. Buell referred to Your Honor's rationale

10  in Rally, and we do think that that's relevant here, that the

11  ability of an asset purchaser to return to the bankruptcy court

12  for construction or clarification of a sale order, will

13  maximize the value of the debtor's assets.

14       And finally, Your Honor -- and I'd like to spend a

15  little time on this one before I get into the factors -- we

16  think permissive abstention is unwarranted where New GM and the

17  UAW previously agreed to the court's exclusive jurisdiction,

18  certainly over the preclusion dispute, which does involve

19  consideration of the MOU contract.

20       And the UAW did not object to the exclusive

21  jurisdiction provisions in the sale order.  It's my

22  understanding that the UAW had a chance to pass on that order

23  before it was entered and submitted to Your Honor, and they

24  didn't object to that.  So that exclusive jurisdiction is in

25  the sale order.

Page 43

1          Your Honor, the district court in the Winstar Holdings

2    case characterized the parties' agreement regarding

3    jurisdiction as the most important factor affecting its

4    decision not to abstain in a dispute involving a sale of the

5    debtors' assets among nonparties.  And the UAW goes through

6    this argument a little bit more in its brief, and I'd like to

7    respond to its points.

8          Again, the UAW expressly agreed to the jurisdiction --

9    the exclusive jurisdiction of this Court in the 2009 settlement

10   agreement and then consented to it by not objecting to the sale

11   order.  So it would perverse for the UAW to profit from its

12   disregard of these commitments by filing the VEBA complaint and

13   having the Michigan court hear it.

14         Similarly, Your Honor, our papers cite multiple case

15   holding that a court's reservation of exclusive jurisdiction

16   divests other courts of jurisdiction.  And I believe Your Honor

17   held so recently in its Lyondell opinion that came out at the

18   end of March of this year.

19         THE COURT:  Divests unless the court wants to order

20   otherwise, right?

21         MS. LENNOX:  Certainly, Your Honor.  You can choose to

22   order otherwise.  But it would be unusual, I believe, for --

23         THE COURT:  In essence, what you're saying is that if

24   I thought, with respect to Judge Cohn, that my toes were being

25   stepped on, just as I expressed in colloquy to one or another

Page 44

1    of you guys that I was nervous about stepping on Judge Drain's

2    toes -- but if I thought that my toes were being stepped on, I

3    would be able to tell Judge Cohn, with respect, that I've got

4    to keep this controversy.  That's in substance what you're

5    telling me, right?

6              MS. LENNOX:  Certainly, Your Honor.

7              THE COURT:  Okay.  But you're not arguing the

8    converse, which is that I lack the power to determine that my

9    toes aren't being stepped on and that I have no important

10   interests that I need to protect?

11             MS. LENNOX:  Your Honor, there are cases out there,

12   not from this jurisdiction, that we have found, that have said

13   that a court that has exclusive jurisdiction can choose to

14   abstain.  I've not found any in this jurisdiction.  And it

15   would seem to me that that would be sort of a mockery of the

16   principle of why keep exclusive jurisdiction over a matter that

17   is so important for which exclusive jurisdiction is required,

18   and the parties have agreed to, if one is not going to exercise

19   it.  Which is why I would think I didn't find many, many cases

20   where abstention was granted in exclusive jurisdiction cases.

21             And there's yet another principle that adds to this,

22   Your Honor, and that is, New GM and the UAW have contractually

23   agreed to a forum selection clause, granting this Court

24   exclusive jurisdiction.  Second Circuit cases and cases in this

25   district and elsewhere are clear that a first-filed rule or

1   abstention shouldn't overcome a presumptively valid and

2   mandatory forum selection clause.  And we think that that's

3   what's at issue here in Section 26(b) of the retiree settlement

4   agreement.

5         So with that background on the general principles,

6   Your Honor, I thought that I would go through some of the

7   factors and address some of Ms. Buell's points.

8         With respect to the degree of relatedness or

9   remoteness to the proceedings of the main bankruptcy case,

10  certainly we have argued in front of this Court today that the

11  sale obviously was the most important thing that happened in

12  this case, and there were two key components to the sale.  One

13  was the dealing with of the bond debt, and the other one was

14  the dealing with of UAW obligations.  This retiree settlement

15  agreement wasn't just some ancillary agreement.  It was a prop.

