C. Michael Forrest
Vice-President
2400 North Main
Cleburne, Texas 76033
817-994-8535    Cell (my)

Charles Michael Forrest, Forrest Chevrolet-Cadillac Inc., Forrest Pontiac-Buick-

GMC Trucks, Inc.vs. General Motors/GMAC

## FOREWORD

For as many as fifteen years, General Motors has targeted the two Forrest family franchises in Cleburne, Texas for termination. As has been the case in many national WHISTLEBLOWER pursuits, dealer-operator C. Michael Forrest was uniquely TARGETED FOR ELIMINATION because of what he knows AND his willingness to speak the truth. GM has NOT operated or fulfilled in "good faith" its responsibilities to the Forrest franchises. A close examination of General Motors' actions, and the actions of those in authority who represented GM with respect to the Forrest franchises, will show a calculated attempt to eliminate the Forrest franchises. Using unethical business practices, unprincipled behavior and prejudicial strategies, GM/GMAC demonstrated a callous disregard toward their responsibilities and obligations under Dealer Franchise Agreements. GM's "joined at the hip" relationship and/or influence with GMAC, the primary finance arm for the Forrest franchises, on close examination will show outrageous, predatory behavior and timing BEYOND COINCIDENCE as to the suspension of the Forrest Floor Plan. Is it merely coincidental that the following events took place? Or did General Motors always intend to seek the elimination of the Forrest brand while positioning "insiders" or former corporate employees so as to gain influence, power, and financial strength over Michael Forrest, a dealer always searching for the best solutions to operate an American "'small town family" dealership; a concept that did not fit into the future of such a large corporate structure. Where does General Motors stand today? Are they a stronger company because of their actions that they executed against the Forrest franchises and other similar dealerships? Did General Motors need America's tax dollars to grant their own "floor plan" and viability? We know the answer to some of these questions because we witnessed the inabilities and poor business practices that left GM bankrupt and accepting of government "bailout" of our very own taxpayer dollars.   Listed below you will find many events, names, and actions that The Forrest franchises were forced to deal with due to General Motors corruption and poor business practice dealings.

## CASE REFERENCE...PREAMBLE TO PROTEST

In a case against General Motors in the fall of 2003 (RE: Docket No. 03-0024 LIC) at which time GM was "phasing out" the Oldsmobile line of product, Administrative Law Judge Kathryn A. Scales offered this ruling. "At the heart of this case is the allegation, by Forrest Chevrolet-Oldsmobile-Cadillac ("Forrest"), that Respondent (General Motors Corporation) has effectively terminated its dealer sales and service agreement with Forrest as it relates to the Oldsmobile line. It is undisputed that on December 12, 2000, GM announced the phase-out of the Oldsmobile brand over the next several years. It is Forrest's position that the public nature of such an announcement coupled with GM's activities in anticipation of the phase-out have inflicted an insurmountable blow to its dealership operations so as to be best characterized as a de facto or "constructive" termination and/or modification of the existing dealer sales and service agreement between the parties, as it relates to the Oldsmobile line, in violation of ss2301.453, 2301.454 and 2301.455 of the Texas Occupations Code (formerly TMVCC ss5.02(b)(3), (4) and (5))." Judge Scales went on to say regarding GM's motion to dismiss, "Given the express language of the Texas Occupations Code and Board precedent on the issue of de facto termination, I think it inappropriate to grant the pending Motion to Dismiss if it can be shown that genuine issues of material fact exist with respect to the question of whether de facto termination has occurred here. Michael Forrest's affidavit, which I am inclined to consider over GM's objections, seeks to illustrate, from the dealership's perspective, the financial fallout resultant from GM's announcement. The fact that GM disputes Mr. Forrest's allegations clearly demonstrates the existence of genuine issues of material fact to be more thoroughly examined at hearing on the merits. To that end, I am denying Respondent's Motion to Dismiss."

In the above mentioned proceeding (No. 03-0024LIC) Forrest's interest was represented by law firms Myers & Fuller, P.A., and Heath, Davis & McCalla P.C. Instead of pursuing a maximum damage claim these law practices opted for mediation that amounted to only a fraction of the losses incurred due to General Motors' breach of contract. If you hold yourself out, or proclaim yourself to be, a manufacturer of product, like GM, and you contractually obligate others [dealerships] to sell your product and these companies make significant financial commitments, what is YOUR obligation to them?

2

## FORMAL PROTEST TO THE STATE OF TEXAS AND THE UNITED STATES

## OF AMERICA

As a citizen and taxpayer who temporarily holds an equity ownership stake in General Motors Corporation and GMAC, the finance company (now known as ALLY), I represent that GMAC illegally suspended the floor plan agreements of my family's two General Motors auto dealerships, Forrest Chevrolet-Cadillac Co. Inc., and Forrest Pontiac-Buick-GMC Co. Inc., on May 26, 2008. This scheme, as identified in my objection response to the New York City, Southern District bankruptcy court on July 27 and July 28, 2009 was preceded by, and inclusive of a larger plan to commit no less than five illegal acts of contractual bad faith by GMAC since early August 2005. Such acts are named and identified in my proxy to the commission. The documentation (email, letters, faxes, etc.) and interactions with three attorneys during that time (Mitchell Madden of Madden & Sewell of Irving Texas, Gerald Staton of Staton & Taylor of Fort Worth, Texas, and Bill Blankenship of Dallas, Texas) can and should provide a preponderance of evidence that various powers-at-be within GMAC (now known as ALLY) were motivated to seek remarkable and punitive collateral assignments and financial benefit from the principals of the dealership operations, Charles Michael Forrest and Martha Jean Forrest. GMAC sought to proclaim an unproven right to three-day payoff demands on new vehicle sales that set in motion a "business related death spiral" and prompting me as dealer-operator to sacrifice for conversion into cash millions of dollars of used car equity to meet such continuing demands. Within the context of this behavior arose one Ezra Merkin, former Chairman of GMAC, who was indicted by New York State Attorney General, Andrew Cuomo, in or around April 2009 for $2.5 billion of illegal investment transfers to the Ponzi schemes of his already convicted associate Bernie Madoff. Representing the interest of my family, I proclaim that at the core of this behavior was a willful and wanton intent to extort money from my family, favoring GMAC (now known as ALLY) to capture an income stream from our real estate-laden assets to support the growing losses of said financier, validated by its own "brush with bankruptcy" in December 2008. As a citizen, whose dutiful payment of taxes has allowed the United States government, visa vi actions by the Federal Reserve, Treasury Department, Congress, and the Executive branch, to intervene in the pending bankruptcy of GMAC [whose significant, if not majority ownership stake was, at the time, known to be the privately held Cerberus Capital Management Group], I protest that the financier has been allowed to prosper, even as its unconscionable and illegal behavior contributed in large part to the potentially fatal disruption of my family's 50 year new car franchise operations. Let it be known that GMAC (now known as ALLY) created a "pressure cooker" in August 2008, to cause my mother, Martha Jean Forrest, and me, Charles Michael Forrest, to sign a letter of intent under maximum duress not to file a lawsuit against them, even as we continued to sell new and used vehicles and pay our employees to maintain the continuity of our business operations. GMAC begat a forbearance agreement, choosing to extend the terms of such an arrangement on a month-to-month basis for extortion

