Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for the Motors Liquidation
Company GUC Trust

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
:
In re                                          :     **Chapter 11 Case No.**
:
**MOTORS LIQUIDATION COMPANY**, *et al.*,     :     **09-50026 (REG)**
    **f/k/a General Motors Corp.**, *et al.*    :
:
              **Debtors.**    :     **(Jointly Administered)**
:
------------------------------------------------------------x

## NOTICE OF MOTION OF THE MOTORS LIQUIDATION COMPANY GUC TRUST FOR LIMITED MODIFICATION OF THE AUTOMATIC STAY AND THE PLAN INJUNCTION

**PLEASE TAKE NOTICE** that the Motors Liquidation Company GUC Trust

(the "**GUC Trust**") will present the annexed Motion for Limited Modification of the Automatic

Stay and the Plan Injunction (the "**Motion**") to the Honorable Robert E. Gerber, United States

Bankruptcy Judge, for approval and signature at Room 621 of the United States Bankruptcy

Court for the Southern District of New York, One Bowling Green, New York, New York 10004

on **June 22, 2011, at 9:45 a.m. (Eastern Time)**.

        PLEASE TAKE FURTHER NOTICE that any responses or objections to the

Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the

Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a)

electronically in accordance with General Order M-399 (which can be found at

www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by

all other parties in interest, on a CD-ROM or 3.5 inch disk, preferably in text-searchable portable

document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with

the customary practices of the Bankruptcy Court and General Order M-399, to the extent

practicable, and served in accordance with General Order M-399, and on (i) Weil, Gotshal &

Manges LLP, attorneys for the GUC Trust, 767 Fifth Avenue, New York, New York 10153

(Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (ii) the

Debtors, c/o Motors Liquidation Company, 401 South Old Woodward Avenue, Suite 370,

Birmingham, Michigan  48009 (Attn: Thomas Morrow); (iii) General Motors LLC, 400

Renaissance Center, Detroit, Michigan 48265 (Attn: Lawrence S. Buonomo, Esq.); (iv)

Cadwalader, Wickersham & Taft LLP, attorneys for the United States Department of the

Treasury, One World Financial Center, New York, New York 10281 (Attn: John J. Rapisardi,

Esq.); (v) the United States Department of the Treasury, 1500 Pennsylvania Avenue NW, Room

2312, Washington, D.C. 20220 (Attn: Joseph Samarias, Esq.); (vi) Vedder Price, P.C., attorneys

for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019

(Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.); (vii) Kramer Levin Naftalis &

Frankel LLP, attorneys for the statutory committee of unsecured creditors, 1177 Avenue of the

Americas, New York, New York 10036 (Attn:  Thomas Moers Mayer, Esq., Robert Schmidt,

Esq., Lauren Macksoud, Esq., and Jennifer Sharret, Esq.); (viii) the Office of the United States

Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New

York 10004 (Attn: Tracy Hope Davis, Esq.); (ix) the U.S. Attorney's Office, S.D.N.Y., 86

Chambers Street, Third Floor, New York, New York 10007 (Attn: David S. Jones, Esq. and

Natalie Kuehler, Esq.); (x) Caplin & Drysdale, Chartered, attorneys for the official committee of

unsecured creditors holding asbestos-related claims, 375 Park Avenue, 35th Floor, New York,

New York 10152-3500 (Attn:  Elihu Inselbuch, Esq. and Rita C. Tobin, Esq.) and One Thomas

Circle, N.W., Suite 1100, Washington, DC 20005 (Attn:  Trevor W. Swett III, Esq. and Kevin C.

Maclay, Esq.); (xi) Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation,

attorneys for Dean M. Trafelet in his capacity as the legal representative for future asbestos

personal injury claimants, 2323 Bryan Street, Suite 2200, Dallas, Texas 75201 (Attn:  Sander L.

Esserman, Esq. and Robert T. Brousseau, Esq.), (xii) Gibson, Dunn, Crutcher LLP, attorneys for

Wilmington Trust Company as GUC Trust Administrator and for Wilmington Trust Company as

Avoidance Action Trust Administrator, 200 Park Avenue, 47th Floor, New York, New York

10166 (Attn: Keith Martorana, Esq.); (xiii) FTI Consulting, as the GUC Trust Monitor and as the

Avoidance Action Trust Monitor, One Atlantic Center, 1201 West Peachtree Street, Suite 500,

Atlanta, Georgia  30309 (Attn: Anna Phillips); (xiv) Crowell & Moring LLP, attorneys for the

Revitalizing Auto Communities Environmental Response Trust, 590 Madison Avenue, 19th

Floor, New York, New York 10022-2524 (Attn:  Michael V. Blumenthal, Esq.); (xv) Kirk P.

Watson, Esq., as the Asbestos Trust Administrator, 2301 Woodlawn Boulevard, Austin, Texas

78703; and (xvi) John W. Andrews, Esq., attorney for Lisa G. Henry, 3220 Henderson Blvd.,

Tampa, Florida 33609, so as to be received no later than **June 15, 2011 at 4:00 p.m. (Eastern**

**Time)** (the "**Objection Deadline**").

PLEASE TAKE FURTHER NOTICE that if no objections are timely filed and

served with respect to the Motion, the GUC Trust may, on or after the Objection Deadline,

submit to the Bankruptcy Court the Order annexed to the Motion, which may be entered with no

further notice or opportunity to be heard offered to any party.

Dated: New York, New York
      May 23, 2011

                              /s/ Joseph H. Smolinsky
                              Harvey R. Miller
                              Stephen Karotkin
                              Joseph H. Smolinsky

                              WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, New York 10153
                              Telephone: (212) 310-8000
                              Facsimile: (212) 310-8007
                              Attorneys for the Motors Liquidation
                              Company GUC Trust

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for the Motors Liquidation
Company GUC Trust

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                                             :
In re                                        :        **Chapter 11 Case No.**
                                             :
**MOTORS LIQUIDATION COMPANY,** *et al.,*    :        **09-50026 (REG)**
        **f/k/a General Motors Corp.,** *et al.*  :
                                             :
                    **Debtors.**             :        **(Jointly Administered)**
                                             :
------------------------------------------------------------x

**MOTION OF THE MOTORS LIQUIDATION COMPANY**
**GUC TRUST FOR LIMITED MODIFICATION OF THE**
**AUTOMATIC STAY AND THE PLAN INJUNCTION**

TO THE HONORABLE ROBERT E. GERBER
UNITED STATES DISTRICT BANKRUPTCY JUDGE:

                The Motors Liquidation Company GUC Trust (the "**GUC Trust**") respectfully

represents:

**Relief Requested**

                1.      The GUC Trust attempted to settle proofs of claim numbers 187 and

39274 (collectively, the "**Proofs of Claim**") filed by Lisa G. Henry, individually and on behalf

of the Estate of Jodi E. Henry (together, the "**Plaintiffs**") through mediation pursuant to the ADR

Procedures.[1]  Such mediation was unsuccessful.  Accordingly, pursuant to the ADR Order and

ADR Procedures, the GUC Trust now requests a limited modification of the Automatic Stay and

the Plan Injunction solely to the extent necessary to permit liquidation of the Proofs of Claim

through litigation of the Action in the Florida State Court where Plaintiffs' Action is pending,

subject to the Debtors' right to seek removal and/or transfer of venue.

### Jurisdiction

2.        This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Background

A.        The Bankruptcy Proceedings and the Automatic Stay

3.        On June 1, 2009 (the "**Commencement Date**"), Motors Liquidation

Company (f/k/a General Motors Corporation) ("**MLC**"), and certain of its subsidiaries, as

debtors in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), commenced

voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**")

in the United States Bankruptcy Court for the Southern District of New York (the "**Court**").

4.        Pursuant to section 362 of the Bankruptcy Code, the automatic stay went

into effect on the Commencement Date barring, *inter alia*, the commencement or continuation of

any judicial action or proceeding against the Debtors that was commenced prior to the

Commencement Date (the "**Automatic Stay**").

B.        The Plaintiffs' Filed Proofs of Claim Related to Their Underlying Action

5.        A lawsuit styled *Lisa G. Henry, as Personal Representative of Estate of*

*Jody Eugene Henry, Deceased v. Chevrolet Division of General Motors Corporation, Sunset*

---

[1] Capitalized terms not defined in this section are defined below.

*Chevrolet, Inc. Dimmitt Chevrolet, Inc. TRW, Inc., TRW Vehicle Safety Systems, Inc., and*

*Withlacoochee River Electric Cooperative, Inc.*, Case No. 51-02-CA-1946-WS (the "**Action**"),[2]

is currently pending in the Circuit Court of the Sixth Judicial Circuit in and for Pasco County,

Florida (the "**Florida State Court**") and has been stayed since the Commencement Date

pursuant the Automatic Stay.

6.    Plaintiffs filed the Proofs of Claim[3] relating to the Action asserting

unsecured claims in the following amounts:

| Claim Number | Filed Amount |
|:---:|:---:|
| 187 | "Undetermined" |
| 39274 | "Undetermined" |

C.    The Proofs of Claim Remain Unresolved After Mediation Pursuant to the ADR
Order and ADR Procedures

7.    On February 23, 2010, this Court entered the Order Pursuant to 11 U.S.C.

§ 105(a) and General Order M-390 (the "**ADR Order**") Authorizing Implication of Alternative

Dispute Procedures, Including Mandatory Mediation (the "**ADR Procedures**") (ECF No. 5037).[4]

8.    Pursuant to the ADR Order and the ADR Procedures, Plaintiffs and the

GUC Trust participated in mediation of the Proofs of Claim, but were unable to resolve the

Proofs of Claim at that mediation.  Thus, the Proofs of Claim are "Unresolved Designated

Claims" pursuant to the ADR Order and the ADR Procedures.

---

[2] The complaint filed by Plaintiffs in the Action is annexed hereto as "**Exhibit A.**"

[3] The Proofs of Claim are annexed hereto as "**Exhibit B**."

[4] The ADR Order and ADR Procedures were subsequently amended by the Court on October 25, 2010 (ECF No. 7558).  The amended ADR Order and ADR Procedures are annexed hereto as "**Exhibit C**."

9.      The ADR Order and the ADR Procedures provide that if an Unresolved

Designated Claim cannot be adjudicated in the Court as a result of abstention or because of lack

of or limitations upon subject matter jurisdiction, litigation of such Unresolved Designated Claim

shall proceed in the nonbankruptcy forum where the Unresolved Designated Claim was pending

on the date the Debtors commenced their respective voluntary chapter 11 cases, subject to the

Debtors' right to seek removal and/or transfer of venue or in such other forum.  (*See* ADR

Procedures § II.E.3; ADR Order at 6.)

10.      On March 28, 2011, the Court entered its Findings of Fact, Conclusions

of Law, and Order Pursuant to Sections 1129(b) and (b) of the Bankruptcy Code and Rule 3020

of the Federal Rules of  Bankruptcy Procedure Confirming Debtors' Second Amended Joint

Chapter 11 Plan (ECF No. 9941) (the "**Confirmation Order**").  Among other things, the

Confirmation Order (i) confirmed the Debtors' Second Amended Joint Chapter 11 Plan (the

"**Plan**"), (ii) established the GUC Trust pursuant to that certain Motors Liquidation Company

GUC Trust Agreement, (iii) transferred certain claims pending against MLC to the GUC Trust,

(iv) authorized the GUC Trust to resolve such claims on behalf of the Debtors' estates, and (v)

enjoined all persons from commencing or continuing in any manner on account of or respecting

any claim, debt, right, or cause of action for which the Debtors, the GUC Trust Administrator, or

the Avoidance Action Trust Administrator retains sole and exclusive authority to pursue in

accordance with the Plan (the "**Plan Injunction**").  (*See* Confirmation Order ¶ 54.)  The Proofs

of Claim were among the claims transferred to the GUC Trust.

11.      Pursuant to the ADR Order and the ADR Procedures, the GUC Trust

wishes to modify the Automatic Stay and the Plan Injunction solely to the extent necessary to

permit the liquidation of the amount of the Proofs of Claim through litigation of the Action in the

Florida State Court, subject to the GUC Trust's rights to seek removal and/or transfer of venue.

## The Relief Requested Should Be Approved by the Court

12.     The ADR Procedures provide that if a Designated Claim is not resolved

by the ADR Procedures, was pending in a nonbankruptcy forum on the Commencement Date,

and cannot be adjudicated by the Bankruptcy Court,[5] litigation of such claim shall proceed in

such nonbankruptcy forum, subject to the Debtors' right to seek removal or transfer of venue.

(ADR Procedures § II.E (Ex. B).)

13.     The ADR Order further provides that if litigation of an Unresolved

Designated Claim in a forum other than the Bankruptcy Court is required, the Automatic Stay

shall be modified "solely to the extent necessary to permit the liquidation of the amount of such

Unresolved Designated Claim in the appropriate forum."  (ADR Order at 6 (Ex. B); *see also*

ADR Procedures §§ II.E(3)-(4) (Ex. B).)[6]

14.     Here, pursuant to the ADR Order and the ADR Procedures, Plaintiffs and

the GUC Trust participated in mediation of the Proofs of Claim, but were unable to resolve the

Proofs of Claim at that mediation.  Thus, the Proofs of Claim are "Unresolved Designated

Claims" pursuant to the ADR Order and the ADR Procedures.  Further, the Plaintiffs allege

personal injury claims against Motors Liquidation Company in the Proofs of Claim, and thus, the

Proofs of Claim should be liquidated by litigation in the Action pending in the Florida State

---

[5] The Proofs of Claim cannot be adjudicated to judgment by the Bankruptcy Court because they are unliquidated personal injury claims.  *See* 28 U.S.C. 157(b).

[6]  The ADR Procedures further provide that any such liquidated claim "(a) shall be subject to treatment under the applicable chapter 11 plan or plans confirmed in these cases; and (b) shall be treated as a general unsecured nonpriority claim against the Debtor identified in the judgment, unless otherwise determined and ordered by the Bankruptcy Court.  (*See* ADR Procedures § II.E(4) (Ex. B).)

5

Court, subject to the Debtors' and/or the GUC Trust's rights to seek removal and/or transfer of venue.[7]

15.     Accordingly, pursuant to the ADR Order and Section II.E of the ADR Procedures, the GUC Trust hereby requests that the Court modify the Automatic Stay and the Plan Injunction solely to the extent necessary to enable the Action to proceed to final judgment or settlement so that the Action may proceed in the Florida State Court, subject to the Debtors' and/or the GUC Trust's rights to seek removal and/or transfer of venue.

**Notice**

16.     Notice of this Motion has been provided to Plaintiffs, by and through their counsel of record, and parties in interest in accordance with the Sixth Amended Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and Case Management Procedures, dated May 5, 2011 (ECF No. 10183).  The GUC Trust submits that such notice is sufficient and no other or further notice need be provided.

17.     No previous request for the relief sought herein has been made by the GUC Trust to this or any other Court.

---

[7] In an effort to avoid the filing of this Motion, counsel for the GUC Trust has tried to contact counsel for Plaintiffs numerous times to obtain Plaintiffs' consent to a stipulation and agreed order to modify the Automatic Stay and Plan Injunction.  Unfortunately, to date, counsel for Plaintiffs has not responded to any of those communications.

WHEREFORE the GUC Trust respectfully requests entry of an order granting the

relief requested herein and such other and further relief as is just.


Dated:  May 23, 2011
          New York, New York

/s/ Joseph H. Smolinsky
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000

Attorneys for the Motors
Liquidation Company GUC Trust

## Exhibit A

**Complaint**

THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PASCO COUNTY, FLORIDA
CIVIL DIVISION

LISA G. HENRY, AS PERSONAL
REPRESENTATIVE OF ESTATE OF
JODY EUGENE HENRY, DECEASED,

     Plaintiff,

vs

CHEVROLET DIVISION OF GENERAL
MOTORS CORPORATION;
SUNSET CHEVROLET, INC ,
DIMMITT CHEVROLET, INC,
TRW, INC., TRW VEHICLE SAFETY
SYSTEMS, INC , and WITHLACOOCHEE
RIVER ELECTRIC COOPERATIVE, INC ,

     Defendants

_____/

Case No 51-02-CA-1946-WS

Division H

**RECEIVED TO BE
FILED**

**JUL 23 2002**

**JED PITTMAN
CLERK**

### COMPLAINT

  COMES NOW the Plaintiff, LISA G  HENRY, AS PERSONAL REPRESENTATIVE

OF ESTATE OF JODY EUGENE HENRY, DECEASED, by and through the undersigned

counsel and sue the Defendants, CHEVROLET DIVISION OF GENERAL MOTORS

CORPORATION, SUNSET CHEVROLET, INC , DIMMITT CHEVROLET, INC , TRW,

INC , TRW VEHICLE SAFETY SYSTEMS, INC  and WITHLACOOCHEE RIVER

ELECTRIC COOPERATIVE, INC, and allege

### COMMON ALLEGATIONS

1  This is an action for damages against the Defendants in excess of Fifteen

   Thousand Dollars ($15,000 00)

2  Jody Eugene Henry (hereinafter "HENRY") died on or about August 7, 2000 as

   further set forth below

3        All potential beneficiaries of a recovery for the wrongful death of HENRY and

their relationship to the Decedent HENRY are identified as follows

   (a)    Lisa G Henry, wife of HENRY,

   (b)    Three step-children

          Larry Barabas, presently 18 years old,

          Landon Barabas, presently 16 years old,

          Lance Barabas, presently 14 years old,

   (c)    Jodi Nichole Henry, date of birth May 27, 1993,

   (d)    Estate of Jody Eugene Henry

4        Plaintiff LISA G  HENRY is a natural person residing in Pasco County, Florida.

5        Plaintiff LISA G. HENRY has been appointed Personal Representative of the

Estate of Jody Eugene Henry.

