Hearing Date: To Be Determined
Objection Deadline: To Be Determined

Robert B. Weiss
HONIGMAN MILLER SCHWARTZ AND COHN LLP
660 Woodward Avenue
2290 First National Building
Detroit, MI  48226
Telephone: (313) 465-7596
Facsimile: (313) 465-7597

*Special Counsel for Debtors*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

```
..............................................................x
                                            :
In re                                       :
                                            :        Chapter 11 Case No.
MOTORS LIQUIDATION COMPANY, et al.,         :        09-50026 (REG)
                                            :
               Debtors.                     :        (Jointly Administered)
..............................................................x
```

### SUMMARY SHEET PURSUANT TO UNITED STATES TRUSTEE GUIDELINES FOR REVIEWING APPLICATION FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES FILED UNDER 11 U.S.C. SECTION 330

### SECOND INTERIM AND FINAL FEE APPLICATION

| NAME OF APPLICANT: | Honigman Miller Schwartz and Cohn LLP |
|---|---|
|  |  |
| TIME PERIOD: | July 10, 2009 through and including March 29, 2011 |
|  |  |
| ROLE IN THE CASE: | Special Counsel for the Debtors and Debtors in Possession |
|  |  |
| CURRENT APPLICATION: | Total Fees Requested:        $108,539.25 |
|  | Total Expenses Requested:    $4,661.97 |
|  |  |
| PRIOR APPLICATIONS: | One |

**PRIOR APPLICATIONS**

| Date Filed | Docket No. | Compensation Period | Fees Requested | Expenses Requested |
|---|---|---|---|---|
| 11/16/2009 | 4446 | First Interim Fee Application 6/1/2009 - 9/30/2009 | $2,297,160.00 | $16,799.46 |

| Date Order Entered | Docket No. | Fees Allowed | Expenses Allowed | Fees Held Back |
|---|---|---|---|---|
| 5/21/2010 | 5834 | $2,280,456.92 | $16,799.46 | $228,045.69 |

**SUMMARY OF SECOND INTERIM AND FINAL FEE APPLICATION OF
HONIGMAN MILLER SCHWARTZ AND COHN LLP FOR SERVICES RENDERED
FOR THE PERIOD JUNE 1, 2009 THROUGH MARCH 30, 2011**

| NAME OF PROFESSIONAL: PARTNERS | DEPARTMENT | YEAR ADMITTED | 2009 RATE | 2010 RATE | TOTAL HOURS BILLED | TOTAL COMPENSATION |
|---|---|---|---|---|---|---|
| Baty Jr., Donald F. | Commercial Law, Bankruptcy, and Reorganization | 1985 | 475.00 | 500.00 | 14.10 | 6,755.00 |
| Binkow, Maurice S | Real Estate | 1958 | 455.00 | 470.00 | 1.50 | 705.00 |
| Calton, Judy | Commercial Law, Bankruptcy, and Reorganization | 1986 | 475.00 | | 72.10 | 34,247.50 |
| Gorman, Frank L. | Commercial Law, Bankruptcy, and Reorganization | 1998 | 370.00 | | 9.80 | 3,626.00 |
| Meisner, Mitchell | Estate | 1984 | 375.00 | 375.00 | 18.10 | 6,787.50 |
| Murphy, Lawrence | Litigation | 1992 | 370.00 | | .50 | 185.00 |
| Sherick, Tricia A. | Commercial Law, Bankruptcy, and Reorganization | 1997 | 370.00 | 390.00 | 8.50 | 3,165.00 |
| Silver, Aaron M. | Commercial Law, Bankruptcy, and Reorganization | 2002 | 285.00 | | 1.30 | 370.50 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Stern, Mark A. | Litigation | 1984 | 455.00 | | .30 | 113.75 |
| Taigman, Michelle | Commercial Law, Bankruptcy, and Reorganization | 1993 | 370.00 | 390.00 | 7.40 | 2,832.00 |
| Weiss, Robert B. | Commercial Law, Bankruptcy, and Reorganization | 1975 | 565.00 | 585.00 | 22.10 | 12,848.50 |
| Boyce, Marcia Bennett | Commercial Law, Bankruptcy, and Reorganization | 2000 | 310.00 | | 16.80 | 5,208.00 |
| | | | | | | |
| **TOTAL** | | | | | **172.50** | **$76,843.75** |

| NAME OF PROFESSIONAL: ASSOCIATES | DEPARTMENT | YEAR ADMITTED | 2009 RATE | 2010 RATE | TOTAL HOURS BILLED | TOTAL COMPENSATION |
|---|---|---|---|---|---|---|
| Kochenderfer, Adam L. | Litigation | 2004 | 265.00 | | 5.60 | 1,484.00 |
| Linna Jr., Daniel W. | Commercial Law, Bankruptcy, and Reorganization | 2004 | 265.00 | | 17.20 | 4,571.25 |
| Sgroi, Joseph R. | Commercial Law, Bankruptcy, and Reorganization | 2005 | 240.00 | 270.00 | 3.20 | 780.00 |
| Yourchock, Kimberly A. | Commercial Law, Bankruptcy, and Reorganization | 2008 | 195.00 | 225.00 | 2.40 | 498.00 |
| | | | | | | |
| **TOTAL** | | | | | **28.40** | **$7,333.25** |

