1    don't we have this witness testify first so

2    she is not held outside of work?  Does the

3    Board have any objection?

4         MR. FERNANDEZ:  I have no objection.

5         MR. WOLFER:  No.

6         MR. TUCK:  All right.  What we're going

7    to ask you to do -- do you know why you're

8    here to testify?  You're not sure?

9         MS. HOBBS:  I think it has something to

10    do with the claim that was filed with

11    Progressive.

12         MR. TUCK:  What kind of claim, an

13    insurance claim?

14         MS. SIMMONS:  The consumer listed her

15    as a witness.

16         MR. TUCK:  Right.

17         MR. KODSY:  If I may?  She test drove

18    the vehicle, so she is aware of the

19    condition of the vehicle.  She is aware of

20    my complaint to the Board today of how the

21    vehicle was performing.

22         MR. TUCK:  Was there any written report

23    made of her test --

24         MR. KODSY:  There was --

25         MR. TUCK:  Is it part of our

1    documentation?

2        MR. KODSY:  There is a part of it, yes,

3    from the insurance company stating that this

4    problem was due to a Progressive defect, not

5    an accidental one.

6        MR. TUCK:  All right.  What I would

7    like to ask you to do is frame questions to

8    the witness that will elicit the kind of

9    information that you want us to hear.

10       MR. KODSY:  Do you want me to go ahead?

11       MR. TUCK:  Yes.

12       MR. KODSY:  When you test drove the

13   vehicle, did it feel normal to you from your

14   prior experience of driving a Hummer H2 that

15   that was normal for the way the vehicle

16   performed?

17       MS. HOBBS:  When you brought the car in

18   to our service center for the claim -- I've

19   driven Hummers a couple of times, I'm by no

20   means an expert on them.  I did feel some

21   type of vibration when we were driving the

22   vehicle; however, I couldn't tell you what

23   it is.

24       MR. WOLFER:  Excuse me. Can you just

25   give us a little bit of background about

1    yourself?

2        MS. HOBBS:  Sure.  I am a claims

3    manager for Progressive Insurance.  That's

4    the company that Mr. Kodsy has his Hummer

5    insured with.  He filed a claim with us and

6    I manage the service center where customers

7    bring their vehicles for repairs or

8    estimates.

9        MR. TUCK:  What was the nature of the

10   claim?

11       MS. HOBBS:  The nature of the claim was

12   unknown.  He filed the claim and said that

13   he had an issue with the vehicle.  It came

14   into my service center.  I actually took him

15   in.  When he came in, I was working up front

16   that day.  I asked him what's going on with

17   the vehicle, what is your claim for?  He

18   said he has a vibration and he just wanted

19   us to have documentation that he had an

20   issue with it.  After discussing it with

21   him, he said he hadn't had an accident or

22   anything like that.  So it wasn't any kind

23   of issue that would be something covered

24   under our policy.

25       MR. TUCK:  No personal injury claims?

1    MS. HOBBS:  No personal injury claim or

2    anything like that, no.  So I test drove the

3    vehicle with him because he brought it in.

4    I drove with him down the road and there was

5    vibration.  I don't know what it is or

6    isn't, but there was a vibration with the

7    vehicle.

8    MR. TUCK:  Okay.  Do you have any other

9    questions?

10    MR. KODSY:  Sure.  You heard the

11    vehicle idling kind of loud from the outside

12    as well when we stood on the outside with

13    the vehicle running.  I know that we noticed

14    that the vehicle was idling high and was

15    making a noise.

16    MS. HOBBS:  Again, the first time I had

17    seen the vehicle is when he brought it in.

18    So as far as what RPM's or whatever the car

19    is supposed to idle at, I don't know.  You

20    could hear it kind of idling and then coming

21    back down more frequent than what I have

22    ever experienced with those vehicles

23    previously.

24    MR. TUCK:  How long did you drive it

25    for and under what conditions?

1        MS. HOBBS:  I probably drove it for

2    three to five minutes at best from what I

3    recall.  I don't remember what the weather

4    conditions were.  I drove it up the road

5    where my office is located onto Haverhill

6    Road up maybe like a mile and then back down

7    and back into my parking lot.

8        MR. TUCK:  At what speeds?

9        MS. HOBBS:  The posted speed limit on

10   my road is 25, on Haverhill it's 45.

11       MR. TUCK:  You drove it the posted

12   speeds, of course?

13       MS. HOBBS:  I don't recall.  I could

14   not tell you that.

15       MR. KODSY:  She did.

16       MR. FERNANDEZ:  Bernard Fernandez.

17       Ms. Hobbs, did you have any difficulty

18   maintaining control of the vehicle?

19       MS. HOBBS:  As in driving it straight

20   down the road?

21       MR. FERNANDEZ:  Yes.  Did you have any

22   difficulty keeping it in a straight course

23   or when you had to turn, did the vehicle

24   turn correctly?

25       MS. HOBBS:  I didn't have any

1    difficulty maintaining it straight or

2    turning it, no, not that I recall.

3        MR. FERNANDEZ:  You have driven Hummers

4    before and there was no such vibration?

5        MS. HOBBS:  I have driven other Hummers

6    before in the past.  I can't say necessarily

7    that none of them had a vibration similar to

8    that.  When we were driving the vehicle, I

9    felt like there was a vibration more severe

10   than anything I had experienced before.

11   Like I said, I drive all kinds of different

12   cars everyday so.

13       MR. TUCK:  Anything else?

14       MR. KODSY:  Yes.  The mass air flow

15   sensor on that vehicle, is that normal for

16   it to go out at 5,000 miles and have to be

17   replaced?  Do you have any idea?

18       MR. LOPEZ:  I think I have an objection

19   to that.  She has no way --

20       MR. TUCK:  Are you motor vehicle repair

21   person?

22       MS. SIMMONS:  Is that a no?  She is

23   shaking her head no.

24       MS. HOBBS:  No, I am not.

25       MR. KODSY:  From experience?

1     MS. SIMMONS:  What's the ruling on the

2    objection?

3     MR. TUCK:  I'm going to give her a

4    chance to say if she knows about these

5    things and if she doesn't, then she is not

6    qualified to answer it.

7     MS. HOBBS:  I wouldn't say that I know

8    about it where I'm an expert on it to say

9    that I know one way or another how long on

10   that particular vehicle that they're

11   supposed to last for.

12    MR. TUCK:  Okay.  But we do have some

13   technical experts here that you will get an

14   opportunity to question later and clarify

15   that.

16    Any other questions for the witness?

17    MR. KODSY:  No.

18    MR. TUCK:  Any questions?

19    MR. LOPEZ:  Mr. Lopez to Ms. Hobbs, did

20   I say it right?

21    MS. HOBBS:  Yes, you did.

22    MR. LOPEZ:  H-O-B-E-S?

23    MS. HOBBS:  H-O-B-B-S.

24    MR. LOPEZ:  Thank you.

25    Ms. Hobbs, so you work for Progressive,

1      that's an insurance company, correct?

2          MS. HOBBS:  Yes, that's correct.

3          MR. LOPEZ:  You stated to the Board

4      that you didn't have any difficulty in

5      driving the vehicle, correct?

6          MS. HOBBS:  In driving it straight down

7      the road or turning it, no, I did not.

8          MR. LOPEZ:  Turning it, did you have

9      any problem with it?

10         MS. HOBBS:  No, I did not.

11         MR. LOPEZ:  Okay.  Did you feel any

12     hopping of the vehicle or any like, it would

13     bounce like that or make noises or --

14         MS. HOBBS:  As far as hopping of the

15     vehicle, I wouldn't be able to say yes or no

16     on that.  There was a vibration going down

17     the road where you could visually see the

18     steering wheel doing this.

19         MR. LOPEZ:  Do you see Hummers often at

20     your insurance company?

21         MS. HOBBS:  I couldn't tell you how

22     often I see them.  Have I seen them over the

23     course of five years?  Yes.  How many?  I

24     couldn't tell you that.

25         MR. LOPEZ:  Did you see more or less

1    two, three, ten, in five years?

2         MS. HOBBS:  I probably would say more,

3    20 to 30.

4         MR. LOPEZ:  With accidents?

5         MS. HOBBS:  With accidents, correct.

6         MR. LOPEZ:  And you drive each one of

7    them every time they come in?

8         MS. HOBBS:  Not every car every time

9    they come in, no.

10        MR. LOPEZ:  So this was kind of a

11    special request by Mr. Kodsy requested from

12    you, correct?

13        MS. HOBBS:  I don't know if special

14    request would be the right to say it.  He

15    came in and presented the claim to the

16    insurance company that I work for.  So it is

17    our duty to see if there is any kind of

18    damage that currently exists on the vehicle

19    that we need to inspect if there is any kind

20    of damage to the vehicle that would be a

21    covered loss.  So that's what I was doing

22    was ruling that out.

23        MR. LOPEZ:  So basically there was no

24    damage to the vehicle?

25        MS. HOBBS:  There was no damage that

1    would be covered under our policy, no.

2        MR. TUCK:  Was there damage that was

3    excluded under your policy?

4        MS. HOBBS:  Well, we don't cover any

5    kind of wear and tear under the policy.

6    Whatever the vibration, I couldn't say what

7    it is or isn't.  We don't cover that under

8    our policy.  We just cover comprehensive or

9    collision losses.

10        MR. TUCK:  Did you notice any cosmetic

11    defects or damage?

12*        MS. HOBBS:  No, I did not see any.

13        MR. LOPEZ:  Are you aware that the

14    Hummer, the H2, looks similar on the outside

15    but has different powertrains?  Are you

16    aware of that?

17        MS. HOBBS:  Of the different

18    powertrains on the vehicles?

19        MR. LOPEZ:  Yes.

20        MS. HOBBS:  I'm aware that there are

21    different ones, yes.

22        MR. LOPEZ:  Okay.  Thank you.

23        MR. TUCK:  Do you have any questions

24    regarding the answers that she just gave to

25    these questions?

1          MR. KODSY:  No.

2          MR. TUCK:  Okay.  Does anybody object

3    to this witness being excused with our

4    thanks?

5          MR. LOPEZ:  She may be excused.  I know

6    she has to work.

7          MR. TUCK:  Are you ready to release the

8    witness?

9          MR. KODSY:  Sure.

10         MR. TUCK:  Thank you for your

11   cooperation and participation..

12         MS. HOBBS:  Not a problem, thank you.

13         (Thereupon, Hillary Hobbs was excused

14   from the hearing.)

15         MR. TUCK:  The record will reflect that

16   this witness is leaving the hearing.

17         Now we're going to ask you starting at

18   the beginning to explain your concerns as

19   they arose.  We're going to start with the

20   rough vibration and idle.

21         MR. KODSY:  Okay.

22         MS. SIMMONS:  Excuse me, Mr. Tuck.  If

23   we could do similar to what we just did

24   earlier, address by issues?

25         MR. TUCK:  That's what I said.

1          Starting with the rough idle, when did

2     you first observe it, describe the condition

3     to us and then refer us -- hopefully you've

4     got your repair orders in order.

5          MR. KODSY:  Can I speak?

6          MR. TUCK:  Yes.

7          MR. KODSY:  Basically what happened is

8     the vehicle -- it was giving me a difficulty

9     of steady ride.  So I took it in for

10    service.  That was the first time I took it

11    in for service.

12         MR. TUCK:  When was that?

13         MR. KODSY:  The first date of service

14    here was 10-20, it looks the earliest time

15    this vehicle was serviced.

16         MR. TUCK:  Of 2008?

17         MR. KODSY:  Of 2008.

18         MR. TUCK:  All right.  That would be

19    our number eight.

20         MR. KODSY:  The service department

21    confirmed or rather discovered that the mass

22    air flow sensor was the problem and went

23    ahead to replace it.  Ever since that air

24    mass flow sensor was replaced, this vehicle

25    never ran like it did originally.  I've had

1    constant problems with the vibration and the

2    irregular idle on that vehicle.

3        MR. TUCK:  So how long had you had it,

4    it looks like you had put about 5200 miles

5    on it?

6        MR. KODSY:  Exactly, which was about in

7    one month's time.

8        MR. TUCK:  In the first month it was

9    running fine until --

10        MR. KODSY:  It was running I would say,

11    if I had to put it in a scale from one to

12    100, it was running roughly about 85 percent

13    with no problem.  The other 15 percent was

14    undetermined..  I had no idea what it is

15    until it got worse and I had to take it in

16    for service.

17        MR. TUCK:  Had the engine stalled

18    before you brought it in on October 20th?

19        MR. KODSY:  Yes.

20        MR. TUCK:  It had actually stalled?

21        MR. KODSY:  It had actually stalled.

22        MR. TUCK:  Did it stall after they

23    changed the --

24        MR. KODSY:  It didn't stall afterwards.

25        MR.. TUCK:  Okay.

1      MR. KODSY:  But it did have an

2   irregular heartbeat or idle.

3      MR. TUCK:  That was not there prior?

4      MR. KODSY:  It was not there prior,

5   plus the vibration.

6      MR. TUCK:  We'll get to the vibration.

7   So when is the next time that you brought it

8   in for this complaint?

9      MR. KODSY:  I believe that the first

10   time I took it out of there and I brought it

11   back the next day, which was --

12      MR. TUCK:  The next one we have here is

13   November 5th.

14      MR. KODSY:  November 5th, yes, but the

15   first one extended and I guess they put it

16   on the same, but my rental receipts will

17   show that there was two in one work order.

