Hearing date and time: June 22, 2011, 9:45 a.m.<br>
Objection deadline: June 17, 2011

PREET BHARARA
United States Attorney
  for the Southern District of New York
By:    David S. Jones
         Natalie N. Kuehler
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, NY 10007
Tel.: (212) 637-2800
Fax: (212) 637-2730
david.jones6@usdoj.gov
natalie.kuehler@usdoj.gov

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | |
|---|---|
| In re | Chapter 11 Case No. |
| MOTORS LIQUIDATION COMPANY, *et al.*, <br> f/k/a General Motors Corp., *et al.* | 09-50026 (REG) |
| Debtors. | (Jointly Administered) |

------------------------------------------------------------x

**MOTION OF THE UNITED STATES OF AMERICA FOR AN ORDER APPROVING
THE CONSENT DECREE AND SETTLEMENT AGREEMENT REGARDING
NATURAL RESOURCE DAMAGE CLAIMS BETWEEN
THE DEBTORS, THE UNITED STATES OF AMERICA, THE STATE OF INDIANA, THE
STATE OF NEW YORK, AND THE ST. REGIS MOHAWK TRIBE**

**PRELIMINARY STATEMENT**

The United States of America, on behalf of the United States Department of the Interior ("**DOI**") and the National Oceanic and Atmospheric Administration ("**NOAA**") (collectively, the "**Settling Federal Agencies**"), with the concurrence of State and Tribal trustees for natural resources, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, hereby moves this Court for (i) an order approving under applicable environmental laws

the natural resource damage ("**NRD**") consent decree (the "**NRD Consent Decree**") by and among the United States, the States of Indiana and New York, the St. Regis Mohawk Tribe (collectively, "**Settling Trustee Parties**"), and debtor Motors Liquidation Company (f/k/a General Motors Corporation, hereafter, "**MLC**"), its affiliated debtors, and its successors, as debtors (collectively, the "**Debtors**"); and (ii) an order shortening the required notice period to the extent required to permit this motion to be heard on the Court's calendar currently scheduled for June 22, 2011. The NRD Consent Decree with March 31, 2011 notice of lodging in this Court is annexed as Exhibit 1 hereto, and a proposed order granting the requested relief is annexed as Exhibit 2 hereto.[1]

As explained below, under prior orders of this Court, Debtors are authorized to enter this agreement without obtaining the Court's approval under Bankruptcy Rule 9019, because the resolved claim amount is less than $50 million and, prior to the effective date of the Debtors' confirmed plan of liquidation, the Official Committee of Unsecured Creditors received notice of the proposed NRD Consent Decree yet did not object to it. The Court's approval is required, however, under federal environmental laws. Such approval is warranted here.

Under the NRD Consent Decree, the Settling Trustee Parties will be granted allowed NRD claims at a total of 5 sites in the aggregate amount of $11,571,413. NRD claims involving the Onondaga Superfund Site in New York remain unresolved and are not affected by the NRD Consent Decree.

As required by the environmental laws, notice of the proposed NRD Consent Decree was published in the Federal Register, and the public comment period has expired. *See* 76 *Fed. Reg.*

---

[1] While this brief is filed only on behalf of the United States, the state environmental agencies and tribe who are parties to the proposed NRD Consent Decree have authorized the United States to inform the Court that they join in the United States' request that the Court approve and enter the NRD Consent Decree.

2

20372 (Apr. 12, 2011). The United States received no comments concerning the proposed NRD Consent Decree, and believes that the settlement is fair, reasonable, and in the public interest. The United States therefore requests that the Court approve the NRD Consent Decree.

The function of the Court in reviewing such motions is not to substitute its judgment for that of the parties to the proposed Agreement, but to confirm that the terms of the proposed Agreement are "fair and adequate and are not unlawful, unreasonable, or against public policy." *United States v. Hooker Chem. & Plastics Corp.*, 540 F. Supp. 1067, 1072 (W.D.N.Y. 1982), *aff'd*, 749 F.2d 968 (2d Cir. 1984). The Court should also confirm that the proposed Settlement Agreement is consistent with CERCLA's goals. *See United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1426 (6th Cir. 1991). Finally, in conducting its review, the Court should be deferential to the United States' determination that the settlement is in the public interest. *See United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990). Accordingly, for the reasons set forth herein, the United States respectfully requests that this Court approve and enter the proposed NRD Consent Decree lodged with this Court on March 4, 2011.

