Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 09-50026(REG)

5  - - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  MOTORS LIQUIDATION COMPANY, et al.

9  f/k/a General Motors Corporation, et al.,

10

11              Debtors.

12

13  - - - - - - - - - - - - - - - - - - - - - -x

14

15              United States Bankruptcy Court

16              One Bowling Green

17              New York, New York

18

19              June 22, 2011

20              9:52 AM

21

22

23  B E F O R E:

24  HON. ROBERT E. GERBER

25  U.S. BANKRUPTCY JUDGE

Page 2

1

2    HEARING re Debtors' 151st Omnibus Objection to Claims

3    (Claims For Equity Interests)

4

5    HEARING re Debtors' 153rd Omnibus Objection to Claims

6    (Claims For Equity Interests)

7

8    HEARING re Debtors' 155th Omnibus Objection to Claims

9    (Claims For Equity Interests)

10

11    HEARING re Debtors' 156th Omnibus Objection to Claims

12    (Claims For Equity Interests)

13

14    HEARING re Debtors' 179th Omnibus Objection to Claims

15    (Welfare Benefits Claims of Retired and Former Salaried and

16    Executive Employees)

17

18    HEARING re Debtors' 210th Omnibus Objection to Claims

19    (Claims For Equity Interests)

20

21    HEARING re Motions filed by Billy Kidwell

22

23    HEARING re 221st Omnibus Objection to Claims

24    (Claims For Equity Interests)

25

Page 3

```
 1

 2    HEARING re 222nd Omnibus Objection to Claims

 3     (Duplicate Debt Claims)

 4

 5    HEARING re 223rd Omnibus Objection to Claims

 6     (Eurobond Deutsche Debt Claims)

 7

 8    HEARING re 224th Omnibus Objection to Claims

 9     (No Liability GMAC Debt Claims)

10

11    HEARING re 225th Omnibus Objection to Claims

12     (Welfare Benefits Claims of Retired and Former Salaried and

13     Executive Employees)

14

15

16    HEARING re 226th Omnibus Objection to Claims

17     (Welfare Benefits Claims of Retired and Former Salaried and

18     Executive Employees)

19

20

21    HEARING re 227th Omnibus Objection to Claims

22     (Welfare Benefits Claims of Retired and Former Salaried and

23     Executive Employees)

24

25
```

Page 4

1

2    HEARING re 228th Omnibus Objection to Claims

3    (Qualified Defined Benefits Pension Benefits Claims and Welfare

4    Benefits Claims of Former Salaried, Executive or Hourly

5    Employees)

6

7    HEARING re 229th Omnibus Objection to Claims

8    (Supplemental Benefits Claims of Retired and Former Salaried

9    and Executive Employees)

10

11    HEARING re 230th Omnibus Objection to Claims

12    (Splinter Union Employee Claims Assumed by General Motors LLC)

13

14    HEARING re 231st Omnibus Objection to Claims

15    (Qualified Defined Benefits Pension Benefits Claims of Former

16    and Salaried and Hourly Employees)

17

18    HEARING re 232nd Omnibus Objection to Claims

19    (Claims Relating to Former Employees Represented by United Auto

20    Workers)

21

22    HEARING re 233rd Omnibus Objection to Claims

23    (Supplemental Executive Retirement Benefits Claims of Former

24    Executive Employees)

25

Page 5

1

2    HEARING re Application by AP Services, LLC as Crisis Mangers to

3    the Debtors for Approval of Discretionary Fees

4

5    HEARING re Motors Liquidation Company GUC Trusts' Objection to

6    Claim No. 10038 for Failure to Comply with Amended Order

7    Pursuant to 11 U.S.C. Section 105(A) AND General Order M-390

8    Authorizing Implementation of Alternate Dispute Procedures,

9    Including Mandatory Mediation

10

11    HEARING re Motion for Objection to Claim(s) Number 39218,

12    39219, 39220, 39221 and 39222 for Failure to Comply with

13    Amended Order Pursuant to 11 U.S.C. Section 105(A) AND General

14    Order M-390 Authorizing Implementation of Alternate Dispute

15    Procedures, Including Mandatory Mediation

16

17    HEARING re Motion for Relief from Stay filed by Steven R.

18    Montgomery on behalf of The Roman Catholic Diocese of

19    Pittsburgh and Transfiguration Parish

20

21    HEARING re Motion to Approve Compromise Under Environmental

22    Laws of NRD Consent Decree filed by David S. Jones on behalf of

23    the United States of America

24

25    Transcribed by:  Linda Ferrara

Page 6

1

2    A P P E A R A N C E S :

3    WEIL GOTSHAL & MANGES LLP

4         Attorneys for the Debtors and Debtors-in-Possession

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:  JOSEPH H. SMOLINSKY, ESQ.

9

10   UNITED STATES DEPARTMENT OF JUSTICE

11        U.S. Attorney's Office

12        86 Chambers Street

13        3rd Floor

14        New York, NY 10007

15

16   BY:  DAVID S. JONES, DEPUTY CHIEF, AUSA

17        LOUIS A. PELLEGRINO, AUSA

18

19   KING & SPALDING, LLP

20        Attorneys for General Motors, LLC

21        1185 Avenue of the Americas

22        New York, New York 10036

23

24   BY:  ARTHUR J. STEINBERG, ESQ.

25        SCOTT DAVIDSON, ESQ.

1

2  UNITED STATES DEPARTMENT OF JUSTICE

3        OFFICE OF THE UNITED STATES TRUSTEE

4        33 Whitehall Street

5        New York, New York

6  BY:  BRIAN MASUMOTO, UST

7

8  TELEPHONICALLY:

9  DOMENICA DITTMEIER, In Propria Persona

10  MARK F. HASSON, III, In Propria Persona

11  DAVID McKINNEY, In Propria Persona

12  RUTH MEYER, In Propria Persona

13  LARRY P. SCHRAMM, In Propria Persona

14  TERRIE SIZEMORE, In Propria Persona

15  KATHRYN J. SLADE, In Propria Persona

16  EDMOND STERNIAK, Pro Se

17  RONALD TANCIAR, In Propria Persona

18

19

20

21

22

23

24

25

09-50026-mg   Doc 10539   Filed 06/24/11   Entered 06/30/11 15:27:07   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 8 of 64

Page 8

1               P R O C E E D I N G S

2          THE COURT:  Have seats, please.  Okay.  We're here on

3     General Motors, Motors Liquidation Corporation.  I did get some

4     last minute requests for continuances or at least one.  The

5     debtor can tell me whether it has a problem with that request.

6     I would like to take Mr. Kidwell's issues last and just before

7     them, the medical benefits terminations issues and deal with

8     preliminaries first if we can.

9          Mr. Smolinsky, are you going to take the lead on

10     behalf of the GM estate -- all of GM estate?

11          MR. SMOLINSKY:  Good morning, Your Honor.  Joseph

12     Smolinsky of Weil Gotshal & Manges for the debtors and post-

13     effective date debtors, as well as the Motors Liquidation

14     Company, GUC Trust.  Your Honor, I'm happy to go through the

15     agenda as its currently constructed.

16          With respect to the letter that I believe is the one

17     you're referring to from Sharon Bell requesting a continuance,

18     that was a letter that hit the docket this morning.  We have

19     several claims matters that are on this morning that have been

20     carried on the calendar for quite some time.  And we recently

21     filed replies in our efforts to start moving forward with those

22     lingering objections.

23          Given the lapse of time, we didn't want to surprise

24     anyone with a hearing, so we went out to each and every one of

25     the claimants that we filed responses with respect to and gave

Page 9

1    them the option of either going forward today or adjourning it

2    to July 27.  The default, if they did not respond, was to kick

3    that hearing.  So as far as I know, Sharon Bell is not on the

4    calendar today.  It's on the calendar for July 27 and we will

5    notify --

6              THE COURT:  So in substance, she got what she wanted.

7              MR. SMOLINSKY:  That's right, Your Honor.

8              THE COURT:  Okay.

9              MR. SMOLINSKY:  So each of those matters that are on

10   the calendar today, they have asked to be heard today.

11             THE COURT:  Okay.

12             MR. SMOLINSKY:  Your Honor, just a case update.  Your

13   Honor may have heard that recently Barry Seidel and Eric Fisher

14   left the firm of Butzel Long and moved to Dickstein Shapiro.

15   And I trust that you'll be receiving substitution of counsel

16   papers with respect to that move of the two matters that they

17   were involved in.

18             THE COURT:  I had not heard that.  In other words,

19   the same lawyers will be continuing to act on behalf of the

20   creditors committee but for -- out of a different law firm?

21             MR. SMOLINSKY:  That's correct, Your Honor.  In

22   connection with that move or as part of that move, we have also

23   decided the GUC Trust to bring in Dickstein Shapiro as a co-

24   counsel to create some efficiencies in the claims objection

25   process.  And in the court today is Stefanie Greer, a partner

Page 10

1    at Dickstein Shapiro who will be very active in several of the

2    claims matters going forward.

3            THE COURT:  Okay.  Welcome, Ms. Greer.

4            MR. SMOLINSKY:  Your Honor, the first matter on the

5    calendar today is the Terrie Sizemore matter.  That was

6    adjourned.  We notified chambers of that adjournment.  Matters

7    two through six are omnibus objections to claims that all

8    relate to claims by equity holders who have asserted claims for

9    damages for a variety of reasons.

10           The first one on the calendar is the debtors' 151st

11   omnibus objection.  We're going to address the Hasson response

12   today.  Many of my comments with respect to Mr. Hasson's

13   response are equally applicable to the other similar matters on

14   the calendar.  Mr. Hasson alleges fraud and misrepresentation

15   to equity holders, basically alleging that GM didn't advise

16   equity holders of the precarious financial condition that led

17   to its ultimate bankruptcy and assert claims for damages

18   relating to that misrepresentation.

