# AKIN GUMP
# STRAUSS HAUER & FELD LLP

━━━━━ Attorneys at Law

**SEAN E. O'DONNELL**
212.872.1093/fax: 212.872.1002
sodonnell@akingump.com

July 19, 2011

**VIA ECF AND UPS**

Hon. Robert E. Gerber
United States Bankruptcy Court for the Southern District of New York
One Bowling Green
New York, New York 10004-1408

> Re:  *In re General Motors Corp., et al.*, 09-50026 (REG): Official Committee of
> Unsecured Creditors' (the "Committee") First Amended Objection to Claims filed
> by Green Hunt Wedlake, Inc. and Noteholders of General Motors Nova Scotia
> Finance Company and Motion for Other Relief (Docket No. 7859)

Dear Judge Gerber:

On behalf of Green Hunt Wedlake, Inc., the trustee of General Motors Nova Scotia
Finance Company (the "Nova Scotia Trustee"), we are writing pursuant to Local Bankruptcy
Rule 7007-1(b) to request a conference with the Court regarding a discovery dispute between the
Nova Scotia Trustee and the Motors Liquidation Company GUC Trust (the "GUC Trust").
Pursuant to section 6.2 of the confirmed plan, the GUC Trust is now prosecuting the objection to
the Nova Scotia Trustee's claim which had formerly been prosecuted by the Official Committee
of Unsecured Creditors (the "Committee"). The Nova Scotia Trustee and the GUC Trust have
met-and-conferred regarding the discovery dispute, but have been unable to reach any resolution.

## BACKGROUND

**The Litigation At Bar**

On November 25, 2009, the Nova Scotia Trustee filed a proof of claim (claim no. 65814)
against Motors Liquidation Company in an amount not less than $1,607,647,592.49. On
November 30, 2009, the Nova Scotia Trustee filed an amended claim (claim no. 66319),
providing additional detail regarding its claim. Relevant to the instant dispute, the Nova Scotia
Trustee's claim is, in part, comprised of amounts owed under a currency swap agreement with
General Motors Co. (the "Swap Liability").

One year later, on November 19, 2010, the Committee filed its First Amended Objection
(the "Objection") to the Nova Scotia Trustee's claim, as well as the claim of certain noteholders
of General Motors Nova Scotia Finance Company (the "Noteholders," and together with the

A K I N  G U M P
S T R A U S S  H A U E R  &  F E L D LLP
━━━━━━━━━━  Attorneys at Law

Hon. Robert E. Gerber
July 19, 2011
Page 2

Committee and the Nova Scotia Trustee, the "Parties"). This dispute arises out of the litigation concerning the Committee's Objection.

**The April 15, 2011 Telephonic Conference**

In connection with the litigation, this spring, each of the Parties produced certain documents. A dispute arose between the Committee and the Noteholders, requiring this Court to conduct an informal telephonic conference on April 15, 2011 (the "Telephonic Conference").

One of the primary questions addressed at the Telephonic Conference was the Committee's request that the Noteholders produce documents from June 1, 2008 through July 2, 2010. *See* Letter from Eric B. Fisher to Hon. Robert E. Gerber, dated March 29, 2011 at 2 [Dkt. No. 9940] (the "March 29 Letter"). The Nova Scotia Trustee had previously agreed to produce documents for this period, and therefore the dispute over the time frame was entirely between the Committee and the Noteholders.

**During The Telephonic Conference, The Committee Made Various Representations To The Court Concerning The Nova Scotia Trustee's Production**

At the Telephonic Conference, the Committee made various representations to this Court in support of its argument that the Noteholders should be required to produce documents dating back not only to June 1, 2008, but now through December 31, 2010 as well. Specifically, at the Telephonic Conference, counsel to the Committee made the following representations to the Court concerning documents the Committee had purportedly reviewed in the Nova Scotia Trustee's initial production:

- "[T]here are emails saying that [the swap] claim may be overstated. And when I stay [sic] overstated, not by a trivial amount, but by an amount in excess of 100 million dollars." Telephonic Conference Tr. 7:9-11, Apr. 15, 2011, attached as Ex. A to the Nova Scotia Trustee's document requests which are attached hereto as Ex. 1.

- "[R]ight up through the end of 2010, there are communications between the GM Nova Scotia Finance trustee and the noteholders and other bondholders about filing claims in the Nova Scotia proceeding that relate to – the same claims the various – in the Old GM case." *Id.* at 7:18-22.

- "[We have] already seen communications going until the end of 2010 that bear on how [the swap] claim ought to be properly calculated and whether or not it be allowed." *Id.* at 8:21-23.

AKIN GUMP
STRAUSS HAUER & FELD LLP
■■■■■■■■■ Attorneys at Law

Hon. Robert E. Gerber
July 19, 2011
Page 3

- "[W]ell into 2010 there is discussion whether those swaps are being properly calculated for purposes of the claim in this case." *Id.* at 20:14-16.

(the "Representations.")

    After hearing these Representations and other arguments from the Committee, the Court ordered that the Noteholders produce responsive documents through December 31, 2010. *Id.* at 21:2-3. Shortly thereafter, the Committee approached the Nova Scotia Trustee and demanded that it too produce documents through December 31, 2010. Not wanting to further burden the Court, the Nova Scotia agreed to produce these documents, despite its belief that the documents would be irrelevant to any issue raised in the Committee's Objection. On April 29, 2011, after many hours of additional document searching and review, the Nova Scotia Trustee made a supplemental production of documents responsive through December 31, 2010 to the Committee.

**The Nova Scotia Trustee Propounded Document Requests To The
Committee Related To The Representations**

    After the Telephonic Conference, the Nova Scotia Trustee's counsel thoroughly searched its production and could not find any documents supporting the four Representations made to the Court by the Committee. As a result, on May 19, 2011, the Nova Scotia Trustee served the Committee with four discrete document requests asking the Committee to identify all documents and communications in its possession, custody, or control, as of the date of the Telephonic Conference (April 15) that supported the four Representations made to this Court (the "Requests").

    In the interests of resolving the issue quickly, the Requests allowed the Committee to simply identify the Bates numbers of any responsive documents in its possession, custody or control as of April 15, 2011, including those in its own production and those it received from the Noteholders, or if no such Bates numbers existed, to produce a copy of the document(s) itself.

**The GUC Trust Has Unreasonably Refused To Produce Or Identify
the Requested Documents**

    On June 20, 2011, the GUC Trust served its Responses and Objections to the Document Requests (the "Responses and Objections"), pursuant to which the GUC Trust categorically refused to identify any of the documents relating to the Representations it made to this Court. A copy of the GUC Trust's Responses and Objections is attached as Ex. 2. In support of its position, the GUC Trust argued, among other things, that the Requests: (i) were served after the

A K I N   G U M P
S T R A U S S   H A U E R   &   F E L D LLP
━━━━━━━━━━━ Attorneys at Law

Hon. Robert E. Gerber
July 19, 2011
Page 4

parties purported January 11 deadline to serve all document requests; (ii) seek information that is
obtainable from the Nova Scotia Trustee itself; and (iii) are actually "contention interrogatories"
which are "in excess" of the discovery obligations allowed by your Honor and not permitted
under Local Rule 7033-1(c). Each of these arguments is in error.

## ARGUMENT

### THE GUC TRUST SHOULD BE INSTRUCTED
### TO COMPLY WITH THE REQUESTS

**The Federal Rules Provide For Expansive Discovery**

The GUC Trust should be directed to comply with the Nova Scotia Trustee's Requests.
Federal Rule of Civil Procedure 26, made applicable to this case by Federal Rule of Bankruptcy
Procedure 7026, provides that "parties may obtain discovery regarding any nonprivileged matter
that is relevant to any party's claim or defense . . . ." Fed. R. Civ. P. 26(b)(1). "All agree that the
rules of discovery are to be applied broadly." *In re Six Grand Jury Witnesses,* 979 F.2d 939, 943
(2d Cir. 1992); *see also Jackan v. New York State Dep't of Labor,* 205 F.3d 562, 568 n.4 (2d Cir.
2000) ("Once the litigation has begun, the [parties] can utilize the liberal discovery procedures of
the Federal Rules of Civil Procedure, including interrogatories, depositions, and document
demands . . . ."). This broad application of discovery rules makes litigation more efficient.
"'[L]iberal discovery rules and summary judgment motions allow the parties 'to define disputed
facts and issues and to dispose of unmeritorious claims.'" *In re Tamoxifen Citrate Antitrust Litig.,*
466 F.3d 187, 231 (2d Cir. 2006) (citing *Swierkiewicz v. Sorema,* 534 U.S. 506, 512 (2002)); *see
also Four Star Capital Corp. v. Nynex Corp.,* 183 F.R.D. 91, 99 (S.D.N.Y. 1997) ("Rules
governing discovery should be broadly construed to . . . enable the parties to obtain factual
information in preparation for trial.").

**The GUC Trust Has Failed To Produce A Single Document
Responsive To The Nova Scotia Trustee's Discovery Demands**

Although the Nova Scotia Trustee has complied with each of the Committee's overly
broad discovery demands and produced nearly 7,000 pages of responsive documents, the GUC
Trust has refused to produce even a page of materials responsive to the Nova Scotia Trustee's
Requests.

The Nova Scotia Trustee's Requests are entirely reasonable and should be honored. The
Requests merely seek to have produced or identified certain documents the Committee referred
to at the Telephonic Conference. Those documents relate to core issues in this litigation: (i) the

A K I N   G U M P
S T R A U S S   H A U E R   &   F E L D LLP
━━━━━━━━━━━━  Attorneys at Law

Hon. Robert E. Gerber
July 19, 2011
Page 5

value of the Swap Liability (allegedly overstated by $100 million), and (ii) discussions of the calculation of the Nova Scotia Trustee's claim. If the GUC Trust was to simply produce or identify the documents sought in the Requests, the purpose of the liberal application of discovery rules would be served: "to define disputed facts and issues and to dispose of unmeritorious claims." *In re Tamoxifen Citrate Antitrust Litig.,* 466 F.3d at 231; *see also Hines v. City of Albany,* 542 F. Supp. 2d 218, 230 (N.D.N.Y. 2008); *Condit v. Dunne,* 225 F.R.D. 113, 115 (S.D.N.Y. 2004) ("The discovery provisions of the Federal Rules of Civil Procedure are designed to achieve disclosure of all the evidence relevant to the merits of a controversy.") (internal citation omitted).

**The GUC Trust's Objections To The Requests Are Meritless**

The GUC Trust's stated objections to the Requests are meritless. First, its argument that the parties previously agreed to serve all document requests by January 11, 2011 is nonsensical because the Committee's Representations to this Court were not made until April 15, 2011. Arguing that a party should be required to request documents based on an event that has not yet occurred is untenable. Furthermore, we are still in the early stages of this litigation. Depositions have yet to be scheduled and no evidentiary hearing has been calendared. In other words, there is absolutely no prejudice to the GUC Trust if it were compelled to produce or identify the responsive documents—particularly since it has (presumably) already identified these documents prior to making the various Representations to the Court.

Second, the GUC Trust's objection that responsive documents are already in the possession of the Nova Scotia Trustee is unpersuasive, because the Nova Scotia Trustee has already searched its files and cannot locate such materials. Moreover, even if the GUC Trust ultimately does identify documents within the range produced by the Nova Scotia Trustee, precedent from this Court supports production of such documents. "Nothing in Fed. R. Civ. P. 26(b)(1) precludes a party from seeking to determine what documents an adverse party has even though the party seeking the discovery may prove to have some or all of them." *In re Chadborne Indus., Ltd.,* 71 B.R. 86, 89 (Bankr. S.D.N.Y. 1987).

And finally, the GUC Trust's objection that the Requests are nothing but "disguised interrogatories" in violation of this Court's practices and Local Rule 7033-1(c) is off base. First, the Requests are document requests which call for the identification or production of documents. Second, even if the Requests were interrogatories (which they are not), they would still be in keeping with this Court's preference that such interrogatories be limited to "the most basic statistical and numeric information." *See* Pre-Trial Conference Hr'g Tr. 57:11-12, Dec. 15, 2010, attached as Ex. B to the Responses and Objections. In fact, these Requests seek only basic information—the identification of Bates numbers, or in the alternative, production of documents

AKIN GUMP
STRAUSS HAUER & FELD LLP
━━━━━━━━━━ Attorneys at Law

Hon. Robert E. Gerber
July 19, 2011
Page 6

concerning only the four Representations made by the Committee to this Court.  Further, Local
Rule 7033-1(c) is inapposite because these Requests cannot be considered "contention
interrogatories" under any reasonable interpretation of that phrase.  Contention interrogatories
are geared towards understanding a party's legal theory of a case and are "distinct from those that
request identification of witnesses or documents that bear on the allegations." *Strauss v. Credit
Lyonnais, S.A.*, 242 F.R.D. 199, 233 (E.D.N.Y. 2007) (internal citation omitted).  Here, the
Requests are not designed to uncover the GUC Trust's legal theories or contentions, but merely
to identify the documents its counsel referred to when it made the four factual Representations to
this Court.

Accordingly, we respectfully request a conference with the Court to address the GUC
Trust's refusal to comply with the Nova Scotia Trustee's Requests.

Respectfully,

Sean E. O'Donnell

cc:    Daniel H. Golden, Esq.
       Eric B. Fisher, Esq.
       Kevin D. Finger, Esq.

# EXHIBIT 1

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Daniel H. Golden
Philip C. Dublin
Sean E. O'Donnell

*Counsel for Green Hunt Wedlake Inc.,*
*Trustee of General Motors Nova Scotia Finance Company*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ------------------------------------------------ | x | |
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY, *et al.*, | : | Case No. 09-50026 (REG) |
| f/k/a General Motors Corp., *et al.*, | : | |
| | : | (Jointly Administered) |
| The Nova Scotia Trustee. | : | |
| | : | |
| | : | |
| ------------------------------------------------ | x | |

## FIRST SET OF DOCUMENT REQUESTS OF GREEN HUNT WEDLAKE INC., TRUSTEE OF GENERAL MOTORS NOVA SCOTIA FINANCE COMPANY, TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, as made applicable

herein by Rules 7026, 7034, and 9014 of the Federal Rules of Bankruptcy Procedure, Green

Hunt Wedlake Inc., in its capacity as trustee for General Motors Nova Scotia Finance Company

(the "**Nova Scotia Trustee**"), hereby requests that the Official Committee of Unsecured

Creditors of Motors Liquidation Company f/k/a General Motors Corporation (the "**Creditors'**

**Committee**") in the above-captioned matter produce the documents and materials described

herein for inspection and copying at the offices of Akin Gump Strauss Hauer & Feld LLP,

attention: Sean E. O'Donnell, One Bryant Park, New York, New York 10036, by June 20, 2011.

1

# DEFINITIONS

As used herein:

1.      "*And*" and "*or*" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these requests any information that might be deemed outside their scope by any other construction.

2.      "*Any*" means one or more.

3.      The "*April 15 Oral Argument*" refers to the telephonic hearing conducted by the Court on the morning of April 15, 2011 in connection with a discovery dispute between the Creditors' Committee and the Noteholders in this matter.

4.      "*Communication*" means any verbal, written, or electronic exchange of information and includes, but is not limited to, discussions, negotiations, correspondence, faxes, telegrams, telexes, memoranda, notes, conversations, speeches, meetings, conferences, remarks, questions, answers, panel discussions, and symposia, whether written or oral.  The term includes both communications and statements which are face-to-face and those which are transmitted by media such as intercom, telephone, televisions, radio, modem or electronic mail.

5.      The "*Court*" means Judge Robert E. Gerber, United States Bankruptcy Judge in the United States Bankruptcy Court for the Southern District of New York.

6.      "*Creditors' Committee's Production*" means those materials produced by the Creditors' Committee to the Noteholders and the Nova Scotia Trustee in this matter in response to any discovery request issued by either the Noteholders or the Nova Scotia Trustee.

7.      "*Document*" is synonymous in meaning and equal in scope to the usage of the term in Federal Rule of Civil Procedure 34(a), including, without limitation, electronic or computerized data compilations.  A draft or non-identical copy is a separate document within the

2

meaning of this term. "Document" includes any Communication and all other writings, drawings, graphs, charts, photographs, sound recordings, images, and other data stored in any medium from which information can be obtained.

8.    The term "*Identify*," with respect to a Document or Communication, requires that you state the Bates number associated with the Document or Communication, or if no such Bates number exists, that you produce a copy of the Document or Communication itself.

9.    "*Noteholders*" means Appaloosa Management L.P., Aurelius Capital Management, LP, Elliot Management Corporation, and Fortress Investment Group LLC.

