# Exhibit C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
In re                                                          :
                                                               :    **Chapter 11 Case No.**
**MOTORS LIQUIDATION COMPANY,** *et al.*,                      :
    f/k/a General Motors Corp., *et al.*                       :    **09-50026 (REG)**
                                                               :
                    Debtors.                                   :    **(Jointly Administered)**
                                                               :
---------------------------------------------------------------x

<u>CERTIFICATE OF PUBLICATION</u>

I, Angela Ferrante, certify as follows:

    1.    I am a Director of the Business Reorganization Department of the Melville office of The Garden City Group, Inc., the claims and noticing agent for the debtors and debtors-in-possession (the "Debtors") in the above-captioned proceeding. The business address for the Melville office is 105 Maxess Road, Melville, New York 11747

    2.    On October 15, 2009, at the direction of Weil, Gotshal & Manges LLP, counsel for the Debtors, I caused publication of the **Notice of Deadlines for Filing Proofs of Claim (Including Claims Under Section 503(b)(9) of the Bankruptcy Code)** in the following publications:

<u>Publication Name</u>
*Financial Times*, Worldwide
*The Wall Street Journal*, Global
*The New York Times*, National
*USA Today*, (Mon-Thurs) National
*Detroit Free Press/Detroit News*
*Le Journal de Montreal* (French) [1]
*Montreal Gazette* (English)
*The Global and Mail*, National
*The National Post*

---

[1] The Certificate of Translation is attached hereto.

2

     3.   I certify under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Dated: Melville, New York
October 23, 2009

                                                       /s/ Angela Ferrante
                                                         Angela Ferrante

# World news

## US hunkers down in arduous search for Mideast peace

**Regional solution**

The administration has begun to talk in terms of a long and difficult process, write **Harvey Morris** and **Vita Bekker**

The Obama administration has reached an impasse in its Middle East peace strategy as it this week assesses progress – or rather the lack of it – in nine months of intensive diplomacy aimed at reviving stalled Israeli-Palestinian talks.

In the face of rigid positions adopted by both sides, the administration has begun to talk in terms of a long and difficult process towards the peace settlement that Barack Obama, president, made a high policy priority from his first day in the Oval Office last January.

"We're under no illusions here that even when a formal negotiation begins, it is going to be arduous," according to Philip Crowley, US Department of State spokesman. "It's going to take a considerable amount of time. How much? Who knows?"

An already negative atmosphere has been further soured by a human rights report from a United Nations panel chaired by Richard Goldstone, a South African judge, that focused on alleged Israeli war crimes during the invasion of Gaza at the turn of the year. The report called for a full investigation of atrocities claimed to have been committed by both Israel and Hamas.

Israeli fury at the report's findings entrenched public opinion behind the right-wing government of Benjamin Netanyahu in resisting pressure from the US to compromise on the terms for reopening peace talks.

Mishandling of the Palestinian response to the Goldstone report by Mahmoud Abbas, the Palestinian Authority president, meanwhile provoked an outcry at home that threatens his political future.

He bowed to US and Israeli pressure to defer discussion of the report's findings at the Human Rights Council, which ordered the Goldstone investigation, and then backtracked in the face of domestic opposition that has been exploited by his Hamas rivals.

The Geneva-based HRC will now vote today on whether to endorse a report that could theoretically lead to Israeli politicians and soldiers facing indictments at the International Criminal Court.

Mr Abbas's about-face on the Goldstone report further fuelled domestic dissent provoked by his decision to meet Mr Netanyahu in New York last month, at the invitation of Mr Obama, after he said he would do so only if Israel announced in advance a freeze on settlement activity.

Michael Warschawski, founder of the Alternative Information Centre, an Israeli-Palestinian advocacy group in Jerusalem, says Mr Obama's bid to renew peace talks would be undermined by Mr Abbas's weakness.

He adds: "Abu Mazen [Abbas] does not have the trust of the people right now to protect their right in negotiations with Israel."

George Mitchell, is Mr Obama's special envoy to the Middle East, will this week report back to Hillary Clinton, secretary of state, after his seventh and apparently inconclusive visit to the region and Mrs Clinton will, in turn, report to the president.

"Those who are stonewalling are hoping that the Obama administration will give up and go away," says Hussein Ibish of the Washington-based American Task Force on Palestine. "But there's no sign of a let-up by the administration in the push [for peace]. There's a sense though that they're hunkering down for the long haul."



Hard sell: this year Indians have been minding the price tag on gold, with demand falling rapidly because of a weak economy and high rupee prices *Reuters*

## Golden words to tempt Indian buyers

**Bullion sales**

By **Joe Leahy** and **James Fontanella-Khan** in Mumbai

"Only gold is divine. You can't really put a price tag on something so divine," gushes the advertisement on the cover of HT Café, an English-language lifestyle magazine.

As India prepares to celebrate Diwali this Saturday, gold industry groups have stepped up marketing campaigns to persuade Indians to indulge in their love affair with the precious metal.

The problem for the gold industry is that even during normal price fluctuations, Indian sales suffer from lumpy demand.

India's main gold-buying season usually kicks off in October or November with Dussehra, a festival celebrating the triumph of good over evil, and Diwali, when Hindus pray to the goddess Lakshmi for prosperity and buy gold for family members. People also buy during the wedding season, mainly in November and December.

To try to spread buying more evenly through the year, the World Gold Council strategy is to encourage gold buying during more of India's ancient religious festivals. groups, such as the World Gold Council, author of the "gold is divine" advert, is that this year Indians have very much been minding the price tag on gold.

A weak economy and high rupee prices for gold in India, the world's largest importer of bullion, pushed demand down 83 per cent from a year earlier to 17.7m tonnes in the January-March quarter. In the next quarter demand was down 38 per cent year on year, though recently there have been signs of a rebound.

These include Baisakhi, the Punjabi harvest festival in April and Pitru Paksha, a period when Hindus honour their ancestors. "In a way, it would be a tribute to your ancestors to show them you are prosperous. So gold buying during [Pitru Paksha] is not bad at all," says Dharmesh Sodah, director of the World Gold Council in Mumbai.

Other initiatives include gold savings schemes at post offices, micro-finance schemes to enable peasant farmers to save gold, and retail marketing schemes such as the "Great Indian Gold Rush".

Regardless of these efforts, near Zaveri market, Janhavi, a housewife, admits during some frantic pre-Diwali shopping that she is buying stuff other than gold this season. She plans to shop for gold when it becomes cheaper. In the meantime she has bought some pens and toys for her children and is looking for a wallet.

"I will also be buying imitation jewellery that I will wear for Diwali. A lot of my friends are doing the same."

**Video:** Keyur Shah, of India's World Gold Council www.ft.com/indiagold

---

**Legal Notices**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re : Chapter 11 Case No.
MOTORS LIQUIDATION COMPANY : 09-50026 (REG)
f/k/a GENERAL MOTORS CORPORATION, et al., :
Debtors. : (Jointly Administered)

NOTICE OF DEADLINES FOR FILING PROOFS OF CLAIM (INCLUDING CLAIMS UNDER SECTION 503(b)(9) OF THE BANKRUPTCY CODE)

TO ALL PERSONS AND ENTITIES WITH CLAIMS (INCLUDING CLAIMS UNDER SECTION 503(b)(9) OF THE BANKRUPTCY CODE) AGAINST A DEBTOR SET FORTH BELOW:

| Name of Debtor | Case Number | Tax Identification Number | Other Names Used by Debtors in the Past 8 Years |
|---|---|---|---|
| Motors Liquidation Company (f/k/a General Motors Corporation) | 09-50026 | 38-0572515 | General Motors Corporation GMC Truck Division NAO Fleet Operations GM Corporation GM Corporation-GM Auction Department National Car Rental National Car Sales Automotive Market Research |
| MLCS, LLC (f/k/a Saturn, LLC) | 09-50027 | 38-2577506 | Saturn, LLC Saturn Corporation Saturn Motor Car Corporation GM Saturn Corporation Saturn Corporation of Delaware |
| MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation) | 09-50028 | 38-2755764 | Saturn Distribution Corporation |
| MLC of Harlem, Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc.) | 09-13558 | 20-1426707 | Chevrolet-Saturn of Harlem, Inc. CKS of Harlem |

PLEASE TAKE NOTICE THAT, on September 16, 2009, the United States Bankruptcy Court for the Southern District of New York (the "Court"), having jurisdiction over the Chapter 11 cases of Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession (collectively, the "Debtors") entered an order (the "Bar Date Order") establishing (i) November 30, 2009, at 5:00 p.m. (Eastern Time) as the last date and time for each person or entity (including, without limitation, individuals, partnerships, corporations, joint ventures, and trusts) to file a proof of claim ("Proof of Claim" based on prepetition claims, including a claim under section 503(b)(9) of the Bankruptcy Code, as described more fully below (a "503(b)(9) Claim"), against any of the Debtors (the "General Bar Date"); and (ii) November 30, 2009, at 5:00 p.m. (Eastern Time) as the last date and time for each governmental unit (as defined in section 101(27) of the Bankruptcy Code) to file a Proof of Claim based on prepetition claims against any of the Debtors (the "Governmental Bar Date", and, together with the General Bar Date, the "Bar Dates").

The Bar Date Order, the Bar Dates and the procedures set forth below for the filing of Proofs of Claim apply to all claims against the Debtors that arose prior to June 1, 2009, the date on which the Debtors commenced their cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

If you have any questions relating to this Notice, please feel free to contact AlixPartners at 1-800-414-9607 or by e-mail at claims@motorsliquidation.com. In addition, you may contact the Official Committee of Unsecured Creditors through its website at www.motorsliquidationcreditorscommittee.com or at 1-212-715-3275.

YOU SHOULD CONSULT AN ATTORNEY IF YOU HAVE ANY QUESTIONS, INCLUDING WHETHER YOU SHOULD FILE A PROOF OF CLAIM.

1. WHO MUST FILE A PROOF OF CLAIM

You MUST file a Proof of Claim to vote on a chapter 11 plan filed by the Debtors or to share in any of the Debtors' estates if you have a claim that arose prior to June 1, 2009, including a 503(b)(9) Claim, and it is not one of the other types of claims described in Section 2 below. Acts or omissions of the Debtors that arose before June 1, 2009 may give rise to claims against the Debtors that must be filed by the applicable Bar Date, notwithstanding that such claims may not have matured or become fixed or liquidated or certain prior to June 1, 2009.

