Hearing Date and Time:  September 26, 2011 at 9:45 a.m. (Prevailing Eastern Time)

Timothy F. Nixon
Katherine Stadler (*Pro Hac Vice*)
GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Telephone: (414) 273-3500
Facsimile: (414) 273-5198

*Attorneys for Fee Examiner*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x
                          :

In re:                               :      Chapter 11
                          :

MOTORS LIQUIDATION COMPANY, *et al.,*  :      Case No. 09-50026
     f/k/a General Motors Corp., *et al.,*        :      (Jointly Administered)
                          :

            Debtors.            :      Honorable Robert E. Gerber
                          :
-------------------------------------------------------- x

### <u>FEE EXAMINER'S LIMITED OBJECTION TO HOURLY RATE INCREASES</u>

       The Fee Examiner by his counsel, Godfrey & Kahn, S.C., objects to the hourly rate

increases, whether unjustified or unjustifiable, reflected on the final fee applications (including

the fees not yet approved on an interim basis) scheduled for hearing on September 26, 2011.

       In support of the objection, the Fee Examiner asserts that there is no substantive basis in

the record for the significant hourly rate increases imposed in the 22 months of these proceedings

and that unjustified or unjustifiable increases are not reasonable under the U.S. Bankruptcy

Code, especially in light of the prevailing conditions in 2009 and 2010 in the market for legal

services.  To further support this objection, the Fee Examiner submits the accompanying

affidavit of Andrew Dalton and states that:

## STATEMENT OF FACTS AND ISSUES

1.       The Court confirmed the Debtors' amended plan of reorganization on March 29, 2011, requiring the submission of final fee applications on or before May 16, 2011.  The plan provided as well that the professional services subject to review and final Court approval would be the services provided to the Debtors between the Petition Date, June 1, 2009, through the Confirmation Date, March 29, 2011.

2.       By the week of June 1, 2011, a total of 25 Retained Professionals had submitted final fee applications for review and approval, totaling $107,619,087.12 in fees and $3,251,401.16 in expenses for a combined total of $110,870,488.28.[1]  The Court also has received two applications for compensation under 11 U.S.C. § 503(b), which the Fee Examiner is reviewing.

3.       The final fee applications included, by informal stipulation, unapproved and unreviewed fees and expenses for the period from October 1, 2010 to March 29, 2011.  In the interests of economy and efficiency, the Retained Professionals and the Fee Examiner had agreed that the fees and expenses for that time period, which otherwise would have been the subject of interim applications (for the fifth and sixth interim fee periods), would be deferred and combined with the final fee applications.

4.       In the meantime, the Retained Professionals continued to receive 80 percent of the invoiced amounts for fees and 100 percent of the invoiced amounts for expenses pursuant to the Court's August 7, 2009 *Order Pursuant to §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* (the "**Interim Compensation Order**") [Docket No. 3711].

---

[1] This total does not include the amounts ($698,278.01) requested under section 503(b).  Nor does it include the two final fee applications the Court already has approved: Alan Chappell ($72,900) [Docket No. 5751] and PricewaterhouseCoopers ($1.9 million) [Docket No. 8613].

5.      From the Petition Date to the Confirmation Date, hourly rate increases account for at least $3 million in professional compensation.  Those hourly rate increases are concentrated in several firms and, within those firms, in several categories.[2]

A.      For example, 10 associates at three firms accounted for more than $1.3 million of the total amount attributable to hourly rate increases by all 21 Retained Professionals providing legal services.

B.      At least six Retained Professionals, in contrast, have not sought compensation for any hourly rate increases.

6.      The burden of proof to justify the reasonableness of any hourly rate increase, like the burden of proof for every other element of compensation sought pursuant to 11 U.S.C. §§ 327-330, rests with the applicant.  *See In re Northwest Airlines Corp.*, 400 B.R. 393, 398 (Bankr. S.D.N.Y. 2009) ("Under Section 330(a), '[t]he applicant bears the burden of proof on its claim for compensation.'"); *see also* 11 U.S.C. § 330(a)(2) ("The court may, on its own motion or on the motion of the United States Trustee ... or any other party in interest, award compensation that is less than the amount of compensation that is requested.").

