Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 09-50026-reg

5  - - - - - - - - - - - - - - - - - - - - - -x

6

7  In the Matter of:

8  MOTORS LIQUIDATION COMPANY, et al.,

9  f/k/a General Motors Corporation, et al.,

10                Debtors.

11

12  - - - - - - - - - - - - - - - - - - - - - -x

13

14                United States Bankruptcy Court

15                One Bowling Green

16                New York, New York

17                July 26, 2011

18                9:55 AM

19

20

21  B E F O R E:

22  HON. ROBERT E. GERBER

23  U.S. BANKRUPTCY JUDGE

24

25

Page 2

1

2     HEARING re MOTION to File Proof of Claim After Claims Bar Date

3     by Judge Wiesjahn and Anna Lisa Sand filed by Candace Lee on

4     behalf of Judd Wiesjahn.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25     Transcribed by:  Aliza Chodoff

Page 3

1

2  A P P E A R A N C E S :

3  WEIL GOTSHAL & MANGES LLP

4       Attorneys for the Debtors

5       767 Fifth Avenue

6       New York, NY 10153

7

8  BY:  JOSEPH H. SMOLINSKY, ESQ.

9

10  WEIL GOTSHAL & MANGES LLP

11       Attorneys for Debtors

12       1300 Eye Street NW

13       Suite 900

14       Washington, DC 2005

15

16  BY:  BRIANNA N. BENFIELD, ESQ.

17

18  LAW OFFICES OF MARTIN STANLEY

19       Attorneys for Anna Lisa Sand and Judd Wiesjahn

20       137 Bay Street, #2

21       Santa Monica, CA  90405

22

23  BY:  JEFFREY R. LAMB, ESQ.

24       MARTIN STANLEY, ESQ.

25

Page 4

```
 1                P R O C E E D I N G S
 2          THE CLERK:  All rise.  Good morning, have your seats,
 3     please.
 4          THE COURT:  Okay.  GM -- the evidentiary hearing on
 5     the late claims for Wiesjahn and Sand.  I've read the papers.
 6     I don't need openings.  We're going to go straight to the cross
 7     examinations if, as I assume, the declarations that I have are
 8     the ones that are the direct testimony.  I noticed that I got
 9     two declarations on the Stanley side -- on the Wiesjahn side.
10     Are both of the declarants, here?
11          MR. STANLEY:  Yes, Your Honor, we are.  I'm Martin
12     Stanley and this is Jeff Lamb and he's one of my associates.
13          THE COURT:   All right.  And both of you will be
14     cross examined?
15          MR. STANLEY:  That's fine with us, Your Honor.
16          THE COURT:  Well, if you're not both cross examined,
17     whoever doesn't get cross examined the declaration is going to
18     be stricken.
19          MR. STANLEY:  Oh no we should then, that would be
20     fine with us.  We're happy to be cross examined.
21          THE COURT:  Okay.
22          MR. STANLEY:  We're here, we came here with the
23     intent of having that done and we're here at the court's
24     pleasure and we're happy to do that.
25          THE COURT:  All right.  Very well.  Who is going to
```

MOTORS LIQUIDATION COMPANY, ET AL.

Page 5

1    be doing the questioning for the estate?

2            MR. SMOLINSKY:  I will, Your Honor, Joseph Smolinsky

3    of Weil, Gotshal & Manges for the debtors and the Motors

4    Liquidation Company GUC Trust.

5            THE COURT: Okay, fair enough.  Who do you wish to

6    cross examine first?

7            MR. SMOLINSKY:  I guess we could start with Mr.

8    Stanley.

9            THE COURT:  Okay.  Mr. Stanley you want to come on

10   up, please and be sworn.

11           THE CLERK:  Please raise your right hand.

12              MARTIN STANLEY, WITNESS, SWORN

13           THE COURT: All right.  Have a seat, please, Mr.

14   Stanley.  I don't want to turn off the air conditioning so I'm

15   going to need you to speak loudly and into the microphone.

16           THE WITNESS::  Likewise, Your Honor, I appreciate it,

17   I don't hear that well sometimes.  I was having a little

18   difficulty over there, but I will.  I'll do my best.  Is that

19   all right, can you hear me okay?

20           THE COURT:  When you lean forward, yes.

21           THE WITNESS:  Okay.

22                  CROSS EXAMINATION

23   BY MR. SMOLINSKY:

24   Q.  Good morning, Mr. Stanley.

25   A.  Good morning.

Page 6

1   Q.   Mr. Stanley, you're aware of why we're here today.  I just

2   have a couple of questions for you.

3        How long have you practiced law in the State of

4   California.

5   A.   Well, I first became admitted in 1982, in February of

6   1982.  As a result of an alcoholism problem I lost my license

7   in 1986.  I was sober, and have been sober, since May 1st of

8   1986, for over twenty-five years now.  I was reinstated in 1993

9   and have been practicing under -- unconditionally since that

10  time.

11       And during that time I've done a number of things both

12  before, while I was suspended, or while I was out of practice

13  and since I've come back I've spoken at the American Bar

14  Association Conventions.  I've taught hundreds of CLE seminars

15  on substance abuse and alcoholism in the legal community.  I've

16  been a probation monitor for the State Bar of California.  I

17  was appointed to the State Dental Boards Committee in

18  California as the public member of the diversion board where we

19  monitor dentists who are trying to get sober.

20       And I've served as a volunteer, and have even done

21  interventions on judges in the State of California voluntarily

22  along with doing interventions on dozens of attorneys and

23  speaking at hundreds of law firms about what happened to me and

24  what happened since I've been sober.

25  Q.   Sir, how long have you practiced at the address 137 Bay

Page 7

1   Street, Unit 2, Santa Monica, California?

2   A.    Mr. Lamb would probably know that better than I would

3   because he's good with dates, but I believe it was October of

4   2008 when we moved in at that office.

5   Q.    Could you describe that space for us?

6   A.    Yes.  It is a, it's near the beach and that's why I like

7   it.  I was at one of those, in one of the high-rises in Beverly

8   Hills and I live in Santa Monica which is on the ocean, and so

9   this office was sort of a little house looking thing.

10       It's a two-story office with four units.  It's an old

11  building.  In association therewith there are two other

12  buildings that are identical except they are different in

13  color; they're white, ours is green.  And there's -- because

14  this is important there is a single mail box for all three

15  units or all three buildings.  Each one has four units.

16       Behind our building there is one additional green unit

17  that also has four units, and they are all owned by the same

18  landlord.

19  Q.    Does that mean that one person sorts all the mail that

20  enters that mailbox?

21  A.    I believe so.  It would be the postman who puts it in

22  boxes that are designated for each individual unit.

23  Q.    Do you know whether you've had the same postman for a

24  number of years?

25  A.    I don't.

Page 8

1    Q.    Have you had any experience in the past with mail being

2    not delivered?

3    A.    As far as mail that is addressed to Martin Stanley, I

4    don't believe I've ever had anything that I've ever complained

5    about.

6              THE COURT:  Pause, please, Mr. Smolinsky, because I'm

7    getting a little confused.

8              Mr. Stanley, I think you said there were three

9    separate buildings, did I understand that correctly?

10             THE WITNESS:  I forgot there's one behind us well, so

11   I mentioned the fourth -- three are sixteen total units.

12             THE COURT:  Sixteen total units.

13             THE WITNESS:  Correct.

14             THE COURT:  Now you're in a Unit No. 3 in one of the

15   buildings, is that correct?

16             THE WITNESS:  Unit No. 2, Your Honor.

17             THE COURT:  Unit No. 2.  And you talked about there

18   being a single mailbox.  Is that a single mailbox for the

19   sixteen units or a single mailbox for the units that are in the

20   building in which your Unit No. 2 is located?

21             THE WITNESS:  There is actually one unit and I think

22   it has sixteen or seventeen little drop boxes within the unit

23   that are each individually locked, and they apply to each unit

24   -- I think one of the units is for the -- or one of the drop,

25   one of the little boxes is for the owner.

MOTORS LIQUIDATION COMPANY, ET AL.

Page 9

1        And it's basically on the other side of the property

2    away from our building, so it would be sixteen little boxes

3    stacked, I think, they're four by four, if I remember

4    correctly.

5            THE COURT: Mailboxes not unlike those that are in an

6    apartment building?

7            THE WITNESS:  Correct.

8            THE COURT:  And how many people share your mailbox?

9            THE WITNESS:  Only us.  So we have one little box

10    like you do in an apartment building.

11            THE COURT:  And that box says your address 137 Bay

12    Street, No. 2?

13            THE WITNESS:  It does not have an address on it, it

14    has numbers on it.  But apparently --

15            THE COURT:  A number 2?

16            THE WITNESS:  -- the postman -- there are other unit

17    2s so I cannot say that ours is No. 2 but I think ours is No. 2

18    coincidentally, but there are other No. 2s because our building

19    is 137 and there is a 135 Unit 2 and then there's a, I think,

20    133 Unit 2 if I'm not mistaken.

21            But ours is definitely Unit No. 2 and I'm pretty sure

22    because I'm trying to think back as to what it looks like

23    because I actually go down and get the mail, but I generally

24    don't look at the box, you know, the number on there, but I

25    think ours has a No. 2 on the box.

09-50026-mg    Doc 10665    Filed 07/27/11    Entered 08/09/11 09:43:45    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 10 of 137

Page 10

1          THE COURT:  And how many units are there that also

2    have 137 Bay Street?

3          THE WITNESS:  Four units.

4          THE COURT:  Okay, continue, please, Mr. Smolinsky.

5    BY MR. SMOLINSKY:

6    Q.   Mr. Stanley, have you ever been involved in a bankruptcy

7    case before or your firm's activities?

8    A.   I've never actually done much bankruptcy work other than I

9    do recall there is another case that we have in our office the

10   Magic Mountain case, the Six Flags case.  We have a client that

11   was extremely badly injured.  He was hit in the head by a

12   roller coaster at Magic Mountain.  There's an issue about there

13   being a hole in the fence and he's, unfortunately a younger

14   individual, went in to retrieve his hat.  A very dangerous

15   situation.  He was very badly damaged.  We did file claim forms

16   in that particular case.

17        And I also know that there was recently a civil case that

18   I handled wherein my client had declared bankruptcy and there

19   was an issue -- because we settled the case, about how they

20   were going to divvy up the money.  So there was an order from

21   the bankruptcy court as to how that happened.

22        But overall our involvement with bankruptcies over the

23   past, I guess it's a lot of years now, has been extremely

24   limited.

25   Q.   In the Magic Mountain case did you file those proofs of

1   claim timely?

2   A.   Yes.

3   Q.   Are you generally familiar with the proof of claim process

4   and the bar date process?

5   A.   Generally, yes, because I know that sometimes you have to

6   move -- I think one time I might have moved for relief, one or

7   two times in my career I might have moved for relief from stay

8   on a different kind of an issue, but it was many, many years

9   back.  But I'm generally familiar that if there's a bankruptcy

10  at some point in time you have to file a claim when they give

11  you notice of that.

12  Q.   You've never filed a motion to allow a late claim before

13  have you?

14  A.   Not that I recall.  This is the first one.

15  Q.   Mr. Stanley, when did you first become aware that General

16  Motors Corporation filed for Chapter 11?

17  A.   I became aware of that in about, if I can -- I received

18  this chart, Your Honor, this morning from the debtor and if I

19  might use that to just refresh my recollection of the

20  approximate date or I can, you know, it's somewhere in mid-

21  2009.

22          THE COURT:  Pause, please.  Mr. Smolinsky --

23          MR. SMOLINSKY:  Your Honor, let me --

24          THE COURT:  -- do you consent or do you want to

25  proceed by a different means?

09-50026-mg    Doc 10665    Filed 07/27/11    Entered 08/09/11 09:43:45    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 12 of 137

Page 12

1          MR. SMOLINSKY:  I consent.  Let me give Your Honor a

2     bit of background.

3          In preparing for the hearing today Ms. Ferrante, who

4     will be testifying, went back and prepared a chronology, and

5     we're well aware of Your Honor's case management rules which

6     require three days advance circulation of demonstratives and

7     therefore we weren't prepared to put it in as an exhibit unless

8     everyone wants to, but Ms. Ferrante will have it up on the

9     stand with her.  So as a courtesy I provided a copy to Mr.

10    Stanley prior to the hearing, and I believe there's a copy on

11    Your Honor's bench if you'd like to follow along with it as

12    well.

13         THE COURT:  Mr. Stanley do you object to me looking

14    at the demonstrative?

15         THE WITNESS:  No, as long as, Your Honor, I have some

16    comments about it as well or some testimony about it as well

17    that I think would be extremely important for Your Honor to

18    consider, and I think it's a good demonstrative because it has

19    a lot of important things in there that would be important in

20    this motion.

21         THE COURT:  All right then gentlemen under those

22    circumstances I'm going to admit it subject to each parties'

23    rights to comment on it in any way he sees fit.

24         It's admitted, Mr. Smolinsky.

25         MR. SMOLINSKY:  I --

MOTORS LIQUIDATION COMPANY, ET AL.

Page 13

1           THE COURT:  As a demonstrative, however.

2    (Debtor's Exhibit 2, Demonstrative Chart, was hereby received

3    into evidence)

4           MR. SMOLINSKY:  Yes, yes, Your Honor.

5           THE COURT:  Okay.

6    BY MR. SMOLINSKY:

7    Q.   Mr. Stanley, again, when did you first become aware that

8    General Motors Corporation filed for Chapter 11?

9    A.   I believe it was somewhere in mid-2009.  What happened was

10   is I received, or I filed a lawsuit on behalf of Mr. Wiesjahn,

11   Judd Wiesjahn and Anna Lisa Sand because their daughter had

12   been killed in a car accident.  I filed a lawsuit against,

13   among other entities, General Motors relating to some issues

14   that we had with regards to the accident.  And then I received

15   from -- I served it and the defendants --

16           THE COURT:  Did you say the axel?

17           THE WITNESS:  Pardon me?

18           THE COURT:  You had some problems with respect to the

19   what, the axel did you say?

20           THE WITNESS:  No, with regards to some of the issues

21   of the vehicle.  Specifically the tire that was put on, the

22   spare tire was one of those smaller tires as opposed to the

23   normal sized tire.  It was placed on the front right tire --

24   that's right because I recall going up there, the police

25   officers were kind enough to allow me to come and inspect --

Page 14

1              THE COURT:  Forgive me.

2              THE WITNESS:  -- THE matter.

3              THE COURT:  Mr. Stanley, if you continue to digress

4      we're not going to get this trial done.

5              THE WITNESS:  I apologize.

6              THE COURT:  I need you to simply answer Mr.

7      Smolinsky's questions and mine.

8              THE WITNESS:  That's fine.

9              THE COURT:  And my narrow question was what did you

10     say because I didn't hear you.  I wasn't looking for a further

11     substantive explanation.

12             THE WITNESS:  I apologize.  I think it had to do with

13     the tire was our main issue.

14             THE COURT:  Okay, thank you.  Continue, please, Mr.

15     Smolinsky.

16     BY MR. SMOLINSKY:

17     Q.   Mr. Stanley, as matter of public record General Motors

18     Corporation filed for Chapter 11 on June 1st 2009, if that

19     refreshes your recollection, do you remember reading about the

20     filing in the press?

21     A.   I did not.  I don't read a lot of newspapers to be honest

22     with you.  I did receive a notice from the defendants'

23     attorneys, who had appeared in the action, informing me that

24     there was a stay because of the bankruptcy.  And I think we

25     attached it to my declaration.

MOTORS LIQUIDATION COMPANY, ET AL.

Page 15

1    Q.    So you're familiar, I think what you're referring to is

2    the notice of commencement of bankruptcy that was filed in the

3    California State Court proceeding on June 9th 2009.

4    A.    Correct.  Not by you but by the defendant's attorneys in

5    that particular action.

6    Q.    And prior to that time you were unaware that General

7    Motors corporation had filed for Chapter 11?

8    A.    I may have heard something on the news.  I wouldn't have

9    seen anything in the newspapers because I generally don't read

10   those, but I can't say for sure.  It's very time consuming to

11   read newspapers nowadays, but I might have heard on the news.

12   There was news about that.

13   Q.    But it's fair to say that, that as of June 9th 2009 you

14   were aware of the bankruptcy filing?

15   A.    At or around that date, yes.

16   Q.    Do you know what a notice of appearance is?

17   A.    No.

18   Q.    Do you remember sending any writing to the debtors telling

19   the debtors where you would want notices sent or inquiring as

20   to what to do as a result of the filing with your lawsuit?

21   A.    No, because it was my understanding that they already had

22   my notice because I was the attorney of record, and my address

23   was listed in all the pleadings in the case that was filed in

24   the California State Court.

25   Q.    But not the addresses of your clients?

Page 16

1   A.   Correct.  Although they had access, I believe, to that

2   information at some point in time.  But I can't say for sure.

3   Q.   Mr. Lamb states in his declaration that from the period

4   2008 to 2009 Mr. Lamb and you opened up the mail each and every

5   day; is that correct?

6   A.   That's correct.  I don't even know if we had a secretary.

7   It was generally he and I in the office.

8        THE COURT:  You don't know if you had a secretary?

9        THE WITNESS:  I don't believe -- at that time we had

10  an assistant, we didn't have an official secretary.  And we did

11  have an assistant, but I and he because she was a student at

12  the university, she was working about thirty hours a week, he

13  and I opened all the mail ourselves.  We had a pattern and

14  practice of doing that every day.

15       THE COURT:  Go on, Mr. Smolinsky.

16  BY MR. SMOLINSKY:

17  Q.   Would that be in your office, sir, or in a conference

18  room?

19  A.   No, no, we'd go downstairs.  One of us would open up the

20  mailbox, we'd bring the mail back up and we'd open it up in the

21  office.  Our office is not that big, it's probably as big as

22  from the wall to your desk here and across, and we have a

23  little area that is a conference room in the corner.

24  Q.   So Mr. Stanley that would include each and every day of

25  September 2009?

Page 17

1   A.   It definitely would.

2   Q.   Is there any reason the mail could have been delivered in

3   September 2009 and not opened by both of you, whether it was

4   due to vacation, trials, office renovation?

5   A.   I don't believe so because I believe one of us was there

6   each and every time.  We definitely weren't having any office

7   renovations.  The trial that I did in 2009 was a trial in, I

8   think, March -- no, April I believe of 200- -- it was a

9   substantial medical malpractice case that lasted three or four

10  weeks, but either he or I or both of us would work on the mail,

11  and then we'd both look at it so that we could see what needed

12  to be calendared et cetera.

13  Q.   Mr. Stanley, would you be surprised to learn that there

14  were forty pieces of mail that were delivered to your address

15  from the General Motors Corporation between June 1st 2009 and

16  April of 2010?  I'm sorry, April of 2011.

17  A.   Extremely surprised and I would say that cannot be, and I

18  can point it out on the chart because I see what your claiming

19  that was delivered.

20  Q.   And would you be surprised given the fact that you, you

21  have not received forty pieces of mail that of those forty

22  pieces of mail only three of them were returned as

23  undeliverable, and each of those that were returned as

24  undeliverable did not contain the name Martin Stanley or

25  Stanley Martin.

Page 18

1   A.    I can assure you, on this chart it indicates mailings were

2   made to Rachel Wiesjahn at care of Anna Lisa Sand at my

3   address.  I can assure you there has never been anything like

4   that sent or received by my -- received by my office.  And

5   there are a whole host of those types, about twenty of those on

6   this particular document if not more.

7        I can assure you that we've never gone by the name of Anna

8   Lisa Sand or Rachel Wiesjahn law offices, so I can assure you

9   that those things were never received.  I'm positive of that.

10  Q.    How do you explain that?  Do you believe that Garden City

11  Group botched the service thirty-seven times or do you believe

12  the post office or maybe something about the mailbox in your

13  building that created issues with delivery of mail?

14  A.    I have no idea other than they were provided with my

15  correct name and address, and they did not address it to my

16  name or -- to my name, that's all I know.  I have no idea what

17  happened to those.

18  Q.    Ms. Ferrante states in her declaration that bar date

19  notices were sent to Wiesjahn comma Judd, Stanley Martin Law

20  Offices of, 137 Bay Street, Unit 2, Santa Monica, California

21  90405.  And that's the bar date notice.  Is it your testimony

22  that there is no possibility that that notice was received by

23  your office?

24  A.    Yes.

25  Q.    Ms. Ferrante states in her declaration that bar date

Page 19

1    notices were sent to Wiesjahn comma Rachel, Stanley Martin Law

2    Offices of, 137 Bay Street, Unit 2, Santa Monica, California

3    90405.  Is it your testimony that there is no possibility that

4    notice was received by your office?

5    A.   Yes.

6    Q.   Ms. Ferrante states in her declaration that bar date

7    notices were sent to Sand comma Anna Lisa at that same address.

