UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────────────────────────

                            )

In re:                            )        Chapter 11

                            )

MOTORS LIQUIDATION COMPANY,        )

        f/k/a General Motors Corp., *et. al.,*     )        Case No. 09-50026 (REG)

                            )

                Debtors.       )        Jointly Administered

───────────────────────────────────)

BENCH DECISION[1] AND ORDER ON NEW GM'S MOTION
TO ENFORCE SALE ORDER WITH RESPECT TO DISPUTE
WITH UAW

APPEARANCES:

JONES DAY
*Attorneys for New GM*
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
By:     Heather Lennox, Esq. (argued)
        Robert S. Walker, Esq.

51 Louisiana Avenue NW
Washington, D.C. 20001
By:     Andrew M. Kramer, Esq.

222 East 41st Street
New York, New York 10017
By:     Lisa G. Laukitis, Esq.

BREDHOFF & KAISER P.L.L.C.
*Attorneys for UAW*
805 Fifteenth Street, N.W. Suite 1000
Washington, D.C. 20005
By:     Andrew D. Roth, Esq. (argued)
        Ramya Ravindran, Esq.

---

[1]     I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where the circumstances do not permit more leisurely drafting or more polished discussion. Because they often start as scripts for decisions to be dictated in open court, they typically have a more conversational tone.

CLEARY GOTTLIEB STEEN & HAMILTON LLP
*Attorneys for UAW*
One Liberty Plaza
New York, New York 10006
425 Lexington Avenue
New York, New York 10017
By:    Deborah M. Buell, Esq. (argued)
      James L. Bromley, Esq.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
*Attorneys for DPH Holdings Corp., et. al.*
155 North Wacker Drive
Chicago, Illinois 60606
By:    John Wm. Butler, Jr., Esq.
      Ron E. Meisler, Esq. (argued)

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

This contested matter arises in the chapter 11 case of Motors Liquidation

Company (formerly known as General Motors Corp.) ("**Old GM**").  But it actually

involves a dispute between nondebtors General Motors LLC ("**New GM**") (the acquiror

of the bulk of Old GM's assets in Old GM's July 2009 asset sale, and which is now the

"General Motors" that continues to sell vehicles today) and New GM's principal union,

the United Auto Workers (the "**UAW**").

New GM moves before me for an order "enforcing" the July 2009 order (the

"**363 Sale Order**") and related agreements under which I authorized the sale of Old GM

assets, under section 363 of the Code, to New GM.  And as part of that, New GM asks

me to block a lawsuit (the "**Michigan Action**") brought by the UAW with respect to the

dispute in the United States District Court for the Eastern District of Michigan (the

"**Michigan Court**")—now pending before the Hon. Avern Cohn, U.S.D.J., who, pending

my ruling, stayed the proceedings before him as a matter of comity.

In the Michigan Action, the UAW contends that New GM wasn't relieved of an

earlier duty, undertaken in connection with the bankruptcy of Old GM spin-off Delphi

Corporation ("**Delphi**"), to make a $450 million contribution to a UAW VEBA Trust that

pays for retiree medical benefits.  New GM disputes that.  New GM contends that an

agreement whose execution I approved in 2009 capped its obligations—superseding any

earlier agreements to the contrary.

In this Court, New GM contends that I have, and should keep, exclusive

jurisdiction over the controversy being litigated in the Michigan Action—because, New

GM contends, it involves enforcement and interpretation of the 363 Sale Order and of an

1

agreement that I approved under the Sale Order, which, New GM contends, caused its duty to make the $450 million contribution come to an end.

The UAW contends that because New GM's contentions as to the underlying merits of the dispute lack a colorable basis under the 363 Sale Order and its related agreements, there's an insufficient basis for my taking exclusive jurisdiction to enforce or interpret anything. And the UAW further contends that even if I have that jurisdiction over New GM's motion, I should abstain from deciding the matter.

For the reasons set forth below, I think both sides' positions as to this controversy are at least colorable; that New GM has made a sufficient showing to invoke the provisions giving me jurisdiction under the 363 Sale Order; and thus that I could appropriately take exclusive jurisdiction if I chose to. But the controversy doesn't involve anything as to which I'd have particular knowledge or expertise warranting my exercise of that jurisdiction—such as knowing what I intended to accomplish when I issued an earlier order—and I think that a Michigan federal judge could decide the controversy at least as well as I could. Frankly, I bring nothing to the table here. Nor would determination of this controversy bear on objectives to be achieved in Old GM's chapter 11 case, or otherwise advance bankruptcy needs and concerns. And especially since so much has already been accomplished in helping New GM and the UAW get back to business as usual, I think it's better for the New York bankruptcy court to minimize its role in New GM affairs, and to act only with respect to matters where the New York Bankruptcy Court has a significant interest, or that truly involve bankruptcy law or policy.

Accordingly, I will abstain from hearing this controversy in favor of the United States District Court for the Eastern District of Michigan.  My Findings of Fact, Conclusions of Law, and bases for the exercise of my discretion follow.

Findings of Fact[2]

*A.  Background*

In 1998, Delphi, an automotive parts manufacturer, was incorporated in Delaware as a wholly-owned subsidiary of Old GM.  In early 1999, Delphi separated from Old GM, and thereafter operated as an independent manufacturer and major supplier to Old GM.

In October 2005, Delphi and certain of its affiliates filed chapter 11 petitions in the Southern District of New York, and the *Delphi* chapter 11 cases were assigned to my colleague Judge Robert Drain.

In 2006, Old GM, the UAW, and a class of GM retirees entered into a settlement agreement resolving a class action lawsuit (the "***Henry I***" lawsuit) in the Eastern District of Michigan.[3]  Under that settlement agreement, Old GM remained obligated to provide medical benefits to its retirees, but Old GM's retiree medical insurance plan was modified to impose new costs on its retirees.  At the same time, the *Henry I* settlement agreement provided for the establishment of a new trust called a "Voluntary Employees' Beneficiary Association" ("**VEBA**"), and in particular, a "Defined Contribution" VEBA,

---

[2]    These Findings of Fact are for the purposes of this decision only, and are without prejudice to any findings that might hereafter be made in the Michigan Action or elsewhere.

    For brevity, citations with respect to factual matters are limited to the most significant matters.

