Steven C. Powell (Admitted *Pro Hac Vice*)
POWELL MURPHY, PLLC
322 N. Old Woodward
Birmingham, MI 48009
Telephone: (248) 723-4390
Facsimile: (248) 646-3380
Email: scpowell@powellmurphylaw.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DIVISION OF NEW YORK**

----------------------------------------------------------------x
                                                                :
In re                                                           :    Chapter 11 Case No.
                                                                :
MOTORS LIQUIDATION COMPANY, *et al.*,                           :    09-50026 (REG)
       f/k/a General Motors Corp., *et al.*        :    Honorable Robert E. Gerber
                                                                :
                    Debtors.        :    (Jointly Administered)
                                                                :
----------------------------------------------------------------x

# RESPONSE OF T. CHARLES POWELL TO 235TH OMNIBUS OBJECTION TO CLAIMS

**(The Objection is at Docket No. 10720)**

## TABLE OF CONTENTS

<u>Title</u>                                                                                                                            <u>Page</u>

INDEX OF PRINCIPAL AUTHORITIES ................................................................................ ii

RELIEF REQUESTED ........................................................................................................4

JURISDICTION ………..........................................................................................................4

BACKGROUND  .......................................................…………………………………….5

DISCUSSION ……………....................................................................................................10

# INDEX OF PRINCIPLE AUTHORITIES

Page(s)

**Cases**

*Am. Fed'n of Grain Millers, AFL-CIO v Int'l Multifoods Corp.*
116 F. 3d 976, 980 (2d Cir. 1997)……………………………………………………………..7

*Aramony v. United Way Replacement Benefit Plan,* 191 F.3d 140, 151 (2d Cir.1999)…………..8

*Cecil v AAA Mid-Atlantic, Inc.* 118 F. Supp. 2d. 659, 664-65 (D. Md. 2000)…………………..10

*Cvelbar v CBI Illinois, Inc.* 106 F. 3d 1368, 1378-79 (7th Cir, 1997)……………………………10

*Combs v Kentucky Wesleyan College*, 42 Employee Benefits Cas. 232, 2008 WL 145253
(W. D. Ky. 2008 )………………………………………………………………………………9

*Devlin v. Transp. Comms. Int'l Union,* 173 F.3d 94, 102 (2d Cir.1999)……………….1, 6, 7, 8, 9

*Farmland Industries Inc.,* 294 B.R. 903 (Bankr.WD.MO.2003)………………………………..12

*IUE-CWA v. Visteon Corp. (In re Visteon Corp.),* 612 F.3d 210 (3d cir. 2010)………………...12

*Minis v Baldwin Bros. Inc.* 150 Fed. Appx. 118, 120 (3d Cir. 2005)……………………………10

*Schonholz v Long Island Jewish Medical Center*, 87 F. 3d 72, 79-80 (2d Cir. 1996)……………8

*Sprague v. Gen. Motors Corp.,* 133 F.3d 929 (5th Cir. 1993)……………………………..9, 10, 11

TO THE HONORABLE ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

Mr. T. Charles Powell ("Powell"), a retired, former employee of Debtor General Motors Corp., n/k/a Motors Liquidation Company (the "Company" or "Debtor"), by and through his attorneys, seeks allowance of his claim, as discussed below.

## OVERVIEW AND RELIEF REQUESTED

1. Mr. Powell requests that this Court deny Company's 235th Omnibus Objection (the "Objection") to Powell's claim no. 51364 (the "Claim") for the reasons discussed in this response. Essentially, the Debtor has made erroneous arguments of fact and erroneous arguments of law.

   a. The Debtor has made erroneous arguments of fact by improperly quoting documents relating to welfare benefits, which were written long after the retirement of Powell. A review of the applicable documents, from prior to Powell's retirement in 1991, make it clear that GM did promise the welfare benefits comprising Powell's Claim, that those benefits vested, and the benefits otherwise cannot be modified by Debtor.

   b. The Debtor improperly relies upon law outside the Second Circuit, which directly contradicts applicable law in this Circuit. See *Devlin v. Transp. Comms. Int'l Union,* 173 F.3d 94, 102 (2d Cir.1999), fully supporting Powell's Claim, and which is inconsistent with Sixth Circuit law cited by Debtor and the Motors Liquidation Company GUC Trust (the "GUC Trust").

