**HEARING DATE AND TIME:** September 26, 2011, 9:45 a.m.

Elihu Inselbuch
Rita C. Tobin
CAPLIN & DRYSDALE, CHARTERED
375 Park Avenue, 35th Floor
New York, New York 10152-3500
Telephone: (212) 319-7125
Facsimile: (212) 644-6755

Trevor W. Swett III
Ronald E. Reinsel
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, N.W.
Suite 1100
Washington, D.C. 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301

John Cooney
**COONEY & CONWAY**
120 N. La Salle Street -- Suite 3000
Chicago, IL 60602-2415
(888) 651-1850

*Attorneys for Mark Buttita, as personal representative of Salvatore Buttita*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
In re                                                          :
MOTORS LIQUIDATION COMPANY, *et al.*,          :    Chapter 11 Case No.
    f/k/a General Motors Corp., *et al.*      :
                                              :    09-50026 (REG)
                                              :
                                              :    (Jointly Administered)
                                              :
                                              :
                                              :
---------------------------------------------------------------x

**RESPONSE OF MARK BUTTITA TO OBJECTION OF THE UNITED
STATES OF AMERICA TO APPLICATION OF MARK BUTTITA FOR ALLOWANCE
OF ADMINISTRATIVE EXPENSES INCURRED IN MAKING A SUBSTANTIAL
CONTRIBUTION IN THIS CHAPTER 11 CASE FROM
<u>JUNE 4, 2009 THROUGH JULY 15, 2009</u>**

DOC# 517005

Mark Buttita, in his capacity as the personal representative of Salvatore Buttita ("**Buttita**"), by and through his undersigned attorneys, hereby submits this response to the Objection of the United States of America (Dkt. No. 10831) (the "**Objection**"), filed on September 12, 2011 on behalf of its agency the United States Department of the Treasury (the "**Treasury**") to the Application of Mark Buttita for Allowance of Administrative Expenses Incurred from June 4, 2009 through July 9, 2009 (Dkt. Nos. 10707) (the "**Buttita Application**"). The Fee Application requests the allowance of administrative expenses for actual, necessary expenses incurred by Buttita and for reasonable compensation of expenses in connection with professional services rendered by Caplin & Drysdale, Chartered ("**Caplin & Drysdale**") as counsel to Buttita, from June 4, 2009 through July 15, 2009 (the "**Compensation Period**") in making a substantial contribution in the above-captioned bankruptcy case, in the amount of (i) $173,272.50 in fees and (ii) $13,973.29 in expenses, for a total of $187,245.70 in compensation (the "**Compensation Amount**").[1]

## PRELIMINARY STATEMENT

1.  Treasury first wrongly contends that in objecting to the sale (the "**Sale Transaction**") of the vast majority of the assets General Motors Corporation's ("**Old GM**") to Vehicle Acquisition Holdings LLC ("**New GM**"), Buttita, rather than performing a service leading to "an actual and demonstrable benefit to the debtor's estate, the creditors and, to the extent relevant, the stockholders," *see Objection* at 2, citing *In re Granite Partners*, 213 B.R. 440, 446 (Bankr. S.D.N.Y. 1997), merely conducted an unsuccessful effort to advance the interests of a single constituency acting to "retard and interrupt" a sale transaction "that was

---

[1] As stated in the Fee Application, the amount requested in fees represents a voluntary discount by Caplin & Drysdale of its total aggregate professional fees by thirty-three percent (33%). *See* Fee Application at ¶¶ 13-15.

indispensible to the successful outcome of this case." *See Objection* at p. 4. To the contrary, the objective of Buttita's opposition to the proposed transaction was to assure that any such sale did not impermissibly trample, but would instead preserve, the due process rights of claimants, including if necessary their opportunity to enforce those rights in subsequent litigation.

2.  Second, Treasury also erroneously contends that, in successfully advocating for the modification of the proposed sale order (the "**Proposed Sale Order**") to respect the due process rights of both presently known and future unknown asbestos tort victims by expressly limiting the enforceability of any resulting injunction, Buttita did not substantially advance the resolution of the GM bankruptcy case because the modification was "merely an articulation of a legal outer boundary to the effect of the Court's ruling," *see id.* at 3. Instead, Treasury argues, despite the explicit attempts in the Master Purchase Agreement (the "**MPA**") and Proposed Sale Order to completely shield New GM from any prospective successor liability to unknown asbestos claimants, that the Court's ruling on the sale would have been restricted to such constitutional bounds and effects "even in the absence of such language," *see id.* Treasury simply ignores the express language that was explicitly included in both the MPA and the Proposed Sale Order, which were opposed by Buttita, that was clearly intended to produce the opposite result.

