Katherine Stadler
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
P.O. Box 2719
Madison, Wisconsin 53701-2719
Telephone: (608) 257-3911
Facsimile: (608) 257-0609

*Attorneys for the Fee Examiner*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------- x
                                                         :
In re:                                                   :    Chapter 11
                                                         :
MOTORS LIQUIDATION COMPANY, et al.,   :    Case No. 09-50026
        f/k/a General Motors Corp., et al.,              :    (Jointly Administered)
                                                         :
                        Debtors.                         :    Honorable Robert E. Gerber
                                                         :
------------------------------------------------------- x
```

**<u>FEE EXAMINER'S FINAL REPORT AND SUMMARY</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................ ii

RECOMMENDATION ............................................................................................................. 1

SUMMARY .................................................................................................................................. 2

BACKGROUND/PREVIOUS DECISIONS ............................................................................... 3

CONTESTED ISSUES ................................................................................................................ 5

CASE LAW DEVELOPMENTS/STANDARDS ........................................................................ 7

FEE REVIEW COSTS ................................................................................................................. 8

NOTES .......................................................................................................................................... 10

CONCLUSION ............................................................................................................................. 11

# TABLE OF AUTHORITIES

**Page**

## CASES

*In re Asarco*, No. 05-21207, 2011 WL 2974957 (Bankr. S.D. Tex., July 20, 2011)...................... 8

*In re: CCT Comnc'ns, Inc.*, No. 07-10210, 2010 WL 3386947 (Bankr. S.D.N.Y. Aug. 24, 2010) .................................................................................................................. 8

*In re: Mesa Air Group, Inc.*, 449 BR 441 (Bankr. S.D.N.Y.)........................................................ 7

*Perdue v. Kenny, A.*, 559 U.S. ___ (2010).................................................................................. 8

## OTHER AUTHORITIES

11 U.S.C. §§ 327-330 ............................................................................................................... 7

Bankruptcy Reform Act of 1978................................................................................................ 5

These proceedings have been a success—legally and economically historic.  The General Motors Chapter 11 bankruptcy, asset sale and liquidation into three trusts have been part of an industry's renaissance.  Now, the 25 professional firms retained by the Debtors and the Creditors' Committee ask the Court to give final approval to a total of $120,508,693.88 in fees and $3,377,274.59 in expenses for their services.  In concert with the work of the Court and the U.S. Trustee's Office and the unprecedented financing provided by the taxpayers, those professional services were indispensable to the proceedings' success.

## RECOMMENDATION

With this report, the Fee Examiner recommends that the Court approve the fees and expenses submitted—subject to the proposed reductions detailed here and in the individual reports, one for each professional, filed earlier this month.[1]  The Court has scheduled most of the professionals' applications for hearing on September 26, the Creditors' Committee application on October 21, and two applications on October 28.[2]  As of the date of this report, the Fee Examiner and 21 professionals have reached agreement on the recommended amounts of compensation and expense reimbursement (reflecting negotiated or accepted reductions).  Issues remain with just one firm (aside from the deferred disagreement over rate increases).  The totals sought and recommended for each professional are summarized in Exhibits A and B.[3]

---

[1] The final fee applications cover the period from June 1, 2009 through plan confirmation on March 29, 2011. Under the plan, post-confirmation professional fees are the responsibility, without judicial review, of the post-confirmation debtors.

[2] The October 21 hearing coincides with the summary judgment hearing in Adversary Proceeding No. 11-09406 between the Official Committee of Unsecured Creditors and the United States Treasury.  The October 28 hearing is on the section 503(b) fee and expense request, totaling $511,032.22, filed by the Ad Hoc Committee of Asbestos Personal Injury Claimants [Docket No. 10245] and on the third and final fee application of Analysis Research Planning Corporation [Docket No. 10250], totaling $760,038.55, which is the subject of limited objections by both the Debtors [Docket No. 10843] and the Fee Examiner [Docket No. 10827] and upon which the Debtors anticipate an evidentiary hearing.

[3] Exhibit A summarizes the two remaining interim fee periods: the fifth (October 1, 2010 through January 31, 2011) and sixth (February 1 through March 29, 2011).  Exhibit B summarizes the final fee period.

**SUMMARY**

This Chapter 11 is one of the largest in history.  From filing to plan confirmation, the reorganization took 22 months.  It was, for the most part, free of contention and, especially compared with several other large cases, free from unnecessary controversy and litigation.  Yet success, however defined, is not the principal measure of professional fees and expenses under federal bankruptcy law.  Reasonableness is.  For the most part, the fees and expenses here have been reasonable—albeit still remarkable.

