Hearing Date and Time:  **November 22, 2011 at 9:45 a.m.**
Response Deadline:      **October 31, 2011 at 4:00 p.m.**
Reply Deadline:  **November 16, 2011 at 4:00 p.m.**

TOGUT SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Albert Togut
Scott E. Ratner
Richard K. Milin

Conflicts Counsel to the Reorganized Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MOTORS LIQUIDATION COMPANY, | ) | Case No. 09-50026 (REG) |
| *et al.*, | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## REORGANIZED DEBTORS' (1) SUPPLEMENTAL CLAIM OBJECTION AND (2) MOTION TO ENFORCE THE PLAN INJUNCTION AND AUTOMATIC STAY AND TO ENJOIN CHARTIS U.S. FROM CONTINUING TO RETAIN MORE THAN $20 MILLION IT IMPROPERLY SEIZED FROM THE REORGANIZED DEBTORS

**[CLAIMS NOS. 58680, 58681, 59682, and 59697]**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

JURISDICTION AND VENUE ..................................................................................4

FACTUAL BACKGROUND .......................................................................................4

    A.    The Chapter 11 Cases ....................................................................4

    B.    The Chartis Proofs of Claim .......................................................5

    C.    Chartis's Seizure of the Reorganized Debtors' Cash ............6

    D.    Chartis Refuses to Return the Seized Cash ............................9

RELIEF REQUESTED ...............................................................................................10

SUPPLEMENTAL CLAIM OBJECTION ...............................................................10

    A.    The Court Should Disallow Chartis's Claims or,
           at a Minimum, Should Classify Them as Unsecured ..........10

          i.    Chartis's Insurance Program Claims for
                Premiums, Deductibles and Related Sums..............11

          ii.    Premiums, Deductibles and Related Sums..............12

          iii.    Chartis's Renick Claim ..............................................18

          iv.    Chartis's Remaining Claims .......................................19

MOTION TO ENFORCE THE PLAN
INJUNCTION AND AUTOMATIC STAY ...............................................................20

    A.    The Court Should Find that Chartis Has
           Violated the Plan Injunction and the Automatic Stay..........20

    B.    The Court Should Enjoin Chartis from Continuing
           To Exercise Dominion and Control over the Seized Cash..................21

    C.    The Court Should Impose Sanctions and Award Damages
           for Civil Contempt Against Chartis Because of Its
           Willful Violation of the Automatic Stay and the Plan Injunction....21

CONCLUSION ...........................................................................................................24

# <u>TABLE OF AUTHORITIES</u>

**<u>Page</u>**

**<u>Cases</u>**

*Bartel v. Eastern Airlines, Inc.*, No. 96-5105, 1998 WL 2405 (2d Cir. Jan 6, 1998) ............... 22

*In re Enron Corp.*, 300 B.R. 201 (Bankr. S.D.N.Y. 2003) ........................................................ 21

*In re Ionosphere Clubs, Inc.*, 171 B.R. 18 (S.D.N.Y. 1994) ..................................................... 22

*In re Keene Corp.*, 162 B.R. 935 (S.D.N.Y. 1994) ................................................................... 20

*In re Power Recovery Sys., Inc.*, 950 F.2d 798 (1st Cir. 1991) ................................................. 22

*In re Stephen W. Grosse, P.C.*, 84 B.R. 377 (Bankr. E.D.Pa. 1988) ......................................... 22

*Marine Asbestosis Legal Clinic v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*,
    920 F.2d 183 (2d Cir. 1990) ............................................................................................... 22

*Spookyworld, Inc. v. Town of Berlin* (*In re Spookyworld, Inc.*), 346 F.3d 1 (1st Cir. 2003) ...... 22

*Sucre v. MIC Leasing Corp.* (*In re Sucre*), 226 B.R. 340 (Bankr. S.D.N.Y. 1998) ................... 23

**<u>Statutes</u>**

11 U.S.C. § 105(a) ..................................................................................................................... 22

11 U.S.C. § 362 ................................................................................................................... 10, 24

11 U.S.C. § 362(a) ..................................................................................................................... 20

11 U.S.C. § 362(a)(3) ........................................................................................................... 20, 21

11 U.S.C. § 362(a)(6) ................................................................................................................. 20

11 U.S.C. § 365(b)(2) ................................................................................................................. 15

28 U.S.C. § 157(b) ....................................................................................................................... 4

28 U.S.C. § 1334(b) ..................................................................................................................... 4

28 U.S.C. § 1408 .......................................................................................................................... 4

28 U.S.C. § 1409 .......................................................................................................................... 4

**<u>Rules</u>**

Federal Rule of Bankruptcy Procedure 9020 ............................................................................ 22

**REORGANIZED DEBTORS' (1) SUPPLEMENTAL CLAIM OBJECTION
AND (2) MOTION TO ENFORCE THE PLAN INJUNCTION AND
AUTOMATIC STAY AND TO ENJOIN CHARTIS U.S. FROM
CONTINUING TO RETAIN MORE THAN $20 MILLION IT
IMPROPERLY SEIZED FROM THE REORGANIZED DEBTORS**

Reorganized Debtors Motors Liquidation Company, *et al.*, formerly known as General Motors Corporation ("**Old GM**"), respectfully submit the Reorganized Debtors' (1) Supplemental Claim Objection and (2) Motion To Enforce the Plan Injunction and Automatic Stay and To Enjoin Chartis U.S. From Continuing To Retain More Than $20 Million It Improperly Seized from the Reorganized Debtors and, in support hereof, respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Reorganized Debtors respectfully submit this supplemental claim objection (**"Supplemental Claim Objection"**) to disallow claims that Chartis U.S. ("**Chartis**") asserted against Old GM without a factual basis, yet apparently relies on as a purported justification for its seizure of $20,571,486 of the Reorganized Debtors' funds (the "**Seized Cash**") as collateral.

