Exhibit 1

TOGUT SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Albert Togut
Scott E. Ratner
Richard K. Milin

Conflicts Counsel to the Reorganized Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MOTORS LIQUIDATION COMPANY, | ) | Case No. 09-50026 (REG) |
| *et al.*, | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DECLARATION OF THOMAS A. MORROW IN SUPPORT OF REORGANIZED DEBTORS' (1) SUPPLEMENTAL CLAIM OBJECTION AND (2) MOTION TO ENFORCE THE PLAN INJUNCTION AND AUTOMATIC STAY AND TO ENJOIN CHARTIS U.S. FROM CONTINUING TO RETAIN MORE THAN $20 MILLION IT IMPROPERLY SEIZED FROM THE REORGANIZED DEBTORS

THOMAS A. MORROW hereby declares as follows:

1.      I am a managing director of AlixPartners, LLP and served as a Vice President of Motors Liquidation Company ("**Old GM,**" and as of the effective date of Old GM's confirmed Second Amended Joint Chapter 11 Plan (the "**Plan**"), the "**Reorganized Debtors**") throughout the period from Old GM's bankruptcy filing until the March 31, 2011 effective date of Old GM's Plan (the "**Effective Date**"). I have continued to serve Old GM after the Effective Date in the capacity of advisor. My responsibilities for Old GM and the Reorganized Debtors have primarily consisted of overseeing risk management activities.

2.      I respectfully submit this Declaration based upon personal knowledge, my review of relevant documents and Court filings, and communications and

advice I have received as specified below in support of the Reorganized Debtors'

(1) Supplemental Claim Objection and (2) Motion To Enforce the Plan Injunction and

Automatic Stay and To Enjoin Chartis U.S. From Continuing To Retain More Than $20

Million It Improperly Seized from the Reorganized Debtors.

3.        Chartis U.S. ("**Chartis**") currently holds at least $20,571,486 of the

Reorganized Debtors' funds (the "**Seized Cash**") that the Reorganized Debtors have

asked Chartis to return.

4.        Chartis originally obtained the Seized Cash from Old GM as

collateral in connection with the insurance agreements identified in the Assumption

and Collateralization Agreements among Old GM, General Motors LLC, Chartis

Specialty Insurance Co. and Lexington Insurance Co. effective July 10, 2009 (the "**Old

GM Insurance Agreements**").

5.        Chartis has identified the following insurance policies (the "**Identi-

fied Policies**"), and only the following policies, as yielding potential obligations that

Old GM or the Reorganized Debtors might be required to collateralize:

| Policy Type | Insurer | Policy Number | Policy Limited and Collateral |
|---|---|---|---|
| Pollution | Chartis Specialty Insurance Co. | 7146277 | $8,000,000 |
| Storage Tanks | Chartis Specialty Insurance Co. | 7146278 | $2,000,000 |
| Hazardous waste (Ohio Closure/Post Closure) | Chartis Specialty Insurance Co. | 7146282 | $5,822,539 |
| Hazardous Waste (Michigan Corrective Action) | Chartis Specialty Insurance Co. | 7146281 | $3,839,721 |
| Hazardous Waste (New Jersey Closure) | Lexington Insurance Co. | 7146280 | $297,022 |
| Hazardous Waste (Illinois Closure) | Lexington Insurance Co. | 7146279 | $612,204 |

2

6.      All of the foregoing insurance policies are "claims made" policies that have expired.  Except for Policy No. 7146281, no covered claims could be asserted under them after April 1, 2011.

7.      Although the claims period for Policy No. 7146281 did not expire until September 1, 2011, the Reorganized Debtors cancelled that policy on March 31, 2011.

8.      My understanding is that the Environmental Response Trust Consent Decree and Settlement Agreement, which became effective on the Effective Date, resolved any potential claims by governmental authorities with respect to all of the sites covered by the Identified Policies except for the site at McCook, Illinois.

9.      My understanding is that any potential claims that might be asserted in the future under the Identified Policies have been released.  After April 1, 2011, at Chartis's request – and after engaging in months of effort and expending significant resources – the Reorganized Debtors obtained signed releases from all but one of the governmental authorities that alone, I have been advised, could assert claims covered by the Identified Policies.  The only exception is the Illinois authorities who have not yet provided a signed release for the McCook site.

10.      The policy limit of the Identified Policy that relates to McCook is $612,204.

11.      By March 1, 2011, based on the Identified Policies' expiration and the Environmental Response Trust Consent Decree and Settlement Agreement, I concluded that Chartis would no longer have a good faith basis for keeping the collateral it had obtained from Old GM after the Effective Date.

12.      By March 1, 2011, I also had been advised that Chartis's proofs of claims (the "**Proofs of Claim**") sought payment of premiums and deductibles that Old

3

GM did not actually owe and that the other sums Chartis sought in its Proofs of Claim were not owed or, at a minimum, were not supported by sufficient documentation for Old GM to determine that they were owed.

13.     Accordingly, I requested that Chartis return the collateral on March 1, 2011.

14.     On or about March 3, 2011, I was informed that Chartis had refused to return Old GM's approximately $20.6 million in collateral – the "Seized Cash" referred to above.

15.     I have not been informed at any time since March 3, 2011 that Chartis is holding the Seized Cash in escrow or for the benefit of the Reorganized Debtors.  Rather, my understanding is that Chartis took control of the Seized Cash for its own purposes.

16.     No other insurer or surety refused to return Old GM's collateral in circumstances similar to Chartis's.

17.     Old GM and, after the effective date of Old GM's Plan, the Reorganized Debtors, have made numerous requests for the return of the Seized Cash after March 1, 2011.  These requests have all been refused, and none of the Seized Cash has been returned.

18.     Old GM and the Reorganized Debtors have also made attempts to reach a negotiated resolution with Chartis after March 1, 2011, both with and without the assistance of counsel.  Those attempts were unsuccessful.  As part of the negotiations, Chartis requested that the Reorganized Debtors obtain releases letters, but even though Chartis has been provided with letters releasing potential claims for all sites except McCook, Illinois, Chartis has not returned any of the Seized Cash.

19.    With respect to McCook, Chartis has provided no documentation to the Reorganized Debtors to show that any claims under the Identified Policies are likely to arise.

20.    To date, Chartis has not provided a reasoned justification – or any written justification at all – for its continued retention of the Seized Cash.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed in New York, New York on October 5, 2011

_____/s/ Thomas A. Morrow_____
THOMAS A. MORROW
40 West 57TH Street
New York, New York 10019
(212) 490-2500

5

Exhibit 2

**ASSUMPTION AND COLLATERALIZATION AGREEMENT**
Effective July 10, 2009

entered into by and between

**CHARTIS SPECIALTY INSURANCE COMPANY**
**(f/k/a American International Specialty Lines Insurance Company**
(hereinafter, the "**Company**")

and

**GENERAL MOTORS LLC**
successor, by conversion to a Delaware limited liability company, of the Delaware corporation formerly
known as General Motors Company[1], (hereinafter, "**NEW GM**")

and

**MOTORS LIQUIDATION COMPANY (f/k/a General Motors Corporation),**
a Delaware corporation[2] (hereinafter, "**OLD GM**")

**WHEREAS**, for the policy periods September 1, 2006 through September 1, 2007; September 1, 2007 through April 1, 2009; and April 1, 2009 through April 1, 2010, the Company issued to OLD GM, certain policies of insurance providing coverage for environmental liability (together with all endorsements, schedules and addenda thereto, the "**OLD GM Insurance Policies**"); and

**WHEREAS**, in conjunction with the OLD GM Insurance Policies, the Company and OLD GM executed that certain Payment Agreement effective September 1, 2006 (collectively with all addenda and schedules thereto, and the terms of any other agreements between the Company and OLD GM related thereto, the "**OLD GM Payment Agreement**"), detailing the respective liabilities, obligations and rights of the Company and OLD GM; and

**WHEREAS**, the OLD GM Insurance Policies and the OLD GM Payment Agreement are incorporated herein by reference and are hereinafter collectively referred to as the "**OLD GM Insurance Program Agreements**"; and

**WHEREAS**, as security for the obligations under the OLD GM Insurance Program Agreements, the Company currently maintains certain collateral in the form of (i) cash collateral in the amount of US Twelve Million Dollars ($12,000,000) (the "**Cash Collateral**"), which such Cash Collateral OLD GM and NEW GM each represents constitutes Restricted Cash (as defined in the Purchase Agreement) retained by OLD GM under the terms of the Purchase Agreement (defined below); and (ii) a collateral trust which, as of February 28, 2010, totals in the aggregate US Thirty One Million Three Hundred Thirty Four Thousand Nine Hundred Eleven Dollars and Fifty-Eight Cents ($31,334,911.58)(the "**Original Collateral Trust**"); and

**WHEREAS**, on June 1, 2009, OLD GM filed a voluntary petition under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"); and

---

[1] Pursuant to that certain Secretary of State Certificate of Conversion attached hereto as Exhibit A, NEW GM is the successor to General Motors Company by conversion to a Delaware limited liability company effective October 16, 2009.

[2] Pursuant to that certain Secretary of State Certificate of Corporate Name Change attached hereto as Exhibit B, General Motors Corporation changed its corporate name to "Motors Liquidation Company" effective July 9, 2009.

1

**WHEREAS**, pursuant to that certain Amended and Restated Master Sale and Purchase Agreement by and between OLD GM and NGMCO, Inc.[3] dated as of June 26, 2009, and approved by the Bankruptcy Court on July 5, 2009 (the "**Purchase Agreement**") and as described in detail therein; on July 10, 2009, NEW GM acquired substantially all of the assets of OLD GM, including but not limited to, in relevant part:

- the specific facilities identified on Exhibit D attached hereto (the "**Purchased Assets**"); and

- all of OLD GM's right, title, and interest in the portion of the Original Collateral Trust related to the Purchased Assets, which OLD GM and NEW GM each represents totals U.S. Twenty One Million Seven Hundred Eighty Seven Thousand Two Hundred Twenty-Three Dollars and Fifty-Eight Cents ($21,787,223.58) valued as of February 28, 2010 (the "**Purchased Collateral**"); and

**WHEREAS**, pursuant to and in accordance with the Purchase Agreement, Company, OLD GM and NEW GM (sometimes individually referred to herein as a "**Party**" and sometimes collectively referred to herein as the "**Parties**") desire to have NEW GM assume all of the existing, outstanding and future insurance debts, liabilities, and duties of OLD GM as such have been incurred and may be incurred with respect to the Purchased Assets (the "**Assumed Obligations**"), and NEW GM has agreed to assume the Assumed Obligations; and

**WHEREAS**, NEW GM is aware of and has a complete understanding of the extent of the Assumed Obligations and is prepared to memorialize its assumption of such Assumed Obligations through execution of this Assumption and Collateralization Agreement (this "**Agreement**"); and

**WHEREAS**, commencing on July 10, 2009, the Company issued to NEW GM certain policies of insurance providing coverage for environmental liability for the Assumed Obligations (together with all endorsements, the "**NEW GM Insurance Policies**"); and

**WHEREAS**, in conjunction with the NEW GM Insurance Policies, the Company and NEW GM executed that certain Payment Agreement effective July 10, 2009 (collectively with all addenda and schedules thereto, and the terms of any other agreements between the Company and NEW GM related thereto, the "**NEW GM Payment Agreement**"), detailing the respective liabilities, obligations and rights of the Company and NEW GM; and

**WHEREAS**, the NEW GM Insurance Policies and the NEW GM Payment Agreement are incorporated herein by reference and are hereinafter collectively referred to as the "**NEW GM Insurance Program Agreements**;" and

**WHEREAS**, to secure both the Assumed Obligations and its other obligations under the NEW GM Insurance Program Agreements, in accordance with the terms of this Agreement, NEW GM will provide the Company with certain security as more specifically set forth below in Paragraph 2.1; and

**WHEREAS**, it is understood and agreed by the Parties that NEW GM's assumption of the Assumed Obligations shall have no impact on the responsibilities of the Parties to each other, if any, outside the scope of this Agreement.

---

[3] Pursuant to that certain Secretary of State Certificate of Corporate Name Change attached hereto as Exhibit C, NGMCO, Inc., a Delaware corporation, changed its corporate name to "General Motors Company" effective July 9, 2009.

2

**NOW, THEREFORE,** in consideration of the premiums paid, premises and the mutual covenants contained herein, the Parties hereby do mutually agree as follows:

## 1. ASSUMPTION OF OBLIGATIONS

1.1 Effective July 10, 2009 (the "**Effective Date**"), and in accordance with the Purchase Agreement, OLD GM sold to NEW GM all of its right, title, and interest in the Purchased Assets and Purchased Collateral, and NEW GM assumed and agreed to perform, fulfill, and discharge all of the Assumed Obligations in conformity with the terms and conditions of the NEW GM Insurance Program Agreements. On and after the Effective Date, OLD GM shall have no further obligations or liabilities to Company related to the Assumed Obligations.

1.2 The Company hereby acknowledges and consents to the assumption of the Assumed Obligations by NEW GM.

## 2. SECURITY

2.1 The Company acknowledges that NEW GM shall, in conjunction with its assumption of the Assumed Obligations and pursuant to the terms of this Agreement and the NEW GM Insurance Program Agreements, procure in favor of the Company collateral in the form of a new collateral trust (the "**New Collateral Trust**"), or such other security in another form acceptable to the Company, in an amount equal to the Purchased Collateral (the "**NEW GM Security**") to secure both the Assumed Obligations and its obligations under the NEW GM Insurance Program Agreements. Subject to Sections 2.4, 2.5, and 2.6 below, NEW GM's procurement of the NEW GM Security shall satisfy its obligations to provide collateral under the NEW GM Insurance Program Agreements and the Assumed Obligations.

2.2 OLD GM consents to the transfer of the Purchased Collateral, plus interest accrued thereon between February 28, 2010 and the date of such transfer, to the New Collateral Trust. The Parties shall take all further actions necessary to effectuate the transfer of Purchased Collateral in accordance with the terms of this Agreement.

2.3 After the transfer of Purchased Collateral to the New Collateral Trust as set forth herein, (i) the amount equal to U.S. Nine Million Five Hundred Forty Seven Thousand Six Hundred Eighty Eight Dollars ($9,547,688.00) will remain in the Original Collateral Trust and (ii) the Cash Collateral shall be deposited in the Original Collateral Trust; and such resulting combined amount U.S. Twenty One Million Five Hundred Forty Seven Thousand Six Hundred Eighty Eight Dollars ($21,547,688.00) shall continue to secure the obligations of OLD GM under, and in accordance with, the OLD GM Insurance Program Agreements; the terms of which, except as amended herein, remain unchanged and in full force and effect.

2.4 Without limitation or regard to the purpose for which the NEW GM Security is originally provided, NEW GM hereby grants to the Company the right to liquidate or take ownership of any and all of the NEW GM Security and apply the proceeds to pay the Company any of the Assumed Obligations or other obligations of NEW GM, including but not limited to its obligations under the NEW GM Insurance Program Agreements.

2.5 It is understood and agreed by the Parties that nothing herein shall imply or serve to provide for a maximum value, cap or limit to the amount of security required at the present or in the future to secure the Assumed Obligations or other obligations of NEW GM, including but not limited to those obligations under the NEW GM Insurance Program Agreements. The terms and conditions of the NEW GM Insurance Program Agreements shall control the review and adjustment of

3

collateral. If as a result of such review the Company determines that additional collateral is required to secure the Assumed Obligations or other obligations of NEW GM, including but not limited to those obligations under the NEW GM Insurance Program Agreements, NEW GM will provide such additional collateral, in a form and amount acceptable to the Company, within thirty (30) days of the Company's written request.

2.6 Until such time as the NEW GM Collateral Trust is established and the NEW GM Security is received and accepted by the Company in accordance with Paragraphs 2.1 and 2.2 above, it is understood and agreed that the portion of the Original Collateral Trust that is Purchased Collateral is and will be available to pay the Company for the Assumed Obligations or other obligations of NEW GM, including but not limited to those obligations under the NEW GM Insurance Program Agreements.

## 3.   REPRESENTATIONS, WARRANTIES AND COVENANTS

3.1 NEW GM agrees that all of the Assumed Obligations assumed pursuant to the terms of this Agreement shall be subject to the terms and conditions of the NEW GM Insurance Program Agreements only.

3.2 New GM and the Company agree to adhere to the existing coverages under the New GM Insurance Policies with respect to the Assumed Obligations for events that have occurred prior to the Effective Date and where claims are brought after the Effective Date.

3.3 Each of the Parties has entered into this Agreement based upon its own independent assessment of its rights and obligations under this Agreement and not based upon any representations, disclosures, or nondisclosures made by the other Party or by any other entity.

3.4 Each of the Parties represents and warrants that it is authorized to enter into this Agreement and the transactions contemplated herein; that the person or persons executing this Agreement on its behalf is/are authorized to do so; that it is not a party to any pending agreements, transactions or negotiations that would render this Agreement or any part hereof void, voidable or unenforceable; and that any authorizations, consents or approvals of any governmental or regulatory entity or authority required to make this Agreement valid and binding upon it has been obtained.

## 4.   INDEMNIFICATION

NEW GM shall indemnify, defend and hold harmless the Company, its affiliates and their respective officers, directors, employees and agents from, against and with respect to any and all claims, liabilities, obligations, losses, damages, assessments, settlements, judgments, costs or expenses (including without limitation, reasonable attorneys' fees and costs and expenses reasonably incurred in investigating, preparing, defending against or prosecuting any litigation or claim), causes of action, suits, proceedings or demands, of any kind or character arising out of or in any manner incident, relating or attributable to any failure of NEW GM to perform, fulfill or discharge any of the insurance obligations assumed under this Agreement.

## 5.   ARBITRATION

5.1 In the event of any dispute between the Company and NEW GM with reference to the interpretation, application, formation, enforcement or validity of this Agreement, or their rights with respect to any transaction involved, whether such dispute arose before or after the termination of this Agreement, such dispute upon the written request of any Party, will be submitted to binding arbitration.

4

5.2 Unless otherwise agreed to by the Company and NEW GM, all arbitrators will be executive officers or former executive officers of property or casualty or reinsurance companies domiciled in the United States not under the control of any of the Parties.

5.3 The arbitrators will interpret this Agreement as an honorable engagement and not merely a legal obligation; they are relieved of all judicial formalities and may abstain from following the strict rules of law, and they will make their award with a view toward effecting the general purpose of this Agreement in a reasonable manner.

