Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 09-50026-reg

5  - - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  GENERAL MOTORS CORPORATION, ET AL.,

9

10          Debtors.

11

12  - - - - - - - - - - - - - - - - - - - - - -x

13

14                U.S. Bankruptcy Court

15                One Bowling Green

16                New York, New York

17

18                September 26, 2011

19                10:26 AM

20

21  B E F O R E:

22  HON. ROBERT E. GERBER

23  U.S. BANKRUPTCY JUDGE

24

25

Page 2

1

2    Hearing on Motions Filed by Billy Kidwell

3

4    Hearing on Fee Applications

5

6    Application of Mark Buttita Pursuant to 11 U.S.C. Section

7    503(b) for Allowance of Administrative Expenses Incurred in

8    Making a Substantial Contribution in this Chapter 11 case from

9    June 4, 2009 through July 15, 2009

10

11   234th Omnibus Objection to Claims (Pension Benefits Claims of

12   Former Salaried and Hourly Employees)

13

14   235th Omnibus Objection to Claims (Pension Claims and Welfare

15   Benefits Claims of Former Salaried Executive, or Hourly

16   Employees)

17

18   236th Omnibus Objection to Claims (Splinter Union Employee

19   Claims)

20

21   237th Omnibus Objection to Claims (Claims Relating to Former

22   Employees Represented by United Auto Workers)

23

24   238th Omnibus Objection to Claims (Welfare Benefits Claims of

25   Retired and Former Salaried and Executive Employees)

1

2   239th Omnibus Objection to claims (Supplemental Executive

3   Retirement Benefits Claims and Welfare Benefits Claims of

4   Retired and Former Salaried and Executive Employees)

5

6   240th Omnibus Objection to Claims (Eurobond Debt Claims)

7

8   241st Omnibus Objection to Claims (Claims for Equity Interests

9   and Duplicate Debt Claims)

10

11   242nd Omnibus Objection to Claims (Contingent Co-Liability

12   Claims)

13

14   243rd Omnibus Objection to Claims and Motion Requesting

15   Enforcement of Bar Date Orders

16

17   244th Omnibus Objection to Claims and Motion Requesting

18   Enforcement of Bar Date Orders

19

20   245th Omnibus Objection to Claims and Motion Requesting

21   Enforcement of Bar Date Orders

22

23   246th Omnibus Objection to Claims

24

25   Cross-Motion of Post Effective Date Debtors and Motors

Page 4

1    Liquidation Company GUC Trust for Entry of Order Pursuant to 11

2    U.S.C. Sections 105(a) and 1142(b) and Fed. R. Bankr. P.

3    7012(b) and 9014(c)(1) Enforcing Settlement Agreement with

4    Claimant Barry H. Spencer, Jr.; (II) Striking Documents Filed

5    by Claimant; and (III) Enjoining Claimant from Further Action

6    Against the Debtors, Post-Effective Date Debtors, Motors

7    Liquidation Company GUC Trust, and Their Officers and

8    Professionals

9

10   Motion to Accept Indemnity & Discharge Bonds filed by Barry-

11   Henry Spencer, Jr.

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Dena Page

Page 5

```
 1

 2   A P P E A R A N C E S :

 3   WEIL, GOTSHAL & MANGES LLP

 4          Attorneys for Motor Liquidation

 5          767 Fifth Avenue

 6          New York, NY 10153

 7

 8   BY:    JOSEPH H. SMOLINSKY, ESQ.

 9          STEPHEN KAROTKIN, ESQ.

10

11

12   DICKSTEIN SHAPIRO LLP

13          Attorneys for Motor Liquidation Trust

14          1633 Broadway

15          New York, NY 10019

16

17   BY:    STEFANIE B. GREER, ESQ.

18

19

20

21

22

23

24

25
```

1

2    HONIGMAN MILLER SCHWARTZ AND COHN LLP

3         Attorneys for Debtors and Debtors-In-Possession

4         2290 First National Building

5         660 Woodward Avenue

6         Detroit, MI 48226

7

8    BY:   ROBERT B. WEISS, ESQ. (TELEPHONICALLY)

9

10

11   KING & SPALDING

12        Attorneys for General Motors LLC

13        1185 Avenue of the Americas

14        New York, NY 10036

15

16   BY:   ARTHUR J. STEINBERG, ESQ.

17        SCOTT DAVIDSON, ESQ.

18

19

20

21

22

23

24

25

Page 7

1

2    BRYAN CAVE LLP

3         Attorneys for Evercore Group LLC

4         211 North Broadway

5         Suite 3600

6         St. Louis, MO 63102

7

8    BY:   BRIAN C. WALSH, ESQ. (TELEPHONICALLY)

9

10

11   BUTZEL LONG

12        Attorneys for the Unsecured Creditors' Committee

13        380 Madison Avenue

14        22nd Floor

15        New York, NY 10017

16

17   BY:   ROBERT SIDORSKY, ESQ.

18

19

20

21

22

23

24

25

Page 8

1

2    CAPLIN & DRYSDALE

3          Attorneys for Mr. Buttita

4          One Thomas Circle N.W.

5          Suite 1100

6          Washington, DC 20005

7

8    BY:   RONALD E. REINSEL, ESQ.

9

10

11   KRAMER LEVIN NAFTALIS & FRANKEL, LLP

12          Attorneys for the Unsecured Creditors' Committee

13          1177 Avenue of the Americas

14          New York, NY 10036

15

16   BY:   LAUREN M. MACKSOUD, ESQ. (TELEPHONICALLY)

17

18

19   GODFREY & KAHN S.C.

20          Attorneys for Fee Examiner, Brady Williamson

21          One East Main Street

22          Madison, WI 53701

23

24   BY:   KATHERINE STADLER, ESQ.

25          BRADY C. WILLIAMSON, ESQ.

Page 9

```
 1

 2   LAW OFFICES OF ROGER GEDDES

 3        Attorneys for Creditor, Erica Davis

 4        826 Orange Avenue

 5        Suite 500

 6        Coronado, CA 92118

 7

 8   BY:   ROGER A. GEDDES, ESQ. (TELEPHONICALLY)

 9

10

11   MORRIS NICHOLS ARSHT & TUNNELL, LLP

12        Attorneys for the Unsecured Creditors' Committee

13        1201 North Market Street

14        18th Floor

15        Wilmington, DE 19899

16

17   BY:   MATTHEW B. HARVEY, ESQ. (TELEPHONICALLY)

18

19

20   NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL

21        Attorneys for State of New York

22        The Capitol

23        Albany, NY 12224

24

25   BY:   MAUREEN F. LEARY, AAG (TELEPHONICALLY)
```

Page 10

1

2    STUTZMAN, BROMBERG, ESSERMAN & PLIFKA

3        Attorneys for Dean Trafelet, Future Claimants'

4        2323 Bryan Street

5        Suite 2200

6        Dallas, TX 75201

7

8    BY:   ROBERT T. BROUSSEAU, ESQ. (TELEPHONICALLY)

9

10

11    UNITED STATES DEPARTMENT OF JUSTICE

12        Office of the United States Trustee

13        33 Whitehall Street, 21st Floor

14        New York, NY 10004

15

16    BY:   BRIAN S. MASUMOTO, ESQ.

17        TRACY HOPE DAVIS, ESQ.

18        DAVID JONES, ESQ.

19

20    ALSO PRESENT:

21        LAURA J. EISELE, AlixPartners

22        BILLY RAY KIDWELL, Party Pro Se

23        MICHAEL EISENBAND, FTI Consulting, Inc.

24        ANNA PHILLIPS, FTI Consulting, Inc.

25        BARRY H. SPENCER, Party Pro Se

GENERAL MOTORS CORPORATION

```
 1                   P R O C E E D I N G S

 2            THE COURT:  Good morning again.  Have seats, please.

 3    Have seats, everybody.

 4            Once more, I apologize to you all.

 5            All right, we'll deal with the GM matters in their

 6    original order.  In my courtroom, I see Mr. Steinberg.  You're

 7    here on Kidwell?

 8            MR. STEINBERG:  Yes, Your Honor.

 9            THE COURT:  All right, Mr. Kidwell, are you on the

10    phone?

11            CourtCall, do we have other folks --

12            COURTCALL OPERATOR:  Yes, he is.

13            THE COURT:  I beg your pardon?

14            COURTCALL OPERATOR:  Yes, he is on the line.

15            THE COURT:  Okay, Mr. Kidwell, are you with us?

16            MR. KIDWELL:  Hello?

17            THE COURT:  Okay, good morning, Mr. Kidwell.

18            MR. KIDWELL:  Good morning.

19            THE COURT:  Now, I understand that you don't have a

20    lawyer, and I'm going to cut you some slack there, but while I

21    have to tell you that while I honor your service, I have a fair

22    number of concerns about your legal entitlement to what you are

23    asking for.  Please focus in your argument, and I understand

24    your frustration with your car, but I think it's a 2003, and

25    both its express warranties and your lemon law rights expired a
```

Page 12

1    long time ago, in fact, before the General Motors case was

2    filed two years ago.  Don't talk so much about the car getting

3    you mad because I understand that.  If I had a car like that,

4    it would get me mad, too.  But talk about your legal

5    entitlement, please, and start with why you think I'm not fair

6    and I need to recuse myself.

7            COURTCALL OPERATOR:  Mr. Kidwell has disconnected.

8            THE COURT:  He's disconnected?

9            COURTCALL OPERATOR:  His line has stopped

10    (indiscernible).

11            THE COURT:  Okay.

12            Mr. Steinberg, I'm going to need to impose on you.

13    There are so many other people in the courtroom, and with it

14    now being 10:30, I'm going to take the 10:30 calendar and ask

15    you to sit by in case he gets back on the line.  And if he

16    does, I'll hear argument.  And I'm also in a position where if

17    I need to, I can rule on the briefs.  Thank you.

18            Is there any reason why we can't start with the 10:30

19    calendar now?  It's one minute to 10:30.

20            Is Mr. -- yeah, Mr. Williamson is there and is out in

21    right field.  And Mr. Karotkin's at third base.  As far as you

22    know, gentlemen, are we in a position where we can proceed?

23            MR. WILLIAMSON:  Yes, Your Honor.

24            THE COURT:  Okay, and who's going to take the lead?

25            Mr. Williamson, good morning.

1          MR. WILLIAMSON:  Good morning, Your Honor.  Brady

2    Williamson, the fee examiner, with counsel, Katherine Stadler.

3    Your Honor, we're here on the final fee applications on Motors

4    Liquidation.  We've filed a final report.  We have filed

5    twenty-five individual reports covering the period from October

6    1st, 2010 through the confirmation date.

7          We recommend that the Court give its approval to the

8    interim and final fees under Section 330 as they were submitted

9    and adjusted by stipulation, and we recommend that the Court

10   enter an order authorizing payment.  The fees are reasonable,

11   they meet the requirements of the Code and the related

12   authority, and the professionals in this case have provided

13   real value to the estates.

14          THE COURT:  Okay.

15          Mr. Masumoto or Ms. Davis, do you wish to be heard?

16          MR. MASUMOTO:  Good morning, Your Honor.  Brian

17   Masumoto for the Office of the United States Trustee.  As

18   indicated by the fee examiner, our office did file a response

19   and did agree with the recommendations of the fee examiner.  We

20   have, at this point, nothing further and no further objections

21   to raise.

22          THE COURT:  Okay.  Do any of the applicants

23   representing the estate fiduciaries wish to be heard in any

24   way?

25          Mr. Smolinsky, are you coming up?

GENERAL MOTORS CORPORATION

Page 14

1          MR. SMOLINSKY:  Yes, Your Honor.

2          Good morning, Your Honor.  Joseph Smolinsky of Weil,

3     Gotshal & Manges for the debtors.  I think Mr. Brady (sic) laid

4     it out well.  I just want to indicate --

5          THE COURT:  Mr. Williamson, I assume.

6          MR. SMOLINSKY:  Mr. Williamson.  I'm sorry.  I just

7     want to lay out for Your Honor a change from what we had

8     discussed previously on the rate increase issue.  The parties

9     have gotten together and have decided that the amounts at issue

10    can be paid out subject to the parties' obligations to disgorge

11    to the extent that there are amounts that are still at issue at

12    the end of the day, and we will speak with Mr. Williamson and

13    his colleagues further on those issues and attempt to resolve

14    them.

15         THE COURT:  So I decide the legal issue, but it's not

16    a matter for today?

17         MR. SMOLINSKY:  That's correct, Your Honor.

18         THE COURT:  Very well.

19         Anybody else wish to be heard?

20         MR. WEISS:  Your Honor, this is Robert Weiss on behalf

21    of Honigman Miller Schwartz and Cohn.

22         THE COURT:  Yes, Mr. Weiss, good morning.

23         MR. WEISS:  Good morning, sir.  I just wanted to point

24    out that the schedule that's been attached to the examiner's

25    final report, we're listed under the schedule that says

GENERAL MOTORS CORPORATION

Page 15

1    "amounts already paid to the professionals, eighty percent of

2    fees and a hundred percent of expenses".  With regard to the

3    final fee application, we have not received any payment at all.

4    I believe the examiner agrees with that, but I just wanted to

5    make that correction.

6            THE COURT:  Okay.

7            Anybody else?  Mr. Williamson, come on up, please.

8            MR. WILLIAMSON:  Just one logistical note, Your Honor.

9    Later today or tomorrow, with the cooperation of the debtors'

10   counsel, we'll be circulating a draft order and slightly

11   modified schedules that I think accommodate everyone's

12   concerns.

13           THE COURT:  Okay.

14           Anything else?

15           All right, well, given the consensual resolution, I'm

16   not going to speak at length.  This, at the risk of stating the

17   obvious, has been an enormous case placing tremendous

18   challenges on many people, most significantly the retained

19   fiduciaries in the estate and the professionals for them.

20           Any time you have a case this big, and this case was

21   huge in terms of both assets and debt, a lot of work has to be

22   done.  A lot of lawyering, a lot of financial advisory

23   services, a lot of accounting services.  Across the board, I

24   was very pleased with the quality of the services here, and I

25   thought the estate got excellent bang for the buck.

1          Legal fees result from an amalgam of factors.  They

2     run -- they're kind of like taxis.  There's how much the meter

3     flips each time and it's also how far you travel.  And each of

4     those contributes to the overall size of the fee, and perhaps

5     you could even take the metaphor to a further extent, as well.

6     Although there were times when I would have preferred that

7     there be less litigiousness amongst competing creditor

8     constituencies, a view that I made known at the time, I think

9     people got the message, and I thought they did a very good job

10    in keeping the fees reasonable for the needs that had to be

11    accomplished.

12         At the same time, I'm very grateful to Mr. Williamson

13    and his colleagues for their services.  Inevitably, when you

14    have so many fee requests and so many timekeepers keeping

15    record of their fees, especially those who have less experience

16    with the requirements of the bankruptcy system, people stray

17    from what we expect.  And I think Mr. Williamson for helping

18    keep people get back on track.

19         By that, I don't mean to understate the contributions

20    of the U.S. Trustee's office which I will note was on the job

21    in this but which, to their credit, avoided duplication of

22    effort, and for that, too, I am grateful.

23         So the fees in the amounts that have been adjusted to

24    consensually resolve these issues are approved.  The remaining

25    matters, as Mr. Smolinsky referred to in his remarks, are

Page 17

```
 1   continued.  And I will enter one or more interim orders

 2   consistent with my ruling today.

 3           Mr. Williamson, as a mechanical matter, are you going

 4   to take the lead on the order or are debtors' counsel or some

 5   other party?

 6           MR. WILLIAMSON:  It will be collegial.  I think we'll

 7   be convening with the debtors' counsel this afternoon, Your

 8   Honor.

 9           THE COURT:  Okay.  What I would like is from whomever

10   presents the order or orders to give me either a letter of

11   transmittal or an e-mail transmittal that confirms that the

12   order has been run by everybody and that it is consistent with

13   what everybody thought it would say.

14           And with that, I think we're adjourned on that.

15   Anybody who's here solely on those few requests -- now we're

16   talking about estate fiduciaries -- you may have a hybrid

17   capacity, Mr. Williamson -- is free to go, if he or she wishes

18   to.

19           MR. WILLIAMSON:  Your Honor, simply let me note for

20   the record that the representatives of those seeking fees for

21   ARPC and for Mr. Buttita have issues that they may want to

22   present to the Court.  But we've outlined our position in our

23   report.

24           THE COURT:  Okay.  So you can either stay on that or

25   leave, as you see fit.  When I was talking about estate
```

GENERAL MOTORS CORPORATION

Page 18

1  fiduciaries, I was intending to be very precise and not to deal

2  with their issues.

