KRAMER LEVIN NAFTALIS & FRANKEL LLP
Thomas Moers Mayer
Robert T. Schmidt
1177 Avenue of the Americas
New York, New York 10036
(212) 715-3275
(212) 715-8000

*Counsel for the Official Committee of Unsecured*
*Creditors of Motors Liquidation Co., (f/k/a General Motors Corp.) et al.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
───────────────────────────────────────────

| | |
|---|---|
| In re: | ) |
| | ) |
| MOTORS LIQUIDATION COMPANY., et al. | ) Chapter 11 |
| (f/k/a General Motors Corp., et al.) | ) |
| | ) Case No. 09-50026 (REG) |
| Debtors. | ) Jointly Administered |
| | ) |

───────────────────────────────────────────

**REPLY OF KRAMER LEVIN NAFTALIS & FRANKEL LLP TO THE LIMITED OBJECTION OF THE UNITED STATES OF AMERICA TO THE FINAL FEE APPLICATION OF KRAMER LEVIN NAFTALIS & FRANKEL LLP, AS COUNSEL TO THE <u>OFFICIAL COMMITTEE OF UNSECURED CREDITORS</u>**

Kramer Levin Naftalis & Frankel LLP ("**Kramer Levin**"), counsel to the Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned debtors and debtors-in-possession in these chapter 11 cases (collectively, the "**Debtors**"), hereby submits this reply (the "**Reply**") to the Limited Objection (the "**Limited Objection**") of the United States of America on behalf of its agency the United States Department of the Treasury ("**Treasury**") to Kramer Levin's Final Fee Application as counsel to the Committee. In support of this Reply, Kramer Levin respectfully states as follows:

## PRELIMINARY STATEMENT[1]

Treasury objects to payment from DIP Loan proceeds of fees incurred in connection with a dispute over title to the Term Loan Avoidance Action ("**Contested Fees**"), of which about $245,000 relate to litigation prior to the Effective Date of the Debtors' Plan. Treasury's Limited Objection is based on paragraph 20 of the DIP Order, which bars the use DIP Loan proceeds to pay fees and expenses in connection with "investigation, initiation or prosecution of claims, causes of action, adversary proceedings or other litigation" against the DIP Lenders ("**Paragraph 20**").

Paragraph 20 does not apply for two reasons.

First, even if applicable, Paragraph 20 would only bar the use of the proceeds of any extension of credit under the DIP Loan to pay the Contested Fees. The Debtors' cash-on-hand includes proceeds of the sales of the DIP Lenders' collateral. There is no bar to using collateral proceeds to pay the Contested Fees.

Second, the Contested Fees were incurred in connection with a motion to enforce Treasury's own agreements in the Wind-Down Order and Wind-Down Loan not to seek recourse

---

[1] Capitalized terms used in this Preliminary Statement but not otherwise defined therein shall have the meaning ascribed to them in the Background section of this Reply.

against the "**Term Loan Avoidance Action**"[2] (the "**Motion to Enforce**").  Paragraph 20 cannot bar the payment of fees incurred to enforce Treasury's own agreements; if it did, none of the Treasury's agreements would be enforceable.

Even if Paragraph 20 did apply, Treasury supported the Debtors' Plan, which in accordance with Section 1129(a)(9) requires payment of administrative expenses.  If the Debtors cannot use their cash to pay the Contested Fees, it is not clear how such fees can be paid at all. Under applicable precedent in this district, Treasury cannot both support a Plan requiring payment of administrative expenses and assert Paragraph 20 to preclude payment of such expenses.  *See In re Emons Industries, Inc.*, 76 B.R. 59 (Bankr. S.D.N.Y. 1987) (secured creditors who supported plan cannot object to payment of Equity Committee counsel's fees out of their collateral).

Accordingly, Kramer Levin deserves and is entitled under the Bankruptcy Code, the Debtors' chapter 11 Plan and the DIP Order, to payment in full of the Contested Fees.

Finally, to the extent Treasury objects to payment of Kramer Levin's ***post-Effective Date*** fees from DIP Loan proceeds, its Limited Objection is misplaced. The Final Fee Application does ***not*** seek reimbursement in connection with the Committee's post-Effective Date filing and prosecution of the 2011 Adversary Proceeding and fees in connection with the 2011 Adversary Proceeding are explicitly not paid out of DIP Loan proceeds.[3]

---

[2] The Term Loan Avoidance Action refers to the adversary proceeding (Adv. Pro. No. 09-0504 (REG)) initiated by the Committee against certain of the Debtors' pre-petition term lenders.

