Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - - - -x

5  In the Matter of:

6  GENERAL MOTORS CORPORATION, ET AL.,    Main Case No.

7      Debtors.                       09-50026-reg

8  - - - - - - - - - - - - - - - - - - - -x

9  OFFICIAL COMMITTEE OF UNSECURED CREDITORS,

10     Plaintiffs,                      Adv. Case No.

11        v.                          11-09406-reg

12  UNITED STATES DEPARTMENT OF TREASURY, ET AL.,

13     Defendants.

14  - - - - - - - - - - - - - - - - - - - -x

15

16              United States Bankruptcy Court

17              One Bowling Green

18              New York, New York

19

20              October 21, 2011

21              9:50 AM

22

23  B E F O R E:

24  HON. ROBERT E. GERBER

25  U.S. BANKRUPTCY JUDGE

1

2  Main Case No. 09-50026-reg:

3      Hearing on Kramer Levin - Final Fee Application

4

5  Adv. Case No. 11-09406-reg:

6      Hearing on Motion for Summary Judgment - and - Cross

7      Motion for Summary Judgment - Oral Argument

8

9      Hearing on Motion to Dismiss Adversary Proceeding

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Karen Schiffmiller

```
                                                          Page 3

 1

 2    A P P E A R A N C E S :

 3    KRAMER LEVIN NAFTALIS & FRANKEL LLP

 4         Attorneys for Official Committee of Unsecured Creditors

 5         1177 Avenue of the Americas

 6         New York, NY 10036

 7

 8    BY:   THOMAS MOERS MAYER, ESQ.

 9

10

11    GODFREY & KAHN S.C.

12         Attorneys for Fee Examiner

13         One East Main Street

14         Suite 500, POB 2719

15         Madison, WI 53701

16

17    BY:   KATHERINE STADLER, ESQ.

18

19

20    UNITED STATES DEPARTMENT OF JUSTICE

21         U.S. Attorney's Office, Southern District of New York

22         86 Chambers Street

23         New York, NY 10007

24

25    BY:   DAVID S. JONES, AUSA
```

Page 4

1

2   VEDDER PRICE P.C.

3        Attorneys for Export Development Canada

4        1633 Broadway, 47th Floor

5        New York, NY 10019

6

7   BY:   MICHAEL J. EDELMAN, ESQ.

8        MICHAEL L. SCHEIN, ESQ.

9

10

11   ALSO PRESENT:

12        ANNA PHILLIPS, FTI Consulting, Inc. (TELEPHONICALLY)

13        TED STENGER, Saturn and Chevrolet

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE COURT:  Have seats, please.  All right, ladies and

3    gentlemen, we have two GM matters today, one Kramer Levin's

4    final fee app; the second, the motions to dismiss and the cross

5    motions for summary judgment on the ownership of the term loan

6    action.  What I want to do is, subject to the rights of the fee

7    examiner and the U.S. Trustee's Office to be heard, to approve

8    right here and now all of the creditors' committee's requested

9    fees, except for the disputed 245,000 bucks.  I'm not aware of

10   any remaining objections, and I think the creditors'

11   committee's counsel did an extraordinary job.

12          Then, while the 245,000 dollars is very important to

13   the law firm, it's pocket change in the context of this case.

14   And I want to put the remainder of that controversy to the end

15   of the calendar, after we've dealt with the much more important

16   issues that we have first.  Mr. Mayer?

17          MR. MAYER:  Your Honor, we would have no objection to

18   that, again subject to one administrative detail.  I believe

19   Mr. Stenger is in court?

20          MR. STENGER:  Yes.

21          MR. MAYER:  Mr. Stenger provided a fairly simple

22   affidavit.  If you plan to cross him on that, then we need him

23   in court, and if not, he can -- is free to go, and we're happy

24   to push it to the end of the calendar.

25          THE COURT:  Mr. Jones?

Page 6

1          MR. JONES:  No, we have no intention to question Mr.

2     Stenger.

3          THE COURT:  Okay, then Mr. Stenger can either stay or

4     leave as he sees fit.

5          MR. MAYER:  Thank you, Your Honor.

6          THE COURT:  But before we get off the subject, I have

7     some comments.  You can sit down, Mr. Mayer.

8          On the 245,000 bucks, I know what the documents say,

9     but that seems to me to be only part of the issue.  Between now

10    and the time we hear it, I want the government to advise me if

11    he really wants to press this issue.  I want the government to

12    tell me whether it's going to exercise a little prosecutorial

13    discretion.  Frankly, folks, and I've said it in this courtroom

14    in other cases.  I don't remember whether I've said it in

15    writing.  It drives me ballistic when people try to use the

16    power of the purse strings to tie their opponent's hands in

17    litigation before me.

18         The underlying issues on the important thing we're

19    going to be talking about today, as my preliminary remarks on

20    that are going to address, are very, very close.  But here we

21    do not have, you know, a greedy debtor management trying to

22    walk away from a deal that it made.  You have an estate

23    fiduciary trying to do its job for a couple of hundred thousand

24    or more creditors, who have a legitimate interest in the

25    fiduciary doing its job.  And I'd always thought the government

Page 7

1   shared the concern for those creditors as much as the creditors

2   committee does and I do.

3          Now, you know, sometimes the government thinks it has

4   to fight fights, and you know, whatever your rights will be,

5   they'll be.  But before we address that issue, I want the

6   government to let me know whether it intends to continue to

7   press that objection.  Now, on the more important thing --

8          MR. JONES:  Your Honor, can I quickly -- I just got a

9   whispered indication that it's acceptable for us to drop the

10  objection --

11         THE COURT:  Oh.

12         MR. JONES:  -- on the fee.

13         THE COURT:  Okay.

14         MR. JONES:  I have Treasury people here who were moved

15  and persuaded, I believe.

16         THE COURT:  All right, very good.  Then is there any

17  further business vis-à-vis the creditors' committee's Kramer

18  Levin fees?  Okay.  Mr. Mayer, at your convenience, get the

19  paperwork done.  Run it past Treasury, U.S. Trustee's Office,

20  fee examiner, Export Canada.

21         MR. MAYER:  Thank you, Your Honor.  And I wish to

22  thank my adversaries for their exercise of discretion.

23         THE COURT:  Okay.  Thank you very much.  Now, on the

24  much more major matters that we have today, I'm going to need

25  help from both sides.  As usual, I want you to make your

Page 8

1    presentations as you see fit, but I want you to address the

2    following questions and concerns.

3         Subject to your rights to be heard, folks, it seems to

4    me this is all about the cross motions for summary judgment,

5    and not the 12(b)(6).  Mr. Jones, when it's your turn to be

6    heard on the 12(b)(6) prong, I'd like you to tell me, if it's

7    not ripe now, when will it be?  Or is it your contention that

8    the possibility that whoever loses a dispute of this size is

9    going to be appealing after a substantive decision, means that

10   it would never be ripe.  We have lots of big stakes litigation

11   where the bankruptcy judge is the first step, but not the last.

12        And while this is plainly not just a core matter, but

13   one that I think everybody agrees that a bankruptcy judge

14   constitutionally can decide, in other areas that is even more

15   so.  And the creditors' committee has articulated strong

16   reasons why a determination, up or down, is in the interest of

17   the creditor community, and not just in their interest, but

18   something where it is deserving of a judicial decision.  And

19   frankly, I'm not persuaded that insurance disputes -- insurance

20   coverage disputes -- are uniquely distinguishable on that basis

21   alone, it's just that that is very often, you know, a

22   paradigmatic example of symptoms why you need a quick decision.

23        And the question I have is, isn't there now a pretty

24   clearly sharp disagreement under circumstances that won't

25   change?  And I saw in the government's briefs the possibility,

Page 9

1   which I think is at least a possibility -- I guess I've got

2   probable cause to believe that it's a lot more than that --

3   that if the creditors' committee wins, it might have some

4   difficulty getting back all the money that it's looking for.

5   But it seems to me that wouldn't the unsecured creditor

6   community benefit to the extent of whatever it can collect?

7   So, it seems to me that this isn't really so much about

8   ripeness.  And in fact, I think it's all about the underlying

9   merits, which we'll be getting to in a minute.

10          Then I need help from you, Mr. Jones, on the other

11   prong of your 12(b)(6).  And I think it's -- you're plainly

12   right.  I don't think Mr. Mayer disagrees with you on this.  If

13   he does, he'd have to -- he'd probably be disagreeing with me

14   as well.  That, of course, the creditors' committee is carrying

15   the sword for the whole estate.  It's not carrying it uniquely

16   for the unsecured creditor community when it's going after

17   JPMorgan Chase and its syndicate.

18          But why does that go to standing here, or even its

19   ability to state a claim?  It seems to me, isn't the real issue

20   the granting documents under which the creditors' committee is

21   acting, and any applicable orders or agreements under which the

22   creditors' committee's ability to carry the sword, if you will,

23   and to ultimately get the fruits of its recovery, ultimately

24   are subject to the superpri that the government contends still

25   exists?

Page 10

1         Now, on a different front, I had some difficulty

2    reading the papers and understanding the distinction between

3    the summary judgment prong and the 12(b)(6).  There is law out

4    there -- and we all know it -- that says that you can go a

5    little beyond the pleadings to look at underlying documents if

6    they were documents that either were or should have been

7    considered by a plaintiff.  But when we're talking about the

8    totality of this, and I got cross motions for summary judgment

9    anyway, I have to understand the purpose in life of a 12(b)(6),

10   because I don't see what the 12(b)(6) would accomplish that the

11   summary judgment issues would not.

12        All right.  So let's talk to summary judgment, because

13   I think that's really what we're all talking about here.  And

14   as I think I telegraphed earlier, I think the issues are much,

15   much closer.  I understand both sides to be arguing, with one

16   variant or another, the rule against surplusage and the

17   underlying idea that everything in the DIP orders and the DIP

18   lending agreement has to be read as having some purpose or

19   meaning in life.  The creditors' committee seems to be arguing

20   most significantly that they're actually two separate clauses.

21   One that says that the term loan isn't collateral, and the

22   second that says the DIP loan is nonrecourse.

23        Meanwhile, the government seems to be arguing that the

24   provisions for the superpri under 364(c)(1) are separate from

25   those granting the lien under 364(c)(2) and (3), if I recall

Page 11

1    the numbers correctly.  And that each of those likewise had a

2    purpose in life.  And the two governmental agencies also point

3    out that in at least two other contexts -- I shouldn't say "at

4    least"; I think there are only two other contexts they point

5    out -- one vis-à-vis a carve-out and one vis-à-vis the equity

6    interest of New GM, that when the parties wanted to make the

7    superpri unable to reach those things, they knew how to do it,

8    and they did do it.  And that there's no basis for ignoring the

9    granting of the superpri under 364(c)(1).

