Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 09-50026(REG)

5  - - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  MOTORS LIQUIDATION COMPANY, et al.

9  f/k/a General Motors Corporation, et al.,

10

11            Debtors.

12

13  - - - - - - - - - - - - - - - - - - - - - -x

14

15            United States Bankruptcy Court

16            One Bowling Green

17            New York, New York

18

19            October 28, 2011

20            9:57 AM

21

22

23  B E F O R E:

24  HON. ROBERT E. GERBER

25  U.S. BANKRUPTCY JUDGE

Page 2

1

2    STATUS CONFERENCE re Nova Scotia Issues:

3    Official Committee of Unsecured Creditors' First Amended

4    Objection to Claims filed by Green Hunt Wedlake, Inc. and

5    Noteholders of General Motors Nova Scotia Finance Company and

6    Motion for Other Relief

7

8    MOTION to Allow Payment of Reasonable Fees and Expenses

9    of the Ad Hoc Committee of Asbestos Personal Injury Claimants

10   Pursuant to 11 U.S.C. § 503(b)

11

12   APPLICATION for Final Professional Compensation for Asbestos

13   Claims Valuation Consultant to Dean M. Trafelet in his Capacity

14   as Legal Representative for Future Asbestos Personal Injury

15   Claimants for Analysis Research Planning Corporation

16

17   MOTION to Reconsider FRCP 60 or FRBP 3008 Claim No. 44306

18   (related document(s) 8000) re Sentry Select Insurance Company

19

20   DEBTORS' OBJECTION to Proof of Claim No. 45631 filed by Steven

21   Newman c/o Michael Green, Deceased

22

23   247TH OMNIBUS OBJECTION to Claims and Motion Requesting

24   Enforcement of Administrative Bar Date Order (Late-Filed

25   Administrative Proofs of Claim)

1

2    248TH OMNIBUS OBJECTION to Claims (Insufficient Documentation)

3    Claims of William Kuntz III

4

5    249TH OMNIBUS OBJECTION to Claims (Insufficient Documentation)

6

7    250TH OMNIBUS OBJECTION to Claims (No Liability: Claims Assumed

8    by General Motors LLC)

9

10    251ST OMNIBUS OBJECTION to Claims (No Liability Claims)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

```
 1

 2    A P P E A R A N C E S :

 3    WEIL GOTSHAL & MANGES LLP

 4         Attorneys for the Post-Effective Date Debtors and Motors

 5          Liquidation GUC Trust

 6         767 Fifth Avenue

 7         New York, NY 10153

 8

 9    BY:  JOSEPH H. SMOLINSKY, ESQ.

10

11    WEIL GOTSHAL & MANGES LLP

12         Attorneys for the Post-Effective Date Debtors and Motors

13          Liquidation GUC Trust

14         1300 Eye Street NW

15         Suite 900

16         Washington, DC 20005

17

18    BY:  JENNIFER L. WINE, ESQ.

19

20

21

22

23

24

25
```

Page 5

1

2      KING & SPALDING LLP

3            Attorneys for General Motors LLC (New GM)

4            1185 Avenue of the Americas

5            New York, NY 10036

6

7      BY:  ARTHUR J. STEINBERG, ESQ.

8            SCOTT DAVIDSON, ESQ.

9

10     HONIGMAN MILLER SCHWARTZ & COHN LLP

11            Special Counsel to the Debtors and Debtors-in-Possession

12            660 Woodward Avenue

13            2290 First National Building

14            Detroit, MI 48226

15

16     BY:  SETH A. DRUCKER, ESQ.

17            (TELEPHONICALLY)

18

19

20

21

22

23

24

25

Page 6

1

2   DICKSTEIN SHAPIRO LLP

3        Attorneys for the Motors Liquidation GUC Trust, Successor

4         to the Official Committee of Unsecured Creditors of Old

5         GM

6        1633 Broadway

7        New York, NY 10019

8

9   BY:  ERIC B. FISHER, ESQ.

10        STEFANIE BIRBROWER GREER, ESQ.

11

12   KRAMER LEVIN NAFTALIS & FRANKEL LLP

13        Attorneys for the Official Committee of Unsecured

14         Creditors and the Official Committee of Unsecured

15         Creditors Holding Asbestos-Related Claims

16        1177 Avenue of the Americas

17        New York, NY 10036

18

19   BY:  LAUREN MACKSOUD, ESQ.

20        (TELEPHONICALLY)

21

22

23

24

25

Page 7

1

2    UNITED STATES DEPARTMENT OF JUSTICE

3         Office of the United States Trustee

4         33 Whitehall Street

5         21st Floor

6         New York, NY 10004

7

8    BY:  BRIAN S. MASUMOTO, TRIAL ATTORNEY

9

10   UNITED STATES DEPARTMENT OF JUSTICE

11        U.S. Attorney's Office

12        Southern District of New York

13        86 Chambers Street

14        New York, NY 10007

15

16   BY:  DAVID S. JONES, AUSA

17

18   AKIN, GUMP, STRAUSS, HAUER & FELD LLP

19        Attorneys for Nova Scotia Trustee, Green Hunt

20         Wedlake, Inc.

21        One Bryant Park

22        New York, NY 10036

23

24   BY:  SEAN E. O'DONNELL, ESQ.

25        DEAN CHAPMAN, ESQ.

Page 8

1

2    GREENBERG TRAURIG, LLP

3         Counsel for Elliott Management Corporation, Fortress

4          Investment Group LLC, and Morgan Stanley

5          International plc

6         MetLife Building

7         200 Park Avenue

8         New York, NY 10166

9

10    BY:   JOHN H. BAE, ESQ.

11          BRUCE R. ZIRINSKY, ESQ. (TELEPHONICALLY)

12

13    GREENBERG TRAURIG, LLP

14         Counsel for Elliott Management Corporation, Fortress

15          Investment Group LLC, and Morgan Stanley

16          International plc

17         77 West Wacker Drive

18         Suite 2500

19         Chicago, IL 60601

20

21    BY:   KEVIN D. FINGER, ESQ.

22          BEVIN M. BRENNAN, ESQ.

23

24

25

Page 9

1

2    LAW OFFICE OF BENJAMIN M. DELVENTO PC

3         Attorneys for Steven Newman on Behalf of the Estate of

4          Michael Green

5         70 South Orange Avenue

6         Suite 150

7         Livingston, NJ 07039

8

9    BY:  MAURICE J. DONOVAN, ESQ.

10

11   STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, PC

12        Attorneys for Ad Hoc Committee of Asbestos Personal

13         Injury Claimants

14        2323 Bryan Street

15        Suite 2200

16        Dallas, TX 75201

17

18   BY:  SANDER L. ESSERMAN, ESQ.

19

20

21

22

23

24

25

1

2   GODFREY & KAHN S.C.

3       Attorneys for Fee Examiner, Brady C. Williamson

4       One East Main Street

5       Suite 500

6       Madison, WI 53701

7

8   BY:  KATHERINE STADLER, ESQ.

9       (TELEPHONICALLY)

10

11  ALSO APPEARING:

12  WILLIAM KUNTZ, III

13      India Street

14      P.O. Box 1801

15      Nantucket Island, MA 02554

16

17  BY:  WILLIAM KUNTZ, III, PRO SE

18

19

20

21

22

23

24

25

09-50026-mg   Doc 11105   Filed 10/31/11   Entered 11/02/11 11:23:41   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 11 of 113

Page 11

                              P R O C E E D I N G S

 1

 2          THE COURT:  Ladies and gentlemen, we have a very busy

 3   calendar today with three, and perhaps, four matters where I'm

 4   going to have to dictate decisions.  For that reason, I want to

 5   take care of matters where -- that wouldn't be a factor, such

 6   as Nova Scotia -- and I see Nova Scotia people are up here at

 7   the front.  And then more likely than not, I will take argument

 8   on everything and then take a recess and come back with all of

 9   the dictated decisions.

10          One or two of them are particularly easy.  And I'm

11   thinking of the Kuntz objection.  And if you want to move that

12   up front, we may be able to vary it, but I think that that will

13   be the way I want to proceed.

14          All right.  People want to give me an update on Nova

15   Scotia?

16          MR. O'DONNELL:  May it please the Court, Your Honor.

17   Sean O'Donnell of Akin Gump on behalf of the Nova Scotia

18   trustee.

19          THE COURT:  I can't hear you.

20          MR. O'DONNELL:  I apologize.  May it please the Court,

21   Your Honor.  Sean O'Donnell with Akin Gump --

22          THE COURT:  O'Donnell?

23          MR. O'DONNELL:  Yes, sir.

24          THE COURT:  Okay.

25          MR. O'DONNELL:  -- on behalf of the Nova Scotia

1    trustee.  As the Court may recall, we wrote to the Court

2    requesting a conference just so we could put a scheduling order

3    in place with respect to the issues that are involved in the

4    litigation.  I defer to my colleagues, Mr. Finger of Greenberg

5    Traurig on behalf of the debtors and also on behalf of the

6    noteholders --

7          THE COURT:  Just a minute.  I hear a lot of noise on

8    the phone which is unacceptable.  CourtCall, mute everybody on

9    the call unless there are people on the call who need to

10   participate in this conference.

11         THE OPERATOR:  Yes, Your Honor.

12         THE COURT:  Thank you.

13         MR. O'DONNELL:  -- and also to Mr. Eric Fisher on

14   behalf of the general unsecured committee trust.  Your Honor, I

15   think all that we need to do at this point is the parties are

16   looking to establish a hearing date with the Court's

17   indulgence.  And then we can work backward and kind of fill in

18   the blanks on our own and submit a proposed order to the Court

19   rather than taking up your time with all the details.  I think

20   there may be one or two other points that the colleagues -- my

21   colleagues would like to mention.  But primarily, we're working

22   around an April 30th date.  The preference for the Nova Scotia

23   trustee and for the noteholders would be that we work backward

24   from that date in terms of the Court's availability.  And I

25   think Mr. Fisher, depending on that availability, may want to

Page 13

1    work forward.

2              THE COURT:  Did you consult with courtroom deputy to

3    find out available dates in that range?

4              MR. O'DONNELL:  I don't think we have specific dates

5    in that range, Your Honor.  I apologize.

6              THE COURT:  Do you have a means for which or by which

7    I could set a schedule without any consultations with my

8    courtroom deputy?

9              MR. O'DONNELL:  Speaking off the top of my head, Your

10   Honor, we could certainly provide a proposal to you with blanks

11   in it for the Court to fill in.

12             THE COURT:  But you're looking for a trial date in the

13   April 30 range?

14             MR. O'DONNELL:  Yes, Your Honor.

15             THE COURT:  All right.  Let me hear from the other

16   parties.  Mr. Fisher?

17             MR. FISHER:  Your Honor, Eric Fisher from Dickstein

18   Shapiro for the GUC trust.  I'll be very brief because Mr.

19   O'Donnell is correct.  I think we just need a hearing date and

20   the parties will be able to work collaboratively back from

21   there.

22             There was some dispute about when that hearing date

23   ought to be.  And if Your Honor simply gives us an indication

24   as to the range that Your Honor considers reasonable, I'm

25   confident, as Mr. O'Donnell indicated, we can work backwards.

1          Based on how thing and given that we're still

2     expecting some documents from one of the noteholders from

3     Morgan Stanley to be delivered by mid-November, we think it's

4     reasonable to expect that document discovery will be completely

5     over by the end of December including resolving whatever stray

6     document disputes there may be.  And then, Your Honor, what's

7     left between the close of document discovery and a hearing is

8     we think approximately fifteen depositions, fact depositions.

9     Expert discovery is likely.  The noteholders and perhaps the

10    trustee will want to seek authorization from the Court to make

11    dispositive motions, pre-hearing submissions and then

12    ultimately a hearing.

13          So we think -

14          THE COURT:  Dispositive motions?  Is there a reason

15    why people think that on this fact-intensive matter,

16    dispositive motions are going to be productive.

17          MR. FISHER:  Your Honor, the GUC trust certainly does

18    not think so.  But I know -- just in terms of scheduling, I

19    expect that the noteholders and the trustee will seek -- will

20    write pre-motion letters and seek permission to make

21    dispositive motions.  There are some standing issues that

22    they've raised that they believe are amenable to dispositive

23    motions.

24          And I mention it only because it affects determining

25    how much time we need between now and a hearing date to get all

Page 15

1    the work done.  We think four months, effectively, is enough

2    time.  So if you envision that fact depositions get going in

3    January, we envision a hearing date April 30th or May.  And

4    we're happy to consult with Your Honor's deputy and get a date

5    during the month of May.  We expect four days of hearing, Your

6    Honor.  I expect that our case will be largely adverse direct

7    testimony and between ten to fifteen witnesses including, in

8    all likelihood, one expert witness.

9           THE COURT:  Ten to fifteen witnesses and an expert in

10   four days?

11          MR. FISHER:  Yes, Your Honor.

12          THE COURT:  Let me hear from you, Mr. O'Donnell.  I

13   take it you're the guy who wants to file or at least wants to

14   have the option to file dispositive motions.

15          MR. STEINBERG:  Your Honor, Arthur Steinberg for new

16   GM.  We would also want to be able to file dispositive motions

17   on certain issues am I'm happy to speak about it after you --

18          THE COURT:  All right.

19          MR. FINGER:  Good morning, Your Honor.  My name is

20   Kevin Finger of Greenberg Traurig on behalf of certain of the

21   noteholders.  And the comments by all counsel I would echo here

22   today.  To directly address the Court's question, there are

23   matters that can be decided as a matter of law.  They have been

24   raised in the responses to the objection.  They've been

25   highlighted there that we think can be decided separate and

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 16 of 113

Page 16

1    apart from any factual issues.  And taking the Court's

2    direction that the last time this issue was presented before

3    the Court to follow the rules applicable in this court for

4    presenting those dispositive motions to the Court.

5              THE COURT:  And what discussions did you have with

6    your opponent with respect to what would happen to the trial

7    date while I was thinking about those dispositive motions

8    assuming I gave permission for them to be filed?

9              MR. FINGER:  Our discussions, Your Honor, have

10   essentially been with Mr. Fisher to follow the rules that are

11   applicable in this court for seeking permission from the Court

12   participating in a conferencing going forward.

13             THE COURT:  You already said that but that wasn't my

14   question.  Presumably, you or new GM or somebody -- by

15   dispositive motion, I assume that's a euphemism for summary

16   judgment.

17             MR. FINGER:  Yes, Your Honor.

18             THE COURT:  That is a matter that, once you get beyond

19   preference cases, is rarely decided off the bench.  I don't

20   remember exactly the amount of controversy in this case, but I

21   think it runs roughly from 350 million to a billion dollars.

22   Am I right in the ballpark terms?

23             MR. FINGER:  It's higher than that, Your Honor.  I

24   believe it's --

25             THE COURT:  Okay.

09-50026-mg   Doc 11105   Filed 10/31/11   Entered 11/02/11 11:23:41   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 17 of 113

Page 17

1          MR. FINGER:  -- in the neighborhood of two billion

2     dollars.

3          THE COURT:  Two billion.  Forgive me.  It's at least

4     foreseeable, isn't it, that it's going to take me a little time

5     to decide dispositive motions?

6          MR. FINGER:  It is, Your Honor, if the Court grants

7     permission to pursue that.

8          THE COURT:  If I grant permission at all.  And then is

9     it also foreseeable that the time to think about such motions

10    and/or to write them might have an effect upon the trial date?

11         MR. FINGER:  Yes, Your Honor.

12         THE COURT:  Now help me better understand the purpose

13    of a trial date when it is subject to that contingency.

14         MR. FINGER:  Two primary issues, Your Honor.  First,

15    we want to take these opportunity to update the Court on

16    discovery.  It's been almost a year since we've been before the

17    Court and the Court authorized discovery in this matter.  And

18    we want to provide a joint status report to that effect.

19         Secondly, the parties had been discussing a potential

20    schedule hearing.  They've had some difficulty getting

21    resolution of those issues.  And the parties believe that

22    setting a hearing date would facilitate, in terms of working

23    backwards, how the parties would then move to written discovery

24    and then oral discovery, expert discovery and work in the

25    prospect of dispositive motions.  So from that perspective,

09-50026-mg   Doc 11105   Filed 10/31/11   Entered 11/02/11 11:23:41   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 18 of 113

Page 18

1    it's been useful --

2         THE COURT:  Well, forgive me.  That sounds a little

3    like Through the Looking Glass.  You know, sentence first,

4    verdict later.  How can one set a schedule without knowing that

5    which must be accomplished to be ready to achieve the event you

6    want me to schedule?

7         MR. FINGER:  Your Honor, it has been a fruitful

8    discussion between the parties to discuss these types of

9    scheduling items.  I think that if we get to a point where the

10   Court permits dispositive motions to go forward then perhaps

11   we -- discovery will be essentially complete under the Court's

12   direction and the rules applicable in this court.  And at that

13   point, we may seek to adjourn the hearing and move it out to

14   accommodate the Court's consideration of those motions if

15   they're permitted to go forward.

16        THE COURT:  Mr. O'Donnell, you want to be heard?

17        MR. O'DONNELL:  Your Honor, I think, as he correctly

18   pointed out, the last time we were here, which was actually in

19   December of 2010, and we talked about whether or not pretrial

20   motions would be appropriate while discovery was ongoing that

21   you correctly pointed out to the parties that that's a bit of

22   putting the cart in front of the horse.  And it's not so much

23   that we are looking to resolve that issue before the Court

24   today as we are to make sure that there are no surprises for

25   the Court and to let you know that the parties have discussed

09-50026-mg   Doc 11105   Filed 10/31/11   Entered 11/02/11 11:23:41   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 19 of 113

Page 19

1   the issues.  I think at the close of the document production

2   and the deposition that, at a minimum, there will be several

3   issues that will be crystallized that we can present to the

4   Court on paper, have the pretrial motion and you'll either be

5   comfortable or not comfortable that that will fit within the

6   schedule that's been set by the Court.  I think the parties,

7   and you'll hear also from Mr. Steinberg, are confident that

8   there will be at least one or two issues, of course Mr. Fisher

9   excluded, that can be resolved on summary judgment and would

10  certainly hopefully narrow the ten to fifteen witnesses that he

11  intends to call.

