Exhibit 1

TOGUT SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Albert Togut
Scott E. Ratner
Richard K. Milin

Conflicts Counsel to the Reorganized Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, *et al.*, | Case No. 09-50026 (REG) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF THOMAS A. MORROW IN SUPPORT OF REORGANIZED
DEBTORS' (1) SUPPLEMENTAL CLAIM OBJECTION AND (2) MOTION
TO ENFORCE THE PLAN INJUNCTION AND AUTOMATIC STAY AND
TO ENJOIN CHARTIS U.S. FROM CONTINUING TO RETAIN MORE THAN
$20 MILLION IT IMPROPERLY SEIZED FROM THE REORGANIZED DEBTORS**

THOMAS A. MORROW hereby declares as follows:

1.      I am a managing director of AlixPartners, LLP and served as a Vice
President of Motors Liquidation Company ("**Old GM,**" and as of the effective date of
Old GM's confirmed Second Amended Joint Chapter 11 Plan (the "**Plan**"), the "**Reorg-
anized Debtors**") throughout the period from Old GM's bankruptcy filing until the
March 31, 2011 effective date of Old GM's Plan (the "**Effective Date**"). I have continued
to serve Old GM after the Effective Date in the capacity of advisor. My responsibilities
for Old GM and the Reorganized Debtors have primarily consisted of overseeing risk
management activities.

2.      I respectfully submit this Declaration based upon personal know-
ledge, my review of relevant documents and Court filings, and communications and

advice I have received as specified below in support of the Reorganized Debtors'

(1) Supplemental Claim Objection and (2) Motion To Enforce the Plan Injunction and

Automatic Stay and To Enjoin Chartis U.S. From Continuing To Retain More Than $20

Million It Improperly Seized from the Reorganized Debtors.

      3.      Chartis U.S. ("**Chartis**") currently holds at least $20,571,486 of the

Reorganized Debtors' funds (the "**Seized Cash**") that the Reorganized Debtors have

asked Chartis to return.

      4.      Chartis originally obtained the Seized Cash from Old GM as

collateral in connection with the insurance agreements identified in the Assumption

and Collateralization Agreements among Old GM, General Motors LLC, Chartis

Specialty Insurance Co. and Lexington Insurance Co. effective July 10, 2009 (the "**Old

GM Insurance Agreements**").

      5.      Chartis has identified the following insurance policies (the "**Identi-

fied Policies**"), and only the following policies, as yielding potential obligations that

Old GM or the Reorganized Debtors might be required to collateralize:

| Policy Type | Insurer | Policy Number | Policy Limited and Collateral |
|---|---|---|---|
| Pollution | Chartis Specialty Insurance Co. | 7146277 | $8,000,000 |
| Storage Tanks | Chartis Specialty Insurance Co. | 7146278 | $2,000,000 |
| Hazardous waste (Ohio Closure/Post Closure) | Chartis Specialty Insurance Co. | 7146282 | $5,822,539 |
| Hazardous Waste (Michigan Corrective Action) | Chartis Specialty Insurance Co. | 7146281 | $3,839,721 |
| Hazardous Waste (New Jersey Closure) | Lexington Insurance Co. | 7146280 | $297,022 |
| Hazardous Waste (Illinois Closure) | Lexington Insurance Co. | 7146279 | $612,204 |

6.      All of the foregoing insurance policies are "claims made" policies that have expired. Except for Policy No. 7146281, no covered claims could be asserted under them after April 1, 2011.

7.      Although the claims period for Policy No. 7146281 did not expire until September 1, 2011, the Reorganized Debtors cancelled that policy on March 31, 2011.

8.      My understanding is that the Environmental Response Trust Consent Decree and Settlement Agreement, which became effective on the Effective Date, resolved any potential claims by governmental authorities with respect to all of the sites covered by the Identified Policies except for the site at McCook, Illinois.

9.      My understanding is that any potential claims that might be asserted in the future under the Identified Policies have been released. After April 1, 2011, at Chartis's request – and after engaging in months of effort and expending significant resources – the Reorganized Debtors obtained signed releases from all but one of the governmental authorities that alone, I have been advised, could assert claims covered by the Identified Policies. The only exception is the Illinois authorities who have not yet provided a signed release for the McCook site.

10.     The policy limit of the Identified Policy that relates to McCook is $612,204.

11.     By March 1, 2011, based on the Identified Policies' expiration and the Environmental Response Trust Consent Decree and Settlement Agreement, I con-cluded that Chartis would no longer have a good faith basis for keeping the collateral it had obtained from Old GM after the Effective Date.

12.     By March 1, 2011, I also had been advised that Chartis's proofs of claims (the **"Proofs of Claim"**) sought payment of premiums and deductibles that Old

3

GM did not actually owe and that the other sums Chartis sought in its Proofs of Claim
were not owed or, at a minimum, were not supported by sufficient documentation for
Old GM to determine that they were owed.

13.    Accordingly, I requested that Chartis return the collateral on March
1, 2011.

14.    On or about March 3, 2011, I was informed that Chartis had refused
to return Old GM's approximately $20.6 million in collateral – the "Seized Cash"
referred to above.

15.    I have not been informed at any time since March 3, 2011 that
Chartis is holding the Seized Cash in escrow or for the benefit of the Reorganized
Debtors.  Rather, my understanding is that Chartis took control of the Seized Cash for
its own purposes.

16.    No other insurer or surety refused to return Old GM's collateral in
circumstances similar to Chartis's.

17.    Old GM and, after the effective date of Old GM's Plan, the
Reorganized Debtors, have made numerous requests for the return of the Seized Cash
after March 1, 2011.  These requests have all been refused, and none of the Seized Cash
has been returned.

18.    Old GM and the Reorganized Debtors have also made attempts to
reach a negotiated resolution with Chartis after March 1, 2011, both with and without
the assistance of counsel.  Those attempts were unsuccessful.  As part of the
negotiations, Chartis requested that the Reorganized Debtors obtain releases letters, but
even though Chartis has been provided with letters releasing potential claims for all
sites except McCook, Illinois, Chartis has not returned any of the Seized Cash.

19.    With respect to McCook, Chartis has provided no documentation to the Reorganized Debtors to show that any claims under the Identified Policies are likely to arise.

20.    To date, Chartis has not provided a reasoned justification – or any written justification at all – for its continued retention of the Seized Cash.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed in New York, New York on October 5, 2011

　　　　　　　　　　　   /s/ Thomas A. Morrow
　　　　　　　　　　　THOMAS A. MORROW
　　　　　　　　　　　40 West 57TH Street
　　　　　　　　　　　New York, New York 10019
　　　　　　　　　　　(212) 490-2500

Exhibit 2

## ASSUMPTION AND COLLATERALIZATION AGREEMENT
Effective July 10, 2009

entered into by and between

## CHARTIS SPECIALTY INSURANCE COMPANY
**(f/k/a American International Specialty Lines Insurance Company**
**(hereinafter, the "Company")**

and

## GENERAL MOTORS LLC
successor, by conversion to a Delaware limited liability company, of the Delaware corporation formerly
known as General Motors Company[1], (hereinafter, "NEW GM")

and

## MOTORS LIQUIDATION COMPANY (f/k/a General Motors Corporation),
a Delaware corporation[2] (hereinafter, "OLD GM")


**WHEREAS**, for the policy periods September 1, 2006 through September 1, 2007; September 1, 2007 through April 1, 2009; and April 1, 2009 through April 1, 2010, the Company issued to OLD GM, certain policies of insurance providing coverage for environmental liability (together with all endorsements, schedules and addenda thereto, the **"OLD GM Insurance Policies"**); and

