Hearing Date and Time: December 8, 2011 at 9:45 am (Eastern Time)
Response Deadline: December 1, 2011 at 4:00 pm (Eastern Time)

CROWELL & MORING LLP
590 Madison Avenue
New York, New York 10022
Telephone: (212) 223-4000
Fax: (212) 223-4134
Michael V. Blumenthal
Steven B. Eichel

Attorneys for the
Revitalizing Auto Communities Environmental Response Trust
f/k/a Environmental Response Trust

Michael O. Hill
General Counsel and Chief Operating Officer
Revitalizing Auto Communities
    Environmental Response Trust
2930 Ecorse Road
Ypsilanti, MI 48198


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>MOTORS LIQUIDATION COMPANY, et al.,<br>f/k/a General Motors Corp., et al,<br><br>Debtors. | Chapter 11 Case No. 09-50026 (REG)<br><br>(Jointly Administered) |

**MOTION OF THE REVITALIZING AUTO COMMUNITIES ENVIRONMENTAL
RESPONSE TRUST FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105 AND 1142 TO
ENFORCE DEBTORS' PAYMENT OBLIGATIONS UNDER THE SECOND
AMENDED JOINT CHAPTER 11 PLAN AND THE CONFIRMATION ORDER**

TO THE HONORABLE ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

The Revitalizing Auto Communities Environmental Response Trust f/k/a the

Environmental Response Trust ("RACER" or "Trust") submits this motion ("Motion") for an

order under 11 U.S.C. §§ 105 and 1142 to enforce certain payment obligations under (i) this

Court's March 29, 2011 Findings of Fact, Conclusions of Law, and Order Pursuant to Section 1129(a) and (b) of the Bankruptcy Code and Rule 3020 of the Federal Rules of Bankruptcy Procedure Confirming Debtors' Second Amended Joint Chapter 11 ("Confirmation Order"),[1] and (ii) Debtors' Second Amended Joint Chapter 11 Plan dated March 18, 2011 ("Plan").[2] Under the Plan, Debtors were required to make a "Cash payment" to fund the Trust. However, as set forth below, Debtors did not fund the Trust by making a Cash payment for the entire amount owed. Instead, Debtors transferred to the Trust a combination of Cash and U.S. Treasury securities that they assigned values substantially higher than the contemporaneous fair market values,[3] resulting in an Effective Date shortfall of $13,505,874.

In support of this Motion, RACER respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      Beginning in June 2009, Motors Liquidation Company (f/k/a General Motors Corporation) ("MLC") and certain affiliated debtors (collectively, "Debtors") each commenced with this Court a voluntary case under Chapter 11 of the United States Code ("Bankruptcy Code"). Various States,[4] the Saint Regis Mohawk Tribe[5] and the United States[6] (collectively the

---

[1] Relevant portions of the Confirmation Order are reproduced as Exhibit A to this Motion.

[2] Relevant portions of the Plan are reproduced as Exhibit B to this Motion.

[3] This motion uses the term "fair market value" to refer to the total price paid for a U.S. Treasury security. For securities that pay interest at defined intervals (for example, every six months), the total price includes a payment for "accrued interest" — that is, for interest that has been earned but not yet paid.

[4] State proofs of claim were filed as follows: Delaware filed No. 48416; Illinois filed Nos. 44875 (against MLC) and 70228 (against Remediation and Liability Management Company, Inc. ("REALM")); Indiana filed No. 59181; Kansas filed No. 45638; Massachusetts Department of Environmental Protection filed No. 65349; Michigan Department of Natural Resources and Environment filed Nos. 60528 (against MLC) and 70233 (against REALM); Missouri filed Nos. 60897 (against MLC) and 70235 (against REALM); New Jersey filed Nos. 44869 and 48352; New York filed No. 50587; Ohio filed Nos. 50676 (against MLC) and 70234 (against REALM); and Wisconsin filed No. 44759.

[5] The St. Regis Mohawk Tribe filed proof of claim No. 59086.

2

"Settling Governments") filed timely Proofs of Claim setting forth claims pertaining to contamination on or originating from properties then owned by Debtors.

