# EXHIBIT A

# CONFIRMATION ORDER
# (EXCERPTS)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

| | : | |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **MOTORS LIQUIDATION COMPANY,** *et al.*, | : | **09-50026 (REG)** |
| **f/k/a General Motors Corp.,** *et al.* | : | |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

----------------------------------------------------------------x

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER PURSUANT TO SECTIONS 1129(a) AND (b) OF THE BANKRUPTCY CODE AND RULE 3020 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE CONFIRMING DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN

WHEREAS Motors Liquidation Company (f/k/a General Motors Corporation)

and its affiliated debtors, as debtors and debtors in possession (collectively, the "**Debtors**"[1]), as

"proponents of the plan" within the meaning of section 1129 of title 11, United States Code (the

"**Bankruptcy Code**"), filed the Debtors' Amended Joint Chapter 11 Plan, dated December 7,

2010 (such plan, as transmitted to parties in interest being the "**Amended Plan**," and as

subsequently modified, the "**Plan**")[2] and the Disclosure Statement for Debtors' Amended Joint

Chapter 11 Plan, dated December 8, 2010 (as transmitted to parties in interest, the "**Disclosure**

**Statement**"); and

WHEREAS on December 8, 2010, the Bankruptcy Court entered an order (the

"**Solicitation Order**") (ECF No. 8043), which, among other things, (i) approved the Disclosure

Statement under section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, (ii)

---

[1] The term "**Debtors**" used herein shall refer to the Debtors whether prior to or on and after the Effective Date.

[2] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Plan, a copy of which is annexed hereto as **Exhibit "A."** Any term used in the Plan or this Confirmation Order that is not defined in the Plan or this Confirmation Order, but that is used in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

E.  <u>Transmittal and Mailing of Materials; Notice</u>.  The Disclosure Statement, the Amended Plan, the Ballots, the Solicitation Order, and the Confirmation Hearing Notice, which were transmitted and served as set forth in the Affidavits of Service, shall be deemed to have been transmitted and served in compliance with the Solicitation Order, the Bankruptcy Rules, and the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), such transmittal and service were adequate and sufficient, and no other or further notice is or shall be required.  The Debtors' publication of the Confirmation Hearing Notice as set forth in the Affidavit of Publication complied with the Solicitation Order.

F.  <u>Voting</u>.  Votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules, the Solicitation Order, and industry practice.

G.  <u>Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>.  The Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

1.  <u>Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1))</u>.  In addition to Administrative Expenses, Priority Tax Claims, and DIP Credit Agreement Claims, which need not be designated, the Plan designates six Classes of Claims and Equity Interests.  Each Secured Claim shall be deemed to be separately classified  in a subclass of Class 1 and shall have all rights associated with separate classification under the Bankruptcy Code.  The Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests, as the case may be, in each such Class.  Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly discriminate between holders of Claims and Equity Interests. The Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

Debtors.  No objections have been filed raising any objection to substantive consolidation as provided in the Plan.

DD.    Environmental Response Trust Consent Decree and Settlement Agreement.  The Environmental Response Trust Consent Decree and Settlement Agreement was negotiated in good faith and at arm's length and is an essential element of the Plan.  The Environmental Response Trust Consent Decree and Settlement Agreement is fair, equitable, and in the best interests of the Debtors, their creditors, and all parties in interest, and satisfies the standards for approval under Bankruptcy Rule 9019.

EE.    Priority Order Sites Consent Decrees and Settlement Agreements.  Each of the Priority Order Sites Consent Decrees and Settlement Agreements were negotiated in good faith and at arm's length and are an essential element of the Plan.  Each of the Priority Order Sites Consent Decrees and Settlement Agreements is fair, equitable, and in the best interests of the Debtors, their creditors, and all parties in interest, and satisfies the standards for approval under Bankruptcy Rule 9019.

FF.    Settlement with Remy International, Inc.  The settlement between the Debtors and Remy International, Inc. (f/k/a Delco Remy International, Inc. and DRA Inc.) ("**Remy**") described in the Disclosure Statement and Section 4.3 of the Plan (the "**Remy Settlement**") was negotiated in good faith and at arm's length, is fair, equitable, and in the best interests of the Debtors, their creditors, and all parties in interest, and satisfies the standards for approval under Bankruptcy Rule 9019.  Remy has provided appropriate consideration to the Debtors' estates in exchange for being included in the definition of "Protected Party" in Section 1.115 of the Plan.

GG.    Satisfaction of Confirmation Requirements.  The Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

HH.    <u>Objections</u>.  All parties have had a full and fair opportunity to litigate all issues raised in the Objections, or which might have been raised, and the Objections have been fully and fairly litigated.

II.    <u>Retention of Jurisdiction</u>.  The Bankruptcy Court may properly retain jurisdiction over the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.

DECREES

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.    <u>Confirmation</u>.  The Plan is approved and confirmed under section 1129 of the Bankruptcy Code.  The terms of the Plan, all Exhibits thereto, and the Plan Supplement are incorporated by reference into and are an integral part of the Plan and this Confirmation Order.

2.    <u>Modifications to the Plan</u>.  The modifications to the Amended Plan, which are incorporated in the Plan, meet the requirements of sections 1127(a) and (c) of the Bankruptcy Code and do not adversely change the treatment of the Claim of any creditor or the Equity Interest of any equity security holder within the meaning of Bankruptcy Rule 3019, and therefore, no further solicitation or voting is required.

3.    <u>Objections</u>.  All Objections that have not been withdrawn, waived, or settled, and all reservations of rights pertaining to confirmation of the Plan included therein, are overruled on the merits for the reasons stated on the record of the Confirmation Hearing.

4.    <u>Plan Classification Controlling</u>.  The classification of Claims and Equity Interests for purposes of the distributions to be made under the Plan shall be governed solely by the terms of the Plan.  The classifications set forth on the Ballots tendered to or returned by the Debtors' creditors in connection with voting on the Plan (a) were set forth on the Ballots for

purposes of voting to accept or reject the Plan, (b) do not necessarily represent, and in no event

shall be deemed to modify or otherwise affect, the actual classification of such Claims and

Equity Interests under the Plan for distribution purposes, and (c) shall not be binding on the

Debtors.

5.      Binding Effect.  The Plan and its provisions shall be binding on the

Debtors, the GUC Trust Administrator, the GUC Trust Monitor, the Asbestos Trust

Administrator, the Environmental Response Trust Administrative Trustee, the Avoidance Action

Trust Administrator, the Avoidance Action Trust Monitor, any entity acquiring or receiving

property or a distribution under the Plan, and any holder of a Claim against or Equity Interest in

the Debtors, including all governmental entities, whether or not the Claim or Equity Interest of

such holder (a) is impaired under the Plan or (b) has accepted the Plan.

6.      Vesting of Assets.  Pursuant to Section 10.1 of the Plan, except as

otherwise provided in the Plan, as of the Effective Date, and thereafter as provided in the Plan,

all property of the Debtors' estates shall vest in the Debtors, and, in accordance with Article VI

of the Plan and subject to the exception contained therein and in the GUC Trust Agreement, the

Asbestos Trust Agreement, the Environmental Response Trust Agreement, and the Avoidance

Action Trust Agreement, (a) the GUC Trust Assets shall be transferred to the GUC Trust (except

with respect to (x) the New GM Securities, which shall be transferred to the GUC Trust in

accordance with Section 5.2(a) of the Plan, and (y) the Residual Wind-Down Assets, which shall

be transferred to the GUC Trust in accordance with Section 6.10 of the Plan), (b) the Asbestos

Trust Assets shall be transferred to the Asbestos Trust, (c) the Environmental Response Trust

Assets shall be transferred to the Environmental Response Trust, and (d) on the Avoidance

Action Trust Transfer Date, the Avoidance Action Trust Assets shall be transferred to the

Avoidance Action Trust (except with respect to the remaining assets of MLC upon its

dissolution, which shall be transferred to the Avoidance Action Trust, if accepted by the

Avoidance Action Trust in the sole discretion of the Avoidance Action Trust Administrator as set

forth in, and in accordance with, Section 6.10 of the Plan).  From and after the Effective Date, (i)

the GUC Trust Administrator may dispose of the GUC Trust Assets free of any restrictions of the

Bankruptcy Code, but in accordance with the provisions of the Plan and the GUC Trust

Agreement, (ii) the Asbestos Trust Administrator may dispose of the Asbestos Trust Assets free

of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan and

the Asbestos Trust Agreement, (iii) the Environmental Response Trust Administrative Trustee

may dispose of the Environmental Response Trust Assets free of any restrictions of the

Bankruptcy Code, but in accordance with the provisions of the Plan, the Environmental

Response Trust Agreement, and the Environmental Response Trust Consent Decree and

Settlement Agreement, and (iv) the Avoidance Action Trust Administrator may dispose of the

Avoidance Action Trust Assets free of any restrictions of the Bankruptcy Code, but in

accordance with the provisions of the Plan and the Avoidance Action Trust Agreement;

*provided, however*, that the DIP Lenders' liens on the DIP Lenders' Collateral remain fully

perfected, nonavoidable, and enforceable with respect to the Cash the DIP Lenders fund into the

Trusts as of and following the Effective Date.  As of the Effective Date, all assets of the Debtors,

the GUC Trust, the Asbestos Trust, the Environmental Response Trust, and the Avoidance

Action Trust shall be free and clear of all Claims and Encumbrances, except as provided in the

Plan, the Environmental Response Trust Consent Decree and Settlement Agreement, the Priority

Order Sites Consent Decrees and Settlement Agreements, and this Confirmation Order.

