Hearing Date and Time: January 18, 2012 at 9:45 a.m.
Reply Deadline: January 10, 2012 at 4:00 p.m.
Response Deadline: December 22, 2011 at 4:00 p.m.

Michael S. Davis
Bryan D. Leinbach
ZEICHNER ELLMAN & KRAUSE LLP
575 Lexington Avenue
New York, New York  10022
(212) 223-0400
mdavis@zeklaw.com
bleinbach@zeklaw.com

*Attorneys for Chartis Specialty Insurance Company
and Lexington Insurance Company*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>MOTORS LIQUIDATION COMPANY,<br>et al.,<br><br>            Debtors. | Chapter 11 Cases<br>Case No. 09-50026 (REG)<br><br>(Jointly Administered) |

### OPPPOSITION OF CHARTIS SPECIALTY INSURANCE COMPANY AND LEXINGTON INSURANCE COMPANY TO THE REORGANIZED DEBTOR'S SUPPLEMENTAL AMENDED CLAIMS OBJECTION TO PROOF OF CLAIM NUMBER 71242 (THE "MOTION") AND CROSS-MOTION TO COMPEL ARBITRATION

Chartis Specialty Insurance Company (f/k/a American International Specialty Lines Insurance Company) ("Specialty") and Lexington Insurance Company ("Lexington") (together "**Chartis**") by and through its undersigned counsel, hereby submits this (i) opposition to the Reorganized Debtor Motors Liquidation Company, formerly known as General Motors Corporation's ("**Old GM**") Motion and (ii) cross-motion to compel arbitration.

## PRELIMINARY STATEMENT

1.    The only issue in dispute between Old GM and Chartis (the "**Dispute**") is whether an allowed claim (the "**Chartis Claim**") is secured. The parties have stipulated that the Chartis Claim be allowed and have further stipulated that funds be held in reserve for the claim. The issues before this Court are, first, whether the Dispute should be referred to arbitration, and second, if not, then the Dispute itself would then come before this Court.

2.    By a Stipulation So-Ordered on November 21, 2011 (the "**Stipulation**"), the Chartis Claim was allowed against Old GM in the amount of $4.5 million. It is undisputed that this Chartis Claim arises from Old GM's responsibility to clean up certain environmental hazards at Bristol, Connecticut. Some time ago, GM sold a property in Bristol, Connecticut that is now owned by Bristol Center LLC ("**Bristol LLC**"), a Chartis insured party. When GM failed to clean up the site, Chartis, acting as Bristol LLC's insurer, undertook the responsibility to do so. (See Motion ¶ 3, 6.)

3.    The Dispute turns on the interpretation of two substantially identical Payment Agreements between Old GM and Chartis (the "**Payment Agreement**") (attached to the Declaration of Bryan D. Leinbach ("Leinbach Decl.") as **Exhibits A** and **B**.)[1]

4.    The Payment Agreement provides, however, that "any…unresolved dispute arising out of this Agreement must be submitted to arbitration," and the arbitrators shall have "exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability" (Payment Agreement, pp. 8, 9) Thus, as a threshold matter, this Court should

---

[1]   References to the "Payment Agreement" refer to both Payment Agreements because they are substantially identical in all instances referred to herein.

submit the issue of arbitrability to arbitration. Moreover, "Unresolved disputes" under the arbitration clause necessarily include any disputes involving Chartis' right to use and hold collateral pursuant to the Payment Agreement and the interpretation of the parties' contractual rights under the Payment Agreement.

5.    Under the Federal Arbitration Act (the "**FAA**"), the Payment Agreement's arbitration provisions must be enforced. The United States Supreme Court, the Second Circuit Court of Appeals and this Court have mandated the enforcement of arbitration agreements by bankruptcy courts. Further, this Court has held that a motion to compel arbitration should be granted even to arbitrate the issues addressed in a debtor's objection to a proof of claim. As a result, this Court should refer this matter to arbitration.

