| | |
|---|---|
| Hearing Date and Time: | **January 18, 2012 at 9:45 a.m.** |
| Reply Deadline: | **December 22, 2011 at 4:00 p.m.** |
| Response Deadline: | **December 1, 2011 at 4:00 p.m.** |

TOGUT SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Scott E. Ratner
Richard K. Milin

Counsel for Motors Liquidation Company GUC Trust

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| MOTORS LIQUIDATION COMPANY, | ) | Case No. 09-50026 (REG) |
| *et al.*, | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**THE MOTORS LIQUIDATION COMPANY GUC TRUST'S
(I) REPLY IN SUPPORT OF OBJECTION TO PROOF OF CLAIM
NUMBER 71242 ASSERTED BY CHARTIS SPECIALTY INSURANCE
COMPANY ON THE GROUND THAT THE CLAIM IS NOT PROPERLY
SECURED BY A VALID RIGHT OF SETOFF AND (II) RESPONSE
IN OPPOSITION TO CROSS-MOTION TO COMPEL ARBITRATION**

**[CLAIM NO. 71242]**

## TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT** ........................................................................... 1

**SUPPLEMENTAL STATEMENT OF FACTS** ................................................... 3

**ARGUMENT** ........................................................................................................ 3

    **I.**    **THE COURT SHOULD DENY CHARTIS'S CROSS-MOTION TO COMPEL ARBITRATION** .................................................................. 5

        **A.**    **BANKRUPTCY COURTS IN THIS DISTRICT APPLY THE HAGERSTOWN TEST TO DETERMINE ARBITRABILITY** ........ 5

            **1.**    **CHARTIS HAS NOT SHOWN THAT ITS ASSERTED RIGHT TO SET OFF AGAINST THE BRISTOL SUBROGATE CLAIM IS WITHIN THE SCOPE OF AN ARBITRATION AGREEMENT** ................................................ 6

            **2.**    **FEDERAL BANKRUPTCY LAW AND POLICY PRECLUDE ARBITRATION OF CHARTIS'S  RIGHT TO SET OFF AGAINST THE BRISTOL SUBROGATION CLAIM** ....................................................................................... 9

                **a.**    **THE DEFAULT ISSUE SHOULD NOT BE ARBITRATED**………………………………….....10

                **b.**    **THE SETOFF ISSUE SHOULD NOT BE ARBITRATED**…………………………………………13

        **B.**    **THE SETOFF ISSUE SHOULD NOT BE ARBITRATED** ............. 13

    **II.**    **THIS COURT SHOULD CLASSIFY THE BRISTOL SUBROGATION CLAIM AS UNSECURED** .................................................................. 15

        **A.**    **OLD GM'S DEFAULT UNDER THE PAYMENT AGREEMENT DID NOT GIVE CHARTIS THE RIGHT TO EXERCISE DEFAULT REMEDIES** ......................................................................... 15

        **B.**    **THE PAYMENT AGREEMENT DOES NOT GIVE  CHARTIS THE RIGHT TO SET OFF NON-INSURANCE OBLIGATIONS AGAINST OLD GM'S COLLATERAL** ............................................ 22

**CONCLUSION** ................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page**

<u>Cases</u>

*C.A.F. Bindery, Inc.,* 199 B.R. 828 (Bankr. S.D.N.Y. 1996) ....................................... *12*

*Collins & Aikman Products Co. v. Building Systems, Inc.,* 58 F.3d 16 (2d. Cir. 1995).............. *7*

*Contec Corp. v. Remote Solution Co.,* 398 F.3d 205 n.1 (2d Cir. 2005) ...................................... *9*

*COR Route 5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co.),* 524 F.3d 373

(2d Cir. 2008)...................................................................................................................... *16*

*First Options of Chicago v. Kaplan,* 514 U.S. 938 (1995) ........................................................ *7*

*In re Cardali,* Adversary No. 10-3531, 2010 WL 4791801 (Bankr. S.D.N.Y. 2010) ............ *5, 6*

*In re Charter Communications,* 419 B.R. 221 (Bankr. S.D.N.Y. 2009) .................................... *21*

*In re Conseco, Inc.,* 330 B.R. 673 (Bankr. N.D. Ill. 2005) ........................................................ *19*

*In re Enron Corp.,* 306 B.R. 465 (Bankr. S.D.N.Y. 2004) ........................................................ *12*

*In re Frank's Nursery & Crafts, Inc.,* Case No. 04-15826, 2006

WL 2385418 (Bankr. S.D.N.Y. 2006)................................................................................. *20*

*In re Gamma Fishing Co.,* 70 B.R. 949 (Bankr. S.D.Ca. 1987) ................................................ *19*

*In re Hagerstown Fiber Ltd. Partnership,* 277 B.R. 181

(Bankr. S.D.N.Y. 2002) ........................................................................... *5, 6, 7, 9, 12*

*In re Lehman Brothers, Inc.,* 458 B.R. 134 (Bankr. S.D.N.Y. 2011) ................................ *2, 13, 14*

*In re Margulis,* 323 B.R. 130 (Bankr. S.D.N.Y. 2005) .............................................................. *20*

*In re New England Carpet Co.,* 18 B.R. 514 (Bankr. D. Vt. 1982)............................................. *19*

*In re Nielson,* 90 B.R. 172 (Bankr. W.D.N.C. 1988).................................................................. *13*

*In re Riodiszio,* 204 B.R. 417 (Bankr. S.D.N.Y. 1997) .............................................................. *16*

*In re S.W. Bach & Co.,* 425 B.R. 78 (Bankr. S.D.N.Y. 2010)..................................................... *10*

*In re Saint Vincent's Catholic Medical Centers of New York,* 440 B.R. 587, 601

(Bankr. S.D.N.Y. 2010) ...................................................................................................... *19*

*In re SemCrude, L.P.*, 399 B.R. 388 (Bankr. D. Del. 2009), aff'd,

428 B.R. 590 (D. Del. 2010) ................................................................................................. 2, 13

*In re Teligent Inc.*, 324 B.R. 479 (S.D.N.Y. 2005) ...................................................................... 19

*In re Wheeling-Pittsburgh Steel Corp.*, 54 B.R. 772 (Bankr. W.D. Pa. 1985) .......................... 21

*In re Whimsy*, 221 B.R. 69, 75 (S.D.N.Y. 1998) ........................................................................ 14

*Morgan Stanley Group Inc. v. New England Ins. Co.*, 225 F.3d 270 (2d Cir. 2000) ................ 24

