# EXHIBIT 2

# AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY

(A Capital Stock Company, herein called the Company)
175 Water Street
New York, New York 10038

## HAZARDOUS WASTE – CORRECTIVE ACTION POLICY

### DECLARATIONS

**NOTICE:**   **THIS IS A CLAIMS-MADE AND REPORTED POLICY - PLEASE READ CAREFULLY.**

**POLICY NUMBER:**   0907329

**ITEM 1:**   **NAMED INSURED:**   General Motors Corporation

  **ADDRESS:**   300 Renaissance Center
    Mail Code:  482-C19-D36
    Detroit, MI 48265

**ITEM 2:**   **POLICY PERIOD:**
  **FROM:**   April 1, 2009    **TO:**   April 1, 2010
  12:01 A.M. Standard Time at the address of the Named Insured shown above

**ITEM 3:**   **Corrective Action Costs Aggregate Limit: $3,794,191**

**ITEM 4:**   **CORRECTIVE ACTION COSTS - COVERED HAZARDOUS WASTE FACILITIES:**
  1) General Motors Corporation, 13000 Eckles Road, Livonia, MI  48150
    EPA ID No.:  MID 005 356 621    Corrective Action Face Amount:  $3,794,191

**ITEM 5:**   **POLICY PREMIUM AND SCHEDULE:**    $30,000 due April 1, 2009

**ITEM 6:**   **RETROACTIVE DATE:**   April 1, 2009

**BROKER:**   AON RISK SERVICES
  3000 TOWN CENTER, SUITE 3000
  SOUTHFIELD, MICHIGAN  48075

"Insurer has determined that this is a financial transaction which does not transfer insurance risk and will record the premium as a deposit in accordance with GAAP"

_____

AUTHORIZED REPRESENTATIVE
or countersignature (where required by law)

Copyright, American International Group, Inc., 2007

**NOTICE: THIS INSURER IS NOT LICENSED IN THE STATE OF NEW YORK
AND IS NOT SUBJECT TO ITS SUPERVISION**

**AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY**
(A Capital Stock Company, herein called the Company)
175 Water Street
New York, New York 10038

## CORRECTIVE ACTION POLICY

**THIS IS A CLAIMS MADE AND REPORTED POLICY.  THIS POLICY HAS CERTAIN PROVISIONS AND REQUIREMENTS UNIQUE TO IT AND MAY BE DIFFERENT FROM OTHER POLICIES THE INSURED MAY HAVE PURCHASED.  DEFINED TERMS APPEAR IN BOLD FACE TYPE.**

In consideration of the payment of the premium, in reliance upon the statements in the Declarations and Application made a part hereof and subject to all the terms of this Policy, the Company agrees with the **Named Insured** as follows:

## SECTION I.  COVERAGES

**CORRECTIVE ACTION INSURANCE**

**1. Insuring Agreement.**

The Company agrees to indemnify the **Insured**, or the **Regulatory Body**, subject to the limits of liability of this Policy, for such **Corrective Action Costs** that the **Regulatory Body** instructs the Company to indemnify in writing.  The **Insured** must be legally obligated to pay such **Corrective Action Costs** by reason of **Corrective Action** at a **Hazardous Waste Facility** designated in Item 4 of the Declarations. **Claims** by the **Insured**, or the **Regulatory Body**, for such **Corrective Action Costs** must be first reported in writing to the Company during the **Policy Period**.  This coverage applies only to **Corrective Action Costs** which arise from **Corrective Action** at a **Hazardous Waste Facility** that first takes place on or after the Retroactive Date shown in Item 6 of the Declarations.

**2. Exclusions.**

This insurance does not apply to expenses, losses, liabilities of, or damages of any kind incurred by, accruing to, or alleged to be liabilities of the **Insured**, by reason of:

A.    Any criminal or civil penalties imposed by reason of the violation of any law or regulation.

B.    Any third-party claims for **Bodily Injury** or **Property Damage** or claims for damages of any nature.

C.    Any expenses, charges or costs resulting from the defense and/or investigation of any liability or obligation for **Corrective Action Costs** hereunder.

## SECTION II.  CLAIMS PROVISIONS

It is a condition precedent to coverage that:

Copyright, American International Group, Inc., 2007

NOTICE: THIS INSURER IS NOT LICENSED IN THE STATE OF NEW YORK
AND IS NOT SUBJECT TO ITS SUPERVISION

A.   In the event that the **Insured** receives information to the effect that **Corrective Action** at a **Hazardous Waste Facility** is under consideration by the **Regulatory Body**, the **Insured** shall immediately forward to the Company any demand or notice from the **Regulatory Body** regarding the **Corrective Action** received by the **Insured** or his or her representative.  The **Insured** shall provide to the Company on a annual basis a written report of the **Corrective Action** undertaken by or on behalf of the **Insured** at a **Hazardous Waste Facility**, and shall provide to the Company other information in the possession of the **Insured** or its hired experts which the Company reasonably deems necessary.

B.   The **Insured** shall cooperate with the Company and, upon the Company's request, assist in obtaining information relative to any **Claim** made.  The **Insured** shall not, except at his own cost, voluntarily make or approve any payments, assume any obligations or incur any expense relating to **Corrective Action Costs** which are not in accordance with the **Corrective Action Plan** without the Company's or the **Regulatory Body's** written permission.

C.   Any notices required by these conditions shall be sent to:

> Dawn Kynard
> ESIS
> 300 Renaissance Center
> Mail Code:  482-C20-D71
> Detroit, MI  48265

> and

> Thomas J. O'Rourke
> American International Companies
> 1375 East 9[th] Street
> Cleveland, Ohio  44114

> and

> General Counsel
> American International Specialty Lines Insurance Company
> 175 Water Street
> New York, New York 10038

or other address(es) as substituted by the Company in writing.

