Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Motors Liquidation
Company GUC Trust

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                                      :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **MOTORS LIQUIDATION COMPANY,** *et al.*, | : | **09-50026 (REG)** |
| **f/k/a General Motors Corp.,** *et al.* | : | |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

-------------------------------------------------------------x

**MOTORS LIQUIDATION COMPANY**
**GUC TRUST'S REPLY TO JOSEPH COBBLE JR.'S RESPONSE**
**TO THE 83rd OMNIBUS OBJECTION TO CLAIMS (LIFE INSURANCE**
**CLAIMS OF RETIRED AND FORMER SALARIED AND EXECUTIVE EMPLOYEES)**

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

           The Motors Liquidation Company GUC Trust (the "**GUC Trust**"), formed by the

above-captioned debtors (collectively, the "**Debtors**")[1] in connection with the Debtors' Second

Amended Joint Chapter 11 Plan, dated March 18, 2011 (as may be amended, supplemented, or

modified from time to time), files this reply (the "**Reply**") to the Cobble Response (defined

---

[1]      The Debtors are Motors Liquidation Company (f/k/a General Motors Corporation) ("**MLC**"), MLCS, LLC
(f/k/a Saturn, LLC), MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation), MLC of Harlem, Inc.
(f/k/a Chevrolet-Saturn of Harlem, Inc.), Remediation and Liability Management Company, Inc., and Environmental
Corporate Remediation Company, Inc.

below) interposed to the 83rd Omnibus Objections to Claims (Welfare Benefits Claims of Retired

and Former Salaried and Executive Employees) (ECF No. 6740) (the "**Omnibus Objection**"),

and respectfully represents:

**Preliminary Statement**

1.        The Omnibus Objection seeks the disallowance and expungement of

certain life insurance claims of retired salaried and executive employees of the Debtors on the

basis that such claims relate to unvested welfare benefits that were capable of being modified or

terminated by the Debtors pursuant to the terms of the governing plan documents governing such

welfare benefits, and were modified or terminated in accordance with such governing plan

documents, and therefore should be disallowed and expunged from the claims register.

2.        The Debtors filed the Omnibus Objection on August 20, 2010, and a

hearing on the Omnibus Objection was scheduled for September 24, 2010.  Responses to the

Omnibus Objection were due by September 17, 2010.  The response listed on Annex 1 hereto

and described further herein was filed with respect to the Omnibus Objection (the "**Cobble

Response**") on August 30, 2010 by Joseph W. Cobble, Jr. relating to Proof of Claim 64959 (the

"**Cobble Claim**").  The Debtors adjourned the hearing on the Omnibus Objection with respect to

the Cobble Claim so that they could review its substance in further detail.

3.        After reviewing the Cobble Response, the GUC Trust[2] respectfully

reiterates the Debtors' position in the Omnibus Objection and submits that Mr. Cobble has failed

to provide sufficient legal or factual support for the Cobble Claim, and as a result the Cobble

Claim should be disallowed and expunged.

---

[2] While the Omnibus Objection was filed by the Debtors, this Reply is being filed by the GUC Trust because, pursuant to the Plan, the GUC Trust now has the exclusive authority to prosecute and resolve objections to Disputed General Unsecured Claims (as defined in the Plan).

4.      The Debtors and the GUC Trust are, of course, sympathetic with the impact that the financial problems of the Debtors have had on Mr. Cobble's life insurance benefits.  However, in view of the Debtors' liquidation, there should be no other outcome.

**The Cobble Response**

5.      The Cobble Claim relates to the Debtors' reduction, as of August 1, 2009, of the maximum amount of basic life insurance benefit ("**Continuing Life Insurance**") to $10,000 (self-funded by General Motors Corporation (hereafter "**GM**") and subsequently by General Motors Company ("**New GM**")), which would be paid by GM and subsequently New GM to the beneficiaries of eligible deceased retirees eligible to receive such benefit upon their death (i.e., those whose most recent date of hire (or adjusted service date) was prior to January 1, 1993).

