**Exhibit 1**

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Motors Liquidation
Company DIP Lenders Trust

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
:
**In re**                                             :    **Chapter 11 Case No.**
:
**MOTORS LIQUIDATION COMPANY,** *et al.*,  :    **09-50026 (REG)**
    f/k/a General Motors Corp., *et al.*    :
:
                                    Debtors.    :    (Jointly Administered)
:
------------------------------------------------------------x

**DECLARATION OF BRIAN ROSENTHAL IN SUPPORT OF MOTORS LIQUIDATION COMPANY DIP LENDERS TRUST'S RESPONSE IN OPPOSITION TO MOTION OF THE REVITALIZING AUTO COMMUNITIES ENVIRONMENTAL RESPONSE TRUST FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105 AND 1142 TO ENFORCE THE DEBTORS' PAYMENT OBLIGATIONS UNDER THE SECOND AMENDED JOINT CHAPTER 11 PLAN AND THE CONFIRMATION ORDER**

Brian Rosenthal, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I have personal knowledge of all items asserted in this declaration. I am currently an employee of Alix Partners LLP. From July 10, 2009 through December 15, 2011, I was a member of the management team of Motors Liquidation Company ("**MLC**" or the "**Debtors**") and principally responsible for MLC's treasury operations. In this role, I managed all banking, escrow, and brokerage accounts and the investment of MLC funds and was actively involved in the creation and purchase of the treasury securities portfolio that was transferred to the

environmental response trust, now known as the Revitalizing Auto Communities Environmental Response Trust ("**RACER**" or the "**Trust**") on March 31, 2011, the effective date of the Debtors' confirmed plan (the "**Effective Date**"). As a member of MLC's finance and accounting team, I worked closely with Jim Selzer, MLC's Vice President and Treasurer and acting Chief Financial Officer ("**Selzer**"), and Scott Hamilton, MLC's acting controller, in preparing the Effective Date funds flow schedule and processing the transfer of cash and treasury securities to RACER's accounts.

2.  From the time leading up to the commencement of the Chapter 11 cases through April 2010, MLC engaged with various States, the Saint Regis Mohawk Tribe and the United States (collectively the "**Settling Governments**") to assess the costs to remediate environmental contamination at MLC's owned properties that were ultimately transferred to RACER.

3.  These settlement efforts allowed Debtors and the Settling Governments to refine their environmental cost projections and scopes of investigation, remediation and monitoring for MLC's owned real properties such that, by April 2010, the Debtors' and the Settling Governments' respective projections of the Debtors' total remediation liabilities were materially aligned. These cost projections and scopes of remediation, which include projected time frames for environmental investigation, cleanup and monitoring, are the basis for the various funding values contained in the Environmental Response Trust Consent Decree and Settlement Agreement Among Debtors, the Environmental Response Trust Administrative Trustee, the United States, the States of Delaware, Illinois, Indiana, Kansas, Michigan, Missouri, New Jersey, New York, Ohio, Wisconsin, Commonwealth of Virginia, the Louisiana Department of Environmental Quality, the Massachusetts Department of Environmental Protection, the Department of Environmental Protection of the Commonwealth of Pennsylvania and the Saint

Regis Mohawk Tribe (the "**Settlement Agreement**") entered into on October 20, 2010. Attached hereto as Exhibit A is a true and correct copy of excerpts of the Settlement Agreement.

4. MLC and the United States Department of Treasury ("**Treasury**"), which provided the majority of financing for MLC's wind-down budget, including the funding that MLC would ultimately transfer to RACER, recognized the potential for inflation to materially erode the Trust's ability to fulfill its mandate to remediate the properties and return them to productive use. As such, MLC gave careful attention to earning a rate of return on the monies it held so as to defease the risk that inflation posed on the funds that would be transferred to RACER at an unknown future date.

