Hearing Date and Time: January 18, 2012 at 9:45 a.m.
Reply Deadline: January 10, 2012 at 4:00 p.m.

Michael S. Davis
Bryan D. Leinbach
ZEICHNER ELLMAN & KRAUSE LLP
575 Lexington Avenue
New York, New York 10022
(212) 223-0400
mdavis@zeklaw.com
bleinbach@zeklaw.com

*Attorneys for Chartis Specialty Insurance Company
and Lexington Insurance Company*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| In re:<br><br>MOTORS LIQUIDATION COMPANY,<br>et al.,<br><br>Debtors. | Chapter 11 Cases<br>Case No. 09-50026 (REG)<br><br>(Jointly Administered) |
|---|---|

### CHARTIS SPECIALTY INSURANCE COMPANY AND LEXINGTON INSURANCE COMPANY'S REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR CROSS-MOTION TO COMPEL ARBITRATION

Chartis Specialty Insurance Company (f/k/a American International Specialty Lines Insurance Company) ("Specialty") and Lexington Insurance Company ("Lexington") (together "**Chartis**") by and through its undersigned counsel, hereby submits this reply in further support of Chartis' cross-motion to compel arbitration.[1]

---

[1] Chartis' reply is limited to the issue of arbitration because it has already submitted its opposition to Old GM's claim objection along with its cross-motion. [Docket No. 11203].

#647856v3/BDL/11038.004

## PRELIMINARY STATEMENT[2]

1. This Court should grant Chartis' motion and compel arbitration of the current dispute. It is undisputed that the Payment Agreement contains a broad arbitration clause that requires the arbitration of <u>any</u> unresolved dispute arising out of the Payment Agreement. (Leinbach Decl.[3], Exs. A and B.) As Old GM concedes, where the arbitration clause is broad (as it is here), there is a presumption that all disputes arising from the Agreement must be submitted to arbitration. When an agreement is assumed (as it is here), there can be no bankruptcy reason not to enforce it. Thus, this Court should grant Chartis' motion and compel arbitration of the Dispute.

2. Throughout its Motion and opposition to Chartis' cross-motion, Old GM desperately tries to avoid the consequences of the broad arbitration clause and the plain meaning of words in the assumed Payment Agreement. The central issue in the Dispute involves the meaning of the word "any" in the phrase "any of Your obligations." (Payment Agreement, p. 8.) Similarly, this cross-motion involves the interpretation of the word "any" in the Payment Agreement's arbitration clause (<u>Id.</u>, pp. 8 and 9) ("any other unresolved dispute arising out of this Agreement" and "any questions as to [the Dispute's] arbitrability.") In both instances, Old GM twists the language of the Payment Agreement until "any" no longer means "any." (<u>See</u> Motion ¶¶ 55-62); (Old GM Reply ¶¶ 15-23.) Having mangled the word "any," Old GM now twists the language of the arbitration clause and redefines the word "arbitrability" to mean something other than its plain meaning – the ability of a dispute to be arbitrated. (Old GM Reply

---

[2] All defined terms shall have the same meaning as those provided in Chartis' Opposition and Cross-Motion [Docket No. 11203], unless otherwise stated herein.

[3] "Leinbach Decl." refers to the Declaration of Bryan D. Leinbach [Docket No. 11202].

#647856.v5/11037.004/msd                    2

¶¶ 22-23.) In the end, Old GM's willful ignorance of the plain meaning of common words is all for naught because <u>all</u> disputes over the meaning of a contract must be submitted to arbitration. See <u>Collins & Aikman Products Co. v. Building Systems, Inc.</u>, 58 F.3d 16, 23 (2d Cir. 1995.)

    3.    Old GM's attempts to rebut the strong presumption of arbitrability and the contractual right of the arbitrators to decide issues of arbitrability are without merit. First, despite conceding the breadth of the arbitration clause, Old GM argues the Payment Agreement's arbitration clause should be limited to "insurance disputes," even though no such artificial distinction exists in the agreement. Indeed, Old GM concedes the Dispute "'implicates issues of contract construction or the parties' rights and obligations under the Payment Agreement". (Old GM Reply, ¶ 18.). Then, taking a second approach, Old GM asks this Court to "override the fact that the dispute involves 'contract construction'", because Old GM did not envision the particular dispute at issue and is suffering from "unfair . . . surprise." (Old GM Reply, ¶ 21.) Old GM's argument, if followed, would nullify the use of broad arbitration provisions. Similarly, with respect to the parties' agreement to have the arbitrators decide the issue of arbitrability, GM simply disavows it despite the clear and unmistakable language evidencing the parties' agreement that arbitrators decide questions of arbitrability.

