HEARING DATE AND TIME: February 9, 2012 at 9:45 a.m. (Eastern Time)
OBJECTION DEADLINE: February 2, 2012 at 4:00 p.m. (Eastern Time)

**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
Matthew J. Williams
Joshua Weisser
Keith R. Martorana

*Attorneys for the Motors Liquidation Company GUC Trust*
*and the Motors Liquidation Company Avoidance Action Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                                              :
**In re**                                                     :
                                                              :          **Chapter 11 Case No.**
**MOTORS LIQUIDATION COMPANY,** *et al.,*                     :
**f/k/a General Motors Corp.,** *et al.*                      :          **09-50026 (REG)**
                                                              :
                    **Debtors.**                              :          **(Jointly Administered)**
                                                              :
-----------------------------------------------------------------x

**NOTICE OF HEARING ON MOTION OF WILMINGTON TRUST COMPANY,**
**(I) AS GUC TRUST ADMINISTRATOR, TO (A) LIQUIDATE NEW GM SECURITIES**
**FOR THE PURPOSE OF FUNDING FEES, COSTS AND EXPENSES OF THE GUC**
**TRUST AND THE AVOIDANCE ACTION TRUST, AND (B) TRANSFER NEW GM**
**SECURITIES TO THE AVOIDANCE ACTION TRUST**
**FOR THE PURPOSE OF FUNDING FUTURE TAX LIABILITIES, AND**
**(II) AS AVOIDANCE ACTION TRUST ADMINISTRATOR, TO APPROVE**
**<u>AN AMENDMENT TO THE AVOIDANCE ACTION TRUST AGREEMENT</u>**

PLEASE TAKE NOTICE that upon the annexed Motion, dated January 20, 2012

(the "**Motion**"), of Wilmington Trust Company, pursuant to sections 105(a) and 1142(b) of title

11, United States Code (the "**Bankruptcy Code**") for entry for an order (I) as Trustee and Trust

Administrator of the Motors Liquidation Company GUC Trust (the "**GUC Trust**"), to (A)

Liquidate New GM Securities for the Purpose of Funding Fees, Costs and Expenses of the GUC

Trust and the Motors Liquidation Company Avoidance Action Trust (the "**Avoidance Action**

**Trust**"), and (B) Transfer New GM Securities for the Purpose of Funding Future Tax Liabilities,

and (II) as Trustee and Trust Administrator of the Avoidance Action Trust, to Approve an

Amendment to the Motors Liquidation Company Avoidance Action Trust Agreement, all as

more fully set forth in the Motion, a hearing will be held before the Honorable Judge Robert E.

Gerber, United States Bankruptcy Judge, in Room 621 of the United States Bankruptcy Court for

the Southern District of New York, One Bowling Green, New York, New York 10004, on

**February 9, 2012 at 9:45 a.m. (Eastern Time),** or as soon thereafter as counsel may be heard.

PLEASE TAKE FURTHER NOTICE that any responses or objections to this

Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the

Local Rules of the Bankruptcy Court, and shall be filed with Bankruptcy Court (a) electronically

in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by

registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest,

on a CD-ROM or 3.5 inch disk, in text-searchable portable document format (PDF) (with a hard

copy delivered directly to Chambers), in accordance with the customary practices of the

Bankruptcy Court and General Order M-399 and on (i) Weil, Gotshal & Manges LLP, attorneys

for the GUC Trust, 767 Fifth Avenue, New York, New York  10153 (Attn:  Harvey R. Miller,

Esq., Stephen Karotkin, Esq., and Joseph Smolinsky, Esq.); (ii) the Debtors, c/o Motors

Liquidation Company, 401 South Old Woodward Avenue, Suite 370, Birmingham, Michigan

48009 (Attn:  Thomas Morrow); (iii) General Motors LLC, 400 Renaissance Center, Detroit,

Michigan 48265 (Attn: Lawrence S. Buonomo, Esq.); (iv) Cadwalder, Wickersham & Taft LLP,

attorneys for the United States Department of the Treasury, One World Financial Center, New

York, New York  10281 (Attn:  John J. Rapisardi, Esq.); (v) the United States Department of

Treasury, 1500 Pennsylvania Avenue, NW, Room 2312, Washington, D.C. 20220 (Attn: Joseph

Samarias, Esq.); (vi) Vedder Price, P.C., attorneys for Export Development Canada, 1633

Broadway, 47th Floor, New York, New York  10019 (Attn:  Michael J. Edelman, Esq. and

Michael L. Schein, Esq.); (vii) Kramer Levin Naftalis & Frankel LLP, attorneys for the statutory

committee of unsecured creditors, 1177 Avenue of the Americas, New York, New York 10036

(Attn:  Thomas Moers Mayer, Esq., Robert Schmidt, Esq., Lauren Macksoud, Esq., and Jennifer

Sharret, Esq.); (viii) the Office of the United States Trustee for the Southern District of New

York, 33 Whitehall Street, 21st Floor, New York, New York (Attn:  Tracy Hope Davis, Esq.);

(ix) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New York, New

York  10007 (Attn: David S. Jones, Esq. and Natalie Kuehler, Esq.); (x) Caplin & Drysdale,

Chartered, attorneys for the official committee of unsecured creditors holding asbestos-related

claims, 375 Park Avenue, 35th Floor, New York, New York, 10152-3500 (Attn:  Elihu Inselbuch,

Esq. and Rita C. Tobin, Esq.) and One Thomas Circle, N. W., Suite 1100, Washington D.C.

20005 (Attn: Trevor W. Swett III, Esq. and Kevin C. Maclay, Esq.); (xi) Stutzman, Bromberg,

Esserman & Plifka, PC, attorneys for Dean M. Trafelet in his capacity as the legal representative

for future asbestos personal injury claimants, 2323 Bryan Street, Suite 2200, Dallas, Texas

75201 (Attn: Sander L. Esserman, Esq. and Robert T. Brousseau, Esq.), (xii) Gibson, Dunn &

Crutcher LLP, Attorneys for the Motors Liquidation Company GUC Trust and the Motors

Liquidation Company Avoidance Action Trust, 200 Park Avenue, 47th Floor, New York, New

York  10166 (Attn: Keith Martorana, Esq.); (xiii) FTI Consulting, Inc., as the GUC Trust

Monitor and as the Avoidance Action Trust Monitor, One Atlantic Center, 1201 West Peachtree

Street, Suite 500, Atlanta, Georgia 30309 (Attn: Anna Phillips); (xiv) Crowell & Moring LLP,

attorneys for the Revitalizing Auto Communities Environmental Response Trust, 590 Madison

Avenue, 19th Floor, New York, New York 10022-2524 (Attn: Michael V. Blumenthal, Esq.); and

(xv) Kirk P. Watson, Esq., as the Asbestos Trust Administrator, 2301 Woodlawn Boulevard,

Austin, Texas 78703, so as to be received no later than **February 2, 2012 at 4:00 P.M. (Eastern Time)** (the "**Objection Deadline**").

PLEASE TAKE FURTHER NOTICE that if no objections are timely filed and served with respect to the Motion, Wilmington Trust Company, acting in its capacities as trustees and trust administrators of the GUC Trust and Avoidance Action Trust, respectively, may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered with no further notice or opportunity to be heard offered to any party.

Dated:  New York, New York
        January 20, 2012

**GIBSON, DUNN & CRUTCHER LLP**

By:  ____/s/ Matthew J. Williams_____

Matthew J. Williams
Joshua Weisser
Keith R. Martorana
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000

*Attorneys for the Motors Liquidation Company*
*GUC Trust and the Motors Liquidation Company*
*Avoidance Action Trust*

**HEARING DATE AND TIME: February 9, 2012 at 9:45 a.m. (Eastern Time)**
**OBJECTION DEADLINE: February 2, 2012 at 4:00 p.m. (Eastern Time)**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
Matthew J. Williams
Joshua Weisser
Keith R. Martorana

*Attorneys for the Motors Liquidation Company GUC Trust*
*and the Motors Liquidation Company Avoidance Action Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

|  |  |  |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11 Case No.** |
| **MOTORS LIQUIDATION COMPANY,** *et al.,* | : | |
| **f/k/a General Motors Corp.,** *et al.* | : | **09-50026 (REG)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

-----------------------------------------------------------------x

**MOTION OF WILMINGTON TRUST COMPANY, (I) AS GUC**
**TRUST ADMINISTRATOR, TO (A) LIQUIDATE NEW GM SECURITIES FOR**
**THE PURPOSE OF FUNDING FEES, COSTS AND EXPENSES OF THE GUC**
**TRUST AND THE AVOIDANCE ACTION TRUST, AND (B) TRANSFER**
**NEW GM SECURITIES TO THE AVOIDANCE ACTION TRUST**
**FOR THE PURPOSE OF FUNDING FUTURE TAX LIABILITIES, AND**
**(II) AS AVOIDANCE ACTION TRUST ADMINISTRATOR, TO APPROVE**
**AN AMENDMENT TO THE AVOIDANCE ACTION TRUST AGREEMENT**

