PRESENTMENT DATE AND TIME: January 31, 2012 at 12:00 Noon (Eastern Time)
OBJECTION DEADLINE: January 31, 2012 at 11:30 a.m. (Eastern Time)

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Motors Liquidation
Company DIP Lenders Trust

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                          :
In re                                     :        Chapter 11 Case No.
                                          :
**MOTORS LIQUIDATION COMPANY,** *et al.,*  :        09-50026 (REG)
      **f/k/a General Motors Corp.,** *et al.*  :
                                          :
                        **Debtors.**       :        **(Jointly Administered)**
                                          :
------------------------------------------------------------x

**NOTICE OF PRESENTMENT OF ORDER ON MOTORS LIQUIDATION COMPANY**
**DIP LENDERS TRUST'S MOTION TO FILE AN AMENDED RESPONSE**
**IN OPPOSITION TO MOTION OF THE REVITALIZING AUTO COMMUNITIES**
**ENVIRONMENTAL RESPONSE TRUST FOR AN ORDER PURSUANT TO 11 U.S.C.**
**§§ 105 AND 1142 TO ENFORCE THE DEBTORS' PAYMENT OBLIGATIONS**
**UNDER THE SECOND AMENDED JOINT CHAPTER 11 PLAN AND THE**
**CONFIRMATION ORDER**

**PLEASE TAKE NOTICE** that the Motors Liquidation Company DIP Lender

Trust (the "**MLC DIP Trust**"), formed in furtherance of the Second Amended Joint Chapter 11

Plan (the "**Plan**") (**ECF No. 9836**) by the above-captioned debtors (collectively, "**MLC**" or the

"**Debtors**"), will present the annexed unopposed motion, dated **January 23, 2012**, to file an

amended response in opposition to the Motion of the Revitalizing Auto Communities

Environmental Response Trust for an Order Pursuant to 11 U.S.C. §§ 105 and 1142 to Enforce

the Debtors' Payment Obligations Under the Second Amended Joint Chapter 11 Plan and the

Confirmation Order (**ECF No. 11164**) (the "**Motion**") and order thereon to the Honorable

Robert E. Gerber, United States Bankruptcy Judge, for approval and signature at Room 621 of

the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy**

**Court**"), One Bowling Green, New York, New York 10004 on **January 31, 2012 at 12:00 noon**

**(Eastern Time)**.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the

Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the

Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a)

electronically in accordance with General Order M-399 (which can be found at

www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by

all other parties in interest, on a CD-ROM or 3.5 inch disk, preferably in text-searchable portable

document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with

the customary practices of the Bankruptcy Court and General Order M-399, to the extent

practicable, and served in accordance with General Order M-399, and on (i) Weil, Gotshal &

Manges LLP, attorneys for the MLC DIP Trust, 767 Fifth Avenue, New York, New York 10153

(Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.);

(ii) Debtors, c/o Motors Liquidation Company, 401 South Old Woodward Avenue, Suite 370,

Birmingham, Michigan 48009 (Attn: Thomas Morrow); (iii) General Motors LLC, 400

Renaissance Center, Detroit, Michigan 48265 (Attn: Lawrence S. Buonomo, Esq.); (iv)

Cadwalader, Wickersham & Taft LLP, attorneys for the United States Department of the

Treasury, One World Financial Center, New York, New York 10281 (Attn: John J. Rapisardi,

Esq.); (v) the United States Department of the Treasury, 1500 Pennsylvania Avenue NW, Room

2312, Washington, D.C. 20220 (Attn: Joseph Samarias, Esq.); (vi) Vedder Price, P.C., attorneys

for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019

(Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.); (vii) Kramer Levin Naftalis &

Frankel LLP, attorneys for the statutory committee of unsecured creditors, 1177 Avenue of the

Americas, New York, New York 10036 (Attn: Thomas Moers Mayer, Esq., Robert Schmidt,

Esq., Lauren Macksoud, Esq., and Jennifer Sharret, Esq.); (viii) the Office of the United States

Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New

York 10004 (Attn: Tracy Hope Davis, Esq.); (ix) the U.S. Attorney's Office, S.D.N.Y., 86

Chambers Street, Third Floor, New York, New York 10007 (Attn: David S. Jones, Esq. and

Natalie Kuehler, Esq.); (x) Caplin & Drysdale, Chartered, attorneys for the official committee of

unsecured creditors holding asbestos-related claims, 375 Park Avenue, 35th Floor, New York,

New York 10152-3500 (Attn: Elihu Inselbuch, Esq. and Rita C. Tobin, Esq.) and One Thomas

Circle, N.W., Suite 1100, Washington, DC 20005 (Attn: Trevor W. Swett III, Esq. and Kevin C.

Maclay, Esq.); (xi) Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation,

attorneys for Dean M. Trafelet in his capacity as the legal representative for future asbestos

personal injury claimants, 2323 Bryan Street, Suite 2200, Dallas, Texas 75201 (Attn: Sander L.

Esserman, Esq. and Robert T. Brousseau, Esq.); (xii) Gibson, Dunn, Crutcher LLP, attorneys for

Wilmington Trust Company as GUC Trust Administrator and for Wilmington Trust Company as

Avoidance Action Trust Administrator, 200 Park Avenue, 47th Floor, New York, New York

10166 (Attn: Keith Martorana, Esq.); (xiii) FTI Consulting, as the GUC Trust Monitor and as the

Avoidance Action Trust Monitor, One Atlantic Center, 1201 West Peachtree Street, Suite 500,

Atlanta, Georgia  30309 (Attn: Anna Phillips); (xiv) Crowell & Moring LLP, attorneys for the

Revitalizing Auto Communities Environmental Response Trust, 590 Madison Avenue, 19th

Floor, New York, New York 10022-2524 (Attn: Michael V. Blumenthal, Esq.); (xv) Kirk P.

Watson, Esq., as the Asbestos Trust Administrator, 2301 Woodlawn Boulevard, Austin, Texas

78703, so as to be received no later than **January 31, 2012 at 11:30 a.m. (Eastern Time)** (the

"**Objection Deadline**").

PLEASE TAKE FURTHER NOTICE that if no objections are timely filed and

served with respect to the Motion, the MLC DIP Trust may, on or after the Objection Deadline,

submit to the Bankruptcy Court the Motion or order thereon, which may be entered with no

further notice or opportunity to be heard offered to any party.

Dated:  January 23, 2012

New York, New York

/s/ Joseph H. Smolinsky
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007

*Attorneys for Motors Liquidation*
*Company DIP Lenders Trust*

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Motors Liquidation
Company DIP Lenders Trust

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                    :
In re                               :        **Chapter 11 Case No.**
                                    :
**MOTORS LIQUIDATION COMPANY**, *et al.*,  :        **09-50026 (REG)**
       **f/k/a General Motors Corp.**, *et al.*   :
                                    :
                    **Debtors.**    :        **(Jointly Administered)**
                                    :
-------------------------------------------------------------x

**MOTORS LIQUIDATION COMPANY DIP LENDERS TRUST'S MOTION TO FILE**
**AN AMENDED RESPONSE IN OPPOSITION TO MOTION OF THE REVITALIZING**
**AUTO COMMUNITIES ENVIRONMENTAL RESPONSE TRUST FOR AN ORDER**
**PURSUANT TO 11 U.S.C. §§ 105 AND 1142 TO ENFORCE THE DEBTORS' PAYMENT**
**OBLIGATIONS UNDER THE SECOND AMENDED JOINT CHAPTER 11 PLAN AND**
**THE CONFIRMATION ORDER**

TO THE HONORABLE ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

      The Motors Liquidation Company DIP Lender Trust (the "**MLC DIP Trust**"), formed in

furtherance of the Second Amended Joint Chapter 11 Plan (**ECF No. 9836**) by the above-

captioned debtors (collectively, "**MLC**" or the "**Debtors**"),[1] hereby moves the Court for the

---

[1] The MLC DIP Trust was formed on December 15, 2011 to hold and administer certain assets
for the benefit of the Debtors' DIP lenders and lists as its assets, *inter alia*, all rights to recover
all or any portion of the amount of approximately $13.6 million that was deposited by MLC with

entry of an order granting the MLC DIP Trust leave to file an amended Response in Opposition

to the Motion of the Revitalizing Auto Communities Environmental Response Trust ("**RACER**"

or the "**Trust**") for an Order Pursuant to 11 U.S.C. §§ 105 and 1142 to Enforce the Debtors'

Payment Obligations Under the Second Amended Joint Chapter 11 Plan and the Confirmation

Order (the "**RACER Motion**") (**ECF No. 11164**).  RACER does not oppose the relief set forth

herein.  In support of this motion, the MLC DIP Trust respectfully represents as follows:[2]

## I.  <u>JURISDICTION</u>

1.  This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a

core proceeding pursuant to 28 U.S.C. § 157(b).

## II.  <u>ARGUMENT</u>

2.  At the request of the United States Department of Justice counsel, the MLC DIP Trust

seeks leave to file an amended response to the RACER Motion in order to clarify a few factual

statements that the parties believe will be helpful to the Court.  The amendments are minor as

reflected in the attached <u>Exhibit A</u> blackline showing revisions, and the requested amended

response is attached as <u>Exhibit B</u>.

3.  On January 5, 2012, the MLC DIP Trust filed its Response in Opposition to the RACER

Motion (**ECF No. 11297**).  The MLC DIP Trust respectfully submits that its request for leave to

file an amended response is reasonable and appropriate under the circumstances.  Granting the

MLC DIP Trust leave to file an amended response as requested herein will not prejudice RACER

---

the Court on or prior to December 15, 2011 in connection with the RACER Motion.  (<u>See</u>
Motors Liquidation Company DIP Lenders Trust Agreement ¶ C & at Schedule B).

[2] The United States Department of Treasury has instructed and funded the MLC DIP Trust to
proceed in defending this dispute.

or any other party in interest.  In light of all the relevant circumstances, the MLC DIP Trust submits that there is ample justification for granting this Motion.

### III.  NOTICE

4.  Notice of this Motion has been provided to RACER, by and through its counsel of record, and parties in interest in accordance with the Sixth Amended Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and Case Management Procedures, dated May 5, 2011 (**ECF No. 10183**).  The MLC DIP Trust submits that such notice is sufficient and no other or further notice need be provided.

5.  No previous request for the relief sought herein has been made by the MLC DIP Trust to this or any other Court.

### IV.  CONCLUSION AND REQUESTED RELIEF

6.  For the reasons stated above, the MLC DIP Trust respectfully requests that the Court grant leave to file the amended response attached hereto as Exhibit B.

Dated:  January 23, 2012

New York, New York

/s/ Joseph H. Smolinsky
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Motors Liquidation
Company DIP Lenders Trust*

# Exhibit A

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Motors Liquidation
Company DIP Lenders Trust

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                        :
**In re**                                    :        **Chapter 11 Case No.**
                                        :
**MOTORS LIQUIDATION COMPANY,** *et al.,*    :        **09-50026 (REG)**
        **f/k/a General Motors Corp.,** *et al.*    :
                                        :
                        **Debtors.**        :        **(Jointly Administered)**
                                        :
------------------------------------------------------------x

**MOTORS LIQUIDATION COMPANY**
**DIP LENDERS TRUST'S AMENDED RESPONSE IN OPPOSITION TO MOTION OF**
**THE REVITALIZING AUTO COMMUNITIES ENVIRONMENTAL RESPONSE**
**TRUST FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105 AND 1142 TO ENFORCE**
**THE DEBTORS' PAYMENT OBLIGATIONS UNDER THE SECOND AMENDED**
**JOINT CHAPTER 11 PLAN AND THE CONFIRMATION ORDER**

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ................................................................... 1

II.  BACKGROUND FACTS ......................................................................... 9

    A.   The Settlement Agreement Established the Scope of Environmental Liabilities and Resolved Claims Associated with MLC's Real Properties ........... 9

    B.   The Settlement Agreement Governs the Debtors' Funding Obligation to RACER ................................................................................. 12

    C.   Treasury and MLC Agreed to Fund RACER Using TIPS to Mitigate the Risk of Inflation .................................................................... 13

    D.   GAAP Dictates That the Debtors Value the TIPS on an Amortized Cost Basis, Because the TIPS Were Intended To Be Held to Maturity ..................... 15

    E.   RACER Praised the MLC's Decision to Purchase TIPS and Indicated RACER's Intent to Follow MLC's Investment Plan By Holding TIPS to Maturity ................................................................................. 16

    F.   The Trustee Conducted Extensive Due Diligence on the Scope of RACER's Soon-To-Be Assumed Environmental Liabilities and the TIPS Investment Plan ......................................................................... 17

    G.   Any Discrepancy in the Value Funded to RACER Was Resolved in the $108,000 True-up Payment to MLC by RACER on June 30, 2011 ................... 21

    H.   RACER Filed the Motion Over Seven Months After Accepting the TIPS and Cash from the Debtors ............................................................ 22

III. ARGUMENT ........................................................................................ 22

    A.   There is No Dispute that Debtors Fully Funded RACER on the Effective Date ............................................................................ 22

    B.   The Settlement Agreement Controls and Provides for a Transfer of Value from MLC to RACER—Not Cash—to Fund Environmental Liabilities Decades into the Future .................................................................... 25

    C.   RACER Has Failed to Assert Any Damages, and Any Additional Monies Would Constitute a Windfall ..................................................... 27

    D.   RACER Waived Any Right It Had to Additional Payment and Failed to Mitigate Its Alleged Damages, If Any ............................................. 32

IV.  CONCLUSION .................................................................................... 34

i

## TABLE OF AUTHORITIES

**Page(s)**

CASES

First Investors Corp. v. Liberty Mut. Ins. Co.,
152 F.3d 162 (2d Cir. 1998)............................................................................28

First Nat'l Bank of Chi. v. Ackerley Commc'ns, Inc.,
No. 94 Civ. 7539(KTD), 2001 WL 15693 (S.D.N.Y. Jan. 8, 2001)................................29, 31

Freund v. Wash. Square Press, Inc.,
314 N.E.2d 419 (N.Y. 1974)............................................................................29

Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.,
7 N.Y.3d 96 (N.Y. 2006) ................................................................................32

Guzzone v. Brandariz,
847 N.Y.S.2d 901 (N.Y. Sup. Ct. 2007) ..............................................................32

In re Phoenix Petroleum Co.,
278 B.R. 385 (Bankr. E.D. Pa. 2001) ................................................................28

In re Rockefeller Center Props.,
272 B.R. 524 (Bankr. S.D.N.Y. 2000) ................................................................33

In re WorldCom, Inc.,
362 B.R. 96 (Bankr. S.D.N.Y. 2007)..................................................................28

Madison Fund, Inc. v. Charter Co.,
427 F. Supp. 597 (S.D.N.Y. 1977)....................................................................29, 30

Middle E. Banking Co. v. State St. Bank Int'l,
821 F.2d 897 (2d Cir. 1987)............................................................................33

Rosenman Colin Freund Lewis & Cohen v. Neuman,
93 A.D.2d 745 (N.Y.A.D. 1st Dept. 1983) ...........................................................33

Scalp & Blade, Inc. v. Advest, Inc.,
309 A.D.2d 219 (N.Y. App. Div. 2003) ...............................................................29, 30, 31

Waehner v. Frost,
770 N.Y.S.2d 596 (N.Y. Sup. Ct. 2003) ..............................................................30

Wilmot v. New York,
297 N.E.2d 90 (N.Y. 1973)............................................................................33

**OTHER AUTHORITIES**

Financial Accounting Standards Board Accounting Standards Codification
  320-10-25-3......................................................................................................................15, 23

Financial Accounting Standards Board Accounting Standards Codification
  320-10-25-5............................................................................................................16, 23, 25, 30

Financial Accounting Standards Board Accounting Standards Codification
  320-10-50-5......................................................................................................................16, 23

The Motors Liquidation Company DIP Lender Trust (the "**MLC DIP Trust**"), formed in furtherance of the Second Amended Joint Chapter 11 Plan (the "**Plan**") (**ECF No. 9836**) by the above-captioned debtors (collectively, "**MLC**" or the "**Debtors**"),[1] submits this Response in Opposition to the Motion of the Revitalizing Auto Communities Environmental Response Trust ("**RACER**" or the "**Trust**") for an Order Pursuant to 11 U.S.C. §§ 105 and 1142 to Enforce the Debtors' Payment Obligations Under the Second Amended Joint Chapter 11 Plan and the Confirmation Order (the "**Motion**") (**ECF No. 11164**), and respectfully represents as follows:[2]

## I.      PRELIMINARY STATEMENT

1.    MLC adequately funded the Trust in accordance with the Settlement Agreement (as defined below), which was approved by the Court as part of the Debtors' chapter 11 plan confirmation process.  Because MLC fully met its funding obligations to RACER, there is enough money in the Trust to fund the environmental obligations at the amounts agreed upon by the parties to the Settlement Agreement.  While RACER creates controversy and alarms Trust stakeholders—fifteen states and the Saint Regis Mohawk Tribe (the "**Tribe**")—about the sufficiency of the Trust's assets, the Debtors transferred at least $625,234,945 of value to RACER in the form of $49,896,945 in cash and $575,338,000 in Treasury securities, consisting primarily of Treasury Inflation-Protected Securities ("**TIPS**")[3] as valued on an amortized cost

---

[1] The MLC DIP Trust was formed on December 15, 2011 to hold and administer certain assets for the benefit of the Debtors' DIP lenders and lists as its assets, *inter alia*, all rights to recover all or any portion of the amount of approximately $13.6 million that was deposited by MLC with the Court on or prior to December 15, 2011 in connection with the Motion.  (See Motors Liquidation Company DIP Lenders Trust Agreement ¶ C & at Schedule B).

[2] The United States Department of Treasury ("**Treasury**") has instructed and funded the MLC DIP Trust to proceed in defending this dispute.

[3] For ease of reference, MLC refers to all securities that it transferred to RACER cumulatively as TIPS.

basis.[4]  No site remedial or administrative budgets have been put into jeopardy by the parties'

funding actions, and all trust stakeholders have substantially benefited from the October 2010

decision to fund RACER using TIPS.

