CROWELL & MORING LLP

590 Madison Avenue
New York, New York 10022
Telephone:  (212) 223-4000
Fax: (202) 223-4134
Michael V. Blumenthal
Steven B. Eichel

HILL & KEHNE, LLC

2300 Wisconsin Avenue, N.W.
Washington, DC  20007
Telephone:  (202) 558-2100
Fax:  (202) 558-2127
Jeffrey P. Kehne

Attorneys for the Revitalizing Auto
Communities Environmental Response Trust
f/k/a Environmental Response Trust

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re** | **Chapter 11 Case No. 09-50026 (REG)** |
| **MOTORS LIQUIDATION COMPANY, et al., f/k/a General Motors Corp., et al,** | |
| **Debtors.** | **(Jointly Administered)** |

## REPLY BRIEF IN SUPPORT OF THE MOTION OF THE REVITALIZING AUTO COMMUNITIES ENVIRONMENTAL RESPONSE TRUST FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105 AND 1142 TO ENFORCE DEBTORS' PAYMENT OBLIGATIONS UNDER THE SECOND AMENDED JOINT CHAPTER 11 PLAN AND THE CONFIRMATION ORDER

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ...............................................................................................1

II.  ARGUMENT .....................................................................................................................6

    A.  The Payment Provisions of the Settlement Agreement Do Not Excuse Debtors' Failure
        to "Make a Cash Payment" to RACER of at Least $625,234,945 on the Effective Date......6

           *The Cash payment requirement is clearly and consistently stated*...........................6

           *The MLC DIP Lenders Trust's evidence of the intent of the parties to the*
           *Settlement Agreement is legally irrelevant and factually inadequate* ......................9

    B.  RACER and the Tribe and Settling States Are Entitled to Additional Funding to
        Correct the Effective Date Shortfall ...................................................................10

           *RACER and the Tribe and Settling States are entitled to damages*
           *assessed at the time of the breach*............................................................11

           *Even if this Court were required to consider post-breach developments,*
           *RACER and the Tribe and Settling States would still be entitled to a*
           *corrective payment of $13,505,874 plus interest* ........................................15

    C.  Arguments That RACER Acceded to Debtor's Funding of the Trust with U.S. Treasury
        Securities Valued at Net Book Value and That RACER Has Improperly Delayed in
        Seeking Redress for the Effective Date Shortfall Are Irrelevant and Factually Incorrect.....16

           *The rights of the Tribe and Settling States to full funding are*
           *unaffected by claims that RACER acquiesced in the funding shortfall*
           *or waited too long to object* ....................................................................17

           *MLC DIP Lenders Trust's assertions that RACER acceded to the underfunding*
           *and delayed in seeking a correction are in any event unfounded*...........................18

III.  CONCLUSION..................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Aroneck v. Atkin,
    456 N.Y.S.2d 558 (4th Dep't 1982) ......................................................................... 13

Berger v. Heckler,
    771 F.2d 1556 (2d Cir. 1985) ................................................................................... 12

Boyce v. Soundview Tech. Group, Inc.,
    464 F.3d 376 (2d Cir. 2006) ..................................................................................... 15

E.E.O.C. v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental
Ironworkers, Joint Apprentice-Journeymen Educ. Fund,
    925 F.2d 588 (2d Cir. 1991) ..................................................................................... 12

Flemington Nat'l Bank & Trust Co. (N.A.) v. Domler Leasing Corp.,
    410 N.Y.S. 2d 75 (1st Dep't 1978), aff'd, 387 N.E.2d 393 (1979)) .......................... 7

Freund v. Washington Square Press, Inc.,
    314 N.E.2d 419 (N.Y. 1974) ..................................................................................... 13

In re Resource Technology Corp.,
    624 F.3d 376 (7th Cir. 2010) ................................................................................... 17

In re WorldCom, Inc.,
    362 B.R. 96 (Bankr. S.D.N.Y. 2007) ....................................................................... 12

Kellar v. Carney,
    451 N.Y.S.2d 904 (3d Dep't 1982) ........................................................................... 19

Lucente v. Int'l Bus. Machs. Corp.,
    310 F.3d 243, 263 (2d Cir. 2002) ............................................................................. 13

Madison Fund, Inc. v. Charter Co.,
    427 F. Supp. 597 (S.D.N.Y. 1977) ........................................................................... 13

Merrill Lynch & Co. v. Allegheny Energy, Inc.,
    500 F.3d 171 (2d Cir. 2007) ..................................................................................... 12

Moreschi v. DiPasquale,
    872 N.Y.S.2d 108 (1st Dep't 2009) ......................................................................... 20

Oscar Gruss & Sons, Inc. v. Hollander,
    337 F.3d 186 (2d Cir. 2003) ............................................................................... 12, 13

CASES (CONT.)

Perfect Fit Indus., Inc. v. Acme Quilting Co.,
    673 F.2d 53 (2d Cir. 1982)...........................................................................12

Perlbinder v. Bd. Of Managers of 411 E. 53rd St. Condo.,
    886 N.Y.S.2d 378 (1st Dep't 2009) ..............................................................7

Proyecfin de Venezuela v. Banco Indus. de Venezuala,
    760 F.2d 390 (2d Cir. 1985).........................................................................7

Ruttenberg v. Davidge Data Sys. Corp.
    626 N.Y.S.2d 174 (1st Dep't 1995) ..............................................................7

Scalp & Blade, Inc. v. Advest, Inc.,
    756 N.Y.S.2d 92 (4th Dep't 2003)...............................................................13

Sharma v. Skaarup Ship Mgmt. Corp.,
    916 F.2d 820 (2d Cir. 1990)...................................................................12, 13

Simon v. Electrospace Corp.,
    269 N.E.2d 21 (N.Y. 1971).....................................................................12, 13

Suarez v. Ward,
    896 F.2d 28 (2d Cir. 1990)............................................................................9

U S West Fin. Servs., Inc. v. Marine Midland Realty Credit Corp.,
    810 F. Supp. 1393 (S.D.N.Y 1993): ............................................................13

United States v. Armour & Co.,
    402 U.S. 673 (1971).......................................................................................9

United States v. Broad Music, Inc.,
    275 F.3d 168 (2d Cir. 2001)..........................................................................9

United States v. Cartwright,
    411 U.S. 546 (1973).....................................................................................15

United States v. ITT Cont'l Banking Co.,
    420 U.S. 223 (1975).......................................................................................9

Waehner v. Frost,
    770 N.Y.S.2d 596 (Sup. Ct. 2003) ..............................................................13

**STATUTES**

N.Y. Est. Powers & Trusts Law § 7-2.4 ......................................................................................18

N.Y. Jud. Law § 27(b). ...........................................................................................................13

The Revitalizing Auto Communities Environmental Response Trust ("RACER") submits this reply ("Reply") in support of its Motion to enforce certain payment obligations under this Court's Confirmation Order and Debtors' Plan.[1]  The Reply addresses arguments raised in the amended response in opposition to the Motion ("Response") filed by Motors Liquidation Company DIP Lenders Trust ("MLC DIP Lenders Trust").[2]

Funds sufficient to provide the relief that RACER seeks have been deposited into the Court Registry Investment System. These funds were placed in escrow pending resolution of the Motion under a Stipulation and Order, agreed to by RACER and the Motors Liquidation Company ("MLC"), acting for itself and its affiliated debtors (collectively, "Debtors"), and approved by this Court on December 12, 2011, three days before MLC's dissolution.

