HEARING DATE AND TIME: February 28, 2012 at 9:45 a.m.
OBJECTION DATE AND TIME:  February 16, 2012 at 4:00 p.m.

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222
Arthur Steinberg, Esq.
Scott Davidson, Esq.

*Counsel to General Motors LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------x
                                                           :
In re:                                                     :     Chapter 11
                                                           :
MOTORS LIQUIDATION COMPANY, et al.,                        :     Case No.: 09-50026 (REG)
       f/k/a General Motors Corp., et al.                  :
                                                           :     (Jointly Administered)
                      Debtors.                             :
                                                           :
-----------------------------------------------------------x
```

**RESPONSE BY GENERAL MOTORS LLC TO THE MOTION OF
MOTORS LIQUIDATION COMPANY GUC TRUST PURSUANT TO
11 U.S.C. § 107(b) AND FED. R. BANKR. P. 9018 FOR AN ORDER
AUTHORIZING THE FILING OF THE COMPLAINT UNDER SEAL;**

<u>CROSS-MOTION TO INTERVENE IN THE ADVERSARY PROCEEDING</u>

General Motors LLC (f/k/a General Motors Company) (on behalf of itself and its affiliate, General Motors of Canada Limited ("**GMCL**")) (individually and collectively, "**New GM**"), by and through its undersigned counsel, hereby submits this response ("**Response**") to the *Motion of Motors Liquidation Company GUC Trust Pursuant To 11 U.S.C. § 107(b) And Fed. R. Bankr. P. 9018 For An Order Authorizing Filing Of Complaint Under Seal*, dated January 17, 2012 ("**Sealing Motion**") filed by the Motors Liquidation Company GUC Trust

18176546v6

("**GUC Trust**").[1]  In addition, New GM moves to intervene in the adversary proceeding ("**Adversary Proceeding**") related to the Complaint (as herein defined) so that it can file an appropriate pleading in connection therewith.  In support of this Response and request to intervene, New GM respectfully represents as follows:

## PRELIMINARY STATEMENT

1. By the Sealing Motion, the GUC Trust seeks an order authorizing it to file a complaint ("**Complaint**") under seal against the Defendants named therein.  As stated by the GUC Trust, the claims asserted in the Complaint supplement, but do not replace, the Claims Objection (as herein defined) previously filed by it to the proofs of claim asserted by the Noteholders (as herein defined) and the Nova Scotia Finance Trustee (as herein defined) in Old GM's bankruptcy cases. The Claims Objection was not filed under seal.

2. As discussed more fully herein, New GM initially believed that the Complaint should be filed under seal.  Certain of the Complaint's allegations are based on documents that were deemed "Confidential" pursuant to a protective order ("**Protective Order**") entered in these bankruptcy cases relating to the Claims Objection. Under the Protective Order, Confidential Information (which includes allegations based on Confidential Information) is to be filed under seal, or subject to the Court's *in-camera* review, if the producing party does not consent to the public filing of the Confidential Information. The GUC Trust provided New GM with a draft complaint ("**Draft Complaint**") and a list of the allegations which were based on Confidential Information provided by New GM. New GM thereafter informed the GUC Trust that the Draft Complaint contained erroneous factual allegations based on the Confidential Information provided by New GM, which should be corrected before the Draft Complaint was filed. The GUC Trust stated that it would make some corrections, but would not share a new draft of the complaint

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Sealing Motion.

2

showing the corrections made before filing the Complaint. Since (a) certain of the allegations based on Confidential Information were wrong and, arguably, defamatory, and (b) the GUC Trust was unwilling to share a revised draft of the complaint before filing it to show New GM how it rectified its mistakes, New GM did not consent to the public filing of the Complaint, thus, necessitating the filing of the Sealing Motion.

3. New GM has now had an opportunity to review the Complaint. Certain, but not all, of the factual allegations based on Confidential Information have been corrected. Nevertheless, New GM no longer objects to the public filing of the Complaint. However, it believes it is important for the Court to understand why it came to this position, and this Response is being filed, in part, for that purpose.

4. A large segment of the Complaint is based on the events related to the Lock-Up Agreement. This transaction was publicly disclosed by Old GM in securities filings, and referred to in publicly filed pleadings made in this Court, before the Sale (as herein defined) by Old GM to New GM occurred. Thus, even though New GM believes that parts of the factual presentation in the Complaint are misleading and/or inaccurate, there is nothing confidential about the Lock-Up Agreement itself, and therefore, on balance, that weighs in favor of the public filing of the Complaint.

5. Also, as noted, the Claims Objection was publicly filed, and many of the allegations of the Complaint (even if New GM disagrees with them) are already in the public arena. This too, on balance, weighs in favor of the public filing of the Complaint.

