February 10, 2012

115278  4790
John A. Walters
Walters Chevrolet-Pontiac Inc.
308 Main Street
Groton, NY 13073


United States Bankruptcy Court
Southern District of New York

**In re: Claim #: 17147**

Motors Liquidation Company
f/k/a General Motors Corporation
Debtors.

**Dear Honorable Robert E. Gerber, United States Bankruptcy Judge**

This letter is being delivered concerning Motors Liquidation, et al., f/k/a General Motors Corporation, et al. 267Th Omnibus Objection to seek to disallow and expunge Claim# 17147 due to "Insufficient Documentation Claims."

Enclosed is documentation of the Buy-Sell Agreement and General Motors Acceptance Letter.
I would like to have this information filed as **Prove of Claim**.
Therefore, seeking relief from Motors Liquidation's objection.


Walters Chevrolet & Pontiac Inc. was in a prior approved buy-sell agreement for the purchase price of $800,000.00 before General Motors filed for bankruptcy, restructured and then canceled Walters Chevrolet & Pontiac Dealer Service and Sale Agreement(s) and Ancillary Agreements. Under those circumstances, Walters Chevrolet & Pontiac Inc. know longer has a General Motors franchise to sell. General Motors obligation under the Service and Sales agreement should be to pay this purchase price of 800,000.00. As a "Windown – Agreement" was never signed only a "Sale Agreement" which they honored.

Sincerely,

John A. Walters
8711 RD#2 Bones Road
Blossvale, NY 13308


Enc:



General Motors Corporation
Dealer Business Planning Group
Mail Code 482-A06-C66
100 GM Renaissance Center
Detroit MI 48265-1000

**FEDERAL EXPRESS: 7974 1980 2094**

March 16, 2009

**PERSONAL AND CONFIDENTIAL**

MJ Chevrolet Pontiac, LLC
308 Main St.
Groton, NY 13073-1328

Attention:  Mr. Martin D. Johnson/ President

This letter is written by General Motors Corporation on behalf of Chevrolet and Pontiac.

By letter dated January 21, 2009, you were notified of General Motors ("GM") conditional approval of a request that GM enter into a General Motors Dealer Sales and Service Agreement for Chevrolet and Pontiac ("DealerAgreements") with MJ Chevrolet Pontiac, LLC ("Dealer Company") naming Martin D. Johnson as Dealer Operator for a dealership to be established at 308 Main St. Groton, NY 13073 ("Proposal").

GM requires certain documentation as stated in the conditional approval letter of January 21, 2009 signed by you on January 26, 2009. As of today, GM still has not received the required documentation that the Dealership has obtained a separate line of credit from a creditworthy financial institution acceptable to GM.

GM has allowed more than ample time for this documentation to be provided. However, GM will allow you until May 15, 2009 to obtain a separate line of credit. If we do not receive that documentation by May 15, 2009, GM will have to withdraw its approval of January 21, 2009.

If you have any questions, please feel free to contact me.

Very truly yours,

*Tamera Jackson*

for  Tamera Jackson
Zone Manager
General Motors Corporation

c:  John Walters
    Dealer Business Planning Group

## AMENDED AND RESTATED PURCHASE AND SALE AGREEMENT

between

JOHN WALTERS, an individual

as Seller

and

THE LICK STREET MILITIA AND REALTY COMPANY LLC, a New York limited liability company,

as Purchaser

September *12*, 2008

## AMENDED AND RESTATED PURCHASE AND SALE AGREEMENT

THIS AMENDED AND RESTATED PURCHASE AND SALE AGREEMENT (this "Agreement") is made as of the ___ day of August, 2008 (the "Effective Date"), by and between JOHN WALTERS, an individual ("Seller"), and THE LICK STREET MILITIA AND REALTY COMPANY LLC, a New York limited liability company ("Purchaser").

## 1.    DEFINITIONS AND EXHIBITS.

1.1    **Definitions**.  In this Agreement, the following defined terms have the meanings set forth for them in the Section of this Agreement indicated below:

Term

| Affiliate | Section 3.2(a) |
| Agreement | Opening |
| Closing | Section 2.2 |
| Closing Date | Section 9.1 |

| | |
|---|---|
| Effective Date | Opening |
| Environmental Laws | Section 5.9(a) |
| Environmental Notice | Section 3.3(b) |
| Exceptions | Section 4.1 |
| Hazardous Substances | Section 5.9(b) |
| Immaterial Taking | Section 12.2 |
| Improvements | Section 2.1(c) |
| Inspection Period | Section 3.4 |
| Intangible Property | Section 2.1(i) |
| Land | Section 2.1(a) |
| Objection Date | Section 4.1 |
| PCBs | Section 5.9(b) |
| Permits | Section 2.1(g) |
| Permitted Exceptions | Section 4.3 |
| Person | Section 3.2(a) |
| Personal Property | Section 2.1(d) |
| Plans | Section 2.1(h) |
| Property | Section 2.1 |
| Purchaser | Opening |
| Purchase Price | Section 2.2 |
| Purchaser's Assessment | Section 3.3 |
| Real Property | Section 2.1(c) |
| Seller | Opening |
| Survey | Section 3.2(b) |
| Surviving Obligations | Section 3.4 |
| Title Commitment | Section 3.1(a) |
| Title Company | Section 3.1(a) |
| Title Policy | Section 3.1(a) |
| Unsatisfactory Environmental Condition | Section 3.3(b) |
| Warranties | Section 2.1(f) |

**1.2    Exhibits.**  The Exhibits listed below are attached to and incorporated into this Agreement.  In the event of any inconsistency between such Exhibits and the terms and provisions of this Agreement, the terms and provisions of the Exhibits shall control.  The Exhibits to this Agreement are:

Exhibit A    –    Legal Description of the Land
Exhibit B    –    Form of Deed
Exhibit C    –    Form of Bill of Sale and Assignment

**1.3    Amendment and Restatement.**  Purchaser and Seller are parties to that certain Purchase and Sale Agreement executed on or about March 24, 2008 (the "Original Real Estate Agreement").  Purchaser and Seller hereby agree to amend and restate the Original Real Estate Agreement in its entirety, and further agree that the Original Real Estate Agreement shall terminate and have no further force or effect upon the execution of this Agreement.

**2.    PURCHASE AND SALE OF THE PROPERTY.**

**2.1    Purchase.**  For the consideration hereinafter set forth, and subject to the provisions contained herein, Seller hereby agrees to sell and convey to Purchaser, and Purchaser agrees to purchase from Seller, wherever located, all of the following (collectively, the

"Property"):

(a)    The real property described in <u>Exhibit A</u>, situated at 308 Main Street in Groton, Tompkins County, New York, together with all reversions, remainders, easements, rights-of-way, appurtenances, hereditaments and water and mineral rights appertaining to or otherwise benefiting or used in connection with such real property, together with all of Seller's right, title and interest in and to any strips of land, streets, and alleys abutting or adjoining such real property (the "<u>Land</u>");

(b)    All water, well, ditch surface and reservoir rights of whatever nature or kind related to the Property (the "<u>Water Rights</u>");

(c)    All existing buildings or other improvements, structures, open parking facilities and fixtures placed, constructed, installed or located on the Land, and all plants, trees, sculptures, and other appurtenances located upon, over or under the Land (collectively, the "<u>Improvements</u>"; the Land and Improvements are sometimes hereinafter collectively referred to as the "<u>Real Property</u>");

(d)    All equipment and other tangible personal property owned by Seller and located, placed or installed on or about the Real Property or used as part of or in connection with the Real Property or for the operation thereof (the "<u>Personal Property</u>");

(e)    Subject to Section 7.3, all right, title and interest of Seller in and to all contracts, including, without limitation, all construction contracts, contracts for repair or maintenance, and contracts for the provision of services, relating to the Real Property or the Personal Property, to the extent assignable (the "<u>Contracts</u>"), if any;

(f)    All right, title and interest of Seller in and to all unexpired warranties, guaranties and bonds, including, without limitation, contractors' and manufacturers' warranties or guaranties, relating to the Real Property or the Personal Property, to the extent assignable (the "<u>Warranties</u>");

(g)    All right, title and interest of Seller in and to all governmental permits, licenses, certificates and authorizations, including, without limitation, certificates of occupancy, relating to the Real Property or the Personal Property, to the extent assignable (the "<u>Permits</u>");

(h)    All right, title and interest of Seller in and to all site plans, surveys, soil and substratus studies, architectural drawings, plans and specifications, engineering, electrical and mechanical plans and studies, floor plans, landscape plans, environmental assessment reports, engineering, structural or physical inspection reports, appraisals, feasibility studies, and other plans and studies of any kind, in Seller's possession or control, relating to the Real Property or the Personal Property (the "<u>Plans</u>"); and

(i)    Any and all other rights, privileges, and appurtenances owned by Seller and in any way related to, or used in connection with, the Real Property or the Personal Property, to the extent assignable (the "<u>Intangible Property</u>").

**2.2    Purchase Price.** The purchase price for the Property shall be Three Hundred Thousand Dollars ($300,000) (the "<u>Purchase Price</u>"). The Purchase Price, subject to adjustment in accordance with Article 10, shall be paid at the closing of the purchase contemplated hereby (the "<u>Closing</u>") in cash, by certified check, cashier's check, wire transfer, or other immediately

available funds.

3.    **INVESTIGATION OF THE PROPERTY.**

   **3.1    Seller's Initial Deliveries.** Within fifteen (15) days after the Effective Date, Seller shall, at its sole expense, deliver or cause to be delivered to Purchaser, the following:

   (a)    Title Insurance Commitment. A current title insurance commitment or preliminary title report issued by a title company reasonably acceptable to Purchaser (the "Title Company"), including copies of all recorded matters affecting title referred to therein (collectively, the "Title Commitment"), showing marketable and insurable title to the Real Property to be vested in Seller and contemplating the issuance by Title Company of a New York ALTA Owner's Policy 2006 of title insurance (the "Title Policy") insuring such title to the Real Property in Purchaser, with such of the standard printed exceptions deleted as acceptable to Title Company, in the amount of the Purchase Price, subject to the satisfaction of the requirements of the instruments to be delivered at the Closing as contemplated hereby and any affidavits and agreements of Seller that Title Company requires. Purchaser shall have the right to require additional endorsements to the Title Policy if Purchaser deems such endorsements reasonably necessary for its protection.

   (b)    Copies and Descriptions. A complete inventory of all of the Personal Property; a list of all Contracts, together with a copy of all written Contracts and a written description of all material terms of all unwritten or oral Contracts; a complete list of all Warranties; copies of all Permits; copies of all Plans; copies of the most recent *ad valorem* tax statements concerning the Real Property and the Personal Property, together with a copy of any notice of increase in valuation received by Seller since such tax statements were issued; and copies of any notices concerning existing or proposed special assessments levied against or affecting the Real Property.

   (c)    Environmental History. A complete copy of any documents or communication relating to the environmental condition of the Property in the possession of Seller.

   **3.2    Inspection of Property.**

   (a)    At any time prior to Closing, Purchaser and its employees, agents, and contractors, shall have the right to enter the Real Property and inspect the Property and all matters relevant to its acquisition, development, usage, operation or marketability. Such right of inspection shall include, without limitation, the right to have made, at Purchaser's expense, any studies or reports of the Property as Purchaser may deem necessary or appropriate, including, without limitation, soils and environmental tests and inspections. Seller shall cooperate reasonably with any such investigations, inspections, or studies made by or at Purchaser's direction. Purchaser shall indemnify, defend and hold Seller, each Affiliate (as hereinafter defined) of Seller, and their respective members, partners, venturers, directors, officers, stockholders, agents, employees, spouses, legal representatives, successors and assigns, harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities, or losses (including, without limitation, reasonable attorneys' fees) resulting from Purchaser's investigations (provided that such indemnity shall not apply to any claims, judgments, damages, penalties, fines, costs, liabilities, or losses resulting from the discovery by Purchaser of pre-existing conditions of or at the Property not caused by Purchaser). "Affiliate"

means, with respect to any Person (as hereinafter defined), any Person who controls, is controlled by or is under common control with such Person, together with its and their respective members, partners, venturers, directors, officers, stockholders, agents, employees and spouses. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise. "Person" means an individual, partnership, limited liability company, association, corporation, or other entity

(b)     Seller shall provide, at its cost, a current ALTA improvement survey of the Real Property (the "Survey"), prepared by a surveyor licensed by the State in which the Land is located. The Survey shall be prepared in form satisfactory to Title Company for the issuance to Purchaser of the Title Policy with no exceptions for matters of survey. Seller shall permit a surveyor to access the Property for purposes of performing the Survey.

