**HEARING DATE AND TIME: February 28, 2012 at 9:45 a.m. (Eastern Time)**
**OBJECTION DEADLINE: February 21, 2012 at 4:00 p.m. (Eastern Time)**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
Matthew J. Williams
Mitchell Karlan
Joshua Weisser
Keith R. Martorana

*Attorneys for the Motors Liquidation Company GUC Trust*
*and the Motors Liquidation Company Avoidance Action Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

|  |  |  |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
|  | : |  |
| **MOTORS LIQUIDATION COMPANY, *et al.*,** | : | **09-50026 (REG)** |
| **f/k/a General Motors Corp., *et al.*** | : |  |
|  | : | **(Jointly Administered)** |
| **Debtors.** | : |  |
|  | : |  |

---------------------------------------------------------------x

**REPLY BRIEF IN SUPPORT OF THE MOTION OF WILMINGTON TRUST COMPANY, (I) AS GUC TRUST ADMINISTRATOR, TO LIQUIDATE NEW GM SECURITIES FOR THE PURPOSE OF FUNDING FEES, COSTS AND EXPENSES OF THE GUC TRUST AND THE AVOIDANCE ACTION TRUST, AND (II) AS AVOIDANCE ACTION TRUST ADMINISTRATOR, TO APPROVE AN AMENDMENT TO THE AVOIDANCE ACTION TRUST AGREEMENT**

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT .................................................................................................................6

I.      Reply to the First Assertion – The Trusts Have Not Exceeded Their Budgets .............6

II.     Reply to the Second Assertion – The Sale of Stock Was Always Anticipated
        for Budget Excesses ......................................................................................9

III.    Reply to the Third Assertion – There is Substantial Support for the Relief................10

IV.     Reply to the Fourth Assertion – The Trusts Are Subject to Sufficient Oversight .......12

V.      Reply to the Fifth Assertion – The Increased Fees of the Trust Administrator
        and the Trust Monitor are Well Documented and Justified .........................................15

VI.     Reply to the Sixth Assertion – Holders of Disputed Claims Will Not be
        Unduly Harmed by the Sale of New GM Securities.....................................................16

VII.    Reply to the Seventh Assertion – The GUC Trust Has Engaged in Efficient
        Litigation of Claims ......................................................................................18

CONCLUSION.............................................................................................................19

Wilmington Trust Company, not in its individual capacity and solely in the capacities as GUC Trust Administrator and Avoidance Action Trust Administrator, submits this reply (the "**Reply**") in support of its motion seeking[1] (I) authority to liquidate certain New GM Securities for the purpose of funding fees, costs and expenses of the GUC Trust and the Avoidance Action Trust, and (II) approval of an amendment to the Avoidance Action Trust Agreement (the "**Motion**").[2]

## PRELIMINARY STATEMENT

1.    The GUC Trust Administrator and the Avoidance Action Trust Administrator (collectively, the "**Trust Administrator**") provided notice of the Motion to thousands of interested parties.[3]  Such parties have been afforded 32 days to review and object to the Motion.  The only objections the Trust Administrator has received are from holders of disputed claims: (i) the limited objection (the "**Trustee Objection**") of Green Hunt Wedlake, Inc., Trustee of General Motors Nova Scotia Finance Company (the "**Nova Scotia Trustee**"), (ii) the objection (the "**Noteholder Objection**") of certain Noteholders of General Motors Nova Scotia Finance Company (the "**Nova Scotia Noteholders**"), and (iii) the recently-filed limited objection (the "**New York State Objection**," and together with the Trustee Objection and the Noteholder Objection, the "**Objections**") of the State of New York ("**New York State**," and together with the Nova Scotia Trustee and the Nova Scotia Noteholders, the "**Objectors**").  While the  Objections assert a panoply of complaints (each of which is

---

[1]  As discussed further below, the GUC Trust Administrator has withdrawn its request to transfer approximately $17 million of New GM Securities to the Avoidance Action Trust for the purposes of funding a potential future tax liability.

[2]  Capitalized terms that are not defined herein have the meanings ascribed to such terms in the Motion.

[3]  As a means of control and oversight over the exact relief requested by the Motion, the GUC Trust Agreement requires extensive 20-day notice on all holders of allowed claims, all holders of disputed claims and all holders of Trust Units.  In addition, supplemental service of the Motion was provided by Wilmington Trust Company (in its capacity as indenture trustee) through the Depository Trust Company to the holders of approximately $23 billion of bond claims pursuant to the notice attached hereto as Exhibit D, and as an attachment to the filing of a Current Report on Form 8-K with the Securities and Exchange Commission.

addressed herein), the primary assertions[4] can be summarized as follows:

- **First Assertion**: The Trust Administrator has "excessively" or "grossly" exceeded the budget (*See* Trustee Objection ¶ 6; Noteholder Objection ¶¶ 1, 3, 4, 11, 12; New York State Objection ¶ 25);

- **Second Assertion**: The Trust Administrator breached an oral representation that the fees and expenses of the Trusts would be "tightly constrained by a detailed and inflexible budget" (*See* Trustee Objection ¶ 2; Noteholder Objection ¶¶ 3, 9, 10, 12; New York State Objection ¶¶ 5, 26);

