# REPLY EXHIBIT E

[Vanaskey Declaration]

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>**MOTORS LIQUIDATION COMPANY., *et al.*<br>      (f/k/a General Motors Corp., *et al.*)**<br><br>                  **Debtors.** | Chapter 11<br><br>Case No. 09-50026 (REG)<br><br>(Jointly Administered) |

**DECLARATION OF DAVID A. VANASKEY JR. IN SUPPORT OF THE MOTION
OF WILMINGTON TRUST COMPANY, (I) AS GUC TRUST ADMINISTRATOR, TO
(A) LIQUIDATE NEW GM SECURITIES FOR THE PURPOSE OF FUNDING FEES,
COSTS AND EXPENSES OF THE GUC TRUST AND AVOIDANCE ACTION TRUST,
AND (B) TRANSFER NEW GM SECURITIES TO THE AVOIDANCE ACTION TRUST
FOR THE PURPOSE OF FUNDING FUTURE TAX LIABILITIES AND
(II) AS AVOIDANCE ACTION TRUST ADMINISTRATOR, TO APPROVE
AN AMENDMENT TO THE AVOIDANCE ACTION TRUST AGREEMENT**

      I, David A. Vanaskey Jr. declare:

      1.      I am a Vice President of Wilmington Trust Company ("**WTC**"), located at

Rodney Square North, 1110 North Market Street, Wilmington, Delaware, 19890-1615, and am

duly authorized to submit this declaration (the "**Declaration**") on behalf of WTC, not in its

individual capacity, but solely in its capacities as GUC Trust Administrator and Avoidance

Action Trust Administrator, as established under the Plan.

      2.      I submit this Declaration in support of the motion (the "**Motion**")[1] submitted by

(i) the GUC Trust Administrator seeking entry of an Order approving (A) the GUC Trust's sale

of New GM Securities to fund accrued and expected fees, costs and expenses of the GUC Trust

and the Avoidance Action Trust, and (B) the GUC Trust's transfer of New GM Securities to the

---

[1]   Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Motion.

Avoidance Action Trust to fund potential future tax liabilities of the Avoidance Action Trust, and (ii) the Avoidance Action Trust Administrator, seeking entry of an Order approving an amendment to the Avoidance Action Trust Agreement.

3.      Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would competently testify thereto.

### Background and the Budget

4.      I am a Vice President of WTC with over 25 years of experience in its financial services group, including 20 years specializing in capital markets, defaults and corporate restructuring.  In such capacity, I and WTC teams overseen by me have directed multiple accounts and products in varying contexts, including chapter 11 reorganizations.  Specifically, I have provided services in connection with the following major bankruptcy cases:  (a) *In re UAL Corp.*; (b) *In re US Airways Group, Inc.*; (c) *In re Baldwin*; (d) *In re Delta Air Lines, Inc.*; (e) *In re Solutia Inc.*; (f) *In re Mesa Air Group, Inc.*; (g) *In re Circuit City Stores, Inc.*; and (h) *In re General Motors Corporation.*

5.      WTC's initial role in the Debtors' Chapter 11 Cases was serving as successor indenture trustee for approximately $23 billion in U.S. dollar denominated unsecured notes, bonds and debentures (collectively, the "**Bonds**") issued by Motors Liquidation Company, formerly known as General Motors Corporation ("**MLC**").[2]

6.      On March 29, 2011, this Court entered an order confirming MLC's liquidating Plan, and appointing WTC as GUC Trust Administrator and Avoidance Action Trust Administrator.  A budget for the GUC Trust proposed by the Debtors, and an administrative fund

---

[2]   WTC was the successor Indenture Trustee to Citibank, N.A., under two indenture agreements with MLC pursuant to which MLC issued senior unsecured debt securities: (i) a Senior Indenture, dated as of December 7, 1995, as amended, and (ii) a Senior Indenture, dated as of November 15, 1990.

for the Avoidance Action Trust, were similarly approved as part of the Plan (collectively, the "**Initial Budget**").  Incorporated into the back-up to the Initial Budget was an estimate of WTC's fees and expenses as GUC Trust Administrator and Avoidance Action Trust Administrator.

7.      I was intimately involved with the calculation, and therefore have direct personal knowledge, of WTC's estimated fees and expenses incorporated into the Initial Budget.  I was not, however, the primary author of the Initial Budget.  Upon information and belief, the Initial Budget was drafted by and agreed to by and among representatives and professionals of United States Department of the Treasury ("**Treasury**"), the Debtors, and the Official Committee of Unsecured Creditors (the "**Committee**").

8.      As chairperson of the Committee, I consistently and forcefully advocated for Treasury to provide sufficient cash to fully fund the wind down of the Debtors' estates and liquidation of estate assets, including the Term Loan Avoidance Action.  At the time the Initial Budget was formulated, however, I did not - and did not have adequate information at the time to – advocate for specific line items for the various Professionals (as defined below) that were ultimately reflected in the Initial Budget.  Rather, upon information and belief, the then proposed Professionals themselves were generally responsible for the individual line items in the Initial Budget, although in some instances, such numbers were set by the Debtors and/or Treasury with input from the Committee.

## Monitoring of Fees to Ensure Budget Compliance and Reasonableness

9.      The GUC Trust currently pays approximately 85 vendors and professionals (each, a "**Professional**" and collectively, the "**Professionals**").  Annexed hereto as ***Exhibit A*** is a list setting forth the identity of outside vendors and the Professionals.  In addition, certain Professionals serve the GUC Trust in multiple capacities.  The Avoidance Action Trust also

employs approximately 5 advisors.

