# **REPLY EXHIBIT F**

[Phillips Declaration]

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>**MOTORS LIQUIDATION COMPANY.,** *et al.*<br>         **(f/k/a General Motors Corp.,** *et al.***)**<br><br>                                           **Debtors.** | Chapter 11<br><br>Case No. 09-50026 (REG)<br><br>(Jointly Administered) |

<u>DECLARATION OF ANNA PHILLIPS IN SUPPORT OF THE MOTION
OF WILMINGTON TRUST COMPANY, (I) AS GUC TRUST ADMINISTRATOR, TO
(A) LIQUIDATE NEW GM SECURITIES FOR THE PURPOSE OF FUNDING FEES,
COSTS AND EXPENSES OF THE GUC TRUST AND AVOIDANCE ACTION TRUST,
AND (B) TRANSFER NEW GM SECURITIES TO THE AVOIDANCE ACTION TRUST
FOR THE PURPOSE OF FUNDING FUTURE TAX LIABILITIES
AND (II) AS AVOIDANCE ACTION TRUST ADMINISTRATOR, TO APPROVE
AN AMENDMENT TO THE AVOIDANCE ACTION TRUST AGREEMENT</u>

I, Anna Phillips declare:

1.     I am a Senior Managing Director of FTI Consulting, Inc. ("**FTI**"), located at 1201 W. Peachtree St. Suite 600, Atlanta, Georgia 30309. I submit this declaration (the "**Declaration**") in support of the motion (the "**Motion**")[1] submitted by (i) the GUC Trust Administrator seeking entry of an Order approving (a) the GUC Trust's sale of New GM Securities to fund accrued and expected fees, costs and expenses of the GUC Trust and the Avoidance Action Trust, and (b) the GUC Trust's transfer of New GM Securities to the Avoidance Action Trust to fund potential future tax liabilities of the Avoidance Action Trust, and (ii) the Avoidance Action Trust Administrator, seeking entry of an Order approving an amendment to the Avoidance Action Trust Agreement.

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Motion.

2.     Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would competently testify thereto.

### Background and the Budget

3.     FTI's initial role in the Chapter 11 Cases was as financial advisor to the Official Committee of Unsecured Creditors (the "**Committee**"). FTI's retention in such capacity was approved by an Order of this Court dated August 18, 2009 (Docket No. 3829).

4.     On March 29, 2011, this Court entered an Order confirming MLC's liquidating Plan, and appointing FTI as GUC Trust Monitor and Avoidance Action Trust Monitor. The Plan, as confirmed by the Court, included a budget for the GUC Trust and an administrative fund for the Avoidance Action Trust (collectively, the "**Initial Budget**"). FTI's projected fees and expenses as GUC Trust Monitor and Avoidance Action Trust Monitor were incorporated into the back-up of the Initial Budget.

5.     As financial advisor to the Committee, FTI was just one of a large number of estate parties and professionals who provided input to the Debtors' professionals in relation to the Initial Budget. The Initial Budget primarily was developed by the Debtors and their professionals. The Debtors dealt directly with the DIP Lenders to secure approval for the Initial Budget.

6.     As an advisor to the Committee, I attempted to ensure that the United States Department of the Treasury (the "**Treasury**"), in its capacity as DIP Lender to the Debtors, provided the cash necessary to fund wind-down of the Debtors' estates. At the time the Initial Budget was formulated, it was not possible to ascertain with certainty whether the line-items allocated in the Initial Budget would prove adequate to fund fees and expenses incurred in connection with the wind-down of the Debtors' estates or the liquidation of the Debtors' assets. I

was aware, however, that the GUC Trust Agreement provided the GUC Trust Administrator with authority to reserve (with GUC Trust Monitor approval) and liquidate (with Court approval) New GM Securities, in the event available funds provided were insufficient.

### Monitoring of Fees to Ensure Reasonableness

7.      The GUC Trust, in general, implements the Plan by reconciling Disputed General Unsecured Claims (Class 3 claims) against the Debtors and distributing New GM Securities to holders of Allowed General Unsecured Claims. In addition, since the December 15, 2012 dissolution of MLC, the GUC Trust has assumed responsibility for the satisfaction of existing Residual Wind-Down Claims (as defined in the GUC Trust Agreement).

8.      The GUC Trust currently receives invoices from approximately 85 separate vendors and professionals (each, a "**Professional**" and collectively, the "**Professionals**"). In addition, numerous Professionals serve the GUC Trust in separate capacities and for which they provide separate invoices. Professionals serve the GUC Trust in various capacities, including: (a) accounting; (b) litigation services; (c) corporate and securities law services; (d) financial advisory work; (e) risk and operational controls; and (f) accounting.

9.      In accordance with Section 8.3 of the GUC Trust Agreement, I and my staff designated to this matter receive and review for reasonableness electronic or hardcopy monthly invoices submitted by Professionals prior to their payment. This has required significant resources to ensure that Professionals act in a reasonable and cost effective manner that will benefit GUC Trust beneficiaries.

10.     It is my view that the GUC Trust Monitor's review process coupled with the other safeguards set forth in the GUC Trust Agreement ensures the reasonableness of Professional fees and expenses and is adequate and in the best interests of allowed creditors.

**The 2012 Budget**

11.     The GUC Trust Monitor also exerts control over Professional compensation through its review of and sign-off on the annual budget and quarterly updates, as required. *See* GUC Trust Agreement §§ 6.4, 11.3. The GUC Trust Administrator is required to submit to the GUC Trust Monitor and the DIP Lenders, for their review and approval, a reasonably detailed annual plan and budget ("**Annual Plan**") at least 30 days prior to the commencement of each calendar year. The Annual Plan must include the anticipated fees and expenses of the GUC Trust for the applicable year.

