# EXHIBIT A



Since 1946

**Shannon Anne Scott**
**Associate**
516-393-8233
sscott@jaspanllp.com

# JASPAN SCHLESINGER LLP
Attorneys at Law

300 GARDEN CITY PLAZA • GARDEN CITY, NEW YORK 11530
TELEPHONE 516.746.8000 • FAX 516.393.8282
www.jaspanllp.com

# FILE COPY

**DELAWARE OFFICE**
913 North Market Street
Wilmington, DE 19801
Telephone 302.351.8000
Fax 302.351.8010

January 14, 2011

The Garden City Group, Inc.
Attn: Motors Liquidation Company
P.O. Box 9386
Dublin, Ohio 43017-4286

**Re:**   **Motors Liquidation Company, et al.,**
**f/k/a General Motors Corp., et al.**
**Chapter 11**
**Case No. 09-50026**

To Whom It May Concern:

Enclosed please find a proof of claim, along with a statement of the legal and factual basis for the claim and relevant exhibits, to be filed in the above-referenced bankruptcy case.

Should you have any questions or comments, please do not hesitate to contact me.

Very truly yours,

Shannon Anne Scott

Enclosures

SXS/D734574v1/M057010/C0152620

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| | |
|---|---|
| Name of Debtor (Check Only One):<br>☒ Motors Liquidation Company (f/k/a General Motors Corporation)<br>☐ MLCS, LLC (f/k/a Saturn, LLC)<br>☐ MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation)<br>☐ MLC of Harlem, Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc.) | Case No.<br>09-50026 (REG)<br>09-50027 (REG)<br>09-50028 (REG)<br>09-13558 (REG) | Your Claim is Scheduled As Follows:<br><br>Scheduled General<br>Unsecured Claim |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case, but may be used for purposes of asserting a claim under 11 U.S.C. § 503(b)(9) (see Item # 5). All other requests for payment of an administrative expense should be filed pursuant to 11 U.S.C. § 503

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property): Woodbury Cadillac, LLC | |
| Name and address where notices should be sent:<br>C/O<br>Steven R. Schlesinger, Esq.<br>Jaspan Schlesinger LLP<br>300 Garden City Plaza, 5th Floor<br>Garden City, NY  11530<br><br>Telephone number: 516-746-8000<br>Email Address: | ☒ Check this box to indicate that this claim amends a previously filed claim.<br><br>Court Claim Number: Scheduled<br>(if known)                 Claim<br><br>Filed on:_____ |
| Name and address where payment should be sent (if different from above):<br><br><br><br><br>Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

If an amount is identified above, you have a claim scheduled by one of the Debtors as shown. (This scheduled amount of your claim may be an amendment to a previously scheduled amount.) If you agree with the amount and priority of your claim as scheduled by the Debtor and you have no other claim against the Debtor, you do not need to file this proof of claim form, EXCEPT AS FOLLOWS: If the amount shown is listed as DISPUTED, UNLIQUIDATED, or CONTINGENT, a proof of claim MUST be filed in order to receive any distribution in respect of your claim. If you have already filed a proof of claim in accordance with the attached instructions, you need not file again.

**1. Amount of Claim as of Date Case Filed, June 1, 2009:** $ 1,000,000.00

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4. If all or part of your claim is entitled to priority, complete item 5. If all or part of your claim is asserted pursuant to 11 U.S.C. § 503(b)(9), complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:** Tort (see attached)
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____

**3a. Debtor may have scheduled account as:** _____
(See instruction #3a on reverse side.)

**4. Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff:  ☐ Real Estate   ☐ Motor Vehicle   ☐ Equipment   ☐ Other
Describe:

Value of Property: $_____ Annual Interest Rate____%

Amount of arrearage and other charges as of time case filed included in secured claim, if any: $_____

Basis for perfection: _____

Amount of Secured Claim: $_____      Amount Unsecured: $_____

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See instruction 7 and definition of "redacted" on reverse side.)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain in an attachment.

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).

☐ Value of goods received by the Debtor within 20 days before the date of commencement of the case – 11 U.S.C. § 503(b)(9) (§ 507(a)(2)).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(__).

Amount entitled to priority:

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

| | | |
|---|---|---|
| Date: 1/14/11 | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>_/s/_<br><br>Steven R. Schlesinger | FOR COURT USE ONLY |

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.
Modified B10 (GCG) (12/08)

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules. The attorneys for the Debtors and their court-appointed claims agent, The Garden City Group, Inc., are not authorized and are not providing you with any legal advice.*

### A SEPARATE PROOF OF CLAIM FORM MUST BE FILED AGAINST EACH DEBTOR

PLEASE SEND YOUR ORIGINAL, COMPLETED CLAIM FORM AS FOLLOWS: IF BY MAIL: THE GARDEN CITY GROUP, INC., ATTN: MOTORS LIQUIDATION COMPANY CLAIMS PROCESSING, P.O. BOX 9386, DUBLIN, OH 43017-4286. IF BY HAND OR OVERNIGHT COURIER: THE GARDEN CITY GROUP, INC., ATTN: MOTORS LIQUIDATION COMPANY CLAIMS PROCESSING, 5151 BLAZER PARKWAY, SUITE A, DUBLIN, OH 43017. PROOFS OF CLAIM MAY ALSO BE HAND DELIVERED TO: THE UNITED STATES BANKRUPTCY COURT, SDNY, ONE BOWLING GREEN, ROOM 534, NEW YORK, NEW YORK 10004. ANY PROOF OF CLAIM SUBMITTED BY FACSIMILE OR E-MAIL WILL NOT BE ACCEPTED.

### THE GENERAL AND GOVERNMENTAL BAR DATE IS NOVEMBER 30, 2009 AT 5:00 P.M. (PREVAILING EASTERN TIME)

**Court, Name of Debtor, and Case Number:**
These chapter 11 cases were commenced in the United States Bankruptcy Court for the Southern District of New York on June 1, 2009. You should select the debtor against which you are asserting your claim.
A SEPARATE PROOF OF CLAIM FORM MUST BE FILED AGAINST EACH DEBTOR.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. Please provide us with a valid email address. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if the debtor, trustee or another party in interest files an objection to your claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor, if any.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507(a):**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

For claims pursuant to 11 U.S.C. § 503(b)(9), indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before June 1, 2009, the date of commencement of these cases (See DEFINITIONS, below). Attach documentation supporting such claim.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the Debtor credit for any payments received toward the debt.

