DICKSTEIN SHAPIRO LLP
Barry N. Seidel
Eric B. Fisher
Katie L. Cooperman
1633 Broadway
New York, New York 10019-6708
Telephone: (212) 277-6500
Facsimile: (212) 277-6501

*Counsel for Motors Liquidation*
*Company GUC Trust*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
|  |  |
| --- | --- |
| In re: | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, *et al.*, f/k/a General Motors Corporation, *et al.*, | Case No.: 09-50026 (REG) |
|  | (Jointly Administered) |
| Debtors. |  |

-------------------------------------------------------------------x
|  |  |
| --- | --- |
| MOTORS LIQUIDATION COMPANY GUC TRUST, | |
| Plaintiff, | Adversary Proceeding Case No.: 12-_____ |
| v. | |
| APPALOOSA INVESTMENT LIMITED PARTNERSHIP I; PALOMINO FUND LTD; THOROUGHBRED FUND LP; THOROUGHBRED MASTER LTD; THE LIVERPOOL LIMITED PARTNERSHIP; ELLIOT INTERNATIONAL LP; DRAWBRIDGE DSO SECURITIES LLC; DRAWBRIDGE OSO SECURITIES LLC; FCOF UB SECURITIES LLC; AURELIUS INVESTMENT LLC; CITIGROUP GLOBAL MARKETS INC.; LMA SPC FOR AND ON BEHALF OF THE MAP 84 SEGREGATED; KNIGHTHEAD MASTER FUND, L.P.; KIVU INVESTMENT FUND LIMITED; CQS DIRECTIONAL OPPORTUNITIES MASTER FUND LIMITED; MORGAN STANLEY & CO. INTERNATIONAL PLC; SG AURORA MASTER FUND L.P.; THE CANYON VALUE REALIZATION FUND (CAYMAN), LTD; ANCHORAGE CAPITAL | **COMPLAINT** |

MASTER OFFSHORE LTD; ONEX DEBT      :
OPPORTUNITY FUND, LTD; REDWOOD MASTER  :
FUND LTD; COLLINS STEWART (CI) LTD; SPH    :
INVEST SA; CONSILIUM TREUHAND AG & BEATA :
DOMUS ANSTALT; MARIA-DOROTHEA LAMINET; :
CREDIT SUISSE AG; CHEVIOT ASSET       :
MANAGEMENT; ING. HUGO WAGNER; ALLIANZ  :
BANK FINANCIAL ADVISORS SPA; RUI MANUEL :
ANTUNES GONCALVES ROSA; UBS AG, ZURICH  :
(SWITZERLAND); ALY AZIZ; JOHANNA      :
SCHOEFFEL; SIRDAR ALY AZIZ; CSS, LLC; JOSEF :
SCHMIDSEDER; HERMANN DETTMAR AND    :
HELENE DETTMAR; CLAUS PEDERSEN; HFR RVA :
ADVENT GLOBAL OPPORTUNITY MASTER    :
TRUST; THE ADVENT GLOBAL OPPORTUNITY  :
MASTER FUND; BANCA DELLE MARCHE SPA;   :
ORE HILL CREDIT HUB FUND LTD; BHALODIA  :
RV/RM/PATEL RG; BARCLAYS BANK PLC;     :
JPMORGAN SECURITIES LIMITED; INTESA    :
SANPAOLO SPA; INTESA SANPAOLO PRIVATE  :
BANKING SPA; CREDITO EMILIANO SPA;     :
UNICREDIT BANCA DI ROMA SPA; HUTCHIN   :
HILL CAPITAL C1, LTD.; DEUTSCHE BANK SPA; :
BANCA POPOLARE DI VICENZA SCPA; CASSA  :
CENTRALE BANCA-CREDITO COOPERATIVO DEL :
NORD EST SPA; BANCA DI CREDITO       :
COOPERATIVO DI ROMA SOCIETA        :
COOPERATIVA; BANK OF VALLETTA PLC;    :
BANCA DI CREDITO COOPERATIVO ABRUZZESE- :
CAPPELLE SUL TAVO-SOCIETA COOPERTIVA;  :
UBS AG; PERA UGO; GARIBALDI ROSANNA;   :
CANYON VALUE REALIZATION FUND LP;    :
LYXOR/CANYON VALUE REALIZATION FUND  :
LIMITED; CANYON-GRF MASTER FUND LP;   :
PROSPECT MOUNTAIN FUND LIMITED; RED   :
RIVER BUSINESS INC.; GREEN HUNT WEDLAKE, :
INC., as trustee for General Motors Nova Scotia Finance :
Company; JOHN DOE NOS. 1-100; and JOHN DOE, :
INC. NOS. 1-100,                :
                             :
           Defendants.        :

-----------------------------------------------------------------------x

Plaintiff, Motors Liquidation Company GUC Trust ("**Plaintiff**" or "**GUC Trust**"), a trust established in connection with the *Debtors' Second Amended Joint Chapter 11 Plan* (Docket No. 9836) dated March 18, 2011 and confirmed on March 29, 2011 (the "**Plan**"), hereby brings this complaint (the "**Complaint**"), and alleges, upon information and belief, as follows against Defendants:

## NATURE OF THE ACTION AND RELIEF SOUGHT

1.      This action for recharacterization and equitable subordination, or alternatively equitable disallowance, of claims held by the Defendants supplements the Objection already on file with this Court with regard to these same claims.

2.      While the United States Government ("**Treasury**") and Old GM raced against the clock to rescue an icon of American industry from liquidation, a band of hedge fund noteholders saw an unprecedented eleventh-hour opportunity for profit and pounced.  On the very same day that Old GM filed its historic bankruptcy, these noteholders entered into a settlement agreement, known as the "**Lock-Up Agreement**," that purported to settle meritless litigation commenced by such hedge funds in Canada, in exchange for an exorbitant and commercially unreasonable $367 million cash payment funded by Old GM, *plus* allowed claims against Old GM's estate for more than $2.67 billion.  Prior to the Lock-Up Agreement, the aggregate face amount of all claims by holders of Notes was less than $1 billion.

3.      The Notes involved in this case, which were guaranteed by Old GM, were issued in 2003 by Old GM's wholly-owned subsidiary, General Motors Nova Scotia Finance Company ("**Nova Scotia Finance**"), a finance company with virtually no assets.  Thus, the approximately $2.67 billion of allowed claims against Old GM's estate pursuant to the Lock-Up Agreement and the $367 million cash payment, which was intentionally mislabeled a "consent fee," were out of

3

all proportion to the claims of Aurelius, Appaloosa, Fortress and Elliot, the four hedge fund

noteholders referred to herein as the "**Lock-Up Noteholders**."

