# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                             :
In re                       :          Chapter 11 Case No.
                             :
GENERAL MOTORS CORP., *et al.*,     :          09-50026 (REG)
                             :
              Debtors.      :          (Jointly Administered)
                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### ORDER (I) AUTHORIZING SALE OF ASSETS PURSUANT TO AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT WITH NGMCO, INC., A U.S. TREASURY-SPONSORED PURCHASER; (II) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE; AND (III) GRANTING RELATED RELIEF

Upon the motion, dated June 1, 2009 (the "**Motion**"), of General Motors

Corporation ("**GM**") and its affiliated debtors, as debtors in possession (collectively, the

"**Debtors**"), pursuant to sections 105, 363, and 365 of title 11, United States Code (the

"**Bankruptcy Code**") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**") for, among other things, entry of an order authorizing and

approving (A) that certain Amended and Restated Master Sale and Purchase Agreement, dated as

of June 26, 2009, by and among GM and its Debtor subsidiaries (collectively, the "**Sellers**") and

NGMCO, Inc., as successor in interest to Vehicle Acquisition Holdings LLC (the "**Purchaser**"),

a purchaser sponsored by the United States Department of the Treasury (the "**U.S. Treasury**"),

together with all related documents and agreements as well as all exhibits, schedules, and

addenda thereto (as amended, the "**MPA**"), a copy of which is annexed hereto as Exhibit "A"

(excluding the exhibits and schedules thereto); (B) the sale of the Purchased Assets[1] to the

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Motion or the MPA.

Purchaser free and clear of liens, claims, encumbrances, and interests (other than Permitted

Encumbrances), including rights or claims based on any successor or transferee liability; (C) the

assumption and assignment of the Assumable Executory Contracts; (D) the establishment of

certain Cure Amounts; and (E) the UAW Retiree Settlement Agreement (as defined below); and

the Court having jurisdiction to consider the Motion and the relief requested therein in

accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to

Bankruptcy Judges for the Southern District of New York of Any and All Proceedings Under

Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion having been provided in accordance with this Court's Order, dated June 2, 2009 (the

"**Sale Procedures Order**"), and it appearing that no other or further notice need be provided;

and a hearing having been held on June 30 through July 2, 2009, to consider the relief requested

in the Motion (the "**Sale Hearing**"); and upon the record of the Sale Hearing, including all

affidavits and declarations submitted in connection therewith, and all of the proceedings had

before the Court; and the Court having reviewed the Motion and all objections thereto (the

"**Objections**") and found and determined that the relief sought in the Motion is necessary to

avoid immediate and irreparable harm to the Debtors and their estates, as contemplated by

Bankruptcy Rule 6003 and is in the best interests of the Debtors, their estates and creditors, and

other parties in interest and that the legal and factual bases set forth in the Motion establish just

cause for the relief granted herein; and after due deliberation and sufficient cause appearing

therefor, it is

FOUND AND DETERMINED THAT:

A.     The findings and conclusions set forth herein and in the Court's Decision dated July 5, 2009 (the "Decision") constitute the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, made applicable to this proceeding pursuant to Fed. R. Bankr. P. 9014.

B.     To the extent any of the following findings of fact or Findings of Fact in the Decision constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law or Conclusions of Law in the Decision constitute findings of fact, they are adopted as such.

C.     This Court has jurisdiction over the Motion, the MPA, and the 363 Transaction pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

D.     The statutory predicates for the relief sought in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code as supplemented by Bankruptcy Rules 2002, 6004, and 6006.

E.     As evidenced by the affidavits and certificates of service and Publication Notice previously filed with the Court, in light of the exigent circumstances of these chapter 11 cases and the wasting nature of the Purchased Assets and based on the representations of counsel at the Sale Procedures Hearing and the Sale Hearing, (i) proper, timely, adequate, and sufficient notice of the Motion, the Sale Procedures, the 363 Transaction, the procedures for assuming and assigning the Assumable Executory Contracts as described in the Sale Procedures Order and as modified herein (the "**Modified Assumption and Assignment Procedures**"), the UAW Retiree

Settlement Agreement, and the Sale Hearing have been provided in accordance with Bankruptcy

Rules 2002(a), 6004(a), and 6006(c) and in compliance with the Sale Procedures Order; (ii) such

notice was good and sufficient, reasonable, and appropriate under the particular circumstances of

these chapter 11 cases, and reasonably calculated to reach and apprise all holders of liens, claims,

encumbrances, and other interests, including rights or claims based on any successor or

transferee liability, about the Sale Procedures, the sale of the Purchased Assets, the 363

Transaction, and the assumption and assignment of the Assumable Executory Contracts, and to

reach all UAW-Represented Retirees about the UAW Retiree Settlement Agreement and the

terms of that certain Letter Agreement, dated May 29, 2009, between GM, the International

Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the

"**UAW**"), and Stember, Feinstein, Doyle & Payne, LLC (the "**UAW Claims Agreement**")

relating thereto; and (iii) no other or further notice of the Motion, the 363 Transaction, the Sale

Procedures, the Modified Assumption and Assignment Procedures, the UAW Retiree Settlement

Agreement, the UAW Claims Agreement, and the Sale Hearing or any matters in connection

therewith is or shall be required. With respect to parties who may have claims against the

Debtors, but whose identities are not reasonably ascertainable by the Debtors (including, but not

limited to, potential contingent warranty claims against the Debtors), the Publication Notice was

sufficient and reasonably calculated under the circumstances to reach such parties.

       F.    On June 1, 2009, this Court entered the Sale Procedures Order approving

the Sale Procedures for the Purchased Assets. The Sale Procedures provided a full, fair, and

reasonable opportunity for any entity to make an offer to purchase the Purchased Assets. The

Debtors received no bids under the Sale Procedures for the Purchased Assets. Therefore, the

Purchaser's bid was designated as the Successful Bid pursuant to the Sale Procedures Order.

Case 1:12-cv-04597-JGK  Document 13-2  Filed 09/7/12  Page 6 of 51

G.     As demonstrated by (i) the Motion, (ii) the testimony and other evidence proffered or adduced at the Sale Hearing, and (iii) the representations of counsel made on the record at the Sale Hearing, in light of the exigent circumstances presented, (a) the Debtors have adequately marketed the Purchased Assets and conducted the sale process in compliance with the Sale Procedures Order; (b) a reasonable opportunity has been given to any interested party to make a higher or better offer for the Purchased Assets; (c) the consideration provided for in the MPA constitutes the highest or otherwise best offer for the Purchased Assets and provides fair and reasonable consideration for the Purchased Assets; (d) the 363 Transaction is a sale of deteriorating assets and the only alternative to liquidation available for the Debtors; (e) if the 363 Transaction is not approved, the Debtors will be forced to cease operations altogether; (f) the failure to approve the 363 Transaction promptly will lead to systemic failure and dire consequences, including the loss of hundreds of thousands of auto-related jobs; (g) prompt approval of the 363 Transaction is the only means to preserve and maximize the value of the Debtors' assets; (h) the 363 Transaction maximizes fair value for the Debtors' parties in interest; (i) the Debtors are receiving fair value for the assets being sold; (j) the 363 Transaction will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, including liquidation under chapters 7 or 11 of the Bankruptcy Code; (k) no other entity has offered to purchase the Purchased Assets for greater economic value to the Debtors or their estates; (l) the consideration to be paid by the Purchaser under the MPA exceeds the liquidation value of the Purchased Assets; and (m) the Debtors' determination that the MPA constitutes the highest or best offer for the Purchased Assets and that the 363 Transaction represents a better alternative for the Debtors' parties in interest than an immediate liquidation constitute valid and sound exercises of the Debtors' business judgment.

H.      The actions represented to be taken by the Sellers and the Purchaser are appropriate under the circumstances of these chapter 11 cases and are in the best interests of the Debtors, their estates and creditors, and other parties in interest.

I.      Approval of the MPA and consummation of the 363 Transaction at this time is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest.

J.      The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the sale of the Purchased Assets pursuant to the 363 Transaction prior to, and outside of, a plan of reorganization and for the immediate approval of the MPA and the 363 Transaction because, among other things, the Debtors' estates will suffer immediate and irreparable harm if the relief requested in the Motion is not granted on an expedited basis.  In light of the exigent circumstances of these chapter 11 cases and the risk of deterioration in the going concern value of the Purchased Assets pending the 363 Transaction, time is of the essence in (i) consummating the 363 Transaction, (ii) preserving the viability of the Debtors' businesses as going concerns, and (iii) minimizing the widespread and adverse economic consequences for the Debtors, their estates, their creditors, employees, the automotive industry, and the national economy that would be threatened by protracted proceedings in these chapter 11 cases.

K.      The consideration provided by the Purchaser pursuant to the MPA (i) is fair and reasonable, (ii) is the highest and best offer for the Purchased Assets, (iii) will provide a greater recovery to the Debtors' estates than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

US_ACTIVE:\43085833\07\43085833_7.DOC\                                                     6

L.      The 363 Transaction must be approved and consummated as promptly as practicable in order to preserve the viability of the business to which the Purchased Assets relate as a going concern.

M.      The MPA was not entered into and none of the Debtors, the Purchaser, or the Purchasers' present or contemplated owners have entered into the MPA or propose to consummate the 363 Transaction for the purpose of hindering, delaying, or defrauding the Debtors' present or future creditors. None of the Debtors, the Purchaser, nor the Purchaser's present or contemplated owners is entering into the MPA or proposing to consummate the 363 Transaction fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to any of the foregoing.

N.      In light of the extensive prepetition negotiations culminating in the MPA, the Purchaser's commitment to consummate the 363 Transaction is clear without the need to provide a good faith deposit.

O.      Each Debtor (i) has full corporate power and authority to execute the MPA and all other documents contemplated thereby, and the sale of the Purchased Assets has been duly and validly authorized by all necessary corporate action of each of the Debtors, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the MPA, (iii) has taken all corporate action necessary to authorize and approve the MPA and the consummation by the Debtors of the transactions contemplated thereby, and (iv) subject to entry of this Order, needs no consents or approvals, other than those expressly provided for in the MPA which may be waived by the Purchaser, to consummate such transactions.

