Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 09-50026(REG)

4    - - - - - - - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6

7    GENERAL MOTORS CORPORATION,

8

9            Debtors.

10

11   - - - - - - - - - - - - - - - - - - - - - - - - - -x

12

13                   U.S. Bankruptcy Court

14                   One Bowling Green

15                   New York, New York

16

17                   March 1, 2012

18                   9:45 AM

19

20   B E F O R E :

21   HON ROBERT E. GERBER

22   U.S. BANKRUPTCY JUDGE

23

24

25

Page 2

1    Hearing re:  Motors Liquidation Company GUC Trust's Motion

2    to Supplement Amended Order Pursuant to 11 U.S.C. § 105(a)

3    and General Order M-390 Authorizing Implementation of

4    Alternative Dispute Procedures, Including Mandatory

5    Mediation

6

7    Hearing re:  Objection to Proof of Claim No. 61381 by

8    Dimitrios Marangos

9

10   Hearing re:  Motion for Objection to Claim(s) Proof of claim

11   No. 15927 by Patricia Meyer

12

13   Hearing re:  Debtors' Eighty-Third Omnibus Objection to

14   Claims (Welfare Benefits Claims of Retired and Former

15   Salaried and Executive Employees)

16

17   Debtors' 103rd Omnibus Objection to Claims (Welfare Benefits

18   Claims of Retired and Former Salaried and Executive

19   Employees)

20

21   266th Omnibus Objection to Claims and Motion Requesting

22   Enforcement of Bar Date Orders

23

24   267th Omnibus Objection to Claim(s) Number

25

1     268th Omnibus Objection to Claims and Motion Requesting

2     Enforcement of Bar Dates Orders

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25     Transcribed by:  Dawn South, Cherri Brown, and Becky Flick

Page 4

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES LLP

3        Attorneys for Debtors

4        767 Fifth Avenue

5        New York, NY 10153-0119

6

7    BY:   DAVID N. GRIFFITHS, ESQ.

8        JOSEPH H. SMOLINSKY, ESQ.

9

10   DICKSTEIN SHAPIRO LLP

11       Attorneys for the GUC Trust

12       1633 Broadway

13       New York, NY 10019-6708

14

15   BY:   STEFANIE BIRBROWER GREER, ESQ.

16       MIKAELA C. WHITMAN, ESQ.

17

18   OFFICE OF THE ATTORNEY GENERAL

19       Attorney for the State of New York

20       The Capitol

21       Albany, NY 12224-0341

22

23   BY:   MAUREEN F. LEARY, ESQ.

24

25

Page 5

1    U.S. DEPARTMENT OF JUSTICE

2         Attorney for the U.S. Trustee

3         86 Chambers Street

4         New York, NY 10007

5

6    BY:  DAVID S. JONES, ESQ.

7

8    DAY PITNEY LLP

9         Attorney for United Technologies Corporation

10        One International Place

11        Boston, MA 02110

12

13   BY:  DANIEL J. CARRAGHER, ESQ.

14

15   HARRIS BEACH PLLC

16        Attorney for the Town of Salina

17        100 Wall Street

18        New York, NY 10005

19

20   BY:  ERIC H. LINDENMAN, ESQ.

21

22

23

24

25

**Page 6**

1    ALSO PRESENT PRO SE TELEPHONICALLY:

2

3    LOUIS J. ALARIE

4    LINDA K. BELLAIRE

5    DANIEL CARRAGHER

6    ROBERT HICKMAN

7    FLOYD JANKOWSKI

8    DIMITRIOS S. MARANGOS

9    LUIS A. MENDEZ

10   PATRICIA MEYER

11   DARLENE SCHNEIDER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        P R O C E E D I N G S

2              THE COURT:  Good morning, have seats, please.

3      okay, General Motors -- Motors Liquidation Company.  We have

4      many, many people who've signed up for the phone, and we

5      have a fair number of matters to deal with today.

6              Here's what we're going to do, folks.  I'm dealing

7      with the ADR matters first, and we will resolve those issues

8      and then I will thereafter deal with the various claims

9      objections.

10             CourtCall, I'm going to ask that the folks who are

11     on the line for claims objections be put on mute until we

12     get to those.  My phone log shows Mr. Carragher of the Day

13     Pitney firm on the phone log, and I think he's here on the

14     environmental matters because I read his submission, I think

15     it was United Technologies.  I would like him kept live if

16     you would, please, and the remainder of the folks should be

17     put on mute until I get to their needs and concerns.

18             OPERATOR:  Thank you, Your Honor, I'm bringing

19     Mr. Carragher live now.

20             THE COURT:  Okay.  Mr. Carragher, can you hear me?

21             MR. CARRAGHER:  Yes, I can, Your Honor.

22             THE COURT:  Very good, okay.  On ADR folks, I've

23     read your various submissions.  I have some preliminary

24     thoughts.

25             I think there is no doubt that the idea of ADR as

Page 8

1    a whole is a very beneficial one, and what we're really

2    going to be talking about is in addition to approving the

3    motion on patents and other things for which there was no

4    opposition, we need solely to address some of the concerns

5    that were articulated in the limited objections.

6        Some of the remarks that were made by the GUC

7    Trust in its response lead me to believe that some of the

8    earlier concerns voiced by the objectors, which would

9    otherwise have troubled me as well, have been addressed, but

10   I sense that some may remain, and at least in one case,

11   vis-à-vis, the federal government.  It looked like my

12   earlier understanding, which was reflected in writing by I

13   think Onondaga County, that the federal EPA wasn't going to

14   be required to participate, may have suffered a reversal by

15   the GUC Trust side and I need an explanation as to that.

16       My general thought that I want everybody to

17   address however is if we assume, as I think all reasonable

18   people do or at least should, that the system as a whole is

19   salutary and we know that the ADR process has been very

20   beneficial for everybody in the areas in which it's already

21   proceeded, do we really have good justifications for not

22   doing it on a level playing field?

23       And I particularly have concerns that I need the

24   GUC Trust side to address, as to whether the GUC Trust

25   should have the right to pick mediators and not -- or to

Page 9

1    nominate them and not those on the other side, and likewise

2    it should have the ability to pull the plug on the process

3    and deny that right to the other side.

4              My tentative, subject to your rights to be heard,

5    is that the ADR process if it's to work best has to have the

6    confidence of everybody, and that people should have comfort

7    that it's going to run fairly on both sides.

8              So although in some respects these are some fine

9    tuning around the edges, and arguably even micromanagement,

10   I do want to give everybody the sense that we're going to be

11   embarking on an enterprise where everybody has confidence in

12   it, and that's what I need you guys to help me with.

13             Now with that said, Mr. Smolinsky, are you going

14   to take the lead for the GUC Trust on this?

15             MR. SMOLINSKY:  Yes, Your Honor.

16             THE COURT:  Can I ask you to come to the main

17   lectern, please.

18             And I think I remember you folks, but before you

19   start talking, Mr. Smolinsky, let me get the appearances on

20   the record and then you can continue.

21             MS. LEARY:  Maureen Leary for the State of New

22   York on behalf of the Attorney General's Office.

23             MR. JONES:  David Jones from the U.S. Attorney's

24   Officer Southern District New York for the United States.

25             MR. LINDENMAN:  Eric Lindenman, Harris Beach for

Page 10

1    the Town of Salina.

2            THE COURT:  Mr. Lindenman, it's been a while.

3            MR. LINDENMAN:  Yes.

4            THE COURT:  Okay.  Mr. Smolinsky.

5            MR. SMOLINSKY:  Thank you, Your Honor, and of

6    course I'm aware that Your Honor has read all the papers and

7    I won't repeat our previous -- previous papers, but I do

8    want to perhaps give just a minute of background because I

9    think it's helpful to try to defuse the notion that this is

10   an unfair process that's not likely to lead to a resolution,

11   which is a theme that came out throughout the objections.

12           There can be no dispute that the ADR process has

13   been extremely successful in this case.  We used it

14   primarily for litigation claims and we started out with

15   thousands of claims -- litigation claims in excess of

16   $500,000.  Of those we only had to designate 354 claims for

17   ADR.  That means that we were successful -- and we do have a

18   couple of hundred claims left, including 53 claims that are

19   still in the ADR process in the offer and counteroffer

20   stage.  So that means that we have worked diligently and

21   quite successfully at resolving claims even before we

22   designated then for ADR.

23           Of those 354 claims 53 are still in the process,

24   there have been 301 mediations to date, and of those we

25   resolved in mediation 289 of them.

Page 11

1           There are ten claims that didn't settle, and I

2    would say that I know about some of those claims and I would

3    have guessed going into the process that we would not have

4    settled it in ADR.

5           An additional two claims have not settled and are

6    currently on appeal for defendants' judgments.

7           So we already won at the trial level the ADR to

8    resolve appeal and now the appeal is going forward.

9           THE COURT:  Pause, please, Mr. Smolinsky.

10          Those were actions in which the defendants' side,

11   which would be either GM or an affiliate had won in like

12   some state trial court but the matter was up on appeal?

13          MR. SMOLINSKY:  Correct, Your Honor.  That means

14   that we -- even taking those two cases into consideration we

15   settled through mediation 289 of 301 cases, which is a

16   success rate of 96 percent.

17          So I could also report to the Court that the

18   mediations have not been a free for all where the GUC Trust

19   has simply opened its pocketbooks and given away the store.

20   They were all done professionally, there were considerations

21   given to hardship cases, it was done with a full exchange of

22   information by the GUC Trust to allow the claimant to fully

23   understand the defenses that the estate had, and there was a

24   full sharing of information.

25          But the reason why in our papers we put in it some

Page 12

1    additional language requiring the delivery of information is

2    unlike a litigation claim where, you know, it's he said, she

3    said, there are police reports and other documents, but

4    calculating the damages is something which relies on a whole

5    host of issues, what the jury is going to look like in a

6    particular jurisdiction, how good the plaintiff's counsel

7    is.  There are a whole host of reasons.

8         When it gets down to patent claims and

9    environmental claims it's usually something which is based

10   on either a calculation in the patents side, a calculation

11   of how many parts were sold during a given period of time,

12   sometimes not by GM but by other manufacturers.  For

13   environmental claims there's often engineering work done

14   that describes what kind of work needs to be done, and

15   that's the first stage in understanding what the appropriate

16   value of the claim should be.

17        So in terms of what the documents say I don't

18   think that we envisioned that this was going to be a one-way

19   discovery street.  It was simply a way of saying to

20   claimants, if you have information about how you're

21   calculating your claim give it to us so we can evaluate it

22   and we'll share our information with you as well.

23        Sometimes there are issues.  I know that New York

24   State has been looking for one particular document, a

25   feasibility study that was commenced by GM with respect to

Page 13

1    the American Axle site I believe, and in that regard the

2    study --

3              THE COURT:  Is that in Onondaga County or a

4    different part of New York?

5              MR. SMOLINSKY:  Is the American Axle --

6              MS. LEARY:  No, I think it's in Erie County,

7    Your Honor.

8              THE COURT:  Out near Buffalo.

9              MS. LEARY:  Yes.

10             THE COURT:  Okay.

11             MR. SMOLINSKY:  So in that case we provided the

12   State, in fact we filed with the State way back a

13   feasibility study, and prior to the bankruptcy the debtors

14   had started a second feasibility study but it wasn't

15   completed.

16             So there's been some talk about whether or not we

17   should deliver the uncompleted feasibility study, and we'll

18   get there.  We will speak to the engineers and figure out

19   how complete it is and how reliable it is and then we'll

20   share that information.  So it's not intended to be a one-

21   way street.

22             So just talking about some of the objections that

23   were made, and I think it touches upon some of your -- some

24   of your concerns.

25             The unfair nature of the process.  I think the

Page 14

1    proof is in the pudding in terms of how we've conducted

2    these ADR processes.

3            The need to broaden the roster of mediators.  As

4    we said in our papers, we did have at least two mediators

5    that had extensive environmental experience.

6            We in the past with respect to litigation claims

7    have worked with parties and in some cases have designated

8    other mediators upon agreement.  I think the same would hold

9    true here.  We're not going through this as we would in a

10   typical litigation where if it settles fine, if it doesn't

11   that's fine too, we're approaching this from a perspective

12   of wanting to settle it.

13           So to the extent that there is a suggestion that

14   there be another mediator considered we would -- we would

15   definitely consider that, and to the extent that it made the

16   mediation more productive we would likely go along with

17   that.

18           The reason why the procedures don't say that the

19   parties will come together and agree on a mediator is that

20   sometimes that process in and of itself could take months

21   and months and months and months, and a lot of disagreements

22   and going back and forth.

23           So we were not intending, and I think our reply

24   papers were quite clear on this, that we were not intending

25   to -- to not avail ourselves of suggestions of mediators

1   that might be more constructive to getting to yes, but

2   rather trying to make sure that the very strict deadlines

3   that are in the ADR procedure that have worked so well to

4   getting to resolutions within a reasonable period of time

5   remains -- remains there and remains as an enforcement

6   mechanism to make sure that we could get through these

7   claims quickly and efficiently.

8           The budgetary constraints I think we addressed.

9   We will agree to pay the mediation costs in connection with

10   any municipally or governmental agency.

11           THE COURT:  Pause.  That's constructive, that

12   isn't what I understood from your rely.  I thought you had

13   made that offer for New York State, but wasn't clear as to

14   whether you made the same offer for Onondaga County and

15   Salina.

16           MR. SMOLINSKY:  I hadn't previously.  My view on

17   those two parties -- and I was going to get to this later --

18   but to the extent that New York State wants to include them

19   in the mediation process I think that they would appear and

20   it would be the same costs that New York is addressing.  And

21   even I think it was Onondaga County that admits and concedes

22   that New York is taking the lead basically saying we don't

23   want to be in a mediation without New York.  And it's never

24   been our intention throughout the ADR process to exclude

25   parties.  We've had multi-party ADRs where we've had several

Page 16

1    claimants in the same accidents, we've had insurance

2    companies and claimants.

3            To the extend New York wants Onondaga County to

4    participate we have no problem with them attending and there

5    shouldn't be any increased cost associated with it.

6            THE COURT:  All right.  Well, what had troubled me

7    -- because I think you had made it pretty clear, (a), that

8    Onondaga County and Salina would be invited to the show, and

9    (b), that you weren't going to tag New York State with the

10    cost.  I would have been troubled if you had said that

11    notwithstanding those things that you were going to lay some

12    of the costs on Onondaga and Salina.

13            MR. SMOLINSKY:  It's not the intention,

14    Your Honor.  There may be a 502(e)(1)(b) objection --

15            THE COURT:  I have no doubt that you would address

16    that, but of course the way you would deal with that is

17    paying the environmental regulator, solving the

18    environmental regulator's needs and concerns, and then

19    taking that into account when the others are putting in a

20    claim for what they think they're entitled to by way of, you

21    know, a contribution claim or something like that.

22            MR. SMOLINSKY:  Right, or objecting to this claim

23    in this court under 502(e)(1)(b).

24            So in my mind I never envisioned a scenario where

25    we would be separately mediating with Onondaga or Salina.

1    If that -- if that comes to pass we will pay the mediator's

2    fee.

3              THE COURT:  All right.  By the way, have I been

4    mispronouncing the name of the town for the three years?

5              MR. SMOLINSKY:  You say tomato I say tomato.

6              THE COURT:  All right.  Well, we'll wait --

7              MR. SMOLINSKY:  I think I've heard different

8    things at this point.

9              THE COURT:  Mr. Lindenman can straighten this out

10   when the time comes.

11             MR. LINDENMAN:  Your Honor, if I can interrupt I

12   vividly remember your asking the same question at a prior

13   hearing and someone from that town said people there differ.

14             MR. SMOLINSKY:  Yes.

15             THE COURT:  All right.

16             UNIDENTIFIED SPEAKER:  Your Honor, I'm told it's

17   Salina, but as I indicated the last time I was here, I

18   believe the correct pronunciation is the town.  It just

19   makes it easier, so we'll go along that.

20             THE COURT:  I'm grateful for that, folk, thank

21   you.

22             MR. SMOLINSKY:  Your Honor, I remember that

23   comment and that's why I said tomato/tomato, I didn't mean

24   to disparage the town and mispronounce its name, I knew that

25   there was some dispute over that fact.

1          THE COURT:  No, I thought you wanted to disparage

2     me.

3          All right, continue, please.

4          MR. SMOLINSKY:  The next category of issues

5     revolve around police and regulatory power.

6          I'll make absolutely clear we're not intending to

7     impact and impair, and our order will certainly provide that

8     we're not seeking to take away any municipality's right to

9     police -- to exercise their police and regulatory power.  I

10    don't think it's relevant here because these are not sites

11    that are owned and controlled and managed by the debtors.

12    So in terms of their claims I believe them to be simple

13    monetary issues.

14          So I'm not quite sure where the police and

15    regulatory power is invoked, but we're not seeking to alter

16    -- alter 362.

17          I think the last issue that was raised by New York

18    was that they wanted to make sure that the claims were

19    subject to withdrawal of the reference, and I think we

20    addressed that -- this, but let me say what our position is.

21          We're not trying to take away anyone's rights

22    ultimately to seek to withdraw the reference, but we think

23    that we should at least prior to this issue being moved out

24    of this Court that we should at least have the time to do a

25    consensual ADR process, not invoking Your Honor's

Page 19

1   jurisdiction to actually try the matter, but to give us the

2   opportunity to resolve -- to resolve the matters

3   consensually.

4           THE COURT:  So you're okay with the notion that

5   before anybody tees anything up for me to decide on an issue

6   that by way of example might include a construction of both

7   the code and CERCLA, that at that point there would be an

8   opportunity for someone to move for a withdrawal of the

9   reference if that claimant thought it wanted to try?

10          MR. SMOLINSKY:  That's right, Your Honor, we can

11   make that clearer in the order.

12          The issue about pulling the plug was -- that's in

13   the procedures, because there are situations that could

14   occur when you're going down the process of trying to

15   mediate a claim and you know based on the discussions that

16   take place before the mediation starts that it's not going

17   to be a constructive process and you're not going to resolve

18   the claim, and the point is to not force the estate to spend

19   the $20,000 or so it costs to actually do a mediation if

20   it's not likely to result in any particular result and that

21   we should be going back to the Court before we move forward.

22          I can't imagine that with respect to environmental

23   claims of this nature, the ones that are represented in the

24   court here today, that we would find that the mediation

25   process is not productive once we commence it, but that's

Page 20

1    the purpose for that language, and I think that that's a

2    fair request to allow -- to force claimants to participate,

3    but to extent that they're not participating in a way that's

4    going to get to a result avoiding the estate's need to just

5    spend money indiscriminately, and that's the purpose.

6           With respect to the federal government.  The catch

7    all exclusion, the carve-out for the federal government had

8    been in there in previous orders and it was inadvertent that

9    we kept that carve-out in our papers.

10          As a matter of fact with respect to some of the

11   Onondaga sites New York and the federal government are both

12   involved, and to be able to mediate the issues in Onondaga

13   effectively we perhaps need the federal government there and

14   present.

15          We -- as soon as Mr. Jones reached out to us and

16   said, you know, what is our position, we told him that it

17   was our desire and intention to include the federal

18   government in the procedures, but I will say that the

19   federal government has been extremely cooperative with us,

20   not to say that other parties haven't, but we have resolved

21   substantial claims with the EPA since confirmation of the

22   case.  You've seen some of those settlements lodged with

23   Your Honor.

24          As a matter of fact one of the benefits of filing

25   this motion is we've resolved a number of additional claims,

 1    and you'll see other settlements being lodged shortly.

 2            I'll knock on wood, but I believe that as recent

 3    as yesterday I could say that I think we've resolved all of

 4    our issues with the federal government with respect to EPA

 5    issues.

 6            THE COURT:  Including those that would otherwise

 7    be subject to ADR under this motion?

 8            MR. SMOLINSKY:  That's right, Your Honor, all

 9    environmental claims.  And Mr. Jones can speak to that, and

10    obviously there may be some additional consents and there's

11    a procedure of lodging that has to take place, so we're

12    reluctant to pull them out of the ADR order because we'd

13    like to have that as a backstop in case anything happens,

14    but the likelihood of actually mediating with the federal

15    government is I believe remote at this point.

16            THE COURT:  I don't know if you're the best guy

17    for me to ask this or whether I should ask it of Mr. Jones

18    or both of you, but do you have a sense as to how long it

19    would take to know whether any requisite approvals could be

20    obtained?  At least in some government settlements the

21    government has to put it out to public comment and so forth,

22    and for lack of a better word we would know whether we need

23    to put the federal government into ADR or whether things

24    already in place will simply take their course.

25            MR. SMOLINSKY:  I think I'll let Mr. Jones or

Page 22

1    Ms. Leary answer that question from a regulatory

2    perspective.

3            I would say that it is not our goal to mediate

4    claims, just to make that very clear.  Our goal is to

5    resolve claims in advance of mediation and to use mediation

6    as a last resort to the extent that claims can't be settled.

7            I've told both Ms. Leary and Mr. Jones that we

8    want to give all these settlement discussions a good faith

9    chance, and in fact some of New York's issues have been

10   resolved and wrapped up in these agreements in principal.

11           And so I can commit to Your Honor that with

12   respect to the Onondaga site and the federal claims that we

13   will not designate those claims for mediation within the

14   next 30 days and that will allow time to let these deals

15   solidify and to get out for comment.

16           I can also assure Your Honor that to the extent

17   that there is a settlement that's been lodged and is out

18   there for comment, that we're not going to designate a claim

19   during that process, I think that would be ridiculous.

20           So again, I think that the protections are in

21   there based on those representations that the government is

22   not going to be dragged in a mediation that's unnecessary.

