Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 09-50026(REG)

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   GENERAL MOTORS CORPORATION,

8

9        Debtors.

10

11  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                U.S. Bankruptcy Court

14                One Bowling Green

15                New York, New York

16

17                February 28, 2012

18                9:56 AM

19

20  B E F O R E:

21  HON ROBERT E. GERBER

22  U.S. BANKRUPTCY JUDGE

23

24

25

Page 2

1   Hearing re:  Motion of Wilmington Trust Company, (I) as GUC

2   Trust Administrator, to (A) Liquidate New GM Securities for

3   the Purpose of Funding Fees, Costs and Expenses of the GUC

4   Trust and the Avoidance Action Trust, and (B) Transfer New

5   GM Securities to the Avoidance Action Trust for the Purpose

6   of Funding Future Tax Liabilities, and (II) as Avoidance

7   Action Trust Administrator, the Approve an Amendment to the

8   Avoidance Action Trust Agreement - Evidentiary Hearing

9

10   Hearing re:  Status Conference re: Nova Scotia Issues

11

12   Hearing re:  Motion of Motors Liquidation Company GUC Trust

13   Pursuant to 11 U.S.C. Section 107(B) and Fed. R. Bankr. P.

14   9018 For An Order Authorizing Filing of Complaint Under Seal

15   - Discovery Conference

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sherri L. Breach and Dawn South

Page 3

1    A P P E A R A N C E S:

2    KING & SPALDING

3        Attorneys for the Debtors

4        1185 Avenue of the Americas

5        New York, NY 10036-4003

6

7    BY:   ARTHUR J. STEINBERG, ESQ.

8        SCOTT DAVIDSON, ESQ.

9

10   GIBSON, DUNN & CRHTCHER LLP

11       Attorneys for the GUC and Avoidance Action Trust

12       200 Park Avenue

13       New York, NY 10166-0193

14

15   BY:   MATT J. WILLIAMS, ESQ.

16       MITCHELL A. KARLAN, ESQ.

17       KEITH R. MARTORAN, ESQ.

18

19   DICKSTEIN SHAPIRO LLP

20       Attorneys for the GUC Trust

21       1633 Broadway

22       New York, NY 10019-6708

23

24   BY:   ERIC B. FISHER, ESQ.

25       KATIE COOPERMAN, ESQ.

Page 4

1    GREENBERG TRAURIG, LLP

2         Attorneys for the Noteholders

3         MetLife Building

4         200 Park Avenue

5         New York, NY 10166

6

7    BY:  BRUCE R. ZIRINSKY, ESQ.

8         KEVIN D. FINGER. ESQ.

9

10   GREENBERG TRAURIG, LLP

11        Attorneys for the Noteholders

12        77 West Wacker Drive, Suite 2500

13        Chicago, IL 60601

14

15   BY:  KEVIN D. FINGER, ESQ.

16

17   AKIN GUMP STRAUSS HAUER & FELD LLP

18        Attorney for Green Hunt Wedlake

19        590 Madison Avenue

20        New York, NY 10022-2524

21

22   BY:  PHILIP C. DUBLIN, ESQ.

23

24

25

**Page 5**

1   AKIN GUMP STRAUSS HAUER & FELD LLP

2        Attorney for the Nova Scotia Trustee

3        One Bryant Park

4        New York, NY 10036

5

6   BY:  SEAN E. O'DONNELL, ESQ.

7

8   OFFICE OF THE ATTORNEY GENERAL

9        Attorney for the State of New York

10       The Capitol

11       Albany, NY 12224-0341

12

13   BY:  MAUREEN F. LEARY, ESQ.

14

15   U.S. DEPARTMENT OF JUSTICE

16       Attorney for the U.S. Trustee

17       86 Chambers Street

18       New York, NY 10007

19

20   BY:  DAVID S. JONES, ESQ.

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2            THE CLERK:  All rise.

 3            THE COURT:  Good morning, have seats, please.

 4   Have seats everybody.

 5            I see some of you have decided to take the front

 6   counsel table before hearing how I want to handle things

 7   today.

 8            We're going to deal with them in an order

 9   different than those that I have on the calendar and on the

10   agenda.  I want to hear the Nova Scotia matters first.

11   Let's have everybody come up for that purpose, please.

12       (Pause)

13            THE COURT:  After you get organized I want to get

14   appearances and then I want you to sit down.

15            MR. FISHER:  Your Honor, Eric Fisher and Katie

16   Cooperman from Dickstein Shapiro for the GUC Trust.

17            THE COURT:  Okay.  That's -- you're Mr. Fisher and

18   your colleague is Ms. Cooperman?

19            MR. FISHER:  Yes, Your Honor.

20            THE COURT:  Okay.

21            MR. ZIRINSKY:  Good morning, Your Honor.  Bruce

22   Zirinsky and Kevin Finger of Greenberg Traurig for the

23   noteholders.

