**HEARING DATE AND TIME: April 12, 2012 at 9:45 a.m. (Eastern Time)**

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Motors Liquidation
Company DIP Lenders Trust

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

|  |  |  |
|---|---|---|
| | : | |
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **MOTORS LIQUIDATION COMPANY**, *et al.*, | : | **09-50026 (REG)** |
|   f/k/a General Motors Corp., *et al.* | : | |
| | : | |
|     Debtors. | : | **(Jointly Administered)** |
| | : | |

-----------------------------------------------------------------x

**MOTORS LIQUIDATION COMPANY DIP LENDERS TRUST'S SUR-REPLY TO THE MOTION OF THE REVITALIZING AUTO COMMUNITIES ENVIRONMENTAL RESPONSE TRUST FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105 AND 1142 TO ENFORCE THE DEBTORS' PAYMENT OBLIGATIONS UNDER THE SECOND AMENDED JOINT CHAPTER 11 PLAN AND THE CONFIRMATION ORDER**

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ................................................................................... 1

II.     ARGUMENT ............................................................................................................. 2

    A.      RACER and the States Have Not Been Damaged ................................................. 2

        1.      Any Loss is Entirely Speculative ................................................................. 3

        2.      Even if RACER and the States Had Been Damaged, Payment of an
Additional $13.5 Million Now Would Result in a Windfall .................... 5

    B.      Funding the Trust with TIPS Valued at Amortized Cost Was Not a Breach ........ 8

    C.      RACER Waived Any Right to Additional Payment, and the Only
Beneficiary of the Trust—the United States—Has Taken No Position on
this Dispute ................................................................................................. 10

    D.      MLC Purchased the TIPS Solely to Benefit the Trust ........................................ 12

III.    CONCLUSION .......................................................................................................... 13

# TABLE OF AUTHORITIES

**Page**

**CASES**

Am. List Corp. v. U.S. News & World Report, Inc.,
   549 N.E.2d 1161 (N.Y. 1989).........................................................................7

Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co., Am.,
   727 F. Supp. 2d 256 (S.D.N.Y. 2010)...........................................................7

Aroneck v. Atkin,
   90 A.D. 966 (N.Y. App. Div. 1982) ..............................................................5

Bogdan & Faist, P.C. v. CAI Wireless Sys. Inc.,
   295 A.D.2d 849 (N.Y. App. Div. 2002) ......................................................3, 6

Freund v. Wash. Square Press, Inc.,
   34 N.Y.2d 379 (1974)................................................................................6, 7

Gosden v. Elmira City Sch. Dist.,
   934 N.Y.S.2d 256 (N.Y. App. Div. 2011) ...................................................6

Indu Craft, Inc. v. Bank of Baroda,
   47 F.3d 490 (2d Cir. 1995)..........................................................................7

Interfilm, Inc. v. Advanced Exhibition Corp.,
   249 A.D.2d 242 (N.Y. App. Div. 1998) ......................................................6

Merrill Lynch & Co. v. Allegheny Energy, Inc.,
   500 F.3d 171 (2d Cir. 2007).........................................................................5

Schneider v. State of New York,
   327 N.Y.S.2d 60 (N.Y. App. Div. 1971) ....................................................4

Stern v. Satra Corp.,
   539 F.2d 1305 (2d Cir. 1976).......................................................................7

Summit Props. Int'l, LLC v. Ladies Prof'l Golf Ass'n,
   No. 07 CIV 10407, 2010 WL 4983179 (S.D.N.Y. Dec. 6, 2010).............6

V.S. Int'l, S.A. v. Boyden World Corp.,
   862 F. Supp. 1188 (S.D.N.Y. 1994).............................................................4

**STATUTES**

11 U.S.C. §§ 105 and 1142 ................................................................................1

**OTHER AUTHORITIES**

RESTATEMENT (SECOND) OF CONTRACTS § 347, cmt. e ......................................4

The Motors Liquidation Company DIP Lender Trust (the "**MLC DIP Trust**"),

formed in furtherance of the Second Amended Joint Chapter 11 Plan (the "**Plan**") (**ECF No.**

**9836**) by the above-captioned debtors (collectively, "**MLC**" or the "**Debtors**"), submits this Sur-

Reply to the Motion of the Revitalizing Auto Communities Environmental Response Trust

("**RACER**" or the "**Trust**") for an Order Pursuant to 11 U.S.C. §§ 105 and 1142 to Enforce the

Debtors' Payment Obligations Under the Second Amended Joint Chapter 11 Plan and the

Confirmation Order (the "**Motion**") (**ECF No. 11164**), and respectfully represents as follows:

## I.    PRELIMINARY STATEMENT

1.        Replies filed by RACER and the States confirm that RACER is seeking an

unjustified windfall.[1]  The MLC DIP Trust's Amended Response in Opposition to the Motion

("**Response**") filed on January 23, 2012 (**ECF No. 11335**) already addressed the majority of

RACER's and the States' contentions set forth in the Motion and again in their respective

replies.[2]  Both RACER and the States admit that the Treasury Inflation-Protected Securities

("**TIPS**") transferred to the Trust on the Effective Date are valuable and do not want to return the

TIPS to MLC in exchange for an all-cash payment.  Moreover, RACER reaffirms its intent to

hold the TIPS to maturity, thereby ensuring sufficient inflation-protected cash flow in the

amounts agreed to by the parties to fund the future environmental liabilities.

