HEARING DATE AND TIME: May 15, 2012 at 9:45 a.m. (Eastern Time)
OBJECTION DEADLINE: May 8, 2012 at 4:00 p.m. (Eastern Time)

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Motors Liquidation
    Company GUC Trust

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                    :
In re                               :        Chapter 11 Case No.
                                    :
MOTORS LIQUIDATION COMPANY, et al., :        09-50026 (REG)
      f/k/a General Motors Corp., et al.  :
                                    :
                  Debtors.          :        (Jointly Administered)
                                    :
------------------------------------------------------------x
```

## NOTICE OF MOTION OF MOTORS LIQUIDATION COMPANY GUC TRUST FOR LIMITED MODIFICATION OF THE AUTOMATIC STAY AND THE PLAN INJUNCTION AS TO ACTION FILED BY BURTON TAFT, ADMINISTRATOR OF THE ESTATES OF BRIAN TAFT

        **PLEASE TAKE NOTICE** that upon the annexed Motion, dated April 13, 2012,

of the Motors Liquidation Company GUC Trust (the "**GUC Trust**")[1] for an order authorizing a

limited modification of the Automatic Stay and the Plan Injunction as to the Action filed by

Burton Taft, Administrator of the Estate of Brian Taft, all as more fully described in the Motion,

a hearing will be held before the Honorable Robert E. Gerber, United States Bankruptcy Judge,

in Room 621 of the United States Bankruptcy Court for the Southern District of New York, One

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in
the Motion.

Bowling Green, New York, New York 10004 on **May 15, 2012, at 9:45 a.m. (Eastern Time)**, or as soon thereafter as counsel may be heard.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a CD-ROM or 3.5 inch disk, preferably in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent practicable, and served in accordance with General Order M-399, and on (i) Weil, Gotshal & Manges LLP, attorneys for the GUC Trust, 767 Fifth Avenue, New York, New York 10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (ii) the Debtors, c/o Motors Liquidation Company, 401 South Old Woodward Avenue, Suite 370, Birmingham, Michigan 48009 (Attn: Thomas Morrow); (iii) General Motors LLC, 400 Renaissance Center, Detroit, Michigan 48265 (Attn: Lawrence S. Buonomo, Esq.); (iv) Cadwalader, Wickersham & Taft LLP, attorneys for the United States Department of the Treasury, One World Financial Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (v) the United States Department of the Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, D.C. 20220 (Attn: Joseph Samarias, Esq.); (vi) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.); (vii) Kramer Levin Naftalis & Frankel LLP, attorneys for the statutory committee of unsecured creditors, 1177 Avenue of the

Americas, New York, New York 10036 (Attn:  Thomas Moers Mayer, Esq., Robert Schmidt, Esq., Lauren Macksoud, Esq., and Jennifer Sharret, Esq.); (viii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Tracy Hope Davis, Esq.); (ix) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New York, New York 10007 (Attn: David S. Jones, Esq. and Natalie Kuehler, Esq.); (x) Caplin & Drysdale, Chartered, attorneys for the official committee of unsecured creditors holding asbestos-related claims, 375 Park Avenue, 35th Floor, New York, New York 10152-3500 (Attn:  Elihu Inselbuch, Esq. and Rita C. Tobin, Esq.) and One Thomas Circle, N.W., Suite 1100, Washington, DC 20005 (Attn:  Trevor W. Swett III, Esq. and Kevin C. Maclay, Esq.); (xi) Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation, attorneys for Dean M. Trafelet in his capacity as the legal representative for future asbestos personal injury claimants, 2323 Bryan Street, Suite 2200, Dallas, Texas 75201 (Attn:  Sander L. Esserman, Esq. and Robert T. Brousseau, Esq.); (xii) Gibson, Dunn, Crutcher LLP, attorneys for Wilmington Trust Company as GUC Trust Administrator and for Wilmington Trust Company as Avoidance Action Trust Administrator, 200 Park Avenue, 47th Floor, New York, New York 10166 (Attn: Keith Martorana, Esq.); (xiii) FTI Consulting, as the GUC Trust Monitor and as the Avoidance Action Trust Monitor, One Atlantic Center, 1201 West Peachtree Street, Suite 500, Atlanta, Georgia  30309 (Attn: Anna Phillips); (xiv) Crowell & Moring LLP, attorneys for the Revitalizing Auto Communities Environmental Response Trust, 590 Madison Avenue, 19th Floor, New York, New York 10022-2524 (Attn:  Michael V. Blumenthal, Esq.); (xv) Kirk P. Watson, Esq., as the Asbestos Trust Administrator, 2301 Woodlawn Boulevard, Austin, Texas 78703; and (xvi) Roth & Dempsey, P.A., attorneys for Burton Taft, Administrator of the Estate of Brian Taft, 436 Jefferson Avenue, Scranton, Pennsylvania 18510 (Attn:  Michael G.

Gallacher, Esq.), so as to be received no later than **May 8, 2012 at 4:00 p.m. (Eastern Time)**

(the "**Objection Deadline**").

         PLEASE TAKE FURTHER NOTICE that if no objections are timely filed and

served with respect to the Motion, the GUC Trust may, on or after the Objection Deadline,

submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed

to the Motion, which may be entered with no further notice or opportunity to be heard offered to

any party.

Dated: New York, New York
       April 13, 2012

                    /s/ Joseph H. Smolinsky
                    Harvey R. Miller
                    Stephen Karotkin
                    Joseph H. Smolinsky

                    WEIL, GOTSHAL & MANGES LLP
                    767 Fifth Avenue
                    New York, New York 10153
                    Telephone: (212) 310-8000
                    Facsimile: (212) 310-8007

                    Attorneys for Motors Liquidation
                    Company GUC Trust

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Motors Liquidation
   Company GUC Trust

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                       :

In re                              :       **Chapter 11 Case No.**
                       :

**MOTORS LIQUIDATION COMPANY,** *et al.,*  :    **09-50026 (REG)**
     **f/k/a General Motors Corp.,** *et al.*    :
                       :

               **Debtors.**     :    **(Jointly Administered)**
                       :

------------------------------------------------------------x

### MOTION OF MOTORS LIQUIDATION COMPANY GUC TRUST FOR LIMITED MODIFICATION OF THE AUTOMATIC STAY AND THE PLAN INJUNCTION AS TO ACTION <u>FILED BY BURTON TAFT, ADMINISTRATOR OF THE ESTATES OF BRIAN TAFT</u>

TO THE HONORABLE ROBERT E. GERBER
UNITED STATES DISTRICT BANKRUPTCY JUDGE:

        The Motors Liquidation Company GUC Trust (the "**GUC Trust**") respectfully

represents:

### <u>Relief Requested</u>

        1.     The GUC Trust attempted to settle proof of claim numbers 764 and

20994 (the "**Proofs of Claim**") filed by Burton Taft, Administrator of the Estate of Brian Taft,

("**Plaintiff**") through mediation pursuant to the ADR Procedures.[2]  Such mediation was

---

[2] Capitalized terms not defined in this section are defined below.

unsuccessful. Accordingly, pursuant to the ADR Order and ADR Procedures, the GUC Trust

now requests a limited modification of the Automatic Stay and the Plan Injunction solely to the

extent necessary to permit liquidation of the Proofs of Claim through litigation of the Action in

the Pennsylvania Federal Court, where Plaintiffs' Action is pending, subject to the Debtors' right

to seek removal and/or transfer of venue.

## Jurisdiction

2.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Background

A.     The Bankruptcy Proceedings and the Automatic Stay

3.     On June 1, 2009 (the "**Commencement Date**"), Motors Liquidation

Company (f/k/a General Motors Corporation) ("**MLC**"), and certain of its subsidiaries, as

debtors in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), commenced

voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**")

in the United States Bankruptcy Court for the Southern District of New York (the "**Court**").

4.     Pursuant to section 362 of the Bankruptcy Code, the automatic stay went

into effect on the Commencement Date and barred, *inter alia*, the commencement or

continuation of any judicial action or proceeding against the Debtors that was commenced prior

to the Commencement Date (the "**Automatic Stay**").

B.     Plaintiff Filed the Proofs of Claim Based on the Underlying Action

5.     A lawsuit styled *Burton Taft, Administrator of the Estate of Brian Taft v.

General Motors Corporation*, Case No. 3:08-CV-2142 (the "**Action**"),[3] is currently pending in

---

[3] The Complaint filed by Plaintiff in the Action is annexed hereto as "**Exhibit A**."

the District Court for the Middle District of Pennsylvania at Scranton (the "**Pennsylvania Federal Court**"), and all claims against the Debtors have been stayed since the Commencement Date pursuant to the Automatic Stay.

6.      Plaintiff filed the Proofs of Claim[4] relating to the Action asserting unsecured claims in the following amounts:

| Claim Number | Filed Amount |
|:---:|:---:|
| 764 | $10,000,000.00 |
| 20994 | $10,000,000.00 |

C.      The Proofs of Claim Remain Unresolved After
Mediation Pursuant to the ADR Order and ADR Procedures

7.      On February 23, 2010, this Court entered the Order Pursuant to 11 U.S.C. § 105(a) and General Order M-390 (the "**ADR Order**") Authorizing Implication of Alternative Dispute Procedures, Including Mandatory Mediation (the "**ADR Procedures**") (ECF No. 5037).[5]

8.      Pursuant to the ADR Order and the ADR Procedures, Plaintiff and the GUC Trust participated in mediation of the Proofs of Claim, but were unable to resolve the Proofs of Claim at that mediation.  Thus, the Proofs of Claim are "Unresolved Designated Claims" pursuant to the ADR Order and the ADR Procedures.

9.      The ADR Order and the ADR Procedures provide that if an Unresolved Designated Claim cannot be adjudicated in the Court as a result of abstention or because of lack of or limitations upon subject matter jurisdiction, litigation of such Unresolved Designated Claim shall proceed in the nonbankruptcy forum where the Unresolved Designated Claim was pending

---

[4] The Proofs of Claim are annexed hereto as "**Exhibit B**."

[5] The ADR Order and ADR Procedures were subsequently amended by the Court on October 25, 2010 (ECF No. 7558).  On February 13, 2012, the GUC Trust filed a Motion to Supplement the ADR Procedures, and entry of that order is currently pending (ECF No. 11413).

on the date the Debtors commenced their respective voluntary chapter 11 cases, subject to the

Debtors' right to seek removal and/or transfer of venue or in such other forum.  (*See* ADR

Procedures § II.E.3; ADR Order at 6.)

> 10.    On March 28, 2011, the Court entered its Findings of Fact, Conclusions

of Law, and Order Pursuant to Sections 1129(b) and (b) of the Bankruptcy Code and Rule 3020

of the Federal Rules of  Bankruptcy Procedure Confirming Debtors' Second Amended Joint

Chapter 11 Plan (ECF No. 9941) (the "**Confirmation Order**").  Among other things, the

Confirmation Order (i) confirmed the Debtors' Second Amended Joint Chapter 11 Plan (the

"**Plan**"), (ii) established the GUC Trust pursuant to that certain Motors Liquidation Company

GUC Trust Agreement, (iii) transferred certain claims pending against MLC to the GUC Trust,

(iv) authorized the GUC Trust to resolve such claims on behalf of the Debtors' estates, and (v)

enjoined all persons from commencing or continuing in any manner on account of or respecting

any claim, debt, right, or cause of action for which the Debtors, the GUC Trust Administrator, or

the Avoidance Action Trust Administrator retains sole and exclusive authority to pursue in

accordance with the Plan (the "**Plan Injunction**").  (*See* Confirmation Order ¶ 54.)  The Proofs

of Claim were among the claims transferred to the GUC Trust.

> 11.    Pursuant to the ADR Order and the ADR Procedures, the GUC Trust

wishes to modify the Automatic Stay and the Plan Injunction solely to the extent necessary to

permit the liquidation of the amount of the Proofs of Claim through litigation of the Action in the

Pennsylvania Federal Court, subject to the GUC Trust's rights to seek removal and/or transfer of

venue.

### <u>The Relief Requested Should Be Approved by the Court</u>

> 12.    The ADR Procedures provide that if a Designated Claim is not resolved

by the ADR Procedures, was pending in a nonbankruptcy forum on the Commencement Date,

and cannot be adjudicated by the Bankruptcy Court,[6] litigation of such claim shall proceed in

such nonbankruptcy forum, subject to the Debtors' right to seek removal or transfer of venue.

(ADR Procedures § II.E (Ex. B).)

13.    The ADR Order further provides that if litigation of an Unresolved

Designated Claim in a forum other than the Bankruptcy Court is required, the Automatic Stay

shall be modified "solely to the extent necessary to permit the liquidation of the amount of such

Unresolved Designated Claim in the appropriate forum."  (ADR Order at 6 (Ex. B); *see also*

ADR Procedures §§ II.E(3)-(4) (Ex. B).)[7]

14.    Here, pursuant to the ADR Order and the ADR Procedures, Plaintiff and

the GUC Trust participated in mediation of the Proofs of Claim, but were unable to resolve the

Proofs of Claim at that mediation.  Thus, the Proofs of Claim are "Unresolved Designated

Claims" pursuant to the ADR Order and the ADR Procedures.  Further, Plaintiff alleges

wrongful death claims in the Proofs of Claim, and, thus, the Proofs of Claim should be liquidated

by litigation in the Action pending in the Pennsylvania Federal Court, subject to the Debtors'

and/or the GUC Trust's rights to seek removal and/or transfer of venue.

15.    Accordingly, pursuant to the ADR Order and Section II.E of the ADR

Procedures, the GUC Trust hereby requests that the Court modify the Automatic Stay and the

Plan Injunction solely to the extent necessary to enable the Action to proceed to final judgment

or settlement, so that the Action may proceed in the Pennsylvania Federal Court, subject to the

Debtors' and/or the GUC Trust's rights to seek removal and/or transfer of venue.

---

[6] The Proofs of Claim cannot be adjudicated to judgment by the Bankruptcy Court because they are unliquidated wrongful death claims.  *See* 28 U.S.C. § 157(b).

[7] The ADR Procedures further provide that any such liquidated claim "(a) shall be subject to treatment under the applicable chapter 11 plan or plans confirmed in these cases; and (b) shall be treated as a general unsecured nonpriority claim against the Debtor identified in the judgment, unless otherwise determined and ordered by the Bankruptcy Court."  (*See* ADR Procedures § II.E(4) (Ex. B).)

## Notice

16.     Notice of this Motion has been provided to Plaintiff, by and through his counsel of record, and parties in interest in accordance with the Sixth Amended Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and Case Management Procedures, dated May 5, 2011 (ECF No. 10183).  The GUC Trust submits that such notice is sufficient and no other or further notice need be provided.

17.     No previous request for the relief sought herein has been made by the GUC Trust to this or any other Court.

WHEREFORE the GUC Trust respectfully requests entry of an order granting the relief requested herein and such other and further relief as is just.


Dated: New York, New York
          April 13, 2012

                              /s/ Joseph H. Smolinsky
                              Harvey R. Miller
                              Stephen Karotkin
                              Joseph H. Smolinsky

                              WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, New York 10153
                              Telephone: (212) 310-8000
                              Facsimile: (212) 310-8007


                              Attorneys for Motors Liquidation
                               Company GUC Trust

## Exhibit A

### Complaint

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BURTON TAFT, ADMINISTRATOR OF      : NO.:
THE ESTATE OF BRIAN TAFT,          :
DECEASED                           :
2503 Cherry Hill Road              :
Clarks Summit, PA 18411            : CIVIL ACTION – LAW
                                   : JURY TRIAL DEMANDED
                 Plaintiff         :
                                   :
     vs.                           :
                                   :
GENERAL MOTORS CORPORATION         :
3044 General Motors Boulevard      :
Detroit, MI 48232-5170             :
                                   :
                 Defendant         :

**COMPLAINT**

**AND NOW**, comes the Plaintiff, Burton Taft,
Administrator of the Estate of Brian Taft, deceased, by
and through his counsel, Roth & Dempsey, P.C., and
complains against the Defendant as follows:

1.   Plaintiff Burton Taft is an adult and competent
individual residing at 2503 Cherry Hill Road, Clarks
Summit, Lackawanna County, Pennsylvania and was
appointed Administrator of the Estate of Brian Taft,
his brother, by the Register of Wills of Lackawanna
County on December 3, 2007.  A copy of the Letters of

Administration is attached hereto as Exhibit "A" and
incorporated herein by reference.

    2.    Defendant General Motors Corporation
(hereinafter GM) is a corporation authorized to conduct
business in the Commonwealth of Pennsylvania and has a
principal place of business located at 3044 General
Motors Boulevard, Detroit, Michigan.  GM has sufficient
contacts with this District to subject it to personal
jurisdiction.

    3.    At all times material hereto, the Defendant
acted by and through its agents, servants and employees
who at all times acted within the course and scope of
their agency, employment and authority.

