Page 1

1  UNITED STATES BANKRUPTCY COURT

2  FOR THE SOUTHERN DISTRICT OF NEW YORK

3  Case No. 09-50026

4  - - - - - - - - - - - - - - - - - - - - - -x

5  In Re:

6

7  GENERAL MOTORS CORPORATION, et al.,

8

9              Debtor.

10

11  - - - - - - - - - - - - - - - - - - - - - -x

12

13              United States Bankruptcy Court

14              Southern District of New York

15              One Bowling Green

16              New York, New York   10004

17

18

19              April 12, 2012

20              9:51 AM

21

22  B E F O R E:

23  HON. ROBERT E. GERBER

24  U.S. BANKRUPTCY JUDGE

25

Page 2

1    Omnibus Objection to Claim(s) Number: 269th (Insufficient

2    Documentation)

3

4    Omnibus Objection to Claim(s) Number 270th (No Liability

5    Claims)

6

7    Motion of the Revitalizing Auto Communities Environmental

8    Response Trust For An Order Pursuant to 11 U.S.C. §§ 105 and

9    1142 To Enforce Debtors' Payment Obligations Under The Second

10   Amended Joint Chapter 11 Plan And The Confirmation Order

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Nick Gereffi

1    A P P E A R A N C E S :

2    DICKSTEIN SHAPIRO LLP

3         Counsel for the Motors Liquidation GUC Trust

4         1633 Broadway

5         New York, NY  10019

6

7    BY:   MIKAELA C. WHITMAN, ESQ.

8

9

10   HILL & KEHNE, LLC

11        Counsel for the Revitalizing Auto Communities

12        Environmental Response Trust

13         2300 Wisconsin Avenue, Suite 300

14         Washington, D.C.  20007

15

16   BY:   JEFFREY P. KEHNE, ESQ.

17

18

19   STATE OF NEW YORK, OFFICE OF THE ATTORNEY GENERAL

20        Counsel for the Environmental Production Bureau

21        The Capitol

22        Albany, NY  12224

23

24   BY:   MAUREEN F. LEARY, ESQ.

25

Page 4

1

2    REVITALIZING AUTO COMMUNITIES ENVIRONMENTAL RESPONSE TRUST

3         Counsel for the Revitalizing Auto Communities

4    Environmental Response Trust

5         2930 Ecorse Road

6         Ypsilanti, MI  48198

7

8    BY:  MICHAEL O. HILL, ESQ.

9

10

11   WEIL, GOTHSAL, & MANGES LLP

12        Counsel for Motors Liquidating Company DIP Lender's Trust

13        1300 Eye Street NW, Suite 900

14        Washington, D.C.  20005

15

16   BY:  RALPH L. MILLER, ESQ.

17        DAVID R. BERZ, ESQ.

18        SUNNY J. THOMPSON, ESQ.

19

20

21

22   CROWELL MORNING

23        Counsel for the Revitalizing Auto Communities

24   Environmental Response Trust

25        590 Madison Avenue, 20th Floor

Page 5

1          New York, NY  10022

2

3    BY:  STEVEN B. EICHEL, ESQ.

4

5

6

7    U.S. DEPARTMENT OF JUSTICE

8          Counsel for the Department of the Treasury and the EPA

9          86 Chambers Street

10         New York, NY  10007

11

12   BY:  DAVID S. JONES, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                   P R O C E E D I N G S

2               THE COURT:   Good morning.  Have seats, please.

3               All right.  Good morning.  Today, on Motors

4    Liquidation Corporation GM, we have, as I understand it, a

5    couple of unopposed matters and then the major event today,

6    which are the issues visa vie the RACER Trust.  On the last of

7    those, I have some preliminary remarks.  I'm going to want

8    people to make appearances and then to sit down while I make

9    them.  Do we have preliminary matters first?

10              MS. WHITMAN:   Good morning, Your Honor.  Mikaela

11   Whitman from Dickstein Shapiro on behalf of the Motors

12   Liquidation GUP Trust.

13              Your Honor, today, we have two uncontensted omnibus

14   objections before the Court.  We have the 269th Omnibus

15   Objection, which is an objection based on insufficient

16   documentation.  From that objection, three have been adjourned,

17   five objections have been withdrawn, and 57 are going forward

18   today.  We also have the 270th Omnibus Objection before this

19   Court.  This is a no liability objection.  From that objection,

20   all 56 claims are going forward today.

21              Unless Your Honor has any objections, I'd like to ask

22   Your Honor to approve these omnibus objections and permission

23   to submit the orders to chambers.

24              THE COURT:   Certainly.  That's granted. My courtroom

25   deputy isn't here today.  I don't want to burden the

Page 7

1    proceedings by asking my law clerks to do it in her absence, so

2    let me ask you to simply work it out with my law clerks after

3    today's hearing.

4              MS. WHITMAN:   Certainly, Your Honor.

5              THE COURT:   Thank you, Ms. Whitman.  Does that do it

6    for you?

7              MS. WHITMAN:   Thank you.  May I be excused?

8              THE COURT:   Yes, you are, and if you would like to

9    leave the lengthy proceedings that I suspect you're going to

10   follow --

11             MS. WHITMAN:   Yes, Your Honor.

12             THE COURT:   -- that's fine.

13             Okay, folks.  Can I now get appearances on the RACER

14   Trust matter?

15             MR. KEHNE:   Good morning, Your Honor.  I'm Jeff

16   Kehne, admitted pro hoc here representing RACER Trust.

17             THE COURT:   Okay.  Good morning, Mr. Kehne.  I know

18   Ms. Leary, of course.

19             MS. LEARY:   Maureen Leary on behalf of the States of

20   New York, New Jersey, Illinois, Indiana, Ohio, Missouri,

21   Kansas, Michigan, Louisiana, Wisconsin, Commonwealth of

22   Massachusetts, and the Saint Regis Mohawk Tribe.

23             THE COURT:   Okay, thank you.

24             MR. HILL:   Good morning, Your Honor.  Michael Hill,

25   General Counsel of the Trust and admitted pro hac vice in this

Page 8

1   matter last November.  Now one slight complication is that, in

2   January, I did submit a declaration in response to the -- or,

3   on February 3 in response to the -- in reply to the response,

4   so in the event that Your Honor has questions of declarance or

5   anyone has questions of declarance, it is possible that I may

6   be called as a witness, so for that reason, I wanted to make

7   sure that you're comfortable with my sitting at the table.

8   Otherwise, I can sit back.

9           THE COURT:  I'm not aware, at this point, that

10  anybody is challenging the credibility of any of the witnesses

11  in the sense of suggesting to me that anybody was lying, so the

12  usual concerns about people commenting on their credibility

13  would not appear to be the case.  I certainly want to hear you

14  if you want to be heard, Mr. Hill.  I'm going to give others a

15  reservation of rights on that issue, but frankly, I don't see

16  an issue right now.

17          MR. HILL:  Thank you, Your Honor.

18          THE COURT:  Okay.

19          MR. BERZ:  Good morning, Your Honor.  David Berz,

20  Motors Liquidation DIP Lender Trust.  I'm here along with with

21  my colleagues Ralph Miller and Sunny Thompson --

22          THE COURT:  Okay.

23          MR. BERZ:  -- and Mr. Miller will be making a

24  presentation on behalf of the DIP Lender Trust today.

25          THE COURT:  All right.  Thank you.

Page 9

1          MR. MILLER:   Good morning, Your Honor.  I am Ralph

2      Miller from Weil Gotshal.

3          THE COURT:   I'm not sure if you heard me, Mr.

4      Miller.  I wanted to get appearances from everybody, and before

5      I hear anything of substance, I have a number of preliminary

6      remarks --

7          MR. MILLER:   I understand, Your Honor.

8          THE COURT:   -- I want to make.

9          MR. MILLER:   I just wanted to identify myself on the

10     record for you, Your Honor, if I may.

11         THE COURT:   Oh, okay.  When Mr. Berz pointed to you,

12     I got that message.

13         MR. EICHEL:   Your Honor, Steve Eichel, Crowell

14     Moring, on behalf of the RACER Trust.

15         THE COURT:   A little slower, please.

16         MR. EICHEL:   I'm sorry, Your Honor.  Steven Eichel

17     with Crowell Moring on behalf of the RACER Trust.  Mr. Kehne

18     will be arguing the motion today, but I wanted to just, you

19     know, make my notice.

20         THE COURT:   Okay, Mr. Eichel.  Who did you say would

21     be making the argument?

22         MR. EICHEL:   Mr. Kehne.

23         THE COURT:   Oh, Mr. Kehne.  Okay.

24         MR. JONES:   And good morning, Your Honor.  David

25     Jones from the U.S. Attorney's Office, Southern District of New

Page 10

1    York, for the United States.

2         THE COURT:   All right.  You're representing the

3    United States kind of as a big bundle without slicing and

4    dicing in that between the Treasury interest and the EPA

5    interest or any other?

6         MR. JONES:   Collectively, the United States, Your

7    Honor, and I will say active -- we've been actively

8    coordinating between Treasury and EPA, so specifically both of

9    those agencies.

10        THE COURT:   Okay.

11        MR. JONES:   Thank you.

12        THE COURT:   All right.  Have I now heard from

13   everybody?  All right.

14        All right, folks. I have, after all of the reading of

15   the materials that have been submitted to me today, I don't see

16   material disputed issues of fact, and as a result, unless

17   somebody wants to change his or her view, as I understood it

18   before today, I don't see the need for a cross examination, and

19   I don't understand anybody to have asked for the ability to

20   cross examine.  Accordingly, I'm going to consider statements

21   made in declarations to have been truthful to the best of the

22   declarant's memory, although it's at least arguable that

23   documents that are in the record should trump people's memories

24   as to things that happened, and I consider the documents to be

25   the best evidence of what they said, although that's not the

Page 11

```
1    same thing, of course, as taking documents as true for the

2    truth of the matter asserted as we would do in part of any

3    hearsay analysis.

4         Now, based on that, I have a bunch of tentatives

5    California-style, and your job on both sides -- because, as

6    you're going to hear, I'm less than agreement in full with

7    either side -- is to find that the original settlement

8    agreement and the contractual obligations as embodied in the

9    Trust were breached by the delivery of the TIPS in lieu of

10   green money of the United States cash, but that the breach was

11   waived that there are no damages and that the RACER Trust

12   failed to mitigate its damages.  I will, of course, want and

13   frankly expect your best views as to why I'm wrong in those

14   respects, but I think that the undisputed facts are pretty

15   clear in terms of what I have before me.

16        I do have a couple of questions.  Don't rule out the

17   possibility that, with all of the stuff that was submitted to

18   me, I missed stuff.  One is I would like to know if the

19   settlement agreement that was entered into back in 2010 -- I'm

20   thinking approximately October 2010; I'll have to check my

21   notes for the exact date --  has an integration clause.  I want

22   to confirm my understanding that that agreement does not say in

23   baby talk anything about the currency with which the

24   contribution would be made, but does use the words "payment"

25   and put a dollar sign before the amount of dollars that are to
```

Page 12

1   go into the RACER Trust.  I want to get my arms around the

2   entirety of the statements that were made in the disclosure

3   statement.  I have noticed a statement on Page 84 of the

4   disclosure statement that says, "Such transfer shall include

5   the transfer of Cash," with a capital C, "in the amount of

6   approximately $641,000,000," again, that being on Page 84.

7   Then, it says on Page 85, "The Environmental Response Trust

8   Administrative Trustee may invest Cash," with a capital C,

9   "including any earnings thereon or proceeds there from as would

10  be permitted by 345 of the code and the earlier agreement."

11  And then I saw a reference in the briefs to a Footnote 6, but I

12  had trouble finding that Footnote 6 in the underlying

13  documents, which, as best I recall from my prep, said or

14  implied that the funding would be with a combination of cash

15  and marketable securities, which is obviously somewhat

16  inconsistent with what I just read, or arguably so, or one or

17  the other didn't embody the entire picture.

18          But I see the disclosure statement as being relative

19  to waiver rather than changing the agreement; as telling the

20  parties who are going to be the beneficiaries of the RACER

21  Trust -- the ultimate beneficiaries, not it's technical

22  beneficiary -- it's practical beneficiaries, which I see is the

23  EPA and the States and the Tribe -- as telling them what was

24  coming down, and in essence, raising a duty to speak up if they

25  didn't like what was coming down.  And then I want to know

Page 13

1    whether the Trust -- the RACER Trust or the States or the Tribe

2    or, for that matter, the EPA disputes what I would be inclined

3    to believe that Mr. Hill, Mr. Laws, and Mr. Hamilton were

4    agents of the Trust and of the states and of the other

5    governmental agencies, and that their knowledge and actions

6    counts for all of the various what I'll call practical

7    beneficiaries of the Trust.  If there are reasons, Ms. Leary or

8    any of the other people, why you think I -- that isn't the case

9    and that the states can disclaim the actions of these folks,

10   I'd like your help in that regard.

11          Now, other areas for which I would like help, aside

12   from whatever folks -- you folks are going to be saying as part

13   of your ordinary presentation.  I want to know if I understood

14   it correctly that either Motors Liquidation or Treasury or

15   somebody said to the RACER Trust, fine; you want to give us

16   back all the TIPS and we'll give you the original amount of

17   money in green money, and that the RACER Trust turned that

18   down.  If that is the case, it seems to me to be relevant to

19   mitigation of damages.  I also am inclined to conclude, unless

20   you guys can show me that I'm wrong, that if green money had

21   been delivered on the original day, it would be worth the exact

22   same amount now and would be the exact same amount over the

23   course of the duration of the Trust, and while it could draw

24   interest -- and I imagine it wouldn't draw a lot of interest,

25   but it would draw interest -- but it's also my understanding

1    that the TIPS drew interest, and that the difference between

2    the interest that could be earned on green money and the

3    interest that could be earned on TIPS wouldn't be that great,

4    and certainly wouldn't be $13 million bucks.  And if it were

5    only the difference between the interest that could have been

6    earned on green money and the interest that was earned on the

7    TIPS, you could have settled this in eight seconds.

8              I don't want to take any more time with preliminary

9    questions.  I do have reason to believe I'll be interrupting

10   you a zillion times, but at this point, I'll hear first from

11   the RACER Trust.  Will that be Mr. Kehne?

12             MR. KEHNE:    That's correct, Your Honor.

13             THE COURT:    Come on up, please.

14             MR. KEHNE:    Your Honor, I just have one preliminary

15   matter.  I've spoken with David Jones for the United States

16   about the United States' position and clarifying that for the

17   Court.  There's been some confusion about the United States'

18   position --

19             THE COURT:    I'm going to need you to speak louder,

20   Mr. Kehne --

21             MR. KEHNE:    Pardon me.

22             THE COURT:    -- and to pull the mic closer to you.

23             MR. KEHNE:    There's been some confusion about the

24   United States' position.  There was an amended response brief

25   from the MLC DIP Lender's Trust on that point, and there's

Page 15

1      further confusion in the sur-reply brief concerning where the

2      United States is in this matter.  If that's of interest to the

3      Court, I've offered Mr. Jones an opportunity to proceed my

4      remarks so that I'm not put in a position of speaking for the

5      United States, our beneficiary, as to where it is in the -- in

6      this case.

7                  THE COURT:  All right, sure.  You can give Mr. Jones

8      a chance to be heard.

9                  MR. JONES:  Thank you, Your Honor.  And again, good

10     morning.  David Jones from the U.S. Attorney's Office for the

11     United States.  And, Your Honor, as I noted previously, when

12     giving appearances in this instance, our office represents

13     specifically both the Department of the Treasury and the EPA.

14                 As Your Honor knows, the United States has filed no

15     papers in connection with this motion, and we wanted to make

16     explicit on the record that the United States takes no position

17     on and is neutral on this dispute.  We think that it's

18     important to make sure there's no misunderstanding as to

19     whether the United States is taking any position.  The United

20     States is committed to fund the wind-down obligations of the

21     estate, including both those being discharged by the RACER

22     Trust and those being handled by the DIP Lender Trust, which is

23     handling MLC's obligations as to funding the RACER Trust in

24     this dispute.  We make those commitments -- we are committed to

25     carry out those obligations in accord with operative law

1    agreements and orders.  The RACER Trust and the DIP Lender

2    Trust obviously have squarely opposing views about what their

3    obligations and entitlements are, and we have left it to them

4    to negotiate or present their arguments for resolution by the

5    Court, and we are neither endorsing nor opposing any -- either

6    party's contentions or positions.

7            The only additional comment I wish to make is that

8    it's very important to the United States -- and I think to all

9    parties -- that this dispute be resolved promptly, and with the

10   least possible administrative expense to either party.

11           Thank you.

12           THE COURT:   All right.  Thank you, Mr. Jones.  Okay,

13   Mr. Kehene.  Back to you.

14           MR. KEHNE:   And the only other preliminary matter

15   I'd like to raise, Your Honor, is that I would like to reserve

16   a few minutes for reply, if that's okay with you.

17           THE COURT:   Yeah.  You haven't appeared before me as

18   much as some of the other people in this room.  I always give

19   permission to reply, and as long as the reply and potential

20   sur-reply are limited to the new stuff that came out, I permit

21   both.

22           MR. KEHNE:   Thank you, Your Honor.

23           In light of Your Honor's view that the cash

24   requirement was breached, I will skip past the terms of the

25   documents except to note that the settlement agreement, Section

Page 17

1    109, requires that any document submitted by the signatories to

2    the Court be in compliance with that -- with the settlement

3    agreement, and to the extent that the disclosure statement

4    makes a reference in one place to the possibility of delivery

5    of cash equivalences in addition to cash, we don't think that

6    that, first of all, could trump the terms of the plan or the

7    confirmation order or the Trust agreement, and would be

8    inconsistent to read it as notice to the world that the

9    securities were going to be delivered at all, especially notice

10   to the settlement governments.  That's the most critical issue.

11            THE COURT:  Well, of course it doesn't change the

12   underlying agreement, Mr. Kehne, and if I was unclear in my

13   suggestion as to the significance of that, I think I need you

14   to help me in light of what was really in my mind.  The

15   disclosure statement doesn't change the underlying deal, but it

16   puts people on notice of what the counter party to the Trust is

17   planning to do in its implementation of the deal, and it is

18   relevant -- or at least arguably relevant -- to waiver.  If

19   waiver is the knowing relinquishment of a given right or of a

20   legal right, and when the disclosure statement says, hey guys,

21   here's what's coming down, subject to your right to be heard,

22   it would seem to be enough to give -- meet the knowing

23   requirement of that, so that's why I care what folks on the

24   Trust side did to say, when the disclosure statement came down,

25   hey, wait a minute; you can't confirm a plan giving us all of

Page 18

1  these TIPS or other securities; you've got to give us green

2  money.  And I regard it as relevant to waiver, not to the

3  underlying breach issue.

4       MR. KEHNE:   I understand, Your Honor.  With respect

5  to the Trust's leadership, designated before the effective

6  date, we're clearly aware that the debtors intended to transfer

7  securities.  That was clear from the establishment of the

8  custodial accounts and from the discussions, and in fact, Mr.

9  Hill's declaration recites that he had conversations with both

10 Treasury and the debtors with respect to the question of

11 whether securities would qualify as cash, and at the time --

12 this was in January 2011 -- he was assured that they had

13 investigated it and that that was clear.  Now, I think, at the

14 time, what's important to focus on is that, for purposes of the

15 Trust's obligation to enforce the terms of the Trust documents

16 and its obligations to its beneficiary -- in this case in

17 particular EPA, to assure full funding -- there was no harm

18 threatened by -- merely by the intent to transfer securities.

19 If the securities had been properly valued on the effective

20 date, there may have been a formal breach and there may have

21 been nominal damages, but there would not have been a harm to

22 the Trust or the parties who settled their claims in response -

23 - in return for full funding of the Trust.

24       The difficult arose -- the only real meat of this

25 dispute came about because it wasn't just a transfer of

Page 19

1    securities at net book value -- the debtors' accounting value

2    of those securities -- rather than the cash equivalent value,

3    the market value on the date of the transfer.  That's the only

4    reason why we're here.

5              THE COURT:  Yes, sir.  Exactly, and Mr. Kehne, I've

6    tried to exercise self control not to interrupt you.  I was

7    going to give you kind of like a Marv Albert yes, if you're a

8    New York sports fan, but the problem is that you're contractual

9    entitlement ain't to delivery of securities using a particular

10   evaluation method, specifically the market quotation method

11   that you favor.  It's your contractual entitlement is to the

12   delivery of cash, and what you're saying in substance is that

13   if they had valued it using a means that you consider

14   appropriate, you would have shrugged your shoulders and said,

15   okay, it's all right that you didn't give us cash, but that

16   isn't what the contract says.  The contract, at least to the

17   extent that I find it breached -- and I know your opponents

18   haven't heard, been heard on this, but, you know, I read the

19   papers and the agreement, settlement agreement, and its

20   relevant part -- your entitlement is to cash.  It's not to

21   securities valued by any particular method, or am I wrong in

22   that regard?

