## Exhibit B

# CREDIT AND SECURITY AGREEMENT

This Credit and Security Agreement (which also includes all exhibits and attachments to it, the "Credit Agreement") is dated as of April 30, 2008 (the "Effective Date") is entered into by and between Wells Fargo Bank, National Association (the "Bank") and Del Norte Chevrolet-Olds, Co. (the "Borrower").

The following additional information pertains to the Borrower:

| | |
|---|---|
| Address: | 811 Highway 86 |
| | Brawley, CA 92227 |
| Facsimile Telephone Number: | (760) 344-1978 |
| State of Organization: | California |
| State of Principal Office: | California |

The Bank maintains its regional Dealer Finance Center at:

| | |
|---|---|
| Address: | 711 West Broadway |
| | Tempe, AZ 85282 |
| Facsimile Telephone Number: | (602) 285-2756 |

The Borrower has requested the Bank to provide certain extensions of credit described below, and the Bank is willing to accommodate these requests, subject to all of the Transactional Terms, Standard Terms, and other provisions contained in this Credit Agreement and subject to all of the terms and provisions contained in the Related Documents.

In addition to the capitalized terms with stipulated definitions set forth above, capitalized terms with stipulated definitions are set forth in other parts of this Credit Agreement, including the Glossary attached as Exhibit A, and all such capitalized terms with stipulated definitions shall apply throughout this Credit Agreement.

Accordingly, for good and valuable consideration, the Bank and Borrower agree as follows:

## TRANSACTIONAL TERMS

SECTION 1   The Credit Facilities

1.1     Description/Nature

**Floor Plan Line of Credit ("Floor Plan Line")**
(This Credit Facility is a renewal of the existing Floor Plan Line)

| | |
|---|---|
| Credit Limit: | $10,650,000.00 |
| Maturity Date: | the earlier of demand by the Bank or May 31, 2009 |
| Unit Fee (per vehicle): | $0.00 |

1

| Funding Purpose | Sublimit | Advance Formula | Curtailment/Vehicle Maturity Payments |
|---|---|---|---|
| New Vehicles | $8,200,000.00 | 100% of manufacturer's invoice | 100% of original advance due 12 months after original advance date |
| Program Vehicles | $700,000.00 | 100% of Borrower's acquisition cost | 100% of original advance due 12 months after original advance date |
| Demo Vehicles | $50,000.00 | 100% of manufacturer's invoice | 2% of original advance due each month beginning 6 months after initial use as demonstrator; remainder due (in full) 12 months after advance date |
| New Trailers | $300,000.00 | 100% of manufacturer's invoice | 10% of original advance due 12 months after advance date; remainder due in full 24 months after original advance date |
| Used Vehicles | $400,000.00 | 100% of value in NADA Wholesale Guide | 10% of original advance due 3 months after advance date; remainder due (in full) 6 months after advance date |
| Rental Vehicles | $1,000,000.00 | 100% of manufacturer's invoice | Minimum of 2.5% of the original advance due monthly |

**Term Loan ("Term Loan I")**
This Credit Facility is an existing term loan.

| | |
|---|---|
| Date of Term Loan: | April 7, 2006 |
| Original Principal Amount: | $478,999.96 |
| Current Principal Amount Outstanding: | $295,383.00 |
| Maturity Date: | April 7, 2011 |

1.2    Grant of Security Interest (Collateral)

To secure the Credit Facilities described above and all other present and future Obligations of the Borrower to the Bank under this Credit Agreement and all present and future Obligations of Borrower to the Bank of other kinds, the Borrower grants to the Bank a lien and security interest in the following property, whether now existing or hereafter arising and whether now owned or hereafter acquired by the Borrower (**all such property referred to as the "Collateral"):**

- all accounts, deposit accounts, contract rights, chattel paper (whether electronic or tangible), instruments, promissory notes, documents, general intangibles, payment intangibles, software, letter of credit rights, health-care insurance receivables and other rights to payment of every kind now existing or at any time hereafter arising;

- all inventory, goods held for sale or lease or to be furnished under contracts for service, or goods so leased or furnished, raw materials, component parts, work in process and other materials used or consumed in Borrower's business, now or at any time hereafter owned or acquired by Borrower, wherever located, and all products thereof, whether in the possession of Borrower, any warehousemen, any bailee or any other person, or in process of delivery, and whether located at Borrower's places of business or elsewhere;

- all warehouse receipts, bills of sale, bills of lading and other documents of every kind (whether or not negotiable) in which Borrower now has or at any time hereafter acquires any interest, and all additions and accessions thereto, whether in the possession or custody of Borrower, any bailee or any other person for any purpose;

2

- all money and property heretofore, now or hereafter delivered to or deposited with Bank or otherwise coming into the possession, custody or control of Bank (or any agent or bailee of Bank) in any manner or for any purpose whatsoever during the existence of this Credit Agreement and whether held in a general or special account or deposit for safekeeping or otherwise;

- all right, title and interest of Borrower under licenses, guaranties, warranties, management agreements, marketing or sales agreements, escrow contracts, indemnity agreements, insurance policies, service or maintenance agreements, supporting obligations and other similar contracts of every kind in which Borrower now has or at any time hereafter shall have an interest;

- all investment property, securities and financial assets now or at any time hereafter owned or acquired by Borrower;

- all goods, tools, machinery, furnishings, furniture and other equipment and fixtures of every kind now existing or hereafter acquired, and all improvements, replacements, accessions and additions thereto and embedded software included therein, whether located on any property owned or leased by Borrower or elsewhere, including without limitation, any of the foregoing now or at any time hereafter located at or installed on the land or in the improvements at any of the real property owned or leased by Borrower, and all such goods after they have been severed and removed from any of said real property; all motor vehicles, trailers, mobile homes, manufactured homes, boats, other rolling stock and related equipment of every kind now existing or hereafter acquired and all additions and accessories thereto, whether located on any property owned or leased by Borrower or elsewhere; and

- all proceeds of the foregoing which includes whatever is receivable or received when any of the foregoing or the proceeds thereof are sold, leased, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, including without limitation, all rights to payment, including returned premiums, with respect to any insurance relating to any of the foregoing, and all rights to payment with respect to any claim or cause of action affecting or relating to any of the foregoing.

All terms used in this Section that are defined in Articles 1 and 9 of the Uniform Commercial Code of the governing law state shall have the meanings stated therein.

1.3    Guarantor/Guarantors

Each of the following individuals or organizations (each a "Guarantor") shall guarantee the Credit Facilities described above in accordance with the terms of the respective Guaranty: James Larry Allen.