16  It was a necessary component of the sale order.  And it is so

17  integral to the main proceeding in this case that we think it

18  could not possibly be more related to this case.

19        I think, Your Honor, you had asked what do you bring

20  that's special.  I think we talked about that in our earlier

21  colloquy.  We do think that particularly if parol evidence is

22  going to come into this, that Your Honor, having sat through

23  three days of hearings, having been in the middle of the

24  importance that was this case, Your Honor really does bring

25  something special to this case that would be missing from just

Page 46

1    a pure reading of the paper.

2            I would also like to clarify a question that Your

3    Honor asked Ms. Buell with respect to Rule 60.  Actually, Your

4    Honor, in Rule 9024, which incorporates Rule 60, there's only a

5    one-year statute of limitations if it were for grounds for

6    relief (b)(1), (2) and (3).  Your Honor --

7            THE COURT:  Well, that's what 60 says also.

8            MS. LENNOX:  I'm sorry, Your Honor?

9            THE COURT:  Isn't that what 60(c) --

10           MS. LENNOX:  (c)(1)?

11           THE COURT:  -- (1) says?

12           MS. LENNOX:  Yes, but for -- if one is going to make

13   an argument under, for example, Rule 60(b)(6) one only has to

14   bring that within a reasonable time.  If somebody wanted to

15   bring grounds for relief on any other reason that justifies

16   relief, Your Honor, they wouldn't have grounds until a 450

17   million dollar obligation was imposed.  So --

18           THE COURT:  Well, the circuit has told us that

19   60(b)(6)s are the poster child for Hail Mary efforts, aren't

20   they?  I mean, 60(b)(6)s are very, very hard to successfully

21   bring.

22           MS. LENNOX:  Understood, Your Honor.  And I'm not

23   suggesting that they would win with any kind of merit.  Alls

24   I'm suggesting, Your Honor, it could have a degree of

25   relatedness to this proceeding, because it could involve papers

Page 47

1     filed in front of Your Honor, whether they were meritorious or

2     not.

3              With respect to the efficient administration of the

4     bankruptcy estate, sort of building on that theme, if you have

5     exclusive jurisdiction over the preclusion dispute, which

6     basically encompasses everything we're talking about here, and

7     anything -- any arguments that emanate from there and/or

8     ancillary to there, it is certainly most efficient for this

9     Court to hear the entire dispute and not risk conflicting

10    judgments in other courts.

11             With respect to issues of state law -- and I would

12    point out, Your Honor, with respect to the cases Ms. Buell

13    cited, issues of state law are not at issue here.  There is no

14    state law cause of action here.  The complaint that the UAW

15    filed is a federal cause of action under Section 301 of the

16    LMRA.  The two cases that Ms. Buell would like you to refer to,

17    Your Honor's Casual Male case and the case in front of Judge

18    Gropper, NTL, involved state law causes of action.

19             And I understand, when there is a state law issue,

20    federal courts are much more deferential and much more

21    concerned about comity than with respect to federal courts.

22    Federal courts, including bankruptcy courts, are entitled and

23    are empowered to decide federal issues.  So state law is not an

24    issue here nor is the law that we're asking you to apply

25    particularly difficult or unsettled.

Page 48

1         With respect to comity, I would relate that to state

2    law issues.  There aren't any.  There's no concern about comity

3    with state courts.  And courts in this district, including this

4    Court, have held that abstention in favor of other federal

5    courts is appropriate in the interests of justice or when

6    circumstances warrant.  And I'm not sure that anybody has

7    articulated the interest of justice or circumstances warranting

8    that would require this Court to abstain from exercising its

9    exclusive jurisdiction, particularly given your vast

10   institutional knowledge of the sale and the agreement that

11   we're talking about.

12        Again, with respect to the existence of a jury trial,

13   I think Your Honor talked to Ms. Buell about that.  I would say

14   that if this had to get to a jury, courts in this district are

15   also quite permissive with respect to having bankruptcy courts

16   handle all the issues up to pre-trial, up until it's clear that

17   there's a trial that has to happen.