3

payments, rather than contemplating its proclaimed powers of seizure. Furthermore, as a citizen/taxpayer who, in this matter of time, holds an equity/ownership stake in both General Motors Corp. and GMAC (now known as ALLY), I declare that these two entities have conspired to eliminate me, individually as dealer-operator, and collaterally my mother, as majority stake holder in Forrest Chevrolet-Cadillac, Inc. and Forrest Pontiac-Buick-GMC, Inc. I am, once again, furnishing to all parties of legal and jurisdictional interest, including,,, but by no means limited to... what has historically been known as the Texas Motor Vehicle Commission (division of Texas Department of Transportation), the office of the Texas Attorney General, the office of Special Inspector General of the TARP, the Federal Bankruptcy Court for Southern District of New York... and so on ...a compilation of grievances and a timeline of events that provide overwhelming evidence (since approximately 1993) that no less than eight known methods to destabilize, provide undue influence and irreparably harm our new vehicle franchise operations were undertaken. I have listed such offenses in an affidavit to the New York City, Southern District Bankruptcy Court and possess the related documents to substantiate my claims. I also proclaim that the coercion by General Motors Corporation for me, as dealer-operator, to build a new dealership for Forrest Pontiac-Buick-GMC against the overwhelming wishes and best business judgment of our family (since 1994) created irreconcilable and insurmountable burdens in operational overhead, prompting a minimum of twenty financial institutions to decline to resurrect our $3.2 million capital outlay in accordance with examining nominal standards of cash flow. Various lenders' objections to assist us and restore capital to our operations happened largely from 2003-2008. During that same time period, the peculiar demands of GMAC (now known as ALLY) that our two dealerships find a new floor plan proved to be calculated actions to force the sale of our franchises. The final threat... of three total threats...to call our loans due was exercised unlawfully on May 26, 2008. In further denial of my rights as a citizen, a taxpayer, and a dealer-operator of two new General Motors franchises, General Motors Corporation on July 10, 2009 sought the favor of the executive branch of the United States government to seek a long-anticipated, pre-arranged protection of the Federal Bankruptcy Court in New York City, New York to illegally terminate my franchise agreements.

After January 23, 2009 on which date General Motors Corporation furnished a letter of intended consolidation of all General Motors brands into one physical location in Cleburne, Texas, representatives Jay Allen, Bill Reichert of dealer operations, and Tim Hughes of Zone Management status, wrongfully insisted that I submit an application to become dealer/operator/franchise owner of a new operating entity that replaces the two franchises that I already own. General Motors sought to use this formality to declare that my recent operational losses, low sales performance, and lack of a viable floor plan were grounds to not renew my status as a franchised new car dealer. As I declined to allow them this opportunity, representatives of General Motors then delivered to me the unsigned letter of intent on May 14, 2009 not to renew my 2010 franchise agreement, but with a caveat that I could then present objections and a business plan in my

4

defense to the contrary by the end of the month. At approximately midnight on May 31, 2009, I delivered a business plan defending my status as dealer/operator and in favor of my continuance. I hereby submit that no time or resource was allocated to my objection by General Motors. Indeed, no conceivable opportunity to do so was even possible as General Motors had already prepared to file for bankruptcy on June 1st…and did so! I received a bizarre contractual agreement from General Motors on June 2nd called a "Wind-down Agreement". The very definition of this contract invites the scrutiny of regulatory authorities such as the Texas Motor Vehicle Commission to identify the eerily similar approach to the Oldsmobile brand termination in December 2000 known as "Phase-out". Indeed, my protest to the Oldsmobile termination was given a voice in the commission during the period of 2000-2005 by refuting the language of "Phase -out" as nothing more than corporate posturing to avoid such scrutiny under Texas Motor Vehicle rules as an illegal brand termination. The comparison of General Motors' legal strategy to eliminate targeted franchise dealers through "wind-down" language is striking. Just as General Motors represented the red herring of compassion toward it's targeted franchise victims to allow an orderly "assisted suicide" to transpire and align itself with franchise renewal dates, so had it done in the Oldsmobile process to avoid real time recognition of the termination of the brand. The formula to reward dealers with "wind-down" payments was also described by the manufacturer as approximately $1000 per car of new vehicle reimbursement, but alas, General Motors for the first time unwittingly adjoined itself to the concept of paying dealerships for their client names and records in much the same way as doctors, lawyers, insurance agents, and countless other types of professional business concerns assign a value to such a class of assets during transitions. In this instance, a true comparison for a lump-sum [payment] approach would necessarily be derived from a certain dollar amount of sales and service customers in proportion to a client base. For example, a three year old average-sized dealership might have a customer base of 3,000 clients while the 48 year progression of a family business such as ours [Forrest Pontiac-Buick-GMC and Forrest Chevrolet-Cadillac] possesses customer files of more than 48,000 clients.

Upon further examination, General Motors (the manufacturer) boasts that it has reconciled its decisions with organizations such as regional and national dealer councils, TADA and NADA. In my written assertions, I have presented to you eye-opening arguments to the contrary about the so-called noble intentions of these highly politicized organizations. For instance, while presenting my position papers over the past 15 years to TADA, not one single action toward the manufacturer in favor of my opinions has ever been confirmed. Indeed, protecting the rights of small-to-midsized new car dealers has been seriously compromised on any occasion when defending the rights of ALL new car dealers has taken precedence! With respect to a referral from NADA, the law firm of Myers and Fuller from Tallahassee, Florida abdicated my position during the Oldsmobile litigation, charging my dealership approximately $125,000 in legal fees. This very high-profile, self- proclaimed national defender of auto dealer's rights in disputes with car manufacturers initially identified an eleven-count

5

indictment over several years of time, then mysteriously and whimsically filtered it down to one complaint in approximately 2003—the illegal termination of the Oldsmobile brand—otherwise, deceptively described by the corporation to be a Phase-out. During approximately five years of time, from 2000 to 2005, Myers & Fuller extended its discussions and deliberations with me ad nauseum, furthering a master strategy that reflected multiplying 15 years of my business life by $500,000 lost profit per year, to create a $7 million negotiating position. The concept was contrived, then abandoned and deemed implausible the very night before the "mediation circus came to town." The two documents that ultimately reflected so-called "mediation solutions" created unique and remarkably damaging replacements of my five-year franchise agreements, effectively offering then paying blackmail or extortion money to define exclusivity in site and property locations for both Forrest Chevrolet-Cadillac and Forrest Pontiac-Buick-GMC. In refusing to sign the two initial 5-page agreements in December 2004, I, C. Michael Forrest, confronted the vengeful action and retribution of General Motors as they filed a lawsuit against our dealerships in a Federal Court in Dallas in March 2005. Their ultimate objective, six months later, was to "sidestep" Texas statutes of Motor Vehicle Law and create a unique and highly prejudicial side agreement. Such actions have been concocted "en masse" all over the United States for decades, with specific motives to continually usurp and bypass state laws, as regards the routine protections afforded by same.