6        Plaintiff LISA G  HENRY, as the Personal Representative of the Estate of Jody

Eugene Henry, is entitled and empowered by the Florida Wrongful Death Act to

recover for Jody Eugene Henry's survivors, beneficiaries, and his estate, all

damages allowed pursuant to said Wrongful Death Act

7        At all times material to this cause of action, Defendant CHEVROLET DIVISION

OF GENERAL MOTORS CORPORATION, INC  (hereinafter "GMC") was and

is a Delaware corporation qualified to do business in the State of Florida, with an

agent or other representative in Pasco County, Florida   Defendant GMC is

engaged in the business of the manufacture and sale of automobiles through

entities in the State of Florida and is licensed to conduct business throughout the

2

State of Florida, and does so, for which it receives substantial revenue

8    At all times material to this cause of action, Defendant SUNSET CHEVROLET

(hereinafter "SUNSET") was and is a Florida corporation, which is here sued

under its common or assumed name as allowed by law   Defendant SUNSET was

authorized to and is doing business throughout the State of Florida, for which it

receives substantial revenue

9    At all times material to this cause of action, Defendant DIMMITT CHEVROLET,

INC., (hereinafter "DIMMITT"), was and is a Florida corporation, which is here

sued under its common or assumed name as allowed by law.  Defendant

DIMMITT was authorized to do and is doing business throughout the State of

Florida, for which it receives substantial revenue

10   At all times material to this cause of action, Defendants TRW, INC , TRW

VEHICLE SAFETY SYSTEMS, INC  and TRW SYSTEM SERVICES

COMPANY (hereinafter "TRW") was and is a foreign corporation, the precise

nature of which is not known to the Plaintiff, which is here sued under its common

or assumed name as allowed by law   Defendant TRW was and is authorized to do

business throughout the State of Florida, for which it receives substantial revenue

TRW, Inc  is the parent company of TRW Vehicle Safety Systems, Inc

11   At all times material to this cause of action, Defendant WITHLACOOCHEE

RIVER ELECTRIC COOPERATIVE, INC, (hereinafter "WITHLACOOCHEE"),

the precise nature of which is not known to the Plaintiff, was and is a Florida

corporation, is a member owned co-op  in and under the laws of the State of

3

Florida, which is here sued under its common or assumed name as allowed by law

The headquarters for this cooperative is located in Dade City, Pasco County,

Florida   Defendant WITHLACOOCHEE was is authorized to do business in the

State of Florida, for which it receives substantial revenue

12    Defendants GMC, DIMMITT, and SUNSET submitted themselves to the

jurisdiction of this Honorable Court by doing, individually or through their agents,

at all times material to this cause of action, the following acts

(a)    Committing a tortious act within this state by selling and delivering

defective GMC vehicles and component GMC parts, including the Corvette

which is the subject of this complaint, to persons, firms, or corporations in

this state via its distributors, dealers, wholesalers, and brokers   Such

Corvettes were used by consumers in Florida in the ordinary course of

commerce, trade, and/or recreation

(b)    Conducting and engaging in substantial business and other activities in

Florida by selling and servicing Corvettes and component parts, including

the Corvette which is the subject of this complaint, to persons, firms, or

corporations in this state via its distributors, wholesalers dealers and

brokers   Such Corvettes were used by consumers in Florida in the ordinary

course of commerce, trade, and/or recreation,

(c)    The acts or omissions of Defendants GMC, DIMMITT and SUNSET

caused injuries to persons in Florida, including the death of HENRY   At or

about the time of said injuries, these Defendants engaged in solicitation

4

activities in Florida to promote the sale, consumption, use, maintenance

and repair of Corvette, including the Corvette which is the subject of this

complaint,

(d)     Selling Corvette and component Corvette parts, including the Corvette

which is the subject of this complaint, with knowledge or reason to foresee

that their Corvette would be shipped in interstate commerce and would

reach the market of Florida users or consumers,

(e)     Voluntarily qualifying to conduct business in this state by registering with

the Florida Department of State and designating a resident agent for

service of process in Florida.

13     The Defendant TRW submitted itself to the jurisdiction of this Honorable Court by

doing, individually or through its agents, at all times material to this cause of

action, the following acts

(a)     Committing a tortious act within this state by selling and delivering

defective component parts, including the seat belt safety systems installed

in Corvettes, including the vehicle which is the subject of this complaint, to

persons, firms, or corporations in this state via its distributors, dealers,

wholesalers, and brokers   Such seat belt safety systems in Corvettes were

used by consumers in Florida in the ordinary course of commerce, trade,

and/or recreation,

(b)     Conducting and engaging in substantial business and other activities in

Florida by selling and servicing seat belt safety  systems installed in

5

Corvettes, including the vehicle which is the subject of this complaint, to

persons, firms, or corporations in this state as a dealer and or distributor of

TRW  Such services offered were used by consumers in Florida in the

ordinary course of commerce, trade, and/or recreation,

(c)      The acts or omissions of Defendant TRW caused injuries to persons in

Florida, including the death of HENRY  At or about the time of said

injuries, these Defendants engaged in solicitation activities in Florida to

promote the sale, consumption, use, maintenance and repair of seat belt

safety systems installed in Corvettes, including the vehicle which is the

subject of this complaint,

(d)      Selling seat belt restraint safety systems installed in Corvettes, including the

one which is the subject of this complaint, with knowledge or reason to

foresee that their seat belt safety systems installed in Corvettes would be

shipped in interstate commerce and would reach the market of Florida

users or consumers,

(e)      Voluntarily qualifying to conduct business in this state by registering with

the Florida Department of State and designating a resident agent for

service of process in Florida

14      The Defendant WITHLACOOCHEE submitted itself to the jurisdiction of this

Honorable Court by doing, individually or through its agents, at all times material

to this cause of action, the following acts

(a)      Committing a tortious act within this state by installing, selling, maintaining

6

and servicing utility poles and attendant "guy wires" or tension cables in

locations that are unsafe for the driving public engaged in vehicular travel

on the roads and highways of Pasco County, Florida,

(b)    Conducting and engaging in substantial business and other activities in

Florida by installing, selling, maintaining and servicing utility poles and

attendant "guy wires" or tension cables along the roads and highways of

Pasco county, Florida,

(c)    The acts or omissions of Defendant WITHLACOOCHEE caused injuries

to persons in Florida, including the death of HENRY  At or about the time

of said injuries, this Defendant engaged in solicitation activities in Florida

to promote the sale, consumption, use, maintenance and repair of utility

poles and attendant "guy wires" or tension cables,

(d)    Installing, selling, maintaining and servicing utility poles and attached,

unprotected or poorly shielded "guy wire" or tension cables, with

knowledge or reason to foresee that such power poles and cables so

installed in the right-of-way of state roads and highways would be a hazard

to the driving public on Florida roads and highways,

(e)    Voluntarily qualifying to conduct business in this state by registering with

the Florida Department of State and designating a resident agent for

service of process in Florida

## THE PRODUCT
### (A) 1991 CHEVROLET CORVETTE

15    Defendant GMC manufactured and introduced into the stream of commerce a

certain 1991 Chevrolet Corvette (hereinafter "CORVETTE"), Vehicle

Identification Number 1G1YY3382M5103288.

16    The CORVETTE was delivered to the original dealer/seller, Defendant SUNSET,

on October 24, 1990 and warranted by the manufacturer, Defendant GMC, as safe,

reliable, free from defect and in all ways suitable for the purposes for which it was

designed, advertised and intended

17    The CORVETTE was designed and manufactured to provide a means of safe

transportation on roads and highways while transporting persons and cargo

18    The CORVETTE was designed and manufactured with a driver's side air bag and

other safety equipment, including a factory designed and installed seat belt safety

system, in order to enhance the safety features of the vehicle and encourage

purchase by the driving public at large, including HENRY

19    The CORVETTE was designed with a door latch assembly that was intended to

keep the door shut in foreseeable collisions

20    The CORVETTE was designed with a throttle system that was supposed to lower

the speed of the engine when the foot was removed from the gas pedal

21    The CORVETTE was designed with brakes that would prevent the vehicle from

losing traction and control

22    The intended use of the CORVETTE includes the foreseeable frequent, and

inevitable contingency that normal automobile use will result in collisions and

injury-producing impacts of the occupants with the interior parts of the

automobile

8

23   Plaintiff LISA G HENRY (also known as Lisa G Barabas at the time of purchase) purchased the CORVETTE, from Defendant DIMMITT on or about April 1, 1998  On the date of the purchase, the CORVETTE had approximately 16,013 miles registered on the vehicle odometer

24   After purchasing the CORVETTE from Defendant DIMMITT, the Plaintiff LISA G HENRY, determined that the driver's seat belt was not operating correctly The Plaintiff, on encountering the condition described above, took the CORVETTE back to Defendant DIMMITT in Clearwater, Florida on April 2, 1998,  for service and correction of the dangerous condition described above, placing her life (other driver's lives) and well-being in the hands of supposedly qualified mechanics trained and endorsed by the Defendants GMC and/or DIMMITT.

25   On April 3, 1998 Defendant DIMMITT advised LISA G HENRY that the problem was corrected a new seat belt system had been installed and that the CORVETTE was safe and suitable for the purposes intended and that the seat belt safety system would perform as intended, and returned the CORVETTE to her on the same day

26   Defendant DIMMITT's invoice for April 2 and 3, 1998 indicate that the following recalls were performed  91C25, 91C26, V6390

27   Plaintiff LISA G HENRY is unsure if the seat belt was actually replaced or not even though there is a work order indicating it was replaced

28.   Plaintiff relied on and are entitled to rely on the superior knowledge, expertise,

9

and/or reputation and representations of Defendant GMC. and its agent/dealer/franchisee, Defendant DIMMITT, that the repairs made by Defendant DIMMITT would resolve the problems encountered with the seat belt safety system on the CORVETTE

29    At the time of the purchase from Defendant DIMMITT, the CORVETTE was substantially in the same condition it was when it was originally purchased

30    At the time of the purchase, Defendant DIMMITT represented to Plaintiff that all safety devices, systems, and safeguards were in good and usable condition well suited for the purposes for which they were intended

31    Defendant DIMMITT endorsed all warranties, express or implied

### THE PRODUCT
### (B) SEAT BELT RESTRAINT SYSTEM

32    Defendant TRW manufactured and introduced into the stream of commerce a certain seat belt safety system that was installed in thousands of vehicles including the subject CORVETTE owned by Plaintiff LISA G HENRY

33.    The subject seat belt system - at the time if left the possession of the Defendants TRW, GMC, SUNSET and DIMMITT - was defective, inherently dangerous for its intended use, and was an unreasonable dangerous product which presented which presented and constituted an unreasonable risk of danger and injury to HENRY in one or more of the following ways

(a)    The seat belt was defectively designed so that it unlatched and failed to restrain Plaintiff in a side impact collision and other types of collisions;

(b)    The seat belt was defectively assembled, so that it unlatched and failed to

10

restrain Plaintiff in a side impact collision and other types of collisions,

(c)   The seat belt was defectively placed and/or installed, so that I unlatched
and filed to restrain Plaintiff in a side impact collision and other types of
collisions,

(d)   There were inadequate warnings of the propensity and/or danger of the
seat belt unlatching and/or not restraining a user in a side impact collision
and other types of collisions

34   At the time of manufacture and on April 2 or 3, 1998, a seat belt safety system
manufactured by Defendant TRW was installed in the CORVETTE to provide a
means of driver and passenger safety in the foreseeable event of a sudden impact
or other event involving the CORVETTE while being operated on roads and
highways and was warranted by the manufacturer Defendant TRW, as safe,
reliable, free from defect and in all ways suitable for the purposes for which it was
designed, advertised and intended

## FACTS OF THE INCIDENT

35   On August 7, 2000, the deceased HENRY was on a two lane road known as
Aripeka Road

36   As it was HENRY's custom and habit prior to starting the car for this drive,
HENRY buckled his seat belt

37   HENRY was traveling in a easterly direction towards U S 19 in Hudson, Pasco
County, Florida

38   As HENRY approached the intersection of U S 19 and Aripeka Road, he applied

11

his brakes

39.    HENRY was unable to stop the car before it reached the intersection of U S. 19.

40.    As HENRY approached U S 19, his brakes were applied and were continued to be
applied until he crossed a six lane divided highway known as U.S. 19, and came
into contact with a utility pole and guy wire.

41    The gas pedal may have failed to fully release after HENRY's foot was removed.

42    After applying the brakes, the CORVETTE slid sideways across U.S 19 until it
came into contact with a utility pole and guy wire owned, maintained, installed,
and protected by Defendant WITHLACOOCHEE.

43.    The intersection of Aripeka Road and U S. 19 is commonly called a "T-
Intersection".

44.    It was foreseeable if a driver was unable to stop at the stop sign on Aripeka Road
where it met U S. 19, that the car may proceed across U.S. 19 and come into
contact with the utility poles and guy wires that were placed close to the
intersection, (where a car that failed to stop at the stop sign at the intersection of
U.S. 19 would end up).

45.    Defendant WITHLACOOCHEE knew or should have known that by placing the
utility poles and the guy wires close to such a "T-intersection" it would create a
dangerous and hazardous condition known as a "target pole and guy wire" for all
vehicles who were unable to stop for the intersection at the stop sign.

46    Further, Defendant WITHLACOOCHEE knew or should have known it could use
extra guards to protect the guy wires and utility poles or remove the hazard

12

entirely

47.  Defendant WITHLACOOCHEE had placed its utility poles and guy wires in a

setting which caused its utility poles and guy wires to become "targets" of vehicles

that were unable to stop at the stop sign at Aripeka Road and U.S. 19

48.  Defendant WITHLACOOCHEE failed to use reasonable care in the placement of

the poles and protecting foreseeable persons from being injured by failing to take

reasonable care to provide adequate protection to prevent injury from individuals

coming into contact with its utility poles and guy wires.

49   Defendant WITHLACOOCHEE failed to follow the principles of safety

engineering and system safety, in failing to eliminate the hazard which caused a

dangerous condition to foreseeable drivers such as HENRY.

50.  The left front wheel well of the CORVETTE came into contact with Defendant

WITHLACOOCHEE's wrongfully placed utility pole.

51.  The Defendant TRW seat belt system installed in the CORVETTE did not hold but

became unlatched.

52.  As a result of the seat belt not holding, HENRY came into contact with the

driver's side door.

53.  The driver's side door failed to hold HENRY in the car

54.  The driver's side air bag deployed at sometime during the incident, but failed to

deploy timely to prevent HENRY from being thrown from the CORVETTE

55.  There was no air bag in the driver's door, which would deploy in a side impact

collision.

56.     As HENRY was thrown from the car, his arm came into contact with an inadequately guarded guy wire maintained by Defendant WITHLACOOCHEE.

57      The inadequately guided guy wire acted as a razor blade and sliced HENRY's arm off at the shoulder level

58      As a result of the defects in the car and the inadequately guarded guy wires and utility poles, HENRY bled to death at the scene.

59.     As a result of the foregoing, HENRY suffered severe injuries which ultimately, and in a natural and continuous sequence lead to his death.

## COUNT ONE
### Strict Liability
### Against General Motors Corporation
### For The Wrongful Death of JODY HENRY

60.     Plaintiff re-alleges as if fully set forth herein all the allegations in paragraphs 1-59.

61      Defendant      Defendant GMC is in the business of manufacturing and selling CORVETTE vehicles.

62.     Sale.    Defendant GMC placed the CORVETTE, which is the subject of this complaint, on the market with knowledge that it would be used without inspection for defects.  The Defendant knew or should have known that ultimate users, operators or consumers would not and could not properly inspect this product for defects and dangerous conditions, and that detection of such defects would be beyond the capabilities of such persons.