| NAME OF PROFESSIONAL: PARALEGALS, CLERKS, LIBRARY STAFF AND NON-LEGAL STAFF | TITLE | DEPARTMENT | 2009 RATE | 2010 RATE | TOTAL HOURS BILLED | TOTAL COMPENSATION |
|---|---|---|---|---|---|---|
| Giddings, M. Lucile | Paralegal | Real Estate | | 175.00 | .50 | 87.50 |
| Lundberg, Brenda E. | Paralegal | Commercial Law, Bankruptcy, and Reorganization | 170.00 | 175.00 | 142.70 | 24,274.75 |
| | | | | | | |
| **TOTAL** | | | | | **143.20** | **$24,362.25** |

| PROFESSIONALS | BLENDED RATE | TOTAL HOURS BILLED | TOTAL COMPENSATION |
|---|---|---|---|
| Partners | $445.00 | 172.50 | $76,843.75 |
| Associates | 258.00 | 28.40 | 7,333.25 |
| Paraprofessionals | 170.00 | 143.20 | 24,362.25 |
| | | | |
| **TOTAL** | **$315.00** | **344.10** | **$108,539.25** |

Respectfully submitted,

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Special Counsel to the Debtors

Dated:  May 23, 2011            By:  _____/s/ Robert B. Weiss_____
                               Robert B. Weiss (Michigan Bar No. P28249)
                               2290 First National Building
                               660 Woodward Avenue
                               Detroit, MI 48226
                               Telephone: (313) 465-7596
                               Facsimile:  (313) 465-7597
                               Email: rweiss@honigman.com

9119740.1

**Hearing Date: To Be Determined**
**Objection Deadline: To Be Determined**

Robert B. Weiss
HONIGMAN MILLER SCHWARTZ AND COHN LLP
660 Woodward Avenue
2290 First National Building
Detroit, MI 48226
Telephone: (313) 465-7596
Facsimile: (313) 465-7597

*Special Counsel for Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ....................................................x | : | |
| In re | : | |
| | : | Chapter 11 Case No. |
| MOTORS LIQUIDATION COMPANY, *et al.*, | : | 09-50026 (REG) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| ....................................................x | | |

**SECOND INTERIM AND FINAL FEE APPLICATION OF HONIGMAN MILLER
SCHWARTZ AND COHN LLP FOR ALLOWANCE OF COMPENSATION FOR
SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES**

**TO THE HONORABLE ROBERT E. GERBER**
**UNITED STATES BANKRUPTCY JUDGE**

Honigman Miller Schwartz and Cohn LLP ("**Honigman**"), special counsel to Motors

Liquidation Company and its affiliate debtors (collectively, the "**Debtors**")[1] hereby submits

its second interim and final application (collectively, the "**Final Application**"), pursuant to

sections 330(a) and 331 of title 11 of the United States Code (the "**Bankruptcy Code**") and

Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"),

---

[1] The Debtors are: Motors Liquidation Company (Case No. 09-50026), Chevrolet-Saturn of Harlum, Inc.
(Case No. 09-13558), Saturn, LLC (Case No. 09-50027), and Saturn Distribution corporation (Case No. 09-50028).

seeking an order allowing compensation for professional services rendered and reimbursement of actual and necessary expenses incurred for the period from June 1, 2009 through March 29, 2010 (the "**Entire Compensation Period**").

By this Final Application, Honigman seeks: (i) allowance of compensation to Honigman for professional services rendered during the period of July 10, 2010 through March 29, 2010 (the "**Second Interim Compensation Period**") in the amount of $108,538.75 and reimbursement of actual, reasonable and necessary expenses incurred during the Second Interim Compensation Period in connection with the rendition of such services in the amount of $4,661.97,[2] (ii) allowance of final compensation to Honigman for professional services rendered during the Entire Compensation Period, inclusive of the amounts sought in the Second Interim Compensation Period, in the amount of $2,388,995.70 and reimbursement of actual, reasonable and necessary expenses incurred during the Entire Compensation Period in the amount of $20,892.42; (iii) authority to apply the pre-petition retainer held by Honigman toward unpaid amounts approved by the Court for compensation for professional services rendered by Honigman during the Entire Compensation Period; and (iv) authority for the Debtors to pay any balance owing for allowed compensation.

---

[2] The referenced amounts include $5,225.50 in fees and $347.22 in costs related to services provided during the period July 1 through July 9, 2009 that were inadvertently not included in Honigman's First Interim Fee Application. In addition, in late 2010 and early 2011, Honigman provided limited litigation-related services to MLC as an ordinary course professional; the ordinary course professional fees are not covered by this Application. The Motors Liquidation Company GUC Trust has requested that Honigman continue to provide services on a limited basis on the referenced litigation matters.

## Background and Prior Interim Fee Applications

1.     On June 1, 2009 (the "**Commencement Date**"), the Debtors each commenced with this Court a voluntary case under Chapter 11 of the Bankruptcy Code.  The Debtors were authorized to operate their businesses and manage their properties as debtors-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code.

2.     On June 12, 2009, the Debtors filed the Application under 11 U.S.C. §§ 327(e) and 328 Authorizing Debtors to Employ and Retain Honigman Miller Schwartz and Cohn LLP as Special Counsel For the Debtors, Nunc Pro Tunc to the Petition Date and the supporting Declaration of Robert B. Weiss and Disclosure Statement In Support of the Application Under 11 U.S.C. §§ 327(e) and 328(a) to Employ and Retain Honigman Miller Schwartz and Cohn LLP as Special Counsel For the Debtors, Nunc Pro Tunc to the Petition Date (Docket No. 951).