18      MR. TUCK:  From October 20th to October

19   23rd?

20      MR. KODSY:  Yes.  There were two

21   rentals involved because the vehicle was

22   returned and then -- it was returned after

23   the repair as non-satisfactory because still

24   the vibration was existing.

25      MR. TUCK:  You had two different kinds

1    of vibration.  Is there a difference?  It

2    says, "Rough vibration at idle, rough

3    vibration during driving."

4        MR. KODSY:  Yes.

5        MR. TUCK:  Is that the same condition?

6        MR. KODSY:  It's the same, but it gets

7    worse.  When you drive it on high RPM's,

8    you're obviously feeling the vehicle put out

9    while it's being choked causing the

10    vibration.

11        MR. TUCK:  Is that related to items

12    three and four, "Hopping of vehicle at all

13    speeds and vehicle bounces at road

14    conditions"?

15        MR. KODSY:  No, that was later observed

16    and submitted for remedy to the dealership.

17        MR. TUCK:  All right.  So let's just

18    stay with one and two which is the engine

19    vibrations.

20        MR. KODSY:  Okay.

21        MR. TUCK:  On the 23rd you brought it

22    back out again?

23        MR. KODSY:  I brought it back on the

24    23rd.

25        MR. TUCK:  You picked it up on the 23rd

1    according to these.  You brought it in on

2    the 20th and you picked it up ready on the

3    23rd.

4         MR. KODSY:  Okay.

5         MR. TUCK:  The next time after that was

6    November 5th that you brought it back in.

7         MR. KODSY:  November 5th, I believe, is

8    when I took it to Schumacher's, right?  Is

9    this --

10        MR. TUCK:  Coral Cadillac.

11        MR. KODSY:  Coral Cadillac did a lot of

12   work to it.  They replaced the brakes.

13        MR. TUCK:  We're still staying with the

14   rough engine.

15        MR. KODSY:  Okay.

16        MR. TUCK:  They attributed it to an

17   exhaust vibration.

18        MR. KODSY:  Right.

19        MR. TUCK:  And they realigned the

20   exhaust system.

21        MS. SIMMONS:  Was it taken in for the

22   number one and two complaint, for the rough

23   idle at driving?

24        MR. TUCK:  That's what it looks like.

25   Customer states, "Engine runs rough."

1        What kind of tires do you have on the

2    vehicle?

3        MR. KODSY:  I have BF Goodrich tires

4    which are supposed to be the best tires out

5    there.  $400 a piece.

6        MR. TUCK:  Are they off-road?

7        MR. KODSY:  No, they're not off-road.

8        MR. TUCK:  Are they knobby?

9        MR. KODSY:  I wouldn't say knobby,

10   they've got some meat to them.

11       MR. TUCK:  Rough tread?

12       MR. KODSY:  It's not rough tread.  This

13   is my second Hummer.  My first Hummer had

14   the same wheels and tires and it didn't have

15   this problem.

16       MR. TUCK:  So after the 12th, was the

17   problem resolved?

18       MR. KODSY:  No.

19       MR. TUCK:  When was the next time that

20   you brought it back for the rough engine?

21       MR. KODSY:  I believe I took it over to

22   Schumacher at that point because I wasn't

23   able to get Coral Cadillac to properly

24   address my concerns with the vibration.

25       MR. TUCK:  Well, I see Coral Cadillac

1    again here on November 12th.  Customer

2    states, "Engine has constant vibration."

3        MR. KODSY:  Okay.  There were several

4    attempts to get this resolved.

5        MR. TUCK:  It says down below after

6    above repair, "Still had some vibrations,

7    steering wheel and seat compared with light

8    vehicle, had same vibration."

9        MR. KODSY:  Right.  That was not --

10   there was no other vehicle produced to me to

11   show me that this is actually the way it is.

12   I know better.  I had another vehicle prior

13   to that that was exactly the same, that's

14   not normal for that vehicle to do that.

15       MR. TUCK:  Same engine and

16   transmission?

17       MR. KODSY:  Same engine and

18   transmission.  It was six months earlier,

19   same year that I had the other one.

20       MR. TUCK:  The way we look at these

21   things is at your particular vehicle that's

22   the subject of the hearing.  We can't

23   consider what other similar cars do.

24       MR. KODSY:  Right, exactly.  It was a

25   6.2 engine, Hummer H2.

1          MR. TUCK:  So this indicates that there

2     is still some vibration?

3          MR. KODSY:  Right.

4          MS. SIMMONS:  This meaning the November

5     12th repair order?

6          MR. TUCK:  Yes.

7          MR.. KODSY:  So then I took it to

8     Schumacher.  Do you see that?

9          MR. TUCK:  Let's see.  Here it is.

10    This is December 1st through December 3rd.

11    It's our number 23.  This only refers to the

12    road, not the engine vibration.

13         MR. KODSY:  I have one here, it's dated

14    December 5th, invoice date.

15         MR. TUCK:  There is another one at

16    circle 25..

17         MS. SIMMONS:  So we're not considering

18    12-1?

19         MR. TUCK:  That one is not for this

20    complaint.

21         MR. KODSY:  There's one of 12-5 and one

22    of 12-8.

23         MR. TUCK:  So we're at the one of 12-5.

24         MR. KODSY:  It says --

25         MR. TUCK:  It says, "There is an engine

1    vibration felt through the truck -- at idle

2    there is a vibration."  Is this the one that

3    you're attributing to the engine or the one

4    you're attributing to driving conditions on

5    the road?

6         MR. KODSY:  That's the engine.

7         MR. TUCK:  This is the engine here?

8         MR. KODSY:  At idle.

9         MR. TUCK:  Okay.  What was done there?

10        MR. KODSY:  It goes down at the bottom

11   -- well, what he did was he replaced three

12   new tires on that truck.

13        MR. TUCK:  Not on this occasion.

14        MR. KODSY:  Not this one, the next one?

15        MR. TUCK:  Yes.

16        MR. KODSY:  It doesn't look like he did

17   anything.  He said there is still a hop as

18   driving --

19        MR. TUCK:  We're not talking about the

20   hop, we're still on the engine vibration,

21   the idle vibration.

22        MR. KODSY:  I don't think he did

23   anything about that.  I have to go back to

24   that.

25        MS. SIMMONS:  You can testify later on.

1              MR. KODSY:  That was an inspection,

2       bulleted.  I don't think he repaired

3       anything for that instance.

4              MR. TUCK:  So did you take it in again?

5              MR. KODSY:  I took it back on the 8th.

6              MS. SIMMONS:  December?

7              MR. KODSY:  That's when I believe he

8       did the tires.

9              MR. WOLFER:  Of what month?

10             MR. KODSY:  December.

11             MR. TUCK:  We don't have a repair order

12      for that.  We have one for December 5th.

13             MR. KODSY:  Let me make sure.

14             MR. WOLFER:  December 1st is the tire

15      -- we're trying to handle the vibration from

16      . the engine.

17             MR. KODSY:  December 1st, yes, that's

18      the one he replaced the tires on.

19             MR. TUCK:  So that doesn't have

20      anything to do with the rough engine idle?

21             MR. KODSY:  This one is for the

22      hopping.

23             MR. TUCK:  We didn't get there yet.

24      We'll come back to that.

25             MR. KODSY:  It says road-tested tire

1    vibration.

2         MR. TUCK:  No, we're looking for engine

3    vibration.

4         MR. WOLFER:  Go to December 22nd,

5    Complaint's C.  Customer states, "Engine

6    idle rough."

7         MR. KODSY:  And he did something else

8    for it.  He inspected and regapped the spark

9    plugs on that vehicle to make sure that

10   that's not the problem.  He found no problem

11   there.

12        MR. WOLFER:  It doesn't state that.

13        MR. TUCK:  It just says, "Engine

14   exhibits normal idle quality for 6.2 liter."

15   Not on this repair, at least it's not

16   listed.

17        MR. KODSY:  Well, he did check the gap

18   on that.  He did regap the spark plugs.

19        MR. TUCK:  That was the last time that

20   you brought it to anybody?

21        MR. KODSY:  To Schumacher, yes.

22        MR. TUCK:  For that complaint, okay.

23   Let's go back and go over the next one.

24   "Rough vibration during driving."  Is that

25   related to the hopping?

1          MR. KODSY:  Yes, that would cause the

2     hopping.

3          MR. TUCK:  And the bouncing?

4          MR. KODSY:  And the bouncing.

5          MR. TUCK:  When did you first notice

6     that?

7          MR. KODSY:  I noticed that prior,

8     sooner to the mass air flow sensor going

9     out, but I didn't think nothing of it.  I

10    figured well, the truck is new, it's stiff,

11    it's going to loosen up as I drive it.  I

12    did drive it and there was no change.

13         MR. TUCK:  Did it get any worse?

14         MR. KODSY:  It's a little worse because

15    you have a higher RPM in the vehicle.  After

16    the air flow sensor was replaced, it wasn't

17    completely tuned to where it's supposed to

18    be, so I was getting more activity out of

19    the truck that wasn't present before.

20         MR. TUCK:  So the next time you brought

21    in for the driving complaints or concerns

22    was --

23         MS. SIMMONS:  Did this hopping issue

24    get addressed?

25         MR. TUCK:  I'm looking for the next

1    repair order, hoping the consumer can point

2    it out to me.

3         MR. KODSY:  For which --

4         MR. TUCK:  For the complaint, the noise

5    vibrations while driving.

6         MR. KODSY:  There's a couple of these

7    work orders that actually address two or

8    three items.

9         MR. TUCK:  Right, I want to go back and

10    find those starting from the beginning.

11         MR. KODSY:  The beginning would be --

12    well, the mass air flow sensor was one.

13         MR. TUCK:  Right.  When did you first

14    bring it in after that?

15         MR. KODSY:  Once I --

16         MR. TUCK:  The driving concerns, the

17    hopping or the road vibration.

18         MR. KODSY:  Right.  That was within --

19    actually that was within a week because I

20    was without my truck for so long I just had

21    to do what I had to do.  I believe it's this

22    one here.  Is it November 12th?

23         MR. TUCK:  We have one that begins

24    November 5th and ends November 12th.

25         MR. KODSY:  Okay, that might be one.

1        MR. TUCK:  Where on there does it

2    complain about -- here it is.  Customer

3    states, "Transmission won't shift."  That's

4    not it.  We'll get to that one.  "Engine

5    runs rough", we did that before where they

6    installed the new exhaust.  So I don't see

7    anything here about driving concerns.

8        MR. KODSY:  The driving concerns were

9    pretty much being addressed with the actual

10   vibrations and the high idle because that

11   was as a result of the high idle and

12   vibration of the vehicle.  The vehicle is

13   more tentative to any road conditions.

14       MR. TUCK:  Here is the next one that I

15   see, that would be December 1st of 2008.

16   "Tire vibration, 45 miles per hour and up."

17   That's where they replace the tires.  That's

18   our number 23.

19       When they replaced the tires, did they

20   put the same type of tires on or a different

21   type?

22       MR. KODSY:  Same exact tires.

23       MR. TUCK:  Did it make any difference?

24       MR. KODSY:  It did not.  They actually

25   left me with one semi-used tire and three

1    brand new tires on the vehicle, which was

2    not acceptable, but I had nothing to say

3    about that at the time.  That's the way they

4    let me go.

5        MR. TUCK:  Then it says they did a

6    force test on the tires.  You said that when

7    you drove it out there was no difference?

8        MR. KODSY:  No difference.  The service

9    rep indicated that there was no improvement

10   as well to that after he replaced the tires.

11       MR. TUCK:  Then we have December 5th,

12   which is 25.  It's still a hop driving over

13   25.  They say they put on new tires, there's

14   no current for this item.  It sounds like

15   they're pretty saying --

16       MR. KODSY:  This is all you get.

17       MR. TUCK:  Operating to specifications

18   at this time.  That's on December 22nd.

19       MR. KODSY:  But it was severe enough to

20   replace tires.

21       MR. TUCK:  Where it says customer

22   states, "Engine runs rough, road-tested for

23   six miles, exhibits normal idle quality for

24   a 6.2 liter engine."  I guess at that point

25   you threw up your hands and said you're

1    coming here.

2         MR. KODSY:  Yeah, there was one more --

3    I don't think I have it in this file.  There

4    was the one with the spark plugs.  It looks

5    like it's not in here.  Just for the record,

6    I will state that they did, in fact, check

7    my spark plugs physically.

8         MR. TUCK:  Did they find anything wrong

9    with them?

10        MR. KODSY:  They didn't find anything

11   wrong with them.

12        MR. TUCK:  Let's go now to the

13   transmission.  It says, "Transmission kicks

14   when shifting."  When did you first feel

15   that?

16        MR. KODSY:  When I bought it that,

17   believe it or not, is somewhat of a

18   characteristic of that vehicle which was not

19   perfected by the manufacturer.  I wasn't

20   making that my major complaint here.

21   However, that tranny does slip at various

22   speeds.  The service maintenance manager

23   indicated that there is an update for the

24   transmission and they should help.  It did

25   help, but it was still present.

1          MR. TUCK:  Is it a warming shift or

2     it's just that you're aware of it -- how

3     would you characterize it?

4          MR. KODSY:  It's very weird because

5     there is no other vehicle like it.  You're

6     driving down the road, you take your foot

7     off the gas, and you go to accelerate again

8     and the vehicle doesn't know which gear

9     you're in until it actually slams into gear.