### I. GENERAL STATUTORY/FACTUAL BACKGROUND

**A.    Statutory Background**

Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act ("**CERCLA**"), 42 U.S.C. §§ 9601-9675, to provide a framework for cleanup of the nation's worst hazardous waste sites. The primary goal of CERCLA is to protect and preserve public health and the environment from the effects of releases or threatened releases of hazardous substances to the environment. *See Voluntary Purchasing Groups, Inc. v. Reilly*, 889 F.2d 1380, 1386 (5th Cir. 1989); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d

3

1074, 1081 (1st Cir. 1986); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1040, n.7 (2d Cir. 1985).

Section 107(f) of CERCLA, 42 U.S.C. § 9607(f)(2), provides for the designation of governmental trustees who may assert claims for natural resource damages on behalf of the public, seeking recovery of assessment and restoration costs necessitated by releases of hazardous substances. DOI and NOAA are the relevant federal natural resource trustees for the sites covered under the proposed NRD Consent Decree; the States of New York and Indiana and the St. Regis Mohawk Tribe are joint trustees along with DOI and/or NOAA at certain of the sites at issue. Under CERCLA section 107(f), potentially responsible parties ("**PRPs**") are liable for natural resource damages and assessment costs incurred and to be incurred by natural resource trustees where such damages and/or costs are caused by the PRP's release of hazardous substances to the environment.

Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), permits the Federal, State, and Tribal Trustees to recover natural resource damages, including assessment costs from PRPs. Pursuant to Section 107(a), PRPs include the owners and operators of Superfund sites at the time of the disposal of hazardous substances at the sites, the current owners and operators of Superfund sites, as well as the generators and transporters of hazardous substances sent to Superfund sites. *See United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 722 (2d Cir. 1993); *O'Neil*, 883 F.2d at 178; *United States v. Monsanto*, 858 F.2d 160, 168-171 (4th Cir. 1988). Section 107(a) of CERCLA creates strict, joint and several liability where environmental harm is indivisible. *See Alcan Aluminum Corp.*, 990 F.2d at 722. The United States, New York, Indiana, and the St. Regis Mohawk Tribe all asserted claims against Debtors under this provision and/or analogous state laws.

4

Having created the liability system and enforcement tools to allow the United States to pursue responsible parties for Superfund cleanups, Congress expressed a strong preference that the United States settle with responsible parties in order to avoid spending resources on litigation rather than on cleanup. See 42 U.S.C. § 9622(a).[2] CERCLA encourages settlements by, inter alia, providing parties who settle with the United States protection from contribution claims for matters addressed in the settlement. See 42 U.S.C. § 9613(f)(2). This provision provides settling parties with a measure of finality in return for their willingness to settle.[3]

**B.    Overview of NRD Claims at Issue; the Parties' Settlement Negotiations, Drafting and Lodging of the Consent Decree; and Public Notice and Comment Period (During Which No Comments Were Received)**

The United States filed a timely claim (Claim No. 64064) that presented numerous federal environmental claims, and included natural resource damage claims for restoration and/or assessment costs at six sites. The Consent Decree resolves NRD claims at five of those sites, while leaving one unresolved. Many of the claims seeking restoration for natural resource damages are joint with co-trustees, namely the State of Indiana (at the Bedford, Indiana site) and the State of New York and St. Regis Mohawk Tribe (at the Massena, New York site), each of whom also timely filed NRD claims (Claims Nos. 50636 and 59087). In addition, New York

---

[2] See also United States v. Alcan Aluminum, Inc., 25 F.3d 1174, 1184 (3d Cir. 1994); United States v. Akzo Coatings of America, Inc., 949 F.2d 1409, 1436 (6th Cir. 1991); In re Cuyahoga Equipment Corporation, 980 F.2d 110 (2d Cir. 1992) (citing City of New York v. Exxon Corp., 697 F. Supp. 677, 693 (S.D.N.Y. 1988)); United States v. Cannons Engineering Corp., 899 F.2d 79, 92 (1st Cir. 1990); United States v. DiBiase, 45 F.3d 541, 545-46 (1st Cir. 1995); H.R. Rep. No. 253, pt. 1, 99th Cong., 1st Sess. 80 (1985), reprinted in 1986 U.S. Code Cong. & Ad. News 2862.