19           Mr. Hasson doesn't assert any specific

20   misrepresentations to him but rather arguably

21   misrepresentations to the entire equity community.  In any

22   event, Your Honor, Section 510(b) is clear and under Section

23   510(b) damages that arise from the sale or purchase of a

24   security are subordinated to the claims that arise in

25   connection with those securities.

Page 11

1    But there's a specific section dealing with equity

2    and I just want to read and paraphrase Section 510(b) because I

3    think it's very important to the resolution of these matters.

4    510(b) says, Your Honor, "For the purpose of distribution under

5    this title, a claim arising for damages arising from the

6    purchase or sale of a security or for reimbursement or

7    contribution allowed under Section 502 on account of such claim

8    shall be subordinated to all claims or interest that are senior

9    to or equal, the claim or interest represented by such

10    security," and this is the important part, "except that if such

11    security is common stock, such claim has the same priority as

12    common stock."

13    So, Your Honor, if Mr. Hasson has a claim for damages

14    arising from the purchase or sale of common stock, then his

15    claim would be equal to that of other equity holders.  Our

16    confirmed Chapter 11 plan is consistent with the absolute

17    priority rule and requires that unsecured creditors be paid in

18    full before equity holders receive any distribution.

19    So we believe that the plan treats Mr. Hasson's claim

20    consistent with those requirements and believe that Mr.

21    Hasson's claim should be reclassified to its proper place as an

22    equity claim.

23    THE COURT:  Okay.  My phone log indicates Mr. Hasson

24    having signed up for the call.  Mr. Hasson, are you on the

25    phone?

1        MR. HASSON:  Yes, I am.

2        THE COURT:  Would you like to argue?

3        MR. HASSON:  You see, I couldn't hear a thing that

4   the attorney had said.  I hadn't heard one thing.  It was

5   quiet.  I could make a statement at this time.

6        THE COURT:  I'm going --

7        MR. HASSON:  Hello?

8        THE COURT:  Just a minute.

9        UNIDENTIFIED FEMALE SPEAKER:  Are you talking to me?

10        THE COURT:  I would like quiet on the line

11   temporarily.

12        Would one of my folks turn off all of the blowers

13   that are air conditioning the courtroom.

14        MR. HASSON:  Hello?

15        THE COURT:  Just a minute please, Mr. Hasson.  Mr.

16   Hasson, we've now turned off all of the air conditioning in the

17   courtroom.  Can you hear me now?

18        MR. HASSON:  I can hear you pretty good; yes.

19        THE COURT:  All right.  Mr. Smolinsky, what I would

20   like you to do is to summarize the points that you made that

21   were particularly focused at Mr. Hasson.  You had cited a

22   section of the Bankruptcy Code.  I think it's 510(b) upon which

23   GM is objecting.

24        MR. SMOLINSKY:  Yes.  Mr. Hasson, can you hear me

25   now?

09-50026-mg    Doc 10539    Filed 06/24/11    Entered 06/30/11 15:27:07    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 13 of 64

Page 13

```
 1              THE COURT:  Mr. Hasson?
 2              MR. HASSON:  I barely can hear him.
 3              THE COURT:  Pull the microphone very close to you,
 4     Mr. Smolinsky.
 5              MR. SMOLINSKY:  Mr. Hasson, how is this?
 6              MR. HASSON:  That's fine.
 7              MR. SMOLINSKY:  Okay.
 8              THE COURT:  Go ahead please, Mr. Smolinsky.
 9              MR. SMOLINSKY:  Mr. Hasson, as I noted to the Court,
10     your allegations relate to misrepresentations that you allege
11     were made by General Motors to the equity holders community.
12     And I cited to Section 510(b) of the Bankruptcy Code which
13     states, "For the purpose of distribution under this title, a
14     claim arising from recision of a purchase or sale of a security
15     of the debtor or of an affiliate of thee debtor for damages
16     arising from the purchase or sale of such a security or the
17     reimbursement or contribution allowed under Section 502 on
18     account of such claim shall be subordinated to all claims or
19     interest that are senior to such claims," -- I'm sorry -- "that
20     are senior to or equal, the claim or interest represented by
21     such security," and note, "except that if such security is
22     common stock, such security has the same priority as common
23     stock."
24              As I stated, Your Honor, we believe that the plan --
25     the Chapter 11 plan that was confirmed in this case properly
```

Page 14

```
 1    prioritizes Mr. Hasson's claim as an equity claim which is

 2    equal to all other claims and junior to the claims of proper

 3    creditors in this case.

 4            THE COURT:  Okay.  Mr. Hasson, I'll hear your

 5    argument, if you wish.

 6            MR. HASSON:  First off, there's somebody breathing in

 7    the phone.  So, it's very --

 8            THE COURT:  I know.  I have that problem all the

 9    time.  I haven't found out what causes it.  I will ask Court

10    Call to mute everybody except Mr. Hasson and then after I've

11    ruled on Mr. Hasson's argument, to free up other's ability to

12    be heard.  I know what you're talking about Mr. Hasson.  All I

13    can say is it frustrates me also.  Go ahead with your argument,

14    too please, sir.

15            MR. HASSON:  Somebody else just said something.

16            THE COURT:  Well I don't think they -- I didn't hear

17    that and I don't see how they could have.  It must have only

18    been me speaking, Mr. Hasson.

19            MR. HASSON:  Okay.  You know, it's very hard again to

20    hear what he said and there's always rules and different things

21    I guess in the Bankruptcy Code, excuse me, of which I don't

22    know anything about.  That's why I went to an attorney, Bononi

23    & Bononi, of Greensburg, Pennsylvania and I had them look over

24    this.  And they felt, as well as I did, also that we were or I

25    was -- General Motors was wrong in what they did to me by not
```

Page 15

1    letting us know how the company was doing when they were

2    actually in dire straits.  Okay?

3           Let me -- if you don't mind, can I back up a little

4    bit on telling you about GM?

5           THE COURT:  You can but I just want you to assume

6    that I've read your papers, Mr. Hasson.  So you don't need to

7    repeat what you said then.  I would find it most helpful if you

8    respond to Mr. Smolinsky's contention that because you were a

9    stockholder, the fact that you're claiming securities fraud

10   even if it's true, wouldn't give you any more rights than a

11   stockholder would otherwise have.

12          MR. HASSON:  Well, GM didn't give us very many

13   rights, all right, as a stockholder, being a salaried person in

14   General Motors.  To the point of where one day State Street

15   Bank notified us and notified myself, that they had done away

16   with our stock completely.  We had nothing to say about it.

17   Okay?  And it was our stock fund -- it was my pension fund,

18   okay?  So State Street Bank for the benefit of General Motors

19   was just doing away with stock.  You see, I used to stay with

20   GM all these years because they always came through in the end.

21   But now my hope was all gone because of what State Street Bank

22   did and General Motors -- well, they handled General Motors

23   stock.  And the General Motors common stock fund was a fund

24   that was, excuse me, approximately 93.11 percent GM common

25   stock and it was 6.89 percent bonds.  All right?

Page 16

1          But the fact is whenever I said it was -- they

2     actually misrepresented themselves and that's what they did.

3     They misrepresented me completely -- themselves to me

4     completely, otherwise I would have gotten out of that thing

5     whenever it was twenty-five, thirty-five, forty dollars a

6     share.

7          So all your hearing is these people specifying

8     certain rules and regulations of the Bankruptcy Code but what

9     you have to do is take a look at what the people like myself

10    are -- you know, we're just a little person involved in this,

11    have gone through and what they've done to us.  And I mean I

12    can't say much more except that's the way GM is.  They took our

13    salary benefits away and I know they have nothing to do with

14    this hearing today, but they've done everything to the retired

15    salaried employees.

16          THE COURT:  I understand.

17          MR. HASSON:  I don't know what else I could say, but

18    say right in with what you want to answer his question.

19          THE COURT:  Fair enough.  I understand, sir.  Okay.

20    Thank you.

21          MR. HASSON:  You know it was my pension.

22          THE COURT:  I well understand, Mr. Hasson.

23          Mr. Smolinsky, anything further?

24          MR. SMOLINSKY:  No, Your Honor.  We sympathize

25    obviously with all of the parties who have lost money in this

Page 17

1    case but I have nothing further to add.

2              THE COURT:  Okay.

3              MR. SMOLINSKY:  We are bound by the requirements of

4    the Bankruptcy Code.

5              THE COURT:  Okay.

6              MR. HASSON:  It's very hard to Mr. Smolinsky.

7              THE COURT:  Mr. Smolinsky said in substance that he

8    sympathized with you and that there were other retirees who

9    were in the same boat and he sympathized with them as well.

10   But that he was bound by the requirements of the Bankruptcy

11   Code.  That isn't verbatim but that's the substance of what he

12   said.

13             MR. HASSON:  So in other words, the people who had

14   faith in General Motors and stayed with General Motors are the

15   ones who get nothing from General Motors for being with them

16   all these years.

17             THE COURT:  Okay.  I'll speak to that in my ruling.

18   Is there any other stockholder who wants to -- I should be

19   hearing now, Mr. Smolinsky?  I know you have a number of

20   stockholder objections.  I don't know if any of them asked to

21   be heard orally.

22             MR. SMOLINSKY:  I'm happy to quickly run through them

23   and if you want to give one ruling with respect to all --

24             THE COURT:  Well, what I'd -- Mr. Hasson's argument

25   is a variant of the argument that applies to other stockholders

Page 18

 1    as well.  Are there any other stockholders who you know of who

 2    said they wanted to argue today?

 3              MR. SMOLINSKY:  All of them wanted to go forward

 4    today.  I suspect that that meant that they wanted to be heard.

 5    So I would open up the floor and I'll be happy to respond to

 6    anything that is different than Mr. Hasson's arguments.