10.    "*Noteholders' Production*" means those materials produced by the Noteholders to the Creditors' Committee and the Nova Scotia Trustee in this matter in response to any discovery request issued by the Creditors' Committee.

11.    "*Nova Scotia Trustee's Production*" means those materials produced by the Nova Scotia Trustee to the Creditors' Committee and the Noteholders in this matter in response to any discovery request issued by the Creditors' Committee.

12.    "*Transcript*" refers to the transcript of the April 15 Oral Argument attached hereto as Exhibit A.

13.    "*You*" and "*Your*" mean the Creditors' Committee and any member or employee thereof, its agents, attorneys, accountants, advisors, representatives, experts, and consultants, and all other persons acting or purporting to act on behalf of or under the control of the Creditors' Committee, whether current, former, or potential.

## INSTRUCTIONS

1.    You are required to obtain and furnish all information available to You and to any of Your representatives, agents, employees, and/or attorneys, and to obtain and furnish all

3

information that is in Your actual or constructive possession, custody, or control, or in the actual

or constructive possession, custody, or control of any of Your representatives, agents, employees,

accountants, or attorneys.

2.    Each document request is continuing and requires You to supplement Your

responses to the fullest extent required by any applicable law or rule.

3.    If information is withheld under a claim of privilege, immunity, or otherwise,

identify in writing the basis upon which the asserted privilege, immunity, or other reason for

non-disclosure is claimed, in accordance with the terms and conditions of the protective order

agreed to among the parties and entered by the Court in this matter.

4.    Each paragraph and subparagraph herein shall be construed independently and not

with reference to any other paragraph or subparagraph for the purposes of limitation.

5.    References to the singular include the plural, and references to the plural include

the singular as needed to construe these requests in their broadest form.

6.    References to the past tense shall be construed to include the present tense, and

references to the present tense shall be construed to include the past tense.

4

## DOCUMENT REQUESTS

1.    Identify all Documents and Communications in the Nova Scotia Trustee's

Production, the Noteholders' Production, or the Creditors' Committee's Production in your

possession, custody, or control as of April 15, 2011, that support your contention made to the

Court at the April 15 Oral Argument that "there are emails saying that [the swap] claim may be

overstated. And when I stay [sic] overstated, not by a trivial amount, but by an amount in excess

of 100 million dollars." *See* Transcript 7:9-11.

2.    Identify all Documents and Communications in the Nova Scotia Trustee's

Production, the Noteholders' Production, or the Creditors' Committee's Production in your

possession, custody, or control as of April 15, 2011, that support your contention made to the

Court at the April 15 Oral Argument that "right up through the end of 2010, there are

communications between the GM Nova Scotia Finance trustee and the noteholders and other

bondholders about filing claims in the Nova Scotia proceeding that relate to – the same claims

the various – in the Old GM case." *See* Transcript 7:18-22.

3.    Identify all Documents and Communications in the Nova Scotia Trustee's

Production, the Noteholders' Production, or the Creditors' Committee's Production in your

possession, custody, or control as of April 15, 2011, that support your contention made to the

Court at the April 15 Oral Argument that you have "already seen communications going until the

end of 2010 that bear on how [the swap] claim ought to properly be calculated and whether or

not it be allowed." *See* Transcript 8:21-23.

4.    Identify all Documents and Communications in the Nova Scotia Trustee's

Production, the Noteholders' Production, or the Creditors' Committee's Production in your

possession, custody, or control as of April 15, 2011, that support your contention made to the

Court at the April 15 Oral Argument that "well into 2010 there is discussion whether those swaps

are being properly calculated for purposes of the claim in this case." *See* Transcript 20:14-16.

Dated: New York, New York
      May 19, 2011

              Respectfully,

              Daniel H. Golden
              Philip C. Dublin
              Sean E. O'Donnell
              AKIN GUMP STRAUSS HAUER & FELD LLP
              One Bryant Park
              New York, New York 10036
              (212) 872-1000 (Telephone)
              (212) 872-1002 (Facsimile)

# EXHIBIT A

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 09-50026(REG)

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   MOTORS LIQUIDATION COMPANY, et al.,

9   f/k/a General Motors Corp., et al.

10          Debtors.

11

12   - - - - - - - - - - - - - - - - - - - -x

13

14                 U.S. Bankruptcy Court

15                 One Bowling Green

16                 New York, New York

17

18                 April 15, 2011

19                 8:47 AM

20

21   B E F O R E:

22   HON. ROBERT E. GERBER

23   U.S. BANKRUPTCY JUDGE

24

25

Page 2

1
2   Telephonic Hearing re Discovery Dispute.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25   Transcribed by:  Penina Wolicki

Page 4

1
2   ALSO PRESENT:  (TELEPHONICALLY)
3       DENNIS A. PRIETO, Aurelius Capital Management
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2  A P P E A R A N C E S :  (TELEPHONICALLY)
3  GREENBERG TRAURIG, LLP
4      Attorneys for The Noteholders
5      77 West Wacker Drive
6      Suite 3100
7      Chicago, IL 60601
8
9  BY:  KEVIN D. FINGER, ESQ.
10
11  GREENBERG TRAURIG, LLP
12      Attorneys for The Noteholders
13      MetLife Building
14      200 Park Avenue
15      New York, NY 10166
16
17  BY:  BRUCE ZIRINSKY, ESQ.
18
19  BUTZEL LONG, P.C.
20      Attorneys for Official Committee of Unsecured Creditors
21      380 Madison Avenue
22      22nd Floor
23      New York, NY 10017
24
25  BY:  ERIC FISHER, ESQ.

Page 5

1              P R O C E E D I N G S
2       (Audio begins mid-sentence)
3           THE COURT:  -- on the phone, please?
4           MR. FISHER:  Good morning, Your Honor.  This is Eric
5   Fisher from Butzel Long for the creditors' committee.
6           THE COURT:  Okay.
7           MR. ZIRINSKY:  Bruce Zirinsky and Kevin Finger, Your
8   Honor, from Greenberg for the noteholders.
9           THE COURT:  Fair enough.
10          All right, gentlemen, I've read your letters.  I
11  gather from the Akin Gump letter that that issue is now off the
12  table.  But I sense that unless you've resolved something since
13  the time of Mr. Fisher's March 29th, letter, we still have four
14  of the five remaining issues.
15          Mr. Fisher, I'll hear from you.  You can assume
16  familiarity with both your letter and Mr. Zirinsky's or Mr.
17  Ticoll's letter.
18          MR. FISHER:  Thank you, Your Honor.  I appreciate that
19  the Court does not enjoy having to get involved in discovery
20  disputes.  And we've been working hard -- I think all sides
21  have been working hard to try to at least narrow the dispute.
22  And so I think that as opposed to four issues to present to
23  Your Honor, I can narrow it down and say that we have two and a
24  half issues to present.
25          So to quickly jump right in, the first issue is a

2 (Pages 2 - 5)

MOTORS LIQUIDATION COMPANY

Page 6

1  question about the relevant time period for responsive
2  documents to be produced by the noteholders. The noteholders'
3  position is that they only need to give up documents that
4  relate to a seven-month period, from January 2009 to July 2009.
5  And the stated rationale for that is that the lockup agreement
6  was entered into in June, and they insist on restricting
7  discovery to a pretty narrow band of time just right around the
8  lockup agreement.
9       And we think that that's too narrow. And the time
10 frame that we propose is that it ought to go back to June 2008.
11 And Your Honor, although my letter says that it ought to go to
12 July 2010, based on documents that we've seen even just in the
13 past few days, we actually think that the time period ought to
14 go to the end of 2010.
15      And the reason for our time frame is as follows.
16 First I want to explain why I think it needs to go beyond July
17 2009, why the end date, that's too restrictive. There are very
18 significant events that happened after July 2009 that relate
19 directly to our objection. For example, a key event here is GM
20 Nova Scotia Finance's own filing for insolvency proceedings in
21 Nova Scotia. That didn't happen until October 2009. Part of
22 why that didn't happen until October 2009, is because they were
23 strategizing around when that filing would take place, and the
24 noteholders wanted to time that filing in order to insulate as
25 best they could from some actions in Nova Scotia, a 369 million

Page 7

1  dollar consent fee that they were paying in mid-2009. So we
2  think that October 2009 is a relevant event.
3       December 2009, we've now seen e-mails between and
4  among the noteholders and the trustee that seem to suggest that
5  there's concern that the swap claim, which is an important part
6  of the claim that we're disputing, is overstated. The swap
7  claim, Your Honor, is 564 million dollars worth of claims
8  asserted in the Old GM bankruptcy case. And in December 2009,
9  there are e-mails saying that claim may be overstated.
10 And when I stay overstated, not by a trivial amount, but by an
11 amount in excess of 100 million dollars.
12      It's not until November 2009 that the actual claims
13 that we're disputing were filed in the Old GM bankruptcy case.
14 Talking about the 2010 period, for just a moment. In September
15 2010, we've seen correspondence between New GM and noteholders
16 in which there's disagreement about what the lockup agreement
17 means and the extent to which it does or does not allow claims
18 in the Old GM case. And into 2 -- right up through the end of
19 2010, there are communications between the GM Nova Scotia
20 Finance trustee and the noteholders and other bondholders about
21 filing claims in the Nova Scotia proceeding that relate to --
22 the same claims the various -- in the Old GM case.
23      So we've seen -- we've already seen documents, I
24 think, that indicate very clearly that the relevant time frame,
25 at least, you know, in terms of the end date, should extend

Page 8

1  until the end of 2010. It --
2       THE COURT: Pause, please, Mr. Fisher.
3       MR. FISHER: Yes, Your Honor.
4       THE COURT: I see, based on what you argued, why it
5  should go at least through October 2009, but help me better
6  understand why it should go through either July 2, 2010 or to
7  the end of 2010. Which of the events that you described would
8  cause me to want to extend it to any of those later dates?
9       MR. FISHER: Well, in terms of an actual event, Your
10 Honor, November 2009 is when the claims were filed in this
11 case. What I described happening in 2010, the events I would
12 describe are the filing claims in the GM Nova Scotia Finance
13 proceedings that relate to the notes and the same claims that
14 are before Your Honor in the Old GM proceeding.
15      But then we've also seen already, because we have the
16 benefit of the trustee's production, extensive communications
17 in 2010 about the -- between and among the relevant parties,
18 about the calculation of the swap amount, certain claims in the
19 Nova Scotia proceedings, whether or not the swap was properly
20 terminated and if so, how to calculate the swap amount. So
21 we've already seen communications going until the end of 2010
22 that bear on how this claim ought to properly be calculated and
23 whether or not it be allowed.
24      THE COURT: All right. Continue, please.
25      MR. FISHER: In terms of why we think the time frame

Page 9

1  ought to go back to June 2008, the lockup agreement that is at
2  the heart of our objection is an agreement that settled
3  litigation that had been commenced by the noteholders in
4  Canada. And they commenced the litigation in March of 2009.
5  But the litigation concerned transfers that had happened
6  between GM Nova Scotia Finance and GM Canada, as far back as
7  May 2008. And so, we'd like to -- the notes here were
8  purchased -- most of them were purchased in 2008. Some notes
9  were purchased before then. We'd like to go back to that
10 period of time in order to find out what it is that these
11 noteholders knew about those transfers at the time that they
12 purchased the notes. And we think that that's relevant.
13      In sensing whether lockup agreement was truly an
14 arm's-length and fair settlement of the Nova Scotia litigation,
15 we need to get to the bottom of the merits of that litigation.
16 And that litigation, again, concerns May 2008 transfers, and
17 the notes were purchased in 2008. So we think it's fair to go
18 back to June 2008 as a starting period of time.
19      THE COURT: All right. Continue, please.
20      MR. FISHER: Okay. That's issue number one, Your
21 Honor, the time period.
22      Issue number two is, we've sought documents concerning
23 the noteholders' decision to purchase the notes. What did they
24 know about Nova Scotia Finance at the time that they purchased
25 the notes? How did they analyze this investment? How did they

3 (Pages 6 - 9)

MOTORS LIQUIDATION COMPANY

1  imagine this investment playing out?  What were their
2  expectations?  What did they expect to realize on this
3  investment?  We think that those questions are critical to
4  determining whether they behaved equitably here.  And we think
5  that at least some of the noteholders are poised to get more
6  than a hundred percent recovery.
7      And so we think the circumstances of the purchase of
8  the notes as an investment decision is just critically
9  relevant.  And I appreciate that they consider that
10  commercially sensitive information.  And that's why we have a
11  protective order.  And we think that we're entitled to that
12  information.  We're not asking for information about any notes
13  or any investment decisions other than the decision to purchase
14  the very notes that are at issue in this case.
15      THE COURT:  Pause, please, Mr. Fisher.  Because what
16  you just said seems to be a potential narrowing of your
17  contentions from your earlier letter.  At this point you're
18  only looking for stuff on the buy side, you're no longer
19  looking for stuff on the sell side?
20      MR. FISHER:  Your Honor, I think that what -- in
21  reading the noteholders' response, when it comes to calculating
22  their profits, I think that based on publicly available
23  information and 2019 statements, that they're correct, that it
24  would be possible for us to calculate profits, in other words,
25  to look at the sell side, based on that kind of information.

1  So, yes, we're focused on the buy side, Your Honor.
2      THE COURT:  All right.  Continue, please.
3      MR. FISHER:  Issue number two, which I would just
4  describe generally as the decision to purchase these notes.
5  And then what I've described as the half issue is we'd like to
6  know what other Nova Scotia unlimited liability company
7  investments these noteholders have made, because at this point,
8  this is a niche investment strategy.  This is something that
9  this group of noteholders is not just doing in this case, but
10  has done in multiple cases.  And we'd like to understand how --
11  what positions they've taken in other cases that are similar to
12  this one to determine whether those positions are consistent or
13  inconsistent.
14      And we appreci -- we're not looking to open up
15  discovery and take discovery about all the documents that have
16  been exchanged in all those other proceedings.  We just want --
17  we just ask for a list of those other ULC investments.  We
18  would use the list to probe, you know, publicly available
19  information, to look at dockets.  And then if there were
20  further information that we thought we needed, we would try to
21  ask for that in a very focused way.
22      But that's why I describe it as a half issue.  Because
23  we're not even asking for the production of documents.  We're
24  just asking for them to identify other unlimited liability
25  company investments that this group of noteholders have been

1  involved with.
2      THE COURT:  All right.  Now, pause, please, Mr.
3  Fisher.  The way I heard that, that seems to be either exactly
4  the same or pretty much the same as what you were asking for in
5  your letter.  Am I correct in that understanding?
6      MR. FISHER:  Yes, Your Honor.
7      THE COURT:  Okay.  All right.
8      MR. FISHER:  And, Your Honor, the fourth issue in our
9  letter relates to documents that support the 2019 statements
10  that have been filed by Greenberg with respect to the
11  noteholder group.  And having thought about it further and
12  having read Greenberg's letter, we have no reason to doubt the
13  integrity of those filings.  And for that reason, I don't think
14  that there's discovery that we need with respect to the backup
15  to the 2019 statements.  And since submitting the letter, I
16  think we've decided to back off of that particular request,
17  which is why I said at the outset that I only have two and a
18  half issues to present to Your Honor.
19      THE COURT:  Okay.  Anything else, Mr. Fisher?
20      MR. FISHER:  Unless the Court has questions about the
21  letter.
22      THE COURT:  No, you took care of them as we went
23  along.
24      Mr. Zirinsky?
25      MR. ZIRINSKY:  Yes, Your Honor.  Your Honor, I'd like

1  to introduce my partner, Kevin Finger, who has been handling
2  the discovery on behalf of the noteholders.
3      THE COURT:  Okay.
4      MR. ZIRINSKY:  And he will respond and argue whatever
5  points need to be argued and to answer any of Your Honor's
6  questions.
7      THE COURT:  Okay.  Mr. Finger?
8      MR. FINGER:  Good morning, Your Honor.  It is Kevin
9  Finger.  It's my pleasure to appear before this Court for the
10  first time.
11      With respect to the discovery that's been ongoing,
12  with respect to the objection, as the Court is aware, the
13  discovery rules dictate that the discovery must be relevant to
14  the issues presented in the litigation.  In this case, in this
15  contested matter, it's the committee's objection to the
16  noteholders' claims.  And in that objection, the committee
17  describes the basis for its objection as related to the
18  circumstances surrounding a lockup agreement.
19      And they claim -- the committee claims that the
20  noteholders have acted inequitably with respect to that lockup
21  agreement.  And I think, and a fair inference is, that the
22  committee is alleging either some sort of coercion by the
23  noteholders with respect to the negotiations with Old GM and
24  their counsel, Weil Gotshal, or some sort of collusion with
25  them; and that that somehow renders this apparently arm's-

4 (Pages 10 - 13)

MOTORS LIQUIDATION COMPANY

Page 14

1 length negotiated transaction somehow unfair.