Pursuant to section 101(5) of the Bankruptcy Code and as used in this Notice, the word "claim" means: (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. Further, claims include unsecured claims, secured claims, priority claims, and 503(b)(9) Claims (as defined in Section 2(d) below).

2. WHO NEED NOT FILE A PROOF OF CLAIM

You need not file a Proof of Claim if:
(a) Your claim is listed on the Debtors' Schedules (as defined below) and (i) is not described in the Schedules as "disputed", "contingent", or "unliquidated", (ii) you do not dispute the amount or nature of the claim set forth in the Schedules, and (iii) you do not dispute that the claim is an obligation of the specific Debtor against which the claim is listed on the Schedules;
(b) Your claim has been paid in full;
(c) You hold an interest in any of the Debtors, which interest is based exclusively upon the ownership of common or preferred stock, membership interests, partnership interests, or warrants or rights to purchase, sell or subscribe to such a security or interest; provided, however, that interest holders who wish to assert claims (as opposed to ownership interests) against any of the Debtors that arise out of or relate to the ownership or purchase of an interest, including claims arising out of or relating to the sale, issuance, or distribution of the interest, must file Proofs of Claim on or before the applicable Bar Date, unless another exception identified herein applies;
(d) You hold a claim allowable under sections 503(b) and 507(a)(2) of the Bankruptcy Code as an administrative claim; provided, however, 503(b)(9) Claims are subject to the General Bar Date as provided above. Section 503(b)(9) provides in part: "…there shall be allowed administrative expenses…including…(9) the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business." Accordingly, if you hold a 503(b)(9) Claim, you must file a Proof of Claim on or before the General Bar Date;
(e) You hold a claim that has been allowed by an order of the Court entered on or before the applicable Bar Date;
(f) You hold a claim against any of the Debtors for which a separate deadline is fixed by the Court (whereupon you will be required to file a Proof of Claim by that separate deadline);
(g) You are a Debtor in these cases having a claim against another Debtor;
(h) You are an affiliate (as defined in section 101(2) of the Bankruptcy Code) of any Debtor as of the Bar Date;
(i) You hold a claim for which you have already properly filed a Proof of Claim against any of the Debtors with the Clerk of the Court or The Garden City Group, Inc., the Debtors' claims agent, utilizing a claim form that substantially conforms to the Proof of Claim Form (as defined below) or Official Form 10; or
(j) You hold a claim that is limited exclusively to the repayment of principal, interest and other fees and expenses on or under any agreements (a "Debt Claim") governing any debt security issued by any of the Debtors pursuant to an indenture (together, the "Debt Instruments") if the indenture trustee or similar fiduciary under the applicable indenture or fiscal and paying agency agreement files a Proof of Claim against the applicable Debtor, on or before the Bar Date, on account of all Debt Claims against such Debtor under the applicable Debt Instruments; provided, however, that any holder of a Debt Claim wishing to assert a claim arising out of or relating to a Debt Instrument, other than a Debt Claim, shall be required to file a Proof of Claim with respect to such claim on or before the Bar Date, unless another exception identified herein applies. Debt Instruments include those agreements listed at the end of this Notice.

YOU SHOULD NOT FILE A PROOF OF CLAIM IF YOU DO NOT HAVE A CLAIM AGAINST THE DEBTORS.

3. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

If you hold a claim arising from the rejection of an executory contract or unexpired lease, you must file a Proof of Claim based on such rejection by the later of (i) the applicable Bar Date, and (ii) the date which is thirty days following the entry of the order approving such rejection or you will be forever barred from doing so. Notwithstanding the foregoing, if you are a party to an executory contract or unexpired lease and you wish to assert a claim on account of unpaid amounts accrued and outstanding as of June 1, 2009 pursuant to that executory contract or unexpired lease (other than a rejection damages claim), you must file a Proof of Claim for such amounts on or before the applicable Bar Date unless an exception identified herein applies.

4. WHEN AND WHERE TO FILE

All Proofs of Claim must be filed so as to be actually received on or before the applicable Bar Date at the following address:

If by overnight courier or
hand delivery to:

The Garden City Group, Inc.
Attn: Motors Liquidation Company
Claims Processing
5151 Blazer Parkway, Suite A
Dublin, Ohio 43017

If by first-class mail, to:

The Garden City Group, Inc.
Attn: Motors Liquidation Company
Claims Processing
P.O. Box 9386
Dublin, Ohio 43017-4286

Or if by hand delivery to:
United States Bankruptcy Court, SDNY
One Bowling Green, Room 534
New York, New York 10004

Proofs of Claim will be deemed timely filed only if actually received by The Garden City Group, Inc. or the Court on or before the applicable Bar Date. Proofs of Claim may not be delivered by facsimile, telecopy, or electronic mail transmission.

5. WHAT TO FILE

If you file a Proof of Claim, your filed Proof of Claim must: (i) be written in the English language; (ii) be denominated in lawful currency of the United States; (iii) conform substantially to Official Bankruptcy Form No. 10 ("Proof of Claim Form"); (iv) state the Debtor against which it is filed; (v) set forth with specificity the legal and factual basis for the alleged claim; (vi) include supporting documentation or an explanation as to why such documentation is not available; and (vii) be signed by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant.

IF YOU ARE ASSERTING A CLAIM AGAINST MORE THAN ONE DEBTOR, SEPARATE PROOFS OF CLAIM MUST BE FILED AGAINST EACH SUCH DEBTOR, AND YOU MUST IDENTIFY ON YOUR PROOF OF CLAIM THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED AND THE CASE NUMBER OF THAT DEBTOR'S BANKRUPTCY CASE. A LIST OF THE NAMES OF THE DEBTORS AND THEIR CASE NUMBERS IS SET FORTH ABOVE.

Additional Proof of Claim Forms may be obtained at www.uscourts.gov/bkforms/ or www.motorsliquidation.com.

YOU SHOULD ATTACH TO YOUR COMPLETED PROOF OF CLAIM FORM COPIES OF ANY WRITINGS UPON WHICH YOUR CLAIM IS BASED. IF THE DOCUMENTS ARE VOLUMINOUS, YOU SHOULD ATTACH A SUMMARY.

6. CONSEQUENCES OF FAILURE TO FILE A PROOF OF CLAIM BY THE APPLICABLE BAR DATE

Except with respect to claims of the type set forth in Section 2 above, any creditor who fails to file a Proof of Claim on or before the applicable Bar Date in the appropriate form in accordance with the procedures described in this Notice for any claim such creditor holds or wishes to assert against each of the Debtors, will be forever barred – that is, forbidden – from asserting the claim against each of the Debtors and their respective claim(s) for filing a Proof of Claim with respect to the claim, and each of the Debtors and their respective chapter 11 estates, successors, and property will be forever discharged from any and all indebtedness or liability with respect to the claim, and the holder will not be permitted to vote to accept or reject any chapter 11 plan filed in these cases, participate in any distribution in any of the Debtors' chapter 11 cases on account of the claim, or receive further notices with respect to any of the Debtors' chapter 11 cases.

7. THE DEBTORS' SCHEDULES, ACCESS THERETO, AND CONSEQUENCES OF AMENDMENT THEREOF

You may be listed as the holder of a claim against one or more of the Debtors in the Debtors' Schedules of Assets and Liabilities and/or Schedules of Executory Contracts and Unexpired Leases (collectively, the "Schedules"). If you rely on the Debtors' Schedules, it is your responsibility to determine that the claim is accurately listed in the Schedules.

As set forth above, if you agree with the classification and amount of your claim as listed in the Debtors' Schedules, and if you do not dispute that your claim is only against the specified Debtor, and if your claim is not described as "disputed", "contingent", or "unliquidated", you need not file a Proof of Claim. Otherwise, or if you decide to file a Proof of Claim, you must do so before the Bar Date in accordance with the procedures set forth in this Notice.

Copies of the Schedules may be examined by interested parties on the Court's electronic docket for the Debtors' chapter 11 cases, which is posted on the website www.motorsliquidation.com and on the PACER Service Center at www.pacer.psc.uscourts.gov). Copies of the Schedules may also be examined by interested parties between the hours of 9:00 a.m. and 4:30 p.m. (Eastern Time) at the office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 511, New York, New York 10004. Copies of the Debtors' Schedules may also be obtained by written request to the Debtors' claims agent at the address and telephone number set forth below.

Copies of the Debtors' Schedules may also be obtained by written request to:
The Garden City Group, Inc., Attn: Motors Liquidation Company,
P.O. Box 9386, Dublin, Ohio 43017-4286, 1-703-286-6401

In the event that the Debtors amend their Schedules to (a) designate a claim as disputed, contingent, unliquidated, or undetermined, (b) change the amount of a claim reflected therein, or (c) change the classification of a claim reflected therein, or (d) add a claim that was not listed on the Schedules, the Debtors will notify you of the amendment. In such case, the deadline for you to file a Proof of Claim with respect to the amended Schedules is the later of (a) the applicable Bar Date and (b) the date that is thirty days after the Debtors provide notice of the amendment.

A holder of a possible claim against the Debtors should consult an attorney regarding any matters not covered in this Notice, such as whether the holder should file a Proof of Claim.