7.      The award of interim compensation is always provisional, subject to a final fee application, review, objection and, in turn, final approval by the Court on notice and a hearing. *See*, *e.g.*, *In re Fibermark, Inc.*, 349 B.R. 385, 403 (Bankr. D. Vt. 2006).

8.      On November 23, 2010, the Court in a bench decision required applicants to give notice of prospective increases in hourly rates for professionals [Docket No. 7896].

A.      The Court did not address, nor was it asked to address, the reasonableness of the hourly rate increases to date as part of its section 330 review—an issue repeatedly reserved here.  *See*, *e.g.*, *In re Teraforce Tech. Corp.*, 347 B.R. 838, 860 (Bankr. N.D. Tex. 2006); *In re*

---

[2] The Fee Examiner will not object to hourly rate increases that have a nominal financial effect on the estates.

*Hale-Halsell Co.*, 391 B.R. 459, 462 (Bankr. N.D. Okla. 2008); *In re Lee Tractor Co.*,

No. 07-3928, 2008 WL 2788413, at *2 (Bankr. E.D.N.C. July 16, 2008) (not reported).

B.      That reasonableness inquiry is always timely because each application

embodies an hourly rate that either has been or could have been increased (or decreased), and the

increases over time—both from application to application and from the outset of these cases to

their conclusion—have significant financial impact.

9.      With isolated exceptions, none of the Retained Professionals provided any

detailed or substantive explanation for the significant hourly rate increases imposed over the

course of these proceedings—neither in the four interim period applications nor in the final fee

applications.

10.      Any explanation offered by Retained Professionals, even retrospectively, to

attempt to justify the reasonableness of significant hourly rate increases would be measured

against evidence presumptively establishing that significant increases are not reasonable:

A.      The comparative data from this proceeding demonstrating that some

Retained Professionals increased hourly rates nominally if at all.  *See* Affidavit of W. Andrew

Dalton ("Dalton Aff."), ¶ 34.

B.      The comparative data demonstrating that increases were not consistently

"class by class" or based on justifiable firm-wide or practice group increases that did not vary

from other practice group increases.  *See id.*, ¶ 37; *see generally*, *id.*, ¶ 30, Ex. C.

C.      The publicly-reported surveys that reflect, at most, nominal hourly rate

increases among the largest firms in the largest markets and sustained resistance by valued

corporate clients to rate increases in general.  *See id.*, ¶¶ 17-20.

D.    The virtual certainty in these cases that approved professional fees would be paid in full with no risk of administrative insolvency.

11.    Blended hourly rate totals cannot be the sole measure of the reasonableness of hourly rate increases.  The blended rate calculations incorporate a variety of factors, including the assignment and work allocation practices of a firm.  A constant or declining blended hourly rate may reflect sound work allocation—with associates doing more work, especially after the initial stages of a Chapter 11—but it is not a justification for significant hourly rate increases.

12.    Hourly rate increases, especially of the magnitude here, are necessarily evaluated on their own—by firm and, within a firm, timekeeper-by-timekeeper.  Even if selected hourly rate increases are justifiable (and, accordingly, are found reasonable), the blended hourly rate and, more importantly, the cost to the estates still would be significantly reduced because, individually and in the aggregate, all of the hourly rate increases are not reasonable.

13.    It is not only a firm's blended hourly rate that must satisfy the reasonableness standard but the hourly rate and hourly rate increases of each professional or paraprofessional within the firm.  *E.g.*, *In re Weaver*, 336 B.R. 115, 123 (Bankr. W.D. Tex. 2005) (rejecting a rate increase for general case administration services as "inappropriate"); *In re Computer Learning Centers, Inc.*, 285 B.R. 191, 217 (Bankr. E.D. Va. 2002) (applying different rates to a retained professional's accounting and consulting services); *In re C-N-D Indus., Inc.*, No. 10-62363, 2011 WL 2263794 (Bankr. N.D. Ohio, June 6, 2011) (hourly rate in excess of the prevailing "community" rate is unreasonable).