8    Is it your testimony that there is no possibility that that

9    notice was received?

10   A.   Yes.  We even reviewed the file to make sure and never saw

11   those things.

12   Q.   Mr. Stanley you received notice of the hearing to consider

13   the debtors' disclosure statement; is that correct?

14   A.   Is that the one that you claim was sent on 9/13/2010?

15   Q.   It was served on September 3rd 2010.

16   A.   I'm looking at the chart, I see a document that says it

17   was served on September 13th, 2010.  But may I have the

18   declaration -- may I get the declaration from the debtor that

19   was filed, if Your Honor wants me to, then I could have more

20   information.  It's up to Your Honor of course.

21              THE COURT:  Well there's a pending question.  Would

22   it refresh your recollection if you got it?

23              THE WITNESS:  I don't believe so because this

24   document, and I'm not 100 percent sure I got it or not, it

25   indicates it was served 9/13/2010 at the, on Judd Wiesjahn,

Page 20

1    Stanley Martin Law Office.  And I can't say because I just got

2    this document whether it was served on that date or not and I

3    don't have my whole file.

4              THE COURT:  Well Mr. Smolinsky do you have position

5    on his request?

6              MR. SMOLINSKY:  Maybe I could refresh his

7    recollection.

8              THE COURT:  Sure.

9    Q.   Mr. Stanley, did you review the declaration filed by

10   Jeffrey R. Lamb?

11   A.   I did not.

12   Q.   Let me draw your attention to paragraph 15 --

13             THE COURT:  Pause, please.  I want to make sure --

14   you did not review Mr. Lamb's declaration?  Is that your

15   testimony Mr. Stanley.

16             THE WITNESS:  Let me just take a look here, Your

17   Honor, because this has things on both sides.  So I'm not sure.

18   We usually print them out on one side.  Let me take a look.

19             Is this the one that was just sent last week?  Yes.

20   Oh, okay.  Yes, I did review this, I apologize.

21   Q.   Let me draw your attention to paragraph 15 of that

22   declaration.  Got it?

23             THE COURT:  That being the Lamb declaration?

24             MR. SMOLINSKY:  Yes, yes, Your Honor.

25   Q.   The last sentence.

Page 21

1    A.    Yes.  I think that's exactly what I said in my declaration

2    in paragraph 15 if I'm not mistaken.  Nope, guess not.  It was

3    paragraph 14 of my declaration, now that I've reviewed my

4    declaration I see that on page 5, line 6 to 11, that I did

5    receive that particular document.  And that does refresh my

6    recollection, but my concern was the date that it was served

7    because I think that's inconsistent on your statement of

8    September 3rd when the docket --

9    Q.    It may, in fact, be the 13th, but it wouldn't surprise you

10   that it was early September -- early to mid-September 2010?

11   A.    Somewhere in September 2010 I received the document, yes.

12   Q.    Do you know what a disclosure statement is?

13   A.    To be honest with you, no.

14   Q.    Wouldn't --

15   A.    I know what a Chapter 11 plan is, that I do know.

16   Q.    When you received the proposed disclosure statement with

17   respect to the debtors joint Chapter 11 were you curious as to

18   how that document may affect your clients' claims?

19   A.    Yes.  And this was a time when I think I mentioned to the

20   Court previously that I had a cardiac ablation on February of

21   2011 because of a arrhythmia that I had.  So the latter part of

22   last year I was suffering with this arrhythmia but I was in and

23   out of the office most of the time in, and I did see this

24   document and as a result I did something about it.

25   Q.    So let's go through what you did about it.  The notice

09-50026-mg    Doc 10665    Filed 07/27/11    Entered 08/09/11 09:43:45    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 22 of 137

Page 22

1   informed you that you could go on a website and review the

2   disclosure statement and plan.  Did you do that?

3   A.   At some point in time I went on the website and I think it

4   was within approximately a month or so and I began to

5   understand a little bit more about what was going on and then I

6   noticed that there was something about filing a claim and I

7   attempted to put forth the information on some sort of

8   document, and I think that's referenced actually in your

9   declaration that you submitted.

10  Q.   So when you received the notice of disclosure statement,

11  you didn't question why you hadn't yet filed a proof of claim

12  or why you hadn't been asked to, you waited a month; is that

13  correct?

14  A.   I don't know that I saw it on that particular date.  Mr.

15  Lamb was not working for me during that period of time.  He had

16  been working for me for several years, I had to hire -- I had

17  hired a new associate when he left, she was in training.  We

18  had a very busy practice.  I looked at it and within a short

19  period of time thereafter I went on the website -- excuse me --

20  I learned that there had been some kind of a deadline, and I

21  actually called the court and the court directed me to Garden

22  City, I think.  And I called them and I talked to them about

23  this and then they told me to go on the website.

24       I think it was them that directed me, and I can't remember

25  the name of the lady that I talked to, but I definitely said I

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 23 of 137

Page 23

```
 1   didn't receive the notice regarding the proof of claim can you

 2   please help me out.  And she said to go on the website.  I did

 3   that and I filled out the beginning of a proof of claim form,

 4   and I think that's referenced actually in your declaration.

 5        Then there was something to the effect that's not

 6   sufficient, you have to file a motion and that's what caused us

 7   to eventually file a motion shortly thereafter.

 8   Q.   Let's come back to that in a minute.

 9        When did Mr. Lamb stop working for you?

10   A.   Mr. Lamb stopped working for me right around, I think it

11   was the last week of 2009, and he came back working for me

12   again approximately -- and he had worked for me for about four

13   years or so, and he came back working for me again in

14   approximately March or April of this year.  It might have been

15   February.

16   Q.   So he was not here during the period that that notice was

17   received that he includes in his declaration?

18   A.   Correct.  It was Candace Lee who was my associate at that

19   time.

20             THE COURT:  Mr. Smolinsky help me, he was not there

21   at the time of which declaration?

22             MR. SMOLINSKY:  In his declaration he refers to --

23             THE COURT:  The Lamb declaration.

24             MR. SMOLINSKY:  -- receiving the notice of the

25   proposed, filing of the proposed disclosure statement which was
```

Page 24

1  in September of 2010.  He was not employed at that period of

2  time by Mr. Stanley.

3          THE COURT: You're talking about the statement in his

4  declaration that's from lines 15 or 16 down to 20 or 21?

5          MR. SMOLINSKY:  Yes.  The last sentence of 15.

6          THE COURT:  He wasn't there then is that what --

7          MR. SMOLINSKY:  That's correct, Your Honor.  The

8  testimony was that he did not work for Mr. Stanley from

9  December 2009 to February 2011?

10         THE WITNESS:  Correct, about that time.  And just for

11  clarity, Your Honor, I put that in my declaration as well.  He

12  relied on my declaration in making that particular statement.

13         THE COURT:  All right.  Folks, I have a problem with

14  witnesses giving me testimony that they don't have first-hand

15  knowledge of.  You can either highlight that Mr. Smolinsky or

16  if you don't I will, but not just because we have a hearsay

17  rule, but because this is one of the fundamental principles of

18  the competency of witnesses.  It isn't helpful to me folks if

19  people testify to stuff as to which they don't have first-hand

20  knowledge.

21         THE WITNESS:  I have no objection, Your Honor, for us

22  to withdraw that particular sentence.  I apologize.  I believe

23  he may have looked at the, my declaration and I had the

24  attachment which was this particular document to my declaration

25  so he was simply following my --

MOTORS LIQUIDATION COMPANY, ET AL.

Page 25

```
 1              THE COURT:  Well, all right.
 2              THE WITNESS:  I apologize.
 3              THE COURT:  Mr. Smolinsky may bring it out himself.
 4    There seem to be, based upon my doing my prep, more than a few
 5    instances in which words seem to have been copied or pasted out
 6    of one declaration into another.  That's okay if both witnesses
 7    have knowledge, but as I said going forward Mr. Stanley and I'm
 8    not going to take away control of this trial from either of the
 9    two counsel, but you're not going to be helping me do my job if
10    either witness testifies as to things that he doesn't have
11    first-hand knowledge of.
12              THE WITNESS:  I understand, Your Honor.
13              THE COURT:  Continue, please, Mr. Smolinsky.
14    BY MR. SMOLINSKY:
15    Q.   Mr. Stanley, just so I can overlap the chronology, you
16    mentioned the fact that you were ill, when did that illness
17    begin?
18    A.   It's hard to say exactly because I have an endurance
19    athlete activity level.  So sometimes when your heart gets very
20    strong you can get an arrhythmia, and so it may have been
21    present for several years but it really started to affect me
22    toward the latter part of 2010.  I had never considered doing
23    anything about it but I decided that, you know, I went through
24    various tests and they recommended it highly that I have this
25    procedure so that I could return to my -- well I never really
```

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 26 of 137

Page 26

1  stopped the athletic functioning, but so that I could continue

2  on with my athletic functioning for many years to come.

3  Q.   Let me ask the question this way, Mr. Stanley, when do you

4  think that your ability to work on a full-time basis became

5  impaired?

6  A.   It wasn't until the end of 2010, toward the end of that

7  period of time.

8  Q.   So is it the case that Mr. Lamb left in 2009, you ran the

9  practice alone until the end of 2010 when you first became ill.

10  A.   Well I had Candace Lee who was a new attorney at the time.

11  She was newly admitted and she was working for me but it was

12  the two of us.

13  Q.   Let's go back to the chronology.  You received the notice

14  of the disclosure statement in September of 2010.  When was the

15  first time that you learned that there was a bar date?

16  A.   Sometime thereafter when I made those telephone calls that

17  I indicated to you I had made.  It was right around the same

18  day or two one way or the other.

19  Q.   Let's do it this way.  Are you aware that someone from

20  your office completed online claim forms on the Garden City

21  website on November 5th, 2010?

22  A.   That was me.  I was -- and I believe I did those at around

23  11 or 12 o'clock at night from my Santa Monica home.

24  Q.   So you received the notice in September, middle of

25  September, nothing happened in September, nothing happened in

Page 27

1    October and then November you -- November 5th you went on line

2    and completed the claim form?

3    A.   Well that's not true that nothing happened.  I was, I had

4    contacted, I believe it was Garden City because I was concerned

5    that no notice had been served by a court.  I contacted Garden

6    City, I didn't ever have a case where a non-court had served me

7    some kind of notice like that in one of my other bankruptcies I

8    did handle, and then they took a few days to get back with me.

9    And they did get back with me and informed me that there was

10   no, there was no claim filed and I needed to go on line and/or

11   file a motion.  I can't recall exactly, but I think they said

12   that you had to file a motion.

13        And so I had to follow their direction.  I filed a claim.

14   I typed up the claim form on line, then I typed up another one

15   on line about a month after that because I wasn't sure I had

16   done it right, and I filed the motion.

17   Q.   Okay.  Let's stick with the November 5th, 2010.  Would you

18   agree or disagree that you filled out a proof of claim form for

19   Anna Lisa Sand care of Martin Stanley at your address and one

20   for Judd Wiesjahn care of Martin Stanley, 137 Bay Street?

21   A.   Yes.  And I think it was that time I discovered that it

22   had Stanley Martin so I wanted to correct that, and I wasn't

23   sure exactly how to do that and so I went on the website and I

24   put that information in.

25   Q.   How did you learn that the names were backwards?

MOTORS LIQUIDATION COMPANY, ET AL.

Page 28

1    A.    Because there was a service list on that website and I

2    remember now, now that you've refreshed my recollection, that

3    when I was looking through those thousands of pages of

4    schedules and trying to figure out exactly which schedule her

5    claim was on, or my clients' claims were on, I noticed that it

6    said Stanley Martin Law Office and I never have gone by that

7    particular name.

8    Q.    Knowing how the mail works, Mr. Stanley, were you more

9    concerned that the notices were being sent to Judd Wiesjahn or

10   Anna Lisa Sand and then under it Law Offices of Stanley Martin

11   or were you more concerned that it said Stanley Martin instead

12   of Martin Stanley?

13   A.    I don't know and I think I even put -- well I think what I

14   did is when I went on there I put one Anna Lisa Sand care of

15   the Law Office of Martin Stanley; Judd Wiesjahn care of the Law

16   Office of Martin Stanley.  I think I also put my own name down,

17   Martin Stanley just so there would be backup.

18   Q.    I don't think that happened in November of 2010, but let's

19   now move forward to December.

20         Your testimony was that a month later, and in fact it was

21   in December, December 8th to be exact, that you completed a

22   second set of online claim forms; is that correct?

23   A.    Hang on one second.  I just want to point out something

24   that you're wrong on with regards to the foundation of your

25   question.  According to your own chart, it says on 11/5/2010 a

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 29 of 137

Page 29

1  solicitation -- well, maybe I'm wrong.  I'm not exactly sure.

2  Q.   Let me try to explain that to you.  The date created

3  refers to the record, so that that was when that new address

4  entered into the service.

5  A.   Right.  And it says --

6  Q.   The solicitation --

7  A.   -- it doesn't say Anna Lisa Sand --

8          THE COURT:  Gentlemen, you can't interrupt each

9  other.

10         THE WITNESS:  Sorry.

11         THE COURT:  This is not helpful to me when a question

12  is asked I need the question asked in full and then an answer

13  can come.

14         THE WITNESS:  Sorry.

15         THE COURT:  If there is an objection to the form of

16  the question or another evidentiary objection I'll let Mr. Lamb

17  raise the objection while you're testifying and vice versa.

18         THE WITNESS:  That's fine.

19         THE COURT:  But I do not permit people to interrupt

20  each other in trials before me.

21         THE WITNESS:  I apologize.

22         MR. SMOLINSKY:  I apologize, Your Honor.

23         THE WITNESS:  You may be correct, I may be wrong.

24  Q.   Now I don't know whose turn it is.

25         Just to explain how the chart works, if it refreshes your

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 30 of 137

Page 30

1    recollection, the date created is the date that the new address

2    becomes a record for service purposes.  The date served which

3    is the fifth column is the date that that particular document

4    got served.  The solicitation package was sent on 12/23/2010 in

5    the case that you were looking at which was based on to Anna

6    Lisa Sand care of Martin Stanley which was a record that was

7    created on 11/5/2010.

8    A.    May I comment on that?

9    Q.    Of course.

10   A.    Well it says on page 6 of 8 that you had my correct name

11   Martin Stanley, 137 Bay Street, Unit 2, Santa Monica,

12   California 90401, and it says the date created is 11/5/2010.

13   And if so --

14   Q.    You are correct, you are correct.  I apologize for

15   confusing you.

16        So now let's go to December 8th, 2010 approximately a

17   month later.  Mr. Stanley you went back on the website and

18   completed new proofs of claim form; is that correct?

19   A.    Yes.

20   Q.    And those proofs of claim forms were in the names of Anna

21   Lisa Sand care of Martin Stanley at the address or actually

22   two, then two for Judd Wiesjahn care of Martin Stanley, does

23   that sound correct?

24   A.    I believe so.

25   Q.    Mr. Stanley, why didn't you file the proofs of claim that

Page 31

```
 1    you created on November 5th, 2010?

 2    A.   Because it was my understanding I had to get an order from

 3    the court in order to do that, that's why I filed a motion.  We

 4    were planning on doing that and filed that shortly thereafter.

 5    Q.   So you filled out the claim form and then you said, did

 6    you learn at that point that the bar date was already set or

 7    had you known that when you filled out that claim form?

 8    A.   I had known that when I filled out that the bar date had

 9    passed because the people at Garden City had told me that.

10    Q.   So nevertheless you filled out the form and you did not

11    file that proof of claim at that time; is that correct?

12    A.   Well it was kind of very confusing for me because I

13    remember doing it the first time when I didn't know exactly how

14    it worked and I wasn't sure whether I was creating the form

15    when I typed the information in or whether that was the

16    information that you all already had, but the second time I

17    typed it in I had more information about it.  I had learned

18    more and so I thought I better redo it to make sure it was done

19    right.

20    Q.   So on December 8th you filled out the proofs of claim

21    forms on line, you printed them out, you didn't mail them in to

22    Garden City Group at that time; is that correct?

23    A.   That's true.

24    Q.   And you didn't send them to the debtors; is that correct?

25    Or to counsel?
```

Page 32

1   A.   I don't believe I did, but I can't recall for certain.

2   Q.   Do you remember when you filed this motion to seek --

3   A.   No, but I'm sure the court has the date and you do too.

4   Q.   It's docketed as a matter of record on January 3, 2011,

5   does that sound right?

6   A.   Sounds right.

7   Q.   Do you have any explanation for why you waited until

8   January 3rd to file the motion when you filled out the claim

9   form for the second time on December 8th?

10  A.   Yes, two things.  One, is we were researching the various

11  issues relating to presenting late claims, and that was a

12  little complicated because we'd never done one of these before

13  so we took some time to do that.  And additionally I have two

14  small children and I was out of town on vacation.  I think I

15  was in Costa Rica for a little bit time and Brazil, they are on

16  vacation from mid-December to early January so I was gone for a

17  little bit of time because of the vacation of my ten-year old

18  and thirteen-year-old.

19  Q.   Mr. Stanley, did you at any time from January 1st or 9th,

20  2009 to the time that you filed that motion ever consult a

21  bankruptcy lawyer, call up a friend whose practiced and said,

22  what do I do?

23  A.   No, because it was my understanding that you had to file a

24  motion so we were preparing that motion and we wanted to

25  research the law on it, and make sure we did it the right way.

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 33 of 137

Page 33

1    So I did not do that.

2    Q.   So just to recap the chronology, I just want to make sure

3    I have this right.  You received the disclosure statement

4    notice on September 3, 2010, that you concede.  You --

5    A.   No.  It says --

6    Q.   I'm sorry, it's September 13th.

7    A.   -- September 13.

8    Q.   I apologize.

9        Didn't do anything with that until November 5th at which

10   time --

11   A.   No, that's not true either.  Because as I said I called

12   Garden City and was getting information about this.

13   Q.   Okay.  You ultimately completed the proof of claim form

14   for the second time on December 8th and filed your motion on

15   January 3rd, 2011.

16   A.   That's true.

17           MR. SMOLINSKY:  Could you give me one second, Your

18   Honor.

19           THE COURT:  Yes.

20       (Pause)

21           MR. SMOLINSKY:  Your Honor, I have nothing further.

22           THE COURT:  Okay, redirect?

23           MR. STANLEY:  Does Your Honor want Mr. Lamb to

24   question me is that the way it works?

25           THE COURT:  I would prefer it.  If you're not capable

MOTORS LIQUIDATION COMPANY, ET AL.

Page 34

1    of doing that I'll ask Mr. Smolinsky whether he objects to

2    taking any redirect in narrative form?

3              MR. SMOLINSKY:  I have no objection, Your Honor.

4              THE COURT:  All right.  Then it's your choice

5    gentlemen.

6              MR. STANLEY:  If I could, Your Honor, I just would

7    like to point out a few things on this chart, and that's all I

8    would like to say.

9              THE COURT:  Yes.  Now folks for the sake of good

10   order, do we have agreement that this demonstrative, even

11   though it's a demonstrative and not classic evidence, can be

12   marked for identification as Debtor's Exhibit 2?

13             MR. SMOLINKSY:  Yes.  We would certainly agree with

14   that, Your Honor.

15             THE COURT:  All right.  And I have admitted it by

16   earlier ruling but only as a demonstrative.

17             Now when you're referring to documents, Mr. Stanley,

18   I would appreciate if from time to time you make it clear if

19   you're referring to a particular document that you refer to it

20   by the number that was given for the purpose of this record.

21             MR. STANLEY:  All right.

22             THE COURT:  Okay.  Continue, please.

23             MR. STANLEY:  Thank you, Your Honor.

24             Your Honor, I'm going to refer to Debtor's Exhibit

25   No. 2 with regards to my comments, if I may, Your Honor.

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 35 of 137

Page 35

1            REDIRECT EXAMINATION

2    BY MR. STANLEY:

3    Q.   First of all on page 1 of this particular document there

4    are indications of certain documents that are allegedly mailed

5    to our office, and the first document is Rachel Wiesjahn, Anna

6    Lisa Sand, 137 Bay Street, Unit 2.  I can assure the court we

7    never received any of these documents that are listed on this

8    particular page, that there would be no way that the post

9    office would know that Anna Lisa Sand or Rachel Wiesjahn, who

10   is dead by the way, would be at our office for any reason

11   whatsoever because they would never have been noticed to be a

12   recipient at that particular address.

13        So I can assure Your Honor that we've never received any

14   of those documents.  The one that was served on 6/5/2009 by

15   first class mail, I don't even know how they would have gotten

16   that particular address without putting my name on it.  And I

17   don't know where that information came from, but I can assure

18   you we didn't get it.

19        The next one which is the bar notice date they indicate

20   that that was returned as undeliverable and we agree we never

21   received that one either.  It wouldn't make sense --

22            THE COURT: Wait.  Are you -- oh, I see, where it has

23   a Y and the returned is undeliverable box?