[3]    *Int'l Union, UAW v. General Motors Corp.*, Civil Action No. 05-73991 (E.D. Mich.).

to be funded by defined contributions provided for under the settlement, for the purpose of mitigating the additional medical[4] costs for Old GM retirees.

Though evidence ultimately introduced may result in a more precise or accurate explanation, the VEBA mechanism was established to mitigate the added costs to retirees from the lowering of retiree benefits. With legacy medical expenses going up, Old GM and the UAW could and did negotiate for Old GM to make defined contributions—*i.e.*, to pay fixed amounts—toward retiree medical expenses, in lieu of uncertain, but generally increasing, actual expenses. Because this VEBA would be funded with defined contributions, it was referred to as a "Defined Contribution" VEBA, and, by the two sides here, as the "**DC VEBA**." To distinguish it from a second VEBA that was later created and is also relevant here, I refer to the DC VEBA as the "**First VEBA**."

B.    *Agreements Relating to Retiree Benefits*

The underlying controversy requires consideration of four agreements. While deciding whether New GM's contentions to invoke my jurisdiction here are colorable and whether abstention is appropriate here won't require deciding the underlying issues on the merits, some discussion of those agreements is necessary by way of context.

1.    *The 2007 Memorandum of Understanding (June 2007)*

In June 2007, Delphi, Old GM, and the UAW entered into a tripartite "Memorandum of Understanding" (often referred to by the parties as an "**MOU**," and by me as the "**2007 Memorandum of Understanding**"),[5] to resolve a number of labor

---

[4]    Though at least some of the retiree benefits may have included dental and vision coverage as well as medical coverage, for simplicity I refer to them all as "medical" benefits.

[5]    New GM Motion, Exh. C. The two sides here use acronyms that aren't meaningful to an outside reader or to anyone else who hasn't been living with the case. Except where acronyms appears in quotations or acquired common meaning, I expand them out, paying the price in a little extra length, so the reader will know what we're talking about.

4

relations issues that had arisen during the *Delphi* chapter 11 case.  It was approved by Judge Drain shortly thereafter.

Among other things, the 2007 Memorandum of Understanding allocated responsibility between Old GM and its spin-off Delphi for UAW-represented Delphi retirees (most of whom were former Old GM employees, having worked for Old GM before the spin-off) with respect to medical benefits.  Significantly here, the 2007 Memorandum of Understanding also provided that Old GM would make a one-time contribution of $450 million to the First VEBA.[6]

The obligation to make that $450 million contribution was made subject to specified conditions, including:

> (1) execution of a settlement agreement between Delphi and Old GM with respect to a number of "financial, commercial and other matters between them"; and

> (2) the "substantial consummation"—not just confirmation—of a *Delphi* reorganization plan "which incorporates, approves and is consistent with all of the terms of this Agreement and the comprehensive settlement agreement between Delphi and GM."[7]

---

[6]     It provided, in its § J(2):

> The UAW has asserted a claim against Delphi in the amount of $450 million as a result of the modifications encompassed by this Agreement and various other UAW agreements during the course of Delphi's bankruptcy.  Although Delphi has not acknowledged this claim, GM has agreed to settle this claim by making a payment in the amount of $450 million, which the UAW directed to be paid directly to the [First VEBA]….

[7]     2007 Memorandum of Understanding § K(2).  In September 2007, shortly after approval of the 2007 Memorandum of Understanding, Old GM and Delphi entered into a "global settlement agreement" which was incorporated into the *Delphi* plan.  In September 2008, at which time the

    *2. The 2008 UAW Retiree Settlement Agreement (February 2008)*

    In February 2008, Old GM, the UAW, and a class of Delphi and GM retirees

entered into a settlement agreement (the "**2008 UAW Retiree Settlement Agreement**")[8]

resolving a second class action lawsuit (the "*Henry II*" lawsuit), also filed in the Eastern

District of Michigan.[9]  Among other things, the 2008 UAW Retiree Settlement

Agreement provided for the establishment of a second VEBA (the "**New VEBA**"), for the

"[p]urpose" of transferring responsibility for GM and Delphi retiree medical benefits

from Old GM to the New VEBA.[10]  The 2008 UAW Retiree Settlement Agreement's

recitals provided that it "resolves and settles any and all claims for GM contributions to

the [First VEBA], and provides for the termination of the [First VEBA] and the transfer

of all assets and liabilities of the [First VEBA] to the New VEBA."[11]

    Section 8 of the 2008 UAW Retiree Settlement Agreement, captioned "GM

Payments to New Plan and New VEBA," provided:

> GM's financial obligation and payments to the New
> Plan and New VEBA are *fixed and capped* by the
> terms of this Settlement Agreement.[[12]]  The timing
> of all payments to the New VEBA shall be as set
> forth in Section 12 of this Settlement Agreement; it
> being agreed and acknowledged that the New Plan,
> funded by the New VEBA, shall provide Retiree
> Medical Benefits for the Class and the Covered
> Group on and after the Implementation Date, and

---

    *Delphi* plan had been confirmed but had not yet become effective, an "Amended and Restated"
global settlement agreement was entered into by the same parties.  New GM Motion, Exh. D.

[8]    Ravindran Decl., Exh. 1.

[9]    *Int'l Union, UAW, et. al. v. General Motors Corp.*, Civil Action No. 07-14074 (E.D. Mich.).

[10]    2008 UAW Retiree Settlement Agreement § 2.

[11]    *Id.* at 1.

[12]    I refer to this as the "**2008 Fixed and Capped Language.**"  It should be distinguished from
similar language in a later agreement, the 2009 UAW Retiree Settlement Agreement, discussed
beginning at page 9 *infra*.

> that all obligations of GM and the GM Plan for
> Retiree Medical Benefits for the Class and the
> Covered Group shall terminate as of the
> Implementation Date, as set forth in this Settlement
> Agreement.[13]

Similar language is contained in other sections of the 2008 UAW Retiree Settlement

Agreement.[14]

The 2008 UAW Retiree Settlement Agreement did not make any explicit

reference to the $450 million payment obligation provided for in the 2007 Memorandum

of Understanding.  At least by anything the 2008 UAW Retiree Settlement Agreement

said expressly, neither modified or extinguished the earlier obligation, nor confirmed that

the obligation continued to exist.