## JURISDICTION

2. The Court has jurisdiction over the matters raised in this motion pursuant to 28 U.S.C. §§ 157 and 1334This motion is a core proceeding pursuant to 28 U.S.C. § 157(b).

## FACTUAL BACKGROUND

3. Powell's employment with the Company began on approximately October 1, 1956.

4. Prior to approximately 1971, Powell obtained coverage under the Company's basic life insurance plan, obtained retirement benefits (including vested retirement benefits) and obtained coverage under the Debtor's basic life insurance plan. (See Powell affidavit, at Exhibit B[1].)

5. Prior to approximately January 1, 1989, the Debtor established a supplemental life benefits program.

### Powell's Retirement

6. Powell began discussing his 1991 retirement with people at General Motors in early 1991. There were a number of benefits that were available for retirees at that time, including the continuation of basic life insurance, but also a supplemental life benefit.

7. Officials of the Debtor repeatedly promised and represented to Powell that the combined benefits under these two programs would not fall below $300,000.00. At the time, Powell determined that this sum would allow him to retire and not require him to keep working. This combined benefit of basic life insurance and a supplemental life benefit totaling at least $300,000 was a critical and necessary factor in Powell making the determination that he would proceed to retire, and he would not have retired without it. Therefore, Powell relied on the promises and representations of Company, verbally and in writing, including official summaries of the welfare benefits and retirement plans.

---

[1] Please note that Exhibit A is a proposed order denying the relief requested in the Objection with respect to claims by Powell.

8. The people with whom Powell discussed his retirement, and who made representations on behalf of General Motors, include my immediate supervisor, Mr. W. R. Herron, a Company representative named Joseph Zuzula (I am not sure of the spelling) and a Mr. Reinbold. Other people who made promises and representations on behalf of the Debtor include the personnel director at the time and the salaried personnel director at the time.

9. Effective as of approximately September 1, 1991, Powell retired from the Debtor.

10. In connection with his retirement, Powell was provided with Basic Life Insurance and was provided with benefits under the Supplemental Life Benefits Program, among other welfare benefits.

11. Specifically, these welfare benefits include basic life insurance and supplemental life benefits totaling the following:

| | |
|---|---|
| (a) Basic Life Insurance: | $79,800 |
| (b) Supplemental Life Benefits Program: | $228,000 |
| **Subtotal:** | **$307,800** |

12. Powell was provided with documentation summarizing these and other benefits at the time of his retirement, specifically providing that the basic life insurance would continue under a formula that would guarantee a minimum coverage amount of $79,800.00, and the Debtor promised to cover the full cost of the policy for the rest of Powell's life. This summary document at Exhibit C states, in part, as follows:

> Basic Group Life Insurance
> Continuing paid up Life Insurance is provided for employees who retire:
> 1. Early voluntary - 85 points
> 2. Early voluntary - 30 years
> 3. Special
> 4. Normal
> 5. Total and permanent

Once retired, the amount will decrease by 2% the first month and a like amount each subsequent month until the amount equals (1.5% times original amount of times years of participation). (Note: T&P begins reducing at age 65.) **G.M. [the Debtor] pays the full cost of this policy**.

> Base (6333.32) X 24 = Current Amount . . $152,000.00     (A)
> Credited service X 1.5% = Reduction Rate $  .525           (B)
> Fully Reduced Amount (Est.) (A x B) . . .  $ 79,800.00
> Beneficiary  Wife - Barbara

See written statement and summary of welfare benefits provided to Powell prior to his retirement, at Exhibit C.

13.    Moreover, the summary of benefits provided to Mr. Powell at retirement provided as follows:

> Supplemental Life Benefits Program:    Amount:  $228,000.00
> Beneficiary:  Wife - Barbara
>
> (Effective January 1, 1989 for Certain Executives Who, on January 1, 1984, Were Under Age 55 and Not Retired)
>
> Under the General Motors Retirement Program for Salaried Employees with ten or more years of credited service and with unreduced retirement benefits, **your supplemental life benefits coverage in effect at the end of the month immediately preceding your retirement effective date will be continued at GM expense during your retirement while your basic life insurance remains in force**, as follows:
>
> Part I - Amount in effect at retirement continued in full,
>
> plus
>
> Part II - Two times your final annual base salary, in excess of $200,000, reduced by 2% per month until it reaches an amount equal to 1 ½% times the amount of coverage in effect at age 65, or at the end of the month immediately preceding your retirement if earlier, multiplied by your years of participation under the Life and Disability Benefits Program…

See Exhibit C. Thus, the supplemental life benefits program was promised to be continued at GM expense during Powell's retirement while the basic life insurance remained in force. Of course, not only is Powell's basic life insurance still in force (albeit at an improperly reduced amount), but additionally the basic life insurance was promised to remain in effect for the rest of his life.