3.  Treasury further incorrectly maintains that subsequent events in the case, including the appointment of both an official committee, chaired by Mr. Buttita's counsel, to represent the interests of present asbestos claimants and a future asbestos claims representative (the "**FCR**") to represent the interests of yet unknown future asbestos claimants and the ultimate negotiation of a plan that provided for the equitable treatment of both present and future asbestos claimants, were not influenced by Buttita's successful effort to persuade the Court to modify the

- 3 -

Proposed Sale Order, but rather resulted merely from a "dynamic of seeking and securing support for a plan and treatment of claims against the estate," that caused the Debtors to "prudently" negotiate[ ] and reach[ ] agreements that satisfied asbestos claimants and their representatives." *See id.* at 4. Treasury's view evidences a blind eye to the actual unfolding of the events in these cases.

4. Treasury's contentions are simply wrong and should be rejected, and the Buttita Application should be approved.

5. In reality, rather than impeding the resolution of these bankruptcy cases, Buttita's successful advocacy on behalf of future asbestos claimants, resulted in a modification of the Proposed Sale Order that expressly affirmed its constitutional limits and preserved the due process rights of the asbestos claimants. Rather than face the prospect of significant, costly and time consuming litigation concerning the scope of the injunctive provisions of the Sale Order that could have delayed the resolution of these cases and imposed significant costs to the detriment of all creditors, the Debtors responded: the modified Sale Order facilitated the parties' negotiation and confirmation of a consensual plan of reorganization (the **"Plan"**) that substantially conformed to the procedural and substantive requirements of 11 U.S.C. § 524(g) and won the support of the vast majority of asbestos claimants and thereby benefitted all creditors in these cases.

6. At the very least, the modification of the Proposed Sale Order advocated by Buttita focused attention on both the due process issues that undoubtedly would be raised following the sale transaction as it was originally proposed, and the prospect of a substantial continued overhang of liability on New GM for the Debtors' asbestos claims.[2] The potential cost

---

[2] As acknowledged by Old GM in its Form 10-K filed shortly before the commencement of these cases, its estimated exposure for present and future asbestos-related claims was at least $648 million.

and delay resulting from litigation over the effect of the Proposed Sale Order and the prospect that such continuing liability also could impair the equity value of New GM that was to form a significant basis for the distributions to all creditors of the Debtors, prompted the parties to address the redress of injuries of all asbestos claimants, both present and future, fairly and equitably within the resulting Plan.

7. Nor was the modification of the Proposed Sale Order, which conditioned the enforceability of any injunction issued pursuant to that Order on meeting the requirements Constitutional due process "merely an articulation of a legal outer boundary to the effect of the Court's ruling." *See Objection* at 3. Indeed, the Court apparently did not believe that such limitations were self-evident, because, in accepting Buttita's arguments, it expressly modified the Proposed Sale Order to make such limitations explicit.

8. Indeed, in explaining its reasons for including the limiting language with respect to the scope of the injunction against successor liability claims against New GM (which it made applicable only with respect to asbestos claimants), the Court specifically addressed the rights of future asbestos claimants pursuant to section 524(g) of the bankruptcy code, stating that notice given on the Debtor's section 363 sale motion (the "**Sale Motion**") (Dkt. No. 92) was not, and could not be, fully effective. *See* Decision on Debtors Motion for Approval of (1) Sale of Assets to Vehicle Acquisition Holdings LLC; (2) Assumption and Assignment of Related Executory Contacts; and (3) Entry into UAW Retiree Settlement Agreement (the "**Sale Opinion**") (Dkt No. 2967) at 62.

9. The Court further emphasized that it was "not of a mind to do anything that might be constitutionally suspect," *see id.* The modification, the Court continued, was inserted into the

Proposed Sale Order so as to "address both sides' legitimate future claims concerns." *See Sale Opinion* at 62-63.

10. The Court's desire to resolve in advance any "legitimate future concerns" that the parties might have regarding the meaning and scope of the Sale Order cannot be characterized as the "mere" articulation of a boundary. Rather, the Court clarified what might otherwise have been a muddy line between those rights that could be terminated by the Sales Order and those that, under constitutional principles, could not be cut off. In doing so, the Court did not merely address the parties' legitimate reservations, but clearly and unequivocally preserved the rights of future asbestos claimants to challenge the constitutionality of any effort by New GM to extinguish their future rights.

11. Finally, Treasury's contention regarding about what might have occurred regarding Plan negotiations absent the Court's ruling is not only entirely speculative, but simply ignores the actual subsequent sequence of events in these cases. There is no evidence to indicate that, absent Buttita's opposition, the Debtors would have "negotiated and reached agreements that satisfied asbestos claimants and their representatives," *see Objection* at 4, had the Proposed Sale Order not been modified to limit its boundaries "to the fullest extent constitutionally permissible," *see Sale Opinion* at 63.