The Court appointed the Fee Examiner on December 23, 2009 to "review and prepare appropriate reports to the Court, the United States Trustee, the Debtors, the [Unsecured Creditors'] Committee and the respective Retained Professionals on all applications for allowances of compensation and reimbursement of expenses filed by Retained Professionals … to assist the Court in determining and ruling on the applications, as well as to provide transparency in the administration of the chapter 11 cases." *Stipulation and Order with Respect to Appointment of a Fee Examiner* [Docket No. 4708].  Since then, the Court has given interim approval to a total of $78,571,802.02 in fees and $2,925,782.41 in expenses.  Pending a final hearing and final approval, it has ordered 10 percent of the interim fees awarded held back.

Either by stipulation or after objection and a hearing, to date the Court has disallowed $1,317,845.26 in fees and $150,303.10 in expenses, not counting the disallowances still at issue in the pending applications, including the objection to hourly rate increases.  The Court has not yet reviewed, on an interim or final basis, approximately $28 million in compensation requests, which have been consolidated with the final fee applications.

2

The most significant remaining disagreement involves approximately $3 million in cumulative hourly rate increases submitted for approval—principally sought by three firms.[4]  In the August 5 *Fee Examiner's Limited Objection to Hourly Rate Increases* [Docket No. 10660] (the "**Rate Increase Objection**"), the Fee Examiner objected to the hourly rate increases on two bases: first, the rate increases have not been justified by the professionals or, second, they are not justifiable in light of the limits imposed by the market for those services from 2009 through the first quarter of 2011.  While the Retained Professionals with significant rate increases have not filed any response to the objection, they and the Fee Examiner have agreed that the Rate Increase Objection will not be heard on September 26—in part, because of the potential need for an evidentiary hearing.[5]  Instead, pending continuing discussions on a negotiated resolution, the objection will be heard on a schedule determined by the Court.

## BACKGROUND/PREVIOUS DECISIONS

Since the outset, the Fee Examiner has reviewed each of the professional's applications individually and issued individual reports as well as several summary reports.  *See* Docket Nos. 5601, 6116, 7009, 7448, 8052, 10617, 10796.  In the initial stages of the case, the Fee Examiner sent a letter to each professional summarizing concerns, followed by a draft report that permitted a continued discussion of issues, followed in turn by a final report.  For the third and subsequent interim periods, the Fee Examiner sent only a draft report, dispensing with the initial

---

[4] Where the total amount attributable to a Retained Professional's hourly rate increase is relatively small, less than $40,000.00 in the aggregate, the Fee Examiner has elected not to pursue this objection.  The Debtors, the Fee Examiner, and the affected professionals also have agreed that the Debtors may—subject to Court approval—pay the amount in dispute attributable to rate increases, subject to disgorgement in whole or in part upon the resolution of the objection.

[5] While rate increases are measurable in different ways, two here are illustrative.  At one firm, for example, one associate's hourly rate increased from $335.00 on the first day of the cases to $515.00 18 months later.  Blended hourly rates—that is, the average hourly rate for all timekeepers—increased at the same firm from $487.70 to $584.76.

3

letter. These reports and the ensuing dialogue did not eliminate the statutory and practical

burden on the Court and the U.S. Trustee system but, at the least, they focused the issues.

Most of the professionals filed fee and expense reimbursement applications for four

interim periods:

- June 1 – September 30, 2009

- October 1, 2009 – January 31, 2010

- February 1 – May 31, 2010

- June 1 – September 30, 2010

With the plan of reorganization destined for confirmation on March 29, 2011, the Debtors, the

Retained Professionals and the Fee Examiner agreed to defer the last two interim periods

(October 1, 2010 through January 31, 2011, and February 1 through March 29, 2011) and merge

those applications with the final fee application process. That saved a significant amount of time

and money, but it complicated the final process because, with fees and expenses of

approximately $28 million, the last "interim" periods involved the largest amount of

compensation of any single period. During the entire process, of course, the professionals

submitted monthly invoices that permitted the estates to pay them 80 percent of the invoiced fees

and 100 percent of the invoiced expenses under the *Order Pursuant to 11 U.S.C. §§ 105(a)*

*and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of*

*Professionals* [Docket No. 3711].

The Court conducted hearings on interim applications on April 29, June 29, October 26,

and December 15, 2010 and January 11, 2011, and it rendered a series of decisions. While

taking the time of the Court and the professionals in the midst of the substantive reorganization

could have seemed a diversion, it proved invaluable in the fee review process. The Court

resolved issues in the initial stages, as and when they arose, permitting the professionals and the

4

Fee Examiner to narrow points of difference in the ensuing periods. This practice—interim applications filed, objections heard and decided—is especially helpful in larger reorganizations and liquidations. Over the four interim periods, the quality and detail of the fee applications improved, and the objections decreased—helped, in no small part, by the Court's willingness to address issues of disagreement and decide them.