2.      In addition, the Reorganized Debtors make this motion (the "**Motion**") to enjoin Chartis from continuing to retain the Seized Cash in violation of the permanent injunction (the "**Plan Injunction**") incorporated into Section 10.7 of Old GM's confirmed Second Amended Joint Chapter 11 Plan (the "**Plan**") and the automatic stay provisions of the Bankruptcy Code, as made applicable here by Section 10.4 of the Plan.

3.      As explained in more detail below, Chartis's seizure and retention of the Reorganized Debtors' funds is a willful violation of the Plan Injunction and automatic stay.

1

4.      Chartis originally obtained the funds it seized as collateral from Old GM in connection with the "**Old GM Insurance Agreements**" described in the Assumption and Collateralization Agreements attached to the Declaration of Richard K. Milin dated October 5, 2011 in support of the relief sought herein (the "**Milin Decl.**") as Exhibit 2.

5.      By March 1, 2011, however, Old GM concluded that Chartis would no longer have a good faith basis for keeping the collateral it had obtained from Old GM after the Plan's effective date and requested its return.  By that time, Old GM had concluded that Chartis's proofs of claims (the "**Proofs of Claim**") sought payment of premiums and deductibles that Old GM did not actually owe and that the other sums Chartis sought in its Proofs of Claim were not owed or, at a minimum, were not supported by sufficient documentation for Old GM to determine that they were owed.  (*See* Declaration of Thomas A. Morrow dated October 5, 2011 (**"Morrow Decl."**), annexed to the Milin Declaration as Exhibit 1, ¶ 12.)

6.      Old GM also concluded that, by April 1, 2011, Chartis would have no good faith basis under the Old GM Insurance Agreements to retain the Seized Cash as collateral.  (*See* Morrow Decl. ¶ 11.)  The only claims Chartis might be entitled to use the Seized Cash to collateralize could not arise after April 1, 2011 because they would be (1) time-barred, in that they could only be based on claims-made insurance policies that had expired by that date, and (2) enjoined by Court order, because this Court had resolved substantially all of them under the Environmental Response Trust Consent Decree and Settlement Agreement (the "**Environmental Response Trust**"). (*See* Morrow Decl. ¶ 8.)  In addition, during the months after April 1, 2011, at Chartis's insistence, the Reorganized Debtors obtained express written releases from all but one of the state

2

agencies that could potentially assert demands covered by the Old GM Insurance Agreements.  (*See* Morrow Decl. ¶ 9.)

7.      As of today, Chartis is holding most of the Seized Cash as collateral for, at best, speculative claims against it that are not a genuine risk for ***all three*** of the foregoing reasons:  even if these hypothetical claims were asserted, they would be (i) time-barred, (ii) invalid because they are maintainable only against the Environmental Response Trust and (iii) barred by express releases.

8.      On or about March 3, 2011, instead of returning Old GM's collateral as it requested, Chartis seized control of the collateral for its own purposes.  Numerous subsequent requests by Old GM and then the Reorganized Debtors for return of the Seized Cash were refused, and Chartis failed to provide any cogent justification – or indeed any written justification at all – for its seizure of Old GM's property.  (*See* Morrow Decl. ¶ 14.)  No other insurer or surety refused to return Old GM's collateral in similar circumstances.  (*See* Morrow Decl. ¶ 16.)

9.      On September 16, 2011, after it became clear that Chartis would not return the Seized Cash voluntarily, the Reorganized Debtors sent Chartis a formal demand letter setting out why Chartis's actions violated the Plan Injunction and automatic stay and were otherwise improper.  (*See* Milin Decl., Exh. 4.)  Chartis has failed to respond to the letter.

10.      As a result of Chartis's unreasonable and unjustified refusal to return the Seized Cash, the Reorganized Debtors have no choice but to request that this Court enter an order enforcing the Plan Injunction and automatic stay, and awarding penalties and sanctions against Chartis based on its flagrant misconduct.

3

## JURISDICTION AND VENUE

11.     Court has jurisdiction over this matter pursuant to 28 U.S.C.

§§ 157(b) and 1334(b).  The relief sought herein constitutes a core proceeding pursuant

to 28 U.S.C. § 157(b).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and

1409.

## FACTUAL BACKGROUND

**A.     The Chapter 11 Cases**

12.     On June 1, 2009 (the "**Commencement Date**"), Motors Liquidation

Company (f/k/a General Motors Corporation), MLCS, LLC (f/k/a Saturn, LLC), MLCS

Distribution Corporation (f/k/a Saturn Distribution Corporation), and MLC of Harlem,

Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc.) (collectively, the "**Initial Debtors**")

commenced voluntary cases in this Court under chapter 11 of the Bankruptcy Code.  On

October 9, 2009, Remediation and Liability Management Company, Inc. and Environ-

mental Corporate Remediation Company (the "**REALM/ENCORE Debtors**") com-

menced voluntary cases in this Court under chapter 11 of the Bankruptcy Code, which

cases are jointly administered under Case Number 09-50026 (REG).  On September 15,

2009, the Initial Debtors filed their schedules of assets and liabilities and statements of

financial affairs, which were amended on October 4, 2009.  On October 15, 2009, the

REALM/ENCORE Debtors filed their schedules of assets and liabilities and statements

of financial affairs.