5.4 The arbitrators will render their decision, in writing, based upon a hearing in which evidence may be introduced without following the strict rules of evidence, but in which cross-examination and rebuttal will be allowed. The arbitrators will have the power to award compensatory money damages, and interest thereupon, and will have exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability; but the arbitrators will not have the power to award exemplary or punitive damages, however denominated, whether or not multiplied.

5.5 Each party to the arbitration will bear the expense of its own arbitrator and jointly and equally bear with the other party the expense of the arbitration.

5.6 Said arbitration will take place in New York, New York unless otherwise mutually agreed to by the Parties. The arbitration will be governed by the United States Arbitration Act, 9 U.S.C. 1, et seq., and judgment upon the award rendered by the arbitrators may be entered by a court having jurisdiction thereof.

5.7 This Article 5 will survive termination of this Agreement.

## 6. OTHER

The Bankruptcy Court shall have jurisdiction over the parties with respect to any disputes involving OLD GM regarding the terms or enforcement of this Agreement. Notwithstanding the preceding sentence, the Parties reserve all of their rights with respect to all jurisdictional issues, including the right to arbitration, regarding any dispute under the OLD GM Insurance Program Agreements, the Original Collateral Trust, the New GM Insurance Program Agreements, or the New Collateral Trust.

## 7. CONSTRUCTION

7.1 This Agreement shall be construed in accordance with the internal laws of the State of New York without regard to those provisions concerning conflicts of laws.

7.2 This Agreement is drafted in good faith. Should the need arise, the Parties shall cooperate in demonstrating to a court or arbitration panel that this Agreement, together with any terms and provisions contained therein, was negotiated in good faith.

7.3 It is expressly understood that this Agreement contains no admissions whatsoever regarding insurance coverage. This Agreement is not and shall not be interpreted as a contract or policy of insurance.

7.4 All Recitals included in this Agreement are specifically incorporated herein and made a part of this Agreement.

## 8.  ENTIRE AGREEMENT

8.1 This Agreement is an integrated document, containing the entire undertaking between the Parties regarding the matters addressed herein, and, except as set forth in this Agreement, no representations, warranties, promises, inducements or considerations have been made or relied upon by the Parties.

8.2 This Agreement shall prevail over all prior communications between the Parties or their representatives regarding the matters contained herein.

## 9.  EFFECT

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective heirs, executors, legal representatives, successors and permitted assigns.

## 10. SEVERABILITY

Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions and without affecting the validity or enforceability of such provision in any other jurisdiction.

## 11. COUNTERPARTS

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against either Party whose signature appears thereupon and all of which shall constitute one and the same instrument.  This Agreement shall be deemed fully executed when one or more counterparts hereof, individually or taken together, shall bear the signatures of each Party.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their duly authorized representatives.

**CHARTIS SPECIALTY INSURANCE COMPANY**

By: _____

Printed Name:  Thomas J. O'Rourke

Title:  Attorney-in-Fact

Date:  April 23, 2010

**GENERAL MOTORS LLC**

By: _____

Printed Name:  Alan G. Gier

Title:  Director, Global Risk Management & Insurance

Date:  April 7, 2010

**MOTORS LIQUIDATION COMPANY**

By: _____

Printed Name:  Thomas A. Morrow

Title:  Vice President

Date:  May 11, 2010

EXHIBIT A

[Secretary of State Certificate of Conversion issued to NEW GM attached]

EXHIBIT B

[Secretary of State Certificate of Corporate Name Change issued to OLD GM attached]

## EXHIBIT C

[Secretary of State Certificate of Corporate Name Change
issued to "General Motors Company" effective July 9, 2009 attached]

EXHIBIT D (page 1 of 2)

| Facility | | UST Facility # |
|---|---|---|
| GM Desert Proving Ground — Yuma<br>1500 East GM Drive<br>Yuma, AZ  85365-9498 | UST/AST | 0-010299 |
| General Motors Manufacturing — Stamping<br>Marion Metal Center<br>2400 W. Second Street<br>Marion, IN 46952-0036 | UST/AST | 003121 |
| General Motors Proving Grounds<br><br>3300 General Motors Road<br>Milford, MI  48380-3726 | UST/AST | 0016461 |
| General Motors Technical Center[4]<br><br>Environmental Services<br>Bldg. 1-1<br>Warren, MI  48090 | UST/AST | 00033132, 00036423, 00036429,<br>00036430, 00036431. 00036434 |
| GM Flint Assembly<br>G-3000 Van Slyke Road<br>Flint, MI  48551 | UST/AST | 00017757 |
| GM Pontiac North Campus – Powertrain<br>895 Joslyn Road<br>Pontiac, MI  48340-2920 | UST/AST | 00038781 |
| GM Powertrain Group<br>Saginaw Metal Casting Operations<br>1629 N. Washington Avenue<br>Saginaw, MI  48605 | UST/AST | 00010581 |
| GM Powertrain<br>Romulus Engine<br>36880 Ecorse Road<br>Romulus, MI  48174 | UST/AST | 00002680 |
| Lansing Grand River<br>920 Townsend Street<br>Lansing, MI  48921 | UST/AST | 00013819 |

---

[4] Identified as GM Powertrain Vehicle Performance Center, 30003 Van Dyke Ave, Warren, MI 48090 in the Purchase Agreement.  They are one and the same.

11

EXHIBIT D (page 2 of 2)

| | | |
|---|---|---|
| GM Powertrain Division<br>Tonawanda Engine Plant<br>2995 River Road<br>P. O. Box 21<br>Buffalo, NY 14240 | UST/AST | 9-600598 |
| MFD Lordstown Metal Center<br>2369 Ellsworth-Baily Road<br>Lordstown, OH 44481 | UST/AST | 78000021 |

EXHIBIT D (continued)

| | |
|---|---|
| GMVM Janesville Assembly[5]<br>544 Kellogg Ave.<br>Janesville, WI 53546<br>Tank ID # 650215<br>Tank Capacity -- 20,000 gallons | UST/AST |
| GM Technical Center<br>6250 West Chicago Road<br>Warren, MI 48090<br>EPA ID#: MID050615996 | Pollution |
| GM Powertrain Group Defiance<br>26427 St., Rte 281 E.<br>Defiance, OH 43512<br>EPA ID#: OHD005050273 | Pollution |
| NACG Metal Fab<br>2369 Ellsworth-Bailey Road<br>Lordstown, OH 44481<br>EPA ID#: OHD083321091 | Pollution |
| GM Powertrain Group Defiance (RCRA & RSWA)<br>26427 St., Rte 281 E.<br>Defiance, OH 43512<br>EPA ID#: OHD005050273 | Closure/Post Closure |
| NACG Metal Fab Plant (RCRA)<br>2369 Ellsworth-Bailey Road<br>Lordstown, OH 44481<br>EPA ID#: OHD083321091 | Closure/Post Closure |

---

[5] Identified as GM Assembly Janesville, 1000 Industrial Ave, Janesville, WI 53546 in the Purchase Agreement. They are one and the same.

**LETTER AGREEMENT**
Effective July 10, 2009

entered into by and between

**LEXINGTON INSURANCE COMPANY**
(hereinafter, the "**Company**")

and

**GENERAL MOTORS LLC**
successor, by conversion to a Delaware limited liability company, of the Delaware corporation formerly known as General Motors Company[1], (hereinafter, "**NEW GM**")

and

**MOTORS LIQUIDATION COMPANY (f/k/a General Motors Corporation)**,
a Delaware corporation[2] (hereinafter, "**OLD GM**", and together with the Company and NEW GM, the "**Parties**")

**WHEREAS**, for the policy period April 1, 2009 through April 1, 2010, the Company issued to OLD GM, certain policies of insurance providing coverage for environmental liability (together with all endorsements, schedules and addenda thereto, the "**OLD GM Insurance Policies**"); and

**WHEREAS**, in conjunction with the OLD GM Insurance Policies, the Company and OLD GM executed a certain Payment Agreement effective April 1, 2009 (collectively with all addenda and schedules thereto, and the terms of any other agreements between the Company and OLD GM related thereto, the "**OLD GM Payment Agreement**"), detailing the respective liabilities, obligations and rights of the Company and OLD GM; and

**WHEREAS**, the OLD GM Insurance Policies and the OLD GM Payment Agreement are incorporated herein by reference and are hereinafter collectively referred to as the "**OLD GM Insurance Program Agreements**"; and

**WHEREAS**, as security for the obligations under the OLD GM Insurance Program Agreements, the Company currently maintains collateral in the form of cash collateral in the amount of US One Million Two Hundred Forty Five Thousand Five Hundred Sixty Dollars and Ninety-Eight Cents ($1,245,560.98) valued as of February 28, 2010 (the "**Original Collateral**"); and

**WHEREAS**, OLD GM (as Grantor), the Company (as Beneficiary), and The Bank of New York Mellon (as Escrow Agent) are parties to that certain Escrow, Security and Control Agreement for Payment Agreement Obligations effective May 6, 2009 (the "**Lexington Trust**"); and

**WHEREAS**, on June 1, 2009, OLD GM filed a voluntary petition under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"); and

---

[1] Pursuant to that certain Secretary of State Certificate of Conversion attached hereto as Exhibit A, NEW GM is the successor to General Motors Company by conversion to a Delaware limited liability company effective October 16, 2009.

[2] Pursuant to that certain Secretary of State Certificate of Corporate Name Change attached hereto as Exhibit B, General Motors Corporation changed its corporate name to "Motors Liquidation Company" effective July 9, 2009.

WHEREAS, pursuant to that certain Amended and Restated Master Sale and Purchase Agreement by and between OLD GM and NGMCO, Inc.[1] dated as of June 26, 2009, and approved by the Bankruptcy Court on July 5, 2009 (the "Purchase Agreement") and as described in detail therein; on July 10, 2009, NEW GM acquired substantially all of the assets of OLD GM, including but not limited to, in relevant part, all of OLD GM's right, title, and interest in the portion of the Original Collateral in an amount equal to U.S. Three Hundred Forty Seven Thousand One Hundred Fifteen Dollars and Ninety-Eight Cents ($347,115.98) valued as of February 28, 2010 (the "Purchased Collateral"); and

WHEREAS, pursuant to the Purchase Agreement, and as approved by the Bankruptcy Court on March 5, 2010, OLD GM shall retain an amount equal to U.S. Eight Hundred Ninety Eight Thousand Four Hundred Forty Five Dollars ($898,445.00) of the Original Collateral.

NOW, THEREFORE, in consideration of the premiums paid, premises and the mutual covenants contained herein, the Parties hereby do mutually agree as follows:

1. Within thirty (30) days of the execution of this Letter Agreement (this "Agreement") by all Parties, Company shall (i) transfer the Purchased Collateral to NEW GM (in accordance with wire instructions to be provided by NEW GM); and (ii) transfer the remainder of the Original Collateral in an amount equal to U.S. Eight Hundred Ninety Eight Thousand Four Hundred Forty Five Dollars ($898,445.00) to the Lexington Trust, which sum shall be held therein in accordance with the terms of the OLD GM Insurance Program Agreements and the Lexington Trust.

2. OLD GM consents to the above-described transfer of the Purchased Collateral, plus interest accrued thereon between February 28, 2010 and the date of such transfer, to NEW GM.

3. The Parties shall take all further actions necessary to effectuate the above-described transfer of the Purchased Collateral in accordance with the terms of this Agreement.

4. Each of the Parties represents and warrants that it is authorized to enter into this Agreement and the transactions contemplated herein; that the person or persons executing this Agreement on its behalf is/are authorized to do so; that it is not a party to any pending agreements, transactions or negotiations that would render this Agreement or any part hereof void, voidable or unenforceable; and that any authorizations, consents or approvals of any governmental or regulatory entity or authority required to make this Agreement valid and binding upon it has been obtained.

5. NEW GM acknowledges that the Company is expressly relying on the representations made in this Agreement in connection with the above-described transfer of the Purchased Collateral to NEW GM. NEW GM further acknowledges that the Company may suffer damages if these representations are determined to be incorrect at any time. NEW GM does not undertake to be responsible for any such damages beyond the actual loss caused to the Company in the event any of these representations are determined to be incorrect; provided, however, that NEW GM's liability to the Company shall in no event exceed the amount of the Purchased Collateral, plus any further amounts incurred by Company for reasonable attorneys' fees and expenses.

---

[1] Pursuant to that certain Secretary of State Certificate of Corporate Name Change attached hereto as Exhibit C, NGMCO, Inc., a Delaware corporation, changed its corporate name to "General Motors Company" effective July 9, 2009.

6. It is understood and agreed by the Parties that nothing herein shall have an impact on the responsibilities of the Parties to each other outside the scope of this Agreement.

7. The terms of the OLD GM Insurance Program Agreements and the Lexington Trust, except as amended herein, remain unchanged and in full force and effect.

8. The Bankruptcy Court shall have jurisdiction over the Parties with respect to any disputes involving OLD GM regarding the terms or enforcement of this Agreement. Notwithstanding the preceding sentence, the Parties reserve all of their rights with respect to all jurisdictional issues, including the right to arbitration, regarding any dispute under the OLD GM Insurance Program Agreements, the Original Collateral Trust, the New GM Insurance Program Agreements, or the New Collateral Trust.

9. The terms of this Agreement cannot be changed or terminated orally, cannot be orally waived, shall be binding on the Parties and their successors and shall be governed in all aspects by the laws of the State of New York.

10. All Recitals included in this Agreement are specifically incorporated herein and made a part of this Agreement.

**[Signature Page Follows]**

3

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed by their duly authorized representatives.

LEXINGTON INSURANCE COMPANY

By: _____

Printed Name:  Thomas J. O'Rourke

Title:  Attorney-in-Fact

Date:  April 23, 2010

GENERAL MOTORS LLC

By: _____

Printed Name:  Alan G. Gier

Title:  Director, Global Risk Management & Insurance

Date:  April 7, 2010

MOTORS LIQUIDATION COMPANY

By: _____

Printed Name:  Thomas A. Morrow

Title:  Vice President

Date:  May 11 2010

4

**EXHIBIT A**

[Secretary of State Certificate of Conversion issued to NEW GM attached]

**EXHIBIT B**

[Secretary of State Certificate of Corporate Name Change issued to OLD GM attached]

EXHIBIT C

[Secretary of State Certificate of Corporate Name Change
issued to "General Motors Company" effective July 9, 2009 attached]

Exhibit 3

# MLC

Motors Liquidation Company
401 S. Old Woodward, Suite 370
Birmingham, MI 48009

Phone: 313.486.4044
Fax: 313.486.4258

March 31, 2011

Aon Risk Services Central
Joseph G. Callanan, Jr.
3000 Town Center, Suite 3000
Southfield, MI 48075

RE:    Motors Liquidation Company
       Hazardous Waste-Corrective Action Policy 7146281 (13000 Eckles Road, Livonia, MI)
       Collateral Amount: $3,839,721

Dear Mr. Callanan:

As you may know, Motors Liquidation Company ("MLC"), f/k/a General Motors Corporation, entered into a settlement agreement on October 20, 2010 with federal and state governmental authorities regarding MLC's environmental obligations at its owned real property, including MLC's site at 13000 Eckles Road, Livonia, MI. ("Settlement Agreement")[1]  On March 3, 2011, this Settlement Agreement was approved by the United States Bankruptcy Court for the Southern District of New York as part of MLC's Chapter 11 Plan of Liquidation. The Settlement Agreement dictates that MLC's owned real property will be transferred to an Environmental Response Trust on March 31, 2011 and discharges MLC's corrective action responsibilities at its owned real property, including those corrective action obligations insured by Hazardous Waste-Corrective Action Policy 7146281.  In exchange for MLC's funding of, and transfer of certain assets to the Environmental Response Trust, the governmental authorities have agreed not to seek, and have provided a covenant not to sue, MLC or the Environmental Response Trust with respect to any financial assurance required under environmental law relating to MLC's owned real property.  (Settlement Agreement ¶ 96).

MLC hereby surrenders policy Hazardous Waste-Corrective Action Policy 7146281 and requests that you cancel Hazardous Waste-Corrective Action Policy 7146281 effective 12:00 midnight March 31, 2011.  Please transfer any and all collateral being held in connection with Hazardous Waste-Corrective Action Policy 7146281 to MLC on March 31, 2011, the Effective Date of a confirmed plan of liquidation of MLC.  Collateral should be transferred via wire transfer from collateral account to the following account:

JPMorgan Chase
611 Woodward Ave. Detroit, MI 48226

---

[1] A copy of the October 20, 2010 Environmental Response Trust Consent Decree and Settlement Agreement can be found on EPA's website at
http://www.epa.gov/compliance/resources/cases/cleanup/cercla/mlc/index.html.

US_ACTIVE:\43656066\02\72240.0639

Account Name: MLC Master Funding Account
Account #: 838723369
Routing#: 021000021

Please make every effort to ensure that these funds are deposited in the aforementioned account by close of business on March 31, 2011. Should you have any questions or concerns, please contact Matthew D. Morton, MLC's counsel at Weil, Gotshal & Manges, at (202) 682-7053.

Tom Morrow, MLC

cc:    Celeste R. Gill (P52484)
Assistant Attorney General
Environment, Natural Resources and
Agriculture Division
6th Floor, G. Mennen Williams Building
525 West Ottawa Street
P.O. Box 30755
Lansing, MI 48909

Exhibit 4

## TOGUT, SEGAL & SEGAL LLP

ONE PENN PLAZA
NEW YORK, NEW YORK 10119

ALBERT TOGUT
FRANK A. OSWALD *
NEIL BERGER *
SCOTT E. RATNER *
SIDNEY SEGAL (1905-1965)
BERNARD SEGAL (1932-1983)

OF COUNSEL
RICHARD K. MILIN °

(212) 594-5000
FACSIMILE
(212) 967-4258

INTERNET
eMail@TeamTogut.com

JAMES J. LEE *
BRIAN F. MOORE *
DAVID M. SMITH
STEPHANIE A. SKELLY °
STEVEN S. FLORES
MICHAEL D. HAMERSKY
NAOMI C. MOSS
LARA R. SHEIKH
JONATHAN P. IBSEN °
ANTHONY F. PIRRAGLIA

*MEMBER NY AND NJ BAR
°MEMBER NY AND CT BAR
c MEMBER NY AND MA BAR
◊ MEMBER NY AND AZ BAR

September 16, 2011

Michael S. Davis, Esq.
Zeichner Ellman & Krause LLP
575 Lexington Avenue
New York, New York 10022
Tel. (212) 826-5311
Fax (866) 213 9038
MDavis@zeklaw.com

Re:  **Motors Liquidation Company**, *et al.*
     **(f/k/a General Motors Corp**, *et al.*)
     **Chapter 11 Case No. 09-50026 (REG)**

Dear Michael:

On behalf of Motors Liquidation Company, *et al.*, f/k/a General Motors Corp., *et al.* ("Old GM"), we write to request the immediate return of $20,571,486 million in cash belonging to Old GM (the "Seized Cash") that your client Chartis U.S. ("Chartis") has improperly seized for its own purposes and has refused to return. As you know, Old GM has been requesting that Chartis return the Seized Cash since early March 2011, but Chartis has refused, and it has similarly failed to provide any substantial justification for its refusal. Old GM can only consider Chartis's conduct to be in bad faith, and it is a clear violation of both the Confirmation Order that Judge Gerber entered in the above-referenced bankruptcy case (the "Bankruptcy Case") and the automatic stay imposed by 11 U.S.C. § 362 (the "Automatic Stay"). Accordingly, unless Chartis returns Old GM's $20.5 million in Seized Cash by September 30, 2011, we will have no choice but to seek Court assistance in securing its return as well as damages and other appropriate relief.