3          Mr. Masumoto, are you rising for anything other than

4  to get out of here?

5          MR. MASUMOTO:  No, Your Honor, although I may monitor

6  some of these subsequent matters.

7          THE COURT:  Okay.

8          MR. MASUMOTO:  Thank you.

9          THE COURT:  Okay.  Very well.  All right.

10          COURTCALL OPERATOR:  Your Honor?

11          THE COURT:  Yes.

12          COURTCALL OPERATOR:  Mr. Kidwell is back on the line.

13          THE COURT:  Okay.  Good.

14          Mr. Kidwell, were you able to hear my opening

15  observations?

16          MR. KIDWELL:  No, sir.  My phone went dead, and I had

17  to get another one from a different room.

18          THE COURT:  Okay.  Well, I'm going to say it again,

19  perhaps not exactly the way I said it the first time, because I

20  was speaking without notes.  But here's where I need your help.

21          First, Mr. Kidwell, I honor your service.  I'm a

22  veteran too, although I wouldn't for half a second suggest that

23  I might have made the sacrifices you did.  But the issue here

24  that I need your help on is your entitlement to the exact -- to

25  the relief you're asking for, because I have very little doubt

 1    that the car drove you nuts.  But it's a 2003 and its express

 2    warranties expired a long time -- not just before today -- but

 3    before the GM case was filed in June of 2009.

 4         First I think I need your help in explaining to me why

 5    you think I'm not going to be fair; why you think I'm

 6    prejudiced against you; and why I need to recuse myself, which

 7    is the legal word we use for disqualifying myself.

 8         Then --

 9         MR. KIDWELL:  Well --

10         THE COURT:  -- bear with me, because I'm telling you

11    what's on my mind and then I'm going to let you speak your

12    piece as soon as I finish the thoughts that I need you to focus

13    on.

14         MR. KIDWELL:  Okay.

15         THE COURT:  Then I want you to focus, not so much

16    about what's bugging you with the car, because I understand the

17    car really bugs you.  But the issue we have to deal with is

18    what I can or should be doing when the warranty on the car

19    expired a long time ago, when your remedies were limited to

20    getting the car fixed, rather than getting money, and when your

21    rights under the Lemon Law expired some time ago, and when you

22    also lost in the Lemon Law procedures.

23         So the issue from a legal perspective -- and I'm

24    obviously going to cut you some slack because you're not a

25    lawyer -- is not how much the car is bugging you, but what I,

GENERAL MOTORS CORPORATION

1    as a bankruptcy judge can do about it under the facts that we

2    have here.

3            So whenever you're ready, make your presentation as

4    you see fit, within a reasonable amount of time.  But before

5    you're done, I need you to focus on the legal issues that I

6    identify.

7            MR. KIDWELL:  Okay.  Thank you, Your Honor.  First

8    off, there's I believe five motions before you right now.  And

9    I'd like to withdraw number 4, the motion for disqualification

10   of judge.

11           THE COURT:  Okay.

12           MR. KIDWELL:  I've been just stopped because of the

13   legal process and the dishonesty by GM's attorneys at every

14   stage of the proceedings.

15           Now, it seems that two matters, two points that you

16   brought up, you've been misinformed on.  One, I did not lose

17   the Lemon Law hearing, I won.  At the Lemon Law hearing, it was

18   found that the vehicle far exceeded the requirements for Lemon

19   Law relief, and I met all the requirements, every single one.

20   And they said that the car had a manufacturing defect that was

21   substantially imparted and that the motor was no good.  The

22   transmission was no good.  The wiring was no good.  The doors

23   would fly open when you drove it.

24           And apparently what happened was, this was the last

25   General Motors S-10 Pickup being made, it was the last coming

GENERAL MOTORS CORPORATION

Page 21

1    off the assembly line, and they used the wrong parts, and they

2    couldn't fix it until they got -- after ordering parts, which

3    they told me would be two years or so later.  So I was stuck

4    with a truck that would sporadically die at a red light, wasn't

5    safe to drive, and everything in the world was wrong with it.

6    So I went through the Lemon Law process and proved this.

7         What happened was in Florida's Lemon Law process, they

8    found that there was a technicality, based on we now know,

9    because it's been proven in other courts, that General Motors

10   paid a Sitel Corporation in Tampa to lie and commit perjury at

11   their Lemon Law hearings, and they have Sitel employees

12   claiming to be General Motors employees.  This happened -- this

13   was discovered by the Ohio appeals court.

14        And what they did was, on this technicality, I'm

15   required to give them notice by certified mail that there's a

16   defect.  Well, they claimed that I never served them by

17   certified mail after they found out that all my records had

18   been destroyed by Hurricane Charlie when my house was

19   destroyed.  So they paid a Sitel employee in Tampa to lie and

20   say that she was a General Motors employee in Detroit, when

21   she's never ever been to Detroit.

22        So I -- because of them lying and saying this, the

23   technicality was that they got what's called in Florida, under

24   Florida's Lemon Law, a last chance to fix my defective vehicle.

25   So I won -- I should have gotten relief right there, but

Page 22

1    because they had lied and said that notice of defect was not

2    served on them by certified mail, they got a last chance.

3              Florida statutes give them ten dollars -- I mean, ten

4    days to perform their last chance.  They had ten days to fix

5    the defect after the Lemon Law court gives them a last chance

6    effort.  I have been -- I have been waiting seven years for

7    them to comply with this ten-day last chance to fix the

8    vehicle.

9              Now, under Florida Lemon Law, the Florida Lemon Law

10   rights are still in effect, because under Florida's Lemon Laws,

11   I sent you a copy of it, I believe I filed it in the case

12   numerous times, but under Statute 681, which is Florida's Lemon

13   Law, and the chapter is cited at Motor Vehicle Warranty

14   Enforcement Act, the enforcement act says that any violations

15   by a manufacturer, gives me a right to pursue this.  And

16   specifically, part of Florida's Lemon Law is going to Florida's

17   state courts.  And it says that it becomes what's known as a

18   fraudulent business practice when the manufacturer violates

19   Florida's Lemon Law, as they did.

20             So I exercised my rights under the Lemon Law and took

21   it to Florida State Court.  They -- General Motor's attorneys

22   kept trying to avoid a hearing on the merits using any delaying

23   tactic they can.  And this same law firm was found guilty of

24   illegally using these tactics and made to pay three times the

25   amount to other Florida Lemon Law victims.

GENERAL MOTORS CORPORATION

Page 23

1          I was finally getting ready for a hearing on this

2     right before the bankruptcy came out.  So the bankruptcy came

3     out, and then General Motors had the New GM attorneys go to the

4     court the day after you signed the order saying that Lemon

5     Law -- state Lemon Law obligations are an acquired liability

6     from the New General Motors.  The day after you signed the law

7     saying that, they went to the state court here where I have my

8     Lemon Act Law action pending, and lied to the state court and

9     said that they was New, because they said that Lemon Law

10    obligations belonged to the Old General Motors, and were

11    protected by your bankruptcy court.

12         So the Lemon Law is still active under Florida law.  I

13    have a right to pursue this before the state court when they

14    violate the chapter.  They have since admitted that they had

15    violated the chapter.  They put it in writing that -- because

16    when I tried to sue the Sitel employee for committing perjury

17    at the hearing, they told me then that they admitted that she

18    was never a General Motors employee, was never in Detroit, and

19    that she actually was a Sitel Corporation employee.

20         So they violated Florida's Lemon Law entitling me to

21    three times the damages from state court, which is part of the

22    Lemon Law process.  And it was actually after the day after

23    your order when the -- it was the New General Motors that

24    committed this illegal act, went to the state court and lied to

25    them, saying that the state Lemon Law obligations are not part

GENERAL MOTORS CORPORATION

Page 24

1    of the sales order, that they're not an acquired liability of

2    the New General Motors.

3            I think what would solve a lot of time in this case is

4    if you could clarify right now, are state Lemon Law actions an

5    assumed liability of the New General Motors.  Can we have a

6    decision on that?

7            THE COURT:  On the New General Motors?

8            MR. KIDWELL:  Yes, sir.

9            THE COURT:  I think I got to give the lawyer from New

10   General Motors a chance to be heard before I issue a ruling on

11   it.

12           MR. KIDWELL:  Okay.  Well, it's my understanding that

13   General Motors made a deal with nine state attorneys and also

14   with the -- so it was nine state attorneys that lodged

15   objections in this case to the sales of General Motors.  Also

16   the Center for Auto Safety, Consumer Action, Consumer's

17   Reliability and Safety, and the National Association of

18   Consumer Advocates, all filing objections to the GM bankruptcy

19   sale, because it attempted to minimize General Motors from

20   state Lemon Laws.

21           Well, General Motors made a deal with the state

22   attorneys, they made a deal with the Center for Auto Safety and

23   Consumer Action and all these groups.  They have -- if they

24   dropped their objections, that they would make Lemon Law

25   commitments part -- an assumed liability for the New General

GENERAL MOTORS CORPORATION

Page 25

1    Motors.

2          And the New General Mot -- in fact, Section 2(a)(7) of

3    the amendment and restated master sale and purchase agreement

4    between Old GM and New GM, provides that New GM assumes all

5    liabilities arising not just under express written warranties,

6    but they also are responsible for all obligations under state

7    Lemon Laws.  That's what it says specifically in your court

8    order and in the sales -- the restated sale and purchase

9    agreement.

10          So unless it says one thing and means something else

11   they're responsible for all state Lemon Law obligations.  And

12   Florida State Lemon Laws state that I am still entitled to

13   relief.  In fact, I'm entitled to three times relief, because

14   they committed fraud.

15          THE COURT:  Okay.  Anything else?

16          MR. KIDWELL:  Is there any other concern you have

17   about the issue, because I can prove beyond any doubt that the

18   Lemon Law has not expired in this case.  And I am confident

19   enough that they are still liable under Florida's Lemon Law, in

20   fact, has been ongoing continuously.  It was in the state court

21   until they lied to the state court about two and a half years

22   ago to freeze that case.  But if they had not lied to the state

23   court about the New General Motors being responsible for Lemon

24   Laws, we would now have a trial on it.

25          And they also lied about me not prevailing at the

GENERAL MOTORS CORPORATION

Page 26

```
 1   Lemon Law hearing.  I sent a judgment order to this court and
 2   to every other court that specifically states that the vehicle
 3   far exceeds the Lemon Law requirements.  The only thing was, is
 4   they were given a last chance opportunity to repair it.  And
 5   under Florida's Lemon Laws they have ten days to take this last
 6   chance.
 7             It should also be noted that under Florida's Lemon
 8   Laws I have a right to appeal this to what they call a new car
 9   arbitration board.  And they denied me my right to do that
10   because they sent the -- General Motors' attorney sent the
11   appeal form that has to be signed within seven days or
12   something -- he sent my appeal form to a car dealership in St.
13   Petersburg, and I had never in my life lived in St. Petersburg,
14   and I didn't discover this until I sued them in state court and
15   asked for them to provide the form.  I told them that I was
16   never provided my form, and they wouldn't let me take it to the
17   new car arbitration board.
18             So there's been nothing but illegal conduct by General
19   Motors in this to steal 30,000 dollars from me and my family.
20   And it should be noted, they spent probably a million dollars
21   on attorneys of the taxpayers' dollars to steal this 30,000
22   dollars from me.  It's outrageous.  They should not only have
23   to pay me what the Florida's Lemon Laws say I have a right to,
24   but they should be prosecuted and put in jail for this.
25             You know, it's beyond outrageous.  They caused me to
```

```
 1    have three heart attacks now.  I had one about June or July of
 2    last year.  I had one Christmas Eve, I fell down and when I
 3    fell down I broke my elbow, shattered my whole elbow, and then
 4    I had one just about three weeks ago -- two or three weeks ago,
 5    September 4th.  And it's all from this dishonest conduct by
 6    General Motors, in this case, where they lied to you and said
 7    that I didn't prevail at the hearing, when General Motors'
 8    attorneys -- General Motors was a party at the Lemon Law
 9    process.  They knew what the judge says, and they know they're
10    lying when they say I didn't prevail.  And they know they're
11    lying when they say they didn't break Florida's law and pay an
12    employee of the Sitel Corporation to commit perjury and claim
13    that she was a GM manager in Detroit.
14            You know, they should be put in jail for their conduct
15    in this case.  So I guess that's -- I'm sorry to be upset
16    towards you, but there's been so much criminal conduct, it's
17    like they operate like the Mafia and they're stealing our
18    taxpayer dollars to engage in this illegal conduct.
19            And the bankruptcy court should stop it, because it's
20    wrong to take our taxpayer dollars intended to bail out General
21    Motors and pay attorneys to lie and commit perjury and do all
22    this illegal stuff just to cheat a disabled veteran out thirty
23    grand.  I paid them thirty grand, in good faith, for a truck,
24    that they left sitting in my driveway and had to stop running
25    the day I bought it.
```

GENERAL MOTORS CORPORATION

Page 28

1          So, you know, when I drove it home, it stalled the

2    first time.  So they stole thirty grand from me.  They've lied

3    in every court.  They get by within -- they spent probably a

4    million of the taxpayers' dollars on law firm after law firm.

5    They use legal technicalities to keep the truth out of the

6    courts.  And the truth is, they paid a woman to commit perjury.

7    They stole thirty grand from me.  And I still -- it's still an

8    active legal Lemon Law claim that's in the state court that

9    they've stopped by lying and saying that the New General Motors

10   doesn't have to honor warranties.

11          But I guess that's it.  I'm sorry to take so long.

12          THE COURT:  Okay.  That's okay.  Thank you, Mr.

13   Kidwell.

14          MR. KIDWELL:  Thank you, Your Honor.

15          THE COURT:  Okay.  I'll hear from New GM now.  Mr.

16   Steinberg, would you come to the main lectern, please.

17          MR. STEINBERG:  Good morning, Your Honor.  I think Mr.

18   Kidwell's presentation highlighted the fact that a lot of what

19   he has complained about were acts made by Old General Motors in

20   the conduct of hearings that took place before the bankruptcy.

21   And all of those actions were not the actions that have been

22   assumed by New General Motors under the asset purchase

23   agreement.

24          A lot of what Mr. Kidwell has argued here with regard

25   to the Lemon Law, was presented to the federal district court.

GENERAL MOTORS CORPORATION

Page 29

1    And the federal district court has actually ruled on the

2    matter.  There are four orders that have been entered in this

3    case which I think we would like to focus Your Honor's

4    attention to and has been laid out in our presentations before.

5             One is an order by the federal district court on

6    September 10, which dismissed New General Motors with --

7    dismissed all claims against New General Motors with prejudice.

8    Then the Eleventh Circuit said that there was a pending motion

9    for reconsideration, and therefore they wanted the district

10   court to further act on the complaint and the motion for

11   reconsideration before it would then entertain any appeal to

12   the September 10th order.

13            And so then, on December 28, 2010, the district court

14   rendered a decision -- and all of these have been provided to

15   Your Honor.  And there, the district court judge, in a

16   decision, dismissed the Lemon Law claims with prejudice.  And

17   on page 6 and 7 of the decision, it highlighted what Mr.

18   Kidwell had argued and said that it interpreted the asset

19   purchase agreement to provide for limited relief under what was

20   defined under the asset purchase agreement, as Lemon Law --

21   Lemon Law was actually a defined term under the APA -- but

22   dismissed with prejudice the Lemon Law rights.