[3] Kramer Levin has billed all of its post-Effective Date time associated with the 2011 Adversary Proceeding to the GUC Trust, which has agreed to pay for such work out of the Reporting and Transfer Holdback, as such term is defined in the Motors Liquidation GUC Trust Agreement (the "**GUC Trust Agreement**").  The GUC Trust Agreement provides that the Reporting and Transfer Holdback will consist exclusively of funds generated from the sale of the New GM Securities and not from funds that constitute proceeds of the DIP Loan or the Wind-Down Loan. Accordingly the post–Effective Date fees associated with the 2011 Adversary Proceeding are not at issue here, and any purported "objection" by Treasury is irrelevant and should be disregarded.

## BACKGROUND

1. On June 1, 2009, the Debtors' filed petitions for relief under chapter 11 of title 11, United States Code (the "**Bankruptcy Code**").

2. Treasury, along with Export Development Canada (together, the "**DIP Lenders**") agreed to provide working capital to the Debtors during their chapter 11 cases via two separate DIP loans. The first DIP loan, in the amount of $33.3 billion, was made under a "DIP Credit Facility" approved by the Court in the final DIP Order dated June 25, 2009 (Docket No. 2529) (the "**DIP Order**"). The second DIP loan, in the amount of $1.175 billion (the "**Wind-Down Loan**"), was approved by the Court on July 5, 2009 (Docket No. 2969) (the "**Wind-Down Order**").

3. Paragraph 20 of the DIP Order states:

> Notwithstanding anything herein to the contrary, **none of the proceeds of any extension of credit under the DIP Credit Facility** shall be used in connection with (a) any investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Lenders or the Existing UST Secured Parties or EDC, in its capacity as lender under the Canadian Facility and on behalf of the Governments of Ontario and Canada, (b) the investigation or prosecution of any claims, causes of actions, adversary proceeding or other litigation against the DIP Lender or the Existing UST Secured Parties or EDC, in its capacity as lender under the Canadian Facility and on behalf of the Governments of Ontario and Canada or any of their respective affiliates with respect to any loans, extensions of credit or other financial accommodations made to any Debtor prior to, on or after the Petition Date, or (c) any loans, advances, extensions of credit, dividends or other investments to any person not a Borrower or Guarantor other than for certain permitted exceptions set forth in the DIP Credit Facility. (Emphasis Added).

4. Paragraph 20 governs the use of proceeds under the Wind-Down Loan because the Wind-Down Order provides that the term "DIP Credit Facility" shall be deemed to mean the Wind-Down Loan. Wind-Down Order at p. 5. We therefore use "**DIP Loan**" to refer to both the DIP Credit Facility and its successor, the Wind-Down Loan.

3

5. Also on July 5, 2009, the Court approved the sale of substantially all of the Debtors' assets to the Treasury-sponsored purchaser known as New GM (the "**363 Sale**").

6. Subsequent to the 363 Sale, the Debtors' commenced the wind-down of its estate, including the liquidation of any and all remaining assets.

7. The sale of those assets generated a total of approximately $71 million for the estates (the "**Asset Sale Proceeds**"). *See* Declaration of Ted Stenger, attached hereto as **Exhibit A** (the "**Stenger Declaration**"), ¶ 2.

8. On August 26, 2010, more than a full year after the Committee initiated the Term Loan Avoidance Action, Treasury filed the Statement of the United States of America with Respect to Cross-Motions for Summary Judgment (the "**Statement**") [Adv. Pro. Case No. 09-00504 (REG), Docket No. 54] requesting that any determination as to the appropriate distribution of the proceeds of the Term Loan Avoidance Action be resolved through the Debtors' plan confirmation process, and not in the adversary proceeding. By filing the Statement, there could be no doubt that Treasury was putting ownership of the Term Loan Avoidance Action at issue.

9. In direct response to Treasury's filing of the Statement, in October of 2010, Kramer Levin filed the Motion to Enforce the DIP Order, the Wind-Down Order and the Amended DIP Facility, dated October 4, 2010 (Docket No. 7226) in an attempt to quiet title to the Term Loan Avoidance Action. This Court ultimately denied the Motion to Enforce on procedural and ripeness grounds. After the Effective Date, Kramer Levin filed a complaint for a declaratory judgment to determine ownership of the Term Loan Avoidance Action (the "**2011 Adversary Proceeding**"). *See* Adv. Pro. No. 11-09406 (REG).