10         Now, what I want both sides to deal with is that you

11   have two aspects of the papers, one of each side, that tend to

12   favor your respective positions.  And what I got to deal with

13   is how they coexist in the same universe under the familiar

14   principle that you try to harmonize them and try to give

15   meaning to every provision.  And in one of the replies -- this

16   is Mr. Mayer's reply -- I'm reading from his page 3, in the

17   context of a provision that I -- of the code that I think we

18   all agree upon, which is 1129(a)(9)(a), it says in substance

19   that you got to pay off all admin claims on the effective date,

20   unless otherwise agreed.  And Mr. Mayer and his colleagues are

21   arguing in substance that yeah, here it was otherwise agreed.

22         And then he goes on to say "the fact that they use

23   somewhat different language, to otherwise agree with respect to

24   the carve-out and the New GM Equity Interests, doesn't

25   invalidate their otherwise agreed with respect to the term loan

Page 12

1    avoidance action".  That comes very close to being the issue

2    that I need both sides to address more.  Is the creditors'

3    committee right on that, or is it wrong on that?  Because

4    plainly there is contrasting language, and I would be hard-

5    pressed to ignore the presence of that contrasting language.

6    And I need help from both sides on that.  And I also need help

7    from both sides on whether nonrecourse, which is very easy to

8    understand in a secured loan context, is subject to multiple

9    entendres, multiple meanings.

10        Lastly, I want both sides to help me with what I think

11   you agree on, which is that neither side has any parol evidence

12   it would suggest is relevant, if I found any of this ambiguous.

13   So that up or down, you want me to decide it on what the

14   documents say.  I think that's implicit in both sides' cross

15   motions for summary judgment, and I noticed that the

16   governmental response to the creditors' committee 7056- -- and

17   forgive me, I forgot what our local numbers -- which local rule

18   it is, one or two, or whatever -- doesn't quarrel with what the

19   relevant documents are, nor does it put forward any other

20   facts.  Everybody seems to be wanting to argue it on the

21   terrain of this.  And forgive me, folks, I said that was the

22   last thing, and it's not the last thing.

23        Neither side seemed to give any real attention to

24   anything that happened before the final DIP was entered into.

25   And if any of you have anything to bring to the table on what

Page 13

```
 1    happened when I considered the interim DIP, I'd like you to

 2    help me on that.  I have no memory of there being anything

 3    relevant in that.  But I remember in other cases on my watch

 4    having focused on the fact that if carve-outs don't reach the

 5    superpri, as well as the DIP lenders' lien, they're not

 6    effective carve-outs.  And that same principle, if it was

 7    discussed earlier, might be helpful here.  Unfortunately, I

 8    don't easily have available to me transcripts of every time

 9    I've heard first day papers over the last eleven years.  But I

10    have a memory of somewhere having discussed this with parties

11    before me, because when I saw your issue, I had deja vu about

12    it.

13         Okay, with that said, since I got the 12(b)(6) first,

14    let me hear first from you, Mr. Jones.  And then under the

15    circumstances, I think I'm going to let each of you take turns

16    arguing back and forth, including surreply, until each of you

17    has had a chance to speak.  Of course, when we get to reply and

18    surreply, it'll be limited to any new stuff that was put

19    forward in the last round.

20         MR. JONES:  Thank you, Your Honor.  David Jones from

21    the U.S. Attorney's Office, Southern District of New York for

22    the United States, specifically Treasury, as DIP lender.  And

23    Your Honor, I will note that EDC wants to argue separately, but

24    we've coordinated to try to avoid duplications.

25         THE COURT:  Sure.  I do want to hear from EDC.  I
```

Page 14

1    thought Canada had put some points in that I thought were kind

2    of freestanding, and I did want to get its perspective.

3         MR. JONES:  Your Honor, I will try to proceed

4    immediately to the questions Your Honor raised as -- the ones

5    in which the Court -- that the Court specifically wanted us to

6    address, and I think the Court has really driven right down to

7    the heart of the question.  I will note that we do stand by our

8    ripeness 12(b)(1) basis motion, and I'm not going to focus on

9    it, because the Court has the papers and understands them.

10        One specific question the Court asked was "when will

11   it be ripe in the government's view?"  And I think as the case

12   law recognizes that's, sort of, a totality of the circumstances

13   analysis, so there's perhaps a sliding scale.  And as to the

14   specific question of would it become ripe based on a decision

15   by this Court, even though that was subject to ongoing appeals,

16   that would be one step further down the road, so it's certainly

17   closer to ripe.  I think we feel because it is a jurisdictional

18   question, we're obliged to raise it and flesh it out to the

19   Court, especially because we do think there's serious question

20   about whether a case or controversy is presented here, but

21   we've briefed it fully and we'll focus our arguments today as

22   the Court suggests and requested.

23        On the question of 12(b)(6) versus summary judgment,

24   and which has primacy, I think we're -- assuming the Court were

25   to not dismiss under 12(b)(1) for lack of subject matter

Page 15

1    jurisdiction, we'd be perfectly happy and delighted to receive

2    summary judgment in our favor on the merits, and we -- I think

3    all things being equal -- think that would be the sensible and

4    perfectly desirable result for us, as opposed to a 12(b)(6)

5    victory.  Remember that when we started down this road, we were

6    contemplating filing threshold dispositive motions, so use the

7    12(b)(6) rubric, but then the committee simultaneously launched

8    summary judgment briefing, so we also cross-moved on that

9    basis.

10           THE COURT:  Pause then, please, Mr. Jones.  Would you

11   be troubled if I came to the view that it is ripe, if I

12   regarding your 12(b)(6) second prong as merely having been

13   subsumed within the subsequent summary judgment motions that

14   I'm hearing anyway?

15           MR. JONES:  No, Your Honor, that would be fine.  I

16   think they're really coextensive, and they're briefing

17   identical issues.  As Your Honor observed, the parties agree

18   what the dispositive and the controlling documents are.  We're

19   fighting about the implications of terms that everybody can

20   read and has read many times, and I think those can be imported

21   into the pleadings for purposes of 12(b)(6), but they're

22   equally susceptible of summary judgment resolution.  And I

23   think that's probably most efficient just to treat this as

24   cross-motions for summary judgment at this point.

25           The Court -- Your Honor asked whether the parties

1    agree, as they implicitly seem to, that neither side wants to

2    advance any parol evidence on this point.  And certainly from

3    our point of view, and I think the committee's, although

4    they'll answer separately, the answer is yes.  And the reason

5    for that --

6         THE COURT:  I forgot how you teed up the question to

7    which the answer was yes.

8         MR. JONES:  Oh, sorry.  I don't think either side

9    wants to present parol evidence, Your Honor.  I think we're --

10   in one of our briefs, we cite a Second Circuit case, Compagnie

11   Financiere, I think it's on page 10 of our reply perhaps on

12   summary judgment, in which the Second Circuit says specifically

13   "summary judgment can appropriately be entered even in a

14   contractual dispute even if there are ambiguous provisions, so

15   long as the nonmovant is not advancing parol evidence."  And I

16   think that's the posture we're in here.

17        So, I know from our point of view, what we think our

18   parol evidence would show is entirely consistent with our

19   interpretation, and I believe that to be the case on the

20   committee's side as well.  So I think we wouldn't really

21   advance the ball, and this really is a dispute based on what

22   the controlling documents show and mean.  So, Your Honor, that

23   does, I believe, get us down to the central merits issue here,

24   which is on the closely related questions identified by Your

25   Honor.  What does nonrecourse mean in this context, and how to

Page 17

1    harmonize the documents as a whole?

2            And if I may, Your Honor, although I know the Court

3    has prepared well and very thoroughly, so this will be familiar

4    ground, I just want to walk through the specific provisions

5    we're relying on, which won't take a terrible amount of time,

6    and which we believe makes very clear that they're both

7    specific and written and conceptualized in a way that isn't

8    susceptible of being modified by either the use of the term

9    "nonrecourse" or the related exclusion of potential avoidance

10   action proceeds from the government's collateral.  So quite

11   simply, we have freestanding, very express obligations, and

12   protections for the DIP lenders that are not anywhere expressly

13   modified or subject to a carve-out.

14           And as our papers note and Your Honor noted, we are

15   relying in part on the fact that the very instruments we rely

16   on expressly say that certain fees are carved out from any

17   ability of the -- from any use to repay DIP lenders, and that

18   in addition, the amended DIP facility, which was approved by

19   the wind-down order, expressly provides that the DIP lenders

20   have no right in any manner whatsoever to the New GM Equity

21   Interests that have been reserved for the unsecured creditors

22   or to any proceeds received from the sale or distribution

23   thereof in satisfaction or repayment of the loans.

24           And so those specific provisions are examples of how

25   the parties could have and should have similarly treated the

1    avoidance action proceeds, if there was in fact an agreement to

2    make those proceeds unavailable for use by the estate to repay

3    the DIP lenders.  Now what we have here, by contrast, is an

4    avoidance action which the committee had been authorized to

5    bring, but which is on its face and by the Bankruptcy Code

6    brought for the benefit of the estate; it's to be a recovery

7    for the estate.  And therefore, it's available, as under case

8    law we've cited, for use by the estate for whatever the

9    estate's legal obligations and needs are.

10         I'm going to interrupt myself, Your Honor, by saying

11   I'm unaware of anything in the interim DIP that is relevant,

12   and I believe Kramer Levin was not a party at that time.  I had

13   not anticipated or gone back to sift through earlier papers, so

14   I can't -- recently -- so I can't --

15         THE COURT:  Well, you're quite right in that regard,

16   Mr. Jones.  One of the reasons why we try to deal with as

17   little as possible when we enter interim DIPs, typically on the

18   first day of a case, is because the creditors' committee isn't

19   yet at the table, and we don't want to prejudice the unsecured

20   creditor community by acting in a way that's excessively

21   activist.  When I talk to younger lawyers, I analogize it to

22   what you learn in medical school.  On the first day of the

23   case, you try to do no harm.

24         And but most well counseled creditors' committees, and

25   here we have one of the best counseled creditors' committee

1   I've seen in a while, go back -- if they can get their hands on

2   transcripts or audio recordings of what happened earlier --

3   just to see what happened before they were on the job.  And if

4   I had said something that would have telegraphed what people

5   should do, that would be of interest to me.  I don't know if I

6   did that or not in this case.  I know I did it in a slightly

7   different way, but analogously in Lyondell Chemical for

8   instance.  And that's what I was driving at in my question, but

9   if you don't have anything, and if Mr. Mayer likewise doesn't

10  have anything, that issue will seemingly drop off the table.