12          THE COURT:  Mr. Steinberg, you can come on up, please.

13          MR. STEINBERG:  Good morning, Your Honor.  I want to

14  be clear that to the greatest extent possible, new General

15  Motors does not want to get into the way of this disagreement

16  which involves a serious issue involving up to two billion

17  dollars worth of claims.  However, as we said in our pleading

18  that we filed and I articulated at the -- about ten months

19  ago -- so if I can just briefly say something in thirty

20  seconds, the committee's objection to claim embodies a Rule

21  60(b) motion or 60(b) allegation to upset the sale order which

22  obviously is something that relates to new General Motors.  A

23  good portion of their theory of recovery with regard to

24  disgorgement of the consent fee involves an avoiding power

25  right which was, in effect, purchased by General Motors as part

09-50026-mg   Doc 11105   Filed 10/31/11   Entered 11/02/11 11:23:41   Main Document
Pg 20 of 113
MOTORS LIQUIDATION COMPANY, et al.

Page 20

1    of the sale order.  Their issues relating to the swap claim

2    which is embedded into the Nova Scotia trustee's claim as

3    against old General Motors, that was something that was

4    purchased by new General Motors as part of the asset purchase

5    agreement.  And if you read the noteholders' response to the

6    objection to claims, they raised the issue that if they don't

7    get everything that they wanted that the release embedded in

8    the lockup agreement, which protected GM Canada, may be

9    impacted.

10         So we rise and we seek to participate in these

11   proceedings to essentially protect our sale order, the assets

12   that we purchased and to make sure that GM Canada is protected

13   so that nothing that Your Honor does in relation to this claim

14   undoes the release that's embedded in the lockup agreement.

15   Other than that, we have contractually agreed to be supportive

16   of the noteholders.  But the noteholders and the Nova Scotia

17   trustee are on their own in establishing the bona fides of

18   their claim in front of Your Honor.  And we didn't commit to do

19   anything more than to be supportive of that.

20         And that is why I was surprised, frankly, when I saw

21   the status conference because documents were taking eight

22   months to gather and all of a sudden everybody wanted to go to

23   trial in four months.  We don't care when you take this to

24   trial.  I know Your Honor does care but we are indifferent.  We

25   will go at whatever pace that Your Honor sets and whatever pace

Page 21

1   that the parties want to set.  I rise today to make sure that

2   Your Honor will allow us to participate in these proceedings,

3   protect those specific rights that I've articulated because

4   they are important to new General Motors.  This is a contested

5   matter, not an adversary proceeding, so I didn't have a motion

6   to intervene to be able to say something.  On the other hand,

7   I've spoken to the committee counsel and to the noteholders'

8   counsel all of whom said they recognize why we have an economic

9   interest to participate.

10          If I --

11          THE COURT:  So you're looking, in substance, for a

12  Caldor order applicable in a contested matter.

13          MR. STEINBERG:  That's correct.

14          THE COURT:  Now to what extent (a)did I already rule

15  on this; and (b)do any of the other parties in the case have

16  any objection?

17          MR. STEINBERG:  I don't think Your Honor has ruled on

18  this at all.  I did speak at the last conference and I did talk

19  to each of the parties beforehand and each one recognized that

20  I should be entitled to participate in the hearing.

21          THE COURT:  I have no memory of having previously said

22  you can't speak.  You would just like to have that a little

23  better clarified?

24          MR. STEINBERG:  Oh, I didn't -- if you did say that

25  then I --

09-50026-mg   Doc 11105   Filed 10/31/11   Entered 11/02/11 11:23:41   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 22 of 113

Page 22

1      THE COURT:  No.  I think I let you speak every time

2  you've come in and you've tried to stand up and say something,

3  haven't I?

4      MR. STEINBERG:  You do.  But since -- I didn't want

5  anybody to say later on that I had not formally done something

6  to solidify my opportunity to speak to protect New GM's rights.

7  And I am particularly concerned -- and I don't mean to make

8  this more complicated, but we do have a procedure where

9  avoiding power claims are essentially being asserted not in the

10  context of an adversary proceeding.  And I want to make sure

11  that issue is joined with regard to whether the lockup

12  agreement will be enforced and specifically the releases

13  contained in the lockup agreement to be enforced, because the

14  last thing I want to do -- see happen is that Your Honor rules

15  how ever Your Honor will rule and then the Nova Scotia trustee

16  sues GM Canada in Canada and says it's based on Judge Gerber's

17  ruling.  I'd want to make sure that Judge Gerber's ruling

18  addresses the issue that we are in compliance with the lockup

19  agreement which solidifies the release for GM Canada.  And

20  that's a very, very important issue not only for New GM but

21  also for the large old creditor constituency in New GM.

22      THE COURT:  Well, Mr. Steinberg, it seems to me that

23  the only thing that I could or should properly give you is an

24  opportunity to be heard on whatever you want to be heard later

25  on.  Am I correct in that's really all you're asking me for?

1          MR. STEINBERG:  That's all I'm asking for.  But I will

2    want to, Your Honor -- and it's not for summary judgment as to

3    the allowance of a claim or not allowance of a claim.  It is

4    with regard to if there's a Rule 60(b) allegation that's

5    contained in the objection to claim, which has never been

6    articulated as to what provision of Rule 60(b) they're moving

7    under, we would, before trial, like to see that thing -- and I

8    think it could be dispositive -- to get rid of that issue.  But

9    we don't know for sure because he hasn't taken his depositions

10   and he hasn't told us why he's really going forward on 60(b) in

11   the first place.  But obviously, the committee was supportive

12   of the sale order and now to try to undo an aspect of the sale

13   order doesn't seem to make sense.

14          To the extent that --

15          THE COURT:  You're tending to repeat yourself now, Mr.

16   Steinberg.

17          MR. STEINBERG:  Okay.  I don't mean to, Your Honor.

18          THE COURT:  All right.  Folks, you know me by now.  I

19   don't like a lot of motion practice on things where it's not

20   required.  Does anybody want to be heard on whether I give Mr.

21   Steinberg Caldor relief so that he can be heard on whatever he

22   wants to be heard going forward?  Mr. Fisher, first you.

23          MR. FISHER:  Your Honor, only to say that I have

24   spoken to Mr. Steinberg.  And we recognize that New GM does

25   have a financial interest in this objection.  And so, we have

Page 24

1    no issue with Mr. Steinberg's participation.

2            THE COURT:  All right.  The bondholders' side.

3            MR. FINGER:  We have the same position, Your Honor.

4    We've spoken with Mr. Steinberg and recognize his right to be

5    heard in this particular matter.

6            THE COURT:  Okay.  Anybody else who wants to weigh in

7    on this who I haven't given an opportunity to?  No.  Subject to

8    one last chance to be heard, I'm going to so-order the record

9    giving Mr. Steinberg on behalf of New GM the rights to appear

10   and be heard in this contested matter to the extent he needs it

11   since 1109 would seemingly already give him that right.

12   Subject to the same conditions that I put in my published

13   decision, which I think was in Adelphia -- it might have been

14   one of my other cases -- shortly after Calgor came out where I

15   said that, of course, is always subject to the rights of the

16   judge to control his docket and to avoid duplication and

17   require coordination and the like.  Anybody want to be heard in

18   opposition to that?

19           MR. ZIRINSKY (TELEPHONICALLY):  Your Honor, it's --

20   can you hear me?  It's Bruce Zirinsky.  I'm on the phone.

21           THE COURT:  Yeah.  Go ahead, Mr. Zirinsky.

22           MR. ZIRINSKY:  How are you, Your Honor?  Your Honor,

23   just very briefly, I have no objection whatsoever to New GM's

24   right to be heard or right to participate.  I just want to make

25   it clear, and I think it is clear but just for the record, that

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 25 of 113

Page 25

1    this order that Your Honor has indicated he would enter would

2    not in any way waive any defenses including jurisdiction over

3    defenses that the parties might have and they might wish to

4    assert with respect to any claims or position of GM -- New GM

5    had asserted.

6            THE COURT:  Well, I don't think I said anything about

7    waivers and I didn't hear any of the parties saying anything

8    about waivers.  I think that goes without saying.  You know,

9    this being --

10           MR. ZIRINSKY:  I just want to be secure.

11           THE COURT:  This being a contested matter rather than

12   an adversary, I'm not even sure if I'm saying anything that

13   isn't already the law.  But you can have your non-waiver

14   rights, Mr. Zirinsky.  Mr. Fisher has his non-waiver rights.

15   And if I failed to include anybody, he or she has similarly not

16   forfeited any waiver rights.

17           Mr. Steinberg, paper this ruling by a short simple

18   order that substantially states what I just said on the record.

19   Run it past the other parties in the case.  See if you can

20   reach agreement on its form.  If you can't -- if you can't, I'm

21   going to be upset.  But if you have to, you can settle it.

22           MR. STEINBERG:  Okay, Your Honor.

23           THE COURT:  Thank you.  All right.  Now I gather

24   there's some kind of timing dispute or some kind of dispute

25   that you guys are --

MOTORS LIQUIDATION COMPANY, et al.

Page 26

1          MR. O'DONNELL:  Your Honor, I actually don't know that

2    there is a dispute anymore.  I think that the date that the

3    parties have pegged is April 30th.  And depending on the

4    Court's availability, I think -- Mr. Fisher's anticipating a

5    four-day trial.  With the number of witnesses that are

6    identified, hopefully we can narrow that down, but we were

7    hoping to hear from the Court as to what its availability was

8    either a little before or a little after April 30th.

9          THE COURT:  Well, forgive me, Mr. O'Donnell, but the

10   way to try to ascertain my availability would have been to try

11   to tell me before I showed up on the bench that you were going

12   to be asking me for a particular date so that I could have

13   consulted Ms. Blum.  And I didn't see it in your letter.  Maybe

14   it was there and I just read it too quickly.

15         MR. O'DONNELL:  No, Your Honor.  Actually, at the time

16   of the letter, I think the parties were further apart.  And

17   we've continued to try and resolve the issues.  And as of

18   today, I think so long as it's somewhere around April 30th,

19   none of us can be heard to complain.

20         THE COURT:  Well, let me tell you, gentlemen, when I

21   make discretionary calls, I do it in part on my experience

22   which is roughly eleven years as a judge and thirty years

23   before that as a lawyer.  When you're taking witnesses on

24   adverse direct, and when redirect by necessity must follow it

25   and to take on a very great importance, and when you've got

MOTORS LIQUIDATION COMPANY, et al.

Page 27

```
 1    fifteen of those witnesses even though you're promising me that
 2    you can lower the number, you're smoking dope if you can do
 3    that in four days.
 4            MR. O'DONNELL:  Yeah.  I --
 5            THE COURT:  And -- forgive me.  And there's another
 6    consideration as well which is that setting the schedule, if
 7    you want to make dispositive motions, is a waste of my time,
 8    your time and my courtroom deputy's time unless you're content
 9    to go with what would be my preference which is to raise all of
10    your legal objections at the same you raise your factual ones.
11    Now, I sense that you don't want to give that right up yet.
12    And I sense that Mr. Steinberg doesn't either.  But am I
13    missing something?
14            MR. FINGER:  This is Kevin Finger, Your Honor.  No,
15    you're not missing that.  We were not prepared to give that
16    right up at this point.  So that's something that we will --
17    fully intend to pursue pursuant to the rules of this court.
18            THE COURT:  When do you think you guys would be in a
19    position to tell me that you want me to consider the pre-motion
20    conference which presumably would be after you've completed the
21    remainder of your discovery?
22            MR. FISHER:  Your Honor, Eric Fisher for the GUC
23    trust.  I'd like to just try to cut through this because I
24    think we're here because when I suggested a May hearing date, I
25    was told that was too slow.  And when I suggested a four-day
```

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 28 of 113

Page 28

1    hearing, I was told that was too long.  So now that we're

2    hearing Your Honor's views on the matter --

3           THE COURT:  Well, I wasn't sitting in your

4    depositions.  Do you think my experience as a litigator

5    wouldn't carry over to considering issues of this character?

6           MR. FISHER:  I'm sure you're right about that, Your

7    Honor.  And it's an ambitious estimate.  But we've been working

8    together as collaboratively as we can.  So I think we're

9    optimistic that we can put on a case efficiently for that

10   reason.

11          All that being said, I think we're going to be done

12   with fact depositions at the latest by some time in mid-

13   February.  So I would simply suggest that we come back to Your

14   Honor towards the end of February.  We can get a date from Your

15   Honor's deputy and use that --

16          THE COURT:  Date for a conference or --

17          MR. FISHER:  Date for a -- simply for a conference and

18   use that conference as a pre-motion conference as well to the

19   extent that any parties still think that they have well

20   grounded dispositive motions.  And not worry about a hearing

21   date until we know what the picture is in terms of whether

22   dispositive motions are going to be going forward or not.

23          THE COURT:  Mr. O'Donnell?  Mr. Finger?

24          MR. O'DONNELL:  Your Honor, that's acceptable to the

25   Nova Scotia trustee.

Page 29

1          MR. FINGER:  And to the noteholders, Your Honor.

2          THE COURT:  All right. I'll agree to that in

3    principle.  I think that makes sense.  I take it you don't need

4    an exact date from me to interrupt this hearing to call my

5    courtroom deputy out to pull out the book at this point.

6          MR. O'DONNELL:  Correct, Your Honor.

7          MR. FINGER:  No, Your Honor.  We'll consult with the

8    courtroom deputy for that purpose.

9          THE COURT:  All right.  Now to what extent do you have

10   other matters in dispute that you need me to address?

11         MR. FINGER:  I don't believe there are any other, Your

12   Honor.  Mr. Fisher may --

13         MR. FISHER:  The only other issue, Your Honor, is

14   going into this conference, we had asked for permission or

15   consent from the other side to exceed the ten deposition limit.

16   At the very most, we're talking about fifteen depositions.  If

17   we now have agreement on that then I don't think there are any

18   remaining issues.

19         THE COURT:  Gentlemen?

20         MR. O'DONNELL:  No objection from the trustee, Your

21   Honor.

22         MR. FINGER:  We -- on behalf of the noteholders, Your

23   Honor, we don't know who the deponents would be.  And I think

24   it's -- I think the reason we haven't reached agreement is

25   because we think it's premature slightly to agree to that

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 30 of 113

Page 30

1    number without knowing who the potential deponents are.  I

2    think, as Mr. Fisher indicated, we've worked collaboratively so

3    far to resolve our disputes.  I just -- I happen to think that

4    this particular issue is premature at this point.

5            THE COURT:  Gentlemen, why don't we do this?  Have the

6    dialogue, talk it out.  And if you continue to have a

7    difference in perspective, set up a telephonic conference call.

8            MR. FINGER:  We'll do that, Your Honor.  Thank you.

9            THE COURT:  Okay.  Anything else?

10           MR. O'DONNELL:  That's it, Your Honor.

11           MR. FINGER:  No, Your Honor.

12           THE COURT:  All right.  Then you're all excused.  And

13   I would like -- did I see Mr. Smolinsky out there somewhere?

14   Mr. Smolinsky, could I ask you to come up and give me your

15   recommendations as to the way to proceed?

16           MR. SMOLINSKY:  Good morning, Your Honor.  Joseph

17   Smolinsky, Weil Gotshal & Manges on behalf of the post-

18   effective date debtors and the Motors Liquidation Company GUC

19   trust.  Your Honor, in view of the comments made by Your Honor

20   earlier, I would suggest that Ms. Greer go forward with her

21   portion of the calendar which are the omnibus claim objections

22   and then we'll proceed through the calendar through its normal

23   course.

24           THE COURT:  Okay.  Ms. Greer?

25           MS. GREER:  Good morning, Your Honor.  Stefanie Greer

Page 31

```
 1    from Dickstein Shapiro on behalf of the trust.  Today we have
 2    five omnibus claim objections, Your Honor.  All except for one
 3    are uncontested.  And the one is only uncontested (sic) as to
 4    one claim and that's the Mr. Kuntz claim that you alluded to
 5    earlier.  If it's all right with Your Honor, I think I'll go
 6    through the omnibus objections and we can go back and hear from
 7    Mr. Kuntz and address --
 8            THE COURT:  Okay.
 9            MS. GREER:  Okay?  So, first, we have the 247th
10    omnibus objection which is late-filed administrative claims.
11    All thirteen of those are going forward on an uncontested
12    basis.  The 248th omnibus objection, which is based on
13    insufficient documentation, one of those has been adjourned,
14    one withdrawn and thirty-nine are going forward.  Today -- and
15    that's where Mr. Kuntz' claim comes in and that the one
16    uncontested (sic) one -- the one contested matter.  The 249th
17    omnibus objection is also an insufficient documentation
18    objection.  Ten of those have been adjourned, three have been
19    withdrawn, and eighty-three are going forward.  And we have the
20    250th omnibus objection.  That's a no-liability objection which
21    deals with claims assumed by New GM.  Two claims have been
22    withdrawn -- or two of our objections have been withdrawn and
23    sixty-four are going forward.  And then the 251st omnibus
24    objection which are also no-liability claims, those are simply
25    claims that General Motors has no liability for.  So eight of
```

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 32 of 113

Page 32

 1    those are going forward on an uncontested basis.