**WHEREAS**, in conjunction with the OLD GM Insurance Policies, the Company and OLD GM executed that certain Payment Agreement effective September 1, 2006 (collectively with all addenda and schedules thereto, and the terms of any other agreements between the Company and OLD GM related thereto, the **"OLD GM Payment Agreement"**), detailing the respective liabilities, obligations and rights of the Company and OLD GM; and

**WHEREAS**, the OLD GM Insurance Policies and the OLD GM Payment Agreement are incorporated herein by reference and are hereinafter collectively referred to as the **"OLD GM Insurance Program Agreements"**; and

**WHEREAS**, as security for the obligations under the OLD GM Insurance Program Agreements, the Company currently maintains certain collateral in the form of (i) cash collateral in the amount of US Twelve Million Dollars ($12,000,000) (the **"Cash Collateral"**), which such Cash Collateral OLD GM and NEW GM each represents constitutes Restricted Cash (as defined in the Purchase Agreement) retained by OLD GM under the terms of the Purchase Agreement (defined below); and (ii) a collateral trust which, as of February 28, 2010, totals in the aggregate US Thirty One Million Three Hundred Thirty Four Thousand Nine Hundred Eleven Dollars and Fifty-Eight Cents ($31,334,911.58)(the **"Original Collateral Trust"**); and

**WHEREAS**, on June 1, 2009, OLD GM filed a voluntary petition under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the **"Bankruptcy Court"**); and

---

[1] Pursuant to that certain Secretary of State Certificate of Conversion attached hereto as Exhibit A, NEW GM is the successor to General Motors Company by conversion to a Delaware limited liability company effective October 16, 2009.

[2] Pursuant to that certain Secretary of State Certificate of Corporate Name Change attached hereto as Exhibit B, General Motors Corporation changed its corporate name to "Motors Liquidation Company" effective July 9, 2009.

1

WHEREAS, pursuant to that certain Amended and Restated Master Sale and Purchase Agreement by and between OLD GM and NGMCO, Inc.[3] dated as of June 26, 2009, and approved by the Bankruptcy Court on July 5, 2009 (the "**Purchase Agreement**") and as described in detail therein; on July 10, 2009, NEW GM acquired substantially all of the assets of OLD GM, including but not limited to, in relevant part:

- the specific facilities identified on Exhibit D attached hereto (the "**Purchased Assets**"); and

- all of OLD GM's right, title, and interest in the portion of the Original Collateral Trust related to the Purchased Assets, which OLD GM and NEW GM each represents totals U.S. Twenty One Million Seven Hundred Eighty Seven Thousand Two Hundred Twenty-Three Dollars and Fifty-Eight Cents ($21,787,223.58) valued as of February 28, 2010 (the "**Purchased Collateral**"); and

WHEREAS, pursuant to and in accordance with the Purchase Agreement, Company, OLD GM and NEW GM (sometimes individually referred to herein as a "**Party**" and sometimes collectively referred to herein as the "**Parties**") desire to have NEW GM assume all of the existing, outstanding and future insurance debts, liabilities, and duties of OLD GM as such have been incurred and may be incurred with respect to the Purchased Assets (the "**Assumed Obligations**"), and NEW GM has agreed to assume the Assumed Obligations; and

WHEREAS, NEW GM is aware of and has a complete understanding of the extent of the Assumed Obligations and is prepared to memorialize its assumption of such Assumed Obligations through execution of this Assumption and Collateralization Agreement (this "**Agreement**"); and

WHEREAS, commencing on July 10, 2009, the Company issued to NEW GM certain policies of insurance providing coverage for environmental liability for the Assumed Obligations (together with all endorsements, the "**NEW GM Insurance Policies**"); and

WHEREAS, in conjunction with the NEW GM Insurance Policies, the Company and NEW GM executed that certain Payment Agreement effective July 10, 2009 (collectively with all addenda and schedules thereto, and the terms of any other agreements between the Company and NEW GM related thereto, the "**NEW GM Payment Agreement**"), detailing the respective liabilities, obligations and rights of the Company and NEW GM; and

WHEREAS, the NEW GM Insurance Policies and the NEW GM Payment Agreement are incorporated herein by reference and are hereinafter collectively referred to as the "**NEW GM Insurance Program Agreements**;" and

WHEREAS, to secure both the Assumed Obligations and its other obligations under the NEW GM Insurance Program Agreements, in accordance with the terms of this Agreement, NEW GM will provide the Company with certain security as more specifically set forth below in Paragraph 2.1; and

WHEREAS, it is understood and agreed by the Parties that NEW GM's assumption of the Assumed Obligations shall have no impact on the responsibilities of the Parties to each other, if any, outside the scope of this Agreement.

---

[3] Pursuant to that certain Secretary of State Certificate of Corporate Name Change attached hereto as Exhibit C, NGMCO, Inc., a Delaware corporation, changed its corporate name to "General Motors Company" effective July 9, 2009.

2

**NOW, THEREFORE,** in consideration of the premiums paid, premises and the mutual covenants contained herein, the Parties hereby do mutually agree as follows:

## 1. ASSUMPTION OF OBLIGATIONS

1.1 Effective July 10, 2009 (the "**Effective Date**"), and in accordance with the Purchase Agreement, OLD GM sold to NEW GM all of its right, title, and interest in the Purchased Assets and Purchased Collateral, and NEW GM assumed and agreed to perform, fulfill, and discharge all of the Assumed Obligations in conformity with the terms and conditions of the NEW GM Insurance Program Agreements. On and after the Effective Date, OLD GM shall have no further obligations or liabilities to Company related to the Assumed Obligations.

1.2 The Company hereby acknowledges and consents to the assumption of the Assumed Obligations by NEW GM.

## 2. SECURITY

2.1 The Company acknowledges that NEW GM shall, in conjunction with its assumption of the Assumed Obligations and pursuant to the terms of this Agreement and the NEW GM Insurance Program Agreements, procure in favor of the Company collateral in the form of a new collateral trust (the "**New Collateral Trust**"), or such other security in another form acceptable to the Company, in an amount equal to the Purchased Collateral (the "**NEW GM Security**") to secure both the Assumed Obligations and its obligations under the NEW GM Insurance Program Agreements. Subject to Sections 2.4, 2.5, and 2.6 below, NEW GM's procurement of the NEW GM Security shall satisfy its obligations to provide collateral under the NEW GM Insurance Program Agreements and the Assumed Obligations.

2.2 OLD GM consents to the transfer of the Purchased Collateral, plus interest accrued thereon between February 28, 2010 and the date of such transfer, to the New Collateral Trust. The Parties shall take all further actions necessary to effectuate the transfer of Purchased Collateral in accordance with the terms of this Agreement.

2.3 After the transfer of Purchased Collateral to the New Collateral Trust as set forth herein, (i) the amount equal to U.S. Nine Million Five Hundred Forty Seven Thousand Six Hundred Eighty Eight Dollars ($9,547,688.00) will remain in the Original Collateral Trust and (ii) the Cash Collateral shall be deposited in the Original Collateral Trust; and such resulting combined amount U.S. Twenty One Million Five Hundred Forty Seven Thousand Six Hundred Eighty Eight Dollars ($21,547,688.00) shall continue to secure the obligations of OLD GM under, and in accordance with, the OLD GM Insurance Program Agreements; the terms of which, except as amended herein, remain unchanged and in full force and effect.