2. Debtors' Plan provided for the creation of an Environmental Response Trust (now RACER) to take title to 89 former General Motors properties ("Properties"), remediate contamination on those Properties and position them for redevelopment. Creation of the Trust was a central feature of the Environmental Response Trust Consent Decree and Settlement Agreement ("Settlement Agreement"),[7] through which the Settling Governments compromised and resolved their claims against Debtors relating to environmental conditions on the Properties. See Settlement Agreement 6 ("the obligations undertaken by Debtors … are in the nature of compromise and it is the position of the Governments that these obligations are less than the Governments would seek in the absence of this settlement"). The Settlement Agreement as executed by Debtors and the Settling Governments was lodged with the Court in October 2010, annexed to and reaffirmed in Debtors' Plan (Plan §§ 1.69, 6.4(a)), and approved by the Court in its Confirmation Order. Confirmation Order ¶ 7 (p.19). Debtors and the Settling Parties also executed the Environmental Response Trust Agreement ("Trust Agreement"),[8] incorporated as Attachment C into the Settlement Agreement.

3. The Confirmation Order, at Paragraph 7, directed Debtors, "on and subject to the occurrence of the Effective Date," to "make a Cash payment" to RACER in an amount totaling no less than $625,234,945, allocated across six distinct accounts. Confirmation Order ¶¶ 7(i)-

---

(continued…)

[6] The United States filed proofs of claims Nos. 67362 and 64064 (against MLC), 70254 (against REALM), and 70255 (against Environmental Corporate Remediation Company, Inc. ("ENCORE")).

[7] Pertinent excerpts of the Settlement Agreement are reproduced as Exhibit C to this Motion.

[8] Pertinent excerpts of the Trust Agreement are reproduced as Exhibit D to this Motion.

3

(vi). The word "Cash," although capitalized in the Confirmation Order, is not defined in the Order itself. However, the Confirmation Order specifically refers to the Plan for definitions of terms that are capitalized but not defined in the Order itself. Confirmation Order 1 n.2. The Plan defines "Cash" as "legal tender of the United States of America." Plan § 1.33.

4. On the Effective Date, Debtors did not make the required Cash payment of $625,234,945. Instead, they transferred to the Trust Cash in the amount of $49,896,945 and a portfolio of U.S. Treasury securities. Debtors assigned this portfolio a value of $575,338,000. However, its fair market value on the Effective Date, determined using price quotes from a generally accepted data service, was $561,832,126, leaving a shortfall of $13,505,874. A table setting out the Effective Date underfunding is set out infra at 11.

5. As discussed more fully below, RACER contends that, because the plain language of the Confirmation Order and related documents required "Cash payment" on the Effective Date, any securities transferred in lieu of Cash must be accounted for at their cash value on that date — that is, at their fair market value rather than at the value that Debtors assigned for their own accounting purposes.

6. Although RACER acknowledges that long-term U.S. Treasury securities have increased in value since the Effective Date and that RACER continues to hold that portfolio, except for one issue that matured in July 2011,[9] the increased fair market value of the transferred securities has no bearing on the right of the Trust and Settling Governments to full performance by the Debtors on the Effective Date. Even if transfers of securities could qualify as a form of

---

[9] Interest rates and maturity dates for the nine distinct issues of U.S. Treasury securities that Debtors transferred to RACER on the Effective Date are set forth in a Letter from M. Christine Poppe, Vice President & Relationship Manager, US Bank, to Scott Hamilton, Chief Financial Officer, RACER Trust (Oct. 21, 2011) ("US Bank Letter"). That letter is attached as Exhibit E to this Motion and Attachment B to the Declaration of Scott Hamilton ("Hamilton Declaration").

4

"Cash payment" under Paragraph 7 of the Confirmation Order, Debtors' combination of Cash and securities plainly failed to provide the required cash value on the Effective Date. If Debtors had made full payment, whether by adding $13,505,874 to the combination of Cash and securities they transferred or by replacing the combination with a single $625,234,945 "Cash payment" (leaving the Trust to purchase the Debtor-recommended, Treasury approved portfolio of long-term U.S. Treasury securities at the then-prevailing market prices), the Trust and Settling Governments would be more than $13.5 million better off today. Changes in the value of long-term U.S. Treasury securities since the Effective Date do not affect the rights of the Trust and Settling Governments. The increase in the fair market value of the transferred securities since the Effective Date cannot support a refusal by Debtors to make full payment any more than a decrease in fair market value could support a demand by the Trust and Settling Governments that Debtors pay extra.