   7.  Approval of Environmental Response Trust Consent Decree and

Settlement Agreement.  For the reasons stated on the record at the Confirmation Hearing, the

Environmental Response Trust Consent Decree and Settlement Agreement is authorized and

approved, as fair, reasonable, and consistent with Environmental Laws and shall become

effective on the Effective Date, and the Debtors' obligations thereunder are legal, valid, binding,

and enforceable.  The Environmental Response Trust Agreement is authorized and approved, and

EPLET, LLC is approved and appointed to serve as the Environmental Response Trust

Administrative Trustee.  The Debtors are authorized to enter into and implement the

Environmental Response Trust Consent Decree and Settlement Agreement, and the parties to the

Environmental Response Trust Consent Decree and Settlement Agreement are authorized to take

all actions necessary to effectuate the relief granted pursuant to this Confirmation Order.  In

accordance with Paragraphs 32 and 36 of the Environmental Response Trust Consent Decree and

Settlement Agreement, the Debtors, on and subject to the occurrence of the Effective Date, shall

make a Cash payment to fund (i) the Environmental Response Trust's Minimum Estimated

Property Funding Account in an amount equal to $280,736,131, (ii) the Environmental Response

Trust's Administrative Funding Account in an amount no less than $100,100,000, which amount

reflects the amount of no less than $102,000,000 specified for the Administrative Funding

Account by the Environmental Response Trust Consent Decree and Settlement Agreement, less

adjustments for administrative expenditures made by the Debtors since January 1, 2011 of

$13,900,000, and increased to reflect (a) the Debtors' payment of an amount no less than

$12,000,000 reflecting certain sales proceeds, as described in Paragraph 23 of this Confirmation

Order, and which may be further increased by agreement of the Debtors and the U.S. Treasury,

and (b) all rights and interests of MLC in the collateral and the bond that have been issued to

support demolition activities at property in Lansing, Michigan, (iii) $84,099,794 to the

Environmental Response Trust's Long Term OMM Property Funding Account, (iv) $68,233,823

to the Environmental Response Trust's Cushion Funding Account, (v) $52,065,197 to the

Environmental Response Trust's Reserve Property Funding Account, and (vi) $40 million to the

Environmental Response Trust's Administrative Funding Reserve Account.  In addition, on and subject to the occurrence of the Effective Date, the Debtors shall pay or cause to be paid any other amounts required to be paid under the terms and provisions of the Environmental Response Trust Consent Decree and Settlement Agreement that have not yet been paid as of the date of the Effective Date.  MLC and the Environmental Response Trust Administrative Trustee shall perform closing procedures to prepare a final accounting of the $14,300,000 adjustment to the Environmental Response Trust's Minimum Estimated Property Funding Account and the $13,900,000 adjustment to the Environmental Response Trust's Administrative Funding Account.  Such procedures shall be consistent with the requirements of Paragraphs 36(a) and (b) of the Environmental Response Trust Consent Decree and Settlement Agreement, including, but not limited to, any approvals required therein.  It is anticipated that such procedures will be completed within one hundred twenty (120) days after the Effective Date.  In the event the adjustments made were in excess of the amounts determined by the final accounting process, then such amount shall be paid by MLC to the Environmental Response Trust.  If the opposite occurs, then the Environmental Response Trust shall pay such amount to MLC.  If the Effective Date does not occur on or before March 31, 2011, the $14,300,000 and $13,900,000 adjustment amounts may be adjusted by agreement of the Debtors and the United States, consistent with the Environmental Response Trust Consent Decree and Settlement Agreement.  The establishment and funding of the Environmental Response Trust and the transfer of the Environmental Response Trust Assets to the Environmental Response Trust or any entity formed by the Environmental Response Trust Administrative Trustee shall be in full settlement and satisfaction of all present and future civil environmental liabilities or obligations of the Debtors to the Governmental Authorities, other than the claims and rights reserved in Paragraphs 100 through

104 of the Environmental Response Trust Consent Decree and Settlement Agreement (as to

which the United States reserves any right of setoff that may exist or arise).

8.      Approval of Priority Order Sites Consent Decrees and Settlement

Agreements.  For the reasons stated on the record of the Confirmation Hearing, the Priority

Order Sites Consent Decrees and Settlement Agreements are authorized and approved, as fair,

reasonable, and consistent with Environmental Laws and shall become effective on the Effective

Date, and the Debtors' obligations thereunder are legal, valid, binding, and enforceable.  The

Debtors are authorized to enter into and implement the Priority Order Sites Consent Decrees and

Settlement Agreements, and the parties to the Priority Order Sites Consent Decrees and

Settlement Agreements are authorized to take all actions necessary to effectuate the relief

granted pursuant to this Confirmation Order.  The Debtors' payments under the Priority Order

Sites Consent Decrees and Settlement Agreements shall be in full settlement and satisfaction of

all present and future civil environmental liabilities of the Debtors to the United States on behalf

of the United States Environmental Protection Agency, Iowa, Indiana, Ohio, and Wisconsin with

respect to the Priority Order Sites, other than any reservations set forth in the applicable Priority

Order Sites Consent Decree and Settlement Agreement.

9.      Assumption or Rejection of Executory Contracts and Unexpired Leases

(11 U.S.C. § 1123(b)(2)).  Pursuant to Section 8.1 of the Plan, all executory contracts and

unexpired leases to which any of the Debtors are parties are rejected, except for an executory

contract or unexpired lease that (a) has been assumed or rejected pursuant to the order of the

Bankruptcy Court approving the 363 Transaction, (b) has been assumed or rejected pursuant to

Final Order of the Bankruptcy Court entered prior to the Effective Date, (c) is the subject of a

separate motion to assume or reject filed under section 365 of the Bankruptcy Code by the

with respect to the Asbestos Trust Claim shall be made directly to the Asbestos Trust rather than

through the GUC Trust or the Avoidance Action Trust.  Any subsequent distributions under the

Plan with respect to the Asbestos Trust Claim shall be made in accordance with the Plan.

30.     Establishment of Trusts.  This Confirmation Order authorizes (a) the

creation and implementation of the GUC Trust, the Asbestos Trust, the Environmental Response

Trust, and the Avoidance Action Trust in accordance with the terms of this Confirmation Order,

the Plan, the GUC Trust Agreement, the Asbestos Trust Agreement, the Environmental

Response Trust Agreement, and the Avoidance Action Trust Agreement, and (b) the GUC Trust

Administrator, the Asbestos Trust Administrator, the Environmental Response Trust

Administrative Trustee, and the Avoidance Action Trust Administrator to accomplish the

purposes of the GUC Trust, the Asbestos Trust, the Environmental Response Trust, and the

Avoidance Action Trust, respectively, as set forth in the GUC Trust Agreement, the Asbestos

Trust Agreement, the Environmental Response Trust Agreement, and the Avoidance Action

Trust Agreement, respectively, notwithstanding any otherwise applicable nonbankruptcy law.

31.     Role of GUC Trust Administrator.  The GUC Trust Administrator shall (a)

have the power and authority to hold, manage, sell, and invest the GUC Trust Assets, and

distribute to the holders of Allowed General Unsecured Claims and holders of GUC Trust Units

the GUC Trust Distributable Assets and the Other GUC Trust Administrative Cash (each as

defined in the GUC Trust Agreement), (b) hold the GUC Trust Assets for the benefit of the

holders of Allowed General Unsecured Claims, (c) have the power and authority to hold,

manage, sell, invest, and distribute the GUC Trust Assets obtained through the exercise of its

power and authority, (d) have the power and authority to prosecute and resolve (x) objections to

Disputed General Unsecured Claims and (y) subject to obtaining any applicable consent from

MLC or Post-Effective Date MLC, as the case may be, and any necessary approval of the

EXHIBIT B


DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN
(EXCERPTS)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

|  |  |  |
|---|---|---|
| | : | |
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **MOTORS LIQUIDATION COMPANY**, *et al.*, | : | **09-50026 (REG)** |
| f/k/a General Motors Corp., *et al.* | : | |
| | : | |
| Debtors. | : | **(Jointly Administered)** |
| | : | |

-------------------------------------------------------------x

<u>**DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN**</u>

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

Attorneys for Debtors and
Debtors in Possession

**1.29** **Bankruptcy Court** means the United States District Court for the Southern District of New York, having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

**1.30** **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any Local Rules of the Bankruptcy Court.

**1.31** **Budget** means that certain budget for the post-Effective Date period agreed to by the U.S. Treasury, as a DIP Lender, the Debtors, and the Creditors' Committee detailing the funding of, among other things, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, the Avoidance Action Trust, the Indenture Trustee/Fiscal and Paying Agent Reserve Cash, and any other post-Effective Date obligations detailed in the Plan or in the GUC Trust Agreement, the Asbestos Trust Agreement, the Environmental Response Trust Agreement, or the Avoidance Action Trust Agreement. The Budget is a supporting schedule to Exhibit "B" annexed to the Disclosure Statement.

**1.32** **Business Day** means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

**1.33** **Cash** means legal tender of the United States of America.

**1.34** **Causes of Action** means the Avoidance Actions and any and all actions, causes of action, liabilities, obligations, rights, suits, damages, judgments, claims, and demands whatsoever, whether known or unknown, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part on any act or omission or other event occurring prior to the Commencement Date or during the course of the Chapter 11 Cases, including through the Effective Date, except to the extent the prosecution of any Causes of Action are prohibited by the DIP Credit Agreement.

**1.35** **Chapter 11 Cases** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Commencement Date in the Bankruptcy Court and currently styled *In re Motors Liquidation Company, et al. f/k/a General Motors Corp. et al,* Ch. 11 Case No. 09-50026 (REG) (Jointly Administered).

**1.36** **Claim** has the meaning set forth in section 101 of the Bankruptcy Code.

**1.37** **Claim Settlement Procedures** means the procedures for settling Claims approved by order of the Bankruptcy Court, pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rules 3007 and 9019(b), authorizing the Debtors to (i) file

**1.64    Environmental Response Trust** means the Environmental Response Trust established under the Plan in accordance with the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement.

**1.65    Environmental Response Trust Administrative Funding Account** means the funding held by the Environmental Response Trust for the administration of the Environmental Response Trust, including property taxes, liability insurance, security, demolition costs, other plant wind-down costs, and any obligations imposed on the Environmental Response Trust or the Environmental Response Trust Administrative Trustee pursuant to the Plan, including expenses relating to the performance of the Environmental Response Trust Administrative Trustee's obligations under the Environmental Response Trust Agreement and Section 6.4 hereof.  The funding of the Environmental Response Trust Administrative Funding Account and the management of such funding shall be as provided in the Environmental Response Trust Consent Decree and Settlement Agreement.

**1.66    Environmental Response Trust Administrative Trustee** means the trustee or trustees designated to serve in a fiduciary capacity consistent with, and in furtherance of, the Environmental Response Trust, pursuant to the terms of the Environmental Response Trust Agreement or as subsequently may be appointed pursuant to the terms of the Environmental Response Trust Agreement.  The Environmental Response Trust Administrative Trustee shall be EPLET, LLC.