6.    Once submitted to arbitration, the Dispute will turn principally on one key contractual provision. The Payment Agreement provides for Old GM to provide collateral and authorizes that collateral to be used for specified obligations in the event Old GM is not in default, but in the event of default, the permitted use of collateral expands to "any" obligation of Old GM to Chartis. As Chartis shows below (fully reserving and without waiving its right to arbitration), and will establish in arbitration, default occurred and thus the Chartis Claim became secured.

## FACTS

**A.**   **The Chartis Claim**

7.      As agreed by the parties, Chartis issued insurance policies to Old GM that are subject to deductibles, reimbursement and other obligations of Old GM to Chartis (collectively, the "**Policies**"). (See Motion ¶¶ 2, 28-30.)

8.      In order to secure Old GM's various obligations to Chartis under the Policies, Old GM and Chartis entered into the Payment Agreement.  (Specialty version, effective September 1, 2006, Leinbach Decl., Ex. A; Lexington version, effective April 1, 2009, Leinbach Decl., Ex. B.)  Under the Payment Agreement, Old GM agreed to provide Chartis with collateral (the "**Chartis Collateral**") to secure Old GM's continuing obligations to Chartis.  The Payment Agreement provides that Old GM granted Chartis a first priority security interest in the Chartis Collateral and a contractual right to use and apply such collateral to satisfy certain defined obligations (referred to as "Your Payment Obligations") that Old GM owes to Chartis as follows:

> You grant us a possessory security interest in any property You deliver to us to secure Your Payment Obligation.  You also grant us a continuing first-priority security interest and right of offset with respect to all premiums, surcharges, dividends, cash, accounts or funds that are payable to You and are now or may in the future come into our possession in connection with Your Payment Obligation.  You agree to assist us in any reasonable way to enable us to perfect our interest.  You direct us to hold all such sums as collateral for Your Payment Obligation as they may be payable now or may become payable in the future.

(Payment Agreement, p. 6.)

9.      However, in the event of a "Default," the Payment Agreement allows Chartis much broader rights.  In that event, Chartis may …

> 3.  ... draw upon, liquidate, or take ownership of any or all collateral we hold regardless of the form, and hold or apply such amounts to any of Your Payment Obligation under this Agreement or any other premium, surcharge or deductible financing agreement between You and us, or under any Policies. However, we will not draw upon, liquidate, or take ownership of more collateral than is reasonably necessary to protect our interest.

(<u>Id.</u>, p. 8.) Further, Chartis has the right to:

> ... satisfy Your obligations to us in whole or in part by set-off against any moneys, securities, collateral, consideration or property of Yours received by, pledged to, held by or otherwise available to us in connection with Your Payment Obligation. You authorize us after any default to charge any account that You maintain with us in connection with Your Payment Obligation in order to satisfy <u>any</u> of Your obligations.

(<u>Id.</u>) (emphasis added).

10.    Chartis asserts that its claim is secured because the word "any" must be given its plain meaning.

11.    Further, Chartis is under no obligation to return collateral to Old GM in the event of Old GM's default:

> ... [W]e are not obligated to return collateral to You if You are in default of any provision of this Agreement or any other similar agreement relating to your primary casualty insurance with us.

(<u>Id.</u>, p. 7.)

12.    Under the Payment Agreement, any disputes relating to Chartis' right to hold or use the Chartis Collateral must be submitted to arbitration:

Any other unresolved disputes arising out of this Agreement <u>must</u> be submitted to arbitration.

(<u>Id.</u>) (emphasis added).

**B.**    <u>**Old GM's Default under the Payment Agreement**</u>

13.    Under the Payment Agreement, Old GM is in default if it becomes insolvent or fails to pay material outstanding debts as they come due.  The Agreement provides:

Default is any of the following:

1. failure by You or any of your subsidiaries to perform within 5 days after its due date any obligation You or any of Your subsidiaries or affiliates have under this Agreement or any other agreement with us.

2. Your insolvency or the occurrence of any of the following:

- The commencement of liquidation or dissolution proceedings, *Your* general failure to pay debts as they become due, general assignment by *You* for the benefit of creditors, the filing by or against *You* of any petition, proceeding, case or action under the provisions of the United States Bankruptcy Code or other such law relating to debtors, the appointment of, or the voluntary or involuntary filing for a petition for the appointment of, a receiver, liquidator, rehabilitator, trustee, custodian or similar official to take possession or control of any of *Your* property; or

- Your default on any material outstanding debt not cured within its applicable cure period, if any.