*National Union Fire Ins. Co. of Pittsburgh, PA v Las Vegas Professional*

*Football Limited Partnership*, Case No. 09-7490, 2009 WL 4059174 (S.D.N.Y. 2009) ........... 10

*Pereira v. United Jersey Bank, N.A.* 201 B.R. 644 (S.D.N.Y. 1996) ........................................... 13

*Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.)*, Case No. 92-7054,

1993 WL 159969 (S.D.N.Y. 1993) ........................................................................................... 11

*Shaw Group Inc. v. Triplefine Intern. Corp.*, 322 F.3d 115 (2d Cir. 2003) ................................. 7

*Westchester Resco Co., L.P.. v. New England Reuinsurance Corp.*, 818 F.2d 2 (2d Cir. 1987) 24

### Statutes

11 U.S.C §365(e). ............................................................................................. 11, 12, 15, 16, 19

11 U.S.C. §553 ........................................................................................................ 2, 13, 14, 15

**THE MOTORS LIQUIDATION COMPANY GUC TRUST'S
(I) REPLY IN SUPPORT OF OBJECTION TO PROOF OF CLAIM
NUMBER 71242 ASSERTED BY CHARTIS SPECIALTY INSURANCE
COMPANY ON THE GROUND THAT THE CLAIM IS NOT PROPERLY
SECURED BY A VALID RIGHT OF SETOFF AND (II) RESPONSE IN
<u>OPPOSITION TO CROSS-MOTION TO COMPEL ARBITRATION</u>**

The Motors Liquidation Company GUC Trust (the **"GUC Trust"**), formed by

Motors Liquidation Company ("**Old GM**") and its affiliated above-captioned debtors

(collectively, the "**Debtors**") in connection with the Debtors' Second Amended Joint

Chapter 11 Plan dated March 18, 2011, respectfully submits its (I) Reply in Support of

their Objection to Proof of Claim Number 71242 Asserted by Chartis Specialty

Insurance Company on the Ground that the Claim Is Not Properly Secured by a Valid

Right of Setoff and (II) Response in Opposition to Cross-Motion To Compel Arbitration

and, in support hereof, respectfully represents as follows:

<u>PRELIMINARY STATEMENT</u>

1.      Old GM did not agree to arbitrate this dispute.  Old GM may have

agreed to arbitrate certain ***insurance*** disputes with Chartis.  However, Old GM did not

agree to arbitrate unrelated, ***non-insurance*** disputes such as this one, particularly when

they implicate important issues of federal bankruptcy law and policy.

2.      Chartis's reading of the arbitration clause it relies on is inequitable

and overreaching:  Chartis argues that, because it holds Old GM's property as collateral

for Old GM's insurance obligations under a Payment Agreement that contains an

arbitration clause -- and because Chartis asserts the right to use that collateral to pay

Old GM's non-insurance obligations -- Old GM must arbitrate *every* dispute of *every*

type it may have with Chartis before a panel of insurance executives.[1]  According to

---

[1]     *See* Opposition of Chartis Specialty Insurance Company and Lexington Insurance Company to the
Reorganized Debtor's Supplemental Amended Claims Objection to Proof of Claim Number 71242
and Cross-Motion to Compel Arbitration (the **"Opposition"**) [Docket No. 11203] ¶¶ 20-29;  Payment

1

Chartis's logic, its arbitration clause requires arbitration of every securities claim, tort

claim, breach of contract claim, or other claim asserted by or against Chartis – which

would include any claim for accidentally injuring a Chartis employee, defaulting on a

swap agreement or selling Chartis a faulty car – in Chartis's chosen forum.[2]  This

asserted right appears to extend, moreover, both to Chartis and to its affiliate Lexington,

as well as to all of Old GM's "subsidiaries and affiliates,"[3] thereby permitting Chartis to

execute and enforce non-mutual, triangular setoffs that would be barred by section 553

of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*  *See In re Lehman Brothers, Inc.*, 458 B.R.

134, 136 (Bankr. S.D.N.Y. 2011);  *In re SemCrude, L.P.*, 399 B.R. 388, 395-96 (Bankr. D. Del.

2009), *aff'd*, 428 B.R. 590 (D. Del. 2010).

        3.      Chartis's reading of the Payment Agreement's arbitration clause,

and Chartis's motion to compel arbitration of a subrogation claim in reliance on it,

cannot be squared with the plain words of the Payment Agreement or with established

principles of bankruptcy law.  This Court should, therefore, reject them.  In addition,

this Court should hold, as the GUC Trust shows below and in the Amended

Supplemental Claim Objection [Docket No. 11149] (the **"Amended Objection"**), that

---

Agreement at 9 ("Unless You and we agree otherwise, all arbitrators must be executive officers or former executive officers of property or casualty insurance or reinsurance companies or insurance brokerage companies, or risk management officials in an industry similar to Yours . . .").  Although Chartis has yielded possession of Old GM's collateral, the parties have stipulated that Chartis has the right to argue as if Chartis still had possession [Docket No. 11163].

[2]   Specifically, Chartis asserts that "'any … unresolved dispute arising out of this Agreement must be submitted to arbitration,'" that "'Unresolved disputes' under the arbitration clause necessarily include any disputes involving Chartis' right to use and hold collateral," and that upon default, "the permitted use of collateral expands to 'any' obligation of Old GM to Chartis."  (Opposition ¶¶ 4 and 6) (quoting the parties' Payment Agreements).).  Chartis also presents a simplified yet more expansive version of its argument:  "Old GM and Chartis have adopted a broad arbitration provision, covering 'any other unresolved disputes,' and granting the arbitrators 'exclusive jurisdiction over the entire matter in dispute, including any question of arbitrability.'" (Opposition ¶ 20 (quoting selections from the parties' Payment Agreements).)

[3]   *See* Payment Agreement at Mandatory Addendum and Schedule which defines "You" as ("You, the organization(s) named as 'our Client' in the Schedule");  and which defines "our Client" as "our Client General Motors Corporation on behalf of You and all Your subsidiaries or affiliates.")

2

Old GM's bankruptcy filing: (i) did not constitute an actionable default authorizing Chartis to exercise default remedies; and (ii) even if it was, those default remedies do not include setting off Old GM's collateral against Chartis's non-insurance subrogation claims based on wholly unrelated third-party obligations.

<u>**SUPPLEMENTAL STATEMENT OF FACTS**</u>

4.    The GUC Trust hereby incorporates the Factual Background section from Old GM's Amended Objection dated November 17, 2011 and supplements it as follows.