## SECTION III.  DEFINITIONS

A.   **Bodily Injury** means: bodily injury, sickness, disease, fear of sickness or disease, mental anguish and mental injury, emotional distress, psychic injury, or disability including care, loss of services or death resulting from any of the foregoing.

B.   **Claim** means:  A request by the **Insured** or the **Regulatory Body**  for payment of a statement or bill of expenditures made for **Corrective Action Costs** by reason of a **Corrective Action** at a **Hazardous Waste Facility** in accordance with its **Corrective Action Plan**, provided that such request:

> (a)   is first submitted in writing to the **Regulatory Body** for approval during the **Policy Period**; and

> (b)   is first reported in writing to the Company during the **Policy Period**.

Copyright, American International Group, Inc., 2007

C.    **Corrective Action** means the investigation, cleanup or remediation of a release of hazardous wastes or hazardous constituents required pursuant to the **Corrective Action Plan** at one or more **Hazardous Waste Management Units** at a **Hazardous Waste Facility**.

D.    **Corrective Action Costs** means all expenses specifically identified in the **Corrective Action Plan** approved in writing by the **Regulatory Body**.

E.    **Corrective Action Face Amount** means the Company's maximum limit of liability for **Corrective Action Costs** for the specific **Hazardous Waste Facility** as designated and shown in Item 4 of the Declarations.

F.    **Corrective Action Plan** means the below-identified written corrective action plan attached to the Policy as Schedule A and made a part hereof, prepared in order to comply with federal regulations promulgated under the Resource Conservation and Recovery Act, or other applicable federal, state or local regulations regarding corrective action of hazardous waste facilities and provided that such plan shall first have been approved by the **Regulatory Body**.

  (a)    Operation, Maintenance, and Monitoring Plan for 13000 Eckles Road/12950 Eckles Road, Livonia, Michigan, July 2007, prepared by Conestoga-Rovers & Associates.

G.    **Hazardous Waste Facility** (or **Facility**) means the entire facility designated by legal description in Item 4 of the Declarations which has received authorization from the **Regulatory Body** to engage in the treatment, storage or disposal of hazardous waste and which includes one or more **Hazardous Waste Management Unit(s)** on, within or under such facility.

H.    **Hazardous Waste Management Unit** means a surface impoundment, waste pile, land treatment area, landfill cell, incinerator, tank and its associated piping and underlying containment system, and container storage area, or other contiguous area of land on or in which hazardous waste is placed, or the largest area in which there is significant likelihood of mixing hazardous waste constituents in the same area.  Such unit must be located on, within or under a **Hazardous Waste Facility**.    A container alone does not constitute a unit; the unit includes containers and the land or pad upon which they are placed.

I.    **Insured** means the **Named Insured**, and any director, officer, partner or employee thereof while acting within the scope of his/her duties as such, and any person or entity designated as an additional insured by an endorsement issued to form a part of this Policy.

J.    **Named Insured** means the person or entity designated as such in Item 1 of the Declarations.

K.    **Policy Period** means the period set forth in Item 2 of the Declarations, or any shorter period arising as a result of cancellation of this Policy.

L.    **Property Damage** means:   (a) Physical injury to, or destruction of tangible property, including loss of use, profits or investments or diminution in value of;   (b) the loss of use of tangible property or rights of any nature, whether related to tangible property or not.

M.    **Regulatory Body** means the Regional Administrator of the United States Environmental Protection Agency for the EPA region in which the **Hazardous Waste Facility** named in Item 4 of the Declarations is located, or any person or State Agency designated by the Regional Administrator.

Copyright, American International Group, Inc., 2007

## SECTION IV.  LIMIT OF LIABILITY

Regardless of the number of:  (i) **Hazardous Waste Facilities** designated and shown in Item 4 of the Declarations; (ii) **Insureds** under this Policy; or (iii) **Claims** made under this Policy:

A.    With respect to each **Hazardous Waste Facility** shown in the Declarations, the Company's total liability for all **Corrective Action Costs** under Section I Coverages, Corrective Action Insurance, of the Insuring Agreement from all **Claims** shall not exceed the limit of liability shown in Item 3 of the Declarations as **Corrective Action Costs Aggregate Limit**.  With respect to each **Hazardous Waste Facility** shown in the Declarations, the Company's total liability for **Corrective Action Costs** shall not exceed the specified individual **Corrective Action Face Amount** shown in Item 4 of the Declarations for each individual **Hazardous Waste Facility**.

B.    The limits of liability shown in the Declarations with respect to each **Hazardous Waste Facility** are separate limits of liability.  The maximum limits of liability under this Policy shall not exceed the limits of liability shown in the Declarations.  Under no circumstances, will the amounts paid by the Company as indemnity under this Policy exceed the amount of cash security paid by the **Named Insured** to the Company.  Additionally, any return of cash security will have a corresponding dollar for dollar reduction to the limit of liability shown in Item 3 of the Declarations as **Corrective Action Costs Aggregate Limit**.

## SECTION V.  TERRITORY

This Policy only applies to a **Claim** arising from **Corrective Action Costs** incurred at **Hazardous Waste Facilities** designated and shown in the Declarations and only if such **Claim** is made or brought in the United States.

## SECTION VI.  CONDITIONS

A.    **Inspection and Audit** - The Company shall be permitted but not obligated to inspect, sample and monitor on a continuing basis the **Insured's** property or operations, at any time.  Neither the Company's right to make inspections, sample and monitor, nor the actual undertaking thereof nor any report thereon, shall constitute an undertaking, on behalf of the **Insured** or others, to determine or warrant that property or operations are safe, healthful or conform to acceptable engineering practice or are in compliance with any law, rule or regulation.  The Company or its designee may examine and audit the **Insured's** books and records at any time during the **Policy Period** and extensions thereof, as far as they relate to the subject matter of this insurance, and within any periods of **Corrective Action** for which coverage is provided whether Insurance of this Policy has expired.