6.      The Cobble Response states opposition to the relief sought in the Omnibus Objection with respect to the Cobble Claim (*see* proof of claim at Ex. 1 attached hereto).  In the Cobble Response, Mr. Cobble opposes the disallowance and expungement of the Cobble Claim on the basis that the claim is for "continuation of an earned and accrued benefit, to wit:  the continuing lifetime coverage and the future payment at the time of [Mr. Cobble's] death of Continuing Life Insurance Benefits in the amount of $122,049.00 pursuant to Debtor's Life and Disability Program."  Mr. Cobble effectively claims that his contractual death benefit is vested rather than unvested.  In support, Mr. Cobble further claims that "said earned and accrued benefit was acknowledged by Debtor in a writing dated April 8, 2002" (after Mr. Cobble had retired from employment with the Debtors), a copy of which is attached to the Cobble Response (the "**Retiree Servicing Center Letter**").  The Retiree Servicing Center Letter includes the following language:

> "Our insurance records, as of the date of this letter, show the
> Continuing Life Insurance has now fully reduced to the ultimate
> amount of $122,049.00.  This ultimate amount will remain in
> effect for the rest of your life and is provided by General Motors at
> no cost to you."

The letter goes on to say:

> "This is not a guarantee of the coverage amount."

7.      In the Cobble Response, Mr. Cobble does not provide any explanation for

why the Retiree Servicing Center Letter should be read as ensuring the vesting of a benefit,

rather than a mere acknowledgement by his former employer of the reduction of a lifetime death

benefit amount in accordance with the written terms of the applicable life insurance plan then in

effect and subject to the plan sponsor's continuing right to change the terms of the life insurance

plan.

### The Cobble Claim Should Be Disallowed and Expunged

8.      Mr. Cobble has failed to demonstrate the validity of the Cobble Claim and,

thus, the Cobble Claim should be disallowed and expunged.  *See, e.g.*, *In re Oneida, Ltd.*, 400

B.R. 384, 389 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 09 Civ. 2229 (DC), 2010 WL 234827

(S.D.N.Y. Jan. 22, 2010) (claimant has burden to demonstrate validity of claim when objection is

asserted refuting claim's essential allegations).

(A)     **Neither the Debtors' Salaried Life Insurance Plan Nor the Retiree Servicing Center
        Letter Provide Mr. Cobble With a Permanent Contractual Right to Continuing Life
        Insurance Benefits at a Guaranteed Amount**

9.      In the Cobble Response, Mr. Cobble provides a copy of his Retiree

Servicing Center Letter, from the GM National Retiree Servicing Center ("**Retiree Servicing**

**Center**").  GM self-administered its life insurance benefits until some point in the 1990s, at

which time it transferred administration of life insurance benefits to MetLife, a third party

administrator.  To enable MetLife to be readily identifiable as GM's administrator for life

insurance benefits, GM permitted MetLife to use the prior name of their internal benefits

administrator, the General Motors National Benefits Center and/or Retiree Servicing Center.

10.     Retiree Servicing Center Letters were routinely sent out by mail by the

Retiree Servicing Center to each retiree of General Motors Corporation entitled to a Continuing

Life Insurance benefit (which was a continuation of the retiree's basic life insurance benefit

offered to them while they were active employees).  The Retiree Servicing Center Letters were

routinely sent out at the time that a scheduled reduction to the retiree's Continuing Life

Insurance benefit had reduced to the maximum amount pursuant to the terms then in effect under

the General Motors Life and Disability Benefits Program for Salaried Employees, as amended

from time to time ("**Debtors' Salaried Life Insurance Plan**").

11.     After stating the amount of the Continuing Life Insurance benefit

applicable to Mr. Cobble as of the date he received the Retiree Servicing Center Letter, Mr.