5. Beginning in May 2010 and continuing through September 2010, MLC examined a number of possibilities to ensure necessary funding for RACER's future activities and to match a rate of return with inflation and concluded that the best option was to construct a portfolio of securities that primarily would consist of a series of Treasury Inflation-Protected Securities ("**TIPS**")[1] with laddered maturity dates matched to the anticipated timing of RACER's remedial and administrative expenditures. Throughout this process, MLC consulted with JP Morgan Asset Management and Mesirow Financial to confirm the soundness of MLC's investment plan to fund RACER.

6. Treasury designed TIPS to provide protection against inflation. The principal of a TIPS increases with inflation and decreases with deflation, as measured by the Consumer Price Index. The quoted market price of a TIPS will fluctuate over time based on a variety of factors and on any given date can be less than, equal to, or greater than the face value. When a TIPS matures, the holder is paid the adjusted principal or original principal, whichever is greater. Therefore, at

---

[1] For ease of reference, I refer to all securities that MLC transferred to RACER cumulatively as TIPS.

maturity, the holder can redeem the TIPS for no less than par value.  TIPS also pay interest twice a year, at a fixed rate.  See http://www.treasurydirect.gov/indiv/products/prod_tips_glance.htm (providing more information on TIPS).

7.  In July and August 2010, MLC met with Treasury to explain its conclusion that investing in a laddered portfolio of TIPS securities would mitigate the inflation risk facing RACER.

8.  After a period of internal review, Treasury advised MLC in August 2010 that the Treasury concurred with MLC's decision to purchase TIPS to fund remedial, monitoring and administrative activities at the properties that would ultimately be transferred to RACER.

9.  Following the Treasury's approval, MLC made similar presentations to the United States Trustee for the Southern District of New York and advisors to the Official Committee of Unsecured Creditors in August 2010.  Both concurred with MLC's recommendation with respect to funding RACER with TIPS.

10. On September 2, 2010, as required by MLC's Debtor-in-Possession Credit Agreement, MLC filed a Statement/Notice of Third Amendment to DIP Credit Facility with the Court providing for investment in Treasury securities with maturities of up to 15 years, solely for the purpose of purchasing the TIPS that would ultimately be transferred to RACER.  (Debtor's Third Amendment to Amended and Restated Secured Superpriority Debtor-in-Possession Credit Agreement ¶ 1 (**ECF No. 6846**)).

11. The Debtors used a conservative approach in designing the laddered TIPS portfolio for RACER in order to ensure that the Trust would not have to sell TIPS before they matured.  On October 12, 2010, MLC purchased the TIPS that it would use to fund RACER.  Attached hereto as Exhibit B is a true and correct copy of the Schedule of Investments Transferred to RACER Trust as of March 31, 2011.

12. MLC purchased the TIPS that would be transferred to RACER with the intent that the investments would be transferred to RACER and held until maturity. Generally Accepted Accounting Principals ("**GAAP**") required MLC to value its investments in "held-to-maturity securities" at amortized cost.

13. If RACER holds the TIPS it received from MLC to maturity, as it says it intends to do, the full faith and credit of the United States guarantees RACER as the holder of TIPS a payment of the adjusted principal or original principal, whichever is greater, upon maturity. (Hamilton Decl. ¶ 7).

14. The Debtors reported the value of the TIPS at amortized cost in Monthly Operating Reports filed with the Court and in monthly 8-Ks filed with the Securities and Exchange Commission and disclosed in a footnote the difference between quoted market value of the TIPS and the amortized cost basis. Attached hereto as Exhibit C are true and correct copies of excerpts of the Debtors' Monthly Operating Reports for the period from October 2010, when the TIPS were purchased, through the end of February 2011. Every one of these Monthly Operating Reports states that the maturities of the TIPS correspond to expected future cash requirements to fund the environmental obligations.

15. Scott Hamilton ("**Hamilton**"), RACER's declarant and current Chief Financial Officer, formerly served as MLC's controller from July 2009 to June 1, 2011. Hamilton prepared the Debtors' Monthly Operating Reports shown in Exhibit C.