    4.    Moreover, arbitration of the Dispute between Old GM and Chartis would not conflict with any underlying purpose of the Bankruptcy Code. Fundamentally, of course, it cannot because the agreement is assumed. <u>See</u>, Assumption and Collateralization Agreement, pp. 1-3 (Miln Decl, Ex. 2) [Docket 111497].

    5.    Disregarding the fact that the Payment Agreement is assumed, Old GM argues that arbitration of the default provisions of the Payment Agreement could conflict with

the Bankruptcy Code's prohibitions on unenforceable *ipso facto* clauses, but Old GM is wrong because:

- The Payment Agreement in this case is not an executory contract -- especially in this case where coverage is, as Old GM acknowledged, expired, cancelled or terminated.

- The *ipso facto* provisions of the Bankruptcy Code do not affect a secured creditor's contractual right to collateral pursuant to a security agreement.

- Even if applicable, the *ipso facto* prohibitions of the Bankruptcy Code do not apply to the Payment Agreement provisions providing for default based upon Old GM's failure to pay material debts or default due to the insolvency or bankruptcy of Old GM's subsidiaries and affiliates.

- Enforcing the default provisions of the Payment Agreement would not frustrate New GM's reorganization, which has already occurred.

Similarly, arbitration of Chartis' contractual right to use collateral held pursuant to the Payment Agreement would not implicate Section 553 of the Bankruptcy Code because Chartis' contractual right to use collateral upon Old GM's default is neither based upon nor limited to common law theories of subrogation or equitable set-off.

      6.     For each of these reasons and the reasons set for in Chartis' cross-motion, this Court should compel arbitration of the Dispute.

## ARGUMENT

### POINT I

### THE DISPUTE FALLS WITHIN THE SCOPE OF THE
### ARBITRATION CLAUSE IN THE PAYMENT AGREEMENT

7.   Under In re Hagerstown Fiber LP, 277 B.R. 181, 205 (Bankr. S.D.N.Y. 2002), this Court has determined the arbitrability of disputes using a four part test: "(1) did the parties agree to arbitrate, (2) does the dispute fall within their arbitration clause, (3) if federal statutory claims are raised, did Congress intend those claims to be arbitrable, and (4) if the court concludes that some but not all of the claims are arbitrable, should it stay the non-arbitrable claims pending the conclusion of the arbitration?" Id., 277 B.R. at 189 (Old GM Reply ¶ 14) [Docket No. 11264]. Here, that test is readily met.

8.   It is undisputed that Old GM and Chartis have an agreement to arbitrate:

> Any other unresolved disputes arising out of this Agreement must be submitted to arbitration.
>
> [The Arbitrators] will have exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability.

(Payment Agreement, pp. 8 and 9, Leinbach Decl., Exs. A and B); Ace Capital Re Overseas Ltd. v. Central United Life Ins. Co., 307 F.3d 24, 29 (2d Cir. 2002) ("where, as here, the existence of an arbitration agreement is undisputed, doubts as to whether a claim falls within the scope of that agreement should be resolved in favor of arbitrability.") (citations omitted). It is also undisputed that the arbitration clause – which covers "all other unresolved disputes arising out of" the Payment Agreement – is a broad arbitration clause. American Home Assurance Company v. Circle L. Roofing, Inc., 2008 U.S. Dist. LEXIS 18313, at *5-6 (S.D.N.Y. 2008) (finding the

same language in another Payment Agreement to be a broad arbitration clause); (Chartis Brief ¶ 20) [Docket No. 11203]; (Payment Agreement, p. 8.)

9. Thus, the first two prongs of the Hagerstown test are met and the Dispute is entitled to a strong presumption of arbitrability. In re Cardali, 2010 WL 4791801, at * 5-6 (Bankr. S.D.N.Y. Nov. 18, 2010) (Old GM Reply ¶ 14) ("If a court concludes that [an arbitration clause] is a broad one, then it will order arbitration and any subsequent construction of the contract and of the parties' rights and obligations under it are within the jurisdiction of the arbitrator.") (quoting Bethlehem Steel Corp v. Moran Towing Corp.(In re Bethlehem Steel Corp.), 390 B.R. 784, 790 (Bankr. S.D.N.Y. 2008)); Collins & Aikman, 58 F.3d at 20 (same).