# TABLE OF CONTENTS

JURISDICTION ...................................................................................................................2

BACKGROUND ...................................................................................................................2

I.      The Motors Liquidation Company GUC Trust..............................................................3

II.     Claims Resolution................................................................................................3

III.    Trust Distributions ...............................................................................................5

IV.     Initial Funding of GUC Trust Costs and Expenses......................................................6

V.      No-Action Relief..................................................................................................9

VI.     The Avoidance Action Trust...................................................................................10

VII.    Summary of Trust Expenses to Date ........................................................................12

RELIEF REQUESTED..........................................................................................................16

BASIS FOR RELIEF ............................................................................................................19

I.      The GUC Trust Should Be Permitted To Sell New GM Securities Necessary
        To Fund Excess Accrued and Estimated GUC Trust Administrative Costs................20

II.     The GUC Trust Should Be Permitted To Sell New GM Securities Necessary
        To Fund Excess Accrued and Estimated Reporting Costs..........................................22

III.    The GUC Trust Should Be Permitted To Sell New GM Securities Necessary
        To Fund the Administrative Costs of the Avoidance Action Trust .............................27

IV.     The GUC Trust Should Be Permitted To Transfer to the Avoidance Action
        Trust New GM Securities Sufficient To Fund any Avoidance Action Trust Tax
        Liability...............................................................................................................28

V.      The Avoidance Action Trust Amendment Should Be Approved ................................29

WAIVER OF THE STAY PROVIDED BY BANKRUPTCY RULE 6004 ..........................29

NOTICE................................................................................................................................30

CONCLUSION.....................................................................................................................31

## TABLE OF AUTHORITIES

**Statutes**

11 U.S.C. § 105(a) ..................................................................................................19

11 U.S.C. § 1142(b) ................................................................................................19

28 U.S.C. § 1334(b) ..................................................................................................2

28 U.S.C. 157(a) .......................................................................................................2

28 U.S.C. § 157(b) ....................................................................................................2

**Rules**

Fed. R. Bankr. P. 6004(h) .......................................................................................29

TO:    **THE HONORABLE ROBERT E. GERBER**
       **UNITED STATES BANKRUPTCY JUDGE**

Wilmington Trust Company, not in its individual capacity and solely in the capacities set forth below, submits this motion (the "**Motion**") seeking entry of an Order, in the form attached hereto as <u>Exhibit A</u> (the "**Order**"), pursuant to sections 1142 and 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 6004(h) of the Federal Rules of Bankruptcy Procedure, the Motors Liquidation Company GUC Trust Agreement dated as of March 30, 2011 (as amended, the "**GUC Trust Agreement**"), and the Motors Liquidation Company Avoidance Action Trust Agreement dated as of March 30, 2011 (the "**Avoidance Action Trust Agreement**"), providing the following relief:

(i) <u>GUC Trust Administrator Requests</u>: Solely in its capacity as trust administrator and trustee (the "**GUC Trust Administrator**") of the Motors Liquidation Company GUC Trust (the "**GUC Trust**"), as established under the Debtors' Second Amended Joint Chapter 11 Plan dated as of March 18, 2011 (Docket No. 9836) (as confirmed, the "**Plan**") of the above-captioned post-effective date debtors (the "**Debtors**"), Wilmington Trust Company seeks entry of an Order approving:

    A.   the GUC Trust's sale of New GM Securities (as defined below) to fund accrued and expected fees, costs and expenses of the GUC Trust and the Avoidance Action Trust (as defined below); and

    B.   the GUC Trust's transfer of New GM Securities to the Avoidance Action Trust to fund potential future tax liabilities of the Avoidance Action Trust; and

(ii) <u>Avoidance Action Trust Administrator Requests</u>:  Solely in its capacity as trust administrator and trustee (the "**Avoidance Action Trust Administrator**") of the Motors Liquidation Company Avoidance Action Trust (the "**Avoidance Action Trust**"), as established under the Plan, Wilmington Trust Company seeks entry of an Order approving:

A.    an amendment to the Avoidance Action Trust Agreement, in the form attached hereto as <u>Annex 1</u> to <u>Exhibit A</u> (the "**Avoidance Action Trust Amendment**").

In support of the foregoing, the GUC Trust Administrator and the Avoidance Action Trust Administrator (as applicable) respectfully represent as follows:

## JURISDICTION

1.    This Court has jurisdiction over this matter under 28 U.S.C. §§ 157(a) and 1334(b), paragraph II of the order of this Court dated as of March 29, 2011 confirming the Plan (Docket No. 9941) (the "**Confirmation Order**"), Article XI of the Plan, Section 6.1 of the GUC Trust Agreement, and Section 13.13 of the Avoidance Action Trust Agreement. This is a core proceeding pursuant to 28 U.S.C. § 157(b).[1]

## BACKGROUND[2]

2.    The GUC Trust and the Avoidance Action Trust were each established pursuant to Article VI of the Plan.  The primary purpose of the GUC Trust is to resolve Disputed General Unsecured Claims and distribute trust assets to GUC Trust beneficiaries. The Avoidance Action Trust was established to administer certain remaining estate assets (*e.g.* the Term Loan Avoidance Action) following the December 15, 2011 dissolution of MLC.  A budget for the GUC Trust was proposed by the Debtors and approved by the Court in March 2011 as part of the Plan confirmation process, and an administrative fund  for the Avoidance Action Trust was similarly approved as part of the Plan (collectively, the "**Initial Budget**").

---

[1]    Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan, the GUC Trust Agreement or the Avoidance Action Trust Agreement, as applicable.   Any description herein of the terms of the Plan, the GUC Trust Agreement or the Avoidance Action Trust Agreement is provided for descriptive purposes only and is qualified in whole by the terms of the Plan, the GUC Trust Agreement or the Avoidance Action Trust Agreement, as applicable.

[2]    Beginning on June 1, 2009, Motors Liquidation Company ("**MLC**") and its affiliated Debtors filed in the United States Bankruptcy Court for the Southern District of New York (the "**Court**") voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Substantially all of the Initial Debtors' assets were sold to an acquisition vehicle sponsored by the United States Treasury pursuant to the Amended and Restated Master Sale and Purchase Agreement dated as of June 26, 2009 (as amended, the "**MSPA**").  The effective date of the Plan (the "**Effective Date**") was March 31, 2011.

**I.    The Motors Liquidation Company GUC Trust**

3.    The GUC Trust implements the Plan through the resolution of claims against the Debtors and the distribution of trust assets.  Pursuant to the GUC Trust Agreement, holders of Disputed General Unsecured Claims become entitled to receive distributions of shares of common stock in General Motors Company ("**New GM Common Stock**") and warrants to purchase New GM Common Stock ("**New GM Warrants**", and together with the New GM Common Stock, "**New GM Securities**") from the GUC Trust if, and to the extent that, such Disputed General Unsecured Claims become Allowed General Unsecured Claims.

4.    In addition, under the Plan, each holder of an Allowed General Unsecured Claim retains a contingent right to receive, on a *pro rata* basis, additional reserved New GM Securities and cash, if any, to the extent such assets are not required for the satisfaction of previously Disputed General Unsecured Claims (such assets, the "**Excess GUC Trust Distributable Assets**").  The GUC Trust issues units ("**Trust Units**") in respect of these contingent rights at a rate of one Trust Unit per $1,000 in amount of Allowed General Unsecured Claim, subject to rounding under the GUC Trust Agreement.