2.   This dispute essentially concerns RACER's contention that the Trust was not adequately

funded and arises from RACER's retroactive attempt use a different valuation method—quoted

market value—long after MLC transferred a portfolio of TIPS valued at amortized cost to the

Trust on March 31, 2011.   The Motion also comes five months after a June 2011 true-up

payment by RACER to MLC based on the amortized cost of those TIPS.   RACER's choice of

accounting for its balance sheet is irrelevant to whether MLC funded the Trust in full, which

MLC unquestionably did.   RACER's Motion is an effort to re-negotiate a done deal and impose

an accounting methodology that is not required—much less mentioned—in the Settlement

Agreement nor supported by the history of the transaction, the course of dealing, or the intent of

the parties.   MLC's valuation of the TIPS at amortized cost was entirely appropriate for MLC

while operating and was a proper method for MLC to meet its obligations under the various

agreements.   None of the governing documents require MLC or RACER to value the transferred

securities using a quoted market basis as of March 31, 2011, the effective date of the Debtors'

confirmed plan and date RACER was funded (the "**Effective Date**").   Moreover, RACER's

accounting choices do not change the economics of the deal; MLC funded the Trust in full in the

amount agreed to in the Settlement Agreement.   Accordingly, RACER's apparent purpose for

applying an estimated market value method to value the securities transferred on March 31, 2011

is to extract additional monies from Debtors' primary debtor-in-possession lender, the Treasury.

---

[4] Amortized cost value includes approximately $1.4 million of accrued interest.

3.   As their name suggests, TIPS provide protection against inflation. The principal of a TIPS increases with inflation and decreases with deflation, as measured by the Consumer Price Index. The quoted market price of a TIPS will fluctuate over time and on any given date can be less than, equal to, or greater than the face value.  Importantly however, the full faith and credit of the United States guarantees the holder of a TIPS a payment of the adjusted principal or original principal, whichever is greater, upon maturity.  In other words, at maturity, the holder can redeem the TIPS for no less than par value.  TIPS also pay interest twice a year, at a fixed rate.[5]   Generally Accepted Accounting Principals ("**GAAP**") required that MLC value investments intended to be held to maturity, such as the TIPS, on an amortized cost basis. The amortized cost basis was used by MLC at all times to value the TIPS and is reflected in the Monthly Operating Reports filed with this Court and the Securities and Exchange Commission (the "**SEC**"), which reports were prepared by RACER's current chief financial officer and declarant Scott Hamilton ("**Hamilton**") in his capacity as MLC's controller.  Hamilton also drafted the footnote in each of the Monthly Operating Reports indicating the difference between quoted market value and the amortized cost basis of the TIPS.  (See Declaration of Brian Rosenthal ("**Rosenthal**")[6] attached hereto as Exhibit 1, ¶¶ 14-15 & at Ex. C (excerpts from Oct. 2010-Feb. 2011 Monthly Operating Reports)).

4.  The product of a Settlement Agreement reached after intense, lengthy negotiation, RACER exists to fund ongoing environmental liabilities for decades.  For this reason, the

---

[5]  See http://www.treasurydirect.gov/indiv/products/prod_tips_glance.htm (last visited Jan. 5, 2011) (providing more information on TIPS).

[6] Rosenthal was a member of Motors Liquidation Company management team principally responsible for its treasury operations.  (Rosenthal Decl. ¶ 1).

portfolio of laddered[7] TIPS was selected by MLC with the advice and consent of the Treasury~~, the Environmental Protection Agency ("**EPA**"),~~ and knowledge and consent of the United States ~~Department of Justice ("**DOJ**", and collectively, the "**Federal Government**")~~Trustee for the Southern District of New York in order (1) to ensure sufficient cash flow consistent with the Trust's obligations to pay the remediation and other environmental liability costs for decades to come, (2) to provide a return that protects against the risk of inflation, and (3) to guarantee, *at minimum*, the greater of par or the inflation-adjusted principal value upon maturity.  MLC selected the portfolio of TIPS to match expected future cash flows based on the projected environmental liabilities.

5.  Now, over six months after the Debtors funded RACER in accordance with the Settlement Agreement, and five months after engaging in a true-up or final accounting with respect to the value of the TIPS on an amortized cost basis, RACER has reversed course and used what amounts to an accounting gimmick to value the TIPS in order to claim a shortfall in value funded to the Trust of approximately $13.5 million.  (Mot. at 4)  Yet using a "market" or "mark to market" valuation method to measure the amount funded to RACER is not required by the governing documents—the Settlement Agreement and the Trust Agreement—the Plan, or this Court's Order confirming the Plan (all as defined below).  RACER relies on alleged "price quotes" and "market data" of the trading prices of TIPS on March 31, 2011 to construct the idea that the Debtors did not fund the Trust in full.  (Mot. at 4, 10, 10 n.16)  In reality, there is no pre- or post-Effective Date evidence that suggests that the parties contemplated or intended to engage in this type of accounting exercise to value the TIPS on a quoted market value basis as of March

---

[7] Laddered ~~Securities~~Treasuries is a capitalized, but undefined, term used in the Settlement Agreement (as defined below) to describe Treasury securities with different maturities.

31, 2011, and RACER's own post-Effective Date actions in May and June 2011 sharply contradict its current allegation that a market value approach must be used.

6.    Paradoxically, while complaining about the market price of the TIPS it received, RACER confirms its intent to hold the TIPS to maturity, thereby guaranteeing RACER the full cash amount of the value promised *and delivered* by the Debtors when they funded RACER on March 31, 2011.  ((Mot. at 4; Hamilton Decl. in Support of Mot. ¶ 7 (**ECF 11165**)).  This admission alone defeats the Motion—quoted market value is irrelevant to the amounts actually funded to the Trust, because when the TIPS are held to maturity, there will be no sale to generate a gain or loss prior to maturity, and TIPS are guaranteed by the United States to pay out *at par or above* at maturity.  In other words, if RACER holds the TIPS to maturity, the TIPS will provide the promised funding value or better.  Moreover, because RACER has not sold any of the TIPS prior to maturity and has stipulated its intent to hold the TIPS until maturity, RACER's alleged harm is a phantom loss.  Therefore, RACER has suffered no damages and its claims should be dismissed as a matter of law.

7.    RACER makes an unjustifiable and specious assertion about what it would have done if provided with cash (instead of a combination of cash and TIPS) on the Effective Date in order to justify a claim that it has been damaged by MLC's funding actions. Yet, the evidence shows that RACER knew it would be funded primarily in TIPS on the Effective Date and made preparations to accept those TIPS on the Effective Date by creating custodial accounts in advance.  RACER never questioned or protested this planned approach or asked for the opportunity to formulate its own investment approach.  RACER then accepted the TIPS without protest on the Effective Date and completed a true-up payment of approximately $108,000 in June 2011—a series of acts that are completely incompatible with RACER's claims that it should have been afforded the

opportunity to formulate its own long-term investment strategy. MLC never would have developed or invested in the laddered TIPS portfolio had the parties intended to fund the Trust in cash only.

8. MLC's valuation of the TIPS transferred to RACER on amortized cost basis was directly in line with GAAP accounting guidance. Following RACER's recently suggested approach to assess the market value of the TIPS on the Effective Date ignores the economic realities of the Trust's mandate, the understanding of the parties prior to and for months after the Effective Date and the fact that the environmental liabilities assumed by RACER have been fully funded. If the TIPS had been trading at a substantial premium on the Effective Date as they do today, MLC would have transferred the TIPS in the same manner using the amortized cost basis due to the fact that the TIPS are intended to be held to maturity. In fact, MLC had the opportunity to sell $226,000,000 in short-term marketable securities that were not matched to the long-term environmental liabilities for a profit of over a half million dollars. However, MLC transferred these securities that matured on July 31, 2011 to RACER at amortized cost value, which resulted in over $700,000 in interest payments to RACER.

9. Beginning with the development of the wind down budget that would carry the Debtors financially through confirmation in this chapter 11 proceeding, MLC steadfastly worked with the Federal Government to create and ensure an adequately funded environmental remediation trust. Along with the Federal Government, the Debtors were primarily responsible for designing the Trust and have no interest in undermining RACER's ability, financially or otherwise, to carry out its mandate with respect to MLC's former properties. Moreover, the MLC DIP Trust has no financial incentive to dispute RACER's claim or financial stake in the outcome of this dispute. MLC fully met its funding obligations to RACER on the Effective Date. RACER's retroactive

use of an accounting trick to low-ball the value of the TIPS now, six months later, threatens the integrity of the Settlement Agreement process that the parties engaged in over a nearly two-year period.

10. Furthermore, RACER has not been damaged by MLC's funding actions on March 31, 2011, and RACER in fact has benefited because the TIPS are trading at above-par prices in the market. (Mot. at 4-5). If RACER wants to return the TIPS now for the cash RACER says it is entitled to, an offer that RACER has repeatedly refused, MLC is willing to accept the TIPS back from RACER and liquidate them in an expeditious fashion. (See Declaration of Albert A. Koch ("**Koch**"), attached hereto as Exhibit 2, ¶ 8 & Ex. D (Nov. 17, 2011 Letter from David Berz to Hill at 2)). After liquidating the TIPS, MLC would provide RACER with the cash it asserts that it was promised, plus interest since March 31, 2011.[8] (Id.). If RACER keeps the TIPS, however, payment of an additional $13.5 million now would result in a windfall gain to the Trust and would put RACER in a better position than it would be had RACER received all cash from the Debtors. Such a result is not permitted under governing New York law.

11. RACER's motion is nothing more than an attempt to reinvent history in order to extract additional monies from Treasury. RACER absolutely knew that it would be receiving a TIPS portfolio on the Effective Date, the quoted market value of which would fluctuate over time, and never proposed an alternative approach to funding. Critically, the TIPS portfolio had always been assessed and accounted for on an amortized cost basis before and up to the Effective Date, and there is a complete absence of evidence that the parties prepared, planned or otherwise discussed or agreed on whether to appraise the value of the TIPS on an estimated market value basis on the Effective Date. Similarly, there is no evidence that the parties ever discussed or

---

[8] MLC would then remit any excess monies from the sale of the TIPS to the Treasury as MLC's primary debtor-in-possession lender.

agreed on a process for appraising the TIPS on a market value basis on the Effective Date.  All of the Debtors' Monthly Operating Reports from October 2010, when the TIPS were purchased, through the end of February 2011, listed the amortized cost basis value of the TIPS and disclosed in a footnote the difference between quoted market value and the amortized cost basis. (Rosenthal Decl., ¶ 14 & Ex. C (excerpts of Monthly Operating Reports)).  Every one of these Monthly Operating Reports states that the maturities of these securities correspond to expected future cash requirements. (Id.).  Hamilton, RACER's declarant and current chief financial officer who formerly worked for the Debtors as controller, prepared those reports.  (Id. ¶ 15).

12. The Debtors funded RACER on March 31, 2011.  Then, over two months later in June 2011, using RACER's calculation, the Debtors and RACER finalized an accounting "true-up", resulting in an approximately $108,000 payment *by* RACER *to* the Debtors as a result of adjustments to TIPS' principal over the three day period between funding and settlement of the account, among other reasons.  The RACER true-up calculation adjusted the amortized cost of the TIPS, the very valuation which RACER now claims is not appropriate.  This true-up exercise would have been irrelevant and unnecessary if RACER had been valuing the TIPS portfolio on a quoted market value basis and believed that it had been shortchanged by MLC.   Despite RACER's true-up and final accounting payment to MLC in June 2011, which was intended to fully address any discrepancy in the value TIPS at the Effective Date, RACER now claims MLC owes it $13.5 million related to those very same securities.  RACER's unwarranted delay in bringing the Motion, aside from the utter lack of merit, should bar any relief RACER seeks. Neither the facts nor the law support the claims RACER asserts, and therefore, the Court should deny the Motion.

## II.    BACKGROUND FACTS

### A.    The Settlement Agreement Established the Scope of Environmental Liabilities and Resolved Claims Associated with MLC's Real Properties.

13. In June 2009, the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  Various States,[9] the Tribe and the United States (collectively, the "**Settling Governments**") filed timely proofs of claim relating to environmental liabilities at the Debtors' owned real properties.  From June 2009 through April 2010, the Debtors engaged in settlement negotiations with the Settling Governments to assess the costs to remediate environmental contamination at eighty nine MLC properties.

14. Throughout the entire environmental liability assessment process, the Debtors committed to an open information exchange so as to eliminate any information imbalance, maintain good relations, and advance the settlement negotiations.   In particular, the Debtors provided the Settling Governments with access to an online database named IDEA, which facilitated the sharing of site information, cost projections and investigation and remediation plans that the Debtors' restructuring professionals were developing.

15. By April 2010, after ten months of intense negotiation, the Debtors' and the Settling Governments' cost projections for the Debtors' environmental liabilities and site-remediation for MLC's owned real properties were materially aligned.  For the next few months through summer and into mid-fall of 2010, the Debtors developed a plan to create an asset portfolio of laddered TIPS to fund RACER.   Treasury reviewed that plan and approved it for implementation.

---

[9] Delaware, Illinois, Indiana, Kansas, Louisiana, the Commonwealth of Massachusetts, Michigan, Missouri, New Jersey, New York, Ohio, the Commonwealth of Pennsylvania, the Commonwealth of Virginia, and Wisconsin are the states that are parties to the Settlement Agreement (collectively, the "**States**").

Accordingly, on October 12, 2010, MLC purchased a laddered portfolio of TIPS solely for the purpose of funding RACER.

16. One week later, on October 20, 2010, the Debtors, the Settling Governments, and the Trustee (as defined below) entered into the Environmental Response Trust Consent Decree and Settlement Agreement (the "**Settlement Agreement**"), which provided for transfer of those liabilities to an environmental response trust, ultimately known as RACER.[10]  The Settlement Agreement set forth funding amounts based on the agreed cost projections and scopes of remediation for the properties, including projected time frames for environmental regulatory investigation, cleanup and monitoring.

17. Sometime in late August or September 2010, the Federal Government selected Elliott Laws ("**Laws**") and Michael O. Hill ("**Hill**") to manage the Environmental Response Trust Administrative Trustee (the "**Trustee**"), which would manage RACER's operations.  The Trust Agreement[11] dated March 3, 2011 sets forth the duties and authorities of the Trustee and reiterates certain of the funding specifications for the Trust as set forth in the Settlement Agreement.  The Federal Government provided Laws and Hill in their capacity as managers of the Trustee with an opportunity to review drafts of the Settlement Agreement before becoming a signatory party, and both Hill and Laws, and their counsels, provided comments on drafts of the

---

[10] For ease of reference, throughout this brief, the Debtors refer to the environmental response trust as created in the Settlement Agreement as RACER, although RACER did not officially exist until the time period immediately prior the March 31, 2011 funding date.

[11] Environmental Response Trust Agreement by and among MLC, Remediation and Liability Management Company, Inc., Environmental Corporate Remediation Company, Inc., as Settlors, EPLET, LLC, not individually but solely in its representative capacity as Environmental Response Trust Administrative Trustee, and the United States of America, as Environmental Response Trust Beneficiary and Powers and Rights Holder, and the remaining Settling Governments (as defined below) as Environmental Response Trust Powers and Rights Holders (the "**Trust Agreement**").

Settlement Agreement.   Beginning in September 2010, Hill and Laws were provided with detailed presentations, and had the opportunity to review the TIPS laddered securities that MLC intended to use to fund RACER.   (<u>See, e.g.</u>, Ex. 2, Koch Decl. ¶ 4 & Exs. A-B (Nov. 4, 2010 meeting agenda and presentation excerpts).   This portfolio of securities was always valued at amortized cost. (Ex. 1, Rosenthal Decl. ¶ 14 & Ex. C (Monthly Operating Reports)).   Hill and Laws also performed field due diligence of the administration and property management operations as well as real property locations of MLC on numerous occasions.

18. On March 28, 2011, the Court entered the Findings of Fact, Conclusions of Law, and Order Pursuant to Sections 1129(a) and (b) of the Bankruptcy Code and Rule 3020 of the Federal Rules of Bankruptcy Procedure Confirming Debtors' Second Amended Joint Chapter 11 Plan (**ECF No. 9941**) (the "**Confirmation Order**").   The Confirmation Order, *inter alia*, (i) confirmed the Debtors' Plan and (ii) approved the Settlement Agreement, which was incorporated into the Plan and set forth the property transfer and funding mechanisms that the MLC and the Settling Governments agreed would be used to establish RACER.   (Confirmation Order at 8, 16, 17, 19-22).   Prior to the hearing on confirmation of the Debtors' Plan, Hill and Laws reviewed and provided comments on drafts of the Plan and Confirmation Order. The Plan became effective on March 31, 2011.   <u>See</u> Notice of (I) Entry of Order Confirming Debtors' Second Amended Joint Chapter 11 Plan and (II) Occurrence of Effective Date at 2 (**ECF No. 10056**).   That same date, the Debtors transferred $49,896,945 in cash and $575,338,000 in TIPS as valued on an amortized cash basis to RACER, pursuant to the Plan and Settlement Agreement. (<u>See</u> Ex. 1, Rosenthal Decl. ¶¶ 11, 21, & Ex. B (Schedule of Investments Transferred to RACER Trust as of Mar. 31, 2011)).

**B.    The Settlement Agreement Governs the Debtors' Funding Obligation to RACER.**

19. The Settlement Agreement is the controlling document for assessing the rights and obligations of MLC and RACER.  The Settlement Agreement states that "[i]n the event of any inconsistency between the Plan, any order confirming the Plan, and this Settlement Agreement, *the terms of this Settlement Agreement shall control*." (Ex. 1, Rosenthal Decl. ¶ 3 & Ex. A (Settlement Agreement) ¶ 109 (emphasis added)); see also Plan ¶ 6.4 (same).  Moreover, the Trust Agreement states that "[w]here the provisions of this Agreement are irreconcilable with the provisions of the Plan of Liquidation, the terms of this Agreement shall govern.  Where the provisions of this [Trust] Agreement are irreconcilable with the provisions of the Settlement Agreement, *the terms of the Settlement Agreement shall govern*." (Trust Agreement ¶ 1.2.5 (emphasis added)).

20. Paragraph 32 of the Settlement Agreement sets forth MLC's Effective Date funding of RACER:

> On the Effective Date, and subject to adjustments as provided in Paragraph 36 of this Settlement Agreement as applicable, Debtors shall make a payment to fund the Environmental Response Trust in the amount of no less than $641,434,945….  The Environmental Response Trust funding amount consists of (i) a Minimum Estimated Property Funding Account containing funding with respect to each Property as set forth on Attachment A Column 2 attached hereto and totaling $295,036,131, (ii) a Reserve Property Funding Account containing funding with respect to each Property as set forth on Attachment A Column 3 attached hereto and totaling $52,065,197, (iii) a Long Term OMM Property Funding Account containing funding (if any) for each Property as set forth in Attachment A Column 4 attached hereto and totaling $84,099,794;  (iv) the Cushion Funding Account totaling $68,233,823; (v) the Administrative Funding Account in an amount of no less than $102 million; and (vi) the Administrative Funding Reserve Account totaling $40 million.