## I.  PRELIMINARY STATEMENT

1.      RACER's Motion advances two straightforward claims:  (a) that Debtors breached an obligation — set forth in the Settlement Agreement, Trust Agreement and Plan, and confirmed and made effective by paragraph 7 of the Confirmation Order — to "make a Cash Payment" of at least $625,234,945 to RACER on the Effective Date (Confirmation Order ¶ 7); and (b) that RACER, as well as the Setting Governments that compromised environmental claims against Debtors in exchange for enforceable commitments to full funding of RACER, are entitled to a supplemental payment of $13,505,874 plus interest to correct the shortfall.

---

[1]  Unless otherwise defined herein, capitalized terms used herein have the definitions set forth in RACER's November 21, 2011 Motion.

[2]  See Motors Liquidation Company DIP Lenders Trust's Amended Response in Opposition to Motion of the Revitalizing Auto Communities Environmental Response Trust for an Order Pursuant to 11 U.S.C. 105 and 1142 to Enforce Debtors' Payment Obligations under the Second Amended Joint Chapter 11 Plan and the Confirmation Order (Jan. 23, 2012).  This Court's order allowing the amended response was entered on February 2, 2012. RACER's time to file this Reply to the amended Response was extended by agreement with MLC DIP Lenders Trust from January 27, 2011, to February 3, 2012.

2.       The Response, filed by the MLC DIP Lenders Trust (a newly created entity), opposes these two central claims with arguments:  (a) that the Settlement Agreement, by requiring payment in dollars without using the word "cash," allowed Debtors to disregard provisions of the Confirmation Order, Plan and Trust Agreement that expressly required Cash payment and fund RACER using U.S. Treasury securities and, further, to value those securities at Debtors' "net book value"[3] rather than at fair market value;[4] and (b) that increases in the value of the securities, since the time of their transfer to RACER, prevent this Court from ordering a corrective payment for any shortfall that existed on the Effective Date.

3.       The Response's arguments on these central issues are legally and factually incorrect.  The assertion that the Settlement Agreement conflicts with and takes precedence over the Confirmation Order, Plan and Trust Agreement posits multiple contradictions where none exists.  It also ignores the Settlement Agreement's express prohibition against Debtors' submitting or agreeing to a Plan or Confirmation Order that would contradict the Settlement Agreement.  The Response further asserts that Debtors' plans to substitute securities for cash were known and that the parties to the Settlement and Trust Agreements understood such a substitution to be permitted.  However, extrinsic evidence of the intentions and understandings of parties to settlement agreements and consent decrees is irrelevant where, as here, the written terms are clear.  Moreover, even if such extrinsic evidence were relevant, the Response offers no evidence that any of the parties to the Settlement and Trust Agreements — apart from Debtors

---

[3]  The Response states that Debtors valued the transferred securities "on an amortized cost basis," with accrued interest included in the "amortized cost value."  Response ¶ 1 & n.4.  However, Debtors used the term "amortized cost" to refer to the book value it assigned the securities exclusive of interest earned but not yet paid.  See, e.g., Response Ex. 1 (Rosenthal Decl.) at Ex. C at 5, 9.  Debtors' term for the total value it claimed at the time of the transfer, including interest, was "net book value" (Hamilton Supp. Decl. ¶ 6), which we use here to avoid confusion.

[4]  As in the Motion, we use the term "fair market value" to refer to the total price that a purchaser would be required to pay for U.S. Treasury securities on a specified date, including the payment for interest earned but not yet paid.  Motion at p.2 n.3.

themselves — were aware of Debtors' plan to transfer the securities at net book value rather than at fair market value (which was substantially lower), let alone evidence that any signatory other than Debtors accepted this valuation.[5]

4.      The Response's argument that an award of damages would constitute an improper "windfall" is equally flawed.  The MLC DIP Lenders Trust invokes New York contract damages law, but it ignores a long and unbroken line of cases establishing that contract damages under New York law are assessed based on the value of relevant assets at the time of the breach, without regard to subsequent changes in asset value.  (See part II.B below.)  The Response's windfall argument also ignores clear, uncontroverted evidence (e.g., Hamilton Nov. 21 Decl. ¶ 7) that RACER and the Settling Governments are worse off today, by $13,505,874 plus interest, than they would be if Debtors had met their Effective Date funding obligations.

5.      In addition to these unsuccessful arguments on the central issues of breach and damages, the Response advances a series of misguided allegations concerning RACER's understandings and actions with respect to Debtors' transfer of securities on the Effective Date. The Response alleges: (a) that in the lead up to the Effective Date individuals who were then designated to assume leadership positions in RACER (and have since taken those positions) were informed of Debtors' purchases of securities and intent to meet most of their funding obligation to RACER by transferring those securities in lieu of Cash; (b) that RACER waived its claim to a corrective payment by accepting a partial account reconciliation payment from MLC that

---

[5]  Indeed, with regard to the Tribe and the States that signed the Settlement and Trust Agreements (collectively, "Tribe and Settling States"), the Response provides no evidence that that they were informed even of Debtors' plan to transfer securities.  The Tribe and Settling States state that they "rejected MLC's attempts to fund the Trust with instruments other than cash" during negotiations over the Trust's formation.  Statement of the States of New York, New Jersey, Ohio, Missouri, Kansas, Michigan, Louisiana, Wisconsin, the Commonwealth of Massachusetts and the St. Regis Mohawk Tribe in Support of the Revitalizing Auto Communities Environmental Response Trust's Motion for an Order Pursuant to 11 U.S.C. 105 and 11422 to Enforce Debtors' Payment Obligations under the Second Amended Joint Chapter 11 Plan and the Confirmation Order ¶ 10 (Dec. 6, 2011) ("Statement in Support").

included a $107,884 offset relating to the Effective Date value of the transferred securities; and (c) that RACER waited too long to file its Motion.

6.    These assertions concerning RACER's understandings and actions are both irrelevant to the issues before this Court and legally and factually unfounded.  The funding shortfall affects the rights of the Settling Governments, which are empowered as signatories to the Settlement and Trust Agreements to seek enforcement of the bargains they struck.  The Tribe and a majority of the Settling States have exercised those rights by filing in support of the Motion.

7.    In any event, the allegations that RACER agreed to the underfunding and waited too long to object are factually incorrect.  As demonstrated in part II. C below:  (a) neither RACER nor the individuals chosen to serve as the Trust's future managers in the period prior to its formation ever agreed to Effective Date funding worth less than the required $625,234,945; and (b) no later than June 17, 2011, RACER provided clear written notice to the U.S. Department of the Treasury ("Treasury"), on whose behalf the MLC DIP Lenders Trust now complains of undue delay, that RACER questioned Debtors' use of securities valued substantially above their Cash-equivalent fair market value to meet their Effective Date funding obligation.