6. In addition, New GM wishes to avoid an unnecessary dispute with the GUC Trust as to whether certain of the allegations contained in the Complaint (which New GM believes are misleading and inaccurate) are defamatory, thus necessitating the sealing of the Complaint. Rather, New GM believes that filing this Response, which addresses the main misleading

3

allegations, will sufficiently dispel any false impressions with the public and the Court of what actually occurred relating to the Lock-Up Agreement. By taking this approach, New GM believes it can withdraw its objection to the Complaint being publicly filed.

7.  New GM also seeks by this Response to intervene in the Adversary Proceeding that is to be commenced upon the filing of the Complaint. New GM already was permitted to participate in the contested matter concerning the Claims Objection pursuant to an Order of the Court, dated October 31, 2011 (Docket No. 11092). No party to the Claims Objection opposed New GM's request to participate therein. Since, according to the GUC Trust, the Complaint (a) is an ancillary matter to the Claims Objection, and (b) was only filed because the Noteholders and/or the Nova Scotia Finance Trustee raised a procedural issue that some claims asserted in the Claims Objection should have been brought in an adversary proceeding instead of a contest matter,[2] no party should have a *bona fide* objection to New GM's intervention in the Adversary Proceeding.

**RESPONSE**

**A.    The Process Leading to the Filing of the Sealing Motion**

8.  As stated in the Sealing Motion, the GUC Trust previously filed an objection (as subsequently amended, the "**Claims Objection**") to the (i) claims asserted by several noteholders ("**Noteholders**") based on Old GM's guarantee of certain notes issued by General Motors Nova Scotia Finance Company ("**Nova Scotia Finance**") approximating $1.072 billion (the "**Guarantee Claims**"), and (ii) the claim asserted by the bankruptcy trustee of Nova Scotia

---

[2] The Court has the power under Bankruptcy Rule 9014(c) to deem Part VII of the Bankruptcy Rules (applicable to adversary proceedings) to be applicable to the Claims Objection. If that were done, presumably not only would the Sealing Motion be moot, but also the necessity for filing the Complaint. That may very well be a preferable result than going forward with the Complaint, which seeks to add numerous additional parties, and could complicate further what already has become an unnecessarily complex matter.

4

Finance ("**Nova Scotia Finance Trustee**") approximating $1.6 billion (the "**Deficiency Claim**" and together with the Guarantee Claims, the "**Disputed Claims**").

9. After certain motion practice, the Protective Order was entered by the Court on April 7, 2011 relating to the Claims Objection. New GM became a party to the Protective Order in May, 2011 by executing an Addendum thereto. The Protective Order provides, in relevant part, that "[a]ll Discovery Material disclosed in this matter by a Party shall be designated confidential information ('Confidential Information')." Protective Order, ¶ 4. Confidential Information (as defined in the Protective Order) was not to be used by an party for any purpose other than in connection with this litigation, and it could not be disclosed by any Party except to certain identified authorized persons. *See id.* The Protective Order further provides as follows:

> Before filing or seeking to introduce into evidence any paper containing Confidential Information, a party shall first identify such Confidential Information to the producing party's counsel in sufficient time to allow that counsel to determine the propriety of the disclosure. If the producing party's counsel does not consent to public filing or disclosure in open court of the Confidential Information, then the party shall file any paper containing Confidential Information under seal or shall submit such Confidential Information to the Court for *in camera* review.

*Id.*

10. After entry of the Protective Order, the Parties engaged in expensive and extensive document discovery, with thousands of documents being produced by certain of the Defendants, New GM and Old GM. Based on certain of these documents, the GUC Trust drafted the Draft Complaint and, on December 19, 2011, circulated the same to the Parties asking, consistent with the Protective Order, if there was consent to the public filing of the Draft Complaint.

11. New GM informed the GUC Trust that the Draft Complaint contained various misstatements, including that (i) the funds used for the $450 million loan from Old GM to

5

GMCL (which were used for the payment of the Consent Fee) were transferred post-petition, when, in fact, the transfer was completed pre-petition, and (ii) the Lock-Up Agreement was a post-petition settlement, when, in fact, it was finalized in the early morning hours on June 1, 2009, was executed by all parties thereto and that such execution was reported to the governments of the United States and Canada, all prior to Old GM's bankruptcy filing. New GM requested that the Draft Complaint be revised to correct these misstatements.