**3.3     Environmental Inspection.** Without limiting the inspection and investigation rights set forth in Section 3.2, Purchaser shall have the right during the Inspection Period (as hereinafter defined), at Purchaser's sole expense, to enter the Property to conduct environmental assessments of the Property, including but not limited to, the collection and analysis of soils, surface water and groundwater samples ("Purchaser's Assessment"). Purchaser shall provide a copy of Purchaser's Assessment to Seller promptly after it is received by Purchaser.

(a)     Environmental Media. In the event Purchaser's Assessment of the Property includes the performance of any subsurface investigation, Seller acknowledges and agrees that Seller is the owner of any and all residual soil, water or other environmental media collected or produced in connection with Purchaser's Assessment. Seller shall be solely responsible for the lawful removal and arrangement for disposal of any such materials collected or produced in connection with Purchaser's Assessment. Purchaser acknowledges and agrees that Purchaser shall make reasonable efforts to use techniques and practices to minimize the volume of soil, water or the media collected or produced during Purchaser's Assessment.

(b)     Unsatisfactory Environmental Condition. In the event Purchaser's Assessment reveals, in Purchaser's sole and absolute discretion, an unsatisfactory environmental condition at the Property ("Unsatisfactory Environmental Condition"), prior to the expiration of the Inspection Period, Purchaser may, at its option, provide Seller with written notice (the "Environmental Notice") of, and specify in reasonable detail, Purchaser's objection to the condition of the Property. In the event of an Environmental Notice, Purchaser and Seller shall work together to resolve the Unsatisfactory Environmental Condition prior to Closing, provided that neither Seller nor Purchaser shall be required to accept any proposed resolution.

(c)     Confidentiality. Seller acknowledges and agrees that any and all information, whether written or verbal, regarding the environmental status of the Property provided to Seller by Purchaser or its employees or agents under this Agreement shall be considered the sole and exclusive property of Purchaser and is considered and shall be kept confidential by Seller in perpetuity, except as provided below, and shall not be discussed with or provided to any third party, without the prior written consent of Purchaser, which consent may be granted or withheld in Purchaser's sole discretion. Purchaser makes no representations or warranties regarding any such

information.

(d) <u>Notification</u>. In the event Seller is specifically required to disclose any such information to a court or governmental entity pursuant to applicable law or pursuant to a directive or order issued by a court or governmental entity, prior to disclosing such information, Seller shall notify Purchaser in writing and provide Purchaser with a copy of the order or directive issued by such court or governmental entity and with copies of all information that Seller intends to disclose. Whenever possible, such notice and information shall be provided to Purchaser by Seller in writing at least five (5) business days prior to disclosure of such information to any court or governmental authority.

(e) <u>Indemnity</u>. In addition to all other indemnity obligations of Seller in this Agreement, Seller shall indemnify, defend and hold Purchaser, each Affiliate of Purchaser, and their respective members, partners, venturers, directors, officers, stockholders, agents, employees, spouses, legal representatives, successors and assigns, harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities, or losses (including, without limitation, reasonable attorneys' fees) resulting from (a) any environmental conditions or contamination existing prior to the Closing Date at, on or emanating from the Property during Seller's ownership of the Property, and (b) any breach by Seller of any of its representations, warranties or covenants contained in this Section 3.3.

(f) <u>Survival</u>. The terms and conditions of this Section 3.3 shall survive the termination of this Agreement.

**3.4   Termination of Agreement**. At any time during the Inspection Period defined below, Purchaser shall be permitted to give Seller written notice terminating this Agreement if Purchaser is dissatisfied with the Property as a result of materially adverse (in Buyer's sole judgment) information discovered or developed in the course of Buyer's investigations and inspections. If Purchaser delivers such a notice, then this Agreement shall terminate and both parties shall be relieved from any further liability hereunder, except for those matters which, by their terms, survive the termination of this Agreement (the "<u>Surviving Obligations</u>"). The period from the Effective Date through the earlier of sixty (60) days or the Closing Date is herein referred to as the "<u>Inspection Period</u>." In the event that Purchaser is unable to obtain full title information, a completed survey or a completed environmental inspection as recommended by its environmental consultants, the Inspection Period may be extended for no more than an additional thirty (30) days at Purchaser's election.

**3.5   Books and Records**. Seller agrees that, during the Inspection Period, Purchaser shall have access at all reasonable times upon reasonable advance notice to Seller's books and records concerning the Property, and shall be permitted to make copies of such books and records at Purchaser's expense.

**4.   TITLE.**

**4.1   Review**. Purchaser shall be entitled to object to any exceptions to title disclosed in the Title Commitment or matters affecting title reflected on the Survey ("<u>Exceptions</u>"), in its sole discretion, by a written notice of objections delivered to Seller on or before the date of expiration of the Inspection Period (the "<u>Objection Date</u>"). If Purchaser fails to deliver to Seller a notice of objections on or before the Objection Date, Purchaser shall be deemed to have waived any objection to the Exceptions and thereafter all Exceptions shall be deemed to be Permitted Exceptions (as hereinafter defined). Seller shall have twenty (20) days from the receipt of

Purchaser's notice of objections either to obtain, as applicable, the issuance of an endorsement to the Title Commitment or a revision to the Survey removing such Exceptions or, if acceptable to Purchaser, to obtain affirmative title insurance protection for such Exceptions satisfactory to Purchaser in Purchaser's sole discretion. If Seller fails either to provide for the removal of such Exceptions or to obtain affirmative title insurance protection for such Exceptions satisfactory to Purchaser in Purchaser's sole discretion within such twenty-day period, then this Agreement, at Purchaser's option, shall be terminated upon written notice to Seller at any time prior to the Closing. Upon delivery of such termination notice by Purchaser, this Agreement shall automatically terminate and the parties shall be released from all further obligations under this Agreement other than the Surviving Obligations. If Purchaser fails to terminate this Agreement in the manner set forth above, all Exceptions referred to in Purchaser's notice of objections shall be deemed to be Permitted Exceptions, and this Agreement shall remain in full force and effect. If Purchaser waives in writing its objection to any matters described in the notice of objections, such matters shall be deemed to be Permitted Exceptions.

     **4.2**    **Title Updates.** If any endorsement or update issued to the Title Commitment or Survey contains Exceptions other than those in the Title Commitment or Survey, Purchaser shall be entitled to object to any such Exceptions by a written notice of objections to Seller on or before the date thirty (30) days following Purchaser's receipt of such endorsement or update. If Purchaser fails to deliver to Seller a notice of objections on or before such date, Purchaser shall be deemed to have waived any objection to matters appearing on such endorsement or update, and thereafter all such Exceptions shall be deemed to be Permitted Exceptions. Seller shall have ten (10) days from the receipt of Purchaser's notice either to obtain, as applicable, the issuance of an endorsement to the Title Commitment or a revision to the Survey removing such Exceptions or, if acceptable to Purchaser, to obtain affirmative title insurance protection for such Exceptions satisfactory to Purchaser in Purchaser's sole discretion. If Seller fails either to provide for the removal of such Exceptions or to obtain affirmative title insurance protection for such Exceptions satisfactory to Purchaser in Purchaser's sole discretion within such ten-day period, then this Agreement, at Purchaser's option, shall be terminated upon written notice to Seller at any time prior to the Closing. Upon delivery of such termination notice, this Agreement shall automatically terminate and the parties shall be released from all further obligations under this Agreement other than the Surviving Obligations. If Purchaser fails to terminate this Agreement in the manner set forth above, all matters set forth in Purchaser's notice of objections relating to such endorsement or update shall be deemed to be Permitted Exceptions, and this Agreement shall remain in full force and effect. If Purchaser waives in writing its objection to any matters described in the notice of objections relating to such endorsement or update, such matters shall be deemed to be Permitted Exceptions.

     **4.3**    **Permitted Exceptions.** The term "Permitted Exceptions" shall mean all Exceptions contained in the Title Commitment or Survey (a) to which Purchaser does not object as herein provided or (b) as to which Purchaser has waived or is deemed to have waived its objection; provided, however, that the term Permitted Exceptions shall not include (i) any taxes or assessments other than general ad valorem real estate taxes for the year of Closing; (ii) any monetary judgments, liens or encumbrances; (iii) any standard printed exceptions which the Title Company agrees to delete; (iv) any matters that Purchaser causes the Title Company to delete from the Title Commitment or the Surveyor to delete from the Survey; or (v) any matters that, prior to Closing, Seller agrees in writing to remove or cure at or before the Closing.

     **4.4**    **Extension of Closing Date.** The Closing Date shall be postponed, if necessary, by the number of days required to accommodate the procedures set forth in this Article 4.

5.    **SELLER'S REPRESENTATIONS AND WARRANTIES.**

Seller represents and warrants to Purchaser as follows:

**5.1    No Possessory Rights.** Except for any rights of possession granted under the Permitted Exceptions or the Contracts, there are no parties in possession of any of the Real Property, and there are no other rights of possession or use which have been granted to any third party or parties.

**5.2    No Third-Party Interests.** Seller has not granted to any party any option, contract or other agreement with respect to the purchase or sale of the Property.

**5.3    Contracts.** Seller is not a party to any contracts that relate to the operation of the Property.

**5.4    Compliance with Law.** To the best of Seller's knowledge, the Property is in compliance in all respects (both as to condition and use) with all applicable statutes, ordinances, codes (including, but not limited to, zoning, building, subdivision, pollution, environmental protection, water disposal, health, fire and safety engineering codes), and rules and regulations of any governmental authority having jurisdiction over the Real Property. Seller has received no notice of any violation of any of the foregoing.

**5.5    Insurance Requirements.** Seller has fully complied with all requirements of each insurance carrier having issued a policy covering any of the Property.

**5.6    No Actions.** There are no actions, suits, proceedings or claims pending or threatened with respect to or in any manner affecting any of the Property or the ability of the Seller to consummate the transaction contemplated by this Agreement.

**5.7    Eminent Domain; Special Assessments.** There are no pending or threatened condemnation or similar proceedings affecting any of the Property and, to the best of Seller's knowledge, no such proceeding is contemplated by any governmental authority. The Property is not situated within any special assessment district other than the districts revealed by the most recent statement for real property taxes for the Property. The Property is not subject to any special assessments except for those relating to such districts. Seller has no knowledge of any proposal under which the Property is to be placed in any other special assessment district.

**5.8    Access.** Seller has no knowledge of any fact or condition that would result or could result in the termination or reduction of the current access to or from the Property to existing thoroughfares or of any reduction in or to a sewer or other utility services currently servicing the Property.

**5.9    Hazardous Materials.** Except as disclosed in writing to Purchaser by Seller, the Property, the use thereof, and any operations now or heretofore conducted at the Property, are, and have been, in compliance with all Environmental Laws (as hereinafter defined); all federal, State and local permits, licenses, registrations and authorizations required for the use of and operations at the Property have been obtained and further, there are currently no violations of such permits, licenses, registrations or authorizations; there are no claimed, alleged or threatened violations of or liabilities under any Environmental Laws with respect to the Property, nor are there any present or planned discussions or negotiations with any agency regarding the release of any Hazardous Substances, nor have there been releases of Hazardous Substances at, on or under the Property which would or could give rise to a cleanup or remediation obligation under any

Environmental Laws; and the Property has not been used for the treatment, storage or disposal of any Hazardous Substances as such treatment, storage or disposal may be regulated under the Resource Conservation and Recovery Act, 42 U.S.C. 6901, *et seq.*, or its State counterparts, as amended and/or reauthorized, and regulations promulgated thereunder. Purchaser acknowledges that it has been advised in writing by Seller that the Property at one time had gasoline pumps and has been used as a site for the service and sale of motor vehicles and may have or have had Hazardous Substance stored or used at the site in connection therewith, and, further, that the Property underwent environmental remediation in the early 1990's.

(a)   "Environmental Laws" means all federal, State and local laws, whether common laws, court or administrative decisions, statutes, rules, regulations, ordinances, court orders and decrees, and administrative orders and all administrative policies and guidelines concerning action levels of a governmental authority (federal, State or local) now or hereafter in effect relating to the environment, public health, occupational safety, industrial hygiene, any Hazardous Substance (including, without limitation, the disposal, generation, manufacture, presence, processing, production, release, storage, transportation, treatment or use thereof), or the environmental conditions on, under or about the Property, as amended and as in effect from time to time (including, without limitation, the following statutes and all regulations thereunder as amended and in effect from time to time: the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601, *et seq.*; the Superfund Amendments and Reauthorization Act of 1986, Title III, 42 U.S.C. §§ 11001, *et seq.*; the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.*; the Safe Drinking Water Act, 42 U.S.C. §§ 300 (f), *et seq.*; the Solid Waste Disposal Act, 42 U.S.C. §§ 6901, *et seq.*; the Hazardous Materials Transportation Act, as amended, 49 U.S.C. §§ 1801, *et seq.*; the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §§ 6901, *et seq.*; the Federal Water Pollution Control Act, as amended, 33 U.S.C. §§ 1251, *et seq.*; the Toxic Substances Control Act of 1976, 15 U.S.C. §§ 2601, *et seq.*; and the Occupational Safety and Health Act, 29 U.S.C. §§ 651, *et seq.*; and any successor statutes and regulations to the foregoing.