- **Third Assertion**: The Trust Administrator has failed to provide sufficient detail or support both to justify the relief requested in the Motion (including a cost/benefit analysis) and to demonstrate that the funds sought are/will be spent in a way that benefits the estates (*See* Trustee Objection ¶ 4; Noteholder Objection ¶¶ 3, 4, 7, 11, 16; New York State Objection ¶¶ 19-22);

- **Fourth Assertion**: The Trust Administrator does not provide sufficient oversight over professional billing and compensation from the Trusts (*See* Noteholder Objection ¶ 4, 8, 24; New York State Objection ¶¶ 25-29);

- **Fifth Assertion**: The Trust Administrator, the GUC Trust Monitor and the Avoidance Action Trust Monitor (together, the "**Trust Monitor**") submitted the Motion for the purposes of unjustifiably increasing their fees and creating a "slush fund" (*See* Noteholder Objection ¶¶ 12, 13, 14, 16, 19);

- **Sixth Assertion**: The sale of New GM Securities will unfairly affect holders of disputed claims (*See* Trustee Objection ¶ 5, New York State Objection ¶¶ 17, 18); and

- **Seventh Assertion**: The Trust Administrator has squandered Trust funds unjustifiably litigating such valid claims as those held by the Nova Scotia Noteholders (*See* Noteholder Objection ¶¶ 17, 20-22).

2.     The First Assertion – that the Trusts have grossly exceeded their budgets – is simply incorrect.  For the calendar year ended 2011, the GUC Trust was in fact under-budget in the aggregate, and the Avoidance Action Trust incurred only immaterial fees/expenses.  As described more thoroughly in the Declaration of David A. Vanaskey, Jr., attached hereto as Exhibit E (the "**Vanaskey Declaration**"), the budget for the GUC Trust is a line-item constrained budget – such that if an individual professional is over-budget, the overage

---

[4]   While the primary objections of New York State are addressed in the main text herein, certain of the ancillary arguments are addressed separately in the chart attached hereto as Exhibit C.

cannot be netted against professionals that were under-budget.  The GUC Trust was actually under-budget by approximately $2 million in the aggregate for the calendar year 2011, and the GUC Trust professionals that exceeded their line-items were only over-budget by approximately <u>$3.5 million total</u>,[5] not the $31.5 million asserted in the Objections.  The Objectors' attempt to classify anticipated fees and expenses for 2012 as current overages is calculated to provide a false sense of "sticker shock" that this Court should ignore.

3.      The Second Assertion – that the Trust Administrator promised that the fees and expenses of the Trusts would be "tightly constrained by a detailed and inflexible budget" and then failed to abide by that representation – is equally misguided.  A budget <u>does</u> exist for use of the Wind-Down Budget Cash, and that budget <u>is</u> tightly constrained and inflexible. The GUC Trust Administrator has no authority to exceed any of the line-items contained in that budget without the consent of the DIP Lenders.  The "promise" by Wilmington Trust Company is entirely consistent with the procedures outlined for the Court by counsel for the Creditors' Committee at the Confirmation Hearing, namely that:  (i) cash to pay professionals would be funded by a closely negotiated and tightly controlled budget for funds contributed by the DIP Lenders, and (ii) in the event of cost overruns, the Trust Administrator would be entitled to sell New GM Securities with the approval of the Court.  While the Noteholder Objection cites and thoroughly discusses the comments of counsel to the Creditors' Committee with respect to item (i) above, it notably ignores any discussion of item (ii).

4.      The Third Assertion – that the Motion lacks sufficient information regarding the benefits to the estate in order to grant the requested relief – is not well taken.  The Motion provides nearly 10 pages of information regarding the work performed by the Trust Administrator, Trust Monitor and Trust Professionals in 2011 and the anticipated additional

---

[5] These calculations are based upon forecasted actual fees and expenses for 2011.  The GUC Trust is still receiving invoices for 2011 and certain invoices remain subject to review and analysis by the GUC Trust Administrator.

work that will be required in order to successfully continue the claims settlement and distribution duties of the Trusts, and to wind-down the Debtors' estates. The benefits to the estate are clear – the GUC Trust's track record in resolving claims is outstanding. As detailed in the Motion, over $2.34 billion[6] of claims have been disallowed since the Effective Date while only approximately $153 million of claims have been allowed during the same period. With respect to the Avoidance Action Trust, the benefit to the estates of litigating a $1.5 billion avoidance action is equally clear – if successful, it will potentially provide an enormous cash recovery to the beneficiaries of the Avoidance Action Trust. However, to the extent the Court requires further substantiation, the Trust Administrator has filed contemporaneously herewith three declarations which, together with the attachments thereto, provide additional information regarding the nature of the costs borne by the Trusts and the expected benefits to the estates related thereto.