10.     The GUC Trust maintains multiple levels of controls over Professional compensation.  Certain controls consist of penalties borne by Professionals who fail to comply with the current budget.  These penalties derive directly from the GUC Trust Agreement.  Other controls depend on the continued vigilance of the GUC Trust Administrator and GUC Trust Monitor.

11.     First, pursuant to Section 2.6 of the GUC Trust Agreement, any Professional that exceeds its line item budgeted amount cannot be paid the overage from "Wind-Down Budget Cash" (*i.e.* - cash provided by Treasury) absent approval of the DIP Lenders.  Further, leaving aside the overage, the Professional's failure to stay within its budgeted fees and expenses also impairs its ability to recoup its full budgeted amount.  Professional fees and expenses from Wind-Down Budget Cash are subject to a 10% monthly holdback.  That holdback is returned to Professionals whose billings do not exceed the amount allocated to them in the budget for a calendar year.  Any Professional that exceeds its annual budgeted amount, by contrast, cannot receive payment of its 10% holdback until the earlier of the termination of such Professional's engagement or the dissolution of the GUC Trust.  Hence, all Professionals are incentivized to stay within their allocable budgeted amounts.

12.     In addition to the foregoing, as representative of the GUC Trust Administrator, I, along with designated staff, have established a system to review and process the fee requests of each Professional to ensure that each request is both reasonable and complies with the Initial Budget.  This system works as follows. Upon engagement, a Professional negotiates an engagement letter with the GUC Trust Administrator.  Each engagement letter is reviewed, commented on, finalized and signed by me in my capacity as the authorized agent of the GUC

Trust Administrator.   If the Professional is to be paid from Wind-Down Budget Cash, prior to

such retention, I, or a member of my staff, identify the Professional for and provide the general

terms of the proposed engagement to Treasury, and I give Treasury the opportunity to object to

such retention.  To date, Treasury has not objected to the terms of any Professional's

employment.

13.      Once the Professional is engaged, it is loaded into our "eApprove" system as an

approved GUC Trust Professional.  The eApprove system assists me in approving, tracking,

processing, paying and reporting the fees and expenses of the GUC Trust.  Specifically,

eApprove maps and routes invoices based on the vendor, amount of invoice and service provided

to separate levels of review, prior to the GUC Trust Administrator's review.  Given that

approximately 85 separate vendors and Professionals invoice the GUC Trust for costs, fees and

expenses, invoices for work performed are received almost daily by the GUC Trust and are input

into the eApprove system.  Invoices are held for at least 15 days pending a review by the DIP

Lenders and the GUC Trust Monitor. Upon information and belief, the DIP Lenders and the

GUC Trust Monitor actively review invoices for reasonableness.

14.      After the 15-day period (and assuming neither the GUC Trust Monitor nor the

DIP Lenders have objected), and assuming no objection has been raised under the eApprove

system, each invoice is then further reviewed by me or a member of my staff.  When reviewing

an invoice, I or a member of my staff reviews the itemized work performed and the cost of the

services.  After review for reasonableness, each Professional's invoiced fees and expenses are

compared to the Initial Budget prior to final approval to ensure that a payment is not made if the

Professional has invoiced an amount above its allotted amount in such calendar year.

15.      If a Professional exceeds its allocated amount under the Initial Budget, a higher

level of review, tracking, monitoring and reporting takes effect.  Each Professional with billings

in excess of its budgeted amount undergoes another review by me and my staff to ensure that the

proposed fees and expenses are reasonable relative to the resulting benefits enjoyed by GUC

Trust beneficiaries.

16.     In addition, with respect to Professionals that perform multiple services for the

GUC Trust, I require separate invoicing, approval, and payment tracking to ensure fees are

allocated to their appropriate line item budgets.  For example, if a Professional incurs fees

resolving a secured, administrative or priority claim, such fees are payable from the "Residual

Wind-Down Assets" (as such term is defined in the GUC Trust Agreement), not Wind-Down

Budget Cash.  Accordingly, the Professional fees in respect of such matter must be invoiced

separately from the Professional's other fees and expenses.  Similarly, if a Professional is

incurring fees and expenses related to "Reporting and Transfer Costs", it must invoice that work

separately from other work being performed for the GUC Trust.

17.     It is my view that, given the various levels of control in place, the process for

ensuring the reasonableness of fees and expenses of Professionals is adequate and in the best

interest of the creditors of the estate.

### Creation of the 2012 Annual Plan

18.     Pursuant to Section 6.4 of the Trust Agreement, the GUC Trust Administrator is

required to submit to the GUC Trust Monitor and DIP Lenders a reasonably detailed annual plan

and budget ("**Annual Plan**") at least 30 days prior to the commencement of each calendar year.

The Annual Plan must include the anticipated fees and expenses of the GUC Trust for the

applicable year.