12.     On December 1, 2011, the GUC Trust Administrator sent to me the 2012 Annual Plan, prompting considerable analysis and review of the underlying drivers of the Annual Plan and resulting financial impact of the proposed payments set forth therein. After a careful evaluation of the foregoing, I approved the 2012 Annual Plan.

13.     Around the same time, the GUC Trust Administrator contacted me regarding reserving New GM Securities from the next distribution of Excess GUC Trust Distributable Assets to pay the anticipated reasonable fees and expenses of Professionals. Although, in 2011, the aggregate Professional fees, costs and expenses likely fell below their estimated amounts in the Initial Budget (in aggregate, by approximately $2 million), certain Professionals likely were over-budget (in the aggregate, by approximately $3.5 million). Based on numbers provided to me by the GUC Trust Administrator, however, future projected overruns appeared substantial. After considerable discussion and due diligence regarding the fees incurred to date, the current status of the various work streams and projected fees going forward for those work streams, I agreed with the GUC Trust Administrator's decision to reserve New GM Securities to pay costs, fees and expenses for 2011 and beyond and the magnitude of the reserve of New GM Securities.

**The Avoidance Action Trust**

14.     Wilmington Trust Company, in its capacity as GUC Trust Administrator, also proposed to establish a separate reserve of New GM Securities to fund the Avoidance Action Trust.  As part of such request, the Avoidance Action Trust Administrator demonstrated for me the expected fees, costs and expenses of operating the Avoidance Action Trust (including in connection with the prosecution of the Term Loan Avoidance Action).  After considerable analysis and due diligence of (a) the Avoidance Action Trust Administrator's budget estimates for expected fees, costs and expenses, (b) the amount of unfinished work in connection with the Term Loan Avoidance Action and the recent appeal of the Term Loan Ownership Ruling, and (c) potential outcomes if the Avoidance Action Trust failed to receive sufficient funding, I agreed with this course of action.

**FTI's Fees on a Going-Forward Basis**

15.     As noted above, the Plan was confirmed in late March of 2011.  Nearly five months prior to confirmation, in early November 2010, FTI submitted a fee proposal (the "**Fee Proposal**") to the Treasury as DIP Lender, to serve as GUC Trust Monitor and Avoidance Action Trust Monitor.  The Fee Proposal contemplated a 36-month engagement with monthly fees equal to (a) $75,000 for the first 3 months of the Trusts' existence, (b) $50,000 for the following 9 months, (c) $30,000 for the next 12 months, and (d) $15,000 for the final 12 months.

16.     The Fee Proposal was based on the general assumption that the duties required of FTI as monitor of both Trusts would require 1,365 total hours of work in year 1, 750 hours of work in year 2, and 375 hours of work in year 3 – and that the Trusts would dissolve by the end of year 3.  In drafting the Fee Proposal, I and my FTI colleagues further assumed that, through

FTI's use of leverage, the blended hourly rate of FTI professionals would be below $500 per hour.

17. The general assumptions on which the Fee Proposal was based have turned out to be inaccurate. Put simply, monitoring approximately 85 Professionals, reviewing, commenting on and providing sign-off to financial statements and reports, analyzing and commenting on certain proposed claims settlements, and reviewing, with the requisite level of due diligence, the Annual Plan and related quarterly updates and reports filed and that will need to be filed with the SEC have each required far more time than previously anticipated. Also, due to the complexity and materiality of the issues being addressed, the work has not been leveraged to more junior staff, resulting in a significantly higher blended hourly fee rate. Finally, based on progress completed to date, I believe the Trusts will not be dissolved by March 31, 2014, necessitating FTI's remaining as GUC Trust Monitor and Avoidance Action Trust Monitor for an estimated additional 9 months.

18. Based on my current understanding of the work to be performed, and based on my experiences from the last ten months, I believe that, going forward, FTI's service as monitor for the GUC Trust and Avoidance Action Trust will require a substantially greater time commitment by senior and highly experienced personnel. The following chart compares the projected work hours underlying the original Fee Proposal versus the FTI's current estimates regarding hours to be spent by FTI acting in its capacities as GUC Trust Monitor and Avoidance Action Trust Monitor (including time spent during the Trust's first 10 months of existence).

|  | **FEE PROPOSAL** | **CURRENT ESTIMATES**[2] |
|---|---|---|
| **YEAR 1** *12 months ending 3/31/12* | 1,365 | 2,100 |
| **YEAR 2** *12 months ending 3/31/13* | 750 | 2,700 |
| **YEAR 3** *12 months ending 3/31/14* | 375 | 2,700 |
| 4/1/14 - 12/31/14 | 0 | 2,000 |
| **TOTAL** | 2,490 | 9,500 |

Notably, FTI is not seeking compensation for time spent in 2011 above the fees set forth in the Fee Proposal notwithstanding the significant negative variance incurred based on actual time worked.

19.     Given the significant increase in the duties of the GUC Trust Monitor and the Avoidance Action Trust Monitor that have arisen since submission of the Fee Proposal, I submit that the relief requested in the Motion with respect to the proposed increase in FTI's fees is warranted to compensate FTI for the additional work performed and the commensurate loss of opportunity associated with foregoing alternative engagements.

20.     Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:   Atlanta, Georgia
             February 23, 2012

                                                        /s/ Anna Phillips
                                                        Anna Phillips

---

[2] The current hours estimates above do not include hours spent by the GUC Trust Monitor compensable as a Reporting and Transfer Cost because FTI's efforts in this respect were not reflected in the initial Fee Proposal.