**7. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). If the claim is based on the delivery of health care goods or services, see instruction 2. Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

## DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.
The Debtors in these Chapter 11 cases are:

| | |
|---|---|
| Motors Liquidation Company | |
| (f/k/a General Motors Corporation) | 09-50026 (REG) |
| MLCS, LLC | |
| (f/k/a Saturn, LLC) | 09-50027 (REG) |
| MLCS Distribution Corporation | |
| (f/k/a Saturn Distribution Corporation) | 09-50028 (REG) |
| MLC of Harlem, Inc. | |
| (f/k/a Chevrolet-Saturn of Harlem, Inc.) | 09-13558 (REG) |

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the Debtor on the date of the bankruptcy filing. See 11 U.S.C. § 101(5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with The Garden City Group, Inc. as described in the instructions above and in the Bar Date Notice.

**Secured Claim Under 11 U.S.C. § 506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be

paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Section 503(b)(9) Claim**
A Section 503(b)(9) claim is a claim for the value of any goods received by the debtor within 20 days before the date of commencement of a bankruptcy case in which the goods have been sold to the debtor in the ordinary course of such debtor's business.

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. § 507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's

## INFORMATION

tax-identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing from The Garden City Group, Inc., please provide a self-addressed, stamped envelope and a copy of this proof of claim when you submit the original claim to The Garden City Group, Inc.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documents or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.), and any applicable orders of the bankruptcy court.

**Additional Information**
If you have any questions with respect to this claim form, please contact Alix Partners at 1 (800) 414-9607 or by e-mail at claims@motorsliquidation.com.

*In re Motors Liquidation Company, et al., f/k/a General Motors Corp., et al.,* – Chapter 11 - Case No. 09-50026 (REG)

## Woodbury Cadillac, LLC

**Total Amount of the General Unsecured Claim of Woodbury Cadillac, LLC as of commencement of Case: $1,000,000.00**

---

1.      On or about March 13, 2009, Woodbury Cadillac, LLC ("Woodbury Cadillac") commenced an action (the "Action") against Country Cadillac, Buick, Pontiac and GMC Truck, LLC ("Country") and General Motors Corp. ("GM"), bearing index number 09/0043687, in the Supreme Court, State of New York, County of Nassau ("Supreme Court"), seeking, among other things, damages for GM's tortuous interference with a Contribution and Asset Purchase Agreement executed on December 11, 2008 by and between Woodbury Cadillac and Country (the "Contract"). Moreover, the Action was also brought to enjoin GM from taking any action to prevent Country from performing its obligations under the Contract.

2.      As a result of the filing of the Action by Order to Show Cause and a Summons and Complaint, the Supreme Court granted Woodbury Cadillac a Temporary Restraining Order (the "TRO") enjoining GM from "relinquishing and/or terminating its franchise agreement with Country". ***A copy of the Order is attached hereto as Exhibit "A".***

3.      Thereafter, on or about June 1, 2009 and periodically thereafter, General Motors Corporation (n/k/a Motors Liquidation Company) and certain of its affiliates (collectively, the "Debtors"), commenced voluntary cases under chapter 11 of the United

States Code ("Chapter 11 cases"). The Debtors' chapter 11 cases have been consolidated

for procedural purposes only and are being jointly administered pursuant to Federal Rule

of Bankruptcy Procedure 1015(b). Woodbury Cadillac is a scheduled creditor of the

Debtors as an unsecured claimant on Schedule F to Exhibit F-7, pg. 177 of 181. As a

result of the Chapter 11 cases, Woodbury Cadillac's Action was stayed as a result of the

automatic stay.

### WOODBURY CADILLAC'S TORT CLAIM

4.     On or about December 11, 2008, Woodbury Cadillac and Country entered

into the Contract wherein, Woodbury Cadillac agreed to acquire certain assets (the

"Assets") of Country's automotive dealership (the "Dealership") for the sale and service

of new and used vehicles bearing the "Cadillac" brand and mark. *A copy of the Contract*

*is attached hereto as Exhibit "B".* Under this Contract, Country agreed to contribute the

Assets from its Dealership located at 305 W. Jericho Turnpike, Huntington, New York for

a 17.5% membership interest in Woodbury Cadillac's dealership located at 760 Jericho

Turnpike, Woodbury, New York. GM was subsequently notified of Country's intention

to transfer the Assets to Woodbury Cadillac.

5.     On or about March 12, 2009, Woodbury Cadillac received a letter from

Country, dated March 10, 2009, in which Country advised Woodbury Cadillac that it

would be unable to abide by the terms of the Contract and would not participate in the

transfer of its Assets and the sale of its membership interest as agreed to due to Country's

failure to obtain the requisite approval from GM and its Cadillac Division (the "Letter").

2

*A copy of the Letter is attached hereto as Exhibit "C".*

6.   In the Letter, Country also informed Woodbury Cadillac of GM's intent to terminate Country's franchise rights effective March 16, 2009.

7.   Woodbury Cadillac at all times was ready, willing and able to perform all of its obligations pursuant to and in accordance with the terms of the Contract, but for the tortuous interference of GM.

8.   On or about April 14, 2009, Woodbury Cadillac was notified that GM had effectively terminated Country's franchise upon service of GM's Affirmation of Counsel Timothy J. McHugh, Esq. in opposition to Woodbury Cadillac's Order to Show Cause, dated April 14, 2009 ("GM Affirmation"). In the GM Affirmation, Mr. McHugh testified, *inter alia*, that Country had been terminated as a dealer in the GM system on March 17, 2009. GM actions clearly demonstrate it violated and continued to act in complete disregard of the TRO.

9.   Based upon the foregoing, and as a result of GM's tortuous interference with the Contract, Woodbury Cadillac suffered irreparable harm and has been damaged in the amount of $1,000,000.00.

3

# EXHIBIT "A"

At a Motion Part 9 of the Supreme Court
of the State of New York, County of Nassau,
at the Courthouse located at 100 Supreme
Court Drive, Mineola, New York, on the
13th day of March, 2009.

P R E S E N T: HON. IRA B. WARSHAWSKY

                              J.S.C.