4.      At stake in this case, however, is more than just an egregious economic overreach

by the Lock-Up Noteholders.  The Lock-Up Noteholders drove such a hard bargain and went to

such lengths to make the most of their perceived economic leverage over Old GM and its

Canadian affiliates, that they did not succeed in wrapping up their sweetheart deal in advance of

Old GM's bankruptcy filing.  Rather, as explained below, the Lock-Up Agreement was not

completed until *after* Old GM's bankruptcy petition was filed.

5.      Because the Lock-Up Agreement was a post-petition settlement to which Old GM

was a party, this Court's approval of the agreement was required.  However, such approval was

neither sought nor obtained.

6.      The failure to seek Court approval of the Lock-Up Agreement was not an

oversight.  To the contrary, it was part of the Lock-Up Noteholders' plan.  The Lock-Up

Noteholders represented to this Court on a number of occasions that the Lock-Up Agreement

was entered into pre-petition, even though that was not the case, in order to evade this Court's

scrutiny of the Lock-Up Agreement and their enrichment at the expense of other unsecured

creditors of Old GM.  Because the Lock-Up Agreement is not a rational settlement, it could not

have passed muster under the "lowest point in the range of reasonableness" standard that the

Court would have applied in reviewing such a settlement.  The Lock-Up Agreement falls well

below the lowest point in such range.

7.       In addition to the above misrepresentation about the Lock-Up Agreement, the

Lock-Up Noteholders violated numerous provisions of the Bankruptcy Code in consummating

the Lock-Up Agreement and entering into the related transactions post-petition.  For example,

4

the Lock-Up Noteholders violated the automatic stay because each post-petition act in furtherance of the Lock-Up Agreement was a wrongful attempt to obtain possession of property of the estate and to collect a pre-petition claim against Old GM.

8.      Further, the Lock-Up Noteholders participated in, and benefited from, a scheme to use property of Old GM's estate out of the ordinary course of business and without bankruptcy court approval, in violation of sections 363(b) and 549 of the Bankruptcy Code.  Indeed, upon information and belief, the $367 million Consent Fee itself was paid from funds that rightfully should have been returned to Old GM's estate.  Instead, those funds were diverted to pay the Consent Fee without any approval by this Court.

9.      All of the above wrongful conduct by the Lock-Up Noteholders, as well as other such conduct detailed herein, warrants equitable subordination, or alternatively, equitable disallowance of the claims held by the Defendants set forth in Exhibit A attached hereto (collectively, the "**Equitable Subordination Defendants**").

10.     Further, because the payment of the "consent fee" was a disguised payment of principal, the Court should, in the exercise of its equitable powers, recharacterize the Consent Fee as a payment of principal and reduce the Defendants' claims accordingly.

## PARTIES

11.     On June 1, 2009 at 7:57 a.m. (the "**Petition Date**"), Motors Liquidation Company f/k/a General Motors Corporation ("**Old GM**") and certain of its subsidiaries (collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York.

12.     On June 3, 2009, the United States Trustee for the Southern District of New York appointed the Official Committee of Unsecured Creditors (the "**Creditors' Committee**"), pursuant to section 1102 of the Bankruptcy Code.

13.     Plaintiff GUC Trust is a trust established pursuant to the Plan, for the benefit of holders of Allowed General Unsecured Claims (as defined in the Plan) to undertake and fulfill certain post-effective date responsibilities under the Plan, including, but not limited to, prosecuting and resolving Disputed General Unsecured Claims (as defined in the Plan), which include (i) claims asserted based on Old GM's guarantee of £350,000,000 principal amount of 8.375% guaranteed notes due December 7, 2015 (the "**2015 Notes**") and £250,000,000 principal amount of 8.875% guaranteed notes due July 10, 2023 (the "**2023 Notes**" and together with the 2015 Notes, the "**Notes**") issued by Nova Scotia Finance in 2003 to certain beneficial owners pursuant to the Nova Scotia Fiscal and Paying Agency Agreement (as defined in the Plan), aggregating $1,072,557,531.72 (the "**Guarantee Claims**") and (ii) the claim asserted by a Canadian bankruptcy trustee of Nova Scotia Finance in the amount of $1,607,647,592.49 (the "**Duplicative Claim**" and together with the Guarantee Claims, the "**Disputed NS Claims**").  The GUC Trust is the successor-in-interest to the Creditors' Committee for all purposes relevant to the Objection, as supplemented by this Complaint.

14.     Defendant Appaloosa Investment Limited Partnership I ("**Appaloosa Investment**") is an entity that legally or beneficially holds Guarantee Claims.

15.     Defendant Palomino Fund LTD ("**Palomino**") is an entity that legally or beneficially holds Guarantee Claims.

16.     Defendant Thoroughbred Fund LP ("**Thoroughbred Fund**") is an entity that legally or beneficially holds Guarantee Claims.

17.     Defendant Thoroughbred Master LTD ("**Thoroughbred Master**" and together with Appaloosa Investment, Palomino and Thoroughbred Fund, "**Appaloosa**") is an entity that legally or beneficially holds Guarantee Claims.

18.     Defendant The Liverpool Limited Partnership ("**Liverpool**") is an entity that legally or beneficially holds Guarantee Claims.

19.     Defendant Elliot International LP (together with Liverpool, "**Elliot**") is an entity that legally or beneficially holds Guarantee Claims.

20.     Defendant Drawbridge DSO Securities LLC ("**Drawbridge DSO**") is an entity that legally or beneficially holds Guarantee Claims.

21.     Defendant Drawbridge OSO Securities LLC ("**Drawbridge OSO**") is an entity that legally or beneficially holds Guarantee Claims.

22.     Defendant FCOF UB Securities LLC ("**FCOF**" and together with Drawbridge DSO and Drawbridge OSO, "**Fortress**") is an entity that legally or beneficially holds Guarantee Claims.

23.     Defendant Aurelius Investment LLC ("**Aurelius**") is an entity that legally or beneficially holds Guarantee Claims.

24.     Defendant Citigroup Global Markets Inc. is an entity that legally or beneficially holds Guarantee Claims.

25.     Defendant LMA SPC for and on behalf of the MAP 84 Segregated is an entity that legally or beneficially holds Guarantee Claims.

26.     Defendant Knighthead Master Fund, L.P. is an entity that legally or beneficially holds Guarantee Claims.

27.     Defendant KIVU Investment Fund Limited is an entity that legally or beneficially holds Guarantee Claims.

28.     Defendant CQS Directional Opportunities Master Fund Limited is an entity that legally or beneficially holds Guarantee Claims.

29.     Defendant Morgan Stanley & Co. International plc is an entity that legally or beneficially holds Guarantee Claims.

30.     Defendant SG Aurora Master Fund L.P. is an entity that legally or beneficially holds Guarantee Claims.

31.     Defendant The Canyon Value Realization Fund (Cayman), Ltd is an entity that legally or beneficially holds Guarantee Claims.

32.     Defendant Anchorage Capital Master Offshore Ltd is an entity that legally or beneficially holds Guarantee Claims.