US_ACTIVE:\43085833\07:43085833_7.DOCX                    7

P.     The consummation of the 363 Transaction outside of a plan of reorganization pursuant to the MPA neither impermissibly restructures the rights of the Debtors' creditors, allocates or distributes any of the sale proceeds, nor impermissibly dictates the terms of a liquidating plan of reorganization for the Debtors. The 363 Transaction does not constitute a *sub rosa* plan of reorganization. The 363 Transaction in no way dictates distribution of the Debtors' property to creditors and does not impinge upon any chapter 11 plan that may be confirmed.

Q.     The MPA and the 363 Transaction were negotiated, proposed, and entered into by the Sellers and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions. Neither the Sellers, the Purchaser, the U.S. Treasury, nor their respective agents, officials, personnel, representatives, and advisors, has engaged in any conduct that would cause or permit the MPA to be avoided under 11 U.S.C. § 363(n).

R.     The Purchaser is a newly-formed Delaware corporation that, as of the date of the Sale Hearing, is wholly-owned by the U.S. Treasury. The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

S.     Neither the Purchaser, the U.S. Treasury, nor their respective agents, officials, personnel, representatives, or advisors is an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

T.     Upon the Closing of the 363 Transaction, the Debtors will transfer to the Purchaser substantially all of its assets. In exchange, the Purchaser will provide the Debtors with (i) cancellation of billions of dollars in secured debt; (ii) assumption by the Purchaser of a portion of the Debtors' business obligations and liabilities that the Purchaser will satisfy; and (iii) no less than 10% of the Common Stock of the Purchaser as of the Closing (100% of which the

Debtors' retained financial advisor values at between $38 billion and $48 billion) and warrants to purchase an additional 15% of the Common Stock of the Purchaser as of the Closing, the combination of which the Debtors' retained financial advisor values at between $7.4 billion and $9.8 billion (which amount, for the avoidance of doubt, does not include any amount for the Adjustment Shares).

U.    The Purchaser, not the Debtors, has determined its ownership composition and capital structure. The Purchaser will assign ownership interests to certain parties based on the Purchaser's belief that the transfer is necessary to conduct its business going forward, that the transfer is to attain goodwill and consumer confidence for the Purchaser and to increase the Purchaser's sales after completion of the 363 Transaction. The assignment by the Purchaser of ownership interests is neither a distribution of estate assets, discrimination by the Debtors on account of prepetition claims, nor the assignment of proceeds from the sale of the Debtors' assets. The assignment of equity to the New VEBA (as defined in the UAW Retiree Settlement Agreement) and 7176384 Canada Inc. is the product of separately negotiated arm's-length agreements between the Purchaser and its equity holders and their respective representatives and advisors. Likewise, the value that the Debtors will receive on consummation of the 363 Transaction is the product of arm's-length negotiations between the Debtors, the Purchaser, the U.S. Treasury, and their respective representatives and advisors.

V.    The U.S. Treasury and Export Development Canada ("EDC"), on behalf of the Governments of Canada and Ontario, have extended credit to, and acquired a security interest in, the assets of the Debtors as set forth in the DIP Facility and as authorized by the interim and final orders approving the DIP Facility (Docket Nos. 292 and 2529, respectively). Before entering into the DIP Facility and the Loan and Security Agreement, dated as of December 31, 2008 (the "**Existing UST Loan Agreement**"), the Secretary of the Treasury, in

consultation with the Chairman of the Board of Governors of the Federal Reserve System and as

communicated to the appropriate committees of Congress, found that the extension of credit to

the Debtors is "necessary to promote financial market stability," and is a valid use of funds

pursuant to the statutory authority granted to the Secretary of the Treasury under the Emergency

Economic Stabilization Act of 2008, 12 U.S.C. §§ 5201 et seq. ("EESA"). The U.S. Treasury's

extension of credit to, and resulting security interest in, the Debtors, as set forth in the DIP

Facility and the Existing UST Loan Agreement and as authorized in the interim and final orders

approving the DIP Facility, is a valid use of funds pursuant to EESA.

       W.    The DIP Facility and the Existing UST Loan Agreement are loans and

shall not be recharacterized. The Court has already approved the DIP Facility. The Existing

UST Loan Agreement bears the undisputed hallmarks of a loan, not an equity investment.

Among other things:

       (i)    The U.S. Treasury structured its prepetition transactions with GM
as (a) a loan, made pursuant to and governed by the Existing UST Loan Agreement, in
addition to (b) a separate, and separately documented, equity component in the form of
warrants;

       (ii)    The Existing UST Loan Agreement has customary terms and
covenants of a loan rather than an equity investment. For example, the Existing UST
Loan Agreement contains provisions for repayment and pre-payment, and provides for
remedies in the event of a default;

       (iii)    The Existing UST Loan Agreement is secured by first liens
(subject to certain permitted encumbrances) on GM's and the guarantors' equity interests
in most of their domestic subsidiaries and certain of their foreign subsidiaries (limited in
most cases to 65% of the equity interests of the pledged foreign subsidiaries), intellectual
property, domestic real estate (other than manufacturing plants or facilities) inventory
that was not pledged to other lenders, and cash and cash equivalents in the United States;

       (iv)    The U.S. Treasury also received junior liens on certain additional
collateral, and thus, its claim for recovery on such collateral under the Existing UST Loan
Agreement is, in part, junior to the claims of other creditors;

       (v)    the Existing UST Loan Agreement requires the grant of security by
its terms, as well as by separate collateral documents, including: (a) a guaranty and

US_ACTIVE:43085833\07\43085833_7.DOC.        10

security agreement, (b) an equity pledge agreement, (c) mortgages and deeds of trust, and (d) an intellectual property pledge agreement;

(vi)   Loans under the Existing UST Loan Agreement are interest-bearing with a rate of 3.00% over the 3-month LIBOR with a LIBOR floor of 2.00%. The Default Rate on this loan is 5.00% above the non-default rate.

(vii)   The U.S. Treasury always treated the loans under the Existing UST Loan Agreement as debt, and advances to GM under the Existing Loan Agreement were conditioned upon GM's demonstration to the United States Government of a viable plan to regain competitiveness and repay the loans.

(viii)   The U.S. Treasury has acted as a prudent lender seeking to protect its investment and thus expressly conditioned its financial commitment upon GM's meaningful progress toward long-term viability.

Other secured creditors of the Debtors also clearly recognized the loans under the Existing UST Loan Agreement as debt by entering into intercreditor agreements with the U.S. Treasury in order to set forth the secured lenders' respective prepetition priority.

X.   This Court has previously authorized the Purchaser to credit bid the amounts owed under both the DIP Facility and the Existing UST Loan Agreement and held the Purchaser's credit bid to be, for all purposes, a "Qualified Bid" under the Sale Procedures Order.

Y.   The Debtors, the Purchaser, and the UAW, as the exclusive collective bargaining representative of the Debtors' UAW-represented employees and the authorized representative of the persons in the Class and the Covered Group (as described in the UAW Retiree Settlement Agreement) (the "UAW-Represented Retirees") under section 1114(c) of the Bankruptcy Code, engaged in good faith negotiations in conjunction with the 363 Transaction regarding the funding of "retiree benefits" within the meaning of section 1114(a) of the Bankruptcy Code and related matters. Conditioned upon the consummation of the 363 Transaction and the approval of the Bankruptcy Court granted in this Order, the Purchaser and the UAW will enter into that certain Retiree Settlement Agreement, dated as of the Closing Date (the "UAW Retiree Settlement Agreement"), which is Exhibit D to the MPA, which resolves

issues with respect to the provision of certain retiree benefits to UAW-Represented Retirees as described in the UAW Retiree Settlement Agreement. As set forth in the UAW Retiree Settlement Agreement, the Purchaser has agreed to make contributions of cash, stock, and warrants of the Purchaser to the New VEBA (as defined in the UAW Retiree Settlement Agreement), which will have the obligation to fund certain health and welfare benefits for the UAW-Represented Retirees. The New VEBA will also be funded by the transfer of assets from the Existing External VEBA and the assets in the UAW Related Account of the Existing Internal VEBA (each as defined in the UAW Retiree Settlement Agreement). GM and the UAW, as the authorized representative of the UAW-Represented Retirees, as well as the representatives for the class of plaintiffs in a certain class action against GM (the "**Class Representatives**"), through class counsel, Stemper, Feinstein, Doyle and Payne LLC ("**Class Counsel**"), negotiated in good faith the UAW Claims Agreement, which requires the UAW and the Class Representatives to take actions to effectuate the withdrawal of certain claims against the Debtors, among others, relating to retiree benefits in the event the 363 Transaction is consummated and the Bankruptcy Court approves, and the Purchaser becomes fully bound by, the UAW Retiree Settlement Agreement, subject to reinstatement of such claims to the extent of any adverse impact to the rights or benefits of UAW-Represented Retirees under the UAW Retiree Settlement Agreement resulting from any reversal or modification of the 363 Transaction, the UAW Retiree Settlement Agreement, or the approval of the Bankruptcy Court thereof, the foregoing as subject to the terms of, and as set forth in, the UAW Claims Agreement.

Z.    Effective as of the Closing of the 363 Transaction, the Debtors will assume and assign to the Purchaser the UAW Collective Bargaining Agreement and all liabilities thereunder. The Debtors, the Purchaser, the UAW and Class Representatives intend that their actions in connection with the UAW Retiree Settlement Agreement and related undertakings

US_ACTIVE:\43085833\07\43085833_7.DOC\                    12

incorporate the compromise of certain claims and rights and shall be deemed to satisfy the requirements of 29 U.S.C. § 186(c)(2).

AA.     The transfer of the Purchased Assets to the Purchaser will be a legal, valid, and effective transfer of the Purchased Assets and, except for the Assumed Liabilities, will vest the Purchaser with all right, title, and interest of the Sellers to the Purchased Assets free and clear of liens, claims, encumbrances, and other interests (other than Permitted Encumbrances), including rights or claims (for purposes of this Order, the term "claim" shall have the meaning ascribed to such term in section 101(5) of the Bankruptcy Code) based on any successor or transferee liability, including, but not limited to (i) those that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Sellers' or the Purchaser's interest in the Purchased Assets, or any similar rights and (ii) (a) those arising under all mortgages, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens, judgments, demands, encumbrances, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income, or other exercise of any attributes of ownership and (b) all claims arising in any way in connection with any agreements, acts, or failures to act, of any of the Sellers or any of the Sellers' predecessors or affiliates, whether known or unknown, contingent or otherwise, whether arising prior to or subsequent to the commencement of these chapter 11 cases, and whether imposed by agreement, understanding, law, equity or otherwise, including, but not limited to, claims otherwise arising under doctrines of successor or transferee liability.