23           And with respect to New York State over the last

24   two weeks we've had several constructive conversations with

25   Ms. Leary.  I believe that we're speaking to her again

Page 23

1    tomorrow, and I'm hopeful that we can make real process over

2    the next 30 days on a number of the New York sites.  That's

3    our -- that's our goal.  The ADR process is not without

4    cost, but it's certainly cheaper than the costs of

5    litigation.

6            So looking down at the various objections I think

7    I've addressed our position on New York, Onondaga County,

8    Town of Salina, same thing, we talked about the multi-party

9    claims that Onondaga was concerned about not being able to

10   participate for the extent New York wanted them to.  United

11   Technologies also filed a joinder, but I think that's in the

12   same category as the 052(e)(10(b).  And I believe I

13   addressed your comments regarding pulling the plug, picking

14   the mediators, and the inclusion of the federal government.

15           THE COURT:  Okay, thank you.

16           I think I would like to next hear from Mr. Jones,

17   then Ms. Leary, Mr. Lindenman, and Mr. Carragher, if he

18   wishes to be heard in addition.

19           Go ahead, Mr. Jones.

20           MR. JONES:  Thank you, Your Honor, David Jones

21   from the U.S. Attorney's Office for the U.S.

22           As Mr. Smolinsky has said, we've made tremendous

23   progress resolving claims, and as our papers said we have

24   essentially two outstanding settlements we're working on,

25   both in the Onondaga area.  In fact just yesterday and today

Page 24

 1    we have achieved at least subject to approval a notice and

 2    comment agreement in principal on one, and we're either

 3    there or very close on the other.  We're going through some

 4    intergovernmental coordination and communication on our

 5    side, that is we want to talk to the county and we have been

 6    talking to the State, that's ongoing.

 7              So I think as a practical matter we -- I think

 8    it's very unlikely even if this motion were granted as to

 9    the federal government that we would end up in the mediation

10    posture, and for that reason I think, you know, my concerns

11    are somewhat certainly less -- apply with less force, but

12    they still exist as a principled matter.

13              So I want to make clear that -- first that the

14    government does -- the United States does favor mediation

15    processes where appropriate and we don't have a principled

16    objection to being asked to mediation claims where we think

17    that'll be productive, but in this instance it's simply the

18    case that we don't foresee a scenario where mediation will

19    be necessary or appropriate as to us, and we would rather

20    not cede the still unilateral power to the GUC Trust to push

21    us into that scenario.

22              I think realistically --

23              THE COURT:  Pause, please, Mr. Jones, because I

24    certainly under your perspective on that, but one thing that

25    had occurred to me -- and forgive me, I don't understand or

Page 25

1    know the break down of responsibility between governmental

2    enforcement on the federal side on the one hand and on the

3    state side on the other -- but success or fail your on your

4    end I would have thought would then bear on whether New

5    York's needs and concerns have been addressed, and when the

6    two of you guys, New York and the federal government, have

7    obtained satisfaction that could -- unless I'm corrected --

8    have 520(e) implications for PRP's.

9          Am I -- that's why I care about you guys being in

10   there or holding the flashlight in the forest for the other

11   guys.

12         MR. JONES:  Your Honor, you're right, I mean these

13   are -- first off we have -- our two claims involve the

14   Onondaga superfund site or site complex -- it's a

15   complicated area, and we do have overlap New York State.  On

16   one of the two we serve co-trustee with New York State for

17   natural resource damage purposes, on the other I believe

18   it's EPA lead, but on a site by site basis EPA and state

19   regulators will work out who plays the lead for what

20   remediation function at what site.

21         Here there are quite a number of New York sites at

22   issue in the bankruptcy that -- where there's no federal

23   role.  I -- the two deals or near deals that I see do

24   involve at least a degree of coordination with New York

25   State and we're going through that process, and we think

Page 26

1    very productively and will every reason to expect success.

2            I mean, and Your Honor mentioned the 502 issue of

3    other PRP's.  One consideration we always keep in mind in

4    negotiating is to -- is that these settlements are subject

5    to lodging of a proposed settlement, a public notice and

6    comment period, and then approval by the Court under the

7    environmental laws as has occurred several times, and of

8    course PRP's can come in and object and say that the

9    settlements are unfair or insufficient.

10            We take pains in negotiating to try to anticipate

11    any such possible objection and make sure that our

12    settlement either won't trigger such an objection or would

13    withstand such an objection, but of course if public

14    comments come in and we've got it wrong we can revisit that.

15            I think the way this will play out is that we

16    believe -- is just consistent with that.  We believe we are

17    presenting sound deals.  The notice and comment period will

18    either bear that out or won't, but if it doesn't, if a

19    problem arises -- I mean the negotiating process has been

20    very involved, we have had extensive technical discussions,

21    each side has their own technical consultants, the program

22    policy and policy people are all participating in the

23    process as well as counsel, and in the event that something

24    goes awry through other PRP's coming in or notice and

25    comment that same process can continue.  I don't -- I simply

Page 27

1    don't see what a mediator would add to the process.  I think

2    it just becomes another layer of procedural complexity,

3    time, expense for the estate, even if the government is now

4    being excused from bearing that mediator expense, for a

5    function that I think we simply don't need.

6            I mean I have a practical problem, Your Honor,

7    which is I'm a creature of what I'm authorized to say or

8    consent to, and I'm not authorized to consent to this

9    application.  I think I do want to acknowledge that

10   Mr. Smolinsky has defanged a lot of the procedural problems.

11   I think there are still issues with the sort of unilateral

12   triggering mechanism and the limitations on flow of

13   information that give us pause and we're not quite sure how

14   this would play out.  I mean the -- and the injunction that

15   would be triggered by invocation of mediation also could

16   become an impediment to resolving disputes, or I suppose

17   possibly to regulatory action, although I think

18   Mr. Smolinsky has accounted for that concern.

19           So I guess, you know, where I am, Your Honor, is I

20   -- our expectation is that this won't be a problem because

21   what Mr. Smolinsky has said will mean that we will simply

22   progress on the path we've been and get deals done and be

23   out without ever triggering this, but to me that factor is

24   in favor of, you know, carving out or exempting the U.S.

25   given the progress that's been made and given the lack of

Page 28

1    need at least for a certain amount of time.

2            We have no problem with MLC, you know, coming back

3    and proposing mediation and we might consent to mediation if

4    we each agree that it would be appropriate at a future time.

5    We're just not there yet and may never be.

6            THE COURT:  Before you sit down, Mr. Jones.  One

7    of your concerns is on -- on what you described as limits

8    and flow of information not just in monster cases like this

9    one, but in practically every case on my watch where I've

10   thought that ADR might be constructive.  I've taken a hybrid

11   approach.

12           History has taught me, experience has taught me

13   that you can't mediate effectively without some exchange of

14   information, but that the whole idea of mediation is to

15   avoid running up what I believe, and I think many believe,

16   is a very expensive discovery process because our discovery

17   rules by their nature are very expensive for parties.

18   That's why the Supreme Court has told us that we're supposed

19   to blow away complaints at the 12(b)(6) level so people

20   don't have to participate in discovery.

21           I would like to find that sweet spot to provide

22   for the necessary exchange of information without getting

23   into full-blown discovery.  How do you think I should do

24   that?

25           MR. JONES:  Your Honor, this is just one person's

Page 29

1    view, and you know, I haven't vetted any particular

2    position, but the thing that fundamentally troubled me was

3    that there's an obligation put on claimants to put forth

4    their justification of their position and there's no

5    reciprocal obligation put onto the GUC Trust to put forth

6    its substantiation for its position as to what the valuation

7    should be.

8            So at a minimum I would think simply a reciprocal

9    exchange instead of a one-way exchange would be appropriate.

10           I will say -- and I think Your Honor's question

11   goes to sort of general operation of the procedures in large

12   part -- I will say that as to us there's been extremely

13   extensive exchange of information and views and technical

14   meetings amongst consultants on each side, so you know, I

15   don't know that my concern is elusory as it applies to us,

16   but I think there has been substantial exchange of

17   information.

18           So I don't want to claim that they're playing hide

19   the ball, but just as a structural matter it seems to me

20   that providing for some form of streamlined exchange of

21   information that flows both ways is better than simply

22   putting a burden on the claimant to cough up information and

23   then be thrown into mediation where they don't know what the

24   GUC Trust is sitting on -- what information the GUC Trust is

25   sitting on.

Page 30

1                   THE COURT:  Okay, thank you.

2                   MR. JONES:  Thank you.

3                   THE COURT:  Ms. Leary?

4                   MS. LEARY:  Thank you, Your Honor.  Maureen Leary

5        for the State of New York and the Department of

6        Environmental Conservation.

7                   I -- New York wants this to work, that's the first

8        thing I want to say, and it's important that it work if we

9        have to do it and the expense has to be incurred.

10                  The thing I like about it is there is a

11       preliminary process.  The problem with the preliminary

12       process is what Mr. Jones was just eluding to, that exchange

13       of information.

14                  Why is that important?  Unlike Mr. Jones'

15       representation I can represent to you that there has not

16       been the same type of exchange of information between New

17       York and MLC or New York and the GUC Trust now.  This hasn't

18       happened.  Whether that's a product of being too busy or

19       whatever it is.

20                  The reason it's important is -- and the problem

21       with the procedures is they fail to recognize what I think

22       the rules give a claimant, which under 3001(f) is quote, "A

23       proof of claim executed and filed in accordance with these

24       rules shall constitute, quote, prima facie evidence of the

25       validity and amount of the claim."

Page 31

1          If the process starts with the onerous -- well,

2     articulated burden on the claimant, which is my view New

3     York has already met because our proofs of claim are

4     substantial, and there's no subsequent requirement for a

5     substantiation of the other side's position this isn't going

6     to work.  It's not fair.  And I'm not even going to get to

7     the pull the plug.  I don't want to pull the plug on that, I

8     don't want that right, but I don't want the GUC Trust to

9     have it unilateral did I.

10          I think when you're in mediation it's tough, gets

11     hot in this kitchen, and that's why you stay, that's when

12     things start to happen.

13          So I went through the order this morning,

14     Your Honor, and I very much appreciate Mr. Smolinsky's good

15     faith in trying to get us to the point of, you know, having

16     all of our concerns addressed.  We're not quite at that

17     point.

18          Shares of the costs definitely went fairly far.

19          The agreement to in good faith consider a mediator

20     beyond those listed is not quite far enough.  We need some

21     additional choices on that panel that I proposed from the

22     United States Institute for Environmental Conflict

23     Resolution which has a particular section that has many

24     members in New York that's just devoted to environmental

25     issues -- mediating environmental issues.

1          THE COURT:  Does it have a list of people --

2          MS. LEARY:  Yes.

3          THE COURT:  -- who both are available to serve and

4     who you suspect would have the requisite qualifications?

5          MS. LEARY:  I actually have not gotten that far,

6     there was only one name that I recognized on this list, and

7     I can conditionally assert that they probably have the

8     requisite experience, but one of the mediators -- and I --

9     we concede this in our papers -- one of the group has one

10    case that would appear to us to also have the requisite.

11         So we're not tossing out some of the proposals on

12    the other side, we're just asking for more choices.

13         The other areas that I don't think are resolved I

14    think involve things like the process for withdrawal of the

15    reference.  I think Mr. Smolinsky answered that question

16    well in terms of what should happen, whether that's actually

17    in the procedures however is a different issue.  I do not

18    think it is.

19         I went through the order this morning and black

20    lined it myself with language that I thought would be both

21    equitable to both sides and not allow either party frankly

22    to just pull the plug at any moment and either go enforce

23    police and regulatory authority and come back here and

24    object to the claim.  If it's going to work you want to have

25    those options after you've given a good faith effort to the

Page 33

1    process.

2              So the other issues that I don't think are

3    resolved and I think there is a hardship on the location of

4    the mediator for the remaining sites.  These -- the

5    remaining sites that I think may be subject to this, there

6    are only three or four of them, and they're -- with the

7    exception of one -- they're in Buffalo.

8              THE COURT:  Well, help me on this.  The site isn't

9    going to negotiate.

10             MS. LEARY:  Correct, but the witnesses are there.

11             THE COURT:  Well, the question it would seem to me

12   would be whether I should be focusing on the location of the

13   negotiators, whether -- since I haven't heard anybody say

14   that there would be a mini-trial I'm not sure whether or not

15   the location of witnesses make a difference -- and since I'm

16   not sure whether anybody would be making field inspections

17   at the premise I'm not sure if proximity to the premise

18   makes a difference or not.  Can you help me on those things?

19             MS. LEARY:  What I thought about was I envisioned,

20   you know -- obviously we have some in the state, some

21   financial -- fiscal constraints -- and I envisioned

22   availability of witnesses within the agency in the regional

23   level as probably the most important thing to be available

24   to the mediator, someone who had the familiarity with the

25   contamination who'd been the project manager or coordinator

Page 34

1    on behalf of the agency who had worked with GM during the

2    process of establishing nature and extent of contamination.

3    That would be an important person I think for the mediator

4    to hear from, and for that person from Buffalo to come to

5    New York, well, they just wouldn't be able to do it.

6         So that -- and maybe we could do it by affidavit

7    or otherwise, again, trying to streamline that process.  All

8    of the documents are in Buffalo.  Your Honor, I'm going to

9    Buffalo to try to get those documents, but -- and I'm not

10   suggesting Buffalo is the only place -- but I think New York

11   City can't be the only place, I think there has to be some

12   greater flexibility to talk with the mediator and the GUC

13   Trust about what makes sense.  What issues have we honed

14   down into and what do we need?  Do we need an agency expert

15   that's not on a regional level but is in a central office

16   location in Albany to talk about what all these kinds of

17   sites cost when you're talking about, for example, a pump

18   and treat system for a ground water contamination problem?

19   Who's the best person to talk about that?  So that type of

20   flexibility is not really in the procedures order.

21        And I appreciate Mr. Smolinsky's concern that we

22   don't want to devolve into months and months of talking

23   about location or the mediator or whatever, but that

24   flexibility seems to be something that would be important in

25   order to make it work.

Page 35

1                THE COURT:  Are you old enough to remember all

2       those arguments in the Paris peace talks during the Vietnam

3       War about the shape of the table?

4                MS. LEARY:  No, I should.

5                THE COURT:  I'm glad to see you're not, but

6       unfortunately I am.  I'm concerned about that.  I want to

7       get you guys to work.

8                MS. LEARY:  Yes.  We want to work, we've been

9       working, but I don't have confidence -- I don't -- as you --

10      Your Honor put your finger on it, I don't have confidence

11      that this isn't just another step and we're going to end up

12      here in a claims objection and then withdrawal the reference

13      and have the GUC Trust really incur some costs.

14               If it's going to be meaningful and it's going to

15      work it really can't look like this, it has to look like

16      both sides are in good faith exchanging information and

17      sitting down at the table without the back door being open.

18      Both parties have the same rights, responsibilities, and

19      obligations and options.  That's what New York is looking --

20      and any party to a mediation is looking for that.  I think

21      we can get there, but again, the devil is in the details.

22               And I went through this order, I'd really like to

23      go through it with Mr. Smolinsky if I thought that that

24      would result quickly in a resolution.  I don't know that it

25      will.  I'm happy to give it a try with Mr. Smolinsky, but

Page 36

1    the one thing we need is information from the GUC Trust

2    about why our number is wrong.

3            I have an affidavit attached to every single proof

4    of claim.  Business documents, documenting costs, remedial

5    investigations, feasibility, all kinds of technical

6    information.  Why isn't our number correct?  Tell me before

7    we start this whole thing.  Why?  And that's the one thing

8    on several of these sites that I don't have.  I've never had

9    it.  On Onondaga we did have it, and that was a concerted

10   effort, it was a very, very big site and we did a pretty

11   good job there exchanging information.  I will say we gave

12   more information than they did, but that's okay, it's -- we

13   hope that it's resolved.

14           That's the -- that's probably the most important

15   thing in this whole process, Your Honor, that hey, I can

16   tell my client they're wrong, just tell me why you think

17   they are wrong, because I think they're right.  That's what

18   I -- that sort of back and forth is very important in the

19   order.  And clarity.

20           If there is -- incidentally, Your Honor, if there

21   is some deference to 362(b)(4), the automatic stay exemption

22   that the governmental entities are entitled to, and believe

23   me we're not looking to exercise this, that really needs to

24   be in your order in the case there's some explosion out at

25   one of these sites and we really have to do something.  We

Page 37

1    can't be tied up with an injunction.  I don't even think it

2    should be called an injunction, it should be an ADR stay

3    that the parties say we're going to -- we are going stay.

4           THE COURT:  I'm losing you on this, Ms. Leary,

5    because I thought their injunction dealt with pushing the

6    claim for monetary allowance.  I thought GM had taken the

7    position or had represented to me that GM doesn't operate

8    any of the stuff anymore.

9           If something that GM still holds even though it

10   doesn't operate it starts belching stuff into the

11   environment and you wanted to enjoin the belching or take

12   immediate curative action that would be closer to what I

13   would think that your 362(b)(3) rights would allow you to

14   do, but I don't see how collecting on a monetary claim

15   relates to that.

16          MS. LEARY:  I think that's right, Your Honor, I

17   think -- but I read the injunction in a far broader way, and

18   maybe I shouldn't have, maybe it is a wordsmithing solution

19   there.  I did not -- I think I remember seeing the word

20   "any," but if the intention is that New York will be able to

21   operate in another realm in two ways.

22          THE COURT:  And a regulatory realm is contrasted

23   to a claimant realm.

24          MS. LEARY:  No, let me make this distinction.

25   Under 362(b)94) and the Second Circuit's rule in City of New

1       York versus Exxon.

2               THE COURT:  But you said (b)(4).  Did they change

3       the numbering?  Am I -- again --

4               MS. LEARY:  I'm pretty sure it's (b)(4), but I --

5               THE COURT:  We're talking about the police powers

6       exception under the automatic stay?

7               MS. LEARY:  Yes.  Would you excuse me so I can get

8       my code, Your Honor?

9               THE COURT:  You bet.

10          (Pause)

11              THE COURT:  Well, you don't need to get your book,

12      you're absolutely right that it's (b)(4), and that somehow

13      there's as (b)(3) in there, and maybe it got renumbered or

14      maybe --

15              MS. LEARY:  I think it did, Your Honor.

16              THE COURT:  -- I just got it wrong.  But in any

17      event we're talking about the same thing.

18              MS. LEARY:  We are, but we're talking about it in

19      two different ways, and I want to make this distinction.

20      Simply because the GUC Trust or MLC or GM doesn't own a site

21      anymore is not the determinative factor about whether we can

22      exercise police and regulatory authority as to them -- as to

23      the GUC Trust, MLC, GM.

24              The first situation that we were just discussing

25      is there's an explosion, we need to act against someone else

Page 39

1    and we can go and do that.  I read the language in this

2    procedures to potentially reach that situation, and I could

3    be wrong.

4            There's a second situation which we are also in

5    this circuit exempted from the automatic stay in pursuing,

6    and that is even if we are pursuing a cost recovery action

7    under CERCLA.  It's all about money.  It's all about these

8    sites.  It's exactly what these sites are about.  Cost

9    recovery for environmental remediation.  We are exempted

10   from the automatic stay from commencing or continuing an

11   action to liquidate, not levy or otherwise affect other

12   creditors, but we can liquidate that claim in any forum that

13   has appropriate jurisdiction outside of the Bankruptcy

14   Court, and that's city of New York versus Exxon.

15           And it's --

16           THE COURT:  What did you say after bankruptcy

17   court?

18           MS. LEARY:  -- I think it's a -- pardon?

19           THE COURT:  What did you say after bankruptcy?

20           MS. LEARY:  I think I cited the name of the case.

21           THE COURT:  Which is?

22           MS. LEARY:  City of New York versus Exxon, and in

23   that case it's a CERCLA cost recovery case.  A bankrupt

24   entity asserted that the City of New York could not seek --

25   it might have been the State of New York -- could not seek

Page 40

1    cost recovery, it was barred by the automatic stay because

2    it involved financial issues of a bankrupt entity, and the

3    Second Circuit rejected that and said, no, CERCLA's remedial

4    processes are classically what 362(b)(4) is addressed at.

5           Now while the government -- and I'm now speaking,

6    not the case -- the government cannot say, okay, now give me

7    that money, it can still liquidate its claim.  So that's why

8    it's important to New York in terms of withdrawal of the

9    reference.

10          And frankly, Your Honor, there's nowhere I'd

11   rather be than in this courtroom liquidating my claim.  I

12   just think that's the most efficient way to do this.

13          Going through the withdrawal of the reference, and

14   I could eat my words on this, but I'm being frank with you,

15   I'm not looking to withdraw the reference, but I can't have

16   an order or a procedures prevent me from making those

17   decisions at a later time when facts may warrant me doing

18   that very thing.

19          And Your Honor, you may -- you're leaving in 2014

20   or was that just when your term is up?  You --

21          THE COURT:  My term ends in 2014.

22          MS. LEARY:  Okay.

23          THE COURT:  I've taken no position on what I'm

24   doing in 2014 other than the fact that I don't want matters

25   festering until 2014.

Page 41

1          MS. LEARY:  I'm just kidding, Your Honor, I'm -- I

2     think that it's important for New York to protect its rights

3     under the procedures.

4          THE COURT:  I think the circuit always has the

5     right to decide whether or not they think I'm qualified to

6     be renominated.

7          Go on, please.  I don't expect you to respond to

8     that.

9          MS. LEARY:  But you know, Your Honor, you should

10    definitely serve beyond 2014.  So -- and I -- there's

11    probably no one that I know that would say otherwise.

12         So Your Honor, might I propose to Mr. Smolinsky, I

13    mean I'm willing to give this some time if he wants to talk

14    about what our concerns are.  I think it may be more

15    efficient for New York to present you with an order that,

16    you know, we feel is addressing our concerns and yet keeping

17    both party's feet to the fire to make this work, but I think

18    I'd like to offer Mr. Smolinsky the opportunity to, you

19    know, talk about some or our continuing concerns.  And I do

20    think that they can be addressed from a crafting standpoint

21    in the procedures order.