24            THE COURT:  All right.

25            MR. STEINBERG:  Good morning, Your Honor.  Arthur
```

Page 7

1    Steinberg and Scott Davidson from King & Spalding on behalf

2    of New General Motors.

3              THE COURT:  All right.  Folks --

4              MR. DUBLIN:  One second, Your Honor.  I'm sorry.

5    Phil Dublin and Sean O'Donnell --

6              THE COURT:  Oh, I'm sorry.  Mr. Dublin.

7              MR. DUBLIN:  Phil Dublin and Sean O'Donnell from

8    Akin Gump for Green Hunt Wedlake.

9              THE COURT:  Okay.

10             MR. O'DONNELL:  Good morning, Your Honor.

11             THE COURT:  Mr. Dublin, your colleague's name?

12             MR. DUBLIN:  Sean O'Donnell.

13             THE COURT:  O'Donnell.  Okay.

14             All right.  Folks, I got the Dickstein Shapiro

15   reply on the public filing and I want you all preliminarily

16   to advise me as to the extent to which I, therefore, have

17   any remaining issues vis-à-vis public filing on the one hand

18   or a filing in a redacted form on the other, and with a

19   particular focus on paragraph 44 of the proposed complaint.

20             The main thing I want to then spend time on is on

21   the disputed documents or the documents where I have

22   allegations which may or may not be disputed that the

23   creditors' committee or the -- I guess it's modern name is

24   the GUC Trust -- relied on those documents in its proposed

25   complaint.

Page 8

1            I'll want both sides to address, in particular,

2    the degree of specificity by which the GUC Trust advised the

3    defendants' side of its intention to use the documents in

4    question and to clarify on a document by document basis, if

5    need be, the extent of any delay or alleged delay between

6    the time that the defendants' side was notified of the

7    intent to rely upon them and the time the defendants' side

8    made its views known.

9            I am going to assume, subject to both sides rights

10   to be heard, but principally the GUC Trust, that the

11   inadvertent disclosure of those documents in the first

12   instance, even if accompanied by some fault, would not by

13   itself give rise to a waiver, so that the contention is that

14   if there was a waiver it was not by reason of the delivery

15   of the documents, but rather a delay or alleged delay in

16   demanding their return and destruction.

17           With that said, maybe I should hear first from

18   you, Mr. Fisher.  Main lectern, please.

19           MR. FISHER:  Good morning, Your Honor.

20           With respect to the first issue which is the

21   status of the motion to seal, I think that a fair summary of

22   where we are is that all parties, with the exception of

23   Aurelius, which I'll deal with in just a moment, consent to

24   the public filing of the complaint.  And my understanding is

25   that Aurelius' object -- Aurelius' objection to the public

Page 9

1    filing is not based on any confidentiality concerns, but is

2    instead based on the production of privilege information

3    dispute that Your Honor referred to.

4              So under -- under the protective order and with

5    regard to confidentiality issues I don't think anyone is

6    objecting at this point to the public filing of the

7    complaint.  And once Your Honor resolves the pending

8    discovery dispute about the production of privileged

9    information, I think from there flows the decision as to

10   whether the complaint can be filed publicly or needs to be

11   revised or redacted in some way, Your Honor.

12             THE COURT:  Uh-huh.  Mr. Fisher, would it make

13   sense if before you continue with the remainder of the

14   issues you yield to Mr. Zirinsky or whoever it is to brief

15   me on the Aurelius position and his views as to what I

16   should do about it?

17             MR. FISHER:  I'd be happy to do that, Your Honor.

18             THE COURT:  Okay.

19             MR. ZIRINSKY:  Your Honor, I'll defer to

20   Mr. Finger.

21             THE COURT:  Okay.

22             MR. FINGER:  Good morning, Your Honor.  Kevin

23   Finger, Greenberg Traurig, on behalf of Aurelius Capital

24   Management and its managed entities.

25             Your Honor, with respect to the -- to the

1    complaint and the GUC Trust motion to file it under seal,

2    the objection that Aurelius has is that one paragraph,

3    paragraph 144, appears to -- to quote one of the four

4    documents that has been clawed back on the grounds of that

5    it's protected from disclosure on the attorney/client

6    privilege.  It is unclear whether any of the other three

7    documents are cited.  The complaint does not refer to any

8    specific documents other than -- than publicly filed

9    documents like SEC filings.

10           So from our reading of the complaint it's just

11   paragraph 144 that appears to quote one of the documents

12   that has been clawed back, and that is the basis of the

13   objection with respect to filing the complaint.

14           THE COURT:  Now, Mr. Finger, there is, of course,

15   the underlying issue.  But if your opponent is

16   inappropriately relying on a document, your opponent is

17   inappropriately relying on the document to influence me or

18   some higher court.  What difference does it make if the rest

19   of the world sees that or not since I'm going to see it

20   anyway?

21           MR. FINGER:  It is -- the difference is that it's

22   a privileged document that is protected from disclosure and

23   that means protected from -- from everybody from disclosure.

24   In that sense that's --

25           THE COURT:  What is the harm that you are trying

Page 11

1    to obviate?

2            MR. FINGER:  The harm is the disclosure of

3    privileged communications.

4            THE COURT:  Well, putting aside the fact that your

5    opponent contends that it's not privileged, it's not

6    privileged at all because it allegedly conveys information

7    obtained from third parties and your opponents contention

8    that it is subject to a waiver, would you articulate for me,

9    if you can, the incremental prejudice to you resulting from

10   the remainder of the world seeing it?

11           MR. FINGER:  It -- it's -- we disagree with

12   Mr. Fisher's characterization that it's not privileged.

13           THE COURT:  I understand that.

14           MR. FINGER:  And I could go into that in more

15   depth at the Court's pleasure.

16           THE COURT:  But assume for the sake of answering

17   my question, which I would like to get the answer to, that

18   you're right.

19           MR. FINGER:  Your Honor, it's the -- it's the

20   fundamental protections that are provided against the

21   disclosure of privileged documents.  It's an attorney/client

22   communication that's between -- clearly between lawyers at

23   Greenberg Traurig and clients at Aurelius, and that client

24   is entitled to a privilege -- to the privilege and entitled

25   to protect otherwise responsive documents from disclosure on

Page 12

1    the grounds of privilege, and that's the prejudice.

2              THE COURT:  Mr. Finger, did you understand my last

3    question when I asked about the incremental prejudice that

4    results as a consequence of the disclosure to the remainder

5    of the public?

6              MR. FINGER:  I guess I don't understand, Your

7    Honor, the increment -- what you mean by incremental

8    prejudice, but I've -- I've tried to articulate the

9    prejudice to Aurelius and protecting its privilege.

10             THE COURT:  Do you have anything further to say?

11             MR. FINGER:  Just, Your Honor, that it's -- it's a

12   mistake that was made by Greenberg Traurig, not by the

13   client, and the client undertook all -- all diligence to

14   protect that privilege in terms of meeting ahead of time and

15   reviewing all the documents not once, but twice.  So from

16   the client's perspective who enjoys that privilege, that

17   client shouldn't be prejudiced for Greenberg Traurig's error

18   in this case which led to the inadvertent production.

19             THE COURT:  Anything else?

20             MR. FINGER:  No, Your Honor.

21             THE COURT:  All right.  If the document is not

22   privileged either because it was never privileged or the

23   portion upon which there was reliance by the GUC Trust is

24   not privileged, or if there was a waiver, the issue goes

25   away in any event.  If it remains privileged it may well be

Page 13

1    that the publication of the entire document and of the

2    entire complaint is nevertheless appropriate, but I'll defer

3    decision on that until I've heard the remainder of the

4    arguments on the privileged nature of what is at least

5    seemingly the single document referred to in paragraph 44

6    and the others in question.

7              Mr. Fisher, come on up again, please, and address

8    that with particular reference to the questions that I asked

9    at the outset.

10             MR. FISHER:  Your Honor, first, one thing I wanted

11   to make clear is that when we prepared the complaint and

12   when we submitted the complaint to Your Honor in connection

13   with our motion to file the complaint under seal all of that

14   was done before any documents were clawed back, so I don't

15   think anyone is claiming that it was improper for us to

16   consult these documents in preparing the complaint.  We

17   hadn't even received a claw back request yet at that point

18   in time.

19             And to speak directly to Your Honor's questions

20   about waiver and the privilege that attaches to these

21   particular four documents, I think the chronology which I

22   can sketch out very briefly is critical to our waiver

23   position.

24             In essence, we sent the first version of our

25   complaint to all parties who had produced confidential

Page 14

1    information on December 19th, and we said, here's the

2    complaint that we plan to file.  We'd like your consent to

3    file it publicly consistent with the protective order.  And

4    the response to --

5              THE COURT:  Pause, please, Mr. Fisher.  At that

6    time did the draft complaint, paragraph 44, have the same or

7    different content than it has now?

8              MR. FISHER:  So, Your Honor, it's paragraph 144.

9              THE COURT:  Oh, 144.  Excuse me.

10             MR. FISHER:  And in substance I think in the same

11   words that allegation was in that first version of the

12   complaint.  It was in a different paragraph number, but the

13   allegation was there and the quoted language from the

14   document at issue was also in that initial complaint.

15             THE COURT:  Continue.

16             MR. FISHER:  The response that we got back the

17   next day was, that's not good enough.  You can't just give

18   us the complaint and ask us to consent to public filing.

19   We'd like to know every document that was confidential that

20   you relied on in preparing this complaint.  We didn't think

21   we were required to, but to move things along we provided

22   the -- all the parties, including the noteholders -- with a

23   complete list of every document that we relied on in

24   preparing the complaint.

25             THE COURT:  In what form?  By numeric reference

Page 15

1    like Bates numbers alone or a combination of Bates number

2    plus a substantive description of the document associated

3    with the Bates number?

4              MR. FISHER:  It was just --

5              THE COURT:  And by way of example, one of the

6    bones of contention between your constituency and JP Morgan

7    Chase in the underlying term litigation is that describing a

8    document by number as contrasted by a textual description

9    is, at least in the view of some, not as helpful.

10             MR. FISHER:  Your Honor, we provided a list of

11   Bates numbers.  There was no substantive description and

12   that's because we responded the next day with our list and

13   we didn't -- we didn't want to waste any time.

14             In response to -- in connection with providing

15   that list of documents we asked all parties to please review

16   it and, if possible, let us know by the end of the week

17   whether they consented to the public filing of the

18   complaint.  The response that we received was, that's not

19   enough time.  The holidays are upon us.  We're going to need

20   a lot more time to carefully review this, and in fact there

21   was an email that we attached to our letter to Your Honor in

22   which Greenberg Traurig said, you're asking us to waive

23   confidentiality under the protective order.  We need an

24   opportunity to -- to look at each and every document

25   carefully, and there was a letter from Mr. Zirinsky to -- to

Page 16

1    a similar effect.

2              THE COURT:  Is the confidentiality that was the

3    subject of that discussion confidentiality in the commercial

4    sense by which people in case after case after case before

5    me produce documents under confidentiality stips and they

6    say that they want everything under seal, or are we talking

7    in the context of confidentiality within the meaning of the

8    attorney/client privilege or both?

9              MR. FISHER:  I think in -- in context that initial

10   communication from Greenberg Traurig was talking about

11   confidentiality in the commercial sense.  In other words,

12   what Greenberg was saying was, before we can allow you to

13   make public allegations that are based on these documents

14   that we've designated as confidential in the commercial

15   sense we need to review them carefully.  And they -- they

16   told us that they needed at least until January 5th to get

17   that done.  So we said, okay.  We can wait until

18   January 5th.

19             On January 5th we received a letter from Greenberg

20   Traurig on behalf of all the noteholders whose confidential

21   information was implicated by the complaint saying, you

22   know, subject to all of our rights to move to dismiss and --

23   and, you know, even though we think your complaint is

24   baseless we consent to the public filing of the complaint.

25             So Greenberg was not the issue at the time.  In

Page 17

1    fact, it was concerns that -- that -- that new GM and that

2    the GM Nova Scotia finance trustee had about confidentiality

3    that required us to file the motion -- the motion to file

4    under seal.  It wasn't Greenberg concerns.  As of

5    January 5th they had authorized us to file the complaint

6    publicly.

7              THE COURT:  Now at -- as of January 5th to what

8    extent was Aurelius carved out from the consent granted on

9    the remainder?

10             MR. FISHER:  As of January 5th the letter from

11   Greenberg Traurig was on behalf of all noteholders

12   authorizing us to publicly file the complaint that was based

13   on documents that we had specifically identified to them and

14   that they had told us that they had reviewed and had

15   concluded they had no objection to the public filing of the

16   complaint.

17             THE COURT:  Continue, please.

18             MR. FISHER:  On January 17th we submitted the

19   complaint to the Court in connection with our motion to have

20   the complaint filed under seal, and then on January 19th,

21   two days later, for the first time we received a claw back

22   request from Aurelius, and on January 24th we received a

23   follow up claw back request.  In total those two letters

24   requested the return of 115 documents that they said had

25   been inadvertently produced and that were privileged.

1          It took us approximately a week to comply with the

2     protective order and destroy all of the documents that they

3     said were privileged, but we reserved all of our rights, and

4     we're not here today to argue about the 115 documents.

5     We're -- that's done.  They clawed them back under the

6     protective order and we destroy -- and we destroyed them.

7          What we're arguing about only are four out of

8     those 115 documents, and the reason why we think that those

9     documents are exceptional are specifically because of the

10    chronology that I just laid out, namely these specific

11    documents.  And in terms of Aurelius documents, Your Honor,

12    there were ten documents in total produced by Aurelius that

13    we identified as Aurelius documents that we relied on in

14    preparing the complaint.

15          So Aurelius had ten documents to look at and told

16    us, you can go ahead and publicly file the complaint and

17    didn't say anything about privilege until after we had

18    prepared two versions of the complaint, because by the time

19    we submitted the complaint to Your Honor it had been

20    revised, and -- and filed a motion to have that complaint

21    filed under -- under seal.

22          So that's why we think those four documents stand

23    out in terms -- and -- and those are the only documents as

24    to which we're making a waiver argument.

25          So it's -- to come to a question that Your Honor

Page 19

1   asked at the outset, it's not simply an inadvertent

2   production situation.  This is a situation where we received

3   authorization to publicly file a complaint after these

4   specific documents were called to Aurelius' counsel's

5   attention and the claw back privilege request came only

6   later.

7          THE COURT:  And you're relying, in substance, on

8   the passage of time between December 19th, 2011 and

9   January 19th, 2012?

10          MR. FISHER:  The documents were first produced --

11   first produced by Aurelius September 30th, 2011.  But it's

12   not even just the passage of time, Your Honor, it's -- it's

13   -- it's the uniqueness of a situation where your adversary

14   tells you, I've looked at these documents you can go ahead

15   and file the complaint.  And -- and -- and then only

16   later --

17          THE COURT:  That -- that being --

18          MR. FISHER:  -- insists a claw back --

19          THE COURT:  -- roughly the period between

20   January 5 and January 17?

21          MR. FISHER:  Well, the documents were first

22   identified to them on December 20, so we would say from

23   December 20 until January 19 or maybe it was January 24 when

24   the claw back concerning these particular documents came.

25   I'm not -- I'm not certain whether it was the 19th or the

Page 20

1    24th with regard to these -- these four.

2              THE COURT:  Uh-huh.

3              MR. FISHER:  In terms of arguments as to whether

4    these four documents are privileged or not, as is often the

5    case in these disputes, we're somewhat hamstrung because

6    we've destroyed the documents, but what we do have left is

7    the allegation in paragraph 144, and so there we can make an

8    argument, I think compellingly, as to why the document that

9    we relied on, and the document that's really the irritant

10   here causing the dispute is not privileged.  And that's

11   because the document in question is an email wherein a non-

12   lawyer at Aurelius conveyed to another non-lawyer at

13   Aurelius the substance of a conversation that that first

14   non-lawyer --

15             MR. FINGER:  Excuse me, Your Honor.  I have to

16   object because I fear that Mr. Fisher's description is

17   conveying the substance of the email and --

18             THE COURT:  Well, Mr. -- I get the point, but as

19   you well know, Mr. Finger, the subject matter of an

20   allegedly privileged communication is not privileged.  Only

21   the substance of it is.

22             Mr. Fisher, I assume you're aware of that

23   distinction as well --

24             MR. FISHER:  Yes, Your Honor.

25             THE COURT:  -- and you're not going to let the cat

1    out of the bag in making your point.

2              MR. FISHER:  I will be careful.

3              THE COURT:  Okay.

4              MR. FINGER:  Thank you, Your Honor.

5              MR. FISHER:  So the first non-lawyer at Aurelius

6    was conveying the substance of a conversation that that non-

7    lawyer had with counsel to new GM.  There's no -- there's no

8    claim of privilege between that non-lawyer -- Aurelius non-

9    lawyer's conversation vis-à-vis new GM.  When the non-lawyer

10   at Aurelius passed that information along to the other non-