---

[1] RACER filed the Reply Brief in support of the Motion (**ECF No. 11384**) (the "**Reply**") and the states of New York, Illinois, Indiana, Kansas, Michigan, Missouri, New Jersey, Ohio, the Massachusetts Department of Environmental Protection and the Saint Regis Mohawk Tribe (collectively, the "**States**") filed a Joinder to the Motion (**ECF No. 11380**) (the "**Joinder**"). Delaware, Illinois, Indiana, Kansas, Louisiana, the Commonwealth of Massachusetts, Michigan, Missouri, New Jersey, New York, Ohio, the Commonwealth of Pennsylvania, the Commonwealth of Virginia, and Wisconsin are the states, along with the Tribe, that are parties to the Settlement Agreement.

[2] All capitalized terms used but not defined herein shall have the meanings given them in the Response.

1

2.          Putting aside RACER's reliance on accounting tactics that do not present accurately and fairly the value of the funding to RACER, MLC adequately funded the Trust using a combination of TIPS[3] and cash that fully satisfies the obligations under the Settlement Agreement.  No site remedial or administrative budgets have been put into jeopardy by funding the Trust in TIPS.  In fact, these budgets have benefited from increases in value in the TIPS' principal and their inflation protection characteristics, which ensure that the Trust obligations are adequately funded in real dollars over time.  Thus, temporary market price fluctuations as of the Effective Date did not impact environmental remediation budgets as no actual sale of TIPS occurred.  Neither RACER nor the States have been harmed or incurred any actual damages.  Furthermore, permitting RACER to keep the TIPS and requiring an additional $13.5 million payment based on a purely hypothetical, unrealized, "phantom" accounting loss would confer a windfall benefit, a result that governing New York contract law forbids.  Accordingly, the Court should deny the Motion.

## II.  **ARGUMENT**

### A.  **RACER and the States Have Not Been Damaged.**

3.          RACER's and the States' claim that they were damaged by the Debtors' funding actions on the Effective Date is an utter fallacy.  RACER and the States ignore how the TIPS work[4] and gloss over the critical fact that RACER continues to hold the TIPS and affirms its

---

[3] As in the Response, for ease of reference, MLC refers to all securities that it transferred to RACER cumulatively as TIPS.

[4] As set forth in the Response, the TIPS are designed specifically to protect against inflation, and although the quoted market price of a TIPS will fluctuate over time (and on any given date can be less than, equal to, or greater than the face value), the full faith and credit of the United States guarantees the holder of a TIPS a payment of the adjusted principal or original principal, whichever is greater, upon maturity.  (Response ¶¶ 3, 5-6, 15, 23-28; Rosenthal Decl. ¶ 4 (**ECF No. 11297**).  Therefore, contrary to the States' contentions, MLC does not "guarantee" the TIPS and never represented otherwise.  (Joinder at 8-9).

2

intent to do so until the TIPS reach maturity. (Reply at 10; Joinder at 8-9, 11-12). In reality, RACER and the States have received precisely the value bargained for in the Settlement Agreement, if not better.

### 1.    Any Loss is Entirely Speculative.

4.        MLC's accounting for the TIPS at amortized cost basis was entirely proper under the circumstances and in no way alters the true economic value of the TIPS that RACER continues to hold. In an asset transfer transaction involving TIPS, the TIPS' principal value at maturity is a function of the credit worthiness of the obligor (the United States),[5] the ability of the recipient to hold the TIPS to maturity (RACER), and the recipient's intent to hold the TIPS to maturity (RACER). Fluctuations in quoted market values during the day or a period of time are just that—fluctuations—but these fluctuations have no ultimate impact on the value of the cash assets to be realized at maturity. At maturity, the TIPS' cash value will be at least their principal amount. (See Response ¶¶ 3-4, 6, 15, 23-28). Therefore, any alleged short term decrease in the TIPS' market value between October 2010, when the TIPS were purchased, and the Effective Date transfer was never captured by RACER and is nothing more than an unrealized accounting loss.

5.        In order to recover a windfall, RACER asks the Court to value the TIPS transferred as if they had been liquidated on the Effective Date, a hypothetical scenario that did not occur. (Reply at 14-15). Looking at the facts, any damages RACER or the States suffered are entirely speculative and unrealized. (See Reply at 16; Response at 16-19, 27-31). In the Response, MLC demonstrated that New York law prohibits damages awards based on speculative or hypothetical losses. (See Response at 29-31); Bogdan & Faist, P.C. v. CAI

---

[5] The credit worthiness of the obligor, the United States, is not at issue in this case.