    4.    This court has jurisdiction over this claim
pursuant to 28 U.S.C. §1332.  Venue is proper under 28
U.S.C. §1391.

    5.    On or about November 12, 2007, Brian Taft was
the owner and driver of a 1986 K30 Chevrolet pickup
truck, VIN No. 1GCGK24M6GJ153097, which was designed,
manufactured and distributed by Defendant GM.

2

6. On the aforementioned date, Brian Taft drove
the aforementioned vehicle out of the parking lot of a
business located at the intersection of SR 435 and
Phillips Road, in Clifton Township, Lackawanna County,
Pennsylvania. Brian Taft intended to turn left and
head south on SR 435.

7. At the aforementioned time and date, as Brian
Taft crossed the northbound lanes of SR 435 and headed
toward the southbound lanes, his vehicle was broadsided
on the driver's side by a vehicle heading north on SR
435.

8. The aforementioned collision resulted in
punctures to the fuel tank mounted by GM on the
driver's side of the truck outside the protective frame
rails of the truck. The punctures resulted in an
immediate explosion and fire.

9. As a direct and proximate result of the
explosion and fire, Brian Taft suffered excruciating
thermal burns, smoke inhalation, and eventually death
which he would not have suffered had the gas tank not
been punctured and the fuel not exploded and burned.

3

10.    In March, 1964, long before the explosion,
fire, fire related injuries, and death of Brian Taft,
and long before the design, manufacture and
distribution of the aforementioned Chevrolet pickup
truck, GM Engineer A.C. Mair, while working on a
Chevrolet Division "Safety Program", concluded that the
fuel tank in GM pickup trucks "must be mounted outside
the cab and as near the center of the vehicle as
practical."  See memorandum attached hereto as Exhibit
"B".

11.    Despite the aforementioned design safety
mandate, Defendant GM designed the K series Chevrolet
pickup trucks, including the one owned by Brian Taft,
with side mounted gas tanks and began manufacturing and
distributing them in 1973.

12.    In 1973, long before the explosion, fire, fire
related injuries, and death of Brian Taft, and long
before the manufacture and distribution of the
aforementioned Chevrolet pickup truck owned by Brian
Taft, GM Engineer Ronald Elwell gave a presentation to
GM management in which he provided his professional

4

engineering opinion that fuel leaks and post-collision
fires in GM vehicles "should not occur in collisions
which produce occupant impact forces below the
threshold level of fatality." He recognized that "any
fuel leak represents a potential fire hazard to the
occupants." See excerpt of Abstract of Presentation
on Fuel System Integrity attached hereto as Exhibit
"C".

    13.  After circulation of the design mandates of
Mr. Mair and the safety statements of Mr. Elwell, but
prior to the aforementioned collision, explosion, fire,
fire related injuries and death of Brian Taft, GM
Engineer Edward Ivy was directed by GM management to
conduct a cost benefit analysis of fire related deaths
in GM vehicles.

    14.  In 1973, Edward Ivy completed his cost benefit
analysis and reported his results to GM.

    15.  Mr. Ivy calculated the value of each human
life consumed by a fire in a GM vehicle at two hundred
thousand dollars ($200,000.00).

16.   Mr. Ivy calculated that if every claim for
death by fire was filed by those surviving the victims,
and GM paid an average of two hundred thousand dollars
($200,000.00) per claim, the cost to GM would be two
dollars and twenty cents ($2.20) per GM vehicle sold.
See Ivy Memorandum attached hereto as Exhibit "D.

17.   Mr. Ivy concluded that "for G.M. it would be
worth $2.20 per new model auto to prevent a fuel fed
fire."   See Exhibit "D".

18.   Despite GM's conclusion that pickup truck fuel
tanks should be located close to the center of the
trucks to protect its occupants from explosions and
fires, GM decided that $2.20 per vehicle was not
sufficient incentive to prevent fire related deaths.
It continued to manufacture and distribute Chevrolet
pickup trucks, including the one owned by Brian Taft at
the time of his death, with vulnerable and dangerous
side mounted fuel tanks, located outside the frame
rails of the trucks and in a known crush zone where,
upon impact, the gas tanks were known to puncture
causing fatal explosions and fires.

6

19.   In 1981, before Mr. Ivy had ever given any
sworn testimony about his cost benefit analysis, he
told GM that:

> His report was written at the request of his
> superiors;
>
> He "did not do it on his own"; and
>
> His analysis was distributed within GM.

20.   GM interviewed Mr. Ivy in 1981 and concluded
that "obviously Ivy is not an individual whom we would
ever, in any conceivable situation, want to be
identified to the Plaintiffs in a [post-collision fuel
fed fire] case, and the documents he generated are
undoubtedly some of the potentially most harmful and
most damaging were they ever to be produced."  See
Notes of Interview of Edward Ivy dated November 3, 1981
attached hereto as Exhibit "E".

21.   After Mr. Ivy's interview, GM embarked upon a
course of conduct designed to prevent Mr. Ivy's cost
benefit analysis from being discovered, and attempted

to cover up the truth about its creation and distribution in an effort to keep it from the general public including decedent Brian Taft.

22.   The conduct of GM in attempting to hide the Ivy interview and in attempting to suppress the truth about the dangerousness of side mounted gas tanks on its pickup trucks, kept members of the motoring public, including decedent Brian Taft, ignorant of the dangers about which they deserved to know and led directly to needless injuries and death, including the injuries to and ultimate death of Brian Taft.

23.   GM designed, manufactured and distributed Chevrolet pickup trucks with the vulnerable and dangerous side mounted fuel tanks so as to allow placement of an optional second fuel tank on the passenger side of the vehicles, thereby increasing the fuel capacity of its pickup trucks above those of its competitors which placed their tanks safely inside the frame rails.

24.   In 1978, after GM decided to design, manufacture and distribute trucks with the vulnerable

8

and dangerous side mounted fuel tanks, GM Automotive

Safety Engineer George Garvil was directed by GM to

consider alternative fuel tank locations for its pickup

trucks, including the one eventually owned by Brian

Taft, because there were a high number of fire related

deaths in GM pickup trucks resulting from the failure

of the side mounted fuel tanks.

25.    George Garvil concluded that, based upon side

impact collision data, nineteen percent (19%) of the

side impacts "were judged to have had high fuel tank

leakage potential". He concluded that "the data

appears to favor a rear located tank" or at a minimum a

tank "positioned inboard of the frame." See Garvil

Memorandum attached hereto as Exhibit "F".

26.    Despite GM's knowledge of the inherent fire

and explosion dangers of side mounted fuel tanks, GM

decided to continue manufacturing and distributing

Chevrolet pickup trucks with the vulnerable and

dangerous side mounted fuel tanks.

27.    In or about 1984, GM, in the person of A.C.

Mair, who in 1964 had recommended that the fuel tanks

9

be located as near to the center of the pickup trucks
as possible, recognized the continuing dangers posed by
GM pickup trucks equipped with the vulnerable side
mounted fuel tanks.  He proposed a "probable easy fix"
to the danger of fires and explosions created by the
side mounted fuel tanks.

     28.  GM, in the person of A.C. Mair, proposed
installing a steel shield above and along the side
mounted fuel tanks to provide protection and more
structural integrity to the tanks.  See sketches
attached hereto as Exhibit "G".

     29.  Despite a "probable easy fix" eliminating the
dangers of fires and explosions created by the side
mounted fuel tanks, GM continued to manufacture and
distribute Chevrolet pickup trucks equipped with the
vulnerable and dangerous side mounted fuel tanks
without any shield after 1984, including the 1986
pickup truck driven by Brian Taft at the time of his
death.

     30.  Despite more than a decade of evidence that
its side mounted fuel tanks were dangerous and exploded

                          10

and/or burst into flames upon impact, GM continued to engineer, manufacture, market, distribute and sell Chevrolet pickup trucks, including the 1986 model driven by Brian Taft, with a defectively designed fuel system which was not crashworthy.

31.    Despite decades of evidence that drivers and occupants of GM pickup trucks were dying in post-collision explosions and fires at a high rate due to the vulnerable and dangerous side mounted fuel tanks, Defendant GM has never recalled these vehicles.

32.    Despite GM's knowledge of the inherent fire and explosion dangers of side mounted fuel tanks, and decades of evidence that its side mounted fuel tanks were dangerous and exploded and/or burst into flames upon impact, GM failed to warn Brian Taft of these dangers.

33.    As a direct and proximate result of the aforementioned defective design, manufacture and distribution by Defendant GM of the 1986 K30 pickup truck driven by Brian Taft, and the failure of GM to

11

warn of those defects, Brian Taft was caused to suffer
severe thermal burns, smoke inhalation, and death.

   34.   Defendant GM made the decision to place the
fuel tanks on its Chevrolet pickup trucks outside the
frame rails and in a crush zone for marketing reasons
and not for safety reasons.

   35.   Despite the aforementioned knowledge, and
empirical data demonstrating that the side mounted fuel
tanks were dangerous and vulnerable to puncture with
resulting fatal fuel explosions and fires in side
impact collisions, Defendant GM continued to
manufacture and distribute pickup trucks equipped with
fuel tanks mounted outside the frame rails and in a
known crush zone until 1987.

   36.   All of the misconduct of Defendant GM outlined
herein manifests a willful, wanton and reckless
disregard for the life of Brian Taft and for the
motoring public, warranting an award of punitive
damages.

   37.   Brian Taft did not, prior to this lawsuit,
bring any action for the crash of November 12, 2007 and

no other action for the injuries and death of Brian

Taft has been commenced against any Defendant.

38.   Brian Taft left surviving him the following

persons who are entitled to recover damages for his

injuries and death and on whose behalf this action is

brought:

> Cathy Taft, HC1 Box 77A, Clifton, Pa 18424
> (spouse)
>
> Zoey Taft, HC1 Box 77A, Clifton, Pa 18424
> (daughter, age 8)
>
> Brian Burton Taft, HC1 Box 77A, Clifton, Pa
> 18424 (son, age 2)

### COUNT I

### Wrongful Death Action

### Strict Liability

39.   Paragraphs 1 through 38 inclusive are

incorporated herein by reference as if fully set forth

at length.

40.   The aforementioned truck driven by Brian Taft

was designed, manufactured and distributed by the

Defendant in a defective and dangerous condition in

that its fuel tank was located outside the truck's

13

frame rails in a known crush zone which made it
vulnerable to puncture with resulting explosion and
fire in the event of a side impact collision and
therefore was not crashworthy.

41.    The aforementioned truck driven by Brian Taft
was designed, manufactured and distributed by the
Defendant in a defective and dangerous condition in
that its fuel tank had little or no shielding to
protect it from puncture creating a known risk of
explosion and fire in the event of a side impact
collision and was therefore not crashworthy.

42.    The aforementioned truck driven by Brian Taft
was designed, manufactured and distributed by the
Defendant in a defective and dangerous condition in
that it violated Defendant GM's own safety and design
policies and was not crashworthy.

43.    The aforementioned truck driven by Brian Taft
was designed, manufactured and distributed by the
Defendant in a defective and dangerous condition in
that it contained inadequate warnings of the known

14

risks of explosion and fire from the side mounted fuel
tank in the event of a side impact collision.

44.   The aforementioned truck driven by Brian Taft
was designed, manufactured and distributed by the
Defendant in a defective and dangerous condition in
that it contained an inadequate and unsafe fuel system
and was therefore not crashworthy.

45.   The Defendant's pickup trucks, including the
one owned and driven by Brian Taft, were defective and
dangerous.

46.   The aforementioned defects and dangers of
Brian Taft's 1986 K30 pickup truck existed when the
truck left the Defendant's possession.

47.   As a direct and proximate result of the
aforementioned design, manufacture and distribution of
the dangerous and defective truck driven by Brian Taft,
the side mounted fuel tank punctured and exploded into
flames when involved in the aforementioned side impact
collision.

48.   As a direct and proximate result of the
aforementioned design, manufacture and distribution of

15

the dangerous and defective truck driven by Brian Taft,
which resulted in the aforementioned puncture of the
side mounted fuel tank and fiery explosion, Brian Taft
was caused to suffer excruciating thermal burns, smoke
inhalation, and death.

49.   As a direct and proximate result of the
aforementioned design, manufacture and distribution of
the dangerous and defective truck driven by Brian Taft,
which caused the aforementioned injuries to and death
of Brian Taft, Burton Taft, Administrator of the Estate
of Brian Taft incurred funeral and burial expenses and
hereby makes claim for the costs of same.

50.   As a direct and proximate result of the
aforementioned design, manufacture and distribution of
the dangerous and defective truck driven by Brian Taft,
which caused the aforementioned injuries to and death
of Brian Taft, the heirs of Brian Taft have suffered a
permanent loss of the services, support, society,
comfort, and contribution of Brian Taft, all to their
great financial loss and detriment.

16

51.    The Plaintiff brings this action for all
damages encompassed by the Pennsylvania Wrongful Death
Act 42 Pa.C.S.A. §8301.

**WHEREFORE,** Plaintiff Burton Taft, Administrator of
the Estate of Brian Taft, demands judgment in his favor
and against the Defendant for compensatory damages in
an amount in excess of seventy-five thousand dollars
($75,000.00), together with interest, costs of
prosecution, punitive damages, and whatever other
relief this court deems just and appropriate.

### COUNT II

### SURVIVAL ACTION

### Strict Liability

52.    Paragraphs 1 through 51 inclusive are
incorporated herein by reference as if fully set forth
at length.

53.    As a direct and proximate result of the
aforementioned design, manufacture and distribution of
the dangerous and defective truck driven by Brian Taft,
which caused the aforementioned injuries to and death

of Brian Taft, there has been a permanent and total
loss of the decedent's income and earning capacity.

54.   As a direct and proximate result of the
aforementioned design, manufacture and distribution of
the dangerous and defective truck driven by Brian Taft,
which caused the aforementioned injuries to and death
of Brian Taft, decedent Brian Taft suffered great
conscious physical and emotional pain prior to his
death.

55.   The Plaintiff brings this action for all
damages encompassed by the Pennsylvania Survival Act 20
Pa.C.S.A. §3371 et seq. and 42 Pa.C.S.A. §8302.

**WHEREFORE**, Plaintiff Burton Taft, Administrator of
the Estate of Brian Taft, demands judgment in his favor
and against the Defendant for compensatory damages in
an amount in excess of seventy-five thousand dollars
($75,000.00), together with interest, costs of

18

prosecution, punitive damages, and whatever other

relief this court deems just and appropriate.

ROTH & DEMPSEY, P.C.

/s/ Michael G. Gallacher
MICHAEL G. GALLACHER, ESQUIRE

/s/ Michael H. Roth
MICHAEL H. ROTH, ESQUIRE
Attorneys for Plaintiff

436 Jefferson Avenue
Scranton, PA 18510
(570) 961-1064

Exhibit A



STATE OF PENNSYLVANIA                                                    SHORT CERTIFICATE
COUNTY OF LACKAWANNA

I,    _LINDA MUNLEY_____
Register for the Probate of Wills and Granting
Letters of Administration &c. in and for
LACKAWANNA County, do hereby certify that on
the 3rd day of December, Two Thousand and Seven
Letters TESTAMENTARY
in common form were granted by the Register of
said County, on the

estate of _TAFT BRAIN_____, late of CLIFTON TWP
            (Last First Middle)

in said county, deceased, to _TAFT BURTON EARL_____
                              (Last First Middle)

and that same has not since been revoked

    IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the
seal of said office at SCRANTON ELECTRIC BLDG , SUITE 400, SCRANTON, PA,
this 3rd day of December Two Thousand and Seven.

File No        _35- 07- 01210_
Date of Death  _11/12/2007_
S S #          _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_

                        _____
                                Register Of Wills

NOT VALID WITHOUT ORIGINAL SIGNATURE AND IMPRESSED SEAL

Exhibit B



INTER-ORGANIZATION LETTERS ONLY

CONFIDENTIAL         CONFIDENTIAL         CONFIDENTIAL

| | | | |
|---|---|---|---|
| TO: | See Below | ADDRESS | Engineering Lab, at least |
| FROM | Mr. A. C. Mair | ADDRESS | Engineering Department |
| SUBJECT | 1967 Safety Program | DATE | March 2, 1964 |

TO:  Messrs.  P. E. Hitch
               O. J. Mach
               D. J. Olander
               V. W. Dorger

CC:  Mr. E. J. Premo

A Budget Authorization is in the process of being prepared for the 1967
Chevrolet Safety Program. The purpose of this budget is to allow each
of you to have sketch type designs for each area of your responsibility
that can be costed and then furnished to Mr. Premo for him to obtain
approval from the Corporation to proceed. Meanwhile, the 1967 Truck
must proceed in a relatively conventional manner in this area until we
have approval to proceed with these items which are quite new or different.

You must work very rapidly on these ideas such that if approved, they can
be incorporated in the design without seriously upsetting the program.