23             MR. KEHNE:  Your Honor, I think, as with any party

24   to a contract or a consent order, if we had come running to the

25   Court based on a disclosure that there was an indication one

Page 20

```
1    document among five or six different documents that suggested

2    that they intended to transfer securities in lieu of cash, and

3    we had come in before there was any indication that there was

4    damages -- that there were damages associated with that

5    transfer of securities, I think we would have been uprated for

6    wasting the Court's time.  It would not have been a sensible

7    expenditure of trust resources or the Court's time to come in

8    and say, you need to sort out whether securities are an

9    adequate substitute for cash before we know what those

10   securities were worth.  Those securities -- the notice to the

11   Trust of what those securitise were actually worth, the cash

12   equivalent value -- in other words, if -- what they -- what we

13   would have received if they had sold them and given us green

14   cash on that date, the first notice of what the Trust had of

15   that was when the bank statement from U.S. Bank came out with

16   evaluations in mid-May.

17              THE COURT:   Mr. Kehne, you're right, of course, that

18   when people come yelling into my court with various grievances,

19   I get cranky, but there's a middle course, which is calling up

20   your opponent in advance and saying, we've got a problem here,

21   guys; we've got to resolve it, and either getting your

22   counterparty to agree, or -- and I've used this expression so

23   much it's as cliché in this room -- agreeing to disagree, and

24   then, if it's important enough, you tee it up for a judicial

25   determination.  It isn't an either or that you stay silent on
```

Page 21

1    the one hand or get the judge mad for raising an issue before

2    him on the other.

3            MR. KEHNE:   Well, I think, Your Honor, that the

4    Trust did take prudent steps in exactly the direction that

5    you're suggesting in Mr. Hill's contacts with both MLC and the

6    debtors -- excuse me, both the debtors and the Treasury in

7    advance of the effective date when it became clear that they

8    intended to transfer securities.  The question was raised, it

9    looks like the documents require cash; have you run the traps

10   on whether cash includes U.S. Treasuries?  And the answer came

11   back yes.  There was, essentially, an agreement -- a position

12   on the part of our counterparties that these were cash, and a

13   position on our part -- on RACER's part, we're not sure about

14   that, but we don't know that there's any harm to seek a

15   resolution of, at this point.

16           THE COURT:   Continue, please.

17           MR. KEHNE:   Well, I think it would be helpful for me

18   to go through a little bit more of the chronology from the

19   period of the bank statement onward so that you can appreciate

20   why it is that we're insisting that RACER didn't waive any

21   objections. And I think it's also important to keep in mind

22   that this is a multilateral dispute; that the States and the

23   Tribe also have rights to enforce here, and I don't see how

24   they are bound by a mistake that the Trust made, even though I

25   want to insist that the Trust didn't make any mistakes and did

Page 22

1    behave prudently with respect to this issue.

2           So, in May, the Trust received the U.S. Bank

3    statement.  Don't forget that this was the period of time when

4    the Trust was first becoming effective, staffing up, learning

5    all the ropes of the remediation, the property marketing,

6    getting all the personnel maters in place, the Trust had

7    essentially no arms and legs prior to the effective date, and

8    it was taking over a large operation on the fly, but --

9           THE COURT:   Pause please, Mr. Kehne.  Your opponent

10   contends that at least two of your folks -- I think it was Mr.

11   Hill and Mister -- bear with me -- I'll try to come up with the

12   other name -- were hired, if you will, or designated in

13   September of 2010.  Is that a disputed fact?

14          MR. KEHNE:   No, that's correct.  Mr. Laws and Mr.

15   Hill had been chosen as --

16          THE COURT:   Okay.  Mr. Laws is the name I was

17   groping for --

18          MR. KEHNE:   That's correct.

19          THE COURT:   -- and if Mr. Laws is in the courtroom,

20   I apologize to him.  Okay, go on.

21          MR. KEHNE:   But their role -- they were the designed

22   managers of the Trust for the period when and if the Trust took

23   affect, but they had no employees, they had a limited kind of

24   contingent budget -- contingent on approval of the plan -- to

25   spend on legal advice during this time, and they had all the

Page 23

1    issues that you're familiar with associated with the drafting,

2    review, and approval of the settlement agreement, the Trust

3    agreement, and the plan -- and the relevant pieces of the plan,

4    as well as lining up high level employees and clean up managers

5    to take over the work of the Trust on the effective date.  But,

6    never the less, in mid-May when the Trust received the bank

7    statement and saw that U.S. Bank's cash equivalent values --

8    the fair market value on the effective date -- were $13.5

9    million lower than the claim values on the flow of funds

10   summary that they received from the debtors.  The Trust

11   investigated, ran the traps internally, reviewed the issues,

12   checked -- talked with the CFO, and went to Treasury, an

13   important arm of our beneficiary, as well as -- on June 17, so

14   there's very little time that passed between actual notice of a

15   claim that could potentially lead to damages and our raising

16   the issue with our beneficiary.

17          And I think it -- I think it's important to pause on

18   the prudent -- why it was prudent to raise it with the

19   beneficiary and not with the debtors, because we are, after

20   all, our Trust.  Our first obligation is to abide by and

21   enforce the written terms of the Trust's documents, and our

22   second obligation, consistent with those legal requirements, is

23   to advance the interest of our beneficiary as our beneficiary

24   articulates them, so it was entirely appropriate for the Trust

25   to go to the beneficiary and say, guys, we see a problem here;

Page 24

1    we see a gap that we're going to have to explain to the estates

2    and the Tribe, if it stays, between what they bargained for --

3    what they got in those remediation and administrative accounts

4    to provide for the cleanup that they settled for in the

5    bankruptcy and what we received, and what we received was not -

6    - it was neither cash, on the effective date in the $625

7    million amount required, nor was it the equivalent of cash,

8    because if we had sold it on that date, we would be down $13

9    and a half million.  That was raised -- on June 17, there's an

10    email to Treasury from Mr. Laws on that date, and it was -- and

11    there were discussions that followed from that.

12          So the -- I think it's clear that the Trust took

13    reasonable efforts to make sure that this didn't just slide

14    past.  One of the things that was motivating that, frankly, was

15    the Trust was aware and our CFO was aware that we were going to

16    have an audited financial statement, and the audited financial

17    statement, which was -- was going to need to declare to all the

18    Tribe -- to the Tribe and all the States what was in their

19    accounts, and if we had settled for the fair -- the net book

20    values, which were lower than the fair market value, our

21    outside auditors would insist on mark to market on the

22    effective date, and we were going to show a $13.5 million gap

23    between what we bargained for and what we received.

24          THE COURT:  Go on, please.

25          MR. KEHNE:   Well, Your Honor, I think that -- I

Page 25

1    mean, that is the core of my response on the waiver issue, and

2    I'm happy to answer any further questions that you have on that

3    matter.  I'd like to touch next on mitigation of damages

4    question, if that suits you.

5            THE COURT:   All right.  If I wasn't clear in the

6    tentative, I have double barreled concerns, both with respect

7    to whether you were damaged at all, and second, based on the

8    mitigation of damages you just mentioned.  Before you're done,

9    be sure to deal with both.

10           MR. KEHNE:   Okay.

11           Well, perhaps as a logical matter, it makes more

12   sense to go first on the question of whether we were damages,

13   and I begin there with the terms of the Trust agreement and the

14   plan that refer to enforcement under New York Law, and I think

15   that's supported by Paragraph 56 of the response brief of the

16   MLC DIP Lender's Trust, which says New York Law governs.  I

17   want to hesitate on that point for a moment, though, because I

18   don't think New York Law is the entire issue here, because this

19   is, in fact, a court order.  I don't think that, given the

20   documents, that it's proper to give less in the way of

21   compensatory damage than New York would provide, but I

22   certainly think that this Court reserves its authority to

23   enforce its own order and go beyond those compensatory damages

24   to vindicate this authority or because it finds that those

25   damages are inadequate.

Page 26

1           THE COURT:   I saw that contention in your brief, and

2     I'm not inclined to quarrel with the notion that judges, when

3     they see their orders have been violated, have powers that may

4     not be constrained by the limits of the applicable law, but --

5     I can't speak for other judges, but my personal jurisprudence

6     is that, when I think that my order has been flouted and/or a

7     litigant before me acted with malice or to be mean or to be

8     overreaching, I'd consider invoking the principal you

9     discussed, but I would normally not be of a view to be heavy

10    handed in the use of my judicial power if I thought that there

11    was a good faith disagreement between people as to what was

12    required, or if, as could be argued here, no good deed goes

13    unpunished.   Do you think I'm being overly conservative in the

14    exercise of my judicial power?

15           MR. KEHNE:   No, I do not quarrel with that approach,

16    Your Honor, and in this case.   We think the New York law is

17    perfectly adequate to raise such purposes here, and the reason

18    why we think New York law is perfectly adequate for the

19    compensatory remedy we seek is the New York law has a very

20    strong principal that you assess damages at the time of breach.

21    That rule is encapsulated nicely in the Kruss case and in the

22    Merrill Lynch case, both Second Circuit cases.   It's also set

23    out in the New York cases of Aaronic and Simon, and the point

24    there is that when there's a breach of an obligation -- a

25    contractual obligation or, in this case, a consent order that's

Page 27

1    contractual in form or partially contractual in form, that the

2    remedy owed to the party that suffers the breach should not

3    depend on the timing of when the action's brought.  You

4    shouldn't -- the New York courts have wisely dictated a rule

5    that you shouldn't encourage gaming of the timing of the action

6    to remedy the breach by allowing asset value fluctuation post-

7    breach to affect what the breached party's entitled to, or

8    whether the breached party's entitled to a remedy at all.

9         And, in this case, if you assess damages at the time

10   of the breach, the damages from the breach of the obligation to

11   provide cash are the difference between the net book values

12   claimed by debtors and the fair market value that existed on

13   the effective date, and that's $13.5 million.

14        THE COURT:   Have you assumed a fact that is still on

15   debate between you and your opponent, which is that that is how

16   the TIPS are valued as compared and contrasted to evaluation

17   that's premised on their being held to their various

18   maturities?

19        MR. KEHNE:   Well, Your Honor, I think -- there are

20   clearly different ways of valuing securities, and one of the

21   things I want to pause on here, because I think it's important,

22   is that these -- although these are referred to TIPS in MLC DIP

23   Lender's brief, in fact, only about 55 percent of the portfolio

24   that was transferred on the effective date was in the form of

25   TIPS.  There was quite a large body of non-tip treasury

Page 28

1    securities that were mostly shorter term, although there were

2    some out to 2015 and 2016 zero coupon bonds.  Those were not

3    inflation protected, and those were also transferred at net

4    book value as opposed to fair market value.

5               THE COURT:   Help me on this, Mr. Keahne.  I assume,

6    from what you just said, that your guys got a bundle of TIPS --

7    if I heard you right -- short-term treasuries.  I'm not clear

8    on whether you also said longer term but not inflation-

9    protected treasuries.

10              MR. KEAHNE:   That's right.  They were zero coupon

11   treasuries called strips.  If you look at the October 21 U.S.

12   Bank letter that's attached to Mr. Hamilton's declaration, they

13   will be identified as strips.  The inflation protected

14   securities will be identified as IP, inflation protected.

15              THE COURT:   Okay.  And was there a fourth component

16   of old fashioned green money?

17              MR. KEAHNE:   There was old fashioned green money in

18   the amount of roughly $49 million.

19              THE COURT:   Okay.

20              MR. KEAHNE:   So the green money was intended as sort

21   of make-up, the catch-up between the value of the securities

22   and the value -- and the $625 million that they were obligated

23   to transfer.  The question we have is whether the make-up was

24   $13.5 million short because they claimed accounting value

25   rather than cash equivalent value, the fair market value on

Page 29

1     that date.

2              THE COURT:   Let me interrupt you again, please.  I

3     don't know if it's fair for me to take judicial notice of this

4     or not and you can weigh in on this and so can your opponent.

5     It's my understanding that the value of debt securities as

6     traded on the market can go up or down with prevailing interest

7     rates, although the extent to which they do go up or down

8     depends in part -- and maybe material part -- by how short-term

9     they are, and that the longer term they are, the more they tend

10    to move up or down.  Do you think it's okay for me to make that

11    assumption?

12             MR. KEAHNE:   To the limits of my knowledge of U.S.

13    Treasuries and securities markets in general, that's correct.

14    There may be unusual circumstances I'm not aware of in which

15    there's more flocculation in the value of shorter term

16    securities with a given swing in interest rates.

17             THE COURT:   Is it also your understanding that,

18    assuming there's no credit default or, I mean, failure to pay

19    at the end, the debt instruments are paid off at their face

20    value when they mature?

21             MR. KEAHNE:   Aside from the risk of default on the

22    part of the, in this case, the U.S. Treasury, which was, in

23    fact, an issue in the financing in this case, although not

24    directly relevant here, but there was a period in July, if

25    you'll recall, when it wasn't clear whether the debt ceiling

Page 30

1    was going to be raised, and there were concerns about which

2    U.S.-backed securities the Trust ought to be in when the

3    initial securities matured, but that's correct.

4                THE COURT:    Okay, but putting aside quibbling

5    between Republicans and Democrats, I take it nobody thought

6    that the U.S. Government wasn't good for the money.

7                MR. KEAHNE:    I guess I would say nobody thought that

8    there was a better option; that there was a more secure option

9    than the U.S. Government.  The --

10               THE COURT:    Continue, please.

11               MR. KEAHNE:    So, we're -- I'm trying to get to the

12   bottom of the question of your question of why there were

13   damages, and we -- I'm pointing to the very strong New York law

14   rule that you assess damages in an action like this as of the

15   date of the breach, and one --  an additional insight, I think,

16   that supports the wisdom of New York's approach here is, if

17   those securities had swung in the opposite direction, if they

18   had become less valuable rather than more valuable since the

19   effective date, I don't think it would have taken you long to

20   dismiss an action by RACER that we should be getting additional

21   support because, in fact, the Treasuries we received took a bad

22   bounce, and now there's a  -- they have a lower fair market

23   value than they did on the effective date.  It happens that

24   they have a higher fair market than they did on the effective

25   date, but under New York law and under, I think, sound -- a

Page 31

1    sound approach to damages assessment, that doesn't matter.

2    They can't be heard to come in and say, but, they're worth more

3    today, you're lucky, any more than we could be heard to say, it

4    doesn't matter that we were fine on the effective date, now

5    we're unlucky, and I think that's part of the thinking and the

6    analysis that underlies this very strong principal in New York

7    damages law that you assess the damages at the time of the

8    breach.

9            Now, there are a number of cases that are cited in

10   MLC DIP Lender's Trust briefs referring to New York courts'

11   aversion to conferring windfalls.  Those typically come up in

12   the case -- in circumstances of restitution or reformulation.

13   There -- I don't believe there's -- I have not seen a single

14   case, Your honor, in which New York courts said, not

15   withstanding our general principal that you assess the breach -

16   - the damages at the time of the breach, we've decided that the

17   asset swing since the breach has benefitted the parties who

18   suffered the breach, and therefore it would be a windfall to

19   award them the damages assessed at the time of the breach.  I

20   just don't think there's a case out there that says that, and

21   there are many cases that say the opposite.

22           Now, we don't think it's the proper approach, but

23   even if, as a matter -- as a thought experiment the Court were

24   inclined to say, what really would have happened in the real

25   world if RACER had received the cash?  What would RACER had

1    done and would they be harmed today in the way that they're

2    asserting before me if they'd received actual green money for

3    the full amount?  Or, rather, would they be harmed today if

4    they'd accepted cash in the lesser amount?, and the answer is

5    yes.  If NLC -- if the debtors had cashed out on the effective

6    date -- suppose the debtors had said, we see a real issue here,

7    Your Honor -- we see a real issue here, Racer, and States and

8    settling governments; we see a real issue about complying with

9    this requirement that you get cash, and we've set up this very

10   thoughtful, very expensive, in transaction cost terms, approach

11   to matching liabilities and future revenues from these

12   securities.  We see a problem because we're supposed to deliver

13   cash and we don't want to be on the wrong side of that

14   requirement, so we need to cash out and then have you cash back

15   in, get back in right away, if you want to have these

16   securities.  RACER was aware that Treasury had vetted this

17   approach.  Treasury had, in fact, supported a change in the DIP

18   Lender agreement that allowed the debtors to go into longer

19   term instruments in order to get into these securities.  If

20   they'd played it out that way, if they had said, we want to

21   comply with a letter of the cash requirements in the governing

22   documents, they would have incurred a very small transaction

23   costs to get out, we would have incurred a very small

24   transaction cost to get back in to the portfolio of securities

25   that we knew Treasury had approved, and that we knew had been

Page 33

1   the subject of considerable analysis by J.P. Morgan, by

2   Mesirow, by the experts among the debtors, there was no reason

3   for the trust not to duplicate what had already been done to

4   match future costs --  future expected costs and maturities of

5   the securities in a way that partially had defeased inflation

6   risks.

7          And, in fact, that's entirely consistent with what

8   the RACER Trust has done.  The transaction costs of getting out

9   of these securities are very small in percentage terms when

10   you're talking about the size of the transactions we're talking

11   about, and RACER has remained with that portfolio, so I think,

12   if we had received -- if they had cashed out and we had cashed

13   back in, we would be $13.5 million behind the position that we

14   were supposed to be in under the documents, so again, we don't

15   think that that's the proper analysis, but we think that the

16   only fact -- the only competent facts in the record are that

17   that's exactly what would have happened if that were the way

18   you were to proceed to analyze the damages question.

19          THE COURT:   Continue, please.

20          MR. KEHNE:   I think that leads right in to the

21   mitigation of damages issue that you raised, and the question,

22   as I understood it, Your Honor, from your tentative was

23   shouldn't RACER have sold when they became aware of this

24   problem in light of the swing in the asset value, in light of

25   the increase in the fair market value of its securities?

1    Shouldn't they have sold and gotten the cash that they wanted,

2    and in fact, had more on hand?

3          And I think the answer to the mitigation of damages -

4    - well, there's a couple parts to it, but the first goes right

5    back to the New York principal that you assess damages at the

6    time of the breach.  Suggesting that we mitigate our damages by

7    taking advantage of the upswing the asset value is just another

8    way of saying repudiate to the assess the damages at the time

9    of the breach principal, because the principal stands for,

10   those asset values are irrelevant.  What the Courts focus on

11   is, was the party damaged and to what amount on the date of the

12   breach?  And the second part of the answer on mitigation of

13   damages is in a line with the hypothetical that I just walked

14   through, which is to say Scott Hamilton's declaration

15   concerning RACER Trust's investment approach and deference to

16   Treasury's approval of the prior securities portfolio, as well

17   as RACER's revealed preference, in fact -- that is, what its

18   actually done shows that it wanted to be in those securities,

19   so if we sold out and got the cash, we would then have to buy

20   -- to get the same benefits that we have committed to in terms

21   of inflation protection, matching expected expenditures to

22   maturities of securities, if we had done that, we would have

23   spent the same money that we received when we cashed out to get

24   back in to what was regarded as the prudent strategy for

25   managing Trust's investments and expenses over the course --

1   over the next 20 years.

2           THE COURT:   You talk, Mr. Kehne, about the prudent

3   strategy, which, implicit in that, is having a basket of

4   securities -- I gather some TIPS, perhaps alternatives, but

5   that wasn't what the practical beneficiaries had negotiated

6   for.  They had negotiated for green money.  If they thought

7   that having a bundle or a basket of the character that you're

8   describing was the prudent thing to do, they didn't bargain for

9   that.  That isn't what the agreement that you're trying to

10  enforce said.