## STANDARD TERMS

SECTION 2  Certain Terms for Specific Credit Facilities

2.1    The Floor Plan Line.

A.    Amount. The Bank agrees to advance loans to the Borrower from time to time under the Floor Plan Line (at the Bank's sole discretion for the purposes specified below) during the Availability Period until the Maturity Date in an aggregate sum not to exceed the Credit Limit for the Floor Plan Line at any one time outstanding. *This is a conditional Credit Facility. This means that a decision whether to make any particular loan advance or advances under the Floor Plan Line shall be at the sole discretion of the Bank and nothing contained in this Credit Agreement or the Related Documents shall be interpreted as a promise or commitment by Bank to make any advance or any future advance. The Bank is not obligated to make advances under the Floor Plan Line even if the Borrower is in compliance with the terms of this Credit Agreement and the Related Documents.*

B.    Floor Plan Note.  All loan advances made under the Floor Plan Line will be evidenced by a promissory note executed by the Borrower to the Bank (the "Floor Plan Note").  The Floor Plan Line will be subject to the payment, interest, and other terms set forth in the Floor Plan Note.

C.    Purposes.  All loan advances made by the Bank to the Borrower under the Floor Plan Line shall be used for purposes of financing the Borrower's motor vehicle inventory described above in the Funding Purpose (unless the loan advance is a "Special Reborrowing" as defined in and authorized by the Floor Plan Note).

D.    Over-the-Credit Limit Amounts.  From time to time the Bank may **at its sole option** make loan advances on a **temporary** basis that will result in the aggregate unpaid principal balance of a Floor Plan Line exceeding the Credit Limit for that Floor Plan Line ("Floor Plan Overline Advances").  Any Floor Plan Overline Advances shall be payable **on demand** and shall be collateralized, accrue interest and otherwise be subject to the other general terms of this Credit Agreement and the applicable Floor Plan Note as regular loan advances.

E.    Initial Loan Advances Intended to Pay Off Another Creditor.  If the Borrower will use certain initial loan advances (in a single lump sum or otherwise) to pay off the Borrower's credit obligations to an existing creditor that is providing similar "floor plan" (specific motor vehicle inventory) financing to the Borrower, then these initial loan advances shall represent the initial amount outstanding under the applicable Floor Plan Line, and each one of these initial loan advances shall be deemed to be used (and shall be allocated) to finance the purchase of a specific New Vehicle, Program Vehicle, Service Vehicle, Demo Vehicle, Rental Vehicle, or Used Vehicle.  The Bank shall communicate to the Borrower the amount of each initial loan advance and the specific vehicle to which it is allocated.  For purposes of the curtailment payments described above and the other payment obligations in the applicable Floor Plan Note, the Bank and Borrower shall treat each one of these initial loan advances as being used to finance the purchase of such allocated vehicle.

F.    Requests for Regular Loan Advance(s).  Each request for loan advance(s) under this Floor Plan Line shall be initiated upon receipt of: (a) a draft or an electronic debit, as described in the Section "Loan Advances for Payments by the Bank to Manufacturers" below; (b) a wire transfer agreement in form acceptable to the Bank, as described in the Section "Loan Advances for Payments by the Bank to Auto Auction" below; or (c) a schedule signed by an Authorized Representative of the Borrower (the "Floor Plan Vehicle Inventory List"), which contains a description and cost of the particular New Vehicle, Program Vehicle, Service Vehicle, Demo Vehicle, Rental Vehicle, or Used Vehicle inventory (not already financed by the Bank), together with such other information as the Bank may require.  The Floor Plan Vehicle Inventory List shall be in form and content acceptable to the Bank.  *In the event the Bank determines that the type of motor vehicle financed by a particular loan advance does not meet the Bank's standards for financing under this Floor Plan Line, the Bank may treat the loan advance as a loan under any other available Credit Facility or (at the Bank's option) demand immediate repayment of such loan advance from the Borrower.*

G.    Loan Advances for Payments by the Bank to Manufacturers.  The Borrower has made arrangements with the Bank and certain manufacturer(s) to enable such manufacturer(s) to obtain the Borrower's payments for motor vehicles shipped to the Borrower.  Such payments may be made by drafts drawn on the Bank or by electronic debits to an account at the Bank.  The Bank is hereby authorized to pay any and all such drafts purported to be drawn by such manufacturer(s) and any and all such electronic debits purported to be initiated by or on behalf of such manufacturer(s).  The amount of each and every such draft or electronic debit honored by the Bank shall constitute a loan advance to the Borrower under this Floor Plan Line.  The Bank shall have no responsibility or liability for the validity, sufficiency or genuineness of any such draft or electronic debit, and the Bank shall not be under any duty to require that any bills of lading, manufacturer's certificates of origin or documents of title be required as a condition of payment of any such draft or electronic debit.  The Bank shall have no responsibility or liability to determine whether any of the vehicles or other goods have been shipped or received or for any breach of contract between such manufacturer(s) and Borrower or any other person or entity.  **In addition, if this Floor Plan Line is terminated for any reason, the Bank may, at its sole discretion, make loan advances (for which the Borrower is liable) to honor and pay any drafts or electronic debits that the Bank is obligated to honor and pay to such manufacturer under the Bank's drafting or commitment letter issued to the manufacturer – and all such loan advances shall immediately be due and payable in full and shall be collateralized and otherwise subject to the same interest charges and other general terms of this Credit Agreement and the applicable Floor Plan Note.**

4

H.   Loan Advances for Payments by the Bank to Auto Auction.  If the Borrower has or will make arrangements with the Bank and an auto auction to enable such auto auction to obtain the Borrower's payments for motor vehicles by Bank's wire transfer of funds, Borrower agrees to execute a wire transfer agreement, in form acceptable to the Bank, prior to Bank having any obligation to make any wire transfer for the Borrower. All wire transfers made by the Bank shall be subject to the terms and conditions of such wire transfer agreement. The amount of each wire transfer payment shall constitute a loan advance to the Borrower under this Floor Plan Line; *however, in the event that the Bank determines that the type of vehicle financed by such a loan advance does not meet the Bank's standards for financing under this Floor Plan Line, the Bank may, at its sole option, treat such loan advance as some other type of loan to the Borrower or demand immediate repayment of such loan advance from the Borrower.* Vehicles purchased by the Borrower through Bank's wire transfer to an auto auction are subject to all terms and conditions of this Credit Agreement. *The Bank may terminate any wire transfer agreement at any time.*

I.   Unit Fees.  In addition to interest, the Borrower will pay to the Bank a Unit Fee (in the amount specified above) for each motor vehicle or other item of inventory financed by a loan advance under the Floor Plan Line.  The Unit Fee is considered due and fully earned at the time the motor vehicle or item is financed.