18        THE COURT:  So you want me to act as an MJ?

19        MS. LENNOX:  No, Your Honor.  I think if it's with

20   respect to contractual interpretation, you don't have to do

21   that.  We actually argue in our papers that we don't think a

22   jury trial is here, one, is because with respect to the

23   preclusion dispute, the UAW has waived it.  They have agreed to

24   jurisdiction in front of this Court and they have waived a

25   right to jury trial on that issue.

1           If they think there's a jury trial right, and even if

2    there were -- and we don't think that there is, because this is

3    a contractual interpretation dispute -- the courts in this

4    district have said judges can decide.  But if for some reason

5    there had to be a jury trial, the only thing I want to point

6    out, Your Honor, is that courts in this district have allowed

7    bankruptcy courts to handle matters until it became absolutely

8    clear that there had to be a jury trial, which we don't think

9    will happen in this case.

10           Finally, Your Honor, with respect to prejudice to an

11   involuntarily removed defendant, New GM is the defendant, and

12   New GM is invoking this Court's jurisdiction.  So we think that

13   that --

14           THE COURT:  Say that again slower, please, Ms. Lennox.

15           MS. LENNOX:  The seventh factor, Your Honor, is the --

16   whether -- the prejudice to an involuntarily removed defendant.

17   New GM is the defendant in the Michigan action.  And so it's

18   not an issue, because we, as the defendant, are invoking this

19   Court's jurisdiction.

20           THE COURT:  Oh.  So you're simply saying the factor

21   doesn't apply one way or the other?

22           MS. LENNOX:  Correct.  Yes.

23           And so --

24           THE COURT:  Because, although discretionary abstention

25   and discretionary remand have the same case law in substance,

Page 50

1    the factor you just articulated applies principally in cases of

2    removal and remand motions in multi-defendant cases.

3            MS. LENNOX:  Yes.  Inequitable remand, yes, Your

4    Honor.

5            And so we think it's clear that all of the factors and

6    all of the relevant governing principles would dictate, in this

7    case, against abstention, Your Honor, and we would ask Your

8    honor to exercise its jurisdiction.

9            THE COURT:  Okay.  Thank you.  I'll hear reply from

10   you, Ms. Buell; sur-reply from Ms. Lennox.  And then I'll hear

11   from Delphi.

12           MS. BUELL:  Thank you, Your Honor.

13           THE COURT:  That's Mr. Meisler.  Forgive me.  I had

14   forgotten your name.

15           Go ahead.

16           MS. BUELL:  Deborah Buell again.  Your Honor, just a

17   couple of points.  One, I wanted to note that the Winstar case

18   which is decided in the Southern District, was a case where the

19   dispute was over what had been sold, and the court order was,

20   itself, in dispute in that case.  That was part of the court's

21   jurisdictional analysis, as well as part of the abstention

22   analysis.

23           It's true that in that case the Court did note that

24   there was an exclusive jurisdiction of the bankruptcy court

25   which also factored into the abstention analysis.  But I really

Page 51

1    think that as a matter almost of common sense, Your Honor, that

2    it cannot be that where a court concludes it has exclusive

3    jurisdiction, that it is not permitted under 1334(c)(1) to

4    choose to abstain in a particular situation.  As you know much

5    better than anyone else here, plans of confirmation routinely

6    have retention of juris -- exclusive jurisdiction provisions,

7    which allow the Court to be the funnel and make a judgment in

8    particular cases, whether it is called upon to exercise its

9    exclusive jurisdiction or not.

10        It cannot be the case that the Court may not abstain,

11   and therefore I think it cannot be the case that a party that

12   has agreed to exclusive jurisdiction is not permitted to argue

13   to the Court on a discretionary matter, that the discretionary

14   factors present for abstention compel or support, really, the

15   exercise of that discretion in a particular case.