The behavior of General Motors in the past fifteen years and the corresponding actions of GMAC finance company (now known as ALLY) have been the direct or indirect cause of many other legal issues and financial crises that are being waged today by the Forrest family. The damages caused by General Motors and GMAC are as plain as the "nose on your face" to anyone that is willing to look at the facts. General Motors and GMAC (now known as ALLY) are trying to distance themselves from both civil and criminal fraud, even seeking unique favor through the Federal Bankruptcy court in Southern District, New York, and changing their names in order to escape their financial responsibilities and legal obligations. They should be unable to escape the damages they have caused simply by assuming new identities, flushing out the old, pretending they are making a new start, while leaving a path of unprecedented destruction and not being held accountable for their actions. Across the country, there are hundreds of dealerships that have experienced similar turmoil in two or three of the major categories of abuse by manufacturers and the lives of thousands of families have been thrown into chaos because corrupt and unconscionable business dealings of General Motors and GMAC. Below is a short list of the Forrest family legal issues that have all been directly or indirectly related to the unethical and illegal bullying tactics of General Motors and GMAC.

## Lawsuits with Cause No.

Forrest Chevrolet-Oldsmobile-Cadillac, Inc.          **Cause No. C200300327**
(Attorney-Gerald G. Staton)
V.

Jeff England Motor Co., Inc.
(Attorney-Bruce W. McGee)
(Attorney John MacLean) (OK)

Thomas M. Pernell                                    **Cause No. C200400588**
(Attorney-Keith Bradley, D. Scott Cain, Kimberly Sikes)
v.
Forrest Pontiac-Buick-GMC Truck, Inc.
(Attorney-Jeffrey Davis)    (Original Attorney-Gerald G. Staton)


Michael Forrest,                                     **Cause No. C200500534**
Forrest Chevrolet-Oldsmobile-Cadillac, Inc.,
Forrest Pontiac-Buick-GMC Trucks, Inc.
(Attorney-Mitchell Madden, Mark A. Hendrix-Madden Sewell, LLP)
V.
M.T. Sandlin Building Corporation,
Larry Sandlin, J. Gary Shaw and Recer & Fox, Inc.
(Attorney-R. Lynn Fielder-Fisk & Fielder, P.C./ Darren Marlowe-The Bush Firm, P.C.)


William Clinton Forrest                              **Cause No. C200900357**
(Attorney-D. Scott Cain)
V.
Forrest Property Management, Inc.,
And Charles Michael Forrest
(Attorney-Jeffrey Davis, Brooks Williams (Bill) Conover III)


Forrest Cleburne Properties, L.P. (Third-Party Plaintiff)    **Cause No. C200900357**
(Attorney-Jeffrey Davis, Brooks Williams (Bill) Conover III)
V.
William Clinton Forrest (Third-Party Defendant)
(Attorney-D. Scott Cain)


Forrest Property Management, Inc.,                   **Cause No. C200900529**
Forrest Cleburne Properties, L.P. Forrest Chevrolet-Cadillac,
Inc. and Forrest Pontiac-Buick-GMC Trucks, Inc. (Attorney-
Jeffrey Davis, Brooks Williams (Bill) Conover III)
V.
Eddie McGinnis
(Attorney-G. Roland Love, Jennifer Lovelace, M. Suzanne Frossard)


Forrest Chevrolet-Oldsmobile-Cadillac, Inc. a Texas Corp.    **Proceeding No. 03-0024LIC**
(Attorney-Myers and Fuller, P.A. / Heath, Davis & McCalla, P.C.)
V.
General Motors Corporation a Delaware Corp.
(Attorney-Strasburger & Price LLP. / Kirkland & Ellis LLP.)

*some* 

Below you will find a list of names with descriptions of those who have played a role or who have knowledge of the Forrest's family business as it relates to their GM/GMAC automotive business, real estate business and transactions, and insurance and estate planning.

Jeff England-Used car dealer and former employee who undermined Forrest dealerships through illegal car brokering by participation in his schemes with as many as 15 new car dealerships.

Tommy Pernell-Leasehold Dispute

M.T. Sandlin/Larry Sandlin Bldg. Corp.-Overcharge project costs...Forrest Pontiac-Buick-GMC/quality of construction dispute/title issue

Cody Jones- Farm property transaction...inducement to purchase my mom's $3 million farm property for $1.1 million plus giving away her 47% mineral interest

Debbie Bouchard-Realtor in farm property transaction

Deanna Rosser-Realtor in farm property transaction

Clint Forrest, Brother-dispute over business dealings and non-continuance of annuity payments

Eddie McGinnis- Fraudulent real estate transaction-presenting himself as a consultant, loan solicitor, self-dealer, dealership sales agent and real estate broker

Mike Cody- 15 year CPA, *presenting himself as an estate planner, a consultant, an insurance* Lawyers *annuity sales agent, loan solicitor, real* (Partial List) *estate broker, oil & gas* 

John MacLean- Cleburne, Jeff England Motor. Co.

Bruce McGee- Ft. Worth, Jeff England Motor. Co.

Pete Benenati- Bedford, Taxes, estate plan, review of issues

Robert Sparks- Cleburne, original estate plan, Oldsmobile, GM "opinion", various issues involving Forrest business matters

Gerald Staton- Ft. Worth, Pernell, Jeff England Motor. Co., GMAC, McGinnis

Mitchell Madden- Irving, Oldsmobile, GMAC, Graham Mortgage

Paul Sewell- Irving, Oil and Gas, GM, Graham Mortgage

Mark Hendricks- Irving, M.T. Sandlin Building Corp, construction of Forrest
     Pontiac-Buick-GMC

Rich Sox- Florida, General Motors dispute regarding elimination of Oldsmobile

Doug Moody- Florida, General Motors dispute regarding elimination of
     Oldsmobile

Tom Cantrill- Dallas, Estate planning for Martha Forrest

Peter Weinstock- Dallas, Estate planning, GM franchise contract overview

Bill Blankenship- Dallas, GMAC dispute

Bill Conover- Cleburne, Clint Forrest, GM

Jeff Davis- Cleburne, Clint Forrest, GM, GMAC, McGinnis, Pernell

Dudley McCalla- Austin, Oldsmobile, Jeff England Motor. Co.

Bill Crocker- Austin, GM Bankruptcy opinion

Jeff Rattikin- Ft. Worth, Title transfer of Forrest Pontiac real estate

Michael Kovich- Austin, TMVC (TX Dot), Jeff England Motor. Co.

Kevin McDonnell- Waxahachie, estate planning review Oldsmobile, GM, GMAC

Chris Cooke- Cleburne, review of local issues as pertaining to GM, GMAC

Randy Johnston- Dallas, review of GM, GMAC issues and real estate matters

Robert Tobey- Dallas, review of GM, GMAC issues and real estate matters

Mike Rogers- Cleburne, brief review of farm property matters

Tommy Mann- Ft. Worth, attempted mediation involving Clint Forrest dispute

Larry Friedman- Dallas, review of GM, GMAC issues and real estate matters

Robert Feiger- Dallas, review of GM, GMAC issues and real estate matters

Haakan Donnelly- Dallas, review of real estate matters

Chuck Lummes- Cleburne, Farm transaction, oil and gas, mineral interests for
     mom, adversarial position.