63      Defect.    The CORVETTE was defective and unreasonably dangerous to ultimate users, operators or consumers at the time it was sold and distributed by the Defendants DIMMITT, SUNSET and GMC.  The CORVETTE was not

14

substantially changed from the time of delivery to the time of the incident. The CORVETTE was defective and unreasonably dangerous to ultimate users or operators as follows:

(a)    In the event the CORVETTE side impact collision, the CORVETTE was incapable of maintaining its integrity and the seat belt was defective and unreasonably dangerous and would unlatch and/or give a failed sense of latching and would cause a danger of injury to users in their use and operation of the CORVETTE,

(b)    The doorlock mechanism was defective, design and/or manufacture in that it did not contain the deceased when the seat belt failed,

(c)    Defective air bags    The air bag failed to deploy timely in order to keep the deceased in his seat;

(d)    The CORVETTE could not withstand ordinary and foreseeable damage during side impact collisions and other types of collisions due to the fact the Defendant used a fiberglass body without proper reinforcements;

(e)    The CORVETTE had defectively inadequate warning stickers, placards, or any proper documentation, or notice to alert users regarding the hazardous conditions, as stated above, involving the use and operation of the CORVETTE;

(f)    The CORVETTE's occupant restraint system was defective because it failed to adequately restrain foreseeable users during side impact collisions;

(g)    The CORVETTE was defectively designed from a handling and stability

15

standpoint thus creating an unreasonably dangerous propensity to cause side impact collisions under normal and foreseeable operating conditions;

(h)   The CORVETTE's suspension system, braking system, steering system and geometry were improperly·designed, manufactured and assembled thus causing it to have an unreasonable and dangerous propensity to slide sideways in foreseeable ordinary and emergency maneuvers;

(i)   *The CORVETTE was generally defective in its design, manufacture, assembly and warnings because it failed to provide adequate dynamic stability when being operated as advertised and marketed, and was furnished without adequate warnings regarding stability and use;*

(j)   The CORVETTE was generally defective in its design, manufacture, assembly and warnings because it failed to use materials that would leave the door intact when there was a left side fender impact;

(k)   The CORVETTE was generally defective in its design, manufacture, assembly and warnings because it failed to have side air bags in the doors to prevent a driver to be thrown from the CORVETTE in a side impact collision;

(l)   The brakes were defective in that they did not allow the driver to maintain control in a foreseeable emergency situation;

(m)   The CORVETTE was generally defective in its design, manufacture, assembly because it used an inherently dangerous fiberglass body, which Defendant GMC knew or should have known would not provide adequate

16

protection in side impact collisions or other foreseeable collisions;

(n)    The accelerator system would allow the gas pedal to become stuck in a downward position, even though the driver's foot was removed from the gas pedal.

(o)    The accelerator foot pedal could become stuck in a downward position after HENRY's foot was removed from a floor mat interference

64    On or about August 7, 2000, the time of the incident, the CORVETTE was substantially unchanged from its condition when sold and distributed by the Defendant GMC

65    Plaintiff    For the reasons set forth above, the CORVETTE was unreasonably and inherently dangerous to members of the general public, including Decedent HENRY, when the product was used for its ordinary and foreseeable purposes, and HENRY was a foreseeable user, and at the time of the incident was using the CORVETTE in a foreseeable manner.

66.    Legal Cause.    The defects described above directly and proximately caused the incident and HENRY's death, in that it directly and in natural and continuous sequence produced or contributed substantially to his death.

67.    Damages.    As a result of HENRY's death, the Plaintiff, HENRY's beneficiaries, Estate, and family have suffered lost support and services, lost parental companionship, loss of instruction and guidance, future lost support and services, mental pain and suffering, future mental pain and suffering, medical and funeral expenses, loss of the prospective net damages and other damages as allowed by

17

Florida Statutes Section 768.21   They have suffered such damages in the past and

will continue to suffer such damages in the future.

WHEREFORE the Plaintiff demands judgment against Defendant GMC for compensatory

damages, costs, interest and attorney fees, and for any such other and relief as the Court deems

just and equitable, and for a trial by jury on all issues so triable as a matter of right.

**COUNT TWO**
**Negligence**
**General Motors Corporation**
**For the Wrongful Death of HENRY**

68.    Plaintiff re-alleges as if fully set forth herein all the allegations in paragraphs 1-67.

69     <u>Duty.</u>    Defendant GMC knew or in the exercise of due care should have known

that the CORVETTE would be used by the public without inspection for defects,

and that placing such a product on the market in a defective and unreasonably

dangerous condition would create a foreseeable and unreasonable zone of risk of

harm to CORVETTE users.

70.    Defendant GMC was under a duty to properly and adequately design,

manufacture, assemble, test, select, inspect, label, provide adequate warnings for,

package, distribute and sell the CORVETTE in a reasonably safe condition so as

not to present a danger to members of the general public who reasonably and

expectedly under ordinary circumstances would come into contact with the

CORVETTE.

71     <u>Breach of Duty.</u>    Defendant GMC breached their duty by negligently, defectively

and inadequately, carelessly designing, manufacturing, assembling, selecting,

installing, marketing, testing, inspecting, labeling, packaging, distributing and

18

selling the CORVETTE to be reasonably safe for foreseeable use as follows·

(a)    Failing to design and manufacture the CORVETTE with adequate crash protection including side air bags,

(b)    Failing to design, manufacture, assemble, distribute and sell the CORVETTE so that it was capable of maintaining its integrity and crash worthiness when involved in a side impact collision, in that the seat belt assembly, door latch and door latch assembly, air bag failed during a side impact collision, and that Defendant GMC knew, or in the exercise of reasonable care should have known this would occur and cause a danger of injury or death to passengers and operators of the CORVETTE,

(c)    Failing to design, manufacture, assemble, test and inspect the CORVETTE in such a manner so that it was dynamically stable, and would handle in a reasonably safe manner under foreseeable circumstances,

(d)    Failing to properly design, manufacture, assemble, test, inspect, label, package and otherwise place the CORVETTE on the market for sale to the public in a condition free of defects and hazards which created an unreasonable danger of injury or death to users under normal and foreseeable circumstances;

(e)    Improperly designing and manufacturing the CORVETTE so as to create an unreasonable and dangerous propensity to side impact collisions under normal and foreseeable circumstances and cause a danger of injury or death to users;

19

(f)     Failing to provide reasonable and adequate warnings to the suppliers and users of the CORVETTE to alert users about the CORVETTE's propensity for the seat belt assembly and the door latch assembly to fail in side impact collisions,

(g)     Marketing, promoting, advertising and representing that the CORVETTE was a safe and stable vehicle when, in fact, Defendant knew the CORVETTE had a clearly demonstrated propensity not to adequately safeguard a driver in a side impact collision in ordinary use;

(h)     Marketing, promoting, advertising and representing that the CORVETTE was suitable for use as a passenger vehicle on the highways and streets of America when, in fact, it was among the worst vehicles on the market with respect to side impact collision injuries,

(i)     Failing to properly design, manufacture, assemble, test, and inspect the CORVETTE in such a manner so that it had an adequate occupant restraint system, so that foreseeable occupants would be adequately and properly restrained during a side impact collision;

(j)     Improperly designing and manufacturing the CORVETTE's brakes so as to create an unreasonable and dangerous propensity to lose control and cause a side impact collision under normal and foreseeable circumstances and cause a danger of injury or death to users,

(k)     Failing to recall a seat belt that they knew or should have know was defective and would not protect the occupant in a side impact collision;

20

(l)   Failing to recall and reassure that there was a locking mechanism that would not cause the door to open up on a side impact to the left front fender;

(m)   *Failing to design and manufacture a total door assembly that would not open up when there is a side impact collision to the left front fender;*

(n)   Failing to warn that the type of seat belt installed in a CORVETTE as OME and the replacement seat belt could come unlatched in a side impact collision;

(o)   Failing to design and install a seat belt that would not give a false sense of having properly latched when in fact it was not properly and totally latched;

(p)   Failing to insure that the dealers replaced the original OME seat belt with a safer design that would not unlatch in a side impact collision, and one that would not appear to be properly and completely latched, when in fact, it may not be;

(q)   Failing to select and test so that the following dangerous propensities were not identified and/or corrected,

(1)   The propensity of the seat belt system to unlatch in a collision,

(2)   The dangerous propensity of the door latch to inadvertently to open in a collision.

(r)   The seat belt unlatched and failed to restrain the Plaintiff in a side impact collision,

(s)   There were in adequate warnings of the propensity and/or danger of the

21

seat belt unlatching and not restraining a user in a side impact collision;

(t)    Failed to identify the dangerous propensity of the seat belt system, the door latch system, and to inadvertently open in a crash,

(u)    Failing to insure that the gas pedal would not stick in a downward position, even thought the driver's foot was removed.

72    The seat belt unlatched and failed to restrain HENRY in a side impact collision

73    *The door latch assembly also failed to restrain HENRY thereby allowing him to be ejected from the CORVETTE.*

74    Defendant GMC knew or should have known that the aforesaid defects, negligence acts and dangerous propensities were likely to cause serious harm to HENRY and others similarly situated

75    <u>Legal Cause</u>.   The negligence described above directly and proximately caused the Incident and HENRY's death, in that it directly and in natural and continuous sequence produced or contributed substantially to his death.

76.    <u>Damages</u>.   Also as a direct and proximate result of the foregoing, the Plaintiff, HENRY's beneficiaries, Estate, and family have suffered lost support and services, lost parental companionship, loss of instruction and guidance, future lost support and services, mental pain and suffering, future mental pain and suffering, medical and funeral expenses, loss of the prospective net damages and other damages as allowed by Florida Statutes Section 768 21  They have suffered such damages in the past and will continue to suffer such damages in the future.

WHEREFORE the Plaintiff demands judgment against Defendant GMC for compensatory

damages, costs, interest and attorney fees, and for such other and relief as the Court deems just

and equitable, and for a trial by jury on all issues so triable as a matter of right.

## COUNT THREE
### Strict Liability
### Against Defendant Sunset Chevrolet
### For The Wrongful Death of HENRY

77    Plaintiff re-alleges as if fully set forth herein all the allegations in paragraphs 1-59

78    <u>Defendant</u>    Defendant SUNSET is in the business of selling CORVETTEs

79    <u>Sale</u>.    Defendant placed the CORVETTE vehicle, which is the subject of this

complaint, on the market with knowledge that it would be used without inspection

for defects.  The Defendant knew or should have known that ultimate users,

operators or consumers would not and could not properly inspect this product for

defects and dangerous conditions, and that detection of such defects would be

beyond the capabilities of such persons.

80.    <u>Defect</u>.    The CORVETTE was defective and unreasonably dangerous to ultimate

users, operators or consumers at the time it was sold and distributed by the

Defendant SUNSET.  The CORVETTE was defective and unreasonably

dangerous to ultimate users or operators as follows.

(a)    In the event the CORVETTE side impact collision, the CORVETTE was

incapable of maintaining its integrity and the seat belt was defective and

reasonably dangerous and would unlatch and/or give a failed sense of

latching and would cause a danger of injury to users in their use and

operation of the CORVETTE;

(b)    The doorlock mechanism was defective in that it did not contain the

23

deceased when the seat belt failed,

(c)    Defective air bags.  The air bag failed to deploy timely in order to keep the

deceased in his seat.  The CORVETTE could not withstand ordinary and

foreseeable damage during side impact collisions;

(d)    The CORVETTE had defectively inadequate warning stickers, placards, or

any proper documentation, or notice to alert users regarding the hazardous

conditions, as stated above, involving the use and operation of the

CORVETTE;

(e)    The CORVETTE's occupant restraint system was defective because it

failed to adequately restrain foreseeable users during side impact collisions;

(f)    The CORVETTE was defectively designed from a handling and stability

standpoint thus creating an unreasonably dangerous propensity to side

impact collisions under normal and foreseeable operating conditions;

(g)    The CORVETTE's suspension system, braking system, steering system and

geometry were improperly designed, manufactured and assembled thus

causing it to have an unreasonable and dangerous propensity to slide

sideways in foreseeable ordinary and emergency maneuvers;

(h)    The CORVETTE was generally defective in its design, manufacture,

assembly and warnings because it failed to provide adequate dynamic

stability when being operated as advertised and marketed, and was

furnished without adequate warnings regarding stability and use,

(i)    The CORVETTE was generally defective in its design, manufacture,

24

assembly and warnings because it failed to use materials that would leave

the door intact when there was a left side fender impact,

(j)    The CORVETTE was generally defective in its design, manufacture,

assembly and warnings because it failed to have side air bags in the doors

to prevent a driver to be thrown from the CORVETTE in a side impact

collision;

(k)    The brakes were defective in that they did not allow the driver to maintain

control in a foreseeable emergency situation;

(l)    The CORVETTE was generally defective in its design, manufacture,

assembly because it used an inherently dangerous fiberglass body, which

Defendant SUNSET knew or should have known would not provide

adequate protection in side impact collisions or other foreseeable collisions;

(m)    The accelerator system would allow the gas pedal to become stuck in a

downward position, even though the driver's foot was removed from the

gas pedal.

81.    On or about August 7, 2000, the time of the incident, the CORVETTE was

substantially unchanged from its condition when sold and distributed by the

Defendant

82    <u>Plaintiff</u>.    For the reasons set forth above, the CORVETTE was unreasonably

and inherently dangerous to members of the general public, including Decedent

HENRY, when the product was used for its ordinary and foreseeable purposes.

HENRY was a foreseeable user, and at the time of the incident was using the

25

CORVETTE in a foreseeable manner.

83    <u>Legal Cause</u>.    The defects described above directly and proximately caused the

Incident and HENRY's death which are hereby re-alleged, in that it directly and in

natural and continuous sequence produced or contributed substantially to his

death

84    <u>Damages</u>.    As a result of HENRY's death, the Plaintiff, HENRY's beneficiaries,

Estate, and family have suffered lost support and services, lost parental

companionship, loss of instruction and guidance, future lost support and services,

mental pain and suffering, future mental pain and suffering, medical and funeral

expenses, loss of the prospective net damages and other damages as allowed by

Florida Statutes §768.21. They have suffered such damages in the past and will

continue to suffer such damages in the future.

WHEREFORE the Plaintiff demands judgment against Defendants, each and individually,

including the Defendant SUNSET for compensatory damages, costs, interest, and attorney fees,

and for such other and relief as the Court deems just and equitable, and for a trial by jury on all

issues so triable as a matter of right.

**COUNT FOUR**
**Negligence**
**Against Defendant Dimmitt Chevrolet, Inc.**
**For the Wrongful Death of HENRY**

85.    Plaintiff re-alleges as if fully set forth herein all the allegations in paragraphs 1-59.

86.    *Duty*.    *Defendant DIMMITT knew or in the exercise of due care should have*

*known that the CORVETTE would be used by the public without inspection for*

*defects, and that placing such a product on the market in a defective and*

unreasonably dangerous condition would create a foreseeable and unreasonable

zone of risk of harm to CORVETTE users and other drivers on the road

Defendant DIMMITT were then and are now under a duty to properly and

adequately, test, inspect, label, provide adequate warnings for, package, and sell

the subject CORVETTE in a reasonably safe condition so as not to present a

danger to members of the general public who reasonably and expectedly under

ordinary circumstances would come into contact with the CORVETTE.

87    Plaintiff re-allege paragraphs 24, 25, 26.

88    <u>Breach of Duty</u>    Defendant DIMMITT breached its duty by negligently,

defectively and inadequately testing, selecting, marketing, installing, warning,

distributing, inspecting, labeling, packaging, and selling the CORVETTE and the

TRW seat belt assembly system to be reasonably safe for foreseeable use as

follows:

(a)    Failing to provide reasonable and adequate warnings to the users of the

CORVETTE and alert users about the Defendant GMC's CORVETTE's

occupant restraint system was defective;

(b)    Negligently failed to replace the seat belt;

(c)    negligently failing to select an install a safe seat belt system that would not

unlatch in a side impact collision and would not give the user a false sense

of being unlatched when in fact it was not properly latched,

(d)    Failing to warn the user that there was a propensity for the Defendant

GMC recommended seat belt to unlatch in a side impact or other impact

27

collisions;

(e)    Failing to warn that a safer designed seat belt/occupant restraint system

should replace the defective seat belt at the time of installation in April 3,

1998,

(f)    Failed to replace the original defective seat belt. The seat belt system was

negligently assembled so it unlatched and failed to restrain HENRY in a

side impact collision;

(g)    The seat belt was negligently placed or installed so it unlatched and failed

to restrain HENRY in a side impact collision;

(h)    There were inadequate warnings from the dealer of the propensity and/or

danger of the seat belt unlatching and/or not restrained the driver in a side

impact collision.

89.    <u>Legal Cause</u>.    The negligence described above directly and proximately caused

the Incident herein described and HENRY's death, in that it directly and in natural

and continuous sequence produced or contributed substantially to his death.

90.    <u>Damages</u>    Also as a direct and proximate result of the foregoing, the Plaintiff,

HENRY's beneficiaries, Estate, and family have suffered lost support and services,

lost parental companionship, loss of instruction and guidance, future lost support

and services, mental pain and suffering, future mental pain and suffering, medical

and funeral expenses, loss of the prospective net damages and other damages as

allowed by Florida Statutes Section 768 21. They have suffered such damages in

the past and will continue to suffer such damages in the future.

28

WHEREFORE the Plaintiff demands judgment against Defendant DIMMITT, each individually, for compensatory damages, costs, interest attorney fees, and for such other and relief as the Court deems just and equitable, and for a trial by jury on all issues so triable as a matter of right.

## COUNT FIVE
### Negligence
### Against Defendant TRW Inc. and TRW Vehicle Safety System, Inc.
### For the Wrongful Death of HENRY

91.    Plaintiff re-alleges as if fully set forth herein all the allegations in paragraphs 1-59.

92.    At all times material hereto, Plaintiff's CORVETTE was equipped with a driver side front seat belt system consisting of a lap belt and shoulder harness (hereinafter "seat belt"). The seat belt was designed and manufactured by Defendant TRW, Inc and TRW Vehicle Safety System, Inc.

93    At all times material hereto, Defendant TRW breached that duty of care by negligently and carelessly designing, selecting, manufacturing, assembling, distributing, marketing, testing and selling the seat belt so that the following dangerous propensities were not identified and/ro corrected.

(a)    The seat belt unlatched and filed to restrain the Plaintiff n a side impact collision;

(b)    There were inadequate warning s of the propensity and/or danger of the seat belt unlatching and not restraining a user in a side impact collision.