3.     No objections were filed to Honigman's retention, so pursuant to the Order Under 11 U.S.C. §§ 327(e) and 328(a) Authorizing the Employment and Retention of Honigman Miller Schwartz and Cohn LLP as Special Counsel to The Debtors, Nunc Pro Tunc To The Petition Date (Docket No. 2548), the Debtors were authorized to retain Honigman as its special counsel to render legal services in the prosecution of their Chapter 11 cases.

4.     On June 3, 2009, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") filed the Appointment of Committee of Unsecured Creditors (the "**Creditors' Committee**") [Docket No. 356].

5.     On December 23, 2009, the Court appointed Brady C. Williamson as the Fee Examiner (the "**Fee Examiner**"), pursuant to the Stipulation and Order with Respect to Appointment of a Fee Examiner [Docket No. 4708].

6.     On August 31, 2010, the Debtors filed a Joint Chapter 11 Plan (the "**Plan**") and Disclosure Statement [Docket No. 6829] and subsequently amended the Plan and Disclosure

3

Statement on December 7, 2010 [Docket No. 8015]. On December 8, 2010, the Court entered an order confirming the Disclosure Statement [Docket No. 8043]. On March 29, 2011, the Court entered an order confirming the Plan [Docket No. 10151]. On March 31, 2011, the Plan became effective (the "**Effective Date**").

7.      On November 19, 2009, Honigman filed its first interim fee application (the "**First Interim Application**") [Docket No. 4446], as special counsel for the Debtors, for interim allowance of compensation for actual and necessary professional services rendered and for reimbursement of actual, reasonable and necessary expenses incurred from June 1, 2009 through and including September 30, 2009 (the "**First Interim Compensation Period**"). In the First Interim Application, Honigman sought the allowance of $2,297,160 in fees and $16,799.46 in expenses relating to the First Interim Compensation Period.

8.      On May 21, 2010, the Court entered an order approving the First Interim Application (the "**First Interim Order**") [Docket No. 5834], whereby the Court allowed Honigman $2,280,456.92 in fees and $16,230.45 in expenses, but ordered that payment of 10 percent (or $228,045.69) of the fees awarded would be held back until further order of the Court.

### Summary of Requested Compensation and Reimbursement of Expenses

9.      Honigman has prepared this Final Application in accordance with the Administrative Order Re: Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases dated June 20, 1991 (the "**Original SDNY Guidelines**"), the Administrative Order Re: Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases dated November 25, 2009 (the "**Amended SDNY Guidelines**," and collectively the "**Local Guidelines**"), the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 promulgated

by the United States Department of Justice dated January 30, 1996 (the "**UST Guidelines**"),

and the Order Pursuant to 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim

Compensation and Reimbursement of Expenses of Professionals [Docket No. 3711] (the

"**Administrative Order**," and collectively with the Local Guidelines and UST Guidelines,

the "**Guidelines**"). To the extent necessary, Honigman requests that the Court waive any

Guidelines requirement not met by this Final Application.

10.    With respect to the Second Interim Compensation Period, Honigman seeks

allowance of reasonable compensation for actual and necessary professional services

rendered during the Second Interim Compensation Period in the aggregate amount of

$106,889.00 and reimbursement of actual, reasonable and necessary expenses incurred

during period in connection with the rendition of such services in the aggregate amount of

$4,661.97.

11.    The fees sought for the Second Interim Compensation Period reflect an

aggregate of 344.1 hours of attorney and paraprofessional time spent and recorded in

performing services for the Debtors during the Second Interim Compensation Period and in

preparing and prosecuting the First Interim Compensation Application.  Of the aggregate

time expended during the Second Interim Compensation Period, 172.4 recorded hours were

expended by partners, 28.5 recorded hours were expended by associates, and 143.2 recorded

hours were expended by paraprofessionals. During the Second Interim Compensation

Period, Honigman's hourly billing rates for attorneys working on these matters ranged from

$195 to $585 per hour.  Allowance of compensation in the amount requested would result in

a blended hourly billing rate for attorneys of $419 for the Second Interim Compensation

Period.

12.    Honigman has received no payments relating to the services rendered during the Second Interim Compensation Period.

13.    In addition to allowance of compensation and reimbursement for the Second Interim Compensation Period, Honigman also seeks final allowance herein of reasonable compensation for actual and necessary professional services rendered to the Debtors during the Entire Compensation Period, in the aggregate amount of $2,388,995.70 and for reimbursement of actual, reasonable and necessary expenses incurred during the Entire Compensation Period in connection with the rendition of such services in the aggregate amount of $20,892.42. Honigman does not seek final allowance of reductions to which Honigman reached an agreement with the Fee Examiner in connection with the firm's First Interim Application.