10          MR. TUCK:  It has to rev up a little

11     bit?

12          MR. KODSY:  Yes.

13          MR. TUCK:  I don't want to put words in

14     your mouth.

15          MR. KODSY:  Well, it spins before it

16     connects to the gear.  That's why you get a

17     little kick.

18          MR. TUCK:  How many times did you bring

19     it in for that concern?

20          MR. KODSY:  I was more concerned about

21     the vibrations.

22          MR. TUCK:  Here it is, we have November

23     5th.  That's our number 14.  Transmission

24     control module.

25          MR. KODSY:  That's abnormal for a

1   control module to be needed on a new vehicle

2   with 5,000 miles.

3       MR. TUCK:  At this point you had 6500.

4       MR. KODSY:  6500 miles.

5       MR. TUCK:  Did this make any difference

6   that you noticed?

7       MR. KODSY:  It depends on how -- I got

8   used to driving a vehicle like that, but it

9   did make a little bit of a difference, but

10  it was still slipping.

11      MR. TUCK:  Did you bring it in again

12  for that?

13      MR. KODSY:  No, because we talked about

14  it and I can of agreed with them that my

15  other Hummer did the same thing so.

16      MR. TUCK:  Then the last is squealing

17  brakes.  How many times did you get it for

18  squealing brakes?

19      MR. KODSY:  A couple of times, two

20  times.  He actually replaced the brakes.

21      MR. TUCK:  Did that solve the

22  squealing?

23      MR. KODSY:  No.

24      MR. TUCK:  It still squeals?

25      MR. KODSY:  It still squeals.

1          MR. TUCK:  All the time?

2          MR. KODSY:  Well, when it gets hot -- I

3     drive the vehicle 100 miles plus a day and

4     sometimes 200 or 300 miles a day.  When that

5     vehicle gets hot, it squeals.  It's very

6     embarrassing, driving down the road and just

7     stopping at the light, you know.

8          MR. TUCK:  Does it affect your stopping

9     or anything, the steering?

10         MR. KODSY:  No, but it's just very

11    uncomfortable.

12         MR. TUCK:  Can you hear it with your

13    windows rolled up?

14         MR. KODSY:  Yes.

15         MR. TUCK:  You can?

16         MR. KODSY:  Yes.

17         MR. TUCK:  With the radio on?

18         MR. KODSY:  That's the thing I did, I

19    kept the radio up.

20         MR. TUCK:  And that worked?

21         MR. KODSY:  Not so much.  It covered

22    the noise, but the vibration was present, so

23    you still get that tired feeling coming out

24    of that truck.

25         MS. SIMMONS:  I need dates, Mr. Tuck,

1      for these brakes and things.  The consumer

2      put down that he brought it in for the

3      brakes issue on October 20th, 2008.

4          MR.. WOLFER:  No, 11-5 is there.

5          MR. TUCK:  11-5, that's our number 13.

6          MR. KODSY:  They did two things for the

7      brakes.  They cut the rotors first.

8          MR. TUCK:  When was that?

9          MR. KODSY:  That was on the first

10     visit.

11         MS. SIMMONS:  What date are you

12     considering the first visit?

13         MR. TUCK:  The first visit would be

14     November 5th?

15         MR. KODSY:  Or 10-20, wasn't it?

16         MS. SIMMONS:  That's what I'm trying to

17     figure out.  Why did you put down 10-20 when

18     I don't see it that day?

19         MR. KODSY:  I don't think he wrote it

20     down on this, but he did cut the brakes.

21     Maybe we can ask him on cross-examination as

22     well as to what he did that day for the

23     brakes.

24         MR. WOLFER:  There is nothing on 10-20

25     to indicate anything about the brakes.

1          MR. TUCK:  Anything else you want to

2     add?

3          MR. KODSY:  I did have some independent

4     repair shops look at my truck as well.

5     After all these repairs were done and the

6     manufacturer or rather the dealer service

7     techs over there letting me know that this

8     is normal, there's nothing wrong with the

9     vehicle.  I have to take it somewhere else

10    because obviously it's my credibility here

11    that's the issue.  I took it to Progressive

12    where she was able to document the vibration

13    and I took it to a couple other service

14    shops.  One was the Texaco service shop and

15    --

16         MS. SIMMONS:  Page 44 on the consumer

17    side, there is an invoice is what I see from

18    Texaco?

19         MR. KODSY:  Yes.  Basically he didn't

20    want to get involved, but he did state it's

21    a new vehicle, it's still under warranty,

22    take it back to the dealer.  That's

23    basically all he documented, take it back to

24    the dealer for more warranty work.

25         MR. TUCK:  Has the car been in an

1       accident?

2           MR. KODSY:  No, not by me, but it may

3       have been prior to purchasing it.  I suspect

4       a couple of problems with that vehicle,

5       major undercarriage rust.  The vehicle just

6       feels like it was in an accident.

7           MR. TUCK:  Was there a reference in the

8       documents here somewhere?

9           MS. SIMMONS:  There's a medical report

10      of --

11          MR. TUCK:  That indicates a side

12      impact.

13          MR. KODSY:  That was prior to this

14      purchase.  That was one of my other issues

15      is I was during recovery when I bought this

16      truck from a prior accident.

17          MS. SIMMONS:  So it was a different

18      2008 Hummer?

19          MR. KODSY:  Yes, it was a different

20      2008 Hummer.

21          MR. TUCK:  This vehicle, to your

22      knowledge, has never been in an accident?

23          MR. KODSY:  No.

24          MR. TUCK:  Mr. Fernandez?

25          MR. FERNANDEZ:  Yes.  Good afternoon,

1     Mr. Kodsy.  I'm a little unclear now because

2     now the Better Business Bureau letter says

3     that because an accident was alleged, that's

4     why they couldn't hear the case.

5         Are you saying that you were never in

6     an accident in this vehicle?

7         MR. KODSY:  Correct.  The Better

8     Business Bureau misunderstood what I said;

9     however, they went ahead and further

10    documented the fact that just because you're

11    complaining of any discomforts, physical

12    discomforts, that they cannot arbitrate.

13        MR. FERNANDEZ:  Thank you.  So you just

14    clarified that point here.  There was never

15    an accident in your vehicle?

16        MR. KODSY:  There was never an accident

17    in my vehicle.  I was recovering from

18    another --

19        MR. FERNANDEZ:  Unrelated.

20        MR. KODSY:  -- unrelated to this one

21    and going through all of these back and

22    forth repairs on the new truck.

23        MR. TUCK:  If we were to test drive

24    that vehicle today, of all of these

25    complaints, what might we find?

1        MR. KODSY:  You're going to find,

2   obviously if you drive it long enough,

3   you're going to find the squealing brakes.

4   You're going to find the missing tranny

5   shifting.  You're going to find the miss

6   that there is on idle.  You're going to find

7   this vehicle to be not a smooth vehicle on

8   the road.

9        MR. TUCK:  At what speeds do we have to

10   drive at to see these things?

11        MR. KODSY:  45 miles.

12        MR. TUCK:  That should be sufficient?

13        MR. KODSY:  Yes.

14        MR. TUCK:  We don't have to get it up

15   over 70 or anything like that?

16        MR. KODSY:  The thing is long driving

17   of this vehicle, let's say for a half hour

18   or hour of driving this vehicle on the

19   highway with high RPM's and you've got this

20   vibration, you will feel very tired.

21        MR. WOLFER:  If we took the car out, we

22   would have to drive it for half an hour to

23   an hour to feel this problem?

24        MR. KODSY:  No, you will feel it right

25   away.  It gets worse as you drive for a

1    longer period of time because once that

2    engine starts getting hot -- it was

3    referenced from some other people that I

4    spoke to that it may be carbon deposits in

5    the engine to where it's running like that.

6         You will notice the miss and the

7    vibration right where it sits.

8         MS. SIMMONS:  When you say miss, is

9    that the transmission?

10        MR. TUCK:  No, that's the engine.  When

11   the engine misses, it would be --

12        MR. KODSY:  Right.

13        MS. SIMMONS:  That's characterized here

14   as what?

15        MR. KODSY:  Rough engine idle.

16        MR. TUCK:  Anything you want to add?

17        MR. KODSY:  No.

18        MR. TUCK:  Okay.  Questions.  I will

19   note, without rushing anybody, that it's ten

20   minutes to three.  To the extent that we can

21   move things along without putting anybody at

22   risk of not making their case, I would like

23   to try to move along as best as we can.

24        MR. LOPEZ:  Good afternoon, Mr. Kodsy.

25        MR. KODSY:  Good afternoon.

1    MR. LOPEZ:  Let's go to the first item,

2 the rough idle.  You state that, as of

3 today, the Board will find a rough idle in

4 the vehicle that is not acceptable to you?

5    MR. KODSY:  Correct.

6    MR. LOPEZ:  You were present at the

7 inspection we performed at Schumacher with

8 the persons present here, Mr. Thornton and

9 Mr. --

10    MR. KODSY:  I believe that was your

11 request, yes.

12    MR. LOPEZ:  You advised us at that time

13 that the vehicle is not being driven, it's

14 being stored in a rental place, correct?

15    MR. KODSY:  Two vehicles not being

16 driven for the last 5,000 miles that I put

17 on the rental.

18    MR. TUCK:  Why is that?

19    MR. KODSY:  I'm tired of driving that

20 truck.  It's just giving me migraines.  I

21 have many medical issues, I don't need to be

22 driving a truck that's just (makes noise)

23 down the road, making me ill.  We went

24 through several steps with the repairs and

25 nothing solved it.  I started this process

1       and I parked the truck.

2           MR. TUCK:  What did you observe at the

3       prehearing inspection?  What did you see

4       happen when these gentlemen went over and

5       looked at the truck?

6           MR. KODSY:  Exactly what I'm

7       complaining about.  They didn't want to

8       comment on it at the time.

9           MR. TUCK:  So nothing was said about it

10      to you?

11          MR. KODSY:  No, no.  They don't want to

12      admit to the problem.

13          MR. LOPEZ:  You refused to do the

14      inspection the first time we asked.  Was

15      there any particular reason?

16          MR. KODSY:  Sure.

17          MR. LOPEZ:  Can you explain more?

18          MR. KODSY:  I will explain, yes.  There

19      was already a request to produce my vehicle

20      prior to Mr. Gonzalez's involvement with

21      this case.  I was in the position to deliver

22      the vehicle to Schumacher where they had a

23      representative from there who claimed to be

24      an engineer.

25          MR. TUCK:  Is that what's characterized

1    as the final repair attempt?

2        MR. KODSY:  Right, that's what I

3    thought it was.

4        MR. TUCK:  All right.

5        MR. KODSY:  No, no.  It was after that.

6    It was the final repair attempt but after

7    that.

8        MR. TUCK:  What was the date of the

9    final repair attempt?

10       MR. KODSY:  The 22nd, I think.

11       MR. TUCK:  That was the final repair

12   attempt, the 22nd?

13       MR. KODSY:  Right.  So two weeks later

14   -- I will tell you exactly when it was.  It

15   was before I filed this motion.

16       MR. TUCK:  I don't know that we need to

17   get too far into that subject to the Board's

18   approval.  You ultimately consented to that

19   inspection?

20       MR. KODSY:  Another inspection after

21   the final inspection.

22       MR. TUCK:  Okay.

23       MR. KODSY:  So when Mr. Gonzalez says

24   one, we need to do a prehearing inspection,

25   so you already got your's.

1          MR. TUCK:  Okay.  We can move on.

2          MR. LOPEZ:  You state that the Board

3     asked you if your vehicle has off-road

4     tires.  Does your vehicle have off-road

5     tires?

6          MR. KODSY:  Excuse me?

7          MR. LOPEZ:  Does your vehicle have

8     off-road tires?

9          MR. KODSY:  They don't look like

10    off-road tires to me.  They look like

11    regular Hummer tires.

12         MR. LOPEZ:  Hummer tires.  Is this the

13    adventure-type vehicle?

14         MR. KODSY:  Is the adventure-type

15    vehicle?

16         MR. LOPEZ:  What type of engine does

17    this vehicle have?

18         MR. KODSY:  Engine?

19         MR. LOPEZ:  Yes, engine.

20         MR. KODSY:  6.2 liter.

21         MR. LOPEZ:  Do you know how much

22    horsepower that vehicle has?

23         MR. KODSY:  393 horsepower or something

24    like that.

25         MR. LOPEZ:  Regarding the transmission,

1    how many shifting speeds does the

2    transmission have, one, two, three, four,

3    one, two, three, four, and five?

4        MR. KODSY:  It's a six-speed.

5        MR. LOPEZ:  Okay.

6        MR. TUCK:  How many cylinders is it?

7        MR. KODSY:  Eight.

8        MR. LOPEZ:  This vehicle has the

9    special equipment to climb, correct?

10        MR. KODSY:  All Hummers do.

11        MR. LOPEZ:  This particular one with

12    the adventure package?

13        MR. KODSY:  They all have the same --

14        MR. TUCK:  Should we take that as a

15    yes?

16        MR. KODSY:  Yes.

17        MR. LOPEZ:  You had advised that you

18    drive the vehicle, but also it was being

19    stored.  Are you aware that rust can get

20    into the rotors?

21        MR. KODSY:  From what, from parking it

22    for a month?