[3] Cannons Engineering, 899 F.2d at 92; O'Neil v. Picillo, 883 F.2d 176, 178-79 (1st Cir. 1989); United Technologies Corp. v. Browning-Ferris Industries, Inc., 33 F.3d 96 (1st Cir. 1994); H.R. Rep. No. 253, pt. 1, 99th Cong., 1st Sess. 80 (1985), reprinted in 1986 U.S. Code Cong. & Ad. News 2862.

State and the St. Regis Mohawk Tribe asserted an additional claim for natural resource damages arising from the severe cultural impacts of the damage caused by Debtors. Certain of the Trustees also sought reimbursement for their past costs of natural resource damage assessment.

All parties to the NRD Consent Decree engaged in intensive, arms'-length negotiations concerning the NRD claims at issue, assisted by retained environmental and economic consultants with expertise in natural resource damage issues. The parties reviewed and debated the significance of, among other things, available technical data and environmental and biological studies at the relevant sites, as well as other relevant literature and studies that shed light on issues raised at various sites. Negotiations involved repeated in-person meetings and many telephone conferences spanning several months. Ultimately, the parties concluded that the negotiated resolution represented a reasonable compromise of the parties' respective positions and the asserted strengths and weaknesses of the NRD claims at each site. The parties then negotiated the precise wording of the NRD Consent Decree document itself. As is recited in that document, Debtors informed the Official Committee of Unsecured Creditors of the proposed settlement prior to the agreement's lodging with the Court. On information and belief, the Committee has expressed no objection to the NRD Consent Decree.

On March 31, 2011, the United States lodged the NRD Consent Decree with this Court (Dkt. No. 9987, copy annexed hereto as **Exhibit "1"**) and the proposed settlement was subject to a 30-day public comment period following the April 12, 2011 publication of notice of the Settlement Agreement in the *Federal Register*. *See* 76 *Fed. Reg.* 20372 (Apr. 12, 2011). The public comment period concluded on May 12, 2011. No comments were received.

**C.    Terms of the NRD Consent Decree**

Under the NRD Consent Decree, the Settling Trustee Parties will receive allowed General Unsecured Claims in the total amount of $11,571,413 as provided in the NRD Consent Decree in satisfaction of MLC's NRD obligations at five sites in New York, New Jersey, and Indiana (except that Indiana reserves rights in connection with its past NRD costs, which are not resolved by the NRD Consent Decree). As permitted by section 5.7 of Debtors' confirmed Plan of Liquidation and paragraph 11 of the NRD Consent Decree, the United States is reserving a right of offset to the extent available to satisfy portions of its NRD Claim. Toward that end, the United States is presently negotiating and intends to seek simultaneous Court approval of a stipulation that identifies the portion of the United States' allowed NRD claims for each of the five sites that will potentially be recovered in full by right of offset, and that defers distributions on account of those portions of the United States' NRD claims pending a determination of whether the anticipated offset right will materialize, while leaving undisturbed the contemplated distribution process for the remaining portions of the allowed claim for which no offset is anticipated. Under the contemplated stipulation, if the anticipated offset recovery does not materialize, the deferred portion of the Federal NRD claim will then be paid as an unsecured claim. If, on the other hand, the United States achieves an offset recovery, the deferred portion of the United States' allowed NRD claim shall be deemed satisfied, and the United States shall transfer or cause to be transferred the amounts received via offset to the appropriate NRD account.

In the NRD Consent Decree, the Settling Trustee Parties covenant not to sue Debtors with respect to NRD claims at the Settled NRD Sites, and the Settling Trustee Parties' proofs of claim with respect to the NRD at the Settled NRD Sites are deemed satisfied (other than

7

Indiana's claim for past costs, which remains unresolved and not affected by the NRD Consent Decree). The Settling Trustee Parties reserve all other claims against Debtors other than with respect to the settled NRD claims. The Debtors covenant not to sue the Settling Trustee Parties concerning the NRD claims at the Settled NRD Sites. As noted, Indiana reserves its claims for past costs at the Bedford, Indiana site, which are not resolved or affected by the NRD Consent Decree.

Site-specific provisions of the NRD Consent Decree are as follows:

**Central Foundry Division a/k/a Massena Superfund Site** -- The Massena Superfund Site was a 270-acre GM aluminum casting facility placed on the Superfund National Priority List in 1984. Contaminants of concern released by this facility include polychlorinated biphenyls (PCBs) and polycyclic aromatic hydrocarbons (PAHs). Releases from the Site have caused injury to fish, birds, wildlife, and other natural resources in the assessment area.