 7              THE COURT:  Okay.  Court Call would you live-in, if

 8    you will or activate everybody's phone access?  And I want to

 9    ask if there is anybody on the phone who is in a stockholder

10    situation who has either --

11              MS. DITTMEIER:  I am a stockholder.

12              THE COURT:  Okay.  Would you like to argue, Miss?

13              MS. DITTMEIER:  Yes, my name is Domenica Dittmeier.

14    I believe I am listed today.

15              THE COURT:  Yes, you are, Ms. Dittmeier.  I have you

16    on my log.

17              MS. DITTMEIER:  Yes, Judge, there are -- I just have

18    a few points.  I'm an eighty-five year old woman of limited

19    income with a totally disabled eighty-eight year old husband

20    and even -- we lost about thirty-two thousand which I recognize

21    to some people isn't much but it is to us.

22              Now I'm seeking a partial return, whatever I can get

23    on the following basis or one of the basis that I believe

24    stockholders are creditors because the bank lends money,

25    expects to get it back with interest, he's a creditor.  The

MOTORS LIQUIDATION COMPANY, et al.

1  buyer sells, he's a creditor.  The stockholders been doing

2  exactly the same thing and he shouldn't be called anything but

3  a creditor and he should have the same preference and priority

4  as all other creditors.

5          Now I have never saw my money as a gift or a charity.

6  General Motors never indicated otherwise and now they're trying

7  to establish a definition to their benefit, so that we won't

8  get anything.  They want to call us equity interests.  Well, we

9  are stockholders and creditors.  And they think by changing the

10  definition, we can go to the very, very end of the line when

11  there's absolutely not a penny left.  And I don't think they

12  should have the right to change definitions and to call us

13  anything but what is generally assumed to be a lender, a

14  creditor.

15          So on that basis, I would like to have the same

16  priorities as any other creditor and not put at the very end of

17  the line and for any other reason that Your Honor could see

18  fit, I would like whatever portion you feel I am entitled to.

19  I would very much like to have something back.  And I don't

20  think that the new GM which is probably being run by the same

21  people, should profit by abandoning the old faithful ones.  I

22  think we are entitled to a higher priority and I very, very

23  much like -- would like to get a little something, okay, Your

24  Honor?  I hope you understand and appreciate what I'm saying.

25          THE COURT:  I do.  Thank you.  Okay.  Are there other

09-50026-mg    Doc 10539    Filed 06/24/11    Entered 06/30/11 15:27:07    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 20 of 64

Page 20

1  stockholders --

2          MS. DITTMEIER:  Are you there?

3          THE COURT:  Yes.  I am here, believe me and I heard

4  everything you said, Ms. Dittmeier.

5          Are there any other stockholders who wish to be heard

6  besides Mr. Hasson and Ms. Dittmeier?

7          MR. STERNIAK:  Yes, my name is Edmond Sterniak.

8          THE COURT:  Your name again, please, sir.

9          MR. STERNIAK:  Edmond Sterniak.

10          THE COURT:  Oh, yes, Mr. Sterniak, forgive me.  Okay.

11  Go ahead, please.

12          MR. STERNIAK:  Okay.  So like the woman just stated,

13  you know, we stayed with it to the end.  We put money in it and

14  they want to just throw us out and not give us anything but

15  already the new GM, they want to turn around and give

16  themselves bonuses already.

17          I can't see -- that should be criminal for them to do

18  that.  I mean they're taking from us.  They knew they were in

19  trouble.  We still stayed with them because we've always

20  been with them.  I still drive General Motor vehicles.

21          We stay with them to the end.  We show our faith.  I

22  mean we do everything possible and they're just going to throw

23  us out like nothing, like we're not even there?  And they're

24  giving themselves bonuses again already.  You know, what's to

25  stop them to keep from doing this and doing this over and over

Page 21

 1   again?  It's just not right.  Like Mrs. Dittmeier said, I think

 2   we should be given first priority of getting something back,

 3   sir.

 4          THE COURT:  Fair enough, Mr. Sterniak.  Thank you.

 5   Other folks who I haven't given a chance to --

 6          MR. STERNIAK:  And I guess, you know, I'll leave it

 7   at that, I guess.  I just, you know, hopefully you can see

 8   through this and, you know, award us a little something, anyway

 9   because even myself, I lost less than Mrs. Dittmeier but, you

10   know, I spent what I lost -- you know, it was twenty years of

11   savings that I lost.

12          THE COURT:  I understand, sir.

13          MR. STERNIAK:  And I guess that's about all I have to

14   say, sir.

15          THE COURT:  Very well.  Thank you.  Anybody who is in

16   the stockholder category who I haven't given a chance to be

17   heard yet?

18          MR. TANCIAR:  Yes, Your Honor.  This is Ron Tanciar.

19   I would like to say a few words if I may.

20          THE COURT:  Yes, you may, Mr. Tanciar.

21          MR. TANCIAR:  Judge Gerber, just a couple of points.

22   First of all, I agree with everything that has been said and

23   you have my letter in front of you.  I was kind of led to

24   believe that GM was going to go out with -- and do what Stemple

25   did in the early nineties when this country went through a

Page 22

```
 1   recess and that was to go out and raise money from our

 2   financial institutions across this nation and also issue new

 3   stock.

 4          Well, unfortunately, that didn't transpire and being

 5   a GM retiree who spent over thirty years with the company, I

 6   was hoping that with good faith with the company and with loyal

 7   employees, such that they would come through and at least award

 8   us with the new stock that they issued.

 9          And if my letter is in front of you, Your Honor, I

10   did attach an article and the top of article says top GM

11   executives received billions in stock prior to the IPO.  So

12   once again, you know, the big boys on the top, you know, try to

13   run the company, do the right things, well they always have

14   their pockets out first.  And I would appreciate if the Court

15   would listen to our grievances and hopefully you'll award the

16   Court leave to -- at least maybe give us a portion of some of

17   the new stock that has been issued.  And that's about all I

18   have to say, Your Honor.

19          THE COURT:  Okay.  Thank you.  All right.  Anybody

20   else?

21          MR. SMOLINSKY:  Your Honor, just -- Joe Smolinsky

22   again.  Just two points; the first point for the record, just

23   to respond to that last comment, obviously as this court knows,

24   new GM, the one that just had its IPO and went public is not

25   under the watch of this court.  It is a separate company from
```

MOTORS LIQUIDATION COMPANY, et al.

Page 23

1    General Motors Corporation, now Motors Liquidation Company.

2            MR. TANCIAR:  I understand that but the way I read

3    this was that the executives prior to the new stock being

4    issued, they were able to receive the stock.  Now if they were

5    employed under the new GM, that I can't tell you.

6            THE COURT:  Okay.

7            MR. SMOLINSKY:  The second point I just want to

8    highlight, just responding to Ms. Dittmeier, I know she's

9    unfamiliar with the term equity or equity interests.  If Your

10   Honor would like, I'd just --

11           THE COURT:  Yes.  No, you're going to say that equity

12   interest is the word of art that's used in the Bankruptcy Code

13   that covers stock.

14           MR. SMOLINSKY:  It's actually defined, Your Honor, in

15   Section 101.16 of the Code which says, "The term equity

16   interest means (a) share in a corporation, whether or not

17   transferrable or denominated stock or similar security."  And

18   that's what -- that's the definition that moves into the

19   priority scheme elsewhere in the Code.

20           THE COURT:  Okay.  Everybody standby for a minute,

21   please.

22           (Pause.)

23           THE COURT:  I am now going to rule but before I do, I

24   want to say that there have been many, many things in the GM

25   bankruptcy case that have saddened me and the realities of what

1   the law requires in this situation is one of them.  Many, many

2   employees have lost their jobs.  Many, many creditors are

3   getting only portions of what they're owed. Maybe if we're

4   lucky, some of them will get thirty cents. That's still a loss

5   for very many people.

6          I have had people coming in in wheelchairs who were

7   victims of car wrecks who will be getting only small portions

8   of what a jury might otherwise award them.  And here we have

9   three people who have spoken but who are only a small portion

10  of what I suspect are tens of thousands of stockholders who

11  have found that stock that they got, in many cases as part of

12  their pension plans, turned out to be worthless when GM had the

13  financial difficulties it did.

14         On this motion, I have old GM's motion to disallow

15  claims by stockholders who were seeking the treatment that

16  creditors get and to which Mr. Smolinsky said, and I understood

17  both halves of what he said, that he had great sympathy but

18  that he was required by law to follow the law.  And

19  unfortunately, I am in the same situation.

20         Although this issue is not hard from a viewpoint of

21  bankruptcy law, the principles aren't as well known to people

22  who aren't lawyers, even educated people.  So I'm going to take

23  a couple of minutes to layout the basis for my ruling which is

24  unfortunately, that I am going to have to disallow these

25  claims.

Page 25

1           American bankruptcy law, and as far as I know, the

2    bankruptcy law of every other country, as well, dishes out

3    whatever a company has available to satisfy claims against it

4    in the order of priorities.  After certain special priorities

5    are taken care of, most significantly for certain types of

6    employee wages and taxes and a few other things, creditors then

7    share based upon their claims, but the creditors must be paid

8    in full before the next level which is stock can get paid.

9    This is a slight oversimplification because sometimes there are

10   different levels of priority among creditors and sometimes

11   there are different levels of priority among stockholders.

12           Ms. Dittmeier commented on one of the obscure words

13   of art that's used in bankruptcy.  She said what are you

14   talking about, equity interests?  I'm a stockholder.  That's a

15   paraphrase of what she said but that's in substance the point

16   she was making.  And the answer is the one that Mr. Smolinsky,

17   the lawyer for old GM said in his reply which is that equity

18   interest is the word of art that bankruptcy uses to describe

19   certain types of ownership of the company that are different

20   from creditor claims, the most significant example of that

21   being common stock which is what most of GM's equity holders

22   had.  Putting it another way, which is what most of GM's

23   stockholders had.