2 And as we've said in our letter, clearly this was a

3 hard-fought negotiation conducted by very sophisticated parties

4 with incredibly competent counsel. And the result was the

5 lockup agreement and ultimately the bankruptcy petition filed

6 by Old GM. And the discovery issues that we're discussing

7 today, Your Honor, are completely unrelated to the fundamental

8 premise of the objection, the lockup agreement.

9 And I should point out that the letter lists on page 3

10 and going on to page 4, a number of significant substantive

11 areas for which the noteholders agreed to produce all relevant

12 documents, including the lockup agreement, the litigation that

13 was commenced in Nova Scotia in 2009, documents relating to

14 those transfers, and a variety of other topics that ultimately

15 led up to the negotiations of the lockup agreement and the

16 filing of a bankruptcy petition by Old GM.

17 So when Mr. Fisher asks for information going back

18 before 2009, that's at odds with the allegations in the

19 objection. Paragraph 26 says quite clearly, "During 2009, the

20 lockup noteholders became concerned about collecting the

21 principal amount of the notes upon maturity." That's

22 absolutely accurate. And that is basically the premise of the

23 objection and that's what caused us to expand the time frame,

24 not just beyond May of 2009, but going all the way back through

25 January 1st, all the way through July 31st, to pick up anything

Page 15

1 that may have transpired in that time frame that ultimately led

2 to the lockup agreement.

3 That would be, the noteholders have agreed to produce

4 thousands and thousands of pages of information from this time

5 frame that's related to all those subject matters listed on

6 page 3 and 4 of the noteholders' letter.

7 THE COURT: Keep going.

8 MR. FINGER: There's nothing about the purchase

9 decision to buy those bonds that informs the negotiations about

10 the lockup agreement. And the committee can't point to

11 anything that's presented in the objection that renders it so

12 other than just some sort of interest in that information. But

13 there's nothing tied to the objection as required by the

14 discovery rules.

15 The time frame after July 31, 2009, again, we view,

16 June 25th, really is the -- June 25, 2009, is really the last

17 act with respect to the lockup agreement, but expanded it

18 beyond June to be overly broad, in fact. Nothing really in the

19 objection -- there's a heading called "post-petition

20 implementation of the lockup agreement". They talk about the

21 June 25th date, and they don't know there's an agreement by

22 that date. Even the assumption by New GM of the lockup

23 agreement is in July of 2009. And the only reference to

24 something after that time period is, in fact, the filing of the

25 claims in this particular case.

Page 16

1 So there's no real basis here to contest the

2 fundamental issue, which is the committee claims that a lockup

3 agreement is unfair, and somehow the noteholders acted

4 inequitably and somehow old GM was not fairly represented by

5 counsel and didn't negotiate properly. Nothing after the July

6 31, 2009 time frame informs any of that issue in this case.

7 And the noteholders submit that they've agreed to produce, in

8 an overbroad way, as much information as possible to permit the

9 committee to pursue its objection and contest the claims if

10 there's any grounds to do so.

11 Going beyond that time frame would impose a

12 significant burden on the noteholders. There's a lot of

13 information. These -- particular financial institutions watch

14 this industry, watch GM. Going back to collect all its

15 information and sift the chaff from the wheat is a time-

16 consuming, costly and burdensome exercise that frankly, without

17 any relation to the objection, is unfair to the noteholders to

18 have to go through this.

19 And again, as cited in the letter, nothing about what

20 the committee has claimed, really informs their objection.

21 Unless the Court has questions on that particular issue here of

22 the time frame, I can move to the noteholders' decision to

23 purchase.

24 THE COURT: Go ahead.

25 MR. FINGER: Your Honor, nothing about their decision

Page 17

1 to purchase, again, informs the objection. It's -- there's no

2 allegation in the objection that says the noteholders knew

3 something or knew something special that wasn't otherwise

4 available to anyone in the market about this particular issue.

5 The noteholders' specific rationale for purchasing is going to

6 be different for each one. It's going to be highly

7 proprietary. It goes to the heart of any financial

8 institution's decisions to invest.

9 To the extent that the committee claims that the

10 profit and loss information somehow informs that, as Mr. Fisher

11 has said, that's already available to them. That's presented

12 with publicly available information as well as the information

13 present in Greenberg Traurig's 2019. So nothing about profit

14 and loss informs that issue.

15 And again, the fundamental issue here is, the

16 noteholders have publicly defined rights as provided by the

17 offerings circular set forth in their memo which has been

18 produced. And whatever rights either party has are clearly set

19 forth in documents. And what the noteholders' subjective

20 belief about those rights vis-a-vis what GM Canada or GM Nova

21 Scotia's subjective belief about those rights is, is

22 irrelevant.

23 Further, Mr. Fisher, in this call as well as in his

24 letter, said that he's trying to get to the bottom of or cite

25 the merits of the litigation in Nova Scotia, and frankly cites

5 (Pages 14 - 17)

MOTORS LIQUIDATION COMPANY

Page 18

1 Canadian law on various issues regarding that. And
2 notwithstanding our disagreement as to what the Canadian law
3 actually holds, asking this Court to retry or to relitigate the
4 Nova Scotia litigation, simply has no place here. The
5 litigation was filed. The information that was discussed or
6 contemplated in the first half of 2009 about that litigation
7 will be provided to the committee. But trying to relitigate
8 that case is, I think, beyond the bounds of what this Court has
9 been asked to do with respect to the objection.
10     What the noteholders' belief about what those rights
11 were that ultimately led them to file that proceeding, is not
12 relevant to the proceeding, which is clearly set forth in the
13 pleadings that were filed and the motions that were filed and
14 contested by both sides.
15     Again, the fair inference of the objection is that
16 there's some sort of coercion or collusion with respect to the
17 lockup agreement. None of that is informed by whatever the
18 noteholders believed at the time that they purchased the notes.
19     THE COURT: All right.
20     MR. FINGER: If the Court has no further questions on
21 that, I can move to the ULC investment issue.
22     THE COURT: Go ahead.
23     MR. FINGER: Similarly, there's nothing about the
24 decision to purchase -- to make investments in other vehicles
25 that relates to the decision -- to the issues related to the

Page 19

1 lockup agreement. So it's even one step further removed.
2 We're not even talking about a decision to invest in the GM
3 Nova Scotia notes, we're talking about some other vehicle which
4 is -- in Mr. Fisher's letter, it's clearly -- he has an idea of
5 what those are, because he identifies docket entries. But to
6 go back and ask the noteholders to review prior investments
7 that may involve ULCs for the purpose of this, has no rational
8 connection to this objection. This is simply another burden
9 that the noteholders shouldn't have to bear in his case.
10     THE COURT: All right. Anything further, Mr. Finger?
11     MR. FINGER: No, Your Honor.
12     THE COURT: All right. Mr. Fisher, do you want to
13 reply?
14     MR. FISHER: Yes. Just briefly, Your Honor. If --
15 Mr. Finger referred to the page 3 of the noteholders' letter to
16 the Court. And I indicated that there are a whole bunch of
17 bullet point categories where the noteholders have agreed to
18 produce documents. What I think is -- we're not quite complete
19 about that presentation, is that with respect to many of those
20 topics, the relevant time frame is before the time frame being
21 proposed by the noteholders and goes later than the time frame
22 being proposed by the noteholders.
23     And so if -- it's not quite right to say that they've
24 agreed to provide us with all relevant documents about these
25 topics. There are very significant exclusions that are built

Page 20

1 into their position. And just by the way of example, the
2 second bullet point refers to all documents concerning the
3 litigation commenced in Nova Scotia against Old GM and certain
4 subsidiaries. Well, that litigation was commenced in March
5 2009, but it concerned events that happened in 2008.
6     All documents concerning any transfers referred to in
7 the Nova Scotia proceeding. Those are 2000 -- those are May
8 2008 transfers that we're talking about. So I'm certainly
9 going to be deprived of relevant information if I'm not getting
10 information before January 2009.
11     All documents concerning currency swaps between Nova
12 Scotia Finance and Old GM. Well, the swaps weren't assumed
13 until August 2009, which is after the time frame that's
14 proposed by the noteholders. And as I indicated, well into
15 2010 there is discussion whether those swaps are being properly
16 calculated for purposes of the claim in this case.
17     All documents concerning intercompany loans from Nova
18 Scotia Finance to GM Canada. That's not a 2009 event. That's
19 a 2008 and earlier event. All documents concerning a potential
20 reorganization or bankruptcy insolvency liquidation or winding
21 up event of Nova Scotia Finance or GM Canada. That didn't
22 happen, Your Honor, until October 2009.
23     So there's a list of categories, and the noteholders
24 are telling the Court that they've agreed to give up all
25 documents concerning those categories. But that sort of evades

Page 21

1 the fundamental issue, which is, what's the relevant period of
2 time in order for the committee to be sure that it's getting
3 the relevant documents concerning those topics. So that's why
4 I think the time frame is such a critical issue here.
5     Issue number two, which is the noteholders' decision
6 to purchase notes. All we're trying to see is whether
7 discovery bears out our theories of the case. But if it
8 doesn't we're not going to be able to press those
9 theories. But based on what we know about what happened here,
10 when the noteholders purchased these notes in 2008, they knew
11 about the intercompany transfers that they then later, in March
12 2009, challenged in litigation commenced in Nova Scotia.
13     So essentially, when they purchased their notes, they
14 were buying an oppression claim against Nova Scotia that they
15 were then going to use for maximum leverage to try to get as
16 much as they could on these notes. And so, you know, I
17 don't -- the committee does not believe that this is a campaign
18 that started sometime in 2009. This is a deliberate investment
19 strategy that started in 2008 when they purchased the notes and
20 thought through how they could take advantage of the ULC
21 structure and projected distress for GM and its Canadian
22 subsidiaries.
23     With respect to the list of the ULC investments,
24 again, I think how they are able to gain the ULC structure in
25 order to maximize their return on investment is a relevant part

6 (Pages 18 - 21)

Page 22

1 of the puzzle. But I'm mindful of the burden, and therefore
2 we've restricted it to a list.
3       And on the topic of burden, Your Honor, in the
4 noteholders' letter, they talked about -- they quote Rule
5 26(b)(2)(B). And this to suggest that this information is not
6 reasonably accessible to them. And that's just not true. Not
7 reasonably accessible is, of course, a term of art, and it
8 refers to electronic data that is not searchable, that exists
9 in backup servers that are difficult to access. I have every
10 reason to believe, and I have not been told to the contrary,
11 this is all live electronic data that can be collected,
12 searched and produced.
13      So I do appreciate that it's more data that needs to
14 be collected, searched and produced. But I don't think it's
15 fair to say that it's an unreasonable burden. We tried to
16 restrict the time frame to that time frame that we think is
17 necessary to give us information that is going to lead to
18 admissible evidence in the ultimate hearing on this objection,
19 Your Honor.
20      THE COURT: All right. Gentlemen, everybody sit in
21 place. There's going to be a few moments of silence, of dead
22 air. So don't be surprised or upset if don't hear anything for
23 a couple of minutes.
24      (Pause)
25      THE COURT: All right, gentlemen. On the remaining

Page 23

1 issues before me, the documents will be produced for the period
2 from June 1, 2008 through the end of 2010. The documents in
3 the second category will be produced to the extent they deal
4 with the decision to purchase, but the request is denied
5 without prejudice with respect to documents that solely relate
6 to sell or hold decisions. It being understood, of course,
7 that if a document refers to both, or some combination of those
8 three things, it still has to be produced. And the request
9 that a list be provided with respect to investments in other
10 ULCs is granted. My bases for the exercise of my discretion
11 follow.
12      First, in my view, after hearing argument from both
13 sides, it's no big deal to add a few months on each end to the
14 requested time coverage of the discovery request. There has
15 been no real showing of burden other than the ipse dixit claim
16 that adding these few months of discovery on each end is
17 significant.
18      The requested expansion of the time coverage for the
19 request does not require production of documents of a different
20 character. And frankly, gentlemen, we're talking about a claim
21 which, at least by some people's count, is 2.67 billion
22 dollars -- perhaps I should say claim or aggregate claims. And
23 when you're trying to get that much money from an estate, to
24 which of course you may be fully entitled, but the incremental
25 cost of a little extra production and a few extra months,

Page 24

1 cannot be considered unfair or oppressive in the context of the
2 extraordinary amounts of money for which recovery is sought.
3       Then, gentlemen, that while I express no view on the
4 merits of the case or even whether anything that the creditors'
5 committee wishes to obtain is ultimately going to be
6 admissible, everybody knows what the standard is for discovery
7 vis-a-vis it being reasonably calculated to lead to admissible
8 evidence or potentially admissible evidence. And I think that
9 the request easily passes muster on that standard.
10      At this stage in the case, I'm not going to let either
11 side's views as to the merits or what its views are concerning
12 what the legal issues are to be determinative of the scope of
13 discovery. Each side is going to be allowed to make its best
14 case based on evidence that may turn out to be relevant with
15 respect to issues as to the merits which have yet to be
16 decided.
17      The creditors' committee has made a number of claims
18 or contentions vis-a-vis the Nova Scotia noteholders,
19 including, without attempting to characterize either side's
20 positions inappropriately or to bind either side to the
21 contentions, that the Nova Scotia noteholders had created a
22 cottage industry to get increased distributions, and to confer
23 an advantage over other creditors. They've used the expression
24 "to buy oppression claims". And they've made accusations of
25 gaming the system.

Page 25

1       I don't know if those allegations are true or not. I
2 don't know if even if those allegations are true, there's
3 necessarily anything wrong with it, or if there is something
4 wrong with it, if whatever's wrong with it is legally
5 actionable or legally cognizable as a basis for relief. But
6 we're going to get to the facts. We're going to get the facts.
7 And I won't decide the ultimate issues in this case in a
8 factual vacuum.
9       It is for that reason -- or those reasons -- that I
10 think the requests in both category number 2 and number 3 are
11 appropriate, subject to the limitations that I articulated
12 before. While I think that those limitations' rationale is
13 obvious, I think I can and should clarify why I think the
14 purchase decisions are relevant, but that decisions as to sell
15 and hold should be denied without prejudice at this time.
16      The various contentions that the creditors' committee
17 made, make buy decision, purchase decisions, plainly relevant.
18 But at least on this state of the record, the amount of money
19 that various Nova Scotia noteholders might be making off this
20 investment, is not now relevant, if it ever will be. The issue
21 isn't so much how much money they're going to make off this. I
22 think it may be argued or inferred that they wouldn't have made
23 the investment unless they wanted to make a profit. But the
24 issue isn't so much -- at least on this state of the record --
25 exactly how much of a profit they're going to make, it's much

7 (Pages 22 - 25)

MOTORS LIQUIDATION COMPANY

Page 26

1 more the underlying rationale and the effect on the creditor

2 community and the various other allegations which provide the

3 basis underlying this controversy.

4      Lastly, gentlemen, for the avoidance of doubt,

5 anything produced will be at least initially subject to

6 coverage under a confidentiality order.  And to deal with an

7 issue which probably didn't need stating, but I will, only

8 documents that actually exist or are known need to be produced.

9      All right, gentlemen, not by way of reargument, are

10 there any open issues?

11      MR. ZIRINSKY:  Your Honor, it's Bruce Zirinsky.

12      THE COURT:  I'm sorry, I couldn't hear that.

13      MR. ZIRINSKY:  I'm sorry, Your Honor.  It's Bruce

14 Zirinsky.  I have a frog in my throat.  I was just clearing it.

15      I don't think it's relevant to today's discussion, but

16 I did want to inform the Court and Mr. Fisher that we were

17 informed this week that two of the noteholders we represent

18 have sold their claims and are no longer creditors of GM.  It's

19 our intention to file an amended 2019 statement as soon as we

20 can obtain the relevant information.  And we'll attempt to file

21 it by next week.

22      THE COURT:  Very well.  Anything else, anybody?

23      MR. FISHER:  Your Honor, this is something I'll take

24 up with Mr. Zirinsky, certainly.  But I just want to ensure

25 that Your Honor's discovery rulings would apply to discovery of

Page 27

1 information in the files of those two noteholders that seem to

2 have withdrawn from Mr. Zirinsky's group.