DATED: September 16, 2009
New York, New York
BY ORDER OF THE COURT

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and Debtors in Possession

Certain Debt Instruments

| | Debt Instrument | CUSIP, ISIN, or Swiss Security Numbers |
|---|---|---|
| 1 | Indenture, dated as of Nov. 15, 1990, between GM and Citibank as indenture trustee | CUSIP Nos. 370442AN5, 370442AJ4, 370442AR6, 370455EAG3, 370455EAS7 |
| 2 | Indenture, dated as of Dec. 7, 1995, between GM and Citibank as indenture trustee | CUSIP Nos. 370442AV7, 370442AZ8, 370442BB0, 370442B16, 370442T74, 370442T66, 370442T58, 370442T41, 370442T33, 370442T25, 370442BQ7, 370442BT1, 370442T17, 370442BW4, 370442BS3, 370442121, 370442691 |
| 3 | Trust Indenture, dated as of July 1, 1995, between Michigan Strategic Fund and Dai-Ichi Kangyo Trust Company of New York ($58,800,000 Multi-Modal Interchangeable Rate Pollution Control Refunding Revenue Bonds) | CUSIP No. 594693AQ6 |
| 4 | Indenture of Trust, dated as of July 1, 1994, between City of Moraine, Ohio and Dai-Ichi Kangyo Trust Company of New York ($12,500,000 Solid Waste Disposal Revenue Bonds) | CUSIP No. 616449AA2 |
| 5 | Indenture of Trust, dated as of July 1, 1999, between City of Moraine, Ohio and Dai-Ichi Kangyo Trust Company of New York ($10,400,000 Solid Waste Disposal Revenue Bonds) | CUSIP No. 616449AB0 |
| 6 | Trust Indenture, dated as of Jan. 1, 1997, between City of Fort Wayne, Indiana, JPMorgan Chase Bank and Bank One Trust Company, N.A., ($31,000,000 Pollution Control Revenue Refunding Bonds) | CUSIP No. 349272AT1 |
| 7 | Trust Indenture, dated as of Mar. 1, 2002, between Indiana Development Finance Authority and JPMorgan Chase Bank ($20,040,000 State of Ohio Solid Waste Revenue Bonds) | CUSIP No. 667596AU2 |
| 8 | Indenture of Trust, dated as of Dec. 1, 2002, between Ohio Water Development Authority and JPMorgan Chase Bank ($46,000,000 State of Ohio Solid Waste Revenue Bonds) | CUSIP No. 67759ABC2 |
| 9 | Trust Indenture, dated as of Apr. 1, 1984, among City of Indianapolis, Indiana, Bankers Trust Company and The Indiana National Bank ($10,000,000 Pollution Control Revenue Bonds) | CUSIP No. 455329AB8 |
| 10 | Fiscal and Paying Agency Agreement, dated as of July 3, 2003, between American Deutsche Bank AG London, as fiscal agent and paying agent, and Banque Générale du Luxembourg S.A., as paying agent | ISIN Nos. XS0171942757, XS0171943649 |
| 11 | Fiscal and Paying Agency Agreement, dated as of July 10, 2003, between GM Nova Scotia Finance Company, Deutsche Bank Luxembourg S.A., as fiscal agent and paying agent, and Banque Générale du Luxembourg S.A., as paying agent | ISIN Nos. XS0171922643, XS0171908063 |
| 12 | Bond Purchase and Paying Agency Agreement dated May 28, 1986 between GM and Credit Suisse | Swiss Security No. 876 926 |

## Debt-burdened Dubai begins to exorcise its economic demons

**Emirate's rally**

Traffic congestion in the city state points to a growth in commercial activity, writes **Simeon Kerr**

It is a strange, but telling, reaction: some commuters in Dubai are breathing a sigh of relief when they hit traffic jams.

"I rejoice when I grind to a halt," says one businessman, who watched with growing unease over the past year as vehicles disappeared from the roads as building activity fell silent and companies downsized their workforces.

The gloom after the crash that followed Dubai's period of petro-dollar and credit-driven growth is starting to clear, and residents who have returned from the extended summer and Ramadan lull to a city that feels as though it is expelling its economic demons.

The first post-break test has been cleared: schools have not seen marked reductions in returning pupils. Analysts had feared that an expatriate exodus would dampen domestic consumption and slash demand for real estate.

Several schools surveyed by the Financial Times have reported strong new-year enrolments, from the high-end Repton School Dubai, a boarding school outpost of the English public school, to the cross-cultural educational empire of GEMS, which has seen numbers rise 5 per cent this year.

"Not many children have left, the school is bustling," said Debbie Watson, head teacher at King's School Dubai, where demand has spiked after a strong performance in last year's debut schools inspections.

Real estate remains in the doldrums, with values half of their peak last year and an overhang of soon-to-be-completed properties, but there are glimmers of hope.

Dubai can now fight back as a competitive city: its infrastructure and lifestyle are now bolstered by reasonable prices, says Blair Hagkull, regional managing director for Jones Lang LaSalle, the global property agent.

Plummeting rents have also allowed workers to upgrade the size and location of their accommodation and agents say some residential areas are seeing a rise in sales inquiries, possibly presaging a price rise. Many of those finding work in booming Abu Dhabi are using the western end of more relaxed Dubai as a dormitory, commuting up to three hours a day.

"The mood is changing and I can feel confidence strengthening as those that tried to suggest Dubai would be hollowed out by a summer expatriate exodus or brought to its knees by a drop in property prices have been proved wrong," said Simon Williams, senior economist with HSBC in Dubai.

He argues that as the regional economy strengthens, demand for the business services that are Dubai's forte will return, while domestic deflation will help the city to compete more effectively.

Already the stock market has rallied, insurance against a government default is easing and markets assume the Dubai government will clear developer Nakheel's $4.05bn (€2.72bn, £2.54bn) Islamic bond maturing in December.

"Dubai still has very serious challenges to overcome," says Mr Williams. "I expect the next 12 months to be an awful lot better but don't confuse this with a return to the boom days."

Yet despite the newly-found optimism, the emirate continues to face several hurdles in its path to growth, from an overbearing debt mountain to a huge upcoming overhang in property supply against questionable demand.

And in the meantime, Dubai-based expatriates continue to lose their jobs.

Nakheel is shedding at least 300 more staff, as it continues to shrink its once-huge workforce towards a third of its peak.

One employee recently made redundant says he is seeking other work before his resident's visa elapses in two months, but fears for the ability of the developer to carry on effectively with such a skeleton staff.

For now, he keeps himself busy at the mall, in between meetings and interviews for new jobs. And such jobs are generally on offer in the new centres of growth, such as Abu Dhabi, Doha and Saudi Arabia.

"I like this area and want to stay, but will there be something for me here?" he asks.



**Dubai downturn**
Total population (m) / Annual % change
Residential property prices (emirati dirham per sq ft)
2006, 08, 09, 10 Forecasts
Asking / Achieved
Q2 2008 — Q1 2009
Source: Jones Lang LaSalle

**MORE ON FT.COM**

Abu Dhabi is emerging as the Middle East bond capital, with $12bn issued so far this year
www.ft.com/world

## Eurozone optimism as output rises again

**EU figures extend V-shaped recovery**

By **Ralph Atkins** in Frankfurt

Eurozone industry has reported a fourth consecutive monthly rise in production, pointing to a robust third-quarter growth rebound right across the 16-country region.

Industrial production in August was 0.9 per cent higher than the previous month, reported Eurostat. The European Union's statistical office also revised up July's data to show a 0.2 per cent rise rather than a 0.3 per cent fall, as reported originally.

The latest data extended the V-shaped recovery in eurozone industrial production since April. Just as the region was worse hit than other parts of the world from repercussions of last year's Lehman Brothers failure, the eurozone was benefiting disproportionately from the subsequent revival in global growth prospects, analysts said.

Much of the region's industrial sector was highly cyclical, said Robert Barrie, European economist at Credit Suisse. "In a downswing, that is a big problem, but as things start to recover it makes for a lot of upside."

The latest upbeat data did not ease fears, however, that the pace of economic recovery would slow later this year and in 2010, as the effects globally of emergency stimulus measures wore off, and eurozone exports were hit by the strength of the euro. At the same time, the eurozone is still a long way off pre-crisis levels of activity: industrial production in August was still 15.4 per cent lower than a year ago.

Recent months' production data have been volatile, perhaps distorted by summer factory shutdowns. But the eurozone's revival appears to be widespread. Italy reported a 7 per cent rise in production in August alone, compared with the 1.5 per cent rise in Germany and 1.9 per cent rise in France.

The eurozone recovery might also assist Spain, which was badly hit by falling house prices and high unemployment. Spanish industrial production was up by 1 per cent in August. However, Ireland, where data have been volatile, saw production fall by almost 17 per cent month on month.

# LEGAL NOTICES

## BANKRUPTCIES

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re MOTORS LIQUIDATION COMPANY f/k/a GENERAL MOTORS CORPORATION, et al., Debtors. | Chapter 11 Case No. 09-50026 (REG) (Jointly Administered) |

**NOTICE OF DEADLINES FOR FILING PROOFS OF CLAIM (INCLUDING CLAIMS UNDER SECTION 503(b)(9) OF THE BANKRUPTCY CODE)**

TO ALL PERSONS AND ENTITIES HOLDING CLAIMS (INCLUDING CLAIMS UNDER SECTION 503(b)(9) OF THE BANKRUPTCY CODE) AGAINST A DEBTOR SET FORTH BELOW:

| Name of Debtor | Case Number | Tax Identification Number | Other Names Used by Debtors in the Past 8 Years |
|---|---|---|---|
| Motors Liquidation Company (f/k/a General Motors Corporation) | 09-50026 | 38-0572515 | General Motors Corporation GMC Truck Division NAO Fleet Operations GM Corporation GM Corporation-GM Auction Department National Car Rental National Car Sales Automotive Market Research |
| MLCS, LLC (f/k/a Saturn, LLC) | 09-50027 | 38-2577506 | Saturn Corporation SaturnCorporation Saturn Motor Car Corporation GM Saturn Corporation Saturn Corporation of Delaware |
| MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation) | 09-50028 | 38-2755764 | Saturn Distribution Corporation |
| MLC of Harlem, LLC (f/k/a Chevrolet-Saturn of Harlem, Inc.) | 09-13558 | 20-1426707 | Chevrolet-Saturn of Harlem, Inc. CKS of Harlem |

**PLEASE TAKE NOTICE THAT,** on September 16, 2009, the United States Bankruptcy Court for the Southern District of New York (the "**Court**"), having jurisdiction over the chapter 11 cases of Motors Liquidation Company f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession (collectively, the "**Debtors**") entered an order (the "**Bar Date Order**") establishing (i) **November 30, 2009, at 5:00 p.m. (Eastern Time)** as the last date and time for each person or entity (including, without limitation, individuals, partnerships, corporations, joint ventures, and trusts) to file a proof of claim ("**Proof of Claim**") based on prepetition claims, including a claim under section 503(b)(9) of the Bankruptcy Code, as described more fully below (a "**503(b)(9) Claim**"), against any of the Debtors (the "**General Bar Date**"); and (ii) **November 30, 2009, at 5:00 p.m. (Eastern Time)** as the last date and time for each governmental unit (as defined in section 101(27) of the Bankruptcy Code) to file a Proof of Claim based on prepetition claims against any of the Debtors (the "**Governmental Bar Date**" and, together with the General Bar Date, the "**Bar Dates**").