14.    The financial effect of the hourly rate increases are obviously concentrated in 2010, totaling nearly $2.4 million.  Several Retained Professionals began increasing hourly rates near the outset of the proceeding (on September 1, 2009, just three months after the Petition

Date) and continued regular increases through the first quarter of 2011, effectively terminating

only with the Confirmation Date.  Some firms did not increase hourly rates for 2011; some did.

15.    In his December 9, 2010 report [Docket No. 8052], the Fee Examiner notified all

of the Retained Professionals that he intended to recommend a deduction to compensate for

hourly rate increases that could not be justified.  The issue of hourly rate increases was

highlighted as well in the September 20, 2010 report [Docket No. 7009] and, most recently, in

the July 25, 2011 status report on the fee review process [Docket No. 10617].

16.    The Fee Examiner has filed this objection five weeks before the fee objection

deadline and eight weeks before the final fee hearing to provide the Retained Professionals with

a final opportunity to provide evidence establishing the reasonableness of their hourly rate

increases, timekeeper-by-timekeeper and within the firm and the prevailing markets as a whole.[3]

### RELIEF REQUESTED

WHEREFORE, the Fee Examiner asks that the Court deny compensation for hourly rate

increases that are neither justified nor justifiable and, accordingly, are not reasonable.

---

[3] *See*, *e.g.*, *In re Ames Dep't Stores*, 76 F.3d 66, 71-72 (2d Cir. 1996), overruled in part by *Lamie v. United States Tr.*, 540 U.S. 526 (2004) (adopting a "market-driven" approach, based on the Bankruptcy Code, to any review for reasonableness); *In re Busy Beaver Building Centers*, 19 F.3d 833, 849 (3d Cir. 1994) ("the principal emphasis [in a market-driven analysis is] on the cost of comparable services (market rates)"); *In re Motors Liquidation Company*, No. 09-50026, Tr. of PM Hr'g, at 29:10-11 (Bankr. S.D.N.Y. Apr. 29, 2010) (Gerber, J.) [Docket No. 5699] ("In general, at least, lawyer's fees are set in the marketplace.").

Dated:  Madison, Wisconsin
        August 5, 2011.

GODFREY & KAHN, S.C.

By:      *s/Katherine Stadler*
         Timothy F. Nixon (TN 2644)
         Katherine Stadler (KS 6831)

         GODFREY & KAHN, S.C.
         780 North Water Street
         Milwaukee, Wisconsin 53202
         Telephone: (414) 273-3500
         Facsimile: (414) 273-5198
         E-mail: tnixon@gklaw.com
                 kstadler@gklaw.com

         *Attorneys for the Fee Examiner*

6658488_1

# ATTACHMENT
# Fee Examiner's Limited Objection to Hourly Rate Increases

## <u>Affidavit of W. Andrew Dalton</u>

Hearing Date and Time:  September 26, 2011 at 9:45 a.m. (Prevailing Eastern Time)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x
                                                          :
In re:                                                    :      Chapter 11
                                                          :
MOTORS LIQUIDATION COMPANY, *et al.,*   :      Case No. 09-50026
     f/k/a General Motors Corp., *et al.,*             :      (Jointly Administered)
                                                          :
                     Debtors.                            :      Honorable Robert E. Gerber
                                                          :
-------------------------------------------------------- x


**AFFIDAVIT OF ANDREW DALTON IN SUPPORT OF**
**FEE EXAMINER'S LIMITED OBJECTION TO HOURLY RATE INCREASES**


STATE OF MISSOURI          )
                                           ) ss:
COUNTY OF ST. LOUIS      )


W. Andrew Dalton, being duly sworn and on oath, states that:

1.      I am Vice President and Director of Legal Audit at Stuart Maue, Ltd. ("**Stuart Maue**").

2.      Stuart Maue is a legal auditing and bill review firm at 3840 McKelvey Road, St. Louis, Missouri, 63044, that employs licensed attorneys, accountants, and IT personnel. Stuart Maue is not engaged in the practice of law.