24            THE WITNESS:  Correct.

25   Q.   So our position on all of these Your Honor is that we

MOTORS LIQUIDATION COMPANY, ET AL.

Page 36

1    never received any of those first, one, two, three, four, five,

2    on that page and then on the bottom Rachel Wiesjahn and Judd

3    Wiesjahn, my testimony would be identical.  They do agree that

4    they got that one back as undeliverable, the proof of claim

5    form by the way which is the most important document, and then

6    what did they do, if anything, to follow up with this fact that

7    these documents were undeliverable.  There is no evidence that

8    they did anything about that.

9         Then on the next page 2 of 8, again, my testimony would be

10   the same that we never received any of these particular

11   documents.  None of them.  Because they were not sent to the

12   Law Office of Martin Stanley, and they weren't even sent care

13   of the Law Office of Martin Stanley, they were just sent to

14   Rachel Wiesjahn or Judd Wiesjahn, people that never existed at

15   our address.

16        Again, they agree that the document, the fifth one -- one,

17   two, three, four, five, fifth one down was not delivered and

18   what follow up if any did they undertake to find out what went

19   wrong, there is no evidence in any of the papers that they did

20   anything about that, on page 2 of 8.

21        And with regards to all the documents on page 3 of 8, the

22   first one, my testimony would be the same.  The other one, two,

23   three, four, five, six I can assure you that we did get the

24   FedEx -- well, let me just see this.  I have some FedEx

25   envelopes that we did receive recently, they have my name

Page 37

1    correctly listed as Martin Stanley, and we may have received

2    this particular FedEx regarding notice of matters scheduled for

3    hearing on February 3, 2011, because I did get a document that

4    notified me of that, and I have the document here.  I do not

5    have the FedEx envelope or the address so I don't know how it

6    was addressed but I did receive that particular document.

7         That would be the one, two, three, four, fifth one down

8    when it starts Wiesjahn, Judd, Stanley Martin Law Office.  The

9    other ones we never received.  Other than that one that I did

10   mention I got which was the one sent November -- I'm sorry,

11   September 13, 2010 that triggered my concerns on this case.

12        On page 4 my testimony would be the same.  And it's

13   interesting that they indicate that they FedEx'd the Stanley

14   Martin Law Office Judd Wiesjahn on 2/1/2001 on page 3 of 8,

15   they don't make the same claim with respect to the Rachel

16   Wiesjahn documents that are listed on page 4 of 8.  They don't

17   claimed to have FedEx'd anything.  And Rachel Wiesjahn was the

18   unfortunate, I think she was 18 or 19-year-old girl that died.

19        Then there are documents that are allegedly sent to my

20   office, or to Stanley Martin Law Office to Anna Lisa Sand.

21   Again there is no FedEx of any hearing date sent with regards

22   to those documents that are listed on the bottom of page 4 of 8

23   and the top of page 5 of 8.

24        So it's showing that there's an inconsistent pattern and

25   practice of what they're doing with regards to providing notice

MOTORS LIQUIDATION COMPANY, ET AL.

Page 38

1   in this particular case.  And we did not receive those

2   documents, Your Honor.

3       Now it is true that on page 5 of 8 it indicates that I

4   created on 11/5/2010 this Anna Lisa Sand care of Martin Stanley

5   document.  But that was well after the bar date, as were every

6   other document that they served, other than that one that they

7   claimed to have served that was not received by us. None of the

8   other documents they sent were sent before the bar date.  There

9   was no follow up taken, no follow up whatsoever.  Not one other

10  document was sent, even they claim, until after September 1st,

11  2010 which was way after the bar date and to be honest with

12  you, I don't remember what the date was but I think it was

13  somewhere in 2009.  So it was way late.  There was no follow up

14  whatsoever.

15      Then at the bottom of page 5 of 8, again, I did create the

16  documents on 11/5/2010 because I was concerned and had been

17  investigating from the time that I received that notice of

18  hearing to consider approval of debtors' proposed disclosure

19  which was sometime in late September that I did get it.  Or

20  mid, it might have been mid-September.

21      And the other documents show things that were done in

22  December of 2010.  So I can assure Your Honor we take our

23  deadlines seriously.  We have never been accused in our office

24  of missing a deadline ever in our office.  Never.  I've never

25  had a malpractice claim for any such thing in my whole entire

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 39 of 137

Page 39

1    career.  And I can assure the court if we see a document, we

2    calendar it.  We have a multiple docketing system.  We use

3    various computers.  We know what's going on.  We check files

4    regularly, we are very thorough.

5         We handle -- we do not have a volume practice, we have a

6    very limited practice.  I try, generally, under five cases a

7    year.  They are all jury trials and they are only for

8    substantially injured people that have serious, serious

9    injuries.

10        I don't want to have a volume practice.  I've never had a

11   volume practice.  I learned when I lost my license that I

12   wanted to be extremely responsible with my practice.  I learned

13   to type my own envelopes and read my own mail because in the

14   early days I couldn't afford a secretary, and I practiced by

15   myself for many years.  Then eventually I worked up to having a

16   secretary, but I always had the practice because I was taught

17   this, I worked for a firm that represented attorneys who had

18   been disbarred during the time, and suspended and had been

19   subject to disciplinary proceedings during the seven years that

20   I was out of practice.  And I did briefs those entire seven

21   years relating to issues like this.  I learned to become

22   extremely responsible seeing thousands of mistakes.

23        The attorney that I worked for, Theodore Cohn (ph) has had

24   more Supreme Court decisions in California than any other

25   attorney in the state because he does lawyer disciplinary

MOTORS LIQUIDATION COMPANY, ET AL.

Page 40

1    proceedings, and I worked there for seven years.  I learned a

2    lot.

3        I can assure the court that I would never intentionally or

4    unintentionally miss a deadline.  I've never done that.  I'm

5    very serious about those things.  And that would be my

6    testimony, Your Honor.

7            THE COURT:  Very well.  Recross?

8                    RECROSS EXAMINATION

9    BY MR. SMOLINSKY:

10   Q.   Mr. Stanley, just a few questions.  Do you recall how many

11   copies of the solicitation package you received, that would be

12   the package that would include the final plan and disclosure

13   statement?

14   A.   That would be the one sent December -- September 13th of

15   2010?

16   Q.   On the list it's December 23rd, on the chart.

17   A.   I don't know.  I don't have my file here on that, I don't

18   know.

19   Q.   Would it surprise you if you received five copies or do

20   you think that you might have only received one?

21   A.   I can assure, one thing for sure is I never received

22   anything that was sent to Rachel Wiesjahn and Anna Lisa Sand

23   because I look at every envelope that comes in before it's

24   opened, and I have a practice that we all look at these things

25   together and multiply look at it.

```
 1        In other words I always have myself and Mr. Lamb or myself

 2    and the other attorney I had working with me at the time look

 3    at the mail.  I look at every piece.  I can't say on that

 4    particular document that was sent on 12/23/2010 that I ever got

 5    it even because I don't have my file here.  I know I received

 6    the one that was sent September 13, 2010.

 7    Q.   Mr. Stanley it sounds like you're trying to be very

 8    diligent in your practice.  Could you explain why from January

 9    of -- I mean from June of 2009 to September of 2010, more than

10    a year later, no action was taken with respect to preserving a

11    proof of claim?

12    A.   Two things; one I never knew about the bar date, and

13    number two because this action involved a criminal case that

14    was related in the underlying action because one of the persons

15    that was driving the vehicle behind the one driven by the

16    General Motors folks was drunk.  There were criminal charges

17    filed.  So all discovery in the entire case was stayed because

18    nothing could be done because that person was entitled to take

19    his Fifth Amendment Right not to testify against himself up

20    until just recently when he finally pled guilty about a month

21    or two ago.

22        There was no action on the case whatsoever as against

23    either GM or any of the other defendants for that matter.  Now

24    we did go to about three or four status conferences and it was

25    my understanding that the bankruptcy continued during that
```

MOTORS LIQUIDATION COMPANY, ET AL.

Page 42

1    period of time.  But I had no knowledge that there was a bar

2    date.

3              MR. SMOLINSKY:  I have no further questions, Your

4    Honor.

5              THE COURT:  All right.  Any re-redirect?

6              MR. STANLEY:  No, Your Honor.

7              THE COURT:  I'm going to be questioning under 614,

8    Rule 614 of the Federal Rules of Evidence.  I'm going to remind

9    both sides that you have the right to object to any of my

10   questions, and though it may seem counterintuitive I do try to

11   rule on objections to my questions.

12                          EXAMINATION

13   BY THE COURT:

14   Q    Mr. Stanley, when was your State Court lawsuit filed?  I'm

15   sure it's in documents that I have, but can you help me with

16   it.

17   A.   I know the complaint was attached, I believe, to my

18   declaration.  I don't have my --

19   Q.   Well my copy of your declaration doesn't have exhibits

20   attached to it.

21   A.   I apologize.  It was attached to the motion which is on my

22   desk.  The motion that was filed in the Court, it was an

23   exhibit to the motion.  I think I don't have the date.

24              THE COURT:  Mr. Smolinsky, do you mind if I ask Mr.

25   Lamb to hand it up to the witness or can you provide it to me?

Page 43

1          MR. SMOLINSKY:  I don't mind.

2          THE WITNESS:  Thank you, appreciate it.

3     A.   It indicates that it was signed by Mr. Lamb as a matter of

4     fact on April 15, 2009 and my assumption, I don't have the file

5     stamped copy would be that it was served very, very -- or filed

6     very, very shortly thereafter in Northern California.

7          THE COURT:  All right.  And does anybody mind me

8     taking judicial notice of the fact that Santa Monica,

9     California is in Southern California or in the Central District

10    of California, but not Northern District of California?

11         THE WITNESS:  I have to make a -- I have no objection

12    to that.  I have one correction in my testimony.

13         THE COURT:  All right.  Mr. Smolinsky, you're okay

14    with me noting where Santa Monica is?

15         MR. SMOLINSKY:  I have no idea, Your Honor, so I will

16    defer to you.

17         THE COURT:  All right.

18    Q.   Do you want to correct your testimony before I continue,

19    Mr. Stanley?

20    A.   I do, Your Honor.  That was the first amended complaint

21    actually that was filed on April 15th.  I notice because there

22    is a civil case cover sheet, and I'm happy to show Mr.

23    Smolinsky as well, that has a date on it, that's the initial

24    pleading that's filed in the court.  It has actually a case

25    number on it and it's dated December 18, 2008.  So the action

MOTORS LIQUIDATION COMPANY, ET AL.

Page 44

```
 1   was filed --

 2   Q.    Okay.

 3   A.    -- a little earlier.

 4         THE COURT:  Now I imagine both sides will agree that

 5   that's before the General Motors bankruptcy case was filed, the

 6   date that the lawsuit was originally filed.

 7   Q.    And you'll agree with that Mr. Stanley?

 8   A.    Yes.

 9   Q.    Did General Motors have a lawyer with whom you were

10   dealing during the time between December 18th, 2008, the date

11   your lawsuit was filed, and the date which I believe was in

12   June, I don't remember the exact date, in 2009, when GM filed

13   this Chapter 11 case?

14   A.    It depends on what you mean by dealing with.  I know that

15   there was a stay filed in our proceeding, a notice of stay

16   filed by Vickie Turner at Christian S. -- and Christian S.

17   Scott at Wilson, Petty, Kosmo, K-o-s-m-o, & Turner in San Diego

18   on June 9th, 2009.  So I know we had a communication with them,

19   but I can't say the nature and scope of the communication.

20   Q.    Did you have a telephone conversation with Ms. Turner on

21   or about June 9th, 2009?

22   A.    I can't say that I did.  I can only say that I did receive

23   the notice of stay of proceedings, which was filed in the state

24   court case, along with a declaration of service also filed in

25   the state court case.  And the state court case was in the
```

Page 45

1    County of Monterrey, which is, I think, just south of San

2    Francisco, the Monterrey Peninsula.

3    Q.   I think you used the words or very close to these words,

4    "I can't say that I did."  By that, do you mean that you don't

5    have a memory one way or another of speaking to Ms. Turner in

6    or around June 2009, or that you're telling me that you had no

7    such conversation or some other possibility?

8    A.   I can't recall one way or another.

9    Q.   Okay.  At any later time, did you have any conversation,

10   by phone or otherwise, with any lawyer who was defending GM in

11   that lawsuit after you brought the lawsuit?

12   A.   I can't recall that I did one way or another.

13   Q.   You've now told me that you can't recall one way or the

14   other whether you had a conversation.  Did you try to have a

15   conversation with any lawyer for GM after you filed your

16   lawsuit on December 18th, 2008?

17   A.   I can't say one way or the other, Your Honor.  I won't --

18   Q.   All right.

19   A.   -- because of that.  I really can't.  I'm not sure.

20   Generally, this is what happens.  I can talk about the pattern

21   and practice in our office if Your Honor --

22   Q.   I want you to answer my questions.

23   A.   I can't --

24   Q.   After I ask my questions, I'm going to give both sides the

25   opportunity to follow-up, but I need you to indulge me to

Page 46

```
 1    answer just my questions.

 2    A.    Okay.

 3    Q.    You told me that your law office has a mailbox in

 4    proximity to other mailboxes.  How many other mailboxes

 5    surround your office's mailbox?  That is the mailbox for Unit

 6    No. 2 at 137 Bay Street?

 7    A.    I believe it's sixteen or seventeen total.  I think it's

 8    seventeen total, sixteen for the units, and then there's a

 9    separate box right next to it for the landlord.

10    Q.    How big is your unit's mailbox?

11    A.    I mean it's -- so it'd be about --

12    Q.    That won't help on a written transcript.

13    A.    Yeah.

14    Q.    Can you give me dimensions in inches, if you can?

15    A.    Approximately -- yes, I apologize.  Approximately a foot

16    wide and three or four inches high, and then maybe a foot and a

17    half deep, maybe two feet deep.

18    Q.    Two feet deep?

19    A.    Yes, so lots of mail can fit in there.

20    Q.    To what extent, if any, have you encountered situations in

21    which all of your mail can't fit in your box?

22    A.    Never.  And if that happens, I think the postman brings it

23    up.  I don't know that that's ever happened, though, so.  I

24    don't believe it ever has.

25             THE COURT:  I'm going to give both sides the
```

Page 47

1    opportunity to object to this, but would somebody hand the

2    witness a legal pad, a blank legal pad.

3              THE WITNESS:  Thanks.  Appreciate it.

4    Q.   Mr. Stanley, would you draw a picture of how your mailbox

5    appears in the context of the remaining boxes that surround it?

6    A.   I'll do my best.  I'm not the best drawer, but I will what

7    I can do.  (Witness complies)

8    Q.   I can't see it from that distance.  You'll forgive me, I

9    have eyesight limitation.

10   A.   It should be --

11             THE COURT:  First show it to Mr. Smolinsky and then

12   hand it to me.

13             THE WITNESS:  Okay.

14   Q.   And mark yours, and also mark on it where the one foot

15   wide is and where the three to four inches high appears.

16   A.   And by the way, these are supposed to be the same.  The

17   ones that I'm drawing are all supposed to be the same size, but

18   because I started out wrong, it didn't work that way, so.

19   Three inches.  And this is like -- I can draw another one, if

20   Your Honor would like me to.

21             THE COURT:  Okay.  Now, the drawing that you just

22   made is going to be marked Court Exhibit 1 for identification,

23   but at this juncture, it's identification only.

24   (Court Exhibit 1, Handwritten Drawing, was hereby marked for

25   identification)

MOTORS LIQUIDATION COMPANY, ET AL.

Page 48

1          MR. SMOLINSKY:  Your Honor, do you mind when you mark

2   it to just include the first page, so I can have the rest of my

3   pad back?

4          THE COURT:  I can't hear your question.

5          MR. SMOLINSKY:  Would you mind if you just mark the

6   first page as the -- for identification, so I can get the rest

7   of my pad back.

8          THE COURT:  Oh, yes.  And we'll also help the world

9   understand why a Court exhibit doesn't say Weil Gotshal &

10  Manges on it.

11         THE WITNESS:  I think Your Honor can see what I mean

12  by the -- they're supposed to be the same size, but I started

13  out kind of wrong.

14  Q.   Now, I'm looking at Court Exhibit No. 1 for ID, Mr.

15  Martin, and I see --

16  A.   Mr. Stanley.

17  Q.   Excuse me, Mr. Stanley.

18  A.   This is an easy mistake that a lot of people have made

19  throughout my life.

20  Q.   I understand, but at this point, forgive me, I don't need

21  commentary.

22       And Unit No. 2 appears to be under a Unit No. 1 and

23  followed by five boxes below it.  How many boxes are there

24  actually below it?

25  A.   I think there are eight on each side and it's two rows.

MOTORS LIQUIDATION COMPANY, ET AL.

Page 49

1    Q.    There are two rows?

2    A.    Correct.  That's why I drew the other side, but they

3    should've been equal sized and it's like a box kind of thing,

4    and I'm trying to -- I believe there are two rows and they are

5    about -- the box is about three feet wide in total, and by

6    about three feet high total, something around there.  And it's

7    about three or four inches of each box, eight I think on each

8    side.  And then one on the left would be the owner's box if

9    you're looking at them from the front.

10   Q.    All right.  And you said, as I understood it, that the two

11   columns, if you will, of eight boxes each are substantially the

12   same in size?

13   A.    They're all identical size.

14   Q.    Except for that, is this drawing a fair representation of

15   your memory of the way the mailboxes look?

16   A.    Yes.  They all have a little number on them, but it does

17   not correspond to the unit, and I don't know the -- exactly --

18   I only looked at my No. 2, and that's basically what I look at.

19   I'm not exactly sure of the numbering system, but I think it's

20   1 through 8 and 9 through 16, but I don't want to say because

21   I'm not sure.

22            THE COURT:  All right.  Actually, give this back

23   first to Mr. Smolinsky.

24            Mr. Smolinsky, do you want to be heard on whether

25   this document can be taken into evidence?  Or for that matter,

MOTORS LIQUIDATION COMPANY, ET AL.

Page 50

```
 1    if you want to voir dire?

 2            MR. SMOLINSKY:  I don't have a problem with that,

 3    Your Honor.  I would just note for the record again that the

 4    picture, as testified to, is distorted, and that the mailboxes

 5    in both columns are of equal width.

 6            THE COURT:  Fair enough.  But with that

 7    clarification, you're okay with it being taken into evidence?

 8            MR. SMOLINSKY:  Yes, Your Honor.

 9            THE COURT:  Mr. Stanley, the same question.

10            MR. STANLEY:  Yes, Your Honor.

11            THE COURT:  All right.

12    (Court Exhibit 1, Handwritten Drawing, was hereby received into

13    evidence)

14    BY THE COURT:

15    Q.   To what extent, if any, do you have a memory of mail that

16    should've gone to you in the past, having been put in other

17    tenant's mailboxes?

18    A.   Not much.  Occasionally a single envelope.  Maybe on three

19    or four occasions over the past, almost three years or two and

20    a half years that I've been at the office.  But when it was

21    addressed to me, maybe once or twice, maybe three times the

22    neighbor in the back would bring it up and give it to me.

23    Q.   To what extent, if any, has mail for your neighbors wound

24    up in your mailbox?

25    A.   The same probably, maybe once or twice, maybe three times.
```

MOTORS LIQUIDATION COMPANY, ET AL.

Page 51

1    I can --

2              THE COURT:  Okay.  I have no 614 questions.  Does

3    either side want to move to strike any of the questions and

4    answers that were occasioned by reason of my 614 question?  Mr.

5    Smolinsky?

6              MR. SMOLINSKY:  No, Your Honor.

7              THE COURT:  Mr. Stanley?

8              MR. STANLEY:  No, Your Honor.

9              THE COURT:  All right.  Does either side want to ask

10   follow-up questions based upon the 614 questions that I asked?

11   Mr. Smolinsky?

12             MR. SMOLINSKY:  Just one question, Your Honor, and it

13   doesn't relate necessarily to your questions, but to the

14   commentary that Mr. Stanley made.

15             THE COURT:  It is new since the last time that you

16   questioned?

17             MR. SMOLINSKY:  Yes, Your Honor.

18             THE COURT:  Okay.

19                        RECROSS EXAMINATION

20   BY MR. SMOLINSKY:

21   Q.   Mr. Stanley, you testified that your name is often

22   confused, Stanley Martin/Martin Stanley.  How often do you

23   receive mail that's addressed to Stanley Martin?

24   A.   Never.

25   Q.   Not once?

Page 52

1    A.    Never.  I have people sometimes calling me, oh is your

2    name Stanley Martin, but I have never received mail, and no

3    counsel on any case has ever sent me anything with Stanley

4    Martin other than this case.

5    Q.    And how often do you receive mail in the name of your

6    clients care of?