### 3.  *The 2008 Implementation Agreement (September 2008)*

About seven months later, in September 2008 (at which time the Delphi plan had

not yet become effective, and, as a result, Delphi was still in bankruptcy), Delphi, Old

GM and the UAW entered into another tripartite agreement (the "**2008 Implementation**

**Agreement**"),[15] which, among other things, implemented, at least in part, a term sheet

that had been entered into between those parties in 2007.  Under the

2008 Implementation Agreement (even though the Delphi plan hadn't yet become

effective), the parties agreed to the immediate triggering of some of Old GM's

commitments under the 2007 Memorandum of Understanding.

---

[13]     2008 UAW Retiree Settlement Agreement § 8 (emphasis added).  "New VEBA" is defined as "a
new trust fund to be established as described in Section 4 of this Settlement Agreement," and
"New Plan" is defined as "the new retiree welfare benefit plan that is the subject of this Settlement
Agreement, and that is funded in part by the GM Separate Retiree Account (as defined in the Trust
Agreement), which New Plan shall provide Retiree Medical Benefits to the Class and Covered
Group." *Id.* § 1.

[14]     *See id.* §§ 2; 5.B; 14.

[15]     New GM Motion, Exh. F.

The 2008 Implementation Agreement modified certain obligations arising under the 2007 Memorandum of Understanding. But with respect to the $450 million payment provided for in the 2007 Memorandum of Understanding (then referred to as the "Restructuring MOU"), the 2008 Implementation Agreement stated:

> The payment required by sections J(2)[16] and K(2)(e)[17] shall remain payable as set forth in the Restructuring MOU.[18]

### 4. The 2009 UAW Retiree Settlement Agreement (July 2009)

On June 1, 2009, Old GM filed this chapter 11 case. On the same day, Old GM moved, with the support of the UAW, among others, for approval of a sale of most of its assets in a section 363 sale. About five weeks later, on June 30 through July 2, 2009, I held an evidentiary hearing (the "**363 Hearing**") on the motion. And on July 5, 2009, I issued a decision,[19] later affirmed on appeal, approving the sale. I entered the 363 Sale Order, approving the 363 sale to the entity that became New GM, on that same day.[20] After requests for a stay were denied, the sale closed a few days later.

At about the same time, by an agreement dated July 10, 2009,[21] New GM and the UAW entered into a subsequent settlement agreement (the "**2009 UAW Retiree**

---

[16]    *See* page 5 & n.6 *supra*.

[17]    *See* page 5 & n.7 *supra*.

[18]    2008 Implementation Agreement ¶ 6.

[19]    *In re General Motors Corp.,* 407 B.R. 463 (Bankr. S.D.N.Y. 2009), *appeal dismissed and aff'd,* 428 B.R. 43 (S.D.N.Y. 2010) and 430 B.R. 65 (S.D.N.Y. 2010), *appeal dismissed sub nom. Parker v. Motors Liquidation Co.,* No. 10-4882-bk (2d Cir. Jul. 28, 2011).

[20]    *See* New GM Motion, Exh. B ("**363 Sale Order**").

[21]    New GM Motion, Exh. A. I suspect that the agreement followed weeks, or months, of negotiations between the UAW, old and new GM management and counsel, and, perhaps, the U.S. Government's Auto Task Force, other representatives of the U.S. and Canadian Governments, or others. But I have no actual knowledge of the duration of the negotiations, or, more importantly, what any of the parties said to each other as any discussions progressed.

8

**Settlement Agreement**”).  Its effect on obligations undertaken or confirmed in the three

predecessor agreements described above is the heart of this controversy.

Many provisions of the 2008 UAW Retiree Settlement Agreement were

unchanged, or minimally changed, by the 2009 UAW Retiree Settlement Agreement.

Whether the 2009 UAW Retiree Settlement Agreement made one particular change—

ending the duty to make the $450 million contribution—is the issue to be decided, here or

in the Michigan Action.  The 2009 UAW Retiree Settlement Agreement made no

mention of the $450 million payment referred to in the 2007 Memorandum of

Understanding and again in the 2008 Implementation Agreement—and the two sides, in

their respective arguments, draw diametrically opposite conclusions from that silence.[22]

But the 2009 UAW Retiree Settlement Agreement did include language (the “**2009 Fixed**

**and Capped Language**”) identical, in material respects, to the 2008 Fixed and Capped

Language discussed above.[23]  The 2009 Fixed and Capped Language provided, in

relevant part:

> [New Co]’s[[24]] financial obligation and payments to
> the New Plan and New VEBA are *fixed and capped*
> by the terms of this Settlement Agreement.  The
> timing of all payments to the New VEBA shall be

---

[22]    Each of New GM and the UAW makes extensive arguments on the underlying merits of the
controversy.  But the underlying merits are before me now to only a very modest degree.  At this
point, I need to confirm, by my review of the underlying agreements and the arguments each side
is likely to make, that New GM’s invocation of my jurisdiction is colorable.  And I need to get a
sense of the issues that will need to be addressed, in some court, to ascertain whether the needs
and concerns of my Court warrant keeping jurisdiction, and whether I bring something to the
table.  But I don’t need to, and do not, decide the underling merits in any way that matters, and for
that reason I don’t quote the agreements at greater length, or more fully address the parties’
detailed contentions.

[23]    *See* page 6 & n.12 *supra*.

[24]    I understand this to be the Purchaser that later became New GM, even though “New Co” was
defined, at the outset of the agreement, as “General Motors Company” (which was the corporate
name of Old GM), and New GM’s corporate name turned out to be “General Motors LLC.”  This
understanding isn’t a factual finding or conclusion or law, or otherwise binding on the parties.

9

> as set forth in Section 12 of this Settlement
> Agreement; it being agreed and acknowledged that
> the New Plan, funded by the New VEBA, shall
> provide Retiree Medical Benefits for the Class and
> the Covered Group on and after the Implementation
> Date, and that all obligations of [New Co] and/or
> the [New Co] Plan for Retiree Medical Benefits for
> the Class and the Covered Group shall terminate as
> of the Implementation Date, as set forth in this
> Settlement Agreement.[25]

The parties disagree on the significance of the 2009 Fixed and Capped Language.

Arguably relevant to that disagreement is the UAW's point that nearly identical

language—the 2008 Fixed and Capped Language—appeared in the 2008 UAW Retiree

Settlement Agreement, which preceded the 2008 Implementation Agreement, and that the

later 2008 Implementation Agreement expressly confirmed that the duty to make the

$450 million would continue.[26]  I would expect that the parties' disagreement as to the

significance of these matters would continue.