14. Mr. Powell was also provided with an additional written summary of the supplemental life benefit providing as follows:

> SUPPMENTAL LIFE BENEFIT . . . active executives born after 1-1-29 and placed as an executive prior to 1-1-89 have a death benefit equal to 3 times their annual base salary PLUS additional death benefit to cover the amount of basic over $200,000.
>
> **In retirement, the portion of the supplemental death benefit equal to 3 times annual base continues for life at corporation expense.** The portion covering the basic over $200,000 reduces in the same way basic reduces (1.5% times original amount times years or Part A credited Service).

See Exhibit D.

15. Moreover, subsequent to his retirement, on approximately August 2, 1993, the Debtor reconfirmed its promise that Mr. Powell's basic life insurance, although then reduced to the minimum amount of $79,800.00, would remain in effect for the rest of his life, provided by General Motors, at no cost to Powell. The August 2, 1993 confirmation from Company stated in part as follows:

> Our insurance records, as of the date of this letter, show the Continuing Life insurance has now fully reduced to the ultimate amount of $79,800.00. **This ultimate amount will remain in effect for the rest of your life and is provided by General Motors at no cost to you.**

See the Debtor's August 2, 1993 letter to Mr. Powell, reconfirming previous promises and representations that the basic life insurance would continue to be paid by the Debtor for the rest of his life at the Debtor's expense.  See Exhibit D.

16. Moreover, at retirement, GM provided a personal umbrella liability insurance in the amount of $5 million dollars providing as follows:

> Duration of Insurance Coverage [concerning personal umbrella]
>
> The insurance coverage will remain in effect for an eligible employee and his/her eligible family members as long as he/she is an eligible employee or retiree, unless he/she elects to cancel the insurance.

See Exhibit C.

17. Thus, Company had made it perfectly clear, and had committed to provide all of these welfare benefits, discussed above, outlined in Mr. Powell's Claim, post retirement, for the duration of his life, without any right whatsoever to modify those welfare benefits.

18. Additionally, the Debtor made numerous verbal representations, promises, and commitments to Mr. Powell to provide benefits outlined in Powell's Claim for the rest of his life.

**Company's Bankruptcy and Improper Reduction of Benefits**

19. On approximately June 1, 2009 the Debtor filed a voluntary bankruptcy petition.

20. Subsequent to filing the bankruptcy petition, in mid to late June of 2009, the Debtor announced that it was cancelling the Supplemental Life Benefits Program, after an earlier -- and also improper -- reduction in the benefits amount, within 180 days prior to the petition date.  The Debtor also announced that it was reducing the Basic Life Insurance to $10,000.

21. Thus, Powell's life benefits were ultimately reduced from $307,800 to $10,000, and the Debtor improperly terminated the umbrella insurance policy and otherwise improperly reduced and terminated Powell's welfare benefits.

## DISCUSSION

### Legal Basis for Allowance of Claim

22. The Debtor and the GUC Trust have failed to cite applicable Second Circuit law properly governing on the issues of this case. See *Devlin v. Transp. Comms. Int'l Union,* 173 F.3d 94, 102 (2d Cir.1999).

23. In *Devlin*, the Second Circuit considered the issue of when a former employer, in that case Empire Blue Cross and Blue Shield ("Empire") significantly lowered the amount of life insurance provided to retirees. The district court initially granted summary judgment in favor of the employer, but was reversed by the Second Circuit Court of Appeals.

24. In *Devlin*, the employer had offered certain early retirement programs. *Id.* at 80. The Second Circuit held that even if the employer had properly reserved the right to modify its life insurance plan, if the employer had promised, or vested, certain benefits then those benefits would be enforced. *Id.* at 82.