12. Rather, what is indisputable is that beginning almost immediately following the issuance of this Court's Sale Opinion and entry of the Sale Order, including the modifications prompted by Buttita's efforts, (i) counsel for the Debtors and counsel for the UCC approached Buttita's state court counsel, Mr. Cooney, to suggest that a subcommittee be formed to represent the asbestos creditor constituency; (ii) an separate Official Committee of Unsecured Creditors Holding Asbestos Related Claims (the "**ACC**"), chaired by Mr. Cooney, ultimately was formed

on March 5, 2010; (iii) an FCR was appointed; (iv) following their respective appointments, the ACC and FCR engaged in extensive negotiations with the Debtors that led to a consensual agreement regarding the estimation of the amount of the Debtors' present and future asbestos liabilities and the formulation and funding for a mechanism which effectively mimics the processes and protections of bankruptcy code section 524(g) to provide for the treatment of all such claims; and (v) a liquidating plan of reorganization that was overwhelmingly accepted by ballots cast by the asbestos constituency was negotiated, confirmed, and went effective.

13.     Indeed, contrary to Treasury's implication, prior to Buttita's opposition to the Sale Motion, the Debtor had opposed, and the Court had rejected, efforts to have the Court appoint an FCR to ensure the rights of future asbestos victims. *See Dkt. Nos. 1915, 2857*. An application to appoint an FCR was finally approved by an order of the Court on April 8, 2010, *see Dkt. No. 5459*, subsequent to the appointment of the ACC.

14.     Therefore, while there is and can be no factual support for Treasury's speculative contention that Buttita's work had no positive effect, the record strongly supports that Buttita made a substantial contribution to these cases, and that his effort was the material impetus for the subsequent appointment of the ACC and FCR and, ultimately, the negotiation of a plan, overwhelmingly supported by the asbestos constituency, that ensured the orderly liquidating reorganization of the Debtors and final resolution of all asbestos-related personal injury claims against the Debtors and New GM.

## ARGUMENT

I.     **Caplin & Drysdale's Services On Behalf of Buttita Conferred a Direct and Demonstrable Positive Benefit Upon the Estate**

15. To be eligible for compensation by the estate for substantial contribution to a bankruptcy case, the applicant's services must have conferred "an actual and demonstrable benefit to the debtor's estate, the creditors and, to the extent relevant, the stockholders." *In re Granite Partners*, 213 B.R. at 446. Substantial contribution provisions must be "narrowly construed," and "[c]ompensable services" are those that "foster and enhance – rather than retard and interrupt—the progress of reorganization." *Id.*

16. As Treasury acknowledges, *see Objection* at 2-4, in opposing the Sale Order, Buttita acted, not merely in his own interests as a present asbestos creditor of GM, but in support of the entire asbestos constituency, including both present asbestos creditors and the future asbestos creditors that, although yet unknown, were certain to ultimately exist. *See In General Electrodynamics Corp.*, 368 B.R. 543, 554-56 (Bankr. N.D. Tex 2007) (finding applicant's actions as a surrogate creditors' committee that policed the debtors a substantial contribution).

17. Moreover, in opposing the Proposed Sale Order, Buttita brought into sharp focus an issue – the due process to be afforded future asbestos claimants – that would otherwise not have been expressly considered by the Court, because no official fiduciary for the interests of asbestos tort victims had yet been appointed and the Court had previously denied a motion to appoint a legal representative with respect to future claims.

18. Rather than leave those due process issues and ultimately the enforceability of the Sale Order and any injunction that might issue based upon that Order open to question, at Buttita's urging, the Court squarely addressed such issues, stating the Court's concern not to do "anything that might be constitutionally suspect," *see Sale Opinion* at 63, and inserting the modifying clause into the final Sale Order.

19.   Further, because the enforceability of the Sale Order and the desirability of avoiding likelihood of costly, protracted litigation and potential liability for claims against New GM, whose future value would determine a significant part of the return on the claims in these cases, were matters of concern to all creditors, Caplin & Drysdale's efforts on behalf of Buttita benefited, not merely Buttita alone, or even all present and future asbestos victims with claims against GM, but also benefitted "all the parties in the case." *See In re Best Foods Co., Inc.*, 173 B.R. 862, 865 (Bankr. S.D.N.Y. 1994) (*citing GATX Terminals Corp. v. Tarricone (In re Tarricone, Inc.)*, 83 B.R. 253, 255 (Bankr. S.D.N.Y. 1988).