## CONTESTED ISSUES

The initial hourly rates charged by the professionals here have never been at issue. They were approved by the Court at the outset and presumptively reflected, at least then, verifiable market rates for bankruptcy and non-bankruptcy matters in major cases involving major corporations—consistent with the mandate of the Bankruptcy Reform Act of 1978. The questions and issues raised by the Fee Examiner, and resolved consensually or by the Court, involved the less notable requirements of the Bankruptcy Code and the case law in this district, its local orders and the U.S. Trustee Guidelines. Those questions and issues were common to most of the applications for most of the interim compensation periods.

The most contentious and difficult questions involved the investment of time and its compensability for editing daily time records and preparing publicly-filed fee applications. The Court's resolution of the issue often turned on the distinction between time records and summaries required (explicitly or implicitly) by the Bankruptcy Code and the routine time-keeping and billing practices required, without compensation, in any professional's practice. The Court issued a decision that provided for 50 percent payment of questioned timekeeping, retaining the separate reasonableness standard. In addition, the Court addressed the issue of compensability for the time spent in discussions (or in disputes) with the Fee Examiner—an inevitable, if occasionally disagreeable, part of the process.

5

Compliance with the requirement, found in the U.S. Trustee Guidelines, for recording time in tenth-of-an-hour increments also proved difficult for some professionals, especially those relatively new to the Chapter 11 process. This led to several of the Court's most pointed comments. *See*, *e.g.*, *In re Motors Liquidation Co.*, Second Interim Fee Ruling Tr. at 19, No. 09-50026 (Bankr. S.D.N.Y. July 6, 2010) [Docket No. 6369]. Whether or not the requirement arguably is too demanding or unnecessary, it remains a requirement, reinforced by the Court.

Many of the other points of disagreement were familiar to anyone who has ever reviewed a bill for professional services—in a bankruptcy case or otherwise. How many professionals were "necessary" at a particular hearing? Were the services provided described in the application with enough detail to determine the work done?[6] Did a partner perform work that more inexpensively might have been done by a qualified associate? Could a skilled paralegal have completed projects at a significantly lower hourly rate than the associate who performed them? Were some tasks, recorded by an associate or a paralegal, more appropriately completed by a staff person and, as administrative overhead, not charged at all? In many instances, the resolution of any shortcomings in the applications was a negotiated percentage reduction of the amount at issue.

The issues identified and the questions asked about the fee applications here ranged from trivial to sublime. They involved deliberate decisions about what and how much to bill as well as human error (an inadvertently-recorded "26-hour day," for example). Yet any thorough review necessarily checks the cost and necessity of mundane issues—car services for professionals working after hours, for example—as well as the decision to spend (and bill)

---

[6] In the Court's words, "task descriptions beginning with 'attention to' are like chalk on a blackboard to me, principally because of the inherent vagueness of that term, how uninformative it is, and how it could cover such a wide spectrum of different levels of concentration and effort and resulting benefit to the estate." *Id*. at 26.

remarkable amounts of time on a 10-page legal research memorandum.  People make mistakes; any audit and review process should correct them.  However, differences over billing judgment and the value of the professional services billed are more subjective and open to dispute with, almost inevitably, a later disagreement over the appropriate compensation for resolving the fee dispute.

Some of the time and expense issues, especially in the context of these cases, appear minor or, in a different setting, difficult to justify.  Reimbursement for local transportation, for example, or unusual meal and hotel costs may not have been justifiable in another case or elsewhere.  Often, the question was not whether a particular expense was customary in the market but, rather, whether the estate should pay for it.  Moreover, the Bankruptcy Code and the other applicable rules and guidelines do not discriminate between major expenses and those involving relatively small sums.  The system has to call attention to both.

## CASE LAW DEVELOPMENTS/STANDARDS

The statutory standards for approving professional compensation are far more easily stated—and they need not be here—than applied.  *See* 11 U.S.C. §§ 327-330.  Here, the unique nature of the cases added to the complexity and cost: the need for a virtually immediate asset sale, the indispensable involvement of the U.S. Treasury and taxpayer financing, the substantial exposure to present and future asbestos claims, and the environmental problems presented by closed facilities and factories in at least half a dozen states.

The Court, in a series of bench and written decisions, made the "law of the case" here. *See*, *e.g.*, Docket Nos. 5699, 6369, 7896, 8626.  Several other decisions are worth noting to the extent they bear on the issues addressed in these proceedings.  *See*, *e.g.*, *In re: Mesa Air Group, Inc.*, 449 BR 441 (Bankr. S.D.N.Y.); *In re: CCT Comnc'ns, Inc.*, No. 07-10210, 2010 WL

7

3386947 (Bankr. S.D.N.Y. Aug. 24, 2010) (addressing the compensability of reviewing and editing time records).