13.     On September 16, 2009, this Court entered an order (Docket No.

4079) establishing November 30, 2009 as the deadline for each person or entity to file a

proof of claim in the Initial Debtors' cases, including governmental units.  On December

2, 2009, this Court entered an order (Docket No. 4586) establishing February 1, 2010 as

the deadline for each person or entity to file a proof of claim in the REALM/ENCORE

Debtors' cases (except governmental units, as defined in section 101(27) of the Bank-

ruptcy Code, for which the Court established April 16, 2010 as the deadline to file

proofs of claim).

14.     On March 29, 2011, this Court entered an order confirming the Plan

(the "**Confirmation Order**," Docket No. 9941).  All conditions to the occurrence of the

Effective Date were met or waived on March 31, 2011, thereby making the Plan effective

as of that date.

**B.     The Chartis Proofs of Claim**

15.     Chartis filed four substantively identical Proofs of Claim dated

November 29, 2009 against Motors Liquidation Company and certain affiliated debtors

(Claims Nos. 59680, 59681, 59682 and 59697).  Chartis designated its Proofs of Claim as

unliquidated and secured by "right of setoff."

16.     Old GM objected to Chartis's Proofs of Claim in its 110th Omnibus

Objection to Claims filed on December 3, 2010 (the "**Claim Objection**," Docket No.

8000).  The Claim Objection sought disallowance of the Proofs of Claim under section

502(e) of the Bankruptcy Code on the ground that they were, at best, contingent and

unliquidated claims of a co-obligor.  The Claim Objection also expressly reserved Old

GM's right to object to the Chartis Proofs of Claim "on any other basis."

17.     In response to the Claim Objection, Chartis filed a Response dated

March 4, 2011 (the "**Chartis Response**," Docket No. 9601) in which Chartis attempted to

articulate a basis for certain limited aspects of its Proofs of Claim in more detail.  Chartis

provided only three paragraphs of additional detail, however, and did not provide any

substantial documentation to support any aspect of its Claims.

18.     The Proofs of Claim assert a right of setoff by stating that "[t]o the

extent Claimant holds any cash or other collateral as security for its claim, regardless of

whether such cash or collateral is property of the Debtors' estates, Claimant asserts a secured claim and/or a right of setoff and reserves its rights to collect against same by recoupment and/or setoff."  (Proofs of Claim at p. 3 ¶ 8.)  The Proofs of Claim provide no further justification or description of this purported right of setoff, however.

**C.      Chartis's Seizure of the Reorganized Debtors' Cash**

19.     Chartis now holds at least $20,571,486 in Seized Cash that belongs to the Reorganized Debtors.

20.     Chartis originally obtained the Seized Cash from Old GM as collateral in connection with the Old GM Insurance Agreements.  (*See* Assumption and Collateralization Agreements, Milin Decl., Exh. 1;  Morrow Decl. ¶ 4.)

21.     The Old GM Insurance Agreements do not authorize Chartis to continue to hold the Seized Cash as collateral because there are no longer any claims for which Chartis could be held liable under those agreements.

22.     Chartis has identified only the following insurance policies (the "**Identified Policies**") as yielding potential obligations that the Reorganized Debtors might be required to collateralize and reimburse:

| Policy Type | Insurer | Policy Number | Policy Limited and Collateral |
|---|---|---|---|
| Pollution | Chartis Specialty Insurance Co. | 7146277 | $8,000,000 |
| Storage Tanks | Chartis Specialty Insurance Co. | 7146278 | $2,000,000 |
| Hazardous waste (Ohio Closure / Post Closure) | Chartis Specialty Insurance Co. | 7146282 | $5,822,539 |
| Hazardous Waste (Michigan Corrective Action) | Chartis Specialty Insurance Co. | 7146281 | $3,839,721 |
| Hazardous Waste (New Jersey Closure) | Lexington Insurance Co. | 7146280 | $297,022 |
| Hazardous Waste (Illinois Closure) | Lexington Insurance Co. | 7146279 | $612,204 |

23.    All of the foregoing insurance policies are "claims made" policies that have expired and, except for Policy No. 7146281, no covered claims could be asserted under them after April 1, 2011.  (*See* Morrow Decl. ¶¶ 5-6.)

24.    Further, although the claims period for Policy No. 7146281 did not expire until September 1, 2011, the Reorganized Debtors cancelled that Policy on March 31, 2011.  (*See* Milin Decl., Exh. 3;  Morrow Decl. ¶ 7.)  Consequently, no new claims against the Reorganized Debtors or Chartis can properly be asserted under any of the Identified Policies – any such claims would be time-barred.

25.    Also, the vast majority of potential claims under the Identified Policies have been resolved by this Court's order approving the Plan and Environmental Response Trust incorporated therein.  Decretal Paragraph 7 of the Confirmation Order states:

> The establishment and funding of the Environmental Response Trust and the transfer of the Environmental Response Trust Assets to the Environmental Response Trust or any entity formed by the Environmental Response Trust Administrative Trustee ***shall be in full***

7

> *settlement and satisfaction of all present and future*
> *civil environmental liabilities or obligations of the*
> *Debtors to the Governmental Authorities*, other than
> the claims and rights reserved ....