To date, Chartis has provided no written explanation of its refusal to return the Seized Cash. As a result, Old GM has been forced to piece together Chartis's rationale from past discussions between the parties, Chartis's proofs of claim Nos. 59680-82 and 59697 (the "Proofs of Claim"), and Chartis's response to Old GM's initial objection to the Proofs of Claim (the

TOGUT, SEGAL & SEGAL LLP

Michael S. Davis, Esq.
Zeichner Ellman & Krause LLP
September 16, 2011
Page 2

"Response"). From these sources, Chartis appears to be relying on three arguments in refusing to return the Seized Cash: (a) the argument that Old GM may owe Chartis significant sums under the "Insurance Program" referenced in the Proofs of Claim; (b) the argument that Old GM may owe Chartis up to $5 million in connection with the "Bristol" matter discussed in Exhibit B to the Proofs of Claim, and (c) the argument that Old GM may owe Chartis up to $1 million in connection with the "Renick Cadillac" settlement mentioned in Exhibit A to the Proofs of Claim.

As discussed below, these arguments provide no basis for Chartis's refusal to return the Seized Cash. At a minimum, the Insurance Program – which is Chartis's sole arguable basis for retaining at least $14.5 million of the Seized Cash – cannot possibly yield further claims against Old GM. Indeed, the only claims that Chartis might speculate could potentially arise out of the Insurance Program would be (1) time-barred, in that they could only be based on claims-made insurance policies that have now expired; (2) enjoined by Court order, because the Bankruptcy Court overseeing Old GM's bankruptcy has resolved substantially all of them under the Environmental Response Trust Consent Decree and Settlement Agreement (the "Environmental Response Trust"); and (3) expressly released in writing, because at Chartis's specific request (and at considerable expense), Old GM has obtained releases from each of the state agencies that could potentially assert demands covered by the Insurance Program, again with the exception of McCook. Moreover, the McCook policy, under which any claims had to have been asserted by April 1, 2011, had a coverage limit of only $612,204. Given these facts, Chartis's seizure and retention of Old GM's cash as a supposed protection against purely hypothetical liabilities that would be time-barred, resolved under the Environmental Response Trust *and* expressly released is not merely bad faith – it is outrageous.

### Chartis Has No Right To Hold the Seized Cash To Collateralize Non-Existent Insurance Program Obligations

Chartis obtained the Seized Cash from Old GM as collateral in connection with the Insurance Program and "Old GM Insurance Agreements" described in the Assumption and Collateralization Agreements attached to this letter as Exhibit 1. By March 1, 2011, Chartis no longer had a good faith basis for keeping Old GM's cash, and Old GM requested its return. Instead, on or about March 3, 2011, Chartis seized Old GM's cash, which it could not plausibly claim it was merely holding in escrow, and thereby violated the Automatic Stay as well as the Bankruptcy Court's March 29, 2011 Confirmation Order continuing the Automatic Stay. *See* Confirmation Order, Docket No. 9941. Every other insurer or surety returned Old GM's collateral upon request in circumstances similar to those of Chartis; Chartis, and only Chartis, refused.

Since March 2011, Old GM has made several further requests for the return of its Seized Cash, and it has attempted to reach a negotiated resolution with Chartis, both with and without the assistance of counsel. Unfortunately, Chartis has responded by resorting to

TOGUT, SEGAL & SEGAL LLP

Michael S. Davis, Esq.
Zeichner Ellman & Krause LLP
September 16, 2011
Page 3

obviously flawed arguments and delaying tactics, such as demanding release letters for merely potential claims that, as of April 1, 2011, would have been both time-barred and not assertable against Old GM or Chartis because they had been resolved pursuant to the Environmental Response Trust. As a result, Chartis has now refused to return Old GM's Seized Cash for more than five months without providing any plausible justification for doing so.

Chartis has no right to continue to hold the Seized Cash: the Old GM Insurance Agreements provide no authorization whatsoever for Chartis to keep Old GM's assets as collateral for claims against it that Chartis knows can never be made. Chartis has identified only the following insurance policies (the "Identified Policies") as yielding potential obligations that Old GM might be required to reimburse:

| Policy Type | Insurer | Policy Number | Policy Limit and Collateral |
|---|---|---|---|
| Pollution | Chartis Specialty Insurance Co. | 7146277 | $8,000,000 |
| Storage Tanks | Chartis Specialty Insurance Co. | 7146278 | $2,000,000 |
| Hazardous waste (Ohio Closure/ Post Closure) | Chartis Specialty Insurance Co. | 7146282 | $5,822,539 |
| Hazardous Waste (Michigan Corrective Action) | Chartis Specialty Insurance Co. | 7146281 | $3,839,721 |
| Hazardous Waste (New Jersey Closure) | Lexington Insurance Co. | 7146280 | $297,022 |
| Hazardous Waste (Illinois Closure) | Lexington Insurance Co. | 7146279 | $612,204 |

However, all of the foregoing insurance policies have expired and, except for Policy No. 7146281, no covered claims could be asserted under them after April 1, 2011. Further, although the claims period for Policy No. 7146281 did not expire until September 1, 2011, Old GM cancelled that Policy on March 31, 2011. [See Exhibit 2]. Consequently, no new claims against Old GM or Chartis can properly be asserted under the Identified Policies that Chartis has used as a pretext for its improper retention of the Seized Cash – any such claims would be time-barred.

Also, claims under the Identified Policies have been resolved by the Bankruptcy Court order approving the Environmental Response Trust. As Decretal Paragraph 7 of Old GM's Confirmation Order states:

Togut, Segal & Segal llp

Michael S. Davis, Esq.
Zeichner Ellman & Krause LLP
September 16, 2011
Page 4

The establishment and funding of the Environmental Response Trust and the transfer of the Environmental Response Trust Assets to the Environmental Response Trust or any entity formed by the Environmental Response Trust Administrative Trustee *shall be in full settlement and satisfaction of all present and future civil environmental liabilities or obligations of the Debtors to the Governmental Authorities,* other than the claims and rights reserved ....

*See* Confirmation Order at pp. 19-21 (emphasis added). The Environmental Response Trust settlement resolved any potential claims by governmental authorities with respect to all of the sites covered by the Identified Policies except for the site at McCook, Illinois.

In addition to being time-barred and resolved by Court order, any potential claims that might be asserted in the future under the Identified Policies have been released. At Chartis's request – and after engaging in months of effort and expending significant resources – Old GM has obtained signed releases from all but one of the governmental authorities that alone could assert claims covered by the Identified Policies. The exception relates only to the Illinois authorities who have not yet provided a signed release for the McCook site but have indicated their willingness to do so. Further, as noted above, the Identified Policy that relates to McCook plainly cannot justify Chartis's retention of $20.5 million in Seized Cash – the policy limit is only $612,204.

Given these facts, Chartis's continued retention of the Seized Cash is a clear violation of the Bankruptcy Court's Confirmation Order and of the Automatic Stay that Order incorporates and extends. Section 10.4 of Old GM's confirmed Second Amended Joint Chapter 11 Plan (the "Plan") provides that the Automatic Stay remains in full force and effect until the closing of the Bankruptcy Case, and Section 10.7 of the Plan enjoins all parties in interest from taking any action to interfere with implementation or consummation of the Plan – such as seizing and refusing to return $20.5 million. Further, the Plan's provisions are made binding on claimants such as Chartis by Decretal Paragraph 5 of the Bankruptcy Court's Confirmation Order. Chartis's unjustified seizure and retention of $20.5 million of Old GM's cash is therefore a clear violation of these provisions of the Plan, for which Old GM, if necessary, will seek appropriate remedies.

### Chartis Has No Right To Hold the Seized Cash To Collateralize
### Its Claimed Subrogation Rights Relating to the Bristol Claim

Despite the fact that it cannot lawfully retain any part of the Seized Cash to collateralize obligations under Old GM's Insurance Program (for the reasons discussed above), Chartis maintains that it has the right to retain approximately $5 million of the Seized Cash to pay sums that Old GM allegedly owes to Chartis in connection with the Bristol matter described in Exhibit B to Chartis's Proofs of Claim (the "Bristol Claim"). According to Chartis, Bristol Center LLC ("Bristol") is the current owner of environmentally contaminated Connecticut real

Togut, Segal & Segal LLP

Michael S. Davis, Esq.
Zeichner Ellman & Krause LLP
September 16, 2011
Page 5

estate that formerly belonged to Old GM. *See* Chartis Proofs of Claim, Exhibit B. When Old GM could no longer pay the costs of environmental remediation, the State of Connecticut held Bristol responsible, and Bristol turned to its insurer, which happened to be Chartis. Chartis asserts that it has been paying for Bristol's remediation efforts and will presumably continue to do so until it exhausts the full $5 million in coverage and is therefore subrogated to Bristol's right to demand reimbursement from Old GM. In other words, Chartis's $5 million Bristol Claim does not arise out of the Insurance Program, the Identified Polices, or any other insurance policy that Chartis issued to Old GM – it arises entirely from Chartis's policy with an unrelated third party, Bristol. *See* Chartis Proofs of Claim, Exhibit B.

Nevertheless, Chartis has asserted that it is entitled to use the Seized Cash to reimburse itself for its Bristol Claim under the Old GM-Chartis Payment Agreement (included herewith as Exhibit 3, the "Payment Agreement"), which states, in what Chartis has identified as relevant part:

If default occurs, we may take reasonable and appropriate steps that are necessary to protect our interest. We will exercise good faith consistent with usual and customary commercial and credit practice in selecting and exercising such steps. We may take steps such as the following:
1. We may declare the entire unpaid amount of Your Payment Obligation immediately due and payable.
2. We may change any or all unexpired Policies....
3. We may draw upon, liquidate, or take ownership of any or all collateral we hold regardless of the form, and hold or apply such amounts to any of Your Payment Obligation under this Agreement or any other premium, surcharge or deductible financing agreement between You and us, or under any Policies. However, we will not draw upon, liquidate, or take ownership of more collateral than is reasonably necessary to protect our interest.
4. We may require You to deliver to us additional collateral....
5. We may cancel any or all unexpired Policies....
6. We may withhold payment of claims to You....
7. We may satisfy Your obligations to us in whole or in part by set-off against any moneys, securities, collateral, consideration or property of Yours received by, pledged to, held by or otherwise available to us in connection with Your Payment Obligation. You authorize us after any default to charge any account that You maintain with us in connection with Your Payment Obligation in order to satisfy any of Your obligations.

Payment Agreement at p. 8.

The Payment Agreement defines "Your Payment Obligation" as: "the amounts that you must pay us for the insurance and services in accordance with the terms of the Policies, this

Togut, Segal & Segal llp

Michael S. Davis, Esq.
Zeichner Ellman & Krause LLP
September 16, 2011
Page 6

Agreement, and any similar primary casualty insurance policies and agreements with us
incurred before the inception date hereof."  Payment Agreement at p. 4.

Chartis has maintained that it is entitled to retain a portion of the Seized Cash because
the seventh numbered default remedy quoted above (the "Setoff Remedy") allows Chartis to
"satisfy Your obligations to us in whole or in part by set-off against any monies, securities,
collateral, consideration or property of Yours received by, pledged to, held by or otherwise
available to us in connection with Your Payment Obligation."  For at least four reasons,
however, the Setoff Remedy does not justify Chartis in retaining the Seized Cash to satisfy its
Bristol Claim.

*First*, Chartis has no right to exercise the Setoff Remedy because it is available only "[i]f
default occurs."  Chartis has acknowledged to us that, notwithstanding contrary statements in
its Response to Old GM's initial objection to its Proofs of Claim, Old GM was not in default on
any financial or other affirmative obligations to Chartis as of Old GM's bankruptcy filing.
Further, Chartis's Response identifies only $41,956 in alleged monetary defaults in connection
with the Insurance Program, which would limit Chartis's remedies to retaining only $41,956 of
the Seized Cash.  In addition, Chartis cannot claim to be entitled to exercise default remedies
due to Old GM's bankruptcy filing, because the Insurance Program, consisting of various
inter-related agreements, is clearly an executory contract and 11 U.S.C. § 365(b)(2) prohibits
Chartis from treating Old GM as in default based solely on its bankruptcy filing.

*Second*, the Payment Agreement specifies that the Setoff Remedy can be used only with
respect to Old GM's property that has been "received by, pledged to, held by or otherwise
available to us in connection with Your Payment Obligation."  It appears, however, that Old
GM's collateral could only have been legally held, under the Assumption and Collateralization
Agreements, in a specified trust.  Chartis has provided no evidence to show that the Seized
Cash is legally or properly held by Chartis rather than by a trust or escrow agent, and it has
failed to show that any agreements pledging the Seized Cash or making it available to Chartis
would make it available to pay the Bristol claim.  Consequently, Chartis has no right to use the
Seized Cash for any Setoff Remedy.

*Third*, it is well established that a subrogee stands in the shoes of the subrogor and can
have no greater rights than the subrogor.  Yet Chartis appears to maintain that it can avail
itself of Old GM's collateral to convert Bristol's unsecured claim against Old GM into a
secured claim against Old GM.  Chartis has offered no legal support for this novel theory, and
it is contrary to black letter law.

*Fourth*, the Payment Agreement does not give Chartis the right to use Old GM's colla-
teral to pay the Bristol Claim or any other claim that Chartis may assert against Old GM by
right of subrogation.  The Payment Agreement makes Old GM liable for its "Payment Obliga-
tion," but the Agreement's definition of that term, which is quoted above, limits it to specified

TOGUT, SEGAL & SEGAL LLP

Michael S. Davis, Esq.
Zeichner Ellman & Krause LLP
September 16, 2011
Page 7

financial obligations arising out of the Insurance Program. The Bristol Claim, therefore, is not part of Old GM's Payment Obligation to Chartis.

The Bristol Claim also does not fall within the scope of the undefined term "obligations to us" that Chartis employs in describing the Setoff Remedy. In context, the natural reading of "obligations to us" is to refer to obligations in connection with the Insurance Program, not unrelated obligations owed for other reasons. Also, "obligations to us" naturally refers only to direct obligations to "us" – i.e., Chartis – and not to indirect obligations to parties other than Chartis who, like Bristol, just happen to be insured by Chartis. Indeed, if the Setoff Remedy were intended to cover every conceivable debt that Old GM might owe to Chartis for any reason, it would allow Chartis to buy other parties' claims and secure or satisfy them with Old GM's collateral at the rate of one hundred cents on the dollar. In addition, if the parties had truly intended to give Chartis the right to use Old GM's collateral to satisfy debts unrelated to the Insurance Program, they would not have limited that right to be effective only upon default.

Equally important, other provisions of the Payment Agreement preclude any reading of "obligations to us" that might cover the Bristol Claim. The Payment Agreement specifies that Old GM "must deliver collateral acceptable to us to secure Your Payment Obligation," adding that Chartis "may apply any collateral we hold in connection with this or any other similar primary casualty insurance policies or agreements to Your Payment Obligation." Payment Agreement at p. 6. This language implies that Chartis will "apply any collateral" only to Old GM's Payment Obligation and not to unrelated obligations arising out of Chartis's business dealings with third parties.

Moreover, the next paragraph eliminates any ambiguity by expressly limiting use of Old GM's collateral to its Payment Obligations. It states that "You grant us a possessory security interest in any property You deliver to us to secure Your Payment Obligation" and "direct us to hold *all such sums as collateral for Your Payment Obligation* as they (sic) may be payable now or may become payable in the future." (Emphasis added.) Payment Agreement at p. 6. Because the Payment Agreement directs Chartis to use *all* of Old GM's collateral for its Payment Obligation, Chartis has no right to use that collateral for any other obligations such as the Bristol Claim.

The Payments Agreement's specific restriction on Chartis's use of Old GM's collateral trumps any potential reading of the vague and undefined term "obligations to us" that might allow Chartis to apply the Seized Cash to the Bristol Claim. This is especially true given that the Payment Agreement must be construed against Chartis as its drafter, and that the phrase "obligations to us" is tucked away as the ambiguous seventh numbered item in a list of default remedies. Further, there is every reason to believe that, if Chartis were to convince a Court that the phrase "obligations to us" is ambiguous, and if the parties were to conduct discovery concerning its meaning as a result, the result would be the same: Old GM could not reason-

Togut, Segal & Segal llp

Michael S. Davis, Esq.
Zeichner Ellman & Krause LLP
September 16, 2011
Page 8

ably have understood or intended that Chartis would use its Setoff Remedy as a reason to
seize Old GM's collateral and apply it to a subrogation claim unrelated to its Payment
Obligation. The Seized Cash must be returned.

### Chartis Has No Right To Hold the Seized Cash To Collateralize
### Its Claimed Subrogation Rights Relating to the Renick Claim

Chartis's claim based on the Renick Cadillac matter (the "Renick Claim") provides even
less justification for retaining even less of the Seized Cash than the Bristol Claim. Like the $5
million Bristol Claim, the $1 million Renick Claim arises from a right to subrogation that
Chartis asserts it has based on an insurance policy it issued to a party other than Old GM.
Chartis's Proofs of Claim describe the Renick Claim in full as follows:

> Renick Cadillac, Inc., Granite State Insurance Company, Policy #02 LX
> 003234283-2/000 (Commercial Garage Policy), Deutsch v. Renick Cadillac,
> Inc., et al., No. BC389150, Superior Court, Los Angeles County, California.
>
> Lexington has paid $1,000,000.00 in connection with settlement of
> the foregoing matter. Pursuant to its Proof of Claim, Lexington claims
> from the Debtor the amount of $1,000,000.00, plus any costs, including
> defense fees, paid by Lexington and/or any of its subsidiary, affiliate,
> and/or member companies in connection with the settlement of the
> foregoing matter, pursuant to the Debtor's indemnification obligations to
> the Insured Dealer.