23            Then in the summer of this year -- and then in the

24   context of dismissing the Lemon Law claims, it said that since

25   there was an ambiguity as to what Mr. Kidwell was claiming on

Page 30

1    the express warranty claims, they were going to dismiss the

2    express warranty claims without prejudice, with leave for Mr.

3    Kidwell to replead those actions.  When Mr. Kidwell did not

4    replead those actions, in I think July of this year, the

5    district court filed a sua sponte order to show cause as to why

6    the matter shouldn't be dismissed.  And in August of this year,

7    the court dismissed the complaint without prejudice.

8         And then in September 15th, of this year, the Eleventh

9    Circuit ruled on the appeal of the original September 10, 2010

10   order of the district court, which had dismissed New GM with

11   prejudice, and decided to affirm the appeal for failure to

12   prosecute.

13        And so right now, we have a district court that has

14   dismissed the Lemon Law claims with prejudice, and any appeal

15   of any claims that had gone from New Gen -- with respect to New

16   General Motors as reflected in the September 10, 2010 order of

17   the federal district court, has been dismissed with prejudice

18   by the Eleventh Circuit.

19        THE COURT:  Pause, please, Mr. Steinberg.

20        MR. KIDWELL:  Your Honor --

21        THE COURT:  Bear with me, Mr. Kidwell, I'm asking Mr.

22   Steinberg a question.

23        Mr. Steinberg, your focus, understandably, is on New

24   GM.  To what extent do any of the motions Mr. Kidwell has

25   raised, in your view, call upon me to decide Old GM's liability

Page 31

1      in contrast to yours?

2           MR. STEINBERG:  I don't know whether Mr. Kidwell has

3      filed a proof of claim in the bankruptcy case with regard to

4      any claims against Old GM.  The sole focus of the motions that

5      are before you today are with regard to New General Motors'

6      culpability.  And there, the asset purchase agreement, I think,

7      specifically talked about what New GM was assuming.  So I don't

8      think for purposes of today you have to rule on the Old General

9      Motors situation.

10          THE COURT:  Okay.  Continue, please.

11          MR. STEINBERG:  The Lemon Law claims are defined in

12     Section 1.1 of the asset purchase agreement.  And it references

13     back to the express warranty claims.  And therefore, the

14     decision by New General Motors to take on Lemon Law claims were

15     the duties to repair.

16          Here the duties to repair had expired through the

17     express warranties in 2006.  Mr. Kidwell refers to the fact

18     that he won the Lemon Law decision.  There was an arbitrator

19     decision in 2005.  And indeed Mr. Kidwell lost in that action,

20     because he had not given Old GM the opportunity to do the final

21     last opportunity to do a repair.

22          Mr. Kidwell's argument is that the was deprived of

23     that opportunity because of either the acts of certain parties

24     or notices were sent in the wrong spot.  All of those things

25     may lead to a claim against Old GM.  They aren't the claims

Page 32

1   that were assumed by New GM.  New GM specifically did not take

2   on all warranty claims.  It only took on the express warranty

3   claims that were in effect in the glove compartment.  They were

4   limited to the duties to repair.  They weren't limited -- they

5   didn't assume damage-type claims at all.  And they didn't

6   assume damage-type claims under the Lemon Law either.  It was

7   only a duty to repair.  They had expired.

8           If Mr. Kidwell has a grievance against attorneys,

9   people, actions, all taken before the bankruptcy, he has

10  whatever those rights are against those people as a claim in

11  the bankruptcy case here.  But those aren't the claims of New

12  General Motors.  Those aren't the claims that New General

13  Motors took as part of the asset purchase agreement.

14          THE COURT:  All right.  Thank you.

15          Mr. Kidwell, I'll give you a chance to reply.

16          MR. KIDWELL:  Yes, sir.  This is why I asked that all

17  attorneys be specifically ordered to abide by the ABA, American

18  Bar Association Model Rules of Conduct and be specifically

19  ordered to be honest, because I'd state under oath that that

20  attorney has just lied about all of the material facts.  And I

21  can prove -- I have proofs he lied about all the material

22  facts.

23          In the first place, Florida's Lemon Law has not

24  expired, and according to Chapter 681 I have a right to pursue

25  it in state court.  In fact, I'll tell you the exact statute

Page 33

```
 1    that says it.  And I did pursue it -- timely pursue it in state

 2    court.  And it was pending and was getting ready for a hearing.

 3    And New General Motors -- not Old General Motors, but the day

 4    after you entered the order, I state under oath that New

 5    General Motors notified the state court and said that were not

 6    responsible for Lemon Law, that they would not honor Lemon

 7    Laws.

 8              Florida Lemon Law statute 681.111, Unfair or Deceptive

 9    Trade Practice says that, "A violation by a manufacturer of

10    this chapter is an unfair or deceptive trade practice as

11    defined in Part II of Chapter 501".  Then Florida Lemon Law

12    681.112, Consumer Remedies, says that as part of Florida's

13    Lemon Laws, "A consumer may file an action to recover damages

14    caused by a violation of this chapter.  The court shall --

15              COURTCALL OPERATOR:  Hold on a second.  Just a moment.

16              You still there?

17              Your Honor?

18              THE COURT:  The judge is.

19              COURTCALL OPERATOR:  Just one moment.  We have a

20    disconnection on the other phone.  Just a moment, sir.

21              You're back.

22              MR. KIDWELL:  Okay.  Hello?

23              THE COURT:  Yes, Mr. Kidwell, continue please.

24              MR. KIDWELL:  I'm sorry, my phone went dead for a

25    second.
```

Page 34

1          Florida Lemon Law 681.112 Consumer Remedies says, "A

2     consumer may file an action in state court to recover damages

3     caused by a violation of this chapter."  That's my state

4     lawsuit I was telling you about.  It says, "The court shall

5     award a consumer who prevails in such action the amount of any

6     pecuniary loss, litigation costs, reasonable attorney's fees,

7     and appropriate equitable relief."

8          Now, Florida's Lemon Law gave me a right to pursue my

9     state lawsuit.  The state -- but New General Motors, the day

10    after you issued the order -- the New General Motors, lied to

11    the state court and said that the sales order made General

12    Motors immune from all state Lemon Laws.  They lied to stop my

13    state lawsuit.

14         Now, what he's telling you about the federal lawsuit,

15    I filed a federal lawsuit, and under the Lemon Laws, they

16    claimed I filed a federal lawsuit, because the New General

17    Motors and the Old General Motors conspired together and they

18    lied to the state court and denied me my right to the state

19    courts.  They denied me access to the state court for the Lemon

20    Law process.

21         And now what happened was, the federal court issued --

22    the federal court ignored me as a pro se litigant, rubber

23    stamped -- what the General Motor's attorney said.  So the

24    federal state court rubber-stamped and issued a court order

25    saying that there was an immunity for the New General Motors

Page 35

1    from state Lemon Laws.

2          Well, then I went and asked the court to reconsider.

3    And as an alternative I filed a mandamus from the appeals

4    court, and I attached -- I copied this court's sales order

5    saying that they were responsible for Lemon Laws.  Because the

6    federal court found that General Motors had intentionally lied,

7    they issued a new court order.  That's why there's four orders.

8    They issued a new court order saying, yes, the sales order does

9    say that they are responsible for Lemon Law actions, and they

10   changed their order.

11         Well, now, they gave me thirty days or something to

12   appeal.  They did dismiss the board of directors for personal

13   liability, but they said that they reversed that and said that

14   the Lemon Law was an obligation of New General Motors.  Well, I

15   appealed that order, and then when I appealed it, the district

16   court went and decided to change their mind, and they issued a

17   new order.  So the appeals court dismissed my appeal saying it

18   wasn't from a final order, because the district court was

19   changing its final order.

20         So then I appealed that order.  And the district court

21   then gave me sixty days or some time to file an amended

22   complaint.  And the new requirements were I was addressing the

23   Lemon Law evidently and not addressing the personal liability

24   of the board of directors.  But they did give me a time to file

25   an amended claim.  And I notified the federal court that I was

1    having heart problems, and because of my health, couldn't

2    comply with the deadline.  Well, I asked them -- I went to the

3    hospital.  I had a heart attack.  I was telling the truth.  But

4    I was too ill to comply.  And also, it's too complex for me to

5    comply with, if the court wants me to reword it.

6        But this whole federal lawsuit is about -- about them

7    lying to the state court.  It's not about the Lemon Law.  The

8    Lemon Law is still active and in state court, and it's just

9    been held up because them lying and saying that your court

10   order prevents it when your court doesn't.

11       So all these court orders and all this contradictory

12   stuff is happening because General Motors constantly lies and

13   some -- one of these courts needs to order their attorneys to

14   be truthful and get to the bottom of this.  As long as they're

15   allowed to lie, they're going to do what the attorney just did

16   to you in your court, and they just tell you a bunch of lies.

17   I've got my witness -- I've got the records to prove it that he

18   lied, you know.

19       The Lemon Law has not expired, because Statute --

20   Chapter 681 in Florida says they if I file a case in court with

21   them and here like I did, that if the Lemon Law is still

22   active, I'm entitled to a decision.  It doesn't matter if the

23   state case is pending twenty years.  The Lemon Law is still

24   going on until that state case is resolved and I get a

25   decision.  And then I have a right to appeal it before this

Page 37

```
 1    court.

 2              THE COURT:  Mr. Kidwell, do you agree that whoever

 3    owes you this duty, the duty is limited to fixing the truck?

 4              MR. KIDWELL:  No, sir.  That's where Florida's Lemon

 5    Laws are unique.  They -- under Florida's Lemon Laws, as I

 6    said, if they didn't take their last chance, within ten days,

 7    which they didn't -- oh, I hate to change the subject, but I

 8    want to point out one more --

 9              THE COURT:  Please don't change the subject.

10              MR. KIDWELL:  Sir?

11              THE COURT:  Please don't change the subject.

12              MR. KIDWELL:  No, it's just because he said -- he said

13    that I did not give Old General Motors an opportunity to repair

14    the truck, and I can prove beyond any doubt that he lied to

15    you -- that General Motors' attorney lied to you when he said I

16    didn't give him an opportunity.  It sat in my driveway and

17    didn't move for seven years blocking my driveway, and I sat

18    here waiting, me, my wife, and child, waiting seven years for

19    them to come repair it, and they never came here once.  And I

20    called them on the phone and begged them to come repair it.

21              And I filed the motions in state court asking when

22    they was going to come repair it.  So when he says that I

23    didn't give them an opportunity to repair it, he is lying to

24    you and he should be found in contempt.  Until we get some

25    truth from the attorneys you're never going to be able to make
```

GENERAL MOTORS CORPORATION

Page 38

1     a proper decision, because they keep lying to you.

2            I gave them every opportunity.  Under Florida laws,

3     they had ten days to come, get it working -- if it's broke down

4     and fix it.  So I would like to have that attorney explain to

5     you how I kept General Motors from coming in and fixing that

6     car within ten days, when I've been sitting here watching my

7     driveway for seven years, begging them to come get the darn

8     thing out of my driveway and fix it.  You know.

9            He lied to you and you should get to the bottom of why

10    he intentionally lied to you and then we can find out what the

11    truth is in this case.  So I'd like to make an oral motion that

12    the attorney explain to you --

13           THE COURT:  I can't accept oral motions, Mr. Kidwell.

14           MR. KIDWELL:  Your Honor?

15           THE COURT:  I cannot accept oral motions.  I've

16    already got five written ones from you.  That's the way you're

17    supposed to do it.

18           MR. KIDWELL:  Oh.  Can you accept my testimony under

19    oath that he lied to you?

20           THE COURT:  Not in that fashion.  Under my case

21    management orders, the first appearance is a non-evidentiary

22    one.  And I hold and take evidence by testimony if, but only

23    if, I think there are disputed issues of fact.

24           MR. KIDWELL:  Well, he's trying to obstructing justice

25    in your court by lying to you about the facts, and I can prove

GENERAL MOTORS CORPORATION

Page 39

1    beyond any doubt that he lied about every fact he's spoken.

2           THE COURT:  All right.  Thank you.

3           MR. KIDWELL:  And it is not true.  But getting back to

4    it, the Lemon Law case is still pending and forwarded, and the

5    state case wasn't closed, it was just suspended indefinitely

6    because they said that the sales order makes all Lemon Law

7    obligations immune.

8           Now, one thing that was filed, all these contradictory

9    orders from the federal court and everything else, the federal

10   case is not decided.  The federal case kept issuing orders that

11   the appeals court said were not final orders.  And in the end,

12   the federal court agreed with me that I had claims that they

13   want me to file an amended complaint with all these complex --

14   that abides by certain standards.  And so I filed an appeal

15   asking the Eleventh Circuit to appoint counsel.  And my appeal

16   to the Eleventh Circuit is that under the Eleventh Circuit

17   guidelines, even though attorneys are not a right in this whole

18   case, when a case is so complex and a person is in too poor of

19   health, to comply and it would violate my doctor's orders in

20   trying to do a complex -- involved in a complex amended

21   complaint like that they need to appoint counsel.

22          So that's where it stands right now.  All the stuff he

23   told you is nothing but a bunch of bull.  The district court

24   case -- the district court, in the end, said that I have

25   claims.  I have to refile an amended complaint, with just those

GENERAL MOTORS CORPORATION

Page 40

1    claims.  And then I appealed that to the Eleventh Circuit,

2    where it's at right now, because I'm in too poor health.  I

3    want an attorney appointed to file this amended complaint that

4    they say I have a right to.

5           Now, Florida appeals in the Eleventh Circuit were

6    found as moot because the court kept changing its orders

7    because it found out General Motors was lying to me, and it

8    kept having to change its orders.  And what happened was, as

9    they kept -- the appeals court said they have -- it wasn't a

10   final order because the district court kept changing its

11   orders.  But where it stands, it's knocked out and the district

12   court order -- where it stands in the district court, is that

13   they want me to file an amended complaint, and I'm not

14   medically able to.  I'm asking for counsel to be appointed,

15   because I don't have the funds to appoint an attorney -- to pay

16   for an attorney.

17          It would stop all this in the district court and it

18   would stop all this confusion if this court had addressed my

19   request for judicial notice to really clarify what the sales

20   order says.  You know, it would stop a whole lot of litigation

21   if this court would just issue a decision, are state Lemon Laws

22   an obligation of the New General Motors, are they an assumed

23   liability of New General Motors or is the statement in the sale

24   order a bunch of baloney.  And that would solve a whole bunch

25   of this litigation.

Page 41

1           THE COURT:  All right.  Thank you.

2           MR. KIDWELL:  And if there's any way this Court can

3   decide if the statement and the sales order saying that state

4   Lemon Law obligations are an obligation of New General Motors,

5   is that a truthful statement in the sales order or is it just

6   baloney that it's an obligation to Old General Motors.  Because

7   I'm sort of confused.  I don't even know -- I mean, clearly the

8   district court is confused.  They keep changing their orders.

9   They don't know one way or another.

10          THE COURT:  Okay.  Thank you.

11          Mr. Steinberg, since he said so much, I'm going to let

12   you sur-reply, but limit it to stuff that he said in his reply.

13          You may, but you really don't need to tell me that --

14   if you want to deny lying to me, you don't need to say that.

15          MR. STEINBERG:  Thank you, Your Honor.  In the

16   December 28, 2010 decision of the district court, the district

17   court denied without -- dismissed without prejudice the right

18   to replead the express warranty claim, as I said before.  But

19   I'd like to read an excerpt from page 7 of the decision which

20   discusses the plaintiff's Lemon Law related claims.

21          It says on the second line, "Plaintiff's allegation

22   that defendant 'did intentionally commit a fraud on Florida's

23   Lemon Law process' is not within the limited scope of the sale

24   approval order."  And then it has some citations to the order.