10. The Debtors' Second Amended Joint Chapter 11 Plan (the "**Plan**") went effective on March 31, 2011 (the "**Effective Date**"). As of the Effective Date, the Debtors had

approximately $929 million in cash, of which $183 million was available for payment of wind-down expenses generally, including payment of professional fees allowed in the chapter 11 cases. *See* Stenger Declaration ¶ 3. On the Effective Date, $50 million was returned to Treasury on account of its Wind-Down Loan. *Id.*

11. The funds disbursed and retained on the Effective Date were disbursed and retained by the Debtors without accounting for whether such funds were obtained from the Asset Sale Proceeds or the DIP Loan. *See* Stenger Declaration ¶ 4. The Debtors' cash was commingled in the funding of the post-Effective Date Debtors and the various trusts under the Plan. *Id.*

12. It is not possible to determine whether the funds now held by the Debtors were originally derived from Asset Sale Proceeds or from the DIP Loan. *Id.* at ¶ 5.

13. The Debtors' Plan provided that "on the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors shall pay to each holder of an Allowed Administrative Expense, in full satisfaction of such Allowed Administrative Expense, an amount in Cash equal to the Allowed amount of such Administrative Expense." (Plan at § 2.1).

14. On May 16, 2011, Kramer Levin filed its application, pursuant to sections 330(a) and 331 of the Bankruptcy Code (i) for final allowance of compensation for the professional services performed for and on behalf of the Committee and for reimbursement of its actual and necessary expenses incurred during the period commencing October 1, 2010, through and including March 29, 2011, and (ii) for final approval of professional services rendered on behalf of the Committee and reimbursement of its actual and necessary expenses incurred during the period June 1, 2009 through and including March 29, 2011 (the "**Final Fee Application**"). Kramer Levin's Final Fee Application sought payment for, among other things, the Contested Fees.

5

15. Following the Effective Date, Kramer Levin ceased billing the Debtors' estates for any and all work related to the Term Loan Avoidance Action and instead, commenced billing the GUC Trust for such work. Kramer Levin believes that in total, it has billed the estate approximately $245,000 in Contested Fees.

## REPLY

### I. Kramer Levin Deserves and Is Entitled To Full Payment of the Contested Fees Notwithstanding Paragraph 20 of the DIP Order

16. Paragraph 20 only precludes payment of the Contested Fees out of DIP Loan proceeds. It does not bar payment of the Contested Fees from the Debtors' cash on hand.

17. Treasury states that the DIP Loan "has been the overwhelming, if not exclusive, source of all administrative funds contained in the estate." (Limited Objection at 2). This unsupported statement is insufficient to support Treasury's Limited Objection. The fact is that approximately $71 million in "administrative funds" were Assets Sale Proceeds. Although those assets were collateral securing the DIP Loan, there is no bar to the use of collateral proceeds to pay Kramer Levin's fees. Asset Sale Proceeds comprise approximately 5.7% of all administrative funds ($71 million/$1.246 billion[4]); the $245,000 in Contested Fees comprise far less than 5.7% of the $183 million of cash left with the Debtors on the Effective Date. Given the commingling of DIP Loan proceeds with Asset Sale Proceeds, Treasury cannot prove (indeed, Treasury does not try to prove) that the cash being used to pay Kramer Levin's fees is DIP Loan proceeds and thus cannot prove that Paragraph 20 bars payment thereof.

18. Moreover, even if all cash on hand was DIP Loan proceeds, Treasury should not be allowed to assert Paragraph 20 as a bar to payment of the Contested Fees from such proceeds.

---

[4] The total, $1.246 billion, is the sum of $71 million Asset Sale Proceeds plus $1.175 billion in Wind-Down Loan proceeds.

19. The Committee's Motion to Enforce was not an "investigation"; it did not involve "discovery proceedings"; and it did not "initiat[e] or prosecut[e]" any "claims, causes of action, adversary proceedings or other litigation". (DIP Order ¶ 20). It was simply a proceeding to enforce Treasury's own agreements, compelled by Treasury's surprise initiation of a dispute with the Committee over ownership of the Term Loan Avoidance Action more than one year after the Committee initiated that action for the benefit of unsecured creditors. If the Court finds that the DIP Lenders did, in fact, agree to forego recourse to the Term Loan Avoidance Action, then Paragraph 20 cannot be read to preclude payment of fees incurred in connection with proceedings to enforce Treasury's own agreements – just as a lender outside of bankruptcy who is found to have wrongly called a financial covenant default would not be allowed to accelerate merely because another covenant precluded the borrower from spending money on lawyers to fight that default. For this reason alone, Treasury's Limited Objection should be overruled.