11          MR. JONES:  Okay, thank you, Your Honor.  Then the

12  reason I raise that at this time is that I think therefore the

13  appropriate starting place is the final DIP order which was

14  entered on June 25th, 2009.  And as the Court knows, the DIP

15  lenders under that order have an allowed superpriority

16  administrative expense claim for all loans, reimbursement,

17  obligations, and other indebtedness by the debtors, whether

18  then existing or arising in the future under the facility.  And

19  one specific thing I want to note that that includes, to quote

20  the DIP order paragraph 5, which is at page 14, without

21  limitation --

22          THE COURT:  This is the final DIP as contrasted to --

23          MR. JONES:  Yes.  I'm sorry, Your Honor.  Yes, I'm

24  talking about the final DIP order --

25          THE COURT:  Which is the second of the three DIP

Page 20

1    orders I entered into.

2            MR. JONES:  Correct.

3            THE COURT:  I entered.  Paragraph 5?

4            MR. JONES:  Yes, in paragraph 5, I don't want to over-

5    dramatize it, but I want to make clear that it specifically

6    says that this "superpriority claim is without limitation for

7    all principal, accrued interest, and all other amounts due

8    under the DIP credit facility."  So that language establishes

9    clearly that whatever amounts have been advanced are due back

10   on a superpriority administrative expense claim basis.  That

11   would have been an appropriate place, if you were saying, oh,

12   but this is limited to the value of the collateral, to say so.

13           And also, this grant -- in the same paragraph -- is

14   under Section 364(c)(1) of the Code, which doesn't even

15   implicate or render such a claim on a secured basis.  So,

16   whatever security treatment or collateral is backing this debt,

17   the debt has independent status under Section 364(c)(1) and is

18   entitled to treatment as a superpriority administrative expense

19   without regard to what separate security interests and

20   provisions have been made.

21           The ensuing order, of course, that we're also relying

22   on is the wind-down order entered on July 5th, 2009, which we

23   call that, because obviously that's the DIP order and agreement

24   that provides the debt facility to finance the entire wind-down

25   of the estate and administration of this case.

1          THE COURT:  Let me interrupt you for a second, please,

2     Mr. Jones.

3          MR. JONES:  Yes.

4          THE COURT:  Just confirm my understanding.  The

5     earlier main DIP was for a time pretty big, maybe as much as 33

6     billion dollars --

7          MR. JONES:  Correct.

8          THE COURT:  -- or something in that range?

9          MR. JONES:  Yes.

10          THE COURT:  And then the wind-down was a supplemental

11     1 billion or 1.2 billion, somewhere in that range, to carry the

12     estate through during its wind-down process, especially in,

13     like, dealing with environmental issues and other issues that

14     needed to be dealt with after the 363 sale took place?

15          MR. JONES:  That's correct, Your Honor.  And the much

16     large prior DIP facility entered in late June was partly to,

17     sort of, provide bridge financing and handle other obligations

18     of the estate.  But the great bulk of that money was used, to

19     the extent it was drawn down, to fuel the credit bid of the

20     sale transaction.  So the great majority of it was used and was

21     satisfied through credit bidding at the time of the sale

22     transaction.  So what that left was the -- it's 1.175 billion,

23     is the number of debt -- of the administrative debt facility --

24     DIP facility -- as of July 5th, 2009.

25          Now, I would note that the initial negotiations

Page 22

```
 1    involving both the reservation of the equity -- the New GM
 2    Equity Interests -- and then also touching on the avoidance
 3    action proceeds, and importantly also, simply setting up what
 4    the amount of the DIP facility was going to be for wind-down
 5    purposes contemplated only 950 million.  And I don't know if
 6    the Court remembers, but during the sale hearing even, there
 7    were negotiations ongoing and due diligence being performed at
 8    a very fast clip to determine what the administrative needs of
 9    the estate would be.  The amount was determined to be higher
10    than that originally contemplated 950.  And so Treasury and the
11    DIP lenders agreed to increase it to 1.175 billion.
12         And the reason that has significance for today's
13    proceeding, Your Honor, is that to the extent the committee's
14    arguments based on the economics of this situation matter, and
15    the notion that there wouldn't be enough money leftover if this
16    money were available to pay the DIP lenders.  That means that
17    at the time this was originally negotiated, there was
18    approximately a 500 million dollar potential recovery on top of
19    the contemplated amount for the DIP facility.  When the DIP
20    facility went up more by a little over 200 million, that ate
21    into the, sort of, potential additional upside that could have
22    been realized by unsecured creditors, but --
23         THE COURT:  I need you to say that again in a
24    different way, or at the least, repeat it, because I didn't
25    keep up with you.
```

Page 23

1          MR. JONES:  Okay, I'm sorry, Your Honor.  When we

2    first negotiated the overall structure -- or the parties, I

3    should say, negotiated the overall structure -- of the DIP

4    credit facility, what was going to be used to finance the

5    ongoing administration of the case, and what assets were going

6    to be reserved for unsecured creditors, and what the DIP

7    lenders collateral was going to be.  They thought -- everyone

8    thought -- that at the time, although due diligence was

9    ongoing, we'd be looking at a wind-down DIP facility of a

10   little under a billion, I believe, 950 million.

11          And the reason I raise this is that the creditors'

12   committee in part argues that because our DIP facility is now

13   1.175 billion, we're eating up the lion's share to all of a

14   likely recovery on this 1.5 billion dollar avoidance action.

15   And they say, you should -- the Court should infer from what

16   they say is that economic reality that they wouldn't rationally

17   have entered such a deal.  So my response to that partly is to

18   factually challenge it, by saying the assessment at the time

19   was that there was over a 500 million dollar potential cushion

20   on top of whatever the DIP lenders might need, as opposed to

21   what now appears to be about a 300 million dollar cushion.

22          So, I mean, this isn't -- I don't think a driver for

23   the Court's decision, it shouldn't be or for the legal

24   analysis --

25          THE COURT:  I would think it shouldn't be if you're

Page 24

1   saying that you don't know of any useful parol evidence.

2   You're not telling me that in exchange for a bigger DIP,

3   something was given up by the creditors' committee.  The bigger

4   DIP was done to meet what was perceived to be simply a bigger

5   cash need.  Am I correct?

6        MR. JONES:  Yes.  I mean, I think -- yes, our primary

7   point, Your Honor, is completely driven by the texts of the

8   agreements and the orders.  And so I'm perhaps detouring and

9   bogging down a little, which isn't wise, but one point the

10   committee has raised is this sort of economic incentives, and

11   questioning what --

12        THE COURT:  Your point is that whether the DIP were

13   950 million or is 1.075 billion, there is a still a delta as

14   compared to the potential upside in the term loan action, which

15   is presumably in the one and a half billion range.  So there's

16   still something in it for everybody.

17        MR. JONES:  That's right.  And they say, Government,

18   your reading of these agreements must be wrong, because what

19   kind of crazy unsecured creditors' committee would enter into a

20   deal with these economics.  And my point is theeconomics are --

21   first off, that doesn't really hold up even assuming the 1.175

22   billion DIP facility, but moreover, when they negotiated, that

23   number was even smaller, meaning they had an even bigger

24   upside.  So I guess for purposes of argument, my analytical

25   point I would like the Court to draw is that it shouldn't be

1    swayed by the committee's economic arguments among other

2    things, because they don't actually hold up factually.

3         So then I will again progress to the July 5th, '09

4    wind-down order, which expressly approved and continued the

5    terms of the final DIP order, subject only to modifications as

6    set forth in that wind-down order.  And again, as I've noted,

7    that wind-down order preserves specifically the superpriority

8    administrative expense status of the DIP lenders, by its terms

9    subject only to the carve-out for fees -- for certain fees,

10   which is unrelated to this dispute.  And the wind-down order

11   approves the amended DIP facility which was annexed to it, and

12   so it forms part of the order.  And that agreement or facility

13   specifically provides that the DIP lenders have no right to

14   receive whatsoever in any form the New GM Equity Interests or

15   proceeds from them that have been reserved.

16        Again, there's absolutely no similar provision

17   regarding the avoidance action proceeds.  This brings me back

18   to the meaning of the term "recourse", and the fact that the

19   avoidance action proceeds are not included in the DIP lender's

20   collateral, and whether those provisions can or do modify the

21   superpriority administrative expense claim provisions that I've

22   just been talking about.  They certainly don't explicitly.  And

23   it's asking an awful lot of them to be an implicit modification

24   of those protections and status of the DIP lenders, especially

25   given the very specific carve-outs and treatments that have

Page 26

1    been applied to other things.  The GM Equity Interestss are

2    excluded from collateral, but also made explicitly unavailable

3    for repayment.  Ditto the carve-out.

4          So given that, you have a textual basis to infer that

5    the parties did not necessarily believe that merely using the

6    word "recourse" was a sufficient way -- "nonrecourse" -- was a

7    sufficient way to limit the effect of the superpriority claim.

8          THE COURT:  Pause right there, please, Mr. Jones,

9    because I understood that -- you and Export Canada made that

10   point quite clear in your papers.  But in essence, you haven't

11   also talked about -- and if you were going to talk about it

12   later, forgive me -- but move it up to talk about it now.  The

13   fact that just as you have language in the agreement that you

14   contend is in surplusage, that of course being, I don't know

15   how many, lines of text it gives your guys the superpri.

16         The creditors' committee has two separate lines, as

17   best I recall, and correct me if my understanding of the facts

18   is erroneous.  One says that the avoidance action isn't

19   collateral.  Let me call that sentence one.  And the second

20   that says the loan is nonrecourse.  We'll call that sentence

21   two.  Under your construction, and you'll not quarreling with

22   it being nonrecourse insofar as it affects collateral, doesn't

23   sentence one skin the cat?  What's the purpose in life of

24   sentence two?

25         MR. JONES:  The two sentences being the exclusion of

Page 27

1    this particular asset from collateral coupled with the

2    nonrecourse --

3            THE COURT:  Sentence one says it ain't collateral

4    anyway.

5            MR. JONES:  Right.

6            THE COURT:  So what's the purpose of sentence two

7    which adds "nonrecourse"?

8            MR. JONES:  I conceive of those sentences as being

9    different ways of saying the same thing.  They're coextensive

10   and they both mean that to the extent you treat the DIP loan as

11   a secured loan, and it has also been given some security

12   protections, and flowing from that, to the extent the DIP

13   lenders have any rights to exercise remedies available to

14   secured lenders, it is recourse only to their collateral, and

15   their collateral doesn't include either the avoidance action or

16   the New GM Equity Interests or the carve-out.

17           So that during the pendency of the case, if there was

18   a complete meltdown and some need for the DIP lenders to come

19   in and on some emergency basis seek to recapture their

20   collateral, their remedies would have been limited to the

21   universe of their collateral.  In other words, they couldn't

22   have grabbed on to the avoidance action; they couldn't have

23   grabbed on to the New GM Equity Interests that are reserved for

24   the unsecured creditors, and to the extent there's a little

25   protected pool of fees, they couldn't have grabbed onto that.