 2              THE COURT:  Okay.  That's all fine.  All right.  Now

 3    are you going to be arguing Kuntz on behalf of the estate?

 4              MS. GREER:  Yes, Your Honor.

 5              THE COURT:  Is Mr. Kuntz in the courtroom?  Come on

 6    up, please.  Mr. Kuntz, come to the main lectern, please.  Give

 7    me your full appearance.  And I will hear you.  You should know

 8    that I've read the papers and I will whatever you have to say

 9    to supplement your papers.

10              MR. KUNTZ:  William Kuntz III, India Street, P.O. Box

11    1801, Nantucket Island, Massachusetts 02554.  Before getting

12    into the merits or demerits of this, I'd like to make it

13    perfectly clear that I'm more than willing to have this

14    adjourned till April.  I already had a matter set for trial in

15    Florida on the 15th of November.  And the date in November that

16    was offered to me would require me to fly back from Florida at

17    my own expense.  And the amount of money that's at issue here

18    is microscopic compared to the sums that are at issue.  It's

19    obvious to me that the debtors haven't done any investigation.

20    They didn't call anybody.  They didn't look anywhere.  And I've

21    had a lot of e-mail exchanges -- I'm willing to give them every

22    opportunity to dig into this.  Their own press release said

23    they analyzed something.  If they analyzed something, that

24    means that there has to be a form, a statement, a witness, an

25    analyst, somebody they can prove.  All they've done so far --

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 33 of 113

Page 33

1          THE COURT:  We're going forward today, Mr. Kuntz.

2          MR. KUNTZ:  That's fine, Your Honor.  I have a

3     prepared statement, if I may read it.

4          THE COURT:  So long as it's consistent with what I

5     said which is that it's nonrepetitive of your papers, yes.

6          MR. KUNTZ:  I'm not sure what you mean by that, Your

7     Honor.

8          THE COURT:  Mr. Kuntz, I have a multi-billion dollar

9     case here for which I prepare in advance based upon papers that

10    counsel give me.

11         MR. KUNTZ:  Well, first --

12         THE COURT:  And -- no.  You can't interrupt the judge,

13    sir.  And I could not run my courtroom or the cases on my watch

14    without orderly procedures.  You may supplement your papers.

15    You can deal with anything that was not addressed in your

16    papers, but you are not going to impose on the patience of the

17    other people in this case or upon GM's creditors, old GM's

18    creditors.  So you will proceed under the terms that I

19    articulated.

20         MR. KUNTZ:  Well, Your Honor, first, let's deal with

21    the reply of the debtor.  It was served -- it was not served

22    within the rules.  It was out of time.  They attempted to fax a

23    hundred pages worth of documents to a motel.  As I understand

24    the procedures, if I don't list a fax number on my papers, if I

25    don't list an e-mail address on my papers, I'm not able to be

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 34 of 113

Page 34

1    served in that fashion.  I previously advised counsel that the

2    computer at the motel on Cape Cod the word system, the program

3    for reading documents, was down.  They went ahead two days ago

4    or three days ago and sent me five large word files or whatever

5    that I couldn't open.  I advised them that.  Within twenty-four

6    hours, they started pumping pages and pages and pages and pages

7    through the motel's fax machine, a fax number which is for the

8    motels to make reservations.  It's not for guests to receive,

9    you know, huge amount of faxes.  The desk clerk wrote on there

10   "Refused", faxed it to them.  The faxes continued to come.  I

11   went up to Staples.  I faxed it again.  Sent -- you know, with

12   a receipt, time and date.  The faxes continued to come.  As I

13   stand here now, their reply papers are out of time.  They're

14   out of time and not served.  I got e-mails saying oh, we need a

15   better address for you.  I have a post office box address on my

16   papers.  The Federal Rules of Civil Procedure provide and

17   contemplate service by mail.  Not Federal Express, not DHL.

18   All those things are in some other area.  And to my knowledge,

19   the papers that they attempted to send to me in Nantucket were

20   put in the hands of their overnight courier after the cutoff

21   time.  And in New York State, as far as I understand, if they

22   don't get the papers in to Federal Express' hands or whoever --

23   and I've never received those papers yet -- I was never served.

24   So therefore, all you have is the two magic words,

25   "insufficient documentation", and my reply and the proofs of

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 35 of 113

Page 35

1    claim.

2          The proofs of claim are filed under penalty of five

3    years in prison and half a million dollar fine.  How much would

4    you expect in a large case like this for somebody to document a

5    300 dollar claim.  There's the form, gets signed.  It was filed

6    in time.

7          The other two involve a thirty-year old truck that

8    went to one dealer and then went to another dealer.  And then

9    General Motors put the guy into the small dealer exit program,

10   none of which was investigated.  You know, they weren't aware

11   of that.  And then right attached to the exhibit to the proof

12   of claim down in Willsboro, the demand for arbitration under

13   the New York CPLR.  I don't know what they mean when they say

14   insufficient documentation.  Maybe it's not boiler plate

15   General Motors style but certainly there was enough for them to

16   send a letter.  In the papers, there's an e-mail from the

17   claims department in April -- April -- where they basically

18   acknowledged they've received.  They'll get back with me.  Did

19   I get a postcard?  Did I get a letter?  Nothing.  This is just

20   carpet filing.  This is the same that's gone on in Lehman and

21   everything else.  The lawyers that come here -- you know,

22   20,000 claims have probably been knocked out of this case

23   because people don't understand the procedure.  I've read some

24   of the handwritten papers that people -- they just don't

25   understand.  I understand a little bit and I think that the

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 36 of 113

Page 36

1    Court should rule them out of time and allow these small

2    claims.

3              THE COURT:  Mr. Kuntz, I need you to focus on one

4    thing.

5              MR. KUNTZ:  I have nothing more --

6              THE COURT:  Which -- no.

7              MR. KUNTZ:  I have nothing more to say.

8              THE COURT:  You will not inter --

9              MR. KUNTZ:  I have nothing more to say, Your Honor.

10             THE COURT:  All right.  Ms. Greer?

11             MS. GREER:  Your Honor, Stefanie Greer again on behalf

12   of the trust.  Our arguments are set forth in our papers, Your

13   Honor.  I'll just make a quick point.  Certainly, Your Honor,

14   we did assert the reply in accordance with the case management

15   order three days prior to the hearing.  He obviously received

16   it since he responded to it with his own surreply.  So I don't

17   think there's any valid issue there.

18             There is nothing in his claims which establishes any

19   claim against GM.  And I just want to note for the record that

20   all the facts that he's alleged in his papers are otherwise --

21   the trust disputes as a matter of fact.

22             THE COURT:  All right.  Very well.

23             MS. GREER:  Do you have any questions, Your Honor?

24             THE COURT:  Not from you.

25             MS. GREER:  Thank you.

1          THE COURT:  Mr. Kuntz, I will hear reply limited to

2     what Ms. Greer said, if you wish.

3          MR. KUNTZ:  I don't see the affidavit of service.  I

4     went to the clerk's office this morning.  I looked this morning

5     on the court's docket.  Their proof of serving the papers has

6     not yet been filed and we're in court now.  I, this morning,

7     filed an errata -- 'cause I left off my phone number on my

8     reply.  So my phone number was on the papers to comply with the

9     Federal Rules of Civil Procedure.  And I also filed my proof of

10    service this morning.  Their proof of service of their late

11    papers is not on file as we speak.  Now perhaps counsel has a

12    copy they'd like to offer.  I've offered to put this over till

13    April.  And I can obviously see you're -- Your Honor is

14    aggravated about this.  I'm not -- I came down here to

15    basically -- I offered to start with to put it over till April.

16    They declined.  This case is going to be going on in April of

17    next year.  This case will probably be going on in April of

18    2014.  It's their ego, their insistence that we're going to do

19    this the General Motors way that has me here making Your Honor

20    angry.  I apologize.

21          THE COURT:  All right.  With so many people in the

22    courtroom, I don't want to interrupt the proceedings now by the

23    dictated decision.  We'll go right to the next matter.

24          Let me ask the people in the courtroom who are

25    waiting.  It seems to me that I have the asbestos ad hoc

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 38 of 113

Page 38

1    committee.  I have asbestos claims valuation consultants.  I've

2    got the Newman matter.  Do you have a recommendation as to the

3    order in which I take those three?  I will take argument on all

4    three.

5              MR. SMOLINSKY:  Again, Joseph Smolinsky, Your Honor.

6    I have no preference.  Perhaps we should just go in accordance

7    with the agenda.  The next matter on the calendar is the final

8    application of Analysis Research Planning Corporation.

9              THE COURT:  All right.

10             MR. SMOLINSKY:  Your Honor, Analysis Research Planning

11   Corporation, or ARPC, has requested total fees in this case of

12   758,031 dollars as consultant to the future claims

13   representative.  We're not objecting.  And, in fact, Your

14   Honor, you may recall the final approval has already been given

15   for $422,782.50 fees.  The debtors are objecting to the

16   remaining amount of $335,248.50.

17             THE COURT:  Mr. Smolinsky, the main thing I want to

18   hear about is the distinction or the delta between the date

19   that the stip was signed and the date that I approved it.

20             MR. SMOLINSKY:  Your Honor, the amount that we're

21   objecting to relates exclusively to fees that were incurred

22   after the settlement was entered into on January 21st, 2011.

23   So if you look at the breakdown of the 3700 hours that were

24   incurred after that point, according to our records, there was

25   approximately 75,000 dollars that was incurred between the time

1    that the stipulation was entered into and the time the

2    stipulation was approved by the Court.  Our calculations show

3    that approximately 260,000 was incurred between the time that

4    the settlement, the asbestos settlement, was approved by the

5    Court and the confirmation hearing.  And then, Your Honor,

6    there was an additional 17,000 dollars that was incurred after

7    the confirmation was approved.  So I used March 31st -- March

8    29th as the cutoff which is the day that the plan was

9    confirmed.  So it's 75,000, 260,000 and 17,000.

10             THE COURT:  Now, Mr. Smolinsky, I need your help, and

11   I'll need help from Mr. Esserman, confirming my memory in the

12   light of stuff that I've read in your respective papers.  To

13   what extent, if any, had any objections been voiced to the

14   stipulation or to issues related to the stipulation in the

15   later confirmation process?

16             MR. SMOLINSKY:  Your Honor, there were no objections

17   to the stipulation of settlement with respect to the fixed

18   allowance of the claims to be used under the plan.

19             With respect to plan confirmation, there were

20   certainly no collateral attacks on the validity of that

21   settlement.  There were some discussions, obviously, about the

22   structure of the plan and the treatment of asbestos

23   plaintiffs --

24             THE COURT:  Well, I understand that.  But the

25   stipulation, among other things, fixed the amount and the

Page 40

 1    mechanism by which the asbestos claims would be satisfied, am I

 2    correct?

 3            MR. SMOLINSKY:  That's right, Your Honor.  And after

 4    that settlement was approved, all of the professionals started

 5    working on -- the attorneys started working on briefs in

 6    support of plan confirmation.

 7            THE COURT:  Right.  Now I remember a zillion -- I

 8    mean, I wrote an opinion on confirmation.  And I remember the

 9    issues that I addressed in that opinion which principally

10    related to dealing with disputed claims, claims reserves and

11    releases.

12            I know what I dealt with in my written opinion.

13    Between the time that the stip was signed and the confirmation

14    hearing, were there pending objections that I never saw because

15    they were dropped that related to asbestos claims getting too

16    much?

17            MR. SMOLINSKY:  No, Your Honor.  There was never an

18    objection raised with respect to the amount of that claim and

19    that settlement.  And the work that was done by the ARPC was

20    not related to confirmation of the plan.  The descriptions of

21    the time that was spent for each and every entry was continued

22    to review GM case documents supplied in response to FCR and ACC

23    requests.  That issue, that calculation, was never addressed

24    after the settlement was signed.

25            THE COURT:  All right.  Continue, please.

MOTORS LIQUIDATION COMPANY, et al.

1        MR. SMOLINSKY:  So, Your Honor, it was understood by

2   all the parties when we gathered by phone to go over the final

3   touches on the stipulation of settlement.  And it was

4   understood by all the parties that it was pencils down after

5   that.  There was a recognition by the parties, and, in fact,

6   the stipulation specifically provides that to the extent that

7   there was a successful challenge to the approval of the

8   stipulation that the March 1st, 2011 date -- trial date that

9   was set for estimation of those claims would be put off to

10  allow the parties to finish their discovery.  And in fact, if

11  you look at the time records that were billed by the other

12  consultants, there was no time spent or virtually no time

13  spent --

14        THE COURT:  By anybody other than this entity.

15        MR. SMOLINSKY:  That's right.  There was one

16  consultant that had thirty-nine hours after the stipulation was

17  entered into.  But other than that, the consultants had no time

18  billed.

19        And for whatever reason, ARPC kept continuing to work

20  on the analysis of how much the claims totaled.  They worked

21  seven days a week, overtime hours.  One person billed twenty-

22  eight hours on President's Day, which was February 21st, 2011,

23  which was a week after the stipulation was approved by Your

24  Honor.

25        So we've read the response and we simply don't

MOTORS LIQUIDATION COMPANY, et al.

Page 42

1    understand and don't think that the arguments that were made

2    are relevant to the issue of whether the fees are reasonable

3    under Section 330 of the Bankruptcy Code.  We're not here to

4    embarrass ARPC.  We're not here to show a lack of gratitude for

5    their participation in fashioning the settlement that was so

6    critical to confirmation of the plan.  But the challenged fees

7    are so egregious that we felt compelled to bring this to Your

8    Honor's attention for your consideration.

9            THE COURT:  All right.

10            MR. SMOLINSKY:  Thank you, Your Honor.  Mr. Esserman,

11    are you going to be speaking on behalf of that applicant?

12            MR. ESSERMAN:  Yes, Your Honor.  Your Honor, first,

13    I've talked with ARPC and we've agreed to reduce -- well, ARPC

14    agreed to reduce their application of -- the requested

15    application to eliminate any fees post-confirmation -- post the

16    commencement of the confirmation hearing on March 3rd, 2011.

17            THE COURT:  But ARPC is still asking for fees after --

18            MR. ESSERMAN:  The stipulation.

19            THE COURT:  -- the deal was struck or at least after I

20    approved the settlement?

21            MR. ESSERMAN:  Yes, Your Honor.  And the reason is as

22    follows.  75,000 dollars of that was incurred prior to the

23    entry of the Court of the stipulation.

24            THE COURT:  That's the question that I asked Mr.

25    Smolinsky.

MOTORS LIQUIDATION COMPANY, et al.

Page 43

```
 1              MR. ESSERMAN:  Yes.

 2              THE COURT:  In your understanding of the facts, it's

 3      the same 75,000 buck amount.

 4              MR. ESSERMAN:  75,396 dollars was --

 5              THE COURT:  I'll hear the remainder of what you have

 6      to say, Mr. Esserman, but that is the principle area as to

 7      which I need argument.

 8              MR. ESSERMAN:  And that's the only area that I intend

 9      to address.

10              THE COURT:  No.  Forgive me.  Are you withdrawing your

11      request for anything after February 14th?

12              MR. ESSERMAN:  No.

13              THE COURT:  Well, then we have a difference in

14      perspective.

15              MR. ESSERMAN:  Okay.  I'm --

16              THE COURT:  So you're going to have to give me some

17      help on that.

18              MR. ESSERMAN:  Okay.  I apologize, Your Honor.  ARPC

19      received on January 13 1.1 million pages of documents of

20      discovery that we had been seeking to complete the report for

21      ARPC.  Until the confirmation hearing, until Your Honor

22      approved confirmation of the plan, there was always the

23      possibility that some creditor could come in and object to

24      either the asbestos settlement or that we would need to

25      testify -- that ARPC would need to testify.  And therefore,
```

MOTORS LIQUIDATION COMPANY, et al.

Page 44

1   they needed to complete their report.  These fees were all

2   incurred to complete the report.  I would point out, Your

3   Honor, that with the reduction that we've requested, the total

4   ARPC fees would be about 600,000 dollars.  The unsecured

5   creditors' committee expert incurred 1.199 million, almost two

6   million dollars (sic) for the same work that ARPC has done.

7   Now they completed it prior to the execution of the

8   stipulation.

9           THE COURT:  Isn't that a huge significant difference?

10          MR. ESSERMAN:  It's gigantic.  It's gigantic.

11          THE COURT:  I'm not talking about the monetary amount.

12  I'm talking about the temporal difference, that the services

13  run up by the asbestos committee's expert were done up until

14  the time the deal was struck and the bone of contention between

15  you and Mr. Smolinsky is after the deal was struck.

16          MR. ESSERMAN:  Except we got 1.1 million pages of

17  documents that could have reflected on exactly what the final

18  analysis was that had to be looked at.  And that is what ARPC

19  did in order to complete the report.  We entered the

20  stipulation under incredible time frames with an incomplete

21  report.  We did not have time to complete the report.  And ARPC

22  didn't have time to complete the report.  And we were trying to

23  accommodate the Court's schedule, everybody wanting to get this

24  out, the tail of the dog being asbestos in the GM case.  We

25  understood that.  We understood all the issues, the pressures

MOTORS LIQUIDATION COMPANY, et al.

Page 45

1   that everyone was under to get this case done.  But we still

2   felt -- the futures rep felt they needed to have a complete

3   report.

4           THE COURT:  Mr. Esserman, was there any discussion

5   with ARPC about the possibility of that effort being done after

6   the deal was struck for some other purpose, for some other

7   controversy or some reason beyond a stipulation that was

8   already reached?