2.4 Without limitation or regard to the purpose for which the NEW GM Security is originally provided, NEW GM hereby grants to the Company the right to liquidate or take ownership of any and all of the NEW GM Security and apply the proceeds to pay the Company any of the Assumed Obligations or other obligations of NEW GM, including but not limited to its obligations under the NEW GM Insurance Program Agreements.

2.5 It is understood and agreed by the Parties that nothing herein shall imply or serve to provide for a maximum value, cap or limit to the amount of security required at the present or in the future to secure the Assumed Obligations or other obligations of NEW GM, including but not limited to those obligations under the NEW GM Insurance Program Agreements. The terms and conditions of the NEW GM Insurance Program Agreements shall control the review and adjustment of

3

collateral. If as a result of such review the Company determines that additional collateral is required to secure the Assumed Obligations or other obligations of NEW GM, including but not limited to those obligations under the NEW GM Insurance Program Agreements, NEW GM will provide such additional collateral, in a form and amount acceptable to the Company, within thirty (30) days of the Company's written request.

2.6 Until such time as the NEW GM Collateral Trust is established and the NEW GM Security is received and accepted by the Company in accordance with Paragraphs 2.1 and 2.2 above, it is understood and agreed that the portion of the Original Collateral Trust that is Purchased Collateral is and will be available to pay the Company for the Assumed Obligations or other obligations of NEW GM, including but not limited to those obligations under the NEW GM Insurance Program Agreements.

## 3. REPRESENTATIONS, WARRANTIES AND COVENANTS

3.1 NEW GM agrees that all of the Assumed Obligations assumed pursuant to the terms of this Agreement shall be subject to the terms and conditions of the NEW GM Insurance Program Agreements only.

3.2 New GM and the Company agree to adhere to the existing coverages under the New GM Insurance Policies with respect to the Assumed Obligations for events that have occurred prior to the Effective Date and where claims are brought after the Effective Date.

3.3 Each of the Parties has entered into this Agreement based upon its own independent assessment of its rights and obligations under this Agreement and not based upon any representations, disclosures, or nondisclosures made by the other Party or by any other entity.

3.4 Each of the Parties represents and warrants that it is authorized to enter into this Agreement and the transactions contemplated herein; that the person or persons executing this Agreement on its behalf is/are authorized to do so; that it is not a party to any pending agreements, transactions or negotiations that would render this Agreement or any part hereof void, voidable or unenforceable; and that any authorizations, consents or approvals of any governmental or regulatory entity or authority required to make this Agreement valid and binding upon it has been obtained.

## 4. INDEMNIFICATION

NEW GM shall indemnify, defend and hold harmless the Company, its affiliates and their respective officers, directors, employees and agents from, against and with respect to any and all claims, liabilities, obligations, losses, damages, assessments, settlements, judgments, costs or expenses (including without limitation, reasonable attorneys' fees and costs and expenses reasonably incurred in investigating, preparing, defending against or prosecuting any litigation or claim), causes of action, suits, proceedings or demands, of any kind or character arising out of or in any manner incident, relating or attributable to any failure of NEW GM to perform, fulfill or discharge any of the insurance obligations assumed under this Agreement.

## 5. ARBITRATION

5.1 In the event of any dispute between the Company and NEW GM with reference to the interpretation, application, formation, enforcement or validity of this Agreement, or their rights with respect to any transaction involved, whether such dispute arose before or after the termination of this Agreement, such dispute upon the written request of any Party, will be submitted to binding arbitration.

5.2 Unless otherwise agreed to by the Company and NEW GM, all arbitrators will be executive officers or former executive officers of property or casualty or reinsurance companies domiciled in the United States not under the control of any of the Parties.

5.3 The arbitrators will interpret this Agreement as an honorable engagement and not merely a legal obligation; they are relieved of all judicial formalities and may abstain from following the strict rules of law, and they will make their award with a view toward effecting the general purpose of this Agreement in a reasonable manner.

5.4 The arbitrators will render their decision, in writing, based upon a hearing in which evidence may be introduced without following the strict rules of evidence, but in which cross-examination and rebuttal will be allowed. The arbitrators will have the power to award compensatory money damages, and interest thereupon, and will have exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability; but the arbitrators will not have the power to award exemplary or punitive damages, however denominated, whether or not multiplied.

5.5 Each party to the arbitration will bear the expense of its own arbitrator and jointly and equally bear with the other party the expense of the arbitration.

5.6 Said arbitration will take place in New York, New York unless otherwise mutually agreed to by the Parties. The arbitration will be governed by the United States Arbitration Act, 9 U.S.C. 1, et seq., and judgment upon the award rendered by the arbitrators may be entered by a court having jurisdiction thereof.

5.7 This Article 5 will survive termination of this Agreement.

6. **OTHER**

The Bankruptcy Court shall have jurisdiction over the parties with respect to any disputes involving OLD GM regarding the terms or enforcement of this Agreement. Notwithstanding the preceding sentence, the Parties reserve all of their rights with respect to all jurisdictional issues, including the right to arbitration, regarding any dispute under the OLD GM Insurance Program Agreements, the Original Collateral Trust, the New GM Insurance Program Agreements, or the New Collateral Trust.

7. **CONSTRUCTION**

7.1 This Agreement shall be construed in accordance with the internal laws of the State of New York without regard to those provisions concerning conflicts of laws.

7.2 This Agreement is drafted in good faith. Should the need arise, the Parties shall cooperate in demonstrating to a court or arbitration panel that this Agreement, together with any terms and provisions contained therein, was negotiated in good faith.

7.3 It is expressly understood that this Agreement contains no admissions whatsoever regarding insurance coverage. This Agreement is not and shall not be interpreted as a contract or policy of insurance.

7.4 All Recitals included in this Agreement are specifically incorporated herein and made a part of this Agreement.

5

## 8. ENTIRE AGREEMENT

8.1 This Agreement is an integrated document, containing the entire undertaking between the Parties regarding the matters addressed herein, and, except as set forth in this Agreement, no representations, warranties, promises, inducements or considerations have been made or relied upon by the Parties.

8.2 This Agreement shall prevail over all prior communications between the Parties or their representatives regarding the matters contained herein.

## 9. EFFECT

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective heirs, executors, legal representatives, successors and permitted assigns.

## 10. SEVERABILITY

Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions and without affecting the validity or enforceability of such provision in any other jurisdiction.

## 11. COUNTERPARTS

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against either Party whose signature appears thereupon and all of which shall constitute one and the same instrument. This Agreement shall be deemed fully executed when one or more counterparts hereof, individually or taken together, shall bear the signatures of each Party.