7.     The Trust seeks $13,505,874 plus interest through the date of payment. For reasons set forth below, RACER believes that interest can fairly be computed at the average rate paid, over that period, on short-term (three to twelve month) Treasury bills.[10]

## JURISDICTION

8.     The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334, and under the Plan's express reservation of this Court's "exclusive jurisdiction of all matters arising under, arising out of, or related to the Chapter 11 Cases and the Plan pursuant to, and for the purpose of, sections 105(a) and 1142 of the Bankruptcy Code," including its jurisdiction "[t]o hear and determine disputes arising in connection with or related to the interpretation, implementation, or

---

[10] Relevant information concerning RACER's management of cash outside its portfolio of long-term U.S. Treasury securities is set out in the Hamilton Declaration..

5

enforcement" the Confirmation Order, Plan, Settlement Agreement, Trust Agreement and "any transactions or payments contemplated" by those documents. Plan § 11.1(i); see also id. § 11.1(p) (Court shall retain jurisdiction to "enforce all orders previously entered by the Bankruptcy Court.").

9. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Statutory authority for the relief sought is provided by sections 105(a) and 1142 of the Bankruptcy Code.

## BACKGROUND

10. During the bankruptcy case, the Debtors and other parties to the Settlement Agreement evaluated the anticipated magnitude and timing of the costs of remediating contamination at the Properties. After extensive analysis and negotiation, Debtors and the Settling Governments entered into a Settlement Agreement that provided, among other things, for the establishment of a Trust (now RACER) and for the funding of that Trust at a specified level on the Effective Date.

11. The Settlement Agreement, as incorporated into the Plan and implemented by the Confirmation Order, required Debtors to pay at least $625,234,945 in Cash to RACER on the

Effective Date.[11] Debtors have not met their obligation to fund the environmental accounts, which were created to cover site-specific remediation work. Nor did Debtors meet their obligations to fund the administrative accounts, which were created to ensure adequate resources for the Trust's non-environmental work, including property management and redevelopment efforts.

12. On November 10, 2011, MLC announced its intent to file a certificate of dissolution during the week beginning December 11, 2011. (A copy of this announcement is set out as Attachment C to the Hamilton Declaration.) The announcement stated that, upon filing the certificate (or such later time as set forth therein), MLC will be dissolved. Prior to its dissolution, MLC is obligated to meet its funding obligations to the RACER Trust.

## RELIEF REQUESTED

13. RACER requests that this Court direct Debtors to remedy their initial underfunding of the Trust by transferring Cash to the Trust in the amount of $13,505,874 (the exact amount of the Effective Date underfunding), plus interest computed at a rate consistent with rates paid on short-term U.S. Treasury securities through the date of full payment. If this Court is unable to decide the underfunding issue before December 11, 2011, when MLC has

---

[11] Paragraph 32 of the Settlement Agreement called for the Debtors to "make a payment to fund the Environmental Response Trust in the amount no less than $641,434,945," with the proviso that this amount was "subject to adjustments provided in Paragraph 36 of this Settlement Agreement." (Those adjustments provide for reductions in Effective Date transfers for certain pre-Effective Date spending by Debtors for environmental and administrative costs. Settlement Agreement ¶ 36.)

The Confirmation Order allowed Debtors to hold back $28,200,000 in estimated pre-Effective Date costs, subject to post-Effective Date reconciliation against documentation of actual expenditure. Confirmation Order ¶ 7 (p.21). The Order also increased Debtors' required Cash payment to the Trust by $12,000,000 to reflect Debtors' receipts of Property sale revenues generated between the December 2010 anticipated Effective Date and the actual March 31, 2011 Effective Date. Id. Taking these adjustments into account, the Cash payment that Debtors were required to make on the Effective Date was reduced to $625,234,945.

stated that it may dissolve, RACER respectfully requests that this Court direct that a sufficient amount be held in escrow to preserve this Court's ability to remedy the underfunding.

## APPLICABLE AUTHORITY

### A.  The Court Has Broad Powers to Enforce Its Own Orders

14.  Section 105 of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Under section 105(a) of the Code, the Court has expansive equitable power to fashion any order or decree that is in the interest of preserving or protecting the value of Debtors' assets. Chinichian v. Campoloingo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code.") (internal citations omitted).

15.  Similarly, section 1142(b) provides that "[t]he court may direct Debtor … to execute or deliver … any instrument required to effect transfer of property dealt with by a confirmed plan, and to perform any other act … that is necessary for the consummation of the plan." 11 U.S.C. § 1142(b).

16.  The Court entered the Confirmation Order, which authorized and/or approved the Plan, the Trust Agreement and Settlement Agreement.  See Confirmation Order ¶¶ EE (p. 16), 1 (p. 17), 7 (p. 19), 30 (p.40).  Under that Order, this Court has retained jurisdiction to resolve all matters relating to implementation of the Settlement Agreement, Trust Agreement, Plan and Confirmation Order, including requests for enforcement of orders previously entered in the Chapter 11 cases.  Confirmation Order ¶ 1 (p .7); Plan § 11.1(i) & (p).