**1.67    Environmental Response Trust Agreement** means that certain Environmental Response Trust Agreement executed by MLC, the Governmental Authorities, the United States, and the Environmental Response Trust Administrative Trustee, substantially in the form annexed to the Environmental Response Trust Consent Decree and Settlement Agreement.

**1.68    Environmental Response Trust Assets** means the Environmental Response Trust Administrative Funding Account and the assets transferred to the Environmental Response Trust in accordance with the Plan, the Environmental Response Trust Agreement, and the Environmental Response Trust Consent Decree and Settlement Agreement, but shall not include any New GM Securities.  The Environmental Response Trust Assets shall be comprised of (i) Cash in the amount of $641,434,945, less any deductions made pursuant to Paragraph 36 of the Environmental Response Trust Consent Decree and Settlement Agreement, (ii) the Environmental Response Trust Properties, (iii) personal property, including equipment, related to certain of the Environmental Response Trust Properties set forth on Attachment A to the Environmental Response Trust Consent Decree and Settlement Agreement, (iv) all leases of manufacturing facilities with New GM, and (v) all property management contracts and contracts related to the Environmental Actions relating to the Environmental Response Trust Properties that the Debtors and the Environmental Response Trust Administrative Trustee agree should be assumed by the Environmental Response Trust.

**1.69**    **Environmental Response Trust Consent Decree and Settlement Agreement** means that certain Consent Decree and Settlement Agreement among the Debtors, the Environmental Response Trust Administrative Trustee, the United States, certain States, and the St. Regis Mohawk Tribe establishing an Environmental Response Trust for certain Environmental Response Trust Properties in Delaware, Illinois, Indiana, Kansas, Louisiana, Massachusetts, Michigan, Missouri, New Jersey, New York, Ohio, Pennsylvania, Virginia, and Wisconsin, executed by MLC and the Governmental Authorities, in the form annexed hereto as Exhibit "C."

**1.70**    **Environmental Response Trust Parties** means the Environmental Response Trust, the Environmental Response Trust Administrative Trustee, and the Environmental Response Trust's officers, directors, employees, consultants, agents, or other professionals or representatives employed by the Environmental Response Trust or the Environmental Response Trust Administrative Trustee.

**1.71**    **Environmental Response Trust Properties** means the properties set forth on Attachment A to the Environmental Response Trust Consent Decree and Settlement Agreement.

**1.72**    **Environmental Response Trust Transfer Date** means the date on which the Environmental Response Trust Assets are transferred to the Environmental Response Trust, which transfer shall occur on the Effective Date.

**1.73**    **Equity Interest** means the interest of any holder of an equity security of any of the Debtors, or any direct or indirect subsidiaries of the Debtors, represented by any issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership interest in any of the Debtors, or any direct or indirect subsidiaries of the Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest.

**1.74**    **Eurobond Claim** means a Claim against any of the Debtors arising under or in connection with any of the respective notes, bonds, or debentures issued under (i) that certain Fiscal and Paying Agency Agreement, dated as of July 3, 2003, among General Motors Corporation, Deutsche Bank AG London, and Banque Générale du Luxembourg S.A. and (ii) that certain Bond Purchase and Paying Agency Agreement, dated May 28, 1986, between General Motors Corporation and Credit Suisse, excluding the fees and expenses of the Fiscal and Paying Agents thereunder, which reasonable fees and expenses shall be paid pursuant to Section 2.5 hereof.

**1.75**    **Final Order** means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceeding for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the

12

the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

## ARTICLE II.

### ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

**2.1    Administrative Expenses.**  Except to the extent that a holder of an Allowed Administrative Expense agrees to a different treatment or as provided in the subsequent sentence of this Section, on the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors shall pay to each holder of an Allowed Administrative Expense, in full satisfaction of such Allowed Administrative Expense, an amount in Cash equal to the Allowed amount of such Administrative Expense. Notwithstanding the foregoing, any and all liabilities of the Debtors to the Governmental Authorities under Environmental Laws associated with the Properties that otherwise would constitute Administrative Expenses shall be treated and satisfied by and in accordance with the terms of the Environmental Response Trust Consent Decree and Settlement Agreement and the Priority Order Sites Consent Decrees and Settlement Agreements.

**2.2    Compensation and Reimbursement Claims.**  All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Confirmation Date, and (ii) shall be paid in full in such amounts as are allowed by the Bankruptcy Court (A) on the date on which the order relating to any such Administrative Expense is entered or (B) upon such other terms as may be mutually agreed upon between the holder of such an Administrative Expense and the Debtors.

**2.3    Priority Tax Claims.**  Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, on the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors shall pay to each holder of an Allowed Priority Tax Claim, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim.  Priority Tax Claims that New GM is liable for under the MSPA shall be the responsibility of New GM and shall receive no distribution under the Plan.

**2.4    DIP Credit Agreement Claims.**  The DIP Lenders shall have an Allowed Administrative Expense for the total amount due under the DIP Credit Agreement as of the Effective Date, ratably in accordance with their respective interests in the DIP Credit Agreement Claims, subject to any applicable provisions of (A) paragraph 5 of the Final Order approving the DIP Credit Agreement (ECF No. 2529) and (B) the Final Order approving the amendment to the DIP Credit Agreement to provide for the Debtors' postpetition wind-down financing (ECF No. 2969).  The Debtors shall pay on account of

the amounts outstanding under the DIP Credit Agreement an amount equal to all Cash and Cash equivalents, if any, remaining after funding all obligations and amounts to be funded under the Plan (including the GUC Trust Administrative Fund, the Asbestos Trust, the Environmental Response Trust Administrative Account, the Avoidance Action Trust Administrative Cash, and the Indenture Trustee/Fiscal and Paying Agent Reserve Cash, and such amounts necessary to satisfy payment of and funding to reconcile Administrative Expenses, Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims), subject to the terms of the Plan, the Budget, and the Confirmation Order, and shall distribute beneficial interests in the Environmental Response Trust to the DIP Lenders.  To the extent it is determined that the DIP Lenders are entitled to any proceeds of the Term Loan Avoidance Action either by (i) mutual agreement between the U.S. Treasury and the Creditors' Committee or (ii) Final Order, the DIP Lenders shall receive the proceeds of the Term Loan Avoidance Action in accordance with Sections 4.3 and 6.5 hereof and the Avoidance Action Trust Agreement.  Notwithstanding anything to the contrary in the Plan, (a) if any of the DIP Lenders' Collateral (including the DIP Lenders' Avoidance Assets) is not distributed pursuant to the Plan, such DIP Lenders' Collateral shall be distributed to the DIP Lenders ratably in accordance with their respective interests in the DIP Credit Agreement Claims, and (b) the DIP Lenders shall (x) have the sole right to collect on, prosecute, designate another party to prosecute, assign, or waive the DIP Lenders' Avoidance Actions and the sole right to recover from or assign the DIP Lenders' Avoidance Assets and (y) be entitled to any Cash, Cash equivalents, proceeds, or other DIP Lenders' Collateral as set forth in Section 5.2(b) hereof.  The Asbestos Insurance Assets shall be held in and administered by the Asbestos Insurance Assets Trust for the benefit of the DIP Lenders as the DIP Lenders' Collateral.  At such time as all payments in respect of the DIP Credit Agreement Claims have been made pursuant to the Plan, any outstanding balance of the DIP Credit Agreement Claims shall be cancelled. Notwithstanding the foregoing, the DIP Credit Agreement Claims shall remain outstanding until such time as the Term Loan Avoidance Action Beneficiaries are determined either by (x) mutual agreement between the U.S. Treasury and the Creditors' Committee or (y) Final Order.

If any Asbestos Insurance Assets are transferred to the Asbestos Insurance Assets Trust, the Asbestos Insurance Assets Trust shall assume all liability for premiums, deductibles, retrospective premium adjustments, security or collateral arrangements, or any other charges, costs, fees, or expenses (if any) that become due to any insurer in connection with the Asbestos Insurance Assets with respect to Asbestos Personal Injury Claims, asbestos-related claims against Entities insured under policies included in the Asbestos Insurance Assets by reason of vendor's endorsements, or under the indemnity provisions of settlement agreements that the Debtors made with various insurers prior to the Commencement Date to the extent that those indemnity provisions relate to Asbestos Personal Injury Claims, and the Debtors shall have no further financial or other responsibility for any of the foregoing.  Upon delivery of the Asbestos Insurance Assets to the Asbestos Insurance Assets Trust, the Debtors and their successors and assigns shall be released from all liability with respect to the delivery of such assets.  The Debtors shall cooperate with the Asbestos Insurance Assets Trust and the entity appointed to

serve as administrator of the Asbestos Insurance Assets Trust and use commercially reasonable efforts to take or cause to be taken all appropriate actions and do or cause to be done all things necessary or appropriate to effectuate the transfer of the Asbestos Insurance Assets to the Asbestos Insurance Assets Trust. By way of enumeration and not of limitation, the Debtors shall be obligated, to the extent practicable, to (i) provide the Asbestos Insurance Assets Trust with copies of insurance policies and settlement agreements included within or relating to the Asbestos Insurance Assets and (ii) execute further assignments or allow the Asbestos Insurance Assets Trust to pursue claims relating to the Asbestos Insurance Assets in its name (subject to appropriate disclosure of the fact that the Asbestos Insurance Assets Trust is doing so and the reasons why it is doing so), including by means of arbitration, alternative dispute resolution proceedings, or litigation, to the extent necessary or helpful to the efforts of the Asbestos Insurance Assets Trust to obtain insurance coverage under the Asbestos Insurance Assets.

**2.5    Special Provisions Regarding Fees and Expenses of Indenture Trustees and Fiscal and Paying Agents.** The reasonable prepetition and postpetition fees and expenses of each of the Indenture Trustees and the Fiscal and Paying Agents solely in connection with their performance of their duties (which includes the reasonable fees and expenses of any counsel and/or other professionals retained by the Indenture Trustees and the Fiscal and Paying Agents in connection with such duties) shall be deemed Allowed Administrative Expenses and shall be paid in Cash on the Effective Date, or as soon thereafter as is reasonably practicable, upon submission of documented invoices (in customary form) to the Debtors, the DIP Lenders, and the Creditors' Committee, subject to a review for reasonableness by the Debtors, the DIP Lenders, and representatives of the members of the Creditors' Committee who are not Indenture Trustees or Fiscal and Paying Agents, without the necessity of making application to the Bankruptcy Court. Notwithstanding the foregoing, under no circumstances shall any such fees and expenses (including counsel and/or other professionals) include fees and expenses associated with defending objections to Claims or associated with Avoidance Actions. Subject to Section 6.7 hereof, each Indenture Trustee's or Fiscal and Paying Agent's charging lien, if any, shall be discharged solely upon payment in full of the respective fees and expenses of the Indenture Trustees or the Fiscal and Paying Agents, as applicable, and termination of the respective Indenture Trustee's or Fiscal and Paying Agent's duties. Nothing herein shall be deemed to impair, waive, or discharge the Indenture Trustees' and the Fiscal and Paying Agents' respective charging liens, if any, for any fees and expenses not paid by the Debtors.