(Payment Agreement, p. 7.)

6

14.    Old GM is plainly in default under the Payment Agreement due to: (i) its bankruptcy filing; (ii) its insolvency; and (iii) its default on numerous material outstanding debts, which have not been cured.

## C.    The Stipulated Chartis Claim

15.    On November 29, 2009, Chartis timely filed Claim Nos. 59680, 59681, 59682 and 59697.  On December 3, 2010, Old GM filed its 110th Omnibus Objection to Claims [Docket No. 8000], which sought disallowance of Chartis' proofs of claim.  Chartis filed a response [Docket No. 9601] and Old GM later filed a supplemental claims objection on or about October 6, 2011, along with a motion seeking to disallow Chartis' proofs of claim, or to reclassify the proof of claims as general unsecured claims and to enjoin Chartis from continuing to hold the Chartis Collateral pursuant to the Payment Agreement and other agreements. [Docket No. 11019.]

16.    Chartis and Old GM subsequently reached a partial resolution of Old GM's various objections to Chartis' proofs of claim memorialized in the Stipulation which, inter alia, allowed the Chartis Claim.

17.    Pursuant to the Stipulation, Chartis and Old GM agreed that Chartis shall be allowed a pre-petition claim in the amount of $4.5 million, which would supersede Chartis' prior proofs of claim. (See Stipulation ¶ 4.) Further, the parties agreed that Chartis' allowed $4.5 million claim against Old GM arose from Chartis' undertaking to clean-up of the Bristol property pursuant to an insurance policy that Chartis issued to Bristol LLC in connection with

environmental hazards at the Bristol site that formerly belonged to Old GM.[2]  (Stipulation ¶ 4);
(Motion ¶¶ 3, 6.)

18.    The Stipulation allows Chartis to assert that the Chartis Claim is a secured
claim.  (Stipulation ¶¶ 4, 12.)  However, Old GM is allowed to dispute Chartis' claim to secured
status.  (See id.)  Finally, the Stipulation expressly preserves Chartis' right to seek arbitration
with regard to the "unresolved dispute" relating to the Chartis Claim, including Chartis'
contractual right to secured status under the Payment Agreement.  (See Stipulation ¶¶ 4-5, 12.)

19.    In accordance with the Stipulation, Chartis filed its amended proof of
claim setting forth the Chartis Claim on November 8, 2011.  Also pursuant to the Stipulation,
Old GM filed this Motion on November 17, 2011 [Docket No. 11149.][3]

## ARGUMENT

### POINT I

### THE MOTION SHOULD BE DENIED OR STAYED BECAUSE THE DISPUTE MUST BE SUBMITTED TO ARBITRATION

20.    Old GM and Chartis adopted a broad arbitration provision, covering
"[a]ny other unresolved disputes," and granting the arbitrators "exclusive jurisdiction over the

---

[2]  Given that the Chartis Claim is now stipulated and allowed, Old GM's assertions that the Bristol property is covered by the Environmental Response Trust established by the Old GM's Second Amended Joint Chapter 11 Plan (the "**Plan**") is irrelevant. (Motion ¶¶ 32-33). Moreover, the assertion is not correct, as the Bristol property is not listed as covered by that trust. (See Attachment A to Environmental Response Trust Consent Decree and Settlement Agreement, Second Amended Joint Chapter 11 Plan, Ex. C [Docket No. 9836].)

[3]  At a hearing on November 22, 2011, the parties informed the Court of Chartis' intention to file a cross-motion to compel arbitration. The Court directed the parties to email the Court an agreed briefing schedule to cover both Old GM's Motion and Chartis' cross-motion. Pursuant to the Court's direction, the parties sent an email containing agreed briefing schedule on November 23, 2011.

entire matter in dispute, including any question of arbitrability." These provisions have specifically been held to be a broad arbitration clause:

> It is undisputed that the Payment Agreement contains a broad arbitration clause which states that "any [] unresolved dispute arising out of this Agreement must be [*6] submitted to arbitration."