5.    The insurance policies that Chartis issued to Old GM in connection with the Chartis/GM insurance program (the **"Insurance Program"**) not only required Chartis to make payments to or on behalf of Old GM, but also, as Chartis states, were "subject to deductibles, reimbursement and other obligations of Old GM to Chartis." (Opposition ¶ 7.)

6.    Chartis relies on two separate payment agreements that Old GM entered into with two different insurance companies – American International Specialty Lines Insurance Company (**"AISLIC"**) and the Lexington Insurance Company (**"Lexington"**) – to justify its claimed right of setoff. (*See* Opposition ¶ 8; Declaration of Bryan D. Leinbach in Support of Opposition of Chartis Specialty Insurance Company and Lexington Insurance Company to the Reorganized Debtor's Supplemental Amended Claims Objection to Proof of Claim Number 71242 and Cross-Motion to Compel Arbitration (the **"Leinbach Decl."**) Exhs. A & B.) Chartis does not explain why it relies on two different agreements or why two different insurance companies' rights are at stake, and it discusses the two payment agreements together without differentiation throughout its Opposition.

3

7.      The AISLIC and Lexington payment agreements (together, for convenience, the **"Payment Agreement"**), were entered into between AISLIC or Lexington, on the one hand, and Old GM, on behalf of itself and all of its "subsidiaries and affiliates," on the other.  (*See* Payment Agreement, Leinbach Decl. Exhs. A & B.)

8.      The arbitration clause of the Payment Agreement states that, unless the parties agree otherwise, arbitrable disputes will be arbitrated before an arbitration panel consisting of "executive officers or former executive officers of property or casualty insurance or reinsurance companies or insurance brokerage companies, or risk management officers in an industry similar to Yours…."  (Payment Agreement at 9.)

9.      According to Chartis, the collateral used to secure Old GM's obligations under the Payment Agreement is or was subject to the Assumption and Collateralization Agreement between Old GM and Chartis and more than $21 million of that collateral was to be kept in trust accounts.  (*See* Opposition ¶ 42.)

10.     The parties have stipulated that the only remaining issue to be resolved between them is whether Chartis's **"Bristol Subrogation Claim"** (as described in the Amended Objection at ¶ 3), which Chartis asserts by right of subrogation under a policy that AISLIC issued to an unrelated third-party known as Bristol Center LLC, should be treated as secured by a right of setoff.  (*See* Stipulation and Agreed Order Approving a Partial Resolution of Certain Claims Asserted Against the Reorganized Debtors by Chartis Specialty Insurance Company and Lexington Insurance Company (the **"Stipulation"**) [Docket No. 11163] ¶ 7.)

11.     Chartis no longer asserts that Old GM is responsible for any monetary defaults under its agreements with Chartis.  Instead, it now states only that "[o]ld GM is plainly in default under the Payment Agreement due to: (i) its bankruptcy filing;

(ii) its insolvency;  and (iii) its default on numerous material outstanding debts, which have not been cured."  (Opposition ¶ 14.)  The relevant debts are not owed to Chartis.

## ARGUMENT

## I.

## THE COURT SHOULD DENY CHARTIS'S
## CROSS-MOTION TO COMPEL ARBITRATION

12.    The dispute between Old GM and Chartis concerning whether the Bristol Subrogation Claim should be treated as secured by a right of setoff does not fall within the arbitration clause at issue and, even if it did, should not be arbitrated because it implicates important issues of bankruptcy law and policy.  The key fact about the parties' dispute concerning the Bristol Subrogation Claim is that the Claim has no relationship to the Payment Agreement *except* that Chartis asserts the right to pay itself for the Claim with Old GM's collateral.  Because Chartis has no such right under the Payment Agreement, the parties' dispute does not arise out of the Payment Agreement and arbitration is not appropriate.

**A.    Bankruptcy Courts in This District Apply
The *Hagerstown* Test To Determine Arbitrability**

13.    In determining whether a dispute is arbitrable, bankruptcy courts in this District apply the four-part test stated in *In re Hagerstown Fiber Ltd. Partnership*, 277 B.R. 181, 189 (Bankr. S.D.N.Y. 2002).  *See, e.g., In re Cardali*, Adversary No. 10-3531, 2010 WL 4791801 *5 (Bankr. S.D.N.Y. 2010).

14.    *Hagerstown* states its test for arbitrability as follows:

Faced with a motion to compel arbitration, a court must apply a four part test: (1) did the parties agree to arbitrate, (2) does the dispute fall within their arbitration clause, (3) if federal statutory claims are raised, did Congress intend those claims to be arbitrable, and (4) if the court concludes that some but not all of the claims are

5

arbitrable, should it stay the non-arbitrable claims pending the conclusion of the arbitration?

*Id.* at 189. *See also In re Cardali* at *5.

> **1.    Chartis Has Not Shown that Its Asserted
> Right To Set Off Against the Bristol Subrogation Claim
> Is Within the Scope of the Parties' Arbitration Agreement**

15.    Old GM did not agree to arbitrate non-insurance disputes such as this one with Chartis. Consequently, Chartis cannot satisfy the second requirement of the *Hagerstown* test.

16.    The Payment Agreement provides that disputes should be arbitrated if they "aris[e] out of" that Agreement. (*See* Payment Agreement at 8.) However, this dispute "aris[es] out of" the Payment Agreement only if that Agreement – contrary to its express language (*see* Point I.A.2. below) – allows Chartis to set off unrelated, non-insurance obligations against Old GM's collateral. Old GM has denied that the Payment Agreement allows setoff of non-insurance obligations, and consequently denies that it agreed to arbitrate issues concerning them.

17.    The GUC Trust is aware that the Second Circuit has endorsed a method of determining whether a particular dispute is within the scope of an arbitration clause that turns on whether the dispute requires construction of the parties' contracts:

> if the arbitration clause is broad, there arises a presumption of arbitrability; if, however, the dispute is in respect of a matter that, on its face, is clearly collateral to the contract, then a court should test the presumption by reviewing the allegations underlying the dispute and by asking whether the claim alleged implicates issues of contract construction or the parties' rights and obligations under it. If the answer is yes, then the collateral dispute falls within the scope of the arbitration agreement; claims that present no question involving construction of the contract, and no questions in respect

of the parties' rights and obligations under it, are beyond the scope
of the arbitration agreement.