B.    **Cancellation** - The Company shall not cancel, terminate or fail to renew the coverages provided herein except for failure to pay the full premium in accordance with Item 5 in the Declarations.  The Company shall notify the **Insured** and the **Regulatory Body** of its intent to cancel, terminate or not to renew by sending, by certified mail, to the **Insured** at the address shown in this policy and to the **Regulatory Body**, written notice stating the date not less than 120 days thereafter allowing time for receipt of notice on which such cancellation, termination or failure to renew shall be effective.

This policy may be canceled by the **Named Insured** pursuant to applicable statute by surrender thereof to the Company or any of its authorized agents or by mailing to the Company written notice stating the date thereafter the cancellation shall be effective.  The mailing of notice as aforesaid shall be sufficient proof of notice.  The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the **Policy Period**.

Copyright, American International Group, Inc., 2007

In the event of (i) cancellation or nonrenewal by the **Insured** or (ii) cancellation by the Company for nonpayment of premium, the full Insurance Premium shown in Item 5 of the Declarations shall be deemed earned and the unpaid portion thereof shall be immediately due and payable.  Upon the effective date of cancellation by the **Insured**, all indemnity obligations on the part of the Company hereunder shall automatically cease and the **Insured** shall have no further recourse against the Company with respect to unpaid losses.

Cancellation, termination or failure to renew may not occur and the policy will remain in full force and effect in the event that on or before the date of expiration:

(a)    The owner or operator is named as a debtor in a voluntary or involuntary proceeding under Title II (Bankruptcy), US Code; or

(b)    The premium due is paid.

C.    **Representations** - By acceptance of this Policy, the **Insured** agrees that the statements in the Declarations and Application(s) are their agreements and representations, that this Policy is issued in reliance upon the truth of such representations and that this Policy embodies all agreements existing between the **Insured** and the Company or any of its agents relating to this insurance.

D.    **Action Against Company** - No action shall lie against the Company, unless as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy, nor until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insured** after actual trial or by written agreement of the **Insured,** the claimant or regulatory body and the Company.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this Policy to the extent of the insurance afforded by this Policy.  No person or organization shall have any right under this Policy to join the Company as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the Company be impleaded by the **Insured** or his legal representative.  Bankruptcy or insolvency of the **Insured** or of the **Insured's** estate shall not relieve the Company of any of its obligations hereunder.

E.    **Assignment** -  This Policy may not be assigned without  the Company's consent to the assignment, which consent shall not be unreasonably withheld.

F.    **Subrogation:** In the event of any payment of this Policy, the Company shall be subrogated to all the **Insured's** rights of recovery therefor against any person or organization and the **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights.  The **Insured** shall do nothing after a **Claim** to prejudice such rights.

G.    **Changes** - Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this Policy or estop the Company from asserting any right under the terms of this Policy; nor shall the terms of this Policy be waived or changed, except by endorsement issued to form a part of this Policy.

H.    **Sole Agent** - The **Named Insured** first listed in Item 1 of the Declarations shall act on behalf of all other **Insureds**, if any, for the payment or return of premium, receipt and acceptance of any endorsement issued to form a part of this Policy, giving and receiving notice of cancellation or nonrenewal.

I.    **Other Insurance** - Where other insurance is available to the **Named Insured** for **Corrective Action Costs** covered under the terms and conditions of the Policy, the Company's obligation to the **Insured** shall be as follows:

Copyright, American International Group, Inc., 2007

(a)  The insurance provided shall apply as excess insurance over any other valid insurance, whether collectible or not, be it primary or excess.  This excess insurance shall in no way be increased or expanded as a result of the receivership, insolvency, or inability to pay of any insurer with respect to both the duty to indemnify and the duty to defend.  This also applies to the **Insured** while acting as a self-insured for any coverage.

(b)  Where this insurance is excess insurance, the Company will pay only its share of the amount of **Corrective Action Costs**, if any, that exceeds the total amount  of all such valid  insurance.

The **Insured** shall promptly upon request of the Company provide the Company with copies of all policies potentially applicable against the liability covered by this Policy.

J.  **Premium -** The full policy premium for coverage hereunder shall be payable in accordance with Item 5 of the Declarations.  It is an absolute condition that the full amount of premium installment be actually received by the Company in accordance with same.

K.  **Regulatory Provisions -** Any term or condition of this Policy to which any federal or state administrative or regulatory provisions apply shall be governed only by those regulations or provisions in effect at the inception date of this Policy.

L.  **Renewal of Coverage -** Coverage may be renewed with a subsequent policy which provides limits of liability no less than those contained in this Policy, and which is issued by the Company at the expiration of the **Policy Period** stated in the Declarations of this Policy, subject to the cancellation provisions set forth in this Section.

M.  **Consistency with Regulations** - With respect to each **Hazardous Waste Facility** designated and shown in Item 4 of the Declarations, subject to the limits of coverage set forth in this Policy, this Policy conforms in all respects with federal and state environmental regulations regarding insurance that is used as a mechanism to meet financial assurance requirements for corrective action of hazardous waste facilities, as applicable and as such regulations were constituted on the inception date of the Policy.  It is agreed that any provision of this Policy, except for those related to the limit of coverage, inconsistent with such regulations is hereby amended to eliminate such inconsistency, except that the limits of insurance shall not be amended.