Cobble's Retiree Servicing Center Letter states that "this is not a guarantee of the coverage

amount."  Among other reasons, such explicit qualification indicates that GM did not intend by

the Retiree Servicing Center Letters to vest Mr. Cobble, or other retirees receiving such letters,

with a permanent benefit, but rather reserved their right to modify the Continuing Life Insurance

benefits at any time, just as GM had clearly and unambiguously reserved its right to amend the

Debtors' Salaried Life Insurance Plan at any time in the Debtors' Salaried Life Insurance Plan .

In the Cobble Response, Mr. Cobble does not take account of this right to amend or terminate the

Continuing Life Insurance benefits at any time, as had been represented to him in employee

benefits handbooks and summary plan descriptions provided to him by GM from time to time

throughout the course of his employment and following his retirement.

12. The Retiree Servicing Center Letters were not approved by the Board of Directors of GM at any time. They were not authorized amendments of the Debtors' Salaried Life Insurance Plan or modifications of the Continuing Life Insurance benefits. They were merely a communication with Mr. Cobble with respect to a change in the current terms of his Continuing Life Insurance.

13. The Omnibus Objection explains that the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), comprehensively regulates employer-provided welfare benefit plans, such as Debtors' Salaried Life Insurance Plan, and that ERISA does not require an employer to provide or to vest welfare benefits. Accordingly, employers "*are generally free under ERISA, for any reason at any time, to adopt, modify or terminate welfare plans.*" *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995); see also *Joyce v. Curtiss-Wright Corp.,* 171 F. 3d 130, 133 (2d Cir. 1999) *(stating the general rule that under ERISA an employer welfare plan is not vested and that an employer has the right to terminate or unilaterally amend the plan at any time).* Welfare benefits provided under the terms of a welfare benefit plan may therefore be reduced or forfeited in accordance with the terms of the applicable welfare benefits plan. 29 U.S.C. § 1051(1); *see Moore v. Metro. Life Ins. Co.*, 856 F.2d 488, 491 (2d Cir. 1988).

14. The Debtors clearly and unambiguously reserved their right to amend or terminate the Continuing Life Insurance benefit under the terms of Debtors' Salaried Life Insurance Plan documents and the summary plan descriptions of the plan provided and made available to Mr. Cobble during his employment period, and therefore, neither the Retiree Servicing Center Letters nor the plan documents create any vested contractual rights to the

Continuing Life Insurance benefits.  Section 3.05 of the most recent restatement of the Debtors'

Salaried Life Insurance Plan, as amended effective January 1, 2007, provides:

> The Corporation reserves the right to amend, modify, suspend or terminate the Program in whole or in part, at any time by action of its Board of Directors or other committee or individual expressly authorized by the Board to take such action.  The benefits available to Employees are determined solely by the terms of this Program. Absent express delegation of authority from the Board of Directors, no one has the authority to commit the Corporation to any benefit or benefit provisions not provided under the terms of this Program.

Because ERISA does not require the vesting of welfare benefits, such provision reserved

Debtors' right to modify Continuing Life Insurance benefits by amendment of the Program.

Moreover, the Debtors could terminate the Program.  Clearly, no vested rights were created

under the Program.  The following reservation of rights to amend or terminate benefits is

prominently stated on the second page of a recent benefits handbook for salaried retirees

containing the summary plan description of Debtors' Salaried Life Insurance Plan:

> General Motors Corporation reserves the right to amend, change, or terminate the Plans and Programs described in this booklet.  The Plans and Programs can be amended only in writing by an appropriate committee or individual as expressly authorized by the Board of Directors.  No other oral or written statements can change the terms of a benefit Plan or Program.

The same or substantially similar reservation of rights language is prominently stated on the

second page of benefits handbooks for salaried retirees issued by the Debtors in 1996, 2000, and

2005.  Mr. Cobble's Retiree Servicing Center letter is dated April 8, 2002.  Mr. Cobble was

therefore clearly on notice of these reservation of rights, as he will have seen them prominently

displayed in the benefits handbooks for salaried retirees that he received along with every other

retiree with such benefits on the schedule set out above.