16. RACER is the post-Effective Date extension of MLC simplified to remove the bankruptcy and claims management aspects. Prior to the March 31, 2011 Effective Date MLC "replicated" all of its operations and activities with only minor changes to create the enterprise called RACER. Virtually all of the personnel currently employed by RACER, except AP

5

Services LLC[2] employees, were transferred to RACER on the Effective Date or within 60 days of the Effective Date. Hamilton, an AP Services employee and the former controller of MLC, was hired by RACER. To my knowledge: (i) RACER generally has continued to implement the MLC remediation tasks and plans, (ii) RACER closed on several property sales for which MLC had executed the purchase and sale agreements, (iii) RACER continues to use the accounting, purchasing, budgeting, cash management and other systems MLC developed for it, and (iv) RACER continues to employ and/or contract with the majority of the administrative and field staff transferred to it on the Effective Date.

17. Elliott P. Laws ("**Laws**") and Michael O. Hill ("**Hill**") manage the Environmental Response Trust Administrative Trustee (the "**Trustee**"), which manages RACER's operations. Prior to funding and transferring assets to RACER, MLC spent an extensive amount of time with Laws and Hill so that they understood the scope and detail of the continuing operations that RACER would be taking over from MLC. This education process began soon after the appointment of the Trustee by the United States in approximately August or September 2010.

18. In meetings, presentations and numerous pre-Effective Date writings, MLC explained to the Trustee that MLC would fund RACER in part by transferring the TIPS securities that MLC had purchased in October 2010. For example, in a meeting on or about November 19, 2010, Hill and Laws conducted a full day of diligence at MLC's Detroit, Michigan headquarters. During that meeting, MLC, including Hamilton in his capacity as controller, discussed the rationale for funding RACER using the recently purchased TIPS portfolio. Attached hereto as <u>Exhibit D</u> is a true and correct copy of excerpts of the November 19, 2010 MLC Finance and Administration Presentation to the Trustee.

---

[2] AP Services, LLC is a wholly owned subsidiary of AlixPartners, LLP.

19. Beginning in late November 2010, in consultation with Hill and Laws, MLC began to research setting up cash management and investment accounts and accounting systems structures on behalf of RACER. These discussions included myself, Selzer, Hamilton, Hill, Laws, and MLC Executive Vice President Ted Stenger. This group conducted in-depth analysis of various financial institutions including interviews and formal requests for proposals. Hill and Laws were intimately involved in this process, including conducting their own interviews and making independent decisions. Further, structuring the custodial accounts involved over 15 separate meetings or calls with Laws, Hill, or Hill's associate concerning establishing new accounts at a financial institution and concluded in late March 2011. This process included establishing custodial accounts to receive the Treasury investments made by MLC, which would have been unnecessary if the Trustee expected to receive only cash on the Effective Date.

20. Attached hereto as <u>Exhibit E</u> is a true and correct copy of excerpts of the Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan, setting forth the Opening Statement of Net Assets (Liabilities) of the Debtors and Trusts Projection Notes and Assumptions (**ECF No. 8023**), stating that the "Cash and cash equivalents" going to the Trust "represent[] cash and investments in U.S. Treasury or U.S. Treasury backed securities with a maturity of 15 years or less."

21. On March 31, 2011, the Debtors transferred at least $625,234,945 of value to RACER in the form of $49,896,945 in cash and $575,338,000 in Treasury securities, consisting primarily of TIPS as valued on an amortized cost basis,[3] as well as short-term Treasury Securities, cash and other assets.

---

[3] Amortized cost value includes approximately $1.4 million of accrued interest.

22. MLC valued the TIPS and other securities that it transferred to RACER on the Effective Date on an amortized cost basis, which was the appropriate way for MLC to value the securities under GAAP.