10. Again, Old GM's various attempts to rebut the strong presumption of arbitrability are unpersuasive. (Old GM Br. at 6-9.) *First*, nothing in the Payment Agreement limits the arbitration clause's scope to "insurance disputes" as Old GM argues. (Old GM Reply ¶¶ 15-16, 23); (Payment Agreement, pp.8-9.)[4] Rather, the arbitration clause encompasses all disputes that "arise[] out of" the Payment Agreement. See id. at 8.

11. *Second*, Old GM cannot claim this dispute falls outside the scope of the Payment Agreement based upon Old GM's narrow (and incorrect) construction of the Payment Agreement and the parties' rights and obligations thereunder. (Old GM Reply ¶¶ 15-18.) The issue in the dispute is the interpretation of Chartis' rights under the Payment Agreement. As Old GM concedes, under Second Circuit authority, any issues of contract interpretation or the parties rights and obligations under the Payment Agreement are arbitrable:

---

[4] Indeed, Old GM fails to even define the terms "insurance dispute" and "non-insurance dispute" or discuss the scope of each purported category of disputes. Tellingly, the Payment Agreement does not define or reference either term.

> if the arbitration clause is broad, there arises a presumption of arbitrability; if, however, the dispute is in respect of a matter that on its face is collateral to the contract, then a court should test the presumption by reviewing the allegations underlying the dispute and by asking whether the claim alleged implicates issues contract construction or the parties' rights and obligations under it. <u>If the answer is yes, then the collateral dispute falls within the scope of the arbitration agreement;</u>

Collins & Aikman, supra at 23 (cited in Old GM Reply ¶ 17.) (emphasis added.).

12. Old GM cannot avoid the strong presumption of arbitrability by claiming Old GM never agreed to arbitrate this specific dispute. (Old GM Reply ¶¶ 19-21.) Even if the arbitration clause in the Payment Agreement was found to be narrow (it is not), the current dispute over Chartis' right to use collateral held pursuant to the Payment Agreement would still be arbitrable because the dispute "aris[es] out of" the Payment Agreement and interprets the scope of the Payment Agreement. See Hagerstown, 277 B.R. at 205 (disputes involving parties' rights and obligations under contract containing arbitration agreement are arbitrable under narrow arbitration clause.)

13. Old GM attempts to disavow the parties' agreement to have the arbitrators decide the issue of arbitrability itself must fail. (Old GM Reply ¶ 22-23.) Courts defer to parties' choice to have arbitrators determine questions of arbitrability where the arbitration agreement "provides clear and unmistakable evidence that the parties intended arbitrators to decide questions of arbitrability." National Union v. Las Vegas Professional Football L.P., 2009 WL 4059174, at * 5 (S.D.N.Y. Nov. 17, 2009), aff'd December 20, 2010, 2010 WL 5141229 (2d. Cir 2010) (finding parties under the same form of Payment Agreement agreed that the arbitrators would decide questions of arbitrability); (Chartis Br. ¶ 22.) (same). Here, the arbitration clause

#647856.v5/11037.004/msd                               7

clearly states the arbitrators "will have exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability." (Payment Agreement, p. 9.) Old GM's contention that this language only applies to the arbitrators' ability to determine which issues can be addressed in the arbitration is absurd. (See Old GM Reply ¶ 22.) The term "arbitrability" is commonly understood to encompass whether a dispute can be submitted to arbitration. See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 942, 115 S.Ct. 1920, 1923 (1995) (noting that a disagreement between two parties about whether they agreed to arbitrate the merits of a dispute concerns "the arbitrability of the dispute.")  Further, the parties – and not the arbitrators - determine what issues are in dispute when they submit a matter to arbitration. (See Payment Agreement, p. 8) (parties must submit unresolved disputes to arbitration.)