**II.    Claims Resolution**

5.    Claims resolution by the GUC Trust is a major component of its distribution mechanic; favorable claims resolution directly contributes to creditor recoveries.  The GUC Trust Administrator, acting pursuant to the GUC Trust Agreement, has reserved New GM Securities for Disputed General Unsecured Claims from the trust distributions.  At the Effective Date, there were approximately $9.7 billion of Disputed General Unsecured Claims (including $1.5 billion of claims reserved in connection with the Term Loan Avoidance Action) versus approximately $29.8 billion of Allowed General Unsecured Claims.  As a result, the GUC Trust reserved approximately 36.7 million shares of New GM Common Stock and 66.8 million New GM Warrants (consisting of approximately 33.4 million New

GM $10.00 Warrants and approximately 33.4 million New GM $18.33 Warrants) from the

GUC Trust's initial distribution, as outlined in the following table:[3]

| | NEW GM COMMON STOCK | NEW GM $10.00 WARRANTS | NEW GM $18.33 WARRANTS |
|---|---|---|---|
| *New GM Securities Set Aside for General Unsecured Creditors under the Plan* | 150,000,000 | 136,363,635 | 136,363,635 |
| *Allowed Claims at Effective Date as a Percentage of Total Asserted Claims* | 75.51% | | |
| *Initial Distribution of New GM Securities* | 113,194,172 | 102,903,821 | 102,903,821 |
| *Reserved Securities for Disputed Claims Post Initial Distribution[4]* | 36,718,646 | 33,380,558 | 33,380,558 |

As Disputed General Unsecured Claims are subsequently disallowed (in whole or in part)

through the claims resolution process, New GM Securities reserved for such claims become

available for distribution in respect of the Trust Units in the form of Excess GUC Trust

Distributable Assets.  As such, the GUC Trust's successful resolution of claims leads to

incremental recoveries enjoyed by holders of Allowed General Unsecured Claims.

6.    From a claims resolution standpoint, the GUC Trust had a productive nine

month period ending December 31, 2011.  During this period, the GUC Trust resolved over

$2.3 billion, or 24.3%, of the approximately $9.7 billion of initial Disputed General

Unsecured Claims.  Moreover, of that approximately $2.3 billion, only claims (or portions

thereof) with an aggregate amount of approximately $153 million were allowed – as such,

claims (or portions thereof) of just under $2.2 billion were disallowed.

---

[3]    Under the MSPA, the total number of shares of New GM Common Stock may be subject to change if the amount of Allowed General Unsecured Claims surpasses $35 billion.

[4]    On May 24, 2011, the GUC Trust sold 87,182 shares of New GM Common Stock and 79,256 New GM Warrants of each class, as required by Section 2.3(e)(i) of the GUC Trust Agreement to fund Reporting and Transfer Costs.

### III.    Trust Distributions

7.    The GUC Trust's disallowance of approximately $2.2 billion of disputed claims (or portions of disputed claims) released New GM Securities for distribution as Excess GUC Trust Distributable Assets to Trust Unit beneficiaries.  As noted in the previous chart, on the Initial Distribution Date the GUC Trust distributed, in respect of Allowed General Unsecured Claims, approximately 75.5% of its distributable assets.  Subsequent to this initial distribution, the GUC Trust has made three quarterly distributions, the first on or about July 28, 2011 (the "**First Quarter Distribution**"), the second on or about October 28, 2011 (the "**Second Quarter Distribution**") and the third on or about January 13, 2012 (the "**Third Quarter Distribution**" and collectively with the First Quarter Distribution and the Second Quarter Distribution, the "**Prior Quarterly Distributions**").  In aggregate, as outlined in the following table, pursuant to the Prior Quarterly Distributions, the GUC Trust distributed approximately 16.3% of its post-initial distribution reserved assets.[5]

|  | NEW GM COMMON STOCK | NEW GM $10.00 WARRANTS | NEW GM $18.33 WARRANTS | PERCENTAGE OF DISTRIBUTION |
|---|---|---|---|---|
| *Reserved Securities for Disputed Claims Post Initial Distribution* | 36,718,646 | 33,380,558 | 33,380,558 | |
| *First Quarter Distribution in respect of subsequently Allowed General Unsecured Claims* | *244,827* | *222,572* | *222,572* | *7.3%* |
| *First Quarter Distribution in respect of Trust Units due to disallowance of disputed claims* | *3,098,004* | *2,816,364* | *2,816,364* | *92.7%* |
| *Reserved Securities for Disputed Claims Post First Quarter Distribution* | 33,375,815 | 30,341,622 | 30,341,622 | |

---

[5]    The GUC Trust did not make any distribution to Trust Unit beneficiaries in connection with the Third Quarter Distribution.  While the GUC Trust successfully resolved claims during the third fiscal quarter, a significant portion of the Excess GUC Trust Distributable Assets associated with such claims resolution were subsequently "held back" from distribution in accordance with Sections 6.1(b), (c) and (d) of the GUC Trust Agreement, for the purposes of funding the current and projected fees, costs and expenses that are the subject of this Motion.  Following the application of this "hold back," the remaining Excess GUC Trust Distributable Assets were less than the Distribution Threshold and, thus, were not distributed to beneficiaries of Trust Units in connection with the third fiscal quarter.

| | | | | |
|---|---|---|---|---|
| Second Quarter Distribution in respect of subsequently Allowed General Unsecured Claims | 161,403 | 146,729 | 146,729 | 6.5% |
| Second Quarter Distribution in respect of Trust Units due to disallowance of disputed claims | 2,306,815 | 2,097,105 | 2,097,105 | 93.5% |
| **Reserved Securities for Disputed Claims Post Second Quarter Distribution** | 30,907,597 | 28,097,788 | 28,097,788 | |
| Third Quarter Distribution in respect of subsequently Allowed General Unsecured Claims | 188,180 | 171,074 | 171,074 | 100% |
| Third Quarter Distribution in respect of Trust Units due to disallowance of disputed claims | 0 | 0 | 0 | 0% |
| **Reserved Securities for Disputed Claims Post Third Quarter Distribution** | **29,514,625** | **26,831,449** | **26,831,449** | |

8.     Because of the GUC Trust's claims resolution successes, the majority – approximately 90% – of the Prior Quarterly Distributions were distributed as Excess GUC Trust Distributable Assets in respect of the Trust Units.  All in, the GUC Trust has distributed approximately 5.4 million shares of New GM Common Stock and approximately 9.8 million New GM Warrants, with a market value[6] of approximately $297 million in the aggregate, to Trust Unit beneficiaries in the Prior Quarterly Distributions.[7]

## IV.     Initial Funding of GUC Trust Costs and Expenses

9.     The Initial Budget was the product of extensive negotiation with the DIP Lenders, and was ultimately crafted to fit the finite sum of cash which the DIP Lenders were willing to provide for the wind-down of the Debtors' estates.  Recognizing that any events could lead to a breach of the Initial Budget, the Debtors and other estate parties crafted a safety-valve for cost overruns in the GUC Trust Agreement.  Thus, while the GUC Trust's general administrative costs (including the costs associated with claims resolution and trust

---

[6]   Market values included herein are estimated based on publicly available market pricing for New GM Common Stock and New GM Warrants as reported on or about the date of each distribution.

[7]   The most recent GUC Trust Report dated as of October 28, 2011 filed with the Court provides additional detail regarding the First Quarter Distribution and the Second Quarter Distribution and is annexed hereto as Exhibit D.  Any description of the First Quarter Distribution or the Second Quarter Distribution herein is qualified in whole by the terms of the GUC Trust Report.

asset distributions) are primarily funded by "**Wind-Down Budget Cash**" contributed by MLC to the GUC Trust on the Effective Date, the GUC Trust Agreement affords the GUC Trust Administrator the flexibility to "hold back" from distributions (with the approval of the GUC Trust Monitor) an amount of New GM Securities necessary to fund any current (and anticipated future) cost overruns associated with the primary functions of the GUC Trust. GUC Trust Agreement §6.1(b) and (d). Such "held-back" New GM Securities may then be sold with the approval of the Court. *Id.*

10.    Reporting and Transfer Costs provided an additional issue for the estate parties. "**Reporting and Transfer Costs**" include the following additional necessary costs of winding-down the Debtors' estates, none of which the DIP Lenders agreed to fund:

A.  fees, costs and expenses incurred by the Creditors' Committee as named plaintiff in the Term Loan Avoidance Action (to the extent such costs and expenses do not constitute actual litigation expenses of the Term Loan Avoidance Action);

B.  fees, costs and expenses incurred by the Creditors' Committee with respect to the determination of the proper beneficiaries of the Term Loan Avoidance Action;

C.  fees, costs and expenses of the GUC Trust that are directly or indirectly related to filings with the SEC and the No-Action Relief (as described further below);

D.  fees, costs and expenses of the GUC Trust that are directly or indirectly related to the application to the Internal Revenue Service for a private letter ruling regarding the tax treatment of the GUC Trust and holders of Allowed General Unsecured Claims; and

E.  fees, costs and expenses of the Avoidance Action Trust that are directly or indirectly related to filings with the SEC, in an amount not to exceed $500,000.

11.    Because no funds were designated for such Reporting and Transfer Costs in the Initial Budget, the GUC Trust Agreement contemplated that such costs would be funded entirely from the sale of New GM Securities. In that regard, Section 2.3(e)(i) of the GUC Trust Agreement required the GUC Trust Administrator to sell, as soon as practicable following the Effective Date, sufficient New GM Securities to fund approximately $5.75

million of Reporting and Transfer Costs.  In accordance therewith, on May 24, 2011, the GUC Trust Administrator sold (a) 87,182 shares of New GM Common Stock and (b) 158,512 New GM Warrants, yielding approximately $5.65 million in sale proceeds (the "**Initial Reporting Funds**").