(Ex. 1, Rosenthal Decl. ¶ 3 & Ex. A (Settlement Agreement) ¶ 32).[12]

21. Importantly, Settlement Agreement Paragraph 32 does not reference "Cash" or "cash"; rather, it simply refers to a dollar value to be transferred and references Attachment A, the "Environmental Response Trust Property Funding for Environmental Activities", which specifically sets forth the real property details and account funding values for the Trust. The terms "Cash" or "cash" are not used anywhere in the Settlement Agreement with respect to MLC's funding obligation to RACER.

22. Moreover, the Debtors' Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan clearly states that the "Cash and cash equivalents" going to the Trust "represents cash and investments in U.S. Treasury or U.S. Treasury backed securities with a maturity of 15 years or less." (See Ex. 1, Rosenthal Decl. ¶ 20 & Ex. E (Disclosure Statement at Opening Statement of Net Assets (Liabilities) of the Debtors and Trusts Projection Notes and Assumptions at note 6 (**ECF No. 8023**))).

### C.  **Treasury and MLC Agreed to Fund RACER Using TIPS to Mitigate the Risk of Inflation.**

23. MLC and Treasury, which provided the majority of the financing for MLC's wind-down budget, including the funding that would ultimately be transferred to RACER, recognized the potential for inflation to materially erode RACER's ability to fulfill its mandate to remediate the properties and return them to productive use. As such, MLC carefully focused on earning a rate of return on the monies it held so as to defease the risk that inflation posed on the funds that would be transferred to RACER at an unknown future date. (Ex. 1, Rosenthal Decl. ¶ 4).

---

[12] Pursuant to paragraph 7 of the Confirmation Order, the Debtors $625,234,945 funded on the Effective Date. Adjustments to the $641,434,945 figure provided in paragraph 32 of the Settlement Agreement, above, includes reduction of $28,200,000 per paragraph 36 of the Settlement Agreement and an increase of $12,000,000 to reflect certain sale proceeds as described in paragraph 23 of the Confirmation Order.

24. During May and June of 2010, MLC considered several options to best match the rate of return with inflation and consulted with JP Morgan Asset Management and Mesirow Financial to confirm the soundness of MLC's investment plan to fund RACER. (Id. ¶ 5). Ultimately, MLC determined that the optimal way to ensure that RACER could meet its mandate to fund environmental liabilities was to construct a portfolio primarily of TIPS with laddered maturity dates matched to the anticipated timing of RACER's cash flows with respect to the myriad environmental liabilities. (Id.).

25. In July and August 2010, MLC presented the RACER investment plan to Treasury and explained how the TIPS portfolio would mitigate inflation risk over the lifetime of the Trust. (See Koch Decl. ¶¶ 2-3). During the course of these July and August 2010 meetings, some of which were structured as question and answer sessions and at least one of which included representatives of the DOJ and EPA, Koch discussed the question of TIPS and the proposed MLC investment strategy. (Id. ¶ 3). In August 2010, Treasury concurred with MLC's decision to use TIPS to fund RACER's remedial, monitoring and administrative activities. (Id. ¶ 4). After receiving Treasury's approval, MLC made similar presentations to the United States Trustee for the Southern District of New York and advisors to the Official Committee of Unsecured Creditors[13] in August 2010, and both concurred with MLC's decision to use TIPS to fund RACER. (Id.).

26. A primary reason why the Debtors created and purchased the portfolio of laddered TIPS back in summer and early fall of 2010 was because the Debtors and Settling Governments were not able to foresee when exactly the Plan would be confirmed and RACER would exist in its

---

[13] The Official Committee of Unsecured Creditors is the statutory committee of unsecured creditors appointed by the U.S. Trustee in the Debtors' chapter 11 cases pursuant to section 1102 of the Bankruptcy Code.

final state and be funded.  The unique nature of the TIPS provided a stable and conservative method of ensuring adequate cash flow to pay environmental liabilities and fund the Trust, despite the uncertainty of the Plan confirmation process.

27. On September 2, 2010, as required by MLC's Debtor-in-Possession Credit Agreement, MLC filed a Statement/Notice of Third Amendment to DIP Credit Facility with the Court providing for investment in United States Treasury securities with maturities of up to 15 years that would ultimately be transferred to RACER.  (See Debtors' Third Amendment to Amended and Restated Secured Superpriority Debtor-in-Possession Credit Agreement ¶ 1 (**ECF No. 6846**)).

28. On October 12, 2010, MLC purchased a laddered portfolio of TIPS.  (See Ex. 1, Rosenthal Decl. ¶11, & Ex. B (Schedule of Investments Transferred to RACER Trust as of Mar. 31, 2011)).  The Debtors used a conservative approach in designing the laddered TIPS portfolio for RACER in order to ensure that the Trust would not have to sell TIPS before they matured. (Id. ¶ 11).  This strategy would guarantee adequate cash flow for RACER based on spending projections agreed to by the Settling Governments in the Settlement Agreement and allow the Trust to hold the TIPS to maturity.  (Id. ¶ 12).

### D.     GAAP Dictates That the Debtors Value the TIPS on an Amortized Cost Basis, Because the TIPS Were Intended To Be Held to Maturity.

29. The Debtors purchased the TIPS with the intent that the TIPS would be transferred to the Trust on the Effective Date and held until maturity.  GAAP required MLC to value its investments in "held-to-maturity securities" at an amortized cost basis.  See Financial Accounting Standards Board Accounting Standards Codification[14] ("**FASB**") 320-10-25-3, 320-

---

[14] "The FASB Accounting Standards Codification is the source of authoritative generally accepted accounting principles (GAAP) recognized by the FASB to be applied to

10-50-5(a).  As such, the Debtors reported the value of the TIPS at amortized cost in Monthly Operating Reports filed with the Court and in monthly 8-Ks filed with the SEC and disclosed quoted market values in accordance with GAAP.  (See Ex. 1, Rosenthal Decl. ¶ 14 & Ex. C (Monthly Operating Reports)).  Upon information and belief, the Trustee reviewed, or should have reviewed these Monthly Operating Reports as part of its due diligence process conducted in preparation to manage the RACER and its assets.

30. Under GAAP, unrealized gains and losses due to market fluctuations for held-to-maturity securities are not recognized.  FASB 320-10-25-5(a).  As of January 5, 2012, the estimated market value of the TIPS in the RACER portfolio is approximately $378,209,474, which is approximately $30.5 million more than the amortized cost basis of the TIPS transferred to RACER by the Debtors on March 31, 2011.[15]  (See Ex. 1, Rosenthal Decl. ¶ 32).  That $30.5 million "gain," however, is not realized and thus not recorded under GAAP, because the TIPS will be held to maturity.  See FASB 320-10-25-5(a).

### E.    RACER Praised the MLC's Decision to Purchase TIPS and Indicated RACER's Intent to Follow MLC's Investment Plan By Holding TIPS to Maturity.

31. Prior to his current position as chief financial officer ("**CFO**") of RACER, Hamilton acted as controller for MLC from July 2009 to June 1, 2011.[16]  (See Ex. 1, Rosenthal Decl. ¶ 15).

---

nongovernmental entities."  FASB Accounting Standards Codification, Notice to Constituents (v 4.5) at 4 (Nov. 1, 2011), *available at* https://asc.fasb.org/imageRoot/09/15227909.pdf.

[15] This data is based on market quotations provided by Mesirow Financial as of 8:00 a.m. Eastern Standard Time on January 5, 2012.  The value of the TIPS portfolio described above excludes the $265,505,495 in securities that have matured since the Effective Date and excludes accrued interest.

[16] From the Effective Date to June 1, 2011, several MLC employees, including Hamilton, were working for both MLC and RACER under the terms of the Transition Services Agreement ("**TSA**").  Time spent working for RACER was billed to RACER under the TSA and these employees officially transferred to RACER on June 1, 2011.

As such, Hamilton has extensive experience with accounting treatment and valuation of assets like TIPS and liabilities under GAAP. In his role as controller in closing the Debtors' monthly books, Hamilton was responsible for drafting the Monthly Operating Reports, including calculating the amortized cost basis of the TIPS at month-end and drafting the footnote disclosing the difference between the amortized cost basis and quoted market value of the TIPS portfolio. (Id. ¶¶ 14-15). Therefore, Hamilton had familiarity with the Debtors' accounting policies, including valuation for the TIPS and environmental liabilities transferred to RACER prior to moving on to work in a similar capacity for RACER.

32. In his declaration attached to the Motion, Hamilton praises the Debtors' "accumulated knowledge and experience with respect to the Trust's anticipated environmental and administrative spending needs over the life of the Trust" and clarifies that he does not "question" that "knowledge and experience[.]" (Hamilton Decl. ¶ 5). Further, Hamilton notes that the Debtors "selected the maturity dates and stated interest rates associated of the [TIPS] . . . to meet the Trust's anticipated spending needs." (Hamilton Decl. ¶ 5). Hamilton also confirms his "understanding that the [Federal] Government had approved the combination of assets that Debtors transferred to RACER on the Effective Date." (Hamilton Decl. ¶ 6). Additionally, Hamilton states that, in light of his trust in the Debtors' financial strategy to use TIPS to fund the Trust and the government's approval and financing this strategy, "RACER held and intends to continue holding until maturity the [TIPS] transferred to it by MLC on the Effective Date." (Hamilton Decl. ¶ 7).

**F.    The Trustee Conducted Extensive Due Diligence on the Scope of RACER's Soon-To-Be Assumed Environmental Liabilities and the TIPS Investment Plan.**

33. Prior to funding and transferring assets to RACER, MLC spent extensive time educating the managers of the Trustee, Hill and Laws, so that they would understood the scope of

environmental liabilities and the plans for remediation that they would be assuming from MLC, as well as the TIPS investment strategy to manage cash flow.  (See Ex. 2, Koch Decl. ¶ 5).  As part of this process, MLC made detailed presentations concerning the eighty nine properties to be transferred, MLC's accounting systems and treasury operations relating to environmental matters, and processes for paying environmental liability invoices.  The scope and frequency of meetings and correspondence increased as MLC moved closer to funding RACER and emerging from bankruptcy.

34. In meetings, presentations and numerous pre-Effective Date writings, MLC explained to the Trustee that MLC would fund RACER in part by transferring the TIPS securities that MLC had purchased in October 2010:

- On November 4, 2010, MLC president and chief executive officer Koch, executive vice president Ted Stenger ("Stenger"), and other MLC employees met with Hill and Laws in Detroit, Michigan to begin on-site diligence.  Discussions included MLC's TIPS investment strategy.  (See Ex. 2, Koch Decl. ¶ 6 & at Exs. A-B (excerpts of presentations)).

- On November 19, 2010, Hill and Laws conducted a full day of diligence at MLC's Detroit, Michigan headquarters.  During that meeting, MLC discussed the rationale for funding RACER using the recently purchased TIPS portfolio.  (See Ex. 1, Rosenthal Decl. at Ex. D (Nov. 19, 2010 MLC Finance and Administration Presentation to the Trustee at 6-10)).

- On February 11, 2011, Hill, Laws and Treasury met with MLC to discuss revised estimates for RACER's business plan, including the estimated funding on the Effective Date.

35. At all times throughout this process, the Trustee had the benefit of its own sophisticated legal counsel to assist in conducting its due diligence.  At no time during or following these various meetings did the Trustee object to or raise concern about the way MLC planned to fund RACER.  Moreover, Hamilton, now CFO of RACER, was one of the Debtors' employees who assisted with this education process when he was controller.  Further, there was a continuity of

operations upon funding and transfer of the environmental liabilities to RACER, with the same MLC employees, computer systems, and operational staff providing transition services to RACER for several months after the Effective Date.

36.    Beginning in late November 2010, in consultation with Hill and Laws, MLC began to research setting up cash management and investment accounts and accounting systems structures on behalf of RACER.   (Rosenthal Decl. ¶ 19).   These discussions included Jim Selzer, Vice President and Treasurer of MLC ("**Selzer**"), Rosenthal, Hamilton, Hill, Laws, and Stenger.   (Id.). This group conducted in-depth analysis of various financial institutions including interviews and formal requests for proposals.   (Id.).   Hill and Laws were intimately involved in this process, including conducting their own interviews and making independent decisions.   (Id.).   Further, structuring the custodial accounts involved over 15 separate meetings or calls with Laws, Hill, or Hill's associate concerning establishing new accounts at a financial institution and concluded in late March 2011.   (Id.).   This process included establishing custodial accounts to receive the Treasury investments made by MLC, which would have been unnecessary if the Trustee expected to receive only cash on the Effective Date.   (Id.).   Significantly, during this extended process with multiple communications on logistics related to the transfer of securities, there was never any discussion of (i) a procedure to determine quoted market value, (ii) the source of the market data, or (iii) the time of day at which to measure the market value on the Effective Date.

37. From February 11, 2011 through the end of March 2011, Hill, Laws, Treasury, Stenger, and Selzer had regular conference calls to review the status of the Effective Date closing. Moreover, during this time period RACER intensified its due diligence efforts such that MLC was interacting with RACER representatives on a daily basis and responding to information

requests from RACER either via documents, meetings or calls.   At no time did RACER question the amortized cost value of the TIPS.

38. Despite the extensive preparation for receiving the transfer of TIPS, no arrangements or protocols were ever discussed or established by any party to set a market value for the TIPS on the Effective Date.  The Debtors would have insisted on such a protocol.  (Id. ¶ 27).  RACER has never suggested that it established any mechanism in advance to determine an estimated market value for the TIPS on the Effective Date, which would have been prudent and customary if the parties had contemplated transferring the TIPS at estimated market value.  The absence of a mechanism to determine market value is in sharp contrast to the Settlement Agreement, Plan and Confirmation Order, which set forth highly detailed and specifically negotiated protocols for making funding adjustments for certain items, such as monies spent on administering the site and costs incurred for environmental remediation by third party contractors and lead regulatory agencies. (Id. ¶ 3 & Ex. A (Settlement Agreement) ¶¶ 36, 37); Plan § 6.4(c); Confirmation Order ¶ 7.

39. On March 31, 2011, the Effective Date for the Plan and funding of RACER, MLC transferred property—the eighty nine real property sites and their respective environmental liabilities—and funding to RACER in accordance with the terms of the Settlement Agreement. (See Ex. 1, Rosenthal Decl. ¶¶ 1, 4, 21).  RACER accepted funding from MLC in the form of $49,896,945 in cash and $575,338,000 of TIPS valued on an amortized cost basis and stepped into MLC's shoes to fulfill the outstanding environmental obligations to the Settling Parties.  (Id. ¶¶ 16, 21).

G.    **Any Discrepancy in the Value Funded to RACER Was Resolved in the
$108,000 True-up Payment to MLC by RACER on June 30, 2011.**

40. On May 9, 2011, Hamilton, operating as RACER's CFO, contacted Rosenthal to finalize
a true-up to the RACER funding value.   (See id. ¶ 29 & Ex. F (May 9, 2011 e-mail from
Hamilton to Rosenthal)).   Used in business, a true-up is an expression meaning to "bring into
alignment" with predetermined criteria or process.   See http://www.ventureline.com/accounting-
glossary/T/trueup-definition/ (last visited Jan. 5, 2011) (providing definition of "true-up").   In
this instance, the "pre-determined criteria and process," as shown by RACER's actions, was that
the TIPS were valued on an amortized cost basis and a true-up was necessary to account for a
change in adjusted TIPS principal balance for the three day period from March 29-31, 2010.
(See Ex. 1, Rosenthal Decl. ¶ 29 & Ex. F).   Second, a true-up was necessary to account for a
correction of the index ratio used to calculate the amount of the adjusted TIPS principal as of
March 28, 2011 that was used to determine the amortized cost basis for the funds flow on the
Effective Date—the very value that RACER now claims is not appropriate.   (Id.).

41. The true-up resulted in RACER owing MLC approximately $108,000 (the "**True-up
Payment**") as reflected as a credit in a June 30, 2011 payment from MLC to RACER.   (See id. ¶
30 & Ex. G (excerpt of June 30, 2011 wire confirmation detailing True-up Payment).   The True-
up Payment from RACER to MLC would have been unnecessary if RACER had been valuing, or
planning to value, the TIPS on a quoted market value basis, rather than an amortized cost basis.

42. If RACER had any intent to use estimated market value for the TIPS on the Effective
Date to determine the adequacy of funding, it had access to information necessary to calculate
the difference between quoted market value and the amortized cost by the time RACER made
the True-up Payment.   (See id. ¶ 31).   Instead, RACER relied on amortized cost to value the

TIPS in its calculation of the True-up Payment, as was consistent with the historical course of dealing of the parties and the governing documents.  (See id.).

> **H.  RACER Filed the Motion Over Seven Months After Accepting the TIPS and Cash from the Debtors.**

43. RACER first contended to MLC that it had been underfunded in October 2011, over six months after the Effective Date and approximately four months after making the approximately $108,000 True-up Payment.  In the Motion, RACER seeks an additional $13.5 million claiming a shortfall in the amount funded to the Trust based on an implied, unrealized loss based on RACER's retroactive use of a quoted market value estimation of the TIPS. (Mot. at 5). RACER's contentions are without merit and are belied by RACER's own actions and those of Hill, Laws, and Hamilton, its principals, as set forth above.

44. Treasury has instructed and funded the MLC DIP Trust to proceed in defending this dispute.  Nine of the fourteen States and the Tribe from the Settling Governments filed a Statement in Support of the Motion on December 6, 2011 (**ECF No. 11220**).  The MLC DIP Trust notes that, in the event RACER prevails on the Motion, any additional monies RACER receives essentially will be funded by Treasury.