8.    In light of the uncertain status of the newly formed MLC DIP Lenders Trust[6] and the amendment of its Response to revise statements concerning the Department of Justice's ("DOJ's") and the U.S. Environmental Protection Agency's ("EPA's") knowledge and actions with respect to the securities transfer, it is important to clarify RACER's relationship to its beneficiary here.  Parts of the Response describe Treasury's position in terms that could suggest

---

[6] Despite citing the Motors Liquidation Company DIP Lenders Trust Agreement (Response at 1 n.1), the MLC DIP Lenders Trust has not responded to our request for a copy of this document.

a conflict between RACER and its beneficiary on the merits of the underfunding issue.[7]
However, RACER's beneficiary is "the United States,"[8] not Treasury, and the United States'
interest in this matter encompasses not only Treasury's interest as DIP lender, but also EPA's
interest as enforcer of federal environmental cleanup requirements.  EPA filed a proof of claim in
the Chapter 11 proceeding to secure funding for environmental cleanups at contaminated
properties then held by the bankrupt estate, and EPA, like the Tribe and Settling States (but
unlike Treasury), is a signatory on the Settlement Agreement and Trust Agreement.  DOJ, which
has exclusive authority to represent the United States in this litigation,[9] has informed RACER
that the United States has taken no position on the Motion.  Any implication to the contrary in
the Response is incorrect and unsupported.

9.      As demonstrated below:  (a) Debtors breached their obligation to fund RACER
with a "Cash payment" of at least $625,234,945 on the Effective Date; (b) damages owed to
RACER and the Settling Governments are not affected by post-Effective Date changes in the
value of the securities that Debtors transferred in place of Cash; and (c) arguments that RACER
acceded to an underfunding and waited too long to object are legally irrelevant and factually
unfounded.

---

[7]  See Response at 1 n.2 (asserting that Treasury "has instructed and funded the MLC DIP Lenders Trust in defending this dispute."); id. ¶ 44 (same effect).

[8]  Settlement Agreement ¶ 38 ("The United States shall be the sole beneficiary of the Environmental Response Trust."); see Trust Agreement § 1.1.8 ("'Beneficiary' or 'Environmental Response Trust Beneficiary' means the United States.").

[9]  Section 516 of United States Code Title 28 provides that "[e]xcept as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General.  28 U.S.C. § 516.  RACER is not aware of any exception to DOJ's exclusive litigating authority that would allow another entity to speak for the United States here.

## II.    ARGUMENT

### A.    The Payment Provisions of the Settlement Agreement Do Not Excuse Debtors Failure to "Make a Cash Payment" to RACER of at Least $625,234,945 on the Effective Date

10.    RACER's Motion discussed the Confirmation Order's requirement, rooted in the remediation funding provisions of the Plan, Settlement Agreement and Trust Agreement, that Debtors "make a Cash payment" to RACER on the Effective Date in an amount totaling no less than $625,234,945.[10]  The Confirmation Order's unambiguous requirement of an Effective Date "Cash payment" tracked similar language in the Plan and Trust Agreement, directing that Debtors fully fund RACER in " Cash" on the Effective Date,[11] and in the Settlement Agreement, which required that Debtors "'make a payment to fund the Environmental Response Trust in an amount of no less than $641,434,945'" on the Effective Date.[12]  The Response attempts without success to avoid the requirement of these clear and consistent provisions.

#### _The Cash payment requirement is clearly and consistently stated_

11.    The Response asserts that, because paragraph 32 of the Settlement Agreement describes Debtors' payment obligation without using the term "Cash" or "cash," an inconsistency or "irreconcilable conflict" exists between the funding provisions of the Settlement Agreement and the funding provisions of the Confirmation Order, Plan and Trust Agreement. Response ¶¶ 19-21, 51-52.  The MLC DIP Lenders Trust argues that paragraph 109 of the Settlement Agreement and section 1.2.5 of the Trust Agreement require resolution of these

---

[10] Motion ¶¶ 3-5, 18, 21 (table) (summarizing and applying Confirmation Order ¶¶ 7(i)-(vi)). The applicable definition of "Cash" is "legal tender of the United States of America." Plan § 1.33.

[11]  Motion ¶ 22 & 22(a)-(b) (quoting Plan § 1.68 and Trust Agreement §§ 1.1.23 & 2.5.1).

[12]  Motion ¶ 22(c) (quoting Settlement Agreement Plan ¶ 32).  As explained in the Motion, the reduction in the required minimum Effective Date payment to RACER, from $641,434,945 in the Settlement Agreement to $625,234,945 in the Confirmation Order, resulted from adjustments designed to account for delay in reaching the Effective Date and resulting increases in Debtors' pre-Effective Date costs and property sale revenues.  Motion ¶ 11 & n.11.

supposed conflicts in favor of the allegedly more permissive payment terms of the Settlement

Agreement.  The terms of the documents provide no support for the claim of a conflict.

Moreover, the Settlement Agreement, even read in isolation, contains no textual support for the

Response's claim that it permits "transfer of *value*" worth less than $625,234,945 on the

Effective Date.  Response at 25 (heading III.B (emphasis in the original)).

12.     Under New York law, interpretations that harmonize and give effect to all the

terms of an agreement prevail over interpretations that ignore terms or construe them

unreasonably.  <u>Ruttenberg v. Davidge Data Sys. Corp.</u>, 626 N.Y.S.2d 174,177 (1st Dep't 1995).

Accordingly, "'where two seemingly conflicting contract provisions reasonably can be

reconciled, a court is required to do so and to give both effect.'"  <u>Perlbinder v. Bd. of Managers</u>

<u>of the 411 East 53rd Street Condo.</u>, 886 N.Y.S.2d 378 , 381 (1st Dep't. 2009) (quoting <u>Proyecfin</u>

<u>de Venezuela v. Banco Indus. de Venezuela</u>, 760 F.2d 390, 395-96 (2d Cir. 1985)).  Similarly,

"'agreements executed at substantially the same time and related to the same subject matter are

regarded as contemporaneous writings and must be read together as one.'"  <u>Id.</u> (quoting

<u>Flemington Natl. Bank & Trust Co. (N.A.) v. Domler Leasing Corp.</u>, 410 N.Y.S.2d 75, 77 (1st

Dep't 1978), <u>aff'd</u>, 397 N.E.2d 393 (1979)).

13.     In attempting to justify Debtors' failure to make the required "Cash Payment" on

the Effective Date, the MLC DIP Lenders Trust disregards the requirement that related

agreements be harmonized wherever possible.  Instead of reconciling the terms of the Settlement

Agreement and the other documents that address Debtors' Effective Date funding obligation, the

Response struggles to invent contradictions where none exists.  Paragraph 32 of the Settlement

Agreement required Debtors, on the Effective Date, to "make a payment to fund the

Environmental Response Trust in the amount of no less than $641,434,945" (adjusted in the

Confirmation Order to $625,234,945).  The Settlement Agreement's instruction that Debtors

fund RACER in United States dollars ("$") is entirely consistent with the instructions of the

Confirmation Order, Plan and Trust Agreement that Debtors pay in Cash (*i.e.*, "legal tender of

the United States of America," Plan § 1.33). Indeed, neither paragraph 32 nor any other

provision of the Settlement Agreement provides the slightest support for Debtors' decision to

substitute securities for Cash.

14.     The Response's reliance on paragraph 109 of the Settlement Agreement as

support for its position that the Settlement Agreement precludes enforcement of the Cash

payment requirements imposed by the Plan and Confirmation Order is particularly misplaced.