12. There is also no legitimate basis for the GUC Trust to continue to debate the legality of the payment of the Consent Fee, insofar as New GM had produced documents to the GUC Trust before the filing of the Sealing Motion that demonstrate that GMCL had fully repaid the $450 million loan before the Sale from Old GM to New GM was consummated. In other words, the Consent Fee was ultimately paid from GMCL's (a non-Debtor subsidiary) funds -- not Old GM's funds.[3] In short, the GUC Trust's allegations regarding the $450 million loan from Old GM to GMCL are not only incorrect and needlessly inflammatory, they are also irrelevant.

13. Thereafter, the GUC Trust informed the Parties that it did make certain revisions to the Draft Complaint based, in part, on comments made by New GM, but that it would not circulate a revised version before filing it with the Court. Given that (i) the GUC Trust was unwilling to share a draft of the revised complaint with New GM and the other Parties to verify whether previous comments had been fully addressed, and (ii) the revised complaint was based, in part, on information previously designated by New GM (and others) as confidential, New GM informed the GUC Trust that it believed the prudent course to follow was to file the Complaint under seal.

---

[3] Even were it otherwise, the cash of Old GM above a specific threshold was acquired by New GM in the Sale, as were claims arising from transfers by Old GM to acquired subsidiaries (such as GMCL).

6

14. As noted, New GM has now had an opportunity to review the final version of the Complaint and for the reasons already stated, has decided not to oppose the public filing of the Complaint.

**B. The Allegations in the Complaint are Misleading and Unnecessarily Complicate this Already Contentious Matter**

15. The general theme running through the Complaint is that there was something nefarious about the Lock-Up Agreement and the activities of the Parties both before and after its execution. This theme, however, is factually wrong, and is the false premise for certain vacuous legal theories, which unnecessarily complicate what should, at the end of the day, be a more streamlined and straight-forward claims objection matter. To compound the problem, the GUC Trust has raised the specter of taking over 30 depositions to go down "dead end" paths based on erroneous factual assumptions and hallow legal theories. The morass which the GUC Trust has created, which is exacerbated by the Complaint and the numerous additional parties added, will need to be straightened out prior to, or at the next status conference scheduled for February 28, 2012, so that litigation expenses are not wastefully incurred by all Parties, and the matter can promptly be adjudicated by the Court.

16. To be specific, there should be no disagreement by the Parties as to the following fundamental facts:

(a) The Lock-Up Agreement was negotiated from Old GM's perspective so that GMCL would get a release from the claims of the Noteholders and Nova Scotia Finance. Further, although Old GM and GMCL believed the direct claims of the Noteholders against GMCL were without merit, GMCL's indebtedness to Nova Scotia Finance was undisputed and exceeded CAD $1 billion. Thus, the Noteholders (as principal creditors of Nova Scotia Finance) had a structural advantage which other Old GM unsecured creditors did not have, in the form of indirect recourse through Nova Scotia Finance to the assets of GMCL. Without the compromise

7

of GMCL's indebtedness to Nova Scotia Finance (which was not possible without the consent of the Noteholders), GMCL would have been required to file for bankruptcy. Old GM perceived that a GMCL bankruptcy would have (i) negatively affected the value of GMCL; (ii) potentially delayed the sale ("**Sale**") of Old GM's assets to New GM with a substantial loss in value of the enterprise; and (iii) increased the costs and complexity associated with the Sale, including the substantial expenses related to coordinating a Canadian insolvency proceeding with the U.S. bankruptcy cases.

(b)   The Lock-Up Agreement was executed before Old GM filed for bankruptcy. The Lock-Up Agreement was immediately publicly disclosed in securities filings. The Lock-Up Agreement was referred to in pleadings filed in the Court before the Sale was consummated. There was no effort to hide the Lock-Up Agreement from the Court or the creditors of Old GM.

(c)   The funds that were used to pay the Consent Fee emanated from a prepetition loan made by Old GM to GMCL. Significantly, however, GMCL repaid that loan in full, with interest, before the Sale was consummated. Thus, it was GMCL, the non-debtor entity which obtained important releases under the Lock-Up Agreement, who ended up paying the Consent Fee.[4]

(d)   The Lock-Up Agreement was the by-product of a hard fought, arms' length negotiation with the Noteholders reflecting that (i) they had a legitimate and undisputed claim on the assets of Nova Scotia Finance (which gave them an economic stake in that entity's claims against GMCL), and (ii) as a result, their consent was effectively required to consummate

---

[4] Although the repayment by GMCL simplifies matters, the fact is that Old GM's creditors had no claim on the excess cash of Old GM, which was acquired by New GM in the Sale.  As noted, even if GMCL had not repaid the $450 million loan, it would not have mattered from the perspective of Old GM's creditors.  Under the Sale, New GM bought all cash of Old GM above $900 million and New GM was assigned all claims against GMCL. Thus, the repayment of the loan amount and the collection of the loan receivable belonged to New GM.