(b)   "Hazardous Substances" means (a) all chemicals, materials and substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants," "contaminants" or "pollutants," or words of similar import, under any applicable Environmental Law; and (b) all other chemicals, materials and substances, exposure to which is prohibited, limited or regulated by any governmental authority, including, without limitation, asbestos and asbestos-containing materials in any form, lead-based paint, radioactive materials, polychlorinated biphenyls ("PCB's"), and substances and compounds containing PCB's.

**5.10    Authority.** Seller is an individual, a U.S. citizen and a resident of the State of New York. Seller has the full right and authority to enter into this Agreement and consummate the transactions contemplated by this Agreement.

**5.11    Consents; Restrictions; Binding Obligations.** Except to the extent, if any, provided by Seller's Dealer Sales and Service Agreement with General Motors Corporation, no third party approval or consent is required for Seller to enter into this Agreement or the documents referenced herein or to consummate the transactions contemplated hereby. To the best of Seller's knowledge, the entering into and consummation of the transactions contemplated hereby will not conflict with or, with or without notice or the passage of time or both, constitute

a default under, any contract, lease or other agreement, including, without limitation, the contracts to which Seller is a party or by which Seller may be bound or any law, rule, license, regulation, judgment, order or decree governing or affecting Seller or the Property. This Agreement and all documents referenced herein to be executed by Seller are and shall be valid and legally binding obligations of Seller.

**5.12    Omissions; Indemnity.** All representations and warranties made by Seller in this Agreement, and all information contained in any statement, document or certificate furnished to Purchaser in connection with this transaction, are free from any untrue statement of material fact and do not omit to state any material facts necessary to make the statements contained herein or therein not misleading. The copies of any documents furnished to Purchaser in connection with this transaction are true and complete copies of the documents they purport to be. Each of the representations and warranties of Seller contained in this Agreement are acknowledged by Seller to be material and to be relied upon by Purchaser in proceeding with this transaction, shall be deemed to have been remade by Seller as of the date of Closing and shall survive Closing. Seller shall indemnify, defend and hold Purchaser, each Affiliate of Purchaser, and their respective members, partners, venturers, directors, officers, stockholders, agents, employees, spouses, legal representatives, successors and assigns, harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities, or losses (including, without limitation, reasonable attorneys' fees) resulting from the breach by Seller of any of its representations or warranties.

**5.13    Entire Interest.** Seller owns one hundred percent (100%) of the interests in the Property.

## 6.    PURCHASER'S REPRESENTATIONS AND WARRANTIES.

Purchaser represents and warrants to Seller as follows:

**6.1    Condition of Improvements.** Except with respect to the environmental condition of the Property, Purchaser acknowledges that it is accepting the Property in "as is" physical condition as of the Effective Date.

**6.2    Authority.** Purchaser is a limited liability company duly organized and existing and in good standing under the laws of the State of New York. Purchaser has the full right and authority to enter into this Agreement and consummate the transactions contemplated by this Agreement. All requisite limited liability company action has been taken by Purchaser in connection with the execution of this Agreement and the documents referenced herein and the consummation of the transactions contemplated hereby. Each of the Persons signing this Agreement on behalf of Purchaser is authorized to do so. Purchaser shall furnish to Seller any and all documents to evidence such authority as Seller shall reasonably request.

**6.3    Consents; Restrictions; Binding Obligations.** No third party approval or consent is required to enter into this Agreement or the documents referenced herein or to consummate the transactions contemplated hereby. To the best of Purchaser's knowledge, the entering into and consummation of the transactions contemplated hereby will not conflict with or, with or without notice or the passage of time or both, constitute a default under, any contract, lease or other agreement to which Purchaser is a party or by which Purchaser may be bound or any law, rule, license, regulation, judgment, order or decree governing or affecting Purchaser. This Agreement and all documents required hereby to be executed by Purchaser are and shall be valid and legally binding obligations of Purchaser.

**6.4     Omissions; Indemnity**. All representations and warranties made by Purchaser in this Agreement, and all information contained in any statement, document or certificate furnished to Seller in connection with this transaction, are free from any untrue statement of material fact and do not omit to state any material facts necessary to make the statements contained herein or therein not misleading. The copies of any documents furnished to Seller in connection with this transaction are true and complete copies of the documents they purport to be. Each of the representations and warranties of Purchaser contained in this Agreement are acknowledged by Purchaser to be material and to be relied upon by Seller in proceeding with this transaction, shall be deemed to have been remade by Purchaser as of the date of Closing and shall survive Closing. Purchaser shall indemnify, defend and hold Seller, each Affiliate of Seller, and their respective members, partners, venturers, directors, officers, stockholders, agents, employees, spouses, legal representatives, successors and assigns, harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities, or losses (including, without limitation, reasonable attorneys' fees) resulting from the breach by Purchaser of any of its representations or warranties.

## 7.     SELLER'S UNDERTAKINGS PENDING CLOSING.

**7.1     Operation of the Property**. Until the earlier of the Closing or the termination of this Agreement, Seller shall:

> (a)     Status of Title. Not do anything, or permit anything to be done, that would impair or modify the status of title as shown on the Title Commitment or the Survey.

> (b)     Operation. Operate and maintain the Property in the same manner as immediately prior to the Effective Date, reasonable wear and tear excepted.

> (c)     Contracts. Not enter into any lease, service contract or other contract that, following Closing, will be binding upon Purchaser or the Property without, in each instance, obtaining the prior written approval of Purchaser. The foregoing shall not apply to any service contract having a term of thirty (30) days or less.

> (d)     Transfer. Not cause or permit transfer, conveyance, sale, assignment, pledge, mortgage, or encumbrance of any of the Property.

> (e)     Insurance. Maintain in full force and effect an "all risk" insurance policy covering the Improvements in an amount not less than their full replacement cost.

> (f)     Zoning. Not to submit any application or similar document to any governmental authority in connection with the rezoning or special permitting of the Property without first obtaining Purchaser's written approval thereof (unless said submittal is fully consistent with any other submittal theretofore approved by Purchaser).

> (g)     Fractional Matters. Seller shall terminate all of its fractional ownership/timeshare agreements that relate to the Property and pay any related termination fees no later than the Closing Date.

**7.2     Notification of Purchaser**. Until the earlier of the Closing or the termination of this Agreement, Seller shall notify Purchaser in writing promptly upon learning or receiving notice, whichever first occurs, of:

> (a)     Events. Any event, transaction, or occurrence prior to Closing that

would or could materially adversely affect any of the Property.

(b)    Representations. Any fact or event that would make any of the representations or warranties of Seller contained in this Agreement untrue or misleading in any material respect or that would cause Seller to be in violation of any of its covenants or other undertakings or obligations hereunder.

(c)    Laws. Any violation of any law, ordinance, regulation or law that would or might materially affect any of the Property.

(d)    Zoning. Any proposed change in any zoning or other law affecting the use or development of any of the Property.

(e)    Litigation. Any pending or threatened litigation that affects any of the Property or that could affect the transaction contemplated hereby.

(f)    Bankruptcy. Any pending or threatened proceeding in bankruptcy or insolvency that could affect any of the Property or any Person owning any interest therein.

(g)    Defaults. Any default under any of the Contracts, Permitted Exceptions or other agreements affecting any of the Property, or any act or omission that with notice or the passage of time, or both, would constitute such a default.

(h)    Environmental. Any (a) enforcement, clean-up, removal or other governmental or regulatory action concerning the Property instituted, completed or threatened pursuant to any Environmental Law; (b) any claim made or threatened by any person against Purchaser and/or Seller, or the Property, relating to damage, contribution, cost recovery, compensation, loss or injury resulting from or claimed to result from any Hazardous Substances; (c) reports made to any environmental agency arising out of or in connection with any Hazardous Substance in, on or about the Property or with respect to any Hazardous Substance in, on or about the Property or with respect to any Hazardous Substance removed from the Property including, without limitation, any complaints, notices, warnings, reports or asserted violations in connection therewith; and (d) Hazardous Substance that Seller knows has been, or will come to be, released or located within, under or about the Property.

## 8.    PARTIES' OBLIGATION TO CLOSE.

8.1    **Conditions.** The parties hereto shall not be obligated to close the transaction contemplated hereunder unless each of the following conditions shall be satisfied on or prior to the Closing Date.

(a)    Title Policy. Title Company shall issue (or commit unconditionally to issue) the Title Policy subject only to the Permitted Exceptions.

(b)    Accuracy of Representations. The representations and warranties of Seller and Purchaser in this Agreement shall be true and correct on and as of the Closing Date with the same force and effect as though such representations and warranties had been made on and as of the Closing Date, and Seller and Purchaser shall so certify at Closing.

(c)    Condition of Repair. The Improvements (including, without limitation,

the Building Systems) shall be in the same condition as on the Effective Date.

     (d)     Investigation. Purchaser shall be satisfied with the results of its investigation of the Property, including without limitation Purchaser's Assessment, conducted pursuant to Article 3.

     (e)     Title to Personal Property. Title to the Personal Property shall be free and clear of all liens, encumbrances, security interests, demands or claims of any kind whatsoever by Seller or any third person or anyone else except as approved in writing by Purchaser. The Personal Property shall be in its condition of repair existing on the Effective Date, ordinary wear and tear excepted.

     (f)     Parties' Performance. The parties hereto shall have performed all covenants and obligations and complied with all conditions required by this Agreement to be performed or complied with by each on or before the Closing Date.

     (g)     Employment Terminations. Seller shall terminate any employees connected with the operation of the Property by Seller and shall have terminated any employment contracts related to the operation of the Property by Seller.

     (h)     Government Approvals. The Property or the transaction shall have received all other necessary government approvals.

     (i)     Financing. Purchaser shall have obtained financing that is acceptable to Purchaser in its sole discretion.

     (j)     Manufacturer Approval. Purchaser shall have received any automotive manufacturer approval for the location of the Property that is required under Purchaser's (or Purchaser's affiliate's) contract with the proposed franchise holder and Seller's affiliate, Walters Chevrolet Pontiac, Inc., a New York corporation, shall have received approval from General Motors Corporation for the sale of its business assets to Purchaser's affiliate, Stafford Chevrolet, Inc., a New York corporation, or its assignee.

     (k)     Asset Agreement. The transactions set forth in that certain Amended and Restated Asset Purchase Agreement dated of even date herewith between Seller's affiliate, Walters Chevrolet Pontiac, Inc., a New York corporation, and Purchaser's affiliate, Stafford Chevrolet, Inc., a New York corporation, or its assignee (the "Asset Agreement") shall have been consummated in accordance with its terms and conditions.

     **8.2**     **Failure of Conditions.** If any condition specified herein is not satisfied on or before the Closing, then at either party's option (as the case may be), (a) if the party notifies the other party (which the party shall have no obligation to do) that it would like to attempt to cure or satisfy any such condition that is susceptible of cure, the other party may extend the date for Closing to allow the first party a sufficient time (but not to exceed sixty (60) days) within which to cure or satisfy any such condition, in which case the other party shall immediately commence prosecution of such cure or satisfaction and diligently pursue same to completion, at which time a new Closing shall be scheduled within ten (10) days after completion of such cure or satisfaction, (b) the party may waive such condition either at the time originally established for Closing or at any time thereafter until the end of the cure period provided pursuant to clause (a) above, (c) the party may terminate this Agreement by written notice thereof to the other party, either at the time originally established for Closing or at the end of the cure period provided pursuant to clause (a) above, if by the end of such cure period such condition has not been cured,

in which case the parties shall thereupon be relieved of all further obligations hereunder other than the Surviving Obligations, or (d) the party may pursue any of its remedies under Section 13.

9.    **CLOSING.**

9.1    **Time of Closing.** Unless otherwise agreed in writing between the Parties, the Closing shall take place at a location consistent with the Asset Agreement on the later of thirty (30) days following satisfaction of the conditions precedent set forth in Article 8 of this Agreement or in connection with the Asset Agreement closing (the "Closing Date").

9.2    **Deliveries.** At the Closing the following shall occur:

(a)    Deed. Seller shall deliver to Purchaser a duly executed and acknowledged deed, in substantially the form and content of Exhibit B, containing general warranties of title conveying the Real Property to Purchaser, free and clear of all matters affecting title, except for the Permitted Exceptions.