5.    The Fourth Assertion – that the Trusts lack oversight and their professionals should submit fee applications to the Court and the U.S. Trustee (and potentially a fee examiner) – was specifically litigated and overruled by this Court in connection with confirmation of the Plan. An objection to confirmation of the Plan was filed by New York State which sought, among other relief, the post-Effective Date review of fees and expenses of Trust Professionals by the Court, the U.S. Trustee and a fee examiner. *See State of New York's Limited Objection to Debtors' Motion for Entry of an Order Confirming Liquidation Plan and GUC Trust* ("**New York State Confirmation Objection**") (Docket No. 9208) at ¶¶ 13, 14. The Court considered and, in its *Bench Decision on Objections to Confirmation* dated March 7, 2011 (Docket No. 9638) (the "**Confirmation Decision**"), specifically overruled this

---

[6] The Motion stated that the GUC Trust had resolved "over $2.3 billion" in Disputed General Unsecured Claims since the Effective Date and that "just under $2.2 billion [of such resolved claims] were disallowed." Motion ¶ 6. However, upon further analysis, the Trust Administrator has determined that approximately $2.5 billion in Disputed General Unsecured Claims have been resolved since the Effective Date, of which over $2.34 billion have been disallowed.

objection, stating that "I'm comfortable, accordingly, that these mechanisms provide for sufficient oversight and control to protect the interests of unsecured creditors." Confirmation Decision p. 29.

6.      The Fifth Assertion – that the Motion is a back-door attempt to create a slush fund for the Trust Administrator and the Trust Monitor – is without merit.  The Nova Scotia Noteholders wrongly argue that the Motion provides "no explanation" for the increase in fees of the Trust Administrator and Trust Monitor.  In contrast to this assertion, the Motion provides substantial information regarding the increased workload of the Trust Administrator and Trust Monitor related to both the GUC Trust and the Avoidance Action Trust.  Both the GUC Trust Agreement and the Avoidance Action Trust Agreement specifically provide that the Trust Administrator and the Trust Monitor are entitled to "fair and reasonable compensation" for their services and may be compensated from the sale of New GM Securities.  The additional compensation sought by the Trust Administrator and the Trust Monitor was specifically highlighted in the Motion for this Court's review and is justified.  In addition, and for the avoidance of doubt, the Trust Administrator and Trust Monitor have provided additional information in the attached Vanaskey Declaration and the Declaration of Anna Phillips attached hereto as Exhibit F (the "**Phillips Declaration**"), respectively.

7.      The Sixth Assertion – that the holders of Disputed General Unsecured Claims will be unduly harmed by the sale of New GM Securities – is based on a misreading of the GUC Trust Agreement.  The New GM Securities sought to be sold and/or transferred pursuant to the Motion derive solely from "Excess GUC Trust Securities" as such term is defined in the GUC Trust Agreement.  In essence, Excess GUC Trust Securities are the New GM Securities that were reserved for holders of Disputed General Unsecured Claims which were then subsequently "released" from such reserve as a result of the disallowance of the associated Disputed General Unsecured Claims.  The GUC Trust Administrator is not

permitted, and is not seeking authority, to sell any of the securities reserved for payment of currently Disputed General Unsecured Claims, including those held by the Objectors. In its Estimation Orders (as defined below) the Court determined that such reserves were sufficient. The assertion that the sale of New GM Securities will decrease the disputed claims reserve is wrong.

8.      Finally, the Seventh Assertion – that the GUC Trust has squandered its resources litigating meritorious claims – reveals the Objections as nothing more than a veiled and improper attack over disputed claims. The final pages of the Noteholder Objection prove this point by attacking the litigation strategy of the GUC Trust's objections to the Nova Scotia Noteholders' individual claims. Such complaints should be confined to the contested matter or adversary proceeding related to the Nova Scotia Noteholders' individual claims and should not be litigated with respect to this Motion. That a large disputed claimant would object here solely to advance its own interests to the detriment of all other creditors by eliminating necessary funding for the Trusts should not be allowed.

## ARGUMENT

9.      The Trust Administrator respectfully requests that the Court overrule the Objections and enter an order approving the relief requested in the Motion, as modified by this Reply, for the reasons set forth below.

**I.      Reply to the First Assertion – The Trusts Have Not Exceeded Their Budgets**

10.     Both the Noteholder Objection and the Trustee Objection lead with a statement that the Trust Administrator is seeking to liquidate approximately $57 million of New GM Securities. *See* Trustee Objection ¶ 1; Noteholder Objection ¶ 1. As an initial matter, $17 million of this quoted $57 million related to New GM Securities that the Trust Administrator was <u>not</u> seeking to liquidate – rather, the Trust Administrator was seeking authority to transfer such New GM Securities to the Avoidance Action Trust where they

would have been held, unliquidated, until a time when and if it became necessary to satisfy a potential tax liability. That request has been withdrawn.[7] A revised proposed Order which incorporates this modification is attached hereto as <u>Exhibit A</u> (with a blackline comparison to the prior proposed Order attached as <u>Exhibit B</u>).[8]

11.    Moreover, the Nova Scotia Noteholders fail to acknowledge that the cited $57 million includes $8.6 million designated for the satisfaction of Reporting and Transfer Costs – relief to which the Objectors do not object. *See* Noteholder Objection ¶ 2. Thus, the true estimated dollar value of New GM Securities at issue (at least with respect to the Noteholder Objection) is $31.5 million, not $57 million.