19.     Near the end of 2011, I and my staff began working on the Annual Plan for the

2012 calendar year.  In connection therewith, I (or in some cases, a member of my staff) contacted each significant Professional to discuss the current trending of its fees and expenses and to collect relevant information in support thereof.  First, I sought from each Professional the rationale behind their estimated fees and expenses as reflected in the Initial Budget and an explanation and understanding for any difference between actual and budgeted fees and expenses during the 2011 calendar year.  Second, I had each Professional provide additional information about progress made in the case generally and the amount of work the Professional believed it had left to perform.  Third, I had each Professional provide its best estimate of the amount of funds that it believed would be necessary to complete the tasks assigned to it to conduct an orderly wind down of the estates.  Fourth, where appropriate, I requested granular detail from particular Professionals, including summaries of individuals working on the case and hours worked (and expected to be worked) by individual.

20.    After reviewing a significant amount of data, and after several internal and external meetings, including meetings with the GUC Trust Monitor, I reached a number of informed conclusions.  First, the review demonstrated that although the Professionals, as a whole, were likely to be under-budget for 2011 (in aggregate, by approximately $2 million), certain Professionals were likely to be over-budget for 2011 (in aggregate, by approximately $3.5 million).  Due to the line item nature of the Budget, the GUC Trust Administrator was unable to pay such overage unless the DIP Lenders consented or New GM Securities were sold to fund such expenses, notwithstanding the fact that such fees and expenses were, in my view, reasonable and the underlying services benefited trust beneficiaries.

21.    Second, the review demonstrated that (a) cost overruns in 2012 were likely to be very significant from the Initial Budget and (b) likely, there would be (substantially smaller)

overruns in 2013 and 2014. Given that Treasury is not obligated to fund over the annual amount set forth in the Initial Budget, I determined that it was necessary and appropriate to pursue other avenues to raise funds for future Professional compensation.

22.     I also asked for various "cost-benefit" analyses to determine the projected return to trust beneficiaries on account of the GUC Trust's payment of additional administrative expenses. Based on the data available to me, I determined that it would be in creditors' best interests to reserve from distribution, and, if necessary, sell, New GM Securities necessary to pay the anticipated reasonable fees and expenses of Professionals. I submitted my conclusions to the GUC Trust Monitor, who agreed with this recommended course of action. This fact was included in the 2012 Annual Plan sent to Treasury.

23.     Although the GUC Trust has currently reserved from distribution New GM Securities which, based on my current estimation, should be adequate to fund the GUC Trust through 2014, at my direction, pursuant to the Motion, the GUC Trust Administrator is only seeking to sell New GM Securities necessary to pay accrued and projected reasonable fees and expenses of the GUC Trust in excess of the Initial Budget for 2011 and 2012.

24.     If it becomes necessary to sell additional New GM Securities, the GUC Trust Administrator will not do so before first obtaining an Order of the Court authorizing such action. Analyses of estimated overages relative to amounts set forth in the Initial Budget and Reporting and Transfer Costs, each for the years 2011 through 2014 are set forth as *Exhibit B* to this Declaration.[3]

---

[3] *Exhibit B* reflects forecasted fees and expenses for 2011 and 2012. The 2011 forecasts include accruals for work performed but not yet invoiced.

## The Avoidance Action Trust

25.    In December 2011, upon the dissolution of MLC, the Term Loan Avoidance

Action was transferred to the Avoidance Action Trust.  Subject only to the DIP Lenders' appeal

of the Court's ruling regarding the ownership of the Avoidance Action Trust, beneficiaries of the

Avoidance Action Trust and the GUC Trust are identical – the Debtors' unsecured creditors.

The Term Loan Avoidance Action is a potentially valuable source of recovery for unsecured

creditors, with over $1.5 billion in dispute.

26.    Per the Initial Budget and the applicable Trust Agreements, the only funding for

the Avoidance Action Trust provided by Treasury consists of $1.6 million in cash to cover all of

the trust's professional fees and expenses and other administrative costs plus $500,000 to cover

fees and expenses directly or indirectly related to any potential filings with the Securities and

Exchange Commission.

27.    I have determined that the current funding of the Avoidance Action Trust is

inadequate to properly fund the Term Loan Avoidance Action and the projected administrative

costs of the Avoidance Action Trust.

28.    An analysis of accrued and estimated Avoidance Action Trust fees and expenses

is attached to this declaration as ***Exhibit C***.

29.    In the event that the fees and expenses are not paid from the New GM Securities

currently held by the GUC Trust, the Avoidance Action Trustee may be compelled to seek either

outside contingency funding (which will likely cost the Avoidance Action Trust substantially

more) or, in the absence thereof, abandon the Term Loan Avoidance Action.

## WTC's Fees on a Going Forward Basis

30.    Sections 9.7 of the GUC Trust Agreement and the Avoidance Action Trust

Agreement provide that the GUC Trust Administrator or Avoidance Action Trust Administrator, as applicable, is entitled to "fair and reasonable" compensation for its services.

31.    As noted above, the Plan was confirmed in March of 2011.  Prior to confirmation, in or around November 2010, WTC submitted a fee proposal (the "**Fee Proposal**") to Treasury, as DIP Lender to the Debtors, to serve as GUC Trust Administrator and Avoidance Action Trust Administrator.  The Fee Proposal contemplated a 46-month engagement with a flat fee of $100,000 per month for the first three years and $50,000 per month thereafter for WTC to serve in the capacities of both GUC Trust Administrator and Avoidance Action Trust Administrator. The Fee Proposal assumed that the Trusts would survive for 46 months.[4]  WTC further noted that charges for non-GUC Trust Administrator or Avoidance Action Trust Administrator services would be billed at WTC's normal and regular rates and the Fee Proposal was subject to modification on account of unusual conditions or requirements.