MOTION SEQUENCE # 1

ORIGINAL RETURN DATE

RELIEF OPI

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
------------------------------------------------------------X
WOODBURY CADILLAC, LLC,

Warshawsky

**ORDER TO SHOW
CAUSE FOR
TEMPORARY AND
PRELIMINARY
INJUNCTIVE RELIEF**

              - against -

Index No. 09004687

COUNTRY CADILLAC, BUICK, PONTIAC AND
GMC TRUCK, LLC and GENERAL MOTORS
CORP.

                              Defendants.
------------------------------------------------------------X

**UPON** the reading of the accompanying emergency affirmation of Steven R. Schlesinger,

Esq., dated March 13, 2009, the affirmation in support of the order the show cause of Steven R.

Schlesinger, Esq., dated March 13, 2009, the annexed summons and verified complaint, verified

on March 12 2009, and the exhibits annexed thereto, and upon all the pleadings and proceedings

heretofore had herein, and good and sufficient reason appearing therefore,

HON. IRA B. WARSHAWSKY

      **LET DEFENDANTS SHOW CAUSE** before the Honorable _____,

at Part 9 of the Courthouse located at 100 Supreme Court Drive, Mineola, New York

ENTERED
IN
COMPUTER
JT

11501, on the _27_ day of March, 2009, at _930_ a.m./p.m., or soon thereafter as counsel can be

heard, why an Order should not be made enjoining General Motors Corporation ("GM"), its

attorneys, agents or any other person acting on their behalf from taking any action to prevent

Country Cadillac, Buick, Pontiac and GMC Truck, LLC ("Country") from performing its

obligations pursuant to its Contract with plaintiff and it is further hereby;

    **ORDERED** that pending further order of the Court, defendants, their attorneys or any

other person acting on their behalf are hereby enjoined from transferring, assigning, pledging or

otherwise disposing of the assets as defined in the Contribution and Asset Purchase Agreement

between Plaintiff and Country, and it is further hereby;

    **ORDERED** that pending further order of the Court, GM, its attorneys or any other

person acting on its behalf are hereby enjoined from relinquishing and/or terminating its

franchise agreement with Country together with other and further and different relief, as this

Court may deem necessary and proper, and it is further hereby;

    **ORDERED** that service of a copy of this Order, together with all of the papers upon

~~Summons + Complaint With Index Number and Filing Date Endorsed Thereon~~

which it is based, pursuant to ~~CPLR § 2103(e)(6),~~ *CPLR 311(1)(a)* on or before the _23_ day of March ___ 2009,

*CPLR 311(a)1*

shall be deemed good and sufficient service if served ~~by overnight mail~~ upon the following

defendants: Country Cadillac, Buick, Pontiac and GMC Truck, LLC at 305 W. Jericho Turnpike,

Huntington, New York 11743-6332 and General Motors Corporation at 767 Fifth Avenue, Suite

16, New York, New York 10019.


               **E N T E R :**

                 _L. B. Warshaw_
                   J.S.C.

DZS/D640951v1/M053398/C0091760

# EXHIBIT "B"

## CONTRIBUTION AND ASSET PURCHASE AGREEMENT

**CONTRIBUTION AND ASSET PURCHASE AGREEMENT**, dated December 11, 2008 between **COUNTRY CADILLAC, BUICK, PONTIAC AND GMC TRUCK, LLC**, a New York limited liability company ("Investor"), and **WOODBURY CADILLAC, LLC**, a New York limited liability company (the "Company").

## RECITALS

1.      Investor desires to become a member of Company and Company desires that Investor be admitted as a member of Company.

2.      Investor is willing to make, and Company is willing to accept, a certain contribution to Company in exchange for its membership interests.

3.      Investor also desires to sell to Company, and Company desires to purchase, certain assets of Investor.

**NOW, THEREFORE**, in consideration of the Recitals and of the mutual covenants, conditions and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed that:

## ARTICLE I
## CONTRIBUTION; ISSUANCE OF INTERESTS

1.1      **Contribution; Issuance of Interests**. Subject to and upon the terms and conditions set forth herein, Investor hereby agrees to acquire, on the Closing Date, a 17.5% membership interest in Company (the "Interest"). In connection therewith, the parties agree that in return for the Interest issued to Investor and the establishment of Investor's capital account with Company, Investor will contribute to Company, on the Closing Date, all of the Contributed Assets (the "Contribution").

1.2      **No Assumption of Liabilities**. Company will not assume, and the Contribution will not include, any Liabilities of Investor.

1.3      **Documents of Conveyance**. With respect to the Contributed Assets, on the Closing Date, Investor shall execute and deliver to Company appropriate bills of sale and such other documents of conveyance as Company may reasonably request to effect the transactions contemplated herein that are to be consummated before or at the Closing. All such documents of conveyance and assumption are collectively referred to herein as the "Contribution Conveyance Documents."

## ARTICLE II
## CONTRIBUTION; ISSUANCE OF INTERESTS

2.1    **Sale of Assets**. Subject to and upon the terms and conditions set forth herein, Investor hereby agrees to sell to Company, and Company agrees to purchase from Investor, on the Closing Date, all of the Purchased Assets (the "Sale"). Notwithstanding anything contained in this Section 2.1 to the contrary, it is expressly understood and agreed that (x) in the event that a vehicle required to be purchased hereunder is or has been damaged in excess of $500.00 (in the aggregate as to each vehicle), or said damage (irrespective of the cost to repair) involves frame damage or damage of the kind or nature required to be disclosed to a customer (pursuant to relevant consumer laws), Company shall not be obliged to purchase such vehicle(s) from Investor; and (y) Company shall not be required to purchase more than nine 2008 model vehicles.

2.2    **Purchase Price**. The purchase price to be paid for each vehicle included in the Purchased Assets (the "Purchase Price") shall be Investor's invoice amount, including freight, handling, dealer installed accessories and conversions less factory holdback of __%. All preparation money and supplemental floor plan payments for 2009 vehicles in stock in excess of 30 days shall be divided equally between the parties. Reimbursable advertising allowances for cars invoiced prior to 30 days prior to the Closing Date shall belong to Investor and invoiced after such date shall belong to Company. Subject to the 2008 Indemnity, Company will assume floor plan interest at Closing. Investor will prepare PDI check lists and assemble proof of supplemental floor plan payments for all cars in stock in excess of 30 days. Notwithstanding anything to the contrary contained in this Agreement, Company's obligations with respect to floor plan financing of the Purchase Assets will commence on, and apply on with respect to periods from and after, the Closing Date.