33.     Defendant Onex Debt Opportunity Fund, LTD is an entity that legally or beneficially holds Guarantee Claims.

34.     Defendant Redwood Master Fund LTD is an entity that legally or beneficially holds Guarantee Claims.

35.     Defendant Collins Stewart (CI) Ltd is an entity that legally or beneficially holds Guarantee Claims.

36.     Defendant SPH Invest SA is an entity that legally or beneficially holds Guarantee Claims.

37.     Defendant Consilium Treuhand AG & Beata Domus Anstalt is an entity that legally or beneficially holds Guarantee Claims.

38.     Defendant Maria-Dorothea Laminet is an individual who legally or beneficially holds Guarantee Claims.

39.     Defendant Credit Suisse AG is an entity that legally or beneficially holds Guarantee Claims.

40.     Defendant Cheviot Asset Management is an entity that legally or beneficially holds Guarantee Claims.

41.     Defendant Ing. Hugo Wagner is an individual who legally or beneficially holds Guarantee Claims.

42.     Defendant Allianz Bank Financial Advisors SPA is an entity that legally or beneficially holds Guarantee Claims.

43.     Defendant Rui Manuel Antunes Goncalves Rosa is an individual who legally or beneficially holds Guarantee Claims.

44.     Defendant UBS AG, Zurich (Switzerland) is an entity that legally or beneficially holds Guarantee Claims.

45.     Defendant Aly Aziz is an individual who legally or beneficially holds Guarantee Claims.

46.     Defendant Johanna Schoeffel is an individual who legally or beneficially holds Guarantee Claims.

47.     Defendant Sirdar Aly Aziz is an individual who legally or beneficially holds Guarantee Claims.

48.     Defendant CSS, LLC is an entity that legally or beneficially holds Guarantee Claims.

49.     Defendant Josef Schmidseder is an individual who legally or beneficially holds Guarantee Claims.

50.     Defendants Hermann Dettmar and Helene Dettmar are individuals who legally or beneficially hold Guarantee Claims.

51.     Defendant Claus Pedersen is an individual that legally or beneficially holds Guarantee Claims.

52.     Defendant HFR RVA Advent Global Opportunity Master Trust is an entity that legally or beneficially holds Guarantee Claims.

53.     Defendant The Advent Global Opportunity Master Fund is an entity that legally or beneficially holds Guarantee Claims.

54.     Defendant Banca delle Marche SPA is an entity that legally or beneficially holds Guarantee Claims.

55.     Defendant Ore Hill Credit Hub Fund Ltd is an entity that legally or beneficially holds Guarantee Claims.

56.     Defendant Bhalodia RV/RM/Patel RG is an entity that legally or beneficially holds Guarantee Claims.

57.     Defendant Barclays Bank PLC is an entity that legally or beneficially holds Guarantee Claims.

58.     Defendant JPMorgan Securities Limited is an entity that legally or beneficially holds Guarantee Claims.

59.     Defendant Intesa Sanpaolo SPA is an entity that legally or beneficially holds Guarantee Claims.

60.     Defendant Intesa Sanpaolo Private Banking SPA is an entity that legally or beneficially holds Guarantee Claims.

61.     Defendant Credito Emiliano SPA is an entity that legally or beneficially holds Guarantee Claims.

62.     Defendant UniCredit Banca di Roma SPA is an entity that legally or beneficially holds Guarantee Claims.

63.     Defendant Hutchin Hill Capital C1, Ltd. is an entity that legally or beneficially holds Guarantee Claims.

64.     Defendant Deutsche Bank SPA is an entity that legally or beneficially holds Guarantee Claims.

65.     Defendant Banca Popolare di Vicenza SCPA is an entity that legally or beneficially holds Guarantee Claims.

66.     Defendant Cassa Centrale Banca-Credito Cooperativo del Nord Est SPA is an entity that legally or beneficially holds Guarantee Claims.

67.     Defendant Banca di Credito Cooperativo di Roma Societa Cooperativa is an entity that legally or beneficially holds Guarantee Claims.

68.     Defendant Bank of Valletta PLC is an entity that legally or beneficially holds Guarantee Claims.

69.     Defendant Banca di Credito Cooperativo Abruzzese-Cappelle sul Tavo-Societa Coopertiva is an entity that legally or beneficially holds Guarantee Claims.

70.     Defendant UBS AG is an entity that legally or beneficially holds Guarantee Claims.

71.    Defendant Pera Ugo is an entity that legally or beneficially holds Guarantee Claims.

72.    Defendant Garibaldi Rosanna is an entity that legally or beneficially holds Guarantee Claims.

73.    Defendant Canyon Value Realization Fund LP is an entity that legally or beneficially holds Guarantee Claims.

74.    Defendant Lyxor/Canyon Value Realization Fund Limited is an entity that legally or beneficially holds Guarantee Claims.

75.    Defendant Canyon-GRF Master Fund LP is an entity that legally or beneficially holds Guarantee Claims.

76.    Defendant Prospect Mountain Fund Limited is an entity that legally or beneficially holds Guarantee Claims.

77.    Defendant Red River Business Inc. is an entity that legally or beneficially holds Guarantee Claims.

78.    Defendant Green Hunt Wedlake, Inc., in its capacity as trustee for Nova Scotia Finance (the "**Nova Scotia Finance Trustee**" and together with the Lock-Up Noteholders, the "**Lock-Up Defendants**"), is the Canadian bankruptcy trustee retained at the direction of the Lock-Up Noteholders to assert the Duplicative Claim for their benefit and is the legal holder of such claim.

79.    The true names, identities and capacities of Defendants sued herein as John Doe Nos. 1-100, and John Doe, Inc. Nos. 1-100 are unknown to Plaintiff. These fictitiously named Defendants acquired Notes after the Petition Date, directly or indirectly, from the Lock-Up Noteholders. As and when the names, identities and capacities of these fictitiously named

Defendants become known, Plaintiff will amend this Complaint to set forth these Defendants'

true names, identities and capacities and otherwise proceed against them as if they had been

named parties upon the commencement of this adversary proceeding in accordance with Rules

15 and 25 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rules

7015 and 7025 of the Federal Rules of Bankruptcy Procedure.

80.    The parties identified in paragraphs 14-79, above, are collectively referred to

herein as the "**Defendants**."

81.    Exhibit A attached hereto identifies the Equitable Subordination Defendants.

This exhibit lists, upon information and belief: (i) Lock-Up Defendants that still hold Disputed

NS Claims, and (ii) current holders of Guarantee Claims that were acquired after the Petition

Date, directly or indirectly, from the Lock-Up Noteholders.

82.    Exhibit B attached hereto identifies, upon information and belief, all current

holders of Disputed NS Claims.  All parties listed in Exhibit B are named as Defendants with

respect to the recharacterization count.