BB.     The Sellers may sell the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever (other than Permitted Encumbrances), including rights or claims based on any successor or transferee liability, because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the

Bankruptcy Code has been satisfied. Those (i) holders of liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability, and (ii) non-Debtor parties to the Assumable Executory Contracts who did not object, or who withdrew their Objections, to the 363 Transaction or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those (i) holders of liens, claims, and encumbrances, and (ii) non-Debtor parties to the Assumable Executory Contracts who did object, fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and, to the extent they have valid and enforceable liens or encumbrances, are adequately protected by having such liens or encumbrances, if any, attach to the proceeds of the 363 Transaction ultimately attributable to the property against or in which they assert a lien or encumbrance. To the extent liens or encumbrances secure liabilities that are Assumed Liabilities under this Order and the MPA, no such liens or encumbrances shall attach to the proceeds of the 363 Transaction.

CC.    Under the MPA, GM is transferring all of its right, title, and interest in the Memphis, TN SPO Warehouse and the White Marsh, MD Allison Transmission Plant (the "**TPC Property**") to the Purchaser pursuant to section 363(f) of the Bankruptcy Code free and clear of all liens (including, without limitation, the TPC Liens (as hereinafter defined)), claims, interests, and encumbrances (other than Permitted Encumbrances). For purposes of this Order, "**TPC Liens**" shall mean and refer to any liens on the TPC Property granted or extended pursuant to the TPC Participation Agreement and any claims relating to that certain Second Amended and Restated Participation Agreement and Amendment of Other Operative Documents (the "**TPC Participation Agreement**"), dated as of June 30, 2004, among GM, as Lessee, Wilmington Trust Company, a Delaware corporation, not in its individual capacity except as expressly stated herein but solely as Owner Trustee (the "**TPC Trustee**") under GM Facilities Trust No. 1999-1 (the "**TPC Trust**"), as Lessor, GM, as Certificate Holder, Hannover Funding Company LLC, as

CP Lender, Wells Fargo Bank Northwest, N.A., as Agent, Norddeutsche Landesbank Girozentrale (New York Branch), as Administrator, and Deutsche Bank, AG, New York Branch, HSBC Bank USA, ABN AMRO Bank N.V., Royal Bank of Canada, Bank of America, N.A., Citicorp USA, Inc., Merrill Lynch Bank USA, Morgan Stanley Bank, collectively, as Purchasers (collectively, with CP Lender, Agent and Administrator, the "**TPC Lenders**"), together with the Operative Documents (as defined in the TPC Participation Agreements (the "**TPC Operative Documents**").

        DD.    The Purchaser would not have entered into the MPA and would not consummate the 363 Transaction (i) if the sale of the Purchased Assets was not free and clear of all liens, claims, encumbrances, and other interests (other than Permitted Encumbrances), including rights or claims based on any successor or transferee liability or (ii) if the Purchaser would, or in the future could, be liable for any such liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability (collectively, the "**Retained Liabilities**"), other than, in each case, the Assumed Liabilities. The Purchaser will not consummate the 363 Transaction unless this Court expressly orders that none of the Purchaser, its affiliates, their present or contemplated members or shareholders (other than the Debtors as the holder of equity in the Purchaser), or the Purchased Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability or Retained Liabilities, other than as expressly provided herein or in agreements made by the Debtors and/or the Purchaser on the record at the Sale Hearing or in the MPA.

        EE.    The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Purchased Contracts to the Purchaser in connection

with the consummation of the 363 Transaction, and the assumption and assignment of the

Purchased Contracts is in the best interests of the Debtors, their estates and creditors, and other

parties in interest. The Purchased Contracts being assigned to, and the liabilities being assumed

by, the Purchaser are an integral part of the Purchased Assets being purchased by the Purchaser,

and, accordingly, such assumption and assignment of the Purchased Contracts and liabilities are

reasonable, enhance the value of the Debtors' estates, and do not constitute unfair discrimination.

       FF.    For the avoidance of doubt, and notwithstanding anything else in this

Order to the contrary:

- The Debtors are neither assuming nor assigning to the Purchaser the agreement to provide certain retiree medical benefits specified in (i) the Memorandum of Understanding Post-Retirement Medical Care, dated September 26, 2007, between the Company and the UAW, and (ii) the Settlement Agreement, dated February 21, 2008, between the Company and the UAW (together, the "**VEBA Settlement Agreement**");

- at the Closing, and in accordance with the MPA, the UAW Collective Bargaining Agreement, and all liabilities thereunder, shall be assumed by the Debtors and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code. Assumption and assignment of the UAW Collective Bargaining Agreement is integral to the 363 Transaction and the MPA, are in the best interests of the Debtors and their estates, creditors, employees, and retirees, and represent the exercise of the Debtors' sound business judgment, enhances the value of the Debtors' estates, and does not constitute unfair discrimination;

- the UAW, as the exclusive collective bargaining representative of employees of the Purchaser and the "authorized representative" of the UAW-Represented Retirees under section 1114(c) of the Bankruptcy Code, GM, and the Purchaser engaged in good faith negotiations in conjunction with the 363 Transaction regarding the funding of retiree health benefits within the meaning of section 1114(a) of the Bankruptcy Code. Conditioned upon the consummation of the 363 Transaction, the UAW and the Purchaser have entered into the UAW Retiree Settlement Agreement, which, among other things, provides for the financing by the Purchaser of modified retiree health care obligations for the Class and Covered Group (as defined in the UAW Retiree Settlement Agreement) through contributions by the Purchaser (as referenced in paragraph Y herein). The New VEBA will also be funded by the transfer of the UAW Related Account from the Existing Internal VEBA and the assets of the Existing External VEBA to the New VEBA (each as defined in the UAW Retiree Settlement Agreement). The Debtors, the

Purchaser, and the UAW specifically intend that their actions in connection with the UAW Retiree Settlement Agreement and related undertakings incorporate the compromise of certain claims and rights and shall be deemed to satisfy the requirements of 29 U.S.C. § 186(c)(2);

- the Debtors' sponsorship of the Existing Internal VEBA (as defined in the UAW Retiree Settlement Agreement) shall be transferred to the Purchaser under the MPA.

GG.    The Debtors have (i) cured and/or provided adequate assurance of cure (through the Purchaser) of any default existing prior to the date hereof under any of the Purchased Contracts that have been designated by the Purchaser for assumption and assignment under the MPA, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, and (ii) provided compensation or adequate assurance of compensation through the Purchaser to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Purchased Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and the Purchaser has provided adequate assurance of future performance under the Purchased Contracts, within the meaning of section 365(b)(1)(C) of the Bankruptcy Code. The Modified Assumption and Assignment Procedures are fair, appropriate, and effective and, upon the payment by the Purchaser of all Cure Amounts (as hereinafter defined) and approval of the assumption and assignment for a particular Purchased Contract thereunder, the Debtors shall be forever released from any and all liability under the Purchased Contracts.

HH.    The Debtors are the sole and lawful owners of the Purchased Assets, and no other person has any ownership right, title, or interest therein. The Debtors' non-Debtor Affiliates have acknowledged and agreed to the 363 Transaction and, as required by, and in accordance with, the MPA and the Transition Services Agreement, transferred any legal, equitable, or beneficial right, title, or interest they may have in or to the Purchased Assets to the Purchaser.

US_ACTIVE:\43085833\07\43085833_7.DOC\                              17

II.     The Debtors currently maintain certain privacy policies that govern the use

of "personally identifiable information" (as defined in section 101(41A) of the Bankruptcy Code)

in conducting their business operations. The 363 Transaction may contemplate the transfer of

certain personally identifiable information to the Purchaser in a manner that may not be

consistent with certain aspects of their existing privacy policies. Accordingly, on June 2, 2009,

the Court directed the U.S. Trustee to promptly appoint a consumer privacy ombudsman in

accordance with section 332 of the Bankruptcy Code, and such ombudsman was appointed on

June 10, 2009. The Privacy Ombudsman is a disinterested person as required by section 332(a)

of the Bankruptcy Code. The Privacy Ombudsman filed his report with the Court on July 1,

2009 (Docket No. 2873) (the "**Ombudsman Report**") and presented his report at the Sale

Hearing, and the Ombudsman Report has been reviewed and considered by the Court. The Court

has given due consideration to the facts, including the exigent circumstances surrounding the

conditions of the sale of personally identifiable information in connection with the 363

Transaction. No showing has been made that the sale of personally identifiable information in

connection with the 363 Transaction in accordance with the provisions of this Order violates

applicable nonbankruptcy law, and the Court concludes that such sale is appropriate in

conjunction with the 363 Transaction.

JJ.     Pursuant to Section 6.7(a) of the MPA, GM offered Wind-Down

Agreements and Deferred Termination Agreements (collectively, the "**Deferred Termination
Agreements**") in forms prescribed by the MPA to franchised motor vehicle dealers, including

dealers authorized to sell and service vehicles marketed under the Pontiac brand (which is being

discontinued), dealers authorized to sell and service vehicles marketed under the Hummer,

Saturn and Saab brands (which may or may not be discontinued depending on whether the

brands are sold to third parties) and dealers authorized to sell and service vehicles marketed

under brands which will be continued by the Purchaser. The Deferred Termination Agreements were offered as an alternative to rejection of the existing Dealer Sales and Service Agreements of these dealers pursuant to section 365 of the Bankruptcy Code and provide substantial additional benefits to dealers which enter into such agreements. Approximately 99% of the dealers offered Deferred Termination Agreements accepted and executed those agreements and did so for good and sufficient consideration.

      KK.    Pursuant to Section 6.7(b) of the MPA, GM offered Participation Agreements in the form prescribed by the MPA to dealers identified as candidates for a long term relationship with the Purchaser. The Participation Agreements provide substantial benefits to accepting dealers, as they grant the opportunity for such dealers to enter into a potentially valuable relationship with the Purchaser as a component of a reduced and more efficient dealer network. Approximately 99% of the dealers offered Participation Agreements accepted and executed those agreements.