22         If Mr. Smolinsky wants to on behalf of the GUC

23    Trust require New York to provide information we don't have

24    a problem with that, but we want that same ability.  If you

25    want us to substantiate our position I don't have a problem

Page 42

1    with that, we want the GUC Trust to substantiate its

2    position; sort of that equal footing kind of thing, and

3    that's what my revisions on the procedures were all about

4    this morning when I was attempting to see how we could

5    present something to Your Honor to sign.

6            THE COURT:  Okay, thanks very much.

7            MS. LEARY:  Thank you.

8            THE COURT:  Mr. Lindenman.

9            MR. LINDENMAN:  Your Honor, going third makes it

10   easier for me to be briefer.

11           Let me just address the more colorful concern you

12   have with regard to the Vietnam peace talks here.

13           I think unlike the peace talks everyone sitting at

14   the table has a vested interest in making sure it works.  I

15   think everyone is very concerned about the costs involved of

16   mediation or any claims resolution, and to waste time

17   deciding on the size of the table and the shape of the table

18   is in no one's best interest.

19           Speaking for the town enormous amounts of money

20   have been spent and will be spent with regard to the claims

21   that we have, and the less that we want to do is have an

22   extended fight over an mediator.

23           But I think as the State says, it is necessary

24   that it not be one sided.  I don't want to waste time

25   picking a mediator, I want to find a mediator and move

Page 43

1    forward.  You know, just one of the two mediators that the

2    trust had offered.  I'm sure the man is immensely qualified,

3    but his qualifications if I recall correctly had to do with

4    nuclear accidents, and maybe he's overqualified, maybe it's

5    just totally unrelated, I don't know, but I don't have the

6    information necessary to determine whether that mediator or

7    another mediator or any other mediator is qualified.

8            There's a reason that mediators typically are

9    chosen by the parties, so the parties agree and the parties

10   have as Your Honor says, confidence in the process.  And I

11   think if the trust is the one choosing the mediator it has

12   the potential to leave any other participant with well, you

13   know, there's some sense of unfairness.

14           I think it's in the party's interest to make this

15   work, and unlike in the peace talks there isn't a judge

16   looking over everyone's shoulder that if it doesn't work out

17   someone is going to have to answer your Honor's questions as

18   to why it didn't work out, and I don't think anyone wants to

19   come back now, in 2014, or any other time to answer your

20   question as to why it took this long or why the costs were

21   more than they should have been just to select a mediator

22   let along the process.

23           So I think that while I understand the concern not

24   having the ability to select the mediator should not be

25   outweighed by moving it forward as quickly and efficiently

Page 44

1    as possible in terms of cost.

2         THE COURT:  Pause, please, Mr. Lindenman.

3         As if I were inclined to say that folks other than

4    the GUC Trust should have the right to nominate mediators or

5    as a possible variant of that designee commonly respected

6    mediation lists from which the mediator would be chosen,

7    could that be done quickly enough so that it wouldn't put us

8    in a Paris peace talks mode?

9         MR. LINDENMAN:  I have to think, Your Honor, that

10   because it's in everyone's interest to move this along, it's

11   been a long time already, that the cost of going back and

12   forth, even -- literally even just attorney costs, dollars

13   spent on the phone and looking and reviewing is wasting time

14   and it's wasting money.

15        I think that there are enough -- as Ms. Leary said

16   -- there are enough experts out there and an access to

17   enough information that the parties should be able to do

18   this quickly.  Again, it's the incentive to do it that

19   matters.

20        THE COURT:  And help me get a better sense of what

21   you mean by quickly.  Are we talking about a week, two

22   weeks, three weeks?  I would hope it would be less than

23   anyone of those.

24        MR. LINDENMAN:  Not having undertaken the review

25   and the research into it I can't speak to it, but I have to

Page 45

1     think that there is enough information to do it quickly.  I

2     just -- I don't feel comfortable being able to put a

3     particular time frame on it, but I don't think it's

4     something that Your Honor would consider to be an

5     unreasonable amount of time.  We want to move it forward.  I

6     just -- it would be remiss of me to suggest that we could do

7     it in a week or in two weeks.  I just don't have the

8     information in front of me to know that.  But I just know

9     the incentive just has to be there for all of the parties to

10    do it quickly.  And if we can't resolve through discussions

11    and settlement and what have you that we have an ability to

12    move quickly.  It's sitting there.

13              You know, with regard to the town, you know, the

14    work needs to be performed, it needs to be taken care of,

15    and every day that this process goes on longer there's more

16    expense for my client, there's more expense for the town --

17    for the County, there's more expense for the trust.  There

18    just is a limited pool of resources here and it makes no

19    sense to further delay.

20              Which does add to the concern that Ms. Leary

21    raised is, you know, this has to work because I don't want

22    to come back to the Court and the say, well, you know, we

23    tried but it didn't really work, the mediation process or

24    the settlement discussions that took place before that

25    because then we're wasting more time and we're wasting more

Page 46

1    money.

2            The cost compromise that Mr. Smolinsky raised

3    certainly is important to us.  We also had the impression

4    that New York State would be excepted from that, but not the

5    town or the county.  So knowing that we're part of the

6    process and we won't have to endure those costs is a big

7    important issue for the -- for the town.

8            The issue of discovery is also vitally important

9    to the town.  We have provided similar to the State, you

10   know, enormous reams of paper with regard to our claims.

11   The claims have never been objected to, they're never been

12   addressed by the debtor or the trust, it just has been

13   there.  And as Ms. Leary said, tell me why it's wrong?

14   We've asked, you know, during the course of settlement

15   discussions without going into specific details about

16   numbers or what have you, they said, all right, we'll offer

17   you X dollars.  I said, well, why?  You know, someone came

18   up with that number, what's the background for it?  We've

19   provided you with information and documents and so on, tell

20   me why your number is right and we're wrong?  And we haven't

21   received anything.  And if this is what's going to happen in

22   the ADR process then we're wasting our time.

23           We need to know the basis for their settlement

24   offer for instance because maybe it does make sense, maybe

25   it's not worth spending even a dime on ADR and we'll just

Page 47

1   take the offer, but we don't know, and we have to be assured

2   that we're getting information pursuant to settlement

3   discussions and then going forward as part of the mediation

4   process, otherwise we can't know where we're missing the

5   boat here on our claim, and maybe there is some area where

6   we can compromise, and maybe there is something that we can

7   deal with during the course of mediation or preferably not

8   even get to the mediation.

9           I believe, Your Honor, that all of the other

10  issues either were resolved by Mr. Smolinsky or have already

11  been discussed by Mr. Jones or Ms. Leary, and along with

12  what I've just discussed I believe that addresses all of the

13  concerns that the town has.

14          THE COURT:  Okay.

15          MR. LINDENMAN:  Thank you.

16          THE COURT:  Thank you.  Mr. Carragher, would you

17  like to weigh in on this?

18          MR. CARRAGHER:  Your Honor, this is Dan Carragher

19  on behalf of United Technologies.

20          Your Honor, you addressed concerns raised by the

21  State of New York, which is undertaking the clean up then I

22  don't have anything else to add to this discussion.

23          THE COURT:  Very well.  Thank you.

24          MR. CARRAGHER:  Thank you.

25          THE COURT:  Mr. Smolinsky, reply?

1          MR. SMOLINSKY:  Jeff Smolinsky, Your Honor.

2          We've had over 70,000 claims filed in this -- in

3     this case.  We have about 1300 left, albeit perhaps some of

4     the most difficult once.  We've resolved over 30,000 --

5     reconciled over 30,000 claims since confirmation.

6          In terms of sharing information to get to the

7     resolution of these claims in a case of this size with these

8     number of claims there has to be a sharing of information.

9          I think Mr. Jones is right in terms of sharing

10    information, I think Ms. Leary is right about Rule 3001, and

11    what 3001 says is that initially the claimant has the burden

12    of proof to come in and demonstrate why the calculation of

13    damages is correct.  That's what we're seeking.  This

14    provision was not meant for Ms. Leary, this provision was

15    meant for a patent claimant perhaps who hasn't demonstrated

16    how their $100 million claim was calculated.

17         Ms. Leary did put in declarations with her proof

18    of claim, and what's interesting about that, this is not a

19    level playing field in a typical litigation where you have

20    both parties who can either share information or not, our

21    goal is to resolve claims.  So once the claimant puts

22    forward the information by declaration or otherwise which

23    shows how the claims were calculated, how the costs were

24    incurred, how the costs are going to be incurred then the

25    burden shifts to us, and we know that if we go into court

Page 49

1    either here or in some other forum we're going to have to

2    dispute those claims, and the burden is going to be on us to

3    prove that their numbers are not correct.

4            So the notion that we're going to prepare for

5    mediation, we're go to do all the mediation statements that

6    we have to do as part of this process and not put forward

7    why it is that their calculations are incorrect would just

8    lead to a failed mediation, and that's not what we're here

9    to do.

10           Our goal once they give us the information is to

11   push back and demonstrate why those numbers are too high or

12   inaccurate with every bit of information that we have at our

13   ready.  Because we know that if we don't settle that claim

14   in mediation it's going to go to a court where it's going to

15   be our burden to prove that those numbers are not correct.

16   So we're going to have that burden any way.

17           And that's the good thing about a mediation.  If

18   you can't settle it otherwise you have to actually sit down

19   with a mediator and look them in the eye and explain to them

20   why your position is correct.  And if you don't explain why

21   your position is correct that mediator is going to look back

22   at you and say, I don't understand.  I don't understand why

23   their numbers are -- shouldn't be taken as valid.

24           So that's the explanation for why it's crafted in

25   such a way.  We didn't want to hold up mediations by virtue

Page 50

1    of obligations to deliver things that haven't been created

2    yet or are incomplete.

3           As Your Honor noticed this is not about doing all

4    the discovery and then going into mediation like it may be

5    in another litigation, this is about them sharing the

6    calculation of damages and us responding with whatever

7    information that we have.  And frankly, if we don't have any

8    information that would support a lower number we're going to

9    assume that the Court is going to find the same way.

10          In terms of the mediators and the location of the

11   mediators let me put on a -- let me just lay out a proposal.

12   I will not take up Ms. Leary's offer to draft the order, but

13   I will commit to working over the next week -- let's say

14   through next Friday to work with Ms. Leary and others to

15   refine the language in such a way that it's acceptable and

16   we can settle an order after next week if there are still

17   issues that remain outstanding.

18          To the extent that Ms. Leary or anybody else wants

19   to propose mediators during that week we can consider adding

20   that to the mediator's panel as part of the order.

21          I will say that -- that if the mediator proposals

22   are going to be mediators in Albany that derive 75 percent

23   of their income from working with the state governments that

24   those things are not going to be acceptable to us because

25   that would -- that would create a situation where there

Page 51

1    might be perceived by us which would affect the mediation,

2    but otherwise I see for reason other than expense as to why

3    a suggested mediator would not be acceptable if they're

4    knowledgeable and otherwise unconnected to either party.

5            With respect to the pulling the plug, and it

6    harkens back to the days of confirmation where frankly I

7    still don't understand some of Ms. Leary's arguments at the

8    confirmation hearing about why claims reconciliation was not

9    subject to the jurisdiction of this Court, but I think she

10   answered the question on pulling the plug.

11           To the extent that -- that she believes that the

12   State can at any time decide to liquidate the claim in some

13   other court then it should be fair game with respect to our

14   pulling of the plug.

15           I am prepared in the case of the Onondaga sites to

16   commit that to the extent that we commence mediation that

17   neither party would have the right to terminate that

18   mediation until we complete that mediation.  I'm happy to

19   commit to that because I know that in that -- with respect

20   to that site we have no alternative other than some

21   expensive litigation.

22           THE COURT:  Pause, please.

23           One thing that I'm toying with, and it's still

24   jump ball and I'm always reluctant to talk about musings, is

25   to require each side to participate in the mediation for a

1    minimum amount of time to see if you can make it work or not

2    after which both sides would have parallel or congruent

3    rights to thereby say it's hopeless.

4            In the context of the mediations that you've had,

5    which are in a different area or based on your sense of

6    what's going to happen here, do you think there would be a

7    time for which such a concept would be practical?  And if

8    so, like what kind of time are we talking about?  Like say

9    three weeks or five weeks or six weeks or whatever to see if

10   you could make it work after which I would then have equal

11   rights on either side to say it ain't gonna (sic) to work,

12   we want to go back into the litigation room.

13           MR. SMOLINSKY:  The problem with scheduling,

14   Your Honor, and coming up with a firm deadline like that is

15   that things happen outside of our control.

16           One of the reasons why the first New York

17   settlement stip was not approved timely was that

18   unfortunately Ms. Leary's father passed away in the summer,

19   and so there are things that happen that if you agree to a

20   tight time frame you may not be able -- you're going to

21   actually impair the mediation process by allowing someone to

22   pull -- pull the rip cord prematurely.

23           I don't know if a time factor is the right

24   approach.

25           THE COURT:  Suppose it were modified to be a

1    conceptual thing where each side would have a prima facie

2    parallel obligation to continue, each side would have the

3    same right to terminate, and if there were circumstances of

4    the type you talked about either side could arrange for a

5    conference call with me to say we should do it sooner or

6    later?

7                    MR. SMOLINSKY:  I think I would prefer that,

8    Your Honor.  So in other words with respect to the New York

9    State mediations -- ADR process I should say, to the extent

10    that either party feels bereaved by the process that we can

11    arrange for a chamber's conference for effectively authority

12    to terminate the injunction and allow other proceedings.  I

13    think that would be fine.

14                    I'm reluctant to include it with respect to

15    Onondaga County and Salina because we do have tight time

16    frames, we want to close out the environmental category of

17    claims, and to the extent that the claim is otherwise

18    subject to disallowance under 502(e)(1)(b) I think we should

19    have the right, even though they're participating in the

20    mediation but it hasn't been designated by us for mediation,

21    but they've been invited by New York State, that that

22    shouldn't bar our ability to go forward with a claim

23    objection.

24                    THE COURT:  Of course that is complicated by the

25    fact that I -- as I mentioned in one of my questions -- I

1    don't remember whether it was to Mr. Jones or Ms. Leary --

2    once the environmental regulator makes progress either by

3    agreement or by the litigation process and the environmental

4    regulator's claims are addressed in some satisfactory

5    fashion, that has a significant effect on what 502(e) rights

6    are.  Because if you write out a check to the government

7    that affects what the PRP's rights are and will -- and if

8    the PRP decides to write out a check and pays on the check

9    -- unless you disagreed with my ruling on Lyondell Chemtura

10   -- to the extent that the PRP has written out a check that

11   becomes an allowed claim and no longer contingent.

12          MR. SMOLINSKY:  And that's exactly the reason why

13   we would want to be able to file our 502(e)(1)(b)

14   objections, we wouldn't want to be barred.  Because if for

15   example there's mediation that resolves not only our

16   obligation but also the Town of Salina, Salina could write a

17   check that day and it would all of a sudden become a real

18   obligation that has to be allowed.

19          THE COURT:  Yes, sir, but conversely the amount of

20   the check that Salina writes out could be influenced by the

21   amount of the check you're writing out to New York State or

22   the EPA.

23          MR. SMOLINSKY:  It could be.  I don't -- I'm not

24   looking for an advisory opinion, but if you read the

25   Chemtura decision carefully I don't believe that it ever

Page 55

1    says that allowance of the regulator's claim is a

2    precondition to disallowing a claim under 502(e)(1)(b).  I'm

3    not sure that I ever says that there actually has to be a

4    claim filed by the regulator in order for that claim to be

5    disallowed if it otherwise meets the requirement of

6    502(e)(1)(b), that it's a co-liability and it's contingent.

7            But so I don't know that -- I don't think that

8    there's any bar to making us wait to object to those claims

9    until such time as the New York claim is resolved.

10           THE COURT:  Uh-huh.  Go on.

11           MR. SMOLINSKY:  But perhaps we can work out with

12   Ms. Leary the language that would insure that we won't pull

13   the plug and they won't pull the plug, because I don't think

14   that there's any need to, and certainly we wouldn't want a

15   situation where they exercise rights under CERCLA during a

16   mediation.  So maybe we can work out some language on that.

17           THE COURT:  Okay.  Continue, please.

18      (Pause)

19           MR. SMOLINSKY:  I think that's all I had,

20   Your Honor.

21           I think that we've made some productive

22   concessions prior to and at this hearing.  It's -- I think

23   Your Honor may want to rule on some of the matters, but we'd

24   be prepared to work over the next week to try to get to a

25   consensual order.

1          THE COURT:  Well, my mind -- and I'll give you

2     guys once last chance to be heard -- is to rule on concepts

3     and then to ask you guys to try to draft a consensual order

4     consistent with the concepts that fleshes them out in a way

5     that best meets both sides needs and concerns.

6          Given that risk or possibility do you want to say

7     anything more before I give the same offer to your

8     opponents?

9          MR. SMOLINSKY:  No, Your Honor.

10         THE COURT:  Okay.  Does anybody want to be heard

11    on whether they're troubled by that concept?  Apparently

12    not.

13         Oh, Ms. Leary, I spoke too soon.

14         MS. LEARY:  Your Honor, I just wanted to present a

15    point of clarification on the strategy that was just

16    articulated by Mr. Smolinsky on --

17         THE COURT:  Come to the main mic if you would,

18    please, Ms. Leary.

19         MS. LEARY:  Having this information I didn't want

20    to, you know, deprive either you or Mr. Smolinsky of it, but

21    the Town of Salina has already written a check.  I mean they

22    are operating as a regulator in the Town of Salina landfill

23    context under a State assistance contract.

24         So that there's a complication to the strategy

25    that I think in terms of Chemtura and Lyondell I did not

Page 57

1    want the Court to think that they were just another 502(e);

2    they're not.  So --

3              THE COURT:  Well, to the extent that Salina wrote

4    out a check to either you or the EPA or to remedial

5    contractors, I would have thought that under Chemtura

6    Lyondell if they showed the canceled check that makes those

7    502(e) issues go away, but I'll give people reservations of

8    rights if I'm mistaken on that.

9              MS. LEARY:  That -- I just wanted to clarify it

10   for the Court, that's all.  It just -- there seems to be a

11   misinterpretation of their role as potentially a co-liable

12   party and the State does not view them as such.

13             THE COURT:  I guess the question I had, and if

14   this is so then I welcome your clarification, is I thought

15   they had possible future checks to write out in the future.

16             MS. LEARY:  That is true.

17             THE COURT:  And that raises 502(e) issues.

18             MS. LEARY:  That -- that is true, but I believe

19   under the contract the dollars are -- it's either 90/10

20   State Salina or 75/25.

21             UNIDENTIFIED SPEAKER:  75/25.

22             MS. LEARY:  72/25.  So the majority of the dollars

23   are State dollars.

24             THE COURT:  Uh-huh.  Okay.

25             MS. LEARY:  So I just wanted to clarify that.

Page 58

1            And I -- I actually was not clear on your question

2     about the conceptual --

3            THE COURT:  I'm going to rule on concepts.

4            MS. LEARY:  I'm okay with that, Your Honor.

5            THE COURT:  And then I'm going to want an order

6     consistent with my concepts.  I do recognize that sometimes

7     the devil is in the details and my concepts may not get us

8     across the goal line, but after you sit down -- assuming

9     nobody else wants to be heard -- I'm going to tell you my

10    rulings on the concepts.

11           MS. LEARY:  Thank you, Your Honor.

12           THE COURT:  Okay.

13           Mr. Smolinsky?

14           MR. SMOLINSKY:  Just one quick thought on the

15    Salina comment that was just made.  Obviously a precondition

16    is also that you have to be co-liable, which means that the

17    amounts that Salina is incurring has to overlap with

18    obligations that we would otherwise have.  The Onondaga site

19    is very complex and there could be different

20    responsibilities with respect to different sites.

21           THE COURT:  And you're not looking for me to rule

22    on that today, but you'd like a reservation of rights on

23    that issue.

24           MR. SMOLINSKY:  That's correct, Your Honor, and

25    that's exactly -- the issue of the 502(e)(1)(b) continuing

Page 59

1    to potentially increase is the reason why we -- exactly why

2    we need this ADR process in place, because every day that we

3    don't resolve these environmental claims leads to potential

4    additional exposure for the estate, and I think that was a

5    great ending comment, because it shows the importance of

6    this process.

7                THE COURT:  Fair enough.

8                All right, everybody sit in place for a minute.

9           (Pause)

10               THE COURT:  All right, folks, the underlying

11   concept of course that the ADR process is in everybody's

12   interest is recognized by all, and the motion as a whole is

13   granted in concept with my only rulings being my nuances,

14   vis-à-vis, it's execution to deal with the limited

15   objections that were filed.  And for the avoidance of doubt

16   it's granted vis-à-vis the non-objectors, and we're talking

17   only about what one might call tweaks or nuances, vis-à-vis,

18   the execution of the motion.

19               I've identified and I'm going to permit you all to

20   identify any issues that I've overlooked, are nine areas

21   where there are differences in perception as to the

22   execution, and I'm going deal with those pretty much in the

23   order in which I have them on my list, which is not

24   congruent with their levels of importance.

25               First of all, vis-à-vis, the duty of the federal

Page 60

1       government and/or its agencies to participate.

2                I'm going to in essence deny without prejudice the

3       duty of the federal government to participate for a limited

4       period of time to allow its settlements which seem to be so

5       far down the road to either bear fruit or fail.  And my

6       thought on that is for a period of 45 days, which can be

7       shortened or extended for cause upon no more than a

8       telephonic conference call with me.