11   lawyer at Aurelius he copied two -- two lawyers from

12   Greenberg Traurig, and I think that that's what gives rise

13   to the claim of privilege, and our argument is simply that

14   when a non-lawyer passes along a non-privileged conversation

15   and it's clear from the face of the document, as we recall

16   it, that the primary objective of -- of this communication

17   was not to secure legal advice, but to convey the substance

18   of a non-privileged conversation.

19              We don't think that a claim of privilege

20   appropriately attaches to that document, Your Honor.

21              THE COURT:  Uh-huh.  Okay.

22              Mr. Finger.

23              MR. FINGER:  Thank you, Your Honor.

24              The -- this was an inadvertent production caused

25   by an error by Greenberg Traurig after substantial meetings

Page 22

 1   with client representative and lawyers, and I can go into

 2   further describe the inadvertence if the -- if the Court is

 3   interested in that, but it's --

 4            THE COURT:  Well, pause, please, Mr. Finger.

 5   You're ahead on that issue because I said that I wasn't of a

 6   mind, subject to Mr. Fisher's ability to be heard, to say

 7   that the production in the first instance amounted to the

 8   waiver.  Do you still want to address that?

 9            MR. FINGER:  No, Your Honor.  I was going to say

10   I was going to transition to the -- to the December 19th

11   through January 19th time period if that's acceptable to the

12   Court.

13            THE COURT:  Yes, please.

14            MR. FINGER:  The -- counsel did provide a draft

15   complaint on January 19th in pursuant to request a --

16            THE COURT:  You said January 19th.

17            MR. FINGER:  I'm sorry.

18            THE COURT:  Did you mean December 19th?

19            MR. FINGER:  I did, Your Honor, I misspoke.  On

20   December 19th.  On December 20th provided a list of Bates

21   numbers of the 192 Bates ranges, but many of those ranges

22   contained multiple documents, and it's --

23            THE COURT:  I couldn't hear you on that last

24   point.

25            MR. FINGER:  I'm sorry.  It's 192 separate Bates

1   ranges, but within certain of the Bates ranges were multiple

2   documents and that amounted to a stack of paper several

3   inches high.

4          On -- now as part of that draft complaint there

5   were three defendants named that were once holders of the

6   Nova Scotia notes, but at that point in time and still today

7   do not hold those notes.  And on December 21st Greenberg

8   Traurig sent a letter to Mr. Fisher on behalf of three of

9   those clients, Aurelius, Capital Management, Appaloosa and

10  Perry informing them that they were not holders of notes or

11  holders of claims and were not proper defendants in that

12  complaint.  And that was the response on behalf of those

13  three noteholders.

14         On behalf of the other three clients of Greenberg

15  Traurig that -- that currently held notes and continue to

16  hold notes, we sent a separate response that informed

17  Dickstein Shapiro that we would need additional time in

18  order to consider the issue of confidentiality.

19         On January -- on January 5th, Mr. Davidson, on

20  behalf of new General Motors, sent an email to Ms. Cooperman

21  and asked about the status of the complaint.  Ms. Cooperman

22  responded and said, we have revised the complaint, but we

23  will not show it to you.  So we still want to know whether

24  you'll consent to publicly filing it.  And with that

25  response we sent a very short response that said, subject to

Page 24

1    all of our rights and remedies, including the right to

2    change our mind about whether it should be publicly filed

3    when we actually see the document, we -- we are not going to

4    stand on the terms of the protective order in terms of

5    compelling the complaint to be filed under seal.

6            We -- we had discussions with our clients about

7    other concerns that may have over -- overridden the

8    confidentiality issues as protected by the protected (sic)

9    order, but that's what we informed them.

10           That letter was not on behalf of Aurelius,

11   Appaloosa or Perry, it was -- it was on behalf of the other

12   ones, although I will say that the letter itself does not

13   say that specifically.

14           THE COURT:  Which letter are we talking about

15   doesn't say that specifically?

16           MR. FINGER:  The January 5th letter whereby we

17   informed Mr. Fisher that we were not going to invoke our

18   rights under the protective order to cause the revise

19   complaint that we hadn't seen to file it under seal.

20           On January 17th Mr. Fisher informed us, the

21   noteholders, new GM, et cetera, that it intended to file a

22   motion to file under seal, and later that afternoon or the

23   evening it sent a copy of the revised draft complaint, which

24   is the first time we had seen it on January 17th.

25           On January 19th is when Aurelius sent the letter

1   clawing back a certain number of documents, caused Greenberg

2   Traurig to review not only the Aurelius production, but

3   every production on behalf of its noteholder clients to see

4   whether the error that caused the inadvertent production in

5   September had been extended to other client productions.

6        On January 24th we sent a letter with a complete

7   list of claw back documents, and that's the sequence of

8   events, Your Honor.  The -- but that sequence, really, is

9   -- is not govern here because the agreed protective order

10  that's entered by the Court is what governs.  In paragraph 3

11  of that protective order says specifically that the

12  inadvertent production of documents otherwise protected from

13  disclosure does not serve as a waiver of the privilege.

14  That -- that -- and the cases --

15       THE COURT:  All right.  Pause, please.

16       MR. FINGER:  Yes.

17       THE COURT:  Are you contending that that would

18  provide absolution for all time or would you still be

19  subject to what is, in substance, a latches contention?

20       MR. FINGER:  Well, Your Honor, I -- the terms of

21  the protective order and the cases that interpret similar

22  provisions of protective orders indicates, or at least

23  suggests that it -- I wouldn't say for all time, that seems

24  extreme -- but that there is no timeliness requirement built

25  in.  That's what the rules and the case law would otherwise

Page 26

1    impose in the absence of a protective order.  And what the

2    cases say that interpret the protective order that have been

3    ordered -- that's the Zevally (ph) case, the HDB -- HDB

4    Nordberg (ph) case, and others suggest that that timeliness

5    requirement has been negotiated away and that in a similar

6    provision the inadvertent production of privileged documents

7    does not serve as a waiver and then it provides a procedure

8    for that.

9            And the remedy that's also provided in that

10   paragraph 3 is if the receiving party wants to challenge the

11   designation of privilege they may do so by motion, but that

12   -- that's how the protective order handles the situation and

13   that protective order governs this case, and the cases

14   interpreting it from the Southern District of New York state

15   clearly that the protective order trumps the case law and

16   even Federal Rule of Evidence 502.

17           So in this case the -- there is no timeliness

18   requirement.  But even if there was a timeliness

19   requirement, Your Honor, that's been met here in the sense

20   that it -- that timeliness runs from not from what I'll call

21   a document dump of saying, here's a long list of Bates

22   numbers, go figure out whether any of them are referenced in

23   this complaint.

24           We discovered on or about January 17th when we got

25   the revised complaint that one of these documents is being

Page 27

1    cited in the complaint and is actually -- has been submitted

2    to the Court, and within two days submitted a claw back of

3    those and other documents, and then within five days after a

4    complete review of all document productions issued the claw

5    back letter of all the documents.

6              So even if this Court applied a timeliness

7    requirement it runs from the date of discovery in this case,

8    so it's a matter of a few days in terms of when it was

9    discovered by counsel and when it was clawed back.

10             Then, even if one was going to apply timeliness

11   requirement it -- the cases suggest that there -- it would

12   valuate the  prejudice.  And in this case there is no

13   prejudice to -- to the trust.  They -- they shouldn't have

14   access to a privileged document, and the fact that they do

15   has been undone by the protective order.

16             So in -- in -- to this point, Your Honor, there is

17   an obligation under the New York ethical rules for a lawyer

18   who is in receipt of a document that appears to be

19   privileged for that lawyer to contact the producing party.

20             The documents we're talking about are emails

21   between client representatives and Greenberg Traurig, and --

22             THE COURT:  Well, Mr. Fisher makes a slightly

23   different contention.  He says they're emails between two

24   non-lawyers and Greenberg Traurig personnel were cc'd.  Is

25   there a factual dispute on his contention?

1            MR. FINGER:  Let me verify that, Your Honor.  That

2     is -- that is technically true.  It's an email exchange that

3     numbers nine pages when it's printed out, and it begins with

4     an email exchange between lawyers at Weil Gotshal and

5     lawyers at Greenberg Traurig.  And then at some point

6     lawyers at Greenberg Traurig --

7            THE COURT:  Okay.  Weil Gotshal is the other

8     side --

9            MR. FINGER:  Yes.

10           THE COURT:  -- from you?

11           MR. FINGER:  So that's not privileged.  There's a

12    -- there's a -- this is why the document was redacted rather

13    than -- than fully withheld on the grounds of privilege.

14           Through this email --

15           THE COURT:  Continue.

16           MR. FINGER:  Through this email string Greenberg

17    Traurig lawyers forwarded to client representatives, which

18    produced a series of back and forth emails between lawyers

19    and clients.  I believe there are eight such email exchanges

20    back and forth discussing how to respond to what the Weil

21    Gotshal lawyer had -- had informed Greenberg Traurig.

22           The very top of that email is an email from a

23    client representative to another client representative, but

24    copying two lawyers at Greenberg Traurig.  And so I don't

25    know if that's technically a factual dispute, but it's still

1    an email exchange, several of them, that's private and

2    confidential between client representatives and lawyers at

3    Greenberg Traurig.

4           Interestingly, the case that Mr. Fisher cites in

5    -- in his response about -- for the -- the only case that's

6    cited to suggest that this document is not privileged, and

7    what -- what he cites it for is the proposition that merely

8    conveying the substance of what a third party has conveyed

9    is not privileged.  That's what Mr. fisher cites it for.

10          Later in that opinion -- it's the Union Box

11   Office --

12          THE COURT:  You're talking about Ted Katz'

13   decision -- Magistrate Judge Katz' decision?

14          MR. FINGER:  Yes, Your Honor.  It's Urban Box

15   Office Network is the name of the case.

16          THE COURT:  Yes.  And -- and presumably you're

17   referring to page 2 of that decision?

18          MR. FINGER:  Well, I'm referring to the specific

19   quote, Your Honor, when information --

20          THE COURT:  "For example, where the attorney or

21   client is merely conveying the substance of what a third

22   party has conveyed the communication is not privileged."

23   That's what Mr. Fisher is relying upon.

24          MR. FINGER:  That's correct, Your Honor.

25          THE COURT:  And I was reading from Judge Katz'

Page 30

1    decision.

2         Okay.  Now are you saying that you disagree with

3    Judge Katz' view of the law on that or are you saying that

4    there's something else that Judge Katz helps you more than

5    that?

6         MR. FINGER:  Later in the opinion Judge Katz goes

7    on to say -- and if the Court wants -- it's at 250 -- I

8    don't have the pin cite to it.  I can get the pin cite if

9    you'd like me to, Your Honor.  But Judge Katz goes on to

10   say:

11        "When information is conveyed to an attorney, the

12        communication need not specifically ask for legal

13        advice in order to maintain the documents

14        privileged status so long as the information is

15        sent to counsel in order for counsel to provide

16        legal advice."

17        That opinion cites the Buspirone Anti-trust

18   litigation and goes on to cite the Pfizer Securities

19   litigation and quotes it and says:

20        "An implied request for legal advice exists when

21        an employee sends information to corporate counsel

22        in order to keep them apprised of ongoing business

23        developments with the expectation that the

24        attorney will respond in the event the matter

25        raises important legal issues."

         1          That's exactly the situation that's here.  There

         2     may have been discussion with third party, but sharing that

         3     with counsel as part of an ongoing string where legal advice

         4     is -- is sought and conveyed continues that privileged

         5     dialogue between lawyers and clients, and that's what --

         6     what the case is in this particular email.

         7          So the fact that there was a discussion with a

         8     third party does not end the inquiry.  The inquiry extends

         9     to suggest that the discussion -- the fact that the

        10     information is shared expects -- is -- is, to quote Judge

        11     Kat, "an implied request for legal advice," and that's what

        12     happened in this case and, therefore, the document is, in

        13     fact, privileged.

        14          THE COURT:  You're saying that when a non-

        15     privileged communication is shared with the attorney a

        16     privilege attaches to the non-privileged communication?

        17          MR. FINGER:  No, Your Honor.  I'm saying that an

        18     -- an attorney/client communicate -- for the privilege to --

        19     to apply there has to be the communication between a lawyer

        20     and a client for the purpose of seeking or obtaining legal

        21     advice.  And that definition is met here and Judge Katz

        22     acknowledged it when, in this case, information is being

        23     conveyed to the lawyer with the expectation that it's a --

        24     it's an implied request for legal advice and with the

        25     expectation that legal advice will be returned based on the

Page 32

1    information that's provided.

2           THE COURT:  Now was the source of the

3    communication that was conveyed to the attorney with

4    somebody at new GM?

5           MR. FINGER:  Yes.  And --

6           THE COURT:  And is it agreed that if Mr. Fisher

7    were to depose the guy at new GM who spoke to your Aurelius

8    guy he could ask away with regard to that?

9           MR. FINGER:  Yes.  He can ask Mr. Benomo (ph) what

10   he said to -- to somebody else that -- that's not a

11   privilege.  He's -- he's a lawyer, but this would not be a

12   privileged communication.  He's free to ask that question,

13   but he's not free to use a document that's protected from

14   disclosure on the grounds of -- of the attorney/client

15   communication privilege.

16          THE COURT:  Uh-huh.

17          MR. FINGER:  And that's --

18          THE COURT:  Anything else before I give Mr. Fisher

19   a chance to respond?

20          MR. FINGER:  No, Your Honor.

21          THE COURT:  Very well.

22          Mr. Fisher, do you wish to reply?

23          MR. FISHER:  Very briefly, Your Honor.

24          THE COURT:  Go ahead.

25          MR. FISHER:  First, just to address the standard

Page 33

1    that Your Honor should apply here, I -- it -- I agree to a

2    certain extent that the timeliness of the request is not the

3    same.  That issue, the timeliness of the claw back is not

4    the same as it would be in the absence of a protective

5    order.

6         My understanding of the case law is that where

7    there is a -- where there is no protective order or at least

8    a protective order that doesn't have a claw back provision

9    like ours, then the Court applies a reasonableness test and

10   looks at a number of different factors, including any delay

11   in seeking the claw back.

12        Where there is a protective order like ours then

13   the standard is recklessness.  But -- and we -- we -- we

14   submit that when you tell Aurelius here are ten documents

15   we're relying on in our complaint, please review them and

16   tell us whether we can publicly file our complaint, they

17   review them and say, go ahead and publicly file the

18   complaint, that that rises to the level of recklessness.

19        But even separate and apart from that, we're not

20   arguing here that it's the inadvertent disclosure that

21   caused the waiver.  We're arguing that that communication is

22   tantamount to a knowing waiver because counsel are telling

23   us we've looked at these documents and you can go ahead and

24   do what you're doing with them.

25        With regard to Mr. Finger's point about on whose

Page 34

1    behalf the January 5th, 2012 letter was written all I can

2    say is that we received the letter from Greenberg Traurig.

3    We know who Greenberg Traurig represents.  We had been going

4    back and forth with them with all kinds of arguments about

5    whether Aurelius should or should not be named as a

6    defendant in the -- in the complaint.  And what they told us

7    was that our clients will not require that the draft

8    complaint be filed under seal.

9          So I would say that the onus is on Greenberg

10   Traurig to tell us on whose behalf they're communicating if

11   they're only communicating supposedly on behalf of a subset

12   of their clients.  I don't' think it's fair to construe that

13   letter as a letter that was not written on Aurelius' behalf.

14         And, finally, Your Honor, with regard to the

15   underlying question of whether this particular document is

16   privileged, I should say that our objective here, really,

17   was having prepared the complaint, having gone through a

18   revision of the complaint after receiving a lot of angry

19   letters, and then having submitted it to the Court, we

20   didn't want to have to revise the complaint and then go

21   through that solicitation process again, and then if someone

22   objected file a new motion to have the complaint filed under

23   seal.  We were trying to move things along here.

24         And for all the reasons I've already mentioned we

25   think there's been a knowing waiver here.  If there hasn't

Page 35

1   been we think that at least as to these four documents the

2   behavior was reckless.

3           And -- and, finally, if Your Honor doesn't find a

4   waiver on one of those two grounds, then Your Honor needs to

5   reach the privilege issue.  Your Honor can probably best

6   reach it by reviewing the document in question, which Your

7   Honor doesn't have the benefit of and I don't have the

8   benefit of having the document in front of me.

9           When Mr. Finger stood here with the document,

10  we're not contending that the privileged portions of the

11  communication should be produced to us.  Of course not.

12  They were originally produced to us in redacted form where

13  paragraph 144 just relies on the first page of that email

14  which is the non-privileged communication that -- that I've

15  described to the Court.

16          THE COURT:  All right.  Everybody sit in place for

17  a minute.

18      (Pause)

19          THE COURT:  Before I rule, Mr. Fisher -- never

20  mind.

21          All right.  Gentlemen, Ms. Cooperman, I am ruling