Wireless Sys. Inc., 295 A.D.2d 849, 854 (N.Y. App. Div. 2002) (dismissing plaintiff's complaint for failure to provide it suffered any "actual financial loss of any conceivable nature as a result of defendant's claimed breach of contract").[6]  Therefore, the damages award that RACER and the States seek should be denied.[7]

6.        The States misunderstand or ignore the fundamental characteristics of TIPS and express concern that the TIPS may lose value in the future, resulting in an under-funded Trust. (Joinder at 8-9, 11-12).  The States also assert that MLC is asking the Court "to value the TIPS on various future dates," which further demonstrates their misunderstanding of the TIPS, which have staggered maturity dates matched to the agreed-upon, expected future cash flows of the Trust.  (Joinder at 9; Response at 14).  Here, MLC's accounting for the TIPS at amortized cost was appropriate for the transfer of TIPS to RACER, because the TIPS were intended to be held to maturity.    See  FASB 320-10-25-3, 320-10-50-5(a); (Response at Argument, Part A). RACER's claim for damages should be denied.  (Joinder at 8; Response at 16, 27-28).[8]

---

[6] See also Schneider v. State of New York, 327 N.Y.S.2d 60, 61 (N.Y. App. Div. 1971) (holding that damages must be commensurate with actual and direct harms or losses and "cannot be awarded on the basis of conjecture and guesswork"); V.S. Int'l, S.A. v. Boyden World Corp., 862 F. Supp. 1188, 1198 (S.D.N.Y. 1994) (refusing to award damages where plaintiffs have continued to receive the benefits of their investment and have shown no actual damages); RESTATEMENT (SECOND) OF CONTRACTS § 347, cmt. e (1981) ("The injured party is limited to damages based on his actual loss caused by the breach.").

[7] In the Reply, RACER repeats the speculative claim that if it had an additional $13.5 million on the Effective Date, it would have purchased the same type laddered TIPS the Debtors transferred to RACER.  (Reply at 16). For the reasons set forth in the Response, RACER's after-the-fact opportunistic desire for more cash to buy the same TIPS portfolio should be rejected. (Response at 16-20, 26-27, 31).

[8] RACER and the States urge the Court to ignore MLC's cited damages case law, asserting that no extrinsic evidence is relevant or admissible here.  (Reply at 2, Joinder at 6).  None of the points MLC raises here or in the Response, however, contradict or add to the terms of the Settlement Agreement, Plan or Confirmation Order, and therefore do not constitute extrinsic evidence.

**2.      Even if RACER and the States Had Been Damaged, Payment of an Additional $13.5 Million Now Would Result in a Windfall.**

7.        In the Response, MLC established that a cash payment of $13.5 million to RACER now would result in a windfall award to the Trust, a result prohibited in New York. (Response at Argument, Part C).  Rather than confronting this inevitable result, RACER muddies the waters with a discussion of general contract law concerning measuring damages at the time of breach.  (Reply at 3, 12-13).  But, this dispute is not about the *date* or *when* a breach occurred, but rather whether there was a breach at all.  No breach occurred here because MLC adequately funded the Trust on the Effective Date in accordance with the Settlement Agreement, approved by the Court as part of the Debtors' chapter 11 plan, by delivering the TIPS and cash to RACER. (See Response at Argument, Parts A & B).  Moreover, even if RACER was correct that a breach had occurred, applying New York law to put the "injured" party in the position it would have been in absent the breach, RACER's damages are zero.  This is so because the difference between the TIPS as promised ($575,338,000)[9] and their value as delivered ($575,338,000) is zero given the government guarantee to pay periodic interest and the full inflation-protected principal of the TIPS and RACER's stated intent to hold the TIPS to maturity.  See Merrill Lynch & Co. v. Allegheny Energy, Inc., 500 F.3d 171, 185 (2d Cir. 2007) (cited by RACER in the Reply at 12).  Additionally, the harm that New York courts seek to prevent by measuring damages at the time of breach arises from the risk of market fluctuations in the prices of securities.  See, e.g., Aroneck v. Atkin, 90 A.D. 966, 966-67 (N.Y. App. Div. 1982) (cited by RACER in Reply at 14).  Given the unique nature of the TIPS, however, market risk is not an issue here.  (See Response ¶¶ 3, 5-6, 15, 23-28).  And, as much as RACER tries to ignore this salient point, in light of the rise in market value of the TIPS since the Effective Date, any alleged

---

[9] Amortized cost value includes approximately $1.4 million of accrued interest.

shortfall in value has been remedied as RACER has the discretion to sell the TIPS today for a profit of over $36.1 million.  (See Supplemental Declaration of Brian Rosenthal ("**Rosenthal**") ¶ 4, attached hereto as Exhibit 1).

8.       RACER and the States also profess harm and cry foul at the Trust's accepting $575,338,000 in Treasury securities valued on an amortized cost basis rather than an all-cash payment from the Debtors, and bemoan that the Trust may be under-funded in the future.  (Reply at 5-8; Joinder at 3, 6-7, 9)  Yet neither RACER nor the States want to exchange the TIPS for cash, rejecting an offer Debtors first made in October 2011, demonstrating that both recognize that the "Trust would sustain a significant loss if the transfer were rescinded[, a]nd the benefit the Trust has otherwise gained from the TIPS since the Effective Date, . . . would be lost." (Joinder at 3, 9; see also Reply at 4).  This acknowledgement that the Trust has not been damaged by receiving TIPS instead of all cash bars any relief RACER or the States seek.  (See Response, Argument, Part C; Rosenthal Decl. ¶¶ 18-19).