All designs must be predicated on the fact that the occupants will be
wearing seat belts. Listed below are the major areas requiring new design:

- 1. Energy Absorbing Steering Column —

     A. Must collapse between gear and toe pan.
     B. Must absorb energy of human impact between steering
        wheel rim and instrument panel. All effort must be
        made to reduce unit pressure on the human body to the
        minimum while collapsing the steering wheel rim, but
        maintain maximum energy absorption.

     * Be sure to co-ordinate steering wheel and steering gear
       design with Inland, Saginaw Steering Gear, and our own
       passenger car group, since the problem here is really
       the same.

- 2. The Instrument Panel must be a collapsible, replaceable energy
     absorbing unit without protrusions and changing knobs. Several
     studies are currently in process with various design approaches,
     such as a wire mesh or crushing plastics. Such a design practi-
     cally eliminates the Instrument Panel as a structural member, and
     compensation for this must be made.

C04101



3. All glass in windshield, side and back light must be the latest material available with high energy absorption, and well restrained so that it does not pop out with human impact. Considerable work is being done currently by increasing the thickness of the film between the two glass layers, which allows more energy to be absorbed before the human head breaks through the glass.

4. The windshield header, the windshield portion of the hinge pillars, and the door opening area at the roof rail and part way down the lock pillar must be covered with, or constructed of, an energy absorbing media to increase the threshold of head injury.

5. The arm rest must be designed into the door as a crushable energy absorbing unit.

6. The seat attachment and its structural strength must be such that it does not break loose from the vehicle in severe accidents.

7. The seat back must not be the folding type such that its energy is not imposed upon the occupant.

8. The fuel tank must be mounted outside the cab and as near the center of the vehicle as practical.

9. For rearward collisions, the cab back inner panel must be covered with, or constructed of, an energy absorbing material in the areas of head impact and, as noted before, the back light must be the best energy absorbing glass available. Incidentally, this is an area of advantage in the truck since no head rest is needed.

10. Improvements must be made to keep the doors closed during collision.

A good starting point for this design criteria is to be able to withstand 45 mph solid impacts in forward collisions and 45 mph vehicle to vehicle rearward collisions. Consider identical weight and configuration vehicles for the rearward collision with a stopped vehicle being struck from the rear by one travelling 45 mph. The forces involved in side collisions are so great that you will have to use as much energy absorbing material as is deemed practical by judgement; that is, the total thickness of the arm rest is really all you can go, and perhaps a 1-1/4" would be the maximum roof rail material that could be added; but, of course, this would be a drastic gain over what we now offer.

Please obtain these costs as quickly as possible to include in the 1967 design, if approved. Your engineers should begin schowing their thoughts on this immediately.

A. C. Mainler

A. C. MAIR
Executive Engineer
Truck Department

ACM: ja

C04142



**Exhibit C**



APPENDIX B

## ABSTRACT OF PRESENTATION ON FUEL SYSTEM INTEGRITY

A recommended level of fuel system performance is given for front, side and rear impacts, and rollover, premised on the concept that occupants involved in collisions which produce occupant impact forces below the threshold level of fatality should be free from the hazard of post-collision fuel fires. A recommendation is made to examine and, if warranted, control the vehicle electrical system as a possible source of fuel ignition if fuel leakage occurs above the recommended fuel system performance levels. The benefits available from the achievement of these performance levels are shown, including the possibility of realizing potential cost savings.

### INTRODUCTION

Present vehicle or vehicle component performance specifications relating to minimizing deaths and injuries are based on human tolerance to impact. Generally speaking, there are acceptable levels of injury resulting from impact in automobile collisions. Examples are the 80 g/3 ms requirement for the instrument panel and seat backs and the 2300# requirement for the E A column. Furthermore, test conditions to determine compliance with these specifications based on such injury levels can be duplicated. We are not aware of any acceptable level of burn injury resulting from fires in motor vehicle collisions. Even assuming for the moment that there is an acceptable level of burn injury, a fire cannot be completely controlled so that we could assure compliance with a specification based on this acceptable burn injury level. Therefore, the recommended performance level which follows is given in terms of a fuel system performance specification unrelated to human tolerance to burn injury.

Any fuel leak represents a potential fire hazard to the occupants. Therefore, a standard established to minimize the hazard of fire should be directed towards preventing fuel leaks. Additional work to reduce or eliminate the electrical system as a possible source of ignition during, or immediately after the collision should a leak occur will effectively supplement this standard.

The potential for a fire, i e , fuel leaks, should not occur in collisions which produce occupant impact forces below the threshold level of fatality. Above this level of severity, fatal injuries occur from various causes, including fire.

It is recognized that the recommended performance levels included herein exceed the present day state of the industry. Accordingly, the recommendations are made as long range goals.

By GM Engineers Ronald Elwood, Jim Booper & Paul Jectson
to GM Vice President for Engineering Worchard, circa 1972

Authenticated by
Ronald Elwood, January 15  1992
James A  Durkin  GM Legal Staff  March 17  1992



Exhibit D



Accident statistical studies indicate a range of 650-1,000 fatalities per year in accidents with fuel fed fires where the bodies were burnt. There has been no real determination of the percent of these people which were killed by the violence of the accidents rather than by fire. The condition of the bodies almost precludes making this determination.

-----------------------------------

Based on this statistic and making several assumptions, it is possible to do a value analysis of automotive fire related fatalities as they relate to General Motors.

The following assumptions can be made:

1. In G.M. automobiles there are a maximum of 500 fatalities per year in accidents with fuel fed fires where the bodies were burnt.

2. Each fatality has a value of $200,000.

3. There are approximately 41,000,000 G.M. automobiles currently operating on U.S. highways.

Analyzing these figures indicates that fatalities related to accidents fuel fed fires are costing General Motors $2.40 per automobile in current operation.

$$\frac{500 \text{ fatalities} \times \$200,000/\text{fatality}}{41,000,000 \text{ automobiles}} = \$2.40/\text{automobile}$$

This cost will be with us until a way of preventing all crash related fed fires is developed.

-----------------------------------

If we assume that all crash related fuel fed fires can be prevented commencing with a specific model year another type analysis can be made.

Along with the assumptions numbered above the following assumptions are necessary:

1. G.M. builds approximately 5,000,000 automobiles per year.

2. Approximately 11% of the automobiles on the road are of the current model year at the end of that model year.

00101350

Valve Analysis of Auto Fuel

Page 2

This analysis indicates that for G.M. it would be worth approximately
$2.20 per new model auto to prevent a fuel fed fire in all accidents.

500 fatalities x 11% new model   =   55 fatalities in
                          autos            new model autos

$$\frac{55 \text{ fatalities} \times \$200,000/\text{fatality}}{1,000,000 \text{ new model autos}} = \$2.20/\text{new model auto}$$

This analysis must be tempered with two thoughts. First, it is really
impossible to put a value on human life. This analysis tried to do so in
an objective manner but a human fatality is really beyond value, subjective.
Secondly, it is impossible to design an automobile where fuel fed fires can
be prevented in all accidents unless the automobile has a non-flammable fue

E. C. Ivey
Advance Design

po

6-29-73

00101251



Exhibit E



INTERVIEW OF EDWARD C. IVEY
NOVEMBER 3, 1981

Edward C. Ivey graduated from GMI with a degree in Mechanical Engineering concentrated in automotive engineering in 1970. He simultaneously obtained his Masters of Science in Mechanical Engineering from the University of Michigan. He appears to be a bright and capable individual who makes a reasonably good appearance, expresses himself well, and has a fairly good recall of his experience in fuel systems, although it was very limited. The majority of his experience at the Corporation has been spent in steering systems design work and his exposure to fuel systems was generally limited to approximately six (6) months while working under Paul Nutty at Oldsmobile after he had been out of school just two years or less.

### BACKGROUND:

Mr. Ivey began working in the Experimental Laboratory of Oldsmobile and stayed there for approximately one (1) year performing mechanical and dynamic tests and he designed the bumper pendulum used at the Oldsmobile facility in Lansing during that year. He then moved into Product Quality, where he stayed for six months and was involved in fuel system reliability and assuring that either the components, as built, were to specifications or that specifications needed to be changed to meet manufacturing requirements. Some engineering judgment was required with regard to change of various parts for one reason or another from those specified to others to be used in production and engineering judgment was necessary to approve each change as not affecting the integrity of the design. However, there was not direct involvement with

Court Exhibit
Case No. 93-33580
10 Ex 3
FILED FEB 09 1998
ROBERT L. LOCKWOOD, Clerk



WORK PRODUCT REPORT

trash testing the vehicles and he has no specific recollection
of any unusual fuel system changes.

Following his six months in Product Quality, Ivey worked
in Experimental Test and was responsible for axle testing.

He then moved to Advance Design at Oldsmobile, where he
stayed for one year and it was during this one year that he
obtained his experience directly with fuel systems.  At
that time, Mr. Paul Mutty was  the release design engineer
for fuel tanks and necks and Mr. Banner was chairman of the
fuel System Coordination Committee and was, therefore, senior
to Mr. Mutty.  In Advance Design, Mr. Ivey worked more directly
for Jack Wallace and Ralph Perkins and at that time Mr.
Wallace was the Assistant Advance Design Engineer and Perkins
was the immediate superior of Mr. Wallace.

## TANK LOCATION:

Mr. Ivey did do some work directly with Mr. Mutty and
through coordination with Perkins and Wallace, worked directly
with Mutty, reporting to all three individuals on some aspects
of fuel system development and the consideration of alternatives.
This generally came about due to a "basic conflict at Olds
at that time" between Jack Ridenour and Paul Mutty.  In
essence, Jack Ridenour thought that the Olds fuel system
was not as crashworthy as necessary and that some alternatives
should be considered and investigated.  Mr. Mutty was of the
opinion that the corporation was building fuel systems at
the state of the art.  However, Ivey characterises Jack
Ridenour as being very vocal and "making a lot of noise to
our management".  Through this conflict of personalities and
differing opinions, Ivey somehow became the "arbitrator"
between Ridenour and Mutty even though he was a junior engineer.
As a part of the disagreements and philosophical differences of
opinion between Ridenour and Mutty and in an attempt to come

try to obtain some knowledge about the performance of various
different fuel systems in the field. Ivey accompanied them
during these inspections. This investigation was not limited
to GM vehicles but covered all vehicles of any design that had
rear impacts or even side impacts towards the rear of the
vehicle that would be near the fuel system. They took Polaroid
pictures of the vehicles and by Mr. Ivey's estimation, they
looked at at least some 150 different wrecks. They categorized
the wrecks as good performance of a fuel system "a survivable
crash where the fuel system failed", a non-survivable crash
where no fuel system would maintain its integrity, etc. and
then all three agreed upon their ratings of the various wrecks
and performance of the alternative designs that they had evaluated
Ivey says that they were evaluating primarily placement or
location of the fuel tank and fuel filler neck and they evaluated
rear fills, side fills, vertical behind-the-axle, the Ford,
under trunk design utilizing the trunk floor as the top of the
tank, etc. They concluded that the Ford design was extremely poor
and that it was obviously one based primarily upon cost con-
siderations and that it would take a very minimal impact to
affect the integrity of the system. Ivey recalls that Mr.
Ridenour's son was working for Ford at the time in fuel system
design and that Mr. Ridenour seemed quite disturbed about his
findings of the Ford fuel system, although his son was very
new at Ford and had not had design responsibility for any of
the systems they had examined. They did examine some over-the-
axle tanks, including the Mercedes and the Toyota Corolla and
concluded that the Toyota Corolla was not a satisfactory
location in that it would allow entrance of the fuel into
the passenger compartment if the fuel system were violated.
Various other conclusions were reached with regard to the
numerous different designs they had examined and all photo-
graphs of the vehicles were categorized and placed on a large
board for a presentation to Frank Ball, Assistant Chief Engineer,
Paul Matty, Mr. Wallace and Mr. Perkins. There was no written

WORK PRODUCT REPORT

presentation at this meeting but the photographs were
displayed and an open discussion was held with Mr. Ivey
presenting the conclusions of the three individuals. He
recalls that during the meeting, Jack Ridenour became very
out-spoken and changed his conclusions from those the three
had agreed upon during their investigation in the field and
Ivey states that he was quite upset with Mr. Ridenour at the
time. He categorized this switch of position and strong out-
spokenness as being very typical of Ridenour's character.
He characterized Mr. Nutty as a very capable engineer who
was trying to do a good job at the time and was very busy
with his design responsibilities and one gets the impression
that he was essentially being annoyed by Ridenour's suggestions
and needed Ivey's additional assistance to accumulate infor-
mation in order to respond to Ridenour's suggestions and
inquiries. Ivey states that he did believe, along with
Ridenour, when he first began the investigation that the
over-the-axle tank location was better but after having
examined the wrecks and discussing the aspects of the
design, he concluded that the over-the-axle tank essentially
amounted to a placement of the tank inside the passenger
compartment and that the preference for letting the fuel fall
onto the ground if the tank is violated, which is achieved by
the under-the-trunk floor design, is preferable. In addition,
the body would have been substantially weakened if the kickup
had been designed so as to extend up and over the axle tank.
Corrosion protection was also somewhat difficult to achieve if
a solid wall is built between the tank and the passenger com-
partment since the structures need to have some drain holes
when they are dipped for corrosion protection in the manu-
facturing process. The expanding volume aspect of the under-
the trunk tank was also preferable to cylindrical or rectangular
tanks that increase pressure on the interior of the tank when
crushed. Mr. Ivey pointed out that Mercedes Benz locates their



tank over the axle in some of their vehicles and that the
tank is essentially within the passenger compartment and not
protected by a solid impenetrable steel barrier because the
barrier has holes for the speakers for the radio, etc. He
was definitely of the opinion that such design is not a
desirable one.

In essence, the conclusion reached by the group, with
the possible exception of Ridenour, was that the filler neck
relocation was about the only aspect of the fuel tank system
utilized by GM that might deserve some further investigation
and study. One such study growing from that conclusion was
a crash test car built by Advance Design by Jim Diener and
Jukes Philo. This was a 1972 "B" car with an under-the-trunk
floor tank which had the filler neck extending upward from
the tank and emerging from the tulip panel behind the rear
windshield and on the left side. This vehicle was crash
tested and performed rather miserably according to Mr. Ivey
since the forward shift of the tank and the static position of
the neck caused the neck to just snap off and fuel to spill.

"STATISTICAL STUDY" AND TANK LINERS:

In addition to his study with Ridenour and Nutty and
due to the concern over pending litigation involving fire,
Ivey was sent to Engineering Analysis where he examined the
aspects of all fuel fed fire cases pending against General
Motors at the time and he did this study with the assistance
of Mr. Ron Elwell. At that time there was a total of only
about ten cases and 4 or 5 dealt with non-collision fires
where road objects punctured the bottom of a tank. This
prompted a discussion between Ivey and Nutty which resulted in
their development of a plastic liner on the bottom half only of
the tank which they thought might reduce puncture from road
objects or under vehicle objects. A nylon liner design was
done primarily by Mr. Nutty and the design was costed but
Ivey does not remember the cost figures although he suspects
that it was very expensive and that cost was probably one

11

WORK PRODUCT NOTES

reason that it was rejected. However, that is primarily
speculation on his part. He does recall that an application
for patent was completed and sent to General Motors legal
but GM legal advised Nutty and Ivey that it was a "prior
knowledge situation where some other individuals had previously
submitted a similar design proposal" and it was, therefore,
not considered patentable and the application never did
leave the GM legal staff.

Although Mr. Ivey did not volunteer without some leading
questions, he did recall performing a societal loss or cost
benefit analysis. The analysis resulted from his review of
information supplied to him by Ron Elwell during his visit to
Engineering Analysis where, in addition to the specific case
files, he was provided with various studies by outside
entities of automotive fires and death in automobile accidents
attributed to fire. Mr. Ivey does not recall the author of
the titles of any of the studies he was provided by Mr. Elwell
but he did obtain copies of each of them and returned to Oldsmobil
with these copies. He recalls that there was a very wide
difference in their conclusions and findings and he concluded
that essentially no one knew how many deaths were actually
occurring as a result of fire in automotive accidents. He then
wrote a report "for Oldsmobile management" and believes it
was probably for Nutty specifically. He was questioned very
closely on this matter and could not specifically recall having
been asked by Nutty to perform the precise analysis he did
perform. He felt Nutty had instigated most of the investigation
("because he was getting a lot of flack from Ridenour") and he
believes the report was submitted for Nutty at Nutty's request.
However, he cannot state definitively that he was asked by
Nutty or anyone else to do the specific analysis he did.
He believes that he probably circulated copies of the report
to Nutty, Kanzer, Ball, Perkins Wallace and possibly Ridenour.