11          MR. KEHNE:   But the bargain also included discretion

12  for the Trust.  Carefully constrained discretion in terms of

13  the limitations on the types of investments that the Trust can

14  enter into, but the Trust also has the power to choose a

15  prudent mix of secure investments to ensure that the money

16  grows as much as possible consistent with our obligation to

17  make sure that we're not running market risks of having to sell

18  out in a down market, and that's where Treasury's approval of

19  the laddered TIP and non-TIP securities portfolio comes in,

20  because, again, the Trust had that authority on the effective

21  date to cash out, and if it had received cash, it had the

22  authority to buy back in, and what the Trust's actions show is

23  that it was committed to that strategy and it had a convenient

24  pre-approved, carefully worked out approach and would have done

25  the same thing, so we -- the parties did bargain for cash, but

Page 36

1    cash wasn't inconsistent with taking a sensible approach to

2    managing that cash beginning on the effective date, and that's

3    what the Trust has done and that's what the Trust would have

4    done if it had been green money.  You could imagine, Your

5    Honor, a scenario again in which the debtors had come to the

6    Trust and said -- and to the settling governments and said, we

7    want to comply, but we don't want you to be out of the market -

8    - out of the securities market for any length of time because

9    we think that you'd run a risk if you were sitting in cash, and

10   you want the full benefit of this carefully worked out

11   portfolio of securities, so let's work out a way where we can

12   cash out in this liquid market on the effective date, and 15

13   minutes later, you can cash back in.  The parties would have

14   been down by very small transaction costs.  They would have

15   complied with the requirements -- the cash payment requirement.

16           I think that's, essentially, the logic of the Trust's

17   position, returning to the first point.  That it didn't make

18   sense to ring an alarm bell prior to knowing how those

19   securities were valued.  Knowing that, in fact, they hadn't

20   been valued at their cash value.

21           THE COURT:   Go on, please.

22           MR. KEHNE:   Well, Your Honor, I think that touches

23   on the points I would like to make with respect to damages and

24   waiver.  I would like to reserve objections to some of the

25   statements in the sir reply affidavit.  We don't think they're

Page 37

1    relevant, but if Your Honor does, we're happy to proceed and

2    resolve those today.  Specifically, we think that, with respect

3    to the $108,000 off-set that --

4           THE COURT:   The true-up that took place shortly

5    after the original?

6           MR. KEHNE:   That's correct.  We think that Mr.

7    Rosenthal's statements concerning his understanding of how

8    debtors and his colleagues at MLC would have worked this out

9    and that the reservation of RACER's rights in the schedule that

10   accompanied the offset payment -- or the payment subject to the

11   offset really wasn't an adequate way -- didn't reflect the way

12   those parties would have proceeded, we think that that can't be

13   credited over Mr. Hamilton's specific recollection of

14   conversations that he was a part of with Mr. Selzer (phonetic),

15   who's -- as I understand, has left MLC, but it's also -- Mr.

16   Hamilton's statements are also consistent with the documentary

17   record and with the undisputed record concerning

18   contemporaneous communications between RACER, including Mr.

19   Hamilton, and Treasury concerning the large issue.

20          In other words, the true-up is presented by MLC DIP

21   Lenders Trust as, this has got to be the end of the story, but

22   at the -- but Mr. Hamilton's uncontradicted declaration is that

23   the issue was reserved specifically with Mr. Selzer.  The

24   documents associated with the true-up -- of the partial true-up

25   are consistent with that, and Mr. Hamilton's participation in

Page 38

1    conversations at that same time with Treasury about the much

2    larger net book value versus fair market value dispute also

3    make it clear that there was no intent on the part of RACER to

4    resolve that larger issue in a communication between people

5    working out $1 million or $2 million in miscellaneous

6    adjustments in preparation for the final adjustment, which

7    didn't appear until December.

8            THE COURT:    I didn't understand them to be arguing

9    an accord and satisfaction, or if they were arguing that, it

10   didn't make a very persuasive argument for such a conclusion.

11   But what I did take from that is that, at the time of the

12   $108,000 true-up, your guys knew that they were getting paid in

13   TIPS, at least in part --you clarified that -- and not in green

14   money.  I take it there is not a dispute of fact that, as of

15   the time of the true-up, your guys knew that they were getting

16   paid in securities and not in green money?

17           MR. KEHNE:    Your Honor, Yes.  In -- the offset was

18   part of a conversation about various payments that had --

19   principally payments that had gone to the debtors that should

20   have gone to RACER, and this was post-effective date in June

21   2011, so by that time, RACER had already received the bank

22   statement and appreciated both that it had received Treasury

23   securities into its custodial account, which RACER knew in

24   advance of the effective date.  But also, more importantly,

25   that's when RACER understood that the value assigned to those

Page 39

1     securities by the debtors in determining the amount of the cash

2     catch-up payment was not the cash equivalent value; was not the

3     fair market value, the quoted value on the date of the

4     effective date.  Instead, it was the accounting value that had

5     been -- the debtors had assigned to that.

6               THE COURT:   Okay.  Continue, please.

7               MR. KEHNE:   There's one more point that I'd like to

8     make with respect to -- there's on more point I'd like to make

9     with respect to the notice question that I think is behind some

10    of your questions, Your Honor, and that goes to the monthly

11    operating reports.  I mean, I didn't hear that as part of your

12    tentative, but I want to touch on what was in those monthly

13    operating reports and what significant they had, just to dispel

14    any notions that they were notice to RACE or the world that the

15    trust -- I mean, that the debtors intended to transfer these

16    securities at something other than the cash value on the

17    effective date.

18              The monthly operating reports included a large

19    disclaimer that they were not intended to comply with GAP

20    principals, and I understand that that's typical in bankruptcy

21    proceedings.  They also reported the amortized cost basises,

22    which is essentially the fair market -- I mean, excuse me, the

23    net book value.  It may be useful to get -- put a little bit of

24    detail in here.  The net book value we refer to in our papers

25    has two components.  One is the amortized cost book value of

Page 40

1    the security as carried on the books of the debtors, and the

2    other is accrued but unpaid interest, and my understanding is

3    it's done this way because, when people look at the underlying

4    value of the security, they want to see a trend line that

5    reflects movement in the bond market, interest rate swings,

6    appetite for risk; the factors that affect the value of bonds,

7    or Treasury securities, and not at where you are in the six

8    month cycle of interest payments, because interest accrues and

9    then is paid at six month intervals, so when you acquire a

10   Treasury security that has a six month interest payment

11   schedule and you buy at five months in, you're entitled to

12   accrue -- you're going to be receiving accrued interest on the

13   -- on that interest payment date.

14            THE COURT:   Sure.  What you said is so fundamental

15   that I'll let your opponent be heard on whether or not I can

16   take --

17            MR. KEHNE:   Okay.

18            THE COURT:   -- judicial notice of it, but anybody

19   who's ever bought a corporate or treasury bond knows that.

20            MR. KEHNE:   Okay.

21            THE COURT:   I mean, that's what you take before you

22   take Finance 101.

23            MR. KEHNE:   Okay.  Well, I'll move on then, Your

24   Honor.  I apologize.

25            THE COURT:   Okay.  No, I agree with that, but I'm

1    not quite clear on where you're headed with that.

2          MR. KEHNE:   Well, okay.  So, what I want to say --

3    what I want to rebut is the notion that the monthly operating

4    reports, by setting out amortized cost values, provided notice

5    that, on the effective date, those amortized cost values were

6    going to be the basis for evaluation of the securities, and the

7    central point is they also reported fair market value, and they

8    reported the difference between fair market value and the

9    amortized cost value.  I don't think there's any notice in that

10   document -- in any of those documents to RACER or the world

11   that, prior to the effective date, MLC or the debtors were

12   telling everyone, we intend to transfer -- we not only intend

13   to substitute securities for cash, but we intend to value them

14   at something other than the cash value.

15          There's been a lot of ink spilled in the papers on

16   consistency with GAP, and whether, in fact, these monthly

17   operating reports and the reporting on an amortized cost basis

18   complied with GAP, and our fundamental answer to that is it's

19   irrelevant to the issue of whether transfer of those securities

20   on the effective date at something other than the cash value

21   complied with the rules.  Even if GAP, as MLC DIP Lenders Trust

22   claims on behalf of debtors, even if GAP required debtors to

23   report, for purposes of their books, in monthly reports on an

24   amortized cost basis, and in fact, they did report exclusively

25   on an amortized cost basis.  They also gave the fair market

1    value, but even if that had been a compulsory evaluation

2    requirement --

3              THE COURT:   Under GAP and under FASB standards --

4              MR. KEHNE:   Under FASB standards.  FASB is not --

5    FASB does not purport to say and FASB trumps an agreement

6    between parties as to the valuation of assets delivered under a

7    contract or a consent order, so compliance with GAP in

8    reporting amortized cost values prior to the effective date

9    says nothing about notice, expectation, or the requirements of

10   the consent order -- I mean, excuse me, the confirmation order,

11   the plan, the settlement agreement, and Trust agreement.

12             Your Honor, I'd like to reserve the balance of any

13   time I have to reply, unless you have further questions for me.

14             THE COURT:   No.  Thank you very much.  You have a

15   luxury that -- with me not being an Appeal Court, I let people

16   talk until they have nothing useful left to say, so we're fine.

17             What I think I would like to do now, though, is to

18   take less than a ten minute break but a little break and then

19   to hear from Ms. Leary or anybody else who's allied with the

20   Trust on what I just heard, so let's reconvene at five after 11

21   on the clock up there as far as soon thereafter as everybody

22   can get back in.

23             We're in recess.

24        (Whereupon these a short recess was had.)

25             THE COURT:   Ms. Leary, do you want to be heard next?

Page 43

1           MS. LEARY:   Yes, Your Honor, thank you.  Maureen

2   Leary on behalf of the states and the Saint Regis Mohawk Tribe.

3           Your Honor, I hate being in a position of convincing

4   -- trying to convince you that you're wrong.  It's just a bit

5   unsavory, but, with all due respect, I think, particularly from

6   an equitable standpoint, you are.

7           What this is about is a mistake, and the mistake

8   wasn't the states' or the Trust's, the mistake was MLC's, and

9   Treasury somehow got ensnared, and I believe -- just my own

10  opinion -- that's why they're not standing before you taking a

11  position.  What was the mistake --

12          THE COURT:   Do you think it might have to do with

13  the fact that Mr. Jones has, under the grand umbrella of the

14  United States Government as a client, two governmental entities

15  that have at least arguably inconsistent positions, and that he

16  might be an ethical lawyer?

17          MS. LEARY:   I think that might be right.  I don't

18  envy him, but the question isn't what the U.S. did.  The

19  question is who should suffer or who should bare the risk that

20  resulted from that mistake.  What was the mistake?  The mistake

21  was that Motors Liquidation went out, unbeknownst to the

22  states, unilaterally and said, I am going to buy securities to

23  fund the Environmental Trust, even though at the time they

24  bought them, I believe, the agreement was pretty much executed

25  that -- it said cash, and the reason it said cash is because

Page 44

1    the states were unwilling, at the market volatility at the

2    time, to take anything less.  They were willing to give the

3    discretion only to someone who would be on their side of the

4    table, not Motors Liquidation, but Motors Liquidation

5    unilaterally went out and bought them, and remember the

6    context, Your Honor.  The original confirmation hearing was

7    scheduled for December, so they were really trying to sort of

8    get a jump, and they thought they maybe had 30 or 60 days

9    before they had to actually have an effective date and give

10   them over.  What happened?  The effective date wasn't until

11   March 31, and in that period of time, the TIPS lost value.

12   That's what happened, so this is just an after-the-fact

13   justification of, okay, here's the TIPS that we bought for you

14   way back when, even though they lost value and even though it's

15   not the amount that the states or the Trust or anybody

16   expected, so the question I have for the Court is, is it fair

17   to impose those on the Trust or the states?  Is it fair to say,

18   oh, whoops, because they unilaterally decided to do this, to

19   buy securities which you didn't want, you didn't intend, and

20   that's not what the deal was, you're now going to bear the risk

21   of loss that happened between October of 2010 and the effective

22   date in March of 2011.

23            Now, the reason Mr. Kehne opened his remarks with a

24   citation to -- well, I will call it a consent decree, is

25   because Paragraph 109 says two things, very important.  The

1    consent decree trumps anything else, anything else, period.  It

2    trumps the disclosure statement, which I know Your Honor has

3    some concerns about, the cash equivalent language, it trumps

4    the plan, it trumps -- with all due respect -- the confirmation

5    order, even though it's incorporated in the confirmation order.

6    That's a very important provision for the states, because what

7    we didn't want was to be here later, fighting about just this

8    very thing, so what does that mean if the consent decree trumps

9    everything else?  Well, what it means is the consent decree --

10   and I'm referring to two documents now, Your Honor; one is the

11   settlement agreement and the other is the Trust agreement.

12   Those two documents were actually approved in your confirmation

13   order, so this is a Federal Court consent decree, these two

14   documents that have particular requirements.  You don't look

15   outside of those.  You don't look at the disclosure statement,

16   you look nowhere else except those two.  What do those two say?

17   Well, what they say is cash, not cash equivalents, not, you can

18   go out and buy securities and the Trust will bear the risk of

19   loss if they go down in value.  And, with all due respect to

20   MLC, we would never have the guts to come before the Court if,

21   all things considered, cash had been invested at the time of

22   the effective date and the value went down.  Would we be able

23   to come back here and say, oh, give us more money MLC?  We

24   would not have, but by the same token, we cannot be asked to

25   bear the risk that MLC, with Treasury's tacit or expressed

Page 46

1    approval, took on in October of 2010.  If they bought the TIPS,

2    they were responsible for making sure the value of the TIPS was

3    maintained, and if it wasn't maintained, they had to close that

4    gap with the adequate amount of cash.

5         I want to talk for a minute about value, because I

6    think this is really important.  If, on the effective date, the

7    Trust and the states and the U.S. had said, you know what, we

8    don't really need this $641 million; we're going to do it

9    ourselves, go sell the TIPS, what would the value on the

10   effective date that a reasonable buyer, a reasonable investor

11   would have paid?  Would it have been this net book value?  No.

12   MLC would never have sold the net book value.  They would have

13   sold for what a reasonable purchaser would have given for those

14   TIPS, and I think that's the analysis, not what happened after.

15        THE COURT:  Forgive me, Ms. Leary.  Am I missing

16   something fairly material, or was the contemplation not that

17   somebody, Emily LaTella-style would say never mind, but that

18   the money would stay at the RACER Trust for the purpose of the

19   environmental remediation for which you and the EPA so

20   eloquently argued back before?  You're talking about a total

21   hypothetical of somebody saying never mind when the purpose for

22   the whole arrangement was for the EPA and your guys to be using

23   the money for which it was put into the Trust in the first

24   place.

25        THE COURT:  I -- you misunderstand me, Your Honor,

Page 47

1    and I apologize.  The reason I gave that example is to point

2    out what the Court should look at in terms of the value on the

3    effective date.  That's New York law.  You value a transfer of

4    an asset on the effective date.  Now, I know Your Honor has

5    some concerns about whether we have a right to value it in one

6    way or another.  The fact of the matter is is that MLC does not

7    have the right to value it in the way that they valued it.

8    There's nothing in the consent decree that says $641 million at

9    net book value.  There's nothing there that says you can

10   manipulate this by an accounting trick.

11           THE COURT:   Well, of course you're right in that

12   regard, but query whether the converse is also true.  Since the

13   contract provided for payment in green money of the United

14   States, it likewise does not provide that the measurement of

15   the value of the funding that goes into the Trust is on the day

16   to day trading value of the securities as against the

17   possibility that, instead of being held to maturity, they're

18   dumped on the market long before the remediation has been

19   completed.

20           MS. LEARY:   Well, Your Honor, a couple of things.

21           I don't think anybody in this room knows whether the

22   TIPS -- whether the Trust will have to liquidate anything

23   before the maturity.  I don't -- we don't, as we stand here,

24   know the answer to that question.  We hope not, but we don't

25   know the answer to that question, and looking into the future,

Page 48

1   as I think MLC would have the Court do, is kind of -- it's very

2   difficult, because I don't think anybody has a crystal ball to

3   define what will happen in the future, okay?  I'm not exactly

4   sure what you're asking me, but my view of the --

5           THE COURT:   What I'm trying to say diplomatically,

6   Ms. Leary, that's what's soft for the goose is soft for the

7   gander, and there is a very good reason -- or at least you can

8   tell me if it's not such a good reason -- why the contract

9   doesn't talk about the method for valuation of the TIPS and the

10  remainder of the governmental securities.  It's because the

11  contract doesn't talk about valuing those because the contract

12  talks about funding it in green money of the United States.

13          MS. LEARY:   Yes, and I think that that's the

14  important piece, because, if it talks about funding it in green

15  money, you never get to amortized, appreciated, net book value,

16  or any of that.  Cash says, to me, whatever the fair market

17  value is.  That's where I think the connection is.  If, today -

18  -

19          THE COURT:   No, forgive me.  Cash says to me green

20  money of the United States.

21          MS. LEARY:   But, Your Honor, we can't go back and

22  reinvent history.  We are stuck with the mistake that MLC made

23  that now is being hoisted upon the Trust and the states.  We

24  can't go back, but let me give you an example that I thought

25  about.

Page 49

1          I owe Company A, Apple Computer, money, and Apple

2     Computer is one of the wealthiest, and over the period of time

3     I owe them money -- let's say it's six months or a year --

4     their stock doubles, their, you know, credit ratings skyrocket,

5     all this cash, and I say to them, you know what, I don't want

6     to pay you money now because you're doing so well.  Does that

7     make sense?  That's analogous, in my view, to MLC's position

8     here.  Oh, because these TIPS are ultimately, crystal ball,

9     going to be worth this and you're going to have 641 million,

10    ultimately, we don't owe you what we should have given you on

11    the effective date.

12          So, I'm appealing to this Court's equity.  The fact

13    is, who should bare this risk of loss that MLC chose to take on

14    in October -- September, October of 2010?  Should that be the

15    states and the Trust?

16          And I wanted to talk for a moment about, you know,

17    whether the Trusts and the Trustee is our agent, et cetera.  WE

18    did not know -- and it's undisputed -- until the middle of

19    November of 2011 that any of this had happened, including that

20    this TIPS thing had happened.  Now, MLC -- and I truly question

21    how they phrase this in their opening response brief -- they

22    claim that the DIP financing amendment, which I believe is

23    Docket 6374, or, it's a September 2, 2010 notice -- they claim

24    that this gave everybody, including the states, some kind of

25    notice that this was going to be the deal, okay?  Now, this was

Page 50

1       before we signed -- we executed the agreement, so I can tell

2       you right now, if I had known that this was going to be the

3       deal, I wouldn't have signed the agreement.  This says, simply,

4       "the third amendment provides that the definition of cash

5       equivalents under the DIP credit facility shall be modified to

6       include securities issued by the United States Treasury that

7       may have maturities of 15 years or less from the date of

8       acquisition."  There's nothing in here that says, we are going

9       to use these securities for the purpose of funding the Trust

10      instead of the cash that the agreement now says.  Nothing says,

11      we should know what this is about.  So, in terms of some waiver

12      by the states, I don't think that there's been any knowing

13      relinquishment of any right, but again, we're after the fact.

14      Can we go back?  We cannot.

15              But the question for the Court is, what's fair to do

16      now?  If MLC had made the decision to acquire securities that

17      lost value before they were transferred to the Trust, does the

18      Trust get less value?  Do the states get less value just

19      because?  Why would that be fair when we said, this amount in

20      cash?  It's just not fair, in my view.

21              The question of agency, Your Honor, I want to refer

22      the Court again to the consent to create, and I believe it's

23      Paragraphs -- it's Pages 25 to 49.  It very, very specifically

24      sets forth the very circumscribed, year-long, negotiated

25      authority of the Trust.  The Trustees do not have the authority

1    to accept less than the states' bargain for, and that's what

2    this Court is -- and MLC is asking the states to do.  The fact

3    that, you know, we -- the securities may have increased in

4    value or whatever is irrelevant to that fact.

5            There is -- a couple of things that I really have

6    issues with in terms of this contractual analysis, and I

7    understand why the Court wants to go there, but this is a

8    Federal Court consent decree.  This is your confirmation order.

9    This isn't some commercial transaction between two, you know,

10   commercial or industrial manufacturers or something.  We're the

11   government.  We, in good faith, believed we were going to get a

12   particular value as a result of this deal, and I can tell you,

13   we don't -- we did not get that value, and that's the sort of

14   puzzling part of this.  If we didn't get the value, what good

15   is a Federal Court consent decree and confirmation order that

16   clearly spells out, cash in this value?  Instead, there's been

17   this level of manipulation with accounting terms that, in my

18   view, are just frankly irrelevant.

19           And I want to go back for a moment to, you know,

20   whether there's been some knowing relinquishment of a right.  I

21   don't think Treasury could have waived our rights either to the

22   extent this Court may view that they did, somehow.  I do not

23   think that the Trust and the Trustees can waive the states'

24   rights either.  You asked about whether the Trustee is our

25   agent.  Again, I refer you to the consent decree, but if you

Page 52

1    look at MLC's papers, they make this argument about continuity

2    of ownership, and, you know, how this Trust was set up for the

3    purpose of bailing them out of environmental liability.  That's

4    not the purpose of the Trust.  The Trust was set up so that we

5    would have a reasonably structured way to deal with literally

6    hundreds of contaminated properties -- actually, it's 90-

7    something contaminated properties across the country.  This

8    wasn't set up for LMC.  This was up for us.  This wasn't --

9    but, just looking at their papers, you'd think maybe the Trust

10   -- the Trustee is their agent, because of this continuity of

11   ownership.  I don't believe that, but their argument taken to

12   its logical conclusion in terms of your question, I don't know.