2.2   The Term Loan

A.   The Term Note.  The Borrower's obligation to repay the Term Loan will be evidenced by a promissory note (the "Term Note") in form and content acceptable to the Bank. The Term Loan will be subject to the payment, interest and other terms set forth in the Term Note.

SECTION 3  Conditions Precedent

3.1   Conditions of Credit Agreement.  The obligation of Bank to extend any credit contemplated by this Credit Agreement is subject to the fulfillment to Bank's satisfaction of all of the following conditions.

A.   Approval of Bank Counsel. All legal matters incidental to the extension of credit by Bank shall be satisfactory to Bank's counsel.

B.   Documentation. Bank shall have received, in form and substance satisfactory to Bank, the requisite documents required by the Bank in connection with this Credit Agreement

C.   Financial Condition. There shall have been no material adverse change, as determined by Bank, in the financial condition or business of Borrower or any Guarantor hereunder, nor any material decline, as determined by Bank, in the market value of any collateral required hereunder or a substantial or material portion of the assets of Borrower or any such Guarantor.

3.2   Conditions of each extension of Credit. The obligation of Bank to make each extension of credit requested by Borrower hereunder shall be subject to the fulfillment to Bank's satisfaction of each of the following conditions:

A.   Compliance. The representations and warranties contained herein and in each of the other Related Documents shall be true on and as of the date of the signing of this Credit Agreement and on the date of each extension of credit by Bank pursuant hereto, with the same effect as though such representations and warranties had been made on and as of each such date, and, on each such date, no Event of Default, as defined herein, and no condition, event or act which with the giving of notice or the passage of time or both would constitute such an Event of Default, shall have occurred and be continuing or shall exist.

B.   Documentation. Bank shall have received all additional documents, which may be required in connection with such extension of credit.

C.   Financial Condition. There shall have been no material adverse change, as determined by Bank, in the financial condition or business of Borrower or any Guarantor hereunder, nor any material decline, as determined by Bank, in the market value of the collateral or a substantial or material portion of the assets of Borrower or any Guarantor.

SECTION 4  Collateral

4.1     Bank's Power and Authority.  The Borrower authorizes the Bank to do the following: (a) give notice of Bank's rights in the Collateral, enforce those rights, and make extension agreements with respect to them; (b) resort to Collateral in any order; (c) take cash, notes, and instruments for the payment of money, and other property to which the Bank is entitled; (d) verify facts concerning the Collateral by inquiry of the obligors, or others, in the Bank's own name or in a similar or fictitious name; (e) notify any account party, lessee, or other party who owes money to the Borrower pursuant to an account, chattel paper, or other Collateral that all payments or other amounts due thereunder shall be paid to the Bank; and (f) exercise all rights, powers, and remedies which Borrower would have (if this Credit Agreement were not in effect) relating to the Collateral subject to this Credit Agreement.

4.2     Attorney-in-Fact Concerning Collateral.  The Borrower appoints the Bank its true attorney in fact to perform the following actions on behalf of the Borrower: (a) release persons liable on Collateral, give receipts and acquittances, and compromise disputes in connection with Collateral; (b) prepare, execute, file, record, or deliver credits, assignments, schedules, designation statements, financing statements, continuation statements, termination statements, statements of assignment, applications for lien or owner registration, or like papers to perfect, preserve, or release the Bank's interests in the Collateral; (c) endorse, collect, deliver, and receive payment under instruments and agreements for the payment of money constituting or relating to Collateral; (d) prepare, adjust, execute, deliver, and receive payment under insurance claims; collect and receive payment of – and endorse any instrument in payment of – loss or returned premiums or any other insurance refund or return; and apply such amounts received by the Bank, at the Bank's sole option, toward repayment of any Credit Facility or replacement of the Collateral; (e) make any compromise or settlement the Bank deems desirable or proper regarding the Collateral; (f) cause any Collateral to be transferred to the Bank's name or the name of the Bank's nominee; and (g) do all things – and execute all documents in the name of the Borrower or otherwise – the Bank deems necessary, proper, or convenient in order to preserve, perfect, or enforce its rights in the Collateral.  The Bank's officers and employees may exercise these powers from time to time, whether or not the Borrower is in default.  The Borrower may not revoke these powers so long as this Credit Agreement is in effect or any indebtedness is outstanding under any Credit Facility. Borrower agrees that Bank is authorized to file financing statements in the name of Borrower to perfect Bank's security interest in the Collateral and proceeds.

4.3     Bank's Care and Delivery.  The obligations of the Bank with respect to Collateral anytime in its possession will be strictly limited to taking reasonable care of and preserving the Collateral. The Bank will have no duty to take any steps necessary to preserve the rights of the Borrower against other secured parties or lien-holders.  The Bank will not be obligated to take any action with respect to the Collateral requested by the Borrower unless the request is made in writing and the Bank determines, in its sole discretion, that the action would not jeopardize the value of the Collateral.

SECTION 5  Representations and Warranties

        To induce the Bank to enter into this Credit Agreement, the Borrower represents and warrants to the Bank as follows, which representations and warranties shall survive the execution of this Credit Agreement and shall continue in full force and effect until the full and final payment, and satisfaction and discharge of all obligations of Borrower to Bank subject to this Credit Agreement:

5.1     Name/Organizational Status/Location.  The Borrower's legal name is exactly as set forth on the first page of this Credit Agreement. The Borrower is a corporation duly organized, existing and in good standing under the laws of the State of California, and it is authorized to do business and is in good standing under the laws of the State of California. All of Borrower's organizational documents or agreements delivered to Bank are complete and accurate in every respect.  Borrower's chief executive office (or principal residence, if applicable) is located at the address set forth on the first page of this Credit Agreement.

5.2     Authorization.  The execution, delivery and performance of this Credit Agreement and the Related Documents executed by the Borrower are within its organizational powers, have been duly authorized, and are not in contravention of law, or the terms of Borrower's organizational documents or of any undertaking to which the Borrower is a party or by which it is bound.

5.3     Collateral Ownership. The Collateral exists and is genuine, and the Borrower owns the Collateral and has the exclusive right to pledge and grant a security interest in the Collateral.

5.4     No Adverse Interests in Collateral. The Borrower maintains the Collateral free from liens, adverse claims, setoffs, default, and other defenses of any kind or character, except as previously disclosed to the Bank in writing.

5.5     Litigation. No litigation or governmental proceeding is pending or, to the knowledge of the officers or managers of the Borrower, threatened against the Borrower which could have a material adverse effect on the Borrower's financial condition or business.