16        Here in particular, Your Honor, I just want to go back

17   to the point that the exclusive jurisdiction here pertains to

18   the defense to this claim rather than to the claim itself.  I

19   understand that that's the basis for the Court's determination

20   that the exclusive jurisdiction provision in the sale order

21   applies to the entire dispute.  But that was not the

22   position --

23        THE COURT:  Well, that's often the case in exclusive

24   jurisdiction controversies, isn't it?  I mean, let's just take

25   Rally.  You have a bunch of disgruntled dealers who are trying

Page 52

1    to do a run-around around the important aspect of the entire

2    scheme which was the wind-down agreements.  And New GM's

3    contention -- I think it was raised by King & Spaulding rather

4    than by Jones Day.  But the contention was these guys want to

5    go elsewhere but the importance of those provisions to the

6    success of the entire 363 transaction made it impossible to say

7    never mind.  It was an important concern.  And I think this was

8    a point you made the first time.

9         It's not uncommon that those invoking exclusive

10   jurisdiction will be doing it principally on defense rather

11   than on offense.

12        MS. BUELL:  That's correct, Your Honor.  And I do

13   think that the Rally decision provides a valuable point of

14   distinction between the situation that the Court was addressing

15   there and the situation that you have in front of you today.

16   In Rally, as I read your decision, certainly the whole question

17   of those wind-down agreements was very important to the GM

18   Chapter 11 case and to the sale agreement -- sale order and

19   that there was plenty of time spent on the propriety of the

20   wind-down agreements in the course of the proceedings before

21   this Court.  And in the sale order, there was an expressed

22   provisions which dealt with the wind-down agreements and this

23   Court's continued exclusive jurisdiction over those wind-down

24   agreements.

25        So as I read Rally, and then I thought about the facts

MOTORS LIQUIDATION COMPANY

Page 53

1    that we have here, what we have here was the 2009 retiree

2    settlement agreement, without question approved by this Court

3    and assigned from Old GM to New GM as part of the sale order.

4    But there is nothing in the sale order today where the parties

5    are pointing to and saying these are the provisions of the sale

6    order that are in dispute on the preclusion dispute or the MOU

7    dispute.  And there is no express focus by the Court in the

8    sale order with respect to that agreement.  That may not change

9    the analysis ultimately, but it helped me as I thought through

10   what the context of the Rally situation that the Court had and

11   the relationship between that issue, that post-sale issue and

12   the risk to the buyer as compared to what we have here today.

13   There is no need for Judge Cohn or any other judge who would

14   resolve this dispute were the Court to abstain to interpret or

15   construe this Court's order.  It is a function of construing

16   and understanding the party's contentions with respect to the

17   two underlying agreements one of which was before this Court

18   but which, in the sale hearing, there was no evidence presented

19   on the matters in question.

20        THE COURT:  The two agreements you're referring to in

21   the last sentence being the 2007 MOU and 2008 original

22   settlement agreement?

23        MS. BUELL:  The 2007 Delphi MOU, which was assigned as

24   part of the sale order in this case from Old GM to New GM, and

25   then the 2009 retiree settlement agreement which was approved

MOTORS LIQUIDATION COMPANY

Page 54

1    by this Court --

2            THE COURT:  Oh.

3            MS. BUELL:  -- as part of the sale order.

4            THE COURT:  Okay.  Okay.  Thank you.  Ms. Lennox?

5            MS. LENNOX:  Again, just quite briefly, Your Honor,

6    and just in response to what Ms. Buell argued, with respect to

7    the Rally and the dealer cases, I believe, after reading those

8    cases and if I'm recalling correctly, those cases also dealt

9    not only with jurisdictional issues and with what happened

10   subsequently with the federal arbitration issues, but they also

11   involved interpretations of the agreements themselves:  what

12   did they say, what -- which dealerships were included.  And it

13   involved a reading of the agreements themselves.

14           So, too, with the 2009 retiree settlement agreement.

15   Your Honor had asked, well, is it just the order or is it the

16   agreement.  And my answer to you was it's both.  And I think in

17   the dealer cases was it's both.

18           And we do -- I would just like to reiterate that we do

19   think there are provisions under the sale order that apply and

20   are important to the merits of this case and, specifically,

21   Findings of Fact FF, R and decretal paragraphs 19, 20 and 71,

22   we do think relate directly to what we would be arguing on the

23   merits and the rights of the parties.