*The following pages are a narrative written by Michael Forrest telling his family story while touching on the major issues that continue to plague his family. Again, this is a classic case of David vs. Goliath, in that General Motors and GMAC have taken liberties due to their power and influence over a small town family dealership; that in the eyes of the people of Cleburne, Texas provided stability and immeasurable value to their community.*

## STORYLINE...AFFIDAVIT

My story, on the surface, could easily be mischaracterized as a 6-year journey of incompetence following a 43 year track record of remarkable family success. I have written about my journey for the sake of car dealers all over America—specifically, those who may have exited the business for unjust reasons or those who may have simply sought the opportunity to afford their children a greater future. I am the second generation son of a legendary car dealer in Cleburne, Texas. My father, the late O.C. Forrest, Jr. began selling cars and trucks in our community in 1949. Through much hard work and sacrifice of my parents, my dad was able to purchase our Chevrolet-Cadillac franchise in 1961. As young children in the fifties, my older brother Clint and I grew up around the automobile business. Then, after graduation from the University of Texas, Clint in 1971, and I in 1974, both elected to join the family business. In 1978, a strike year as I recall, I was visiting with my father about the business climate and the gravity of our own circumstances. Not much effort was required to count only five pickups in stock! As my mom and dad would often get out on Sunday afternoons, driving the country side, they discovered that Durant Chevrolet in Granbury, Texas had about 60 pickups on their lot. My dad was furious. He called the Chevrolet zone manager about the gross disparity of inventories. Within ten minutes of his phone conversation, virtually all the employees at the Dallas zone knew my dad had registered a complaint, along with most of the employees at that dealership. He approached me on the south side of our showroom with a look of fear in his eyes proclaiming, "Son, they're all in it together! What are we going to do?" I thought for a second, but could only respond to him with an empty reply, "I don't know, Dad. I don't know!" My dad had been a director of the Texas Automobile Dealer Association in the sixties and had gained a reputation as a very successful car dealer, businessman, and community leader. Thusly, he commanded some attention to his grievance. The manufacturer, caught with its "hand in the cookie jar", was compelled to divert some of those fleet-ordered vehicles to our normal stock. The Durant family stopped speaking to our family for several years afterward. Basically, we were victimized by the power-broking games of inventory acquisition. In those days, the formula that applied was: "who do you know?" and "what have you done for

10

them lately?" In this instance, there was a separate distribution system for the fleet-related aspect of new vehicle sales versus the retail system, the supposed "normal" way that vehicles were acquired and sold. Within the context of how the retail side of the automobile business functioned, an aggressive, cannibalistic protocol developed as to how new car dealers were uniquely taught to do business. It became known as TURN-and-EARN.

As circumstances would dictate, in 1990, our family was afforded the unique opportunity to purchase the other two General Motors agencies in our community, the Pontiac-Buick agency and the Oldsmobile-GMC agency. Without the "benefit of General Motors' advice or wise counsel", we were blessed with enough common sense to guide the consolidation of those three franchises into two dealerships, which lead to the logical configuration of Forrest Chevrolet-Oldsmobile-Cadillac and Forrest Pontiac-Buick-GMC. Approximately four years later, General Motors adopted those particular brand alignments elsewhere for communities of similar size to ours in Cleburne, Texas.

During the early 90's, I respectfully wrote and spoke to various members of our state legislature, numerous car dealers, dealer council representatives, and wholesale factory representatives about any number of important, relevant issues. Much of my commentary and analyses focused on two of my family's worst experiences of franchise ownership—the manufacturer's new vehicle allocation process and the architecture of the relationship between the franchise holder and the manufacturer. In 1994, on behalf of my family, I invested six months of time and energy in preparing a business proposal to relocate the Pontiac-Buick-GMC dealership (that was occupying rental property adjacent to a cemetery), to our long held family real estate site location at Forrest Chevrolet-Oldsmobile-Cadillac. At a meeting at our Chevrolet store later that year, a Pontiac zone manager named Jeff Fernandez took only twenty minutes to obfuscate our plan. During the next two years I amended our original proposal twice, only to be greeted by more roadblocks. Disturbingly, none of my family realized at the time that Mr. Fernandez was "employed on the inside track", waiting for an opportunity to "get his hands on a dealership" under the minority plank of dealer development. It was not until 2001 that I became aware that Mr. Fernandez had indeed become a new car dealer in our area, or, more explicitly, that he had established a Fernandez Pontiac-Buick-GMC near the intersection of Hwy 67 and Interstate 20 in south Dallas. Several years later, on a routine visit to my franchise, a General Motors sales area representative, with no inducement on my part, volunteered information to me that Mr. Fernandez's motive had indeed been to work inside the corporation to ultimately become a General Motors dealer.

By 1995, at the tender age of 43, I had already seen enough evil propagated by "our corporate partner" to cause grave concern about how good people with noble intentions would ever succeed in such an environment. I became motivated to develop a platform from which to volunteer my name for election to the National Dealer Council. In the final days leading up to the election, I received notice from the corporation that I was ineligible to serve. Even though I had contributed greatly to the value of our family's franchises over my lifetime,

my name had supposedly been listed in paragraph three of our franchise agreement for only two of a required three years. Since General Motors had already delivered to me approximately 225 self-addressed envelopes for all the Chevrolet dealers in North Texas, I thought it foolish to let all my observations go to waste and enthusiastically forwarded my platform issues to the dealer body. As a result, a number of Chevrolet dealers, whose passion and plight was "to play games to get ahead in the system" and whose behavior was being inadvertently characterized by my comments, forwarded my platform concerns and ideas to all the higher-ups in Detroit where apparently "all hell broke loose" in General Motors' inner circle. Raw nerves had obviously been touched. The Chairman of Chevrolet, our dear friend Jim Perkins, summoned my father and me to appear on "the Fourteenth Floor" in Detroit to explain my position paper. During the two hour meeting that followed (his right-hand man, John Burrough, was also in attendance), I began to enthusiastically defend my remarks, but on platform issue number thirteen, it became obvious that Jim could not listen to any more "truth or consequence". Eventually, I was invited to take a one year leave of absence due to my perceived anger and animosity toward "whomever or whatever!" Within my rights as a franchise owner, I refused to do so, but I humbly offered to apologize at the next regional meeting...mind you, for the <u>flavor</u> of my remarks, but <u>not for the content</u>. My offer was tabled and our two hour meeting abruptly adjourned with no obvious outcome. Approximately, six weeks later, Jim Perkins either resigned or was forced out of his job. It is, perhaps, beyond coincidence that my lifelong journey...first, defined by the accumulated knowledge and wisdom of my late thirties...and later, highlighted by my willingness to simply tell the truth about my observations for the next twenty years, has required me to navigate through a minefield of covert and conspiratorial repercussions...not unlike [a personal version of] our nation's 9/11 events!