94.    Defendant TRW knew or in the exercise of reasonable care should have known that the design and/or placement of the seat belt rendered it susceptible to inadvertently opening in a crash.

29

95.    Defendant TRW knew or in the exercise of reasonable care should have known

that the aforesaid dangerous propensities of the seat belt were likely to cause

serious harm to HENRY and others similarly situated.

96    As a direct and proximate result of the Defendant TRW's negligence, the Plaintiff,

HENRY's beneficiaries, Estate, and family have suffered lost support and services,

lost parental companionship, loss of instruction and guidance, future lost support

and services, mental pain and suffering, future mental pain and suffering, medical

and funeral expenses, loss of the prospective net damages and other damages as

allowed by Florida Statutes Section 768.21   They have suffered such damages in

the past and will continue to suffer such damages in the future.

WHEREFORE the Plaintiff demands judgment against Defendant TRW, each individually,

for compensatory damages, costs, interest attorney fees, and for such other and relief as the Court

deems just and equitable, and for a trial by jury on all issues so triable as a matter of right.

### COUNT SIX
### Strict Liability
### Against Defendant TRW Inc. and TRW Vehicle Safety System, Inc.
### For The Wrongful Death of HENRY

97.    Plaintiff re-alleges as if fully set forth herein all the allegations in paragraphs 1-59

and 91-96

98    At all times material hereto, Defendant TRW was engaged in the business of

designing, manufacturing, assembling, testing, selecting, distributing, marketing

and selling seat belts, including the seat belts used in Plaintiff's CORVETTE.

99    At all times material hereto, Plaintiff's CORVETTE was equipped with a driver

side front seat belt system consisting of a lap belt and shoulder harness (hereinafter

30

"seat belt")

100. Defendant TRW selected, designed, manufactured, assembled, distributed, marketed and sold the seat belt.

101. HENRY was foreseeable user of the seat belt

102 At all times material hereto, the seat belt was in substantially the same condition as when it left the possession of Defendant TRW

103 The seat belt - at the time if left the possession of the Defendant TRW - was defective, inherently dangerous for its intended use, and was an unreasonable dangerous product which presented and constituted an unreasonable risk of danger and injury to HENRY in one or more of the following ways:

   (a) The seat belt was defectively designed so that it unlatched and filed to restrain Plaintiff in a side impact collision and other collisions;

   (b) The seat belt was defectively assembled so that it unlatched and filed to restrain Plaintiff in a side impact collision and other collisions;

   (c) There were inadequate warnings of the propensity and/or danger of the seat belt unlatching and not restraining a user in aside impact collision and other collisions,

   (d) The seat belt also had a known propensity to unlatch inadvertently in a collision.

104. As a direct and proximate result of the aforesaid defects, the Plaintiff, HENRY's beneficiaries, Estate, and family have suffered lost support and services, lost parental companionship, loss of instruction and guidance, future lost support and

31

services, mental pain and suffering, future mental pain and suffering, medical and funeral expenses, loss of the prospective net damages and other damages as allowed by Florida Statutes Section 768.21. They have suffered such damages in the past and will continue to suffer such damages in the future.

WHEREFORE the Plaintiff demands judgment against Defendant TRW, each individually, for compensatory damages, costs, interest attorney fees, and for such other and relief as the Court deems just and equitable, and for a trial by jury on all issues so triable as a matter of right.

### COUNT SEVEN
### Negligence
### Withlacoochee River Electric Cooperative, Inc.
### For the Wrongful Death of HENRY

105    Plaintiff re-alleges as if fully set forth herein all the allegations in paragraphs 1-59.

106.    Defendant WITHLACOOCHEE maintained the electric utility poles and guy wires at the intersection of Aripeka Road and U.S. 19 in Hudson, Pasco County, Florida at all times material to this case including August 7, 2000.

107.    Defendant WITHLACOOCHEE was aware or should have been aware from maintaining this utility poles at other T-intersections that it was foreseeable that

   (a)    A driver may fail to stop at the stop sign because of a falling asleep;

   (b)    A mechanical defect in the car;

   (c)    Not being alert;

   (d)    being intoxicated.

108.    Defendant WITHLACOOCHEE knew or should have known as a result of any of these problems unless the utility poles and guy wires were property protected, or the hazard was eliminated, a serious injury or death would occur.

32

109.    Defendant WITHLACOOCHEE had a duty to use reasonable care for the users of

the highways including foreseeable users who may come into contact with its

utility poles and guy wires

110.    Defendant WITHLACOOCHEE breached its duty to use reasonable care by

negligently doing the following

(a)    By placing its utility poles at a T-intersection where the utility poles and

guy wires would become "target" poles if in fact a vehicle user would be

unable to stop at the stop sign at the intersection of Aripeka Road and U.S.

19,

(b)    Failed to provide adequate protection of the utility pole to prevent serious

injury or death;

(c)    Failed to select proper material in order to make the utility pole a forgiving

utility pole,

(d)    Failed to locate the utilities in an under ground conduit to eliminate the

placing of a hazardous pole and guy wire in a "targeted" position;

(e)    Failing to provide adequate safe guard on its guy wires at the location in

question to prevent serious injury or death;

(f)    Failed to take other safety measures that would have prevented serious

injury or death to the deceased HENRY;

(g)    Failed to follow safety system principles and safety engineering principles

to eliminate the hazard, risk and unreasonable danger

111.    <u>Legal Cause</u>.    The negligence described above directly and proximately caused

33

the Incident herein described and HENRY's death, in that it directly and in natural
and continuous sequence produced or contributed substantially to his death

112.    <u>Damages</u>        Also as a direct and proximate result of the foregoing, the Plaintiff,
HENRY's beneficiaries, Estate, and family have suffered lost support and services,
lost parental companionship, loss of instruction and guidance, future lost support
and services, mental pain and suffering, future mental pain and suffering, medical
and funeral expenses, loss of the prospective net damages and other damages as
allowed by Florida Statutes Section 768.21. They have suffered such damages in
the past and will continue to suffer such damages in the future.

WHEREFORE the Plaintiff demands judgment against Defendant WITHLACOOCHEE
for compensatory damages, costs, interest and attorney fees, and for any such other and relief as
the Court deems just and equitable, and for a trial by jury on all issues so triable as a matter of
right.

DATED· ‾7‾ / 8 ‾ 0 2        _____
                             John W. Andrews, Esq.
                             FBN: 178531; SPN: 013131
                             J. Troy Andrews, Esq.
                             FBN: 105635; SPN: 1847250
                             **ANDREWS LAW GROUP**
                             3220 Henderson Blvd.
                             Tampa, FL 33609
                             Ph. (813) 877-1867; Fx. (813) 872-8298
                             Attorney for the Plaintiff(s).

I·\CLIENT\Henry\Pleadings\Complaint wpd                34

**<u>Exhibit B</u>**

**Proofs of Claim Nos. 187 and 39274**

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT | PROOF OF CLAIM |
|---|---|

| Name of Debtor | Case Number |
|---|---|
| General Motors Corporation | 51-02-CA-1946-WS Florida |

NOTE *This form should not be used to make a claim for an administrative expense arising after the commencement of the case  A request for payment of an administrative expense may be filed pursuant to 11 U S C § 503*

Name of Creditor (the person or other entity to whom the debtor owes money or property)
Lisa G. Henry as personal Rep. estate of Jody E. Henry deceased

Name and address where notices should be sent
John W. Andrews, Esquire
Andrews Law Group
3220 Henderson Blvd.
Tampa FL 33609

Telephone number
813-877-1867

❏ Check this box to indicate that this claim amends a previously filed claim

Court Claim Number _____
    *(If known)*

Filed on _____

Name and address where payment should be sent (if different from above)

**FILED – 0187**
**USBC –SOUTHERN DISTRICT OF NEW YORK**
**GENERAL MOTORS**
**09-50026 (REG)**

Telephone number

❏ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim  Attach copy of statement giving particulars

❏ Check this box if you are the debtor or trustee in this case

**1  Amount of Claim as of Date Case Filed**    $    **Undetermined**

If all or part of your claim is secured, complete item 4 below, however, if all of your claim is unsecured, do not complete item 4

If all or part of your claim is entitled to priority, complete item 5

❏ Check this box if claim includes interest or other charges in addition to the principal amount of claim  Attach itemized statement of interest or charges

**2  Basis for Claim** Product Liability Law Suit
  (See instruction #2 on reverse side )

**3  Last four digits of any number by which creditor identifies debtor** Unknown

  **3a  Debtor may have scheduled account as** _____
    (See instruction #3a on reverse side )

**4  Secured Claim** (See instruction #4 on reverse side )
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information

**Nature of property or right of setoff**  ❏ Real Estate  ❏ Motor Vehicle  ❏ Other
Describe

**Value of Property** $_____  **Annual Interest Rate**_____%

**Amount of arrearage and other charges as of time case filed included in secured claim**

if any  $_____  **Basis for perfection** _____

**Amount of Secured Claim** $_____  **Amount Unsecured** $_____

**6  Credits**  The amount of all payments on this claim has been credited for the purpose of making this proof of claim   0

**7  Documents**  Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements  You may also attach a summary  Attach redacted copies of documents providing evidence of perfection of a security interest  You may also attach a summary  (See instruction 7 and definition of "redacted  on reverse side )

DO NOT SEND ORIGINAL DOCUMENTS  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING

If the documents are not available, please explain

**5  Amount of Claim Entitled to Priority under 11 U S C §507(a)**  If any  *portion of your claim falls in* one of  the following categories, check the box  and state the amount

Specify the priority of the claim

❏ Domestic support obligations under 11 U S C §507(a)(1)(A) or (a)(1)(B)

❏ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U S C §507 (a)(4)

❏ Contributions to an employee benefit plan – 11 U S C §507 (a)(5)

❏ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U S C §507 (a)(7)

❏ Taxes or penalties owed to governmental units – 11 U S C §507 (a)(8)

❏ Other – Specify applicable paragraph of 11 U S C §507 (a)(___)

**Amount entitled to priority**

$ N/A

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment*

| Date 6/15/09 | **Signature**  The person filing this claim must sign it  Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above  Attach copy of power of attorney, if any | FOR COURT USE ONLY |
|---|---|---|

*Penalty for presenting fraudulent claim  Fine of up to $500,000 or imprisonment for up to 5 years, or both  18 U S C §§ 152 and 3571*

THE GARDEN CITY GROUP, INC.
JUN 22 2009

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |

| Name of Debtor (Check Only One) | Case No | Your Claim is Scheduled As Follows. |

☒ Motors Liquidation Company (f/k/a General Motors Corporation) — 09-50026 (REG)
☐ MLCS, LLC (f/k/a Saturn, LLC) — 09-50027 (REG)
☐ MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation) — 09-50028 (REG)
☐ MLC of Harlem, Inc (f/k/a Chevrolet-Saturn of Harlem, Inc ) — 09-13558 (REG)

NOTE: This form should not be used to make a claim for an administrative expense arising *after* the commencement of the case but may be used for purposes of asserting a claim under 11 U S C § 503(b)(9) (see Item 8) All other requests for payment of an administrative expense should be filed pursuant to 11 U S C § 503

Name of Creditor (the person or other entity to whom the debtor owes money or property)
   HENRY JODY EUGENE (Estate of)

Name and address where notices should be sent

~~HENRY JODY EUGENE~~
~~HENRY JODY EUGENE~~
~~3220 HENDERSON BLVD~~
~~TAMPA FL 33609-3024~~

John W. Andrews, Esq.
Atty for Estate of
Jody Eugene Henry
3220 Henderson Blvd
Tampa, FL  33609

Telephone number (813) 877-1867
Email Address  andrewslawgroup@1x.netcom.com

Name and address where payment should be sent (if different from above)

FILED - 39274
MOTORS LIQUIDATION COMPANY
F/K/A GENERAL MOTORS CORP
SDNY # 09-50026 (REG)

Telephone number

☐ Check this box to indicate that this claim amends a previously filed claim

Court Claim Number
(If known)

Filed on

June 2009-attached

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim  Attach copy of statement giving particulars

☐ Check this box if you are the debtor or trustee in this case

If an amount is identified above you have a claim scheduled by one of the Debtors as shown (This scheduled amount of your claim may be an amount to a previously scheduled amount ) If you agree with the amount and priority of your claim as scheduled by the Debtor and you have no other documentation against the Debtor you do not need to file this proof of claim form EXCEPT AS FOLLOWS If the amount shown is listed as DISPUTED UNLIQUIDATED or CONTINGENT a proof of claim MUST be filed in order to receive any distribution in respect of your claim If you have already filed a proof of claim in accordance with the attached instructions you need not file again

**1  Amount of Claim as of Date Case Filed, June 1, 2009**   $ Undetermined - $10,000,000.00

If all or part of your claim is secured, complete item 4 below, however if all of your claim is unsecured do not complete item 4 If all or part of your claim is entitled to priority, complete item 5  If all or part of your claim is asserted pursuant to 11 U S C § 503(b)(9) complete item 5

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim  Attach itemized statement of interest or charges

**2  Basis for Claim** Wrongful death suit against General Motors
(See instruction #2 on reverse side )

**3  Last four digits of any number by which creditor identifies debtor**

**3a  Debtor may have scheduled account as** _____
(See instruction #3a on reverse side )

**4  Secured Claim** (See instruction #4 on reverse side )
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information

**Nature of property or right of setoff** ☐ Real Estate  ☐ Motor Vehicle  ☐ Equipment  ☐ Other
**Describe**

**Value of Property** $_____  **Annual Interest Rate**___%

**Amount of arrearage and other charges as of time case filed included in secured claim, if any**  $_____

**Basis for perfection** _____

**Amount of Secured Claim** $_____  **Amount Unsecured** $_____

**6  Credits**  The amount of all payments on this claim has been credited for the purpose of making this proof of claim

**7  Documents**  Attach redacted copies of any documents that support the claim such as promissory notes, purchase orders invoices itemized statements of running accounts contracts judgments, mortgages and security agreements You may also attach a summary Attach redacted copies of documents providing evidence of perfection of a security interest You may also attach a summary (See instruction 7 and definition of redacted on reverse side )

DO NOT SEND ORIGINAL DOCUMENTS  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING

If the documents are not available, please explain in an attachment

**5**
**Amount of Claim Entitled to Priority under 11 U S C § 507(a)**  If any portion of your claim falls in one of the following categories, check the box and state the amount

Specify the priority of the claim

☐ Domestic support obligations under 11 U S C § 507(a)(1)(A) or (a)(1)(B)

☐ Wages, salaries or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business whichever is earlier – 11 U S C § 507(a)(4)

☐ Contributions to an employee benefit plan – 11 U S C § 507(a)(5)

☐ Up to $2,425* of deposits toward purchase lease or rental of property or services for personal family or household use – 11 U S C § 507(a)(7)

☐ Taxes or penalties owed to governmental units – 11 U S C § 507(a)(8)

☐ Value of goods received by the Debtor within 20 days before the date of commencement of the case – 11 U S C § 503(b)(9) (§ 507(a)(2))

☐ Other – Specify applicable paragraph of 11 U S C § 507(a)(__)

**Amount entitled to priority**

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment

**Date**
11-18-09

**Signature**  The person filing this claim must sign it  Sign and print name and title, if any of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above  Attach copy of power of attorney if any

*Jean Andrew* (signature)

**FOR COURT USE ONLY**

*Penalty for presenting fraudulent claim*  Fine of up to $500,000 or imprisonment for up to 5 years, or both  18 U S C §§ 152 and 3571
Modified B10 (GCG) (12/08)

THE GARDEN CITY GROUP INC.
NOV 23 2009

**<u>Exhibit C</u>**

**Order Pursuant to 11 U.S.C. § 105(a) and General Order M-390 Authorizing Implication
of Alternative Dispute Procedures, Including Mandatory Mediation dated October 25, 2010
(ECF No. 7558).**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
                                                      :
In re                                                 :          **Chapter 11 Case No.**
                                                      :
**MOTORS LIQUIDATION COMPANY,** *et al.,*              :          **09-50026 (REG)**
    **f/k/a General Motors Corp.,** *et al.*  :
                                                      :
       **Debtors.**                    :          **(Jointly Administered)**
                                                      :
----------------------------------------------------------------x

## AMENDED ORDER PURSUANT TO 11 U.S.C. § 105(a) AND GENERAL ORDER M-390 AUTHORIZING IMPLEMENTATION OF ALTERNATIVE DISPUTE PROCEDURES, INCLUDING MANDATORY MEDIATION

Upon the Motion, dated January 11, 2010 (the "**Motion**"),[1] of Motors

Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors, as

debtors in possession (collectively, the "**Debtors**"), for an order, pursuant to section

105(a) of title 11, United States Code and General Order M-390 (the "**Original ADR**

**Order**"), for authorization to implement alternative dispute procedures, including

mandatory mediation (the "**ADR Procedures**"), all as more fully set forth in the Motion;

and due and proper notice of the Motion having been provided, and it appearing that no

other or further notice need be provided; and the Court having found and determined that

the relief sought in the Motion is in the best interests of the Debtors, their estates,

creditors, and all parties in interest and that the legal and factual bases set forth in the

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, the Omnibus Reply of the Debtors to Objections to Debtors' Motion for Entry of Order Pursuant to 11 U.S.C. § 105(a) and General Order M-390 Authorizing Implementation of Alternative Dispute Resolution Procedures, Including Mandatory Mediation, and in the ADR Procedures annexed to the Original ADR Order as Exhibit "A."