14.    The fees sought by this Final Application for the Entire Compensation Period reflect an aggregate of 8,022 hours of attorney and paraprofessional time spent and recorded in performing services for the Debtors during the Entire Compensation Period. This aggregate amount does not include time that might be construed as duplicative or otherwise not beneficial to the Debtors; Honigman excluded such time in preparing its fee applications. Of the aggregate time expended during the Entire Compensation Period, 4,010 recorded hours were expended by partners, 3,568 recorded hours were expended by associates and 445 recorded hours were expended by paraprofessionals. During the Entire Compensation Period, Honigman's hourly billing rates for attorneys working on these

6

matters ranged from $175 to $585 per hour. The blended hourly billing rate for attorneys during the Entire Compensation Period was approximately $307.[3]

15.    Such fees are reasonable based on the customary compensation charged by comparably skilled practitioners in comparable non-bankruptcy cases in a competitive national legal market.

16.    In accordance with the Administrative Order and the First Interim Order, Honigman received $2,068,641.68, which consists of $2,052,411.23 (representing 90% of fees) and $16,230.45 of expenses awarded under the First Interim Order.   Honigman now seeks payment by the Debtors of all amounts allowed but previously held back pursuant to the First Interim Order ($228,045.69), together with allowance of fees and expenses for the Second Compensation Period.

17.    There is no agreement or understanding between Honigman and any other person, other than members of the firm, for the sharing of compensation to be received for services rendered in these cases.

18.    As referenced in the First Interim Fee Application, as of the Commencement Date, Honigman held a fund in the amount of $583,394.66, which fund constitutes a retainer (the "**Retainer**").   The Retainer has been used to pay a portion of the fees and expenses allowed under the First Interim Order.   As of May 19, 2011 the balance of the Retainer was $314,547.40.[4]

---

[3] This was calculated by dividing (a) total attorney fees requested by (b) total attorney hours.  This does not reflect any reductions to the total fees requested, which would have the effect of lowering the blended hourly billing rate for attorneys.

[4] Honigman has also identified $965.00 in unpaid fees for prepetition services related to Motors Enterprises, Inc. (see paragraph 30.C. below) which Honigman is requesting authority to pay from the Retainer.

19.    Based on agreement with MLC prior to the Commencement Date, the fees charged by Honigman in these cases have been billed at a discounted rate of ninety-five percent (95%) of Honigman's 2009, 2010 and 2011 standard hourly rates.    Such standard fees are reasonable based on the customary compensation charged by comparably skilled practitioners in comparable nonbankruptcy and bankruptcy cases in a competitive national legal market, rendering the discounted fees even more reasonable.

20.    Annexed hereto as **Exhibit A** is a certification regarding compliance with the Guidelines.

21.    Annexed hereto as **Exhibit B** is a schedule of (a) Honigman professionals and paraprofessionals who performed services for the Debtors during the Second Compensation Period, (b) the capacities in which each such individual is employed by Honigman, (c) the department in which each individual practices, (d) the hourly billing rate charged by Honigman for services performed by such individuals, (e) the year in which each professional was first licensed to practice law, and (f) the aggregate number of hours expended in this matter and fees billed therefor.

22.    Annexed hereto as **Exhibit C** is a summary statement of the number of hours and fees rendered by each professional/paraprofessional for the project categories described below, and the hourly rate of each during the Second Interim Compensation Period.

23.    Annexed hereto as **Exhibit D** is Honigman's detailed time records of the fees billed during the Second Interim Compensation Period using the project categories described below.

24.     Annexed hereto as **Exhibit E** is a summary of the categories of expenses for which Honigman is seeking reimbursement and the total amount for such expense category during the Second Interim Compensation Period.

25.     Annexed hereto as **Exhibit F** is an itemized statement of expenses for which Honigman is seeking reimbursement during the Second Interim Compensation Period..

26.     Annexed hereto as **Exhibit G** is a reconciliation of the Retainer.

**Summary Of Services Performed By**
**Honigman During The First Interim Compensation Period**

27.     Honigman represented MLC for nearly 20 years prepetition with respect to purchasing issues, supplier and customer financial distress, insolvencies and bankruptcies, and certain other discrete areas.  In connection with the MLC case, Honigman was retained to counsel MLC in connection with all aspects of management of MLC's supply chain and the bankruptcy issues attendant thereto, and to continue representing MLC in the types of matters it had represented MCL prepetition.  For example, during the Compensation Period, Honigman represented MLC in a number of Chapter 11 cases, including Delphi, Cadence, Visteon, Metaldyne and Chrysler.  Through the closing of the sale of substantially all of MLC's assets (the **"363 Transaction"**) to NGMCO, Inc. n/k/a as General Motors LLC (**"GM LLC"**), Honigman rendered substantial professional services in furtherance of the Debtors' chapter 11 cases.  Among other tasks, Honigman worked at the direction of Ms. Susanna Webber, Executive Director Global Logistics and Supply Chain (**"GPSC"**), and Christopher F. Dubay, Esq., Group Counsel for Global Purchasing and Supply Chain, in order to develop, implement and execute a supplier call center to address all of the purchasing-related aspects of the bankruptcy, including identifying Essential Vendors, negotiating Trade Agreements and establishing cure costs and managing the assumption and assignment of executory contracts from MLC to GM.

28.    Following the consummation of the 363 Transaction, Honigman had discussions with both MLC and GM LLC, and it was agreed that Honigman's representation of MLC would be limited primarily to the resolution of certain equipment lease, utility contract and executory contract matters involving General Electric Capital Corporation (**"GECC Matters"**), but that Honigman's fees and expenses in connection with the GECC Matters would be billed to and paid by GM LLC.