23        MR. LOPEZ:  Yes.  Are you aware of

24    that?

25        MR. KODSY:  Not really.

1      MR. LOPEZ:  Okay.  You said that the

2   BBB misunderstood what you said on your

3   complaint.  But we got two letters, one, the

4   letter of December 15th of 2008 states that

5   you have agreed to have the vehicle be

6   checked by the dealer under the terms of the

7   warranty and that they ask you to file the

8   motor vehicle defect notice at that time; is

9   that correct?

10      MR. KODSY:  I believe I've been

11   following the steps as I was advised.

12      MR. LOPEZ:  So the motor vehicle defect

13   notice was filed just after the BBB told you

14   about that, correct?

15      MR. KODSY:  Yes.

16      MR. LOPEZ:  Then there is a letter from

17   the BBB advising that you have some issues

18   because you had a previous accident that

19   advised us on another 2008 Hummer that was

20   turned to its side by another vehicle,

21   correct?

22      MR. KODSY:  Incorrect.  I never gave

23   them details.  I told them that I'm

24   recovering from a car accident, I don't need

25   to be driving this truck like that, it's

1   very uncomfortable.  They said --

2       MR. FERNANDEZ:  Excuse me.  Mr. Lopez,

3   what is the relevance of -- the witness has

4   already stated that --

5       MR. LOPEZ:  I was just trying to

6   clarify.

7       MR. FERNANDEZ:  He said that it has

8   absolutely nothing to do with this vehicle,

9   he was never involved in an accident with

10  this vehicle.

11      MR. LOPEZ:  Okay.  You stated to the

12  Board now that in order to feel the rough

13  idle or the condition that you mentioned,

14  that we have to drive the vehicle above 45.

15  However, at the inspection we had, you

16  advised that we didn't have to drive the

17  vehicle.  Could you explain more on that?

18      MR. TUCK:  If I understood his

19  testimony that he stated earlier, the

20  shaking of the engine and the miss in the

21  engine we could see at rest in the parking

22  lot.

23      MR. LOPEZ:  Thank you very much.

24  That's it.

25      MR. TUCK:  Do you want to call a

1       witness?

2           MR. LOPEZ:  Yes, I would like to have

3       Mr. Thomas Thornton.

4           MR. THORNTON:  Yes.

5           MR. LOPEZ:  Mr. Thornton, who do you

6       work for?

7           MR. THORNTON:  I work for General

8       Motors.  I'm the district service manager

9       for geography, we cover Broward County and

10      Delray Beach.

11          MR. LOPEZ:  Briefly could you tell me

12      more information of this case, your personal

13      knowledge of this case?

14          MR. THORNTON:  My personal knowledge of

15      this case has mostly been through working

16      with the dealership, Joe Bardill at Coral

17      Cadillac.  Relative to the case, my first

18      meeting with Mr. Kodsy was the other day at

19      Schumacher.

20          MR. LOPEZ:  It was at the prehearing

21      inspection?

22          MR. THORNTON:  Yes.

23          MR. LOPEZ:  Did you drive the vehicle?

24          MR. THORNTON:  I was a passenger in the

25      vehicle.

1          MR. LOPEZ:  Did you feel anything

2     abnormal, any rough idle that Mr. Kodsy

3     considers abnormal?

4          MR. THORNTON:  No, everything felt

5     completely normal to me.

6          MR. LOPEZ:  Did he state something to

7     the effect that it doesn't drive like a

8     luxury vehicle or something like that?

9          MR. THORNTON:  He did make statements

10    to that effect.  Words to the effect of his

11    expectations that it was a luxury vehicle

12    and should drive differently.

13         MR. LOPEZ:  Okay.  How do you consider,

14    based on your experience of working with GM

15    vehicles as a district service manager, do

16    you consider this vehicle acceptable or not?

17         MR. THORNTON:  Yes, and just a quick

18    note on my experience working specifically

19    with Hummers, I have been involved with the

20    Hummer brand since 2005.  I have driven

21    several Hummers of virtually every

22    configuration..  This vehicle drove

23    absolutely normal and was acceptable to me.

24    I thought the vehicle was in great condition

25    and the number of miles on the odometer

1    seemed to me as an as new vehicle.

2         MR. TUCK:  At anytime during your

3    examination of the vehicle, did the consumer

4    point out to you his concerns like there it

5    is or do you feel that or do you hear that

6    or see that?

7         MR. THORNTON:  Yes, sir, he did.

8         MR. TUCK:  Did you see what he was

9    talking about?

10        MR. THORNTON:  When he pointed out what

11   he was observing, I understood what he was

12   observing, but it is my opinion that those

13   things he was observing are normal

14   characteristics of this type of vehicle.

15        MR. TUCK:  Was there anything radical

16   or extreme or noticeable about the things

17   that he was pointing at?

18        MR. THORNTON:  No, sir.

19        MR. TUCK:  Anything that would be

20   inconsistent with the car as the miles were

21   out on?  In other words, does it deteriorate

22   under 30,000 miles?

23        MR. THORNTON:  I think I understand

24   what you're asking.  If I may clarify,

25   you're asking did the things that we

1    observed on the vehicle, were they abnormal

2    for the number of miles on the car?

3        MR. TUCK:  Right.

4        MR. THORNTON:  No, it seemed absolutely

5    normal to me.  In fact, as I kind of eluded

6    to earlier, you could have told me that it

7    was a brand new truck on the lot and other

8    than the number of miles on the odometer

9    indicating otherwise, the truck acted as

10    new.

11        MR. TUCK:  Did you have any questions?

12        MR. FERNANDEZ:  Just very briefly.

13    Good afternoon, Mr. Thornton.  Bernard

14    Fernandez.  Those points that Mr. Kodsy

15    brought your attention, he's experienced in

16    driving a Hummer, he's had one before.  I've

17    never been in a Hummer in my life.  For

18    example, we may have the opportunity later

19    to inspect the vehicle, but would I as

20    someone who has never been in a Hummer,

21    notice what the consumer was pointing out

22    saying hey, what's going on here, this thing

23    is coming apart?

24        MR. THORNTON:  You would probably

25    notice a different ride quality than what

1    you're accustomed to if you've never driven

2    a heavy-duty off-road vehicle.  The Hummer

3    brand is targeted towards the outdoor

4    enthusiasts, it's an off-road vehicle.  It's

5    obviously a street legal vehicle.  It's a

6    very heavy, very large, very powerful, very

7    capable truck.  The tires on the vehicle are

8    BF Goodrich All Terrain T/A's.  They are

9    very heavy, large, aggressive tread pattern

10   tires intended as the name suggests for all

11   terrain.  BF Goodrich also makes specific

12   off-road tires for off-road use only.

13        They have several other names of tires

14   that are offered for the light duty truck

15   market.  The BF Goodrich all terrain tires

16   that are on this truck are designed for

17   aggressive off-road use.  Again, they are

18   street legal.  That specific to the tires

19   and for the ride quality, the tires in it of

20   themselves being heavy tires, are going to

21   give a stiffer ride.  They are going to be

22   louder.  You will probably feel them as you

23   drive.

24        As far as the suspension is concerned

25   as well, bear in mind that the adventure

1    package on this truck is intended to appeal

2    to outdoor enthusiasts, people who are

3    off-road enthusiasts, and the truck is

4    designed to handle hard off-road driving.

5    It is designed for that.

6        If your driving experience has been

7    limited to sedans, for example, this thing

8    is going to drive like a beast. It is a

9    beast. It is a heavy duty vehicle.

10        MR. TUCK: Would that mean that it

11    would have a much stiffer suspension and

12    ride?

13        MR. THORNTON: Yes, sir.

14        MR. WOLFER: The consumer made mention,

15    as far as the engine goes, it seems to rev

16    higher. Is this characteristic of --

17    normally the RPM's of a vehicle are 700,

18    750. Is the V8 going to be higher revving

19    because it's more compression and you need

20    to keep it from stalling?

21        MR. THORNTON: In my observation of the

22    vehicle, this particular vehicle, it was

23    consistent with other vehicles of its kind.

24    I did not look at the tachometer to see what

25    the idle speed was. However, I would say

1    that it seemed to me to be in a normal range

2    in just listening to it.  It's typically 600

3    to 850 RPM's at idle.

4        Now, it's also a normal thing for many

5    engines to rev higher during, for example,

6    the air-conditioner compressor cycling is

7    one example of a vehicle that might cause

8    the engine RPM to change at idle.  I do not

9    recall if his air-conditioner was turned on

10    at the time that we observed his truck.

11        There's also other things that can

12    occur at idle with the engine that can give

13    the perception of an RPM change.  For

14    example, an electric cooling fan may come on

15    or it may turn off to keep the engine

16    temperature regulated.  Those things can be

17    perceived by an external listener as a

18    change in engine RPM.  I do want to clarify

19    that what I observed was absolutely normal.

20        MR. WOLFER:  Is the compressor a

21    cycling compressor, when the evaporated

22    temperature gets low and it cycles?

23        MR. THORNTON:  Yes.

24        MR. WOLFER:  So it has a fixed

25    expansion to it?

1      MR. THORNTON:  I'm not certain about

2    that.

3         MR. TUCK:  Any further questions?

4         MR. LOPEZ:  Not by me.

5         MR. TUCK:  Do you have any questions of

6    this witness?

7         MR. KODSY:  I have one question.

8         The 2009 H2 now by the manufacturer

9    does not have the BF Goodrich tires; is that

10   correct?

11        MR. TUCK:  I will remind you that we

12   can only consider this tire so what they do

13   with other models, if it's not this one --

14        MR. KODSY:  My point was is that they

15   discontinued those tires on that truck for

16   having many complaints.

17        MR. TUCK:  Do you want to call any

18   other witnesses?

19        MR. LOPEZ:  Yes, I'm going to call Mr.

20   Joe Bardill.

21        MR. TUCK:  Sure.

22        MR. LOPEZ:  Mr. Bardill, based on the

23   time frame and I'm going to make it quick.

24   I know we have gone through all the repair

25   orders.  Could you give us a synopsis of

1   what you have experienced in the case of Mr.

2   Kodsy?

3        MR. BARDILL:  I basically -- Sherif

4   protested with Mike Stammet (phonetic), the

5   service advisor, on the second repair order

6   and the second trip in on the ~~ that would *SAME DAY*

7   be on the November 5th repair order.  He was

8   complaining about roughness in the idle,

9   vibration at all speeds, 45 and also highway

10  speed, and the brakes squeal.  I did

11  duplicate with him the brakes squeal.  I

12  felt -- Sherif kept referring to it as an

13  engine missing.  I kept telling him it's not

14  an engine miss.  It's just like possibly the

15  engine is not isolated enough from the

16  vehicle or a firing frequency exciting the

17  steering wheel a little bit, a little tingle

18  on the steering wheel.  But keep in mind,

19  this was the first '08 Hummer that I had

20  driven and I wasn't thinking about the fact

21  that it has a 6.2 liter in it.  The 6.0

22  liter had a much better idle quality than

23  the 6.2.  It also had 20 percent less

24  horsepower.  So there was a trade off to get

25  the horsepower, you had a little bit of a

1     rougher idle.  Once realizing that we had

2     the same idle quality in the 6.2 liter in

3     the Escalade, the Escalade idles exactly the

4     same way.  Feeling that, going up on the

5     highway, I said that I didn't feel any kind

6     of abnormal vibration at all.  I did feel

7     the transmission.  It had an extreme flare

8     on a down shift and I believe we put a valve

9     body in at that time.

10          MR. TUCK:  Did that solve the problem?

11          MR. BARDILL:  That solved the problem,

12     but we did have to come back and do the

13     reprogram because when they did the valve

14     body, they didn't put the updated program

15     in.

16          MR. TUCK:  Did that resolve the

17     problem?

18          MR. BARDILL:  Yes.

19          MR. WOLFER:  I'm sorry.  What is a

20     flare?

21          MR. BARDILL:  Basically the engine

22     flared up, the transmission didn't down

23     shift.  It was in a down shift type of --

24          MR. WOLFER:  So the RPM's went up?

25          MR. BARDILL:  The RPM's went up, yes.

1          So we addressed the idle quality at

2    that time, basically trying to isolate the

3    firing frequency from getting in the

4    vehicle, we put a weight on a weight on the

5    exhaust system.  It's basically like putting

6    your finger on a guitar string to deaden the

7    sound from a guitar string.  It made some

8    improvement..  We had some buzzing coming

9    through the IPC.  We relocated the line, but

10   it still had that little vibration in the

11   steering wheel.

12          There was another '08.  I went to my

13   shop foreman and I said, "I still feel

14   something here, Brian, feel it."  He says,

15   "There is an '08 right next to it."  So we

16   sat in that '08 and it had exactly the same

17   vibration.

18       MS. SIMMONS:  This was on the 11-5

19   repair date?

20       MR. BARDILL:  This is on 11-5.  You

21   have 11-5 to 11-12.  He left and came back

22   the same day.  So it's actually on the 11-12

23   repair order.  I'm sorry, the weight was

24   done on 11-5.  Then on 11-12 is where we

25   compared it to another vehicle.  So we have

1   two things going on at the same time, but

2   two different repair orders.