The NRD Consent Decree settles NRD liability at the Massena Site for a total allowed claim of $9.5 million, subject to the United States' reservation of possible offset rights. Pursuant to Paragraph 7 of the NRD Consent Decree, the NRD Trustees for Massena (New York, the St. Regis Mohawk Tribe, and DOI and NOAA) have determined that this amount shall be allocated as follows: $1.5 million will be allocated for past assessment costs of the United States (of which $1,232,329 will compensate DOI for its past costs, and $267,671 will compensate NOAA for its past costs), and $8.0 million will be allocated for restoration projects, including activities that will address cultural damages alleged in the Tribe's and State's claims.

The Settling Trustee Parties concluded that this is a fair resolution of the pending claims.

**Diamond Alkali Superfund Site --** The Diamond Alkali Superfund Site in and around Essex, Hudson, and Passaic Counties, New Jersey (the "Diamond Alkali Site") includes a former

8

pesticide manufacturing facility in Newark, New Jersey, that was operated by Diamond Shamrock Chemicals Company from 1951 to 1969, and surrounding property, a 17-mile portion of the Passaic River and its tributaries known as the Lower Passaic River Study Area ("LPRSA"), the Newark Bay Study Area, which includes Newark Bay and portions of the Hackensack River, the Arthur Kill, the Kill Van Kull, and the areal extent of contamination. The Site comprises an unknown number of acres and implicates many PRPs.

From 1918 to 1970, GM owned and operated the Hyatt Roller Bearings Company automotive facility in Harrison, New Jersey (the "Harrison Facility"), the operations of which began in 1907 and included metal working, heat treating and grinding, and the use of oil for heat-treated metal. By discharging hazardous substances from its Harrison Facility into the Passaic River from 1918 to 1970, GM disposed of or arranged for the disposal of hazardous substances at the Diamond Alkali Site. Moreover, as corporate successor to Hyatt Roller Bearings Company, GM is also liable for the disposal of hazardous substances from the Harrison Facility into the Passaic River from 1907 to 1918. These hazardous substances have been determined to include PCBs, copper, lead, zinc and oil.

The federal proof of claim sought compensation for past assessment costs totalling $2,696,288 at the overall Diamond Alkali Site, but that figure was not reduced to reflect MLC's approximate equitable share of contamination at the site. Accordingly, the parties agreed to settle the claim taking into account MLC's equitable share for purposes of settlement of DOI's and NOAA's past costs, resulting in a total federal allowed unsecured claim of $44,721 for NRD at this site, subject to the United States' reservation of possible offset rights.

**GM Bedford Plant Site** -- The GM Bedford Plant Site in Lawrence County, Indiana (the "Bedford Site") contains an aluminum foundry and powertrain plant that has been operated by GM

9

since 1946 and is currently owned by New GM. The Bedford Site comprises approximately 150 acres. Old GM owned and operated the Bedford aluminum foundry from 1946 to July 2009, during which time hazardous substances were disposed of at the Bedford Site. These hazardous substances have been determined to include PCBs and oils. Hazardous substances have been detected in the soil, groundwater and surface water at the Bedford Site.

DOI completed a NRD assessment of the Bedford Site to determine the extent of damage done by the release of hazardous substances from the Site. Under the terms of the settlement, the United States on behalf of DOI shall have an Allowed General Unsecured Claim for NRD (subject to partial recovery by right of offset if it materializes) in the total amount of $2,000,000, including for restoration and DOI's past assessment costs.[4] Cash payments for restoration to the Joint Bedford NRD Trustees shall subsequently be deposited into a separate DOI-administered account to be jointly managed by the Joint Bedford NRD Trustees, and, subject to possible offset recovery, shall be in satisfaction of DOI's and Indiana's restoration claims at Bedford, and DOI's past cost claim.[5]

**Kin-Buc Landfill Superfund Site** -- The Kin-Buc Landfill Superfund Site located in Middlesex County, New Jersey (the "Kin-Buc Site") is a former landfill that was operated by various individuals and corporations, including Kin-Buc, Inc., from the late 1940s to 1976, and that accepted industrial and municipal wastes from 1971 to 1976. The Site comprises approximately 220 acres with two Operating Units ("**OUs**"). OU1 includes waste mounds, as well as low-lying areas and a leachate collection pond. OU2 includes Mill Brook/Martins Creek, Edmonds Creek,

---

[4] DOI's past costs totalled $339,677.