24           Because the American system, for lack of a better

25   word, says that you've got to pay creditors first, stockholders

Page 26

1    can't be given anything out of the assets of an insolvent

2    company like GM until the needs and concerns of the credits

3    have been satisfied.  And although I don't know the exact

4    figures, I'm going to use a number by way of example.  It looks

5    like the creditors may be getting perhaps thirty cents in value

6    on their claims on a dollar's claim which means they're going

7    to lose seventy percent of their claims.  And because of that,

8    I'm not in a position to allow claims on behalf of stockholders

9    because the creditors who are higher than they are in the order

10   of priorities haven't been paid in full.

11           Now, Mr. Hasson raised a variant of that.  Mr. Hasson

12   didn't ask for payment as a stockholder alone but he said that

13   GM owes him as a creditor rather than as a stockholder, because

14   GM was guilty of what I'll call in shorthand, securities fraud,

15   for failing to tell him all of the facts concerning General

16   Motors Financial condition.

17           Assuming for the purposes of the analysis that GM was

18   not fully truthful or fully disclosing its financial condition

19   to its stockholder community and I don't make that finding but

20   I simply assume it for the purpose of the analysis, the

21   Bankruptcy Code has a special provision that deals with that

22   and it's called 510(b).  And it arises because for better or

23   worse, securities fraud is fairly common in the cases that we

24   bankruptcy judges see.  And that if you could get a double

25   recovery, once on your debt and a second time for the

Page 27

1   securities fraud, you'd get a leg up over creditors if you were

2   defrauded when you bought a debt security, like a bond or a

3   note.

4           Under the same principle, if a stockholder who would

5   normally have to get paid only after the creditors were paid in

6   full, could in essence bootstrap that into a creditor claim,

7   that stockholder would be getting a leg up over other

8   stockholders who might have been subject to the same

9   information and in any event, it would be a way of getting

10  around the normal requirements of the Bankruptcy Code.  And

11  that's the reason why Congress in 1979 put in this provision,

12  510(b) which Mr. Smolinsky read at the beginning of the

13  argument which is in substance, an anti-bootstrapping

14  provision.

15          So folks, you've got to believe me when I say I know

16  how you feel but as a matter of law, I just can't help you.

17  Stockholders can't get paid until creditors have been paid and

18  I have thousands of creditors who haven't been paid in full.

19  In some cases, their personal circumstances, and I'm thinking

20  especially of some of the car wreck victims but I'm sure there

21  are many who put their life savings in bonds rather than stock,

22  who suffered the same kinds of injury.

23          There are limits to how much I can help the people

24  who invested in GM.  And as a person who is sworn under the

25  Constitution to comply with the law, I've got to apply the law.

09-50026-mg   Doc 10539   Filed 06/24/11   Entered 06/30/11 15:27:07   Main Document
Pg 28 of 64
MOTORS LIQUIDATION COMPANY, et al.

Page 28

1    So I'll say one more time, I really do understand your

2    circumstances and I feel for you but under the law, my hands

3    are tied.

4              MS. DITTMEIER:  But I understand that you've already

5    ruled --

6              THE COURT:  And forgive me, I must continue.  And for

7    those reasons, the debtors' objections to these claims are

8    sustained.  Mr. Smolinsky, you are to settle an order in

9    accordance with this oral ruling at your earliest reasonable

10   convenience.

11             I want you to triple the normal time that you give

12   notice of settlement.  Give the folks three weeks.  You can use

13   mail for that.  The time to appeal my decision is going to run

14   from the time of the entry of the order and not from the time

15   that I've just dictated this decision and not from today.

16             MR. SMOLINSKY:  Thank you, Your Honor.  We will.

17             THE COURT:  Okay.  What's the next matter on the

18   calendar?

19             MR. SMOLINSKY:  The next matter on the calendar, it's

20   item 7 on the contested agenda is omnibus claims motion number

21   179.   There are two remaining claims under this objection.

22   The first is Kathryn Slade and the second is Larry Schramm.

23             This is one of a number of claims filed against the

24   estate seeking damage for prepetition loss of retiree benefits,

25   particularly healthcare and life insurance benefits.

1          MS. SLADE:  Hello?

2          THE COURT:  Hello?

3          MS. SLADE:  The microphone went blank.

4          THE COURT:  All right.  Mr. Smolinsky --

5          MR. SMOLINSKY:  Should I try this one?

6          THE COURT:  Yes, why don't you take that microphone

7    from the counsel table and I want you to do exactly what you're

8    doing now, lift it up and hold it Oprah Winfrey style, just

9    keep that thing close to your mouth and see if they can hear

10   you better that way.

11          MR. SMOLINSKY:  Let me try, Your Honor.  Hopefully

12   this will work better.

13          THE COURT:  Let me ask you to pause for a second, Mr.

14   Smolinsky.  Could the folks on the phone hear him when he said

15   "Let me try it now, Your Honor?"

16          UNIDENTIFIED MALE SPEAKER:  Yes, we could hear him.

17          THE COURT:  Okay.  Thank you.  Go ahead, Mr.

18   Smolinsky.

19          MR. SMOLINSKY:  Thank you, Your Honor.  So this is

20   the 179th omnibus objecting to claims of Kathryn Slade and

21   Larry Schramm.

22          UNIDENTIFIED MALE SPEAKER:  Hello?  I cannot hear.

23          MS. SLADE:  Hello.  This is Kathryn.

24          THE COURT:  Mr. Smolinsky, do the best you can but

25   forgive me folks, I can't just end my hearing because of

MOTORS LIQUIDATION COMPANY, et al.

Page 30

1    problems on the phone.  I'm going to ask the lawyer to hold the

2    microphone very close to his mouth but I have to move on with

3    the hearing.  Go ahead, Mr. Smolinsky.

4              MR. SMOLINSKY:  Your Honor, prior to the petition

5    date, General Motors Corporation modified certain of its

6    benefit plans to reduce the cost of the benefits they're under.

7    Subsequent to those modifications, the debtors after filing the

8    bankruptcy entered into the master sale and asset purchase

9    agreement, under which new GM, a newly formed company, agreed

10   to assume those benefit plans as had previously been modified.

11             Your Honor, over the course of time, the General

12   Motors Corporation benefit plans have been periodically

13   modified and reduced.  This is not the first time.  Under

14   ERISA, ERISA clearly holds that only vested benefits can't be

15   changed.  And the assumption is that these types of benefit

16   plans, healthcare and life insurance benefit plans, are not

17   vested unless there's a very strong statement indicating that

18   there is an intent to treat those benefits as vested.  In other

19   words, not able to be changed.

20             To the contrary, Your Honor, each and every one of

21   the General Motors Corporation plans provide clearly that

22   they're subject to amendment or termination at any time in the

23   company's discretion.  That language which is cited in our

24   papers also appears in virtually all of the various documents

25   which the human resources department at General Motors

MOTORS LIQUIDATION COMPANY, et al.

Page 31

1    Corporation uses in their day-to-day activities.

2          Several courts, many courts, have confirmed that

3    these types of plans are unvested and can be modified or

4    terminated.  The Sprague case, Sprague v. General Motors

5    Corporation, that's a sixth circuit case, Moore v. Metro Life

6    Insurance Company which is a second circuit case, those cases

7    all hold that there needs to be a very strong statement that

8    claims of these types of benefits, are vested in order to

9    prohibit the company from being able to modify and terminate

10   those plans when they need to.

11         So, Your Honor, we have two remaining objections for

12   the 179th omnibus; Larry Schramm and Kathryn Slade.  Both of

13   them are long term -- long time employees of General Motors

14   Corporation.  Both are retirees.

15         Mr. Schramm concedes in his papers that General

16   Motors Corporation reserved its rights to modify benefit plans,

17   yet argues that for equitable reasons, they should not be

18   allowed to modify those benefits because he wouldn't have

19   retired had he known that those benefits were subject to

20   change.

21         Kathryn Slade and, Your Honor, I believe she filed a

22   supplemental response this morning, I don't know if Your Honor

23   has it, we can hand it up if you don't.

24         THE COURT:  I think I did, Mr. Smolinsky but I may

25   have left it in my chambers.  Go ahead.

Page 32

1          MR. SMOLINSKY:  We can hand up a copy, Your Honor.

2     Ms. Slade similarly argues that her benefits should not be

3     modified.  She is continuing to get benefits as is Mr. Schramm

4     from new GM although in the --

5          THE COURT:  But in the lesser amount --

6          MR. SMOLINSKY:  -- lesser --

7          THE COURT:  -- after the modification.

8          MR. SMOLINSKY:  That's correct, Your Honor.  So

9     again, Your Honor, we sympathize with all of the retirees,

10    employees, stockholders, but we are constrained.  This is a

11    liquidating estate.  These benefits were properly modified.

12    New GM agreed to assume those benefits that existed at the time

13    of the bankruptcy.  And we are constrained and have no ability

14    to honor claims for damages resulting from a loss of those

15    benefits.

16         THE COURT:  Okay.  Thank you.  Ms. Slade, my log

17    shows that you may have signed up for the call.  Are you on?

18         MS. SLADE:  I am on.  Can you hear me?

19         THE COURT:  yes, I hear you pretty well.  Would you

20    like to argue?

21         MS. SLADE:  Well, Judge Gerber, my only argument is

22    very similar to one of the earlier one around the stockholders

23    claims.  GM hourly and salaried management, as I gotten my

24    statement this morning, have been taking these huge bonuses.

25    GM old or new, it's all the same company in my opinion.  They

MOTORS LIQUIDATION COMPANY, et al.

Page 33

1    are taking from the salaried retirees great amounts of money,

2    at the same time profiting from our hardships and our

3    sacrifices.

4              The only thing I guess I would really like to point

5    out was the same as what Mr. Henderson said in his letter to

6    the GM retirees back in June of '09.

7              THE COURT:  You're talking about Fritz Henderson, the

8    former CEO of the company?