3      MR. ZIRINSKY:  Well --

4      THE COURT:  Well, the issue, at least warrants an

5 opportunity for Mr. Zirinsky or Mr. Finger to be heard before

6 I express a view on that.

7      MR. ZIRINSKY:  Understood, Your Honor.  Your Honor, I

8 would suggest that we have a conversation with Mr. Fisher and

9 attempt to work things out.  And if we can't, we'll come back

10 to Your Honor on that.

11      It is our clients' understanding that they are still

12 going to have to produce discovery.  Whether that's in the

13 capacity, now, as a party or as a third-party witness, it may

14 be a distinction without a difference.  But they do understand

15 that they will be required to produce discovery.

16      THE COURT:  Well, I think you may be right, Mr.

17 Finger.  And that's my tentative.  But I like the idea of you

18 having a dialogue with Mr. Fisher on that.  And if you later

19 somehow can't come to an agreement, you can call me up again.

20      MR. ZIRINSKY:  Thank you, Your Honor.  It's Bruce

21 Zirinsky, by the way, that made that comment.

22      THE COURT:  I'm sorry.  That's fine.

23      MR. ZIRINSKY:  That's okay.  Thank you, Your Honor.

24 We appreciate your time.

25      THE COURT:  All right, gentlemen.  Have a good

Page 28

1 weekend.  We're adjourned.

2      MR. ZIRINSKY:  Thank you, Your Honor.  We appreciate

3 it.

4      (Whereupon these proceedings were concluded at 9:28 AM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 29

1

2           I N D E X

3

4           RULINGS

5               Page    Line

6 Documents will be produced for period of      23      1

7 6/1/08 to 12/31/10

8 Documents in category 2 will be produced      23      2

9 regarding buy but not sell or hold decisions

10 Request for list of ULC investments, granted      23      8

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

8 (Pages 26 - 29)

Page 30

1
2            C E R T I F I C A T I O N
3
4  I, Penina Wolicki, certify that the foregoing transcript is a
5  true and accurate record of the proceedings.
6
7
8  _____
9  PENINA WOLICKI
10  AAERT Certified Electronic Transcriber CET**D-569
11
12  Veritext
13  200 Old Country Road
14  Suite 580
15  Mineola, NY 11501
16
17  Date:  April 18, 2011
18
19
20
21
22
23
24
25

VERITEXT REPORTING COMPANY
212-267-6868                    www.veritext.com                    516-608-2400

# EXHIBIT 2

DICKSTEIN SHAPIRO LLP
Barry N. Seidel
Eric B. Fisher
Katie L. Cooperman
1633 Broadway
New York, New York  10019
Telephone: (212) 277-6500

*Special Counsel to the Motors Liquidation
Company GUC Trust*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 Case |
| MOTORS LIQUIDATION COMPANY, *et al.,* | : | Case No. 09-50026 (REG) |
| Debtors. | : | (Jointly Administered) |

### GUC TRUST'S RESPONSES AND OBJECTIONS TO FIRST SET OF DOCUMENT REQUESTS OF GREEN HUNT WEDLAKE, INC.

Pursuant to Rules 7026, 7033 and 7034 of the Federal Rules of Bankruptcy Procedure

("**FRBP**"), Rules 26, 33 and 34 of the Federal Rules of Civil Procedure ("**FRCP**"), and the

Local Rules for the United States Bankruptcy Court for the Southern District of New York

("**Local Rules**"), the Motors Liquidation Company GUC Trust ("**GUC Trust**"), by and through

its Special Counsel, Dickstein Shapiro LLP, hereby responds and objects to the First Set of

Document Requests of Green Hunt Wedlake Inc., Trustee of General Motors Nova Scotia

Finance Company ("**Nova Scotia Finance Trustee**"), to the Official Committee of Unsecured

Creditors, dated May 19, 2011 ("**Requests**"), as follows:

**GENERAL OBJECTIONS**

The GUC Trust incorporates the following general objections into each response as if fully set forth therein. The assertion of same, similar or additional objections with respect to any request, or the failure to assert any additional objection to any request, does not waive any of the GUC Trust's general objections. Any objection or limitation, or lack thereof, made in these responses and objections shall not be deemed an admission by the GUC Trust as to the existence or nonexistence of information sought in a particular request.

1.     The GUC Trust objects to the Requests, and the definitions and instructions set forth therein, to the extent that they seek to impose discovery obligations or demands in excess of those required by the FRCP, the FRBP, the Local Rules and/or any other applicable authority. The GUC Trust will not respond or produce or otherwise perform any act demanded in the Requests except insofar as required by the FRCP and other applicable authority.

2.     The GUC Trust objects to the Requests to the extent that they seek information or call for the production of documents subject to the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity from discovery. The GUC Trust will not provide any information protected by such privileges or immunities, and inadvertent disclosure of such information shall not be deemed or constitute a waiver of any such privilege or immunity.

3.     The GUC Trust objects to the Requests to the extent that they seek documents or information already in the possession, custody or control of the Nova Scotia Finance Trustee, or which are available to the Nova Scotia Finance Trustee, formally or informally, from public sources, on the grounds that such requests for documents are duplicative, overly broad and unduly burdensome.

2

4.    The GUC Trust objects to the Requests to the extent that they seek documents or information outside of the GUC Trust's possession, custody, or control, on the grounds that any such requests are overly broad and unduly burdensome, seek to impose discovery obligations in excess of those imposed by the FRCP and other applicable authority, and would subject the GUC Trust to unreasonable burden and expense.

5.    The GUC Trust objects to the Requests to the extent that they seek documents or information that are neither relevant to any claim asserted in this action nor reasonably calculated to lead to the discovery of admissible evidence.

6.    The GUC Trust objects to the Requests to the extent that they contemplate the production of duplicate copies of a document.

7.    The GUC Trust objects to the Requests as untimely in light of the parties' agreement that the deadline to exchange document requests was January 11, 2011, as set forth in Exhibit A attached hereto.

8.    The GUC Trust objects to the Requests to the extent that they seek to impose discovery obligations in excess of those permitted by Judge Gerber who stated, at the December 15, 2010 pre-trial conference, that "interrogatories can be used to identify the names and locations of witnesses. But I don't want them used for anything other than that." *See* transcript from the December 15, 2010 pre-trial conference at 57:14-16, attached hereto as Exhibit B.

9.    The GUC Trust reserves the right to assert additional general and specific objections that may become apparent as additional information is learned through the course of this litigation.

## SPECIFIC RESPONSES AND OBJECTIONS

The GUC Trust expressly incorporates the general objections in each specific

response to the particular request set forth below, as if fully set forth therein.

**DOCUMENT REQUEST NO. 1:**    Identify all Documents and Communications in the Nova
Scotia Trustee's Production, the Noteholders' Production, or the Creditors' Committee's
Production in your possession, custody, or control as of April 15, 2011, that support your
contention made to the Court at the April 15 Oral Argument that "there are emails saying that
[the swap] claim may be overstated. And when I stay [sic] overstated, not by a trivial amount,
but by an amount in excess of 100 million dollars." *See* Transcript 7:9-11.

**Response:**

The GUC Trust objects to Request No. 1 on the grounds that it is untimely and seeks information

that is obtainable from the Nova Scotia Finance Trustee itself. The GUC Trust further objects to

Request No. 1 on the grounds that it is a disguised "contention" interrogatory, which is not

permitted under Local Rule 7033-1(c). The GUC Trust will not produce documents responsive

to Request No. 1.

**REQUEST NO. 2:**    Identify all Documents and Communications in the Nova Scotia Trustee's
Production, the Noteholders' Production, or the Creditors' Committee's Production in your
possession, custody, or control as of April 15, 2011, that support your contention made to the
Court at the April 15 Oral Argument that "right up through the end of 2010, there are
communications between the GM Nova Scotia Finance trustee and the noteholders and other
bondholders about filing claims in the Nova Scotia proceeding that relate to – the same claims
the various – in the Old GM case." *See* Transcript 7:18-22.

**Response:**

The GUC Trust objects to Request No. 2 on the grounds that it is untimely and seeks information

that is obtainable from the Nova Scotia Finance Trustee itself. The GUC Trust further objects to

Request No. 2 on the grounds that it is a disguised "contention" interrogatory, which is not

permitted under Local Rule 7033-1(c). The GUC Trust will not produce documents responsive

to Request No. 2.

**REQUEST NO. 3:**    Identify all Documents and Communications in the Nova Scotia Trustee's Production, the Noteholders' Production, or the Creditors' Committee's Production in your possession, custody, or control as of April 15, 2011, that support your contention made to the Court at the April 15 Oral Argument that you have "already seen communications going until the end of 2010 that bear on how [the swap] claim ought to properly be calculated and whether or not it be allowed." *See* Transcript 8:21-23.

**Response:**

The GUC Trust objects to Request No. 3 on the grounds that it is untimely and seeks information that is obtainable from the Nova Scotia Finance Trustee itself. The GUC Trust further objects to Request No. 3 on the grounds that it is a disguised "contention" interrogatory, which is not permitted under Local Rule 7033-1(c). The GUC Trust will not produce documents responsive to Request No. 3.

**REQUEST NO. 4:**    Identify all Documents and Communications in the Nova Scotia Trustee's Production, the Noteholders' Production, or the Creditors' Committee's Production in your possession, custody, or control as of April 15, 2011, that support your contention made to the Court at the April 15 Oral Argument that "well into 2010 there is discussion whether those swaps are being properly calculated for purposes of the claim in this case." *See* Transcript 20:14-16.

**Response:**

The GUC Trust objects to Request No. 4 on the grounds that it is untimely and seeks information that is obtainable from the Nova Scotia Finance Trustee itself. The GUC Trust further objects to Request No. 4 on the grounds that it is a disguised "contention" interrogatory, which is not permitted under Local Rule 7033-1(c). The GUC Trust will not produce documents responsive to Request No. 4.

5

Dated: June 20, 2011
    New York, New York

DICKSTEIN SHAPIRO LLP

By: _____

Barry N. Seidel
Eric B. Fisher
Katie L. Cooperman
1633 Broadway
New York, New York  10019
(212) 277-6500

*Special Counsel to the Motors*
*Liquidation Company GUC Trust*

Exhibit A



# BUTZEL LONG
ATTORNEYS AND COUNSELORS

*a professional corporation*

Katie L. Cooperman
212 323 8608
cooperman@butzel.com

22nd Floor  380 Madison Avenue
New York, New York  10017
T: 212 818 1110  F: 212 818 0494
butzel.com

December 23, 2010

**VIA HAND DELIVERY**

Honorable Robert E. Gerber
United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004-1408

Re:     ***In re General Motors Corporation, et al., 09-50026 (REG):  Official Committee of
Unsecured Creditors' First Amended Objection to Claims Filed by Green Hunt
Wedlake, Inc. and Noteholders of General Motors Nova Scotia Finance Company and
Motion for Other Relief* (Docket No. 7859)**

Dear Judge Gerber:

We represent the Official Committee of Unsecured Creditors of Motors Liquidation
Company f/k/a General Motors Corporation with respect to the above-referenced objection.  At
the status conference held on December 15, 2010, Your Honor directed the parties to submit a
proposed scheduling order.  On December 22, 2010, we spoke with counsel for the Trustee of
General Motors Nova Scotia Finance Company ("GMNSF") and counsel for certain holders of
the GMNSF notes about scheduling matters.  The parties have agreed to exchange document
requests by January 11, 2011, and to meet and confer on January 14, 2011 to discuss the overall
discovery schedule.  We hope to submit a consensual scheduling order to the Court sometime
soon after our anticipated January 14, 2011 meeting.

We thank the Court for its attention to this matter.

Respectfully,

*[signature]*

Katie L. Cooperman

cc:    Akin Gump Strauss Hauer & Feld LLP
       Daniel H. Golden, Esq. (via e-mail PDF)
       Attorney for Trustee of GMNSF

       Greenberg Traurig, LLP
       Bruce Zirinsky, Esq. (via e-mail PDF)
       Attorney for Certain GMNSF Noteholders

BUTZEL LONG

## Exhibit B

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 09-50026(REG)

5   - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   MOTORS LIQUIDATION COMPANY, et al.

9           f/k/a General Motors Corporation, et al.,

10

11           Debtors.

12

13   - - - - - - - - - - - - - - - - - - -x

14

15           United States Bankruptcy Court

16           One Bowling Green

17           New York, New York

18

19           December 15, 2010

20           2:10 PM

21

22

23   B E F O R E:

24   HON. ROBERT E. GERBER

25   U.S. BANKRUPTCY JUDGE

Page 2

2 HEARING re IUE-CWA's Motion Pursuant to 11 U.S.C. §§ 105 and

3 363(b) to Approve Assignment of Claim of IUE-CWA to a VEBA

4 Trust

6 HEARING re Fourth Application of Weil, Gotshal & Manges LLP as

7 Attorneys for the Debtors, for Interim Allowance of

8 Compensation for Professional Services Rendered and

9 Reimbursement of Actual and Necessary Expenses Incurred from

10 June 1, 2010 through September 30, 2010

12 HEARING re Second Interim Application of Stutzman, Bromberg,

13 Esserman & Plifka, A Professional Corporation, for Allowance of

14 Interim Compensation and Reimbursement of Expenses Incurred as

15 Counsel for Dean M. Trafelet in his Capacity as Legal

16 Representative for Future Asbestos Personal Injury Claimants

17 for the Period from June 1, 2010 through September 30, 2010

19 HEARING re Second Interim Application of Dean M. Trafelet in

20 His Capacity as Legal Representative for Future Asbestos

21 Personal Injury Claimants, for Allowance of Interim

22 Compensation and Reimbursement of Expenses Incurred for the

23 Period from June 1, 2010 through September 30, 2010

Page 3

2 HEARING re Second Interim Application of Analysis Research

3 Planning Corporation as Asbestos Claims Valuation Consultant to

4 Dean M. Trafelet in his Capacity as Legal Representative for

5 Future Asbestos Personal Injury Claimants for Allowance of

6 Interim Compensation and Reimbursement of Expenses Incurred for

7 the Period from June 1, 2010 through September 30, 2010

9 HEARING re Second Interim Application of Bates White, LLC, as

10 Asbestos Liability Consultant to the Official Committee of

11 Unsecured Creditors, for Allowance of Compensation for

12 Professional Services Rendered and for Reimbursement of Actual

13 and Necessary Expenses Incurred for the Period from June 1,

14 2010 through September 30, 2010

16 HEARING re Fourth Application of Butzel Long, a Professional

17 Corporation, as Special Counsel to the Official Committee of

18 Unsecured Creditors of Motors Liquidation Company, f/k/a

19 General Motors Corporation, for Interim Allowance of

20 Compensation for Professional Services Rendered and

21 Reimbursement of Actual and Necessary Expenses Incurred from

22 June 1, 2010 through September 30, 2010

Page 4

2 HEARING re Second Interim Fee Application of Deloitte Tax LLP

3 as Tax Services Providers for the Period from June 1, 2010

4 through September 30, 2010

6 HEARING re Fourth Interim Application of FTI Consulting, Inc.

7 for Allowance of Compensation and for Reimbursement of Expenses

8 Rendered in the Case for the Period June 1, 2010 through

9 September 30, 2010

11 HEARING re Second Application of Hamilton, Rabinovitz, &

12 Associates, Inc. as Consultants for the Debtors with Respect to

13 Present and Future Asbestos Claims, for Interim Allowance of

14 Compensation for Professional Services Rendered and

15 Reimbursement of Actual and Necessary Expenses Incurred from

16 June 1, 2010 through September 30, 2010

18 HEARING re Fourth Interim Fee Application of Jenner & Block LLP

19 for Allowance of Compensation for Services Rendered and

20 Reimbursement of Expenses

Page 5

2 HEARING re Interim Compensation and Reimbursement of Expenses

3 with Respect to Services Rendered as Consultant on the

4 Valuation of Asbestos Liabilities to the Official Committee of

5 Unsecured Creditors Holdings Asbestos-Related Claims for the

6 Period June 1, 2010 through September 30, 2010

8 HEARING re Third Application of Plante & Moran, PLLC, as

9 Accountants for the Debtors, for Interim Allowance of

10 Compensation for Professional Services Rendered and

11 Reimbursement of Actual and Necessary Expenses Incurred from

12 June 1, 2010 through September 30, 2010

14 HEARING re Fourth Interim Application of The Claro Group, LLC

15 for Allowance of Compensation and Reimbursement of Expenses for

16 the Period June 1, 2010 - September 30, 2010

18 HEARING re Second Application of Togut, Segal & Segal LLP as

19 Conflicts Counsel for the Debtors for Allowance of Interim

20 Compensation for Services Rendered for the Period June 1, 2010

21 through September 30, 2010, and for Reimbursement of Expenses

Page 6

1
2  HEARING re Second Consolidated Application of Brady C.
3  Williamson, Fee Examiner, and Godfrey & Kahn, S.C., Counsel to
4  the Fee Examiner, for Interim Allowance of Compensation for
5  Professional Services Rendered from June 1, 2010 through
6  September 30, 2010 and Reimbursement of Actual and Necessary
7  Expenses Incurred from September 1, 2010 through October 31,
8  2010
9
10  HEARING re Second Application of Stuart Maue for Allowance of
11  Compensation and Reimbursement of Expenses for the Analysis of
12  Interim Fee Applications of Selected Case Professionals
13
14  HEARING re Pre-Trial Conference Regarding Official Committee of
15  Unsecured Creditors' Objection to Claims filed by Green Hunt
16  Wedlake, Inc. and Noteholders of General Motors Nova Scotia
17  Finance Company and Motion for Other Relief
18
19  HEARING re Second Interim Quarterly Application of Caplin &
20  Drysdale, Chartered for Interim Compensation and Reimbursement
21  of Expenses with Respect to Services Rendered as Counsel to the
22  Official Committee of Unsecured Creditors Holdings
23  Asbestos-Related Claims for the Period June 1, 2010 through
24  September 30, 2010
25