The Bar Date Order, the Bar Dates and the procedures set forth below for the filing of Proofs of Claim apply to all claims against the Debtors (other than those set forth below as being specifically excluded) that arose prior to **June 1, 2009**, the date on which the Debtors commenced their cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

**If you have any questions relating to this Notice, please feel free to contact AlixPartners at 1-800-414-9607 or by e-mail at claims@motorsliquidation.com. In addition, you may contact the Official Committee of Unsecured Creditors through its website at www.motorsliquidationcreditorscommittee.com or at 1-212-715-3275.**

**YOU SHOULD CONSULT AN ATTORNEY IF YOU HAVE ANY QUESTIONS, INCLUDING WHETHER YOU SHOULD FILE A PROOF OF CLAIM.**

**1. WHO MUST FILE A PROOF OF CLAIM**

You **MUST** file a **Proof of Claim** to vote on a chapter 11 plan filed by the Debtors or to share in any of the Debtors' estates if you have a claim that arose prior to **June 1, 2009**, including a 503(b)(9) Claim, and it is not one of the other types of claims described in Section 2 below. Acts or omissions of the Debtors that arose before **June 1, 2009** may give rise to claims against the Debtors that must be filed by the applicable Bar Date, notwithstanding that such claims may not have matured or become fixed or liquidated or certain prior to **June 1, 2009**.

Pursuant to section 101(5) of the Bankruptcy Code and as used in this Notice, the word "claim" means: (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. Further, claims include unaccrued claims, secured claims, priority claims, and 503(b)(9) Claims (as defined in Section 2(d) below).

**2. WHO NEED NOT FILE A PROOF OF CLAIM**

You need not file a Proof of Claim if:
(a) Your claim is listed on the Schedules (as defined below) and (i) is **not** described in the Schedules as "disputed", "contingent", or "unliquidated", (ii) you do **not** dispute the amount or nature of the claim set forth in the Schedules, and (iii) you do **not** dispute that the claim is an obligation of the specific Debtor against which the claim is listed on the Schedules;
(b) Your claim has been paid in full;
(c) You hold an interest in any of the Debtors, which interest is based exclusively upon the ownership of common or preferred stock, membership interests, partnership interests, or warrants or rights to purchase, sell or subscribe to such a security or interest; **provided, however**, that interest holders who wish to assert claims (as opposed to ownership interests) against any of the Debtors that arise out of or relate to the ownership or purchase of an interest, including claims arising out of or relating to the sale, issuance, or distribution of the interest, must file Proofs of Claim on or before the applicable Bar Date, unless another exception identified herein applies;
(d) You hold a claim allowable under sections 503(b) and 507(a)(2) of the Bankruptcy Code as an administrative claim; **provided, however**, 503(b)(9) **Claims are subject to the General Bar Date as provided above**. Section 503(b)(9) provides in part: "... there shall be allowed administrative expenses... including...(9) the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business." **Holders of any 503(b)(9) Claim, however, must file a Proof of Claim on or before the General Bar Date**;
(e) You hold a claim that has been allowed by an order of the Court entered on or before the applicable Bar Date;
(f) You hold a claim against any of the Debtors for which a separate deadline is fixed by the Court (whereupon you will be required to file a Proof of Claim by that separate deadline);
(g) You are a Debtor in these cases having a claim against another Debtor;
(h) You are an affiliate (as defined in section 101(2) of the Bankruptcy Code) of any Debtor or as of the Bar Date;
(i) You hold a claim for which you have already properly filed a Proof of Claim against any of the Debtors with the Clerk of the Court or The Garden City Group, Inc., the Debtors' claims agent, utilizing a claim form that substantially conforms to the Proof of Claim Form (as defined below) or Official Form 10; or
(j) You hold a claim that is limited exclusively to the repayment of principal, interest and other fees and expenses on or under any agreement (a "**Debt Claim**") governing any debt security issued by any of the Debtors pursuant to an indenture (together, the "**Debt Instruments**") if the holder of such Debt Claim does not wish to assert a claim based on their applicable indenture or fiscal and paying agency agreement files a Proof of Claim against the applicable Debtor, on or before the Bar Date, on account of all Debt Claims against such Debtor under the applicable Debt Instruments; **provided, however**, that any holder of a Debt Claim wishing to assert a claim arising out of or relating to a Debt Instrument, other than a Debt Claim, shall be required to file a Proof of Claim with respect to such claim on or before the Bar Date, unless another exception identified herein applies. Debt Instruments include those agreements listed at the end of this Notice.

**YOU SHOULD NOT FILE A PROOF OF CLAIM IF YOU DO NOT HAVE A CLAIM AGAINST THE DEBTORS.**

**3. EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

If you hold a claim arising from the rejection of an executory contract or unexpired lease, you must file a Proof of Claim based on such rejection by the later of (i) the applicable Bar Date, and (ii) the date which is **thirty days** following the entry of the order approving such rejection or you will be forever barred from doing so. Notwithstanding the foregoing, if you are a party to an executory contract or unexpired lease and you wish to assert a claim on account of unpaid amounts accrued and outstanding as of June 1, 2009 pursuant to that executory contract or unexpired lease (other than a rejection damages claim), you must file a Proof of Claim for such amounts on or before the applicable Bar Date unless an exception identified above applies.

**4. WHEN AND WHERE TO FILE**

All Proofs of Claim must be filed so as to be **actually received** on or before the applicable Bar Date at the following addresses:

| If by overnight courier or hand delivery to: | If by first-class mail, to: |
|---|---|
| The Garden City Group, Inc. Attn: Motors Liquidation Company Claims Processing 5151 Blazer Parkway, Suite A Dublin, Ohio 43017 | The Garden City Group, Inc. Attn: Motors Liquidation Company Claims Processing P.O. Box 9386 Dublin, Ohio 43017-4286 |

Or if by hand delivery to:
United States Bankruptcy Court, SDNY
One Bowling Green, Room 534
New York, New York 10004

Proofs of Claim will be deemed timely filed only if **actually received** by The Garden City Group, Inc. or the Court on or before the applicable Bar Date. Proofs of Claim may **not** be delivered by facsimile, telecopy, or electronic mail transmission.

**5. WHAT TO FILE**

If you file a Proof of Claim, your filed Proof of Claim must: (i) be written in the English language; (ii) be denominated in lawful currency of the United States; (iii) conform substantially to Official Bankruptcy Form No. 10 ("**Proof of Claim Form**"); (iv) state the Debtor against which the claim is filed; (v) set forth with specificity the legal and factual basis for the alleged claim; (vi) include supporting documentation or an explanation as to why such documentation is not available; and (vii) **be signed** by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant.

IF YOU ARE ASSERTING A CLAIM AGAINST MORE THAN ONE DEBTOR, SEPARATE PROOFS OF CLAIM MUST BE FILED AGAINST EACH SUCH DEBTOR AND YOU MUST IDENTIFY ON YOUR PROOF OF CLAIM THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED AND THE CASE NUMBER OF THAT DEBTOR'S BANKRUPTCY CASE. A LIST OF THE NAMES OF THE DEBTORS AND THEIR CASE NUMBERS IS SET FORTH ABOVE.

Additional Proof of Claim Forms may be obtained at www.uscourts.gov/bkforms/ or www.motorsliquidation.com.

**YOU SHOULD ATTACH TO YOUR COMPLETED PROOF OF CLAIM FORM COPIES OF ANY WRITINGS UPON WHICH YOUR CLAIM IS BASED. IF THE DOCUMENTS ARE VOLUMINOUS, YOU SHOULD ATTACH A SUMMARY.**

**6. CONSEQUENCES OF FAILURE TO FILE A PROOF OF CLAIM BY THE APPLICABLE BAR DATE**

Except with respect to claims of the type set forth in Section 2 above, any creditor who fails to file a Proof of Claim on or before the applicable Bar Date in the appropriate form in accordance with the procedures described in this Notice for any claim such creditor holds or wishes to assert against each of the Debtors, will be forever barred – that is, forbidden – from asserting the claim against each of the Debtors and their respective estates (or filing a Proof of Claim with respect to the claim), and each of the Debtors and their respective chapter 11 estates, successors, and property will be forever discharged from any and all indebtedness or liability with respect to the claim, and the holder will not be permitted to vote to accept or reject any chapter 11 plan filed in these chapter 11 cases, participate in any distribution in any of the Debtors' chapter 11 cases on account of the claim, or receive further notices with respect to any of the Debtors' chapter 11 cases.

**7. THE DEBTORS' SCHEDULES, ACCESS THERETO, AND CONSEQUENCES OF AMENDMENT THEREOF**

You may be listed as the holder of a claim against one or more of the Debtors in the Debtors' Schedules of Assets and Liabilities and/or Schedules of Executory Contracts and Unexpired Leases (collectively, the "**Schedules**"). If you rely on the Debtors' Schedules, it is your responsibility to determine that the claim is accurately listed in the Schedules.

As set forth above, if you agree with the classification and amount of your claim as listed in the Debtors' Schedules, and if you do not dispute that your claim is only against the specified Debtor, and if your claim is not described as "disputed", "contingent", or "unliquidated", you need not file a Proof of Claim. Otherwise, or if you decide to file a Proof of Claim, you must do so before the Bar Date in accordance with the procedures set forth in this Notice.