3.      Stuart Maue has been retained in these matters—now, by the post-plan confirmation Debtors—to provide services to the Fee Examiner and his counsel in reviewing interim and final fee applications for compensation and reimbursement of expenses.

4.      I have been employed at Stuart Maue since 2006.   Prior to my work there, I worked in the Legal Audit Group of Meckler, Bulger & Tilson, a law firm in Chicago, for approximately four years.

5.    As the Director of Legal Audit, I supervise a staff of attorneys and accountants who conduct retrospective fee audits, monthly and quarterly invoice review, and bankruptcy fee examination services.  The fees subject to review by Stuart Maue exceed $250 million annually.

6.    I have a law degree from Emory University, and I am admitted to practice in the states of Georgia and Illinois.

### Stuart Maue Experience

7.    Stuart Maue provides legal auditing and litigation management services to a variety of corporations, including insurance companies.  In this capacity, Stuart Maue performs a monthly or quarterly review of legal fees and expenses incurred by these clients, regularly consulting with clients regarding a range of cost control measures, including billing guidelines, budgets, staffing, and hourly rates.

8.    Stuart Maue also has been appointed fee examiner and/or consultant to fee committees in a series of significant Chapter 11 proceedings, including but not limited to:  *In re Tribune Company, et al., No. 08-13141 (Bankr. D. Del.)*; *In re Merisant Worldwide, Inc., et al.*, No. 09-10059 (Bankr. D. Del.); *In re Stone & Webster, Incorporated, et al.*, No. 00-2142 (Bankr. D. Del.); and *In re Kmart Corporation, et al.*, No. 02-B02474 (Bankr. N.D. Ill.).

9.    While few cases are literally comparable to these proceedings, in size or nature, Stuart Maue does have a substantial breadth of experience on fee issues in complex and sophisticated matters.  Most recently, its ongoing engagement in the Tribune Company Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware has involved the review of more than $150 million in fees.

*Services Provided in These Proceedings*

10.      On January 29, 2010, pursuant to the Fee Examiner Order, the Fee Examiner

submitted the *Fee Examiner's Application to Authorize the Limited Retention and Employment of*

*the Stuart Maue Firm as Consultant to the Fee Examiner as of January 22, 2010* [Docket No.

4910] (the "**Retention Application**").  On February 17, 2010, this Court entered an order

authorizing the limited engagement of Stuart Maue [Docket No. 5005] (the "**Limited Retention**

**Order**") for the purpose of assisting in the analysis of the fees and expenses requested in the first

interim fee applications of a limited group of case professionals.

11.      On April 5, 2010, the Fee Examiner submitted the *Fee Examiner's Application to*

*Authorize the Extended Retention and Employment of the Stuart Maue Firm as Consultant to the*

*Fee Examiner as of March 8, 2010* [Docket No. 5431] (the "**Extended Retention Application**").

The Extended Retention Application sought, among other things, authorization for Stuart Maue

to assist the Fee Examiner in the review of only those additional fee applications the Fee

Examiner determined warranted Stuart Maue's analysis.

12.      On April 29, 2010, this Court provisionally approved the Extended Retention

Application through the second set of interim fee applications, then set for hearing on June 29,

2010.  On June 29, this Court authorized the continued retention of Stuart Maue for one

additional fee period for the limited purpose of analyzing the third interim fee applications of

certain selected case professionals.[1]

---

[1] Stuart Maue assisted the Fee Examiner and his counsel with the analysis of one interim fee application in the fourth interim compensation period.  Stuart Maue incurred $13,300.00 in fees for work related to the fourth interim fee application of Weil Gotshal & Manges LLP (June 1, 2010 to September 30, 2010) and billed those costs directly to counsel for the Fee Examiner, which paid them.