7    A.    Very rare.  If it's care of Martin Stanley extremely rare,

8    because it's inappropriate in California to communicate with

9    counsel, so no attorneys are sending letters to your client.

10   It would be a violation of your duties under the ethical codes

11   to communicate with clients directly.  You're not allowed to

12   really send those types of envelopes, so nobody that I recall

13   has ever sent me one before in the past.

14           MR. SMOLINSKY:  Thank you, Your Honor, no further

15   questions.

16           THE COURT:  All right.  Mr. Stanley, do you want to

17   engage in follow-up vis-a-vis the questions that I asked on my

18   questioning under Federal Rule of Evidence 614?

19           MR. STANLEY:  No, Your Honor.

20           THE COURT:  Okay.  Then you're excused and can return

21   to the counsel table.

22           MR. STANLEY:  Thank you, Your Honor.

23           THE COURT:  We'll take a recess until 11:20 and then

24   I'll hear cross-examination, if any, of Mr. Lamb.

25           MR. STANLEY:  May I state one thing, Your Honor, if I

Page 53

1     might about scheduling.

2              THE COURT:  Scheduling the trial or scheduling this

3     part of your testimony or something different?

4              MR. STANLEY:  No, just about the hearing today, the

5     scheduling of it.

6              THE COURT:  Yeah.

7              MR. STANLEY:  I have a trial starting on Monday in

8     Nevada, and at noon, there are three motions in limine that I'm

9     supposed to be appearing on by telephone, noon our time here.

10             THE COURT:  Noon Eastern time?

11             MR. STANLEY:  Well, it'd be nine o'clock Nevada time,

12    and if it's possible, I have no one else that could attend that

13    particular hearing that's competent.  My local counsel is not

14    up to speed on those motions, because I'm the one that's trying

15    the case.

16             THE COURT:  All right.  I'll give you that courtesy.

17             MR. STANLEY:  Thank you.

18             THE COURT:  One way or another we'll break at noon.

19             MR. STANLEY:  Okay.

20             THE COURT:  How long will you need to do what --

21             MR. STANLEY:  My best guesstimate, because I'm not

22    the judge, is less than a half an hour.

23             THE COURT:  All right.  Then what we'll do is, we'll

24    try to finish Mr. Lamb if we can, and see if we can get into

25    Mr. Ferrante's testimony, but we'll take an early lunch hour

MOTORS LIQUIDATION COMPANY, ET AL.

Page 54

1    and we'll recess at noon if need be.

2            All right.  In light of that, I'm going to make the

3    break even shorter.  Let's try to get back in five minutes if

4    we can.  We don't have a full courtroom where lots of people

5    are going to be waiting to get into men's rooms and ladies'

6    rooms.  Okay.  We're in recess.

7    (Recessed at 11:11 a.m.; reconvened at 11:18 a.m.)

8            THE CLERK:  All rise.  Have seats, please.

9            THE COURT:  Okay.  Mr. Smolinsky, would you like to

10   question Mr. Lamb?

11           MR. SMOLINSKY:  Yes, sir.

12           THE COURT:  Sure.  Mr. Lamb, come on up, and remain

13   standing to be sworn, please.

14           THE CLERK:  Raise your right hand.

15                   JEFFREY LAMB, WITNESS, SWORN

16           THE CLERK:  Please be seated.

17           THE COURT:  All right.  Have a seat, please, Mr.

18   Lamb, and same request of you, keep your voice up, stay close

19   to the microphone.  Mr. Smolinsky.

20                       CROSS EXAMINATION

21   BY MR. SMOLINSKY:

22   Q.   Good morning, Mr. Lamb.

23   A.   Good morning.

24   Q.   For who are you currently employed?

25   A.   I'm employed as an associate with the Law Office --

Page 55

1          THE COURT:  I can't hear you, Mr. Lamb.

2          THE WITNESS:  I'm sorry.  I'm employed as an

3    associate with the Law Office of Martin Stanley.

4    Q.   And when did you first begin working for Mr. Stanley?

5    A.   That was before I even entered law school in July of 2004.

6    Q.   So through the time that you left in 2009, you had no

7    other employment other than for Mr. Stanley?

8    A.   That's correct.

9    Q.   What year did you graduate law school?

10   A.   I graduated in May of 2008, and was admitted to the Bar

11   that November.

12   Q.   Did you take bankruptcy classes in law school?

13   A.   I did take bankruptcy classes in law school.

14   Q.   In fact, you got the highest grade in your class; isn't

15   that correct?

16   A.   That's true.

17   Q.   Have you appeared in bankruptcy court before this?

18   A.   I believe I've appeared twice in bankruptcy court.

19   Q.   Could you describe those situations?

20   A.   One time was with respect to an interpleader action that

21   Mr. Stanley referred to, and the other, I believe, and I'm not

22   sure, but I believe I appeared by telephone on a motion for

23   relief from the automatic stay.  And those are the two times.

24   Q.   In the class or in later practice, did you learn about bar

25   dates and the automatic stay?

Page 56

1    A.    Not that I recall.  It was generally related to litigation

2    matters within the bankruptcy court.

3    Q.    When did you first become aware that General Motors

4    Corporation filed for Chapter 11?

5    A.    I really don't recall.  I know that it was discussed in

6    the news.  I have no recollection of when that first came

7    about.

8    Q.    As I noted for Mr. Stanley, the bankruptcy was filed on

9    June 1st of 2009.  Do you remember, at that time, seeing news

10   stories about the filing?

11   A.    Nothing specifically other than hearing about there was a

12   giant bankruptcy that was going to go forward was my

13   understanding.

14   Q.    So you believe that the notice of bankruptcy that was

15   served out on June 9th, 2009 may have been the first time that

16   you learned about the General Motors bankruptcy?

17   A.    I really couldn't say, because I don't recall exactly when

18   all of the news stories came out.

19   Q.    Mr. Stanley testified that he has maybe four or five

20   trials a year, it's a small firm.  I would think that it would

21   be a big news that the defendant in one of your cases had filed

22   for bankruptcy.  Do you remember the first conversation you had

23   with Mr. Stanley regarding the filing?

24   A.    The bankruptcy filing?

25   Q.    The bankruptcy filing or the impact that it might have on

Page 57

1   your pending case?

2   A.   I really don't recall whatsoever.  When the matter was

3   first filed, the state court action, I don't even believe GM

4   was a defendant.  That was filed in December of 2008.  It was

5   when the first amended complaint was filed or maybe just prior

6   to that, that GM became a party in the action.

7   Q.   Do you disagree with the testimony earlier that the

8   amended complaint was filed in, I believe, May of 2009 shortly

9   before the bankruptcy was filed?

10  A.   If I recall correctly, I think it was sometime in April,

11  but without the papers in front of me with the proof of

12  service --

13  Q.   That's correct, April 15, 2009.

14  A.   I would have to believe that that's when the proof of

15  service went out, it was filed at or about that time.

16  Q.   I notice that the tire manufacturers were not named as

17  defendants, although they were talked about in the complaint.

18  Without getting into attorney/client privilege, can you tell me

19  whether those entities were named later in the lawsuit?

20          MR. STANLEY:  Your Honor, I have to object to this.

21  Mr. Smolinsky doesn't practice in the California area nor in

22  civil litigation, but I think his foundation for his question

23  is incorrect.  If one would take a look at the first amended

24  complaint, I'm happy to explain the procedure if Your Honor

25  would like or to Mr. Smolinsky as well.  But I think he's wrong

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 58 of 137

Page 58

1   because both the General Motors Corporation and Chevrolet,

2   Bridgetown Fire (sic) and Goodyear Rubber were named in the

3   first amended complaint.  They're named within the body of the

4   first amended complaint, because once an action is filed,

5   you're not supposed to change the caption.  I don't know if

6   Your Honor can see from there.  There's a caption, you don't

7   get to change the caption name when you bring in new

8   defendants, you simply name them in the body of the complaint,

9   and that's how they're --

10          THE COURT:  Show it first to Mr. Smolinsky, and then

11  show it to me.  I'll rule on it if the document is given to me,

12  but if you want to voluntarily amend your question, Mr.

13  Smolinsky, then I won't need to rule.

14          MR. SMOLINSKY:  I will, Your Honor.

15  BY MR. SMOLINSKY:

16  Q.   Mr. Lamb, the case has been stayed against all defendants

17  since the bankruptcy was filed; is that correct?

18  A.   Basically, yes.

19          THE COURT:  Pause.  When you said all defendants, you

20  meant defendants besides GM, Mr. Smolinsky?

21          MR. SMOLINSKY:  Yes, Your Honor, including the newly

22  named defendants, the spare tire manufacturer.

23          THE COURT:  Uh-huh, okay.

24  Q.   Did you have any discussions with Mr. Stanley around the

25  time that you received a notice about how the bankruptcy would

MOTORS LIQUIDATION COMPANY, ET AL.

Page 59

1   impact the pendency of the case?

2   A.   I don't recall specifically having any conversations

3   related to that issue.

4   Q.   Other than signing the complaint, were you actively

5   involved in the strategy or prosecution of that action?

6   A.   Yes.

7   Q.   And you don't recall the significant impact that that

8   notice would have had on the pendency of that action?

9   A.   At that time, the entire action was stayed because of the

10  pending criminal investigation that was going on.  So there was

11  really no movement whatsoever.  There was law and motion on the

12  complaint itself for a little bit, but even that got stayed, I

13  believe if I recall correctly, because the judge had so many

14  issues.  They had the pending bankruptcy, the pending criminal

15  case, and we were just having a status conference to see where

16  we were at every sixty to 120 days, and other than that, there

17  was no movement.

18  Q.   Mr. Lamb, what were the circumstances upon -- under which

19  you resigned your position in December of 2009, if resigned is

20  the right word?

21  A.   It was one of those situations where I had worked in the

22  same office all through law school, I'd never done anything

23  different, I'd never clerked for anyone else.  An opportunity

24  arose at that time, which was very rare, given the state of the

25  economy and jobs in our profession.

Page 60

 1        I took the opportunity to move on, but Mr. Stanley had

 2    taught me how to practice law essentially, I'd learned a lot,

 3    and he had his heart issue, and my wife had actually had the

 4    same heart issue a year prior.  She'd had the same surgery.  So

 5    when he called me and told me what was going on, it was -- I

 6    had practiced for a year elsewhere, and it was a fun

 7    opportunity to come back and do what I loved at the same place.

 8    So that's basically the genesis of me being there, leaving, and

 9    coming back.

10    Q.    And what was the exact date, do you recall, that you left

11    the employment for Mr. Stanley?

12    A.    It was some time in December of 2009.

13    Q.    And do you remember when you returned?

14    A.    It was sometime around February, middle of February, it

15    could've been like the second week of 2011.

16    Q.    Did you converse with Mr. Stanley during that hiatus?

17    A.    Yes.

18    Q.    Did you ever talk about the General Motors case?

19    A.    No.

20    Q.    He never mentioned to you that there was an issue with the

21    bar date?

22    A.    I never became aware of that until I came back to the

23    office and reviewed the file.

24    Q.    And what were you told when you came back about the

25    pendency?  There was the reply that was filed on February 1st,

Page 61

1   shortly before you came back.

2   A.    Coming back into the office and being a two-lawyer firm, I

3   refamiliarized myself with any old files that had been there to

4   see what had gone on, and any new files that were there since

5   I'd left.  And we do a status check.  So we go through, here's

6   a list of all of our cases, this is where the case sits.

7        When we did that, I became aware of briefly what had

8   happened in that case, which was that it was still stayed, but

9   there was this issue with respect to the bankruptcy court and

10  this motion had been filed.  And after that, and in preparation

11  for my declaration, I thoroughly went through this file.  In

12  fact, I looked at every piece of paper that was in it about ten

13  days ago, so that I knew everything that I possibly could about

14  what was going on for today's hearing and into the future.

15  Q.    Is it your testimony that you didn't -- weren't aware of

16  the issue until you reviewed the file on your own?

17  A.    I believe I found out that there was an issue with respect

18  to the bankruptcy court when I, you know, would've first come

19  back probably in March, February or March.  But not thoroughly,

20  because I'm coming up to speed on a lot of different cases.

21  Q.    Are you aware of Mr. Stanley or the law firm -- his law

22  firm ever missing a deadline before?

23  A.    Not that I can recall that was, you know, a bar date or

24  any -- we've never had that type of issue before.

25  Q.    That's a pretty significant issue missing a bar date.

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 62 of 137

Page 62

1    A.    If you say so.

2    Q.    Well, you said nothing as important as a bar date.

3    A.    Well, I'm talking about just missing a deadline on filing

4    a motion for summary judgment.  I know we've never blown a

5    statute.  I know we've never been sued for malpractice during

6    the time that I was there with respect to blowing any statute

7    date or anything that I can think of that would be similar to

8    that.

9    Q.    If you did miss a deadline, what would you do about it?

10   A.    Well, I think you'd do what we did here, which is filed

11   the motion to -- for relief, or to address the issue with the

12   court.  That's what I would do.

13   Q.    Four months after you received notice of it, of the missed

14   date?

15   A.    Well, I don't follow you.

16          MR. STANLEY:  I object.

17          THE COURT:  Do you want to rise when you speak to a

18   judge, please?

19          MR. STANLEY:  Oh, I apologize.  I have to object only

20   because I think the timeframe is off in terms of the four month

21   claim.  That misstates the evidence.

22          THE COURT:  Sustained.  Restate the question again,

23   Mr. Smolinsky.

24   BY MR. SMOLINSKY:

25   Q.    Mr. Lamb, you weren't at the law firm in -- when the

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 63 of 137

Page 63

1    notice of the disclosure statement filing was filed as it was

2    testified to earlier in September of 2010, correct?

3    A.   In September?

4    Q.   Yes.

5    A.   I was not there.

6    Q.   And just for the record, your declaration also speaks to

7    the preparation of proofs of claim on the website in paragraph

8    19 of your declaration.  You were also not there at that time,

9    and would ask that that paragraph be stricken; is that correct?

10   A.   At what time?

11   Q.   The plaintiffs preparing a proof of claim forms using the

12   blank claim form on the Motors Liquidation website.

13          MR. STANLEY:  Your Honor, I'm going to object to that

14   only because he indicated he reviewed the files, so he does

15   have personal knowledge of what's in there.

16          THE COURT:  No, I'm overruling that.  Mr. Stanley, it

17   looks to me and I'll allow you or Mr. Lamb to explain it, the

18   material parts of one or both declarations were physically cut

19   and pasted or copied from the other or otherwise moved or

20   adopted or adapted from one to the other, even with

21   typographical errors.  I want to get explanations as to who

22   knows what.  As I said, the objection's overruled.  Continue,

23   Mr. Smolinsky.

24   BY MR. SMOLINSKY:

25   Q.   Mr. Lamb, when you reviewed the file did you see in the

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 64 of 137

Page 64

 1   file filled out proofs of claim forms that were dated in

 2   November of 2010?

 3   A.   That I don't recall specifically without having the file

 4   in front of me.

 5   Q.   Do you remember seeing proofs of claim form that were

 6   dated December in the file?

 7   A.   When I was going through the file, I was double-checking

 8   dates of when documents were served on the office.  And, in

 9   fact, in my declaration and if you review it carefully, I fixed

10   several dates that I felt were incorrect.

11       For instance, I believe it said that we received notice of

12   the bankruptcy stay in 2010.  My declaration fixes that and

13   puts the correct date of 2009.

14       So was I specifically looking for claims forms in the

15   file, no.  What was I doing was, I was trying to make sure that

16   there was an entirely accurate record with respect to when

17   things were served and filed in my declaration, to give the

18   Court the most complete information I could based on my

19   personal knowledge.  That's what I did.

20       Did I look specifically in December or September, at the

21   time, yes.  Do I have a perfect recollection of that right now,

22   no.

23           MR. SMOLINSKY:  Your Honor, may I hand the witness

24   his declaration?

25           THE COURT:  Yes.

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 65 of 137

Page 65

1  Q.   Mr. Lamb, if you could look at paragraph 19 of your

2  declaration.

3  A.   Yes.

4  Q.   Could you tell me what in that paragraph you can testify

5  to based on your personal knowledge?

6  A.   Yes.  I reviewed Exhibit G to our motion to file a late

7  proof of claim, and to me, that appeared to be the proof of

8  claim forms using the form provided by the website.

9       So when I say that the plaintiffs prepared the proof of

10  claim using the blank claims form on the Motors Liquidation

11  website with the web address attached, and it then says,

12  "attached is Exhibit G to the motion," and that is my personal

13  knowledge based on the review of the motion, and that's exactly

14  what I said in my declaration.

15  Q.   Do you know when that claim form was signed?

16  A.   Without having it specifically in front of me, I could not

17  tell you.

18       MR. SMOLINSKY:  Your Honor, if I could approach?

19       THE COURT:  Yes.

20       THE WITNESS:  It appears it was signed on December

21  9th, 2010.

22  Q.   Mr. Lamb, were you alarmed when you reviewed that motion,

23  based on the importance of the bar date that was missed?

24  A.   I don't even know what you mean by alarmed.  When I

25  practice law, I look at a motion and I think everything's

Page 66

1    important.  So I came here today and I prepared my declaration,

2    because I'm trying to do the best for my client with zealous

3    advocacy.  I don't think saying alarmed would be appropriate.

4    Q.   Going back to your earlier testimony, is it your testimony

5    that you didn't have any conversations with Mr. Stanley about

6    the bar date issue until you had an opportunity to sit down

7    with all the files and review them for their current status?

8    A.   I think that misstates my testimony.  What my testimony

9    was is, I got a brief overview of what was going on in the

10   case.  I knew there was a bankruptcy issue.  After that, I

11   reviewed the file thoroughly and did that in preparation for my

12   declaration and my testimony here today.

13   Q.   Mr. Lamb, you heard the testimony that was given by Mr.

14   Stanley.  Was there anything in that testimony that you think

15   is inaccurate or misrepresents the facts?

16   A.   No, I do not.  Although I would -- I think I could provide

17   a better drawing for the Court of our mailbox issue, but we can

18   talk about that if you want.

19   Q.   We'll leave that for the Judge to request.

20        Let me just reconfirm your understanding that in the month

21   of September 2009 if you could recall, that each and every day

22   as you state in your declaration, you reviewed the mail with

23   Mr. Stanley.

24   A.   In 2009, that's true.

25   Q.   And do you agree with the testimony that in September of

Page 67

1   2009 no envelopes or documents were delivered by General Motors

2   Corp. or Motors Liquidation Company during that period?

3   A.   I do believe that's the case.

4   Q.   When you -- when did you first discuss, to the best of

5   your recollection, whether there was anything that was needed

6   to be done with respect to the General Motors bankruptcy

7   filing?

8   A.   Like I said before, I don't -- I think that question's a

9   little overbroad, because the issue was, when we appeared at

10  the court hearing, and the Court in the state court action

11  continued the entire action because of or stayed it because of

12  everything that was going on there was really nothing else that

13  was needed to be done at that time.

14  Q.   Did you learn in law school or in your practice about

15  proofs of claim -- do you know what a proof of claim is?

16  A.   I think I already told you that my bankruptcy class was

17  related to litigation matters, and did not really have any -- I

18  can't think of one case or one lecture that dealt with any bar

19  dates or any claims of creditors, if that makes sense.

20  Q.   Mr. Lamb you signed the first amended complaint.  Was that

21  case your day-to-day responsibility?

22  A.   It was a case that I was working on in the office.  There

23  were only two lawyers at the time, but it's a collaborative

24  effort generally on all of our cases.  So I might have signed

25  it after we reviewed -- I mean, we reviewed that several times

Page 68

1    before it was filed and sent to the court.

2    Q.    So at no time did you discuss with Mr. Stanley whether a

3    proof of claim needed to be filed, even to say, don't worry,

4    let's sit back and wait until we receive a bar date notice?

5    A.    I don't recall any conversation to that effect whatsoever.

6          MR. SMOLINSKY:    Your Honor, can I have a moment?

7          THE COURT:    Yes.

8          (Pause)

9    Q.    Mr. Lamb, let me just go back to our discussion about

10   missed deadlines.    There seemed to be a hesitation there.    Was

11   there any -- you mentioned a summary judgment matter.    Can you

12   elucidate that a bit?

13   A.    I think I said that I don't believe we've ever missed any

14   deadline for an important, for instance, opposition to a motion

15   for summary judgment, or for a statute, you know.    You have a

16   case management conference statement that's due fifteen days

17   before in state court.    Do you file one thirteen or twelve days

18   before, sometimes you do, but that's not like something that's

19   knocking out a claim or doing anything else like that.    And, in

20   fact, I don't think I've ever had a judge tell me, oh, Mr.

21   Lamb, you filed this two days late.    It's -- and some judges

22   say -- they change the deadlines and say, please file it as

23   long as it's two court days before is fine.

24   Q.    So how do you differentiate between a deadline that's

25   really important and a deadline that's not really important?