Both sides agree, however, that under each of the 2009 UAW Retiree Settlement

Agreement and my 363 Sale Order, I at least initially have jurisdiction to decide the

underlying controversy.  Though the 2008 UAW Retiree Settlement Agreement gave the

federal district court that had approved that agreement—*i.e.*, the Eastern District of

Michigan—"exclusive jurisdiction to resolve disputes arising out of or relating to the

enforcement, implementation, application or interpretation of this Settlement

Agreement,"[27] the corresponding provision of the 2009 UAW Retiree Settlement

---

[25]    2009 UAW Retiree Settlement Agreement § 8 (emphasis added) ([New Co] in original).  So far as
I can tell, the only difference between the 2008 Fixed and Capped Language and the 2009 Fixed
and Capped Language is with respect to the entity whose financial obligations and payments are
"fixed and capped."  This understanding too isn't a factual finding or conclusion of law, or
otherwise binding on the parties.

[26]    *See* page 6 & n.18 *supra*.

[27]    2008 UAW Retiree Settlement Agreement § 26.

Agreement (also § 26), gives me "exclusive jurisdiction to resolve" such "disputes" arising out of or relating to that 2009 Agreement.[28]  Similarly, the 363 Sale Order provided, in relevant part:

> This Court retains exclusive jurisdiction to enforce and implement the terms and provisions of this Order, the MPA [*i.e.*, the purchase agreement], all amendments thereto, any waivers and consents thereunder, *and each of the agreements executed in connection therewith*, including the Deferred Termination Agreements [which were agreements entered into with dealers], in all respects, including, but not limited to, retaining jurisdiction to …
> *(d) interpret, implement, and enforce the provisions of this Order....*[29]

One of the "agreements executed in connection therewith" was the 2009 UAW Retiree Settlement Agreement.  In fact, the 363 Sale Order provided made express reference to it, in two of its decretal paragraphs.  In the first of them, ¶ 19, I approved the UAW Retiree Settlement Agreement as "fair, reasonable, and in the best interests of the retirees."[30] That paragraph provided:

> The [2009] UAW Retiree Settlement Agreement, the transactions contemplated therein, and the terms and conditions thereof, are fair, reasonable, and in the best interests of the retirees, and are approved. The Debtors, the Purchaser [the predecessor to New GM] and the UAW are authorized and directed to perform their obligations under, or in connection with, the implementation of the UAW Retiree Settlement Agreement and to comply with the terms of the UAW Retiree Settlement Agreement,

---

[28]     *Compare* 2008 UAW Retiree Settlement Agreement § 26B (p. 36) *with* 2009 UAW Retiree Settlement Agreement § 26B (p. 25).

[29]     363 Sale Order ¶ 71 (emphasis added).  As the preceding discussion makes clear, however, I'm not really asked to interpret or enforce the 363 Sale Order itself, other than insofar as to implement its grant of jurisdiction to enforce and implement (and presumably construe) "each of the agreements executed in connection therewith"—including, most obviously, the 2009 UAW Retiree Settlement Agreement.

[30]     *Id.* ¶ 19.

> including the obligation of the Purchaser to
> reimburse the UAW for certain expenses relating to
> the 363 Transaction and the transition to the New
> VEBA Arrangements….[31]

In the second of those paragraphs, ¶ 20, "[i]n accordance with the terms of the UAW Retiree Settlement Agreement," with lengthy language that ran on for about a full page, I authorized the fiduciaries for the First VEBA to transfer the First VEBA's assets to the New VEBA, and provided that obligations of Old GM and New GM to provide retiree medical benefits would be governed by the UAW Retiree Settlement Agreement Agreement, as more fully provided in the order.[32]

I can and do take judicial notice, pursuant to Fed. R. Evid. 201(b)(1) and (c), of the evidence that was put before me with respect to these issues at the time of the 363 Hearing. At that hearing, a UAW witness, David Curson, submitted a direct testimony declaration in support of approval of the underlying 363 sale, and he was cross-examined, briefly, by a lawyer for certain Old GM bondholders who were opposing the transaction.[33] Mr. Curson's declaration was "also submitted in support of approval of the [2009] UAW Retiree Settlement Agreement and in response to objection letters submitted by individual UAW-represented retirees."[34]

Two exhibits to UAW witness Curson's declaration were admitted into evidence—one of which was a summary of the terms of agreed-on modifications to collective bargaining agreements,[35] and the other of which was a "White Book" with

---

[31]    *Id.*

[32]    *Id.* ¶ 20.

[33]    7/1/09 Hrg. Tr. at 205-211.

[34]    Curson Decl. ¶ 1.

[35]    Curson Decl., Exh. A.

detailed terms of the modifications to the collective bargaining agreements amendments.[36]  The latter included a "a VEBA modification termsheet that outlined the principal terms that form the basis of the UAW Retiree Settlement Agreement."[37]  But the terms of the UAW Retiree Settlement Agreement were not otherwise addressed in Mr. Curson's declaration, and I was not called upon to—nor did I—otherwise focus on the UAW Retiree Settlement Agreement Agreement, or, especially, its specifics.

I likewise can and do take judicial notice of the extent to which I had any understanding as to the parties' intent as to specifics of the 2009 UAW Retiree Settlement Agreement when I signed the 363 Order.  That extent is "not at all."

Of course, I signed an order which included the language in ¶¶ 19 and 20.  As is customary in 363 transactions, the 363 Order, which was 50 pages long, was drafted by the movants (and, perhaps other parties in interest) for my review, approval, and ultimate entry.  Though I reviewed the 363 Order with considerable care insofar as it addressed matters that were litigated or that affected litigants' rights,[38] I did not do likewise with respect to provisions that weren't matters of dispute.  Paragraphs in that order upon which New GM and/or the UAW may rely, ¶¶ 19 and 20, are in that category.  So far as I can tell, and recall, the 2009 UAW Retiree Settlement Agreement was never offered into evidence.  Neither New GM nor the UAW has contended otherwise.[39]  Understandably or

---

[36]      Curson Decl., Exh. B.

[37]      Curson Decl. ¶ 12.

[38]      For example, I deleted a provision in the order that, as proposed, would have made it effective immediately, and revised the order to provide for a stay sufficient to permit objectors to seek a further stay pending appeal.  *See* 363 Sale Order ¶ 70, as blacklined to show changes, at 48.