25. Moreover, the *Devlin* court held that a retiree could enforce promises and representations that certain benefits would remain in place (or had vested). *Id.* at 83. Rather, "it is enough [to] point to written language *capable of reasonably being interpreted* as creating a promise on the part of [the employer] to vest [the recipient's] . . . benefits.' " *Id.* at 83 (emphasis original) quoting *Am. Fed'n of Grain Millers, AFL-CIO v Int'l Multifoods Corp.* 116 F. 3d 976, 980 (2d Cir. 1997).

26. The *Devlin* court found that language in a pre-retirement description of benefits stating that retired employees, after completion of 20 years of full-time permanent service and attaining 55 years of age, "will be insured" was a statement which could be reasonably read as promising such insurance so long as employees retire after age 55 and have provided full-time

permanent service to Empire for at least 20 years. *Id.* at 84. The Court found that this provision could be construed as an offer that specified performance as a means of acceptance, which the employees thereby accepted by working for 20 years until attaining the age of 55. *Id.* at 84.

27. The *Devlin* Court then found that Empire could not rely upon documentation drafted and/or issued <u>after</u> the retirement of the employee, subsequently containing reservations of a right to modify insurance benefits for the first time, since such documentation was after-the-fact changes which did not effect the retiree's prior performance and agreement. In short, the employer was not free to revoke. *Id.* at 84-85.

28. The Court further found that the statement in the documentation pre-dating the retirement, that life insurance benefits "will remain at [the annual salary level] for the *remainder of their lives* …" supported the retiree's claim that the employer had promised to vest retiree life insurance benefits at the stated level." *Id.* at 85 (emphasis original). The Court found that statement in the documentation pre-dating the retirement was capable of reasonably being interpreted as creating a promise to vest lifetime life insurance benefits in those employees eligible for retirement. *Id.*

**Powell is also entitled to enforce his Claim through estoppel**

29. The *Devlin* court also held that principles of estoppel can apply in ERISA cases. *Id.* at 85.

30. In order to prevail on a claim of promissory estoppel under ERISA a retiree must establish:

> " '(1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced.' " *Aramony v. United Way Replacement Benefit Plan,* 191 F.3d 140, 151 (2d Cir.1999) (quoting *Schonholz,* 87 F.3d at 79). Additionally, "an ERISA plaintiff must 'adduce [ ] not only facts sufficient to support the four basic elements of promissory estoppel, but facts sufficient to [satisfy an]

> 'extraordinary circumstances' requirement as well.' " *86 *Aramony,* 191 F.3d at 151 (quoting *Devlin v. Transp. Comms. Int'l Union,* 173 F.3d 94, 102 (2d Cir.1999)). *Schonholz* provides an example of such extraordinary circumstances, where the employer used promised severance benefits to induce the plaintiff to retire. *Schonholz,* 87 F.3d at 79-80.
>
> *Id.* at 85 -86.

31. The Second Circuit Court of Appeals recognized that these extraordinary circumstances may be present where the employer used promised severance benefits to induce an employee to retire. *Id.* at 86, citing *Schonholz v Long Island Jewish Medical Center*, 87 F. 3d 72, 79-80 (2d Cir. 1996).

32. The *Devlin* Court noted, "Plaintiffs also contend that they were induced by Empire to work for over twenty and up to forty years in order to receive (inter alia) a particular level of life insurance coverage, and that Empire acted with the intent to induce by 'distributing literature guaranteeing "lifetime" benefits . . . at "no cost" ' " *Id.* at 86. The Court noted that the employees of Empire did more than merely accept employment at Empire in exchange for the benefits but instead dedicated their working lives to Empire. *Id.*

33. In the instant case, Powell has set forth that he was induced to, and decided to, retire based upon the representations and promises of the Debtor, that the basic life insurance and supplemental life benefits would remain in place and, for example, "will be continued at GM [Debtor] expense during your retirement while your basis life insurance remains in force." See Exhibit C.

### Powell's Claims Can Be Enforced Through
### Fiduciary Duty Principle as Well

34. The Second Circuit in *Devlin* held that the plaintiffs in that case could have a claim for breach of fiduciary duty under ERISA. *Id.* at 87-88. The Court determined, "Empire may still have violated any fiduciary duties in its retiree letters and other communications which

promised lifetime benefits but failed to note that Empire could reduce or terminate those benefits at any time." *Id.* at 88. Further, " 'when a plan administrator affirmatively misrepresents the terms of a plan or fails to provide information when it knows that its failure to do so might cause harm, the plan administrator had breached its fiduciary duty to individual plan participants and beneficiaries.' " *Id.* at 88 (citations omitted).