20.   Moreover, although Treasury states in a parenthetical that the *Tarricone* case stands for the principle that a creditor is not entitled to a "substantial contribution" award based on efforts to pursue a client's right against the debtor, *see Objection* at 2, that was not the Court's holding in that case. Rather, *Tarricone* concerned the application by the attorneys for a warehouse creditor for fees related to that creditor's attempts to obtain a declaratory judgment regarding the Debtor's property interest in certain warehousing agreements. *See In re Tarricone, Inc.*, 83 B.R. at 253-54. In rejecting that application, the Court held, not that such fees should not be awarded where an applicant had acted in opposition to a debtor, but rather merely – the usual rule -- that the services rendered could not have *exclusively* serviced the creditor's interests. *See id.* at 255.

21.   In fact, Treasury expressly acknowledges that Buttita's efforts were made on behalf of future asbestos creditors, not present asbestos claimants such as himself. *See Objection* at 2. Moreover, as argued above, such efforts ultimately benefited all creditors by facilitating the issuance of an unambiguous Sale Order and, ultimately, confirmation of a consensual plan that effectively resolved all asbestos litigation against both the Debtors and New GM.

## II. Caplin & Drysdale's Work on Behalf of Buttita "Foster[ed] and Enhance[d]" the successful outcome of the GM Bankruptcy Cases.

22. Substantial contribution provisions must be "narrowly construed," and "[c]ompensable services" are those that "foster and enhance – rather than retard and interrupt— the progress of reorganization." *In re Granite Partners,* 213 B.R. 440, 446 (Bankr. S.D.N.Y. 1997).

23. Contrary to Treasury's assertion that the Proposed Sale Order already encompassed due process protections and the modification was "merely an articulation" of what was already implicit in that Order, as is evident in the Sale Opinion the Court believed that the parties had "legitimate" concerns regarding how that order might be interpreted. *See Sale Opinion* at 62-63.

24. The Court's comments in the Sale Opinion and the clarifying language included into the Sale Order as a result of Buttita's efforts served to resolve such doubts once and for all and expressly preserved the claimants constitutional due process rights and their rights to seek redress for their claims.

25. Further, subsequent to the issuance of the Sale Order, and the discussion in the Sale Opinion of future asbestos claimants' due process rights, an ACC and FCR were appointed and negotiations ensued that led to the confirmation of the Plan.

26. Moreover, nothing that occurred prior to the modification of the Proposed Sale Order or Court's opinion as advocated by Buttita, suggested that the Debtors intended to support the appointment of either an asbestos claimant committee or an FCR, as they later did. Indeed, the Debtors had previously opposed efforts to have any such official representatives appointed by the Court.

27.     The logical conclusion, therefore, is that it was not the "dynamic of seeking and securing support for the plan and treatment of claims against the estate" that led to negotiated agreements between the Debtors and the asbestos claimants representatives, *see Objection* at 4, but that those agreements, and the Plan, resulted from the "dynamic" of the Debtors' need to address the due process rights of future claimants that had been raised by Buttita and acknowledged by the Court in the Sale Opinion and Sale Order. Any assertion by Treasury to the contrary simply ignores the actual course of events in these cases.

28.     In sum, by advocating for Buttita, Caplin & Drysdale successfully focused the Court's concern to expressly preserve the due process rights of claimants and a secured provision in the Sale Order that "fostered and enhanced" the successful outcome of these bankruptcy cases by prompting the parties to address and adopt a processes and procedures that protected the interests of the entire asbestos constituency and ultimately served to benefit all creditors of the Debtors' estates.

## **CONCLUSION**

For all of the reasons set forth herein, the Objection should be overruled, and this Court should, pursuant to 11 U.S.C. §§ 503(b)(3)(D) and (b)(4), enter an order, in the form attached to as Exhibit F, allowing an administrative claim in the amount of $172, 272.50 in favor of Buttita on account of the fees and costs incurred by Buttita in making a substantial contribution in these chapter 11 cases.

Dated: New York, New York
       September 22 2011

By: /s/ Elihu Inselbuch

Elihu Inselbuch (EI-2843)
Rita C. Tobin (RCT-5413)

- 11 -

**CAPLIN & DRYSDALE, CHTD.**
375 Park Avenue, 27th Floor
New York, New York 10152-3500
Telephone: (212) 319-7125
Facsimile: (212) 644-6755

Trevor W. Swett III
Ronald E. Reinsel
**CAPLIN & DRYSDALE, CHTD.**
One Thomas Circle, N.W.
Suite 1100
Washington, D.C. 20005
(202) 862-5000

John Cooney
**COONEY & CONWAY**
120 N. La Salle Street -- Suite 3000
Chicago, IL 60602-2415
(888) 651-1850

*Attorneys for Mark Buttita, as personal representative of Salvatore Buttita*