Beyond this district, the U.S. Supreme Court in *Perdue v. Kenny, A.*, 559 U.S. ___ (2010) (a fee-shifting case), and a bankruptcy court in Texas recently discussed fees and expenses in a way that those interested in fee review might find noteworthy. *In re Asarco*, No. 05-21207, 2011 WL 2974957 (Bankr. S.D. Tex., July 20, 2011). Putting aside the fact that bankruptcy courts do not bind each other, the decision in *Asarco* is of interest for several reasons: the extended discussion of fees in Chapter 11, the baseline for partner and associate hourly rates in a different, though large and sophisticated, metropolitan market, and the extensive exhibits comparing law firm rates and practices.

## FEE REVIEW COSTS

The fee examination process itself imposed a significant cost to the estates. At the outset, with the Court's approval, the Fee Examiner worked with Stuart Maue, an auditing firm, to analyze, quantitatively, a selected number of applications. Through the date of plan confirmation, Stuart Maue submitted applications totaling $478,112.50 in fees and $3,579.99 in expenses. The sheer mass of the applications, especially those submitted by the Debtors' and Creditors' Committee's counsel, made some kind of basic audit necessary—if only to permit a more qualitative analysis.

This threshold review of fees and expenses, an audit for errors and excess, is not the end of the process—for the Fee Examiner, the U.S. Trustee or the Court. Beyond that, the context of the time spent—when and why the professional services were provided—is central to any "reasonableness" assessment. Here, the time spent in the first 60 days of the proceedings, including the work on the pivotal section 363 sale of assets, could not be reviewed from the same perspective as time spent later in the cases. Yet the professional services rendered then were no

less "reasonable" for the fact that, in hindsight, they might have been rendered more efficiently or with less expense.

At the Fee Examiner's request, the appointment order made his compensation subject to the same standards and procedures as the applications of virtually every other professional. His applications, combined with those of his legal counsel, totaled $1.4 million in fees and $108,988.93 in expenses, each subject to hearing and objection, though there was none. The hourly rates charged by the Fee Examiner and his counsel did not increase over the course of these proceedings.

The value of any examination process can be measured in a number of ways. One tangible metric, of course, is the amount of fees and expenses "saved"—whether by compromise or challenge and judicial decision. But it is only one measure and, perhaps, not the most significant. The pending hourly rate increase disagreement, whether resolved by the Court or by the parties to it, would change even that calculus significantly.

More importantly, any quantitative analysis cannot measure the savings to the Court, the U.S. Trustee system, and the other parties in these proceedings that might have reviewed and challenged the fees and expenses of other professionals. Nor can it measure, in light of the scrutiny provided by the process, the amounts professionals ultimately chose not to bill at all. It also does not measure, cannot measure, the value of an independent assessment—whatever its conclusion—of the costs to the estates of the professionals that helped make the proceedings successful. The cumulative impact of court-sanctioned monitoring upon all of the participants is immeasurable but, quite likely, it is significant.

9

## NOTES

This is not the place for systemic recommendations, especially given the fact that the rate increase issue remains open and, in its potential financial effect, substantial.  Nevertheless, several points and themes recur that are worth briefly noting:

- The Court's early resolution of disputed issues on the record resulted in subsequent fee applications that markedly improved.  Deductions sanctioned by the Court reduced problematic billing practices in later fee periods.

- In general and not surprisingly, law firm applications were more complete and less subject to challenge than those of financial, accounting and other consulting firms.  The Fee Examiner's disagreements with law firms tended to be substantive; those with other professionals procedural and mechanical.  Accordingly, more attention might well be paid at the outset of any significant case to case-specific procedures and standards, providing more pre-retention guidance to Retained Professionals, especially those relatively new to Chapter 11.

- Flat fee arrangements, whether authorized at the outset of a proceeding or later, are always difficult to evaluate—either because of the legal standard that applies or, perhaps related, the differing approach to record-keeping for many flat fee professionals.  If the arragements are denominated as "success" fees, the evaluation becomes more difficult.  As a result, flat fee agreements might well warrant more scrutiny at the outset.

- The fees and expenses of firms providing essential reorganization services—here, indeed, the entire post-confirmation management of the Debtors—generally cannot be reviewed in the same way that the Retained Professionals have been subject to review.  Yet those costs and fees ($95,749,028.13 by AP Services) undoubtedly comprise a significant portion of many large Chapter 11 case budgets.

The fees and expenses for these proceedings are being reviewed and evaluated under a statute enacted more than 30 years ago and U.S. Trustee Guidelines last revised 15 years ago.  The relevant case law is limited.  No one, it is fair to say, anticipated or could have anticipated the magnitude of the Chapter 11 cases filed in this district and others since mid-2008, nor the imperfect workings of the fee review and approval process within them, required by law.