(*See* Confirmation Order at pp. 19-21 (emphasis added).)

26.    The Environmental Response Trust settlement resolved any potential claims by governmental authorities with respect to all of the sites covered by the Identified Policies except for the site at McCook, Illinois.  (*See* Morrow Decl. ¶ 8.)

27.    In addition to being time-barred and resolved by Court order, any potential claims that might be asserted in the future under the Identified Policies have been released.  At Chartis's request – and after engaging in months of effort and expending significant resources – the Reorganized Debtors have obtained signed releases from all but one of the governmental authorities that, alone, could assert claims covered by the Identified Policies.  The only exception is the Illinois authorities who have not yet provided a signed release for the McCook site.  (*See* Morrow Decl. ¶ 9.)

28.    The Identified Policy that relates to McCook cannot justify Chartis's retention of more than $20.5 million in Seized Cash – the policy limit is only $612,204. (*See* Morrow Decl. ¶ 10.)

29.    Based on the foregoing facts, Chartis cannot assert claims against the Reorganized Debtors for more than $20.5 million under the Old GM Insurance Policies.  Chartis simply cannot maintain in good faith that more than $20.5 million in claims will be asserted against it under the Identified Policies that the Reorganized Debtors will be obligated to reimburse.  At a minimum, Chartis has failed to identify any likely insurance liabilities that could justify it in retaining any of the Seized Cash as collateral.

**D.      Chartis Refuses to Return the Seized Cash**

30.      Old GM requested the return of the Seized Cash on March 1, 2011. Chartis refused the request and took control of the Seized Cash for its own unspecified purposes about two days later.  Chartis has also refused numerous subsequent requests by the Reorganized Debtors for the return of its Seized Cash.  (*See* Morrow Decl. ¶ 13.)

31.      Chartis has not informed the Reorganized Debtors that it is currently holding the Seized Cash in escrow or for the benefit of the Reorganized Debtors.  (*See* Morrow Decl. ¶ 15.)  Instead, Chartis is merely keeping the Seized Cash for itself.  It also has suggested that it may be retaining the Seized Cash as an offset against the claims arising from the Bristol and Renick matters discussed below, but those claims do not exceed $6 million as asserted and, thus, total almost $15 million less than the Seized Cash.

32.      Old GM and the Reorganized Debtors made attempts to reach a negotiated resolution with Chartis after March 1, 2011, both with and without the assistance of counsel.  Those attempts were unsuccessful.  As part of the negotiations, Chartis requested that the Reorganized Debtors obtain releases letters, but even though Chartis has been provided with letters releasing potential claims for all sites except McCook, Illinois, Chartis has not returned any of the Seized Cash.  (*See* Morrow Decl. ¶ 18.)

33.      To date, Chartis has neither returned any of the Seized Cash nor provided a reasoned justification – or any written justification at all – for its actions. (*See* Morrow Decl. ¶ 20.)

34.      Section 10.7 of the Plan enjoins all parties in interest from taking any action to interfere with implementation or consummation of the Plan.

9

35.    Section 10.4 of the Plan provides that the automatic stay remains in full force and effect until the closing of Old GM's chapter 11 case, which has not yet occurred.

36.    Further, the Plan's provisions are made binding on claimants such as Chartis by Decretal Paragraph 5 of this Court's Confirmation Order.

37.    On September 16, 2011, the Reorganized Debtors sent Chartis a formal demand letter setting out why Chartis's actions violated the Plan Injunction and automatic stay and requesting the return of the Seized Cash by September 30, 2011. (*See* Milin Decl., Exh. 4.)  Chartis has failed to respond to the substance of the letter.

## RELIEF REQUESTED

38.    The Reorganized Debtors request that this Court:  (i) disallow Chartis's claims because they lack factual support, (ii) enter an Order finding that Chartis's seizure and retention of the Seized Cash violates the Plan Injunction and the automatic stay imposed by section 362 of the Bankruptcy Code, which continues in effect pursuant to Section 10.4 of the Plan;  (iii) enjoin Chartis from continuing to exercise dominion and control over the Reorganized Debtors' Seized Cash;  (iv) impose civil sanctions and award damages against Chartis, including an award of the Reorganized Debtors' costs and attorneys' fees incurred in connection with this Motion or the Seized Cash at any time on or after April 1, 2011;  and (v) grant the Reorganized Debtors such other and further relief as is just.

## SUPPLEMENTAL CLAIM OBJECTION

**A.    The Court Should Disallow Chartis's Claims or,
at a Minimum, Should Classify Them as Unsecured**

39.    The Chartis Proofs of Claim assert four types of claims (the "**Claims**") against Old GM:  (a) claims for premiums, deductibles and related sums (the

"**Insurance Program Claims**");  (b) claims arising out of the Bristol Center matter (the

"**Bristol Claim**");  (c) claims arising out of the Renick Cadillac matter (the "**Renick**

**Claim**");  and (d) claims that Chartis reserves the right to assert, but has not yet asserted

(the "**Reserved Claims**").  For the reasons stated below, all four types of claims should

be disallowed or, at a minimum, should be categorized as unsecured.

### i.    Chartis's Insurance Program Claims for <u>Premiums, Deductibles and Related Sums</u>

40.    The Chartis Proofs of Claim state that:  "the Debtors are indebted to

Claimant for premiums, deductibles, and other related fees, expenses and obligations

for, among other things, insurance coverages and services …."  (*Id.* at p. 1 ¶ 1.)