As this description indicates, Chartis's Renick Claim seeks reimbursement from Old
GM for sums that Chartis's affiliate Lexington paid to or on behalf of Renick Cadillac pursuant
to an insurance policy issued to Renick, not Old GM. Like the Bristol Claim, the Renick Claim
is a subrogation claim asserting rights that have no relationship to Old GM's Insurance
Program. As a result, all of the reasons why Chartis cannot use the Seized Cash to satisfy the
Bristol Claim apply equally to the Renick Claim. Moreover, Chartis has not provided, and Old
GM has been unable to locate, any proof that Old GM actually owes any "indemnification
obligations to the Insured Dealer." Consequently, Chartis has no right to retain any of the
Seized Cash to satisfy or collateralize its Renick Claim.

### Conclusion

For all of the foregoing reasons, among others, Chartis must return the Seized Cash by
September 30, 2011. Neither Old GM's Insurance Program, nor Chartis's Bristol and Renick
Claims, provide any genuine grounds for retaining $20.5 million of Old GM's money. Chartis
has held the Seized Cash, with no good faith justification, for far too long. It has done so,
moreover, in violation of the Bankruptcy Court's Confirmation Order and the Automatic Stay.

TOGUT, SEGAL & SEGAL LLP

Michael S. Davis, Esq.
Zeichner Ellman & Krause LLP
September 16, 2011
Page 9

Please contact us immediately to discuss the return of Old GM's Seized Cash so that the
parties can avoid any further costs or delays for which, as indicated above, Old GM reserves
the right to hold Chartis accountable.

Very truly yours,

TOGUT, SEGAL & SEGAL LLP
By:

Richard K. Milin

RKM/lw, cj

cc:    Michelle Leavitt, Esq.
       Mr. Tom Morrow
       Scott E. Ratner, Esq.

Exhibit 5



# Payment Agreement

For

## Insurance and Risk Management Services

effective on the 1ˢᵗ day of April, 2009

by and between *us*,

**Lexington Insurance Company**

And *you, our* Client

***General Motors Corporation***
***300 Renaissance Center***
***Detroit, MI 48265***

in consultation with *your* representative

***Aon Risk Services***
***3000 Town Center, Suite 3000***
***Southfield, MI 48075***

## PAYMENT AGREEMENT

## TABLE of CONTENTS

| | |
|---|---|
| Title Page | 1 |
| Table of Contents | 2 |
| Who Has Agreed To This Agreement? | 3 |
| What Have *You* And We Agreed To? | 3 |
| When Does This Agreement Begin? | 3 |
| When Will This Agreement End? | 3 |
| Which Words Have Special Meanings In This Agreement? | 3 |
| What Else Should *You* Know About *Your* Payment Obligation? | 4 |
| When Must *You* Pay *Your* Payment Obligation? | 4 |
| What Is the Payment Plan? | 5 |
| What Is the Billing Method? | 5 |
| What About Collateral? | 6 |
| What Is Default? | 7 |
| What May We Do In Case Of Default? | 8 |
| How Will Disagreements Be Resolved? | 8 |
| To Whom Must *You* and We Give Notices? | 9 |
| May Rights or Obligations be Assigned? | 9 |
| Will Past Forbearance Waive Rights under This Agreement? | 9 |
| Who Must Pay to Enforce This Agreement? | 9 |
| How May This Agreement Be Changed? | 9 |
| What If the Law Changes? | 10 |
| Are *You* Authorized to Make This Agreement? | 10 |
| Signatures | 10 |
| Schedule of Policies and Payments | Appended |

# PAYMENT AGREEMENT

## WHO HAS AGREED TO THIS AGREEMENT?

This Agreement is between:
- *You*, the organization(s) named as "our Client" in the *Schedule*, and
- *us*, the Insurer(s) named in the *Schedule*.

The words "we", "us" and "our" in this Agreement refer to the Insurer(s) named in the *Schedule*.

## WHAT HAVE *YOU* AND WE AGREED TO?

**We have agreed** to the following:
- to provide *You* insurance and services according to the *Policies* and other agreements; and
- to extend credit to *You* by deferring our demand for full payment of the entire amount of *Your Payment Obligation* if *You* make partial payments according to this Agreement.

To induce us to agree as above,

**You have agreed** to the following:
- to pay us all *Your Payment Obligation* and to perform all *Your* other obligations according to this Agreement and *Schedule* for all entities covered by the *Policies*;
- to provide us with collateral according to this Agreement and *Schedule*;

## WHEN DOES THIS AGREEMENT BEGIN?

This Agreement begins on the Effective Date shown in the first page (the title page) of this Agreement. Unless otherwise agreed in writing, this Agreement will also apply to any policies and *Schedules* that we may issue as renewals, revisions, replacements or additions to the attached *Schedule* and the *Policies* listed there.

## WHEN WILL THIS AGREEMENT END?

This Agreement will end only after *You* and we have settled and paid all obligations between *You* and us relating to this Agreement. Neither *You* nor we may cancel this Agreement without the other's consent.

## WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT?

Words with special meanings in the *Policies* have the same meanings in this Agreement as they have in the *Policies*. Non-italicized capitalized words in this Agreement are defined in the *Policies*, or their meanings are otherwise described in this Agreement.

The following are definitions of other special words. Terms printed in this Agreement in italic typeface have the meanings described below.

1. **"ALAE"** means Allocated Loss Adjustment Expense as defined in the *Policies*.
2. **"Deductible Loss Reimbursements"** means the portion of any *Loss* and *ALAE* we pay that *You* must reimburse us for under any "Deductible" or "Loss Reimbursement" provisions of a *Policy*.
3. **"Loss"** or **"Losses"** means damages, benefits or indemnity that we become obligated under the terms of the *Policies* to pay to claimants.
4. **"Policy"** or **"Policies"** means:
   - any of the insurance *Policies* described by their policy numbers in the *Schedule*, and their replacements and renewals;
   - any additional insurance *Policies* that we may issue to *You* that *You* and we agree to make subject to this Agreement;
5. **"Retained Amount"** or **"Retention"** means one of the following:
   - **Self-Insured Retention:** the amount specified in the applicable *Policy* as *Your* Self-Insured Retention per occurrence, accident, offense, claim or suit; or
   - **Deductible:** the amount specified in the applicable *Policy* as the Reimbursable or Deductible portion of *Loss* per occurrence, accident, offense, claim or suit; or
   - **Loss Limit:** the portion of any *Loss* we pay because of an occurrence, offense, accident, claim or suit, that we will include in the computation of the premiums.

The *Policies* show the type of *Retention* that applies to any specific occurrence, offense, accident, claim or suit.

## PAYMENT AGREEMENT

6. **"Schedule"** means each of the attachments to this Agreement that describes specific elements of the Agreement for a specified period of time. Each *Schedule* is a part of this Agreement. Additional *Schedules* or amendments to *Schedules* may be attached to this Agreement from time to time by mutual agreement between *You* and us.

7. **"You"** means the person or organization named as our Client in the title page of this Agreement, its predecessor and successor organizations, and each of its subsidiary, affiliated or associated organizations that are included as Named Insureds under any of the *Policies*. Each is jointly and severally liable to us for the entire amount of *Your Payment Obligation*.

8. **"Your Payment Obligation"** means the amounts that you must pay us for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance policies and agreements with us incurred before the inception date hereof. Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

- the premiums and premium surcharges,
- *Deductible Loss Reimbursements*,
- any amount that we may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *you* are a self-insurer,
- any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and we may agree from time to time.

**Loss Reserves:** *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and *ALAE*. Those *reserves* shall include specific reserves on known *Losses* and *ALAE*, reserves for incurred but not reported *Losses* and *ALAE*, and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to us. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *your* cumulative *Loss* and *ALAE* history.

## WHAT ELSE SHOULD *YOU* KNOW ABOUT *YOUR PAYMENT OBLIGATION*?

**Amounts:** We will calculate *Your Payment Obligation* according to the methods stated in the *Policies* and any other similar primary casualty insurance policies and agreements between us.

*You* must abide by the results under this Agreement of any payment of *Loss* or *ALAE* that the claims service provider or we shall have made in the absence of negligence and in good faith under any of the *Policies*.

**Credit:** Credit is extended to you whenever *Your* payment of some or all of *Your Payment Obligation* is postponed beyond the effective date of the insurance policies to which such obligations pertain. Any extension of unsecured credit to *You* under this Agreement is extended only for the duration of the policy year for which it is extended. It is subject to review and revision or withdrawal at each anniversary of this Agreement or at other times in accordance with the terms of this Agreement. Any extension of credit to you under this Agreement, including any deferral or waiver of the collection of collateral from *You* is not an assumption by us of any of *Your* obligations to us. Any extension of credit to *You* does not limit our right to enforce *Your* performance under this Agreement.

A Credit Fee may be charged for any unsecured credit extended to you. The Credit Fee, if any, is shown in the *Schedule*. Any such Credit Fee is an annual fee and applies only to the policy year to which such *Schedule* applies. A renewal Credit Fee may be charged for the period of any renewed extension of unsecured credit, and shall be shown in the *Schedule* pertaining thereto.

Payment of the Credit Fee, if any, is neither payment of premium for insurance of any kind nor payment of *Deductible Loss Reimbursements*.

## WHEN MUST *YOU* PAY *YOUR PAYMENT OBLIGATION*?

All payments are due by the due date stated in the *Schedule*, or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or your evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment.

## PAYMENT AGREEMENT

### WHAT IS THE PAYMENT PLAN?

#### Deposit and Installments

*You* must pay us a Deposit and Installments in the amounts and by the dates shown in the *Schedule* for the *Policies* described in the *Schedule*.

**Claims Payment Deposit:** If so shown in the *Schedule*, the Deposit includes a Claims Payment Deposit. The Claims Payment Deposit will not bear interest. We will return the amount of the Claim Payment Deposit to *You* when *You* have paid us all amounts due us.

If the total amount of claims we shall have paid on *Your* behalf exceeds the sum of the Claims Payment Deposit for three (3) consecutive billing periods, we may require *You* to pay us additional funds for the Claims Payment Deposit. However, the entire Claims Payment Deposit shall not exceed 250% of the average amount of the claims we had paid in each of the prior 3 periods.

#### Additional Payments

*You* must also make payments in addition to the Deposit and Installments according to the Payment Method described under "Additional Payments" in the *Schedule*.

### WHAT IS THE BILLING METHOD?

**Deposit and Installments:** *You* must pay us the amounts shown in the *Schedule* as "Installments". *You* must pay us those amounts by their Due Dates shown there.

**Additional Payments:** *You* have chosen the **Direct Billing Method** or the **Automatic Withdrawal Method**, or a combination of both. *Your* choice is shown in the *Schedule*.

#### Direct Billing Method

For the Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will further bill *You* as necessary for the payment of *Losses* we must pay or have paid within *Your* "*Retention*" and *Your* share of *ALAE* covered by the *Policies*. We will not bill more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*.

#### Automatic Withdrawal Method

For the Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will draw funds from the "Automatic Withdrawal Account" described in the *Schedule* as necessary for the payment of *Losses* within *Your* "*Retention*" and *Your* share of *ALAE* covered by the *Policies*. We will not withdraw more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*.

*You* hereby authorize us to withdraw funds from that Account upon our demand.

*You* must pay enough cash into that "Automatic Withdrawal Account" to cover our expected payments of *Loss* within *Your Retention* and *Your* share of *ALAE* during the next Claims Payment Fund Coverage Period shown in the *Schedule*. The minimum amount of such cash funds is shown in the *Schedule* as "Minimum Amount". *You* must make a payment in that amount into that Account immediately whenever its balance falls below 25% of that amount. Interest earned on that Account belongs to *You*.

## PAYMENT AGREEMENT

## WHAT ABOUT COLLATERAL?

### Collateral is Required

*You* must deliver collateral acceptable to us to secure *Your Payment Obligation* at the time(s), in the form(s) and in the amount(s) shown in the *Schedule*. Subject to the terms of this Agreement, we may apply any collateral we hold in connection with this or any other similar primary casualty insurance policies or agreements to *Your Payment Obligation.*

### Grant of Security Interest and Right to Offset

*You* grant us a possessory security interest in any property *You* deliver to us to secure *Your Payment Obligation. You* also grant us a continuing first-priority security interest and right of offset with respect to all premiums, surcharges, dividends, cash, accounts, or funds that are payable to *You* and are now or may in the future come into our possession in connection with *Your Payment Obligation. You* agree to assist us in any reasonable way to enable us to perfect our interest. *You* direct us to hold all such sums as collateral for *Your Payment Obligation* as they may be payable now or may become payable in the future.

### Letter of Credit

Any letter of credit must be clean, unconditional, irrevocable and evergreen. It must be from a bank that we and the Securities Valuation Office of the National Association of Insurance Commissioners have approved and in a form acceptable to us. It must be in the amount shown in the *Schedule.*

If any letter of credit is canceled, no later than 30 days before that letter of credit expires, *You* must deliver to us a substitute letter of credit that complies with the requirements set forth above. Upon *Your* written request, we will not unreasonably withhold our consent to a reasonable extension of the time within which *You* must deliver such a substitute letter of credit to us. The substitute letter of credit must take effect no later than the date of termination of the expiring letter of credit. *Your* duty to deliver such a letter of credit will continue until *You* have satisfied all *Your* obligations under this Agreement and the *Policies.* If *You* fail to provide us with a qualifying substitute letter of credit as indicated above, we may draw upon the existing letter of credit in full.

### Other Collateral

With respect to any collateral we accept other than a letter of credit, including but not limited to any collateral we hold in trust or escrow, any agreements between *You* and us about our respective rights and obligations with respect to such collateral are incorporated by reference into this Agreement. Nothing in those agreements will limit or modify any of our rights under this Agreement.

### Collateral Reviews

The collateral we require to secure *Your Payment Obligation* is subject to reviews and revisions as described below.

We will review our collateral requirement annually. In addition, we may review our collateral requirement at any time that we may deem reasonably necessary, including at any time after an event such as but not limited to the following:

1. the non-renewal or cancellation of any *Policy* to which this Agreement applies,

2. the failure or violation of any financial covenants or tests, or minimum financial rating (if any) specified in the *Schedule,*

3. the occurrence of any direct or indirect transaction for the merger or consolidation, or the conveyance, sale, transfer, dividend, spin-off, lease, or sale and lease back, of all or any material portion of *Your* property, assets, business or equity to any other entity,

4. any material adverse change in the financial condition of *You, Your* subsidiaries or affiliates taken separately or in combination, or any other entity on which we rely for security or guarantee in connection with this Agreement.

*You* and we will cooperate with each other and each other's designated consultants in the conduct of such reviews.

If as a result of any review we find that we require additional collateral, *You* will provide us such additional collateral within 30 days of our written request, which shall be accompanied by a worksheet showing our calculation of the amount thereof. If a return of collateral to *You* is indicated, we will return annually the indicated amount to *You* within 30 days of our written acknowledgement thereof.

## PAYMENT AGREEMENT

### Collateral Adjustment Procedure

The additional collateral that *You* must provide us will be in the amount of the difference between the total unpaid amount of *Your Payment Obligation* and the total amount of *Your* collateral that we then hold. We may adjust the collateral requirement relating to the unexpired term of the *Policies* on the basis of our evaluation of *Your* financial condition. If such difference is a negative sum, that sum is the amount that we will return to *You*. However, we are not obligated to return collateral to *You* if *You* are in default of any provision of this Agreement or any other similar agreement relating to your primary casualty insurance with us.

### Financial Information

*You* must provide financial information to us as a basis for our collateral reviews within 14 days after our request.

If *You* are not subject to the reporting requirements of the Securities and Exchange Act of 1934, *You* must provide us copies of *Your* audited annual financial statements.

If we so request, *You* must provide us such financial information as we may reasonably deem necessary to determine *Your* financial condition, including but not limited to copies of *Your* completed quarterly financial statements. Those statements must include the following:

- balance sheet,
- income statement
- statement of retained earnings,
- cash flow statement,
- notes to the statements, and
- any supplemental schedules.

### Reporting Requirement

Give us prompt notice of the event of any default as described in the section titled "What Is Default", or any event described in the section titled "Collateral Reviews" in this Agreement, that has happened or is about to happen.

As an alternative to the above, at *Your* option, provide us with the same notices at the same time that *You* provide such notices to any other creditor regarding any material financial or operational condition that *You* are obligated to report to such other creditor.

## WHAT IS DEFAULT?

Default is any of the following:

1. failure by *You* or any of *Your* subsidiaries or affiliates to perform within 5 days after its due date any obligation *You* or any of *Your* subsidiaries or affiliates have under this Agreement or any other agreement with us.

2. *Your* insolvency, or the occurrence of any of the following:

   - the commencement of liquidation or dissolution proceedings, *Your* general failure to pay debts as they become due, general assignment by *You* for the benefit of creditors, the filing by or against *You* of any petition, proceeding, case or action under the provisions of the United States Bankruptcy Code or other such law relating to debtors, the appointment of, or the voluntary or involuntary filing for a petition for the appointment of, a receiver, liquidator, rehabilitator, trustee, custodian or similar official to take possession or control of any of *Your* property; or

   - *Your* default on any material outstanding debt not cured within its applicable cure period, if any.

3. the cancellation by *You*, without our prior consent, of any *Policy* material to this Agreement. However, *Your* concurrent cancellation of <u>all</u> the unexpired *Policies* shall not constitute default.

4. the discovery of any material inaccuracy or incompleteness in any representation, warranty or condition precedent *You* make in connection with this Agreement, the insurance afforded by any of the *Policies* or *Your Payment Obligation*.

## PAYMENT AGREEMENT

## WHAT MAY WE DO IN CASE OF DEFAULT?

If default occurs, we may take reasonable and appropriate steps that are necessary to protect our interest. We will exercise good faith consistent with usual and customary commercial and credit practice in selecting and exercising such steps. We may take steps such as the following:

1. We may declare the entire unpaid amount of *Your Payment Obligation* immediately due and payable.

2. We may change any or all unexpired *Policies* under Loss Reimbursement or Deductible plans to Non-Deductible plans for the remaining term of any such *Policy*, to become effective after ten days written notice to *You*. We will therewith increase the premiums for those *Policies* in accordance with our applicable rating plan.