25          "Specifically, plaintiff's Lemon Law related claims

GENERAL MOTORS CORPORATION

Page 42

1    are really for fraud and obstructions of justice rather than an

2    action under the substantive provisions of the statute."  And

3    then it has some citations to the order and then to the Ames v.

4    Winnebago case, and then it concludes by saying, "Thus Counts

5    IV and V of plaintiff's amended complaint were properly

6    dismissed with prejudice."

7           So I think Mr. Kidwell is a little confused as to what

8    the Florida district court did do.  It did talk about a

9    dismissal without prejudice to the express warranty claims,

10   subject to his right to replead.  So it was clear whether he

11   was asserting the type of warranty claim that New GM had

12   assumed, which was the repair responsibility only.  But with

13   regard to the Lemon Law claims, the district court was clear,

14   that that was a dismissal with prejudice, and it had ruled on

15   that in the connection with the motion for consideration.

16          THE COURT:  Mr. Steinberg, I mean, I assume your fees

17   are being paid by New GM and they aren't being paid by the

18   creditors of this estate?

19          MR. STEINBERG:  That's correct.

20          THE COURT:  Is there some reason why you and Mr.

21   Kidwell didn't just settle this thing by an agreement that he

22   would throw out all of the other stuff and that you'd just fix

23   the damn truck?

24          MR. STEINBERG:  With respect to New General Motors or

25   Old General Motors?

GENERAL MOTORS CORPORATION

Page 43

1          THE COURT:  I think it's clear, based upon my reading

2      of the briefs and the underlying statutes, that New GM doesn't

3      have any liability for anything other than fixing the truck.

4      Which I assume might cost more than a couple of thousand

5      dollars, but somehow I suspect costs a lot less than it's cost

6      to litigate this matter.

7          But if Old GM didn't give the proper notice of the

8      last clear chance to fix the truck, then it may -- and I'm

9      talking more as a lawyer or as a judge than Mr. Kidwell did --

10     then it may not be able to invoke the condition that would have

11     brought all of its Lemon Law liabilities to an end, in which

12     case the duty to fix the truck might have continued.

13         Now, I can't believe that the duty to fix the truck

14     would have cost more than giving him a new truck.  And it

15     probably would have cost a lot less.  But this controversy's

16     been going on kind of like Dickens wrote about a couple of

17     hundred years ago, several Dickens books, not just "Bleak

18     House".  And I could deal with this on the merits.  And if I

19     deal with it on the merits, I'm going to likely say that

20     whatever Mr. Kidwell has is a pre-petition claim, except to the

21     extent that you're not able to contend that all Lemon

22     liabilities ended, in which case your liability would be

23     limited to fixing the truck.  And I don't know what you'd do,

24     and I'm not going to decide without more, if you can't fix the

25     truck.

GENERAL MOTORS CORPORATION

Page 44

```
 1            But my reaction -- and this isn't a legal ruling, it's
 2    what I would do if I were holding you both in a private
 3    conference room or if I were a mediator, is say Mr. Kidwell's
 4    got to give up all of that extra stuff which is way
 5    overreaching, and that somebody should just fix the damn truck.
 6    And that's kind of what I'm scratching my head about.
 7            MR. KIDWELL:  Your Honor?
 8            THE COURT:  Yes, Mr. Kidwell.  The question was aimed
 9    at Mr. Steinberg the way I articulated it.  But it's really at
10    both of you guys.
11            MR. KIDWELL:  Yeah.  Your Honor, I've sought in good
12    faith for a settlement conference in the U.S. district court,
13    and I had their attorneys come down, and their attorneys came
14    down here and said that under no conditions would they -- were
15    they going to honor the warranty.  So I tried in good faith to
16    get them to resolve this from the start.
17            THE COURT:  Now, was all of that you asking to get
18    your truck fixed or to try to break the bank with all of these
19    other claims?  If I can be crude about it.
20            MR. KIDWELL:  I'd point out to the Court that my -- he
21    just finally admitted that the federal lawsuit was about their
22    fraud and the state lawsuit is authorized by Florida's Lemon
23    Laws, and is about the vehicle.  And I'd point out that I was
24    entitled to -- according to the statute, over 600,000 in
25    damages.
```

GENERAL MOTORS CORPORATION

Page 45

1           THE COURT:  Yeah, that's the big problem, Mr. Kidwell

2    because you --

3           MR. KIDWELL:  But --

4           THE COURT:  -- no.  Mr. Kidwell, you can't interrupt

5    me.  The Court has ruled there was no fraud.  Old GM and New GM

6    might have been stupid, but they didn't defraud you.  And

7    that's a huge difference in the amount of the damages.

8           Now, Mr. Steinberg, I'll hear your perspective.

9           MR. KIDWELL:  But, Your Honor, I just wanted to

10   explain that I offered to settle if they would simply honor

11   their warranty.

12          THE COURT:  Okay.

13          MR. KIDWELL:  I'd point out that despite the mass

14   amount of damages, that I was just trying to get them to honor

15   their warranty.  Just like you're telling them now, you know,

16   that they spent all this money on attorneys; it'd be a lot

17   cheaper if you told them to do the right thing that they should

18   have done all along.

19          THE COURT:  Okay.  Mr. Steinberg?

20          MR. STEINBERG:  Your Honor, I want to try to be as

21   precise as I can be with respect to your particular question.

22   When I saw the lengthy procedural history in this case in both

23   the arbitration decision under Lemon Law, the state court

24   proceeding, the federal court proceeding and then the

25   bankruptcy proceeding, all with respect to the original

Page 46

1    purchase of a vehicle which was between 25- and 30,000 dollars,

2    and knowing what it costs to spend the legal time for all of

3    that, I had asked the client, wasn't there any way through this

4    entire process where you could just repair the vehicle and

5    finish the matter; notwithstanding the fact that he had sued

6    GM's board for RICOH and other types of violations, but simply

7    just deal with the car and to repair the car.

8         And I think they said that -- and I'm doing this from

9    memory now -- that they felt that any attempt to try to have

10   done that from the beginning back in '05 and '06 was met with

11   resistance by Mr. Kidwell, who wanted to pursue his rights

12   through legal remedies, which were seeking damages way beyond

13   the cost of the vehicle, and therefore there was never ever the

14   ability to try to settle it in the way that you had articulated

15   it.

16        And I think even when you were trying to ask Mr.

17   Kidwell whether this could be settled simply by the repair of

18   the vehicle, because it would be cheaper to do that than to

19   continue to deal with these pro se pleadings throughout, I

20   don't think he really gave you a specific response.

21        But I did ask the same question that Your Honor had,

22   and that was the response that I got when I asked the question

23   to my client and to my colleagues in Atlanta who had been

24   litigating the district court action.  And I don't have a

25   better response than that.

GENERAL MOTORS CORPORATION

Page 47

```
 1                THE COURT:  That's okay.  Thank you.

 2                All right.  Both sides had an opportunity to speak

 3       their piece?

 4                MR. KIDWELL:  Your Honor?

 5                THE COURT:  Mr. Kidwell, I can't -- I'm going to let

 6       you speak but I can't let you be repetitious.

 7                MR. KIDWELL:  Okay.  I just want to point out that I

 8       have a stack of letters from the date the truck broke down to

 9       prove that that's not true that I told them over and over

10       again, and just come and fix the damn truck.  And I asked

11       for -- moved for the settlement conference again and again in

12       the state federal court, and each time I said fix the truck.

13       And you know -- you know give me the money for the truck, you

14       know.

15                THE COURT:  Okay.

16                MR. KIDWELL:  And each time, they have refused.  So

17       his representing to you that I have resisted that's completely

18       wrong.  I am the only one in this case that has tried to

19       resolve this.

20                THE COURT:  All right.

21                MR. KIDWELL:  And I've tried continuously since the

22       truck broke down.  I agree with you that it's ridiculous that

23       they're spending this much money on attorneys instead of just

24       simply resolving it.  So I would suggest that you ask him --

25       point out to him that I do have letters that I have constantly
```

GENERAL MOTORS CORPORATION

Page 48

```
 1    tried to just get the darn truck, you know, fixed, and that you

 2    have him go back to his clients and see if they can't just pay

 3    me for the truck like they should have, and resolve everything.

 4            THE COURT:  All right.  Thank you.

 5            MR. KIDWELL:  It would save everybody a lot of money.

 6            THE COURT:  Again, we've taken a lot of time on this.

 7    I'm ready to rule.

 8            MR. KIDWELL:  Okay.

 9            THE COURT:  And my ruling is as follows, to the extent

10    I can rule.  First, the motion to recuse me, to disqualify me

11    for not being fair, having been withdraw, I don't need to deal

12    with that.

13            On the merits of the claims -- the remaining claims,

14    and we have to keep our eye on the ball here, because these

15    claims are aimed at New GM rather than Old GM -- it's clear

16    that all claims other than whatever Lemon Law claims might be

17    surviving, after the district court action after reviewing the

18    purchase and sale agreement, cannot be asserted.  So what is

19    left?

20            There is one thing left which is getting the car

21    fixed.  And whether the claim for getting the car fixed

22    survives, depends upon the extent, if any, to which any Lemon

23    Law obligations under Florida law survived as late as the time

24    the purchase and sale agreement was entered into and became

25    effective, which was shortly after I issued that decision on
```

1    the 4th of July back in 2009.

2         Now, Mr. Steinberg, on behalf of Old GM -- excuse me,

3    New GM, properly observes that to the extent, if any, to which

4    New GM might have any claims there, they would be simply for

5    fixing the vehicle or possibly -- though I don't decide it

6    today -- replacing the vehicle if fixing it isn't doable.

7         The courts -- the Florida courts have already ruled --

8    or perhaps I should say federal court in Florida has ruled

9    there was no fraud.  So all we're talking about is getting the

10   vehicle fixed.  Now, Mr. Kidwell contends -- it hasn't been

11   proven, but I well understand his contention, that although he

12   acknowledges that GM -- which at the time was Old GM -- had a

13   last clear chance to fix the vehicle to make all of this go

14   away, he says it was sent to the wrong address that didn't give

15   him the notice that he needed to invoke that remedy.

16        I can't decide that issue.  But I note that if his

17   contention is right, what that means is that you would have, in

18   substance, a do-over.  That New GM would then say, yeah, we'll

19   give you another opportunity to fix the car.  And the car would

20   be fixed.  But you don't break the bank under those

21   circumstances -- and I said car, I apologize, I know it's a

22   truck -- and you fix the truck.

23        So all we have left here, gentlemen is the duty to fix

24   the truck and possibly a pre-petition claim against Old GM

25   which isn't before me today, but which, if it could be

GENERAL MOTORS CORPORATION

Page 50

1    asserted, would be subject to all of the usual stuff about

2    filing a proof of claim and res judicata, which means it's

3    already been decided, as a consequence of ruling in the Florida

4    federal court.

5           Now, vis-a-vis New GM's duty under the remainder, I'm

6    going to take that under submission.  I am going to strongly

7    urge you -- both sides -- to make this issue go away before I

8    issue the ruling -- the final ruling, based on the obvious

9    common sense thing to do here, which is to -- and I won't use

10   the obscenity -- fix the truck and abandon all of the other

11   claims.  You have thirty days to try to make that happen.  If

12   you don't, I will issue a ruling, which may be embarrassing to

13   one side or both.

14          We'll take a five-minute recess, and then I'll take

15   the Buttita --

16          MR. KIDWELL:  Your Honor?

17          THE COURT:  Yes.

18          MR. KIDWELL:  Just one thing.  I would just like to

19   ask that you replace "fix the truck" with "replace the purchase

20   price", because everyplace, under Florida Lemon Law, it says

21   that consumer is returned the purchase price.  And fixing the

22   truck now after seven years, won't be much help after

23   spending -- you know, I paid for a new truck.  So is there any

24   possible way to change it -- obeying Florida Lemon Law

25   refunding the purchase price?

Page 51

1              THE COURT:  I'm not good enough on knowing the Florida

2     Lemon Law without having to do all sorts of research to study

3     that.

4              MR. KIDWELL:  I can send you --

5              THE COURT:  No, no.  Please.  This has been briefed

6     enough.  One of the books I was referring to by Charles Dickens

7     was called "Bleak House", which talks about a litigation going

8     on forever.  And this litigation is getting to be in

9     contention.  Now it may be that the cost of litigating --

10             MR. KIDWELL:  If I could --

11             THE COURT:  -- no.  Mr. Kidwell, you can't talk over

12    me.

13             MR. KIDWELL:  Okay.

14             THE COURT:  That's one of the rules we have in the

15    federal courts.  Okay?

16             MR. KIDWELL:  Okay.

17             THE COURT:  It may be that the difference isn't that

18    big a deal.  What you guys can do in making your own deal,

19    gives you much more flexibility than I can where I'm required

20    to rule within the confines of the law.

21             It also might be that replacing the whole truck is

22    cheaper than continuing this litigation for the next I don't

23    know how many years or whatever it's going to take.  But I'm

24    not going to decide an issue that I'm not prepared to decide

25    today.

GENERAL MOTORS CORPORATION

Page 52

1          Mr. Steinberg?

2          MR. STEINBERG:  Your Honor, so that I have

3    something -- I think you were clear, Your Honor, in what you

4    suggested and what you told both sides.  But I would ask if I

5    can ask you to ask Mr. Kidwell whether he would be satisfied in

6    dropping all claims against New General Motors -- New General

7    Motors, if either the truck was either repaired so that it's

8    workable or that the original purchase price of the truck was

9    refunded, so that I have something clear to talk to my client

10   about as stating what Mr. Kidwell's position might be.

11         THE COURT:  All right.  Mr. Kidwell, do you want to

12   respond to that question?

13         MR. KIDWELL:  Yes.  As he knows, they found everything

14   wrong, from wiring to motor to transmission.  I would be

15   agreeable to return of the purchase price.

16         THE COURT:  You want a return of the purchase price

17   rather than a new truck?

18         MR. KIDWELL:  I don't think the repair could ever fix

19   it, since they found even the doors and body defective.  It was

20   the last one to come off the assembly line.  Everything on it's

21   wrong.

22         THE COURT:  No, I understand that.  But there was the

23   third option which is getting a replacement truck of comparable

24   value.

25         MR. KIDWELL:  Yeah.  I don't think I really ever want

GENERAL MOTORS CORPORATION

Page 53

1    to have to -- to get --

2            THE COURT:  All right.  But the most important aspect

3    of Mr. Steinberg's question is, that you're prepared to drop

4    everything other than the claim for your money back?

5            MR. KIDWELL:  Right.

6            THE COURT:  Okay.

7            MR. KIDWELL:  Yeah.

8            THE COURT:  I think he answered your question, Mr.

9    Steinberg.  If you require me to rule on that, after thirty

10   days, that is, the claims other than what amounts to repair or

11   rescission, you've got a reservation of rights on that, and so

12   does Mr. Kidwell.

13           MR. STEINBERG:  Okay.  Now, Your Honor, there were --

14           THE COURT:  I think I telegraphed my leanings in that

15   regard.

16           MR. STEINBERG:  I heard them, Your Honor.  The --

17   there were a number of other motions, some of them are

18   sanctions motions.  I don't know whether you were ruling on

19   those.

20           THE COURT:  All are denied as moot.

21           MR. STEINBERG:  Thank you, Judge.

22           THE COURT:  Right.  All right.  We'll recess until

23   twenty of 12 and then I'll hear the substantial contribution

24   claim.

25           (Recess from 11:32 a.m. until 11:40 a.m.)

Page 54

1          THE COURT:  Okay.  The Buttita substantial

2     contribution claim.  I see Mr. Reinsel and Mr. Jones.

3          Folks, make your presentations as you see fit and I

4     want you to address the following questions and concerns,

5     mainly you, Mr. Reinsel.  I've read all the papers, including

6     Mr. Inselbuch's submission and of course Mr. Jones.

7          I got to tell you, you're starting on your own one-

8     yard line, Mr. Reinsel.  And the principal point that I want

9     both sides to address is the value, if any, to the estate vis-

10    a-vis my structuring the form of my order insofar as -- and my

11    ruling insofar as it might affect future claimants who aren't

12    within the meaning of the Code creditors, to keep it within

13    constitutional limits which, not being a constitutional scholar

14    I, nevertheless, recognized when I saw it and the question as

15    to whether that aspect had any value.