## II. Treasury Cannot Properly Object To Payment of the Contested Fees Because Treasury Supported Confirmation of The Debtors' Plan Which Requires Payment of Fees

20. In *In re Emons Industries, Inc.*, the debtor confirmed a Chapter 11 plan providing that all administrative claims would be paid in full in cash on the consummation date. 76 B.R. 59, 60 (Bankr. S.D.N.Y 1987) ("*Emons Industries*"). The official creditors committee, comprised mainly of secured creditors who were undersecured, had supported the plan. After confirmation, counsel to the official committee of equity security holders applied for the allowance of its fees and the creditors committee objected. The bankruptcy court allowed the fees over the creditors' committee's objection because Bankruptcy Code section 1129(a)(9)(A) requires payment of all administrative expenses and "[i]f the secured parties desire confirmation, the administration claims must be paid in full in cash at confirmation even if it means invading their collateral." *Id.* at 60.

21. In this case, Treasury supported confirmation of the Debtors' Plan knowing that Section 1129(a)(9)(A) requires payment of all administrative expenses  Therefore, just like the creditors' committee in *Emons Industries*, Treasury cannot object to payment of the Contested Fees out of DIP Loan proceeds.

## CONCLUSION

22. For the reasons set forth above, Kramer Levin respectfully requests that the Court overrule Treasury's Limited Objection and grant Kramer Levin's Final Fee Application in its entirety, including payment of the Contested Fees, and provide such other and further relief as the Court deems just and proper.

Dated: October 18, 2011
      New York, New York

    /s/ Thomas Moers Mayer
Thomas Moers Mayer

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Thomas Moers Mayer
Robert T. Schmidt
1177 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 715-9100
Facsimile:  (212) 715-8000

*Counsel for the Official Committee of Unsecured Creditors of Motors Liquidation Co., (f/k/a General Motors Corp.) et al.*

8

# EXHIBIT A

**Declaration of Ted Stenger**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Thomas Moers Mayer
Robert T. Schmidt
1177 Avenue of the Americas
New York, New York 10036
(212) 715-3275

*Counsel for the Official Committee of Unsecured*
*Creditors of Motors Liquidation Co., (f/k/a General Motors Corp.) et al.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) |
| MOTORS LIQUIDATION COMPANY., et al. | ) Chapter 11 |
| (f/k/a General Motors Corp., et al.) | ) |
| | ) Case No. 09-50026 (REG) |
| Debtors. | ) Jointly Administered |
| | ) |

**DECLARATION OF TED STENGER IN SUPPORT OF THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
REPLY TO THE LIMITED OBJECTION OF THE UNITED
STATES OF AMERICA TO THE FINAL FEE APPLICATION
OF KRAMER LEVIN NAFTALIS & FRANKEL LLP,
<u>AS COUNSEL TO THE COMMITTEE</u>**

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

TED STENGER, under the penalty of perjury, deposes and says that:

1. I am a Managing Director with Alix Partners LLP, a financial advisory services firm with numerous offices throughout the country. I am also the Executive Vice-President of Motors Liquidation Company (f/k/a General Motors Corporation). I submit this Declaration (the "**Stenger Declaration**") on behalf of the Official Committee of Unsecured Creditors (the "**Committee**") appointed in the chapter 11 cases of Motors Liquidation Company, *et al.*, (f/k/a General Motors Corp., *et al.*) the debtors and debtors-in-possession herein (collectively, the "**Debtors**") and in support of the Committees' reply (the "**Reply**") to the

Limited Objection (the "**Limited Objection**") of the United States of America on behalf of its agency the United States Department of the Treasury ("**Treasury**") to the Final Fee Application of Kramer Levin as counsel to the Committee.[1]

2.  The Debtors received a total of approximately $71 million in proceeds from sales of assets (the "**Asset Sale Proceeds**").

3.  As of the Effective Date, the Debtors had approximately $929 million in cash, of which $183 million was available for payment of wind-down expenses generally, including payment of professional fees allowed in the chapter 11 cases. On the Effective Date, $50 million was returned to Treasury on account of its Wind-Down Loan.

4.  The funds disbursed and retained on the Effective Date were disbursed and retained by the Debtors without accounting for whether such funds were obtained from the Asset Sale Proceeds or the DIP Loan. The Debtors' cash was commingled in the funding of the post-Effective Date Debtors and the various trusts under the Plan.

5.  It is not possible to determine whether the funds now held by the Debtors were originally derived from Asset Sale Proceeds or from the DIP Loan.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed:    New York, New York
             October 18, 2011

                                          /s/ *Ted Stenger*
                                          Ted Stenger

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Reply.