1        But that simply has no bearing on either the existence

2   of a textual obligation on the debtors to repay the amounts due

3   under the DIP facility; that's established in the provisions

4   I've been talking about and relying on.  And particularly

5   because we've got our status under Section 364(c)(1), which is

6   independent of secured remedies, it doesn't affect our ability

7   or the requirement that we be repaid from available funds at

8   the end of the case, just under the ordinary operation of the

9   Bankruptcy Code.

10       THE COURT:  I think a colleague of yours wants to pass

11  you something.  I'll let him do that.

12       MR. JONES:  Yeah, I'd like -- thanks.

13       UNIDENTIFIED SPEAKER:  Sorry, thank you.

14       MR. JONES:  Oh, okay.  Yes, another meaning of

15  "nonrecourse" which has been pointed out to me, or an

16  implication of nonrecourse, is that we don't -- that precludes

17  our asserting a general unsecured claim for the amount of

18  any -- independently -- for the amount of any deficiency, which

19  in this case, we wouldn't have anyway.  But, so there's --

20  that's simply another consequence of the fact that this is a

21  nonrecourse styled obligation.

22       But again, that's -- all of these things I'm saying

23  are to respond to the question:  why would -- I guess it's

24  related questions.  One is why have both the provisions

25  governing collateral at the same time that you have the

Page 29

1     nonrecourse provision; aren't those duplicative?  And there's

2     substantial overlap, although there may be some independent

3     implications from each just as the limitation on being able to

4     make a general unsecured deficiency claim flows from

5     nonrecourse uniquely.

6          But then also the question of how do you -- why would

7     those provisions exist, and how can they be harmonized with the

8     world in which we also have -- we the DIP lenders -- have an

9     allowed superpriority administrative claim?  And, you know,

10    that's my attempt to touch on both of those things.  They do

11    have significance.  They are not rendered meaningless by the

12    fact that we are -- have and continue to assert our allowed

13    superpriority administrative expense claim.  And so I think the

14    doctrinal legal contract law answer is, these are all

15    provisions that have independent meaning, but that -- and that

16    don't render each other annullity, they simply operate

17    independently.

18         So we have an unqualified superpriority claim that's

19    entitled to treatment under the Code.  We bargained for that;

20    we got it.  And it's very important, I should say, to the

21    Treasury.  I mean, just to step back to the real world, the

22    commitment that Treasury made here was to fund the operation of

23    these cases, to fund the wind-down, but that to the extent

24    funds were available to repay it at the end of the day, to

25    recapture it, we've used public funds to confer vast value on

Page 30

1    many, many people, and we're happy to have done that, because

2    that has brought about great public benefit.

3         But at the same time, we're trying to do so as

4    responsibly as possible.  And of course, to the extent we'd

5    agreed otherwise, to have value preserved for other

6    constituencies, as is the case of the New GM Equity Interests

7    reserved for unsecureds, we are a hundred percent honoring that

8    commitment.  We don't believe there is any agreement -- any

9    comparable agreement -- with regard to the treatment of the

10   avoidance action proceeds.  And in fact, we have specific

11   contractual provisions and provisions in orders that provide

12   that we're entitled to be repaid out of estate funds, which

13   include recoveries in the avoidance action.  And there's

14   nothing in these documents to put that out of reach for use for

15   repaying DIP lenders.

16        Your Honor, I am happy to answer any other questions

17   the Court may have, but I think I have really walked through

18   and presented the basis of our claim, to the extent I

19   understand it, so.

20        THE COURT:  I have one other that I didn't mention at

21   the outset.  I want you to respond to it; when it's Mr. Mayer's

22   turn, I want him to do the same.  We're out of 12(b)(6)

23   territory.  We're now in summary judgment territory, Rule 56.

24   The Supreme Court has told us in Ashcroft somewhat to my

25   surprise, but I do what the Supreme Court tells me, that

Page 31

1    bankruptcy judges are allowed to use their experience in

2    determining when contentions they hear are plausible.

3           Now we're beyond 12(b)(6) and I'm troubled by that,

4    and I may have said this in other cases on my watch, because

5    that would at least seemingly on a pure question of law give

6    rise to different rules of law, depending on who is sitting up

7    here.  And I, by way of example, have seen a fair number of DIP

8    financing documents over the years.  I don't know if it's

9    twenty or fifty or seventy-five, but more than other judges

10   might have.

11          Have much do you think I can or should -- pause.

12   Folks, historically that's resulted from people's Blackberrys

13   interfering with our systems.  Turn off your Blackberrys.  I'm

14   not going to make you give them up, but turn them off, please.

15   How much, Mr. Jones, do you think it's appropriate for me to

16   use my experience in ruling on this controversy?

17          MR. JONES:  Your Honor, I know my Blackberry's off.  I

18   did triple-checked.

19          THE COURT:  That's why I'm not saying anything to you,

20   and I'm just scratching my head.  Go ahead.

21          MR. JONES:  I will confess that's a very hard question

22   for me to answer, Your Honor.  I'll sort of work -- as I see

23   it, first off, the modified standard of review that Your Honor

24   mentioned, is a 12(b)(6) standard of review.  And, so a simple

25   way to answer it is to say you can ignore that, because we're

Page 32

1   going to resolve it on some --

2          THE COURT:  It's just 12(b)(6).

3          MR. JONES:  Yes.

4          THE COURT:  But I take it you don't quarrel with the

5   idea that both the 12(b)(6) and a Rule 56 are decisions on

6   disputed matters of law.  And most significantly, they're not

7   discretionary decisions.  If, as is very possible, whoever

8   loses this case takes it up, you guys are going to be arguing

9   whether I got it right or wrong, not whether I abused my

10  discretion.

11         MR. JONES:  That's right.  I mean, Your Honor -- yeah,

12  a decision on summary judgment or on 12(b)(6) is subject to de

13  novo review.  I'm going to get my crutch out, which is my brief

14  standard of review discussion.

15         And again, I mentioned earlier the Compagnie

16  Financiere case, 232 F.3rd 153 by the Second Circuit, which I

17  think, in terms of procedural guidance, although it's from

18  2000, is about the best we find -- I    found -- because it

19  talks about the standard for summary judgment, which is simply

20  that there has to be no material factual dispute, and then it's

21  a decision is a matter of law.  And that Compagnie Financiere

22  case, which I mentioned, talks about -- makes clear that the

23  court can decide disputed contentions arising from contracts,

24  where the parties aren't advancing extrinsic or parol evidence,

25  even if the court believes there's some ambiguity in the

Page 33

1    agreement.

2         Now in terms of the Court's question, to what extent

3    can you use your experience on that?  I don't think the summary

4    judgment case law as it's now written speaks specifically to

5    that.  I think every judge, of course --

6         THE COURT:  Well, it's evidence outside the record,

7    and I got to tell you, that because it's evidence outside the

8    record, I'm uncomfortable in relying upon it.  And you know, if

9    this goes up, how is Joe or Jane appellate judge going to know

10   whether I had a basis for applying my experience or not?

11        MR. JONES:  Your Honor, I don't know that I have a

12   very intelligent answer to that, other than to say, I think

13   that to facilitate appellate review, it would be appropriate to

14   articulate whatever factors, whether record or to the extent

15   they're nonrecord factors considered, go into the Court's

16   decision, and then an appellate judge would be able to review

17   it.  And if those factors are not articulated, they wouldn't be

18   available for appellate review.

19        I'm a little unsure, to the extent the Court's talking

20   about experience with proceedings or other filings or hearings

21   in this case, that can form part of the record on review, and

22   be susceptible of assessment and consideration.  We haven't

23   identified anything else relevant.  If the Court does, of

24   course, it's entitled to do so.

25        If the Court's talking about its more general

Page 34

1   experience over the years in presiding over bankruptcy cases

2   and substantial Chapter 11s, I'm -- you know, I think the Court

3   inevitably will do that realistically.  And I don't know that

4   there's any special rule dictating to the extent to which that

5   is or isn't permissible as you review the record before the

6   Court.

7          THE COURT:  Continue, please.

8          MR. JONES:  Your Honor, I think on that equivocal

9   note, if the Court has no other questions, I've covered the

10  heart of our position.  And to the extent the Court determines

11  not to dismiss under 12(b)(1), we respectfully request entry of

12  summary judgment in favor of the DIP lenders.

13         THE COURT:  Okay, thank you.

14         MR. JONES:  Thank you.

15         THE COURT:  Mr. Mayer, I'm sure you're itching to

16  speak, but should I be letting Mr. Schein or Mr. Edelman be

17  heard -- is it Mr. Edelman, by the way?  I know Mr. Schein a

18  little better.

19         MR. EDELMAN:  Yes, it is.

20         THE COURT:  Okay.  Do you want to be heard before Mr.

21  Mayer?

22         MR. EDELMAN:  It probably makes sense to have all

23  arguments on -- it's up to you.

24         THE COURT:  That's kind of why I was asking you --

25  inviting you to speak now.  Yes, why don't you go ahead and do

Page 35

1    that?

2        MR. MAYER:  The committee would agree with that.  It

3    makes sense for Mr. Edelman to go first.

4        THE COURT:  Sure, come on up, please, Mr. Edelman.

5        MR. EDELMAN:  Good morning, Your Honor, Michael

6    Edelman for Export Development Canada.  I will try to be brief

7    and not overlap too much --

8        THE COURT:  Sure.

9        MR. EDELMAN:  -- with the statements from my colleague

10   from the United State's Attorney's Office.  And I'll also try

11   to focus on the questions that you asked.

12       One of the questions you asked was whether we thought

13   that our interpretation of the documents, how do we explain the

14   non -- the exclusion from collateral, and also of the

15   nonrecourse?  Those two provisions -- we believe that the

16   nonrecourse language and the exclusion from collateral work

17   hand in hand together.  But there are some different purposes

18   that are covered by the nonrecourse provision that is broader

19   than just an exclusion from collateral.

20       As Mr. Jones stated that nonrecourse provision

21   protects against any assertion of a general unsecured claim for

22   any deficiency.  That's important here, because -- and it's

23   different than the -- you know, a general unsecured is

24   different than our grant of superpriority.  The grant of our

25   superpriority is a separate freestanding right that has its own

Page 36

1   exclusions.  The nonrecourse language limits any deficiency

2   from our liens from being converted into a general unsecured

3   claim.  And general unsecured claims in this case were entitled

4   to distributions of the equity interests in the New GM assets.

5           So all those concepts, the exclusion of collateral,

6   covers, you know, excludes from our liens, but it doesn't

7   necessarily exclude from our deficiency claim, and that works

8   in loan with our agreement that we would not seek to have any

9   rights in the New GM Equity Interests and any plan

10  distribution, as a result of our general unsecured claim

11  arising from our deficiency.