9           MR. ESSERMAN:  It was strictly for GM -- it was

10  strictly for the GM case and strictly for the futures rep's

11  understanding and analysis of the asbestos liability.

12          THE COURT:  Vis-à-vis a deal that he had already

13  struck back on January 21st.

14          MR. ESSERMAN:  And a deal which he may have been

15  called upon to testify at confirmation should that have been

16  contested.  And he needed to have a complete record.

17  Otherwise, he was unprepared to testify as to the amount.

18          THE COURT:  Remember the questions I asked Mr.

19  Smolinsky when it was his turn?  To what extent were any

20  objections raised after the stip was signed to approval of that

21  stip?

22          MR. ESSERMAN:  I am not aware of any objections to the

23  asbestos -- I agree with Mr. Smolinsky -- to the asbestos

24  settlement.

25          THE COURT:  All right.  And if there had been any, you

Page 46

1      would know it, wouldn't you?

2              MR. ESSERMAN:  Oh, of course.  I mean --

3              THE COURT:  All right.  Now to what extent were there

4      any objections to confirmation premised upon the notion that

5      asbestos claimants got too sweet a deal?

6              MR. ESSERMAN:  There is no timely or untimely

7      objection filed that I was aware of.

8              THE COURT:  All right.  Continue.

9              MR. ESSERMAN:  But that doesn't mean that we -- we

10     felt ARPC needed to be prepared and the futures rep needed to

11     be prepared.

12             THE COURT:  Well, let me raise one last question, a

13     first cousin of what I asked a second ago.  From time to time,

14     people don't file formal objections but they call you up, they

15     write you letters and they put you on notice that an objection

16     is in the wings.  Did you get any phone calls of that

17     character?

18             MR. ESSERMAN:  Not by anyone that I can recall.

19             THE COURT:  Any letters of that character?  Anybody

20     saying in words or substance that the deal that had been struck

21     for the asbestos claimants --

22             MR. ESSERMAN:  It was somehow --

23             THE COURT:  -- was too good and that it was going to

24     lead to a confirmation objection?

25             MR. ESSERMAN:  Not that I'm aware of, Your Honor.

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 47 of 113

Page 47

1                THE COURT:  Go on.

2                MR. ESSERMAN:  That's all I have to say.

3                THE COURT:  All right.  Mr. Smolinsky, any reply

4      limited to what Mr. Esserman said?

5                MR. SMOLINSKY:  Your Honor, I don't want to beat a

6      dead horse.  I just want to add that he wouldn't have received

7      any calls because these are future claimants.  They don't have

8      claims yet so they couldn't object.  And what I struggle with

9      in understanding is that if they finished their report and they

10     found out that they settled too low, they could only be called

11     into question for the settlement that they did based on the

12     facts that they had at the time.  If they corroborated the

13     information, they were already prepared to testify at the

14     settlement hearing that the amount that was fixed by the

15     settlement was fair and reasonable.  So that's all I have to

16     say, Your Honor.

17               THE COURT:  Okay.  Let's move on to the ad hoc

18     asbestos committee fee app.  Mr. Esserman?

19               MR. ESSERMAN:  Yes, Your Honor, we filed a

20     supplemental paper which I assume Your Honor has reviewed.

21               THE COURT:  Yes.

22               MR. ESSERMAN:  We received two timely objections and

23     one untimely objection from the U.S. trustee.  We --

24               THE COURT:  Mr. Esserman, putting aside whether the

25     U.S. trustee's apparent sending you the document the day after

MOTORS LIQUIDATION COMPANY, et al.

Page 48

1    was due, if math is right, assuming that it committed an

2    offense by doing that, doesn't the bankruptcy judge have an

3    independent right even in the absence of any objection?

4         MR. ESSERMAN:  Absolutely.  And although we've

5    objected to the timeliness, it does not detract in any way from

6    the independent right of the bankruptcy judge to address all

7    issues including those perhaps raised by the U.S. trustee.  But

8    I do point that out.

9         We have been able to resolve the objections of the

10   government represented by Mr. Jones of the Treasury.  We've

11   withdrawn all fees related to the sale issues and have filed

12   our amended request for $232,082.22.  We've broken it down by

13   categories of -- general categories:  appointment of the

14   futures rep which was $27,81.25; the bar date issues which we

15   addressed, which was $37,048.25.

16        THE COURT:  Now the bar date issues are those by Remy

17   and Detroit Diesel, am I correct?

18        MR. ESSERMAN:  No.  That's a different issue.  Those

19   are what I'll call --

20        THE COURT:  Oh, you said bar date.

21        MR. ESSERMAN:  Yes.

22        THE COURT:  Forgive me.  Yeah, I need help on that

23   because I thought that the debtor had asked for a bar date

24   already.

25        MR. ESSERMAN:  I'm sorry?

Page 49

```
 1              THE COURT:  I thought the debtor asked me to set a bar
 2     date.
 3              MR. ESSERMAN:  Yes.  And the question on the bar date
 4     was not just a bar date.  The question was the timing, the
 5     notice provisions, how it was going to be noticed, what time
 6     asbestos claimants had to respond to that bar date.  All those
 7     were in play.  All those were in issues.  The debtor had one
 8     view.  We had another view of when the bar date should be
 9     effective, how it should be defined, who should have to comply.
10     And all those issues, I believe, were worked out between the
11     debtor and our ad hoc group.
12              THE COURT:  Tell me what the bid and the ask was, what
13     the nature of the difference in perspective was.
14              MR. ESSERMAN:  I think, ultimately, the biggest
15     issue -- and I will, to a certain extent defer it to Mr.
16     Smolinsky to either refresh or change my recollection, but I
17     believe the biggest issue was -- one of the biggest issues was
18     the timing of when compliance had to be given to respond to the
19     bar date.
20              THE COURT:  So 35,000 bucks were for services to agree
21     upon how many days --
22              MR. ESSERMAN:  That was --
23              THE COURT:  -- there would be to respond?
24              MR. ESSERMAN:  That was just one issue, Your Honor.
25     The issue -- I think there were definitional issues of who had
```

Page 50

1    to respond.  There was a question as to whether or not a bar

2    date was even appropriate for unsecured asbestos claims,

3    whether or not there should be a bar date.  We ultimately

4    agreed to the bar date.  And I think the big issue -- a big

5    issue was how you define who needed to respond and when.  And I

6    think all those issues were entailed in the bar date.  Whether

7    there were others that I forgot and Mr. Smolinsky can

8    supplement me on or not, I don't recall any at this -- other at

9    this time.

10         THE COURT:  Now how did that dialogue benefit

11   creditors of the estate generally as contrasted to asbestos

12   claimants?

13         MR. ESSERMAN:  Well, for one thing, it would be our

14   view that if the bar dates and the definitions were used as the

15   debtor had wished, the notice could well have been

16   constitutionally infirm and could not have been binding on

17   various claimants because they would not have received

18   constitutional notice of the bar date, would not have been

19   bound and would not have had an opportunity to comply because

20   you have to remember that these people -- you're talking about

21   a hundred thousand or more of widely dispersed claimants, some

22   of whom are known, some of whom did not have lawsuits on file.

23   So this was an important issue to make sure that the proper

24   notice procedures and timeliness issues were given so everyone

25   could respond so they could be both bound by a plan and

MOTORS LIQUIDATION COMPANY, et al.

Page 51

1    ultimately channel to an asbestos trust.

2            The other issue that we spent $72,970.50 on was the

3    Detroit Diesel and Remy issues.  And those had to be -- I

4    believe we were the main opposition to --

5            THE COURT:  In fact, you were the only opposition.

6            MR. ESSERMAN:  I think we were the only opposition to

7    both Detroit Diesel and Remy and were successful before the

8    Court.  The Court agreed with our position, disagreed with the

9    position of Detroit Diesel and Remy.  And we opposed their

10   relief which would be to extend the protections of the

11   automatic stay to them.  And we think that --

12           THE COURT:  And you're saying this was a benefit to

13   the estate?

14           MR. ESSERMAN:  Well, I think it was because people

15   then went to Remy and Detroit Diesel to settle their claims

16   instead of potentially trying to assert them against GM 'cause

17   Remy --

18           THE COURT:  Well, in substance, you were saying that

19   lawsuits by asbestos plaintiffs should continue against Detroit

20   Diesel and Remy, am I correct?

21           MR. ESSERMAN:  Yes.

22           THE COURT:  Now --

23           MR. ESSERMAN:  And not against GM.

24           THE COURT:  -- the debtor was protected by an

25   automatic stay, am I correct?

1          MR. ESSERMAN:  Yes.

2          THE COURT:  And the debtor didn't file a response to

3     that at all, am I correct?

4          MR. ESSERMAN:  Yes.  I believe that's correct.

5          THE COURT:  And the creditors' committee didn't

6     either.

7          MR. ESSERMAN:  I think that's right.

8          THE COURT:  And there was at least a contention by

9     Remy and Detroit Diesel that they had indemnification rights

10    against the estate, wasn't there?

11         MR. ESSERMAN:  Yes.  And that's dealt with the basis

12    of their claim for protection.

13         THE COURT:  Yes.  And if any of those asbestos

14    plaintiffs succeeded in the litigations, that could at least

15    potentially increase the claims against the estate, couldn't

16    it, by reason of that indemnification obligation?

17         MR. ESSERMAN:  If that indemnification was, in fact,

18    valid and proper.  And if it was valid and proper, it might

19    have even imposed grounds for an automatic stay.

20         THE COURT:  Yeah.  Go on.

21         MR. ESSERMAN:  So we think what that did was

22    redirected claimants to Detroit Diesel and Remy rather than to

23    General Motors and that that did benefit the estate.  And those

24    are the components that we're seeking today.

25         THE COURT:  That motion didn't involve a waiver by

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 53 of 113

Page 53

 1   either Remy or Detroit Diesel of their rights to file claims

 2   against the estate, the ones that were stayed by the automatic

 3   stay, did it?

 4          MR. ESSERMAN:  That's correct.

 5          THE COURT:  Go on.

 6          MR. ESSERMAN:  I made one error.  I said that was the

 7   extent of our application.  We also had $87,430.25 of costs and

 8   expenses which were -- which we categorized as asbestos due

 9   diligence which really got things going on the discovery for

10   the aggregate estimation of asbestos liability, the extent of

11   liability for General Motors, all of which investigations and

12   inclusions that we reached were shared both with the future

13   claimants' representative and the official committee of

14   asbestos claimants and did not need to repeated in any way.

15   That's the, I guess, the fourth component.  And that's it.

16          THE COURT:  All right.  Anything else?

17          MR. ESSERMAN:  That's all I have to say.

18          THE COURT:  Mr. Masumoto?

19          MR. MASUMOTO:  Good morning, Your Honor.  Brian

20   Masumoto for the Office of the United States Trustee.  Your

21   Honor, counsel is correct.  Unfortunately, our office did file

22   our objection on the 18th which was one day after the deadline.

23   In part, there was some discussions in our office about the

24   application which caused some delay.  And one of the

25   motivations for, in fact, filing the objection was because of

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 54 of 113

Page 54

1     the perception that the original application did not identify

2     relevant facts for the Court and particularly in the unique

3     circumstances relating to the asbestos committee.  And in

4     addition, we felt that it did not satisfy its burden of proof

5     of proving its substantial contribution.

6              I'm sure Your Honor is aware but we wanted to make

7     sure that we had on the record that with respect to the

8     official asbestos committee although it was appointed on March

9     5th of 2010 that the Court had rendered a ruling allowing the

10    professionals or the counsel for the official asbestos

11    committee to apply for compensation beginning in October 6th of

12    2009.  And that certainly overlapped with the application being

13    sought by Mr. Esserman.

14             In addition, with respect to the application itself,

15    as we indicated it was strictly a chronological presentation

16    notwithstanding a summary, a breakdown of the categories into

17    the various areas that Mr. Esserman just addressed and which

18    have been addressed in his reply.  In that reply, I think, as

19    the discussion that you had with counsel indicated, there's

20    some substantial questions as to whether or not the efforts

21    that were being -- the services that were being rendered on

22    behalf of the asbestos committee benefited the estate as a

23    whole or the individual creditors at issue putting aside the

24    issue of whether or not some of those service overlapped.

25             With respect to one category that wasn't fully

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 55 of 113

Page 55

1  discussed, certainly the original application, although

2  addressed in the reply, was the efforts with respect to a

3  futures claims representative.  As the reply acknowledged, that

4  early attempt at the appointment of a futures claims

5  representative was originally denied arguably costing the

6  estate additional funds and perhaps unnecessary funds in

7  responding to it prematurely to a premature motion.

8         Accordingly, one of the concerns that we do have is

9  the idea of professionals volunteering their services either

10  prematurely or unnecessarily in anticipation of the actions of

11  an official committee which would then increase the cost to the

12  estate.  For example, just hypothetically, in many cases an

13  unsecured creditors' committee always has the option or the

14  right to investigate the lien validity.  If before the official

15  committee sought to do that, some other creditor sought to

16  preempt the committee's investigation and voluntarily begin

17  that investigation on its own, we would not want to be in a

18  position of having to consider the substantial contribution of

19  those volunteer professionals.

20         Accordingly, we believe that the services that were

21  rendered by the ad hoc committee had not sufficiently

22  established in their application that they were either -- that

23  were not either duplicative or solely for the benefit of the ad

24  hoc committee members.  And accordingly, we felt important to

25  raise that issue with the Court and also to remind the parties

MOTORS LIQUIDATION COMPANY, et al.

Page 56

1    that, in fact, it was an unusual circumstances in this case in

2    which the professionals for the official committee, in fact,

3    had started to do work beginning in October of 2009.  Thank

4    you, Your Honor.

5              THE COURT:  All right.  Mr. Esserman, reply?

6              MR. ESSERMAN:  Since lots of our time and effort were

7    spent in October, November, December time period when Mr.

8    Masumoto just argued that there was overlap with the asbestos

9    committee, the asbestos committee was not appointed until March

10   5th, 2010.  If you --

11             THE COURT:  However --

12             MR. ESSERMAN:  If --

13             THE COURT:  -- didn't I nunc pro tunc Mr. Inselbuch's

14   retention application back to October over the objection of the

15   U.S. trustee?

16             MR. ESSERMAN:  I was just going to get to that, Your

17   Honor.  Yes.  And what I was going to get to was if you look at

18   what they did during that period of time to address this

19   overlap that our services performed, there was zero overlap.

20   In fact, the total amount of fees that Mr. Inselbuch's firm

21   billed from October, November and December was 11,000 dollars.

22   And what he did during that period of time was mostly

23   administration, internal administration for their committee and

24   had nothing to do with any of the issues that we were

25   addressing.  So as far as the overlap concern, there was zero

Page 57

1    overlap, as far as I can see, and notwithstanding your nunc pro

2    tunc authorization, they did virtually nothing, nothing that

3    was certainly anything that we were involved in.

4            THE COURT:  Mr. Esserman, I have a recollection and

5    I -- when I was reading the papers, I didn't note the source of

6    that recollection, that amongst the services for which Caplin &

7    Drysdale was compensated was not just getting themselves

8    retained but also getting the future claims representative

9    appointed and that your firm either as counsel -- as fiduciary,

10   a professional for the claims representative or the claims

11   representative himself, were also compensated for services

12   incident to that retention.  So between one and three

13   fiduciaries of the estate were compensated for that appointment

14   process.  Am I mistaken in that understanding?

15           MR. ESSERMAN:  I think so, Your Honor.  What we've

16   applied for for the appointment of future claimants'

17   representative -- it's not just the future claimants'

18   representative but we also sought appointment of the official

19   committee of asbestos claimants.

20           THE COURT:  Which was denied at the time you made

21   it --

22           MR. ESSERMAN:  It was denied initially but eventually

23   both of those motions were granted.  So I don't know if you can

24   parse it so thinly because I think -- I think we were here

25   pressing those issues.  And if those issues were not pressed, I

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 58 of 113

Page 58

1   think they wouldn't have come to ultimate fruition.  And that

2   is $27,817.25 of our application.  But I think that those --

3   there was no overlap and no double charging for those services

4   that we're seeking.  That was mostly June of 2009 and a little

5   bit after.

6            THE COURT:  Okay.  Continue, please.

7            MR. ESSERMAN:  That's all I have in response.

8            THE COURT:  All right.  Thank you.  All right.  I'm

9   going to do all the rulings today at one.  So we'll take a ten

10  minute recess and then I'll hear the Newman matter.

11           THE COURT:  Mr. Jones, are you rising to be heard?

12           MR. JONES:  Actually, Your Honor, I'm asking for

13  permission to leave, if I may.  This was the only matter I had

14  an interest in.

15           THE COURT:  Sure.

16           MR. JONES:  I'm happy to stay if it would be helpful

17  to the Court.

18           THE COURT:  No.  You've got permission to leave.

19           MR. JONES:  Thank you, Your Honor.

20      (Recess from 11:09 a.m. until 11:20 a.m.)

21           THE COURT:  Okay.  Newman.  I want to get appearances

22  and then I have some preliminary questions I want both sides to

23  address.

24           MR. SMOLINSKY:  Your Honor, Joe Smolinsky for the

25  Motors Liquidation Company GUC Trust.

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 59 of 113

Page 59

1            THE COURT:  Okay.

2            MR. DONOVAN:  Good morning, Your Honor.  Maurice J.

3    Donovan appearing on behalf of Newman.

4            THE COURT:  Okay.  Thank you, gentlemen.  Folks, as

5    you know, under my case management orders, the initial argument

6    on any matter unless prior arrangements have been made to the

7    contrary is nonevidentiary hearing.  It seems to me, subject to

8    your rights to be heard, that one of the matters that's before

9    me is a legal issue or a bundle of legal issues, maybe breaking

10   down into four or five vis-à-vis whether the elements of the

11   Newman claim are or are not for punitive damages.  And it also

12   appears that some of the matters that have been put in issue,

13   most significantly GM's contentions that even if punitive

14   damages couldn't be disallowed, there still hasn't been a

15   showing that it did conduct of the type that would trigger or

16   provide a basis for that.