### [SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly
authorized representatives.

**CHARTIS SPECIALTY INSURANCE COMPANY**

By: _____

Printed Name:  Thomas J. O'Rourke

Title:  Attorney-in-Fact

Date:  April 23, 2010

**GENERAL MOTORS LLC**

By: _____

Printed Name:  Alan G. Gier

Title:  Director, Global Risk Management & Insurance

Date:  April 7, 2010

**MOTORS LIQUIDATION COMPANY**

By: _____

Printed Name:  Thomas A. Morrow

Title:  Vice President

Date:  May 11, 2010

7

EXHIBIT A

[Secretary of State Certificate of Conversion issued to NEW GM attached]

EXHIBIT B

[Secretary of State Certificate of Corporate Name Change issued to OLD GM attached]

9

**EXHIBIT C**

[Secretary of State Certificate of Corporate Name Change
issued to "General Motors Company" effective July 9, 2009 attached]

10

EXHIBIT D (page 1 of 2)

| Facility | | UST Facility # |
|---|---|---|
| GM Desert Proving Ground — Yuma<br>1500 East GM Drive<br>Yuma, AZ 85365-9498 | UST/AST | 0-010299 |
| General Motors Manufacturing — Stamping<br>Marion Metal Center<br>2400 W. Second Street<br>Marion, IN 46952-0036 | UST/AST | 003121 |
| General Motors Proving Grounds<br><br>3300 General Motors Road<br>Milford, MI 48380-3726 | UST/AST | 0016461 |
| General Motors Technical Center[4]<br><br>Environmental Services<br>Bldg. 1-1<br>Warren, MI 48090 | UST/AST | 00033132, 00036423, 00036429,<br>00036430, 00036431. 00036434 |
| GM Flint Assembly<br>G-3000 Van Slyke Road<br>Flint, MI 48551 | UST/AST | 00017757 |
| GM Pontiac North Campus – Powertrain<br>895 Joslyn Road<br>Pontiac, MI 48340-2920 | UST/AST | 00038781 |
| GM Powertrain Group<br>Saginaw Metal Casting Operations<br>1629 N. Washington Avenue<br>Saginaw, MI 48605 | UST/AST | 00010581 |
| GM Powertrain<br>Romulus Engine<br>36880 Ecorse Road<br>Romulus, MI 48174 | UST/AST | 00002680 |
| Lansing Grand River<br>920 Townsend Street<br>Lansing, MI 48921 | UST/AST | 00013819 |

---

[4] Identified as GM Powertrain Vehicle Performance Center, 30003 Van Dyke Ave, Warren, MI 48090 in the
Purchase Agreement. They are one and the same.

11

EXHIBIT D (page 2 of 2)

| | | |
|---|---|---|
| GM Powertrain Division<br>Tonawanda Engine Plant<br>2995 River Road<br>P. O. Box 21<br>Buffalo, NY 14240 | UST/AST | 9-600598 |
| MFD Lordstown Metal Center<br>2369 Ellsworth-Baily Road<br>Lordstown, OH 44481 | UST/AST | 78000021 |

EXHIBIT D (continued)

| | |
|---|---|
| GMVM Janesville Assembly[5]<br>544 Kellogg Ave.<br>Janesville, WI 53546<br>Tank ID # 650215<br>Tank Capacity -- 20,000 gallons | UST/AST |
| GM Technical Center<br>6250 West Chicago Road<br>Warren, MI 48090<br>EPA ID#: MID050615996 | Pollution |
| GM Powertrain Group Defiance<br>26427 St., Rte 281 E.<br>Defiance, OH 43512<br>EPA ID#: OHD005050273 | Pollution |
| NACG Metal Fab<br>2369 Ellsworth-Bailey Road<br>Lordstown, OH 44481<br>EPA ID#: OHD083321091 | Pollution |
| GM Powertrain Group Defiance (RCRA & RSWA)<br>26427 St., Rte 281 E.<br>Defiance, OH 43512<br>EPA ID#: OHD005050273 | Closure/Post Closure |
| NACG Metal Fab Plant (RCRA)<br>2369 Ellsworth-Bailey Road<br>Lordstown, OH 44481<br>EPA ID#: OHD083321091 | Closure/Post Closure |

---

[5] Identified as GM Assembly Janesville, 1000 Industrial Ave, Janesville, WI 53546 in the Purchase Agreement. They are one and the same.

## LETTER AGREEMENT
Effective July 10, 2009

entered into by and between

## LEXINGTON INSURANCE COMPANY
(hereinafter, the "**Company**")

and

## GENERAL MOTORS LLC
successor, by conversion to a Delaware limited liability company, of the Delaware corporation formerly
known as General Motors Company[1], (hereinafter, "**NEW GM**")

and

## MOTORS LIQUIDATION COMPANY (f/k/a General Motors Corporation),
a Delaware corporation[2] (hereinafter, "**OLD GM**", and together with the Company and NEW GM, the
"**Parties**")

**WHEREAS**, for the policy period April 1, 2009 through April 1, 2010, the Company issued to
OLD GM, certain policies of insurance providing coverage for environmental liability (together with all
endorsements, schedules and addenda thereto, the "**OLD GM Insurance Policies**"); and

**WHEREAS**, in conjunction with the OLD GM Insurance Policies, the Company and OLD GM
executed a certain Payment Agreement effective April 1, 2009 (collectively with all addenda and schedules
thereto, and the terms of any other agreements between the Company and OLD GM related thereto, the
"**OLD GM Payment Agreement**"), detailing the respective liabilities, obligations and rights of the
Company and OLD GM; and

**WHEREAS**, the OLD GM Insurance Policies and the OLD GM Payment Agreement are
incorporated herein by reference and are hereinafter collectively referred to as the "**OLD GM Insurance
Program Agreements**"; and

**WHEREAS**, as security for the obligations under the OLD GM Insurance Program Agreements,
the Company currently maintains collateral in the form of cash collateral in the amount of US One
Million Two Hundred Forty Five Thousand Five Hundred Sixty Dollars and Ninety-Eight Cents
($1,245,560.98) valued as of February 28, 2010 (the "**Original Collateral**"); and

**WHEREAS**, OLD GM (as Grantor), the Company (as Beneficiary), and The Bank of New York
Mellon (as Escrow Agent) are parties to that certain Escrow, Security and Control Agreement for Payment
Agreement Obligations effective May 6, 2009 (the "**Lexington Trust**");and

**WHEREAS**, on June 1, 2009, OLD GM filed a voluntary petition under Chapter 11 of Title 11 of
the United States Code in the United States Bankruptcy Court for the Southern District of New York (the
"**Bankruptcy Court**"); and

---

[1] Pursuant to that certain Secretary of State Certificate of Conversion attached hereto as Exhibit A, NEW GM is the
successor to General Motors Company by conversion to a Delaware limited liability company effective October 16,
2009.

[2] Pursuant to that certain Secretary of State Certificate of Corporate Name Change attached hereto as Exhibit B,
General Motors Corporation changed its corporate name to "Motors Liquidation Company" effective July 9, 2009.

1

**WHEREAS**, pursuant to that certain Amended and Restated Master Sale and Purchase Agreement by and between OLD GM and NGMCO, Inc.[1] dated as of June 26, 2009, and approved by the Bankruptcy Court on July 5, 2009 (the "**Purchase Agreement**") and as described in detail therein; on July 10, 2009, NEW GM acquired substantially all of the assets of OLD GM, including but not limited to, in relevant part, all of OLD GM's right, title, and interest in the portion of the Original Collateral in an amount equal to U.S. Three Hundred Forty Seven Thousand One Hundred Fifteen Dollars and Ninety-Eight Cents ($347,115.98) valued as of February 28, 2010 (the "**Purchased Collateral**"); and

**WHEREAS**, pursuant to the Purchase Agreement, and as approved by the Bankruptcy Court on March 5, 2010, OLD GM shall retain an amount equal to U.S. Eight Hundred Ninety Eight Thousand Four Hundred Forty Five Dollars ($898,445.00) of the Original Collateral.