17.  The Court has jurisdiction and the authority to clarify and enforce the Plan, Confirmation Order, Settlement Agreement and Trust Agreement.  See, e.g., In re Petrie Retail, Inc., 304 F.3d 223, 230 (2d Cir. 2002) ("A bankruptcy court retains post-confirmation

8

jurisdiction to interpret and enforce its own orders, particularly when disputes arise over a bankruptcy plan of reorganization"); Back v. LTV Corp. (In re Chateaugay Corp), 213 B.R. 633, 640 (S.D.N.Y. 1997) (Sections 105 and 1142 of the Bankruptcy Code "codify the bankruptcy court's inherent power to enforce its own orders."); Thornburg v. Lynch (In re Thornburg), 277 B.R. 719, 726 (Bankr. E.D. Tex. 2002) ("Bankruptcy Court has jurisdiction to clarify and enforce its own orders under 11 U.S.C. § 105(a) and is the best court to do so.").

B.   **Debtors Underfunded RACER by $13.5 Million on the Effective Date**

18.   Debtors' obligations to fund the Trust's environmental action and administrative work are clearly stated in Paragraph 7 of the Confirmation Order.[12] To fund environmental remediation, the Confirmation Order required Debtors to pay a total of $485,134,945, allocated among four distinct environmental action accounts.[13] To cover the Trust's administrative expenses, Debtors were required to pay at least an additional $140,100,000.[14] Thus, the

---

[12] See also Confirmation Order ¶ 6 (providing that pursuant to section 10.1 of the Plan, "the Environmental Response Trust Assets shall be transferred to the Environmental Response Trust").

[13] In particular, Debtors were required to fund:

- "the Environmental Response Trust's Minimum Estimated Property Funding Account in an amount equal to $280,736,131" (Confirmation Order ¶ 7(i));
- "$84,099,794 to the Environmental Response Trust's Long Term OMM Property Funding Account" (id. ¶ 7(iii));
- "$68,233,823 to the Environmental Response Trust Cushion Funding Account" (id. ¶ 7(iv)); and
- "$52,065,197 to the Environmental Response Trust's Reserve Property Funding Account" (id. ¶ 7(iv)).

[14] Cash payments for administrative expenses were required to fund:
- "the Environmental Response Trust's Administrative Funding Account in an amount no less than $100,100,000" (Confirmation Order ¶ 7(ii)); and
- "$40 million to the Environmental Response Trust's Administrative Funding Reserve Account" (id. ¶ 7(vi)).

The Order directed Debtors to fund the Administrative Funding Account an amount "no less than $100,100,000," rather than to transfer a precise amount. This formulation reflects the contingent nature of Debtors' and now RACER's interest in cash held as collateral for a demolition bond required by the City of Lansing, Michigan. See Confirmation Order ¶ 7(ii)(b). In view of the nature of this cash collateral account and its treatment in the Confirmation Order, neither Debtors nor RACER have counted the cash collateral account toward the minimum

(continued…)

9

Confirmation Order required Debtors to make a Cash payment to the Trust on the Effective Date in an amount no less than $625,234,945.

19. Instead of making a Cash payment in this amount, Debtors transferred just $49,896,945 in Cash, together with a portfolio of U.S. Treasury securities with varying dates of maturity and fair market values that change on a daily basis. Debtors prepared a "Flow of Funds Summary," dated March 30, 2011 (reproduced as Attachment A to the Hamilton Declaration), in which they assigned the transferred securities a value of $575,338,000.[15] Based on this incorrect valuation, Debtors claimed to have transferred financial assets worth $625,234,945, and to have satisfied the Confirmation Order's minimum Cash payment requirement.

20. The fair market value of the securities on the Effective Date (March 31, 2011) was $561,832,126. This valuation is based on objective, verifiable market data, regularly used by banks and other financial institutions to determine the fair market value of U.S. Treasury securities. It is documented in the US Bank letter, attached as Exhibit E to this Motion.[16]

---

(continued…)

$100,100,000 Cash payment that Debtors were required to make to RACER for the Environmental Response Trust Administrative Funding Account.

[15] The values that the Debtors' assigned to the securities they transferred to the Trust are set out in rows 2 and 4 of Debtors' Flow of Funds Summary. Row 2 shows a transfer valued at $450,238,000 into the environmental action custody account. Row 4 shows a transfer valued at $125,100,000 into the administrative custody account.