## ARTICLE III.

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

The following table designates the Classes of Claims against and Equity Interests in the Debtors and specifies which of those Classes are (i) impaired or unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to reject the Plan:

former Equity Interest issued by MLC pursuant to this Section 4.6 shall be
nontransferable.

## ARTICLE V.

## PROVISIONS GOVERNING DISTRIBUTIONS

**5.1    Distribution Record Date.**  Except with respect to any publicly-traded
securities as to which distributions shall be treated as set forth in Section 5.10 hereof, (i)
as of the close of business on the Distribution Record Date, the various transfer registers
for each of the Classes of Claims or Equity Interests as maintained by the Debtors, or
their agents, shall be deemed closed, (ii) there shall be no further changes in the record
holders of any of such Claims or Equity Interests, and the Debtors shall have no
obligation to recognize any transfer of such Claims or Equity Interests occurring on or
after the Distribution Record Date, and (iii) the Debtors shall be entitled to recognize and
deal for all purposes hereunder only with those record holders stated on the transfer
ledgers as of the close of business on the Distribution Record Date, to the extent
applicable; *provided, however*, that if the GUC Trust Units are transferable as set forth in
Section 6.2(h) hereof, then the GUC Trust Administrator may set additional record dates
for subsequent distributions to holders of GUC Trust Units, in accordance with the GUC
Trust Agreement.

**5.2    Method of Distributions Under the Plan.**

**(a)    Payments and Transfers on Effective Date.**  On the Effective
Date, or as soon thereafter as is reasonably practicable, the Debtors shall (i) remit to
holders of Allowed Administrative Expenses (except as otherwise provided herein),
Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and, if applicable,
Allowed Secured Claims an amount in Cash equal to the Allowed amount of such
Claims, (ii) transfer the GUC Trust Assets (other than the New GM Securities and the
Residual Wind-Down Assets) to the GUC Trust free and clear of all liens, claims, and
encumbrances, but subject to any obligations imposed by the Plan, on behalf of holders of
General Unsecured Claims, (iii) transfer the Asbestos Trust Assets to the Asbestos Trust
free and clear of all liens, claims, and encumbrances, but subject to any obligations
imposed by the Plan, on behalf of holders of Asbestos Personal Injury Claims, (iv)
transfer the Environmental Response Trust Assets to the Environmental Response Trust
free and clear of all liens, claims, and encumbrances (except for any statutory liens for
property and ad valorem taxes not yet due and payable and all liens, claims, or security
interests of the DIP Lenders under the DIP Credit Agreement and any order of the
Bankruptcy Court approving the DIP Credit Agreement), but subject to any obligations
imposed by the Plan, on behalf of holders of Property Environmental Claims, and (v)
reserve Cash for the Indenture Trustee/Fiscal and Paying Agent Reserve Cash, which
Cash shall be distributed to the Indenture Trustees and Fiscal and Paying Agents, as
applicable, upon submission of documented invoices (in customary form) to the Debtors
prior to December 15, 2011, or, thereafter, to the GUC Trust Administrator in accordance
with Section 6.2(f) hereof without the necessity of making application to the Bankruptcy

Court.  The Debtors shall remit and transfer to the holders of Allowed DIP Credit
Agreement Claims the payments and distributions provided for in Section 2.4 hereof.

On the Avoidance Action Trust Transfer Date, the Debtors shall transfer
the Avoidance Action Trust Assets to the Avoidance Action Trust (except with respect to
the remaining assets of MLC upon its dissolution, which shall be transferred to the
Avoidance Action Trust, if accepted by the Avoidance Action Trust in the sole discretion
of the Avoidance Action Trust Administrator as set forth in, and in accordance with,
Section 6.10 hereof).

After the Effective Date and from time to time thereafter through no later
than December 15, 2011, and upon the written request of the GUC Trust Administrator
specifying the number of New GM Securities to be transferred to the GUC Trust, Post-
Effective Date MLC shall promptly transfer to the GUC Trust such New GM Securities
free and clear of all liens, claims, and encumbrances, but subject to any obligations
imposed by the Plan.  All such New GM Securities shall be distributed by the GUC Trust
to holders of Allowed General Unsecured Claims in accordance with the provisions of
the GUC Trust Agreement and the Plan within thirty (30) days of the receipt thereof by
the GUC Trust.  On or after December 15, 2011 but by no later than December 29, 2011,
all remaining New GM Securities and all Residual Wind-Down Assets held by Post-
Effective Date MLC shall be transferred to the GUC Trust free and clear of all liens,
claims, and encumbrances, but subject to any obligations imposed by the Plan.  To the
extent that any such remaining New GM Securities so delivered would otherwise be
distributed on the next Distribution Date (as defined in the GUC Trust Agreement)
because of Claims resolved (whether Allowed or disallowed) on or prior to the date such
New GM Securities are received by the GUC Trust, such distribution shall be made no
later than thirty (30) days after the receipt of such remaining New GM Securities by the
GUC Trust.  All New GM Securities held by Post-Effective Date MLC in accordance
with this paragraph shall be segregated and shall not be used for any purpose whatsoever
other than for transfer to the GUC Trust as provided herein; *provided, however*, that Post-
Effective Date MLC may sell certain of the New GM Securities pursuant to Section 2.3
of the GUC Trust Agreement (with the Cash proceeds thereof being transferred to the
GUC Trust in accordance with the provisions of the GUC Trust Agreement, but in any
event no later than December 29, 2011).  In no event shall the New GM Securities held
by Post-Effective Date MLC be subject to or available for the payment of any Claims,
liabilities, or obligations of MLC, except as explicitly provided in the GUC Trust
Agreement.

(b)    **Repayment of Excess Cash to DIP Lenders.**  If the Debtors have
any Cash remaining after (i) transferring the GUC Trust Assets to the GUC Trust,
including the funding of the GUC Trust Administrative Fund and the transfer of the
Indenture Trustee/Fiscal and Paying Agent Reserve Cash in accordance with Section 6.2
hereof, (ii) transferring the Asbestos Trust Assets to the Asbestos Trust, (iii) transferring
the Environmental Response Trust Assets to the Environmental Response Trust,
including the funding of the Environmental Response Trust Administrative Funding
Account, (iv) transferring the Avoidance Action Trust Assets to the Avoidance Action

Trust, (v) the resolution (and the payment, to the extent Allowed) of all Disputed Administrative Expenses (including compensation and reimbursement of expenses under sections 330 or 503 of the Bankruptcy Code), Disputed Priority Tax Claims, Disputed DIP Credit Agreement Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims; *provided, however*, that at the time of the transfer of the Residual Wind-Down Assets to the GUC Trust, the Debtors shall only transfer Cash in an amount (based on the Debtors' reasonable estimate) necessary to satisfy the ultimate Allowed amount of all remaining unpaid Administrative Expenses (including any compensation and reimbursement of expenses to the extent allowed by Final Order under section 330 or 503 of the Bankruptcy Code), Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims, (vi) the payment in full of all Allowed Administrative Expenses (including any compensation and reimbursement of expenses to the extent allowed by Final Order under section 330 or 503 of the Bankruptcy Code), Allowed Priority Tax Claims, Allowed DIP Credit Agreement Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims, and (vii) completing the acts described in Section 6.10 hereof, the Debtors shall pay such Cash to the DIP Lenders by wire transfer of immediately available funds to an account designated by the U.S. Treasury and by EDC, respectively, ratably in accordance with their respective interests in the DIP Credit Agreement Claims.  In the event any Cash remains in the GUC Trust Administrative Fund, the Environmental Response Trust Administrative Funding Account, the Avoidance Action Trust Administrative Cash, or the Indenture Trustee/Fiscal and Paying Agent Reserve Cash after all the obligations imposed on the GUC Trust Administrator, the Environmental Response Trust Administrative Trustee, the Avoidance Action Trust Administrator, the Indenture Trustees, or the Fiscal and Paying Agents, respectively, and the GUC Trust, the Environmental Response Trust, and the Avoidance Action Trust, respectively, pursuant to the Plan, the GUC Trust Agreement, the Environmental Response Trust Agreement, the Environmental Response Trust Consent Decree and Settlement Agreement, and the Avoidance Action Trust Agreement, respectively, have been satisfied, the GUC Trust Administrator, the Environmental Response Trust Administrative Trustee, and the Avoidance Action Trust Administrator, respectively, shall pay such Cash to the DIP Lenders by wire transfer of immediately available funds to an account designated by the U.S Treasury and by EDC, respectively, ratably in accordance with their respective interests in the DIP Credit Agreement Claims.  If the GUC Trust Administrator determines to close the Chapter 11 Cases in accordance with Section 6.2(q) hereof, the GUC Trust Administrator shall repay the Cash from the balance of the GUC Trust Administrative Fund after reserving any amounts necessary to close the Chapter 11 Cases to the DIP Lenders by wire transfer of immediately available funds to an account designated by the U.S. Treasury and by EDC, respectively, ratably in accordance with their respective interests in the DIP Credit Agreement Claims.

**(c)**    **Payment of Cash or Certain Assets to Charitable Organizations.**  In the event any Cash or property remains in the Asbestos Trust after all the obligations imposed on the Asbestos Trust Administrator and the Asbestos Trust pursuant to the Plan and the Asbestos Trust Agreement have been satisfied, the Asbestos Trust Administrator shall pay such Cash amounts to a charitable organization exempt

from U.S. federal income tax under section 501(c)(3) of the Tax Code to be selected by, and unrelated to, the Asbestos Trust Administrator.  In the event any Asbestos Trust Assets remain in the Asbestos Trust after all Asbestos Personal Injury Claims have been satisfied pursuant to the Plan and the Asbestos Trust Agreement, the Asbestos Trust Administrator shall transfer such Asbestos Trust Assets to a charitable organization exempt from U.S. federal income tax under section 501(c)(3) of the Tax Code to be selected by, and unrelated to, the Asbestos Trust Administrator.