American Home Assurance Company v. Circle L. Roofing, Inc., 2008 U.S. Dist. LEXIS 18313, at *5-6 (S.D.N.Y. 2008); Crum Staffing, Inc., et al. v. National Union Fire Insurance Company of Pittsburgh, Pa., 2006 WL 3289265, at *2 (M.D. Fla. 2006) (same); see also Raytheon v. Nat'l Union Fire Ins. Co. of Pittsburgh PA, 306 F. Supp. 2d 346, 356 (S.D.N.Y. 2004) (finding a similarly worded arbitration clause in another Chartis insurance agreement to be broad); Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Champps Entm't, Inc., 2004 WL 2884304, at *3 (S.D.N.Y. Dec. 13, 2004) (same).

21.    As a threshold matter, because the arbitration provisions state that the arbitrators "will have exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability," the Court should refer the issue of arbitrability to arbitration. (Payment Agreement, p. 9) (emphasis added). The Supreme Court has made it abundantly clear that such provisions shall be enforced. Rent-A-Center, West, Inc. v. Jackson, 561 U.S. __, __, 130 S.Ct. 2772, 2781 (2010) ("[p]arties to an agreement may provide that arbitrators will decide questions of arbitrability"); Preston v. Ferrer, 552 U.S. 346, 353, 128 S. Ct. 978, 983-84 (2008). Indeed, the Court's analysis may end here with the matter referred to arbitration. See also, e.g., Contec Corp. v. Remote Solution Co. Ltd., 398 F.3d 205, 211 (2d Cir. 2005) (compelling arbitration of arbitrability where agreement provided "clear and unmistakable evidence" the parties intended arbitrators to decide arbitrability).

22.     Of significance, moreover, Chartis' right to have arbitrators decide arbitrability itself has repeatedly been upheld in this district. See National Union v. Las Vegas Professional Football L.P., 2009 WL 4059174, at * 5 (S.D.N.Y. Nov. 17, 2009), aff'd December 20, 2010, 2010 WL 5141229 (2d. Cir 2010) (addressing the same form of Payment Agreement, the District Court said that it "provides clear and unmistakable evidence that the parties intended arbitrators to decide questions of arbitrability and further provides an independent basis for granting National's petition to compel arbitration") (citation omitted); Raytheon Co. v. National Union Fire Ins. Co. of Pittsburgh, PA, supra, at 356-57 (dispute concerning whether claims relating "to *coverage* under insurance policies issued by National Union [a Chartis affiliate], rather than Raytheon's *payment* obligations under the Payment Agreement," are questions of arbitrability that must be resolved by the arbitrators in light of the clause in the same form of Payment Agreement giving the arbitrators "exclusive jurisdiction over the entire matter in dispute, *including any questions as to arbitrability*") (emphasis in original); American Home Assurance Company v. New Community Corporation, 10 Civ 7489 (S.D.N.Y. August 25, 2011, page 8 of 10) (addressing the same form of Payment Agreement, the District Court said "whether or not the claims in New Jersey are arbitrable, the dispute concerning arbitrability is properly a matter to be decided by the arbitrators, not by the Court - exactly as parties agreed when signing the Payment Agreements").

23.     Accordingly, because issues of arbitrability are for the arbitrators, this Court should refer the Motion to arbitration for that reason alone.

24.     The FAA plainly requires that courts enforce these arbitration provisions. Section 2 of the Act, 9 U.S.C. § 2 provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, **shall be valid, irrevocable, and enforceable**, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. (emphasis added.)  The Supreme Court has unambiguously held that this provision is to be followed.  Shearson/American Express v. McMahon, 482 U.S. 220, 226-27, 1907 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987); Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 220, 105 S.Ct. 1238, 1241 (1985).

25.    Similarly, the Second Circuit has consistently enforced arbitration agreements:

> The FAA, codified at 9 U.S.C. §§1-14, provides that written provisions to arbitrate controversies in any contract involving interstate commerce 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' Id. §2. 'There is a strong federal policy favoring arbitration as an alternative means of dispute resolution.'  In accordance with that policy, where, as here, the existence of an arbitration agreement is undisputed, doubts as to whether a claim falls within the scope of that agreement should be resolved in favor of arbitrability.