*Collins & Aikman Products Co. v. Building Systems, Inc.*, 58 F.3d 16, 23 (2d. Cir.
1995).

18.     The GUC Trust is also aware that the question whether the Bristol

Subrogation Claim is secured by a right of setoff "implicates issues of contract

construction or the parties' rights and obligations under" (*id.*) the Payment Agreement.

Nevertheless, the GUC Trust respectfully suggests that more basic considerations must

override the fact that the dispute involves "contract construction."

19.     The fundamental question in enforcing arbitration, the Supreme

Court has emphasized, is whether the parties agreed in their contracts that they would

arbitrate.  The Court stated in *First Options of Chicago v. Kaplan,* 115 S. Ct. 1920, 1924

(1995), for example, that arbitrability "is simply a matter of contract between the parties;

it is a way to resolve those disputes – but only those disputes – that the parties have

agreed to submit to arbitration."  *Id.*  Further, "a party who has not agreed to arbitrate

will normally have a right to a court's decision about the merits of its dispute."  *Id.* at

942.  *See also Shaw Group Inc. v. Triplefine Intern. Corp.*, 322 F.3d 115, 120 (2d Cir. 2003)

("courts are mindful that 'arbitration is a matter of contract,' and that parties cannot be

compelled to arbitrate issues that they have not specifically agreed to submit to

arbitration."); *Hagerstown,* 277 B.R. at 198 (stating that the "starting point" for an

analysis of arbitration rights "is the parties' agreement," and if that agreement includes

an arbitration clause, its "scope is a question of federal contract law.").

20.     Here, if the Court is to give effect to what Old GM actually agreed,

Old GM's intent as manifest in the Payment Agreement must trump the fact that

Chartis's overreaching arguments require construction of that Agreement.  Old GM

could only have agreed to arbitrate this dispute if it not only knew that it might default

7

under a Payment Agreement that contained an arbitration clause, but also that Chartis
would interpret the Payment Agreement to allow it to set off Old GM's collateral
against non-insurance obligations – and that Chartis would do so despite clear
contractual language to the contrary.

21.     No matter how sophisticated Old GM may be judged to be, it
cannot reasonably be found to have agreed to -- or to have interpreted the Payment
Agreement to provide -- such an expansive arbitration right.  To the contrary, this is a
case of unfair and unreasonable surprise;  Chartis is taking unfair advantage of what is,
at best, a contractual ambiguity.  Consequently, to give effect to the parties' agreements
as the Supreme Court has directed, this Court should determine that Old GM did not
agree in the Payment Agreement to arbitrate this dispute, and Chartis's cross-motion to
compel arbitration should be denied.

22.     For the same reasons, this Court should not give effect to the Pay-
ment Agreement's provision that, as Chartis interprets it, the arbitrators should decide
whether they can arbitrate this dispute.  The relevant provision states that arbitrators
"will have exclusive jurisdiction over the entire matter in dispute, including any ques-
tion as to its arbitrability."  (Payment Agreement at 9.)  Because this provision states
that arbitrators will decide whether "*the entire matter*" rather than whether "*a matter*"
is arbitrable -- and because it does so in a discussion of "[h]ow the arbitration must
proceed" rather than in a discussion of how arbitration is commenced – the GUC Trust
contends that the clause only gives arbitrators the right to decide which issues can be
addressed as part of the "entire matter" in an arbitration rather than whether an
arbitration can be commenced in the first place.

23.     Once again, the GUC Trust recognizes that some cases reject this
view.  (*See* Opposition at ¶¶ 20-22.)  Nevertheless, for the same reasons that Old GM

did not agree to arbitrate non-insurance disputes with Chartis, Old GM could not have

agreed to allow arbitrators to decide whether it was required to arbitrate non-insurance

disputes with Chartis.  At a minimum, given the tenuousness of Chartis's position

concerning its purported right to set off against non-insurance claims, Old GM did not

make the "clear and unmistakable" agreement necessary to allow arbitrators to decide

the arbitrability of non-insurance issues under the Payment Agreement.  *See Contec*

*Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 n.1 (2d Cir. 2005) (Parties will be deemed

to have consented to allow arbitrators to decide arbitrability only if they have "clearly

and unmistakably" agreed to do so).  Accordingly, Chartis's cross-motion to compel

arbitration should be denied.

     **2.**     **Federal Bankruptcy Law and Policy**
           **Preclude Arbitration of Chartis's**
           **Right To Set Off Against the Bristol Subrogation Claim**

     24.     As *Hagerstown* recognized, "[w]hen arbitration law meets bank-

ruptcy law head on, clashes inevitably develop." *Id.* at 199.  To resolve these clashes,

*Hagerstown* held, in discussing the third requirement of its test for arbitrability, that

arbitration clauses should not be enforced with respect to "core" matters such as the

instant claim objection if doing so would "adversely affect an underlying purpose of the

Bankruptcy Code."[4]  *See Hagerstown,* 277 B.R. at 202.  *See also In re S.W. Bach & Co., 425*

*B.R. 78*, 91 (Bankr. S.D.N.Y. 2010) ("Core claims may be subject to mandatory arbitration

if arbitration of the claims would not violate any bankruptcy policy.").

---

[4]    *Hagerstown* distinguishes between "procedurally core" and "substantively core" issues and indicates
that conflicts with bankruptcy policy are more likely to arise with respect to the latter.  However, the
test for whether arbitration should be allowed to proceed is the same for both types of issues.  *See*
*Hagerstown,* 277 B.R. at 203.  Chartis's Opposition appears to assume otherwise, but cites no genuine
support for its position.  (*See* Opposition ¶¶ 26-28.)

25.     Case law has also recognized that arbitration clauses should not be enforced if the result would be to create a "clash" or "conflict" with the Bankruptcy Code.  *See S.W. Bach & Co.*, 425 B.R. at 89.   This is true even if the parties have agreed to allow the arbitrators to determine arbitrability.  *See National Union Fire Ins. Co. of Pittsburgh, PA v Las Vegas Professional Football Limited Partnership*, Case No. 09-7490, 2009 WL 4059174 **3-5 (S.D.N.Y. 2009).

26.     Arbitrating Old GM's dispute with Chartis would be inconsistent with the provisions and purposes of the Bankruptcy Code.  This dispute presents, in essence, two issues for decision.  First, the **"Default Issue"**: Were Old GM's financial problems or bankruptcy filing actionable defaults such that Chartis (or Lexington) was permitted to exercise default remedies?  And second, the **"Setoff Issue"**: Was Chartis permitted to set off non-insurance obligations such as its unrelated Bristol Subrogation Claim against Old GM's collateral?  As discussed below, neither of these issues can properly be arbitrated because they both involve application of important principles of bankruptcy law and policy.