## SECTION VII. SERVICE OF SUIT

**Service of Suit** - It is agreed that in the event of failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the **Insured**, will submit to the jurisdiction of a court of competent jurisdiction within the United States.  Nothing in this condition constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.  It is further agreed that service of process in such suit may be made upon Counsel, Legal Department, American International Specialty Lines Insurance Company, 70 Pine Street, New York, New York 10270, or his or her representative, and that in any suit instituted against the Company upon this contract, the Company will abide by the final decision of such court or of any appellate court in the event of any appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner, or Director of Insurance, other officer specified for that purpose in the statute, or his or her successor or successors in office as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Insured** or any beneficiary hereunder arising out of this contract of

Copyright, American International Group, Inc., 2007

insurance, and hereby designates the above named counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

IN WITNESS WHEREOF, the Company has caused this Policy to be signed by its president and secretary and signed on the Declarations page by a duly authorized representative or countersigned in states where applicable.

_____          _____
            Secretary                                              President

Copyright, American International Group, Inc., 2007

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT**

This endorsement, effective 12:01 A.M.    04/01/2009

Forms a part of Policy No.:  0907329

Issued to:  GENERAL MOTORS CORPORATION

By:  **American International Specialty Lines Insurance Company**

**COVERAGE TERRITORY ENDORSEMENT**

*This endorsement modifies insurance provided under the following:*

    Payment of loss under this policy shall only be made in full compliance with all
United States of America economic or trade sanction laws or regulations, including, but not
limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury
Department's Office of Foreign Assets Control ("OFAC").

_____
AUTHORIZED REPRESENTATIVE

ENDORSEMENT NO. 01

**This endorsement, effective 12:01 AM,**    04/01/2009

**Forms a part of Policy No:**    0907329

**Issued to:**    General Motors Corporation

**By:**    American International Specialty Lines Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

<u>**ADDITIONAL INSURED ENDORSEMENT**</u>

It is hereby agreed that, subject to the coverage provided by the Policy, the following entity(s) is (are) included as additional insured(s), but solely as respects liability arising out of the **Named Insured's** ownership, operation, maintenance or use of the **Hazardous Waste Facility** designated in Item 4 of the Declarations.

<u>Additional Insured</u>

United States Department of the Treasury
1500 Pennsylvania Avenue, NW, Room 2312
Washington, D.C. 20220
Reference / Attention:  Assistant General Counsel (Banking and Finance)

All other terms, conditions, and exclusions shall remain the same.

_____
AUTHORIZED REPRESENTATIVE
or countersignature (in states where applicable)

PAGE 1 OF 1

# Schedule A



July 2007



# OPERATION, MAINTENANCE, AND MONITORING PLAN

### 13000 ECKLES ROAD
### 12950 ECKLES ROAD
### LIVONIA, MICHIGAN

### U.S. EPA No. MID 005 356 621

Prepared for:

General Motors Corporation

Remediation and Liability Management Company, Inc.

DISCLAIMER:
SOME FORMATTING CHANGES MAY HAVE OCCURRED WHEN
THE ORIGINAL DOCUMENT WAS PRINTED TO PDF; HOWEVER,
THE ORIGINAL CONTENT REMAINS UNCHANGED.

**Prepared by:**
**Conestoga-Rovers**
**& Associates**

14496 Sheldon Road
Suite 200
Plymouth, Michigan 48170

Office:   (734) 453-5123
Fax:     (734) 453-5201

web:  http:\\www.CRAworld.com

JULY 2007
REF. NO. 12607 (56)

July 2007

## TABLE OF CONTENTS

Page

1.0   INTRODUCTION .................................................................................................1

2.0   OBJECTIVES.......................................................................................................1

3.0   CONTROLS.........................................................................................................2
      3.1      INSTITUTIONAL CONTROLS.........................................................3
      3.2      ENGINEERING CONTROLS.............................................................4

4.0   ANNUAL REPORTING ......................................................................................7

5.0   CHANGING CONDITIONS................................................................................8

### LIST OF FIGURES
(Following Text)

FIGURE 1.1      SITE LOCATION

FIGURE 1.2      SITE PLAN

FIGURE 2.1      OMM IMPLEMENTATION SCHEDULE

### LIST OF TABLES
(Following Text)

TABLE 2.1      GROUNDWATER CRITERIA FOR VERIFYING PLUME STABILITY AND
               EVALUTING HEALTH SIGNIFICANCE

TABLE 2.2      FINANCIAL ASSURANCE COST ESTIMATE

July 2007

## 1.0    INTRODUCTION

Conestoga-Rovers & Associates (CRA) has prepared this "Operation, Maintenance, and Monitoring Plan" (OMM Plan), on behalf of Remediation and Liability Management Company, Inc. (REALM), a subsidiary of General Motors Corporation (GM), to set forth requirements for operation, maintenance, and monitoring (OMM) of institutional and engineering controls which have been implemented under an Administrative Order on Consent, voluntarily signed by GM and the United States Environmental Protection Agency (U.S. EPA), executed May 21, 2007 (U.S. EPA, May 2007). These OMM activities relate to the properties located at 13000 Eckles Road and 12950 Eckles Road, Livonia, Michigan (Site). The Site location is presented on Figure 1.1.  The current Site Plan is presented on Figure 1.2.

On March 13, 2006, U.S. EPA issued a Final Decision and Response to Public Comments (U.S. EPA, March 2006) which selected final corrective measures at the Site.  The final corrective measures included: soil excavation, characterization and transport for disposal off site at area of interest (AOI) 5, AOI 27, AOI 31, and AOI 37; development and implementation of a particulate emissions control plan to control particulate emissions from surface soil at AOI 39; installation and operation of the French drain collection system, groundwater extraction and treatment system, and barrier wall at Area 1 to ensure effective control of off-site migration of chromium and nickel-impacted groundwater; in-situ chemical oxidation (ISCO) at AOI 31 to control the migration of trichloroethylene (TCE)-impacted groundwater; implementation of a groundwater monitoring plan; and implementation of institutional controls to restrict the use of the property.  These final corrective measures have already been performed.