US_ACTIVE:\43864645\03\72240.0639

15.    On the basis of such language, the Sixth Circuit in *Sprague* reviewed the

plan documents and summary plan descriptions of certain of the Debtors' salaried welfare

benefits plans, as contained in benefits handbooks regularly provided by Debtors to their

employees and retirees, and concluded that the Debtors' salaried welfare benefits plans explicitly

permitted the Debtors to unilaterally amend, terminate or modify the salaried welfare benefits

provided under such plans.  The Sixth Circuit's opinion in Sprague contains the following

description of the Debtors' reservation of rights to change or terminate health care benefits at any

time, which reservation would have equally pertained to the right to change or terminate life

insurance benefits, the summary plan description of which was contained in the same booklet as

contained the summary plan description of the health plan.

> "GM has long made it a practice to inform its salaried employees
> and retirees of their health care coverage by providing them
> booklets containing summaries of the company's health insurance
> policies and programs.  Prior to 1974 GM put out a booklet entitled
> "The GM Insurance Program for Salaried Employees."   After
> ERISA took effect in 1974 the booklet became "Highlights of
> Your GM Benefits."  Beginning in 1977, GM also issued a booklet
> called "Your Benefits in Retirement."  Each of these publications
> went through a series of different editions […] and most of the
> booklets also put plan participants on notice of GM's right to
> change or terminate the health care plan at any time:
>
>> "General Motors believes wholeheartedly in this Insurance
>> Program for GM men and women, and expects to continue
>> the Program indefinitely. However, GM reserves the right
>> to modify, revoke, suspend, terminate, or change the

> Program, in whole or in part, at any time...." The General Motors Insurance Program for Salaried Employees (1965, 1968, and 1971).
>
> "General Motors Corporation reserves the right to amend, change or terminate the Plans and Programs described in this booklet." Your GM Benefits (1985).
>
> "The Corporation reserves the right to amend, modify, suspend, or terminate its benefit Plans or Programs by action of its Board of Directors.' Your Benefits in Retirement (1985)."

*Sprague v. Gen. Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) at 400.[3]"

16.     As evidenced by the description set forth in *Sprague* and as confirmed by the Debtors, GM had a long-term practice of providing explicit notice to participants of their reservation of rights to amend or terminate salaried welfare benefits at any time through the issuance of benefits handbooks to both active and retired employees on a regular basis spanning over a period of 37 years or more (i.e., since at least 1974).  This means that Mr. Cobble would have been on notice from the start of and through the end of his career with General Motors Corporation that his employer had reserved its rights to amend or terminate his basic life insurance benefit and/or his Continuing Life Insurance benefit.

17.     Each summary plan description of the Debtors' Salaried Life Insurance Plan contained in the employee handbooks issued over the years has contained a description of the Continuing Life Insurance benefits and an explanation of the manner in which the Continuing Life Insurance benefits were to be reduced upon or during the retirement of a retiree.  Pursuant to the terms of the Debtors' Salaried Life Insurance Plan, the Continuing Life Insurance benefit

---

[3] The Sixth Circuit found: "Most of the summary plan descriptions unambiguously reserved GM's right to amend or terminate the plan.  For example: 'General Motors Corporation reserves the right to amend, change or terminate the Plans and Programs described in this booklet.'  Your GM Benefits (1984) [and] 'The Corporation reserves the right to amend, modify, suspend or terminate the Program in whole or in part, at any time, by action of its Board of Directors.'  Your Benefits in Retirement (1985)." 133 F.3d at 400.

was, upon retirement or age 65, subject to reduction in the case of all of the Debtors' retirees

eligible for such benefit depending on when the retiree retired.  The terms of such reductions in

effect under the Debtors' Salaried Life Insurance Plan immediately prior to the commencement

of these chapter 11 cases are set forth in Appendix A hereto.  The fact that different groups of

retirees were subject to different rates of reduction reflects the fact that the Debtors' Salaried

Life Insurance Plan had been amended many times previously, each amendment of which would

have modified, i.e, increased or reduced, the Continuing Life Insurance benefits applicable to

different groups of retirees.  Mr. Cobble does not question the right of the Debtors to have

modified their Continuing Life Insurance benefits for better or worse at any time prior to the

commencement of these chapter 11 cases.