23. Upon information and belief, RACER knew how MLC accounted for the TIPS prior to the Effective Date and did not request that MLC value the transferred securities using a quoted market basis as of the Effective Date.

24. To my knowledge, at no time prior to or on the Effective Date did RACER object to MLC's planned method of funding the Trust with a combination of TIPS and cash.

25. To my knowledge, at no time prior to or on the Effective Date did RACER request that the Trust be funded solely in cash. Additionally, to my knowledge, at no time prior to or on the Effective Date did RACER request that the Trust be funded in cash so that RACER could implement its own investment strategy.

26. To my knowledge, at no time prior to or on the Effective Date did RACER seek advice from the Debtors or Treasury with respect to developing a portfolio of long-term securities to purchase in order to ensure that adequate funding would be available to cover RACER's environmental liabilities and defease the risk of inflation.

27. To my knowledge, at no time prior to or following the Effective Date, did MLC and RACER prepare, plan, agree, arrange, establish, or otherwise discuss the concept of an appraisal mechanism or protocol to set a market value for the TIPS on the Effective Date. To my knowledge, the Debtors would have insisted on such a mechanism or protocol, so as to eliminate any potential disputes regarding the calculation method employed to determine a market value.

28. If the TIPS had been trading at a substantial premium on the Effective Date as they do today, MLC would have transferred the TIPS in the same manner using the amortized cost basis due to the fact that the TIPS are intended to be held to maturity. In fact, prior to the Effective Date, MLC had the opportunity to sell $226,000,000 in short-term marketable securities that were not matched to the long-term environmental liabilities for a profit of over a half million dollars. However, MLC transferred these securities that matured on July 31, 2011 to RACER at amortized cost value, which resulted in over $700,000 in interest payments to RACER.

29. On May 9, 2011, Hamilton, who by this point was operating as RACER's CFO, contacted me to finalize a true-up to the RACER funding value. Attached hereto as Exhibit F is a true and correct copy of Hamilton's May 9, 2011 email and attachment from Hamilton, titled "MLC - TIP adjustment 3/31 vs. 3/28." The true-up was necessary to account for a change in adjusted TIPS principal balance for the three day period from March 29-31, 2011. Second, a true-up was necessary to account for a correction of the index ratio used to calculate the amount of the adjusted TIPS principal as of March 28, 2011 that was used to determine the amortized cost basis for the funds flow on the Effective Date.

30. The true-up resulted in RACER owing MLC $107,883.90, which amount was combined with other reconciliation payments reviewed and settled on June 30, 2011 (the "**True-up Payment**"). The True-up Payment from RACER to MLC would have been unnecessary if RACER had been valuing, or planning to value, the TIPS on a quoted market value basis, rather than an amortized cost basis. Attached hereto as Exhibit G is a true and correct copy of an excerpt of a June 30, 2011 wire confirmation detailing the True-up Payment as a line item called "Reconciliation of TIPS transfer" and noting the $107,883.90 amount due from RACER to MLC.

9

31. If RACER had any intent to use estimated market value for the TIPS on the Effective Date to determine the adequacy of funding, it had access to information necessary to calculate the difference between quoted market value and the amortized cost by the time RACER made the True-up Payment that was settled on June 30, 2011. Instead, RACER relied on amortized cost to value the TIPS in its calculation of the True-up Payment.

32. As of January 5, 2012, the estimated market value of the TIPS in the RACER portfolio is approximately $378,209,474, which is approximately $30.5 million more than the amortized cost basis of the TIPS transferred to RACER by the Debtors on March 31, 2011.[4]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 5, 2012, in Charlotte, North Carolina.

*/s/ Brian Rosenthal*

Brian Rosenthal

---

[4] This data is based on market quotations provided by Mesirow Financial as of 8:00 a.m. Eastern Standard Time on January 5, 2012. The value of the TIPS portfolio described above excludes the $265,505,495 in securities that have matured since the Effective Date and excludes accrued interest.