## POINT II

### ARBITRATION OF THE DISPUTE WILL NOT CONFLICT WITH THE BANKRUPTCY CODE

14.     Under the test in Hagerstown, a Bankruptcy Court should only decline to compel arbitration where doing so would "adversely affect an underlying purpose of the Bankruptcy Code." Hagerstown, 277 B.R. at 202.  Here, no such conflict exists, first, and foremost, because the Payment Agreement is an assumed agreement.  Assumption and Collateralization Agreement, (Miln Decl, Ex. 2) [Docket 111497] ("New GM assumed and agreed to perform, fulfill and discharge all of the Assumed Obligations."). See, In re Village Rathskeller, Inc., 17 B.R. 665, 671 (Bankr. S.D.N.Y. 1992) ("the debtor or the trustee is not free to retain the favorable features of a contract and reject the unfavorable ones").

15.     Quite apart from assumption, which should end the issue of whether there is a conflict between arbitration and an underlying purpose of the Bankruptcy Code to find a

conflict, the court must determine "whether the underlying dispute concerns rights created under the Bankruptcy Code or non-Bankruptcy Code issues derivative of the debtor's pre-petition business activities. In the former situation, the bankruptcy court has discretion to refuse arbitration, but in the latter it does not." Id.  Indeed, Hagerstown made clear that such a determination applied equally to core and non-core matters:

> If the matter is core, the bankruptcy court must still examine the nature and reason for its "coreness."  Many proceedings are procedurally core; they are garden variety pre-petition contract disputes dubbed core because of how the dispute arises or gets resolved.  Objections to proofs of claim and counterclaims asserted by the estate, the types of core proceedings involved in Singer and Winimo, exemplify this type of matter.  The arbitration of a procedurally core dispute rarely conflicts with any policy of the Bankruptcy Code unless the resolution of the dispute fundamentally and directly affects a core bankruptcy function.

Id. at 203; In re Singer Co., 2001 WL 984678, at * 6 (S.D.N.Y. 2001) (finding an objection to proof of claim to be arbitrable even though the claim objection was a "core" proceeding.)

16.    Here, the parties agree that the Dispute concerns a pre-petition contract between Chartis and Old GM.  As in Singer, the Dispute is "procedurally core" because it comes before the Court as an objection to a proof of claim. (Chartis Br. ¶¶ 15-19.)  Under the holding in Hagerstown and Singer, arbitration of the Dispute would not conflict with the Bankruptcy Code, unless Old GM could demonstrate a conflict with the Bankruptcy Code.  Old GM has failed to demonstrate any viable conflict.

A.  **Exercising Chartis' Rights Based Upon Old GM's Default does Not Conflict with the Ipso Facto Provision of the Bankruptcy Code**

17. Old GM argues that a finding that Old GM was in default under the Payment Agreement would violate the *ipso facto* provisions under Section 365(e) of the Bankruptcy Code. Old GM is wrong for five separate reasons:

- the Payment Agreement has been assumed and must be followed in full;

- the Payment Agreement is not an executory contract, especially in this case where the policies it relates to are no longer in force;

- the *ipso facto* provisions of the Bankrupt Code may not affect a secured creditor's contractual right to collateral pursuant to a security agreement;

- even if applicable, the *ipso facto* prohibitions of the Bankruptcy Code do not apply to the Payment Agreement provisions providing for default based upon Old GM's failure to pay material debts or default due to the insolvency or bankruptcy of Old GM's subsidiaries and affiliates; and

- enforcing the default provisions of the Payment Agreement would not frustrate New GM's reorganization, which has already occurred.

18. *First*, the Payment Agreement has been assumed. See, Assumption and Collateralization Agreement, pp. 1-3 (Miln Decl, Ex. 2) [Docket 111497]. Having been assumed, all the provisions are fully enforceable ("remain unchanged and in full force and effect") (Miln Decl. Ex. 2, ¶ 2.3). The assumption made eminent good sense for the estate. As a consequence of that assumption, pursuant to the Assumption Agreement and the Stipulation, Chartis has returned or will be returning up to $20 million of security to the estate, subject to this $4.5 million claim. (Stipulation ¶¶ 1, 2).

19.  *Second,* the *ipso facto* provisions of the Bankruptcy Code only bar termination or modification of executory contracts. Here, the Payment Agreement is a security agreement, not an executory contract, but, as Old GM states about the underlying insurance, "all of the foregoing insurance policies are 'claims made policies that have expired.'" (Motion ¶ 30). In re General Growth Properties, Inc., 451 B.R. 323, 329 (Bankr. S.D.N.Y. 2011); (Chartis Br. ¶ 33-34). Specifically, in General Growth, this court found that a loan agreement was not an executory contract where the only significant remaining obligation for the debtor party to the contract was payment. Id. at 329-30. In reaching this decision, the Court noted that, under this reasoning, loan agreements are generally not viewed as executory contracts. See id. (citations omitted.)