12.    Given the breadth of duties allocated to Reporting and Transfer Costs, there was significant uncertainty on the Effective Date as to the ultimate fees, costs and expenses that would be required to be expended to satisfy these obligations.  As such, the GUC Trust Agreement provides the GUC Trust Administrator with the ability to "hold back" from distributions (with the approval of the GUC Trust Monitor) an amount New GM Securities necessary to fund any current and future anticipated Reporting and Transfer Costs.  GUC Trust Agreement §6.1(c).  Such "held-back" New GM Securities may then be sold with the approval of the Court.  *Id.*

13.    Prior to the Third Quarter Distribution, the GUC Trust Administrator, in consultation with the GUC Trust Monitor, determined that the current and future general administrative costs of the GUC Trust and the current and future Reporting and Transfer Costs substantially exceeded the allocable portion of the Wind-Down Budget Cash and Initial Reporting Funds, respectively.  As such, the GUC Trust Administrator (acting with the approval of the GUC Trust Monitor) "held back" Excess GUC Trust Distributable Assets consisting of 1,204,792 shares of New GM Common Stock, 1,095,265 New GM $10.00 Warrants and 1,095,265 New GM $18.33 Warrants, in the aggregate from the Third Quarter Distribution.

14.    Such "held-back" New GM Securities reflect an aggregate reserve intended to cover anticipated fees, costs and expenses of the GUC Trust for the years 2011 (cost overruns), 2012, 2013 and 2014.  However, by this Motion, the GUC Trust Administrator is only seeking authority to sell 554,923 shares of New GM Common Stock, 504,475 New GM

$10.00 Warrants and 504,475 New GM $18.33 Warrants (the "**Reserved Securities**") for the purposes of funding accrued and projected fees, costs and expenses of the GUC Trust for the years 2011 and 2012.[8]

## V.    No-Action Relief

15.    Both the Confirmation Order and the GUC Trust Agreement permit the GUC Trust to issue transferable Trust Units if the GUC Trust receives confirmation from the Staff of the SEC's Division of Corporation Finance (the "**Staff**") that the Staff will not recommend an enforcement action if transferable Trust Units are issued without the GUC Trust having registered under Section 12(g) of the Securities Exchange Act of 1934 (the "**No-Action Relief**").  *See* Confirmation Order ¶ 13, GUC Trust Agreement § 3.5(a).  The GUC Trust Administrator may waive this No-Action Relief requirement and issue Trust Units if (and only if) the Trust Units are non-transferable.  *Id*.  To date, the GUC Trust has issued only non-transferable Trust Units on the trust's books and records.[9]

16.    Six months prior to the Effective Date, representatives of the Debtors and the Creditors' Committee first approached the Staff regarding the No-Action Relief.  In March 2011, the parties submitted to the Staff a draft formal "no-action request" (the "**March No-Action Request**").  The applicants were hopeful that, post-Effective Date, the GUC Trust would be permitted to issue transferable Trust Units pursuant to a formal no-action letter

---

[8]    The Reserved Securities include (i) a price fluctuation reserve which is equal to approximately 10% in excess of the anticipated needs of the GUC Trust as described in this Motion and (ii) a contingency reserve of New GM Securities equal to approximately $5 million (as of January 17, 2012).  The intent of the price fluctuation reserve is to protect the GUC Trust against any potential decrease in the value of the New GM Securities between the date hereof and the date on which such securities are liquidated (to the extent the relief requested herein is approved).  In addition, the purpose of the contingency reserve is to provide a further cushion in the event that the Revised GUC Trust Budget (as defined below) underestimates the costs and expenses associated with administrative or reporting duties of the GUC Trust.  While the GUC Trust Administrator requests the authority to sell the entirety of the Reserved Securities, including the price fluctuation reserve and the contingency reserve, the GUC Trust shall only liquidate the portion of the price fluctuation reserve and/or contingency reserve necessary to effect the relief requested herein.

[9]    Although contingent rights to receive Excess GUC Trust Distributable Assets under the GUC Trust Agreement existed from the Effective Date, the GUC Trust did not initially issue Trust Units in respect of such contingent rights.  Non-transferable Trust Units were first issued on the GUC Trust's books and records in respect of Initial Allowed General Unsecured Claims after the execution of a July 8 amendment to the GUC Trust Agreement establishing mechanics for the issuance of non-transferable Trust Units.

granted by the Staff that would provide relief from many of the SEC's general reporting requirements.

17.    Post-Effective Date, the GUC Trust Administrator has continued discussions with the Staff regarding the requested No-Action Relief.  Revised draft no-action letters were submitted by counsel to the GUC Trust on behalf of the GUC Trust Administrator (the "**Post-Effective Date No-Action Request**").   The level and detail of proposed Exchange Act reporting under the Post-Effective Date No-Action Request is greater than that proposed in the March No-Action Request.

## VI.    The Avoidance Action Trust

18.    The Avoidance Action Trust was established to liquidate and distribute its non-administrative assets, which consist entirely of the proceeds of the Term Loan Avoidance Action (if any).  Its current administrative assets are comprised of approximately $1.6 million of Avoidance Action Trust Administrative Cash and $500,000 for reporting costs.  Avoidance Action Trust Administrative Cash was set aside to fund litigation costs relating to the Term Loan Avoidance Action and the trust's general corporate expenses.  The legal costs associated with litigating the Term Loan Avoidance Action are anticipated to comprise the Avoidance Action Trust's most substantial administrative expense.

19.    On December 2, 2011, the Court ruled in favor of the plaintiff in the adversary proceeding entitled *Official Committee of Unsecured Creditors of Motors Liquidation Company, et al. v. United States Department of Treasury, Export Development Canada* (Case No. 11-09406), denying the defendants' (the DIP Lenders) motion for summary judgment and ruling that unsecured creditors are the proper beneficiaries of Term Loan Avoidance Action proceeds (the "**Term Loan Ownership Ruling**").  The judgment, if upheld on appeal, directs any proceeds of the $1.5 billion litigation to holders of Allowed General Unsecured Claims, the current class of GUC Trust beneficiaries.

20.     Although the Avoidance Action Trust's purpose is limited, a substantial amount of time and effort has been expended to establish and maintain the Avoidance Action Trust, in addition to the substantial effort related to the prosecution of the Term Loan Avoidance Action itself.  In connection with MLC's dissolution, Avoidance Action Trust Professionals negotiated an assignment agreement with MLC relating to the transfer of trust assets, including the Term Loan Avoidance Action, drafted a budget for the DIP Lenders' review and consent and attended to certain tax issues.  With respect to this last point, under the Avoidance Action Trust Agreement, the Avoidance Action Trust Administrator must perform a good faith valuation of the Term Loan Avoidance Action in order to establish a tax basis for any future recovery.  Such a good faith analysis requires, among other steps, analyses of the likelihood of litigation success on the merits (including on any potential appeals), the likelihood of successful collection from hundreds of individual and differently situated defendants, the potential value of any remaining collateral, and an appropriate discounting of the projected future recovery to present value.  This detailed and complex analysis has required, and will continue to require, the substantial work of the Avoidance Action Trust Administrator, the Avoidance Action Trust Monitor and a myriad of Avoidance Action Trust Professionals.

21.     In addition, the Avoidance Action Trust may be subject to a tax liability that had not previously been anticipated.  While Trust Professionals had always anticipated that there could be tax liability upon a realization of proceeds from the Term Loan Avoidance Action (and the Avoidance Action Trust Agreement specifically contemplates that proceeds may be utilized to fund such liabilities prior to any distribution to trust beneficiaries), the recent appeal of the Term Loan Ownership Ruling has created an anomalous situation not previously considered.  While ownership of the Term Loan Avoidance Action remains under appeal, the Avoidance Action Trust is treated as a Disputed Ownership Fund rather than a

liquidating trust for tax purposes.  In the event that this Court decides the underlying merits of the Term Loan Avoidance Action prior to the ultimate resolution of the ownership of the Term Loan Avoidance Action (i.e. while the Avoidance Action Trust is treated as a Disputed Ownership Fund), a taxable event may be deemed to have occurred.  If the value of the Term Loan Avoidance Action is deemed to exceed its initial valuation at the time of any such taxable event, a substantial tax may potentially be asserted against any such incremental increase in value (the "**Avoidance Action Trust Tax Liability**").  Given the relative size of the potential Term Loan Avoidance Action proceeds, even a small percentage increase in value could have an enormous tax consequence.  Because any decision on the merits may be under appeal at the time that any tax payments are due, there may be no proceeds available to make payment on potential taxes.  As such, the Avoidance Action Trust may be left with a large tax liability and virtually no ability to fund such liability.