## III.  ARGUMENT

> **A.  There is No Dispute that Debtors Fully Funded RACER on the Effective Date.**

45. MLC adequately funded the Trust in accordance with the Settlement Agreement, which was approved by the Court as part of the Debtors' chapter 11 plan confirmation process. RACER's belated and unsubstantiated claim that it did not receive sufficient value from MLC with respect to the TIPS based on RACER's use of an accounting gimmick—quoted market value accounting methodology—does not change the economics of the transaction and is unsubstantiated by the facts or the law applicable to this matter.  GAAP mandated that MLC

value the TIPS on an amortized cost basis because the TIPS would be held to maturity, which RACER confirms it will do. (Hamilton Decl. ¶ 7). FASB, which codified GAAP, requires investments in "held-to-maturity securities" to be valued at amortized cost basis. See 320-10-25-3, 320-10-50-5(a). Further, FASB explicitly states that "[t]he justification for using historical-cost-based measurement [*i.e.*, amortized cost basis] for debt securities classified as held-to-maturity is that *no matter how market interest rates fluctuate*, the holder will recover its recorded investment and thus *realize no gains or losses* when the issuer pays the amount promised at maturity." FASB 320-10-25-5(a) (emphasis added).

46. Use of a particular accounting methodology is not dictated by any of the governing documents, and assessing the TIPS' value using market value trading prices, which fluctuate, was never contemplated by MLC, the Settling Governments or RACER during the lengthy settlement negotiations and investment strategy discussions. Prior to funding RACER, MLC made it abundantly clear to RACER that MLC valued the TIPS using an amortized cost basis, as GAAP requires for securities that are expected to be held to maturity. (See Ex. 1, Rosenthal Decl. ¶¶ 14, 18, Ex. C (Monthly Operating Reports), Ex. D (Nov. 19, 2010 MLC Finance and Administration Presentation at 6-10)); FASB 320-10-25-3. RACER's choice to account for the TIPS on its balance sheet using quoted market value is irrelevant to whether MLC funded the Trust in full at the amounts agreed to in the Settlement Agreement.

47. In the Motion, RACER does not dispute that MLC valued the TIPS portfolio it transferred to RACER at $575,338,000. (Mot. at 4). Nor does RACER claim that MLC was using estimated market value accounting to value the TIPS portfolio. No wool has been pulled over anyone's eyes. The process of quantifying the ongoing environmental liabilities transferred to RACER in the Settlement Agreement and developing the inflation-protected investment

portfolio of assets matched to fund those obligations was transparent to ~~Treasury, the EPA, the DOJ~~ the Federal Government, RACER's principals Hill, Laws, and Hamilton (who formerly served as the Debtors' controller), the States, and the Tribe.

48. Laws and Hill, who dually manage the Trustee for RACER, were hired by the Federal Government in late August or September 2010, six months prior to March 31, 2011, when MLC transferred the TIPS and fully funded RACER.  Both Hill and Laws had the opportunity to review and comment on the Settlement Agreement prior to signing.  Additionally, because of his role as MLC's former controller, Hamilton—RACER's current CFO—prepared the Debtors' Monthly Operating Reports, valuing the TIPS at amortized cost basis and disclosing in a footnote the difference between amortized cost and quoted market value.  (See Ex. 1, Rosenthal Decl. ¶¶ 14-15 & Ex. C (Monthly Operating Reports)).  In light of the extensive due diligence that MLC and the Federal Government, along with the Settling Governments and the Trustee did while creating RACER it was crystal clear and fully disclosed that (i) RACER would be funded primarily with the TIPS, and (ii) the TIPS were valued on an amortized cost basis.  Accordingly, there is no basis for RACER's assertion that MLC underfunded the Trust or that MLC should have valued the TIPS transferred to RACER using a quoted market value rather than amortized cost.

49. Moreover, if RACER's contention that the TIPS transferred to RACER should have been measured using a quoted market value on the Effective Date were true, then the Settlement Agreement would have contained a mechanism to determine a quoted market value of the TIPS on the Effective Date and the resulting cash payment to be funded.  The Settlement Agreement, however, has no such mechanism.  Taking RACER's assertion to its logical extreme, had the TIPS been worth *more* using a quoted market value than amortized cost basis on the Effective

Date (instead of worth *less*, as RACER claims), MLC would have been required to reduce the

cash portion of the funding consideration transferred to RACER.  Of course, this did not happen

and was never contemplated by the parties.

50. In their Statement in Support of the Motion, the States and Tribe do not cite a single case

or any other legal or financial authority to support their assertion that "financial institutions and

financial professionals would not dispute that the value of the securities is based upon the fair

market value on the date of transfer."  (Statement in Support at 7 (**ECF No. 11220**)).  The States

merely rely "[o]n information and belief" throughout their brief to support their contentions.

(See generally id.)  MLC followed GAAP's clear guidance on the proper accounting for debt

securities to be held to maturity, like the TIPS.  See FASB 320-10-25-5(a).

### B.   The Settlement Agreement Controls and Provides for a Transfer of *Value* from MLC to RACER—Not Cash—to Fund Environmental Liabilities Decades into the Future.

51. In its Motion, RACER quotes various Trust funding provisions in the Confirmation

Order, Plan and Trust Agreement for the proposition that RACER was to be funded with cash

(Mot. at 3, 4, 9, 11, 12), even though RACER is not seeking to be funded in cash and has refused

to accept cash funding from MLC in exchange for returning the TIPS as a mechanism to resolve

this dispute.  (Ex. 2, Koch Decl. at Ex. C (Koch Letter to D. Berz dated Nov. 8, 2011)).  The

terms "Cash" and "cash", however, are not used anywhere in the Settlement Agreement with

respect to MLC's funding obligation to RACER.  Rather, Paragraph 32 of the Settlement

Agreement refers to a dollar value to be transferred and provides that the "Debtors shall make a

payment to fund the Environmental Response Trust in the amount of no less than $641,434,945",

and references Attachment A, the "Environmental Response Trust Property Funding for

Environmental Activities", which sets forth the real property details and account funding values

for the Trust.  (Ex. 1, Rosenthal Decl. ¶ 3 & Ex. A (Settlement Agreement) ¶ 32).  Further, the

Debtors' Disclosure Statement clearly states that the "Cash and cash equivalents" going to the Trust "represent[] cash and investments in U.S. Treasury or U.S. Treasury backed securities with a maturity of 15 years or less."  (See Ex. 1, Rosenthal Decl. ¶ 20 & Ex. E (Disclosure Statement at Opening Statement of Net Assets (Liabilities) of the Debtors and Trusts Projection Notes and Assumptions at note 6 (**ECF No. 8023**))).

52. Moreover, the Settlement Agreement provides that "[i]n the event of any inconsistency between the Plan, any order confirming the Plan, and this Settlement Agreement, *the terms of this Settlement Agreement shall control*."  (See Ex. 1, Rosenthal Decl. ¶ 20 & Ex. A (Settlement Agreement) ¶ 109 (emphasis added)); Plan ¶ 6.4 (same).  Similarly, the Trust Agreement states that "[w]here provisions of this [Trust] Agreement are irreconcilable with the provisions of the Settlement Agreement, *the terms of the Settlement Agreement shall govern*." (Trust Agreement ¶ 1.2.5 (emphasis added)).

53. In addition, RACER's lost-investment opportunity argument is wholly unrealistic and unjustifiable based on its actions in the time period leading up to and following funding.  First, although fully aware that MLC planned to fund RACER with TIPS purchased in October 2010, RACER or the Trustee never protested this approach or asked for the opportunity to formulate its own investment approach.  Instead, RACER took numerous steps throughout February and March 2011 to prepare to accept the TIPS that MLC had already purchased, including setting up custodial accounts at US Bank.  RACER then accepted the TIPS that MLC had specifically purchased for the purpose of funding the Environmental Response Trust on the Effective Date.  Although RACER argues that it would have followed Debtors' and Treasury's recommendations in putting together this theoretical portfolio, there would have been no such recommendations made to RACER as the TIPS portfolio had long since been purchased in October 2010.  The

MLC DIP Trust also notes that RACER has not invested the over $200,000,000 in proceeds it received from the short term securities that reached maturation during July 2011.  (Mot. ¶ 24). Therefore, RACER's assertion that it would have invested, on or immediately after the Effective Date, over half a billion dollars in a series of laddered securities designed to match anticipated spending at RACER's properties is implausible based on RACER's pre- and post-Effective Date actions.

54. The States' and Tribe's contention that "MLC unilaterally and without authority determined to make a significant investment decision to purchase and transfer securities rather than cash to the Trust" (Statement in Support at 10) is completely without merit as discussed in the extensive background facts, <u>supra</u> at Part II, and as evidenced by the close involvement of Treasury in the investment decision to fund RACER with TIPS and Federal Government's knowledge as of ~~July~~October 2010 concerning MLC's TIPS investment strategy. (<u>See</u> Ex. 2, Koch Decl. ¶¶ 3-4).  The States' and Tribe's assertion also ignores the reality that (i) Treasury provided the majority of debtor-in-possession financing to MLC, and therefore, exercised great power over how MLC invested its money, and (ii) MLC filed a Statement/Notice of Third Amendment to DIP Credit Facility with the Court on September 2, 2010 providing for investment in United States Treasury securities with maturities of up to 15 years that would ultimately be transferred to RACER.  (<u>See</u> Debtors' Third Amendment to Amended and Restated Secured Superpriority Debtor-in-Possession Credit Agreement ¶ 1 (**ECF No. 6846**)).

## C.    <u>RACER Has Failed to Assert Any Damages, and Any Additional Monies Would Constitute a Windfall.</u>

55. In the Motion, RACER seeks enforcement of rights under the Settlement Agreement— essentially alleging that the Debtors breached that Agreement—but admits that the Trust was not damaged in any way by the alleged underfunding.  (Motion ¶¶ 4, 6 ("RACER acknowledges that

long-term U.S. Treasury securities have increased in value since the Effective Date"), 18, 23).

RACER's claim plainly falls short under New York law, which requires proof of damages,

among other elements, to succeed on a breach of contract claim.  See First Investors Corp. v.

Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998).

56. Courts interpreting confirmed plans of reorganization look to state contract principles in

interpreting rights and obligations of the parties.  See In re WorldCom, Inc., 362 B.R. 96, 111

(Bankr. S.D.N.Y. 2007) (holding that "[a] confirmed plan holds the status of a binding contract

as between the debtor and its creditors") (citation omitted); In re Phoenix Petroleum Co., 278

B.R. 385, 399 (Bankr. E.D. Pa. 2001) (observing that confirmed plans of reorganization "must be

interpreted in accordance with applicable contract law") (citation omitted).  Section 12.13 of the

Plan provides that New York law governs, and thus, New York contract law applies here to

interpret the rights and obligations of RACER, MLC, and the Settling Governments under the

Plan.  (Plan § 12.13 ("the rights, duties, and obligations arising under the Plan shall be governed

by, and construed and enforced in accordance with, the laws of the State of New York")).

57. Moreover, even if RACER was correct that the Trust was under-funded, which it is not,

payment of an additional $13.5 million now would put the Trust in a better position that it would

have been if it had received all funding in cash, given the TIPS' increase in value since the

Effective Date.  (See Motion ¶ 6; Ex. 1, Rosenthal Decl. ¶ 32 (noting that the TIPS' estimated

market value as of January 5, 2012 is approximately $30.5 million more than the amortized cost

basis of the TIPS transferred to RACER by the Debtors on March 31, 2011)).  Such a result is

not permitted under New York law.  "Money damages are substitutional relief designed in theory

to put the injured party in as good a position as he would have been put by full performance of

the contract. . . . [I]t is equally fundamental that the injured party should not recover more from

the breach than he would have gained had the contract been fully performed." <u>Freund v. Wash.</u> <u>Square Press, Inc.</u>, 314 N.E.2d 419, 420-21 (N.Y. 1974) (reversing lower court for using a measure of damages that would "place [plaintiff] in a far better position than he would have occupied had the defendant fully performed") (citations omitted); <u>Madison Fund, Inc. v. Charter</u> <u>Co.</u>, 427 F. Supp. 597, 608 (S.D.N.Y. 1977) ("It is a familiar enough principle that the basis for an award of damages for breach of contract is just compensation for losses necessarily flowing from that breach.  As a corollary of that principle, one whose contract has been breached is not entitled to be placed, because of that breach, in a position better than that which he would have occupied had the contract been performed.") (citation omitted).

58. New York also bars a party from recovering damages based on theoretical or hypothetical losses, like those RACER seeks here.  It is black-letter New York law that damages must be commensurate with the loss actually sustained.  <u>See</u> <u>Scalp & Blade, Inc. v. Advest, Inc.</u>, 309 A.D.2d 219, 225-26 (N.Y. App. Div. 2003).  Here, RACER has suffered no harm, and in fact admits that there has been an "increase in the fair market value of the [TIPS] since" the date the Debtors funded the Trust and "that RACER continues to hold that portfolio," and "intends to continue holding until maturity[.]"  (Motion ¶ 6; Hamilton Decl. ¶ 7).  The relief RACER seeks is thus clearly contrary to these basic principles of New York contract and damages law.  <u>See</u> <u>First Nat'l Bank of Chi. v. Ackerley Commc'ns, Inc.</u>, No. 94 Civ. 7539(KTD), 2001 WL 15693, at *2 (S.D.N.Y. Jan. 8, 2001) (denying bank damages that were not shown to be the result of the borrower's cessation of performance and characterizing the bank's case as purely theoretical).

59. Further, under New York law, damages must be commensurate with a party's actual loss, and an aggrieved party may not, through the recovery of contract damages, reap any kind of

windfall.  Scalp & Blade, Inc., 309 A.D.2d at 97; see also Madison Fund, Inc., 427 F. Supp. at

608 ("One whose contract has been breached is not entitled to be placed, because of that breach,

in a position better than that which he would have occupied had the contract been performed.").

Indeed, "litigants are to be fairly compensated but . . . duplicative recoveries and windfalls

should be avoided."  Waehner v. Frost, 770 N.Y.S.2d 596, 599 (N.Y. Sup. Ct. 2003) ("double

recoveries are prohibited and discouraged both in common law . . . and by statute") (citations

omitted).  RACER claims it is entitled to an additional $13.5 million based on its assertion that it

should have been funded in cash.  (Mot. ¶¶ 18-19).  MLC has offered to fund RACER entirely in

cash in return for the TIPS, but RACER has rejected this offer in favor of keeping the TIPS.  (Ex.

2, Koch Decl. ¶ 8 & Ex. D (Nov. 17, 2011 Letter from Berz to Hill at 2)).  RACER cannot have

it both ways, however, and must choose to be funded either in TIPS plus cash or all cash.

Permitting RACER to retain the TIPS, which are guaranteed by the United Stated to pay out at

par or above upon maturity, and providing the Trust with an additional $13.5 million in cash puts

RACER in "a position better than that which [it] would have occupied had the contract been

performed"—a result prohibited under governing New York law. Madison Fund, Inc., 427 F.

Supp. at 608.

60. As discussed above, GAAP's treatment of securities like TIPS that will be held to

maturity recognizes the same actual loss or gain concept, and accordingly requires amortized

cost basis valuation for such assets because "no matter how market interest rates fluctuate, the

holder will recover its recorded investment and thus realize no gains or losses when the issuer

pays the amount promised at maturity."  FASB 320-10-25-5(a).  MLC's accounting for the TIPS

on amortized cost basis followed GAAP and was appropriate.

61. Further, RACER's assertion that, if provided the opportunity, it would have purchased the exact same portfolio of long-term securities" "at then prevailing market prices" "on or immediately after the Effective Date" is plainly unrealistic based on the Trust's pre- and post-Effective Date actions.  (RACER Motion ¶ 6; Hamilton Declaration ¶ 7).  The Trustee was fully aware that MLC was funding RACER with TIPS on the Effective Date.  The Trustee never protested this approach but took affirmative steps to prepare to accept this funding.   On the Effective Date, RACER then accepted the TIPS that MLC had specifically purchased in October 2010 for the purpose of funding RACER on the Effective Date.  MLC and Treasury never would have made recommendations to RACER with respect to a theoretical portfolio of securities, because MLC had already purchased the TIPS in October 2010.  To expect a newly formed and operating entity to analyze its long-term liabilities and projected funding while matching them to an optimal portfolio of laddered securities worth over $575,000,000 in a matter of days is improbable—and is belied by the Trust's pre- and post-funding actions.   Indeed, the Debtors purchased the TIPS used to fund RACER six months prior to the Effective Date in October 2010 and consulted with numerous financial advisors for months to plan the asset portfolio.  There is no evidence that RACER planned a long-term investment strategy for the half billion dollars in cash it claims it should have received, nor has RACER invested the over $200,000,000 it received from the short term securities that reached maturation during July 2011. (RACER Motion ¶ 24).  Therefore, RACER's alleged investment strategy is entirely hypothetical and does not support its claim for damages under New York law.  See Scalp & Blade, Inc., 309 A.D.2d at 225-26; Ackerley Commc'ns, Inc., 2001 WL 15693, at *2.

### D. RACER Waived Any Right It Had to Additional Payment and Failed to Mitigate Its Alleged Damages, If Any.

62. Aside from the Motion's lack of merit, RACER's delay in objecting to TIPS valued on an amortized cost basis bars any requested relief.  More than six months after this Court evaluated and approved the Settlement Agreement as part of the Plan, and more than a year after the Settlement Agreement was signed, RACER raised this claim with MLC for the first time.  Now RACER asks the Court to re-evaluate what has already been decided and finalized long ago.  If RACER believed it was entitled to cash funding on the Effective Date, it never would have accepted over $575 million worth of TIPS on the Effective Date.  Moreover, if RACER believed that it had been shortchanged by MLC on the Effective Date, it would not have reached out to MLC in order to conduct the true-up based on MLC's amortized cost basis valuation of the TIPS resulting in the approximately $108,000 True-up Payment to MLC.  Such conduct amounts to inexcusable delay and waiver of any right to object to the TIPS transferred by MLC, and consequently, RACER is barred from asserting the claim for additional monies now.  See Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P., 7 N.Y.3d 96, 104 (N.Y. 2006) ("Contractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned" and "[s]uch abandonment may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage.") (citations omitted); Guzzone v. Brandariz, 847 N.Y.S.2d 901, at *8 (N.Y. Sup. Ct. 2007) (finding plaintiff had waived right to object to defendants' use of driveway as common easement by conduct of acquiescence and delaying too long in objecting).