Paragraph 109 protects the Settling Governments against modification of the Settlement

Agreement without their consent. To that end, it not only directs that the Settlement Agreement

take precedence over inconsistent terms of the Plan or Confirmation Order, it also prohibits

Debtors from creating such an inconsistency, stating:

> The Debtors shall *not file a Plan or amend the Plan in a manner inconsistent with the terms and provisions of this Settlement Agreement*, take any other action in the Bankruptcy Cases that is inconsistent with the terms and provisions of this Settlement Agreement, *or propose terms for any order confirming the Plan that are inconsistent with this Settlement Agreement*.

Settlement Agreement ¶ 109 (emphasis added).

15.     Debtors prepared and submitted both the Plan and the proposed Confirmation

Order that imposed the "Cash payment" requirement,[13] and Treasury raised no objection.

Unsurprisingly, neither Debtors nor Treasury saw an inconsistency between the Cash payment

mandates of the Plan and Confirmation Order and the Settlement Agreement's directive that

Debtors transfer U.S. dollars on the Effective Date. The Response's efforts to manufacture

inconsistency where Debtors and Treasury saw none should be rejected.

---

[13] Debtors submitted the Plan and draft Confirmation Order on March 18, 2011.

16.     At bottom, there is no inconsistency, much less an irreconcilable conflict, between the Settlement Agreement's direction that Debtors fund RACER in United States dollars and the provisions of the Confirmation Order, Plan and Trust Agreement that required Debtors to make Cash payments.

### *The MLC DIP Lenders Trust's evidence of the intent of the parties to the Settlement Agreement is legally irrelevant and factually inadequate*

17.     The Response argues that Debtors disclosed their intent to transfer securities on the Effective Date and that a lack of contemporaneous objections demonstrates a common understanding that Cash payment was not required. Response ¶¶ 11, 17, 35-38. This effort to recast Debtors' obligation fails first on the ground that the unambiguous terms of a settlement agreement or consent decree cannot be altered by extrinsic evidence as to the signatories' understandings. "When the language of a consent decree is unambiguous, 'the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.'" United States v. Broad Music, Inc., 275 F.3d 168, 175 (2d Cir. 2001) (quoting United States v. Armour & Co., 402 U.S. 673, 682 (1971)).[14]

18.     Even if extrinsic evidence of how signatories to the Settlement and Trust Agreements understood the Cash payment requirement were relevant, the MLC DIP Lenders Trust's account of those understandings is incomplete and incorrect. The parties to the Settlement Agreement and Trust Agreement included the St. Regis Mohawk Tribe and fourteen States, as well as Debtors, the individuals who had been designated to lead RACER, DOJ and EPA. There is no indication that the Tribe and Settling States received any notice, prior to the Effective Date, of Debtors' plan to use securities to fund the environmental response trust.

---

[14] See Suarez v. Ward, 896 F.2d 28, 30-31 (2nd Cir. 1990) ("[I]f the language of a settlement agreement is unambiguous, its meaning must be discerned within the 'four corners' of the agreement.") (citing United States v. ITT Cont'l Baking Co., 420 U.S. 223, 236 (1975)).

19.     The MLC DIP Lenders Trust's assertion (Response ¶¶ 29-30) that Debtors'
reported amortized cost values in accordance with accounting principles generally accepted in
the United States of America ("GAAP") provides no support for the its position.    GAAP does
not purport to constrain parties' agreements as to asset valuation standards in transactions.  The
views of the MLC DIP Lenders Trust as to the appropriateness, under GAAP, of Debtors'
amortized cost accounting prior to the Effective Date simply has no bearing on whether
securities valued on an amortized cost basis satisfied Debtors' "Cash payment" obligation under
the Confirmation Order, Plan, Settlement Agreement and Trust Agreement.

20.     The harm to RACER and the Settling Governments flowed not from Debtors'
substitution of securities for Cash per se, but from their overvaluation of the securities.  If
Debtors had transferred the securities at their cash value on the Effective Date, RACER could
have pointed to a formal breach of the Cash payment requirement, but not to the harm that is the
subject of its Motion.  RACER and the Settling Governments were harmed by Debtors' decision
to transfer the securities at net book value when that value exceeded fair market value by
$13,505,874.  This decision, discussed in part II.C below, was not disclosed to RACER or to the
Tribe and Settling States until after the Effective Date, and was never assented to by RACER, the
Tribe, or any of the Settling States.

**B.     RACER and the Tribe and Settling States Are Entitled to Additional Funding to Correct the Effective Date Shortfall**

21.     The right of RACER and the Tribe and Settling States to additional funding
follows from Debtors' violation of their obligation to "make a Cash payment" of at least

$625,234,945.[15]  Instead of making the required Cash payment, Debtors transferred $49,896,945

in Cash and a portfolio of securities that Debtors assigned a value of $575,338,000.[16]  Debtors'

valuation of the securities was based on the net book values that MLC assigned them as of the

Effective Date.  These net book values, as explained in the Supplemental Declaration of RACER

Chief Financial Officer Scott Hamilton (filed with this Reply), combined the amortized cost that

Debtors assigned to the securities and earned but unpaid interest.  Hamilton Supp. Decl. ¶¶ 5-7.

However, the fair market value of this portfolio, assessed on the Effective Date using price

quotes from a generally accepted financial data service, was $561,832,126, leaving a shortfall of

$13,505,874.  Motion ¶¶ 20-21 & Ex. E.

22.    The MLC DIP Lenders Trust objects to the demand of RACER and the Tribe and

Settling States for an additional payment to correct for this shortfall on grounds:  (a) that RACER

has not incurred a compensable loss; and (b) that RACER officials allegedly acceded to Debtors'

transfer of securities at net book value and improperly delayed in asserting a shortfall.  We first

address the proper measure of damages suffered by RACER and the Tribe and Settling States

before turning, in part II.C below, to the Response's assertions that relief should be denied due to

RACER's alleged acquiescence in the shortfall and delay in objecting.

### *RACER and the Tribe and Settling States are entitled to damages assessed at the time of the breach*

23.    RACER agrees with the MLC DIP Lenders Trust that the rights and obligations of

Debtors, RACER and the Settling Governments under the Confirmation Order, Plan, Settlement

---

[15] The MLC DIP Lenders Trust does not contest RACER's calculation (Motion ¶¶ 18, 21 (table)) that the
Confirmation Order required Effective Date funding totaling $625,234,945.  See Response ¶¶ 1, 20 n.12 (reciting
RACER figures for total funding required and amount provided in cash).

[16] See Response ¶ 1; Hamilton Nov. 21 Decl. ¶ 2 & Attach. A (MLC's March 30, 2011 "Flow of Funds Summary").

Agreement and Trust Agreement are governed in part by New York contract law principles.[17]  Of course, violation of this Court's Confirmation Order implicates remedial powers that would not apply in a simple breach of contract action.[18]  However, RACER believes that New York contract damages are sufficient in this matter to vindicate both the rights of RACER and the Settling Governments and the authority of this Court.