8

the Sale in the form deemed most desirable by Old GM -- that being, no bankruptcy filing for GMCL. The Disputed Claims do not arise from the Lock-Up Agreement. Specifically, the Guarantee Claims are premised on a contractual agreement with Old GM entered into years before the bankruptcy filing. The Deficiency Claim is premised on Nova Scotia law, and the fact that Nova Scotia Finance is an unlimited liability company.

(e) The only significant obligation Old GM had under the Lock-Up Agreement was the "cooperation" covenant regarding the claims of the Defendants. However, from the perspective of the Debtors' estates, the Lock-Up Agreement, by its terms, did not constitute the allowance of any claims by the Noteholders or the Nova Scotia Finance Trustee, and the assumption by Old GM and assignment to New GM of the Lock-Up Agreement did not change that result. The operative language remained the same: Old GM agreed not to object to the claims of the Noteholders or the Nova Scotia Finance Trustee, but those claims would only be allowed "to the fullest extent permitted under applicable law." Lock-Up Agreement, ¶ 6(a). The GUC Trust's right to object to the Disputed Claims under applicable law was expressly preserved.

(f) The Lock-Up Agreement did not cause Nova Scotia Finance to go into bankruptcy. Nova Scotia Finance's inability to pay the Noteholders made it inevitable that it would be the subject of a Canadian insolvency proceeding.

(g) The Sale, not the Lock-Up Agreement, transferred the Swap Liability to New GM, and created that component of the Deficiency Claim, against Old GM.

17. Once these facts are acknowledged by the Parties, it becomes clear that the issues relating to the Disputed Claims are mostly legal - not factual, and discovery to the extent and scope which the GUC Trust is contemplating, is not necessary. The primary issues are whether the Guaranty Claim is duplicative of the Deficiency Claim, and whether the Consent Fee should

9

reduce the amount of the Disputed Claims. Issues relating to the Lock-Up Agreement itself, whether it is a post-petition transaction, *etc.*, are "red herring" issues. Indeed, issues directly relating to transactions between two non-debtor subsidiaries (Nova Scotia Finance and GMCL) are not within the Court's jurisdiction, and the purported claims raised by the GUC Trust arising from intercompany transactions were transferred to New GM as part of the Sale, in order to not disrupt the operations of those purchased subsidiaries (in particular, GMCL).

**C.     New GM Should Be Permitted to
         Participate In the Adversary Proceeding**

18.     For the reasons previously stated, New GM believes that it should be permitted to intervene in the Adversary Proceeding. The critical piece of the Lock-Up Agreement for Old GM was the release obtained by GMCL (a purchased and valued subsidiary), and New GM wants to make sure that nothing that emanates from this Adversary Proceeding will modify or impact that release.[5]

**D.     This Matter Needs to be Reigned
         In Before it Spirals Out of Control**

19.     Since the entry of the Protective Order eight months ago, the GUC Trust has sought the production of documents from the Defendants, New GM and Old GM, refining and supplementing its requests on a number of occasions. Although New GM believed that many of the document requests were overbroad and not relevant to the issues at hand, and that the list of custodians that New GM was required to contact (and to search their documents) was excessive, it worked with the GUC Trust over the last several months and, at significant expense, produced thousands of pages of documents.

20.     However, the GUC Trust recently informed the Defendants and New GM that it may want to take over 30 depositions in connection with the issues raised in the Complaint

---

[5] Creditors of Old GM, who are shareholders of New GM, should share this goal as well.

and Claims Objection. A significant number of these depositions would be of New GM personnel, and former Old GM personnel. Although the GUC Trust subsequently agreed "to start" with seven depositions, it has not agreed to limit itself to these depositions and has reserved its right to seek leave of the Court to take more than ten depositions (as required by Rule 30(a)(2) of the Federal Rules of Civil Procedure, made applicable herein by Rule 7030 of the Federal Rules of Bankruptcy Procedure).

21. Accordingly, New GM requests that at the Status Conference, the Court explore with the Parties ways to streamline this matter. By doing so, a resolution of this matter may be achieved more expeditiously and efficiently, which will inure to the benefit of all the Parties.

WHEREFORE, New GM respectfully requests that the Court (i) permit New GM to intervene in the Adversary Proceeding; and (ii) grant to New GM such other and further relief as is just and proper.

Dated:  New York, New York
        February 13, 2012

KING & SPALDING LLP

By:  ___/s/ Arthur Steinberg_____
     Arthur Steinberg
     Scott Davidson
1185 Avenue of the Americas
New York, NY  10036
(212) 556-2100

*Counsel to General Motors LLC*