(b)    Purchase Price. Purchaser shall pay to Seller the Purchase Price as provided in Section 2.2, subject to the adjustments described in Article 10.

(c)    Possession. Possession of the Property shall be delivered to Purchaser.

(d)    Affidavit. Seller shall execute and deliver to Purchaser and Title Company an affidavit that evidences that Seller is exempt from the withholding requirements of Section 1445 of the Internal Revenue Code.

(e)    Bill of Sale. Seller shall execute and deliver to Purchaser a bill of sale and assignment, in substantially the form and content of Exhibit C, conveying and assigning to Purchaser all of the Personal Property and all of Seller's right, title and interest in and to the Warranties, Permits and Intangible Property and shall deliver to Purchaser the originals of any Warranties or Permits in Seller's possession or control.

(f)    Seller's Certificate. Seller shall execute and deliver to Purchaser a certificate confirming Seller's representations and warranties as described in Section 8.1 (b).

(g)    Title Documents. Seller shall execute and deliver to Title Company such agreements or statements concerning parties in possession of the Property or claims for mechanic's liens as may be required by Title Company in order to issue the Title Policy.

(h)    Additional Documents. Seller and Purchaser shall execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, any and all conveyances, assignments and all other instruments and documents as may be reasonably necessary in order to complete the transaction herein provided and to carry out the intent and purposes of this Agreement.

(i)    Plans. Immediately after the Closing, all master keys to the Improvements, the originals of all Plans in Seller's possession or control and all other materials of whatever kind owned by Seller relating to the design, construction, development, ownership, maintenance and operation of the Property shall be delivered to and become the property of Purchaser.

## 10.    PRORATIONS AND CLOSING EXPENSES.

**10.1    Closing Adjustments**. The cash due at Closing pursuant to Section 2.2 (b) shall be subject to adjustment as of the Closing Date in accordance with the following provisions:

(a)    <u>Taxes</u>. Real and personal property taxes on the Property for the year of the Closing shall be prorated to the Closing Date based on the most recent assessed valuations and mill levy available, which proration shall be deemed a final settlement between the parties. At or before Closing, Seller shall pay all real property taxes on the Property for years prior to the year of Closing, and shall pay the full amount (whether or not then due) of all outstanding special assessments against any of the Property.

(b)    <u>Utilities</u>. To the extent possible, the parties shall cause all utility meters to be read on the day preceding the Closing Date. Seller shall be responsible for the payment of all utility charges incurred prior to the Closing Date. Seller shall escrow with Title Company an amount sufficient to pay Seller's final water and sewer bill if Title Company so requires in order to issue the Title Policy. If any utility meters cannot be read on the day prior to the Closing Date, the parties shall pay the bills therefor in accordance with Section 10.3. Seller shall not receive credit for security deposits, if any, posted with utility companies, and Seller may seek return thereof following the Closing.

(c)    <u>Liens and Encumbrances</u>. The amount of any lien, deed of trust or other monetary encumbrance then affecting the Property shall be paid from the funds to which Seller shall otherwise be entitled. If such funds are insufficient to pay all such encumbrances, Seller shall pay the deficiency.

(d)    <u>Closing Costs</u>. Seller shall pay all transfer taxes, the cost of recording any instruments required to discharge any liens or encumbrances against the Property, and Seller's other customary closing costs. Purchaser shall pay the premium for the Title Policy, for recording Seller's deed, premiums for any Title Policies required by lenders, and Purchaser's other customary closing costs.

**10.2    Settlement Statement**. At the Closing, Seller and Purchaser shall execute a Closing settlement statement to reflect the credits, prorations, and adjustments contemplated by or specifically provided for in this Agreement.

**10.3    Post-Closing Adjustments**. Except as expressly herein provided, Seller shall entitled to all income, and shall pay all expenses, relating to the operation of the Property for the period prior to the Closing Date, and Purchaser shall be entitled to all income, and shall pay all expenses, relating to the operation of the Property for the period commencing on the Closing Date. Purchaser and Seller shall undertake, following Closing, to adjust between themselves, as of the Closing Date, any income or expenses of the Property that are not adjusted on the settlement statement. Seller shall pay promptly upon receipt any bills relating to the operation of the Property for periods prior to Closing.

## 11.    CASUALTY DAMAGE.

**11.1    Notice and Estimate**. In the event that the Property is damaged by any casualty prior to Closing, Seller shall promptly give Purchaser written notice of such occurrence, and as soon thereafter as practicable shall provide Purchaser with an estimate made by an architect, engineer or contractor selected by Seller and approved by Purchaser (which approval shall not be unreasonably withheld or delayed) of the cost and amount of time required to repair such damage

so that the Property does not present a hazard or other detrimental condition. If Purchaser does not terminate this Agreement pursuant to Section 11.3, Purchaser shall be given an opportunity to review and approve any construction contract that Seller proposes to enter into to have such damage repaired, and Purchaser shall not unreasonably withhold or delay such approval.

**11.2    Minor Damage.** If the estimated cost of repairing such damage is less than $10,000.00, Seller shall promptly contract for and commence the repairs and complete so much thereof as may be accomplished prior to the Closing Date. If such repairs are not completed on or before the Closing Date, then at Purchaser's option (which shall be exercised by notice to Seller given on or before the Closing Date), either (a) the Closing Date shall be extended by the period of time that Seller's architect, engineer or contractor then estimates it will take to complete the repairs and, upon completion thereof, the parties shall schedule a new Closing Date (not later than ten (10) days following such completion) on which the Closing shall occur in accordance with the terms hereof; or (b) the Closing shall take place as scheduled and, at Closing, Seller shall assign to Purchaser so much of the insurance proceeds resulting from such damage as have not then been expended for repairs, Seller shall credit Purchaser with the amount of any deductible under Seller's insurance policy that has not then been expended for repairs, and Seller shall assign to Purchaser, and Purchaser shall assume, the rights (including, without limitation, all warranties) and obligations under any construction contract pursuant to which such repairs are being completed.

**11.3    Major Damage.** If the estimated cost of such repairs is $10,000.00 or more, Purchaser may elect to terminate this Agreement upon notice to Seller within fifteen (15) days after Purchaser's receipt of the estimate, in which event both parties shall be relieved of any further obligations hereunder except for the Surviving Obligations; provided, however, that if Purchaser does not so elect to terminate this Agreement, this Agreement shall remain in full force and effect and the parties shall proceed in accordance with Section 11.2 above.

## 12.    CONDEMNATION.

**12.1    Notice.** If, prior to Closing, Seller learns of any actual or threatened taking in condemnation or by eminent domain (or a sale in lieu thereof) of any of the Real Property, Seller shall notify Purchaser promptly thereof.

**12.2    Termination.** Other than with respect to an Immaterial Taking (as hereinafter defined), any actual or threatened taking or condemnation for any public or quasi-public purpose or use by any competent authority in appropriate proceedings or by any right of eminent domain of any of the Real Property between the date of this Agreement and the Closing Date shall, at Purchaser's option, cause a termination of this Agreement. The election to terminate provided hereby shall be exercised by written notice to Seller to that effect given within thirty (30) days following Purchaser's receipt of Seller's notice pursuant to Section 12.1 above. Upon delivery of such termination notice, both parties shall be relieved of any further obligations hereunder except for the Surviving Obligations. If Purchaser shall not so elect to terminate this Agreement, or in the event of an Immaterial Taking, Seller shall be relieved of all obligations under this Agreement with respect to the portion of the Real Property so taken or condemned, but Purchaser shall be entitled to receive all proceeds of any such taking or condemnation, and Seller agrees that it shall not make any adjustment or settlement of any such taking or condemnation proceeding without Purchaser's consent and shall take at Closing all action necessary to assign its entire interest in such award to Purchaser. Any taking or condemnation for any public or quasi-public purpose or use that affects less than ten percent (10%) of the square footage of the Land and that does not affect access, reduce parking, reduce the square footage of buildings and other improvements that may be constructed on the Property, or reduce required utilities shall be

deemed an "Immaterial Taking."

## 13.    REMEDIES.

**13.1    Breach by Seller**. Time is of the essence with respect to Seller's obligations hereunder. If Seller fails to comply with any of its obligations hereunder, Purchaser, at Purchaser's option, shall be entitled: to treat this Agreement as terminated, in which case both parties shall be discharged from all duties and performance hereunder other than the Surviving Obligations, and Purchaser may in addition recover such damages and remedies to which it may be entitled at law or in equity.

**13.2    Breach by Purchaser**. Time is of the essence with respect to Purchaser's obligations hereunder. If Purchaser fails to complete the acquisition as herein provided by reason of any default by Purchaser, Seller, at Seller's option, shall be entitled to treat this Agreement as terminated, in which case both parties shall be discharged from all duties and performance hereunder other than the Surviving Obligations, and Seller may in addition recover such damages and remedies to which it may be entitled at law or in equity; provided, however, that Seller shall not have the right of specific performance.

## 14.    GENERAL PROVISIONS.

**14.1    Construction**. As used in this Agreement, the singular shall include the plural and any gender shall include all genders as the context requires and the following words and phrases shall have the following meanings: (a) "including" shall mean "including without limitation"; (b) "provisions" shall mean "provisions, terms, agreements, covenants and/or conditions"; (c) "lien" shall mean "lien, charge, encumbrance, title retention agreement, pledge, security interest, mortgage and/or deed of trust"; (d) "obligation" shall mean "obligation, duty, agreement, liability, covenant and/or condition"; (e) "any of the Property" shall mean "the Property or any part thereof or interest therein"; (f) "any of the Land" shall mean "the Land or any part thereof or interest therein"; (g) "any of the Real Property" shall mean "the Real Property or any part thereof or interest therein"; and (h) "any of the Improvements" shall mean "the Improvements or any part thereof or interest therein."

**14.2    Brokers**. Seller and Purchaser each hereby represent and warrant to the other that their sole contact with the other or with the Property has been made without the assistance of any broker or other third party. Purchaser and Seller shall each indemnify, defend and hold the other party, each Affiliate of such party, and their respective members, partners, venturers, directors, officers, stockholders, agents, employees, spouses, legal representatives, successors and assigns, harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities, or losses (including, without limitation, reasonable attorneys' fees) resulting from the breach by the indemnifying party of the representation and warranty set forth in the preceding sentence.

**14.3    Further Assurances**. Each of the parties hereto undertakes and agrees to execute and deliver such documents, writings and further assurances as may be required to carry out the intent and purposes of this Agreement.

**14.4    Counterparts**. This Agreement may be executed in one or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together will constitute one and the same instrument. Purchaser and Seller acknowledge and agree that this Agreement and the Purchase Agreement represent a collective agreement between the parties and that in order for one to close, the other must also close, as

contemplated in Section 8 above.

**14.5    Entire Agreement**. No change or modification of this Agreement shall be valid unless the same is in writing and signed by the parties hereto. No waiver of any of the provisions of this Agreement shall be valid unless in writing and signed by the party against whom such waiver is sought to be enforced. This Agreement contains the entire agreement between the parties relating to the purchase and sale of the Property. All prior negotiations between the parties are merged in this Agreement, and there are no promises, agreements, conditions, undertakings, warranties or representations, oral or written, express or implied, between the parties other than as herein set forth.

**14.6    Survival**. All of the parties' representations, warranties, covenants and agreements hereunder, to the extent not fully performed or discharged by or through the Closing, shall not be deemed merged into any instrument delivered at Closing, shall survive Closing, and shall remain fully enforceable thereafter.

**14.7    Dates**. If any date set forth in this Agreement for the delivery of any document or the happening of any event (such as, for example, the expiration of the Inspection Period or the Closing Date) should, under the terms hereof, fall on a weekend or holiday, then such date shall be automatically extended to the next succeeding weekday that is not a holiday.

**14.8    Governing Law**. This Agreement shall be construed and enforced in accordance with the laws of the State in which the Land is located.

**14.9    Notices**. All notices, demands or other communications required or permitted to be given hereunder shall be in writing, and any and all such items shall be deemed to have been duly delivered upon personal delivery; or as of the date of acceptance or refusal of delivery after mailing by United States mail, certified, return receipt requested, postage prepaid, addressed as follows; or as of the immediately following business day after deposit with Federal Express or a similar overnight courier service, addressed as follows; or as of the business day of facsimile transmission to the facsimile number set forth below:

If to Seller:

> John A. Walters
> 113 Beechwood Drive
> Groton, New York 13073
> Telecopy:_____

If to Purchaser:

> The Lick Street Militia And Realty Company LLC
> 79 North St.
> Rt. 13 North
> Dryden, NY 13053
> Attn: Martin Johnson
> Telecopy: (607) 844-4422

with a copy to:

> Greenberg Traurig, LLP
> 1200 17th Street, Ste. 2400

Denver, Colorado 80202
Attn: Stephen J. Dietrich
Telecopy: (720) 904-7602

Any address or telecopy number fixed pursuant to the foregoing may be changed by the addressee by notice given pursuant to this Section 14.8.