12.    Next, both of the Objectors assert that the Trust Administrator has "failed to comply" with the Initial Budget, has "prematurely exhausted" the funding provided by the DIP Lenders and has allowed significant "cost overruns." *See* Trustee Objection ¶ 6; Noteholder Objection ¶¶ 1, 3, 4, 11, 12; New York State Objection ¶ 25.

13.    Such assertions are simply false and are easily dispelled by the fact that the Trusts are actually under-budget for the calendar year 2011. The total aggregate 2011 GUC Trust budget, as agreed by the DIP Lenders and filed with this Court as part of the Disclosure

---

[7] Since the filing of the Motion, it has come to the attention of the Trust Administrator that possession of approximately $17 million in securities by the Avoidance Action Trust could potentially trigger registration and/or reporting obligations for the Avoidance Action Trust under section 12(g) of the Securities Exchange Act of 1934. In order to avoid the additional cost associated with such potential registration/reporting obligations, the GUC Trust Administrator has determined that it will not pursue the transfer of the approximately $17 million of New GM Securities to the Avoidance Action Trust at this time, and hereby withdraws that portion of the requested relief. The withdrawal of the request is without prejudice to the right of the GUC Trust Administrator to seek such relief in the future.

[8] The Internal Revue Service has issued private letter rulings concerning, *inter alia*, the tax characterization of (i) the 2009 section 363 sale by MLC and MLC's subsequent liquidation and (ii) the GUC Trust. The proposed Order provides authority, but not the requirement, for the GUC Trust Administrator to transfer cash to the Avoidance Action Trust. The GUC Trust Administrator will not transfer any cash or New GM Securities to the Avoidance Action Trust until the Internal Revenue Service confirms that such transfers would not affect its prior rulings regarding the tax characterization of (i) the 2009 section 363 sale by MLC and MLC's subsequent liquidation and (ii) the GUC Trust as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9.

Statement, provided for $23,044,150 in estimated expenditures.[9]  Actual expenditures by the GUC Trust for the calendar year 2011 were $20,988,648.[10]  However, because the Initial Budget is a line-item constrained budget, budget room created by under-billing professionals cannot be utilized to satisfy the fees of over-budget professionals.  Thus, while the GUC Trust was under-budget in the aggregate, it was "over-budget" by $3.456 million due to individual line item overages.  *See* Exhibit B to the Vanaskey Declaration.

14.    To the extent that the GUC Trust can be considered "over-budget" for 2011, such overage is, at worst, $3.456 million – an eminently reasonable amount given the number of professionals employed by the GUC Trust, the high level of pressure exerted by the DIP Lenders in negotiating the Initial Budget, and the uncertainty in any forward-looking estimation of fees.[11]  Thus, of the $31.5 million in proposed sales of New GM Securities, $28 million relates to anticipated GUC Trust overages for 2012 and Avoidance Action Trust overages for its expected life.  These "overages" have not yet occurred – instead, the request for relief is a predominantly forward looking and proactive request on behalf of the Trust Administrator that reflects a prudent exercise of its fiduciary duties under the GUC Trust Agreement.  In the view of the Trust Administrator, as detailed further below, the incurrence of these future costs and expenses is accompanied by a significant benefit to the estates – as such, the relief requested in the Motion should be approved.

---

[9]  The Initial Budget, filed as Exhibit B to the Disclosure Statement, originally provided for aggregate estimated expenditures of $25,211,000 for 2011.  However, this aggregate budget was subsequently reduced to $23,044,150.

[10]  As noted above, the Avoidance Action Trust did not begin operations until December 15, 2011 when MLC dissolved.  As such, there was no "budget" specified for the Avoidance Action Trust in 2011.  Only immaterial costs were incurred during 2011.

[11]  Despite the assertions of the Nova Scotia Noteholders and New York State to the contrary (*see* Noteholder Objection ¶ 11; New York State Objection ¶ 21), the Motion provides five pages of detailed information describing the nature and scope of the 2011 "overruns" and their reasonableness.  See Motion ¶¶ 22-32.

**II.     Reply to the Second Assertion – The Sale of Stock Was Always Anticipated for Budget Excesses**

15.     The Objectors assert (i) that the Trust Administrator promised in its response (the "**Confirmation Reply**") (Docket No. 9390) in connection with confirmation of the Plan that Trust Professionals would be "tightly constrained by a detailed and inflexible budget," and (ii) that the Creditors' Committee assured objectors to the Plan that the Initial Budget would be tightly controlled (the "**Committee Comments**").   *See* Trustee Objection ¶ 2; Noteholder Objection ¶¶ 3, 9, 10, 12; New York State Objection ¶¶ 5, 26.   The Objectors have taken these statements out of context to narrowly and wrongly assert that the Trust Administrator and Creditors' Committee promised that professional fees and expenses would not exceed the Initial Budget.   No such promise was actually made, and to suggest otherwise is to misunderstand (or misrepresent) the Confirmation Reply and Committee Comments.