32.    The Fee Proposal was based on the general assumption that the duties required of WTC, as administrator of both the GUC Trust and Avoidance Action Trust, would require the time of one full time senior person (at $425 per hour) and one full time junior person (at $200 per hour).

33.    Even putting aside the additional duties that are required of WTC in connection with its efforts to seek No Action Relief from the SEC, the general assumptions regarding the nature and complexity of the wind-down of the estates, on which the Fee Proposal was based, have turned out to be inaccurate.  Put simply, monitoring approximately 85 vendors and

---

[4]    Subsequent to the submission of the Fee Proposal, a portion of the aggregate fee ($50,000) was separated and designated as fees for services rendered as Avoidance Action Trust Administrator.  The remainder was designated as fees for services rendered as GUC Trust Administrator.

Professionals, developing financial statements and reports, reviewing proposed objections and settlements to claims, making quarterly distributions to thousands of creditors, reviewing and filing tax returns and addressing additional tax issues, coordinating litigation strategy, assisting creditors with setting up brokerage accounts to receive stock, reviewing updates and analyses from my staff and Professionals, reviewing reports filed with the SEC and answering creditor inquiries has taken a substantially increased amount of WTC's time.  Accordingly, WTC has, and will continue to devote, significantly more of its resources, time and energy to the engagements than originally contemplated.  Based on my current understanding of the work to be performed, and based on my experiences from the last ten months, I believe that, going forward, it will be necessary for WTC to devote at least two additional senior persons (one full time and one part time) to the GUC Trust Administrator role and one additional part time senior person to the Avoidance Action Trust Administrator role. Notably, despite the additional work performed in 2011, WTC is not seeking additional payment for its efforts in 2011.

34.     Given the unexpected and significant increase in the duties of the GUC Trust Administrator and the Avoidance Action Trust Administrator that have arisen since the submission of the Fee Proposal, I submit that the relief requested in the Motion with respect to the proposed increase in WTC's fees is warranted to compensate WTC for the additional work performed and the commensurate loss of opportunity associated with foregoing alternative engagements.

35.     Upon information and belief, concurrently herewith, FTI Consulting, Inc. ("**FTI**"), as the GUC Trust Monitor and Avoidance Action Trust Monitor, is submitting a declaration in support of the proposed increase in its fees in connection with the GUC Trust and the Avoidance Action Trust, as described in the Motion.  Based on my knowledge regarding the

FTI's initial fee proposal and the time and effort required of the GUC Trust Monitor and

Avoidance Action Trust Monitor in connection with the operation and maintenance of the two

trusts, I believe that the proposed increase in the GUC Trust Monitor's and Avoidance Action

Trust Monitor's respective monthly fees, as proposed in the Motion, is reasonable.

36.     Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my knowledge, information, and belief.


Dated:  Wilmington, Delaware
        February 23, 2012


                                        /s/ David A. Vanaskey Jr.
                                        David A. Vanaskey Jr.

*Exhibit A*

# *Exhibit A*

# *Identities of Vendors and Professionals*

| | |
|---|---|
| ADR Systems | JP Research, Inc. |
| AlixPartners LLP | King & Spalding LLP |
| American Arbitration Association | Kramer Levin |
| AON Premium Finance, LLC | Lathrop & Gage LLP |
| Avoidance Action Trust | Luscinia Research, LLC |
| Bernard, Cassisa, Elliott & Davis | McKenna Long & Aldridge LLP |
| Borden Ladner Garvais LLP | Michigan Consolidated Gas |
| Bowman and Brooke LLP | Mortality Research & Consulting |
| Burdin Mediations | Motors Liquidation Company |
| Butler Snow O Mara Stevens & Cannada PLLC | Needham Kepner & Fish |
| Butzel Long | O'Hagan Spencer LLP |
| Christopher Nolland | Osler, Hoskin & Harcourt |
| Computershare Inc. | Pepper Hamilton |
| Craddock Davis & Krause LLP | Plante & Moran PLLC |
| Crowell & Moring | Prichard Hawkins McFarland & Young LLP |
| CT Corporation | Richards Layton & Finger |
| D McMurtry & Associates LLC | RR Donnelley |
| Deloitte Tax | Rumberger Kirk & Caldwell, PA |
| Dickinson Wright PLLC | Safety Forensics, PLLC |
| Dickstein Shapiro | Sanchez Daniels & Hoffman LLP |
| DykemaGossett PLLC | Secure 24 |
| Eckert Seamans Cherin & Mellott, LLC | Sedgwick LLP |
| Econsult Corporation | Stewart McKelvey |
| EldridgeCooperSteichen & Leach | Tansey, Tracy & Convery, Esqs. |
| Epiq Bankruptcy Solutions, LLC | The Claro Group |
| Eric H. Holtzman | The Garden City Group, Inc. |
| Exponent, Inc. | Thorn Gershon Tymann Bonanni, LLP |
| First Insurance Funding Corp | Togut, Segal & Segal LLP |
| Foster Swift Collins & Smith PC | Tumino s Towing |
| Francis Carling Mediation & Arbitration | Turner, Reid, Duncan, Loomer & Patton PC |
| Garden City Group | US Department of Justice Office of the US Trustee |
| General Motors Company | Vincent Lopez Serafino Jenevein, PC |
| Genex Services, Inc. | Watkins Meegan |
| Gibson Dunn & Crutcher LLP | Weil, Gotshal & Manges LLP |
| Gilbert Mediation Group | Young Ricchiuti Caldwell & Heller, LLC |
| Glass Dispute Resolution | Zablocki Consulting |
| Godfrey & Kahn, S.C. | Zausmer Kaufman August Caldwell & Tayler |