2.3    **No Assumption of Liabilities**. Company will not assume, and the Sale will not include, any Liabilities of Investor.

2.4    **Documents of Conveyance**. With respect to the Purchased Assets, on the Closing Date, Investor shall execute and deliver to Company appropriate bills of sale and such other documents of conveyance as Company may reasonably request to effect the transactions contemplated herein that are to be consummated before or at the Closing. All such documents of conveyance and assumption are collectively referred to herein as the "Sale Conveyance Documents."

## ARTICLE III
## COMPANY'S REPRESENTATIONS AND WARRANTIES

Company hereby represents and warrants to Investor that:

3.1    **Authorization; Enforceability**. Company has the full power and authority to enter into this Agreement and carry out the transactions contemplated hereby. This Agreement is, and the other documents and instruments contemplated hereunder to which Company is a party will be, when executed and delivered by the parties thereto, Company's legal, valid and binding obligations.

    3.2    **No Violation or Conflict.** The execution and delivery by Company of this Agreement do not, and the performance by Company of its obligations under this Agreement and the consummation of the transactions contemplated hereby will not:

        (i)    conflict with or result in a violation or breach of any of the terms, conditions or provisions of the articles of organization of Company;

        (ii)    conflict with or result in a violation or breach of any term or provision of any Law or Order applicable to Company or any of its assets and properties; or

        (iii)    (v) conflict with or result in a violation or breach of, (w) constitute (with or without notice or lapse of time or both) a default under, (x) require Company to obtain any consent, approval or action of, make any filing with or give any notice to any Person as a result or under the terms of, (y) result in or give to any Person any right of termination, cancellation, acceleration or modification in or with respect to, or (z) result in the creation or imposition of any Lien upon Company or any of its assets and properties under, any Contract or License to which Company is a party or by which any of its assets and properties are bound.

    3.3    **Consents.** No consent, approval or action of, filing with or notice to any Governmental Body or any other Person on the part of Company is required in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby.

    3.4    **Company.** Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New York, and has full corporate power and authority to conduct its business as and to the extent now conducted and to own, use and lease its assets and properties. Company does not have a written operating agreement, has conducted no business other than entering into this Agreement and issuing membership interests to each of Antonio Izzo and Ivan M. Leist (the "Original Members"), and, prior to giving effect to the transactions contemplated by this Agreement, has no liabilities or assets. The Original Members are the sole members of Company. There are no outstanding Options with respect to Company.

    3.5    **The Membership Interests.** Company has the unrestricted power to issue the Interest. The Interest is duly authorized, validly issued, outstanding, fully paid and nonassessable.

    3.6    **No Misleading Statements.** The representations of Company in this Agreement or any list or other document delivered by Company pursuant hereto do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein or herein not misleading or incomplete. To the knowledge of Company, no information material to this transaction necessary to make any of the representations and warranties herein contained not misleading has been withheld from, or has not been disclosed in writing to, Investor.

## ARTICLE IV
## INVESTOR'S REPRESENTATIONS AND WARRANTIES

Investor hereby represents and warrants to Company that:

4.1    **Authorization; Enforceability**. Investor has the full power and authority to enter into this Agreement and carry out the transactions contemplated hereby. This Agreement is, and the other documents and instruments contemplated hereunder to which Investor is a party will be, when executed and delivered by the parties thereto, Investor's legal, valid and binding obligations.

4.2    **No Violation or Conflict**. The execution and delivery by Investor of this Agreement do not, and the performance by Investor of its obligations under this Agreement and the consummation of the transactions contemplated hereby will not:

(i)    conflict with or result in a violation or breach of any of the terms, conditions or provisions of the articles of organization or operating agreement of Investor;

(ii)    conflict with or result in a violation or breach of any term or provision of any Law or Order applicable to Investor or any of its assets and properties; or

(iii)    subject to obtaining the consents set forth on Schedule 4.2 hereto, (v) conflict with or result in a violation or breach of, (w) constitute (with or without notice or lapse of time or both) a default under, (x) require Investor to obtain any consent, approval or action of, make any filing with or give any notice to any Person as a result or under the terms of, (y) result in or give to any Person any right of termination, cancellation, acceleration or modification in or with respect to, or (z) result in the creation or imposition of any Lien upon Investor or any of its assets and properties under, any Contract or License to which Investor is a party or by which any of its assets and properties are bound.

4.3    **No Litigation or Judgments**. Except as set forth on Schedule 4.3 hereto, (x) there are no actions, suits, proceedings, arbitrations or Governmental Body investigations pending or, to the knowledge of Investor, threatened against, relating to or affecting Investor or its principals, (y) no there are no judgments pending against Investor or its principals; and (z) there are no insolvency proceedings pending or, to the knowledge of Investor, threatened against, relating to or affecting Investor or its principals.

4.4    **Consents**. Except as provided in Schedule 4.2 hereto, no consent, approval or action of, filing with or notice to any Governmental Body or any other Person on the part of Investor is required in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby.

4.5    **Liens**. Except as provided in Schedule 4.5 hereto, there are no Liens on the Contributed Assets or the Purchased Assets.

4.6    **Investor**. Investor is a limited liability company duly organized, validly existing and

in good standing under the laws of the State of New York, and has full corporate power and authority to conduct its business as and to the extent now conducted and to own, use and lease its assets and properties. Investor Principals are the sole members of Investor.

4.7    **Customers; Customer List**. Investor has received no notice from any of Investor's customers, and Investor has no reason to believe, that any such customer intends to terminate or materially decrease its relationship with Investor. The customer list included as part of the Contributed Assets is a true, complete and correct list of all customers of Investor with respect to Cadillac vehicles.

4.8    **Equipment**. All special tools, computers and shop equipment included in the Contributed Assets are in good condition and repair, are free from material defects and have been reasonably maintained, and no material repairs, replacements or regularly scheduled maintenance relating to such items has been deferred.

4.9    **Purchased Assets**. All of the Purchased Assets are 2008 and 2009 model new, unused, never registered, Cadillac motor vehicles with less than 50 actual miles thereon, with unreported retail delivery cards (or its equivalent) for each.