## JURISDICTION AND VENUE

83.    This action is brought pursuant to Rules 3007 and 7001 of the Federal Rules of

Bankruptcy Procedure seeking relief in accordance with §§ 105(a), 501, 502 and 510 of the

Bankruptcy Code.

84.    This Court has subject matter jurisdiction over this matter under 28 U.S.C. §§

1334 and 157.  This matter constitutes a "core" proceeding within the meaning of 28 U.S.C. §§

157(b)(1) and 157(b)(2)(A), (B) and (O).

85.    This Court has personal jurisdiction over each of the Defendants because each

Defendant has filed a proof of claim or notice of a claim transfer ("**Transfer Notice**") in the

13

above-captioned bankruptcy cases (the "**Bankruptcy Cases**") and has, therefore, submitted to

the jurisdiction of this Court.  While counsel to the Lock-Up Noteholders has stated that certain

Lock-Up Noteholders have transferred their Guarantee Claims, the Transfer Notices filed on the

docket on or before the Distribution Record Date (as defined in the Plan) do not reflect any such

transfers.

86.      Plaintiff brings this action pursuant to the authority granted to it in section 6.2(f)

of the Plan, among other sources of authority.

## PROCEDURAL HISTORY

87.      On July 2, 2010, the Creditors' Committee filed an objection (Docket No. 6248)

(the "**First Objection**") seeking to (i) disallow certain Guarantee Claims and the Duplicative

Claim under section 502 of the Bankruptcy Code on the grounds, among others, that (a) such

claims are duplicative and (b) the Lock-Up Agreement is avoidable as a fraudulent transfer under

section 548 of the Bankruptcy Code and under New York law, or, in the alternative, the Lock-Up

Agreement is avoidable as an unauthorized post-petition transfer under section 549 of the

Bankruptcy Code; and/or (ii) equitably subordinate certain Guarantee Claims and the Duplicative

Claim under section 510(c) of the Bankruptcy Code.

88.      On November 19, 2010, the Creditors' Committee filed an amended objection

(Docket No. 7859) (the "**Amended Objection**" and together with the First Objection, the

"**Objection**") seeking to, among other things, disallow all Disputed NS Claims under section

502(d) of the Bankruptcy Code or equitably subordinate the Disputed NS Claims under section

510(c) of the Bankruptcy Code, or, in the alternative, reduce the Disputed NS Claims to the

principal amount of the Notes less the "consent fee," which fee should be recharacterized as a

principal prepayment.

89.     As noted above, this Complaint supplements the Objection already on file.

## FACTUAL ALLEGATIONS

**Lock-Up Noteholders Join An Ad-Hoc Bondholders' Committee**

90.     In late December 2008, due to the unprecedented economic crisis in the United States, Old GM was in need of a lifeline to avoid liquidation.  Treasury provided emergency funding to Old GM on the condition that Old GM develop a proposal to achieve and sustain long-term viability.  This condition required that Old GM negotiate with its creditors, such as the United Auto Workers and bondholders, to implement a restructuring of its obligations and reduction of its debt.

91.     As set forth in Exhibit C attached hereto, before the Petition Date, certain Lock-Up Noteholders began to purchase their Notes in the secondary market at a steep discount to par.

92.     Around that same time, various holders of unsecured debt issued or guaranteed by Old GM, including certain Lock-Up Noteholders, joined an ad-hoc bondholders' group (the "**Steering Committee**") to negotiate with Old GM, on behalf of all bondholders, regarding a potential out-of-court restructuring of its overall unsecured debt.  Soon after the Steering Committee was formed, Old GM, with the assistance of Treasury, commenced negotiations with its creditors to develop such a restructuring plan.

93.     In March 2009, Treasury rejected Old GM's initial restructuring plan and gave Old GM sixty (60) days to submit a viable restructuring plan.  If Old GM could not submit a viable restructuring plan before this deadline – June 1, 2009 – Treasury would not provide additional financing.  In such a circumstance, Old GM would have been forced to discontinue its operations and liquidate under chapter 7 of the Bankruptcy Code.

**The Lock-Up Noteholders Commence Litigation In Canada**

94.    On March 2, 2009, while negotiations with Old GM and the Steering Committee, among others, were continuing, certain Lock-Up Noteholders commenced a lawsuit (the "**Nova Scotia Action**") against Old GM, Nova Scotia Finance, GM Nova Scotia Investments Ltd., a Nova Scotia company ("**Nova Scotia Investments**"), General Motors of Canada Limited, a Canadian corporation ("**GM Canada**") and certain individual officers and directors of such entities, in the Supreme Court of Nova Scotia, alleging, among other things, oppressive conduct by the defendants named therein.

95.    The Nova Scotia Action claimed that the Lock-Up Noteholders had suffered "oppression" as a result of certain transfers of money from Nova Scotia Finance and Nova Scotia Investments to Old GM.  As to Old GM, the complaint alleged that Old GM had been unjustly enriched as a result of these transfers and sought to recover the value of the transfers from Old GM, among other defendants, for payment to the Lock-Up Noteholders.

96.    These claims, however, were entirely without merit and were asserted to exert maximum leverage in Old GM's domestic and Canadian restructuring process.

97.    Among other reasons, the Nova Scotia Action lacked merit because, in order to establish eligibility for the oppression remedy under Nova Scotia law, the Lock-Up Noteholders were required to show that they acquired the Notes without constructive or actual knowledge of the complained of acts.  Here, the July 9, 2003 disclosure provided in connection with issuance of the Notes (the "**Offering Circular**") stated that the proceeds therefrom would be provided, directly or indirectly, to Old GM as part of an overall effort to accelerate improvements in Old GM's balance sheet.  The Offering Circular stated that Nova Scotia Finance "has no independent operations other than acting as a finance company" for Old GM and its affiliates.  Furthermore,

Nova Scotia Finance had no legal obligation to maintain any level of assets or share capital, and was not required to satisfy any test of solvency before making the transfers at issue in the Nova Scotia Action.

98.     Old GM's exposure from the Nova Scotia Action, therefore, was minimal. Indeed, the Lock-Up Noteholders appeared to acknowledge as much, with one Lock-Up Noteholder referring in an internal communication to the oppression claims as a "last refuge of scoundrels" providing "equitable powers to fashion remedies out of whole cloth."

99.     Moreover, the Lock-Up Noteholders knew or should have known about the challenged transfers before purchasing the Notes, notice of which was publicly filed at the Registry of Joint Stock Companies of Nova Scotia on May 27, 2008, almost a year prior to the filing of the Nova Scotia Action.

100.    These facts notwithstanding, the Lock-Up Noteholders waited until Old GM was in an extraordinarily precarious financial position before commencing the Nova Scotia Action.