      LL.    This Order constitutes approval of the UAW Retiree Settlement Agreement and the compromise and settlement embodied therein.

      MM.    This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Consistent with Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order to the full extent to which those rules provide, but that its Order should not become effective instantaneously. Thus the Court will shorten, but not wholly eliminate, the periods set forth in Fed.R.Bankr.P. 6004(h) and 6006, and expressly directs entry of judgment as set forth in accordance with the provisions of Paragraph 70 below.

      NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

| Deleted: Notwithstanding |

| Deleted: herein |

### General Provisions

1.      The Motion is granted as provided herein, and entry into and performance under, and in respect of, the MPA and the 363 Transaction is approved.

2.      All Objections to the Motion or the relief requested therein that have not been withdrawn, waived, settled, or resolved, and all reservation of rights included in such Objections, are overruled on the merits other than a continuing Objection (each a "**Limited Contract Objection**") that does not contest or challenge the merits of the 363 Transaction and that is limited to (a) contesting a particular Cure Amount(s) (a "**Cure Objection**"), (b) determining whether a particular Assumable Executory Contract is an executory contract that may be assumed and/or assigned under section 365 of the Bankruptcy Code, and/or (c) challenging, as to a particular Assumable Executory Contract, whether the Debtors have assumed, or are attempting to assume, such contract in its entirety or whether the Debtors are seeking to assume only part of such contract. A Limited Contract Objection shall include, until resolved, a dispute regarding any Cure Amount that is subject to resolution by the Bankruptcy Court , or pursuant to the dispute resolution procedures established by the Sale Procedures Order or pursuant to agreement of the parties, including agreements under which an objection to the Cure Amount was withdrawn in connection with a reservation of rights under such dispute resolution procedures. Limited Contract Objections shall not constitute objections to the 363 Transaction, and to the extent such Limited Contract Objections remain continuing objections to be resolved before the Court, the hearing to consider each such Limited Contract Objection shall be adjourned to August 3, 2009 at 9:00a.m. (the "**Limited Contract Objection Hearing**"). Within two (2) business days of the entry of this Order, the Debtors shall serve upon each of the counterparties to the remaining Limited Contract Objections a notice of the Limited Contract Objection Hearing. The Debtors or any party that withdraws, or has withdrawn, a Limited

| Deleted: | July |
| Deleted: | |

US_ACTIVE:\43085833\07\43085833_7.DOC.                    20

Contract Objection without prejudice shall have the right, unless it has agreed otherwise, to

schedule the hearing to consider a Limited Contract Objection on not less than fifteen (15) days

notice to the Debtors, the counterparties to the subject Assumable Executory Contracts, the

Purchaser, and the Creditors' Committee, or within such other time as otherwise may be agreed

by the parties.

### Approval of the MPA

3.        The MPA, all transactions contemplated thereby, and all the terms and

conditions thereof (subject to any modifications contained herein) are approved. If there is any

conflict between the MPA, the Sale Procedures Order, and this Order, this Order shall govern.

4.        Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the

Debtors are authorized to perform their obligations under, and comply with the terms of, the

MPA and consummate the 363 Transaction pursuant to, and in accordance with, the terms and

provisions of the MPA and this Order.

5.        The Debtors are authorized and directed to execute and deliver, and

empowered to perform under, consummate, and implement, the MPA, together with all

additional instruments and documents that the Sellers or the Purchaser deem necessary or

appropriate to implement the MPA and effectuate the 363 Transaction, and to take all further

actions as may reasonably be required by the Purchaser for the purpose of assigning, transferring,

granting, conveying, and conferring to the Purchaser or reducing to possession the Purchased

Assets or as may be necessary or appropriate to the performance of the obligations as

contemplated by the MPA.

6.        This Order and the MPA shall be binding in all respects upon the Debtors,

their affiliates, all known and unknown creditors of, and holders of equity security interests in,

any Debtor, including any holders of liens, claims, encumbrances, or other interests, including

US_ACTIVE:\43085833\07\43085833_7.DOC\                                21

rights or claims based on any successor or transferee liability, all non-Debtor parties to the

Assumable Executory Contracts, all successors and assigns of the Purchaser, each Seller and

their Affiliates and subsidiaries, the Purchased Assets, all interested parties, their successors and

assigns, and any trustees appointed in the Debtors' chapter 11 cases or upon a conversion of any

of such cases to cases under chapter 7 of the Bankruptcy Code and shall not be subject to

rejection. Nothing contained in any chapter 11 plan confirmed in any of the Debtors' chapter 11

cases or the order confirming any such chapter 11 plan shall conflict with or derogate from the

provisions of the MPA or this Order.

<u>Transfer of Purchased Assets Free and Clear</u>

7.      Except for the Assumed Liabilities, pursuant to sections 105(a) and 363(f)

of the Bankruptcy Code, the Purchased Assets shall be transferred to the Purchaser in accordance

with the MPA, and, upon the Closing, shall be free and clear of all liens, claims, encumbrances,

and other interests of any kind or nature whatsoever (other than Permitted Encumbrances),

including rights or claims based on any successor or transferee liability, and all such liens,

claims, encumbrances, and other interests, including rights or claims based on any successor or

transferee liability, shall attach to the net proceeds of the 363 Transaction in the order of their

priority, with the same validity, force, and effect that they now have as against the Purchased

Assets, subject to any claims and defenses a Seller or any other party in interest may possess

with respect thereto.

8.      Except as expressly permitted or otherwise specifically provided by the

MPA or this Order, all persons and entities, including, but not limited to, all debt security

holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade

creditors, dealers, employees, litigation claimants, and other creditors, holding liens, claims,

encumbrances, and other interests of any kind or nature whatsoever, including rights or claims

US_ACTIVE:\43085833\07\43085833_7.DOC\                          22

based on any successor or transferee liability, against or in a Seller or the Purchased Assets
(whether legal or equitable, secured or unsecured, matured or unmatured, contingent or
noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way
relating to, the Sellers, the Purchased Assets, the operation of the Purchased Assets prior to the
Closing, or the 363 Transaction, are forever barred, estopped, and permanently enjoined (with
respect to future claims or demands based on exposure to asbestos, to the fullest extent
constitutionally permissible) from asserting against the Purchaser, its successors or assigns, its
property, or the Purchased Assets, such persons' or entities' liens, claims, encumbrances, and
other interests, including rights or claims based on any successor or transferee liability.

9.    This Order (a) shall be effective as a determination that, as of the Closing,
(i) no claims other than Assumed Liabilities, will be assertable against the Purchaser, its
affiliates, their present or contemplated members or shareholders, successors, or assigns, or any
of their respective assets (including the Purchased Assets); (ii) the Purchased Assets shall have
been transferred to the Purchaser free and clear of all claims (other than Permitted
Encumbrances); and (iii) the conveyances described herein have been effected; and (b) is and
shall be binding upon and govern the acts of all entities, including, without limitation, all filing
agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds,
registrars of deeds, registrars of patents, trademarks, or other intellectual property, administrative
agencies, governmental departments, secretaries of state, federal and local officials, and all other
persons and entities who may be required by operation of law, the duties of their office, or
contract, to accept, file, register, or otherwise record or release any documents or instruments, or
who may be required to report or insure any title or state of title in or to any lease; and each of
the foregoing persons and entities is directed to accept for filing any and all of the documents

and instruments necessary and appropriate to consummate the transactions contemplated by the MPA.

10.     The transfer of the Purchased Assets to the Purchaser pursuant to the MPA constitutes a legal, valid, and effective transfer of the Purchased Assets and shall vest the Purchaser with all right, title, and interest of the Sellers in and to the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever (other than Permitted Encumbrances), including rights or claims based on any successor or transferee liability, other than the Assumed Liabilities.

11.     On the Closing of the 363 Transaction, each of the Sellers' creditors and any other holder of a lien, claim, encumbrance, or other interest, is authorized and directed to execute such documents and take all other actions as may be necessary to release its lien, claim, encumbrance (other than Permitted Encumbrances), or other interest in the Purchased Assets, if any, as such lien, claim, encumbrance, or other interest may have been recorded or may otherwise exist.

12.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing a lien, claim, encumbrance, or other interest in the Sellers or the Purchased Assets (other than Permitted Encumbrances) shall not have delivered to the Sellers prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all liens, claims, encumbrances, or other interests, which the person or entity has with respect to the Sellers or the Purchased Assets or otherwise, then (a) the Sellers are authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Sellers or the Purchased Assets, and (b) the Purchaser is authorized to file, register, or otherwise record a certified copy of this Order, which

US_ACTIVE:\43083833\07\43085833_7.DOC.                24

shall constitute conclusive evidence of the release of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever in the Sellers or the Purchased Assets.

13. All persons or entities in possession of any of the Purchased Assets are directed to surrender possession of such Purchased Assets to the Purchaser or its respective designees at the time of Closing of the 363 Transaction.

14. Following the Closing of the 363 Transaction, no holder of any lien, claim, encumbrance, or other interest (other than Permitted Encumbrances) shall interfere with the Purchaser's title to, or use and enjoyment of, the Purchased Assets based on, or related to, any such lien, claim, encumbrance, or other interest, or based on any actions the Debtors may take in their chapter 11 cases.

15. All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to the Purchaser in accordance with the MPA and this Order; *provided, however,* that the foregoing restriction shall not prevent any person or entity from appealing this Order or opposing any appeal of this Order.

16. To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Purchased Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the 363 Transaction contemplated by the MPA.

17. From and after the Closing, the Purchaser shall comply with the certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety Act, as amended and recodified, including by the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety

Code, and similar Laws, in each case, to the extent applicable in respect of motor vehicles, vehicles, motor vehicle equipment, and vehicle parts manufactured or distributed by the Sellers prior to the Closing.