9                From time to time you're going to hear in this

10      that I'm making myself available for conference calls.  My

11      presumption is, vis-à-vis, any of such calls that they would

12      be telephonic but on the record with any party having the

13      right to suggest that the on the record portion be waived,

14      but it would be waived only if all parties to the call

15      consent to it being waived.  The idea is to put money into

16      the pockets of creditors and/or taxpayers and to minimize

17      the burdens associated with resolving disputes, but to give

18      you a mechanism for resolving disputes if you think that's

19      necessary.

20               If the efforts now under way by the federal

21      government indicate that we do still need the federal

22      government to participate my ruling is that the federal

23      government will have to participate, but it should be given

24      a fair shot at avoiding the need for it to do it if either

25      within those 45 days or a reasonable time thereafter it can

Page 61

1    obviate the need to do so.

2          Turning now to the remainder of the parties, and I

3    have a similar but slightly different thought between those

4    remaining authorities who are governmental entities on the

5    one hand and Mr. Carragher's client.  Mr. Carragher has the

6    misfortunate of representing the only client who's not on a

7    public fisk (ph).

8          First, all parties will have the right to

9    participate insofar as the same sites are involved.  And I

10   must say that although I tried to read the papers with as

11   much care as the circumstances permitted I'm still not clear

12   on how many different sites in New York State are involved,

13   although I do understand that everything that is now the

14   subject of this motion is located within New York State.

15         We now have consensus that if by way of example a

16   particular site involves not just New York but the Town of

17   Salina, United Technologies, and so forth, that all would be

18   allowed to come to the table and negotiate at that time.  I

19   not only permit that I would prefer that.

20         On the matter of cost sharing associated with the

21   mediator who's going to be mediating, vis-à-vis, that site,

22   if I heard Mr. Smolinsky right he's now agreed that just as

23   he wouldn't make New York State pay for that he wouldn't

24   make Onondaga County, Salina pay either.  If it's no

25   material incremental cost to not stick Unit Technologies

Page 62

 1    with the costs even though it's not on the public fisk, I

 2    would prefer it, but if the State wants to tag United

 3    Technologies with some portion of the cost, recognizing it's

 4    giving a free ride to the others, within reason I guess I'll

 5    let it do so.

 6         I don't think I need to rule on whether the

 7    federal government would be tagged with those costs.

 8    Everybody on this planet who's been in the case for the last

 9    two and a half years knows that the federal government has

10    already written out its share of checks, but you've got a

11    reservation of rights on whether you want to stick the

12    federal government with costs if it ultimately gets to that

13    point.

14         I am however going to give you an advisory opinion

15    that I'm sympathetic to the federal government's position in

16    that regard, and given the difficulties of the political

17    process and political controversy involving any time the

18    federal government has written out a check to aid the

19    automotive industry I do have a certain sympathy with the

20    federal government on what it's already done.

21         Right to withdraw.  I think the right to withdraw

22    should be parallel, I don't think it should be one sided,

23    but I do believe that both sides should be obligated to give

24    it a good fair shot to make it succeed before anybody should

25    exercise their withdrawal rights.

1          Consistent with the colloquy I had with

2     Mr. Smolinsky I don't think it's productive to set a

3     particular time by my ruling today with respect to when each

4     side could withdraw after its thrown up its hands and come

5     to the view that's it's concerned that it's a waste of time.

6     I would prefer to have the loosey-goosey mechanism that I

7     discussed with Mr. Smolinsky where it is understood that

8     there would be a right to withdraw when there is a view that

9     it's going to be hopeless, that the right apply to both

10    sides, but that it should be based on some kind of

11    articulated cause which could be explained to me at a

12    conference telephone call at which time I could then provide

13    the green light.  I don't want to impose a particular time

14    period for the reasons Mr. Smolinsky articulated.

15          Choice of mediator.  As the Second Circuit

16    speaking through Judge Friendly said in the Ira Hop (ph)

17    case back in the '60s, the process of bankruptcy must not

18    only be right, it must appear right, and people need to have

19    confidence that the system is fair and that it's not tilted

20    in favor of one side or the other.

21          While that principal was articulated in a broader

22    context it's particularly clear -- or particularly

23    applicable when you're talking about mediation in which both

24    sides have to have confidence that they're engaged in a fair

25    process, because ultimately mediation is consensual and it

Page 64

1    works best when people believe that it's fair.

2           Therefore, I'm ruling in concept that the counter-

3    parties to the GUC Trust or the claimants side must be given

4    a reasonable opportunity to nominate new mediators or

5    additional mediators either by reference to a list that is

6    commonly respected with the environmental remediation

7    industry or by named people whose curriculum vitaes can be

8    examined, but the process can't drift.

9           So you are to agree, if you can, on either

10   additional people who can be added to the list or additional

11   folks who can be considered eligible with those nominations

12   to come forward within a fixed period of time, and I'm

13   thinking two weeks subject to extension for cause, but

14   you've got to give me a reason why two weeks ain't enough.

15          I am not close enough to environmental matters --

16   even though I've been asked to rule on a number of

17   environmental things -- to have any knowledge as to who is

18   respected in the field and who isn't, but I am ruling that

19   the claimants don't have to simply accept the names that the

20   GUC Trust nominated, and that if they can do it in a timely

21   way they're allowed to put their own nominations forward.

22          Location of mediation.  As I said in colloquy with

23   somebody, I think it was with Ms. Leary, and to this extend

24   I'm overruling her objection in this regard.

25          The site isn't going to testify in an ADR process.

Page 65

1    It is very rare in my experience that mediators even take --

2    of course they're not taking testimony -- comments directly

3    from witnesses, but I don't rule that possibility out.  If

4    the principal negotiation -- if it's going to be principally

5    a negotiation I think it's going to give us most bang for

6    the buck if it takes place in New York.  If there -- and by

7    New York I mean New York City.  If there is a reason why we

8    need some kind of local presence in Buffalo, Syracuse,

9    somewhere up state I think the issue is best addressed then,

10   and you guys may come to the view that it's still best to

11   have it in New York City, but it's cheaper rather than

12   dragging a bunch of people up state to simply pay for a

13   particular person to come to New York.

14          I don't want to micro manage that, but my concept

15   is that the presumption is that it's going to be in New York

16   and that I think most players at the table can appear in New

17   York at least on the negotiating side, and I'll jump off the

18   bridge of cost for anybody else who should be there, if and

19   when that's really perceived to be necessary.  We're going

20   to do it in New York.

21          On withdrawal of the reference.  I don't think I

22   have the power nor should I weigh in on the wisdom of a

23   withdrawal of the reference, although I assume the District

24   Court judge who is asked to do it if he or she ever does

25   knows the law as well as I do, which is that not every

Page 66

1    matter that involves consideration of non-bankruptcy federal

2    law warrants withdrawal of the reference, but only those

3    that require a material consideration of the non-bankruptcy

4    law, which case law has said is for the most part cutting

5    issues rather than routine applications of the non-federal

6    law.

7            But be that as it may I am not going to take away

8    the right to move for withdrawal of the reference, assuming

9    I had the power to do so, but do believe I have the power to

10   impose modest restraints on the timing for any such request.

11           For sure I'm telling you that I'm not going to

12   decide any issue that could be subject to withdrawal of the

13   reference before giving people who would have the right to

14   move for withdrawal of the reference an opportunity to make

15   such a motion, but as we're going to deal with in the

16   injunction part of this decision I think both consideration

17   by a Bankruptcy Court and by a district judge needs to await

18   giving the flowers in the garden a fair amount of time to

19   bloom in the mediation process before we get into a

20   litigation mode either here or in the District Court.

21           So that brings us to the injunction.  I am going

22   to issue an injunction that says that the parties shall be

23   enjoined from litigating before me or any higher court while

24   the ADR process is ongoing, and then it's going to have a

25   proviso that says that notwithstanding the foregoing that

1    nothing in this order shall prohibit any entity that has

2    362(b)(4) rights from exercising its police powers.

3          I am not going to decide today what that means in

4    practical terms, although I do believe and you're going to

5    have to convince me otherwise, that anything to recover on

6    anything that is the subject of existing claims is not a

7    362(b)(4) issue.

8          If Ms. Leary unfortunately encounters an explosion

9    of the type that she mentioned she's got a reservation of

10   rights on that.  If she's talking about collecting on the

11   claims that she's already filed -- and I got a sense without

12   being totally clear that she may be part of the negotiations

13   with Mr. Jones -- this issue may go away, but if there's

14   something that comes up that invokes 362(b)(4) issues that

15   isn't the subject of pending claims the legislative history

16   of the order is that if it's a genuine 362(b)(4) issue she's

17   going to have the rights to proceed to address her needs and

18   concerns, but if it's an effort to collect on claims already

19   filed then we're still talking about going through the

20   normal claims process.

21        (Pause)

22          THE COURT:  So for the avoidance of doubt if we're

23   talking about claims that are already filed if they're not

24   resolved consensually then they are going to be subject to

25   ADR and the injunction will prohibit New York State or

Page 68

1    anybody else from moving to withdraw the reference for that

2    period of time during which ADR is under way.

3            When it comes to an end New York or anybody else

4    will have the right to move for withdrawal of the reference.

5            As further clarification of my thinking in this

6    regard I disagree with New York State's contention that

7    routine claims allowance matters are not core, whether or

8    not they involve consideration of non-bankruptcy federal

9    law.

10           I think claims in the Bankruptcy Court are the

11   paradigmatic example of matters that invoke the in rem

12   jurisdiction of the Court and that bankruptcy judges

13   constitutionally are empowered to decide.  And I do so

14   because they're claims, not because they're administration

15   of the estate, a matter which has a certain elasticity to it

16   as to which I have some concerns as to their scope when you

17   get into claims allowance matters.

18           But claims allowance is if anything is left for

19   bankruptcy judges to do in this world, what bankruptcy

20   judges are allowed to decide, and if not then I don't need

21   to wait until 2014, I'll quit tomorrow.

22           The hardest issue that you guys raise before me is

23   on information sharing, but it's hard at the edges; it's not

24   hard on the more fundamental points.

25           Each side is to tell the other side what its

Page 69

1      position is and why.  It's also to provide to the other side

2      information reasonably necessary to back up the basis for

3      what it tells the other side, and this is either at or

4      before the mediation.

5              I am however bringing to a halt, to the extent

6      that you haven't already voluntarily agreed to that,

7      exercise of traditional discovery mechanisms.

8              The whole idea of ADR is to protect both sides

9      from the costs and expenses associated with discovery, and

10     if there's something in the grayism where anybody believes

11     that the other side hasn't been satisfactorily forthcoming

12     in explaining its rationale for its position or for that

13     matter what its position is arrange for a conference call

14     with me.

15              But the idea is as I articulated to Mr. Lindenman,

16     finding that sweet spot where we've given the parties enough

17     information to allow ADR to succeed on the one hand without

18     subjecting everybody to the very extensive costs that are

19     associated with discovery, particularly in the environmental

20     area.

21              Not by way of your argument, are there any of the

22     areas for concern that I haven't addressed on -- addressed

23     one way or the other?

24              MS. LEARY:  I have two questions, Your Honor.

25              On the injunction prohibition that would prevent

1    withdrawal of the reference during ADR would that similarly

2    apply to the GUC Trust enjoining them from asserting a

3    claims objection on the claim prior to ADR being completed?

4            THE COURT:  Yes.

5            MS. LEARY:  And the second question I have, I

6    probably wasn't very clear in my presentation, but in

7    discussing 362(b)(4) it is not the State's position that we

8    would be entitled to collect on a claim asserted before this

9    Court, it was that we are entitled to liquidate our claim in

10   another forum and not collect.  There's a very bright line

11   in New York.

12           THE COURT:  I understood that point you made --

13           MS. LEARY:  Okay.

14           THE COURT:  -- Ms. Leary, you made it very clear

15   the first time.

16           MS. LEARY:  Okay.  I --

17           THE COURT:  But I am going to give your opponent

18   or opponents, which most likely is the GUC Trust, an

19   opportunity to be heard before me if you decide to go into

20   another forum on your 362(b)(4) rights, because I am going

21   to decide, not some State Court, what 362(b)(4) covers and

22   doesn't.  Frankly, I believe that I have a better

23   understanding of 362(b)(4) law than somebody might in some

24   supreme court in some county in New York City or up state.

25           MS. LEARY:  And that would be on a lift stay -- in

1    a lift stay context?

2              THE COURT:  Essentially, yes.

3              MS. LEARY:  Okay.

4              THE COURT:  Or for a declaratory judgment that you

5    don't need relief from the stay, because 362(b)(4) says that

6    you have the power to do what you might think you might want

7    to do.

8              MS. LEARY:  Thank you, Your Honor.

9              THE COURT:  Okay.  Mr. Lindenman?

10             MR. LINDENMAN:  Your Honor, just one question

11   concerning the mediator.

12             I understand that we'll have the two weeks to add

13   names into the pool.  Who ultimately makes the decision as

14   to which mediator?  I don't think that was addressed here.

15             THE COURT:  Well, I'm hoping that you can reach

16   consensus on this.  In most of my mediations the parties and

17   not the judge decides that.

18             MR. LINDENMAN:  Absolutely, Your Honor.  The way

19   it's currently drafted I just don't think it -- to me it

20   wasn't clear.

21             THE COURT:  I wasn't clear, I was intentionally

22   not clear.

23             MR. LINDENMAN:  Okay.

24             THE COURT:  And the reason for that is because I'm

25   hoping that after you nominate your nominees when you put

Page 72

1    your noodles together you're going to reach a person who's

2    satisfactory.

3           When my back has been against the wall one or two

4    times in 11 and a half years I've chosen a mediator, but I

5    cannot think of a single time in which I've allowed one side

6    to dictate a mediator to the other side because that's an

7    invitation to -- I won't say disaster -- but it raises

8    material risks that the mediation will ultimately succeed.

9           MR. LINDENMAN:  Thank you, Your Honor.  Because it

10   certainly was the antithesis of the fairness that you had

11   started that section with, so I want to be clear that you're

12   intentionally leaving open who decides at this point.

13   You're not -- in other words it's not going to stay the way

14   it is currently that the GUC Trust --

15          THE COURT:  I have a strong reluctance to allow

16   one side to dictate the mediator to the other side.

17          MR. LINDENMAN:  Okay.  Thank you.

18          THE COURT:  But I guess if that sorts itself out

19   I'll hear more about why you guys couldn't agree, and then

20   if there's still an impasse I'll deal with it, but I'm

21   hoping that ain't going to happen.  The understand lying

22   concept though is that neither side can shove the mediator

23   down the other side's throat.

24          MR. LINDENMAN:  that's perfect, Your Honor.

25          THE COURT:  All right.

Page 73

1              MR. LINDENMAN:  Thank you.

2              THE COURT:  Mr. Smolinsky?

3              MR. SMOLINSKY:  Thank you, sir.  I just have three

4     -- three points or questions.

5              First of all, what we tried to do in our order was

6     actually amend the existing ADR order, and since those

7     procedures that have been in place are tried and true we

8     have panels of mediators, they get to pick who the mediator

9     is off of the panel.

10             For example, I'm reluctant to revise the whole ADR

11     procedures with respect to everyone, and I wonder whether it

12     would be --

13             THE COURT:  Well, my point was to deal solely with

14     the environmental claims.

15             MR. SMOLINSKY:  Okay, that's --

16             THE COURT:  I'm not asking you to reinvent the

17     wheel on matters that weren't up for consideration today.

18             MR. SMOLINSKY:  Thank you.

19             Obviously with respect to choosing the mediator

20     the current procedures as I said says that the other side,

21     the claimant gets to pick who the mediator is.  Obviously

22     we'll work to fix that along with giving them the

23     opportunity to suggest mediators.  They can't suggest

24     them --

25             THE COURT:  I didn't follow you.  I assume you're

Page 74

1    now shifting to the environmental mediation --

2                 MR. SMOLINSKY:  Yes.

3                 THE COURT:  -- rather than tort litigation

4    mediation.  But I thought your opponent's concerns was they

5    didn't like having to choose amongst a panel that you would

6    designate and only had two names in it that they weren't yet

7    comfort.

8                 MR. SMOLINSKY:  Yes, so we'll change the entire

9    procedure so that --

10                THE COURT:  Okay.

11                MR. SMOLINSKY:  -- they don't pick and we don't

12   select the panel.

13                The last issue is -- I assume it's not an issue --

14   you talked about a telephonic conference call to for example

15   shorten the time or lengthen the time.  I just wanted to

16   make sure that Your Honor doesn't have a problem with any

17   ability, for example, with the federal claims to just agree

18   with the EPA that the time is shortened or lengthened, that

19   we don't have to come back to the Court if there's an

20   agreement.

21                THE COURT:  No, my view of telephonic conference

22   calls was to help in dispute resolution, and the more you

23   guys can make disputes go away or agree upon things on your

24   own the better I like it.

25                MR. SMOLINSKY:  Thank you for your clarification.

Page 75

1                THE COURT:  Okay.

2                Ms. Leary?

3                MS. LEARY:  I'll just discuss with Mr. Smolinsky,

4      I have a -- I'm not understanding what you're saying about

5      the mediators, but I think we can talk about that.  I'm

6      pretty clear on what you said, Your Honor.

7                The one question I have and this was in -- I

8      believe it was in my papers, I hope it was, I didn't raise

9      it in my argument earlier, but of the potential -- and I

10     hope it's only three or four sites that will remain because

11     we are still in active discussions on the remainder of our

12     sites, so we're talking about a universe of three or four,

13     those three or four sites are significant from a dollar

14     standpoint from a complexity, technically, environmentally

15     from that standpoint.

16               One thing that we do not want to receive, because

17     it's just me, are three or four notices that all of them are

18     going into mediation.  We just don't have the resources to

19     deal with this, so I need some good faith understanding from

20     the GUC Trust that we are not going to be bombed as we

21     otherwise would be in a discovery context trying to justify

22     three or four sites at one time and provide information on

23     those three or four all at one time in the short time frames

24     that the procedures order allows.

25               My suggestion in fixing this was to allow one to

Page 76

1    proceed during that abbreviated time frame to ADR and then

2    know or not know and then serially have the next one come

3    up.

4           This is a resource issue, Your Honor, and I know

5    that everybody is in a big hurry, hopefully we will get

6    these resolved, but I have vulnerability because those three

7    or four sites present a formattable challenge in the context

8    of the procedures to do all at one time.

9           THE COURT:  Well, rather than make Mr. Smolinsky

10   respond now why don't we simply provide -- we all

11   Mr. Smolinsky, we know he's an honorable guy, and if you

12   feel like you're being double or triple or quadruple teamed

13   then you can pick up the phone firsthand.

14           MS. LEARY:  That sounds good.

15           THE COURT:  And then if that doesn't work to me.

16           MS. LEARY:  Thank you very much, Your Honor.

17           THE COURT:  Okay.  All right, anything else,

18   anybody?

19           Here's what we're going to do.  Obviously this was

20   a lengthy argument, but it was important, very important.

21   We're going to take just a five-minute recess.  I would ask

22   CourtCall to keep all of the others on the phone, to unmute

23   their lines during the next five minutes, then we're going

24   to resume at a quarter to 12:00 in which we're going to take

25   the claims objection issues in the other matters on today's

Page 77

1      calendar.

2              Those who were here solely on environmental

3      matters are excused if they wish to be.

4              MR. LINDENMAN:  Thank you, Your Honor.

5              THE COURT:  Thank you.

6              MR. SMOLINSKY:  Thank you, Your Honor.

7              MS. LEARY:  Thank you, Your Honor.

8          (Recess at 11:41 a.m.)

9              THE COURT:  All right, we're continuing, and we

10     now have a largely emptied courtroom, and I'll hear the

11     matters involving the claims objections and anything else we

12     have.  At the lectern.

13             MR. GRIFFITHS:  Your Honor, good morning, David

14     Griffiths of Weil, Gotshal & Manges for the debtors, the

15     post effective date debtors and the Motors Liquidation

16     Company GUC Trust.

17             THE COURT:  Okay, Mr. Griffiths.

18             MR. GRIFFITHS:  With your permission I'll be

19     presenting items 4 and 5 on the agenda --

20             THE COURT:  Sure.

21             MR. GRIFFITHS:  -- which are the 83rd and 103rd

22     omnibus objection to claims which relate to welfare benefit

23     claims or retired and former salaried and executive

24     employees.

25             THE COURT:  All right, Mr. Griffiths, I need you

Page 78

1      to just speed a little bit slower and to keep the microphone

2      close to you.

3                  MR. GRIFFITHS:  Yes, sir, of course.

4                  Your Honor, before we start with respect to those

5      omnibus objections we just wanted to bring to your attention

6      that we have approximately 100 claims -- replies that we --

7      or responses that we've received from former employees.  Out

8      of the approximately 3,000 claims that have been objected to

9      those will be brought before your attention in the coming

10     months.  We plan to schedule a number of hearings in April

11     and May to handle these, and we just request that if we

12     schedule too many to be dealt with at any one hearing that

13     you just let us know and we can reduce that number.

14                 THE COURT:  Certainly.

15                 MR. GRIFFITHS:  Before I start I'd like to thank

16     the employees on the phone this morning for their patience

17     both today and in bringing a -- in allowing us to bring

18     these replies to your attention.

19                 Your Honor, the omnibus objections that are before

20     you today are of the type that have been dealt with at

21     previous hearings.  Most notably on July 27, 2011,

22     September 26, 2011, and January 18, 2012.  I'd like to

23     designate as part of the record for my appeal your prior

24     rulings with respect to these omnibus objections and claims

25     which are similar in form and substance to what we have

1    before us today.

2              THE COURT:  Granted.  Anything that I've issued an

3    opinion on either in writing or by a dictated decision at

4    the conclusion of an argument will be deemed to be a part of

5    the record on these proceedings.