22  that the protective order does not provide absolution for

23  all time for delays in asserting rights that would otherwise

24  apply under the protective order and that undue delay or

25  latches could still, under certain circumstances, result in

Page 36

1    a waiver.

2            But I'm further ruling that under the facts here,

3    given the chronology, with or without the specific carve-out

4    on behalf of Aurelius, that the Greenberg Traurig firm, on

5    behalf of its client, sufficiently acted promptly so that I

6    do not have a situation at the outer end where contentions

7    as to latches or waiver by undue delay would consequently

8    attach.

9            Therefore, the production of the documents will

10   rise or fall with respect to their underlying nature as

11   documents as to which the privilege properly could be

12   invoked.

13           Putting it another way, if and to the extent that

14   they're privileged you can't use them, and you would have to

15   drop the statement in 144 that relied upon them, and

16   conversely to the extent that they're not privileged you can

17   use them as you see fit.  This, of course, would, in

18   addition, be without prejudice to your rights to depose

19   parties on either side of a non-privileged communication to

20   find out what either said to the other.

21           A separate issue, which was articulated in your

22   letter and which exists under Judge Katz' statement of the

23   law in Urban Box Office Network, 2006 WestLaw 1004472, with

24   which neither side appears to disagree, is whether the

25   privilege was properly invoked in the first place with any

Page 37

1    -- with respect to any one of the four documents in

2    question.

3            Mr. Finger, you or Mr. Zirinsky or some person

4    acting on your behalf is to get me those four documents at

5    your earliest reasonable convenience for in camera review.

6    You are to also provide me, if you wish, and Mr. Fisher or

7    his designee is to provide me, if he wishes, any cases --

8    and I want, as a favor to me, copies of the cases, not just

9    giving me cites -- of any cases that either side believes I

10   should take into account on the legal principles associated

11   with the communication between attorney and client with

12   respect to communications by a third party.

13           And if the law is different -- and I express no

14   view on it now -- I'm pretty good on this law except with

15   respect to cases that have come up in the last couple of

16   years, but I want to be sure that I've gotten it right --

17   with respect to whether it makes a difference as to whether

18   the lawyer is the principle addressee or is being copied,

19   and to the extent there is a rule of law as stated by

20   Mr. Finger with respect to either conveying information from

21   the third party as part of a continuing representation by

22   the lawyer or more broadly providing the substance of the

23   non-privileged communication to the lawyer sanitizes an

24   otherwise non-privileged communication and makes it subject

25   to non-disclosure.

1          Those are areas in which I would specifically want

2    your assistance, but that's without prejudice to your rights

3    to give me anything else that you think is relevant.

4          I well understand, Mr. Fisher, that you no longer

5    have the document and you, are in a sense, are fighting with

6    Mr. Finger with a hand tied behind your back, but that's the

7    way it is.  You can't do anything about that.  I'm not going

8    to require Mr. Finger to give you the document again to help

9    you fight the fight with him.

10          Cases going back thirty years to a case which, if

11   I recall its name correctly, is J.P. Foley and Company

12   versus Vanderbilt, discuss the proposition that otherwise

13   privileged communications do not become -- let me rephrase

14   that -- otherwise unprivileged communications do not become

15   privileged because non-privileged information is

16   communicated by attorney to client or client to attorney,

17   but the issue may or may not be the same when it's part of a

18   continuing legal representation.  And I'll give you guys,

19   both sides, the opportunity to brief me on that.

20          I also would not for half a second suggest that

21   you exclude decisions by MJ's.  The magistrate judges in

22   this district and elsewhere are some of the most expert on

23   these areas and I very much care what they have to say.

24          All right.  Pending my consideration of the

25   underlying privilege issues on those four documents,

Page 39

1    Mr. Fisher, you are authorized to file the complaint in the

2    clear, but with the contested paragraph 144 redacted.  And

3    after I rule I will then decide whether or not we'll

4    declassify the redacted portion of that document.

5           Okay.  Not by way of re-argument, do we have any

6    further business here?

7           MR. FISHER:  Yes, Your Honor.  Just the status

8    conference component of today's hearing on Nova Scotia,

9    which I believe we've achieved a fairly broad consensus on

10   scheduling issues and I just wanted to briefly apprise the

11   Court of that.

12          THE COURT:  Certainly.  But I want you to come to

13   the main lectern so I can hear you better, and then if

14   Mr. Finger or Mr. Zirinsky wants to be heard after that, I'm

15   going to make a similar request.

16          MR. FISHER:  Your Honor, the parties have agreed

17   on cut-offs for the conclusion of fact depositions and also

18   on cut-offs for expert discovery.  And we -- if Your Honor

19   wishes we can simply reflect those dates in a stipulation to

20   be submitted to the -- to the Court.

21          We also envision an evidentiary hearing, which is

22   something that we mentioned to the Court at the last status

23   conference, and we spoke to Your Honor's deputy this morning

24   about potential dates.  And it appears that there are dates

25   available during the week of August 6th.  Ms. Blum was able

Page 40

1    to --

2              THE COURT:  There are indeed dates available on

3    August 6th, but I was less clear on how many days you guys

4    needed the aggregate.

5              MR. FISHER:  I -- I think, Your Honor, it's of

6    course hard to know, but we project perhaps seven or eight

7    days, although I think we'll all try to be as efficient as

8    possible and we appreciate that we may not be able to get

9    all of those days consecutively on Your Honor's calendar.

10             So I think our approach was to sort of take as

11   much as we -- we -- we reasonably could given Your Honor's

12   calendar and -- and then try our best to -- to fit the

13   hearing into whatever time Your Honor had, and then to find

14   supplemental dates as necessary.

15             So Ms. Blum was able to identify approximately

16   five dates and said during that week -- she -- she wasn't

17   certain whether Your Honor would want to have hearing days

18   on the Monday, August 6th or on the Friday, August 10th.  If

19   Your Honor is open to hearing -- to having this matter heard

20   on those dates then there are five consecutive days that --

21   that week, Your Honor.

22             THE COURT:  Uh-huh.  Well, of course, the

23   practical problem is that as important as -- as some people

24   like to think that the GM case is, it's not the only case on

25   my docket, including others that have some very major

1    controversies and others who believe that, you know, you

2    don't have to be a mega-case to be entitled to court time.

3              I assume that the estimate of trial time that you

4    have is still on the assumption that direct will go in by

5    affidavit or declaration?

6              MR. FISHER:  Yes.

7              THE COURT:  Uh-huh.  All right.  Let me hear from

8    Mr. Finger or Mr. Zirinsky.

9              MR. ZIRINSKY:  Thank you, Your Honor.

10             I -- I do think and I want to thank Mr. Fisher and

11   the other -- and counsel for the other parties in this

12   litigation that I do think we've made substantial progress

13   in terms of defining the road map to be able to present this

14   controversy to Your Honor.

15             We believe that in addition to having agreed to

16   firm deadlines for completion of fact depositions and expert

17   depositions, we -- we believe we've also agreed on some

18   maximum numbers of depositions as well, which are

19   significant, but we've attempted -- we thought they needed

20   less, if any.  They thought they needed a lot more, but

21   we've actually reached an agreement, you know, subject to

22   some startling development where parties could come back to

23   see Your Honor if they needed relief.

24             But we -- we do think it's a significant

25   accomplishment.  We've agreed to basically sixteen fact

Page 42

1    depositions by --

2              THE COURT:  Did you say 1-6?

3              MR. ZIRINSKY:  1-6.  The original ask was over

4    forty.  So we're down to 1-6 which we think is a major feet.

5              We have not finalized our view, but we think we --

6    from -- from our perspective we think no more than three

7    that we would be taking for a total of nineteen, and other

8    parties have reserved rights.  They may wish to try to

9    designate some additional parties for deposition.

10             THE COURT:  Pause, please, Mr. Zirinsky.  What

11   parties are there besides you and -- or your clients and the

12   GUC Trust, and to a lesser extent, new GM?

13             MR. ZIRINSKY:  We also have the Canadian

14   trustee --

15             THE COURT:  Oh, of course.

16             MR. ZIRINSKY:  -- Nova Scotia trustee.

17             THE COURT:  Green Hunt Wedlake.

18             MR. ZIRINSKY:  Green Hunt Wedlake, which is --

19             THE COURT:  Oh, yes.

20             MR. ZIRINSKY:  -- they -- they are the holder --

21   the trustee is the holder of the wind up claim --

22             THE COURT:  Uh-huh.

23             MR. ZIRINSKY:  -- under Canadian law, which is

24   disputed, obviously, by the GUC Trust.

25             THE COURT:  Mr. Dublin's client.

Page 43

1          MR. ZIRINSKY:  Yes.  That's correct.  So those are

2     the parties.

3          THE COURT:  Okay.

4          MR. ZIRINSKY:  We did all meet and confer

5     yesterday and I think we have a -- you know, roughly we have

6     a -- a global agreement, and I think Mr. Fisher's suggestion

7     that the parties endeavor to reduce this to a written

8     stipulation to be submitted to Your Honor is a good idea.

9          We think the deadlines are realistic, the target

10    deadlines are realistic.  We also think that we should be

11    able to accomplish an evidentiary hearing in five to eight

12    days.  I'm more optimistic, perhaps, than Mr. Fisher, but I

13    do think that if Your Honor is able to carve-out time in --

14    in August that would be very helpful.  We would all endeavor

15    to try to complete within whatever time Your Honor was able

16    to allocate to us.

17         I just want to make one -- one other comment, and

18    that is I know Your Honor's views on dispositive motions and

19    we had had conversations about that in the past.  I just

20    want to make it clear, and I don't think there's any

21    disagreement on this, that we obviously are not agreeing to

22    waive any rights or defenses or objections or -- or

23    otherwise by agreeing to go forward on this basis without an

24    evidentiary hearing.  We assume that the schedule will allow

25    sufficient time for pretrial briefs to be submitted to Your

1    Honor in advance of an evidentiary hearing.

2            And we might suggest that at the outset of the

3    evidentiary hearing, or an earlier date if Your Honor wants

4    to set that, that Your Honor might hear some argument as to

5    try -- so that we could try to at least eliminate some of

6    the issues that we think Your Honor may be able to dispose

7    of without evidentiary hearing and try to narrow the focus

8    of what actually has to get heard before Your Honor through

9    -- through testimony.

10           THE COURT:  Do you think there would be material

11   incremental benefits as a result of doing so?

12           MR. ZIRINSKY:  I believe so, yes.  I believe a

13   number of the claims can be dealt with as a matter of law.

14           THE COURT:  Uh-huh.  All right.

15           MR. ZIRINSKY:  Thank you.

16           Mr. Steinberg, do you want to weigh in on this?

17           MR. STEINBERG:  Yes.

18           Your Honor, we did file a statement in connection

19   with the ceiling motion.  There was an element that was sort

20   of a technical situation where we wanted to close the loop,

21   which is that we had formally been a party to the contested

22   matter and now that they're bringing the adversary

23   proceeding, which was done for -- to try to address the

24   procedural objection, we wanted to be able to participate in

25   the adversary proceeding aspect of this dispute.

1                  All of the parties have agreed that we should be

2       able to do that, but we would like to be able to submit an

3       order similar to what we had done in the contested matter as

4       a right to be heard and -- and -- in this matter.

5                  THE COURT:  Well, you've got that right under term

6       loan lenders Caldor (ph), right?

7                  MR. STEINBERG:  I certainly have the right to be

8       heard, but this is an adversary proceeding --

9                  THE COURT:  A right to intervene.

10                 MR. STEINBERG:  Right.  I -- that's correct.

11                 THE COURT:  And under my ruling in Adelphia (ph)

12      you have that right to intervene, but the extent to which

13      you would participate would depend on the circumstances as

14      to the level of your participation and what you want to do,

15      and it wouldn't equate to ownership of the cause of action

16      except insofar as you otherwise have one under law.  You

17      understand all of that?

18                 MR. STEINBERG:  That -- that's true, Your Honor.

19      But to remember what's in the contested matter, they are

20      bringing a Rule 60 motion to upset the sale order and things

21      like that.  They have not withdrawn that aspect of it.

22      That's the reason why we sought to participate in the

23      contested matter.

24                 When you read through the draft -- the complaint

25      that -- that's going to be filed, there are elements as to

1    whether the lock up agreement which gives GM Canada a post

2    -- a release should somehow be potentially vitiated, which

3    obviously affects new GM and the sale order.  These are very

4    critical issues for new GM and a reason why it needs to

5    participate in this matter.

6           And that's the reason why -- but we're not looking

7    to -- to take what is an objection to claim matter and try

8    to say that that is a new GM prerogative.  But we will be

9    saying that -- that as part of the sale order there were

10   certain assets that conveyed to new GM that the GUC Trust

11   may not pursue and that they are trying to do that.

12          And -- and to pick up on Mr. Zirinsky's point, it

13   didn't seem to be a -- too appropriate, especially in light

14   of Your Honor's prior remarks at other status conferences,

15   that you were interested in any kind of dispositive motions

16   to at least narrow the dispute.  I don't think the dispute

17   goes away.  I think there will be an evidentiary trial on

18   the claims itself.

19          But one of the things that we try to do in

20   responding to the ceiling motion is to try to address the

21   fact that there's a lot of things in there that we think are

22   inappropriate to be brought.  And, in fact, one of the

23   reasons why this complaint was revised was because there

24   were factual errors that they corrected themselves when we

25   pointed them out to them.  They didn't correct all of it.

Page 47

1            And we're hoping that at the conclusion of the

2    discovery of the depositions that we may be able to address

3    to Your Honor certain issues that will streamline any kind

4    of evidentiary trial.

5            For example, I have a hard time envisioning at the

6    end of the day why the committee, now the GUC Trust, should

7    be able to vitiate the sale order.  That is an element

8    that's still here, but we hope that that's not going to be

9    an issue that's in the evidentiary trial.

10            The GUC Trust may come to that conclusion itself

11    at the -- at the end of the depositions.  They may come to

12    the conclusion at the end of the depositions that there was

13    no improper post-petition transaction.

14            Therefore, I didn't want to try to force that

15    issue now.  I want them to either evolve to what I think

16    would be the right decision or to have the opportunity to

17    address that to Your Honor so that you don't have an eight-

18    day trial, but you have a much shorter streamline trial.

19            I also think, Your Honor, that this case would --

20    would have the benefit of an adjourned status conference

21    just so that Your Honor would be able to monitor what was

22    going on, because it is going -- I mean, you -- Your Honor

23    knows that there's potentially nineteen depositions in this

24    case.  I mean, the depositions including Weil, Gotshal,

25    Kramer, Levin, the government, the U.S. government, the

Page 48

1    Canadian government.  That's the wish list that people have

2    in this case in connection with this noteholder dispute.

3              Now they want to try to do it.  I can't tell them

4    they shouldn't take their depositions now, but I do know

5    that they're -- they're certainly going to the far -- the

6    farthest boundary of what is relevant for purposes of

7    whether certain claims filed in this case should be deemed

8    disallowed or -- either in total or partial.

9              So I think we need another status conference date,

10   and it could be just a holding date to report to Your Honor.

11   But if we're actually going to get this case to be tried in

12   August or to be resolved in August, I think that it needs

13   further judicial monitoring of what's going on because, as

14   you can see from the ceiling motion response that we filed,

15   we are terrifically unhappy with some of the things that are

16   happening here, but we have decided that now is not the

17   right time to further address those issues.

18             But we do think they need to be further addressed

19   and we do reserve the opportunity to do so before an

20   evidentiary trial.  We just think that Your Honor has to let

21   them go through the process of the depositions, but some of

22   these depositions are very, very far ranging and -- and we

23   think are -- are not necessarily appropriate.  But we're not

24   going to do the noteholders' bidding.  We -- we're going to

25   protect our interest and do what's required under the lock-

1   up agreement.

2            THE COURT:  Uh-huh.

3            Mr. Dublin, anything to add?

4            MR. DUBLIN:  No, Your Honor.

5            THE COURT:  All right.

6            Mr. Fisher, Mr. Zirinsky, the way that some people

7    talked about it was as the claims objection.  Am I right in

8    assuming that it also includes trial on the equitable

9    subordination and equitable disallowance claims?

10           MR. FISHER:  Yes, Your Honor.

11           THE COURT:  Mr. Zirinsky, you agree?

12           MR. ZIRINSKY:  That's in their complaint, Your

13   Honor, yes.

14           THE COURT:  Okay.  All right.  Anything else,

15   anybody?

16           All right.  Here's what we're going to do, folks.

17   You're going to give me two separate stips to which, if I

18   understand it correctly, there would be four parties each.

19   One dealing with scheduling and one dealing with

20   intervention for new GM into the adversary, each of which,

21   if reasonable, I'll so order.

22           The intervention stip should, in addition to

23   giving new GM the right to intervene, to which I think it's

24   plainly entitled, either agreements or reservations of

25   rights with respect to matters that are addressed in my

Page 50