9.       New York courts reject damages awards that would "place [plaintiff] in a far better position than he would have occupied had the defendant fully performed." Freund v. Wash. Square Press, Inc., 34 N.Y.2d 379, 382 (1974).[10]  In this instance, if RACER keeps the TIPS and holds them to maturity as intended, the additional $13.5 million RACER seeks would be a windfall beyond what the parties agreed to in the Settlement Agreement.  Windfall damages in contract actions are prohibited under New York law.  See Gosden v. Elmira City Sch. Dist., 934 N.Y.S.2d 256, 258 (N.Y. App. Div. 2011).[11]  Moreover, "if any benefit or opportunity for

---

[10] See also Bogdan, 295 A.D.2d at 854 (same); Interfilm, Inc. v. Advanced Exhibition Corp., 249 A.D.2d 242, 242 (N.Y. App. Div. 1998) (same).

[11] See also Summit Props. Int'l, LLC v. Ladies Prof'l Golf Ass'n, No. 07 CIV 10407, 2010 WL 4983179, at *4-6 (S.D.N.Y. Dec. 6, 2010).

benefit appears to have accrued to the plaintiff because of the breach, a balance must be struck between benefit and loss, and the defendant is only chargeable with the net loss." Stern v. Satra Corp., 539 F.2d 1305, 1311-12 (2d Cir. 1976) (when breach freed appellant to sell services elsewhere, affirming district court's reduction of appellant's damages by amount of profit incurred in sale made possible by breach); Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co., Am., 727 F. Supp. 2d 256, 289 (S.D.N.Y. 2010) ("if a victim derives a benefit from the breaching party's breach of contract, the breaching party only is responsible for the victim's net loss.").[12]

10.      RACER claims it is entitled to the market value decline of the TIPS on the Effective Date, or approximately $13.5 million.  Awarding RACER damages in this amount would result in RACER receiving $625,234,945 (the value of the TIPS plus cash transferred on the Effective Date) plus an additional $13,505,874 million, which totals $638,740,819—far more than the $625,234,945 that the Federal Government and the States bargained for and agreed was sufficient to remediate the Debtors' properties transferred to RACER and satisfy any other contemplated obligations of the Trust.  Even if MLC did breach the Settlement Agreement by funding RACER in part with TIPS, RACER may not be placed in a better position than it otherwise would be but for the funding in TIPS.[13]  See, e.g., Freund, 34 N.Y.2d at 382.

---

[12] See also Am. List Corp. v. U.S. News & World Report, Inc., 549 N.E.2d 1161, 1165 (N.Y. 1989) ("In calculating the damages due plaintiff in this case, Supreme Court properly computed the total due plaintiff under the contract, taking into account the costs reasonably saved by plaintiff as a result of the breach[.]"); Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 495 (2d Cir. 1995) ("[R]evenues due a plaintiff because of a breached contract must be offset by any amount plaintiff saved as a result of the breach. In the typical contract action such an offset usually consists of variable costs, that is, those costs that would have been incurred solely as a result of performance under the contract.").

[13] Paradoxically, RACER's claim for damages based on the unrealized decrease in value of the TIPS as of the Effective Date would be even less justifiable had the market value of the TIPS decreased more substantially between the time the TIPS were purchased by Debtors and

11.        Indeed, pursuant to the Settlement Agreement, MLC, through its DIP Lenders—

primarily the United States Department of Treasury—agreed to fund a certain amount of dollars

to RACER, which MLC did when it transferred $575,338,000 in TIPS as valued on an amortized

cash basis using government cash on the Effective Date.    (See Response at 9-11, 13-15).

Because the TIPS will adequately fund the liabilities, payment of an additional $13.5 million

would exceed the cash funding already provided from Treasury funds at taxpayer expense.

### B.        Funding the Trust with TIPS Valued at Amortized Cost Was Not a Breach.

12.        RACER and the States allege that the Debtors' funding the Trust with TIPS,

instead of cash, constituted a breach of the Settlement Agreement, Confirmation Order and Plan.

(Reply at 8; Joinder at n.5).  It is too late to make this argument; the time to object to the Plan has

come and gone.  And, neither RACER nor the States objected to the Plan or at the confirmation

hearing to the Debtors' funding the Trust in TIPS.    (See also Response at 11, ¶¶ 36, 53;

Rosenthal Decl. ¶ 19).

13.        Because no one really wants to return the TIPS, despite insisting that cash was

what the Settlement Agreement required,[14] RACER and the States have invented a new theory

that market value on the Effective Date equals cash.  (Reply at 5-6, 10-14; Joinder at 5-6).  But,

neither RACER nor the States have cited any authority to support the contention that "cash"

means "cash value" which means "market value on the Effective Date."  Moreover, the States

---

transferred to RACER.  For example, if the TIPS' market value temporarily had decreased by 50
percent as of the Effective Date, RACER would be asking this Court to award approximately
$287.5 million in damages.  If such relief was granted, and if RACER held the TIPS to maturity,
RACER would receive a windfall of $287.5 million, resulting in a total amount of funding that
never would have been available nor contemplated by any of the parties to the Settlement
Agreement, including the Federal Government.