He had been sent to find out anything he could from Engineering
Analysis in attempting to figure out the magnitude of the
problem with fuel system litigation and whether anything else
could be done by Olds. He characterized the nature of his
analysis submitted to Mutty and others as one to assist them
in "trying to figure out how much Olds could spend on fuel
systems." He was somewhat reluctant to state that he had
assigned a value to human life in the study and stated that
he believes that value came from one of the reports he had
been supplied by Elwell and that he did not arbitrarily
assign such a value. He agreed that he did not like the
sound of such a study and admitted that they were very
cautious with distribution of the copies due to the nature
of the subject. In any event, he took the value and averaged
it over the number of GM vehicles on the road and arrived at
the cost figure reported in the memo.

He has no idea what happened as a result of any of his
work on fuel systems while at Olds and states that his in-
volvement in fuel systems while at Advance Design was all
taking place essentially within a six month period of his
one year assignment. He does not know if any decisions were
ever based upon his memo or any of his other work and simply
has no knowledge whatsoever of what occurred as a result of
any of his work. He does not have any files reflecting
any of the work he did as all of his files would have been
left at Oldsmobile when he moved on to the chassis group to
work on steering in 1973.

The remainder of his career to date at GM has been spent
in steering systems, the "L" car project which was eventually
scrapped, and the "X" car project center where he is presently
assigned.

Obviously, Ivey is not an individual whom we would ever,
in any conceivable situation, want to be identified to the
Plaintiffs in a PCTFF case and the documents he generated are
undoubtedly some of the potentially most harmful and most
damaging were they ever to be produced. —



Exhibit F



Inter - Organization

Environmental Activities Staff
General Motors Corporation
General Motors Proving Ground
Milford, Michigan 48042

**Date**  September 7, 1978

**Subject**  Alternative Fuel Tank Locations in Light Trucks

**To**  W. Nanteu

The purpose of this letter is to clarify and document a study which was
done by Field Accident Research in response to a request from Design
Staff. The request involved an assessment of the relative safety merits
of two potential fuel tank locations which have been under consideration
for 1981-1983 pickups. The two locations apparently are: (1) a side
location either outboard or inboard of the frame (and inboard of the
rocker panel), and (2) a rear location similar to certain current model
light trucks.

The study used data comprising 1973-1976 current-model GM light trucks
which were insured by MIC (Motors Insurance Corporation), a subsidiary
of GM. Data on "current-model" light trucks are collected only during
the actual model year. These accident cases routinely have been for-
warded from MIC to BRDL, since 1968, for computer processing and study.

The methodology involved three steps:

(1) a gross overview of frequencies comparing "left side"* impacts,
    "right side" impacts, and rear impacts;
(2) a more detailed view which also looked at vehicle damage severity;
    and,
(3) a comprehensive case-by-case panel review.

Note that steps (1) and (2) only used computer searches, while step (3)
involved a panel of engineers who were required to review, case-by-case,
all available information (which included slides as well as several
forms) on the cases of interest. The third step became necessary when
we realized that the study required finer tuning than that afforded by
routine computer search methods.

The actual results are as follows:

Step (1) resulted in the following table which shows the relative
frequencies of pickups versus suburbans and blazers by type of impact:

| | Pickups | Suburbans and Blazers | |
|---|---|---|---|
| Right Impact | 110 | 7 | GM 40752 |
| Left Impact | 102 | 11 | |
| Rear Impact | 28 | — | |
| | 240 | 18 | |

*where "left side" impacts, "right side" impacts and rear impacts have
been defined so as to include only those types of impacts which could
conceivably result in a fuel tank leak in the tank locatio
(see appendix).



W Nantau
Alternative Fuel Tank Locations      Page 2            September 7, 1978

The above table shows that pickups represent, by far, the major portion of light trucks involved in these accidents.

Step (2), which used damage severity data in the form of "maximum inches of crush", led to Figure I, which is shown on the attached page. From Figure I two points are observed:

- While the figure shows there to be more higher severity impacts on the left side than on the right side (and vice-versa for lower severity impacts), these differences are not significant
- Side impacts are more prevalent than rear impacts at each of the severity level groups.

At this point we should realize that the variable plotted in Figure I, "maximum inches of crush", while a fair measure of overall damage severity, is not a good measure of fuel tank leak/damage potential because it cannot focus well enough on the specific areas of damage in which we are interested. Step (3), then, attempted to estimate the fuel tank leak/damage potential for pickups by using a case-by-case analysis technique. This yielded the following results:

- The field representative sample of cases yielded 26 rear impacts and 212 side impacts;
- 4 of 26, or 14%, of the rear impacts were judged to have had high fuel tank leakage potential for rear located tanks;
- Approximately 40 of 212, or 19%, of the side impacts were judged to have had high fuel tank leakage potential for outboard side-located tanks. Moving these side tanks inboard might eliminate most of these potential leakers;
- Approximately 20 of 211 side impact cases were found with the filler neck cap missing at the time the insurance adjuster took photographs of the case vehicles.

In summary, Step (3) supports the observations made from Figure I.

In conclusion, while the data appear to favor a rear-located tank, it should be considered that a side-located tank, protected from the prop shaft, and positioned inboard of the frame, with more room for lateral motion (versus being caught, during a collision, between the frame and the striking object, as assumed in step (3)) might become as effective as a rear-located tank.

George Garvil
Automotive Safety Engineering

attach.
copies:  /R. W. Bryant
         R. Elwell
         L. Faloon
         D. Faust
         D. McDonald                          .014254
         D. Pureel



APPENDIX

Figure 2, below, illustrates the areas of damage included in the study Notice that portions of the sides were selected to include only areas showing vulnerability to fuel tank damage.

Figure 2

Areas used in defining "left"; "right", and "rear" hits.

    

Areas          Areas not
Included       Included

018255









Exhibit G



# A probable easy fix

### Sketch by Alex Mair
### Vice President General Motors
### 1984



### SHIELD
### (TOP)



SHIELD                ── FRAME
(SIDE)





# Mair Shield
## "A probable easy fix."





PRODUCED BY
GENERAL MOTORS CORPORATION

PURSUANT TO PROTECTIVE ORDER



















Case 3 08-cv-02142-JMM    Document 1-9    Filed 11/25/2008    Page 9 of 9



## **Exhibit B**

**Proofs of Claim Nos. 764 and 20994**

03791023
APS0708186137

 

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

**Name of Debtor (Check Only One)**                                     **Case No**
☒ Motors Liquidation Company (f/k/a General Motors Corporation)    09-50026 (REG)
☐ MLCS, LLC (f/k/a Saturn, LLC)    09-50027 (REG)
☐ MLCS's Distribution Corporation (f/k/a Saturn Distribution Corporation)    09-50028 (REG)
☐ MLC of Harlem, Inc (f/k/a Chevrolet-Saturn of Harlem, Inc)    09-13558 (REG)

NOTE - This form should not be used to make a claim for an administrative expense arising after the commencement of the case, but may be used for purposes of asserting a claim under 11 U S C § 503(b)(9) (see Item B 5) All other requests for payment of an administrative expense should be filed pursuant to 11 U S C § 503

**Name of Creditor** (the person or other entity to whom the debtor owes money or property) TAFT, BURTON

**Name and address where notices should be sent**
TAFT, BURTON
ROTH & DEMPSEY PC
436 JEFFERSON AVE
SCRANTON, PA 18510-2413

Telephone number (570) 961-1064
Email Address rothdempsey@comcast.net

☐ Check this box to indicate that this claim amends a previously filed claim

Court Claim Number _____
(If known)

Filed on _____

**Name and address where payment should be sent** (if different from above)
FILED - 20994
MOTORS LIQUIDATION COMPANY
F/K/A GENERAL MOTORS CORP
SDNY # 09-50026 (REG)
Telephone number

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim Attach copy of statement giving particulars

☐ Check this box if you are the debtor or trustee in this case

**Your Claim is Scheduled As Follows:**

Motors Liquidation Company

Unsecured Unknown

Contingent / Unliquidated / Disputed

If an amount is identified above you have a claim scheduled by one of the Debtors as shown (This scheduled amount of your claim may be an amendment to a previously scheduled amount) If you agree with the amount and priority of your claim as scheduled by the Debtor and you have no other claim against the Debtor, you do not need to file this proof of claim form, EXCEPT AS FOLLOWS If the amount shown is listed as DISPUTED UNLIQUIDATED, or CONTINGENT, a proof of claim MUST be filed in order to receive any distribution in respect of your claim If you have already filed a proof of claim in accordance with the attached instructions, you need not file again

1 **Amount of Claim as of Date Case Filed, June 1, 2009** $10,000,000.00

If all or part of your claim is secured, complete item 4 below, however, if all of your claim is unsecured, do not complete item 4 If all or part of your claim is entitled to priority, complete item 5 If all or part of your claim is asserted pursuant to 11 U S C § 503(b)(9), complete item 9

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim Attach itemized statement of interest or charges

2 **Basis for Claim** wrongful death/survival action
(See instruction #2 on reverse side)

3 **Last four digits of any number by which creditor identifies debtor** _____
3a Debtor may have scheduled account as _____
(See instruction #3a on reverse side)

4 **Secured Claim** (See instruction #4 on reverse side)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information

Nature of property or right of setoff. ☐ Real Estate  ☐ Motor Vehicle  ☐ Equipment  ☐ Other
Describe

Value of Property $_____  Annual Interest Rate ___%

Amount of arrearage and other charges as of time case filed included in secured claim, if any $_____

Basis for perfection _____

Amount of Secured Claim $_____  Amount Unsecured $10,000,000.00

5 **Amount of Claim Entitled to Priority under 11 U S C § 507(a)**
If any portion of your claim falls in one of the following categories, check the box and state the amount

Specify the priority of the claim

☐ Domestic support obligations under 11 U S C § 507(a)(1)(A) or (a)(1)(B)

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U S C § 507(a)(4)

☐ Contributions to an employee benefit plan – 11 U S C § 507(a)(5)

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U S C § 507(a)(7)

☐ Taxes or penalties owed to governmental units – 11 U S C § 507(a)(8)

☐ Value of goods received by the Debtor within 20 days before the date of commencement of the case – 11 U S C § 503(b)(9) (§ 507(a)(2))

☐ Other – Specify applicable paragraph of 11 U S C § 507(a)(__)
Amount entitled to priority

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment

6 **Credits** The amount of all payments on this claim has been credited for the purpose of making this proof of claim

7 **Documents** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements You may also attach a summary Attach redacted copies of documents providing evidence of perfection of a security interest You may also attach a summary (See instruction 7 and definition of "redacted" on reverse side)

DO NOT SEND ORIGINAL DOCUMENTS ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING

If the documents are not available, please explain in an attachment  See attached Complaint

| Date 10/7/09 | Signature The person filing this claim must sign it Sign and print name and title, if any of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above Attach copy of power of attorney if any | FOR COURT USE ONLY |
|---|---|---|

Michael B Gallagher, Michael B Gallagher, attorney

Penalty for presenting fraudulent claim Fine of up to $500,000 or imprisonment for up to 5 years, or both 18 U S C §§ 152 and 3571
Modified B10 (GCC) (12/08)

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT    Southern District of New York | PROOF OF CLAIM |
|---|---|

Name of Debtor
**General Motors Corporation**

Case Number
**09-50026**

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503*

Name of Creditor (the person or other entity to whom the debtor owes money or property)
**Burton Taft, Administrator of the Estate of Brian Taft**

☐ Check this box to indicate that this claim amends a previously filed claim

Name and address where notices should be sent:
c/o Roth & Dempsey, P C
436 Jefferson Avenue
Scranton, PA 18510

Telephone number:
**(570) 961-1064**

Court Claim Number: _____
(If known)

Filed on: _____

Name and address where payment should be sent (if different from above)

Telephone number:

FILED - 00764
SDNY
GENERAL MOTORS CORPORATION
09-50026 (REG)

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

1. Amount of Claim as of Date Case Filed:   $   **10,000,000.00**

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4

If all or part of your claim is entitled to priority, complete item 5

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim Attach itemized statement of interest or charges.

2. Basis for Claim: **wrongful death/survival**
(See instruction #2 on reverse side.)

3. Last four digits of any number by which creditor identifies debtor: _____

3a. Debtor may have scheduled account as _____
(See instruction #3a on reverse side.)

4. Secured Claim (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff   ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe:

Value of Property: $ _____   Annual Interest Rate _____ %

Amount of arrearage and other charges as of time case filed included in secured claim,

if any $ _____   Basis for perfection: _____

Amount of Secured Claim $ _____   Amount Unsecured: $ **10,000,000.00**

6. Credits   The amount of all payments on this claim has been credited for the purpose of making this proof of claim

7. Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. (See Instruction 7 and definition of "redacted" on reverse side)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING

If the documents are not available, please explain   **See attached Complaint**

5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B)

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5)

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7)

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8)

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__)

Amount entitled to priority.
$ _____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment

FOR COURT USE ONLY

(stamp: THE GARDEN CITY GROUP INC. JUL 22 2009)

Date: **7/21/09**

Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any

*Michael G. Gallagher   Attorney*

Penalty for presenting fraudulent claim. Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571

## Exhibit C

**Order Pursuant to 11 U.S.C. § 105(a) and General Order
M-390 Authorizing Implication of Alternative Dispute Procedures,
Including Mandatory Mediation, dated October 25, 2010 (ECF No. 7558)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                              :
In re                                         :        Chapter 11 Case No.
                                              :
MOTORS LIQUIDATION COMPANY, *et al.*,         :        09-50026 (REG)
        f/k/a General Motors Corp., *et al.*  :
                                              :
                        Debtors.              :        (Jointly Administered)
                                              :
----------------------------------------------------------------x

<u>ORDER GRANTING MOTION OF MOTORS
LIQUIDATION COMPANY GUC TRUST FOR LIMITED MODIFICATION
OF THE AUTOMATIC STAY AND PLAN INJUNCTION AS TO ACTION
FILED BY BURTON TAFT, ADMINISTRATOR OF THE ESTATES OF BRIAN TAFT</u>

Upon the Motion, dated April 13, 2012 (the "**Motion**"),[1] of the Motors

Liquidation Company GUC Trust (the "**GUC Trust**"), for entry of an order providing for a

limited modification of the Automatic Stay and the Plan Injunction as to the Action filed by

Burton Taft, Administrator of the Estate of Brian Taft, all as more fully described in the Motion;

and due and proper notice of the Motion having been provided, and it appearing that no other or

further notice need be provided; and the Court having found and determined that the relief

sought in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties

in interest and that the legal and factual bases set forth in the Motion establish just cause for the

relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted as provided herein; and it is further

ORDERED that the Automatic Stay and the Plan Injunction are modified solely to

the extent necessary to permit liquidation of the Proofs of Claim by enabling the Action to

proceed to final judgment or settlement; and it is further

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in
the Motion.

ORDERED that pursuant to the ADR Order and the ADR Procedures, the Action

shall proceed as to the claims against the Debtors in the Pennsylvania Federal Court, subject to

the Debtors' and/or the GUC Trust's rights to seek removal and/or transfer of venue or in such

other forum as determined by the Court on request of the Debtors and/or the GUC Trust; and it is

further

ORDERED that pursuant to the ADR Order and the ADR Procedures, any final

judgment in the Action shall be subject to treatment under the Plan and shall be treated as a

general unsecured nonpriority claim against the GUC Trust, unless otherwise determined and

ordered by this Court and it is further

ORDERED that, except as provided in Paragraph 2 above, the provisions of the

Automatic Stay, the Plan Injunction, or any provision or injunction created in connection with

confirmation of the Plan and the order confirming the Plan, including, without limitation, those

provisions prohibiting execution, enforcement, or collection of any judgment that may be

obtained against the Debtors, the GUC Trust, and/or assets or property of the Debtors' estates (as

defined in section 541 of the Bankruptcy Code), shall remain in full force and effect and it is

further

ORDERED that nothing contained herein shall be deemed or construed as an

admission of liability by the Debtors or the GUC Trust with respect to the Action, and the

defendants in the Action reserve the right to assert any and all defenses in the Action; and it is

further

2

ORDERED that this Court shall retain jurisdiction and shall be the exclusive

forum to resolve any disputes or controversies arising from or relating to this Order.