13            THE COURT:   Well, I -- if the Trust were their

14   agent, you wouldn't have the problem you have now.

15            MS. LEARY:   Right.

16            THE COURT:   I understand the problem to be that the

17   Trust is acting for your benefit, that there were no

18   independent provisions in either the consent decree or the

19   settlement agreement of which I'm aware that gave the states

20   the ability to act for the Trust directly, and that was the

21   purpose of the Trust personnel, and if there was something I'm

22   unaware of, you know, help me on that, Ms. Leary.

23            MS. LEARY:   I don't think that there is any evidence

24   before the Court in the consent decree that would support, you

25   know, a fining of some agency, or a fining of waiver.  I just

Page 53

1     don't see it.  If we find out in November of 2011, less than a

2     month before we appeared before Your Honor on December 8, I

3     don't think that there's evidence in the record to make that

4     finding.

5               One thing that is also not before the Court in terms

6     of an evidentiary basis is any approval the Treasury gave MLC

7     in terms of how they were going to value the TIPS on the

8     effective date.  There's no evidence the Treasury said, oh, go

9     ahead, value them at Netbook value so you can deal with this

10    loss that you've sustained between the purchase of the TIPS and

11    the present time.

12              Section 109 of the consent decree also has another

13    provision I want to make Your Honor aware of, and that

14    provision Mr. Kehne touched on, and it has to do with

15    undertaking actions or submitting anything to this Court that

16    are inconsistent with the consent decree, and this is fairly

17    puzzling to me because just about everything you have before

18    you that's been submitted by MLC, in my view, is inconsistent

19    with the consent decree and its cash payment requirement.  So,

20    it's not -- their violation of this consent decree goes beyond

21    just, you know, the TIPS versus cash issue.  It has to do with,

22    you know, a bigger problem here, which is, I think, not really

23    standing behind a document that they signed and agreed to, and,

24    you know, to me, the biggest problem I have is if the states

25    have to sustain, you know, this risk of loss rather than MLC,

Page 54

1    the way environmental remediation -- I've said this to Your

2    Honor before -- it is very difficult to predict.  This is a

3    fund that, if I were to take bets among the states, nobody

4    thinks this is going to be enough.  The hope is that it would

5    be more.  Nobody thought when they signed this agreement -- and

6    it says so, frankly, in the consent decree -- I don't have that

7    paragraph number in front of me, but I believe it's somewhere

8    near the end where the states say, you know, we don't agree

9    that this is a good deal, but it's really the best deal we

10   could get, and in the context of this case, it was.  We

11   believed it would work.  But the way environmental remediation

12   is, you always need more money, you never need less.  And --

13   you know, most puzzling to me is that, if there is any money

14   left over, it goes back to Treasury anyway, and so -- is this

15   much ado about nothing?  Why --

16           THE COURT:  Ms. Leary, forgive me.  I didn't want to

17   interrupt you, but I think I've got to.  You said environmental

18   remediation is hard to predict and I understand that, but isn't

19   the time to deal with that before you make the deal, before you

20   enter into the settlement agreement?

21           MS. LEARY:  We did.

22           THE COURT:  Or, if you think that the settlement

23   agreement that's in the offing isn't going to be good enough,

24   than, you know, you come before me.  I don't think I'm exactly

25   hostile to environmental needs and concerns.

Page 55

1          MS. LEARY:   Your Honor, this was the best deal we

2     could get.  That's the bottom line, and we're okay with it, but

3     nobody thinks that this is going to be enough money.  Nobody

4     thinks that.  I just want to be clear about that.  It's okay.

5          THE COURT:   Okay, and you're saying that's relevant

6     on this contractual interpretation issue and this --

7          MS. LEARY:   Well, I think it's --

8          THE COURT:   -- you know, contractual dispute how?

9          MS. LEARY:   I think it's relevant to MLC's argument

10    that says, oh, just wait; you'll have plenty of money, you'll

11    have the 641 ultimately.  What we need is what we bargained

12    for, which was on the effective date getting a particular

13    value.  Now, the agreement says cash; we didn't get that, so

14    the next question is, if we didn't get that, fine, the Trust

15    had to get up and running, there was a big handoff, there was a

16    big rush, what was the value of what they got?  That's really

17    the single question for this Court, and I submit that the value

18    of what they got was not what the states bargained for, and the

19    reason it wasn't was because of this concept of the TIPS losing

20    value and after the fact justification on this netbook value,

21    we'll value it this way and it'll look like we gave you what

22    you were supposed to get.  That's my view of what happened

23    here.  The question for the Court is this very straightforward

24    one: on March 31, what was the value of those TIPS?  And I

25    submit that it should be some --  have some -- that decision be

Page 56

1    informed by the requirement that we receive cash, that the

2    Trust receive cash, and what that says to me is you valued the

3    TIPS on that date based on their fair market value, not on some

4    balance sheet value, which is what netbook value, by

5    definition, is.  It's how a company carries an asset on its own

6    books.  It has nothing to do with the value that a reasonable

7    person would give to a security on the date of a transfer.

8         THE COURT:   All right.  Thank you.

9         MS. LEARY:   Thank you.

10        THE COURT:   Okay, Mr. Miller?  Wait.  Mr. Jones, are

11   you rising to be heard on something beyond what you told me

12   before, where I thought you weren't going to be heard other

13   than to make disclaimers?

14        MR. JONES:   I am, Your Honor, and I'll be more terse

15   in my disclaimer but, again, repeat that this in no way alters

16   our position of neutrality.  However, Your Honor did ask

17   questions at the outset specifically about whether

18   beneficiaries -- excuse me, whether a Trustee is the agent of

19   the beneficiary, and at the break, a colleague armed me with a

20   little law on that question, which is actually of some

21   programmatic importance to the government and, I think, may

22   also just be helpful to the Court, so I wanted to provide that

23   now in case it's helpful.

24        And the answer, according to research I've been

25   provided -- and I can provide some cites -- is no, that is a

Page 57

1    technical common-law matter.  A Trust does not act as the agent

2    of the beneficiary of the Trust.

3            THE COURT:   That's why I used the word effective

4    each time.

5            MR. JONES:   Right, and Your Honor I --

6            THE COURT:   If the Trust wasn't put into place to

7    advance the interests -- and I hate to make you take positions,

8    but I'd still like to have my questions answered -- if the

9    Trust wasn't put into place to advance the interests of the EPA

10   and the states and the Tribe, are you suggesting to me that

11   nobody was?

12           MR. JONES:   Your Honor, I was all ready to say, Your

13   Honor, I absolutely agree with the Court that the RACER Trust

14   was created to advance the interests of -- certainly the broad

15   public interest in remediation of contaminated sights and,

16   specifically, EPA's interests and the relevant states and the

17   Tribes' interests, so I have no quibble with that at all, and I

18   recognize Your Honor worded your initial observations or

19   tentatives in a way that may be consistent with the law that

20   I'm point out, but particularly because this -- we deal with

21   Trusts a lot, we have sensitivity to what exactly potential

22   liabilities we're taking on, and we want to disavow --

23           THE COURT:   Well, I understand that.

24           MR. JONES:   Yeah.

25           THE COURT:   But I kind of have a sensitivity to

Page 58

1        trying to get the right result in this controversy.

2                MR. JONES:   Right, and this actually is not

3        oriented, really, so much, as I say, at advocating a result as

4        just it -- making sure that there's not a false premise at

5        foot; that it's a technical matter and, formally speaking,

6        RACER or its Trustees are acting as an agent of the EPA.  If it

7        would be helpful, I can provide a few cites I've been given.

8        If not, I will sit down.

9                THE COURT:   Early on in your first remarks, you

10       talked about the importance of trying to get this resolved

11       expeditiously and quickly.  I'm going to accept, for the

12       purposes of this argument, subject to your opponent's or

13       anybody's rights to be heard -- I don't know who's your

14       opponent, who's your ally; I don't know who your client is --

15       at least with respect to any particular point, but I'm going to

16       try to give you guys some help before the sun sets tonight.  I

17       don't -- and the bottom line is, therefore, you don't need to

18       give me supplemental briefing.  I'm going to assume that you

19       were truthful and candid to me.  You always have been, I'm sure

20       you always will be.

21               MR. JONES:   Oh, thank you, Your Honor.  No, all I --

22       I'm sitting here looking at a cite to a Supreme Court decision

23       wondering if it would be helpful to the Court to hear it or

24       not.  If -- that's really all I was contemplating.

25               THE COURT:   If you want to read me the words of what

Page 59

1    the Supreme Court said, I'll hear them.  I know of at least one

2    Supreme Court decision that said we're deciding a very narrow

3    issue, an issue that's important to the authority of Bankruptcy

4    Judges, and nobody takes those words alone as meaning a whole

5    lot, but if you want to tell me those words that you want me to

6    be aware of, I'll hear them.

7              MR. JONES:   I'll couple it with a really important

8    Court, Your Honor: this Court, Judge Glenn decision of last

9    year in the Dryer matter, so -- both Judge Glenn in the Dryer

10   case and the Supreme Court in a case called Chauffeurs,

11   Teamsters, and Helpers stated that -- just what I just said,

12   that a Trustee does not serve as an agent of the beneficiary,

13   and the specific cites are 494 U.S. 558 at 585 to 586, that's

14   from 1990, and the Dryer decision is 452 B.R. 391 at 421, Note

15   25.

16             So, I'd just offer those to the extent they're

17   helpful to the Court.

18             THE COURT:   Okay.

19             MR. JONES:   Thank you.

20             THE COURT:   Thank you.  All right, Mr. Miller. Your

21   turn finally.

22             MR. MILLER:   May it please the Court, this is Ralph

23   Miller, again, from Weil Gotshal.

24             Your Honor, I'm going to try to address your

25   questions first, if I might, and the first question that I show

1     that you asked specifically was about an integration clause in

2     the settlement agreement.  I don't think we find what we would

3     consider to be a traditional integration clause.  Paragraph 12

4     says that, "the debtor shall incorporate the settlement

5     agreement into the plan by reference, and approval of this

6     settlement agreement shall be a condition precedent to

7     confirmation of the plan."  It states, "the debtor shall not

8     file a plan or amend the plan in a manner inconsistent with the

9     terms and provisions of the settlement agreement, take other

10    action in the bankruptcy case that's inconsistent with the

11    terms and provisions of the settlement agreement, or propose

12    terms for any order confirming the plan that are inconsistent."

13    It says, "the government shall not oppose any term or provision

14    of the plan or an order confirming the plan that is addressed

15    by and is consistent with this settlement agreement," and then,

16    "the parties reserve all other rights or defenses they may have

17    with respect to the plan.  In the event of any inconsistency

18    between the plan, in the order confirming the plan and this

19    settlement agreement, the terms of the settlement agreement

20    shall control."  I will note that our belief is that the

21    settlement agreement never talks about cash; it talks about a

22    dollar amount.  I believe that answers as best as I can the

23    first question you had asked.

24            You had also asked about the disclosure statements,

25    and if I might approach, Your Honor, I have four excerpts -- or

Page 61

1    some excerpts from the exhibits which we'll pass out, and also

2    --

3              THE COURT:   You may, as long as you give it to your

4    opponents as well.

5              MR. MILLER:   Yes, of course, Your Honor.   We are

6    passing out copies of these, Your Honor.

7              First, with regard the disclosure statement, Your

8    Honor, I've passed out Exhibit E from the first Rosenthall

9    declaration.   These are excerpts from the disclosure statement,

10   and we've highlighted on Page 4, which is the opening statement

11   of Net Assets and Liabilities of Debtors and Trusts as of

12   December 31, 2010, and this has a line for assets showing cash

13   and cash equivalents; it has a column for the ERT, which the

14   Court will recognize as the Environmental Response Trust, the

15   former name of what became RACER; and it has a Footnote 4 by

16   the ERT column, and so it's showing 447 median dollars in cash

17   and cash equivalents, and if you look at Footnote 4, Footnote 4

18   says, "the cash and cash equivalents contributed to the ERT

19   include amounts for" -- and then it has a listing of

20   subcategories, and then Footnote 6 states, "cash and cash

21   equivalents represent cash and investments in U.S. Treasury or

22   U.S. Treasury-backed securities with a maturity of 15 years or

23   less."

24             THE COURT:   Pause, please, Mr. Miller.   That opening

25   statement of Net Assets and Liabilities of the Debtors and

Page 62

1    Trusts looks to me a little bit like a balance sheet.  Is it

2    something different than that?

3              MR. MILLER:   It is a balance sheet, I believe, Your

4    Honor. It's unaudited.

5              THE COURT:   Okay.  As of December 31, 2010?

6              MR. MILLER:   That's right, Your Honor.

7              THE COURT:   And it seems to say debtors and Trusts.

8    It is consolidated?

9              MR. MILLER:   Your Honor, I believe it's the -- I

10   believe it is consolidated for the debtors and the Trust.  It

11   has the sub column that is not consolidated for the

12   Environmental Response Trust.

13             THE COURT:   Oh.  ERT is an acronym for the

14   Environmental Response Trust?

15             MR. MILLER:   Yes, Your Honor, and it's so defined.

16             THE COURT:   That's one reason why I love acronyms so

17   much.  Okay.  ERT is what we now call the Racer Trust?

18             MR. MILLER:   Yes, Your Honor.  In fact, if you look

19   at their pleadings, they're all titled RACER Trust, formally

20   Environmental Response Trust.

21             THE COURT:   All right.  And you're relying on

22   Footnote 6 to this balance sheet?

23             MR. MILLER:   Well, Footnotes 4 and 6, Your Honor.

24   Footnote 4 specifically says, "the cash and cash equivalents

25   contributed to the ERT" -- that is, contributed to RACER --

Page 63

1    "include amounts for," and then it lists a series of funding

2    accounts, which are actually further defined on the next page.

3    It also refers to the proceeds from asset sales and restricted

4    cash releases that are going to be used to fund ERT, and then

5    Footnote 6 says, "cash and cash equivalents represents cash and

6    secure investments in U.S. Treasury or U.S. Treasury-backed

7    securities with a maturity of 15 years or less," so the term

8    "cash and cash equivalents" is defined.  In other words, it

9    cannot be anything except either green money cash or U.S.

10   Treasury or Treasury-backed securities with a maturity of 15

11   years or less.

12           THE COURT:   And so I understand you, Footnote 4

13   makes express reference to the Environmental Response Trust,

14   and you'll figure me if I use real words rather than acronyms.

15           MR. MILLER:   Yes, Your Honor, that's correct.

16           THE COURT:   And Footnote 6 refers to all four of the

17   entities whose consolidated cash and equivalents are shown on

18   the first line of that balance sheet.

19           MR. MILLER:   That's correct, Your Honor, but it --

20   Footnote 6 limits the cash and cash equivalents definition to

21   make it clear that cash equivalents would not be municipal

22   bonds or something else.  It would only be Treasury securities

23   and green money.

24           THE COURT:   I see.  All right, continue please.

25           MR. MILLER:   Yes, Your Honor.

Page 64

1          I would also -- well, I'd like to deal with some of

2     the points that the Court has made and try to reconfirm some of

3     them with further items in this rather voluminous record.

4          The second thing we have passed up in this stack,

5     Your Honor, is a letter from Mr. Burrs (phonetic) to Mr. Hill

6     in November of 2011, which is in the record.  It's Exhibit D to

7     the declaration of Al Coch (phonetic,) and it expressly calls

8     upon the RACER Trust to mitigate its damages and urges the

9     RACER Trust to sell the TIPS if it wants cash, which it could

10    have done at that point at a substantial profit, and I just

11    direct the Court to the paragraphs with the yellow

12    highlighting.  Mr. Burrs writes, "While we disagree with you on

13    these matters to the extent you're concerns about how the

14    funding of the RACER Trust with TIPS impacts your accounting

15    reporting obligations, you simply may sell the TIPS to cover

16    any alleged shortfall.  You may perceive the initial funding as

17    the difference in the current value of the TIPS far exceeds any

18    perceived funding shortfall.  Indeed, we encourage you to take

19    this step to mitigate any alleged damages you believe have been

20    incurred to the defendant of the RACER Trust," and then,

21    alternatively, the next paragraph says, "If you want to give

22    the TIPS to us, we'll sell the TIPS and give you money."

23          The third thing that we have pushed -- that we've

24    passed up, Your Honor, is a significant and I think helpful

25    document that deals with the understanding of the parties as

Page 65

1    they were setting all this up and it bears on a number of

2    issues.  This is Exhibit B to the Coch declaration.  This is a

3    presentation of, according to the Coch declaration, was made at

4    a meeting in Detroit in November 2010 with Mr. Hill and Mr.

5    Laws present.  This was at the point where they were coming up

6    to speed on what was going to be done. This --

7             THE COURT:   Forgive me, Mr. Miller.  The date of

8    this?

9             MR. MILLER:   It's November of 2010 and I believe we

10   think the date is November 4, Your Honor, of 2010.  The

11   effective date, as you know, is March 31, 2011, and as Ms.

12   Leary said, there was an anticipation that the effective date

13   might have been as early as December, but it was delayed, so

14   this was clearly before any possible effective date.

15            And one of the things that this outlines, Your Honor

16   -- and I call the Court's attention to this pie chart -- is

17   this illustrates the ladder of TIPS that had been acquired with

18   the concurrence of Treasury for the purpose of making sure that

19   the Environmental liabilities were funded.  Some of them may go

20   out as far as 30 years, but this handles funding out through

21   2025, and I want to call the Court's attention to several

22   things.  This is the ladder of TIPS that's being described at

23   the top, and if you see, for example, the 125 TIP shows $167

24   million maturing on January 15, 2025.  The reason this is

25   important, Your Honor, is that the parties did not talk about

Page 66

1    the TIPS in terms of fluctuating market value.  They talked

2    about the TIPS in terms of maturity value, and the cost basis

3    that was used by MLC is derived from maturity value.  It's not

4    derived from fluctuating trading basis.  This $167 million is

5    the so called original principal of the TIPS, and I want to

6    clarify something that I think is unclear in some of the

7    briefs.  TIPS can go up, but they can never go down in terms of

8    the original principal.  If there is inflation -- and there has

9    been inflation since many of these TIPS were created -- the

10   adjusted principal goes up and interest is actually paid on

11   that adjusted principal, but when the TIPS matures, the TIPS

12   always pays its face amount that's guaranteed by the full faith

13   and credit of the United States, and the payment of interest as

14   it goes forward is guaranteed.  This makes the TIPS a perfect

15   instrument to fund expenses like environmental remediation that

16   are likely to move with the Consumer Price Index, because, as

17   the Court knows, environmental remediation tends to be going

18   out and drilling wells and pumping water and hiring people and

19   doing tests, and those people -- it's very labor intensive --

20   tend to have wages that are driven by the Consumer Price Index,

21   so the TIPS inflate with the Consumer Price Index.  The TIPS

22   never deflate, however, below their original principal when

23   they are held to maturity.

24           THE COURT:  So your point is, by way of example,

25   that on that January 2025 TIP, that it will pay off no less

Page 67

1       than $167 million.

2               MR. MILLER:   That's one of my points, Your Honor,

3       and the other TIPS will pay off the amounts shown.  And the

4       further point, Your Honor, is that these amounts were not

5       randomly selected.  There was a cash flow projection -- it's

6       fairly complicated -- done site by site and then combined year

7       by year of these steps, and as you know, environmental

8       remediation has time delays that are inherent, and it's you

9       pump water for a little while and then do some tests or you

10      clean up stuff for a little while and then you test it, and

11      this takes time.  And the parties had negotiated site by site

12      and agreed on when blocks of money were going to be needed for

13      these environmental remediations. They can't be all done at

14      once.  You can't spend it all this year and not have to worry

15      with it for the next 30 years because it's -- I've sometimes

16      thought environmental remediation is a little like the problem

17      of a glass with a -- with something like a dishwashing liquid

18      and you've got to run water in it a little while until the

19      bubbles stop; in other words, they have to pump the water for a

20      while and test it or do other remediating steps, so time is

21      inherent in their mediation process.  It's one of the tools

22      that is used.  And the parties agreed on when funds were going

23      to be needed, and those funds are provided for by this ladder

24      of TIPS coming in at specific times to match the cash flow

25      projections.  This was discussed with the Trustees.  I would

Page 68

1    point out the states have not said this is wrong, we want to

2    give this back, we don't like the ladder.  Everybody agrees

3    that the ladder, which was designed with Treasury, works very

4    well to make sure that the best possible protection was put in

5    place to get these liabilities funded as needed, including

6    inflation protection, because, although the TIPS can never pay

7    less, they can pay more.