5.6     Financial Statements. All financial statements delivered to the Bank by or on behalf of Borrower, including any schedules and notes pertaining thereto, fairly and accurately present the financial condition of the Borrower based on the Accepted Accounting Basis (or generally accepted accounting principles consistently applied) at the dates thereof and the results of operations for the periods covered thereby, and there have been no material adverse changes in the financial condition or business of the Borrower from the date of the most recent financial statements delivered to the Bank by the Borrower to the date of this Credit Agreement.

SECTION 6  Financial Reporting Covenants

During the Availability Period of any Credit Facility and afterward until all indebtedness owed by the Borrower to the Bank is paid in full, the Borrower will furnish and deliver to the Bank the following financial reports, information, and other items within the time period and in the manner described:

6.1     Monthly Financial Statements. Within 30 days after the end of each month, the Financial Statements of the Borrower as of the end of such month, prepared by the Borrower.

6.2     Annual Financial Statements. Within 90 days after the end of each fiscal year, the Financial Statements of the Borrower as of the end of such year, prepared by the Borrower.

6.3     Personal Financial Statements for Individual Guarantor(s). Within 90 days after the end of each calendar year, the personal financial statement for each Guarantor who is an individual in a format or on a form approved by the Bank.

6.4     Federal Income Tax Returns. Within 30 days after filing with the Internal Revenue Service for each fiscal year, a complete copy of the Borrower's federal income tax return for such fiscal year, including all applicable schedules and attachments.

6.5     Federal Income Tax Returns for Guarantor(s). Within 30 days after filing with the Internal Revenue Service for each fiscal year, a complete copy of the federal income tax return of each Guarantor for such fiscal year, including all applicable schedules and attachments.

6.6     Other Information. Promptly upon the request of the Bank, such other information as the Bank may reasonably request or require.

6.7     Annual Proof of Insurance. Annually and (in any case) at least 10 days before the expiration date of any insurance coverage required under the Section "Insurance" below, a certificate of insurance (or similar proof acceptable to the Bank) that such insurance is in full force and effect with a mortgagee/lienholder endorsement in favor of the Bank.

SECTION 7  Financial and Other Covenants

During the Availability Period of any Credit Facility and afterward until all indebtedness owed by the Borrower to the Bank is paid in full, the Borrower will:

7.1     Collateral Audits and Inspections. Permit any of Bank's duly authorized employees or agents the right, at any reasonable time and from time to time, to conduct audits and examine the Collateral and to visit and inspect the properties of Borrower and to examine and take abstracts from its books and records.

7

7.2    Insurance. Maintain adequate insurance against fire, theft, collision, extended coverage, public liability, workers compensation and other events commonly insured against by motor vehicle dealerships within that state, covering the Borrower's property in such amounts and against such other risks as the Bank reasonably requires, with a mortgagee/lienholder endorsement in favor of the Bank on all such policies on insurance, and provide proof of such insurance to the Bank.

7.3    No Dispositions. Not enter into any transaction of merger or consolidation, or transfer, sell, assign, lease or otherwise dispose of (other than in the ordinary course of business) all or a substantial part of its properties or assets, including without limitation any of its notes or accounts receivable, or any shares of stock or equity interest, or any assets or properties necessary or desirable for the proper conduct of its business, or change the nature of its business, or wind up, liquidate or dissolve, or agree to do any of the foregoing.

7.4    No Guaranties. Not become or remain a guarantor or surety, or pledge its credit or become liable in any manner (except by endorsement for deposit in the ordinary course of business and guaranties in favor of the Bank) on undertakings of another without the prior written consent of the Bank.

7.5    Change of Ownership. Not permit any transfer or change, direct or indirect that would result in 15% or more of the shares, units, or equity interests transferring or changing from one person or entity to another within any 12-month period.

7.6    Books and Records. Maintain adequate books and records, refrain from making any material changes in its accounting procedures for tax or other purposes (including without limitation changing its current fiscal year-end), and permit the Bank to inspect the same upon reasonable notice.

7.7    Compliance with Laws. Comply with all statutes, rules, ordinances, and other laws applicable to its form of organization, business, and the ownership of its property, including (without limitation) all dealer licensing and insurance licensing applicable to its business and all consumer protection disclosures and other laws regarding the sale and lease of its inventory to consumers.

7.8    Preservation of Business Rights. Maintain (and preserve and pay fees and charges applicable to) all permits, licenses, rights, privileges, charters and franchises that it now owns or holds.

7.9    Preservation of Collateral. Take the following action with respect to the Collateral: (a) pay when due all license fees, registration fees, and other charges in connection with the Collateral; (b) use the Collateral only for lawful purposes – and never in a way that could be construed as unlawful or that would nullify any insurance coverage required under this Credit Agreement; (c) do all things necessary to maintain, preserve and protect the Collateral; (d) keep the Collateral free from tax liens of any kind and attachment or levies by any third party; (e) deal with the Collateral according to the standards and practices generally adhered to by motor vehicle dealerships located in that state; (f) provide any service and do all things necessary to keep the Collateral free and clear of all defenses, rights of offset, and counterclaims.

7.10    No Removal of Motor Vehicle Inventory Collateral. Not remove any of the Borrower's motor vehicle inventory from its dealership premises prior to the sale, lease, or rental of such vehicle, unless such removal is for a limited, brief period for a legitimate business purpose, is consistent with the practices of motor vehicle dealerships similarly situated within that state, affects an insignificant number of motor vehicles within the Borrower's motor vehicle inventory, and the Bank has not objected to the removal after disclosure of the removal by the Borrower to the Bank.

7.11    Bank's Lien on Title Certificates for Leased/Rented Vehicles. The Borrower shall take all necessary action to register -- and have a certificate of title issued for – each motor vehicle that is leased, rented, or sold at retail. In addition, the Borrower shall take all necessary action to have the Bank's security interest endorsed and properly noted on the certificate of title for each motor vehicle subject to a lease or rental agreement financed by the Bank (and for each motor vehicle that otherwise will be financed by the Bank subject to a rental or lease arrangement with a lessee) at the time the Bank makes the loan advance for such vehicle.

7.12    In-Floor Plan Position. Maintain an In-Floor Plan Position at all times.

7.13    First Priority Position in Floor Plan Vehicles. Grant to the Bank a first priority security interest and lien position in each and every motor vehicle financed by the Bank under the Floor Plan Line.

7.14    Used Vehicle Position. Maintain at all times an aggregate unpaid principal balance with respect to all loan advances under the Floor Plan Line used to finance Used Vehicles of no more than 60% of its Used Vehicle inventory, valued under the Accepted Accounting Basis, provided that flooring of used vehicles shall be limited to current year models, plus four previous model years for which valuations may be found in standard wholesale guide books.