24           THE COURT:  You said FF, RR and what was the third?

25           MS. LENNOX:  Single R, Your Honor.

Page 55

```
 1              THE COURT:  Single R?

 2              MS. LENNOX:  Yes.  19, 20 and 71.

 3              THE COURT:  Of the --

 4              MS. LENNOX:  Sale order.

 5              THE COURT:  -- 363 order?

 6              MS. LENNOX:  Yes, Your Honor.  Thank you.

 7              THE COURT:  Okay.  Thank you.  Mr. Meisler, do you

 8   want to be heard?

 9              MR. MEISLER:  Thank you, Your Honor.  Your Honor, to

10   the extent this relates to the labor MOU and whether the

11   conditions have been satisfied to trigger the 450 million

12   dollar contribution, then Your Honor asked your question as to

13   whether or not you might be stepping on Judge Drain's toes, I'd

14   answer that in the affirmative.

15              Your Honor, the textural analysis is plain.  Judge

16   Drain did reserve exclusive jurisdiction.  Ms. Buell raises a

17   curious question, indeed.  The labor MOU order did say that

18   there was nonexclusive jurisdiction reserved by Judge Drain's

19   court.  That was something that was negotiated by the parties.

20   But in 2007, the state of the world was much different in the

21   auto industry than it was in 2009 when a modified plan was

22   approved and consummated.  The jurisdictional provision was a

23   trilateral agreement.  All parties were represented by counsel

24   and it was negotiated among the parties.  There were lots of

25   moving pieces.  And there were reasons for the parties to
```

Page 56

1    decide that, in that situation, the state of the world in

2    2009 -- that having Judge Drain take exclusive jurisdiction

3    over that matter was the right thing to do and a decision that

4    was made by the parties.  No party objected to exclusive

5    jurisdiction being retained by Judge Drain.

6         Your Honor, you ask an important question.  Do we have

7    standing?  Does DPH Holdings have standing?  Your Honor, we

8    have no issue and we do not have standing as it relates to

9    whether or not the sale order capped and fixed the claims that

10   UAW might have against GM.  But to the extent the motion -- or

11   to the extent the question relates to the MOU that was agreed

12   to by three parties, then, Your Honor, we do have standing.

13   Delphi is a party to the MOU.  It was entered into as part of

14   the Delphi Chapter 11 case.  And just as an example of GM's

15   argument regarding whether or not the conditions were satisfied

16   to trigger the 450 million dollar contribution then, Your

17   Honor, respectfully, I'd say that we do have standing.  And

18   among the reasons that we have standing is there's also a claim

19   waiver in there.  And there's a release in that same agreement.

20   And once you start --

21        THE COURT:  Don't you have those anyway?

22        MR. MEISLER:  Your Honor, the way the plan works is it

23   incorporates the release inside the MOU.  And so, once you

24   start eating away at the integrity of the MOU then you take

25   away from our release that we have in the plan.

Page 57

1          THE COURT:  You have an effective confirmation order,

2     don't you?

3          MR. MEISLER:  That's correct, Your Honor.

4          THE COURT:  I think you anticipated, Mr. Meisler, the

5     question that I was about to ask you if you hadn't hit it first

6     which is why you care so much about this because I had always

7     thought that Delphi is protected, that Delphi doesn't have a

8     dog in this fight.

9          MR. MEISLER:  Your Honor, as to whether or not the

10    sale order fixes and caps the claim against GM, you're correct,

11    Your Honor.  We have no dog in this fight.  Where we start

12    getting anxious is when someone's trying to pick apart the

13    labor MOU because that agreement is integral to our modified

14    plan.  That agreement comes very close, Your Honor, to a

15    collateral attack on our plan.  And the releases and discharges

16    in the modified plan are very important to us.

17         THE COURT:  Well, it's one thing for GM to say -- New

18    GM to say that, no, UAW, we don't owe you the extra 450 million

19    bucks.  It's quite a different thing for them to say that they

20    or anybody else can go back against the Delphi estate and to

21    try to undo a confirmed plan that, if I understand correctly,

22    has also gone effective, to say never mind with respect to

23    discharges and releases that you have incident to that plan.