After many years of collecting and analyzing data, and thereby, exposing the Achilles heel of the manufacturer's most diabolical tool with which to "terrorize" dealers, their product allocation methodology, I was told in the mid-nineties that GM was embarking on a mission to reinvent the "turn-and-earn" process. This decades-old draconian and prejudicial system had never even been able to pass the age old smell test: "which came first, the chicken or the egg?" How could a small-to-midsized car dealer ever be treated fairly in a system whereby, if you could not first get products, then, by definition, you could never earn them! In other words, the system has always ensured that the rich do get richer and the poor do get poorer! Naively, for a brief moment in time, I actually believed that someone in the management of the corporation had taken my suggestions to heart. Lo and behold, as several years evolved and the new system was being introduced in 1998, it seemed obvious that its primary goal was to make it a moving target and render the process virtually impossible for a dealer to challenge or to capture a legal footprint of any historical data. As for the impressions of many sales managers, dealers, and legal professionals, the outcome appeared to be nothing much different than an on-line version of the old "turn-and-earn" system. It's on-line nature made the entire system time-sensitive

to use, prone to hi-tech sabotage or failure, much more difficult to get vehicles that you wanted, easier to receive vehicles you didn't order, more difficult to continually train new employees, and so on. With respect to the second declaration, many of our time-sensitive, on-line attempts to use their new vehicle ordering system in the first year were suspiciously halted by "frozen screen syndrome" that would simply deny us new merchandise. No one at the corporate level ever explained this disturbing phenomenon or offered to reconcile our "turn-and-earn" losses.

Consequently, in 1999, I drafted a hand written letter to Ron Tonkin, a former head of the National Automobile Dealers Association, noting at the time that I possessed only five Chevrolet extended cabs in my inventory. Mr. Tonkin kindly left me a sympathetic voicemail. It was in that same year that I mailed a copy of my 1995 National Dealer Council platform issues to every member of the 1999 Chevrolet National Dealer Council. The obvious reason I did so was to remind these individuals of my previous efforts to indict the so called "turn-and-earn" distribution system as a very manipulative and dysfunctional process that often "starves dealers out of vehicles" or "floods them with vehicles". My correspondence was met by a deafening silence from this group. There was no phone response, no letter, no email...nothing! In spite of this ominous threat to our livelihood, our dealership overcame this lack of sellable product as we had done many times before.

Upon my father's untimely passing in 1997, we had to confront the reckoning of a seven year leasehold assumption with the Pernell family. As my brother, Clint, was officially dealer-operator of Forrest Pontiac-Buick-GMC, he, in particular had to entertain the idea of what to do next. Apparently, Tommy Pernell, the son in charge of his father's trust, tried to present a new lease agreement to my brother. Clint did not act to immediately reconcile the contract dispute, but in late summer of 1998, signed a new three year agreement with the blessing of local attorney Robert Sparks. My mother and I were unaware at the time that a new contract was forthcoming until we received a copy of it at our Chevrolet agency. During the ensuing three years, I continued to develop a logical plan with Mr. Sparks to establish a holding company to oversee our business/real estate affairs. After dismissing the final agreement offered by Mr. Sparks, my brother received local legal advice to seek the protection of a large law firm in Fort Worth. My mother, Martha Forrest, and I finally had to confront the difficult 54 month [transition that followed my father's untimely death] with an exit opportunity for my older brother...tragically, at the costliest price anyone could pay—the loss of our fragile relationship with him and his entire family! General Motors "stonewalled" an emergency request to relocate Forrest Pontiac-Buick-GMC within the real estate site location of Forrest Chevrolet-Cadillac because of an adversarial relationship that developed with our lessor. My mother and I could not endorse a mandate by the son, Tommy, to sign an onerous new three year lease agreement, thereby defaulting our tenant status to a month-to-month basis. After I received no formal response by General Motors to my "emergency relocation request", the Chevrolet and Pontiac zone managers met one time at our Chevrolet site, but discussed only absurd and illogical

contradictions to the placement of a service reception area and the alteration of a sales building (that would not have met engineering compliance standards). The posturing of General Motors officials from November 2001 to an official written acknowledgement to build a new Pontiac-Buick-GMC facility approximately in February 2004 was diabolically negligent as to any definition of timely and/or practical resolutions to our predicament. Indeed, from April 2003 until February 2004, when faced with a "Hobson's choice", I had performed about $1 million of demolition and excavation work on the old bowling alley site with verbal assurances from the Pontiac zone manager, Rick Beets, as to the erecting of a new facility. For many years, preliminary plans and speculative ideas about any updating of our facilities had been contemplated with a local architectural firm known as DSA. However, over a six month period of time in 2003, I was systematically petitioned by Larry Sandlin to use his family's local company, the M.T. Sandlin Building Corporation, to "save" the steel structure and partial floor of the former bowling alley. After much politicizing by Larry Sandlin, I acquiesced. It was bid on a cost-plus basis at approximately $2 million, which allocated $1.5 million for the main facility and $0.5 million for the ancillary building. Eventually, I had to address numerous issues with the development, inviting the assistance of a family friend, Maury Rester, to supervise the final six months of construction. The "low ball" nature of the original bidding process, together with innumerable daily change orders and wanton mismanagement of the development, caused my mother and me to invest an additional $1.2 million or a total of $3.2 million on the project, which required one year and nine months to complete. I initiated a premature move to the new development site in December 2004.

During the summer of the year 2000, I received a bizarre phone call from a young man named Jeff England. Mr. England was a former employee of ours, the used car manager, at our Chevrolet-Cadillac store. The reasoning behind his call was to suggest that he had a great many of "his" customers who wanted to purchase new vehicles, and that he needed a place to send them. I reminded him that "his" customers consisted of many clients that he was either empowered to assist on behalf of my father and our family or that he had come to know during his fourteen year tenure (1984-1998) with our company. When I told Mr. England that our store certainly should be the presumed destination for what he deemed as "his customers", he propositioned me to send "his customers" to us, but that he wanted the trade-ins in return as compensation. Furthermore, he said that he could send "his customers" to any number of new car dealers. I told him that the game he was playing was blackmail, and not only that, it was also illegal! I challenged him to admit that if he had departed our company when my father was still alive, he would not have dared to call and suggest such a scheme to my father. He admitted that he would not have done so. Then I told him not to ever mention such a scheme to me either! Over the next three years, Mr. England proceeded to develop a network of new car dealers with which he could execute his brokering activities. Furthermore, he constantly recruited our employees. Having seen and heard about many instances of vehicles that he brokered into our area of sales responsibility, and suffering both the obvious loss of key employees and the avoidance of candidates for employment due to his

14

interference, I hired George Bray, a private investigator in the Forth Worth area to set up a sting operation on his business. Shortly thereafter, Mr. Bray successfully recorded on both audio and video two new vehicle purchases/deliveries on England's used car lot—one from Lynn Smith Chevrolet in Burleson, Texas and one from Durant Chevrolet in Granbury, Texas. Mr. England and/or his employees also affixed Jeff England Motor Company emblems to the new vehicles as they were being delivered.