Motion establish just cause for the relief granted herein; and after consideration of the

response pleadings filed; and the Court having entered the Original ADR Order; and

upon the Debtors' Motion, dated October 8, 2010 (the "**Motion to Amend**") to amend

the ADR Order; and the Court having determined since the entry of the Original ADR

Order that the Original ADR Order should be modified in certain respects and restated in

its entirety as provided herein; and after due deliberation and sufficient cause appearing

therefor, it is

ORDERED that this Amended ADR Order supersedes in all respects the

Original ADR Order; and it is further

ORDERED that notwithstanding anything to the contrary in the Motion or

Motion to Amend, the ADR Procedures, as set forth in **Exhibit "A"** to this Amended

ADR Order, are approved as provided herein with respect to (a) personal injury claims,

(b) wrongful death claims, (c) tort claims, (d) product liability claims, (e) claims for

damages arising from the rejection of an executory contract or unexpired lease with a

Debtor under section 365 of the Bankruptcy Code (excluding claims for damages arising

from the rejection of executory contracts that relate primarily to environmental matters),

(f) indemnity claims (excluding tax indemnity claims relating to leveraged fixed

equipment lease transactions and excluding indemnity claims relating to asbestos

liability), (g) lemon law claims, to the extent applicable under section 6.15 of the Master

Sale and Purchase Agreement by and between the Debtors and NGMCO, Inc., dated as of

June 1, 2009, and as amended (the "**MPA**"), (h) warranty claims, to the extent applicable

under section 6.15 of the MPA, and (i) class action claims (the "**Initial Subject**

**Claims**"); and it is further

ORDERED that, notwithstanding anything to the contrary in the Motion, the Motion to Amend, or the ADR Procedures, the ADR procedures shall not apply to claims filed by the United States of America or its agencies; *provided*, *however*, nothing shall preclude the Debtors from seeking in the future by separate motion alternative dispute resolutions in connection with any such claims; and it is further

ORDERED that, notwithstanding anything to the contrary in the Motion or the ADR Procedures, the ADR Procedures shall not apply to claims filed by state and tribal governments concerning alleged environmental liabilities; *provided*, *however*, nothing shall preclude the Debtors from seeking in the future by separate motion alternative dispute resolutions in connection with any such claims; and it is further

ORDERED that, notwithstanding anything to the contrary in the Motion, the Motion to Amend, or the ADR Procedures, the United States of America, nor any state or tribal government shall be in any way bound by any determination made pursuant to the ADR Procedures as to any other party or claim subject to the ADR Procedures, including any determination with respect to the amount, classification, disallowance, or type of claim; and it is further

ORDERED that, annexed to this Amended ADR Order as **Exhibit "B"** is a revised schedule of mediators (the "**Schedule of Mediators**"); and it is further

ORDERED that, the Debtors from time to time may further modify the Schedule of Mediators, in consultation with the Ad Hoc Committee, by filing a revised

Schedule of Mediators with this Court and providing counsel to the Ad Hoc Committee

with the Sharing Cap for each additional mediator added to the Schedule of Mediators;

and it is further

ORDERED that, the Debtors are authorized to waive the obligation to

share costs of non-binding mediation in their sole discretion to the extent the Designated

Claimant establishes, to the satisfaction of the Debtors, that sharing of such expenses

would constitute a substantial hardship upon the Designated Claimant; and it is further

ORDERED that, within thirty (30) days from the date of entry of this

Order (the "**Capping Period**"), any holder of an Unliquidated/Litigation Claim that is an

Initial Subject Claim filed against any of the Debtors may request the Debtors to initiate

the ADR Procedures for such Unliquidated/Litigation Claim by sending a letter (each a

"**Capping Proposal Letter**," the form of which is annexed to this Order as **Exhibit "C"**)

to the Debtors indicating a willingness to cap its Unliquidated/Litigation Claim at a

reduced amount (the "**Claim Amount Cap**"); *provided*, *however*, that with respect to any

claim for amounts resulting from the rejection of an executory contract that is rejected

pursuant to an order entered after the date of this Order, a Capping Proposal Letter will

be deemed timely if it is received within thirty (30) days of the entry of the order

authorizing such rejection; and it is further

ORDERED that, upon receiving a Capping Proposal Letter, the Debtors

will, if, and only if, the Claim Amount Cap is accepted by the Debtors, initiate the ADR

Procedures by designating the Unliquidated/Litigation Claim in accordance with the

ADR Procedures and will indicate in the ADR Notice that the Claim Amount Cap has

been accepted; and it is further

ORDERED that, if the Claim Amount Cap is accepted by the Debtors, the

Claim Amount Cap will become binding on the Designated Claimant, and the ultimate

value of his or her Unliquidated/Litigation Claim will not exceed the Claim Amount Cap.

To the extent the Debtors accept the Claim Amount Cap, the Debtors will be responsible

for all fees and costs associated with any subsequent mediation.  If the Claim Amount

Cap is not accepted, the Debtors will notify the Designated Claimant that the Claim

Amount Cap has been rejected, and the Claim Amount Cap will not bind any party and

shall not be admissible to prove the amount of the Unliquidated/Litigation Claim; and it

is further

ORDERED that, within one month after the Capping Period has expired,

the Debtors will provide to (i) counsel for the statutory committee of unsecured creditors

(the "**Creditors' Committee**"), and (ii) counsel for the United States of America, a

privileged and confidential report containing information on the status of the

Unliquidated/Litigation Claims (the "**Committee Report**").  The Debtors shall provide

both the Creditors' Committee and the United States of America with an updated

Committee Report once a month; and it is further

ORDERED that the following notice procedures are hereby approved:

1.  Within **three (3) days** of entry of this Order, the Debtors shall
    cause to be mailed a copy of this Order to all known holders of
    Initial Subject Claims that are subject to the ADR Procedures.

2.  The Debtors shall post a form of the Capping Proposal Letter on
    the website established by GCG for the Debtors' cases:
    www.motorsliquidationdocket.com;

and it is further

ORDERED that the Debtors are authorized to take any and all steps that are necessary or appropriate to implement the ADR Procedures with respect to the Initial Subject Claims, including, without limitation, by implementing any arbitration awards or settlements with respect to Designated Claims achieved under the terms of the ADR Procedures; *provided, howeve*r, that nothing in this Order or the ADR Procedures, shall obligate the Debtors to settle or pursue settlement of any particular Designated Claim; *further provided* that any such settlements may be pursued and agreed upon as the Debtors believe are reasonable and appropriate in their sole discretion, subject to the terms and conditions set forth in the ADR Procedures; and it is further

ORDERED that, if litigation of an Unresolved Designated Claim in a forum other than this Court is required for any of the reasons forth in Section II.E.3 of the ADR Procedures (as determined by this Court), then the Stay shall be modified subject to the terms and conditions set forth in Section II.E.4 of the ADR Procedures.  Any such modification of the Stay shall be solely to the extent necessary to permit the liquidation of the amount of such Unresolved Designated Claim in the appropriate forum.  If the Debtors fail to file a Notice of Stay Modification or a Stay Motion for any reason with respect to an Unresolved Designated Claim, as set forth in Section II.E.4 of the ADR Procedures, the Stay shall remain in effect with respect to such Unresolved Designated Claim, and the Designated Claimant may seek a determination of this Court regarding whether the Stay must be modified to permit litigation in a non-bankruptcy forum as set forth in Section II.E.3 of the ADR Procedures; and it is further

ORDERED that nothing contained in this Amended ADR Order shall be deemed to preclude any party in interest from objecting to any Designated Claim to the extent such entity has standing to assert an objection in accordance with Bankruptcy Code and applicable law; and it is further

ORDERED that nothing contained in this Order shall alter the Creditors' Committee's rights set forth in this Court's Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 3007 and 9019(b) authorizing the Debtors to (i) File Omnibus Claims Objections and (ii) Establish Procedures for Settling Certain Claims, entered on October 6, 2006 [Docket No. 4180]; and it is further

ORDERED that nothing in the ADR Procedures, including the ADR Injunction set forth therein, shall preclude the holder of a Designated Claim from commencing or continuing an action against a non-debtor party; and it is further

ORDERED that Rule 408 of the Federal Rules of Evidence shall apply to all aspects of the Capping Proposal Letter, the ADR Procedures, and the Committee Report; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to this Amended ADR Order and the ADR Procedures.

New York, New York
Date: **_October 25, 2010_**

_**s/ Robert E. Gerber**_
Honorable Robert E. Gerber
United States Bankruptcy Judge

**<u>Exhibit A</u>**

**<u>The ADR Procedures</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                                    :
In re                                               :          **Chapter 11 Case No.**
                                                    :
**MOTORS LIQUIDATION COMPANY**, *et al.*,           :          **09-50026 (REG)**
        **f/k/a General Motors Corp.**, *et al.*    :
                                                    :
                        **Debtors.**                :          **(Jointly Administered)**
                                                    :
-----------------------------------------------------------------x

<u>**ALTERNATIVE DISPUTE RESOLUTION PROCEDURES**</u>

The alternative dispute resolution procedures (the "**ADR Procedures**") adopted

in the chapter 11 cases of Motors Liquidation Company (f/k/a General Motors Corporation)

("**MLC**") and its affiliated debtors, as debtors in possession (collectively, the "**Debtors**"), are set

forth below:

### I.    CLAIMS SUBJECT TO THE ADR PROCEDURES AND ADR INJUNCTION

**A.    <u>Claims Subject to the ADR Procedures</u>**

1.    The claims subject to the ADR Procedures (collectively, the "**Designated**

**Claims**") include any and all claims (other than an Excluded Claim as defined below) designated

by the Debtors under the notice procedures set forth below that assert or involve claims based on

one or more of the following theories of recovery, whether or not litigation previously has been

commenced by the claimant: (a) personal injury claims, (b) wrongful death claims, (c) tort

claims, (d) product liability claims, (e) claims for damages arising from the rejection of an

executory contract or unexpired lease with a Debtor under section 365 of the Bankruptcy Code

(excluding claims for damages arising from the rejection of executory contracts that relate

primarily to environmental matters), (f) indemnity claims (excluding tax indemnity claims

relating to leveraged fixed equipment lease transactions and excluding indemnity claims relating

to asbestos liability), (g) lemon law claims, to the extent applicable under section 6.15 of the

Master Sale and Purchase Agreement by and between the Debtors and NGMCO, Inc., dated as of

June 1, 2009, and as amended (the "**MPA**"), (h) warranty claims, to the extent applicable under

section 6.15 of the MPA, and (i) class action claims ("**Class Claims**").  The Debtors may

identify as a Designated Claim any proof of claim asserted in these cases, other than Excluded

Claims as defined in Section I.B below, if the Debtors believe, in their business judgment and

sole discretion, that the ADR Procedures would promote the resolution of such claim and serve

the intended objectives of the ADR Procedures.

       2.      The holders of the Designated Claims are referred to herein as the

"**Designated Claimants**."

    **B.**    <u>**Excluded Claims**</u>

       The Debtors shall not identify as a Designated Claim any proof of claim within

any of the following categories (collectively, the "**Excluded Claims**"): (a) claims for which the

automatic stay under section 362 of title 11 of the United States Code (the "**Bankruptcy Code**")

was modified by prior order of this Court (the "**Bankruptcy Court**") to allow the litigation of

the claim to proceed in another forum; (b) claims asserted in liquidated amounts of $500,000 or

less; (c) asbestos-related claims (including indemnity claims relating to asbestos liability); (d)

environmental claims that constitute prepetition unsecured claims (including claims for damages

arising from the rejection of executory contracts that relate primarily to environmental matters);

(e) patent infringement claims; (f) tax claims (excluding tax indemnity claims relating to

leveraged fixed equipment lease transactions); and (g) claims subject to a separate order of the

Bankruptcy Court providing for arbitration or mediation.  Notwithstanding the foregoing, any of

the Excluded Claims, any disputed postpetition administrative expenses, and any claims or

counterclaims asserted by the Debtors may be submitted to the ADR Procedures by agreement of

the applicable Debtor and the applicable claimant or by further order of the Bankruptcy Court.

### C. **The ADR Injunction**

Upon service of the ADR Notice (as defined below) on a Designated Claimant

under Section II.A.1 below, such Designated Claimant (and any other person or entity asserting

an interest in the relevant Designated Claim) shall be enjoined from commencing or continuing

any action or proceeding in any manner or any place, including in the Bankruptcy Court, seeking

to establish, liquidate, collect on, or otherwise enforce the Designated Claim(s) identified in the

ADR Notice other than (1) through these ADR Procedures, or (2) pursuant to a plan or plans

confirmed in the applicable Debtors' chapter 11 cases (collectively, the "**ADR Injunction**").

Notwithstanding the forgoing, the Debtors shall not be precluded from seeking to estimate any

Designated Claim not subject to an accepted Claim Amount Cap in connection with confirmation

or consummation of a plan or plans confirmed in the applicable Debtors' chapter 11 cases, or

preclude the Designated Claimant from seeking estimation of its Designated Claim solely for

voting purposes in connection with confirmation of a plan or plans confirmed in the applicable

Debtors' chapter 11 cases.  The ADR Injunction shall expire with respect to a Designated Claim

only when that Designated Claim has been resolved or after the ADR Procedures have been

completed as to that Designated Claim.  Except as expressly set forth herein or in a separate

order of the Bankruptcy Court, the expiration of the ADR Injunction shall not extinguish, limit,

or modify the automatic stay established by section 362 of the Bankruptcy Code or any similar

injunction that may be imposed upon the confirmation or effectiveness of a plan or plans in the

applicable Debtors' chapter 11 cases (a "**Plan Injunction**"), and the automatic stay and the Plan

Injunction shall remain in place to the extent then in effect.

## II.    THE ADR PROCEDURES

### A.    Offer Exchange Procedures

The first stage of the ADR Procedures will be the following offer exchange procedures, requiring the parties to exchange settlement offers and thereby providing an opportunity to resolve the underlying Designated Claim on a consensual basis without any further proceedings by the parties (the "**Offer Exchange Procedures**").  Rule 408 of the Federal Rules of Evidence shall apply to the ADR Procedures.  Except as permitted by Rule 408, no person may rely on, or introduce as evidence in connection with any arbitral, judicial, or other proceeding, any offer, counteroffer, or any other aspect of the ADR Procedures.

### 1.    *Designation of Designated Claims and Settlement Offer by the Debtors*

(a)    At any time following the entry of an order approving the ADR Procedures, as applicable (the "**ADR Order**") and subject to the terms and conditions in Sections I.A and I.B above, the Debtors may designate a Designated Claim for resolution through the ADR Procedures by serving upon the Designated Claimant, at the address listed on the Designated Claimant's most recently filed proof of claim or amended proof of claim, as well as to any counsel of record in these cases for the Designated Claimant, the following materials (collectively, the "**ADR Materials**"): (i) a notice that the Designated Claim has been submitted to the ADR Procedures (an "**ADR Notice**"),[1] (ii) a copy of the ADR Order, and (iii) a copy of these ADR Procedures.  For transferred claims, the Debtors also will serve a copy of the ADR Materials on the transferee identified in the notice of transfer of claim.

---

[1] The form of the ADR Notice is attached hereto as **Annex 1** and incorporated herein by reference.  The Debtors anticipate that the ADR Notice will be substantially in the form of Annex 1; however, the Debtors reserve the right to modify the ADR Notice, as necessary or appropriate, consistent with the terms of the ADR Procedures.

(b)        The ADR Notice will (i) advise the Designated Claimant that his or her

Designated Claim has been submitted to the ADR Procedures; (ii) request that the Designated

Claimant verify or, as needed, correct, clarify, or supplement, certain information regarding the

Designated Claim (including the addresses for notices under the ADR Procedures); and (iii)

include an offer by the Debtors to settle the Designated Claim (a "**Settlement Offer**").  The

ADR Notice also will require the Designated Claimant to sign and return the ADR Notice along

with the Claimant's Response (as defined in Section II.A.2 below) to the Debtors so that it is

received by the Debtors no later than twenty-one (21) days[2] after the mailing of the ADR Notice

(the "**Settlement Response Deadline**").

(c)        If the Designated Claimant fails to sign and return the ADR Notice or to

include a Claimant's Response (as defined below) with the returned ADR Notice by the

Settlement Response Deadline, (i) the Offer Exchange Procedures will be deemed terminated

with respect to the Designated Claim and (ii) the Designated Claim will be submitted to

nonbinding mediation.

2.        *The Claimant's Response*

The only permitted responses to a Settlement Offer (the "**Claimant's Response**")

are (i) acceptance of the Settlement Offer, or (ii) rejection of the Settlement Offer coupled with a

counteroffer (as further defined below, a "**Counteroffer**").  If the ADR Notice is returned

without a response or with a response that is not a permitted response, the Designated Claim

shall be treated as set forth in Section II.A.1(c) above.

---

[2] Bankruptcy Rule 9006(a) shall apply to all periods calculated in the ADR Procedures.