29.    The following is a summary of the services rendered by Honigman during the First Interim Compensation Period (grouped into different project categories or task codes):

**a.**    **Asset Analysis and Recovery**

- Assisted MLC in analyzing rights in various assets and developing and executing strategies to deal with such assets.

**b.**    **Asset Disposition**

- Assisted in sale process as requested by client and general bankruptcy counsel.

- Handled issues with respect to GECC relating to the 363 Transaction, including resolving GECC objections to the sale.

- Assisted in Michigan law issues relating to the sale.

- Reviewed and conducted research regarding various real estate issues and consequences of transaction.

- Participated in court hearings to obtain approval of sale procedures including assumption and assignment of executory contracts and to approve sale relating to assignment and assumption of contracts.

**c.**    **Business Operations**

- answer MLC employees' questions about bankruptcy.

**d.**    **Case Administration**

- assist in First Day Motion hearings

- general monitoring of case

- work with client on compliance with cash management order

e.    **Essential Vendor Program**

- Assisted MLC in developing and implementing its essential vendor protocol.

- Worked with MLC GPSC personnel to develop a protocol to manage MLC's direct and indirect supply base, including classification and treatment of those vendors in the bankruptcy proceedings. Recognizing early on the importance of maintaining supply and the inherent fragility of the MLC supply base due to the unprecedented economic conditions that preceded MLC's filing, MLC made a decision to treat its direct material suppliers as essential and pay the pre-petition claims of those vendors in consideration of the vendors entering into Essential Vendor Trade Agreements.

- The Essential Vendor Trade Agreements served two primary functions: (1) obtaining the essential vendor's written commitment to supply GM during the pendency of MLC's bankruptcy proceeding; and (2) returning the vendors to "normalized" supply terms following the commencement of the bankruptcy.

- Shortly after obtaining approval of the Essential Vendor Motion from the Bankruptcy Court, MLC began in earnest the process of communicating with its supply base concerning the Essential Vendor protocol. Honigman attorneys assisted MLC with this effort in two primary areas: (1) Honigman attorneys manned the MLC call center to answer any and all questions concerning MLC's essential vendor program, including, how to obtain a trade agreement and general questions concerning completing the trade agreement process; and (2) Honigman attorneys worked with the business contacts and attorneys for over 3800 eligible direct material suppliers to MLC to finalize Trade Agreements with those suppliers as appropriate.

- Each Trade Agreement submitted to MLC was reviewed for any changes proposed by the supplier and then referred to the business team for further processing. Honigman attorneys worked closely with the involved MLC functional business leads to negotiate and finalize the Trade Agreements.

- Ultimately, MLC entered into 1,494 Trade Agreements with the assistance of Honigman attorneys.

- The importance of MLC's Essential Vendor Program to maintaining uninterrupted supply cannot be overstated. During the period from the Commencement Date through the conclusion of the 363 Transaction, MLC did not lose a single parts shipment from a direct material supplier

11

nor did MLC prosecute before the Bankruptcy Court a single motion to show cause a supplier to compel performance in accordance with the terms of a contract. These two facts alone underscore the successful implementation of MLC's Essential Vendor protocol in which Honigman played a primary role.

- Assisted MLC in operating a supplier call center that commenced operations on the Petition Date and operated thereafter for 24 hours a day, seven days a week for the first three weeks of MLC's bankruptcy proceeding. The call center was a critical tool for MLC to communicate with its global supply base on all issues concerning Old MLC's bankruptcy proceeding, including maintaining uninterrupted supply to MLC's vehicle assembly, powertrain and stamping plants, certain of which operated on a full time basis during bankruptcy proceeding.

- The call centers were staffed with approximately 60 MLC GPSC personnel and two Honigman attorneys working in approximately three eight hour or two 12-hour shifts per day. At the inception of the bankruptcy, the call center's primary purpose was to manage all "stop ship" threats from suppliers and provide general information concerning the bankruptcy and the bankruptcy's implications on the suppliers' obligations to MLC.

- The call center attorneys assisted the MLC business personnel in answering questions concerning the implications of the automatic stay and the requirement to continue to perform in accordance with existing contracts so as to maintain uninterrupted supply.

- The call center also answered questions concerning the bankruptcy generally, including, without limitation, where to access information concerning the bankruptcy and what to expect in terms of the bankruptcy continuing.

- During the early days of the MLC bankruptcy proceeding, the call center processed on average 300 calls per day, including answering inquiries from MLC's suppliers around the world as to the implications of the MLC bankruptcy proceeding on their obligations to MLC.  By June 24, 2009, the call center had logged over 6,200 calls.

f.    **Fee/Employment Applications**

- Prepare and file application and disclosure to be retained, plus supplemental disclosures.

- Provide additional information requested by office of U.S. Trustee, including relating to parties objecting to 363 Transaction, receipt of prepetition retainers and prepetition transfers.

- Train professionals to comply with bankruptcy requirements.

- Prepare monthly statements consistent with requirements.

- Monitor court orders on fee procedures.

- Commence preparation of first interim fee application.

g.    **Financing**

- Opinion letters for financing, including review of documentation as needed to render legal opinions, negotiated and finalized legal opinions with counsel to the lenders.

- Reviewed and commented on various mortgages, assignments of leases and rents given by borrowers and guarantors.

- Prepared officers' backup certificates for the opinions.