3       At that time, I contacted Bob Martin,

4   the quality manager for H2, and I spoke to

5   him about it because I still wasn't -- it

6   still hadn't hit me about the 6.2 versus the

7   6.0 liter.  He has isolate the engine,

8   disconnect the transmission from the engine

9   and see if we still had the vibration which

10  we did.  That was pretty much it.  We did

11  that and still had the vibration.  Then we

12  compared it with another car and the other

13  car had the same vibration.  I called Bob

14  back and that's when he said, "Joe, we've

15  got a 6.2 liter in here and there is a trade

16  off."  As soon as he said that, I felt

17  stupid, I felt like I wasted a lot of time.

18  It's the exact same idle quality as in the

19  Escalade, it's the same engine that's in the

20  Escalade and I just never thought about it

21  because it was the first '08 that I was

22  involved with.

23      MR. LOPEZ:  How much is the horsepower?

24      MR. BARDILL:  393 horsepower, which is

25  20 percent more than what we had in the six

1     liter.

2           MR. TUCK:  Any other questions?

3           MR. LOPEZ:  No more questions.

4           MR. TUCK:  Do you have any questions of

5     this witness?

6           MR. KODSY:  Just one to confirm what

7     Joe what has said.  You did isolate the

8     starter as per Bob Martin and the fly wheel

9     bolts and restart the engine to isolate

10    vibration, still has vibration with fly

11    wheel disconnected?

12          MR. BARDILL:  Correct.

13          MR. KODSY:  Okay. I just wanted to

14    confirm that.

15          MR. WOLFER:  Can I just ask one

16    question?  The repair order dated December

17    23rd, it says, "Vehicle exhibits some rail

18    snake characteristics."  What is that?

19          MR. BARDILL:  Rail shake.

20          MR. WOLFER:  I'm sorry, rail shake.

21          MR. BARDILL:  Rail shake is terminology

22    that we use for the pick-up trucks and just

23    about any of the SUV's, about 45 miles an

24    hour down typical roads like Federal

25    Highway, you get a little bit of vibration

1    in the seat from the chassis.  It's pretty

2    much in every truck.  There's nothing that

3    can be done for that.

4        MR. WOLFER:  Okay.

5        MR. TUCK:  Any further witnesses?

6        MR. FERNANDEZ:  I just have one quick

7    follow up question also.  On your December

8    5th invoice, where at idle there is still

9    vibration felt throughout the truck.

10        MR. BARDILL:  Which one was that?

11        MR. TUCK:  Schumacher.

12        MR. FERNANDEZ:  Okay.  Did you know

13    about that?

14        MR. BARDILL:  No.  What does it say?

15        MR. FERNANDEZ:  Schumacher.  I'm

16    reading here, "There is still a hope at

17    driving over 25 miles."

18        MR. BARDILL:  That's the customer's

19    complaint.

20        MR. FERNANDEZ:  Still a hope?

21        MS. SIMMONS:  Hop.

22        MR. TUCK:  Hop.

23        MR. FERNANDEZ:  Oh, okay.  I got hope.

24    Okay.  Thank you.

25        MR. TUCK:  Are you going to testify to

1    anything?

2        MR. LOPEZ:  Basically it would be what

3    I have said so I am not --

4        MR. TUCK:  If we've heard it, then

5    we've heard it.  Do you have anything

6    further before we close out the evidence?

7        MR. KODSY:  I may have one more

8    question.

9        MR. TUCK:  Okay.

10        MR. KODSY:  On the last documentation

11    that we received today in regards to this

12    witness list, we have one rep which is

13    Robert from Schumacher was listed as a

14    witness.  He is not present today while we

15    do have invoices here reflecting work that

16    was done by that dealership.  Is there any

17    reason for that?

18        MR. LOPEZ:  He told me he couldn't be

19    here today.  I cannot --

20        MR. KODSY:  Because he could have

21    clarified a couple of things.

22        MR. TUCK:  Do you have any further

23    documentary evidence or testimony?

24        MR. KODSY:  I have one more recent

25    inspection done by Palm Beach Garage, which

1    is right here.

2        MR. TUCK:  Is that already in your

3    documentation that we have received?

4        MR. KODSY:  It should be.  It basically

5    states, I told him --

6        MS. SIMMONS:  Mr. Kodsy, can you hold

7    on a second while we find that invoice?

8        MR. KODSY:  Sure.

9        MS. SIMMONS:  I believe I did see it in

10    the file.

11        MR. LOPEZ:  Give me date.

12        MS. SIMMONS:  2-10-09, Palm Beach

13    Garage.

14        MR. LOPEZ:  I've got it, yes.

15        MR. KODSY:  Basically I requested from

16    Mr. Proper (phonetic), which is the owner of

17    the garage, check the vehicle, I have a

18    vibration, and the engine idle is rough.

19    His conclusion was, after test driving the

20    vehicle, which is short and not trying to be

21    involved in this matter at all, he stated,

22    "Exhaust vibration felt throughout the car."

23        MR. TUCK:  Was that before or after?

24        MR. KODSY:  No, this is on 2-20-09.  So

25    this was two weeks ago.

1          MR. TUCK:  After all the treatments

2     were done, okay.

3          MR. KODSY:  Exactly.

4          MR. TUCK:  Any questions regarding

5     that?

6          MR. LOPEZ:  No.  Unfortunately, we

7     don't have the person here to cross-examine

8     him.

9          MS. SIMMONS:  Was that 2-20?

10          MR. KODSY:  Yes.

11          MR. TUCK:  All right.  We have to

12     decide whether to inspect or test drive the

13     vehicle.  If I understood the testimony

14     correctly, we don't need to drive it to see

15     that it's shaking.  So I think at the very

16     least we should go out and see if and how

17     much it shakes.

18          Does anybody think we need to drive it?

19          MR. KODSY:  I would recommend driving

20     it, get the feel of it.

21          MR. TUCK:  We've also talked about the

22     tires.  So I think at the very least drive

23     it around the road, he says at 20 or 25

24     miles we'll hear it.

25          MR. KODSY:  You have to understand this

1    truck has been sitting --

2        MS. SIMMONS:  Mr. Kodsy, one moment.

3    This is an opportunity for the Board to take

4    a vote on that issue.

5        MR. KODSY:  Sorry.

6        MS. SIMMONS:  So the vote is to test

7    drive?

8        MR. TUCK:  I think we need to test

9    drive it briefly.  If you agree that that

10   would be sufficient?

11       MR. LOPEZ:  I do.

12       MR. TUCK:  Do you have proof of

13   insurance here with you?

14       MR. KODSY:  Of course..

15       MR. TUCK:  May we see it?

16       MR. KODSY:  Yes.

17       MR. TUCK:  This is Progressive.  I'm

18   looking for a VIN number here.  It looks

19   like 5GRGN2 something 87811107653.

20       MS. SIMMONS:  That's a different number

21   than what's listed on the request for

22   arbitration.

23       MR. KODSY:  What's the date on that?

24       MR. WOLFER:  This December of '08

25   through June '09.

1          MR. KODSY:  That's the one.

2          MS. SIMMONS:  The VIN number that I

3    have is 5GRGN23878H107653.

4          MR. WOLFER:  That's correct.

5          MS. SIMMONS:  It's from Progressive?

6          MR. WOLFER:  Yes, from December 27th,

7    '08 through June 27th, '09.

8          MS. SIMMONS:  Mr. Wolfer, could you

9    read out the policy number please?

10         MR. WOLFER:  76759112-2.

11         MS. SIMMONS:  Thank you.

12         MR. TUCK:  All right.  The way this

13   works is the vehicle will hold five people?

14         MR. KODSY:  Yes.

15         MR. TUCK:  Who do you want to go from

16   the manufacturer?

17         MR. THORNTON:  I can go.

18         MR. TUCK:  We're going to be

19   off-the-record when we go out.

20         MR. KODSY:  I just want to mention

21   something if we're still on the record.

22         MR. TUCK:  We are.

23         MR. KODSY:  The longer you drive this

24   vehicle -- obviously it's been sitting, it

25   has not been driven for about a month.

1    We're going to drive it for half an hour,

2    that's not going to do much.

3        MR. TUCK:  We're only driving it for a

4    few minutes.

5        MR. WOLFER:  We're not driving it half

6    an hour.

7        MR. KODSY:  That's even less.  But when

8    you drive it for an hour or so, the

9    mechanisms get hot and it gets rougher.

10        MS. SIMMONS:  Mr. Tuck, do you want me

11    to stop the record?

12        MR. TUCK:  Yes.  When we get back, we

13    will discuss what we all saw.  You can point

14    out to us, did you see that, did you hear

15    it, but we can't answer you.  We'll talk

16    about it when we get back.

17        (Thereupon, a brief recess was had to

18    test drive the vehicle.)

19        MR. TUCK:  It's 3:32.  We're back from

20    the test drive.  The mileage in and out was

21    --

22        MR. LOPEZ:  11,127, that was the

23    mileage in and the mileage out was 11,138.

24        MR. TUCK:  Do you want to start, Mr.

25    Fernandez?

1          MR. FERNANDEZ:  Sure.  I participated

2      in the drive.  I heard the sound of the

3      engine quite louder..  I heard the squeaking

4      brakes intermittent, but more often than

5      not.  I don't know if my fellow Board

6      members heard this, but at the end of the

7      drive I was with Mr. Kodsy and we heard

8      momentarily exactly from the rear end,

9      knock, knock, knock, and then it stopped.

10         I believe, like Mr. Thornton said, it

11     is a beast, a beautiful beast, but it is a

12     beast nevertheless.

13         MS. SIMMONS:  Mr. Fernandez, where were

14     you seated?

15         MR. FERNANDEZ:  I was seated in the

16     right rear passenger.

17         MS. SIMMONS:  Okay.

18         MR. WOLFER:  I drove the vehicle.

19     Before driving the vehicle, I walked around

20     and I inspected all the tires.  I really

21     expected to see hot marks or bounce marks or

22     flat spots on the tires because the consumer

23     really complained that the vehicle hopped

24     all along.  I observed all four tires and

25     the one tire that was not replaced looked

1    almost similar to the other three tires.  I

2    didn't see any malformation of the tires in

3    any way to indicate any kind of bouncing

4    effect that would then make the tires look

5    flat or anything like that.  The tires are

6    off-road type tires and are not smooth type

7    of tires that would give you a nice,

8    comfortable ride.

9         I got in and I started it up.  It's a

10   truck, so I don't expect to drive in that

11   vehicle and feel comfortable.  Vibration

12   from the steering wheel, I didn't feel any

13   or at most very, very slightly.  Again, like

14   I said, the vehicle looks pretty inside and

15   all, but this is a massive type of a truck

16   vehicle.  Did I hear engine noise in the

17   vehicle when I hard accelerated?  Yes.  But

18   the way the vehicle is constructed, there is

19   not super insulation and such to keep the

20   noise from entering the cabin.  I really

21   watched the tachometer which at idle never

22   got above 750.  It was maybe, very slightly

23   it might fluctuate a little bit, but I

24   couldn't discern any kind of a miss like

25   there was a hesitation where I would see the

1    needle really drop off.  Those were my

2    observances of the vehicle.

3         MR. TUCK:  I sat in the front passenger

4    seat.  We drove on local roads for the miles

5    that we did go at speeds of up to 30, 35

6    miles an hour, mostly around 25 to 30, with

7    frequent stops.  The consumer asked us to

8    within gear stop a few times and see if we

9    felt anything different.  I did notice that

10   when you're stopped in gear, you feel a -- I

11   would guess it is a surge in the motor, but

12   light enough that would be like a mild

13   vibration.  I don't want to incorrectly

14   state it.  I think mild vibration when you

15   stop with your foot on the brake.  It is a

16   big engine and you can hear it, but not to a

17   point where I felt it was evasive.  We

18   didn't have the radio on.  We did have the

19   windows closed and the air-conditioner on.

20        MS. SIMMONS:  The windows were up?

21        MR. TUCK:  Closed, yes.

22        MS. SIMMONS:  And the AC was on?

23        MR. TUCK:  Yes.

24        MS. SIMMONS:  How about the brakes that

25   Mr. Fernandez talked about, did you hear any

1 squeaking?

2   MR. TUCK:  I heard a light squeak but

3 it's nothing I haven't heard many times.  We

4 had testimony that the brake pads had been

5 redone.  So the only time I would be

6 concerned about a squeak like the one I

7 heard would be if it was constant and the

8 brakes had been checked and the brakes might

9 be worn, but these brakes were recently

10 serviced.

11   MS. SIMMONS:  The squeak that you

12 heard, was it constant or just once in a

13 while?

14   MR. TUCK:  No, just very occasionally

15 when putting your foot on the brake at slow

16 speeds.  On rapid deceleration I didn't hear

17 it all.  I had my hand on the steering wheel

18 at times, on the dashboard, on the shifter

19 level, and you could feel that the engine

20 was running, but I felt nothing that would

21 make me say oh, there is something wrong

22 here..  As far as the miss, I didn't see it.

23 I missed that if it happened.

24   MS. SIMMONS:  Mr. Tuck, I just wanted

25 to clarify.  Did you experience the squeak

1  that Mr. Fernandez was talking about during

2  braking?

3       MR. TUCK:  No.

4       MS. SIMMONS:  I'm sorry, Mr. Wolfer?

5       MR. WOLFER:  No, I didn't hear any

6  noise --

7       MS. SIMMONS:  Did you hear the brakes

8  squeak?

9       MR. WOLFER:  Not from the brakes

10  squeak, I just didn't hear it at all.