[5] The State of Indiana's past costs at the Bedford Site will be resolved pursuant to a separate litigation or settlement concerning both those costs and other environmental claims of the State of Indiana.

and associated wetlands. Old GM arranged for the transport of at least 15 million gallons of hazardous substances from various Old GM facilities to, and the disposal of those hazardous substances at, the Kin-Buc Site from 1971 through 1976. These hazardous substances included PCBs and hydraulic fluids.

NOAA has conducted a limited assessment of the Kin-Buc Site and, as of June 2009, NOAA had incurred approximately $26,318 in unreimbursed past costs associated with the NRD assessment at the Kin-Buc Site. NOAA did not assert a restoration claim against MLC with respect to the Kin-Buc Site. In settlement and satisfaction of the United States' Claim No. 64064 with respect to the Kin-Buc Site, the United States, on behalf of NOAA, shall have an Allowed General Unsecured Claim in the amount of $26,318, subject to the United States' possible right of offset. The NRD Consent Decree provides for the full allowance of NOAA's past costs.

**National Lead Industries Superfund Site --** The National Lead Industries Superfund Site ("National Lead Site" or "NL Site"), located in Salem County, New Jersey, is a former secondary lead smelting facility that was operated from 1972 to 1982, and was sold to National Smelting of New Jersey, Inc. ("NSNJ") in 1983. The facility, which recycled lead from spent automotive batteries, continued to operate until 1984, when NSNJ filed for bankruptcy. The Site comprises approximately 44 acres with two OUs. OU1 includes the site's groundwater, surface water, contaminated soil, and sediment, and OU2 includes ponded water, slag pits, building structures, and debris. GM arranged for the transport of hazardous substances to, and the disposal of those hazardous substances at, the NL Site from 1983 to 1984. These hazardous substances included dust, sulphuric acid, lead scrap, lead oxide, and slag.

NOAA has conducted a limited natural resources damage assessment of the National Lead Site, which documents past injuries to estuarine and freshwater habitat. As of September

11

2009, NOAA had incurred approximately $41,537 in unreimbursed past costs associated with the natural resources damage assessment at the National Lead Site. In settlement and satisfaction of the United States' Claim No. 64064 with respect to the National Lead Site, the United States, on behalf of NOAA, shall have an Allowed General Unsecured Claim in the amount of $374 for assessment costs based on MLC's estimated equitable allocation for purposes of settlement, subject to possible right of setoff.

**Reservation of Right of Offset** – While the NRD Consent Decree otherwise provides that the Settling Trustee Parties shall receive allowed general unsecured claims in specified amounts, the Consent Decree and Plan specifically preserve the United States' potential right to recover on parts of its NRD Claim by right of offset. *See* Plan of Liquidation § 5.7; NRD Consent Decree ¶ 11. As noted, the United States anticipates that, at the same time it seeks Court approval of the NRD Consent Decree, it will request approval of a separate stipulation and order providing that specified amounts of the settled NRD claims will not result in an immediate distribution, but will be subject to a deferral of distributions pending negotiations relating to any right of offset. If the United States successfully recovers on account of such a right of offset, the United States will advise the GUC Trust (or any other party responsible for administrating distributions) so that any assets reserved on account of possible further NRD claim distributions can be released. In the event an offset recovery does not materialize, the United States will request, and Debtors will provide, additional distributions on account of the reserved portions of the allowed NRD claims, so that the NRD claims ultimately will be allowed and compensated based on the full amounts set forth herein and in the NRD Consent Decree.

**Remaining Unresolved NRD Claim** -- If and when the Court approves the NRD Consent Decree, the only remaining federal NRD claim will involve the Onondaga County, New

York site. That site is the subject of ongoing discussions, and the NRD Consent Decree has no effect on the parties' positions with respect to NRD claims at that site.

## ARGUMENT

## THE COURT SHOULD APPROVE THE NRD CONSENT DECREE

### A.  Statement of Relief Requested

The United States, with the concurrence of the other Settling Trustee Parties, moves for approval under the environmental laws of the NRD Consent Decree, which partially resolves proof of claim No. 64064 timely filed by the United States (the "**US NRD Claim**"), proof of claim No. 59181 timely filed by the State of Indiana (the "**Indiana NRD Claim**"), proof of claim No. 50636 timely filed by the State of New York (the "**New York NRD Claim**"), and proof of claim No. 59087 timely filed by the St. Regis Mohawk Tribe (the "**St. Regis Mohawk Tribe Claim**").