9              MS. SLADE:  Yes.  But what he said was to continue to

10   support GM and -- or we're going to have to sacrifice.  Well,

11   we will always continue to sacrifice as GM retiree in our

12   medical and in our insurance.  And we're still going to

13   continue to sacrifice and the upper management scrapes in great

14   heaps of money.  I guess there's such an unfairness when you

15   see what I put in and Larry put in thirty something years, all

16   these other folks that have dedicated a life to a company who

17   is still making profits and seriously, riding on some of the

18   hard work that we performed and we're just being chucked by the

19   wayside.

20             Sir, I understand you have to follow the letter of

21   the law and if that's the way it goes, I understand, I accept

22   that.  I just appreciate being heard as a GM employee and as a

23   fellow human being.  That's all.

24             THE COURT:  Okay.  Thanks.  Mr. Smolinsky, I made a

25   note in my note --

09-50026-mg   Doc 10539   Filed 06/24/11   Entered 06/30/11 15:27:07   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 34 of 64

Page 34

1          MS. SLADE:  Is anyone there?

2          THE COURT:  Yes.  The last thing I said was thank

3    you, Ms. Slade or words to that effect.  And then I was about

4    to ask Mr. Smolinsky, the lawyer for old GM the name of the

5    other person who is similarly situated which I didn't put in my

6    notes.  I want to ask if he wants to be heard on the phone

7    also.

8          MR. SMOLINSKY:  That's Mr. Schramm, Larry Schramm.

9          THE COURT:  Okay.  Mr. Larry Schramm, are you on the

10   line?

11         MR. SCHRAMM:  Judge Gerber, this is Larry Schramm.

12         THE COURT:  Would you like to be heard in argument

13   also?

14         MR. SCHRAMM:  Please, if I could.  I have just a

15   couple of points I'd like to make.

16         THE COURT:  Sure.  Go ahead, sir.

17         MR. SCHRAMM:  Even though they said during an earlier

18   discussion, that ERISA does not provide for anything other than

19   the pension part of it or the other welfare benefits as they

20   call it.  For my thirty-six, thirty-seven years at GM, over

21   half of that time, there were no exclusions that I was aware of

22   in the retirement package that GM put out almost every year to

23   salaried employees, a total compensation statement.  And

24   included in that was figured in the retirement benefit that I

25   was getting.  That I'd be working for less money on a current

09-50026-mg   Doc 10539   Filed 06/24/11   Entered 06/30/11 15:27:07   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 35 of 64

Page 35

1    benefit to accrue some sort of benefit after I retire.

2            And that, along with what I was -- and the retirement

3    that I took was based on, predicated on getting some sort of

4    welfare benefit, you know, some of my other medical expenses

5    and things paid for in retirement.  And I early retired and it

6    got changed.  I have a hard -- it's hard for me to believe that

7    the retirement was not the -- they knew what they were going to

8    do prior to having you retired.  And the termination systems

9    (sic) that came into that, because I was notified by the

10   program that I -- because of what happened, I was actually --

11   you know was not necessarily a voluntary retirement and by

12   definition of the termination systems (sic).

13           THE COURT:  Pause please, Mr. Schramm.  GM's response

14   says in substance that the disclosures to its employees all

15   provided that there was an express disclosure of the fact that

16   the plan could be modified or terminated by the employer and

17   they said in their reply, and I'm looking at page 4 of their

18   reply, that you don't dispute their right to amend or terminate

19   in accordance with the terms.  And then they go on to say but

20   you're further arguing that because you retired, it shouldn't

21   be subject to being changed after that.

22           Did your -- is it agreed on your part that your

23   paperwork did have that right to modify or terminate or do you

24   have some different document you want to show me?

25           MR. SCHRAMM:  No.  The -- I guess the question I have

MOTORS LIQUIDATION COMPANY, et al.

Page 36

1    is was there a reason so they could get the retirement, so that

2    would be able to at that point in time change knowing -- did

3    they know at the time of my retirement that they were going to

4    make a change at that point, and find -- that's after I

5    retired.

6              THE COURT:  When did you retire, sir?

7              MR. SCHRAMM:  October 2008.

8              THE COURT: 2008.

9              MR. SCHRAMM:  Yes.

10             THE COURT:  Was there any paperwork that you signed

11   when you retired that changed what they said about the right to

12   modify or terminate that had been in place before you retired?

13             MR. SCHRAMM:  No, I had a standard retirement forms

14   to sign.

15             THE COURT:  Okay.  Anything else, Mr. Schramm?

16             MR. SCHRAMM:  That's all.  Thank you.

17             THE COURT:  Thank you.  Okay.  Mr. Smolinsky, do you

18   wish to reply?

19             MR. SMOLINSKY:  No, Your Honor.  I just want to make

20   one comment for Ms. Slade's benefit.  I think she wrote in her

21   reply that she was concerned about her pension and I just want

22   to make clear that there were no modifications to the pension

23   plan that was assumed by new GM.  So she doesn't have to worry

24   about these procedures here modifying those benefits.

25             THE COURT:  When we talk about welfare plans, we're

09-50026-mg    Doc 10539    Filed 06/24/11    Entered 06/30/11 15:27:07    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 37 of 64

Page 37

1    talking about retiree medical benefits?

2            MR. SMOLINSKY:  Medical and life insurance.

3            THE COURT:  Medical and life insurance.  Okay.  All

4    right.  I think there were only two employees in this category,

5    am I correct or two retirees in this category?

6            MR. SMOLINSKY:  On today's calendar, that's correct,

7    Your Honor.

8            THE COURT:  Okay.

9            MR. SMOLINSKY:  All relating to the same objection

10   which if the relief is granted, will resolve that objection.

11           THE COURT:  All right.  Then stand in place for a

12   second.  I'm going to rule on these.

13           Folks, once more I'm in the unhappy position of

14   having to comply with the law, notwithstanding the hardship

15   that my ruling will have on the two people who are affected

16   here who, in fact, may only be the most conscientious of a

17   larger group who were affected in a similar way.

18           Here, GM -- old GM modified its retiree's medical and

19   life insurance benefits.  Benefits of this type are described

20   in the law as welfare plans.  Before the plans as modified

21   typically by providing for lesser benefits, were then assumed

22   by new GM, which would continue to perform under them but in a

23   typically smaller way in the form of delivering benefits.

24           I do note and it's important to note as Mr. Smolinsky

25   clarified at the end, we're not talking about pensions.  We're

09-50026-mg   Doc 10539   Filed 06/24/11   Entered 06/30/11 15:27:07   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 38 of 64

Page 38

1    talking about medical benefits which retirees normally get

2    after they retire to cover them up until the time they get

3    Medicare and sometimes to provide a supplemental benefit above

4    what you'd get under Medicare.

5           It is undisputed, and we dealt with this back in June

6    of 2009 when I got a request by some folks who were going to

7    represent retirees, asking me to form a committee to represent

8    their interest, it is undisputed that insofar as the retirees

9    we're talking about here could be affected by this, that GM,

10   now called old GM, had expressly provided in its plans and in

11   the disclosures to its employees, that it reserved the right to

12   terminate or modify their plans and its rights to do so were

13   upheld by the Sixth Circuit Court of Appeals in a case called

14   Sprague v. General Motors.

15          That reservation was part of the contract, if you

16   will, between the retiree and the employee.  And while any time

17   an employee loses the benefits, even in part, that's a

18   hardship, it was part of the contract that I'm sworn to enforce

19   as a judge.

20          Now it is some, but not total consolation that new GM

21   agreed as part of its purchase agreement, to take on the

22   remaining medical benefits in their modified form.  But sadly,

23   I'm not allowed to look at the hardship on any particular

24   employee.  I've just got to determine what are the rights of

25   the parties because I have a responsibility not just to the

MOTORS LIQUIDATION COMPANY, et al.

Page 39

1    folks who were objecting, but to all of GM's other creditors,

2    as well.

3            And there is only so much in the way of available

4    value, if you will, to distribute to the entirety of old

5    General Motors creditor community.

6            By the same token, it's clear that the undertaking

7    that new GM took on was to take the welfare benefits only in

8    their modified form which insofar as I'm aware is in every

9    case, providing less in the way of benefits for the retiree

10   than it used to provide.

11           Now Mr. Schramm makes a slight variant of the

12   argument.  He says that he wouldn't have retired if he thought

13   that GM was going to do that to him.  And he says that he

14   thinks there was an intention to take away his benefits when he

15   retired at the end of 2008 and that wasn't disclosed to him.

16           There has been no allegation, nor proof, that GM lied

17   to him in that regard.  At most, I have an argument that there

18   just wasn't a disclosure of that type.  However, given the

19   rights that were reserved under the plan, I'm not in a position

20   to find that that provides an exception to the general rule.

21           So for the same, in some ways, reasons as we had

22   before, which is ultimately that I'm bound to comply with the

23   law and notwithstanding its hardship on particular affected

24   retirees, I must sustain the objection.

25           But Mr. Smolinsky, with the same procedural

09-50026-mg   Doc 10539   Filed 06/24/11   Entered 06/30/11 15:27:07   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 40 of 64

Page 40

1   requirements that I imposed on the stockholders, I want you to

2   triple the amount of notice you're giving before you enter the

3   order and I want to say in baby talk, say explicitly that the

4   time to appeal does not run from today.  It will run from the

5   time of entry of the order.

6         Ms. Slade, Mr. Schramm, I want to note for you and

7   also for the stockholders if they're still on the phone, that

8   the time to appeal from a decision of a bankruptcy court is

9   much shorter than the time to appeal from an order of a

10  district court.  You've only got fourteen days.  So just keep

11  that in mind if you do decide that you want to appeal.

12        Mr. Smolinsky, what's your next matter?

13        MR. SMOLINSKY:  Thank you, sir.  I believe the next

14  matters relate to Billy Ray Kidwell which I think you indicated

15  you wanted to hold to the end of the hearing; is that correct,

16  Your Honor?

17        THE COURT:  Yes, I don't see Mr. Kidwell on my call

18  in log.  And I don't see anybody who I would think might be Mr.

19  Kidwell in the courtroom.  Mr. Kidwell, are you on the phone?

20        (No response.)