---

Page 7

1
2  HEARING re Third Interim Application of LFR Inc. for Allowance
3  of Compensation and for Reimbursement of Expenses for Services
4  Rendered in the Case for the Period February 1, 2010 through
5  May 30, 2010
6
7  HEARING re Fourth Interim Application of LFR Inc. for Allowance
8  of Compensation and for Reimbursement of Expenses for Services
9  Rendered in the Case for the Period June 1, 2010 through
10  September 30, 2010
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  Transcribed by:  Lisa Bar-Leib

---

Page 8

1
2  A P P E A R A N C E S :
3  WEIL GOTSHAL & MANGES LLP
4      Attorneys for the Debtors and Debtors-in-Possession
5      767 Fifth Avenue
6      New York, NY 10153
7
8  BY:  STEPHEN KAROTKIN, ESQ.
9
10  KING & SPALDING LLP
11      Attorneys for New GM
12      1185 Avenue of the Americas
13      New York, NY 10036
14
15  BY:  ARTHUR J. STEINBERG, ESQ.
16      SCOTT DAVIDSON, ESQ.
17
18  U.S. DEPARTMENT OF JUSTICE
19      Office of the United States Trustee
20      33 Whitehall Street
21      21st Floor
22      New York, NY 10004
23
24  BY:  BRIAN MASUMOTO, ESQ.
25

---

Page 9

1
2  AKIN GUMP STRAUSS HAUER & FELD LLP
3      Attorneys for Claimant Green Hunt Wedlake, Inc. as
4      Trustee of General Motors Nova Scotia Finance Company
5      One Bryant Park
6      New York, NY 10036
7
8  BY:  SEAN E. O'DONNELL, ESQ.
9      DEAN CHAPMAN, ESQ. (TELEPHONICALLY)
10
11  BROWN RUDNICK LLP
12      Attorneys for Certain Noteholders of General Motors Nova
13      Scotia Finance Company
14      Seven Times Square
15      New York, NY 10036
16
17  BY:  DANIEL J. SAVAL, ESQ.
18
19
20
21
22
23
24
25

Page 10

```
 1
 2   BROWN RUDNICK LLP
 3        Attorneys for Certain Noteholders of General Motors Nova
 4         Scotia Finance Company
 5        One Financial Center
 6        Boston, MA 02111
 7
 8   BY:  CALEB B. PIRON, ESQ.
 9        (TELEPHONICALLY)
10
11   BUTZEL LONG P.C.
12        Attorneys for the Official Committee of Unsecured
13         Creditors
14        380 Madison Avenue
15        22nd Floor
16        New York, NY 10017
17
18   BY:  ERIC B. FISHER, ESQ.
19
20
21
22
23
24
25
```

Page 11

```
 1
 2   CAPLIN & DRYSDALE, CHARTERED
 3        Attorneys for Official Committee of Unsecured Creditors
 4         Holding Asbestos-Related Claims
 5        One Thomas Circle, NW
 6        Suite 1100
 7        Washington, DC 20005
 8
 9   BY:  RONALD E. REINSEL, ESQ.
10
11   DICONZA LAW, P.C.
12        Attorneys for LFR, Inc.
13        880 Third Avenue
14        New York, NY 10017
15
16   BY:  GERARD DICONZA, ESQ.
17
18
19
20
21
22
23
24
25
```

Page 12

```
 1
 2   GODFREY & KAHN S.C.
 3        Attorneys for the Fee Examiner, Brady C. Williamson
 4        One East Main Street
 5        Suite 500
 6        Madison, WI 53701
 7
 8   BY:  KATHERINE STADLER, ESQ.
 9        BRADY C. WILLIAMSON, ESQ. (TELEPHONICALLY)
10        MONICA SANTA MARIA, ESQ. (TELEPHONICALLY)
11        ERIC J. WILSON, ESQ. (TELEPHONICALLY)
12
13   GODFREY & KAHN S.C.
14        Attorneys for the Fee Examiner, Brady C. Williamson
15        333 Main Street
16        Suite 600
17        Green Bay, WI 54307
18
19   BY:  CARLA O. ANDRES, ESQ.
20        (TELEPHONICALLY)
21
22
23
24
25
```

Page 13

```
 1
 2   GREENBERG TRAURIG, LLP
 3        Attorneys for Certain Noteholders of General Motors Nova
 4         Scotia Finance Company
 5        MetLife Building
 6        200 Park Avenue
 7        New York, NY 10166
 8
 9   BY:  BRUCE R. ZIRINSKY, ESQ.
10        JOHN H. BAE, ESQ.
11
12   KENNEDY, JENNIK & MURRAY, P.C.
13        Attorneys for IUE-CWA
14        113 University Place
15        New York, NY 10003
16
17   BY:  SUSAN M. JENNIK, ESQ.
18
19   LOEB & LOEB LLP
20        Attorneys for Deloitte Tax LLP
21        345 Park Avenue
22        New York, NY 10154
23
24   BY:  DANIEL B. BESHKOF, ESQ.
25
```

Page 14

```
 1
 2    MORRISON & FOERSTER LLP
 3         Attorneys for Citigroup Global Markets, Inc.
 4         1290 Avenue of the Americas
 5         New York, NY 10104
 6
 7    BY:  JORDAN WISHNEW, ESQ.
 8
 9    RICHARDS KIBBE & ORBE LLP
10         Attorneys for Morgan Stanley International plc
11         One World Financial Center
12         New York, NY 10281
13
14    BY:  NEIL S. BINDER, ESQ.
15
16    STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.
17         Attorneys for Dean M. Trafelet
18         2323 Bryan Street
19         Suite 2200
20         Dallas, TX 75201
21
22    BY:  HEATHER PANKO, ESQ.
23
24
25
```

Page 16

```
 1         MS. JENNIK:  And there's been no objection from them.
 2    If I may approach?
 3         THE COURT:  Yes.
 4         MS. JENNIK:  What you have there is a redline version
 5    and also the amended order in a clean copy.
 6         THE COURT:  Sure.  It's granted.  It'll be entered as
 7    soon as I get this --
 8         MS. JENNIK:  Thank you, Your Honor.
 9         THE COURT:  -- courtroom support to get it typed.
10    (Pause)
11         MR. KAROTKIN:  Your Honor, the other -- I think the
12    only other -- there are two subject matters on the calendar.
13    One is fee applications and the other is the dispute related to
14    the Nova Scotia claims.  I think -- and counsel for the fee
15    examiner is here.  I think that all but two of the fee
16    applications have been resolved.
17         THE COURT:  Those being Caplin & Drysdale and LFR?
18         MR. KAROTKIN:  Yes, sir.  So my suggestion, again,
19    subject to whatever you'd like to do, is that you address those
20    first.
21         THE COURT:  All right.  We'll do that but everybody
22    stay seated.  Folks, I'm concerned that the costs of the fee
23    examiner process are excessively cutting into the very savings
24    that the fee examiner process is supposed to accomplish.  And I
25    don't want to make that situation which, frankly, is getting me
```

Page 15

```
 1              P R O C E E D I N G S
 2         THE CLERK:  All rise.
 3         THE COURT:  Have seats, please.  All right.  General
 4    Motors -- Motors Liquidation.  Mr. Karotkin, I'll hear your
 5    recommendations as to the order in which we should proceed.  I
 6    gather that the IUE's motion is wholly unopposed.  Should we
 7    get that out of the way?
 8         MR. KAROTKIN:  I was going to suggest that first.
 9    Sure.
10         THE COURT:  All right.
11    (Pause)
12         MS. JENNIK:  Thank you, Your Honor.  Susan Jennik for
13    IUE-CWA.  As you know, the IUE-CWA has a claim in this matter
14    because of the settlement agreement with General Motors.  The
15    settlement agreement requires any assignment of the claim be
16    approved by the Court.
17         THE COURT:  Can I interrupt you, Ms. Jennik?  Because
18    I saw the motions, I saw the papers.  And most importantly, I
19    saw that it was wholly unopposed and was wholly innocuous.  Any
20    reason why I shouldn't grant it without any further comment?
21         MS. JENNIK:  I have an amended version of the order,
22    Your Honor, which makes some corrections.  And I'd like to
23    offer that up.  I've given it to the committee counsel and also
24    the U.S. trustee and the counsel for the debtors.
25         THE COURT:  Okay.
```

Page 17

```
 1    increasingly annoyed, even worse by lengthy argument today.
 2         I'm also concerned that the factor that most affects
 3    the legal fees and other professional expenses in this case
 4    isn't the vague time descriptions or even contentions that two
 5    senior lawyers are doing things, but the intercreditor
 6    disputes, most significantly, the battling between the
 7    creditors' committee and the asbestos claims creditors'
 8    committee.  And I think that those who've spoken in writing and
 9    in panels about their efforts to keep these down in large 11s
10    are kidding themselves and the public when they don't realize
11    that the thing that most affects the cost of running a large 11
12    isn't the things that the examiner and the professionals on
13    this motion and in the last three applications we've had have
14    been fighting about but this intercreditor jousting.
15         Now, I can and will do the bandaid types of measures
16    that the Code requires me to do as part of my responsibility.
17    But I need to tell you all that I want to keep our eye on the
18    ball in this case.  And I want to bring this case to an end.
19    And I don't think we should be self-congratulatory, on the one
20    hand, or spending all of this time, on the other, vis-à-vis the
21    issues that we have on this fee application dispute today
22    because until and unless we stop the intercreditor bickering,
23    we're never going to get this case done and we're never going
24    to keep the case expenses reasonably under control.
25         Now, with that said, I have a number of tentative
```

MOTORS LIQUIDATION COMPANY, et al.

Page 18

1  rulings based upon my review of the papers, all of which I have
2  read, and I will hear very brief legal argument directed at
3  telling me why, after reading the briefs I am wrong.
4        One, the Caplin & Drysdale younger partners, for the
5  most part, the same price as the Weil and Kramer Levin
6  associates.  I find nothing troublesome about people who are
7  called young partners or partners doing work when the
8  associates who would be posted at other firms for doing that
9  same work are charging what is, in substance, the same amount.
10 The showing -- except for Inselbuch and Lockwood -- the Caplin
11 & Drysdale lawyers are at the cheap end of what I've seen.  And
12 the showing that other firms' associates are billed at rates
13 comparable to the young partners or the younger partners at
14 Caplin & Drysdale makes me unpersuaded that I'm going to make a
15 big deal of that issue.
16       Next.  There are enough deficiencies in each of the
17 positions of Caplin & Drysdale and the fee examiner's so that
18 neither side substantially prevailed in the back and forth and
19 the disputes.  I don't need a conference call.  The cost of
20 Caplin & Drysdale's responding to a fee examiner criticism will
21 not be compensable.  Obviously, many of the fee examiner
22 positions were likewise not accepted by me but that isn't the
23 test.
24       The objections based on vague descriptions even if
25 made vague for tactical reasons or for confidentiality reasons

MOTORS LIQUIDATION COMPANY, et al.

Page 19

1  are sustained.  You'll have to figure out what the dollar
2  consequence of that is.  There are ways to skin the cat by
3  means of description more specific than saying "Reading a
4  pleading to determine whether our committee's interests are
5  affected".
6        And when a task that's in the middle of a list of
7  many tasks separately stated to avoid the anti-bunching rules
8  is a tact as being beneath the level of sophistication of the
9  remainder of the lawyer, I think that's so de minimis and so
10 inefficient to critique and punish the lawyer for doing
11 something when it's a flow of work matter that I'm not going to
12 penalize the lawyer for being so accurate in his or her
13 description or for allowing a seemingly menial task to be mixed
14 as part of a larger flow.
15       With that said, what else do we have on Caplin &
16 Drysdale?
17       MS. STADLER:  Good afternoon, Judge.  Katherine --
18       THE COURT:  Ms. Stadler?
19       MS. STADLER:  Katherine Stadler, yes, for the fee
20 examiner of Godfrey & Kahn.  Nothing really left on Caplin &
21 Drysdale, Judge.  I don't quarrel at all with any of your
22 conclusions.  I did want to just clarify one thing for the
23 record.  The issue with the task allocation wasn't whether it
24 should be done by partners or associates.  The issue was
25 whether they were more in the nature of clerical tasks that

MOTORS LIQUIDATION COMPANY, et al.

Page 20

1  were inappropriate to bill attorneys for at all, such as docket
2  monitoring, et cetera.
3        THE COURT:  Well, were there ever any instances of an
4  attorney charging for using the xerox machine or something of
5  that sort?
6        MS. STADLER:  Not indicated on the time detail, no.
7  It would be check PACER, create to do lists, that sort of
8  thing.
9        THE COURT:  I'm not persuaded by that distinction,
10 Ms. Stadler.
11       MS. STADLER:  That's the only point on Caplin that I
12 have remaining after your tentatives, Judge.
13       THE COURT:  All right.  Anybody from Caplin &
14 Drysdale want to be heard given what I already said?  Mr.
15 Reinsel?
16       MR. REINSEL:  Thank you, Your Honor.  Robert Reinsel
17 for Caplin & Drysdale.  Just want to briefly respond to two
18 points you raised, Judge.  With respect to the -- I want to
19 come back to your fee order and whether or not fees would be
20 compensable for responding to the fee examiner based upon your
21 earlier ruling that the parties substantially prevailing ought
22 to be able to be compensated for that.
23       The first objection that we responded to, Your Honor,
24 that's involved here, although the fee examiner didn't quantify
25 a number or quantify their objection, they do acknowledge that

MOTORS LIQUIDATION COMPANY, et al.