Copies of the Schedules may be examined by interested parties on the Court's electronic docket for the Debtors' chapter 11 cases, which is posted on the Internet at www.motorsliquidation.com and www.nysb.uscourts.gov (a PACER login and password are required and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov). Copies of the Schedules may also be examined by interested parties between the hours of 9:00 a.m. and 4:30 p.m. (Eastern Time) at the office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 511, New York, New York 10004. Copies of the Debtors' Schedules may also be obtained by written request to the Debtors' claims agent at the address and telephone number set forth below:

The Garden City Group, Inc., Attn: Motors Liquidation Company,
P.O. Box 9386, Dublin, Ohio 43017-4286, 1-703-286-6401

In the event that the Debtors amend their Schedules to (a) designate a claim as disputed, contingent, unliquidated, or undetermined, (b) change the amount of a claim reflected therein, (c) change the classification of a claim reflected therein, or (d) add a claim that was not listed on the Schedules, the Debtors will notify you of the amendment. In such case, the deadline for you to file a Proof of Claim on account of any such claim is the later of (a) the applicable Bar Date and (b) the date that is **thirty days** after the Debtors provide notice of the amendment.

**A holder of a possible claim against the Debtors should consult an attorney regarding any matters not covered in this Notice, such as whether the holder should file a Proof of Claim.**

DATED: September 16, 2009     BY ORDER OF THE COURT
New York, New York

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Attorneys for Debtors and Debtors in Possession

**Certain Debt Instruments**

| | Debt Instrument | CUSIP, ISIN, or Swiss Security Numbers |
|---|---|---|
| 1 | Indenture, dated as of Nov. 15, 1990, between GM and Citibank as indenture trustee | CUSIP Nos. 370442AN5, 370442AJ4, 370442AR6, 37045EAG3, 37045EAS7 |
| 2 | Indenture, dated as of Dec. 7, 1995, between GM and Citibank as indenture trustee | CUSIP Nos. 370442AT2, 370442AU9, 370442AV7, 370442AZ8, 370442BB0, 370442B16, 370442T74, 370442T66, 370442758, 370442741, 370442733, 370442725, 370442BQ7, 370442BT1, 370442717, 370442BW4, 370442BS3, 370442121, 370442691 |
| 3 | Trust Indenture, dated as of July 1, 1995, between Michigan Strategic Fund and Dai-Ichi Kangyo Trust Company of New York ($58,800,000 Multi-Modal Interchangeable Rate Pollution Control Refunding Revenue Bonds) | CUSIP No. 594693AQ6 |
| 4 | Trust Indenture, dated as of July 1, 1994, between City of Moraine, Ohio and Dai-Ichi Kangyo Trust Company of New York ($12,500,000 Solid Waste Disposal Revenue Bonds) | CUSIP No. 616449AA2 |
| 5 | Indenture of Trust, dated as of July 1, 1999, between City of Moraine, Ohio and Dai-Ichi Kangyo Trust Company of New York ($10,000,000 Solid Waste Disposal Revenue Bonds) | CUSIP No. 616449AB0 |
| 6 | Trust Indenture, dated as of Dec. 1, 2002, among City of Fort Wayne, Indiana, JPMorgan Chase Bank and Bank One Trust Company, N.A., ($31,000,000 Pollution Control Revenue Refunding Bonds) | CUSIP No. 349272AT1 |
| 7 | Trust Indenture, dated as of Mar. 1, 2002, between Ohio Water Development Authority and JPMorgan Chase Bank ($20,040,000 State of Ohio Pollution Control Refunding Revenue Bonds) | CUSIP No. 667596AU2 |
| 8 | Indenture of Trust, dated as of Mar. 1, 2002, between Ohio Water Development Authority and JPMorgan Chase Bank ($46,000,000 State of Ohio Solid Waste Revenue Bonds) | CUSIP No. 67759ABC2 |
| 9 | Trust Indenture, dated as of Apr. 1, 1984, among City of Indianapolis, Indiana, Bankers Trust Company and The Indiana National Bank ($1,400,000 Pollution Control Revenue Bonds) | CUSIP No. 455329AB8 |
| 10 | Fiscal and Paying Agency Agreement, dated as of July 3, 2003, between GM, Deutsche Bank AG London, as fiscal agent and paying agent, and Banque Générale du Luxembourg S.A., as paying agent | ISIN Nos. XS0171942757, XS0171943649 |
| 11 | Fiscal and Paying Agency Agreement, dated as of July 10, 2003, between GM Nova Scotia Finance Company, GM, as guarantor, Deutsche Bank Luxembourg S.A., as fiscal agent and paying agent, and Banque Générale du Luxembourg S.A., as paying agent | ISIN Nos. XS0171922643, XS0171908063 |
| 12 | Bond Purchase and Paying Agreement dated May 28, 1986 between GM and Credit Suisse | Swiss Security No. 876 926 |

---

## Be in the Legal Loop

Legal Notices in The Wall Street Journal.

To advertise, call

**44-20-7842-9600**

or **49-69-971-4280.**

**THE WALL STREET JOURNAL.**
EUROPE

---

Bookshelf / *By Alexander Theroux*

# Urban Ardor, Urban Angst

### Chronic City
*By Jonathan Lethem*
(Doubleday, 467 pages, $27.95)

'My childhood fame had made me impossible to cast, and relieved me of the burden of ambition." This is one of the early confessions of the narrator of "Chronic City," a hapless 40-year-old man named Chase Insteadman who is for no strongly apparent reason drawn deeper and deeper into the "pocket universe" of a New York City—specifically, the Upper East Side—that is as random, antic and oddly peopled as any party that Holly Golightly ever threw.

In a way, Insteadman plays the role of Everyman in "Chronic City," an entertaining novel devoted to a kind of roamy urban sociology. He is even called "Chase Unperson" by one of his friends, as if to point up his role as random *raisonneur*. A former child-actor who lives off the residuals of a long-ago TV show, Insteadman has plenty of time to involve himself with a number of bizarre marginals, both rich and poor.

There is, for instance, the young, cheeky, mysterious, always-black-attired Oona Laszlo, a mercurial ghostwriter. Or the runty, roosterish Richard Abneg, "like a cartoon Communist in his wide-legged charcoal suit," a hip fixer for New York's billionaire mayor. Most notably, there is Insteadman's sweetheart and fiancée, Janice Turnbull, an astronaut on the International Space Station whom we encounter in the book solely through the loving letters she writes to him from beyond the stratosphere.

If this all sounds a bit comic and satirical, it is, though the satire is gentle—these are sweet, if unstable, urban types—and the flaky confusion cannot hide, at times, a portentous Quest for Meaning. The search becomes chronic in Mr. Lethem's focal character, the bohemian Perkus Tooth, a wall-eyed rock critic and rumpled misfit—a "fugitive ecstatic"—who experiences no end of obsessive compulsions and comic "intertextual eurekas" as he collects books, scuffed LPs and rare ceramics. He is disconnected from society, the duke of his own domain. He smokes high-grade marijuana. He wears suits. He lives alone and solely for his heroes, among whom are Norman Mailer, G.I. Gurdjieff, the Russian mystic, and Marlon Brando.

"Chronic City" is, then, a prosopo-graphical investigation of New York City by way of a handful of strange, unclassifiable characters (and some remarkable writing). But it is Tooth's fate that commands the book's attention. He is troubled, and caring for him seems to be inexplicably the self-appointed hobby of all those who know him. "Perkus had thrown a lot of himself, too much, down a rabbit-hole leading into no Wonderland whatsoever," Insteadman says, assessing his friend. What this odd duck represents, if anything, is anyone's guess. I opt for dogged—not rugged—individualism. Perkus Tooth seems to combine two previous Lethem characters: rock journalist Dylan Ebdus in "The Fortress of Solitude," a lonely, confused soul wishing for invisibility, and Lionel Essrog, the protagonist of "Motherless Brooklyn," who with Tourette's Syndrome has his own obsessions, one of them language itself.

Insteadman pursues Tooth and what he "means" as, say, Ishmael does Ahab, though the comparison is extravagant: "Chronic City" has not a jot of the weight of such a classic. There is nothing deeply philosophical at stake in any of these pages. It is mostly whimsy, interrupted by splendidly observed if sardonic evaluations and support-group-like gatherings in 24-hour cafés.

The individual portraits remain the book's best features. There is no urgency to the plot, however, because there is no plot. At best, the arc of the book traces Tooth's brief, varied and not always convincing life. Entire chapters of "Chronic City" could be expunged without changing the book at all. The narration is open-ended, going off in arbitrary directions—at one moment the "embedded" histories of words, at another the questionable drama of a detailed online auction for a rare object.

It is New York City itself, "a puzzletrap for anonymous encounters," that takes pride of place here—or provides the place of pathos. One could draw a street grid from the citations in "Chronic City." And yet it is an unmappable city, too: "Our sphere of the real (call it Manhattan) was riddled with simulations, yet was the world at hand," Insteadman says at one point. "Or the simulation was riddled through with the real. . . . The world was ersatz and actual, forged and fake, by ourselves and unseen others. Daring to attempt to absolutely sort fake from real was a folly that would call down tigers or hiccups to cure us of our recklessness."

That reference to "simulation"—suggesting a surface reality that is not real—is telltale. The work of Thomas Pynchon inevitably comes to mind. Like Mr. Pynchon, Mr. Lethem loves crazy names—we encounter (along with Insteadman and Tooth) Sadie Zapping, Laird Noteless, Rossmoor Danzig and Strabo Blandiana, among many others. Like Mr. Pynchon, Mr. Lethem revels in a goofy, puzzling randomness, as well as in the presentation of enthusiastic arcana. But beneath it all beats a pulse of paranoia. With the narrator, readers of Mr. Lethem's novel travel on a lively and learned odyssey of their own, trying to sort through information, flirting with chaos and running into wing-nuts, oddballs and dead ends.





**Pepper . . . and Salt**
THE WALL STREET JOURNAL

"Well, what do you know — I guess this was my ideal weight."

*Mr. Theroux's latest novel is "Laura Warholic: Or, The Sexual Intellectual" (Fantagraphics).*

---

# The Message of Dollar Disdain

**By Judy Shelton**

Unprecedented spending, unending fiscal deficits, unconscionable accumulations of government debt: These are the trends shaping America's financial future. And since loose monetary policy and a weak U.S. dollar are part of the mix, apparently, it's no wonder people around the world are searching for an alternative form of money in which to calculate and preserve their own wealth.

It may be too soon to dismiss the dollar as an utterly debauched currency. It remains the most used for international transactions and constitutes over 60% of other countries' official foreign-exchange reserves. But the dollar's reputation is being severely compromised.