3

13.    Based on my review of a list of parties-in-interest and professionals connected

with these chapter 11 cases,[2] to the best of my knowledge, information and belief, neither I nor

any employee or representative of Stuart Maue has any relationship with: (i) the Debtors;

(ii) their creditors or equity security holders; (iii) any other parties-in-interest; (iv) the respective

attorneys and accountants of any of the foregoing; or (v) the United States Trustee or any person

employed in the Office of the U.S. Trustee in any matter relating to these cases—except that

Stuart Maue has provided or is providing legal auditing services, including in other bankruptcy

proceedings, and in that capacity has analyzed or is analyzing fees and expenses of certain listed

case professionals here.

### *Economic Impact on Hourly Rates*

14.    As a general matter, professionals increase hourly rates to coincide with some

event, such as the beginning of a firm's fiscal year, or a timekeeper's promotion to a new

position, or an anniversary date of employment.

15.    When increasing their hourly rates, professionals can and do choose to seek those

increases in a variety of ways—simultaneously on all of a firm's clients, on all of a firm's clients

within a practice area, or on a single client.

16.    The national economic crisis, beginning in the summer and fall of 2008, has

curtailed a long period of rate increase discretion, however, significantly limiting the hourly rate

increases imposed by legal professionals.

17.    Since the commencement of these proceedings, on June 1, 2009, much has been

written about the very limited extent to which firms have increased their hourly rates, if at all,

---

[2] The complete list of Debtors, creditors, parties-in-interest, and attorneys is attached as Exhibit A to *Affidavit of James P. Quinn in Support of Order Authorizing the Appointment and Employment of Stuart Maue as Consultant to the Fee Examiner* [Docket No. 4910].

since the beginning of 2009.  In summarizing its national survey last fall of the nation's 250

largest law firms, the *National Law Journal* reported:

> Billing rates continued to climb in 2010—but only by a fraction of the rate they
> grew during the boom years of the mid-2000s.
>
> The average firmwide billing rate—a combination of associate and partner rates—
> increased by 2.7% in 2010 . . . . It's the second straight year of growth rates less
> than 3%, which is a far cry from the standard 6% to 8% increases from 2004 until
> 2008 and just slightly higher than the rate of inflation.

•   •   •

> The current slide in rate growth started in 2008, when the average firmwide
> increase was 4.3%, compared to 7.7% in 2007.  Growth has slowed even further
> in the past two years, and the average firmwide billing rate is now $385, up just
> $10 from 2009.

Karen Sloan, *Billing Blues*, Nat'l Law Journal (Dec. 6, 2010).   In the same survey the previous

year, the *National Law Journal* reported similar trends.  *See* Sloan, *Reality Dawns on Hourly*

*Rates*, Nat'l Law Journal (Dec. 7, 2009) (77 percent of 142 firms responding reporting that they

would raise rates by 5 percent or less in 2010).

18.    Other surveys reflect the same finding.  In the last two years, given the recession,

rate increases at large law firms have been very small.  *See* Thomas S. Clay and Eric A. Seeger,

*2011: Law Firms in Transition, An Altman Weil Flash Survey* (2011) (reporting survey data

from 805 law firms—all of which had 50 or more lawyers—and noting that median rate

increases in 2011 are expected to be four percent, compared to a three percent median increase in

2010) (cited with permission);  *The New Normal*, American Lawyer (Dec. 1, 2010) (reporting

*American Lawyer* survey data from country's 200 largest law firms, 90 percent of which reported

that they would raise rates by 5 percent or less in 2011); Molly McDonough, *Billing Rates*

*Projected to Increase 3.2% in 2010*, A.B.A. Journal (Dec. 1, 2009).

19.     The survey results are not surprising.  In the face of the recession, major institutional clients, faced with macro- and micro-economic pressures, consistently resisted hourly rate increases for legal services and, increasingly, asked professionals to eliminate any hourly rate increases or to discount their hourly rates or total amounts charged.  Many large firms complied.  *See 2010 Billing Rates, An Altman Weil Flash Survey* ("representative comments" from law firms responding to a survey regarding rates changes for 2010 included "[w]e are finding it very difficult to get any rate changes from most of our clients" and "[m]ost clients are not honoring rate increases in 2010, just like 2009") (quoted with permission).