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 69 of 137

Page 69

1    A.    The same way every lawyer does.

2    Q.    But you consider a bar date to be a pretty important date?

3    A.    Obviously in this case it was very important.

4    Q.    Why do you think it's so important if you didn't even

5    think about whether a proof of claim needed to be filed when

6    you learned that General Motors filed for bankruptcy?

7    A.    I don't believe that I ever found out of any bar date, or

8    anything else during the time that I was practicing before I

9    left with respect to this case.  So I really couldn't answer

10   that question.

11   Q.    So when you reviewed the papers, when you came back, and

12   you reviewed the motion that was filed for extension of bar

13   date, were you surprised that there was a bar date, or that a

14   bar date, as a concept exists?

15   A.    I actually was.  I mean, I was -- I've never heard of the

16   bar date.  I don't practice in bankruptcy court.

17   Q.    Did you go to Mr. Stanley and say, did someone mess up

18   here, did I mess up, I was working on this case day-to-day

19   during the time that the bar date happened?

20   A.    No.  Because it was my understanding that we never

21   received notice of -- any of the proof of claim forms.

22              MR. SMOLINSKY:  I have no further questions, Your

23   Honor.

24              THE COURT:  Okay.  Redirect?

25              MR. STANLEY:  Respectfully, Your Honor, I don't have

Page 70

1   anything unless Your Honor thinks anything's important, I have

2   no further questions.

3            THE COURT:  All right.  No, I don't have much, but I

4   have a little.

5                         EXAMINATION

6   BY THE COURT:

7   Q.   Mr. Lamb, upon my review of your declaration and Mr.

8   Stanley's, there do appear to be very substantial similarities

9   between a lot of the paragraphs of the two declarations.  How

10  did that come to happen?

11  A.   Well, I would certainly agree with that, Your Honor.  I

12  reviewed Mr. Stanley's declaration, but you have to remember I

13  was there practicing for, you know, up until December of 2009,

14  so I had knowledge of things that occurred as well.  And like I

15  said, that's why I changed some of the dates in my declaration

16  to make them accurate.  I don't really know what else I could

17  tell you about that.

18  Q.   Whose declaration was prepared first?

19  A.   Mr. Stanley's declaration was prepared first.

20  Q.   And can I appropriately infer that after you read Mr.

21  Stanley's declaration, you drafted your own?

22  A.   That's correct.  I took his, and reviewed it, and then

23  modified it so that it made sense with respect to my

24  understanding and knowledge of what had occurred, based on my

25  review of the file and personal knowledge of what occurred.

Page 71

```
 1              THE COURT:  All right.  Mr. Smolinsky, do you want to

 2    ask any follow-up based on my questions?

 3              MR. SMOLINSKY:  No, Your Honor.

 4              THE COURT:  Mr. Stanley?

 5              MR. STANLEY:  No, Your Honor.

 6              THE COURT:  All right.  Then you're excused, Mr.

 7    Lamb.  You can return to the counsel table and continue to sit

 8    through the hearing and participate in it.

 9              Mr. Smolinsky, am I correct that you have no further

10    need to cross-examine at this point?

11              MR. SMOLINSKY:  That's correct, Your Honor.

12              THE COURT:  Okay.  Mr. Stanley, do you wish to cross-

13    examine Ms. Ferrante?

14              MR. STANLEY:  Yes, Your Honor, briefly.

15              THE COURT:  All right.  Well, I know you said you

16    wanted to be participating in a noon motion in limine, if I

17    recall correctly.  Do you think you can usefully use the time

18    between now and noon, or do you want to resume after lunch?

19              MR. STANLEY:  If Your Honor wants to go for five

20    minutes now, I'm happy to, whatever is better.  You have a lot

21    of staff here.  I'm happy to start if Your Honor would like.

22              THE COURT:  Do you think you can do that without

23    interrupting the continuity of your questioning?

24              MR. STANLEY:  Sure.

25              THE COURT:  Okay.  Then --
```

09-50026-mg    Doc 10665    Filed 07/27/11    Entered 08/09/11 09:43:45    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 72 of 137

Page 72

1          MR. STANLEY:  Fortunately or unfortunately, I've done

2    this quite a bit of times in my career.

3          THE COURT:  I'm sorry, I can't hear you.

4          MR. STANLEY:  I said, fortunately or unfortunately,

5    I've cross-examined quite a number of individuals, I think I

6    can.

7          THE COURT:  All right.  Ms. Ferrante, do you want to

8    come on up, please.  And remain standing to be sworn.

9          THE CLERK:  Would you please raise your right hand.

10             ANGELA FERRANTE, WITNESS, SWORN

11          THE COURT:  All right.  Have a seat, please, and

12    again stay close to the microphone, please.  Mr. Stanley, I'm

13    going to leave it up to you to balance your competing needs to

14    continue with your cross and your desire to take a recess in

15    time for your conference call.

16          MR. STANLEY:  Thank you so much, Your Honor, I

17    appreciate that.

18                       CROSS EXAMINATION

19    BY MR. STANLEY:

20    Q.   Good morning, Ms. Ferrante.

21    A.   Good morning.

22    Q.   You've indicated your position as the Assistant Vice-

23    President of Bankruptcy Operations at the Garden City Group,

24    true?

25    A.   That's correct.

09-50026-mg    Doc 10665    Filed 07/27/11    Entered 08/09/11 09:43:45    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 73 of 137

Page 73

 1    Q.    And how long have you had that position?

 2    A.    I've had that position, that particular position since

 3    January of this year.

 4    Q.    January of this year.  And what position did you have

 5    before that?

 6    A.    I was a senior director.

 7    Q.    Senior director, were you also working at Garden City

 8    Group?

 9    A.    Yes.  I've been at the Garden City Group since January of

10    2007.

11    Q.    And were you the senior director -- how long did that job

12    last?

13    A.    About three years.

14    Q.    All right.  And as the senior director, what did you do?

15    A.    I managed day-to-day operations of many matters, including

16    the Motors Liquidation matter.

17    Q.    Okay.  You didn't, yourself, do mailings and things like

18    that; is that true?

19    A.    That's correct.

20    Q.    And so your declaration involves all matters that you,

21    yourself, looked at the file and declared to; is that fair?

22    A.    That's correct.

23    Q.    And you don't have any personal knowledge of whether any

24    of the matters set forth on the chart that your counsel and you

25    were kind enough to draft for all of us were sent, not sent,

MOTORS LIQUIDATION COMPANY, ET AL.

Page 74

```
 1    right?

 2    A.   I do have personal knowledge.

 3    Q.   Well, you didn't do any of the mailings, right?

 4    A.   That's correct.  For 1.7 million parties, that would be

 5    impossible.

 6    Q.   There were a lot of mailings, right?

 7    A.   There were.

 8    Q.   And who did the mailings?

 9    A.   We have a dedicated team who effectuates notice, and it

10    varied throughout the case.  It varies throughout all of our

11    cases.  There were many matters that are outlined in our

12    service chart that were, what we would call matrix mailings,

13    which would basically mean our mailings that would be sent to

14    the entire creditor body, after what we would call a de-duping,

15    or eliminating duplications.

16    Q.   Okay.  So the mailings that are attached to your

17    declaration, and the ones I'll mention in this chart, I take

18    it, are all these matrix kind of mailings?

19    A.   Many of them, most of them are, correct.

20    Q.   How about the proof of claim form, was that a matrix

21    mailing as well?

22    A.   Yes, it is.

23    Q.   Okay.  And you knew, did you not, that it was important

24    that everyone receive notice of those proof of claims, true?

25    A.   Absolutely.
```

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 75 of 137

Page 75

1    Q.   And according to your chart, one was sent, on the first

2    page of the chart on 5/25, 2009 -- I'm sorry, it was created

3    5/25, 2009 and served between 9/24 and 9/26, 2009 to Rachel

4    Wiesjahn or Wiesjahn Rachel; Sand, Anna Lisa at 137 Bay Street,

5    true?

6    A.   Correct.

7    Q.   And that was returned as undeliverable, right?

8    A.   That's correct.

9    Q.   And did you bring that envelope here showing the document

10   returned?

11   A.   No, I did not.

12   Q.   What happened to all the documents that were returned as

13   undeliverable?

14   A.   It is our practice that all of the envelopes are bar

15   coded, and all the envelopes that are returned to us as

16   undeliverable or remailed, depending on the indication from the

17   post office, are all returned to our intake facility in Ohio.

18        All the envelopes are bar codes, they are scanned, and

19   automatically associated with their underlying records.  So

20   here, that's how we know that this particular package came back

21   as undeliverable because of that process.

22   Q.   Who did the scanning?

23   A.   Our intake facility in Ohio.

24   Q.   Do you know who did that?  Who did --

25   A.   The particular individual?

09-50026-mg    Doc 10665    Filed 07/27/11    Entered 08/09/11 09:43:45    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 76 of 137

Page 76

1    Q.    Yes.

2    A.    I don't have that information with me.  We have records on

3    that as well.

4    Q.    But you did not bring that?

5    A.    I did not, no.

6    Q.    And by the way, when it was returned as undeliverable, did

7    anyone do anything to follow-up to try to redeliver it?

8    A.    It did not come back as a remail, it came back as

9    undeliverable.  We remail on remails.

10   Q.    So did you know there was a case pending in Monterrey

11   Superior Court?

12   A.    I -- at the time, I had no direct knowledge of that.

13   Q.    Did anyone do an investigation to see whether or not they

14   could follow-up to see if there was a way to deliver this

15   particular document?

16   A.    That is not standard practice.

17   Q.    So your testimony is no one ever did any follow-up to try

18   to redeliver this document that had been returned as

19   undeliverable; is that true?

20   A.    Not that particular document.  There were other documents

21   that were received at that address.

22           MR. STANLEY:  Well, I'd ask to strike the last

23   portion of her testimony as nonresponsive, Your Honor.

24           THE COURT:  Sustained.  You'll have to wait until Mr.

25   Smolinsky asks you that on redirect, if he chooses to.

09-50026-mg    Doc 10665    Filed 07/27/11    Entered 08/09/11 09:43:45    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 77 of 137

Page 77

1                THE WITNESS:  Yes, Your Honor.

2                MR. STANLEY:  And I see it's five minutes of, and I'd

3       respectfully request, if it's not too much trouble that the

4       Court give us a chance to run down to the end of the hall and

5       make our calls.

6                THE COURT:  All right.  And after you finish that,

7       how much time do you need for your lunch --

8                MR. STANLEY:  Your Honor --

9                THE COURT:  -- or want for your lunch?

10               MR. STANLEY:  -- we -- we're at your pleasure.  We

11      don't have to eat if Your Honor doesn't want us to.  It's up to

12      Your Honor.

13               THE COURT:  All right.  We'll resume at 1:30.

14               Ms. Ferrante, I don't know how much you've testified

15      before or have interrupted your testimony in the middle of a

16      cross-examination, I need to direct you that although it's okay

17      for you to talk to Mr. Smolinsky and his colleague about what

18      you want for lunch, where you're going for lunch, I'm directing

19      you that you cannot in any way discuss the substance of either

20      the testimony or any work matters while you're eating lunch.

21               THE WITNESS:  Yes, Your Honor.

22               THE COURT:  Okay.  We're in recess until 1:30.

23               MR. STANLEY:  Thank you.

24               MR. SMOLINSKY:  Thank you, Your Honor.

25               THE WITNESS:  Thank you.

09-50026-mg    Doc 10665    Filed 07/27/11    Entered 08/09/11 09:43:45    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 78 of 137

Page 78

1    (Recessed at 11:51 p.m.; reconvened at 1:37 p.m.)

2              THE CLERK:  Please rise.

3              THE COURT:  Have seats, please.  All right.  We'll

4    continue.  Ms. Ferrante, you're still under oath.

5              THE WITNESS:  Yes, Your Honor.

6              MR. STANLEY:  Thank you.

7    BY MR. STANLEY:

8    Q.   Good afternoon, Ms. Ferrante.

9    A.   Good afternoon.

10   Q.   Since we missed our flight and I missed lunch, I can take

11   a little more time with you.

12   A.   Great.

13   Q.   Now, we were talking about that chart that you created.

14   Do you remember --

15   A.   Yes.

16   Q.   -- that before lunch?

17   A.   Yes.

18   Q.   It indicates that there was this bar date notice together

19   with non-customized proof of claim form that was created on

20   5/25/2009.  That's what it says on page 1 of the chart; is that

21   true?

22   A.   That's correct.

23   Q.   Okay.  Now, you agree that that was probably the most

24   important form to send out of all of these forms to the debtors

25   in this case, right?

09-50026-mg    Doc 10665    Filed 07/27/11    Entered 08/09/11 09:43:45    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 79 of 137

Page 79

1    A.    To the debtors?

2    Q.    I'm sorry, to the creditors.

3    A.    They're all equally important, they're all very important

4    documents.

5    Q.    They're all important.  Now, you indicated that when this

6    one came back, there was a reason it came back when you put a Y

7    on there, returned as undeliverable, right?

8    A.    It was undeliverable, there's no reason for the

9    undeliverable.

10   Q.    And when you get them back, usually there's a stamp from

11   the post office; isn't that true?

12   A.    There's some sort of indication on the envelope for the

13   undeliverable.

14   Q.    So what was the indication on this particular document?

15   A.    It was just undeliverable, that's all.

16   Q.    You don't know what the indication was on this particular

17   envelope, because you never saw it; isn't that true?

18   A.    When a claim is returned to our intake center, it is

19   scanned, and the record is automatically connected to the

20   record in our database.

21   Q.    But it is true that you never saw the envelope, right?

22   A.    That is correct.  We do not -- that's correct.

23   Q.    And you didn't retain the envelope, did you?

24   A.    We do not retain envelopes, no.

25   Q.    So you have no idea what the post office stamp said on it,

Page 80

1    true?

2    A.    That is correct.

3    Q.    Okay.  Now, you have no idea also why later on after that

4    initial one was found to be undeliverable, a year later you

5    were still sending to the same address that had been found to

6    be undeliverable before?

7    A.    Can -- I'm sorry, can you rephrase your question?

8    Q.    Absolutely.  That was a bad question, I apologize.

9         So on 9/24 or 9/26/09, you sent out this non-customized

10   proof of claim form, right?

11   A.    On 9/26?

12   Q.    Of '09.  Do you want me to --

13   A.    Can you tell me what you're looking at?

14   Q.    Sure.  I'm looking at the chart.  Do you have your chart

15   there?

16   A.    Oh, I'm sorry, yes, that's correct.

17   Q.    Okay.  So it says on 9/24 to 9/26/09, you served this

18   claim form; is that true?

19   A.    That's correct.

20   Q.    Now, the affidavit of service was filled out by a Barbara

21   Kelly Keene (ph); is that correct?

22   A.    That's correct.

23   Q.    And the affidavit of service is attached to your

24   declaration; is that true?

25   A.    That's correct.

MOTORS LIQUIDATION COMPANY, ET AL.

Page 81

1   Q.   And the affidavit of service does use these same dates of

2   September 24 to September 26, 2009, right?

3   A.   Correct.

4   Q.   Now, did you ever talk to Barbara Kelly Keene yourself?

5   A.   All the time.

6   Q.   About this particular incident?

7   A.   Yes, I have in detail.

8   Q.   And it's true that she sent out lots of these, right?

9   A.   She herself directed the mailing, she herself did not

10  stuff any envelopes, for example, if that's what you're asking.

11  Q.   So she didn't do the mailing herself?

12  A.   She directed the mailing.

13  Q.   Okay.  So when she says, "I caused to be served by

14  depositing same in sealed postage page (sic) envelopes at

15  United States Post Office for delivery in the United States

16  Postal Service via First Class Mail," it's true that she didn't

17  do that, she didn't deposit the same in the sealed postage paid

18  envelopes, did she?

19  A.   She did not put 1.7 million notices in the mail herself,

20  no, she did not.

21  Q.   So to that extent, her declaration under oath and the

22  affidavit of service that's attached to your declaration is

23  untrue, right?

24  A.   Wrong.  She did cause them to be served.  In our industry

25  that means that she directed the service, it was done under her

09-50026-mg    Doc 10665    Filed 07/27/11    Entered 08/09/11 09:43:45    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 82 of 137

Page 82

1    supervision.  She reviewed everything that was done, the

2    records in our database that were flagged for mailing, et

3    cetera.

4    Q.   She doesn't say in her declaration that she caused them to

5    be served.  She says in her declaration that she deposited same

6    -- well, she used the words, "by depositing same in sealed

7    postage paid envelopes."

8              THE COURT:  Where are you reading from, Mr. Stanley?

9              MR. STANLEY:  I'm reading from the affidavit of

10   service which is the first page -- I'm sorry.  There's an

11   Exhibit A, and it says, "Schedule of Assets and Liabilities

12   For," and then about Exhibit B, the first page of Exhibit B is

13   the affidavit of service.  And I don't know if Your Honor has

14   that.

15             THE COURT:  Yeah, the one I have does say in

16   paragraph 2, is that where you're reading from?

17             MR. STANLEY:  The affidavit of service on Exhibit B

18   says in paragraph 2, yes.  At the bottom right before the

19   signature, quote "by depositing same in sealed postage paid

20   envelopes."

21             THE COURT:  Yeah.  What's causing me confusion is at

22   the beginning of that same paragraph 2, it says, as the witness

23   says, "I caused to be served."

24             MR. STANLEY:  Yes.  She caused to be served, to do

25   the service, Your Honor, but she says she caused it to be

Page 83

1   served by depositing same, and she did not do the deposit is my

2   point.

3           THE COURT:  Well, I think she said didn't do the

4   deposit.

5           MR. STANLEY:  Right.  But she indicates in her

6   declaration that she deposited them.

7           THE COURT:  Well, that's one of two ways to read the

8   declaration.

9           MR. STANLEY:  All right.

10  BY MR. STANLEY:

11  Q.   Now, it is true that Barbara Kelly Keene didn't recall

12  these particular mailings that are set forth in the chart when

13  you talked with her, right?

14  A.   What do you mean she didn't recall them?

15  Q.   Well, she doesn't specifically remember the name Rachel

16  Wiesjahn, right?

17  A.   The name Rachel Wiesjahn was the subject of numerous e-

18  mails and conversations.

19  Q.   But she doesn't specifically remember putting or causing

20  Rachel Wiesjahn's papers to be served, true?

21  A.   She herself did not deposit them in the envelope, that is

22  correct.

23  Q.   And it would be the same answer with regards to every

24  mailing on this particular list, right?

25  A.   Correct.  She caused them to be served.

Page 84

1    Q.    Okay.  Now, in any event, you indicated in your

2    declaration on page 2 at the top, "I have personal knowledge of

3    the facts stated herein and I am competent to make this

4    declaration."  True?

5    A.    Correct.

6    Q.    All right.  And in paragraph 2, you -- you heard Mr.

7    Lamb's testimony, right?

8    A.    I did.

9    Q.    Where he reviewed the files and he put some stuff in his

10   declaration, right?

11   A.    Correct.

12   Q.    And you did the same thing in essence here with regard to

13   everything in your declaration, true?

14   A.    I looked at the database.  We engaged in totally different

15   exercises, obviously.  What I did is I reviewed our database, I

16   reviewed the affidavits of service.  I looked at the actual

17   records within our database, looked at the mail histories

18   related to those records, in order to prepare for the hearing

19   today.

20   Q.    And those are all things on the computer, right?

21   A.    That's correct.

22   Q.    You did not look at the original files at all, like Mr.

23   Lamb did, to see what, in fact, was in there, right?

24   A.    We don't keep files other than electronically.

25   Q.    So, in other words, when these matters came back as

MOTORS LIQUIDATION COMPANY, ET AL.

Page 85

1   undelivered, you simply discarded them?

2   A.    That is our standard practice, yes.

3   Q.    Okay.  And how many matters of all the claim forms that

4   you sent out came back undeliverable?

5   A.    Fifty thousand.

6   Q.    Fifty thousand out of how many?

7   A.    1.7 million.

8   Q.    And out of those fifty thousand that came back, did you

9   all do anything to follow-up on those fifty thousand that

10  didn't make it to their destination to see what you could do to

11  try to help them make it to their destination?

12  A.    Prior to sending them out, we conducted what's called the

13  national change of address search.  So we tried to have the

14  records be as deliverable as possible before the mailing, and

15  that was done before the mailing.  When the mailing comes back

16  and it's tagged, as we like to call it, as undeliverable in our

17  database, depending on the nature of the case, the size of the

18  case, the magnitude, we sometimes go back and try to find

19  better addresses for undeliverables, and in some cases, we

20  don't.  In this case we did not.

21  Q.    You knew that this case was a death case, didn't you?

22  A.    I'm sorry?

23  Q.    You knew this case involved a wrongful death allegation,

24  didn't you?