[39]      In fact, I note that the 363 Sale Order was entered on the Court's docket on Sunday, July 5, and that the 2009 UAW Settlement is dated July 10, 2009, the following Friday, five days thereafter.  I do not know the reason for this, or its significance, if any.  While I suspect that as of July 5 there may have existed a final or near-final version of the UAW Settlement that was thereafter executed

13

otherwise, because the *fact* of a settlement between Old GM, New GM and the UAW—as
contrasted to the specifics of the settlement—was all that mattered at the time, I had no
occasion to notice that the parties hadn't furnished me with the agreement to which
they'd made reference on page 27 of their 50 page order.

     In short, while I knew then and now that Old GM, New GM and the UAW had
entered into a new collective bargaining agreement and, along with it, a settlement with
respect to retiree benefits, I now have no knowledge that would be helpful with respect to
the specifics of this controversy.  I never saw the agreement I'm now asked to construe.
I'm seeing the 2009 UAW Settlement Agreement now for the first time, just as Judge
Cohn would.

### C.  Delphi's Emergence from Bankruptcy and the UAW's Subsequent Payment Demand

     On October 6, 2009, about 3 months after the closing on Old GM's 363 sale, the
Delphi Debtors substantially consummated their modified plan, and the effective date for
the plan occurred.  Pursuant to that modified plan, Delphi sold substantially all of its core
businesses to a third-party and sold its non-core steering business and certain U.S.
manufacturing plants to an affiliate of New GM.  The Delphi Debtors then liquidated,
disposing of their remaining assets, and paying retained liabilities.

### D.  The Michigan Action

     In October 2009, the UAW sent a letter to New GM, expressing the UAW's
position that now that Delphi had emerged from bankruptcy, New GM was obliged to
make the $450 million contribution that had been provided for under the agreements from

---

on the July 10 date that it bears, see n.21 *supra*, this underscores my lack of knowledge of the
specifics of the agreement at that time.

the summer of 2007.  New GM declined to make the $450 million payment, saying in substance that its earlier obligation had come to an end.

While the UAW continued discussions with New GM regarding its obligations under the 2007 Memorandum of Understanding, the New VEBA became operational on January 1, 2010, and the First VEBA transferred its assets into that New VEBA on January 16, 2010 and was then terminated.

On April 6, 2010, the UAW filed a complaint (the "**UAW Complaint**") against New GM in the Eastern District of Michigan.  Under the heading "Claim for Relief," the complaint stated that "[New GM's] failure and refusal to make the payment to the DC VEBA specified in Section J.2 of the [2007 Memorandum of Understanding]—as demanded by the UAW in its October 29, 2009 letter—constitutes a breach of the MOU that is remediable in this action . . . ."[40]  And in the "Prayer for Relief" section, the UAW requested that the Michigan District Court "[f]ind and declare that [New GM] is in breach of its contractual obligation under the MOU to make the payment to the DC VEBA specified in Section J.2 of the MOU," and "[o]rder [New GM] to make that contractually-required payment forthwith."[41]

On October 8, 2010, New GM filed an answer to the UAW Complaint in the Michigan Court, asserting, among other things, an affirmative defense that I have exclusive jurisdiction over the dispute between the parties.  The UAW then filed a motion to strike that asserted defense, and the next day, New GM filed a motion before me to enforce the 363 Sale Order.  After a status conference with the parties, I determined that I'd resolve the question of whether I have jurisdiction over the underlying controversy

---

[40]    New GM Motion, Exh. I ("**UAW Complaint**") at 4.

[41]    UAW Complaint at 5.

15

between the parties, and, if so, whether I should exercise it.  On November 3, 2010, as a

courtesy to me, Judge Cohn entered an order staying proceedings in the Michigan District

Court Litigation, pending my ruling on the jurisdictional questions.

### Discussion

Here I need to decide the two questions just noted:  whether I have exclusive

jurisdiction over the underlying controversy, and, if so, whether I should exercise it.  I

address the two issues in turn.

### I.

### Exclusive Jurisdiction

The 363 Sale Order provided, in relevant part:

> This Court retains exclusive jurisdiction to enforce
> and implement the terms and provisions of this
> Order, the MPA, all amendments thereto, any
> waivers and consents thereunder, and each of the
> agreements executed in connection therewith….[42]

"Retention of Jurisdiction" provisions appear in the great bulk of bankruptcy sale

orders, as disputes not infrequently arise after section 363 sales, requiring the bankruptcy

court to construe or enforce those orders.[43]  And it's well established, of course, that

bankruptcy courts, like other federal courts, have the jurisdiction to enforce their earlier

orders, even after confirmation.[44]  It's also common, if not the usual practice, for such

provisions to provide that the bankruptcy court's jurisdiction is to be exclusive, to protect

the bankruptcy court's orders from collateral attack, and because in many cases, the

---

[42]     363 Sale Order ¶ 71.

[43]     *See, e.g., In re Petrie Retail*, Inc., 304 F.3d 223, 230 (2d Cir. 2002) ("***Petrie Retail***"); *Universal Oil Ltd. v. Allfirst Bank (In re Millenium Seacarriers, Inc.)* 419 F.3d 83, 97 (2d Cir. 2005) ("Bankruptcy courts retain jurisdiction to enforce and interpret their own orders" (citing *Petrie Retail*)).

[44]     *See, e.g., Petrie Retail*, 304 F.3d at 230; *In re Johns-Manville Corp.,* 97 B.R. 174, 179-180 (Bankr. S.D.N.Y. 1989) (Lifland, C.J.).

bankruptcy court's intention in entering the order is the matter to be determined, and the judge who entered the order best knows what he or she wished to achieve.

For similar reasons, even though the rationale for doing so is not quite as strong, bankruptcy court orders normally also provide for retention of jurisdiction to construe and enforce not just the sale orders themselves, but also the underlying contractual agreements and related agreements whose execution was approved under the order, or that otherwise were the underpinnings of the order that was entered.

The UAW doesn't argue to the contrary, nor does it dispute what the 363 Sale Order says. But it argues that here the dispute doesn't turn on my construction of any of my earlier orders (most significantly, the 363 Sale Order), or raise any prospect of a "cognizable effect" on the Old GM estate.[45] And the UAW further argues that New GM's claims on the merits aren't colorable, and thus that New GM can't avail itself of the continuing jurisdiction clause that the 363 Sale Order contained.