35. Thus, under *Devlin,* Powell has recognizable and enforceable claims for the benefits, including life welfare benefits that he was promised by GM.

36. A number of courts have followed and applied the decision in *Devlin v. Empire Blue Cross and Blue Shield*. In *Karl v. ASARCO Inc.*, 204 WL 2997872 (S.D. N.Y. 2004) the plaintiff had been the former Director of Labor Relations for the defendant. *Id.* at *1. Prior to his retirement he received a letter outlining his status as a retiree under various benefit plans, explaining his benefits under the plan. The letter further stated that life insurance would continue in effect without any premium costs to him as long as the Company's contract with the insurance company remained in effect. *Id.* The company then amended the Plan to provide a maximum of $10,000.00 in life insurance coverage for salaried retirees. In that case, the Court relying in large part upon *Devlin,* denied Defendants' Motion for Summary Judgment with respect to Plaintiff's claims for equitable estoppel, promissory estoppel and breach of fiduciary duty. The Court found it significant that the Plaintiff attested that he relied upon the statements by the Defendant regarding his entitlement to life insurance including that he did not purchase additional life insurance and that to purchase replacement coverage at his advanced age and adverse health would be prohibitively costly. *Id.* at *7-8.

37. Instead of discussing *Devlin*, counsel for the GUC Trust has discussed an applicable law outside of the Second Circuit, including *Sprague v. Gen. Motors Corp.,* 133 F.3d 929 (5th Cir. 1993).

38. The Debtor and the GUC Trust have not explained why they have cited contradictory law from the Sixth Circuit, when the proper application of law requires contradictory law from the Second Circuit.

39. Bankruptcy Courts in the Southern District of New York have recognized that they are obligated to follow the decisions of the Second Circuit, as opposed to decisions of the Sixth Circuit. In the case of *In Re Brown*, 2007 WL 2120380 (Bkrtcy. N.D. N. Y. 2007) the Bankruptcy Court was called upon to determine an issue regarding objections to exemptions. *Id.* at *1. The Bankruptcy Court acknowledged that its conclusion regarding the exemption was contrary to the holding of the United States Bankruptcy Court for the Western District of Michigan in the *Wallace* decision. *Id.* at *12, discussing *In Re Wallace*, 347 B.R. 626 (Bkrtcy W.D. Mich. 2006). However, the Court in *Brown* stated, "The United States Bankruptcy Court for the Western District of Michigan which rendered the decision in *Wallace* is located in the Sixth Circuit. Accordingly, it is bound by decisions rendered by the circuit where it sits, just as this Court is bound by decisions of the Court of Appeals for the Second Circuit. See I*n Re Montgomery County, Maryland v. Metro Media Fiber Network, Inc.,* 326 B.R. 483, 489 (S.D. N.Y 2005)" *Id.* at *13.

40. The United States District Court also recognized that it was required to apply Second Circuit decisions in the case of *Montgomery County, Maryland v. Metro Media Fiber Network, Inc.,* 326 B.R. 483, 489 (S.D. N.Y 2005). In that case, the District Court recognized that the dispute in the case involved application and interpretation of the Federal

Telecommunications Act. *Id.* at 489. The Court stated, "A federal bankruptcy court, like the federal district court, is bound to apply federal laws as they've been interpreted by the Court of Appeals in the circuit where it sits." *Id.* at 489, citing *Ithaca College v. NLRB*, 623 F. 2d 224, 228 (2d Cir. 1980). The Court went onto state, "By contrast, the decisions issued by other circuits on federal questions are not binding in this circuit." *Id.* citing *Newsweek, Inc. v. U.S. Postal Service,* 663 F. 2d 1186, 1196 (2d Cir. 1981). The Court further stated, "In fact, this court has recognized that 'federal courts are competent to decide issues of federal law and should not be placed in the awkward position of having to apply the federal law of another circuit when it conflicts with their own circuit's interpretation.'" *Id.* (citations omitted). [2]

41.     Courts outside of the Sixth Circuit have disagreed with and declined to apply *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998). In the case of *McMunn v. Pirelli Tire, LLC*, 161 F. Supp. 2d 97 (D. Conn. 2001) the Court noted that the defendant employer relied upon *Sprague* in support of its motion of summary judgment and its arguments that Plaintiffs could not rely upon any representations where the employer reserved the right to amend its plan. Id. at 134. The Court, in rejecting defendant's argument and reliance on *Sprague* stated, "as discussed in greater detail below there is unrebutted evidence in the record here supporting plaintiffs' contention that Armstrong, and then Pirelli, consistently and deliberately fostered the belief that benefits would be lifetime benefits through the use of the