## CONCLUSION

There is nothing inexpensive about Chapter 11 generally or, at $122 million in fees and expenses, these proceedings in particular. However, whether the fees and costs are evaluated in terms of the size of the cases, the amount of time they took, or the complex issues they raised and resolved, the fees and expenses here are proportionate and reasonable. They meet the requirements of the Bankruptcy Code and the rules and guidelines established by the Court and the U.S. Trustee.

In a case of this magnitude and significance, with this many professionals, some form of independent fee and expense review is essential. That need is inescapable given the practical burden that the Bankruptcy Code places on the Court and the U.S. Trustee's office for reviewing tens of thousands of pages of applications and supporting records. It is also inescapable given the need for transparency and accountability, especially in proceedings that involve taxpayer dollars as the principal funding source and that affect so many people with individual claims and interests—some poignantly raised in this Court by former employees and 401(k) beneficiaries.

It is for others to decide whether the fee review approach here has been the most efficient or effective model. The rate increase issue, which involves a significant amount of legal fees, remains to be resolved. On September 26, however, the Court should it choose can give final (and, with respect to the rate increases, provisional) approval to the fees requested based, at least in part, on the Fee Examiner's assessment. That assessment is unequivocal: with a relatively modest number of exceptions, including hourly rate increases, the professionals' applications were appropriately prepared and reflected services that provided real value to the estates. Where they did not, they were adjusted—by the professionals and the Fee Examiner or by the Court—to the benefit of the estates and those with financial and intangible interests in them.

Dated:  Madison, Wisconsin
        September 22, 2011.

                        GODFREY & KAHN, S.C.


                By:        /s/ *Katherine Stadler*
                        Katherine Stadler

                        GODFREY & KAHN, S.C.
                        One East Main Street, Suite 500
                        P.O. Box 2719
                        Madison, Wisconsin 53701-2719
                        Telephone: (608) 257-3911
                        Facsimile: (608) 257-0609
                        E-mail: kstadler@gklaw.com

                        *Attorneys for the Fee Examiner*

6796974_3

# EXHIBIT A

Interim Fee Applications and
§ 503(b) Administrative Expense Claim

# EXHIBIT A

INTERIM FEE APPLICATIONS AND § 503(B) ADMINISTRATIVE EXPENSE CLAIM
NOTICED FOR HEARING ON SEPTEMBER 26, 2011 AT 10:30 A.M. (PREVAILING EASTERN TIME)

MOTORS LIQUIDATION COMPANY, *et al.*, DEBTORS
CHAPTER 11 CASE NO. 09-50026 (REG)

| NAME OF RETAINED PROFESSIONAL | DATE FEE APPLICATION SUBMITTED [DKT. NO.] | PERIOD COVERED BY FEE APPLICATION | AMOUNTS REQUESTED | | AMOUNTS RECOMMENDED FOR DISALLOWANCE / STATUS[1] | | AMOUNTS ALREADY PAID TO RETAINED PROFESSIONALS 80% OF FEES AND 100% OF EXPENSES | | AMOUNTS ALLOWED BY THE COURT | | EXAMINER'S REPORT/ STATEMENT [DKT. NO.] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | FEES | COSTS | FEES | COSTS | FEES | COSTS | FEES | COSTS | |
| **Analysis Research Planning Corp.[2]** | 05/16/2011 [10250] | 10/01/2010- 03/29/2011 | $536,458.00 | $1,150.33 | **$188,035.50** | **$0.00** | $429,166.40 | $1,150.33 | | | **09/12/2011 [10827]** |
| Baker & McKenzie LLP | 05/16/2011 [10262] | 10/01/2009- 03/29/2011 | 107,283.05 | 2,281.05 | 40,000.00 | 169.68 | 85,826.44 | 2,281.05 | | | 09/11/2011 [10813] |
| Bates White LLC | 05/16/2011 [10264] | 10/01/2010- 03/29/2011 | 910,311.25 | 6,777.20 | 2,362.55 | 0.00 | 728,249.00 | 6,777.20 | | | 09/11/2011 [10815] |
| Brownfield Partners, LLC | 05/13/2011 [10224] | 10/01/2010- 03/29/2011 | 152,616.00 | 6,966.30 | 0.00 | 0.00 | 122,092.80 | 6,996.30 | | | 09/12/2011 [10826] |
| Butzel Long, a Professional Corporation | 05/16/2011 [10241] | 10/01/2010- 03/31/2011 | 703,367.50 | 59,500.51 | 15,238.49 | 0.00 | 562,694.00 | 59,500.51 | | | 09/11/2011 [10814] |
| Caplin & Drysdale, Chartered | 05/17/2011 [10280] | 10/01/2010- 03/31/2011 | 1,209,846.00 | 88,405.90 | 19,803.36 | 30.96 | 984,038.20 | 88,405.90 | | | 09/14/2011 [10875] |
| Deloitte Tax, LLP | 05/13/2011 [10231] | 10/01/2010- 03/29/2011 | 955,126.00 | 7,476.00 | 28,314.62 | 0.00 | 764,100.80 | 7,476.00 | | | 09/12/2011 [10845] |
| FTI Consulting, Inc. | 05/16/2011 [10265] | 10/01/2010- 03/29/2011 | 7,993,423.00 | 25,582.37 | 0.00 | 0.00 | 2,394,738.40 | 25,582.37 | | | 09/12/2011 [10829] |
| Hamilton Rabinovitz & Associates, Inc. | 05/16/2011 [10266] | 10/01/2010- 03/29/2011 | 31,862.50 | 0.00 | 3,000.00 | 0.00 | 25,490.00 | 0.00 | | | 09/12/2011 [10844] |

---

[1] Entries in boldface type indicate that the Retained Professional has not stipulated to the amounts recommended for disallowance by the Fee Examiner.