41.    Chartis has provided no documentation to substantiate these

Insurance Program Claims, and the Claims cannot be reconciled with Old GM's books

and records, which show nothing due.  Further, the Reorganized Debtors understand

that Chartis has acknowledged that no premiums, deductibles, related fees, expenses or

obligations are actually due.

42.    In addition, to the extent that Chartis intends to assert claims for

hypothetical obligations arising out of the Identified Policies, those claims are without

merit for the reasons set forth above:  any demands against the Reorganized Debtors or

Chartis under the Identified Policies would be time-barred, would be invalid by reason

of the Court's orders in connection with the Environmental Response Trust except with

respect to the McCook, Illinois site, and, except with respect to that site, have been

formally released.  Even with respect to McCook, Chartis has provided no documen-

tation to show that any claims are potentially likely to arise.  (*See* Morrow Decl. ¶ 19.)

Accordingly, Chartis's Insurance Program Claims should be disallowed in their

entirety.

11

ii.    <u>**Chartis's Bristol Claim**</u>

43.    Chartis's counsel has maintained in discussions with the Reorganized Debtors that Chartis is entitled to retain the Seized Cash as security for the subrogation rights it asserts with respect to the Bristol and Renick Claims.  Chartis has failed to provide documentation to support its Bristol claim, however, and there is no basis for categorizing that claim as secured.  Further, even if Chartis could demonstrate that its Bristol Claim is a valid, secured claim – and as explained below, it cannot – the Bristol and Renick Claims as asserted total almost $15 million less than the Seized Cash that Chartis is refusing to return.

44.    Chartis's Bristol Claim against the Reorganized Debtors seeks approximately $5 million.  According to Chartis, Bristol Center LLC ("**Bristol**") is the current owner of environmentally contaminated Connecticut real estate that formerly belonged to Old GM.  (*See* Proofs of Claim, Exhibit B.)

45.    When Old GM could no longer pay the costs of environmental remediation, Bristol turned to its insurer, which happened to be Chartis, to fund the remediation costs.  Chartis asserts that it has been paying for Bristol's remediation efforts and presumably will continue to do so until it exhausts the full $4.9 million in Bristol's insurance coverage.  Chartis has asserted that it is therefore subrogated to Bristol's right to demand reimbursement from the Reorganized Debtors.  (*See* Proofs of Claim, Exhibit B.)

46.    Chartis's Bristol Claim does not arise out of Chartis's insurance program with Old GM, the Old GM Insurance Agreements or the Identified Polices – it arises entirely from Chartis's policy with an unrelated third party, Bristol.  (*See* Proofs of Claim, Exhibit B.)

12

47. Chartis's Bristol Claim should be disallowed in its entirety because Chartis has provided no substantial documentation to support it. The Reorganized Debtors cannot determine, from the information Chartis has provided, exactly what remediation efforts Chartis maintains the Reorganized Debtors are liable for, whether the Reorganized Debtors are liable for all of them, or their likely cost.

48. Further, and at a minimum, the Court should classify the Bristol Claim as an unsecured claim that provides no basis for Chartis to retain the Seized Cash.

49. The only argument Chartis has articulated to justify retaining the Seized Cash to reimburse itself for the Bristol Claim is based on the Old GM-Chartis Payment Agreements (the "**Payment Agreement**," Milin Decl., Exh. 5). The Payment Agreement states, in what Chartis has identified as relevant part:

> If default occurs, we may take reasonable and appropriate steps that are necessary to protect our interest. We will exercise good faith consistent with usual and customary commercial and credit practice in selecting and exercising such steps. We may take steps such as the following:
>
> 1. We may declare the entire unpaid amount of Your Payment Obligation immediately due and payable.
>
> 2. We may change any or all unexpired Policies….
>
> 3. We may draw upon, liquidate, or take ownership of any or all collateral we hold regardless of the form, and hold or apply such amounts to any of Your Payment Obligation under this Agreement or any other premium, surcharge or deductible financing agreement between You and us, or under any Policies. However, we will not draw upon, liquidate, or take ownership of more collateral than is reasonably necessary to protect our interest.
>
> 4. We may require You to deliver to us additional collateral.…
>
> 5. We may cancel any or all unexpired Policies….

13

6.  We may withhold payment of claims to You….

7.  We may satisfy Your obligations to us in whole or in part by set-off against any moneys, securities, collateral, consideration or property of Yours received by, pledged to, held by or otherwise available to us in connection with Your Payment Obligation.  You authorize us after any default to charge any account that You maintain with us in connection with Your Payment Obligation in order to satisfy any of Your obligations.

(Payment Agreement at p. 8.)

50.     The Payment Agreement defines "Your Payment Obligation" as: "the amounts that you must pay us for the insurance and services in accordance with the terms of the Policies, this Agreement, and any similar primary casualty insurance policies and agreements with us incurred before the inception date hereof."  (Payment Agreement at p. 4.)

51.     Chartis has argued that the seventh numbered default remedy quoted above (the "**Setoff Remedy**") allows Chartis to retain some of the Reorganized Debtors' collateral to "satisfy [the Reorganized Debtors'] obligations to [Chartis] in whole or in part by set-off against any monies, securities, collateral, consideration or property of Yours received by, pledged to, held by or otherwise available to us in connection with Your Payment Obligation."  (Payment Agreement at p. 8.)