3. We may draw upon, liquidate, or take ownership of any or all collateral we hold regardless of the form, and hold or apply such amounts to any of *Your Payment Obligation* under this Agreement or any other premium, surcharge or deductible financing agreement between *You* and us, or under any *Policies*. However, we will not draw upon, liquidate, or take ownership of more collateral than is reasonably necessary to protect our interest.

4. We may require *You* to deliver to us additional collateral, including an amendment to the letter of credit or an additional letter of credit or other additional collateral. The other additional collateral, letter of credit or its amendment must conform to the requirements described above. *You* must deliver it within 15 days of *Your* receipt of a written notice from us.

5. We may cancel any or all unexpired *Policies* as if for non-payment of premium or *Deductible Loss Reimbursements*. We may apply any return of premium resulting from the cancellation to remedy any default.

6. We may withhold payment of claims to *You* or any of *Your* subsidiaries or affiliates.

7. We may satisfy *Your* obligations to us in whole or in part by set-off against any moneys, securities, collateral, consideration or property of *Yours* received by, pledged to, held by or otherwise available to us in connection with *Your Payment Obligation*. *You* authorize us after any default to charge any account that *You* maintain with us in connection with *Your Payment Obligation* in order to satisfy any of *Your* obligations.

## HOW WILL DISAGREEMENTS BE RESOLVED?

### What if we disagree about payment due?

If *You* disagree with us about any amount of *Your Payment Obligation* that we have asked *You* to pay, within the time allowed for payment *You* must:

- give us written particulars about the items with which *You* disagree; and
- pay those items with which *You* do not disagree.

We will review the disputed items promptly and provide *You* with further explanations, details, or corrections. *You* must pay us the correct amounts for the disputed items within 10 days of agreement between *You* and us about their correct amounts. Any disputed items not resolved within 60 days after our response to *Your* written particulars must immediately be submitted to arbitration as set forth below. With our written consent, which shall not be unreasonably withheld, *You* may have reasonable additional time to evaluate our response to *Your* written particulars.

So long as *You* are not otherwise in default under this Agreement, we will not exercise our rights set forth under "What May We Do In Case of Default?", pending the outcome of the arbitration on the disputed amount of *Your Payment Obligation*.

### What about disputes other than disputes about payment due?

Any other unresolved dispute arising out of this Agreement must be submitted to arbitration. *You* must notify us in writing as soon as *You* have submitted a dispute to arbitration. We must notify *You* in writing as soon as we have submitted a dispute to arbitration.

### Arbitration Procedures

**How arbitrators must be chosen:** *You* must choose one arbitrator and we must choose another. They will choose the third. If *You* or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make an application to a Justice of the Supreme Court of the State of New York, County of New York and the Court will appoint the additional arbitrator or arbitrators.

# PAYMENT AGREEMENT

**Qualifications of arbitrators:** Unless *You* and we agree otherwise, all arbitrators must be executive officers or former executive officers of property or casualty insurance or reinsurance companies or insurance brokerage companies, or risk management officials in an industry similar to *Yours*, domiciled in the United States of America not under the control of either party to this Agreement.

**How the arbitration must proceed:** The arbitrators shall determine where the arbitration shall take place. The arbitration must be governed by the United States Arbitration Act, Title 9 U.S.C. Section 1, et seq. Judgment upon the award rendered by the arbitrators may be entered by a court having jurisdiction thereof.

*You* and we must both submit our respective cases to the arbitrators within 30 days of the appointment of the third arbitrator. The arbitrators must make their decision within 60 days following the termination of the hearing, unless *You* and we consent to an extension. The majority decision of any two arbitrators, when filed with *You* and us will be final and binding on *You* and on us.

The arbitrators must interpret this Agreement as an honorable engagement and not merely a legal obligation. They are relieved of all judicial formalities. They may abstain from following the strict rules of law. They must make their award to effect the general purpose of this Agreement in a reasonable manner.

The arbitrators must render their decision in writing, based upon a hearing in which evidence may be introduced without following strict rules of evidence, but in which cross-examination and rebuttal must be allowed.

The arbitrators may award compensatory money damages and interest thereupon. They may order *You* to provide collateral to the extent required by this Agreement. They will have exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability. However, they will not have the power to award exemplary damages or punitive damages, however denominated, whether or not multiplied, whether imposed by law or otherwise.

**Expenses of Arbitration:** *You* and we must each bear the expense of our respective arbitrator and must jointly and equally bear with each other the expense of the third arbitrator and of the arbitration.

This Section will apply whether that dispute arises before or after termination of this Agreement.

## TO WHOM MUST *YOU* AND WE GIVE NOTICES?

We will mail or deliver all notices to *You* at *Your* address in the *Schedule*. *You* must mail or deliver all notices to our Law Representative with a copy to our Account Executive at the address specified in the *Schedule*. All notices must be in writing.

## MAY RIGHTS OR OBLIGATIONS UNDER THIS AGREEMENT BE ASSIGNED?

Neither *You* nor we may assign our rights or obligations under this Agreement without the written consent of the other, which shall not be unreasonably withheld.

## WILL PAST FORBEARANCE WAIVE RIGHTS UNDER THIS AGREEMENT?

Past forbearance, neglect or failure to enforce any or all provisions of this Agreement, or to give notice of insistence upon strict compliance with it, will not be a waiver of any rights. A waiver of rights in a past circumstance will not be a course of conduct that waives any rights in any subsequent circumstance.

## WHO MUST PAY TO ENFORCE THIS AGREEMENT?

If *You* or we fail to perform or observe any provisions under this Agreement, the other may incur reasonable additional expenses to enforce or exercise its remedies. Either *You* or we must reimburse the other upon demand and presentation of clear and convincing supporting evidence for any and all such additional expenses.

## HOW MAY THIS AGREEMENT BE CHANGED?

This Agreement may be changed only by agreement by *You* and us, as evidenced by a written addendum to this Agreement, duly executed by the authorized representatives of each.

# PAYMENT AGREEMENT

## WHAT IF THE LAW CHANGES?

If any part of this Agreement should become unenforceable because of any change in law, the remainder of this Agreement will remain in full force and effect.

## ARE YOU AUTHORIZED TO MAKE THIS AGREEMENT?

You hereby represent and warrant that Your execution, delivery and performance of this Agreement have been authorized by all necessary corporate actions. The individual executing this agreement on Your behalf has full right and authority to execute and deliver this agreement and to bind You jointly and severally.

## SIGNATURES

TO SIGNIFY AGREEMENT, You and we have caused this Agreement to be executed by the duly authorized representatives of each.

For **Lexington Insurance Company**
On behalf of itself and its affiliates first listed above:
In New York, New York,
This 12th day of May, 2009
Signed by _____
Typed Name: Joseph Davide
Title: Attorney-In-Fact

For You, our Client
**General Motors Corporation**
In Detroit, MI
This 22 day of ADivel, 2009
Signed by _____
Typed Name Alan G. Fires
Title Director, Global Risk Financing + Insurance

# Schedule of Policies and Payments

## Paid-Loss Payments Plan

Effective from 04/01/2009 to 04/01/2010

Annexed to the PAYMENT AGREEMENT

effective on 04/01/2009

by and between us,

### Lexington Insurance Company

and *You*, our Client

## *General Motors Corporation*

on behalf of *You* and all *Your* subsidiaries or affiliates except those listed below:

*(None)*

For our use only: Contract Number

**Your Address:**

Contact Name: Alan Gier
Company Name: General Motors Corporation
Street: 300 Renaissance Center
City: Detroit        State: Michigan        Zip: 48265        Telephone: (313)665-3457

**Your Representative:**

Contact Name: Joseph Callanan
Company Name: Aon Risk Services
Street: 3000 Town Center, Suite 3000
City: Southfield        State: MI        Zip: 48075        Telephone: (248)936-5260

**Our Account Executive:**

Contact Name: Peter Rapciewicz
Company Name: Lexington Insurance Company
Street: 175 Water Street, 27th Floor
City: New York        State: NY        Zip: 10038        Telephone: (212)458-3019

**Our Law Representative:**

Contact Name: Salvatore Tollis
Company Name: AIU Holdings, Inc.
Street: 175 Water Street, 18th Floor
City: New York        State: NY        Zip: 10038        Telephone: (212)458-7051

**Remit Payments to:**

Contact Name: Lystra Charles
Company Name: AIU Holdings, Inc.
Street: PO Box 10472
City: Newark        State: NJ        Zip: 07193        Telephone: (908)679-2621

**Remit Collateral to:**

Contact Name: Attn: Donato DiLuzio
Company Name: AIU Holdings, Inc.
Street: PO Box 923, Wall Street Station
City: New York        State: NY        Zip: 10268        Telephone: (212)820-2412

---

Edition 1/99        Paid-Loss Payments Method        Page 1 of 4

## A. *Policies* and Other Agreements

Workers Compensation and Employers Liability Insurance

Commercial General Liability Insurance
0907328          0907330
Automobile Liability Insurance

Other Insurance

Other Agreements (Describe)

## B. Payment Plan:

### 1. Cash Deposit, Installments and Estimated Deferred Amounts

| Pay-ment No. | Due Date | Provision for Expenses and Excess Losses [1] | Special Taxes and Surcharges | Annual Credit Fee | Provision for Limited Losses [2] | *Your Estimated Payment Obligation* |
|---|---|---|---|---|---|---|
| 1 | 04/01/2009 | $60,000 | $0 | $0 | $0 | $ 60,000 |
|  | Subtotals | $60,000 | $ 0 | $ 0 | $ 0 | $ 60,000 |
|  | DLP* | N/A | N/A | N/A | $898,445 | $898,445 |
|  | DEP* | $0 | $0 | $0 | N/A | $ 0 |
|  | Totals | $60,000 | $ 0 | $ 0 | $898,445 | $ 958,445 |

DLP means "Deferred Loss Provision". This is the estimated amount *You* must pay us as "Regular Loss payments" and "Sizeable Loss Payments" described below.

DEP means "Deferred Expense Provision". This is an estimated amount that *You* must pay us as follows:

Notes:  (1) "Provision for Expenses and Excess Losses" is a part of the Premium
       (2) "Provision for Limited Losses" includes provision for *Loss* within your *Retention* (both Deductible and Loss Limit) and *Your* share of *ALAE*. Any "Deposit" in this column is the Claims Payment Deposit. Refer to definitions in the Payment Agreement.

## 2. Adjustments

The sums shown above are only estimated amounts. If *Your Payment Obligation* changes under the terms of the *Policies*, we will promptly notify *You* as such changes become known to us. All additional or return amounts relating thereto shall be payable in accordance with the terms of the Payment Agreement.

## 3. Additional Payments

On a <u>Monthly</u> basis, we will report to *You* the amounts of *Loss* and *ALAE* that we have paid under the *Policies. You* must subsequently pay us as described below.

**Regular Loss Payments:** Regular Loss Payments apply in addition to the amounts shown with Due Dates in Section B above.

We will bill *You* or withdraw funds from the Automatic Withdrawal Account (whichever Billing Method applies as shown below) at the periodic intervals stated above for the amounts of *Loss* within *Your Retention* and *Your* share of *ALAE* that we will have paid under the *Policies*, less all amounts *You* will have paid us to date as such Regular Loss Payments and the Sizable Loss Payments described below.

**Sizable Loss Payments:** If we must make payment for any *Loss* within *Your Retention* and *Your* share of *ALAE* arising out of a single accident, occurrence, offense, claim or suit that in combination exceeds the Sizable Loss Payment Amount of **$25,000**, *You* must pay us the amount of that payment of *Loss* within 10 days after *You* receive our bill.

**Billing Method:**

☒ Billing to

    ☒ *You* at *Your* address shown in the *Schedule*, or

    ☐ *Your* Representative at its address shown in the *Schedule*; or

☐ Automatic Withdrawal from the account described below.

| | |
|---|---|
| If Automatic Withdrawal Account applies: | Minimum Amount: $0 |

Name of Depository Institution:

Address:

Account Number:

## 4. Conversion

**The Conversion Date** for each *policy* described in section A above shall be the date _ months after the inception of such *Policy*.

On or shortly after the Conversion Date upon the presentation of our invoice, *You* must pay in cash the entire unpaid amount of *Your Payment Obligation* for such *Policies*.

# C. Security Plan

## 1. Collateral

| Collateral on Hand (by Type) | Amount of Collateral |
|---|---|
| Trusts | $898,445 |
| Total Collateral on Hand | $ 898,445 |

| Additional Collateral Required (by Type) | Amount of Collateral | Due Date |
|---|---|---|
| N/A | $0 | |
| Total Additional Collateral Required | $ 0 | |
| Total Collateral Required | $ 898,445 | |

## 2. Financial Covenants, Tests, or Minimum Credit Ratings

We may require additional collateral from *You* in the event of the following:

a. **Credit Trigger:**

   i. If the credit rating of the entity named below and for the type of debt described below, promulgated by Standard & Poor's Corporation ("S&P") or by Moody's Investors Services, Inc. ("Moody's"), drops to or below the grade shown respectively under S&P or Moody's, or

   ii. If S&P or Moody's withdraws any such rating.

   We may require and *You* must deliver such additional collateral according to the Payment Agreement up to an amount such that our unsecured exposure will not exceed the amount shown as the Maximum Unsecured Exposure next to such rating in the grid below.

   "Unsecured exposure" is the difference between the total unpaid amount of *Your Payment Obligation* (including any similar obligation incurred before the inception of the Payment Agreement and including any portion of *Your Payment Obligation* that has been deferred and is not yet due) and the total amount of *Your* collateral that we hold.

**Name of Entity:**      **Type of Debt Rated:**

### Ratings at Effective Date

| S&P | Moody's | Unsecured Exposure at Effective Date |
|-----|---------|--------------------------------------|
|     |         |                                      |

### Potential Future Ratings

| S&P | Moody's | Maximum Unsecured Exposure |
|-----|---------|----------------------------|
|     |         | $0                         |

b. Other Financial Tests or Covenants:

## 3. Adjustment of Credit Fee

If the amount of unsecured exposure is changed because of *Your* delivery of additional collateral to us due to the requirements under item 2 above, the Credit Fee shall be adjusted on a pro-rata basis from the date of such delivery. Adjustment of the credit fee shall not include an adjustment of any fees associated with your deferred premium payment plan.

## SIGNATURES

IN WITNESS WHEREOF, *you* and we have caused this *Schedule* to be executed by the duly authorized representatives of each.

For us, Lexington Insurance Company,

This 12th day of April, 2009

Signed by _____

Typed Name Joseph Davide

Title Attorney-in-Fact

For You: *General Motors Corporation*

this 22 day of July 2009

Signed by _____

Typed Name Alan G. Grier

Title Director, Global Risk Financing + Insurance

**Mandatory Addendum**

**to**

**PAYMENT AGREEMENT**

**By and between us**

**Lexington Insurance Company**

**(Company, "we", "us" or "our")**

**and *You*, our Client**

**General Motors Corporation**

This Addendum is attached to and forms a part of the Payment Agreement entered into between Company and Client as of the 1st day of April 2009.

1.  The section entitled **WHO HAS AGREED TO THIS AGREEMENT?**, is deleted and replaced with the following:

    This Agreement is between:

    - *You*, the organization(s) named as "our Client" in the *Schedule*, and

    - *us*, the insurers set forth above as "Company", "we," "us" and "our" in this Addendum.

2.  The section entitled **WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT? 8. - Your Payment Obligation**, is deleted and replaced with the following:

    **"Your Payment Obligation"** means the amounts that *You* must pay *us* for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance policies and agreements with *us* incurred before the inception date hereof.   Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

    - the premiums and premium surcharges, taxes and assessments,
    - *Deductible Loss Reimbursements*,
    - any amount that we may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *You* are a self-insurer,
    - any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and we may agree from time to time,
    - costs and expenses incurred by any third party administrator,
    - any penalties or charges incurred as a result of your failure to cooperate in the completion of an actual premium audit.

    **Loss Reserves:** *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and *ALAE*. Those reserves shall include specific reserves on known *Losses* and *ALAE*, reserves for incurred but not reported *Losses* and *ALAE*, and reserves for statistically expected development on *Losses* and *ALAE* that

have been reported to *us*. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *Your* cumulative *Loss* and *ALAE* history.

**Taxes, Assessments and Surcharges:** The taxes, assessments and surcharges shown on the Schedule are based upon our knowledge of the current law in the states involved. If the law changes, or a rate or assessment changes, or a new surcharge is imposed, or a state reinterprets its law, any additional taxes, assessments and surcharges will become part of *Your Payment Obligation.*

3.  The section entitled: **WHAT ELSE SHOULD YOU KNOW ABOUT YOUR PAYMENT OBLIGATION?** is amended to include the following:

We will contract with a Third Party Administrator (TPA) that *You* select for the adjustment of *Your* claims under the Policies provided that we consent to *Your* selection in advance. Our relationship with the TPA will be governed by a Claims Service Agreement (CSA) between *us* and the TPA, a copy of which will be made available to *You* upon *Your* request. Any TPA *You* select must meet all of our licensing requirements. Should we terminate the CSA at *Your* request or should the TPA no longer meet our service standards, we will enter into a CSA with another TPA.   We will exercise good faith consistent with usual and customary commercial practice before we change one TPA to another TPA. Any amounts we pay to any TPA on *Your* behalf shall be considered part of *Your Payment Obligation*, and shall include, but not be limited to the following: cost of adjusting expense at new TPA; costs or losses incurred as a result of claims handling conduct of prior TPA, including fines and penalties; fines and penalties for failure to submit accurate data to regulatory bureaus; data transfer expense; costs to retrieve or recreate information not properly maintained by prior TPA; and costs to set up new escrow account.

4.  The section entitled: **WHEN MUST *YOU* PAY *YOUR* PAYMENT OBLIGATION?** is amended to include the following:

All payments are due by the due date stated in the *Schedule*, or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or *Your* evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment. If payment is not made when due, interest will accrue on the unpaid balance daily after the due date at the Prime Rate then in effect at Citibank, N.A., NY, NY, plus 150 basis points.