16          The more troublesome problem you have, Mr. Reinsel, is

17    one that I've dealt with in too many of my cases, of course

18    Adelphia is the poster child for it, where parties are prepared

19    to bring down a whole case, with disastrous consequences for

20    everybody, to advance their own private agendas.  And while the

21    efforts to oppose the 363 sale and, if I'm not mistaken, to

22    join in the stay request even after I had opposed -- after I

23    had approved the 363 sale, at a time when the direct testimony

24    affidavits proffered by the debtor and by the U.S. government

25    made clear to the whole country the disastrous consequences of

Page 55

1    a disapproval of a 363 sale, how you can be contending that

2    that is a contribution at all, much less a substantial

3    contribution.

4         I don't feel the urge to be as scathing in my

5    disapproval of that as I was when I when I saw the efforts in

6    Adelphia, but that's what you've got to help me with, Mr.

7    Reinsel, if anybody could.

8         I'll hear from you first and from Mr. Jones.

9         MR. REINSEL:  Thank you, Your Honor.  Ron Reinsel,

10   Caplin & Drysdale on behalf of Mr. Buttita.

11        Without going into the whole background, Judge,

12   because I'm sure you're familiar.

13        THE COURT:  That's when you and I first met, if I

14   recall.  Well, I knew a couple of your partners.

15        MR. REINSEL:  It was, Your Honor.

16        THE COURT:  I think I saw you when you were opposing

17   the 363.

18        MR. REINSEL:  That's correct, Judge.  And let me focus

19   about what the thrust of Mr. Buttita's opposition to the 363

20   sale was and it was -- it was to focus specifically on the

21   constitutional due process issues with respect to the future

22   claimants.

23        What the sale order -- what the sale was intended to

24   do, what the purchase agreement specifically said and what you

25   were being requested to do was to provide that the sale was

GENERAL MOTORS CORPORATION

Page 56

1    going to be free and clear of "All liabilities to third parties

2    for death, personal injury or other personal injury to persons

3    or damage to property arising out of asbestos exposure".  It

4    was a broad, injunctive relief given to New GM to leave all of

5    those liabilities behind at Old GM despite the fact two things.

6    One, Old GM had already acknowledged, through it's 10K filings

7    and other filings, that it new, at least an estimated almost

8    650 million dollars worth of asbestos personal injury claims

9    would be brought against it.  By their very nature those

10   claims, most of them because of the long latency period between

11   exposure and actually manifesting a disease, most of those

12   claims would arise, if at all, in the future.

13        What we had here was a buyer taking on what, under

14   most state law constructs, would have really established

15   successor liability to allow those future arising claims to

16   assert them against the successor entity.  Yet, we had a sale

17   order or a proposed sale order that would have completely

18   shielded them and having a liquidating debtor where when those

19   claims finally did arise, matured, ripened, the existing estate

20   of what was in effect a liquidation debtor would have been

21   administered.  Those claimants would have had no recovery from

22   the old entity because it would have dried up and gone.  And

23   from the new entity nominally because this Court's order would

24   have protected it.

25        Where we were -- now, what the government said is we

Page 57

1   didn't really provide a contribution because what Judge Gerber

2   did was simply clarify what the constitutional limits were

3   anyway.  Except what they would have held out there is an order

4   from this Court that says we are shielded.  Come and sue us in

5   state court, in federal courts around the country, to establish

6   your own constitutional rights, which we're going to try to

7   extinguish through this Court's order.

8          What we did, Judge, and we appreciate your, I think,

9   thoughtful consideration, that those future claimants could not

10  have received effective notice of the sale.  Could not have

11  asserted their objections to the sale in any kind of fashion

12  whatsoever.

13         Now Mr. Buttita, as you noted, was not a future

14  claimant, he's a current claimant.  He was asserting those

15  objections on behalf of a larger class, a class that --

16         THE COURT:  In which he was not a member.

17         MR. REINSEL:  In which he was not a member.

18         THE COURT:  And let me tell you what's bugging me, Mr.

19  Reinsel.

20         MR. REINSEL:  Yes, sir.

21         THE COURT:  And you can compare and contrast your

22  behavior in this case with that of the New York AG's office

23  when we had an issue on confirmation.  I think the New York AG

24  office was joined by somebody else with a similar perspective.

25         The New York AG office thought the releases were

GENERAL MOTORS CORPORATION

Page 58

1  overly broad.  I think it was Ms. Leary, Maureen Leary, but it

2  doesn't matter.  But instead of bringing down the whole

3  confirmation and bringing down the whole case, she said we

4  support confirmation but massage your order to deal with this

5  issue.

6        That isn't my memory of what you did here and in fact

7  I had given you exactly what you thought you should get,

8  putting aside the fact that Buttita wasn't a future claimant,

9  and you still supported the stay.  Now by the stay -- by the

10  time of the stay my order had given future claimants the

11  protection that they could legitimately expect and you were

12  still doing it.  And that just gives me deja vu all over again,

13  compared to what I see from the hedge funds before me in case

14  after case.  Where am I wrong?

15        MR. REINSEL:  Your Honor, Mr. Buttita's objective, and

16  really his sole objective here, was not to bring down the case.

17  It was not to bring down the sale but it was to make absolutely

18  clear that the rights of those claimants would be preserved and

19  that the injunction that would result from the sale would not

20  extend to those future claimants except through, essentially,

21  what we finally ended up doing here, which was at least through

22  a mechanism that mimicked, at best, 524(g) of the Code.

23        I think, Your Honor, and another the Treasury, I

24  think, makes light of, what that contribution of having the

25  asbestos claimants stand up before the Court and say no, you

Page 59

1    can't hide behind the shield for the future claimants here.

2    That we didn't bring a substantial contribution to the case by

3    making ourselves heard at that point was belied by how the rest

4    of the facts of the case ran out.  Right after the sale, the

5    sale order became final, Mr. Buttita's state court counsel, Mr.

6    Cooney, was immediately -- almost immediately approached to

7    chair a subcommittee of the unsecured creditors committee in

8    order to provide for the proper treatment of both present and

9    future claimants as the case developed.

10        Ultimately that turned into the appointment, as the

11   Court's aware, of a separate asbestos committee.  That resulted

12   in the negotiation of an acceptable treatment for both present

13   and future claims through this case, a procedure that, number

14   one, resulted in a consensual estimation of the amount of the

15   claims, the development of procedures to treat both present and

16   future claims and through procedures that effectively mimic

17   section 524(g) of the Code and as a result obtained the

18   overwhelming support of all of the asbestos creditors in the

19   case.

20        Now Judge, perhaps joining in a stay motion was not

21   the wisest thing that Mr. Buttita could have done, but that was

22   not his primary thrust here.  That was obviously a motion that

23   was brought by another party and things were still in a state

24   of flux at that time.  But what Mr. Buttita did was to ensure

25   the proper treatment of a larger class of creditors, creditors

GENERAL MOTORS CORPORATION

Page 60

1    which we and you acknowledge he was not even truly a member of

2    the future claimants, to provide for their -- that ultimately

3    provided for their full and equitable treatment in the case.

4            We think, Judge, that those nece -- without those

5    necessary first steps, none of that would have happened.  None

6    of it could have happened because those rights would have been

7    foreclosed.  And we believe, Your Honor, that that ought to

8    resolve in -- what is, certainly in the scope of this case, a

9    very modest request for substantial contribution.  Which I

10   note, number one, my firm substantially discounted fees to Mr.

11   Buttita before we came in here, by at least a third.  That

12   we've turned off our fees I think a month and a half into the

13   case, about a week or so after the sale order was entered.

14           No request has been made by Mr. Buttita's personal

15   counsel, Mr. Cooney or his firm, Cooney & Conway, for what

16   ended up being hundreds and hundreds of hours devoted to his

17   representation.

18           And the only other objection that we're aware of is

19   one from the fee examiner which, although we questioned the fee

20   examiner's authority given the scope of the Court's order to

21   deal with non-estate professionals, we reached a resolution

22   with the fee examiner to, again, reduce the amount of fees that

23   we were requesting such that in our -- as modified after taking

24   into account the fee examiner's objection.  We're looking for a

25   total of --

GENERAL MOTORS CORPORATION

Page 61

1          THE COURT:  Was it 172,000 bucks or is that before you

2    had your dialogue with Mr. --

3          MR. REINSEL:  Yeah.  We are now, Judge, the actual

4    request should be, as agreed, $154,692.62 in fees, $13,973.29

5    in expenses for a total request of $168,665.91.

6          THE COURT:  Okay.  Mr. Jones, may I get your

7    perspective, please?

8          MR. JONES:  Thank you, Your Honor.  David Jones from

9    the U.S. Attorney's Office, Southern District of New York for

10   the United States and specifically Treasury as DIP lender.

11          Your Honor, quite simply I don't see how this

12   application constitutes -- is for work that constitutes

13   substantial contributions to the estate.  As the Court noted,

14   the application period is solely for June and July 2009, at

15   which point Mr. Buttita was actively opposing the sale

16   application that was the indispensable prerequisite for any

17   kind of recovery being achieved in this case.

18          And as the Court also noted, his objections were not

19   phrased as limited objections or requests to modify, in some

20   limited respect, the relief being provided but rather they were

21   outright -- phrased as outright objections and even, at docket

22   number 3013, Mr. Buttita joined a request for an expedited

23   appeal and/or stay from the Court's sale order.

24          None of that -- and as the Court also referenced,

25   there was undisputed testimony at the sale hearing that the

GENERAL MOTORS CORPORATION

Page 62

1    sale had to go through promptly and on the terms that had been

2    negotiated as commercially reasonable and calculated to make

3    New GM to succeed for this case to have any prospect of

4    success.

5            So for all of these reasons, the work for which

6    compensation is being sought simply did not make any material

7    contribution to the estate.

8            There's a bit of a disconnect because the -- Mr.

9    Buttita talks about subsequent stages of the case, beginning in

10   2010, when the asbestos constituency, including his counsel,

11   pursued remedies against the debtors' estate.  Again, as he

12   characterized it, sort of, roughly, trying to replicate the

13   524(g) connection -- protections and procedures available in

14   plans of reorganization.  That is exactly what the government

15   said and the proponents of the sale said was their property

16   remedy even back at the time of the sale hearing.

17           What we said was, 524(g) protections are not available

18   and are irrelevant for purposes of this sale.  What needs to

19   occur -- that is a remedy and a requirement that exists in the

20   context of plan development in confirmation and that process

21   will be gone through, in this case, at a subsequent stage.

22           So where that process was pursued and brought into

23   being in 2010 was the appropriate stage and was consistent with

24   the government and the sale proponents' position at every step

25   in this case, yet was opposed by Buttita at the outset.

GENERAL MOTORS CORPORATION

Page 63

1         I'll also note that the preservation through the

2    language saying the effect of the injunction was solely to the

3    extent constitutionally permitted, if anything would permit

4    future claimants whose claims haven't ripened yet, so they're

5    not creditors, to potentially pursue some relief from New GM,

6    not from the estate.  And so, again, to the extent that right

7    was preserved, which is not defined through the sale order as I

8    understand it, that is not, again, a substantial contribution

9    to the processes of this case in any respect or the resolution

10   of affairs as to the debtor.  It simply is a preservation of a

11   right of a particular, as of now undefined future interest

12   group, future subset of the population who may, in the future,

13   want to proceed against New GM.  Again, that is -- I don't

14   understand and I haven't seen any authority suggesting that

15   that could be compensable as a substantial contribution to the

16   functioning of this case.

17         Your Honor, if the Court has no further questions,

18   I'll just rest on our papers at this point.

19         THE COURT:  All right.

20         MR. JONES:  Thank you.

21         THE COURT:  Mr. Reinsel, reply?

22         MR. REINSEL:  Your Honor, just back to that last point

23   about the -- the Court's modification of the order simply

24   subsuming the existing law.  What that would have done, I think

25   in the absence, Judge, of your opinion and the modifications to

GENERAL MOTORS CORPORATION

Page 64

1    the order that were ultimately entered was expressly intended

2    to, at minimum, create ambiguity and at worst to throw up an

3    absolute wall to further claimants.

4         An approach which would have cost, I think, the estate

5    itself as well as New GM significant dollars in litigation

6    outside of this court in subsequent matters to determine that

7    those rights did still exist, despite the expressed wording

8    that was sought in the sale order.  That was a significant

9    success, I think, by Mr. Buttita to set the stage for what then

10   happened in the case.

11        Thank you, Your Honor.

12        THE COURT:  All right.  Mr. Jones, is there really a

13   need for you to rise at this point?  All right.

14        MR. JONES:  Only to grab my Redweld at the corner.  I

15   have nothing to say, Your Honor.

16        THE COURT:  You can grab your Redweld and then I want

17   everybody to sit in place.

18    (Pause)

19        THE COURT:  In this contested matter in the Chapter 11

20   case of Motors Liquidation Company, formerly known as General

21   Motors and its affiliates, Mark Buttita seeks an award of, on a

22   substantial contribution basis, for services performed wholly

23   or principally by the law firm of Caplin & Drysdale during the

24   months of June and July of 2009.

25        The United States Government, on behalf of the U.S.

GENERAL MOTORS CORPORATION

Page 65

1    Treasury and ultimately the taxpayers, objects.  The

2    government's objections is sustained and the motion for payment

3    of an administrative expense is denied.

4         The facts are not in material dispute.  In fact, I

5    don't think they're in dispute in any regard.  Buttita, through

6    counsel, opposed a motion, that being the 363 sale motion,

7    urged by the debtors with the support of the United States

8    Treasury, the Canadian government, the UAW and other parties,

9    including the creditors' committee as a whole, that was

10   essential to the company's survival.

11        He did so to advance his private agenda.  He even

12   supported a motion for a stay after I had found as a fact,

13   consistent with affidavits that were available before the

14   evidentiary hearing on the 363 sale, as to how critically

15   important to the needs of GM stakeholders the 363 sale was.  He

16   supported the motion for the stay even after I had put the

17   language in the 363 order, which provides such an important,

18   alleged contribution to the estate, in other words, the

19   objection to continuing with the sale continued after I had

20   given Buttita what he claimed he was after.

21        Now Buttita is asking the other creditors and the U.S.

22   taxpayers to pay for that.  That is not a contribution, much

23   less a substantial contribution.

24        Too often, in cases on my watch, in major Chapter 11

25   cases, too often over the eleven years that I've been sitting

Page 66

1    up here, I've seen stakeholders taking actions that would bring

2    the downfall of the entire estate to advance private agendas,

3    to boost individual recoveries.  My concerns in this regard are

4    not new.  In two published decisions, each in the Adelphia

5    case, 336 B.R. 610 and then again at 441 B.R. 6, I addressed

6    tactics of this type.  I said "The bringing of motions like

7    these is not unethical or sanctionable but neither should it be

8    encouraged or rewarded.  Motions that would bring an

9    intolerable consequences for an estate should not be used as a

10   tactic to augment a particular constituency's recovery."

11          To be sure, what I saw in the summer of 2009 is not

12   egregious as the actions that I dealt with in Adelphia.  And at

13   the risk of stating the obvious, in one case it was destructive

14   motions that were brought on and here it was an opposition to a

15   motion that was widely acknowledged to be essential to the

16   company's survival.

17          It may have been entirely reasonable, and certainly

18   was not sanctionable from the perspective of the party that

19   wanted to advance its private agenda, but as I said it cannot,

20   in any fair meaning of the term, be regarded as either a

21   contribution or a substantial contribution.  In fact, it

22   necessitated efforts by other stakeholders in the case who, by

23   the way, had more at stake than the objectors did, to expend

24   funds to deal with the objection.