12          It's also interesting to note that the nonrecourse

13  terminology that's used consistently throughout the documents

14  always talks about loans and collateral concepts, which work

15  hand in hand together, whereas a different terminology is used

16  when we talk about the scope of the superpriority rights.  That

17  extends to all obligations.  So, even the terminology shows

18  that there's a difference between the two concepts.  So we do

19  think that there is a distinction between those two matters.

20          THE COURT:  Pause, please, Mr. Edelman, because I

21  understood what you just said in the context of your superpri,

22  but if it weren't for the nonrecourse feature, couldn't you

23  look to your collateral to all obligations under your DIP as

24  well?

25          MR. EDELMAN:  Well, as for a general unsecured claim,

1    that's correct.  But as I said, that doesn't give rise to --

2         THE COURT:  No, I mean as a DIP loan.

3         MR. EDELMAN:  We're -- see --

4         THE COURT:  Oh, you're talking about nonrecourse

5    having different meanings in the context of the ordinary pre-

6    petition loan, which could have a deficiency and a post-

7    petition loan where you got your lien under (c)(2) or

8    (c))(3) -- 364(c)(2) or (c)(3).

9         MR. EDELMAN:  I don't know if I was making that broad

10   a proposition.  I was just saying in the context of these

11   documents, different terminology was used.  And I think that

12   shows that the intent was different between the scope of the

13   superpriority and the meanings of the nonrecourse.  And we

14   believe, and I think the interpretation of the contracts show,

15   that the nonrecourse is -- supplements the limitations on our

16   liens, so that we do not have any lingering unsecured claims --

17   general unsecured claims.  We do have our superpriority rights

18   and there are express exclusions and limitations on those

19   superpriority rights, but those are two separate, independent

20   concepts under the documents.

21        THE COURT:  Continue, please.

22        MR. EDELMAN:  With respect to -- you know, you also

23   asked, generally, is recourse a general concept.  And our

24   review of -- before, in putting together our papers, we believe

25   that recourse is purely a concept that's used in collateral,

Page 38

1  secured loan context.  So I -- we didn't find any context other

2  -- you know, outside of a secured loan context where recourse

3  was used.

4       We believe that the -- there are four factors that --

5  that show that our interpretation of the contract is more

6  appropriate.  You know, first of all, the -- and I am not going

7  to review all the rules of contract interpretation because I

8  think all parties agree on the general rules.  And we're not

9  arguing as to what rules apply, but how they're applied in this

10  case.

11       Here are the specific terms that talk about the

12  superpriority.  The grant to superpriority are very broad, but

13  they do set forth certain delineated limitations.  And so the

14  rules where the specific governs over the general, we believe

15  shows that the separate grant under 364(c)(1), which are dealt

16  with under separate provisions under the loan agreement and

17  also under the -- each of the DIP orders, shows that these

18  rights are very broad, but only have certain delineated

19  limitations.  And none of those provisions limit the scope of

20  the superpriority rights to collateral concepts, and none of

21  them limit our rights for any proceeds from any of the estate

22  assets, including the avoidance actions, other than the two

23  specified carve-outs, which are the carve-out and also the

24  limitations on seeking recovery from a new equity -- New GM

25  Equity Interests.

Page 39

1          Second, there is also a rule -- a presumption in

2     contract interpretation where the Court should not read into

3     exclusions that were easily added by the parties.  And we've

4     cited a number of cases.  But here, the parties show that they

5     knew how to add exclusions to DIP loans -- DIP liens and

6     superpriority rights.  And with respect to the carve-out, the

7     carve-out was specifically set forth in both places, whereas

8     for the grant of liens, the -- sorry, with respect to the New

9     GM Equity Interests, it was specified with respect to both the

10    liens and also under section 8.20 of the loan agreement under

11    the wind-down loan facility that limit that -- the rights of

12    the superpriority rights to attach to the New GM rquity

13    interest.

14          No such exclusion with respect to proceeds of

15    avoidance action was contained in the superpriority rights.

16    And -- sorry.  Going back, as the Court knows, the proceeds

17    from the avoidance actions were specifically excluded from the

18    grant -- the scope of our liens.  So we think that the

19    presumption against reading into the contract exclusions also

20    controls here.  It's also interesting to note that the

21    exclusion under section 8.20 of the wind-down loan facility,

22    that's actually a new exclusion that was added to the

23    documents.  That's a difference between the final DIP order and

24    the wind-down credit agreement.

25          THE COURT:  Pause, please, Mr. Edelman.  I think you

Page 40

1    said 8.20 and used the words "final DIP facility".  Are you

2    referring to the loan agreement for the wind-down or are you

3    referring to the wind-down order or are you going back a step

4    to the loan agreement under the final DIP --

5             MR. EDELMAN:  I'm actually going back --

6             THE COURT:  -- which was executed a couple of weeks

7    earlier --

8             MR. EDELMAN:  -- I'm going --

9             THE COURT:  -- or the order at that time?

10            MR. EDELMAN:  -- I'm going down -- back to the order

11   that was approved as the -- under the final DIP order.

12            THE COURT:  The thirty million -- thirty-three million

13   buck one?

14            MR. EDELMAN:  The -- thirty-three billion.

15            THE COURT:  Forgive me.  Billion, yes.

16            MR. EDELMAN:  Sorry, I thought I didn't --

17            THE COURT:  No, I thought I was used to the numbers in

18   this case; I blew it.

19            MR. EDELMAN:  Under the original final order, before

20   it was modified for the wind-down -- under the wind-down order,

21   that credit facility agreement did not have 8.20 in it.

22            THE COURT:  Okay.  So 8.20 was added with the wind-

23   down?

24            MR. EDELMAN:  That's right.  And that's which -- you

25   know, waives our rights to any proceeds from the new equity

Page 41

1  interest, which effectively eliminates our superpriority

2  rights.  And so that was a change -- so that's worth noting

3  that -- you know, the carve-outs and exclusions did evolve over

4  time and that was specifically added, but no such express

5  exclusion was added with respect to the avoidance actions.

6         Now, under the committee's arguments, there would be

7  no need because if nonrecourse means what it means and -- under

8  their view -- I'm not accepting that view -- you know, there'd

9  be no need for the existence of 8.20 or actually, they need to

10  add it between the time of the final DIP order agreement and

11  the later wind-down agreement.

12         THE COURT:  Pause; let me make sure I'm keeping up

13  with you.  Your point is that the nonrecourse language had

14  preexisted as of the time of the second of the three DIP

15  orders?

16         MR. EDELMAN:  That's correct.

17         THE COURT:  And therefore, if it -- your contention is

18  that if it meant what your opponent says it means, it wouldn't

19  have been necessary to add 8.20 because it already would have

20  been covered by the nonrecourse language?

21         MR. EDELMAN:  That's correct.

22         THE COURT:  Okay.  Go on.

23         MR. EDELMAN:  So we think that the rule -- the

24  presumption against adding inclusions and the history of how

25  these documents evolved show that there is a difference

                                                        Page 42

1    between -- that the nonrecourse language was meant to solely

2    limit collateral concepts, and that we had the separate,

3    freestanding superpriority rights under 364(c)(1) that was

4    granted in the loan agreement.  And the -- each of the DIP

5    orders, which had no such exclusion with respect to the

6    proceeds from the avoidance actions, shows that these are

7    different concepts and different rights and the exclusions

8    should not be added on belatedly by the committee.

9         The third rule of contractual construction, as a

10   follow-on from the second that I just mentioned, is that we

11   believe that numerous provisions would be read out of the

12   contract.  There would just be no need for, you know,

13   provisions.  And it's not just -- you know, frankly, the whole

14   superpriority grant would be rendered superfluous; there'd be

15   no purpose, no reason to have a separate provision for

16   superpriority rights if we're solely limited to collateral.  It

17   just wouldn't make any sense.

18        If nonrecourse means that we don't have any

19   superpriority rights, then why would we even have that

20   provision?  We'd be totally covered by the grant of liens under

21   364(c)(2) and (c)(3), and 364(d) in certain circumstances.  So

22   that separate 364(c)(1) right would be written out of the

23   contract, effectively.  Also, the add-on that I just talked

24   about, 8.20, would not be needed.  And as I said, that was

25   specifically added between the time of the final DIP order

Page 43

1    agreement and the later wind-down facility agreement.  So, you

2    know, their -- we view that concept of contractual

3    interpretation also shows that these are separate concepts that

4    should not be limited.

5           You know, as an add-on, under Chapter 11 cases,

6    Section 1111 is the one provision that talks about nonrecourse

7    treatment.  That's true most of the cases deal with pre-

8    petition obligations, but a pure reading of the statute shows

9    that in a Chapter 11 case, so long as a debtor is subject to a

10   case, that the secured creditor has a claim secured by a lien

11   on the property and the property has not been sold, that

12   nonrecourse in Chapter 11 cases -- you know, it does not mean

13   that you don't have any claims.

14          THE COURT:  I saw that in your brief, Mr. Edelman.  I

15   found that to be one of your less persuasive points --

16          MR. EDELMAN:  And that's --

17          THE COURT:  -- and let me tell you what was bothering

18   me about it.

19          1111 -- and let me see if I can find it -- which talks

20   about -- let me see if I can find it.  It talks about not just

21   a claim.  I think we all agree -- or most of us who are

22   experienced in bankruptcy matters agree -- that a claim can be

23   both a pre-petition claim and a post-petition claim.  But a

24   creditor, unlike a claimant, has a pre-petition claim.  And

25   while claim, unlike creditor, isn't limited to pre-petition

Page 44

1    claims, if you look in 1111(b)(1)(A), it talks about it being

2    allowed or disallowed under 502 of the Code.  And if you look

3    at 502, it applies to claims that are filed by a creditor under

4    501, and a creditor has got to be a pre-petition creditor.  So

5    I'm not sure if 1111(b) is applied to post-petition claims or

6    not.

7              MR. EDELMAN:  I appreciate that argument, but if you

8    look at the terms of 1111(b), it doesn't -- the entitlement

9    goes to "a claim secured by a lien on property of the estate

10   shall be allowed", and then it refers to 502.  So I think the

11   threshold issue for 1111 is if you're secured by property of

12   the estate, then that provides for a treatment.  It doesn't say

13   that this is a creditor holding claims allowed under 502 that

14   has security in property; it's just telling that the treat --

15   if you meet the first threshold, then you look at 502.  I think

16   that --

17             THE COURT:  But I don't think it's productive to get

18   into a debate on this, but it seems to say a claim secured by a

19   lien on property of the estate will be allowed or disallowed

20   under 502.  And when you apply 502, you've got to go back to

21   501, and 501 seems to be limited to creditors.  And that's

22   what's bugging me.  I'll look at your brief again, but that's

23   what's bugging me.