17           Mr. Smolinsky, when it's your time to be heard, I

18   would like you to let me know whether you contend that that's

19   something that can be decided without an actual evidentiary

20   hearing.  It seems to me that the principle focus today is on

21   whether punitive damages have been alleged here or not vis-à-

22   vis each of the elements for which Mr. Donovan wants to proceed

23   on behalf of the Green estate on behalf of Mr. Newman.

24           The underlying principle -- bankruptcy principles

25   don't seem to be in dispute.  If there is some kind of

MOTORS LIQUIDATION COMPANY, et al.

Page 60

1   difference in perspective on bankruptcy law that wasn't

2   articulated in the papers, it's kind of late to raise that now

3   but you better tell me.

4          It seems to me about the various elements of the

5   claim.  Now on a few of them, there may be another issue that

6   is one that can be dealt with as a matter of law.  But I have

7   some questions about it and I'm not sure if I can deal with it

8   as a matter of law.  And that is, I have a claim for attorneys'

9   fees.  I need help on whether it can be stipulated to or

10  assumed as a fact now or whether I need to clarify it later as

11  to whether the Green estate was paying for legal services on a

12  time for services basis and actually wrote out a check for

13  those or whether this was a mini tort actions or a contingent

14  fee basis.  I need to know the extent, if any, to which the

15  Newman was out of pocket anything beyond the twenty-two million

16  dollars, or whatever the exact figure is, for which Old GM

17  already wrote out a check.  And I had thought from reading the

18  papers that GM paid the compensatory aspects of this and that

19  what we're now talking about is the consequences of GM's

20  alleged discovery failures which, for the purpose of this

21  argument, subject to your rights to be heard, it seems to me I

22  have to assume that the fact of the failures should be taken as

23  true but that the scienter associated with those failures is

24  something that is still in dispute.

25          So with that said, you can make your arguments as you

MOTORS LIQUIDATION COMPANY, et al.

Page 61

1     see fit and you can address my questions at any time as long as

2     you deal with them by the time you're done.  I'll hear first

3     from you, Mr. Smolinsky, then from you, Mr. Donovan, then reply

4     from Mr. Smolinsky.

5              MR. SMOLINSKY:  Thank you, Your Honor.  Mr. Smolinsky

6     for the GUC trust.  I will address your questions, Your Honor,

7     but I'd like to put it into an equitable framework because, at

8     the end of the day, we are seeking equitable disallowance of

9     this claim.

10             Your Honor, the debtors and now the GUC trust have

11    worked --

12             THE COURT:  Pause, please, Mr. Smolinsky.  I want you

13    to address, and also Mr. Donovan, whether anybody cares that

14    we're dealing with this in contested matter form rather than

15    adversary proceeding form.  Presumably, you would be skinning

16    the cat if I either equitably subordinated this claim or

17    equitably disallowed it.  In either case, your point is that

18    the unsecured creditors shouldn't be writing out a check for

19    punitive damages.  Normally, we think of equitable

20    subordination as requiring an adversary.  I have ruled and

21    Judge McKenna has ruled and I think it's becoming increasingly

22    clear that, under Pepper v. Litton, which did exactly that,

23    equitable disallowance is just as permissible as equitable

24    subordination is.  But do we have a procedural thing or should

25    we just go straight to the merits of the issue?

MOTORS LIQUIDATION COMPANY, et al.

Page 62

1          MR. SMOLINSKY:  Your Honor, I don't and I don't what

2     Mr. Donovan has to say on the issue.  But my view is there's a

3     threshold contest -- matter that could be dealt with as a

4     contested matter.  Equitable subordination requires factual

5     allegations of an inequitable act.  We're not here saying that

6     Mr. Donovan or his clients have done anything improper.  We are

7     taking the position that this Court, as a matter of equity, has

8     the ability to equitably disallow the claim and to do that on a

9     contested matter.  That's our view, Your Honor.  And then only

10    if we lose that threshold issue do we get into an adversary

11    proceeding which has already been the subject of litigation in

12    New Jersey.

13          THE COURT:  And, of course, your point is that if you

14    didn't go through the ritual of a complaint, you'd be back

15    where you started from making the exact same arguments you're

16    making now.

17          MR. SMOLINSKY:  That's correct, Your Honor.

18          THE COURT:  All right.  Continue.

19          MR. SMOLINSKY:  And we don't believe that evidence is

20    necessary so that may also argue in favor -- for this aspect of

21    the hearing, that may also work towards finding that it's a

22    contested matter that can be addressed on these papers.

23          Your Honor, the debtors and now the GUC trust have

24    worked very hard in this case to resolve product liability

25    claims so that we can get distributions into the hands of

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 63 of 113

Page 63

1    claimants.  Victims of automobile accidents with horrific

2    injuries cannot look to insurance in this case, as Your Honor

3    is aware, and therefore has to accept a pro rata distribution

4    of New GM's stock and warrants.

5         The vast majority of claimants that have entered into

6    the ADR process with the debtors have settled their claims

7    consensually.  As you can imagine, Your Honor, in virtually all

8    product liability cases, punitive damages are ever present.  Of

9    course, their purpose is to defer future malfeasance by the

10   debtor.  But they also provide a way for the plaintiffs to seek

11   recoveries beyond the full measure of their actual damages.

12        Insistence by the product liability claimants in this

13   case on getting credit for the punitive damage allegations in

14   their claims which often attach a complaint would have

15   devastated the otherwise widely successful ADR procedures that

16   have been used.  Claimants in ADR, in mediation, have properly

17   abstained from pursuing those types of damage claims in

18   negotiations.  And this has allowed the estate to treat all

19   product liability claimants fairly and consistently by looking

20   only to the measure of damages, actual damages and theories of

21   liability.

22        After the mistrial in 1993, Mr. Green won a trial

23   against General Motors in 1996 on his motor vehicle accident.

24   The Court awarded him twenty-two million dollars which included

25   a substantial portion of -- amount of interest as the full

Page 64

1    measure of his damages.  And it was based in part on a life

2    plan.  That means, a plan to take care of the maintenance of

3    his person and his medical concerns up through the age of

4    seventy-seven.  And if you look at the award of the twenty-two

5    million dollars, thirteen million of it was for the purpose of

6    compensating Mr. Green for future medical and future lost

7    earnings.  And that's reflected in the appellate decision

8    appeal of the underlying Green trial.

9         Mr. Green unfortunately died two years after the award

10   at the age of thirty-one.  Mr. Green had no dependents and that

11   resulted in his heirs receiving a windfall based on the sooner

12   than expected passing of Mr. Green.

13        In this case, Your Honor, the debtors don't object or

14   deny that certain documents were improperly withheld from Mr.

15   Green's counsel until after the second trial.  We can debate

16   whether that failure was intentional or unintentional but

17   that's not really the issue here and certainly not the issue

18   here today.  The issue for today is whether Mr. Green's claim

19   can stand at all in this case.  Since Mr. Green won

20   conclusively at trial without all the documents in question,

21   and was paid for all of his actual and perspective damages, the

22   only remaining claim that exists are for punitive damages or

23   sanctions which, in effect, are punitive damages.

24        End of story.  Mr. Donovan dresses up his claims to

25   make it look like compensatory claims, compensation for failure

Page 65

1    to be able to get punitive damages.  But at the end of the day,

2    they're all considered compensatory.

3            Taking us earlier back in the case, the claimant

4    agreed to cap his 486 million dollar claim at seventy-five

5    million dollars in exchange for the debtors' agreement to put

6    this claim promptly into the court-mandated ADR procedures.

7            THE COURT:  Pause, please, Mr. Smolinsky.  I thought I

8    heard you say that it was originally a 486 million dollar

9    claim.  For some reason, I thought it was unliquidated.  Was I

10   just -- don't be diplomatic.  Was I mistaken in that regard?

11           MR. SMOLINSKY:  I have to look, Your Honor.  I believe

12   that when we took a look at the papers we concluded that the

13   totality of the unliquidated when you add it all together was

14   486 million dollars.

15           THE COURT:  I see.

16           MR. SMOLINSKY:  It could have come from the debtors

17   reaching out and asking Mr. Donovan what the full amount of the

18   claim was because, as Your Honor knows, we had to take all

19   unliquidated claims and turn them into liquidated claims so

20   that we could establish reserves.

21           THE COURT:  Okay.  Now I'm with you.

22           MR. SMOLINSKY:  But we can get you that answer,

23   though, Your Honor.

24           THE COURT:  Well, I'm not sure if it matters.  But I

25   just thought I hadn't done my homework right.  Go on, please.

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 66 of 113

Page 66

1          MR. SMOLINSKY:  You've never been accused of not doing

2     your homework, Your Honor.

3          In discussing the cap, the debtors provided Mr.

4     Donovan with the debtors' view that punitive damages should not

5     be awarded in these cases because all it does is dilute the

6     other creditors.  We also provided Mr. Donovan with our view

7     that in a liquidating case such as this one, there's even more

8     precedent for the Court using its equitable powers to disallow

9     those claims.  And as we explained, it could be likened to what

10    happens in a Chapter 7 case where there's a mandatory

11    subordination of punitive and -- or multiple damages under

12    726(a)(4) of the Bankruptcy Code.

13         Notwithstanding our position on the merits, we did, in

14    fact, initiate ADR as we had agreed to do and complied with our

15    obligations under the ADR procedures to provide Mr. Donovan

16    with a settlement offer that we believed was very meaningful.

17    Suffice it to say that that offer was not accepted and we then

18    proceeded to mediation which we held in New York.  And that

19    mediation failed to result in a settlement.

20         Mr. Donovan would like to engage in a prolonged and

21    expensive litigation in New Jersey, the jury trial, to pursue

22    his damage claim and then come back to this court to determine

23    whether any resulting jury verdict could be allowed for

24    bankruptcy purposes.  He envisions a jury trial which,

25    according to the pretrial order that was filed in New Jersey,

MOTORS LIQUIDATION COMPANY, et al.

Page 67

1    would include 123 fact witnesses and eight expert witnesses.

2           To the contrary, we're of the opinion that no trial is

3    necessary.  This claim should be and can be expunged and

4    disallowed in its entirety based on the threshold issue of

5    equitable disallowance.

6           Your Honor, with all due respect, we think this is an

7    easy case.  So many creditors in these cases have suffered

8    greatly as a result of this liquidation and they will not

9    receive full compensation for their injuries and losses.

10   There's no deterrent effect in punishing Motors Liquidation

11   Company or the GUC trust in order to prevent future

12   malfeasance.  So all punitive damage award accomplishes in this

13   case is to dilute other creditor recoveries and provide the

14   Green estate with an even greater windfall.

15          Your Honor, we cite to a number of cases in our

16   papers.  I'm not going to go all over of them.  The Johns-

17   Manville case, which is a Southern District New York bankruptcy

18   case that discussed punitive damages, found that whether or not

19   punitive damages are recoverable in bankruptcy, it is well

20   within the authority of this Court to disallow a claim for

21   punitive damages in the circumstances of this case where

22   allowing such claim will ill serve the policy of such awards.

23   In Novak v. Callahan, an Eleventh Circuit case, future wrongful

24   conduct will not be deterred when the punitive damages are paid

25   from wrongdoer's estate rather than from his own pocket.  And

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 68 of 113

Page 68

1    that's exactly what's happening here, Your Honor.  These

2    punitive damages, if allowed, would be paid by the estate and

3    the creditors.

4           Just to name a couple of -- two more cases, the

5    Williams v. City of New York case -- that's a Second Circuit

6    case, 1974, 508 F.2d 356.  There, the Court found, at page 359,

7    "Unlike compensatory damages, punitive damages are assessed,

8    punish the wrongdoer rather than restore the victim."  In re

9    Collins -- that's a Southern District New York, 44 B.R. 806

10   (1984) case.  It says "Punitive damage claims are penalty

11   claims.  If, as is the case, punitive damages are to be paid

12   not by the alleged wrongdoer but by his estate, the purpose of

13   the penalty is not served.  The effect would be to force

14   innocent creditors sharing in the debtors' assets to pay for

15   his wrongdoing.  Such a result is clearly untenable and

16   patently inequitable."  And there's a long string of cases,

17   Your Honor.

18          Now we do concede that there is a Supreme Court case,

19   United States v. Noland.  It's a 1996 case.  And in that case,

20   you can debate how broad the holding goes.  But if you take a

21   broad reading, it says that it's improper or inappropriate to

22   categorically subordinate punitive damage claims without doing

23   a case by case survey.

24          But the circumstances found in this case, including

25   (a)the liquidating nature of the plan; (b)the fact that Mr.

MOTORS LIQUIDATION COMPANY, et al.

Page 69

1    Green was already awarded and received twenty-two million

2    dollars in cash; (c)the fact that other product liability

3    claimants are only receiving a portion of their compensatory

4    damages; and (d)the fact that in hindsight, the compensatory

5    damages that were awarded back in 1996 was far in excess of Mr.

6    Green's actual damages, all way heavily in favor of equitable

7    disallowance.

8            THE COURT:  I don't know if it matters, Mr. Smolinsky,

9    but when Michael Green passed on, did he do so as a consequence

10   of injuries from the accident or from some kind of intervening

11   cause?

12           MR. SMOLINSKY:  I don't know, Your Honor.  That would

13   probably be a fact in dispute.

14           THE COURT:  Okay.

15           MR. SMOLINSKY:  But I will say that the allegation

16   that the death might have occurred as a result of the delayed

17   trial, there is compensation between the first trial and the

18   second trial in interest that was paid.  So he was compensated

19   for that delay.

20           But even more importantly, the mistrial did not occur

21   because of these missing documents.  Without these documents in

22   the second trial, Mr. Donovan was able to successfully win,

23   blow the barn doors off this case and prove that GM was wholly

24   responsible for the damage claim.  And so, there is no, I

25   think, proper position that because of the withholding of these

Page 70

1    documents, there was a delay in the trial.  And in fact, if you

2    look at the appellate decision which appealed the Green jury

3    verdict, the Court goes out of its way to find that the jury

4    found and determined that roof collapse was the proximate cause

5    of the injury and that a hundred percent of the injuries were

6    solely attributable as to the design defect in the T-roof

7    Camaro.  The Court found that the jury disregarded the fact

8    that the car was going eighty plus miles an hour in a twenty-

9    five mile an hour zone as being relevant.  So it's not as if

10   the Court apportioned liability and gave Mr. Green less than

11   his full damages.  They won.  And they got their full damages

12   notwithstanding the absence of these documents.

13        So, Your Honor, I can speak now as to the different

14   allegations Mr. Donovan -- the different types of claims that

15   he claims are compensatory or I can wait until after Mr.

16   Donovan presents.  But the bottom line is that we believe that

17   all of the claims that are asserted are really punitive in

18   nature or sanctions in nature including the legal fees.  And

19   therefore, we believe that the Court, as a matter of law, or

20   using its equitable powers here can disallow the claim in its

21   entirety without any factual determinations or any trial.

22        THE COURT:  I think which category his individual

23   claims goes in or should go in is one of the most important

24   issues.  And I'm not comfortable with giving you the last word

25   on that without giving Mr. Donovan a chance to respond.  So I

MOTORS LIQUIDATION COMPANY, et al.

Page 71

1    would like your view on the particular claims.  And then I'll

2    give Mr. Donovan a chance to give me his view.  And then when

3    you get your chance to reply, it'll be limited to what he says.

4        I assume that what we're talking about is the stuff

5    that he has on pages 5, 6 and 7 of his response.  But I will

6    hear whatever you have to say on that just like I'll hear Mr.

7    Donovan on those issues.

8        MR. SMOLINSKY:  Let me see if I can run through them,

9    Your Honor, and if I miss any, I'll come back.  One is the

10   spoliation of evidence that is claimed to be a tort that is

11   entitled to compensatory damages.  Mr. Donovan cites the

12   Rosenblit v. Zimmerman case for the purpose that spoliation of

13   evidence is a separate tort.  That case, I believe, Your Honor,

14   is 766 A.2d 749.  It's a Supreme Court New Jersey case.

15       But the Court found there -- the Court says that "When

16   spoliation occurs, the law has developed a number of civil

17   remedies, the purpose of which is to make whole, as nearly as

18   possible, the litigant whose cause of action has been impaired

19   by the absence of [critical] evidence; to punish the wrongdoer;

20   and deter others from such conduct."

21       So the first element is to compensate for what would

22   have happened had the documents not been -- had been there.

23   But as I indicated, the Court found that we were entirely

24   responsible for all of the actual damages and future damages

25   that were incurred by Mr. Green and he was paid in cash for

MOTORS LIQUIDATION COMPANY, et al.

Page 72

1    that; the second element, to punish the wrongdoing, that's

2    punitive -- the equivalent of punitive damages; and deter

3    others from such conduct -- not relevant here, we would argue.

4         The next cause of action is New Jersey RICO.  And for

5    that, Mr. Donovan cites Paul St. James v. Future Finance

6    Creative Development Enterprises, 776 A.2d 847.  There, the

7    Court says, "We agree with the cases which suggest that the

8    amount of the punitive damages awarded to defendant should be

9    reduced by two-thirds of the N.J. RICO award to reflect the

10   duplicative punitive aspect of the overall award."  So there

11   again, the Court says, under RICO, you can get three times the

12   damage award, but, in reality, the first third of it is

13   compensatory damages.  Those are the damages that Mr. Green has

14   already received.  And the second two-thirds of the award is

15   purely punitive and duplicative of the compensatory damages.