**NOW, THEREFORE**, in consideration of the premiums paid, premises and the mutual covenants contained herein, the Parties hereby do mutually agree as follows:

1. Within thirty (30) days of the execution of this Letter Agreement (this "**Agreement**") by all Parties, Company shall (i) transfer the Purchased Collateral to NEW GM (in accordance with wire instructions to be provided by NEW GM); and (ii) transfer the remainder of the Original Collateral in an amount equal to U.S. Eight Hundred Ninety Eight Thousand Four Hundred Forty Five Dollars ($898,445.00) to the Lexington Trust, which sum shall be held therein in accordance with the terms of the OLD GM Insurance Program Agreements and the Lexington Trust.

2. OLD GM consents to the above-described transfer of the Purchased Collateral, plus interest accrued thereon between February 28, 2010 and the date of such transfer, to NEW GM.

3. The Parties shall take all further actions necessary to effectuate the above-described transfer of the Purchased Collateral in accordance with the terms of this Agreement.

4. Each of the Parties represents and warrants that it is authorized to enter into this Agreement and the transactions contemplated herein; that the person or persons executing this Agreement on its behalf is/are authorized to do so; that it is not a party to any pending agreements, transactions or negotiations that would render this Agreement or any part hereof void, voidable or unenforceable; and that any authorizations, consents or approvals of any governmental or regulatory entity or authority required to make this Agreement valid and binding upon it has been obtained.

5. NEW GM acknowledges that the Company is expressly relying on the representations made in this Agreement in connection with the above-described transfer of the Purchased Collateral to NEW GM. NEW GM further acknowledges that the Company may suffer damages if these representations are determined to be incorrect at any time. NEW GM does not undertake to be responsible for any such damages beyond the actual loss caused to the Company in the event any of these representations are determined to be incorrect; provided, however, that NEW GM's liability to the Company shall in no event exceed the amount of the Purchased Collateral, plus any further amounts incurred by Company for reasonable attorneys' fees and expenses.

---

[1] Pursuant to that certain Secretary of State Certificate of Corporate Name Change attached hereto as Exhibit C, NGMCO, Inc., a Delaware corporation, changed its corporate name to "General Motors Company" effective July 9, 2009.

6.  It is understood and agreed by the Parties that nothing herein shall have an impact on the responsibilities of the Parties to each other outside the scope of this Agreement.

7.  The terms of the OLD GM Insurance Program Agreements and the Lexington Trust, except as amended herein, remain unchanged and in full force and effect.

8.  The Bankruptcy Court shall have jurisdiction over the Parties with respect to any disputes involving OLD GM regarding the terms or enforcement of this Agreement.  Notwithstanding the preceding sentence, the Parties reserve all of their rights with respect to all jurisdictional issues, including the right to arbitration, regarding any dispute under the OLD GM Insurance Program Agreements, the Original Collateral Trust, the New GM Insurance Program Agreements, or the New Collateral Trust.

9.  The terms of this Agreement cannot be changed or terminated orally, cannot be orally waived, shall be binding on the Parties and their successors and shall be governed in all aspects by the laws of the State of New York.

10. All Recitals included in this Agreement are specifically incorporated herein and made a part of this Agreement.

**[Signature Page Follows]**

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed by their duly authorized representatives.

**LEXINGTON INSURANCE COMPANY**

By: _____

Printed Name:  Thomas J. O'Rourke

Title:  Attorney-in-Fact

Date:  April 23, 2010

**GENERAL MOTORS LLC**

By: _____

Printed Name:  Alan G. Gier

Title:  Director, Global Risk Management & Insurance

Date:  April 7, 2010

**MOTORS LIQUIDATION COMPANY**

By: _____

Printed Name:  Thomas A. Morrow

Title:  Vice President

Date:  May 11, 2010

4

# EXHIBIT A

[Secretary of State Certificate of Conversion issued to NEW GM attached]

EXHIBIT B

[Secretary of State Certificate of Corporate Name Change issued to OLD GM attached]

EXHIBIT C

[Secretary of State Certificate of Corporate Name Change
issued to "General Motors Company" effective July 9, 2009 attached]

# Exhibit 3

# MLC

Motors Liquidation Company
401 S. Old Woodward, Suite 370
Birmingham, MI 48009

Phone: 313.486.4044
Fax: 313.486.4258

March 31, 2011

Aon Risk Services Central
Joseph G. Callanan, Jr.
3000 Town Center, Suite 3000
Southfield, MI 48075

RE:    Motors Liquidation Company
       Hazardous Waste-Corrective Action Policy 7146281 (13000 Eckles Road, Livonia, MI)
       Collateral Amount: $3,839,721

Dear Mr. Callanan:

As you may know, Motors Liquidation Company ("MLC"), f/k/a General Motors Corporation, entered into a settlement agreement on October 20, 2010 with federal and state governmental authorities regarding MLC's environmental obligations at its owned real property, including MLC's site at 13000 Eckles Road, Livonia, MI. ("Settlement Agreement")[1]  On March 3, 2011, this Settlement Agreement was approved by the United States Bankruptcy Court for the Southern District of New York as part of MLC's Chapter 11 Plan of Liquidation. The Settlement Agreement dictates that MLC's owned real property will be transferred to an Environmental Response Trust on March 31, 2011 and discharges MLC's corrective action responsibilities at its owned real property, including those corrective action obligations insured by Hazardous Waste-Corrective Action Policy 7146281.  In exchange for MLC's funding of, and transfer of certain assets to the Environmental Response Trust, the governmental authorities have agreed not to seek, and have provided a covenant not to sue, MLC or the Environmental Response Trust with respect to any financial assurance required under environmental law relating to MLC's owned real property.  (Settlement Agreement ¶ 96).

MLC hereby surrenders policy Hazardous Waste-Corrective Action Policy 7146281 and requests that you cancel Hazardous Waste-Corrective Action Policy 7146281 effective 12:00 midnight March 31, 2011.  Please transfer any and all collateral being held in connection with Hazardous Waste-Corrective Action Policy 7146281 to MLC on March 31, 2011, the Effective Date of a confirmed plan of liquidation of MLC.  Collateral should be transferred via wire transfer from collateral account to the following account:

JPMorgan Chase
611 Woodward Ave.  Detroit, MI 48226

---

[1] A copy of the October 20, 2010 Environmental Response Trust Consent Decree and Settlement Agreement can be found on EPA's website at http://www.epa.gov/compliance/resources/cases/cleanup/cercla/mlc/index.html.

US_ACTIVE:\43656066\02\72240.0639

Account Name: MLC Master Funding Account
Account #: 838723369
Routing#: 021000021

Please make every effort to ensure that these funds are deposited in the aforementioned account by close of business on March 31, 2011. Should you have any questions or concerns, please contact Matthew D. Morton, MLC's counsel at Weil, Gotshal & Manges, at (202) 682-7053.