[16] The US Bank letter provides March 31, 2011 market value and accrued interest figures for the nine issues of U.S. Treasury securities that Debtors transferred to RACER. The Bank's method for valuing U.S. Treasury securities is explained in US Bank Trust & Custody Services, Report on Controls Placed in Operation and Tests of Operating Effectiveness (Nov. 15, 2010), relevant portions of which are attached as Attachment D to the Hamilton Declaration. As described on page 22 of that Report, U.S. Bank uses Interactive Data Corporation ("IDC") to price U.S. Treasury Securities.

  IDC, as reported in its most recent Form 10K filing, serves "many of the world's largest financial institutions, including 47 of the top 50 U.S. banks, 47 of the top 50 global asset managers, all of the top 50 U.S. mutual funds and the top 15 global custodians." Interactive Data Corp., Annual Report (Form 10-K) 4 (March 31, 2011), available at http://www.sec.gov/Archives/edgar/data/888165/000119312511085147/d10k.htm.

21.     The differences between US Bank's and Debtors' valuations of the financial assets that were transferred to the Trust on the Effective Date (including both Cash and U.S. Treasury securities)[17] are set out in the table that follows:

**Comparison of Debtors' and US Bank's
Valuations of Cash and Treasury Securities
Transferred to RACER on the Effective Date**

|  | Confirmation Order Requirements | Debtors' Flow of Funds Summary | US Bank Letter (using fair market values) | Fair Market Value v. Order Requirements |
|---|---|---|---|---|
| **Environmental Action Funding** | | | | |
| Cash | $485,135,945 | $34,896,945 | $34,896,945 | |
| U.S. Treasury Securities | | $450,238,000 | $440,050,047 | |
| Environmental Action Subtotal: | $485,134,945 | $485,134,945 | $474,946,992 | ($10,187,953) |
| **Administrative Funding** | | | | |
| Cash | $140,100,000 | $15,000,000 | $15,000,000 | |
| U.S. Treasury Securities | | $125,100,000 | $121,782,079 | |
| Administrative Subtotal: | $140,100,000 | $140,100,000 | $136,782,079 | ($3,317,921) |
| **Combined Environmental Action and Administrative Funding** | | | | |
| Totals: | $625,234,945 | $625,234,945 | $611,729,071 | **($13,505,874)** |

22.     The Confirmation Order's requirement that Debtors transfer Cash is reinforced by the terms of the Plan, Settlement Agreement and Trust Agreement. The Plan, which this Court

---

[17] Cash was transferred from MLC to RACER by wire on March 31, 2011. U.S. Treasury securities were transferred from MLC to RACER on that same day. Settlement on the transfer occurred on the following day, April 1, 2011.

"approved and confirmed under section 1129 of the Bankruptcy Code" (Confirmation Order ¶ 1 (p.17)), directed Debtors to provide "Cash in the amount of $641,434,945" to the Trust on the Effective Date (subject to adjustment for certain defined pre-Effective Date expenditures). Plan § 1.68. Similarly, section 6.4(c) of the Plan provides that on the Effective Date (as defined in the Plan), Debtors shall transfer $641,434,945 in "Cash" to RACER, less adjustments described in paragraph 36 of the Settlement Agreement. The Plan, as noted above, defines "Cash" as "legal tender of the United States of America." Id. § 1.33.

These provisions of the Plan conform to funding requirements established in the Trust Agreement and Settlement Agreement, including:

a. The Trust Agreement provides that the "Environmental Response Trust Assets" are comprised of, among other things, **cash** in an amount of no less than $641,414,653 (as adjusted pursuant to paragraphs 36 and 37 of the Settlement Agreement). Trust Agreement § 1.1.23 (emphasis added).

b. Trust Agreement further provides that on the "Effective Date, the [Debtors] shall (i) transfer or cause to be transferred to the Environmental Response Trust or at the direction of the Environmental Response Trust Administrative Trustee **cash** in the amount of no less than $641,414,653…." Id. § 2.5.1 (emphasis added).

c. The Settlement Agreement provides, in pertinent part that, "[o]n the Effective Date, and subject to adjustments as provided in paragraph 36 of [the] Settlement Agreement as applicable, Debtor shall make a payment to fund the Environmental Response Trust in an amount of no less than $641,434, 945…." Settlement Agreement ¶ 32.