>>>>>>>>>>> (d)    **Distributions of Cash.**  At the option of the Debtors or the GUC Trust Administrator, the Asbestos Trust Administrator, the Environmental Response Trust Administrative Trustee, or the Avoidance Action Trust Administrator, as applicable, any Cash payment to be made under the Plan, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, or the Avoidance Action Trust, as applicable, may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

>>>>>>>>>>> (e)    **Sale of New GM Warrants About to Expire.**  During the one hundred twenty (120) days preceding the expiration of the New GM Warrants, the GUC Trust Administrator shall have the authority to sell any New GM Warrants remaining in the GUC Trust, whether held in a reserve for Disputed General Unsecured Claims or otherwise, and distribute the proceeds thereof to holders of Allowed General Unsecured Claims and/or GUC Trust Units, as applicable, consistent with, and as provided in, the Plan.  Any such sale shall be made in compliance with an applicable exemption from the registration requirements of the Securities Act of 1933, as amended (the "**Securities Act**") and any equivalent securities law provisions under state law, other than section 1145(a) of the Bankruptcy Code, which is not available for such sale.  For the avoidance of doubt, any holder of an Allowed General Unsecured Claim and/or GUC Trust Unit, as applicable, that is entitled to receive such New GM Warrants shall receive only the net cash proceeds, if any, of the sold New GM Warrants that the GUC Trust Administrator received upon such sale.  To the extent holders of Allowed Claims and/or GUC Trust Units, as applicable, have received a portion of the New GM Warrants to which they are entitled pursuant to the Plan, the GUC Trust Administrator shall have the authority to sell the remaining portion of New GM Warrants pursuant to this Section 5.2(e).

>>>> **5.3**    **Delivery of Distributions and Undeliverable Distributions.**

>>>>>>>>>>> (a)    Subject to Bankruptcy Rule 9010 and except as otherwise provided in the GUC Trust Agreement, all distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents or in a letter of transmittal unless the Debtors or the GUC Trust Administrator or the Avoidance Action Trust Administrator, as applicable, have been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim by such holder that contains an address for such holder different from the address reflected on such Schedules for such holder.  In the event that any distribution to any holder is returned as undeliverable, no further distributions to such holder shall be made unless and until the

(o)   **Dissolution.**  The Asbestos Trust Administrator and the Asbestos Trust shall be discharged or dissolved, as applicable, at such time as (i) all Asbestos Personal Injury Claims have been resolved, (ii) all Asbestos Trust Assets have been liquidated, and (iii) all distributions required to be made by the Asbestos Trust Administrator under the Plan and the Asbestos Trust Agreement have been made.

(p)   **Indemnification of Asbestos Trust Administrator.**  The Asbestos Trust Administrator and its or their agents and professionals shall not be liable for actions taken or omitted in its or their capacity as, or on behalf of, the Asbestos Trust Administrator or the Asbestos Trust, except those acts arising out of its or their own willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or *ultra vires* acts, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its or their capacity as, or on behalf of, the Asbestos Trust Administrator or the Asbestos Trust, except for any actions or inactions involving willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or *ultra vires* acts.  Any indemnification claim of the Asbestos Trust Administrator (and the other parties entitled to indemnification under this subsection (p)) shall be satisfied first from the $2 million in Cash in the Asbestos Trust Assets and then from the Asbestos Trust Assets.  The Asbestos Trust Administrator shall be entitled to rely, in good faith, on the advice of its retained professionals.

### 6.4   **The Environmental Response Trust.**

(a)   **Environmental Response Trust Agreement and Environmental Response Trust Consent Decree and Settlement Agreement.**  On the Effective Date, the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement shall become effective and the Environmental Response Trust shall be established and funded.  Entry of the Confirmation Order shall constitute approval of the Environmental Response Trust Consent Decree and Settlement Agreement pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019.  The establishment and funding of the Environmental Response Trust and the transfer of Environmental Response Trust Assets to the Environmental Response Trust shall be in full settlement and satisfaction of all present and future civil environmental liabilities or obligations of the Debtors to the Governmental Authorities, other than the claims and rights reserved in Paragraphs 100-104 of the Environmental Response Trust Consent Decree and Settlement Agreement (as to which the United States reserves any right of setoff that may exist or arise), with respect to any of the Environmental Response Trust Properties listed on Attachment A to the Environmental Response Trust Consent Decree and Settlement Agreement, whether prepetition or postpetition, in accordance with this Section 6.4 and the Environmental Response Trust Consent Decree and Settlement Agreement; *provided, however*, that nothing in this sentence shall preclude additional payments to the Environmental Response Trust in the event that any of the Priority Order Sites Consent Decrees and Settlement Agreements are not approved as provided in the Priority Order Sites Consent Decrees and Settlement Agreements.  In the event of any conflict between the terms of the Plan and the terms of the Environmental

Response Trust Consent Decree and Settlement Agreement, the terms of the
Environmental Response Trust Consent Decree and Settlement Agreement shall govern.

       **(b)**    **Purpose of Environmental Response Trust.**  The purpose of the
Environmental Response Trust shall be to conduct, manage, and/or fund Environmental
Actions with respect to certain of the Environmental Response Trust Properties, including
the migration of hazardous substances emanating from certain of the Environmental
Response Trust Properties, in accordance with the provisions of the Environmental
Response Trust Agreement and the Environmental Response Trust Consent Decree and
Settlement Agreement; to reimburse the lead agency for Environmental Actions it
conducts or has agreed to pay for with respect to the Environmental Response Trust
Properties; to own certain of the Environmental Response Trust Properties, carry out
administrative and property management functions related to the Environmental
Response Trust Properties, and pay associated administrative costs; and to try to sell or
transfer the Environmental Response Trust Properties owned by the Environmental
Response Trust with the objective that the Environmental Response Trust Properties be
put to productive or beneficial use.  After the establishment and funding of, and the
conveyance of the Environmental Response Trust Properties owned by the Debtors to,
the Environmental Response Trust as provided in the Environmental Response Trust
Consent Decree and Settlement Agreement, the Debtors shall have no further liability,
role, or residual interest with respect to the Environmental Response Trust or the
Environmental Response Trust Properties.

       **(c)**    **Environmental Response Trust Assets.**  The Environmental
Response Trust shall consist of the Environmental Response Trust Assets, as described in
the Environmental Response Trust Consent Decree and Settlement Agreement.  On the
Effective Date, the Debtors shall transfer all the Environmental Response Trust Assets to
the Environmental Response Trust, as provided in and subject to the provisions of the
Environmental Response Trust Consent Decree and Settlement Agreement.  Such transfer
shall include the transfer of Environmental Response Trust Cash in the amount of
$641,434,945, less any deductions made pursuant to Paragraph 36 of the Environmental
Response Trust Consent Decree and Settlement Agreement, which represents the
aggregate amounts approved by the Bankruptcy Court to pay the costs that will be
incurred by the Environmental Response Trust with respect to Environmental Actions
and the costs of administering the Environmental Response Trust.  In settlement and full
satisfaction of the Property Environmental Claims relating to the Environmental
Response Trust Properties, on or before the Effective Date, the Environmental Response
Trust Administrative Trustee shall create, and the Debtors shall make payments to,
accounts held by or within the Environmental Response Trust as specified and in the
amounts provided in the Environmental Response Trust Consent Decree and Settlement
Agreement, and the Debtors shall make the payments required under the Priority Order
Sites Consent Decrees and Settlement Agreements.  The Environmental Response Trust
Administrative Trustee shall deposit, maintain, and use the funding in accordance with
the terms of the Environmental Response Trust Agreement and the Environmental
Response Trust Consent Decree and Settlement Agreement for the purposes described

therein.  Any Environmental Response Trust Property may be sold or transferred by the Environmental Response Trust Administrative Trustee in the circumstances and in light of the considerations described in the Environmental Response Trust Consent Decree and Settlement Agreement.

(d)      **Governance of Environmental Response Trust.**  The Environmental Response Trust shall be governed by the Environmental Response Trust Administrative Trustee according to the terms set forth in the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement.

(e)      **Role of Environmental Response Trust Administrative Trustee.**  The Environmental Response Trust Administrative Trustee shall be responsible for implementing the purpose of the Environmental Response Trust, including overseeing the development of budgets, retaining and overseeing professionals to conduct Environmental Actions, entering into and overseeing the implementation of all contracts binding the Environmental Response Trust, executing agreements, preparing and filing all required plans and reports with the applicable Governmental Authorities, handling accounting and legal matters for the Environmental Response Trust, establishing funding objectives, monitoring the performance of the staff, and other administrative tasks, and shall carry out and implement the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement.  The Environmental Response Trust Administrative Trustee shall not be authorized to engage in any trade or business with respect to the Environmental Response Trust Assets.

(f)      **Nontransferability of Environmental Response Trust Interests.** The beneficial interests in and powers under the Environmental Response Trust shall not be certificated and are not transferable (except as otherwise provided in the Environmental Response Trust Agreement or the Environmental Response Trust Consent Decree and Settlement Agreement).

(g)      **Cash.**  The Environmental Response Trust Administrative Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as would be permitted by (i) section 345 of the Bankruptcy Code were the Environmental Response Trust a debtor under the Bankruptcy Code and (ii) the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement.

(h)      **Indemnification of Environmental Response Trust Administrative Trustee.**  The potential liability of each Environmental Response Trust Party shall be limited as set forth in the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement.  Each Environmental Response Trust Party shall be indemnified and protected from litigation-related expenses as set forth in the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement.