Ace Capital Re Overseas Ltd. v. Central United Life Ins. Co., 307 F.3d 24, 29 (2d Cir. 2002) Citing, Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001) and Moses H. Cone Mem'l Hosp., supra, 24-25.  See also, Garten v. Kurth, 265 F.3d 136, 142 (2d Cir. 2001) ("Under the FAA, courts are required generally to resolve questions of arbitrability in favor of arbitration."); Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading

Inc., 252 F. 3d 218, 223 (2d Cir. 2001) ("It is familiar law that the Federal Arbitration Act, 9

U.S.C. § 1 et seq.  (1994) (Arbitration Act), expresses 'a liberal federal policy favoring

arbitration agreements' and that 'any doubts concerning the scope of arbitrable issues should be

resolved in favor of arbitration." Citing, Moses H. Cone Mem'l Hosp., supra, 24-25.)

26.    Furthermore, arbitration of issues, including determination of the pre-

petition contractual relationship between a Debtor and Creditor, which affects allowance or

disallowance of a proof of claim, "will not conflict with any bankruptcy policy." In re

Hagerstown Fiber LP, 277 B.R. 181, 205 (Bankr. S.D.N.Y. 2002).  See also, In re Singer Co.,

2001 WL 984678 (S.D.N.Y. 2001).  Both Hagerstown and Singer involve a "pre-petition

contractual relationship" which was "raised as counterclaims in connection with the [debtor's]

objection to [creditor's] proof of claim." Hagerstown, at 205.  In Singer, this Court stated:

> While a creditor must generally file a proof of claim to be eligible
> to receive payment and the Bankruptcy Code imposes an automatic
> stay on creditors' collection efforts in non-bankruptcy fora, there is
> no Code requirement that all issues relating to a debtor's activities
> be adjudicated in the Bankruptcy Court. The risk of inconsistent
> adjudications is not unique to bankruptcy and does not frame an
> inherent conflict between Bankruptcy Code and FAA policy.

Singer, at *6.

27.    Similarly, in Hagerstown this Court found that "the issues between the

parties were rooted in their pre-petition contractual relationship rather than rights arising under

the Bankruptcy Code," and therefore, "are core solely for procedural reasons."  The Court held:

> My discretion, if any, is extremely limited, and the arbitration of
> these counts will not conflict with any bankruptcy policy.
> Accordingly, I am required to compel arbitration…

Hagerstown, at 205.

28.    Under the authority in Hagerstown and Singer, the Dispute over Chartis'
contractual right under the Payment Agreement to apply the security it holds to the Chartis Claim
must be submitted to arbitration.  By its Motion, Old GM disputes Chartis' right to a secured
claim based upon Chartis' contractual rights under the Payment Agreement. (See Motion ¶¶ 46-
62.)  Under the Payment Agreement, such "unresolved disputes" can only be resolved by
arbitration:

> Any other unresolved disputes arising out of this Agreement must
> be submitted to arbitration.

(Payment Agreement, p. 8) (emphasis added).  See also In re Electric Machinery Enterprises,
Inc., 479 F.3d 791, 798 (11th Cir. 2007) (bankruptcy court erred in denying arbitration of dispute
arising from pre-petition agreement); In re Mintze, 434 F.3d 222, 232 (3rd Cir. 2006)
(bankruptcy court lacks discretion to deny arbitration of matter arising from pre-petition
agreement).

29.    Thus, Chartis' cross-motion should be granted.

## POINT II
## THE CHARTIS CLAIM SHOULD BE HELD SECURED

30.    Chartis submits the following argument without any intent to waive its
right to arbitrate either arbitrability or the Dispute itself.  Moreover, Chartis submits that the
Court ought not turn to or consider the Dispute unless and until the right of arbitration is
resolved.  Accordingly, Chartis submits that even if the Court is inclined to deny arbitration, the

Court should consider postponing its own ruling on the merits of the Dispute in the event Chartis elects to exercise its right to immediate appeal under Section 16 of the FAA.[4]