### a.     The Default Issue Should Not Be Arbitrated

27.     Old GM and Chartis do not disagree about what the default provision in the Payment Agreement means or whether Old GM would be in default of that provision if it is given effect.  Chartis asserts that "Old GM is plainly in default under the Payment Agreement due to (i) its bankruptcy filing; (ii) its insolvency; and (iii) its default on numerous material outstanding debts, which have not been cured." (Opposition ¶ 14.)  Old GM cannot deny its bankruptcy filing.  Accordingly, an insurance arbitrator interpreting the Payment Agreement will be bound to conclude that Old GM was in default.

28.    An insurance arbitrator will also be bound to conclude that Old GM's default entitled Chartis to exercise its specified contractual remedies.  That is what the Payment Agreement provides, and what Chartis says it will demonstrate to the arbitrators.  (*See* Opposition ¶ 6 ("As Chartis … will establish in arbitration, default occurred and thus the Chartis Claim became secured.").)

29.    However, if the arbitrator were to determine that Chartis was entitled to exercise its default remedies, the arbitrator would be acting directly contrary to bankruptcy law and policy by giving effect to an unenforceable "*ipso facto*" clause, *i.e.*, a clause that grants remedies based solely on a debtor's insolvency or bankruptcy filing.

30.    Section 365(e) of the Bankruptcy Code bars any modification or termination of the Payment Agreement and Insurance Program, or of Old GM's rights under the Payment Agreement and Insurance Program, based on Old GM's insolvency or bankruptcy filing.  Section 365(e) of the Bankruptcy Code provides:

> Notwithstanding a provision in an executory contract … an executory contract of the debtor may not be terminated or modified, and any right or obligation under such contract … may not be terminated or modified, at any time after commencement of the case solely because of a provision in such contract … that is conditioned on –
>
> (a) the insolvency or financial condition of the debtor at any time before the closing of the case; [or]
>
> (b) the commencement of a case under this title; …

11 U.S.C § 365(e).

31.    Further, section 365(e) bars the exercise of default remedies based on Old GM's insolvency, inability to pay, or commencement of a bankruptcy case.  *See*, *e.g.*, *Reloeb Co. v. LTV Corp. ( In re Chateaugay Corp.)*, Case No. 92-7054, 1993 WL 159969 *4 (S.D.N.Y. 1993) ("Section 365 abrogates the power of *ipso facto* clauses.  No default

may occur pursuant to an *ipso facto* clause and no reliance may be placed upon an alleged default where the only cause for default is the debtor's commencement of a bankruptcy case.").

32.    Section 365(e) is based on fundamental policies of the Bankruptcy Code.  Its purpose is to prevent "the forfeiture of valuable assets and hamper[ing of] the debtor's rehabilitation or liquidation."  *In re* C.*A.F. Bindery, Inc.*, 199 B.R. 828, 833 (Bankr. S.D.N.Y. 1996).  *See also In re Enron Corp.*, 306 B.R. 465, 472 (Bankr. S.D.N.Y. 2004) ("Ipso facto clauses are generally unenforceable pursuant to section 365(e) of the Bankruptcy Code because the automatic termination of a debtor's contractual rights deters rehabilitation and causes a forfeiture of assets.").

33.    Thus, Chartis cannot arbitrate the Default Issue because an arbitrator interpreting the parties' contracts as written would give effect to an otherwise unenforceable "ipso facto" clause, and thereby violate bankruptcy law and its fundamental policies of avoiding forfeitures and encouraging the reorganization of debtors.   Under *Hagerstown*'s third requirement, Chartis's cross-motion to compel arbitration should be denied.

34.    Chartis attempts to avoid the impact of section 365(e) by arguing that the Payment Agreement, which it wrongly views in isolation from the Insurance Program, is not executory.   Chartis is incorrect, as discussed in Point II.A. below. Whether or not Chartis is correct, however, the scope of section 365(e) is a fundamental issue of bankruptcy law as just noted.  The scope of section 365(e) too, therefore, must be decided by the Bankruptcy Court and not an insurance arbitrator if the fundamental policies of the Bankruptcy Code are to be protected.

35.    For all of the foregoing reasons, Chartis's cross-motion to compel arbitration should be denied.

b.    **The Setoff Issue Should Not Be Arbitrated**

36.    The Setoff Issue also implicates fundamental issues of bankruptcy law and policy and therefore should be decided by this Court rather than referred to arbitration.

37.    Section 553 of the Bankruptcy Code provides that, with certain important exceptions, the Bankruptcy Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case…."  11 U.S.C. § 553.

38.    The instant claim dispute arose because Chartis contends that one of its default remedies under the Payment Agreement allows it to set off its Bristol Subrogation Claim against Old GM's collateral – a proposition that Old GM and the GUC Trust have disputed.  Even if an arbitrator were to determine that Chartis has such a right, however, the arbitrator's decision could conflict with the limits on setoffs imposed by section 553 of the Bankruptcy Code.  *See, e.g., In re Lehman Bros. Inc.*, 458 B.R. at 140 ("even where a setoff right exists under applicable state law, the Bankruptcy Code imposes its own strict requirements.");  *Pereira v. United Jersey Bank, N.A.* 201 B.R. 644, 661 (S.D.N.Y. 1996) ("Even if the right exists under non-bankruptcy law, however, 'whether a setoff of existing obligations may be effected or sustained in bankruptcy depends upon the terms of section 553 [of the Bankruptcy Code], and not upon the terms of state laws or statutes.'").

39.    Section 553's limitations on setoffs implement important policies of the Bankruptcy Code, including the principle of ensuring fair and equal treatment to similarly situated creditors.  *See, e.g., In re Semcrude, L.P.*, 428 B.R. 590, 594 (D. Del. 2010) (stating that restricting setoffs to ensure strict mutuality is "consistent with the primary

13

goal of the Bankruptcy Code to ensure equal and fair treatment among similarly situated creditors."); *In re Whimsy*, 221 B.R. 69, 75 (S.D.N.Y. 1998) (noting that "inequality among creditors is inherent in the very nature of setoff."); *In re Nielson*, 90 B.R. 172, 173-74 (Bankr. W.D.N.C. 1988) (stating that, "[t]he right of offset recognized by 11 U.S.C. § 553(a) is a long-standing, but narrow exception to the basic tenets of the Bankruptcy Code, which generally prohibit preferential treatment of creditors of similar status.").