This OMM Plan addresses all measures that must be taken to ensure the continued effectiveness and integrity of final corrective measures.

## 2.0    OBJECTIVES

OMM activities will be performed to ensure that engineering and institutional controls will continue to be maintained unless and until USEPA determines that performance standards have been met and such controls are no longer necessary for the Site:

- Maintain future land and groundwater use consistent with the institutional controls as identified in Section 11 of the Administrative Order on Consent;
- Appropriately manage soil and/or debris, surface water and/or groundwater required or necessary because of excavation, demolition, or soil disturbance

---

July 2007

related to future use, development, or construction at or on the Site in compliance with applicable federal, state, or local environmental laws, regulations, or ordinances, including the requirements imposed under Section 20107(a) of Michigan Public Act 451, Part 201. The term "debris" includes any existing utility infrastructure and any remnants of previous construction or demolition activities that may be present at, on, or in the Site;

- Appropriately maintain any applicable due care obligations under Section 20107a of Michigan Public Act 451, and any maintenance issues related to engineering controls, installed or constructed on, in, or under the Site in connection with levels of contaminants that remain at the Site which exceed the Michigan generic residential cleanup criteria set forth in Part 201 Environmental Remediation of the Natural Resources and Environmental Protection Act and its rules;

- Operate the Area 1 French drain collection system and treatment system to effectively control the migration of chromium and nickel-impacted groundwater such that the plume remains stable in accordance with Section 11 of the Administrative Order on Consent. Plume stability criteria are presented in Table 2.1;

- Maintain the Area 1 barrier wall and cover system to effectively control the migration of groundwater through Area 1 such that the plume remains stable in accordance with Section 11 of the Administrative Order on Consent. Plume stability criteria are presented in Table 2.1;

- Implement the approved Dust Control Plan dated January 2007 (CRA, January 2007) to control particulate emissions from surface soil along the North Boundary Area (AOI 39) in accordance with Section 14 of the Administrative Order on Consent; and

- Monitor groundwater quality at the Site in accordance with the approved Groundwater Monitoring Plan dated December 1, 2006 (CRA, December 2006) in accordance with Section 12 of the Administrative Order on Consent.

A schedule for the implementation of the above OMM activities is presented on figure 2.1. A financial assurance cost estimate for the implementation of the above OMM activities is presented in Table 2.2.

## 3.0    CONTROLS

Both institutional and engineering controls are required to ensure the continued effectiveness of final corrective measures at the Site. These controls which are outlined below are described in the following documents.

July 2007

INSTITUTIONAL CONTROLS

- Declaration of Restrictive Covenant MDEQ Reference No. RC-WHMD-06-007 (GM, December 2006); and
- Declaration of Restrictive Covenant MDEQ Reference No. RC-WHMD-07-001 (GM, February 2007).

ENGINEERING CONTROLS

- Cover and Barrier Wall;
- Operation and Maintenance Manual for the Area 1 groundwater collection and treatment system (CRA, July 2007);
- Long-Term Groundwater Monitoring Plan; and
- Dust Control Plan

Combined, these documents describe in detail how environmental conditions at the Site will be managed in the future, ensuring that the final corrective measures remain protective.

## 3.1    INSTITUTIONAL CONTROLS

A Declaration of Restrictive Covenant has been recorded with the Wayne County Register of Deeds for both the 12950 Eckles Road and 13000 Eckles Road properties. The Declaration of Restrictive Covenant for the 12950 Eckles Road property was filed to: 1) prohibit groundwater use on the Property for any purpose; 2) restrict the uses of the Property for any purpose other than those characterized by the Michigan Department of Environmental Quality (MDEQ) as Limited Commercial II, Limited Commercial III, Limited Commercial IV, and Limited Industrial, unless otherwise agreed to by GM and U.S. EPA and in consultation with MDEQ; and 3) maintain the barrier wall in Area 1. The Declaration of Restrictive Covenant for the 13000 Eckles Road property was filed to: 1) prohibit groundwater use on the Property for any purpose; 2) restrict the uses of the Property for any purpose other than those characterized by the MDEQ as Limited Commercial II, Limited Commercial III, Limited Commercial IV, and Limited Industrial, unless otherwise agreed to by GM and U.S. EPA and in consultation with MDEQ; 3) maintain the barrier wall and cover in Area 1; and 4) control particulate emissions from surface soil at the North Boundary Area (AOI 39), as described in the Dust Control Plan. Additionally, as identified in both Declarations of Restrictive Covenant, monitoring wells associated with the Groundwater Monitoring Plan must not be disturbed, removed, or abandoned unless otherwise agreed to by GM and U.S. EPA and in

July 2007

consultation with MDEQ.  If monitoring wells must be removed or abandoned for
redevelopment purposes, replacement monitoring well locations must be agreed to by
GM and U.S. EPA and in consultation with MDEQ.  These institutional controls will be
maintained until concentrations of constituents in Site soil and groundwater meet the
requirements in Section 20107(a) of Michigan Public Act 451, Part 201, Residential
Cleanup Criteria for soil and groundwater to the extent they are applicable to this Site.

3.2     ENGINEERING CONTROLS

Engineering controls implemented at the Site are outlined below.  The activities outlined
below will be conducted in accordance with the OMM Plan, O&M Manual, Declarations
of Restrictive Covenant No. RC-WHMD-06-007 and RC-WHMD-07-001, and Dust
Control Plan.