18.    Following approval by the Employee Benefits Plans Committee of

Debtor's Board of Directors, the Debtors reduced to $10,000 the maximum amount of the

Continuing Life Insurance benefit that would be paid by the Debtors (and subsequently by New

GM) to the beneficiaries of a retiree eligible to receive such benefit upon death (i.e., those whose

most recent date of hire (or adjusted service date) was prior to January 1, 1993).  The reduction

was effected by amendment of the Salaried Life Insurance Plan made by the Employee Benefits

Plans Committee of Debtor's Board of Directors on June 19, 2009, who had been expressly

delegated by the Board of Directors the authority to amend the Debtors' welfare benefit plans.

19.    Pursuant to the terms of the Debtors' Salaried Life Insurance Plan, upon

attaining age 65, retirees were no longer required to make contributions to maintain their

Continuing Life Insurance benefits.  Reduction of the maximum amount of the Continuing Life

Insurance benefits has not changed this fact.

(B)    **Retirees Were Offered An Opportunity to Supplement Continuing Life Insurance**

20.     In a letter announcing the reduction in Continuing Life Insurance benefits

sent to all of the Debtors' salaried retirees in June 2009, the Debtors provided retirees with the

opportunity to supplement the reduced amount of their Continuing Life Insurance benefit by

enrolling in a voluntary life insurance program through MetLife.  Eligibility to participate in the

program did not require proof of good health.  During the first two years of participation in the

program, the death benefit available would to be equal to the amount of the premiums paid by

retirees.  Following two years of premium contributions, the full amount of coverage elected

would be payable in the event of the retiree's death.   By virtue of the supplemental program, Mr.

Cobble was fully eligible, at his cost, to continue to be covered by life insurance benefit at the

same level as prior to the reduction in his Continuing Life Insurance.

(C)     **The Retiree Servicing Center Letters Are Neither Summary Plan Descriptions Nor Summaries of Material Modifications**

21.     ERISA provides that the contractual rights established under a welfare

benefits plan must be in writing and contained in the plan document for the welfare benefits plan,

and furthermore, requires that a welfare benefits plan sponsor provide a summary plan

description (and as necessary, summaries of material modifications) of the plan and the terms of

benefits provided under the plan to participants of the plan; however, the summary plan

description does not establish any contractual rights not provided by the plan document. *Cigna*

*Corp. v. Amara*, *000 U.S. 09-804 (2011)* (holding that a summary plan description has no

contractual authority because it does not constitute a part of the plan document; however, plan

participants may seek appropriate equitable relief in the case of a false or misleading summary

plan description).  Communications from the plan sponsor to plan participants, such as the

Retiree Servicing Center Letter received by Mr. Cobble, are neither summary plan descriptions

nor summaries of material modifications.  Even so, by the reasoning of *Amara*, Mr. Cobble's

Retiree Servicing Center Letter does not supersede the terms of the Debtors' Salaried Life

Insurance Plan, which provided the Debtors the right to amend, modify or terminate the

Continuing Life Insurance benefits at any time.

           22.    In the Cobble Response, Mr. Cobble has not provided any evidence that

contradicts the Debtors' common practice of advising participants of the Debtors' Salaried Life

Insurance Plan of the Debtors' right to amend or terminate the Continuing Life Insurance

benefits at any time.  Moreover, Mr. Cobble has not provided any evidence of an affirmative

contractual obligation on the part of the Debtors separate from the terms of Debtors' Salaried

Life Insurance Plan to permanently provide the same level of Continuing Life Insurance benefits

specifically to Mr. Cobble.  Mr. Cobble's Retiree Servicing Center Letter refers to and explains a

"Continuing Life Insurance" benefit, which appearing as a capitalized term explicitly relates to,

and is one and the same with, the basic life insurance benefit provided to Debtors' retirees

pursuant to Debtors' Salaried Life Insurance Plan.  Mr. Cobble should readily have recognized