20.  In reaching its decision, the General Growth court relied upon In re Saint Vincent's Catholic Medical Centers of New York, 440 B.R. 587 (Bankr. S.D.N.Y. 2010.) In Saint Vincent's, the Court found that the Event of Default provision of a secured lending agreement was not an impermissible *ipso facto* clause because the secured loan agreement was not an executory contract. In reaching this decision, the Saint Vincent's Court first noted that under the *Countryman* definition, a contract was only deemed to be an "executory contract" if "the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." Id., 440 B.R. at 601 (Old GM Reply ¶ 47). Applying the *Countryman* test, the Court reviewed a list of the parties remaining obligations, and found that the secured loan agreement was not an executory contract because "none of these obligations are so material that a breach would excuse Debtor's obligation to perform." Id.

21.   The Saint Vincent's Court also found that the secured loan agreement was not an executory contract because the dispute between the parties concerned the secured creditor's right to collateral:

> The collateral unquestionably came into the bankruptcy estate. Indeed, the Court approved its sale after the standard bankruptcy process. The question is how much the Creditor may recover from the sale on account of its first-priority mortgage, not whether the collateral is property of the estate.

Id. at 602. See also, In re Frank's Nursery & Crafts, Inc., 2006 WL 2385418 at *5 (Bankr. S.D.N.Y. May 8, 2006) (finding a contract could not be found to contain an invalid *ipso facto* clause because the contract had already been approved by the Court).

22.   Based upon the holdings in General Growth and Saint Vincent's, the Payment Agreement is not an executory contract, and thus, not subject to the *ipso facto* prohibitions under Section 365(e) of the Bankruptcy Code. General Growth and Saint Vincent's stand for the proposition that agreements, such as the Payment Agreement, are not executory unless the respective obligations of the parties are largely unperformed and non-performance of those remaining obligations would excuse the other's performance. Saint Vincent's, 440 B.R. at 601 (cited in Old GM Reply ¶ 47).

23.   Here, Old GM's only significant remaining obligation under the Payment Agreement is payment of the one claim at issue in this motion. Old GM's list of its past, expired obligations under the Payment Agreement (Old GM Reply ¶ 48) does not convert the Payment Agreement into an executory contract because Old GM has failed to demonstrate that: (a) any of the listed obligations have not yet been performed; and (b) failure to perform any of these obligations without more would excuse Chartis' from all performance under the Payment

Agreement. General Growth, supra; Saint Vincent's, supra. Tellingly, Old GM fails to cite a single current obligation under the Payment Agreement that it must perform.[5]

24. Further, Old GM cannot construe the Payment Agreement as an executory contract by conflating the Agreement with certain insurance policies between Old GM and Chartis. (Old GM Reply ¶¶ 49-51.) The Stipulation between Old GM and Chartis carved out the Payment Agreement and the current Dispute as a separate solitary issue involving payment of the Chartis Claim. (See Stipulation ¶¶ 4, 12.) None of the insurance policies between Old GM and Chartis are encompassed within the relevant provisions of the Stipulation. (See id.) Further, Old GM's newfound reliance upon the insurance policies to justify the existence of significant obligations among Chartis and Old GM flies in the face of Old GM's argument that no obligations remain under these same insurance polices to justify Chartis' continued retention of collateral pursuant to the Payment Agreement. (Motion ¶¶ 30-31.)

25. *Third*, under Saint Vincent's, the *ipso facto* provisions of Section 365(e) do not bar a secured creditor from exercising its right to collateral. Pursuant to the Stipulation, the only issue between the parties involves Chartis' right to use collateral under the Payment Agreement. (Stipulation ¶¶ 4-5); Saint Vincent's, 440 B.R. at 602. Old GM specifically assumed its remaining payment obligation to Chartis under the Payment Agreement in connection with a

---

[5] Moreover, even if the Dispute over the Payment Agreement encompassed the insurance policies between Old GM and Chartis, Old GM would still not have an executory contract. Courts have held that insurance agreements are not executory contracts the insurer is required to continue to perform under an insurance agreement after non-performance by the insured. See In re International Fibercom, Inc., 503 F.3d 933, 941 (9th Cir. 2007) (insurance contract found to not be an executory contract where insurer was required to continue to perform workers compensation policy after non-performance by insured.) Here, Old GM does not even allege that Old GM's breach under its insurance agreements would completely relieve Chartis of all of its obligations under those agreements.