## VII.    Summary of Trust Expenses to Date

22.    During its first calendar year, the GUC Trust incurred unbudgeted administrative and reporting fees and expenses.  In the aggregate, for 2011, the GUC Trust (a) is approximately $3.5 million over budget in respect of administrative costs, and (b) incurred Reporting and Transfer Costs of approximately $65,000 in excess of the Initial Reporting Funds.

23.    The majority of the GUC Trust's budgeted and unbudgeted expenses, for 2011 and beyond, relate to its primary functions: resolving Disputed General Unsecured Claims and distributing New GM Securities to trust beneficiaries.  Below is a brief explanation of the GUC Trust's incurrence of additional fees and expenses in 2011, much of which equally applies moving forward.

24.    <u>Claims Resolution Costs</u>:  Claims resolution, while overall a success, has been more time consuming and costly than anticipated in the Initial Budget.  For example, the

GUC Trust has been able to resolve a large number of claims without any judicial intervention and continues to do so.  One of the GUC Trust's tools to resolve the thousands of filed litigation claims is the Alternative Dispute Resolution ("**ADR**") procedures which set forth uniform steps for resolving claims outside of the purview of the Court.  The ADR procedures are beneficial in that the resources necessary to prepare for and conduct each mediation are highly predictable and the absence of judicial intervention reduces professional costs.  However, the process to prepare, execute, and finalize the exchange of offers has been slower than anticipated, resulting in increased costs.  In addition, while the ADR procedures provide for an expedited mediation process, the actual timeframes have been significantly longer than originally anticipated.

25.    With respect to non-litigation claims, significant progress has similarly been made, although the GUC Trust has also encountered some unforeseen obstacles.  The GUC Trust continues to face a large number of claims filed by *pro se* individual claimants that require attention well beyond that which would be indicated by the face amount of the claims. These claimants often have difficulty understanding the legal impediments to allowance of their claims and do not have counsel to provide advice with respect to the validity of the GUC Trust's positions.  In many cases, these individuals have continued to litigate in courts around the country despite the imposition of the automatic stay and the injunctions provided in the Debtors' confirmed Plan.  There are even instances where the GUC Trust Administrator and the GUC Trust's professionals have been named as additional defendants in their individual capacities.  The GUC Trust could not have anticipated the resolve of these individuals to pursue their claims into litigation notwithstanding the GUC Trust's good faith efforts to resolve these claims consensually.  Many of these claims were asserted for the first time after the Initial Budget was prepared.

26.     The GUC Trust has respected the rights to due process of each individual claimant.  In doing so, however, the GUC Trust has incurred costs in excess of those that could have been predicted.  Moreover, over a dozen appeals filed by individual claimants are currently pending against the GUC Trust.  Due to the length of time needed to litigate these particular claims to final judgment, the GUC Trust has had to prioritize the litigation of these claims, thereby delaying its ability to address some of the more substantial claims that remain.

27.     Finally, the GUC Trust has experienced a continued barrage of new claims that have diverted attention from its predetermined course.  Some of these claims have asserted liabilities in the hundreds of millions of dollars and have spawned litigation that was completely unanticipated when the GUC Trust was created.

28.     Distribution Costs:  To date, as noted above, the GUC Trust has issued the Trust Units on its own books and records only, and has not issued transferable Trust Units in a global (transferable) form registered in the name of the nominee for, and lodged into the dematerialized clearing and settlement system of, the Depository Trust Company ("**DTC**"). Had the Trust Units then been issued in a global (transferable) form, the GUC Trust Administrator and Trust Professionals would have sent all notices to, and made a single lump distribution to, DTC in connection with the prior distributions.  DTC, through its system, would have handled the distribution to its participants (and subsequently, distributions would be made by its participants to beneficial owners) without further effort and expense on the part of the GUC Trust.  Without the use of DTC's clearing and settlement system, the GUC Trust Administrator and the Trust Professionals took direct responsibility for managing the Prior Quarterly Distributions, and in particular, the $297 million of New GM Securities distributed to Trust Unit beneficiaries as Excess GUC Trust Distributable Assets.

29.     Distributions in respect of non-transferable Trust Units not issued through DTC have proven more time consuming and costly than previously anticipated.  In order to make the Prior Quarterly Distributions, the GUC Trust Administrator and Trust Professionals established a complex distribution mechanism that fully and properly accounts for and makes distributions to each GUC Trust beneficiary.

30.     In particular, the GUC Trust Administrator and the Trust Professionals expended considerable effort to distribute securities to holders of Allowed General Unsecured Claims which did not arise under one of the Debtors' pre-petition note or bond issuances (collectively, the "**Non-Bondholder Claimants**").   GUC Trust distributions of New GM Securities to such claimants were required to be made directly to individual Non-Bondholder Claimant brokerage accounts.  Making such individualized distributions timely and accurately entailed a lengthy and detailed distribution process replete with internal controls.  In connection with each Prior Quarterly Distribution, the GUC Trust Administrator (working with Trust Professionals) has, among other actions, performed the following tasks:

A.  Communicated, in a series of letters, with Non-Bondholder Claimants to alert each such claimant of (a) the existence of each distribution, (b) the steps such claimant would need to complete in order to qualify for such distribution (which such steps included the provision of brokerage account information and W-9s), and (c) the claimant's individualized expected recovery pursuant to such distribution via a personalized mini-account statement;

B.  Communicated by phone with certain Non-Bondholder Claimants to resolve numerous deficiencies in the responsive information provided by such claimants;

C.  Maintained and updated a register of all Non-Bondholder Claimants which lists brokerage and other individualized claimant information;

D.  Worked directly with the brokerage house of each Non-Bondholder Claimant to arrange for and document the free delivery of New GM Securities; and

E.  Where claimants were entitled to cash payments in lieu of fractional New GM Securities, liquidated securities to fund cash payments and drafted/delivered physical checks to individual claimants.

31.    <u>Communication</u>.    Because of the high-profile nature of the chapter 11 cases and the large number of small claimants, the volume of calls and inquiries received by dedicated phone lines and email accounts maintained by the GUC Trust was greater than anticipated.    In addition to updating the GUC Trust's website and automated phone voice messages, over 6,000 calls and emails have been handled by a communications staff employed by AlixPartners, LLP, a Trust Professional.    The GUC Trust Administrator intends and expects to keep phone lines open to support distributions and the inevitable questions that will come as individual claimants prepare tax returns.

32.    <u>Reporting and Transfer Costs</u>.    In 2011, the GUC Trust incurred additional Reporting and Transfer Costs associated with the Creditors' Committee's litigation of the Term Loan Ownership Ruling and with respect to the application to the IRS for a private letter ruling regarding the tax treatment of the GUC Trust.    In addition, the GUC Trust incurred Reporting and Transfer Costs as part of its efforts to obtain No-Action Relief from the Staff and to enhance existing entity level and transactional internal controls and accounting systems, as well as draft proposed filings to be made pursuant to the terms of any No Action Relief, in response to communications with the Staff relating to the March No-Action Request.    Post-Effective Date, the GUC Trust Administrator and the Trust Professionals have continued discussions with the Staff regarding No-Action Relief. Additional Post-Effective Date No-Action Requests were submitted, and the GUC Trust Administrator and Trust Professionals have continued to engage in informal communications with the Staff.

## RELIEF REQUESTED

33.    Based on expenses incurred to date, together with the anticipated additional costs associated with any No-Action Relief that may be received and the additional anticipated costs of the Avoidance Action Trust, the GUC Trust and Avoidance Action Trust

each completed the revised budgets for calendar years 2011 and 2012 annexed hereto as
Exhibit B (the "**Revised GUC Trust Budget**") and Exhibit C, respectively (the "**Revised Avoidance Action Trust Budget**", and together with the Revised GUC Trust Budget, the "**Revised Budgets**").[10]    The GUC Trust Administrator and the Avoidance Action Trust Administrator submit that the Revised Budgets better reflect, in contrast to the Initial Budget, the actual fees and expenses expected to be incurred by each of the Trusts on a go-forward basis.