63. In addition, the doctrine of account stated bars RACER's claim.  "Under New York law, an account stated is an agreement between the parties to an account based upon prior transactions between them with respect to the correctness of the separate items composing the account and

the balance due, if any, in favor of one party or another. Under this doctrine, a party who receives an account is bound to examine it, and if that party admits that the account is correct, it becomes a stated account and is binding on both parties." In re Rockefeller Center Props., 272 B.R. 524, 541 (Bankr. S.D.N.Y. 2000) (citations omitted); see also Rosenman Colin Freund Lewis & Cohen v. Neuman, 93 A.D.2d 745, 746 (N.Y.A.D. 1st Dept. 1983) (holding that "a stated account . . . is binding on both parties—the balance being the debt which may be sued for and recovered at law.") (citations omitted). Here, the Settlement Agreement (as well as the Trust Agreement, Plan and Confirmation Order) provided for the payment of a certain amount of value to RACER by MLC. After MLC paid that value in TIPS and cash, and RACER made the True-up Payment to MLC, RACER's conduct constituted an admission that the amount exchanged was correct. The value transferred from MLC to RACER became a stated account and is therefore binding on both parties. See In re Rockefeller Center Props., 272 B.R. at 541.

64. Further, to the extent RACER received anything less than the full amount of funding pursuant to the Settlement Agreement, a proposition the Debtors contest, RACER could have made up the difference at the time of the True-up Payment in June 2011 and thereby mitigated its damages. New York law imposes a duty to mitigate damages, but RACER did not do so, and in fact made the approximately $108,000 True-up Payment to the Debtors, rather than claiming a shortfall. See Wilmot v. New York, 297 N.E.2d 90, 92 (N.Y. 1973) (stating that the party seeking damages is under a duty to make reasonable efforts to avoid consequences of the act complained of); Middle E. Banking Co. v. State St. Bank Int'l, 821 F.2d 897, 902 (2d Cir. 1987) ("It is beyond dispute that New York requires injured parties to take reasonable steps to minimize damages.") (citation omitted).

65. Through its conduct of paying the True-up Payment and waiting too long to assert any alleged right it may have had for greater value, RACER has waived any right to additional recovery and should be estopped from asserting any such claim now.

## IV.    CONCLUSION

66. From the outset of this chapter 11 proceeding, MLC's steadfast objective has been to work with the Settling Governments to successfully establish and fund RACER so that the properties transferred from MLC would be remediated and put back into productive use. Because MLC was a liquidating entity, which would return any unused DIP financing to Treasury, the goal of the TIPS portfolio was not to maximize the amount of money returned to Treasury upon liquidation, but to ensure that RACER had sufficient funding to meet the environmental liabilities in amounts agreed to in the Settlement Agreement at the time that they were expected to arise. Thus, the MLC DIP Trust has no financial incentive to dispute RACER's claim or financial stake in the outcome of this dispute. In defending against the Motion, the MLC DIP Trust has no intention or interest in undermining RACER's capacity to fulfill its mandate; rather the MLC DIP Trust believes that RACER has been funded in full.

67. MLC has met its funding obligations to RACER and the Settling Governments under the terms of the Settlement Agreement. RACER has not been shortchanged by MLC, and the Settling Governments and their constituents have not been damaged by MLC's provision of a combination of TIPS and cash to RACER. The Settlement Agreement does not require a particular accounting method to value the securities that would be transferred, and the course of dealing between the parties is devoid of evidence that an appraisal process would be undertaken to estimate the market value of TIPS on the Effective Date. GAAP required MLC to value the TIPS on an amortized cost basis, and RACER knew how MLC accounted for the TIPS prior to the Effective Date. Further, RACER made the True-up Payment based on the same amortized

cost basis for the TIPS.  RACER's retroactive attempt to apply a different accounting method to the securities it received from MLC is nothing more than an afterthought designed to wrest additional and unnecessary funds from Treasury.

68. For the reasons stated above, the MLC DIP Trust respectfully requests that the Court deny the Motion.

Dated:  January 5,[], 2012

        New York, New York

                      /s/ Joseph H. Smolinsky
                      Harvey R. Miller
                      Stephen Karotkin
                      Joseph H. Smolinsky

                      WEIL, GOTSHAL & MANGES LLP
                      767 Fifth Avenue
                      New York, New York 10153
                      Telephone:  (212) 310-8000
                      Facsimile:  (212) 310-8007

                      *Attorneys for Motors Liquidation*
                      *Company DIP Lenders Trust*

Document comparison by Workshare Professional on Friday, January 20, 2012
11:52:18 AM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://USDMS/US_ACTIVE/43903871/1 |
| Description | #43903871v1<US_ACTIVE> - MLC- Revised Response in Opposition to RACER Motion |
| Document 2 ID | interwovenSite://USDMS/US_ACTIVE/43903871/2 |
| Description | #43903871v2<US_ACTIVE> - MLC- Revised Response in Opposition to RACER Motion |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 13 |
| Deletions | 12 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 25 |

# Exhibit B

HEARING DATE AND TIME: February 9, 2012 at 9:45 a.m. (Eastern Time)
RESPONSE DEADLINE: January 5, 2012

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Motors Liquidation
Company DIP Lenders Trust