24.       Settled principles of New York contract damages law are fatal to the MLC DIP Lenders Trust's contention that correction of the Effective Date funding shortfall would confer an improper "windfall" on RACER.  Response ¶¶ 10, 59-60.  Under New York law, "[i]t is a well established principle that contract damages are measured at the time of the breach," Merrill Lynch & Co. v. Allegheny Energy, Inc., 500 F.3d 171, 185 (2d Cir. 2007), and that "events subsequent to the breach, viewed in hindsight, may neither offset nor enhance [a breach of contract victim's] general damages," id.[19]  Thus, post-breach changes in asset value neither increase damages when the change improves the position of the party that suffered the breach,

---

[17]  See Response ¶ 56 (citing In re WorldCom, Inc., 362 B.R. 96, 111 (Bankr. S.D.N.Y. 2007) and Plan § 12.13 (Plan to be construed and enforced under New York law)); Trust Agreement § 7.3 (Trust Agreement to be "construed and enforced in accordance with" New York law).

[18]  See, e.g., E.E.O.C. v. Local 580, Intern. Ass'n of Bridge, Structural & Ornamental Ironworkers, 925 F.2d 588, 593 (2d Cir. 1991) ("[T]he court has inherent power to enforce consent judgments, beyond the remedial 'contractual' terms agreed upon by the parties. Unlike a private agreement, a consent judgment contemplates judicial interests apart from those of the litigants."); Berger v. Heckler, 771 F.2d 1556, 1567-68 (2d Cir. 1985) ("Consent decrees are a hybrid in the sense that they are at once both contracts and orders, they are construed largely as contracts, but are enforced as orders."); see also Perfect Fit Indus., Inc. v. Acme Quilting Co., 673 F.2d 53, 57 (2d Cir. 1982) (when acting to enforce court order for "compensatory" purpose, relief should be "fashioned so as to reimburse the injured party for his actual damages").

[19]  Oscar Gruss & Sons, Inc. v. Hollander, 337 F.3d 186, 196-97 (2d Cir. 2003); Sharma v. Skaarup Ship Mgmt. Corp., 916 F.2d 820, 826 (2d Cir. 1990) ("Where the breach involves the deprivation of an item with a determinable market value, the market value at the time of the breach is the measure of damages."); Simon v. Electrospace Corp., 269 N.E.2d 21, 26 (N.Y. 1971) (The "proper measure of damages for breach of contract is determined by the loss sustained or gain prevented at the time and place of breach.") (superseded, as to certain foreign currency transactions, by NY Jud. Law § 27(b)).

Simon, 269 N.E.2d at 26-27, nor reduce damages when the change adds to the loss, Aroneck v.

Atkin, 456 N.Y.S.2d 558, 559 (4th Dep't 1982).[20]

25.     Contrary to the foregoing authority that damages must be assessed at the time of

the breach, the MLC DIP Lenders Trust incorrectly urges this Court to consider post-breach

increases in the fair market value of the transferred securities and deny relief that would confer

an alleged "windfall" on RACER and the Settling Governments.

26.     None of the cases cited in the Response remotely supports this approach.  The

Response twice quotes from Madison Fund, Inc. v. Charter Co., 427 F. Supp. 597 (S.D.N.Y.

1977), which ruled that Florida law permitted the application of conversion damages principles

(i.e., valuation as of the date of judgment) in a breach of contract action.  Id. at 609.  The Second

Circuit has rejected efforts to apply conversion principles in contract actions governed by New

York law.[21]  The Response's other purported windfall-prevention cases are equally inapposite.[22]

---

[20]  These principles were aptly summarized in U S West Fin. Servs., Inc. v. Marine Midland Realty Credit Corp.,
810 F. Supp. 1393 (S.D.N.Y. 1993):

> New York courts have upheld damage awards based on "what knowledgeable investors
> anticipated the future conditions and performance would be at the time of the breach" and have
> rejected awards based on what "the actual economic conditions and performance" were in light of
> hindsight. New York courts have refused to adopt a "wait and see" theory of damages.

Id. at 1398-99 (discussing Sharma and Aroneck; internal quotation marks and citations omitted).

[21]  E.g., Oscar Gruss & Son, 337 F.3d at 196-97 (Second Circuit has "flatly rejected under New York law the use of
the conversion measure of damages in a breach of contract case") (citing Lucente v. Int'l Bus.Machs. Corp., 310
F.3d 243, 263 (2d Cir. 2002) (same effect)).

[22]  In Freund v. Washington Square Press, Inc., 314 N.E.2d 419 (N.Y. 1974), the Court of Appeals ruled that an
author's damages for breach of a publisher's promise to publish his work should be based on the loss to the author
rather than the costs that the publisher avoided.  The reference date for the evaluation of damages was not at issue.
Scalp & Blade, Inc. v. Advest, Inc., 756 N.Y.S.2d 92 (4th Dep't 2003), involved damages arising out of a trustee's
tortious breach of trust.  The court expressly limited its holding to "a case such as is this, involving claims of
churning, investment unsuitability, or other acts of unauthorized trading by defendants."  Id. at 101; see id. at 100
(damages for lost appreciation recoverable "provided that there has been a breach of trust extending beyond mere
negligence and committed for the personal gain of the fiduciary").  In Waehner v. Frost, 770 N.Y.S.2d 596 (Sup. Ct.
2003), the court refused to confirm a condominium developer's arbitration award against a general contractor where
that award, in combination with an earlier settlement payment from the project's architect, would have resulted in
total recoveries in excess of actual damages.  None of these decisions supports the Response's contention that
correction of the Effective Date funding shortfall, as requested by RACER and the Tribe and Settling States, would
confer an improper windfall.

27.    In this case, Debtors substituted a combination of Cash and securities worth

$611,729,071 on the Effective Date for the required "Cash Payment" of at least $625,234,945.

See Motion ¶ 21 (Table comparing Effective Date values); Hamilton Nov. 21 Decl. ¶ 7 & Attach.

A.  The damage suffered by RACER and the Settling Governments, evaluated under settled New

York law, is the difference between the value that Debtors provided to RACER on the Effective

Date and the value that they were required to provide — that is, $13,505,874 — plus interest

since the Effective Date.

28.    In a variant on its contention that RACER and the Settling Governments are

seeking an improper windfall, the MLC DIP Lenders Trust argues that RACER should be

restricted to the remedy that Debtors first suggested in November 2011:[23]  a return of the

transferred securities in return for payment of the Cash that Debtors were required to transfer on

the Effective Date (financed by the sale of the securities at current market prices).  Response ¶¶

10, 51, 59.  According to this argument, RACER and the Settling Governments should not be

allowed to recover for the Effective Date breach while retaining the benefit of post-breach

increases in the value of the transferred securities.  This is not the law of New York, which

requires that damages be determined at the time of the breach.

29.    The Response also asserts that the damages sought by RACER, the Tribe and the

States are "theoretical or hypothetical" (Response ¶ 58), and that they are based on "an

accounting gimmick — quoted market value accounting" (id. ¶ 44).  There is, however, nothing

speculative, hypothetical or gimmicky about the shortfall computation that New York law

requires in this case — a simple subtraction of the transferred securities' fair market value on the

---

[23] As stated in the Declaration of RACER General Counsel and Chief Operating Officer Michael Hill, Debtors first
proposed that RACER return the transferred securities for Cash in the November 2011.  Declaration of RACER
General Counsel and Chief Operating Officer Michael Hill ¶¶ 24-25 (discussing Response Ex. 2 (Koch Decl.) at Ex.
D (attached letter).