    **14.10   Headings**. The headings of Articles and Sections of this Agreement are for purposes of convenience and reference and shall not be construed as modifying the Articles or Sections in which they appear.

    **14.11   Assignment**. Purchaser may assign this Agreement without the consent of Seller to an Affiliate of Purchaser. Purchaser may not assign this Agreement without the consent of Seller to a non-Affiliate of Purchaser. Any assignee shall assume all obligations imposed on Purchaser as if the assignee were the original purchaser in this Agreement. Upon any such assignment and assumption, Purchaser shall be released from all liability hereunder.

    **14.12   Successors and Assigns**. Subject to Section 14.10, this Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, personal representatives, successors and assigns.

    **14.13   Attorneys' Fees**. If either party commences an action to enforce the terms of, or resolve a dispute concerning, this Agreement, the prevailing party in such action shall be entitled to recover all costs and expenses incurred by such party in connection therewith, including reasonable attorneys' fees.

    **14.14   Severability**. If any provision of this Agreement is declared void or unenforceable by a final judicial or administrative order, this Agreement shall continue in full force and effect, except that the void or unenforceable provision shall be deemed deleted and replaced with a provision as similar in terms to such void or unenforceable provision as may be possible and be valid and enforceable.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the date(s) set forth below, but as of the Effective Date.

SELLER:

JOHN WALTERS, an individual

Date: September 10, 2008

PURCHASER:

THE LICK STREET MILITIA AND REALTY COMPANY LLC, a New York limited liability company

Date: September 11, 2008

By:
Name: Martin Johnson
Title: President

## EXHIBIT A

## LEGAL DESCRIPTION

ALL THAT TRACT OR PARCEL OF LAND, situate in the Town and Village of Groton, County of Tompkins and State of New York, bounded and described as follows:

BEGINNING at a point, said point being the intersection of the south line of Railroad Street and the west line of Main Street; thence running S 05° 01' 00" E along the west line of Main Street a distance of 347.01 feet to an iron survey marker set in said west line of Main Street; thence running N 88° 33' 00" W a distance of 191.14 feet to an iron survey marker; thence running N 00° 11' 00" W a distance of 82.39 feet to an iron survey marker; thence running N 87° 56' 00" W, passing through 3 iron survey markers on line, a total distance of 142.77 feet to an iron survey marker; thence running N 13° 34' 27" E a distance of 31.00 feet to an iron survey marker; thence running N 00° 06' 00" E a distance of 193.11 feet to a point in said south line of Railroad Street; thence running N 84° 12' 00" E along the south line of Railroad Street a distance of 297.59 feet to a point and the place of beginning and containing 2.085 acres of land, more or less.

TOGETHER with a right of way over 3.5 feet from the north part of the lands adjoining on the south the lands above described (said adjoining premises now or formerly of Samuel C. Rose and Cheryl M. Rose - see Liber 725 of Deeds at page 11) and SUBJECT to a right of way over 3.5 feet from the south part of the above described premises, said rights of way forming a partnership driveway, the terms and obligations of which are set forth more fully in a deed from Edna J. Kennedy to Thomas Franklin Ogden dated August 18, 1917 and recorded in the Tompkins County Clerk's Office in Liber 188 of Deeds at page 515.

TOGETHER with all right, title and interest of the Grantor in and to the land abutting upon the

above described premises on the east and lying between the easterly line thereof and the centerline of Main Street, and abutting upon the above described premises on the north and lying between the northerly line thereof and the centerline of Railroad Street, SUBJECT to the public easement therein for highway purposes.

The above described premises are shown on a map of survey dated August 13, 2008, prepared by G. Bruce Davison, L.S. #49603, a copy of which map is attached hereto and incorporated herein by reference.

TOGETHER with a right of way in common with David G. DuMont, his heirs and assigns, over the eastern 15 feet of the roadway shown on a map of survey dated November 12, 1991, prepared by G. Bruce Davison, L. S. #49603, a copy of which map is recorded in the Tompkins County Clerk's Office in Liber 666 of Deeds at page 155, extending from West South Street on the south to the westerly extension of the north line of the above described premises on the north, as more particularly described in a deed dated November 26, 1991 and recorded in the Tompkins County Clerk's Office in Liber 666 of Deeds at page 153.

The above described premises are conveyed SUBJECT to utility easements and/or rights of way, and TOGETHER with and SUBJECT to any other easements, rights of way or restrictions.

BEING the same premises conveyed to John A. Walters by Executor's Deed from Robert C. Dempsey, as Executor of the Last Will and Testament of J. Karl Dates, deceased, dated December 19, 1994 and recorded in the Tompkins County Clerk's Office in Liber 741 of Deeds at page 198.

Village of Groton
Tax Map #7-2-17
            #7-2-18
            #7-2-22.22
            #7-2-23.2


## EXHIBIT B

## FORM OF DEED

# WARRANTY DEED


**THIS INDENTURE**, made                    , 2008

**BETWEEN**

        **JOHN A. WALTERS**
        113 Beechwood Drive
        Groton, New York 13073,
                                                        party of the first part,

and


        **THE LICK STREET MILITIA AND REALTY COMPANY LLC**,
        a New York limited liability company

79 North Street, Route 13 North
Dryden, New York 13053,

party of the second part,

**WITNESSETH** that the party of the first part, in consideration of Ten Dollars ($10.00), lawful money of the United States, and other good and valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

ALL THAT TRACT OR PARCEL OF LAND, situate in the Town and Village of Groton, County of Tompkins and State of New York, bounded and described as follows:

BEGINNING at a point, said point being the intersection of the south line of Railroad Street and the west line of Main Street; thence running S 05° 01' 00" E along the west line of Main Street a distance of 347.01 feet to an iron survey marker set in said west line of Main Street; thence running N 88° 33' 00" W a distance of 191.14 feet to an iron survey marker; thence running N 00° 11' 00" W a distance of 82.39 feet to an iron survey marker; thence running N 87° 56' 00" W, passing through 3 iron survey markers on line, a total distance of 142.77 feet to an iron survey marker; thence running N 13° 34' 27" E a distance of 31.00 feet to an iron survey marker; thence running N 00° 06' 00" E a distance of 193.11 feet to a point in said south line of Railroad Street; thence running N 84° 12' 00" E along the south line of Railroad Street a distance of 297.59 feet to a point and the place of beginning and containing 2.085 acres of land, more or less.

TOGETHER with a right of way over 3.5 feet from the north part of the lands adjoining on the south the lands above described (said adjoining premises now or formerly of Samuel C. Rose and Cheryl M. Rose - see Liber 725 of Deeds at page 11) and SUBJECT to a right of way over 3.5 feet from the south part of the above described premises, said rights of way forming a partnership driveway, the terms and obligations of which are set forth more fully in a deed from Edna J. Kennedy to Thomas Franklin Ogden dated August 18, 1917 and recorded in the Tompkins County Clerk's Office in Liber 188 of Deeds at page 515.

TOGETHER with all right, title and interest of the Grantor in and to the land abutting upon the above described premises on the east and lying between the easterly line thereof and the centerline of Main Street, and abutting upon the above described premises on the north and lying between the northerly line thereof and the centerline of Railroad Street, SUBJECT to the public easement therein for highway purposes.

The above described premises are shown on a map of survey dated August 13, 2008, prepared by G. Bruce Davison, L.S. #49603, a copy of which map is attached hereto and incorporated herein by reference.

TOGETHER with a right of way in common with David G. DuMont, his heirs and assigns, over the eastern 15 feet of the roadway shown on a map of survey dated November 12, 1991, prepared by G. Bruce Davison, L. S. #49603, a copy of which map is recorded in the Tompkins County Clerk's Office in Liber 666 of Deeds at page 155, extending from West South Street on the south to the westerly extension of the north line of the above described premises on the north, as more particularly described in a deed dated November 26, 1991 and recorded in the Tompkins County Clerk's Office in Liber 666 of Deeds at page 153.

The above described premises are conveyed SUBJECT to utility easements and/or rights of way.

and TOGETHER with and SUBJECT to any other easements, rights of way or restrictions.

BEING the same premises conveyed to John A. Walters by Executor's Deed from Robert C. Dempsey, as Executor of the Last Will and Testament of J. Karl Dates, deceased, dated December 19, 1994 and recorded in the Tompkins County Clerk's Office in Liber 741 of Deeds at page 198.

Village of Groton
Tax Map #7-2-17
          #7-2-18
          #7-2-22.22
          #7-2-23.2

**TOGETHER** with the appurtenances and all the estate and rights of the party of the first part in and to said premises,

**TO HAVE AND TO HOLD** the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

        **AND** the party of the first part covenants as follows:

        **FIRST,** That said party is seized of the said premises in fee simple and has good right to convey the same, and that the party of the second part shall quietly enjoy the said premises;

        **SECOND,** That the party of the first part will forever WARRANT and defend the title to said premises;

        **THIRD,** That said premises are free from encumbrances other than as described on Exhibit A; and

        **FOURTH,** That this deed is subject to the trust fund provisions of Section 13 of the Lien Law.

        - The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

        **IN WITNESS WHEREOF,** the party of the first part has duly executed this deed the day and year first above written.

In Presence of

‾‾‾‾                                            ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
                                                John A. Walters

STATE OF NEW YORK   )
COUNTY OF TOMPKINS)ss.:

        On the        day of              in the year 2008 before me, the undersigned,

personally appeared JOHN A. WALTERS, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity (ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____

_____

Notary Public

**EXHIBIT A**

(Permitted Exceptions)

## EXHIBIT C

## FORM OF BILL OF SALE AND ASSIGNMENT

THIS BILL OF SALE AND ASSIGNMENT, dated as of _____, 2008, is made by JOHN WALTERS, an individual ("Seller") for the benefit of THE LICK STREET MILITIA AND REALTY COMPANY LLC, a New York limited liability company ("Purchaser").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Seller, Seller hereby sells, conveys, transfers, assigns, and sets over unto Purchaser the following (collectively, the "Transferred Property"):

1.      Those items of equipment and tangible personal property owned by Seller and located on, or used in connection with, the real property described in Schedule 1 attached hereto and made a part hereof, together with all improvements located thereon (the "Real Property"), which equipment and personal property is more particularly described on the inventory attached as Schedule 2 hereto and made a part hereof (the "Personal Property"):

2.      Any site plans, surveys, soil and substratum studies, architectural drawings, plans and specifications, engineering, electrical and mechanical plans and studies, floor plans, landscape plans, appraisals, feasibility studies, and other plans and studies, if any and in Seller's possession or control that relate to the Real Property or the Personal Property, to the extent that they are assignable, without representation or warranty of any kind whatsoever as to the assignability of such items or any matter contained therein:

3.      Any unexpired warranties, guaranties and bonds, including, without limitation, contractors' and manufacturers' warranties or guaranties, belonging to Assignor in connection with the Real Property or the Personal Property, but only to the extent such warranties, guaranties and bonds can be lawfully assigned; and

4.      Any governmental permits, licenses, certificates and authorizations, including, without limitation, certificates of occupancy, held by Assignor and related to the construction, use or operation of the Real Property, or to any of the Personal Property, but only

to the extent such permits, licenses, certificates and authorizations can be lawfully assigned.

Seller warrants and represents that the Transferred Property is free and clear of all liens and encumbrances whatsoever and shall defend Purchaser, and its successors and assigns, from and against any and all adverse claims against the Transferred Property.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

Executed as of the date set forth above.

JOHN WALTERS, an individual

———

## SCHEDULE 1

## REAL PROPERTY

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

THIS AMENDED AND RESTATED ASSET PURCHASE AGREEMENT (this "Agreement") is made on September __12__, 2008, between STAFFORD CHEVROLET, INC., a New York corporation ("Buyer"), and WALTERS CHEVROLET PONTIAC, INC., a New York corporation ("Seller"). In this Agreement, Buyer and Seller are sometimes referred to individually as a "Party" and together as "Parties."

## RECITALS

A. Seller owns and operates the Chevrolet/Pontiac car and truck dealership (the "Dealership") located at 308 Main Street, Groton, New York 13073 (the "Property").

B. Seller and Buyer are parties to that certain Amended and Restated Purchase and Sale Agreement of even date herewith for the purchase of the Property (the "Purchase and Sale Agreement").

C. Buyer intends to buy, and Seller intends to sell, all of Seller's assets described below upon the terms and conditions of this Agreement.

D. Buyer and Seller are parties to that certain Asset Purchase Agreement executed on or about March 24, 2008 (the "Original Asset Agreement").