16.     First, the statement in the Confirmation Reply was and still remains true today – a detailed budget, approved by the DIP Lenders, exists and <u>is</u> inflexible.   However, nothing in the Confirmation Reply or in the Committee Comments ever suggests that the failure by professionals to comply with the Initial Budget destroys such professionals' right to compensation.   Instead, The Confirmation Reply and the Committee Comments outline a package of oversight/controls for Trust Professional fee review which <u>begin</u> with the inflexible DIP Lender-approved Initial Budget (the item on which the Objectors are focused) and <u>end</u> with Court review and approval of any proposed sale of New GM Securities to fund fees and expenses in excess of the Initial Budget (the item which the Objectors ignore).

17.     Second, it was always understood that the limited funds contributed by the DIP Lenders for the wind-down of the Debtors' estates might not be sufficient to satisfy the needs of the Trusts.   The fact that professional fees could potentially exceed the Initial Budget was no secret – it was specifically contemplated in the GUC Trust Agreement and highlighted for this Court in connection with confirmation of the Plan.   Indeed, the GUC

Trust Agreement includes incentives and penalties for non-compliance with the Initial Budget, both of which would be unnecessary if strict compliance with the Initial Budget was required. *See* GUC Trust Agreement §2.6(d) (providing that all professional fees are subject to a 10% holdback, to be paid at each calendar year end if professional is under-budget and to be withheld until dissolution if over-budget). Moreover, the GUC Trust Agreement further contains lengthy and detailed procedures for the funding of professional fees from the sale of New GM Securities in the event of professional fee overages. Such procedures would be unnecessary if, as the Objectors erroneously assert that the Trust Administrator represented, strict compliance with Initial Budget was required.

18.     Third, both the Confirmation Reply and the Committee Comments acknowledged that budget overages were a definite possibility. Indeed, Court oversight and approval of the sales of New GM Securities to fund over-budget professionals was highlighted in the Confirmation Reply and in the Committee Comments immediately after the statements cited by the Nova Scotia Noteholders pertaining to a tightly controlled budget:

> Finally, if the trustee, if Wilmington Trust ends up having to sell stock to pay for professional expenses, it has to come to this Court first…

Confirmation Hearing Tr. at 147:16-147:18 (Docket No. 9791).

19.     In sum, all parties were aware that the Trusts were authorized to seek the relief requested in the Motion. Any attempts to characterize the prior statements of the Trust Administrator or the Creditors' Committee as promises that the Initial Budget could not be exceeded are without merit and should be disregarded.

**III.    Reply to the Third Assertion – There is Substantial Support for the Relief**

20.     The Objectors assert that, despite its 32-page length, the Motion "fails to provide any detail about how or why [the Trust Administrator] has so greatly exceeded the approved budget or to articulate how these additional expenses will translate into actual benefits to the estates." *See* Trustee Objection ¶ 4; Noteholder Objection ¶¶ 3, 4, 7, 11, 16;

New York State Objection ¶¶ 19-22.  Such assertions are difficult to swallow given the Motion's length and the substantial text devoted to the issues that have confronted the Trusts since the Effective Date and are anticipated in the future.  However, because the Trust Administrator endeavors to provide full transparency with respect to the operations of the Trusts (indeed, the GUC Trust files quarterly reports with the Court and the SEC in addition to periodic filings related to material events) this Reply is accompanied by three declarations which provide additional information supporting the request for relief.

21.    As an initial matter, the Motion details many of the unforeseen issues that arose in 2011 and are anticipated to continue into 2012.  In contrast to the Nova Scotia Noteholders' allegation that the Trust Administrator engaged only in a "simple recitation of factors" with respect to these issues (*see* Noteholder Objection ¶ 16), a detailed explanation of the costs incurred by the Trusts, and those likely to be incurred in the future, are provided in over 10 pages of text in the Motion.[12]  *See* Motion pp. 13-17, 21-23, 28-29.

22.    As further described in the Motion, the current and future costs and expenses of the GUC Trust are almost exclusively related to its primary functions: claims resolution, the distribution of New GM Securities to holders of Allowed General Unsecured Claims, and the wind-down of the Debtors' estates.  *See* Motion ¶¶ 22-31.  Indeed, approximately $14.5 million of the $17.8 million in New GM Securities sought to be sold to cover 2011-2012 administrative costs of the GUC Trust are related to such functions.  *See* Exhibit B to Vanaskey Declaration.  Given the prior successes of the GUC Trust from a claims resolution standpoint, the benefits associated with such costs are apparent.  In the nine-month period ended December 2011, the GUC Trust resolved approximately 25% ($2.5 billion) of the total Disputed General Unsecured Claims pending on the Effective Date.  Motion ¶ 6 (as modified

---

[12]  As the Objectors have not objected to the requested relief as it pertains to Reporting and Transfer Costs, issues related to such costs are not addressed herein.

by n.6 *supra*).  Of this $2.5 billion in claims resolved, over $2.34 billion were disallowed.  *Id*.

A cost-benefit analysis is included in the Declaration of Thomas A. Morrow, attached hereto

as Exhibit G (the "**Morrow Declaration**") and shows the significant benefit associated with

the continuation of the claims resolution process.