*Exhibit B*

Declaration of David A. Vanaskey Jr.
**Exhibit B** (page 1 of 5)

**MLC GUC Trust 2011 and 2012 Expected Cost Analysis**
Analysis in support of request to liquidate shares
($ in thousands)

| | 2011 (Mar 1 - Dec 31) | | | | 2012 Full Year | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Estimated 2011 Expense | Initial Budget | Unfav Variance to be funded | Fav Variance due to timing (carried to 2012) | Estimated 2012 Expense | Initial Budget | plus: Fav Variance from 2011 to be carried over to 2012 | Original Budget plus: 2011 carry over | Unfav Variance to be funded |
| 1 Trust Monitor (FTI Consulting) | 579.0 | 625.0 | | 46.0 | 1,648.5 | 360.0 | 46.0 | 406.0 | 1,242.5 |
| 2 Trust Administrator (Wilmington Trust) | 945.0 | 1,184.9 | | 239.9 | 2,520.0 | 1,146.0 | 239.9 | 1,386.0 | 1,134.0 |
| Financial Reporting & Claims Resolution (AlixPartners) | 8,755.8 | 7,359.0 | 1,396.9 | | 7,918.2 | 2,245.2 | 0.0 | 2,245.2 | 5,673.0 |
| Lead Counsel[1] | 5,878.1 | 4,500.0 | 1,378.1 | | 7,020.0 | 3,600.0 | 0.0 | 3,600.0 | 3,420.0 |
| ADR Legal Counsel Fees & Expenses[2] | 1,406.2 | 5,762.2 | | 4,356.0 | 9,566.6 | 5,210.6 | 4,356.0 | 9,566.6 | 0.0 |
| Nova Scotia Litigation[3] | 1,286.5 | 1,900.0 | | 613.5 | 3,400.0 | 100.0 | 613.5 | 713.5 | 2,686.5 |
| Canadian Counsel (Stewart McKelvey ) | 14.7 | 125.0 | | 110.3 | 160.3 | 50.0 | 110.3 | 160.3 | 0.0 |
| Garden City Group | 915.8 | 770.0 | 145.8 | | 500.0 | 300.0 | 0.0 | 300.0 | 200.0 |
| Trust Counsel (Gibson Dunn) | 800.8 | 265.1 | 535.7 | | 300.0 | 246.0 | 0.0 | 246.0 | 54.0 |
| 3 Trust Professionals | 19,057.9 | 20,681.2 | 3,456.5 | 5,079.8 | 28,865.1 | 11,751.8 | 5,079.8 | 16,831.6 | 12,033.5 |
| Accounting & Tax Advisors[4] | 127.2 | 250.0 | | 122.8 | 622.8 | 500.0 | 122.8 | 622.8 | 0.0 |
| Rent and Facilities[5] | 154.6 | 178.0 | | 23.4 | 201.4 | 178.0 | 23.4 | 201.4 | 0.0 |
| Insurance Expense | 125.0 | 125.0 | 0.0 | | 125.0 | 125.0 | 0.0 | 125.0 | 0.0 |
| 4 Other Costs | 406.8 | 553.0 | 0.0 | 146.2 | 949.2 | 803.0 | 146.2 | 949.2 | 0.0 |
| 5 Reserve for Tax on DIP Loan | 0.0 | 0.0 | 0.0 | | 6,000.0 | 6,000.0 | | 6,000.0 | 0.0 |
| Total | 20,988.6 | 23,044.2 | 3,456.5 | 5,512.0 | 39,982.8 | 20,060.8 | 5,512.0 | 25,572.8 | 14,410.0 |

| | |
|---|---|
| 6 Total 2011 and 2012 estimated fees and expenses | 60,971.5 |
| 7 Amount funded by Initial Budget | (43,105.0) |
| 8 Total GUC Trust fees and expenses to be funded with proceeds from the sale of New GM securities[6] | 17,866.5 |

[1] Lead Counsel expenses are fees paid to and estimated for the following professionals:
  Weil
  Dickstein

[2] ADR Legal Counsel Fees & Expenses include fees paid to and estimated for the following vendors and professionals:
  Bernard, Cassisa, Elliott & David
  Borden Ladner Gervais LLP
  Bowman & Brook LLP
  Butler Snow
  Carddock Davis & Krause LLP
  D. McMurtry & Associates LLC
  Dykema
  Eckert Seamans Chernin & Mellot LLC
  Eldridge Cooper Steichen & Leach PLLC
  Epiq
  Hanson Bolkcom Group Ltd
  Hartline Davus Barger Dreyer
  Honigman Miller Schwartz Cohn LLP
  Jenner & Block LLP
  King & Spalding LLP
  Lathrop & Gage
  McKenna, Long & Aldridge
  O'Hagan Spencer LLP
  Prichard, Hawkins, McFarland & Young LLP
  Richard Layton & Finger
  Remberger, Kirk & Caldwell, P.A.
  Sedgwick, Detert, Morgan & Arnold LLP
  Tansey, Tracy & Convery
  The Rose Law Firm LLC
  Thorn Gershon Tymann
  Turner, Reid, Duncan, Loomer & Patton, P.C.
  Zausmer, Kaufman, August, Caldwell, & Taylor, P.C.