4.10    **Taxes**. That all Tax Returns required to be filed on or before the date of Closing with respect to Investor's business or the assets which are the subject matter of this Agreement, have been filed, or will be filed on or before the Closing date, in accordance with all applicable laws (after taking into account extensions duly obtained), and, to the best of Investor's knowledge, no penalties or other charges are due or will become due with respect to the late filing of any such Tax Return. All such Tax Returns are or will be accurate and complete in all respects and properly reflect the Taxes due for the periods covered thereby. All Taxes due and payable with respect to Investor's business, as shown on such Tax Returns have been paid, adequately provided for in reserves, or properly protested or will be so paid, reserved for or protested by Investor by the Closing date. All Taxes required to be withheld or collected by Investor with respect to its business have been duly withheld or collected and have been or will be paid over to the appropriate governmental authorities. No audit of any such Tax Return is pending or, to the best of Investor's knowledge, threatened. Investor is not a party to any pending action or proceeding by any governmental authority for assessment or collection of Taxes with respect to its business, and no claim for assessment or collection of Taxes has been asserted or threatened against Investor with respect to its business.

4.11    **No Misleading Statements**. The representations of Investor in this Agreement or any list or other document delivered by Investor pursuant hereto do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein or herein not misleading or incomplete. To the knowledge of Investor, no information material to this transaction necessary to make any of the representations and warranties herein contained not misleading has been withheld from, or has not been disclosed in writing to, Company.

4.12    **No Other Representations**. Investor is acquiring the Interest voluntarily and in its own judgment and not upon any representations made by Company, or by any one acting on its behalf, other than those set forth in this Agreement.

4.13    **Securities Acts Representations**. Investor acknowledges that:

(i)    the Interest has not been registered under the Securities Act of 1933, 15 U.S.C. § 15b et seq., the New York State securities act or any other state securities laws (collectively, the "Securities Acts") because Company has issued the Interest in reliance upon exemptions from the registration requirements contained in the Securities Acts for issuances not involving a public offering;

(ii)    Company has relied upon the fact that the Interest is to be held by Investor for investment purposes only, and not with a view to or for any resale or distribution thereof, unless such sale or distribution is made in accordance with applicable Laws; and

(iii)    Company and its members are not under any obligation to register or qualify the Interest or to assist Investor in complying with any exemption from registration under the Securities Acts if Investor wishes to dispose of the Interest in accordance with applicable Laws.

4.14    **Investment Purpose**. Investor is acquiring the Interest for its own account, for investment purposes only, and not with a view to or for the resale or distribution thereof, unless such sale or distribution is made in accordance with applicable Laws.

Nothing contained herein is intended to be construed as an admission that the Interest constitutes "securities" for purposes of any of the Securities Acts or other Law.

## ARTICLE V
## INDEMNITIES AND ADDITIONAL COVENANTS

5.1    **Company's Indemnity**. Company hereby indemnifies and hold harmless Investor and its successors and permitted assigns (collectively, with Investor, the "Investor Indemnitees") from and against, and agrees to defend promptly the Investor Indemnitees from and reimburse the Investor Indemnitees for, any and all demands, actions, suits, proceedings, hearings, investigations, charges, complaints, demands, injunctions, judgments, decrees, rulings, amounts paid in settlement, liens, causes of actions, assessments, losses, damages, costs, expenses, liabilities, obligations and claims of any kind, including without limitation, reasonable attorney's fees and other legal costs and expenses and any liability (hereinafter referred to collectively in this Article V as "Losses"), that the Investor Indemnitees or any of them may at any time suffer or incur, or become subject to, as a result of or in connection with any breach or inaccuracy of any of the representations, warranties, covenants and agreements made by Company in or pursuant to this Agreement or any documents executed by Company pursuant to the provisions of this Agreement.

5.2    **Investor's Indemnity**. Investor hereby indemnifies and holds harmless Company, its members from time to time other than Investor, and its and their successors and permitted assigns (collectively, with Company, the "Company Indemnitees") from and against, and agrees to defend promptly Company Indemnitees from and reimburse the Company Indemnitees for, any and all Losses that Company Indemnitees or any of them may at any time suffer or incur, or become subject

to, as a result of or in connection with (a) any breach or inaccuracy of any of the representations, warranties, covenants and agreements made by Investor in or pursuant to this Agreement or any documents executed by Investor pursuant to the provisions of this Agreement; or (b) any Liabilities of Investor.

5.3    **Survival.** All representations, warranties, covenants and agreements made by any Person in this Agreement will survive the consummation of the transactions contemplated herein.

5.4    **Admission to Company.** Company agrees that upon the issuance of the Interest hereunder, Investor will be admitted as a member of Company.

## ARTICLE VI
## PRE-CLOSING COVENANTS

6.1    **Pre-Closing Covenants.** Investor and Company agree as follows with respect to the period between the execution of this Agreement and the Closing Date:

(a)    General. Each of the parties will use its best efforts to take all actions and to do all things necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the closing conditions set forth in Article VII). Without limiting the generality of the foregoing, the Company will promptly (i) submit to General Motors all information required by law and General Motors to obtain the Franchise Approval, (ii) apply for the Floor Plan Financing.

(b)    Notices and Consents. Investor will give notice to any third parties whose consent is required in order to consummate the transactions contemplated by this Agreement, and will use its best efforts to obtain all such consents. Each of the parties will give any notices to, make any filings with, and use its reasonable best efforts to obtain any authorizations, consents, and approvals of governments and governmental agencies that are required in order to consummate the transactions contemplated by this Agreement.

(c)    Operation of Business. Investor will not engage in any practice, take any action, or enter into any transaction outside the ordinary course of business, and will use its best efforts to keep available the services of its officers and employees and to maintain satisfactory relationships with licensors, suppliers, distributors, customers and others having business relations with Investor.

(d)    Exclusivity.  Investor will not, directly or indirectly, through any representative or otherwise, solicit or entertain offers from, negotiate with, or in any manner encourage, accept, consider or discuss any proposal of any other Person relating to the acquisition of the membership interests of Investor, its assets or business, in whole or in part, whether directly or indirectly, through purchase, merger or otherwise (other than sales of inventory in the ordinary course of business).