**The Bond Exchange Offer Expires And The Lock-Up Noteholders Seek A Payday**

101.    On April 27, 2009, with Treasury's restructuring deadline looming, Old GM launched an exchange offer and consent solicitation for approximately $27 billion of its unsecured debt (the "**Bond Exchange Offer**"), pursuant to which Old GM offered nearly identical consideration (a combination of shares and cash) for each outstanding series of notes, including the Notes.

102.    In connection with the Bond Exchange Offer, Old GM filed a prospectus disclosing that Nova Scotia Finance (i) had assets consisting of two unsecured intercompany loans to GM Canada, dated July 10, 2003, with a face value of approximately CAD $1.33 billion (the "**Intercompany Loans**") and (ii) was a party to two currency swap agreements with Old

GM, dated July 10, 2003, pursuant to which Nova Scotia Finance would pay Canadian dollars

and receive pounds sterling (the "**Swap Arrangements**").  Upon expiration of the Swap

Arrangements, assuming the Canadian dollar appreciated relative to the pound sterling, Old GM

would be "in the money," resulting in a swap receivable owed to Old GM by Nova Scotia

Finance based on the Swap Arrangements (the "**Swap Liability**").

103.    The prospectus also disclosed that, under Nova Scotia corporate law, because

Nova Scotia Finance is an unlimited company, if Nova Scotia Finance "is 'wound up' (which

includes liquidation and likely includes bankruptcy), the liquidator or trustee in bankruptcy may

be able to assert a claim against [Old GM], the shareholder of [Nova Scotia Finance], to

contribute to [Nova Scotia Finance] an amount sufficient" to pay its debts and liabilities.

104.    Upon learning of the existence of the Intercompany Loans, the Lock-Up

Noteholders, acting on behalf of Nova Scotia Finance (which the Lock-Up Noteholders alleged

was conflicted and unable to act against its affiliate GM Canada), used their bogus pending

litigation to demand repayment of the Intercompany Loans.  Given GM Canada's limited

resources at the time, such demand threatened to force GM Canada into bankruptcy.

105.    In aggressively pursuing the Nova Scotia Action, the Lock-Up Noteholders

dropped any pretense of seeking a global resolution through the Steering Committee on behalf of

all bondholders, and the Bond Exchange Offer, unsurprisingly, failed and expired on May 26,

2009.

106.    With less than three days remaining before the Treasury deadline, Nova Scotia

Finance, on Thursday, May 28, 2009, made a cash offer to pay the Lock-Up Noteholders 0.28

GBP (pounds sterling) per GBP outstanding under the Notes in an attempt to settle the Nova

Scotia Action and all liability of any GM entity with respect to the Notes.  Nova Scotia Finance's

18

settlement offer contemplated that, in exchange for payment of approximately 28% of the face

amount of the Notes, the Notes would be cancelled and all GM parties would be released from

all liability related to the Notes.

107.    The Lock-Up Noteholders, however, rejected this offer as "wholly inadequate."

**The Pre-Petition Scramble To Move Cash To**
**"Trust" To Pay Off The Lock-Up Noteholders**

108.    On Friday, May 29, 2009, the last business day before the Treasury deadline and

with the prospect of an Old GM bankruptcy filing looming, officials at GM Canada and Old GM,

which would be responsible for funding any settlement with the Lock-Up Noteholders, became

concerned that they were running out of time to reach a deal.

109.    The Lock-Up Noteholders had rejected Nova Scotia Finance's May 28, 2009 offer

to pay 28% of the face value of the Notes, and on June 1, upon the filing of a bankruptcy case,

Old GM would not be able to transfer such a large sum of money – nearly half a billion dollars –

outside of its ordinary course of business absent Court approval.

110.    As the day progressed, GM Canada sought a number of revised consents from its

secured lender, Export Development Canada ("**EDC**"), to permit it to receive additional funds, in

the form of a loan from Old GM.  The purpose of the loan was to fund a settlement with the

Lock-Up Noteholders that would extinguish the Notes in exchange for a cash payment, and

eliminate all Disputed NS Claims.  EDC's consent was required because, pursuant to GM

Canada's loan agreement with EDC, GM Canada was required to notify EDC before incurring

out of the ordinary course indebtedness in excess of $100 million.

111.    Because the filing of a bankruptcy case would cut off Old GM's ability to transfer

funds without this Court's approval, Old GM attempted to transfer the funds to GM Canada,

even before reaching a deal with the Lock-Up Noteholders.

112.    As the close of business on Friday, May 29, 2009 approached, GM Canada

informed relevant parties that any wire transfer from Old GM to GM Canada would have to be

made right away in order to complete the transfer of funds to GM Canada before the anticipated

Old GM bankruptcy filing on June 1, 2009.  It was not until several hours later that EDC

consented via email to the $450 million loan from Old GM to GM Canada.

113.    Late in the day on Friday, May 29, 2009, Old GM purportedly transferred $450

million (the "**Earmarked Funds**") to an account at TD Canada Trust in Canada, which was to

be held in trust pursuant to an agreement dated as of May 29, 2009 and signed by Old GM and

GM Canada (the "**Trust Agreement**").  This $450 million transfer was documented as an inter-

company loan and evidenced by a promissory note dated May 29, 2009 and signed by GM

Canada (the "**Promissory Note**").

114.    Pursuant to the Trust Agreement, the Earmarked Funds were to be held in trust

and used only to ultimately fund an amendment to the Notes to provide that such Notes would

become mandatorily exchangeable into cash.  Further, the Earmarked Funds were required to be

returned to Old GM if the Lock-Up Noteholders failed to sign and deliver the Lock-Up

Agreement on or before 11:30 p.m. EST on May 31, 2009 (the "**Lock-Up Deadline**").

115.    As of the Lock-Up Deadline, the Lock-Up Noteholders had not yet signed and

delivered their counterparts of the Lock-Up Agreement.  In fact, as of such date and time, there

was not yet a final draft of the Lock-Up Agreement.  Consequently, pursuant to the Trust

Agreement, GM Canada was required to return the Earmarked Funds to Old GM to satisfy the

Promissory Note.

116.    Negotiations between Old GM and the Lock-Up Noteholders continued well after

the Lock-Up Deadline and through the morning of Monday, June 1, the Petition Date.  When Old

GM filed its bankruptcy petition at 7:57 a.m. on the morning of June 1, 2009, which was more

than eight hours after the Lock-Up Deadline, the status of the Earmarked Funds had not changed:

The Lock-Up Noteholders still had not signed and delivered their counterparts of the Lock-Up

Agreement.  Thus, as of the Petition Date, the Earmarked Funds were payable to Old GM and the

right to receive such funds under the Trust Agreement constituted property of Old GM's

bankruptcy estate.

117.    Remarkably, the Earmarked Funds were not returned to Old GM.  Instead, to

avoid this Court's scrutiny (and the likelihood that this Court's approval would not be

forthcoming), the Trust Agreement was twice amended after the Petition Date and backdated to

create the impression that the Earmarked Funds were not property of Old GM's estate and,

therefore, that this Court's approval for the disposition of such funds was not necessary.