18.    Notwithstanding anything to the contrary in this Order or the MPA, (a) any Purchased Asset that is subject to any mechanic's, materialman's, laborer's, workmen's, repairman's, carrier's liens and other similar Encumbrances arising by operation of law or statute in the Ordinary Course of Business for amounts that are not delinquent or that are being contested in good faith by appropriate proceedings, or any lien for Taxes, the validity or amount of which is being contested in good faith by appropriate proceedings, and statutory liens for current Taxes not yet due, payable, or delinquent (or which may be paid without interest or penalties) shall continue to be subject to such lien after the Closing Date if and to the extent that such lien (i) is valid, perfected and enforceable as of the Commencement Date (or becomes valid, perfected and enforceable after the Commencement Date as permitted by section 546(b) or 362(b)(18) of the Bankruptcy Code), (ii) could not be avoided by any Debtor under sections 544 to 549, inclusive, of the Bankruptcy Code or otherwise, were the Closing not to occur; and (iii) the Purchased Asset subject to such lien could not be sold free and clear of such lien under applicable non-bankruptcy law, and (b) any Liability as of the Closing Date that is secured by a lien described in clause (a) above (such lien, a "**Continuing Lien**") that is not otherwise an Assumed Liability shall constitute an Assumed Liability with respect to which there shall be no recourse to the Purchaser or any property of the Purchaser other than recourse to the property subject to such Continuing Lien. The Purchased Assets are sold free and clear of any reclamation rights, *provided, however,* that nothing, in this Order or the MPA shall in any way impair the right of any claimant against the Debtors with respect to any alleged reclamation right to the extent such reclamation right is not subject to the prior rights of a holder of a security interest in

the goods or proceeds with respect to which such reclamation right is alleged, or impair the
ability of a claimant to seek adequate protection against the Debtors with respect to any such
alleged reclamation right. Further, nothing in this Order or the MPA shall prejudice any rights,
defenses, objections or counterclaims that the Debtors, the Purchaser, the U.S. Treasury, EDC,
the Creditors' Committee or any other party in interest may have with respect to the validity or
priority of such asserted liens or rights, or with respect to any claim for adequate protection.

### Approval of the UAW Retiree Settlement Agreement

19.     The UAW Retiree Settlement Agreement, the transactions contemplated
therein, and the terms and conditions thereof, are fair, reasonable, and in the best interests of the
retirees, and are approved.  The Debtors, the Purchaser, and the UAW are authorized and
directed to perform their obligations under, or in connection with, the implementation of the
UAW Retiree Settlement Agreement and to comply with the terms of the UAW Retiree
Settlement Agreement, including the obligation of the Purchaser to reimburse the UAW for
certain expenses relating to the 363 Transaction and the transition to the New VEBA
arrangements. The amendments to the Trust Agreement (as defined in the UAW Retiree
Settlement Agreement) set forth on Exhibit E to the UAW Retiree Settlement Agreement, are
approved, and the Trust Agreement is reformed accordingly.

20.     In accordance with the terms of the UAW Retiree Settlement Agreement,
(I) as of the Closing, there shall be no requirement to amend the Pension Plan as set forth in
section 15 of the Henry II Settlement (as such terms are defined in the UAW Retiree Settlement
Agreement); (II) on the later of December 31, 2009, or the Closing of the 363 Transaction (the
"**Implementation Date**"), (i) the committee and the trustees of the Existing External VEBA (as
defined in the UAW Retiree Settlement Agreement) are directed to transfer to the New VEBA all
assets and liabilities of the Existing External VEBA and to terminate the Existing External

VEBA within fifteen (15) days thereafter, as provided under Section 12.C of the UAW Retiree Settlement Agreement, (ii) the trustee of the Existing Internal VEBA is directed to transfer to the New VEBA the UAW Related Account's share of assets in the Existing Internal VEBA within ten (10) business days thereafter as provided in Section 12.B of the UAW Retiree Settlement Agreement, and, upon the completion of such transfer, the Existing Internal VEBA shall be deemed to be amended to terminate participation and coverage regarding Retiree Medical Benefits for the Class and the Covered Group, effective as of the Implementation Date (each as defined in the UAW Retiree Settlement Agreement); and (III) all obligations of the Purchaser and the Sellers to provide Retiree Medical Benefits to members of the Class and Covered Group shall be governed by the UAW Retiree Settlement Agreement, and, in accordance with section 5.D of the UAW Retiree Settlement Agreement, all provisions of the Purchaser's Plan relating to Retiree Medical Benefits for the Class and/or the Covered Group shall terminate as of the Implementation Date or otherwise be amended so as to be consistent with the UAW Retiree Settlement Agreement (as each term is defined in the UAW Retiree Settlement Agreement), and the Purchaser shall not thereafter have any such obligations as set forth in Section 5.D of the UAW Retiree Settlement Agreement.

### Approval of GM's Assumption of the UAW Claims Agreement

21.    Pursuant to section 365 of the Bankruptcy Code, GM's assumption of the UAW Claims Agreement is approved, and GM, the UAW, and the Class Representatives are authorized and directed to perform their obligations under, or in connection with, the implementation of the UAW Claims Agreement and comply with the terms of the UAW Claims Agreement.

**Assumption and Assignment to the Purchaser of Assumable Executory Contracts**

22.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code and
subject to and conditioned upon (a) the Closing of the 363 Transaction, (b) the occurrence of the
Assumption Effective Date, and (c) the resolution of any relevant Limited Contract Objections,
other than a Cure Objection, by order of this Court overruling such objection or upon agreement
of the parties, the Debtors' assumption and assignment to the Purchaser of each Assumable
Executory Contract (including, without limitation, for purposes of this paragraph 22) the UAW
Collective Bargaining Agreement) is approved, and the requirements of section 365(b)(1) of the
Bankruptcy Code with respect thereto are deemed satisfied.

23.     The Debtors are authorized and directed in accordance with sections
105(a) and 365 of the Bankruptcy Code to (i) assume and assign to the Purchaser, effective as of
the Assumption Effective Date, as provided by, and in accordance with, the Sale Procedures
Order, the Modified Assumption and Assignment Procedures, and the MPA, those Assumable
Executory Contracts that have been designated by the Purchaser for assumption pursuant to
sections 6.6 and 6.31 of the MPA and that are not subject to a Limited Contract Objection other
than a Cure Objection, free and clear of all liens, claims, encumbrances, or other interests of any
kind or nature whatsoever (other than Permitted Encumbrances), including rights or claims based
on any successor or transferee liability, other than the Assumed Liabilities, and (ii) execute and
deliver to the Purchaser such documents or other instruments as the Purchaser reasonably deems
may be necessary to assign and transfer such Assumable Executory Contracts and Assumed
Liabilities to the Purchaser.  The Purchaser shall Promptly Pay (as defined below) the following
(the "**Cure Amount**"):  (a) all amounts due under such Assumable Executory Contract as of the
Commencement Date as reflected on the website established by the Debtors (the "**Contract
Website**"), which is referenced and is accessible as set forth in the Assumption and Assignment

Notice or as otherwise agreed to in writing by an authorized officer of the parties (for this

purpose only, Susanna Webber shall be deemed an authorized officer of the Debtors) (the

"**Prepetition Cure Amount**"), less amounts, if any, paid after the Commencement Date on

account of the Prepetition Cure Amount (such net amount, the "**Net Prepetition Cure**

**Amount**"), plus (b) any such amount past due and owing as of the Assumption Effective Date, as

required under the Modified Assumption and Assignment Procedures, exclusive of the Net

Prepetition Cure Amount.  For the avoidance of doubt, all of the Debtors' rights to assert credits,

chargebacks, setoffs, rebates, and other claims under the Purchased Contracts are purchased by

and assigned to the Purchaser as of the Assumption Effective Date.  As used herein, "**Promptly**

**Pay**" means (i) with respect to any Cure Amount (or portion thereof, if any) which is undisputed,

payment as soon as reasonably practicable, but not later than five (5) business days after the

Assumption Effective Date, and (ii) with respect to any Cure Amount (or portion thereof, if any)

which is disputed, payment as soon as reasonably practicable, but not later than five (5) business

days after such dispute is resolved or such later date upon agreement of the parties and, in the

event Bankruptcy Court approval is required, upon entry of a final order of the Bankruptcy

Court.  On and after the Assumption Effective Date, the Purchaser shall (i) perform any

nonmonetary defaults that are required under section 365(b) of the Bankruptcy Code; *provided*

that such defaults are undisputed or directed by this Court and are timely asserted under the

Modified Assumption and Assignment Procedures, and (ii) pay all undisputed obligations and

perform all obligations that arise or come due under each Assumable Executory Contract in the

ordinary course.  Notwithstanding any provision in this Order to the contrary, the Purchaser shall

not be obligated to pay any Cure Amount or any other amount due with respect to any

Assumable Executory Contract before such amount becomes due and payable under the

applicable payment terms of such Contract.

24.     The Debtors shall make available a writing, acknowledged by the
Purchaser, of the assumption and assignment of an Assumable Executory Contract and the
effective date of such assignment (which may be a printable acknowledgment of assignment on
the Contract Website).  The Assumable Executory Contracts shall be transferred and assigned to,
pursuant to the Sale Procedures Order and the MPA, and thereafter remain in full force and
effect for the benefit of, the Purchaser, notwithstanding any provision in any such Assumable
Executory Contract (including those of the type described in sections 365(b)(2), (e)(1), and (f) of
the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and,
pursuant to section 365(k) of the Bankruptcy Code, the Sellers shall be relieved from any further
liability with respect to the Assumable Executory Contracts after such assumption and
assignment to the Purchaser.  Except as may be contested in a Limited Contract Objection, each
Assumable Executory Contract is an executory contract or unexpired lease under section 365 of
the Bankruptcy Code and the Debtors may assume each of their respective Assumable Executory
Contracts in accordance with section 365 of the Bankruptcy Code.  Except as may be contested
in a Limited Contract Objection other than a Cure Objection, the Debtors may assign each
Assumable Executory Contract in accordance with sections 363 and 365 of the Bankruptcy
Code, and any provisions in any Assumable Executory Contract that prohibit or condition the
assignment of such Assumable Executory Contract or terminate, recapture, impose any penalty,
condition renewal or extension, or modify any term or condition upon the assignment of such
Assumable Executory Contract, constitute unenforceable antiassignment provisions which are
void and of no force and effect in connection with the transactions contemplated hereunder.  All
other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the
assumption by the Debtors and assignment to the Purchaser of each Assumable Executory
Contract have been satisfied, and, pursuant to section 365(k) of the Bankruptcy Code, the

Debtors are hereby relieved from any further liability with respect to the Assumable Executory

Contracts, including, without limitation, in connection with the payment of any Cure Amounts

related thereto which shall be paid by the Purchaser. At such time as provided in the Sale

Procedures Order and the MPA, in accordance with sections 363 and 365 of the Bankruptcy

Code, the Purchaser shall be fully and irrevocably vested in all right, title, and interest of each

Purchased Contract. With respect to leases of personal property that are true leases and not

subject to recharacterization, nothing in this Order or the MPA shall transfer to the Purchaser an

ownership interest in any leased property not owned by a Debtor. Any portion of any of the

Debtors' unexpired leases of nonresidential real property that purport to permit the respective

landlords thereunder to cancel the remaining term of any such leases if the Sellers discontinue

their use or operation of the Leased Real Property are void and of no force and effect and shall

not be enforceable against the Purchaser, its assignees and sublessees, and the landlords under

such leases shall not have the right to cancel or otherwise modify such leases or increase the rent,

assert any Claim, or impose any penalty by reason of such discontinuation, the Sellers' cessation

of operations, the assignment of such leases to the Purchaser, or the interruption of business

activities at any of the leased premises.