6              The principals of law of course while not binding

7    on any litigant are precedent, what we call in Latin stare

8    decisis, but each individual's facts of course are

9    considered unique to that particular individual.

10             MR. GRIFFITHS:  Yes, Your Honor, of course.

11             And prior to going forward would Your Honor like

12    to have a brief summary of the 83rd and 103rd omnibus

13    objection to claim?

14             THE COURT:  Only insofar as they're objected to.

15    You don't need to take time on folks who did not object.

16             MR. GRIFFITHS:  Yes, Your Honor.

17             So if I may with respect to the 83rd omnibus

18    objection to claims we have three claimants who have

19    submitted responses.  Mr. Hickman, Ms. Schneider, and

20    Mr. McMullen who I believe are all on the phone today.

21             I've spoken with each of these claimants at

22    length, I've made them aware of Your Honor's prior rulings,

23    and they've elected to proceed with this hearing.

24             On behalf of the Motors Liquidation Company, GUC

25    Trust, and the debtors we'd like to just express our

1   sympathies that the -- of the impact that the debtors'

2   financial situation has had on their personal lives, but

3   given the debtors' liquidation there isn't any other result

4   that's available to us today.

5            Moving to Mr. Hickman.  Mr. Hickman --

6            THE COURT:  Pause, please, Mr. Griffiths.

7            MR. GRIFFITHS:  Yes, Your Honor.

8            THE COURT:  Mr. Hickman, you on the phone with us?

9            MR. HICKMAN:  Yes, I am, Your Honor.

10           THE COURT:  Okay.  And can you hear Mr. Griffiths

11   okay?

12           MR. HICKMAN:  Very faintly.

13           THE COURT:  All right.  Then I'm going to request

14   that Mr. -- you, Mr. Griffiths, pull that microphone even

15   closer to you and don't worry about being polite to me, keep

16   your voice loud and speak slowly so that the folks who are

17   appearing only by phone have the best possible chance of

18   hearing what you have to say.

19           MR. GRIFFITHS:  Yes, Your Honor, thank you.

20           Mr. Hickman has not submitted a response to the --

21   to the omnibus objection to claims though has elected to

22   proceed with the hearing today.  We're happy to hear any

23   representations that Mr. Hickman may make.  We're content to

24   rely on both the omnibus objection and our reply in terms of

25   our submission with Mr. Hickman's matter.

1          THE COURT:  Okay.  Then you stand by at the

2     counsel table -- or excuse me -- at the podium, and I'll --

3     I'll hear from Mr. Hickman.  But I'm wondering if I should

4     make Mr. Hickman speak before you've had a chance to speak,

5     because I think you're going to be making similar points,

6     Mr. Griffiths, with respect to Mr. McMullen, Ms. Schneider,

7     Mr. Jankowski, Mr. Alarie, and Mr. Conrad.  Do you wish to

8     make any statements that apply to them generally?

9          MR. GRIFFITHS:  Yes, Your Honor, I'll make a

10     general statement that would apply to each of the

11     respondents.

12          THE COURT:  I think you probably should and then I

13     want to give each of those six folks a chance to be heard,

14     and then I'm going to give you a chance to reply, and I'm

15     going to give any of them a chance to surreply.  I think

16     that's the most efficient way of dealing with it.

17          MR. GRIFFITHS:  Yes, Your Honor, thank you.

18          MS. BELLAIRE:  I don't mean to interrupt, this is

19     Linda Bellaire, and I was included in the 83rd omnibus,

20     whatever it is, and David, you told me that I would hear

21     whether or not my request to continue in delay would be

22     honored and all I got was that I needed to participate

23     today.

24          THE COURT:  Are you looking for more time,

25     Ms. Bellaire or do you want to be heard today?

Page 82

1            MS. BELLAIRE:  I can be heard today.  I was hoping

2     for more time, you'll get my emotional response rather than

3     a researched and well prepared response.

4            THE COURT:  Well, Mr. Griffiths, I wonder if I

5     should give Ms. Bellaire extra time.  Would there be any

6     material prejudice if I allowed her to be heard at the next

7     hearing that we have instead of this one?

8            MR. GRIFFITHS:  No, Your Honor.  It's our

9     understanding that we had granted Ms. Bellaire an

10    adjournment, that she had been invited to attend this

11    hearing purely for informational purposes.

12           THE COURT:  Oh, okay, fine.

13           MR. GRIFFITHS:  And --

14           THE COURT:  Then Ms. Bellaire, you're going to --

15    I'm granting the request for extra time.

16           MS. BELLAIRE:  Okay, thank you.

17           THE COURT:  What happens today will be a

18    precedent, but it will not be binding on you.  If there's

19    some reason why any principals of law that I announce today

20    wouldn't apply to you.

21           MS. BELLAIRE:  Okay.

22           THE COURT:  Now you may, but need not stay on the

23    line, it's up to you.

24           MS. BELLAIRE:  Okay, thank you.

25           THE COURT:  Okay.  Go ahead then, Mr. Griffiths.

Page 83

1          MR. GRIFFITHS:  Thank you, Your Honor.

2          Each of the claimants require to the bar date

3     submitted proofs of claim in each case arguing that --

4          MR. HICKMAN:  I can't hear him, Judge.

5          MR. GRIFFITHS:  I will speak close to the

6     microphone.  Arguing that benefit modifications that had

7     been made by the debtors both prior to their Chapter 11

8     filing and following the Chapter 11 filing to welfare

9     benefit plans and life insurance were either not validly

10    entered into or that they had some sort of claim for the

11    difference between the value that their benefits had been

12    reduced to and the value that their benefits had previously

13    existed at.

14          Subsequent to this the debtors filed an omnibus

15    objection to claims to each of these various proofs of claim

16    that were filed.  The omnibus objection to claim argues in

17    essence that the welfare benefit plans that govern each of

18    the benefits granted to the employees reserve the rights

19    unequivocally for the debtors to amend or modify such

20    benefits.  Those -- those reservation of rights are

21    contained both in the plan documents themselves and in the

22    summary plan descriptions that were provided to employees

23    during their employment and to retirees every five years

24    following their retirement.

25          The omnibus objection goes on to cite various case

Page 84

1    law in various jurisdictions which supports the debtors'

2    position that there is no -- that no claim can be founded

3    against the debtors for these benefit modification claims.

4         The omnibus objection cites Sprague in the Sixth

5    Circuit and More Metrolife (ph) in the Second Circuit.  More

6    Metrolife particularly relevant today given that many of the

7    replies that have been -- or responses that have been filed

8    by employee claimants cite various discussions they had had

9    with management of General Motors during the course of their

10   employment and that the benefit modifications were not in

11   accordance with their understanding of their benefit plans.

12        More Metrolife explains very clearly that the only

13   way a benefit modification can be deemed to -- the only way

14   that benefits can be deemed to be vested is if the plan

15   itself provides for such vesting, and the relevant statute

16   in this case, the Employee Retirement Income Security Act of

17   1974 is also clear insofar as vesting requires a specific

18   intent on behalf of the employer.

19        In terms of our reply it goes into substantially

20   the same arguments, and our replies include a general

21   summary of the arguments that each claimant have made.  And

22   what I propose is therefore just to briefly summarize the

23   arguments that are being made by each claimant and then to

24   allow each claimant to just speak at Your Honor's

25   discretion.

Page 85

1                THE COURT:  All right, you may continue.

2                MR. GRIFFITHS:  Thank you, Your Honor.

3                Turning first to Mr. Hickman who I believe

4     Your Honor has indicated is on the telephone today.

5                The remarks I have just made apply to Mr. Hickman,

6     and should he wish to make any further comments then perhaps

7     now is an appropriate time.

8                THE COURT:  All right, pause.

9                Mr. Hickman, I'll hear your argument.

10               MR. HICKMAN:  Thank you, Your Honor, and thank you

11    Mr. Griffiths for bringing this up today.

12               Since I filed by original complaint on the loss of

13    benefits I suppose each of us has become a little better

14    educated on the bankruptcy laws, and I've tried to settle

15    this outside of having to follow through with the Bankruptcy

16    Court on my own.

17               I spend 40 years to the day, November 1, 1968 to

18    November 1, 2008 and then took what I call an early

19    retirement, most people would probably call it late

20    retirement, but I would be there today if it weren't for the

21    bankruptcy.

22               My situation is slightly different than David has

23    mentioned.  I realize the loss of the benefits and the

24    ruling of the federal bankruptcy, and I realize the

25    reduction in those eliminations.

1          Shortly after the bankruptcy filing -- this is a

2     new piece of information which I have just recently

3     uncovered, tried to settle it with my own input but

4     unfortunately have not been able to.  Shortly after the

5     bankruptcy became effective a number of GM salary employees

6     were contacted either by e-mail or regular mail or

7     registered mail, and I don't know the circumstances of how

8     they were chosen, but I do know that some were provided

9     opportunity, a window in time between GM, HR, and

10    Metropolitan Life to purchase at the employee's expense a

11    replacement life insurance coverage for their life and the

12    coverage of their spouse.

13          It's particularly important in my case.  I did not

14    receive such a letter, but I've had it read to me over the

15    phone and Metropolitan does agree that it does exist in loss

16    of supply to employees.

17          My case is a little different and I'm sure you

18    here this from all thousand of employees that (indiscernible

19    - 02:03:55).  I spent 40 years with the company, and during

20    that I believe according to my business cards, that I held

21    15 different positions and had 12 geographical relocations

22    around the country.  Some wonderful places, some not so.

23    But with those many moves I did not end up being married

24    till close to age 50.  So there's quite a number of years

25    between my and my spouses age, 17 years.

1        So when the GM pamphlet of the -- prior to the --

2    just prior to the bankruptcy was provided, I think it was

3    about a 221-page document, I still retain it -- regard a

4    number of agreements between you and your spouse and some

5    witness signatures.  And one of those documents related to

6    whether your spouse would obtain spousal benefits after your

7    death.

8        GM's formula in their retirement booklet, which

9    was provided to us, this was November of 2008, showed a

10    penalty if your spouse is five years different than your age

11    and greater and it had a sliding share.  So for us with 17

12    years it was a -- it was a penalty that I couldn't take the

13    retirement and allow the penalty.

14        So as long as we had the life insurance and

15    coverage we chose to defer the spousal coverage which then

16    allowed me to take the early retirement.  Of course the

17    bankruptcy --

18        THE COURT:  Pause, please, Mr. Hickman.  Just -- I

19    want to keep up with you.

20        MR. HICKMAN:  Yes, sir.

21        THE COURT:  Are you talking on coverage for your

22    wife about life insurance coverage --

23        MR. HICKMAN:  No.

24        THE COURT:  -- or medical insurance --

25        MR. HICKMAN:  No.

1          THE COURT:  -- or pension?  Help me --

2          MR. HICKMAN:  Pension.

3          THE COURT:  -- better understand.

4          MR. HICKMAN:  Yes, pension.  Spousal coverage of

5     the pension.  And you have an opportunity in the GM

6     documents to choose the spousal coverage after your dealt

7     that she would receive the remaining portion -- a reduced

8     portion of your pension, and if you chose to do that there

9     was a penalty to pay if there were five years or greater in

10    your ages, and it was a sliding stage.  And with 17 years

11    difference it was a little bit cost problematic for us.

12         So we still had the GM -- at that time we still

13    had the GM life insurance coverage so we chose to defer her

14    spousal pension coverage, which is a reduced portion of my

15    pension.

16         THE COURT:  Uh-huh.  The rationale for that being

17    that the younger your wife might be at such time as you died

18    the longer her life expectancy at least actuarially would

19    be?

20         MR. HICKMAN:  Well that and the combination that

21    my age is so much greater than hers that there was a longer

22    period of coverage that they would have to pay her.

23         THE COURT:  I'm with you, keep going, please.

24         MR. HICKMAN:  And there was a penalty in the

25    documents, we reviewed it with both my accountant, my tax

Page 89

1     attorney, and my attorney.  There was not a good answer to

2     it, but if we were going to take the early out package I had

3     to defer the spousal coverage because she was still going to

4     be covered by my then retirement life insurance in the

5     retirement (indiscernible - 02:07:45) period.

6            So there was no problem until the bankruptcy came

7     through and of course that life insurance for the GM

8     salaried employees was one of the eliminated components, and

9     I understand that.

10           And what shortly followed that that GM salary

11    employees who had retired -- and I don't know the schedule

12    or how this formula was -- was provided -- but a letter was

13    sent to employees in the white collar employment area that

14    had retired -- I don't know if they were deferred to spousal

15    coverage or if they were recent retirees -- but I know that

16    the letter came and there was a small bundle in time.  I

17    think it was seven days, it could have been ten, that you

18    could apply to reinstate that coverage at the employee

19    expense to cover your spouse.

20           I never saw the letter.  I'm not sure how it was

21    provided, and many things come to us with signature

22    requested or sign receipt or registered mail.  I did not

23    receive the letter and knew nothing about it, and with the

24    short window of seven or ten days by the time I did find out

25    about it through it being read to me I contacted both HR and

Page 90

```
 1    Metropolitan and they did agree that there was this special

 2    coverage available made to the employees -- or retirees for

 3    this short window in time.

 4           So I have no objection to what's happened here in

 5    the bankruptcy, I understand the law, my 40 wonderful

 6    productive years I wouldn't replace it for anything, I wish

 7    I was still there, but I would just like to have the

 8    opportunity to participate in that same reinstatement at my

 9    expense of the insurance coverage that was granted during

10    this seven or ten-day window following the bankruptcy.

11           THE COURT:  Okay.  I think I understood what you

12    told me.  I'm going to have to think about it a bit.

13           What I want to do next is give other folks who are

14    on the phone a chance to be heard as you were Mr. Hickman,

15    and then I'm going to give Mr. Griffiths a chance to reply,

16    and then I'll rule on everybody in this group after

17    everybody has had a chance to speak their peace.

18           Do I have -- I don't see -- yes, I do see

19    Mr. McMullan on the phone.  Would you like to be heard next,

20    Mr. McMullan?

21           OPERATOR:  Your Honor, Mr. McMullan has not joined

22    us today.

23           THE COURT:  Oh, forgive me, okay.  Then

24    Mr. McMullan did not.

25           What about Darlene Schneider?
```

Page 91

1            MS. SCHNEIDER:  I'm here, Your Honor.

2            THE COURT:  Would you like to argue,

3     Ms. Schneider?

4            MS. SCHNEIDER:  I sure would.

5            THE COURT:  Go ahead then, please.

6            MS. SCHNEIDER:  Well, after everything that's been

7     said in the summary that David Griffiths has made I want to

8     just make a statement that I too appreciate that GM -- the

9     new GM accepted the obligation to continue our pension fund,

10    but I mean they did it for business reasons too and they did

11    get some benefits from it.  And all the years we worked for

12    them -- I mean a big company makes decisions I mean decades

13    before that either results in a positive or negative result

14    in the future just as GM ended up in the bankruptcy.

15           Well, I'm just going to compare that to my

16    situation.  I made a decision to stay with General Motors

17    for my career of 37 years for a retirement benefit, and my

18    husband developed heart problems and had many surgeries and

19    became totally permanently disabled and could not work

20    almost our whole married life.

21           So we reversed roles at a very young age when we

22    first married for his health sake and we -- and he raised

23    the three children while I worked, okay?  So I wanted to

24    make that statement.

25           I mean my family all worked for the automotive

1       company and everyone thought, especially my father, that

2       with my situation he felt that he was glad that I had the

3       security behind me.

4              So I know that the statement has been made that

5       because of bankruptcy law GM has the unilateral decision

6       whether to eliminate benefits or not, and I just want to

7       make a statement that I don't think it's fair that these

8       benefits were used as a carrot kind of to us and they were

9       kind of balancing the equation of our wages that are frozen

10      and we need to work overtime without pay, and we did this

11      because we were part of this great company, okay?

12             We knew that on our benefit sheet it stated, you

13      know, that these benefits could be changed or modified or

14      eliminated, but my leader never identifies that when

15      whenever I spoke to him about my career or when I wasn't

16      getting a large raise, instead the benefits were emphasized,

17      and that's what I base my career on was the benefit package.

18             Now I want to talk about the fact that I did that

19      because -- because of the benefits not the salary, and I

20      base that on the fact that I was raising the children

21      without a father's income, so it was very important to me to

22      have benefits.

23             I started in June in 1969, I retired in 2007,

24      okay?  When I graduated with my Bachelor's in business from

25      the University of Michigan in 1991 I had a discussion with

1   my husband about leaving GM.  I was not receiving regular

2   increasing.  I was in the clerical field at that time but I

3   was positioning myself out of the clerical field with this

4   degree.

5          At that time I had 22 years of service and a

6   family of three children, plus a disabled husband, and I

7   felt that my retirement with benefits meant more to me than

8   my salary, and so at that time I decided to make the

9   decision to stay with GM.

10          Now I graduated in '91, so in '93 I transferred to

11   the General Motors Milford Proving Ground, it's an hour

12   distance from my home to take a purchasing position, and I

13   asked the leader at that time, couldn't I just get a little

14   bit of an increase to, you know, for gas and wear and tear

15   on my car, and there was nothing available for me.  It was

16   just a lateral transfer.  So I received no promotion, but

17   again, I was positioning myself for a promotion.  So in 1994

18   I finally did get the promotion.

19          But the point I'm trying to make here is that

20   during the years 1983 -- 1986 to 1993, seven years I stayed

21   with GM and sacrificed salary increases for the sake of the

22   corporation when GM management made the business decision to

23   freeze my salary during these years.  This decision

24   ultimately reduced my social security benefits for

25   retirement too.  Then again it was frozen for three years

1   during 1991 through '94 for the same reason, because of

2   decisions made by the corporation.

3              Now I'm going to go all the way to the end of my

4   career.  Here I am it's 2006, I've gotten a lot of

5   promotions and acclamations and all that, and I finally

6   received -- when I received my final promotion my pay grade

7   was $8,388 less than the market rate at that time.  So there

8   was a minimum and maximum for what you should make at that

9   position and I was 8,000 below, and I had been thousands

10  below in each level up, so I never really caught up with the

11  marketability of my position and responsible, but I stayed

12  with GM because I wanted the security of the benefits and

13  the life insurance for my family and my husband.

14             I want to go to my objections that I put in on

15  October 17th.

16             THE COURT:  Uh-huh, go ahead.

17             MS. SCHNEIDER:  I mean my first one might be

18  thrown out because it said that I asked that General Motors

19  retain -- not retain their unilateral right to withhold or

20  eliminate benefits promised to employees, and now I

21  understand under bankruptcy law that they have that

22  opportunity.

23             My second one was about hardship cases to be heard

24  individually and consider a settlement that would instill

25  compensation, that would allow the party to prepare other

Page 95

1     options or changes that would improve their financial

2     position, provide some funding that would provide for

3     alternative income to make up the difference for what I've

4     lost.  And in my case I actually when I retired early I was

5     trying to maybe work another position so I could be with my

6     husband in Arizona.  He had to leave the winter months in

7     Michigan to go to Arizona because of his health.  He has

8     gotten pneumonia, and because of his previous heart

9     surgeries we had to separate, and I would fly there for a

10    week but I couldn't afford to really keep going back and for

11    so I usually saw him for a week and then for six weeks.  So

12    he'd stay six weeks, I'd go for a week, he'd stay six weeks,

13    and then maybe reunite in the summer.

14           And so that after a few years didn't work very

15    well with me so I decided to take an early retirement and we

16    made it -- we talked about it and I said, well, I will do a

17    job that maybe I can do in both places.

18           So I took some classes in interior design and when

19    this happened with the bankruptcy our money just -- our

20    whole financial thing just kind of fell apart.  I mean we

21    had a meager savings and I had by 401(b), but we didn't have

22    enough to cover $3,000 in medical expenses for me and his

23    life insurance, I added more life insurance, and then his

24    medical, which is another point I'm going to make too.

25           Let's see.  We received a letter from -- it's -- I

1    sent this package over earlier so that you would have it if

2    I referred to it in court, and it was -- I have number 3

3    circled on the top.  It says, "Material modifications to the

4    General Motor Salary Healthcare Program effective

5    January 1st, 2010," and it was sent by HR and the fifth

6    paragraph down indicates that we should be getting $260 a

7    month to an HRA account for retirees and surviving spouses

8    under the age 65 who are eligible for Medicare.  Well, my

9    husband is on Medicare because of his disability, and then

10   it says, "therefore, the participant may obtain

11   reimbursement of cost for qualified healthcare expenses."

12   Then when we attain the age of 65, we would receive a $300

13   into the pension check.

14           So, we thought well at least that'll defer some of

15   the costs; however, we did not receive that, and then when

16   we called HR, they indicated that he was not eligible for

17   it, and we didn't understand why.  It was never really

18   explained to us why.

19           They sent us to one of their employees who spoke

20   to my husband to help him arrange for which healthcare would

21   be best for him knowing he would have open-heart surgery, so

22   we did get advice on that, but we don't understand why we're

23   not receiving this money.

24           THE COURT:  Uh-huh Pause please, Ms. Schneider.

25           MS. SCHNEIDER:  And then --

Page 97

1              THE COURT:  Pause please, a question for you.

2      Forgive me.  Are you now eligible for Medicare?

3              MS. SCHNEIDER:  No, my age is 61.

4              THE COURT:  Uh-huh, continue please.

5              MS. SCHNEIDER:  Okay, in addition, my life

6      insurance benefit, okay, was to equal a one year salary at

7      the time of retirement.  This amount was planned to

8      compensate the difference of the reduction of my pension

9      benefit to myself in case that I predeceased him, because he

10     has no retirement benefits, and I have elected to reduce my

11     pension, so that upon my death he does receive something.