```
 1    Adelphia decision that was execute -- that I issued shortly

 2    after term loan lenders Caldor was issued.

 3            And if I recall correctly there was a decision of

 4    the Second Circuit, in a case whose name I've forgotten,

 5    that at least seemingly approved things I said in that case,

 6    and Judge Chin (ph) who I think was then a district judge,

 7    and I think Sunbeam, wherein it was stated or implied that

 8    intervention is not the same as owning causes of action.

 9    You'll have reservations of rights on those things, but put

10    in as much as you can that you can agree upon.

11            I think Mr. Steinberg's recommendation that there

12    be a status conference between now and August is a good one,

13    but I need you to put your noodles together to give me a

14    recommendation, jointly, if possible, on the zone of time

15    when you think that would be most productive.

16            I'll tell you guys now that you'll have at least

17    three trial dates -- or three trial days in the week of

18    August 3rd, and if my schedule permits more, but I don't

19    know yet what I'm going to be able to give you.

20            I sense from what you're saying now that unless

21    either side hits a home run on dispositive motions or

22    narrowing motions or whatever Mr. Zirinsky calls it, we're

23    not going to finish the week of August 3rd no matter how

24    many days I give you, but that will at least be a start.

25            Lastly, I want you to focus, if you're thinking
```

Page 51

1   about the motions of the type that Mr. Zirinsky talked

2   about, what kind of bang for the buck any such motion would

3   result in, even if successful, because I care about the

4   incremental benefits of those, and trying an extra issue or

5   two when you're having a trial anyway doesn't get you that

6   much more or less than it might if that issue were to go

7   away.

8           All right.  Anything else, either side?

9           All right.  Five-minute recess, only five, and

10  then I'll take the GUC Trust funding issues.

11          THE CLERK:  All rise.

12      (Recess at 11:05 p.m.)

13          THE COURT:  Have seats, please.

14          All right.  On the GUC Trust motion for leave to

15  liquidate securities.

16          Let me get appearances and then ask you all to sit

17  down.

18          MR. WILLIAMS:  Your Honor, Matthew Williams,

19  Gibson, Dunn and Crutcher for the GUC Trust and the

20  Avoidance Action Trust administrator.

21          THE COURT:  Okay, Mr. Williams.

22          MR. WILLIAMS:  Oh, I'm sorry, Your Honor.  And

23  with me is my colleague, Keith Martorana and my partner,

24  Mitchell Karlan.

25          THE COURT:  I'm sorry.  I couldn't hear your

1    colleagues names, Mr. Williams.

2              MR. WILLIAMS: Mitchell Karlan, Your Honor.

3              THE COURT:   Karlan?

4              MR. WILLIAMS:  And -- Mitchell Karlan and Keith

5    Martorana.

6              THE COURT:  Okay.

7              MS. LEARY:  Good morning, Your Honor.  Maureen

8    Leary on behalf of the State of New York.

9              THE COURT:  All right, Ms. Leary.

10             MR. DUBLIN:  Good morning, Your Honor.  Phil

11   Dublin, Akin Gump on behalf of Green Hunt Wedlake.

12             THE COURT:  All right.  Mr. Zirinsky.

13             MR. ZIRINSKY:  Bruce Zirinsky, Your Honor,

14   Greenberg Traurig, on behalf of certain noteholders.

15             THE COURT:  All right.  Mr. Jones for the U.S.

16             MR. JONES:  Yes, Your Honor.

17             THE COURT:  Okay.

18             MR. JONES:  David Jones, U.S. Attorney's Office.

19   Thank you.

20             THE COURT:  Right.

21             Okay.  Folks, make your presentations as you see

22   fit, but I want you to address some particular questions and

23   concerns that I have, because I have problems with positions

24   by both sides.

25             As Green Hunt Wedlake properly notes I do approach

Page 53

1    objections on the part of Green Hunt Wedlake and the Nova

2    Scotia bondholders with skepticism where I'm seeing once

3    again -- and I don't know how many times I've seen this over

4    my judicial tenure -- efforts to attack ones adversary

5    through the purse strings.

6              But with that said, I do have concerns about

7    several aspects of the request.

8              When you look at it with a less litigation driven

9    view as New York State does, although I well understand that

10   New York State is in litigation with the estate as well, I

11   don't see a discrimination issue; that is, an issue vis-à-

12   vis different treatment of creditors, although just as I

13   made creditors deal with the vagaries of movements in the

14   stock market, vis-à-vis delays in getting paid, I am

15   strongly inclined to do the same for professionals and for

16   anyone else who's going to be getting money out of a stock

17   that by necessity can go up or down in value.

18              Other issues, however, are more troublesome to me.

19              Both sides, I don't see that much of a ripeness

20   issue with respect to 2011 cost overruns and efforts to fund

21   those, but I do see ripeness issues with respect to expenses

22   anticipated for 2012.  And I want both sides to address

23   whether my view, based on my reading of the briefs in that

24   regard, should be modified.

25              I was surprised and disappointed to see how much

Page 54

1    people were talking about for tax-related matters,

2    especially since -- and you can correct me -- but I could

3    swear that I was told by Tom Mayer (ph) that if I decided

4    the issue of the ownership controversy between the U.S.

5    government and the GUC Trust -- excuse me -- the Avoidance

6    Action Trust by the December 15th deadline that Mr. Mayer

7    told me about that that had put the issue of disputed

8    ownership assets off the table from a tax perspective.  And

9    suddenly the need to spend what seems to be a huge amount of

10   money on tax issues is one where I need some help.

11           I cannot for the life of me see how the GUC Trust

12   or the Avoidance Trust, either one, can be spending more

13   than a peppercorn on the term loan action since you're both

14   -- the GUC Trust/Avoidance Trust on the one hand -- I guess

15   it's the Avoidance Trust here -- and JP Morgan on the other

16   would -- I would have thought be doing nothing more than

17   waiting for my decision on the cross-motions for summary

18   judgment, which are now sub judice.

19           The issue, it seems to me, under the plan

20   documents is not whether Wilmington Trust and the others can

21   ask for me to authorize the sale of securities, but whether

22   I should grant it.  And I ask both sides whether I'm a

23   rubber stamp on that issue on the one hand or whether I do

24   have a responsibility to be determining whether the

25   creditors in this case are entitled to their money's worth

Page 55

1    in terms of the management of the trust assets going

2    forward.

3             A statement was made to me, which all seem to

4    acknowledge was made to me, that going forward the GUC Trust

5    was on a detailed and inflexible budget, or words to that

6    effect, and when I overruled an objection by Ms. Leary and

7    maybe one or two others where they had then expressed as a

8    confirmation objection failures to provide more formalized

9    procedures for cost management that was one of the things

10   that I had been told would form the basis for that

11   conclusion.  And the question that I now have for you all is

12   whether and to what extent I should hold people to that.

13            I also want both sides to address the extent, if

14   any, to which I should slice and dice the particular

15   requests for relief or the particular funding requests by an

16   applicant by applicant basis or a cause for relief in that

17   basis.

18            I am particularly troubled by requests where

19   parties proposed to me and to the creditor community that

20   they get paid X-hundred-thousand-dollars or $50,000 or

21   $100,000 per month, and now determine that that wasn't a

22   good deal for them.  That is a matter of concern to me.

23            It could have been drafted; that is the underlying

24   trust documentation could have been drafted kind of like the

25   contracts that I dealt with when I was in the Air Force on a

Page 56

1    cost plus fixed fee basis and people chose not to do that.

2            I also see more incremental base -- benefit in the

3    services provided by Jay Alix than some of the others,  but

4    people can and should address that.

5            Also, if I understand the figures correctly, there

6    are about three-and-a-half-million bucks in cost overruns

7    for 2011 which, if I'm not mistaken, are about half for

8    counsel and I believe the other half are for financial

9    advisory services.

10           I want to know what percentage of the total they

11   are and I want to get a better handle on why they were

12   incurred and how I deal with the tension between -- in a

13   situation where it was expressly agreed that there wouldn't

14   be fee apps, wouldn't be U.S. Trustee review, wouldn't be

15   fee examiner review, but the fees were nevertheless

16   presumably assumed to be subject to some reasonableness

17   test.

18           With that said I'll let you guys address those

19   issues, starting with you, Mr. Williams.

20           As implicit in what I said, I am concerned about

21   the creditors in this case getting their money's worth, and

22   I'm concerned about avoiding prejudice or at least material

23   prejudice to the creditors in this case who are looking to

24   the leadership of the GUC Trust to continue to deliver value

25   to them as this claims process is continuing.

1          MR. WILLIAMS:  Thank you, Your Honor.  Matthew

2   Williams for Gib -- of Gibson, Dunn and Crutcher for

3   Wilmington Trust in its capacity as GUC Trust administrator

4   and the GUC Trust -- and the Avoidance Action Trust

5   administrator.

6          I'll -- if it's okay with Your Honor, I'll get to

7   right to your questions, although I would like to just give

8   you a brief update of the status of some discussions we've

9   had with various parties.

10         THE COURT:  Okay.  Go ahead, please.

11         MR. WILLIAMS:  First, in connection with the tax

12  issue, we had initially requested a $17 million reserve of

13  -- of tax, not to sell the $17 million worth of stuff, but

14  to transfer it to the Avoidance Action Trust in the event a

15  tax issue arose.

16         We've subsequently withdrawn that request.  We've

17  been having numerous discussions with the IRS as well as

18  internally and ultimately we've determined that we're not

19  going to need that contingency funding for that $17 million.

20  So that's been withdrawn.

21         THE COURT:  That's obviously very helpful.  To

22  what extent, then, am I asked to authorize sales of

23  securities for other tax advice or does that take it all off

24  the table?

25         MR. WILLIAMS:  No.  There's still -- we still do

Page 58

1    need tax advice, Your Honor.  There are still a lot of tax

2    issues ongoing.  Most of that's with -- again, how this

3    works, if Your Honor will recall, is tax advice is generally

4    dealt with, at least with respect to the GUC Trust as this

5    reporting and transfer costs, notwithstanding the fact that

6    it doesn't deal with reporting and transfer, given the fact

7    that the Department of Treasury was not willing to fund that

8    we -- we -- we agreed that it would come out of reporting

9    and transfer cost, but --

10             THE COURT:  What do you mean by recording and

11   transfer?  I thought that whatever other people disagree

12   with and -- when you do it on 363 sales, if you transfer

13   assets under a plan you're off the hook on recording and

14   transfer taxes.

15             MR. WILLIAMS:  No, no, no, I'm sorry.  Reporting

16   with a P, Your Honor, reporting and transfer.  It's a

17   defined term in the GUC Trust agreement.

18             If Your Honor will recall, the GUC Trust agreement

19   -- and the plan itself provided that it -- or anticipated

20   that the GUC Trust units would actually be transferable.  In

21   order to do that we, the GUC Trust, are going to incur what

22   are called -- what we -- what is defined in a GUC Trust

23   agreement as reporting and transfer costs.

24             THE COURT:  As a proxy for 34 Act and 33 Act

25   compliance?

1          MR. WILLIAMS:  Yes.  And in order to get up to

2     speed and to deal with all sorts of issues that we're

3     currently negotiating with the SEC.

4          But, in addition -- I'm sorry, I didn't mean to

5     cut you off, Your Honor.

6          THE COURT:  Well, it -- it had appeared to me, but

7     I'll need to hear from Mr. Zirinsky or Mr. Dublin on this,

8     that on that issue you didn't have opposition from the Nova

9     Scotia bondholders and Green Hunt Wedlake.

10          MR. WILLIAMS:  I think that's correct, Your Honor,

11     but just to be clear, when we talk about reporting and

12     transfer costs it's not -- you know, it's a bit of a

13     misnomer in the trust agreement because the trust agreement

14     -- reporting and transfer costs cover -- cover a couple of

15     things.  It covers the SEC stuff that we -- that I was just

16     talking about, and it also covers certain -- this private

17     letter ruling that we're seeking with the IRS, and it also

18     covers the dispute over the term loan ownership litigation.

19     Obviously, treasury wasn't willing to fund that because

20     they've taken the position on appeal now that they own the

21     term loan ownership litigation.

22          So my only point being, Your Honor, is when we

23     talk about reporting and transfer costs, it's actually not

24     just reporting and transfer costs.  There are some other

25     things in there as well.  It's not all tax advice, but it's

Page 60

1    a lot of the tax analysis goes into the reporting and

2    transfer costs.  Other tax advice, with respect to the

3    Avoidance Action Trust, we still do need.

4           For instance, Your Honor, the Avoidance Action

5    Trust agreement itself requires -- doesn't -- doesn't

6    authorize, it requires the Avoidance Action Trustee to do a

7    tax valuation of the underlying litigation.  That actually

8    takes time and money and we have to hire professionals to do

9    it.  So --

10          THE COURT:  I mean, you know, I was a general

11   purpose litigator before I came over to the bankruptcy side.

12   Is there some way by which your guys think that they should

13   be valuing the litigation other than estimating the

14   probability that the Avoidance Trust is going to win on the

15   one hand or JP Morgan and its syndicate are going to win on

16   the other?

17          MR. WILLIAMS:  Yes, absolutely, Your Honor.  There

18   is a number of different variables.  And, again, I haven't

19   been hired to do the analysis, but I've seen drafts of it

20   and there are a number of variables, including the value of

21   the leftover collateral, for instance.

22          THE COURT:  I see now.

23          MR. WILLIAMS:  There's also collection risk.

24          THE COURT:  Because underlying that is the point

25   that while the UCC-3 in question involved the biggest chunk

Page 61

1    of collateral, it wasn't all the collateral.

2            MR. WILLIAMS:  Exactly, Your Honor.  And it -- and

3    another issue is collection risk, obviously; another issue

4    is time value of money, discounting to present value.

5            We as the GUC Trust administrator have to prepare

6    a tax analysis that's ultimately going to hold up to an

7    audit if that ultimately comes, and because of that if --

8    these are the kind of things, Your Honor, that seem simple

9    when you first look at the trust agreement, or you know, you

10   prepare a tax analysis of the avoidance action, but when you

11   actually delve into it and -- and again, I haven't been

12   hired to do that analysis, so, you know, I can speak

13   generally to it, but it takes time and it takes money.  And

14   at the end of the day it's Wilmington Trust and to a lesser

15   extent, but to a significant extent the GUC Trust monitor

16   that have to sign off on these analyses.  And because of

17   that, you know, we want to make sure that it's done right.

18           THE COURT:  The GUC Trust monitor is FTI?

19           MR. WILLIAMS:  Yes.  The FTI is the GUC Trust

20   monitor and the Avoidance Action Trust monitor, Your Honor.

21           THE COURT:  Okay.

22           MR. WILLIAMS:  With -- and one other, you know,

23   speaking up for my former colleague, Tom Mayer, he was -- he

24   was -- you know, we all thought that if Your Honor ruled we

25   wouldn't have the issue of the disputed ownership fund.

Page 62

1    Treasury appealed obviously, and that threw a bit of a

2    monkey wrench into the works.  But, you know, as I stated

3    earlier, we're no longer seeking to send that $17 million in

4    stock over for a number of reasons.  One, because -- and,

5    again, with the -- with the idea that things are always more

6    complicated than they seem in this matter -- it could have

7    potentially created 12(g) reporting for the Avoidance Action

8    Trust had we done that --

9            THE COURT:  12(g) under the 34 Act?

10            MR. WILLIAMS:  Yes, because we would have had

11   holders of over -- over -- I believe it's 500 holders, Your

12   Honor, and over --

13            THE COURT:  Requiring you to file a Form 10?

14            MR. WILLIAMS:  Yeah.  So rather -- so that was one

15   reason we ultimately determined not to do it.

16            Subsequently, we've been in continued discussions

17   with the IRS, and it turns out that the IRS, so long as we

18   get some other issues resolved with them, that they're not

19   going to take the position that the GUC Trust is a disputed

20   ownership fund, not withstanding treasury's appeal.  So --

21   so that's a good thing.  But, again, this is the kind of

22   stuff that is taking time and money to resolve.

23            What -- a couple of other just general updates,

24   Your Honor.

25            The Nova Scotia trustee had filed a limited

1    objection and their limited objection was really a request

2    for more information; you know, what professionals were

3    over, by how much, how much did we anticipate professionals

4    were going to be over in 2012?

5            We filed a couple of declarations.  We filed the

6    declaration of David Vinasky (ph) of Wilmington Trust where

7    we tried to outline that information.  We filed a

8    declaration by FTI, and we filed a declaration by -- by Alix

9    Partners, all, you know, dealing with certain issues.  Each

10   of them are here to -- for cross-examination to the extent

11   that they --

12           THE COURT:  Well, you know that's not the way we

13   deal with contest -- contested evidentiary issues either

14   under the local rules of this Court, my case management

15   order, or even Rule 9014; that the return date on a motion

16   is never an evidentiary hearing.

17           MR. WILLIAMS:  I -- I apologize, Your Honor.  I --

18   I thought that we had complied with Your Honor's chambers

19   rules by submitting those declarations and making the

20   witnesses available here to testify.

21           THE COURT:  Did you contact my chambers and tell

22   me that you had contemplated having an evidentiary hearing

23   today?  These affidavits, if I recall there were three of

24   them, were submitted as part of a reply brief.

25           MR. WILLIAMS:  That's correct, Your Honor.  If I

1    could just confer with my colleague for one second.

2                (Pause)

3                MR. WILLIAMS:  Your Honor, we had provided those

4    -- the answer to your question is unfortunately no, we did

5    not contact chambers and say that we wanted an evidentiary

6    hearing today.  I apologize for that, Your Honor, it was an

7    oversight on my part.

8                To the extent that -- you know, we had provided

9    those declarations because the parties had asked for

10   additional information.  If there's a need to schedule a

11   subsequent evidentiary hearing obviously we'd be amenable to

12   that.

13               THE COURT:  If your affidavits address their

14   concerns and they're satisfied of course the issue goes

15   away.

16               MR. WILLIAMS:  Yeah, well --

17               THE COURT:  But if there are material disputed

18   issues of fact, the National Bankruptcy Rules, the way that

19   9014 was amended to deal with evidentiary hearings, and what

20   I have said in baby talk in my case management orders this

21   is certainly miscontrol.

22               MR. WILLIAMS:  We understand, Your Honor.

23               THE COURT:  Okay.  Continue, please.

24               MR. WILLIAMS:  But I guess at least with respect

25   to Nova Scotia -- the Nova Scotia trustee, the good news is,

Page 65

1    is that the declarations did resolve their concerns.

2              THE COURT:  Okay.

3              MR. WILLIAMS:  We -- now again, I -- that is not

4    the case or at least I can't speak for, you know, the other

5    two objecting parties, but with respect to Nova Scotia, you

6    know, we had helpful discussions, they told us what they

7    wanted, we tried to include, you know, by line item in the

8    declarations, you know, by professional, who's over by how

9    much and the like, and because of that I believe Nova Scotia

10   has -- the trustee has agreed to withdraw its objection.

11             We've also agreed in order to provide full

12   disclosure just generally to all parties in interest that on

13   a going forward basis the GUC Trust files what are called

14   6.2 reports -- it's 6.2 because it's Section 6.2 of the GUC

15   Trust agreement -- and we've agreed going forward -- these

16   are quarterly reports filed with the SEC and the like --

17   we've agreed that we're going provide that information on a

18   going forward basis in the 6.2 reports.

19             So there's going to be line items akin to what's

20   in the Vinasky declaration, I believe it's on page 1 of

21   Exhibit B of the Vinasky declaration, we're going to provide

22   a form like that going forward so people can get an idea as

23   to what professionals are spending and how much.

24             With respect to Your Honor's particular questions,

25   I'm happy to just delve right into them.

Page 66

1           Your first question was about ripeness, why are we

2    asking Your Honor to sell stock for 2012 anticipated

3    overages, notwithstanding the fact that those fees and

4    expenses haven't been incurred yet?  There's a couple of

5    reasons, Your Honor.

6           First and foremost is that this process is

7    expensive.  Any time we have to sell stock we have to

8    notice, you know, every allowed claimant, every disputed

9    claimant, it's an expensive process, and given the fact that

10   we were over by 011 and we were making the motion to -- you

11   know, again, it's a line item budget -- so given the fact

12   that certain professionals were over for 2011 and we were

13   making the motion the GUC Trust administrator thought that

14   it was prudent given the fact that based upon all the

15   information available to it we are going to be over for

16   2012, that it made sense to make this motion now.

17          So that's really the first reason.

18          THE COURT:  How expensive is it?

19          MR. WILLIAMS:  Your Honor, I don't -- the answer

20   is I don't know.  I mean we -- you know, obviously you saw

21   our motion and our reply so this has been a relatively

22   expensive process.  The noticing itself is expensive.  We,

23   Wilmington Trust, you know, noticing the bondholders

24   actually isn't that expensive because we can just push it

25   out through DTC, but noticing the actual claimants it's,

1    right, it's every claimant, every --

2            THE COURT:  Is there a reason why I was -- the

3    documentation was structured to provide notice to every

4    creditor --

5            MR. WILLIAMS:  Yes, Your Honor.

6            THE COURT:  -- instead of the way we more commonly

7    do it in Chapter 11 cases?

8            MR. WILLIAMS:  I believe so, Your Honor.  And the

9    reason for that is because what Your Honor eluded to

10   earlier, which is this is an important motion and creditors

11   who are otherwise entitled to this stock should get notice

12   as to how their stock is being used and why.  And I believe

13   it was the creditors' committee's concern that if the GUC

14   administrator was going to make a determination that it

15   wanted to sell stock because it was the best interest of

16   creditors that every creditor should get notice of it.

17           THE COURT:  Uh-huh.  Continue.

18           MR. WILLIAMS:  And in this vain, Your Honor, you

19   know, I do think it's telling, obviously it's not

20   dispositive nor near disclose positive, but no creditor with

21   merely allowed claims has objected to the motion.  So I do

22   think that the process works.  It's expensive, but it works.

23           Also with respect to ripeness and because I think

24   in part that the document requires that we have to notice

25   everybody under the sun, the document also only allows for

Page 68

1    -- the GUC Trust agreement itself only allows us to make

2    this motion on a semiannual basis.  So we're not allowed to

3    come in every couple of months and make a motion to sell

4    stock, the document explicitly says we can only make a

5    motion on a semiannual basis.

6              So, you know, I've got a shot here, I've got a

7    shot at some point in the future.  So that's the second

8    reason.

9              And then the third reason is that the GUC Trust

10   administrator has determined that it wants to incentivize

11   its professionals and make sure that they're paid on a

12   timely basis so we can get this work done quickly and get

13   out quickly.

14             How the budget works, how the budget works with

15   treasury we're allowed -- you know, the GUC Trust is allowed

16   to pay professionals for 2012 up to a certain amount and

17   that's it, and then they have to wait till 2013 and then we

18   can start paying them again out of the 2013 budget.  What we

19   wanted to avoid is any kind of slow down in the work.

20             We know that we're going to be over budget based

21   upon the -- based upon all the due diligence that the GUC

22   Trust administrator has done, and we want to be able to make

23   sure that professionals can get paid so we can continue to

24   get this work done in a timely manner.  So because of -- for

25   all of those reasons we do think that this motion is ripe

Page 69

1    and that it makes sense to sell the stock now.

2            Now what we haven't done, Your Honor, we did

3    reserve, you know, based upon -- we extrapolated out through

4    2014 what we thought we were going need.  We have not sought

5    to sell stock for 2013 or 2014 because -- just because of

6    the vagaries of it.

7            You know, 2012 it's relatively easy to figure out.

8    I shouldn't say easy -- nothing is easy in this case,

9    Your Honor -- but it's -- we have a relatively good handle

10   on what 2012 is going to be, we think we know what 2013 and

11   2014 is going to be, but the truth is we don't.  Things

12   continue to pop up, you know, new claims continue to get

13   filed, you know, we continue to be sued and --

14           THE COURT:  Wait.  New claims continue to be filed

15   --

16           MR. WILLIAMS:  Yeah.

17           THE COURT:  -- after the bar dates?

18           MR. WILLIAMS:  After the bar date new claims

19   continue to be filed, Judge.  I -- look, it's -- they're

20   easy to knock out, but you know --

21           THE COURT:  You can do it with a second year

22   associate can't you --

23           MR. WILLIAMS:  Yes, but Your Honor --

24           THE COURT:  -- after he or she has been admitted

25   to the bar for about two weeks?

Page 70

1              MR. WILLIAMS:  Yes.  Your Honor, to be clear, new

2      claims being filed is not -- we're not spending a lot of

3      time and effort on it, but it's one of many things.  Right,

4      we've been sued as Your Honor knows we have to come in here,

5      and you know, sometimes people withdraw the suits