[14] (See Response at 10-13, 25-27; Rosenthal Decl. ¶ 19 (noting that RACER's principals spent
months of diligence preparing treasury and custodial accounts to hold the TIPS they would
receive on the Effective Date)).

admit that "[o]n the Effective Date . . . , MLC was required to transfer a specific *value* to the RACER Trust[,]" not necessarily "cash."  (Joinder at 5, emphasis in original).  For the reasons set forth in the Response, valuing the TIPS at quoted market value on the Effective Date was not required in the Settlement Agreement, Plan, or Confirmation Order, and the Debtors' valuation of the TIPS at amortized cost based on their held-to-maturity nature was in accordance with GAAP guidance.  (Response at 15-17, Argument Parts A & B).

14.       RACER and the States wrongly suggest that GAAP accounting was not applicable to the TIPS and the Debtors.  (Supp. Hamilton Decl. ¶¶ 5-6 (**ECF No. 11386**); Joinder at 9, 9 n.8, 10).  While MLC's financial statements did not comply with all facets of GAAP, such as not depreciating certain assets and that MLC had liabilities subject to compromise, MLC did research and follow GAAP guidance where appropriate to do so, as in the case of accounting for the TIPS.  (See Response at 15-16; 22-25; Supp. Rosenthal Decl. ¶ 5).  The States suggest that MLC never could have intended to hold the TIPS to maturity, perhaps because MLC was a debtor.  (Joinder at 9).  This argument ignores the realities of the transaction between MLC and RACER, in that the environmental liabilities and TIPS (and other assets, including cash accounts) had a type of continuity of ownership.  (Supp. Rosenthal Decl. ¶ 3).  RACER exists for the primary purpose of holding enough assets to pay the environmental liabilities it took on on the Effective Date.  RACER is not an independent commercial entity, but a qualified settlement fund established to assume and discharge the Debtors' environmental liabilities related to Debtor's formerly owned properties.  (See Trust Agreement, at Recitals (setting forth the

purpose the Trust)).   In light of these circumstances, MLC's accounting for the TIPS at amortized cost was entirely appropriate.[15]

### C.    RACER Waived Any Right to Additional Payment, and the Only Beneficiary of the Trust—the United States—Has Taken No Position on this Dispute.

15.        RACER and the States assert that even if RACER failed to act diligently in raising any concern about the TIPS, the States have the right to insist on "full funding."  (Reply at 17-18; Joinder at 7).  Yet, under the Settlement Agreement, the sole beneficiary of the Trust is the Federal Government, which "disagree[s] with RACER's position that the Trust ha[s] been underfunded." (Hill Decl. ¶ 16 (**ECF No. 11385**); Settlement Agreement ¶ 38 (Ex. A to Rosenthal Decl.); see also Response at 1 n.2, 22 (noting that while the Federal Government has not expressed a position on the dispute in this Court, Treasury instructed and funded the Debtors to oppose RACER's Motion)).  Neither the States nor RACER can avoid the absolute fact that RACER has been fully funded to satisfy the environmental obligations at the amounts agreed upon by the parties to the Settlement Agreement.

16.        RACER and the States also claim their entitlement to an additional $13.5 million because the States allegedly did not know of the Debtors' "decision to fund the Trust with TIPS, or value them on any basis other than market value" until "November 15, 2011."  (Joinder at 2.) The States' knowledge of the TIPS is irrelevant to whether the Debtors funded the Trust in full. Moreover, it is undisputed that Treasury and RACER's principals were aware the Trust would be funded with TIPS and understood how the TIPS worked.  (Response at 10-11, 15-22; Reply at 9, 15-16).  In fact, on information and belief, RACER's principals also took responsibility for

---

[15] RACER also incorrectly contends that the Debtors' Monthly Operating Reports "provided two measures of the value" of the TIPS.  (Supp. Hamilton Decl. ¶ 6).  Rather, MLC provided the appropriate value of the TIPS as GAAP required and disclosed in a footnote the unrealized loss or gain based on the difference between quoted market value, which fluctuates daily, and the amortized cost basis.  (Supp. Rosenthal Decl. ¶ 6; see also Response at 3, 8, 11, 17, 23, 24).

keeping the States advised on the progress of establishing the Trust.  Additionally, during the settlement negotiations leading up to the Settlement Agreement through the creation and funding of the Trust on the Effective Date, the Federal Government was the primary party negotiating the Settlement Agreement with and on behalf of the States, and the Debtors rarely communicated directly with the States.