Dated: New York, New York
_____, 2012


_____
THE HONORABLE ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                       :

**In re**                            :        **Chapter 11 Case No.**
                                         :

**MOTORS LIQUIDATION COMPANY,** *et al.,*  :      **09-50026 (REG)**
        f/k/a **General Motors Corp.,** *et al.*  :
                                       :

                   **Debtors.**       :        **(Jointly Administered)**
                                         :
-------------------------------------------------------------x

## AMENDED ORDER PURSUANT TO 11 U.S.C. § 105(a) AND GENERAL ORDER M-390 AUTHORIZING IMPLEMENTATION OF ALTERNATIVE DISPUTE PROCEDURES, INCLUDING MANDATORY MEDIATION

Upon the Motion, dated January 11, 2010 (the "**Motion**"),[1] of Motors

Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors, as

debtors in possession (collectively, the "**Debtors**"), for an order, pursuant to section

105(a) of title 11, United States Code and General Order M-390 (the "**Original ADR**

**Order**"), for authorization to implement alternative dispute procedures, including

mandatory mediation (the "**ADR Procedures**"), all as more fully set forth in the Motion;

and due and proper notice of the Motion having been provided, and it appearing that no

other or further notice need be provided; and the Court having found and determined that

the relief sought in the Motion is in the best interests of the Debtors, their estates,

creditors, and all parties in interest and that the legal and factual bases set forth in the

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, the Omnibus Reply of the Debtors to Objections to Debtors' Motion for Entry of Order Pursuant to 11 U.S.C. § 105(a) and General Order M-390 Authorizing Implementation of Alternative Dispute Resolution Procedures, Including Mandatory Mediation, and in the ADR Procedures annexed to the Original ADR Order as Exhibit "A."

Motion establish just cause for the relief granted herein; and after consideration of the

response pleadings filed; and the Court having entered the Original ADR Order; and

upon the Debtors' Motion, dated October 8, 2010 (the "**Motion to Amend**") to amend

the ADR Order; and the Court having determined since the entry of the Original ADR

Order that the Original ADR Order should be modified in certain respects and restated in

its entirety as provided herein; and after due deliberation and sufficient cause appearing

therefor, it is

ORDERED that this Amended ADR Order supersedes in all respects the

Original ADR Order; and it is further

ORDERED that notwithstanding anything to the contrary in the Motion or

Motion to Amend, the ADR Procedures, as set forth in **Exhibit "A"** to this Amended

ADR Order, are approved as provided herein with respect to (a) personal injury claims,

(b) wrongful death claims, (c) tort claims, (d) product liability claims, (e) claims for

damages arising from the rejection of an executory contract or unexpired lease with a

Debtor under section 365 of the Bankruptcy Code (excluding claims for damages arising

from the rejection of executory contracts that relate primarily to environmental matters),

(f) indemnity claims (excluding tax indemnity claims relating to leveraged fixed

equipment lease transactions and excluding indemnity claims relating to asbestos

liability), (g) lemon law claims, to the extent applicable under section 6.15 of the Master

Sale and Purchase Agreement by and between the Debtors and NGMCO, Inc., dated as of

June 1, 2009, and as amended (the "**MPA**"), (h) warranty claims, to the extent applicable

under section 6.15 of the MPA, and (i) class action claims (the "**Initial Subject**

**Claims**"); and it is further

ORDERED that, notwithstanding anything to the contrary in the Motion,
the Motion to Amend, or the ADR Procedures, the ADR procedures shall not apply to
claims filed by the United States of America or its agencies; *provided, however,* nothing
shall preclude the Debtors from seeking in the future by separate motion alternative
dispute resolutions in connection with any such claims; and it is further

ORDERED that, notwithstanding anything to the contrary in the Motion
or the ADR Procedures, the ADR Procedures shall not apply to claims filed by state and
tribal governments concerning alleged environmental liabilities; *provided, however,*
nothing shall preclude the Debtors from seeking in the future by separate motion
alternative dispute resolutions in connection with any such claims; and it is further

ORDERED that, notwithstanding anything to the contrary in the Motion,
the Motion to Amend, or the ADR Procedures, the United States of America, nor any
state or tribal government shall be in any way bound by any determination made pursuant
to the ADR Procedures as to any other party or claim subject to the ADR Procedures,
including any determination with respect to the amount, classification, disallowance, or
type of claim; and it is further

ORDERED that, annexed to this Amended ADR Order as **Exhibit "B"** is
a revised schedule of mediators (the "**Schedule of Mediators**"); and it is further

ORDERED that, the Debtors from time to time may further modify the
Schedule of Mediators, in consultation with the Ad Hoc Committee, by filing a revised

Schedule of Mediators with this Court and providing counsel to the Ad Hoc Committee

with the Sharing Cap for each additional mediator added to the Schedule of Mediators;

and it is further

ORDERED that, the Debtors are authorized to waive the obligation to

share costs of non-binding mediation in their sole discretion to the extent the Designated

Claimant establishes, to the satisfaction of the Debtors, that sharing of such expenses

would constitute a substantial hardship upon the Designated Claimant; and it is further

ORDERED that, within thirty (30) days from the date of entry of this

Order (the "**Capping Period**"), any holder of an Unliquidated/Litigation Claim that is an

Initial Subject Claim filed against any of the Debtors may request the Debtors to initiate

the ADR Procedures for such Unliquidated/Litigation Claim by sending a letter (each a

"**Capping Proposal Letter**," the form of which is annexed to this Order as **Exhibit "C"**)

to the Debtors indicating a willingness to cap its Unliquidated/Litigation Claim at a

reduced amount (the "**Claim Amount Cap**"); *provided, however*, that with respect to any

claim for amounts resulting from the rejection of an executory contract that is rejected

pursuant to an order entered after the date of this Order, a Capping Proposal Letter will

be deemed timely if it is received within thirty (30) days of the entry of the order

authorizing such rejection; and it is further

ORDERED that, upon receiving a Capping Proposal Letter, the Debtors

will, if, and only if, the Claim Amount Cap is accepted by the Debtors, initiate the ADR

Procedures by designating the Unliquidated/Litigation Claim in accordance with the

ADR Procedures and will indicate in the ADR Notice that the Claim Amount Cap has

been accepted; and it is further

ORDERED that, if the Claim Amount Cap is accepted by the Debtors, the Claim Amount Cap will become binding on the Designated Claimant, and the ultimate value of his or her Unliquidated/Litigation Claim will not exceed the Claim Amount Cap. To the extent the Debtors accept the Claim Amount Cap, the Debtors will be responsible for all fees and costs associated with any subsequent mediation. If the Claim Amount Cap is not accepted, the Debtors will notify the Designated Claimant that the Claim Amount Cap has been rejected, and the Claim Amount Cap will not bind any party and shall not be admissible to prove the amount of the Unliquidated/Litigation Claim; and it is further

ORDERED that, within one month after the Capping Period has expired, the Debtors will provide to (i) counsel for the statutory committee of unsecured creditors (the "**Creditors' Committee**"), and (ii) counsel for the United States of America, a privileged and confidential report containing information on the status of the Unliquidated/Litigation Claims (the "**Committee Report**"). The Debtors shall provide both the Creditors' Committee and the United States of America with an updated Committee Report once a month; and it is further

ORDERED that the following notice procedures are hereby approved:

1. Within **three (3) days** of entry of this Order, the Debtors shall cause to be mailed a copy of this Order to all known holders of Initial Subject Claims that are subject to the ADR Procedures.

2. The Debtors shall post a form of the Capping Proposal Letter on the website established by GCG for the Debtors' cases: www.motorsliquidationdocket.com;

and it is further

ORDERED that the Debtors are authorized to take any and all steps that

are necessary or appropriate to implement the ADR Procedures with respect to the Initial

Subject Claims, including, without limitation, by implementing any arbitration awards or

settlements with respect to Designated Claims achieved under the terms of the ADR

Procedures; *provided, however*, that nothing in this Order or the ADR Procedures, shall

obligate the Debtors to settle or pursue settlement of any particular Designated Claim;

*further provided* that any such settlements may be pursued and agreed upon as the

Debtors believe are reasonable and appropriate in their sole discretion, subject to the

terms and conditions set forth in the ADR Procedures; and it is further

ORDERED that, if litigation of an Unresolved Designated Claim in a

forum other than this Court is required for any of the reasons forth in Section II.E.3 of the

ADR Procedures (as determined by this Court), then the Stay shall be modified subject to

the terms and conditions set forth in Section II.E.4 of the ADR Procedures.  Any such

modification of the Stay shall be solely to the extent necessary to permit the liquidation

of the amount of such Unresolved Designated Claim in the appropriate forum.  If the

Debtors fail to file a Notice of Stay Modification or a Stay Motion for any reason with

respect to an Unresolved Designated Claim, as set forth in Section II.E.4 of the ADR

Procedures, the Stay shall remain in effect with respect to such Unresolved Designated

Claim, and the Designated Claimant may seek a determination of this Court regarding

whether the Stay must be modified to permit litigation in a non-bankruptcy forum as set

forth in Section II.E.3 of the ADR Procedures; and it is further

ORDERED that nothing contained in this Amended ADR Order shall be deemed to preclude any party in interest from objecting to any Designated Claim to the extent such entity has standing to assert an objection in accordance with Bankruptcy Code and applicable law; and it is further

ORDERED that nothing contained in this Order shall alter the Creditors' Committee's rights set forth in this Court's Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 3007 and 9019(b) authorizing the Debtors to (i) File Omnibus Claims Objections and (ii) Establish Procedures for Settling Certain Claims, entered on October 6, 2006 [Docket No. 4180]; and it is further

ORDERED that nothing in the ADR Procedures, including the ADR Injunction set forth therein, shall preclude the holder of a Designated Claim from commencing or continuing an action against a non-debtor party; and it is further

ORDERED that Rule 408 of the Federal Rules of Evidence shall apply to all aspects of the Capping Proposal Letter, the ADR Procedures, and the Committee Report; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to this Amended ADR Order and the ADR Procedures.

New York, New York
Date: **_October 25, 2010_**

_s/ Robert E. Gerber_
Honorable Robert E. Gerber
United States Bankruptcy Judge

**Exhibit A**

**The ADR Procedures**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                                    :
**In re**                                           :      **Chapter 11 Case No.**
                                                    :
**MOTORS LIQUIDATION COMPANY,** *et al.,*           :      **09-50026 (REG)**
    f/k/a General Motors Corp.,** *et al.*   :
                                                    :
        **Debtors.**    :      **(Jointly Administered)**
                                                    :
-------------------------------------------------------------------x

## ALTERNATIVE DISPUTE RESOLUTION PROCEDURES

       The alternative dispute resolution procedures (the "**ADR Procedures**") adopted

in the chapter 11 cases of Motors Liquidation Company (f/k/a General Motors Corporation)

("**MLC**") and its affiliated debtors, as debtors in possession (collectively, the "**Debtors**"), are set

forth below:

### I.    CLAIMS SUBJECT TO THE ADR PROCEDURES AND ADR INJUNCTION

**A.**    Claims Subject to the ADR Procedures

       1.    The claims subject to the ADR Procedures (collectively, the "**Designated**

**Claims**") include any and all claims (other than an Excluded Claim as defined below) designated

by the Debtors under the notice procedures set forth below that assert or involve claims based on

one or more of the following theories of recovery, whether or not litigation previously has been

commenced by the claimant: (a) personal injury claims, (b) wrongful death claims, (c) tort

claims, (d) product liability claims, (e) claims for damages arising from the rejection of an

executory contract or unexpired lease with a Debtor under section 365 of the Bankruptcy Code

(excluding claims for damages arising from the rejection of executory contracts that relate

primarily to environmental matters), (f) indemnity claims (excluding tax indemnity claims

relating to leveraged fixed equipment lease transactions and excluding indemnity claims relating

to asbestos liability), (g) lemon law claims, to the extent applicable under section 6.15 of the

Master Sale and Purchase Agreement by and between the Debtors and NGMCO, Inc., dated as of

June 1, 2009, and as amended (the "**MPA**"), (h) warranty claims, to the extent applicable under

section 6.15 of the MPA, and (i) class action claims ("**Class Claims**"). The Debtors may

identify as a Designated Claim any proof of claim asserted in these cases, other than Excluded

Claims as defined in Section I.B below, if the Debtors believe, in their business judgment and

sole discretion, that the ADR Procedures would promote the resolution of such claim and serve

the intended objectives of the ADR Procedures.

        2.      The holders of the Designated Claims are referred to herein as the

"**Designated Claimants**."

      **B.**     **Excluded Claims**

        The Debtors shall not identify as a Designated Claim any proof of claim within

any of the following categories (collectively, the "**Excluded Claims**"): (a) claims for which the

automatic stay under section 362 of title 11 of the United States Code (the "**Bankruptcy Code**")

was modified by prior order of this Court (the "**Bankruptcy Court**") to allow the litigation of

the claim to proceed in another forum; (b) claims asserted in liquidated amounts of $500,000 or

less; (c) asbestos-related claims (including indemnity claims relating to asbestos liability); (d)

environmental claims that constitute prepetition unsecured claims (including claims for damages

arising from the rejection of executory contracts that relate primarily to environmental matters);

(e) patent infringement claims; (f) tax claims (excluding tax indemnity claims relating to

leveraged fixed equipment lease transactions); and (g) claims subject to a separate order of the

Bankruptcy Court providing for arbitration or mediation. Notwithstanding the foregoing, any of

the Excluded Claims, any disputed postpetition administrative expenses, and any claims or

counterclaims asserted by the Debtors may be submitted to the ADR Procedures by agreement of the applicable Debtor and the applicable claimant or by further order of the Bankruptcy Court.

## C.    The ADR Injunction

Upon service of the ADR Notice (as defined below) on a Designated Claimant under Section II.A.1 below, such Designated Claimant (and any other person or entity asserting an interest in the relevant Designated Claim) shall be enjoined from commencing or continuing any action or proceeding in any manner or any place, including in the Bankruptcy Court, seeking to establish, liquidate, collect on, or otherwise enforce the Designated Claim(s) identified in the ADR Notice other than (1) through these ADR Procedures, or (2) pursuant to a plan or plans confirmed in the applicable Debtors' chapter 11 cases (collectively, the "**ADR Injunction**"). Notwithstanding the forgoing, the Debtors shall not be precluded from seeking to estimate any Designated Claim not subject to an accepted Claim Amount Cap in connection with confirmation or consummation of a plan or plans confirmed in the applicable Debtors' chapter 11 cases, or preclude the Designated Claimant from seeking estimation of its Designated Claim solely for voting purposes in connection with confirmation of a plan or plans confirmed in the applicable Debtors' chapter 11 cases. The ADR Injunction shall expire with respect to a Designated Claim only when that Designated Claim has been resolved or after the ADR Procedures have been completed as to that Designated Claim. Except as expressly set forth herein or in a separate order of the Bankruptcy Court, the expiration of the ADR Injunction shall not extinguish, limit, or modify the automatic stay established by section 362 of the Bankruptcy Code or any similar injunction that may be imposed upon the confirmation or effectiveness of a plan or plans in the applicable Debtors' chapter 11 cases (a "**Plan Injunction**"), and the automatic stay and the Plan Injunction shall remain in place to the extent then in effect.

## II.    THE ADR PROCEDURES

### A.    Offer Exchange Procedures

The first stage of the ADR Procedures will be the following offer exchange

procedures, requiring the parties to exchange settlement offers and thereby providing an

opportunity to resolve the underlying Designated Claim on a consensual basis without any

further proceedings by the parties (the "**Offer Exchange Procedures**").  Rule 408 of the Federal

Rules of Evidence shall apply to the ADR Procedures.  Except as permitted by Rule 408, no

person may rely on, or introduce as evidence in connection with any arbitral, judicial, or other

proceeding, any offer, counteroffer, or any other aspect of the ADR Procedures.

1.    *Designation of Designated Claims and Settlement Offer by the Debtors*

(a)    At any time following the entry of an order approving the ADR

Procedures, as applicable (the "**ADR Order**") and subject to the terms and conditions in

Sections I.A and I.B above, the Debtors may designate a Designated Claim for resolution

through the ADR Procedures by serving upon the Designated Claimant, at the address listed on

the Designated Claimant's most recently filed proof of claim or amended proof of claim, as well

as to any counsel of record in these cases for the Designated Claimant, the following materials

(collectively, the "**ADR Materials**"): (i) a notice that the Designated Claim has been submitted

to the ADR Procedures (an "**ADR Notice**"),[1] (ii) a copy of the ADR Order, and (iii) a copy of

these ADR Procedures.  For transferred claims, the Debtors also will serve a copy of the ADR

Materials on the transferee identified in the notice of transfer of claim.

---

[1] The form of the ADR Notice is attached hereto as **Annex 1** and incorporated herein by reference.  The Debtors anticipate that the ADR Notice will be substantially in the form of Annex 1; however, the Debtors reserve the right to modify the ADR Notice, as necessary or appropriate, consistent with the terms of the ADR Procedures.

(b)      The ADR Notice will (i) advise the Designated Claimant that his or her

Designated Claim has been submitted to the ADR Procedures; (ii) request that the Designated

Claimant verify or, as needed, correct, clarify, or supplement, certain information regarding the

Designated Claim (including the addresses for notices under the ADR Procedures); and (iii)

include an offer by the Debtors to settle the Designated Claim (a "**Settlement Offer**").  The

ADR Notice also will require the Designated Claimant to sign and return the ADR Notice along

with the Claimant's Response (as defined in Section II.A.2 below) to the Debtors so that it is

received by the Debtors no later than twenty-one (21) days[2] after the mailing of the ADR Notice

(the "**Settlement Response Deadline**").