8            Now, there was a point that was made earlier -- in

9    the argument, I believe, by Mr. Kehne -- that the RACER had no

10    arms and legs.  RACER did not have the tools once it came into

11    existence to assemble and put this portfolio of TIPS together.

12    This portfolio, as a whole, is much more valuable than the

13    piece meal TIPS, because it was carefully designed by

14    professionals to match the needs of this Trust, and that is

15    what the cost basis reflects.  It reflects the fact that they

16    bought the TIPS as they reached the decisions.  This was actual

17    money that was paid by MLC.  The cost basis is what was paid by

18    the TIPS.  The TIPS do fluctuate day to day in terms of what

19    traders will pay for the TIPS -- that's true -- but the key

20    point is, Your Honor, that the accounting standards all say,

21    you've got to value a security based on what is it going to be

22    used for?  What is going to be done with that security?

23            If the security's held by a trading house and they're

24    going to keep it until tomorrow or next week or a week

25    afterward based on the trading value, it has to be based on the

Page 69

1    trading value, but if the maturity's going to be held to

2    security, trading value has nothing to do with the value of

3    that security to that user, because that user is going to get

4    the security payment at the end of that time period, and what

5    accounting guidance says for anyone who's going to hold a

6    security to maturity is they look at the cost basis for that

7    security.

8           This cost basis we believe, by the way, carries

9    forward -- this is the reason for the continuity of ownership

10   discussion -- into the Trust.  This is what was actually paid

11   for it by MLC and this is the cost basis.  It's true that, when

12   these were bought, there was a -- the TIPS vary, by the way,

13   not only based on interest rate expectations but also inflation

14   expectations.  Technically, there's a forward curve expectation

15   of what's akin to inflation.  Inflation expectations happened

16   to be a little low in March.  They're now much higher, so the

17   TIPS have now gone up and the adjusted principal of these TIPS

18   is going to be much higher.  The TIPS are much more valuable,

19   at this point, than CASH would have been or, frankly, than any

20   cash than RACER can come up with, any investment that would

21   have served its purposes.

22          The point is that TIPS are not really designed for

23   day-in day-out trading in this system.  They were a portfolio

24   that was designed to fit this purpose, and this supports, Your

25   Honor, among other things, a point the Court made: we do

Page 70

1     dispute the fact that anybody ever talked about fluctuating

2     trading value.  Fluctuating trading value made no sense in the

3     context of this transaction.  For one thing, nobody knew what

4     the closing date was going to be.  It was a somewhat random

5     date.  If there had been any intention for a fluctuating

6     closing date evaluation, there had to be some mechanism in the

7     documents to deal with that.  There's all sorts of mechanisms

8     in these documents to deal with different things, but there's

9     no reference to a valuation based on a fluctuating closing

10    date.  There's no agreement on whose value you're going to use,

11    where you're going to get it, are you going to use noon, or are

12    you going to use the end of the day?  There's a lot of issues

13    around that.  The reason it was not addressed is it doesn't

14    matter if you're going to use the normal accounting cost basis

15    because everybody knew the securities were going to be held to

16    maturity, and the record reflects everybody's agreement that

17    the securities were going to be held to maturity.

18            There's another important point here, Your Honor, in

19    this presentation.  If you flip over to the last page, there is

20    a reference to the custodial account, and it says, "The custody

21    account to hold Treasury securities transferred to the ERT" --

22    that was the name then being used for RACER -- "will be set up

23    and tied to the ERT primary transaction account" -- and I think

24    Mr. Kehene made reference to this -- the Trustees worked with

25    the MLC personnel to set up these custodial accounts so the

Page 71

1    TIPS could be passed seamlessly, not sold, but passed into

2    these custodial accounts.  They clearly knew well before the

3    effective date that they were going to receive these TIPS.

4              THE COURT:   By transfer, you mean by in kind

5    transfer?

6              MR. MILLER:   In kind, yes, Your Honor.  If the TIPS

7    were going to be sold --

8              THE COURT:   Kind of like journaling them from one

9    brokerage account to the next?

10             MR. MILLER:   That's correct, Your Honor, so -- and

11   the record shows more than 15 calls and meetings were devoted

12   to setting up these custodial accounts.  It was a lot of

13   trouble, so the hand-off was carefully worked out with the

14   Trustees of this group of TIPS.  The Trustees, by the way,

15   would have had an opportunity to say, we don't like this mix of

16   TIPS, if they'd wanted to, and MLC would have been happy to do

17   it.

18             Let me point out that, if MLC had just sat on the

19   cash used to buy these TIPS, it actually would have had more

20   cash, but everybody -- nobody wanted to take a lottery based

21   on, what are the TIPS going to be on the day of the closing?

22   Nobody knew what the day of closing was.  That had nothing to

23   do with what they were doing.  Nobody was buying these TIPS to

24   hold them for trading.  Everybody was buying these TIPS to hold

25   them to maturity, and we suggest that that's why the maturity

Page 72

1    keyed cost value is the only value that has anything to do with

2    the facts or the record.  There is not a shred of evidence,

3    Your Honor, that anyone ever talked about trading value before

4    the effective date.  It's a complete after thought.  It came

5    about, clearly, long after this -- or, at least, at the time of

6    this close-out is the first time we heard about it.  The so-

7    called true-up, Your Honor, for a $107,000, it goes out to the

8    penny, the calculation there used the cost basis that had been

9    consistently used by MLC.  At that time, RACER was carrying

10   this on its books on the cost basis.

11           So, you know, although there is a question as to

12   whether some rights were reserved, the point is that all of the

13   discussion had been about using this, valuing it at cost basis,

14   which is derived from the maturity value, and there's nothing

15   in the record that suggests that a trading value had ever been

16   discussed or considered by anybody, and frankly, it makes no

17   sense, because the purpose of these trips -- these TIPS and

18   other securities was not to trade them.

19           The other securities that are not TIPS -- my

20   understanding is that most of those were very short term.

21   They've actually paid.  They paid at a premium, and they've

22   been converted to cash, so they're no longer an issue that we

23   have to deal with.

24           So, Your Honor, the -- I would now like to deal with

25   some of the points that were made in the arguments.  The states

Page 73

1    have made the argument, Your Honor, that they thought they were

2    going to get cash, and the Court has made a preliminary ruling

3    that cash was what was required.  We don't agree that that was

4    what was required, and one of the reasons I would like to point

5    out on that is that the communications that had been had, I

6    understand, with the states were through the Treasury.  My

7    understanding is the MLC never negotiated directly with the

8    States.  The Treasury acted as an intermediary.

9            And the declaration of Michael Hill, filed February

10   3, contains some important statements about the position of Mr.

11   Mark Dowd, who was the RACER's primary contact at the Treasury

12   department.  In Paragraph 5, Mr. Hill recalls that Mr. Dowd and

13   Mr. Foo (phonetic), also with the Treasury, stated on January

14   28, 2011 that, quote, "In Treasury's view, U.S. Treasury

15   securities were the equivalent of cash for purposes of the

16   Trust agreement," close quote.  That's Paragraph 6.  So, that's

17   a statement saying that the Treasury agreed with the view that

18   cash equivalents, Treasury instruments, could be used for this

19   purpose.  And then -- and it's clear that an effort was made to

20   try to get Treasury to come in and make an objection -- in a

21   meeting on October 11, 2011, after RACER had been basically

22   campaigning with Treasury, according to the declaration, to --

23            THE COURT:   What was the date?

24            MR. MILLER:   It's October 11, 2011.  This is after

25   this dispute had arisen.

Page 74

1           Mr. Hill recalls a meeting in which Mr. Dowd

2    disagreed with RACER's position that the Trust had been

3    underfunded, so -- it's important to understand that, from

4    MLC's perspective, it understood the Treasury thought and all

5    the parties believed that everyone was okay with the use of

6    Treasury securities, and MLC had no reason to believe that the

7    states were not aware of this and that this had not been

8    communicated because it was actually not the place of MLC to

9    communicate with the states.  That was not its role.

10           THE COURT:   I can see why you're arguing that's a

11    waiver.  I have greater difficulty seeing why you contend that

12    that changes a written contract.

13           MR. MILLER:   Oh, I'm actually offering it, Your

14    Honor, in support of waiver.  I also think it's evidence of

15    others interpreting the agreement as --

16           THE COURT:   And you're making reference to Mark Dowd

17    at Treasury --

18           MR. MILLER:   Yes.

19           THE COURT:   -- who is one of the bundle of people

20    who were involved in this back before the confirmation order

21    was entered.

22           MR. MILLER:   That's correct, Your Honor.  And Mr.

23    Dowd was identified in the Hill declaration as RACER's primary

24    contact at the Treasury Department.  That was how they

25    identified him.

Page 75

1            THE COURT:   Uh-huh.  Now, forgive me, I've got to

2    ask you the same question I was water torturing Mr. Jones with.

3    Dowd is on the Treasury side of the United States Government as

4    contrasted to the EPA side?

5            MR. MILLER:   Yes, Your Honor.

6            THE COURT:   Okay.  But what you're also saying is

7    that Dowd, although he worked for Treasury, was the

8    intermediary between RACER and the States?

9            MR. MILLER:   My understanding, Your Honor -- and I

10   was not part of this -- is the Treasury was the intermediary

11   between the States and MLC.  I don't -- Mr. Dowd was a

12   participant in that.  I believe a Mr. Tannenbaum was also

13   involved in --

14           THE COURT:   No, he's an environmental guy, if I note

15   that --

16           MR. MILLER:   -- in some of this, Your Honor.

17           THE COURT:   Yeah, I --

18           MR. MILLER:   But my understanding is --

19           THE COURT:   There are a lot of people in this

20   courtroom on both sides of this controversy who I know in the

21   history of this case and through other methods.

22           MR. MILLER:   Yes, well --

23           THE COURT:   It doesn't affect my objectivity, but it

24   does affect the fact that I know that Tannenbaum's on the

25   environmental side.

Page 76

1          MR. MILLER:   Well, I'm not suggesting Mr. Tannenbaum

2     was in these meetings, Your Honor.   I'm actually trying to make

3     a full disclosure that I believe Mr. Dowd was part of this, but

4     there were others who were part of the intermediaries with the

5     State.   We only know about these meetings through the

6     declaration of Mr. Hill because MLC was not in these meetings,

7     but MLC had similar meetings with Treasury, and I will tell the

8     Court -- and this is in our papers -- that the MLC DIP Lender

9     Trust is funded by Treasury, and our fees are approved by

10    Treasury, and my experience is that clients rarely pay me to

11    oppose a motion they agree with.   So my presumption is that

12    since we have a budget to oppose this motion, that we are here

13    with the approval of Treasury.   I can't speak for the United

14    States.

15          THE COURT:   I feel more comfort in drawing that

16    inference you're asking me if I knew who was Mr. Jones' client.

17          MR. MILLER:   Well, Your Honor, I hope I know who

18    mine is.

19          The -- I want to go back now to this -- to the

20    Court's, I think, completely correct analysis of waiver and

21    damages.   We believe there is no doubt about the fact that Mr.

22    Hill and Mr. Laws were acting for the Trust.   They knew that

23    the Treasury securities were coming in.   They wanted those

24    Treasury securities.   They were actually better than cash for

25    their purposes because they were already invested, they've been

Page 77

1     working, they were laid out perfectly, and the truest evidence

2     that nobody's unhappy with those is nobody wants to give them

3     back.   Nobody actually wants to sell the TIPS, and we're not

4     urging, by the way, the TIPS should be sold.  We think -- and

5     this includes the Zero-Coupon Bonds -- we think this was a

6     perfectly designed investment portfolio, and we still think it

7     was well designed.  It was a long-term plan, and we think that

8     plan is still right on track.  And I would point out there was

9     some concern by Ms. Leary about whether this Trust can have

10    enough money in it.  There's about a hundred million dollar

11    cushion built into this Trust that's a contingency fund over

12    the best estimates.  The TIPS have actually already gone up in

13    value and we have a statement in the declaration of Mr.

14    Rosenthal that confirms that as of about a month ago, the TIPS

15    were $36.1 million in trading value over the cost-based value

16    that was used, and they've gone up I understand about another

17    million dollars in trading value over the last month.  That's

18    important because it leads me to my next point which is New

19    York damages law.  And for that purpose we passed up a case,

20    Your Honor.  This is the last of the four items that I sent up.

21    There are a number of cases, but this is the New York Court of

22    Appeals in sort of a landmark case, the Freund v. Washington

23    Square Press case, dealing with contract damages.  And if you

24    turn to page 3 -- excuse me -- we've highlighted about three

25    sentences that I'd like to call the Court's attention and talk

Page 78

1    about.  It's axiomatic that except where punitive damages

2    allowed, the law awards damages for breach of contract to

3    compensate for injury caused by the breach, injury which was

4    foreseeable, i.e., injury within the contemplation of the

5    parties at the time was entered into.  Money -- and then

6    there's a citation -- money damages are substitutional relief

7    designed in theory, quote, "to put the injured party in as good

8    a position as he would have been put by full performance of the

9    contract at the least cost to the defendant and without

10   charging him with harms that he had no sufficient reason to

11   foresee when he made the contract," closed quote.  And then,

12   Your Honor -- that was a Corbin quote.  I'm going to skip over

13   some discussion that has to do with foreseeability and benefit

14   of the bargain, and go down to a sentence that says, "but as

15   equally fundamental to that," -- just a minute, let me start

16   over -- "but it's equally fundamental that the injured party

17   should not recover more from the breach than he would have

18   gained had the contract been fully performed."  This is a

19   statement of what's sometimes called the one-recovery rule,

20   it's a statement of what's sometimes called the no-windfall

21   rule, and that is that if a party has actually -- is going to

22   actually receive more as a result of the breach than without

23   the breach, then they have no damages.  It's a limitation on

24   the normal damage rule.

25         I do want to deal briefly with the point that is made

1   about this New York rule that says that damages are to be set

2   at the time of breach.  It's true that there are a number of

3   cases that say that lost opportunities after the breach can't

4   be used to increase damages, and there are some that say it

5   can't go the other way.  And that actually deals with this

6   statement of Mr. Kehne that RACER would have taken cash and

7   would have invested in TIPS with a greater value, or would have

8   invested in something else.  This breach rule actually cuts off

9   speculative loss profits.  But the breach rule does not have

10  anything to do with the analysis of the one-recovery rule or

11  the windfall rule, because those things always come up after

12  breach.  It also doesn't have anything to do with mitigation of

13  damages.  Mitigation is always post breach.  This has to do

14  with fixing the initial damage and for that reason, Your Honor,

15  I'd like to call your attention, for example, to another case

16  we cite --

17          THE COURT:   Pause, please, Mr. Miller.  Would the

18  corollary of what you've just said be that you can't claim

19  credit for the fact that they're 36.1 ahead?

20          MR. MILLER:   No, Your Honor.  And the reason is that

21  if they keep the TIPS, then the result is going to be that

22  they're going to have a windfall and they're going to be ahead.

23  In other words, I'm not trying to say that you use that --

24          THE COURT:   You're not saying that they should be

25  penalized for getting the 36.1, what you're saying is all they

Page 80

1    got to do is hold on to the TIPS and they'll get the exact

2    benefit of their original bargain.

3              MR. MILLER:    That's one of my points.  Yes, Your

4    Honor.  But that --

5              THE COURT:    But you're saying something different as

6    well?

7              MR. MILLER:    Yes, I am saying something different as

8    well.  I'm saying as well that their proposal is, we'll just

9    keep the TIPS and you give us another $13.5 million.  That

10   would be a windfall recovery because the TIPS they want to

11   keep, which they say is a mistake -- you get -- you sent us

12   something wrong, it turns out it was worth more than what you

13   were supposed to send us, we just want to keep that and you

14   also send us some of the other things we wanted.  That would be

15   a windfall, and I will explain that with a case in just a

16   moment, Your Honor.  And windfall is tested after the fact,

17   because windfalls occur when people get paid more than they

18   should get paid for a breach.  The Wackler Weichert (phonetic)

19   case, Your Honor -- I'm not sure if I'm pronouncing it right --

20   Wachner v. Frost (phonetic), which is cited in our brief, was a

21   case in which a condominium developer, a New York case,

22   received a settlement of $60,000, then an arbitration award for

23   the full amount of the same damages.  And the Court said -- and

24   of course, kept the $60,000 -- the Court concluded if the

25   award, referring to the arbitration award, were to remain

 1    intact, plaintiffs would receive a windfall, the award cannot

 2    stand.  There are a number of cases like this that deal with

 3    the fact that somebody has already gotten their damages taken

 4    care of, and now they want to get the damages again from

 5    another source.  And the rule there is one recovery, and what

 6    we're suggesting, Your Honor, is that if they keep the TIPS,

 7    they've already had their recovery.  If they want to sell them,

 8    fine, they can sell them, and they'll have their recovery.  But

 9    if they want to give the TIPS back, that's fine with us.  Mr.

10    Berz proposed that.  They should have done that, by the way, at

11    the time it was proposed to mitigate their damages.  They

12    shouldn't sit on the TIPS, not sell the TIPS, and then say we

13    wish we'd sold the TIPS at some other time.  That's not a fair

14    result.  You're completely correct, they did not mitigate their

15    damages.  The point is that under New York law, if you accept

16    the State's theory they should have had cash, then they still

17    have no damage, because what they got was worth more frankly

18    than cash to them as a useful tool for the Trust, and if they

19    wanted to mitigate it, then if they'd done anything to mitigate

20    it, what should have happened is they wanted cash, they should

21    have sold the TIPS as soon as they knew about it, and then we'd

22    settle up on the cash and there would be virtually nothing due,

23    in fact we think money technically would be owed back to MLC.

24    Now, we're not seeking any money back, Your Honor, and frankly

25    MLC wants to see the Trust succeed and wants to see the

Page 82

1    environmental liabilities covered, and believes TIPS is the

2    right way to do this.

3            There may have been some mistake in conforming the

4    documentation in the plan, but the mistake here was not to put

5    the TIPS together.  Whether the States were parties to that or

6    not, that's really not something MLC could deal with.  MLC

7    couldn't advise the States.  MLC assumed that the States were

8    being advised either by Treasury or by someone else that they

9    were going to use TIPS, and frankly it never occurred to any of

10   the people who were investing in these TIPS that this wasn't a

11   good idea.

12           Let me deal with a few more points in the argument,

13   if I may, Your Honor, and then I'll try to conclude it for you.

14           You did ask a question which I think I've answered

15   which was whether a fact had been assumed that on which there

16   was a disagreement as whether the parties looked at trading

17   value as opposed to the time that the -- what TIPS would be

18   worth when they were held to maturity, and you were absolutely

19   correct, and I think I've shown that with the PowerPoint, and

20   the record is replete with the fact that the parties were not

21   interested in the TIPS as a fluctuating investment.  They

22   didn't have the staff to deal with day trading.

23           THE COURT:   Let me interrupt you for a second.  That

24   PowerPoint; you're talking about the meeting of November 2010,

25   if I'm not mistaken?

Page 83

1          MR. MILLER:   Yes, Your Honor.  That's an example.

2          THE COURT:   And was that PowerPoint shown on a

3     screen or handed out in paper to the participants at that

4     meeting?

5          MR. MILLER:   Let me ask, Your Honor.  It was handed

6     out, I'm told, Your Honor.

7          THE COURT:   Okay.  And the participants at that

8     meeting included RACER personnel?

9          MR. MILLER:   Yes.  This was a presentation to Mr.

10    Hill and Mr. Laws --

11         THE COURT:   -- where they were the actual targets of

12    the presentation?

13         MR. MILLER:   Yes.  They were the subjects of the

14    presentation.  Mr. Koch and others went to Detroit to explain

15    this to them.  And this was a central part of the presentation.

16         So, there -- I wanted to respond to your point that

17    yes, MLC believes that the value that was looked at was always

18    the ultimate value, and I would stress, Your Honor, that there

19    is -- when you look at the cash flows, they needed $167 million

20    in 2025, according to the projection going forward, or actually

21    it's more precise to look at the $19 million that they needed

22    by July 15, 2020.  There was no assumption that the TIPS were

23    going to pay a certain amount of appreciation for inflation.