7.15    Minimum Tangible Net Worth. Maintain a minimum Tangible Net Worth of at least $3,000,000.00 as of the end of each month. For purposes of calculating Tangible Net Worth for this covenant, the Borrower may include 60% of its LIFO inventory reserves and subordinated debt.

7.16    Debt to Tangible Net Worth Ratio. Maintain a ratio of Debt to Tangible Net Worth of no greater than 4.0 to 1.0 as of the end of each month. For purposes of calculating Tangible Net Worth for this covenant, the Borrower may include 60% of its LIFO inventory reserves and subordinated debt.

7.17    Current Ratio. Maintain a Current Ratio of at least 1.1 to 1.0 as of the end of each month. For purposes of calculating current assets for this covenant, the Borrower may include 100% of its LIFO inventory reserves attributable to current assets.

7.18    Debt Service Coverage Ratio. Maintain a Debt Service Coverage Ratio, determined in accordance with the Accepted Accounting Basis of no less than to 1.25 to 1.0 as of the end of each year. "Debt Service Coverage Ratio" for the purpose of this Credit Agreement shall mean the sum of net income plus taxes, depreciation, amortization and interest expense plus or minus LIFO, divided by annual debt service plus non-floor plan interest.

7.19    Notice. Not change its name, chief executive office or the jurisdiction where it is organized or registered without giving Bank prior written notice thereof.

SECTION 8  Default.

8.1    Automatic Default and Acceleration. The Credit Facilities shall automatically terminate and the Notes shall immediately be due and payable in full without any notice or demand in the event that a custodian, trustee or receiver is appointed for any property of the Borrower, or the Borrower is dissolved or liquidated or any action is taken to seek such dissolution or liquidation, or in the event that a petition is filed by the Borrower under the U. S. Bankruptcy Code (or is filed against the Borrower under the U.S. Bankruptcy Code and remains undismissed for 30 days).

8.2    Declaration of Default and Acceleration. If any of the Credit Facilities is a conditional line of credit, the Bank is not obligated to make advances under such Credit Facility even if the Borrower is in compliance with the terms of this Credit Agreement and the Note evidencing such Credit Facility shall be payable by Borrower on DEMAND by the Bank. In addition, the Bank also may, at its option, terminate the Credit Facilities and declare the Notes to be immediately due and payable in full upon any of the following events of default:

    A.    The occurrence of an event of default under any Note, whether such event of default is for non-payment or otherwise;

    B.    The failure by the Borrower to comply with any term, condition, covenant, or any other provision contained in this Credit Agreement;

    C.    The failure by the Borrower to comply with any term, condition, covenant, or any other provision contained in any other agreement between the Borrower and the Bank or between the Borrower and any other subsidiary or affiliate of Wells Fargo & Company;

D.      The failure by the Borrower to comply with any term, condition, or covenant contained in any agreement between it and any other creditor, the effect of which may permit such creditor to declare the indebtedness owed to it by the Borrower to be due prior to the date(s) fixed for payment;

E.      The failure by any Guarantor or any subsidiary or affiliate of the Borrower to comply with any term, condition, or covenant in any agreement that he, she, or it has with the Bank; or an event of default occurs under any such agreement with the Bank;

F.      Any representation or warranty made by the Borrower to the Bank (whether contained in this Credit Agreement or otherwise) is untrue or misleading in any material respect; or any financial statement submitted by the Borrower or any Guarantor to the Bank contains any information, which (at the time it is made) is untrue or misleading in any material respect;

G.      Adverse conditions develop at any time that affect the Borrower's or any Guarantor's affairs, financial or otherwise, and the Bank in good faith determines that such adverse conditions impair the due and punctual payment of any Note or any future advances under any Credit Facility or any Guaranty; or

H.      The death or incapacity of any individual Borrower or Guarantor.

**If any Note is payable on demand, nothing herein contained shall preclude or limit the Bank from demanding payment of such Note at any time and for any reason without notice.**

8.3     Cure Period for Certain Events of Default.  Upon any event of default other than those set forth in the subsection A or F of the Section "Declaration of Default and Acceleration" above, the Bank may immediately or at any time thereafter provide a written notice to the Borrower that describes the event or events of default and indicates that if such event is (or events are) not cured within ten (10) days, the Bank may exercise and/or pursue its rights and remedies.  If such event is (or events are) not cured within the ten (10) day cure period contained in any such notice, the Bank may then or at any time thereafter exercise and/or pursue any one or more rights and remedies as described in the Section "Rights and Remedies" below.  Any cure of an event or events of default shall not prejudice the Bank's rights at any future time(s) to send another notice of default and, upon failure to cure that default within the time period, exercise and/or pursue such rights and remedies.  (No notice of default needs to be sent and no cure period will apply for any event of default described in subsections A or F in the Section "Declaration of Default and Acceleration" above.)

8.4     Rights and Remedies.  Subject to any applicable notice and cure period (as described above), upon any event of default the Bank may do any one or more (or all) of the following without presentment, demand or any notices of any kind, including without limitation notice of nonperformance, notice of protest, protest, notice of dishonor, notice of intention to accelerate or notice of acceleration, all of which are expressly waived by Borrower: (a) accelerate and declare any of the Borrower's Obligations immediately due and payable in full; (b) direct the Borrower not to dispose of the Collateral except on terms approved by the Bank; (c) direct the Borrower to assemble and deliver all Collateral and related books and records to Bank at a reasonably convenient place designed by the Bank; (d) to the extent allowable by the law, enter on to the Borrower's premises and take possession of the Collateral and documents, records, and files pertaining to the Collateral; (e) sell, lease, license or otherwise liquidate the Collateral and apply proceeds toward repayment of the Borrower's Obligations in such order of application as the Bank may elect or, at the Bank's sole option, place proceeds in a cash collateral account; (f) exercise or pursue rights provided in this Credit Agreement or in any other agreement with the Borrower or in any Guaranty; and (g) exercise or pursue any rights or remedies provided by law or in equity.  Bank shall be under no obligation to extend any further credit under any of the Related Documents upon the occurrence of an event of default under any of the Related Documents or the occurrence of any condition, event or act which with the giving of notice or the passage of time or both would constitute such an event of default.

To the extent allowable by the law, it is agreed that public or private sales or other dispositions (for cash or on credit, to a wholesaler, retailer, investor, or user of collateral of the types subject to this Credit Agreement) or public auction are all commercially reasonable.  Borrower further agrees that Bank shall have no obligation to process or prepare any Collateral for sale or other disposition. In disposing of Collateral, Bank may disclaim all warranties of title, possession, quiet enjoyment and the like.