24    Now, I don't want to make you talk contrary to your client's

25    interest.  I suspect you would love to agree with me on that

MOTORS LIQUIDATION COMPANY

Page 58

```
1   from the bigger picture even if it costs you the war today.  Or
2   am I mistaken in that regard?
3        MR. MEISLER:  Your Honor, you're absolutely correct.
4   But our concern is that the issues are so interrelated that if
5   one were to argue that the conditions precedent to the
6   triggering of the 450 million dollar contribution then one
7   necessarily has to tackle the issue of whether or not the UAW
8   has waived its claim, its 450 million dollar claim against
9   Delphi because that's what J-2 was all about.  J-2 was a
10  give-and-get by the various parties.  There was a trilateral
11  agreement between these parties.  And any argument as to
12  whether or not the conditions precedent were satisfied may just
13  have an effect on whether or not that claim waiver went
14  effective.
15       THE COURT:  Are you saying, Mr. Meisler, to help me
16  keep us with you, that the deal in Delphi can be thought of the
17  UAW saying we won't go after you, Delphi, for that money; we'll
18  just go after GM instead?
19       MR. MEISLER:  Well, Your Honor, I wouldn't want to say
20  it that way.  I would want to say that the three parties came
21  together and the agreement was that the UAW would waive its
22  claim against Delphi.  And in consideration for doing so,
23  because there were also claims against GM in connection with
24  the benefit guaranty, that GM was going to make a contribution.
25  Now, what happened afterwards, Your Honor, again, we don't have
```

Page 59

```
 1    a dog in that fight.  And whether or not the sale order capped

 2    and fixed that claim -- God bless this Court but we don't have

 3    a dog in that fight.  We don't have an issue.  And we're not

 4    looking to get involved in the merits of that matter.  But as

 5    it relates to what happened in the labor MOU and whether those

 6    conditions were satisfied, Your Honor, that's something that we

 7    do have issue with and, Your Honor, that's something that Judge

 8    Drain reserved exclusive jurisdiction upon.

 9              THE COURT:  Isn't the corollary of your point, Mr.

10    Meisler, that if I agreed with you on this, I couldn't decide

11    this controversy any more than Judge Cohn could?

12              MR. MEISLER:  Your Honor, let's -- just to be clear,

13    the scope of what you said, the controversy being whether or

14    not the conditions precedent to the labor MOU, to the

15    triggering of the 450 million dollar contribution, yes, Your

16    Honor, I agree with you.  And, Your Honor, to the same point,

17    when you were asking about discretionary abstention, Your

18    Honor, I don't think that that's a question that this Court

19    should answer because, in fact, that's a question that needs to

20    be addressed by Judge Drain.

21              THE COURT:  Whether I should exercise discretionary

22    abstention with respect to an issue before me should be decided

23    by Judge Drain?

24              MR. MEISLER:  Your Honor, the whole point is that with

25    respect to the labor MOU, DPH Holdings' perspective is that
```

Page 60

1    this Court does not have jurisdiction.  And therefore,

2    discretionary abstention on this particular matter shouldn't

3    come into play at all.

4            THE COURT:  Okay.  Anything else?

5            MR. MEISLER:  Your Honor, with respect to -- the only

6    other points I have is if you would like to discuss

7    discretionary abstention.  But again, I rest on the point

8    that --

9            THE COURT:  I think the other two counsel did it

10   pretty well.  You have some factor that neither of them thought

11   of?

12           MR. MEISLER:  Your Honor, again, with respect to the

13   labor MOU, it's uniquely a bankruptcy issue because our

14   releases and discharges are at issue.  There's questions as to

15   whether or not the Delphi bankruptcy plan is a plan of

16   reorganization which is a concept that the bankruptcy court is

17   uniquely situated to answer.

18           THE COURT:  You think a district judge is too dumb to

19   know what a plan of reorganization is?

20           MR. MEISLER:  No, Your Honor.  I don't think that

21   that's the case.  But there's some nuances here that require an

22   understanding of what happened in the Delphi bankruptcy case

23   and was the -- what is called an amended plan of

24   reorganization, is that a plan of reorganization or is that a

25   plan of liquidation?  Now is that something that Judge Cohn can

Page 61

1   answer?  Of course he can.  But what we're saying is that Judge

2   Drain is uniquely situated to answer that question.

3          THE COURT:  You got the same it-proves-too-much

4   argument, Mr. Meisler, because the issue before me is whether I

5   should keep the matter, not whether I'm going to pick it apart

6   and send part of it to Judge Drain.