   The first attorney from Fort Worth who was referred to me about the matter was simply going to take the two examples to the Texas Motor Vehicle Commission. I objected to this strategy, believing that a "slap on the hand" fine could easily invite more insidious forms of abuse and/or revenge. The second attorney to whom I was referred, Gerald Staton of the Staton and Taylor Law firm in Fort Worth, suggested that I file a complaint against the Jeff England Motor Co. in a civil court in reference to a "tortuous interference with my contract with General Motors." This idea seemed more compelling. With considerable unsolicited feedback from our customers and employees, my family's own observations, and Mr. Bray's assistance, I assembled a dozen examples of brokered purchases. When a preliminary hearing finally happened in 2004 in front of Judge Wayne Bridewell in Cleburne, several things shocked me and my mother. For one thing, Jeff England had recruited the services of John MacLean, the foremost local powerbroker who was also listed as a top 5% plaintiff's attorney in the state. He happened to be a customer of ours and a friend of our family, whose vacation home in Vail, Colorado we had visited on several occasions. My mother and I even heard "through the grapevine" that Mr. MacLean had rearranged the court venue to make sure that Judge Bridewell was presiding that day. Secondly, Jeff England brought in a second lawyer, Bruce McGee of Forth Worth, whose area of expertise I never researched, but who presumably had some knowledge of Texas Motor Vehicle statutes. Thirdly, in spite of repeated requests from my mother and me that Gerald Staton reinforce our case with an additional lawyer who would have "local firepower", and eventual assurances that someone else would assist him, he nonetheless appeared as a solo act.

   From approximately that moment in 2004 through 2008, I persistently requested the help of the Texas Motor Vehicle Commission in pursuing the abetment of administrative issues from the civil court in Cleburne to the proper venue in Austin. Having to confront various changes in attorneys and personnel changes within the department over several years, I found the process itself to be quite a road block to success. After repeated efforts to seek the assistance of attorney Gerald Staton in Fort Worth to agitate my issues within jurisdiction of the TMVC, I eventually sought the assistance of Rob Orr, our state representative from Burleson, Texas to get someone's attention to my matters. To his credit, Representative Orr "got my foot in the door" with that agency, but it was still about two years for me to achieve a small token of justice for all my efforts and gain relief for actions dating back to the year 2000.

   Given the circumstances, I personally had to assume the awkward responsibility to both give my testimony on the witness stand and also to act as

additional advice and counsel to Mr. Staton! The hearing itself was punctuated with very aggressive questioning and "soap opera outbursts" from Mr. England's attorneys, tragically with very little objection from my attorney Mr. Staton. Judge Bridewell clearly had no command of this "kangaroo court", appearing to be clueless as to the ramifications of Texas Motor Vehicle (administrative) law. Otherwise, he quickly would have abated the civil hearing, yielding to its obvious jurisdiction in many of the issues, not the least of which was the brokering matter. Nonetheless, there was remarkably damning testimony from Jeff England and many of his associates, contrasted with great enlightenment by myself, one of George Bray's associates, and others that clearly supported my claims. At the end of this troubling four hour escapade, Judge Bridewell acquiesced to the pressure of trying to appease both sides. He invited the attorneys to a back room and asked everyone what they wanted to happen. Eventually, he issued a convoluted assortment of opinions that made no legal sense, but in his own desperation to pacify all parties, ruled that, with respect to the Jeff England Motor Company, several things were acceptable to do, but several other things were not!

In March 2008, Michael Kovich, attorney for TXDOT (Texas Motor Vehicle Commission) began repeated efforts to glean information about the Jeff England Motor Co. debacle from attorney Gerald Staton in Fort Worth, but Staton refused to cooperate with him. Looking back on the dilemma, the only plausible explanation was that Staton had been baited by GM personnel to arrange a sale of our car dealerships to James Wood of Decatur at the time, but my mother wisely had objected to his insistence to purchase our real estate. A few months later, in early June 2008, my mother and I delivered a termination letter to Staton's office, in the presence of my friend Bill Pacheco. Kovich had set a hearing in mid-May to address England's misdeeds, but another compromising situation developed when private investigator George Bray could not locate the audio/video evidence he had collected on our "sting operation". Mr. Bray told me he later found the information in an older video recorder, but tragically not in a time-frame to assist Mr. Kovich in his casework. Mr. Kovich, lacking critical pieces of the puzzle that should have arisen from our two most important contributors, delayed the hearing until early November 2008. I actually discovered this surprising fact by initiating a random phone call to Mr. Kovich within a day or two of a hearing that had transpired. Not only was I not notified of the hearing, I had solicited the presence of a "motor vehicle practitioner", Bill Crocker based in Austin, to represent me and our dealerships in the original hearing in mid-May, who was also NOT notified. I was informed that the limitations of evidence to address Mr. England's issues resulted in [my worst fears from eight years earlier] a $3,000 "slap on the wrist" fine for his brokering activities, and fundamentally, a warning to cease and desist with such behavior. This "sentence" was tantamount to telling a thief not to rob you anymore, after he had taken so much from you that you had nothing left. Nonetheless, my privilege was to return to the civil court in Cleburne, Texas for a final hearing about the damages due our family following eight years of "in your face" antics from England and his cast of characters. Approximately two and a half years later,

16



after numerous efforts on my part to rekindle the pursuit of this case, all attempts to finalize the judicial outcome have been thwarted, in deference to the "larger and grander chess games" of General Motors and their finance arm, GMAC (now known as ALLY). The patronizing statements of one of England's two attorneys after the initial civil court battle in Cleburne, Texas confirmed guilt as to the mediocre standards of justice that threaten the virtues of our system. Fort Worth-based attorney, Bruce McGee, was quoted in the *Fort Worth Star Telegram* that he expected the case to be resolved in an out of court settlement. Indeed, I had "heard though the grapevine" that England had decided to set aside $10,000 a month over a period of time to prepare to pay our family about $150,000 to silence the matter. No such trivial mockery of a settlement ever surfaced...and rightly so, given the multi-million dollar collateral damage that he inflicted...colluding with a variety of people and entities to achieve his objective. This part of the story will not end until justice is served.