3.       *The Counteroffer*

The Counteroffer shall (i) provide all facts that substantiate the Designated Claim and that are sufficient for the Debtors to evaluate the validity and amount of the Designated Claim; (ii) provide all documents that the Designated Claimant contends support the Designated Claim; (iii) state the dollar amount of the Designated Claim (the "**Proposed Claim Amount**"), which may not (A) improve the priority set forth in the Designated Claimant's most recent timely filed proof of claim or amended proof of claim, or (B) exceed the lesser of the Claim Amount Cap (as defined in the ADR Order), if applicable, or the amount set forth in the Designated Claimant's most recent timely filed proof of claim or amended proof of claim (but may liquidate any unliquidated amounts expressly referenced in a proof of claim), with an explanation of the calculation and basis for the Proposed Claim Amount; and (iv) provide the name and address of counsel representing the Designated Claimant with respect to the Designated Claim, unless the Designated Claimant is a natural person, in which case the Designated Claimant shall either provide the name of such counsel or state that he or she is appearing without counsel.

The Counteroffer is presumed to offer the allowance of the Designated Claim as a general unsecured claim in the Proposed Claim Amount against the Debtor identified in the applicable proof of claim.  If the Debtors accept the Counteroffer, the Designated Claimant shall not seek recovery from the Debtors of any consideration other than the consideration ultimately distributed to holders of other allowed general unsecured claims against the relevant Debtor.  A Counteroffer may not be for an unknown, unliquidated, or indefinite amount or priority, or the Designated Claim shall be treated as set forth in Section II.A.1(c) above.

4.      *Consent to Subsequent Binding Arbitration*

As described in Sections II.B and II.C below, in the absence of a settlement at the conclusion of the Offer Exchange Procedures, Designated Claims shall proceed to nonbinding mediation and, if such mediation is unsuccessful, upon consent of the parties (including deemed consent based on prior contractual agreements), to binding arbitration.  A Designated Claimant is required to notify the Debtors whether it consents to, and thereby seeks to participate in, binding arbitration in the event that its Designated Claim ultimately is not resolved through the Offer Exchange Procedures and the nonbinding mediation.  A Designated Claimant shall make an election to either consent or not consent to binding arbitration by checking the appropriate box in the ADR Notice (an "**Opt-In/Opt-Out Election**").  Any Designated Claimant that does not consent to binding arbitration in its response to the ADR Notice may later consent in writing to binding arbitration, subject to the agreement of the Debtors.  Consent to binding arbitration, once given, cannot subsequently be withdrawn without consent of the Debtors.

5.      *The Debtors' Response to a Counteroffer*

The Debtors must respond to any Counteroffer within fifteen (15) days after their receipt of the Counteroffer (the "**Response Deadline**"), by returning a written response (as further defined below, each a "**Response Statement**").  The Response Statement shall indicate that the Debtors (a) accept the Counteroffer; or (b) reject the Counteroffer, with or without making a revised Settlement Offer (a "**Revised Settlement Offer**").

(a)      *Failure to Respond*

If the Debtors fail to respond to the Counteroffer by the Response Deadline, (i) the Counteroffer will be deemed rejected by the Debtors; (ii) the Offer Exchange Procedures will be deemed terminated with respect to the Designated Claim; and (iii) the Designated Claim will be submitted to nonbinding mediation.

(b)    *Revised Settlement Offer*

If the Debtors make a Revised Settlement Offer by the Response Deadline, the Designated Claimant may accept the Revised Settlement Offer by providing the Debtors with a written statement of acceptance no later than ten (10) days after the date of service of the Revised Settlement Offer (the "**Revised Settlement Offer Response Deadline**").  If the Designated Claimant does not accept the Revised Settlement Offer by the Revised Settlement Offer Response Deadline, the Revised Settlement Offer will be deemed rejected and the Designated Claim automatically will be submitted to nonbinding mediation.

(c)    *Request for Additional Information*

The Debtors may request supplemental or clarification of information supplied in the Designated Claimant's most recently filed proof of claim to assist in a good faith evaluation of any particular Designated Claim.  If the Debtors request additional information or documentation by the Response Deadline, the Designated Claimant shall serve additional information or documentation sufficient to permit the Debtors to evaluate the basis for the Designated Claim (with the exception, in the Designated Claimant's sole discretion, of privileged information or information prepared expressly in contemplation of litigation) so that it is received by the Debtors within fifteen (15) days after such request.  If the Designated Claimant timely responds, the Debtors shall have fifteen (15) days to provide an amended Response Statement, which may include a Revised Settlement Offer as a counter to the Counteroffer.  If the Debtors do not provide an amended Response Statement within this period, or if the Designated Claimant fails to provide the requested information or documentation within the time allotted, the Designated Claim will be submitted to nonbinding mediation.

6. _Offer Exchange Termination Date_

Upon mutual written consent, the Debtors and a Designated Claimant may exchange additional Revised Settlement Offers and Counteroffers for up to twenty (20) days after the later of (a) the Revised Settlement Offer Response Deadline or (b) the expiration of the applicable timeframes provided for in Section II.A.5(c) above with respect to requesting, receiving, and responding to additional information or documentation. Otherwise, the Offer Exchange Procedures shall conclude and terminate on the earliest of the following (the "**Offer Exchange Termination Date**"): (i) the date upon which the Designated Claim automatically advances to nonbinding mediation under the provisions set forth above; (ii) the date that any settlement offer for a Designated Claim is accepted under the procedures set forth above; (iii) the date upon which a Response Statement was served by the Debtors, if the Debtors notified the Designated Claimant in their Response Statement of the Debtors' intention to proceed directly to nonbinding mediation; or (iv) such earlier date as is agreed upon by the Debtors and the Designated Claimant.

7. _Ability to Settle Claims_

Nothing herein shall limit the ability of a Designated Claimant and the Debtors to settle a Designated Claim by mutual consent at any time. All such settlements shall be subject to the terms of Section II.D.2 below.

B. **Nonbinding Mediation ("Mediation")**

1. _Mediation Notice_

If the Debtors and the Designated Claimant do not settle the Designated Claim through the Offer Exchange Procedures, the Debtors shall serve a notice of nonbinding mediation, with a copy of the Designated Claimant's applicable proof(s) of claim attached, on the Designated Claimant no later than thirty (30) days after the Offer Exchange Termination

Date, or as soon thereafter as is reasonably practicable.[3]  The Mediation Notice will provide the

Mediation Location (as such term is defined in Section II.B.2 below).

2.  *Location and Appointment of the Mediator*

All Mediations shall be conducted in either (i) New York, New York; (ii) Detroit,

Michigan; (iii) Dallas, Texas; (iv) San Francisco, California; or (v) Chicago, Illinois

(collectively, the "**Mediation Locations**"), unless the parties agree to a different location.

Within ten (10) days after receiving the Mediation Notice, the Designated Claimant shall choose

one of the individuals identified in a list of mediators annexed to the Mediation Notice and

corresponding to the applicable Mediation Location to conduct the mediation (the "**Mediator**").

To the maximum extent practicable, the scheduling and location of Mediation

sessions shall give due consideration to the convenience of the parties and the proximity of the

Designated Claimant.  Notwithstanding the foregoing, within ten (10) business days after service

of the Mediation Notice, the Designated Claimant may file a motion with the Bankruptcy Court,

on notice to the Debtors and any previously appointed mediator, for an order directing that the

Mediation be conducted in a different location (a "**Hardship Motion**") if the Designated

Claimant can demonstrate that traveling to any of the Mediation Locations presents a

"substantial hardship;" *provided, however*, that there shall be a rebuttable presumption that,

absent other extraordinary facts, there is no "substantial hardship" imposed on a Designated

Claimant if the primary representative for a Designated Claimant resides in a location that is less

than 750 miles from the Mediation Location or is less than a three-hour plane trip from the

Mediation Location (based on typical commercial schedules for the fastest route, excluding any

---

[3] The form of the Mediation Notice is attached hereto as **Annex 2** and incorporated herein by reference.  The Debtors anticipate that the Mediation Notice will be substantially in the form of Annex 2; however, the Debtors reserve the right to modify the Mediation Notice, as necessary or appropriate, consistent with the terms of the ADR Procedures.

layovers).  While a Hardship Motion is pending, all deadlines under these ADR Procedures shall

be suspended.  If a Hardship Motion is granted, any alternative location shall be determined by

the Bankruptcy Court, taking into account the convenience of the parties and any agreements

reached by the parties.  If the location of the Mediation is changed, (i) any Mediator appointed in

the original location may be replaced by a Mediator in the new location (selected by mutual

agreement of the parties or order of the Court), and (ii) the Bankruptcy Court may require that

that the Debtors and the Designated Claimant share the costs of the Mediation.

> 3.    *Mediation Rules*

The Mediation of Designated Claims shall be governed by the Mediator's regular

procedures, except where expressly modified in the ADR Procedures.  In the event of any

conflict, the ADR Procedures shall control.  Any party to a Mediation that fails to participate in

good faith, on the terms described herein, may be subject to sanctions under Section II.F below.

> (a)    *Impartiality and Qualifications of Mediators*

A person appointed as a Mediator must (i) be an impartial, neutral person; (ii)

have no financial or personal interest in the proceedings or, except when otherwise agreed by the

parties, in any related matter; and (iii) upon appointment, disclose any circumstances likely to

create a reasonable inference of bias.  In the event a Mediator discloses circumstances likely to

create a reasonable inference of bias, such Mediator may be replaced at the written request of

either the Debtors or the Designated Claimant prior to the mediation.

> (b)    *Fees and Costs for Mediation*

For each Mediation conducted under these ADR Procedures, the Mediator

selected to preside will be entitled to charge the mediation fees disclosed to, and agreed to by,

the Debtors and the Designated Claimant.  Unless the parties have expressly agreed otherwise in

writing (either prepetition or postpetition) as part of an agreement to submit Designated Claims

to Mediation, the Mediator's fees and the costs of any Mediation shall be shared equally by the

Debtors and the Designated Claimant subject to the Sharing Cap (as such term is described in the

ADR Order.  For purposes of clarity, these costs shall not include travel expenses of the parties.

(c)    *Pre-Mediation Briefing*

Unless the parties agree otherwise, on or before thirty (30) days prior to the

scheduled Mediation, the Designated Claimant shall serve on the Mediator and the Debtors by

electronic transmission or facsimile, at a minimum, and no later than by 6:00 p.m. (Eastern

Time), a nonconfidential, pre-Mediation statement (the "**Opening Statement**") not to exceed

fifteen (15) pages, excluding any attachments, setting forth all of the Designated Claimant's

claims and identifying each and every cause of action or theory the Designated Claimant asserts,

including a short and plain statement of the facts and law upon which the Designated Claimant

relies for recovery and maintains entitle it to relief.  The Designated Claimant shall include, as

exhibits or annexes to the Opening Statement, all documents (or summaries of voluminous

documents), affidavits, and other evidentiary materials on which the Designated Claimant relies

(with the exception, in the Designated Claimant's sole discretion, of privileged information or

information prepared expressly in contemplation of litigation).  Unless the parties agree

otherwise, on or before fifteen (15) days after service of the Opening Statement, the Debtors

shall serve on the Mediator and the Designated Claimant, by electronic transmission or facsimile,

at a minimum, and no later than by 6:00 p.m. (Eastern Time), a nonconfidential response

statement (the "**Mediation Response Statement**") not to exceed fifteen (15) pages, excluding

attachments.  The Designated Claimant shall receive copies of all exhibits to the Mediation

Response Statement (with the exception, in the Debtors' sole discretion, of privileged

information or information prepared expressly in contemplation of litigation).  The Debtors shall

provide copies of the Opening Statement and Mediation Response Statement to counsel to the statutory committee of unsecured creditors (the "**Creditors' Committee**") upon request, on a confidential basis. At the Mediator's discretion and direction, the parties may submit additional, confidential letters or statements to the Mediator, which shall receive "Mediator's-eyes-only" treatment.

(d)     *The Mediation Session*

Unless otherwise agreed by the parties or as provided herein, the Mediation session must occur no later than sixty (60) days after the date on which the Mediator is appointed. Unless otherwise agreed by the parties, the Mediation session is open only to the parties and their respective counsel, and insurers (if any).

(e)     *Treatment of Mediation Settlement*

If the Mediation results in a settlement of the Designated Claim, such settlement shall be subject to the terms of Section II.D below. If the Mediation of a Designated Claim does not result in a settlement of the Designated Claim, the Designated Claim shall be subject to Section II.C or II.E below.

(f)     *Modification of the Mediation Procedures*

The Mediation procedures described herein may be modified upon the mutual written consent of the Debtors and the Designated Claimant.

**C.     Arbitration**

1.     *Binding Arbitration*

If the Designated Claimant and the Debtors have consented to binding arbitration under Section II.A.4 above, the Designated Claim will be arbitrated under the terms of this Section II.C if such claim is not resolved in the Offer Exchange Procedures or Mediation. If the Designated Claimant has expressly indicated that it does not consent to binding arbitration in its

response to the ADR Notice and has not subsequently opted in to binding arbitration pursuant to

Section II.A.4 above, the Designated Claim shall be resolved in the Bankruptcy Court by the

Debtors' commencement of proceedings pursuant to the Bankruptcy Code, including without

limitation, estimating or objecting to the Designated Claims.  Any party to an arbitration that

fails to participate in the arbitration in good faith, on the terms described herein, may be subject

to sanctions under Section II.F below.

2.    *Arbitration Notice*

To initiate the arbitration process for a Designated Claim, the Debtors shall serve

a notice of arbitration (the "**Arbitration Notice**"), with a copy of the Designated Claimant's

applicable proof(s) of claim attached, on the Designated Claimant, the Creditors' Committee,

and the American Arbitration Association (the "**AAA**").[4]

3.    *Arbitration Rules and Procedures*

For Designated Claims that are not designated by the Debtors as Complex

Designated Claims (as defined below), the arbitration of all Designated Claims shall be

conducted by a single arbitrator selected pursuant to the Commercial Arbitration Rules of the

AAA.  The arbitrator shall be governed by the commercial arbitration rules of the AAA then in

effect (the "**Arbitration Rules**"), except where the Arbitration Rules are expressly modified in

the ADR Procedures.[5]

The Debtors may, at their discretion, designate certain Designated Claims as

complex designated claims (the "**Complex Designated Claims**").  The arbitration of all

---

[4] The form of the Arbitration Notice is attached hereto as **Annex 3** and incorporated herein by reference.  The Debtors anticipate that the Arbitration Notice will be substantially in the form of Annex 3; however, the Debtors reserve the right to modify the Arbitration Notice, as necessary or appropriate, consistent with the terms of the ADR Procedures.

[5] In the event of any conflict between the Arbitration Rules and the ADR Procedures, the ADR Procedures shall control.

Complex Designated Claims shall be conducted by a panel of three arbitrators selected pursuant to the Commercial Arbitration Rules of the AAA.  The AAA Procedures for Large, Complex Commercial Disputes, in addition to the Commercial Rules of Arbitration, shall be used for arbitration of all Complex Designated Claims; *provided, however*, unless otherwise agreed by the parties, (i) the AAA shall appoint a panel of three (3) arbitrators, as provided in this Section and Section II.C.3(g) and (ii) the arbitration hearing on a Complex Designated Claim must be held no later than ninety (90) days after the date of appointment of the arbitrator(s), as provided in Section II.C.3(k).  Finally, the AAA Supplementary Rules for Class Arbitrations shall also be used for all Class Claims, including those related to class certification and the Class Determination Award (as defined in Rule 5 of the AAA Supplementary Rules for Class Arbitrations), except that the arbitrator(s) shall not make a Clause Construction Award (as defined in Rule 3 of the AAA Supplementary Rules for Class Arbitrations), or determine that a Class Claim is not arbitrable for failure for each class member to have entered into an arbitration agreement, the Court having specifically found that the ADR Procedures are applicable to Class Claims notwithstanding the absence of a written agreement to arbitrate.[6]

> (a)    *Governing Law*

The ADR Procedures, as they relate to arbitration proceedings, are governed by the Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq*. (the "**Federal Arbitration Act**"), and the enforceability of an arbitration award is governed by Section 9 of the Federal Arbitration Act, except as modified herein.

---

[6] In the event of any conflict between the AAA Supplementary Rules for Class Arbitrations and the ADR Procedures, the ADR Procedures shall control.

(b)      *Fees and Costs for Binding Arbitration; Sharing*

Unless the parties expressly have agreed otherwise in writing (either prepetition

or postpetition) as part of an agreement to submit claims to binding arbitration, the fees and costs

charged by the AAA and the arbitrator(s) shall be shared equally by the Debtors and the

Designated Claimant; *provided, however*, that the arbitrator(s), in the arbitrator(s)' sole

discretion, may assess fees and costs against any party that the arbitrator(s) finds to be abusing or

unduly delaying the arbitration process.  The AAA shall submit invoices to the Designated

Claimants and the Debtors according to the AAA's ordinary invoicing practices then in effect

and subject to the AAA's ordinary payment terms then in effect.  For purposes of clarity, these

costs shall not include travel expenses of the parties.

(c)      *Impartiality and Qualifications of Arbitrators*

In designating the arbitrator in accordance with the procedures described below,

the AAA shall review the Arbitration Notice and the applicable Designated Claim.  Any person

appointed as an arbitrator must: (i) be an impartial, neutral person; (ii) be experienced (either

from past arbitrations or former employment) in the law that is the subject of the Designated

Claim; (iii) have no financial or personal interest in the proceedings or, except when otherwise

agreed by the parties, in any related matter; and (iv) upon appointment, disclose any

circumstances likely to create a reasonable inference of bias.  In the event that an arbitrator

discloses circumstances likely to create a reasonable inference of bias, such arbitrator may be

replaced by the AAA at the written request of the Debtors or the Designated Claimant within ten

(10) days after such disclosure.