- Evaluation of background, development of strategy and advice regarding resolution of GE Capital financing issues.

- Research and analysis on Michigan tax law, statutory tax liens, related to financing objections from Michigan taxing authorities.

- Attention to drafting and negotiating legal opinions in connection with DIP financing and continuing loan obligations, including review of related financing, security and organizational documents, affecting either Michigan property or borrower subsidiaries incorporated in Michigan.

- Review impact of financing arrangements on various third party leases and joint ventures.

h.    **Purchasing**

- Assist MLC in addressing a variety of purchasing issues.

i.    **Representing MLC in Other Bankruptcy Cases**

- This category included representing MLC in the Chrysler bankruptcy case, including analyzing and establishing cure amounts.

- Lear was another bankruptcy case in this category.

j.    **Executory Contracts**

- Assisted MLC in the development and refinement of the Sales Procedures governing the rejection or assumption and assignment of some 700,000 executory contracts to which MLC was a party.

- Following entry of the Sales Procedures Order, Honigman attorneys worked closely with GPSC attorneys to execute the notice procedures for executory contract assumption and assignment. In order to streamline the noticing process, MLC established an electronic contracts database and contracts website, in each case, with legal support from Honigman, in order for suppliers to access the website and obtain information concerning the (1) contracts that MLC proposed to assume and assign to GM LLC and (2) the "cure amounts" associated with the contracts.

- Following the website's launch, Honigman assisted GPSC personnel by fielding supplier questions from the call center to address the myriad of issues that suppliers raised in connection with the executory contract assumption and assignment process. The questions ranged from issues concerning identification of the contracts proposed to be assumed, why certain contracts were listed and certain contracts omitted and, finally, the computation of the "cure amounts" relating thereto.

- Honigman attorneys also managed the processing of over 500 objections filed by parties to executory contracts who alleged cure disputes. In connection with dealing with these objections, Honigman organized a process to reach out to each of the objector's attorneys individually and attempt to address the issues on a business and legal level short of proceeding to a hearing on the issue at the Sale Hearing.

- Honigman also was actively involved in the process of managing the resolution of the cure objections and the execution of cure resolution agreements to formally resolve the objection and elicit withdrawal of the objection on the docket.

k.    **Delphi**

- Negotiating and drafting of agreements between MLC, Delphi, Delphi's DIP Lenders and Platinum Equity Partners relating to GM LLC's (as successor to MLC) acquisition of Delphi's UAW "keep sites" and Delphi's global steering business.  This was done to protect GM LLC's continued supply of Delphi's component parts and assemblies.

- Negotiation and drafting of agreements between MLC and Delphi's DIP "C" tranche lenders with respect to the commercial arrangements between the parties post-effectiveness of Delphi's plan of reorganization.

14

- Counsel MLC with respect to executory contracts with Delphi and strategy in the Delphi bankruptcy case in general, and the ongoing business relationship between MLC and Delphi as a troubled supplier.

l. **Tax Appeals**

- Prior to the Commencement Date, Honigman filed property tax appeals involving a number of jurisdictions including: Detroit, Flint, Grand Blanc Township, Lansing, Lansing Township, Livonia, Orion Township, Pontiac, Romulus, Warren, and Ypsilanti Township.

- All of the 2006 and most of the 2007 appeals have been settled. In each jurisdiction where there have been settlements, the settlements resulted in tax reductions.

- There are a number of 2008 appeals pending as well as the numerous appeals recently filed in May of 2009.

- During the Compensation Period, Honigman continued work on resolving the pending appeals.

m. **Real Estate**

- Review of principal real estate documents affecting the downtown Detroit Renaissance Center and related properties, including Renaissance Center Phase I, Renaissance Center Phase II, Millender Center, Beaubien Deck, Marriott Hotel and Marriott Courtyard, to evaluate possible restrictions on transfers, needs for third party consents and approvals, master leasing of Renaissance Center and structural issues, and preparation, negotiation of certain consents and amendments.

- Develop proposals and advice regarding lessening impact of Michigan transfer tax obligations in the course of Michigan property transfers.

- Complete conveyance of surplus properties in New Center area.

- Work on disposition of Arizona assets, including water rights, leases in Yuma, Mesa.

- Work on relocation of a dealership in Manhattan.

- General coordination of real estate dispositions in Michigan and certain other leasing matters.

- Advice regarding Saturn of Harlem lease, Harlem bonds.

n. **Litigation**

15

- Prepetition, Honigman represented MLC and affiliates in litigation in Michigan and around the country. Honigman filed notices of automatic stay where applicable and assisted in analysis of which actions should be or would be continued despite the automatic stay.

- Honigman analyzed whether certain actions should be removed.

- Honigman evaluated the applicability of the automatic stay as it relates to Weber's counterclaim against MLC and the merits of Weber's counterclaim against MLC.

- Honigman researched jurisdiction over MLC and GM Mexico in the Weber litigation in the event that the automatic stay applied or MLC was dismissed

- Litigation in the Bill Heard's bankruptcy cases in the United States Bankruptcy Court in the Northern District of Alabama continued over, among other issues, MLC's rights in escrow accounts established prepetition, assertions MLC held funds in constructive trust and the applicability of the MLC automatic stay.

o.    **Tax**

- Work on Michigan Department of Treasury's sales and use tax audit.