11       MR. TUCK:  The acceleration was

12  definitely smooth and more than adequately

13  powered.  I didn't see any break up upon

14  acceleration or any hesitation.

15       MS. SIMMONS:  Thank you.

16       MR. TUCK:  I'm going to ask the

17  consumer what were your observations?

18       MR. KODSY:  My observation is it's not

19  as bad as it can be because the vehicle has

20  been sitting.  However, that particular

21  vehicle as much as it looks like a beast, it

22  is not supposed to drive like a beast.  If

23  you drive that truck the way it runs like

24  now claiming it's a beast, then you can only

25  drive it for a limited distance.  If you go

1    here to the store and back --

2        MR. TUCK:  You'll have a chance to make

3    a closing statement.  What we're asking you

4    now is what did you see and hear?

5        MR. KODSY:  I felt the vibration.

6        MS. SIMMONS:  Where were seated, Mr.

7    Kodsy?

8        MR. KODSY:  I was sitting behind the

9    driver's side.  I felt the hopping because

10   every bump on the road, whether it was there

11   or not, was being felt inside the truck as

12   it bounced.  That type of truck is not

13   supposed to do that.  I also felt the

14   vibration in the idle where the truck is

15   idling like a beast and it is not supposed

16   to do that, not for $60,000.

17       The other thing was the gentleman over

18   here stated that there was no tire wear.  I

19   just want to bring it up to your attention

20   that those tires only have 3,000 miles on

21   them.  Basically they were replaced, because

22   they had some unevenness to them, by

23   Schumacher.  The one low skip at idle when

24   you're -- I felt it, too, it was light.  It

25   is light, but it is very annoying when you

1    drive that truck all day and you stop and

2    this and that.  That's not normal for any

3    vehicle to do that.  That's basically it.

4         MR. TUCK:  Manufacturer's observations?

5         MR. THORNTON:  This is Tom Thornton

6    with General Motors.  I was seated in the

7    second row middle.  During the drive, I felt

8    the vehicle drove exactly as it drove

9    earlier in the week when we had the

10   prehearing inspection.  All characteristics

11   of the vehicle worked as they were designed.

12        MR. TUCK:  Thank you.

13        We come now to closing statements.  Now

14   is the time for you to put together what you

15   want us to hear in five minutes or less.

16        MR. KODSY:  Yes, of course.  Thank you

17   for your time for being here today.

18        Basically what I want to say is there

19   were many, many repairs done to this truck.

20   Whether it's better now or it isn't, this

21   truck is no longer new to me.  It's been

22   abused by repairs.  It's not acceptable.

23        MR. TUCK:  Anything else?

24        MR. KODSY:  That's it.

25        MR. TUCK:  Thank you.

1          MR. LOPEZ:  Mr. Lopez of General

2    Motors.  Very briefly.  We believe that this

3    truck is operating normally as designed.  We

4    have been able to corroborate the hearing

5    inspection and tested by Mr. Joe Bardill,

6    sorry.  I'm bad with names, I'm sorry.  We

7    believe that this vehicle is working as

8    designed and it should not be considered a

9    lemon.  The value, use, and safety is not

10   compromised on this vehicle at all.

11        Again, we feel that he's in a situation

12   -- we understand the situation that Mr.

13   Kodsy is in, that he had an accident and he

14   has damage to his cervical spine and it

15   feels so bad, but this is a truck and this

16   is how it rides.  You cannot correct

17   anything when there is no problem.  Again, I

18   would say it is the nature of the beast.

19   Thank you very much.

20        MR. TUCK:  Thank you.

21        We come now to the deliberation phase.

22   As I said earlier, you're free to remain

23   here while we speak, but you're not free to

24   participate unless we have a particular

25   questions for somebody.  In keeping with Ms.

1   Simmons' preference for analytical thinking,

2   we're going to go through the complaints in

3   the order that they are here.

4        Rough idle, rough vibration at idle,

5   and rough vibration during driving, hopping

6   of vehicle and bouncing of vehicle.  I think

7   we can categorize those as one operational

8   issue.

9        MS. SIMMONS:  One through four?

10       MR. TUCK:  Yes.  What does the Board

11   think, unless you want to split them up

12   between engine idle and operation and

13   driving?  We can do that.

14       MR. WOLFER:  Yes.

15       MR. TUCK:  So we're going to start out

16   with just the vibration in the engine.

17       MS. SIMMONS:  That would be what, one

18   and two?

19       MR. TUCK:  That's number one.  Two is

20   vibration during driving.

21       MS. SIMMONS:  So we're just dealing now

22   with vibration?

23       MR. TUCK:  Right.  I know we talked

24   earlier about consolidating the different

25   ones, but as the testimony evolved, it

1    became clear that there was one problem with

2    the engine at idle and engine vibration and

3    the other problem with vibration of the

4    vehicle.

5         MS. SIMMONS:  Which is two, three, and

6    four?

7         MR. TUCK:  Yes.

8         MS. SIMMONS:  Thank you for clarifying

9    that.

10        MR. TUCK:  Vibration at idle.  Why

11   don't we start with our technician.

12        MR. WOLFER:  Okay.  Originally, there

13   must have been some kind of problem because

14   the mass air flow sensor failed and, of

15   course, that would cause the engine to

16   vibrate.  I just find that -- I don't want

17   to say this vehicle is a beast.  The vehicle

18   is a truck.  In getting into this vehicle, I

19   really felt that I was going to really feel

20   a vibration, something really is going to

21   knock my socks off.  I found that this

22   vehicle idles beautifully.  If there was a

23   problem with the idle, I feel that it's been

24   repaired and there is absolutely no problem

25   with the idle.

1    MS. SIMMONS:  Before we move on from

2    Mr. Wolfer, did you believe at the time

3    originally when it existed, do you believe

4    that was substantial to use, safety, or

5    value?

6    MR. WOLFER:  It would have to be for

7    use because the vehicle wouldn't stay

8    running, but it was corrected.

9    MS. SIMMONS:  So you believe it was

10    substantial but it was corrected?

11    MR. WOLFER:  Correct.

12    MR. TUCK:  At the time of the air mass

13    --

14    MR. WOLFER:  At the time that they

15    changed the mass air flow sensor.

16    MS. SIMMONS:  Thank you.

17    MR. TUCK:  Mr. Fernandez?

18    MR. FERNANDEZ:  I agree with my

19    co-member.  The rough idle, the rough

20    vibration at idle, I did not feel it was

21    substantial.  I did not feel that it

22    impacted the use, value, or safety.

23    MS. SIMMONS:  You don't feel that it

24    impacts it now or did you believe, like Mr.

25    Wolfer, it was a substantial --

1          MR. FERNANDEZ:  It was a substantial

2     impairment of --

3          MR. TUCK:  Of use?

4          MR. FERNANDEZ:  Of use and value of the

5     vehicle that no longer exists.

6          MS. SIMMONS:  Do you also believe that

7     it was repaired at the time that the mass

8     air flow was replaced?

9          MR. FERNANDEZ:  Yes.

10         MS. SIMMONS:  Thank you.  Mr. Tuck?

11         MR. TUCK:  I concur also on all three

12    issues.

13         MS. SIMMONS:  Thank you.

14         MR. TUCK:  Moving now to the vibration.

15         Two, three, and four.  Mr. Wolfer?

16         MR. WOLFER:  Yes.  I think we can link

17    all of these together on two, three, and

18    four.

19         MS. SIMMONS:  What would you call them

20    as a tech because I need to name them

21    something?

22         MR. WOLFER:  I think driving vibration.

23         MS. SIMMONS:  Okay.

24         MR. TUCK:  Now it's difficult to sort

25    out --

1          MR. WOLFER: Right. I inspected all

2     four tires. In fact, the consumer even

3     pointed out that the right rear tire was the

4     one that was not replaced. So I paid

5     particular attention to that making the

6     assumption that there should be some kind of

7     distortion of the tire, which I didn't find.

8          I drove the vehicle and I know that

9     this is just part of the conditions.

10    Evidently, there were some minor adjustments

11    made, that being relocating a hose, which

12    seemed to transmit some kind of vibration.

13    Also, doing something to the exhaust system

14    in order to stop some kind of a vibration

15    that's coming through when the vehicle was

16    being driven. I don't get the feeling that

17    there is something there. I don't know if

18    there was anything there. I don't know if

19    the tires were replaced to placate the

20    customer. I just don't know, but I get into

21    this vehicle and I drive this vehicle. In

22    my opinion, the vehicle drives nicely.

23         MR. TUCK: But would you say operating

24    as designed?

25         MR. WOLFER: I would think it's

1    operating as designed because I would not

2    get into a big vehicle like this and expect

3    to have a cushioney drive as if I got into a

4    Cadillac and drove that down the road.   I

5    mean, they're two entirely different

6    vehicles.   This vehicle is not made so that

7    you don't feel a bump in the road, that it's

8    supposed to be nice and smooth.   It's just

9    not.

10    MS. SIMMONS:  But you realize not

11    operating as designed doesn't necessarily

12    mean it's not a lemon if that, in fact, it

13    is a substantial non-conforming --

14    MR. WOLFER:  Correct.

15    MR. TUCK:  It could have a bad design.

16    MS. SIMMONS:  Yes.

17    MR. WOLFER:  No, no.

18    MS. SIMMONS:  Do you feel that, not

19    only based on your test drive, but based on

20    your documents and testimony, do you feel as

21    to this driving vibration that there is a

22    non-conformity?

23    MR. WOLFER:  No, I don't feel that

24    there is any non-conformity for that.

25    MR. FERNANDEZ:  As to points one, two,

1    three, and four, I also agree, I do not feel

2    that they are not non-conformities.  They're

3    conformities.  That's how the vehicle, in my

4    opinion, is designed to operate.

5        MS. SIMMONS:  Do you believe that the

6    way that's designed, does it substantially

7    affect its use, value, or safety?

8        MR. FERNANDEZ:  No.

9        MS. SIMMONS:  Mr. Tuck?

10       MR. TUCK:  When we were driving down

11   the street there, the consumer pointed out

12   that you could feel the bumps on the road.

13   He is absolutely right.  When you over a

14   bump you feel it, even the smaller bumps.

15       In looking at the aggressive tread of

16   the tires and how large and hard they are

17   and hearing the testimony earlier from the

18   technicians that the truck was designed for

19   both on and off-road use, it was designed to

20   maintain contact with the road or the

21   ground.  So it wouldn't have this soft feel

22   that you would expect in a car.  I know the

23   consumer felt that for that kind of money,

24   you should have a softer drive.  I would

25   respectfully suggest for that kind of money

1    it should have been test-driven before

2    spending that kind of money.  This is all

3    you can expect in it.  It's been that way

4    since the very beginning and that's the way

5    it was designed.  From what I saw -- and I

6    fully respect the consumer's opinion and his

7    frankness in his testimony.

8        MR. KODSY:  It's not an opinion, sir.

9        MR. TUCK:  Well, his statement in his

10    testimony.

11        MR. KODSY:  I --

12        MR. TUCK:  You're not permitted to

13    interrupt, I'm sorry.

14        MR. KODSY:  Yes.

15        MR. TUCK:  What I saw here is the way

16    the truck was supposed to be and it seems

17    like it was doing just what it was supposed

18    to be and it's not a non-conformity on those

19    issues.

20        MS. SIMMONS:  Do you believe that when

21    it was doing what it was supposed to be

22    doing that you don't -- do you believe that

23    that was a substantial impairment in the

24    safety, use, or value?

25        MR. TUCK:  No.

1          MS. SIMMONS:  So you don't find a

2     non-conformity?

3          MR. TUCK:  No, I don't.

4          The transmissions kicks.

5          MR. WOLFER:  Yes.  I find that at the

6     time that would be a non-conformity.  The

7     dealer had opportunity to repair it.  It

8     took them two repair attempts.  Evidently,

9     the first time they changed the solenoid,

10    but either they didn't have the software or

11    they had it and they didn't put it in.  The

12    vehicle was subsequently brought back and

13    the software was installed, which corrected

14    the transmission shifting.  In fact, when I

15    went down the road I really accelerated hard

16    on that and that transmission just kept

17    right on going.  I didn't feel any knock

18    into another gear or anything like that, it

19    just went.  So I would say there was a

20    non-conformity in the transmission.

21         MS. SIMMONS:  For what, use, safety, or

22    value?

23         MR. WOLFER:  Use.  I'll stick with use,

24    but that the transmission has been repaired

25    and there is no non-conformity at this time.

1          MS. SIMMONS:  Was repaired when, Mr.

2     Wolfer?

3          MR. WOLFER:  The second repair -- I

4     think the second repair was the 22nd.  Is

5     that when they put the software in?

6          MS. SIMMONS:  The final repair?

7          MR. TUCK:  No..

8          MS. SIMMONS:  November 12th, page 18?

9          MR. WOLFER:  No, that's when they tried

10     to isolate the vibration and they took

11     things apart.  I know I saw a solenoid

12     replaced.  Anyone can jump in.

13          MR. BARDILL:  November 5th is when they

14     did a reprogramming.

15          MR. TUCK:  On November 12th --

16          MR. WOLFER:  The 5th through the 12th?

17          MR. TUCK:  It's number 20.

18          MR. WOLFER:  Right.

19          MS. SIMMONS:  So you believe it was

20     repaired on November 12th through November

21     21st repair?