As explained below, the Debtors' Settlement Procedures Order (as defined below) does not require Court approval for settlements less than or equal to $50 million, and the Court therefore need not analyze this motion under the rubric of Bankruptcy Rule 9019. However, under the environmental laws, the United States was required to provide notice and an opportunity for public comment on the proposed settlement, upon which, if (as is true here), the Government concludes that the settlement should be approved, the United States must seek Court approval of the settlement under applicable environmental laws.

The United States also respectfully requests an order shortening the notice time on this motion so that the motion can be heard and approved during the now-scheduled June 22, 2011 calendar. The notice provided will give sufficient opportunity for any interested party to object, especially as the agreement is already agreed to by Debtors and not objected to by the Official

Committee of Unsecured Creditors, has been lodged with the Court since March 31, 2011, and was the subject of no public comment during the notice and comment period.

**B.     Jurisdiction**

This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**C.     The Relief Requested Should Be Approved by the Court**

Although the Debtors, at the time the NRD Consent Decree was executed, had authority to enter into settlements where, as in here, the total settlement amount is less than or equal to $50 million (*see* Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 3007 and 9019(b) Authorizing the Debtors to (i) File Omnibus Claims Objections and (ii) Establish Procedures for Settling Certain Claims (ECF No. 4180) (the "**Settlement Procedures Order**")), a consent decree and settlement agreement negotiated by the United States to protect the public interest is subject to judicial review under federal environmental laws.

Under the environmental laws, approval of a settlement agreement is a judicial act committed to the informed discretion of the Court. *In re Cuyahoga.*, 908 F.2d at 118; *Cannons Eng'g*, 720 F. Supp. at 1035. Judicial review of a settlement negotiated by the United States to protect the public interest is subject to special deference; the Court should not engage in "second-guessing the Executive Branch." *Cannons Eng'g*, 899 F.2d at 84; *In re Cuyahoga*, 980 F.2d at 118 (noting the "usual deference given" to the government environmental agency (there, the Environmental Protection Agency); *New York v. Solvent Chem. Corp.*, 984 F. Supp. 160, 165 (W.D.N.Y. 1997) ("This Court recognizes that its function in reviewing consent decrees apportioning CERCLA liability is not to substitute its judgment for that of the parties to the

14

decree but to assure itself that the terms of the decree are fair and adequate and are not unlawful, unreasonable, or against public policy." (internal quotation marks omitted)). An evidentiary hearing is not required in order to evaluate a proposed CERCLA consent decree because such hearings would frustrate the statutory goal of expeditious settlement; hearing requests are therefore routinely and properly denied. *See United States v. Charles George Trucking Inc.*, 34 F.3d 1081, 1085 (1st Cir. 1994); *Cannons Eng'g*, 899 F.2d at 94. This "limited standard of review reflects a clear policy in favor of settlements." *Solvent Chem. Corp.*, 984 F. Supp. at 165.

As discussed below, the Court should approve the NRD Consent Decree because it is fair, reasonable, in the public interest, and furthers the goals of CERCLA. *See Charles George Trucking*, 34 F.3d at 1084; *Cannons Eng'g*, 899 F.2d at 85; *Solvent Chem. Corp.*, 984 F. Supp. at 166; *Hooker Chem.* 540 F. Supp. at 1073 ("the task has been to examine the proposal and determine whether it is a fair and adequate settlement and whether its implementation will reflect concern for the problems for which Congress has enacted the various environmental statutes.").

The merit of this application is highlighted by the fact that no one has objected to the proposed NRD Consent Decree, despite its being publicly docketed since March 31, 2011 in a highly visible bankruptcy that is followed widely in the environmental and bankruptcy bar, and despite having been the subject of a public notice and comment period. Indeed, that process yielded no comments whatsoever.

    **1.**    <u>**The NRD Consent Decree Is Fair**</u>

The fairness criterion of a CERCLA settlement integrates both procedural fairness and substantive fairness. *Cannons Eng'g*, 899 F.2d at 86-88. To measure procedural fairness, the Court "should ordinarily look to the negotiation process and gauge its candor, openness, and bargaining balance." *Id.* at 86. The proposed NRD Consent Decree is procedurally fair because

15

it was negotiated at arm's length over many months, with good faith participation by governmental actors and parties who were represented by experienced counsel, and with the assistance of technical experts on matters such as estimating the extent of ecological and associated harms and the cost of future restoration activities. *See id.* at 87 (finding a CERCLA settlement procedurally fair based on criteria including an arms-length negotiation, experienced counsel, and good faith participation by settling agency).