21        THE COURT:  No.  Am I right that Mr. Kidwell isn't in

22  the courtroom?

23        (No response.)

24        THE COURT:  Right again.  I've read the papers, Mr.

25  Smolinsky, and am required to sustain old GM's objection and to

09-50026-mg   Doc 10539   Filed 06/24/11   Entered 06/30/11 15:27:07   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 41 of 64

Page 41

1    grant new GM all of the requests new GM sought, as well with

2    the exception of enjoining Mr. Kidwell from continuing his

3    litigation.  What I state in the way of a ruling on the merits,

4    of course, will be stuff that either old GM or new GM could use

5    if Mr. Kidwell chooses to continue his litigation elsewhere.

6         I was originally going to dictate a decision but my

7    script, if you will, for it runs twelve pages and with him not

8    on the call, my voice starting to give out already, I don't

9    think I'm going to burden everybody with reading a twelve page

10   script now.  I think instead what I'm going to do is put a

11   caption on it and just post it on ECF.

12        I guess I will hear argument by new GM as to my

13   tentative or my instinct that I don't want to be enjoining

14   litigants from raising issues.  I mean the guy at least

15   seemingly has a gripe with respect to a vehicle, a truck that

16   has given him one nightmare after another.  This isn't a Martin

17   Tragona (ph.) type of situation in my view.  You've got a guy

18   who was upset and was trying to get his remedies and if he

19   didn't do it the right way, I'm not of a mind to enjoin him

20   from looking to the courts.  I don't think he has a remedy but

21   I'm not going to enjoin him.

22        Mr. Steinberg, do you want to argue that?

23        MR. STEINBERG:  Good morning, Your Honor.  I'm going

24   to raise my voice, just in case someone on the phone needs to

25   hear but it's not intended to be shouting at anybody.

1          THE COURT:  Hopefully not me, among others.

2          MR. STEINBERG:  Your Honor, I certainly am not

3     shouting at you or anybody else.  We did not move affirmatively

4     in this court but we responded to Mr. Kidwell's motions that he

5     had filed and he had filed numerous motions.  The disputes with

6     Mr. Kidwell have traversed the state courts in Florida, the

7     federal district court in Florida, and now before Your Honor.

8     And there have been appeals taken from the district court

9     decision up and down to the circuit court level.  I am not

10    going to try to --

11         THE COURT:  The circuit court of appeals or the

12    Florida circuit court?

13         MR. STEINBERG:  The circuit court of appeals.  I am

14    not going to try to argue with Your Honor's ruling that he

15    should be enjoined from pursuing whatever remedy he thinks is

16    appropriate.  We do believe that based on Your Honor's ruling,

17    that he should follow the appropriate procedures and we are to

18    some extent, empathetic that he's a pro se litigant and

19    therefore, he may not be fully familiar with exactly how to put

20    forth what he believes is his grievance.  But I am not here

21    today to try to talk Your Honor out of your ruling on the

22    injunction.

23         THE COURT:  All right.  Very well.  Thank you.  Then

24    a written decision on Mr. Kidwell's various claims will be

25    forthcoming out of my chambers in the next couple of days.

09-50026-mg   Doc 10539   Filed 06/24/11   Entered 06/30/11 15:27:07   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 43 of 64

Page 43

1          MR. SMOLINSKY:  Thank you, Your Honor.  We now move

2    to the uncontested portion of the calendar.  Your Honor, the

3    first matter is a motion by the United States of America to

4    approve a consent decree.  If it's okay, I'll just handle that

5    motion and Mr. Jones could make comments if necessary.

6          Your Honor, we continue to make progress on the

7    environmental front.  This consent decree is similar to ones

8    that you've approved in the past as we continue to narrow the

9    scope of the EPA's global claim filed in this case.  This

10   consent decree resolves five additional sites in New York, New

11   Jersey and Indiana.

12         I believe Your Honor has actually signed an order

13   approving this motion on Friday.

14         THE COURT:  You anticipated the question I was going

15   to ask to you or Mr. Jones, Mr. Smolinsky.  I had been under

16   the impression, unless I am confusing the settlement and I know

17   that there have been a lot of environmental settlements, that

18   on this one which involved if I recall, the Passaic River and

19   perhaps the tribe upstate, involving the Messina plant, but I

20   may have it confused with another was below the threshold for

21   which the old GM estate needed my okay, that the U.S.

22   government still needed my approval to make sure that the

23   government was acting in accordance with the public interest

24   but nobody had complained either in proceedings before the U.S.

25   government or in this court contending that the government

MOTORS LIQUIDATION COMPANY, et al.

Page 44

1    hadn't done its job and I thought that I could therefore sign

2    it without a hearing.  And I think I did.  Are we talking about

3    the same one?

4            MR. SMOLINSKY:  Yes, Your Honor.  That's correct.

5    The government lodged the consent decree for comment period

6    like it has in the past and there were no objections.  And Your

7    Honor was free to sign the order, although we did schedule it

8    for today.

9            There is one more companion stipulation that's

10   referred to in the motion but wasn't attached and if I can, I

11   would just like to spend a minute walking Your Honor through

12   it.

13           THE COURT:  Sure.

14           MR. SMOLINSKY:  We have done this in the past.  As

15   Your Honor may recall in connection with confirmation of the

16   plan, the U.S. government asked that they reserve their rights

17   with respect to setoff and the confirmation order so-provides.

18           Your Honor, may also recall that under the master

19   sale and asset purchase agreement, the debtors transferred to

20   new GM all rights to tax refunds.  The issue in the stipulation

21   which will be submitted to Your Honor in the next day or so,

22   which I believe now has all of the requisite approvals, and Mr.

23   Jones can speak to that, reserves the right to setoff the

24   claims, certain portions of the claims, the 11.5 million

25   dollars which is being provided to the government in connection

Page 45

1    with the settlement against tax refunds that the government

2    owns MLC and now new GM.

3           The debtors are somewhat in the middle here.  The

4    debtors just want to make sure that we don't end up in a

5    situation where the government exercises a right of setoff and

6    new GM or the government then seeks to get real dollars from us

7    for violation of the master sale -- master purchase -- sale and

8    purchase agreement.

9           So what the stipulation provides is that -- and the

10   government is currently in negotiations with new GM over

11   allowing the setoff to take place.  The result of the setoff,

12   if that agreement is reached, is that the claims against the

13   estate will actually be reduced at no cost to the estate.  So

14   this is a benefit to the estate to the extent that the

15   government could reach agreement with new GM.

16          But those discussions are not yet complete, so what

17   the stipulation does is on account of the 11.5 million dollars

18   which is being settled today, only a portion of that will be

19   distributed today in the next quarterly distribution.  The rest

20   will be held in abeyance pending a determination as to whether

21   that agreement with new GM is reached or not.

22          If an agreement is reached, the setoff will take

23   place and the GUC Trust will not be responsible for making any

24   further distributions on account of the consent decree.  If

25   that agreement is not reached, then the GUC Trust would go

Page 46

1    ahead and make that distribution.  So I wanted to put it on the

2    record that from the GUC Trust perspective and from the Motors

3    Liquidation Company's perspective, and I'd like Mr. Jones to

4    confirm this, the impact of the stipulation is never to assert

5    claims, additional claims against the estate or the GUC Trust

6    but rather to potentially reduce the number of claims that

7    could be asserted.

8            THE COURT:  Let me hear from Mr. Jones and also if

9    either wants, new GM or the GUC Trust to find out if anybody

10   has any problems with what Mr. Smolinsky said.  Mr. Jones, good

11   morning.

12           MR. JONES:  Thank you, Your Honor.  David Jones from

13   the U.S. Attorney's Office for the government.

14           First to start with, Mr. Smolinsky's last point, that

15   is correct.  His characterization of the intended stipulation

16   is correct, that serves simply for purposes of this case to

17   alter what would otherwise be the distribution of the full 11.5

18   million settled claim amount in the next distribution, so that

19   2.5 million is being held back in anticipation of a potential

20   offset recovery.  There will be a distribution on account of a

21   total of nine million on these five settled claims and then

22   with the estate to simply hold back enough assets to permit an

23   eventual unsecured distribution if the offset does not

24   materialize.  Otherwise, if we do achieve an offset recovery,

25   we will notify the estate and the assets tied up for what would

Page 47

1    be a distribution and that 2.5 million slice would then be

2    freed up for other distributions or estate purposes.

3              As Mr. Smolinsky represented, I've been told by

4    counsel for all the signatories to the stipulation and that's

5    counsel for the state of Indiana, the state of New York, St.

6    Regis Mohawk Tribe, and MLC and the GUC Trust, that they have

7    authorizations needed to sign.  I'll need a day or two to

8    actually acquire a fully executed copy and submit it.  But

9    that's the -- I understand I have everyone's signoff that I

10   need.

11             If I can, Your Honor, let me just backup to where we

12   started which is that yes, the Court did enter an approval

13   order and Your Honor's description of the status of this matter

14   was absolutely correct.  This is an unobjected to consent

15   decree, and I'll specify regarding natural resource damage

16   claims of the government.  So these are brought federally on

17   behalf of the Department of Interior and NOAA, the National

18   Oceanic and Atmospheric Administration.  These are to

19   compensate for natural resource harms caused by contamination,

20   whereas EPA claims, roughly speaking are for cleanup costs.

21             In part, these claims are brought jointly with co-

22   trustees, namely the states that I just mentioned and the tribe

23   that I just mentioned and therefore, the resolution is all

24   bundled together.  I can give the Court a quick update on what

25   remains open in the environmental front with the government in

MOTORS LIQUIDATION COMPANY, et al.