Page 21

1  that went to significantly all of our fees or a significant
2  portion of all of the fees in our first fee application which
3  were in excess of 400,000 dollars.  What we did was work with
4  the examiner, spent a great deal of time responding and,
5  ultimately, ended up compromising without admitting that
6  anything was wrong only about 13,000 dollars out of a 400,000
7  fee application with Your Honor.  Respectfully, Your Honor, I
8  would say that we did substantially prevail on that.
9        THE COURT:  Respectfully, Mr. Reinsel, aside from the
10 fact that I thought I made my thinking clear, I don't think
11 that pleading nolo contendere is a satisfactory way to get a
12 "Get out of jail free" card on this issue.  The fact is that I
13 got problems with both sides' positions and I don't find that
14 the Caplin & Drysdale side of the feuding was sufficiently
15 persuasive that I can find that you substantially prevailed.
16 Under those circumstances, as I stated in my last opinion, the
17 one that I had to publish, we go by the American rule and you
18 got to eat it.
19       MR. REINSEL:  I understand your ruling, Your Honor.
20       THE COURT:  Okay.
21       MR. REINSEL:  The second part, Your Honor, dealing
22 with the fee examiner's assertion of vagueness in certain
23 billing entries, as you say, there are a number of ways to
24 slice that cat up when we come down to it.  One of our problems
25 in responding both to the fee examiner's present objection and

Page 22

1   to others is the lack of specificity in what they were
2   asserting was wrong with the particular billing entries.  What
3   they did was simply attach all of the billing run for one of
4   our attorneys and say take ten percent off of his entire cut
5   when the objection that they specifically framed, our vague
6   reference to review, analyze pleadings for impact on the
7   committee, really only accounted for six hours out of over 200
8   hours of his effort.  Now, if what the Court is saying is work
9   with the fee examiner to see if we can't refine that number,
10  our problem is with their just overall reach and making a
11  generalized take ten percent off the top.
12      THE COURT:  My ruling is that you identify the issues
13  that were subject to the -- or the time entries that were
14  subject to that affliction and those are disallowed.  And if
15  that's less than the ten percent then you win.  And if that's
16  more than ten percent then Mr. Williamson wins.
17      MR. REINSEL:  Understand, Your Honor.  Thank you very
18  much.
19      THE COURT:  Okay.  LFR.  Now, is Mr. DiConza here?
20  Come on up, please.
21      Folks, it's been the law in this district since long
22  before I was a judge, much more than ten years ago, probably
23  twenty or twenty-five, that the test for determining whether or
24  not a person or entity is a professional is governed by two
25  things.  One, the degree of control over the Chapter 11 case;

Page 23

1   and, two, the extent to which those services would be provided
2   in the absence of bankruptcy.  If anybody believes that I'm
3   applying the wrong standard, he or she can correct me.
4       Under that standard, it seems to me that I don't have
5   a need for a retention of an environmental consultant who would
6   have to clean up the mess whether or not GM -- or Motors
7   Liquidation was in Chapter 11.  And Mr. DiConza has pointed out
8   that I already ruled on this issue in one of our earlier
9   sessions on fees.  Ms. Stadler, to what extent am I mistaken in
10  either of those understandings?  Mr. DiConza, make room for
11  her, please.
12      MS. STADLER:  Thank you, Judge.  I don't think you're
13  mistaken in either of those.  I would note that there are
14  numerous environmental consultants in the case that are
15  retained subject to Section 327 of the Bankruptcy Code.
16  Arguably, your analysis would apply to any of them.  With
17  respect to the first part of your inquiry, I wouldn't have any
18  corrections to make.
19      THE COURT:  All right.  Mr. DiConza, do you want to
20  be heard?
21      MR. DICONZA:  Well, Your Honor, we did file
22  responsive papers several days ago and basically we argued that
23  under the Seatrain decisions and cases that have followed it
24  that TEA is not a professional within the meaning of the
25  Bankruptcy Code.  What was troubling is that the fee examiner

Page 24

1   sought disallowance of a hundred percent of my client's
2   requested reimbursements with -- in connection with TEA under
3   the third and then an arbitrary fifty percent under the fourth
4   interim application.  We believe that the invoices submitted in
5   connection with the TEA expenses do contain sufficient detail.
6   And obviously -- we were on a conference earlier today with the
7   fee examiner and were able to resolve all the other issues with
8   the third and fourth interim fee applications.  If the fee
9   examiner has any particular issue with any of the time entries
10  submitted by TEA, my client would be more than happy to work
11  with the fee examiner and obtain additional information.  The
12  problem we had with TEA was that the fee examiner took a
13  hardline position and said, look, they are a professional, they
14  should have been retained and, therefore, we're going to seek
15  disallowance of all of their expenses under the third and fifty
16  percent under the fourth.
17      THE COURT:  All right.  Well, my ruling on the
18  TEA/LFR issue is as follows:
19      I am adhering to my stated articulation of what the
20  law is and when a party is a professional and when it isn't.
21  However, when an entity is used as a subcontractor for a
22  professional, retained professional, having opened the door by
23  getting oneself retained, the LFR estate -- or entity, excuse
24  me, as you properly anticipated, Mr. DiConza, must take the
25  heat or make any adjustments if any of the underlying time

Page 25

1   turns out to have been unreasonable.  So the overall objection
2   that TEA was not retained is overruled.  However, the -- to the
3   extent that there were any instances of inappropriate billing
4   by TEA, TEA and/or LFR is going to have to eat those.  And you
5   can work out your specifics with the fee examiner staff to make
6   that happen.  Your deals with the fee examiner staff, I don't
7   need to hear in detail.  If they're consensual between the two
8   of you, they'll be ratified and confirmed.
9       MR. DICONZA:  Yes, Your Honor.  Thank you.
10      THE COURT:  All right.  Am I correct that we have no
11  further fee issues?  All right.  I'm just going to say one
12  other thing.
13      As I indicated at the outset of my remarks, in my
14  view, the kinds of things that we dealt with today and the
15  kinds of things that were consensually resolved before I had to
16  deal with them today are miniscule in importance compared to
17  the major, major costs that the estate is incurring both in
18  terms of running meters and delay in getting distributions to
19  creditors occasioned by the intercreditor disputes.  I want you
20  to redouble your efforts to resolve those issues and/or if you
21  have to agree to disagree, to minimize the number of people and
22  meters running to address those concerns.
23      All right.  Now, we'll turn to the one issue which
24  also has, of course, intercreditor dispute trappings but which
25  raises very serious issues which is the Nova Scotia matter.  As

MOTORS LIQUIDATION COMPANY, et al.

Page 26

1  I understand it, we have just a status conference today. Mr.
2  Fisher?
3       MR. FISHER:  That's correct, Your Honor.
4       THE COURT:  Come on up, please.
5       MR. FISHER:  Good afternoon, Your Honor.  Eric Fisher
6  from Butzel Long for the creditors' committee.  I think, Your
7  Honor, that the only issue for the Court's consideration today
8  is the question of how the creditors' committee's objection
9  that's at issue which is an objection that arises out of Old
10  GM's guaranty of approximately a billion dollars face amount of
11  bonds issued by a subsidiary, GM Nova Scotia Finance.  The only
12  question is how that objection ought to be litigated.  And just
13  to cut right to the chase to the area of disagreement that we
14  have with noteholders' counsel, with trustee's counsel and, I
15  think, with New GM's counsel as well, it's the creditors'
16  committee's position that this objection raises complicated
17  factual issues.  Discovery is necessary.  And discovery will
18  ultimately contribute to the most efficient resolution of the
19  case even if that means that it needs to go the distance and be
20  heard at an evidentiary hearing before your Court -- before
21  Your Honor.
22       And it's the position of the claimants here that
23  early summary judgment is called for.  No discovery is
24  necessary.  And our view is that this early summary judgment
25  type approach will actually impede, as opposed to expedite, the

MOTORS LIQUIDATION COMPANY, et al.

Page 27

1  progress of the case because given how complicated it is
2  factually, I think, Your Honor, that it's a virtual certainty
3  that if there's no discovery that's permitted and then we're
4  faced with early summary judgment motions, we will be opposing
5  the summary judgment motions at least in part on Rule 56(f)
6  grounds and tell Your Honor that we need discovery.
7       And so, we think it's important for the Court to put
8  in place a reasonable discovery schedule, to schedule an
9  evidentiary hearing down the road.  And certainly, we're open
10  to dispositive briefing in advance of that evidentiary hearing
11  as long as there is a reasonable period of discovery that
12  precedes that dispositive briefing.
13       If Your Honor will permit, I wanted to take just a
14  few minutes, since this is our first appearance before Your
15  Honor with respect to this objection, to just sketch out the
16  procedural history behind the objection, give Your Honor in
17  very broad brushstrokes just a sense of what our objection is
18  all about, and then describe what we think the proposed scope
19  of discovery and what a reasonable discovery schedule would
20  look like.
21       THE COURT:  Yes, but in a nonargumentative way
22  because I don't want an argument, mini or otherwise, on the
23  merits of this controversy today.
24       MR. FISHER:  I will try to give Your Honor just the
25  facts.  We first filed the objection on July 2010.  And when we

MOTORS LIQUIDATION COMPANY, et al.

Page 28

1  filed the objection, we secured from chambers an evidentiary
2  hearing date in November.  And soon after --
3       THE COURT:  My chambers gave you an evidentiary
4  hearing date for -- on the filing of an objection?
5       MR. FISHER:  Yes, Your Honor.  We called chambers and
6  reque -- we indicated that we thought the objection was
7  appropriate for an evidentiary hearing --
8       THE COURT:  Well, it isn't that it's not appropriate
9  for an evidentiary hearing.  The problem is that an evidentiary
10  hearing on a matter of this character is one that isn't like a
11  new value preference hearing that you resolve in an hour and a
12  half.
13       MR. FISHER:  Right.  Your Honor, as a practical
14  matter, I think that date served as nothing more than a
15  placeholder at this point.  But what we did was within a few
16  weeks of serving -- of filing and serving our objection, we
17  served discovery requests on the GM Nova Scotia Finance
18  bondholders' counsel at Greenberg Traurig and we also served
19  interrogatories.  The response that we got was we don't think
20  discovery is appropriate here.  We don't think any discovery
21  should go forward.  Let's have a meeting.  We had a meeting
22  with bondholders' counsel at Greenberg in September 2010.  At
23  the time, Greenberg Traurig was representing the bondholders
24  and, I believe, also representing the GM Nova Scotia Finance
25  trustee.

MOTORS LIQUIDATION COMPANY, et al.

Page 29

1       For the time being, at that meeting, we agreed to
2  disagree about whether or not there would be discovery or what
3  the scope would be or whether we would agree to litigate
4  threshold issues before proceeding with discovery.  We
5  continued to talk.  And then in November 2010, still no
6  response to our discovery because we had a disagreement with
7  them about whether there would be any discovery.  We had
8  another meeting.  That meeting was attended by Akin Gump who
9  had now come on as counsel for the GM Nova Scotia Finance
10  trustee.  And it was attended by the New GM.  And following
11  that meeting, the creditors' committee filed an amended
12  objection which is the operative objection before Your Honor.
13  That was filed on November 19, 2010.  And then pursuant to an
14  agreed schedule, because the noteholders and the other
15  claimants here wanted to be able to put in a response before
16  Your Honor had an initial pretrial conference in the case, they
17  did so just this past Monday, December 13th.
18       There were three substantive responses filed.  It's
19  more than 110 pages of response.  And there were a number of
20  joinders that were filed as well.
21       Procedurally, that's where we are.  A brief overview
22  of the objection.  The claims that we're challenging arise out
23  of something called a lockup agreement.  The lockup agreement
24  was entered into hours and maybe minutes before GM filed its
25  bankruptcy petition on June 1, 2009.  And the consequences of

Page 30

1  the lockup agreement are that the GM Nova Scotia Finance

2  bondholders received a consent fee, a cash consent fee, of 369

3  million dollars which is thirty-six percent of the face amount

4  of their bonds.  They have asserted 2.67 billion dollars worth

5  of claims in the Old GM bankruptcy proceedings.  And you get to

6  that number by adding the GM Nova Scotia Finance trustee's

7  claim and the guaranty claim that's been asserted by the

8  bondholders.  600 million dollars of that 2.6 billion dollars

9  worth of claims relates to a swap that, in the first instance,

10  was an obligation that GM Nova Scotia Finance owed to Old GM.

11  And through a series of provisions in the lockup agreement that

12  I know Your Honor doesn't want to hear about now, that became a

13  claim against the Old GM estate.

14        And so, it's this whole ball of wax that we are

15  taking aim at with our objection.  And all of these claims, at

16  the end of the day, are based upon 1.07 billion dollars worth

17  of notes that were guaranties by Old GM and that we argue in

18  our objection ought to, in the first instance, be reduced by

19  the 369 million dollar consent fee that was paid because we say

20  it wasn't really a consent fee.  It was a payment against the

21  principal amount of the notes.

22        I won't take Your Honor through the various legal

23  theories that we have in our objection.  But --

24        THE COURT:  I've read the objection.

25        MR. FISHER:  -- those are the facts that are

Page 31

1  essential to our objection.

2        As I said at the outset, we need discovery.  It's

3  been our position from the very beginning that we need

4  discovery.  That's why we served discovery requests in August.

5        I think that part of the arrangements behind the

6  lockup agreement and the choreography that followed the lockup

7  agreement was to try to have the agreement escape this Court's

8  scrutiny.  And we want to make sure that we have a full and

9  fair opportunity to kick the tires and to test the legitimacy

10  of these claims.  And so, I think what we envision is document

11  discovery from the parties to the lockup agreement.  We

12  envision taking between ten and fifteen depositions.  And then

13  it's possible that this objection would require expert

14  testimony on the question of whether this consent fee, the 369

15  million dollar fee was reasonable.

16        What we've proposed to the other side was that we

17  ought to devote five months to all of that discovery, that's

18  the paper discovery, the deposition discovery and, potentially,

19  the expert discovery.  Based on the Court's calendar, it should

20  be scheduled for an evidentiary hearing for sometime

21  thereafter.  And we would be happy to work with all the other

22  parties to come up with an agreed to pre-hearing briefing

23  schedule so that as many issues that can be vetted as a matter

24  of law in advance of the hearing are vetted.

25        In a nutshell, that's our position, Your Honor.

Page 32

1        THE COURT:  All right.  Mr. Zirinsky, are you

2  speaking for some of the noteholders or all of them?

3        MR. ZIRINSKY:  I'm speaking for four noteholders that

4  I represent, Your Honor.

5        THE COURT:  All right.  Come on up.

6        MR. ZIRINSKY:  For the record, Bruce Zirinsky,

7  Greenberg Traurig on behalf of Appaloosa, Aurelius, Fortress

8  and Elliott.  Your Honor, mindful of your point that we're not

9  here today to argue the merits, I'm not going to argue the

10  merits.

11        THE COURT:  All right.  I'll tell you the same thing

12  that I told Mr. Fisher.  I read your response and Philip

13  Dublin's response and the New GM response although somebody can

14  help me understand its standing a little bit better along with

15  the creditors' committee's response.

16        MR. ZIRINSKY:  Thank you, Your Honor.  Just to put

17  things into context, Your Honor.  The objection obviously seeks

18  to disallow and/or reduce or and/or equitably subordinate the

19  claims filed by the noteholders on their guaranty against GM.

20  GM is the guarantor of the bonds.  It also seeks similar relief

21  with respect to a claim filed by the bankruptcy trustee of GM

22  Nova Scotia which is a claim based upon the Companies Act of

23  Nova Scotia.  Nova Scotia is what's called an unlimited

24  liability company.  GM -- Old GM is the sole member and, under

25  Canadian law, Old GM is responsible for payment of any

Page 33

1  deficiency claim upon the winding up of the unlimited liability

2  company.  So those are the two claims.

3        I'm not going to go into all of the background and

4  transactions.  Suffice it to say that there were arm's length

5  negotiations held between the bondholders, represented by me,

6  and GM shortly before GM filed for bankruptcy.  The terms of

7  that agreement were set forth in what's described as a lockup

8  agreement.  There was a public disclosure through an SEC filing

9  by GM on June 1st through an 8(k) in which the entire

10  transaction or the agreement was disclosed.  It was the subject

11  of a consent solicitation process which occurred, I believe,

12  sometime in either late June or early July of 2009.  The --

13  part of the arrangement was a release of intercompany claims

14  held by GM Nova Scotia of about a billion three hundred million

15  or a billion four hundred million dollars depending upon the

16  exchange rate of Canadian versus U.S. dollar.  So GM Canada

17  received a release of that intercompany claim in exchange for

18  the payment of the consent fee.

19        As a consequence of that, GM Canada was able to avoid

20  the necessity for seeking bankruptcy or similar relief under

21  Canadian law.  And as the Court is well aware, GM Canada, a

22  wholly owned subsidiary of Old GM was part of the assets

23  acquired by New GM under the purchase agreement which Your

24  Honor approved back in July of 2009 as part of the overall GM

25  restructuring sale transaction.

Page 34

1    The objection ignores or tends to overlook or try to

2    overlook two or three very important elements.  First of all,

3    these transactions were fully known and were public and were

4    disclosed at the time of the sale held before Your Honor.  At

5    the time of the sale and included in the sale of assets to New

6    GM were any claims against GM Canada, including any avoidance

7    actions which were acquired by New GM under the sale order.

8        In addition, under the sale order, as I mentioned,

9    the stock of GM Canada was sold to New GM.  And in addition,

10   New GM assumed -- the lockup agreement was assumed and assigned

11   by Old GM to New GM under Section 365.  It was an assumed

12   agreement.

13       Now, without getting into an argument today as to

14   what all of that means, as we set forth in our papers, we

15   believe that even if you accept the factual allegations of the

16   committee on their face, and they obviously we don't, and their

17   attempt to characterize the transactions as something

18   inappropriate, which again they weren't, the fact is that we

19   believe, as a matter of law, all of these claims can be

20   disposed of by the Court by way of summary judgment.  At the

21   very least, we believe that a motion for summary judgment would

22   enable the Court to determine to what extent, if any, there

23   were any genuine tryable issues of fact which might be the

24   basis for discovery.

25       The committee has suggested and they've given us a

Page 35

1    working list of fifteen potential deponents, including the U.S.

2    Treasury Department and the Export Development Canada, two

3    governmental agencies which were, if not involved, were aware

4    of these transactions at the time they were being negotiated.

5    My point -- and they're proposing a five month discovery

6    schedule at which time will first determine how to proceed

7    before Your Honor with a hearing.