Funny how words normally used to address issues of morality come to the fore when judging the dollar. Perhaps it's because the U.S. has long represented the virtues of democratic capitalism. To be "sound as a dollar" is to be deemed trustworthy, dependable, and in good working condition.

It used to mean all that, anyway. But as the dollar is increasingly perceived as the default mechanism for out-of-control government spending, its role as a reliable standard of value is destined to fade. Who wants to accumulate assets denominated in a shrinking unit of account? Excess government spending leads to inflation, and inflation plays dollar savers for patsies—both at home and abroad.

A return to sound financial principles in Washington would signal that America still believes it can restore the integrity of the dollar and provide leadership for the global economy. But for all the talk from the Obama administration about needing to exert fiscal discipline—the president's 10-year budget is subtitled "A New Era of Responsibility: Renewing America's Promise"—the projected numbers anticipate a permanent pattern of deficit spending and vastly higher levels of outstanding federal debt.

Even with the optimistic economic assumptions implicit in the Obama administration's budget, it's a mathematical impossibility to reduce debt if you continue to spend more than you take in. Mr. Obama promises to lower the deficit from its current 9.9% of gross domestic product to an average 4.8% of GDP for the years 2010-2014, and an average 4% of GDP for the years 2015-2019. All of this presupposes no unforeseen expenditures such as a second "stimulus" package or additional costs related to health-care reform. But even if the deficit shrinks as a percentage of GDP, it's still a deficit. It adds to the amount of the nation's outstanding indebtedness, which reflects the cumulative total of annual budget deficits.

By the end of 2019, according to the administration, the federal debt will reach $23.3 trillion, compared to $11.9 trillion today. To put it in perspective: U.S. federal debt equalled 61.4% of GDP in 1999; it grew to 70.2% in 2008 (under the Bush administration); it will climb to an estimated 90.4% this year and touch the 100% mark in 2011, after which the projected debt will continue to equal or exceed America's entire annual economic output through 2019.

The U.S. is thus slated to join the ranks of those countries—Zimbabwe, Japan, Lebanon, Jamaica—with the highest government debt-to-GDP ratio (which measures debt against a nation's capacity to repay). In 2008, the U.S. ranked 23rd on the list—crossing the 100% threshold vaults the country into seventh place.

If you were a foreign government, would you increase your holdings of Treasury securities knowing the U.S. has no plans to balance its budget in the next decade, let alone achieve a surplus?

European Union countries wishing to adopt the euro must first limit government debt to 60% of GDP. It's the reference criterion for "soundness and sustainability of public finances." Politicians find it all too tempting to print money—something Europeans have understood since the Weimar Republic—and excessive government borrowing poses a threat to monetary stability.

Valuable lessons also emerge from Japan's unsuccessful experiment with quantitative easing in the aftermath of its ruptured 1980s bubble economy. The Bank of Japan's desperate efforts to fight deflation through a zero-interest rate policy aimed at bailing out zombie companies, along with massive deficit spending, only contributed to a decade of stagnant growth. Japan's government debt-to-GDP ratio escalated to more than 170% now from 65% in 1990.

Over the same period, the yen's use as an international reserve currency went from comprising 10.2% of official foreign-exchange reserves to 3.3% today.

The U.S. has long been the world's "indispensable nation" and the dollar's role in the global economy has likewise seemed to testify to American exceptionalism. But Washington's passivity toward the nation's dismal fiscal future, and its inevitable toll on U.S. economic influence, suggests that American leadership is no longer a priority and that U.S. money cannot be trusted.

If money is a moral contract between government and its citizens, Americans are being violated. The rest of the world, meanwhile, simply wants to avoid being duped. That is why China and Russia—large dollar holders—are angling for some new kind of global currency for denominating reserve assets. It's why oil-producing Gulf States are fretting over whether to continue pricing energy exports in depreciated dollars. It's why central banks around the world are dumping dollars for alternative currencies, even as reduced demand exacerbates the dollar's decline. Until the U.S. sends convincing signals that it believes in a strong dollar—rhetorical assertions ring hollow—the world has little reason to hold dollar-denominated securities.

Sadly, due to the fiscal quagmire, the Federal Reserve may be forced to raise interest rates to draw foreign capital even if it hurts the domestic economy. That's the price of having already succumbed to symbiotic fiscal and monetary policy. If Washington could genuinely commit to private-sector growth by reducing taxes, while significantly cutting future spending, it might be able to turn things around. Under President Reagan, the Fed slashed inflation and strengthened the dollar by dramatically tightening credit. It was a painful process, but the economy ultimately boomed.

Whether the U.S. can once more summon the resolve to address its problems is an open question. But the world's growing dollar disdain conveys a message: Issuing more promissory notes is not the way to renew America's promise.

*Ms. Shelton, an economist, is author of "Money Meltdown: Restoring Order to the Global Currency System" (Free Press, 1994).*

4 THURSDAY, OCTOBER 15, 2009 THE WALL STREET JOURNAL. | 09-50026-mg Doc 10601-3 Filed 07/20/11 Entered 07/20/11 15:49:47 Exhibit C - Cert of Pub - pt 1 Pg 6 of 6 | THE WALL STREET JOURNAL. THURSDAY, OCTOBER 15, 2009 17

# CORPORATE NEWS

## GM expects strong growth in China in 2009

*Sales should rise 47% from a year ago, company says, but end of government incentives could pose problem*

BY PATRICIA JIAYI HO

BEIJING— **General Motors** Co.'s sales in China this year will likely exceed 1.6 million vehicles, said Kevin Wale, president and managing director of GM China Group.

The forecast represents an increase of about 47% from last year, when GM's total vehicle sales in China rose 6.1% to 1.09 million. GM in September forecast its China sales growth would exceed 40% this year.

GM sold 1.29 million vehicles in China in the January-September period this year, up 56% from the same period last year. GM counts sales of Wuling commercial vans, produced by a joint venture of which GM owns a third, as part of its overall sales.

By comparison, **Toyota Motor** Corp.'s sales in China have suffered this year after a failure to anticipate the demand for smaller cars. The Japanese auto maker's China sales from January through August rose 9% from a year earlier to 415,000 vehicles. Toyota has said it seeks to raise its 2009 sales in China slightly from 2008 levels, when its sales rose 17% to 585,000.

Car makers in China have benefited from Beijing's policies to boost sales, including tax incentives for purchases of vehicles with engines of 1.6 liters or smaller, and subsidies to encourage sales of some autos in rural areas. Both policies are set to expire at the end of the year.

GM's sales performance in China could prove especially vulnerable to changes in government policy, as all of the vehicles sold by its Wuling joint venture with **SAIC Motor** Corp. and Wuling Automobile Co. qualify for the small-engine tax cut. Sales by the venture accounted for more than 60% of GM's volume in China in the January-September period.

Mr. Wale said he is confident the Chinese government will take appropriate actions next year to maintain stability in the country's auto market, which is on track to overtake the U.S. as the world's largest car market this year.

Mr. Wale also said demand from smaller cities "should ensure some growth momentum."

GM aims to increase its Chinese sales volume next year at a slightly faster rate than that of the overall auto industry, he said.

Tuesday, GM Chief Executive Frederick "Fritz" Henderson, on his first trip to China since GM emerged from bankruptcy in July, said China plays an increasingly important role in GM's global operations.

Mr. Henderson said Tuesday that GM plans to launch a new Chevrolet Sail by the Lunar New Year in mid-February, designed and developed primarily by the Pan-Asia Technical Automotive Center Co., or Patac, an automotive design and development joint venture between GM and SAIC Motor in Shanghai.

Mr. Henderson said the compact Sail "has been developed for customers in China and has great potential for other customers in emerging markets."

GM said in August that its Wuling joint venture will expand exports of two micro-minivans designed and produced in China, apparently part of a wider strategy to use China as an export hub.

Other auto makers have come up with small no-frills cars targeted at emerging markets. GM's Sail follow such cars as **Ford Motor** Co.'s recently unveiled Figo, to be made in India and exported to South Africa and other countries, as well as **Renault** SA's low-cost Dacia models.

Separately, GM's Thai subsidiary said it has reached an agreement with striking assembly workers that will allow production to resume Thursday, the Associated Press reported.

Its factory in the eastern Thailand seaboard province of Rayong, which makes one-ton pickup trucks and passenger cars, had halted production Oct. 5 when several hundred of its 1,700 workers began striking for higher pay and better conditions.

GM executives have repeatedly extolled China's significance but haven't quantified how much revenue comes from the country.

The China Association of Automobile Manufacturers said Tuesday that vehicle sales from January through September rose 34% from a year earlier to 9.66 million. The association expects overall auto sales for the whole year to exceed 12 million.



◀ General Motors CEO Fritz Henderson at a Chinese dealership in Shanghai

**Speeding up**
GM automobile sales in China
2.0 million
Forecast
1.5
1.0
0.5
0
2003 '04 '05 '06 '07 '08 '09

Source: the company

## Intel quarterly results bolster hopes for PC rebound

BY DON CLARK

**Intel** Corp. served up evidence that the computer market is healthier than many people suspected, reporting third-quarter results that were well above upbeat projections it issued several weeks ago.

The chip giant predicted business conditions will improve even more in the current quarter, including a jump in its closely watched gross profit margin to the highest level since late 2005.

It predicted revenue of about $10.1 billion, up about 7% from the third period.

Intel, maker of the chips that act as electronic brains in personal computers, is seen as an early proxy for changes in PC demand because manufacturers typically stock up on chips to prepare for sales to their customers.

Intel executives said they saw signs of strong purchasing of laptop PCs, led by back-to-school purchases in the U.S. and demand from consumers in China.

The company's third-quarter profit and revenue remained about 8% lower than the same quarter in 2008, before the recession took hold.

But revenue was up 17% from the second quarter, and profit—excluding a $1.45 billion antitrust fine levied by the European Union—was up 77% over the same period.

"It's a nice indication of what we can achieve when the market is co-operating and we are executing well," said Stacy Smith, Intel's chief financial officer, in an interview.

Intel reported income for the period ended Sept. 26 of $1.86 billion, or 33 cents a share, compared to profit in the year-earlier period of $2.01 billion, or 35 cents a share.