20.     Given the economic climate, some professionals have chosen to discount their rates in recent bankruptcy cases.  For example, one New York law firm chose to provide its services to a municipality for free.  *See* Romy Varghese, *Harrisburg Hires Cravath Swaine*, MarketWatch (Nov. 10, 2010).   In another case, a hospital in Chapter 11 received a 10 percent discount from a New York law firm also involved in these proceedings.  *See* Barbara Benson, *Advisers Descend on St. Vincent's to Pick the Bones Clean*, Crain's New York Business (May 2, 2010) (noting ten percent discount provided by Kramer Levin Naftalis & Frankel "[i]n recognition of the important mission" of the hospital).

21.     Indeed, some of the professionals here or in related matters also have chosen to discount their rates.  *See, e.g.*, *Application Under 11 U.S.C. § 327(e) Authorizing Debtors to Employ and Retain Jones Day as Special Counsel for the Debtors, Nunc Pro Tunc to the Petition Date*, Exhibit B, *Declaration of Andrew Kramer*, ¶ 3, [Docket No. 3282] (describing discounted rates provided by Jones Day); Aaron Lucchetti, Dennis K. Berman and Robin Sidel, *GM Will Pay A Cut-Rate Price To Do Its New IPO*, The Wall Street Journal (June 12, 2010) (noting that

underwriters of the initial public stock offering for the new General Motors chose to charge

approximately one quarter of their typical fees).

**Hourly Rate Increases in These Proceedings**

22.    At the request of the Fee Examiner and his counsel, in conjunction with their

review of the final fee applications, Stuart Maue analyzed the increases in hourly rates recorded

by the Retained Professionals from the Petition Date (June 1, 2009) through the Confirmation

Date (March 29, 2011).

23.    Counsel for the Fee Examiner reviewed the final fee applications and the relevant

interim fee applications to determine the extent (if any) to which they disclosed hourly rate

increases on the face of the applications.  With isolated exceptions,[3] the interim fee applications

neither discussed nor attempted to explain or justify in any substantive fashion hourly rate

increases, and they did not discuss whether Retained Professionals sought approval for rate

increases from the Debtors, the Creditors Committee, or the relevant "client."

24.    Other than isolated and conclusory statements, I am aware of no statement or

representation in the docketed pleadings that compares hourly rate increases in the bankruptcy

practice of any firm with hourly rate increases in the relevant market, whether firm-wide or in

non-bankruptcy practices or groups.  Nor am I aware of any statement or representation that

discusses or describes hourly rate increases among large firms in major markets.

---

[3] *See, e.g.*, *Motion of Debtors for Entry of Order Pursuant to 11 U.S.C. § 327(a) and 330 Authorizing the Debtors to Amend the Terms of Their Engagement with Brownfield Partners, LLC* [Docket No. 5207], ¶¶ 8-9 (seeking authorization for revised rates as approved by Debtor); *Third Application of Plante & Moran, PLLC, as Accountants for the Debtors, for Interim Allowance of Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred from June 1, 2010 through September 30, 2010* [Docket No. 7733], ¶ 57; *Fourth Interim Application of Kramer Levin Naftalis & Frankel LLP, as Counsel for the Official Committee of Unsecured Creditors, for Allowance of Compensation for Professional Services Rendered and for Reimbursement of Actual and Necessary Expenses Incurred for the Period from June 1, 2010 through September 30, 2010* [Docket No. 7804], at 2 n.3.

25.     Counsel for the Fee Examiner reviewed the initial retention documents (as amended) filed by the Retained Professionals to determine the extent (if any) to which the applications for retention and the subsequent orders made reference to hourly rate increases or the potential for them.  The references to hourly rate increases were general or did not expressly refer to rate increases at all.  *See, e.g.*, *Affidavit and Disclosure Statement on Behalf of Weil, Gotshal & Manges LLP Pursuant to  Sections 327, 328(a), 329 and 504 of the Bankruptcy Code and Fed. R. Bankr. P. 2014(a) and 2016(b)* [Docket No. 949], ¶ 19 ("WG&M intends to charge the Debtors for services rendered in these chapter 11 cases at WG&M's normal hourly rates in effect at the time the services are rendered.").