25  A.    I did not have any direct knowledge of that at the time,

09-50026-mg    Doc 10665    Filed 07/27/11    Entered 08/09/11 09:43:45    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 86 of 137

Page 86

1    no.

2    Q.    Did anyone at your company investigate the seriousness of

3    this particular case?

4    A.    No, we did not.

5    Q.    Okay.  You only investigated the seriousness of certain

6    claimants, but individuals claimants were not investigated; is

7    that fair?

8    A.    We didn't distinguish between one class of claim or I'm

9    sorry, one class of undeliverable versus another.

10    Q.    Why is it that you failed to investigate this particular

11    claimant further to see if you could follow-up and get

12    additional address information?

13    A.    The reason is because there were other proofs of claim

14    specifically if we're talking in that particular mailing that

15    were delivered to that address, and those records related to

16    scheduled records.  And therefore, because the -- with regard

17    to the POC mailing, or the proof of claim mailing, since six

18    packages were delivered curtaining -- containing rather that

19    those documents, and three were delivered, and three came back

20    as undeliverable, they were delivered.

21    Q.    Now, you indicated that before mailing, you did a national

22    change of address search for every claim.

23    A.    For every record in our database, yes.

24    Q.    Okay.  And the records in the database included Anna Lisa

25    Sand, Judge -- and Judd Wiesjahn's claim, right?

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 87 of 137

Page 87

1    A.   It did.  They did.

2    Q.   And so where are those records of this national change of

3    address change?

4    A.   The -- it is a software product that basically is provided

5    by the U.S. Postal Service, and the practice is, you would

6    quote/end quote run the records through the software, and it

7    will flag for you any addresses that the post office will deem

8    undeliverable.  It was -- these records were run through that

9    process.  They did not have any quote/end quote hits, and they

10   were not tagged as being as an undeliverable.

11             MR. STANLEY:  Your Honor, I'm going to move to strike

12   as hearsay and lack of competency and personal knowledge with

13   respect to the last portion of that answer, Your Honor.

14             THE COURT:  Clarify the portion you want to get

15   stricken.

16             MR. STANLEY:  The part where she starts -- where I

17   asked her about it, then she starts testifying about what

18   happened in this particular case, because she has no idea, she

19   doesn't have personal knowledge.

20             THE COURT:  Do you want to be heard on that, Mr.

21   Smolinsky?  I'm inclined to sustain.

22             MR. SMOLINSKY:  I think the testimony, Your Honor,

23   was that she does have personal knowledge that it came back

24   without a hit, which means that the postal service did not tag

25   this as an address which would be undeliverable, and that would

MOTORS LIQUIDATION COMPANY, ET AL.

Page 88

```
 1   be in her system, and she did look at that.
 2            THE COURT:  I'm going to overrule and decline to
 3   strike.  You can make points in summation as to where you think
 4   her knowledge falls down, although you'll be able to redirect
 5   on this if you think you can make a stronger foundation, Mr.
 6   Smolinsky.
 7   BY MR. STANLEY:
 8   Q.   All right.  Just so we're clear, you looked at your
 9   computer base recently and you made these determinations, and
10   everything you -- with regards to this particular issue; is
11   that fair?
12   A.   That's correct.
13   Q.   So you didn't do it at the time way back in 2009 when the
14   process was undertaken, true?
15   A.   That's correct.
16   Q.   You're just relying on your computer database, but you,
17   yourself, have no knowledge whether it was done appropriately,
18   inappropriately, or anything else, right?
19   A.   It was done according to our standard practice.
20   Q.   And do you have those rules of standard practice, are they
21   written rules?
22   A.   We have protocols.
23   Q.   And you didn't bring those here today, did you?
24   A.   No, I did not.
25   Q.   Now, where is Ms. Keene located?
```

1    A.    She is in our Lake Success office.

2    Q.    What state is that in?

3    A.    It's in New York State.

4    Q.    In New York State.  How far away is that from here?

5    A.    It's about forty-five minutes.

6    Q.    And she didn't drive down to testify, did she?

7    A.    No, she did not.

8    Q.    Do you know why you didn't call her as a witness in this

9    case, or ask her to come down, and without inquiring of

10   anything your counsel may have talked to you about, because

11   we're not -- I'm not allowed to ask you those questions?

12   A.    I have direct knowledge of all the matters here.  She and

13   I worked very closely on this particular case.  We thought it

14   was redundant.

15   Q.    All right.  Now, I just want to be clear that I understood

16   you correctly.  All fifty thousand envelopes -- was it fifty

17   thousand envelopes or fifty thousand claims that were returned,

18   when you said fifty thousand were returned undeliverable?

19   A.    Fifty thousand packages containing the bar date mailing

20   were returned as undeliverable.

21   Q.    And everyone of those fifty thousand was tossed away?

22   A.    After they're scanned into our database, yes, they are

23   tossed.

24   Q.    Now, did you bring with you the actual scanning from your

25   database so we could see what the envelope looked like?

Page 90

1    A.    It is not a scan of the envelope, it is basically -- it

2    would read the bar code, and as the process of reading the bar

3    code, it tags the record or the underlying record with what we

4    call a message code, that would indicate that it was

5    undeliverable.

6    Q.    And did you bring the computer screens that show those

7    particular items?

8    A.    I actually do have copies if the Court would allow them.

9         MR. STANLEY:  Okay.  So perhaps at a break I can take

10   a look at those, if the Court wouldn't mind.

11        THE COURT:  I don't mind.  It would've been helpful

12   to run my calendar if you'd looked at them before this minute,

13   but --

14        MR. STANLEY:  Yes.

15        THE COURT:  -- I won't prohibit that.

16        MR. STANLEY:  Only because I didn't know that they

17   existed, and so --

18        THE COURT:  Okay.

19        MR. STANLEY:  -- and that's the only reason.  I may

20   not have any questions about them.

21   BY MR. STANLEY:

22   Q.    In any event, the process was the same with respect to all

23   the matters set forth on page 1 of 8 on your chart; is that

24   correct?

25   A.    The process of?

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 91 of 137

Page 91

1    Q.   The things we talked about, that there was a mailing that

2    you didn't participate in that, that all of your thoughts and

3    the matters set forth in the declaration are based on your

4    review of the computer-generated material that you went through

5    in your system?

6         MR. SMOLINSKY:  Objection, Your Honor.  I don't think

7    the testimony was that she didn't participate.

8         THE COURT:  All right.  I'm going to sustain that,

9    but obviously this is an area in which you can inquire, Mr.

10   Stanley.  Rephrase and proceed.

11   Q.   All right.  Let's just go through your declaration.

12   Paragraph 2 of your declaration indicates "The debtor's filed

13   their schedule of assets and liabilities."  Do you see that?

14   A.   I do.

15   Q.   And then it indicates "Anna Lisa Sand, Judd Wiesjahn and

16   Rachel Wiesjahn were individually listed in Schedule F-6 of the

17   Schedules for Motor Liquidation Company."  Is that true?

18   A.   That's correct.

19   Q.   So you knew that Anna Lisa Sand, Judd Wiesjahn and Rachel

20   Wiesjahn were making a claim of some kind in regards to Motor

21   Liquidation Company, right?

22   A.   No, I would not know that.

23   Q.   Well, why were they listed on Schedule F-6 if you know?

24   A.   They were listed on the debtor's books and records as a

25   litigation party.

MOTORS LIQUIDATION COMPANY, ET AL.

Page 92

1  Q.    That they were making a litigation claim against Motors

2  Liquidation Company, right?

3  A.    I wouldn't say that they were making a claim.  They were

4  listed as a potential liability of the debtor.

5  Q.    So at all times from September of 2009 to the present,

6  Motors Liquidation Company knew that Anna Lisa Sand, Judd

7  Wiesjahn and Rachel Wiesjahn were potential claimants, true?

8  A.    I can't speak to that.

9  Q.    You don't know one way or the other?

10  A.    I can't speak to what the debtor was thinking, I can only

11  tell you what is in the paperwork.

12  Q.    So Motors Liquidation Company, the company that you all --

13  by the way, you all are paid by Motors Liquidation Company to

14  do your work?

15  A.    We are paid from the assets of the estate, correct.

16  Q.    All right.  And Motors Liquidation Company were they the

17  ones that recommended you to the Honorable Court here?

18  A.    They filed the motion to retain us, yes, they did.

19  Q.    Motors Liquidation Company is represented by your same

20  counsel here today; is that correct?

21  A.    Mr. Smolinsky is counsel for the debtor.

22  Q.    Okay.  And Motors Liquidation Company then -- oh, strike

23  that.

24      You don't know what Motors Liquidation Company's mindset

25  with respect to Anna Lisa Sand, Judd Wiesjahn and Rachel

MOTORS LIQUIDATION COMPANY, ET AL.

Page 93

1   Wiesjahn, other than you know they were involved in litigation

2   at least with those parties; is that true?

3   A.   They were listed on Schedule, I believe it was F-6 of the

4   debtor's schedules of assets and liabilities.

5   Q.   All right. And it was Motors Liquidation Company then that

6   provided you with the address, for example, the creditor, Judd

7   Wiesjahn and the address, Stanley Martin Law Office of 137 Bay

8   Street, No. 2, Santa Monica 90405, true?

9   A.   All of the records in our database, at varying times,

10  depending on which record you're talking about specifically at

11  this moment, came to us from the debtor's financial advisors,

12  which are AlixPartners.

13       Again, at varying times there were sort of different data

14  loads, as we call them.  There were three that were given to us

15  prefiling, and those were the -- those are the first ones that

16  are listed in our chart.  And then there were three records

17  given to us as a result of the schedules data load, basically

18  all of the schedule -- all of the claimants or potential

19  claimants listed in the debtor's schedules.  And then the

20  different records after those that are outlined here with

21  regard to this matter were created on our website.

22  Q.   Okay.  Now, I want to look at Exhibit A to your

23  declaration on the page where, for example, Judd Wiesjahn

24  exists.  And we can look at Anna Lisa Sands or Rachel Wiesjahn

25  for that matter, but I'm just going to use Judd Wiesjahn as a

Page 94

1   sample, which is on the bottom, page 271 of 281 to Exhibit F-6

2   and I'll wait till His Honor has had a chance to find that

3   attached to your declaration.

4           MR. STANLEY:  Exhibit A, Your Honor.

5           THE COURT:  All right.  I found 271 of 281 and --

6           MR. STANLEY:  Thank you.

7           THE COURT:  -- you're referring about halfway down

8   the page?

9           MR. STANLEY:  Yes.

10  Q.   It says Judd Wiesjahn, and then it says Stanley Martin Law

11  Office across.  And then on the right-hand side, it says C-U-D

12  on the top, the column.  And then next to that it says "total

13  claim amount," do you see that column?

14  A.   I do.

15  Q.   So you understood that these were the claims made against

16  Motors Liquidation Company, didn't you?

17  A.   These are --

18  Q.   When you read total claim amount?

19  A.   These are schedule liabilities or potential liabilities.

20  Q.   Schedule liabilities.

21  A.   And these particular ones are tagged, as you can see,

22  contingent, unliquidated and disputed.

23  Q.   So they were -- so you all knew and General Motors knew,

24  and everybody involved with General Motors knew, or Motors

25  Liquidation Company that these were contingent, they were --

1    A.    Contingent, unliquidated and disputed.

2    Q.    -- unliquidated and disputed claims, true?

3    A.    Yes, potential claims, yes.

4    Q.    Thank you.

5          And that same particular entries occurred with respect to

6    Rachel Wiesjahn and also on the prior page, Anna Lisa Sand, S-

7    a-n-d, at the top of the prior page, true?

8    A.    Yes.

9    Q.    Now, in paragraph 3 of your declaration, you talk about

10   the affidavit of Barbara Kelly Keene that we talked about

11   previously; is that fair?

12   A.    Yes.

13   Q.    And it is true that she was the one that supervised the

14   mailings and signed the affidavit and you did not, correct?

15   A.    Barbara worked under my direction, so I did work on these

16   mailings and Barbara worked below me on these mailings.

17   Q.    Did you put together the affidavit of service?

18   A.    No, I did not.

19   Q.    Did you participate at all in putting together the

20   affidavit of service?

21   A.    I proofread it and approved it, yes, before it was filed.

22   Q.    And did you review the proofs of service?

23   A.    I'm sorry?

24   Q.    Did you review the addresses that were attached to the

25   affidavit of mailing?

1   A.   I took a quick review to make sure that they looked okay.

2   Q.   Okay.  So specifically, you did not review Anna Lisa Sand,

3   Judd Wiesjahn and Rachel Wiesjahn, with regards to the

4   affidavit, true?

5   A.   At the time of the affidavit of service filing, no, I did

6   not.

7   Q.   Now, on paragraph four, did you arrange -- well, I'm going

8   to skip that one, because I don't doubt that it's likely that

9   these -- that this particular bar date appeared in these

10  publications that are attached here.  Those are the ones it

11  appeared in, correct?

12  A.   Yes, it is.

13  Q.   All right.  Now -- but I will ask you this, I notice you

14  indicated, you put here the Detroit Free Press and Detroit

15  News.  Were there any Los Angeles specific newspapers that you

16  published this in?

17  A.   No.  These were the publications where the publication

18  program was done.

19  Q.   And were there any northern California, like Monterrey

20  County specific newspapers that you published this in?

21  A.   No.

22  Q.   Okay.  Now, would your testimony that we talked about

23  regarding the service, with regards to paragraph 5 of your

24  declaration be the same as testimony on the paragraph 3?  In

25  other words, that you, from looking at your database obtained

09-50026-mg    Doc 10665    Filed 07/27/11    Entered 08/09/11 09:43:45    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 97 of 137

Page 97

1    the information in paragraph 5 of your declaration?

2    A.    Yes, that's correct.

3    Q.    You didn't participate other than that?

4    A.    I had the same level of involvement.

5    Q.    Okay.  Now, I just want to look at paragraph 7.  Now, you

6    indicate that you sent out one and a half million claim forms;

7    is that right?

8    A.    That's correct.

9    Q.    And in paragraph 7, it says that you received only seventy

10   thousand timely proof of claims; is that true?

11   A.    That's correct.

12   Q.    So you almost got back as many undeliverable proof of

13   claims as the amount of claims you received, right?

14   A.    That's not untypical.

15   Q.    Pardon me?

16   A.    That's about -- that's not untypical.

17   Q.    But that's what happened in this case?

18   A.    Yes.

19   Q.    And what happened to the other 1.4 million -- 1.43 million

20   claims, if you know?

21   A.    1.4 million claims?

22   Q.    You said you mailed out 1.5 million mailings.  You only

23   got seventy thousand back.

24   A.    That happens in a lot of cases.  There's no way for me to

25   speak to that.

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 98 of 137

Page 98

1   Q.   You have no idea what happened to all those other ones, do

2   you?

3   A.   I can't speak to why they would not have filed a proof of

4   claim, no.

5   Q.   Well, were there other envelopes that were returned, but

6   not returned as undeliverable?

7   A.   Remail, there were some who were -- that were tagged for

8   remail, and what would happen in those instances is, it comes

9   back to us at our intake facility.  There's, you know, what's

10  commonly a yellow sticky that says where to mail it to, sort of

11  a forwarding address.  We process them the same way by scanning

12  it in, the address is then updated, reflected in our database,

13  and the piece of mail is remailed.  So there were a fair number

14  of those.

15  Q.   Anything else?  Any other undeliverable for whatever

16  reason?

17  A.   All the undeliverables are lumped together.

18            MR. STANLEY:  Okay.  No further questions, Your

19  Honor.

20            THE COURT:  All right.  Redirect, Mr. Smolinsky?

21                      REDIRECT EXAMINATION

22  BY MR. SMOLINSKY:

23  Q.   Ms. Ferrante, good afternoon.

24  A.   Good afternoon.

25  Q.   There's been a bit of confusing testimony about this

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 99 of 137

Page 99

1   demonstrative, and I only received it for the first time this

2   morning, but I want to ask you a few questions about it.

3   A.   Sure.

4   Q.   If you look at page 1 and you look at the date created,

5   which is the third column, and it says date created in the

6   first category is 5/25/2009, which as you know is before the

7   bar date.  Could you explain to me how at the outset of the

8   case, you know who to send -- serve documents on?

9   A.   Yes.  At the outset of the case, we create what's called a

10  creditor matrix, which is basically a download of the debtor's

11  AP run, whatever they may have in their records as, you know,

12  sort of anyone they may have -- who may potentially have a

13  claim in the debtor's bankruptcy, they may potentially owe

14  money to.  There's often a look-back period, so that the -- how

15  big a quote/end quote matrix is, you know, varies from case to

16  case.

17  Q.   And what happens along the way in the case when you get

18  other addresses or better addresses?

19  A.   Additional addresses are simply added to the database.  If

20  it is a quote/end quote better address, the address may be

21  updated for that particular record.  That's a commonality as

22  well.

23  Q.   But not always?

24  A.   No, not always.

25  Q.   So it's not unusual that you would mail out mailings to a

Page 100

```
 1    large group of people that may ultimately not be the best

 2    address that you may ultimately have?

 3    A.    It is very common to do that.

 4    Q.    So if we go to the first category and we see that these

 5    names and addresses were created on 5/25, what was the first

 6    thing that was sent to those addresses, which is Rachel

 7    Wiesjahn, Sand, Anna Lisa, at the address of Mr. Stanley's

 8    office?

 9    A.    It was a combination sale hearing notice, and notice of

10    the Chapter 11 filing.

11    Q.    And when was that mailed?

12    A.    That was served on June 5th of 2009.

13    Q.    And did that come back as not deliverable?

14    A.    It did not.

15    Q.    So if looking further down in that section, once you --

16    you did send the bar date notice to the same address; is that

17    correct?

18    A.    Yes, we did.

19    Q.    And that one came back undeliverable?

20    A.    Correct.

21          MR. STANLEY:  Your Honor, I have to object, I

22    apologize, that it calls for speculation based on her

23    testimony.  She doesn't have personal knowledge of whether

24    these were sent or not.  She's simply reviewing a computer

25    program a year and a half later.
```

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 101 of 137

Page 101

```
 1              THE COURT:  I'm going to sustain that now, Mr.

 2    Smolinsky.  You're going to have to lay a foundation to

 3    establish the basis for her reliance upon what's in her

 4    computer.

 5    Q.   Ms. Ferrante, when packages are sent out, are the

 6    envelopes hand-marked with the address by hand?

 7              MR. STANLEY:  I have to object, Your Honor, because

 8    there's no foundation with regards to --

 9              THE COURT:  Overruled.  We're going to use common

10    sense here, Mr. Stanley.  I won't say anymore.  Go ahead, Mr.

11    Smolinsky.

12    Q.   Ms. Ferrante, maybe we should step back and perhaps you

13    could explain to us how the service process works mechanically.

14    A.   Sure.  When we receive, especially at the beginning of the

15    case, what we call the matrix data, it is given to us in a --

16    what we provide is a standard data format, and basically, it is

17    given to us.  We ask our systems department to upload it into

18    our database, and it creates depending on the name and address

19    of that particular row, a record.  And that record is built on

20    throughout the case, and it sort of is layered as the case

21    continues.

22         So you may have -- you know, if a record comes in and it's

23    simply on the debtor's, as part of the debtor's matrix, it's

24    very possible then it gets layered and associated with a

25    scheduled record, or it may -- and it has a whole lot of
```

MOTORS LIQUIDATION COMPANY, ET AL.

Page 102

1   mailing history layered on top of that, or depending on how the

2   data is given to us, they may be side-by-side records created.

3       So you may have like there were here, multiple names and

4   addresses delineating various records that were for similar

5   claimants at the same address, but because they're not exact

6   matches we wouldn't, quote/unquote dupe them out in the

7   abundance of caution to ensure that the claimants all receive

8   as much notice as possible.

9   Q.   Let's stay with the sale notice, the first notice that

10  went out in the case.  You get a call from Weil Gotshal or from

11  AlixPartners or from the debtors and they say, serve that

12  notice out.  What actually happens?

13  A.   We create what's called a print file.

14          THE COURT:  A what file?

15          THE WITNESS:  A print file.  So what would happen is,

16  we get usually a PDF of whatever notice they would like us to

17  send out.  Depending on the service request, we tag in our

18  database the records that would need to be served.  So, for

19  example, it's not a matrix mailing, let's just say, the parties

20  who are on the master service list, and let's say the parties

21  who filed a notice of appearance, we would tag just those

22  parties in our database that fall under those categories and

23  only those parties would receive that particular mailing.