I well understand the UAW's first point, but I see that as relevant to whether I *exercise* my jurisdiction (or, to the contrary, abstain), not to whether I have jurisdiction, or exclusive jurisdiction, in the first place. The 363 Sale Order expressly stated that I'd be reserving jurisdiction, and exclusive jurisdiction, not just to construe and enforce the order itself, but also "each of the agreements executed in connection therewith."[46] The 2009 UAW Retiree Settlement Agreement was plainly in that category, especially since it was expressly mentioned in ¶¶ 19 and 20 of the 363 Sale Order.

Just as I can, and at least usually should, construe and enforce my earlier orders when called upon to do so, I think I should construe and enforce the 363 Sale Order's

---

[45]     UAW Memo of Law at 19.

[46]     *See* page 11 *supra*.

17

retention of jurisdiction provisions as written—which means that (subject to the "colorable invocation" exception to be discussed momentarily), I have jurisdiction to construe not just the 363 Sale Order itself, but also any agreements that were executed "in connection therewith."

The UAW is correct, however, that there's an exception to the general rule, where the invocation of the court's jurisdiction isn't colorable. But I can't agree with the UAW's further contention that the "colorable invocation" exception results in a lack of jurisdiction here. In my view, each side's position is at least colorable, and my review of the 2009 UAW Retiree Settlement Agreement—which didn't expressly mention the $450 million obligation, and where each side can argue that its opponent could have provided for express language clarifying the issues in its favor if that were the intent— suggests that each side will have respectable arguments on the merits. While, other than that, I express no view on the underlying merits, I think it's possible (though again I do not now determine) that deciding the underlying contractual issue may require consideration of parol evidence.

With New GM's invocation of the exclusive jurisdiction clause in the 363 Sale Order supported by the clause's express language, and its underlying position being at least colorable, I have exclusive jurisdiction over the controversy if I elect to exercise it.

## II.

## Abstention

The statute governing district (and hence bankruptcy) courts' jurisdiction over bankruptcy cases and proceedings, 28 U.S.C. §1334, provides, with an exception not relevant here:[47]

> [N]othing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

Because a court exercising § 1334 jurisdiction can abstain when such is in the interest of justice (and not just in the interest of comity with State courts or respect for State law), it can abstain in favor of another federal court or tribunal, just as it can abstain in favor of a state court.[48]

The standards for discretionary abstention under section 1334(c) have been articulated in slightly different ways in different cases. In an earlier decision, relying on

---

[47]  It does not apply to cases under chapter 15 of the Code, where U.S. Bankruptcy Courts provide assistance to insolvency proceedings in foreign countries.

[48]  *See In re Portrait Corp. of America, Inc.*, 406 B.R. 637, 639, 643 (Bankr. S.D.N.Y. 2009) (Drain, J.) ("*Portrait Corp.*") (abstaining, in exercise of discretion under § 1334(c)(1), in favor of United States District Court for the Northern District of Ohio, with respect to trademark infringement claims); *Chamberlain Group, Inc. v. Lear Corp.*, Adv. No. 09-01441, 2009 WL 3191369, *3, 2009 Bankr. LEXIS 3035, at *8-10 (Bankr. S.D.N.Y. Sept. 4, 2009) (Gropper, J.) (abstaining, in favor of another federal court and concluding that earlier authority "did not rule out abstention in favor of another Federal court 'in the interest of justice,'" as the quoted language "is a separate clause stated in the disjunctive that does not refer to state law or policy"); *cf.* Tr. of Hrg. of Oct. 4, 2010 re New GM Motion to Enforce 363 Order with respect to Rally Motors, *In re Motors Liquidation Co.*, No. 09-50026 (Bankr. S.D.N.Y. Oct. 4, 2009) (Gerber, J.) ("***Rally Motors***") ("while [§ 1334(c)(1)] speaks principally of state courts and state law, I accept for the purposes of this analysis that we bankruptcy courts have the power to abstain in favor of other federal courts when circumstances so warrant" (transcription error corrected)).

earlier caselaw (much of which involved discretionary remand, the standards for which

are very similar),[49] I listed as the relevant factors:

> (1) the effect on the efficient administration of the
> bankruptcy estate, (2) the extent to which issues of
> state law predominate, (3) the difficulty or unsettled
> nature of the applicable state law, (4) comity,
> (5) the degree of relatedness or remoteness of the
> proceeding to the main bankruptcy case, (6) the
> existence of the right to a jury trial, and
> (7) prejudice to the involuntarily removed
> defendant.[50]

Thereafter, my colleague Judge Drain, in *Portrait Corp.,* considered those factors,

and also others, in a more comprehensive way.  In doing so, he also adapted them to a

situation, like the one here, where abstention in favor of another federal court, in a non-

removal situation, was under consideration.  Those considerations, particularly in the

aggregate, make use of Judge Drain's *Portrait Corp.* factors preferable.  He identified the

relevant factors as:

> (1) the effect or lack thereof on the efficient
> administration of the estate if a Court recommends
> abstention, (2) the extent to which [non-bankruptcy]
> law issues predominate over bankruptcy issues,
> (3) the difficulty or unsettled nature of the
> applicable [non-bankruptcy] law, (4) the presence
> of a related proceeding commenced in state court or
> other non-bankruptcy court, (5) the jurisdictional
> basis, if any, other than 28 U.S.C. § 1334, (6) the
> degree of relatedness or remoteness of the
> proceeding to the main bankruptcy case, (7) the
> substance rather than form of an asserted "core"
> proceeding, (8) the feasibility of severing [non-
> bankruptcy] law claims from core bankruptcy
> matters to allow judgments to be entered in [non-
> bankruptcy] court with enforcement left to the

---

[49]    *See, e.g., ML Media Partners, LP v. Century/ML Cable Venture (In re Adelphia Communications
Corp.*), 285 B.R. 127, 144 (Bankr. S.D.N.Y. 2002) (Gerber, J.).