---

[2] Although the *Montgomery County* decision was vacated and remanded by joint motion of the parties, No. 05-4123-bk (2d Cir. Aug. 31, 2006) the decision has nonetheless been cited favorably by a number of courts including *A Slice of Pie Productions, LLC v. Wayans Bros. Entertainment*, 487 F.Supp.2d 33, 40 (D.Conn. May 30, 2007); *Webb Candy, Inc. v. Walmart Stores, Inc.*, 2010 WL 2301461, *9 (D.Minn. Jun 07, 2010); *Qwest Communications Corp. v. City of New York*, 387 F.Supp.2d 191, 194 (E.D.N.Y. Sep 15, 2005); *In Re Brown*, 2007 WL 2120380, *13, 58 Collier Bankr.Cas.2d 519, 519 (Bankr.N.D.N.Y. Jul 23, 2007); *In Re ASARCO LLC*, 2009 WL 8176641, *24 (Bankr.S.D.Tex.June 05, 2009).

1976 PPD and verbal communications." Id. at 12. The Court then determined that the plaintiffs could proceed on their claims for breach of fiduciary duty and estoppel.

42. The court in *Bobban v. The Bank Julius Baer Postretirement Health and Life Insurance Program,* 723 F.Supp.2d 560 (S.D.N.Y. 2010) also applied Devlin to deny the defendant's motion to dismiss. The court found that representations in separation agreements relating to the payment of health insurance and life insurance coverage could support claims for a failure to pay benefits and a claim for promissory estoppel and denied a motion to dismiss under Rule 12(b)(6).

43. However, not only has *Sprague* been criticized outside of the Sixth Circuit, it has also been criticized and distinguished within the Sixth Circuit.

44. Indeed, a number of more recent court decisions have recognized distinctions or exceptions to *Sprague*. In *Combs v Kentucky Wesleyan College*, 42 Employee Benefits Cas. 232, 2008 WL 145253 (W. D. Ky. 2008 ) the Court found that the Plaintiffs could maintain claims that the Defendant Kentucky Wesleyan College (KWC) could not terminate health insurance coverage when it had promised continuing health insurance coverage to certain retirees. First, the *Combs* Court determined that the early retirement agreements that the employees entered into constituted plans documents under ERISA. *Id.* at *8.[3] The Court held these early retirement agreements were sufficiently specific to constitute an ERISA Plan. *Id.* at *8 citing *Minis v Baldwin Bros. Inc.* 150 Fed. Appx. 118, 120 (3d Cir. 2005); *Cvelbar v CBI Illinois, Inc.* 106 F.

---

[3] The Court found that the Early Retirement Contracts specified the intended benefits, i.e. medical coverage up to age 65 for the retiree, spouse and dependent children with Medicare supplement coverage thereafter; and also specified a source of financing, which was intended to be the College and provided a procedure for receiving the benefits which was sufficiently ascertainable, i.e. that after retirement the Plaintiff retirees were to receive medical coverage up to the age of 65 and a Medicare supplement thereafter. *Id.* at *8

3d 1368, 1378-79 (7th Cir, 1997), *Cecil v AAA Mid-Atlantic, Inc.* 118 F. Supp. 2d. 659, 664-65 (D. Md. 2000).

45. Alternatively, the *Combs* Court found that if the retirement contracts were not free-standing ERISA Plans, the Court determined that they were amendments to the Plans in effect at the time the Plaintiffs retired. *Id.* at *9. The Court found this based upon the principal cited in *Sprague* that, "employers are generally free under ERISA, for any reason at anytime, to adopt, modify or terminate welfare plans." *Id.* at *9 citing *Sprague*, 133 F. 3d at 400. The Court found that although the Health Care Plans in question provided that the employer had the right to amend the Plans the Court found, "in the present case, all the retirement contracts are independent contracts, contain the signatures of an authorized officer of KWC, clearly changed the duration of benefits for the contracting Plaintiff, and at the very least, constitute an amendment to the Employee Health Care Plan." *Id.* at *9. The Defendants attempted to claim that the "reservation of rights" clause in the Summary Plan Documents defeated the Plaintiff's claims. The Court found, "the execution of the early retirement contracts 'vested' continued medical coverage and Medicare supplements in the retirees despite what right KWC may have had to terminate retiree coverage contained in the original Plan. *Id.* Otherwise, there would have been no reason to separately negotiate an early retirement contract." *Id.* (citations omitted).