[2] The Debtors and the applicant have agreed to jointly request that the September 26 hearing date be treated as a status conference in anticipation of a later evidentiary hearing.

| NAME OF RETAINED PROFESSIONAL | DATE FEE APPLICATION SUBMITTED [DKT. NO.] | PERIOD COVERED BY FEE APPLICATION | AMOUNTS REQUESTED | | AMOUNTS RECOMMENDED FOR DISALLOWANCE / STATUS[1] | | AMOUNTS ALREADY PAID TO RETAINED PROFESSIONALS 80% OF FEES AND 100% OF EXPENSES | | AMOUNTS ALLOWED BY THE COURT | | EXAMINER'S REPORT/ STATEMENT [DKT. NO.] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | FEES | COSTS | FEES | COSTS | FEES | COSTS | FEES | COSTS | |
| Honigman Miller Schwartz and Cohn LLP | 05/23/2011 [10313] Supplemented 08/29/2011 [10762] | 10/01/2009-03/29/2011 | 52,415.25 | 2,124.15 | 1,964.32 | 165.53 | 41,932.20 | 2,124.15 | | | 09/11/2011 [10817] |
| Jenner & Block, LLP | 05/16/2011 [10246] | 10/01/2010-03/29/2011 | 12,064.10 | 131.85 | 29,460.00 | 551.18 | 9,651.28 | 131.85 | | | 09/11/2011 [10816] |
| Legal Analysis Systems, Inc. | 05/16/2011 [10269] | 10/10/2010-03/31/2011 | 241,437.50 | 0.00 | 3,104.63 | 0.00 | 193,150.00 | 0.00 | | | 09/11/2011 [10821] |
| LFR, Inc. | 05/16/2011 [10251] | 10/01/2010-03/29/2011 | 243,858.10 | 2,546.41 | 3,239.85 | 0.00 | 195,086.48 | 2,546.41 | | | 09/12/2011 [10825] |
| Morris, Nichols, Arsht & Tunnell LLP | 05/16/2011 [10261] | 11/16/2010-03/29/2011 | 10,529.67 | 2,987.21 | 288.90 | 0.00 | 8,423.74 | 2,987.21 | | | 09/11/2011 [10822] |
| Plante & Moran, PLLC | 05/17/2011 [10279] | 10/01/2010-03/29/2011 | 331,849.95 | 4,674.91 | 0.00 | 0.00 | 265,479.96 | 4,674.91 | | | 09/11/2011 [10818] |
| Stutzman, Bromberg, Esserman & Plifka, a Professional Corporation | 05/16/2011 [10248] | 10/01/2010-03/29/2011 | 684,676.75 | 12,251.58 | 107.50 | 0.00 | 547,741.40 | 12,251.58 | | | 09/12/2011 [10841] |
| The Claro Group, LLC | 05/16/2011 [10239] | 10/01/2010-03/31/2011 | 1,662.50 | 92.82 | 0.00 | 0.00 | 1,330.00 | 92.82 | | | 09/12/2011 [10828] |
| Togut Segal & Segal LLP | 05/16/2011 [10240] | 10/01/2010-03/29/2011 | 438,826.00 | 2,453.94 | 3,009.55 | 27.75 | 351,060.80 | 2,453.94 | | | 09/12/2011 [10823] |

| Name of Retained Professional | Date Fee Application Submitted [Dkt. No.] | Period Covered by Fee Application | Amounts Requested Fees | Costs | Amounts Recommended For Disallowance / Status[1] Fees | Costs | Amounts Already Paid to Retained Professionals 80% of Fees and 100% of Expenses Fees | Costs | Amounts Allowed by the Court Fees | Costs | Examiner's report/ Statement [Dkt. No.] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Dean M. Trafelet in his Capacity as Legal Representative for Future Asbestos Personal Injury Claimants | 05/16/2011 [10247] | 10/01/2010-03/29/2011 | 133,704.75 | 249.06 | 0.00 | 0.00 | 106,963.80 | 249.06 | | | 09/11/2011 [10819] |