52.     For at least four reasons, however, the Payment Agreement's Setoff Remedy does not justify Chartis in using the Reorganized Debtors' collateral to satisfy its Bristol Claim.

53.     *First*, Chartis has no right to exercise the Setoff Remedy because it is available only "[i]f default occurs."  Chartis has acknowledged to the Reorganized Debtors that, notwithstanding contrary statements in the Chartis Response, Old GM

14

was not in default on any financial or other affirmative obligations to Chartis as of Old GM's bankruptcy filing.

54.     Further, Chartis's Response identifies only $41,956 in alleged monetary defaults in connection with the Insurance Program, which would limit Chartis's remedies to retaining only $41,956 of the Seized Cash.  In addition, Chartis cannot claim to be entitled to exercise default remedies due to Old GM's bankruptcy filing, because the Insurance Program, consisting of various inter-related agreements, is an executory contract and 11 U.S.C. § 365(b)(2) prohibits Chartis from treating Old GM as in default based solely on its bankruptcy filing.

55.     *Second*, the Payment Agreement specifies that the Setoff Remedy can be used only with respect to Old GM property that has been "received by, pledged to, held by or otherwise available to us in connection with Your Payment Obligation." It appears, however, that Old GM's collateral could only have been legally held, under the Assumption and Collateralization Agreements, in a specified trust, and not by Chartis.  Chartis has provided no documents to show that Chartis could legally or properly hold the Seized Cash instead of delivering it to a trust or escrow agent, and Chartis has failed to show that any agreements pledging the Seized Cash or making it available to Chartis – if there are such agreements – would make the Seized Cash available to pay the Bristol Claim.  Consequently, Chartis has no right to use the Seized Cash for any Setoff Remedy.

56.     *Third*, it is well established that a subrogee stands in the shoes of the subrogor and ordinarily can have no greater rights than the subrogor.  Yet, Chartis appears to maintain that it can avail itself of the Reorganized Debtors' collateral to convert Bristol's unsecured claim against the Reorganized Debtors into a secured claim

against the Reorganized Debtors. Chartis has offered no legal support for this novel theory, and the Reorganized Debtors are aware of none.

57. *Fourth*, the Payment Agreement does not give Chartis the right to use Old GM's collateral to pay the Bristol Claim or any other claim that Chartis may assert against the Reorganized Debtors by right of subrogation. The Payment Agreement makes Old GM liable for its "Payment Obligation," but the Agreement's definition of that term, which is quoted above, limits it to specified financial obligations arising out of the Insurance Program. The Bristol Claim, therefore, is not part of Old GM's Payment Obligation to Chartis.

58. The Bristol Claim also does not fall within the scope of the undefined term "obligations to us" that Chartis employs in describing the Setoff Remedy. In context, the natural reading of "obligations to us" is to refer to obligations in connection with the Insurance Program, not unrelated obligations owed for other reasons.

59. Also, "obligations to us" naturally refers only to direct obligations to "us" – *i.e.*, Chartis – and not to obligations to parties other than Chartis who, like Bristol, just happen to be insured by Chartis. Indeed, if the Setoff Remedy were intended to cover every conceivable debt that Old GM might have owed Chartis for any reason, it would allow Chartis to buy other parties' claims and secure or satisfy them with Old GM's collateral at the rate of one hundred cents on the dollar. In addition, if the parties had truly intended to give Chartis the right to use Old GM's collateral to satisfy debts unrelated to the Insurance Program, they would not have limited that right to be effective only upon default.

60. Equally important, other provisions of the Payment Agreement preclude any reading of "obligations to us" that might cover the Bristol Claim. The

16

Payment Agreement specifies that Old GM "must deliver collateral acceptable to us to secure Your Payment Obligation," adding that Chartis "may apply any collateral we hold in connection with this or any other similar primary casualty insurance policies or agreements to Your Payment Obligation." (Payment Agreement at p. 6.)  This language suggests that Chartis will "apply any collateral" only to Old GM's Payment Obligation and not to unrelated obligations arising out of Chartis's business dealings with third parties.

61.     Moreover, the next paragraph unambiguously limits use of the collateral to Old GM's Payment Obligations.  It states that "You grant us a possessory security interest in any property You deliver to us to secure Your Payment Obligation" and "direct us to hold *all such sums as collateral for Your Payment Obligation* as they (sic) may be payable now or may become payable in the future." (Payment Agreement at p. 6 (emphasis added).)  Because the Payment Agreement directs Chartis to use *all* of the collateral for Old GM's Payment Obligation, Chartis has no right to use that collateral for anything else, such as indirect, hypothetical obligations like the Bristol Claim.

62.     The Payments Agreement's specific restriction on Chartis's use of Old GM's collateral trumps any potential reading of the vague and undefined term "obligations to us" that might allow Chartis to apply the Seized Cash to the Bristol Claim.  This is especially true given that the Payment Agreement must be construed against Chartis as its drafter, and that the phrase "obligations to us" is tucked away as the ambiguous seventh numbered item in a list of default remedies.

63.     Further, there is every reason to believe that, if Chartis were to convince a Court that the phrase "obligations to us" is ambiguous, and if the parties were therefore to conduct discovery concerning its meaning, the result would be the same:  Old GM could not reasonably have understood or intended that Chartis would

17

use its Setoff Remedy as a reason to seize Old GM's collateral and apply it to a
hypothetical subrogation claim unrelated to Old GM's Payment Obligation.