5.  The section entitled: **WHAT ABOUT COLLATERAL?** is amended to include the   following:

Collateral Exchange:

At our sole discretion we may approve *Your* substitution or exchange of one form or instrument of collateral for another. Any replacement collateral must be in a form and drawn on a bank or insurer acceptable to *us*. If the original collateral was in the form of cash on which interest was being earned, a substitution may result in a change to the interest rate. We will not approve *Your* substitution or exchange of collateral if *You* are in Default of any of the terms of this Agreement or have triggered any applicable Financial Covenants, Tests or Minimum Credit Ratings shown in the Schedule.

Mandatory Addendum LEX.Doc

6.  The section entitled: **HOW WILL DISAGREEMENTS BE RESOLVED? ARBITRA-TION PROCEDURES - How Arbitrators Must Be Chosen**, is deleted and replaced with the following:

**How arbitrators must be chosen:** *You* must choose one arbitrator and we must choose another. They will choose the third. If *You* or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make application only to a court of competent jurisdiction in the City, County, and State of New York. Similarly, any action or proceeding concerning arbitrability, including motions to compel or to stay arbitration, may be brought only in a court of competent jurisdiction in the City, County, and State of New York.

7.  The section entitled: **ARE YOU AUTHORIZED TO MAKE THIS AGREEMENT?** is amended to include the following:

This Agreement together with the Schedules, Addenda, Policies and any related agreements between *You* and *us*, constitute the basis for a program of insurance coverage. We would not have entered into any of them without *Your* agreement on all of them. For that reason, *You* should review all such documents together when making any accounting, tax or legal determinations relating to the insurance program.

**IN WITNESS WHEREOF**, the parties hereto have caused this Addendum to be executed by their duly authorized representatives.

For **Lexington Insurance Company:**

In New York, New York,
This 12th day of April, 2009

Signed by _____

Typed Name Joseph Davide

Title Attorney-In-Fact

**For You,** our Client

**General Motors Corporation**

In _____Detroit_____ Mi

This 22 day of June 2009

Signed by _____

Typed Name Alan Gier

Title Director, Global Risk Financing & Insurance



# Payment Agreement

For

## Insurance and Risk Management Services

effective on the 1st day of September, 2006

by and between *us*,

**American International Specialty Lines Insurance Company**

And *you*, *our* Client

**General Motors Corporation**
**300 Renaissance Ctr**
**Detroit, MI 48265-0001**

in consultation with *your* representative

**Aon Risk Services, Inc. of MI**
**P.O. Box 5156**
**Southfield, MI 48086-5156**

PAYMENT AGREEMENT

## TABLE of CONTENTS

| | |
|---|---|
| Title Page | 1 |
| Table of Contents | 2 |
| Who Has Agreed To This Agreement? | 3 |
| What Have *You* And We Agreed To? | 3 |
| When Does This Agreement Begin? | 3 |
| When Will This Agreement End? | 3 |
| Which Words Have Special Meanings In This Agreement? | 3 |
| What Else Should *You* Know About *Your* Payment Obligation? | 4 |
| When Must *You* Pay *Your* Payment Obligation? | 4 |
| What Is the Payment Plan? | 5 |
| What Is the Billing Method? | 5 |
| What About Collateral? | 6 |
| What Is Default? | 7 |
| What May We Do In Case Of Default? | 8 |
| How Will Disagreements Be Resolved? | 8 |
| To Whom Must *You* and We Give Notices? | 9 |
| May Rights or Obligations be Assigned? | 9 |
| Will Past Forbearance Waive Rights under This Agreement? | 9 |
| Who Must Pay to Enforce This Agreement? | 9 |
| How May This Agreement Be Changed? | 9 |
| What If the Law Changes? | 10 |
| Are *You* Authorized to Make This Agreement? | 10 |
| Signatures | 10 |
| Schedule of Policies and Payments | Appended |

# PAYMENT AGREEMENT

## WHO HAS AGREED TO THIS AGREEMENT?

This Agreement is between:
- *You*, the organization(s) named as "our Client" in the *Schedule*, and
- *us*, the insurer named in the *Schedule*.

The words "we", "us" and "our" in this Agreement refer to the insurer named in the *Schedule*.

## WHAT HAVE *YOU* AND WE AGREED TO?

**We have agreed** to the following:
- to provide *You* insurance and services according to the *Policies* and other agreements; and
- to extend credit to *You* by deferring our demand for full payment of the entire amount of *Your Payment Obligation* if *You* make partial payments according to this Agreement.

To induce us to agree as above,

**You have agreed** to the following:
- to pay us all *Your Payment Obligation* and to perform all *Your* other obligations according to this Agreement and *Schedule* for all entities covered by the *Policies*;
- to provide us with collateral according to this Agreement and *Schedule*;

## WHEN DOES THIS AGREEMENT BEGIN?

This Agreement begins on the Effective Date shown in the first page (the title page) of this Agreement. Unless otherwise agreed in writing, this Agreement will also apply to any policies and *Schedules* that we may issue as renewals, revisions, replacements or additions to the attached *Schedule* and the *Policies* listed there.

## WHEN WILL THIS AGREEMENT END?

This Agreement will end only after *You* and we have settled and paid all obligations between *You* and us relating to this Agreement. Neither *You* nor we may cancel this Agreement without the other's consent.

## WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT?

Words with special meanings in the *Policies* have the same meanings in this Agreement as they have in the *Policies*. Non-italicized capitalized words in this Agreement are defined in the *Policies*, or their meanings are otherwise described in this Agreement.

The following are definitions of other special words. Terms printed in this Agreement in italic typeface have the meanings described below.

1. **"ALAE"** means Allocated Loss Adjustment Expense as defined in the *Policies*.
2. **"Deductible Loss Reimbursements"** means the portion of any *Loss* and *ALAE* we pay that *You* must reimburse us for under any "Deductible" or "Loss Reimbursement" provisions of a *Policy*.
3. **"Loss"** or **"Losses"** means damages, benefits or indemnity that we become obligated under the terms of the *Policies* to pay to claimants.
4. **"Policy"** or **"Policies"** means:
   - any of the insurance *Policies* described by their policy numbers in the *Schedule*, and their replacements and renewals;
   - any additional insurance *Policies* that we may issue to *You* that *You* and we agree to make subject to this Agreement;
5. **"Retained Amount"** or **"Retention"** means one of the following:
   - **Self-Insured Retention:** the amount specified in the applicable *Policy* as *Your* Self-Insured Retention per occurrence, accident, offense, claim or suit; or
   - **Deductible:** the amount specified in the applicable *Policy* as the Reimbursable or Deductible portion of *Loss* per occurrence, accident, offense, claim or suit; or
   - **Loss Limit:** the portion of any *Loss* we pay because of an occurrence, offense, accident, claim or suit, that we will include in the computation of the premiums.

The *Policies* show the type of *Retention* that applies to any specific occurrence, offense, accident, claim or suit.

# PAYMENT AGREEMENT

6. **"Schedule"** means each of the attachments to this Agreement that describes specific elements of the Agreement for a specified period of time. Each *Schedule* is a part of this Agreement. Additional *Schedules* or amendments to *Schedules* may be attached to this Agreement from time to time by mutual agreement between *You* and us.

7. **"You"** means the person or organization named as our Client in the title page of this Agreement, its predecessor and successor organizations, and each of its subsidiary, affiliated or associated organizations that are included as Named Insureds under any of the *Policies*. Each is jointly and severally liable to us for the entire amount of *Your Payment Obligation*.

8. **"Your Payment Obligation"** means the amounts that you must pay us for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance policies and agreements with us incurred before the inception date hereof. Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

- the premiums and premium surcharges,
- *Deductible Loss Reimbursements*,
- any amount that we may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *you* are a self-insurer,
- any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and we may agree from time to time.

**Loss Reserves:** *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and *ALAE*. Those reserves shall include specific reserves on known *Losses* and *ALAE*, reserves for incurred but not reported *Losses* and *ALAE*, and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to us. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *your* cumulative *Loss* and *ALAE* history.

## WHAT ELSE SHOULD *YOU* KNOW ABOUT *YOUR PAYMENT OBLIGATION?*

**Amounts:** We will calculate *Your Payment Obligation* according to the methods stated in the *Policies* and any other similar primary casualty insurance policies and agreements between us.

*You* must abide by the results under this Agreement of any payment of *Loss* or *ALAE* that the claims service provider or we shall have made in the absence of negligence and in good faith under any of the *Policies.*

**Credit:** Credit is extended to you whenever *Your* payment of some or all of *Your Payment Obligation* is postponed beyond the effective date of the insurance policies to which such obligations pertain. Any extension of unsecured credit to *You* under this Agreement is extended only for the duration of the policy year for which it is extended. It is subject to review and revision or withdrawal at each anniversary of this Agreement or at other times in accordance with the terms of this Agreement. Any extension of credit to you under this Agreement, including any deferral or waiver of the collection of collateral from *You* is not an assumption by us of any of *Your* obligations to us. Any extension of credit to *You* does not limit our right to enforce *Your* performance under this Agreement.

A Credit Fee may be charged for any unsecured credit extended to you. The Credit Fee, if any, is shown in the *Schedule*. Any such Credit Fee is an annual fee and applies only to the policy year to which such *Schedule* applies. A renewal Credit Fee may be charged for the period of any renewed extension of unsecured credit, and shall be shown in the *Schedule* pertaining thereto.

Payment of the Credit Fee, if any, is neither payment of premium for insurance of any kind nor payment of *Deductible Loss Reimbursements.*

## WHEN MUST *YOU* PAY *YOUR PAYMENT OBLIGATION?*

All payments are due by the due date stated in the *Schedule*, or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or your evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment.

## PAYMENT AGREEMENT

## WHAT IS THE PAYMENT PLAN?

### Deposit and Installments

*You* must pay us a Deposit and Installments in the amounts and by the dates shown in the *Schedule* for the *Policies* described in the *Schedule*.

**Claims Payment Deposit:** If so shown in the *Schedule*, the Deposit includes a Claims Payment Deposit. The Claims Payment Deposit will not bear interest. We will return the amount of the Claim Payment Deposit to *You* when *You* have paid us all amounts due us.

If the total amount of claims we shall have paid on *Your* behalf exceeds the sum of the Claims Payment Deposit for three (3) consecutive billing periods, we may require *You* to pay us additional funds for the Claims Payment Deposit. However, the entire Claims Payment Deposit shall not exceed 250% of the average amount of the claims we had paid in each of the prior 3 periods.

### Additional Payments

*You* must also make payments in addition to the Deposit and Installments according to the Payment Method described under "Additional Payments" in the *Schedule*.

## WHAT IS THE BILLING METHOD?

**Deposit and Installments:** *You* must pay us the amounts shown in the *Schedule* as "Installments". *You* must pay us those amounts by their Due Dates shown there.

**Additional Payments:** *You* have chosen the **Direct Billing Method** or the **Automatic Withdrawal Method,** or a combination of both. *Your* choice is shown in the *Schedule*.

### Direct Billing Method

For the Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will further bill *You* as necessary for the payment of *Losses* we must pay or have paid within *Your* "*Retention*" and *Your* share of *ALAE* covered by the *Policies*. We will not bill more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*.

### Automatic Withdrawal Method

For the Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will draw funds from the "Automatic Withdrawal Account" described in the *Schedule* as necessary for the payment of *Losses* within *Your* "*Retention*" and *Your* share of *ALAE* covered by the *Policies*. We will not withdraw more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*.

*You* hereby authorize us to withdraw funds from that Account upon our demand.

*You* must pay enough cash into that "Automatic Withdrawal Account" to cover our expected payments of *Loss* within *Your Retention* and *Your* share of *ALAE* during the next Claims Payment Fund Coverage Period shown in the *Schedule*. The minimum amount of such cash funds is shown in the *Schedule* as "Minimum Amount". *You* must make a payment in that amount into that Account immediately whenever its balance falls below 25% of that amount. Interest earned on that Account belongs to *You*.

## PAYMENT AGREEMENT

## WHAT ABOUT COLLATERAL?

### Collateral is Required

*You* must deliver collateral acceptable to us to secure *Your Payment Obligation* at the time(s), in the form(s) and in the amount(s) shown in the *Schedule*. Subject to the terms of this Agreement, we may apply any collateral we hold in connection with this or any other similar primary casualty insurance policies or agreements to *Your Payment Obligation.*

### Grant of Security Interest and Right to Offset

*You* grant us a possessory security interest in any property *You* deliver to us to secure *Your Payment Obligation. You* also grant us a continuing first-priority security interest and right of offset with respect to all premiums, surcharges, dividends, cash, accounts, or funds that are payable to *You* and are now or may in the future come into our possession in connection with *Your Payment Obligation. You* agree to assist us in any reasonable way to enable us to perfect our interest. *You* direct us to hold all such sums as collateral for *Your Payment Obligation* as they may be payable now or may become payable in the future.

### Letter of Credit

Any letter of credit must be clean, unconditional, irrevocable and evergreen. It must be from a bank that we and the Securities Valuation Office of the National Association of Insurance Commissioners have approved and in a form acceptable to us. It must be in the amount shown in the *Schedule.*

If any letter of credit is canceled, no later than 30 days before that letter of credit expires, *You* must deliver to us a substitute letter of credit that complies with the requirements set forth above. Upon *Your* written request, we will not unreasonably withhold our consent to a reasonable extension of the time within which *You* must deliver such a substitute letter of credit to us. The substitute letter of credit must take effect no later than the date of termination of the expiring letter of credit. *Your* duty to deliver such a letter of credit will continue until *You* have satisfied all *Your* obligations under this Agreement and the *Policies.* If *You* fail to provide us with a qualifying substitute letter of credit as indicated above, we may draw upon the existing letter of credit in full.

### Other Collateral

With respect to any collateral we accept other than a letter of credit, including but not limited to any collateral we hold in trust or escrow, any agreements between *You* and us about our respective rights and obligations with respect to such collateral are incorporated by reference into this Agreement. Nothing in those agreements will limit or modify any of our rights under this Agreement.

### Collateral Reviews

The collateral we require to secure *Your Payment Obligation* is subject to reviews and revisions as described below.

We will review our collateral requirement annually. In addition, we may review our collateral requirement at any time that we may deem reasonably necessary, including at any time after an event such as but not limited to the following:

1. the non-renewal or cancellation of any *Policy* to which this Agreement applies,

2. the failure or violation of any financial covenants or tests, or minimum financial rating (if any) specified in the *Schedule,*

3. the occurrence of any direct or indirect transaction for the merger or consolidation, or the conveyance, sale, transfer, dividend, spin-off, lease, or sale and lease back, of all or any material portion of *Your* property, assets, business or equity to any other entity,

4. any material adverse change in the financial condition of *You, Your* subsidiaries or affiliates taken separately or in combination, or any other entity on which we rely for security or guarantee in connection with this Agreement.

*You* and *we* will cooperate with each other and each other's designated consultants in the conduct of such reviews.

If as a result of any review we find that we require additional collateral, *You* will provide us such additional collateral within 30 days of our written request, which shall be accompanied by a worksheet showing our calculation of the amount thereof. If a return of collateral to *You* is indicated, we will return annually the indicated amount to *You* within 30 days of our written acknowledgement thereof.

# PAYMENT AGREEMENT

## Collateral Adjustment Procedure

The additional collateral that *You* must provide us will be in the amount of the difference between the total unpaid amount of *Your Payment Obligation* and the total amount of *Your* collateral that we then hold. We may adjust the collateral requirement relating to the unexpired term of the *Policies* on the basis of our evaluation of *Your* financial condition. If such difference is a negative sum, that sum is the amount that we will return to *You*. However, we are not obligated to return collateral to *You* if *You* are in default of any provision of this Agreement or any other similar agreement relating to your primary casualty insurance with us.

## Financial Information

*You* must provide financial information to us as a basis for our collateral reviews within 14 days after our request.

If *You* are not subject to the reporting requirements of the Securities and Exchange Act of 1934, *You* must provide us copies of *Your* audited annual financial statements.

If we so request, *You* must provide us such financial information as we may reasonably deem necessary to determine *Your* financial condition, including but not limited to copies of *Your* completed quarterly financial statements. Those statements must include the following:

- balance sheet,
- income statement
- statement of retained earnings,
- cash flow statement,
- notes to the statements, and
- any supplemental schedules.

## Reporting Requirement

Give us prompt notice of the event of any default as described in the section titled "What is Default", or any event described in the section titled "Collateral Reviews" in this Agreement, that has happened or is about to happen.

As an alternative to the above, at *Your* option, provide us with the same notices at the same time that *You* provide such notices to any other creditor regarding any material financial or operational condition that *You* are obligated to report to such other creditor.

## WHAT IS DEFAULT?

Default is any of the following:

1. failure by *You* or any of *Your* subsidiaries or affiliates to perform within 5 days after its due date any obligation *You* or any of *Your* subsidiaries or affiliates have under this Agreement or any other agreement with us.
2. *Your* insolvency, or the occurrence of any of the following:
   - the commencement of liquidation or dissolution proceedings, *Your* general failure to pay debts as they become due, general assignment by *You* for the benefit of creditors, the filing by or against *You* of any petition, proceeding, case or action under the provisions of the United States Bankruptcy Code or other such law relating to debtors, the appointment of, or the voluntary or involuntary filing for a petition for the appointment of, a receiver, liquidator, rehabilitator, trustee, custodian or similar official to take possession or control of any of *Your* property; or
   - *Your* default on any material outstanding debt not cured within its applicable cure period, if any.
3. the cancellation by *You*, without our prior consent, of any *Policy* material to this Agreement. However, *Your* concurrent cancellation of <u>all</u> the unexpired *Policies* shall not constitute default.
4. the discovery of any material inaccuracy or incompleteness in any representation, warranty or condition precedent *You* make in connection with this Agreement, the insurance afforded by any of the *Policies* or *Your Payment Obligation*.

## PAYMENT AGREEMENT

## WHAT MAY WE DO IN CASE OF DEFAULT?

If default occurs, we may take reasonable and appropriate steps that are necessary to protect our interest. We will exercise good faith consistent with usual and customary commercial and credit practice in selecting and exercising such steps. We may take steps such as the following:

1. We may declare the entire unpaid amount of *Your Payment Obligation* immediately due and payable.

2. We may change any or all unexpired *Policies* under Loss Reimbursement or Deductible plans to Non-Deductible plans for the remaining term of any such *Policy*, to become effective after ten days written notice to *You*. We will therewith increase the premiums for those *Policies* in accordance with our applicable rating plan.

3. We may draw upon, liquidate, or take ownership of any or all collateral we hold regardless of the form, and hold or apply such amounts to any of *Your Payment Obligation* under this Agreement or any other premium, surcharge or deductible financing agreement between *You* and us, or under any *Policies*. However, we will not draw upon, liquidate, or take ownership of more collateral than is reasonably necessary to protect our interest.