25          Now Buttita properly observes that there was an

GENERAL MOTORS CORPORATION

Page 67

1    element of the motion that initially required fixing, which was

2    early language in the proposed sale order which would have

3    inappropriately dealt with future claims, claims in that

4    context being used loosely because, of course, they weren't 101

5    claims and in considering this application I pause to think

6    about whether I should therefore allow some kind of partial

7    award to take into account that feature.

8         But after thinking about it I rejected that notion and

9    I did so for two reasons.  The first is that as the New York

10   AG's office pointed out, or exemplified perhaps better than

11   pointed out, when it objected to confirmation you can raise

12   concerns of that sort without threatening to bring down a whole

13   Chapter 11 case.  There, at the risk of stating the obvious and

14   reminding people of things that I think are known to everybody

15   in this room, the New York AG filed a limited objection, said

16   we support everything but we want you to massage your

17   confirmation order to narrow it in the following respect.  And

18   after hearing the New York AG's counsel, I was persuaded that

19   she was right.  We massaged the confirmation order and we

20   didn't risk recoveries for thousands of affected people much

21   less, again, the taxpayers of the United States.  It was wholly

22   unnecessary to raise the objection in the form it did -- it was

23   raised and it is particularly troublesome that the applicant

24   now seeks to be paid for it.

25        Secondly, as I discussed in colloquy in argument on

GENERAL MOTORS CORPORATION

Page 68

1    the motion, assuming, though it's obviously contrary to what I

2    just said, that any legitimate objective might have been

3    achieved by the filing of the original objection.  Its stated

4    purpose, I'm not sure if it was the real purpose but I'll

5    assume arguendo that it was, was fully achieved when I issued

6    the 363 order.  I put in the exact language which most, maybe

7    not everybody but most, concede was necessary to deal with the

8    constitutional issue.  So that language was sitting in the 363

9    order when it then went up on appeal and when it then was the

10   subject of the stay application.  And even though the

11   ostensible purpose for the objection had been fully satisfied,

12   there was still support for the stay application.  At the very

13   least you have to wonder where is the benefit to the estate in

14   that regard, assuming, though the contrary inference screams

15   out for consideration, that the constitutional issue wasn't

16   what it was about at all, but that there was a higher agenda.

17          Again, such conduct may not be unethical or

18   sanctionable but neither should it be encouraged or rewarded

19   and I am not going to pay for it in the form of a substantial

20   contribution award.  I shouldn't say I am not going to pay for

21   it, I'm not the one who would be paying for it either way, it

22   would be an amalgam of Old GM, Treasury and ultimately the

23   taxpayers of the United States.

24          If there is anything I would like to convey here,

25   aside from a narrow ruling on the merits, it's that there are

Page 69

1   ways to accomplish legitimate needs and concerns without

2   bringing down a whole Chapter 11 case.  And while doing so may

3   not always be inappropriate, the notion that it should be a

4   substantial contribution to a Chapter 11 case is offensive to

5   at least me as a bankruptcy judge.

6          Mr. Jones, you're to settle an order in accordance

7   with the foregoing.

8          MR. JONES:  Very well, Your Honor.

9          MR. REINSEL:  Very good, Your Honor.

10         THE COURT:  Do we have any further business?  Mr.

11  Smolinsky, are you coming up?

12         MR. SMOLINSKY:  Yes, Your Honor.

13         THE COURT:  Sure.

14         MR. JONES:  Your Honor, that's my last matter today,

15  can I be excused?

16         THE COURT:  Yes, sir.

17         MR. JONES:  Thank you.

18         MR. SMOLINSKY:  Your Honor, Joe Smolinsky on behalf of

19  the debtors and the Motors Liquidation Company trust.  We're

20  going to move to the claims matters on the calendar today, they

21  appear on page 22 of the agenda.

22         The first matter is omnibus objection number 234,

23  that's pension benefit claims of former salaried and hourly

24  employees.  We've had one response; as usual we will adjourn

25  with respect to that response and seek an order on default with

Page 70

1    respect to the remainder.

2           THE COURT:  Certainly.

3           MR. SMOLINSKY:  Thank you, Your Honor.  235th omnibus

4    objections, that's pension claims, welfare, benefit claims of

5    former salaried executive or hourly employees.  One response,

6    Charles Powell, we will adjourn to October 28th and seek an

7    order with respect to the remainder

8           236th omnibus objections to claim, splinter union

9    employee claims, we have received no responses and we'd like an

10   order approving that objection.

11          THE COURT:  Yes.

12          MR. SMOLINSKY:  Number 237, that is claims relating to

13   former UAW workers, although there was no formal response there

14   was one informal, Beverly Carrie, and we had one walk-in today,

15   Arocelia Roman (ph.), and Your Honor's chambers was kind enough

16   to find a translator for us.  We spoke to Ms. Roman and it

17   appears to be an issue with her union rep as opposed to with

18   the debtors' request for relief.  We're going to adjourn that

19   matter to October 28th just so we make sure that we facilitate

20   a conversation between her and the union.

21          THE COURT:  Was she a splinter union member or a UAW?

22          MR. SMOLINSKY:  UAW, Your Honor.

23          THE COURT:  So she'll talk to the UAW about that?

24          MR. SMOLINSKY:  Yeah.  She had some problems with some

25   prescriptions filled, is my understanding and we're just going

Page 71

1    to adjourn it and make sure that she gets an opportunity to

2    discuss the matter with the union.

3          MR. SMOLINSKY:  The next matter, 238th omnibus

4    objections to claim -- that's welfare benefit claims -- of

5    retired and former salaried and executive employees.  We

6    received no response and we'd like to go forward with an order.

7          THE COURT:  Yes, sir; granted.

8          MR. SMOLINSKY:  The same holds true for the 239th

9    omnibus objection, the 240th and the 241st; we've received no

10   responses.

11         With respect to the 242nd omnibus objection to claims,

12   that's contingent co-liability claims, we've received a total

13   of three responses from Seneca Insurance Company, State Farm

14   Fire and Casualty, and Centerpoint Associates, and we wish to

15   adjourn relief with respect to those claims until October 28th

16   and go forward with the remainder.

17         THE COURT:  Help me on that, Mr. Smolinsky; usually

18   those issues come up with PRPs and folks who are like co-

19   defendants, how are the insurance companies involved?  They

20   were insurers for PRPs or -- and it shelled out checks and then

21   were looking to get subrogated to what they had paid or what?

22         MR. SMOLINSKY:  It's not only in the environmental

23   space, it also is any insurance company that may have been

24   insuring the debtors and have a contingent subrogation claim

25   back and has filed a claim to protect against paying out on the

GENERAL MOTORS CORPORATION

Page 72

1   policy.

2          THE COURT:  Okay.  So you're in substance, continuing

3   the dialog with them, and then if you need to disagree you'll

4   be back later?

5          MR. SMOLINSKY:  Yes, and in almost all circumstances

6   we've worked it out, so I expect the same will be true in this

7   case.

8          That brings us to the 243rd objection and I'd like to

9   turn the podium over to Ms. Greer.

10          THE COURT:  Sure; come on up, please?

11          MS. GREER:  Good afternoon, Your Honor, Stefanie Greer

12   from Dickstein Shapiro also on behalf of the Motors Liquidation

13   Trust --

14          THE COURT:  Good morning Ms. Greer, could I impose on

15   you to pull that microphone closer to you, please?

16          MS. GREER:  Sure.  Is that better?

17          THE COURT:  Yes.

18          MS. GREER:  Okay.  All right, we have four objections

19   to claims.  Inconsistent with Mr. Smolinsky's approach, what

20   we'd like to do is go forward only with those for which we did

21   not receive a response and adjourn the remainder.

22          So we have the 243rd omnibus objection to -- which was

23   late file claims -- we had seven, which we have either received

24   informal or formal responses and will adjourn those and go

25   forward with the rest.

Page 73

1          On the 244th omnibus objection, also on the basis that

2     the claims were late filed, we received seven responses, which

3     we will adjourn.  We also decided to withdraw one of those

4     objections and we are going forward with the thirty-one

5     remaining objections.

6          The 245th omnibus objection is also on the basis of

7     late file claims; these were all claims filed after the

8     effective date.  Sixteen of those are being adjourned and

9     twenty-eight are going forward today.

10         Finally, Your Honor, we have the 246th omnibus

11    objection; these are claims for which the debtors do not have

12    liability on the very bases as described in the objection.  Two

13    of those have been adjourned and sixteen are going forward.

14         Does Your Honor have any questions on the objections?

15         THE COURT:  No, I really don't; to the extent that

16    you're pursuing the objections today, your objections are

17    sustained and those that have been kicked will be continued.

18         If I didn't sufficiently interrupt Mr. Smolinsky

19    saying the same ruling on all of his, the decision's the same.

20    So if I didn't say so explicitly, on those that he raised,

21    those that are actually being objected to today, and are being

22    pursued today, the objections on his side are sustained as well

23    and the remainder will be kicked and rescheduled.

24         MS. GREER:  Thank you, Your Honor.  Shall I approach

25    with orders or --

GENERAL MOTORS CORPORATION

Page 74

1          THE COURT:  Go across the hall to my courtroom deputy,

2    Ms. Blum, and take care of the paperwork.

3          MS. GREER:  Thank you, Your Honor.

4          THE COURT:  Thank you.  To what extent do we have

5    further business before we continue this afternoon with

6    Spencer?

7          Mr. Smolinsky?

8          MR. SMOLINSKY:  As Your Honor noted we have the 2

9    o'clock hearing with Mr. Spencer and that concludes today's

10    calendar.

11          THE COURT:  Okay, then we're adjourned until 2

12    o'clock.

13          MR. SMOLINSKY:  Thank you.

14       (Recess from 12:19 p.m. until 2:11 p.m.)

15          THE COURT:  Good afternoon, have seats please.  I

16    apologize for keeping you all waiting; there was something that

17    simply had to be done before I could return to the bench.

18          All right, we have the Barry Henry Spencer matter.

19    And the motions -- it needs direction with respect to Mr.

20    Spencer's desire to not be bound by the settlement agreement he

21    signed and GM's desire that I put some controls on Mr.

22    Spencer's filings.

23          I have questions of both sides, but principally of

24    you, Mr. Spencer.

25          MR. SPENCER:  Yes, Your Honor.

GENERAL MOTORS CORPORATION

Page 75

 1          THE COURT:  I've read your papers; there's a lot of

 2     rhetoric in them.  I cannot see the relevance of your

 3     contentions that you're a sovereign citizen and the various

 4     references to inalienable rights and things of that sort.  I

 5     did notice the absence of any allegations of what, if anything,

 6     GM told you that was fraudulent.  And the job of a guy like me

 7     is to get behind the rhetoric and get to the underlying facts

 8     and it seemed to me that a lot of what you said kind of went

 9     overboard, if you will forgive me.  By the same token, in

10     essence what GM is asking for is a Martin-Trigona order, that

11     being named after the famous case of Martin-Trigona, where a

12     guy with pleading after pleading was plainly abusing the

13     system.  And I know we have the power to grant them and at some

14     point we do when enough is enough.  But I want GM to tell me

15     whether it thinks we've gone over that point now; we may have.

16     But I want help on that.

17          Who -- well, Mr. Spencer, you're on the phone, am I

18     correct?

19          MR. SPENCER:  Yes, sir.  I'm sorry I couldn't be

20     there.  I tried; it was not in my control.

21          THE COURT:  I'm having trouble hearing you, Mr.

22     Spencer.

23          MR. SPENCER:  I said I tried to get there as much as I

24     could, but it just wasn't in my control.

25          THE COURT:  No, that's all right, you can appear by

Page 76

1    telephone.  And who is going to be arguing on behalf of GM?

2            MR. SMOLINSKY:  I will, Your Honor.

3            THE COURT:  Okay, Mr. Smolinsky.  All right, I'll hear

4    first from you, Mr. Spencer.

5            MR. SPENCER:  Your Honor, basically, I mean, I'm not

6    trying to just prolong this lawsuit.  I think this case has

7    gone on since the 11th of 2009 --

8            THE COURT:  Pause, please, Mr. Spencer.  Are you using

9    a cell phone or something that would make it hard to understand

10   you?

11           MR. SPENCER:  No, it's a regular landline, I believe.

12           THE COURT:  Okay, the second time you spoke, when you

13   just made reference to the landline you sounded a little

14   clearer.

15           MR. SPENCER:  Okay.

16           THE COURT:  Thank you, continue, please.

17           MR. SPENCER:  All right.  Well, the case goes back to

18   2003, set in Massachusetts when I filed the actual complaint.

19   In 2005, when I actually docketed, we went to court; I actually

20   moved for a lien against GM and asked for discovery.  And I

21   asked if they examined the vehicle because the vehicle would

22   keep shutting off on me and my fiancee numerous times, and we

23   almost crashed.  You know, and --

24           THE COURT:  Let me interrupt you, Mr. Spencer,

25   because --

Page 77

1          MR. SPENCER:  Okay.

2          THE COURT:  -- I understand you're upset with the car.

3          MR. SPENCER:  Right.

4          THE COURT:  And --

5          MR. SPENCER:  This is --

6          THE COURT:  No, you can't interrupt me, Mr. Spencer'

7     you've got to let me speak.  But the legal issue is whether you

8     can walk from the settlement agreement you entered into.

9          MR. SPENCER:  Okay.

10          THE COURT:  And the second legal issue is whether I

11     should be granting GM -- Old GM -- relief on its cross-motion,

12     where they're saying I got to put a halt to the stuff you've

13     been doing, putting a lien on GM's assets being a classic

14     example of that, because you may or may not have a claim

15     against GM, but you can't keep throwing liens on people.

16          MR. SPENCER:  Your Honor, I didn't put a lien on

17     anyone.  The only lien I have is the actual paperwork I filed

18     in this court, sir, and actually, as a claimant in this action.

19          THE COURT:  And you're asserting a lien in this court?

20          MR. SPENCER:  No, I actually -- I filed only paperwork

21     in this court because the stay had stopped me from filing any

22     paperwork in the Massachusetts court, which I had to read the

23     law and figure that out.  And the only thing that I'm arguing

24     is that GM, at the time when I took the -- when I was going to

25     take the settlement, Your Honor, there was two three-family

GENERAL MOTORS CORPORATION

Page 78

```
 1   houses in Massachusetts in a very good area which I was trying
 2   to get on the foreclosure, which I was actually explaining to
 3   Mr. Smolinsky that we're going around 100,000 a piece, so I
 4   really wanted to just end all this, you know, because my life's
 5   been in shambles for long enough and running back and forth to
 6   court over money isn't worth it.  You know, so I was going to
 7   buy the houses and fix them up and sell them as condos.  I
 8   mean, I wasn't trying to -- to have this go on and on and on,
 9   you know, even with me and Mr. Smolinsky, over the ADR, we
10   argued and he wrote down a settlement floor of 200,000; I told
11   him 500,000.  You know what I'm saying?  Because I feel that's
12   only fair.  I mean, I had suffered 27,000 dollars' worth of
13   medical bills; fractured sternum, fractured pelvis.  You know,
14   I still carry cups in my hand and drop them because my hand
15   can't close all the way because I was holding the steering
16   wheel.  My knees are shot, you know.  I have a hernia from when
17   I was working at the shift (ph.) that was compounded, which
18   they wanted to operate on me, you know?  But it hurt more so
19   they decided not to see if it would work again.  You know, I
20   don't think anything I ask is unreasonable.  I'm not trying to
21   sit up here and keep filing and filing.  And I told Mr.
22   Smolinsky, you know, I want to end all this.
23            THE COURT:  Forgive me, Mr. Spencer, I did not want to
24   interrupt you.
25            MR. SPENCER:  Oh, I'm sorry.
```

GENERAL MOTORS CORPORATION

Page 79

1        THE COURT:  But at the outset I asked you to focus on

2    the legal issue, which is how you assert that GM defrauded you

3    when they agreed to give you a 200,000 dollar unsecured claim.