24             MR. EDELMAN:  No, I think that -- I understand that is

25   an interpretation if you put emphasis on 502/501.  And frankly,

Page 45

```
1    one of the -- you know, that same limitation would actually

2    also apply to the committee's argument stressing that cramdown

3    treatment could be a potential reason why we added the

4    nonrecourse treatment.  And we don't believe that, you know,

5    nonrecourse treatment -- sorry, sorry, cramdown treatment --

6    under 1129(b), cramdown treatment applies to classes of

7    claims -- creditors holding claims under 501 or 502.  So that

8    same --

9         THE COURT:  Let me keep with you on this, because that

10   nuance hadn't occurred to me.  You're talking about what

11   subsection of 1129(b)?

12        MR. EDELMAN:  It's 1129(b), the cramdown treatment

13   and -- it's a --

14        THE COURT:  Yes, I mean -- but cramdown against an

15   unsecured or a secured or what or equity?

16        MR. EDELMAN:  It's for other.  It's talking about

17   classes -- any voting classes under a plan.

18        You know, it talks about holders of plans -- claims

19   entitled to vote.  The only classes entitled to vote under --

20   you know, you go to legal cramdown treatments because you're

21   dealing with 1129(a)(10), and the only classes entitled to vote

22   are pre-petition --

23        THE COURT:  Pre-petition claims.

24        MR. EDELMAN:  -- pre-petition claims.  So that whole

25   purpose -- if you accept that argument, I don't think that
```

Page 46

1    cramdown would work from that same statutory --

2            THE COURT:  You can't cram down against your DIP

3    lender; I think most of us agree with that much.

4            MR. EDELMAN:  Yeah, and furthermore, cramdown just

5    doesn't apply to post-petition obligations under 364(c) and

6    (d).

7            So I appreciate, you know, that your interpretation of

8    1111(b) -- their -- I appreciate your interpretation.

9            THE COURT:  Fair enough.  Let's move on.

10            MR. EDELMAN:  But going back to that point that -- you

11    know, might as well address it since we just raised it.  So the

12    committee's argument that the purpose of the inclusion of the

13    superpriority rights is to protect against cramdown doesn't

14    work because cramdown doesn't -- is just not a concept that's

15    applicable to a DIP lender who has a loan approved under 364(c)

16    or (d).

17            We have not found any cases that deal with that, we

18    don't think it works under the statutory construct.  And we

19    also have the protections from the original final DIP order

20    that would protect us from any cramdown treatment.  So all the

21    provisions under the original final order still apply to the

22    wind-down facility, except to the extent that they were

23    expressly superseded and/or modified, and that protection was

24    not modified.  So the inclusion of superpriority is after we

25    have the protections in the original final DIP order -- you

Page 47

1     know, that -- there was no need for it.  So that cannot explain

2     the existence of the superpriority rights.

3           So in sum, we think that these provisions must be read

4     in the entire construct of the contracts.  We believe that the

5     numerous statutory rules' construction show that our

6     interpretation of the contracts should control -- and to

7     explain the inconsistency -- you know, the facial

8     inconsistency.  And, accordingly, we believe that we should be

9     granted summary judgment and go to DIP lenders.

10          THE COURT:  Okay.

11          MR. EDELMAN:  One other thing I'd like to add.  You

12    also asked if we thought that any parol evidence is needed and

13    we agreed.  We think that the documents can and should be read

14    for the given or clear facial meaning, and no parol evidence is

15    needed.

16          THE COURT:  Okay.  Folks, let's take a ten-minute

17    recess and I'll hear you, Mr. Mayer, at 11:15.

18          MR. MAYER:  Thank you.

19        (Recess from 11:04 a.m. until 11:41 a.m.)

20          THE COURT:  Okay, Mr. Mayer, whenever you're ready.

21          MR. MAYER:  Thank you, Your Honor.  I will be brief.

22    This issue has been -- the issues have been extensively briefed

23    twice.

24          I want to go straight to your questions.  First, you

25    asked me to address why there is separate language for the

Page 48

1  carve-out and for the New GM securities if, in fact, the

2  superpriority claim is limited by the nonrecourse provision, as

3  we assert it is.

4       The carve-out is the easiest to address.  The purpose

5  of carve-out is to ensure that there is a pool of assets that

6  would otherwise be collateral that goes to very specific

7  parties who are identified in the carve-out.  To write a carve-

8  out in a way that would have worked for the term loan avoidance

9  action, we would have had to have drafted a carve-out that

10  said, notwithstanding the lien and superpriority, there is a

11  carve-out of the -- the term loan avoidance action for the

12  benefit of all unsecured creditors.  I don't think I would have

13  gotten away with that.  I would have loved to have tried.  I

14  guess I could have drafted it to say there will be a carve-out

15  for the benefit of all parties in the estate other than the DIP

16  lenders; that would have worked, too.

17       But that's not what a carve-out does.  A carve-out

18  says there are these very specific professionals whose work is

19  necessary for the maintenance of the estate, and the secured

20  lenders have agreed that their collateral will be used to pay

21  those professionals.  It is completely different in purpose and

22  operation from the clause that we are talking about here.  So I

23  don't view the carve-out as being illustrative of any

24  surplusage argument.

25       THE COURT:  Don't they all, though, share the

Page 49

1    characteristic of defining a zone of matters as to which rights

2    that the post-petition lenders, protected by any of (c)(1),

3    (c)(2) or (c)(3), would otherwise have ahead of the people who

4    want to get paid with the carve-out proceeds?

5             MR. MAYER:  Yes, Your Honor.  Absolutely, they do.

6    But the point, again, is the carve-out is limited to a

7    narrowly-defined group of parties and, frankly, advances the

8    interests of those parties ahead of creditors who would

9    otherwise be in their same priority.  A carve-out does not

10   benefit post-petition trade; a carve-out does not benefit post-

11   petition extenders -- slip-and-fall creditors, who have claims

12   post-petition.  It only benefits a limited class of

13   professionals.  It's entirely different from a nonrecourse

14   provision such as we have here, which was intended to

15   provide -- we believe did provide -- that the DIP lenders

16   simply aren't going to touch that asset.

17             And that's for the benefit of the estate, as Your

18   Honor pointed out.  It's not for the benefit of any particular

19   small universe of people; it's for the benefit of everybody.  I

20   say again, if we were going to draft the carve-out as -- to

21   protect the term loan avoidance action, we would have had to

22   have included in the beneficiaries of the carve-out everybody

23   in the case other than the DIP lenders.  I think it's a

24   completely false analogy.

25             THE COURT:  Continue, please.

Page 50

1    MR. MAYER:  The next issue is with respect to the

2    superpriority and the New GM securities.  I want a go at this

3    head on, Your Honor.  We believe that the superpriority claim

4    is surplusage and the arguments in this Court illustrate why it

5    is.  Let us assume there was no superpriority claim.  None at

6    all; there were no provisions and -- in the order, there were

7    no provisions in the loan agreement that ever referred to a

8    superpriority claim.  364(c)(1), (2) and (3) never appeared

9    anywhere.  The arguments would be exactly the same.

10    Mr. Edelman is wrong; there can't be an interpretation

11    here that says nonrecourse means you don't have an unsecured

12    claim because they never have an unsecured claim.  The worst

13    they ever have is an administrative expense claim because they

14    are an extender of post-petition credit.  So even if they never

15    got a superpri, they would still be here.

16    Your Honor, you asked -- cutting right to a question

17    that you were asked about your experience.  Matters of -- that

18    you referred to, such as difference between one judge and the

19    next are a little deep for me, and I won't venture there.  But

20    I do venture this --

21    THE COURT:  I'm not sure if I do, either.

22    MR. MAYER:  -- I do venture this, Your Honor, because

23    I think this is an area where experience would be uniform

24    across the judges in this district and probably everywhere else

25    in the country.  Post-petition lenders always ask for

Page 51

1    superpriority claims.  I believe you can rely on your

2    experience to say that because I've never seen a DIP loan that

3    didn't ask for a superpriority claim when it got a lien.  And

4    meaning no presumption, Your Honor, I would bet that you've

5    never seen one, either.  And if that's true --

6          THE COURT:  Well, of course that's exactly correct.

7    And for whatever reason, you correctly identified the issue

8    that was under the covers.  It is, in fact, true that in eleven

9    years as a judge and nearly thirty before that, when I was

10   doing what you guys do, I have never seen a post-petition

11   lender not ask for it, either -- ask for both, either.  In

12   fact, I may have used my -- said to one of my law clerks when

13   we were getting ready for this that in my experience, parties

14   in our cases are like the kids in Oliver Twist, and they always

15   want more.  And I don't doubt that people ask for -- try to say

16   things in different ways or ask for as much as they get.

17         But A, I am uncomfortable in using my personal

18   experience on a disputed matter of law.  And B, assuming that I

19   could, the same argument applies to your saying first, that the

20   collateral doesn't reach the avoidance action, and B, that it's

21   nonrecourse.  Everybody in cases on my watch says things three

22   different ways and tries to get as much as they can.  And I

23   don't know if there's a principal basis upon which I can draw

24   the line in that regard.

25         MR. MAYER:  Well, Your Honor, if I may.  And again, my

Page 52

1   experience is limited; it is only what it is.  But I've never

2   seen another credit agreement -- a DIP loan credit agreement

3   that has a nonrecourse provision in it.  That's because the

4   circumstances of this case were unique.

5          THE COURT:  Yes, but you can't be cross-examined and I

6   don't know whether, or to what extent, I can rely on your

7   experience or mine or, you know, whether I can take a poll of

8   the other judges in this court or the other 350 bankruptcy

9   judges in the country.

10         MR. MAYER:  Again, Your Honor, the issue of the

11  difference in judicial experience is one that is a little deep

12  for me, but I -- if I might suggest, it seems to me, under

13  Ashcroft, you could appropriately note what your experience is

14  and leave it for an appellate court, if there is one reviewing,

15  to decide whether, under Ashcroft, that's the sort of thing

16  they should pay attention to.  And --

17         THE COURT:  Yes, but you would certainly understand

18  that I try to get it right the first time.

19         MR. MAYER:  Yes, Your Honor.

20         THE COURT:  And also, that although a few times over

21  the years I've respectfully suggested to appellate courts that

22  they reconsider principles, until they do, I follow.

23         MR. MAYER:  Yes, Your Honor.  I think I've said what

24  I've had to say on this topic.

25         THE COURT:  Okay.

1       MR. MAYER:  With respect to the New GM Equity

2  Interests, the arguments that have been made repeatedly by the

3  debtors -- by -- strike that.  I'm so used to, as a committee

4  lawyer, arguing against debtors -- against the -- by the DIP

5  lenders is that where I have a belt and I put on suspenders, it

6  turns out that if one day I'm not wearing suspenders, my pants

7  fall down.  I believe that what we negotiated with respect to

8  nonrecourse was fine on its own basis, and the fact that

9  additional material is added in no way cuts against it.