16        With respect to treble damages, you could look at the

17   case of Liberty Mutual Insurance Company v. Rose Land and Frank

18   Land -- that's 892 A.2d 1240.  That goes to treble damages

19   generally for punitive damages.  Under New Jersey, punitive

20   damages are capped at three times the amount of actual damages.

21   And it says, "The Punitive Damages Act" -- it actually cites

22   the statute in New Jersey for punitive damages.  "The Punitive

23   Damages Act defines compensatory damages [are] 'damages

24   intended to make good the loss of an injured party, and no

25   more,' and punitive damages as damages intended 'to penalize

MOTORS LIQUIDATION COMPANY, et al.

Page 73

1    and to provide additional deterrence against a defendant to

2    discourage similar conduct in the future.'"

3           By that definition, only one part of the treble

4    damages award covers compensatory damages and the other two

5    parts compose punitive damages.

6           So I don't know if I missed any, Your Honor, but there

7    are various arguments espoused by Mr. Donovan but it's all

8    variations on the same theme.

9           THE COURT:  Well --

10          MR. SMOLINSKY:  Mr. Green has been compensated.

11          THE COURT:  -- I don't know whether you missed it or

12    not but, for instance, on page 5 in paragraph 12(a)(ii), they

13    talk about attorneys' fees and costs of the second trial.  If

14    the decedent or his family had written out a check for that, I

15    can see how that might be argued to be compensatory.  To what

16    extent do I have evidence in the record as to whether or not

17    that was done?

18          MR. SMOLINSKY:  That was my last point, Your Honor,

19    with respect to attorneys' fees.

20          THE COURT:  I'm sorry.  Okay.  Then --

21          MR. SMOLINSKY:  No.  It's --

22          THE COURT:  -- proceed.  Go ahead.

23          MR. SMOLINSKY:  -- quite all right.  I believe that

24    this was all contingency and therefore there wasn't a check

25    written out for the costs of the trial.  If you look at the

MOTORS LIQUIDATION COMPANY, et al.

Page 74

1   cost of the trial, Mr. Donovan says that two million dollars

2   was spent on the trial and then all of this litigation with

3   respect to the punitive damages.  The attorneys' fees with

4   respect to the punitive damages, in my view, at most, are

5   sanctions and therefore, are not compensatory.  With respect to

6   the second trial, to the extent that costs were paid by the

7   Greens' estate for that trial, I can only say that when we went

8   into ADR, we made a settlement proposal that we think was quite

9   fair that would cover --

10           THE COURT:  Careful on Rule 408.

11           MR. SMOLINSKY:  And, Your Honor, I'm not getting into

12   the settlement discussions.  I think it's fair to say that we

13   complied with the ADR procedures.  We made an initial offer.

14   And while I do believe that the cost of the second trial -- the

15   trial was not lost because of the lack of these documents.  I

16   don't know why the first case resulted in a mistrial.  But with

17   the same pool of documents, the same evidence, Mr. Donovan was

18   able to succeed in the second trial.

19           So I don't think there's proximate cause, if you will,

20   for the inability to have access to these documents.  I don't

21   think that connects to the cost of the second trial.  And so, I

22   guess, just in conclusion, I don't think the Green estate paid

23   for the attorneys' costs other than through the contingency.  I

24   think that future attorneys' fees are more in the nature of

25   sanctions.  And I believe it wasn't caused by this issue, the

Page 75

```
 1    cost of the second trial.  It's really the expenses after that

 2    that we should be talking about.

 3              THE COURT:  You said you think attorneys' fees should

 4    be regarded as sanctions.  Aren't -- sanctions have a punitive

 5    element as well --

 6              MR. SMOLINSKY:  That's right, Your Honor.

 7              THE COURT:  -- although when we grant sanctions, we

 8    usually measure the amount of the sanctions by looking to the

 9    cost to undo the mess.  How do you think I should look the

10    sanctions punitive distinction if there should be a

11    distinction?

12              MR. SMOLINSKY:  I'll only say at this point that I do

13    believe that it's punitive.  I think sanctions are for the

14    purpose of deterring future malfeasance.  And therefore, it is

15    punitive.  To the extent Mr. Donovan has a different view, I'm

16    happy to address it on rebuttal.  But I don't see why -- since

17    he won an award that would include all damages which takes into

18    account all of the costs associated with the trial, to the

19    extent he was entitled to -- to the extent he was entitled to

20    attorneys' fees as part of the underlying trial on Mr. Green's

21    actual remedies, that was addressed in connection with the

22    second trial.  Anything beyond that results in penalty for the

23    discovery situation and therefore, in my mind, is sanctions

24    equals punitive.  There's no distinction.

25              THE COURT:  Okay.  Thank you.
```

Page 76

1              MR. SMOLINSKY:  Thank you, Your Honor.

2              THE COURT:  Does that take care of your needs, Mr.

3     Smolinsky?

4              MR. SMOLINSKY:  For now, it does, yes.

5              THE COURT:  Okay.  Mr. Donovan, can I ask you to come

6     to the main lectern, please?

7              MR. DONOVAN:  Good morning, Your Honor.  Maurice J.

8     Donovan appearing on behalf of Mr. Newman as the executor under

9     the will of Michael Green and one of the claimants in this

10    matter.  First, I want to thank the Court for allowing me to be

11    here this morning to address these issues.  They are kind of

12    interesting compared to what else I've heard this morning, I

13    think.

14             When I first met Mr. Green twenty-five years ago, he

15    was a young man lying in a hospital bed.  His neck had been

16    broken because General Motors put on the market a defective

17    IROC Camaro.

18             THE COURT:  Pause, please, Mr. Donovan.  With respect,

19    you can't talk to me like you talk to a jury.  Your client was

20    already compensated for his injuries when you won the second

21    trial.  I need you to hone in on the legal issues that we're

22    wrestling with and on the factual issues or mixed questions of

23    fact and law as to how we categorize the various elements of

24    your claim.

25             MR. DONOVAN:  And I can do that and intend to do that,

1    Your Honor.  But I think we need to understand that this Court

2    is a court of equity.  The equity swings both ways, both in

3    consideration of Mr. Smolinsky's request that this claim be

4    extinguished but also the other way that this claim is so

5    important in terms of the fraud committed by General Motors in

6    the discovery practices that those equities militate in favor

7    of this claim going forward.  And I think that, whether we

8    classify these claims as compensatory or punitive, whether we

9    set the standard as a negligent standard or gross standard or a

10   willful standard in a spoliation case, no matter how we parse

11   those issues, the bottom line comes down to whether this Court

12   is going to exercise its equitable powers in order to

13   extinguish a claim.  And the problem with that being is -- you

14   know, Mr. Smolinsky argues that it would have no relevance.

15   Well, it does have relevance because if this Court was going to

16   extinguish this claim, what it would be telling General Motors

17   is that the new General Motors could engage in the same

18   practices that the old General Motor engages; that is, sending

19   documents through a maze and hundreds of different hands and

20   people so that they would never be found and never be produced.

21   GM made a willful decision in this case not to produce these

22   smoking gun documents.  These documents say that GM knew that

23   this car they put on the market was defective.  They say they

24   analyzed the various strengths of alternative designs, that the

25   alternative designs were better designs, safer designs, more

Page 78

1    crashworthy designs.  And yet, they decided to put the IROC

2    Camaro on the market because it had a more macho appearance.

3    And that more macho appearance translated into more dollars

4    into the coffers of General Motors.

5           That's what underlies this case.  And those documents,

6    those smoking gun documents is what for the last -- since 2001,

7    we have been trying to redress against General Motors when this

8    bankruptcy was filed.  And should this Court put its imprimatur

9    on the dismissal of those claims, what this Court is saying is

10   that GM has gotten away with fraud.  Fraud upon -- in this case

11   and whatever other case it did the exact same thing of

12   secreting documents and can do it again in the New GM and it

13   also says to every other defendant in a litigated matter that

14   they, too, can hide documents and thwart the discovery process.

15   Just as long as they filed bankruptcy, they can get away with

16   it and especially if those claims are punitive.

17          Now, Mr. Smolinsky kept saying that somehow GM is here

18   to protect so the other people who are injured by their

19   defective products won't get full compensation.  That's not Mr.

20   Green's fault; that's General Motor's fault.  They decided to

21   file for bankruptcy.  They decided to not honor these claims.

22   And they very could -- New GM could very well decide to pay off

23   each and every one of these individuals who was grossly injured

24   by GM's uncrashworthy vehicles.  They could do that.  New GM

25   could take the right path and say, we're going to do what we're

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 79 of 113

Page 79

1   supposed to do.  If you prove we have a defective car, we are

2   going to pay that because that is our obligation and that is

3   our moral duty to do.  But no.  They hide behind this

4   bankruptcy court and say to Your Honor that Mr. Green, who was

5   deprived of a viable claim, a claim for punitive damages for

6   putting on the market a car that GM knew was unsafe in its

7   design and had the potential of causing devastating injuries

8   like the quadriplegia Mr. Green sustains.  They would be

9   walking away from this situation.

10          And that's what's unfair here, Judge.  When GM says,

11  oh, we want to make sure everyone is compensated even if it's

12  to a small amount, that is so disingenuous.  GM has battled

13  this litigation, I know from first-hand for twenty-five that

14  I've been involved with it.  I tried both the Green 1 and Green

15  2 cases.  I know -- there's no one around who knows more about

16  these cases than I do.  So that's a little disingenuous

17  argument.

18          The claims here -- I mean, I can describe to you --

19  and we can play a semantics game.  But basically, what Mr.

20  Green was deprived of by not having these documents in the

21  first trial was two things.  A cause of action for punitive in

22  that first trial, Green 1, as well as having the proofs

23  necessary to show that GM had an alternative design and what it

24  was.  What Mr. Smolinsky probably doesn't know is that between

25  Green 1 and Green 2, we had to change experts because the first

09-50026-mg   Doc 11105   Filed 10/31/11   Entered 11/02/11 11:23:41   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 80 of 113

Page 80

1    expert had a stroke.  The first expert and the second expert

2    had different alternative designs.  The second alternative

3    design in the second Green trial was exactly the alternative

4    design, unknownst (sic) to us at that point in time, that GM

5    had considered and tested.  The first alternative design in the

6    first Green case was something entirely different.  Had we had

7    those documents, we would have had the alternative design that

8    we presented in the second trial in the first trial.  So that's

9    what we were deprived of there, proofs in the case which

10   necessarily would have convinced a jury in the first trial that

11   GM had put on the market a defective vehicle.

12          Now the claim for punitive damages is different in

13   this litigation.  There is no claim for punitive damages in

14   this current litigation premised on the fact that GM put on the

15   market a dangerous product.  Okay?  There is no claim for that.

16   That claim would have been litigated in the first or the second

17   Green trials.  What is sought here is damages for the

18   deprivation of a claim which Mr. Green would have had in his

19   earlier litigation.

20          Now, just as Your Honor said a few minutes ago --

21          THE COURT:  Pause, please, Mr. Donovan.  A claim for

22   what?

23          MR. DONOVAN:  A claim for -- his claim here is for the

24   loss of that cause of action in the cases below.  And just as

25   Your Honor said about sanctions, are sanctions attorneys' fees,

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 81 of 113

Page 81

1    and you kind of couched it almost the same way I do.  The

2    sanction is different than how we value it.  We say someone did

3    wrong and we're entitled -- we're going to impose a sanction.

4    Then this next step is how are we going to value that sanction.

5    Should we put the person in jail?  Should we deprive their

6    client of something?  Should we do it evidentially?  Or should

7    we use attorneys' fees.  Attorneys' fees set the quantum of

8    damages for the sanction.  They are not the sanction.

9            Just as in this case, punitive damages in the

10   underlying case may set the quantum of damages for the

11   deprivation of the claim which Mr. Green lost but they are not

12   punitive damages.  They are compensatory damages in this

13   litigation.

14           Now there are punitive damage claims in this

15   litigation.  There is specifically a punitive damage claim

16   sought for GM willfully secreting documents during discovery,

17   for taking these smoking gun documents and hiding them in

18   amongst thousands of documents and never producing them.  That

19   is a punitive damage claim which I will concede.

20           And there are other claims here.  Mr. -- you asked

21   whether there was out of pocket.  Mr. Green put out of pocket

22   one million dollars in order to pursue this litigation.  Out of

23   pocket.

24           THE COURT:  Such as by advancing costs or expenses?

25           MR. DONOVAN:  Absolutely.  And that million dollars is

MOTORS LIQUIDATION COMPANY, et al.

Page 82

1    gone.

2              THE COURT:  Okay.

3              MR. DONOVAN:  Attorneys' fees --

4              THE COURT:  Pause, please.  Was that one million bucks

5    extended before trial number 1, between trial number 1 and

6    trial number 2 or after trial number 2 --

7              MR. DONOVAN:  After --

8              THE COURT:  -- or some combination of those?

9              MR. DONOVAN:  After he got paid by General Motors in

10   1999.  He put forth a million dollars to pursue this

11   litigation.  He was still alive at that point.  He died two

12   years after he got his money, never really enjoying any of it.

13             THE COURT:  Okay.  Pause for just a second.

14        (Pause)

15             THE COURT:  Continue, please.

16             MR. DONOVAN:  With respect to the attorneys' fees, all

17   of the matters were taken on a contingency basis including this

18   one.  But attorneys' fees on a contingent basis with reference

19   to the deprivation of the claim under Rosenblit may be

20   contingent.  But under the RICO, attorneys' fees are one of the

21   causes of action, the damages as part of that cause of action.

22   So therefore, if we prevail on that particular aspect of this

23   that attorneys' fees would not be a sanction, they would not

24   be -- they would be part of the cost of pursuing that

25   particular cause of action.

09-50026-mg   Doc 11105   Filed 10/31/11   Entered 11/02/11 11:23:41   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 83 of 113

Page 83

1          Now the fraud here as attested to by Magistrate Patty

2     Shwartz, who -- I don't know if you follow local New Jersey

3     judges -- who has just been nominated to go from a magistrate

4     to a Third Circuit judge -- wrote a hundred page opinion in

5     which she describes the fraud in which she describes the fraud

6     committed by General Motors.  That was part of a privilege

7     hearing where she decided to waive General Motors'

8     attorney/client privilege under the crime/fraud exception to

9     attorney/client privilege.  So she had to have found the prima

10    facie case of fraud in order to waive the attorney/client

11    privilege.  That decision of Judge Shwartz was then affirmed by

12    Judge Hayden, who was the district court judge sitting on this

13    matter, as well as went to the Third Circuit and three judges

14    including Maryanne Trump Barry -- also affirmed that decision.

15         When you read her opinion, though, you see an awful

16    lot of blank -- black marks.  That part of the opinion has not

17    been released.  We don't know what that says because when this

18    litigation -- when this bankruptcy was filed, we were in the

19    Third Circuit trying to get all of that litigation released.

20    So we don't even know what good stuff is in that opinion that

21    she held.  We don't even know what the good stuff is that was

22    in hearings, in camera hearings, during the privileged hearing

23    that we don't know about.

24         The fraud here is --

25         THE COURT:  Pause, please, Mr. Donovan.  I assume your

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 84 of 113

Page 84

1    point, though, is that you're assuming or asking me to assume,

2    at least for the purposes of discussion, that it will show that

3    GM acted badly.

4        MR. DONOVAN:  I don't know any other reason why they

5    would battle so valiantly to keep it hidden.

6        THE COURT:  But let me sharpen my question because you

7    answered it the way I asked it.  But your point is that the

8    stuff that was redacted would go to either GM scienter or its

9    evil motive or its evil conduct but as compared and contrasted

10   to some damages of which the magistrate judge was aware that

11   you didn't already collect on of a compensatory character.

12       MR. DONOVAN:  Absolutely.

13       THE COURT:  Okay.  Continue, please.

14       MR. DONOVAN:  Absolutely.  The fraud committed here

15   should be of particular concern to this and every other Court

16   because it was fraud that attacked the very foundation of

17   litigation, the exchange of discovery and the search for the

18   truth.  By hiding these documents, GM sought to deprive the

19   plaintiff and anyone else who knew about this knowing what they

20   had done in putting this car on the market which was to put a

21   defective vehicle on the market.

22       And I alluded to a minute ago the standard for

23   spoliation and I disagree with Mr. Smolinsky in the sense that

24   only a willful spoliation is actionable.  And I don't think

25   that's true.  And I think that's clear in the case of Pension

MOTORS LIQUIDATION COMPANY, et al.

Page 85

1    Committee of the University of Montreal Pension Plan, which is

2    685 F.Supp.2d 456, this district in which the Court said that

3    you can have a negligence spoliation, you can have a grossly

4    negligent spoliation or you can have a willful spoliation.

5    Either of those standards can apply.  However, it may determine

6    what the sanction is and how the sanction is applied.  For

7    instance, if you were willful, we may dismiss your whole case

8    or we may strike all of your defenses.  If we have a negligence

9    spoliation then maybe we'll give you an adverse inference at

10   trial or maybe we'll impose a monetary sanction.  But the

11   standard is not that I need to prove in this case that the

12   spoliation was intentionally or willfully committed.  That

13   simply isn't true by that case and a very recent case in the

14   district of New Jersey by Judge Salas, Magistrate Salas then;

15   she is now a federal judge.  Magistrate Salas --

16          THE COURT:  Magistrate judges are already federal

17   judges.