Tom Morrow, MLC

cc:    Celeste R. Gill (P52484)
Assistant Attorney General
Environment, Natural Resources and
Agriculture Division
6th Floor, G. Mennen Williams Building
525 West Ottawa Street
P.O. Box 30755
Lansing, MI 48909

Exhibit 4

# Togut, Segal & Segal llp

ONE PENN PLAZA
NEW YORK, NEW YORK 10119

ALBERT TOGUT
FRANK A. OSWALD *
NEIL BERGER *
SCOTT E. RATNER *
SIDNEY SEGAL (1935-1965)
BERNARD SEGAL (1932-1983)

OF COUNSEL
RICHARD K. MILIN°

(212) 594-5000
FACSIMILE
(212) 967-4258
INTERNET
eMail@TeamTogut.com

JAMES J. LEE *
BRIAN F. MOORE °
DAVID M. SMITH
STEPHANIE A. SKELLY ◊
STEVEN S. FLORES
MICHAEL D. HAMERSKY
NAOMI C. MOSS
LARA R. SHEIKH
JONATHAN P. IBSEN °
ANTHONY F. PIRRAGLIA

* MEMBER NY AND NJ BAR
° MEMBER NY AND CT BAR
e MEMBER NY AND MA BAR
◊ MEMBER NY AND AZ BAR

September 16, 2011

Michael S. Davis, Esq.
Zeichner Ellman & Krause LLP
575 Lexington Avenue
New York, New York 10022
Tel. (212) 826-5311
Fax (866) 213 9038
MDavis@zeklaw.com

Re:    **Motors Liquidation Company**, *et al.*
       **(f/k/a General Motors Corp**, *et al.*)
       **Chapter 11 Case No. 09-50026 (REG)**

Dear Michael:

On behalf of Motors Liquidation Company, *et al.*, f/k/a General Motors Corp., *et al.* ("Old GM"), we write to request the immediate return of $20,571,486 million in cash belonging to Old GM (the "Seized Cash") that your client Chartis U.S. ("Chartis") has improperly seized for its own purposes and has refused to return. As you know, Old GM has been requesting that Chartis return the Seized Cash since early March 2011, but Chartis has refused, and it has similarly failed to provide any substantial justification for its refusal. Old GM can only consider Chartis's conduct to be in bad faith, and it is a clear violation of both the Confirmation Order that Judge Gerber entered in the above-referenced bankruptcy case (the "Bankruptcy Case") and the automatic stay imposed by 11 U.S.C. § 362 (the "Automatic Stay"). Accordingly, unless Chartis returns Old GM's $20.5 million in Seized Cash by September 30, 2011, we will have no choice but to seek Court assistance in securing its return as well as damages and other appropriate relief.

To date, Chartis has provided no written explanation of its refusal to return the Seized Cash. As a result, Old GM has been forced to piece together Chartis's rationale from past discussions between the parties, Chartis's proofs of claim Nos. 59680-82 and 59697 (the "Proofs of Claim"), and Chartis's response to Old GM's initial objection to the Proofs of Claim (the

TOGUT, SEGAL & SEGAL LLP

Michael S. Davis, Esq.
Zeichner Ellman & Krause LLP
September 16, 2011
Page 2

"Response"). From these sources, Chartis appears to be relying on three arguments in refusing
to return the Seized Cash: (a) the argument that Old GM may owe Chartis significant sums
under the "Insurance Program" referenced in the Proofs of Claim; (b) the argument that Old
GM may owe Chartis up to $5 million in connection with the "Bristol" matter discussed in
Exhibit B to the Proofs of Claim, and (c) the argument that Old GM may owe Chartis up to $1
million in connection with the "Renick Cadillac" settlement mentioned in Exhibit A to the
Proofs of Claim.

As discussed below, these arguments provide no basis for Chartis's refusal to return the
Seized Cash. At a minimum, the Insurance Program – which is Chartis's sole arguable basis
for retaining at least $14.5 million of the Seized Cash – cannot possibly yield further claims
against Old GM. Indeed, the only claims that Chartis might speculate could potentially arise
out of the Insurance Program would be (1) time-barred, in that they could only be based on
claims-made insurance policies that have now expired; (2) enjoined by Court order, because
the Bankruptcy Court overseeing Old GM's bankruptcy has resolved substantially all of them
under the Environmental Response Trust Consent Decree and Settlement Agreement (the
"Environmental Response Trust"); and (3) expressly released in writing, because at Chartis's
specific request (and at considerable expense), Old GM has obtained releases from each of the
state agencies that could potentially assert demands covered by the Insurance Program, again
with the exception of McCook. Moreover, the McCook policy, under which any claims had to
have been asserted by April 1, 2011, had a coverage limit of only $612,204. Given these facts,
Chartis's seizure and retention of Old GM's cash as a supposed protection against purely
hypothetical liabilities that would be time-barred, resolved under the Environmental Response
Trust *and* expressly released is not merely bad faith – it is outrageous.

### Chartis Has No Right To Hold the Seized Cash To
### Collateralize Non-Existent Insurance Program Obligations

Chartis obtained the Seized Cash from Old GM as collateral in connection with the
Insurance Program and "Old GM Insurance Agreements" described in the Assumption and
Collateralization Agreements attached to this letter as Exhibit 1. By March 1, 2011, Chartis no
longer had a good faith basis for keeping Old GM's cash, and Old GM requested its return.
Instead, on or about March 3, 2011, Chartis seized Old GM's cash, which it could not plausibly
claim it was merely holding in escrow, and thereby violated the Automatic Stay as well as the
Bankruptcy Court's March 29, 2011 Confirmation Order continuing the Automatic Stay. *See*
Confirmation Order, Docket No. 9941. Every other insurer or surety returned Old GM's
collateral upon request in circumstances similar to those of Chartis; Chartis, and only Chartis,
refused.

Since March 2011, Old GM has made several further requests for the return of its Seized
Cash, and it has attempted to reach a negotiated resolution with Chartis, both with and
without the assistance of counsel. Unfortunately, Chartis has responded by resorting to

TOGUT, SEGAL & SEGAL LLP

Michael S. Davis, Esq.
Zeichner Ellman & Krause LLP
September 16, 2011
Page 3

obviously flawed arguments and delaying tactics, such as demanding release letters for merely
potential claims that, as of April 1, 2011, would have been both time-barred and not assertable
against Old GM or Chartis because they had been resolved pursuant to the Environmental
Response Trust. As a result, Chartis has now refused to return Old GM's Seized Cash for more
than five months without providing any plausible justification for doing so.

Chartis has no right to continue to hold the Seized Cash: the Old GM Insurance
Agreements provide no authorization whatsoever for Chartis to keep Old GM's assets as
collateral for claims against it that Chartis knows can never be made. Chartis has identified
only the following insurance policies (the "Identified Policies") as yielding potential
obligations that Old GM might be required to reimburse:

| Policy Type | Insurer | Policy Number | Policy Limit and Collateral |
|---|---|---|---|
| Pollution | Chartis Specialty Insurance Co. | 7146277 | $8,000,000 |
| Storage Tanks | Chartis Specialty Insurance Co. | 7146278 | $2,000,000 |
| Hazardous waste (Ohio Closure/ Post Closure) | Chartis Specialty Insurance Co. | 7146282 | $5,822,539 |
| Hazardous Waste (Michigan Corrective Action) | Chartis Specialty Insurance Co. | 7146281 | $3,839,721 |
| Hazardous Waste (New Jersey Closure) | Lexington Insurance Co. | 7146280 | $297,022 |
| Hazardous Waste (Illinois Closure) | Lexington Insurance Co. | 7146279 | $612,204 |

However, all of the foregoing insurance policies have expired and, except for Policy No.
7146281, no covered claims could be asserted under them after April 1, 2011. Further, although
the claims period for Policy No. 7146281 did not expire until September 1, 2011, Old GM
cancelled that Policy on March 31, 2011. [See Exhibit 2]. Consequently, no new claims against
Old GM or Chartis can properly be asserted under the Identified Policies that Chartis has used
as a pretext for its improper retention of the Seized Cash – any such claims would be time-
barred.