23. In short, the Settling Governments compromised environmental claims against Debtors in exchange for specific benefits set out first in the Settlement Agreement, then in the Plan and Confirmation Order. The promised benefits included a right to full funding of the Trust on the Effective Date. That right should be enforced.

**C.     RACER and the Settling Governments Are Entitled to Interest on the Additional $13.5 Million in Cash that Should Have Been Transferred on the Effective Date**

24.     Determination of the interest that the Trust and the Settling Governments have lost due to the underfunding is a straightforward exercise.  RACER since its inception has retained the portfolio of long-term securities that Debtors and the Department of the Treasury selected.[18]  Funds not held in long-term U.S. Treasury securities have been invested in short-term, low-risk U.S. Treasury securities or money market instruments that invest exclusively in U.S. Treasury securities.  If RACER had received $13,505,874 in additional Cash on the Effective Date, as required by the Confirmation Order, its financial strategy would have dictated that this additional Cash be managed conservatively, in the same manner as other Trust funds not committed to the long-term portfolio.  As the Hamilton Declaration demonstrates, in light of RACER's approach to funds outside the long-term portfolio, rates of return provided by U.S. Treasury securities with relatively short maturity dates (e.g., three to twelve months) and money market funds that exclusively purchase short-term U.S. Treasury securities provide a reasonable basis for determining lost interest to RACER on the underfunded amount.   Although calculation of interest will required a specific payment date, it is clear that interest computed using this approach will be modest (less than $2,000 to date).

**D.     If the Issue of Effective Date Underfunding Cannot be Resolved Before December 11, 2011, This Court Should Order that Funds be Held in Escrow in an Amount Sufficient to Preserve Its Ability to Provide a Complete Remedy to the Trust and the Settling Governments**

25.     The dissolution of MLC and distribution of its funds would make it difficult for this Court to remedy the Effective Date underfunding.  The Plan appears to provide two different

---

[18] Although one group of securities included in the portfolio has reached maturity, none of these securities have been sold prior to maturity.   Hamilton Declaration  ¶ 7.

13

sets of instructions for the distribution of funds remaining in MLC's estate at the time of its dissolution. Section 6.10 of the Plan provides for the distribution to the GUC Trust and Avoidance Action Trust of funds remaining at the time of MLC's dissolution. There is an apparent tension between these instructions and Sections 2.4 and 5.2(b), which require that any Cash (or cash equivalents) remaining after MLC has met all of its obligations (including funding the various trusts) be transferred to the U.S. Treasury and to the Governments of Canada and Ontario through Export Development Canada ("EDC").[19] Under either approach, distribution of MLC's remaining funds in accordance with the provisions of the Plan would, at the very least, severely complicate any effort to remedy the Trust's Effective Date underfunding.

26. In the event that the underfunding issue cannot be resolved before December 11, this Court should exercise its authority to preserve the funds needed to implement the Confirmation Order and order that $13,600,000 of the funds remaining at the time of MLC's dissolution be placed in escrow pending final resolution of this matter.[20]

## CONCLUSION

For the reasons set out above, RACER respectfully requests that this Court enter an Order (a) directing Debtors to transfer $13,505,874 to RACER, plus interest from the Effective Date; and (b) granting such additional relief as is just and proper. If this Court is unable to resolve the funding issues before December 11, 2011, RACER respectfully requests that the Court enter an

---

[19] According to Section 5.2(b)(vii) of the Plan, the flow of funds to the U.S. Treasury and EDC is subject to "completing the acts described in Section 6.10 [of the Plan]," so transfers to the GUC Trust and Avoidance Action Trust appear to take precedence over payments to U.S. Treasury and EDC.

[20] See, e.g., In re Resource Tech. Corp., 624 F.3d 376, 386 (7th Cir. 2010) (affirming Bankruptcy Court order requiring that funds be placed into escrow to assure fulfillment of settlement agreement obligations).

14

order directing Debtors to deposit $13.6 million into an escrow account pending resolution of this Motion.

Dated:  November 21, 2011

          CROWELL & MORING LLP

          By:  /s/ Michael V. Blumenthal
          Michael V. Blumenthal
          Steven B. Eichel
          590 Madison Avenue
          New York, NY 10022
          212-223-4000

          Attorneys for the
          Revitalizing Auto Communities
          Environmental Response Trust

          And

          Michael O. Hill
          General Counsel and Chief
          Operating Officer
          Revitalizing Auto Communities
             Environmental Response Trust
          2930 Ecorse Road
          Ypsilanti, MI  48198