Committee to continue their role as members of the Creditors' Committee, as contemplated by Section 12.1 hereof, (iii) permitting the Indenture Trustees and the Fiscal and Paying Agents to receive payment from the Indenture Trustee/Fiscal and Paying Agent Reserve Cash, and (iv) permitting the Indenture Trustees and the Fiscal and Paying Agents to maintain any rights or liens they may have for fees, costs, expenses, and indemnities under the Indentures and the Fiscal and Paying Agency Agreements, against or recoverable from distributions made under the Plan to the Registered Holders and/or beneficial owners of debt securities with respect to the Note Claims and the Eurobond Claims. Notwithstanding the foregoing or Section 5.10 hereof, nothing contained herein shall affect any rights that a holder of a Note Claim or an Indenture Trustee may have against Delphi Corporation and/or any of its affiliates or successors with respect to that certain Assumption and Assignment Agreement – Industrial Revenue Bonds, dated as of January 1, 1999, between Delphi Automotive Systems LLC and General Motors Corporation and/or any related agreements or documents. For the avoidance of doubt, nothing contained herein shall affect the rights of the holders of the Nova Scotia Guarantee Claims to assert direct claims, if any, against General Motors Nova Scotia Finance Company.

**6.8** **Equity Interests in MLC Subsidiaries Held by the Debtors.** On the Effective Date, at the option of the Debtors, each respective Equity Interest in a direct or indirect subsidiary of MLC shall be unaffected by the Plan, in which case the Debtor holding such Equity Interests shall continue to hold such Equity Interests and shall cause any such subsidiaries to be dissolved prior to December 15, 2011. An amount equal to any net proceeds realized from such dissolutions shall be distributed to the DIP Lenders on account of amounts outstanding.

**6.9** **Administration of Taxes.** Subject to the MSPA and the GUC Trust Agreement, MLC shall be responsible for all tax matters of the Debtors until a certificate of cancellation or dissolution for MLC shall have been filed in accordance with Section 6.10 hereof.

**6.10** **Dissolution of the Debtors.** Within thirty (30) days after its completion of the acts required by the Plan, or as soon thereafter as is practicable, but no later than December 15, 2011, each Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of each Debtor; *provided, however,* that each Debtor shall file with the office of the Secretary of State or other appropriate office for the state of its organization a certificate of cancellation or dissolution; and *provided, further,* that upon the filing of such certificate of cancellation or dissolution, each such Debtor immediately shall cease to be, and not continue as, a body corporate for any purpose whatsoever. Upon the dissolution of MLC (and therefore no later than December 15, 2011), (i) the Residual Wind-Down Assets shall be transferred to the GUC Trust, (ii) the Indenture Trustee/Fiscal and Paying Agent Reserve Cash shall be transferred to the GUC Trust, and (iii) all remaining assets of MLC shall be transferred to the Avoidance Action Trust at the sole discretion of the Avoidance Action Trust Administrator and shall constitute Avoidance Action Trust Assets, and any remaining assets not transferred to the Avoidance Action Trust shall be deemed

abandoned by the Debtors for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors.

### 6.11    Determination of Tax Filings and Taxes.

(a)    Following the filing of a certificate of cancellation or dissolution for MLC, subject to Section 6.16(a) of the MSPA and the GUC Trust Agreement, the GUC Trust Administrator shall prepare and file (or cause to be prepared and filed) on behalf of the Debtors, all tax returns, reports, certificates, forms, or similar statements or documents (collectively, "**Tax Returns**") required to be filed or that the GUC Trust Administrator otherwise deems appropriate, including the filing of amended Tax Returns or requests for refunds, for all taxable periods ending on, prior to, or after the Effective Date.

(b)    Each of the Debtors and the GUC Trust Administrator shall cooperate fully with each other regarding the implementation of this Section 6.11 (including the execution of appropriate powers of attorney) and shall make available to the other as reasonably requested all information, records, and documents relating to taxes governed by this Section 6.11 until the expiration of the applicable statute of limitations or extension thereof or at the conclusion of all audits, appeals, or litigation with respect to such taxes.  Without limiting the generality of the foregoing, the Debtors shall execute on or prior to the filing of a certificate of cancellation or dissolution for MLC a power of attorney authorizing the GUC Trust Administrator to correspond, sign, collect, negotiate, settle, and administer tax payments and Tax Returns for the taxable periods described in Section 6.11(a) hereof.

(c)    The Debtors and the GUC Trust Administrator shall have the right to request an expedited determination of the tax liability of the Debtors, if any, under section 505(b) of the Bankruptcy Code with respect to any tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the filing of a certificate of cancellation or dissolution for MLC.

(d)    Following the filing of a certificate of cancellation or dissolution for MLC, subject to Section 6.16(a) and (d) of the MSPA, the GUC Trust Administrator shall have the sole right, at its expense, to control, conduct, compromise, and settle any tax contest, audit, or administrative or court proceeding relating to any liability for taxes of the Debtors and shall be authorized to respond to any tax inquiries relating to the Debtors (except with respect to any property and ad valorem taxes relating to the Environmental Response Trust Assets).

(e)    Following the filing of a certificate of cancellation or dissolution for MLC, subject to the MSPA, the GUC Trust Administrative Fund shall be entitled to the entire amount of any refunds and credits (including interest thereon) with respect to or otherwise relating to any taxes of any Debtors, including for any taxable period ending on, prior to, or after the Effective Date (except with respect to any property and ad valorem tax refunds and credits relating to the Environmental Response Trust Assets).

Confirmation Date, (ii) any liability that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code, (iii) any valid right of setoff or recoupment, (iv) any police or regulatory action, (v) any environmental liability that the Debtors, their Estates, any successors thereto, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, the Avoidance Action Trust, or any other Person or Entity may have as an owner or operator of real property after the Effective Date, and (vi) any liability to a "governmental unit" (as defined in the Bankruptcy Code), on the part of any Persons or Entities other than the Debtors, their Estates, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, the Avoidance Action Trust, the GUC Trust Administrator, the Asbestos Trust Administrator, the Environmental Response Trust Administrative Trustee, or the Avoidance Action Trust Administrator, except with respect to the parties as specifically provided for in Sections 12.5 and 12.6 hereof.

**ARTICLE XI.**

**RETENTION OF JURISDICTION**

**11.1    Jurisdiction of Bankruptcy Court.**  The Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)  To hear and determine motions for the assumption, assumption and assignment, or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

(b)  To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced before or after the Confirmation Date, including, without limitation, any proceeding with respect to a Cause of Action or Avoidance Action (including the Term Loan Avoidance Action);

(c)  To ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(d)  To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(e)  To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)  To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g) To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h) To hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

(i) To hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, the Avoidance Action Trust, the GUC Trust Agreement, the Asbestos Trust Agreement, the Environmental Response Trust Agreement, the Environmental Response Trust Consent Decree and Settlement Agreement, and the Avoidance Action Trust Agreement, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing, including to formulate and enforce alternative dispute resolution procedures with respect to the Environmental Response Trust Agreement or the Environmental Response Trust Consent Decree and Settlement Agreement; *provided, however*, that the Bankruptcy Court's jurisdiction with respect to the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement shall be concurrent with the jurisdiction of other courts of competent jurisdiction over such matters to the extent such agreements provide for concurrent jurisdiction;

(j) To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation;

(k) To recover all assets of the Debtors, property of the Debtors' estates, the GUC Trust Assets, the Asbestos Trust Assets, and the Avoidance Action Trust Assets, wherever located;

(l) To hear and determine all objections to the termination of the Asbestos Trust;

(m) To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n) To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including, without limitation, matters with respect to any taxes payable by a trust or reserve established in furtherance of the Plan);

(o) To resolve all matters related to the 363 Transaction;

(p) To enforce all orders previously entered by the Bankruptcy Court;

(q) To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code; and

(r) To enter a final decree closing the Chapter 11 Cases.

To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the forgoing matters, the reference to the "Bankruptcy Court" in this Article XI shall be deemed to be replaced by the "District Court." Notwithstanding anything in this Article XI to the contrary, (i) the resolution of Asbestos Personal Injury Claims and the forum in which such resolution will be determined shall be governed by and in accordance with the Asbestos Trust Distribution Procedures and the Asbestos Trust Agreement and (ii) the Bankruptcy Court and/or the District Court shall have concurrent, rather than exclusive, jurisdiction with respect to disputes relating to (a) rights under insurance policies issued to the Debtors that are included in the Asbestos Insurance Assets, and (b) the Debtors' rights to insurance with respect to workers' compensation claims. Nothing contained in this Section 11.1 shall expand the exclusive jurisdiction of the Bankruptcy Court beyond that provided by applicable law.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

**12.1    Dissolution of Committees.**  On the Effective Date, the Creditors' Committee shall dissolve; *provided, however*, that, following the Effective Date, the Creditors' Committee shall continue to have standing and a right to be heard with respect to (i) Claims and/or applications for compensation by professionals and requests for allowance of Administrative Expenses for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code, (ii) any appeals of the Confirmation Order that remain pending as of the Effective Date to which the Creditors' Committee is a party, (iii) responding to creditor inquiries for one hundred twenty (120) days following the Effective Date, (iv) the settlement or determination by Final Order of the Asbestos Trust Claim (including through any appeals), and (v) its role as plaintiff in the Term Loan Avoidance Action, and the settlement or determination by Final Order of the proper Term Loan Avoidance Action Beneficiaries (including through any appeals). On the Effective Date, the Asbestos Claimants' Committee shall dissolve.  Upon the dissolution of the Creditors' Committee and the Asbestos Claimants' Committee, the current and former members of the Creditors' Committee, the members of the Asbestos Claimants' Committee, and the Future Claimants' Representative, and their respective officers, employees, counsel, advisors, and agents, shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's, the Asbestos Claimants' Committee's, and the Future

EXHIBIT C


ENVIRONMENTAL RESPONSE TRUST CONSENT DECREE
AND SETTLEMENT AGREEMENT
(EXCERPTS)

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 09-50026 (REG) |
| MOTORS LIQUIDATION COMPANY, *et al.*, | ) | Chapter 11 |
|     f/k/a General Motors Corp., *et al.*, | ) | (Jointly Administered) |
| | ) | |
|     Debtors. | ) | |

**ENVIRONMENTAL RESPONSE TRUST**
**CONSENT DECREE AND SETTLEMENT AGREEMENT**
**AMONG DEBTORS,**
**THE ENVIRONMENTAL RESPONSE TRUST ADMINISTRATIVE TRUSTEE,**
**THE UNITED STATES,**
**THE STATES OF DELAWARE, ILLINOIS, INDIANA, KANSAS, MICHIGAN,**
**MISSOURI, NEW JERSEY, NEW YORK, OHIO, WISCONSIN, COMMONWEALTH**
**OF VIRGINIA, THE LOUISIANA DEPARTMENT OF ENVIRONMENTAL**
**QUALITY, THE MASSACHUSETTS DEPARTMENT OF ENVIRONMENTAL**
**PROTECTION, THE DEPARTMENT OF ENVIRONMENTAL PROTECTION OF**
**THE COMMONWEALTH OF PENNSYLVANIA AND THE SAINT REGIS**
**MOHAWK TRIBE**

**WHEREAS**, in consideration of, and in exchange for, the promises and covenants herein, the parties hereby agree to the terms and provisions of this Settlement Agreement;

**WHEREAS**, the obligations undertaken by Debtors pursuant to this Settlement Agreement are in the nature of compromises and it is the position of the Governments that these obligations are less than the Governments would seek in the absence of this settlement; and

**WHEREAS**, this Settlement Agreement is fair, reasonable, and in the public interest, and is an appropriate means of resolving the matters addressed in this Settlement Agreement.