31.    Under the circumstances, should this Court undertake consideration of the Dispute, there are three contentions raised by Old GM to be considered. By its Motion, Old GM has argued that: (i) it is not in default under the Payment Agreement and thus the broader "any" obligation language is not triggered; (ii) Chartis' contractual rights under the Payment Agreement should be deemed limited to common law right of subrogation; and (iii) the language of the Payment Agreement should be construed to limit Chartis' use of the Chartis Collateral to certain "direct" obligations that Old GM owes to Chartis. Old GM is wrong on all points. Of course, it is Chartis' position that these "unresolved disputes" should be submitted to arbitration, and, as a result, not decided by this Court. However, in the event this Court does not refer this dispute to arbitration, Chartis sets out the reasons Old GM's arguments fail.

## A.    Old GM is in Default

32.    First, there is no room to deny that Old GM is in default under the Payment Agreement. The Payment Agreement defines default to include:

2. *Your* insolvency, or the occurrence of any of the following:

- The commencement of liquidation or dissolution proceedings, *Your* general failure to pay debts as they become due, general assignment by *You* for the benefit of creditors, the filing by or against *You* of any petition, proceeding, case or action under the provisions of the United States Bankruptcy Code or other such law relating to debtors, the appointment of, or the voluntary or involuntary filing for a petition for the appointment of, a receiver, liquidator, rehabilitator, trustee,

---

[4]    9 U.S.C. § 16(a)(1)(a), "An appeal may be taken from . . . denying a petition under Section 4 of this title to order arbitration to proceed."

14

custodian or similar official to take possession or control of any
of *Your* property; or

- *Your* default on any material outstanding debt not cured within
its applicable cure period, if any.

(Payment Agreement, p. 7.) There is no dispute that Old GM has achieved the insolvency and

bankruptcy status specified under this clause, and contrary to Old GM's assertion (see Motion ¶

9), a default clause based upon a debtor's insolvency, bankruptcy, or failure to pay material debts

is not an impermissible *ipso facto* clause under the Bankruptcy Code.

33.    To the contrary, In re General Growth Properties, Inc., 451 B.R. 323

(Bankr. S.D.N.Y. 2011) is directly on point and plainly requires that Old GM be found in default.

In General Growth, this Court found that the secured creditor was entitled to default interest

based upon the debtor's bankruptcy filing. Id. at 331. In reaching its decision, the Court noted

that a default based upon a party's bankruptcy filing can only be deemed an invalid *ipso facto*

clause if the contract is deemed to be an executory contract. Id. at 329. The Court went on to

find that there was no executory contract at issue because the debtor's only remaining obligation

under the contract was payment. Id. at 329-30. The Court went on to hold that, under Second

Circuit authority, *ipso facto* clauses are not per se invalid in non-executory contracts. Id. at 330.

Finally, while the Court recognized that *ipso facto* clauses in non-executory contracts are

sometimes invalid where enforcement of the *ipso facto* clause would impair the debtor's ability

to "enjoy a fresh start," such exception did not apply because the debtor company was solvent

and had already completed its reorganization and emerged from bankruptcy months earlier, id. at

330-31, exactly the situation here.

34.     Under the authority in <u>General Growth</u>, Old GM is in default based upon its insolvency, its bankruptcy filing and its general failure to pay its debts.    The Payment Agreement is not an executory contract because Old GM has no remaining obligations under the Agreement other than payment.    <u>General Growth</u>, 451 B.R. at 329; <u>see also</u> <u>In re Saint Vincent's Catholic Medical Centers of New York</u>, 440 B.R. 587, 601 (Bankr. S.D.N.Y. 2010) (ipso facto prohibitions in the Bankruptcy Code did not prevent a secured creditor from declaring a default and exercising its contractual rights against a debtor's collateral.)    Further, no special circumstances exist that would merit the invalidation of the default provisions in the Payment Agreement.    New GM has already confirmed its plan of reorganization and emerged from bankruptcy a solvent entity.    As a result, Chartis may assert a default under the Payment Agreement based upon Old GM's bankruptcy filing.