40.    Further, there are sound reasons to believe that Chartis's proposed setoff would be contrary to section 553. One "axiomatic" requirement for a proper setoff, for example, is "mutuality" – the requirement that the claim and offsetting debt be owed by and to the same parties in the same capacities. *See, e.g., In re Lehman Bros. Inc.*, 458 B.R. at 140-42 . Yet here, Chartis's setoff appears to depend in part on sums owed by or to its affiliate Lexington, because Chartis relies on Lexington's as well as AISLIC's Payment Agreement, and there is no evidence before the Court concerning the relationship between AISLIC and Chartis. Also, there is no evidence before the Court concerning whether Old GM's debts or claims are at issue, or whether Chartis's proposed setoff is based on those of Old GM's subsidiaries or affiliates, all of which are included in the definition of "You" under the Payment Agreement.

41.    In addition, there is no evidence before the Court concerning whether the allegedly offsetting debts and claims were pre- or post-petition or how much of Old GM's collateral was held in escrow or in trust. According to Chartis, "the collateral used to secure Old GM's obligations under the Payment Agreement" is subject to the Assumption and Collateralization Agreement which specifies that more than $21 million of that collateral "will remain in trust." (*See* Opposition ¶ 42.)

14

42.     Absent a demonstration that Chartis's proposed setoff, if allowed by the arbitrators, would fully comply with section 553, the supervening requirements of the Bankruptcy Code require denial of Chartis's cross-motion to arbitrate in accord with the third requirement of *Hagerstown*.  The arbitrators' interpretation of the parties' insurance contracts, and the provisions of the Bankruptcy Code overriding those contracts, are likely to "clash."  In any event, because Chartis has failed to provide the Court with facts showing that its proposed setoff would be consistent with the Bankruptcy Code, its cross-motion should be denied.

## II.

### THIS COURT SHOULD CLASSIFY THE
### BRISTOL SUBROGATION CLAIM AS UNSECURED

43.     Old GM's Amended Objection showed that Chartis's Bristol Subrogation Claim is not secured by a right of setoff, or any other right, for two main reasons:  (i) the "*ipso facto*" clause of section 365(e) of the Bankruptcy Code precludes Chartis from treating Old GM's default as actionable, and (ii) the "Setoff Remedy" provided as item 7 in the default provision of the Payment Agreement does not allow a setoff of non-insurance obligations against Old GM's Collateral.   These are, of course, the Default Issue and the Setoff Issue whose arbitrability was discussed in Point I above.

### A.    Old GM's Default under the Payment Agreement Did
       Not Give Chartis the Right To Exercise Default Remedies

44.     Old GM's Amended Objection pointed out that, because Old GM's defaults under the Payment Agreement were based solely on its insolvency or bankruptcy filing, there was no actionable default.  (*See* Amended Objection ¶ 12.)

45.     In response, Chartis argues that the *ipso facto* clause of section 365(e) of the Bankruptcy Code does not apply here because the Payment Agreement was not executory in that "Old GM has no remaining obligations under the Agreement other than payment."  (Opposition ¶¶ 33-34.)

46.     Chartis's argument is factually and legally incorrect.  Indeed, and ironically, Chartis is simultaneously asserting that Old GM's sole obligation under the Payment Agreement is "payment" and relying on the Payment Agreement to compel Old GM to participate in an arbitration simply to get its collateral back.  Chartis is doing so, moreover, even though Old GM owes no further payments under the Payment Agreement.

47.     In the Second Circuit, courts apply the *Countryman* approach to determine whether a contract is executory.  *See, e.g., COR Route 5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co.),* 524 F.3d 373, 379 (2d Cir. 2008) (adopting the test for executory contracts "first articulated by Professor Vernon Countryman.").  Under this approach "an executory contract is one 'under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.'" *Id.* at 379–80 (citing *Countryman*).  *See also In re Riodizio,* 204 B.R. 417, 421 (Bankr. S.D.N.Y.1997) ("Under Countryman's 'material breach' test, a prepetition contract is executory when both sides are still obligated to render substantial performance.").

48.     The Payment Agreement imposes numerous obligations on Old GM in addition to payment, including obligations which, if not performed, would constitute a material breach.  The Agreement begins by specifying that Old GM is obligated not only to provide payment and collateral, but also "to perform all Your

16

other obligations according to this Agreement and Schedule for all entities covered by the Policies." (Payment Agreement at 3.) Old GM's obligations include:

- Assisting Chartis "in any reasonable way" to enable it to perfect security interests in Old GM's collateral. (Payment Agreement at 6.)

- Delivering a substitute letter of credit if any letter of credit is canceled. (Payment Agreement at 6.)

- Cooperating with Chartis's designated consultants in the conduct of collateral reviews. (Payment Agreement at 6.)

- "[P]rovid[ing] financial information to [Chartis] … within 14 days after our request." (Payment Agreement at 7.)

- Providing Chartis with "such financial information as we may reasonably deem necessary to determine Your financial condition…." (Payment Agreement at 7.)

- Giving Chartis "prompt notice of the event of any default…or any event described in the section titled 'Collateral Reviews.'" (Payment Agreement at 7.)

- Refraining from cancelling any policy material to the Payment Agreement without Chartis's consent. (Payment Agreement at 7.)

- Refraining from assigning rights or obligations under the Payment Agreement. (Payment Agreement at 9.)

49.    Moreover, the Payment Agreement must be viewed together with all of the insurance policies that Chartis issued to Old GM as part of the Insurance Program as a whole. The Payment Agreement provides security for Old GM's "Payment Obligation" based on multiple policies issued to multiple Old GM affiliates; it states that Old GM has agreed "to pay us all Your Payment Obligation and to perform all Your other obligations according to this Agreement and Schedule for all entities covered by the Policies." (Payment Agreement at 3. *See also* Payment Agreement at 7.)

50.    The insurance agreements impose numerous additional substantive obligations on Old GM. For example, one representative agreement imposes obligations that include:

17

- Providing Chartis with written notice of claims, a confirmed release or pollution conditions.  (Exhibit 1 at 4.)

- Cleaning up pollution conditions to the extent required by environmental laws.  (Exhibit 1 at 5.)

- Notifying Chartis of actions and measures taken regarding pollution conditions.  (Exhibit 1 at 5.)

- Reimbursing Chartis for advancing any element of clean-up costs, corrective action or loss falling within the deductible.  (Exhibit 1 at 6.)