*Cover and barrier wall* – Currently, the remaining concrete slab is in place over
approximately 3 acres of the Site inside the perimeter of the Area 1 barrier wall.  The
purpose of this cover is to increase the efficiency of the groundwater recovery system by
limiting the infiltration of precipitation into the subsurface in Area 1.  If future
redevelopment of the Site requires alterations to the existing cover, a suitable alternative
cover (e.g., new concrete slab, roof structure, pavement, etc.) shall be maintained in this
area to achieve the engineering and institutional controls described herein. Additionally,
any waste materials generated as a result of such redevelopment activities shall be
managed appropriately.

*Groundwater collection and treatment system* – This system includes an on-site treatment
operation capable of recovering and treating groundwater from an approximately 600
linear foot perforated collection pipe at approximately 20 feet below ground surface
(bgs) (French Drain) and ensuring that discharge of extracted and treated groundwater
is in compliance with applicable standards.

Effluent from the treatment system is sampled pursuant to a City of Detroit Water and
Sewerage Department (DWSD) permit, and the data are reported monthly to the DWSD.
The discharge permit requirements and discharge criteria are presented along with other
similar requirements and operations guideline in an Operations and Maintenance
Manual (O&M Manual).   The O&M Manual provides information regarding the
treatment system components, operation and maintenance of such components, startup
and shutdown procedures, information management procedures, sampling and analysis
requirements, laboratory requirements, training and awareness requirements, health
and safety requirements, emergency response procedures, and waste management

July 2007

requirements. The O&M Manual provides guidance and reference for the proper operation and maintenance of the treatment system by Site operating personnel, and will be used and maintained as long as the groundwater collection and treatment system is operating at the Site. As modifications are made to the system (e.g., for system optimization), the O&M Manual will be modified accordingly. The groundwater collection and treatment system will be operated such that the plume remains stable in accordance with Section 11 of the Administrative Order on Consent. Plume stability criteria are presented in Table 2.1.

*Groundwater Monitoring Plan* – A long-term groundwater monitoring plan has been implemented to provide for annual monitoring of the extents of impacted groundwater at the Site's perimeter and downgradient of Area 1 (nickel) and AOI 31 (trichloroethylene). Additionally, the plan provides for quarterly monitoring of the thickness of light non-aqueous phase liquid (LNAPL) quarterly at AOI 21 – Former Pickling Machine/Polish Area. The Groundwater Monitoring Plan guides the collection and interpretation of the following data:

- Groundwater analytical data at downgradient property boundary monitoring wells and at off-site monitoring wells downgradient of Area 1 to ensure that nickel-impacted groundwater remains stable and continues to meet the Site-specific risk based criteria presented in Table 2.1 under current and reasonably expected groundwater exposures for the area plume;
- Groundwater analytical data at downgradient property boundary monitoring wells and at off-site monitoring wells downgradient of AOI 31 to ensure that TCE-impacted groundwater remains stable and continues to meet the Site-specific risk based criteria presented in Table 2.1 under current and reasonably expected groundwater exposures for the area plume;
- Groundwater data at the interior of the Facility to confirm that concentrations of constituents remain at or below levels that meet the Site-specific risk based criteria under current and reasonably expected future land use at the Site.
- Groundwater elevation measurements to verify control of groundwater migration downgradient of the barrier wall at Area 1; and
- Observations of the absence or presence and thickness of LNAPL at AOI 21 to show that LNAPL is not significantly increasing or migrating over time.

As Site conditions change, it may be necessary to modify the groundwater monitoring program to continue to gather the appropriate data needed to demonstrate that the objectives of the corrective action are being achieved. The Groundwater Monitoring Plan will be modified as necessary to account for these changes. Any proposed changes,

July 2007

including addition and/or removal of monitoring wells, will be identified in the Annual Monitoring Report and require approval by U.S. EPA in consultation with MDEQ.

*Dust Control Plan* - the Dust Control Plan has been developed to incorporate the risk assessment for the Site to ensure that control of dust generated during activities in AOI 39 (such as vehicular traffic, Site redevelopment, or other excavation activities) is conducted in a way that is protective of human health and the environment as well as being in compliance with applicable laws.   The Dust Control Plan is specifically applicable to AOI 39 – North Boundary Area identified in the RCRA Facility Investigation (RFI), which requires engineering and institutional controls as described in the RCRA Final Decision. The plan specifies that for any dust generating activities in AOI 39 that last longer than 5 consecutive days, a written dust control plan must be submitted to U.S. EPA by the current owner for review at least 21 days in advance of dust generating activities and be approved by U.S. EPA before dust generating activities begin.   The dust control plan must describe the nature and duration of the dust generating activities and the specific details of the measures that will be implemented to monitor and control manganese particulate emissions during the activities.

Additionally, soil and groundwater at the Site should be handled in general conformance with the due care requirements under Michigan Part 201 and the declarations of restrictive covenant.

July 2007

## 4.0    ANNUAL REPORTING

An annual report will be prepared to document the OMM activities completed during
the previous calendar year.  This report will cover the following:

- LNAPL and groundwater monitoring activities;
- Operation and performance of the groundwater collection and treatment system;
- Non-routine maintenance completed for Site engineering controls (e.g., repairs to
  the collection and treatment system, Site fencing, or existing concrete cover); and
- Any changes in Site conditions that necessitate changes to the institutional or
  engineering controls.

If applicable, the annual report may also include recommendations to improve the
efficiency of the groundwater collection and treatment system.  Any modifications made
to the system will be described in the annual reports, and the O&M Manual and
Groundwater Monitoring Plan will be updated accordingly.  All modifications to the
Groundwater Monitoring Plan or OMM Plan will require approval by U.S. EPA in
consultation with MDEQ.

This report will be submitted to the U.S. EPA by March 1 for the previous calendar
years' OMM activities.