"Continuing Life Insurance" as a defined term of the Debtors' Salaried Life Insurance Plan, of

which he would have been familiar by having read, over the past 37 years or more, employee

benefits handbooks and summary plan descriptions of the Continuing Life Insurance.  That the

Retiree Servicing Center Letter states that the maximum amount is not a "guarantee of the

coverage amount" indicates that the maximum amount was itself subject to modification at any

time and reinforced that Debtors had reserved their right to amend the Continuing Life Insurance

benefit at any time.  Therefore, the Retiree Servicing Center Letter could not serve to have vested

Mr. Cobble in any new life insurance obligations on the part of the Debtors.  As such, the

Continuing Life Insurance benefits were fully subject to the terms of the Debtors' Salaried Life

Insurance Plan and could not have been subject only to the terms set forth on the single page of the Retiree Servicing Center Letter.

(D)     **The Retiree Servicing Center Letter Does Not Create a New Contract With Mr. Cobble**

23.     The Retiree Servicing Center Letter was sent to Mr. Cobble after his retirement, during a period which he was no longer providing services to the Debtors, and therefore cannot reasonably be construed as an inducement for Mr. Cobble to provide new services to the Debtors, or to retire. Indeed, the Debtors never used the provision of permanent, unalterable welfare benefits as a form of consideration inducing retirement. Rather, even for employees who elected to participate in early retirement window programs, consideration for which was typically in cash, retiree medical, life insurance and all other welfare benefits would have been the same following retirement as for regular retirees. Given such treatment, there would be no reason to provide any separate communication to window program participants with respect to their welfare benefits, such as a letter promising guaranteed lifetime benefits.

24.     The Retiree Servicing Center Letter does not contain any language establishing it as a new contract between Mr. Cobble and his former employer. To establish the Retiree Servicing Center Letter as such, under the standard of the Second Circuit, Mr. Cobble "must first identify 'specific written language that is reasonably susceptible to interpretation as a promise.'" *Devlin v. Empire Blue Cross and Blue Shield, 274 F.3d 76, 83 (2nd Cir. 2001)(quoting Joyce*, 171 F.3d at 134).

25.     The Second Circuit in *Devlin* discussed that the offering of a benefit that could have been susceptible to induce employees to perform without having been negated by the employer's reservation of its right to amend or terminate the benefit (which Empire's pre-1987

summary plan description had not done) was an example of language that is reasonably

susceptible to interpretation as a promise:

> "Plaintiffs direct our attention to two sentences within the pre-1987 [summary plan description]s. The first provides that 'retired employees, after completion of twenty years of full-time permanent service and at least age 55 will be insured.' J.A. at 522 (emphasis added).   We believe that this statement can be reasonably read as promising such insurance so long as employees retire after age 55 and have provided full-time permanent service to Empire for at least twenty years.   This provision can be construed as an offer that specifies performance as the means of acceptance -- sometimes referred to as an offer for a unilateral contract -- and promises lifetime life insurance benefits upon performance.  Therefore, by 'performing' (that is, working for at least twenty years until attaining the age of 55), the plaintiffs accepted this offer. Restatement (Second) of Contracts 45(1) (1981). Where the offeror did not explicitly reserve the power to revoke, such an offer cannot be revoked once the offeree has begun to perform. See id. 45 & cmt. d ('The beginning of performance . . . completes the manifestation of mutual assent and furnishes consideration.').   Therefore, Empire's reliance on its 1987 [summary plan description], 'Your Handbook,' for its reservation of the right to modify the life insurance benefits is unavailing. We reject Empire's argument because after the plaintiffs began performance, pursuant to the pre-1987 [summary plan description]s, Empire was not free to revoke." *Id*. at 84.

Contrary to the facts with respect to Empire's failure to reserve its right in pre-1987 summary

plan descriptions to amend or terminate the life insurance benefit, the Debtors have had a long-

term practice over at least the past 37 years, and most likely for an even longer period of time, to

provide explicit notice in each of their summary plan descriptions of their right to amend or

terminate life insurance benefits at any time.  Moreover, by the time that Mr. Cobble had

received the Retiree Servicing Center Letter in question, he had since retired and could no longer

be induced to perform any services for the Debtors, nor be induced to retire a second time, and

so, the contents of the Retiree Servicing Center Letter could not have been susceptible to

interpretation as a promise.