Court-approved sale of Old GM assets. See Assumption and Collateralization Agreement, p. 2[6] (Miln Decl, Ex. 2) [Docket No. 11149]; Saint Vincent's at 602. See also Frank's Nursery, 2006 WL 2385418, at *5. As such, Old GM cannot now attempt to parse out the Payment Agreement's payment obligations to avoid payment.

26.     Indeed, if the provision of Section 365(e) were read to deprive a secured creditor of the use of security in the manner asserted by Old GM, Section 365(e) would run up against the constitutional limits of bankruptcy power. Dewsnup v. Timm, 502 U.S. 410, 419, 112 S.Ct 773, 779 (1992) (recognizing that altering secured creditor's substantive rights to collateral violates the Takings Clause of the Fifth Amendment); Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 589-90, 55 S.Ct. 854, 863 (1935) (same).

27.     *Fourth*, the *ipso facto* prohibitions of the Bankruptcy Code do not apply to Old GM's failure to pay material debts because this provision would not trigger the *ipso facto* prohibition in the Bankruptcy Code. Indeed, in In re Margulis, 323 B.R. 130 (Bankr. S.D.N.Y. 2005), this Court found that the termination of a debtor's contract right was caused by his failure to make the required payment eight days after the debtor's bankruptcy petition was not prohibited *ipso facto* clause, stating:

> [I]t may be that bankruptcy made it more difficult to satisfy the condition, but that difficulty did not turn the condition into an unenforceable *ipso facto* clause.

---

[6] Old GM's argument that Chartis could not use collateral because of the parties' execution of the Assumption and Collateralization Agreement is meritless. (Old GM Reply ¶ 67.) Under the Payment Agreement, Chartis can use collateral "received by, pledged to, held by or otherwise available to [Chartis]" to satisfy Old GM's outstanding obligations upon default. Old GM's argument that Chartis cannot use collateral because is "held by" a separate trust ignores the plain language of the Payment Agreement and the fact that certain trust funds were available to Chartis under the Payment Agreement, which was incorporated into the Assumption and Collateralization Agreement.

Id. at 136; In re C.A.F. Bindery, Inc., 199 B.R. 828, 833 (Bankr. S.D.N.Y. 1996) (cited in Old GM Reply ¶ 32) ("If the debtor's default arises for some reason other than those set forth in section 365(e)(1), the prohibition against *ipso facto* clauses does not apply.") (emphasis added); Margulis, 323 B.R. at 135-36 (same.)[7] Similarly, a default triggered by Old GM's subsidiaries' insolvency or bankruptcy does not constitute an unenforceable *ipso facto* clause. The Payment Agreement contains a definition of "You" (Payment Agreement, p. 4) that includes Old GM's "subsidiary[ies]" or "affiliated or associated organizations." Thus, since certain such subsidiaries also "file[d] any petition, proceeding, case or action under the provisions of the United States Bankruptcy Code" (Payment Agreement, p. 7), those filings are also defaults, creating in effect a cross-default.

28. Contrary to Old GM's arguments (Old GM Reply ¶¶ 58-60), this cross-default is also enforceable. "Cross-default provisions will be enforceable in bankruptcy where they...do not affect the debtor's right to assume and assign executory contracts. See In re Wheeling-Pittsburgh Steel Corp., 54 B.R. 772, 778 (Bankr. W.D. Pa 1985.) Here, the cross-default provisions in the Payment Agreement do not affect Old GM's assumption of the Payment Agreement in any way. Further, the cross-default provisions do not require the bankruptcy or insolvency of all of Old GM's subsidiaries and affiliates. Instead, the definition of "You" in the Payment Agreement applies to "each" of Old GM's subsidiaries and affiliates jointly and severally. (Payment Agreement, p. 4.)

---

[7] Contrary to Old GM's assertion, the holding in Margulis does not recognize a default triggered by the debtor's failure to pay a debt as an *ipso facto* clause. See Margulis, 323 B.R. at 135-36; Supra ¶ 28. Moreover, Old GM's attempt to distinguish Margulis from the present Dispute fails. Indeed, Old GM fails to explain why its failure to pay material debts is different from Marguils' failure to pay a material debt. (Old GM Reply ¶ 56.)