34.    By this Motion, (i) the GUC Trust Administrator requests authority to (a) liquidate the Reserved Securities to satisfy in full (I) accrued and projected GUC Trust administrative fees, costs and expenses, and (II) accrued and projected Reporting and Transfer Costs, including projected costs that would be incurred by the GUC Trust in connection with the anticipated terms and conditions of No-Action Relief, (b) liquidate a sufficient number of New GM Securities to satisfy in full the projected Avoidance Action Trust fees, costs and expenses as reflected in the Revised Avoidance Action Trust Budget, and authorize the GUC Trust and GUC Trust Administrator to transfer the proceeds of such liquidation to the Avoidance Action Trust free and clear of any liens, claims and encumbrances (other than a remainder interest of the GUC Trust as described in the Avoidance Action Trust Amendment), and (c) transfer to the Avoidance Action Trust a sufficient number of New GM Securities to satisfy the potential Avoidance Action Trust Tax Liability, free and clear of any liens, claims and encumbrances (other than a remainder interest of the GUC Trust as described in the Avoidance Action Trust Amendment), to be

---

[10]    Section 6.4 of the GUC Trust Agreement and Section 6.3 of the Avoidance Action Trust Agreement require the GUC Trust Administrator and the Avoidance Action Trust Administrator, respectively, to submit budgets on an annual basis to the DIP Lenders for their approval.  While the GUC Trust Administrator and the Avoidance Action Trust Administrator each submitted budgets for the calendar year 2012 to the DIP Lenders, such budgets did not reflect all of the anticipated fees, costs and expenses reflected in the Revised Budgets attached hereto.  The GUC Trust Administrator and the Avoidance Action Trust Administrator each anticipate that the Revised Budgets will be submitted for DIP Lender approval in connection with a quarterly budget update permitted by each of the Trust Agreements.

liquidated by the Avoidance Action Trust Administrator only in the event that the Avoidance

Action Trust Tax Liability arises, and (ii) the Avoidance Action Trust Administrator requests

authority to enter into the Avoidance Action Trust Amendment.  Presented below is a chart

outlining the relief requested in this Motion:

| AUTHORITY REQUESTED[11] | NEW GM COMMON STOCK | NEW GM $10.00 WARRANTS | NEW GM $18.33 WARRANTS | ANTICIPATED PROCEEDS[12] |
|---|---|---|---|---|
| *Liquidate New GM Securities to Fund Accrued and Projected Administrative Fees, Costs and Expenses (2011 – 2012)* | 373,918 | 339,925 | 339,925 | $17,866,537 |
| *Liquidate New GM Securities to Fund Accrued and Projected Reporting and Transfer Costs (2011 – 2012)* | 181,005 | 164,550 | 164,550 | $8,648,781 |
| *Liquidate New GM Securities to Fund Accrued and Projected Avoidance Action Trust Administrative Costs (2012- 2014)* | 287,012 | 260,920 | 260,920 | $13,714,000 |
| *Transfer New GM Securities to Potentially Fund Avoidance Action Trust Tax Liability* | 355,783 | 323,439 | 323,439 | N/A |
| *Approve Avoidance Action Trust Amendment* | N/A | N/A | N/A | N/A |
| ***TOTAL*** | 1,197,718 | 1,088,834 | 1,088,834 | $40,229,318 |

35.    In support of the relief requested herein, the GUC Trust Administrator and the

Avoidance Action Trust Administrator submit that the additional fees and expenses the GUC

Trust Administrator seeks to fund hereunder, together with the approval of the Avoidance

---

[11]    As discussed above, the Reserved Securities contain (i) a price fluctuation reserve equal to approximately 10% in excess of the anticipated needs of the GUC Trust as described in this Motion and (ii) a contingency reserve of New GM Securities equal to approximately $5 million (as of January 17, 2012).  By this Motion, the GUC Trust seeks authority to liquidate the price fluctuation reserve and/or contingency reserve to the extent that the New GM Securities set forth in this chart are insufficient to deliver the anticipated proceeds described therein.

[12]    The anticipated proceeds are based on publicly available market pricing for New GM Common Stock and New GM Warrants as reported on January 17, 2012.

Action Trust Amendment that is necessary to implement certain aspects of the relief requested herein, will enable the GUC Trust Administrator and Avoidance Action Trust Administrator to satisfy their respective obligations under the GUC Trust Agreement and Avoidance Action Trust Agreement respectively and will directly benefit unsecured creditors.[13]

## BASIS FOR RELIEF

36.    The relief requested herein is consistent with the terms of the Plan, the Confirmation Order, the GUC Trust Agreement and applicable bankruptcy law.  The GUC Trust Administrator has the power and authority to perform such "functions as are provided in the Plan and the Trust Agreement" including, if acting in consultation with the GUC Trust Monitor, seeking Court authority to liquidate New GM Securities to fund administrative and reporting fees, costs and expenses.  Confirmation Order ¶¶ 15, 31; GUC Trust Agreement § 6.1.  The Avoidance Action Trust Administrator has the authority to amend the Avoidance Action Trust Agreement for any purpose "on petition to, and with the approval of, the Bankruptcy Court."  Avoidance Action Trust Agreement § 13.13(b).

37.    The relief requested herein, pursuant to the terms hereof, is also supported by governing bankruptcy law and offers immediate and long-term benefits to GUC Trust beneficiaries.  Section 105(a) of the Bankruptcy Code provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Section 1142(b) further provides the Court with authority to direct any necessary party "to perform any [act] . . . that is necessary for the consummation of the plan."  11 U.S.C. § 1142(b).

---

[13]    As required by Section 6.1 of the GUC Trust Agreement, the GUC Trust Administrator has consulted with FTI Consulting Inc., the monitor for the GUC Trust (in such capacity, the "**GUC Trust Monitor**"), with respect to the proposed liquidation of New GM Securities.  GUC Trust Agreement § 6.1.  The GUC Trust Monitor has indicated that it supports the relief requested herein.

38.    By this Motion, the GUC Trust Administrator asks the Court to authorize the liquidation and (as applicable) transfer of New GM Securities to fund fees, costs and expenses to the extent set forth herein.  The Avoidance Action Trust Administrator asks the Court to approve the Avoidance Action Trust Amendment for the purposes of implementing certain of the relief requested herein.

I.    **The GUC Trust Should Be Permitted To Sell New GM Securities Necessary To Fund Excess Accrued and Estimated GUC Trust Administrative Costs**

39.    Subsequent to the Effective Date, over $8.2 billion in value has been distributed to holders of Allowed General Unsecured Claims (including the $297 million in respect of Trust Units).  Primarily in connection with those distributions and the claims resolution process, the GUC Trust has accrued $3.5 million of administrative fees and expenses not reflected in the Initial Budget.  In addition, as detailed in the Revised GUC Trust Budget, the GUC Trust Administrator anticipates that approximately $14.4 million in additional cash, in excess of the Initial Budget, will be necessary to fund the continued administration of the GUC Trust in 2012.  To ensure that the GUC Trust can pay all accrued and unpaid fees and expenses for 2011 and is adequately funded on a go-forward basis, the GUC Trust Administrator hereby requests authority to sell New GM Securities with a present market value of approximately $17.9 million.

40.    <u>Fees and Expenses of Trust Professionals</u>:  As described above, the claims resolution process, while undeniably successful, has proved more time consuming and costly than was previously expected.  The GUC Trust Administrator and Trust Professionals have made every effort to streamline the resolution process – for example, by utilizing the ADR procedures, filing approximately 265 omnibus objections and avoiding individualized litigation wherever possible.  Nonetheless, many claims or specific aspects of claims required detailed, thoughtful analysis.  In addition, although the GUC Trust Administrator and Trust Professionals have taken steps to improve efficiencies in this regard, they have nonetheless

been forced to respond to numerous individual pleadings. Litigation claims, in particular, have required a factual analysis of each underlying cause of action and often prolonged negotiation.

41.     In addition, the Initial Budget, as drafted pre-Effective Date and pre-initial GUC Trust distribution, constituted a good faith estimate of GUC Trust fees, costs and expenses attendant to the distribution processes. Estate professionals who drafted the Initial Budget, however, did so without an understanding of the magnitude of effort that would be required to perform distributions or that distributions would be completed outside DTC's distribution mechanic. To complete the Prior Quarterly Distributions, the GUC Trust was required take extra steps and develop incremental internal controls to ensure orderly and accurate distributions to claimants – in particular, smaller Non-Bondholder Claimants. No party previously anticipated either the GUC Trust Administrator or the Trust Professionals having to go to such lengths. The GUC Trust Administrator and the Trust Professionals established and maintained a registry of all Non-Bondholders Claimants and provided free delivery of New GM Securities directly to such claimants' brokerage accounts (except, in certain cases, where claimants were entitled to cash in lieu of partial securities). Where claimants were entitled to cash, moreover, the GUC Trust Administrator sold the corresponding New GM Securities and drafted checks to claimants.