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                  :
In re                             :     Chapter 11 Case No.
                                  :
MOTORS LIQUIDATION COMPANY, et al.,  :   09-50026 (REG)
     f/k/a General Motors Corp., et al.  :
                                  :
               Debtors.           :     (Jointly Administered)
                                  :
------------------------------------------------------------x
```

**MOTORS LIQUIDATION COMPANY**
**DIP LENDERS TRUST'S AMENDED RESPONSE IN OPPOSITION TO MOTION OF**
**THE REVITALIZING AUTO COMMUNITIES ENVIRONMENTAL RESPONSE**
**TRUST FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105 AND 1142 TO ENFORCE**
**THE DEBTORS' PAYMENT OBLIGATIONS UNDER THE SECOND AMENDED**
**JOINT CHAPTER 11 PLAN AND THE CONFIRMATION ORDER**

# <u>TABLE OF CONTENTS</u>

**Page**

I.  PRELIMINARY STATEMENT ................................................................................ 1

II.  BACKGROUND FACTS ....................................................................................... 9

    A.  The Settlement Agreement Established the Scope of Environmental Liabilities and Resolved Claims Associated with MLC's Real Properties ........... 9

    B.  The Settlement Agreement Governs the Debtors' Funding Obligation to RACER ..................................................................................................... 12

    C.  Treasury and MLC Agreed to Fund RACER Using TIPS to Mitigate the Risk of Inflation .................................................................................... 13

    D.  GAAP Dictates That the Debtors Value the TIPS on an Amortized Cost Basis, Because the TIPS Were Intended To Be Held to Maturity ...................... 15

    E.  RACER Praised the MLC's Decision to Purchase TIPS and Indicated RACER's Intent to Follow MLC's Investment Plan By Holding TIPS to Maturity ................................................................................................ 16

    F.  The Trustee Conducted Extensive Due Diligence on the Scope of RACER's Soon-To-Be Assumed Environmental Liabilities and the TIPS Investment Plan ...................................................................................... 17

    G.  Any Discrepancy in the Value Funded to RACER Was Resolved in the $108,000 True-up Payment to MLC by RACER on June 30, 2011 ................... 21

    H.  RACER Filed the Motion Over Seven Months After Accepting the TIPS and Cash from the Debtors ................................................................... 22

III.  ARGUMENT .................................................................................................... 22

    A.  There is No Dispute that Debtors Fully Funded RACER on the Effective Date .................................................................................................... 22

    B.  The Settlement Agreement Controls and Provides for a Transfer of Value from MLC to RACER—Not Cash—to Fund Environmental Liabilities Decades into the Future ........................................................................ 25

    C.  RACER Has Failed to Assert Any Damages, and Any Additional Monies Would Constitute a Windfall ................................................................... 27

    D.  RACER Waived Any Right It Had to Additional Payment and Failed to Mitigate Its Alleged Damages, If Any .................................................... 32

IV.  CONCLUSION .................................................................................................. 34

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

First Investors Corp. v. Liberty Mut. Ins. Co.,
    152 F.3d 162 (2d Cir. 1998)..................................................................................28

First Nat'l Bank of Chi. v. Ackerley Commc'ns, Inc.,
    No. 94 Civ. 7539(KTD), 2001 WL 15693 (S.D.N.Y. Jan. 8, 2001).................................29, 31

Freund v. Wash. Square Press, Inc.,
    314 N.E.2d 419 (N.Y. 1974)..................................................................................29

Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.,
    7 N.Y.3d 96 (N.Y. 2006) .....................................................................................32

Guzzone v. Brandariz,
    847 N.Y.S.2d 901 (N.Y. Sup. Ct. 2007) ....................................................................32

In re Phoenix Petroleum Co.,
    278 B.R. 385 (Bankr. E.D. Pa. 2001) .......................................................................28

In re Rockefeller Center Props.,
    272 B.R. 524 (Bankr. S.D.N.Y. 2000) ......................................................................33

In re WorldCom, Inc.,
    362 B.R. 96 (Bankr. S.D.N.Y. 2007) .......................................................................28

Madison Fund, Inc. v. Charter Co.,
    427 F. Supp. 597 (S.D.N.Y. 1977)........................................................................29, 30

Middle E. Banking Co. v. State St. Bank Int'l,
    821 F.2d 897 (2d Cir. 1987).................................................................................33

Rosenman Colin Freund Lewis & Cohen v. Neuman,
    93 A.D.2d 745 (N.Y.A.D. 1st Dept. 1983) ..................................................................33

Scalp & Blade, Inc. v. Advest, Inc.,
    309 A.D.2d 219 (N.Y. App. Div. 2003) ..............................................................29, 30, 31

Waehner v. Frost,
    770 N.Y.S.2d 596 (N.Y. Sup. Ct. 2003) ....................................................................30

Wilmot v. New York,
    297 N.E.2d 90 (N.Y. 1973)..................................................................................33

**OTHER AUTHORITIES**

Financial Accounting Standards Board Accounting Standards Codification
320-10-25-3......................................................................................................................15, 23

Financial Accounting Standards Board Accounting Standards Codification
320-10-25-5.............................................................................................................16, 23, 25, 30

Financial Accounting Standards Board Accounting Standards Codification
320-10-50-5......................................................................................................................16, 23

The Motors Liquidation Company DIP Lender Trust (the "**MLC DIP Trust**"), formed in furtherance of the Second Amended Joint Chapter 11 Plan (the "**Plan**") (**ECF No. 9836**) by the above-captioned debtors (collectively, "**MLC**" or the "**Debtors**"),[1] submits this Response in Opposition to the Motion of the Revitalizing Auto Communities Environmental Response Trust ("**RACER**" or the "**Trust**") for an Order Pursuant to 11 U.S.C. §§ 105 and 1142 to Enforce the Debtors' Payment Obligations Under the Second Amended Joint Chapter 11 Plan and the Confirmation Order (the "**Motion**") (**ECF No. 11164**), and respectfully represents as follows:[2]

## I.    PRELIMINARY STATEMENT

1.    MLC adequately funded the Trust in accordance with the Settlement Agreement (as defined below), which was approved by the Court as part of the Debtors' chapter 11 plan confirmation process.    Because MLC fully met its funding obligations to RACER, there is enough money in the Trust to fund the environmental obligations at the amounts agreed upon by the parties to the Settlement Agreement.    While RACER creates controversy and alarms Trust stakeholders—fifteen states and the Saint Regis Mohawk Tribe (the "**Tribe**")—about the sufficiency of the Trust's assets, the Debtors transferred at least $625,234,945 of value to RACER in the form of $49,896,945 in cash and $575,338,000 in Treasury securities, consisting primarily of Treasury Inflation-Protected Securities ("**TIPS**")[3] as valued on an amortized cost

---

[1] The MLC DIP Trust was formed on December 15, 2011 to hold and administer certain assets for the benefit of the Debtors' DIP lenders and lists as its assets, *inter alia*, all rights to recover all or any portion of the amount of approximately $13.6 million that was deposited by MLC with the Court on or prior to December 15, 2011 in connection with the Motion.    (See Motors Liquidation Company DIP Lenders Trust Agreement ¶ C & at Schedule B).

[2] The United States Department of Treasury ("**Treasury**") has instructed and funded the MLC DIP Trust to proceed in defending this dispute.

[3] For ease of reference, MLC refers to all securities that it transferred to RACER cumulatively as TIPS.

1

basis.[4]  No site remedial or administrative budgets have been put into jeopardy by the parties' funding actions, and all trust stakeholders have substantially benefited from the October 2010 decision to fund RACER using TIPS.

2.  This dispute essentially concerns RACER's contention that the Trust was not adequately funded and arises from RACER's retroactive attempt use a different valuation method—quoted market value—long after MLC transferred a portfolio of TIPS valued at amortized cost to the Trust on March 31, 2011.  The Motion also comes five months after a June 2011 true-up payment by RACER to MLC based on the amortized cost of those TIPS.  RACER's choice of accounting for its balance sheet is irrelevant to whether MLC funded the Trust in full, which MLC unquestionably did.  RACER's Motion is an effort to re-negotiate a done deal and impose an accounting methodology that is not required—much less mentioned—in the Settlement Agreement nor supported by the history of the transaction, the course of dealing, or the intent of the parties.  MLC's valuation of the TIPS at amortized cost was entirely appropriate for MLC while operating and was a proper method for MLC to meet its obligations under the various agreements.  None of the governing documents require MLC or RACER to value the transferred securities using a quoted market basis as of March 31, 2011, the effective date of the Debtors' confirmed plan and date RACER was funded (the "**Effective Date**").  Moreover, RACER's accounting choices do not change the economics of the deal; MLC funded the Trust in full in the amount agreed to in the Settlement Agreement.  Accordingly, RACER's apparent purpose for applying an estimated market value method to value the securities transferred on March 31, 2011 is to extract additional monies from Debtors' primary debtor-in-possession lender, the Treasury.

---

[4] Amortized cost value includes approximately $1.4 million of accrued interest.

3.   As their name suggests, TIPS provide protection against inflation. The principal of a TIPS increases with inflation and decreases with deflation, as measured by the Consumer Price Index. The quoted market price of a TIPS will fluctuate over time and on any given date can be less than, equal to, or greater than the face value.  Importantly however, the full faith and credit of the United States guarantees the holder of a TIPS a payment of the adjusted principal or original principal, whichever is greater, upon maturity.  In other words, at maturity, the holder can redeem the TIPS for no less than par value.  TIPS also pay interest twice a year, at a fixed rate.[5]   Generally Accepted Accounting Principals ("**GAAP**") required that MLC value investments intended to be held to maturity, such as the TIPS, on an amortized cost basis. The amortized cost basis was used by MLC at all times to value the TIPS and is reflected in the Monthly Operating Reports filed with this Court and the Securities and Exchange Commission (the "**SEC**"), which reports were prepared by RACER's current chief financial officer and declarant Scott Hamilton ("**Hamilton**") in his capacity as MLC's controller.  Hamilton also drafted the footnote in each of the Monthly Operating Reports indicating the difference between quoted market value and the amortized cost basis of the TIPS.  (See Declaration of Brian Rosenthal ("**Rosenthal**")[6] attached hereto as Exhibit 1, ¶¶ 14-15 & at Ex. C (excerpts from Oct. 2010-Feb. 2011 Monthly Operating Reports)).

4.   The product of a Settlement Agreement reached after intense, lengthy negotiation, RACER exists to fund ongoing environmental liabilities for decades.  For this reason, the

---

[5]  See http://www.treasurydirect.gov/indiv/products/prod_tips_glance.htm (last visited Jan. 5, 2011) (providing more information on TIPS).

[6] Rosenthal was a member of Motors Liquidation Company management team principally responsible for its treasury operations.  (Rosenthal Decl. ¶ 1).

portfolio of laddered[7] TIPS was selected by MLC with the advice and consent of the Treasury and knowledge and consent of the United States Trustee for the Southern District of New York in order (1) to ensure sufficient cash flow consistent with the Trust's obligations to pay the remediation and other environmental liability costs for decades to come, (2) to provide a return that protects against the risk of inflation, and (3) to guarantee, *at minimum*, the greater of par or the inflation-adjusted principal value upon maturity. MLC selected the portfolio of TIPS to match expected future cash flows based on the projected environmental liabilities.

5. Now, over six months after the Debtors funded RACER in accordance with the Settlement Agreement, and five months after engaging in a true-up or final accounting with respect to the value of the TIPS on an amortized cost basis, RACER has reversed course and used what amounts to an accounting gimmick to value the TIPS in order to claim a shortfall in value funded to the Trust of approximately $13.5 million. (Mot. at 4.) Yet using a "market" or "mark to market" valuation method to measure the amount funded to RACER is not required by the governing documents—the Settlement Agreement and the Trust Agreement—the Plan, or this Court's Order confirming the Plan (all as defined below). RACER relies on alleged "price quotes" and "market data" of the trading prices of TIPS on March 31, 2011 to construct the idea that the Debtors did not fund the Trust in full. (Mot. at 4, 10, 10 n.16). In reality, there is no pre- or post-Effective Date evidence that suggests that the parties contemplated or intended to engage in this type of accounting exercise to value the TIPS on a quoted market value basis as of March 31, 2011, and RACER's own post-Effective Date actions in May and June 2011 sharply contradict its current allegation that a market value approach must be used.

---

[7] Laddered Treasuries is a capitalized, but undefined, term used in the Settlement Agreement (as defined below) to describe Treasury securities with different maturities.

6.    Paradoxically, while complaining about the market price of the TIPS it received, RACER confirms its intent to hold the TIPS to maturity, thereby guaranteeing RACER the full cash amount of the value promised *and delivered* by the Debtors when they funded RACER on March 31, 2011.  ((Mot. at 4; Hamilton Decl. in Support of Mot. ¶ 7 (**ECF 11165**)).  This admission alone defeats the Motion—quoted market value is irrelevant to the amounts actually funded to the Trust, because when the TIPS are held to maturity, there will be no sale to generate a gain or loss prior to maturity, and TIPS are guaranteed by the United States to pay out *at par or above* at maturity.  In other words, if RACER holds the TIPS to maturity, the TIPS will provide the promised funding value or better.  Moreover, because RACER has not sold any of the TIPS prior to maturity and has stipulated its intent to hold the TIPS until maturity, RACER's alleged harm is a phantom loss.  Therefore, RACER has suffered no damages and its claims should be dismissed as a matter of law.

7.    RACER makes an unjustifiable and specious assertion about what it would have done if provided with cash (instead of a combination of cash and TIPS) on the Effective Date in order to justify a claim that it has been damaged by MLC's funding actions. Yet, the evidence shows that RACER knew it would be funded primarily in TIPS on the Effective Date and made preparations to accept those TIPS on the Effective Date by creating custodial accounts in advance.  RACER never questioned or protested this planned approach or asked for the opportunity to formulate its own investment approach.  RACER then accepted the TIPS without protest on the Effective Date and completed a true-up payment of approximately $108,000 in June 2011—a series of acts that are completely incompatible with RACER's claims that it should have been afforded the opportunity to formulate its own long-term investment strategy.  MLC never would have

developed or invested in the laddered TIPS portfolio had the parties intended to fund the Trust in cash only.

8.    MLC's valuation of the TIPS transferred to RACER on amortized cost basis was directly in line with GAAP accounting guidance.  Following RACER's recently suggested approach to assess the market value of the TIPS on the Effective Date ignores the economic realities of the Trust's mandate, the understanding of the parties prior to and for months after the Effective Date and the fact that the environmental liabilities assumed by RACER have been fully funded.  If the TIPS had been trading at a substantial premium on the Effective Date as they do today, MLC would have transferred the TIPS in the same manner using the amortized cost basis due to the fact that the TIPS are intended to be held to maturity.  In fact, MLC had the opportunity to sell $226,000,000 in short-term marketable securities that were not matched to the long-term environmental liabilities for a profit of over a half million dollars.  However, MLC transferred these securities that matured on July 31, 2011 to RACER at amortized cost value, which resulted in over $700,000 in interest payments to RACER.

9.    Beginning with the development of the wind down budget that would carry the Debtors financially through confirmation in this chapter 11 proceeding, MLC steadfastly worked with the Federal Government to create and ensure an adequately funded environmental remediation trust. Along with the Federal Government, the Debtors were primarily responsible for designing the Trust and have no interest in undermining RACER's ability, financially or otherwise, to carry out its mandate with respect to MLC's former properties.  Moreover, the MLC DIP Trust has no financial incentive to dispute RACER's claim or financial stake in the outcome of this dispute. MLC fully met its funding obligations to RACER on the Effective Date.  RACER's retroactive use of an accounting trick to low-ball the value of the TIPS now, six months later, threatens the

integrity of the Settlement Agreement process that the parties engaged in over a nearly two-year period.

10. Furthermore, RACER has not been damaged by MLC's funding actions on March 31, 2011, and RACER in fact has benefited because the TIPS are trading at above-par prices in the market. (Mot. at 4-5). If RACER wants to return the TIPS now for the cash RACER says it is entitled to, an offer that RACER has repeatedly refused, MLC is willing to accept the TIPS back from RACER and liquidate them in an expeditious fashion. (See Declaration of Albert A. Koch ("**Koch**"), attached hereto as Exhibit 2, ¶ 8 & Ex. D (Nov. 17, 2011 Letter from David Berz to Hill at 2)). After liquidating the TIPS, MLC would provide RACER with the cash it asserts that it was promised, plus interest since March 31, 2011.[8] (Id.). If RACER keeps the TIPS, however, payment of an additional $13.5 million now would result in a windfall gain to the Trust and would put RACER in a better position than it would be had RACER received all cash from the Debtors. Such a result is not permitted under governing New York law.

11. RACER's motion is nothing more than an attempt to reinvent history in order to extract additional monies from Treasury. RACER absolutely knew that it would be receiving a TIPS portfolio on the Effective Date, the quoted market value of which would fluctuate over time, and never proposed an alternative approach to funding. Critically, the TIPS portfolio had always been assessed and accounted for on an amortized cost basis before and up to the Effective Date, and there is a complete absence of evidence that the parties prepared, planned or otherwise discussed or agreed on whether to appraise the value of the TIPS on an estimated market value basis on the Effective Date. Similarly, there is no evidence that the parties ever discussed or agreed on a process for appraising the TIPS on a market value basis on the Effective Date. All of

---

[8] MLC would then remit any excess monies from the sale of the TIPS to the Treasury as MLC's primary debtor-in-possession lender.

the Debtors' Monthly Operating Reports from October 2010, when the TIPS were purchased, through the end of February 2011, listed the amortized cost basis value of the TIPS and disclosed in a footnote the difference between quoted market value and the amortized cost basis. (Rosenthal Decl., ¶ 14 & Ex. C (excerpts of Monthly Operating Reports)).  Every one of these Monthly Operating Reports states that the maturities of these securities correspond to expected future cash requirements. (Id.).  Hamilton, RACER's declarant and current chief financial officer who formerly worked for the Debtors as controller, prepared those reports.  (Id. ¶ 15).

12. The Debtors funded RACER on March 31, 2011.  Then, over two months later in June 2011, using RACER's calculation, the Debtors and RACER finalized an accounting "true-up", resulting in an approximately $108,000 payment *by* RACER *to* the Debtors as a result of adjustments to TIPS' principal over the three day period between funding and settlement of the account, among other reasons.  The RACER true-up calculation adjusted the amortized cost of the TIPS, the very valuation which RACER now claims is not appropriate.  This true-up exercise would have been irrelevant and unnecessary if RACER had been valuing the TIPS portfolio on a quoted market value basis and believed that it had been shortchanged by MLC.  Despite RACER's true-up and final accounting payment to MLC in June 2011, which was intended to fully address any discrepancy in the value TIPS at the Effective Date, RACER now claims MLC owes it $13.5 million related to those very same securities.  RACER's unwarranted delay in bringing the Motion, aside from the utter lack of merit, should bar any relief RACER seeks. Neither the facts nor the law support the claims RACER asserts, and therefore, the Court should deny the Motion.

## II.    BACKGROUND FACTS

### A.    The Settlement Agreement Established the Scope of Environmental Liabilities and Resolved Claims Associated with MLC's Real Properties.

13. In June 2009, the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  Various States,[9] the Tribe and the United States (collectively, the "**Settling Governments**") filed timely proofs of claim relating to environmental liabilities at the Debtors' owned real properties.  From June 2009 through April 2010, the Debtors engaged in settlement negotiations with the Settling Governments to assess the costs to remediate environmental contamination at eighty nine MLC properties.

14. Throughout the entire environmental liability assessment process, the Debtors committed to an open information exchange so as to eliminate any information imbalance, maintain good relations, and advance the settlement negotiations.   In particular, the Debtors provided the Settling Governments with access to an online database named IDEA, which facilitated the sharing of site information, cost projections and investigation and remediation plans that the Debtors' restructuring professionals were developing.

15. By April 2010, after ten months of intense negotiation, the Debtors' and the Settling Governments' cost projections for the Debtors' environmental liabilities and site-remediation for MLC's owned real properties were materially aligned.  For the next few months through summer and into mid-fall of 2010, the Debtors developed a plan to create an asset portfolio of laddered TIPS to fund RACER.   Treasury reviewed that plan and approved it for implementation.

---

[9] Delaware, Illinois, Indiana, Kansas, Louisiana, the Commonwealth of Massachusetts, Michigan, Missouri, New Jersey, New York, Ohio, the Commonwealth of Pennsylvania, the Commonwealth of Virginia, and Wisconsin are the states that are parties to the Settlement Agreement (collectively, the "**States**").

Accordingly, on October 12, 2010, MLC purchased a laddered portfolio of TIPS solely for the purpose of funding RACER.

16. One week later, on October 20, 2010, the Debtors, the Settling Governments, and the Trustee (as defined below) entered into the Environmental Response Trust Consent Decree and Settlement Agreement (the "**Settlement Agreement**"), which provided for transfer of those liabilities to an environmental response trust, ultimately known as RACER.[10]  The Settlement Agreement set forth funding amounts based on the agreed cost projections and scopes of remediation for the properties, including projected time frames for environmental regulatory investigation, cleanup and monitoring.

17. Sometime in late August or September 2010, the Federal Government selected Elliott Laws ("**Laws**") and Michael O. Hill ("**Hill**") to manage the Environmental Response Trust Administrative Trustee (the "**Trustee**"), which would manage RACER's operations.  The Trust Agreement[11] dated March 3, 2011 sets forth the duties and authorities of the Trustee and reiterates certain of the funding specifications for the Trust as set forth in the Settlement Agreement.  The Federal Government provided Laws and Hill in their capacity as managers of the Trustee with an opportunity to review drafts of the Settlement Agreement before becoming a signatory party, and both Hill and Laws, and their counsels, provided comments on drafts of the

---

[10] For ease of reference, throughout this brief, the Debtors refer to the environmental response trust as created in the Settlement Agreement as RACER, although RACER did not officially exist until the time period immediately prior the March 31, 2011 funding date.