Effective Date from the net book value that Debtors used.  The Response suggests that market

values of U.S. Treasury securities are uncertain because market quotes can be obtained from

different data services based on trades at different times of the business day.  Response ¶ 36.  But

these uncertainties are minor in relation to those that courts routinely resolve in making damage

awards.[24]  Moreover, these uncertainties appear not to have troubled MLC when it recorded the

market value of its securities in its Monthly Operating Reports.  See, e.g., Response Ex. 1

(Rosenthal Decl.), Ex. C at 5, 9, 13, 17, 22.  Those reports quote end-of-month "fair value" and

"current market value" figures as straightforward, objective numbers.  Debtors saw no need in

these reports to identify the data service that had provided the quotes or the specific method used

to identify end-of-month market values.

### Even if this Court were required to consider post-breach developments, RACER and the Tribe and Settling States would still be entitled to a corrective payment of $13,505,874 plus interest

30.    New York law does not call upon this Court to analyze the hypothetical scenario

in which Debtors made the required Cash payment on the Effective Date to determine where

RACER and the Settling Governments would be today in the absence of the breach.  However, if

this were the relevant task, the damages owed would be virtually identical to those determined

under the principles set out above.  When RACER received its funding on the Effective Date, its

managers were aware that Debtors, working with Treasury and hired financial experts, had gone

to considerable effort and expense to develop projections of future remediation expenses and

acquire a portfolio of U.S. Treasury securities designed to control inflation risk, through heavy

---

[24]  See, e.g., Boyce v. Soundview Tech. Group, Inc., 464 F.3d 376, 384-85 (2d Cir. 2006) (contrasting "straightforward" task of valuing "publicly traded stock" with more challenging task of valuing stock in companies that are not publicly traded") (citing United States v. Cartwright, 411 U.S. 546, 551 (1973) (valuing publicly traded stock at "the mean between the highest and lowest quoted selling prices")).

weighting toward inflation-protected securities, and market risks, through the alignment of

maturity dates with projected cash needs.  See Hamilton Nov. 21 Decl. ¶¶ 4-6; Hill  Decl. ¶ 4.

31.    RACER, as a newly formed entity in the process of assuming a challenging array

of administrative obligations, had no new information on projected expenses or financial options

that would have led it to reconsider the securities portfolio that Debtors and Treasury had

selected.  The point is clearly demonstrated by RACER's decision to retain the portfolio of U.S.

Treasuries that Debtors transferred on the Effective Date.  There is no reason to expect that

RACER would have followed a different path if Debtors had sold the securities and made a full

Cash payment on the Effective Date.  RACER, as stated in the Hamilton Declarations (Hamilton

Nov. 21 Decl. ¶ 7), would have taken advantage of the work that Debtors and Treasury had

overseen and duplicated the portfolio of U.S. Treasury securities that had previously been

selected.  The only significant difference in RACER's position would have been its possession of

an additional $13,505,874 plus interest due to its receipt of funding in Cash rather than in Cash

and overvalued securities.

**C.    Arguments That RACER Acceded to Debtors' Funding of the Trust With Securities
Valued at Net Book Value and That RACER Has Improperly Delayed in Seeking
Redress for the Effective Date Shortfall Are Irrelevant and Factually Incorrect**

32.    The Response's remaining arguments focus on RACER's alleged understandings

and conduct with respect to Debtors' Effective Date transfer of securities. The Response asserts

that:  (a) in the months preceding the Effective Date, individuals who had been designated to

lead RACER following its formation were told of Debtors' purchases of long-term U.S. Treasury

securities and intent to transfer those securities to RACER in lieu of Cash on the Effective Date

(Response ¶¶ 11, 17, 34-38); (b) that RACER waived any claim to a corrective payment by

accepting a partial account reconciliation payment in June 2011 that included a $107,884 offset

to relating to Debtors' calculation of the net book value of the transferred securities on the

Effective Date (Response ¶¶ 6, 40-42, 62-64); and (c) that RACER waited too long to file its

Motion (Response ¶¶ 12, 43, 62-65). These arguments are legally irrelevant because they ignore

the independent rights of the Settling Governments to full funding, without regard to RACER's

alleged missteps.  They are also legally and factually unsupported on their own terms.

### ***The rights of the Tribe and Settling States to full funding are unaffected by claims that RACER acquiesced in the funding shortfall or waited too long to object***

33.    The MLC DIP Lenders Trust arguments concerning RACER's supposed

acceptance of the funding shortfall and delay in raising its objection have no bearing on the

issues before this Court.  The Tribe and Settling States have an independent right to insist on full

funding on the Effective Date.  The Tribe and Settling States specifically reserved "all rights

against Debtors" with respect to the filing of "any action to enforce their rights under this

Settlement Agreement."  Settlement Agreement ¶ 100.  These rights, obtained in exchange for

their compromise of environmental claims against Debtors and confirmed by this Court, include

the right to full funding of the environmental response trust,[25] which RACER has no authority to

undermine.  See In re Resource Technology Corp., 624 F.3d 376, 386-87 (7th Cir. 2010) (settling

party and bankruptcy "could not privately agree to modify a settlement agreement that was

approved by court order").  The MLC DIP Lenders Trust has not even alleged that the Tribe and

Settling States acceded to funding worth less than $625,234,945 on the Effective Date.  Thus,

---

[25] In describing the rights of the Settling Governments, paragraph 60 of the Settlement Agreement states:

> The Governments have entered into this Settlement Agreement and the Trust Agreement in significant reliance on the availability of the Minimum Estimated Property Funding Account provided for each Property. There shall be a presumption against any reductions in amounts allocated for each Property absent the showing as set forth below.

Settlement Agreement ¶ 60 (the referenced showing, which involves "a material event or a material condition at the Property that was not reasonably foreseeable" when remediation funding figures were agreed upon, has no relevance here); see id. ¶ 61 (same effect).

even if the assertions of RACER acquiescence and delay were correct, which they are not, the issues before this Court would remain unchanged.

34.     In addition to the rights conferred by the Settlement and Trust Agreements, the Settling Governments are protected by New York trust law.  RACER was formed as a New York trust, in conformity with the Trust Agreement's instruction that "obligations arising under the Trust Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York."  Trust Agreement § 7.3.  Under New York law, where a trust is formed by a written instrument, "the act of a trustee in contravention of the trust, except as authorized by this article [NY Est. Powers & Trust Law Article 7] and by any other provision of law is void."  NY Est. Powers & Trusts Law § 7-2.4.  For this reason too, the Response's arguments based on alleged acquiescence and delay are misdirected as well as unfounded.

### *MLC DIP Lenders Trust's assertions that RACER acceded to the underfunding and delayed in seeking a correction are in any event unfounded*

35.     The allegations that RACER acceded to the underfunding and waited too long to object are factually incorrect.  First, neither RACER nor the individuals designated to help create the Trust and to lead it following the Effective Date ever agreed to funding worth less than the required $625,234,945 on the Effective Date.  As set forth in the Hill Declaration, Debtors disclosed, prior to the Effective Date, that they  intended to transfer securities in lieu of some of the Cash due to RACER.  Hill Decl. ¶ 4.  However, there was no notice, prior to the Effective Date, that Debtors intended to transfer those securities at a value significantly higher than their contemporaneous fair market value.  Hill Decl. ¶ 7.