E. Buyer and Seller have hereby agreed to amend and restate the Original Asset Agreement in its entirety, and further agree that the Original Asset Agreement shall terminate and have no further force or effect upon the execution of this Agreement.

Therefore, the Parties agree as follows:

1. **PURCHASED ASSETS; EXCLUDED ASSETS; ASSUMPTION OF LIABILITIES.**

   1.1 **Purchased Assets.** Subject to the terms and conditions of this Agreement, on the Closing Date (as defined in Section 3.1), Seller will sell to Buyer, and Buyer will purchase from Seller, all of the assets listed on Schedule 1.1 (collectively, the "Purchased Assets"), free and clear of all security interests, liens, restrictions, claims, encumbrances or charges of any kind ("Encumbrances").

   1.2 **Excluded Assets.** The Purchased Assets do not include those assets described on Schedule 1.2 (the "Excluded Assets").

   1.3 **Liabilities Not Assumed.** Except for those ongoing obligations commencing on and after the Closing Date described in Schedule 1.3 (the "Assumed Contracts") or as otherwise provided for herein, Buyer will not assume, and Seller will pay and discharge, any and all debts, obligations or liabilities of Seller, contingent or otherwise, presently existing or arising after the date hereof (collectively, "Seller's Obligations").

2.    **PURCHASE PRICE; PAYMENT; PRORATIONS; ALLOCATIONS.**

   **2.1    Purchase Price; Payment.** The consideration to be paid by Buyer to Seller for the Purchased Assets will be (i) Five Hundred Thousand Dollars ($500,000), (ii) amounts paid for new, used, and demonstrator vehicles as provided in Schedule 1.1, and (iii) Buyer's assumption of the Assumed Contracts (the "Purchase Price"). The Purchase Price shall be paid as follows:

      (a)    refundable deposits payable to Seller in monthly installments (each, a "Deposit Installment") of Eight Thousand Eight Hundred Sixty-Five and No/100 ($8,865.00) commencing on the Effective Date, (the aggregate of such amounts delivered to Seller is referred to herein as the "Deposit");

      (b)    at the Closing, a promissory note made by Buyer in favor of Seller in the amount of Two Hundred Thousand and No/100 Dollars ($200,000), less the Deposit, bearing interest on the unpaid balance at the rate of six percent (6%) per annum from the Effective Date, payable in twenty-four (24) monthly installments, including the Deposit Installments, with the unpaid balance of the Note becoming due and payable with the final such installment (the "Note"), secured by a mortgage upon the real property known as 308 Main Street, Groton, New York, being purchased by Buyer, said mortgage to have a 3rd priority behind the First National Bank of Groton ($275,000) and the Village of Groton ($100,000), so long as acceptable to such lenders; and

      (c)    at the Closing, the balance of the Purchase Price in cash, less any Working Capital Contribution and any adjustments and prorations contemplated herein, by certified check, cashier's check, wire transfer, or other immediately available funds.

   On the Closing Date, the Parties shall compute the amount of each remaining installment due on the Note (as adjusted by the Deposit Installments and the timing of the Closing Date) so that each installment over the remaining period of the Note is equal.

   **2.2    Prorations.** All sales taxes, personal property taxes and assessments which are past due or have become due upon any of the Purchased Assets on or before the Closing Date will be paid by Seller, together with any penalty or interest thereon. Current personal property taxes will be prorated and adjusted between Buyer and Seller as of the Closing Date on a due date basis. If current tax bills are unavailable on the Closing Date, the prior year's tax bills will be used for proration purposes and taxes will be re-prorated between Buyer and Seller when the current year's tax bills are received. Any amounts owed by either Party with respect to such re-proration will be paid to the other Party within thirty (30) days of the determination of such re-proration. All transfer, sales or similar tax due as a result of this transaction will be paid by Buyer at the Closing.

   **2.3    Allocations.** The consideration for the Purchased Assets will be allocated for the purposes of Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code"), in accordance with Schedule 2.3. This allocation will be conclusive and binding for all purposes, and each Party will file all income or other tax returns in a manner consistent with such allocation.

3.    **CLOSING.**

    **3.1    Closing Date.** Subject to the terms and conditions of this Agreement, the closing of the transactions (the "Closing") contemplated by this Agreement and any other agreement or instrument executed by the Parties pursuant to this Agreement, including, without limitation, the Purchase and Sale Agreement (collectively, the "Related Agreements") will occur at a mutually agreeable location at 10:00 a.m. local time on the date 2 weeks after receipt of General Motors Corporation's ("GM") approval (the "Closing Date"), or at such other place, date and time as may be mutually established by the Parties.

    **3.2    Actions to be Taken at the Closing.** At the Closing, the Parties will take the following actions and deliver the following documents:

        (a)    Seller will execute and deliver to Buyer a Bill of Sale, Assignment and Assumption Agreement (the "Bill of Sale") transferring to Buyer good and marketable title in and to the Purchased Assets, free and clear of all Encumbrances in substantially the form attached hereto as Exhibit A.

        (b)    Buyer will pay the Purchase Price and Note to Seller.

        (c)    The Parties will take such other actions and will execute and deliver such other instruments, documents and certificates as are required by the terms of this Agreement and the Related Agreements or as may be reasonably requested by any Party in connection with the consummation of the transactions contemplated herein.

4.    **REPRESENTATIONS; WARRANTIES.**

    **4.1    Seller Representations.** Seller represents and warrants to Buyer as follows:

        (a)    Seller is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation. Seller has full power and lawful authority to (i) enter into this Agreement and all Related Agreements, and (ii) consummate the transactions contemplated by this Agreement and the Related Agreements.

        (b)    Seller is duly authorized to own, lease or otherwise hold the Purchased Assets conveyed under this Agreement. The execution delivery and performance of this Agreement by Seller and the consummation by Seller of the transactions contemplated herein have been authorized by all requisite corporate actions on the part of Seller.

        (c)    This Agreement constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to the effect of the application of equitable principles (where applied in a proceeding at law or in equity) and the effect of bankruptcy, insolvency, reorganization, arrangement, moratorium, fraudulent conveyance or other similar laws affecting creditors generally. Seller's execution, delivery and performance of this Agreement does not and will not (i) constitute a breach or violation of Seller's incorporation documents or bylaws, (ii) constitute a breach or violation of any material agreement, indenture, deed of trust, mortgage, loan agreement or

any material instrument, by Seller, to which Seller is a party or by which Seller, the Property or any of the Purchased Assets is bound or affected, (iii) constitute a violation of any order, judgment or decree by which Seller is bound, or to Seller's Knowledge (as hereinafter defined), by which any of the Purchased Assets or the Property is bound or affected, (iv) result in the creation of any lien or charge on the Purchased Assets, or (v) except for the consent of those parties to the Assumed Contracts and the consent or approval (if any) required from General Motors Corporation pursuant to Seller's Dealer Sales and Service Agreement, require any authorization or consent of any third party.

(d)     Seller has, and at the Closing Buyer will receive, good and marketable title to the Purchased Assets, free and clear of all Encumbrances.

(e)     Schedule 1.3 is a true and correct listing of any and all Assumed Contracts. To Seller's Knowledge, each Assumed Contract is valid and enforceable in accordance with its terms. Neither Seller nor, to Seller's knowledge, any other party thereto is in breach of or in default under any Assumed Contract nor has any notice or claim with respect to any breach or default thereunder been given by Seller or received by Seller.

(f)     To Seller's Knowledge, neither Seller nor the Purchased Assets are subject to any pending or threatened litigation, proceeding or administrative investigation, and there are no outstanding orders, decrees or stipulations issued by any governmental authority in any proceeding to which Seller is or was a party which have not been complied with in full or which continue to impose any obligations on Seller. To Seller's Knowledge, Seller has not been cited, fined or otherwise notified of any past or present failure to comply with any Legal Requirements (as hereinafter defined). "Legal Requirements" shall mean all laws, statutes, codes, acts, ordinances, order, judgments, decrees, injunctions, rules, regulations, permits, licenses, authorizations, variances, consents, approvals, directions and requirements of, and agreements with, all governmental authorities having jurisdiction over the Seller.

(g)     To Seller's Knowledge, except as set forth on Schedule 4.1(g), and except for notices which are no longer applicable, GM has not: (a) notified Seller of any deficiency in dealership operation, including, but not limited to, the following areas: (i) brand imaging, or (ii) facility conditions; or (b) otherwise advised Seller of a present or future need for facility improvement or upgrades in connection with Seller's business.

(h)     "Employee Benefit Plan" means an "employee benefit plan," within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") (including, but not limited to Seller's 401 (k) plan), and which is currently maintained by Seller. Each such Employee Benefit Plan (and each related trust, insurance contract, or fund) has been maintained in material compliance with all applicable laws, including, but not limited to, ERISA, and the Code. To Seller's Knowledge, to the extent any such Employee Benefit Plan is not in material compliance with all applicable laws, such noncompliance is not material with respect to the transaction contemplated hereunder.

(i)     To Seller's Knowledge, Seller has (i) filed, when due, with all

appropriate governmental agencies, all tax returns, estimates, reports and statements required to be filed by it, all of which are true and correct in all material respects, and (ii) paid, when due and payable, all requisite income taxes, sales, use, property and transfer taxes, levies, duties, licenses and registration fees and charges of any nature whatsoever and workmens' compensation and unemployment taxes, including interest and penalties thereon. To Seller's Knowledge, Seller has withheld all tax required to be withheld under applicable tax laws and regulations.

**4.2    Buyer Representations.** Buyer represents and warrants to Seller as follows:

(a)    Buyer is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation and has or will have the corporate power and authority to enter into this Agreement and the Related Agreements and to consummate the transactions contemplated by this Agreement and the Related Agreements.

(b)    Prior to the Closing, this Agreement and each Related Agreement will have been duly authorized by all necessary corporate action on the part of Buyer. This Agreement and the Related Agreements each constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

(c)    As of the Closing Date, Buyer and its representatives will have conducted such investigation of the Purchased Assets as deemed necessary by Buyer. The sale of the Purchased Assets by Seller to Buyer is being made "AS IS, WHERE IS" without any warranty or representation of any kind (other than as set forth in Sections 4.1 and 4.3). Without limiting the generality of the foregoing, there is no express or implied warranty of merchantability or of fitness for a particular purpose made by Seller regarding the Purchased Assets. Nothing in this Article 4 negates the possibility that certain of the Purchased Assets may be subject to warranties extended by the applicable manufacturers of the Purchased Assets. Any such warranties, to the extent they are assignable, will be assigned by Seller to Buyer at Closing without recourse. Any transfer or similar fees charged in connection with such assignment of warranties will be the sole responsibility and at the sole expense of Buyer.

**4.3    Mutual Representation and Warranty.** Each Party represents and warrants to the other Party that neither it nor anyone acting on its behalf has employed any financial advisor, broker or finder or incurred any liability for any financial advisory, brokerage or finder's fee or commission in connection with this Agreement, the Related Agreements or the transactions contemplated by such Agreements.

**4.4    Survival.** The representations and warranties of the Parties contained in this Article 4 will survive the Closing of this Agreement.

## 5.    CERTAIN COVENANTS.

**5.1    Sales tax.** To the extent such letters or notices are available from the State of New York, Buyer will obtain, and deliver to Seller prior to Closing, sales tax clearance letters or notifications from the taxing authority of the State of New York responsible for the collection of sales and use taxes indicating that all such taxes have been reported, collected, and remitted in accordance with the applicable tax laws of the

State of New York. Buyer and Seller shall work together as reasonably necessary to allow Buyer to comply with the provisions of this Section 5.1.

**5.2**      **Access to Properties and Records; Inspection.** After the Closing, Buyer and its counsel, accountants and other representatives will be given full access during normal business hours to all of the financial and operating data, books, and records of Seller relating to the Purchased Assets. Prior to the Closing, Buyer shall be given access to, or copies of any contract Seller desires to be an Assumed Contract.

**5.3**      **Indemnification.**

(a)      Seller will indemnify, defend and hold Buyer, its Affiliates (as defined below) and their respective members, partners, venturers, stockholders, directors, officers, employees, spouses, legal representatives, agents, successors and assigns (the "Buyer Indemnified Parties") harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities, losses or expenses (including, without limitation, reasonable attorneys' fees and expenses) (collectively, "Losses") incurred by the Buyer Indemnified Parties arising from or directly relating to:

(i)      any breach by Seller of any term or provision of this Agreement or any Related Agreement, including, but not limited to, any representation and warranty set forth in Section 4.1 of this Agreement; or

(ii)      Seller's operation of the Dealership prior to the Closing Date.