23.    With respect to the Avoidance Action Trust, the approximately $13.7 million

in New GM Securities which the Trust Administrator seeks to liquidate to cover

administrative expenses substantially relate to the primary function of the Avoidance Action

Trust: prosecution of the Term Loan Avoidance Action.   *See* Exhibit C to Vanaskey

Declaration.   The remaining expenses include insurance, tax advice and corporate legal costs

which together constitute the necessities to the continued existence of the Avoidance Action

Trust.  Given the sheer size of the potential $1.5 billion cash recovery for the Debtors' estates

in the event of a successful resolution to the Term Loan Avoidance Action, the Trust

Administrator submits that benefits associated with the $13.7 million in requested relief

(which represents less than 1% of the total potential cash recovery on the Term Loan

Avoidance Action) significantly outweigh the associated costs.

24.    If the requested relief with respect to the Avoidance Action Trust is denied,

the Trust will be left with two unattractive alternatives, each of which will significantly

reduce any potential recovery to its beneficiaries: (i) abandon the Term Loan Avoidance

Action or (ii) obtain a loan secured by the Term Loan Avoidance Action.  Abandonment has

obvious repercussions, and given the contingent nature of the Term Loan Avoidance Action,

any loan will likely result in a significant concession on the "upside" potential of the Term

Loan Avoidance Action.  As such, the Trust Administrator submits that the sale of New GM

Securities requested in the Motion will provide the most significant benefit to the estates.

**IV.    Reply to the Fourth Assertion – The Trusts Are Subject to Sufficient Oversight**

25.    In an attempt to re-litigate objections raised, and overruled, in connection with

confirmation of the Plan, the Nova Scotia Noteholders and New York State assert that the Trusts lack sufficient controls and oversight and that the fees and expenses of Trust Professionals should be subject to the review of the U.S. Trustee and the Court (and possibly a fee examiner). *See* Noteholder Objection ¶ 4, 8, 24; New York State Objection ¶¶ 25-29. For the same reasons that this Court denied the objections of interested parties in connection with confirmation of the Plan, the Court should overrule the Noteholder Objection and New York State Objection now.

26.    Prior to confirmation of the Plan, an objection was lodged by New York State which stated, in relevant part:

> [T]he confirmation order should require… appointment of a fee examiner to oversee fees and expenses to be paid by the GUC Trust; Bankruptcy Court approval of such fees; compliance with the United States Trustee's Fee Guidelines and prior rulings of the Court; and imposition of appropriate sanctions upon professionals in the event that the fee examiner prevails in any disputes related to GUC Trust fees and expenses.

New York State Confirmation Objection ¶ 14.    In response thereto, Wilmington Trust Company, then as proposed Trust Administrator, filed its Confirmation Reply which outlined the complete package of oversight and controls to which it, as Trust Administrator, and the Trusts are subject. *See* Confirmation Reply ¶¶ 4, 23-29.   This recitation of the controls was further detailed orally by counsel to the Creditors' Committee at the Confirmation Hearing. Confirmation Hearing Tr. at 146:7-148:3.   Following the Confirmation Hearing, the Court entered its Confirmation Decision, which specifically recounted and approved these procedures as appropriate, without the need for fee examiner or U.S. Trustee review and approval on an ongoing basis.   Confirmation Decision pp. 9-10, 29.

27.    This package of controls has not been altered since the Effective Date,[13] and continues to be implemented by the Trusts.   The controls, which are more thoroughly

---

[13]   Notably, to the extent that the No-Action Relief is afforded by the Staff, the GUC Trust may be required to comply with the Sarbanes-Oxley Act of 2002, which will add further layers of controls and oversight over the GUC Trust.

addressed in the Vanaskey Declaration and the Phillips Declaration, include the following:

- Budget – An annual Budget is submitted to the Trust Monitor and the DIP Lenders prior to the beginning of each calendar year for approval. Once approved, all Trust Professionals are bound to their individual line entry and may not be paid any amount from Wind-Down Budget Cash in excess of their individual budgets. GUC Trust Agreement §§ 6.4, 2.6(c).

- Holdback – Each month, 10% of the amount billed by each Trust Professional is reserved and left unpaid by the Trust Administrator. As an incentive to remain under-budget, Trust Professionals that remain within their budgeted line item for the calendar year are entitled to receive payment of such held-back funds within 30 days following the end of the calendar year. Trust Professionals that are over-budget are not entitled to receive full payment of their invoices until the earlier of (i) the dissolution of the GUC Trust or (ii) the termination of such Trust Professional's engagement by the GUC Trust. GUC Trust Agreement § 2.6(d).

- Trust Administrator/Trust Monitor/DIP Lender Review – Invoices of every Trust Professional must be submitted on a monthly basis to the GUC Trust Administrator, the GUC Trust Monitor and the DIP Lenders. The GUC Trust Administrator is prohibited from paying any invoices which are disputed by either the GUC Trust Monitor or the DIP Lenders. GUC Trust Agreement § 8.3(b).