[3] Nova Scotia Litigation expenses include fees paid to and estimated for the following professionals:
  Butzel Long
  Jenner & Block
  Dickstein Shapiro

[4] Accounting and Tax Advisor expenses include fees paid to and estimated for the following professionals:
  Wilmington Trust (Investment Management Fee)
  Plante Moran (External Auditor)
  Rick Zablocki (Tax Advisor)

[5] Rent and Facilities expenses include fees paid to and estimated for the following professionals:
  Wilmington Trust (Custody Fee)
  Computershare
  US Trustee Fee

[6] Fees and expenses to be paid from the proceeds of the stock sale will not be restricted by line items so that a surplus in one line item can be used to fund budget overages in another line item.

Declaration of David A. Vanaskey Jr.

**Exhibit B** (page 2 of 5)

**MLC GUC Trust 2011 Estimated Fee Detail**
*($ in thousands)*

| | 2011 (Mar 1 - Dec 31) | | | |
|---|---|---|---|---|
| | Estimated 2011 Expense | Initial Budget | Unfav Variance to be funded | Fav Variance due to timing (carried to 2012) |
| 1 **Trust Monitor (FTI Consulting)** | **579.0** | **625.0** | | **46.0** |
| 2 **Trust Administrator (Wilmington Trust)** | **945.0** | **1,184.9** | | **239.9** |
| Financial Reporting & Claims Resolution (AlixPartners) | 8,755.8 | 7,359.0 | 1,396.9 | |
| Weil | 5,393.3 | | | |
| Dickstein | 484.8 | | | |
| Lead Counsel | 5,878.1 | 4,500.0 | 1,378.1 | |
| Bernard, Cassisa, Elliott & David | 6.0 | | | |
| Borden Ladner Gervais LLP | 2.5 | | | |
| Bowman & Brook LLP | 177.8 | | | |
| Butler Snow | 5.8 | | | |
| Carddock Davis & Krause LLP | 0.0 | | | |
| D. McMurtry & Associates LLC | 47.1 | | | |
| Dykema | 76.0 | | | |
| Eckert Seamans Chernin & Mellot LLC | 27.2 | | | |
| Eldridge Cooper Steichen & Leach PLLC | 6.8 | | | |
| Epiq | 61.9 | | | |
| Hanson Bolkcom Group Ltd | 31.9 | | | |
| Hartline Davus Barger Dreyer | 149.0 | | | |
| Honigman Miller Schwartz Cohn LLP | 1.3 | | | |
| Jenner & Block LLP | 17.3 | | | |
| King & Spalding LLP | 90.8 | | | |
| Lathrop & Gage | 10.7 | | | |
| McKenna, Long & Aldridge | 0.0 | | | |
| O'Hagan Spencer LLP | 2.2 | | | |
| Prichard, Hawkins, McFarland & Young LLP | 1.5 | | | |
| Richard Layton & Finger | 5.2 | | | |
| Remberger, Kirk & Caldwell, P.A. | 1.4 | | | |
| Sedgwick, Detert, Morgan & Arnold LLP | 4.0 | | | |
| Tansey, Tracy & Convery | 40.3 | | | |
| The Rose Law Firm LLC | 0.0 | | | |
| Thorn Gershon Tymann | 7.2 | | | |
| Turner, Reid, Duncan, Loomer & Patton, P.C. | 5.8 | | | |
| Zausmer, Kaufman, August, Caldwell, & Taylor, P.C. | 5.9 | | | |
| ADR Accrual | 509.0 | | | |
| Mediation and expert expense | 111.4 | | | |
| ADR Legal Counsel Fees & Expenses | 1,406.2 | 5,762.2 | | 4,356.0 |
| Butzel Long | 146.9 | | | |
| Jenner & Block | 0.0 | | | |
| Dickstein Shapiro | 1,139.6 | | | |
| Nova Scotia Litigation | 1,286.5 | 1,900.0 | | 613.5 |
| Canadian Counsel (Stewart McKelvey ) | 14.7 | | | |
| Garden City Group | 915.8 | | | |
| Trust Counsel (Gibson Dunn) | 800.8 | | | |
| 3 **Trust Professionals** | **19,057.9** | **20,681.2** | **3,456.5** | **5,079.8** |
| Wilmington Investment Fee | 76.2 | | | |
| Plante Moran | 37.5 | | | |
| Rick Zablocki | 13.4 | | | |
| Accounting & Tax Advisors | 127.2 | 250.0 | | 122.8 |
| Rent/Facilities Expense | 106.2 | | | |
| Wilmington Custody Fee | 25.0 | | | |
| Computershare | 0.6 | | | |
| US Trustee Fee | 22.8 | | | |
| Rent and Facilities | 154.6 | 178.0 | | 23.4 |
| Insurance Expense | 125.0 | | | |
| 4 **Other Costs** | **406.8** | **553.0** | **0.0** | **146.2** |
| 5 **Reserve for Tax on DIP Loan** | 0.0 | 0.0 | | |
| 6 **Total 2011 estimated fees and expenses** | **20,988.6** | **23,044.2** | **3,456.5** | **5,512.0** |
| Net variance of estimated expenses to the Initial Budget | | | | (2,055.5) |

Declaration of David A. Vanaskey Jr.
**Exhibit B** (page 3 of 5)