## ARTICLE VII
## CONDITIONS TO OBLIGATION TO CLOSE

7.1    **Conditions to Obligation of Company**. The obligation of Company to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions (provided Company may waive any such condition if it executes a writing so stating at or prior to the Closing):

(i)    the representations and warranties set forth in Article IV shall be true and correct in all material respects at and as of the Closing Date;

(ii)    Investor shall have performed and complied with all of its covenants hereunder in all material respects through the Closing;

(iii)    there shall not be any Order in effect preventing consummation of any of the transactions contemplated by this Agreement;

(iv)    Investor shall have delivered to Company a certificate to the effect that each of the conditions specified in Section 7.1(i)-(iii) is satisfied in all respects;

(v)    Investor shall have delivered to Company (A) the articles of organization of Investor certified by the Secretary of State of New York and a recent certificate of good standing of Investor; and (B) certified copies of the resolutions evidencing the authorization of this Agreement by the members of Investor;

(vi)    no damage, destruction or loss (whether or not covered by insurance) shall have occurred which materially and adversely affects the Contributed Assets or the Purchased Assets;

(vii)    all actions to be taken by Investor in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments, and other documents required to effect the transactions contemplated hereby will be reasonably satisfactory in form and substance to Company;

(viii)    the issuance and execution of a standard form and term Dealer Sales and Service Agreement between Company and General Motors Corporation, on such terms and conditions as are satisfactory to Company in Company's sole and absolute discretion, authorizing Company's sale and factory authorized service of Cadillac motor vehicles, parts, and accessories at the Company's premises (the "Franchise Approval");

(ix)    Company shall have obtained floor plan lines of credit from General Motors Acceptance Corporation or other lender approved by Company on terms and conditions reasonably satisfactory to it in the amount of $3,000,000 for new vehicles and $1,000,000 for used vehicles (the "Floor Plan Financing");

(x)    Company shall have entered into a triple net lease, with rent at $300,000 per annum, with 760 Jericho Turnpike, LLC with respect to premises located at 760 Jericho Turnpike, Woodbury, New York (the "Premises Lease");

(xi)    the execution of an operating agreement for Company in form and substance satisfactory to Investor and the Original Members (the "Operating Agreement")[1];

(xii)    all consents required to be obtained in order to consummate the transactions contemplated by this Agreement shall have been obtained; and

(xiii)    (as the Schedules hereto will not have been prepared at the time of the execution of this Agreement) Company shall be satisfied with the Schedules hereto.

7.2    **Conditions to Obligation of Investor**. The obligations of Investor to consummate the transactions to be performed by them in connection with the Closing is subject to satisfaction of the following conditions (provided Investor may waive any such condition if it or he executes a writing so stating at or prior to the Closing):

(i)    the representations and warranties set forth in Article III shall be true and correct in all material respects at and as of the Closing Date;

(ii)    Company shall have performed and complied with all of its covenants hereunder in all material respects through the Closing;

(iii)    there shall not be any Order in effect preventing consummation of any of the transactions contemplated by this Agreement;

(iv)    Company shall have delivered to Investor a certificate to the effect that each of the conditions specified in Section 7.2(i)-(iii) is satisfied in all respects;

(v)    Company shall have delivered to Investor (A) the articles of organization of Company certified by the Secretary of State of New York and a recent certificate of good standing of Company; and (B) certified copies of the resolutions evidencing the authorization of this Agreement by the Original Members;

(vi)    all actions to be taken by Company in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments, and other documents

---

1 Investor and Company acknowledge that, among other things, the Operating Agreement will provide that (x) the Original Members will be fully indemnified by Investor with respect to 2008 model vehicles included in the Purchase Assets (with respect to all related floor plan principal and interest and losses on sales), which shall be mandatorily pre-paid (taken out of floor plan) if and when Michael Caruso, a member of Investor, BMW of the Hamptons (the "2008 Vehicle Indemnity"); (y) Vincent LaRosa, a member of Investor, will receive compensation of $500/week for acting as Sales Manager for Company; and (z) each member of Company will bear proportionate liability with respect to the Floor Plan Financing.

required to effect the transactions contemplated hereby will be reasonably satisfactory in form and substance to Investor;

    (vii)  the Franchise Approval shall have been obtained by Company;

    (viii)  the Floor Plan Financing shall have been obtained by Company;

    (ix)  Company shall have entered into the Premises Lease;

    (x)  the execution of an operating agreement for Company in form and substance satisfactory to Investor and the Original Members; and

    (xi)  all consents required to be obtained in order to consummate the transactions contemplated by this Agreement shall have been obtained

## ARTICLE VIII
## TERMINATION

   8.1  **Termination of Agreement**. Investor and Company may terminate this Agreement as provided below:

    (i)  Investor and Company may terminate this Agreement by mutual written consent at any time prior to the Closing.

    (ii)  Company may terminate this Agreement by giving written notice to Investor at any time prior to the Closing: (A) in the event Investor has breached any representation, warranty, or covenant contained in this Agreement in any material respect, Company has notified Investor of the breach, and the breach has continued without cure for a period of 10 days after the notice of breach; or (B) if the Closing shall not have occurred on or before March 1, 2009, by reason of the failure of any condition precedent under Section 7.1 or 11.13 (unless the failure results primarily from Company itself breaching any representation, warranty, or covenant contained in this Agreement).

    (iii)  Investor may terminate this Agreement by giving written notice to Company at any time prior to the Closing: (A) in the event Company has breached any representation, warranty, or covenant contained in this Agreement in any material respect, Investor has notified Company of the breach, and the breach has continued without cure for a period of 10 days after the notice of breach; or (B) if the Closing shall not have occurred on or before March 1, 2009, by reason of the failure of any condition precedent under Section 7.2 (unless the failure results primarily from Investor breaching any representation, warranty, or covenant contained in this Agreement).

   8.2  **Effect of Termination**. If Investor or Company terminates this Agreement pursuant to Section 8.1, all rights and obligations of the parties hereunder shall terminate without any liability of any Person to any other Person (except for any liability of any Person then in breach).

## ARTICLE IX
## THE CLOSING

9.1    **The Closing**. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Jaspan Schlesinger LLP, 300 Garden City Plaza, Garden City, New York, commencing at 10:00 a.m. local time on February 1, 2009, or, if later, the business day following the satisfaction or waiver of all conditions to the obligations of the parties to consummate the transactions contemplated hereby (other than conditions with respect to actions the respective parties will take at the Closing itself), or such other date as the parties may mutually agree in writing (the "Closing Date"). At the Closing, the parties shall establish, by written agreement, the effective date thereof.