118.    Upon information and belief, on or about June 8, 2009, the first amendment to the

Trust Agreement was executed and delivered by Old GM, though backdated "as of May 31,

2009" (the "**First Trust Amendment**") which, for the first time, introduced the possibility that

the Earmarked Funds would be used for a purpose other than extinguishment of the Notes.

Moreover, the First Trust Amendment, among other things, ostensibly extended the Lock-Up

Deadline from 11:30 p.m. on May 31, 2009 to 6:00 a.m. on June 1, 2009.

119.    Even though the First Trust Amendment was not executed before the Petition

Date, no Court approval was sought or obtained for the Old GM bankruptcy estate to enter into

such an out-of-the-ordinary-course transaction.  The First Trust Amendment thus is voidable and

not binding.  Even if the First Trust Amendment had been executed prior to the Petition Date, the

Earmarked Funds were still required to be repaid to Old GM inasmuch as the Lock-Up

Noteholders had not signed and delivered their counterparts to the Lock-Up Agreement by the 6:00 a.m. deadline, as discussed below.

120.    Upon information and belief, on or about June 8, 2009, a second amendment to the Trust Agreement was executed and delivered by GM Canada and Old GM, though backdated "as of June 3, 2009" (the "**Second Trust Amendment**" and together with the First Trust Amendment, the "**Trust Amendments**") which, for the first time, introduced the possibility that the Earmarked Funds would be used to fund legal fees incurred by the Lock-Up Noteholders and any fees incurred by the Nova Scotia Finance Trustee.  Court approval for this Second Trust Amendment was neither sought nor obtained; thus, the Second Trust Amendment is voidable and not binding.

121.    On June 5, 2009, more than $367 million of the Earmarked Funds were released from the GM Canada trust account and paid over to an escrow agent, pursuant to an escrow agreement, where such funds were held until the "extraordinary resolution" of holders of Notes approving the Lock-Up Agreement was passed on June 25, 2009.  The following day, $367 million was paid as a "consent fee" to the holders of Notes.

122.    As such Trust Amendments effectively transferred approximately $367 million of the Earmarked Funds from Old GM to the Lock-Up Noteholders after the Petition Date, bankruptcy approval was unquestionably required.

**The Lock-Up Agreement Was A Post-Petition Agreement**

123.    As explained above, because the Lock-Up Noteholders' demands were far in excess of what Old GM had anticipated, the Lock-Up Agreement itself was not even finalized before the petition was filed at 7:57 a.m. on June 1, 2009.  The negotiations came down to the wire and then pushed beyond the wire.  Information, including correspondence and electronic

22

information obtained from the Lock-Up Defendants, New GM and Old GM, demonstrates that

the Lock-Up Agreement was not finalized until after Old GM filed its Bankruptcy Case.

124.    Although the Lock-Up Defendants have repeatedly represented to this Court that

the Lock-Up Agreement is a pre-petition agreement insulated from this Court's scrutiny, upon

information and belief, the Lock-Up Agreement was a post-petition settlement that should have

been approved by the Court.  But no approval was ever sought or obtained.

125.    The implementation of the Lock-Up Agreement also required several post-

petition transfers and uses of property of Old GM's bankruptcy estate, as well as post-petition

actions by the Lock-Up Noteholders against Old GM, none of which were disclosed to, let alone

approved by, the Court or the creditors in this case.

126.    For example, Old GM, as the sole shareholder of Nova Scotia Finance, executed

and delivered its consent to the transactions described in the Lock-Up Agreement on June 8,

2009, more than a week after the Petition Date, though the consent was backdated to June 1,

2009.

127.    Further, the Lock-Up Agreement required that the Earmarked Funds, which

constituted property of the Old GM bankruptcy estate on the Petition Date, be transferred to the

Lock-Up Noteholders as a "Consent Fee."

128.    The two amendments to the Trust Agreement discussed above were similarly not

executed or delivered by Old GM or GM Canada until after the Petition Date.  These two

amendments were necessary to implement the terms of the Lock-Up Agreement and release the

Earmarked Funds.  As a result, payment of the Earmarked Funds to the holders of Notes violated

the Trust Agreement in effect on the Petition Date inasmuch as the Lock-Up Agreement was not

finalized by the May 31 deadline and the Earmarked Funds were not paid to ultimately
extinguish the Notes.

## The Final Terms Of The Lock-Up Agreement Are Economically Irrational

129.    The final Lock-Up Agreement was grossly disproportionate to any minimal
benefit conferred on Old GM pursuant to the agreement.

130.    According to Old GM's own internal analyses at the time of the May 30-31, 2009
weekend negotiations with the Lock-Up Noteholders, any settlement exceeding $285 million "all
in" did not make economic sense for Old GM.  In other words, while Old GM was prepared to
cancel the Notes and all Disputed NS Claims, in exchange for a payment of up to $285 million, a
negotiated resolution with the Lock-Up Noteholders did not make sense at amounts beyond $285
million or in a scenario where the Notes were not extinguished.  In the end, under the Lock-Up
Agreement, the Lock-Up Noteholders received value far in excess of Old GM's settlement
parameters and beyond all economic reason.

131.    First, under the Lock-Up Agreement, holders of the Notes as of June 25, 2009
received a cash "consent fee" of £223,303,500 (or approximately $367 million) (the "**Consent
Fee**") plus reimbursement of the Lock-Up Noteholders' legal costs.  The Consent Fee alone was
well beyond any economically rational point of settlement.

132.    Although the Consent Fee was nominally to be paid by Nova Scotia Finance, Old
GM funded the Consent Fee.  Upon information and belief, as explained above, payment of the
Consent Fee after Old GM's bankruptcy petition was filed constituted an unauthorized use of
Old GM's property.

133.    The Lock-Up Noteholders extracted this $367 million cash payment from Old
GM without any Court authorization, let alone adequate disclosure to the Court, Old GM's

24

creditors or other parties-in-interest in the Bankruptcy Cases.  As shown in <u>Exhibit C</u> attached

hereto, Appaloosa and Fortress purchased additional Guarantee Claims after the Petition Date,

but before the Consent Fee was to be paid, in order to receive a greater share of such fee.

134.    The Consent Fee represented over 35% of the face amount of the Notes then

outstanding, and is thus many times greater than any commercially-reasonable consent fee.

135.    Second, under the Lock-Up Agreement, the Consent Fee does not extinguish the

Notes.  Rather, under the Lock-Up Agreement, which specifically contemplated that Old GM

would file a bankruptcy case on June 1, 2009, Old GM agreed to allow, to the fullest extent

permitted under applicable laws, and not contest in its Bankruptcy Case, the Guarantee Claims

for the full face amount of the Notes and other fees aggregating in excess of $1 billion, despite

that, in substance, the Consent Fee was a payment of the principal amount owed on the Notes.