     25.    Except in connection with any ongoing Limited Contract Objection, each

non-Debtor party to an Assumable Executory Contract is forever barred, estopped, and

permanently enjoined from (a) asserting against the Debtors or the Purchaser, their successors or

assigns, or their respective property, any default arising prior to, or existing as of, the

Commencement Date, or, against the Purchaser, any counterclaim, defense, or setoff (other than

defenses interposed in connection with, or related to, credits, chargebacks, setoffs, rebates, and

other claims asserted by the Sellers or the Purchaser in its capacity as assignee), or other claim

asserted or assertable against the Sellers and (b) imposing or charging against the Debtors, the

US_ACTIVE:43085833-07-43085833_7.DOC       32

Purchaser, or its Affiliates any rent accelerations, assignment fees, increases, or any other fees as a result of the Sellers' assumption and assignment to the Purchaser of the Assumable Executory Contracts. The validity of such assumption and assignment of the Assumable Executory Contracts shall not be affected by any dispute between the Sellers and any non-Debtor party to an Assumable Executory Contract.

26.     Except as expressly provided in the MPA or this Order, after the Closing, the Debtors and their estates shall have no further liabilities or obligations with respect to any Assumed Liabilities other than certain Cure Amounts as provided in the MPA, and all holders of such claims are forever barred and estopped from asserting such claims against the Debtors, their successors or assigns, and their estates.

27.     The failure of the Sellers or the Purchaser to enforce at any time one or more terms or conditions of any Assumable Executory Contract shall not be a waiver of such terms or conditions, or of the Sellers' and the Purchaser's rights to enforce every term and condition of the Assumable Executory Contracts.

28.     The authority hereunder for the Debtors to assume and assign an Assumable Executory Contract to the Purchaser includes the authority to assume and assign an Assumable Executory Contract, as amended.

29.     Upon the assumption by a Debtor and the assignment to the Purchaser of any Assumable Executory Contract and the payment of the Cure Amount in full, all defaults under the Assumable Executory Contract shall be deemed to have been cured, and any counterparty to such Assumable Executory Contract shall be prohibited from exercising any rights or remedies against any Debtor or non-Debtor party to such Assumable Executory Contract based on an asserted default that occurred on, prior to, or as a result of, the Closing, including the type of default specified in section 365(b)(1)(A) of the Bankruptcy Code.

US_ACTIVE:\43085833\07\43085833_7.DOC\                    33

30.     The assignments of each of the Assumable Executory Contracts are made in good faith under sections 363(b) and (m) of the Bankruptcy Code.

31.     Entry by GM into the Deferred Termination Agreements with accepting dealers is hereby approved.  Executed Deferred Termination Agreements represent valid and binding contracts, enforceable in accordance with their terms.

32.     Entry by GM into the Participation Agreements with accepting dealers is hereby approved and the offer by GM of entry into the Participation Agreements and entry into the Participation Agreements was appropriate and not the product of coercion.  The Court makes no finding as to whether any specific provision of any Participation Agreement governing the obligations of Purchaser and its dealers is enforceable under applicable provisions of state law. Any disputes that may arise under the Participation Agreements shall be adjudicated on a case by case basis in an appropriate forum other than this Court.

33.     Nothing contained in the preceding two paragraphs shall impact the authority of any state or of the federal government to regulate Purchaser subsequent to the Closing.

34.     Notwithstanding any other provision in the MPA or this Order, no assignment of any rights and interests of the Debtors in any federal license issued by the Federal Communications Commission ("FCC") shall take place prior to the issuance of FCC regulatory approval for such assignment pursuant to the Communications Act of 1934, and the rules and regulations promulgated thereunder.

### TPC Property

35.     The TPC Participation Agreement and the other TPC Operative Documents are financing transactions secured to the extent of the TPC Value (as hereinafter defined) and shall be Retained Liabilities.

US_ACTIVE:\43085833\07\43085833_7.DOC\                    34

36.     As a result of the Debtors' interests in the TPC Property being transferred
to the Purchaser free and clear of all liens, claims, interests, and encumbrances (other than
Permitted Encumbrances), including, without limitation, the TPC Lenders' Liens and Claims,
pursuant to section 363(c) of the Bankruptcy Code, the TPC Lenders shall have an allowed
secured claim in a total amount equal to the fair market value of the TPC Property on the
Commencement Date under section 506 of the Bankruptcy Code (the "**TPC Value**"), as
determined at a valuation hearing conducted by this Court or by mutual agreement of the
Debtors, the Purchaser, and the TPC Lenders (such claim, the "**TPC Secured Claim**"). Either
the Debtors, the Purchaser, the TPC Lenders, or the Creditors' Committee may file a motion with
this Court to determine the TPC Value on twenty (20) days notice.

37.     Pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate
protection for the TPC Secured Claim and for the sole benefit of the TPC Lenders, at the Closing
or as soon as commercially practicable thereafter, but in any event not later than five (5) business
days after the Closing, the Purchaser shall place $90,700,000 (the "**TPC Escrow Amount**") in
cash into an interest-bearing escrow account (the "**TPC Escrow Account**") at a financial
institution selected by the Purchaser and acceptable to the other parties (the "**Escrow Bank**").
Interest earned on the TPC Escrow Amount from the date of deposit through the date of the
disposition of the proceeds of such account (the "**TPC Escrow Interest**") will follow principal,
such that interest earned on the amount of cash deposited into the TPC Escrow Account equal to
the TPC Value shall be paid to the TPC Lenders and interest earned on the balance of the TPC
Escrow Amount shall be paid to the Purchaser.

38.     Promptly after the determination of the TPC Value, an amount of cash
equal to the TPC Secured Claim plus the TPC Lenders' pro rata share of the TPC Escrow
Interest shall be released from the TPC Escrow Account and paid to the TPC Lenders (the "**TPC**

Payment") without further order of this Court. If the TPC Value is less than $90,700,000, the TPC Lenders shall have, in addition to the TPC Secured Claim, an aggregate allowed unsecured claim against GM's estate equal to the lesser of (i) $45,000,000 and (ii) the difference between $90,700,000 and the TPC Value (the "**TPC Unsecured Claim**").

      39. If the TPC Value exceeds $90,700,000, the TPC Lenders shall be entitled to assert a secured claim against GM's estate to the extent the TPC Lenders would have an allowed claim for such excess under section 506 of the Bankruptcy Code (the "**TPC Excess Secured Claim**"); *provided, however,* that any TPC Excess Secured Claim shall be paid from the consideration of the 363 Transaction as a secured claim thereon and shall not be payable from the proceeds of the Wind-Down Facility; *and provided further, however,* that the Debtors, the Creditors' Committee, and all parties in interest shall have the right to contest the allowance and amount of the TPC Excess Secured Claim under section 506 of the Bankruptcy Code (other than to contest the TPC Value as previously determined by the Court). All parties' rights and arguments respecting the determination of the TPC Secured Claim are reserved; *provided, however,* that in consideration of the settlement contained in these paragraphs, the TPC Lenders waive any legal argument that the TPC Lenders are entitled to a secured claim equal to the face amount of their claim under section 363(f)(3) or any other provision of the Bankruptcy Code solely as a matter of law, including, without limitation, on the grounds that the Debtors are required to pay the full face amount of the TPC Lenders' secured claims in order to transfer, or as a result of the transfer of, the TPC Property to the Purchaser. After the TPC Payment is made, any funds remaining in the TPC Escrow Account plus the Purchasers' pro rata share of the TPC Escrow Interest shall be released and paid to the Purchaser without further order of this Court. Upon the receipt of the TPC Payment by the TPC Lenders, other than any right to payment from GM on account of the TPC Unsecured Claim and the TPC Excess Secured Claim, the TPC

Lenders' Claims relating to the TPC Property shall be deemed fully satisfied and discharged, including, without limitation, any claims the TPC Lenders might have asserted against the Purchaser relating to the TPC Property, the TPC Participation Agreement, or the TPC Operative Documents. For the avoidance of doubt, any and all claims of the TPC Lenders arising from or in connection with the TPC Property, the TPC Participation Agreement, or the TPC Operative Documents shall be payable solely from the TPC Escrow Account or GM and shall be nonrecourse to the Purchaser.

      40.    The TPC Lenders shall not be entitled to payment of any fees, costs, or expenses (including legal fees) except to the extent that the TPC Value results in a TPC Excess Secured Claim and is thereby oversecured under the Bankruptcy Code and such claim is allowed by the Court as a secured claim under section 506 of the Bankruptcy Code.

      41.    In connection with the foregoing, and pursuant to Section 11.2 of the TPC Trust Agreement, GM, as the sole Certificate Holder and Beneficiary under the TPC Trust, together with the consent of GM as the Lessee, effective as of the date of the Closing, (a) exercises its election to terminate the TPC Trust and (b) in connection therewith, assumes all of the obligations of the TPC Trust and TPC Trustee under or contemplated by the TPC Operative Documents to which the TPC Trust or TPC Trustee is a party and all other obligations of the TPC Trust or TPC Trustee incurred under the TPC Trust Agreement (other than obligations set forth in clauses (i) through (iii) of the second sentence of Section 7.1 of the TPC Trust Agreement).