12     But it's not even what I get, you know.  So, I used the life

13     insurance in addition to that.  Now, I've added life

14     insurance, but it's at additional cost to me.

15             So, we've accepted, you know, a lot of different

16     things that put us in a very awkward financial position, not

17     what I had expected to have with General Motors when I left,

18     and it's not their fault, but I do feel that we deserve some

19     compensation that would help us out of our financial

20     position.  You know, some sort of settlement that could

21     reduce our debt, and so that we could be in a better

22     position to handle the whole situation.  We just didn't have

23     enough time to know this.  So, maybe I wouldn't have taken

24     retirement, but, you know, who knows what would have

25     happened?

1          So, with the bankruptcy it then affected my

2    retirement savings, the loss of the stock market, and our

3    vestments in General Motors.  I even had stock options that

4    were given to us as a reward, instead of stock, and that was

5    lost in bankruptcy, because we're required to hold it for

6    five years before we are able to sell that.

7          So, you know, I'm not asking for recompense on

8    that.  I just want to be in a better position for us to be

9    able to take care of my husband.  Thank you very much for

10   the opportunity of stating my case.

11          THE COURT:  Thank you.

12          Okay, Floyd Jankowski?  Do you wish to be heard,

13   sir?  Mr. Jankowski?

14          MR. JANKOWSKI:  Yes?

15          THE COURT:  Would you like to argue also?

16          MR. JANKOWSKI:  Yes, I would.  My name is Floyd

17   Jankowski, and I retired on February 1, 1992, due to a heart

18   condition that I've had, well, that I obtained while I was

19   working back in 1989.  I had 11 heart attacks, and I went

20   back to work, and I worked for a little over a year.

21          Now, I retired February 1st, and on my going out,

22   they gave me a life insurance policy for $77,000, which was

23   twice my base salary.  They also had me get comprehensive

24   medicals for my wife and I, in case I had to go to on a

25   long-term care.  I also had paid medical, which they were

Page 99

1    paying on a monthly basis up until the latter '90s when they

2    made salaries start paying for their medical, and then I

3    also had an optional life insurance policy which, I was

4    paying $30 some dollars a month for five times my base

5    salary, which at the age of 50 took me up to $76,092.

6            So, okay, I retired February 1st of 1992, and

7    December of 1992, I had a worker's comp trial, which they

8    stated in there that I was to get all my pension benefits,

9    and anything that was, oh, awarded to me, you know, for

10   other stuff.  And mainly, that's what I would like to get

11   reimbursed for all the insurance that I lost which was

12   $60,000, or $67,000.

13           I'd also like to get reimbursed $5,834.60 for my

14   extended care that I paid for, and I would also to get

15   reimbursed for my Medicare premium that I was supposed to be

16   reimbursed.

17           I'd also like to get reimbursed for my premium

18   life insurance from when I was having my optional life

19   insurance, and then I'd also like to be reimbursed for the

20   medical insurance that I had to pay from '92 to when they

21   started making us pay in the latter '90s, and that's

22   typically my case.

23           I figure that if I had an award from the worker's

24   comp trial that, that should overrule what I did when I

25   signed out to go to retire.

1                That's it, Your Honor.

2                THE COURT:  Okay, thank you, Mr. Jankowski.

3                And on the next claimant, forgive me if I am not

4        pronouncing the name correctly, Louis J. Alarie?

5                MR. ALARIE:  That's right, Your Honor.

6                THE COURT:  Would you like to argue, Mr. Alarie?

7                MR. ALARIE:  Louis J. Alarie is the English

8        pronunciation of Louie Alarie, good French name.

9                THE COURT:  Do you have a preference as to what I

10       call you?

11               MR. ALARIE:  The English pronunciation is fine.

12               THE COURT:  Okay, then proceed with your argument,

13       please.

14               MR. ALARIE:  A couple of points of clarification

15       that you might need.  The reduced pension that the previous

16       callers talked about was a percentage of the pension that

17       was earned to be set aside for your spouse upon your death.

18       In my case it was five percent and it would have been half

19       of what my pension would have been, because my wife is

20       basically the same age I am.  All right, that was an

21       agreement and it is done, and I certainly hope this goes on.

22               Now, to my argument.  The other folks are arguing

23       about the fact that we didn't have a contract, signed

24       contract for this life insurance reduction.  Well, no, we

25       don't have a signed contract.  We have an implied contract.

Page 101

1          When I wanted to retire and sat down with the

2    retirement people at the corporation, this is what I was

3    going to get, five percent was going to be set aside for my

4    wife's pension after I die, and so on, and so on, and life

5    insurance one time your base salary.  I'm sure you

6    understand that, because the others have spoken about it.

7          THE COURT:  Yes, continue, please.

8          MR. ALARIE:  In my case, I guess I wasn't as well

9    paid as some of them, but in my case it amounted to $36,000

10   that they just cut out from underneath me.

11         Now, I retired September 1st, 1990.  I have been

12   retired almost 22 years.  I'm 77 years old, all right?  I

13   took an early retirement back in the days when they could,

14   they were going through a cost reduction program, and if you

15   could eliminate your job without just quitting, they would

16   let you retire early.  Well, I did.  There's a long story to

17   that, but you don't need that for the discussion.  I just

18   fulfilled all the requirements, and I went out early.

19   That's why I'm only 77 and been retired for almost 22 years,

20   but that's beside the point right now.

21         The point of the matter is it was an implied

22   contract.  It was listed on my sheet when I retired.  I

23   still have it.

24         Now, I realize that the board of directors can

25   change things whenever they want to.  My point is this, the

Page 102

1      board of directors was coerced in this guided, dictated,

2      bankruptcy which broke all the rules of bankruptcy that I

3      can rely on by putting one group of people ahead of

4      creditors in the payoff, and to hell with everybody else.

5      And we'll just cut out the life insurance and we won't have

6      to pay that premium anymore.

7              In addition to that, the car czar said, we don't

8      need to give the retirees any cost of living adjustment, and

9      my pension hasn't increased, except over the medical

10     business that they got out of two, three years ago.  My

11     pension hasn't increased in four years, since bankruptcy.

12     No cost of living allowance.  Finally, this year Social

13     Security Administration has decided, well we've had enough

14     inflation, well, we'll give the people some more money.

15     Comes down to less than $50 a month.

16             Now, my point is this.  I counted on my full life

17     insurance as a part of my retirement, early retirement.  I

18     had, at one point in time, but I gave up on it because the

19     premium was too great, the opportunity to buy up to four

20     times my base salary which I did when I was working for a

21     long period of time, and for the first five years of my

22     retirement.  The premium got so great that I decided that I

23     really can't afford that.  All right?

24             Here's the bit.  I retired under certain premises,

25     written or not written.  I have a paper in which my

Page 103

1     retirement benefits were listed and on that paper is life

2     insurance, term life insurance.

3              Now, I have written you two letters recommending

4     several possible solutions to this problem.  I'll add one

5     more.  Out of the treasury stock in the corporation, in the

6     new corporation, they give us five shares for every $100 of

7     life insurance that they took away.  Now, that would cost

8     them the printing and issuing of the life insurance policy

9     and a reduction in their treasury issues.  And I'm going to

10    say to you this.  You are a federal employee, and I respect

11    that position, but put yourself in our position, where some

12    dictated, guided bankruptcy, which broke all the rules, can

13    come along and say, I'm sorry, Judge, you're not going to

14    get a big life insurance policy as you used to have, and

15    we're going to reduce your pension, and we're going to do a

16    whole bunch of things, and we're going to cut off your

17    surviving spouse, and take it or leave it.  Now, I don't

18    think you'd like that.  Or if we have some nutcase in

19    Congress who decides we don't need your level of federal

20    judge and, so, we're going to do away with you and all of

21    your pensions and benefits, take it or leave it.  What would

22    you do?  You'd be really unhappy, I think.  So, would your

23    wife if you've got one.

24              THE COURT:  I do, but please continue.

25              MR. ALARIE:  Now, the point is the government, the

Page 104

1      administration, the car czar made edicts telling the

2      corporation you will do these things, or we won't bail you

3      out.  And guess what?  The top executives and their salaries

4      are scrutinized.  The bonuses are scrutinized.  The unions,

5      they get their money because they have a contract and the

6      government can't fight that nor do they want to.  That's

7      their voting base.  We got screwed, Your Honor.  Flat out

8      screwed by the administration and the whole thing, and I

9      know how you're going to probably rule, because it's written

10     all over the political pages of the newspaper, but be that

11     as it may, I think we got some sort of compensation coming,

12     shares of stock, five shares for every $100 that we got

13     screwed out of, maybe only four because it did close at $26

14     yesterday.  Or a one-time, now I put this in the letters I

15     sent to you.  A one-time premium, get all your whiz kids

16     sitting down, figure out with the insurance companies how

17     much money it would be necessary to buy a one, one-time

18     premium to cover everybody and all the money.  And then

19     figure that out and add that to your liquidation

20     proceedings.

21             Another possible situation is to flat out restore

22     it and tell the corporation that they have to do that.  You

23     told them they could take it away or had to take it away.

24     Now tell them they got to put it back.  There are altogether

25     too many people out here in the world that had their, some

Page 105

1    of their financial legs just cut right out from under them.

2    And that's not right.  It is not the way to do business.

3            And I guess I'm done, so I will await your ruling,

4    sir.

5            THE COURT:  Very well, thank you.

6            MR. ALARIE:  Hello?  Are you there?

7            THE COURT:  Yes, but I didn't want to interrupt

8    you.

9            MR. ALARIE:  I'm sorry, I cannot hear you.

10           THE COURT:  Can you hear me now?

11           MR. ALARIE:  Not well.

12           THE COURT:  Well, I'm speaking very loudly and

13   directly into the microphone.

14           MR. ALARIE:  Okay, now you're coming through.

15           THE COURT:  Okay, thank you, Mr. Alarie. I would

16   like to hear next from Mr. Conrad, Mr. George Conrad, if he

17   would like to heard.

18           OPERATOR:  Your Honor, this is your operator

19   again.  Mr. Conrad has not joined the feeder.

20           THE COURT:  Oh, okay.  Very well.  Then I believe

21   I have heard from all of the people on this motion, and

22   after they spoke, I'm now going to give Mr. Griffiths the

23   chance to reply, to respond to the new matter that was set

24   forth by the people who have just had a chance to be heard.

25           MR. GRIFFITHS:  Thank you, Your Honor, and I'll

Page 106

1       try and speak as loud as I can into the microphone, as well.

2               Turning first to Mr. Hickman's submission,

3       obviously on July the 10th, 2009, benefits were transferred

4       to new GM as part of the master settlement purchase

5       agreement.  New GM assumed responsibility for all pension

6       obligations and assumed welfare benefit plans, as modified,

7       and then put in place some modifications of its own.

8               I'm more than happy to spend as much time as

9       necessary with Mr. Hickman trying to determine what

10      additional benefits from new GM he thinks he may be entitled

11      to.  I'm more than happy to intercede with new GM and with

12      their employee benefits team to determine whether Mr.

13      Hickman was contacted by them, and whether there were any

14      procedural irregularities in that respect.

15              I would just like to point out that these are

16      benefits provided by new GM, not by the debtors or the GUC

17      Trust and, therefore, this issue that he has raised today,

18      does not have a bearing on his claim against the debtors or

19      the GUC Trust.

20              With respect to life insurance specifically, I

21      believe that the offer that was made by new GM following the

22      master settlement purchase agreement, was a one-time offer

23      to former employees, or retirees, to purchase additional

24      life insurance at a reduced cost, and while I haven't seen

25      the terms of that document, it was an offer made by new GM.

Page 107

1      I don't believe it affected pension benefits, as such.

2            Pension benefits, having been assumed by new GM,

3      were then subsequently increased by $300 to compensate for

4      the benefits.

5            THE COURT:  Well, I understood Mr. Hickman to say

6      that he made a decision about, and I would have to go back

7      to my notes, either life insurance based upon pension, or

8      pension based upon life.  But, your point is that each of

9      those is now being covered by new GM, and that it isn't

10     relevant to this motion or this objection that I have before

11     me today?

12           MR. GRIFFITHS:  Yes, Your Honor.  Pensions were

13     assumed by new GM.  Life insurance was reduced to $10,000,

14     the $10,000 obligation was assumed by new GM, as well.

15     There may have been a one-time offer by new GM for former

16     employees to purchase addition insurance; that's not

17     relevant to Mr. Hickman's claim, and the fact that the offer

18     was made doesn't grant Mr. Hickman a claim for the modified

19     benefits between the difference his life insurance would

20     have been and what it was subsequently reduced to based on

21     the arguments we've raised in our objection and reply.

22           MR. HICKMAN:  Your Honor?

23           THE COURT:  I'm going to give you a chance to be

24     heard again, Mr. Hickman, but I don't want to interrupt

25     Mr. Griffiths in his points.  Make a note of the thought you

Page 108

1    want to express to me, and I'll hear it in a couple of

2    minutes.

3              Mr. Griffiths, please continue.

4              MR. GRIFFITHS:  I have nothing else to say with

5    respect to Mr. Hickman.

6              THE COURT:  Okay, well then maybe it's good, even

7    though you have other things on other people, to give Mr.

8    Hickman a chance to respond now?

9              MR. HICKMAN:  Thank you, Your Honor.

10             I believe Mr. Griffiths is primarily correct.

11   When I filed my first loss on the old GM for the bankruptcy

12   losses, I think all of us have become better educated.

13   Maybe we should have been at a better level at the time we

14   filed those losses.  I have since studied it enough to

15   understand that those losses are basically a part of the

16   federal bankruptcy proceedings.

17             The really only two items that I see that stand

18   out.  One is the is the one I brought to your attention, and

19   that's the fact that either all or a select number of GM

20   white collar employees, salaried employees, were offered a

21   one-time opportunity at the employee expense to replace the

22   lost life insurance should they choose to.  It was

23   communicated to a group of salaried employees and I don't

24   know in what fashion, and it was a slight window in time,

25   either seven or 10 days that you could purchase it.  Someone

Page 109

1    read me the notice over the phone from the East Coast, I

2    didn't, never received it.  So, I called Metropolitan and

3    both HR.  Metropolitan acknowledged that yes, you did have a

4    short window in time that we sent out shortly after the

5    bankruptcy proceedings allowing the salaried employees at

6    their expense to purchase the life insurance, but you cannot

7    purchase it now because the window is closed.

8              So, I would like to proceed as to how I was not

9    notified and can that window be reopened, so I can

10   participate in that claim at my expense?

11             THE COURT:  Okay, I think I understand now, and

12   when I asked my question before and had uncertainty, I think

13   you've now answered it.  You may have said it right the

14   first time too, but now I understand it.

15             Okay, back to you, Mr. Griffiths.

16             MR. GRIFFITHS:  Mr. Hickman's understanding is

17   largely correct.  If an offer for life insurance was made by

18   new GM and wasn't communicated to him, that's not a matter

19   for the Motors Liquidation Company GUC Trust.  That being

20   said, we're more than happy to intercede with new GM to

21   determine the factors surrounding the offer, and I would

22   just like to point out, although I don't want to argue the

23   case for new GM, that ERISA doesn't require all employees to

24   be treated equally.

25             I can't speak to why Mr. Hickman may or may not

Page 110

1    have received this offer, but I can certainly spend as much

2    time as is necessary at finding out why, explaining it to

3    Mr. Hickman, and bringing it to Your Honor's attention if we

4    believe that there is a procedure irregularity in that

5    respect.

6              THE COURT:  Okay, then would you continue, please.

7              MR. GRIFFITHS:  Yes, Your Honor, thank you.

8              The next claimant is Mrs. Schneider.

9    Mrs. Schneider's correct that pensions were transferred to

10   new GM.  Mrs. Schneider sent us a fax yesterday which we

11   forwarded to the Court which raised this new issue with

12   respect to whether she should be receiving additional from

13   new GM.  The arguments are largely the same, as raised for

14   Mr. Hickman.  Pensions were transferred to new GM following

15   the master settlement purchase agreement.  If new GM

16   determined to make some additional benefits available to

17   Mrs. Schneider, that's their right to do so.

18             Again, I'm more than happy to contact new GM to

19   determine why Mrs. Schneider is not receiving benefits to

20   which she's entitled.  Having briefly looked into it last

21   night, I suspect that the answer revolves around the

22   definition of surviving spouse, and that those benefits are

23   only available as an additional premium where a surviving

24   is, in fact, what is meant by the word where the --

25             THE COURT:  In other words, you're wondering it

Page 111

1    would apply if you've lost your spouse --

2            MR. GRIFFITHS:  Correct.

3            THE COURT:   -- it would not yet be triggered if

4    both spouses are still living?

5            MR. GRIFFITHS:  Exactly, Your Honor.  The

6    definition of surviving spouse is used in all of the GM

7    communications that I'm aware of refer to surviving spouse

8    in that sense.

9            The document that Mrs. Schneider sent through

10   doesn't use a defined term, as such, but new GM should be

11   able to clear up the matter, I think.  My firm will be able

12   to have more success than she will in getting new GM to

13   respond to the request and we would, of course, do so.  And

14   again, if there is any irregularity, bring it to Your

15   Honor's attention.  This doesn't affect Mrs. Schneider's

16   claim against the GUC Trust or the debtors which I believe

17   is unfounded.

18           THE COURT:  Okay, continue please.

19           MR. GRIFFITHS:  Thank you, Your Honor.

20           Next is Mr. Jankowski.  I would just like to

21   briefly address the settlement that Mr. Jankowski addressed.

22           I've reviewed this as part of Mr. Jankowski's

23   proof of claim, and then subsequently requested additional

24   documentational pages from the judgment, so that I could

25   review it.  This was a settlement providing, to settle a

Page 112

1    worker's compensation claim that the transcript itself has

2    Mr. Jankowski's attorney explaining that Mr. Jankowski would

3    not be able to prove a worker's compensation claim against

4    General Motors, that General Motors had agreed to enter into

5    a settlement in full and final settlement of all the claims

6    that Mr. Jankowski had brought, and the settlement goes on

7    to note that this would have no effect on Mr. Jankowski's

8    pension benefits.  There's no mention of welfare benefits,

9    as such.

10           Again, Mr. Jankowski's pension was transferred to

11   new GM on July 10, 2009.  New GM is responsible for

12   Mr. Jankowski's pension.  I'm not aware of any changes to

13   the pension itself.  I believe it continues to be paid.  It

14   is not a responsibility of the debtors or of the GUC Trust

15   and, therefore, the settlement has no bearing on the claim.

16           Mr. Jankowski has also raised the question of

17   extended care provided by new GM.  I've explained the basis

18   on which there is no claim against the debtors or the GUC

19   Trust to Mr. Jankowski, but I'm happy to put it on the

20   record.

21           The extended care program was a voluntary program

22   that employees entered into on a pay-as-you-go basis,

23   whereby they would pay additional premiums out of their own

24   pocket to cover certain additional welfare benefits.  That

25   welfare benefit plan was subject to the same terms and

Page 113

1    conditions as all of GM's welfare benefit plans, insofar as

2    it could be amended or terminated at any time.

3          Mr. Jankowski was provided with the benefits under

4    that plan while it was in existence.  Once it had

5    terminated, Mr. Jankowski was no longer for additional

6    payments, that GM is no longer responsible to provide that

7    benefits, and no recovery is possible for the premiums paid

8    because, like any insurance policy, a home insurance policy

9    or anything like that, he was covered during the time that

10   the payments were being made.  So, had he elected or had, in

11   fact, availed himself of the benefits, then he would have

12   received those benefits.

13         Lastly, that Medicare payments are not the

14   responsibility of the debtors or the GUC Trust and,

15   therefore, we have no liability for those.

16         THE COURT:  Okay.  Anything further, Mr.

17   Griffiths?

18         MR. GRIFFITHS:  Only if Mr. Jankowski would like

19   to reply further.

20         MR. JANKOWSKI:  Yes, I feel that you should

21   reimburse me for all this.  See, I lost my spouse in 2003,

22   had 29.6 years seniority, and when I look at my contract

23   with General Motors it states in there that you guys owe me

24   for my retirement benefit, and there's -- what are

25   retirement benefits?  And that was everything -- I put my

Page 114

1    life into this, into that company.  I retired because if I

2    would have I would have been dead, and I had everything set

3    up for my wife so that in case I did die she was had gotten

4    five times my base pay and been set for life.  Well, it

5    didn't work that way, I ended up burying her, so I feel GM

6    needs to compensate me all the monies that I contributed to

7    that extended care program, to my medical bills that are --

8    or medical premiums that I had to pay from the latter '90s

9    to when they got the other contracts going with the union.

10   And I feel they owe me what they owe me, what I asked the

11   judge for.

12          And I sent the judge a letter and I hope he

13   received it the other day about, you know, what happens to

14   me.  Look, you're a judge, I'll let you have that and let

15   you make your decision.

16          Thank you.

17          THE COURT:  Mr. Griffiths, continue with the next

18   claimant, please, if you wish.

19          MR. GRIFFITHS:  Yes, Your Honor, the last claimant

20   is Mr. Alaire.  Clearly all pension benefits again were

21   transferred to new GM addressing Mr. Alarie's argument

22   earlier.

23          Mr. Alaire argues that new GM -- sorry, that

24   General Motors didn't make the reduction in benefits, it was

25   otherwise forced on them through the U.S. Treasury and so on

Page 115

1    and so forth.  We've cited the minutes of the board of

2    directors of the debtors reducing their benefits, in fact

3    well before the bankruptcy, and we believe the benefits are

4    being validly reduced.

5            Mostly the facts with respect to Mr. Alarie are

6    very similar to those in Sprague and we cited Sprague as

7    authority for the elimination or the expungement of

8    Mr. Alarie's claim.

9            THE COURT:  Okay.

10           MR. GRIFFITHS:  That concludes our submissions.  I

11   do believe that Mr. -- I think it was Mr. McMullen and

12   Mr. Conrad had -- had agreed to attend today's hearing and

13   haven't attended and we're happy to rely on our submissions

14   and on the written submissions for each of those claims.