6      consensually sometimes they don't.

7              But in any event, so for 2012, you know, we think

8      we have a good handle on it.  For 2013 and 2014 we think we

9      have an okay handle on it but we're not sure, and so we

10     hadn't sought, even though the stock is reserved, because

11     per the GUC Trust agreement we're not required to seek Court

12     authority to reverse the stock, just to sell it, we've

13     withheld stock from distribution in case that it turns out

14     that, you know, 2013 and 2014 are over as well.  But we're

15     not seeking to sell that at this time, because the truth is

16     we may not need it.

17             We hope that we don't need it and we hope that we

18     can make -- distribute that stock out to creditors, but for

19     2012 we are confident that we're going to need the vast

20     majority of this money.

21             With respect -- I should say one caveat, Judge,

22     which is everything I just said it's a little bit different

23     with respect to the Avoidance Action Trust for one reason,

24     which is notwithstanding the fact that we are seeking to

25     sell stock just for 2012 for the GUC Trust, for the

1    Avoidance Action Trust we're seeking it to fund what we

2    think is going to be through the life of the trust.  And the

3    reason for that is it harkens back to what I had said --

4    talked earlier about, which is this -- these transferable

5    units of the GUC Trust.

6              You know, we've been, and as noted in our papers,

7    we've been in lengthy discussions with is SEC about

8    implementing a plan provision that would have to GUC Trust

9    units transferable.  Right now, you know, today taking a

10   snapshot, the GUC Trust and the Avoidance Action Trust have

11   the exact same beneficiaries, i.e., unsecured creditors of

12   the estate, they're both in essence frozen in amber.  So now

13   there's no prejudice to GUC Trust holders to the extend that

14   we were to fund the Avoidance Action Trust with GUC Trust

15   cash because they're the same beneficiaries.

16             Obviously, you know, in 2013 we're hopeful.  You

17   know, that may not be the case because the GUC Trust units

18   may be transferring, and it's for that reason that we've

19   sought to fund the Avoidance Action Trust, you know, through

20   2014 right now.

21             So that was the -- so you know, I said we're not

22   selling stock for 2013/2014 for the GUC Trust, but we are

23   seeking authority to do that for the Avoidance Action Trust.

24             With respect to the -- Your Honor had had

25   questions about the -- you know, you assumed that we're just

Page 72

1    waiting on the term loan avoidance action, why is there --

2    you know, why do we need more funding for that now?  I think

3    I addressed it earlier, which is, you know, a couple of

4    things.

5              The Avoidance Action Trust provides for a couple

6    things.  One it provides that we're acquired to do that tax

7    valuation, which you know, I described earlier, which isn't

8    as simple as it seems.  It also requires -- doesn't give us

9    permissive authority, it requires us to get insurance, and

10   obtaining insurance --

11             THE COURT:  What kind of insurance?

12             MR. WILLIAMS:  You know, liability insurance for

13   the GUC Trust monitor in the avoidance action -- I'm sorry

14   -- for the Avoidance Action Trust --

15             THE COURT:  Is this analogous to D&O insurance?

16             MR. WILLIAMS:  Yes, it is, Your Honor.  And I

17   would have thought, Your Honor, that the D&O insurance would

18   have been very cheap for this trust.  The truth of the

19   matter is it's not.  It's very expensive.  There's -- I

20   believe it's a $2.5 million deductible that, you know, we're

21   not seeking -- that we need to know that we have, so we've

22   got to sell stock for that just to have it, and it's also I

23   believe the insurance itself it's -- if I'm correct, and

24   it's in our -- it's in the exhibits, I believe it's

25   something like a million two.  It's expensive.  And one of

Page 73

1    the reasons for that is --

2             THE COURT:  The premium for it is a million two?

3             MR. WILLIAMS:  Yes, Your Honor.  And the reason --

4    and again, this is required by the document that says -- and

5    you know, we with the monitor, the Avoidance Action Trust

6    administrator, you know, we went out looking for insurance

7    and we were surprised how expensive it was, but that's the

8    best deal that we could get.  People were having a hard time

9    getting a handle about, you know, what kind of animal this

10   document is, and for that reason insurance was much more

11   expensive.

12            So it's those types of things that keep popping

13   up, which is why we need funding.  And obviously the

14   prosecution of the action itself, although it's currently

15   stayed, ultimately it's not going to be stayed, and so we're

16   going to -- the truth is we're going to need more money to

17   fund that litigation.

18            I don't think that on a billion five action

19   whatever we have remaining in -- I don't think we're going

20   to have anything remaining in the Avoidance Action Trust

21   after we pay the insurance and the like, so the issue is,

22   well, how do we fund the action?  And there were really --

23   there was a decision --

24            THE COURT:  Well --

25            MR. WILLIAMS:  Go ahead, Your Honor.

 1                THE COURT:  -- forgive me, Mr. Williams.

 2                MR. WILLIAMS:  Sure.

 3                THE COURT:  But you said a couple of minutes ago

 4      that the reason for the valuation services was that you

 5      can't measure the value of the litigation even if one, by

 6      the gross amount of the debt that was paid to JP Morgan

 7      Chase in satisfaction of the -- as agent I guess in

 8      satisfaction of the underlying obligation because there's

 9      other collateral out there, and of course you've got to

10      arbitrage it by the likelihood of success.

11                I take it you're not retreating from any of those

12      observations, so it isn't exactly a one and a half billion

13      dollar litigation, especially since if you win you still got

14      to give JP Morgan Chase and its syndicate the unsecured

15      claims that are undisputed.

16                MR. WILLIAMS:  I agree with that 100 percent, nor

17      am I retreating from that statement.

18                There's -- to be frank, there's other issues with

19      the litigation as well.  There's collection risk because

20      we've got to go out to each, you know, hedge fund that, you

21      know, bought into this and see -- you know, we -- you know,

22      see if -- so there's all sorts of issues, I agree, but at

23      the end of the day, right, even -- I don't want to -- I

24      don't want to disclose obviously what our valuation

25      ultimately is, but I think it's fair to say that it's

1    significant, not withstanding all of those contingencies and

2    issues that, you know, Your Honor just described, and I

3    think it's to -- I think it's fair to say -- actually I know

4    it's fair to say that the Avoidance Action Trust

5    administrator in its fiduciary duties for the holders of

6    units in that trust has determined that it makes sense to

7    adequately fund it and it's going to benefit all unsecured

8    creditors, and it wasn't a decision we took lightly.

9            There were other things we could have done,

10   Your Honor, with respect to the Avoidance Action Trust, and

11   we've explored some of those alternatives.

12           For instance, we explored and we're in the process

13   of exploring -- to the extent that Your Honor doesn't grant

14   the motion with respect to the Avoidance Action Trust --

15   alternative funding arrangements with both counsel and with

16   outside lenders who, you know, might be willing to loan

17   money to the Avoidance Action Trust.

18           But based upon our, you know, preliminary

19   discussions with some of those lenders and what that -- what

20   that construct would be they're going to want a significant

21   piece of -- for all the contingencies and you know

22   uncertainties in the action we just described, any money

23   that they're going to loan they're going to want a

24   significant piece of the avoidance action litigation, the

25   underlying litigation.  And the avoidance action

Page 76

1   administrator and the avoidance action monitor and of course

2   their fiduciary duties believe that it's more responsible

3   and it's going to be -- hopefully return a larger recovery

4   to unsecured creditors doing it this way.

5           And again, which is why we noticed it out to all

6   the creditors and all creditors have had an opportunity to

7   come in and object.

8           But -- so we're comfortable and we believe that

9   this is the best approach.

10          THE COURT:  Continue, please.

11          MR. WILLIAMS:  Your Honor had asked if it was

12  appropriate for you to rubber stamp this motion.  I --

13  absolutely not.  I -- neither the -- certainly from the GUC

14  Trust administrator's point of view it is not appropriate

15  for you to rubber stamp this motion.  It's -- this is an

16  important motion.

17          We, the -- Wilmington Trust, who is chair of the

18  official creditors' committee, we fought hard with treasury

19  to try to get as much funding for this trust as we could,

20  and the truth is we did the best that we could, and

21  unfortunately notwithstanding all of our efforts and the

22  committees' efforts and the debtors' efforts, there's not

23  enough money to resolve all the claims and get distributions

24  out the door in a timely manner right now, there's just not.

25  But the GUC Trust agreement provides -- you know,

Page 77

1   anticipating this the GUC Trust agreement provided that the

2   GUC Trust administrator could sell stock after a motion to

3   all creditors and upon hearing to the Court.  So I don't

4   think you should rubber stamp it.

5           In the same vain though I would note that these --

6   it's not as if these fees aren't reviewed.  All the fees

7   that are being sought here are, you know, are subject to a

8   number of different reviews under the GUC Trust agreement,

9   which we described, you know, back at confirmation, which

10  remain in force today.

11          First, you know, given that treasury is funding

12  the wind down all the bills go to treasury.  All right, so

13  treasury, I think it's fair to say, has been a very tough

14  negotiator in this case and I don't see why they would stop

15  now with respect to the fees.  So they get all of the fees.

16          Second, the GUC Trust monitor reviews all of the

17  fee statements and after -- you know, after a 15-day waiting

18  period, and then -- for reasonableness -- and as does the

19  GUC Trust administrator, so there's three levels.

20          But then there's a fourth, right?  Which is to the

21  extent that --

22          THE COURT:  All right, the first two being

23  treasury and FTI?

24          MR. WILLIAMS:  Yes, treasury, FTI.

25          The third being the GUC Trust administrator

Page 78

1    reviews after that 15-day period.

2            THE COURT:  Is that Alix or is that somebody else?

3            MR. FISCHER:  No, that's my client, Your Honor.

4    That's Wilmington Trust.

5            THE COURT:  Oh, that's Wilmington Trust.

6            MR. WILLIAMS:  That's Wilmington trust, yeah.

7            THE COURT:  All right, continue.

8            MR. WILLIAMS:  And then on top of that any

9    professional that goes over its line item budget for any

10   year gets subject to a penalty, and the penalty is they

11   don't get their 10 percent hold back until the end of the

12   case.

13           And then on top of that is really the fifth layer

14   of protection which is this motion, Your Honor, which is --

15   and again -- and by the way I should note, that by this

16   motion none of the professionals who have gone over budget

17   for 011 or who are anticipated to go over budget for 2012

18   are getting that 10 percent hold back paid.  That's there

19   until the conclusion of the case or until, you know, they're

20   gone from the case, but they don't get that.  And the GUC

21   Trust administrator is not seeking authority to pay that

22   right now.

23           These professionals went over budget and it may

24   have been -- actually we think it was justified in these

25   cases, but you know, the agreement says what it says, this

Page 79

1   was the deal that treasury cut and we're stuck to live by

2   it.

3           So we think -- the GUC Trust administrator thinks

4   that this process is working.

5           We're in the procedure now where we've let the

6   Court and all creditors know that, you know, we're over by

7   this amount, we've given more information -- substantially

8   more information than was ever acquired in the disclosure

9   statement.

10          If you look at the disclosure statement budget,

11  Your Honor, it's vague, and it was -- and maybe this was my

12  fault, but in our initial motion that we made to the Court

13  we in essence used the disclosure statement budget as kind

14  of the proxy and we sort of laid it out, then when creditors

15  asked for more information -- it wasn't that we were trying

16  to hide the ball -- we said, okay, here's some more

17  information, here's the by line item professional.  But --

18  so there's many layers of protection here on the fees.

19          I don't think that, you know, professionals who

20  had -- because and again, one other thing I note,

21  Your Honor, is the professionals who are doing most of the

22  wind down work are the professionals who were involved in a

23  lot of the case obviously, they're close to the case, they

24  know the issues.  I don't see why the minute that the plan

25  goes effective that all these -- it's all these

1    professionals are going to raid the till and start over

2    billing, especially because to the extent that one, we've

3    got the budget, we're going to know that you're over budget

4    and you're going to be subject to this 10 percent hold back.

5    And moreover there isn't any certainty because -- that

6    you're going to get paid, because again, we've got to make

7    the motion to the Court and the GUC Trust administrator and

8    the monitor and treasury all have to review the fees to see

9    that they're reasonable.

10              THE COURT:  Then why do I see partners litigating

11    with prose's?

12              MR. WILLIAMS:  Your Honor, partners litigating

13    with prose's, I -- again, I am personally not close to the

14    claims reconciliation issues.

15              As I said earlier, you know, I represent

16    Wilmington Trust, I represent it as an indenture trustee

17    during the case and as chair of the committee and so I

18    stayed on with them in their kind of court for capacity as

19    the GUC Trust administrator and the Avoidance Action Trust

20    administrator.

21              To the extent that Your Honor has particular

22    concerns about how certain of the claims reconciliation, you

23    know, litigation has been done I've -- Mr. Joe Malinsky (ph)

24    of Walagoshal (ph) is here in the courtroom and he can

25    address any particular concerns Your Honor has about

Page 81

1    particular claims or just the claims reconciliation

2    procedures in general.

3              THE COURT:  Go on.

4              MR. WILLIAMS:  Your Honor had made reference and a

5    number of the papers make reference to the detailed and

6    inflexible budget.  That is the case.  I mean, and that's

7    one of the reasons that we're here.

8              On an aggregate basis for 2011 we were actually a

9    little bit under budget, the GUC Trust, but on the line item

10   basis we were over.  And -- but that's -- again, but the

11   detailed on inflexible budget is one layer of control, but

12   it was never anticipated nor does the document provide

13   anywhere that professionals are only entitled to be paid

14   from the budgeted amounts that's been authorized to be paid

15   by treasury.  What the document provides is to the extent

16   that you go over we have to go through this process, and

17   that's what we're going.

18             And again I'd note as I said earlier, that this

19   detailed and inflexible budget, which it certainly is.  I

20   would note that, you know, when we realized we were going to

21   be over budget for 2012 we went back and pushed on treasury

22   and we said, look, we're over, you guys -- you guys did very

23   well on your budget, you negotiated a good budget, but we

24   need more money.  And the answer is they said no.  We asked

25   if were could roll up the 2012 numbers into 2011, if we

Page 82

1    pushed 2013, we tried to -- you know, we asked for all sorts

2    of relief in connection with the budget and treasury's

3    response was in essence no.  So it is a detailed and

4    inflexible budget.

5           But the problem with -- right, that's a good thing

6    and a bad thing.  Because to the extent -- right, it's good

7    in that it keeps professionals honest, but it's bad to the

8    extent that the GUC Trust administrator or the Avoidance

9    Action Trust administrator isn't going to be able to

10   compensate its professionals to do the work.  Because if

11   we're in that situation, Judge, this case is going to take

12   longer.  I really think it's going to take longer and it's

13   not going to be a quicker case.

14          With respect to the proposed increases of the

15   Avoidance Action Trust administrator and the Avoidance

16   Action Trust monitor as well as the GUC Trust administrator

17   and the GUC Trust monitor.

18          Again, Your Honor was correct, initially it has

19   been -- set forth in the budget as flat fees for both

20   Wilmington Trust as administrator and for FTI as monitor,

21   and no one is seeking to recut that deal with respect to

22   2011, that sort of is what it is.

23          The truth of the matter is and as we -- it's taken

24   substantially more time not only for the professionals to

25   resolve the claims and the like, but for Wilmington Trust

1   and FTI it's taken them substantially more time in this

2   engagement.

3           And what the trust agreement provides, it doesn't

4   provide that they're -- they get a flat fee, it says that

5   they get their quote reasonable fee.  So when --

6           THE COURT:  Pause.

7           MR. WILLIAMS:  Sure.

8           THE COURT:  I didn't follow that.  I thought that

9   Wilmington Trust was getting 100,000 bucks per month for its

10  services.

11          MR. WILLIAMS:  It currently is, Your Honor, that's

12  correct.  It currently is.  Wilmington Trust gets $100,000

13  per month for its services as GUC Trust administrator and

14  Avoidance Action Trust administrator.

15          THE COURT:  Now does the trust documentation say

16  that notwithstanding that $100,000 fee that the compensation

17  to Wilmington Trust must be reasonable?

18          MR. WILLIAMS:  Yes.  Your Honor, the trust

19  agreement itself doesn't make reference to the $100,000 fee

20  at all, the $100,000 fee was based upon Wilmington Trust's

21  initial proposal to the Department of Treasury and therefore

22  it was included in a line item in the budget.  The GUC Trust

23  agreement itself and the Avoidance Action Trust agreement

24  itself just say reasonable compensation, that's it.

25          And so when my client, the -- Wilmington Trust

Page 84

1    came to me and said, look, I'm getting -- I'm spending a lot

2    more time than we initially anticipated on this case, this

3    $100,000, although it's substantial, is not what we -- is

4    not covering the amount of work that we're doing what are my

5    rights?  I said, look, you're entitled to reasonable

6    compensation, but I think -- and again, the document is

7    silent on this point -- but I said, look, as a practical

8    matter given the fact that we're making this motion let's

9    let all creditors know what you're proposed -- Your Honor, I

10   would just reference section 9.7 of the GUC Trust agreement,

11   and it says:

12        "Compensation and expenses.  The GUC Trust

13        administrator shall receive fair and reasonable

14        compensation for its services to be paid out of the

15        wind down budget cash in accordance with the budget

16        prior to the final distribution date.

17        The GUC Trust administrator shall be entitled

18        without the need for approval of the Bankrupt Court to

19        reimburse itself from wind down budget cash on a

20        monthly basis."

21        And then I go to the next sentence:

22        "In addition, to the extent the wind down budget

23        cash is not sufficient to provide the GUC Trust

24        administrator fair and reasonable compensation for its

25        services or for reasonable out-of-pocket expenses it

Page 85

1           shall be paid out of other GUC Trust administrative

2           cash."

3                   THE COURT:  Now to what extent is the $100,000

4           embodied in a contract or other piece of paper?

5                   MR. WILLIAMS:  Your Honor, the only piece of paper

6           that it was embodied in -- well, it's really two.  There was

7           an initial proposal that went to the Department of United

8           States Treasury, and then it subsequently wound up in the

9           line item of the budget itself, but that's really it.

10          There's not a separate contract --

11                  THE COURT:  Proposal walks and talks a little bit

12          like an offer.  Was there any acceptance?

13                  MR. WILLIAMS:  I think it's fair to say that there

14          was acceptance by treasury and that everybody assumed that

15          this was going to be -- that the $100,000 per month was

16          going to be enough.  But the proposal itself provided that,

17          you know, that even in the proposal that to the extent that

18          we reserve the right to revisit the fee -- that Wilmington

19          Trust reserves the right to revisit the fee.

20                  And the truth of the matter, Judge, is that

21          Wilmington Trust is doing substantially more work than it

22          was originally contemplated in this engagement, and because

23          of that we think -- which is why -- you know, we noticed

24          this out to every creditor, right, I said, look, there's not

25          really a -- there's not really a provision in the GUC Trust

Page 86

1    agreement that says, you know, how do you get -- how do you

2    determine what's fair and reasonable for your compensation?

3    You certainly can't agree with yourself, right, so I said,

4    here -- the best way to do it, we're doing this motion to

5    sell stock, let's notice up, because every creditor is going

6    to get notice of this, this notice up every creditor, let's

7    try to describe in some meaningful detail, you know, what

8    your hours are and what you're doing and we'll let people --

9    and we'll let the creditors decide if this is reasonable or

10   not.  That was the best thing that we could come up with.

11   And to date three creditors objected and now it's down to

12   two, and we've got to Nova Scotia trustee -- I'm sorry --

13   the Nova Scotia trustee has withdrawn its objection, we have

14   certain of the Nova Scotia bondholders that have objected,

15   and I'm not sure if the State of New York -- they filed an

16   objection, I'm not sure if they objected to this particular

17   component of the relief or not, but those are the two

18   parties that objected.

19            We submit that based upon the time and energy

20   being utilized by Wilmington Trust in this engagement that

21   the proposal -- the up size in the fee is reasonable based

22   upon the up size in the work that they're doing.

23            I would also note that, right, in connection with

24   the reporting and transfer costs, which I don't think any

25   party has objected to, Wilmington Trust is doing substantial

Page 87

1    work -- substantial work.

2           Nobody, you know, when this plan went effective

3    back in -- when was it March or -- of 010 -- nobody

4    envisioned -- right, well, the thought was that we were

5    going to have sign off from the SEC on no action relief and

6    we were going to be -- you know, we were going to be able to

7    implement the plan on the transferability of the units.  The

8    SEC has come back and asked for numerous, numerous

9    additional controls.  They've asked in essence for full

10   Sarbanes-Oxley compliance, we're going to be filing 10-K's,

11   10-Q's, Wilmington Trust is taking on substantial additional

12   liability risk and for that reason, you know, again we think

13   it's appropriate that they be compensated for that.

14          And again, I don't think that any of the parties

15   here have objected to that relief, but it's just another

16   showing that the document itself never required that

17   Wilmington Trust will be limited to $100,000 per month on

18   its flat fee.

19          I -- Your Honor had a question about Jay Alix

20   Services, it was a little bit unclear to me what you were

21   asking.

22          THE COURT:  Well, I thought what Jay Alix was

23   doing was fly specking the claims and providing assistance

24   on claims objections.

25          MR. WILLIAMS:  They are doing that, Your Honor,

1    but they're doing other things.

2              Again, for instance, with the reporting and

3    transfer costs they've been helping the GUC Trust build --

4    assist us in building up the controls and the like, so Alix

5    is doing substantial other work as well.

6              But the answer is, Alix is doing a lot of work in

7    the claims reconciliation procedure -- the claims

8    reconciliation process and we think that --

9              THE COURT:  Well, but the premise underlying my

10   question, and you can tell me whether you think that premise

11   was well taken or not, was that there is at least seemingly

12   a greater direct benefit in analyzing claims and trying to

13   knock them down than some of the other things that you're

14   trying to sell stock for.

15             MR. WILLIAMS:  Look, claims reconciliation is a

16   huge component of what we're trying to do, I certainly agree

17   with that, but I don't think -- look, I mean if you were to

18   ask the creditors' committee, you know, reporting and

19   transfer, right, that was -- and again no one has objected

20   to that, I think creditors have said that, you know, we're

21   in favor of that.  I think that that's very important.

22             Certain of these other things, you know, while

23   they're not necessarily fun to talk about, like insurance or

24   you know the insurance deductible or you know tax analysis,

25   we're required to do that.  Wilmington Trust is required to

Page 89

1    do that.

2           And so, you know, from Wilmington Trust's

3    perspective and from a liability perspective I would say

4    that they're all important, certainly with respect to making

5    the distributions to creditor, which, you know, originally

6    one of the reasons we're over budget with respect to

7    distributions itself was as it's initially been

8    contemplated, and which we're hopefully going get there at

9    some point soon, all distributions would be pushed out

10   directly through DTC because we would have these

11   transferable units and every unit would actually be in DTC

12   land and we could sort of push it all out, but we're not

13   there yet.  And because of that, right, the budget initially

14   contemplated that we'd be able to pass on most of these

15   costs to the SEC.

16          The answer is we hasn't been able to do that.

17   We've been spending, you know, time -- we and Gibson Dunn,

18   some of my associates and we've been able to push off the

19   work now, but you know, assisting creditors, you know,

20   talking to them about getting their distributions, what

21   forms you have to fill out, how you have to contact your

22   brokers and the like, this all takes real time, and I don't

23   think we can just say, you know, knocking out claims is the

24   only thing that is important here.  I think that it's all

25   important and it's -- a lot of it to be frank just wasn't

Page 90