17.        RACER claims that it did not delay too long to object to MLC's funding the Trust in TIPS or the Debtors' valuation of the TIPS at amortized cost.  (Reply at 4, 18-20).  But, Hamilton, RACER's current CFO, knew that Debtors were going to fund RACER with TIPS that Debtors valued at amortized cost long before the Effective Date.  (Response at 32-34).  RACER offers no explanation why, if Hamilton was aware in February 2011 of the difference between quoted market value and the amortized cost basis of the TIPS, Hamilton did not raise this issue with his new employers at RACER in mid-March prior to the Effective Date.  (See Supp. Hamilton Decl. at ¶¶ 8-9).

18.        RACER also asserts that its making the approximately $108,000 True-up Payment does not constitute a waiver because (i) Hamilton sent the May 9, 2011 email in his capacity as an MLC employee, not a RACER employee, and (ii) RACER reserved its right to contest the amount of TIPS funding.  (Reply at 19).  Both contentions are absolutely wrong. First, the data Hamilton relied on in the May 9, 2011 email in raising the need for a True-up Payment came from RACER's account representative at U.S. Bank, which information would only have been available to a RACER employee, not MLC.  (Supp. Rosenthal Decl. ¶ 8). Second, based on his time records, Hamilton spent almost six hours on May 9, 2011 devoted to RACER CFO responsibilities, as well as RACER accounting and treasury matters.  (Id.).

Therefore, despite the fact that he used his MLC email account, when Hamilton sent the true-up email it was in his capacity as a RACER employee.  (*Id.*).

19.        Second, the language RACER points to regarding a "funding adjustment" (Reply at 19 nn.26-27) does not refer to RACER's alleged reservation of its right concerning the quoted market value of the TIPS and instead refers to the Confirmation Order paragraph 7 funding adjustment, which has nothing to do with valuation of the TIPS.  (Underline See Supp. Rosenthal Decl. ¶ 9).   Furthermore, the June 30, 2011 True-up spreadsheet contains a line item for a "reconciliation of TIPS transfer," which addresses the issue of the Debtors' overfunding of the TIPS portfolio as reflected by the approximately $108,000 credit to the Debtors.  (Underline See Supp. Rosenthal Decl. ¶¶ 7, 9-10; Response at 21-22; Rosenthal Decl. ¶¶ 23-31 & Exs. F & G).  Any insinuation that the "funding adjustment" language was meant to reserve RACER's rights with regard to the TIPS' value is entirely without merit.  Indeed, if this parenthetical language were really a reservation of rights on the TIPS valuation question, RACER likely would have documented that more plainly.  (Supp. Rosenthal Decl. ¶ 10).

### D.        MLC Purchased the TIPS Solely to Benefit the Trust.

20.        Finally, MLC must adamantly affirm to the Court that MLC had no profit motive in selecting the portfolio of TIPS transferred to RACER, despite the States' suggestion to the contrary.  (Underline See Joinder at 8).  The States apparently did not read MLC's Response brief, which stated:

> Because MLC was a liquidating entity, which would return any unused DIP financing to Treasury, the goal of the TIPS portfolio was not to maximize the amount of money returned to Treasury upon liquidation, but to ensure that RACER had sufficient funding to meet the environmental liabilities in amounts agreed to in the Settlement Agreement at the time that they were expected to arise. Thus, the MLC DIP Trust has no financial incentive to dispute RACER's claim or financial stake in the outcome of this dispute. In defending against the Motion, the MLC DIP Trust has no

intention or interest in undermining RACER's capacity to fulfill its mandate; rather the MLC DIP Trust believes that RACER has been funded in full.

(Response at 34).   Moreover, as MLC noted, it had opportunity to sell $226M in short-term marketable securities that were not matched to the long-term environmental liabilities for a profit of over a half million but transferred them to RACER on amortized cost value, resulting in over $700,000 in interest payments to RACER.   (*Id.* at 6).   Neither MLC nor its restructuring professionals had any profit motive in purchasing the TIPS portfolio nor anything to gain by underfunding the Trust or using TIPS instead of all cash.   Any allegation otherwise is specious and flat wrong.[16]

### III.    CONCLUSION

For the reasons stated above and in the Response, the MLC DIP Trust respectfully requests that the Court deny the Motion.

Dated: March 14, 2012
      New York, New York

/s/ Joseph H. Smolinsky
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Motors Liquidation Company DIP Lenders Trust*

---

[16] Indeed, contrary to the States' allegation, MLC never sought "to transfer to the Trust the loss incurred[;]" because no loss was or has been incurred.  (Joinder at 8; Response at 16, 27-28).  As of March 12, 2012, the estimated  market value of the TIPS remaining in the portfolio is $36 million more than the amortized cost basis of the TIPS transferred to RACER by the Debtors on the Effective Date.  (Supp. Rosenthal Decl. ¶ 4).