(c)      If the Designated Claimant fails to sign and return the ADR Notice or to

include a Claimant's Response (as defined below) with the returned ADR Notice by the

Settlement Response Deadline, (i) the Offer Exchange Procedures will be deemed terminated

with respect to the Designated Claim and (ii) the Designated Claim will be submitted to

nonbinding mediation.

2.      *The Claimant's Response*

The only permitted responses to a Settlement Offer (the "**Claimant's Response**")

are (i) acceptance of the Settlement Offer, or (ii) rejection of the Settlement Offer coupled with a

counteroffer (as further defined below, a "**Counteroffer**").  If the ADR Notice is returned

without a response or with a response that is not a permitted response, the Designated Claim

shall be treated as set forth in Section II.A.1(c) above.

---

[2] Bankruptcy Rule 9006(a) shall apply to all periods calculated in the ADR Procedures.

3.    *The Counteroffer*

The Counteroffer shall (i) provide all facts that substantiate the Designated Claim and that are sufficient for the Debtors to evaluate the validity and amount of the Designated Claim; (ii) provide all documents that the Designated Claimant contends support the Designated Claim; (iii) state the dollar amount of the Designated Claim (the "**Proposed Claim Amount**"), which may not (A) improve the priority set forth in the Designated Claimant's most recent timely filed proof of claim or amended proof of claim, or (B) exceed the lesser of the Claim Amount Cap (as defined in the ADR Order), if applicable, or the amount set forth in the Designated Claimant's most recent timely filed proof of claim or amended proof of claim (but may liquidate any unliquidated amounts expressly referenced in a proof of claim), with an explanation of the calculation and basis for the Proposed Claim Amount; and (iv) provide the name and address of counsel representing the Designated Claimant with respect to the Designated Claim, unless the Designated Claimant is a natural person, in which case the Designated Claimant shall either provide the name of such counsel or state that he or she is appearing without counsel.

The Counteroffer is presumed to offer the allowance of the Designated Claim as a general unsecured claim in the Proposed Claim Amount against the Debtor identified in the applicable proof of claim.  If the Debtors accept the Counteroffer, the Designated Claimant shall not seek recovery from the Debtors of any consideration other than the consideration ultimately distributed to holders of other allowed general unsecured claims against the relevant Debtor.  A Counteroffer may not be for an unknown, unliquidated, or indefinite amount or priority, or the Designated Claim shall be treated as set forth in Section II.A.1(c) above.

4.    *Consent to Subsequent Binding Arbitration*

As described in Sections II.B and II.C below, in the absence of a settlement at the

conclusion of the Offer Exchange Procedures, Designated Claims shall proceed to nonbinding

mediation and, if such mediation is unsuccessful, upon consent of the parties (including deemed

consent based on prior contractual agreements), to binding arbitration. A Designated Claimant is

required to notify the Debtors whether it consents to, and thereby seeks to participate in, binding

arbitration in the event that its Designated Claim ultimately is not resolved through the Offer

Exchange Procedures and the nonbinding mediation. A Designated Claimant shall make an

election to either consent or not consent to binding arbitration by checking the appropriate box in

the ADR Notice (an "**Opt-In/Opt-Out Election**"). Any Designated Claimant that does not

consent to binding arbitration in its response to the ADR Notice may later consent in writing to

binding arbitration, subject to the agreement of the Debtors. Consent to binding arbitration, once

given, cannot subsequently be withdrawn without consent of the Debtors.

5.    *The Debtors' Response to a Counteroffer*

The Debtors must respond to any Counteroffer within fifteen (15) days after their

receipt of the Counteroffer (the "**Response Deadline**"), by returning a written response (as

further defined below, each a "**Response Statement**"). The Response Statement shall indicate

that the Debtors (a) accept the Counteroffer; or (b) reject the Counteroffer, with or without

making a revised Settlement Offer (a "**Revised Settlement Offer**").

(a)    *Failure to Respond*

If the Debtors fail to respond to the Counteroffer by the Response Deadline,

(i) the Counteroffer will be deemed rejected by the Debtors; (ii) the Offer Exchange Procedures

will be deemed terminated with respect to the Designated Claim; and (iii) the Designated Claim

will be submitted to nonbinding mediation.

(b)    *Revised Settlement Offer*

If the Debtors make a Revised Settlement Offer by the Response Deadline, the Designated Claimant may accept the Revised Settlement Offer by providing the Debtors with a written statement of acceptance no later than ten (10) days after the date of service of the Revised Settlement Offer (the "**Revised Settlement Offer Response Deadline**"). If the Designated Claimant does not accept the Revised Settlement Offer by the Revised Settlement Offer Response Deadline, the Revised Settlement Offer will be deemed rejected and the Designated Claim automatically will be submitted to nonbinding mediation.

(c)    *Request for Additional Information*

The Debtors may request supplemental or clarification of information supplied in the Designated Claimant's most recently filed proof of claim to assist in a good faith evaluation of any particular Designated Claim. If the Debtors request additional information or documentation by the Response Deadline, the Designated Claimant shall serve additional information or documentation sufficient to permit the Debtors to evaluate the basis for the Designated Claim (with the exception, in the Designated Claimant's sole discretion, of privileged information or information prepared expressly in contemplation of litigation) so that it is received by the Debtors within fifteen (15) days after such request. If the Designated Claimant timely responds, the Debtors shall have fifteen (15) days to provide an amended Response Statement, which may include a Revised Settlement Offer as a counter to the Counteroffer. If the Debtors do not provide an amended Response Statement within this period, or if the Designated Claimant fails to provide the requested information or documentation within the time allotted, the Designated Claim will be submitted to nonbinding mediation.

6.    *Offer Exchange Termination Date*

Upon mutual written consent, the Debtors and a Designated Claimant may

exchange additional Revised Settlement Offers and Counteroffers for up to twenty (20) days

after the later of (a) the Revised Settlement Offer Response Deadline or (b) the expiration of the

applicable timeframes provided for in Section II.A.5(c) above with respect to requesting,

receiving, and responding to additional information or documentation.  Otherwise, the Offer

Exchange Procedures shall conclude and terminate on the earliest of the following (the "**Offer

Exchange Termination Date**"): (i) the date upon which the Designated Claim automatically

advances to nonbinding mediation under the provisions set forth above; (ii) the date that any

settlement offer for a Designated Claim is accepted under the procedures set forth above; (iii) the

date upon which a Response Statement was served by the Debtors, if the Debtors notified the

Designated Claimant in their Response Statement of the Debtors' intention to proceed directly to

nonbinding mediation; or (iv) such earlier date as is agreed upon by the Debtors and the

Designated Claimant.

7.    *Ability to Settle Claims*

Nothing herein shall limit the ability of a Designated Claimant and the Debtors to

settle a Designated Claim by mutual consent at any time.  All such settlements shall be subject to

the terms of Section II.D.2 below.

**B.    Nonbinding Mediation ("Mediation")**

1.    *Mediation Notice*

If the Debtors and the Designated Claimant do not settle the Designated Claim

through the Offer Exchange Procedures, the Debtors shall serve a notice of nonbinding

mediation, with a copy of the Designated Claimant's applicable proof(s) of claim attached, on

the Designated Claimant no later than thirty (30) days after the Offer Exchange Termination

Date, or as soon thereafter as is reasonably practicable.[3]  The Mediation Notice will provide the Mediation Location (as such term is defined in Section II.B.2 below).

### 2.    *Location and Appointment of the Mediator*

All Mediations shall be conducted in either (i) New York, New York; (ii) Detroit, Michigan; (iii) Dallas, Texas; (iv) San Francisco, California; or (v) Chicago, Illinois (collectively, the "**Mediation Locations**"), unless the parties agree to a different location. Within ten (10) days after receiving the Mediation Notice, the Designated Claimant shall choose one of the individuals identified in a list of mediators annexed to the Mediation Notice and corresponding to the applicable Mediation Location to conduct the mediation (the "**Mediator**").

To the maximum extent practicable, the scheduling and location of Mediation sessions shall give due consideration to the convenience of the parties and the proximity of the Designated Claimant.  Notwithstanding the foregoing, within ten (10) business days after service of the Mediation Notice, the Designated Claimant may file a motion with the Bankruptcy Court, on notice to the Debtors and any previously appointed mediator, for an order directing that the Mediation be conducted in a different location (a "**Hardship Motion**") if the Designated Claimant can demonstrate that traveling to any of the Mediation Locations presents a "substantial hardship;" *provided, however*, that there shall be a rebuttable presumption that, absent other extraordinary facts, there is no "substantial hardship" imposed on a Designated Claimant if the primary representative for a Designated Claimant resides in a location that is less than 750 miles from the Mediation Location or is less than a three-hour plane trip from the Mediation Location (based on typical commercial schedules for the fastest route, excluding any

---

[3] The form of the Mediation Notice is attached hereto as **Annex 2** and incorporated herein by reference.  The Debtors anticipate that the Mediation Notice will be substantially in the form of Annex 2; however, the Debtors reserve the right to modify the Mediation Notice, as necessary or appropriate, consistent with the terms of the ADR Procedures.

layovers).  While a Hardship Motion is pending, all deadlines under these ADR Procedures shall

be suspended.  If a Hardship Motion is granted, any alternative location shall be determined by

the Bankruptcy Court, taking into account the convenience of the parties and any agreements

reached by the parties.  If the location of the Mediation is changed, (i) any Mediator appointed in

the original location may be replaced by a Mediator in the new location (selected by mutual

agreement of the parties or order of the Court), and (ii) the Bankruptcy Court may require that

that the Debtors and the Designated Claimant share the costs of the Mediation.

>    3.    *Mediation Rules*

>    The Mediation of Designated Claims shall be governed by the Mediator's regular

procedures, except where expressly modified in the ADR Procedures.  In the event of any

conflict, the ADR Procedures shall control.  Any party to a Mediation that fails to participate in

good faith, on the terms described herein, may be subject to sanctions under Section II.F below.

>    (a)    *Impartiality and Qualifications of Mediators*

>    A person appointed as a Mediator must (i) be an impartial, neutral person; (ii)

have no financial or personal interest in the proceedings or, except when otherwise agreed by the

parties, in any related matter; and (iii) upon appointment, disclose any circumstances likely to

create a reasonable inference of bias.  In the event a Mediator discloses circumstances likely to

create a reasonable inference of bias, such Mediator may be replaced at the written request of

either the Debtors or the Designated Claimant prior to the mediation.

>    (b)    *Fees and Costs for Mediation*

>    For each Mediation conducted under these ADR Procedures, the Mediator

selected to preside will be entitled to charge the mediation fees disclosed to, and agreed to by,

the Debtors and the Designated Claimant.  Unless the parties have expressly agreed otherwise in

writing (either prepetition or postpetition) as part of an agreement to submit Designated Claims

to Mediation, the Mediator's fees and the costs of any Mediation shall be shared equally by the

Debtors and the Designated Claimant subject to the Sharing Cap (as such term is described in the

ADR Order. For purposes of clarity, these costs shall not include travel expenses of the parties.

(c)    *Pre-Mediation Briefing*

Unless the parties agree otherwise, on or before thirty (30) days prior to the

scheduled Mediation, the Designated Claimant shall serve on the Mediator and the Debtors by

electronic transmission or facsimile, at a minimum, and no later than by 6:00 p.m. (Eastern

Time), a nonconfidential, pre-Mediation statement (the "**Opening Statement**") not to exceed

fifteen (15) pages, excluding any attachments, setting forth all of the Designated Claimant's

claims and identifying each and every cause of action or theory the Designated Claimant asserts,

including a short and plain statement of the facts and law upon which the Designated Claimant

relies for recovery and maintains entitle it to relief. The Designated Claimant shall include, as

exhibits or annexes to the Opening Statement, all documents (or summaries of voluminous

documents), affidavits, and other evidentiary materials on which the Designated Claimant relies

(with the exception, in the Designated Claimant's sole discretion, of privileged information or

information prepared expressly in contemplation of litigation). Unless the parties agree

otherwise, on or before fifteen (15) days after service of the Opening Statement, the Debtors

shall serve on the Mediator and the Designated Claimant, by electronic transmission or facsimile,

at a minimum, and no later than by 6:00 p.m. (Eastern Time), a nonconfidential response

statement (the "**Mediation Response Statement**") not to exceed fifteen (15) pages, excluding

attachments. The Designated Claimant shall receive copies of all exhibits to the Mediation

Response Statement (with the exception, in the Debtors' sole discretion, of privileged

information or information prepared expressly in contemplation of litigation). The Debtors shall

provide copies of the Opening Statement and Mediation Response Statement to counsel to the statutory committee of unsecured creditors (the "**Creditors' Committee**") upon request, on a confidential basis. At the Mediator's discretion and direction, the parties may submit additional, confidential letters or statements to the Mediator, which shall receive "Mediator's-eyes-only" treatment.

   (d) *The Mediation Session*

   Unless otherwise agreed by the parties or as provided herein, the Mediation session must occur no later than sixty (60) days after the date on which the Mediator is appointed. Unless otherwise agreed by the parties, the Mediation session is open only to the parties and their respective counsel, and insurers (if any).

   (e) *Treatment of Mediation Settlement*

   If the Mediation results in a settlement of the Designated Claim, such settlement shall be subject to the terms of Section II.D below. If the Mediation of a Designated Claim does not result in a settlement of the Designated Claim, the Designated Claim shall be subject to Section II.C or II.E below.

   (f) *Modification of the Mediation Procedures*

   The Mediation procedures described herein may be modified upon the mutual written consent of the Debtors and the Designated Claimant.

  **C.** **Arbitration**

   1. *Binding Arbitration*

   If the Designated Claimant and the Debtors have consented to binding arbitration under Section II.A.4 above, the Designated Claim will be arbitrated under the terms of this Section II.C if such claim is not resolved in the Offer Exchange Procedures or Mediation. If the Designated Claimant has expressly indicated that it does not consent to binding arbitration in its

response to the ADR Notice and has not subsequently opted in to binding arbitration pursuant to

Section II.A.4 above, the Designated Claim shall be resolved in the Bankruptcy Court by the

Debtors' commencement of proceedings pursuant to the Bankruptcy Code, including without

limitation, estimating or objecting to the Designated Claims. Any party to an arbitration that

fails to participate in the arbitration in good faith, on the terms described herein, may be subject

to sanctions under Section II.F below.

2.    *Arbitration Notice*

To initiate the arbitration process for a Designated Claim, the Debtors shall serve

a notice of arbitration (the "**Arbitration Notice**"), with a copy of the Designated Claimant's

applicable proof(s) of claim attached, on the Designated Claimant, the Creditors' Committee,

and the American Arbitration Association (the "**AAA**").[4]

3.    *Arbitration Rules and Procedures*

For Designated Claims that are not designated by the Debtors as Complex

Designated Claims (as defined below), the arbitration of all Designated Claims shall be

conducted by a single arbitrator selected pursuant to the Commercial Arbitration Rules of the

AAA. The arbitrator shall be governed by the commercial arbitration rules of the AAA then in

effect (the "**Arbitration Rules**"), except where the Arbitration Rules are expressly modified in

the ADR Procedures.[5]

The Debtors may, at their discretion, designate certain Designated Claims as

complex designated claims (the "**Complex Designated Claims**"). The arbitration of all

---

[4] The form of the Arbitration Notice is attached hereto as **Annex 3** and incorporated herein by reference. The Debtors anticipate that the Arbitration Notice will be substantially in the form of Annex 3; however, the Debtors reserve the right to modify the Arbitration Notice, as necessary or appropriate, consistent with the terms of the ADR Procedures.

[5] In the event of any conflict between the Arbitration Rules and the ADR Procedures, the ADR Procedures shall control.

Complex Designated Claims shall be conducted by a panel of three arbitrators selected pursuant to the Commercial Arbitration Rules of the AAA.  The AAA Procedures for Large, Complex Commercial Disputes, in addition to the Commercial Rules of Arbitration, shall be used for arbitration of all Complex Designated Claims; *provided, however*, unless otherwise agreed by the parties, (i) the AAA shall appoint a panel of three (3) arbitrators, as provided in this Section and Section II.C.3(g) and (ii) the arbitration hearing on a Complex Designated Claim must be held no later than ninety (90) days after the date of appointment of the arbitrator(s), as provided in Section II.C.3(k).  Finally, the AAA Supplementary Rules for Class Arbitrations shall also be used for all Class Claims, including those related to class certification and the Class Determination Award (as defined in Rule 5 of the AAA Supplementary Rules for Class Arbitrations), except that the arbitrator(s) shall not make a Clause Construction Award (as defined in Rule 3 of the AAA Supplementary Rules for Class Arbitrations), or determine that a Class Claim is not arbitrable for failure for each class member to have entered into an arbitration agreement, the Court having specifically found that the ADR Procedures are applicable to Class Claims notwithstanding the absence of a written agreement to arbitrate.[6]

(a)    *Governing Law*

The ADR Procedures, as they relate to arbitration proceedings, are governed by the Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq.* (the **"Federal Arbitration Act"**), and the enforceability of an arbitration award is governed by Section 9 of the Federal Arbitration Act, except as modified herein.