24    This was the face amount.  If there had been deflation, which

25    by the way would have reduced, presumably, remediation costs,

Page 84

1      the TIPS were guaranteed at this price.  So the -- everybody

2      was looking forward to what was going to be there when they

3      needed the TIPS, not looking at the day-to-day fluctuation.

4              I think I've already dealt with the issue that the

5      short-term securities which are -- by the way, the securities

6      that are shown here at the bottom of this list, these are the

7      non-TIPS securities -- that a number of those were January of

8      '10 and July of '11, that's 300 -- about $400 million worth of

9      that, those have all paid, and we understand they paid --

10     actually they matured and they came in at those values, so

11     there's no real dispute about that.  That cash is already in

12     the RACER Trust, and on information and belief, Your Honor, we

13     understand RACER has not invested that cash.  We are not aware

14     that they have an active investment program.  You may want to

15     clarify that.

16             THE COURT:  Well, if it's on information and belief,

17     I don't think I should be relying on it in an evidentiary

18     hearing --

19             MR. MILLER:  I don't think you should, Your Honor.

20             THE COURT:  -- of this character.  I'm happy to go

21     with uncontroverted declarations --

22             MR. MILLER:  All right.  Thank you, Your Honor, but

23     --

24             THE COURT:  -- and documents, but --

25             MR. MILLER:  -- let me say that the record does not

1    reflect that any investments have been made with that cash that

2    would be inconsistent with RACER wanting to rely on the TIPS

3    and the program that was set up.  In other words, there's been

4    no inconsistent conduct.

5            There was a reference in I believe it's Mr. Kehne's

6    argument to the fact that this portfolio was expensive to set

7    up.  That's a good point.  I mean, it's not just the piecemeal

8    value of these tips, it was the fact that this was a

9    professionally designed portfolio, custom tailored to the needs

10   of this Trust.  That's the value to this Trust that it

11   received.  And the cost that was reflected here was part of the

12   fact that these TIPS were bought as they were available.

13   They're not always available on a given day, I'm told, in

14   exactly the right denominations and the ideal mix.  They were

15   collected over time, so our belief is that the value of this

16   portfolio is correctly reflected under standard accounting

17   practices by the cost basis, the amortized cost basis.  So --

18           THE COURT:  You're not suggesting that the cost

19   shown would capitalize the expenses in terms of labor and

20   professionals and so forth --

21           MR. MILLER:  No, I'm not, Your Honor.

22           THE COURT:  -- to put it together?

23           MR. MILLER:  I'm suggesting those are additional

24   values that are not in the record anywhere.  I mean, if this

25   were a traditional damage case, and if the plaintiff were

Page 86

1   trying to prove that it got something less than it was supposed

2   to get, it would have to prove what the value was of what it

3   did get.  There's really no proof in this record of anything

4   except this trading value assertion which has no reference, as

5   the Court's pointed out, to anything in the contracts, nor

6   reference to anything the parties did before, no indication

7   that that's how accounting would deal with these.  It's really

8   a constructed legal argument, and what I am suggesting is that

9   the value of this really to the Trust included the time and

10  effort that was put in to assembling the portfolio, not what it

11  would be, basically, a fire sale if you took all this stuff and

12  sold it to day traders, which is what the trading value is.

13          So I'm suggesting that again, this is another reason

14  why there is -- where there are no damages, why mitigation

15  could have taken care of the complaint by the States.  If they

16  really wanted cash, they could get cash.  But nobody wants cash

17  because this is more valuable than cash.  And I already

18  referred to the fact that there was no mechanism to appraise

19  these on a day-to-day basis that ever came up.  And I -- there

20  is -- I think this is a small point, but it is -- I do want to

21  clarify it.  The Hamilton declaration does refer to a

22  conversation about a dispute over value.  The parenthetical

23  that has claimed to be a reservation of rights is not

24  identified in the Hamilton declaration as having anything to do

25  with this dispute.  It just says there's a parenthetical there

Page 87

1    that says subject to the RACER funding adjustment.  There were

2    lots of adjustments that were being made at that point, Your

3    Honor.  Property was being sold, things were happening, there

4    were provisions dealing with adjustments.  So there's nothing

5    in the record that suggests any written reservation of rights,

6    and that's consistent with the fact that the parties continued

7    to deal with this on a cost basis.

8            I would note that in the States' argument, there was

9    no suggestion that they would like to give back the TIPS and

10   get money.  And I think that that is -- that's a key point.

11   This argument that the TIPS lost value between October and

12   November -- actually between October and March -- that's a

13   purely theoretical, unrealized loss.  They then gained value.

14   There was no risk that the value for the Trust changed.  The

15   maturity value was always the same, the inflation protection

16   was always the same, and subsequent events have confirmed that

17   -- which is not part of the damage analysis, Your Honor -- but

18   had confirmed the fact that there is no evidence of any real

19   loss.  It's just a hypothetical claim that they could have sold

20   and could have bought and the hypothetical sale never occurred.

21           I do want to correct one point.  There was a

22   statement that if there's any money left over, it goes to back

23   to the Treasury.  I believe it actually goes to the

24   environmental super fund, if there's any money left over.  So I

25   just want to correct that point on the record.

1        So in conclusion, Your Honor, we agree with certainly

2   your analysis that there could be no damages even if there is a

3   technical violation of the use of the term cash.  We believe

4   there is a waiver -- there's waiver by conduct, by full

5   disclosure, by the setting up of the custodial accounts.  We

6   believe that this is a dispute between the Trusts, and the

7   beneficiaries don't have a right, normally, to come in and sue

8   unless they somehow seize control of the Trust and change

9   things.  It's like a shareholder suing for corporation, by the

10  way.  This Trust -- the Trust speaks for the Trust in terms of

11  RACER Trust, and we believe its clear agent is the Trustee.  It

12  has no other agents that exist that we know of.  I'm not aware

13  that there's any board or other institution that governs the

14  Trust.  It just has the Trustees.  So there's no doubt that Mr.

15  Hill and Mr. Laws were agents for the Trust and the Trust is

16  the other party, the RACER Trust, in this process.  And we also

17  -- we believe the Court's analysis is essentially correct on

18  all issues except we want to stress the fact that we think

19  there was complete disclosure as far as MLC was concerned of --

20  and the Treasury -- of the fact that this was going to be

21  funded by Treasury securities as well as by cash.  There was

22  agreement on that and we think that that was in effect course

23  of conduct that clarifies what the amount, the dollar symbol,

24  in the settlement agreement meant.  And therefore, we don't

25  agree that there was a technical breach of the contract, but

Page 89

1      even if there was, we agree with the Court there's no damage.

2              I'd be happy to answer any other questions the Court

3      has.

4              THE COURT:   No.  You took care of me as we went

5      along.

6              Okay.  Am I right that there's nobody on the MLC side

7      who wants to be heard before I give people a chance to reply?

8              All right.  Mr. Kehne -- and I realize that I don't

9      know if I pronounced your name correctly.  I've heard it now

10     two ways in addition to how I was calling you.  What do you

11     prefer and how much time do you want?

12             MR. KEHNE:   Kehne and until you don't have any more

13     questions for me.  It should be relatively brief, Your Honor.

14             THE COURT:   Then we're not going to take a break.

15     We're going to go straight forward, and again I apologize for

16     mispronouncing your name.  Come on up, please.

17             MR. KEHNE:   I answer to everything close.

18             Well, I want to touch first on the question of notice

19     and the effect of the disclosure statement.  I think on its

20     face, the disclosure statement could not be notice of intent to

21     transfer securities on the effective date let alone an intent

22     to transfer them at net book value as opposed to the cash

23     equivalent value.  It's dated December 31.  It would have been

24     -- it have been --

25             THE COURT:   Dated what date did you say?

Page 90

1          MR. KEHNE:    It's dated three months before the

2     effective date.  So it's a statement of what was on-hand and

3     it's completely consistent with an understanding that these are

4     the assets that we've targeted for transfer to the Trust.  It

5     doesn't say that they will continue in this form.  If I'm the

6     States and I -- or the Tribe and I get this, I don't see how

7     I'm supposed to understand that this is notice to me to raise

8     my hand if I object to the transfer of securities at all, let

9     alone the transfer of securities at less than fair market value

10    -- excuse me -- for stated claim valuation above their fair

11    market cash value on the effective date.

12          And I want to stress that it would have been -- it

13    have been quite easy for MLC -- for the debtors, excuse me --

14    prior to the effective date to provide notice to the world.

15    They may not have had an open line of communication.  They may

16    not have been calling the States and the Tribe routinely.  But

17    it would have been quite easy for them to disclose in a monthly

18    operating report or just in a statement to the world that by

19    the way, even though there's a gap opening up here between the

20    fair market value and the net book value of these securities,

21    we are intending to transfer them in lieu of cash, and we're

22    intending to transfer them for whatever their net book value is

23    on the effective date regardless of the gap that's opening up

24    between -- that's opened up between the net book value and the

25    fair market value.  I'll refer you to Mr. Hamilton's

Page 91

1    supplemental affidavit where he indicates that he was aware of

2    that gap, he was preparing monthly reports that documented that

3    gap, and he had discussed that it was potentially problematic

4    with Mr. Rosenthal at MLC.  I do not think this was a surprise

5    to ML -- to the debtors that this was potentially an issue, and

6    if they had wanted to provide notice, the kind of notice that

7    really could have provided a knowing waiver, it was perfectly

8    within their means to state that clearly to the world, instead

9    of referring in retrospect to a three months -- what was three

10   months passed by the time of the effective date two footnotes

11   that don't say we intend to transfer these assets in their

12   current form, let alone how they intended to value them.

13           A cost to the debtors, by the way, and to Treasury of

14   doing that would have been that -- it would have probably

15   brought people into your courtroom in advance of the effective

16   date to clarify, and if they had, in fact, announced that even

17   earlier when the purchased the securities, they would have been

18   bound to follow through, regardless of which way the assets

19   moved.  As things stood, they weren't committed with any

20   clarity at all at the time of the purchase to using fair market

21   value or net book value.  They could see which one was more

22   advantageous.

23           I want to touch next on the waiver issue.  And

24   there's a couple of components of that that I think need a

25   little more attention.  One is the notion that we were acting

Page 92

1    as agents for the States, and there was some discussion with

2    Mr. Jones of whether there's an agent relationship between the

3    Trustee and the beneficiary.  But it's important to note that

4    we are not, even the Trustee for -- we do not have a Trustee-

5    Beneficiary relationship with the States or Tribe.  The

6    settlement agreement and Trust agreement are quite clear that -

7    - both say specifically that the sole beneficiary of the

8    Environmental Remediation Trust is the United States, the

9    collective United States.  It is not the State and the Tribes.

10   The State and the Tribes have separate and independent, fully

11   preserved rights to enforce in this Court their rights under

12   that settlement agreement and Trust agreement.  They were in no

13   way dependant on us, and we, although the objectives of the

14   Trust as set forth in the documents include advancing their

15   interests, our legal obligation as a Trust is to our

16   beneficiary, and that is the United States.

17          Now, there was a -- this is a small point, but there

18   was a representation that TIPS can't go down.  That's not quite

19   correct.  If you sell out of the TIP before its maturity, it

20   can go down.  If you hold it to maturity, the TIP cannot be

21   worth less than the initial value.  But if, for example, at one

22   of our 60 sites, we had an acceleration or an increase in the

23   cost of the remediation, we may well some time down the road be

24   required to sell out of a TIP before its maturity because its

25   maturity, after all -- the maturity dates of those TIPS were

Page 93

1    after all geared to long-term estimates of remediation cost

2    curves for 60 different sites.  It would be unprecedented if

3    you could take a random 60 environmental remediation sites and

4    not find any that strayed from the cost curve that was

5    projected as far in advance of the real expenditures and the

6    real work as we're talking about here.

7              By the way, one of those sites has a $120 million

8    budget -- that's the New York Messina site.  And when there are

9    remediation activities of that scale, I think that the odds of

10   a need to accelerate go up.  So it isn't a lock that these

11   securities will all be held to maturity.  That's the

12   expectation and the hope, and that's our understanding and hope

13   as things stand now, but it is not an assured outcome.

14             There was a reference made to the cushion account for

15   the environmental remediation in this context.  The cushion

16   account for environmental remediation is $68 million, but there

17   are strict limitations on the Trust's access to that cushion

18   account.  It has to be determined that it was an unforeseen

19   cost, so if there are known and foreseeable remediation issues

20   and they turn out to be more expensive or to need acceleration

21   to avoid additional environmental damage, that is not an

22   occasion to reach the cushion account.  And that also bears on

23   the prospect that the Trust may need to get out of some of

24   these securities before the maturity date.

25             Now, I understood Mr. Miller to say that sort of a

Page 94

1    background accounting principal that ought to inform the

2    Court's understanding of what was known by all the interested

3    parties prior to the effective date is that there's continuity

4    between the debtors and the Trust with respect to these assets,

5    and that we have a carry-forward basis.  I'm not aware that

6    that was addressed in any of the pleadings that RACER, in fact,

7    is entitled to use the net book value basis, and in fact our

8    analyses have all been to the contrary, that we have to mark to

9    market.  It's also worth pointing out with respect to the

10   accounting issue; to the extent that it's intended as sort of a

11   background principal of what everyone would understand about a

12   proposal to transfer this portfolio of securities that there

13   are all kinds of different ways -- different occasions to value

14   assets.  For example, there's tax valuation of these assets,

15   and the general rule for tax valuation is that it's marked to

16   market, and there's in fact been a filing by the GUC

17   administrator with respect to the wrap-up value of assets for

18   tax purposes that were transferred to ERT.  There's no

19   representation --

20              THE COURT:  Pause, please, Mr. Kehne.  There's a

21   fairly well-entrenched principal of bankruptcy law that when we

22   look at valuations -- and you don't need me to tell you that

23   valuations are engaged in for a host of different reasons in

24   bankruptcy.  I could probably come up with seven or eight off

25   the top of my head, and I think 506(c) of the Code says it in

Page 95

1    baby talk, that valuations are engaged in with a view toward

2    the purpose for which the valuation is undertaken.  Here, of

3    course, we're talking about a dispute of contract law, but do

4    you differ with the concept that when I'm looking at a

5    valuation controversy, the best way to do that would be to take

6    into account the purpose for which the valuation is undertaken?

7            MR. KEHNE:   Yes, I think that's a proper approach,

8    but I would say that the purpose for the valuation here needs

9    to be determination of whether the funding obligation was met.

10   And one point I want to emphasize in that respect is that the

11   instructions to make a cash payment in the settlement -- in the

12   Trust agreement, the plan, and the confirmation order, and the

13   requirement to transfer dollars, all specify on the effective

14   date.  The instruction to transfer asset -- financial assets,

15   cash in particular, to the Trust to fund its efforts specify on

16   the effective date.  They don't say transfer this value at a

17   future point in time assuming that you're permitted to hold --

18   that you're able to hold the assets to maturity.  There's not

19   just a valuation term in the controlling documents, there's

20   also a time term, and the time term says on the effective date.

21   So valuation of these securities on the effective date I don't

22   think can be undertaken by reference to the value at maturity

23   just because the Trust has deferred to Treasury in regarding

24   this as a prudent portfolio of securities to hold going forward

25   given the information that it has now.

Page 96

1            THE COURT:   Okay.  Continue.

2            MR. KEHNE:   There are two -- first I want to address

3      that case law that was provided to you by Mr. Miller.  This is

4      the Freund case.  Freund case and Wexler case both provide --

5      both contain broad statements of an anti-windfall principal,

6      but they do not contain statements of an anti-windfall

7      principal that negates the assess-the-damages-at-the-time-of-

8      the-breach principal.  Neither involve --

9            THE COURT:   Couldn't hear that last part.  Forgive

10     me.

11           MR. KEHNE:   Oh, sorry.  Neither Freund nor Wexler in

12     its broad statement of an anti-windfall principal purports to

13     swallow the rule that you assess damages at the time of the

14     breach.  Neither case involved the valuation of assets.  In

15     Freund the issue was whether a frustrated author would receive

16     the benefit of a breached promise to publish his books in terms

17     of the profits that he could show he would have realized, or

18     whether he was entitled to the cost that the publisher avoided

19     by breaching.  There's no asset valuation in that -- issue in

20     that case.  The Wexler case was about double recovery under a

21     settlement in parallel litigation against one of the other

22     defendants.  Again, the anti-windfall principal was recited for

23     common sense kind of outcome that you don't get to double

24     recover, but there was no holding in either of those cases or

25     any of the others that MLC DIP Lender Trust had cited to you

Page 97

1    that purports to negate the broad principal that where there's

2    a need to measure the value of assets or the value of

3    performance to determine damages, the valuation is done at the

4    time of the breach and not later when the assets actually

5    delivered could have increased or decreased in value.  And if

6    you apply the anti-windfall principal to say either that

7    mitigation of damages requires us to sell, or to say that

8    there's in fact no harm and we're seeking a windfall, then you

9    do negate that fundamental principal of New York damages law,

10   that the value -- that the cost -- excuse me -- that the amount

11   of the damages are assessed at the date of the breach.

12          The other case I want to cite -- I want to refer you

13   to is cited on page 17 of our second brief, and this goes to

14   the question, Your Honor, of a Trustee's ability to modify the

15   terms or the obligations of an agreement, a consent order, in

16   that case as well as in this, with effects on other parties by

17   agreement.  And that's the Resource Technologies Corporation

18   case of 2010, Seventh Circuit case.  In there a bankruptcy

19   trustee essentially acceded to one of the parties' substitution

20   of direct payments for establishment of an escrow account.

21          THE COURT:   Couldn't hear that.

22          MR. KEHNE:    In that case, the bankruptcy trustee in

23   a bankruptcy proceeding acceded to, or arguably acceded to, a

24   parties' substitution of direct payments for establishment of

25   an escrow account from which those payments could be made going

Page 98

```
 1    forward.  And there was no -- the Court didn't take on the

 2    issue that the trustee had accepted that, but said, "The

 3    Trustee's knowledge of Chiplease's direct payments has no

 4    bearing on Chiplease's obligation to comply with the escrow

 5    order.  Chiplease and the Trustee could not privately agree to

 6    modify a settlement agreement that was approved by a Court

 7    order.  Unlike a private contract an agreement whose every

 8    provision has been approved and therefore activated by Court

 9    order requires Court approval before it may be modified."  And

10    it cites an earlier Seventh Circuit case from 2004.

11            And we think that that's important to this notion

12    that -- as you know, we think there are many difficulties with

13    the notion that the Trust's acceptance that it would receive

14    securities on the effective date waived its right to object to

15    an improper valuation of those securities which was in no way

16    signal to the Trust, and could have been easily by the debtors.

17    But even stronger, I think, is the argument that the States and

18    Tribe can't have their rights under the consent order affected

19    by the Trust's actions, even if the Trust had behaved in an

20    irresponsible way, which emphatically we do not believe is

21    true.

22            And I just want to circle back to, before I sit down,

23    to the windfall point again.  The notion that because these

24    assets are worth more now than they were on the effective date,

25    and in fact are worth more now than a cash payment would have
```

1   been worth on the effective date had we kept it all in cash, is

2   irrelevant first because of New York damages law, and assess at

3   the time of the breach principal, but it's also irrelevant

4   because I think we have an uncontradicted record that if we had

5   received cash, we would be $13.5 million down from -- excuse me

6   -- $13.5 million ahead and in exactly the same position with

7   respect to our securities portfolio as we are today.  The only

8   difference if we had received cash is that we would have -- we

9   would purchase that preapproved portfolio and had $13.5 million

10  more in short-term assets.

11          THE COURT:   Wait.  I lost you there, Mr. Kehne.  If

12  you had gotten the full amount in cash on the closing date, on

13  the effective date, why wouldn't you have that same amount of

14  cash less whatever you had spent between then and now at this

15  point?

16          MR. KEHNE:   Because the Trust was already aware of

17  the effort that had been undertaken to match the projected cost

18  curve of its remediation efforts and administrative efforts

19  with securities.  It would have been irresponsible for the

20  Trust to hold those assets in short-term --

21          THE COURT:   -- in the cash that Trust had bargained

22  for?

23          MR. KEHNE:   Yeah -- in cash, because the Trust --

24  well, the Trust and the settling parties didn't bargain just

25  for cash to hold in eternity.  It bargained for cash and a set

Page 100

1     of authorities to manage that cash responsibly.

2               THE COURT:   So you're saying the Trust if it had

3     that pile of cash as the contract originally provided for would

4     have done the exact same thing that MLC and Treasury

5     collectively decided to do before the effective date?

6               MR. KEHNE:   That's exactly what Mr. Hamilton's first

7     declaration states, and the reasons -- I mean, I think it's

8     very sound -- I mean, I think it's easy to understand why, and

9     it's also consistent with what the Trust has actually done.