SECTION 9  Miscellaneous

9.1    Supplemental Provisions.  The provisions of this Credit Agreement shall be in addition to and supplement those provisions in the other Related Documents.  Nothing contained in this Credit Agreement shall prevent the Bank from enforcing any Note, Guaranty, pledge or security agreement in accordance with its respective terms; however, the provisions contained in this Credit Agreement shall supersede any inconsistent provisions contained in any other agreement between the Borrower and the Bank.

9.2    Additional Documents.  From time to time, the Borrower will execute and deliver to the Bank such additional documents and will provide such additional information as the Bank may reasonably require to carry out the terms of this Credit Agreement and be informed of the Borrower's status and affairs.

9.3    Costs and Expenses/Attorneys' Fees.  The Borrower will pay all costs and expenses, including reasonable attorneys' fees and related costs or expenses, incurred by the Bank in connection with the amendment, modification or enforcement of this Credit Agreement or the collection or attempted collection of any Note.

9.4    Notices/Consents.  Any notices or consents required or permitted by this Credit Agreement shall be in writing and shall be deemed delivered if delivered in person or if sent by first class mail, postage prepaid, or by telegraph or by facsimile transmission with confirmation of receipt to the Bank or Borrower (as applicable) to its address or facsimile telephone number set forth in page 1 of this Credit Agreement, unless such address or facsimile telephone number is changed by written notice consistent with this Section.

9.5    Governing Law. All interest, fees, and other charges for or in connection with any Credit Facility that are considered "interest" within the meaning of Section 85 of the National Bank Act (12 U.S.C. 85; 12 C.F.R. 7.4001(a)) and other applicable federal law will be governed by and interpreted under Arizona law. In all other respects, this Credit Agreement and the Related Documents – as well as the rights, remedies, and duties of the Bank and Borrower – will be governed and interpreted under Arizona law.

9.6    Assignment.  This Credit Agreement and the Related Documents shall inure to the benefit of, and shall be binding upon, the respective successors and assigns of the parties to this Credit Agreement; provided, however, that the Borrower has no right to assign or transfer any of its rights, interests, or obligations under this Credit Agreement or the Related Documents without the prior written consent of the Bank.

9.7    Severability.  If any provision of this Credit Agreement or Related Documents shall be held invalid under any applicable laws, such invalidity shall not affect any other provision of this Credit Agreement or Related Documents that can be given effect without the invalid provision, and, to this end, the provisions of this Credit Agreement and Related Documents are severable.

9.8    Collateral Indemnification.  THE BORROWER AGREES TO INDEMNIFY THE BANK AGAINST ALL LOSSES, CLAIMS, DEMANDS, AND LIABILITIES OF EVERY KIND CAUSED BY OR RELATING TO THE COLLATERAL, UNLESS ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE BANK.

9.9    Transfer of Funds.  The Borrower authorizes the Bank to withdraw and/or transfer any funds that the Borrower has on deposit with any financial institution that is an affiliate of the Bank (whether such deposit is in the nature of a checking account, savings account, certificate of deposit, or otherwise) to make any payment or payments on the Borrower's Obligations.

9.10    Consent to Release any Guarantor.  The Borrower consents to the release of any Guarantor by the Bank.

9.11    Entire Agreement; Amendment.  This Credit Agreement and the Related Documents constitute the entire agreement between Borrower and Bank with respect to each Credit Facility subject hereto and supersede all prior negotiations, communications, discussions and correspondence concerning the subject matter hereof. This Credit Agreement may be amended or modified only in writing signed by each party hereto.

SECTION 10  Arbitration

10.1    Agreement to Arbitrate.    The parties hereto agree, upon demand by any party, to submit to binding arbitration all claims, disputes and controversies between or among them (and their respective employees, officers, directors, attorneys and other agents), whether in tort, contract, or otherwise arising out of or relating to in any way (a) (a) the loans and related Loan Documents, which are the subject of this Credit Agreement, and their negotiation, execution, collateralization, administration, repayment, modification, extension, substitution, formation, inducement, enforcement, default or termination; or (b) requests for additional credit.

10.2    Governing Rules.    Any arbitration proceeding will (i) proceed in a location in AZ selected by the American Arbitration Association ("AAA"); (ii) be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any conflicting choice of law provision in any of the documents between the parties; and (iii) be conducted by the AAA, or such other administrator as the parties shall mutually agree upon, in accordance with the AAA's commercial dispute resolution procedures, unless the claim or counterclaim is at least $1,000,000.00 exclusive of claimed interest, arbitration fees and costs in which case the arbitration shall be conducted in accordance with the AAA's optional procedures for large, complex commercial disputes (the commercial dispute resolution procedures or the optional procedures for large, complex commercial disputes to be referred to, as applicable, as the "Rules"). If there is any inconsistency between the terms hereof and the Rules, the terms and procedures set forth herein shall control. Any party who fails or refuses to submit to arbitration following a demand by any other party shall bear all costs and expenses incurred by such other party in compelling arbitration of any dispute. Nothing contained herein shall be deemed to be a waiver by any party that is a bank of the protections afforded to it under 12 U.S.C. §91 or any similar applicable state law.

10.3    No Waiver of Provisional Remedies, Self-Help and Foreclosure.    The arbitration requirement does not limit the right of any party to (i) foreclose against real or personal property collateral; (ii) exercise self-help remedies relating to collateral or proceeds of collateral such as setoff or repossession; or (iii) obtain provisional or ancillary remedies such as replevin, injunctive relief, attachment or the appointment of a receiver, before during or after the pendency of any arbitration proceeding. This exclusion does not constitute a waiver of the right or obligation of any party to submit any dispute to arbitration or reference hereunder, including those arising from the exercise of the actions detailed in sections (i), (ii) and (iii) of this paragraph.

10.4    Arbitrator Qualifications and Powers.    Any arbitration proceeding in which the amount in controversy is $5,000,000.00 or less will be decided by a single arbitrator selected according to the Rules, and who shall not render an award of greater than $5,000,000.00. Any dispute in which the amount in controversy exceeds $5,000,000.00 shall be decided by majority vote of a panel of three arbitrators; provided however, that all three arbitrators must actively participate in all hearings and deliberations. The arbitrator will be a neutral attorney licensed in the State of Arizona [or a neutral retired judge of the state or federal judiciary of Arizona, in either case] with a minimum of ten years experience in the substantive law applicable to the subject matter of the dispute to be arbitrated. The arbitrator will determine whether or not an issue is arbitratable and will give effect to the statutes of limitation in determining any claim. In any arbitration proceeding the arbitrator will decide (by documents only or with a hearing at the arbitrator's discretion) any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication. The arbitrator shall resolve all disputes in accordance with the substantive law of Arizona and may grant any remedy or relief that a court of such state could order or grant within the scope hereof and such ancillary relief as is necessary to make effective any award. The arbitrator shall also have the power to award recovery of all costs and fees, to impose sanctions and to take such other action as the arbitrator deems necessary to the same extent a judge could pursuant to the Federal Rules of Civil Procedure, the Arizona Rules of Civil Procedure or other applicable law. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests such action for judicial relief.