7          MR. MEISLER:  Your Honor, that's why I go back to what

8   I said earlier.  I think, with respect to discretionary

9   abstention, I think that question should not be in front of

10  this Court regarding the labor MOU.

11         THE COURT:  Okay.  Anything else?

12         MR. MEISLER:  No, thank you, Your Honor.

13         THE COURT:  Okay.  I'll give either of the other two

14  counsel an opportunity to respond to Mr. Meisler if either

15  wants to.

16         MS. BUELL:  Briefly, Your Honor, I think we have a

17  profound --

18         THE COURT:  Having trouble hearing you, Ms. Buell.

19         MS. BUELL:  Yeah.  Deborah Buell, for the record, Your

20  Honor.  We have a profound disagreement with the Delphi

21  position as described to you.  We think it's inconsistent with

22  the documents, the confirmed plan that they have, the discharge

23  that they've received, the fact that the Delphi MOU had

24  provisions in it that were always those of GM and that those

25  provisions of GM were assigned by this Court from Old GM to New

Page 62

1    GM as part of the sale order.  And what was left under the

2    Delphi MOU for Delphi was assigned to GM as part of the Delphi

3    plan confirmation.  I really -- I don't understand -- I really

4    don't understand what we just heard.  I just want to make clear

5    that we think --

6            THE COURT:  Well, I think he has a fear -- and maybe

7    the key to the jail is in your own pocket.  He's afraid that if

8    you -- excuse me -- that if New GM wins in its battle with you,

9    in Manhattan or Detroit as contrasted to White Plains, that

10   you're then going to go back against Delphi and say, well, we

11   didn't get it out of New GM so we want to go against Delphi to

12   get that 450 million bucks.  Can you take that issue off the

13   table?

14           MS. BUELL:  According to my co-counsel, the answer is

15   yes, Your Honor.

16           THE COURT:  All right.  That's helpful.

17           MS. BUELL:  Thank you.

18           THE COURT:  Thank you.  Ms. Lennox, do you want to add

19   anything?

20           MS. LENNOX:  I have nothing further to add to Ms.

21   Buell's remarks.

22           THE COURT:  Okay.  Thank you.  I'm not going to give

23   you guys a ruling this minute, folks.  There are a couple of

24   things that I want to read and consider.  In your proceedings

25   before Judge Cohn in Detroit, did he indicate to you any

Page 63

1    request vis-a-vis the level of formality of my ruling or did he

2    care solely about the bottom line?

3              MR. MEISLER:  Solely about the bottom line, Your

4    Honor.  Just asked us to advise him -- the parties to advise

5    him of your Court's ruling.

6              THE COURT:  Very well.  Your understanding is the

7    same, Ms. Lennox?

8              MS. LENNOX:  Yes, Your Honor.

9              THE COURT:  Okay.  I may ask you guys to join me in an

10   on-the-record conference call or I may write something.  I

11   haven't decided yet.  But I'm not going to make you wait around

12   this afternoon.  Thank you very much.  Very helpful.  We're in

13   recess.  Bye-bye.

14             MS. BUELL:  Thank you, Your Honor.

15        (Whereupon these proceedings were concluded at 3:34 p.m.)

16

17

18

19

20

21

22

23

24

25

Page 64

1

2                          C E R T I F I C A T I O N

3

4      I, Penina Wolicki, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6

7      Penina Wolicki    Digitally signed by Penina Wolicki
                          DN: cn=Penina Wolicki, c=US
                          Reason: I am the author of this
8      _____   document
                          Date: 2011.05.19 15:46:05 -04'00'

9      PENINA WOLICKI

10     AAERT Certified Electronic Transcriber CET**D 569

11     Also transcribed by:     Lisa Bar-Leib CET**D-486

12

13     Veritext

14     200 Old Country Road

15     Suite 580

16     Mineola, NY 11501

17

18     Date:  May 19, 2011

19

20

21

22

23

24

25