Through an unfortunate referral by NADA in early 2001, the Myers and Fuller Law firm of Tallahassee, Florida "represented" our two GM dealerships (from the announcement of General Motors termination of the Oldsmobile brand in December 2000) until I was invited into a "mockery of a mediation resolution" in October 2005. During the first couple of years, I virtually conceived the platform issues upon which the law firm eventually fashioned an approximate 11-count indictment. Mysteriously, in or around 2003, this "major-league" assortment of misdeeds was filtered down to a single complaint against the auto maker [General Motors]. Simply stated, it read that, contrary to its claim that the corporation had announced a phase-out of the Oldsmobile lines, GM had instead illegally terminated the Oldsmobile franchise. This issue, in my mind, was indisputable. However, I was shocked by the law firm's willingness to dismiss so many overt and obvious violations of the TMVC code, resulting in a much weakened characterization of (GM's) conduct. A lawyer with the firm quickly convinced me that focusing and prevailing on this particular issue was all that was really necessary to "open the door" to a favorable hearing with the Texas Motor Vehicle Commission. They (the law firm) would then utilize the financial analysis of another NADA-recommended participant, a Tennessee accounting firm, to develop a damage profile for our particular set of circumstances. From such an analysis, an associate presented me an approximate idea of a damage formula associated with the Oldsmobile brand termination of $500,000 gross profit per-year (with very little additional overhead expense) x 15 years of time that I might predictably be active in the operation of our stores, totaling $7M! In the legal world of staking out positions from which to negotiate, this seemed like a logical and justifiable framework for damages. Sometime, I believe, in early 2004, I received news that the TMVC would at least <u>not dismiss</u> our claim that the so-called Oldsmobile phase-out was really a disguised termination. This ruling lead to a preliminary meeting of me, a Myers and Fuller lawyer (Rich Sox), and three representatives from General Motors to discuss damages. At a brief breakfast, the lawyer spent a few minutes alluding to various "pots of money" from which General Motors would fashion an offer. As strange as this sounded, I eventually came to understand what he meant.

In August 2005, two months before the Oldsmobile mediation hearing, we were confronted with a GMAC audit of "car deal" payoffs, resulting in an immediate payment demand of $1.2 million dollars. This assessment was based on three day payoff requirements by their internal definitions, which I had never heard of, nor have I, to this day, ever seen in writing. Consequently, I have had to constantly engage GMAC through legal representation since early August 2005. From August 2005 through early January 2006, I also invited attorney Mitchell Madden to represent our GM dealerships in the initial confrontation with GMAC. Toward the end of 2005, about five months later, I became very concerned that Madden's level of intensity might invite an "all or nothing showdown" that could leave me in an untenable position, so I "changed horses", asking Gerald Staton of Staton and Taylor in Fort Worth to intervene in the matter to try to calm the rhetoric and to allow me an opportunity to develop a game plan. Tragically, in the two and a half years that Staton engaged GMAC on our behalf; they managed to impose five punitive actions that are identified in a client alert forwarded to me by the Myers and Fuller law firm of Tallahassee, Florida, in November 2008. Aside from two prior demands by GMAC that we choose a new floor plan source, a third notice from their operations supervisor in March 2008 advised us that our line of credit would be suspended in late May 2008. As I had previously characterized their behavior as attempting to force the sale of our franchises, I was both shocked and outraged that they followed through on their threat. Afterward, our two General Motors franchises, Forrest Chevrolet-Cadillac Inc. and Forrest Pontiac-Buick-GMC Inc, survived over a year with no ability to order new vehicles from the manufacturer. Predictably, the manufacturer sent letters outlining violations of our obligation to furnish new product to their customer base.

During the past seventeen years, since 1994, our family has been exposed to a myriad of methods of General Motors Corporation to destabilize our franchises and force us out of business. The initial strategy was to alter the sales outcome in our primary area of responsibility by allowing the relocation of our closest Chevrolet competitor, Lynn Smith Chevrolet in Burleson, Texas, in 1994. In about 2001, I successfully sought a two million dollar damage opinion from Technical Associates in Virginia with respect to this abuse. However, due to the unwillingness of the Myers and Fuller law firm to partner with the Baddley and Mauro law firm in Birmingham, Alabama, I was unable to execute a legal strategy at that time. In or around 1998-1999, during the period that a new on-line distribution formula was being introduced, General Motors attempted to "starve" our stores of new product allocations. Lastly, in December 2005, following a significant influx of new product resulting from the "price-fixing" madness (visa vi GM Employee Pricing) of June 2005, they (the manufacturer) attempted to "flood" us with new product. GMAC (the other side of the two-headed dragon) acted aggressively against our stores when we had accumulated over 12 million dollars of new vehicle inventory. Steve Evans, who inherited his father's 30 year old franchise, R.O. Evans Pontiac-Buick-GMC in Dallas in 1988, is a former victim of this multifaceted strategy of General Motors. Mr. Evans contacted me in 2005, warning me of such a diabolical possibility. He was very concerned at the time

18

that the same thing that happened to him and his family would happen to me and my family! And it has! GMAC issued a notice in March 2008, that the floor plan lines of Forrest Chevrolet-Cadillac and Forrest Pontiac-Buick-GMC would be suspended on May 22, 2008. This was actually the third notice of this kind since the end of 2005, leading to the current death spiral of our family's fifty year journey as a General Motor's dealer.

To summarize our experiences, we represent one of the all-time "train wrecks" of a family dealership operation by a manufacturer. From 1994 to present, we have logically sought approval to economize the overhead of Forrest Pontiac-Buick-GMC, presenting several common sense rearrangements that would have allowed dealership profitability to be the first priority. Instead, GM (the manufacturer) has elected to repeatedly "stonewall" our efforts to do so, allowing only the construction of a new Pontiac-Buick-GMC dealership. Since that time, while trying to deal with the strategy of a former Chevrolet dealer (named Eddie McGinnis) in Fort Worth, Texas to pursue the sale of our store, while my mother was induced into an improper leverage of three million dollars against our recent Pontiac-Buick-GMC development in mid-August 2008. I managed to "catch my breath" in the face of approximately nine months of demands from various creditors. My critically ill mother, my increasingly irrational older brother (and his family of four), and I are all completely dependent on an estimated 50 to 60 thousand dollars of monthly income from our operations. I am understandably very disturbed, sick to my stomach, and "mad as a hornet!"

We currently have no new vehicles remaining in inventory on our 17 acre tract and have no cash with which to continue operating. In this "pressure-cooker", our family's approximate real estate and business-related assets of eleven to twelve million dollars are being diminished to a "fire sale" value. In mid-July 2008, as dealer principal of the two franchises, I had to reverse a 56 year pathway of progress in managing the continuation of our 50 year heritage, realizing that a final attempt to secure a real estate/floor plan loan (even based on asset value) might be forsaken.

## Illegal Actions of General Motors and/or GMAC

- Illegal (unconstitutional) termination by General Motors of my Forrest Chevrolet-Cadillac, Co., Inc. dealership franchise agreement through a Federal bankruptcy court in New York on July 10, 2009

- Illegal (unconstitutional) termination by General Motors of my Forrest Pontiac-Buick-GMC, Co., Inc. dealership franchise agreement through a Federal bankruptcy court in New York on July 10, 2009

- Illegal suspension of my Forrest Chevrolet-Cadillac, Co., Inc. dealer floor plan agreement by GMAC finance of General Motors on May 26, 2008

- Illegal suspension of my Forrest Pontiac-Buick-GMC. Co., Inc. dealer Floor plan agreement by GMAC finance arm of General Motors on May 26, 2008

- Illegal violations by GMAC of my Forrest Chevrolet-Cadillac. Co., Inc. floor plan agreement (from 1990-current 2009) by utilizing the following tactics:

  - Imposing high-risk interest rates unrelated to agreed interest rate formula
  - Imposing unreasonable inventory retirement guidelines when such inventory was originally purchased without repayment restrictions.
  - Demanding substantial additions to dealer working capital which contradict the original capital formula
  - Demand that additional dealership and shareholder assets and accounts be designated as lender collateral
  - Demand that cash collateral accounts be established

- Violations by GMAC of our Forrest Pontiac-Buick-GMC, Co., Inc. floor plan agreement (from 1990-current 2009) by utilizing the following tactics:

  - Imposing high-risk interest rates unrelated to agreed interest rate formula
  - Imposing unreasonable inventory retirement guidelines when such inventory was originally purchased without repayment restrictions.
  - Demanding substantial additions to dealer working capital which contradict the original capital formula
  - Demand that additional dealership and shareholder assets and accounts be designated as lender collateral
  - Demand that cash collateral accounts be established

- Massive over shipment of new vehicle inventory from July, 2005 to December, 2005, precipitated by (GM) the auto manufacturer's relentless willingness to endorse and utilize a diabolical allocation methodology known as "turn-and-earn"

- Inducement to build the new Forrest Pontiac-Buick-GMC automobile dealership by refusing multiple requests to relocate and blend Forrest Pontiac-Buick-GMC. Co. Inc. (formally at 2145 N. Main St.) onto the primary, and more than adequate, historical real estate site of Forrest Chevrolet-Geo-Cadillac at 2400 N. Main. Cleburne, Texas. The first denial of a Forrest family business plan to make a blended move was from 1994-1996. This plan was blocked, at the very least, by former Pontiac zone manager Jeff Fernandez in a self enrichment scheme to, in effect, trigger the sale of said store, and benefit, by his insider status to knowingly have been in pursuit of a minority-driven application through General Motor's dealer development program to become a dealer himself. Shortly thereafter, Fernandez accomplished his objective, with the same franchise arrangement as ours, but in a neighboring community. The second denial of a Forrest family business plan to make a blended move was from Fall

2001-Winter 2004. Two zone managers of General Motor's business-control entities Chevrolet's Keith Best, and Pontiac's Rick Beets, "stonewalled" our emergency request to relocate Forrest Pontiac-Buick-GMC, Co., Inc. at 2145 N. Main, Cleburne to the real estate site of Forrest Chevrolet-Cadillac. My mother and I refused to embellish the onerous language of a new lease agreement demanded by tenant trustee Tom Pernell, Jr. thusly causing our leasehold to default to a 30-day, month-to month basis. Caught in the crossfire of arguments between the two business-control entities for more than a year, we finally decided to begin site excavation on an adjacent piece of property that we owned, knowing that General Motor's preference was to have a stand-alone facility on its own piece of property. At the time that we finally received an official written authority to build a new dealership, in approximately late January/early February 2004, we had already invested over $1 million in the preparatory phase of the development. As the dealership development, that originally was bid at about $2 million by Lam- Sandlin of M.T. Building Corp., on a cost plus basis, approached completion, the out-of-pocket cost to Forrest Chevrolet-Cadillac Co., Inc. to build the sister facility reached approximately $3.2 million! The $1.2 million cost overrun has never been reconciled by either the builder or the insurance policy he solicited and charged us $6,000 in monthly premiums.

- Tortuous interference with my contractual relationship with General Motors by the Jeff England Motor Co. and numerous new car dealers as co-conspirators (such as Durant Chevrolet in Granbury, Texas and Lynn Smith Chevrolet in Burleson, Texas) in the timeframe summer of 2000 till present day.

- Discrimination by (GM) the auto manufacturer in denying our new vehicle franchises appropriate and sustaining levels of new vehicle inventory in its relentless willingness to endorse and utilize a diabolical allocation methodology known as turn-and-earn" substantiated in the timeframe 1994-1999.

- Inducement by (GM) the auto manufacturer to resolve its ill-advised termination of the Oldsmobile brand through the systematic pursuit of confidential side agreements, designed in large part to usurp and/or bypass the scrutiny of state franchise laws and impose irreconcilable, punitive actions toward us, its" franchise holders, in the timeframe from December 2000 till November 2005.

- Expansion of our (so called) area of primary sales responsibility into the vicinity of Alvarado, Texas, thereby raising our standard of required sales performance, but with no logical explanation, and under protest by me as dealer-operator in the timeframe of approximately 1999.

- Relocation of the Lynn Smith Chevrolet franchise in Burleson, Texas in 1994, effectively altering its allocation methodology toward new vehicle shipments under the definition of metro versus non-metro status and

causing preferential treatment toward that dealership that harmed Forrest
Chevrolet-Geo-Olds-Cadillac.

## Lawyer's Protest

Given that substantial operational losses occurred in the past six years,
(approximately $5 million), at Forrest Chevrolet-Cadillac and Forrest Pontiac-
Buick-GMC,

...and given that the original Pontiac-Buick-GMC company had lost money
in the prior seven years before its relocation,

...and given that Forrest Chevrolet-Cadillac had begun to reclaim its
profitability in the first 6 months of 2005 when General Motors elected to offer and
advertise an employee price-fixing scheme that contributed to a breach in the
confidentiality of dealer invoices and the right of a franchise dealer to negotiate
discount margins and/or trade in valuations,

...and given that the two Forrest dealerships inadvertently increased their
relative sales by approximately 75 units in June 2005 in response to the
perceptions by customers that this was an unprecedented purchasing opportunity
on new GM vehicles, and given that GMAC elected to audit June sales activity at
the two Forrest dealerships during early August 2005 demanding immediate
payment of $1.2 million to "comply" with 3-day payoff demands, with no prior
knowledge by dealer-principal as to any such requirement,

...and given that the hostile action of GMAC in confronting dealership
personnel and emphasizing its presence in dealer's facility caused the departure
of four key employees in the first ten days of its presence a said facility,

...and given that the dealer-principal recognizes eight motives of
GMAC/General Motors to act aggressively against his franchises, namely $9-$10
million of real estate assets and a 10 week countdown for dealer-principal to
attempt mediation of its position with respect to termination of Oldsmobile in
December 2000 and realizing that GM had filed suit in a federal court in Dallas,
Texas in March 2005 to enforce a term sheet discussed by attorneys as a legal
contract with respect to the Oldsmobile settlement,

...and given that GMAC made a demand of $1.2 million in early August
2005 that preceded a scheduled mediation hearing with GM officials concerning
the termination of the Oldsmobile division by 2½ months, the timing of which
occurred "beyond coincidence",

...and given that the GM employee price mania of June 2005 precipitated
a dramatic increase in the "turn-and-earn" allocation dynamic of Forrest
Chevrolet-Cadillac and Forrest Pontiac-Buick-GMC contributing early rumors that

GM might become a candidate for bankruptcy and/or major suppliers such as Delphi to record shipments of new vehicle inventory by the end of December 2005,

...and given that, at such a time in December 2005 GMAC claimed our two dealerships had risen above and beyond a ceiling that was unfamiliar to dealer-principal because a number of addendums were added to a core value of about $6 million during the 8-plus years since the untimely death of O.C. Forrest, Jr. in May 1997.