(d)    *Time and Location of Arbitration Hearings*

All arbitration hearings shall be conducted in either (i) New York, New York; (ii) Detroit, Michigan; (iii) Dallas, Texas; or (iv) San Francisco, California (collectively, the "**Arbitration Locations**").  To the maximum extent practicable, the scheduling and location of arbitration hearings shall give due consideration to the proximity of the Designated Claimant and to the convenience of the parties to the Arbitration Location.  Within ten (10) days of appointment, the arbitrator(s) shall conduct a preliminary hearing pursuant to AAA Commercial Arbitration Rule 20.  Notwithstanding anything set forth herein or in the ADR Order to the contrary, the Creditors' Committee, through its counsel, shall be permitted to participate in the arbitration hearings to the same extent the Creditors' Committee would be permitted to participate in claims litigation in the Bankruptcy Court pursuant to sections 502, 1103, 1109(b), or any other applicable section of the Bankruptcy Code.

(e)    *Appeals of Arbitration Awards*

All arbitration awards shall be final and binding.  Other than the identities of the applicable Debtors and Designated Claimants, the claims register number(s) assigned to the applicable arbitrated Designated Claims and the priority and dollar amounts of the Designated Claims as awarded in the arbitration awards, and except as otherwise required by law or agreed upon by the parties, all arbitration awards shall be treated as confidential.  No party shall have the right to appeal an arbitration award except pursuant to the appeal provisions of the Federal Arbitration Act, in which case any appeal must be to the United States District Court for the Southern District of New York.  Any appeal shall be governed by the Federal Arbitration Act. The parties shall have ten (10) days from the date the arbitration award is served to appeal such award.  Failure to timely appeal shall result in the loss of any appeal rights.  Once any appeal has

concluded or appellate rights are waived, the Debtors shall update the claims docket in their

chapter 11 cases accordingly and may file any notice of the liquidated amount of the Designated

Claim that they deem necessary or appropriate for such purpose.

(f)    *Modification of the Arbitration Procedures*

The arbitration procedures described herein may be modified only upon the

mutual consent of the Debtors and the Designated Claimant.  In addition, the Debtors shall

consult with the Creditors' Committee prior to any modification to the arbitration procedures.

(g)    *Appointment of the Arbitrator*

Within 5 five days of receiving the applicable Arbitration Notice, the AAA shall

commence the following procedures for the appointment of arbitrator(s) (the "**Appointment of**

**Arbitrator(s) Procedures**") by concurrently sending by electronic transmission or facsimile, to

the Debtors and the applicable Designated Claimant, an identical list of the names of at least

eight (8) arbitrator candidates who meet the qualifications necessary for the matter.[7]  The

Debtors and the applicable Designated Claimant shall have seven (7) business days from the date

this list is served to (i) strike two (2) names from the proposed list, (ii) list the remaining names

in order of preference, and (iii) return the list to the AAA.  In the event that the Designated

Claim is not a Complex Designated Claim, the AAA shall appoint a single arbitrator from the

name(s) not stricken, giving consideration first to the preferences of the parties and second to

scheduling and the availability of the arbitrator.  In the event that the Designated Claim is a

Complex Designated Claim, the AAA shall appoint a panel of three (3) arbitrators from the

name(s) not stricken, giving consideration first to the preferences of the parties and second to the

---

[7] If, for any reason, there are more than two parties to an arbitration, AAA shall identify a number of potential
arbitrators equal to the number of parties, plus one, and the remaining selection proceedings shall otherwise govern.
Affiliated entities are considered a single party for this purpose.  The Creditors' Committee shall have no role in the
arbitrator selection process.

scheduling and the availability of the arbitrators.  The AAA shall appoint the arbitrator(s) in

accordance with the Appointment of Arbitrator(s) Procedures within ten (10) business days of its

receipt of the applicable Arbitration Notice.

(h)    *Pre-Hearing Matters*

Unless otherwise agreed to by the parties, any pre-hearing issues, matters or

disputes (other than with respect to merits issues) shall be presented to the arbitrator(s)

telephonically (or by such other method agreed to by the arbitrator(s) and the parties) for

expeditious, final, and binding resolution.  Upon a party's request, the arbitrator(s) may order

that a substantive motion, such as a motion for summary judgment, be heard in person rather

than telephonically.  Any pre-hearing issue, matter, or dispute (other than with respect to merits

issues) must be presented to the arbitrator(s) not later than fifteen (15) days prior to the

arbitration hearing so as to permit the arbitrator(s) to review and rule upon the requests by

telephonic or electronic communication at least five days prior to the arbitration hearing.

(i)    *Discovery*

Unless the Designated Claim is a Complex Designated Claim, there shall be no

interrogatories.  Any requests for production of documents, electronically-stored information and

things ("**Document Requests**") shall be made in writing and shall be limited to no more than

twenty (20) requests, including discrete subparts.  Items requested in the Document Requests

must be produced within thirty (30) days after service of the Document Requests.  All documents

from discovery shall be confidential and shall not be (i) disclosed to any person or party not

participating in the arbitration proceeding or (ii) used for any purpose other than in connection

with the arbitration proceeding, except as provided herein.  Notwithstanding the foregoing, upon

request of the Creditors' Committee, the Debtors shall provide to the Creditors' Committee, on a

confidential basis, copies of all discovery materials produced pursuant to this Section II.C.3(i)

for any particular Designated Claim.

(j)    *Pre-Arbitration Statement*

Unless otherwise agreed by the parties, on or before ten (10) days prior to the

scheduled arbitration hearing, each party shall submit to the arbitrator(s) and serve on the other

party or parties and the Creditors' Committee by overnight mail a pre-arbitration statement not to

exceed fifteen (15) pages, excluding any attachments.  On or before ten (10) days prior to the

scheduled arbitration hearing, the Creditors' Committee may submit a short statement, not to

exceed five (5) pages, to the arbitrator(s) and serve such statement on the parties to the

arbitration.

(k)    *Arbitration Hearing*

Unless otherwise agreed by the parties and the arbitrator(s) or as provided herein,

the arbitration hearing on a Designated Claim must be held no later than ninety (90) days after

the date of appointment of the arbitrator(s).  The arbitration hearing is open only to the parties

and their respective counsel, insurers (if any), and witnesses.  In addition, notwithstanding

anything else set forth herein or in the ADR Order to the contrary, the Creditors' Committee,

through its counsel, shall be permitted to attend and participate in the arbitration hearing to the

same extent the Creditors' Committee would be permitted to participate in claims litigation in the

Bankruptcy Court, pursuant to sections 502, 1103, 1109(b), and any other applicable section of

the Bankruptcy Code.  Nonparty witnesses shall be sequestered.  No posthearing briefs may be

submitted, unless the arbitrator(s) requests briefs, in which case such briefing shall be subject to

the issues, timing, and page limitations the arbitrator(s) imposes.  There shall be no reply briefs.

(l)    *Awards*

The arbitrator(s) shall issue a written, reasoned opinion and award (the

"**Arbitration Award**") within fourteen (14) days after the arbitration hearing.  The arbitrator(s)

shall not be compensated for more than eight hours of deliberations on and preparation of the

Arbitration Award for a Designated Claim.  Any Arbitration Award shall be an allowed general

unsecured nonpriority claim against the Debtor identified in the Arbitration Award (or if no

Debtor is identified in the Arbitration Award, the claim shall be deemed to be against the Debtor

identified in the Designated Claimant's applicable proof of claim included with the service of the

Arbitration Notice, unless otherwise ordered by the Bankruptcy Court).  The Arbitration Award

may not award a priority claim or otherwise determine the priority of the claim under the

Bankruptcy Code; *provided, however*, that, within thirty (30) days after the issuance of an

Arbitration Award, the Designated Claimant may seek relief from the Bankruptcy Court to

determine that some or all of the Arbitration Award is subject to treatment as a priority claim if

the Designated Claimant's applicable proof of claim filed as of the date of filing of the ADR

Order asserted an entitlement to such priority.  Further, no portion of a claim resulting from any

Arbitration Award shall be allowed to the extent that it consists of (a) punitive damages; (b)

interest, attorneys' fees, or other fees and costs, unless permissible under section 506(b) of the

Bankruptcy Code; (c) an award under any penalty rate or penalty provision of the type specified

in section 365(b)(2)(D) of the Bankruptcy Code; (d) amounts associated with obligations that are

subject to disallowance under section 502(b) of the Bankruptcy Code; (e) specific performance,

other compulsory injunctive relief, restrictive, restraining, or prohibitive injunctive relief or any

other form of equitable remedy; or (f) any relief not among the foregoing but otherwise

impermissible under applicable bankruptcy or nonbankruptcy law.  The Debtors and the

Creditors' Committee shall have the right within thirty (30) days after the issuance of an

Arbitration Awards to file a motion seeking relief from the Bankruptcy Court to enforce the

preceding sentence and obtain the disallowance of any portion of a claim included in an

Arbitration Award in violation of clauses (a) through (f) herein.  In all cases, the awarded claim

shall be subject to treatment in the Debtors' chapter 11 cases as set forth in any order(s)

confirming a chapter 11 plan or plans, or in such other applicable order of the Bankruptcy Court.

The entry of an Arbitration Award shall not grant the Designated Claimant any enforcement or

collection rights.

      **D.**     **<u>Settlements of Designated Claims</u>**

      1.     *<u>Settlements Permitted at Any Stage of the ADR Procedures</u>*

      Designated Claims may be settled by the Debtors and a Designated Claimant

through the Offer Exchange Procedures, Mediation, or by agreement at any point during these

ADR Procedures.  Nothing herein shall prevent the parties from settling any claim at any time.

      2.     *<u>Settlement Authority and Approvals</u>*

      Nothing herein shall limit, expand, or otherwise modify the Debtors' authority to

settle claims pursuant to orders of the Bankruptcy Court then in effect, including without

limitation the Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 3007 and 9019(b)

authorizing the Debtors to (i) File Omnibus Claims Objections and (ii) Establish Procedures for

Settling Certain Claims, entered on October 6, 2006 [Docket No. 4180] (the "**Claims**

**Procedures and Settlement Order**") and any future order(s) confirming a chapter 11 plan or

plans in these cases (collectively, the "**Settlement Authority Orders**").  Any settlements of

claims pursuant to, or in connection with, the ADR Procedures shall be approved consistent with

the terms, conditions, and limitations set forth in the applicable Settlement Authority Orders.

The Debtors shall be requested to seek Bankruptcy Court approval of such settlements only to

the extent that (a) such approval is required by the terms of the Settlement Authority Orders or

(b) the settlement falls outside of the authority granted in the Settlement Authority Orders and

otherwise requires Bankruptcy Court approval.

### E.    Failure to Resolve a Designated Claim Through ADR Procedures

#### 1.    *Litigation Generally*

Claims not resolved through the ADR Procedures shall proceed to litigation for

resolution.  Notwithstanding anything herein, the Debtors may terminate the ADR Procedures at

any time prior to serving the Arbitration Notice and proceed to litigation of the Designated Claim

as set forth herein.

#### 2.    *Litigation in the Bankruptcy Court*

If the Designated Claim is not resolved by the ADR Procedures (an "**Unresolved**

**Designated Claim**"), litigation of such Unresolved Designated Claim shall proceed in the

Bankruptcy Court by the commencement by the Debtors of proceedings consistent with the

terms, conditions, and limitations set forth in the Claims Procedures Order or other applicable

procedures or orders, as soon as reasonably practicable upon completion of the ADR Procedures

for the Unresolved Designated Claim, to the extent that (a) the Bankruptcy Court has subject

matter jurisdiction over the Unresolved Designated Claim and (b) the Unresolved Designated

Claim is not subject to the abstention provisions of 28 U.S.C. § 1334(c).  Disputes over the

subject matter jurisdiction of the Bankruptcy Court or the application of abstention shall be

determined by the Bankruptcy Court.

#### 3.    *Litigation in Other Courts*

If the Unresolved Designated Claim cannot be adjudicated in the Bankruptcy

Court as a result of abstention or because of lack of or limitations upon subject matter

jurisdiction (as determined by the Bankruptcy Court), then, subject to the terms and conditions

set forth in Section II.E.4 below, litigation of such Unresolved Designated Claim shall proceed

(a) if the Unresolved Designated Claim was pending in a nonbankruptcy forum on the date the

Debtors commenced their respective voluntary chapter 11 cases (the "**Commencement Date**"),

then (i) in such nonbankruptcy forum, subject to the Debtors' right to seek removal or transfer of

venue or (ii) in such other forum as determined by the Bankruptcy Court on request of the

Debtors;[8] or (b) if the Unresolved Designated Claim was not pending in any forum on the

Commencement Date, then in the United States District Court for the Southern District of New

York or such other nonbankruptcy forum that, as applicable, (i) has personal jurisdiction over the

parties, (ii) has subject matter jurisdiction over the Unresolved Designated Claim, (iii) has in rem

jurisdiction over the property involved in the Unresolved Designated Claim (if applicable) and

(iv) is a proper venue.  If necessary, any disputes regarding the applicability of this Section II.E.3

shall be determined by the Bankruptcy Court.

### 4.    *Modification of the Automatic Stay*

If litigation of an Unresolved Designated Claim in a forum other than the

Bankruptcy Court is required as set forth in Section II.E.3 above, the ADR Order provides that

the automatic stay imposed by section 362 of the Bankruptcy Code, or any subsequent Plan

Injunction (collectively, the "**Stay**"), shall be modified solely to the extent necessary to permit

the liquidation of the amount of such Unresolved Designated Claim in the appropriate forum;

*provided, however*, that any such liquidated claim (a) shall be subject to treatment under the

applicable chapter 11 plan or plans confirmed in these cases; and (b) shall be treated as a general

unsecured nonpriority claim against the Debtor identified in the judgment, unless otherwise

---

[8] The Debtors may elect to file a motion pursuant to 28 U.S.C.§ 157(b)(5) to remove to the United States District Court for the Southern District of New York any Unresolved Designated Claim (along with any other unliquidated and litigation claims asserted against the Debtors) where the underlying claim is a personal injury claim or wrongful death claim.

determined and ordered by the Bankruptcy Court.  No later than forty-five (45) days after the

Bankruptcy Court determines that the terms of Section II.E.3 above applies to an Unresolved

Designated Claim or at such other time as agreed to by the parties, the Debtors shall either (a)

file a notice of such modification of the Stay (a "**Notice of Stay Modification**") with the

Bankruptcy Court and serve a copy of such notice on the Designated Claimant and the Creditors'

Committee or (b) file a motion seeking an order governing the terms upon which the Stay will be

modified (a "**Stay Motion**") and serve such Stay Motion on the Designated Claimant and the

Creditors' Committee.  The Stay shall be modified solely to the extent set forth above (a) as of

the date that is forty-five (45) days after the filing of a Notice of Stay Modification, unless the

Bankruptcy Court orders otherwise or the parties otherwise agree; or (b) as ordered by the Court

in connection with a Stay Motion.  If the Debtors fail to file a Notice of Stay Modification or a

Stay Motion for any reason with respect to an Unresolved Designated Claim, the Stay shall

remain in effect with respect to such Unresolved Designated Claim and the Designated Claimant

may seek a determination of the Bankruptcy Court regarding whether and on what terms the Stay

must be modified to permit litigation in a nonbankruptcy forum as set forth in Section II.E.3

above.

        **F.**       **Failure to Comply with the ADR Procedures**

       If a Designated Claimant or the Debtors fail to comply with the ADR Procedures,

negotiate in good faith, or cooperate as may be necessary to effectuate the ADR Procedures, the

Bankruptcy Court may, after notice and a hearing, find such conduct to be in violation of the

ADR Order or, with respect to a Designated Claimant, an abandonment of or failure to prosecute

the Designated Claim, or both.  Upon such findings, the Bankruptcy Court may, among other

things, disallow and expunge the Designated Claim, in whole or part, or grant such other or

further remedy deemed just and appropriate under the circumstances, including, without

limitation, awarding attorneys' fees, other fees, and costs to the other party.

ANNEX 1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                                           :
**In re**                                  :        **Chapter 11 Case No.**
                                           :
**MOTORS LIQUIDATION COMPANY,** *et al.,*  :        **09-50026 (REG)**
        **f/k/a General Motors Corp.,** *et al.* :
                                           :
                        **Debtors.**       :        **(Jointly Administered)**
                                           :
------------------------------------------------------------x

**ALTERNATIVE DISPUTE RESOLUTION NOTICE**

Service Date:

Claimant(s):

Claimant(s)' Address:

Designated Claim Number(s):

Amount(s) Stated in Proof(s) of Claim:

**Deadline to Respond:**

By this notice (the "**ADR Notice**"), Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession (collectively, the "**Debtors**") designate the above-identified claim(s) (the "**Designated Claim(s)**") in the Debtors' chapter 11 cases and submit the Designated Claim(s) to alternative dispute resolution, pursuant to the procedures (the "**ADR Procedures**") established by the Amended Order Pursuant to 11 U.S.C. § 105(a) and General Order M-390 Authorizing Implementation of Alternative Dispute Resolution Procedures, Including Mandatory Mediation entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on _____ ___, 2010 and the Supplemental Order Pursuant to 11 U.S.C. § 105(a) and General Order M-390 Authorizing Implementation of Alternative Dispute Resolution Procedures, Including Mandatory Mediation entered by the Bankruptcy Court on April 29, 2010 (together, the "**ADR Order**").  A complete copy of the ADR Procedures is enclosed for your reference.