- Work on damages phase and appellate issues in use tax refund litigation against Michigan Department of Treasury.

- Advise regarding Michigan sales and use tax consequences from 363 Transaction.

- Appeal of adverse Michigan Court of Claims decision in sales tax bad debt refund litigation.

p.    **Environmental**

- Assembling documents related to the ultimate closure of the Windiate Park/Pengelly Road site, preparing reports on the status of the matter with respect to the positions of the City of Flint and the Michigan Department of Environmental Quality.

- Conference with the client concerning the status of the Terrells' replacement trailer installation, communication from the Assistant Attorney General for the State of Indiana regarding the status of the Bedford natural resource damages proposed settlement with the State of Indiana natural resource trustees and the United States Department of Interior.

16

q.    **Saturn**

- Negotiation and drafting of various agreements in connection with the a proposed sale of the Saturn brand, including the proposed Master Agreement, Vehicle Supply Agreement, Transition Services Agreement, Service Parts Agreement, Spring Hill Lease Agreement, and related exhibits, schedules and other documentation.

r.    **Hummer**

- The negotiation and drafting of transaction documents for the proposed sale of certain Hummer assets, including:

  ° Assisting with due diligence activities.

  ° Structuring the terms upon which GM would supply H2 and H3 vehicles to the purchaser.

  ° Structuring and documenting the various services to be provided by GM under the Transition Services Agreement

  ° Preparation and drafting of the Master Agreement, H2 Supply Agreement, H3 Assembly Agreement, After Sales Service Parts Supply Agreement, and Transition Services Agreement with the purchaser, and related exhibits and schedules.

s.    **Troubled Suppliers**

- Honigman represented MLC in all aspects of its relationships with financially distressed suppliers, which included the following: developing and implementing legal strategies to protect MLC's interests; participation in bankruptcy proceedings involving suppliers where it was necessary for MLC to provide financial accommodations to insure an uninterrupted supply of goods and services; negotiation and documentation of supply protections for MLC should the insolvent suppliers be unable to meet their obligations to MLC; addressing disputes regarding tooling ownership; negotiating the purchase of inventory, equipment and intellectual property necessary for MLC production; and the negotiation and preparation of commercial agreements with alternate suppliers.

- Selected specific Troubled Supplier Matters were summarized in the First Interim Application which is incorporated by reference.

**Summary of Services Performed By Honigman**
**During the Second Interim Compensation Period**

30.     During the Second Interim Compensation Period, Honigman provided the following services (grouped by project categories or task codes):

a.     **Fee/Employment Applications - Total Hours 299.70 - Total Compensation requested $95,920.00**

- Prepare monthly statements consistent with requirements.

- Monitor court orders on fee procedures.

- Prepare and file supplemental disclosures.

- Prepare and file First Interim Application.

- Answer questions and provide additional information to Fee Examiner and U.S. Trustee re: questions on fee application.

- File necessary pleadings for ordinary course professional status.

- Attend hearing on First Interim Fee Application.

- Prepare fee projections requested by MLC.

b.     **Financing - Total Hours 27.40 - Total Compensation requested $10,256.00**

- Opinion letters for financing, including review of documentation as needed to render legal opinions, negotiated and finalized legal opinions with counsel to the lenders.

- Reviewed and commented on various mortgages, assignments of leases and rents given by borrowers and guarantors.

- Attention to drafting and negotiating legal opinions in connection with DIP financing and continuing loan obligations, including review of related financing, security and organizational documents, affecting either Michigan property or borrower subsidiaries incorporated in Michigan.

- Review impact of financing arrangements on various third party leases and joint ventures.

c.     **Motor Enterprises - Total Hours 26.30 – Total Compensation Requested $7,369.05**

Motor Enterprises, Inc. ("**MEI**") was an entity owned by MLC that provided financing to minority suppliers. Prior to the Debtors' bankruptcy filing, Honigman represented MEI in connection with the workout/collection of several

18

of its loans.  At the request of MLC, Honigman continued representing MLC post-petition in connection with the pending matters.  Representation included:

- Preparation of summaries of existing matters and analysis of potential recoveries.

- Worked on settling outstanding claims against Guarantors.

- Responded to discovery requests in pending litigation.

d. **Troubled Suppliers – Total Hours 18.2 - Total Compensation Requested $5,255.50**

- As noted in footnote 2 above, after filing its First Interim Application, Honigman discovered $5,255.50 in fees and $347.22 in expenses incurred in representing the Debtors in troubled supplier matters during the period July 1-9, 2009.  To save the cost of filing an Amended First Interim Application, Honigman has included those fees and expenses in this Application.

- The services provided are summarized in paragraph 29(s) above.

31.    During the Second Interim Compensation Period, Honigman billed the Debtors for time expended by attorneys based on hourly rates ranging from $195 to $585 per hour. Allowance of compensation in the amount requested would result in a blended hourly billing rate of approximately $419.00 (based on 344.1 recorded hours for attorneys at Honigman's discounted billing rates in effect at the time of the performance of services).  Honigman's special discounted rates for the Debtors represents a $5,712.57 reduction of charges during the Second Interim Compensation Period.

32.    As set forth in **Exhibit D** hereto, Honigman disbursed $4,661.97 as expenses during the Second Interim Compensation Period.  Prepetition the Debtors established policies for the reimbursement of expenses which Honigman followed post-petition.  These policies are consistent with the Guidelines for bankruptcy professionals.  These policies include:

(a)    reimbursement for reasonable and actual out-of-pocket payments made to third-party vendors, with no mark-up or surcharges added (with inside photocopy charges limited to seven cents per page);

(b)    no reimbursement for the following:

- Word processing
- Overtime charges
- Secretarial/clerical charges
- Fax communications (except long distance telephone charges)
- Local personal transportation (taxi/limousine to/from home)
- Local telephone charges
- Local meals
- Books, subscriptions
- Membership fees
- Office supplies
- Storage charges; and

(c)    The Firm does not bill for long distance telephone charges other than for conference calls using an outside vendor.

## The Requested Compensation Should Be Allowed

33.    Section 331 of the Bankruptcy Code provides for interim compensation of professionals and incorporates the substantive standards of section 330 to govern the Court's award of such compensation.  11 U.S.C. § 331.  Section 330 provides that a court may award a professional employed under section 327 of the Bankruptcy Code "reasonable compensation for actual necessary services rendered . . . and reimbursement for actual, necessary expenses." *Id.* § 330(a)(1).  Section 330 also sets forth the criteria for the award of such compensation and reimbursement:

> In determining the amount of reasonable compensation to be awarded, the court should consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –
>
> (A)    the time spent on such services;
>
> (B)    the rates charged for such services;
>
> (C)    whether the services were necessary to the administration of, or beneficial at the time at which the services were rendered toward the completion of , a case under this title;

(D)    whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E)    whether the compensation is reasonably based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

34.    In the instant case, Honigman respectfully submits that the services for which it seeks compensation and the expenditures for which it seeks reimbursement in this Application were necessary for and beneficial to the Debtors' orderly administration of their estates.

35.    Additionally, Honigman's combined activities were largely aimed at maintaining the operation of Debtors' business to preserve its value for the sale of assets to MLC and the sale of assets such as Debtors' Hummer and Saturn businesses, Debtors' acquisition of assets from Delphi, the representation of Debtors in other bankruptcy cases, and litigation to recover assets, such as tax litigation.

36.    Honigman further submits the compensation requested herein is commensurate with the complexity, importance and nature of the problems, issues, and tasks involved. The professional services were performed efficiently and in an intense expedited basis. Whenever possible, Honigman sought to minimize the costs of its services to the Debtors by staffing talented junior attorneys and paraprofessionals to handle the more routine aspects of case administration.

37.    In sum, the services rendered by Honigman were necessary and beneficial to the Debtors' estates, were consistently performed in a timely manner, and reasonable in light of the value of such services to the Debtors, their estates, and all parties in interest. Therefore, approval

of the compensation for professional services and reimbursement of expenses sought herein is warranted.

38.     No agreement or understanding exists between Honigman and any other person or firm for the division of any compensation requested in this matter other than agreements or understandings relating to the division of compensation among the partners of Honigman.

## **Waiver of Memorandum of Law**

39.     This Application does not raise any novel issues of law.  Accordingly, Honigman respectfully requests that the Court waive the requirement contained in Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York that a separate memorandum of law be submitted.

## **Notice**

40.     Notice of this Application and its exhibits will be given to: (a) the Debtors; (b) counsel to the Debtors; (c) counsel to the Official Committee of Unsecured Creditors; (d) the U.S. Trustee; (e) the fee examiner appointed in these cases; and (f) the Master Service List established under the Case Management Order in these cases.  Honigman respectfully submits that no other or further notice is required.

Wherefore, Honigman requests that the Court enter an order:

(i)      approving and allowing fees in the amount of $108,538.75 and authorizing reimbursement of expenses in the amount of $4,661.97 for services rendered by Honigman as Special Counsel to the Debtors, during the Second Interim Compensation Period;

(ii)     approving all previously awarded fees and costs on a final basis;

(iii)    authorizing Honigman to apply $965.00 of the Retainer to pay Honigman's outstanding prepetition fees which were reconciled postpetition.

(iv)    authorizing Honigman to apply its remaining Retainer for payment of the awards

reference above and authorizing the Debtors to pay any balance owing; and

(v)    granting such additional relief as is just and equitable.

Respectfully submitted,

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Special Counsel for Debtors

Dated:  May 23, 2011          By: /s/ Robert B. Weiss _____
                                              Robert B. Weiss (Michigan Bar No. P28249)
                                          2290 First National Building
                                          660 Woodward Avenue
                                          Detroit, MI 48226
                                          Telephone: (313) 465-7596
                                          Facsimile:  (313) 465-7597
                                          Email: rweiss@hongiman.com

## DECLARATION

Robert B. Weiss declares that he is a partner of the law firm of Honigman Miller Schwartz and Cohn LLP, special counsel to the Debtors, that he has read the foregoing Application for compensation by him subscribed for and on behalf of said firm, he is authorized to do so, he knows the contents thereof, and that the same is true to the best of his knowledge and belief.

Declarant further states that the law firm of Honigman Miller Schwartz and Cohn LLP has no agreement with any person for a division of the fees requested in the application other than in accordance with the Partnership Agreement existing by and between the partners of his law firm.

I declare under penalty of perjury that the foregoing is true and correct.

_Robert B. Weiss_ _____
ROBERT B. WEISS

Executed at Detroit, Michigan on May 20, 2011.

9141537.3

23