22          MR. WOLFER:  Yes.

23          MS. SIMMONS:  Thank you, Mr. Wolfer.

24     Mr. Fernandez?

25          MR. FERNANDEZ:  As to the transmission,

1    I do find that it's substantial as to both

2    the use and value of the vehicle.  I'm glad

3    Mr. Wolfer was the driver and he gave that

4    good summarization.  I concur with his

5    impressions that there was nothing there,

6    just very smooth acceleration.  I believe

7    that the non-conformity was repaired on the

8    November 12th.

9        MS. SIMMONS:  Thank you.  Mr. Tuck?

10       MR. TUCK:  I certainly believe a

11   transmission that's not functioning properly

12   is a substantial non-conformity as to use,

13   value, and safety, and that it was repaired

14   by the November 12th through 21 repair

15   invoice.

16       Which brings us to --

17       MS. SIMMONS:  The squealing brakes.

18       MR. TUCK:  Squealing brakes.

19       MR. WOLFER:  Okay.  I did not hear any

20   noise from the brakes, but the manufacturer

21   stated that and the consumer also told us

22   that this car has been in storage for a

23   while.  The rotors can pick up a little bit

24   of rust if the car has been in storage and

25   it's damp down here.  Possibly on our road

1   test, my two colleagues did hear a slight

2   squeak, but no squeal.  I didn't hear any

3   noise at all.  At the time, if there is a

4   brake noise I would say that that would

5   arise to not only value but safety and use.

6   If I heard the noises, I would be afraid,

7   but the dealer addressed it and replaced the

8   pads on 12-23.  I believe that cured the

9   squealing noise.

10      MS. SIMMONS:  Just to clarify here.  Do

11   you believe prior to 12-23, was there a

12   brake issue that was a substantial

13   non-conformity to safety, use, or value?

14      MR. WOLFER:  Yes, because previous they

15   addressed the brake issue I think on October

16   10th through 20th.  They also did some work

17   on the brake pads at that time.

18      MS. SIMMONS:  Okay.

19      MR. WOLFER:  But yes --

20      MS. SIMMONS:  All three, use, safety,

21   and value?

22      MR. WOLFER:  Right.

23      MS. SIMMONS:  But you believe it was

24   repaired on the final repair attempt, 12-22?

25      MR. WOLFER:  No.  12-22, we're

1    considering that the final?

2        MS. SIMMONS:  Well, that's what we

3    stipulated to as the final repair.

4        MR. WOLFER:  Then yes, that's it.

5        MR. TUCK:  Mr. Fernandez?

6        MR. FERNANDEZ:  As to the squealing

7    brakes, I heard them today, so I can't say

8    that they were repaired.  It may be as Mr.

9    Wolfer says that there might be some

10   moisture, maybe not.  It doesn't rise to --

11   and that's also evidenced by the fact that

12   not everyone heard them.  I wouldn't say

13   that the noise is to a point of distraction

14   or to a point where I couldn't drive the

15   vehicle because of the noise.  I would find

16   that the problem is still there.  I do not

17   believe it is substantial and I do not

18   believe it impacts the use, value, or safety

19   of the car.

20       MS. SIMMONS:  How about from a safety

21   point of view, do you believe there was a

22   brake condition that contributed to this

23   squeak noise?

24       MR. FERNANDEZ:  There is a brake

25   condition that is contributed to the brake

1    noise that I believe I heard this afternoon.

2         MS. SIMMONS:  Do you believe then, if

3    you say there is a brake condition, do you

4    think that perhaps would substantially

5    affect its safety, use, or value?

6         MR. FERNANDEZ:  Noise?

7         MS. SIMMONS:  A brake condition --

8    you're saying that you felt there was a

9    brake condition that contributed to this  ·

10   noise.

11        MR. FERNANDEZ:  If there were a brake

12   condition, it would certainly apply to all

13   three, the safety, use, and value of the

14   vehicle.

15        MS. SIMMONS:  Are you saying that there

16   is a brake condition that is a

17   non-conformity to the substantial impairment

18   to use, safety, or value?

19        MR. FERNANDEZ:  I do not believe it's a

20   substantial impairment.

21        MS. SIMMONS:  Mr. Tuck?

22        MR. TUCK:  As evidenced by the repairs

23   that were done to the brake system, to me

24   that makes it evident that there was a

25   substantial non-conformity as to use, value,

1    and safety.  Brakes that don't work can

2    variably affect all those issues.  It was

3    fixed when they did that last repair on

4    12-22.

5         MS. SIMMONS:  Before doing your vote,

6    would the Board count the days and make sure

7    for the ones that you found were

8    non-conformities.  In this case, you found

9    to be non-conformities that the vibration at

10   the time it existed was a non-conformity,

11   right, but it was repaired?

12        MR. TUCK:  Yes.

13        MS. SIMMONS:  Do you believe there were

14   30 days out for that condition?

15        MR. WOLFER:  No.

16        MS. SIMMONS:  Or any of the conditions

17   that were found today as a non-conformity?

18        MR. TUCK:  We agreed earlier I thought,

19   as a stipulation of the parties, that the

20   vehicle was out for 26 days for everything.

21   So I don't know how breaking it up would

22   bring us out of the 30-day limit.

23        MS. SIMMONS:  That brings me to my next

24   point then.  Is the Board speaking to the

25   30-day presumption or is the Board going to

1    consider 26 is close enough, let's now break

2    it down to the dates?  It's the Board's

3    decision.

4        MR. TUCK:  I think with the nature of

5    our findings as to the seriousness of the

6    complaints that that shouldn't bring us to

7    where we set aside the 30-day presumption.

8        MS. SIMMONS:  Okay.  Do the other board

9    members agree?

10        MR. TUCK:  I'm going to ask them now.

11        MR. FERNANDEZ:  I agree that we should

12    follow the legislative --

13        MR. WOLFER:  I agree that it would need

14    to be the 30 days.

15        MS. SIMMONS:  I guess a vote is left

16    for you.

17        MR. TUCK:  Mr.. Wolfer started all the

18    time, so we will let Mr. Fernandez start.

19        MR. FERNANDEZ:  As to?

20        MR. TUCK:  Final vote as to the

21    consumer or manufacturer?

22        MR. FERNANDEZ:  The manufacturer.

23        MR. WOLFER:  I find for the

24    manufacturer.

25        MR. TUCK:  I concur.

1      That's going to conclude the hearing.

2   I want to thank you all for your

3   presentations and your patience.  Any

4   questions can be addressed to the attorney's

5   office tomorrow.  A decision should be

6   rendered within a few days and sent out by

7   mail to everybody.

8      Again, that concludes the hearing.  The

9   recorder will continue to run until

10   everybody has left the hearing room, which

11   I'm going to ask you all to do now.  Thank

12   you.

13      (Thereupon, the above proceedings were

14   concluded.)

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4           I, MICHELLE RUSSELL, do hereby certify
that I was authorized to and did transcribe the foregoing
5    proceedings and that the transcript is a true and correct
transcription of the above-styled proceedings.

6

7           Dated the 2nd day of April, 2009

8

9           _____
MICHELLE RUSSELL
Stenograph Reporter
10   March 15, 2013

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L

L

# WHOLE-BODY-VIBRATION EXPOSURE EXPERIENCED DURING THE OPERATION OF SMALL AND LARGE LOAD-HAUL-DUMP VEHICLES

**Tammy Eger**
School of Human Kinetics, Laurentian University
Sudbury, Ontario, Canada, P3E 2C6. teger@laurentian.ca
**Martin Smets**
BEK Lab, School of Human Kinetics, Laurentian University, Sudbury, Ontario, Canada
**Sylvain Grenier**
School of Human Kinetics, Laurentian University, Sudbury, Ontario, Canada
**Vibration Research Group**
(Laurentian University, IRSST, Queen's University, University of Western Ontario, Mines and Aggregates Safety and Health Association and Construction Safety Association of Ontario)

**Abstract**
The body harmlessly attenuates most vibration, however frequencies between 1 and 20 Hz cause the body (pelvis and spine) to resonate (Kitazaki & Griffin, 1998; Thalheimer, 1996) leading eventually to structural damage and health problems including lower-back pain, spinal degeneration, gastro-intestinal track problems, sleep problems, headaches, neck problems, autonomic nervous system dysfunction, hearing loss, and nausea (Scutter et al., 1997; Seidel, 1993; Thalheimer, 1996). Despite the health concerns related to WBV exposure, little attention has been given to understanding the levels of WBV experienced by mining equipment operators.    The primary purpose of the present study was to measure WBV exposure levels at the vehicle seat interface and the operator seat interface, during the operation of both small and larger LHD vehicles.    Results were compared to the ISO 2631-1 health guidance caution zones to determine safe exposure durations.    Preliminary test results indicated that LHD operators were exposed to whole-body vibration levels putting them at risk for injury.    ISO 2631-1 exposure guidelines for the health caution zone were exceeded during the operation of several different vehicles.    Some seats were also found to amplify the vibration signal resulting in a reduction in the recommended exposure duration.

Key words: Whole-body vibration, ISO 2631-1, LHD vehicle

# EXPOSITION AUX VIBRATIONS GLOBALES DU CORPS ÉPROUVÉES PAR LES CONDUCTEURS DE PETITE OU GROSSE CHARGEUSE-DÉCHARGEUSE

**Résumé**
Même si le corps atténue sans danger la plus grande partie des vibrations, les fréquences qui se situent entre 1 et 20 Hz occasionnent une résonance au corps (bassin et colonne vertébrale) (Kitazaki & Griffin, 1998; Thalheimer, 1996), ce qui peut entraîner des troubles structurels et des problèmes de santé comme : douleur lombaire, dégénérescence rachidienne, troubles gastro-intestineux, troubles de sommeil, maux de tête, cervicalgie, trouble neurologique, perte de l'ouïe et nausées (Scutter et autres, 1997; Seidel, 1993; Thalheimer, 1996). Malgré les préoccupations pour la santé liées à l'exposition des vibrations globales du corps, très peu d'attention a été portée à la compréhension des vibrations globales du corps éprouvées par les conducteurs de matériel d'exploitation des mines. L'objectif premier de la présente étude visait à mesurer les taux d'exposition aux vibrations globales du corps à l'interface du siège du véhicule et l'interface du siège du conducteur lors de l'opération d'une petite ou grosse chargeuse-déchargeuse.  Les résultats ont été comparés aux zones de risques pour la santé afin de déterminer les durées d'exposition sécuritaire. Les résultats de tests préliminaires ont indiqué que les conducteurs de

chargeuse-déchargeuse sont exposés à des taux de vibrations globales du corps risquant d'entraîner des blessures. Les directives de risques pour la santé de l'ISO 2631-1 ont été dépassées lors de l'opération de plusieurs véhicules différents. On a également remarqué que certains sièges amplifiaient le signal de vibrations donnant lieu à une diminution de la durée d'exposition recommandée.

Mots clés : vibrations globales du corps, ISO 2631-1, chargeuse-déchargeuse

## INTRODUCTION

Increased mechanization in mining has resulted in a larger number of workers exposed to longer durations of whole-body vibration, WBV, and the trend towards extended shift lengths (10+ hrs) has resulted in longer durations of exposure. Adverse health outcomes associated with WBV exposure have been well documented and include damage to the nervous, circulatory, and digestive systems. Degenerative changes to the spine are also a concern as they are linked with increased rates of low-back pain and injury (Scutter et al., 1997; Seidel, 1993; Thalheimer, 1996). Research has also shown that health concerns are more likely if the vibration experienced is in the resonance zone which is 4-8 hz for the z-axis and 1-2 hz for the x, y axes (ISO 2631-1). The amount of vibration experienced by an operator of mobile equipment is also determined by driving speed, road condition, vehicle maintenance, vehicle load, vehicle suspension, vehicle size and seat type (Ozkaya et al., 1994; Village et al., 1989; Bush and Hubbard, 2000; Eger et al., 2004).

In a 1989 study by Village, Morrison, and Leong WBV experienced by LHD vehicle operators was measured (11 vehicles, 6 operators, and 4 work locations). The variables of interest were LHD size (3.5 to 8 yard capacities), task (mucking, dumping, driving full, driving empty), and driving speed. Attempts were made to control for operator experience (all experienced), tire pressure, seat suspension (all seats the same), and road conditions (all vehicles driven over the same terrain). The study found that WBV exposure was higher when driving (empty or full) than under all other conditions. The authors also reported higher values of exposure when driving at higher speeds and for smaller capacity LHD vehicles. The present study builds on these results. WBV was measured during the operation of small and large haulage capacity LHDs, while performing three tasks (tramming full, tramming empty and mucking) under similar underground mining terrain. However, WBV exposure levels were measured at the vehicle floor/seatbase interface and the seatpad/operator interface in order to determine the effectiveness of the seat.

## METHODOLOGY

### WBV Measurement
Whole-body vibration was measured in accordance with the guidelines set out in the 1997 ISO 2631-1 standard. A tri-axial seat-pad accelerometer was used to measure vibration exposure at the seatpad/operator interface and a tri-axial accelerometer mounted with a large magnet was placed on the floor at the base of the seat in order to measure WBV at the vehicle floor/seatbase interface. Measured vibration values were compared to the 1997 ISO 2631-1 Health Guidance Caution Zones (HGCZ) in



Fig. 1 Health guidance caution zone (ISO 2631-1)

order to determine recommended exposure durations (Fig. 1). No crest factors were measured above 9 therefore frequency weighted RMS acceleration values were used when making comparisons to the HGCZ.

## Test Sites and LHD Vehicles

WBV measurements were conducted at 6 underground mine sites in Ontario on 16 different LHD vehicle models. WBV levels were recorded during tramming (loaded and unloaded) and mucking tasks.

## RESULTS AND DISCUSSION

### Preliminary Results

Preliminary results are shown for two LHD vehicles tested in Table 1. For Model A (10 yard haulage capacity), the highest vibration magnitudes were observed in the z-axis, the seat acted to increase the magnitude of the vibration signal in all axes and the maximum vibration magnitudes fell between 0.89-1.18 m/s/s. The vibration levels experienced fell in the HGCZ indicating harmful health effects are likely. Moreover the seat installed in the vehicle was not appropriate for the vibration experienced in the underground mining environment. For Model B (6 yard haulage capacity), the highest vibration magnitudes were observed in the x-axis, the seat acted to increase the magnitude of the vibration signal, and the maximum vibration magnitudes fell between 0.55-0.64 m/s/s. The vibration levels experienced fell within the zone of caution with respect to health effects and the seat was not appropriate for the vibration experienced in the underground environment.

### Control Strategies

Preliminary results from this study support the findings of Village et al., (1989) and Eger et al., (2004). Vibration levels were found to be higher when the vehicles were operated with the buckets empty and WBV exposure measured at the seatpad/operator interface indicated increased health risks for the LHD operators. In order to reduce harmful levels of WBV exposure mining companies were encouraged to maintain equipment (will result in less mechanical vibration), maintain roadways (regular care will act to reduce the peak values in the vibration signal) and operators were encouraged to reduce driving speeds (decreased rate of travel will decrease the magnitude of vibration).

### Future Research Directions

Further research is required to evaluate the effectiveness of seating used in underground mining vehicles (for maximum damping, the seat's resonant frequency needs to be smaller than the frequencies produced by the vehicle or amplification of the vibration can occur). In order to tackle this issue the authors of this paper will conduct controlled experiments (reproducing WBV measured in the field) in a laboratory environment in order to evaluate current seat design in an effort to identify seat characteristics required for mining applications.

## ACKNOWLEDGEMENTS

Support for this research project has been provided by the Workplace Safety and Insurance Board of Ontario. The research team would also like to thank the Mines and Aggregates Safety and Health Association, the Ontario mining industry and the mining equipment manufacturers for their continued support.

Table1. Frequency weighted RMS acceleration for the X, Y, and Z axis for two LHD models. Measured crest factors were less than 9 for all measured reported. Recommendations based on the ISO 2631-1 health guidance caution zone are reported.

| Machine Model | Haulage Capacity and Activity | Frequency Weighted RMS Acceleration Values (m/s/s) | | | | | | Recommendation based on ISO-2631-1 HGCZ |
| | | LHD Floor/Seatbase Interface | | | LHD Seatpad/Operator Interface | | | |
| | | X-axis | Y-axis | Z-axis | X-axis | Y-axis | Z-axis | |
| Model A | • 10 yard haulage capacity<br>• Tramming with a fully loaded bucket | 0.54 | 0.43 | 0.86 | 0.51 | 0.61 | 0.89 | Caution with respect to health risks is necessary. Interventions should be put in place. |
| Model A | • 10 yard haulage capacity<br>• Tramming with an EMPTY bucket | 0.51 | 0.46 | 0.78 | 0.57 | 0.58 | 1.00 | Health effects are likely. Operator should not be exposed to vibration of this magnitude for 8 hour periods. Therefore the duration of exposure should be reduced or vibration magnitude attenuated. |
| Model A | • 10 yard haulage capacity<br>• Mucking (process to load the bucket) | 0.65 | 0.61 | 1.47 | 0.64 | 0.78 | 1.18 | Health effects are likely. Operators should not be exposed to vibration of this magnitude for 8 hour periods. Therefore the duration of exposure should be reduced or vibration magnitude attenuated |
| Model B | • 6 yard haulage capacity<br>• Tramming with a fully loaded bucket | 0.39 | 0.24 | 0.44 | 0.51 | 0.30 | 0.55 | Caution with respect to health risks is necessary. Interventions should be put in place. |
| Model B | • 6 yard haulage capacity<br>• Tramming with an EMPTY bucket | 0.81 | 0.56 | 1.07 | 0.59 | 0.46 | 0.46 | Caution with respect to health risks is necessary. Interventions should be put in place. |
| Model B | • 6 yard haulage capacity<br>• Mucking (process to load the bucket) | 0.41 | 0.34 | 0.73 | 0.64 | 0.55 | 0.54 | Caution with respect to health risks is necessary. Interventions should be put in place. |

## REFERENCES

Eger, T, Grenier, S & Salmoni, A. (2004) Whole-Body Vibration exposure experienced by mining equipment operators. *Proceedings of Fifth Canadian Rural Health Research Society Conference and the Fourth International Rural Nurses Congress*, Sudbury, ON.

Kitazaki, S., & Griffin, M. (1998). Resonance behaviour of the seated human body and effects of posture. *Journal of Biomechanics*, 31, 143-149.

ISO 2631-1 (1997). Mechanical vibration and shock – Evaluation of human exposure to whole-body vibration-Part 1: General requirements, *International Organization for Standardization*, Switzerland.

Scutter, S., Turker, K., & Hall, R. (1997). Headaches and neck pain in farmers. *Australian Journal of Rural Health*, 5(1), 2-5.

Seidel, H. (1993). Selected health risks caused by long-term whole-body vibration. *American Journal of Industrial Medicine*, 23(4), 589-604.

Thalheimer, E. (1996). Practical approach to measurement and evaluation of exposure to whole-body vibration in the workplace. *Seminars in Perinatology*, 20(1), 77-89.

Village, J., Morrison, J., & Leong, D. (1989). Whole-body vibration in underground load-haul-dump vehicles. *Ergonomics*, 32(10), 1167-1183.

M

Canadian Centre for Occupational      Centre canadien d'hygiène et de                        Canada
Health and Safety                     sécurité au travail

# > Vibration – Measurement, Control and Standards

Ask a Question
Feedback
Printer-friendly

How can you measure vibration?
Are there methods for controlling exposure to vibration?
What are some examples of controlling exposure to vibration?
Are there any Canadian regulations or guidelines for vibration exposure?
What are the standards or guidelines for exposure to hand-arm vibration?
What are the standards or guidelines for exposure to whole-body vibration?

## How can you measure vibration?

A complete assessment of exposure to vibration requires the measurement of vibration acceleration in meters per second squared (m/s$^2$). Vibration exposure direction is also important and is measured in a well-defined directions. Vibration frequencies and duration of exposure are also determined. How hard a person grips a tool affects the amount of vibrational energy entering the hands; therefore, hand-grip force is another important factor in the exposure assessment.

The amount of exposure is determined by measuring acceleration in the units of m/s$^2$. Most regulating jurisdictions and standard agencies use acceleration as a measure of vibration exposure for the following reasons:

- Several types of instruments are available for measuring acceleration, the rate of change of velocity in speed or direction per unit time (e.g., per second).
- Measuring acceleration can also give information about velocity and amplitude of vibration.
- The degree of harm is related to the magnitude of acceleration.

Health research data tells us that the degree of harm is related to the magnitude of acceleration.

## Instrumentation

A typical vibration measurement system includes a device to sense the vibration (accelerometer), and an instrument to measure the level of vibration. Today a number of industries are making vibration measuring instruments that look like sound level meters. This equipment also has settings for measuring frequency, a frequency-weighting network, and a display such as a meter, printer or recorder.

The accelerometer produces an electrical signal. The size of this signal is proportional to the acceleration applied to it. The frequency-weighting network mimics the human sensitivity to vibration of different frequencies. The use of weighting networks gives a single number as a measure of vibration exposure and is expressed as the frequency-weighted vibration exposure in metres per second squared (m/s$^2$), units of acceleration.



**Figure 1**

The frequency-weighting network for hand-arm vibration is given in the International Organization for Standardization (ISO) standard ISO 5349. Human hand is not equally sensitive to vibration energy at all frequencies. The sensitivity is the highest around 8-16 Hz (Hertz or cycles per second). Measuring equipment takes this fact into account by using a weighting network. The gain is assigned a value of 1 for vibration frequencies to which the hand-arm system has the highest sensitivity. The dashed lines in Figure 1 represent the filter tolerances in the weighting network.

## Are there methods for controlling exposure to vibration?

Protecting workers from the effects of vibration usually requires a combination of appropriate tool selection, the use of appropriate vibration-absorbing materials (in gloves, for example), good work practices, and education programs.

## What are some examples of controlling exposure to vibration?

### Anti-Vibration Tools

Tools can be designed or mounted in ways that help reduce the vibration level. For example, using anti-vibration chain saws reduces acceleration levels by a factor of about 10. These types of chain saws must be well maintained. Maintenance must include periodic replacement of shock absorbers. Some pneumatic tool companies manufacture anti-vibration tools such as anti-vibration pneumatic chipping hammers, pavement breakers and vibration-damped pneumatic riveting guns.

### Anti-Vibration Gloves

Conventional protective gloves (e.g., cotton, leather), commonly used by workers, do not reduce the vibration that is transferred to workers' hands when they are using vibrating tools or equipment. Anti-vibration gloves are made using a layer of viscoelastic material. Actual measurements have shown that such gloves have limited effectiveness in absorbing low-frequency vibration, the major contributor to vibration-related disorders. Therefore, they offer little protection against developing vibration-induced white finger syndrome. However, gloves do provide protection from typical industrial hazards (e.g., cuts, abrasions) and from cold temperatures that, in turn, may reduce the initial sensation of white finger attacks.

## Safe Work Practices

Along with using anti-vibration tools and gloves, workers can reduce the risk of hand-arm vibration syndrome (HAVS) by following work practices:

- Employ a minimum hand grip consistent with safe operation of the tool or process.
- Wear sufficient clothing, including gloves, to keep warm.
- Avoid continuous exposure by taking rest periods.
- Rest the tool on the work piece whenever practical.
- Refrain from using faulty tools.
- Maintain properly sharpened cutting tools.
- Consult a doctor at the first sign of vibration disease and ask about the possibility of changing to a job with less exposure.

## Employee Education

Training programs are an effective means of heightening the awareness of HAVS in the workplace. Training should include proper use and maintain vibrating tools to avoid unnecessary exposure to vibration. Vibrating machines and equipment often produce loud noise as well. Therefore, training and education in controlling vibration should also address concerns about noise control.

## Whole-Body Vibration

The following precautions help to reduce whole-body vibration exposure:

- Limit the time spent by workers on a vibrating surface.
- Mechanically isolate the vibrating source or surface to reduce exposure.
- Ensure that equipment is well maintained to avoid excessive vibration.
- Install vibration damping seats.

The vibration control design is an intricate engineering problem and must be set up by qualified professionals. Many factors specific to the individual work station govern the choice of the vibration isolation material and the machine mounting methods.

## Are there any Canadian regulations or guidelines for vibration exposure?

Many Canadian jurisdictions do not have regulations concerning vibration exposure. However, it is prudent to reduce the level of exposure as much as practical since vibration causes ill health effects. It is possible to do this by engineering controls, the use of protective equipment and safe work practices. The design of vibration-damped equipment and engine mountings are the most effective engineering methods of controlling vibration exposure.

In the absence of formal regulations, Canadian agencies often use the Threshold Limit Values (TLVs) and guidelines recommended by the American Conference of Governmental Industrial Hygienists (ACGIH). These TLVs are based on the recommendations of the International Organization for Standardization (ISO).

## What are the standards or guidelines for exposure to hand-arm vibration?

The American Conference of Governmental Industrial Hygienists (ACGIH) has developed Threshold Limit Values (TLVs) for vibration exposure from hand-held tools. The exposure limits are given as frequency-weighted acceleration that

represents a single number measure of the vibration exposure level. The frequency-weighting is based on a scheme recommended in the international standard ISO 5349. Vibration-measuring instruments have a frequency-weighting network as an option for vibration measurement. Table 1 lists acceleration levels and exposure durations to which, ACGIH has determined, most workers may be exposed repeatedly without severe damage to fingers. ACGIH advises that these guidelines be applied in conjunction with other protective measures including vibration control.

| Table 1 | |
|---|---|
| The ACGIH Threshold Limit Values (TLVs) for exposure of the hand to vibration in X, Y, or Z direction* | |
| **Total Daily Exposure Duration (hours)** | **Maximum value of frequency weighted acceleration (m/s$^2$) in any direction*** |
| 4 to less than 8 hours | 4 |
| 2 to less than 4 hours | 6 |
| 1 to less than 2 hours | 8 |
| less than 1 hour | 12 |

\* Directions of axes in the three-dimensional system

The International Organization for Standardization (ISO) has published a method for measuring vibration and interpreting the resulting data. This 2001 standard (ISO 5349-1) also gives the set of curves shown in Figure 2 that can determine exposure levels likely to cause the first signs of white finger in workers.



**Figure 2 – Curves for exposure times of percentiles of population groups (ISO 5349) to suffer mild effects on tip of finger (see Stage 1, Table 2)**

The horizontal axis in Figure 2 represents vibration acceleration. This is measured as RMS (Root Mean Square) weighted acceleration in m/s$^2$. RMS is a method of