To measure "substantive" fairness, the Court considers whether the settlement is "based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability . . . according to rational (if necessarily imprecise) estimates of how much harm each PRP has done." *Id.* at 87; *see also United States v. Davis*, 261 F.3d 1, 24 (1st Cir. 2001); *Charles George Trucking*, 34 F.3d at 1087; *DiBiase*, 45 F.3d at 544-45. The proposed NRD Consent Decree is substantively fair because the amount of the allowed claim for each site was determined by considering actual assessment costs, the parties' best estimates of ecological and associated harms and resulting restoration needs and costs, and Debtors' estimated percentage allocation or fair share of liability for each site. Often, these estimates were determined after extensive discussions with environmental experts and/or agency technical personnel responsible for the sites. The amount of the allowed claim for each site therefore represents a substantively fair resolution of the Debtors' liabilities taking into account the uncertainties and litigation risks involved.

### 2. The NRD Consent Decree Is Reasonable

Courts evaluating the reasonableness of CERCLA settlements have considered three factors: (i) technical adequacy of the work to be performed; (ii) satisfactory compensation to the public; and (iii) the risks, costs, and delays inherent in litigation. *See Charles George Trucking*,

16

34 F.3d at 1085; *Cannons*, 899 F.2d at 89-90; *see also United States v. Montrose Chemical Co.*, 50 F.3d 741, 746 (9th Cir. 1996) (Court evaluates whether CERCLA settlement is fair, reasonable, and consistent with CERCLA).

Although the first prong of the reasonableness inquiry is not at issue in this settlement, as the claims derive from past assessment costs as well as anticipated restoration work that will not be performed by Debtors, the NRD Consent Decree satisfies the other, necessarily intertwined, considerations relevant to reasonableness. As discussed above, the United States and the other Settling Trustee Parties will receive Allowed General Unsecured Claims for NRD totaling more than $11.5 million, with potential United States offset rights reserved.

These settlement terms compensate the public and further the goals of CERCLA's natural resource damage provision. *See* CERCLA § 107(a), (f), 42 U.S.C. § 9607(a), (f). Specifically, the NRD Consent Decree reasonably balances the extent of Debtors' liability, the Trustees' need to recover funds for restoration and to compensate for assessment costs, and the need to minimize the expense and potential delay of protracted litigation. Accordingly, the proposed NRD Consent Decree is reasonable.

### 3. The NRD Consent Decree Is Consistent With the Goals of CERCLA

The primary goals of CERCLA are to "encourage prompt and effective responses to hazardous waste releases and to impose liability on responsible parties," and to "encourage settlements that would reduce the inefficient expenditure of public funds on lengthy litigation." *In re Cuyahoga*, 980 F.2d at 119. The NRD Consent Decree furthers these statutory goals. As discussed above, the proposed NRD Consent Decree accounts for past assessment costs and estimated restoration costs at the sites at issue. The settlement further meets CERCLA's statutory goal of providing final resolution of liability for settling parties. Moreover, the

17

proposed NRD Consent Decree serves CERCLA's goal of reducing, where possible, the litigation and transaction costs associated with response actions, as well as the public policy favoring settlement to reduce costs to litigants and burdens on the courts. *See Solvent Chem. Corp.*, 984 F. Supp. at 165; *Hooker Chem.*, 540 F. Supp. at 1072.

### Notice

Pursuant to Bankruptcy Rule 9006(c)(1), the Court may shorten time without notice. Accordingly, no separate notice of this Motion to Shorten Time has been given.

### No Prior Request

No prior request for the relief sough in this Motion has been made to this or any other Court.

WHEREFORE, the United States, with the concurrence of the other Settling Trustee Parties, respectfully requests entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: New York, New York
June 16, 2011

                                                PREET BHARARA
                                                United States Attorney for the
                                                Southern District of New York

                                                /s/ David S. Jones_____
                                By:    David S. Jones
                                                Natalie N. Kuehler
                                                Assistant United States Attorneys
                                                86 Chambers St., 3rd Floor
                                                New York, NY 10007
                                                Tel. (212) 637-2800
                                                Fax (212) 637-2730
                                                david.jones6@usdoj.gov
                                                natalie.kuehler@usdoj.gov