Page 48

1    case that's helpful.  On the natural resource damage front,

2    there's only one site remaining unresolved.  That's in Onondaga

3    County, New York.  We are attempting to negotiate a resolution

4    of that and if we fail, I guess we'll have to come back to the

5    Court and this --

6             THE COURT:  That's the site that engendered several

7    confirmation objections if I recall --

8             MR. JONES:  Correct.

9             THE COURT:  -- in Onondaga County's, actually sending

10   Onondaga's County attorney to argue, if I recall.

11            MR. JONES:  That is correct, Your Honor.  And that

12   same site is also open on the EPA side and it's really the EPA

13   claim issues that have engendered most controversy involving a

14   county more than the natural resource damage piece.  But both

15   the EPA and the natural resource damage elements of Onondaga

16   remain open and we are working hard on trying to achieve a

17   resolution.  As perhaps that degree of interest suggests, it's

18   a complicated and difficult site to resolve, but we're working.

19            On the EPA side, there are only two other sites that

20   remain unresolved, one is called Diamond Alkali in New Jersey.

21   That's what Your Honor referred to as the Passaic River site.

22            THE COURT:  Oh, the last one I approved doesn't -- I

23   thought that covered the Passaic River in part.

24            MR. JONES:  Sorry, Your Honor, it -- what Your Honor

25   just approved is --

Page 49

1              THE COURT:  I come from New Jersey and the Passaic

2      River is infamous.

3              MR. JONES:  As the federal government, I don't think

4      I should use the word infamous to describe any body of water in

5      this great nation, Your Honor.  But the settlement Your Honor

6      approved --

7              THE COURT:  Let me say that I'm sympathetic to your

8      desires to clean it up; is that better?

9              MR. JONES:  Fair enough.  So, are we.  Yeah, let me

10     be clear.  Again, there's both EPA and NRD, Natural Resource

11     Damage claims.  The EPA piece is unresolved.  So what Your

12     Honor just approved was the Natural Resource Damage claim piece

13     for Interior and NOAA but the EPA piece remains unresolved.

14     And finally, the EPA piece resolves -- it remains unresolved at

15     a site called Hayford Bridge (ph.).

16             So we're trying to close gaps on those remaining

17     issues but other than that, I believe the environmental piece

18     of the case is done with this settlement.

19             A specific request I would make, Your Honor, is that

20     just as a formality, that the Court check and confirm that no

21     one is objecting to this consent decree that was approved by

22     order dated June 17, docket number 10453 because we did notice

23     it for approval today.  Nothing has been filed and I'm sure

24     it's unopposed but just to make sure.

25             THE COURT:  All right.  Is there anybody in the

MOTORS LIQUIDATION COMPANY, et al.

Page 50

1    courtroom who wants to be heard on that settlement between the

2    estate and the environmental regulatory authorities?

3              (No response.)

4              THE COURT:  The record will reflect no response.

5    Anybody on the phone who wants to be heard on the wisdom of

6    that settlement?

7              MR. HASSON:  Your Honor?

8              THE COURT:  Yes, sir.

9              MR. HASSON:  It's not a question -- this is Mr.

10   Hasson.

11             THE COURT:  Yes, Mr. Hasson, go ahead.

12             MR. HASSON:  Are we finished with our claims of

13   equity interest?

14             THE COURT:  Yes, and I apologize to you, Mr. Hasson.

15   You're free to drop off the call if you want.  Let me ask a

16   question before you do, Mr. Hasson.  Mr. Smolinsky, am I right

17   that the estate is picking up the cost of the phone-ins for the

18   stockholders who objected?

19             MR. SMOLINSKY:  Yes, Your Honor.  And to the extent

20   that that's not correct with respect to anyone who didn't know,

21   they could contact me at my offices and I'll arrange for it.

22   But I believe that we made those services available to the

23   individuals.

24             THE COURT:  Okay.  Mr. Hasson, your having stayed on

25   the call didn't cost you any money but you're free to get of

Page 51

1    now if you choose to.

2              MR. HASSON:  Okay.  I do have one more question for

3    you.  Can I?

4              THE COURT:  Sure.

5              MR. HASSON:  All right.  So what you've done is

6    you've ruled on it that under the law we are to get nothing; is

7    that correct?

8              THE COURT:  In substance; yes.

9              MR. HASSON:  And what about my situation with the

10   fraud?

11             THE COURT:  The same thing, that's why I talked about

12   510(b).

13             MR. HASSON:  Right, the security fraud.  Okay.  I

14   don't know much about that 510(b).  And you said that to appeal

15   the decision, you're going to give us three times the amount of

16   time.

17             THE COURT:  Not the time to appeal, but what I am

18   saying is that he's going to -- Mr. Smolinsky or somebody who

19   works for him is going to be drafting up an order for me to

20   review which, in essence, embodies the ruling.  When that order

21   is entered, and I told him to take extra time to give you

22   plenty of notice that such an order would be forthcoming.  When

23   that order is entered, there's going to be a time prescribed by

24   law for you to appeal if you want to.  And as best I recall,

25   that time is fourteen calendar days.

Page 52

```
 1              MR. HASSON:   And we will we be notified to that

 2      effect?

 3              THE COURT:  Yes, sir.

 4              MR. HASSON:  Okay.

 5              THE COURT:  Okay.

 6              MR. HASSON:  All right.  I'm going to drop out now.

 7              THE COURT:  Very well.

 8              MR. HASSON:  Thank you.

 9              THE COURT:  All right.  Mr. Jones, you may continue.

10              MR. JONES:  Thank you, Your Honor.  I had very little

11      else but I did want to note for the record that the consent

12      decree refers to a government omnibus environmental proof of

13      claim number of 64064 and that has subsequently been amended to

14      claim number 71118.  The stipulation applies fully to the claim

15      as amended.  So I just wanted to note that clarification for

16      the record.

17              Subject to that, Your Honor, and with the observation

18      of no objections today, we don't think there's anything further

19      for the Court to do.  The order as entered is all we need and

20      we thank the Court for its consideration.

21              THE COURT:  All right.  Well, obviously nothing has

22      come to my attention that would cause me to change my view that

23      when I signed it.  Do you think either -- you don't need to be

24      diplomatic -- for the sake of good order, you would like me to

25      reenter the order or issue some supplemental thing to say I
```

09-50026-mg   Doc 10539   Filed 06/24/11   Entered 06/30/11 15:27:07   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 53 of 64

Page 53

1    meant it or my thinking hasn't change or whatever?

2            MR. JONES:  Your Honor, I think that's unnecessary

3    with the state of the record as it now is, unless if the Court

4    prefers, we're happy to submit a slightly modified proposed

5    order that the Court could --

6            THE COURT:  I would prefer not to embarrass myself or

7    the United States Federal Courts by issuing a new order if

8    you're satisfied that the old one skins the cat.

9            MR. JONES:  We're satisfied.  I consulted internally

10   and was advised to seek the clarifications that we achieved on

11   the record and I think we're set.

12           THE COURT:  Fair enough.

13           MR. JONES:  Thank you, Your Honor.  Oh, and Your

14   Honor, may I be excused for the balance of the hearing?

15           THE COURT:  Yes, you may, Mr. Jones.  Was somebody

16   speaking to me at the same time Mr. Jones was?  I don't hear

17   anything now.

18           Mr. Steinberg?

19           MR. STEINBERG:  Yes, Your Honor.  I had appeared for

20   the Kidwell matter, is now concluded, I would just like to be

21   excused.

22           THE COURT:  Sure.

23           MR. STEINBERG:  Thank you, Judge.

24           THE COURT:  Just look for ECF.  Something will be

25   coming out very quickly.

MOTORS LIQUIDATION COMPANY, et al.

Page 54

1          MR. STEINBERG:  Thank you.

2          MR. SMOLINSKY:  Your Honor, again, Joe Smolinsky.

3     The next matter on the calendar is an application by AP

4     Services for the payment of certain discretionary fees.  We did

5     not file that application with the Court but if Your Honor

6     will, I'd like to just present it for approval.

7          THE COURT:  Sure.

8          MR. SMOLINSKY:  Under this application, AP Services,

9     LLC seeks authorization to pay certain discretionary bonuses

10    under its third amended engagement letter that was approved by

11    this court on September 17, 2010.  There are three components

12    to the payments that are all based on milestones that have been

13    achieved under that engagement letter.

14          The first is a seven million dollar payment for

15    achieving the goal of confirming a Chapter 11 plan.  There is

16    an additional 2.5 million that is due as a result of

17    distributing seventy percent of the common stock and warrants

18    which were done in the first distribution.  I believe we

19    distributed approximately seventy-five percent of the

20    securities at the first distribution date.

21          And the third is based on the total amount of claims

22    at the end of the case.  There is a discretionary payment of

23    between 2.5 million and five million dollars that get paid as

24    the claims go down below forty-two billion dollars and then

25    down to the low point of thirty-five billion where they would

MOTORS LIQUIDATION COMPANY, et al.

Page 55

1    earn the full five million.  To date, they're entitled 2.5

2    million of that payment, so they seek authorization to pay

3    that, as well.  Those payments total twelve million dollars.

4            Your Honor, no one in the trenches in this case could

5    disagree with the conclusion that AP Services has acted in a

6    first rate manner with utmost integrity and exemplary in every

7    respect in this case.  And personally, I couldn't imagine a

8    better steward for the assets of these estates.

9            The fee examiner filed a statement of no objection

10   with respect to the application, although I guess there was a

11   question as to whether it fell within his jurisdiction but he

12   nevertheless noted that he had no objection.

13           And I believe, Your Honor, although Mr. Masumoto is

14   in the courtroom, that the U.S. Trustee has indicated that it

15   has no objection to the payment of these fees which were

16   approved previously by Your Honor but subject to coming back

17   and seeking now authorization to pay.

18           THE COURT:  All right.  Mr. Masumoto, do you wish to

19   be heard?

20           MR. MASUMOTO:  No, Your Honor.  We have no objection.

21           THE COURT:  All right.  And am I correct that no

22   objections have been expressed by anybody, Mr. Smolinsky?

23           MR. SMOLINSKY:  That's correct, Your Honor.  There

24   have been no objections.

25           THE COURT:  All right.  They're approved.

MOTORS LIQUIDATION COMPANY, et al.

Page 56

1              MR. SMOLINSKY:  Your Honor, items number three and

2     four on the uncontested calendar involve two claims, two series

3     of claims that we're seeking to expunge for breach of the ADR

4     procedures.  We do not bring these motions, these objections

5     arbitrarily.  We've tried on many times and circumstances to

6     get these claimants to engage in the ADR procedures.

7              And as Your Honor is aware, those ADR procedures have

8     proved very successful in trying to manage the thousands of

9     primarily product liability claims that exist against the

10    estate.  We recognize that expungement of the claims for

11    failure to comply with the ADR procedures is a harsh remedy but

12    this should come as no surprise to the claimants.

13             I just want to read into the record from the ADR

14    procedures themselves, that were the subject of several court

15    hearings and this court's approval.  Section 4(f) of the -- I'm

16    sorry, Section F of the Procedures called Failure to Comply

17    with the ADR Procedures states:

18             "If a designated claimant or the debtors fail to

19    comply with the ADR procedures, negotiate, in good faith or

20    cooperate as may be necessary to effectuate the ADR procedures,

21    the bankruptcy court may after notice and a hearing, find such

22    conduct to be in violation of the ADR order or with respect to

23    a designated claimant, an abandonment of or failure to

24    prosecute the designated claim or both."

25             "Upon such findings, the bankruptcy court may, among

09-50026-mg    Doc 10539    Filed 06/24/11    Entered 06/30/11 15:27:07    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 57 of 64

Page 57

1    other things, disallow and expunge the designated claim in

2    whole or in part or grant such other and further remedy deemed

3    just and appropriate under the circumstances including without

4    limitation, awarding attorneys fees, other fees and costs to

5    the other party."

6            The first is item number three on the agenda.  That's

7    an objection to claim number 1038 filed by the personal

8    representative of Valier Torres Rodriguez.  The second is a

9    series of five claims.  It's claim number 39218, 39219, 39220,

10   39221 and 39222 filed by Carla Scott, Ryan Hawkins and Barbara

11   Hawkins.

12           In the case of the Rodriguez claims, all efforts to

13   contact counsel have proven to be completely ignored.  We left

14   several voicemails without response.  In our papers, Your

15   Honor, we listed all of the times that we reached out to them

16   in an effort to try to get them to respond to the initial offer

17   which is the first step in the ADR procedures.

18           After filing this objection, we again called Mr.

19   Pendras (ph.), who is counsel to the claimant and left a

20   message and there was no response.

21           In the case of Scott Hawkins, which is item number

22   four -- the Scott Hawkins claims which is item number four, we

23   had a little bit more response from these claimants but at the

24   end, we scheduled two mediations and at the very last minute,

25   they told us that they didn't want to appear at the mediations.

MOTORS LIQUIDATION COMPANY, et al.

Page 58

1    I don't know if this is --

2              THE COURT:  Are the Hawkins' pro se or do they have a

3    lawyer?

4              MR. SMOLINSKY:  They have a lawyer, Your Honor.  Let

5    me just confirm that.  Your Honor, the proofs of claim reflect

6    the fact that payments should be made to Gary, Williams, Finney

7    Lewis, Watson & Sperando in Stuart, Florida and they were

8    provided notice, as well.

9              So these are claims that were geared up.  Apparently

10   both parties were aware that mediations were scheduled and at

11   the last minute, there was a cancellation and a failure to

12   appear.  We don't know what else to do at this point but to

13   seek to expunge the claim.  And we've had no response to this

14   objection by those claimants, similar to the representative of

15   Valerie Torres Rodriguez.

16             THE COURT:  Let me tell you what's -- and I take it

17   neither of them responded to your motion before me today.

18             MR. SMOLINSKY:  That's correct, Your Honor.

19             THE COURT:  Let me tell you what's bothering me about

20   this, Mr. Smolinsky.  Defaulting in the ADR procedures walks,

21   talks and quacks like malpractice on behalf of a lawyer who

22   should be representing his clients.  And because these lawyers

23   did not do something as basic as this, their clients are going

24   to be the ones who are victimized -- don't hold me to the

25   figure but thirty cents on the dollar for whatever you

09-50026-mg   Doc 10539   Filed 06/24/11   Entered 06/30/11 15:27:07   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 59 of 64

Page 59

1  ultimately fix as the claimant's loss is still a lot better

2  than zero.  And I am not in a position today, of course, to

3  find that these guys are guilty of malpractice.  They're kind

4  of like Potter Stewart and pornography, I know it when I see

5  it.  And I cannot understand how any responsible lawyer can do

6  this to his client.

7            But I as a judge am troubled by penalizing the

8  clients for their lawyer's failure to step up to the plate and

9  participate in these procedures.  I don't want to understate

10  the importance of them.  We couldn't run this Chapter 11 case

11  without the ADR procedures but the clients are going to be the

12  victims, not the lawyers unless we can be creative here in some

13  way.

14            MR. SMOLINSKY:  Your Honor, we're prepared to be

15  creative.  I want to note that it's not only the lawyers that

16  could potentially be the roadblock here.  It might actually be

17  the lawyer's inability to obtain the requisite cooperation from

18  their clients.

19            So I don't know that you can draw that conclusion

20  firmly but what we can do is we can settle the order and we can

21  attach to it a letter and we could serve not only the lawyer's

22  but the claimants and tell them in plain English that a result

23  of this order being entered, they will have no further claims

24  in this case and give a phone number to call prior to a certain

25  date in order to respond if they so choose.

Page 60

1          Beyond that, I think that we fully and amply provided

2     evidence that we've tried and tried and tried and gave this a

3     lot of patience and cooperation with this court to make sure

4     that we don't enter these orders lightly.

5          THE COURT:  Well I'm confident you're not entering it

6     lightly, Mr. Smolinsky.  My problem isn't with the way the

7     estate has handled it.  It's with the clients who may have been

8     victimized by the way their lawyers were failing to serve them.

9          I am going to go along with your request but I want

10    you to add a paragraph to your proposed order which is that the

11    lawyers for each of these guys are to forthwith call chambers

12    for an on the record conference call at which they will explain

13    to the Judge personally why they failed to comply with the

14    procedures and how they thought they were serving their

15    client's interests by failing to do so.  And why the Court

16    should not send a letter to the disciplinary authorities in

17    which they practice law, in the jurisdictions in which they

18    practice law, reporting these circumstances and reporting how

19    their clients were prejudiced by their failure to do what the

20    ADR order required.

21         And forgive me for raising my voice, Mr. Smolinsky.

22    I'm raising it to the wrong guy but this really bothers me and

23    again, I apologize to you or anybody else in the room who was

24    obviously the wrong person to hear this message.

25         MR. SMOLINSKY:  Not offended at all, Your Honor.

MOTORS LIQUIDATION COMPANY, et al.

Page 61

1   Thank you.

2              THE COURT:  All right.

3              MR. SMOLINSKY:  Anything else on that matter, Your

4   Honor?

5              THE COURT:  No, sir.  Thank you.

6              MR. SMOLINSKY:  The next matter on the agenda is a --

7              THE COURT:  Oh, one  last thing, Mr. Smolinsky, put

8   that stuff that I told you to add in bold in the proposed

9   order.

10             MR. SMOLINSKY:  And how long would you like for us to

11  settle that order?

12             THE COURT:  Whatever you think is fair but perhaps a

13  little extra time might be in order because frankly, I am not

14  looking to impose sanctions.  I'm looking to get compliance.

15             MR. SMOLINSKY:  And we're not looking to enter orders

16  and then have to vacate them if --

17             THE COURT:  Yes, I understand.

18             MR. SMOLINSKY:  -- there's an appropriate response.

19  Your Honor, item five on the uncontested agenda is a motion for

20  relief from the stay by the Roman Catholic Dioceses of

21  Pittsburgh and the Transfiguration Parish.  We have agreed to

22  lift the stay.  We have a stipulation which we will submit to

23  chambers for consideration.

24             THE COURT:  Sure.

25             MR. SMOLINSKY:  The last matters, Your Honor, are all

MOTORS LIQUIDATION COMPANY, et al.

Page 62

1    new omnibus objections.  That is items number six through

2    eighteen on the uncontested agenda.  We had very few responses

3    with respect to these matters and as usual, we'd like to go

4    ahead and submit an order for those parties who did not respond

5    and we will adjourn to the next hearing those claimants who did

6    file either formal or informal responses.

7            THE COURT:  Very well.

8            MR. SMOLINSKY:  Your Honor, I believe that concludes

9    the agenda.

10           THE COURT:  Okay.  Thank you very much.

11           MR. SMOLINSKY:  Thank you.

12           THE COURT:  Have a good day.  We're adjourned.

13       (Whereupon these proceedings were concluded at 11:22 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 63

```
 1

 2                          I N D E X

 3

 4                        R U L I N G S

 5     DESCRIPTION                                PAGE      LINE

 6     Debtors' Omnibus Objection to Claims        24        24

 7     Claims for Equity Interests

 8     Debtor's 179th Omnibus Objections to Claims  39       24

 9     Sustained

10

11     Application by AP Services Approved         55        25

12

13     GUC Trust Objection to Claims 1038, 39218,  59         9

14     39219, 39220, 39221 and 39222

15

16     Motion for Relief from Stay - stipulated    61        18

17

18

19

20

21

22

23

24

25
```

Page 64

1

2                            C E R T I F I C A T I O N

3

4      I, Linda Ferrara, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6        Linda            Digitally signed by Linda Ferrara
                           DN: cn=Linda Ferrara, o, ou,
                           email=digital1@veritext.com,
7        Ferrara          c=US
                           Date: 2011.06.24 10:50:01 -04'00'

8      LINDA FERRARA

9

10     Veritext

11     200 Old Country Road

12     Suite 580

13     Mineola, NY 11501

14

15     Date:  June 23, 2011

16

17

18

19

20

21

22

23

24

25