8        Our clients are owed substantial amounts of money.

9    The debtors' plan, which is -- Your Honor just recently, I

10   believe, approved the disclosure statement -- treats these

11   claims as disputed claims.  And as a consequence, no

12   distributions can be made on these claims if that's the way the

13   plan ultimately gets confirmed.  No distributions can be made

14   on these claims unless and until Your Honor has resolved the

15   objections.  We believe that's, obviously, unfavorable to all

16   of the bondholders who will not receive any distributions if

17   that remains the state of play.  Moreover, the type of schedule

18   that the committee is proposing, five months of discovery and

19   then we'll decide how to try the case, means, for all intents

20   and purposes -- and I'm mindful of one of Your Honor's remarks

21   earlier in connection with the fee hearing or the fee

22   applications -- that this will delay distributions to

23   creditors.  We don't think that's fair.  We think this matter

24   should be adjudicated as promptly as possible and --

25       THE COURT:  Well, you're not suggesting it's going to

Page 36

1    delay distributions to all creditors.  It's just going to delay

2    distributions to those creditors who are parties to this

3    transaction.

4        MR. ZIRINSKY:  It will delay distributions to all

5    bondholders of these -- all holders of these notes.  And there

6    are many holders of these notes beyond the four entities that I

7    represent.  So none of those parties will receive a

8    distribution on these notes or on the guaranty claim under

9    these notes as long as the objection is outstanding unless the

10   Court were to make some ruling to the contrary allowing some

11   form of distribution.

12       So we believe it's important that these matters get

13   resolved expeditiously.  We are mindful that Your Honor has a

14   rule that you must, in effect, approve any motion for summary

15   judgment --

16       THE COURT:  Not just me.  The entire Southern

17   District of New York.

18       MR. ZIRINSKY:  Well, which also applies to Your

19   Honor.  We are mindful of the rule.  And we obviously were

20   tempted to ask Your Honor to permit us to file summary judgment

21   some time ago.  But we also determined that given the efforts

22   to try to work this out with the committee's counsel to see if

23   there was a way to avoid a dispute about this and to see if we

24   could proceed on some form of summary judgment basis, on an

25   expedited basis, which unfortunately did not work out.  We were

Page 37

1    unable to reach agreement on that, we decided to file our

2    responses.

3        New GM is represented here by Mr. Steinberg.  He can

4    speak to any questions you have for them.  But in terms of

5    their standing, I think that -- remember that the committee is

6    not only objecting to the claims, but the committee has filed a

7    motion or has included within their objection, a request for

8    relief under Federal Rule 60(b) to set aside the sale order or

9    to modify the sale order.  Obviously that would have rather

10   substantial consequences to New GM as well as potentially to

11   the entire Chapter 11 case, but I'll let Mr. Steinberg speak as

12   to the potential consequences for New GM.  So there, I think

13   they are potentially affected by what happens here.

14       And we also believe that the committee has failed

15   utterly to set forth any basis -- legitimate basis -- for that

16   kind of relief.  And given the fact that the entire predicate

17   of their claim is that somehow or another the consent fee was

18   somehow a fraudulent transfer or otherwise an avoidable

19   transfer, and that claim has been assigned -- any avoidance

20   claim has been assigned to New GM, it doesn't belong to the

21   estate.  The claim was given up.

22       So just as a matter of law, we don't see how that can

23   be pursued, unless the committee is serious about trying to ask

24   Your Honor to, in effect, set aside Your Honor's order of 2009,

25   which approved the sale to GM -- to New GM, and modify the sale

MOTORS LIQUIDATION COMPANY, et al.

Page 38

1  order, which we don't think is warranted.  We don't think

2  there's any basis for it.  And again, we think that's something

3  that should be disposed of by the Court up front.  In

4  connection with a motion for summary judgment, we would also

5  seek a ruling from Your Honor as to the 60(b) relief requested

6  by the committee.

7      So just to sum it all up, Your Honor.  We would

8  propose to file a motion for summary judgment in early January.

9  We could agree to a schedule.  Obviously before argument is

10  made, Your Honor will have an opportunity, together with the

11  parties, to determine, based on the papers filed, whether or

12  not there are any legitimate, genuine issues of fact that need

13  to be pursued or tried for which discovery may possibly be

14  warranted.  And so even if we don't eliminate all claims and

15  all discovery, I think we will certainly narrow the field

16  substantially.  It will also reduce the time necessary for

17  discovery, if that's the way it goes.  And it will also

18  substantially reduce the cost and expense of litigating and

19  potentially resolving this matter.  Thank you.

20      THE COURT:  All right.  I don't see Mr. Golden or Mr.

21  Dublin.

22      MR. O'DONNELL:  Your Honor, may it please the Court.

23  Sean O'Donnell.

24      THE COURT:  McDonald?

25      MR. O'DONNELL:  O'Donnell.

---

MOTORS LIQUIDATION COMPANY, et al.

Page 39

1      THE COURT:  O'Donnell.

2      MR. O'DONNELL:  Mr. Golden and Mr. Dublin are in

3  Delaware on another matter and apologize for not being here

4  today.

5      THE COURT:  I see your name on the submission.

6      MR. O'DONNELL:  Yes, Your Honor.

7      THE COURT:  All right, Mr. O'Donnell.

8      MR. O'DONNELL:  Your Honor, for the record, Sean

9  O'Donnell with Akin Gump on behalf of Green Hunt Wedlake

10  Incorporated, Trustee of General Motors Nova Scotia Finance

11  Company.  We join in the suggestion by the noteholders that, in

12  fact, most if not all of the claims could be disposed of by

13  summary judgment.

14      If you were to look at essentially the five claims

15  for relief that the committee's seeking, they all can either be

16  dealt with as a matter of law or by certain undisputed facts

17  that are either in public filings or in their very own papers.

18  The duplicative claim, for example, is an issue of law that can

19  be dealt with by summary judgment, and the remainder of the

20  claims, the avoidance claims, go towards -- the lynchpin of the

21  claim is an objection to the lockup agreement and the consent

22  fee.  And as mentioned a moment ago by counsel for the

23  noteholders, on June 1, 2009 there was an 8-K that was filed by

24  the debtors.  That 8-K expressly, not only identifies the

25  lockup agreement but goes through and describes the very terms

---

MOTORS LIQUIDATION COMPANY, et al.

Page 40

1  that the committee is objecting to now.

2      THE COURT:  Mr. O'Donnell, as I understand the

3  exchange of papers, or at least the committee's position,

4  they're not saying that this was done in the dead of night;

5  they're saying that this was a bad transaction that would be no

6  less bad if it were done in Macy's window, which it seemingly

7  was.  Both you and Mr. Zirinsky had talked about the disclosure

8  of it.  But as I understand the gist of the creditors'

9  committee's position, as to which I express no substantive

10  view, but I hear when people talk to me, they're saying that in

11  substance it was an avoidable transaction and/or one that

12  justifies equitable subordination.

13      MR. O'DONNELL:  The problem with that position, Your

14  Honor, is they didn't say that at the sale hearing.  They

15  didn't say it -- in fact not only did they not object, they

16  consented and supported the transfer of any claim relating to

17  the consent fee by GM Canada to New GM.  It's no longer an

18  asset of the estate.  It's not something that the committee can

19  complain of after approving the sale.  So there's no dispute as

20  to the disclosure and a month later they say this is fine, you

21  can sell these claims to New GM.  It's part of what New GM

22  bought.  It's why, if you were to grant the relief that they're

23  seeking, you'd have to essentially unwind that 363 sale, which

24  I don't think anybody wants.

25      Now, Your Honor, at a minimum, what I would suggest

---

MOTORS LIQUIDATION COMPANY, et al.

Page 41

1  is allow the parties to move on an expedited basis, summary

2  judgment briefing.  We can -- in the meantime, document

3  requests can go out the door, but we're prepared to move for

4  summary judgment within another week or two.  The other side is

5  free to argue that it's premature or that there are facts that

6  will raise tryable issues.  We don't think that's the case,

7  Your Honor.  And we're pretty sure that we can convince you of

8  that with our papers.  Thank you.

9      THE COURT:  I'll hear from New GM, at least until I

10  can ascertain its standing.

11      MR. STEINBERG:  Good afternoon, Your Honor.  Arthur

12  Steinberg from King & Spalding on behalf of New GM.  There's a

13  part of me that wants to agree with you and then sit down.  And

14  I would, because this is really an objection to claims filed by

15  an estate representative against claimants who have filed large

16  claims in the case.  So under normal circumstances, what would

17  a purchaser of the assets have to weigh in on the subject, and

18  why would, in effect, New GM want to weigh in something where

19  the plaintiff is the creditors' committee?  And so, to that

20  extent, Your Honor, I was almost happy to sit maybe even

21  further --

22      THE COURT:  Yes, I kind of thought that New GM had an

23  interest in the welfare of the creditors of Old GM.

24      MR. STEINBERG:  That's correct, Your Honor.  And on

25  the same token, the creditors of Old GM have an interest in the

MOTORS LIQUIDATION COMPANY, et al.

Page 42

1  welfare of New GM.  And it is because of that reason that I
2  stand here today, why we filed a fairly substantial response,
3  and why I believe there are five separate reasons why we have
4  to weigh in on this matter and why I actually support the
5  suggestions made by that side of the table so much of this
6  can be resolved without five months of discovery with lots of
7  depositions, because some of the issues are very specific, very
8  concrete, and can be decided on the papers.  But I'd like to go
9  through what Your Honor's threshold issue is, which is why New
10  GM is weighing in on this controversy, and go through the five
11  factors.
12          The first, as articulated by Mr. Zirinsky, was that
13  there's a Rule 60(b) request to vacate the sale order.  We're
14  the purchaser under the sale order.  We had a final and
15  nonappealable order.  The ramifications of any kind of Rule
16  60(b) relief, given to the committee or anyone else, has major
17  ramifications to New GM.  So on that basis alone, New GM would
18  be appearing.
19          And by the way, if I can just digress off the five
20  points?  Because I think that whole 60(b) relief is a tempest
21  in a teapot.  And the fact that no one really wants to say what
22  it is, except for what I'm about to say now, I think it's
23  important for Your Honor to hear.  They filed a 60(b) relief.
24  The other side files fifteen pages of briefing in response to
25  it.  The committee doesn't really articulate what their 60(b)

MOTORS LIQUIDATION COMPANY, et al.

Page 43

1  request is, other than to say it's protective, which is a very
2  unusual way of articulating what it is.
3          What I think that's really behind here, just so that
4  Your Honor has the issue on the table, without trying to
5  articulate it, is that when New GM designated the lockup
6  agreement as an executory contract to be assigned to it, it did
7  so because it believed that there was a cooperation covenant in
8  the agreement that if either Old GM hadn't complied with, it
9  could potentially unravel the lockup agreement and particularly
10  have an impact on GM Canada.  So they asked for the assignment
11  in order to make sure that that cooperation covenant was going
12  to be complied with.
13          The noteholders have articulated that the assumption
14  and the assignment of that lockup agreement constituted the
15  allowance of the noteholders' claims and the Nova Scotia
16  trustee claim, for all purposes.  We've stated in our papers
17  that that was not our belief that that was the intent or what
18  actually happened by virtue of the assignment, because the
19  actual lockup agreement says that Old GM would acknowledge the
20  claims and agree to support the claims to the fullest extent
21  permitted by law.  And that when that document -- when that
22  lockup then gets assigned to New GM, that's all that happened,
23  is that New GM will advocate and support their position to the
24  fullest extent permitted by law.  We believe that preserved the
25  right for the committee to raise the objection and do what they

MOTORS LIQUIDATION COMPANY, et al.

Page 44

1  are trying to do now.
2          We also believe that the noteholders' position is the
3  correct position, but the issue was still for Your Honor to
4  determine, and no one was trying to in, in effect, have claims
5  allowed of a billion dollars, by virtue of designating it in a
6  long list of executory contracts after the sale order.
7          I think all of the Rule 60(b) issue is whether there
8  was a greater ramification for the assumption and assignment
9  order other than what I've just said, which is that we wanted
10  to take on the cooperation covenant, but it wasn't a deemed
11  allowance for purposes of the bankruptcy case.
12          If that is litigated, because the noteholders will
13  want to articulate their position, the committee will take
14  whatever their position is, I've already articulated what New
15  GM's position is -- and Mr. Karotkin is in court, I bet you he
16  will agree with me on what Old GM's position is, because we've
17  talked about it before -- then Your Honor could have that issue
18  teed up without discovery.  Because there's nothing, really, I
19  think, more behind the Rule 60(b) relief.  And then one
20  material issue that's involved in this case from New GM's
21  perspective, would go away.  And a very big issue from a public
22  perception, that the committee is trying to undo a portion of
23  the sale order for protective basis.
24          And you couldn't -- if Your Honor didn't see the
25  issue without me articulating it, it's because the committee

MOTORS LIQUIDATION COMPANY, et al.

Page 45

1  never articulated what their real reason was.  And they framed
2  -- they didn't say what part of Rule 60(b) that they were
3  moving under.  And they came up with the notion, which I've
4  never heard of before, is I'm moving on a protective basis.
5          THE COURT:  Pause, please, Mr. Steinberg.  If you
6  could agree in paper by a stip or consent order or something
7  like that with the creditors' committee in this case and with
8  debtors' counsel, Mr. Karotkin or his designee, to confirm and
9  memorialize your understanding of the limited significance of
10  the assignment, then I need your help on a related standing
11  issue.  What standing do other individual parties in the case,
12  most obviously bondholders, have to quarrel with the
13  confirmatory understanding between the two sides of the assume
14  and assign relationship?
15          MR. STEINBERG:  Your Honor, if they wanted to argue
16  that it had a greater ramification, I think they should be free
17  to argue that, if they seriously want to argue that.  All I can
18  articulate was why New GM designated the assignment as part of
19  the list of executory contracts and what it was trying to
20  accomplish and what it was not trying to accomplish.  And I
21  think it's that concern of the deemed allowance of these claims
22  which underlies the Rule 60, and I think you don't need
23  discovery on that issue.
24          You can easily have the parties -- or Your Honor
25  could decide that issue.  We can stipulate as to what New GM's

MOTORS LIQUIDATION COMPANY, et al.

Page 46

1  intention was. Old GM could stipulate what its intention was.
2  And then the issue is teed up. And if I'm correct, the Rule
3  60(b) relief of this entire motion goes away.
4         Now, I'll go through my entire presentation, but the
5  committee counsel can say whether I'm correct as to what that
6  basis of the 60(b) relief --
7         THE COURT: Well, it wouldn't be fair to any lawyer
8  in the country to make him respond on his feet to that. But
9  obviously some of the questions that I ask are intended to
10  provide food for thought for lawyers in the days that follow a
11  hearing.
12         MR. STEINBERG: Okay. The second reason why, Your
13  Honor, as to why we have -- why we are trying to weigh in on
14  this matter, is that we -- our reading of the lockup agreement
15  is that if there is a disgorgement, if there's a requirement to
16  repay the consent fee, that that would have ramifications to
17  the intercompany claims that have been released, and would have
18  real ramifications to GM Canada. And therefore, in order to
19  protect an asset that we purchased, we believe we have to weigh
20  in.
21         And that dovetails to the third point, which is that
22  in the sale order itself, we protected ourselves so that the
23  committee couldn't do what they're trying to do, because we
24  bought the avoidance power claims between the estates. That
25  was part of the list of assets that went over. It was not

MOTORS LIQUIDATION COMPANY, et al.

Page 47

1  based on the lockup agreement, it was based on the sale order.
2  And therefore, the ability to get a disgorgement of the consent
3  fee, which has ramifications on GM Canada, is something that we
4  made sure would not happen by virtue of the terms of the sale
5  agreement.
6         And so the third point is that they are looking to
7  build a case based on assets which are not part of this estate.
8  Voiding power claims were sold. Accounts receivable -- so the
9  intercompany claim between GM and GM Canada -- were sold to New
10  GM. In fact, cash above 950 million dollars was all swept by
11  New GM. So if there was more cash in this estate, that would
12  have been swept to New GM as well too. They are trying to, in
13  effect, to pick a provision of the sale order -- forget the
14  lockup agreement -- that they say, you know what, that's a
15  benefit that was there that I'd like to have back.
16         The fourth element, Your Honor --
17         THE COURT: Well, is the creditors' committee's
18  position -- and maybe Mr. Fisher is the better guy to ask than
19  you -- but is the creditors' committee's position that they
20  want to recover 360,000 dollars worth of -- 360 million dollars
21  worth of cash, or rather simply that they want to get -- have
22  the estate get credit for the 360 million dollars that was laid
23  out as part of that consent fee?
24         MR. FISHER: It's the latter, Your Honor.
25         THE COURT: Yeah.

MOTORS LIQUIDATION COMPANY, et al.

Page 48

1         MR. STEINBERG: It may be the latter, but I think
2  they wrote --
3         THE COURT: Go on, Mr. Steinberg.
4         MR. STEINBERG: -- okay. It may be the latter now,
5  but I think their papers actually have the former.
6         Your Honor, the next thing -- and by the way, that's
7  why I think a motion practice would narrow the gap here. But
8  if their ability is based on avoiding power claims, then we
9  weighed in because we wanted to make sure that everybody
10  understood that we bought avoiding power claims which dealt
11  with transfers from Old GM to its subsidiaries.
12         The fourth thing, Your Honor, is that they have
13  talked about the swap liability claim, which is a claim that is
14  asserted by New GM against the Nova Scotia trustee, which is
15  part of their claim. And in the context of objecting to their
16  claim, they have used language like "nefarious conduct" and
17  stuff like that. So to the extent that the conduct of New GM
18  was being weighed in on, we thought we needed to respond. To
19  the extent that they're talking about --
20         THE COURT: Well, wait, Mr. Steinberg. At the time
21  that all of this went on, I didn't think there was a New GM.
22         MR. STEINBERG: There wasn't. But they just picked
23  us because --
24         THE COURT: Well, I --
25         MR. STEINBERG: -- but they wrote it --

MOTORS LIQUIDATION COMPANY, et al.

Page 49

1         THE COURT: -- does protecting you against
2  accusations of nefarious conduct require any more than me
3  saying, I understand that there wasn't a New GM when this went
4  on?
5         MR. STEINBERG: Well, that's fair, Your Honor, and I
6  appreciate that. It's just that until you said it, all I had
7  was a naked allegation by a committee that didn't want to
8  attack its own estate, because they were the representative of
9  the estate. So I figured I had to say something. And I
10  appreciate Your Honor's remark.
11         But counsel misstated that the lockup agreement is
12  where the swap liability claim was transferred. The swap
13  liability claim was transferred as part of the sale order. It
14  is another asset that is embedded in the sale order. So a good
15  portion of the underpinnings of the committee's objection is
16  based on assets that were sold pursuant to the sale order,
17  totally without regard to the lockup agreement.
18         And therefore, I believe that since I'm firmly
19  convinced that I'm right on these issues, that we might as well
20  have motion practice to confirm that I'm right and see what's
21  left of their complaint, and how they want to articulate their
22  complaint, based on what the provisions of the sale order are.
23         And, Your Honor, just two -- one other thing. Your
24  Honor had said that they're not articulating that in the dead
25  of the night the lockup agreement was; that it was open and

MOTORS LIQUIDATION COMPANY, et al.

Page 50

```
1   notorious and you should be able to evaluate the claim.  In
2   counsel's opening presentation to Your Honor he said that we
3   tried to -- someone, I don't know who -- tried to keep the
4   lockup agreement away from the Court's scrutiny.  So there was
5   the element, in even the presentation heard this morning, that
6   there was an element that this was hidden from somebody.
7           And that's why you've got me saying what I did in our
8   papers, and why the noteholders went through a long list of
9   disclosures that were made with regard to this lockup
10  agreement.  And these disclosures were things that the
11  committee knew.  At the bottom line, at the end of the day,
12  from New GM's perspective, we would love to exit the case, love
13  this to be a strip-down objection between the committee and the
14  noteholders and the Nova Scotia trustee as to whether these
15  claims should be allowed or not allowed.  If we are a fact
16  witness in connection with the lockup agreement, then we will
17  have to bear the consequences.  It's probably the Old GM people
18  who would be the fact witnesses.  But we stand and rise
19  because, A) --
20          THE COURT:  Well, the Old GM people are for the most
21  part New GM people, aren't they?
22          MR. STEINBERG:  That's correct, Your Honor.  And
23  that's why I'm able to make the statements I made as to what
24  was intended, is because I spoke to the people who are in New
25  GM who were involved in the transaction for Old GM.
```

MOTORS LIQUIDATION COMPANY, et al.

Page 51

```
1           But until Rule 60(b) relief goes away, until I'm sure
2   that GM Canada is not going to be impacted by this proceeding
3   by virtue of anybody arguing that there's a damage to the
4   lockup agreement, until I can confirm that no one is trying to
5   use assets that we purchased as part of the sale agreement as a
6   basis for any type of claims, then I feel I was compelled, at
7   least in the first instance, to raise those issues and point
8   them out to Your Honor.  Thank you.
9           THE COURT:  All right.  Mr. Fisher, would you like to
10  reply?  Well, before you do, Mr. Fisher, Mr. Karotkin, I assume
11  you have no dog in this fight right now?
12          MR. KAROTKIN:  That's correct, Your Honor.  We view
13  this as an intercreditor dispute.  And consistent with what you
14  said earlier, our interest is in getting this resolved
15  expeditiously and economically.
16          THE COURT:  All right.  Mr. Fisher?
17          MR. FISHER:  Your Honor, I certainly won't address
18  all the arguments on the merits.  But I did not mean to leave
19  out from my opening remarks a discussion of 60(b).  Because I
20  recognize that that request for relief has been something of a
21  lightning rod, and we certainly did not intend it to be that.
22  And in fact, that's why we used this peculiar word
23  "protective."  So I want to explain what it is that we mean
24  with respect to our 60(b) relief and how I think the best way
25  to approach that particular request is.
```

MOTORS LIQUIDATION COMPANY, et al.

Page 52

```
1           We've learned that the lockup agreement was assumed
2   by Old GM and assigned to New GM.  And we see now from the
3   papers that were filed on Monday what we expected to see, which
4   is that at least some of the parties are arguing that the
5   assumption of the lockup agreement by Old GM means that there
6   was a judicial finding that the lockup agreement was a
7   reasonable exercise of the debtors' business judgment.
8           They're trying to use the assumption itself to
9   bootstrap arguments on the merits and to argue that the lockup
10  agreement in its entirety is insulated from review.  And so to
11  the extent that the sale order and the assumption order can be
12  construed to be a judicial finding to that effect, we might
13  need relief from such an order.  I don't think we will, because
14  I'm hopeful that Your Honor will -- again, I think that this is
15  factual as well -- but I think that once it's established that
16  despite what the 8-K said, because the disclosure actually was
17  not as complete as counsel would suggest, the creditors'
18  committee did not know when and whether this contract was being
19  assumed and assigned, and it could not have appreciated what
20  the full consequences of that assumption and assignment were.
21          And so it's possible -- one way to have gone would
22  have been to seek 60(b) relief from every aspect of the sale
23  order that we thought we needed to in order to preserve maximum
24  flexibility to challenge the lockup agreement and then press
25  forward with that motion.  But I think that that would have
```

MOTORS LIQUIDATION COMPANY, et al.

Page 53

```
1   been a very aggressive and unsettling approach.  And I think
2   that as discovery progresses it's quite possible that we can
3   narrow the extent to which we need 60(b) relief, if at all;
4   which is yet another reason why, as opposed to the suggestion
5   of New GM, I think the better approach is to let everyone learn
6   what the real facts are here before we come to this Court and
7   ask for rulings.  Because if our hand is forced, we end up
8   having to ask for rulings that are more definitive and perhaps
9   broader than would be necessary if discovery were permitted.
10          And when I say that the 8-K -- first, I think Your
11  Honor is correct that even if -- that it's our position that
12  even if this agreement had happened in the Macy's department
13  store window, it would still be inequitable.  But it's also the
14  case that we are complaining about the lack of sunshine and
15  that there was not sufficient disclosure about what the true
16  implications of this agreement were and who it benefited and
17  why it benefitted them.
18          So we need discovery with respect to all of that.
19  You heard New GM's counsel say that the only reason that the
20  lockup agreement was assumed was because they wanted to make
21  sure that Old GM couldn't take pot shots at the lockup
22  agreement.  That's the -- the euphemism is the cooperation
23  covenant.  But in substance, that's what it means.  And I guess
24  it means that that was the only remaining portion of this
25  contract that required performance on the part of Old GM.  And
```

MOTORS LIQUIDATION COMPANY, et al.

Page 54

```
1   it's Old GM's requirement to keep its sock in its mouth that
2   makes this contract executory and even capable of being
3   assumed.
4           But if that's the meaning of assumption, if the only
5   meaning is that Mr. Karotkin and Weil Gotshal is not allowed to
6   say anything bad about the lockup agreement, I think we can
7   live with that.  But that's not what they're going to argue the
8   only meaning is.  They're going to argue that the meaning of
9   the assumption is that this was a reasonable exercise of Old
10  GM's business judgment.  And we certainly can't accept that
11  there's already been a judicial finding as to that, since the
12  creditors' committee and Your Honor was never apprised of what
13  the consequences of this assumption and assignment were.
14          On the topic of delay, I'll simply point out again,
15  we served discovery requests in August.  If we had just been
16  engaged in discovery during this period of time, I think we
17  would be quite far along.  And we're only now hearing that in
18  two weeks, claimants are prepared to make summary judgment
19  motions.  And as I pointed out at the outset, I think that the
20  proposal by claimant's counsel is actually not going to achieve
21  the objective that they seem to want, which is the more
22  expeditious resolution of this case.
23          Your Honor is also correct that the distributions
24  that are being held up are not distributions to all creditors,
25  it's only distributions to GM Nova Scotia Finance bondholders.
```

MOTORS LIQUIDATION COMPANY, et al.

Page 55

```
1   And there's a reserve that's been established to ensure that if
2   we're wrong, no one is prejudiced by whatever delay is
3   occasioned by the full and fair litigation of this objection.
4           THE COURT:  All right.  Everybody sit in place.
5       (Pause)
6           THE COURT:  All right, ladies and gentlemen.  The
7   notion that I would allow summary judgment motions before
8   giving the creditors' committee a fair opportunity for
9   discovery is unthinkable.  And I'm not going to permit summary
10  judgment motions under those circumstances without determining
11  the extent, if any, to which I would permit them thereafter.
12          It's unthinkable under Rule 56(f) of the Federal
13  Rules.  It's unthinkable as a matter of basic fairness to the
14  creditors in this case -- the nonbondholder creditors in this
15  case.  I wouldn't do it in a baby 11 and I'm sure not going to
16  do it in an 11 of this size, where there are thousands of
17  nonbondholder creditors who have a legitimate interest in the
18  fair prosecution of this litigation.
19          At the risk of stating the obvious, I express no view
20  as to the ultimate merits of the creditors' committee's
21  position on these issues.  But these are, as the exchange of
22  briefs on both sides makes clear, serious claims, factually
23  complicated claims, which deserve and indeed require judicial
24  scrutiny, as to the facts as well as the law underlying the
25  claims that the creditors' committee wishes to pursue, and not
```

MOTORS LIQUIDATION COMPANY, et al.

Page 56

```
1   in a factual vacuum, or under which I or any higher court would
2   be required to analyze them with knowledge of less than all of
3   their relevant facts.
4           I am painfully aware, as my earlier remarks
5   telegraphed pretty clearly, of the reality that intercreditor
6   disputes are very expensive.  Nevertheless, there are some
7   intercreditor issues that can't be swept under the rug and
8   ignored or be given expedited shorthand attention.  As much as
9   I have probably articulated by words or body language my
10  frustration with the disputes between the asbestos claims
11  creditors' committee and the general creditors' committee, I
12  would not have suggested and I don't suggest to this day that
13  those parties are entitled to a judicial determination of their
14  respective rights.  And I feel no differently with respect to
15  this issue.
16          So we're going to do it by the book, folks.  We're
17  going to do it by the way that this court -- and by this court,
18  I mean not me alone but the judges in the United States
19  Bankruptcy Court for the Southern District of New York -- have
20  done by our local court rules which is summary judgment motions
21  may be made after a pre-motion conference under which the Court
22  can consider whether or not the green light for filing such a
23  motion should be given.  But that pre-motion conference will be
24  taken after most or all of the discovery has been taken, not
25  now, and certainly not today.
```

MOTORS LIQUIDATION COMPANY, et al.

Page 57

```
1           I express no view as to whether or not I would later
2   grant or deny or, as I so often do, grant but with a message "I
3   think you're wasting your time", if such a request were made
4   down the road.  Just as it would be irresponsible for me to do
5   anything else at this point in time, it would be irresponsible
6   for me to make a prediction with respect to that issue at this
7   point in time.  So I'm not going to do it.
8           Now, with that said, I do believe that the discovery
9   has to be handled in a sensible way.  First, I don't remember
10  how often I've had to address this since the request is made
11  increasingly rarely, but I hate interrogatories, except on the
12  most basic statistical and numeric information.  Or, like we
13  used to do under the old MDL rules, before Rule 26 was amended,
14  interrogatories can be used to identify the names and locations
15  of witnesses.  But I don't want them used for anything other
16  than that.
17          Document production is authorized.  And lay witness
18  deposition testimony will be authorized.  But you've got to
19  come back to me for permission to use interrogatories.  And the
20  presumption is going to be that there are other and better ways
21  of getting information of that character.
22          Whenever you're talking about discovery of
23  governmental witnesses -- and I assume for the purposes of this
24  discussion that I should treat the Canadian government with the
25  same respect that I would treat our own -- you tend to involve
```

MOTORS LIQUIDATION COMPANY, et al.

Page 58

1   more complicated issues of internal deliberations, deliberative
2   privilege.  I haven't dealt with these issues in years.  I'm
3   not sure if I have my arms around them other than recognizing
4   that they exist.  But that's going to have to be done with the
5   consent of the government; or if there is an agreement to
6   disagree, you're going to have to give me an opportunity to
7   understand what kinds of discovery of the government are
8   appropriate and what are not.
9         At least seemingly, if the government discusses
10  things with outsiders, like bondholders or their lawyers, that
11  well might not be privileged or subject to the protections
12  which we, as citizens and judges, accord to the federal
13  government and its personnel.  But you've got to be careful in
14  that area.  And I'll be available if you have to agree to
15  disagree.
16        You are to do your discovery quickly, cleanly; and
17  I'll be available, as I always am, in the event of discovery
18  disputes, after the usual meet-and-confers.  But I need you to
19  redouble your efforts to make sure that the discovery is
20  efficiently handled, cooperative and clean.
21        You are to prepare a stip or consent order embodying
22  the request for discovery.  As is apparent, discovery is
23  presumptively a two-way street.  I recognize that the
24  creditors' committee is likely to have less in the way of
25  information that's relevant than maybe other parties, but it is

MOTORS LIQUIDATION COMPANY, et al.

Page 59

1   not, just because it's the creditors' committee, exempt from
2   discovery.  And after you have some kind of stipulation or
3   consent order with as much as you can paper, you're to submit
4   it to me for judicial approval.  If it's reasonable, that
5   judicial approval will be granted.
6         All right.  Not by way of reargument, do we have open
7   issues?  All right.  Hearing none -- am I correct, Mr.
8   Karotkin, we have no further business as well?
9         MR. KAROTKIN:  That's correct, Your Honor.  Thank
10  you.
11        THE COURT:  All right.  We're adjourned.
12  (Whereupon these proceedings were concluded at 3:26 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 60

1
2               I N D E X
3
4              R U L I N G S
5   DESCRIPTION                              PAGE    LINE
6   Motion of IUE-CWA to approve assignment of    16      6
7   claim of IUE-CWA to a VEBA trust granted
8   Caplin & Drysdale's fee application generally
9   approved based on specific rulings made on the
10  record re:
11  objection of fee examiner re billing rates and   18      6
12  task allocation sustained;
13  cost of Caplin & Drysdale's responding to fee    18      19
14  examiner's criticism will not be compensable;
15  objection of fee examiner re vague              19      1
16  communications and repetitive tasks sustained;
17  Overall objection of fee examiner in LFR fee    25      2
18  application that TEA, Inc. was not retained
19  overruled
20  Summary judgment motions will only be made      56      20
21  after a pre-motion hearing and after
22  substantially all discovery, as outlined
23  on the record
24
25

Page 61

1
2            I N D E X, cont'd
3
4              R U L I N G S
5   DESCRIPTION                              PAGE    LINE
6   Parties directed to prepare stipulation or      58      21
7   consent order re discovery requests for
8   judicial approval
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2                  C E R T I F I C A T I O N

3

4    I, Lisa Bar-Leib, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    _____

8    LISA BAR-LEIB

9    AAERT Certified Electronic Transcriber (CET**D-486)

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date:  December 16, 2010

17

18

19

20

21

22

23

24

25