Revenue declined to $9.39 billion from $10.22 billion.

Intel in late August predicted that its third-quarter revenue would be about 6% higher than it estimated the prior month, citing improving chip demand. The numbers reported Wednesday were 4% higher than the revised projection, and also higher than analysts' average estimates.

The improvement in profitability was more striking. Intel had projected in August that its second-quarter gross profit margin would be in the upper half of its prior prediction of 53% "plus or minus two percentage points."

Instead, the company said its profit margin hit 57.6%, and projected it would likely rise to 62% in the current quarter. It predicted revenue would rise about 7% from the third period.

"People have been underestimating demand for a long time," said Unni Narayanan, chief executive of Primary Global Research. Among other things, he said, PC makers are placing orders on the expectation that **Microsoft** Corp.'s Windows 7 operating system—to be formally released Oct. 22—will get customers buying.

Paul Otellini, Intel's chief executive officer, told analysts that the company was seeing unit sales of chips for conventional notebook PCs growing at a faster rate than sales of its Atom chip for popular low-end portable computers called netbooks.

Fears that demand for netbooks would cannibalize sales from Intel's more profitable chip lines have dogged the company since last year.

Mr. Otellini also reported strong demand for chips used in server systems, based on a new technology line called Nehalem, despite the sour economy.

In Nasdaq trading midday Wednesday, the shares were up 2.6%, or 54 cents, at $21.03.

"The market had set high expectations for Intel this quarter, and Intel delivered," said Bill Kreher, an analyst at Edward Jones.



**Ups and downs**
Intel's gross profit margin, by quarter

50%
40
30
20
10
0
3Q 4Q 1Q 2Q 3Q
2008     '09

Source: the company

## ASML posts first quarterly profit in year as chip demand rises

BY ARCHIBALD PREUSCHAT

Semiconductor-equipment maker **ASML Holding** NV Wednesday reported a profit in the third quarter after three consecutive quarters of losses, as demand from the chip industry improved after months of underinvestment.

ASML, based in the Netherlands, posted a net profit of €19.7 million ($29.2 million) in the quarter ended Sept. 30, down 73% from a net profit of €73.3 million a year earlier. The company posted a net loss of €104 million in the second quarter.

Sales slipped 20% to €555.3 million from €696.5 million.

ASML Chief Financial Officer Peter Wennink said in an interview posted on the company's Web site that the first half of 2010 looks good, but he added that ASML needs a recovery in the world economy for the second half.

Mr. Wennink said ASML had experienced nine months of underinvestment. There is now higher-than-expected end-demand for chips used in personal computers and wireless phones, Mr. Wennink said, but he cautioned that customers buy new technology to drive down their costs—not to scale up capacity.

The company's order intake in the third quarter was €777 million, and its backlog stood at €1.35 billion as of Sept. 30.

The company expects order intake in the fourth quarter be "at least" level with the third quarter, with net sales of about €550 million and a gross margin of about 37%.

The results beat analyst expectations for net profit of €13.5 million on sales of €526 million, according to a Dow Jones Newswires poll of five analysts.

ASML is the world's largest maker of lithography systems, which map out tiny electronic circuits on silicon wafers. It counts Intel Corp., Samsung Electronics Co. and Taiwan Semiconductor Manufacturing Co. among its customers.

Late Tuesday, Intel—the world's largest semiconductor maker—reported a 7.8% decline in profit but said revenue and gross margin exceeded the company's guidance.

---

# LEGAL NOTICES

## BANKRUPTCIES

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re : Chapter 11 Case No.
MOTORS LIQUIDATION COMPANY : 09-50026 (REG)
f/k/a GENERAL MOTORS CORPORATION, et al.,
    Debtors. : (Jointly Administered)

**NOTICE OF DEADLINES FOR FILING PROOFS OF CLAIM (INCLUDING CLAIMS UNDER SECTION 503(b)(9) OF THE BANKRUPTCY CODE)**

TO ALL PERSONS AND ENTITIES WITH CLAIMS (INCLUDING CLAIMS UNDER SECTION 503(b)(9) OF THE BANKRUPTCY CODE) AGAINST A DEBTOR SET FORTH BELOW:

| Name of Debtor | Case Number | Tax Identification Number | Other Names Used by Debtors in the Past 8 Years |
|---|---|---|---|
| Motors Liquidation Company (f/k/a General Motors Corporation) | 09-50026 | 38-0572515 | General Motors Corporation, GMC Truck Division, NAO Fleet Operations, GM Corporation, GM Corporation-GM Auction Department, National Car Rental, National Car Sales, Automotive Market Research |
| MLCS, LLC (f/k/a Saturn, LLC) | 09-50027 | 38-2577506 | Saturn, LLC, Saturn Motor Car Corporation, GM Saturn Corporation, Saturn Corporation of Delaware |
| MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation) | 09-50028 | 38-2755764 | Saturn Distribution Corporation |
| MLC of Harlem, Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc. | 09-13558 | 20-1426707 | Chevrolet-Saturn of Harlem, Inc., CKS of Harlem |

**PLEASE TAKE NOTICE THAT**, on September 16, 2009, the United States Bankruptcy Court for the Southern District of New York (the "**Court**"), having jurisdiction over the chapter 11 cases of Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession (collectively, the "**Debtors**") entered an order (the "**Bar Date Order**") establishing (i) **November 30, 2009, at 5:00 p.m. (Eastern Time)** as the last date and time for each person or entity (including, without limitation, individuals, partnerships, corporations, joint ventures, and trusts) to file a proof of claim ("**Proof of Claim**") based on prepetition claims, including a claim under section 503(b)(9) of the Bankruptcy Code, as described more fully below (a "**503(b)(9) Claim**"), against any of the Debtors (the "**General Bar Date**") and (ii) **November 30, 2009, at 5:00 p.m. (Eastern Time)** as the last date and time for each governmental unit (as defined in section 101(27) of the Bankruptcy Code) to file a Proof of Claim based on prepetition claims against any of the Debtors (the "**Governmental Bar Date**"), and, together with the General Bar Date, the "**Bar Dates**").

The Bar Date Order, the Bar Dates and the procedures set forth below for the filing of Proofs of Claim apply to all claims against the Debtors (other than those set forth below as being specifically excluded) that arose prior to **June 1, 2009**, the date on which the Debtors commenced their cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

**If you have any questions relating to this Notice, please feel free to contact AlixPartners at 1-800-414-9607 or by e-mail at claims@motorsliquidation.com. In addition, you may contact the Official Committee of Unsecured Creditors through its website at www.motorsliquidationcreditorscommittee.com or at 1-212-715-3275.**

YOU SHOULD CONSULT AN ATTORNEY IF YOU HAVE ANY QUESTIONS, INCLUDING WHETHER YOU SHOULD FILE A PROOF OF CLAIM.

**1. WHO MUST FILE A PROOF OF CLAIM**
You **MUST** file a **Proof of Claim** to vote on a chapter 11 plan filed by the Debtors or to share in any of the Debtors' estates if you have a claim that arose prior to **June 1, 2009**, including a 503(b)(9) Claim, and it is not one of the other types of claims described in Section 2 below. Acts or omissions of the Debtors that arose before **June 1, 2009** may give rise to claims against the Debtors that must be filed by the applicable Bar Date, notwithstanding that such claims may not have matured or become fixed or liquidated or certain prior to **June 1, 2009**.

Pursuant to section 101(5) of the Bankruptcy Code and as used in this Notice, the word "claim" means: (a) a right to payment, whether or not such right is reduced to judgment, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. Further, claims include unsecured claims, secured claims, priority claims, and 503(b)(9) Claims (as defined in Section 2(d) below).

**2. WHO NEED NOT FILE A PROOF OF CLAIM**
You need not file a Proof of Claim if:
(a) Your claim is listed on the Schedules (as defined below) and (i) is **not** described in the Schedules as "disputed", "contingent", or "unliquidated", (ii) you do **not** dispute the amount or nature of the claim set forth in the Schedules, and (iii) you do **not** dispute that the claim is an obligation of the specific Debtor against which the claim is listed on the Schedules;
(b) Your claim has been paid in full;
(c) You hold an interest in any of the Debtors, which interest is based exclusively upon the ownership of common or preferred stock, membership interests, partnership interests, or warrants or rights to purchase, sell or subscribe to such a security or interest; **provided, however**, that interest holders who wish to assert claims (as opposed to ownership interests) against any of the Debtors that arise out of or relate to the ownership or purchase of an interest, including claims arising out of or relating to the sale, issuance, or distribution of the interest, must file Proofs of Claim on or before the applicable Bar Date, unless another exception identified herein applies;
(d) You hold a claim allowable under sections 503(b) and 507(a)(2) of the Bankruptcy Code as an administrative claim; **provided, however, 503(b)(9) Claims are subject to the General Bar Date as provided above**. Section 503(b)(9) provides in part: "... there shall be allowed administrative expenses...including...(9) the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business." **Accordingly, if you have a 503(b)(9) Claim, you must file a Proof of Claim on or before the General Bar Date**;
(e) You hold a claim that has been allowed by an order of the Court entered on or before the applicable Bar Date;
(f) You hold a claim against any of the Debtors for which a separate deadline is fixed by the Court (whereupon you will be required to file a Proof of Claim by that separate deadline);
(g) You are a Debtor in these cases having a claim against another Debtor;
(h) You are an affiliate (as defined in section 101(2) of the Bankruptcy Code) of any Debtor as of the Bar Date;
(i) You hold a claim for which you have already properly filed a Proof of Claim against any of the Debtors with the Clerk of the Court or The Garden City Group, Inc., the Debtors' claims agent, utilizing a claim form that substantially conforms to the Proof of Claim Form (as defined below) or Official Form 10; or
(j) You hold a claim that is limited exclusively to the repayment of principal, interest and other fees and expenses on or under any agreements (a "**Debt Claim**") governing any debt security issued by any of the Debtors pursuant to an indenture (together, the "**Debt Instruments**") if the indenture trustee or similar fiduciary under the applicable indenture or fiscal and paying agency agreement files a Proof of Claim against the applicable Debtor, on or before the Bar Date, on account of all Debt Claims against such Debtor under the applicable Debt Instruments, **provided, however**, that any holder of a Debt Claim wishing to assert a claim arising out of or relating to a Debt Instrument, other than a Debt Claim, shall be required to file a Proof of Claim with respect to such claim on or before the Bar Date, unless another exception identified herein applies. Debt Instruments include those agreements listed at the end of this Notice.

**YOU SHOULD NOT FILE A PROOF OF CLAIM IF YOU DO NOT HAVE A CLAIM AGAINST THE DEBTORS.**

**3. EXECUTORY CONTRACTS AND UNEXPIRED LEASES**
If you hold a claim arising from the rejection of an executory contract or unexpired lease, you must file a Proof of Claim based on such rejection by the later of (i) the applicable Bar Date, and (ii) the date which is **thirty days** following the entry of the order approving such rejection or you will be forever barred from doing so. Notwithstanding the foregoing, if you are a party to an executory contract or unexpired lease and you wish to assert a claim on account of unpaid amounts accrued and outstanding as of June 1, 2009 pursuant to that executory contract or unexpired lease (other than a rejection damages claim), you must file a Proof of Claim for such amounts on or before the applicable Bar Date unless an exception identified above applies.

**4. WHEN AND WHERE TO FILE**
All Proofs of Claim must be filed so as to be **actually received** on or before the applicable Bar Date at the following address:

| If by overnight courier or hand delivery to: | If by first-class mail, to: |
|---|---|
| The Garden City Group, Inc. Attn: Motors Liquidation Company Claims Processing 5151 Blazer Parkway, Suite A Dublin, Ohio 43017 | The Garden City Group, Inc. Attn: Motors Liquidation Company Claims Processing P.O. Box 9386 Dublin, Ohio 43017-4286 |

Or if by hand delivery to:
United States Bankruptcy Court, SDNY
One Bowling Green, Room 534
New York, New York 10004

Proofs of Claim will be deemed timely filed only if **actually received** by The Garden City Group, Inc. or the Court on or before the applicable Bar Date. Proofs of Claim may **not** be delivered by facsimile, telecopy, or electronic mail transmission.

**5. WHAT TO FILE**
If you file a Proof of Claim, your filed Proof of Claim must: (i) be written in the English language; (ii) be denominated in lawful currency of the United States; (iii) conform substantially to the Official Bankruptcy Form No. 10 ("**Proof of Claim Form**"); (iv) state the Debtor against which it is filed; (v) set forth with specificity the legal and factual basis for the alleged claim; (vi) include supporting documentation or an explanation as to why such documentation is not available; and (vii) be **signed** by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant.

IF YOU ARE ASSERTING A CLAIM AGAINST MORE THAN ONE DEBTOR, SEPARATE PROOFS OF CLAIM MUST BE FILED AGAINST EACH SUCH DEBTOR AND YOU MUST IDENTIFY ON YOUR PROOF OF CLAIM THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED AND THE CASE NUMBER OF THAT DEBTOR'S BANKRUPTCY CASE. A LIST OF THE NAMES OF THE DEBTORS AND THEIR CASE NUMBERS IS SET FORTH ABOVE.

Additional Proof of Claim Forms may be obtained at www.uscourts.gov/bkforms/ or www.motorsliquidation.com.

YOU SHOULD ATTACH TO YOUR COMPLETED PROOF OF CLAIM COPIES OF ANY WRITINGS UPON WHICH YOUR CLAIM IS BASED. IF THE DOCUMENTS ARE VOLUMINOUS, YOU SHOULD ATTACH A SUMMARY.

**6. CONSEQUENCES OF FAILURE TO FILE A PROOF OF CLAIM BY THE APPLICABLE BAR DATE**
Except with respect to claims of the type set forth in Section 2 above, any creditor who fails to file a Proof of Claim on or before the applicable Bar Date in the appropriate form in accordance with the procedures described in this Notice for any claim such creditor holds or wishes to assert against each of the Debtors, will be forever barred – that is, forbidden – from asserting the claim against each of the Debtors and their respective estates (or filing a Proof of Claim with respect to the claim), and each of the Debtors and their respective chapter 11 estates, successors, and property will be forever discharged from any and all indebtedness or liability with respect to the claim, and the holder will be not be permitted to vote to accept or reject any chapter 11 plan filed in these chapter 11 cases, participate in any distribution in any of the Debtors' chapter 11 cases on account of the claim, or receive further notices with respect to any of the Debtors' chapter 11 cases.

**7. THE DEBTORS' SCHEDULES, ACCESS THERETO, AND CONSEQUENCES OF AMENDMENT THEREOF**
You may be listed as the holder of a claim against one or more of the Debtors in the Debtors' Schedules of Assets and Liabilities and/or Schedules of Executory Contracts and Unexpired Leases (collectively, the "**Schedules**"). If you rely on the Debtors' Schedules, it is your responsibility to determine that the claim is accurately listed in the Schedules.

As set forth above, if you agree with the classification and amount of your claim as listed in the Debtors' Schedules, and if you do not dispute that your claim is only against the specified Debtor, and if your claim is not described as "disputed", "contingent", or "unliquidated", you need not file a Proof of Claim. Otherwise, or if you decide to file a Proof of Claim, you must do so before the Bar Date in accordance with the procedures set forth in this Notice.

Copies of the Schedules may be examined by interested parties on the Court's electronic docket for the Debtors' chapter 11 cases, which is posted on the Internet at www.motorsliquidation.com and www.nysb.uscourts.gov (a PACER login and password are required and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov). Copies of the Schedules may also be examined by interested parties between the hours of 9:00 a.m. and 4:30 p.m. (Eastern Time) at the office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 511, New York, New York 10004. Copies of the Debtors' Schedules may also be obtained by written request to the Debtors' claims agent at the address and telephone number set forth below:
    The Garden City Group, Inc., Attn: Motors Liquidation Company,
    P.O. Box 9386, Dublin, Ohio 43017-4286, 1-703-286-6401

In the event that the Debtors amend their Schedules to (a) designate a claim as disputed, contingent, unliquidated, or undetermined, (b) change the amount of a claim reflected therein, (c) change the classification of a claim reflected therein, or (d) add a claim that was not listed on the Schedules, the Debtors will notify you of the amendment. In such case, the deadline for you to file a Proof of Claim on account of any such claim is the later of (a) the applicable Bar Date and (b) the date that is **thirty days** after the Debtors provide notice of the amendment.

A holder of a possible claim against the Debtors should consult an attorney regarding any matters not covered in this Notice, such as whether the holder should file a Proof of Claim.

DATED: September 16, 2009
New York, New York
BY ORDER OF THE COURT
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Attorneys for Debtors and Debtors in Possession

**Certain Debt Instruments**

| | Debt Instrument | CUSIP, ISIN, or Swiss Security Numbers |
|---|---|---|
| 1 | Indenture, dated as of Nov. 15, 1990, between GM and Citibank as indenture trustee | CUSIP Nos. 370442AN5, 370442AJ4, 370442AR6, 37045EAG3, 37045EAS7 |
| 2 | Indenture, dated as of Dec. 7, 1995, between GM and Citibank as indenture trustee | CUSIP Nos. 370442AT2, 370442AU9, 370442AV7, 370442AZ8, 370442BB0, 370442AX6, 370442AT4, 370442AY6, 370442BS8, 370442BW4, 370442BS3, 370442AY1, 370442AQ1 |
| 3 | Trust Indenture, dated as of July 1, 1995, between Michigan Strategic Fund and Dai-Ichi Kangyo Trust Company of New York ($58,800,000 Multi-Modal Interchangeable Rate Pollution Control Refunding Revenue Bonds) | CUSIP No. 594693AQ6 |
| 4 | Indenture of Trust, dated as of July 1, 1994, between City of Moraine, Ohio and Dai-Ichi Kangyo Trust Company of New York ($12,500,000 Solid Waste Disposal Revenue Bonds) | CUSIP No. 616449AA2 |
| 5 | Indenture of Trust, dated as of July 1, 1999, between City of Moraine, Ohio and Dai-Ichi Kangyo Trust Company of New York ($10,000,000 Solid Waste Disposal Revenue Bonds) | CUSIP No. 616449AB0 |
| 6 | Trust Indenture, dated as of Dec. 1, 2002, among City of Fort Wayne, Indiana, JPMorgan Chase Bank and Bank One Trust Company, N.A., ($31,000,000 Pollution Control Revenue Refunding Bonds) | CUSIP No. 349272AT1 |
| 7 | Trust Indenture, dated as of Mar. 1, 2002, between Ohio Water Development Authority and JPMorgan Chase Bank ($20,040,000 State of Ohio Pollution Control Refunding Revenue Bonds) | CUSIP No. 667596AU2 |
| 8 | Indenture of Trust, dated as of Dec. 1, 2002, between Ohio Water Development Authority and JPMorgan Chase Bank ($46,000,000 State of Ohio Solid Waste Revenue Bonds) | CUSIP No. 67759ABC2 |
| 9 | Trust Indenture, dated as of Apr. 1, 1984, among City of Indianapolis, Indiana, Bankers Trust Company and The Indiana National Bank ($1,400,000 Pollution Control Revenue Bonds) | CUSIP No. 455329AB8 |
| 10 | Fiscal and Paying Agency Agreement, dated as of July 3, 2003, between GM, Deutsche Bank AG London, as fiscal agent and paying agent, and Banque Générale du Luxembourg S.A., as paying agent | ISIN Nos. XS0171942757, XS0171943649 |
| 11 | Fiscal and Paying Agency Agreement, dated as of July 10, 2003, between GM Nova Scotia Finance Company, GM, as guarantor, Deutsche Bank Luxembourg S.A., as fiscal agent and paying agent, and Banque Générale du Luxembourg S.A., as paying agent | ISIN Nos. XS0171922643, XS0171908063 |
| 12 | Bond Purchase and Paying Agency Agreement dated May 28, 1986 between GM and Credit Suisse | Swiss Security No. 876 926 |



# Be
in the
Legal Loop

Legal Notices
in
The Wall Street Journal.

To advertise, call
(852) 2831-2553
or (65) 6415-4279.

**THE WALL STREET JOURNAL.**
ASIA