26.     Whether or not a Retained Professional had provided explicit notice of hourly rate increases or had disclosed them on the face of its applications, Stuart Maue compared the changes in hourly rates charged by timekeepers for each Retained Professional over the course of these proceedings as disclosed in their filed applications for compensation.  Stuart Maue then calculated the financial impact to the estates of those rate increases.

27.     The rate increases imposed by professionals in these proceedings had a direct impact on the fees charged to, and provisionally paid by, the estates.  If, hypothetically, during the course of these proceedings, no Retained Professional had increased its hourly rates—that is, if the hourly rates charged at the beginning remained the same on the Confirmation Date—the total amount of aggregate compensation sought by the Retained Professionals would be at least

$3 million less than the total amount of compensation sought in the final fee applications.[4]  *See*

**Exhibit A**.[5]

28.    This calculation almost certainly understates the impact of rate increases for

several reasons:

A.    The analysis does not take into account timekeepers who started working

on the case after a rate increase for that timekeeper took effect.  For example, if a

timekeeper started working on the cases during the second interim compensation period

(October 1, 2009 to January 31, 2010), but had a rate increase during the first interim

compensation period (June 1, 2009 to September 30, 2009), the fees attributable to that

increase are not included.

B.    For the sake of simplicity, the analysis excluded any time billed (and any

rate increases) at a mandated half-rate, such as time billed to non-working travel or the

review of time entries.

C.    To allow an analysis of hourly rate increases across different position

descriptions, Stuart Maue treated as two different timekeepers a single individual whose

position status (as opposed to hiring anniversary) changed—for example, from associate

to partner.  As a result, the analysis does *not* include any fees resulting from a rate

increase corresponding to such status changes.

29.    For each Retained Professional, Stuart Maue determined the blended hourly rate

for all timekeepers for each interim compensation period and over the course of the proceedings.

---

[4] The hourly rates for Baker McKenzie reflect fluctuations due to currency exchange rates.  Accordingly, a small portion of the fees attributable to "rate increases" for Baker McKenzie undoubtedly encompasses these fluctuations. As reflected on Exhibit A, the total fees attributable to rate increases for Baker McKenzie were $26,994.92.
[5] The four exhibits accompanying this affidavit, Exhibits A through D, served on the Retained Professionals, are available from the affiant but not publicly-filed.

**Exhibit B** shows the blended hourly rates for each firm by position description, calculated for each period and for the entire proceeding.

30.     Stuart Maue then analyzed the blended hourly rates among those Retained Professionals with common position descriptions (*i.e.*, shareholder or partner, counsel, associate, other professionals).  **Exhibit C** shows a comparison of blended rates by position.

31.     The differences in blended rates between and among Retained Professionals are significant.  While those differences may suggest differences in work allocation (*i.e.*, the hours billed by associates rather than partners/shareholders), they also suggest a concentration of rate increases among associates who both record a large number of hours and, in their hourly rates as a group, have the widest range.

32.     For example, the reported hourly rate for associates at the domestic offices of Weil Gotshal & Manges LLP ranged from $355 to $695.  A wide disparity in rates necessarily allows (but does not require) a larger fluctuation in the individual hourly rates and firm-wide blended rate over time—depending on which associates do the work and how much of it. Indeed, as reflected in Exhibit C, the blended rate among all associates at that firm increased by more than 18 percent during the course of these proceedings.

33.     Blended rate information, however, is not determinative of the impact of rate increases because blended rates not only reflect rate increases but also staffing decisions and work allocation among timekeepers of varying rates.

34.     For example, even if a Retained Professional had frozen every timekeeper's hourly rate for the entire course of the proceedings (as a few professionals in this case in fact did), the blended rate for the firm might still increase if work shifted over the course of the case to timekeepers with higher billing rates.  Conversely, if the firm had shifted work to timekeepers

with lower billing rates, a blended rate could decrease over the course of a proceeding even if a firm has increased hourly rates (justified or not) for certain timekeepers.  In fact, as reflected in Exhibit C, the blended rate for certain positions within some firms did decrease although those firms increased rates and thus received increased fees directly attributable to those increases.

35.    To assess the actual financial impact to the estates of an increase in hourly rates, the analysis necessarily focuses on individual timekeepers because rates are increased timekeeper-by-timekeeper, even if they are part of a "class" or invariably included in a blended rate calculation.  Accordingly, for every timekeeper whose hourly rate increased during these proceedings, Stuart Maue calculated the fees attributable solely to those rate increases.

**Exhibit D** compiles all such timekeepers, organized by the amount of fees actually attributable to the rate increase(s) for each timekeeper.

36.    Demonstrated by Exhibit D, the decisions by Retained Professionals to impose hourly rate increases often had a significant financial impact on the revenue (and cost to the estates) attributable to many individual timekeepers.  For example, rate increases during these proceedings increased the fees of the following attorneys by more than $100,000 each, resulting in an increased charge to the estates of more than $1.6 million, almost half of the total attributable to rate increases:

| Attorney | Fees Attributable to Rate Increases |
| --- | --- |
| Weil, Gotshal & Manges associate 1 | $239,939 |
| Weil, Gotshal & Manges associate 2 | $166,530 |
| Weil, Gotshal & Manges associate 3 | $163,185 |
| Weil, Gotshal & Manges associate 4 | $144,582 |
| Weil, Gotshal & Manges associate 5 | $139,062 |

| Attorney | Fees Attributable to Rate Increases |
|---|---|
| Weil, Gotshal & Manges counsel 1 | $118,225 |
| Weil, Gotshal & Manges associate 6 | $117,914 |
| Kramer Levin Naftalis & Frankel associate 1 | $109,565 |
| Weil, Gotshal & Manges associate 7 | $108,490 |
| Weil, Gotshal & Manges partner 1 | $105,345 |
| Butzel Long associate 1 | $101,944 |
| Weil, Gotshal & Manges associate 8 | $101,164 |
| **Total** | **$1,615,943** |

37.     The data for individual timekeepers also show a wide disparity in the increases among timekeepers between firms and among timekeepers within the same firm.  As a general matter, the rate increases also do not appear related—solely or even directly—to bar admission date or practice area.

38.     Exhibit D also shows the percentage rate increases for each timekeeper.  The "percentage increase in rate" is simply the difference between the highest and lowest rates charged by that timekeeper during the case, measured as a percentage.  The "compound annual growth rate" measures the rate of that increase on an annual basis, measured between the dates of the timekeeper's first and last time entry on the case.  (No such annualized rate has been provided for timekeepers who worked less than a year on the case.)

39.     Measured over the span of the cases—which lasted only 22 months—the percentage rate increases were quite significant with many exceeding 20 percent.  When viewed on an annualized basis, the rate increases were no less significant—with the rates for many timekeepers increasing by double-digit percentages.

12

40.    These increases are inconsistent with the very limited rate increases (if any) generally imposed by professionals during the recession and its aftermath and, in these proceedings, are inconsistent with smaller rate increases or outright rate freezes imposed by other professionals.  *See* Exhibits A and D.

41.    This affidavit reflects Stuart Maue's quantitative analysis of hourly rate data provided by the Retained Professionals.  It does not attempt to offer a legal opinion about whether the increases were justifiable or "reasonable" under the Bankruptcy Code—in part because no substantive explanation or justification generally has been provided.


Dated:  August 3, 2011.


_____/s/ *W. Andrew Dalton*_____
W. Andrew Dalton
Stuart Maue, Ltd.
3840 McKelvey Road
St. Louis, MO 63044
Telephone:  (314) 291-3030
Facsimile:  (314) 291-6546
E-mail:   a.dalton@smmj.com


Subscribed and sworn to before me,
this 3rd day of August, 2011.

_____/s/ Beverly A. Moore_____
Notary Public, State of Missouri
My Commission Expires: November 5, 2012

6626131_7