24          The ones here, the five, for example, types of

25  mailings that these initial quote/unquote matrix records

Page 103

```
1    received, they're all what we generally refer to as matrix

2    mailings, which are basically mailings that go to the entire

3    database.

4            So in that -- for those kinds of mailings, we

5    basically take all of the records in our database, tag them as

6    necessary for that mailing.  We have our systems department

7    programmatically dedupe and that means in this case, and it

8    varies from case-to-case depending on tolerance of counsel, the

9    budget, et cetera, but here, because of the scale and magnitude

10   of this database, everything was done programmatically, and it

11   was only deduped for exact matches.

12           So our systems department would quote/unquote compare

13   the data for exact matches.  The exact matches would be tagged

14   as exact matches, what is called a print file is then generated

15   by our systems department, and the print file is delivered, in

16   this case, to our dedicated printer, who actually effectuates

17   the mailing.

18           THE COURT:  Before you ask your next question, Mr.

19   Smolinsky, you used some vocabulary that I didn't understand.

20           THE WITNESS:  Okay.

21           THE COURT:  What does programmatically mean in the

22   context in which you used it?

23           THE WITNESS:  I mean they run a program, our systems

24   department would run a program that would basically compare the

25   data.  So basically overlay it to find out what are exact
```

MOTORS LIQUIDATION COMPANY, ET AL.

Page 104

1    matches.  So let's say a claimant name is the same, but there's

2    -- one digit is off on the address.  It would not tag it as an

3    exact match.  Again, because you want to make sure that --

4    especially those matrix mailings are as inclusive as possible.

5           So it's basically the computer program that would

6    compare all of the rows of data, and tag the ones that are

7    exact matches, so that those don't have to be mailed to.

8           Let's say you've got 9X in your database, you know,

9    forty, fifty times at the exact same address, you don't want to

10   send fifty notices of commencement to that exact same address,

11   but they have -- the debtor's have forty different accounts, so

12   they're rightfully in our database forty times, but for

13   purposes of a static mailing, you wouldn't want to mail to them

14   forty times, so that's what programmatic means.  It would tag

15   those records mechanically for lack of a better description.

16          THE COURT:  You used another word, deduped, what does

17   that mean?

18          THE WITNESS:  It's the same process, and forgive me,

19   Your Honor.  It's basically to avoid duplication.  So basically

20   when a record is duplicative of another record, we

21   quote/unquote, dedupe it, which is basically tagging a record

22   that is duplicative or exactly duplicative in this case of

23   another record as duplicative.  So that it wouldn't get

24   captured into the print file, and therefore wouldn't get mailed

25   to.

09-50026-mg    Doc 10665    Filed 07/27/11    Entered 08/09/11 09:43:45    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 105 of 137

Page 105

1          THE COURT:  All right.  Continue.

2          MR. STANLEY:  May I, so I don't have to interrupt,

3     have a running objection to her testifying about what -- with

4     -- because I think she lacks personal knowledge to testify

5     about what the underlings, what the other folks at the company

6     did.  It's hearsay and she lacks personal knowledge.  That way

7     I won't have to interrupt.

8          THE COURT:  You can certainly have the objection on

9     what underlings did, but the standard as to whether or not it's

10    going to be sustained or not, is going to depend on what the

11    underling did and the extent to which she has knowledge as to

12    whether or not the underling did it.

13          Under those circumstances, in fact, although I

14    normally allow lawyers to make their records as they see fit, I

15    think you're going to need to make them individually because

16    sometimes I'm going to sustain your objections and sometimes

17    I'm going to overrule them.

18          MR. STANLEY:  Respectfully, Your Honor, just for the

19    record, I move to strike then her last statements, because

20    there's no evidence that she actually supervised, saw it, or

21    anything else like that.

22          THE COURT:  That's denied.  Go on, Mr. Smolinsky.

23    BY MR. SMOLINSKY:

24    Q.   Ms. Ferrante, with this many records, there's nobody

25    sitting about a Selectric, an IBM Selectric typewriter typing

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 106 of 137

Page 106

1    out addresses.  How do addresses get from the database to the

2    envelope?  Is there a sticker with the address that gets spit

3    out by the computer?  How does that happen?

4    A.    It depends on the mailing itself.  Sometimes the -- it

5    depends on the envelope that's used.  It depends on whether the

6    mailing is folded.  There are all kinds of factors that come

7    into play, and we look at each mailing individually to see what

8    is the most cost efficient way of doing it.

9         So sometimes the name and address or basically the address

10   label, for lack of a better definition would become the last

11   page of the document, and it would go -- and it would be

12   programmed to fit appropriately on the last page, so that it

13   could show through a window envelope.  That's one way that it

14   would happen.

15        Another way would be simply label generation, that would

16   then get affixed to envelopes.  It really depends on the

17   mailing and what the most cost efficient process is for that

18   particular mailing.

19   Q.    So when you look at a schedule that's going to be attached

20   to an affidavit of service, how do you know that each and every

21   address that is on that schedule was included in the print job?

22   A.    Because basically the print file is what's used to create

23   or generate the affidavit of service.  And so once all the

24   quote/unquote -- I'm going to use more terms that may not be

25   commonplace, but once all those records in the database are

Page 107

1    quote/unquote set to print is the -- you know, the inside term

2    that we would use, it automatically generates a mail history

3    for all of those individual records, which automatically

4    creates another exhibit that becomes affixed to the affidavit

5    of service.

6         And that's how we know with certainty, honestly, you don't

7    want human hands touching it, you want it to be generated by

8    the computer.  Because you know with certainty that they're

9    identical.

10   Q.   So there's no chance that the listing attached to the

11   affidavit of service is different from the mail list because,

12   in fact, it is the same list?

13   A.   It's generated from the same data source.

14   Q.   So let's go back, if you would, Ms. Ferrante, to this

15   chart, and we were on the notice of sale hearing, and the

16   notice of commencement of the case, which was a single notice.

17   It was served on 6/5/2009, you testified, I think earlier, that

18   it did not come back.

19   A.   That's correct.

20   Q.   Since this is in chronological order, it is not until the

21   bar date notice that you knew that there was an issue; is that

22   correct?

23   A.   That's correct.

24   Q.   With this particular record, Rachel Wies -- Wiesjahn,

25   Rachel; Sand, Anna Lisa at that address.

MOTORS LIQUIDATION COMPANY, ET AL.

Page 108

1    A.    That's correct.

2    Q.    And then subsequent to that, using the same exact address,

3    the next three notices did go out, and according to your

4    records, it did not come back as undeliverable?

5    A.    That's correct.

6    Q.    Is it true that this chart, this entire chart was created

7    in chronological order using the date created?

8    A.    Yes, by record.

9    Q.    That's right.

10   A.    And grouped by record, yes.

11   Q.    So the second category was also an individual Stanley

12   Martin, Martin Stanley was nowhere on the envelope that was, I

13   think you testified information that was given to you by

14   AlixPartners, and according to this, it was given to you before

15   the bankruptcy based on the best available information that

16   they had at the time; is that correct?

17   A.    Which record are you referring to specifically?

18   Q.    All of these records that were given to you on May 25th,

19   2009?

20   A.    Yes.    All of those were given to us before the schedules

21   were filed by the debtor's professionals.

22   Q.    So the second grouping, the same exact thing happened.

23   All the documents, all the services were sent out and did not

24   come back as undeliverable except for that bar date notice?

25   A.    That's correct.

Page 109

1    Q.   And lastly, with the last category of 5/25, the Rachel

2    Wiesjahn, same thing happened?

3    A.   That's correct.

4    Q.   If you could turn to page 3 of 8, the date created is now

5    changed.  Can you explain why the date created is changed?

6    A.   These are new records.  This record was given to us after

7    the schedules were filed.  I believe that the schedules were

8    filed on September 15th, and the day after, we were provided

9    with a print file or, I'm sorry, an upload file by AlixPartners

10   containing all of -- because we did not create the schedules,

11   AlixPartners did.  So they gave us a file for upload into our

12   database with all the records contained within the schedules.

13   Q.   And according to this chart, you didn't replace this

14   information with the previous records, you continued to serve

15   on those as well --

16   A.   Correct, these are different.

17   Q.   -- the matrix mailings?

18        Okay.  Of course, the sale notice wasn't sent to that

19   address because you didn't have the record as of that date.

20   A.   That's correct.

21   Q.   So the first in that category, Wiesjahn, Judd, Stanley

22   Martin Law Office of 137 Bay Street, Unit 2, Santa Monica,

23   California 90405, the bar date notice, that was according to

24   the schedule and I think as testified earlier, was served

25   between 9/24 and 9/26 of 2009.

1    A.    That's correct.

2    Q.    Did that come back as undeliverable?

3    A.    No, it did not.

4    Q.    Did any other mailings to that address come back as

5    undeliverable?

6    A.    No, they did not.

7    Q.    What about to Rachel Wiesjahn?

8    A.    Same thing.

9    Q.    And Sand, Anna Lisa?

10    A.    Same thing.

11            THE COURT:  I don't understand the same thing.

12            THE WITNESS:  I'm sorry.  None of those records came

13    back as -- or none of those packages came back as

14    undeliverable.

15    Q.    So just to break it down --

16            THE COURT:  Which ones are we talking about, because

17    I do see mailings to Rachel Wiesjahn and Anna Lisa Sand and

18    Rachel Wiesjahn and Judd Wiesjahn that were returned as

19    undeliverable.  That's why I have problems with same, because

20    we're -- same as what?  What are you talking about, I'm not

21    following?

22            THE WITNESS:  Well, I believe Mr. Smolinsky was

23    asking me about the subsequent records, those created on 9/16,

24    which are -- which began on page 3 of 8 of the chart.

25            THE COURT:  All right.  And these were served on the

Page 111

1    dates that appear in the fifth column.

2              THE WITNESS:  Correct.

3              THE COURT:  And you're saying that they were not

4    returned as undeliverable?

5              THE WITNESS:  That's correct.

6    BY MR. SMOLINSKY:

7    Q.   So just to be clear, based on where we are right now in

8    our conversation, bar date notices were sent out on about 9/24

9    to 9/26/2009, they were sent to six different -- there were six

10   different packages; three that were based on the records that

11   were given to you before the bankruptcy filing, and three that

12   were given to you based on updated records that were given to

13   you in September; is that correct?

14   A.   That's correct.

15   Q.   And the ones that were based on the updated records that

16   included Stanley Martin Law Office of were not sent back as

17   undeliverable?

18   A.   That's correct.

19   Q.   So to the best of your knowledge, they were delivered, you

20   have no reason to believe that they were not?

21   A.   That's correct.

22   Q.   Now, let's go to page 5 of 8.  We have a new date created,

23   a new record date, 11/5/2010.  Could you tell me why a new

24   record was created on 11/5/2010?

25   A.   Yes.  This record was created on line, and the reason why

Page 112

1    we know that is if you compare, for example, the DCG record

2    number to the record right above it, it starts with a three.

3    So anything with a 3000 series is a scheduled record.  Anything

4    with a 7000 series is a web-created record.  And if you go back

5    to the first page, anything with a 1000 series if a matrix

6    record.  So that's how we know.

7            THE COURT:  What was the third category?  I couldn't

8    hear that.  I need you to get closer to the microphone.

9            THE WITNESS:  Sure.  So this record created on

10   November 5th is a record created on line.  And the way that we

11   can tell that is because if you look at the GCG number, it

12   starts with a 7000 number or a seven.

13           THE COURT:  Yeah, the portion that I couldn't hear

14   was something about a record that started with a one rather

15   than a three.

16           THE WITNESS:  I was sort of describing.  So if you

17   look at the record right above it, it starts with a three, and

18   to us internally, that indicates that that is a scheduled

19   record as compared to a record, for example, on the first page

20   of the chart which start with a one, and that's how we know

21   that those are matrix record, or initial data loads.

22           THE COURT:  Is matrix record another way of saying

23   initial data load or are those different things?

24           THE WITNESS:  Well, we tend to interchange them and

25   I'm afraid we overuse the word matrix in our shop, but yes, it

Page 113

1    would be the initial data load.

2            THE COURT:  Whose source you said was AlixPartners?

3            THE WITNESS:  Correct.

4            THE COURT:  All right.  Mr. Smolinsky, continue.

5    BY MR. SMOLINSKY:

6    Q.   Why do you create a record when someone accesses and in

7    this case the web-based claim site, maybe you want to describe

8    what that claim site is.

9    A.   Basically, previous to the bar date and it's no longer

10   there, although we have it in other cases whose bar date has

11   not elapsed, we have the ability for a claimant or potential

12   claimant to fill out a proof of claim form on line with clear

13   instructions that they must print that PDF that gets generated

14   and mail it back to us for processing.

15           And the reason why it automatically creates a

16   quote/unquote record in our database is two-fold.  One, it

17   allows us to track those records, and the second is, because

18   once that person prints that PDF that is generated, it is bar

19   coded on the top.  So when someone sends that particular claim

20   form and it's scanned in by our Ohio facility, it is

21   automatically linked to that record obviating the need for a

22   lot of manual entry and it's very efficient and it allows us to

23   code it appropriately and that's why it's done.

24   Q.   But if I understand you correctly, even if they never mail

25   in that proof of claim, they still have created a record.

MOTORS LIQUIDATION COMPANY, ET AL.

Page 114

1    A.    That's correct.

2    Q.    And that record is used for sending out notices that go

3    out to the world, such as these, correct?

4    A.    Yes, that's correct.  Our goal is to be over-inclusive.

5    Q.    So looking at this record, 11/5/2010 was obviously too

6    late to send the bar date notice to.  So am I correct that the

7    first package that was sent to that record was the solicitation

8    package?

9    A.    That's correct.

10   Q.    And then finally the notice of entry of confirmation

11   order?

12   A.    That's right.

13   Q.    And these were addressed to Anna Lisa Sand care of Martin

14   Stanley, or Judd Wiesjahn, care of Martin Stanley, and those

15   were sent out on 12/23/2010 and did not come back as

16   undeliverable?

17   A.    That's correct.

18   Q.    Going to page 6 of 8, there is another record here for

19   11/5/2010 and that is in the name of Martin Stanley; is that

20   correct?

21   A.    Yes.

22   Q.    And again, to that address was sent the solicitation

23   package and the notice of entry of confirmation order?

24   A.    Yes.

25   Q.    And those were sent out and according to your records did

09-50026-mg    Doc 10665    Filed 07/27/11    Entered 08/09/11 09:43:45    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 115 of 137

Page 115

```
 1    not come back as undeliverable?

 2    A.   That's correct.

 3             MR. SMOLINSKY:  Your Honor, could you give me one

 4    second?

 5             THE COURT:  Yes.

 6        (Pause)

 7    BY MR. SMOLINKSY:

 8    Q.   Ms. Ferrante, just one last question if you can answer it

 9    in your experience, and if you can't, that's fine.

10        You testified earlier that the matrix, the initial mailing

11    is over inclusive and might include, for example, I think you

12    mentioned all employees, even though those employees may not

13    have claims.

14    A.   I don't believe I mentioned the employees but it often

15    can.

16    Q.   So it would not be unusual in your experience that notices

17    go out, proofs of claim go out, forms, and only a small

18    percentage are returned signed -- executed and filled out; is

19    that correct?

20    A.   That's correct.

21             MR. SMOLINSKY:  I don't have any further questions.

22             THE COURT:  All right.  Mr. Stanley, do you wish to

23    question further?

24             MR. STANLEY:  Just very briefly.

25                       RECROSS EXAMINATION
```

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 116 of 137

Page 116

1    BY MR. STANLEY:

2    Q.   Did you --

3         THE COURT:   Come to the main microphone, please.

4         MR. STANLEY:   Pardon me?

5         THE COURT:   Come to the lectern, please.

6         MR. STANLEY:   All right.

7    Q.   Did you ever review the notice of stay of proceedings that

8    was filed by the attorneys for GM in the proceeding in

9    Monterrey County?

10   A.   I saw it as an exhibit to the motion.

11   Q.   And you know the declaration of service that was filed by

12   those attorneys, did you review that as well?

13   A.   I took a quick look at it, yes.

14   Q.   And you know that they indicated that they served Martin

15   Lewis Stanley, Esq., Law Office of Martin Stanley, 137 Bay

16   Street, No. 2, Santa Monica, California 90405 and also included

17   my phone number and my fax number as the attorney for claimant,

18   right?

19   A.   I would not have known that before two days ago.

20   Q.   So you never reviewed these when you were sending your

21   mailings?

22   A.   No, we did not.

23   Q.   And you don't know if anyone at GM ever reviewed these

24   documents when they created those lists that they gave to you?

25   A.   I can't speak to what they might do.

Page 117

1    Q.   And you also know that you did not serve Martin Lewis

2    Stanley, Esq. on any of these documents, right?

3    A.   That's correct.  As all the mailings are outlined in this

4    chart.

5    Q.   And you did not serve the Law Office of Martin Stanley on

6    any of the mailings, right?

7    A.   We served as they're outlined on this chart.

8    Q.   But you did not serve the Law Office of Martin Stanley,

9    true?

10   A.   To the best of my knowledge, that's correct.

11         MR. STANLEY:  Thank you.  Nothing further.

12         THE COURT:  Okay.  Mr. Smolinsky, anything further,

13   limited of course, to what Mr. Stanley said?

14         MR. SMOLINSKY:  No further questions, Your Honor.

15         THE COURT:  All right.  To what extent, if any, do I

16   have further evidence to take into the record before I take

17   closing argument?

18         Nothing from either side?  All right.  Ten minute

19   recess and then I'll take argument.  We're in recess.

20   (Recessed at 2:34 p.m.; reconvened at 2:45 p.m.)

21         THE COURT:  Okay.  Closing arguments, Mr. Stanley.

22         MR. STANLEY:  Just very briefly.  Does Your Honor

23   want me at the podium?

24         THE COURT:  Yes, please.

25         MR. STANLEY:  Thank you, Your Honor.

Page 118

1           Now, the issue in this case is whether or not our law

2     firm received notice of this bar date, and that's the issue for

3     Your Honor to determine.  And you heard from Mr. Lamb and you

4     heard from me with regards to that issue, and you heard from

5     Ms. Ferrante, who's a very nice woman, but the problem is that

6     she's not a) the person most knowledgeable with regards to

7     mailings on this, and b) she's not the computer, and no

8     computer records were entered or generated or brought forth.

9           What they do is they take these envelopes and they

10    throw them away if they get to come back, so we have no record

11    of what the post office told them, what was done, what actually

12    happened.  We only have some alleged computer statements that

13    we got them.  You can't cross-examine a computer.

14          Now, the person that did this mailing was Kelly

15    Keene, I think her name was.  She's here in New York, we came

16    from Los Angeles to have this hearing, to attend here and

17    testify as Your Honor suggested way back when I argued the

18    motion by phone.  I even brought Mr. Lamb because his testimony

19    I thought would be important for Your Honor to hear.  And did

20    they even bring their people from New York?  No.  They're a

21    forty-five minute drive away.  She could've come and testified.

22    We could've had the benefit of cross-examination with regards

23    to her testimony.  We did not get that.

24          All of the matters set forth by Ms. Ferrante are

25    really not based on her personal knowledge.  They, like most of

Page 119

1   Mr. Lamb's testimony in his declaration, are based on the

2   review of the computer or file when it comes to Mr. Lamb.  But

3   Mr. Lamb did have personal knowledge of one thing, the very

4   important thing that in September of 2009, we were both opening

5   and looking at the mail together as we did, because I liked to

6   keep a careful practice, and like to have both of us on the

7   same page, and we didn't get any such mailings.

8          It's up to the defendants to provide us with this

9   notice.  That's -- I'm sorry, not the defendant --

10         THE COURT:  Clarify the testimony for me, please --

11         MR. STANLEY:  The debtor.

12         THE COURT:  -- Mr. Stanley.

13         MR. STANLEY:  The testimony --

14         THE COURT:  You and Mr. Lamb opened up the mail side-

15   by-side, or sometimes you would do it, sometimes he would do

16   it, but either way, one of the two of you would do it?

17         MR. STANLEY:  No.  We would both do it either side-

18   by-side, or he would open it up and then bring it to me and

19   share with me about it, and we would have a discussion, rather

20   brief, but we would have a discussion about the mailing.  We

21   would both review each and everything that was -- that came

22   into the office by mail each and every day, because it was a

23   small practice, and we were both involved in each and every

24   case, and it was incumbent upon us to both have knowledge of

25   what was going on with respect to each and every case.

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 120 of 137

Page 120

1          So we would both open up -- we wouldn't both open the

2    envelope, but we'd both sit down at some point in time during

3    the day with the mail that came in each and every day and go

4    through each and every package to see what was in there and

5    what needed to be done.

6          And most of the time, I'd write on there calendar

7    this or do that, and then we'd both know what to do with the --

8    we'd make a little note on it.  So if we got it, we would do

9    something with it.  We'd have a discussion.  There's no

10   evidence that we ever got the information, and there is no

11   evidence that we ever got anything.

12         Now, whether it was an error of the computer, we

13   don't know, or the post office we don't know, but we do know

14   one thing for certain is that Ms. Ferrante admitted that she

15   never served Martin Stanley or Martin Lewis Stanley or the Law

16   Office of Martin Stanley.  That all these envelopes were

17   envelopes and the second line of the envelope maybe, maybe not,

18   I was a little unclear, said Law Office of Stanley Martin.

19   What is clear is we've never gone by that name, no matter what

20   anyone says, those envelopes were incorrectly addressed,

21   through no fault of our own.

22         We provided honest and accurate information to GM and

23   their attorneys, and GM and their attorneys knew our honest and

24   accurate information, because of their proof of service of the

25   notice of stay, that's filed in Monterrey Superior Court has

Page 121

```
 1    our correct information in their own hand, and by their own

 2    proof of service.

 3             And then yet somehow, in the transmission, there's

 4    that movie, Lost in Translation, there was some kind of mix-up

 5    from that attorney sending it to General Motors, and then

 6    generating these documents that all say, Stanley Martin Law

 7    Office.  The fact of the matter is, there is no such office,

 8    Stanley Martin Law Office, at 137 Bay Street, Unit 2, and it's

 9    easy to see that especially since it was not just to the

10    Stanley Martin Law Office, it was Anna Lisa Sand, and the next

11    line was Stanley Martin Law Office to see that the postman

12    could get confused and send these back or not deliver them or

13    do something else with them.  It's easy to see that that

14    happened.

15             Especially since on three of these items that were

16    addressed to Anna Lisa Sand, Judd Wiesjahn, or Rachel Wiesjahn,

17    the three important ones, the ones that had the bar date

18    notice, together with proof of claim, those went back.  Okay.

19             The other facts that are interesting is that they

20    sent out one and a half million mailings, and only seventy

21    thousand claims came in, and fifty thousand were returned as

22    undeliverable, and then they threw those in the trash, rather

23    than keep those in safekeeping, so that we all could see them.

24    Because we have no idea what the post office said on those

25    envelopes.
```

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 122 of 137

Page 122

1         And maybe the post office said, wrong address.  Or

2    maybe the post office said something else that was important.

3    But since they threw them away, and I'm not trying to criticize

4    Ms. Ferrante, that was their procedure, but they threw them

5    away.  So we have no idea what's going on again.  We have to

6    rely on the computer system, and maybe the envelope was bent,

7    maybe the bar code didn't get scanned properly, we don't know,

8    because we didn't see the written protocols that were designed

9    for this.

10         And I don't want to make this hearing a two-week

11    hearing, but you could easily -- and ruin Your Honor's

12    calendar, ruin my calendar, and ruin everyone else's calendar,

13    but you could easily do that in this case, because there was a

14    lot of open questions from the debtor's witness.  Opened, that

15    were not -- unanswered.

16         So respectfully, Your Honor, out of fifty thousand

17    claims or seventy thousand claims, twenty-eight hundred were

18    late filings.  That's quite a substantial number, almost five

19    percent.  And respectfully, we did not get these claims or we

20    would've answered and done something.

21         It's just as though on my other case --

22         THE COURT:  What's your point on the five percent

23    because at our earlier hearing, Mr. Smolinsky had expressed a

24    concern which is normally a concern within the bankruptcy

25    community about floodgates issues, and I thought you were

MOTORS LIQUIDATION COMPANY, ET AL.

Page 123

1    saying that your situation represented an exception to the

2    general rule, and was in substance, the perfect storm.

3            MR. STANLEY:  It does.  But what I'm concerned about

4    is because we don't have enough records, we can't really

5    determine exactly what happened here.  Records from the other

6    side, that perhaps they should've kept.  And so that makes it

7    difficult for anybody, especially us where the mailing was

8    addressed incorrectly, to come here and determine the truth.

9            The fact in California, there is a Civil Code

10   section, or Code of Civil Procedures Section 473, and when a

11   counsel makes an affidavit under oath, the Court is duty bound

12   to accept that and believe that, and set aside a default or do

13   something else, or give the client relief.  And that's because

14   based on a whole host of factors, Courts have determined over

15   the years that counsel are generally honest people and that we

16   should believe them.  And that's the truth here.  The truth is

17   we're honest, we got some of these mailings, but we didn't get

18   the essential ones, the most important one is the bar date,

19   because these other ones would really have not much relevance

20   once we filed our claim.  That -- those were the keys.

21           And out of the six they allegedly sent, three they

22   know they got back, and the other three were addressed

23   incorrectly, so it's questionable at the very least, especially

24   given our testimony.

25           What happened in 2010 after the bar date, after the

Page 124

1    so-called horse was out of the barn doesn't matter that much.

2    It's what happened before the bar date, because I can assure

3    you if we had brought the petition three days after the bar

4    date, they would be making the same arguments here that they

5    did today.  The issue is what was the bar date and what notice

6    was provided to us before the bar date.  What happened

7    afterward is the so-called red herring, it doesn't have that

8    much relevance.

9            Respectfully, there is insufficient evidence on the

10   debtor's part that these were appropriately served, and there's

11   strong evidence, and even in all the cross-examination and it's

12   very uncomfortable for any attorney to be subjected to cross-

13   examination, even under all the cross-examination that Mr.

14   Smolinsky conducted in an appropriate fashion, even he said

15   that we maintain a diligent practice during his time of

16   questioning us, and that's the honest truth, and that's what

17   this Court is duty bound to look for, the honest truth.  Thank

18   you.

19           THE COURT:  All right.  Mr. Smolinsky.

20           MR. SMOLINSKY:  Thank you, Your Honor.

21           Claimant's counsel learned of the GM bankruptcy at

22   least as early as June 9th, 2009.  Angela Ferrante, Vice-

23   President of Operations -- Assistant Vice-President of

24   Operations at Garden City Group testified today that there were

25   forty packages, separate packages sent to Mr. Stanley's

Page 125

1  address, and only three which did not include the name Stanley

2  Martin or Martin Stanley were returned as undeliverable.

3            THE COURT:  Is that the appropriator denominator to

4  be using, Mr. Smolinsky?  Because it appears from the

5  demonstrative that there came a time on or about November 5th,

6  2010 I think, when he put the input into the computer, that the

7  address was much more clearly stated.

8            Now, if I recall further he testified that even after

9  that date he still wasn't getting everything, but the number of

10  documents after November 5th would at least seemingly be in a

11  different category when mailings no longer either omit any

12  reference to the law firm or no longer scramble his name.

13            MR. SMOLINSKY:  It's a fair point, Your Honor, but

14  there were forty packages that were sent with slightly

15  different addresses, none were perfect, because even the ones

16  that Mr. Stanley entered had the name of the individual above

17  the Law Offices of Martin Stanley and those were received, and

18  I think he's acknowledged they're received.

19            Although the testimony is very murky, I asked him

20  whether he received five copies of the solicitation package,

21  and that's something which you usually remember.  It's a very

22  significant number.  As a matter of fact, we had people calling

23  up and screaming at us of how could you send us so many copies

24  of the same document, and it's because we try to be over

25  inclusive, we try to take bad records that we have and continue

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 126 of 137

Page 126

1    to try to make them better.

2            So I take your point, Your Honor, that some of

3    those --

4            THE COURT:  All right.  You take my point and --

5            MR. SMOLINSKY:  -- forty were better addresses.

6            THE COURT:  -- your point is that there were still a

7    lot remaining that seemingly would've been received, if not,

8    forty, let's just pull a number out, twenty, thirty, and that

9    there were various variance of an address which still had the

10   address and the suite number.

11           MR. SMOLINSKY:  And the suite number, which is a

12   pretty --

13           THE COURT:  Or the unit number.

14           MR. SMOLINSKY:  -- specific address.

15           Yet, claimant's counsel asserts that other than

16   notice of bankruptcy that was filed in the California State

17   Court, they didn't receive any mailings about this Chapter 11

18   case until September 3rd, 2010 when they received the notice of

19   hearing of the disclosure statement.

20           The evidence shows that the claimant's counsel did

21   not take any public action in response to receiving notice that

22   the debtor's disclosure statement had been filed, and treated

23   the missed deadline almost as a routine matter.  I asked Mr.

24   Lamb when he came back to the firm in February of 2011 whether

25   there was an uproar, and there doesn't seem to be -- have been

Page 127

1    too much concern over that issue.

2              Mr. Stanley testified that he investigated the matter

3    from September 2010 to January 2011 when he finally filed his

4    motion to allow a late filed claim.

5              They waited two months and then after they received

6    the September 3rd notice of the -- I'm sorry, September 13th

7    notice of the disclosure statement to access the Motors

8    Liquidation website maintained by Garden City Group.  That was

9    on November 5th, 2010.  They completed the on-line forms.

10             They didn't file those forms, they didn't send them

11   to the debtors, they didn't send them to the Court, they waited

12   another month.  And then on December 8th, 2010, went back on

13   the Motors Liquidation website and completed a second set of

14   on-line proof of claim forms for Ms. Sand and Mr. Wiesjahn.

15   But plaintiff's counsel did not file that claim form either,

16   rather they waited another full month and then filed the

17   instant motion, attaching those back-dated claim forms as

18   Exhibit G.

19             Your Honor, something doesn't add up here.  This is a

20   period of four months after which they reasonably had notice

21   that there was a bar date.  Regular creditors who concede that

22   they did receive the bar date notice had forty-five days to

23   file a proof of claim.  We're talking about a period here of

24   four months.

25             Even if the Court were to believe that the post

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 128 of 137

Page 128

1   office erred in failing to deliver a dozen of notices, the

2   Court cannot countenance of delay of almost four months after

3   learning that the disclosure statement was filed.

4          But again, the delay is paramount.  The cases cited

5   by Mr. Stanley for excusable neglect, and I'll pick out, In Re:

6   Ginther and Bruno Machinery, talk about delays of seven minutes

7   and one day, and there the Court found that there was excusable

8   neglect in filing, seven minutes and one day.  This is four

9   months.

10         While motions to file late claims may turn on whether

11  a claimant is credible in testifying that they did not receive

12  the bar date notice, here the sheer number of documents that

13  are claimed not to have reached claimant's counsel, together

14  with the lack of immediate remedial action after learning of

15  the bar date, dictate that the motion be denied.

16         To allow a late filed claim under these circumstances

17  would be prejudicial to the tens of thousands of claimants who

18  filed timely proofs of claims and would set a negative

19  precedent as Your Honor noted, that will undoubtedly burden the

20  Court and the debtors with a slew of similar excusable neglect

21  claims that the postman never rings twice.  Thank you, Your

22  Honor.

23         THE COURT:  All right.  Mr. Stanley, any reply?

24         MR. STANLEY:  Thank you, Your Honor, just very

25  briefly.

Page 129

1          One thing that was never explained by Mr. Smolinsky

2     or anyone else was why is it that all the claim forms that were

3     mailed to Rachel or Wiesjahn Rachel, Sand Anna Lisa, et cetera

4     that were sent on 9/24 to 9/26/09 were returned, as well as the

5     ones to Judd and Rachel, why were those returned, and then how

6     is it that the subsequent mailings with that same exact address

7     were not returned?  It doesn't make sense.  Because why would

8     the post office have delivered those to our office, after

9     having sent the first ones back unaddressed or undeliverable?

10    It doesn't make sense.

11         So what they're claiming is, we got all these things

12    that were addressed Anna Lisa Sand, Rachel Wiesjahn that didn't

13    have anything to do with us on it, and why would the post

14    office deliver those if the first ones were sent back as

15    undeliverable?  It doesn't make sense, because we've never been

16    known as Rachel Wiesjahn, Anna Lisa Sand or Judd Wiesjahn, like

17    is set forth on their first two pages where they say, oh, well,

18    the notice of hearing to consider approval of debtor's proposed

19    disclosure was received by or was mailed to Rachel Wiesjahn on

20    the first page, Your Honor.  Anna Lisa Sand --

21         THE COURT:  But a question, if you look at page 3 of

22    8, they're addressed in a variant of that.  They start off with

23    the same Wiesjahn, but then they follow with Stanley Martin Law

24    Office of.  So they're not exactly the same, are they?

25         MR. STANLEY:  Well, no, but on the first page, they

09-50026-mg    Doc 10665    Filed 07/27/11    Entered 08/09/11 09:43:45    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 130 of 137

Page 130

1    have the ones that were identically sent.  And as well as the

2    ones on the second page.

3              THE COURT:  Oh.

4              MR. STANLEY:  They claim that they sent Anna -- or

5    Wiesjahn, Rachel; Sand, Anna Lisa a bar date notice together

6    with non-customized proof of claim form on 9/24 to 9/26/09.

7              THE COURT:  Okay.  That one was returned as

8    undeliverable, and your point is the next three on the

9    demonstrative --

10             MR. STANLEY:  The next three --

11             THE COURT:  -- which are identically addressed --

12             MR. STANLEY:  Addressed.

13             THE COURT:  -- do not show that they were returned as

14    undeliverable.

15             MR. STANLEY:  And they even claim that the first one

16    was delivered.  That's what her testimony was, Ms. Ferrante.

17    And the same thing with all the ones on the bottom of page 1,

18    on the top of page 2, and on the bottom of page 2, all the way

19    through the first entry on the top of page 3.  It doesn't make

20    sense.  Because it shows either that someone had to have made a

21    mistake.  Either the post office made the mistake by dropping

22    those, or the post office really sent them back, and we have

23    the mistake on that side that we can't prove because we don't

24    know what happened to the envelopes.

25             Someone made a mistake, and you have our testimony

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 131 of 137

Page 131

1    that we never got that.  And why would the post office deliver

2    to the Law Office of Martin Stanley a document that is sent to

3    Wiesjahn, Rachel; Sand, Anna Lisa without my name on it at all?

4          Why would they ever send or deliver something to

5    Wiesjahn, Rachel; Wiesjahn, Judd without my name on it at all

6    or Mr. Lamb's name at least, and why would they deliver to

7    Wiesjahn, Rachel, Wiesjahn, Rachel at my office without Mr.

8    Lamb's name on it or my name on it at all, given that they sent

9    three of those fifteen that they allegedly sent back?  Why

10   would they deliver them to us?  There's no explanation about

11   that, and it simply doesn't make sense.

12         That would be like delivering McDonald's packages to

13   the bankruptcy court.  That's what they're saying happened.

14   That the person who delivered them failed to totally look at

15   the envelopes, and they just put them in the box.  And it just

16   doesn't make sense, it's not true and honest.

17         One thing we do know for certain is Mr. Ferrante

18   admitted there was no service on counsel whatsoever.  As Martin

19   Stanley was not served, and the Law Office of Martin Stanley

20   was not served.

21         By the time Mr. Lamb came back to work for us, we had

22   already filed our motion.  So of course, there wasn't a big

23   discussion on that because to be honest with you, I took over

24   the handling of it up until I thought well it would be

25   important to have his testimony when he did his declaration

09-50026-mg   Doc 10665   Filed 07/27/11   Entered 08/09/11 09:43:45   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 132 of 137

Page 132

1    last week.

2         And then there was a delay from the middle of

3    September to the date when I entered that information, but as I

4    mentioned in my testimony, I was having my health issues during

5    that time, and I had a busy practice, and unfortunately I had

6    lost Mr. Lamb, who I was very close to, had worked for me for a

7    long time, we had a good system, and it was a bit of extra

8    stress to have a new lawyer that was not familiar with the

9    system there working for us.

10         So we did our best to do something and get this filed

11   in as timely as possible a fashion.  But to be honest with you,

12   I guarantee you GM would've objected even if it was filed the

13   day after we got that September 13th notice.  They would've

14   said too late, because you missed the bar date by eight months

15   or however long, eight months, nine months, ten months, however

16   long it had been, I think it was in October of the year before.

17   There's no relevance to that, because they would've made the

18   same objections as they do now.

19         So respectfully the important thing is, Your Honor,

20   is GM always knew about this claim.  The original paper that

21   they filed, and I showed you Exhibit or page 271 of 281 to

22   Exhibit F-6 indicated that Rachel Wiesjahn, Judd Wiesjahn and

23   on the page before, Anna Lisa Sand had a claim that their claim

24   was contingent, it was unliquidated and disputed, and the

25   amount was undetermined.  They always knew about this claim.

09-50026-mg    Doc 10665    Filed 07/27/11    Entered 08/09/11 09:43:45    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 133 of 137

Page 133

1         That was, by the way, the identical information that

2    was put into that proof of claim much later.  They printed it

3    out and it says the same exact same thing.  It says in Exhibit

4    G to our papers that Anna Lisa Sand has a claim, that the

5    amount of claim is undetermined, and then it's not a secured

6    claim.  What's the difference?  Is there any prejudice?  Did

7    they have the information?  They had it, they knew it was a

8    claim, they indicated total claim amount, and they didn't bring

9    anyone down here to talk about that.  Thank you.

10         THE COURT:  Mr. Smolinsky, limited to what he said in

11    his reply.

12         MR. SMOLINSKY:  Just one point on that final point

13    about the schedules.

14         I think Your Honor at the last hearing had already

15    ruled on the informal proof of claim argument, and so I don't

16    think that that was the subject of this evidentiary hearing.

17    I'm just looking for it in the transcript.  But Your Honor did

18    note that the issue relating to an informal proof of claim was

19    a done issue, and of course, I would note that under Rule 3002,

20    proof of claim is needed if a schedule --

21         THE COURT:  I couldn't hear that, Mr. Smolinsky.

22         MR. SMOLINSKY:  That under Bankruptcy Rule 3002 that

23    a proof of claim is needed to be filed if the -- if it's marked

24    as contingent, unliquidated, or disputed by the debtors.

25         THE COURT:  All right.  Folks, I am going to try to

09-50026-mg    Doc 10665    Filed 07/27/11    Entered 08/09/11 09:43:45    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 134 of 137

Page 134

1    rule in the next couple of hours.  I don't know exactly how

2    long it's going to take me.  I would like both sides here from

3    four o'clock thereon.  We're in recess.

4            MR. STANLEY:  Your Honor, respectfully, do we need to

5    be here for the ruling, because we do have a plane to catch,

6    and I did move it already.

7            THE COURT:  Well, if you'd like to take your plane

8    and I'll announce my ruling by an on the record conference

9    call, then I'll permit both sides to be excused.  Would that --

10   Mr. Smolinsky, I assume you're willing to go back to your

11   office and hear my ruling over the telephone as well?

12           MR. SMOLINSKY:  Your Honor, just -- what time would

13   work for counsel?

14           MR. STANLEY:  Well, I don't want Your Honor staying

15   too late or his staff, I could do it tomorrow just about any

16   time.  I have an eye appointment at 8:30, and that's why I have

17   an urgent matter with my eyes and I've waited --

18           THE COURT:  Well, normally counsel like to get

19   decisions from me as quickly as possible, but I can just as

20   easily do it by on the record conference call, and under these

21   circumstances what I will do is I'll just call both sides and

22   tell them when the conference call will take place.  I'll do it

23   at a time that both sides can be ready to hear it, okay.

24           MR. SMOLINSKY:  Perhaps we can advise chambers, work

25   out a time that works out for both of us?

MOTORS LIQUIDATION COMPANY, ET AL.

Page 135

1          THE COURT:  Well, frankly, if -- I don't need to rule

2    right now, I'd prefer to have the flexibility to let you guys

3    know when I want to deliver it.

4          MR. SMOLINSKY:  That's fine, Your Honor.

5          MR. STANLEY:  I have no objection.

6          THE COURT:  As big as GM is, it's not the only case

7    on my docket.  Okay.  We're in recess.  You can catch your

8    plane, have a good flight.

9          MR. STANLEY:  Thank you, Your Honor, appreciate it.

10       (Whereupon these proceedings were concluded at 3:12 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                          Page 136

  1

  2                          I N D E X

  3

  4                       T E S T I M O N Y

  5    WITNESS                 EXAM BY              PAGE      LINE

  6    MARTIN STANLEY          MR. SMOLINSKY         5         22

  7                            MR. STANLEY          35          1

  8                            MR. SMOLINSKY        40          8

  9                            THE COURT            42         12

 10                            MR. SMOLINSKY        51         19

 11

 12    JEFFREY LAMB            MR. SMOLINSKY        54         20

 13                            THE COURT            70          5

 14

 15    ANGELA FERRANTE         MR. STANLEY          72         18

 16                            MR. SMOLINSKY        98         21

 17                            MR. STANLEY         115         25

 18

 19                       E X H I B I T S

 20    PARTY   NO   DESCRIPTION              ID.       EVID.

 21    Debtor  2    Demonstrative Chart                 13

 22

 23    Court   1    Handwritten Drawing      47         50

 24

 25
```

Page 137

1

2                    C E R T I F I C A T I O N

3

4    I, Aliza Chodoff, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    Aliza Chodoff     Digitally signed by Aliza Chodoff
                       DN: cn=Aliza Chodoff, c=US, o=Veritext
                       Reason: I am the author of this
8    _____   document
                       Date: 2011.07.27 15:16:53 -04'00'

9    ALIZA CHODOFF

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date:  July 27, 2011

17

18

19

20

21

22

23

24

25