[50]    *In re Lyondell Chemical Co.*, 402 B.R. 596, 613 (Bankr. S.D.N.Y. 2009) (Gerber, J.).

bankruptcy court, (9) the burden of [the bankruptcy
court's] docket, (10) the likelihood that the
commencement of the proceeding in a bankruptcy
court involves forum shopping by one of the parties,
(11) the existence of a right to a jury trial, and
(12) the presence in the proceeding of non-debtor
parties.[51]

In *Portrait Corp.*, Judge Drain recognized that federal courts should be sparing in
the exercise of discretionary abstention, but that in the appropriate case they should
abstain.[52]  And in that case, which was remarkably like this one—where he had
continuing jurisdiction to enforce a 363 order, but had to decide whether he'd exercise
it—Judge Drain abstained in favor of another federal court.  Applying the *Portrait Corp.*
factors to the facts here, I come to the same conclusion.

1.      *Effect on Efficient Administration of Estate (Factor #1)*
        *Relatedness to Main Bankruptcy Case (Factor #6)*

Here I start with the obvious:  the dispute is between two nondebtor parties, and
the debtor Old GM is not a party to this dispute.  Apart from that, this controversy has no
effect on Old GM's estate, or Old GM's reorganization, or the administration of the Old
GM chapter 11 case.  There are times, of course, when it's important to give purchasers
of debtors' assets the benefit of their bargain—such as when they've acquired assets
under a "free and clear" order, or where they wish to avoid attacks on major
underpinnings of their purchase transactions.[53]  But this controversy, which involves, or
arguably involves, an asserted element of a New GM-UAW deal that was never
mentioned in any of the proceedings before me (and a contract that was barely mentioned

---

[51]        *Portrait Corp.*, 406 B.R. at 641-42.

[52]        *Id.* at 641.

[53]        Considerations of that character, for instance, were present in the *Petrie Retail* case and my *Rally
Motors* decision, the latter of which is discussed below.

in the proceedings before me), does not need to be decided by me to enable New GM to secure the benefit of its bargain.

Here the issues have little, if any, relatedness to the main bankruptcy case. Likewise, the administration of the Old GM estate—whose reorganization plan has gone effective—would be unaffected if I were to abstain.

Finally, the 363 Sale has been successfully completed, and New GM and the UAW have moved on in their joint effort to get back to business as usual. At this point I think that the New York bankruptcy court should interpose itself in New GM affairs only with respect to matters where the bankruptcy court has a significant interest, or that truly involve bankruptcy law or policy.

> 2.  *Whether Nonbankruptcy Issues Predominate (Factor #2)*
>     *Difficulty of Applicable Nonbankruptcy Law (Factor #3)*

Considering another important factor, whether nonbankruptcy law issues predominate over bankruptcy ones, there here are no bankruptcy issues at all. When bankruptcy issues are present, and especially when they predominate, there are often good reasons why bankruptcy judges should decide them, to utilize their particular expertise in that area. But here that consideration doesn't apply.

Rather—and as relevant to another, but related, factor—the nonbankruptcy issues to be addressed are of garden-variety contractual interpretation. With respect to issues of that character, there are no material differences in the skill sets of bankruptcy judges, on the one hand, and district judges, on the other. While the latter factor here doesn't tilt *in favor of* abstention (as it might, for example, if the underlying issues involved difficult issues of labor law, and not just contractual interpretation), it doesn't tilt the other way either, and thus suggest any reason why I should keep the controversy.

     **3.**    *Jurisdictional Bases for Claims (Factor #5)*
           *Proceeding in Another Court (Factor #4)*
           *Jury Trial (Factor #11)*
           *Ability of Bankruptcy Judge to Issue Final Orders (Factor #7)*
           *Forum Shopping (Factor #10)*

Several factors are a wash.  I assume that the Michigan Court has federal question jurisdiction under 28 U.S.C. § 1331 (by reason of claims under the LMRA), as well as under 28 U.S.C. § 1334; my jurisdiction arises under § 1334 alone.  But once it is clear that either court can decide the issues that need to be decided, the jurisdiction factor becomes unimportant.

And of course here a related proceeding was brought, and brought first, in another, nonbankruptcy, court—the Michigan Action.  But it was brought with actual or constructive notice that I'd also have jurisdiction over this controversy, and, at least initially, exclusive jurisdiction.  Thus I don't think that this factor can fairly be argued to tilt in favor of the UAW, and I must reject the UAW's contention that it should get any special benefits for having sued first.  Rather, I think the issue must be analyzed in terms of there simply being two courts in which the issues could be determined, leaving me to decide whether my needs and concerns, or expertise, would warrant hearing the controversy myself—factors that I've addressed above, and discuss further below.

Then, of course, I can't conduct a jury trial in the absence of consent.  A district judge can.  If the claims were of a type where there's a clear right to a trial by jury, this would tip in favor of abstention.  But here the matter is closer, because I'm not sure there would necessarily be a right to trial by jury.  I thus consider the jury trial factor to be a wash.

Then, I plainly have core judicial power to interpret and enforce my 363 Sale Order,[54] which in turn gave me the right to construe agreements whose execution I authorized under that order. I assume, without deciding, that my core judicial power extends to the latter as well. So I do not see myself limited by constraints upon Article I Judge judicial power, and find this factor too to be a wash.

Finally, I think that both sides are equally guilty of forum shopping, with each preferring the forum in which it perceives that its tactical needs would best be served.

### 4.    Remaining Enumerated Factors

The remaining enumerated factors, as is so often the case when we judges exercise our discretion using a list of factors we're directed to consider, have no material relevance to the controversy here.[55]

### 5.    Special Considerations Where There is a
### Retention of Jurisdiction in an Order

In a case, like this one (and also *Portrait Corp.*, which raised like concerns), where a bankruptcy court has retained jurisdiction to construe and enforce its order, or agreements related to its order, special considerations must also be considered.[56] As noted above,[57] bankruptcy courts (like others) need the ability to enforce their orders, and to construe them if necessary. A classic example of that is where a sale order conveys assets free and clear of claims, and someone nevertheless brings suit in another court in an attempt to assert successor liability. Another is where a confirmation order provides

---

[54]    *See Portrait Corp.*, 406 B.R. at 641 (citing, *inter alia*, *Travelers Indemnity Co. v. Bailey*, 129 S.Ct. 2195, 2205 (2009)). *See also* n.43 *supra*.

[55]    *See Portrait Corp.*, 406 B.R. at 642 ("Not all of these factors need be applied, however").

[56]    I agree with the UAW (UAW Reply Br. at 15) that a court can abstain, in its discretion, even when it has retained jurisdiction to hear the controversy. *See*, *e.g.*, *Portrait Corp.*, 406 B.R. at 643 (doing exactly that).

[57]    *See* page 16 *supra*.

for exculpation or releases, and someone nevertheless brings litigation in another court without regard to those provisions.[58]  In most situations where the judge is asked to *enforce* the order—as in *Lyondell-Highland*, for example[59]—the judge will do exactly that.  Likewise, in many instances where the bankruptcy judge is asked to *construe* the order, the bankruptcy judge will know what he or she wanted to accomplish by the questioned provision in the order, and know what is necessary to clear up the ambiguity.  In such cases, the bankruptcy court will usually need to exercise the jurisdiction it retained.  And in most such instances, whether asked to enforce or construe, the court will decline invitations to abstain.

But a more nuanced situation arises when the bankruptcy court is asked to construe an agreement where the order merely authorized the agreement's execution.  Then the situation, which is always at least somewhat fact-intensive to start with, will be more so.  There will be some instances in which the agreement was a prominent aspect of the transaction which was the subject of the order, and there will be other instances in which it was not.  And there will be some instances in which the provision within the agreement to be construed had been focused on by the judge, and there will be others in which it was not.

---

[58]     That was the case in my decision earlier this year in *In re Lyondell Chemical Co.*, 445 B.R. 277, 285-86 (Bankr. S.D.N.Y. 2011) ("**Lyondell-Highland**"), where Highland Capital Corporation, an entity aggrieved that it did not get the opportunity to provide exit financing to the reorganized debtors, had brought an action in state court on claims that were subject to exculpation provisions in Lyondell Chemical's plan and confirmation order.

[59]     *See* n. 58 *supra*.  In *Lyondell-Highland*, I was asked to, and did, enforce provisions in the confirmation order that gave me exclusive jurisdiction "[t]o hear and determine all disputes involving the existence, scope and nature of the discharges, injunctions and releases granted under the Plan the Confirmation Order, or the Bankruptcy Code," and thus require that such claims be brought in my Court.  But because *Lyondell-Highland* involved *enforcement* of my *order*, rather than *interpretation* of agreements whose execution was *authorized* under the order, it presented quite a different situation than the one we have here.

25

Here we are faced with a situation where my order authorized the execution of a relevant agreement—the 2009 UAW Retiree Settlement Agreement—but other than knowing that it existed, or would be executed in the future, I had no knowledge of its content, or of the parties' intent with respect to that agreement or any of its provisions. In fact, as noted in my Findings of Fact above, the 2009 UAW Retiree Settlement Agreement was never offered into evidence. While it was mentioned, in passing, in the course of a 3-day hearing, and in two places in a 50-page sale order, its specific content was not. At the risk of stating the obvious, under such circumstances I'd have no more expertise in construing that agreement—or in determining its effect, if any, on earlier agreements—that any other federal judge.

Thus I'd suggest that when a judge, like me, is asked to construe an *agreement* whose execution he or she authorized in an order, or to abstain from doing so—and in contrast to enforcing and/or construing an *order* the judge signed—appropriate additional factors to consider include the importance of that agreement to the transaction that was otherwise approved, and the extent to which the judge acquired any knowledge of facts relevant to the matter in controversy.

In this case, the UAW Retiree Settlement Agreement was quite unlike the dealer termination agreements that were a prominent feature of the 363 Sale. The latter were repeatedly described to me as important to the Purchaser that later became New GM, and important to the U.S. Government's Auto Task Force. By contrast, the UAW Retiree Settlement Agreement was hardly mentioned.[60] And I have no knowledge of any facts relevant to this controversy that Judge Cohn or any other judge wouldn't have.[61]

---

[60]    This distinguishes this matter from my decision in *Rally Motors*. There I declined to abstain when a dealer, unhappy with the result of the congressionally authorized arbitration offered to

6. *Overall Balancing*

As in *Portrait Corp.*, "the balance tips decidedly in favor of abstention."[62]  This controversy doesn't involve anything as to which I have any particular knowledge or expertise warranting my exercise of the jurisdiction I retained, such as knowing what I intended to accomplish when I issued the 363 Sale Order.  In fact, it doesn't involve construction of the 363 Sale Order at all.  It rather involves the construction of a series of agreements I never saw.  A Michigan federal judge could decide this controversy at least as well as I could.

Nor would determination of this controversy bear on objectives to be achieved in Old GM's chapter 11 case, or otherwise advance bankruptcy needs and concerns.  It doesn't involve Old GM, the debtor in the chapter 11 case on my watch.  And especially since so much has already been accomplished in helping New GM and the UAW get back to business as usual, I think it's better for the New York bankruptcy court to minimize its role in New GM affairs, and to act only with respect to matters where the New York Bankruptcy Court has a significant interest, or that truly involve bankruptcy law or policy.

---

[60]    terminated auto dealers, sought to evade the 363 Order, the termination agreement the dealer had signed, and the result of the arbitration by bringing a collateral attack in another court, and I barred the dealer from doing so.  I was not asked to construe the dealer's termination agreement, or to ascertain its effect on any earlier agreements.

[61]    On this motion, counsel for reorganized debtor Delphi filed a limited objection, contending, most significantly, that "to the extent that an interpretation of the [2007 Memorandum of Understanding] or any order entered by the Delphi Bankruptcy Court is necessary," I should "refrain from ruling on that question and require New GM to seek redress on that issue with the Delphi Bankruptcy Court."  (Delphi Br. at 2).  I would likely agree, if Delphi's fear were realized, but I don't see that happening.  While I'd give Judge Drain the same courtesies Judge Cohn gave me if I thought Judge Drain's needs and concerns were in any way affected, here they are not.  What the 2007 Memorandum of Understanding said is undisputed.  The issue here doesn't require interpretation of that agreement or any order entered by Judge Drain; the only issue is whether an obligation in that unambiguous agreement was thereafter modified in a later agreement.  Judge Drain would have no more knowledge of that than I do.

[62]    406 B.R. at 642.

27

<u>Conclusion</u>

For the reasons described above, in the first instance I have exclusive jurisdiction over this controversy, and could exercise it if I needed to.  But here no useful purpose would be served by doing so.  I will abstain.  The parties are free to continue the Michigan Action.

SO ORDERED.

Dated: New York, New York                    ___*s/Robert E. Gerber*___
          August 23, 2011                              United States Bankruptcy Judge