46. Alternatively, the Court concluded that even if the retirements agreements were not ERISA Plans or amendments to the original plan the Court would nonetheless enforce the early retirement agreements as a matter of federal common law. *Id.* at *10. The Court held, 'where an employer bargains away its right to modify an ERISA Welfare Plan, the terms of that modification, though governed by ERISA, are to be enforced pursuant to the federal law of contract'" *Id.* at *9 (citations omitted).

47.     The *Combs* Court discussed *Sprague,* but determined that *Sprague* was distinguishable based on the fact that the employees in *Combs* had more individualized, negotiated agreements. The Court in Combs also found that the retirement agreements were supported by separate consideration and granted the individual retirees benefits that were in excess of the minimum standards guaranteed by ERISA. *Id.* at *13.

### The Company is Liable for Payment of the Claim, and Powell has an Administrative Expense for the Claim

48.     11 USC § 1114 (e) provides as follows:

> **(1)** Notwithstanding any other provision of this title, the debtor in possession, or the trustee if one has been appointed under the provisions of this chapter (hereinafter in this section "trustee" shall include a debtor in possession), shall timely pay and shall not modify any retiree benefits, except that—
> **(A)** the court, on motion of the trustee or authorized representative, and after notice and a hearing, may order modification of such payments, pursuant to the provisions of subsections (g) and (h) of this section, or
> **(B)** the trustee and the authorized representative of the recipients of those benefits may agree to modification of such payments,
> after which such benefits as modified shall continue to be paid by the trustee.
> **(2)** Any payment for retiree benefits required to be made before a plan confirmed under section 1129 of this title is effective has the status of an allowed administrative expense as provided in section 503 of this title.

49.     The Debtor has not proceeded properly to reduce Powell's retiree benefits, and therefore the benefits cannot be reduced and Powell is entitled to an administrative expense claim for the amount of the benefits.

50.     Moreover, the Company must reinstate any modifications made to Powell's benefits in the 180 day period ending on the date of the petition date of June 1, 2009, and thus Powell is entitled to his full benefits.

51.     § 1114 is applicable to require payment of Powell's benefits.

52. The Company argues that § 1114 does not require payment of Powell's benefits, but bases that argument on the erroneous assumption that the Company had the right to modify Mr. Powell's retirement benefits, which is not the case, as discussed above.[4]

WHEREFORE, Powell requests that this Honorable Court enter an order allowing payment of his Claim, and allow his Claim as an administrative expense (Powell has filed and administrative claim based on the welfare benefits), and alternatively that the Court grant discovery and adjourn the hearing until a point when the parties can complete discovery, and for such other and further relief as the Court shall deem just and proper.

Dated: September 19, 2011

POWELL MURPHY, PLLC
Counsel to T. Charles Powell

By: __/s/ Steven C. Powell__
Business Address:
322 N. Old Woodward
Birmingham, MI 48009
Telephone: (248) 723-4390
Fax (248) 646-3380

Powell, TCharles-Barb\GM benefits\Response.9.19.11

---

[4] Moreover, even if the Company had the right to modify Mr. Powell's benefits -- which it did not -- § 1114 still applies and thus prevents and voids any purported modifications the Company has made. See *IUE-CWA v. Visteon Corp. (In re Visteon Corp.), 612 F.3d 210 (3d cir. 2010)* (section applies even when sponsor reserved the right to amend or terminate plan). Also see, *In re Farmland Industries Inc.,* 294 B.R. 903 (Bankr.WD.MO.2003)

## Index of Exhibits

| Exhibit # | Description |
|---|---|
| A | Proposed Order |
| B | Affidavit of T. Charles Powell |
| C | Written statement and summary of welfare benefits provided to Mr. Powell at retirement |
| D | Written statement by Debtor concerning the duration of the supplemental life benefit |
| E | August 2, 1993 letter from Debtor confirming its prior promises and representations that the basic life insurance would remain in place throughout Mr. Powell's life. |