| Weil, Gotshal & Manges, LLP | 05/17/2011 [10270] Supplemented 08/08/2011 [10662] | 10/01/2010-03/29/2011 | 9,205,855.50 | 280,933.67 | 89,225.03 | 17,398.07 | 7,364,684.40 | 280,933.67 | | | 09/16/2011 [10880] |
| § 503(b) Administrative Expense Claim - Mark Buttita | 05/13/2011 [10233] | 06/04/2009-07/15/2009 | 173,272.50 | 13,973.29 | 18,579.88 | 0.00 | 0.00 | 0.00 | | | 09/15/2011 [10878] |
| TOTAL Interim Fee Applications and § 503(b) Administrative Expense Claim Noticed for Hearing on Sept. 26, 2011 | | | $24,130,445.87 | $520,558.55 | | | | | | | |

6856005_3

3

# EXHIBIT B

Final Fee Applications and
§ 503(b) Administrative Expense Claim

# EXHIBIT B

FINAL FEE APPLICATIONS AND § 503(B) ADMINISTRATIVE EXPENSE CLAIM
NOTICED FOR HEARING ON SEPTEMBER 26, 2011 AT 10:30 A.M. (PREVAILING EASTERN TIME)

MOTORS LIQUIDATION COMPANY, *et al.*, DEBTORS
CHAPTER 11 CASE NO. 09-50026 (REG)

| NAME OF RETAINED PROFESSIONAL | DATE FEE APPLICATION SUBMITTED [DKT. NO.] | PERIOD COVERED BY FEE APPLICATION | AMOUNTS REQUESTED IN FINAL COMPENSATION | | AGGREGATE AMOUNTS FOR DISALLOWANCE[1] | | AMOUNTS ALLOWED BY THE COURT IN FINAL COMPENSATION | | EXAMINER'S REPORT/ STATEMENT [DKT. NO.] |
|---|---|---|---|---|---|---|---|---|---|
| | | | FEES | COSTS | FEES | COSTS | FEES | COSTS | |
| **Analysis Research Planning Corp.[2]** | 05/16/2011 [10250] | 10/01/2010- 03/29/2011 | $758,031.00 | $2,007.55 | **$189,667.00** | **$0.00** | | | 09/12/2011 [10827] |
| Baker & McKenzie LLP | 05/16/2011 [10262] | 10/01/2009- 03/29/2011 | 1,280,837.78 | 24,236.72 | 256,380.08 | 169.68 | | | 09/11/2011 [10813] |
| Bates White LLC | 05/16/2011 [10264] | 10/01/2010- 03/29/2011 | 1,995,593.84 | 13,968.88 | 22,369.21 | 10.73 | | | 09/11/2011 [10815] |
| Brownfield Partners, LLC | 05/13/2011 [10224] | 10/01/2010- 03/29/2011 | 1,223,102.63 | 85,798.37 | 22,912.97 | 22,418.94 | | | 09/12/2011 [10826] |
| Butzel Long, a Professional Corporation | 05/16/2011 [10241] | 10/01/2010- 03/31/2011 | 2,046,609.06 | 144,757.17 | 38,189.18 | 1,636.83 | | | 09/11/2011 [10814] |
| Caplin & Drysdale, Chartered | 05/17/2011 [10280] | 10/01/2010- 03/31/2011 | 2,297,993.96 | 173,913.01 | 62,760.65 | 756.05 | | | 09/14/2011 [10875] |

---

[1] Entries in boldface type indicate that the Retained Professional has not stipulated to the amounts recommended for disallowance by the Fee Examiner.

[2] The Debtors and the applicant have agreed to jointly request that the September 26 hearing date be treated as a status conference in anticipation of a later evidentiary hearing.

| Name of Retained Professional | Date Fee Application Submitted [Dkt. No.] | Period Covered by Fee Application | Amounts Requested in Final Compensation | | Aggregate Amounts For Disallowance[1] | | Amounts Allowed by the Court in Final Compensation | | Examiner's report/ Statement [Dkt. No.] |
|---|---|---|---|---|---|---|---|---|---|
| | | | Fees | Costs | Fees | Costs | Fees | Costs | |
| Deloitte Tax, LLP | 05/13/2011 [10231] | 10/01/2010-03/29/2011 | 1,891,645.12 | 7,651.13 | 86,242.50 | 15.00 | | | 09/12/2011 [10845] |
| Evercore Group LLC | 11/16/2009 [4453] | 06/01/2009-07/10/2009 | 16,029,032.00 | 2,920.62 | 0.00 | 1,042.34 | | | 09/12/2011 [10842] |
| FTI Consulting, Inc. | 05/16/2011 [10265] | 10/01/2010-03/29/2011 | 18,495,125.25 | 135,380.13 | 25,681.13 | 2,088.79 | | | 09/12/2011 [10829] |
| Hamilton Rabinovitz & Associates, Inc. | 05/16/2011 [10266] | 10/01/2010-03/29/2011 | 68,295.00 | 0.00 | 3,000.00 | 0.00 | | | 09/12/2011 [10844] |
| Honigman Miller Schwartz and Cohn LLP | 05/23/2011 [10313] Supplemented 08/29/2011 [10762] | 10/01/2009-03/29/2011 | 2,332,872.17 | 18,923.61 | 18,667.40 | 734.54 | | | 09/11/2011 [10817] |
| Jenner & Block, LLP | 05/16/2011 [10246] | 10/01/2010-03/29/2011 | 4,952,968.55 | 271,139.73 | 108,223.30 | 9,303.67 | | | 09/11/2011 [10816] |
| Jones Day | 05/16/2011 [10244] | 06/01/2009-01/31/2010 | 465,693.65 | 5,591.62 | 0.00 | 0.00 | | | 09/11/2011 [10820] |
| Legal Analysis Systems, Inc. | 05/16/2011 [10269] | 10/10/2010-03/31/2011 | 442,626.00 | 3,479.45 | 10,670.63 | 14.00 | | | 09/11/2011 [10821] |
| LFR, Inc. | 05/16/2011 [10251] | 10/01/2010-03/29/2011 | 3,125,474.54 | 618,744.80 | 18,806.31 | 30,921.70 | | | 09/12/2011 [10825] |
| Morris, Nichols, Arsht & Tunnell LLP | 05/16/2011 [10261] | 11/16/2010-03/29/2011 | 10,529.67 | 2,987.21 | 288.90 | 0.00 | | | 09/11/2011 [10822] |
| Plante & Moran, PLLC | 05/17/2011 [10279] | 10/01/2010-03/29/2011 | 1,306,275.54 | 19,496.99 | 1,848.50 | 167.10 | | | 09/11/2011 [10818] |
| Stutzman, Bromberg, Esserman & Plifka, a Professional Corporation | 05/16/2011 [10248] | 10/01/2010-03/29/2011 | 1,060,215.22 | 20,171.01 | 3,382.34 | 64.94 | | | 09/12/2011 [10841] |

| NAME OF RETAINED PROFESSIONAL | DATE FEE APPLICATION SUBMITTED [DKT. NO.] | PERIOD COVERED BY FEE APPLICATION | AMOUNTS REQUESTED IN FINAL COMPENSATION | | AGGREGATE AMOUNTS FOR DISALLOWANCE[1] | | AMOUNTS ALLOWED BY THE COURT IN FINAL COMPENSATION | | EXAMINER'S REPORT/ STATEMENT [DKT. NO.] |
|---|---|---|---|---|---|---|---|---|---|
| | | | FEES | COSTS | FEES | COSTS | FEES | COSTS | |
| The Claro Group, LLC | 05/16/2011 [10239] | 10/01/2010- 03/31/2011 | 1,436,467.62 | 18,408.22 | 26,479.95 | 744.53 | | | 09/12/2011 [10828] |
| Togut Segal & Segal LLP | 05/16/2011 [10240] | 10/01/2010- 03/29/2011 | 1,078,996.00 | 6,142.83 | 5,803.55 | 27.75 | | | 09/12/2011 [10823] |
| Dean M. Trafelet in his Capacity as Legal Representative for Future Asbestos Personal Injury Claimants | 05/16/2011 [10247] | 10/01/2010- 03/29/2011 | 213,684.48 | 2,314.50 | 993.02 | 80.92 | | | 09/11/2011 [10819] |
| Weil, Gotshal & Manges, LLP | 05/17/2011 [10270] Supplemented 08/08/2011 [10662] | 10/01/2010- 03/29/2011 | 44,719,081.80 | 1,476,502.19 | 610,504.48 | 89,971.71 | | | 09/16/2011 [10880] |
| § 503(b) Administrative Expense Claim - Mark Buttita | 05/13/2011 [10233] | 06/04/2009- 07/15/2009 | 173,272.50 | 13,973.29 | 18,579.88 | 0.00 | | | 09/15/2011 [10878] |
| | | **TOTAL FINAL Fee Applications and § 503(b) Administrative Expense Claim Noticed for Hearing on Sept. 26, 2011** | **$107,404,423.38** | **$3,068,509.03** | | | | | |

6860225_2