64.    For the foregoing reasons, Chartis's Bristol Claim should be
disallowed or, at a minimum, classified as unsecured.  The Court should also rule that
Chartis cannot assert a right of setoff with respect to its Bristol Claim and is not entitled
to retain the Seized Cash as security for that Claim.

**iii.    Chartis's Renick Claim**

65.    Chartis's $1 million Renick Claim, like its Bristol Claim, is an
undocumented, unsecured claim that Chartis asserts by purported right of subrogation.
The Renick Claim should be disallowed or, at a minimum, the Court should classify it
as unsecured and rule that Chartis cannot set off against it.

66.    Chartis's Proofs of Claim describe the Renick Claim, in full, as
follows:

> Renick Cadillac, Inc., Granite State Insurance Company,
> Policy #02 LX 003234283-2/000 (Commercial Garage Policy),
> Deutsch v. Renick Cadillac, Inc., et al., No. BC389150,
> Superior Court, Los Angeles County, California.
>
> Lexington has paid $1,000,000.00 in connection with
> settlement of the foregoing matter. Pursuant to its Proof of
> Claim, Lexington claims from the Debtor the amount of
> $1,000,000.00, plus any costs, including defense fees, paid by
> Lexington and/or any of its subsidiary, affiliate, and/or
> member companies in connection with the settlement of the
> foregoing matter, pursuant to the Debtor's indemnification
> obligations to the Insured Dealer.

(Proofs of Claim, Exh. A.)

67.    As this description indicates, Chartis's Renick Claim seeks
reimbursement from Old GM for sums that Chartis's affiliate Lexington paid to or on
behalf of Renick Cadillac pursuant to an insurance policy issued to Renick, not Old GM.

68.     Chartis's Renick Claim, like its Bristol Claim, should be disallowed because Chartis has provided no substantial documentation to support it.  The Reorganized Debtors have investigated the matter and have been unable to locate any proof that Old GM actually owed the indemnification obligations to Renick Cadillac, Inc. that Chartis has asserted by purported right of subrogation.

69.     Further, and at a minimum, the Court should classify the Renick Claim as an unsecured claim that Chartis cannot set off against the Seized Cash.  The Renick Claim is a subrogation claim asserting rights that have no relationship to Old GM's insurance program with Chartis, and all of the reasons why Chartis cannot use the Seized Cash to satisfy the Bristol Claim apply equally to the Renick Claim.

70.     For the foregoing reasons, Chartis's Renick Claim should be disallowed or, at a minimum, classified as unsecured.  Also, the Court should rule that Chartis has no right to use the Renick Claim as the basis for a setoff against the Seized Cash.

### iv.     Chartis's Remaining Claims

71.     Although Chartis's Proofs of Claim and Response reserve the right to assert additional claims, Chartis has not in fact asserted any additional claims and it has provided the Reorganized Debtors with no basis to assert such claims.  At this late date, this Court should disallow any additional, hypothetical claims that Chartis purports to have the right to assert.

72.     For the foregoing reasons, all four of the types of Claims that Chartis asserts in its Proofs of Claims should be disallowed.

19

## MOTION TO ENFORCE THE PLAN INJUNCTION AND AUTOMATIC STAY

**A.    The Court Should Find that Chartis Has
Violated the Plan Injunction and the Automatic Stay**

73.    Chartis had no justification for seizing the Seized Cash and has no justification for continuing to retain it.  As shown above, Chartis has no legitimate expectation that it will incur liability under the Identified Policies, and it has no right to set off the Seized Cash against any of its Claims.

74.    Chartis's seizure of more than $20.5 million of the Reorganized Debtors' money interferes with implementation and consummation of the Plan in violation of Section 10.7 of the Plan.

75.    Chartis's seizure and retention of the Seized Cash also violates Section 10.4 of the Plan, which provides that the automatic stay of 11 U.S.C. § 362(a) remains in full force and effect until the closing of this chapter 11 Bankruptcy case.

76.    Section 362(a)(6) of the Bankruptcy Code expressly stays "any act to collect, assess, or recover a claim against the debtor that arose before the commence-ment of the case."  Similarly, section 362(a)(3) stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  *See In re Keene Corp.*, 162 B.R. 935, 942 (S.D.N.Y. 1994).

77.    Chartis has violated 11 U.S.C. §§ 362(a)(3) and (a)(6) because it has acted to exercise control over and obtain possession of the Reorganized Debtors' property in an attempt to recover on claims under pre-petition insurance contracts.

78.    Chartis cannot deny that it is bound by Sections 10.4 and 10.7 of the Plan.  Decretal Paragraph 5 of the Bankruptcy Court's Confirmation Order expressly makes the Plan's provisions binding on claimants such as Chartis.

20

79.    Further, Chartis's continuing violation of the Plan Injunction and automatic stay are willful:  Old GM, and then the Reorganized Debtors, requested return of the Seized Cash on multiple occasions on and after March 1, 2011, and on September 16, 2011, the Reorganized Debtors provided Chartis with a full analysis of the issues, including a warning that Chartis was violating the Plan Injunction and automatic stay.  Chartis has refused to return the Seized Cash despite the Reorganized Debtor's requests and warnings.

**B.    The Court Should Enjoin Chartis from Continuing
To Exercise Dominion and Control over the Seized Cash**

80.    This Court should enjoin Chartis from continuing to exercise dominion and control over the Seized Cash.  Chartis has no right to retain the Reorganized Debtors' property, and that property should be returned.  *See* 11 U.S.C. § 362(a)(3) (barring "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.");  *In re Enron Corp.*, 300 B.R. 201, 211 (Bankr. S.D.N.Y. 2003) ("Section 362 of the Bankruptcy Code operates … to, inter alia, stay automatically any act to transfer control over property of the estate.").

**C.    The Court Should Impose Sanctions and Award Damages
for Civil Contempt Against Chartis Because of Its
Willful Violation of the Automatic Stay and the Plan Injunction**

81.    Given Chartis's knowledge of the Plan Injunction and automatic stay, and its willful violation of both, this Court should impose civil contempt sanctions and award damages against Chartis.  This is not a case of an unsophisticated creditor with little or no understanding of the bankruptcy process.  This is a case of an insurer that is acting without explanation or justification and in blatant bad faith.  Chartis's failure to provide a substantive response to the Reorganized Debtors' September 16,

21

2011 demand letter explaining why Chartis is in violation of the Plan Injunction and automatic stay is in itself a sufficient proof that Chartis's violation of the Plan Injunction and stay are willful.

82.    In the Second Circuit, "contempt proceedings are the proper means of compensation and punishment for willful violations of the automatic stay." *Marine Asbestosis Legal Clinic v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 920 F.2d 183, 187 (2d Cir. 1990). Sanctions are the appropriate remedy because under section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9020, this Court may impose civil contempt sanctions that will: (a) protect the estate; and (b) enforce compliance with this Court's orders and the Bankruptcy Code. *See Spookyworld, Inc. v. Town of Berlin* (*In re Spookyworld, Inc.*), 346 F.3d 1, 11 (1st Cir. 2003) ("bankruptcy courts do possess the discretionary authorization to award damages for automatic stay violations under section 105"); *Bartel v. Eastern Airlines, Inc.*, No. 96-5105, 1998 WL 2405, at *2 (2d Cir. Jan 6, 1998) ("Bankruptcy courts have the power to impose civil contempt sanctions . . . for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for the losses sustained.").

83.    This Court has discretion to award civil contempt sanctions requiring Chartis to pay the Reorganized Debtors' attorneys' fees and costs incurred as a result of its deliberate misconduct. *See In re Power Recovery Sys., Inc.*, 950 F.2d 798, 802 (1st Cir. 1991) (imposing civil contempt fine in the amount of $1,000 for each day defendant continued to disobey court orders); *In re Ionosphere Clubs, Inc.*, 171 B.R. 18, 21 (S.D.N.Y. 1994) (rejecting appellant's argument that $750 per day sanction was improper and concluding that it was a proper remedy to compel the defendant to "stop violating the automatic stay and to desist from further violations."); *In re Stephen W. Grosse, P.C.*, 84 B.R. 377, 382 (Bankr. E.D.Pa. 1988) ("For deliberate and willful violations

22

of the automatic stay constituting civil contempt, compensatory damages as well as costs and attorneys fees are appropriate relief.").

84.    Further, an award of costs and attorneys fees is plainly appropriate here:  Once the Plan became effective on March 31, 2011, and the period for asserting claims under the Identified Policies expired on April 1, 2011, Chartis should have returned all, or at a minimum most, of the Seized Cash.  Instead, Chartis has kept the Seized Funds for months while refusing the Reorganized Debtors' repeated requests for its return.  Chartis also imposed unnecessary costs on the Reorganized Debtors' estates by demanding that the Reorganized Debtors obtain letters releasing patently invalid claims, and then ignoring those letters once they had been obtained.

85.    In addition, even after release letters were obtained, Chartis forced the Reorganized Debtors to incur the costs of preparing a formal demand letter and then preparing and filing this Supplemental Claim Objection and Motion as the price of obtaining its own property.  Chartis thereby caused – and knew it caused – significant harm to the Reorganized Debtors' estates.  Chartis thus unquestionably "possessed general intent in taking actions which have the effect of violating the automatic stay." *Sucre v. MIC Leasing Corp.* (*In re Sucre*), 226 B.R. 340, 349 (Bankr. S.D.N.Y. 1998).

86.    For the foregoing reasons, the Reorganized Debtors are entitled to reimbursement of their attorneys' fees and expenses incurred in acting to enforce the Plan Injunction and automatic stay.  Also, Chartis should be held liable for any additional costs or damages that the Reorganized Debtors incur in their effort to obtain the return of the Seized Cash.

23

## CONCLUSION

87.     For all of the foregoing reasons, this Court should: (i) disallow

Chartis's claims;  (ii) enter an Order finding that Chartis's seizure and retention of the

Seized Cash violates the Plan Injunction and section 362 of the Bankruptcy Code;

(iii) enjoin Chartis from continuing to exercise dominion and control over the

Reorganized Debtors' Seized Cash;  (iv) impose civil sanctions and award damages

against Chartis, including an award of the Reorganized Debtors' costs and attorneys'

fees incurred in connection herewith or the Seized Cash at any time on or after April 1,

2011;  and (v) grant the Reorganized Debtors such other and further relief as is just.

DATED:     New York, New York
           October 6, 2011
                                      TOGUT, SEGAL & SEGAL LLP
                                      By:

                                      _____/s/ Richard K. Milin_____
                                      SCOTT E. RATNER
                                      RICHARD K. MILIN
                                      One Penn Plaza - Suite 3335
                                      New York, New York 10119
                                      (212) 594-5000

                                      Conflicts Counsel to Reorganized
                                      Debtors Motors Liquidation Company, *et al.*