4. We may require *You* to deliver to us additional collateral, including an amendment to the letter of credit or an additional letter of credit or other additional collateral. The other additional collateral, letter of credit or its amendment must conform to the requirements described above. *You* must deliver it within 15 days of *Your* receipt of a written notice from us.

5. We may cancel any or all unexpired *Policies* as if for non-payment of premium or *Deductible Loss Reimbursements*. We may apply any return of premium resulting from the cancellation to remedy any default.

6. We may withhold payment of claims to *You* or any of *Your* subsidiaries or affiliates.

7. We may satisfy *Your* obligations to us in whole or in part by set-off against any moneys, securities, collateral, consideration or property of *Yours* received by, pledged to, held by or otherwise available to us in connection with *Your Payment Obligation*. You authorize us after any default to charge any account that *You* maintain with us in connection with *Your Payment Obligation* in order to satisfy any of *Your* obligations.

## HOW WILL DISAGREEMENTS BE RESOLVED?

### What if we disagree about payment due?

If *You* disagree with us about any amount of *Your Payment Obligation* that we have asked *You* to pay, within the time allowed for payment *You* must:

- give us written particulars about the items with which *You* disagree; and
- pay those items with which *You* do not disagree.

We will review the disputed items promptly and provide *You* with further explanations, details, or corrections. *You* must pay us the correct amounts for the disputed items within 10 days of agreement between *You* and us about their correct amounts. Any disputed items not resolved within 60 days after our response to *Your* written particulars must immediately be submitted to arbitration as set forth below. With our written consent, which shall not be unreasonably withheld, *You* may have reasonable additional time to evaluate our response to *Your* written particulars.

So long as *You* are not otherwise in default under this Agreement, we will not exercise our rights set forth under "What May We Do in Case of Default?", pending the outcome of the arbitration on the disputed amount of *Your Payment Obligation*.

### What about disputes other than disputes about payment due?

Any other unresolved dispute arising out of this Agreement must be submitted to arbitration. *You* must notify us in writing as soon as *You* have submitted a dispute to arbitration. We must notify *You* in writing as soon as we have submitted a dispute to arbitration.

### Arbitration Procedures

**How arbitrators must be chosen:** *You* must choose one arbitrator and we must choose another. They will choose the third. If *You* or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make an application to a Justice of the Supreme Court of the State of New York, County of New York and the Court will appoint the additional arbitrator or arbitrators.

# PAYMENT AGREEMENT

**Qualifications of arbitrators:** Unless *You* and we agree otherwise, all arbitrators must be executive officers or former executive officers of property or casualty insurance or reinsurance companies or insurance brokerage companies, or risk management officials in an industry similar to *Yours*, domiciled in the United States of America not under the control of either party to this Agreement.

**How the arbitration must proceed:** The arbitrators shall determine where the arbitration shall take place. The arbitration must be governed by the United States Arbitration Act, Title 9 U.S.C. Section 1, et seq. Judgment upon the award rendered by the arbitrators may be entered by a court having jurisdiction thereof.

*You* and we must both submit our respective cases to the arbitrators within 30 days of the appointment of the third arbitrator. The arbitrators must make their decision within 60 days following the termination of the hearing, unless *You* and we consent to an extension. The majority decision of any two arbitrators, when filed with *You* and us will be final and binding on *You* and on us.

The arbitrators must interpret this Agreement as an honorable engagement and not merely a legal obligation. They are relieved of all judicial formalities. They may abstain from following the strict rules of law. They must make their award to effect the general purpose of this Agreement in a reasonable manner.

The arbitrators must render their decision in writing, based upon a hearing in which evidence may be introduced without following strict rules of evidence, but in which cross-examination and rebuttal must be allowed.

The arbitrators may award compensatory money damages and interest thereupon. They may order *You* to provide collateral to the extent required by this Agreement.  They will have exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability. However, they will not have the power to award exemplary damages or punitive damages, however denominated, whether or not multiplied, whether imposed by law or otherwise.

**Expenses of Arbitration:** *You* and we must each bear the expense of our respective arbitrator and must jointly and equally bear with each other the expense of the third arbitrator and of the arbitration.

This Section will apply whether that dispute arises before or after termination of this Agreement.

## TO WHOM MUST *YOU* AND WE GIVE NOTICES?

We will mail or deliver all notices to *You* at *Your* address in the *Schedule*. *You* must mail or deliver all notices to our Law Representative with a copy to our Account Executive at the address specified in the *Schedule*. All notices must be in writing.

## MAY RIGHTS OR OBLIGATIONS UNDER THIS AGREEMENT BE ASSIGNED?

Neither *You* nor we may assign our rights or obligations under this Agreement without the written consent of the other, which shall not be unreasonably withheld.

## WILL PAST FORBEARANCE WAIVE RIGHTS UNDER THIS AGREEMENT?

Past forbearance, neglect or failure to enforce any or all provisions of this Agreement, or to give notice of insistence upon strict compliance with it, will not be a waiver of any rights. A waiver of rights in a past circumstance will not be a course of conduct that waives any rights in any subsequent circumstance.

## WHO MUST PAY TO ENFORCE THIS AGREEMENT?

If *You* or we fail to perform or observe any provisions under this Agreement, the other may incur reasonable additional expenses to enforce or exercise its remedies. Either *You* or we must reimburse the other upon demand and presentation of clear and convincing supporting evidence for any and all such additional expenses.

## HOW MAY THIS AGREEMENT BE CHANGED?

This Agreement may be changed only by agreement by *You* and us, as evidenced by a written addendum to this Agreement, duly executed by the authorized representatives of each.

# PAYMENT AGREEMENT

## WHAT IF THE LAW CHANGES?

If any part of this Agreement should become unenforceable because of any change in law, the remainder of this Agreement will remain in full force and effect.

## ARE *YOU* AUTHORIZED TO MAKE THIS AGREEMENT?

*You* hereby represent and warrant that *Your* execution, delivery and performance of this Agreement have been authorized by all necessary corporate actions. The individual executing this agreement on *Your* behalf has full right and authority to execute and deliver this agreement and to bind *You* jointly and severally.

## SIGNATURES

TO SIGNIFY AGREEMENT, *You* and we have caused this Agreement to be executed by the duly authorized representatives of each.

For **American International Specialty Lines Insurance Company**

In New York, New York,

This 15th day of November, 2006

Signed by _____

Typed Name David Bowlin

Title Authorized Representative

For *You*, our Client

**General Motors Corporation**

In Detroit, Michigan

This 8 day of Dec 2006

Signed by _____

Typed Name Alan G. Gier

Title          Director Risk Financing

# Schedule of Policies and Payments

## Paid-Loss Payments Plan

Effective from 9/1/2006 to 9/1/2007

Annexed to the PAYMENT AGREEMENT

effective on  9/1/2006

by and between us,

**American International Specialty Lines Insurance Company**

and *You*, our Client

### *General Motors Corporation*
### *300 Renaissance Ctr*
### *Detroit, MI  48265-0001*

on behalf of *You* and all *Your* subsidiaries or affiliates except those listed below:

For our use only: Contract Number 680451

| | | | | | |
|---|---|---|---|---|---|
| **Your Address:** | | | | | |
| Contact Name: | Alan Gier | | | | |
| Company Name: | General Motors Corporation | | | | |
| Street: | 300 Renaissance Ctr | | | | |
| City: | Detroit | State: MI | Zip: 48265-0001 | Telephone: | (313) 665-3457 |
| **Your Representative:** | | | | | |
| Contact Name: | Joseph Callanan | | | | |
| Company Name: | Aon Risk Services, Inc. of MI | | | | |
| Street: | P.O. Box 5156 | | | | |
| City: | Southfield | State: MI | Zip: 48086-5156 | Telephone: | (248) 396-5293 |
| **Our Account Executive:** | | | | | |
| Contact Name: | David Bowlin | | | | |
| Company Name: | American International Group | | | | |
| Street: | 175 Water Street | | | | |
| City: | New York | State: NY | Zip: 10038 | Telephone: | (212) 458-6325 |
| **Our Law Representative:** | | | | | |
| Contact Name: | Virginia Doty | | | | |
| Company Name: | American International Group | | | | |
| Street: | 175 Water Street | | | | |
| City: | New York | State: NY | Zip: 10038 | Telephone: | (212) 458-7015 |
| **Remit Payments to:** | | | | | |
| Contact Name: | Lystra Charles | | | | |
| Company Name: | American International Group | | | | |
| Street: | P.O. Box 10472 | | | | |
| City: | Newark | State: NJ | Zip: 07193 | Telephone: | (908) 679-2621 |
| **Remit Collateral to:** | | | | | |
| Contact Name: | Attn: Mr. Art Stillwell | | | | |
| Company Name: | American International Group | | | | |
| Street: | P.O. Box 923 Wall Street Station | | | | |
| City: | New York | State: NY | Zip: 10268 | Telephone: | (212) 770-0896 |

## A. *Policies* and Other Agreements

Commercial General Liability Insurance
GL 5756340          GL 5756341          GL 5756342
Automobile Liability Insurance

Other Insurance

Other Agreements (Describe)

## B. Payment Plan:

### 1. Cash Deposit, Installments and Estimated Deferred Amounts

| Pay-ment No. | Due Date | Provision for Expenses and Excess Losses [1] | Special Taxes and Surcharges | Annual Credit Fee | Provision for Limited Losses [2] | *Your* Estimated Payment Obligation |
|---|---|---|---|---|---|---|
| 1 | 2/1/2007 | $15,000 | $0 | $0 | $0 | $15,000 |
| Subtotals | | $ 15,000 | $0 | $0 | $0 | $15,000 |
| DLP* | | N/A | N/A | N/A | $73,000,000 | $ 73,000,000 |
| DEP* | | $0 | $0 | $0 | N/A | $0 |
| Totals | | $15,000 | $0 | $0 | $0 | $73,015,000 |

DLP means "Deferred Loss Provision". This is the estimated amount *You* must pay us as "Regular Loss payments" and "Sizeable Loss Payments" described below.

DEP means "Deferred Expense Provision". This is an estimated amount that *You* must pay us as follows:

Notes:  (1) "Provision for Expenses and Excess Losses" is a part of the Premium
        (2) "Provision for Limited Losses" includes provision for *Loss* within your *Retention* (both Deductible and Loss Limit) and *Your* share of *ALAE*. Any "Deposit" in this column is the Claims Payment Deposit. Refer to definitions in the Payment Agreement.

## 2. Adjustments

The sums shown above are only estimated amounts. If *Your Payment Obligation* changes under the terms of the *Policies*, we will promptly notify *You* as such changes become known to us. All additional or return amounts relating thereto shall be payable in accordance with the terms of the Payment Agreement.

## 3. Additional Payments

On a **Monthly** basis, we will report to *You* the amounts of *Loss* and *ALAE* that we have paid under the *Policies*. *You* must subsequently pay us as described below.

**Regular Loss Payments:** Regular Loss Payments apply in addition to the amounts shown with Due Dates in Section B above.

We will bill *You* or withdraw funds from the Automatic Withdrawal Account (whichever Billing Method applies as shown below) at the periodic intervals stated above for the amounts of *Loss* within *Your Retention* and *Your* share of *ALAE* that we will have paid under the *Policies*, less all amounts *You* will have paid us to date as such Regular Loss Payments and the Sizable Loss Payments described below.

**Sizable Loss Payments:** If we must make payment for any *Loss* within *Your Retention* and *Your* share of *ALAE* arising out of a single accident, occurrence, offense, claim or suit that in combination exceeds the Sizable Loss Payment Amount of **$25,000**, *You* must pay us the amount of that payment of *Loss* within 10 days after *You* receive our bill.

**Billing Method:**

☒ Billing to

    ☒ *You* at *Your* address shown in the *Schedule*, or

    ☐ *Your* Representative at its address shown in the *Schedule*; or

☐ Automatic Withdrawal from the account described below.

If Automatic Withdrawal Account applies:    Minimum Amount: $0

Name of Depository Institution:

Address:

Account Number:

## 4. Conversion

**The Conversion Date** for each *policy* described in section A above shall be the date **66** months after the inception of such *Policy*.

On or shortly after the Conversion Date upon the presentation of our invoice, *You* must pay in cash the entire unpaid amount of *Your Payment Obligation* for such *Policies*.

# C. Security Plan

## 1. Collateral

| Collateral on Hand (by Type) | Amount of Collateral |
|---|---|
| Cash Security (Cash Collateral) | $48,000,000 |
| **Total Collateral on Hand** | **$48,000,000** |

| Additional Collateral Required (by Type) | Amount of Collateral | Due Date |
|---|---|---|
| Cash Security (Cash Collateral) | $25,000,000 | 10/31/2006 |
| **Total Additional Collateral Required** | **$25,000,000** | |
| **Total Collateral Required** | **$73,000,000** | |

## 2. Financial Covenants, Tests, or Minimum Credit Ratings

We may require additional collateral from *You* in the event of the following:

a.   Credit Trigger:

    i.   If the credit rating of the entity named below and for the type of debt described below, promulgated by Standard & Poor's Corporation ("S&P") or by Moody's Investors Services, Inc. ("Moody's"), drops below the grade shown respectively under S&P or Moody's, or

    ii.   If S&P or Moody's withdraws any such rating.

We may require and *You* must deliver such additional collateral according to the Payment Agreement up to an amount such that our unsecured exposure will not exceed the amount shown as the Maximum Unsecured Exposure next to such rating in the grid below.

"Unsecured exposure" is the difference between the total unpaid amount of *Your Payment Obligation* (including any similar obligation incurred before the inception of the Payment Agreement and including any portion of *Your Payment Obligation* that has been deferred and is not yet due) and the total amount of *Your* collateral that we hold.

**Name of Entity:**    **Type of Debt Rated:**

### Ratings at Effective Date

| S&P | Moody's | Unsecured Exposure at Effective Date |
|-----|---------|--------------------------------------|
|     |         |                                      |

### Potential Future Ratings

| S&P | Moody's | Maximum Unsecured Exposure |
|-----|---------|----------------------------|
|     |         |                            |
|     |         | $0                         |

b.   Other Financial Tests or Covenants:

## 3. Adjustment of Credit Fee

If the amount of unsecured exposure is changed because of *Your* delivery of additional collateral to us due to the requirements under item 2 above, the Credit Fee shall be adjusted on a pro-rata basis from the date of such delivery. Adjustment of the credit fee shall not include an adjustment of any fees associated with your deferred premium payment plan.

## SIGNATURES

IN WITNESS WHEREOF, *you* and we have caused this *Schedule* to be executed by the duly authorized representatives of each.

For us, **American International Specialty Lines Insurance Company,**

This 21st day of November, 2006

Signed by _____

Typed Name  David Bowlin

Title  Authorized Representative

For You: *General Motors Corporation*

this 8 day of Dec, 2006

Signed by _____

Typed Name   Alan G. Gier

Title   Director Risk Financing

**2006 Addendum**

**to**

**PAYMENT AGREEMENT**

**By and between us**

**American International Specialty Lines Insurance Company**

**(Company, "we", "us" or "our")**

**and *You*, our Client**

**General Motors Corporation**
**300 Renaissance Ctr**
**Detroit, MI  48265-0001**

This Addendum is attached to and forms a part of the Payment Agreement entered into between Company and Client as of the 1st day of September 2006.

1.  The section entitled **WHO HAS AGREED TO THIS AGREEMENT?,** is deleted and replaced with the following:

    This Agreement is between:

    - *You*, the organization(s) named as "our Client" in the *Schedule*, and

    - *us*, the insurer set forth above as "Company", "we," "us" and "our" in this Addendum.

2.  The section entitled **WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT? 8. - Your Payment Obligation,** is deleted and replaced with the following:

    **"Your Payment Obligation"** means the amounts that *You* must pay us for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance policies and agreements with us incurred before the inception date hereof.  Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

    - the premiums and premium surcharges, taxes and assessments,
    - *Deductible Loss Reimbursements,*
    - any amount that we may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *you* are a self-insurer,
    - any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and we may agree from time to time.
    - costs and expenses incurred by any third party administrator.

**Loss Reserves**: *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and *ALAE*. Those reserves shall include specific reserves on known *Losses* and *ALAE*, reserves for incurred but not reported *Losses* and *ALAE*, and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to us. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *Your* cumulative *Loss* and *ALAE* history.

**Premium Tax on Deductibles**: If any claim is made by any state regulatory authority that the amounts which *You* have paid us as deductible reimbursements hereunder are premium, and thus subject to premium taxes and/or assessments, we will notify *You* of the existence of such claim. We will give *You* the opportunity of joining with us in any proceeding to contest such claim at *Your* own expense, or to contest such claim independently at *Your* own expense. In the event a determination is made that said reimbursed amounts are taxable as premium or subject to assessments, *You* agree to pay the premium taxes and/or assessments and any related fines, penalties or interest that may be imposed as a result of the non-payment of premium taxes and/or assessments applicable to the *Policies*. Any state in which premium tax on deductible reimbursements is already included in the premium charged hereunder will be identified on the *Schedule*.

3.  The section entitled: **WHAT ELSE SHOULD YOU KNOW ABOUT YOUR PAYMENT OBLIGATION?** is amended to include the following:

We will contract with a Third Party Administrator (TPA) that you select for the adjustment of your claims under the Policies provided that we consent to your selection in advance. Our relationship with the TPA will be governed by a claims service agreement between us and the TPA, a copy of which will be made available to you upon your request. Any TPA you select must meet all of our licensing requirements. You will be responsible for any costs associated with any change from one TPA to another TPA that we or you make at any time. We will exercise good faith consistent with usual and customary commercial practice before we change one TPA to another TPA. Any amounts we pay to any TPA on your behalf shall be considered part of *Your* Payment Obligation, and shall include, but not be limited to the following: cost of adjusting expense at new TPA; costs or losses incurred as a result of claims handling conduct of prior TPA, including fines and penalties; fines and penalties for failure to submit accurate data to regulatory bureaus; data transfer expense; costs to retrieve or recreate information not properly maintained by prior TPA; and costs to set up new escrow account.

4.  The section entitled: **WHEN MUST *YOU* PAY *YOUR* PAYMENT OBLIGATION?** is amended to include the following:

All payments are due by the due date stated in the *Schedule*, or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or *Your* evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment. If payment is not made when due, interest will accrue on the unpaid balance daily after

the due date at the Prime Rate then in effect at Citibank, N.A., NY, NY, plus 150 basis points.

5. The section entitled: **WHAT ABOUT COLLATERAL?** is amended to include the following:

Collateral Exchange:

At our sole discretion we may approve Your substitution or exchange of one form or instrument of collateral for another. Any replacement collateral must be in a form and drawn on a bank or insurer acceptable to us. If the original collateral was in the form of cash on which interest was being earned, a substitution may result in a change to the interest rate. We will not approve your substitution or exchange of collateral if you are in Default of any of the terms of this Agreement or have triggered any applicable Financial Covenants, Tests or Minimum Credit Ratings shown in the Schedule.

6. The section entitled: **HOW WILL DISAGREEMENTS BE RESOLVED? ARBITRA-TION PROCEDURES - How Arbitrators Must Be Chosen**, is deleted and replaced with the following:

**How arbitrators must be chosen:** You must choose one arbitrator and we must choose another. They will choose the third. If you or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make application only to a court of competent jurisdiction in the City, County, and State of New York. Similarly, any action or proceeding concerning arbitrability, including motions to compel or to stay arbitration, may be brought only in a court of competent jurisdiction in the City, County, and State of New York.

7. The section entitled: **ARE YOU AUTHORIZED TO MAKE THIS AGREEMENT?** Is amended to include the following:

This Agreement together with the Schedules, Addenda, Policies and any related agreements between *You* and *Us,* constitute the basis for a program of insurance coverage. We would not have entered into any of them without your agreement on all of them. For that reason, you should review all such documents together when making any accounting, tax or legal determinations relating to the insurance program.

**IN WITNESS WHEREOF**, the parties hereto have caused this Addendum to be executed by their duly authorized representatives.

For **American International Specialty Lines Insurance Company**

On behalf of itself and its affiliates first listed above:

In New York, New York,

This 13th day of February, 2007,

Signed by _____

Typed Name David Bowlin

Title Authorized Representative

For *You,* our Client

*General Motors Corporation*

In _Detroit_ _MI_

This _28_ day of _March_ , _2007_

Signed by _____

Typed Name       Alan Gier

Title       Director Risk Financing

# Schedule of Policies and Payments

## Paid Loss Payments Plan

Effective from 09/01/2007 to 09/01/2008

Annexed to the PAYMENT AGREEMENT

effective on __09/01/2006__

by and between us,

**American International Specialty Lines Insurance Company**

and *You*, our Client

**GENERAL MOTORS CORPORATION**
**300 RENAISSANCE CTR**
**DETROIT  MI  48265-0001**

on behalf of *You* and all *Your* subsidiaries or affiliates except those listed below:

For our use only: **680452**

## List of Addressees for Notices and Other Purposes

### Your Address:

**Contact Name:** Alan Gier
**Company Name:** GENERAL MOTORS CORPORATION
**Street:** 300 RENAISSANCE CTR
**City:** DETROIT     **State:** MI          **Zip:** 48265-0001 **Phone:** (313) 665-3457

### Your Representative:

**Contact Name:** Joseph Callanan
**Company Name:** AON RISK SERVICES, INC. OF MI
**Street:** 3000 TOWN CENTER #3000
**City:** SOUTHFIELD     **State:** MI          **Zip:** 48086-5156 **Phone:** (248) 936-5260

### Our Account Executive:

**Contact Name:** Thomas Agnello
**Company Name:** American International Group
**Street:** 175 Water Street
**City:** New York     **State:** NY          **Zip:** 10038     **Phone:** (212) 458-6325

### Our Law Representative:

**Contact Name:** Salvatore Tollis
**Company Name:** American International Group
**Street:** 175 Water Street
**City:** New York     **State:** NY          **Zip:** 10038     **Phone:** (212) 458-7051

### Remit Payments to:

**Contact Name:** Lystra Charles
**Company Name:** American International Companies
**Street:** PO Box 10472
**City:** Newark     **State:** NJ          **Zip:** 07193     **Phone:** (908) 679-2621

### Remit Collateral to:

**Contact Name:** Attn: Mr. Donato DiLuzio
**Company Name:** American International Group Inc.
**Street:** P.O.Box 923 Wall Street Station
**City:** New York     **State:** NY          **Zip:** 10268     **Phone:** (212) 820-2412

**Contact Name:**
**Company Name:**
**Street:**
**City:**     **State:**          **Zip:**     **Phone:**

**Contact Name:**
**Company Name:**
**Street:**
**City:**     **State:**          **Zip:**     **Phone:**

## A. *Policies* and Other Agreements

Workers Compensation and Employers Liability Insurance

Commercial General Liability Insurance

GL 1595325 , GL 1595326 , GL 1595327 , GL 1595328 , GL 1595329 , GL 1595466 , GL 1595502 , GL 1595629.

Automobile Liability Insurance

Other Insurance

Other Agreements (Describe)

## B. Payment Plan:

### 1. Cash Deposit, Installments and Estimated Deferred Amounts

| Payment No. | Due Date | Provision for Expenses And Excess Losses(1) | Special Taxes and Surcharges | Annual Credit Fee | Provision for Limited Losses(2) | *Your* Estimated Payment Obligation |
|---|---|---|---|---|---|---|
| 1 | 02/01/2008 | $90,000 | $0 | $0 | $0 | $90,000 |
| | Subtotals | $90,000 | $0 | $0 | $0 | $90,000 |
| | DLP* | N/A | N/A | N/A | $45,284,947 | $45,284,947 |
| | DEP* | $0 | $0 | $0 | N/A | $0 |
| | Totals | $90,000 | $0 | $0 | $45,284,947 | $45,374,947 |

DLP means "Deferred Loss Provision". This is the estimated amount *You* must pay us as "Regular Loss Payments" and "Sizeable Loss Payments" described below.

DEP means "Deferred Expense Provision". This is an estimated amount that *You* must pay us as follows:

| Date | Type | Amount |
|---|---|---|
| N/A | N/A | N/A |

Notes

(1) "Provision for Expenses and Excess Losses" is a part of the Premium.

(2) "Provision for Limited Losses" includes provision for *Loss* within *Your Retention* (both Deductible and Loss Limit) and *Your* share of *ALAE*. Any "Deposit" in this column is the Claims Payment Deposit. Refer to definitions in the Payment Agreement.

### 2. Adjustments

The sums shown above are only estimated amounts. If *Your Payment Obligation* changes under the terms of the *Policies*, we will promptly notify *You* as such changes become known to us. All additional or return amounts relating thereto shall be payable in accordance with the terms of the Payment Agreement.

### 3. Additional Payments

On a **Monthly** basis, we will report to *You* the amounts of *Loss* and *ALAE* that we have paid under the *Policies*. *You* must subsequently pay us as described below.

**Regular Loss Payments:** Regular Loss Payments apply in addition to the amounts shown with Due Dates in Section B above.

We will bill *You* or withdraw funds from the Automatic Withdrawal Account (whichever Billing Method applies as shown below) at the periodic intervals stated above for the amounts of *Loss* within *Your Retention* and *Your* share of *ALAE* that we will have paid under the *Policies*, less all amounts *You* will have paid us to date as such Regular Loss Payments and the Sizable Loss Payments described below.

**Sizable Loss Payments:** If we must make payment for any *Loss* within *Your Retention* and *Your* share of *ALAE* arising out of a single accident, occurrence, offense, claim or suit that in combination exceeds the Sizable Loss Payment Amount of **$25,000** , *You* must pay us the amount of that payment of *Loss* within 10 days after

*You* receive our bill.

**Billing Method:**

☒ Billing to

☒*You* at *Your* address shown in the *Schedule*, or

☐*Your* Representative at its address shown in the *Schedule*; or

☐ Automatic Withdrawal from the account described below.

If Automatic Withdrawal Account applies: Minimum Amount:

Name of Depository Institution:

Address:

Account Number:

## 4. Conversion

The **Conversion Date** for each *Policy* described in section A above shall be the date _ months after the inception of such *Policy*.

On or shortly after the Conversion Date upon the presentation of our invoice, *You* must pay in cash the entire unpaid amount of *Your Payment Obligation* for such *Policies*.

# C. Security Plan

## 1. Collateral

| Collateral on Hand (by Type) | Amount of Collateral |
|---|---|
| Trusts | $47,214,508 |
| **Total Collateral on Hand** | $47,214,508 |

| Additional Collateral Required (by Type) | Amount of Collateral | Due Date |
|---|---|---|
| N/A | N/A | |
| **Total Additional Collateral Required** | **$0** | |
| **Total Collateral Required** | **$47,214,508** | |

## 2. Financial Covenants, Tests, or Minimum Credit Ratings

We may require additional collateral from *You* in the event of the following:

a.  Credit Trigger:

   i.  If the credit rating of the entity named below and for the type of debt described below, promulgated by Standard & Poor's Corporation ("S&P") or by Moody's Investors Services, Inc. ("Moody's"), drops below the grade shown respectively under S&P or Moody's, or

   ii.  If S&P or Moody's withdraws any such rating.

We may require and *You* must deliver such additional collateral according to the Payment Agreement up to an amount such that our unsecured exposure will not exceed the amount shown as the Maximum Unsecured Exposure next to such rating in the grid below.

"Unsecured exposure" is the difference between the total unpaid amount of *Your Payment Obligation* (including any similar obligation incurred before the inception of the Payment Agreement and including any portion of *Your Payment Obligation* that has been deferred and is not yet due) and the total amount of *Your* collateral that we hold.

**Name of Entity: Type of Debt Rated:**

**Ratings at Effective Date**

| S&P | Moody's | Unsecured Exposure at Effective Date |
|-----|---------|--------------------------------------|
|     |         |                                      |
|     |         |                                      |
|     |         |                                      |

**Potential Future Ratings**

| S&P | Moody's | Maximum Unsecured Exposure |
|-----|---------|----------------------------|
|     |         |                            |

b.  Other Financial Tests or Covenants:

## 3. Adjustment of Credit Fee

If the amount of unsecured exposure is changed because of *Your* delivery of additional collateral to us due to the requirements under item 2 above, the Credit Fee shall be adjusted on a pro-rata basis from the date of such delivery. Adjustment of the credit fee shall not include an adjustment of any fees associated with your deferred premium payment plan.

## SIGNATURES

IN WITNESS WHEREOF, *You* and we have caused this *Schedule* to be executed by the duly authorized representatives of each.

For us, **American International Specialty Lines Insurance Company**

this *18th* day of *December 2007*

Signed by *[signature]*

Typed Name *Thomas Agnello*

Title *Attorney-In-Fact*

For *You:* **GENERAL MOTORS CORPORATION**

this *14* day of *January 2008*

Signed by *[signature]*

Typed Name  **Alan G. Gier**

Title  **Director, Global Risk Financing & Insurance**

# Schedule of Policies and Payments

## Paid-Loss Payments Plan

Effective from 04/01/2009 to04/01/2010

Annexed to the PAYMENT AGREEMENT

effective on 09/01/2006

by and between us,

**American International Specialty Lines Insurance Company**

and *You*, our Client

## *General Motors Corporation*

on behalf of *You* and all *Your* subsidiaries or affiliates except those listed below:

*(None)*

For our use only: Contract Number

### Your Address:

Contact Name: Alan Gier
Company Name: General Motors Corporation
Street: 300 Renaissance Center
City: Detroit        State: MI              Zip: 48265            Telephone: (313)665-3457

### Your Representative:

Contact Name: Joseph Callanan
Company Name: Aon Risk Services
Street: 3000 Town Center
City: Southfield     State: MI              Zip: 48075            Telephone: (248)936-5260

### Our Account Executive:

Contact Name: Peter Rapciewicz
Company Name: American International Specialty Lines Insurance Company
Street: 175 Water Street, 27th Floor
City: New York       State: NY              Zip: 10038            Telephone: (212)458-3019

### Our Law Representative:

Contact Name: Salvatore Tollis
Company Name: AIU Holdings, Inc.
Street: 175 Water Street, 18th Floor
City: New York       State: NY              Zip: 10038            Telephone: (212)458-7051

### Remit Payments to:

Contact Name: Lystra Charles
Company Name: AIU Holdings, Inc.
Street: PO Box 10472
City: Newark         State: NJ              Zip: 07193            Telephone: (908)679-2621

### Remit Collateral to:

Contact Name: Attn: Donato DiLuzio
Company Name: AIU Holdings, Inc.
Street: PO Box 923, Wall Street Station
City: New York       State: NY              Zip: 10268            Telephone: (212)820-2412

---

Edition 1/99                Paid-Loss Payments Method                Page 1 of 4

## A. *Policies* and Other Agreements

Workers Compensation and Employers Liability Insurance

Commercial General Liability Insurance
0907325          09027326          0907327          0907329
Automobile Liability Insurance

Other Insurance

Other Agreements (Describe)

## B. Payment Plan:

### 1. Cash Deposit, Installments and Estimated Deferred Amounts

| Pay-ment No. | Due Date | Provision for Expenses and Excess Losses [1] | Special Taxes and Surcharges | Annual Credit Fee | Provision for Limited Losses [2] | Your Estimated Payment Obligation |
|---|---|---|---|---|---|---|
| 1 | 04/01/2009 | $140,000 | $0 | $0 | $0 | $140,000 |
| | Subtotals | $140,000 | $0 | $0 | $0 | $140,000 |
| | DLP* | N/A | N/A | N/A | $31,300,114 | $31,300,114 |
| | DEP* | $0 | $0 | $0 | N/A | $ 0.00 |
| | Totals | $140,000 | $0 | $0 | $31,300,114 | $31,440,114 |

DLP means "Deferred Loss Provision". This is the estimated amount *You* must pay us as "Regular Loss payments" and "Sizeable Loss Payments" described below.

DEP means "Deferred Expense Provision". This is an estimated amount that *You* must pay us as follows:

Notes:  (1) "Provision for Expenses and Excess Losses" is a part of the Premium

(2) "Provision for Limited Losses" includes provision for *Loss* within your *Retention* (both Deductible and Loss Limit) and *Your* share of *ALAE*. Any "Deposit" in this column is the Claims Payment Deposit. Refer to definitions in the Payment Agreement.

## 2. Adjustments

The sums shown above are only estimated amounts. If *Your Payment Obligation* changes under the terms of the *Policies*, we will promptly notify *You* as such changes become known to us. All additional or return amounts relating thereto shall be payable in accordance with the terms of the Payment Agreement.

## 3. Additional Payments

On a <u>Monthly</u> basis, we will report to *You* the amounts of *Loss* and *ALAE* that we have paid under the *Policies*. *You* must subsequently pay us as described below.

**Regular Loss Payments:** Regular Loss Payments apply in addition to the amounts shown with Due Dates in Section B above.

We will bill *You* or withdraw funds from the Automatic Withdrawal Account (whichever Billing Method applies as shown below) at the periodic intervals stated above for the amounts of *Loss* within *Your Retention* and *Your* share of *ALAE* that we will have paid under the *Policies*, less all amounts *You* will have paid us to date as such Regular Loss Payments and the Sizable Loss Payments described below.

**Sizable Loss Payments:** If we must make payment for any *Loss* within *Your Retention* and *Your* share of *ALAE* arising out of a single accident, occurrence, offense, claim or suit that in combination exceeds the Sizable Loss Payment Amount of <u>$25,000</u>, *You* must pay us the amount of that payment of *Loss* within 10 days after *You* receive our bill.

**Billing Method:**

☒ Billing to

    ☒ *You* at *Your* address shown in the *Schedule*, or

    ☐ *Your* Representative at its address shown in the *Schedule*; or

☐ Automatic Withdrawal from the account described below.

If Automatic Withdrawal Account applies:    Minimum Amount: $0

Name of Depository Institution:

Address:

Account Number:

## 4. Conversion

**The Conversion Date** for each *policy* described in section A above shall be the date _ months after the inception of such *Policy*.

On or shortly after the Conversion Date upon the presentation of our invoice, *You* must pay in cash the entire unpaid amount of *Your Payment Obligation* for such *Policies*.

# C. Security Plan

## 1. Collateral

| Collateral on Hand (by Type) | Amount of Collateral |
|---|---|
| Trusts | $32,501,547 |
| Total Collateral on Hand | $32,501,547 |

| Additional Collateral Required (by Type) | Amount of Collateral | Due Date |
|---|---|---|
| Trusts | ($1,201,433) | |
| Total Additional Collateral Required | $ 0 | |
| Total Collateral Required | $31,300,114 | |

## 2. Financial Covenants, Tests, or Minimum Credit Ratings

We may require additional collateral from *You* in the event of the following:

a. Credit Trigger:

    i. If the credit rating of the entity named below and for the type of debt described below, promulgated by Standard & Poor's Corporation ("S&P") or by Moody's Investors Services, Inc. ("Moody's"), drops to or below the grade shown respectively under S&P or Moody's, or

    ii. If S&P or Moody's withdraws any such rating.

We may require and *You* must deliver such additional collateral according to the Payment Agreement up to an amount such that our unsecured exposure will not exceed the amount shown as the Maximum Unsecured Exposure next to such rating in the grid below.

"Unsecured exposure" is the difference between the total unpaid amount of *Your Payment Obligation* (including any similar obligation incurred before the inception of the Payment Agreement and including any portion of *Your Payment Obligation* that has been deferred and is not yet due) and the total amount of *Your* collateral that we hold.

Name of Entity:        Type of Debt Rated:

### Ratings at Effective Date

| S&P | Moody's | Unsecured Exposure at Effective Date |
|-----|---------|--------------------------------------|
|     |         |                                      |

### Potential Future Ratings

| S&P | Moody's | Maximum Unsecured Exposure |
|-----|---------|----------------------------|
|     |         | $0                         |

b. Other Financial Tests or Covenants:

## 3. Adjustment of Credit Fee

If the amount of unsecured exposure is changed because of *Your* delivery of additional collateral to us due to the requirements under item 2 above, the Credit Fee shall be adjusted on a pro-rata basis from the date of such delivery. Adjustment of the credit fee shall not include an adjustment of any fees associated with your deferred premium payment plan.

## SIGNATURES

IN WITNESS WHEREOF, *you* and we have caused this *Schedule* to be executed by the duly authorized representatives of each.

For us, **American International Specialty Lines Insurance Company,**

This 12th day of May, 2009

Signed by _____

Typed Name Joseph Davide

Title Attorney-in-Fact

For You: **General Motors Corporation**

this 22 day of July 2009

Signed by _____

Typed Name Alan G. Geier

Title Director, Global Risk Financing & Insurance