4        MR. SPENCER:  Okay, well I --

5        THE COURT:  And my other question, based on liens, was

6    based on page 5 of 28, where one of the elements of your claim

7    is billing costs associated with levies and liens upon

8    violation shall be, and then you list a whole bunch of things

9    that you're claiming.

10       MR. SPENCER:  Okay.  Well, I just made a billing

11   assessment, what I was getting to, in actual fact, is because

12   when I was taking the lien -- the actual settlement offer --

13   they didn't tell me that the warrants I'll have to receive

14   taxes on them, I would have to sell them.  And then when I went

15   to -- asked about them, they told me I can't receive it then.

16   And then, when I found out I could receive it, they told me I

17   could only receive 25,000, to 48- to 50,000 for some of these

18   companies that actually was offering to buy the stocks at the

19   time which were no good me or my family.  So I believe that was

20   fraud and deceit at the time.  So that's why within twenty days

21   later -- before twenty days -- I moved to rescind and to be --

22   pull out the settlement offer.  I even wrote them, I even

23   called them; they ignored my phone calls, they ignored my text,

24   they ignored everything.  I tried as an honest man, trying to

25   resolve this debt, you know?  I'm not trying to prolong this; I

 1  mean for all I care, you know, I just want it done.

 2         But I think that's very unreasonable because at the

 3  time, if I was able to get what I needed, I could have had two

 4  three-family houses in Massachusetts, which would have been

 5  worth over a million dollars, and there was no reason to go

 6  arguing with GM anymore; over anything.  But now that can't

 7  happen because of what was told to me at the time.  And even

 8  now, they still want me to go with the trust administrator, to

 9  make a count, what has to be sold, and I still receive taxes

10  taken out, I still receive -- but this is for bodily injury.

11         THE COURT:  Mr. Spencer, respectfully, --

12         MR. SPENCER:  Are you saying I can't do that --

13         THE COURT:  -- I ask you one more time to answer the

14  question I asked at the beginning.

15         MR. SPENCER:  Well --

16         THE COURT:  This is your last chance, sir.

17         MR. SPENCER:  Okay, sir, I thought I did.  But if you

18  believe that I haven't then I guess I must sit with what you

19  have given me or what you're going to rule, sir.  Because it

20  seems like you're not hearing anything I've said.  But

21  thanks --

22         THE COURT:  Well, I read all of your stuff, Mr.

23  Spencer, and when I read all of your stuff, I was looking for

24  the one thing that I need to find, which is what you say that

25  GM said to you that was false, when you agreed to take a

GENERAL MOTORS CORPORATION

Page 81

1    settlement agreement, which would give you a 200,000 unsecured

2    claim, instead of the hundreds of millions of dollars that you

3    had claimed in your proofs of claim.  And that's the legal

4    issue that I've got to deal with from your side, although I've

5    got to tell you, that the more we have this discussion, the

6    more I'm wondering whether I've got to grant GM a Martin-

7    Trigona order as well.

8           MR. SPENCER:  Well, Your Honor, I guess you have to do

9    what you want to do.

10          THE COURT:  Okay, fair enough.

11          Mr. Smolinsky, do you want to respond?

12          MR. SMOLINSKY:  Yes Your Honor, thank you.

13          I think it might be helpful to give Your Honor a bit

14   of background because this is not a settlement that was reached

15   on one phone call where it was easy to forget what the

16   distributions would look like and what an unsecured claim

17   against General Motors Corporation would provide to Mr.

18   Spencer.

19          Mr. Spencer filed two unsecured proofs of claim, as

20   Your Honor is aware -- two duplicate claims, each in the amount

21   of 682 million dollars; 125 million of that was secured and

22   12.5 million of it was filed as priority.  This claim,

23   immediately when it was filed, came on our radar screen and was

24   flagged for immediate review.  The reason why these claims were

25   important to deal with quickly, is that it alleges personal

GENERAL MOTORS CORPORATION

Page 82

1    injury and as Your Honor is aware, those matters cannot be

2    estimated or liquidated by Your Honor, so we would have had to

3    slog through a state court proceeding in some other

4    jurisdiction.

5            Number two, Mr. Spencer, at the time, was incarcerated

6    and we were concerned about the ability to litigate effectively

7    with him within the confines of the time we had from the filing

8    of the case to confirmation because obviously a claim of this

9    size would make a dramatic impact on distributions to creditors

10   and, in fact, 250 million dollars of secured claims could have

11   become an obstacle to confirmation.

12           Third, Your Honor, Mr. Spencer is not a stranger to

13   litigation.  We had identified twenty-nine separate lawsuits

14   where Mr. Spencer was a party; some of those are related to one

15   another, but if you look at the totality of the proceedings,

16   there are a fair amount of proceedings on different grounds.

17           So we spent a lot of time talking about the Spencer

18   claim and how we were going to resolve it.  We did something in

19   this matter that we have not done with any other individual

20   claim.  In order to attract Mr. Spencer to cap his claim, we

21   agreed to provide a floor of 200,000 in the settlement amount;

22   so we said if you agree to cap your claim at nine million

23   dollars, we would agree to make a settlement offer of a general

24   unsecured claim of 200,000 dollars.  Even if, at the end of the

25   day, mediation was unsuccessful, we ended up litigating in

GENERAL MOTORS CORPORATION

Page 83

1    another court and the court finding that Mr. Spencer was not

2    entitled to any claim, our agreement was that we would offer

3    him a 200,000-dollar settlement in exchange for an agreement

4    not to appeal.  And of course if he appeals the decision then

5    all bets would be off and we could seek a judgment in favor of

6    MLC or GM.

7            These conversations initially took place with

8    Sylvester, who is Mr. Spencer's brother.  Mr. Sylvester Spencer

9    was identified on the proof of claim as the party who would

10   speak.  I had numerous conversations with Sylvester Spencer; I

11   explained to him the court claims process, with the stock and

12   warrants that came out of the sale.  At some point when it got

13   into brass tacks, I asked Sylvester Spencer whether I could get

14   a power of attorney from Barry Spencer so that I knew that he

15   was authorized to negotiate on his behalf.  That power of

16   attorney was provided to me and then it was later retracted by

17   Barry Spencer.

18           THE COURT:  After the settlement agreement was entered

19   into?

20           MR. SMOLINSKY:  No, this was prior to -- this is when

21   we were negotiating the bracket.  Brackets are used in

22   mediation often to come closer to a resolution by fixing a

23   floor and a ceiling and that's what we tried to do with Mr.

24   Spencer, to give him real benefit for agreeing to cap his claim

25   to something that would be more manageable for us to confirm a

Page 84

1    plan, were we not able to settle it in mediation.

2           The 200,000 dollars, we believe was very rich for the

3    claim.  Mr. Spencer had also sued Expressway Toyota, which was

4    the dealer in connection with the same car accident that was

5    involved in this claim.  And in that case the claim was

6    dismissed and the appellate court ruled that --

7           MR. SPENCER:  Let me interrupt for a minute.

8           THE COURT:  Go on, Mr. Smolinsky.

9           MR. SMOLINSKY:  -- the appellate court ruled that that

10   claim was not viable because Mr. Spencer couldn't demonstrate a

11   defect to the car and Tamika Scott, who is the owner of the

12   car, sold the car -- or disposed of the car -- so that no

13   expert testimony was possible regarding the status of the

14   vehicle and the alleged defect.  So already we had a court

15   decision which ruled against Mr. Spencer in terms of product

16   liability; nevertheless, we thought that the 200,000-dollar

17   offer was a good deal for the estate because it removed a

18   confirmation obstacle.  We then started negotiating with Mr.

19   Spencer, I had conversations with Mr. Spencer, I explained to

20   him the claims process.

21           THE COURT:  This is after he yanked the power of

22   attorney?

23           MR. SMOLINSKY:  Yes, Your Honor.

24           I explained to him the secondary market and how claims

25   were trading, the fact that claims were trading from between

Page 85

1    twenty-five and thirty cents on the dollar; he asked me -- I

2    told him that there was actually a list of traders that was

3    available to him if he wanted to sell his claim immediately,

4    which would have avoided the need to sell warrants and stock.

5    And in fact the e-mail correspondence back and forth

6    demonstrates the fact that around the same time as the

7    settlement agreement, we had sent him that list of claims

8    traders.  So it's not true that he was unaware that the -- that

9    he would not be receiving 200,000 dollars in cash after the

10   settlement.

11        After many rounds of negotiation, we told Mr. Spencer

12   that we could simply not go above 200,000 dollars and he

13   ultimately decided to take the 200,000-dollar general unsecured

14   claim, signed a settlement agreement and then a month later he

15   started -- or three weeks later -- he started filing with the

16   bankruptcy court various pleadings, seeking to invalidate the

17   settlement, based on "subtle threats, coercion and

18   intimidation".  He purported to place maritime liens on

19   fictitious vessels in the name of various individuals including

20   myself, filed promissory note surety bonds, warrants of arrest,

21   UCC-1 financial statements.

22        Now, I agree with Mr. Spencer, we don't have any

23   indication that he filed those documents in the Secretary of

24   State -- in Massachusetts or the Office of Homeland Security,

25   which is where maritime liens are filed; it is possible that he

Page 86

1    only filed those pleadings in the bankruptcy court, are those

2    documents.  But they did give us reason for concern.

3           So, of course because of this ongoing repudiation of

4    the agreement where he sought not only to invalidate the

5    agreement but also to go far beyond the nine million dollars

6    and started asserting claims well above the cap, we were not in

7    a position to make distributions to him on the effective date

8    of the plan.  We were very focused on confirmation and we

9    decided that we'd have to deal with Mr. Spencer after

10   confirmation.  It's unfortunate because as Your Honor may be

11   aware, the stock has dropped in value, and if Mr. Spencer had

12   taken his settlement agreement -- the stock price of course

13   could come back -- but it certainly is worth a little bit less

14   than when we went effective.

15          Your Honor, I think the settlement agreement

16   constitutes a valid agreement.  I don't think there's any

17   indication that entering into it was improper.  If there was

18   any coercion, it was coercion against us for having to allow

19   the claim for 200,000 dollars, where if this was a straight

20   claim, we probably would have taken it to try to get a judgment

21   in favor of MLC.

22          THE COURT:  Pause, please, Mr. Smolinsky.

23          What was the gross amount of the original claims?  600

24   million?

25          MR. SMOLINSKY:  682 million.

1        THE COURT:  Each?

2        MR. SMOLINSKY:  Each.  So it was a 1.4 billion dollar

3    claim.  There was a question as to whether the twelve and half

4    million priority claim should have been tacked on to that,

5    which would have made it 794 million -- add another twelve and

6    half million.  But it was obviously substantial and it was a

7    big obstacle to the case.

8        So Your Honor, our papers cite New York law for the

9    proposition that settlement agreements are to be favored and

10   not to be upset unless there is a reason to -- cause to --

11   invalidate a contract; change of heart doesn't matter.  I think

12   we, you know, we had very cordial conversations with Mr.

13   Spencer, I think we negotiated at arm's length, we certainly

14   negotiated in good faith.  We reached a resolution, and I don't

15   know why the change of heart, but we're here to seek

16   enforcement of the contract so we can make our distributions to

17   Mr. Spencer as well as to enjoin end-runs from the plan by

18   virtue of taking further actions that would act to do an end-

19   run around the plan treatment.

20        Thank you, Your Honor.

21        THE COURT:  Now -- pause.  Before -- now shift from

22   why he should live with the settlement agreement to the request

23   for a Martin-Trigona order.  Frankly that's the only

24   controversial aspect of this matter.

25        MR. SMOLINSKY:  A Martin-Trigona order is an order

Page 88

1    that provides that Mr. Spencer can't file any papers in the

2    bankruptcy court without first seeking your leave.

3              THE COURT:  Right.

4              MR. SMOLINSKY:  Whether it goes so far as to a blanket

5    order, what we're trying to avoid are actions taken against

6    individual officers and directors; Carrianne Basler, who is in

7    the courtroom today, has been the subject of those filings.

8    Again, perhaps filings only in the bankruptcy court, but you

9    wonder what the next step will be.  So we want to strike these

10   documents; frankly, we don't even know what these documents

11   mean.  Some of these promissory notes -- I can't figure them

12   out -- but the estate has already not gotten the benefit of its

13   bargain.  What it bargained for is a settlement for 200,000-

14   dollar claim and in exchange it would no longer spend any

15   estate resources on this claim.

16             MR. SPENCER:  Your Honor --

17             MR. SMOLINSKY:  As Your Honor can see, we've continued

18   to spend money and we don't want to spend any more money.

19             THE COURT:  All right.  Okay.  Mr. Spencer, your turn

20   to reply.

21             MR. SPENCER:  Well, Your Honor, I've been sitting here

22   listening, okay.  If Mr. Smolinsky can -- and make it so that I

23   don't have to pay no taxes or liquidate any kind of stocks or

24   anything and they can send me the full 200,000, I'll accept it

25   and we can stop all this.

1           THE COURT:  Mr. Spencer, we're not here to play Let's

2    Make A Deal --

3           MR. SPENCER:  Well --

4           THE COURT:  -- nor -- nor to rewrite the Bankruptcy

5    Code, forgive me.  The documents were unequivocal that the

6    company was giving you an unsecured claim and you're getting

7    treated the same on your unsecured claim that all of GM's other

8    general unsecured creditors are getting.  If your legal

9    position is that the company has to give you a check for

10   200,000 dollars again with respect and I'm trying very hard to

11   keep my voice soft and to act with the demeanor everybody would

12   hope that I would act with, that is inconsistent with the law

13   and if you weren't pro se, if you were a lawyer making that

14   contention, I would have to sanction you.

15          MR. SPENCER:  Oh.

16          THE COURT:  Now, I won't sanction you because you're

17   not a lawyer but that kind of position doesn't stand up under

18   the law, sir.

19          MR. SPENCER:  Question.  It's a bodily injury, it's

20   not supposed to be taxed, that's inconsistent with the law but

21   I'm ending up in bankruptcy court and you're giving me a bunch

22   of stocks which is inconsistent with the law for a bodily

23   injury.

24          THE COURT:  I am not expressing a view and I'm not

25   sure what -- whether GM is as to what your tax liability is.

GENERAL MOTORS CORPORATION

Page 90

1    You will get what you're entitled to from this estate and you

2    can work that out with the IRS.

3            MR. SPENCER:  Okay.  But if it's inconsistent with the

4    law.  That's the only qualms I've been having since day one.

5            THE COURT:  Okay.  Any further points in reply?

6            MR. SPENCER:  Okay.  Well, for you to put a blanket, I

7    believe, a blanket filing on anything I filed with the court I

8    believe it would deny me due process of the law especially if I

9    wanted to appeal any decision that came out of this court, you

10   know.  So, I don't believe that I did anything that would harm

11   anyone intentionally and there isn't any record of me harming

12   anyone.  They may put a person on notice, you know, of me

13   protecting and observing my rights.  However, I know of times I

14   have an opportunity to voice my opinion under my First

15   Amendment right even in bankruptcy court.  And, Your Honor, it

16   seems as though -- Your Honor, even though he's keeping his

17   voice very lightly, has been very biased by interrupting me.

18   And when I'm trying to explain why I felt as though that the

19   settlement offer was inconsistent, you know.  And why I felt as

20   though there was deceit and dishonor in it.  You know, I

21   haven't even got a chance to voice my opinion.  And I'm sitting

22   here listening to Mr. Smolinsky go on about issues that I

23   wanted to object to but I couldn't because I'm on the phone.

24           And two, I didn't see Your Honor interrupt him as much

25   as he interrupted me.  So, I think there's a little bias here,

GENERAL MOTORS CORPORATION

Page 91

1    you know.  So, Your Honor's going to do what Your Honor wants

2    to do, you know, because it seems like that's going to be done

3    anyone.  So, and you say -- told me and I only ask for a copy

4    of the transcripts for this hearing here just in case.

5           This whole issue is me accepting the settlement offer

6    or not.  So, when I said I accept it if you take away all the

7    things that are illegal about it, that I believe are illegal,

8    you still want to go on and tell right or wrong.  I'm done.

9           THE COURT:  The pauses you're hearing, Mr. Spencer,

10   are me waiting to hear any further points you with to make.

11          MR. SPENCER:  I'm through.  Thank you for your time.

12          THE COURT:  Okay.

13          MR. SPENCER:  An opportunity and for the time and be

14   heard.

15          THE COURT:  Okay.

16          MR. SPENCER:  And God bless you.

17          THE COURT:  All right.  Everybody sit in place and I

18   will rule.

19      (Pause)

20          THE COURT:  All right.  Ladies and gentlemen, in this

21   contested matter in the jointly administered Chapter 11 cases

22   of Motors Liquidation Company and its affiliates, claimant

23   Barry Henry Spencer filed a verified declaration in the nature

24   of an affidavit of truth in commerce, rejection of the

25   settlement offer, and contract for waiver of tort.  The debtors

1    responded with a cross-motion seeking enforcement of a

2    settlement agreement with Mr. Spencer, the striking of

3    documents filed by Mr. Spencer, and an injunction against Mr.

4    Spencer often referred to as a Martin-Trigona order enjoining

5    him from further action against the debtors and individuals

6    associated with the debtors.

7         The debtors' motion to enforce the settlement agreement is

8    granted.  The harm already having been done, the motion for the

9    striking of the documents that he filed is denied since it

10   would no longer do any good.  And the injunctions requested

11   enjoining him from further action against the debtors and

12   debtor personnel or individuals associated with the debtor will

13   be granted in a modified form.  And the following are my

14   findings of fact and bases for the exercise of my discretion in

15   this regard.

16        As facts I find that Mr. Spencer's claim arises out a pre-

17   petition personal injury caused by a car accident in 2003

18   involving the vehicle that had been recalled.  Mr. Spencer

19   initially filed duplicate proofs of claim on November 30, 2009

20   each for 682 million dollars.

21        On July 13, 2010, Mr. Spencer agreed to expunge the

22   duplicate claim and to cap the surviving claim at nine million

23   dollars pursuant to the alternate dispute resolution

24   procedures.  This same letter also set a claims settlement

25   floor of 200,000 dollars meaning in substance that the debtors

1   agree to give him an allowed claim of 200,000 dollars

2   irrespective of the strength or weakness of Mr. Spencer's

3   claims.

4       The debtors then sent a notice to Mr. Spencer on July 19,

5   2010 indicating that they were submitting his claim to ADR,

6   that being the nickname for Alternative Dispute Resolution,

7   which included a proposed settlement offer for a general

8   unsecured claim nonpriority for 200,000 dollars.

9           MR. SPENCER:  That's a --

10          THE COURT:  Mr. Spencer, I'm dictating a decision.

11  I'll let you be heard after I do so but you can't interrupt me

12  now.

13      On July 24, 2010, Mr. Spencer rejected the settlement

14  offer and proposed a counteroffer of an allowed priority claim

15  of nine million dollars which if granted would put him ahead of

16  all of the other general unsecured creditors of Motors

17  Liquidation formerly known as Old GM.

18      The debtors and Mr. Spencer then engaged in negotiations

19  regarding his claim which included an explanation by the

20  debtors' counsel to Mr. Spencer of the proposed treatment of

21  allowed unsecured claims and anecdotal information on the

22  expected market value of the securities that would be

23  distributed on account of allowed claims under the plan.  The

24  parties ultimately agreed to settle Mr. Spencer's claim for an

25  allowed general unsecured claim against Motors Liquidation

GENERAL MOTORS CORPORATION

Page 94

1    Company for 200,000 dollars.  The agreement signed by both

2    parties on September 1, 2010 also extinguished any other claims

3    Mr. Spencer might have against the debtors.

4         Since the time the agreement was signed, Mr. Spencer has

5    repeatedly made filings with this Court with the goal of

6    invalidating the agreement.  Among other documents, Mr. Spencer

7    filed a motion to lift the automatic stay to allow enforcement

8    of a purported lien of 112.5 million dollars which I denied on

9    June 13, 2011.

10        He also filed a UCC-1 financing statement which is used to

11   get a security interest asserting that he is a secured creditor

12   in the amount of thirty-nine million dollars.

13        Mr. Spencer's pleadings, which I've reviewed more than

14   once, do no more than merely assert his dissatisfaction with

15   the terms of the settlement agreement particularly his concerns

16   as to how much he could get if he sold the stock and warrants

17   that he would get as an unsecured creditor, that being, of

18   course, the same consideration every other unsecured creditor

19   of GM is getting and his concerns as to the tax treatment

20   which, of course, is a matter not between him but between him

21   and the United States government, the IRS.

22        In particular, I've reviewed his pleadings to see what

23   exactly he was saying that GM said to him that was false that

24   could provide a basis for fraud and there are simply no

25   allegations of that character.  His pleadings provide no basis

Page 95

1   for legal relief.

2        It's well settled that public policy favors settlements,

3   see, for example, In re WorldCom, Inc. Securities 388 F. Supp

4   2d, 319, 337 (SDNY 2005).  The reduction of litigation and

5   related expenses is an important factor underlying this policy.

6   See for example Weinberger v. Kendrick 698 F. 2d 61, 73 (2d

7   Circuit 1982).

8        I, of course, do not hold that one could be bound to a

9   settlement if he had been defrauded in connection with that

10   settlement but the allegations of fraud that could give a

11   result -- results of that character have to be stated and

12   indeed they have to be stated with particularity and Mr.

13   Spencer has failed to comply with requirements of law in each

14   of those respects.

15        So, then we turn to the remaining matters before me those

16   being the debtors' requests for relief in the other direction.

17   I'm sympathetic to the debtors' desire to expunge the

18   allegations but the problem is that the cat is out of the bag

19   and the allegations have already been made.  I could direct

20   their being expunged but it wouldn't do much good at this

21   point.  I well understand the extent to which the debtors are

22   upset by the allegations which fairly read and even cutting

23   them some slack as the statements of a pro se debtor are

24   irresponsible and temperate and except for his allegations of

25   his underlying injury in the car wreck with which I have

 1    sympathy but which, of course, underlie the 200,000 dollar

 2    allowed claim he is getting exceedingly inappropriate.

 3        Worse than what he said about the parties is, frankly,

 4    debtors and bankruptcy cases have a lot of bad things said

 5    about them and their professionals do as well and their

 6    management do as well and we kind of get used to that, are the

 7    grossly inappropriate tactics in connection with his pursuing

 8    this claim both in terms of asserting claims in such an

 9    astronomical amount and making claims of lien and making claims

10    of priority treatment any one of which individually and

11    certainly in the aggregate would justify sanctions if they'd

12    ever been done by a lawyer.  That gets us to the remaining

13    issue which is the Martin-Trigona order.

14        The Second Circuit has held that, and I'm quoting, "Courts

15    may resort to restrictive measures that except for normally

16    available procedures, litigants who have abused their

17    litigation opportunities."  In re Martin-Trigona 9 F.3d 226,

18    228 (2d Circuit 1993).

19        I think the showing for Martin-Trigona order has largely

20    been made here.  The debtors might legitimately criticize me

21    for not simply giving them a full and complete Martin-Trigona

22    order.  I am hoping, however, that my telling Mr. Spencer now

23    that, a, what he gets is what every other creditor gets on this

24    unsecured claim, which is, obviously, quite sizeable, and also

25    that he can't keep doing this stuff with legal pleadings in

GENERAL MOTORS CORPORATION

Page 97

1   this court or outside this court.  And that it's got to come to

2   an end will be sufficient.  So, I'm going to issue a hybrid of

3   a Martin-Trigona order.

4       I'm ruling that Mr. Spencer is still free to file matters

5   in this court but that nobody has to answer them or respond to

6   them until and unless I determine that they need to.  I am,

7   however, ruling that anybody other than the debtors, like any

8   individuals he's trying to lay liens on or that he's trying to

9   sue not only that they needn't respond but that he can't attack

10  anybody other than the Motors Liquidation estate without

11  getting my approval first.  I think that balances the needs to

12  be addressed aren't under a Martin-Trigona order with the

13  implementing a little of judicial restraint.

14      So, Mr. Spencer, you can't attack anybody except Motors

15  Liquidation without me giving you the green light before you do

16  so.  And if you decide to attack Motors Liquidation more after

17  I've ruled today, you're not enjoined from doing that but I'm

18  ruling that nobody has to respond to that until and unless I

19  direct so.

20      Now, one clarification.  I am not in any way impairing

21  your ability to appeal the order that I'm going to be entering

22  at the conclusion of this argument or shortly thereafter.  You

23  do have the right to appeal and I take no position on that.  In

24  due course, pretty soon, and you'll have to learn the rules on

25  appeals if you choose to appeal, you will need to submit a

GENERAL MOTORS CORPORATION

Page 98

1   designation of record which will include the transcript of this

2   and by all means the transcript of this hearing will be part of

3   the record on that appeal.  And Mr. Smolinsky, I'm going to

4   authorize and direct that if he makes a request for the

5   transcript you have one of your folks see that it's provided to

6   him as soon as one can be prepared if he chooses, of course, to

7   appeal.

8        Any review in court can read the exhibits that were put

9   before me, can follow the various pleadings that were filed by

10  Mr. Spencer, and can determine whether or not I got it right

11  and, of course, whether I acted in any appropriate way by

12  repeatedly asking Mr. Spencer to focus on the most important

13  issue which was the extent, if any, to which he was defrauded

14  when he agreed to the 200,000 dollar allowed general unsecured

15  claim.

16       Mr. Smolinsky, you are to settle an order consistent with

17  the rulings that I dictated today.  The time to appeal that

18  order will run from the time of the entry of the order and not

19  from the date of this dictated decision.

20       Not by way of reargument, does anybody have any questions?

21  Hearing none, we're adjourned.

22            MR. SPENCER:  Your Honor, I have a question.

23            THE COURT:  Go ahead, Mr. Spencer.

24            MR. SPENCER:  Question.  To note that I'll be

25  accepting this offer now, thanks to the Court, is it based on

GENERAL MOTORS CORPORATION

Page 99

1   the warrants?  Is it still going to be the same settlement

2   amount?

3          THE COURT:  Yes.  I'm not allowed to give you legal

4   advice but that -- I understand the settlement is for an

5   unsecured claim, a general unsecured claim of 200,000 dollars.

6   Am I correct, Mr. Smolinsky?

7          MR. SMOLINSKY:  That's correct, Your Honor.  He'll

8   receive distributions on account of a 200,000-dollar general

9   unsecured claim that will be paid out in stock and warrants.

10  He'll receive the same number of shares and the same number of

11  warrants as anybody else on account of the same claim amount.

12  Although, obviously, the value of the stock and warrants go up

13  and down over time.

14         THE COURT:  I understand that.  And, in fact, I think

15  I expressly addressed that issue in the decision -- in the --

16  with respect to confirmation, didn't I?

17         MR. SPENCER:  The attorney didn't touch it though

18  because I was wondering if it's -- the stock being down, if

19  it's at twenty-two, if it was at thirty-eight, the day that

20  they pay out it's down to twenty-two will there be more stock

21  or would it be the same amount if the stocks are at thirty-

22  eight?

23         THE COURT:  It would be the exact same stock in terms

24  of numbers of shares and warrants that everybody else got on a

25  per claim basis.  I addressed this exact issue in a published

1    decision which you can find in the law books.

2            MR. SPENCER:  What case?

3            THE COURT:  It's called In re Motors Liquidation

4    Company.  I don't know the citation to it but it dealt with a

5    position that had been raised, I think, by New York State with

6    respect to whether I had to put a market movement adjustment

7    mechanism in the plan and discussing the law in that area, I

8    concluded that no such measure was necessary.  And that when

9    every creditor got the same number of stock shares and warrants

10   that was equal treatment.  I'm paraphrasing the opinion but

11   that's the substance of it.

12           MR. SPENCER:  Oh, they can claim that actually the

13   stock is worth thirty dollars and pay out thirty dollars when

14   they actually had twenty-two dollars, you mean?

15           THE COURT:  Well, I think what they're going to do is

16   give you stocks and warrants and then you can hold it and see

17   if the market goes up or down --

18           MR. SPENCER:  But is it --

19           THE COURT:  -- well forgive me, Mr. Spencer.  Please

20   don't interrupt me.

21           MR. SPENCER:  I'm trying to figure it out, Your Honor.

22           THE COURT:  Okay.  And I'm repeating myself but what I

23   said was you will get a bundle of stock and warrants that

24   corresponds to having their claim of 200,000 bucks.  Then, you

25   will have choices.  You can hold it or you can sell it.  You

GENERAL MOTORS CORPORATION

Page 101

1   can hold it and maybe it will go up, on the other hand maybe it

2   will go down.  Mr. Smolinsky didn't have to but he said in oral

3   argument that he told you of people who are willing to buy

4   claims and you can consider that.  He's not giving you legal

5   advice on that and for sure I'm not giving you legal advice on

6   that.  But what you are getting is an allowed claim for 200,000

7   dollars.  And then that is what you're entitled to as a matter

8   of law along with the rights that go with an allowed claim of

9   200,000 dollars which is a bundle of stock and warrants that

10  measures up to a claim of that size.

11          MR. SPENCER:  So, then, I got to make an account to

12  put all that in?  I'm in jail.

13          THE COURT:  Well, I didn't know whether you were in

14  jail or not.  The fact that you're in jail doesn't affect your

15  legal rights.

16          MR. SPENCER:  Yeah, I understand that but it's -- all

17  right.  Okay.

18          THE COURT:  But that's what you're entitled to under

19  the law.

20          MR. SPENCER:  Yes.

21          THE COURT:  Okay.  We're now adjourned.  Have a good

22  day.

23          MR. SPENCER:  You too.

24          MR. SMOLINSKY:  Thank you, Your Honor.

25      (Whereupon these proceedings were concluded at 3:04 PM)

Page 102

```
 1
 2                           I N D E X
 3
 4                           RULINGS
 5                                              Page      Line
 6   Final Fee Applications Approved             16        23
 7   On the one motion remaining filed by Mr.    50         5
 8   Kidwell that the Court may rule on, the
 9   Court takes it under submission, allowing
10   the parties 30 days to reach their own
11   agreement before the Court will rule.
12   All Sanctions Motions Denied as Moot        53        20
13   Application of Mark Buttita for Allowance of 65         2
14   Administrative Expenses Incurred Denied
15   236th Omnibus Objection to Claim, Splinter  70        11
16   Union Employee Claims Approved
17   238th Omnibus Objections to Claim Granted   71         7
18   243rd Omnibus Objection Sustained as to     73        15
19   Claims Presented in this Hearing
20   244th Omnibus Objection Sustained as to     73        15
21   Claims Presented in this Hearing
22   245th Omnibus Objection Sustained as to     73        15
23   Claims Presented in this Hearing
24   246th Omnibus Objection Sustained as to     73        15
25   Claims Presented in this Hearing
```

Page 103

1    Debtors' Motion to Enforce Settlement          92          7

2    Agreement Granted

3    Motion to Strike Documents Denied               92          8

4    Injunctions Enjoining Claimant from Further     92         10

5    Action against Debtors, et al., Granted In

6    Modified Form

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 104

C E R T I F I C A T I O N

I, Dena Page, certify that the foregoing transcript is a true

and accurate record of the proceedings.


Dena Page
Digitally signed by Dena Page
DN: cn=Dena Page, c=US
Reason: I am the author of this document
Date: 2011.09.28 13:50:34 -04'00'
_____

DENA PAGE


Also transcribed by:

PENINA WOLICKI, AAERT Certified Electronic Transcriber

CET**D-569

PNINA EILBERG, AAERT Certified Electronic Transcriber

CET**D-488

ELLEN KOLMAN, AAERT Certified Electronic Transcriber

CET**D 568

DEVORA KESSIN


Veritext

200 Old Country Road

Suite 580

Mineola, NY 11501


Date:  September 28, 2011