10      I have a little demonstrative.  It's a -- it's just a

11 quotation of some language.  And it's not -- you can say that

12 there are other provisions that I didn't put in, but it is,

13 nonetheless, illustration of the -- of the argument.  If I may

14 hand this up, Your Honor.

15      THE COURT:  You can, but whenever somebody gives me a

16 demonstrative -- although you're only using it as a

17 demonstrative, I still give opponents a chance to be heard.

18      MR. MAYER:  Of course.

19      This is just quotes from --

20      THE COURT:  All right, pause for a second.

21      MR. MAYER:  Certainly.

22      THE COURT:  Mr. Jones, Mr. Edelman, any objection to

23 me considering the demonstrative?

24      MR. MAYER:  I've --

25      THE COURT:  I think he's merely quoting from documents

Page 54

1    that are in evidence, but I'll give you a chance to be heard.

2            MR. EDELMAN:  It looks like they're just paraphrasing

3    what's -- paraphrasing or quoting.  We'd just like to note that

4    there are numerous other provisions.

5            THE COURT:  Sure, but that's what demonstratives

6    always are.

7            MR. EDELMAN:  Of course.

8            THE COURT:  Okay.

9            MR. JONES:  Yeah, I think that's fine, Your Honor.  I

10   haven't been able to fact-check it, but it looks -- it looks

11   exactly like excerpts --

12           THE COURT:  Mr. Mayer, if --

13           MR. JONES:  -- and that's fine.

14           THE COURT:  -- if you have -- if you've left out words

15   or you changed it, I'm going to be mad at you, but I'm going to

16   assume for the time being that what you said is what it says.

17           MR. MAYER:  And I will concede, Your Honor, that there

18   are other provisions that could be added to the right-hand side

19   of this chart; it's not a complete list.

20           But for purposes of argument, our argument is that if

21   you just take a look at the materials that aren't sheeted --

22   shaded by the sticky, I think you would agree, I hope -- it is

23   our argument -- that these are sufficient to establish that the

24   DIP lenders disclaimed an interest in the term loan litigation.

25   And when you peel back the sticky, you see additional language

Page 55

1   with respect to the New GM Equity Interests.  And that's

2   correct.  Now, that doesn't make the preceding language any

3   less enforceable.

4        And that, basically, is our argument.  The fact that

5   with respect to the New GM Equity Interests things were said

6   three times, doesn't mean that when they were said once -- with

7   respect to the term loan litigation -- that once was any less

8   effective.  Because we think nonrecourse means what everybody

9   understands it to mean, which is that your rights are limited

10  to your collateral.  That's how I understand nonrecourse to

11  work; I believe that's how everybody understands nonrecourse to

12  work.

13       Nor was this a provision -- if we want to get into

14  saying things multiple times.  The feature of this, that this

15  was a nonrecourse loan, was specifically mentioned by Mr. Jones

16  at the hearing on the approval of this facility.  This wasn't

17  something that the unsecureds snuck in at any point in time;

18  this is something that was in the document for a purpose and it

19  was acknowledged by the government at the hearing at the wind-

20  down agreement.

21       Which leads me to a -- I guess it's appropriate to say

22  it here.  I was going to end with it, but it's appropriate to

23  say it here.  Principle of contractual interpretation that I

24  think is wholly appropriate here is that it is construed

25  against the drafter.

Page 56

1          And I think the record of this case -- this goes into

2     your parol evidence question.  We do not believe that witnesses

3     add much, if anything, to this case.  We don't believe

4     discovery is appropriate.  We do believe you are entitled to

5     take cognizance of proceedings that happened before you, what

6     you've seen in the hearings before you and the documents that

7     have been filed before you, such as prior orders.

8          And it is really undeniable -- Canada advances what I

9     think is not a particularly effective denial -- that these

10    documents were in the care and feeding of Treasury's counsel

11    from day one.  Treasury was the drafter here; Treasury did

12    provide the money; Treasury did control the documents.  And I

13    don't believe that's meaningfully contested.

14         When we were last here, indeed, we had a little

15    kerfuffle over a change that the DIP lenders insisted be made

16    even after the loan was approved.  I don't think there's any

17    meaningful contest to Treasury's role in controlling these

18    documents.  Canada asserts, in its papers, we were just along

19    for the ride; you shouldn't hold us against us.  I don't view

20    that --

21         THE COURT:  The "we" being the creditors' committee or

22    "we" being Export Development Canada?

23         MR. MAYER:  Export Development Canada was along for

24    the ride; don't hold what Treasury -- the draft -- don't hold

25    the interpret-the-document-against-the-drafts or against Canada

Page 57

1    because Canada didn't draft the documents.

2         Your Honor, the DIP lenders have moved in tandem.

3    Treasury took the lead; it drafted these documents.  To the

4    extent there is an ambiguity here, I think that should be

5    construed against Treasury and through Treasury, against

6    Canada.

7         Now I want to go to the broad context and end with

8    that.  At the beginning of the hearing, Your Honor, you said

9    something with which we wholeheartedly agree, which is yes, we

10   brought this action on behalf of the estate.  The fact that we

11   brought it doesn't mean that we own it.  We understand that.

12   That's not the issue.  I know that's the way Treasury and

13   Canada want to frame the issue.  They want to say that we think

14   we own it and no, it's not true; the estate owns it.  That's

15   right; the estate does own it.

16        But the question is what do the documents mean?  What

17   do they provide?  Did the documents operate to exclude the DIP

18   lenders from this asset or did it operate to reserve an

19   interest to them in this asset?  And that really is the

20   question.

21        Now the question is -- and this -- I don't think this

22   qualifies as parol evidence; it is a proceeding before this

23   Court.  The fact is that only the committee could bring this

24   action.  Treasury couldn't bring it; Canada couldn't bring it;

25   only the committee could bring it.  If the committee didn't

Page 58

1    bring it, it wouldn't exist, because the initial order says

2    that only the committee has the standing, on behalf of the

3    estate, to go after the pre-petition lenders.  Only the

4    committee.

5         So what Treasury and Canada are asking you to do is to

6    interpret documents they controlled to reserve to them the

7    right to collect from an asset they had no ability to bring and

8    whose existence is entirely dependent on the decision of a

9    third party they don't control.

10         THE COURT:  That ties into another distinction which,

11   when you think about best practices, you focus on, but which I

12   don't know if it's relevant here; we dealt with this in

13   Lyondell Chemical.

14         Sometimes DIP documents give post-petition lenders a

15   lien on proceeds and sometimes they give them on the avoidance

16   action altogether, the difference being principally in the

17   degree of control that the grant gives.  But here, it gave you

18   guys both, if I recall -- am I correct in that?  It gave you

19   both a -- or rephrasing it, they disclaimed a lien on the

20   action and also, at least impliedly, on its proceeds, but was

21   silent on the issue on the superpri.  Am I correct?

22         MR. MAYER:  Your Honor, again, this gets to the heart

23   of the matter.  We don't believe that calling a secured loan

24   nonrecourse is silent on a superpriority claim.  And again,

25   because if the superpri didn't exist, they would have an admin;

1    we would had to have said they were nonrecourse anyway because

2    it would be the only way to limit their admin.  Nonrecourse is

3    critical to the interpretation of the document as a whole.

4            With respect to proceeds, this is not -- we have not

5    featured this argument because I'm not entirely crazy about it

6    myself.  But if you take a look at the definition of New GM

7    Equity Interests in the critical document that grants the lien,

8    which is the order, it actually refers back to the term loan

9    avoidance action.

10           I'm not saying that anybody designed that definition

11   that way.  Your Honor was here --

12           THE COURT:  Where does that appear, Mr. Mayer?

13           MR. MAYER:  Okay.  I'm sorry, Your Honor.

14           It's in the order approving the wind-down credit

15   agreement, and it's on page 5 of that order.  Lauren (ph.), do

16   you have a copy?  We have copies for everybody, but this is an

17   order that everybody's got attached to everything.

18           THE COURT:  Can I impose on you?  I'm confident it's

19   here, it's somewhere in this thick notebook --

20           MR. MAYER:  I have a separate order for Your Honor.

21           THE COURT:  Would you mind?

22           MR. MAYER:  Certainly.  Lauren, do you have copies for

23   everybody else?  May I approach, Your Honor?

24           THE COURT:  Yes.

25           MR. MAYER:  If you look at the very end of the indent

Page 60

1    at the top of page 5, you will see a defined term "New GM

2    Equity Interests".  This is the critical paragraph.

3         (Pause)

4              THE COURT:  All right.  Repeat your point, please.

5              MR. MAYER:  And as I said, Your Honor, we have not

6    featured this argument.  I say it only to indicate that you

7    have to read this paragraph a certain way to give life to

8    certain of their arguments.

9              The defined term "New GM Equity Interest" comes at the

10   end of the proviso.  And it could be read to apply to

11   everything that goes before it, up to the proviso, including

12   the term loan avoidance action.

13             THE COURT:  I see why you didn't make that argument.

14             MR. MAYER:  Thought I would bring it to the Court's

15   attention.

16             In any event, Your Honor, the basic point remains --

17   the basic point remains that if you think this is a close call,

18   one, I think you should construe it against the drafter.  And

19   two, it doesn't make sense to construe it to reserve to DIP

20   lenders the rights to an action that wouldn't exist unless the

21   third party brought it in the first place.

22             We do kind of feel we were snookered here.  You

23   can't -- the economic argument made by Mr. Jones can't be

24   addressed without going beyond the record.  But every dollar

25   that's recovered on this term loan action creates an unsecured

Page 61

1    claim and dilutes my clients' recovery.  It's a point we

2    made -- earlier, we did make it in our papers -- that we are

3    never fully protected against the dilution.  At best, we are

4    protected against half of the dilution.

5            The issue isn't really why would we be dumb enough to

6    bring this action if we weren't going to own it, because yeah,

7    that gets to why I sometimes get emotional in private,

8    hopefully, over why I'm standing here.  The issue really is how

9    do you interpret these documents; why would you interpret them

10   to reserve to the DIP lenders an action they couldn't bring and

11   wouldn't exist unless I brought it?

12           We asked for nonrecourse for a reason.  We knew what

13   it meant.  We thought they knew what it meant.  And the rest of

14   this is taking belt-and-suspenders language that appears in

15   every DIP loan request and saying look, we're going to say

16   nonrecourse doesn't apply to the superpriority claim.  What

17   else would it possibly apply to?  It can't apply to anything

18   else; it has to apply to a claim that isn't secured.  And that,

19   really, is the essence.  And if there was no superpriority

20   grant here, I'd still need it to take care of their admin.

21           I'm not sure I have anything else to add.  If you have

22   questions, I'm happy to answer.

23           THE COURT:  No, you took care of them as we go along.

24           I'll take a reply, making the obvious point that Mr.

25   Mayer was a lot briefer than the folks were on the other side,

Page 62

1    and I expect the reply to take that into account.

2          MR. JONES:  Your Honor, David Jones, again, for the

3    U.S. Attorney's Office.

4          I will try to be briefer yet.  If the Court has any

5    follow-up questions based on what Mr. Mayer said, I'm happy to

6    address them.  I think, as to his demonstrative, it shows half

7    of the story:  what the language is that makes this a

8    nonrecourse facility for whatever that implies.  But that

9    doesn't demonstrate the existence of, as Section 1129 says, an

10   agreement otherwise on the part of DIP lenders that they not

11   receive payment in full on account of their allowed

12   superpriority administrative claim in any way that affects

13   entitlement to receive avoidance action proceeds.

14         A narrow point, Mr. Mayer relies heavily on the notion

15   that any ambiguity should be construed against the drafter.

16   But we presented case law in our briefs making clear that that

17   principle does not apply and is not appropriately used where

18   you have an actively negotiated document in which both parties

19   were represented by sophisticated counsel, as is abundantly

20   clearly the case here.

21         Your Honor, I believe that's all I have to say that's

22   directly responsive.  If the Court has questions, I'll

23   entertain them.  Otherwise, we'll rest on our papers.  Thank

24   you very much.

25         THE COURT:  Okay.  Mr. Edelman, anything else?

Page 63

1        MR. EDELMAN:  Your Honor, the committee points to the

2    fact and raises issues about carve-out and how superpriority

3    liens are included in almost every DIP.  We're not talking

4    about, you know, what's --

5        THE COURT:  I think he said "every DIP".  I --

6        MR. EDELMAN:  I --

7        THE COURT:  -- I think even -- I don't think he

8    diluted his argument even to say "almost any".  And I don't

9    know if I'm allowed to consider my experience, but if I could,

10   I would be either likely or certainly agreeing with him on

11   that.

12       MR. EDELMAN:  I would actually say almost every DIP

13   because in our research, we actually saw some cases -- which

14   I'm not familiar with -- but there are cases out there in which

15   there has been granted liens where superpriority was also not

16   included --

17       THE COURT:  Okay.  Fair enough.

18       MR. EDELMAN:  -- so they exist.  But I'm -- I'm not --

19       THE COURT:  Which, of course, underscores why maybe

20   guys like me shouldn't rely on our experience.

21       MR. EDELMAN:  -- but I'm not quibbling with the

22   concept that, you know, superpriority isn't -- and liens are --

23   go hand-in-hand together in most cases.  I can't quibble with

24   that because that's what the cases show.  But I have seen the

25   cases out there.

Page 64

1           But we're not talking about the -- those provisions.

2    What we're talking about are the exclusions.  And yes, the

3    carve-out is usually excluded, but, you know, the absence of

4    other exclusions, we think, is telling here.  And so the

5    absence of any exclusion of the proceeds from the avoidance

6    action, we think, is telling, whereas the carve-out and the

7    avoidance actions were expressly excluded from our liens, only

8    the carve-out was excluded from the superpriority claims in the

9    paragraphs that specifically deal with those items.

10          The committee also raises a point that there was no

11   possibility of us having an unsecured claim here.  Well -- and

12   they say that, you know, we would definitely have at least an

13   administrative claim if -- to the extent that we weren't paid

14   from our collateral.  That's not true; there's case law out

15   there that says unless you actually state in your loan that

16   you're -- you're seeking 364(c) -- (b) treatment, you don't

17   have administrative claim unless you meet the requirements

18   under 503(b), and you have to prove your administrative claim.

19   So at least conceptually, there would have been an ability to

20   have an administrative claim.  But we protected ourselves by

21   having --

22          THE COURT:  Say that again, slower, please, Mr.

23   Edelman.

24          MR. EDELMAN:  Sure.  There's case law that exists that

25   say that a DIP lender, to the extent that their collateral is

Page 65

1    not sufficient to repay them, does not necessarily hold an

2    administrative claim unless they were granted an administrative

3    claim under 364(b), and that if you -- unless you specifically

4    stated admin claim or superpriority claim, you wouldn't have

5    that claim.  So at least, you know, the statement -- I'm just

6    saying that there was no ability to -- for us to have an

7    unsecured claim is not true because we would --

8         THE COURT:  Mr. Edelman, have you ever, in your life,

9    seen a DIP financing order that invoked 364(b)?  I sure have

10   not.  I mean, what lender in its right mind would take 364(b)

11   priority?

12        MR. EDELMAN:  As for a general DIP, I agree.  There's

13   been some specific equipment that's been financed, but those

14   are very limited DIPs, not for general -- I've never seen a

15   364(b).  Once again, under -- I've seen cases that talk about

16   364(b) grants of DIP priority, but I've never dealt with it.

17        THE COURT:  I've never even seen one.  I mean, it's

18   close to lending malpractice, isn't it, to subject your post-

19   petition lender to the risk of administrative insolvency, going

20   pari passu with the remainder -- the administrative expense

21   community.  Not just vendors, but post-petition tort claimants

22   and even, perish the thought, professionals?

23        MR. EDELMAN:  Your Honor, I'm not going to -- we're

24   not saying that this is what we did here.  The statement was we

25   could never have an unsecured deficiency claim.  And the

Page 66

 1   statement -- that's just not correct.  We've negotiated for

 2   something better by having, also, protection by including a

 3   superpriority claim.

 4        So I'm not saying the statement by counsel --

 5        THE COURT:  If there were a difference in the scope of

 6   the liens granted on the post-petition basis, the post-petition

 7   superpri would obviously have a much greater relevance.  But,

 8   you know, we were talking about Oliver, when the little kid

 9   comes up with his porridge bowl and asks for more.  The -- I

10   cannot remember a case -- there probably is one somewhere out

11   there -- where, if a post-petition lender was getting 364(c)(2)

12   and (3) liens, that it didn't ask for its liens on everything

13   it could get its hands on.  The reason why you have 364(c)(3)

14   liens is because sometimes there's liens out there that you

15   can't prime, so you take a junior lien, but you ask for that as

16   well.

17        The problem I have is -- again, and raises the

18   question as to whether I'm allowed to use my experience, but my

19   experience has been that post-petition lenders go belt and

20   suspenders and rope and everything else they can get their

21   hands on as a matter of course.  They try to get their hands on

22   everything, whether or not it means -- it has economic

23   significance.  But I don't know if I'm allowed to consider

24   that.

25        MR. EDELMAN:  Your Honor, I think here, where you have

Page 67

1    differences in the exclusions between the superpriority admin

2    claim and the liens, I think that clearly shows that there is a

3    difference between these two rights, and we think those -- the

4    contractual provisions control.  And we don't just write them

5    away as mere surplus.

6          Your Honor, I'd also just like to address -- I know

7    you've discounted this, but the committee raised, on page 5 of

8    the wind-down order, the definition of New GM Equity Interests.

9    I'd just like to point out that that paragraph only deals with

10   the DIP liens.  The previous page deals with the superpriority

11   claims.  And that paragraph talks about the claims, all claims

12   of the DIP lenders, whereas the following page, the paragraph

13   they cite, is that the DIP liens are limited.

14         One other point.  In the original exit financing

15   order, on page 15 of that order, there's a clear statement that

16   the superpriority claim "shall be subject and subordinate only

17   to the carve-out and the claims set forth in the preceding

18   proviso."  And the preceding proviso was the whole wind-down

19   budget.  Whereas the next paragraph, paragraph 6 on page 15 of

20   the exit financing order, that -- and that's the order that

21   stayed in effect, except as modified by the wind-down order.

22   That -- paragraph 6 of the DIP lien shall be subject to the

23   avoidance powers of the Bankruptcy Code.  I paraphrase here

24   because it lists all the avoidance sections.  So we think that

25   they're -- you know, the distinction that they're trying to

Page 68

1    draw between these two rights have -- just has no bearing.

2         You know, in sum, you originally asked if the DIP

3    lenders otherwise agreed.  You've heard -- we briefed this, we

4    think all the contractual interpretation shows this, that, you

5    know, the DIP lenders agreed to many things for their

6    superpriority liens -- sorry, superpriority claims.  They

7    agreed for the funding of the whole wind-down, about, you know,

8    a billion dollars or so; we agreed to the carve-out; we agreed

9    that the allowed -- the proceeds from the New GM Equity

10   Interests would not be touched by the superpriority claim.  But

11   the DIP lenders never agreed -- and nowhere in the provisions,

12   the deal -- in the contracts or the orders did the DIP lenders

13   ever agree to so limit the superpriority claim rights with

14   respect to the proceeds of the avoidance actions.

15        And so, going back to your original questions, we,

16   EDC, never affirmatively otherwise agreed that -- not to touch

17   the proceeds of the avoidance action with respect to the

18   superpriority claims.

19        THE COURT:  Okay, thank you.

20        MR. EDELMAN:  Thank you.

21        THE COURT:  Mr. Mayer, I didn't have a problem with

22   you being heard; I just had a problem with you being in the

23   middle of Mr. Edelman's argument.  Did you rise for something?

24        MR. MAYER:  Your Honor, I decided I -- I was confused

25   as to what order he was referring to.  But on reflection, I

Page 69

1   don't think there's a need for me to respond.

2          THE COURT:  Okay.

3          All right, has everybody had a chance to speak their

4   piece?  Well, folks, I'm going to have to take this under

5   submission.  I will get something out as quickly as a

6   responsible decision permits.

7          Did I understand that the key date, from your

8   perspective, Mr. Mayer, was December 15th?

9          MR. MAYER:  Yes, Your Honor.

10         THE COURT:  Okay.

11         All right.  Thank you very much, folks.  Very helpful

12  arguments.  We're adjourned.

13         MR. MAYER:  Thank you.

14         MR. EDELMAN:  Thank you, Your Honor.

15         MR. JONES:  Thank you.

16         (Whereupon these proceedings were concluded at 11:49 AM)

17

18

19

20

21

22

23

24

25

Page 70

I N D E X

RULINGS

|  | Page | Line |
|---|---|---|
| Creditors' Committee requested fees, except | 5 | 7 |
| for the disputed 245,000 dollars -- Approved | | |

Page 71

1

2                    C E R T I F I C A T I O N

3

4    I, Karen Schiffmiller, certify that the foregoing transcript is

5    a true and accurate record of the proceedings.

6

7    *Karen*
                                    Digitally signed by Karen
                                    Schiffmiller
                                    DN: cn=Karen Schiffmiller,
                                    o=Veritext, c=US
8    *Schiffmiller*                 Date: 2011.10.24 14:03:15 -04'00'

9    KAREN SCHIFFMILLER

10   AAERT Certified Electronic Transcriber CET**D 570

11   Also transcribed by:

12   SHALOM BORODA

13

14

15   Veritext

16   200 Old Country Road

17   Suite 580

18   Mineola, NY 11501

19

20   Date:  October 24, 2011

21

22

23

24

25