18          MR. DONOVAN:  Yeah.

19          THE COURT:  Go on, please.

20          MR. DONOVAN:  Well, I'm sorry.  She is now a district

21   court judge.  My error -- in which she found attorneys

22   responsible for spoliation of evidence because of their

23   negligence in not properly overseeing their client's retention

24   of documents in the case.  Clearly a negligent standard and

25   clearly very akin to this litigation which is pending here.

1          But more importantly, in the Pension Committee case is

2    this language because this is what should tilt the scale in

3    favor of not dismissing these claims.  And it talks about the

4    inherent power, the equitable power of the Courts in situations

5    such as this.  It says, "The policy underlying this inherent

6    power of the courts is the need to preserve the integrity of

7    the judicial process in order to retain confidence that the

8    process works to uncover the truth. The courts must protect the

9    integrity of the judicial process because, as soon as the

10   process falters the people are then justified in abandoning

11   support for the system."  And maybe that's why those people are

12   over there on Wall Street with their tents and with their tarps

13   because in this situation, General Motors is seeking something

14   that if they were an individual debtor in a Chapter 7

15   proceeding and they had gone -- and the debtor had gone out and

16   secreted documents and was able to obtain a mortgage or a loan

17   and walked with a hundred thousand dollars and then filed

18   bankruptcy the same day, this Court would never countenance in

19   getting away with that.  They would say, huh uh, you pay back

20   that money.

21          But that's what General Motors wants to do here

22   because, under Chapter 11, it doesn't have the same case law

23   behind it in terms of fraud or it doesn't have the same

24   statutorily language as it does.  But that's what they want you

25   to do.  They want you to say, we hid these documents.  We tried

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 87 of 113

Page 87

1    to disrupt the litigation.  And we want to walk away from it

2    scot free, Judge.  We want to walk away with your imprimatur as

3    a court of equity saying that was all right, General Motors.

4    That was all right.  And with no consequences of that.

5            And that's what I submit to you trumps all of the

6    other legal issues whether these are compensatory or punitive

7    damages, whether it's a negligent standard or a gross negligent

8    standard and any of the other -- the argument over whether

9    John-Mansville (sic) applies here because, really, they were

10   talking about a trust for future asbestos victims or whether

11   the Robins case applies here because, really, that was a

12   reorganization and they needed to keep the money in order to

13   have the company become viable.  We can argue that till we're

14   blue in the face.  But we're talking about equity here.

15   Equity.  And that's what I would urge this Court to do is not

16   deny this claim and say no, go ahead with this claim.  If you

17   can prove General Motors fraudulently secretly documents as

18   part of a pattern of discovery which they engaged in in order

19   to deprive claimants of rightful claims, well, I don't think

20   that would be right.  I don't know if there's anything else

21   you'd like.

22           THE COURT:  Thank you.  Okay.  Mr. Smolinsky, reply.

23   As usual, limited to what Mr. Donovan said.

24           MR. SMOLINSKY:  Your Honor, as an initial matter, I

25   just want to point out that what Judge Shwartz found was not

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 88 of 113

Page 88

1    that GM committed fraud.  The issue was whether plaintiffs had

2    asserted a prima facie case that, under the broad definition of

3    fraud as set forth in the Ocean Spray Cranberries, Inc. v. Holt

4    Cargo case, whether it satisfies the necessary criteria for

5    opening up the privilege.  And that's what the Court found.

6    This was not a trial on whether GM committed fraud nor was that

7    the holding of the case.

8            Mr. Donovan's passionate arguments keep coming back to

9    one basic point.  As a matter of equity, you can't let GM walk

10   away scot free.  You can't let GM walk out of the room and say,

11   I got away with fraud.  I think that was his words.  But if

12   Your Honor allows this claim to stand and to go forward and,

13   God forbid, go to a trial and then -- a jury trial and then

14   come back to this court, you will have New GM standing there

15   and saying perhaps I got away with fraud, I got off scot free,

16   because there's no way, under this bankruptcy case, that any

17   element of the result of this issue, if it were tried, would

18   blow back to General Motors.  This is --

19           THE COURT:  To new General Motors.

20           MR. SMOLINSKY:  To new General Motors.  This is an

21   indictment of maybe the process of discovery in large cases.

22   Maybe things have changed.  I don't know.  But all I know is

23   that when you look at the equity of these cases and the equity

24   of the impact of this claim on all creditors, you're making the

25   individual creditors of this estate pay for the acts of General

09-50026-mg   Doc 11105   Filed 10/31/11   Entered 11/02/11 11:23:41   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 89 of 113

Page 89

1    Motors Corporation.  And it's not General Motors Corporation

2    that's paying the bills of the creditors.

3            And I keep coming back to that issue.  Mr. Green was

4    fully compensated for all of his losses.  And that's where this

5    issue should end.

6            With respect to the attorneys' fees that were out of

7    pocket, I don't know if that becomes a factual issue.  I --

8    that's something for Your Honor to consider.  But I do believe

9    that it was to pursue a claim that, unfortunately -- and this

10   happens from time to time.  When you're pursuing a claim and

11   the defendant goes into bankruptcy that you end up losing that

12   claim.  And it's unfortunate that that's a situation which

13   happens in all bankruptcy cases.  And to the event it rises to

14   the level of sanctions then, as I said before, I believe it's

15   simply punitive and the creditors of these estates should not

16   be forced to foot the bill.

17           I don't have anything else, Your Honor, unless you

18   have any questions.

19           THE COURT:  All right.  No, I don't.  Thank you.  All

20   right.  Here's what we're going to do.  On the final matter we

21   handle today, Newman, I'm taking that under submission.  And

22   while I don't know the degree of formality upon which I'm going

23   to write the decision, it will be a written decision.  It will

24   not be a dictated decision.

25           On the remaining three matters, I want you folks to

MOTORS LIQUIDATION COMPANY, et al.

Page 90

1    take a long lunch and to be back here at 2:00 at which time I

2    will dictate my rulings on the three matters for which I took

3    oral argument before the Newman matter.  Anybody -- most

4    obviously, you, Mr. Donovan, who has no interest in the matters

5    that others are coming back for, is free to leave.  All right.

6    We're in recess.  Thank you.

7         (Recess from 12:15 p.m. until 2:19 p.m.)

8         THE COURT:  Good afternoon.  Ladies and gentlemen, in

9    this contested matter in the Chapter 11 case of reorganized

10   debtor, Motors Liquidation Company, formerly known as General

11   Motors, the GUC trust, which was formed under the plan for,

12   among other purposes, protecting the interests of Old GM's

13   unsecured creditor community, objects to three proofs of claim

14   filed by Mr. William Kuntz, III.  The GUC trust contends that

15   they failed to describe the basis for the claims and lack all

16   of the things that are necessary to even establish a prima

17   facie claim against the estate.

18        The GUC trusts objections are sustained and the claims

19   will be expunged.

20        On September 16, 2009, I entered a bar date order

21   establishing November 30, 2009 as the deadline for filing all

22   proofs of claim in these Chapter 11 cases.  Prior to the

23   deadline established under the bar date order, Mr. Kuntz filed

24   three proofs of claim against debtor "General Motors".  Two of

25   the claims were dated July 29, 2009 and a third was dated

MOTORS LIQUIDATION COMPANY, et al.

Page 91

1    August 23rd, 2009.  For each, Mr. Kuntz utilized the Court's

2    official Form 10 for filing proofs of claim which form was the

3    same in all material respects as the form that I approved when

4    I entered the bar date order.

5         As is fundamental, a proof of claim sets forth the

6    facts necessary to support the claim for the claim to receive

7    the prima facie validity accorded to proofs of claim under the

8    bankruptcy rules.  See In re Chain, 225 B.R. at 280 (Bankr.

9    D.Conn. 2000) and In re Marino, 90 B.R. at 28, another case

10   from the district of Connecticut, this one in 1998, these being

11   two of the many cases cited by my colleague, Judge Peck, in

12   addressing claims filed by Mr. Kuntz in other bankruptcy

13   proceedings in this court, there the Lehman Brothers

14   bankruptcy.  See also Ashford v. Consolidated Pioneer Mortgage,

15   178 B.R. at 226, which was affirmed by the Ninth Circuit

16   thereafter, and In re Allegheny International, 954 F.2d 173-

17   174.

18        My bar date order further articulated the requirements

19   for establishing a prima facie claim.  According to the bar

20   date order, all proofs of claim had to set forth with

21   specificity the legal and factual basis for the alleged claim

22   and include supporting documentation or an explanation as to

23   why such documentation is not available.  See page 2 of my bar

24   date order at docket entry 4079.

25        In addition, the Court's official Form 10 and the form

MOTORS LIQUIDATION COMPANY, et al.

Page 92

1    that I approved both required, on their face, that a claimant

2    "state the type of debt or how it was incurred".  In two places

3    on the forms, the claimant was instructed to "attach redacted

4    copies of any documents that support the claim".  In addition,

5    the form explained that a claimant "may be required to provide

6    additional disclosure if the debtor, trustee, or another party

7    in interest files an objection "to such claim".

8           In this case, Mr. Kuntz filed nothing more than a one-

9    page form for each of his three claims.  Mr. Kuntz wrote on one

10   claim for 300 dollars that it is a claim for "mail fraud/bait

11   and switch by a GM dealer."  But it said nothing more and no

12   attachments that accompanied the claim.

13          Moreover, to the extent it said anything, it alleged

14   wrongful conduct by a GM dealer not by GM and did not allege,

15   assuming arguendo that it might be sufficient to do so, even

16   that the dealer was acting at GM's direction.

17          Second claim.  Mr. Kuntz wrote there seeking 4500

18   dollars that it is for a "Chevy truck" and next to the words

19   "Chevy truck," Mr. Kuntz wrote "See attached" even though, like

20   the other claims, nothing was attached.  No attachments

21   accompanied the claim.

22          On his third claim which was in the amount of 2400

23   dollars, Mr. Kuntz wrote that it is a for "file cabinet with GM

24   dealer, Willsboro, NY".  As with the others, this baffling

25   description was not accompanied by further details.

09-50026-mg   Doc 11105   Filed 10/31/11   Entered 11/02/11 11:23:41   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 93 of 113

Page 93

1        At the risk of stating the obvious, neither the claim

2    that I just quoted from, nor the other two, came close to

3    meeting the requirements under the Code, the rules and the

4    official forms, much less my earlier orders, for laying out a

5    prima facie claim.

6        The GUC trust says that these claims "do not include

7    sufficient documentation to ascertain the nature or validity of

8    such claims.  See omnibus objection, paragraph 9 in Exhibit A

9    as amended.  And of course, the GUC trust is right in that

10   respect.

11       On October 21st, my Court received a response by Mr.

12   Kuntz to the GUC trust objection.  Then he purported to add

13   meat to his earlier proofs of claim.  He explained that his

14   claim for 300 dollars was connected to a free gas card promised

15   in exchange for a test drive and credit application.  He

16   described the claim for 4500 dollars as a claim for the loss of

17   an old Chevy truck that Mr. Kuntz purchased from his Uncle Don.

18   And the claim appeared to reflect cause for towing the truck

19   and perhaps other expenses relating to a citation issued by the

20   police because the truck was blocking the sidewalk.  Mr. Kuntz'

21   explanation was unclear and in no way explained how he was

22   entitled to a claim of 4500 dollars from the old General Motors

23   estate.  And his response also addressed his claim for 2400

24   dollars explaining that it represented the loss of a fireproof

25   file cabinet which he blamed on a small dealer exit program.

MOTORS LIQUIDATION COMPANY, et al.

Page 94

1          These explanations were impossible not just difficult

2    to follow.  They lacked logical coherence but, more

3    fundamentally, the supporting documentation and/or explanation

4    that is essential to a filed proof of claim.

5          Finally, on October 26th, Mr. Kuntz submitted a

6    further response after the GUC trust had filed a reply once

7    more failing to advance or substantiate his claims in any

8    reasonable or comprehensible measure.

9          Because his claims are so lacking in supporting

10   evidence and logical linkage to the debtors' cases, most

11   fundamentally in showing anything that Old GM even allegedly

12   did that was wrong, they're not entitled to any presumption of

13   validity that otherwise attaches to most creditors' proofs of

14   claim.

15         Justice Sonya Sotomayor, now of the United States

16   Supreme Court, when she was a district judge sitting in this

17   district, observed while ruling against Mr. Kuntz in one of the

18   many other matters in which he has appeared as a litigant that

19   his "status as a pro se litigant is of little import," because

20   even back then, in 1993, he had already "amassed litigation

21   experience that would embarrass the majority of associates and

22   some partners at large New York law firms" while demonstrating

23   a "consistent patter of vexatious litigation and little respect

24   for the Courts or other parties".  See Kuntz v. Pardo, 160 B.R.

25   at 39.

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 95 of 113

Page 95

1          Unfortunately, here, we have more of the same.

2     Assuming without deciding that a bankruptcy claimant with this

3     kind of track record would still be able to assert a claim if a

4     sufficient basis for it had been shown, that doesn't help Mr.

5     Kuntz here.  His various submissions simply can't show the

6     existence of a debt, at least one that's owed by Old GM.

7          The GUC trust is to settle an order expunging the

8     claim.  The time to appeal from this determination will run

9     from the time of the resulting entry of the resulting order and

10    not from the time of this dictated decision.

11         Just a moment, please, folks.

12    (Pause)

13         THE COURT:  Next.  In this contested matter in the

14    jointly administered Chapter 11 cases of Motors Liquidation

15    Company, formerly known as General Motors Corporation and its

16    affiliates, an asbestos valuation consultant called Analysis

17    Research Planning Corporation applies, pursuant to Sections 330

18    and 331 of the Code, for compensation for the services it

19    provided to the legal representative for future asbestos

20    personal injury claimants which we more typically refer to

21    simply as the future claims representative.

22         The application has engendered two objections, limited

23    objections in part, one by the debtors who object to the

24    payment of fees for services after January 26, 2011 (sic), the

25    date on which a key stipulation resolving obligations to

09-50026-mg   Doc 11105   Filed 10/31/11   Entered 11/02/11 11:23:41   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 96 of 113

Page 96

1    asbestos claimants was signed, and another by the fee examiner

2    in these cases which makes a like objection but which is

3    applicable only to the date after that earlier stipulation I

4    just mentioned was approved.

5              The fees, except insofar as objected to, are approved.

6    Both objectors' objections are sustained for the period from

7    and after February 14th.  And in addition, the estate's

8    objections are also sustained for the period between January

9    21st, 2011 and that February 14th date for the reasons that

10   follow.

11             The underlying facts are not in dispute although the

12   inferences that flow from them and the conclusions that must be

13   drawn from the explanations I was given require me to make

14   findings in this area, probably mixed questions of fact and

15   law, as to the reasonableness of services after the two dates

16   in question.  As facts or as mixed questions of fact and law, I

17   find that services after each of those two dates, and

18   particularly the latter, were patently unreasonable and cannot

19   in any way, shape or form be tagged upon the remaining

20   creditors in this case.

21             Under Section 330(a)(3) of the Code, when determining

22   the amount of reasonable compensation to be awarded to a

23   professional, under familiar principles, I must consider the

24   nature, extent and value of such services taking into account

25   all relevant factors including (1)whether the services were

Page 97

1   necessary to the administration of the case -- and I interrupt

2   myself to say, for the avoidance of doubt, here, after each of

3   those two dates, they were not; (2)whether the services were

4   beneficial at the time at which the services were rendered --

5   and I once more interrupt myself to say that, here, they were

6   not; (3)and whether the services were performed within a

7   reasonable amount of time commensurate with the nature of the

8   task addressed as to which I, here, need make no finding

9   because the first two factors are so clear.

10          Also, under Section 330(a)(4), I should not allow

11   compensation for unnecessary duplication of services where

12   services that were either not necessary or not likely,

13   reasonably likely, to benefit the debtor's estate.

14          Since there is no objection, I'm not going to make

15   extensive findings vis-à-vis the portion of the fees that did

16   not warrant any concerns.  It's sufficient for me to say that

17   they were fine and I have no problems with them.  But although

18   those in the room know that I'm not speaking in anything other

19   than a conversational voice, and I'm certainly not raising my

20   voice, I am very, very troubled, disturbed and indeed annoyed

21   at the request insofar as it deals with the period after the

22   two key dates for which the objections related, and

23   particularly the services, 3,700 hours that were spent after a

24   deal had been struck.

25          On January 21st, 2011, the four parties with the

09-50026-mg   Doc 11105   Filed 10/31/11   Entered 11/02/11 11:23:41   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 98 of 113

Page 98

1     highest stakes in the valuation of the debtors' asbestos

2     claims -- that, of course, being the purpose for which Analysis

3     Research Planning Corp. was retained to act, those being the

4     debtors, the creditors' committee, the official committee of

5     unsecured creditors holding asbestos related claims, which we

6     refer to, in short, as the asbestos creditors' committee, and

7     the future claims representative all executed a stipulation

8     fixing the amount of the debtors' aggregate liability for

9     asbestos personal injury claims.  They reached an agreement to

10    fix those at 625 million dollars.  But the amount of the

11    settlement isn't important; it's the fact of the settlement

12    that's so critical.

13          Now that settlement was reached after earlier

14    litigation, most significantly, a motion previously filed by

15    the debtors seeking to estimate their aggregate liability for

16    asbestos claims at an earlier time.  And it goes without saying

17    that whatever reasonably was required, from the time that the

18    controversy arose when the debtors filed a motion up to the

19    time of the stip, is a price that just needs to be paid.  But

20    that February 21st date was a watershed event.  The purpose for

21    all of that estimation then came to an end.

22          Now we have a slight difference in perspective between

23    the debtors, on the one hand, who start their objection running

24    on January 21st, and the fee examiner's perspective who, out of

25    discretion or kindness or common sense or giving somebody a

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 99 of 113

Page 99

1    break, says he won't object until after February 14th when the

2    stipulation was ultimately approved.

3            The fee examiner's later date is not a reasonable one

4    but I reject it because of the total lack of any measures to do

5    a stop, look and listen to evaluate the risk that there was any

6    possibility that the stipulation would be disapproved.  I asked

7    questions as to that to both counsel.  Did anybody telegraph an

8    intention to object to that stipulation?  Were there any

9    objections?  Did anybody pick up the phone and say we're

10   thinking about objecting?  Was there any probable cause to

11   believe that there was an objection?  Every single one of those

12   answers was expressly or impliedly no.  It should have been

13   pencils down at that point.  Indeed, except for a relatively

14   modest thirty-nine hours that were spent by the asbestos

15   committee's counsel, all of the other people similarly situated

16   did go pencils down, much less not run up 3700 hours.

17           Incredibly, Analysis Research Planning Corporation

18   continued incurring fees not only after the execution of the

19   stip, but also after I so ordered the stip in February.  That,

20   of course, underlies the fee examiner's objection.  In fact,

21   the consultant's fees increased dramatically after the

22   stipulation was executed.

23           More shocking still, Analysis Research Planning

24   Corporation's highest per month fees in these cases were

25   incurred during the month that followed my so ordering of the

09-50026-mg   Doc 11105   Filed 10/31/11   Entered 11/02/11 11:23:41   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 100 of 113

Page 100

1    stip.  They went up to 116,000 dollars for the month of

2    February 2011 and 204,000 in fees for the month of March 2011.

3         Now I got a couple of explanations for all of this.

4    One related to the fact that a high volume of documents was

5    produced for review shortly before the January 21st stipulation

6    was entered into.  But as debtors' counsel properly observed,

7    that simply is irrelevant.  Assuming, as was obviously the

8    case, that the future claims representative could do enough to

9    enter into the stip, once the stip was entered into, there was

10   no purpose in engaging in the late produced documents any more

11   than there was a purpose in reviewing the earlier produced

12   documents.  It should have been pencils down.  Obviously, it

13   wasn't.

14        The next explanation I was told was that Analysis

15   Research Planning Corporation was told by the futures claim

16   representative that it should keep working.  Kind of like the

17   devil made me do it.  That is an unacceptable answer.  Any

18   party that is retained as a professional in a Chapter 11 case

19   in this district, and I'll go so far as to say in any

20   bankruptcy court in the United States of America undertake

21   statutory duties with which it must comply if it wants to get

22   paid.  It also owes a responsibility to, first, its

23   constituency and to the system to act responsibly.  As I noted,

24   there were there others in the same boat.  One of them put in

25   only a minimal amount of time and the others put in none at

MOTORS LIQUIDATION COMPANY, et al.

Page 101

1    all.  It was patently irresponsible and it cannot be the law

2    that one can be cleansed of its duties to comply with the

3    requirements of law by saying that one's client made him do it

4    or told him to do it.  In fact, if that ever were the law, it

5    would result in a kind of laundering of the requirements that

6    we impose upon professionals for responsible activity.

7         Now it goes without saying that we don't look at these

8    things solely in hindsight.  We look at services and their

9    reasonableness at the time they are rendered.  And if, by way

10   of example, it had turned out that the services were reasonable

11   when rendered at the time but later didn't turn out to be such,

12   I wouldn't be disapproving them at all, much less being as

13   annoyed as I am with respect to this application.

14        Here, a settlement had been entered into.  There was

15   no reason whatever to believe that it would be disapproved.  At

16   the time, no reasonable professional would have put in 3700

17   hours or anything close or, I dare say, even more than the

18   slightly excessive thirty-nine hours that were put in by the

19   asbestos committee.  The very fact that caused the other two to

20   not do anything thereafter was so obviously the right thing to

21   do.

22        In In re St. Rita's Associates Private Placement, LP,

23   216 B.R. 490 (Bankr. W.D.N.Y. 1998), the bankruptcy court

24   evaluated the reasonableness of services performed once a

25   settlement was "in prospect".  The St. Rita's court determined

Page 102

1    that the professionals should have deferred its work until the

2    outcome of the settlement had become known because such

3    settlement would render the services unnecessary.  See 216 B.R.

4    at 498.

5          Another explanation I was told was that either

6    Analysis Research Planning Corporation or the future claims

7    representative -- it's not to clear to me who had this idea --

8    was worried that the stipulation or the amount fixed by the

9    stipulation might be later challenged.  But it was executed by

10   each of the representatives of the primary stakeholders in

11   these cases.  Who was going to challenge it?  Well, from time

12   to time, it is true, as we all know, that people come out of

13   the woodwork to object to things which is why I asked the

14   question, had anybody in the world filed an objection or phoned

15   you or written you saying such would be forthcoming.  And both

16   sides told me no.

17          Even if there had been such, it was incumbent upon

18   Analysis Research Planning Corporation to consider the degree

19   of risk.  Contingencies can be theoretically possible and

20   nevertheless be remote.  Or, if it had uncertainty, it could

21   have picked up the phone and arranged for a conference saying

22   we think we need to keep on doing work, just want to give

23   everybody a chance to be heard on that, or give us an

24   opportunity if something goes bad to let us get back up to

25   speed without requiring us to do all that work now.  There were

MOTORS LIQUIDATION COMPANY, et al.

Page 103

1    a zillion things that could have been done.  But the one that

2    was done, spending thousands, hundreds of thousands of dollars

3    of creditor money, was an unacceptable one.

4         Finally, I was told that the consultant was doing

5    other stuff, too, assisting the future claims representative

6    performing other asserted lien necessary functions including

7    working against the possibility that somebody might object to

8    the plan.  But there was no basis whatever for concluding,

9    especially after the stipulation was approved by me, that

10   anybody would be contending that future claimants were being

11   paid too much.

12        I don't think I need to go on.  I think I've more than

13   satisfactorily explained my reasons for this decision.  The

14   motion is granted to the extent I noted and is otherwise

15   denied.  The parties in this case are authorized and instructed

16   to take the principles that I've articulated and to convert

17   them into their dollar equivalent and to submit an order to me

18   authorizing and directing payment of the requested fees to the

19   extent that the principles I just articulated dictate and

20   otherwise denying the motion.

21        Stand by.  Mr. Smolinsky?

22        MR. SMOLINSKY:  Yes, Your Honor.  Joe Smolinsky.  In

23   the process of making my remarks this morning, I noted that we

24   had already entered a final order approving the portion of the

25   fees attributable to the period before January 21st.  And so,

Page 104

1    from that perspective, I don't know that we need to do anything

2    further with respect to those fees.

3            THE COURT:  I see.

4            MR. SMOLINSKY:  If I understood Your Honor's ruling,

5    you are disallowing everything above that, everything that we

6    objected to.

7            THE COURT:  Yes.  I didn't realize that there was a

8    period -- that for services through January 21st they had

9    already been paid.

10           MR. SMOLINSKY:  I just want to make sure there's no

11   disagreement.  We'll prepare an order which reflects that fact.

12           THE COURT:  Okay.

13           MR. SMOLINSKY:  Thank you.

14           THE COURT:  In this third contested matter before me

15   today, this one also, of course, in the Chapter 11 cases of

16   reorganized debtor, GM, and its affiliates, the ad hoc

17   committee of asbestos personal injury claimants seeks about

18   232,000 dollars now reduced from an earlier larger request of

19   about 511,000 dollars for an asserted substantial contribution

20   to the debtors' reorganization.  The United States trustee

21   objects.

22           The U.S. trustee's objection is sustained and the

23   application is denied.  The following are my findings of fact

24   and bases for the exercise of my discretion in connection with

25   this determination.

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 105 of 113

Page 105

1          First, by way of background, it's the law in this

2     district and others, if not everywhere, that substantial

3     contribution provisions of the Code must be narrowly construed

4     to discourage mushrooming expenses.  Provisions like 503(b) do

5     not change the basic rule that the attorney must look to his

6     own client for payment.  See In re Granite Partners, 213 B.R.

7     440 at page 445 and, likewise, In re United States Lines, 103

8     B.R. 427 at page 429.  In short, the substantial contribution

9     provisions are narrowly construed and they're subject to strict

10    scrutiny.  As Judge Bushman noted in U.S. Lines, that rule is

11    well settled.  Page 429.

12         Similarly, as my colleague, Judge Beatty noted in In

13    re Villa Luisa L.L.C., 354 B.R. 345 at page 348, and I'm

14    quoting, "The burden of proving substantial contribution rests

15    on the petitioning creditor and it is exceedingly difficult

16    since the general presumption is that the creditor is acting in

17    its own interest.  Such an award is given only for

18    'extraordinary creditor actions on those rare occasions when

19    the creditor's involvement truly fosters [and] enhances the

20    administration of the estate.'"

21         That rule is broadly unique to this district.  As

22    noted by Judge Richard Schmidt in In re Asarco LLC, 2010 WL

23    3812642 at page *8 -- Judge Schmidt, of course, sitting in the

24    Southern District of Texas and having a very substantial

25    expertise in Chapter 11 cases -- "Substantial contribution

Page 106

1    claims may only be granted in unusual and rare circumstances.

2    Narrowly construing the allowance of substantial contribution

3    claims to rare and unusual circumstances is consistent with the

4    general doctrine that priority statutes, such as Section 503(b)

5    should be strictly construed to preserve the estate for the

6    benefit of creditors."

7            Here, I don't doubt that the ad hoc asbestos

8    committee's efforts benefited asbestos claimants.  I suspect

9    they benefited asbestos claimants substantially.  But I find as

10   a fact that there's been no comparable showing of a benefit for

11   anyone else.  In fact, I find the exact contrary to be true.

12   This is a classic case where the ad hoc committee was acting in

13   its own interest, see Villa Luisa, even where the position it

14   was taking could harm the estate as a whole, as its position

15   did with respect to the more than half of its original fee

16   request that it later withdrew and, indeed, as the ad hoc

17   committee did with respect to another 69,000 dollars in fees

18   with respect to the Remy International and Detroit Diesel that

19   I'll discuss momentarily.

20           The ad hoc committee's motion says as much.  See, for

21   example, Motion at paragraph 33.  "The Stutzman firm also spent

22   numerous hours attending to asbestos due diligence issues to

23   protect and preserve the rights of its constituency at a time

24   when no other party was advocating on behalf of the debtors'

25   asbestos victims."  See also Motion, paragraph 11.  "The ad hoc

Page 107

1    committee vigorously represented the interest of asbestos

2    creditors at a time when no other case fiduciary was advocating

3    their interests."

4         Assuming that to be true, and it's true only in part

5    because I authorized nunc pro tunc retention for counsel for

6    the official asbestos committee, even over the objection of the

7    U.S. trustee, that's a very different thing than saying that

8    the services provided were services that benefited everybody.

9    They were services that benefited a very small subset of the

10   Old GM creditor community that, as the cases make clear, is the

11   group that should pay for it, not the car wreck victims, not

12   the bondholders, not the retiree medical benefit plans.

13        The mindset of this group was evidenced by the

14   approximately 250,000 dollars in fees it spent in opposing the

15   363 sale to advance its private agenda despite how critical

16   that was to all of the ordinary and governmental creditors of

17   this case.  Now, of course, that request was withdrawn.  If it

18   didn't, I would truly be scratching my head.  I spoke to that

19   conduct before and I note that the ad hoc committee has now

20   withdrawn its request to be paid for that reducing its request

21   from its original size of about a half million down to about

22   232,000 dollars.  But its preoccupation with its own needs and

23   concerns and its failure even to materially assist everybody

24   else in anything more than the most minimal way is apparent.

25   And the request that remain still show that it was acting at

09-50026-mg    Doc 11105    Filed 10/31/11    Entered 11/02/11 11:23:41    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 108 of 113

Page 108

1    cross-purposes to the interest of the estate as a whole or, at

2    the very least, looking out for itself without any

3    corresponding or even modest benefit to anyone else in the

4    estate.

5           A classic example of this is the approximately 69,000

6    dollars that the ad hoc committee wants for what it calls

7    automatic stay issues.  But the Old GM estate was already

8    protected by the automatic stay.  The services involved a

9    request by Remy International and Detroit Diesel, two other

10   entities that can be regarded as the asbestos equivalent

11   analogue to PRPs in the environmental area, to extend the

12   automatic stay to protect themselves by lawsuits that had been

13   brought by asbestos claimants.

14          This controversy was a poster child for private

15   litigants involving themselves in the bankruptcy process to

16   advance their private agendas.  The matter was so unimportant

17   to the estate that the debtors' counsel didn't respond to it.

18   The debtors' counsel didn't waste the creditors' money by

19   preparing a response.  The creditors' committee whose

20   constituents' money has really been on the line in this case,

21   didn't respond either.  But the asbestos committee -- ad hoc

22   committee did opposing the request which just so happened to

23   have the effect of assisting asbestos claimants in going after

24   others.  And it did so when those asking for the injunction,

25   Remy International and Detroit Diesel, had a right or at least

1    an arguable right, to go after the estate for indemnification

2    which could actually increase claims against the estate.  So

3    the asbestos ad hoc committee sided with asbestos plaintiffs

4    even though its doing so could increase claims against the

5    estate.

6          Now I asked questions to see if my analysis in that

7    regard was mistaken in any way.  And the answer I got to the

8    extent it was an answer was that the asbestos litigants, other

9    than the ad hoc committee, of course, who wanted to bring these

10   actions, went against Remy International and Detroit Diesel

11   instead of going after the estate.  But I'm not sure what

12   basis, if any, I have to make such a finding especially since

13   this was a motion to extend the stay.  It had nothing to do

14   with asbestos plaintiffs giving up right to go against the

15   estate.  And, frankly, folks, it walks, talks and quacks like

16   helping out one's friends in the asbestos plaintiffs'

17   community.  It certainly didn't benefit this estate in any way,

18   shape or form.

19         Moreover, it's been held that "Something more than

20   mere conclusory statements regarding one's involvement in an

21   act resulting in 'substantial contribution' must be tendered in

22   order for such involvement to be compensable."  It's been

23   further stated that "Corroborating testimony by a disinterested

24   party attesting to a claimant's instrumental acts has proven to

25   be a decisive factor in awarding compensation to activities

Page 110

1    which otherwise might not constitute a substantial

2    contribution."  See U.S. Lines, which made those observations.

3    And look also at Baldwin United, 79 B.R. at 340, where the

4    debtor's former management testified as to helpful acts in

5    mediating disputes between senior and subordinated and equity

6    security holders.

7            It's quite clear, however, that if the judge sees the

8    substantial contribution itself, that's at least as good as a

9    disinterested observer coming forward and making that

10   observation.  But here, I have neither.  Here, I saw no

11   evidence of any benefit to the estate as a whole as contrasted

12   to advancing the private needs of asbestos claimants.

13           This case was not asbestos driven.  But dealing with

14   the needs and concerns of the small subset of asbestos

15   creditors materially delayed and complicated the case.  It

16   didn't assist it in any way.  And certainly the efforts of the

17   asbestos ad hoc committee didn't do so.  I already was asked to

18   authorize payment of approximately 3.5 million dollars for fees

19   and expenses of counsel for the official asbestos committee,

20   counsel for the future claims representative and for the future

21   claims representative himself.  Now I have a request for

22   another 232,000 dollars for a non-fiduciary plainly advancing

23   interest of the subset of the creditor community rather than

24   the entire creditor community in this case.

25           Finally, there is also an important principle of

MOTORS LIQUIDATION COMPANY, et al.

Page 111

1    fairness here.  In substance, the ad hoc committee here is

2    asking all of the other creditors of this estate and the

3    taxpayers of the United States and Canada to pay its fees

4    incurred for advancing its own needs and concerns, for

5    advancing its own agenda.  That's simply not tolerable in the

6    absence of a substantial benefit for everyone else, a benefit

7    for the other creditors who are being asked to foot the bill.

8           For all of these reasons, the motion is denied.  The

9    U.S. trustee is to settle an order in accordance with the

10   foregoing.

11          We're adjourned.

12          MR. MASUMOTO:  Thank you, Your Honor.

13       (Whereupon these proceedings were concluded at 3:15 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25                         I N D E X

Page 112

1

2                            R U L I N G S

3      DESCRIPTION                                    PAGE      LINE

4      Request by New GM to participate in proceedings    24        8

5      Re Nova Scotia trustee's claim as against old

6      General Motors granted; record is so ordered

7      GUC trust's objection to William Kuntz' claims     90        18

8      sustained;  GUC trust to settle an order           95         7

9      expunging Mr. Kuntz' claims

10     Fee application of Analysis Research Planning      96         8

11     Corporation for services rendered to the future

12     claims representative approved only through

13     1/21/11, the date when a stipulation resolving

14     obligations to asbestos claimants was signed;

15     debtors' objection sustained and application

16     for remainder of fees denied

17     Objection of the United States trustee re         104        23

18     application of the ad hoc committee of

19     asbestos personal injury claimants for payment

20     of fees and reimbursement of expenses sustained;

21     application denied

22

23

24

25

Page 113

1

2                    C E R T I F I C A T I O N

3

4    I, Lisa Bar-Leib, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6        Lisa Bar-Leib  Digitally signed by Lisa Bar-Leib
                         DN: cn=Lisa Bar-Leib, o, ou,
                         email=digital1@veritext.com, c=US
7    _____  Date: 2011.10.31 14:48:08 -04'00'

8    LISA BAR-LEIB

9    AAERT Certified Electronic Transcriber (CET**D-486)

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date:  October 31, 2011

17

18

19

20

21

22

23

24

25