Also, claims under the Identified Policies have been resolved by the Bankruptcy Court
order approving the Environmental Response Trust. As Decretal Paragraph 7 of Old GM's
Confirmation Order states:

Togut, Segal & Segal llp

Michael S. Davis, Esq.
Zeichner Ellman & Krause LLP
September 16, 2011
Page 4

> The establishment and funding of the Environmental Response Trust and the
> transfer of the Environmental Response Trust Assets to the Environmental
> Response Trust or any entity formed by the Environmental Response Trust
> Administrative Trustee *shall be in full settlement and satisfaction of all present
> and future civil environmental liabilities or obligations of the Debtors to the
> Governmental Authorities,* other than the claims and rights reserved ....

*See* Confirmation Order at pp. 19-21 (emphasis added). The Environmental Response Trust
settlement resolved any potential claims by governmental authorities with respect to all of the
sites covered by the Identified Policies except for the site at McCook, Illinois.

In addition to being time-barred and resolved by Court order, any potential claims that
might be asserted in the future under the Identified Policies have been released. At Chartis's
request – and after engaging in months of effort and expending significant resources – Old GM
has obtained signed releases from all but one of the governmental authorities that alone could
assert claims covered by the Identified Policies. The exception relates only to the Illinois
authorities who have not yet provided a signed release for the McCook site but have indicated
their willingness to do so. Further, as noted above, the Identified Policy that relates to
McCook plainly cannot justify Chartis's retention of $20.5 million in Seized Cash – the policy
limit is only $612,204.

Given these facts, Chartis's continued retention of the Seized Cash is a clear violation of
the Bankruptcy Court's Confirmation Order and of the Automatic Stay that Order incorporates
and extends. Section 10.4 of Old GM's confirmed Second Amended Joint Chapter 11 Plan (the
"Plan") provides that the Automatic Stay remains in full force and effect until the closing of
the Bankruptcy Case, and Section 10.7 of the Plan enjoins all parties in interest from taking any
action to interfere with implementation or consummation of the Plan – such as seizing and
refusing to return $20.5 million. Further, the Plan's provisions are made binding on claimants
such as Chartis by Decretal Paragraph 5 of the Bankruptcy Court's Confirmation Order.
Chartis's unjustified seizure and retention of $20.5 million of Old GM's cash is therefore a clear
violation of these provisions of the Plan, for which Old GM, if necessary, will seek appropriate
remedies.

### Chartis Has No Right To Hold the Seized Cash To Collateralize
### Its Claimed Subrogation Rights Relating to the Bristol Claim

Despite the fact that it cannot lawfully retain any part of the Seized Cash to collateralize
obligations under Old GM's Insurance Program (for the reasons discussed above), Chartis
maintains that it has the right to retain approximately $5 million of the Seized Cash to pay
sums that Old GM allegedly owes to Chartis in connection with the Bristol matter described in
Exhibit B to Chartis's Proofs of Claim (the "Bristol Claim"). According to Chartis, Bristol
Center LLC ("Bristol") is the current owner of environmentally contaminated Connecticut real

TOGUT, SEGAL & SEGAL LLP

Michael S. Davis, Esq.
Zeichner Ellman & Krause LLP
September 16, 2011
Page 5

estate that formerly belonged to Old GM. *See* Chartis Proofs of Claim, Exhibit B. When Old GM could no longer pay the costs of environmental remediation, the State of Connecticut held Bristol responsible, and Bristol turned to its insurer, which happened to be Chartis. Chartis asserts that it has been paying for Bristol's remediation efforts and will presumably continue to do so until it exhausts the full $5 million in coverage and is therefore subrogated to Bristol's right to demand reimbursement from Old GM. In other words, Chartis's $5 million Bristol Claim does not arise out of the Insurance Program, the Identified Polices, or any other insurance policy that Chartis issued to Old GM – it arises entirely from Chartis's policy with an unrelated third party, Bristol. *See* Chartis Proofs of Claim, Exhibit B.

Nevertheless, Chartis has asserted that it is entitled to use the Seized Cash to reimburse itself for its Bristol Claim under the Old GM-Chartis Payment Agreement (included herewith as Exhibit 3, the "Payment Agreement"), which states, in what Chartis has identified as relevant part:

If default occurs, we may take reasonable and appropriate steps that are necessary to protect our interest. We will exercise good faith consistent with usual and customary commercial and credit practice in selecting and exercising such steps. We may take steps such as the following:

1. We may declare the entire unpaid amount of Your Payment Obligation immediately due and payable.

2. We may change any or all unexpired Policies....

3. We may draw upon, liquidate, or take ownership of any or all collateral we hold regardless of the form, and hold or apply such amounts to any of Your Payment Obligation under this Agreement or any other premium, surcharge or deductible financing agreement between You and us, or under any Policies. However, we will not draw upon, liquidate, or take ownership of more collateral than is reasonably necessary to protect our interest.

4. We may require You to deliver to us additional collateral....

5. We may cancel any or all unexpired Policies....

6. We may withhold payment of claims to You....

7. We may satisfy Your obligations to us in whole or in part by set-off against any moneys, securities, collateral, consideration or property of Yours received by, pledged to, held by or otherwise available to us in connection with Your Payment Obligation. You authorize us after any default to charge any account that You maintain with us in connection with Your Payment Obligation in order to satisfy any of Your obligations.

Payment Agreement at p. 8.

The Payment Agreement defines "Your Payment Obligation" as: "the amounts that you must pay us for the insurance and services in accordance with the terms of the Policies, this

TOGUT, SEGAL & SEGAL LLP

Michael S. Davis, Esq.
Zeichner Ellman & Krause LLP
September 16, 2011
Page 6

Agreement, and any similar primary casualty insurance policies and agreements with us
incurred before the inception date hereof." Payment Agreement at p. 4.

Chartis has maintained that it is entitled to retain a portion of the Seized Cash because
the seventh numbered default remedy quoted above (the "Setoff Remedy") allows Chartis to
"satisfy Your obligations to us in whole or in part by set-off against any monies, securities,
collateral, consideration or property of Yours received by, pledged to, held by or otherwise
available to us in connection with Your Payment Obligation." For at least four reasons,
however, the Setoff Remedy does not justify Chartis in retaining the Seized Cash to satisfy its
Bristol Claim.

*First*, Chartis has no right to exercise the Setoff Remedy because it is available only "[i]f
default occurs." Chartis has acknowledged to us that, notwithstanding contrary statements in
its Response to Old GM's initial objection to its Proofs of Claim, Old GM was not in default on
any financial or other affirmative obligations to Chartis as of Old GM's bankruptcy filing.
Further, Chartis's Response identifies only $41,956 in alleged monetary defaults in connection
with the Insurance Program, which would limit Chartis's remedies to retaining only $41,956 of
the Seized Cash. In addition, Chartis cannot claim to be entitled to exercise default remedies
due to Old GM's bankruptcy filing, because the Insurance Program, consisting of various
inter-related agreements, is clearly an executory contract and 11 U.S.C. § 365(b)(2) prohibits
Chartis from treating Old GM as in default based solely on its bankruptcy filing.

*Second*, the Payment Agreement specifies that the Setoff Remedy can be used only with
respect to Old GM's property that has been "received by, pledged to, held by or otherwise
available to us in connection with Your Payment Obligation." It appears, however, that Old
GM's collateral could only have been legally held, under the Assumption and Collateralization
Agreements, in a specified trust. Chartis has provided no evidence to show that the Seized
Cash is legally or properly held by Chartis rather than by a trust or escrow agent, and it has
failed to show that any agreements pledging the Seized Cash or making it available to Chartis
would make it available to pay the Bristol claim. Consequently, Chartis has no right to use the
Seized Cash for any Setoff Remedy.

*Third*, it is well established that a subrogee stands in the shoes of the subrogor and can
have no greater rights than the subrogor. Yet Chartis appears to maintain that it can avail
itself of Old GM's collateral to convert Bristol's unsecured claim against Old GM into a
secured claim against Old GM. Chartis has offered no legal support for this novel theory, and
it is contrary to black letter law.

*Fourth*, the Payment Agreement does not give Chartis the right to use Old GM's colla-
teral to pay the Bristol Claim or any other claim that Chartis may assert against Old GM by
right of subrogation. The Payment Agreement makes Old GM liable for its "Payment Obliga-
tion," but the Agreement's definition of that term, which is quoted above, limits it to specified

Togut, Segal & Segal llp

Michael S. Davis, Esq.
Zeichner Ellman & Krause LLP
September 16, 2011
Page 7

financial obligations arising out of the Insurance Program. The Bristol Claim, therefore, is not part of Old GM's Payment Obligation to Chartis.

The Bristol Claim also does not fall within the scope of the undefined term "obligations to us" that Chartis employs in describing the Setoff Remedy. In context, the natural reading of "obligations to us" is to refer to obligations in connection with the Insurance Program, not unrelated obligations owed for other reasons. Also, "obligations to us" naturally refers only to direct obligations to "us" – i.e., Chartis – and not to indirect obligations to parties other than Chartis who, like Bristol, just happen to be insured by Chartis. Indeed, if the Setoff Remedy were intended to cover every conceivable debt that Old GM might owe to Chartis for any reason, it would allow Chartis to buy other parties' claims and secure or satisfy them with Old GM's collateral at the rate of one hundred cents on the dollar. In addition, if the parties had truly intended to give Chartis the right to use Old GM's collateral to satisfy debts unrelated to the Insurance Program, they would not have limited that right to be effective only upon default.

Equally important, other provisions of the Payment Agreement preclude any reading of "obligations to us" that might cover the Bristol Claim. The Payment Agreement specifies that Old GM "must deliver collateral acceptable to us to secure Your Payment Obligation," adding that Chartis "may apply any collateral we hold in connection with this or any other similar primary casualty insurance policies or agreements to Your Payment Obligation." Payment Agreement at p. 6. This language implies that Chartis will "apply any collateral" only to Old GM's Payment Obligation and not to unrelated obligations arising out of Chartis's business dealings with third parties.

Moreover, the next paragraph eliminates any ambiguity by expressly limiting use of Old GM's collateral to its Payment Obligations. It states that "You grant us a possessory security interest in any property You deliver to us to secure Your Payment Obligation" and "direct us to hold *all such sums as collateral for Your Payment Obligation* as they (sic) may be payable now or may become payable in the future." (Emphasis added.) Payment Agreement at p. 6. Because the Payment Agreement directs Chartis to use *all* of Old GM's collateral for its Payment Obligation, Chartis has no right to use that collateral for any other obligations such as the Bristol Claim.

The Payments Agreement's specific restriction on Chartis's use of Old GM's collateral trumps any potential reading of the vague and undefined term "obligations to us" that might allow Chartis to apply the Seized Cash to the Bristol Claim. This is especially true given that the Payment Agreement must be construed against Chartis as its drafter, and that the phrase "obligations to us" is tucked away as the ambiguous seventh numbered item in a list of default remedies. Further, there is every reason to believe that, if Chartis were to convince a Court that the phrase "obligations to us" is ambiguous, and if the parties were to conduct discovery concerning its meaning as a result, the result would be the same: Old GM could not reason-

TOGUT, SEGAL & SEGAL LLP

Michael S. Davis, Esq.
Zeichner Ellman & Krause LLP
September 16, 2011
Page 8

ably have understood or intended that Chartis would use its Setoff Remedy as a reason to
seize Old GM's collateral and apply it to a subrogation claim unrelated to its Payment
Obligation. The Seized Cash must be returned.

### Chartis Has No Right To Hold the Seized Cash To Collateralize
### Its Claimed Subrogation Rights Relating to the Renick Claim

Chartis's claim based on the Renick Cadillac matter (the "Renick Claim") provides even
less justification for retaining even less of the Seized Cash than the Bristol Claim. Like the $5
million Bristol Claim, the $1 million Renick Claim arises from a right to subrogation that
Chartis asserts it has based on an insurance policy it issued to a party other than Old GM.
Chartis's Proofs of Claim describe the Renick Claim in full as follows:

> Renick Cadillac, Inc., Granite State Insurance Company, Policy #02 LX
> 003234283-2/000 (Commercial Garage Policy), Deutsch v. Renick Cadillac,
> Inc., et al., No. BC389150, Superior Court, Los Angeles County, California.
>
> Lexington has paid $1,000,000.00 in connection with settlement of
> the foregoing matter. Pursuant to its Proof of Claim, Lexington claims
> from the Debtor the amount of $1,000,000.00, plus any costs, including
> defense fees, paid by Lexington and/or any of its subsidiary, affiliate,
> and/or member companies in connection with the settlement of the
> foregoing matter, pursuant to the Debtor's indemnification obligations to
> the Insured Dealer.

As this description indicates, Chartis's Renick Claim seeks reimbursement from Old
GM for sums that Chartis's affiliate Lexington paid to or on behalf of Renick Cadillac pursuant
to an insurance policy issued to Renick, not Old GM. Like the Bristol Claim, the Renick Claim
is a subrogation claim asserting rights that have no relationship to Old GM's Insurance
Program. As a result, all of the reasons why Chartis cannot use the Seized Cash to satisfy the
Bristol Claim apply equally to the Renick Claim. Moreover, Chartis has not provided, and Old
GM has been unable to locate, any proof that Old GM actually owes any "indemnification
obligations to the Insured Dealer." Consequently, Chartis has no right to retain any of the
Seized Cash to satisfy or collateralize its Renick Claim.

### Conclusion

For all of the foregoing reasons, among others, Chartis must return the Seized Cash by
September 30, 2011. Neither Old GM's Insurance Program, nor Chartis's Bristol and Renick
Claims, provide any genuine grounds for retaining $20.5 million of Old GM's money. Chartis
has held the Seized Cash, with no good faith justification, for far too long. It has done so,
moreover, in violation of the Bankruptcy Court's Confirmation Order and the Automatic Stay.

TOGUT, SEGAL & SEGAL LLP

Michael S. Davis, Esq.
Zeichner Ellman & Krause LLP
September 16, 2011
Page 9

Please contact us immediately to discuss the return of Old GM's Seized Cash so that the
parties can avoid any further costs or delays for which, as indicated above, Old GM reserves
the right to hold Chartis accountable.

Very truly yours,

TOGUT, SEGAL & SEGAL LLP
By:

Richard K. Milin

RKM/lw, cj

cc:    Michelle Leavitt, Esq.
       Mr. Tom Morrow
       Scott E. Ratner, Esq.