**NOW, THEREFORE**, without the admission of liability or any adjudication on any issue of fact or law, and upon the consent and agreement of the parties by their authorized attorneys and authorized officials, it is hereby agreed as follows:

## I.  DEFINITIONS

1.    Unless otherwise expressly provided herein, terms used in this Settlement Agreement that are defined in CERCLA, RCRA, state environmental law or their respective regulations, or in the Bankruptcy Code shall have the meaning assigned to them in CERCLA, RCRA, state environmental law or their respective regulations, or in the Bankruptcy Code, as applicable.  Whenever terms listed below are used in this Settlement Agreement, the following definitions shall apply:

2.    "Administrative Funding Account" shall mean the funding held by the Environmental Response Trust for the costs necessary for the administration of the Environmental Response Trust and the orderly wind-down of the Properties, including, but not limited to, administrative and personnel costs, including professional and legal fees, security, utilities, maintenance, property taxes, property marketing costs, and demolition costs unrelated to Environmental Actions.  Such funding shall be set aside in separate dedicated subaccounts.

Environmental Response Trust's completion of a sale of such Property or personalty.  After

Debtors execute this Settlement Agreement, Debtors shall not further encumber the Properties

or Debtors' other interests therein and shall maintain the Properties, including the

improvements thereon and the fixtures thereto that are related to Environmental Actions in the

condition that they exist as of the date of such execution, except to the extent that ongoing

Environmental Actions require otherwise or, with respect to demolition activities at Properties

with existing and prospective contracts for demolition activities listed on Attachment B.

Notwithstanding anything to the contrary herein or in the Plan, the lenders under the DIP

Credit Agreement shall maintain any and all liens on any Collateral (as defined in the DIP

Credit Agreement) and any transfer of that Collateral to the Environmental Response Trust

shall not be made free and clear of the liens of the lenders under the DIP Credit Agreement,

provided however that the Required Lenders hereby consent to the expenditure or sale of all

Collateral securing those liens, claims and interests if such sale is made in accordance with the

approved annual budget and the provisions of this Settlement Agreement, the Trust

Agreement and the Plan.

32.   On the Effective Date, and subject to adjustments as provided in Paragraph 36 of this

Settlement Agreement as applicable, Debtors shall make a payment to fund the Environmental

Response Trust in the amount of no less than $641,434,945; and the Debtor shall pay or cause

to be paid to the Expendable Trust as defined in Paragraph 79 of this Agreement in the

amount of $786,944, and the 807 Trust Fund as defined in Paragraph 80 of this Agreement in

the amount of $102,390.  The Environmental Response Trust funding amount consists of (i) a

Minimum Estimated Property Funding Account containing funding with respect to each

Property as set forth on Attachment A Column 2 attached hereto and totaling $295,036,131,

(ii) a Reserve Property Funding Account containing funding with respect to each Property as set forth on Attachment A Column 3 attached hereto and totaling $52,065,197, (iii) a Long Term OMM Property Funding Account containing funding (if any) for each Property as set forth in Attachment A Column 4 attached hereto and totaling $84,099,794; (iv) the Cushion Funding Account totaling $68,233,823; (v) the Administrative Funding Account in an amount of no less than $102 million; and (vi) the Administrative Funding Reserve Account totaling $40 million.

33.  Environmental Response Trust funding of the Minimum Estimated Property Funding Accounts, Reserve Property Funding Accounts, and Long Term OMM Property Funding Accounts shall be held in trust in segregated trust subaccounts for each Property as provided in this Settlement Agreement and the Trust Agreement.  Environmental Response Trust funding with respect to the Administrative Funding Account and the Cushion Funding Account each shall be held in trust in a segregated trust subaccount as provided in this Settlement Agreement.  Funding from a subaccount for a Property may not be used for another Property except as otherwise expressly provided by and in accordance with this Settlement Agreement.

34.  All interest earned in a subaccount shall be retained in such subaccount and used only for the same purposes as the principal in that subaccount as provided in this Settlement Agreement, subject to any reallocation provided for in accordance with the terms of this Settlement Agreement.

35.  Notwithstanding any other provision of this Settlement Agreement or the Trust Agreement, "separately dedicated subaccounts" may be accomplished by accounting entries and nothing herein shall preclude the Administrative Trustee from commingling funds solely

16

for investment or administrative purposes, provided, however, that the Administrative

Funding Account and Administrative Reserve Funding Account shall not be commingled with

any other accounts under any circumstances.

Funding Adjustments.

36.  (a) The amount of funding provided with respect to any Property in the Minimum

Estimated Property Funding Account and Reserve Property Funding Account shall be reduced

on the Effective Date to reflect actual expenditures by the Debtors at the Property for third

party contractor costs for Environmental Actions at the Property (1) that were paid by Debtors

between July 1, 2010, and October 31, 2010, except to the extent already credited under

Attachment A, provided that the costs for which the Debtors are seeking reduction were

approved in writing by the Lead Agency (including approval of an estimate of such costs),

and (2) any actual expenditures by the Debtors at the Property for third party contractor costs

for Environmental Actions with respect to a Property between November 1, 2010 and the

Effective Date will be a reduction provided that such costs were pre-approved in writing by

the Lead Agency (including pre-approval of an estimate of such costs).  In no event shall any

reductions be made for Environmental Actions performed by Debtors between July 1, 2010,

and the Effective Date that exceed either the cost for them in the Property's Minimum

Estimated Property Funding Account or Reserve Property Funding Account or any approval

or pre-approval of such costs.  Following completion of any such Environmental Action and

payment thereof, Debtors shall provide documentation to the Lead Agency of the exact

amount of the expenditure.  In no event shall reductions be made for expenditures of Debtors

that are not reimbursements of expenditures for and payments to third party contractors.  In no

event shall reductions be made for expenditures of Debtors on any property that is not related

17

to a Property set forth on Attachment A hereto.  Any reductions or payments under this

Paragraph are subject to the approval in writing of the Lead Agency that the reductions or

payments are consistent with this Paragraph.  Any disputes under this Paragraph shall be

resolved by the Bankruptcy Court.

(b) The amount of funding provided with respect to the Administrative Funding

Account shall be adjusted on the Effective Date to reflect actual expenditures by the Debtors,

as a result of any delay in the Effective Date beyond December 31, 2010, for administrative

costs that were part of Debtors projected budget for the Administrative Funding Account.

Such adjustment shall be subject to the approval of the U.S. Treasury.

37.   Debtors shall, on or before the Effective Date, directly reimburse a Lead Agency for costs

expended by the Lead Agency for Environmental Actions with respect to a Property between

June 1, 2009 and December 31, 2010 for Properties transferred to the Environmental

Response Trust by MLC, or October 9, 2009 and December 31, 2010 for Properties

transferred to the Environmental Response Trust by REALM or ENCORE, provided that (i)

the applicable Debtor, the Lead Agency, and U.S. Treasury agree that the costs for which the

Lead Agency is seeking reimbursement were included in the Property's Minimum Estimated

Property Funding Account or Reserve Property Funding Account or were for Emergency

Environmental Actions within the meaning of Paragraph 49; and (ii) the amount of funding

provided with respect to any Property in the Minimum Estimated Property Funding Account

and Reserve Property Funding Account is reduced on the Effective Date to reflect actual

payments made by the Debtors to the Lead Agency.  In the event of a dispute between the

relevant Debtor, the United States, and/or Lead Agency regarding the Debtor's reimbursement

of costs incurred by the Lead Agency as provided for in this Paragraph, the Bankruptcy Court

shall resolve the dispute.  Any costs expended by the Lead Agency for Environmental Actions

with respect to a Property between January 1, 2011 and the Effective Date will be included in,

and reimbursed by the Trust after the Effective Date pursuant to the Property's first approved

Annual Cleanup Budget provided that those costs were included in the Property's Minimum

Estimated Property Funding Account or Reserve Property Funding Account or were for

Emergency Environmental Actions within the meaning of Paragraph 49.  Under no

circumstances will the Debtors or the Environmental Response Trust under this Paragraph pay

any costs expended by the Governments in connection with any work relating to Debtors'

bankruptcy proceedings.

38.  The United States shall be the sole beneficiary of the Environmental Response Trust.

39.  The United States, the States, and the Tribe shall have the rights and powers set forth in

this Settlement Agreement and the Trust Agreement, and nothing shall limit their ability to

enforce those rights and powers, including but not limited to (i) the right to file suit against

Debtors or the Administrative Trustee for failure to fund on the Effective Date the

Environmental Response Trust's Minimum Estimated Property Funding Accounts, Reserve

Property Funding Accounts, Long Term OMM Property Funding Accounts and Cushion

Funding Account as set forth in this Settlement Agreement; (ii) the right to file suit against the

Environmental Response Trust or the Environmental Response Trust Protected Parties at any

time for fraud or willful misconduct (with all funds recovered in any such action to be

restored to the Environmental Response Trust subaccount from which they were taken); or

(iii) the right to file suit against the Administrative Trustee as set forth in Paragraphs 50, 101,

102, and 103 of this Settlement Agreement, provided, however, that the Bankruptcy Court

shall have exclusive jurisdiction over any issues relating to (a) approval of budgets and

# EXHIBIT D

# ENVIRONMENTAL RESPONSE TRUST AGREEMENT (EXCERPTS)

# ENVIRONMENTAL RESPONSE TRUST AGREEMENT

## BY AND AMONG

### MOTORS LIQUIDATION COMPANY f/k/a GENERAL MOTORS CORP., REMEDIATION AND LIABILITY MANAGEMENT COMPANY, INC., and ENVIRONMENTAL CORPORATE REMEDIATION COMPANY, INC.
as Settlors,

### EPLET, LLC,
not individually but solely in its representative capacity
as Environmental Response Trust Administrative Trustee,

## AND

### THE UNITED STATES OF AMERICA,
as Environmental Response Trust Beneficiary and Powers and Rights Holder

## AND

### THE STATES OF DELAWARE, ILLINOIS, INDIANA, KANSAS, MICHIGAN, MISSOURI, NEW JERSEY, NEW YORK, OHIO, WISCONSIN, COMMONWEALTH OF VIRGINIA, THE LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY, THE MASSACHUSETTS DEPARTMENT OF ENVIRONMENTAL PROTECTION, THE DEPARTMENT OF ENVIRONMENTAL PROTECTION OF THE COMMONWEALTH OF PENNSYLVANIA AND THE SAINT REGIS MOHAWK TRIBE
as Environmental Response Trust Powers and Rights Holders

1.1.22  "Environmental Response Trust Account" shall have the meaning given in Section 2.5.2. hereof.

1.1.23  "Environmental Response Trust Assets" means the funding placed in the Environmental Response Trust Accounts and the assets transferred to the Environmental Response Trust in accordance with this Agreement, the Settlement Agreement and the Plan, but shall not include any General Motors, LLC ("New GM") securities. The Environmental Response Trust Assets are comprised of (i) Cash in the amount of no less than $641,414,653 million, as adjusted pursuant to Paragraphs 36 and 37 of the Settlement Agreement; (ii) the Properties listed in Exhibit "A" to this Trust Agreement; (iii) personal property, including equipment, related to certain of the Properties; (iv) all leases of Environmental Response Trust Assets with New GM; (v) all Transferred Contracts; and (vi) such other assets acquired or held by the Environmental Response Trust from time to time pursuant to this Agreement, the Settlement Agreement and the Plan of Liquidation, or an order of the Court.

1.1.24  "Environmental Response Trust Protected Parties" means the Administrative Trustee, individually and/or in its capacity as official representative of the Environmental Response Trust, and the Environmental Response Trust's and the Administrative Trustee's shareholders, members, officers, managers, directors, employees (including but not limited to the Cleanup Managers and the Redevelopment Manager), attorneys and agents, if any, solely in their capacities as such. Each of the Environmental Response Trust Protected Parties is, individually, an Environmental Response Trust Protected Party. For avoidance of doubt, the Environmental Response Trust is not an Environmental Response Trust Protected Party.

1.1.25  "Environmental Response Trust Proceeds" means income, interest earned and proceeds of any liquidation, sale, lease, recovery or other disposition of or other proceeds with respect to the Environmental Response Trust Assets.

1.1.26  "Environmental Response Trust Beneficiary" or "Beneficiary" means the United States of America ("United States").

1.1.27  "Environmental Law" means any applicable federal, tribal, state or local law, statute, ordinance, rule, regulation or code, any license, permit, authorization, administrative or court order, judgment, decree or injunction, including all common law, related to pollution, protection or restoration of health, safety or the environment, or the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production, release or disposal of pollutants or Hazardous Substances, including, without limitation, CERCLA; RCRA; the Clean Air Act, 42 U.S.C. Section 7401, et seq.; the Federal Water Pollution

5

2.5    Transfer of Funds and Creation of Environmental Response Trust Accounts

    2.5.1    Funding. On the Effective Date, the Settlors shall (i) transfer or cause to be transferred to the Environmental Response Trust or at the direction of the Environmental Response Trust Administrative Trustee cash in the amount of no less than $641,414,653, which constitutes the Environmental Response Trust Funds; (ii) pay or cause to be paid to the Expendable Trust as defined in Paragraph 79 of the Settlement Agreement the amount of $786,944; and (iii) pay or cause to be paid to the 807 Trust Fund as defined in Paragraph 80 of the Settlement Agreement the amount of $102,390. Upon the Settlors' transfer of the Properties listed in Exhibit "A" and Funds pursuant to this Agreement and the Settlement Agreement, Debtors shall have no further obligation to transfer any additional properties or funds under this Agreement, the Settlement Agreement or otherwise for the purpose of paying Environmental Costs, the costs of administering the Environmental Response Trust or for any other purpose relating to the Properties.

    2.5.2    Environmental Response Trust Accounts. Upon receipt of the Properties and the Funds, the Environmental Response Trust Administrative Trustee shall set aside in separate segregated trust subaccounts (each an "Environmental Cost Account"), the Funding for Environmental Costs with respect to each Property as follows: (i) minimum estimated property funding shall be placed in a Minimum Estimated Property Funding Account containing funding amounts for each Property as set forth on Table A Column 2 attached to the Settlement Agreement and totaling $294,977,592, (ii) reserve property funding shall be placed in a Reserve Property Funding Account containing funding amounts for each Property as set forth on Table A Column 3 attached to the Settlement Agreement and totaling $52,054,867, and (iii) a Long Term OMM Property Funding Account containing funding amounts (if any) for each Property as set forth in Table A Column 4 attached to the Settlement Agreement and totaling $84,099,794. The Environmental Response Trust Administrative Trustee shall also set aside into a separate segregated trust subaccount the Cushion Funding totaling $68,282,400 (the "Cushion Funding Account"). The Environmental Response Trust Administrative Trustee shall further set aside into a separate segregated trust subaccount the Administrative Funding in an amount no less than $102 million (the "Administrative Funding Account"), and into a further separate segregated trust subaccount the Administrative Reserve Funding totaling $40 million (the "Administrative Funding Reserve Account"). The separate subaccounts are referred to in this Agreement individually as an "Environmental Response Trust Account" and collectively as the "Environmental Response Trust Accounts." The initial Funds for each of the Environmental Response Trust Accounts shall be as set forth in Paragraph 32 of the Settlement Agreement, subject to adjustment as provided by Paragraphs 36 and 37 of the Settlement Agreement. Subject to Section 2.7

# EXHIBIT E

# LETTER FROM US BANK



All of **us** serving you®

Institutional Trust & Custody
425 Walnut Street
Cincinnati, OH 45202

October 21, 2011

Scott R. Hamilton, Chief Financial Officer
RACER Trust
2930 Ecorse Road
Ypsilanti, MI  48198

Dear Scott:

Below is a recap of the assets we received for the initial funding for RACER Trust.  The assets are valued as of 3/31/2011.

### RACER Environmental Action Investment Account

| Asset Description | Int. Rate | Maturity | Units | Market Value | Accrued Interest | Total Value |
|---|---|---|---|---|---|---|
| Cash | | | | 34,896,945.00 | 0 | 34,896,945.00 |
| U S TREASURY I P | 2.38% | 1/15/2025 | 104,020,808.37 | 116,771,679.06 | 518,667.29 | 117,290,346.35 |
| U S TREASURY I P | 2.38% | 1/15/2017 | 7,924,719.880 | 8,930,763.07 | 39,514.14 | 8,970,277.21 |
| U S TREASURY I P | 1.63% | 1/15/2018 | 7,241,665.600 | 7,830,050.93 | 24,705.68 | 7,854,756.61 |
| U S TREASURY I P | 2.13% | 1/15/2019 | 6,975,927.140 | 7,784,158.06 | 31,121.88 | 7,815,279.94 |
| U S TREASURY NT | 1.00% | 7/31/2011 | 189,564,000.00 | 190,104,257.40 | 314,194.48 | 190,418,451.88 |
| U S TREASURY I P | 1.38% | 1/15/2020 | 63,758,507.91 | 66,852,070.71 | 184,054.26 | 67,036,124.97 |
| U S TREASURY I P | 1.25% | 7/15/2020 | 11,536,260.90 | 11,913,842.72 | 30,274.72 | 11,944,117.44 |
| U S TREAS BD STRIP | | 2/15/2015 | 9,329,000.00 | 8,706,289.25 | 0.00 | 8,706,289.25 |
| U S TREAS BD STRIP | | 2/15/2016 | 22,339,000.00 | 20,014,403.66 | 0.00 | 20,014,403.66 |
| | | | 422,689,889.80 | 473,804,459.86 | 1,142,532.45 | 474,946,992.31 |

### RACER Administrative Investment Account

| Asset Description | Int. Rate | Maturity | Units | Market Value | Accrued Interest | Total Value |
|---|---|---|---|---|---|---|
| Cash | | | | 15,000,000.00 | 0.00 | 15,000,000.00 |
| U S TREASURY I P | 2.38% | 1/15/2025 | 37,988,755.73 | 42,645,417.41 | 189,419.07 | 42,834,836.48 |
| U S TREASURY I P | 2.38% | 1/15/2017 | 9,621,470.32 | 10,842,915.98 | 47,974.46 | 10,890,890.44 |
| U S TREASURY I P | 1.63% | 1/15/2018 | 3,678,640.00 | 3,977,529.50 | 12,550.06 | 3,990,079.56 |
| U S TREASURY I P | 2.13% | 1/15/2019 | 3,536,165.36 | 3,945,865.48 | 15,775.99 | 3,961,641.47 |
| U S TREASURY NT | 1.00% | 7/31/2011 | 36,473,000.00 | 36,576,948.05 | 60,452.49 | 36,637,400.54 |
| U S TREASURY I P | 1.38% | 1/15/2020 | 5,501,496.69 | 5,768,429.31 | 15,881.39 | 578,4310.70 |
| U S TREASURY I P | 1.25% | 7/15/2020 | 6,203,289.60 | 6,406,323.27 | 16,279.35 | 6,422,602.62 |
| U S TREAS BD STRIP | | 2/15/2015 | 5,671,000.00 | 5,292,460.75 | 0.00 | 5,292,460.75 |
| U S TREAS BD STRIP | | 2/15/2016 | 6,661,000.00 | 5,967,856.34 | 0.00 | 5,967,856.34 |
| | | | 115,334,817.70 | 136,423,746.09 | 358,332.81 | 136,782,078.90 |



All of **us** serving you®

Institutional Trust & Custody
425 Walnut Street
Cincinnati, OH 45202

If you have any questions, or need any further information, please do not hesitate to contact me.

Sincerely,

*M C Poppe*

M. Christine Poppe
Vice President & Relationship Manager

**usbank.com**