35.     Further, even if this Court did not find Old GM to be in default under the Payment Agreement based on Old GM's bankruptcy filing, Old GM is nonetheless in default under the Payment Agreement based upon Old GM's failure to pay material debts because this provision would not trigger the ipso facto prohibition in the Bankruptcy Code.    Indeed, in <u>In re Margulis</u>, 323 B.R. 130 (Bankr. S.D.N.Y. 2005), this Court found that the termination of debtor's contract right was caused by his failure to make the required payment eight days after the debtor's bankruptcy petition was not prohibited ipso facto clause, stating:

> [I]t may be that bankruptcy made it more difficult to satisfy the condition, but that difficulty did not turn the condition into an unenforceable *ipso facto* clause.

<u>Id.</u> at 1356; <u>In re Frank's Nursery & Crafts, Inc.</u>, Case No. 04-15826, 2006 WL 2385418, at *5 (Bankr. S.D.N.Y. May 8, 2006) (finding the secured creditor's exercise of its rights under

agreements with the debtor were not prohibited by the ipso facto provisions of the Bankruptcy Code because the security agreements at issue had been approved by a prior bankruptcy court in connection with a prior reorganization.)

36.     Additionally, even though General Growth, Margulis, and Frank's Nursery resolve the question of Old GM's default, there is an additional reason why Old GM is further in default under the Payment Agreement. In addition to Old GM's own insolvency and bankruptcy, Old GM's subsidiaries are also insolvent or bankrupt. The Payment Agreement contains a definition of "You" (Payment Agreement, p. 4) that includes Old GM's "subsidiary[ies]" or "affiliated or associated organizations." Thus, since certain such subsidiaries also "file[d] any petition, proceeding, case or action under the provisions of the United States Bankruptcy Code" (Payment Agreement, p. 7), those filings are also defaults, creating in effect a cross-default. This cross-default is also enforceable. See In re Wheeling-Pittsburgh Steel Corp., 54 B.R. 772, 778 (Bankr. W.D. Pa 1985.)

## B.    Chartis' Claim is not a Common Law Claim, It Arises Under Contract

37.     Second, Old GM's asserts, seemingly as an afterthought without citation to authority (Motion ¶ 56), that Chartis' right to a secured claim is limited to its status as the holder of a subrogation claim. Again, Old GM is mistaken.

38.     Chartis' right to *security* does not arise under the common law theory of subrogation. (See Motion ¶¶ 2-3, 56.) While Chartis does have the right to subrogation, Chartis has a separate additional contractual right -- which is at the heart of the Dispute -- to have that claim secured. This derives from Chartis' contractual right to use collateral in order to satisfy "any" of Old GM's "obligations" to Chartis Companies. (Payment Agreement, p. 8.) The plain

language of the agreement, without any express limitation, broadens Chartis' common law subrogation rights, and grants Chartis' the addition right to satisfy "any" obligations. The plain broad language of the Payment Agreement, not common law, grants the right to security. Tellingly, nothing in the Payment Agreement limits Chartis' contractual rights in this regard.

39.    Thus, under the explicit terms of the governing Payment Agreement, not common law subrogation, Chartis is entitled to apply the Chartis security to "any" obligation Old GM owes to Chartis.

**C.    Due to Old GM's Default, Chartis May
        Use the Collateral for "Any" Obligation**

40.    Third, Chartis' right to use collateral under the Payment Agreement is not limited by Old GM's strained interpretation of the Payment Agreement's language. Upon default, Chartis has the right to use the collateral held in order to satisfy "any" of Old GM's "obligations" to Chartis. (See Payment Agreement, p. 8, Leinbach Decl., Ex. A.) The plain language of the Payment Agreement grants Chartis the right to use the collateral it holds in order to satisfy "any…obligations" that Old GM owes to Chartis, **even if such "obligations" are broader than Chartis' right to hold the Chartis Collateral**. The agreement provides:

> We may satisfy Your obligations to us in whole or in part by set-off against any moneys, securities, collateral, consideration or property of Yours received by, pledged to, held by or otherwise available to us in connection with Your Payment Obligation. You authorize us after any default to charge any account that You maintain with us in connection with Your Payment Obligation in order to satisfy any of Your obligations.

(Id.) (emphasis added).

41.     Contrary to Old GM's assertions (see Motion ¶¶ 16-17, 47, 55, 59-61), Chartis' authority to *use* collateral, upon event of default, is broader than Chartis' rights to *hold* collateral (See Payment Agreement, p. 8.)   Moreover, Chartis' right to satisfy Old GM's "obligations" to Chartis is also not limited to "direct" obligations to Chartis. (See Motion ¶¶ 18, 57-58.)  Indeed, neither Payment Agreement contains any such express limitation on the term "obligations."   Thus, the Payment Agreement's broad contractual right allowing Chartis to satisfy "any obligations" should be read to mean exactly that, "any obligations," without Old GM's manufactured limitations.  See ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co., 307 F.3d 24, 33-34 (2d Cir. 2002) (interpreting the term "any dispute" to make the scope of an arbitration clause broad and not limited by language such as "arising from" or "relating to") (emphasis added); Chiste v. Hotels.com L.P., 756 F.Supp.2d 382, 409 (S.D.N.Y. 2010) (interpreting the words "any dispute of any kind" in a choice of law clause to be broad enough to encompass both contract and tort claims) (emphasis added.)

42.     Finally, Old GM asserts that because Old GM and Chartis entered into an Assumption and Collateralization Agreement in connection with Old GM's assumption of the Payment Agreement, Chartis can no longer assert its rights under the Payment Agreement. (Motion ¶ 55.)  Once again, Old GM is wrong.  Under the Assumption and Collateralization Agreement, the collateral used to secure Old GM's obligations under the Payment Agreement continues, and the Chartis Collateral therefore continues to secure Old GM's obligations in the same form, with an additional infusion of collateral.  The Assumption and Collateralization Agreement provides:

> … the amount equal to U.S. Nine Million Five Hundred Forty
> Seven Thousand Six Hundred Eighty Eight Dollars
> ($9,547,688.00) will remain in the Original Collateral Trust and

(ii) the Cash Collateral shall be deposited in the Original Collateral Trust; and such resulting combined amount U.S. Twenty One Million Five Hundred Forty Seven Thousand Six Hundred Eighty Eight Dollars ($21,547,688.00) <u>shall continue to secure the obligations of OLD GM under, and in accordance with, the OLD GM Insurance Program Agreements[5]; the terms of which, except as amended herein, remain unchanged and in full force and effect.</u>

(Assumption and Collateralization Agreements, pp. 1, 2, Motion, Ex. 2) (emphasis added).

Indeed, the Agreement expressly states that it does not modify or amend <u>any</u> of Chartis' rights under the Payment Agreement:

> WHEREAS, the Old GM Insurance Policies and the Old GM Payment Agreement are incorporated herein by reference…
>
> …
>
> WHEREAS, it is understood and agreed by the Parties that New GM's assumption of the Assumed Obligations shall have no impact on the responsibilities of the Parties to each other, if any outside the scope of this Agreement.

(<u>Id.</u>, pp. 1, 2.)

---

[5] "Insurance Program Agreements" is defined to include the Payment Agreement. (Assumption and Collateralization Agreements, p. 1.)

43.    In sum, for each of these reasons, Chartis submits that a properly constituted arbitration panel should decide arbitrability, address the Dispute and uphold Chartis' contractual right to use the Chartis Collateral pursuant to the Payment Agreement.  For the same reasons, should this Court undertake to decide the Dispute (which Chartis submits it should not), this Court should uphold Chartis' contractual right to use the Chartis Collateral.

## CONCLUSION

44.    WHEREFORE, Chartis respectfully requests that the Court grant Chartis' cross-motion and order that Old GM submit the resolution of its Motion to arbitration, or in the alternative, deny that Motion.

Dated:    New York, New York
          December 1, 2011

                              ZEICHNER ELLMAN & KRAUSE LLP

                              BY: _____
                                  Michael S. Davis
                                  Bryan D. Leinbach
                                  575 Lexington Avenue
                                  New York, New York 10022
                                  (212) 223-0400
                                  mdavis@zeklaw.com
                                  bleinbach@zeklaw.com

                                  *Attorneys for*
                                  *Chartis Specialty Insurance Company*
                                  *and Lexington Insurance Company*