- Cooperating with Chartis and, upon its request, assist in obtaining information relative to any claim made.  (Exhibit 1 at 6.)

- Submitting to examination under oath, and attending hearings, depositions, and trials, if required by Chartis.  (Exhibit 1 at 6.)

- Writing statements or attending meetings with Chartis if required by Chartis.  (Exhibit 1 at 6.)

- Assisting Chartis in effecting settlement, securing and providing evidence and obtaining the attendance of witnesses.  (Exhibit 1 at 6.)

(*See* Policy 0907326, annexed to the Supplemental Declaration of Richard K. Milin dated December 22, 2011 as Exhibit 1.)

51.    Similarly, a second insurance agreement requires:

- Forwarding Chartis any demand or notice from a regulatory body in the event that the Insured receives information that a corrective action at a hazardous waste facility is under consideration.  (Exhibit 2 at 2.)

- Providing a written report of any corrective actions undertaken by or on behalf of the insured at a hazardous waste facility on an annual basis.  (Exhibit 2 at 2.)

- Providing Chartis with other information in the Insured's or its hired experts' possession which Chartis reasonably deems necessary.  (Exhibit 2 at 2.)

- Cooperating with Chartis and upon Chartis's request, assisting in obtaining information relative to any claim made.  (Exhibit 2 at 2.)

- Permitting Chartis to inspect, sample, and monitor on a continuing basis the Insured's property.  (Exhibit 2 at 4.)

- Permitting Chartis to examine and audit the Insured's books and records at any time during the policy period and extensions thereof.  (Exhibit 2  at 4.)

- Providing Chartis with copies of all policies potentially applicable against the liability covered by the policy, promptly upon its request.  (Exhibit 2 at 6.)

(*See* Policy 0907329, annexed to the Supplemental Declaration of Richard K. Milin dated December 22, 2011 as Exhibit 2.)

52.     Applying the *Countryman* test here, it is clear that the Payment Agreement, related insurance agreements and Insurance Program are executory because they were effective at the time Old GM filed its bankruptcy petition and required Old GM to perform material continuing obligations which, if not performed, could have justified Chartis in refusing to perform its own obligations.  *Cf. In re Teligent Inc.*, 324 B.R. 479 (S.D.N.Y. 2005) (insurance agreements that impose continuing obligations on the debtor to pay premiums and the non-debtor insurer to provide insurance protections are executory);  *In re New England Carpet Co.*, 18 B.R. 514, 516 (Bankr. D. Vt. 1982) (same);  *In re Conseco, Inc.*, 330 B.R. 673, 686 (Bankr. N.D. Ill. 2005) ("Insurance contracts are generally considered executory contracts.");  *In re Gamma Fishing Co.*, 70 B.R. 949, 951 (Bankr. S.D. Ca. 1987) (insurance agreement fulfilled the requirements of an executory contract).

53.     Moreover, Chartis's reliance on *In re Saint Vincent's Catholic Medical Centers of New York*, 440 B.R. 587, 601 (Bankr. S.D.N.Y. 2010), is inapposite.  *St. Vincent's* concerns mortgages, not a complex insurance program that, as Chartis itself admits, was "subject to deductibles, reimbursement and ***other obligations*** of Old GM to Chartis."  (Opposition ¶ 7 (emphasis added).)

54.     For the foregoing reasons, it is clear that the Payment Agreement, whether viewed by itself or as part of the Insurance Program, was an executory contract

at the time of Old GM's bankruptcy filing and that it incorporated the obligations of other executory contracts such as insurance agreements. The *ipso facto* clause of section 365(e) of the Bankruptcy Code therefore applied to Old GM, and it barred Chartis from treating Old GM's insolvency, failure to pay debts to others and bankruptcy filing as actionable defaults.

55.    Chartis argues in the alternative that Old GM is in default because of its "failure to pay material debts." (Opposition ¶ 35.) According to Chartis, the Payment Agreement's provision that failure to pay material debts constitutes a default "would not trigger the ipso facto prohibition in the Bankruptcy Code." Chartis cites *In re Margulis*, 323 B.R. 130 (Bankr. S.D.N.Y. 2005), and *In re Frank's Nursery & Crafts, Inc.*, Case No. 04-15826, 2006 WL 2385418 (Bankr. S.D.N.Y. 2006), in support of this novel proposition.

56.    Chartis's proposition is incorrect. *Margulis* provides no support because it concerns a monetary default resulting from the debtor's failure to pay the other contract party a specific sum due – not from a failure to pay "material debts" to others because of the debtor's financial condition. Indeed, *Margulis* expressly recognizes that a default triggered by the debtor's financial condition is an *ipso facto* clause. *See id.* at 135-36.

57.    *Frank's Nursery* provides Chartis with even less support: it concerns a claim objection and not a default provision, section 541 of the Bankruptcy Code and not section 365, and a right that a prior bankruptcy court had specifically approved "to assert the Deferred Indebtedness upon the filing of a bankruptcy petition." *Id.* at *5. *Frank's Nursery* did not concern, however, a default triggered by a generalized failure to pay "material debts," which is plainly only an alternative means of referring to the debtor's insolvency.

20

58.    Chartis next argues that Old GM is in default because "Old GM's subsidiaries are also insolvent or bankrupt."  Chartis points out that "You" is defined in the Payment Agreement to include Old GM's subsidiaries, and reasons that the subsidiaries' defaults are "cross-defaults" that render Old GM itself in default.  (Opposition ¶ 36.)

59.    In fact, the default provision that Chartis relies on for this argument states that "Your insolvency," and not the insolvency of "You or Your subsidiaries," is a default.  (Payment Agreement at 7.)  Because "You" includes both Old GM and its subsidiaries and affiliates, "Your insolvency" actually would occur only if Old GM and all of its subsidiaries and affiliates were insolvent.  Further, a different default provision in the Payment Agreement distinguishes between Old GM and its subsidiaries, specifying that a default would occur if "You or any of Your subsidiaries or affiliates" defaulted in the specified way.  Thus, the default provision Chartis relies on, far from creating cross-defaults, actually limits default to the insolvency of Old GM and every one of its subsidiaries and affiliates.  Chartis's cross-default argument must be rejected.

60.    Finally, Chartis attempts to bolster its cross-default argument by citing to *In re Wheeling-Pittsburgh Steel Corp.*, 54 B.R. 772, 778 (Bankr. W.D. Pa. 1985). *Wheeling-Pittsburgh* is not controlling, however, and provides no support to Chartis.  It merely holds that "cross default provisions will be enforceable in bankruptcy where they relate to a new insolvency or receivership situation and where they do not affect the debtor's right to assume and assign executory contracts and unexpired leases." That is hardly the case here.  A more relevant case is *In re Charter Communications*, 419 B.R. 221, 250-52 (Bankr. S.D.N.Y. 2009), which held that a cross-default provision in a complex corporate enterprise such as Old GM was an invalid *ipso facto* clause.

21

61.    For all of the foregoing reasons, Old GM's purported default did not permit Chartis to exercise remedies under the Payment Agreement, and the Bristol Subrogation Claim must therefore be classified as unsecured.

**B.    The Payment Agreement Does Not Give
Chartis the Right To Set Off Non-Insurance
Obligations Against Old GM's Collateral**

62.    Old GM's Amended Objection explains why, for at least three reasons, Chartis does not have the right to set off Old GM's non-insurance obligations, such as the Bristol Subrogation Claim, against Old GM's collateral.

63.    First, Old GM argued:

> the Setoff Remedy specifies that it can be used only with respect to Old GM property that has been "received by, pledged to, held by or otherwise available to us in connection with Your Payment Obligation."  (Payment Agreements at 8.)  It appears, however, that Old GM's collateral could only have been legally held, under the Parties' Assumption and Collateralization Agreements, in a specified trust, and not by Chartis. Chartis has provided no documents to show whether Chartis itself held Old GM's collateral, whether Chartis could legally or properly hold that property instead of delivering it to a trust or escrow agent, or whether the property was pledged on terms that would make it available to pay Chartis's Amended Claim.  Consequently, Chartis has failed to demonstrate a right to use Old GM's collateral for any Setoff Remedy.

(Amended Objection ¶ 55.)

64.    Chartis responds to this argument only by mischaracterizing it. Chartis says, "Old GM asserts that because Old GM and Chartis entered into an Assumption and Collateralization Agreement…Chartis can no longer assert its rights under the Payment Agreement."  (Opposition ¶ 42.)  Chartis also quotes provisions of the Assumption and Collateralization Agreement that require the funds it governs to be held in trust.  (*Id.*)  Chartis does not, however, state whether Old GM's collateral was held in trust, as the Assumption and Collateralization Agreement apparently required, or how Chartis obtained the right to set off funds that seemingly should have been held

22

subject to a trust agreement. Accordingly, Old GM's argument should be taken as dispositive, and this Court should hold that Chartis has no right to set off its Bristol Subrogation Claim against Old GM's collateral.

65.    Second, Old GM argued, based on time-honored principles, that Chartis could have no greater rights as subrogee than Bristol would have as subrogor. (Amended Objection ¶ 56.) Chartis responds that the Payment Agreement gives it additional rights to security, and that it is entitled to greater rights than its subrogor for that reason. Chartis does not cite any authority for its novel argument that it can convert an unsecured subrogation claim into a secured claim by this means, however, and the Court should not accept Chartis's mere say-so. Chartis's conversion of Bristol's unsecured claim into a secured claim through the happenstance that Chartis was Old GM's insurer, as well as Bristol's, is an inequitable violation of the fundamental bankruptcy principle of equal treatment, and Chartis should be denied the right to set off for that reason.

66.    Finally, Old GM's Amended Objection showed that several provisions of the Payment Agreement are inconsistent with Chartis's claim that it can use Old GM's collateral to satisfy non-insurance obligations. Most importantly, the Payment Agreement states that, "You grant us a possessory security interest in any property You deliver to us to secure Your Payment Obligation" and "direct us to hold *all such sums as collateral for Your Payment Obligation* as [it] may be payable now or may become payable in the future." (Payment Agreement at 6 (emphasis added).) This language plainly requires Chartis to use "all" of Old GM's collateral for its insurance-related "Payment Obligation" and for no other purpose.

67.    Chartis's sole relevant response is specious: Chartis states that "Chartis' authority to *use* collateral, upon event of default, is broader than Chartis'

23

rights to *hold* collateral." (Opposition ¶ 41 (original emphasis).) This does nothing, however, to explain how property that Chartis has been directed to hold *in trust* "as collateral for Your Payment Obligation" can be used for some other purpose. If Chartis uses Old GM's collateral to pay the Bristol Subrogation Claim, for example, Chartis surely will not be holding that collateral for Old GM's Payment Obligation as it "may become payable in the future" – Chartis cannot do both.

68.    Thus, the Payment Agreement's express restriction on Chartis's use of Old GM's collateral, and the other provisions of the Payment Agreement discussed in Old GM's Amended Objection, demonstrate that Chartis is not entitled to use Old GM's collateral to pay itself for the Bristol Subrogation Claim. "All" of Old GM's collateral was to be held for Old GM's Payment Obligation and for no other purpose.

69.    In addition, and at a minimum, the Payment Agreement's restrictions on the use of Old GM's collateral preclude any argument that Chartis has an unambiguous right of set off, and it is well established that ambiguities in insurance contracts should be construed against the insurer, even when the insurer is a sophisticated party. *See, e.g., Morgan Stanley Group Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (stating that, under New York law, any ambiguity in insurance policies may be resolved in favor of the insured and that there is no general rule denying sophisticated businesses the benefit of that rule); *Westchester Resco Co., L.P. v. New England Reinsurance Corp.*, 818 F.2d 2, 3 (2d. Cir. 1987) ("New York law … recognizes a general rule that ambiguities in an insurance policy are to be construed strictly against the insurer.").

70.    Consequently, for all of the foregoing reasons, this Court should hold that Chartis's Bristol Subrogation Claim is not secured by a right of setoff and should be classified as unsecured.

## CONCLUSION

71.    For all of the foregoing reasons, this Court should deny Chartis's

cross-motion to compel arbitration, hold that Chartis has no valid right of setoff, limit

its Bristol Subrogation Claim to an unsecured claim in the stipulated amount of $4.5

million, and grant the GUC Trust such other and further relief as is just and proper.

DATED:        New York, New York
              December 22, 2011

                                        TOGUT, SEGAL & SEGAL LLP
                                        By:

                                        /s/ Richard K. Milin
                                        SCOTT E. RATNER
                                        RICHARD K. MILIN
                                        One Penn Plaza - Suite 3335
                                        New York, New York 10119
                                        (212) 594-5000

                                        Counsel to the Motors Liquidation Company
                                        GUC Trust