July 2007

## 5.0    CHANGING CONDITIONS

Any major modification to this plan (e.g., a modification that may affect the fundamental approach to the engineering or institutional controls described above) will require approval by U.S. EPA prior to implementation per the Consent Order. Examples of such modifications could include changes in Site environmental conditions involving new information that substantially changes the potential for exposure at the Site, or significant changes in technologies used to achieve the engineering or institutional goals described herein.

July 2007

## 6.0  <u>REFERENCES</u>

United States Environmental Protection Agency, March 2006, RCRA Final Decision and Response to Comments – Selection of Remedial Alternative for General Motors Corporation, 13000 Eckles Road Site, Livonia, Michigan.

Conestoga-Rovers & Associates, December 2006, Revised Groundwater Monitoring Plan, 13000 Eckles Road, Livonia, Michigan.

Conestoga-Rovers & Associates, December 2006, Interim Measures Completion Report Area 1 Barrier Wall, 13000 Eckles Road, Livonia, Michigan.

General Motors Corporation, December 2006, Declaration of Restrictive Covenant, 13000 Eckles Road, Livonia, Michigan, Recorded with the Wayne Country Register of Deeds January 22, 2007, Liber 45871, pp. 446-461.

Conestoga-Rovers & Associates, January 2007, AOI 39 Soil Dust Control Plan, Former General Motors Delphi Chassis Systems Plant, 13000 Eckles Road, Livonia, Michigan.

General Motors Corporation, February 2007, Declaration of Restrictive Covenant, 12950 Eckles Road, Livonia, Michigan, Recorded with the Wayne Country Register of Deeds March 16, 2007, Liber 46089, pp. 412-426.

United States Environmental Protection Agency, May 2007, Administrative Order on Consent, 13000 Eckles Road Property, Livonia, Michigan.

Conestoga-Rovers & Associates, July 2007, Operation and Maintenance Manual, Groundwater Treatment Plant, 12950 Eckles Road, Livonia, Michigan.



SOURCE: USGS QUADRANGLE MAPS;
NORTHVILLE AND WAYNE, MICHIGAN

figure 1.1

SITE LOCATION AND SURROUNDING LAND USE

12950 ECKLES ROAD SITE
13000 ECKLES ROAD SITE
*Livonia, Michigan*



figure 1.2
SITE PLAN
12950 ECKLES ROAD SITE
13000 ECKLES ROAD SITE
Irvonia, Michigan

FIGURE 2.1
RCRA CORRECTIVE ACTION OPERATION, MAINTENANCE, AND MONITORING PLAN IMPLEMENTATION SCHEDULE
U.S. EPA ID NO 006 364 621 - U.S. EPA DOCKET NO. RCRA-05-2007-0008
13000 ECKLES ROAD SITE - GENERAL MOTORS CORPORATION
LIVONIA, MICHIGAN

| ID | Task Name | Duration | Start | Finish |
|----|-----------|----------|-------|--------|
| 1 | Groundwater Monitoring Plan Sampling | 1050 days | Mon 9/1/06 | Fri 9/17/10 |
| 7 | Groundwater Monitoring Plan LNAPL Monitoring | 1111 days | Wed 9/27/06 | Wed 12/29/10 |
| 24 | Annual OM&M Report | 7568 days | Thu 3/1/07 | Mon 3/3/36 |
| 37 | Groundwater Treatment Plant Operation | 7828 days | Mon 1/1/07 | Wed 12/31/36 |

Project: CRA 12607-56-63.mnf    GWTP Operation ▓▓▓    Recurring Tasks ◉

Page 1 of 1
July 2007

FIGURE 2.1
RCRA CORRECTIVE ACTION OPERATION, MAINTENANCE, AND MONITORING PLAN IMPLEMENTATION SCHEDULE
U.S. EPA ID NO 095 364 001 - U.S. EPA DOCKET NO. RCRA-05-2007-0008
13000 ECKLES ROAD SITE - GENERAL MOTORS CORPORATION
LIVONIA, MICHIGAN

| ID | Task Name | Duration | Start | Finish |
|---|---|---|---|---|
| 1 | Groundwater Monitoring Plan Sampling | 1050 days | Mon 9/1/06 | Fri 9/17/10 |
| 7 | Groundwater Monitoring Plan LNAPL Monitoring | 1111 days | Wed 9/27/06 | Wed 12/29/10 |
| 24 | Annual OM&M Report | 7568 days | Thu 3/1/07 | Mon 3/3/06 |
| 27 | Groundwater Treatment Plant Operation | 7828 days | Mon 1/1/07 | Wed 12/31/26 |

Project: CRA 12637-56-ScSched     GWTP Operation     Recurring Tasks

Page 2 of 3
July 2007

FIGURE 2.1
RCRA CORRECTIVE ACTION OPERATION, MAINTENANCE, AND MONITORING PLAN IMPLEMENTATION SCHEDULE
U.S. EPA ID MID 005 356 821 – U.S. EPA DOCKET NO. RCRA-05-2007-0008
13000 ECALES ROAD SITE - GENERAL MOTORS CORPORATION
LIVONIA, MICHIGAN

| ID | Task Name | Duration | Start | Finish |
|---|---|---|---|---|
| 1 | Groundwater Monitoring Plan Sampling | 1050 days | Mon 9/11/06 | Fri 9/17/10 |
| 7 | Groundwater Monitoring Plan LNAPL Monitoring | 1111 days | Wed 9/27/06 | Wed 12/29/10 |
| 26 | Annual OM&M Report | 7568 days | Thu 3/4/07 | Mon 3/9/26 |
| 27 | Groundwater Treatment Plant Operation | 7828 days | Mon 1/2/07 | Wed 12/30/26 |

Project CRA 12607-56-Sched

OWTP Operation

Recurring Tasks

| Area | Chem Group | Chemical | CASRN | Plume Stability Criteria (mg/L) | Risk-Based Criteria (mg/L) |
|---|---|---|---|---|---|
| Area 01 | INORG | Nickel | 7440-02-0 | 1.0E-01 | 2.4E+03 |
| | | | | | |
| AOI 31 | VOC | cis-1,2-Dichloroethene | 156-59-2 | 7.0E-02 | 1.8E+00 |
| AOI 31 | VOC | 1,1,1-Trichloroethane | 71-55-6 | 2.0E-01 | 1.3E+02 |
| AOI 31 | VOC | Trichloroethene | 79-01-6 | 5.0E-03 | 7.9E-01 |
| AOI 31 | VOC | Vinyl Chloride | 75-01-4 | 2.0E-03 | 7.9E-02 |

**Table 2.1 - Groundwater Criteria for Verifying Plume Stability and Evaluating Health Significance**
**GMC - 13000 Eckles Road, Livonia, Michigan**

Notes:

1.  The criteria for verifying plume stability are drinking water criteria.

2.  The risk-based criterion for evaluating health significance for Area 1 is based on construction worker contact with groundwater.

3.  The risk-based criteria for evaluating health significance for AOI 31 are based on the most potential significant exposure among construction worker contact, residential vapor intrusion, residential nonpotable groundwater uses.

TABLE 2.2

RCRA CORRECTIVE ACTION FINANCIAL ASSURANCE COST ESTIMATE
OPERATION, MAINTENANCE, AND MONITORING PLAN
U.S. EPA ID: MID 005 356 621 - U.S. EPA DOCKET NO: RCRA-05-2007-0008
13000 ECKLES ROAD SITE - GENERAL MOTORS CORPORATION
LIVONIA, MICHIGAN

| Item | Estimated Quantity | Unit | Unit Cost | Estimated Total Cost |
|---|---|---|---|---|
| I.   COVER AND BARRIER WALL INSPECTION  (2007 - 2036) | | | | |
| Technician | 10 | hours | $55.97 | $559.70 |
| Project Manager | 5 | hours | $94.27 | $471.35 |
| Disbursements (travel, etc.) | 1 | Lump Sum | $110 | $110.00 |
| | | | I. Subtotal | $1,141.05 |
| | | | | |
| II.  GROUNDWATER COLLECTION AND TREATMENT SYSTEM  (2007 - 2036) | | | | |
| A. Routine Operations and Maintenance | | | | |
| Technician (25 hours per week) | 1300 | hours | $55.97 | $72,761.00 |
| Operator (5 hours per week) | 260 | hours | $86.12 | $22,391.20 |
| Project Manager (1 hr per week) | 52 | hours | $94.27 | $4,902.04 |
| Chemist | 26 | hours | $125.24 | $3,256.24 |
| Discharge Sampling Analytical | | lump sum | | $10,500.00 |
| Monthly Reporting (DWSD) | | lump sum | | $4,000.00 |
| Chemicals/Materials | | lump sum | | $35,000.00 |
| Utilities (electric/gas/refuse/phone/etc.) | | lump sum | | $36,000.00 |
| Permit Renewal | | lump sum | | $1,000.00 |
| Filter Cake Transport | 4 | trip | $200.00 | $800.00 |
| Filter Cake Disposal | 80 | tons | $25.88 | $2,070.40 |
| Filter Cake Container Rental | 12 | month | $250.00 | $3,000.00 |
| | | | | $195,680.88 |
| B. Non-Routine Operations and Maintence | | | | |
| System Repairs (estimate) | | lump sum | | $35,000.00 |
| | | | | $35,000.00 |
| | | | II. Subtotal | $230,680.88 |
| | | | | |
| III. ANNUAL OM&M REPORT (2007 - 2036) | | | | |
| Project Manager | 20 | hours | $94.27 | $1,885.40 |
| Project Engineer | 30 | hours | $69.82 | $2,094.60 |
| Drafting | 5 | hours | $64.12 | $320.60 |
| Support Staff | 5 | hours | $55.00 | $275.00 |
| Data Evaluation and Reporting - Environ | | Lump Sum | | $7,000.00 |
| Public Communications | | Lump Sum | | $500.00 |
| Disbursements (printing, courier charges, etc.) | | Lump Sum | | $800.00 |
| | | | III. Subtotal | $12,875.60 |
| | | | | |
| IV. GROUNDWATER MONITORING PLAN (2007 - 2010) | | | | |
| Technician | 50 | hours | $55.97 | $2,798.50 |
| Project Manager | 15 | hours | $94.27 | $1,414.05 |
| Project Engineer | 10 | hours | $69.82 | $698.20 |
| Chemistry - Setup, Validation, Coordination | 10 | hours | $91.91 | $919.10 |
| Database Management | 7 | hours | $75.84 | $530.86 |
| Laboratory Analytical Costs | | Lump Sum | | $1,300.00 |
| Public Communications | | Lump Sum | | $500 |
| Field Equipment | | Lump Sum | | $1,500.00 |
| Disbursements | | Lump Sum | | $1,000.00 |
| | | | IV. Subtotal | $10,660.71 |

| | |
|---|---|
| SUBTOTAL - ANNUAL ON GOING COSTS (ITEMS I, II, AND III.) | $244,697.53 |
| NET PRESENT WORTH OF ONGOING COSTS - I, II, AND III. (30 years at a discount rate of 5.7%) | $3,677,474.96 |
| SUBTOTAL - ANNUAL ON GOING COSTS (ITEM IV.) | $10,660.71 |
| NET PRESENT WORTH OF ONGOING COSTS - IV. (4 years at a discount rate of 5.7%) | $39,315.82 |
| TOTAL - ALL TASKS | $3,716,790.78 |

Note:  The amount of financial assurance will be decreased by the annual amount each year.