(E)    **No Promise To Provide Permanent Life Insurance Benefits Was Made To Mr. Cobble**

26.    Though Mr. Cobble has not made any such argument or suggestion, it cannot be said that Mr. Cobble relied on the qualified statement made in the Retiree Servicing Center to his detriment.  In order to prevail on a claim of promissory estoppel under ERISA in the Second Circuit, Mr. Cobble must establish:  "(1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced."  *Aramony v. United Way Replacement Benefit Plan, 191 F.3d 140, 151 (2d Cir. 1999) (quoting Schonholz v. Long Island Jewish Med. Ctr., 87 F.3d 72, 79 (2d Cir. 1996).*  Additionally, "an ERISA plaintiff must 'adduce[…] not only facts sufficient to support the four basic elements of promissory estoppel, but facts sufficient to [satisfy an] 'extraordinary circumstances' requirement as well.'"  *Aramony, 191 F.3d at 151 (quoting Devlin v. Transp. Comms. Int'l Union, 173 F.3d 94, 102 (2d Cir. 1999)).*  The Second Circuit in *Devlin* cited that "*Schonholz* provides an example of such extraordinary circumstances, where the employer used promised severance benefits to induce the plaintiff to retire."  *Devlin, 274 F.3d at 86 (quoting Schonholz, 87 F.3d at 79-80).*

27.    With respect to the Cobble Claim, there was no promise to provide permanent basic life insurance benefits at the same level where the Debtors had provided explicit notice to Mr. Cobble, over the past 37 years or more, that they could amend or terminate the basic life insurance benefits at any time.  Because there was no promise of a permanent benefit, there could be no reliance on such promise.  It has been demonstrated that the Retiree Servicing Center Letter itself did not create a separate obligation on the Debtors to provide a benefit separate from benefits offered under Debtors' Salaried Life Insurance Plan, and as such, the Retiree Servicing Center Letter in and of itself could not have created a promise or any reliance upon a promise.  Even supposing that Mr. Cobble had relied on the continuation of basic life

insurance at the level stated in the Retiree Servicing Center Letter, any such reliance was

mitigated by the opportunity provided by the Debtors to elect voluntary life insurance to

supplement the reduced Continuing Life Insurance.

28.    Nor were there any facts that may separately support the existence of

extraordinary circumstances in the case of either the Retiree Servicing Center Letter or the

reduction in 2009 of the Continuing Life Insurance.  Basic life insurance is a benefit that is

commonly provided by employers on an unvested basis, and is accordingly assumed by most

employees and retirees to be a benefit that could be lost at any time, absent an extraordinary

circumstance, such as a separate, express contractual commitment.  With respect to the Cobble

Claim, Mr. Cobble has not suggested any extraordinary circumstances with respect to his right to

Continuing Life Insurance, such as receiving it as an inducement to enter into employment or to

retire early.  No such extraordinary circumstance could exist where the Debtors have clearly and

unambiguously represented to their employees and retirees over the past 37 years or more of

their right to amend or terminate life insurance benefits at any time.  Moreover, at the time that

Mr. Cobble received the Retiree Servicing Center Letter and at the time that the Debtors

provided notice in June 2009 to Mr. Cobble of the reduction in their Continuing Life Insurance

benefits, Mr. Cobble had already retired and could therefore neither have been induced to

perform (i.e., in a manner discussed by *Devlin*, *supra*) or otherwise made to rely in any manner

constituting an extraordinary circumstance.

### Conclusion

29.    Because (i) ERISA recognizes that employers are free to amend or

terminate welfare benefits, (ii) the Debtors had explicitly reserved their right to amend, modify

or terminate the Continuing Life Insurance benefits at any time, (iii) the Retiree Servicing Center

Letters do not establish any contractual rights to vested Continuing Life Insurance benefits, and

(iv) Mr. Cobble has not provided evidence of any permanent contractual right to vested

Continuing Life Insurance benefits, whether at the levels stated in the Retiree Servicing Center

Letter that applied at the time it was written or otherwise; the Debtors and the GUC Trust have

no liability for the Cobble Claim.  The GUC Trust reiterates that the Cobble Response has not

provided any legal or factual support for the Cobble Claim and cannot be afforded prima facie

validity under the Bankruptcy Code.  Accordingly, the Cobble Claim should be disallowed and

expunged in its entirety.

WHEREFORE, for the reasons set forth above and in the Omnibus Objection, the

GUC Trust respectfully requests that the Court grant the relief requested in the Omnibus

Objection and such other and further relief as is just.

Dated: New York, New York
       December 31, 2011

/s/ Joseph H. Smolinsky
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Motors Liquidation
Company GUC Trust

**Appendix A**

Pursuant to the terms of Debtors' Salaried Life Insurance Plan, and as fully described to participants in summary plan descriptions of the plan, the Continuing Life Insurance benefit was, upon retirement or age 65, subject to reduction in the case of all of the Debtors' retirees eligible for such benefit depending on when the retiree retired, as follows:

(i)      Category I:  If the retiree's most recent date of hire (or adjusted service date) was on or after January 1, 1993, the retiree was not eligible for a Continuing Life Insurance benefit following retirement.

(i)      Category II:  If the retiree's most recent date of hire (or adjusted service date) was prior to January 1, 1993 and the retiree retired prior to May 1, 2007, the amount of the retiree's Continuing Life Insurance benefit was to be reduced immediately upon retirement to an amount equal to 1-1/2% for each year of the retiree's participation in Debtors' Salaried Life Insurance Plan (i.e., for each year of service to Debtors) times the amount of the retiree's basic life insurance benefit in force immediately prior to retirement (but not less than $5,000), and would be reduced an additional 50% on May 1, 2017 (but not less than $25,000).

(iii)      Category III:  If the retiree's most recent date of hire (or adjusted service date) was prior to January 1, 1993 and the retiree retired on or after May 1, 2007, the amount of the retiree's Continuing Life Insurance benefit was to be reduced immediately upon retirement to an amount equal to the lesser of one times the retiree's annual base salary at the time of retirement and $200,000, and would be reduced an additional 50% on the tenth anniversary of the date of retirement (but not less than $25,000).

(ii)      Category IV:  If the retiree last worked on or after July 1, 1985 and prior to January 1, 1994, the amount of the retiree's Continuing Life Insurance benefit was the amount of the retiree's basic life insurance in effect immediately prior to the earlier of age 65 or

retirement to be reduced by 2% each month beginning on the earlier of age 65 or retirement, which successive reduction would continue until the amount of the Continuing Life Insurance benefit equaled the amount of basic life insurance in force immediately prior to when the amount began to reduce times 1-1/2% for each year of the retiree's participation in Debtors' Salaried Life Insurance Plan (i.e., for each year of service to Debtors).

(iii)    Category V:  If the retiree last worked prior to July 1, 1985, the amount of the retiree's Continuing Life Insurance benefit was the amount of the retiree's basic life insurance in effect immediately prior to age 65 to be reduced by 2% each month commencing at age 65.

**Annex 1**

| 83rd Omnibus Objection to Claims (Welfare Benefits Claims of Retired and Former Salaried and Executive Employees) | | | | | |
|------|-----------------------------|----------------------------|-----------------|------------------|-----------|
| No. | Proof of Claim No. | Response Docket No. | Name | Total Claimed | Summary |
| 1. | 64959 | 7074 | Joseph Cobble Jr. | $112,049.00 (U) | Mr. Cobble's response asserts that his welfare benefits were earned based upon thirty-two years of employment with the Debtors, and that such welfare benefits were earned and accrued as acknowledged in a letter from the "Retiree Servicing Center" dated April 8, 2002. |