#647856.v5/11037.004/msd                         15

29. Fifth, enforcement of Old GM's default would not conflict with the fundamental policies of the Bankruptcy Code by "hampering the debtor's rehabilitation" because the Old GM Plan is confirmed. (Old GM Reply ¶ 32) (quoting In re C.A.F. Bindery, Inc., 199 B.R. 828, 833 (Bankr. S.D.N.Y. 1996.) Indeed, New GM has already reorganized and emerged from bankruptcy months ago. Thus, the default provision of the Payment Agreement does not frustrate New GM's reorganization, which has already occurred.

30. For each of these reasons, the Court should compel arbitration of the Dispute.

**B.    Exercising Chartis' Contractual Right Under the Payment Agreement
Does Not Conflict with the Set-off Provisions of the Bankruptcy Code**

31. Old GM next argues that Chartis' exercise of its contractual rights would conflict with the Bankruptcy Code's treatment of set-off under Section 553. Once again, Old GM is wrong.

32. Chartis' right to *security* does not arise under the common law theories of equitable set-off or subrogation. (See Motion ¶¶ 2-3, 56); (Old GM Reply ¶ 38-40.) Instead, Chartis' enjoys a contractual right under the Payment Agreement to use collateral in order to satisfy "any" of Old GM's "obligations" to Chartis. (Payment Agreement, p. 8.) The plain language of the agreement, without any express limitation, provides the right to satisfy "any"

obligations. This right does not rely upon subrogation or set-off. Thus, the plain broad language of the Payment Agreement, not common law, grants the right to security.[8]

33.  Further, even if the dispute implicated Section 553 of the Bankruptcy Code (it does not -- no common law setoff rights are claimed), Old GM again fails to demonstrate an inherent conflict between the Bankruptcy Code and arbitration of the Dispute. Indeed, Old GM only states that the arbitrators decision "could conflict" with the Bankruptcy Code. (Old GM Reply ¶ 38.) Old GM's concern is baseless since setoff is not the basis of the claim. The basis of the claim is that an assumed agreement to apply collateral to "any" obligation means exactly what it says. Thus, Old GM does not demonstrate an inherent conflict

---

[8]  Contrary to Old GM's assertion (Old GM Reply ¶ 65), Chartis' contractual right to use collateral does not convert unsecured claims into secured claims. The Payment Agreement granted Chartis the right to a secured claim in the event of Old GM's default. (Payment Agreement, p. 8.) To restrict Chartis' contractual rights to those otherwise available to it under common law theories of subrogation would rob Chartis of the benefit of the contractual bargain it struck with Old GM when it entered into the Payment Agreement. In any event, whether Chartis' is entitled to a secured claim is a dispute that must be determined by the arbitrators. (Chartis Br. ¶¶ 21-23) (Supra ¶¶ 9-11.) Further, Chartis' contractual right to use collateral is not limited to the common law right of set-off because the Payment Agreement uses the term "set-off" in the default clause. Rather, the Payment Agreement uses the plain meaning of the term "set-off" to describe Chartis' contractual right to use collateral to satisfy Chartis' obligations. (See Payment Agreement, p. 8.)

with the Bankruptcy Code by questioning Chartis' ability to satisfy the "mutuality" which is simply not at issue. (Old GM Reply ¶¶ 40-41.)[9]

### CONCLUSION

34.  Chartis respectfully requests that the Court grant Chartis' cross-motion and order that Old GM submit the resolution of its Motion to arbitration.

Dated: New York, New York
January 10, 2012

ZEICHNER ELLMAN & KRAUSE LLP

By: /s/ Michael S. Davis
Michael S. Davis
Bryan D. Leinbach
575 Lexington Avenue
New York, New York 10022
(212) 223-0400
mdavis@zeklaw.com
bleinbach@zeklaw.com

*Attorneys for
Chartis Specialty Insurance Company
and Lexington Insurance Company*

---

[9] Old GM's "mutuality" argument (even if applicable) is meritless. Old GM's question why Chartis relies on the two Payment Agreements (Old GM Reply ¶ 6) has a simple answer: Chartis will only be asserting this claim under the Specialty Payment Agreement because Specialty is the actual holder of the Chartis claim at issue. (Leinbach Decl., Ex. A.)