42.     GUC Trust Administrator and GUC Trust Monitor Fees: In addition to the fees and expenses associated with GUC Trust Professionals, the GUC Trust Administrator anticipates that both the GUC Trust Administrator and the GUC Trust Monitor will be required to devote additional staff and other resources in order to continue to make timely distributions to holders of Allowed General Unsecured Claims. As described above, the distribution process is time consuming and resource intensive, and will require a significant amount of additional work by both the GUC Trust Administrator and the GUC Trust

Monitor.  The GUC Trust Administrator submits that the value of such anticipated additional

work is $1.2 million for the GUC Trust Administrator and $1.2 million for the GUC Trust

Monitor for the year 2012 (the costs of which are included in the $17.9 million described

above).  The liquidation of New GM Securities to fund additional fees of the GUC Trust

Administrator and the GUC Trust Monitor are permitted by Sections 9.7 and 11.5 of the GUC

Trust Agreement, respectively, which provide that the GUC Trust Administrator and the

GUC Trust Monitor, respectively, are entitled to "fair and reasonable compensation" for their

services and may be compensated from the sale of New GM Securities.

## II.    The GUC Trust Should Be Permitted To Sell New GM Securities Necessary To Fund Excess Accrued and Estimated Reporting Costs

43.    Estate parties drafted section 2.3 of the GUC Trust Agreement, which directs

the GUC Trust Administrator to liquidate a limited number of securities to fund Reporting

and Transfer Costs, on the assumptions that (a) the GUC Trust would receive No-Action

Relief pre-Effective Date, (b) the Creditors' Committee would receive a final judgment

determining the proper beneficiaries of the Term Loan Avoidance Action and (c) the

application to the IRS for a private letter ruling regarding the tax treatment of the GUC Trust

would be complete.  None of these assumptions have proven to be accurate.  As a result of

these events, the GUC Trust has accrued approximately $65,000 Reporting and Transfer

Costs in excess of the Initial Reporting Funds.  In addition, as detailed in the Revised GUC

Trust Budget, the GUC Trust Administrator anticipates that approximately $8.6 million in

additional cash will be necessary to fund the future anticipated Reporting and Transfer Costs

in 2012 in the event that the No-Action Relief is received.  To ensure that the GUC Trust can

pay all accrued and unpaid Reporting and Transfer Costs for 2011 and can satisfy future

Reporting and Transfer Costs in 2012, the GUC Trust Administrator hereby requests

authority to sell New GM Securities with a present market value of approximately $8.6

million.

44.    <u>Fees and Expenses of Trust Professionals</u>: With respect to the Term Loan Avoidance Action, on December 2, 2011, this Court issued the Term Loan Ownership Ruling in favor of unsecured creditors.  On December 16, 2011, however, the DIP Lenders appealed such ruling.  As such, additional Reporting and Transfer Costs will be incurred by the GUC Trust with respect to the Creditors' Committee's continued work on the appeal of the Term Loan Ownership Ruling.

45.    In addition, the GUC Trust incurred additional Reporting and Transfer Costs in connection with its continued efforts to obtain and satisfy the anticipated terms of the No-Action Relief.  First, fees were incurred in connection with the GUC Trust Administrator's continued discussions with the Staff regarding the terms of any No-Action Relief.  In addition, as it became clear that obtaining No-Action Relief would require that the GUC Trust greatly increase its internal controls structure and provide additional filings under the Exchange Act, the GUC Trust Administrator took steps to enhance already existing entity level and transactional controls and improve the existing accounting system.  The GUC Trust Administrator further directed the GUC Trust to retain additional auditors and other professionals to guide the GUC Trust with respect to these regulatory issues.  The GUC Trust Administrator submits that these modifications have improved the operation of the GUC Trust to the benefit of the trust beneficiaries, even in the absence of No-Action Relief.  Moreover, to the extent the anticipated No-Action Relief is granted, absent the work completed by the GUC Trust Administrator and Trust Professionals to date, the GUC Trust would be in no position to satisfy the terms and conditions of such relief.

46.    Also, as described in greater detail above, assuming the GUC Trust receives No-Action Relief, the GUC Trust's issuance of transferable Trust Units is contingent on its satisfaction of the terms and conditions of the No-Action Relief.  Such terms and conditions of the anticipated No-Action Relief will require the GUC Trust to comply with numerous

Exchange Act requirements, and not surprisingly, additional reporting attendant to the GUC Trust's compliance with the terms of the anticipated No-Action Relief would come at a cost. Both the GUC Trust Administrator and the Trust Professionals would need to dedicate additional resources to produce the detailed financial reporting required by the terms of the No-Action Relief. In addition, the GUC Trust Administrator would need to engage additional Trust Professionals who specialize in reporting trusts and compliance with the Sarbanes-Oxley Act of 2002. The Revised GUC Trust Budget constitutes an estimate of projected fees, costs and expenses which the GUC Trust Administrator and Trust Professionals believe may be incurred in connection with the GUC Trust's compliance with the terms and conditions of the anticipated No-Action Relief.[14]

47.    The resulting benefits of No-Action Relief to the GUC Trust and trust beneficiaries outweigh the costs. First, issuing transferable Trust Units through DTC would simplify the GUC Trust's distribution mechanic, lowering go-forward future distribution costs. Distributions on account of Trust Units would be performed by the delivery of blocks of New GM Securities to DTC which will then be divided between the various DTC participants and liquidated as necessary to fund cash payments. Notices and other communications with Trust Unit holders would be delivered through DTC. Finally, the GUC Trust Administrator and its professionals would not have to create mini-account statements for, communicate directly with, liquidate shares for or draft checks to, individual Non-Bondholder Claimants. Such tasks would be handled by DTC, at no cost to the GUC Trust (and ultimately, its beneficiaries).

48.    Second, a material benefit of the compliance with the anticipated terms and conditions of the No-Action Relief is increased disclosure and transparency. Currently, as

---

[14]    In the event that the No-Action Relief is ultimately not received by the GUC Trust, the GUC Trust Administrator anticipates that the reporting obligations of the GUC Trust will be less onerous. In such contingency, any proceeds of the securities reserved and sold pursuant to this Motion (if approved) that are not necessary to fund then accrued Reporting and Transfer Costs will be distributed to holders of Trust Units in accordance with the terms of the GUC Trust Agreement.

required under Section 6.2 of Trust Agreement, the GUC Trust files quarterly "**GUC Trust Reports**", consisting of a summary of the distribution and claims resolution processes, basic financial reporting and footnotes to the foregoing.  GUC Trust Reports were last filed with this Court on October 28, 2011 and were subsequently filed with the SEC.  Absent the relief requested herein, the GUC Trust is not required to – and likely will not – file quarterly reports on Forms 10-Q or otherwise increase the scope of its reporting, in large part because no Other GUC Trust Administrative Cash would be available to fund the attendant costs and expenses. The GUC Trust Administrator submits that the costs associated with greater disclosure are only justified by the benefits associated with transferability of the Trust Units.

49.    Third, the issuance of transferable Trust Units also would benefit GUC Trust beneficiaries by potentially allowing them to monetize their future Plan distributions immediately to the extent they wish to do so.[15]  Potential liquidity will serve to benefit claimants – particularly smaller claimants who may have a more immediate need to realize their entire recoveries on their claims against the Debtors.  Notably, any potential liquidity will not result in any "forced sales" of Trust Units.  Beneficiaries can choose to assume the risks related to the Trust Units in the hope that the GUC Trust will continue to successfully resolve Disputed General Unsecured Claims, generating additional excess distributable assets.

50.    Finally, and perhaps most importantly, granting the relief herein is consistent with and in furtherance of the terms of the Plan.  Both the Plan and the Disclosure Statement envision that the GUC Trust will issue transferable Trust Units.  Indeed, for many of the reasons set forth above, the Creditors' Committee fought long and hard and expended substantial time and resources with the goal of ensuring that the Trust Units would be

---

[15]    Neither the GUC Trust Administrator nor the Trust Professionals will engage the services of any market maker or encourage market making activity in the Trust Units, facilitate the development of an active trading market or encourage others to do so, collect or publish information about prices at which Trust Units have been or may be transferred, or engage in any investor relations program designed to promote investment in the Trust Units or enhance their liquidity.

transferable.  This Plan was overwhelmingly accepted by unsecured creditors.  Allowing the GUC Trust to sell New GM Securities will enable it to meet the expectations of unsecured creditors and, therefore, is warranted and appropriate under the circumstances.

51.    <u>GUC Trust Administrator and GUC Trust Monitor Fees</u>:  In addition to the work to be performed by GUC Trust Professionals, the GUC Trust Administrator anticipates that, if the No-Action Relief is ultimately received, the duties and litigation exposure of the GUC Trust Administrator and GUC Trust Monitor will be significantly increased.  In such event, the GUC Trust will be required to comply with additional public reporting requirements, including the Sarbanes-Oxley Act of 2002.  Continued compliance with these reporting requirements will require both the GUC Trust Administrator and the GUC Trust Monitor to dedicate additional resources to this matter and could also expose the GUC Trust Administrator and GUC Trust Monitor to additional litigation risk and potential liability.

52.    The GUC Trust Administrator submits that the value of such anticipated additional resources is approximately $2.05 million for the GUC Trust Administrator and approximately $750,000 for the GUC Trust Monitor for the year 2012 (the costs of which are included in the $8.6 million described above).  The liquidation of New GM Securities to fund additional fees of the GUC Trust Administrator and the GUC Trust Monitor are permitted by Sections 9.7 and 11.5 of the GUC Trust Agreement, respectively, which provide that the GUC Trust Administrator and the GUC Trust Monitor, respectively, are entitled to "fair and reasonable compensation" for their services and may be compensated from the sale of New GM Securities.  In the event that the No-Action Relief is not received, the GUC Trust Administrator and the GUC Trust Monitor would not be required to devote additional resources to the satisfaction of added reporting requirements, and the proceeds of the liquidated Reserved Securities associated with these fees would be distributed to holders of Trust Units (other than the proceeds necessary to cover accrued fees at that time).

**III.    The GUC Trust Should Be Permitted To Sell New GM Securities Necessary To Fund the Administrative Costs of the Avoidance Action Trust**

53.    The $1.6 million of Avoidance Action Trust Administrative Cash set aside under the Plan is insufficient to fund litigation costs related to the Term Loan Avoidance Action and to satisfy the Avoidance Action Trust's general administrative costs.  By this Motion, the GUC Trust Administrator seeks to liquidate securities to fund additional Avoidance Action Trust fees, costs and expenses.

54.    The additional Avoidance Action Trust administrative costs are primarily related to the Avoidance Action Trust's principal function, prosecuting the Term Loan Avoidance Action.  Other costs include general corporate and tax legal advice and the cost of retaining a valuation expert for the purposes of setting a tax basis for the Term Loan Avoidance Action.  These costs are not reflected in the Initial Budget.

55.    In addition, it is anticipated that both the Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor will be required to provide services that substantially exceed those that were contemplated in the Initial Budget.  Due to complications surrounding the tax treatment of the Avoidance Action Trust, difficulties in valuing the Term Loan Avoidance Action and the impact of the Term Loan Ownership Ruling and its appeal, the Avoidance Action Trust has been required to hire more professionals than previously contemplated – each of which the Avoidance Action Trust Administrator and Avoidance Action Trust Monitor must supervise and compensate.  The Avoidance Action Trust Administrator submits that the value of such anticipated additional work is $1.95 million for the Avoidance Action Trust Administrator and $1.34 million for the Avoidance Action Trust Monitor for the years 2012 through 2014.

56.    If the Avoidance Action Trust lacks sufficient funds to finance the Term Loan Avoidance Action, the Avoidance Action Trust Administrator may be forced to discontinue the Term Loan Avoidance Action or, if possible, compensate counsel on a contingency basis.

Either result, given this Court's recent Term Loan Ownership Ruling, would impair unsecured creditors' recoveries. The GUC Trust Administrator submits, therefore, that additional funding of the Avoidance Action Trust is well justified and serves to benefit holders of Allowed General Unsecured Claims.

### IV.    The GUC Trust Should Be Permitted To Transfer to the Avoidance Action Trust New GM Securities Sufficient To Fund any Avoidance Action Trust Tax Liability

57.    There is currently no cash set aside to fund the Avoidance Action Trust Tax Liability if and when it is incurred. In the event that this tax arises, and the Avoidance Action Trust lacks a source of funding, it is uncertain what actions the Internal Revenue Service will take against the Avoidance Action Trust.

58.    Absent the relief requested herein, the Avoidance Action Trust may be forced to sell all or a portion of the Term Loan Avoidance Action (if possible) to cover any Avoidance Action Trust Tax Liability. Given the speculative nature of the Term Loan Avoidance Action, any distressed sale of this asset would likely be possible only at a deep discount. Such a sale would greatly reduce any potential recovery on the Term Loan Avoidance Action to holders of Allowed General Unsecured Claims.

59.    Given the uncertainty as to whether the Avoidance Action Trust Tax Liability will arise, the GUC Trust Administrator does not seek authority to immediately sell the New GM Securities necessary to satisfy this liability. Rather, by this Motion, the GUC Trust Administrator seeks authority to transfer to the Avoidance Action Trust an amount of New GM Securities that are estimated to be sufficient to cover this potential liability. As described further below, the Avoidance Action Trust Amendment (if approved) would then permit the Avoidance Action Trust Administrator to sell, as needed, such New GM Securities to fund any tax liability. New GM Securities not necessary to fund the Avoidance Action Trust Tax Liability would be returned to the GUC Trust.

60.    The GUC Trust Administrator submits that the transfer of New GM Securities to the Avoidance Action Trust as a reserve to fund any potential Avoidance Action Trust Tax Liability is well justified and serves to benefit holders of Allowed General Unsecured Claims.

**V.    The Avoidance Action Trust Amendment Should Be Approved**

61.    The Avoidance Action Trust Amendment is intended to implement the relief requested by this Motion with respect to the Avoidance Action Trust.  Because it was never anticipated that the Avoidance Action Trust would be funded by a source other than the Avoidance Action Trust Administrative Cash, the Avoidance Action Trust Agreement does not contain mechanisms for the use of any other such source of funding.

62.    The Avoidance Action Trust Amendment has been narrowly tailored to implement only the relief requested herein.  Notably, to the extent that any of the funds or New GM Securities transferred to the Avoidance Action Trust pursuant to this Motion (if approved) shall be returned to GUC Trust to the extent that they are not utilized for the purposes described herein.

<u>**WAIVER OF THE STAY PROVIDED BY BANKRUPTCY RULE 6004**</u>

63.    The GUC Trust Administrator and the Avoidance Action Trust Administrator further seek a waiver of any stay of the effectiveness of the Order.  Pursuant to Bankruptcy Rule 6004(h), "[an] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Based upon the facts and circumstances set forth herein, the GUC Trust Administrator and the Avoidance Action Trust Administrator submit that ample cause exists to justify a waiver of any stay imposed by Bankruptcy Rules 6004(h) to the extent it applies.  Because the property that forms the basis of this Motion is subject to price fluctuation, any delay in the ability to commence the sales requested could result in an interim decrease in the market price of the property and thus,

correspondingly, a decrease in the sales proceeds.  Any decrease in the projected sales proceeds could leave the GUC Trust and the Avoidance Action Trust underfunded, thus necessitating additional reserves and potentially additionally sales.

64.    The GUC Trust Administrator and the Avoidance Action Trust Administrator submit that the waiver of the stay under Bankruptcy Rule 6004 is appropriate here to facilitate the immediate commencement of the sales contemplated by this Motion. Accordingly, the GUC Trust Administrator and the Avoidance Action Trust Administrator submit that a waiver of the stay under Bankruptcy Rule 6004 is appropriate and necessary.

## **NOTICE**

65.    The GUC Trust Administrator and Avoidance Action Trust Administrator have served notice of this Motion on (a) the Office of the United States Trustee, Tracy Hope Davis, Esq. for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, (b) the parties identified on Exhibit E annexed hereto and (c) any other required notice parties under Section 6.2(b)(iv) of the GUC Trust Agreement.  Pursuant to the Confirmation Order and Section 6.2(b)(iv) of the GUC Trust Agreement, the GUC Trust Administrator respectfully submits that no other or further notice need be provided.

## CONCLUSION

WHEREFORE, the GUC Trust Administrator and the Avoidance Action Trust Administrator respectfully request that the Court enter an order substantially in the form attached hereto as <u>Exhibit A</u>, (i) approving the sale of the New GM Securities to fund certain fees, costs and expenses, (ii) authorizing the transfer of New GM Securities to the Avoidance Action Trust to fund future potential tax liabilities, (iii) approving the Avoidance Action Trust Amendment, and (iv) granting such other and further relief as may be deemed just and proper.

Dated:  New York, New York
        January 20, 2012

GIBSON, DUNN & CRUTCHER LLP

By:    /s/  Matthew J. Williams       

Matthew J. Williams
Joshua Weisser
Keith R. Martorana
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000

*Attorneys for the Motors Liquidation Company*
*GUC Trust and the Motors Liquidation*
*Company Avoidance Action Trust*