[11] Environmental Response Trust Agreement by and among MLC, Remediation and Liability Management Company, Inc., Environmental Corporate Remediation Company, Inc., as Settlors, EPLET, LLC, not individually but solely in its representative capacity as Environmental Response Trust Administrative Trustee, and the United States of America, as Environmental Response Trust Beneficiary and Powers and Rights Holder, and the remaining Settling Governments (as defined below) as Environmental Response Trust Powers and Rights Holders (the "**Trust Agreement**").

Settlement Agreement.   Beginning in September 2010, Hill and Laws were provided with detailed presentations, and had the opportunity to review the TIPS laddered securities that MLC intended to use to fund RACER.   (See, e.g., Ex. 2, Koch Decl. ¶ 4 & Exs. A-B (Nov. 4, 2010 meeting agenda and presentation excerpts).   This portfolio of securities was always valued at amortized cost. (Ex. 1, Rosenthal Decl. ¶ 14 & Ex. C (Monthly Operating Reports)).   Hill and Laws also performed field due diligence of the administration and property management operations as well as real property locations of MLC on numerous occasions.

18. On March 28, 2011, the Court entered the Findings of Fact, Conclusions of Law, and Order Pursuant to Sections 1129(a) and (b) of the Bankruptcy Code and Rule 3020 of the Federal Rules of Bankruptcy Procedure Confirming Debtors' Second Amended Joint Chapter 11 Plan (**ECF No. 9941**) (the "**Confirmation Order**").   The Confirmation Order, *inter alia*, (i) confirmed the Debtors' Plan and (ii) approved the Settlement Agreement, which was incorporated into the Plan and set forth the property transfer and funding mechanisms that the MLC and the Settling Governments agreed would be used to establish RACER.   (Confirmation Order at 8, 16, 17, 19-22).   Prior to the hearing on confirmation of the Debtors' Plan, Hill and Laws reviewed and provided comments on drafts of the Plan and Confirmation Order. The Plan became effective on March 31, 2011.   See Notice of (I) Entry of Order Confirming Debtors' Second Amended Joint Chapter 11 Plan and (II) Occurrence of Effective Date at 2 (**ECF No. 10056**).   That same date, the Debtors transferred $49,896,945 in cash and $575,338,000 in TIPS as valued on an amortized cash basis to RACER, pursuant to the Plan and Settlement Agreement. (See Ex. 1, Rosenthal Decl. ¶¶ 11, 21, & Ex. B (Schedule of Investments Transferred to RACER Trust as of Mar. 31, 2011)).

### B.     The Settlement Agreement Governs the Debtors' Funding Obligation to RACER.

19. The Settlement Agreement is the controlling document for assessing the rights and obligations of MLC and RACER.  The Settlement Agreement states that "[i]n the event of any inconsistency between the Plan, any order confirming the Plan, and this Settlement Agreement, *the terms of this Settlement Agreement shall control*." (Ex. 1, Rosenthal Decl. ¶ 3 & Ex. A (Settlement Agreement) ¶ 109 (emphasis added)); <u>see also</u> Plan ¶ 6.4 (same).  Moreover, the Trust Agreement states that "[w]here the provisions of this Agreement are irreconcilable with the provisions of the Plan of Liquidation, the terms of this Agreement shall govern.  Where the provisions of this [Trust] Agreement are irreconcilable with the provisions of the Settlement Agreement, *the terms of the Settlement Agreement shall govern*." (Trust Agreement ¶ 1.2.5 (emphasis added)).

20. Paragraph 32 of the Settlement Agreement sets forth MLC's Effective Date funding of RACER:

> On the Effective Date, and subject to adjustments as provided in Paragraph 36 of this Settlement Agreement as applicable, Debtors shall make a payment to fund the Environmental Response Trust in the amount of no less than $641,434,945…. The Environmental Response Trust funding amount consists of (i) a Minimum Estimated Property Funding Account containing funding with respect to each Property as set forth on Attachment A Column 2 attached hereto and totaling $295,036,131, (ii) a Reserve Property Funding Account containing funding with respect to each Property as set forth on Attachment A Column 3 attached hereto and totaling $52,065,197, (iii) a Long Term OMM Property Funding Account containing funding (if any) for each Property as set forth in Attachment A Column 4 attached hereto and totaling $84,099,794; (iv) the Cushion Funding Account totaling $68,233,823; (v) the Administrative Funding Account in an amount of no less than $102 million; and (vi) the Administrative Funding Reserve Account totaling $40 million.

(Ex. 1, Rosenthal Decl. ¶ 3 & Ex. A (Settlement Agreement) ¶ 32).[12]

21. Importantly, Settlement Agreement Paragraph 32 does not reference "Cash" or "cash"; rather, it simply refers to a dollar value to be transferred and references Attachment A, the "Environmental Response Trust Property Funding for Environmental Activities", which specifically sets forth the real property details and account funding values for the Trust. The terms "Cash" or "cash" are not used anywhere in the Settlement Agreement with respect to MLC's funding obligation to RACER.

22. Moreover, the Debtors' Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan clearly states that the "Cash and cash equivalents" going to the Trust "represents cash and investments in U.S. Treasury or U.S. Treasury backed securities with a maturity of 15 years or less." (See Ex. 1, Rosenthal Decl. ¶ 20 & Ex. E (Disclosure Statement at Opening Statement of Net Assets (Liabilities) of the Debtors and Trusts Projection Notes and Assumptions at note 6 (**ECF No. 8023**))).

### C.    Treasury and MLC Agreed to Fund RACER Using TIPS to Mitigate the Risk of Inflation.

23. MLC and Treasury, which provided the majority of the financing for MLC's wind-down budget, including the funding that would ultimately be transferred to RACER, recognized the potential for inflation to materially erode RACER's ability to fulfill its mandate to remediate the properties and return them to productive use. As such, MLC carefully focused on earning a rate of return on the monies it held so as to defease the risk that inflation posed on the funds that would be transferred to RACER at an unknown future date. (Ex. 1, Rosenthal Decl. ¶ 4).

---

[12] Pursuant to paragraph 7 of the Confirmation Order, the Debtors $625,234,945 funded on the Effective Date. Adjustments to the $641,434,945 figure provided in paragraph 32 of the Settlement Agreement, above, includes reduction of $28,200,000 per paragraph 36 of the Settlement Agreement and an increase of $12,000,000 to reflect certain sale proceeds as described in paragraph 23 of the Confirmation Order.

24. During May and June of 2010, MLC considered several options to best match the rate of return with inflation and consulted with JP Morgan Asset Management and Mesirow Financial to confirm the soundness of MLC's investment plan to fund RACER.  (<u>Id.</u> ¶ 5).  Ultimately, MLC determined that the optimal way to ensure that RACER could meet its mandate to fund environmental liabilities was to construct a portfolio primarily of TIPS with laddered maturity dates matched to the anticipated timing of RACER's cash flows with respect to the myriad environmental liabilities.  (<u>Id.</u>).

25.  In July and August 2010, MLC presented the RACER investment plan to Treasury and explained how the TIPS portfolio would mitigate inflation risk over the lifetime of the Trust.  (<u>See</u> Koch Decl. ¶¶ 2-3).  During the course of these July and August 2010 meetings, some of which were structured as question and answer sessions and at least one of which included representatives of the DOJ and EPA, Koch discussed the question of TIPS and the proposed MLC investment strategy.  (<u>Id.</u> ¶ 3).  In August 2010, Treasury concurred with MLC's decision to use TIPS to fund RACER's remedial, monitoring and administrative activities.  (<u>Id.</u> ¶ 4).  After receiving Treasury's approval, MLC made similar presentations to the United States Trustee for the Southern District of New York and advisors to the Official Committee of Unsecured Creditors[13] in August 2010, and both concurred with MLC's decision to use TIPS to fund RACER.  (<u>Id.</u>).

26. A primary reason why the Debtors created and purchased the portfolio of laddered TIPS back in summer and early fall of 2010 was because the Debtors and Settling Governments were not able to foresee when exactly the Plan would be confirmed and RACER would exist in its

---

[13] The Official Committee of Unsecured Creditors is the statutory committee of unsecured creditors appointed by the U.S. Trustee in the Debtors' chapter 11 cases pursuant to section 1102 of the Bankruptcy Code.

final state and be funded.  The unique nature of the TIPS provided a stable and conservative method of ensuring adequate cash flow to pay environmental liabilities and fund the Trust, despite the uncertainty of the Plan confirmation process.

27. On September 2, 2010, as required by MLC's Debtor-in-Possession Credit Agreement, MLC filed a Statement/Notice of Third Amendment to DIP Credit Facility with the Court providing for investment in United States Treasury securities with maturities of up to 15 years that would ultimately be transferred to RACER.  (See Debtors' Third Amendment to Amended and Restated Secured Superpriority Debtor-in-Possession Credit Agreement ¶ 1 (**ECF No. 6846**)).

28. On October 12, 2010, MLC purchased a laddered portfolio of TIPS.  (See Ex. 1, Rosenthal Decl. ¶ 11, & Ex. B (Schedule of Investments Transferred to RACER Trust as of Mar. 31, 2011)).  The Debtors used a conservative approach in designing the laddered TIPS portfolio for RACER in order to ensure that the Trust would not have to sell TIPS before they matured. (Id. ¶ 11).  This strategy would guarantee adequate cash flow for RACER based on spending projections agreed to by the Settling Governments in the Settlement Agreement and allow the Trust to hold the TIPS to maturity.  (Id. ¶ 12).

**D.      GAAP Dictates That the Debtors Value the TIPS on an Amortized Cost Basis, Because the TIPS Were Intended To Be Held to Maturity.**

29. The Debtors purchased the TIPS with the intent that the TIPS would be transferred to the Trust on the Effective Date and held until maturity.  GAAP required MLC to value its investments in "held-to-maturity securities" at an amortized cost basis.  See Financial Accounting Standards Board Accounting Standards Codification[14] ("**FASB**") 320-10-25-3, 320-

---

[14] "The FASB Accounting Standards Codification is the source of authoritative generally accepted accounting principles (GAAP) recognized by the FASB to be applied to

15

10-50-5(a).  As such, the Debtors reported the value of the TIPS at amortized cost in Monthly

Operating Reports filed with the Court and in monthly 8-Ks filed with the SEC and disclosed

quoted market values in accordance with GAAP.  (<u>See</u> Ex. 1, Rosenthal Decl. ¶ 14 & Ex. C

(Monthly Operating Reports)).  Upon information and belief, the Trustee reviewed, or should

have reviewed these Monthly Operating Reports as part of its due diligence process conducted in

preparation to manage the RACER and its assets.

30. Under GAAP, unrealized gains and losses due to market fluctuations for held-to-maturity

securities are not recognized.  FASB 320-10-25-5(a).  As of January 5, 2012, the estimated

market value of the TIPS in the RACER portfolio is approximately $378,209,474, which is

approximately $30.5 million more than the amortized cost basis of the TIPS transferred to

RACER by the Debtors on March 31, 2011.[15]  (<u>See</u> Ex. 1, Rosenthal Decl. ¶ 32).  That $30.5

million "gain," however, is not realized and thus not recorded under GAAP, because the TIPS

will be held to maturity.  See FASB 320-10-25-5(a).

**E.**  **RACER Praised the MLC's Decision to Purchase TIPS and Indicated RACER's Intent to Follow MLC's Investment Plan By Holding TIPS to Maturity.**

31. Prior to his current position as chief financial officer ("**CFO**") of RACER, Hamilton

acted as controller for MLC from July 2009 to June 1, 2011.[16]  (<u>See</u> Ex. 1, Rosenthal Decl. ¶ 15).

---

nongovernmental entities."  FASB Accounting Standards Codification, Notice to Constituents (v 4.5) at 4 (Nov. 1, 2011), *available at* <u>https://asc.fasb.org/imageRoot/09/15227909.pdf</u>.

[15] This data is based on market quotations provided by Mesirow Financial as of 8:00 a.m. Eastern Standard Time on January 5, 2012.  The value of the TIPS portfolio described above excludes the $265,505,495 in securities that have matured since the Effective Date and excludes accrued interest.

[16] From the Effective Date to June 1, 2011, several MLC employees, including Hamilton, were working for both MLC and RACER under the terms of the Transition Services Agreement ("**TSA**").  Time spent working for RACER was billed to RACER under the TSA and these employees officially transferred to RACER on June 1, 2011.

As such, Hamilton has extensive experience with accounting treatment and valuation of assets like TIPS and liabilities under GAAP. In his role as controller in closing the Debtors' monthly books, Hamilton was responsible for drafting the Monthly Operating Reports, including calculating the amortized cost basis of the TIPS at month-end and drafting the footnote disclosing the difference between the amortized cost basis and quoted market value of the TIPS portfolio. (Id. ¶¶ 14-15). Therefore, Hamilton had familiarity with the Debtors' accounting policies, including valuation for the TIPS and environmental liabilities transferred to RACER prior to moving on to work in a similar capacity for RACER.

32. In his declaration attached to the Motion, Hamilton praises the Debtors' "accumulated knowledge and experience with respect to the Trust's anticipated environmental and administrative spending needs over the life of the Trust" and clarifies that he does not "question" that "knowledge and experience[.]" (Hamilton Decl. ¶ 5). Further, Hamilton notes that the Debtors "selected the maturity dates and stated interest rates associated of the [TIPS] . . . to meet the Trust's anticipated spending needs." (Hamilton Decl. ¶ 5). Hamilton also confirms his "understanding that the [Federal] Government had approved the combination of assets that Debtors transferred to RACER on the Effective Date." (Hamilton Decl. ¶ 6). Additionally, Hamilton states that, in light of his trust in the Debtors' financial strategy to use TIPS to fund the Trust and the government's approval and financing this strategy, "RACER held and intends to continue holding until maturity the [TIPS] transferred to it by MLC on the Effective Date." (Hamilton Decl. ¶ 7).

**F.    The Trustee Conducted Extensive Due Diligence on the Scope of RACER's Soon-To-Be Assumed Environmental Liabilities and the TIPS Investment Plan.**

33. Prior to funding and transferring assets to RACER, MLC spent extensive time educating the managers of the Trustee, Hill and Laws, so that they would understood the scope of

environmental liabilities and the plans for remediation that they would be assuming from MLC, as well as the TIPS investment strategy to manage cash flow. (See Ex. 2, Koch Decl. ¶ 5). As part of this process, MLC made detailed presentations concerning the eighty nine properties to be transferred, MLC's accounting systems and treasury operations relating to environmental matters, and processes for paying environmental liability invoices. The scope and frequency of meetings and correspondence increased as MLC moved closer to funding RACER and emerging from bankruptcy.

34. In meetings, presentations and numerous pre-Effective Date writings, MLC explained to the Trustee that MLC would fund RACER in part by transferring the TIPS securities that MLC had purchased in October 2010:

- On November 4, 2010, MLC president and chief executive officer Koch, executive vice president Ted Stenger ("Stenger"), and other MLC employees met with Hill and Laws in Detroit, Michigan to begin on-site diligence. Discussions included MLC's TIPS investment strategy. (See Ex. 2, Koch Decl. ¶ 6 & at Exs. A-B (excerpts of presentations)).

- On November 19, 2010, Hill and Laws conducted a full day of diligence at MLC's Detroit, Michigan headquarters. During that meeting, MLC discussed the rationale for funding RACER using the recently purchased TIPS portfolio. (See Ex. 1, Rosenthal Decl. at Ex. D (Nov. 19, 2010 MLC Finance and Administration Presentation to the Trustee at 6-10)).

- On February 11, 2011, Hill, Laws and Treasury met with MLC to discuss revised estimates for RACER's business plan, including the estimated funding on the Effective Date.

35. At all times throughout this process, the Trustee had the benefit of its own sophisticated legal counsel to assist in conducting its due diligence. At no time during or following these various meetings did the Trustee object to or raise concern about the way MLC planned to fund RACER. Moreover, Hamilton, now CFO of RACER, was one of the Debtors' employees who assisted with this education process when he was controller. Further, there was a continuity of

18

operations upon funding and transfer of the environmental liabilities to RACER, with the same MLC employees, computer systems, and operational staff providing transition services to RACER for several months after the Effective Date.

36.   Beginning in late November 2010, in consultation with Hill and Laws, MLC began to research setting up cash management and investment accounts and accounting systems structures on behalf of RACER.   (Rosenthal Decl. ¶ 19).   These discussions included Jim Selzer, Vice President and Treasurer of MLC ("**Selzer**"), Rosenthal, Hamilton, Hill, Laws, and Stenger.   (Id.). This group conducted in-depth analysis of various financial institutions including interviews and formal requests for proposals.   (Id.).   Hill and Laws were intimately involved in this process, including conducting their own interviews and making independent decisions.   (Id.).   Further, structuring the custodial accounts involved over 15 separate meetings or calls with Laws, Hill, or Hill's associate concerning establishing new accounts at a financial institution and concluded in late March 2011.   (Id.).   This process included establishing custodial accounts to receive the Treasury investments made by MLC, which would have been unnecessary if the Trustee expected to receive only cash on the Effective Date.   (Id.).   Significantly, during this extended process with multiple communications on logistics related to the transfer of securities, there was never any discussion of (i) a procedure to determine quoted market value, (ii) the source of the market data, or (iii) the time of day at which to measure the market value on the Effective Date.

37. From February 11, 2011 through the end of March 2011, Hill, Laws, Treasury, Stenger, and Selzer had regular conference calls to review the status of the Effective Date closing. Moreover, during this time period RACER intensified its due diligence efforts such that MLC was interacting with RACER representatives on a daily basis and responding to information

requests from RACER either via documents, meetings or calls.    At no time did RACER question the amortized cost value of the TIPS.

38. Despite the extensive preparation for receiving the transfer of TIPS, no arrangements or protocols were ever discussed or established by any party to set a market value for the TIPS on the Effective Date.  The Debtors would have insisted on such a protocol.  (Id. ¶ 27).  RACER has never suggested that it established any mechanism in advance to determine an estimated market value for the TIPS on the Effective Date, which would have been prudent and customary if the parties had contemplated transferring the TIPS at estimated market value.  The absence of a mechanism to determine market value is in sharp contrast to the Settlement Agreement, Plan and Confirmation Order, which set forth highly detailed and specifically negotiated protocols for making funding adjustments for certain items, such as monies spent on administering the site and costs incurred for environmental remediation by third party contractors and lead regulatory agencies. (Id. ¶ 3 & Ex. A (Settlement Agreement) ¶¶ 36, 37); Plan § 6.4(c); Confirmation Order ¶ 7.

39. On March 31, 2011, the Effective Date for the Plan and funding of RACER, MLC transferred property—the eighty nine real property sites and their respective environmental liabilities—and funding to RACER in accordance with the terms of the Settlement Agreement. (See Ex. 1, Rosenthal Decl. ¶¶ 1, 4, 21).  RACER accepted funding from MLC in the form of $49,896,945 in cash and $575,338,000 of TIPS valued on an amortized cost basis and stepped into MLC's shoes to fulfill the outstanding environmental obligations to the Settling Parties.  (Id. ¶¶ 16, 21).

### G. Any Discrepancy in the Value Funded to RACER Was Resolved in the $108,000 True-up Payment to MLC by RACER on June 30, 2011.

40. On May 9, 2011, Hamilton, operating as RACER's CFO, contacted Rosenthal to finalize a true-up to the RACER funding value. (See id. ¶ 29 & Ex. F (May 9, 2011 e-mail from Hamilton to Rosenthal)). Used in business, a true-up is an expression meaning to "bring into alignment" with predetermined criteria or process. See http://www.ventureline.com/accounting-glossary/T/trueup-definition/ (last visited Jan. 5, 2011) (providing definition of "true-up"). In this instance, the "pre-determined criteria and process," as shown by RACER's actions, was that the TIPS were valued on an amortized cost basis and a true-up was necessary to account for a change in adjusted TIPS principal balance for the three day period from March 29-31, 2010. (See Ex. 1, Rosenthal Decl. ¶ 29 & Ex. F). Second, a true-up was necessary to account for a correction of the index ratio used to calculate the amount of the adjusted TIPS principal as of March 28, 2011 that was used to determine the amortized cost basis for the funds flow on the Effective Date—the very value that RACER now claims is not appropriate. (Id.).

41. The true-up resulted in RACER owing MLC approximately $108,000 (the "**True-up Payment**") as reflected as a credit in a June 30, 2011 payment from MLC to RACER. (See id. ¶ 30 & Ex. G (excerpt of June 30, 2011 wire confirmation detailing True-up Payment). The True-up Payment from RACER to MLC would have been unnecessary if RACER had been valuing, or planning to value, the TIPS on a quoted market value basis, rather than an amortized cost basis.

42. If RACER had any intent to use estimated market value for the TIPS on the Effective Date to determine the adequacy of funding, it had access to information necessary to calculate the difference between quoted market value and the amortized cost by the time RACER made the True-up Payment. (See id. ¶ 31). Instead, RACER relied on amortized cost to value the

TIPS in its calculation of the True-up Payment, as was consistent with the historical course of dealing of the parties and the governing documents.  (See id.).

> ### H.    RACER Filed the Motion Over Seven Months After Accepting the TIPS and Cash from the Debtors.

43. RACER first contended to MLC that it had been underfunded in October 2011, over six months after the Effective Date and approximately four months after making the approximately $108,000 True-up Payment.  In the Motion, RACER seeks an additional $13.5 million claiming a shortfall in the amount funded to the Trust based on an implied, unrealized loss based on RACER's retroactive use of a quoted market value estimation of the TIPS. (Mot. at 5).  RACER's contentions are without merit and are belied by RACER's own actions and those of Hill, Laws, and Hamilton, its principals, as set forth above.

44. Treasury has instructed and funded the MLC DIP Trust to proceed in defending this dispute.  Nine of the fourteen States and the Tribe from the Settling Governments filed a Statement in Support of the Motion on December 6, 2011 (**ECF No. 11220**).  The MLC DIP Trust notes that, in the event RACER prevails on the Motion, any additional monies RACER receives essentially will be funded by Treasury.

## III.    ARGUMENT

> ### A.    There is No Dispute that Debtors Fully Funded RACER on the Effective Date.

45. MLC adequately funded the Trust in accordance with the Settlement Agreement, which was approved by the Court as part of the Debtors' chapter 11 plan confirmation process.  RACER's belated and unsubstantiated claim that it did not receive sufficient value from MLC with respect to the TIPS based on RACER's use of an accounting gimmick—quoted market value accounting methodology—does not change the economics of the transaction and is unsubstantiated by the facts or the law applicable to this matter.  GAAP mandated that MLC

22

value the TIPS on an amortized cost basis because the TIPS would be held to maturity, which RACER confirms it will do.  (Hamilton Decl. ¶ 7).  FASB, which codified GAAP, requires investments in "held-to-maturity securities" to be valued at amortized cost basis.  See 320-10-25-3, 320-10-50-5(a).  Further, FASB explicitly states that "[t]he justification for using historical-cost-based measurement [*i.e.*, amortized cost basis] for debt securities classified as held-to-maturity is that *no matter how market interest rates fluctuate*, the holder will recover its recorded investment and thus *realize no gains or losses* when the issuer pays the amount promised at maturity."  FASB 320-10-25-5(a) (emphasis added).

46. Use of a particular accounting methodology is not dictated by any of the governing documents, and assessing the TIPS' value using market value trading prices, which fluctuate, was never contemplated by MLC, the Settling Governments or RACER during the lengthy settlement negotiations and investment strategy discussions.  Prior to funding RACER, MLC made it abundantly clear to RACER that MLC valued the TIPS using an amortized cost basis, as GAAP requires for securities that are expected to be held to maturity.  (See Ex. 1, Rosenthal Decl. ¶¶ 14, 18, Ex. C (Monthly Operating Reports), Ex. D (Nov. 19, 2010 MLC Finance and Administration Presentation at 6-10)); FASB 320-10-25-3.  RACER's choice to account for the TIPS on its balance sheet using quoted market value is irrelevant to whether MLC funded the Trust in full at the amounts agreed to in the Settlement Agreement.

47. In the Motion, RACER does not dispute that MLC valued the TIPS portfolio it transferred to RACER at $575,338,000.  (Mot. at 4).  Nor does RACER claim that MLC was using estimated market value accounting to value the TIPS portfolio.  No wool has been pulled over anyone's eyes.  The process of quantifying the ongoing environmental liabilities transferred to RACER in the Settlement Agreement and developing the inflation-protected investment

23

portfolio of assets matched to fund those obligations was transparent to the Federal Government,

RACER's principals Hill, Laws, and Hamilton (who formerly served as the Debtors' controller),

the States, and the Tribe.

48. Laws and Hill, who dually manage the Trustee for RACER, were hired by the Federal

Government in late August or September 2010, six months prior to March 31, 2011, when MLC

transferred the TIPS and fully funded RACER.   Both Hill and Laws had the opportunity to

review and comment on the Settlement Agreement prior to signing.   Additionally, because of his

role as MLC's former controller, Hamilton—RACER's current CFO—prepared the Debtors'

Monthly Operating Reports, valuing the TIPS at amortized cost basis and disclosing in a footnote

the difference between amortized cost and quoted market value.   (See Ex. 1, Rosenthal Decl.

¶¶ 14-15 & Ex. C (Monthly Operating Reports)).   In light of the extensive due diligence that

MLC and the Federal Government, along with the Settling Governments and the Trustee did

while creating RACER it was crystal clear and fully disclosed that (i) RACER would be funded

primarily with the TIPS, and (ii) the TIPS were valued on an amortized cost basis.   Accordingly,

there is no basis for RACER's assertion that MLC underfunded the Trust or that MLC should

have valued the TIPS transferred to RACER using a quoted market value rather than amortized

cost.

49. Moreover, if RACER's contention that the TIPS transferred to RACER should have been

measured using a quoted market value on the Effective Date were true, then the Settlement

Agreement would have contained a mechanism to determine a quoted market value of the TIPS

on the Effective Date and the resulting cash payment to be funded.   The Settlement Agreement,

however, has no such mechanism.   Taking RACER's assertion to its logical extreme, had the

TIPS been worth *more* using a quoted market value than amortized cost basis on the Effective

24

Date (instead of worth *less*, as RACER claims), MLC would have been required to reduce the cash portion of the funding consideration transferred to RACER. Of course, this did not happen and was never contemplated by the parties.

50. In their Statement in Support of the Motion, the States and Tribe do not cite a single case or any other legal or financial authority to support their assertion that "financial institutions and financial professionals would not dispute that the value of the securities is based upon the fair market value on the date of transfer." (Statement in Support at 7 (**ECF No. 11220**)). The States merely rely "[o]n information and belief" throughout their brief to support their contentions. (See generally id.) MLC followed GAAP's clear guidance on the proper accounting for debt securities to be held to maturity, like the TIPS. See FASB 320-10-25-5(a).

### B. The Settlement Agreement Controls and Provides for a Transfer of *Value* from MLC to RACER—Not Cash—to Fund Environmental Liabilities Decades into the Future.

51. In its Motion, RACER quotes various Trust funding provisions in the Confirmation Order, Plan and Trust Agreement for the proposition that RACER was to be funded with cash (Mot. at 3, 4, 9, 11, 12), even though RACER is not seeking to be funded in cash and has refused to accept cash funding from MLC in exchange for returning the TIPS as a mechanism to resolve this dispute. (Ex. 2, Koch Decl. at Ex. C (Koch Letter to D. Berz dated Nov. 8, 2011)). The terms "Cash" and "cash", however, are not used anywhere in the Settlement Agreement with respect to MLC's funding obligation to RACER. Rather, Paragraph 32 of the Settlement Agreement refers to a dollar value to be transferred and provides that the "Debtors shall make a payment to fund the Environmental Response Trust in the amount of no less than $641,434,945", and references Attachment A, the "Environmental Response Trust Property Funding for Environmental Activities", which sets forth the real property details and account funding values for the Trust. (Ex. 1, Rosenthal Decl. ¶ 3 & Ex. A (Settlement Agreement) ¶ 32). Further, the

Debtors' Disclosure Statement clearly states that the "Cash and cash equivalents" going to the Trust "represent[] cash and investments in U.S. Treasury or U.S. Treasury backed securities with a maturity of 15 years or less." (See Ex. 1, Rosenthal Decl. ¶ 20 & Ex. E (Disclosure Statement at Opening Statement of Net Assets (Liabilities) of the Debtors and Trusts Projection Notes and Assumptions at note 6 (**ECF No. 8023**))).

52. Moreover, the Settlement Agreement provides that "[i]n the event of any inconsistency between the Plan, any order confirming the Plan, and this Settlement Agreement, *the terms of this Settlement Agreement shall control*." (See Ex. 1, Rosenthal Decl. ¶ 20 & Ex. A (Settlement Agreement) ¶ 109 (emphasis added)); Plan ¶ 6.4 (same). Similarly, the Trust Agreement states that "[w]here provisions of this [Trust] Agreement are irreconcilable with the provisions of the Settlement Agreement, *the terms of the Settlement Agreement shall govern*." (Trust Agreement ¶ 1.2.5 (emphasis added)).

53. In addition, RACER's lost-investment opportunity argument is wholly unrealistic and unjustifiable based on its actions in the time period leading up to and following funding. First, although fully aware that MLC planned to fund RACER with TIPS purchased in October 2010, RACER or the Trustee never protested this approach or asked for the opportunity to formulate its own investment approach. Instead, RACER took numerous steps throughout February and March 2011 to prepare to accept the TIPS that MLC had already purchased, including setting up custodial accounts at US Bank. RACER then accepted the TIPS that MLC had specifically purchased for the purpose of funding the Environmental Response Trust on the Effective Date. Although RACER argues that it would have followed Debtors' and Treasury's recommendations in putting together this theoretical portfolio, there would have been no such recommendations made to RACER as the TIPS portfolio had long since been purchased in October 2010. The

MLC DIP Trust also notes that RACER has not invested the over $200,000,000 in proceeds it received from the short term securities that reached maturation during July 2011.  (Mot. ¶ 24). Therefore, RACER's assertion that it would have invested, on or immediately after the Effective Date, over half a billion dollars in a series of laddered securities designed to match anticipated spending at RACER's properties is implausible based on RACER's pre- and post-Effective Date actions.

54. The States' and Tribe's contention that "MLC unilaterally and without authority determined to make a significant investment decision to purchase and transfer securities rather than cash to the Trust" (Statement in Support at 10) is completely without merit as discussed in the extensive background facts, <u>supra</u> at Part II, and as evidenced by the close involvement of Treasury in the investment decision to fund RACER with TIPS and Federal Government's knowledge as of October 2010 concerning MLC's TIPS investment strategy. (<u>See</u> Ex. 2, Koch Decl. ¶¶ 3-4).  The States' and Tribe's assertion also ignores the reality that (i) Treasury provided the majority of debtor-in-possession financing to MLC, and therefore, exercised great power over how MLC invested its money, and (ii) MLC filed a Statement/Notice of Third Amendment to DIP Credit Facility with the Court on September 2, 2010 providing for investment in United States Treasury securities with maturities of up to 15 years that would ultimately be transferred to RACER.  (<u>See</u> Debtors' Third Amendment to Amended and Restated Secured Superpriority Debtor-in-Possession Credit Agreement ¶ 1 (**ECF No. 6846**)).

### C.     <u>RACER Has Failed to Assert Any Damages, and Any Additional Monies Would Constitute a Windfall.</u>

55. In the Motion, RACER seeks enforcement of rights under the Settlement Agreement— essentially alleging that the Debtors breached that Agreement—but admits that the Trust was not damaged in any way by the alleged underfunding.  (Motion ¶¶ 4, 6 ("RACER acknowledges that

long-term U.S. Treasury securities have increased in value since the Effective Date"), 18, 23).

RACER's claim plainly falls short under New York law, which requires proof of damages,

among other elements, to succeed on a breach of contract claim.  See First Investors Corp. v.

Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998).

56. Courts interpreting confirmed plans of reorganization look to state contract principles in

interpreting rights and obligations of the parties.  See In re WorldCom, Inc., 362 B.R. 96, 111

(Bankr. S.D.N.Y. 2007) (holding that "[a] confirmed plan holds the status of a binding contract

as between the debtor and its creditors") (citation omitted); In re Phoenix Petroleum Co., 278

B.R. 385, 399 (Bankr. E.D. Pa. 2001) (observing that confirmed plans of reorganization "must be

interpreted in accordance with applicable contract law") (citation omitted).  Section 12.13 of the

Plan provides that New York law governs, and thus, New York contract law applies here to

interpret the rights and obligations of RACER, MLC, and the Settling Governments under the

Plan.  (Plan § 12.13 ("the rights, duties, and obligations arising under the Plan shall be governed

by, and construed and enforced in accordance with, the laws of the State of New York")).

57. Moreover, even if RACER was correct that the Trust was under-funded, which it is not,

payment of an additional $13.5 million now would put the Trust in a better position that it would

have been if it had received all funding in cash, given the TIPS' increase in value since the

Effective Date.  (See Motion ¶ 6; Ex. 1, Rosenthal Decl. ¶ 32 (noting that the TIPS' estimated

market value as of January 5, 2012 is approximately $30.5 million more than the amortized cost

basis of the TIPS transferred to RACER by the Debtors on March 31, 2011)).  Such a result is

not permitted under New York law.  "Money damages are substitutional relief designed in theory

to put the injured party in as good a position as he would have been put by full performance of

the contract. . . . [I]t is equally fundamental that the injured party should not recover more from

the breach than he would have gained had the contract been fully performed." Freund v. Wash. Square Press, Inc., 314 N.E.2d 419, 420-21 (N.Y. 1974) (reversing lower court for using a measure of damages that would "place [plaintiff] in a far better position than he would have occupied had the defendant fully performed") (citations omitted); Madison Fund, Inc. v. Charter Co., 427 F. Supp. 597, 608 (S.D.N.Y. 1977) ("It is a familiar enough principle that the basis for an award of damages for breach of contract is just compensation for losses necessarily flowing from that breach.  As a corollary of that principle, one whose contract has been breached is not entitled to be placed, because of that breach, in a position better than that which he would have occupied had the contract been performed.") (citation omitted).

58. New York also bars a party from recovering damages based on theoretical or hypothetical losses, like those RACER seeks here.  It is black-letter New York law that damages must be commensurate with the loss actually sustained.  See Scalp & Blade, Inc. v. Advest, Inc., 309 A.D.2d 219, 225-26 (N.Y. App. Div. 2003).  Here, RACER has suffered no harm, and in fact admits that there has been an "increase in the fair market value of the [TIPS] since" the date the Debtors funded the Trust and "that RACER continues to hold that portfolio," and "intends to continue holding until maturity[.]"  (Motion ¶ 6; Hamilton Decl. ¶ 7).  The relief RACER seeks is thus clearly contrary to these basic principles of New York contract and damages law.  See First Nat'l Bank of Chi. v. Ackerley Commc'ns, Inc., No. 94 Civ. 7539(KTD), 2001 WL 15693, at *2 (S.D.N.Y. Jan. 8, 2001) (denying bank damages that were not shown to be the result of the borrower's cessation of performance and characterizing the bank's case as purely theoretical).

59. Further, under New York law, damages must be commensurate with a party's actual loss, and an aggrieved party may not, through the recovery of contract damages, reap any kind of

windfall.  Scalp & Blade, Inc., 309 A.D.2d at 97; see also Madison Fund, Inc., 427 F. Supp. at

608 ("One whose contract has been breached is not entitled to be placed, because of that breach,

in a position better than that which he would have occupied had the contract been performed.").

Indeed, "litigants are to be fairly compensated but . . . duplicative recoveries and windfalls

should be avoided."  Waehner v. Frost, 770 N.Y.S.2d 596, 599 (N.Y. Sup. Ct. 2003) ("double

recoveries are prohibited and discouraged both in common law . . . and by statute") (citations

omitted).  RACER claims it is entitled to an additional $13.5 million based on its assertion that it

should have been funded in cash.  (Mot. ¶¶ 18-19).  MLC has offered to fund RACER entirely in

cash in return for the TIPS, but RACER has rejected this offer in favor of keeping the TIPS.  (Ex.

2, Koch Decl. ¶ 8 & Ex. D (Nov. 17, 2011 Letter from Berz to Hill at 2)).  RACER cannot have

it both ways, however, and must choose to be funded either in TIPS plus cash or all cash.

Permitting RACER to retain the TIPS, which are guaranteed by the United Stated to pay out at

par or above upon maturity, and providing the Trust with an additional $13.5 million in cash puts

RACER in "a position better than that which [it] would have occupied had the contract been

performed"—a result prohibited under governing New York law. Madison Fund, Inc., 427 F.

Supp. at 608.

60. As discussed above, GAAP's treatment of securities like TIPS that will be held to

maturity recognizes the same actual loss or gain concept, and accordingly requires amortized

cost basis valuation for such assets because "no matter how market interest rates fluctuate, the

holder will recover its recorded investment and thus realize no gains or losses when the issuer

pays the amount promised at maturity."  FASB 320-10-25-5(a).  MLC's accounting for the TIPS

on amortized cost basis followed GAAP and was appropriate.

30

61. Further, RACER's assertion that, if provided the opportunity, it would have purchased the exact same portfolio of long-term securities" "at then prevailing market prices" "on or immediately after the Effective Date" is plainly unrealistic based on the Trust's pre- and post-Effective Date actions.  (RACER Motion ¶ 6; Hamilton Declaration ¶ 7).  The Trustee was fully aware that MLC was funding RACER with TIPS on the Effective Date.  The Trustee never protested this approach but took affirmative steps to prepare to accept this funding.   On the Effective Date, RACER then accepted the TIPS that MLC had specifically purchased in October 2010 for the purpose of funding RACER on the Effective Date.  MLC and Treasury never would have made recommendations to RACER with respect to a theoretical portfolio of securities, because MLC had already purchased the TIPS in October 2010.  To expect a newly formed and operating entity to analyze its long-term liabilities and projected funding while matching them to an optimal portfolio of laddered securities worth over $575,000,000 in a matter of days is improbable—and is belied by the Trust's pre- and post-funding actions.   Indeed, the Debtors purchased the TIPS used to fund RACER six months prior to the Effective Date in October 2010 and consulted with numerous financial advisors for months to plan the asset portfolio.  There is no evidence that RACER planned a long-term investment strategy for the half billion dollars in cash it claims it should have received, nor has RACER invested the over $200,000,000 it received from the short term securities that reached maturation during July 2011. (RACER Motion ¶ 24).  Therefore, RACER's alleged investment strategy is entirely hypothetical and does not support its claim for damages under New York law.  See Scalp & Blade, Inc., 309 A.D.2d at 225-26; Ackerley Commc'ns, Inc., 2001 WL 15693, at *2.

---

**D.    RACER Waived Any Right It Had to Additional Payment and Failed to Mitigate Its Alleged Damages, If Any.**

62. Aside from the Motion's lack of merit, RACER's delay in objecting to TIPS valued on an amortized cost basis bars any requested relief.  More than six months after this Court evaluated and approved the Settlement Agreement as part of the Plan, and more than a year after the Settlement Agreement was signed, RACER raised this claim with MLC for the first time.  Now RACER asks the Court to re-evaluate what has already been decided and finalized long ago.  If RACER believed it was entitled to cash funding on the Effective Date, it never would have accepted over $575 million worth of TIPS on the Effective Date.  Moreover, if RACER believed that it had been shortchanged by MLC on the Effective Date, it would not have reached out to MLC in order to conduct the true-up based on MLC's amortized cost basis valuation of the TIPS resulting in the approximately $108,000 True-up Payment to MLC.  Such conduct amounts to inexcusable delay and waiver of any right to object to the TIPS transferred by MLC, and consequently, RACER is barred from asserting the claim for additional monies now.  See Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P., 7 N.Y.3d 96, 104 (N.Y. 2006) ("Contractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned" and "[s]uch abandonment may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage.") (citations omitted); Guzzone v. Brandariz, 847 N.Y.S.2d 901, at *8 (N.Y. Sup. Ct. 2007) (finding plaintiff had waived right to object to defendants' use of driveway as common easement by conduct of acquiescence and delaying too long in objecting).

63. In addition, the doctrine of account stated bars RACER's claim.  "Under New York law, an account stated is an agreement between the parties to an account based upon prior transactions between them with respect to the correctness of the separate items composing the account and

the balance due, if any, in favor of one party or another. Under this doctrine, a party who receives an account is bound to examine it, and if that party admits that the account is correct, it becomes a stated account and is binding on both parties." In re Rockefeller Center Props., 272 B.R. 524, 541 (Bankr. S.D.N.Y. 2000) (citations omitted); see also Rosenman Colin Freund Lewis & Cohen v. Neuman, 93 A.D.2d 745, 746 (N.Y.A.D. 1st Dept. 1983) (holding that "a stated account . . . is binding on both parties—the balance being the debt which may be sued for and recovered at law.") (citations omitted). Here, the Settlement Agreement (as well as the Trust Agreement, Plan and Confirmation Order) provided for the payment of a certain amount of value to RACER by MLC. After MLC paid that value in TIPS and cash, and RACER made the True-up Payment to MLC, RACER's conduct constituted an admission that the amount exchanged was correct. The value transferred from MLC to RACER became a stated account and is therefore binding on both parties. See In re Rockefeller Center Props., 272 B.R. at 541.

64. Further, to the extent RACER received anything less than the full amount of funding pursuant to the Settlement Agreement, a proposition the Debtors contest, RACER could have made up the difference at the time of the True-up Payment in June 2011 and thereby mitigated its damages. New York law imposes a duty to mitigate damages, but RACER did not do so, and in fact made the approximately $108,000 True-up Payment to the Debtors, rather than claiming a shortfall. See Wilmot v. New York, 297 N.E.2d 90, 92 (N.Y. 1973) (stating that the party seeking damages is under a duty to make reasonable efforts to avoid consequences of the act complained of); Middle E. Banking Co. v. State St. Bank Int'l, 821 F.2d 897, 902 (2d Cir. 1987) ("It is beyond dispute that New York requires injured parties to take reasonable steps to minimize damages.") (citation omitted).

65. Through its conduct of paying the True-up Payment and waiting too long to assert any alleged right it may have had for greater value, RACER has waived any right to additional recovery and should be estopped from asserting any such claim now.

## IV. CONCLUSION

66. From the outset of this chapter 11 proceeding, MLC's steadfast objective has been to work with the Settling Governments to successfully establish and fund RACER so that the properties transferred from MLC would be remediated and put back into productive use. Because MLC was a liquidating entity, which would return any unused DIP financing to Treasury, the goal of the TIPS portfolio was not to maximize the amount of money returned to Treasury upon liquidation, but to ensure that RACER had sufficient funding to meet the environmental liabilities in amounts agreed to in the Settlement Agreement at the time that they were expected to arise. Thus, the MLC DIP Trust has no financial incentive to dispute RACER's claim or financial stake in the outcome of this dispute. In defending against the Motion, the MLC DIP Trust has no intention or interest in undermining RACER's capacity to fulfill its mandate; rather the MLC DIP Trust believes that RACER has been funded in full.

67. MLC has met its funding obligations to RACER and the Settling Governments under the terms of the Settlement Agreement. RACER has not been shortchanged by MLC, and the Settling Governments and their constituents have not been damaged by MLC's provision of a combination of TIPS and cash to RACER. The Settlement Agreement does not require a particular accounting method to value the securities that would be transferred, and the course of dealing between the parties is devoid of evidence that an appraisal process would be undertaken to estimate the market value of TIPS on the Effective Date. GAAP required MLC to value the TIPS on an amortized cost basis, and RACER knew how MLC accounted for the TIPS prior to the Effective Date. Further, RACER made the True-up Payment based on the same amortized

cost basis for the TIPS.  RACER's retroactive attempt to apply a different accounting method to the securities it received from MLC is nothing more than an afterthought designed to wrest additional and unnecessary funds from Treasury.

68. For the reasons stated above, the MLC DIP Trust respectfully requests that the Court deny the Motion.

Dated:  January 23, 2012

New York, New York

/s/ Joseph H. Smolinsky
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Motors Liquidation
Company DIP Lenders Trust*

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Motors Liquidation
Company DIP Lenders Trust

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                          :
**In re**                                 :        **Chapter 11 Case No.**
                                          :
**MOTORS LIQUIDATION COMPANY**, *et al.*, :        **09-50026 (REG)**
         **f/k/a General Motors Corp.,** *et al.* :
                                          :
                        **Debtors.**      :        **(Jointly Administered)**
                                          :
-------------------------------------------------------------x

## [PROPOSED] ORDER GRANTING MOTORS LIQUIDATION COMPANY DIP LENDERS TRUST'S MOTION TO FILE AN AMENDED RESPONSE IN OPPOSITION TO MOTION OF THE REVITALIZING AUTO COMMUNITIES ENVIRONMENTAL RESPONSE TRUST FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105 AND 1142 TO ENFORCE THE DEBTORS' PAYMENT OBLIGATIONS UNDER THE SECOND AMENDED JOINT CHAPTER 11 PLAN AND THE CONFIRMATION ORDER

Upon the unopposed Motion, dated January 23, 2012 (the "**Motion**"), of the

Motors Liquidation Company DIP Lender Trust (the "**MLC DIP Trust**") for the entry of an

order granting the MLC DIP Trust leave to file an amended Response in Opposition to the

Motion of the Revitalizing Auto Communities Environmental Response Trust ("**RACER**" or the

"**Trust**") for an Order Pursuant to 11 U.S.C. §§ 105 and 1142 to Enforce the Debtors' Payment

Obligations Under the Second Amended Joint Chapter 11 Plan and the Confirmation Order

(**ECF No. 11164**), all as more fully described in the Motion; and due and proper notice of the

Motion having been provided, and it appearing that no other or further notice need be provided;

and the Court having found and determined that the legal and factual bases set forth in the

Motion establish just cause for the relief granted herein; and after due deliberation and sufficient

cause appearing therefor, it is

ORDERED that the Motion is granted in its entirety; and it is further

ORDERED that the MLC DIP Trust is authorized to file the amended response

attached as Exhibit B to the Motion; and it is further

ORDERED that this Court shall retain jurisdiction over all matters arising from or

related to the interpretation and implementation of this order.

ORDERED that all costs are taxed against the party originally incurring same.

All relief not expressly granted herein is denied.

Dated: New York, New York
_____, 2012

_____
THE HONORABLE ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE

2