36.     The assertion that RACER waived its claim to a corrective payment by accepting a partial account reconciliation payment from MLC in late-June 2011 that included a $107,884 offset relating to the value of the transferred securities is equally groundless.  As explained by Mr. Hamilton, the $107,884 offset was a technical correction of Debtors' net book value

18

calculations.  Hamilton Supp. Decl. ¶¶ 16-17.[26]  The larger issue of whether Debtors had acted

properly in transferring the securities at net book value rather than fair market value was

specifically reserved.[27]  Debtors' agreement that the offset constituted an interim technical

adjustment, without any implication for the larger valuation question, is demonstrated by:  (a)

Debtors' continued work with RACER, from July to December 2011, on other adjustments of the

type addressed in the June 2011 partial account reconciliation payment (id. ¶¶ 18-19); (b) the

notable absence of an Agreement and Release of the type that Debtors and RACER executed

when they completed the account reconciliation process required by paragraph 7 of the

Confirmation Order (id. & Attachs. D, E); and (c) Debtors' failure even to mention the $107,884

offset in any of their communications with RACER concerning the underfunding issue until the

filing of their Response (Hill Decl. ¶¶ 27).[28]

37.    Finally, the MLC DIP Lenders Trust's request that this Court reject RACER's

Motion based on undue delay is also groundless.  On April 11, 2011, Mr. Hill sent an email to

Mr. Hamilton, then also serving as MLC's Controller, questioning the use of net book value.

Hill Decl. ¶ 10 & Attach. B.  Then, on June 17, 2011, RACER provided clear written notice to

---

[26]  The Response's assertion that RACER reached out to MLC in order to conduct the true-up based on MLC's amortized cost basis valuation" is incorrect.  The May 9, 2011 email on which MLC DIP Lenders Trust relies (Response Ex.1 (Rosenthal Decl.) ¶ 29 & Ex. F) was sent by Mr. Hamilton in his continuing capacity as MLC Controller, not RACER CFO (see Hamilton Supp. Decl. ¶ 10).

[27]  When this technical correction was made, RACER CFO Scott Hamilton informed Jim Selzer, MLC's Vice President, Treasurer and Chief Financial Officer, that the larger question of whether the securities should have been transferred at net book value or fair market value remained open.  Hamilton Supp. Decl. ¶ 17.  Mr. Selzer's acknowledgement of this reservation is confirmed by the caption of the schedule of adjustments that he sent to Mr. Hamilton on June 28, 2011, which includes the notation "*(excludes RACER funding adjustment)*" (emphasis in the original).  Hamilton Supp. Decl. Attach. C; see also Response Ex. 1 (Rosenthal Decl.) Ex. G (wire confirmation version of schedule with same notation).

[28]  Even if the offset had been presented and accepted as a final resolution of the larger issue underfunding issue, the Response's invocation of the stated account doctrine (Response ¶ 63) would fail because, among other reasons, RACER notified Debtors of their objection to the overvaluation of the transferred securities only three and one-half months after the supposed acceptance.  See, e.g., Kellar v. Carney, 451 N.Y.S.2d 904, 905 (3d Dep't 1982) (three month lapse insufficient to unequivocal assent as a matter of law).

Treasury, on whose behalf the MLC DIP Lenders Trust now complains of undue delay, that

RACER questioned Debtors' transfer of the securities at a claimed value well above their Cash-

equivalent fair market value.  Hill Decl. ¶ 17 & Attach. C; Hamilton Supp. Decl. ¶ 14 & Attach.

B.  Moreover, Debtors were aware, as the Effective Date approached, that the attempt to transfer

the securities at net book value was likely to prove controversial in light of the growing disparity

between net book value and fair market value.  Hamilton Supp. Decl. ¶ 17.    They were also

informed in late June 2011, shortly after RACER raised the issue in writing with Treasury, that

the issue of net book value versus fair market value remained to be resolved.  Id.

38.    Further, the Response does not even attempt to show that RACER's supposed

delay has resulted in any prejudice. [29]  RACER, joined by the Tribe and a majority of the Settling

States, has presented two straightforward legal questions:  whether Debtors violated their

funding obligation and whether a corrective payment is owed.  Debtors chose not to address the

merits of these issues before MLC's dissolution.   Funds needed to correct the underfunding were

therefore placed into escrow pending resolution of this dispute.  The MLC DIP Lenders Trust

offers no indication that the passage of time since the Effective Date has undermined the parties'

ability to present their positions or this Court's ability to decide the issues. In short, even if the

allegations of undue delay on the part of RACER were pertinent to the issues before this Court,

they would fail for lack of factual and legal support.

### III.    CONCLUSION

For the foregoing reasons and the reasons set out in RACER's November 21, 2011

Motion, this Court should order that RACER be paid $13,505,874 plus interest to correct for

Debtors' underfunding of the Trust on the Effective Date.

---

[29] See Moreschi v. DiPasquale, 872 N.Y.S.2d 108, 109 (1st Dep't 2009) (rejecting laches defense because "[e]ven if we were to find factual issues as to the element of undue delay, defendants have failed to show prejudice").

HILL & KEHNE, LLC

By: /s/ Jeffrey P. Kehne
Jeffrey P. Kehne
2300 Wisconsin Avenue, N.W.
Washington, DC  20007
(202) 558-2100

CROWELL & MORING LLP
Michael V. Blumenthal
Steven B. Eichel
590 Madison Avenue
New York, NY  10022
(212) 223-4000

Attorneys for the
Revitalizing Auto Communities
Environmental Response Trust

February 3, 2012

## CERTIFICATE OF SERVICE

Jeffrey P. Kehne, hereby certifies that on the 3rd day of February, 2011 he served or caused to be served true and accurate copies of the following: (1) Reply Brief in Support of the Motion of the Revitalizing Auto Communities Environmental Response Trust for an Order Pursuant to 11 U.S.C. §§ 105 and 1142 to Enforce Debtors Payment Obligations Under the Second Amended Joint Chapter 11 Plan and the Confirmation Order ("Motion"); (2) Declaration of Michael O. Hill in Support of the Motion; and (3) Supplemental Declaration of Scott R. Hamilton in Support of the Motion, upon each of the parties set forth below by electronic or first class mail, postage prepaid, or by the Electronic Case Management Filing System maintained by the United States Bankruptcy Court for the Southern District of New York:

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, NY 10153
harvey.miller@weil.com
stephen.karotkin@weil.com
Joseph.Smolinsky@weil.com
*Attorneys for Motors Liquidation Company
DIP Lenders Trust*

David R. Berz
Thomas Goslin
Weil Gotshal & Manges, LLP
1300 Eye Street, NW, Suite 900
Washington, DC 20005
david.berz@weil.com
thomas.goslin@weil.com
*Attorneys for Motors Liquidation Company
DIP Lenders Trust*

Lawrence S. Buonomo
General Motors LLC
400 Renaissance Center
Detroit, Michigan 48265

John J. Rapisardi
Cadwalader Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
*Attorney for the United States Department of
Treasury*

Joseph Samarias
United States Department of Treasury
1500 Pennsylvania Avenue NW
Room 2312
Washington, D.C. 20220
Joseph.Samaria@do.treas.gov

Michael J. Edelman
Michael L. Schein
Vedder Price P.C.
1633 Broadway, 47th Floor
New York, NY 100019
Mj_edelman@vedderprice.com
M_schein@vedderprice.com
*Attorneys for Export Development Canada*

Elliott P. Laws, Administrative Trustee
RACER Trust
2930 Ecorse Road
Ypsilanti, Michigan 48198
elaws@racertrust.org
*Environmental Response Trust
Administrative Trustee*

Michael O. Hill,
Chief Operating Office and
General Counsel
RACER Trust
2930 Ecorse Road
Ypsilanti, Michigan 48198
mhill@racertrust.org

Thomas Moers Mayer
Robert Schmidt
Lauren Macksound
Jennifer Sharret
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of The Americas
New York, NY 10036
tmayer@kramerlevin.com
rschmidt@kramerlevin.com
lmacksound@kramerlevin.com
jsharret@kramerlevin.com
*Attorneys for Official Committee of*
*Unsecured Creditors*

Tracy Hope Davis
Andrew D. Velez-Rivera
Brian Shoichi Masumoto
Office of the United States Trustee
33 Whitehall Street, 21st Floor
New York, NY 10004
andy.velez-rivera@usdoj.gov
Brian.Masumoto@usdoj.gov
*Attorneys for the United States*

David S. Jones
Natalie Kuehler
Assistant United States Attorneys
United States Attorney's Office
Southern District of New York
86 Chamber Street, 3rd Floor
New York, NY 10007
David.Jones6@usdoj.gov
Natalie.Kuehler@usdoj.gov
*Attorneys for the United States*

Alan Tenenbaum
Patrick M. Casey
United States Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
patrick.casey@usdoj.gov
alan.tenenbaum@usdoj.gov
*Attorneys for the United States*

Elihu Inselbuch
Rita C. Tobin
Caplin & Drysdale, Chartered
375 Park Avenue, 35th Floor
New York, NY 10152-3500
ei@capdale.com
rct@capdale.com
*Attorneys for Asbestos Claimants' Comm.*

Trevor W. Swett III
Kevin C. Maclay
Caplin & Drysdale
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
tws@capdale.com
kcm@capdale.com
*Attorneys for Asbestos Claimants'*
*Committee*

Sander L. Esserman
Robert T. Brousseau
Stutzman, Bromberg, Esserman & Plifka
A Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
esserman@sbep-law.com
brousseau@sbep-law.com
*Attorneys for Future Claimants'*
*Representative*

John J. Privitera
Jacob Lamme
McNamee, Lochner, Titus & Williams, P.C.
677 Broadway
Albany, NY 12207-2503
*Attorneys for the Saint Regis Mohawk Tribe*
privitera@mltw.com; lamme@mltw.com

Margarita Padilla
Deputy Attorney General
California Office of the Attorney General
P.O. Box 70550
1515 Clay Street
Oakland, CA 94615-0550
Margarita.Padilla@doj.ca.gov

Robert Kuehl
Deputy Attorney General
Delaware Office of the Attorney General
391 Lukens Drive
New Castle, DE 19720
Robert.Kuehl@state.de.us

James L. Morgan
State of Illinois Environmental Control
500 South Second
Springfield, IL 62706
jmorgan@atg.state.il.us

Timothy K. Junk
Deputy Attorney General
Office of the Indiana Attorney General
Indiana Government Center South, 5th Fl.
302 West Washington Street
Indianapolis, IN 46204
Tim.Junk@atg.in.gov

Bruce H. Palin
Indiana Dept. of Environmental Mgmt.
MC 50-01, ICGB 1301
Indianapolis, IN 46204

Robert Moser, Secretary
Kansas Dept. of Health and Environment
Curtis State Office Building
1000 SW Jackson
Topeka, KS 66612

Beau James Brock, Assistant Secretary
Louisiana Dept. of Environmental Quality
P.O. Box 4312
Baton Rouge, LA 70821-4312

Christopher A. Ratcliff, Attorney
Louisiana Department of Environmental
Quality
P.O. Box 4302
602 N. 5th Street (70802)
Baton Rouge, Louisiana 70821-4302
Christopher.ratcliff@la.gov

Carol Iancu
Assistant Attorney General
Environmental Protection Division
Massachusetts Office of Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
carol.iancu@state.ma.us

Celeste R. Gill, Assistant Attorney General
Env., Natural Resources, and Agriculture
State of Michigan Attorney General's Office
P.O. Box 30755
Lansing, MI 48909
gillc1@michigan.gov

John McManus, Chief Counsel
Jeff Klusmeier, Assistant Attorney General
Attorney General for the State of Missouri
Agriculture and Environmental Division
P.O. Box 899
Jefferson City, MO 65102
jack.mcmanus@ago.mo.gov
Jeff.klusmeier@ago.mo.gov

John Dickinson
Richard F. Engel
Deputy Attorney General
New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market St, CN 093
Trenton, NJ 08625
John.Dickinson@dol.lps.state.nj.us
Richard.Engel@dol.lps.state.nj.us

Dale T. Vitale
Assistant Attorney General
Chief, Environmental Enforcement Section
30 E. Broad Street, 25th Floor
Columbus, OH 43215
dale.vitale@ohioattorneygeneral.gov
Michael.Idzkowski@OhioAttorneyGeneral.gov

Susan Shinkman
Chief Counsel
Office of Chief Counsel
Rachel Carson State Office Building
400 Market Street
Harrisburg, PA  17101-2301

Kerri L. Nicholas
Virginia Office of the Attorney General
900 East Main Street
Richmond, VA  23219
knicholas@oag.state.va.us
Anne C. Murphy,
Assistant Attorney General
Wisconsin Attorney General's Office
17 West Main Street
PO Box 7857
Madison, WI 53707-7857
Murpheyac@doj.state.wi.us

Michael V. Blumenthal
Steven B. Eichel
CROWELL & MORNING LLP
590 Madison Avenue
New York, NY  10022
*Attorneys for the RACER Trust*
mblumenthal@crowell.com
SEichel@crowell.com

Timothy E. Keck
Deputy Chief Counsel
Kansas Department of Health and
Environment
1000 SW Jackson, suite 560
Topeka, KS 66612-1371
785-296-1334
Tkeck@kdheks.gov

Matthew J. Williams
Gibson, Dunn, Crutcher LLP
200 Park Avenue, 47th Floor
New York, NY 10166
*Attorneys for Wilmington Trust Company as
GUC Trust Administrator and Avoidance
Action Trust Administrator*
mjwilliams@gibsondunn.com

Anna Phillips
FTI Consulting
One Atlantic Center
1201 West Peachtree, Suite 500
Atlanta, GA 30309
*GUC Trust and Avoidance Action
Trust Monitor*

Kirk. P. Watson, Esq.
2301 Woodlawn Boulevard
Austin, Texas 78703
*Asbestos Trust Administrator*

Maureen F. Leary
Assistant Attorney General
Toxics Section Chief
Environmental Protection Bureau
The Capitol
Albany, New York 12224-0341
Maureen.Leary@ag.ny.gov

Robert Roberts
U.S. Environmental Protection Agency 1200
Pennsylvania Avenue, NW,
Mailcode 2272A,
Washington, DC 20460
Roberts.Robert@epa.gov

/s/ Jeffrey Kehne
Jeffrey P. Kehne
Attorney for the Revitalizing Auto
Communities Environmental
Response Trust

- 4 -