(b)      Buyer will indemnify, defend and hold Seller, its Affiliates and their respective members, partners, venturers, stockholders, directors, officers, employees, spouses, legal representatives, agents, successors and assigns (the "Seller Indemnified Parties") harmless from and against any and all Losses incurred by the Seller Indemnified Parties arising from or directly or indirectly relating to:

(i)      any breach by Buyer of any term or provision of this Agreement or any Related Agreement, or

(ii)      Buyer's operation of the Dealership on and after the Closing Date.

"Affiliate" means, with respect to any Person (as hereinafter defined), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective members, partners, venturers, directors, officers, stockholders, agents, employees and spouses. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise. "Person" means an individual, partnership, limited liability company, association, corporation, or other entity.

**5.4**      **Employees.**

(a)  For purposes of this Section 5.4, the term "Employee" shall mean an

individual who, immediately prior to the Closing Date, is included on Seller's payroll records as a common law employee, including but not limited to any such individual who is on a leave of absence or otherwise not actively working on the Closing Date. On the Closing Date, Seller shall terminate all of its Employees. At the time of termination, Seller will pay to such Employees all vacation, sick leave and other similar benefits, which are accrued and unpaid, to which they are entitled with respect to their employment up to the Closing, including, all salary and wages due on the date of termination, bonuses and incentives, and all other employee benefits to which said employees are entitled at the time of their termination. Seller shall provide each terminated Employee with a notice in accordance with applicable laws.

(b) From the date of this Agreement through the Closing Date, Seller will not amend the pay plans in place at the Dealership as of the date of this Agreement relating to any of its employees, except only for (i) wage increases required by applicable law; (ii) pay plan amendments to which Seller committed prior to the date of this Agreement and which are disclosed to Buyer; or (iii) short term Seller-sponsored incentive plans.

(c) Subject to the last sentence of this Section 5.4(c), Buyer may, in its sole discretion, offer employment to certain employees of Seller and shall provide Seller a list of those employees Buyer wishes to employ no later than five (5) days prior to Closing. All such persons so employed by Buyer will be considered as "new hires" by Buyer. Employees who accept employment with Buyer shall be referred to as "Retained Employees." If, as of the Closing Date, an Employee is on a leave of absence granted by Seller, Buyer's offer of employment shall allow the Employee to remain on a leave of absence on substantially the same terms as applied prior to the Closing Date. All Employee records shall be retained by Seller subsequent to the Closing. Buyer shall be entitled, upon reasonable request to Seller, to receive copies of the records of Retained Employees. Notwithstanding anything set forth above, Buyer will rehire the applicable number of employees at the Dealership to meet the exclusion requirements for compliance with the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. Sections 2101-2109.

(d) Buyer will not assume or be deemed to have assumed any past or future obligations of Seller to Retained Employees, or any employees of Seller who are not hired by Buyer. Nothing in Section 5.8, expressed or implied, shall limit Buyer's right to terminate the employment of any Employee after the Closing Date or Seller's right to terminate the employment before the Closing Date of any Employee as either may deem reasonable in the normal operation of their business.

**5.5    Health Care Continuation Coverage.** Seller shall remain responsible for all liabilities and obligations in connection with all requirements under COBRA (as hereinafter defined) with respect to, and Seller's obligation to make COBRA Coverage (as hereinafter defined) available to, all of (i) the Dealership's employees, (ii) eligible dependents of such Dealership employees, who on the Closing Date are qualified beneficiaries, as such term is defined by COBRA (26 U.S.C. §4980B(g)(1) and 29 U.S.C. §1167(3)) ("Qualified Beneficiaries"), as a result of the transaction contemplated by this Agreement, and (iii) the Dealership's employees, former employees and all such Qualified Beneficiaries who experienced "qualifying events" as defined by COBRA

prior to the Closing Date. Buyer shall be responsible for all obligations under COBRA with respect to any Retained Employee who experiences a "qualifying event" after the Closing Date. For those employees of Seller that Buyer offers employment pursuant to Section 5.4, Buyer shall waive any waiting period for medical coverage. For purposes of this Section, the term "COBRA Coverage" means the health insurance coverage required to be offered pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), 26 U.S.C. §§4980B et seq., and 29 U.S.C. §§1162 –1167. Buyer shall pay the premiums associated with John and Kim Walters' COBRA Coverage for the two (2) months following the Closing Date.

**5.6    Notices.** Buyer and Seller will promptly notify the other in writing if it receives any notice, or otherwise becomes aware, of any action or proceeding instituted or threatening before any court or governmental agents by any third party to restrain or prohibit, or obtain substantial damages in respect of this Agreement or any Related Agreement or the consummation of the transactions contemplated by such Agreements.

**5.7    Non-Competition.** Seller and John Walters ("Walters") hereby agree and covenant from and after the Closing Date:

(a) for a period of one (1) year (the "Non-Compete Period"), not to, directly or indirectly, engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, associated with, or in any manner connected with, lend their names or any similar names to, lend their credit to or render services or advice to, any new or used car dealership located within twenty-five (25) miles of the Property (the "Restricted Region") whose products or activities compete in whole or in part with the products or activities of the Dealership in the Restricted Region; provided, however, that Walters may purchase or otherwise acquire up to (but not more than) one percent (1%) of any class of securities of any enterprise (but without otherwise participating in the activities of such enterprise) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Securities Exchange Act of 1934, as amended;

(b) whether for Seller's and/or Walters' own account or for the account of any other person, at any time during the Non-Compete Period, solicit business of the same or similar type being carried on by the Dealership or any of its Affiliates within the Restricted Region from any person known by Seller and/or Walters to be a past or present customer of the Dealership during the three (3) year period immediately prior to Closing, whether or not Walters had personal contact with such person during and by reason of their employment by or consultation to Seller or the Dealership and regardless of the geographic location of such customer;

(c) whether for Seller's and/or Walters' own account or the account of any other person at any time during the Non-Compete Period, interfere with Buyer's relationship with any person, including any person who during the three (3) year period immediately prior to Closing, was an employee, contractor, customer, or supplier of the Dealership; provided however, that for purposes of this paragraph the term "interfere" does not include the act of selling a vehicle to a Customer; if the provisions of Section 5.7(b) above are complied with; or

(d) at any time during or after the Non-Compete Period, disparage the Dealership or Buyer or any of Buyer's shareholders, directors, officers, employees, or agents.

**5.8     Working Capital Contributions.**  To the extent Buyer provides additional working capital to the Seller between the Effective Date and the Closing Date (the total amount of which is referred to herein as the "Working Capital Contribution"), such additional working capital shall be properly accounted for by Seller and deducted from the cash portion of the Purchase Price payable at Closing.  Any Working Capital Contribution shall be promptly returned to Buyer in the event of termination of this Agreement pursuant to Article 7.

**5.9     Further Assurances.**  Each Party will execute and deliver any further instruments or documents, and take all further action, reasonably requested by the other Party to carry out the transactions contemplated by this Agreement and the Related Agreements.

**5.10     Survival.**  The covenants of the Parties contained in this Article 5 will survive the Closing of this Agreement, except that each Party's covenant to indemnify contained in Section 5.3 shall survive the Closing for a period of three (3) years following the Closing Date.

6.     **CONDITIONS PRECEDENT.**

**6.1     Conditions to Buyer's Obligations.**  Buyer's obligations under this Agreement are subject to the satisfaction, on the Closing Date, of each of the following conditions, any of which may be waived in writing by Buyer:

(a)     Seller will have fully complied with and performed all its obligations under this Agreement and the Related Agreements.

(b)     All representations of Seller in this Agreement or the Related Agreements will be true and complete as of the date when given and on the Closing Date.

(c)     The transactions under the Purchase and Sale Agreement shall have been consummated in accordance with its terms.

(d)     Buyer shall have obtained financing that is acceptable to Buyer in its sole discretion.

(e)     Buyer shall have received all required regulatory agency approvals under terms and conditions acceptable to Buyer and legally required for Buyer to operate the Seller's Business following Closing, including, but not limited to, approvals with respect to certain officers of Buyer and any representative(s) thereof to serve as a motor vehicle dealer, used motor vehicle dealer, motor vehicle lessor or motor vehicle salesperson under New York law.

(f)     All consents, approvals and waivers (including the approval by GM) required to consummate the transactions contemplated by this Agreement and the Related Agreements will have been obtained by Buyer or Seller, whichever party is responsible for obtaining such consents or approval.

**6.2    Condition to Seller's Obligations.**  Seller's obligations under this Agreement are subject to the satisfaction, on the Closing Date, of each of the following conditions, any of which may be waived in writing by Seller:

(a)    Buyer will have fully complied with and performed all its obligations under this Agreement and the Related Agreements.

(b)    All representations of Buyer in this Agreement or the Related Agreements will be true and complete as of the date when given and on the Closing Date.

(c)    The transactions under the Purchase and Sale Agreement shall have been consummated in accordance with its terms.

(d)    All consents, approvals and waivers (including the approval by GM) required to consummate the transactions contemplated by this Agreement and the Related Agreements will have been obtained in writing by Buyer.

**7.    TERMINATION OF AGREEMENT; EFFECT OF TERMINATION.**

**7.1    Termination.**  This Agreement may be terminated at any time before the Closing as follows:

(a)    By Buyer, by notice to Seller, if any of Buyer's conditions precedent to Closing has not been satisfied as of the Closing Date or has become incapable of being satisfied by the Closing Date.

(b)    By Seller, by notice to Buyer, if any of Seller's conditions precedent to Closing has not been satisfied as of the Closing Date or has become incapable of being satisfied by the Closing Date.

(c)    By Buyer or Seller, by notice to the other, if the Closing does not take place before December 10, 2008; provided that a Party will not be entitled to terminate this Agreement pursuant to this Section 7.1 if such Party's willful breach of this Agreement or any Related Agreement or intentional misrepresentation under this Agreement or any Related Agreement has prevented the Closing from taking place before such date.

**7.2    Effect of Termination.**  Upon a termination in accordance with Section 7.1, this Agreement will have no further force or effect and the Deposit shall be promptly returned to Buyer.  The Parties' rights under this Article 7 are cumulative and are in addition to the other rights and remedies available to them under any other agreement or applicable law.

**8.    RISK OF LOSS.**

If, prior to the Closing Date, the Purchased Assets or any portion thereof, are destroyed by fire or other casualty, then Buyer will have the option, to be exercised within ten (10) days following the date of such destruction or taking, but in any event prior to the Closing Date, to either (a) deduct from the Purchase Price the value of those Purchased Assets which were so destroyed or taken as is mutually agreed to by Buyer and Seller or, in the event of disagreement, in the amount determined by an arbitrator or appraiser mutually agreeable to Buyer and Seller, and to otherwise consummate this

transaction, or (b) consummate this transaction without any deduction, in which event Buyer will be entitled to receive all casualty insurance proceeds payable to Seller due to such destruction, if any, and Seller will assign such proceeds (or the right to receive such proceeds) to Buyer.

## 9.    MISCELLANEOUS.

**9.1    No Waiver.** No waiver of any breach of any provision of this Agreement will be deemed a waiver of any other breach of this Agreement. No extension of time for performance of any act will be deemed an extension of the time for performance of any other act.

**9.2    Severability.** The provisions of this Agreement will be deemed severable, and if any provision of this Agreement is held illegal, void or invalid under applicable law, such provision may be changed to the extent reasonably necessary to make the provision legal, valid and binding.

**9.3    Entire Agreement; Amendment.** This Agreement, the Related Agreements and the schedules, exhibits and attachments to such agreements contain the entire agreement of the Parties with respect to the purchase and sale of the Purchased Assets and the other transactions contemplated by such agreements. This Agreement may be amended only by an instrument in writing signed by Buyer and Seller. The headings in this Agreement are solely for convenience of reference and will not affect the interpretation of any provision of this Agreement. The Schedules to this Agreement are incorporated as a part of this Agreement.

**9.4    Applicable Law.** This Agreement will be construed in accordance with and governed by the laws of the State of New York.

**9.5    Time is of the Essence.** The parties to this Agreement acknowledge and agree that time is of the essence with respect to the consummation of the transactions contemplated by this Agreement and each Related Agreement.

**9.6    Binding Agreement, Assignment.** The terms and provisions of this Agreement will bind Seller and Buyer and their respective permitted successors and assigns. Neither this Agreement nor any Related Agreement may be assigned by Seller without the prior written consent of Buyer. Buyer may assign this Agreement and any Related Agreement without the consent of Seller to an Affiliate of Buyer. Buyer may not assign this Agreement or any Related Agreement to any non-Affiliate of Buyer without the prior written consent of Seller.

**9.7    Expenses.** Each Party will pay all of its expenses, including attorneys' and accountants' fees in connection with the negotiation of this Agreement or any Related Agreement, the performance of its obligations hereunder or thereunder, and the consummation of the transactions contemplated by this Agreement or any Related Agreement; provided that in any proceeding or other attempt to enforce, construe or to determine the validity of this Agreement or any Related Agreement, the nonprevailing Party will pay the reasonable expenses of the prevailing Party, including reasonable attorneys' fees and costs.

**9.8    Notices.** All notices, demands or other communications required or permitted to be given hereunder will be in writing, and any and all such items will be

deemed to have been duly delivered upon personal delivery; or as of the third business day after mailing by United States mail, certified, return receipt requested, postage prepaid, addressed as follows; or as of the immediately following business day after deposit with Federal Express or a similar overnight courier service, addressed as follows; or as of the business day if by facsimile to the facsimile number set forth below:

Notices to Buyer:

Stafford Chevrolet, Inc.
79 North St.
Rt. 13 North
Dryden, NY 13053
Attention: Martin Johnson
Phone: (800) 722-2287
Fax: (607) 844-4422

With copies to:

Greenberg Traurig, LLP
The Tabor Center
1200 Seventeenth Street, Suite 2400
Denver, Colorado 20202
Attention: Stephen J. Dietrich, Esq.
Phone: (303) 572-6502
Fax: (720) 904-7602

Notices to Seller:

Walters Chevrolet Pontiac, Inc.
113 Beechwood Drive
Groton, NY 13073
Attention: John Walters
Phone: (607) 898-4259
Fax: _____

**9.9    Counterparts.** This Agreement may be executed in one or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together will constitute one and the same instrument. Buyer and Seller acknowledge and agree that this Agreement and the Purchase Agreement represent a collective agreement between the parties and that in order for one to close, the other must also close, as contemplated in Section 6 above.

**9.10    Non-Solicitation; Exclusivity.** During the term of this Agreement and the Purchase and Sale Agreement, the principals of Seller will not directly or indirectly solicit or encourage any inquiries or proposals from (or enter into any agreements with) any person other than Buyer for the purchase of the Seller, the Purchased Assets or the Property, or enter into discussions with, or furnish any non-public information concerning Seller, its assets (including the Property) or business, to any such other person in connection with such proposal. Seller shall promptly notify Buyer of any such proposal or inquiry received by Seller or any of its representatives.

*[Signature Page Follows]*

The Parties have executed and delivered this Agreement on the date set forth in the introductory paragraph of this Agreement.

SELLER

WALTERS CHEVROLET PONTIAC, INC.,
a New York corporation                                    BUYER

By:                                                STAFFORD CHEVROLET, INC., a New
                                                   York corporation

Name: John Walters                                 By:
Title: President

                                                   Name: Martin Johnson
                                                   Title: President

The undersigned executes only as to Section 5.7 above as of this 10th day of September, 2008.

John Walters, Individually

**EXHIBIT A**

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is entered into as of the ____ day of _____, 2008, by WALTERS CHEVROLET PONTIAC, INC., a New York corporation ("Assignor"), to and for the benefit of STAFFORD CHEVROLET, INC., a New York corporation ("Assignee").

## RECITALS

A.    Assignor owns and operates a Chevrolet/Pontiac motor vehicle dealership (the "Dealership") located at 308 Main Street, Groton, New York 13073.

B.    Assignor and Assignee have entered into that certain Amended and Restated Asset Purchase Agreement dated, September ____, 2008 (the "Purchase Agreement"), pursuant to which Assignor is to sell and Assignee is to purchase certain of Assignor's assets used by Assignor in connection with or related to the Dealership, as more particularly described on Schedule 1 attached hereto (the "Purchased Assets"). In connection with the conveyance of the Purchased Assets, Assignor desires to assign all of Assignor's right, title and interest in and to those contracts listed on Schedule 2 attached hereto and made a part hereof (the "Assumed Contracts"). Capitalized terms not otherwise defined in this Agreement have the meanings given them in the Purchase Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Assignment.  Subject t...

assigns, free and clear of all security interests, liens, restrictions, claims, encumbrances or charges of any kind (other than any assumed liabilities), all of Assignor's right, title and interest in and to the Purchased Assets.

TO HAVE AND TO HOLD all such Purchased Assets hereby sold, conveyed, assigned, transferred and delivered unto Assignee, its successors and assigns, for its and their own use, benefit and behalf forever.

This Agreement is executed and delivered in connection with the Purchase Agreement and notwithstanding anything set forth herein, nothing herein shall in any way vary the covenants, representations and warranties of Assignor and Assignee as set forth in the Purchase Agreement.

2.    Assumption.  Assignee hereby expressly assumes and agrees to perform all of the obligations of Assignor under the Assumed Contracts to be performed from and after the date hereof.  Except as expressly assumed pursuant to this Section 2, Assignee assumes no obligations, liabilities or debts of Assignor, contingent or otherwise, presently existing or arising after the date hereof.

3.    Obligations.  Other than as specifically stated above or in the Purchase Agreement, Assignee assumes no debt, liability or obligation of Assignor, and it is expressly understood and agreed that all debts, liabilities and obligations not assumed hereby by Assignee shall remain the sole obligation of Assignor, its successors and assigns.

4.    Further Assurances.  Assignor covenants and agrees that it will at any time and from time to time do, execute, acknowledge, and deliver any and all other acts, deeds, assignments, transfers, conveyances, powers of attorney, or other instruments that Assignee deems reasonably necessary or proper to carry out the assignments, conveyances and assumptions intended to be made hereunder.

5.    Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns.

6.    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

ASSIGNOR:

WALTERS CHEVROLET PONTIAC, INC., a New York corporation

By:
Name: John Walters
Title: President

ASSIGNEE:

STAFFORD CHEVROLET, INC., a New York corporation

By:
Name: Martin Johnson
Title: President

## SCHEDULE 1

### ASSETS

## SCHEDULE 2

**ASSUMED CONTRACTS**

## LIST OF SCHEDULES

Schedule 1.1      —      Purchased Assets
Schedule 1.2      —      Excluded Assets
Schedule 1.3      —      Assumed Contracts
Schedule 2.3      —      Allocation
Schedule 4.1(g)   —      Notices

## SCHEDULE 1.1

## PURCHASED ASSETS

A.    <u>New Vehicles</u>.

        All 2008 and 2009 model new and unused Chevrolet and Pontiac cars and trucks shall be purchased at Seller's invoice cost of such vehicles <u>less</u> (i) any holdback, advertising allowances, unexpired floorplan or interest allowances, (ii) a mileage deduction equal to twenty-five cents ($.25) per mile for each recorded mile in excess of one thousand (1,000) miles, and (iii) incentives that are due and payable on said vehicles for which Seller has previously received, or will receive a benefit, <u>plus</u> any additional equipment that has been installed at Seller's net cost (including cost of labor) for such equipment less any deductible items that have been removed from said vehicles. For clarity, Buyer will not purchase any 2007 model new Chevrolet and Pontiac cars or trucks.

B.    <u>Demonstrators</u>

        Demonstrator inventory of all 2008 and 2009 models, if any, of Chevrolet and Pontiac cars and SUV/trucks with less than 6,000 miles, shall be valued in the same manner as new vehicles in Section A above, except that the mileage deduction shall be equal to twenty-five cents ($.25) per mile for each mile on the odometer (not only for the miles over 1,000 miles). Demonstrators with odometer readings of 6,000 miles or more, shall be purchased as used vehicles pursuant to Section C below.

C.    <u>Used Vehicles</u>

        Used vehicles which are in stock on the Closing Date may be purchased by Buyer at values to be mutually agreed upon in writing by Buyer and Seller prior to the Closing Date. All used vehicles which are not purchased by Buyer from Seller pursuant to this Agreement will be removed from the Property by Seller, at Seller's sole expense, within five (5) days after the Closing Date.

D.    <u>Parts and Accessories</u>.

        All of Seller's parts and accessories. At Closing, Seller shall assign to Buyer all of Seller's parts return privileges granted to Seller by GM and/or any other manufacturer.

E.    <u>Miscellaneous Inventories</u>.

        All items of inventory of Seller other than those referred to above, including new and unused tires, gas, oil and grease, unopened cans of paint and body shop materials, sublet repairs, work-in-progress labor and rustproofing and undercoating material.

F.    <u>Fixed Assets</u>.

        All of Seller's machinery, shop equipment, parts and accessories equipment, furniture, fixtures, leasehold improvements, small tools, special tools, signs, service and cleaning supplies and office and shop supplies, whether reflected on Seller's books or not. Fixed Assets will not include all items of dealership personnel (including, without

limitation, furniture, pictures, etc.).

G.    <u>New Vehicle Deposits</u>.

      All unfulfilled contracts for the sale of automobiles, and/or trucks to customers of Seller ("<u>Sales Orders</u>") will be assigned to Buyer by Seller; provided that Buyer (i) has the right to approve all proposed trade-in allowances on used vehicles to be taken in trade for new vehicles, which will not be delivered by Seller prior to Closing and (ii) has the right to accept or reject each such Sales Orders if, in its sole discretion it deems the sale terms be in its best interest.

H.    <u>Sublet Repair and Work in Process</u>.

In connection with sublet repairs and work-in-process, Seller shall continue to intake such work using its historical standards between the date of this Agreement and the Closing Date. So long as sublet repairs and work-in-process is done in a commercially reasonable manner, Buyer will purchase such items from Seller at a price equal to Seller's actual expended cost as of the Closing Date. Buyer will have the opportunity to review all sublet repairs and work-in-process prior to Closing and Buyer and Seller shall negotiate in good faith any disagreements on the value of such items.

I.    <u>Assumed Contracts</u>.

      All of the Assumed Contracts will be transferred to Buyer for no additional consideration, other than Buyer's assumption. Buyer will review all contracts provided in accordance with Section 5.2 and determine in its sole discretion what contracts will be Assumed Contracts; provided, however, that Buyer will assume the following contracts so long as the timing set forth across for each such contract is correct:

          (i)    Reyna Corp. Computer Lease- 10 months from March, 2008 with option to purchase; and

          (ii)    GM Exxon/Mobile Program (Oil)- Expires March, 2010.

      Any and all amounts currently due under any of the Assumed Contracts as of the Closing Date shall be paid in full by Seller. In the event Buyer pays such amounts currently due on behalf Seller between the Effective Date and the Closing Date, the amount so paid shall be added to the Working Capital Contribution and deducted from the cash portion of the Purchase Price payable at the Closing or promptly returned to Buyer in the event of termination of this Agreement, as the case may be. In the event such amounts currently due remain outstanding as of the Closing Date, Buyer shall assume the liability for such amounts and the cash portion of the Purchase Price payable at the Closing shall be reduced by the amount of such liability.

J.    <u>Records</u>.

      All hard copies of sales journals, all operating data and records used in connection with the Dealership, including books, records, customer lists, order files and credit histories, supplier information (the "<u>Operating Records</u>"), shall be delivered to

Buyer. Seller may, at its expense and at a time reasonably acceptable to Seller and Buyer, make copies of all of the Operating Records. All repair order files and parts files including perpetual inventory records, purchasing records, technical and repair data and manuals, and invoices ("Service Records") shall be delivered to Buyer and retained by Buyer after the Closing for a period of two (2) years. Seller may, at its expense and at a time reasonably acceptable to Seller and Buyer, make copies of all of the Service Records. Seller shall provide Buyer with a an electronic copy of the Operating Records and the Service Records, to the extent such records exist, on the Closing Date.

K.     Goodwill. All of Seller's goodwill and other intangible assets relating to the Dealership.

L.     Miscellaneous Assets.

The following (collectively "Miscellaneous Assets"), will be provided to Buyer:

(i)      The right to use the telephone number or numbers used by the Dealership immediately prior to the Closing Date with assumption of yellow page advertising.

(ii)     The right to use the name "Walters Chevrolet Pontiac, Inc.", and all other names, marks and rights of Seller relating to the Dealership and all derivatives of the foregoing.

(iii)    Except for the Excluded Assets, all other property and rights, tangible and intangible, real, personal or mixed, which Seller owns, uses or is acquiring in connection with the Dealership, wherever located and regardless of whether reflected on Seller's books and records.

**SCHEDULE 1.2**

**EXCLUDED ASSETS**

None.

**SCHEDULE 1.3**

**ASSUMED CONTRACTS**

(i)      Reyna Corp. Computer Lease- 10 months from March, 2008 with option to purchase; and

(ii)     GM Exxon/Mobile Program (Oil)- Expires March, 2010.

**SCHEDULE 2.3**

**ALLOCATION**

| Parts and Accessories | $300,000 |
| Fixed Assets | $50,000 |
| Non–Compete | $50,000 |
| Intangible Assets | $100,000 |

## SCHEDULE 4.1(g)

### NOTICES

None.