- Court Approval of Sale of New GM Securities – The Trust Administrator is permitted to sell New GM Securities to cover current and anticipated budget overages of Trust Professionals, solely with the approval of the Court and on 20-days' notice to the GUC Trust Monitor, the holders of Trust Units and the holders of Disputed General Unsecured Claims. GUC Trust Agreement §§ 6.1(b), 6.1(d).

*See* Vanaskey Dec. ¶¶ 9-17; Phillips Dec. ¶¶ 7-10.

28.    The Trusts are in full compliance with the protocols approved by this Court; therefore, any suggestion that the Trust Professionals should submit fee applications to the Court, the U.S. Trustee or a fee examiner at this juncture is simply not appropriate or customary. The cases cited by the Nova Scotia Noteholders concern bankruptcy court review of pre-effective date chapter 7 trustee fees and the fees of professionals retained by a debtor under section 327 or 328 of the Bankruptcy Code. Similarly, the cases cited by New York State with respect to court review and approval of fees pursuant to section 1129(a)(4) of the Bankruptcy Code concern payments to be made by debtors on the effective date of a plan, not

by post-confirmation liquidating trusts.  The Objectors' request for fee review therefore lacks any relevant authority.  Further, the suggested alterations to the fee review structure are likely to engender additional litigation and, correspondingly, greater costs for the Trusts.

29.    Most importantly, the current procedures have been successful, and there is thus no justification for changing them.  Every Trust Professional that has exceeded the Initial Budget has been forced to defer 10% of its billed fees until the dissolution of the GUC Trust.  No Trust Professional has received payment in excess of the Initial Budget.  Every party in interest has had notice and an opportunity to object to the use of New GM Securities to satisfy the payment of Trust Professionals in excess of the Initial Budget.  The objections of the Objectors are proof that the system works.

V.    **Reply to the Fifth Assertion – The Increased Fees of the Trust Administrator and the Trust Monitor are Well Documented and Justified**

30.    The Nova Scotia Noteholders create allusions of self-dealing as a further means to attack the requested relief.  The Noteholder Objection repeatedly references the increased fees sought by the Trust Administrator and the Trust Monitor, alleging that such fees are not adequately documented and are, in effect, a disguised attempt to raid the store till.  *See* Noteholder Objection ¶¶ 12, 13, 14, 16, 19.  Neither allegation is supportable.

31.    In anticipation of such allegations from holders of Disputed General Unsecured Claims, the proposed fee increases were not hidden in the Motion or buried in an aggregate line item in the attached Exhibits – on the contrary, they were specifically highlighted for the review of the Court and all interested parties.  *See* Motion ¶¶ 42, 51-52, 55, Exhibit B, Exhibit C.  Over 2 pages of text were devoted to the proposed fee increases for the Trust Administrator and Trust Monitor – no other individual Trust expense was so thoroughly addressed.

32.    While the proposed increases to the Trust Administrator and Trust Monitor fees were highlighted in the Motion in part to dispel any notion of self-dealing, they were

also emphasized for another, more practical reason: they are completely justified.  Both the Trust Administrator and the Trust Monitor submitted fee estimates in connection with the creation of the Initial Budget.  These fee estimates were based on the resources anticipated to be devoted to the operations of the GUC Trust and the Avoidance Action Trust.  However, neither the Trust Administrator nor the Trust Monitor was irrevocably bound by such fee proposals in the event that the work associated with managing and overseeing the Trusts substantially exceeded the assumptions underlying such proposals.  Indeed, the Trust Agreements each provide that the Trust Administrator and the Trust Monitor are entitled to receive "fair and reasonable compensation" for their services, not compensation as provided in their fee proposals.  *See* GUC Trust Agreement §§ 9.7, 11.5; Avoidance Action Trust Agreement §§ 9.7, 11.5.

33.    As detailed further in the Vanaskey Declaration and the Phillips Declaration, the amount of man-hours necessary to properly manage and oversee the Trusts is substantially greater than initially anticipated.  Both the Trust Administrator and the Trust Monitor have been required to add additional personnel, and increase the workloads of current personnel, in order to satisfy their required duties.  The Trust Administrator submits that the proposed fee increases are justified as "fair and reasonable" compensation of both the Trust Administrator and the Trust Monitor and should be approved.

## VI.    Reply to the Sixth Assertion – Holders of Disputed Claims Will Not be Unduly Harmed by the Sale of New GM Securities

34.    In their objections, the Nova Scotia Trustee and New York State each assert that the proposed sale of New GM Securities will increase the risk that holders of Disputed General Unsecured Claims will fail to receive a *pro rata* share of the Plan distribution in the event that such claims are allowed.  *See* Trustee Objection ¶ 5; New York State Objection ¶¶ 17, 18.  This analysis is based upon a flawed reading of the GUC Trust Agreement and should be dismissed.

16

35.    Prior to the initial distribution to holders of Allowed General Unsecured Claims under the Plan, the GUC Trust established a reserve (the "**Reserve**") of New GM Securities for the purposes of ensuring that holders of Disputed General Unsecured Claims, to the extent allowed in the future, would receive a *pro rata* distribution under the Plan.  In order to calculate this Reserve, the Trust Administrator first segregated New GM Securities in an amount that would be distributable to all holders of Disputed General Unsecured Claims as liquidated by the Debtors' schedules or timely filed proofs of claim.  With respect to unliquidated claims and partially unliquidated claims, the Trust Administrator calculated the Reserve based upon the estimations of the Court as set forth in its *Order Granting Motion Establishing Claims Reserves* dated March 4, 2011 (Docket No. 9591), and its *Order Granting Motion Estimating Maximum Amount of Certain Claims for Purposes of Establishing Claims Reserves* dated March 23, 2011 (Docket No. 9877) (together, the "**Estimation Orders**").  When any Disputed General Unsecured Claim is disallowed, the New GM Securities held in the Reserve which are associated with such claim are released for distribution to holders of Allowed General Unsecured Claims.  Such released securities are described in the GUC Trust Agreement as "**Excess GUC Trust Distributable Assets**."

36.    The GUC Trust Agreement provides that any of the New GM Securities "held-back" (and ultimately liquidated) for purposes of funding current or future liabilities of the GUC Trust are deducted from the Excess GUC Trust Distributable Assets only, while the Reserve remains intact.  *See* GUC Trust Agreement §§1.1(x), 5.4.  Under no circumstances are the New GM Securities held in the Reserve utilized for the satisfaction of fees and expenses of the GUC Trust in the manner requested in the Motion.  As such, it is the holders of Allowed General Unsecured Claims (i.e., holders of Trust Units) that are directly affected by the requested relief, not the holders of Disputed General Unsecured Claims.  As the GUC Trust Agreement requires distributions of Excess GUC Trust Distributable Assets to be made

evenly among holders of Trust Units (*see* GUC Trust Agreement § 5.4), such holders will be affected by the proposed sale of New GM Securities evenly.

37.     The provision of the GUC Trust Agreement cited by the Nova Scotia Trustee for the proposition that its Disputed General Unsecured Claim could be discharged if New GM Securities are insufficiently reserved (§5.3(c)) is inapposite.  That provision captures the scenario where the Estimation Orders were inaccurate and resulted in the under-estimation of unliquidated claims.  In such unlikely scenario, the Reserve could be insufficient to satisfy all Disputed General Unsecured Claims, and any such remaining claims upon exhaustion of the Reserve would be discharged.  But, as discussed above, the relief requested in the Motion will have no effect on the Reserve – as such, the sale of any New GM Securities from the Excess GUC Trust Distributable Assets cannot increase the risk that the Reserve will be insufficient to satisfy Disputed General Unsecured Claims that are ultimately allowed.

## VII.   Reply to the Seventh Assertion – The GUC Trust Has Engaged in Efficient Litigation of Claims

38.     In their final salvo, the Nova Scotia Noteholders argue that the GUC Trust has inefficiently squandered its resources by litigating meritorious claims, such as the claims of the Nova Scotia Noteholders.  *See* Noteholder Objection ¶¶ 17, 20-22.  While the GUC Trust Administrator understands that the Nova Scotia Noteholders are unhappy with the level of discovery sought by the GUC Trust in connection with its objection to the claims of the Nova Scotia Trustee and the Nova Scotia Noteholders (the "**Nova Scotia Contested Matter**"), these concerns should be addressed via motion practice and in status conferences concerning the Nova Scotia Contested Matter, not the Trust Administrator's Motion to sell New GM Securities.  The GUC Trust is currently litigating more than 100 Disputed General Unsecured Claims.  Were each defendant to follow the lead of the Nova Scotia Noteholders and use this Motion as a podium to address concerns related to their individual claims objections, the hearing on this Motion would be unnecessarily lengthy, wasteful and disruptive.

18

39.    Moreover, the assertions of the Nova Scotia Noteholders are simply incorrect. The GUC Trust has approached each claim objection, including its objections to the claims of the Objectors, with efficiency in mind.  The Nova Scotia Noteholders complain of the spirited objection of the GUC Trust to their claims – but that is exactly the job the Trust Administrator has been tasked to perform.  As noted in the Confirmation Decision:

> Of course, no claimant may appropriately object to the appointment of any post-Effective Date administrator out of concern that such administrator will litigate hard against it. When the claim warrants an objection, that is precisely what any such administrator is supposed to do.

Confirmation Decision p. 31.    For these reasons, the objections of the Nova Scotia Noteholders should be rejected.

## CONCLUSION

For the foregoing reasons and the reasons set forth in the Motion, the GUC Trust Administrator and the Avoidance Action Trust Administrator respectfully request that the Court enter an order substantially in the form attached hereto as Exhibit A and grant such other and further relief as may be deemed just and proper.

Dated:  New York, New York
February 23, 2012

GIBSON, DUNN & CRUTCHER LLP

By:    /s/   Matthew J. Williams

Matthew J. Williams
Mitchell Karlan
Joshua Weisser
Keith R. Martorana
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000

*Attorneys for the Motors Liquidation Company GUC Trust and the Motors Liquidation Company Avoidance Action Trust*