**MLC GUC Trust 2013 and 2014 Projected Cost Analysis**
*Analysis in support of decision to reserve shares*
*($ in thousands)*

| | 2013 Full Year | | | 2014 Full Year | | |
|---|---|---|---|---|---|---|
| | Estimated 2013 Expense | Initial Budget | Unfav Variance to be funded | Estimated 2014 Expense | Initial Budget | Unfav Variance to be funded |
| 1 Trust Monitor (FTI Consulting) | 1,443.8 | 180.0 | 1,263.8 | 1,307.3 | 0.0 | 1,307.3 |
| 2 Trust Administrator (Wilmington Trust) | 2,467.5 | 1,146.0 | 1,321.5 | 2,467.5 | 573.0 | 1,894.5 |
| Financial Advisor & Claims Resolution (AlixPartners) | | 658.9 | | | 0.0 | |
| Lead Counsel[1] | | 900.0 | | | 0.0 | |
| ADR Legal Counsel Fees & Expenses[2] | | 4,296.3 | | | 0.0 | |
| Nova Scotia Litigation[3] | | 0.0 | | | 0.0 | |
| Canadian Counsel (Stewart McKelvey ) | | 0.0 | | | 0.0 | |
| Subtotal estimate for Alix, Lead Counsel, ADR Legal, Nova Scotia Litigation & Canadian Counsel[4] | 10,000.0 | 5,855.2 | 4,144.8 | 4,000.0 | 0.0 | 4,000.0 |
| Garden City Group | 300.0 | 300.0 | 0.0 | 300.0 | 300.0 | 0.0 |
| Trust Counsel (Gibson Dunn) | 501.0 | 246.0 | 255.0 | 501.0 | 123.0 | 378.0 |
| 3 Trust Professionals | 10,801.0 | 6,401.2 | 4,399.8 | 4,801.0 | 423.0 | 4,378.0 |
| Accounting & Tax Advisors[5] | 150.0 | 150.0 | 0.0 | 150.0 | 150.0 | 0.0 |
| Rent and Facilities[6] | 178.0 | 178.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Insurance Expense | 125.0 | 125.0 | 0.0 | 178.0 | 178.0 | 0.0 |
| 4 Other Costs | 453.0 | 453.0 | 0.0 | 328.0 | 328.0 | 0.0 |
| 5 Reserve for Tax on DIP Loan | 0.0 | 0.0 | 0.0 | 125.0 | 125.0 | 0.0 |
| *Total* | *15,165.2* | *8,180.2* | *6,985.0* | *9,028.7* | *1,449.0* | *7,579.7* |

| | | |
|---|---|---|
| 6 Total 2013 and 2014 projected fees and expenses | | 24,194.0 |
| 7 Amount funded by Initial Budget | | (9,629.2) |
| 8 Total GUC Trust fees and expenses to be reserved from future excess distributions but not liquidated at this time | | 14,564.7 |

[1] Lead Counsel expenses include fees paid to and estimated for the following professionals:
  Weil
  Dickstein

[2] ADR Legal Counsel Fees & Expenses include fees paid to and estimated for the following vendors and professionals:
  Bernard, Cassia, Elliott & David
  Borden Ladner Gervais LLP
  Bowman & Brook LLP
  Butler Snow
  Carddock Davis & Krause LLP
  D. McMurtry & Associates LLC
  Dykema
  Eckert Seamans Chernin & Mellot LLC
  Eldridge Cooper Steichen & Leach PLLC
  Epiq
  Hanson Bolkcom Group Ltd
  Hartline Davus Barger Dreyer
  Honigman Miller Schwartz Cohn LLP
  Jenner & Block LLP
  King & Spalding LLP
  Lathrop & Gage
  McKenna, Long & Aldridge
  O'Hagan Spencer LLP
  Prichard, Hawkins, McFarland & Young LLP
  Richard Layton & Finger
  Remberger, Kirk & Caldwell, P.A.
  Sedgwick, Detert, Morgan & Arnold LLP
  Tansey, Tracy & Convery
  The Rose Law Firm LLC
  Thorn Gershon Tymann
  Turner, Reid, Duncan, Loomer & Patton, P.C.
  Zausmer, Kaufman, August, Caldwell, & Taylor, P.C.

[3] Nova Scotia Litigation expenses include fees paid to and estimated for the following professionals:
  Jenner & Block
  Dickstein Shapiro

[4] Given the extended time horizon, 2013 and 2014 estimates were based off of high level trends, not line by line budgets.

[5] Accounting and Tax Advisor expenses include fees paid to and estimated for the following professionals:
  Wilmington Trust (Investment Management Fee)
  Plante Moran (External Auditor)
  Rick Zablocki (Tax Advisor)

[6] Rent and Facilities expenses include fees paid to and estimated for the following professionals:
  Computershare
  US Trustee Fee

[7] Fees and expenses to be paid from the proceeds of the stock sale will not be restricted to line items so that a surplus in one line item can be used to fund budget overages in another line item.

Declaration of David A. Vanaskey Jr.
**Exhibit B** (page 4 of 5)

**MLC GUC Trust Reporting & Transfer 2011 and 2012 Expected Cost Analysis**
Analysis in support of request to liquidate shares
*($ in thousands)*

| | | Estimated 2011 Expense Mar 1 - Dec 31 | Estimated 2012 Expense |
|---|---|---|---|
| 1 | **Trust Monitor (FTI Consulting)** | **0.0** | **787.5** |
| 2 | **Trust Administrator (Wilmington Trust)** | **0.0** | **2,152.5** |
| | AlixPartners | 1,942.1 | 816.3 |
| | Gibson Dunn | 1,328.1 | 500.0 |
| | Watkins Meegan | 20.6 | 279.4 |
| | Plante Moran | 200.0 | 100.0 |
| | Crowell Moring | 350.0 | 250.0 |
| | Kramer Levin | 808.7 | 300.0 |
| 3 | **Trust Professionals** | **4,649.5** | **2,245.7** |
| | Insurance | 535.0 | 13.0 |
| | Bowne Printing | 30.0 | 30.0 |
| | Legal Reserve Fund | 0.0 | 2,000.0 |
| | Other Reporting/Compliance Contingency√ | 0.0 | 1,354.7 |
| 4 | **Other Costs and Reserves** | **565.0** | **3,397.7** |
| 5 | **Funding for Avoidance Action Reporting Costs** | **500.0** | **0.0** |
| | *Total* | *5,714.5* | *8,583.4* |
| 6 | **Total 2011 and 2012 estimated fees and expenses** | | 14,298.0 |
| 7 | Amount to be funded by Initial Budget | | (5,649.3) |
| 8 | Total GUC Trust Reporting & Transfer fees and expenses to be funded with proceeds from the sale of New GM securities | | 8,648.7 |

[1] Other Reporting/Compliance Contingency costs includes $1.354MM in 2012 for additional reporting or
   compliance costs that may arise as a result of the finalization of the SEC no action letter or the Sarbanes Oxley risk
   assessment and corresponding gap analysis.

Declaration of David A. Vanaskey Jr.

**Exhibit B** (page 5 of 5)

**MLC GUC Trust Reporting & Transfer 2013 and 2014 Projected Cost Analysis**
Analysis in support of decision to reserve shares
*($ in thousands)*

| | Estimated 2013 Expense | Estimated 2014 Expense |
|---|---|---|
| 1 **Trust Monitor (FTI Consulting)** | 525.0 | 525.0 |
| 2 **Trust Administrator (Wilmington Trust)** | 1,365.0 | 1,365.0 |
|   AlixPartners | 450.0 | 450.0 |
|   Gibson Dunn | 325.0 | 488.0 |
|   Watkins Meegan | 150.0 | 125.0 |
|   Plante Moran | 100.0 | 100.0 |
|   Crowell Moring | 100.0 | 100.0 |
|   Kramer Levin | 0.0 | 0.0 |
| 3 **Trust Professionals** | 1,125.0 | 1,263.0 |
|   Insurance | 13.0 | 13.0 |
|   Bowne Printing | 30.0 | 30.0 |
|   Legal Reserve Fund | 0.0 | 0.0 |
|   Other Reporting/Compliance Contingency¹ | 0.0 | 0.0 |
| 4 **Other Costs and Reserves** | 43.0 | 43.0 |
| 5 **Funding for Avoidance Action Reporting Costs** | 0.0 | 0.0 |
| *Total* | *3,058.0* | *3,196.0* |
| 6 **Total 2013 and 2014 projected fees and expenses** | | 6,254.0 |
| 7 Amount to be funded by Initial Budget | | 0.0 |
| 8 Total GUC Trust Reporting & Transfer fees and expenses to be reserved from future excess distributions but not liquidated at this time | | 6,254.0 |

¹ Other Reporting/Compliance Contingency costs are $0 in 2013 and 2014.

*Exhibit C*

Declaration of David A. Vanaskey Jr.

**Exhibit C** (page 1 of 1)

**MLC AAT Trust 2011 - 2014 Expected Cost Analysis**

Analysis in support of request to liquidate shares

*($ in thousands)*

| | | Estimated 2012 Expense | Estimated 2013 Expense | Estimated 2014 Expense |
|---|---|---|---|---|
| 1 | **Trust Monitor (FTI Consulting)** | **480.0** | **480.0** | **480.0** |
| 2 | **Trust Administrator (Wilmington Trust)** | **700.0** | **700.0** | **700.0** |
| | Financial valuation (Ernst & Young/Frazier Deeter) | 50.0 | 0.0 | 0.0 |
| | Legal valuation (Dickstein Shapiro) | 150.0 | 0.0 | 0.0 |
| | Insurance | 1,250.0 | 0.0 | 0.0 |
| | Tax Consultant (Grant Thornton) | 400.0 | 200.0 | 400.0 |
| | Trust Counsel (Gibson Dunn) | 100.0 | 25.0 | 25.0 |
| | Other [1] | 400.0 | 325.0 | 2,825.0 |
| 3 | **Total trust professional fees and expenses** | **2,350.0** | **550.0** | **3,250.0** |
| 4 | **Litigation expense (Dickstein Shapiro)** | **1,600.0** | **2,000.0** | **2,000.0** |
| | *Total* | *5,130.0* | *3,730.0* | *6,430.0* |
| 5 | **Total 2011 - 2014 estimated fees and expenses** | | | **15,290.0** |
| 6 | Amount to be funded by Initial Budget | | | (1,576.0) |
| 8 | Total AAT Trust fees and expenses to be funded with proceeds from the sale of New GM securities | | | 13,714.0 |

[1] Other costs includes general contingencies of $400k in 2012; $325k in 2013; and $325k plus a $2.5MM reserve against a potential insurance deductible in 2014.