9.2    **Deliveries at the Closing**. At the Closing:

(i)    Investor will deliver to Company the various certificates, instruments, and documents referred to in Section 7.1;

(ii)    Company will deliver to Investor the various certificates, instruments, and documents referred to in Section 7.2;

(iii)    Investor and Company will execute, acknowledge (if appropriate), and deliver to each other the Contribution Conveyance Documents and the Sale Conveyance Documents;

(iv)    Investor will deliver to Company possession of the Contributed Assets and the Purchased Assets;

(v)    Company will pay the Purchase Price to Investor by wire transfer of funds pursuant to instructions provided by Investor at least three business days prior to the Closing Date;

(vi)    Investor and the Original Members will execute the Operating Agreement.

## ARTICLE X
## DEFINITIONS

10.1    **Definitions**. As used in this Agreement, the following terms have the meanings set forth below:

"Closing" has the meaning given such term in Section 9.1

"Closing Date" has the meaning given such term in Section 9.1

"Contract" means any agreement, lease, license, evidence of indebtedness, mortgage, indenture, security agreement or other contract.

"Contributed Assets" means: (a) all tools, including special tools and equipment required by General Motors Corporation for the proper operation of a Cadillac dealership; (b) [computers]; (c) the customer list of Investor's Cadillac business; (d) 13 above ground lifts; (e) two compressors; (f) two New York State inspection machines; (g) two engine hoists; (h) two transmission jacks; (i) two engine stands; (j) one touch; (k) two battery charges; (l) two engine jacks; (m) one ac machine; (n) one spring compressor; (o) two floor jacks; (p) one Hunter alignment machine; (q) four tex 2s; (r) one tire monitor; (s) two clean stations; (t) five flush machines; (u) three brake lathes; (v) one portable brake lathe; (w) one tire balance machine; (x) one tire mounting machine for up to 22" wheels; (y) all telephone and fax numbers used by Investor in the conduct of its business; (z) one snow plow; and (aa) one tow truck.

"Governmental Body" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision.

"Investor Principals" means Michael A. Caruso and Vincent LaRosa.

"Laws" means all laws, statutes, rules, regulations, ordinances and other pronouncements having the effect of law of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision or of any Governmental Body.

"Liability" means, with respect to any Person, any liability or obligation of such Person of any kind, character or description that is material to such Person, whether known or which reasonably should have been known, absolute or contingent, asserted or unasserted, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, due or to become due, vested or unvested, or executory, and whether or not the same is required to be accrued on the financial statements of such Person.

"Licenses" means all licenses, permits, certificates of authority, authorizations, approvals, registrations, franchises and similar consents granted or issued by any Governmental Body.

"Liens" means any mortgage, pledge, assessment, security interest, lease, lien, adverse claim, levy, charge or other encumbrance of any kind, or any conditional sale Contract, title retention Contract or other Contract to give any of the foregoing.

"Operating Agreement" has the meaning given such term in Section 7.1(ix).

"Option" with respect to any Person means any security, right, subscription, warrant, option, "phantom" stock right or other Contract that gives the right to (i) purchase or otherwise receive or be issued any shares of capital stock or other equity interest of such Person or any security of any kind convertible into or exchangeable or exercisable for any shares of capital stock or other equity interest of such Person or (ii) receive or exercise any benefits or rights similar to any rights enjoyed by or accruing to the holder of shares of capital stock or other equity interest of such Person, including any rights to participate in the equity or income of such Person or to participate in or direct

the election of any directors, officers or managers of such Person or the manner in which any shares of capital stock or other equity interests of such Person are voted.

"Order" means any writ, judgment, decree, injunction or similar order of any Governmental Body (in each such case whether preliminary or final).

"Original Members" has the meaning given such term in Section 3.5.

"Person" means any natural person, corporation, general partnership, limited partnership, proprietorship, other business organization, trust, union, association or Governmental Body.

"Purchase Price" has the meaning given such term in Section 2.2.

"Purchased Assets" means all of Investor's 2008 and 2009 model new, unused, never registered, Cadillac motor vehicles with less than 50 actual miles thereon, with unreported retail delivery cards (or its equivalent) for each.

"Tax Return" means any return, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto.

"Taxes" means any federal, state, county, local, foreign and other tax, whether income, sales, gross receipts, excise or otherwise, including any interest, penalty, or addition thereto, whether disputed or not.

"2008 Indemnity" has the meaning given such term in the footnote to Section 7.1(ix).

## ARTICLE XI
## MISCELLANEOUS

11.1    **Entire Agreement; Amendment**.    This Agreement and the documents to be delivered pursuant hereto constitute the entire agreement among the parties pertaining to the subject matter hereof, and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions of the parties, whether oral or written, and there are no warranties, representations or other agreements between the parties in connection with the subject matter hereof, except as specifically set forth herein or therein. No amendment, supplement, modification, waiver or termination of this Agreement will be binding unless executed in writing by the party to be bound thereby. No waiver of any of the provisions of this Agreement will be deemed or will constitute a waiver of any other provision of this Agreement, whether or not similar, nor will such waiver constitute a continuing waiver unless otherwise expressly provided. Wherever, in this Agreement, reference is made to the agreement, approval, consent, determination, request or election by a party or parties hereto, the same must be in writing.

11.2    **Expenses**. Each party will be responsible for and bear all of its or his costs and expenses, as the case may be, incurred at any time in connection with pursuing or consummating the proposed transactions.

11.3    **Governing Law**. This Agreement and all rights of the parties hereunder will in all respects be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and fully to be performed in such state by residents thereof.

11.4    **Assignment**. This Agreement is binding upon and inures to the benefit of the parties and their respective successors and permitted assigns. This Agreement and each party's respective rights hereunder may not be assigned by either party without the prior consent of the other party; provided that Investor may assign this Agreement to Investor Principals or to any entity controlled by them provided that on or before such assignment it conveys the Contributed Assets and the Purchased Assets to such Persons.

11.5    **Notices**. All notices, requests, demands, claims, and other communications hereunder will be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given if (and then three (3) business days after) it is sent by certified mail, return receipt requested, postage prepaid, or if (and then one (1) business day after) it is sent by nationally recognized overnight courier, and addressed to the intended recipient as set forth below:

| If to Company: | Copy to: |
|---|---|
| Woodbury Cadillac, LLC | Jaspan Schlesinger LLP |
| 760 Jericho Turnpike | 300 Garden City Plaza |
| Woodbury, New York 11797 | Garden City, New York 11530 |
| Attention:    Antonio Izzo | Attention:  David E. Paseltiner, Esq. |

and:

Mr. Ivan Leist
3857 Kings Highway
Brooklyn, New York 11234

| If to Investor: | Copy to: |
|---|---|
| Country Cadillac, Buick, | Raymond Peck, Esq. |
| Pontiac and GMC Truck, LLC | 35 Montauk Highway, Suite B |
| 305-311 West Jericho Turnpike | Southampton, New York 11968 |
| Huntington, New York 11743 | |
| Attention:    Michael A. Caruso | |

Any Person may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Person notice in the manner herein set forth.

11.6    **Counterparts; Headings**. This Agreement may be executed in several counterparts, each of which will be deemed an original, but such counterparts will together constitute but one and the same Agreement. The Article and Section headings herein are inserted for convenience of reference only and do not constitute a part of this Agreement.

11.7    **Interpretation**. Unless the context requires otherwise, all words used herein in the singular number will extend to and include the plural, all words in the plural number will extend to and include the singular and all words in any gender will extend to and include all genders.

11.8    **Severability**. If any provision, clause or part hereof, or the application thereof under certain circumstances is held invalid or unenforceable to any extent, the remainder hereof and the application of such provision, clause or part under other circumstances will not be affected thereby and will be enforced to the greatest extent permitted by applicable law.

11.9    **Specific Performance**. The parties agree that this Agreement is subject in all respects to an award of specific performance and that the award of monetary damages in connection with a breach or default hereunder is not an adequate remedy for the damage or harm suffered by the non-defaulting party.    Any court may award specific performance of the terms, conditions, provisions and agreements contained in this Agreement, and the parties hereby declare, agree and stipulate that specific performance of the agreements and obligations of the parties set forth herein is an appropriate and suitable remedy in the event of a breach of the agreements of the parties set forth herein

11.10    **Further Assurances**. In connection with the transactions contemplated by this Agreement, the parties agree to execute and deliver such further instruments, and to take such further actions, as may be reasonably necessary or proper to effectuate and carry out the transactions contemplated in this Agreement, provided that nothing in this Section 11.10 shall require either party to execute an Operating Agreement containing terms unacceptable to such party (provided that each party acknowledges that the terms set forth in the footnote to Section 7.1(ix) are acceptable to such party).

11.11    **Interpretation**. This Agreement has been negotiated at arm's length and between persons sophisticated and knowledgeable in the matters dealt with in this Agreement. Each party has been represented by experienced and knowledgeable legal counsel. Accordingly, any rule of law or legal decision that would require interpretation of any ambiguities in this Agreement against the party that has drafted it is not applicable and is waived. The provisions of this Agreement will be interpreted in a reasonable manner to implement the purposes of the parties and this Agreement.

11.12    **Guaranty**. By their signatures at the foot hereof, Investor Principals hereby jointly and severally personally guarantee all of Investor's payment and performance obligations hereunder

and join in the making of all representations and warranties made by Investor herein. This guaranty is a guaranty of payment and not of collection only, and Investor Principals waive all suretyship defenses in respect of this guaranty.

11.13 **Due Diligence**. Notwithstanding anything to the contrary contained in this Agreement, Company's obligations to consummate the transactions hereunder are expressly contingent upon Company and its representatives conducting a satisfactory due diligence investigation, in its sole discretion, of whatever kind or nature of the subject business as it deems necessary or appropriate, within 30 days from the date hereof.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.
SIGNATURE PAGE FOLLOWS.]**

DEC-11-2008 16:34 From:                          To:8455117              P.1/1

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed in their names as of the day and year first above written.

COUNTRY CADILLAC, BUICK, PONTIAC
AND GMC TRUCK, LLC

By: _____
Name: _Michael (Caruso)_____
Title: _Member_____

WOODBURY CADILLAC, LLC

By: _____
Name: _____
Title: _____

FOR THE PURPOSES OF SECTION 11.12 HEREOF:

_____
MICHAEL A. CARUSO

_____
VINCENT LaROSA

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed in their names as of the day and year first above written.

COUNTRY CADILLAC, BUICK, PONTIAC
AND GMC TRUCK, LLC

By: _____
Name: _____
Title: _____

WOODBURY CADILLAC LLC

By: _____
Name: _____
Title: MANAGER / MEMBER

FOR THE PURPOSES OF SECTION 11.12 HEREOF:

_____
MICHAEL A. CARUSO

_____
VINCENT LAROSA

17

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed in their names as of the day and year first above written.

COUNTRY CADILLAC, BUICK, PONTIAC
AND GMC TRUCK, LLC

By:_____
Name:_____
Title:_____

WOODBURY CADILLAC, LLC

By: _____
Name: _ANTHONY / IZZO_____
Title: _MANAGER/MEMBER_____

FOR THE PURPOSES OF SECTION 11.12 HEREOF:

_____
MICHAEL A. CARUSO

_____
VINCENT LaROSA

# EXHIBIT "C"



   

305 West Jericho Turnpike
Huntington, NY 11743
(631) 549-7700
Fax (631) 421-9261

March 10, 2009

Woodbury Cadillac, LLC
760 Jericho Turnpike
Woodbury, New York 11797
Attn:  Antonio Izzo
       Ivan Leist

Jaspan Schlesinger, LLP
300 Garden Center Plaza
Garden City, New York 11530
Attn: David Paseltiner, Esq.

Dear Tony, Ivan and David:

As we have discussed, I regret having to formally notify you that COUNTRY
CADILLAC, BUICK, PONTIAC AND GMC TRUCK, LLC ("Country") will be unable
to close on, and complete the performance and conditions assumed by it pursuant to, that
Contribution and Asset Purchase Agreement signed on December 11, 2008, with respect
to the assignment or other indirect transfer to Woodbury Cadillac, LLC ("Woodbury") of
the same or similar rights now held by Country under a Dealer Sales and Service
Agreement between itself and the Cadillac Division of the General Motors Corporation.

Contrary to all of our expectations, we have been informed by such Cadillac Division that
they will not approve such effective transfer of rights, and will instead terminate our own
Cadillac franchise rights effective March 16, 2009.   Our efforts to cause a
reconsideration and reversal of these decisions have not been successful.

Needless to say, we deeply regret this outcome, and being deprived of the privilege and
pleasure of the proposed association between our respective entities.

With all best wishes, I remain sincerely,

Michael A. Caruso, Member