136.    Third, the Lock-Up Agreement resulted in an enormous claim asserted against

Old GM by the Nova Scotia Finance Trustee for the benefit of holders of the Notes.  The Lock-

Up Agreement set the wheels in motion for a Nova Scotia Finance bankruptcy, and enabled

holders of the Notes to claim the amounts owed on the Notes from Old GM through the Nova

Scotia Finance Trustee's assertion of the Duplicative Claim.  Absent the Nova Scotia Finance

bankruptcy, which was orchestrated by the Lock-Up Noteholders pursuant to the Lock-Up

Agreement, Old GM would have had no liability to these noteholders other than under the

guarantee.

137.    Fourth, the Lock-Up Agreement created a massive and improper Swap Liability

against Old GM.  The Lock-Up Agreement transformed the Swap Liability from an amount

owed to Old GM into an amount payable by Old GM by requiring that the Swap Liability be

included as part of the Nova Scotia Finance Trustee's Duplicative Claim for the benefit of
holders of the Notes.

138.    Finally, under the Lock-Up Agreement, Nova Scotia Finance agreed to release
GM Canada from its obligation to repay the Intercompany Loans.  As a direct result of this
release (which appears to have been executed on June 25, 2009 in connection with passing the
extraordinary resolution), Old GM became liable to Nova Scotia Finance with respect to the
Intercompany Loans via the Duplicative Claim.  Thus, every dollar that Nova Scotia Finance
agreed to release GM Canada from with respect to the Intercompany Loans was a dollar for
which Old GM became liable.

**Nova Scotia Finance Files For Bankruptcy In Canada**

139.    On October 8, 2009, without notice to the Court or the creditors in this case, the
Lock-Up Noteholders applied for a bankruptcy order, relying upon a previously-executed
resolution dated as of June 4, 2009 that was purportedly signed by Nova Scotia Finance's
directors.  The Canadian bankruptcy order was entered on October 9, 2009, as first disclosed in
an Old GM 8-K filing that same day (the "**October 8-K**").

140.    This Canadian bankruptcy case was collusive from the start.  The Lock-Up
Noteholders intentionally waited three months following their receipt of the Consent Fee to
commence a Nova Scotia Finance bankruptcy in order to shield the Consent Fee from avoidance
claims under Canadian law.  Further, the Lock-Up Noteholders caused the appointment of a
trustee – Green Hunt Wedlake, Inc. –  hand-picked by them, who acts at their direction and for
their benefit.

141.    The Nova Scotia Finance Trustee presented a preliminary report to creditors dated
as of November 12, 2009 (the "**Report**").  The Report sets forth the Nova Scotia Finance

Trustee's understanding of Nova Scotia Finance's financial picture and contains a section on

"Preferences and Transfers at Undervalue" that discusses the settlement of the Intercompany

Loans for less than one third of the face amount owed.  The Report notes that while "these

transactions may qualify as a preference or transfer undervalue, it appears that all of the known

creditors of . . . [Nova Scotia Finance] were either a beneficiary of the transaction or consented

to and/or participated in the transaction . . . [and] no creditors were prejudiced."  The Nova

Scotia Finance Trustee failed to further investigate this settlement or to insist on the appointment

of inspectors, as provided for under Canadian law.

**The Lock-Up Agreement Was Not Properly Assumed By Old GM**

142.    On November 18, 2009, New GM sent Greenberg Traurig, counsel for the Lock-

Up Noteholders, a letter confirming that Old GM had supposedly assumed the Lock-Up

Agreement as of July 24, 2009.  According to New GM, each Lock-Up Noteholder should have

received a notice of assumption with instructions, as required by the court-approved assumption

and assignment procedures.  Upon information and belief, such notice was not provided.

Moreover, although the Lock-Up Agreement had monumental consequences to Old GM's

unsecured creditors, the Creditors' Committee was not provided with any notice that the

agreement was purportedly being assumed by Old GM.

**The Swap Component Of The Duplicative Claim Is Not Enforceable And Is Overstated**

143.    On November 9, 2009, as contemplated by the Lock-Up Agreement, New GM

asserted a claim against Nova Scotia Finance based on the Swap Arrangements for more than

$564 million (the "**Swap Claim**").  In support of the Swap Claim, New GM attached a

"statement of account" indicating that it had acquired rights in that account pursuant to the sale

order entered in these Bankruptcy Cases on July 5, 2009.  Although the Swap Arrangements, like

27

the Lock-Up Agreement, had monumental consequences to Old GM's unsecured creditors, the

Creditors' Committee was not provided with any notice that the Swap Liability was purportedly

being transferred to New GM.

144.

# REDACTED

145.    Further, New GM and the Lock-Up Defendants knew that, to the extent the Swap

Claim was properly included in the Nova Scotia Finance Trustee's Duplicative Claim, the Swap

Claim as asserted was inflated by several hundred million dollars. For example, internal

analyses prepared by Old GM, New GM and the Lock-Up Noteholders reveal valuations of the

Swap Claim well under $564 million.

146.    In addition, a portion of the Swap Claim includes amounts purportedly due based

on early termination despite knowledge by New GM and the Lock-Up Defendants that the Swap

Arrangements had not been terminated. Upon information and belief, to this day, the Swap

Arrangements have not been properly terminated.

The Lock-Up Defendants Made Misrepresentations To This Court

147.    As discussed herein, the Lock-Up Agreement was a post-petition agreement. The

Lock-Up Defendants, however, misstated the nature of the Lock-Up Agreement in an attempt to

shield the agreement from scrutiny by the Court and by other creditors in the Bankruptcy Cases.

For example, the Lock-Up Defendants falsely state in their respective responses to the Amended

Objection, filed with the Court on December 13, 2010, that the Lock-Up Agreement was a pre-petition settlement and therefore outside the review of the Court.

148.    The Lock-Up Noteholders participated in the Lock-Up Agreement negotiations and related transactions, and thus knew that the Lock-Up Agreement and the transactions necessary to complete Old GM's performance thereunder were not completed until after Old GM's bankruptcy petition was filed.

149.    Moreover, the Lock-Up Noteholders incorrectly claim that "the transactions under the Lock-Up Agreement" were fully and publicly disclosed and that the "Lock-Up Agreement was well publicized."  Although Old GM filed an 8-K on June 1, 2009 that purported to disclose the Lock-Up Agreement (the "**June 8-K**"), the June 8-K did not disclose most of the critical facts about the agreement, only a portion of which were disclosed by the subsequent October 8-K.  For example, the June 8-K does not mention Nova Scotia Finance's consent to bankruptcy (and contemplated assertion of the Duplicative Claim) or the Swap Liability.  Nor does the June 8-K disclose that Old GM was the source of funding for the Promissory Note used to pay the Consent Fee.  Thus, the material particulars of the Lock-Up Agreement were not publicly disclosed in a timely manner.

150.    Further, to this day, no participant in the Lock-Up Agreement negotiations and related transactions has ever acknowledged to this Court that the "settlement" with the Lock-Up Noteholders left Old GM's estate burdened by a *three-billion-dollar* tab comprised of allowed claims and cash payments.

151.    The Lock-Up Defendants' misrepresentations to this Court concerning the Lock-Up Agreement, as well as the Lock-Up Defendants' other inequitable conduct discussed herein both prior to and during this Bankruptcy Case, merit equitable subordination or, in the

29

alternative, equitable disallowance of the claims held by the Equitable Subordination

Defendants.

## CLAIMS FOR RELIEF

## COUNT I:  EQUITABLE SUBORDINATION/EQUITABLE DISALLOWANCE

152.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 151 as if

fully set forth herein.

153.    The Lock-Up Defendants in this case engaged in and benefited from inequitable

conduct that resulted in injury to Old GM's creditors and conferred an unfair benefit upon the

Lock-Up Noteholders.  The Equitable Subordination Defendants either acquired their claims,

directly or indirectly, from the Lock-Up Noteholders or are Lock-Up Defendants.  Such claims,

therefore, should be equitably subordinated under section 510 of the Bankruptcy Code to the

claims of other general unsecured creditors, or in the alternative, should be equitably disallowed.

154.    The Lock-Up Noteholders' conduct was inequitable because, in connection with

the Nova Scotia Action, the Lock-Up Noteholders prosecuted a baseless lawsuit and threatened

to force GM Canada into bankruptcy.  The Lock-Up Noteholders were aware of the underlying

transactions that formed the basis of their claims well in advance of the filing of this action;

however, they chose to wait until March 2009, when they knew that Old GM was at its most

vulnerable.  This lawsuit was designed to extract the maximum benefit for the Lock-Up

Noteholders at the expense of Old GM's other creditors and culminated in the Lock-Up

Agreement, which resulted in a settlement that paid holders of the Notes as of June 25, 2009 over

35% of the principal amounts due on the Notes as a "Consent Fee" and permitted the Lock-Up

Defendants to assert claims *more than three times* the amounts actually due on Old GM's

guarantee.

155.    Moreover, the Lock-Up Defendants, as participants in this Bankruptcy Case, have a duty of candor to this Court.  The Lock-Up Defendants, however, were not forthright with this Court or the Creditors' Committee.  The Lock-Up Defendants have falsely told this Court on numerous occasions that the Lock-Up Agreement was well-publicized and entered into pre-petition and therefore, not subject to this Court's scrutiny.  Upon information and belief, however, as set forth above, the Lock-Up Agreement was not executed by all necessary parties until after Old GM's bankruptcy petition was filed on June 1, 2009 at 7:57 a.m. and the material transactions necessary to implement the Lock-Up Agreement did not take place until after the bankruptcy petition was filed.  The Lock-Up Agreement, which purported to settle all Disputed NS Claims, was therefore, a post-petition settlement for which Bankruptcy Court approval was required under Rule 9019 of the Federal Rules of Bankruptcy Procedure.  No such approval was sought or obtained.

156.    In addition, upon information and belief, property of Old GM's bankruptcy estate was transferred or utilized post-petition in order to effectuate the Lock-Up Agreement, including: (a) release of the Earmarked Funds from GM Canada's "trust" account to the escrow agent to ultimately pay the Consent Fee and (b) post-petition execution and delivery by Old GM, as the sole shareholder of Nova Scotia Finance, of the necessary consents to the transactions contemplated by the Lock-Up Agreement (including the settlement of the Intercompany Loans).  These transfers and out-of-the-ordinary-course uses of estate property were neither authorized by nor disclosed to the Court in violation of sections 363(b) and/or 549 of the Bankruptcy Code.

157.    Finally, the Lock-Up Noteholders' actions in completing execution of the Lock-Up Agreement after Old GM's bankruptcy petition was filed and obtaining payments and other benefits thereunder from Old GM after the Petition Date were wrongful attempts to obtain

possession of property of the estate and to collect a pre-petition claim against Old GM, and thus violated section 362 of the Bankruptcy Code.

158.    As already explained in detail above, the Lock-Up Defendants' misconduct caused injury to Old GM's creditors and conferred an unfair advantage on the Lock-Up Noteholders.

159.    Equitable subordination, or alternatively equitable disallowance, of the Equitable Subordination Defendants' claims is consistent with the Bankruptcy Code and established principles of bankruptcy law.

## COUNT II:  RECHARACTERIZATION OF CONSENT FEE

160.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 159 as if fully set forth herein.

161.    The Consent Fee paid in this case was a disguised payment of principal on the Notes, and the Court should, in the exercise of its equitable powers, recharacterize the Consent Fee as a payment of principal and reduce the Defendants' claims accordingly.

162.    The Lock-Up Noteholders extracted over $367 million in cash from Old GM as a "Consent Fee" without any Court authorization, let alone adequate disclosure to the Court, Old GM's creditors or other parties-in-interest in the Bankruptcy Cases.

163.    Although the Lock-Up Defendants label this payment as a "Consent Fee," this $367 million fee is out of all proportion to the amounts actually due on the Notes, which at the time of payment of the Consent Fee was less than $1 billion.  The Consent Fee is thus many times greater than any commercially reasonable consent fee.

164.    The Bankruptcy Court, as a court of equity, should look to the substance of the transaction rather than the labels applied to such transaction by the parties.  In this case, in substance, the Consent Fee was a payment of the principal amount owed on the Notes.

165.    Permitting the Lock-Up Noteholders to retain the Consent Fee and assert claims in full based upon the principal amount of the Notes would be inequitable under the circumstances of this case.

166.     Accordingly, the Court should recharacterize the Consent Fee as a payment of

principal and the Defendants' claims in this case should be reduced accordingly.

WHEREFORE, Plaintiff prays for relief against Defendants as follows:

(i)     On Count I (Equitable Subordination/Equitable Disallowance):  an order
equitably subordinating the claims of the Equitable Subordination Defendants to
the claims of other general unsecured creditors, or in the alternative, equitably
disallowing the claims of the Equitable Subordination Defendants;

(ii)     On Count II (Recharacterization):  an order recharacterizing the Consent Fee as a
payment of principal on the Notes and reducing the Defendants' claims
accordingly; and

(iii)     All such other and further relief as this Court deems necessary and proper.

Dated: New York, New York
         January 17, 2012


                         DICKSTEIN SHAPIRO LLP


                         /s/ Eric B. Fisher
                         _____
                              Barry N. Seidel
                              Eric B. Fisher
                              Katie L. Cooperman
                         1633 Broadway
                         New York, New York 10019-6708
                         Telephone: (212) 277-6500
                         Facsimile: (212) 277-6501

                         *Counsel for Motors Liquidation
                         Company GUC Trust*