      42.    As a condition precedent to the 363 Transaction, in connection with the termination of the TPC Trust, effective as of the date of the Closing, all of the assets of the TPC Trust (the "**TPC Trust Assets**") shall be distributed to GM, as sole Certificate Holder and beneficiary under the TPC Trust, including, without limitation, the following:

US_ACTIVE\43085833\07\43085833_7.DOC\               37

(i)      Industrial Development Revenue Real Property Note (General Motors Project) Series 1999-I, dated November 18, 1999, in the principal amount of $21,700,000, made by the Industrial Development Board of the City of Memphis and County of Shelby, Tennessee, to PVV Southpoint 14, LLC, as assigned by Assignment and Assumption of Loan and Loan Documents dated as of November 18, 1999, between PVV Southpoint 14, LLC, as Assignor, to the TPC Trustee of the TPC Trust, as Assignee, recorded as JW1268 in the records of the Shelby County Register of Deeds (the "TPC Tennessee Ground Lease");

(ii)     Real Property Lease Agreement dated as of November 18, 1999, between the Industrial Development Board of the City of Memphis and County of Shelby, Tennessee, as Lessor, and PVV Southpoint 14, LLC, as Lessee, recorded as JW1262 in the records of the Shelby County Register of Deeds, as assigned by Assignment and Assumption of Real Property Lease dated as of November 18, 1999, between PVV Southpoint 14, LLC, as Assignor, to the TPC Trustee of the TPC Trust, as Assignee, recorded as JW1267 in the records of the Shelby County Register of Deeds;

(iii)    Deed of Trust dated as of November 18, 1999, between the Industrial Development Board of the City of Memphis and County of Shelby, Tennessee, as Grantor, in favor of Mid-South Title Corporation, as Trustee, for the benefit of PVV Southpoint 14, LLC, Beneficiary, recorded as JW1263 in the records of the Shelby County Register of Deeds, as assigned by Assignment and Assumption of Loan and Loan Documents dated as of November 18, 1999, between PVV Southpoint 14, LLC, as Assignor, to the TPC Trustee of the TPC Trust, as Assignee, recorded as JW1268 in the records of the Shelby County Register of Deeds;

(iv)     Assignment of Rents and Lease dated as of November 18, 1999, between the Industrial Development Board of the City of Memphis and County of Shelby, Tennessee, as Assignor, and PVV Southpoint 14, LLC, as Assignee, recorded as JW1264 in the records of the Shelby County Register of Deeds, as assigned by Assignment and Assumption of Loan and Loan Documents dated as of November 18, 1999, between PVV Southpoint 14, LLC, as Assignor, to the TPC Trustee of the TPC Trust, as Assignee, recorded as JW1268 in the records of the Shelby County Register of Deeds;

(v)      The Tennessee Master Lease (as defined in the TPC Participation Agreement);

(vi)     A certain tract of land being known and designated as Lot 1, as shown on a Subdivision Plat entitled "Final Plat – Lot 1, Whitemarsh Associates, LLC Property," which Plat is recorded among the Land Records of Baltimore County in Plat Book SM No. 71 at folio 144, Maryland, together with a certain tract of land being known and designated as "1.1865 Acre of Highway Widening," as shown on a Subdivision Plat entitled "Final Plat – Lot 1, Whitemarsh Associates, LLC Property," which Plat is recorded among the Land Records of Baltimore County in Plat Book SM No. 71 at folio 144, Baltimore, Maryland, saving and excepting from the above described property all that land conveyed to the State of Maryland to the use of the State Highway Administration of the Department of Transportation dated November 24, 2003, and

recorded among the Land Records of Baltimore County in Liber 19569, folio 074,
Maryland, together with all rights, easements, covenants, licenses, and appurtenances
associated with the ownership thereof in any way, including, without limitation, those
easements benefiting Parcel 1 set forth in the Declaration and Agreement Respecting
Easements, Restrictions and Operations, between the TPC Trust, GM, and Whitemarsh
Associates, LLC, recorded among the Land Records of Baltimore County in Liber 14019,
folio 430, as amended (collectively, the "**Maryland Property**");

        (vii)    alternatively to the transfer of a direct interest in the Maryland
Property pursuant to item (vi) above, if such documents are still extant, the following
interests shall be transferred: (a) Ground Lease Agreement dated as of September 8,
1999, between the TPC Trustee of the TPC Trust, as lessor, and Maryland Economic
Development Corporation, as lessee, recorded among the Land Records of Baltimore
County in Liber 14019, folio 565, (b) Sublease Agreement dated as of September 8,
1999, between the Maryland Economic Development Corporation, as sublessor, and the
TPC Trustee of the TPC Trust, as sublessee, recorded among the Land Records of
Baltimore County in Liber 14019, folio 589, together with (c) all agreements, loan
agreements, notes, rights, obligations, and interests held by the TPC Trustee of the TPC
Trust and/or issued by the TPC Trustee of the TPC Trust in connection therewith; and

        (viii)    The Maryland Master Lease (as defined in the TPC Participation
Agreement).

    43.    As a result of the distribution of the TPC Trust Assets, effective as of the
date of the Closing, title to the leasehold interest of the TPC Trustee of the TPC Trust under the
TPC Tennessee Ground Lease and the lessor's interest under the Tennessee Master Lease shall
be held by GM, as are the lessor's and lessee's interests under the Tennessee Master Lease, and
as permitted by the TPC Trust Agreement, the Tennessee Master Lease shall hereby be
terminated, and GM shall succeed to all rights of the lessor thereunder to the property leased
thereby, together with all rights, easements, covenants, licenses, and appurtenances associated
with the ownership thereof in any way.

    44.    As a result of the distribution of the TPC Trust Assets, effective as of the
date of the Closing, title to the Maryland Property, the lessor's and lessee's interests under the
Maryland Master Lease shall be held by GM, and as permitted by the TPC Trust Agreement, the
Maryland Master Lease shall hereby be terminated, and GM shall succeed to all rights of the

lessor thereunder to the property leased thereby, together with all rights, easements, covenants, licenses, and appurtenances associated with the ownership thereof in any way.

45.     All of the TPC Trust Assets and the TPC Property are Purchased Assets under the MPA and shall be transferred by GM pursuant thereto to the Purchaser free and clear of all liens, claims, encumbrances, and interests (other than Permitted Encumbrances), including, without limitation, any liens, claims, encumbrances, and interests of the TPC Lenders.  To the extent any of the TPC Trust Assets are executory contracts and unexpired leases, they shall be Assumable Executory Contracts, which shall be assumed by GM and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code and the Sale Procedures Order.

### Additional Provisions

46.     Except for the Assumed Liabilities expressly set forth in the MPA, none of the Purchaser, its present or contemplated members or shareholders, its successors or assigns, or any of their respective affiliates or any of their respective agents, officials, personnel, representatives, or advisors shall have any liability for any claim that arose prior to the Closing Date, relates to the production of vehicles prior to the Closing Date, or otherwise is assertable against the Debtors or is related to the Purchased Assets prior to the Closing Date.  The Purchaser shall not be deemed, as a result of any action taken in connection with the MPA or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Purchased Assets, to:  (i) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with respect to any obligations arising under the Purchased Assets from and after the Closing); (ii) have, de facto or otherwise, merged with or into the Debtors; or (iii) be a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors.  Without limiting the foregoing, the Purchaser shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any claims,

US_ACTIVE:\43085833\07\43085833_7.DOC\                40

including, but not limited to, under any theory of successor or transferee liability, de facto merger or continuity, environmental, labor and employment, and products or antitrust liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted, or unasserted, fixed or contingent, liquidated or unliquidated.

47.     Effective upon the Closing and except as may be otherwise provided by stipulation filed with or announced to the Court with respect to a specific matter or an order of the Court, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Purchaser, its present or contemplated members or shareholders, its successors and assigns, or the Purchased Assets, with respect to any (i) claim against the Debtors other than Assumed Liabilities, or (ii) successor or transferee liability of the Purchaser for any of the Debtors, including, without limitation, the following actions: (a) commencing or continuing any action or other proceeding pending or threatened against the Debtors as against the Purchaser, or its successors, assigns, affiliates, or their respective assets, including the Purchased Assets; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Debtors as against the Purchaser, its successors, assigns, affiliates, or their respective assets, including the Purchased Assets; (c) creating, perfecting, or enforcing any lien, claim, interest, or encumbrance against the Debtors as against the Purchaser or its successors, assigns, affiliates, or their respective assets, including the Purchased Assets; (d) asserting any setoff, right of subrogation, or recoupment of any kind for any obligation of any of the Debtors as against any obligation due the Purchaser or its successors, assigns, affiliates, or their respective assets, including the Purchased Assets; (e) commencing or continuing any action, in any manner or place, that does not comply, or is inconsistent with, the provisions of this Order or other orders of this Court, or

the agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating,

or failing or refusing to renew any license, permit, or authorization to operate any of the

Purchased Assets or conduct any of the businesses operated with such assets. Notwithstanding

the foregoing, a relevant taxing authority's ability to exercise its rights of setoff and recoupment

are preserved.

        48.     Except for the Assumed Liabilities, or as expressly permitted or otherwise

specifically provided for in the MPA or this Order, the Purchaser shall have no liability or

responsibility for any liability or other obligation of the Sellers arising under or related to the

Purchased Assets. Without limiting the generality of the foregoing, and except as otherwise

specifically provided in this Order and the MPA, the Purchaser shall not be liable for any claims

against the Sellers or any of their predecessors or Affiliates, and the Purchaser shall have no

successor, transferee, or vicarious liabilities of any kind or character, including, but not limited

to, any theory of antitrust, environmental, successor, or transferee liability, labor law, de facto

merger, or substantial continuity, whether known or unknown as of the Closing, now existing or

hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated,

with respect to the Sellers or any obligations of the Sellers arising prior to the Closing.

        49.     The Purchaser has given fair and substantial consideration under the MPA

for the benefit of the holders of liens, claims, encumbrances, or other interests. The

consideration provided by the Purchaser for the Purchased Assets under the MPA is greater than

the liquidation value of the Purchased Assets and shall be deemed to constitute reasonably

equivalent value and fair consideration under the Bankruptcy Code and under the laws of the

United States, any state, territory, possession, or the District of Columbia.

US_ACTIVE:\43085833\07\43085833_7.DOC\                    42

50.    The consideration provided by the Purchaser for the Purchased Assets under the MPA is fair and reasonable, and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

51.    If there is an Agreed G Transaction (determined no later than the due date, with extensions, of GM's tax return for the taxable year in which the 363 Transaction occurs), (i) the MPA shall, and hereby does, constitute a "plan" of GM and the Purchaser solely for purposes of sections 368 and 354 of the Tax Code, and (ii) the 363 Transaction, as set forth in the MPA, and the subsequent liquidation of the Sellers, are intended to constitute a tax reorganization of GM pursuant to section 368(a)(1)(G) of the Tax Code.

52.    This Order (a) shall be effective as a determination that, except for the Assumed Liabilities, at Closing, all liens, claims, encumbrances, and other interests of any kind or nature whatsoever existing as to the Sellers with respect to the Purchased Assets prior to the Closing (other than Permitted Encumbrances) have been unconditionally released and terminated, and that the conveyances described in this Order have been effected, and (b) shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

53.    Each and every federal, state, and local governmental agency or department is authorized to accept any and all documents and instruments necessary or appropriate to consummate the transactions contemplated by the MPA.

54.     Any amounts that become payable by the Sellers to the Purchaser pursuant
to the MPA (and related agreements executed in connection therewith, including, but not limited
to, any obligation arising under Section 8.2(b) of the MPA) shall (a) constitute administrative
expenses of the Debtors' estates under sections 503(b)(1) and 507(a)(1) of the Bankruptcy Code
and (b) be paid by the Debtors in the time and manner provided for in the MPA without further
Court order.

55.     The transactions contemplated by the MPA are undertaken by the
Purchaser without collusion and in good faith, as that term is used in section 363(m) of the
Bankruptcy Code, and were negotiated by the parties at arm's length, and, accordingly, the
reversal or modification on appeal of the authorization provided in this Order to consummate the
363 Transaction shall not affect the validity of the 363 Transaction (including the assumption
and assignment of any of the Assumable Executory Contracts and the UAW Collective
Bargaining Agreement), unless such authorization is duly stayed pending such appeal.  The
Purchaser is a purchaser in good faith of the Purchased Assets and the Purchaser and its agents,
officials, personnel, representatives, and advisors are entitled to all the protections afforded by
section 363(m) of the Bankruptcy Code.

56.     The Purchaser is assuming the obligations of the Sellers pursuant to and
subject to conditions and limitations contained in their express written warranties, which were
delivered in connection with the sale of vehicles and vehicle components prior to the Closing of
the 363 Transaction and specifically identified as a "warranty." The Purchaser is not assuming
responsibility for Liabilities contended to arise by virtue of other alleged warranties, including
implied warranties and statements in materials such as, without limitation, individual customer
communications, owner's manuals, advertisements, and other promotional materials, catalogs,
and point of purchase materials.  Notwithstanding the foregoing, the Purchaser has assumed the

US_ACTIVE:\43085833\07\43085833_7.DOC\                    44

Sellers' obligations under state "lemon law" statutes, which require a manufacturer to provide a consumer remedy when the manufacturer is unable to conform the vehicle to the warranty, as defined in the applicable statute, after a reasonable number of attempts as further defined in the statute, and other related regulatory obligations under such statutes.

57.    Subject to further Court order and consistent with the terms of the MPA and the Transition Services Agreement, the Debtors and the Purchaser are authorized to, and shall, take appropriate measures to maintain and preserve, until the consummation of any chapter 11 plan for the Debtors, (a) the books, records, and any other documentation, including tapes or other audio or digital recordings and data in, or retrievable from, computers or servers relating to or reflecting the records held by the Debtors or their affiliates relating to the Debtors' business, and (b) the cash management system maintained by the Debtors prior to the Closing, as such system may be necessary to effect the orderly administration of the Debtors' estates.

58.    The Debtors are authorized to take any and all actions that are contemplated by or in furtherance of the MPA, including transferring assets between subsidiaries and transferring direct and indirect subsidiaries between entities in the corporate structure, with the consent of the Purchaser.

59.    Upon the Closing, the Purchaser shall assume all liabilities of the Debtors arising out of, relating to, in respect of, or in connection with workers' compensation claims against any Debtor, except for workers' compensation claims against the Debtors with respect to Employees residing in or employed in, as the case may be as defined by applicable law, the states of Alabama, Georgia, New Jersey, and Oklahoma.

60.    During the week after Closing, the Purchaser shall send an e-mail to the Debtors' customers for whom the Debtors have usable e-mail addresses in their database, which will provide information about the Purchaser and procedures for consumers to opt out of being

US_ACTIVE:\43085837\07\43085833_7.DOC\                    45

contacted by the Purchaser for marketing purposes. For a period of ninety (90) days following

the Closing Date, the Purchaser shall include on the home page of GM's consumer web site

(www.gm.com) a conspicuous disclosure of information about the Purchaser, its procedures for

consumers to opt out of being contacted by the Purchaser for marketing purposes, and a notice of

the Purchaser's new privacy statement. The Debtors and the Purchaser shall comply with the

terms of established business relationship provisions in any applicable state and federal

telemarketing laws. The Dealers who are parties to Deferred Termination Agreements shall not

be required to transfer personally identifying information in violation of applicable law or

existing privacy policies.

      61.    Nothing in this Order or the MPA releases, nullifies, or enjoins the

enforcement of any Liability to a governmental unit under Environmental Laws or regulations

(or any associated Liabilities for penalties, damages, cost recovery, or injunctive relief) that any

entity would be subject to as the owner, lessor, or operator of property after the date of entry of

this Order. Notwithstanding the foregoing sentence, nothing in this Order shall be interpreted to

deem the Purchaser as the successor to the Debtors under any state law successor-liability

doctrine with respect to any Liabilities under Environmental Laws or regulations for penalties for

days of violation prior to entry of this Order. Nothing in this paragraph should be construed to

create for any governmental unit any substantive right that does not already exist under law.

      62.    Nothing contained in this Order or in the MPA shall in any way (i)

diminish the obligation of the Purchaser to comply with Environmental Laws, or (ii) diminish the

obligations of the Debtors to comply with Environmental Laws consistent with their rights and

obligations as debtors in possession under the Bankruptcy Code. The definition of

Environmental Laws in the MPA shall be amended to delete the words "in existence on the date

of the Original Agreement." For purposes of clarity, the exclusion of asbestos liabilities in

section 2.3(b)(x) of the MPA shall not be deemed to affect coverage of asbestos as a Hazardous Material with respect to the Purchaser's remedial obligations under Environmental Laws.

63. No law of any state or other jurisdiction relating to bulk sales or similar laws shall apply in any way to the transactions contemplated by the 363 Transaction, the MPA, the Motion, and this Order.

64. The Debtors shall comply with their tax obligations under 28 U.S.C. § 960, except to the extent that such obligations are Assumed Liabilities.

65. Notwithstanding anything contained in their respective organizational documents or applicable state law to the contrary, each of the Debtors is authorized and directed, upon and in connection with the Closing, to change their respective names, and any amendment to the organizational documents (including the certificate of incorporation) of any of the Debtors to effect such a change is authorized and approved, without Board or shareholder approval. Upon any such change with respect to GM, the Debtors shall file with the Court a notice of change of case caption within two (2) business days of the Closing, and the change of case caption for these chapter 11 cases shall be deemed effective as of the Closing.

66. The terms and provisions of the MPA and this Order shall inure to the benefit of the Debtors, their estates, and their creditors, the Purchaser, and their respective agents, officials, personnel, representatives, and advisors.

67. The failure to specifically include any particular provisions of the MPA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the MPA be authorized and approved in its entirety, except as modified herein.

68. The MPA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification,

US_ACTIVE\43085833-07-43085833_7.DOC\                    47

amendment, or supplement does not have a material adverse effect on the Debtors' estates. Any

such proposed modification, amendment, or supplement that does have a material adverse effect

on the Debtors' estates shall be subject to further order of the Court, on appropriate notice.

       69.     The provisions of this Order are nonseverable and mutually dependent on

each other.

       70.     As provided in Fed.R.Bankr.P. 6004(h) and 6006(d), this Order shall not

be stayed for ten days after its entry, and instead shall be effective as of 12:00 noon, EDT, on

Thursday, July 9, 2009. The Debtors and the Purchaser are authorized to close the 363

Transaction on or after 12:00 noon on Thursday, July 9. Any party objecting to this Order must

exercise due diligence in filing any appeal and pursuing a stay or risk its appeal being foreclosed

as moot in the event Purchaser and the Debtors elect to close prior to this Order becoming a Final

Order.

       71.     This Court retains exclusive jurisdiction to enforce and implement the

terms and provisions of this Order, the MPA, all amendments thereto, any waivers and consents

thereunder, and each of the agreements executed in connection therewith, including the Deferred

Termination Agreements, in all respects, including, but not limited to, retaining jurisdiction to (a)

compel delivery of the Purchased Assets to the Purchaser, (b) compel delivery of the purchase

price or performance of other obligations owed by or to the Debtors, (c) resolve any disputes

arising under or related to the MPA, except as otherwise provided therein, (d) interpret,

implement, and enforce the provisions of this Order, (e) protect the Purchaser against any of the

Retained Liabilities or the assertion of any lien, claim, encumbrance, or other interest, of any

kind or nature whatsoever, against the Purchased Assets, and (f) resolve any disputes with

respect to or concerning the Deferred Termination Agreements. The Court does not retain

jurisdiction to hear disputes arising in connection with the application of the Participation

**Deleted:** Pursuant to Bankruptcy Rules 6004(h) and 6006(d), this Order shall not be stayed for ten days after its entry and shall be effective immediately upon entry, and the Debtors and the Purchaser are authorized to close the 363 Transaction immediately upon entry of this Order.

Agreements, stockholder agreements or other documents concerning the corporate governance of

the Purchaser, and documents governed by foreign law, which disputes shall be adjudicated as

necessary under applicable law in any other court or administrative agency of competent

jurisdiction.

Dated: New York, York
         July 5, 2009


                              _____s/Robert E. Gerber_____
                              UNITED STATES BANKRUPTCY JUDGE