15           THE COURT:  Okay, thank you, Mr. Griffiths.

16           Is there any claimant who has anything further to

17   say in reply to what Mr. Griffiths said the second time?

18   Mr. Jankowski and Mr. Hickman having already availed

19   themselves of that opportunity, and then I'm going to rule.

20           MR. ALARIE:  This is Lou Alarie.  I would like to

21   make some additional comments.

22           THE COURT:  You may, sir, so long as they're

23   limited to anything new that Mr. Griffiths said the second

24   time.

25           MR. ALARIE:  Right.  That letter that was spoken

1    about about giving us the opportunity to buy life insurance

2    when they did away with it, I never received any letter like

3    that, and would have availed myself of it had I received it.

4    Because for the first five years of my retirement I did

5    participate in the extra up to four times your base salary

6    until the premiums got to be enormous, and I decided that I

7    didn't need to do that.

8            As far as the board of directors I'll still make

9    my contention that even though before bankruptcy was

10   announced the board of directors was coerced into the

11   bankruptcy, the bankruptcy was guided by the administration

12   and the car czar and they put a group of people ahead of

13   creditors, they broke all kinds of rules in your court, sir.

14   I'm sorry, but it comes down to this, you're hiding behind

15   coercion.  You want our money you'll do this.  Well, the

16   board of directors said, yeah, all right we'll do this, now

17   give us the money and we'll announce bankruptcy.

18           I'm sorry, I just can't find a place in my heart

19   for what went on any place, any time.  I think that the

20   liquidation company and its attorneys are presenting a

21   factual case, yes, based on the dates of the board of

22   directors' meetings, but as Paul Harvey used to say,

23   "They're not telling you the whole story."  And I think they

24   should be brought to account.

25           Thank you, sir, I will await.

Page 117

1              THE COURT:  Thank you.

2              Okay, folks, I want you to sit in place if you're

3    in the courtroom or stand by the phone, you're going to hear

4    a couple of minutes of silence.

5         (Pause)

6              THE COURT:  All right, folks, now I must rule.

7              In these contested matters in the jointly

8    administered Chapter 11 cases of Motors Liquidation Company

9    and its affiliates, Motors Liquidation being the new name of

10   the old GM.

11             Old GM moves, along with the recently formed GUC

12   Trust, which is a trust formed for the benefit of old GM's

13   creditors to disallow and expunge the welfare benefit claims

14   of retirees and former employees pursuant to old GM's 83rd

15   and 103rd omnibus objections.

16             Welfare benefit, as I used that expression to

17   describe the claims of the retirees and former employees, is

18   a word of art in pension law or ERISA law and bankruptcy law

19   to describe benefits offered to employees, at least

20   principally in the medical and life insurance areas, and are

21   to be compared and contrasted to pension benefits which are

22   not the subject of this motion that we have before us today.

23             As I'll go on to explain in more detail, the

24   claims, insofar as they are based on such welfare benefits

25   for medical coverage or life insurance coverage, must,

Page 118

1    unfortunately, be disallowed.  It gives me no pleasure to

2    deny these claims.  Denial of these claims results in

3    hardships on the objectors.  It also, of course, imposes

4    hardships on those who did not object.  And, in fact, the

5    changes in the life insurance and medical benefits have

6    created hardships on thousands, or at least hundreds, of

7    similarly situated employees.  I'm well aware of that fact,

8    folks, but I am compelled to comply with the law and I'll be

9    discussing that law momentarily.  First, however, my

10   findings of fact.

11           On June 1st, 2009, GM and its affiliates commenced

12   these Chapter 11 bankruptcy cases.  The following

13   individuals, among others, timely filed proofs of claim.

14   Mr. McMullen, Ms. Darlene M. Schneider, Mr. Robert R.

15   Hickman, Mr. Floyd Jankowski, Mr. Louis Alarie, and

16     Mr. George Conrad.  That's six people who filed the

17   objections that are before me today, four of whom orally

18   argued.  And I've considered both the written submissions

19   and the oral argument in reaching these decisions.

20           Pursuant to procedures that were set up earlier in

21   this case, the debtors filed omnibus claims objections to

22   the claims of the six people I mentioned, among many, many

23   others.  An omnibus claims objection is one that applies to

24   many people or entities at the same time.

25           The debtors and then the GUC Trust did so because

Page 119

1     they have a fiduciary duty, that is a duty as a matter of

2     trust, to the remainder of the creditors of old GM's estate

3     to allow the claims that are deserving of allowance but, at

4     the same time, to object to those that are not.  The omnibus

5     objections before me today were directed at claims of

6     retired or former employees of old GM.  Each of the six

7     folks who I'm dealing with today timely responded to the GUC

8     Trust's objections and the common thread that deals with all

9     of these is that these objections, which are all, and I

10    emphasize this and I'm going to come back to it, directed at

11    claims that old GM rather than new GM involved rights that

12    old GM had reserved or, to put it in another word,

13    maintained and don't involve obligations that might be

14    obligations imposed upon new GM.

15          Several points that were made today, most

16    significantly by Mr. Hickman, though he wasn't the only one,

17    deal with rights that some of them may have, vis-à-vis, new

18    GM and I'm going to say now and I'll probably say again that

19    rights against new GM aren't affected one way or the other

20    by the objections we have here today.

21          Now, turning to my conclusions of law, including

22    certain mixed findings of fact in law.  A proof of claim is

23    prima facie evidence of the validity and amount of the claim

24    and the objector bears the initial burden of persuasion.  In

25    Re: Onita, Limited, 400BR at page 389, a decision of Judge

Page 120

1    Cropper of this Court.  What that means, translating from

2    the Latin, is that, once a claimant, like each of the six

3    people here, files a proof of claim, assuming at least if

4    it's satisfactory, which all here have been found to be

5    satisfactory in the first instance, it's good enough unless

6    there is an objection.  It's good enough to get paid the

7    amount set forth in the claim.

8            When a proof of claim has been filed, the burden

9    then shifts to the claimant if the objector produces

10   evidence equal in force to the claim that was previously

11   filed, which, if believed, would refute at least one of the

12   allegations that's essential to the claim's legal burden.

13   When the burden is shifted back to the claimant, the

14   claimant must then prove by a preponderance of the evidence

15   that, under applicable law, the claim should, again, be

16   allowed.

17           Now, here we have exactly that situation.  Each of

18   the claims was prima facie okay.  The GUC Trust then

19   objected and met its burden, which meant that the claimants

20   once more had the burden, and then I decide what the

21   claimants are entitled to based on all of the evidence

22   before me.

23           Here I am required to find and I do find as a

24   mixed question of fact and law that the claimants haven't

25   met their burden to show that their welfare benefits vested,

Page 121

1    which means putting it in plainer English that they couldn't

2    be taken away.

3              In dealing with claims of old GM retirees, which

4    were very, very similar to the claims that are before me

5    now, the U.S. Court of Appeals for the Sixth Circuit, in a

6    case called Sprague versus General Motors Corp., 133 F.3rd,

7    388, determined that, because vesting of welfare planned

8    benefits is not required by law, an employer's commitment to

9    vest such benefits is not to be inferred lightly.  The

10   intent to vest must be found in the plan documents and must

11   be stated in clear and express language.  And as the Sixth

12   Circuit observed in the Sprague decision, at page 401 of

13   that decision, most of the summary plan descriptions

14   unambiguously reserved GM's right to amend or terminate the

15   plan.

16             What that means is that, while the claimants may

17   very well have had, and I assume for the purpose of this

18   analysis they had rights as the claimants have alleged them,

19   new GM had the right to terminate those benefits and the

20   plan documents that the employees had said that.  Thus,

21   although the benefits existed at one time, they could be

22   changed and new GM changed them.

23             Now, I am intentionally taking documents and plan

24   descriptions that could be described in more legalese terms

25   and I'm, in essence, translating them into plain English so

Page 122

1       that educated people, but who are not lawyers would better

2       understand the reasons for this ruling.  I invite people, if

3       they want to, and, of course, any Appellate Court reviewing

4       my work, to read the Sprague decision in greater detail and

5       to read the plan documents of each employee in greater

6       detail.

7               Now, several of the claimants have talked about

8       decisions they made based on the documents that they read at

9       the time and Mr. Jankowski, in particular, asked for a

10      return of his premiums because he feels that he didn't get

11      what he paid for.  I well understand Mr. Jankowski's

12      frustration in this regard, but what Mr. Jankowski was

13      paying for was the benefits that were described in the

14      benefit plan documents that he got and the benefit documents

15      that he got showed the rights that GM leader availed itself

16      of.

17              I know how frustrating that is, but because the

18      plan documents reserved or maintained that right, and,

19      again, I'm translating into plain English, the premiums that

20      he paid got him the benefits that were then described.  And

21      those benefits that were then described that he admittedly

22      and acknowledgedly paid for gave old GM the right to change

23      them.

24              Now, others, most significantly Mr. Hickman, make

25      a slightly different kind of claim.  Mr. Hickman said in

Page 123

1    substance that, while he understood the basis for the

2    changes, he was making a different contention.  In

3    substance, and I know I'm paraphrasing, he said that there

4    was a window of time, roughly seven to ten days, although I

5    don't hold him to that, during which an offer was made to at

6    least some people, to his understanding, an offer that was

7    made by a mailing that he understands some of them to have

8    received, but that he did not receive, to participate in an

9    opportunity to replace lost life insurance.  That offer,

10   however, appears to have been made by new GM rather than old

11   GM and it is possible, in Mr. Hickman's case, also Ms.

12   Schneider's and perhaps others, that they may have rights

13   from new GM but, if that's so, they're not the subject of

14   this motion.

15          With very limited exceptions, none of which apply

16   today, my responsibilities involve determining what old GM,

17   now called Motors Liquidation Company and now the GUC Trust,

18   owe to their employees not what new GM might owe or MetLife

19   if new GM set up arrangements with MetLife.  I will say and

20   will require the GUC Trust to say that my ruling is without

21   prejudice, which means it doesn't affect rights that any

22   former employees have against new GM or anybody retained on

23   behalf of new GM.  Such rights are unaffected by this

24   determination.

25          Mr. Griffiths said, if I heard him right and I'm

Page 124

1    pretty sure he did because I think I heard him say it more

2    than once, that he would be happy to help people who are the

3    objectors on this motion communicate with new GM and to be

4    of any assistance he could.  I'm not ordering him to do

5    that, but I appreciate his offer in that regard.  And though

6    the people on the phone couldn't see that, when I just said

7    that, Mr. Griffiths nodded in an up and down yes direction.

8         I know that is not full consolation to the people

9    who were affected by this motion, but they should understand

10   that he's trying to do the right thing.

11        The one other contention that was made that isn't

12   already governed by what I said so far was the contention

13   made by Mr. Alarie that, in this bankruptcy that either I or

14   the Treasury Department or the United States Government or

15   perhaps new GM or some combination of them, broke all of the

16   rules of bankruptcy when we got to this point in the

17   bankruptcy case.

18        The contentions that Mr. Alarie made were

19   addressed in a written opinion that I issued that was

20   roughly 80 pages long, which was then appealed to, if I'm

21   not mistaken, five  district judges and, in one of those

22   appeals, also to the Second Circuit Court of Appeals.  Two

23   or perhaps to a lesser extent three of the District Court

24   opinions were district courts to whom the earlier

25   proceedings were made issued their own rulings and, in those

Page 125

1    two, the decision was affirmed.  I tried very hard, folks,

2    to get it right.  I guess the Appellate judges were the ones

3    who would ultimately decide that.

4           But those rulings are what they are and fully

5    understanding the views of Mr. Alarie on this issue and the

6    views of hundreds of others, maybe thousands of others, who

7    have expressed views yea or nay on the wisdom of what

8    happened up to this point, what has happened up to this

9    point gives me the case as I'm now required to decide it.

10   People, of course, have the right, if they think the

11   government did the wrong thing, to be heard at the ballot

12   boxes around the country.  But a judge like me is sworn to

13   obey the law and to try to decide what the law is the best

14   he or she can.  And, folks, that's what I did and, after

15   having done so, I necessarily must take the case in the form

16   in which it's now presented to me.

17          Now, Mr. Griffiths, I'm authorizing and directing

18   that you settle an order in accordance with what I just

19   said.  Settling an order is a word of art that doesn't mean

20   what it sounds.  Settling an order means proposing an order

21   that I sign that is sent out to people who have the right to

22   comment on whether they think an order as presented to me

23   for signature is consistent with the ruling.

24          After that order is entered, each of the six

25   people who objected has the right to seek appellate review

Page 126

1    to appeal the order.  The time to appeal in a bankruptcy

2    case is much more limited than it is in other areas of the

3    law.  Fourteen days.  But the time to appeal is going to run

4    from the time that my order is entered, not from the time

5    that I am dictating it now.

6           If you are not objecting to the form of the order,

7    but you nevertheless want to appeal it, you have that right

8    as long as you file a notice of appeal within the 14 day

9    deadline after the appeal is entered and after, assuming, of

10   course, that you comply with the other requirements for

11   prosecuting the appeal that the law has, most significantly

12   in rules of the Federal Bankruptcy Procedure that are to be

13   found in rule, starting with 8,000.

14          Folks, I understand once more how hard this case

15   has been on you and on other employees similarly situated.

16   Other employees, other retirees.  But, once again, I am

17   required to comply with the law.

18          We're now going to take a recess until 1:30.  It's

19   now 1:22 by the clock in my courtroom.  I don't know if

20   you're all on the eastern time zone or not. and then I'm

21   going to take the remaining matters.

22          Those who are on the phone whose matters I

23   just dealt with are free to drop off the call or to stay as

24   they choose.  I would ask for further patience from those

25   people whose claims I have not yet addressed and we'll

Page 127

1    continue again at 1:30.  We're in recess.

2        (Recess at 1:22)

3            THE COURT:  Have seats, please.

4            Okay.  I want to thank the folks who are on

5    the phone for their patience.  It's been a very long day and

6    we're not done yet, but we're just going to keep moving

7    forward.  Okay.

8            I have counsel for the GUC Trust in the courtroom.

9    Do I have recommendations as to which of the remaining

10   issues you'd like to deal with next?

11           MS. GREER:  Certainly, Your Honor.  Stephanie

12   Greer from Dickstein Shapiro on behalf of the GUC Trust.

13           Your Honor, I'd suggest that we take Ms. Meyer's

14   claim first, followed by Mr. Marangos so we don't have to

15   keep them on the phone.  We can go to the uncontested

16   matters.  And just, I wanted to also give Your Honor an

17   update as follow-up from our February 9th hearing.  It won't

18   take but a minute, but I think we should take Ms. Meyers

19   first if you're amenable to that.

20           THE COURT:  Fair enough.  Ms. Meyer, Ms. Patricia

21   Meyer, are you still with us?  CourtCall?  Do we still have

22   Ms. Meyer showing as on your line?

23       Court Operator:  No, Your Honor.  Her line is no longer

24   connected.

25       THE COURT:  Oh.  It's no longer connected.  All right.

Page 128

1          Then, Ms. Greer, I'm going to recommend a

2    revision.  I will dictate a decision on Ms. Meyer, but I

3    wonder if it would make sense if Mr. Marangos wants to argue

4    to move him up then and then I can dictate the decision

5    thereafter.

6          MS. GREER:  Sure.  That's fine, Your Honor.

7          If you'd like, my colleague, Ms. Whitman, is here

8    with me.  She could go and see if she could get in touch

9    with Ms. Meyer, have her dial back in.  You know, I

10   understand, perhaps, she got, you know, brought away.  We

11   could at least give her the opportunity.  I think we can do

12   that if you'd like.

13         THE COURT:  I think that's an excellent idea.  Can

14   we do that?

15         OPERATOR:  Sure.

16         THE COURT:  Okay.  Well, Mr. Marangos, are you on

17   the phone?

18         MR. MARANGOS:  Yes, Your Honor.  I'm here.

19         THE COURT:  Okay.  Very good.  All right.  Then

20   here's how we're going to do this one.  Ms. Greer, I'm going

21   to hear your objection first, then I'm going to hear

22   Mr. Marangos, then I'm going to hear any reply that you

23   might have to what Mr. Marangos says, and I'm going to give

24   Mr. Marangos one opportunity further to be heard, but

25   limited to any of the new stuff that you might say the

Page 129

1    second time around.

2            MS. GREER:  Sounds good, Your Honor.

3            THE COURT:  Okay.  Then go ahead, please.

4            MS. GREER:  Mr. Marangos, I'd like to also thank

5    you for your patience.  I will be brief, Your Honor.  I know

6    you've read the papers and, of course, happy to answer any

7    questions.  Your Honor, Mr. --

8            MR. MARANGOS:  Can you speak any louder?  I'm

9    unable to hear very well.

10           MS. GREER:  I'm sorry, sir.

11           MR. MARANGOS:  That's okay.

12           MS. GREER:  Is that better?

13           MR. MARANGOS:  Yes.  Thank you.

14           MS. GREER:  Okay.  You're welcome.  All right.

15           Your Honor, Mr. Marangos filed in excess of $20

16    million claim against the debtors.  The claim is labeled as

17    a claim for personal injury and other.  The allegations in

18    Mr. Marangos' claim have all been addressed in prior

19    litigation before courts in Michigan.  There were eight

20    cases that Mr. Marangos filed against old GM.  Each of those

21    cases was resolved in favor of old GM.  In certain cases,

22    Mr. Marangos  exercised his rights of appeal.  In other

23    cases, I'm not sure that he did.  But in any event, all of

24    those rights to appeal or seek reconsideration were well,

25    are past prior to the commencement of the bankruptcy case.

Page 130

1          It appears that -- all of the allegations that Mr.

2     Marangos made are related to the prior litigation and Mr.

3     Marangos acknowledges that.

4          MR. MARANGOS:  Hello?

5          THE COURT:  I'm not sure what that noise was,

6     Ms. Greer, but why don't you try to continue?

7          MS. GREER:  Okay.  Sorry.  And Mr. Marangos

8     acknowledges that his claims as set forth in, his proof of

9     claim, in fact, do relate to that same litigation.  In his

10    response, what Mr. Marangos says is that the prior

11    litigation was subject to various corrupt practices and

12    otherwise.  I don't believe, Your Honor, there's any basis

13    for any of that.  Mr. Marangos filed numerous, numerous

14    pages of documents, including his odyssey brief, which we

15    addressed in part in our response.

16          But the bottom line, Your Honor, is that all of

17    the allegations that he's made he had an opportunity to

18    raise with GM prior to the bankruptcy.  They were raised and

19    litigated.  Any allegations that those cases were not

20    properly addressed, for whatever reason, have no basis in

21    fact as I can see it and, certainly, all those rights

22    expired prior to the bankruptcy case.  So Mr. Marangos is

23    essentially looking for another bite at the apple, so to

24    speak, and we don't see any basis to give him one.

25          In short, Your Honor, there is no pre-petition

Page 131

1    right to payment that gives rise to a claim and Mr. Marangos

2    hasn't met his burden.  So, Your Honor, we'd request that

3    the Court expunge the claim and certainly reserve our rights

4    with respect to anything Mr. Marangos has to say.

5            THE COURT:  Very well.  Mr. Marangos, would you

6    like to be heard?

7            MR. MARANGOS:  Again, I understand what the

8    counselor is saying, but I want to add that I have sent a

9    filing in to the Court and to the law office of Dickstein

10   Shapiro to Ms. Stephanie, they will agree and explain what

11   basically has transpired and why these cases have been

12   dismissed.  This case has however been dismissed under false

13   pretense and especially over 100 exhibits I sent to the

14   Court.  I have the proof there was a filing of civil rights

15   and EOC for discrimination, and they should not have

16   dismissed the case unless it went to the full review and

17   give me the opportunity to present myself at the Court and

18   talk about it.

19           And, unfortunately, there is missing from the

20   Sixth  District Court of Detroit with no position and, if

21   I'm not mistaken, the laws clarify he should not dismiss

22   discrimination case from EOC civil rights until an end that

23   shows satisfaction.  Unfortunately, Judge O'Meara (ph)

24   again, was not good with Spanish and, in fact, the EOC would

25   have request the Sixth District Court to provide me with an

Page 132

1    attorney because once the EOC complained and he denied this

2    right to me.

3               Also, the court clerk can provide me with the full

4    basis of the right to the Court to give me an attorney and I

5    can when I submit to them they just deny me to provide an

6    attorney to me.

7               So, basically, they have railroaded everything

8    with end of my case, they say (indiscernible - 00:07:40) to

9    be called and then I was given all the rights and the

10   resource to stay on that before the case and follow the

11   proper procedure and finalize.  But, unfortunately, the

12   Court would not allow me to present myself to the Court

13   neither to see what has happened there behind closed doors.

14   I did not bother to (indiscernible - 00:08:01).  Nobody

15   knows.  (Indiscernible - 00:08:04) they have misplaced the

16   EOC right to (indiscernible - 00:08:11).  And to me that's

17   not an excuse.  It's supposed to have been very simple to us

18   for me or the Court or somebody else to provide that

19   (indiscernible - 00:08:22) letter back to (indiscernible -

20   00:08:24).

21              So basically all this has been kind of abnormal

22   and there have bent all the rules basically and in order to

23   dismiss this case is because if you read the brief I sent to

24   you, you will find a lot more explanation of what has

25   transpired over the years.

1          Now, to go to the filing of the law office of

2     (Indiscernible - 00:08:51) to present by Dickstein Shapiro.

3     I do realize that first filing from January 26 on the page

4     of, not page, page number 5, which says there is no legal

5     factual based on the claim.  They haven't touched Exhibit F,

6     on the very last page of the exhibits and that's the very

7     same exhibit where they have falsified the exhibit to the

8     federal courts, which was exclude on my WorldCom case.

9     That's what base they use to go blame for discrimination,

10    blackmail, et cetera, and before they don't even pay

11    attention (indiscernible - 00:09:36) closed the case.

12         But this new law office now submit the same paper

13    to the Court, to the Bankruptcy Court, to you as a hall of

14    evidence to dismiss the case for a non-legal factual basis.

15    Well, after I received all of this information, I reply and

16    I should be hearing my reply by now and I closed the video

17    tape over the World Com case.  I closed the transcript.

18    Also, other evidence to prove this Exhibit F, as they call

19    them here, this law office.  It was actually Exhibit A back

20    in 1999, January 12, who the judge have exclude from the

21    record because they forced me to sign, but this law office

22    sent me that in order to divert the opinion of the Court and

23    just dismiss the case.

24         Well, actually, see, my filing of February 2nd, I

25    have a couple of more replies from the law office who they

Page 134

1    start talking about the legal or factual basis, and they

2    create a footnote and the last filing under page three, who

3    they say they submit this exhibit back to the Court, to the

4    Bankruptcy Court for reasons as supported under my

5    (indiscernible - 00:11:04) for background information.

6           But as you see, they hold, to an exchange now,

7    we're not talking about legal or factual basis of my case,

8    but we tried to hide on the bottom of the page and so nobody

9    pay attention, they did file it again to the Court falsify

10   records.  So for one more time, we (indiscernible -

11   00:11:29) be in 1999, excuse me, they providing again

12   falsified records to the Court.

13          So I believe, I really believe this filing of the

14   Dickstein Shapiro should be completely dismissed by the

15   Court based on this falsified records provided into the

16   Court.  And I believe other courts should allow me to state

17   my case and not have any more objection to that so go

18   forward with that and be able, at some point in time, to

19   have a ruling from you or someone else in order to close

20   this case and go on with my life.

21          So any other information that you might need to

22   know about this claim is a part of the paperwork I sent to

23   you and the disks and also a cc to the law office, but I do

24   believe I have legal and factual case here.  Those

25   (indiscernible - 00:12:37) just tried to throw them under

Page 135

1    the board for other reasons, which is beyond my knowledge

2    probably way up.

3              So pretty much that's what I have to say to

4    Your Honor.

5              THE COURT:  Okay.  Thank you.

6              MR. MARANGOS:  Thank you, Judge.

7              THE COURT:  Ms. Greer, do you want to reply?

8              MS. GREER:  Yes, Your Honor.  Just briefly.

9              THE COURT:  Go ahead.

10             MS. GREER:  I don't want to belabor the point,

11   Your Honor, but, you know, Mr. Marangos' attempts to recover

12   from the debtors for these claims that he's asserted, both

13   in his odyssey brief and in his proof of claim, are simply

14   misguided.  There's no factual basis, no legal basis, and

15   the GUC Trust expressly refutes whatever facts Mr. Marangos

16   has asserted.

17             I will point out, and as we said in our reply to

18   Mr. Marangos' response, that we withdraw that exhibit from

19   consideration without conceding any point and I certainly

20   don't see any basis for why the record was falsified, as Mr.

21   Marangos claims, but it was not essential to the pleading.

22   In fact, it was just provided to give the Court background

23   information as to the fact that Mr. Marangos was a former

24   employee and that his employment terminated at a particular

25   date.

Page 136

1          So, Your Honor, I don't think we need to consider

2     that at this time.

3          You know, again, I just wanted to reiterate that

4     any claims that Mr. Marangos may or may not have had against

5     GM were resolved in prior litigation.  Mr. Marangos brought

6     eight cases.  They were resolved by motions to dismiss or

7     summary judgment motions, all in favor of the debtors.  So I

8     think that sort of says it all, Your Honor, unless you have

9     any questions.

10          THE COURT:  No, I do not.  Ms. Greer, have a seat,

11     please.

12          Mr. Marangos, you will hear a moment or two

13     of silence before I rule.

14          (Pause)

15          Ladies and gentlemen, this contested matter

16     between the Motors Liquidation Company, GUC Trust, and

17          Mr. Dimitrios Marangos arises in the jointly

18     administered Chapter 11 cases of Motors Liquidation Company,

19     formerly known as General Motors and its affiliated debtors.

20          The GUC Trust moves to disallow the claim of

21     Mr. Marangos and, after considering the record on this

22     motion and having heard oral argument, I am granting that

23     motion to disallow the claim and disallowing the claim.  And

24     the following are my findings of fact and conclusions of law

25     for that determination.

Page 137

1          Mr. Marangos was a GM employee from 1977 until his

2     resignation in 1999.  By his own admission, he has filed no

3     less than eight federal lawsuits against GM, all before GM's

4     Chapter 11 case was filed for various reasons, including

5     discrimination, swindling of intellectual property,

6     blackmail, and conspiracy, among others.  He also filed a

7     Workers Comp. claim in Michigan, which was ultimately

8     settled for $135,000.

9          As relevant here, Mr. Marangos' file, claim number

10    61381, in the amount of $20 million plus increases, I

11    quoted, for the reasons of "personal injury/other."  His

12    claim form also attached information about his prior Workers

13    Compensation claim, lists of the lawsuits he had filed

14    against GM, information regarding an appeal of one such

15    suit, and information about a pension from GM that he

16    believed he was entitled to receive.

17         Mr. Marangos claimed in his response and its

18    lengthy exhibits that GM falsified court records and that GM

19    controlled the courts such that he did not receive a fair

20    trial.  Importantly, Mr. Marangos does not dispute that each

21    of his lawsuits and his Workers Comp dispute were finally

22    resolved before this bankruptcy case, including any

23    opportunity to appeal.

24         In the case of Teachers Insurance versus Butler,

25    803 F. 2nd 61, Second Circuit, 1986, the Second Circuit

Page 138

1    observed that a Bankruptcy Court is precluded from

2    relitigating judgments rendered by courts of competent

3    jurisdiction absent a showing that the judgment was procured

4    by fraud or collusion at page 66.  Thus, Mr. Marangos may

5    not relitigate before me claims that he raised in his

6    earlier lawsuits unless his claims fall within the fraud or

7    collusion exception.

8            To fall within the exception, Mr. Marangos must

9    meet certain pleading requirements.  To adequately plead

10   fraud, Mr. Marangos must meet the requirements of Bankruptcy

11   Rule 7009, which is substantively identical to Federal Rule

12   of Civil Procedure 9 and which states that a party must

13   state with particularity the circumstances constituting

14   fraud or mistake.

15           The contents of Mr. Marangos' pleadings, though

16   voluminous, do not meet this stringent pleading requirement.

17   He does not plead the fraud he alleges with sufficient

18   particularity.  Similarly, applying the lesser standard of

19   Rule 8 of the Federal Rules of Civil Procedure,

20   Mr. Marangos' allegations regarding collusion similarly do

21   not rise to the requisite level to survive the claim

22   objection raised by the GUC Trust.  He has not alleged facts

23   from which I can find that he has made a plausible claim

24   that GM owned or otherwise controlled the courts that ruled

25   against him or that it falsified court records.

Page 139

1          In this connection, I note that the Supreme Court

2     has many times told us in the pleading context that

3     conclusory statements as to ultimate facts are not enough

4     and, instead, the court must see facts which, if proven,

5     would establish a plausible claim upon which the court could

6     grant the relief.  Here I cannot determine that the

7     allegations, notwithstanding how voluminous they are, meet

8     that standard.

9          The GUC Trust motion to disallow is accordingly

10    granted in its entirety.  Mr. Marangos' claim will be

11    expunged.

12         Ms. Greer, do I still have a request that I take

13    action to prohibit -- to absolve you from the need to

14    respond to further pleadings?

15         MS. GREER:  Your Honor, I think it would be a good

16    idea out of an abundance of caution.  Your Honor, I'd just

17    hate to have the trust incur expenses associated with having

18    to review the voluminous documents that have been presented

19    to us to the extent he tries to take further action.

20         THE COURT:  All right.  Given the prior request

21    for that in writing, I don't need to take further action on

22    this by way of argument on this request.  The order will

23    also provide that, in the event he makes any further

24    filings, the GUC Trust does not need to respond unless and

25    until I or another judge so directs.

1          Ms. Greer, you are to settle an order consistent

2     with this ruling at your earliest reasonable convenience.

3     Mr. Marangos, do you remember what I said to the people

4     ahead of you about what settling an order is?  That means

5     giving you an indication of what the order I am going to be

6     asked to sign will say, in fact, it gives you a copy of that

7     order, and gives you a chance to be heard on whether the

8     order accurately embodies the Court's ruling.

9          You do not need to respond to that notice of

10    settlement if you wish to appeal, but if you think that the

11    proposed order doesn't accurately convey my ruling, you will

12    have the opportunity to comment on it or to give me your

13    version of an order that would, which is called a counter

14    order, within the time provided in the notice of settlement.

15         As I indicated, it does not address or affect your

16    right to appeal.  You will have 14 days from the time of

17    entry of the earlier order to appeal, but you have no more

18    than that.  I note, for the avoidance of doubt, that the

19    time to appeal runs from the time of entry of the resulting

20    order, not from the time that I am dictating this decision.

21         MR. MARANGOS:  Yes, Your Honor.  I hear that.

22         THE COURT:  Thank you.  All right.

23    Mr. Marangos, you're free to drop off the line if you wish

24    now.

25         MR. MARANGOS:  Okay.

Page 141

1          THE COURT:  And Ms. Greer, we have the other

2     matter involving Patricia Meyer and you have some undisputed

3     matters?

4          MS. GREER:  Yes.  We have some undisputed matters,

5     as well.  Ms. Whitman reached out to Ms. Meyers and left her

6     a message, but I don't know if she joined.  Ms. Meyers?

7          OPERATOR:  Excuse me, Your Honor.  This is the

8     CourtCall operator.  Ms. Meyer has not rejoined at this

9     time.

10          THE COURT:  All right.  Very well.  Then, Court

11     caller, is there anybody else left on the line who is still

12     listening?

13          OEPRATOR:  No, Your Honor, not at this time.

14          THE COURT:  Okay.  Then you are authorized to drop

15     yourself off the line if you choose to.

16          OPERATOR:  Yes, Your Honor.  Have a wonderful day.

17          THE COURT:  Thank you.  We are, of course, staying

18     on the record here and the court reporting equipment is

19     continuing.

20          Go ahead, Ms. Greer.

21          MS. GREER:  Thank you, Your Honor.  With respect

22     to Ms. Meyers, I understand Your Honor has read the

23     pleadings.  Would you like me to go through a little bit of

24     the background information and the legal arguments or would

25     you like me to rest on the papers?

Page 142

1          THE COURT:  No.  Frankly, Ms. Greer, if she's not

2     on the line, I don't want you saying anything more that she

3     can't hear, and, instead, I'm going to dictate a decision.

4          MS. GREER:  Okay.

5          THE COURT:  And I think I should, while we're

6     focused on it, do it now.

7          Based on a review of the papers, my ruling on

8     Ms. Meyer's claim is as follows.

9          This contested matter between Patricia Meyer and

10     the Motors Liquidation Company, GUC Trust, arises in the

11     jointly administered Chapter 11 cases of Motors Liquidation

12     Corporation, formerly known as General Motors Corporation,

13     and its affiliated debtors, and the exercise of my

14     discretion for the reasons that follow.  The objection to

15     the claim is sustained and the claim will be disallowed and

16     expunged.  While I said that this is an exercise of my

17     discretion, I believe, in fact, that I can and should reach

18     the same conclusion as a matter of law.

19          On September 16, 2009, I entered a bar date order

20     establishing November 30, 2009, as the deadline for filing

21     all proofs of claim against the debtors.  The bar date order

22     articulated the requirements for establishing a prima facie

23     claim.  Under the bar date order, all proofs of claim had to

24     set forth with specificity the legal and factual basis for

25     the alleged claim and include supporting documentation or an

Page 143

1    explanation as to why such documentation was not available.

2    See page two of that order at docket entry 4079.

3            In addition, the Court's official Form 10 and the

4    form that I approved both required on their face that a

5    claimant attached redacted copies of any documents that

6    support the claim.  It further explained that a claimant may

7    be required to provide additional disclosure if the debtor

8    trustee or another party in interest files an objection to

9    such claim.

10           It's well established that a proof of claim will

11   set forth the facts necessary to support the claim for the

12   claim to receive the prima facie validity accorded under the

13   bankruptcy rules.  See Ashford versus Consolidated Pioneer

14   Mortgage, 178 BR at 226, among many other cases.

15           When a claim is not considered prima facie valid,

16   the burden remains with the claimant to establish the

17   validity of the claim.  See Lehman, 53 BR 256.  I think I

18   lost a digit there.  Decision -- oh, Bankruptcy Court

19   decisions, excuse me, 256.  A decision by Judge Peck in

20   2010.

21           The bankruptcy code defines a claim as a right to

22   payment.  A right to payment is nothing more nor less than

23   an enforceable obligation.  A claim exists only if the

24   obligation or if the relationship between the debtor and the

25   creditor contains all elements necessary to give rise to a

Page 144

1    legal obligation under relevant non-bankruptcy law.  See,

2    for example, Chategay, 53 F. 3rd at 497, a decision by the

3    Second Circuit in 1995.

4          As for the type of claim asserted here, the

5    District Court explained in U.S. v. Messer, 2000 Westlaw

6    991337, and I'm quoting, "Section 507A of the bankruptcy

7    code establishes priorities for certain types of expenses

8    and unsecured claims against a debtor.  Eighth on this list

9    of priority claims are claims for unpaid income taxes.  This

10   priority reflects Congress' determination that, when a

11   debtor is in bankruptcy, the Internal Revenue Service, which

12   cannot choose its debtors, should be paid before the general

13   unsecured creditors that can.

14         Congress limited its priority, however, to tax

15   liabilities for which a return was due within three years of

16   the filing of the bankruptcy petition.  As the statutory

17   text of Section 5078A makes clear, priority is given to

18   allow tax claims "of governmental units" not of private

19   individuals.

20         Turning now to Ms. Meyers' claim, on October 26th,

21   2009, she filed proof of claim number 15927.  On the face of

22   her claim, she asserted an amount of "billions in back

23   taxes" and the basis for her claim was "tax evasion."  By

24   checking a certain box on the proof of claim form, she, in

25   fact, sought priority status for that claim under Section

Page 145

1     5078A of the bankruptcy code as a tax or penalty owed to

2     governmental units.  Where the proof of claim asked the

3     claimant to identify credits that might apply to the claim,

4     she wrote, "Unknown.  Check with the IRS."

5            After considering this proof of claim, the debtors

6     contacted Ms. Meyer to request that she provide a more

7     specific dollar amount than "billions."  She responded by

8     reducing her claim to a liquidated amount of exactly

9     $500,000.

10           On January 6, 2012, the GUC Trust, which was

11    formed under the debtors confirmed plan of reorganization,

12    filed an objection to Ms. Meyers' claim arguing that her

13    claim was lacking in any supporting documentation or legal

14    authority.  In her response, she contended that her claim

15    was "based on the cost of my organization's investigation of

16    the debtors and to others related to the debtor's purported

17    fraud."

18           These expenses began in 1997, Ms. Meyer explains,

19    that, of course, being 12 years before the bankruptcy, when

20    GM workers became aware of rumors of a spin-off of GM's

21    parts division called Delphi.  Apparently, these rumors led

22    Ms. Meyer to incur expenses in the aggregate amount of

23    exactly $500,000 over the course of the following 15 years.

24    She described those expenses as including office rent,

25    office supplies, communications, travel, meetings at various

Page 146

1   meeting sites, and phone bills, none of which were itemized

2   or cataloged.  And even if they were, that is, even if there

3   were proof that these expenses were actually incurred by Ms.

4   Meyer, I remain unable to connect such expenses to a right

5   of payment by the debtors to Ms. Meyer under the law.

6          To be clear, there is no evidence that Ms. Meyer

7   herself was ever employed by GM or Delphi, nor is there any

8   indication that she ever purchased a GM product, nor is

9   there any indication that she ever sold any parts or

10  assemblies to GM or that she provided any services to GM.

11  Her connection to the debtor's employment or to the debtors

12  in any way is entirely unclear.  I have been unable to find

13  any statutory or contractual relationship between Ms. Meyer

14  and the debtors under which they would owe any sum, whether

15  a sum in the amount of the billions or even $500,000.

16         As for Ms. Meyer's accusations, she contends that

17  GM and Delphi were "cooking their books to appease Wall

18  Street."  She states that she felt she "had an honest claim"

19  because GM "created the lie and fraud, therefore, it is GM's

20  due to the American taxpayer."  She attached to her response

21  various pages of what appeared to be a prospectus for Delphi

22  dated sometime around 1998, but the significance and

23  relevance of this prospectus is impossible for me to

24  ascertain.

25         In addition to the Delphi prospectus, she provided

1       in support of her claim e-mails and letters.  Such

2       correspondence proves that she occasionally contacted

3       various governmental officials about her accusations

4       concerning GM over the course of many years, but it fails to

5       advance or substantiate her claims by any reasonable or

6       comprehensible measure.

7                Apparently, Ms. Meyer wants to be reimbursed by GM

8       for her investigation of GM, an investigation that led

9       nowhere and produced no fruits whatsoever.  She seems to

10      have alleged fraud, but failed to logically tie that fraud

11      to any discernible harm.  She cited no legal authority or

12      principles underlying her claims and I'm aware of none.

13               The federal rules require that allegations of

14      fraud must be stated with particularity.  Generalized

15      allegations of fraud without more do not give rise to relief

16      or a right to payment, especially where the claimant's

17      connection to the alleged fraud is so completely mystifying.

18               Ms. Meyer's proof of claim neither articulates

19      what GM did that might afford her legal relief, nor

20      demonstrate how she would even have standing to pursue

21      remedies against the debtor.  And she plainly hasn't shown

22      an entitlement to priority treatment under Section 507A-8 of

23      the bankruptcy code, which is to be used by governmental

24      taxing authorities only.

25               Even if I were to impose only the relaxed

Page 148

1    standards for general unsecured claims under 502B, I

2    necessarily would have to conclude and do conclude that she

3    has alleged no legal obligation giving rise to a right of

4    payment.  Because her claim was so entirely lacking in

5    supporting evidence and logical linkage to GM, it was not

6    entitled to any presumption of prima facie validity and she

7    failed to meet her burden for establishing a claim.

8           I determined that she has failed to meet her

9    burdens to show an entitlement to relief from GM and that

10   the claim, accordingly, must be expunged.

11          Ms. Greer, you're to settle an order in accordance

12   with the foregoing at your earliest reasonable convenience.

13          MS. GREER:  Yes, Your Honor.  Thank you.

14          THE COURT:  Do you want to deal with any other

15   matters now?

16          MS. GREER:  Your Honor, with the Court's

17   indulgence, I'd like my colleague, Ms. Whitman, to quickly

18   present to the uncontested omnibus objections.

19          THE COURT:  Sure.  Come on up, please,

20   Ms. Whitman.

21          MS. WHITMAN:  Mikaela Whitman from Dickstein

22   Shapiro on behalf of the Motors Liquidation Company GUC

23   Trust.

24          THE COURT:  Welcome.

25          MS. WHITMAN:  Thank you.  We have three

Page 149

1    uncontested omnibus objections before the Court today.  They

2    are the 266th omnibus objection.  We have zero adjourned

3    claims and five going forward.  The 267th omnibus objection,

4    we have 3 adjourned claims and 25 going forward.  The 268th

5    omnibus objection, one adjourned and five going forward.

6              Unless Your Honor has any questions, I'd like to

7    ask the Court to approve these objections.

8              THE COURT:  The objections are sustained.  The

9    claims will be disallowed to the extent you requested, so to

10   the extent you continued them, we'll deal with them for

11   another day.  And I would ask you or one of your colleagues

12   to get the order and floppy or CD with the proposed order

13   over to my courtroom deputy, Ms. Blum (ph), at your earliest

14   convenience.

15             MS. WHITMAN:  Thank you, Your Honor.

16             THE COURT:  Thank you.  All right.  It's now

17   almost 2:15.  Am I correct that we're done?

18             MS. GREER:  Yes, Your Honor.

19             THE COURT:  All right.  Thank you, folks.  We're

20   adjourned.

21        (Whereupon these proceedings were concluded at 2:14 PM)

22

23

24

25

Page 150

1                          I N D E X

2

3                          RULINGS

4                                            Page        Line

5      ADR Motion                             59          10

6

7      Prior Rulings on Omnibus              78           2

8

9      Ms. Bellaire's Request for More Time  82          15

10

11     Objection to Proof of Claim by

12     Dimitrios Marangos                    136          15

13

14     Objection to Claim by Patricia Meyer  142           9

15

16     Debtors' 83rd Omnibus Objection to Claims   117     6

17

18     Debtors' 103rd Omnibus Objection to Claims  117     6

19

20     266th Omnibus Objection to Claims and Motion

21     Requesting Enforcement of Bar Date Orders   149     8

22

23     267th Omnibus Objection Claim         149           8

24

25

Page 151

1      268 Omnibus Objection to Claims and Motion

2      Requesting Enforcement of Bar Date Orders     149          8

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3        I, Dawn South, Cherri Brown, and Becky Flick, certify that

4        the foregoing transcript is a true and accurate record of

5        the proceedings.

6

7

8

9        AAERT Certified Electronic Transcriber CET**D-408

10       Also transcribed by:

11

12       _____

13       Cherri Brown

14

15       _____

16       Becky Flick

17

18

19       Veritext

20       200 Old County Road

21       Suite 580

22       Mineola, NY   11501

23

24       Date:  March 2, 2012

25