```
 1   anticipated and that's why we're here, Your Honor.  And the
 2   GUC Trust administrator in its fiduciary capacity has
 3   determined that this motion makes sense, it doesn't make
 4   this motion lightly.
 5          We -- as I said earlier, we had been pushing very
 6   hard to -- we were hoping we would never be in this
 7   situation, Your Honor, I think that's fair to say, but
 8   unfortunately we are, but we do think that this is going to
 9   be the best way to maximize value for creditors, and for
10   that we would ask that your court -- that Your Honor grant
11   the motion.
12          I'm happy to answer any other questions,
13   Your Honor has.
14          THE COURT:  No, you took care of them once we went
15   along, Mr. Williams.  Thank you.
16          MR. WILLIAMS:  Thank you, Your Honor.
17          THE COURT:  Who wants to be heard next?
18          Mr. Dublin?
19          MR. DUBLIN:  Phil Dublin, Akin Gump Strauss Hauer
20   & Feld truck on behalf of Green Hunt Wedlake.
21          Your Honor, Mr. Williams is correct that our
22   objection has been resolved.  We've had numerous --
23          THE COURT:  It is correct?
24          MR. DUBLIN:  He is correct, yes.
25          THE COURT:  Okay.
```

Page 91

1                MR. DUBLIN:  That our objection has been resolved.

2                We had numerous conversations after the filing of

3        our objection to get more information, which they then

4        incorporated into the reply.  They gave us some of that

5        information in advance that we'd be able continue to due

6        diligence leading up to the hopeful resolution.

7                I think it boils down to the fact of poor

8        budgeting for the most part as to what happened here.

9        People did not foresee what the aggregate costs were going

10       to be for the trust and we know that there is work for that

11       trust that needs to be done, work for the trust to do, and

12       we believe that through modifying the reporting now with the

13       6.2 reports as Mr. Williams referenced, that now the

14       creditor body will have an opportunity to see on a quarterly

15       basis the types of costs that are being incurred by the

16       professionals and for the different types of services, and

17       with that greater clarity we wouldn't be in a situation of

18       surprise when a year goes by and you see the amounts that

19       have been incurred and amounts that are projected there

20       would be better controls for the world to understand what's

21       happening in connection with this trust.

22               And hopefully as Mr. Williams mentioned this is

23       more than sufficient enough value to take care of everything

24       the trust needs to do, and if they have to come back asking

25       for more later then we have our rights to challenge that as

Page 92

1    well.

2         At that since we've resolved our objections I'm

3    not going to go through each of your points unless there's

4    anything specific you have for me, Your Honor.

5         THE COURT:  All right, thank you.

6         Who's next?  Mr. Jones?

7         MR. JONES:  Thank you, Your Honor, David Jones for

8    the U.S. Attorney's Office, and specifically actually I'm

9    here today in my capacity as counsel for the U.S.'s

10   unsecured creditor and specifically EPA.

11        I'll very briefly say that a lot of things were

12   said about treasury department and its role in the budgeting

13   process and in negotiations, and I simply am not in a

14   position to comment knowledgeably or at least in depth on

15   that.  I do know that treasury at the time of confirmation

16   accurately negotiated what it believed to be appropriate

17   budgets going forward and what professionals agreed would be

18   appropriate budgets going forward with an eye to meeting

19   treasury's obligations to fund the wind down, yet at the

20   same time not do so in a manner that would waste public

21   resources unnecessarily.

22        So my understanding is the design of the plan and

23   the relevant trusts is that they're to live within funding

24   provided by treasury for that purpose, and to the extent

25   that's not sufficient they need to eat into other sources of

1    funding, and the purpose of that structure is to encourage

2    efficient discharge of the various responsibilities.

3             THE COURT:  You're saying in substance that what

4    they spend so long as it's not part of the treasury budget

5    is their problem, but you're not taking the position on

6    whether that's good or bad.

7             MR. JONES:  Right.  And Your Honor, I should say,

8    I am -- and I hesitate to have -- I want to make clear the

9    limits of my knowledge.  I am going on my memory of events

10   at the time of confirmation and my understanding of how that

11   went, so I don't want to misspeak, but I, at the same time

12   having heard a lot of things said about treasury, want to

13   just put out that my, you know, imprecise and unrefreshed

14   understanding is essentially that treasury wanted to impose

15   cost discipline on this case going forward, that it was

16   going to fund prospectively the remainder of the wind down

17   but only up to justified levels that it committed to do

18   that, it provided funding up to that level, and yes, that it

19   did not want that to be a lax process or one without teeth.

20   I'm not --

21            THE COURT:  What you've just told me was the

22   treasury perspective, now switch to the EPA perspective.

23            MR. JONES:  Correct.  And Your Honor, I want to be

24   clear that for neither treasury nor for EPA nor any other

25   governmental component are we taking any position on this

Page 94

1    motion.

2            EPA of course is a very major unsecured creditor

3    of the estate and so has a very substantial interest simply

4    in appropriate cost controls and preservation of the corpus

5    of assets that will ultimately be paid out to unsecured

6    creditors in the estate.

7            Every single unsecured creditor in this case has

8    its own unique and very great significance they attach to

9    the payout in the case of EPA, critical public purposes are

10   achieved through these payouts in the form of environmental

11   remediation.

12           We did request from counsel for Wilmington Trust

13   clarifications and additional information of the nature that

14   they've discussed here today and that they also provided

15   another party, and they did provide some clarifications and

16   also an indication that they would be scaling back the scope

17   of their request at the present time, and in part based on

18   those discussions and based specifically on their assurance

19   that the request sought would not cause any, as Your Honor

20   said, discrimination issue, there will be not be a disparate

21   payout rate for any creditors they assure us as a result of

22   this motion we determined simply to take no position.

23           We have not undertaken a fly specking of their

24   budgets and their cash burn rates and everything else that's

25   being -- that gives rise to the situation that's before the

1    Court today, so we're -- I mean, I'll say it again, so we

2    are neither affirmatively consenting nor affirmatively

3    objecting.

4            We do want to note that any incursions into the

5    corpus, into the assets available for unsecured creditors is

6    of very great concern to the government as unsecured

7    creditor and I know it is as to the entire creditor body,

8    and for that reason we want to express and put on the record

9    our hope that there will be no further asset sales required

10   or sought in the future, that the professionals will

11   redouble their efforts to live within the budget as set

12   forth, and that this case can proceed as efficiently and

13   cost effectively as possible.

14           That's really the full extent of what I have to

15   say, Your Honor, and if the Court has no questions --

16           THE COURT:  Okay.

17           MR. JONES:  -- then I'll sit.  Thank you.

18           THE COURT:  Others?  Mr. Zirinsky and Ms. Leary.

19           MS. LEARY:  Your Honor, good morning, Maureen

20   Leary for the State of New York and New York Attorney

21   General's Office.

22           New York was actually heartened to see in the

23   reply a lot of the information that was provided in the

24   three affidavits.

25           There are a couple of small points I'd like to

Page 96

1    make.

2            We were pleased that the no action funding and the

3    future tax liability funding requests were withdrawn.  I

4    don't necessarily believe that the trust concurred that

5    those matters were not ripe as we asserted, but it's

6    academic.  I still believe that there are some matters here

7    that may still not be ripe, and Your Honor referred to the

8    2012/2014 budget.

9            THE COURT:  You said 2020 -- 2012 to 2014,

10   Ms. Leary, but if I heard it right they're only looking for

11   2011 and 2012 at this point.

12           MS. LEARY:  I think that's right, but I think the

13   reserve is still being requested; is that correct?  So the

14   money would be available for liquidation any way?

15           THE COURT:  Do you mind yielding to him to answer

16   your question, Ms. Leary?

17           MS. LEARY:  Not at all.

18           MR. WILLIAMS:  I'm just not sure I understand the

19   question.

20           The reserve being the -- we've -- Your Honor, as I

21   stated earlier, we've reserved stock for 2013 and 2014,

22   we're not seeking to sell that at this time, the initial

23   motion didn't seek to --

24           THE COURT:  So if the stock isn't being sold can I

25   properly assume -- both parties, first you, Mr. Williams and

Page 97

1    Ms. Leary -- that that aspect is no harm no foul at this

2    juncture?

3            MR. WILLIAMS:  I believe so, Your Honor, yes.  And

4    again, for the reasons I stated earlier we don't know if

5    it's going to be adequate or unnecessary based upon our

6    initial budgeting, we think we're going to need it, but

7    given 2013 is so far away and given all the uncertainties

8    we've seen in this case to date we're not seeking to sell it

9    at this time.

10           THE COURT:  Well, if you're not seeking to sell it

11   that's obviously helpful, but is the purpose of -- what then

12   is the purpose of reserving it?  So you don't have to come

13   back to me?

14           MR. WILLIAMS:  No, we would still have to come

15   back to you, Your Honor.  The way the GUC Trust agreement

16   works is that we're entitled to reserve it to the extent

17   that we think we're going to be over.  We don't have to sell

18   it yet.

19           The issue is that if we don't reserve it now the

20   GUC Trust has a very set formula, and if it's not set aside

21   in the reserve it gets pushed out to unsecured creditors on

22   a quarterly basis.

23           And so the concern is that if we push out that

24   stock that we think we're going to need for 2013 and 2014

25   we're not going to have it to sell at that point.  So right

Page 98

1        now we've just put it in a lock box.

2                THE COURT:  Forgive me, I think you've said this,

3        but it's important.

4                MR. WILLIAMS:  Sure.

5                THE COURT:  So under the reserve concept the stock

6        wouldn't be sold, but it wouldn't be considered to be -- the

7        value of the reserve would not be considered available for

8        distribution in the next wave to the unsecured creditor

9        community.

10               MR. WILLIAMS:  That's correct, Your Honor.

11               THE COURT:  All right.  Back to Ms. Leary, please.

12               MS. LEARY:  And so the reserve concept, I want to

13       direct the Court to Ms. Phillips' affidavit, and I believe

14       it's paragraph 13 in which she states, "It is clear that

15       there will be substantial overruns based on future

16       projections."

17               So the reserve, whether it's liquidated or not,

18       it's still not going to be available to the creditors, so we

19       still have concern about that.

20               And just to sort of make a finer point here, I

21       believe in the claims resolution process once claims are

22       disallowed that amount of stock is then freed up and

23       available to the GUC Trust if it chooses to come back to the

24       Court and see a reservation.

25               So I don't really think that this money going out

1   as a reserve is going to result in them not having any

2   available assets.  But let me -- let me just broaden this.

3          THE COURT:  You mean to distribute to the

4   unsecured creditor community who's got all fully allowed

5   claims?

6          MS. LEARY:  That's correct.

7          So there's a question in my mind about whether

8   there is still ripeness on that future projected substantial

9   as referred to by Ms. Phillips, overruns, that are

10  anticipated.  Because as far as I'm concerned that money is

11  reserved and liquidated whether they have to come back to

12  the Court or not, there's not going to be much anybody in my

13  view will be able to say about it.  Maybe they will, but I

14  certainly don't want to come back.

15         As Mr. Jones eluded to, my purpose is to assure

16  that all creditors are treated equally within not just this

17  small box of pro rata sharing in the reserves that

18  Your Honor ordered -- and I'm speaking about a different

19  reserve now -- you entered an order that set reserves for

20  each of the allowed -- the disputed not allowed claims

21  before confirmation.

22         And what is troubling in -- and it may be my own

23  misunderstanding or some semantical issue -- what's

24  troubling in the GUC Trust motion is their reference to --

25  in response to New York's concern about discrimination --

1    which I understand Your Honor doesn't see -- but their

2    statement is that all creditors share pro rata in the

3    reserve, and I view that as different than sharing pro rata

4    in the entire corpus of the trust.  Maybe there's no

5    difference, but what I expected in response to our objection

6    on discrimination isn't a statement that it won't result in

7    undue harm, I expected a statement consistent with the GUC

8    Trust that this liquidation of assets and future

9    liquidations will not unfairly discriminate against any

10   creditor whether it's Wilmington Trust down to the smallest

11   of creditors.  That's the statement that's missing from the

12   papers.

13          Even though I feel that the reply gave a lot of

14   information, there's still this one piece that perhaps

15   Mr. Williams can clarify, and maybe I'm reading too much

16   into the difference between sharing and pro rata in this

17   reserve, which I view as differently than the corpus of the

18   trust.

19          THE COURT:  I'll tell you now, Ms. Leary, I'm

20   going need help either from you or Mr. Williams in

21   understanding that issue.  Because I thought that for those

22   who have heretofore unallowed claims, claims that were

23   disputed but not ruled on, you're fully reserved, and I'm

24   not clear on whether you're trying to protect your interest

25   in the subset of your claims that's in this category or the

Page 101

1    subset of your claims that have been fully allowed, because

2    it's my impression you've got claims in each category.

3            MS. LEARY:  That's right.  And I would suggest,

4    Your Honor, that we're trying to protect both.  We're trying

5    to protect both our position as an allowed claimant and our

6    position as still holding unresolved claims.

7            THE COURT:  And in your disallowed category -- or

8    not disallowed because they haven't been disallowed --

9    you're not yet allowed category --

10           MS. LEARY:  Correct.

11           THE COURT:  -- or your unallowed category -- maybe

12   they'll be allowed and maybe they won't -- I -- it's my

13   understanding subject to your rights to convince me

14   otherwise that you're fully reserved and protected on that

15   and that your contention, if any, is as the -- one of the

16   relatively few in the unsecured creditor community who

17   thinks that there's an inequality issue there because I'm

18   having more trouble seeing that.

19           MS. LEARY:  Well, you know, in all honesty, I

20   don't -- I can't tell.  I cannot tell whether at the end of

21   the day Wilmington Trust, who got the initial distribution,

22   is going to have been treated differently than New York

23   State or any other creditor that is allowed later.

24           THE COURT:  You got your piece of the action on

25   the initial distributions --

Page 102

1           MS. LEARY:  No.

2           THE COURT:  -- up to this point.

3           MS. LEARY:  No.

4           THE COURT:  On your allowed claims?

5           MS. LEARY:  No.  We were -- we were not given a

6    distribution until a month ago and that was the first

7    distribution we received, I believe it was the 3rd.  We

8    had --

9           THE COURT:  Is that because of a delay in getting

10   your claims allowed or because they were mean to you back

11   when you had allowed claims and didn't get distributions on

12   the original effective date?

13          MS. LEARY:  I'm going to have to plead the Fifth

14   on that, but as I think I set forth in either these papers

15   or the ones on the motion you're going to consider on

16   March 1st, New York had a deal on its -- on those claims

17   that have since been allowed in March, and it was before

18   confirmation I believe.

19          THE COURT:  March of 2012?

20          MS. LEARY:  '11.

21          THE COURT:  '11.

22          MS. LEARY:  Yes.  In March 2011.  And it did not

23   -- we did not receive a distribution until January of 2012.

24   We had a stipulation I believe in June, that took -- I mean

25   there was in my view some -- I chalked it up to up and

Page 103

1    running kind of trying to figure things out, the GUC was --

2    GUC Trust was mixed up with many, many different issues and

3    so forth, but I don't know why it took that long.  I know

4    that I had some correspondence with the GUC Trust in which I

5    emailed and telephoned, and I'm not getting a whole lot of

6    feedback frankly, but you know, those issues are not before

7    the Court.  We did not participate in the initial

8    distribution that Wilmington Trust got, the 150 million

9    shares I believe it was.

10           So at the end of the day I don't know.  I -- and

11   that's why I'm here, I don't know.  And each time there is

12   an erosion of the corpus of the trust through liquidation

13   and payment of professionals that reduces the recovery that

14   New York will receive in either position that it holds I

15   believe, because it -- New York believes it shares in the

16   entire corpus equitably with the other creditors, and I

17   believe that's what the GUC Trust says, that's what

18   Your Honor said in confirming this plan.  But the question

19   really is at the end of the day is that actually what

20   happened?

21           So my expectation in these rely papers was that

22   Mr. Williams -- the GUC Trust would come back and say not,

23   you won't be unduly harmed, they would come back and say,

24   no, we have this issue addressed.  You will not be

25   discriminated, you will be treated the same whether you're

1    allowed on day one, as Wilmington Trust was as the initial

2    recipient of the initial distribution, as on day whatever

3    the end date is.

4            THE COURT:  However I had understood when I issued

5    my ruling that day one is the day that your claim is allowed

6    or the effective date of the plan, whichever comes later --

7            MS. LEARY:  That's right.

8            THE COURT:  -- but day one -- if there was a delay

9    in your claim being allowed --

10           MS. LEARY:  I still get treated the same as day

11   one.

12           THE COURT:  -- but that it would be measured by

13   the time -- well, day one was the date your claim was

14   allowed even though that's after the effective date.

15           MS. LEARY:  I may have misunderstood you,

16   Your Honor, but are you saying that under your order New

17   York gets treated or any creditor gets treated the same no

18   matter when their claim is allowed?  Because I believe

19   that's expressed in your order.  Regardless of when my claim

20   becomes --

21           THE COURT:  You get X shares of stock then without

22   a true up on account of market movements.

23           MS. LEARY:  That's correct, we do not get the true

24   up on account of whether the stock is trading on the day I

25   get distribution at 19 or 35.

Page 105

1          THE COURT:  So unless they pocket vetoed you on

2     distributions after your claim would be allowed I don't see

3     a prejudice to you.

4          MS. LEARY:  Well, Your Honor, I hope -- I hope so.

5     I did have an expectation that the GUC Trust would come back

6     and make that statement, not the statement of undue harm,

7     which implies some harm, it's just not undue.

8          You know, I also want to address a couple of other

9     issues primarily on the professional fees.

10          You know, I think the Vinasky, Phillips, and

11    Marrow (ph) affidavit were certainly -- went further in

12    providing information to creditors about how everything

13    works behind this black curtain, and as set forth in our

14    objection, our limited objection, there's no question that

15    professionals have to be paid.  The administrator has to be

16    paid.  The monitor should be paid.  No question in our mind.

17          The only question is, is what are the controls?

18    And the thing missing from these papers is the criteria that

19    is applied in terms of determining reasonableness.  Love the

20    layers.

21          What's the criteria?  Are they applying this

22    Court's rulings, the law of this case that you spent -- not

23    hours -- weeks, months with the fee examiner talking about?

24    Is it inconsistent -- is it consistent or inconsistent with

25    U.S. Trustee's guidelines?  What is the story on the

1    criteria being applied?

2         THE COURT:  Well, I'm not aware that the U.S.

3    Trustee guidelines either present or proposed have any

4    relation to this issue.

5         MS. LEARY:  Well, I think there has to be some

6    criteria, and that criteria has to be disclosed to the

7    creditors who are the beneficiaries.

8         And the important thing that I believe is worth

9    noting is the GUC Trust views this 10 percent hold back as

10   some time of a penalty.  That money gets paid.  It may be a

11   hold back, but it's not available to the creditors.

12        So there's no incentive here to stay within

13   budget.  All there's an incentive to do is say, well, can we

14   live with that 10 percent until the end of the case?  We're

15   going to get paid, but -- so that's no penalty in my view.

16        And I think it would be easy for this Court to

17   impose some criteria to ask the GUC Trust to disclose to --

18   this is the criteria on which we will judge reasonableness.

19   And I think this Court has spoken as has the fee examiner in

20   this case or numerous occasions about that issue.

21        THE COURT:  Okay.  Now you hit on one of the

22   things I was about to ask you about, Ms. Leary.

23        After they gave you the clarifying information and

24   the three new affidavits what issues do I have left from

25   your perspective other than the need to announce the

1    criteria for payment?

2         MS. LEARY:  Well, I think -- I think that the

3    Court should look again at this question of ripeness of the

4    2012/2014 budget, and I think Ms. Phillips is the -- you

5    know, probably the best source of why that -- the Court

6    should look at that more closely in terms of her statement

7    that there will be future projected overruns and they will

8    be substantial.

9         And other than that, Your Honor, I hope that -- my

10   hope for all the creditors in the pool is that there be

11   greater transparency, and I think that that is going to be

12   helped by the settlement that was reached to one of the

13   objections that requires a little bit additional disclosure

14   under 6.2.

15        Other than that, Your Honor, if you don't have any

16   other questions I -- I have nothing further.

17        THE COURT:  Okay.  Thank you.

18        MS. LEARY:  Thank you.

19        THE COURT:  Mr. Zirinsky?

20        MR. WILLIAMS:  Thank you, Your Honor.

21   (Pause)

22        MR. ZIRINSKY:  Thank you, Your Honor.  I will try

23   to be brief.

24        I think like Your Honor our reaction when we saw

25   -- our client's reaction when we saw the initial motion was

1    people were basically astounded at the dramatic increase in

2    the projected budget for 2012.  This was a budget that was

3    put together and submitted and represented to the Court and

4    to the creditors through the disclosure statement only nine

5    months earlier before the end of March 2011.

6              And so the initial question was, well, how could

7    they have underestimated by such a large amount?  Basically

8    for 2012 it's almost a 70 percent increase from what their

9    budget was -- their original budget was and what they're now

10   asking for.

11             And we understand that the people who were

12   involved in preparing that initial budget had to negotiate

13   with the U.S. Treasury, the DIP lender, other parties, but

14   they were also the parties who were in the best position to

15   know what the cost would likely be.

16             You have the former chairperson of the creditors'

17   committee who is now Wilmington Trust as the GUC and the

18   Avoidance Action Trustee, and FTI, which is the monitor for

19   both of those trusts.  My understanding was they were the

20   financial advisor or one of the financial advisors for the

21   creditors' committee.

22             So these people didn't come in as babes in the

23   wood not understanding the terrain and what the future tasks

24   were likely to be.

25             Having said that we're not suggesting that they be

Page 109

1    starved and that they shouldn't get a penny more, that's not

2    our issue.  Moreover, we are pleased that in the reply we

3    did get a lot more information than we had in the original

4    motion, which at least explains where the areas with more

5    specificity where the areas of increase were likely to be.

6           What we don't really have is an explanation as to

7    how they arrive at these numbers and whether they're

8    reasonable in terms of the -- basically the potential

9    benefits to the creditors through the expenditure of these

10   additional monies.

11          But that's really a transparency issue, and I

12   think that what we're really concerned about is not so much

13   that there's a prospect of higher costs, but how are we

14   going to control those costs going forward?

15          And there's been a lot said by the trustee in its

16   papers regarding this very precise process or strict process

17   of budgeting and living up to budgets, and the U.S.

18   Treasury, the DIP lender examining all of the expenses

19   before they're paid.  But I think what's also clear is that

20   U.S. Treasury is concerned about its money not being spent

21   beyond what it's approved in its budget.

22          I don't think it's reasonable to expect the U.S.

23   Treasury once the amounts being requested are in excess of

24   the budget that they're going to pay and now it's going to

25   come out of the creditors' money to fund the excess.  It's

Page 110

```
 1   not fair to say that the people who are spending the money

 2   and the people who are receiving the increased -- the

 3   benefit of these increases are the sole judges or should be

 4   the sole judges of what's reasonable.

 5          Put another way, the people who really have a

 6   financial stake in the GUC Trust and the other trust

 7   potentially are not represented in any fashion in terms of

 8   the budgeting process.  We get information after the fact.

 9          And what I would suggest, and I don't have a

10   proposal for Your Honor, but what I would suggest is that

11   there needs to be an independent party.  I mean I understand

12   the skepticism that we're an adversary right now on our

13   disputed claim so it certainly shouldn't be us, and we're

14   not proposing that it be us, but there should be somebody

15   who the Court is comfortable with who has an ability not

16   just to complain after the fact, after the money has been

17   spent and they come back next year and say, well, you know,

18   last year the budget was this and now we've anticipated

19   we're going to have another 50 percent increase in expenses

20   because of all of these unforeseen things.  We need somebody

21   who's there and can see the money being spent or how the

22   decisions are made.

23          THE COURT:  Who'll work for free, Mr. Zirinsky?

24   Because I could swear that one of the entities that is on

25   the list of the people who the unsecureds are paying for --
```

 1                 MR. ZIRINSKY:  Is the monitor.

 2                 THE COURT:  -- is the fee examiner's own law firm.

 3       Isn't that part of my problem that every time I put somebody

 4       new in the process I've got --

 5                 MR. ZIRINSKY:  It's another expense layer.

 6                 THE COURT:  -- Wilmington Trust, FTI, they're not

 7       only not working for free but they're contributing to the

 8       overruns that I'm dealing with?

 9                 MR. ZIRINSKY:  That's the dilemma.  And what I'm

10       -- I mean I'd happy to hear about the partial -- what I

11       consider to be a partial resolution as we'll get more

12       information on a quarterly basis, that's good, okay, I'm

13       happy with that, but the question is what's the control

14       mechanism to make sure that what -- that if the money is not

15       -- how do we assure that the money is being well spent?

16       It's in the budget, yes, we'll be able to track and see

17       whether or not they've spent more than they were supposed to

18       spend, but how do we determine whether or not at the end of

19       the day the money has been well spent?

20                 And secondly, how do we determine or get

21       comfortable that the same people who gave us a projection

22       that's off by 70 percent nine months later for 2012, how do

23       we have confidence that they're projection for 2012 and

24       potentially years beyond 2012, how do we have confidence

25       that those are good projections?

Page 112

1          I understand their projections and there are no

2   guarantees on projections, but I think anyone in this room

3   would concede that a 70 percent variance in nine months from

4   a budget estimate is extraordinary.

5          And we're not here to, you know, fall on our

6   swords over this, we're not here because we're -- you know,

7   we -- you know, we don't like them because they're

8   litigating with us over their claims, we're here because at

9   the end of the day we have confidence that we are going to

10  have allowed claims, and we, like every other creditor, has

11  an interest in making sure that whatever money needs to be

12  spent to maximize creditor recoveries is being spent wisely,

13  and it's as simple as that.

14         And we haven't had an opportunity to meet with the

15  trustee or its counsel.  We were not in part of the

16  dialogue.  There may be, and I don't think that the Court

17  wants to take the rest of the day dealing with this, but I

18  think there may be an opportunity or benefit if we could

19  have a recess or an adjournment of this so we can have an

20  opportunity to talk to Gibson Dunn and their clients and see

21  if there's an ability to come up with some mechanism that's

22  not going to add another substantial layer of cost, but some

23  additional mechanism that will give creditors comfort that

24  money -- the money spending decisions are being done wisely

25  and that the costs are reasonable.

1           I mean one example, Your Honor, is the 13 some

2    million dollars that's being proposed to be put from these

3    proceeds into the Avoidance Action Trust.  There's a dispute

4    -- it's on appeal now I understand -- but there's a dispute

5    as to who's the beneficiary of any recovery under that

6    action.

7           So the papers filed -- I mean reply filed by

8    Wilmington Trust says, well, you know, the potential

9    recovery is a billion and a half dollars, and what's 13 and

10   a half million dollars, it's a very small minuscule

11   percentage of that.  Well that's one way to look at it, but

12   it's also 13 and a half million dollars of money coming

13   that's being funded by the unsecured creditors.

14          We have no idea what happens if the appeal -- if

15   it turns out that the unsecured creditors are not entitled

16   to the benefits of that avoidance action.  We have no basis

17   -- understanding one way or another as to what the potential

18   likelihood of success is on that litigation.

19          We're not looking for trade secrets, we're not

20   looking to invade confidential information, but we don't

21   have any sense at all as to if the recovery is going to be

22   made ultimately for the benefit of the DIP lenders then it

23   should be the DIP lenders what are potentially funding that

24   litigation.  If there is a recovery that's going to be made

25   as Your Honor noted earlier in the hearing, there's a

1    potential billion and a half dollars of additional unsecured

2    claims, so we could have the terrible result where they

3    actually win the litigation on that avoidance action, they

4    create an unsecured claim for a billion and a half dollars,

5    they recover assets, and the benefit of that recovery

6    doesn't go to the unsecured creditors, and the unsecured

7    creditors paid for all of that.

8            THE COURT:  Would your argument be the same or

9    different if I told you that I thought that under -- in the

10   spectrum of issues that I decide, some I think are close and

11   some aren't that close, and I'm really pretty damn sure that

12   I got it right on that last one.

13       (Laughter)

14           MR. ZIRINSKY:  I have no doubt.

15           THE COURT:  I'm sure Mr. Jones ain't going like

16   that, but I mean that's what his rights are in the appellate

17   system.

18           MR. ZIRINSKY:  Well, that may be the answer, but

19   you know, until you just said that I don't know.  I mean I

20   obviously haven't read every paper or attended every hearing

21   in this case.

22           THE COURT:  Unfortunately on the underlying issue

23   my opinion no longer matters because I issued a judgment.

24           MR. ZIRINSKY:  I understand that.

25           THE COURT:  But I'm now asked to make

Page 115

1    discretionary calls based upon my estimate of the

2    probability of a reversal, and I think that if I'm allowed

3    to exercise my discretion I don't weigh the probability of a

4    reversal very highly.

5         MR. ZIRINSKY:  And that's all to the good,

6    Your Honor.

7         My only point is that there needs to be some

8    dialogue in terms of explaining that to people, because I

9    frankly did not glean that from the papers and their request

10   for take 13 and a half million dollars and put it in another

11   trust without having any knowledge as to what evaluation the

12   trust has made in terms of the cost benefit analysis other

13   than to say it's only a small percentage -- very minuscule

14   percentage of the potential recovery.  I agree with that,

15   but it's also 13 and a half million dollars which is a lot

16   of money.

17        So having said that, Your Honor, I don't want to

18   take up more of your time.  I do think that it would be

19   helpful to have some additional dialogue to see if there's

20   some reasonable way to impose some discipline -- I have the

21   complete confidence in the U.S. Treasury to watch its money

22   on the portion of the budget that it's going to be -- that

23   it's funding, okay?  I have less confidence in them -- I

24   love my country and I love my government -- but I have less

25   confidence in them to be as careful when it's no longer

1    their money being spent but it's the unsecured creditor's

2    money being spend.

3            I don't think to be fair at the time of the

4    confirmation of the plan, I think the message we heard was

5    that we have this mechanism to sell securities as a safety

6    valve, that in the event the trust ran into a problem and

7    there was a short fall there'd be an ability to access some

8    of the money subject to Court approval.  What I don't think

9    was -- and I agree with that.

10           What I don't think was contemplated was that this

11   was part of the deal and that therefore in terms of

12   evaluating how they're going to pay their expenses going

13   forward they could assume that they had access to the

14   reserve securities in order to fund whatever additional

15   expenses they thought might be reasonable in the future.

16           I think it -- there's a real difference in that in

17   terms of -- and I think Your Honor eluded to that in your

18   opening comments on this matter -- that I sat in the

19   confirmation hearing, I heard the same thing Your Honor

20   heard.  I heard that there was going to be strict adherence

21   to a budget, and said fine, we didn't object by the way, we

22   didn't object to that -- to that issue at all.  We objected

23   to others and Your Honor dealt with them.  But we were

24   satisfied with that.  But it was not our understanding that

25   what was viewed as a safety valve was going to be viewed as

Page 117

1    an open faucet for more money just to come in whenever they

2    had a need for it and a desire to spend it.

3               So I do think that it's good to have -- it's good

4    to have some mechanism where the unsecured creditors who are

5    the potential beneficiaries of all of this and are also

6    going to be funding the bill for these excess costs have

7    some person other than parties who are recipients of these

8    monies and these expenditures to be able to be comfortable

9    that the money is being wisely spent.

10              Thank you.

11              THE COURT:  All right, thank you.

12              Mr. Williams, I'll take reply.

13              MR. WILLIAMS:  Thank you, Your Honor, I'll be

14   brief.

15              With respect to the question that New York State

16   had about the reserve, this is not coming out of the

17   reserve.  We don't view this as -- you know, I mentioned to

18   Ms. Leary that I would make the statement that from our

19   perspective, you know, this is -- the stock that's being

20   sold was defined as excess GUC Trust distributable assets.

21   A lot of definitions in this trust agreement.  But the

22   excess GUC Trust distributable assets had we not sold them

23   they would have been distributed out to unsecured creditors.

24              The reserve is what it is, and at the time when

25   the claim is allowed they'll be entitled to the same pro

Page 118

1    rata distribution that allowed claim holders get.

2              I would note that Ms. -- the State of New York's

3    claim when it was allowed it was paid in the next quarterly

4    distribution.  There were apparently some hold ups with the

5    allowance of the claim.  It wasn't a distribution mechanic,

6    right, the GUC Trust makes quarterly distributions, and she

7    was -- and New York State got its distribution in the next

8    quarterly distribution.  There wasn't any issue with the

9    trust.  The trust has been pushing out distributions very

10   efficiently, Your Honor.

11             With respect to the -- there were some references

12   to the Anna Phillips declaration about substantial overruns

13   and how it's a real issue.  We agree it's a real issue,

14   which is why we're making this motion.  The substantial

15   overruns that she references are overruns for 2012.

16             And as Your Honor mentioned earlier, the vast

17   majority of this is for claims reconciliation.  If you look

18   at the 2012 budget or the revised budget the vast majority

19   of it for claims reconciliation.  And thee truth is, there

20   are still a lot of claims to do.  The initial budget had

21   contemplated that by now we'd be through all of the -- or

22   through a lot of the claims, and the truth is we still have

23   a lot more claims to do.  And as I said earlier to the

24   extent Your Honor wants an update on the claims

25   reconciliation process we can give you one.

1              With respect to this issue about, you know,

2    another layer of some sort of professional monitor on top of

3    the monitor, I've got real concerns about that for a couple

4    of reasons.

5              One is, you know, we filed this motion -- this

6    filed was filed 35 days ago, right, so you know, the idea

7    that we're going to work out some sort of a new mechanism

8    where we're going to have a monitor or a trustee or

9    something to sit on top of the monitor to review the

10   monitor's fees who reviews the professional's fees, it's --

11   and who's going to monitor that monitor's fee?  At some

12   point we have to stop this.

13             And the truth is there is somebody reviewing the

14   fees here, right, in addition to treasury, and it's both

15   Ms. Phillips' firm, FTI, and Wilmington Trust, they review

16   it for reasonableness.  That's part of their job and they've

17   been doing that.

18             And you know, right, the idea that we need some

19   sort of standard to do that, you know, Mr. Vinasky -- you

20   know, Wilmington Trust hires professionals all the time,

21   they know better than anybody, probably better than a lot of

22   the lawyers what a good fee statement looks like and what's

23   getting done and what's not.

24             So I don't think we want to hire yet another

25   professional and then at some point if someone is unhappy

```
 1    with their fees that we're going to have to hire a

 2    professional to oversee that professional.  Doesn't make a

 3    lot of sense to me, and I think that we've already got

 4    enough oversight here.

 5            And at the end of the day even if there isn't --

 6    as I said earlier, Judge, this has been noticed up to all

 7    creditors, so every creditor has an opportunity to look at

 8    this motion and figure out, you know what, you know, based

 9    upon this and the benefit that I'm getting and the

10    distributions that I've been getting from the trust on a

11    quarter basis -- we've made a distribution I think on every

12    quarter except for one so far -- and the reason we didn't

13    make a distribution for the one quarter is because we didn't

14    have enough excess GUC Trust distributable assets, there's a

15    minimum threshold so we didn't make a distribution that

16    quarter.  I think that the creditors think that the GUC

17    Trust is doing a pretty good job here and I don't think that

18    we need -- the mere fact that it turned out that the initial

19    budget negotiated with treasury wasn't enough isn't --

20    doesn't make it necessary to hire yet another professional

21    because it's just going to be another layer of expense.

22            Unless Your Honor has any other questions I don't

23    have anything else to say, Your Honor.

24            THE COURT:  Okay.  Here's what we're going to do.

25    It appears to me that the principal issues remaining after
```

Page 121

1    what we've heard today, and especially what we got in the

2    way of the three clarifying affidavits, are ripeness going

3    forward, and I forgot the exact words Mr. Zirinsky, but it

4    was roughly how we control cost going forward, and matters

5    of transparency.

6            I think his idea of there being a caucus amongst

7    the movants and the remaining objectors had some merit, and

8    I would need time to dictate a decision in any event.

9            So here's what I want to do.  Mr. William, I want

10   you and anybody who's giving you direction or guidance to

11   put your noodles together with Mr. Zirinsky and Ms. Leary on

12   the matter of future control of cost and transparency over

13   the lunch break while I'm blocking out thoughts to dictate a

14   decision.  Hopefully if your discussions are productive they

15   will make some of the issues that I would otherwise need to

16   decide go away.

17           As a preview of my decision that would be coming

18   out at the end I think that concerns for 2011 have largely

19   been addressed -- maybe I should say at least largely

20   addressed giving myself that much wiggle move -- save and

21   except only for one area where I might need extra

22   information unless you can give it to me right now, as to

23   the extent to which I've got a request for 2011 compensation

24   above the 100,000 a month, and maybe you can tell me now

25   whether we're talking about something material or whether

Page 122

1    it's de minimis in the context of the total request.

2            My main concern is getting a protocol for deciding

3    if I have to have it litigated or having comfort that it's

4    going to be resolved, how we're going to avoid problems

5    going forward in 2012.

6            And you're to caucus with them maybe over soup or

7    sandwiches to see if you can make some issues or

8    recommendation to me that gives me something that people are

9    comfortable with.

10           I don't want to play a venging angel here if there

11   are no objections, but I do need to have comfort that the

12   unsecured creditors are going to be as protected as well as

13   the government is in 2012 and thereafter.

14           So my recommendation, it's 1 o'clock, is that we

15   reconvene at 2:15, at which time or as quickly thereafter as

16   I can I'll dictate something, but hopefully you'll give me a

17   lesser number of areas upon which I have to dictate a

18   litigated decision.  Okay?

19           So we're in recess.

20           Oh, before we do, Mr. Williams, can you answer the

21   question that I articulated in the remarks I just made?  How

22   much are we talking about that your client wants above

23   100,000 a month?

24           MR. WILLIAMS:  For 2011 none.

25           THE COURT:  For 2011 none at all?

Page 123

1            MR. WILLIAMS:  None at all.

2            THE COURT:  Okay.

3            MR. WILLIAMS:  For 2011 the issue was, you know,

4    011 ended and we said, you know, we're seeking it for 012

5    going forward, but for 011 none.

6            THE COURT:  Okay, that's helpful.

7            All right, we're in recess.

8            MR. WILLIAMS:  Thank you, Your Honor.

9        (Recess at 1:00 p.m.)

10           THE CLERK:  All rise.

11           THE COURT:  Have seats, please.

12           Okay, before I rule are there any understandings

13   that you folks have to report to me?

14           MR. WILLIAMS:  Yes, Your Honor, if I may.

15           THE COURT:  Come on over to the microphone,

16   please, Mr. Williams.

17           MR. WILLIAMS:  Good afternoon, Your Honor, Matthew

18   William, Gibson, Dunn & Crutcher for Wilmington Trust as the

19   GUC Trust administrator and GUC Trust monitor.

20           I'm happy to report to Your Honor that I think we

21   had very productive discussions during the lunch break.  I

22   think we've reached a deal in principal with both the Nova

23   Scotia creditors as well as the State of New York, and I was

24   going to let Your Honor knows the terms of that arrangement

25   and answer any questions that Your Honor may have.

Page 124

1          THE COURT:  Why don't you go ahead and do that and

2     then I'll give Mr. Zirinsky and Ms. Leary a chance to

3     comment.

4          MR. WILLIAMS:  Okay, thank you, Your Honor.

5          As I mentioned earlier I just wanted to clarify

6     again for the Court that with respect to the initial relief

7     that we had sought on the $17 million worth of stock the

8     transfer to the Avoidance Action Trust to fund a potential

9     tax issue we're no longer seeking that relief.

10         For the 2012 budget what the parties agreed to

11    would be that it would in essence be a hard cap based upon

12    what's in the current -- based upon a proposal that we made

13    to the Court, and it would be I guess their budget attached

14    to Exhibit B to the Vinasky declaration, which you know, has

15    the line items, we'll file that with the 6.2 reports on a

16    quarterly basis.

17         The hard cap for 2012, to the extent that the

18    professionals go over the hard cap professionals are just

19    going to have to share the pain.  There's not going to be

20    another request to the Court for 2012 to sell more stock to

21    fund professional fees.

22         But that being said, the budget is not going to be

23    line item constrained as it is currently with respect to the

24    treasury budget.  So to the extent there's an overage for

25    one professional and an underage in another, you know, you

Page 125

1    can move around the line items, but there's going to be a

2    hard cap, there's no more stock sales in 012, Your Honor.

3              In connection with the -- in 2013 -- for the 2013

4    budget, we, the GUC Trust administrator, we're required to

5    provide that to the DIP lenders in November of 2012.  We'll

6    be providing that to any other parties that, you know, ask

7    for it, among others.  We understand that the New York State

8    as well as Mr. Zirinsky's clients have already asked for

9    that so we'll be providing that to them at the same time we

10   provide it to treasury.

11             And finally, to the extent that we are going to

12   make a motion, if we are in 2013 to sell anymore stock to

13   fund expenses for 2013 we would meet and confer with the

14   objecting parties before we made any such motion.

15             THE COURT:  The parties who have objected on this

16   one?

17             MR. WILLIAMS:  That's correct, Your Honor.

18             THE COURT:  Okay.

19             Okay, Mr. Zirinsky, Ms. Leary, you want to be

20   heard?

21             MR. ZIRINSKY:  Your Honor, I think that

22   Mr. Williams has accurately set forth the understandings we

23   reached over the lunch break.

24             You know, I just want to reiterate and I think

25   this was very helpful for me to hear, and one of my clients

1    is here today, Morgan Stanley, was helpful for us to hear

2    directly from Wilmington Trust and FTI some of the efforts

3    that they have been making to try to control the expenses as

4    well as the efforts that they have assured us they will

5    continue to make and that will, you know, basically be, you

6    know, a hard and fast budget, and if a professional is going

7    over the budget too bad.

8           It's not going to be line item, but to the extent

9    that the overall cap is being reached or breached it's not

10   like the lawyers or the other professionals will stop

11   working, they will be required to continue to work, but in

12   some equitable fashion we'll leave it up to them, they're

13   going to have to share the pain because there will not be

14   any additional money and there won't be any money funding in

15   2013 to cover deficiencies in 2012.

16          This is a hard cap, full stop, and this is the

17   budget they've asked for and they've agreed that they will

18   live within the confines of this budget.

19          And with that, I mean we're not 100 percent happy,

20   but we think that's a fair resolution.

21          THE COURT:  Uh-huh.

22          Ms. Leary?

23          MS. LEARY:  Thank you, Your Honor.

24          One of the benefits of this discussion I want to

25   be perfectly frank with you that -- was that we really did

Page 127

1    get to see firsthand some of the things that both FTI and

2    Wilmington are doing, and I have a greater level of

3    confidence that I think the future will be better.

4              And I know this first year must have been very

5    difficult for them, especially living with a budget that

6    they themselves did not necessarily negotiate or plan for.

7              One of the things that I raised in the hearing

8    this morning that I have a level of comfort on is the effort

9    that will be undertaken in the future to really keep the

10   professionals in a result-oriented mode and to evaluate the

11   professional fees incurred when compared with the results

12   achieved.

13             There's a lot to do in this case, I think

14   everybody in this room knows it, but I have confidence at

15   this point having discussed specifically with FTI what those

16   efforts are going to all be about in the future.

17             And no, we didn't get anything we wanted, we

18   wouldn't have gotten it from you no doubt, but I think that

19   this is a good result and I think it's a very good result

20   for all the creditors.

21             Time will tell I think how the professionals may

22   react and so forth, and I hope people in good faith move

23   forward and this case doesn't last beyond 2014 at the

24   latest.

25             THE COURT:  My judicial term ends on

Page 128

1    September 5th, 2014.

2              MS. LEARY:  That's a great deadline.  So I hope it

3    happens.

4              MR. ZIRINSKY:  That's a hard deadline, Judge.

5              MS. LEARY:  Yeah.  Thank you, Your Honor.

6              THE COURT:  All right.  Has everybody had a chance

7    to speak their piece?  Evidently yes.

8              Mr. Williams, am I correct that you in

9    consultation with the others will be working up an order

10   that you can then represent to me that everybody is on board

11   on?

12             MR. WILLIAMS:  Yes, Your Honor, that would be our

13   intention.

14             THE COURT:  Very good.  Okay, make it happen.

15             Under these circumstances I see no need for me to

16   dictate anything that I was prepared to dictate, and I

17   assume that at this point nobody wants to know.

18             MS. LEARY:  I do.

19             UNIDENTIFIED SPEAKER:  It's always nice to have a

20   peak.

21             THE COURT:  I'm going to exercise judicial

22   restraint.

23        (Laughter)

24             THE COURT:  All right, very well, we're adjourned.

25        (A chorus of thank you)

Page 129

1        (Whereupon these proceedings were concluded at 2:32 PM)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 130

1                          I N D E X

2

3                          RULINGS

4                                           Page        Line

5   Status Conference re: Nova Scotia Issues    49          16

6

7   Motion of Motors Liquidation Company GUC

8   Trust Pursuant to 11 U.S.C. Section 10(B)

9   and Fed. R. Bankr. P. 9018 for an Order

10  Authorizing Filing of Complaint Under

11  Seal - Discovery Conference               35          21

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 131

1              C E R T I F I C A T I O N

2

3    I, Sherri L. Breach and Dawn South, certify that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6

7

8

9    Sherri L. Breach

10   AAERT Certified Electronic Reporter & Transcriber

11   CERT*D-397

12

13   Also transcribed by:

14

15

16

17   AAERT Certified Electronic Transcriber CET**D-408

18

19   Veritext

20   200 Old Country Road

21   Suite 580

22   Mineola, NY  11501

23

24   Date:  March 1, 2012

25