**Exhibit 1**

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Motors Liquidation
Company DIP Lenders Trust

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                      :
In re                                 :    Chapter 11 Case No.
                                      :
MOTORS LIQUIDATION COMPANY, et al.,   :    09-50026 (REG)
        f/k/a General Motors Corp., et al. :
                                      :
                Debtors.              :    (Jointly Administered)
                                      :
------------------------------------------------------------x
```

**SUPPLEMENTAL DECLARATION OF BRIAN ROSENTHAL IN SUPPORT OF**
**MOTORS LIQUIDATION COMPANY DIP LENDERS TRUST'S SUR-REPLY TO THE**
**MOTION OF THE REVITALIZING AUTO COMMUNITIES ENVIRONMENTAL**
**RESPONSE TRUST FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105 AND 1142 TO**
**ENFORCE THE DEBTORS' PAYMENT OBLIGATIONS UNDER THE SECOND**
**AMENDED JOINT CHAPTER 11 PLAN AND THE CONFIRMATION ORDER**

Brian Rosenthal, pursuant to 28 U.S.C. § 1746, declares as follows:

1.   I have personal knowledge of all items asserted in this declaration. I am currently an

employee of AlixPartners LLP.  From July 10, 2009 through December 15, 2011, I was a

member of the management team of Motors Liquidation Company ("**MLC**" or the "**Debtors**")

and principally responsible for MLC's treasury operations.

2.   I am providing this supplemental declaration to address assertions made in the Reply

Brief in support of the Motion of the Revitalizing Auto Communities Environmental Response

Trust ("**RACER**" or the "**Trust**") for an Order Pursuant to 11 U.S.C. §§ 105 and 1142 to

Enforce the Debtors' Payment Obligations Under the Second Amended Joint Chapter 11 Plan and the Confirmation Order (the "**Motion**") (**ECF No. 11384**) (the "**Reply**"), the Joinder of the states of New York, Illinois, Indiana, Kansas, Michigan, Missouri, New Jersey, Ohio, the Massachusetts Department of Environmental Protection and the Saint Regis Mohawk Tribe (collectively, the "**States**") to the Motion (**ECF No. 11380**) (the "**Joinder**"), and the Supplemental Declaration of Scott R. Hamilton ("**Hamilton**") in support of the Motion (**ECF No. 11386**). This supplemental declaration augments the information provided in my January 5, 2012 Declaration (**ECF No. 11297**) in support of the MLC DIP Trust's Amended Response in Opposition to the Motion ("**Response**") filed on January 23, 2012 (**ECF No. 11335**).[1]

A.    <u>There is a Continuity of Ownership between MLC and RACER.</u>

3.    RACER is not an independent commercial entity, but a qualified settlement fund established to assume and discharge the Debtors' environmental liabilities related to Debtors' formerly owned properties. (<u>See</u> Trust Agreement, at Recitals).[2]  In other words, RACER was formed to stand in MLC's shoes with respect to the assets and environmental liabilities that the Debtors would transfer to the Trust. As such, the environmental liabilities and TIPS (and other assets, including cash accounts) have a type of continuity of ownership.

4.    As of March 12, 2012, the estimated market value of the TIPS remaining in the RACER portfolio is approximately $383.8 million, which is approximately $36.1 million more than the

---

[1] All capitalized terms used but not defined herein shall have the meanings given them in the Response.

[2] "WHEREAS, …the Environmental Response Trust is established to resolve or satisfy … one or more contested or uncontested claims … asserting liability under environmental laws; and, in connection therewith, to conduct, manage and/or fund Environmental Actions with respect to certain of the Properties, including the migration of Hazardous Substances emanating from certain of the Properties, in accordance with the provisions of this Settlement Agreement and the Trust Agreement; to reimburse the Lead Agency for Environmental Actions it conducts or has agreed to pay for with respect to the Properties; own certain of the Properties; carry out administrative and property management functions related to certain of the Properties and pay associated administrative costs; and try to sell or transfer the Properties owned by the Environmental Response Trust so that they can be put to productive or beneficial use." (Trust Agreement, at Recitals).

2

amortized cost basis of the TIPS transferred to RACER by the Debtors on March 31, 2011, the

Effective Date.[3]

### B. Hamilton's Explanation of the Debtors' Financial Statements and Their Compliance with GAAP is Inaccurate and Incomplete.

5.  While the Debtors' financial statements were not required to comport with all facets of

Generally Accepted Accounting Principals ("**GAAP**"), MLC did research and follow GAAP

guidance where appropriate to do so, such as was the case for accounting for the TIPS.  GAAP

required the Debtors to value the investments as "held-to-maturity securities" at amortized cost.

The Debtors could not follow GAAP in certain aspects, such as depreciating certain assets,

because MLC had liabilities subject to compromise due to the circumstances of the bankruptcy.

6.  Hamilton's statement that MLC's Monthly Operating Reports "provided two measures of

the value" of the TIPS is incorrect.  (Supp. Hamilton Decl. ¶ 6).  The Debtors never reported

"two measures" of value for the TIPS; rather, the Debtors complied with GAAP and reported the

TIPS solely using amortized costs in the Debtors' financial statements as reported in the Monthly

Operating Reports.  In further compliance with GAAP, the Debtors disclosed implied, unrealized

gains and losses due to fluctuating market prices in the notes to the financial statements in each

monthly operating report. The Debtors never recognized any gains or losses associated with

market price fluctuations nor did the Debtors adjust the reported value of the TIPS based on

market price fluctuations in the Debtors' financial statements.

### C. RACER and Hamilton Mischaracterize the Circumstances and Consequences of RACER's True-up Payment to MLC.

7.  Both RACER's Reply and Hamilton's Supplement Declaration address Hamilton's

May 9, 2011 email to me regarding a true-up to account for a correction of the index ratio used to

---

[3] This data is based on market quotations provided by Mesirow Financial as of 1:30 p.m. Eastern Standard Time on March 12th, 2012.  The value of the TIPS portfolio described above excludes the $265,505,495 in securities that have matured since the Effective Date and accrued interest.

calculate the amount of the adjusted TIPS principal as of March 28, 2011, which ratio was used to determine the amortized cost basis for the funds flow on the Effective Date. (Reply at ¶ 36; Supp. Hamilton Decl. ¶¶ 10-12, 16-17). RACER also asserts that its making the approximately $108,000 True-up Payment does not constitute a waiver because (i) Hamilton sent the May 9, 2011 email in his capacity as an MLC employee, not a RACER employee, and (ii) RACER reserved its right to contest the amount of TIPS funding. (Reply at 19). These contentions are not accurate.

8. First, the data Hamilton relied on in the May 9, 2011 email in raising the need for a True-up Payment came from RACER account statements provided by U.S. Bank that were only available to RACER. (See Ex. F to Rosenthal Decl.). Therefore, Hamilton only could have had access to that U.S. Bank data in his capacity as RACER CFO. Second, based on his time records, Hamilton spent almost six hours devoted to his RACER responsibilities on May 9, 2011, the day he emailed MLC concerning the True-up Payment. Attached hereto as Exhibit A is a true and correct copy of Hamilton's time record for May 9, 2011. Upon information and belief, Hamilton's three other MLC-related time entries for that day would not have concerned the True-up Payment. Finally, MLC and AlixPartners employees did not typically distinguish between RACER and AlixPartners email accounts when corresponding with Hamilton.

9. In addition, the language used in the document heading that RACER points to regarding a "funding adjustment" does not refer to RACER's alleged reservation of its right concerning the quoted market value of the TIPS. (See Rosenthal Decl. at Ex. G; Reply at 19; Supp. Hamilton Decl. ¶ 16). The "funding adjustment" language instead refers to the Confirmation Order paragraph 7 funding adjustment, which has nothing to do with valuation of the TIPS. The Confirmation Order paragraph 7 adjustment refers to funding adjustments for specific items set

forth in paragraphs 36 and 37 of the Settlement Agreement, namely monies spent by the Debtors

and Lead Agencies (as defined in the Settlement Agreement and referring primarily to the States)

for environmental actions carried out at the properties that were ultimately transferred to

RACER.  Paragraph 7 of the Confirmation Order and paragraphs 36 and 37 of the Settlement

Agreement thus only provide a mechanism for adjusting funding to RACER for monies spent

investigating, remediating and monitoring the properties and do not mention or refer to the

method by which Debtors would fund RACER or how those funds should be valued.

10. Moreover, the June 30, 2011 True-up spreadsheet includes a line item titled

"reconciliation of TIPS transfer," which addresses the issue of the Debtors' overfunding of the

TIPS portfolio as reflected by the approximately $108,000 credit to the Debtors (the True-up

Payment).  (See Rosenthal Decl. ¶ 30 & Ex. G).  Based on my experience working with

RACER's principals to set up the Trust, if this parenthetical "funding adjustment" language that

is located only in the heading of the document were really a reservation of rights on the alleged

TIPS underfunding, RACER would have documented that reservation in clearer terms.

Furthermore, there would have been no reason to process an "interim" true-up in the form of the

True-up Payment had RACER intended to reserve its right to challenge the value of the TIPS on

a quoted market value basis, rather than an amortized cost basis.


[The remainder of this page is intentionally blank.]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 13, 2012, in Atlanta, Georgia.

Brian Rosenthal

# Exhibit A

**Detailed Schedule of Time Billed by Scott Hamilton on May 9, 2011**

| Date | Description | | Hours Billed | Payment Responsibility |
|------|-------------|---|---|---|
| 5/9/2011 | RACER CFO responsibilities | | 2.7 | Billed to RACER under TSA for Hamilton time working as RACER CFO |
| 5/9/2011 | RACER accounting and treasury matters. | | 3.1 | Billed to RACER under TSA for Hamilton time working as RACER CFO |
| 5/9/2011 | Research and respond to various purchase order and disbursement requests. | (1) | 2.1 | Motors Liquidation Company |
| 5/9/2011 | Prepare draft March monthly operating report. | (2) | 3.4 | Motors Liquidation Company |
| 5/9/2011 | Analyze and review daily cash report. | (3) | 0.7 | Motors Liquidation Company |

1.) Disbursement associated with the True-up Payment was handled by Rosenthal and Selzer for MLC.

2.) March 2011 was the final Monthly Operating Report prepared by MLC and did not include the True-up Payment that was determined in May and paid in June of 2011.

3.) Daily cash reports only include cash payments actually made and do not include forecasted payments.   As the True-up Payment was not processed until June 2011, there would be
   no related work associated with this task.