---

[6] In the event of any conflict between the AAA Supplementary Rules for Class Arbitrations and the ADR Procedures, the ADR Procedures shall control.

    (b)    *Fees and Costs for Binding Arbitration; Sharing*

Unless the parties expressly have agreed otherwise in writing (either prepetition or postpetition) as part of an agreement to submit claims to binding arbitration, the fees and costs charged by the AAA and the arbitrator(s) shall be shared equally by the Debtors and the Designated Claimant; *provided, however*, that the arbitrator(s), in the arbitrator(s)' sole discretion, may assess fees and costs against any party that the arbitrator(s) finds to be abusing or unduly delaying the arbitration process. The AAA shall submit invoices to the Designated Claimants and the Debtors according to the AAA's ordinary invoicing practices then in effect and subject to the AAA's ordinary payment terms then in effect. For purposes of clarity, these costs shall not include travel expenses of the parties.

    (c)    *Impartiality and Qualifications of Arbitrators*

In designating the arbitrator in accordance with the procedures described below, the AAA shall review the Arbitration Notice and the applicable Designated Claim. Any person appointed as an arbitrator must: (i) be an impartial, neutral person; (ii) be experienced (either from past arbitrations or former employment) in the law that is the subject of the Designated Claim; (iii) have no financial or personal interest in the proceedings or, except when otherwise agreed by the parties, in any related matter; and (iv) upon appointment, disclose any circumstances likely to create a reasonable inference of bias. In the event that an arbitrator discloses circumstances likely to create a reasonable inference of bias, such arbitrator may be replaced by the AAA at the written request of the Debtors or the Designated Claimant within ten (10) days after such disclosure.

    (d)    *Time and Location of Arbitration Hearings*

All arbitration hearings shall be conducted in either (i) New York, New York; (ii) Detroit, Michigan; (iii) Dallas, Texas; or (iv) San Francisco, California (collectively, the "**Arbitration Locations**"). To the maximum extent practicable, the scheduling and location of arbitration hearings shall give due consideration to the proximity of the Designated Claimant and to the convenience of the parties to the Arbitration Location. Within ten (10) days of appointment, the arbitrator(s) shall conduct a preliminary hearing pursuant to AAA Commercial Arbitration Rule 20. Notwithstanding anything set forth herein or in the ADR Order to the contrary, the Creditors' Committee, through its counsel, shall be permitted to participate in the arbitration hearings to the same extent the Creditors' Committee would be permitted to participate in claims litigation in the Bankruptcy Court pursuant to sections 502, 1103, 1109(b), or any other applicable section of the Bankruptcy Code.

    (e)    *Appeals of Arbitration Awards*

All arbitration awards shall be final and binding. Other than the identities of the applicable Debtors and Designated Claimants, the claims register number(s) assigned to the applicable arbitrated Designated Claims and the priority and dollar amounts of the Designated Claims as awarded in the arbitration awards, and except as otherwise required by law or agreed upon by the parties, all arbitration awards shall be treated as confidential. No party shall have the right to appeal an arbitration award except pursuant to the appeal provisions of the Federal Arbitration Act, in which case any appeal must be to the United States District Court for the Southern District of New York. Any appeal shall be governed by the Federal Arbitration Act. The parties shall have ten (10) days from the date the arbitration award is served to appeal such award. Failure to timely appeal shall result in the loss of any appeal rights. Once any appeal has

concluded or appellate rights are waived, the Debtors shall update the claims docket in their

chapter 11 cases accordingly and may file any notice of the liquidated amount of the Designated

Claim that they deem necessary or appropriate for such purpose.

(f)     *Modification of the Arbitration Procedures*

The arbitration procedures described herein may be modified only upon the

mutual consent of the Debtors and the Designated Claimant. In addition, the Debtors shall

consult with the Creditors' Committee prior to any modification to the arbitration procedures.

(g)     *Appointment of the Arbitrator*

Within 5 five days of receiving the applicable Arbitration Notice, the AAA shall

commence the following procedures for the appointment of arbitrator(s) (the "**Appointment of**

**Arbitrator(s) Procedures**") by concurrently sending by electronic transmission or facsimile, to

the Debtors and the applicable Designated Claimant, an identical list of the names of at least

eight (8) arbitrator candidates who meet the qualifications necessary for the matter.[7]  The

Debtors and the applicable Designated Claimant shall have seven (7) business days from the date

this list is served to (i) strike two (2) names from the proposed list, (ii) list the remaining names

in order of preference, and (iii) return the list to the AAA. In the event that the Designated

Claim is not a Complex Designated Claim, the AAA shall appoint a single arbitrator from the

name(s) not stricken, giving consideration first to the preferences of the parties and second to

scheduling and the availability of the arbitrator. In the event that the Designated Claim is a

Complex Designated Claim, the AAA shall appoint a panel of three (3) arbitrators from the

name(s) not stricken, giving consideration first to the preferences of the parties and second to the

---

[7] If, for any reason, there are more than two parties to an arbitration, AAA shall identify a number of potential
arbitrators equal to the number of parties, plus one, and the remaining selection proceedings shall otherwise govern.
Affiliated entities are considered a single party for this purpose. The Creditors' Committee shall have no role in the
arbitrator selection process.

scheduling and the availability of the arbitrators. The AAA shall appoint the arbitrator(s) in

accordance with the Appointment of Arbitrator(s) Procedures within ten (10) business days of its

receipt of the applicable Arbitration Notice.

   (h) *Pre-Hearing Matters*

    Unless otherwise agreed to by the parties, any pre-hearing issues, matters or

disputes (other than with respect to merits issues) shall be presented to the arbitrator(s)

telephonically (or by such other method agreed to by the arbitrator(s) and the parties) for

expeditious, final, and binding resolution. Upon a party's request, the arbitrator(s) may order

that a substantive motion, such as a motion for summary judgment, be heard in person rather

than telephonically. Any pre-hearing issue, matter, or dispute (other than with respect to merits

issues) must be presented to the arbitrator(s) not later than fifteen (15) days prior to the

arbitration hearing so as to permit the arbitrator(s) to review and rule upon the requests by

telephonic or electronic communication at least five days prior to the arbitration hearing.

   (i) *Discovery*

    Unless the Designated Claim is a Complex Designated Claim, there shall be no

interrogatories. Any requests for production of documents, electronically-stored information and

things ("**Document Requests**") shall be made in writing and shall be limited to no more than

twenty (20) requests, including discrete subparts. Items requested in the Document Requests

must be produced within thirty (30) days after service of the Document Requests. All documents

from discovery shall be confidential and shall not be (i) disclosed to any person or party not

participating in the arbitration proceeding or (ii) used for any purpose other than in connection

with the arbitration proceeding, except as provided herein. Notwithstanding the foregoing, upon

request of the Creditors' Committee, the Debtors shall provide to the Creditors' Committee, on a

confidential basis, copies of all discovery materials produced pursuant to this Section II.C.3(i)

for any particular Designated Claim.

      (j)    *Pre-Arbitration Statement*

      Unless otherwise agreed by the parties, on or before ten (10) days prior to the

scheduled arbitration hearing, each party shall submit to the arbitrator(s) and serve on the other

party or parties and the Creditors' Committee by overnight mail a pre-arbitration statement not to

exceed fifteen (15) pages, excluding any attachments. On or before ten (10) days prior to the

scheduled arbitration hearing, the Creditors' Committee may submit a short statement, not to

exceed five (5) pages, to the arbitrator(s) and serve such statement on the parties to the

arbitration.

      (k)    *Arbitration Hearing*

      Unless otherwise agreed by the parties and the arbitrator(s) or as provided herein,

the arbitration hearing on a Designated Claim must be held no later than ninety (90) days after

the date of appointment of the arbitrator(s). The arbitration hearing is open only to the parties

and their respective counsel, insurers (if any), and witnesses. In addition, notwithstanding

anything else set forth herein or in the ADR Order to the contrary, the Creditors' Committee,

through its counsel, shall be permitted to attend and participate in the arbitration hearing to the

same extent the Creditors' Committee would be permitted to participate in claims litigation in the

Bankruptcy Court, pursuant to sections 502, 1103, 1109(b), and any other applicable section of

the Bankruptcy Code. Nonparty witnesses shall be sequestered. No posthearing briefs may be

submitted, unless the arbitrator(s) requests briefs, in which case such briefing shall be subject to

the issues, timing, and page limitations the arbitrator(s) imposes. There shall be no reply briefs.

(l)    *Awards*

The arbitrator(s) shall issue a written, reasoned opinion and award (the

"**Arbitration Award**") within fourteen (14) days after the arbitration hearing.  The arbitrator(s)

shall not be compensated for more than eight hours of deliberations on and preparation of the

Arbitration Award for a Designated Claim.  Any Arbitration Award shall be an allowed general

unsecured nonpriority claim against the Debtor identified in the Arbitration Award (or if no

Debtor is identified in the Arbitration Award, the claim shall be deemed to be against the Debtor

identified in the Designated Claimant's applicable proof of claim included with the service of the

Arbitration Notice, unless otherwise ordered by the Bankruptcy Court).  The Arbitration Award

may not award a priority claim or otherwise determine the priority of the claim under the

Bankruptcy Code; *provided, however*, that, within thirty (30) days after the issuance of an

Arbitration Award, the Designated Claimant may seek relief from the Bankruptcy Court to

determine that some or all of the Arbitration Award is subject to treatment as a priority claim if

the Designated Claimant's applicable proof of claim filed as of the date of filing of the ADR

Order asserted an entitlement to such priority.  Further, no portion of a claim resulting from any

Arbitration Award shall be allowed to the extent that it consists of (a) punitive damages; (b)

interest, attorneys' fees, or other fees and costs, unless permissible under section 506(b) of the

Bankruptcy Code; (c) an award under any penalty rate or penalty provision of the type specified

in section 365(b)(2)(D) of the Bankruptcy Code; (d) amounts associated with obligations that are

subject to disallowance under section 502(b) of the Bankruptcy Code; (e) specific performance,

other compulsory injunctive relief, restrictive, restraining, or prohibitive injunctive relief or any

other form of equitable remedy; or (f) any relief not among the foregoing but otherwise

impermissible under applicable bankruptcy or nonbankruptcy law.  The Debtors and the

Creditors' Committee shall have the right within thirty (30) days after the issuance of an

Arbitration Awards to file a motion seeking relief from the Bankruptcy Court to enforce the

preceding sentence and obtain the disallowance of any portion of a claim included in an

Arbitration Award in violation of clauses (a) through (f) herein.  In all cases, the awarded claim

shall be subject to treatment in the Debtors' chapter 11 cases as set forth in any order(s)

confirming a chapter 11 plan or plans, or in such other applicable order of the Bankruptcy Court.

The entry of an Arbitration Award shall not grant the Designated Claimant any enforcement or

collection rights.

      **D.**    **Settlements of Designated Claims**

           1.    *Settlements Permitted at Any Stage of the ADR Procedures*

      Designated Claims may be settled by the Debtors and a Designated Claimant

through the Offer Exchange Procedures, Mediation, or by agreement at any point during these

ADR Procedures.  Nothing herein shall prevent the parties from settling any claim at any time.

           2.    *Settlement Authority and Approvals*

      Nothing herein shall limit, expand, or otherwise modify the Debtors' authority to

settle claims pursuant to orders of the Bankruptcy Court then in effect, including without

limitation the Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 3007 and 9019(b)

authorizing the Debtors to (i) File Omnibus Claims Objections and (ii) Establish Procedures for

Settling Certain Claims, entered on October 6, 2006 [Docket No. 4180] (the "**Claims**

**Procedures and Settlement Order**") and any future order(s) confirming a chapter 11 plan or

plans in these cases (collectively, the "**Settlement Authority Orders**").  Any settlements of

claims pursuant to, or in connection with, the ADR Procedures shall be approved consistent with

the terms, conditions, and limitations set forth in the applicable Settlement Authority Orders.

The Debtors shall be requested to seek Bankruptcy Court approval of such settlements only to

the extent that (a) such approval is required by the terms of the Settlement Authority Orders or

(b) the settlement falls outside of the authority granted in the Settlement Authority Orders and

otherwise requires Bankruptcy Court approval.

E.      **Failure to Resolve a Designated Claim Through ADR Procedures**

1.      *Litigation Generally*

Claims not resolved through the ADR Procedures shall proceed to litigation for

resolution.  Notwithstanding anything herein, the Debtors may terminate the ADR Procedures at

any time prior to serving the Arbitration Notice and proceed to litigation of the Designated Claim

as set forth herein.

2.      *Litigation in the Bankruptcy Court*

If the Designated Claim is not resolved by the ADR Procedures (an "**Unresolved**

**Designated Claim**"), litigation of such Unresolved Designated Claim shall proceed in the

Bankruptcy Court by the commencement by the Debtors of proceedings consistent with the

terms, conditions, and limitations set forth in the Claims Procedures Order or other applicable

procedures or orders, as soon as reasonably practicable upon completion of the ADR Procedures

for the Unresolved Designated Claim, to the extent that (a) the Bankruptcy Court has subject

matter jurisdiction over the Unresolved Designated Claim and (b) the Unresolved Designated

Claim is not subject to the abstention provisions of 28 U.S.C. § 1334(c).  Disputes over the

subject matter jurisdiction of the Bankruptcy Court or the application of abstention shall be

determined by the Bankruptcy Court.

3.      *Litigation in Other Courts*

If the Unresolved Designated Claim cannot be adjudicated in the Bankruptcy

Court as a result of abstention or because of lack of or limitations upon subject matter

jurisdiction (as determined by the Bankruptcy Court), then, subject to the terms and conditions

set forth in Section II.E.4 below, litigation of such Unresolved Designated Claim shall proceed

(a) if the Unresolved Designated Claim was pending in a nonbankruptcy forum on the date the

Debtors commenced their respective voluntary chapter 11 cases (the "**Commencement Date**"),

then (i) in such nonbankruptcy forum, subject to the Debtors' right to seek removal or transfer of

venue or (ii) in such other forum as determined by the Bankruptcy Court on request of the

Debtors;[8] or (b) if the Unresolved Designated Claim was not pending in any forum on the

Commencement Date, then in the United States District Court for the Southern District of New

York or such other nonbankruptcy forum that, as applicable, (i) has personal jurisdiction over the

parties, (ii) has subject matter jurisdiction over the Unresolved Designated Claim, (iii) has in rem

jurisdiction over the property involved in the Unresolved Designated Claim (if applicable) and

(iv) is a proper venue.  If necessary, any disputes regarding the applicability of this Section II.E.3

shall be determined by the Bankruptcy Court.

4.    *Modification of the Automatic Stay*

If litigation of an Unresolved Designated Claim in a forum other than the

Bankruptcy Court is required as set forth in Section II.E.3 above, the ADR Order provides that

the automatic stay imposed by section 362 of the Bankruptcy Code, or any subsequent Plan

Injunction (collectively, the "**Stay**"), shall be modified solely to the extent necessary to permit

the liquidation of the amount of such Unresolved Designated Claim in the appropriate forum;

*provided, however*, that any such liquidated claim (a) shall be subject to treatment under the

applicable chapter 11 plan or plans confirmed in these cases; and (b) shall be treated as a general

unsecured nonpriority claim against the Debtor identified in the judgment, unless otherwise

---

[8] The Debtors may elect to file a motion pursuant to 28 U.S.C.§ 157(b)(5) to remove to the United States District Court for the Southern District of New York any Unresolved Designated Claim (along with any other unliquidated and litigation claims asserted against the Debtors) where the underlying claim is a personal injury claim or wrongful death claim.

determined and ordered by the Bankruptcy Court.  No later than forty-five (45) days after the

Bankruptcy Court determines that the terms of Section II.E.3 above applies to an Unresolved

Designated Claim or at such other time as agreed to by the parties, the Debtors shall either (a)

file a notice of such modification of the Stay (a "**Notice of Stay Modification**") with the

Bankruptcy Court and serve a copy of such notice on the Designated Claimant and the Creditors'

Committee or (b) file a motion seeking an order governing the terms upon which the Stay will be

modified (a "**Stay Motion**") and serve such Stay Motion on the Designated Claimant and the

Creditors' Committee.  The Stay shall be modified solely to the extent set forth above (a) as of

the date that is forty-five (45) days after the filing of a Notice of Stay Modification, unless the

Bankruptcy Court orders otherwise or the parties otherwise agree; or (b) as ordered by the Court

in connection with a Stay Motion.  If the Debtors fail to file a Notice of Stay Modification or a

Stay Motion for any reason with respect to an Unresolved Designated Claim, the Stay shall

remain in effect with respect to such Unresolved Designated Claim and the Designated Claimant

may seek a determination of the Bankruptcy Court regarding whether and on what terms the Stay

must be modified to permit litigation in a nonbankruptcy forum as set forth in Section II.E.3

above.

      F.      **Failure to Comply with the ADR Procedures**

         If a Designated Claimant or the Debtors fail to comply with the ADR Procedures,

negotiate in good faith, or cooperate as may be necessary to effectuate the ADR Procedures, the

Bankruptcy Court may, after notice and a hearing, find such conduct to be in violation of the

ADR Order or, with respect to a Designated Claimant, an abandonment of or failure to prosecute

the Designated Claim, or both.  Upon such findings, the Bankruptcy Court may, among other

things, disallow and expunge the Designated Claim, in whole or part, or grant such other or

further remedy deemed just and appropriate under the circumstances, including, without

limitation, awarding attorneys' fees, other fees, and costs to the other party.

## ANNEX 1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x

|  |  |  |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
|  | : |  |
| **MOTORS LIQUIDATION COMPANY**, *et al.*, | : | **09-50026 (REG)** |
| f/k/a **General Motors Corp.**, *et al.* | : |  |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)** |
|  | : |  |

-----------------------------------------------------------------x

## ALTERNATIVE DISPUTE RESOLUTION NOTICE

Service Date:

Claimant(s):

Claimant(s)' Address:

Designated Claim Number(s):

Amount(s) Stated in Proof(s) of Claim:

**Deadline to Respond:**

       By this notice (the "**ADR Notice**"), Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession (collectively, the "**Debtors**") designate the above-identified claim(s) (the "**Designated Claim(s)**") in the Debtors' chapter 11 cases and submit the Designated Claim(s) to alternative dispute resolution, pursuant to the procedures (the "**ADR Procedures**") established by the Amended Order Pursuant to 11 U.S.C. § 105(a) and General Order M-390 Authorizing Implementation of Alternative Dispute Resolution Procedures, Including Mandatory Mediation entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on _____ ___, 2010 and the Supplemental Order Pursuant to 11 U.S.C. § 105(a) and General Order M-390 Authorizing Implementation of Alternative Dispute Resolution Procedures, Including Mandatory Mediation entered by the Bankruptcy Court on April 29, 2010 (together, the "**ADR Order**"). A complete copy of the ADR Procedures is enclosed for your reference.

       The Debtors have reviewed your Designated Claim(s) and, pursuant to the ADR Procedures, offer the amounts set forth below for allowance of your Designated Claim(s) as [a] prepetition general unsecured nonpriority claim(s) in full satisfaction of the Designated Claim(s) (the "**Settlement Offer**").

*You are required to return this ADR Notice with a Claimant's Response (as defined below) to the Settlement Offer by no later than the **Deadline to Respond** indicated above.*

In addition, to the extent your most recent proofs of claim **[does]/[do]** not: (a) state the correct amount of your Designated Claim(s); (b) expressly identify each and every cause of action and legal theory on which you base your Designated Claim(s); (c) include current, correct, and complete contact information of your counsel or other representative; or (d) provide all documents on which you rely in support of your Designated Claim(s), you hereby are requested to provide all such information and documentation with your Claimant's Response.

If you do not return this ADR Notice with the requested information and a Claimant's Response to the Settlement Offer to **[Debtor's Representative]** so that it is received by the Deadline to Respond, your Designated Claims will be subject to mandatory mediation as set forth in Section II.B of the ADR Procedures.

IN ADDITION, YOU ARE REQUIRED TO INDICATE EXPRESSLY WHETHER YOU CONSENT TO **BINDING ARBITRATION** IF YOUR DESIGNATED CLAIM(S) CANNOT BE SETTLED. PLEASE MARK THE BOX BELOW INDICATING WHETHER YOU (i) CONSENT TO **BINDING ARBITRATION** OR (ii) **DO NOT** CONSENT TO (AND SEEK TO **OPT OUT** OF) **BINDING ARBITRATION**. PLEASE NOTE THAT YOUR CONSENT TO **BINDING ARBITRATION** CANNOT SUBSEQUENTLY BE WITHDRAWN. IN ADDITION, ANY ATTEMPT TO OPT OUT OF **BINDING ARBITRATION** IN THE RESPONSE TO THIS ADR NOTICE SHALL BE INEFFECTIVE IF YOU PREVIOUSLY HAVE CONSENTED IN WRITING (EITHER PREPETITION OR POSTPETITION) TO **BINDING ARBITRATION** AS A MEANS TO RESOLVE YOUR CLAIM(S).

Details about the arbitration process, including the sharing of fees, are set forth in Section II.C of the ADR Procedures.

YOU MUST RESPOND TO THE FOLLOWING SETTLEMENT OFFER:

**Settlement Offer**: The Debtors offer you an allowed general unsecured, nonpriority claim in the amount of $_____ against **[Name of Debtor]** in full satisfaction of your Designated Claim(s), to be satisfied in accordance with any plan or plans of reorganization confirmed and implemented in the Debtors' chapter 11 cases.

The only permitted response (the "**Claimant's Response**") to the Settlement Offer are (a) acceptance of the Settlement Offer or (b) rejection of the Settlement Offer coupled with a counteroffer (a "**Counteroffer**"). Accordingly, please select your Claimant's Response below:

---

*Please indicate below if you accept or reject the Debtors' Settlement Offer by marking the appropriate box. If you reject the Settlement Offer, please make your counteroffer where indicated.*

☐ I/we agree to and accept the terms of the Settlement Offer.

**or**

---

☐ I/we reject the Settlement Offer. However, I/we will accept, and propose as a Counteroffer, the following allowed claim in full satisfaction of the Designated Claim(s), to be satisfied in accordance with any plan or plans of reorganization confirmed and implemented in the Debtors' chapter 11 cases:

Debtor: _____
Amount: $_____
Priority:  unsecured nonpriority claim (presumed) or ☐ other:*_____

*Note - If you choose a different priority, you must attach an explanation and any relevant documentation.

Section II.A.3 of the ADR procedures sets forth the restrictions on Counteroffers. Your Counteroffer may not (a) improve the priority set forth in your most recent timely-filed proof of claim or amended proof of claim, or (b) exceed the lesser of the Claim Amount Cap (as defined in the ADR Order) or the amount set forth in your most recent timely-filed proof of claim(s) or amended proof of claim(s). You may not amend your proof of claim solely for the purpose of proposing a Counteroffer of a higher amount or a better priority.

Please indicate below whether you consent to binding arbitration for your Designated Claim(s) by marking the appropriate box.

☐ I/ WE CONSENT TO BINDING ARBITRATION.

**or**

☐ I/WE DO NOT CONSENT TO BINDING ARBITRATION.

[Signature of the Designated Claimant's Authorized Representative]

By:    _____
       Printed Name

## ANNEX 2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                        :

**In re**                         :        **Chapter 11 Case No.**
                         :

**MOTORS LIQUIDATION COMPANY,** *et al.*,  :        **09-50026 (REG)**
    **f/k/a General Motors Corp.,** *et al.*  :
                         :

                  **Debtors.**       :        **(Jointly Administered)**
                         :
-------------------------------------------------------------x

## NOTICE OF NONBINDING MEDIATION

Service Date:

Claimant(s):

Claimant(s)' Address:

Designated Claim Number(s):

Amount(s) Stated in Proof(s) of Claim:

Mediation Location:

        By this Mediation Notice, Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession (collectively, the "**Debtors**") submit the above-identified claim(s) (the "**Designated Claim(s)**") in the Debtors' chapter 11 cases to mediation, pursuant to the procedures (the "**ADR Procedures**") established by the Amended Order Pursuant to 11 U.S.C. §105(a) and General Order M-390 Authorizing Implementation of Alternative Dispute Resolution Procedures, Including Mandatory Mediation, entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on _____ __, 2010 and the Supplemental Order Pursuant to 11 U.S.C. § 105(a) and General Order M-390 Authorizing Implementation of Alternative Dispute Resolution Procedures, Including Mandatory Mediation entered by the Bankruptcy Court on April 29, 2010.  The Debtors have been unable to resolve your Designated Claim(s) on a consensual basis with you through the Offer Exchange Procedures of the ADR Procedures, or the Offer Exchange Procedures otherwise were terminated as to your Designated Claim(s) as provided for in the ADR Procedures.

        As provided for in the ADR Procedures, mediation shall be conducted in the Mediation Location set forth above, unless the parties agrees to a different location.  As further

provided in the ADR Procedures, you have ten (10) days to choose one of the individuals identified on the list of mediators enclosed with this Mediation Notice to conduct the mediation.

A complete copy of the ADR Procedures is enclosed for your reference. Please refer to Section II.C of the ADR Procedures, concerning mediation.

[Signature of the Debtors' Authorized Person]

**ANNEX 3**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                              :
**In re**                                      :        **Chapter 11 Case No.**
                                              :
**MOTORS LIQUIDATION COMPANY,** *et al.,*      :        **09-50026 (REG)**
        f/k/a **General Motors Corp.,** *et al.*   :
                                              :
                            **Debtors.**       :        **(Jointly Administered)**
                                              :
-------------------------------------------------------------x

## NOTICE OF BINDING ARBITRATION

Service Date:

Claimant(s):

Claimant(s)' Address:

Designated Claim Number(s):

Amount(s) Stated in Proof(s) of Claim:

Arbitration Location:

       By this Arbitration Notice, Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession (collectively, the "**Debtors**") submit the above-identified claim(s) (the "**Designated Claim(s)**") in the Debtors' chapter 11 cases to **binding arbitration,** pursuant to the procedures (the "**ADR Procedures**") established by the Amended Order Pursuant to 11 U.S.C. § 105(a) and General Order M-390 Authorizing Implementation of Alternative Dispute Resolution Procedures, Including Mandatory Mediation, entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on _____ ___, 2010 and the Supplemental Order Pursuant to 11 U.S.C. § 105(a) and General Order M-390 Authorizing Implementation of Alternative Dispute Resolution Procedures, Including Mandatory Mediation entered by the Bankruptcy Court on April 29, 2010.  The Debtors have been unable to resolve your Designated Claim(s) on a consensual basis with you through the Offer Exchange Procedures of the ADR Procedures or through binding mediation.

       PLEASE NOTE THAT YOU HAVE CONSENTED (OR ARE DEEMED TO HAVE CONSENTED) TO BINDING ARBITRATION. THEREFORE, YOUR DESIGNATED CLAIM(S) WILL PROCEED TO BINDING ARBITRATION, PURSUANT TO THE ADR PROCEDURES.

As provided for in the ADR Procedures, an arbitrator will be appointed through the American Arbitration Association ("**AAA**").  The ADR Procedures require you and the Debtors to share the administrative fees and costs of arbitration charged by the AAA and the arbitrator.

A complete copy of the ADR Procedures is enclosed for your reference.  Please refer to Section II.C of the ADR Procedures, concerning binding arbitration.

[Signature of the Debtors' Authorized Person]

## Exhibit B

### Schedule of Mediators

**Dallas, Texas**

| Name | Experience |
| --- | --- |
| Burdin, Mary | Personal injury, products liability |
| Damuth, Brenda J. | Personal injury, products liability |
| Grissom, Jerry | Class actions, personal injury, products liability |
| Hale, Earl F. | Complex business disputes |
| Lopez, Hon. Carlos G. | Personal injury, products liability |
| Martin, Hon. Harlan | Complex business disputes, personal injury, products liability |
| Nolland, Christopher | Complex business disputes, class actions |
| Parker, Walter E. "Rip" | Personal injury, products liability, complex disputes |
| Pryor, Will | Personal injury, products liability, complex business disputes |
| Rubenstein, Kenneth J. | Personal injury, products liability, complex business disputes |
| Stoddard, Ross | Personal injury, products liability, complex business disputes |
| Young, James | Class actions, complex business disputes, insurance disputes, personal injury |

**New York, New York**

| Name | Experience |
| --- | --- |
| Carling, Francis | Products liability, personal injury |
| Cyganowski, Melanie | Complex business disputes |
| Ellerin, Hon. Betty | Complex business disputes, products liability, personal injury, class actions |
| Farber, Eugene I. | Products liability |
| Feerick, Kevin | Complex business disputes, products liability |
| Gafni, Abraham J. | Complex business disputes, products liability, personal injury |
| Holtzman, Eric H. | Products liability |
| Hyman, Ms. Chris Stern | Insurance disputes |
| Leber, Bernice K. | Complex business disputes |
| Levin, Jack P. | Class actions, breach of warranty claims, products liability |
| McAllister, Michael T. | Personal injury, products liability |
| McLaughlin, Hon. Joseph T. | Complex business disputes, class actions |
| Ricchiuti, Joseph F. | Complex business disputes, products liability, personal injury, class actions |
| Silbermann, Hon. Jacqueline W. | Complex business disputes, products liability, personal injury, class actions |
| Woodin, Peter H. | Complex business disputes, products liability, personal injury, class actions |

## Detroit, Michigan

| Name | Experience |
|------|------------|
| Connor, Laurence D. | Complex business disputes |
| Harrison, Michael G. | Personal injury |
| Kaufman, Richard C. | Personal injury |
| Muth, Jon R. | Complex business disputes, class actions |
| Pappas, Edward H. | Complex business disputes, products liability |

## San Francisco, California

| Name | Experience |
|------|------------|
| Cahill, Hon. William J. | Complex business disputes, products liability, personal injury, class actions |
| Denver, Thomas | Products liability, personal injury |
| Infante, Hon. Edward A. | Complex business disputes |
| Komar, Hon. Jack | Products liability class actions, mass torts |
| Lynch, Hon. Eugene F. | Complex business disputes |
| McLean, William | Complex business disputes, products liability, personal injury |
| McPharlin, Linda Hendrix | Complex business disputes |
| Needham, Craig | Products liability, personal injury |
| Williams, John R. (Jack) | Products liability, personal injury |
| Wulff, Randall W. | Complex business disputes, products liability, class actions |

## Chicago, Illinois

| Name | Experience |
|------|------------|
| Anderson, Hon. Wayne R. | Complex business disputes, personal injury, products liability, class actions, mass torts |
| Cohn, Lynn | Personal injury, products liability, class actions |
| DiVito, Hon. Gino | Complex business disputes, products liability, personal injury |
| Dutenhaver, Katheryn M. | Complex business disputes, products liability, personal injury |
| Ginn, Bradley R. | Complex business disputes, products liability, personal injury |
| Neville, Hon. Richard E. | Complex business disputes, personal injury, products liability |
| Nudelman, Hon. Stuart A. | Complex business disputes, personal injury, products liability |
| Sullivan, Hon. James E. | Complex business disputes, personal injury, products liability, class actions |

2

**Exhibit C**

**Form of Capping Claim Letter**

[Date]

**BY E-MAIL AND FIRST CLASS MAIL**

Motors Liquidation Company
2101 Cedar Springs Road, Suite 1100
Dallas, TX 75201
Attn.: ADR Claims Team
claims@motorsliquidation.com

   Re: In re Motors Liquidation Company, *et al.* ("**Debtors**")
     Case No. 09-50026 (REG) – Capping Proposal Letter

Dear Motors Liquidation Company,

    By this letter, I, the undersigned, am the below-referenced claimant, or an authorized signatory for the below-referenced claimant, and hereby submit my claim to the capping procedures established in the Amended Order Pursuant to 11 U.S.C. § 105(a) and General Order M-390 Authorizing Implementation of Alternative Dispute Procedures, Including Mandatory Mediation (the "**ADR Procedures**") entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on _____, 2010 and the Supplemental Order Pursuant to 11 U.S.C. § 105(a) and General Order M-390 Authorizing Implementation of Alternative Dispute Resolution Procedures, Including Mandatory Mediation entered by the Bankruptcy Court on April 29, 2010.

    Accordingly, I hereby propose to cap my claim at the amount specified below (the "**Claim Amount Cap**").

| Claimant's Name | Proof of Claim No. | Original Filed Amount | Claim Amount Cap |
|---|---|---|---|
|  |  |  |  |

    I understand and agree that the Claim Amount Cap includes all damages and relief to which I believe I am entitled, including all interest, taxes, attorney's fees, other fees, and costs. If the Claim Amount Cap is accepted by the Debtors, I understand that I am required to submit my claim to the ADR Procedures and acknowledge that my claim may be a "Designated Claim" as such term is used under the ADR Procedures.

        Very truly yours,

       By   _____
       Address _____
       State  _____

cc: Pablo Falabella, Esq.
  Weil, Gotshal & Manges LLP
  767 Fifth Avenue, New York, NY 10153
  pablo.falabella@weil.com