10    Nothing has prevented the Trust from changing that portfolio of

11    assets, but the Trust has not spent the money to reconfigure

12    that, to hire JPMorgan and Mesirow and undertake a planning

13    effort.  We haven't had a change, a significant change, in our

14    cost projections to this date that would require that.  And we

15    knew on the effective date that Treasury had already approved

16    this.  Why -- with everything else going on in the Trust's

17    work, it would have been a very ill-advised exercise to try to

18    rethink the investment strategy of the Trust on the fly on the

19    effective date.  And what the Trust has done is consistent with

20    what Mr. Hamilton says it would have done if it had received

21    cash, which is to hold those securities in that form.  The only

22    difference, again, is that we would be $13.5 million ahead if

23    the contract had been fully performed -- excuse me -- the

24    consent order had been fully met.

25               THE COURT:   Okay.

Page 101

```
 1            MR. KEHNE:   If there are no further questions,

 2      that's it for me.

 3            THE COURT:   Thank you.  Ms. Leary, I'll hear your

 4      reply, but of course, briefly and taking into account

 5      everything that's already been said.

 6            MS. LEARY:   Yes, Your Honor.  I want to correct a

 7      couple of things Mr. Miller may have misunderstood or maybe I

 8      misunderstood.  I just want to clarify them for the Court.

 9            This document, the finance and administration

10      transition document, that was a PowerPoint apparently for the

11      Trustee, Mr. Laws and Mr. Hill --

12            THE COURT:   Uh-huh?

13            MS. LEARY:   -- it would have been nice if the States

14      had seen this before they signed the agreement.  We might have

15      been fine with it.  I can't tell you that.  I did not want to

16      leave any impression with the Court that we had any idea about

17      this, and I also want to correct any perception the Court may

18      have that Mr. Tannenbaum was somehow aware of this as well.  It

19      is my understanding that he was not.  And that the States and

20      he and other members within D of J found out about the dispute

21      and about this whole mess at the same time we did, which was

22      the middle of November.  There was nothing that Mr. Tannenbaum

23      -- and more importantly, and this is really critical --

24            THE COURT:   Well, again, we're getting a little

25      metaphysical here, and I need to put you through the same water
```

                                                              Page 102

1        torture I put Mr. Jones through.  Mr. Jones has made it

2        repeatedly clear to me that he represents a single client,

3        which is the United States.  And you're saying now for this

4        purpose, I should make a distinction between the EPA or the --

5        I guess he's not in the EPA, he may be the DOJ who deals with

6        environmental issues, but he's kind of like an environmental

7        guy, and without a doubt, he's an employee of the United States

8        Government, which for that matter, so am I.  But you're saying

9        that I should for this purpose make a distinction between

10       Treasury within the United States Government and the DOJ and/or

11       the EPA within the United States Government.

12            MS. LEARY:   I'm not suggesting that.  All I'm

13       suggesting is that I don't want you to be left with the

14       impression by virtue of Mr. Miller's statement that Mr.

15       Tannenbaum participated in any of this, and I also want to make

16       very clear that Mr. Dowd and no one at Treasury represented or

17       were authorized to represent the State of New York or any other

18       state in negotiating with MLC.  Negotiations between the State

19       of New York and MLC at that time were ongoing, the door was

20       open, we were talking.  I spoke with probably Mr. Berz, Mr.

21       Goslin, Mr. Schmolensky (phonetic) -- I mean, I could tell you

22       there's no reason that we did not know about this.  There's no

23       reason.  And as Mr. Kehne said, had the Trust exercised its

24       discretion, which it was clear in the consent decree, it has

25       discretion to invest, it would have been 13.5 to the better.

Page 103

1           I don't know whether we could have resolved this had

2    we known about it, but I don't want you to be left with the

3    impression that somehow Mr. Dowd was authorized to do this or

4    participate in this or say this okay or any of that.  I don't

5    think there's evidence before Your Honor, Mr. Miller presented

6    none, about that authority.  And that's all I'm saying.  Mr.

7    Tannenbaum didn't know and Mr. Dowd did not represent the

8    States or the Tribe.

9           One thing I also want to clarify again, Mr. Miller

10   was not a participant in the almost over a year-long

11   negotiation on this consent decree.  There are two pieces to

12   this consent decree; one is the agreement, and the other is the

13   Trust.  So they're attached to our opening joinder, and it's

14   one document that's complete.  It is not just the agreement,

15   and if those two documents are read together, and I submit

16   they're the only two, they govern the matter and the Court

17   doesn't need to look outside at a PowerPoint or anything else.

18   I also want to clarify that what the States agreed to in the

19   consent decree was a lump sum of money that was based upon

20   calculations.  There was no agreement on cash flow projections

21   as I thought I heard Mr. Miller say.  I may have misunderstood.

22   We never saw this ladder approach or when things were going to

23   mature.  As far as we knew, we had an idea of what it was going

24   to take to remediate sites, there were different tasks that

25   were given dollar amounts that added up to a dollar amount as

1    Mr. Kehne indicated.  For example, Messina, $121 million,

2    that's what we understood and agreed to, nothing about this

3    projection or when things mature or any of that.

4           Very important I think is to understand that Mr.

5    Miller wants to have this Court look into a crystal ball and

6    say everything's going to be fine, they're going to have so

7    much money, they don't need this $13.5 million.  And it's

8    important again on the environmental side, fires and explosions

9    and other emergencies happen at these sites, and you will have

10   to liquidate TIPS sooner, and you will lose money as a result.

11   That's why you need all the money you can get.  And the fact of

12   the matter is this is sort of $13.5 million that we would have

13   had had the deal been followed through as it should and the

14   investment discretion been exercised by the Trustee.

15          I think -- this concept of offering in November of

16   2011, Mr. Berz's letter that Mr. Miller raises, the concept of

17   offering in 2011, late 2011, to take back the TIPS is so

18   disingenuous because the value of the TIPS at that point had

19   increased.  That doesn't mean that we weren't entitled to the

20   13.5 million initially required.  All it means is that it is

21   not -- it was too late.  It was too late, and I don't think the

22   Court can impose a mitigation requirement at that late date,

23   which was less than a month before we came here with the

24   dispute.

25          I also want to clarify the States, I believe, have a

Page 105

1   full reservation of rights on page 59 of the agreement, and

2   another thing is that the dollars that are left over if there

3   are any go to both Treasury and the Federal superfund.  So

4   there are two pockets that any excess money will go into.

5   Again, just a factual.

6           But in closing, Your Honor -- oh, I do want to make

7   one point about the 506(a) question that you posed.  So, 506(a)

8   is --

9           THE COURT:  I thought I said 506(c), how you value a

10  secured claim.

11          MS. LEARY:  Well, I might have read the wrong thing

12  then, because 506(a) talks about such value shall be determined

13  in light of the purpose --

14          THE COURT:  Oh, forgive me.  Then I think you're

15  right.  Just a minute, please.

16          MS. LEARY:  Didn't we have this with 362(b)(4), last

17  time I was here?

18          THE COURT:  Yeah, I think we did.

19          MS. LEARY:  So, such value --

20          THE COURT:  No, you're -- I've been asked for so

21  many 506(c) waivers that I think I've had that on the brain.

22  You're absolutely right.  When we value under the allowed claim

23  of a secured creditor, that's covered by 506(a) and not (c).

24          MS. LEARY:  So, it's such value, quote -- 506(a)(1),

25  "such value shall be determined in light of the purpose of the

1    valuation and of the proposed disposition or use of such

2    property, and in conjunction --

3                THE COURT:   Right.  That's what I was making

4    reference to.

5                MS. LEARY:   -- with the hearing."

6                Now, so I gave that some thought, and I thought,

7    okay, what is the purpose of the valuation here?  Because I

8    think this language is instructive.  You're not valuing a

9    secured claim, but it's instructive to the extent that the

10   purpose of the valuation is really for the parties to the

11   consent decree to be assured that they got everything they

12   bargained for.  And to elicit from the document itself what

13   that was.  And so the purpose of the valuation is really to

14   assure compliance with MLC's payment obligation, and --

15               THE COURT:   -- to ensure that your environmental

16   folks have the money they need to do the work that needs to be

17   done.

18               MS. LEARY:   -- that -- you took the words out of my

19   mouth, Your Honor.  That's exactly right.  So the proposed

20   disposition and use of this property is to assure environmental

21   compliance, not environmental compliance to the extent of 641,

22   but environmental compliance to the extent of whatever the

23   dollar amount is that the Trustee invests and gains for the

24   Trust.  And --

25               THE COURT:   Yeah.  And you're saying that helps you?

1          MS. LEARY:   Well, I believe it does, because had the

2     Trustee exercised its discretion on the effective date to do

3     the investment, we would have been 13 point -- the Trust would

4     have been $13.5 million to the better, is my point.  They would

5     have had 641 million to purchase the TIPS and our position is

6     we would have had that additional money that we do not have

7     now, that was the shortfall.  So it's to grow the Trust.  So

8     the purpose included --

9          THE COURT:   Well, cash wouldn't have grown.  Cash

10    would have been cash.

11          MS. LEARY:   But this is what I'm -- my point about

12    the crystal ball.  You're -- the Trust has indicated in the

13    record, or in the evidence in the affidavits and declarations,

14    that they would have invested in the TIPS.  It was a prudent

15    thing to do.  The question is what would they have gotten on

16    the effective date to make their own investment decision?  We

17    submit they would have gotten $13.5 million more had they made

18    the decision themselves.  And the crystal ball aspect of this

19    is to try to figure out, I guess, and Mr. Miller went here a

20    couple of times, he's projecting out in a neat little world

21    what may be.  And his citation to the Freund case assumes that

22    later there's going to be a lot more money than we needed.  And

23    I don't think that there's anything before the Court on an

24    evidentiary basis or, may I suggest, in reality would this

25    happen -- I made this point earlier -- that there's really

Page 108

1    going to be a big amount of money later.

2            So I don't think the windfall -- I don't think that

3    case is applicable, and I don't think there's any evidence

4    before the Court that there is going to be a windfall.  The

5    only question really is is what did we bargain for?  And the

6    States again submit, respectfully, is it fair to impose on the

7    States something that MLC had every opportunity to talk to us

8    about before we executed the agreement, so we wouldn't have

9    this misunderstanding.  And we'd be very clear about a laddered

10   approach and when they'd mature and all of those things that

11   when we put cash in that agreement we wanted to avoid, any kind

12   of fluctuation of on securities.  I'm not suggesting these are

13   -- these particular securities have huge fluctuations, but as

14   you pointed out at the opening of the hearing, based on

15   interest rates, they indeed do.

16           THE COURT:   Okay.

17           MS. LEARY:   Thank you.

18           THE COURT:   Thank you.  I'll take briefs or reply,

19   but obviously limited to the new stuff.

20           MR. MILLER:   Thank you, Your Honor.  Ralph Miller.

21   I'll be very brief.  I just want to correct some of my own

22   confusion that I may have caused.

23           First, I used the term "cushion" with a lower case C

24   when I referred to the cushion amounts.  There are two

25   accounts; there is a cushion funding account totaling

Page 109

1    $68,233,823, and then there is an administrative funding

2    reserve account, totaling $40 million.  I was referring to

3    those two collectively which go over $100 million.  When I made

4    reference to contingency funding that is built in, I just want

5    to correct that.  I was certainly not intentionally misstating.

6            I also wanted to clarify, when I said that I

7    understood that there were cash flows; I understood that I did

8    not participate, that site by site, there were cash flows over

9    time and that the States were involved in that, and that those

10   site-by-site cash flows were aggregated into annual cash flows,

11   and that was the basis that was used for the total amount that

12   was due from the TIPS.

13           And finally, Your Honor, this argument that's been

14   repeated that if there had been more cash, there would have

15   been an immediate effort to reconstruct the ladder of TIPS that

16   had been bought over a period of time before professionals is

17   frankly a nonsensical claim if you were assuming a but-for

18   world in which people had said we want cash.  The ladder of

19   TIPS would not have existed.  Nobody would have created a

20   ladder of long-term TIPS in MLC to hold it for four months or

21   two months or three months.  It was a long-term project, it was

22   developed.  Their argument that they could have come in with

23   this cash and created and developed this ladder is precisely

24   the kind of lost opportunity claim which the New York Courts

25   have said you don't get to consider.  You can't say, gee, if

Page 110

1    we'd had this cash, we would have bought Apple stock when it

2    was low.  Gee, if we'd had this cash, we would have bought

3    TIPS.  That is prohibited by the date of damage analysis, but

4    the date of damage analysis says that's the initial

5    calculation.  There are limitations on those damages that arise

6    afterward; one is the duty to mitigate, which always -- almost

7    always arises after the breach.  One can't mitigate until the

8    brief happens, and the other is the windfall doctrine which

9    almost always has to do with so what has actually been received

10   by the damaged party.  And those are applicable to say that if

11   they keep the TIPS, which MLC is happy to have them do, they

12   have not been damaged.  Thank you, Your Honor.

13           THE COURT:  All right.  Thank you.

14           All right, folks.  It's just about one o'clock.

15   We've had a long morning.  Here's what we're going to do.

16           I'm very sensitive to the point that Mr. Jones made

17   that this deserves an expeditious resolution.  I want you to

18   take a long lunch hour, be back here at 3 o'clock.  I don't

19   know if I'll have what I need to give you a ruling then or not,

20   but I want to try.  You can tell the marshals that I gave you a

21   cell phone waiver, those of you who aren't lawyers who already

22   have a cell phone waiver, so that you can have your cell phones

23   in your pockets and to bring them upstairs.  Just be sure

24   they're turned on vibrate or some other silent method so I

25   don't have phones ringing in the courtroom.  And I can't

1    guarantee you that I'll be back at three or anytime close, but

2    I'm not going to make you wait beyond sometime today for at

3    least as much as I possibly can in the way of a ruling.

4              We're in recess.

5         (Whereupon a lunch recess was had.)

6              THE COURT:   Have seats, please.   I apologize for

7    keeping you all waiting.

8              Ladies and gentlemen, consideration of the very

9    lengthy arguments we heard today has clarified certain things

10   in my mind and sensitized me to some nuances that I failed to

11   pick up in my reading of the papers before the trial.   But

12   nothing I heard in oral argument has caused me to make material

13   changes in the tentative rulings that I articulated at the

14   start of the argument today.

15             I'm ruling that Motors Liquidation breached the

16   settlement agreement and provisions of the plan when it

17   provided the funding for the RACER Trust in the currency of

18   securities rather than cash, though there's no evidence that

19   Motors Liquidation did so out of any wrongful motive or even

20   that it intended to breach any of those agreements at all.   But

21   I'm further ruling that the RACER Trust through its personnel

22   who were acting for the RACER Trust waived Motors Liquidation

23   breach and that the States, the Tribe, and if it matters, the

24   Federal government, even though they may effectively be

25   beneficiaries of the RACER Trust, though the U.S. is the actual

1    named beneficiary, can't escape the effect of those waivers or

2    independently assert claims that to the extent they exist

3    belong to the RACER Trust.

4         I'm further ruling that even if the RACER Trust

5    hadn't waived the breach, its damages measured as of the time

6    of the breach are zero, and I'm further ruling that the RACER

7    Trust failed to mitigate its damages and that if it had

8    mitigated, its damages likewise would have been zero.

9         So I'm denying the motion insofar as it asks me to

10   rule that Motors Liquidation's breach requires it to pay an

11   additional $13 million into the RACER Trust in order to comply

12   with the settlement agreement plan or confirmation order.

13   Putting it another way, I'm ruling that the RACER Trust is

14   entitled to nothing further on account of its alleged loss.

15   When I enter the order implementing this determination, the

16   order will include provisions providing in substance that the

17   RACER Trust will not have the right to the $13 million that was

18   deposited into Court, and it will provide that when it becomes

19   a final order, that $13 million may be returned to Motors

20   Liquidation or to the Treasury as their interests may appear.

21        I'm outlining the reasons for these determinations

22   now in some detail, and I'm laying out my most important

23   findings of fact.  After they hear them, the RACER Trust and

24   its allies can think about whether any of them will want to

25   appeal.  Until I know their desires in that respect, I'm going

Page 113

1    to be deferring entry of the order on this ruling so as not to

2    start the clock on appellate brief writing prematurely, and

3    I'll consider then whether I should prepare a formal written

4    opinion to more fully flesh out all of the findings of fact,

5    conclusions of law, and other bases for this decision.

6              Turning first to the issue of breach; I determine as

7    mixed questions of fact and law that there were two separate

8    breaches of contract here of two separate agreements or

9    documents that should be regarded as such, though I see no

10   evidence, much less persuasive evidence, that Motors

11   Liquidation, Treasury, or anyone else intended to commit a

12   breach, or especially acted with any kind of evil purpose or

13   malice.  In fact, as I said in oral argument, this entire

14   episode is a classic example of no good deed goes unpunished.

15   Let's look at the key documents that are relevant to the claims

16   of breach.  The first is the settlement agreement which was

17   entered into October 20, 2010.  It provided in its paragraph 32

18   in relevant part, "Debtors shall make a payment to fund the

19   Environmental Response Trust in the amount of no less than

20   dollars 641,434,495."  That language is somewhat ambiguous in

21   the respect relevant here as it does not describe the currency

22   by which that payment would be made, but of course the

23   contractual provision that I just quoted does not say in words

24   or substance that the debtors will deliver value in that

25   amount, nor that they'll deliver anything other than cash.  It

Page 114

1   does, of course, refer to quote, "payment," quote, and use a

2   dollar sign, both of which would normally be thought of as

3   calling for payment in cash.  And more importantly it does not

4   describe the obligation as one to deliver securities of a value

5   of the stated amount which is the more normal way by which an

6   understanding to fund the RACER Trust with securities in whole

7   or in part would be expressed.

8           The next relevant document is the plan which was the

9   subject of the confirmation order which approved it and which

10  was entered on March 28, 2011.  All parties agree, or should,

11  that the plan was effectively a contract and that it could be

12  enforced as such.  The plan provided in relevant part, and I'm

13  quoting, "The Environmental Response Trust assets shall be

14  comprised of," little I in the whole, initial-capped "Cash in

15  the amount of dollars 641,434,945, less any deductions made

16  pursuant to paragraph 36 of the Environmental Response Trust

17  consent decree and settlement agreement."  I was quoting from

18  plan article 1.68.

19          The plan further provided, and again I'm quoting, "On

20  the effective date, the Debtors shall transfer all the

21  Environmental Response Trust assets to the Environmental

22  Response Trust," comma, "as provided in and subject to the

23  provisions of the Environmental Response Trust consent decree

24  and settlement agreement.  Such transfer shall include the

25  transfer of Environmental Response Trust Cash," with a capital

Page 115

1    C, "in the amount of dollars 641,434,945."  I was quoting from

2    plan article 6.4(c).

3           Under the plan and its article 1.33, the capitalized

4    term, quote, initial caps, "Cash," end quote, was defined as

5    quote, "legal tender of the United States of America," comma,

6    quote, which obviously excludes securities, comma, even U.S.

7    Government obligations which I find have minimal risk.  The

8    provisions in the confirmation order weren't as specific, but

9    they didn't undercut those very clear provisions that I just

10   quoted.  Payment in cash was also described as the mechanism

11   for future performance at page 84 of the plan's disclosure

12   statement describing the funding of the RACER Trust.  It

13   provided, and I'm quoting, "Such transfer shall include the

14   transfer of" initial caps, "Cash in the amount of dollars 641

15   million."  I don't think I need to add the rest.

16          Now it's true as Motors Liquidation has pointed out

17   that a balance sheet for the debtor and certain of its

18   affiliates dated December 31, 2010, showed on a consolidated

19   basis, quote, "Cash and cash equivalence," comma, quote, and

20   that a footnote 6 to it said, and I'm quoting, "Cash and cash

21   equivalence represent cash and investments in U.S. Treasury or

22   U.S. Treasury-backed securities with the maturity of 15 years

23   or less."  But that related to a line item that covered not

24   just the Environmental Response Trust, which was the

25   predecessor to the RACER Trust, but also the Asbestos Trust,

Page 116

1    the GUC Trust, and Motors Liquidation itself.  A separate

2    footnote 4 to that balance sheet disclosed that cash and cash

3    equivalence had been contributed to the Environmental Response

4    Trust, but that footnote described the past performance under

5    the settlement agreement that in fact took place in 2010 as

6    contrasted to purporting to describe the contractual obligation

7    that was imposed on Motors Liquidation going forward.

8            So I find, based on all of that contractual language

9    that I read to you, that Motors Liquidation's contractual

10   obligation was to contribute cash, green money of the United

11   States, and that the contribution that was made instead was by

12   a means of cash, TIPS, and other U.S. Government securities

13   instead.  You can call that a technical breach, in part because

14   I find no intent to breach, and indeed the breach to be a

15   totally innocent one, or you can regard, quote, "technical,"

16   quote, as an irrelevancy in this context and simply call it a

17   breach.  Either way, the delivery of securities in lieu of cash

18   was different than the performance that the contract called for

19   and it was a breach.

20           Yet one of the reasons I say no good deed goes

21   unpunished is that the mechanism that was used providing for

22   TIPS and other government securities was used because it was

23   then unclear when the plan would be confirmed and go effective

24   and the funders wanted to ensure that the ability to fund the

25   RACER Trust would be protected.  Even at the oral argument

Page 117

1    today, everyone I heard from noted that delivering securities,

2    and especially laddered as they were, was a good idea.  So we

3    have the odd situation where there was a breach but nobody

4    disputes that the concept underlying the delivery of the

5    securities was a good one.  It just wasn't what the contractual

6    documents called for, and nobody bothered to change them.

7              So while I find a breach, I must make one thing very

8    clear, and it's a point with which I must respectfully find

9    fault with the RACER Trust and its allies.  Two separate

10   arguments as to claims of breach were made, and they were badly

11   intertwined.  They need to be sliced and diced.  One claim of

12   breach, which I sustain, is the failure to deliver on the

13   contractual entitlement to cash as contrasted to securities.

14   That breach violated the settlement agreement, that being

15   contract number one, and the plan, that being contract number

16   two.  But the other kind of breach which was confused with the

17   breach that I just described was allegedly that Motors

18   Liquidation breached by providing securities but not delivering

19   enough of them, because they were valued using the wrong

20   mechanism.  And that contention of breach I reject as a fact or

21   as a mixed question of fact and law.

22             The first argument was legitimate, and as I just

23   noted, I agree with it, though I will ultimately find as I'll

24   discuss below that it was no harm, no foul.  The second of the

25   two alleged types of breach is based on a complaint that has no

Page 118

1    basis in the underlying contracts.  The RACER Trust can't argue

2    that it had had an entitlement to securities but with a

3    different valuation because that isn't what any of the relevant

4    contracts said.  Over and over again, I heard an oral argument,

5    and in the briefs before it, that the delivery of the

6    securities, especially in the ladder form in which they were

7    delivered, was fine, but that another $13 million of value for

8    that currency had to be delivered.  That isn't what the

9    contract said, and I expressly find, again as a mixed question

10   of fact and law, that I am not finding a breach of the latter

11   type.  Evidence of an obligation of that character was wholly

12   lacking.

13        Turning next to the matter of waiver; as I indicated

14   at the outset, while I find a breach, I find as a mixed

15   question of fact and law, or as a fact, that it was waived.

16   The evidence is undisputed that back in August or September

17   2010, Laws and Hill were selected to act as Trustees for the

18   RACER Trust, and in September 2010, they were provided with

19   detailed presentations from which they could and did discover

20   that the RACER Trust would be funded with securities, mainly

21   TIPS, and not cash.  It's less clear that Laws and Hill were

22   then informed as to how the TIPS would be valued, and I assume

23   that they were not then told about the valuation technique, but

24   I don't find that to be particularly significant because as I

25   noted, the breach was in the funding in the currency of

Page 119

1    securities rather than cash, and the valuation of those

2    securities is irrelevant except as it might affect damages.  In

3    a presentation delivered to Laws and Hill on or about November

4    4, 2010, evidenced by a PowerPoint that was introduced in

5    evidence, Laws and Hill were advised in detail as to how the

6    entity that would become the RACER Trust would be funded.  The

7    third page of the PowerPoint showed six series of TIPS, two

8    Zero-Coupon Treasuries, another kind of Treasury, and a T-Bill.

9    They did not protest.  This I note is after the settlement

10   agreement was signed up, but before the plan was confirmed.  I

11   also note that at that meeting, those present discussed the

12   securities custody account that would have to be set up to hold

13   the Treasury securities that would ultimately be delivered to

14   the Trust.  There can be no doubt, and I find as a fact, that

15   at least by this date, if not sooner, the Trustees of the RACER

16   Trust were on notice that the RACER Trust wasn't going to be

17   funded in cash.

18          The disclosure statement published on or about

19   December 8, 2010, after the entry into the settlement

20   agreement, and of course before confirmation of the plan,

21   included as I noted a footnote 4 that stated that not just

22   cash, but also cash equivalence, which I find that most

23   businesspeople would understand to be securities, and more

24   importantly something different than cash, had been contributed

25   to the Trust.  I note that the disclosure was in the footnotes

Page 120

1    to a balance sheet that described the Trust with the acronym

2    Environmental Response Trust, hardly screaming out what it

3    showed, and that there was language elsewhere in the disclosure

4    statement which I previously quoted which would suggest to the

5    reader that the funding of the RACER Trust would be in real

6    cash.

7              So I don't place great reliance on the footnotes to

8    the financial statement to the balance sheet that appeared in

9    the disclosure statement, but I don't need to place great

10   reliance on that because the personalized PowerPoint

11   presentation that I talked about a moment ago, which was

12   delivered in early November 2010, had already stated in

13   excruciating detail how the funding would be made.  It made it

14   at length and in unmistakable terms.

15             As I also have discussed, at least in part a moment

16   ago, the RACER Trust was told that it would have to set up

17   custodial accounts or at least one to take the securities it

18   would be given.  After knowing that, after knowing that it

19   would be getting securities instead of cash, the RACER Trust

20   made preparations to accept them on the effective date by

21   creating custodial accounts to hold them in advance.  Before

22   establishing those custodial accounts, or for that matter

23   afterwards, it did not then say, quote, "Why are you giving us

24   securities?  We're entitled to cash, green money," end quote.

25   And then again, on or about March 31, 2011, the RACER Trust

1   accepted the securities as the funding currency and it did so

2   without protest.

3          Then the RACER Trust completed a true-up payment in

4   June 2011.  At that time, it made a $108,000 payment to the

5   debtors which was necessitated at least in part by the fact

6   that the RACER Trust had been funded with securities and not

7   just cash.  Then there was a delay from March 31, 2011 to at

8   least June 17, 2011 in raising any complaint.  In fact, I think

9   the better way to measure the relevant delay is from March 31,

10  2011 to October 12, 2011, almost nine months later.  It wasn't

11  until June 17, 2011 that the RACER Trust said anything.  At

12  that time, Elliot Laws sent an e-mail to Mark Dowd at Treasury

13  stating that, and I'm quoting, "I would like to raise a

14  recently identified discrepancy between U.S. Bank's market-

15  based valuation of the bonds and the value that MLC assigned to

16  those bonds.  This $15 million discrepancy was identified

17  during our review of U.S. Bank's April statements."  And it

18  wasn't until October 12, 2011 that the RACER Trust said more.

19  At that time, Michael Hill of the RACER Trust sent an e-mail to

20  various attorneys at the Department of Justice asking, and I'm

21  quoting, "to discuss with you or others acting on behalf of the

22  U.S. as Trust beneficiary, an apparent effective date

23  underfunding of the Trust."

24         I note that neither of these messages talked about

25  the actual breach that I've found, the submission of securities

Page 122

1    instead of cash.  They talked about underfunding of the RACER

2    Trust which as I've explained is not a legitimate claim.  With

3    respect to the actual failure to comply with the contract,

4    delivering securities instead of cash, there was a waiver at

5    least through October 2011, eight months after the funding, and

6    about a year after Hill and Laws were told that the bargain for

7    performance wouldn't be forthcoming.  It's possible that for

8    waiver purposes, a delay of that duration, either eight months

9    or more, precisely a year, is the better measure, and that even

10   though the complaint was for the wrong reason, it reflected an

11   intention no longer to live with the contractual performance

12   that had been delivered.  Frankly I think that if there was no

13   complaint based on the real objectionable conduct, the waiver

14   was continuing even longer.  Either way, all of that

15   acquiescence for such a long time is a paradigmatic example of

16   a waiver.

17        Now for the avoidance of doubt, I don't consider all

18   of the events either before or after the effective date of the

19   plan on March 31, 2011, to have resulted in an amendment of the

20   original contracts.  But the matters that I just discussed

21   very, very strongly evidence the RACER Trust's acquiescence in

22   the form of performance that Motors Liquidation was tendering

23   until the RACER Trust realized that it could potentially secure

24   more in the way of funding by making the arguments that I have

25   before me today.  Now in responding to the waiver concerns, the

Page 123

1       RACER Trust contends that while it was aware that it was

2       getting securities, it wasn't aware of how they would be valued

3       and that it was the amount of the securities that was

4       troublesome to it, and that the amount of the securities was

5       insufficient.  It's really on that premise that the RACER Trust

6       contends that it didn't waive the issues that it has raised

7       here.  Well, that's not an answer.  The RACER Trust valuation

8       concern doesn't go to an entitlement under the contract.  Just

9       as the contract didn't provide for performance by delivery of

10      the securities, it didn't provide for a mechanism for the

11      valuation of them.  It didn't say how they should be valued.

12      That's because securities weren't supposed to be delivered.  In

13      essence, the RACER Trust is basing its defense to Motors

14      Liquidation's waiver contentions on contractual obligations

15      that did not exist.

16           I'm also unpersuaded by the argument that all of

17      these events don't count because some or all of the States and

18      the Tribe weren't privy to everything that was happening.  The

19      RACER Trust was established as the vehicle for meeting their

20      needs and concerns along with those of the Government or at

21      least the EPA, Department of Justice Environmental Division

22      side of the Government.  And Hills, Laws, and Hamilton were the

23      agents for the RACER Trust.  It was the RACER Trust that would

24      take the assets and manage them for the ultimate environmental

25      remediation needs of the State and the Tribe.  Having heard

Page 124

1   points that the U.S. Attorney made, I don't rule that the Trust

2   was the agent for its beneficiaries or its effective

3   beneficiaries, but I likewise can't rule and don't rule that

4   such beneficiaries have the independent right or standing to

5   enforce claims based on obligations running to the Trust.  The

6   States and Tribe could, I suppose, have negotiated for their

7   own Trust, or they could have negotiated for additional rights

8   with respect to the RACER Trust itself, or to be exempted from

9   the consequences of the actions that the Trustees or other

10  personnel of the RACER Trust took.  But of course they didn't

11  do that nor has there been a claim that they did so.  The

12  entity with rights, if any, with respect to any Motors

13  Liquidation non-performance is the RACER Trust.  Likewise, the

14  RACER Trust must live with any defenses to its efforts to

15  enforce its rights, including waiver defenses arising from the

16  acts of its agents.

17          Turning next to my conclusion that the damages were

18  zero; I further find that as of the time of the breach, which I

19  agree should be the appropriate time at which damages are

20  measured under New York law, Motors Liquidation had delivered

21  securities of a value equal to the cash that Motors Liquidation

22  was obligated to pay, and thus, that even if the breach hadn't

23  been waived, the RACER Trust damages must be zero.  Neither of

24  the two methods for valuing the securities that I heard about

25  in the briefing and argument before me is in my view an, quote,

Page 125

1   "accounting gimmick," quote, as each side accuses the other of

2   having employed.  But I think that ultimately under the facts

3   here, references of that character and accusations of that

4   character are just rhetoric.  I agree that what is appropriate

5   for recording and reflecting the value of a corporation's

6   assets for financial reporting purposes is not necessarily the

7   same as its valuation of those assets for other purposes, such

8   as a fair market valuation, but a method consistent with FASB

9   standards and GAP isn't necessarily wrong for that purpose

10  either.  As I, and I think most triers of fact, would be

11  skeptical of a valuation of an asset that was contemplated to

12  be held for a long time, but could be subject to short-term

13  volatility or fluctuations in its value.  In fact, I think and

14  find that for valuing an asset that's to be held for a long

15  time and where the facts don't reflect an intent to sell off

16  the asset in the short term, or to be trading it, especially on

17  a day-to-day basis, in the short term, the Motors Liquidation

18  valuation approach is the right one.  Putting it differently,

19  because I had a lot of subordinate clauses there, if I had an

20  asset that was being traded day to day, or that people knew was

21  going to be disposed of quickly, I would be more inclined to

22  look to short-term market trading values.  Conversely, for an

23  asset that is not to be disposed of that quickly, and which is

24  to be held for a materially longer period of time, it is not

25  only appropriate but the right choice to value it using

Page 126

1    mechanisms that take into account that longer holding period.

2    As all seem to agree, valuation techniques are best applied

3    when taking into account the purpose for which the valuation is

4    made.   That principal is codified in Section 506(a) of the

5    Bankruptcy Code which provides the valuations for the purposes

6    of that section are to be made with a view as to the purposes

7    of the valuation.   Section 506(a) provides, and I'm quoting,

8    "Such value shall be determined in light of the purpose of the

9    valuation, and of the proposed disposition or use of such

10   property, and in conjunction with any hearing on such

11   disposition or use or on a plan affecting such creditors'

12   interest."

13          Those principals, while plainly having been

14   articulated in a somewhat different context, reflect an

15   underlying understanding as to valuation that has utility in

16   many contexts, as I think all who have spoken on that subject

17   agree and indeed have acknowledged.   Once again, if the

18   securities had been delivered to the RACER Trust with the

19   understanding that they'd be actively traded on a day-to-day

20   basis, I might very well agree that a valuation based on then-

21   prevailing market trading prices would be appropriate, and

22   indeed that perhaps they should be marked to market.   But here

23   the shared intent was exactly the opposite.   The securities

24   were purchased under a laddered structure with a variety of

25   specific maturities to reflect the times at which those

Page 127

1    securities' principal would most likely need to be realized.

2    That was expressly discussed at the meeting of November 4.

3    Valuing those securities, taking into account the purpose for

4    which they were obtained, is the most appropriate way to value

5    them, and when they are valued in that fashion, they are worth

6    exactly what Motors Liquidation contended they'd be worth.  And

7    that's particularly true here since, as we all know, if the

8    RACER Trust simply held the TIPS and the other Treasury

9    securities until maturity, it could achieve payment in full.

10   There was no material credit risk here.  The U.S. Government

11   isn't Greece.  It was good for the money, and in fact, 55

12   percent of the securities were TIPS, which would give the RACER

13   Trust the best of both worlds; protection against downside

14   risk, guaranteeing payment at least at par, and additionally

15   offering protection against inflation.  That's better than

16   delivery in the form of cash, and at the least is, as I find,

17   no harm, no foul, once again demonstrating that the damages are

18   zero.

19        If Motors Liquidation had complied with its

20   contractual obligation to fund the RACER Trust with cash, that

21   cash wouldn't have appreciated.  It would be worth the same now

22   as it was on March 31, 2011.  It would also be worth the same

23   at the maturity of each of the securities that it was worth

24   back then.  If the RACER Trust simply held on to what it got,

25   it would have obtained the exact same benefit of its bargain.

Page 128

1    Then I think there's a great irony here.  The RACER Trust

2    contractual entitlement as I've noted more than once was to

3    payment in cash.  But the RACER Trust has told us it would have

4    invested the cash in laddered securities of the very type that

5    it got.  Frankly, I think that the RACER Trust's statements to

6    me on this matter as to what it might have done with the cash

7    if it had received cash are self-serving and speculative.  And

8    in New York, if not everywhere else, damages for breach of

9    contract can't be speculative.  But ironically, what I was told

10   was that if it got cash, the RACER Trust would put its cash in

11   exactly the same laddered securities it got.  It just wants

12   more money to have accomplished that.  But that, once again,

13   isn't its contractual entitlement.  Motors Liquidation breach

14   had nothing to do with the valuation of the securities that

15   Motors Liquidation delivered.  Motors Liquidation's offense, if

16   I can call it that, was solely in delivering securities in lieu

17   of cash.

18            The securities that Motors Liquidation delivered have

19   paid and will continue to pay interest, and as importantly or

20   more so, they'll yield their full principal upon maturity.  If

21   the RACER Trust and those looking to the Trust for

22   environmental remediation are patient, they'll get value

23   exactly to what their contract offered them.  Anything more

24   than that would be a windfall.  And the Courts of New York, if

25   not others, have repeatedly noted that the purpose of

Page 129

1    contractual damages are not to award windfalls, but to make

2    parties injured by breaches of contract whole for the actual

3    losses they suffered.

4         Turning finally to mitigation of damages; it's

5    undisputed that if the RACER Trust wants to return the

6    securities now for the cash that the RACER Trust is entitled

7    to, Motors Liquidation is willing to accept the securities back

8    from the RACER Trust, liquidate them, and to give the RACER

9    Trust the cash it was promised with interest.  That, of course,

10   was confirmed by the letter of November 17, 2011, sent by Mr.

11   Berz.  RACER Trust's unwillingness to get the performance under

12   the contract to which it was entitled is a failure to mitigate

13   damages.  If the RACER Trust took that offer, it would have no

14   damages because we must remember the breach was the failure to

15   give the RACER Trust cash, not to give the RACER Trust

16   securities based on a valuation method that the RACER Trust

17   prefers.  The RACER Trust could also mitigate damages by simply

18   holding the TIPS until maturity.  Then, too, it would have the

19   exact cash it was promised since all agree that there would be

20   no credit risk associated with that course.

21        Finally, if the RACER Trust were to sell its

22   securities on the open market today, it could then turn them

23   into cash and it could get all the cash it was entitled to with

24   no loss, in fact, with a $31 million profit, and that would

25   provide it with the third means for it to mitigate its damages.

Page 130

1       The RACER Trust doesn't have to do any of those things, of

2       course, but if it chooses not to do so, and so far, of course,

3       it has intentionally chosen not to do so, it can't expect

4       Motors Liquidation to pay for the RACER Trust's non-existent

5       loss.  In substance, giving the RACER Trust the extra $13

6       million would, as Motors Liquidation argues, give the RACER

7       Trust a windfall.  And as Motors Liquidation pointed out, and

8       as I pointed out in a different context a moment ago, there are

9       many cases under New York law saying that when awarding damages

10      for a breach of contract, we don't award windfalls.  But the

11      more precise way of articulating my concerns with the RACER

12      Trust position, I think, is that the RACER Trust is asking for

13      much more than it needs to make it whole, to restore it to the

14      position it would have been in, if it had secured strict

15      performance of Motors Liquidation's contractual obligations

16      with the currency for which the settling parties agree.  The

17      RACER Trust already got that.  We don't need to give it any

18      more to make it whole.

19              Now, ladies and gentlemen, I think you heard what I

20      said, and certainly you can get this ruling transcribed.  I'm

21      going to suggest to the RACER Trust and its allies that you

22      think about these findings of fact, that you think about these

23      mixed questions of fact and law conclusions that I've reached,

24      and that you make a decision as to whether you're going to want

25      to take an appeal.  I'm intentionally going to hold off

Page 131

1    entering an order consistent with this decision to allow you to

2    do that.  If you tell me that you want to take it up on appeal,

3    then I'll consider whether the determination that I've made and

4    that I've dictated for roughly the last hour should be

5    converted into more formal findings of fact and law and should

6    have case citations.  I don't think it would be a productive

7    exercise for me to do that unless I know that the RACER Trust

8    really disputes what I've come to conclude.  Until then, of

9    course, all parties' rights are reserved.  I well understand

10   that the practical consequence of this course of action is that

11   the 13 million bucks stays in the registry of the Court for a

12   longer period of time, but subject to your rights to be heard,

13   I'm unlikely to authorize the release of those funds until

14   there has been a final order on this controversy in favor of

15   one side or the other.

16          There is no immediate time limit that I'm now

17   imposing for the RACER Trust and its allies to decide what they

18   want to do.  I'll simply rely on your good faith and your

19   diligence in that regard.

20          And with that, ladies and gentlemen, we're adjourned.

21

22   (Whereupon these proceedings were concluded at 5:02 PM)

23

24

25

1                        I N D E X

2

3                        RULINGS

4                                        Page      Line

5    Omnibus Objection to Claim(s) Number        6        24

6    269th- approved

7    Omnibus Objection to Claim(s) Number        6        24

8    270th- approved

9    Motion of the Revitalizing Auto Communities  112      9

10   Environmental Response Trust-

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 133

1              C E R T I F I C A T I O N

2

3    I, Nick Gereffi, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6        Nick           Digitally signed by Nick Gereffi
                        DN: cn=Nick Gereffi, o, ou,
                        email=digital1@veritext.com,
7        Gereffi        c=US
                        Date: 2012.04.19 10:59:53
8    _____ -04'00'

9    Nick Gereffi

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16

17   Date:  April 18, 2012

18

19

20

21

22

23

24

25