10.5    Discovery.    In any arbitration proceeding discovery will be permitted in accordance with the Rules. All discovery shall be expressly limited to matters directly relevant to the dispute being arbitrated and must be completed no later than 20 days before the hearing date and within 180 days of the filing of the dispute with the AAA. Any requests for an extension of the discovery periods, or any discovery disputes, will be subject to final

determination by the arbitrator upon a showing that the request for discovery is essential for the party's presentation and that no alternative means for obtaining information is available.

10.6  Class Proceedings and Consolidations.  The resolution of any dispute arising pursuant to the terms of this Agreement shall be determined by a separate arbitration proceeding and such dispute shall not be consolidated with other disputes or included in any class proceeding.

10.7  Payment Of Arbitration Costs And Fees.  The arbitrator shall award all costs and expenses of the arbitration proceeding.

10.8  Miscellaneous.  To the maximum extent practicable, the AAA, the arbitrators and the parties shall take all action required to conclude any arbitration proceeding within 180 days of the filing of the dispute with the AAA. No arbitrator or other party to an arbitration proceeding may disclose the existence, content or results thereof, except for disclosures of information by a party required in the ordinary course of its business or by applicable law or regulation.  If more than one agreement for arbitration by or between the parties potentially applies to a dispute, the arbitration provision most directly related to the Loan Documents or the subject matter of the dispute shall control. This arbitration provision shall survive termination, amendment or expiration of any of the Loan Documents or any relationship between the parties.

This Credit Agreement is executed by the undersigned Bank and Borrower to be effective as of the date first shown above.


WELLS FARGO BANK,
NATIONAL ASSOCIATION

By: _____
       Scott Fuller, Assistant Vice President

DEL NORTE CHEVROLET-OLDS, CO.

By: _____
       James Larry Allen, President

## Exhibit A to Credit Agreement

| Glossary | (Standard Definitions for Capitalized Terms) |
|---|---|

*This Glossary is attached to and made a part of the Credit Agreement between the Bank and the Borrower. The capitalized terms with stipulated definitions set forth in this Glossary shall apply throughout the Credit Agreement and Related Documents (as defined below). In addition, capitalized terms with stipulated definitions are set forth in other parts of the Credit Agreement and Related Documents (as defined below) and also shall apply throughout those documents.*

| **Term** | **Definition** |
|---|---|
| Accepted Accounting Basis | For any Borrower or organization that is a motor vehicle dealership with a current franchise or similar brand/retail type agreement in effect with a motor vehicle manufacturer, the manner and method of accounting prescribed for such motor vehicle dealership by that manufacturer, using consistent procedures and the same elections and treatment of specific items as those used during the preceding fiscal year -- unless such manufacturer prescribes a change in a particular election or treatment from the preceding fiscal year, in which case such change shall apply. (If the Borrower or organization has such agreements in effect with more than one manufacturer, it may choose the accounting manner/method prescribed by any one of those manufacturers.) *In all other cases, this term means the manner and method of accounting prescribed by generally accepted accounting principles consistently applied.* |
| Advance Formula | The maximum amount that the Bank will lend as a loan advance to finance the purchase or carrying of a particular motor vehicle as inventory. |
| Agreement | The Credit Agreement between the Bank and the Borrower (to which this Glossary is a supplement and into which it is incorporated) and any Related Documents. |
| Asset Values for Primary Vehicle Inventory | The following assets of the Borrower, determined in accordance with the Accepted Accounting Basis:<br><br>● Contracts in transit (meaning consummated retail credit sales contracts with a commitment to be purchased);<br>● New Vehicle inventory;<br>● Program Vehicle inventory;<br>● Demo Vehicle inventory;<br>● Service-Loaner Vehicle inventory;<br>● Cash proceeds from the sale of vehicles in which the Bank has a first priority security interest;<br>● Accounts receivable from manufacturers that arise from New Vehicle sales (other than manufacturers' holdbacks already included above); and<br>● Accounts receivable from authorized dealers, auctions, and businesses that arise from New Vehicle, Program Vehicle, Demo Vehicle, or Service-Loaner Vehicle sales, except those accounts receivable which are (i) greater than 90 days past the invoice date in the case of a sale to a government agency or fleet sale to a business, and greater than 30 days past the invoice date in other cases; (ii) due from an account debtor who is subject to any bankruptcy proceeding, (iii) owed by a shareholder or affiliate of the Borrower, (iv) otherwise deemed unacceptable by the Bank in its reasonable discretion. |
| Authorized Representative | Any officer, partner, member, trustee or representative authorized and empowered to take action on behalf of the Borrower. |
| Availability Period | The period during which the Borrower may request loan advances from the Bank under a |

14

particular line of credit as specified in the Credit Agreement.

| | |
|---|---|
| Borrowing Base Certificate | A certificate or report that contains financial and other information pertaining to the Borrowing Base described in the Credit Agreement (in a format prescribed by the Bank and provided to the Borrower) which is completed and signed by the Borrower and on which the Bank relies in making loan advances and verifying various covenants. |
| Compliance Certificate | A certificate or report that contains financial and other information pertaining to various covenants and representations of the Borrower described in the Credit Agreement (in a format prescribed by the Bank and provided to the Borrower) which is completed and signed by the Borrower and on which the Bank relies in making loan advances. |
| Credit Facility/ Facilities | Each floor plan line, revolving line, lease line, term loan, and any other existing or new extension of credit by the Bank to the Borrower identified in the Credit Agreement. |
| Credit Limit | The maximum dollar amount specified in the Credit Agreement for all unpaid loan advances that can be outstanding under a particular line of credit, not necessarily the amount available for a particular loan advance if an Advance Formula applies to the line of credit. |
| Current Ratio | The ratio of the aggregate amount of the Borrower's current assets (net of any contra accounts) to the aggregate amount of the Borrower's current liabilities (minus any of the Borrower's debt that has been subordinated to the Borrower's indebtedness to the Bank in a form and manner satisfactory to the Bank), all determined in accordance with the Accepted Accounting Basis. |
| Debt | The aggregate amount of the Borrower's liabilities minus any of the Borrower's debt that has been subordinated to the Borrower's indebtedness to the Bank in a form and manner satisfactory to the Lender, all as determined in accordance with the Accepted Accounting Basis. |
| Demo Vehicle | Any motor vehicle being purchased (or already owned) by the Borrower which, at the time of financing by the Bank: <br> • has less than 5,000 actual miles; and <br> • is used or intended to be used as a demonstrator vehicle for retail customers of the Borrower; and <br> • has not previously been sold, leased, or transferred at retail; and <br> • is a current model year or future model year. <br> Any New Vehicle also will be treated as a Demo Vehicle at the time it reaches 5,000 actual miles – whether or not it falls within the foregoing definition. B* **See Important Footnote.** |
| Financial Statements | The financial statements of the Borrower or other identified business organization, including the balance sheet (as of the date described) and the income statement (from the beginning of the applicable fiscal year to the end of the period described). All financial statements shall be prepared in accordance with the Accepted Accounting Basis, except that any financial statements prepared by a certified public accountant shall be prepared in accordance with generally accepted accounting principles consistently applied. |
| Guaranty/Guaranties | Each guaranty, in form and content prescribed by the Bank, executed by a Guarantor. |
| In Floor Plan Position | When the Asset Values for Primary Vehicle Inventory equal or exceed all unpaid loan advances outstanding under the Floor Plan Line. |

| | |
|---|---|
| Lease Line Termination Date | The date on and after which the Bank will not consider making any loan advances under the Lease Line. |
| Maturity Date | The date on which all unpaid principal balances outstanding under a particular Credit Facility are due and payable in full. Also, the date on and after which the Bank will not consider making any loan advances under any line of credit. |
| Net Worth | The aggregate amount of the assets (net of any contra accounts) of the Borrower, minus the aggregate amount of the liabilities of the Borrower (net of the Borrower's debt that has been subordinated to the Borrower's indebtedness to the Bank in a form and manner satisfactory to the Bank), all determined in accordance with the Accepted Accounting Basis. |
| New Vehicle | Any motor vehicle being purchased (or already owned) by the Borrower which, at the time of financing by the Bank: <br>• has less than 5,000 actual miles; and<br>• has not previously been sold, leased, or transferred at retail; and<br>• is not a Program Vehicle and is not used and will not be used as a Demo Vehicle, Service-Loaner Vehicle or Rental Vehicle; and<br>• is a current model year or future model year (or if financed during the first five months of any calendar year, additionally may be a model year one year prior to the current model year).<br>Any New Vehicle will be treated as a Demo Vehicle at the time it reaches 5,000 actual miles. **\* See Important Footnote.** |
| Note/Notes | Each and every promissory note executed by the Borrower payable to the Bank, whether such note or notes evidence indebtedness under a Credit Facility or other Obligations. |
| Obligations | Any and all advances liabilities, obligations, debts and indebtedness of Borrower or any of them, to the Bank, whether now existing or hereinafter incurred or created all as determined in the most comprehensive sense and whether any such obligations are voluntarily or involuntarily incurred, due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined; and whether Borrower may be liable individually or jointly with others, or primarily or secondarily, or as guarantor or surety or whether recovery upon any such Obligation may be or hereafter becomes unenforceable. **Without limiting the generality of the foregoing, "Obligations" includes the Borrower's Guaranty dated April 29, 2005, and all replacements or substitutions thereof in favor of Bank for all indebtedness.** |
| Program Vehicle | **Any motor vehicle being purchased (or already owned) by the Borrower which, at the time of financing by the Bank:** <br>• has less than 40,000 actual miles; and<br>• is (or initially was) acquired by the Borrower from a dealer auction, dealer exchange, or another source satisfactory to the Bank; and<br>• is not considered a New Vehicle and is not used and will not be used as a Demo Vehicle, Service-Loaner Vehicle or Rental Vehicle; and<br>• is a model year no older than two years prior to the current model year. **\* See Important Footnote.** |
| Qualifying Lease/Leases | Each legally enforceable motor vehicle lease by and between the Borrower as lessor and a lessee: (i) with terms and a residual value of the leased vehicle acceptable to the Bank; (ii) for which the underlying leased vehicle has been delivered to (and has been accepted by) such lessee; (iii) in full compliance with all laws and regulations applicable thereto; (iv) not subject to offset or dispute; (v) not in default at the time of financing; and (vi) not |

previously financed by the Bank or a third party.

| | |
|---|---|
| Related Documents | All promissory notes, instruments, agreements and documents (other than the Credit Agreement and any Guaranty) which the Borrower has signed or delivered (or will sign or deliver) in connection with the Credit Agreement. |
| Rental Vehicle | Any motor vehicle being purchased (or already owned) by the Borrower which, at the time of financing by the Bank:<br>• has less than 40,000 actual miles; and<br>• is used or intended to be used as a short-term rental vehicle for retail customers of the Borrower; and<br>• has not previously been sold, leased, or transferred at retail; and<br>• is a current model year or future model year. * **See Important Footnote.** |
| Sublimit | A credit limit (established below the aggregate Credit Limit for a particular line of credit), which represents the maximum dollar amount for all unpaid loan advances that can be used and outstanding for a specified funding purpose. |
| Tangible Net Worth | Net Worth plus subordinated debt minus the following items determined in accordance with the Accepted Accounting Basis: (i) goodwill, patents, copyrights, mailing lists, trade names, trademarks, servicing rights, organizational and franchise costs, bond underwriting costs, and other like assets properly classified as intangible; (ii) leasehold improvements; (iii) receivables, loans and other amounts due from any person (or any immediate family member of such person), corporation, limited liability company, partnership, trust, or estate that controls or is affiliated with the Borrower – either directly or indirectly, plus 60% of LIFO inventory reserves. |
| Used Vehicle | Any motor vehicle being purchased (or already owned) by the Borrower <u>other than</u> a Demo Vehicle, New Vehicle, Program Vehicle, Rental Vehicle, or Service-Loaner Vehicle financed by the Bank under the Floor Plan Line. * **See Important Footnote.** |

\* **Important Footnote**. *In addition, the Bank may reclassify any vehicle from a New Vehicle, Program Vehicle, Demo Vehicle, Loaner-Service Vehicle, Rental Vehicle, or Used Vehicle to another type of vehicle within these classifications or otherwise if the Bank is informed or learns that the purpose for which the vehicle is held as inventory has changed. All curtailment payments and other terms shall then apply to that vehicle (and the loan advances used to finance it) as reclassified.*