The Debtors have reviewed your Designated Claim(s) and, pursuant to the ADR Procedures, offer the amounts set forth below for allowance of your Designated Claim(s) as [a] prepetition general unsecured nonpriority claim(s) in full satisfaction of the Designated Claim(s) (the "**Settlement Offer**").

*You are required to return this ADR Notice with a Claimant's Response (as defined below) to the Settlement Offer by no later than the **Deadline to Respond** indicated above.*

In addition, to the extent your most recent proofs of claim **[does]/[do]** not: (a) state the correct amount of your Designated Claim(s); (b) expressly identify each and every cause of action and legal theory on which you base your Designated Claim(s); (c) include current, correct, and complete contact information of your counsel or other representative; or (d) provide all documents on which you rely in support of your Designated Claim(s), you hereby are requested to provide all such information and documentation with your Claimant's Response.

If you do not return this ADR Notice with the requested information and a Claimant's Response to the Settlement Offer to **[Debtor's Representative]** so that it is received by the Deadline to Respond, your Designated Claims will be subject to mandatory mediation as set forth in Section II.B of the ADR Procedures.

IN ADDITION, YOU ARE REQUIRED TO INDICATE EXPRESSLY WHETHER YOU CONSENT TO **BINDING ARBITRATION** IF YOUR DESIGNATED CLAIM(S) CANNOT BE SETTLED.  PLEASE MARK THE BOX BELOW INDICATING WHETHER YOU (i) CONSENT TO **BINDING ARBITRATION** OR (ii) **DO NOT** CONSENT TO (AND SEEK TO **OPT OUT** OF) **BINDING ARBITRATION**.  PLEASE NOTE THAT YOUR CONSENT TO **BINDING ARBITRATION** CANNOT SUBSEQUENTLY BE WITHDRAWN.  IN ADDITION, ANY ATTEMPT TO OPT OUT OF **BINDING ARBITRATION** IN THE RESPONSE TO THIS ADR NOTICE SHALL BE INEFFECTIVE IF YOU PREVIOUSLY HAVE CONSENTED IN WRITING (EITHER PREPETITION OR POSTPETITION) TO **BINDING ARBITRATION** AS A MEANS TO RESOLVE YOUR CLAIM(S).

Details about the arbitration process, including the sharing of fees, are set forth in Section II.C of the ADR Procedures.

YOU MUST RESPOND TO THE FOLLOWING SETTLEMENT OFFER:

**Settlement Offer**: The Debtors offer you an allowed general unsecured, nonpriority claim in the amount of $_____ against **[Name of Debtor]** in full satisfaction of your Designated Claim(s), to be satisfied in accordance with any plan or plans of reorganization confirmed and implemented in the Debtors' chapter 11 cases.

The only permitted response (the "**Claimant's Response**") to the Settlement Offer are (a) acceptance of the Settlement Offer or (b) rejection of the Settlement Offer coupled with a counteroffer (a "**Counteroffer**").  Accordingly, please select your Claimant's Response below:

---

*Please indicate below if you accept or reject the Debtors' Settlement Offer by marking the appropriate box.  If you reject the Settlement Offer, please make your counteroffer where indicated.*

☐ I/we agree to and accept the terms of the Settlement Offer.

**<u>or</u>**

---

☐ I/we reject the Settlement Offer. However, I/we will accept, and propose as a Counteroffer, the following allowed claim in full satisfaction of the Designated Claim(s), to be satisfied in accordance with any plan or plans of reorganization confirmed and implemented in the Debtors' chapter 11 cases:

Debtor: _____

Amount: $_____

Priority: unsecured nonpriority claim (presumed) or ☐ other:*_____

*Note - If you choose a different priority, you must attach an explanation and any relevant documentation.

Section II.A.3 of the ADR procedures sets forth the restrictions on Counteroffers. Your Counteroffer may not (a) improve the priority set forth in your most recent timely-filed proof of claim or amended proof of claim, or (b) exceed the lesser of the Claim Amount Cap (as defined in the ADR Order) or the amount set forth in your most recent timely-filed proof of claim(s) or amended proof of claim(s). You may not amend your proof of claim solely for the purpose of proposing a Counteroffer of a higher amount or a better priority.

*Please indicate below whether you consent to binding arbitration for your Designated Claim(s) by marking the appropriate box.*

☐ I/ WE CONSENT TO BINDING ARBITRATION.

**or**

☐ I/WE DO NOT CONSENT TO BINDING ARBITRATION.

[Signature of the Designated Claimant's Authorized Representative]

By: _____

Printed Name

ANNEX 2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                                          :
In re                                     :        **Chapter 11 Case No.**
                                          :
**MOTORS LIQUIDATION COMPANY,** *et al.,* :        **09-50026 (REG)**
        **f/k/a General Motors Corp.,** *et al.*   :
                                          :
            **Debtors.**                  :        **(Jointly Administered)**
                                          :
------------------------------------------------------------x

## NOTICE OF NONBINDING MEDIATION

Service Date:

Claimant(s):

Claimant(s)' Address:

Designated Claim Number(s):

Amount(s) Stated in Proof(s) of Claim:

Mediation Location:

  By this Mediation Notice, Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession (collectively, the "**Debtors**") submit the above-identified claim(s) (the "**Designated Claim(s)**") in the Debtors' chapter 11 cases to mediation, pursuant to the procedures (the "**ADR Procedures**") established by the Amended Order Pursuant to 11 U.S.C. §105(a) and General Order M-390 Authorizing Implementation of Alternative Dispute Resolution Procedures, Including Mandatory Mediation, entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on _____ __, 2010 and the Supplemental Order Pursuant to 11 U.S.C. § 105(a) and General Order M-390 Authorizing Implementation of Alternative Dispute Resolution Procedures, Including Mandatory Mediation entered by the Bankruptcy Court on April 29, 2010.  The Debtors have been unable to resolve your Designated Claim(s) on a consensual basis with you through the Offer Exchange Procedures of the ADR Procedures, or the Offer Exchange Procedures otherwise were terminated as to your Designated Claim(s) as provided for in the ADR Procedures.

  As provided for in the ADR Procedures, mediation shall be conducted in the Mediation Location set forth above, unless the parties agrees to a different location.  As further

provided in the ADR Procedures, you have ten (10) days to choose one of the individuals identified on the list of mediators enclosed with this Mediation Notice to conduct the mediation.

A complete copy of the ADR Procedures is enclosed for your reference. Please refer to Section II.C of the ADR Procedures, concerning mediation.

[Signature of the Debtors' Authorized Person]

2

<u>ANNEX 3</u>

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                                          :
In re                                                     :        **Chapter 11 Case No.**
                                                          :
**MOTORS LIQUIDATION COMPANY,** *et al.,*                  :        **09-50026 (REG)**
     **f/k/a General Motors Corp.,** *et al.*        :
                                                          :
         **Debtors.**               :        **(Jointly Administered)**
                                                          :
-----------------------------------------------------------------x

<u>**NOTICE OF BINDING ARBITRATION**</u>

Service Date:

Claimant(s):

Claimant(s)' Address:

Designated Claim Number(s):

Amount(s) Stated in Proof(s) of Claim:

Arbitration Location:

      By this Arbitration Notice, Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession (collectively, the "**Debtors**") submit the above-identified claim(s) (the "**Designated Claim(s)**") in the Debtors' chapter 11 cases to **binding arbitration**, pursuant to the procedures (the "**ADR Procedures**") established by the Amended Order Pursuant to 11 U.S.C. § 105(a) and General Order M-390 Authorizing Implementation of Alternative Dispute Resolution Procedures, Including Mandatory Mediation, entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on _____ ___, 2010 and the Supplemental Order Pursuant to 11 U.S.C. § 105(a) and General Order M-390 Authorizing Implementation of Alternative Dispute Resolution Procedures, Including Mandatory Mediation entered by the Bankruptcy Court on April 29, 2010.  The Debtors have been unable to resolve your Designated Claim(s) on a consensual basis with you through the Offer Exchange Procedures of the ADR Procedures and or through binding mediation.

      PLEASE NOTE THAT YOU HAVE CONSENTED (OR ARE DEEMED TO HAVE CONSENTED) TO BINDING ARBITRATION. THEREFORE, YOUR DESIGNATED CLAIM(S) WILL PROCEED TO BINDING ARBITRATION, PURSUANT TO THE ADR PROCEDURES.

As provided for in the ADR Procedures, an arbitrator will be appointed through the American Arbitration Association ("**AAA**").  The ADR Procedures require you and the Debtors to share the administrative fees and costs of arbitration charged by the AAA and the arbitrator.

A complete copy of the ADR Procedures is enclosed for your reference.  Please refer to Section II.C of the ADR Procedures, concerning binding arbitration.

[Signature of the Debtors' Authorized Person]

**Exhibit B**

**Schedule of Mediators**

**Dallas, Texas**

| Name | Experience |
|------|-----------|
| Burdin, Mary | Personal injury, products liability |
| Damuth, Brenda J. | Personal injury, products liability |
| Grissom, Jerry | Class actions, personal injury, products liability |
| Hale, Earl F. | Complex business disputes |
| Lopez, Hon. Carlos G. | Personal injury, products liability |
| Martin, Hon. Harlan | Complex business disputes, personal injury, products liability |
| Nolland, Christopher | Complex business disputes, class actions |
| Parker, Walter E. "Rip" | Personal injury, products liability, complex disputes |
| Pryor, Will | Personal injury, products liability, complex business disputes |
| Rubenstein, Kenneth J. | Personal injury, products liability, complex business disputes |
| Stoddard, Ross | Personal injury, products liability, complex business disputes |
| Young, James | Class actions, complex business disputes, insurance disputes, personal injury |

**New York, New York**

| Name | Experience |
|------|-----------|
| Carling, Francis | Products liability, personal injury |
| Cyganowski, Melanie | Complex business disputes |
| Ellerin, Hon. Betty | Complex business disputes, products liability, personal injury, class actions |
| Farber, Eugene I. | Products liability |
| Feerick, Kevin | Complex business disputes, products liability |
| Gafni, Abraham J. | Complex business disputes, products liability, personal injury |
| Holtzman, Eric H. | Products liability |
| Hyman, Ms. Chris Stern | Insurance disputes |
| Leber, Bernice K. | Complex business disputes |
| Levin, Jack P. | Class actions, breach of warranty claims, products liability |
| McAllister, Michael T. | Personal injury, products liability |
| McLaughlin, Hon. Joseph T. | Complex business disputes, class actions |
| Ricchiuti, Joseph F. | Complex business disputes, products liability, personal injury, class actions |
| Silbermann, Hon. Jacqueline W. | Complex business disputes, products liability, personal injury, class actions |
| Woodin, Peter H. | Complex business disputes, products liability, personal injury, class actions |

## Detroit, Michigan

| Name | Experience |
|---|---|
| Connor, Laurence D. | Complex business disputes |
| Harrison, Michael G. | Personal injury |
| Kaufman, Richard C. | Personal injury |
| Muth, Jon R. | Complex business disputes, class actions |
| Pappas, Edward H. | Complex business disputes, products liability |

## San Fancisco, California

| Name | Experience |
|---|---|
| Cahill, Hon. William J. | Complex business disputes, products liability, personal injury, class actions |
| Denver, Thomas | Products liability, personal injury |
| Infante, Hon. Edward A. | Complex business disputes |
| Komar, Hon. Jack | Products liability class actions, mass torts |
| Lynch, Hon. Eugene F. | Complex business disputes |
| McLean, William | Complex business disputes, products liability, personal injury |
| McPharlin, Linda Hendrix | Complex business disputes |
| Needham, Craig | Products liability, personal injury |
| Williams, John R. (Jack) | Products liability, personal injury |
| Wulff, Randall W. | Complex business disputes, products liability, class actions |

## Chicago, Illinois

| Name | Experience |
|---|---|
| Anderson, Hon. Wayne R. | Complex business disputes, personal injury, products liability, class actions, mass torts |
| Cohn, Lynn | Personal injury, products liability, class actions |
| DiVito, Hon. Gino | Complex business disputes, products liability, personal injury |
| Dutenhaver, Katheryn M. | Complex business disputes, products liability, personal injury |
| Ginn, Bradley R. | Complex business disputes, products liability, personal injury |
| Neville, Hon. Richard E. | Complex business disputes, personal injury, products liability |
| Nudelman, Hon. Stuart A. | Complex business disputes, personal injury, products liability |
| Sullivan, Hon. James E. | Complex business disputes, personal injury, products liability, class actions |

**Exhibit C**

**Form of Capping Claim Letter**

[Date]

**BY E-MAIL AND FIRST CLASS MAIL**

Motors Liquidation Company
2101 Cedar Springs Road, Suite 1100
Dallas, TX 75201
Attn.: ADR Claims Team
claims@motorsliquidation.com

> Re:    **In re Motors Liquidation Company,** *et al*. **("Debtors")**
>       **Case No. 09-50026 (REG) – Capping Proposal Letter**

Dear Motors Liquidation Company,

By this letter, I, the undersigned, am the below-referenced claimant, or an authorized signatory for the below-referenced claimant, and hereby submit my claim to the capping procedures established in the Amended Order Pursuant to 11 U.S.C. § 105(a) and General Order M-390 Authorizing Implementation of Alternative Dispute Procedures, Including Mandatory Mediation (the "**ADR Procedures**") entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on _____ ___, 2010 and the Supplemental Order Pursuant to 11 U.S.C. § 105(a) and General Order M-390 Authorizing Implementation of Alternative Dispute Resolution Procedures, Including Mandatory Mediation entered by the Bankruptcy Court on April 29, 2010.

Accordingly, I hereby propose to cap my claim at the amount specified below (the "**Claim Amount Cap**").

| Claimant's Name | Proof of Claim No. | Original Filed Amount | Claim Amount Cap |
|---|---|---|---|
| | | | |

I understand and agree that the Claim Amount Cap includes all damages and relief to which I believe I am entitled, including all interest, taxes, attorney's fees, other fees, and costs. If the Claim Amount Cap is accepted by the Debtors, I understand that I am required to submit my claim to the ADR Procedures and acknowledge that my claim may be a "Designated Claim" as such term is used under the ADR Procedures.

Very truly yours,

By          _____

Address     _____

State       _____

cc:    Pablo Falabella, Esq.
       Weil, Gotshal & Manges LLP
       767 Fifth Avenue, New York, NY 10153
       pablo.falabella@weil.com

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for the Motors Liquidation
Company GUC Trust

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                                    :

**In re**                            :            **Chapter 11 Case No.**
                                      :

**MOTORS LIQUIDATION COMPANY, _et al._,**   :         **09-50026 (REG)**
       **f/k/a General Motors Corp., _et al._**    :
                                       :

                     **Debtors.**      :         **(Jointly Administered)**
                                       :
------------------------------------------------------------------x

**ORDER GRANTING THE MOTION OF THE
MOTORS LIQUIDATION GUC TRUST FOR LIMITED
MODIFICATION OF THE AUTOMATIC STAY AND PLAN INJUNCTION**

Upon the Motion, dated May 23, 2011 (the "**Motion**"),[8] of Motors Liquidation

Company GUC Trust (the "**GUC Trust**"), for entry of an order providing for a limited

modification of the Automatic Stay and the Plan Injunction, all as more fully described in the

Motion; and due and proper notice of the Motion having been provided, and it appearing that no

other or further notice need be provided; and the Court having found and determined that the

relief sought in the Motion is in the best interests of the Debtors, their estates, creditors, and all

parties in interest and that the legal and factual bases set forth in the Motion establish just cause

---

[8] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it

is

1.    ORDERED that the Motion is granted as provided herein; and it is further

2.    ORDERED that the Automatic Stay and the Plan Injunction are modified

solely to the extent necessary to enable the Action to proceed to final judgment or settlement.

Pursuant to the ADR Order and the ADR Procedures, the Action shall proceed in the Florida

State Court, subject to the Debtors' and/or the GUC Trust's rights to seek removal and/or

transfer of venue or in such other forum as determined by the Court on request of the Debtors

and/or the GUC Trust.  Pursuant to the ADR Order and the ADR Procedures, any final judgment

in the Action shall be subject to treatment under the Plan and shall be treated as a general

unsecured nonpriority claim against the GUC Trust, unless otherwise determined and ordered by

this Court.

3.    ORDERED that, except as provided in Paragraph 2 above, the provisions

of the Automatic Stay, the Plan Injunction, or any provision or injunction created in connection

with confirmation of the Plan and the order confirming the Plan, including, without limitation,

those provisions prohibiting execution, enforcement, or collection of any judgment that may be

obtained against the Debtors, the GUC Trust, and/or assets or property of the Debtors' estates (as

defined in section 541 of the Bankruptcy Code), shall remain in full force and effect.

4.    ORDERED that nothing contained herein shall be deemed or construed as

an admission of liability by the Debtors or the GUC Trust with respect to the Action, and the

defendants in the Action reserve the right to assert any and all defenses in the Action.

5.    ORDERED that this Court shall retain jurisdiction and shall be the

exclusive forum to resolve any disputes or controversies arising from or relating to this Order.

Dated: New York, New York
_____, 2011

_____
THE HONORABLE ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE