Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Motors Liquidation
Company GUC Trust

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                          :
**In re**                                 :        **Chapter 11 Case No.**
                                          :
**MOTORS LIQUIDATION COMPANY,** *et al.*, :        **09-50026 (REG)**
      **f/k/a General Motors Corp.,** *et al.*  :
                                          :
            **Debtors.**                  :        **(Jointly Administered)**
                                          :
-------------------------------------------------------------x

**MOTORS LIQUIDATION COMPANY**
**GUC TRUST'S REPLY TO THE MEDER RESPONSE**
**TO THE 169TH OMNIBUS OBJECTION TO CLAIMS (WELFARE BENEFIT**
**CLAIMS OF RETIRED AND FORMER SALARIED AND EXECUTIVE EMPLOYEES)**

# TABLE OF CONTENTS

**Page**

Preliminary Statement.................................................................................................. 1

The Welfare Benefits Claims Should Be Disallowed and Expunged........................... 3

I.    The Welfare Benefits Claims Should Be Disallowed As Debtors Had Right to
      Amend or Terminate Each Welfare Benefit Plan ............................................... 3

      (A)    Neither the Debtors' Salaried Life Insurance Plan Nor the Retiree
             Servicing Center Letter Provided Mr. Meder With a Permanent
             Contractual Right to Continuing Life Insurance Benefits at a Guaranteed
             Amount ...................................................................................................... 6

      (B)    The Retiree Servicing Center Letter Did Not Create A New Contract With
             Mr. Meder ................................................................................................ 13

II.   Ongoing Benefits Have Been Assumed by New GM.......................................... 18

The Meder Response...................................................................................................... 19

Conclusion ..................................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Curtiss-Wright Corp. v. Schoonejongen*,
  514 U.S. 73 (1995)...........................................................................................................4

*Devlin v. Empire Blue Cross and Blue Shield*,
  *274 F.3d 76 (2nd Cir. 2001)* ...........................................................................................4, 15

*In re Oneida, Ltd.*,
  400 B.R. 384 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 09 Civ. 2229 (DC), 2010 WL
  234827 (S.D.N.Y. Jan. 22, 2010)....................................................................................3

*Moore v. Metro. Life Ins. Co.*,
  856 F.2d 488 (2d Cir. 1988)............................................................................................4, 7

*Sprague v. Gen. Motors Corp.*,
  133 F.3d 388 (6th Cir. 1998) ..................................................................................4, 9, 10, 11

STATUTES

29 U.S.C. § 1051(1) ...........................................................................................................4, 7

Employee Retirement Income Security Act of 1974 ......................................................3

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

The Motors Liquidation Company GUC Trust (the "**GUC Trust**"), formed by the above-captioned debtors (collectively, the "**Debtors**")[1] in connection with the Debtors' Second Amended Joint Chapter 11 Plan, dated March 18, 2011 (as may be amended, supplemented, or modified from time to time), files this reply (the "**Reply**") to the Meder Response (defined below) interposed to the 169th Omnibus Objections to Claims (Welfare Benefits Claims of Retired and Former Salaried and Executive Employees) (ECF No. 8851) (the "**Omnibus Objection**"), and respectfully represents:

<u>**Preliminary Statement**</u>

1.    On January 26, 2011, the Debtors filed the Omnibus Objection.  The Omnibus Objection seeks the disallowance and expungement of certain compensation and welfare benefits claims of retired and former salaried and executive employees of the Debtors on the basis that such claims (a) are related to unvested welfare benefits that were capable of being modified or terminated by the Debtors at will pursuant to the terms of the operative documents governing such welfare benefits, and were modified or terminated in accordance with such operative documents, and (b) to the extent modified, have otherwise been assumed by New GM[2] pursuant to the terms of the Master Purchase Agreement and, as described in the Omnibus Objection, are not the responsibility of the Debtors or the GUC Trust and therefore should be disallowed and expunged from the claims register.

---

[1]    The Debtors are Motors Liquidation Company (f/k/a General Motors Corporation) ("**MLC**"), MLCS, LLC (f/k/a Saturn, LLC), MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation), MLC of Harlem, Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc.), Remediation and Liability Management Company, Inc., and Environmental Corporate Remediation Company, Inc.

[2] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Omnibus Objection.

2.      Responses to the Omnibus Objection were due by February 22, 2011.  The response listed on **Exhibit 1** hereto and described further herein was filed with respect to the Omnibus Objection (the "**Meder Response**") by Marilea Meder on behalf of her deceased husband Robert Meder, relating to his individual claims (the "**Welfare Benefits Claims**," which include "**Continuing Life Insurance Claims**").

3.      The Meder Response is generally not substantive, but is critical of the reduction or termination of welfare benefits provided to retired and former salaried and executive employees of the Debtors.  After reviewing the Meder Response, the GUC Trust[3] respectfully reiterates the Debtors' position in the Omnibus Objection, and submits that Mrs. Meder has failed to provide any legal or factual support for the Welfare Benefits Claims.  The Meder Response alleges the same facts provided by, and does not take any position different from the position taken by another former employee of the Debtors, George Cobble Jr., with respect to the alleged vesting of Mr. Cobble's Continuing Life Insurance benefit, which was disallowed and expunged by an order of the Court, dated February 8, 2012 (ECF No. 11391).[4]

4.      Notwithstanding Mrs. Meder's opposition, the Meder Response should be dismissed because (i) the Debtors had a right to amend or terminate the employee welfare benefit plans (the "**Welfare Benefits Plans**") providing medical, dental, vision, and life insurance benefits (the "**Welfare Benefits**"), including those on which the Welfare Benefits Claims are based, without further liability, and in all relevant instances did so, and (ii) New GM otherwise

---

[3] While the Omnibus Objection was filed by the Debtors, this Reply is being filed by the GUC Trust because, pursuant to the Plan, the GUC Trust now has the exclusive authority to prosecute and resolve objections to Disputed General Unsecured Claims (as defined in the Plan).

[4] Mr. Cobble filed Proof of Claim No. 64959, which was objected to in the Debtors' 171st Omnibus Objections to Claims (Welfare Benefits Claims of Retired and Former Salaried and Executive Employees) (ECF No. 6740).  Mr. Cobble's reply to the 171st omnibus objection appears at ECF No. 7074.  The GUC Trust's response to Mr. Cobble's reply is at ECF No. 11283.

assumed Welfare Benefits as they existed on the Closing Date and continues to provide Welfare

Benefits as modified prior to their assumption by New GM, and consequently the Debtors and

the GUC Trust have no liability for the Welfare Benefits Claims (which, as noted above, include

the Continuing Life Insurance Claims).  Accordingly, the GUC Trust files this Reply in support

of the Omnibus Objection and respectfully requests that the Welfare Benefits Claims be

disallowed and expunged from the claims register.

5.      The Debtors and the GUC Trust are, of course, sympathetic with the

impact that the financial problems of the Debtors have had on Mr. and Mrs. Meder's Welfare

Benefits.  However, in view of the Debtors' liquidation and under applicable law, there should be

no other outcome.

### The Welfare Benefits Claims Should Be Disallowed and Expunged

6.      Mrs. Meder has failed to demonstrate the validity of the Welfare Benefits

Claims, and the Welfare Benefits Claims should therefore be disallowed and expunged.  *See,*

*e.g.*, *In re Oneida, Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 09 Civ. 2229

(DC), 2010 WL 234827 (S.D.N.Y. Jan. 22, 2010) (claimant has burden to demonstrate validity

of claim when objection is asserted refuting claim's essential allegations).

I.      **The Welfare Benefits Claims Should Be Disallowed As Debtors
        Had Right to Amend or Terminate Each Welfare Benefit Plan**

7.      In the Meder Response, Mrs. Meder has not demonstrated that the Debtors

were bound by any legal or contractual requirement to continue to provide Mr. Meder, or other

retired and former salaried and executive employees, with the Welfare Benefits on a permanent

basis.  The Omnibus Objection explains that the Employee Retirement Income Security Act of

1974, as amended ("**ERISA**"), comprehensively regulates employer-provided welfare benefit

plans, and that ERISA does not require an employer to provide or to vest welfare benefits.

Welfare benefits provided under the terms of a welfare benefit plan may therefore be reduced or

forfeited in accordance with the terms of the applicable welfare benefit plan.  29 U.S.C. §

1051(1); *see Moore v. Metro. Life Ins. Co.*, 856 F.2d 488, 491 (2d Cir. 1988); *Sprague v. Gen.

Motors Corp.*, 133 F.3d 388, 400 (6th Cir. 1998).

   8.  In addressing claims similar to the Welfare Benefits Claims, the U.S.

Supreme Court has noted that welfare plans such as the Welfare Benefit Plans are specifically

exempted from vesting requirements (to which pension plans are subject) under ERISA, and

accordingly, employers "are generally free under ERISA, for any reason at any time, to adopt,

modify or terminate welfare plans*.*" *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78

(1995) (emphasis added) (citing *Adams v. Avondale Indus., Inc.*, 905 F.2d 943, 947 (6th Cir.

1990))*. See also Joyce. v. Curtiss Wright Corp.*, 171 F. 3d 130 (2d Cir.  1999) stating the general

rule that under ERISA an employer welfare plan is not vested and that an employer has the right

to terminate or unilaterally amend the plan at any time.  As noted in the Omnibus Objection,

however, the Sixth Circuit has recognized that once welfare benefits are vested, they are

rendered forever unalterable. *See also Devlin v. Empire Blue Cross and Blue Shield,* 274 F.3d

76, 82 (2nd Cir. 2001)(quoting *Am. Fed'n of Grain Millers, AFL-CIO v. Int'l Multifoods Corp*,

116 F.3d 976, 980 (2d Cir. 1997) ("If a [plan] document unambiguously indicates whether retiree

… benefits are vested, the unambiguous language should be enforced").

   9.  Thus, Mrs. Meder bears the burden of showing that the Debtors intended

to vest Welfare Benefits provided by the Welfare Benefits Plans, and did *in fact* vest the Welfare

Benefits, such that Mr. Meder had a contractual right to the perpetual continuation of his Welfare

Benefits at a contractually specified level.

10.    In the Meder Response, Mrs. Meder has not provided any evidence that contradicts the Debtors' common practice of advising participants of the Welfare Benefits Plans of the Debtors' right to amend or terminate the Welfare Benefits at any time.  Moreover, Mrs. Meder has not provided any evidence of a separate, affirmative contractual obligation on the part of the Debtors to continue to provide the Welfare Benefits specifically to Mr. Meder.  Therefore, the Debtors and the GUC Trust do not have any liability with respect to the reduction in or discontinuation of the Welfare Benefits.

11.    The Meder Response further states opposition to the relief sought in the Omnibus Objection with respect to Continuing Life Insurance Claims, which relate to the Debtors' reduction, as of August 1, 2009, of the maximum amount of basic life insurance benefit ("**Continuing Life Insurance**") to $10,000 (self-funded by General Motors Corporation (hereafter "**GM**") and subsequently by General Motors Company ("**New GM**")), which would be paid by GM and subsequently New GM to the beneficiaries of eligible deceased retirees to receive such benefit upon their death (*i.e.*, those whose most recent date of hire (or adjusted service date) was prior to January 1, 1993).

12.    In the Meder Response, Mrs. Meder opposes the disallowance and expungement of Mr. Meder's Continuing Life Insurance Claims on the basis that the Continuing Life Insurance benefits are vested rather than unvested.  In support, Mrs. Meder provides a one-page letters from the Debtors to Mr. Meder following his retirement from employment with the Debtors (the "**Retiree Servicing Center Letter**").  Each Retiree Servicing Center Letter generally contains the following standard language:

> As a retiree of General Motors with 10 or more years of participation in the Life and Disability Benefits Program, you are eligible for Continuing Life Insurance.  Our insurance records, as of the date of this letter, show the Continuing Life Insurance has

now fully reduced to the ultimate amount of $[**stated amount**]. This ultimate amount will remain in effect for the rest of your life and is provided by General Motors at no cost to you.

13.     In the Meder Response, Mrs. Meder does not provide any explanation for why the Retiree Servicing Center Letter received by Mr. Meder should be read as ensuring the vesting of a benefit, rather than a mere acknowledgement by their former employer of the reduction of a lifetime death benefit amount in accordance with the written terms of the applicable life insurance plan then in effect and subject to the plan sponsor's continuing right to change the terms of the life insurance plan.

**(A)     Neither the Debtors' Salaried Life Insurance Plan Nor the Retiree Servicing Center Letter Provided Mr. Meder With a Permanent Contractual Right to Continuing Life Insurance Benefits at a Guaranteed Amount**

14.     In the Meder Response, Mrs. Meder provides a copy of a Retiree Servicing Center Letter from the GM National Retiree Servicing Center ("**Retiree Servicing Center**").  GM self-administered its life insurance benefits until some point in the 1990s, at which time it transferred administration of life insurance benefits to MetLife, a third party administrator.  To enable MetLife to be readily identifiable as GM's administrator for life insurance benefits, GM permitted MetLife to use the prior name of their internal benefits administrator, the General Motors National Benefits Center and/or Retiree Servicing Center.

15.     The Retiree Servicing Center Letter and letters substantially similar to it were routinely sent out by mail from the Retiree Servicing Center to each retiree of General Motors Corporation entitled to a Continuing Life Insurance benefit (which was a continuation of the retiree's basic life insurance benefit offered to them while they were active employees).  The letters were routinely sent out at the time that a scheduled reduction to the retiree's Continuing Life Insurance benefit had reduced to the maximum amount pursuant to the terms then in effect

under the General Motors Life and Disability Benefits Program for Salaried Employees, as amended from time to time ("**Debtors' Salaried Life Insurance Plan**").

16.    As explained above with respect to the Debtors' right to amend or terminate other Welfare Benefits, ERISA does not require an employer to provide or to vest life insurance benefits.  Insurance benefits provided under the terms of a welfare benefit plan may therefore be reduced or forfeited in accordance with the terms of the applicable welfare benefits plan.  29 U.S.C. § 1051(1); *see Moore v. Metro. Life Ins. Co.*, 856 F.2d 488, 491 (2d Cir. 1988).

17.    ERISA provides that the contractual rights established under a welfare benefits plan must be in writing and contained in the plan document for the welfare benefits plan, and furthermore, requires that a welfare benefits plan sponsor provide a summary plan description (and as necessary, summaries of material modifications) of the plan and the terms of benefits provided under the plan to participants of the plan; however, the summary plan description does not establish any contractual rights not provided by the plan document. *Cigna Corp. v. Amara*, 000 U.S. 09-804 (2011) (holding that a summary plan description has no contractual authority because it does not constitute a part of the plan document; however, plan participants may seek appropriate equitable relief in the case of a false or misleading summary plan description).  Communications from the plan sponsor to plan participants, such as the Retiree Servicing Center Letter received by Mr. Meder, are neither summary plan descriptions nor summaries of material modifications.  Even so, by the reasoning of *Amara*, the Retiree Servicing Center Letter does not supersede the terms of the Debtors' Salaried Life Insurance Plan, which provided the Debtors the right to amend, modify or terminate the Continuing Life Insurance benefits at any time.

18.    The Debtors clearly and unambiguously reserved their right to amend or terminate the Continuing Life Insurance benefit under the terms of the plan documents and the summary plan descriptions of the Debtors' Salaried Life Insurance Plan provided and made available to Mr. Meder during his employment period, and therefore, neither the Retiree Servicing Center Letter received by Mr. Meder nor the plan documents create any vested contractual rights to the Continuing Life Insurance benefits.  Section 3.05 of the most recent restatement of the Debtors' Salaried Life Insurance Plan, as amended effective January 1, 2007, provides:

> The Corporation reserves the right to amend, modify, suspend or terminate the Program in whole or in part, at any time by action of its Board of Directors or other committee or individual expressly authorized by the Board to take such action.  The benefits available to Employees are determined solely by the terms of this Program. Absent express delegation of authority from the Board of Directors, no one has the authority to commit the Corporation to any benefit or benefit provisions not provided under the terms of this Program.

Because ERISA does not require the vesting of welfare benefits, such provision reserved the Debtors' right to modify Continuing Life Insurance benefits by amendment of Debtor's Salaried Life Insurance Plan.  Moreover, the Debtors could terminate the plan.  Clearly, no vested rights were created under the plan.  The following reservation of rights to amend or terminate benefits is prominently stated on the second page of a recent benefits handbook for salaried retirees containing the summary plan description of Debtors' Salaried Life Insurance Plan:

> General Motors Corporation reserves the right to amend, change, or terminate the Plans and Programs described in this booklet.  The Plans and Programs can be amended only in writing by an appropriate committee or individual as expressly authorized by the Board of Directors.  No other oral or written statements can change the terms of a benefit Plan or Program.

The same or substantially similar reservation of rights language is prominently stated on the second page of benefits handbooks for salaried retirees issued by the Debtors in 1996, 2000, and 2005.  Mr. Meder was therefore clearly on notice of this reservation of rights, as he will have seen it prominently displayed in the benefits handbooks for salaried retirees that they received along with every other retiree with such benefits.

19.    On the basis of such language, the Sixth Circuit in *Sprague* reviewed the plan documents and summary plan descriptions of certain of the Debtors' salaried welfare benefits plans, as contained in benefits handbooks regularly provided by Debtors to their employees and retirees, and concluded that the Debtors' salaried welfare benefits plans explicitly permitted the Debtors to unilaterally amend, terminate or modify the salaried welfare benefits provided under such plans.  The Sixth Circuit's opinion in *Sprague* contains the following description of the Debtors' reservation of rights to change or terminate health care benefits at any time, which reservation would have equally pertained to the right to change or terminate life insurance benefits, the summary plan description of which was contained in the same booklet as contained the summary plan description of the health plan:

> GM has long made it a practice to inform its salaried employees and retirees of their health care coverage by providing them booklets containing summaries of the company's health insurance policies and programs.  Prior to 1974 GM put out a booklet entitled "The GM Insurance Program for Salaried Employees."  After ERISA took effect in 1974 the booklet became "Highlights of Your GM Benefits."  Beginning in 1977, GM also issued a booklet called "Your Benefits in Retirement."  Each of these publications

9

went through a series of different editions […] and most of the booklets also put plan participants on notice of GM's right to change or terminate the health care plan at any time:

> "General Motors believes wholeheartedly in this Insurance Program for GM men and women, and expects to continue the Program indefinitely. However, GM reserves the right to modify, revoke, suspend, terminate, or change the Program, in whole or in part, at any time...." The General Motors Insurance Program for Salaried Employees (1965, 1968, and 1971).

> "General Motors Corporation reserves the right to amend, change or terminate the Plans and Programs described in this booklet." Your GM Benefits (1985).

> "The Corporation reserves the right to amend, modify, suspend, or terminate its benefit Plans or Programs by action of its Board of Directors." Your Benefits in Retirement (1985).

*Sprague v. Gen. Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) at 400.[5]

20.    As evidenced by the description set forth in *Sprague* and as confirmed by the Debtors, GM had a long-term practice of providing explicit notice to participants of their reservation of rights to amend or terminate salaried welfare benefits at any time through the issuance of benefits handbooks to both active and retired employees on a regular basis spanning over a period of 47 years or more (*i.e.*, since at least 1965). This means that Mr. Meder would have been on notice from the start of and through the end of his career with General Motors Corporation that his employer had reserved its rights to amend or terminate his basic life insurance benefit and/or their Continuing Life Insurance benefit.

---

[5] The Sixth Circuit found: "Most of the summary plan descriptions unambiguously reserved GM's right to amend or terminate the plan. For example: 'General Motors Corporation reserves the right to amend, change or terminate the Plans and Programs described in this booklet.' Your GM Benefits (1984) [and] 'The Corporation reserves the right to amend, modify, suspend or terminate the Program in whole or in part, at any time, by action of its Board of Directors.' Your Benefits in Retirement (1985)." 133 F.3d at 400.

21.     The Second Circuit has held that an employer's reservation of rights to amend or to terminate insurance benefits was sufficient to preclude such insurance benefits from being susceptible to being interpreted as promises of vested lifetime insurance benefits:

> Here ... we have [SPD or Summary Plan Description] language that both appears to promise lifetime life insurance coverage at a particular level and clearly reserves Empire's right to amend or terminate such coverage. Because the same document that potentially provided the 'lifetime' benefits also clearly informed employees that these benefits were subject to modification, we conclude that the language contained in the 1987 SPD is not susceptible to an interpretation that promises vested lifetime life insurance benefits.

> The Sixth Circuit has similarly concluded, where a group of General Motors retirees challenged a reduction in health coverage, that the relevant SPD provided that lifetime health coverage would be provided at no cost. *See Sprague v. Gen. Motors Corp., 133 F.3d 388, 401 (6th Cir. 1998) (en banc).* The same SPD also provided that 'General Motors Corporation reserves the right to amend, change or terminate the Plans and Programs described in this booklet.' *Id.* The Sixth Circuit reasoned:

>> "We see no ambiguity in a summary plan description that tells participants both that the terms of the current plan entitle them to health insurance at no cost throughout retirement and that the terms of the current plan are subject to change.... As the Third Circuit explained in a similar case, `the promise made to retirees was a qualified one: the

promise was that retiree medical benefits were for life
provided the company chose not to terminate the plans,
pursuant to clauses that preserved the company's right to
terminate the plan under which those benefits are
provided.' *Id.* (quoting *In re Unisys Corp. Retiree Med.
Benefit ERISA Litig.*, 58 F.3d 896, 904 n.12 (3d Cir.
1995))." *Abbruscato v. Empire Blue Cross and Blue
Shield*, 274 F. 3d 90, 99-100 (2nd Cir. 2001)

22.     Each summary plan description of the Debtors' Salaried Life Insurance

Plan contained in the employee handbooks issued over the years has contained a description of

the Continuing Life Insurance benefits and an explanation of the manner in which the Continuing

Life Insurance benefits were to be reduced upon or during the retirement of a retiree.  Pursuant to

the terms of the Debtors' Salaried Life Insurance Plan, the Continuing Life Insurance benefit

was, upon retirement or age 65, subject to reduction in the case of all of the Debtors' retirees

eligible for such benefit depending on when the retiree retired.  In addition to notice provided by

the summary plan descriptions, the Debtors were in the practice of notifying retirees of such

reductions, at the point of the ultimate reduction, in the form of the Retiree Servicing Center

Letters.

23.     The terms of such reductions in effect under the Debtors' Salaried Life

Insurance Plan immediately prior to the commencement of these chapter 11 cases are set forth in

**Exhibit 1** hereto.  The fact that different groups of retirees were subject to different rates of

reduction reflects the fact that the Debtors' Salaried Life Insurance Plan had been amended many

times previously, each amendment of which would have modified, *i.e.*, increased or reduced, the

Continuing Life Insurance benefits applicable to different groups of retirees.  Mrs. Meder does

not question the right of the Debtors to have modified Continuing Life Insurance benefits for

better or worse at any time prior to the commencement of these chapter 11 cases.

24.     In connection with their insolvency, following approval by the Employee Benefits Plans Committee of Debtor's Board of Directors, the Debtors reduced to $10,000 the maximum amount of the Continuing Life Insurance benefit that would be paid by the Debtors (and subsequently by New GM) to the beneficiaries of a retiree eligible to receive such benefit upon death (*i.e.*, those whose most recent date of hire (or adjusted service date) was prior to January 1, 1993).  The reduction was effected by amendment of the Salaried Life Insurance Plan made by the Employee Benefits Plans Committee of Debtor's Board of Directors on June 19, 2009, who had been expressly delegated by the Board of Directors the authority to amend the Debtors' welfare benefit plans.

25.     Pursuant to the terms of the Debtors' Salaried Life Insurance Plan, upon attaining age 65, retirees were no longer required to make contributions to maintain their Continuing Life Insurance benefits.  Reduction of the maximum amount of the Continuing Life Insurance benefits has not changed this fact.

26.     Upon reduction of the Continuing Life Insurance benefit in connection with their insolvency, the Debtors provided retirees with the opportunity to supplement the reduced amount of their Continuing Life Insurance benefits by enrolling in a voluntary life insurance program through MetLife.  By virtue of the supplemental program, Mr. Meder was fully eligible, at his own cost, to continue to be covered by the life insurance benefit at the same level as prior to the reduction in his Continuing Life Insurance benefits.

**(B)     The Retiree Servicing Center Letter Did Not Create A New Contract With Mr. Meder**

27.     In the Meder Response, Mrs. Meder has not provided any evidence that contradicts the Debtors' common practice of advising participants of the Debtors' Salaried Life Insurance Plan of the Debtors' right to amend or terminate the Continuing Life Insurance

benefits at any time.  Moreover, Mrs. Meder has not provided any evidence of an affirmative

contractual obligation on the part of the Debtors separate from the terms of Debtors' Salaried

Life Insurance Plan to permanently provide the same level of Continuing Life Insurance benefits

specifically to Mr. Meder.  The Retiree Servicing Center Letter refers to and describes a

"Continuing Life Insurance" benefit, which appearing as a capitalized term explicitly relates to,

and is one and the same with, the basic life insurance benefit provided to Debtors' retirees

pursuant to Debtors' Salaried Life Insurance Plan.  Mr. Meder should readily have recognized

"Continuing Life Insurance" as a defined term of the Debtors' Salaried Life Insurance Plan, of

which he would have been familiar by having read, over the past 47 years or more, employee

benefits handbooks and summary plan descriptions related to the Continuing Life Insurance.

Moreover, the Retiree Servicing Center Letter received by Mr. Meder directly refers to the

applicability of Debtors' Salaried Life Insurance Plan in prefacing eligibility for such Continuing

Life Insurance benefit (which had been reduced) on Mr. Meder's status as a "a retiree of General

Motors with 10 or more years of participation in the Life and Disability Benefits Program."

Therefore, the Retiree Servicing Center Letter clearly indicated that the Continuing Life

Insurance benefits were fully subject to the terms of the Debtors' Salaried Life Insurance Plan

and, as such, could not have been subject only to the terms set forth on the single page of the

Retiree Servicing Center Letter.  The Retiree Servicing Center Letter could therefore not serve to

have vested Mr. Meder in any new life insurance obligations on the part of the Debtors.

        28.     The Retiree Servicing Center Letter was not approved by the Board of

Directors of GM at any time.  It was not an authorized amendment of the Debtors' Salaried Life

Insurance Plan or modifications of the Continuing Life Insurance benefits.  The Retiree

Servicing Center Letter sent to Mr. Meder was merely a communication with Mr. Meder with

respect to a change in the benefit amounts of their Continuing Life Insurance pursuant to the terms of Debtors' Salaried Life Insurance Plan.

29.    The Retiree Servicing Center Letter was sent to Mr. Meder after his retirement, during a period which he was no longer providing services to the Debtors, and therefore cannot reasonably be construed as an inducement for Mr. Meder to provide new services to the Debtors, or to retire.  Indeed, Mr. Meder never used the provision of permanent, unalterable welfare benefits as a form of consideration inducing retirement.  Rather, even for employees who elected to participate in early retirement window programs (consideration for which was typically in cash), retiree medical, life insurance and all other welfare benefits would have been the same following retirement as for regular retirees.  Given such treatment, there would be no reason to provide any separate communication to window program participants with respect to their welfare benefits, such as a letter promising permanent lifetime benefits.

30.    The Retiree Servicing Center Letter does not contain any language establishing it as a new contract between Mr. Meder and his former employer.  To establish the Retiree Servicing Center Letter as such, under the standard of the Second Circuit, Mrs. Meder "must first identify 'specific written language that is reasonably susceptible to interpretation as a promise.'" *Devlin v. Empire Blue Cross and Blue Shield,* 274 F.3d 76, 103 (2nd Cir. 2001)(quoting *Joyce*, 171 F.3d at 134).

31.    The Second Circuit in *Devlin* discussed an example of language offering a benefit that could have been susceptible to induce employees to perform without having been negated by the employer's reservation of its right to amend or terminate the benefit (which Empire's pre-1987 summary plan description had not done) and that is reasonably susceptible to interpretation as a promise:

> Plaintiffs direct our attention to two sentences within the pre-1987 [summary plan description]s. The first provides that 'retired employees, after completion of twenty years of full-time permanent service and at least age 55 will be insured.' J.A. at 522 (emphasis added).    We believe that this statement can be reasonably read as promising such insurance so long as employees retire after age 55 and have provided full-time permanent service to Empire for at least twenty years.    This provision can be construed as an offer that specifies performance as the means of acceptance -- sometimes referred to as an offer for a unilateral contract -- and promises lifetime life insurance benefits upon performance.    Therefore, by 'performing' (that is, working for at least twenty years until attaining the age of 55), the plaintiffs accepted this offer. Restatement (Second) of Contracts 45(1) (1981). Where the offeror did not explicitly reserve the power to revoke, such an offer cannot be revoked once the offeree has begun to perform. See id. 45 & cmt. d ('The beginning of performance . . . completes the manifestation of mutual assent and furnishes consideration.').    Therefore, Empire's reliance on its 1987 [summary plan description], 'Your Handbook,' for its reservation of the right to modify the life insurance benefits is unavailing. We reject Empire's argument because after the plaintiffs began performance, pursuant to the pre-1987 [summary plan description]s, Empire was not free to revoke.  *Id*. at 84.

Contrary to the facts with respect to Empire's failure to reserve its right in pre-1987 summary plan descriptions to amend or terminate the life insurance benefit, the Debtors have had a long-term practice over at least the past 47 years, and most likely for an even longer period of time, to provide explicit notice in each of their summary plan descriptions of their right to amend or terminate life insurance benefits at any time.  Moreover, by the time that Mr. Meder had received the Retiree Servicing Center Letter in question, he had since retired and could no longer be induced to perform any services for the Debtors, nor be induced to retire a second time, and so, the contents of the applicable Retiree Servicing Center Letter could not have been susceptible to interpretation as a promise.

32.    Though Mrs. Meder has not made any such argument or suggestion, it cannot be said that Mr. and Mrs. Meder relied on the qualified statement made in the Retiree

Servicing Center Letter to his or her detriment.  In order to prevail on a claim of promissory

estoppel under ERISA in the Second Circuit, Mrs. Meder must establish:  "(1) a promise, (2)

reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is

not enforced."  *Aramony v. United Way Replacement Benefit Plan,* 191 F.3d 140, 151 (2d Cir.

1999) (quoting *Schonholz v. Long Island Jewish Med. Ctr.,* 87 F.3d 72, 79 (2d Cir. 1996).

Additionally, "an ERISA plaintiff must 'adduce[…] not only facts sufficient to support the four

basic elements of promissory estoppel, but facts sufficient to [satisfy an] 'extraordinary

circumstances' requirement as well.'"  *Aramony,* 191 F.3d at 151 (quoting *Devlin v. Transp.

Comms. Int'l Union,* 173 F.3d 94, 102 (2d Cir. 1999)).  The Second Circuit in *Devlin* cited that

"*Schonholz* provides an example of such extraordinary circumstances, where the employer used

promised severance benefits to induce the plaintiff to retire."  *Devlin,* 274 F.3d at 86 (quoting

*Schonholz,* 87 F.3d at 79-80).

      33.    With respect to the Continuing Life Insurance Claims, there was no

promise to provide permanent basic life insurance benefits at the same level where the Debtors

had provided explicit notice to Mr. Meder over the past 47 years or more, that they could amend

or terminate the basic life insurance benefits at any time (*i.e.*, in a manner discussed by

*Abbruscato*, *supra*).  Because there was no promise of a permanent benefit, there could be no

reliance on such promise.  It has been demonstrated that the Retiree Servicing Center Letter itself

did not create a separate obligation on the Debtors to provide a benefit separate from benefits

offered under Debtors' Salaried Life Insurance Plan, and as such, the Retiree Servicing Center

Letter in and of itself could not have created a promise nor could it have been susceptible to

interpretation as a promise.

34.     Nor were there any facts that may separately support the existence of extraordinary circumstances in the case of either the Retiree Servicing Center Letter or the reduction in 2009 of the Continuing Life Insurance.  Basic life insurance is a benefit that is commonly provided by employers on an unvested basis, and is accordingly assumed by most employees and retirees to be a benefit that could be lost at any time, absent an extraordinary circumstance, such as a separate, express contractual commitment.  With respect to the Continuing Life Insurance Claims, Mrs. Meder has not suggested any extraordinary circumstances with respect to the right to Continuing Life Insurance, such as receiving it as an inducement to enter into employment or to retire early.  No such extraordinary circumstance could exist where the Debtors have clearly and unambiguously represented to their employees and retirees over the past 47 years or more of their right to amend or terminate life insurance benefits at any time.  Moreover, at the time that Mr. Meder received the Retiree Servicing Center Letter and at the time that the Debtors provided notice in June 2009 to Mr. Meder of the reduction in their Continuing Life Insurance benefits, Mr. Meder had already retired and could therefore neither have been induced to perform (*i.e.*, in a manner discussed by *Devlin*, *supra*) or otherwise made to rely in any manner constituting an extraordinary circumstance.

## II.     Ongoing Benefits Have Been Assumed by New GM

35.     On the Closing Date, New GM completed its purchase of certain assets in accordance with the Master Purchase Agreement.  Pursuant to Section 6.17(e) of the Master Purchase Agreement (*Assumption of Certain Parent Employee Benefit Plans and Policies*), New GM assumed the plans specified in a disclosure schedule, and the Welfare Benefit Plans (including Debtors' Salaried Life Insurance Plan) are set forth on that schedule.  New GM assumed the obligation to provide the Welfare Benefits to the extent required to be provided under the terms of the applicable Welfare Benefits Plan in effect on the Closing Date, including

both responsibility for all claims incurred prior to the Closing Date and all future claims properly payable pursuant to the terms of the applicable Welfare Benefit Plan in effect when such claims are incurred.  Therefore, the Debtors and the GUC Trust do not have any liability with respect to Welfare Benefits (including the Continuing Life Insurance benefits) that have been assumed by New GM, and Mrs. Meder has not provided any credible factual or legal basis to suggest otherwise.

**The Meder Response**

**Claim No. 10370**

36.    On February 17, 2011, a non-substantive response was filed by Mrs. Meder to the Omnibus Objection at ECF No. 9293.  In the Meder Response, Mrs. Meder asserts that at the time of Mr. Meder's retirement, Mr. Meder was notified that he would have life insurance in the amount of $645,610.00 ($162,610.00 Continuing Life Insurance and $483,000.00 Supplemental Life Benefits) to be paid upon his death.  The Meder Response notes that, had such a promise not been made, Mr. and Mrs. Meder would have secured their own private policy, and that at the time of the chapter 11 filing of the Debtors, Mr. Meder's health precluded insurance being purchased (See Proof of Claim No. 10370 at **Exhibit 3** hereto, and the Meder Response at **Exhibit 4** hereto).

37.    In the Meder Response, Mrs. Meder does not provide any explanation for why the Retiree Servicing Center Letter she submitted as support for Proof of Claim No. 10370 should be read as ensuring the vesting of a benefit, rather than a mere acknowledgement by Mr. Meder's former employer of the reduction of a lifetime death benefit amount in accordance with the written terms of the applicable life insurance plan then in effect and subject to the plan sponsor's continuing right to change the terms of the life insurance plan, as discussed in more detail above.  As illustrated by the transcript of the Motors Liquidation Company hearing of

January 18, 2012 annexed as **Exhibit 5** hereto, this Court has in the past expunged a similar claim of a former employee based on the Debtors' modification of Continuing Life Insurance benefits.

38.     No additional documentation is provided in either the Welfare Benefit Claims or the Meder Response to support Mrs. Meder's opposition to the reduction of Mr. Meder's Welfare Benefits.  Further, the GUC Trust is not aware of any other documentation or facts supporting the Welfare Benefit Claims.

39.     The Meder Response does not provide any additional support for the Welfare Benefit Claims.  For the reasons set out above, the GUC Trust respectfully submits that the Meder Response should be overruled, and the Welfare Benefit Claims should be disallowed and expunged.

### Conclusion

40.     Because (i) ERISA recognizes that employers are free to amend or terminate welfare benefits, (ii) the Debtors had explicitly reserved their right to amend, modify or terminate the Welfare Benefits (including Continuing Life Insurance benefits) at any time, (iii) the Retiree Servicing Center Letter submitted by Mrs. Meder does not establish any contractual rights to vested Continuing Life Insurance benefits, and (iv) Mrs. Meder has not provided evidence of any permanent contractual right to vested Welfare Benefits (including Continuing Life Insurance benefits); the Debtors and the GUC Trust have no liability for the Welfare Benefits Claims (including Continuing Life Insurance Claims).  The GUC Trust reiterates that the Meder Response has not provided any legal or factual support for the Welfare Benefits Claims and the Continuing Life Insurance Claims, which cannot be afforded prima facie validity under the Bankruptcy Code.  Accordingly, the Welfare Benefits Claims and the Continuing Life Insurance Claims should be disallowed and expunged in their entirety.

41.     WHEREFORE, for the reasons set forth above and in the Omnibus

Objection, the GUC Trust respectfully requests that the Court grant the relief requested in the

Omnibus Objection and such other and further relief as is just.

Dated:  New York, New York
        May 21, 2012

                                        /s/ Joseph H. Smolinsky
                                        Harvey R. Miller
                                        Stephen Karotkin
                                        Joseph H. Smolinsky
                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007

                                        Attorneys for Motors Liquidation
                                        Company GUC Trust

## **Exhibit 1**

Pursuant to the terms of Debtors' Salaried Life Insurance Plan, and as fully

described to participants in summary plan descriptions of the plan, the Continuing Life Insurance

benefit was, upon retirement or age 65, subject to reduction in the case of all of the Debtors'

retirees eligible for such benefit depending on when the retiree retired, as follows:

(i)　　　Category I:  If the retiree's most recent date of hire (or adjusted service

date) was on or after January 1, 1993, the retiree was not eligible for a Continuing Life Insurance

benefit following retirement.

(ii)　　　Category II:  If the retiree's most recent date of hire (or adjusted service

date) was prior to January 1, 1993 and the retiree retired prior to May 1, 2007, the amount of the

retiree's Continuing Life Insurance benefit was to be reduced immediately upon retirement to an

amount equal to 1-1/2% for each year of the retiree's participation in Debtors' Salaried Life

Insurance Plan (*i.e.*, for each year of service to Debtors) times the amount of the retiree's basic

life insurance benefit in force immediately prior to retirement (but not less than $5,000), and

would be reduced an additional 50% on May 1, 2017 (but not less than $25,000).

(iii)　　　Category III:  If the retiree's most recent date of hire (or adjusted service

date) was prior to January 1, 1993 and the retiree retired on or after May 1, 2007, the amount of

the retiree's Continuing Life Insurance benefit was to be reduced immediately upon retirement to

an amount equal to the lesser of one times the retiree's annual base salary at the time of

retirement and $200,000, and would be reduced an additional 50% on the tenth anniversary of

the date of retirement (but not less than $25,000).

(iv)　　　Category IV:  If the retiree last worked on or after July 1, 1985 and prior

to January 1, 1994, the amount of the retiree's Continuing Life Insurance benefit was the amount

of the retiree's basic life insurance in effect immediately prior to the earlier of age 65 or

retirement to be reduced by 2% each month beginning on the earlier of age 65 or retirement,

which successive reduction would continue until the amount of the Continuing Life Insurance

benefit equaled the amount of basic life insurance in force immediately prior to when the amount

began to reduce times 1-1/2% for each year of the retiree's participation in Debtors' Salaried

Life Insurance Plan (*i.e.*, for each year of service to Debtors).

(v)    Category V:  If the retiree last worked prior to July 1, 1985, the amount of

the retiree's Continuing Life Insurance benefit was the amount of the retiree's basic life

insurance in effect immediately prior to age 65 to be reduced by 2% each month commencing at

age 65.

**Exhibit 2**

| | 169th Omnibus Objection to Claims (Welfare Benefits Claims of Retired and Former Salaried and Executive Employees) | | | | |
|---|---|---|---|---|---|
| No. | Proof of Claim No. | Response Docket No. | Name | Total Claimed | Summary |
| 1. | 10370 | 9293 | Meder, Robert | $635,610.00 (U) | Mr. Meder's surviving spouse's response asserts that at the time of his retirement, Mr. Meder was notified that he would have life insurance in the amount of $645,610.00 ($162,610.00 Continuing Life Insurance and $483,000.00 Supplemental Life Benefits) to be paid upon his death.  The response notes that, had such a promise not been made, claimants would have secured their own private policy, and that at the time of the chapter 11 filing of the Debtors, Mr. Meder's health precluded insurance being purchased. |

**<u>Exhibit 3</u>**

7137304

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor (Check Only One) | Case No |
|---|---|
| ☐ Motors Liquidation Company (f/k/a General Motors Corporation) | 09-50026 (REG) |
| ☐ MLCS, LLC (f/k/a Saturn, LLC) | 09-50027 (REG) |
| ☐ MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation) | 09-50028 (REG) |
| ☐ MLC of Harlem, Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc.) | 09-13558 (REG) |

**Your Claim is Scheduled As Follows.**

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case, but may be used for purposes of asserting a claim under 11 U.S.C. § 503(b)(9) (see Item # 5). All other requests for payment of an administrative expense should be filed pursuant to 11 U.S.C. § 503*

Name of Creditor (The person or other entity to whom the debtor owes money or property) ROBERT MEDER

Name and address where notices should be sent

ROBERT MEDER

1314 KINGS CARRIAGE RD.
GRAND BLANC, MI 48439

Telephone number 810-694-5197
Email Address ramedor1@aol.com

☐ Check this box to indicate that this claim amends a previously filed claim

Court Claim Number:_____
(If known)

Filed on _____

THE GARDEN CITY GROUP, INC.
OCT 15 2009

Name and address where payment should be sent (if different from above)

FILED - 10370
MOTORS LIQUIDATION COMPANY
F/K/A GENERAL MOTORS CORP
SDNY # 09-50026 (REG)

Telephone number

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case

If an amount is identified above, you have a claim scheduled by one of the Debtors as shown. (This scheduled amount of your claim may be an amendment to a previously scheduled amount.) If you agree with the amount and priority of your claim as scheduled by the Debtor and you have no other claim against the Debtor, you do not need to file this proof of claim form, EXCEPT AS FOLLOWS: If the amount shown is listed as DISPUTED, UNLIQUIDATED, or CONTINGENT, a proof of claim MUST be filed in order to receive any distribution in respect of your claim. If you have already filed a proof of claim in accordance with the attached instructions, you need not file again.

**1. Amount of Claim as of Date Case Filed, June 1, 2009:** $ 635,610

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4. If all or part of your claim is entitled to priority, complete item 5. If all or part of your claim is asserted pursuant to 11 U.S.C. § 503(b)(9), complete item 5

☐ Check this box if your claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2 Basis for Claim:** Insurance reduction - see attached
(See instruction #2 on reverse side )

**3. Last four digits of any number by which creditor identifies debtor:** 7614

**3a. Debtor may have scheduled account as.** _____
(See instruction #3a on reverse side.)

**4. Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Equipment ☐ Other
Describe

Value of Property $_____ Annual Interest Rate_____%

Amount of arrearage and other charges as of time case filed included in secured claim, if any: $_____

Basis for perfection: _____

Amount of Secured Claim: $_____ Amount Unsecured: $_____

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim

**7 Documents.** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary (*See instruction 7 and definition of "redacted" on reverse side.*)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING

If the documents are not available, please explain in an attachment.

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507(a).**
If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C § 507(a)(1)(A) or (a)(1)(B)

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C § 507(a)(4)

☐ Contributions to an employee benefit plan – 11 U.S.C § 507(a)(5)

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7)

☐ Taxes or penalties owed to governmental units – 11 U.S.C § 507(a)(8)

☐ Value of goods received by the Debtor within 20 days before the date of commencement of the case – 11 U.S.C § 503(b)(9) (§ 507(a)(2))

☐ Other – Specify applicable paragraph of 11 U.S.C § 507(a)(__)

**Amount entitled to priority:**

$

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

| Date: 10/13/09 | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any | FOR COURT USE ONLY |
|---|---|---|

Robert A. Meder    Robert A. Meder

*Penalty for presenting fraudulent claim.* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C §§ 152 and 3571
Modified B10 (GCG) (12/08)

**NATIONAL RETIREE SERVICING CENTER**
**LIFE INSURANCE COVERAGES AND AMOUNTS IN FORCE**

April 1, 2002

**NAME:  Robert Meder**
**SOCIAL SECURITY NUMBER: 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**
**CISCO:  19017**
**ESTIMATED RETIREMENT: 04/01/2002**
**ESTIMATED YEARS OF PARTICIPATION:  33 08**
**YEARS OF CREDITED SERVICE:  33 08**
**CURRENT BASE INSURANCE RATE:  13416.66**

| | | |
|---|---|---|
| BASIC GROUP LIFE INSURANCE | $ 322,000 | |
| ULTIMATE AMOUNT | $ 162,610 | reduced to 10,000 |
| POLICY  #14000-G | | |
| | | |
| OPTIONAL LIFE INSURANCE | $ N/A | |
| POLICY #23600-G | | |
| | | |
| DEPENDENT LIFE INSURANCE    SPOUSE | $ 25,000 | |
| POLICY #23950-G    CHILD | $ N/A | |
| | | |
| SUPPLEMENTAL GROUP LIFE INSURANCE | $ N/A | |
| POLICY #24390-G | | |
| | | |
| SUPPLEMENTAL LIFE BENEFITS PROGRAM | $ 483,000 | eliminated |
| | | |
| PERSONAL UMBRELLA LIABILITY INSURANCE | $ 5,000,000 | |
| | | |
| PERSONAL ACCIDENT INSURANCE    EMPLOYEE | $ 50,000 | |
| SPOUSE | $ 50,000 | |
| CHILD | $ N/A | |

THE AMOUNTS SHOWN ABOVE ARE ESTIMATES BASED ON YEARS OF PARTICIPATION,
CREDITED SERVICE AND BASE INSURANCE RATE AS OF THE DATE OF THIS DOCUMENT.
THESE AMOUNTS MAY CHANGE BECAUSE YOU ACCUMULATE ADDITIONAL YEARS OF
PARTICIPATION OR CREDITED SERVICE AND/OR MAY HAVE A BASE INSURANCE RATE
CHANGE.

**ALL INFORMATION PROVIDED IN THIS LETTER IS SUBJECT TO THE TERMS AND
CONDITIONS OF THE APPLICABLE GROUP POLICIES OR PROGRAM.  THESE POLICIES
ARE TERM INSURANCE AND HAVE NO CASH VALUE.**

Michelle A. Cavazos
Benefits Administrator
National Benefit Center

RSC/PRERET/PR7S (03/02/00)

Loss: 162610
+ 483,000
645,610
- 10,000
635,610



APS2080687249
00009299

**BALLOT #753**

PLEASE COMPLETE THE FOLLOWING

ITEM 1    **Amount of General Unsecured Claim.**  For purposes of voting to accept or reject the Plan, the undersigned holds a General Unsecured Claim against the Debtor listed below in the amount set forth below

| Claim Amount | $663,934 55 |
|---|---|
| Debtor | MOTORS LIQUIDATION COMPANY |

ITEM 2    **Vote on the Plan.**  The undersigned holder of a Class 3 General Unsecured Claim in the amount set forth in Item 1 above hereby votes to

Check one box          ☑  Accept the Plan

                       ☐  Reject the Plan

ITEM 3    **Acknowledgement and Certification.**  By signing this Ballot, the undersigned acknowledges that the undersigned has been provided with a copy of the Disclosure Statement, including all exhibits thereto  The undersigned certifies that (i) it is the holder of the General Unsecured Claim identified in Item 1 above and (ii) it has full power and authority to vote to accept or reject the Plan  The undersigned further acknowledges that the Debtors' solicitation of votes is subject to all terms and conditions set forth in the Disclosure Statement and the order of the Bankruptcy Court approving the Disclosure Statement and the procedures for the solicitation of votes to accept or reject the Plan contained therein

| | |
|---|---|
| Print or Type Name of Claimant | *Robert A. Meder* |
| Social Security or Federal Tax I D  No  of Claimant | 386 - 50 - 7614 |
| Signature | *Marilea Meder* |
| Name of Signatory (if different than claimant) | Marilea Meder |
| If by Authorized Agent, Title of Agent | surviving spouse |
| Street Address | 1314 Kings Carriage Rd. |
| City, State, and Zip Code | Grand Blanc, MI  48439 |
| Telephone Number | 810-694-5197 |
| E-mail Address | MarileaM1@aol.com |
| Date Completed. | Jan. 3, 2011 |

*Please check __one or both__ of the below boxes, if the above address is a change of address for the purpose(s) of*

☐ future notice mailings, **AND/OR**  ☐ distributions

JAN 11 2011
THE GARDEN CITY GROUP, INC.

01-11-11 P03 13 IN

5

1180 / Z 4

NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

# BUSINESS REPLY MAIL

FIRST-CLASS MAIL    PERMIT NO 18    DUBLIN OH

POSTAGE WILL BE PAID BY ADDRESSEE

THE GARDEN CITY GROUP, INC
ATTN  MOTORS LIQUIDATION CO  BALLOTING CENTER
PO BOX 9386
DUBLIN OH  43017-9957

Marilea Meder
1314 Kings Carriage Rd
Grand Blanc, MI 48439-8785

**<u>Exhibit 4</u>**

Hearing Date and Time: March 1, 2011 at 9:45 a.m. EST

Marilea Meder
1314 Kings Carriage Rd
Grand Blanc, MI 48439

Phone: 810-694-5197
E-mail: MarileaM1@aol.com

Surviving spouse of Robert A. Meder, retired salaried employee of General Motors, with
unsecured claim for life insurance benefits.
Claim No. 10370, Page 15, Exhibit A, Debtor's 169th Omnibus Objection to Claims

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------x
In re                                          :     **Chapter 11 Case No.**
                                               :
**MOTORS LIQUIDATION COMPANY, et al.,**        :     **09-50026 (REG)**
    **f/k/a General Motors Corp., et al**.  :
                                               :     **(Jointly Administered)**
       **Debtors.**             :
----------------------------------------------x

Response to the **NOTICE OF DEBTORS' 169TH OMNIBUS OBJECTION TO CLAIMS**,
dated January 26, 2011.

On behalf of my deceased husband, Robert A. Meder, I object to the attempt by Motors
Liquidation Co. and General Motors to avoid paying any money to the survivors of retirees who
had been promised life insurance benefits in retirement. (See attached letters dated April 1, 2002
and April 8, 2002.)

At the time of my husband's retirement on April 1, 2002, we were notified that he would have
life insurance in the amount of $645,610.00 ($162,610,00 Continuing Life Insurance and
$483,000.00 Supplemental Life Benefits) to be paid upon his death. Had we not been promised
coverage, we would have secured our own private policy. By the time of the GM bankruptcy,
my husband's health prevented us from being able to purchase any life insurance.

I respectfully ask the Court to order that my husband's claim be honored by Motors Liquidation
Co. and General Motors.

Dated:   Grand Blanc, MI
      February 14, 2011

                         *Marilea Meder*
                         Marilea Meder

*Court Clerk Copy*

**RETIREE SERVICING CENTER**
P.O. Box 5113
Southfield, Michigan 48086-5113
**1-800-828-9236**
1-800-872-8682
TELECOMMUNICATION DEVICE FOR THE DEAF

Apr 08, 2002

Robert A Meder
1314 Kings Carriage Rd.
Grand Blanc, MI 48439

Dear Robert A Meder:

As a retiree of General Motors with 10 or more years of participation in the Life and Disability Benefits Program, you are eligible for Continuing Life Insurance.

Our insurance records, as of the date of this letter, show the Continuing Life Insurance has now fully reduced to the ultimate amount of **$162,610.00**. This ultimate amount will remain in effect for the rest of your life and is provided by General Motors at no cost to you.

This is not a guarantee of the coverage amount.

**IMPORTANT: YOU SHOULD KEEP THIS NOTICE WITH YOUR OTHER VALUABLE PAPERS.**

If you have any questions regarding this letter, you may call toll-free, **1-800-828-9236** (Telecommunication Device for the Deaf 1-800-872-8682), during normal business hours, or write to the address above.

Always include this Social Security number, **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**, in all your correspondence.

**Retiree Servicing Center**

UA01

**NATIONAL RETIREE SERVICING CENTER**
**LIFE INSURANCE COVERAGES AND AMOUNTS IN FORCE**

April 1, 2002

**NAME: Robert Meder**
**SOCIAL SECURITY NUMBER: 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**
**CISCO: 19017**
**ESTIMATED RETIREMENT: 04/01/2002**
**ESTIMATED YEARS OF PARTICIPATION: 33 08**
**YEARS OF CREDITED SERVICE: 33 08**
**CURRENT BASE INSURANCE RATE: 13416.66**

| | | |
|---|---|---|
| BASIC GROUP LIFE INSURANCE | | $ 322,000 |
| ULTIMATE AMOUNT | | $ 162,610 |
| POLICY #14000-G | | |
| | | |
| OPTIONAL LIFE INSURANCE | | $ N/A |
| POLICY #23600-G | | |
| | | |
| DEPENDENT LIFE INSURANCE | SPOUSE | $ 25,000 |
| POLICY #23950-G | CHILD | $ N/A |
| | | |
| SUPPLEMENTAL GROUP LIFE INSURANCE | | $ N/A |
| POLICY #24390-G | | |
| | | |
| SUPPLEMENTAL LIFE BENEFITS PROGRAM | | $ 483,000 |
| | | |
| PERSONAL UMBRELLA LIABILITY INSURANCE | | $ 5,000,000 |
| | | |
| PERSONAL ACCIDENT INSURANCE | EMPLOYEE | $ 50,000 |
| | SPOUSE | $ 50,000 |
| | CHILD | $ N/A |

THE AMOUNTS SHOWN ABOVE ARE ESTIMATES BASED ON YEARS OF PARTICIPATION, CREDITED SERVICE AND BASE INSURANCE RATE AS OF THE DATE OF THIS DOCUMENT. THESE AMOUNTS MAY CHANGE BECAUSE YOU ACCUMULATE ADDITIONAL YEARS OF PARTICIPATION OR CREDITED SERVICE AND/OR MAY HAVE A BASE INSURANCE RATE CHANGE.

**ALL INFORMATION PROVIDED IN THIS LETTER IS SUBJECT TO THE TERMS AND CONDITIONS OF THE APPLICABLE GROUP POLICIES OR PROGRAM. THESE POLICIES ARE TERM INSURANCE AND HAVE NO CASH VALUE.**

Michelle A. Cavazos
Benefits Administrator
National Benefit Center

RSC/PRERET/PR7S (03/02/00)

**Exhibit 5**

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 09-50026-reg

5   - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   GENERAL MOTORS CORPORATION, ET AL.,

9

10                  Debtors.

11

12   - - - - - - - - - - - - - - - - - - - - -x

13

14                  United States Bankruptcy Court

15                  One Bowling Green

16                  New York, New York

17

18                  January 18, 2012

19                  9:49 AM

20

21   B E F O R E:

22   HON. ROBERT E. GERBER

23   U.S. BANKRUPTCY JUDGE

24

25

Page 2

1

2    Debtors' Eighty-Third Omnibus Objection to Claims (Welfare

3    Benefits Claims of Retired and Former Salaried and Executive

4    Employees) - Only Cobble Claim

5

6    Motion for Objection to Claim(s) Number:  70860 and 70869 Filed

7    by Tracy Woody and Motion Requesting Enforcement of Court

8    Orders Setting Deadlines to File Proofs of Claim

9

10   Motion of Post-Effective Date Debtors and Motors Liquidation

11   Company GUC Trust for Entry of Order Pursuant to 11 U.S.C.

12   Sections 105(A) and 1142(B) and Fed R. Bankr. P. 7012(B) and

13   9014(C)(I) Directing the Tullises to Dismiss the Debtors and

14   Their Attorneys from Pending Action with Prejudice; and (II)

15   Enforcing Prior Orders of this Court by Enjoining the Tullises

16   from Further Action Against the Debtors, Post-Effective Date

17   Debtors, Motors Liquidation Company GUC Trust, and Their

18   Officers and Professionals

19

20

21

22

23

24

25   Transcribed by:  Aliza Chodoff

Page 3

1

2    A P P E A R A N C E S :

3    WEIL GOTSHAL & MANGES LLP

4         Attorneys for Debtors

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:    JOSEPH H. SMOLINSKY, ESQ.

9

10

11   DICKSTEIN SHAPIRO LLP

12        Attorneys for the Motors Liquidation Company GUC Trust

13        1633 Broadway

14        New York, NY 10020

15

16   BY:    STEPHANIE GREER, ESQ.

17

18

19   ALSO PRESENT:

20        JOSEPH COBBLE, Claimant, In Pro Se (Telephonically)

21        CLINTON M. TULLIS, Claimant, In Pro Se (Telephonically)

22

23

24

25

Page 4

1                    P R O C E E D I N G S

2            THE COURT:  Have seats, please.  Okay.  General

3      Motors, Motors Liquidation.  I know of three matters that we

4      have disputed, and I sense we have some others that we need to

5      take care of even though there may not be opposition.  Mr.

6      Smolinsky, are you taking the lead?  You want to give me an

7      update on where we stand?

8            MR. SMOLINSKY:  Good morning, Your Honor.  Joe

9      Smolinsky of Weil Gotshal & Manges, for the Motors Liquidation

10     Company GUC Trust.

11           I believe this morning we have four matters on.  Two

12     of them relate to Tracy Woody.  I don't believe there are

13     other -- any other matters on the calendar.  I do not believe

14     that Ms. Woody signed up for CourtCall.  And rather than go in

15     the order of the agenda, to the extent that the Woody matter is

16     uncontested, perhaps we should start there.

17           THE COURT:  Um-hum.  Ms. Woody, are you on the phone?

18     No.  Anybody in the court here on behalf of Ms. Woody?  No.

19           MR. COBBLE:  (Indiscernible)

20           THE COURT:  Yes, Mr. Cobble.  If I'm not mistaken, you

21     have a pension or a welfare benefit related claim, which we'll

22     be dealing with shortly.  But before that, Mr. Cobble, I want

23     to deal with Ms. Woody if Ms. Woody is on the phone or

24     somebody's on on her behalf.  All right.  I hear no response.

25           Mr. Smolinsky, I think the brief on Ms. Woody was

GENERAL MOTORS CORPORATION, ET AL.

Page 5

1    submitted by Ms. Greer.  Are you going to be handing off to her

2    on that or --

3            MR. SMOLINSKY:  Yes, Your Honor.

4            THE COURT:  Okay.  Ms. Greer.

5            MS. GREER:  Good morning, Your Honor.  Stephanie Greer

6    from Dickstein Shapiro, on behalf of the Trust.

7            As you said, Your Honor, we're here on the Tracy Woody

8    claims this morning.

9            THE COURT:  Can you come closer to the microphone,

10   please, Ms. --

11           MS. GREER:  Sure.

12           THE COURT:  -- Greer?

13           MS. GREER:  It's always a problem.  Your Honor, we set

14   forth in the pleadings the basis for the objection to Ms.

15   Woody's claims.  Each of the claims were filed late; the first

16   two in accordance with the bar date order, and the second two

17   in accordance with this Court's order.  Ms. Woody's pleadings

18   haven't satisfied her burden of excusable neglect, and so I'm

19   happy to rest on our pleadings or answer whatever questions

20   Your Honor may have.

21           THE COURT:  Well, I read the papers, Ms. Greer.  Do

22   we -- not we -- do you have any understanding as to why she

23   blew the second bar date; the deadline I'd given her of thirty

24   days, but only did it by -- missed it by a few days?

25           MS. GREER:  Your Honor, I don't know.  And there's a

09-50026-mg   Doc 11739   Filed 05/21/12   Entered 05/21/12 17:36:01   Main Document
GENERAL MOTORS CORPORATION, ET AL.
Pg 43 of 78

Page 6

1    few facts that I would like to bring this Court's attention --

2    to this Court's attention before you make a ruling.  And the

3    first is that Ms. Woody did file an affidavit of service with

4    her second group of claims, which was dated February 5th.  The

5    deadline to file was February 7th.  Of course, the order says

6    it has to be received by the Court by the 7th.  We didn't

7    receive it -- or the trust, Garden City Group, didn't receive

8    it until the 10th.  So technically, the claims were late.

9          Ms. Woody has been nonresponsive to our request for

10   more information as to why the claims were late and to --

11   talking to her about potential resolution of the claims.  So we

12   were at sort of a loss to resolve them on our own, and that's

13   why we had to file these pleadings because the obje -- the

14   claims were technically late.

15         THE COURT:  She mailed it in time, but it wasn't

16   received in time?

17         MS. GREER:  That's right, Your Honor.  And while we're

18   on the subject, Your Honor, I -- with respect to the first

19   claims, there's also a slight factual issue I wanted to bring

20   to your attention.  As an officer of the court, despite the

21   fact that Ms. Woody hasn't raised it herself, and that is that

22   there was -- there is at least some question as to whether she

23   got actual notice of the original bar date order.

24         THE COURT:  I had that concern at the last hearing.

25         MS. GREER:  Yeah.  And we went back and looked at the

09-50026-mg    Doc 11739    Filed 05/21/12    Entered 05/21/12 17:36:01    Main Document
GENERAL MOTORS CORPORATION, ET AL.
Pg 44 of 78

Page 7

1    facts, and it looked like there was a package mailed to her

2    address.  However, upon looking at it even fur -- more closely,

3    it looks like there was a mistake in the way that the address

4    was -- somehow ended up on the envelope.  So I think there is

5    at least some question as to whether she had actual notice.

6        Now, Ms. Woody was involved in litigation with GM at

7    the time, and so it's certainly possible that she had actual

8    notice.  And I think based on the facts that we know likely

9    that she had actual notice.  But as far as the service, there's

10   certainly are some issues there that I wanted to bring to your

11   Court -- the Court's attention.

12       THE COURT:  Yeah.  If you had a commercial claimant, I

13   would throw this out at this point in the blink of an eye.  But

14   the additional fact that you brought my attention today, which

15   I hadn't picked up from the papers, about her having mailed it

16   before the deadline and just not having arrived at the time,

17   coupled with the lack of prejudice to the Motors Liquidation

18   estate on a very small claim of this size, it's a matter of

19   concern to me.

20       MS. GREER:  Your Honor, what we would ask -- and I

21   understand the Court's view, and we wouldn't object to deeming

22   the claims timely for the purpo -- for -- solely for this

23   purpose for Ms. Woody.  But what we would ask the Court to do

24   is reclassify the claims.  The claims are filed as secured

25   priority claims, which is part of why we haven't just been able

Page 8

```
 1   to resolve them.  These are claims that arose from an allegedly

 2   defective SUV, and so clearly they're unsecured claims.  So if

 3   the Court is inclined to allow them as -- or deem them timely

 4   filed, we'd ask that the Court reclassify the claims.  And that

 5   way we can just resolve them fully and finally.

 6          THE COURT:  Ironically, this is the exact same issue

 7   upon I was affirmed yesterday by Judge Buchwald in the district

 8   court on another person who had a car accident, who was trying

 9   to get secured status.  And Judge Buchwald agreed with me that

10   whatever it was, it wasn't a secured claim.  I think that's

11   very fair, Ms. Greer.

12          Settle an order in accordance with what you just said,

13   but additionally provide that it is ordered that she has to

14   respond to any existing settlement offers you have or tee up

15   her matter for ADR within a time certain -- you pick a

16   reasonable time.  You got a little bit of flexibility to do

17   that.  Failing which, her claim will be dismissed for lack of

18   prosecution.

19          MS. GREER:  Thank you, Your Honor.

20          THE COURT:  She's got to -- your willingness to not

21   throw her out is commendable, but she's got to do what it takes

22   to allow this case to move forward.

23          MS. GREER:  Understood, Your Honor.

24          One --

25          THE COURT:  Okay.
```

GENERAL MOTORS CORPORATION, ET AL.

Page 9

```
 1              MS. GREER:  -- more thing.  Ms. Woody did file a

 2    motion seeking sanctions against --

 3              THE COURT:  That's denied.

 4              MS. GREER:  Thank you.

 5              THE COURT:  On the papers.

 6              MS. GREER:  Thank you very much.

 7              THE COURT:  Oh, put a decretal paragraph in the order

 8    that says that in baby talk.

 9              MS. GREER:  Thank you.  Will do.

10              THE COURT:  Okay.

11              MS. GREER:  Your Honor, what Mr. Smolinsky points out

12    to me, and I think is consistent with my understanding as well,

13    I think the cli -- our client is inclined to allow the claim in

14    the full amount as long as it's allowed as an unsecured claim

15    in the interest of efficiency.

16              THE COURT:  Very good, okay.

17              MS. GREER:  Thank you, Your Honor.

18              THE COURT:  Make it happen then.

19              Back to you, Mr. Smolinsky.

20              MR. SMOLINSKY:  Thank you, sir.  The two remaining

21    matters:  we have the Tullis matter.  I'm not sure that I heard

22    Mr. Tullis on the phone, but I believe after speaking with him

23    yesterday he planned on attending.

24              THE COURT:  He's on my phone log.  Let's pause for a

25    second.  Mr. Tullis, are you on the phone?
```

09-50026-mg   Doc 11739   Filed 05/21/12   Entered 05/21/12 17:36:01   Main Document
Pg 47 of 78
GENERAL MOTORS CORPORATION, ET AL.

Page 10

1           MR. TULLIS:  Yeah.

2           THE COURT:  Oh, okay.  We're going to -- is it your

3    recommendation, Mr. Smolinsky, that we deal with Mr. Tullis'

4    claim next?

5           MR. SMOLINSKY:  Yes.

6           MR. TULLIS:  Don't talk too fast.  I can't hear

7    (indiscernible) my hearing aids (indiscernible).  Is this the

8    Honorable Robert E. Gerber, or is this (indiscernible)?

9           THE COURT:  This is the judge, Mr. Tullis.  My name is

10   Robert Gerber.

11          MR. TULLIS:  I appreciate that.  (indiscernible)

12   Okay, sir.  I appreciate that, and I'll do my best, but I am

13   hard of hearing and am wearing hearing aids.

14          THE COURT:  Okay.  Mr. Smolinsky, the lawyer for GM,

15   you may proceed.

16          MR. SMOLINSKY:  Thank you.  Clinton and Margaret

17   Tullis has been pursuing claims against General Motors

18   Corporation since 2008 relating to a 2004 motor vehicle

19   accident.  Our motion and reply describe a web of litigation

20   that -- in state and federal court that goes well beyond a

21   judicial determination that was previously made in state court

22   that his claims are barred by the statute of limitations.

23          We have tried to inform Mr. Tullis that his continued

24   litigation is in violation of the various orders of this Court,

25   including the bar date order, the plan of confirmation and the

09-50026-mg    Doc 11739    Filed 05/21/12    Entered 05/21/12 17:36:01    Main Document
GENERAL MOTORS CORPORATION, ET AL.
Pg 48 of 78

Page 11

1    exculpation provisions.  But in fact, Mr. Tullis continues to

2    file various papers and pleadings in state court in Washington.

3    Our understanding is that he might have filed additional

4    pleadings as recently as yesterday in those actions.

5         Our efforts to advise him of his obligations pursuant

6    to these bankruptcy court orders have not been met with a

7    response other than his attempts to assert claims not only

8    against General Motors Corporation, but also against my firm

9    and members and associates of my firm for bringing that to his

10   attention.  At this point, I would advise the Court that Mr.

11   Tullis did not file a proof of claim, although he did seem to

12   file copies of state court pleadings in this court with a

13   caption that references the Southern District of New York.

14        But we do not believe that that -- those pleadings

15   could rise to the level of a -- an informal proof of claim, and

16   they were not timely.  We attached to our papers parts of the

17   affidavit of service showing that both Margaret Tullis and

18   Clinton Tullis received actual notice of the bar date and

19   elected not to file claims in this court.

20        Your Honor, we would ask that you put an end to this

21   litigation and to enforce this Court's prior orders so that we

22   can continue to wrap up these estates.

23        THE COURT:  All right.  Mr. Tullis, I'll hear from you

24   now.  I read the papers.  There seems --

25        MR. TULLIS:  (indiscernible)

GENERAL MOTORS CORPORATION, ET AL.

1              THE COURT:  -- there seems --

2              MR. TULLIS:  Your Honor?

3              THE COURT:  No, okay.  Please.  One of the things you

4      have to understand, Mr. Tullis, is you can't interrupt me.  The

5      facts that Old GM lays out do not appear to be disputed.  And

6      they're very serious.  They show very serious violations of

7      bankruptcy law.  And while my in -- I'll hear what you have to

8      say.  And while my inclination isn't to throw you in jail or

9      recommend that you be thrown in jail or to have you fined right

10     now, it's to tell you that it's got to come to a stop right

11     here and now.

12             Now, I need you to help me as a matter of either

13     telling me that the facts that they put forward in their papers

14     aren't true, or, as a matter of bankruptcy law, why I shouldn't

15     enter an order saying you've got to stop.  Go ahead, sir.

16             MR. TULLIS:  Your Honor, (indiscernible) here in the

17     state of Washington (indiscernible) there's crimes committed.

18     I cannot (indiscernible).  And Margaret's had her problems

19     because of it, but not as much injury as I took.  And it's

20     something that you need (indiscernible), and you wouldn't want

21     to go through it, either.  And after I filed (indiscernible),

22     General Motors Corporation, telling them what the situation was

23     and that.  They went right out immediately and ordered better

24     steel for their vehicles.

25             They put it out for their framework, and it's much

Page 13

1   stronger steel.  And the same for the steering (indiscernible)

2   steering.  And they've sent me many papers out saying that they

3   thank me for bringing those things up so they can take care of

4   them and be proud of the vehicle that they manufacture.  So I

5   hope, again, together on this (indiscernible) Weil Gotshal &

6   Manges tell me that I'm committing a crime by proceeding with

7   my agenda they are off their -- up on the wrong trail.  Are you

8   there, sir?

9           THE COURT:  Yes.  I just didn't want to interrupt you.

10  Are you finished, sir?

11          MR. TULLIS:  Yeah.  Yes, sir.

12          THE COURT:  Okay.  Mr. Smolinsky, do you wish to

13  reply?

14          MR. SMOLINSKY:  While we are sympathetic with Mr.

15  Tullis' injuries and his wife's injuries, Mr. Tullis had his

16  day in court.  It was determined that he had no claim under

17  Washington State law.  His attempts to -- his attempts to

18  criminal law in order to expand the statute of limitations I

19  think evidences confusion on his part as to who can bring

20  criminal actions and prosecute them.

21          My first takes very seriously the allegations that

22  have been leveled against the firm and against individuals.  We

23  attached copies of our letter -- letters.  And as you can see,

24  sir, we did not allege any criminal activity of any kind but

25  were merely pointing out that there orders of this Court which

Page 14

```
 1    bar the very things that Mr. Tullis is considering.  I could

 2    see this spinning out of control.  And while we don't seek

 3    sanctions at this point, we very much as serious about the

 4    possibility of seeking sanctions in the future.

 5            THE COURT:  All right.  Okay.  I want you to have a

 6    seat for a second, Mr. Smolinsky.  Mr. Tullis, you're going to

 7    hear a couple of minutes of silence, and then I'm going to

 8    rule.

 9            MR. TULLIS:  Yes, sir.  Your Honor (indiscernible).

10    Okay.

11            THE COURT:  All right.  Just stand by, please.

12            All right.  Folks, in this contested in the jointly

13    administered cases of Motors Liquidation Company and its

14    affiliates, Motors Liquidation and the GUC Trust move for an

15    order protecting the debtors, the GUC Trust and their officers

16    and professionals from actions initiated by Clinton M. Tullis

17    and Margaret L. Tullis in violations on the Bankruptcy Code's

18    automatic stay.  The injunctions that have been previously put

19    in place and exculpation provision set forth in the debtors'

20    reorganization plan and in the order that I signed confirming

21    the reorganization plan.

22            For the reasons that follow, the debtors' motion is

23    granted.  Turning first to my findings of fact.  On January 17,

24    2008, the Tullises commenced an action against General Motors

25    Corporation in the Superior Court of the State of Washington
```

Page 15

1    for the County of Pierce.  The Pierce County Superior Court

2    dismissed that action with prejudice on April 4th, 2008,

3    finding that that Tullises' claims against the defendants were

4    barred by the applicable statute of limitations.

5           Following this dismissal, the Tullises attempted to

6    resurrect the action with motions to vacate and motions to show

7    cause, and each of these attempts was unsuccessful.

8           On June 1st, 2009, the debtors commenced the Chapter

9    11 case, which is now before me.  The debtors were represented

10   in the Chapter 11 case by the law firm of Weil Gotshal &

11   Manges, which I'll refer to as Weil.  Two weeks after the

12   debtors commenced the Chapter 11 case, the Tullises filed a

13   complaint in the U.S. District Court for the Western District

14   of Washington.  The district court complaint replicates the

15   complaint filed in the Pierce County Superior Court, but with

16   the additional handwritten notes that read "continuance of this

17   case" and "This case is removed from Pierce County Superior

18   Court to federal court; June 5" -- "15, 2009."

19          While the debtors say they were never served with the

20   federal district court complaint, the Tullises did send a copy

21   to the clerk of the bankruptcy court here, and the clerk's

22   office filed it on the debtors' public docket at entry number

23   1977 on June 19, 2009.  That same day, the Washington State

24   Federal District Court entered an order remanding the federal

25   action back to the Pierce County Superior Court.

1        On September 16, 2009, I signed an order establishing

2    November 30, 2009 as the deadline, which is sometimes known as

3    a bar date, for filing claims against the debtors.  The bar

4    date order was served upon the Tullises as indicated of Exhibit

5    D of the GUC Trust motion.  Despite notice of the bar date, the

6    Tullises failed to file any proofs of claim in the Chapter 11

7    case.

8        Notwithstanding full knowledge of the Chapter 11 case,

9    as evidenced, among other things, by their sending the clerk of

10    the bankruptcy court the earlier federal district court

11    complaint, the Tullises commenced yet another action against

12    the debtors on July 16, 2010, once more in Washington State

13    court, but this time in Washington State's Kings -- King

14    County.

15        On July 30, 2010, the debtors' attorneys sent the

16    Tullises a letter advising the Tullises of the bankruptcy and

17    the requirements of the automatic stay, which prohibits the

18    commencement or continuation of actions against any debtor that

19    could have or were commenced prior to such debtors' filing of a

20    petition for bankruptcy relief.

21        On December 30, 2010, the Tullises filed a revised

22    complaint in the federal district court in Washington, adding

23    Weil -- and two Weil attorneys as individual defendants,

24    seeking a five-million-dollar fine and/or criminal sanctions

25    against the Weil defendants.  Though debtors and the Weil

1   defendants were not made aware of the revised complaint until

2   it was filed in the bankruptcy court's docket at GM docket

3   entry 10299.

4          On March 29, 2011, I entered an order confirming the

5   debtors' plan of reorganization.  That confirmation order and

6   the underlying plan both include what are known as exculpation

7   provisions providing that neither the debtors, the GUC Trust,

8   nor their respective officers or professionals, which obviously

9   includes both the Weil law firm and the Weil attorneys, "shall

10  have or incur any liability to any holder of a claim or equity

11  interest for any act or omission in connection with, related to

12  or arising out of the Chapter 11 cases."  See paragraph 52 of

13  the confirmation order and Section 12.6 of the plan.

14         In addition, the plan provides for an injunction

15  against interference with the implementation or consummation of

16  the plan.  See Section 10.7 of the plan.  Both the plan and my

17  confirmation order reserved to this bankruptcy Court, that's

18  me, exclusive jurisdiction to consider matters arising out of

19  or relating to these Chapter 11 cases.  See paragraph 52 of the

20  confirmation order and Sections 11.1 and 12.6 of the plan.

21         Now, turning to my conclusions of law and certain

22  mixed findings of fact and law:  the Tullises' actions -- and

23  please listen to me, Mr. Tullis -- are in direct violation of

24  the automatic stay, my bar date order, the plan and my

25  confirmation order.  I will address each violation in turn.

GENERAL MOTORS CORPORATION, ET AL.

Page 18

1          Section 362(a) of the Bankruptcy Code provides that

2     the filing of a Chapter 11 petition serves as an automatic

3     stay.  Mr. Tullis, a stay is an injunction applicable to the

4     commencement or continuation of an action against the debtor

5     that was or could have been commenced before the petition date.

6     That's Section 362(a)(1) of the Bankruptcy Code.  The

7     pending -- please don't interrupt me, Mr. Tullis.  I'll give

8     you a chance to speak after I have announced my ruling, okay?

9     The pending King County action initiated by the Tullises in

10    July of 2010 over a year after the bankruptcy case was filed

11    clearly, very clearly, violates the automatic stay.

12         The King County action arises out of an automobile

13    accident that occurred sometime around 2003 or 2004 and the

14    subsequent surgery that was performed in 2005; all long before

15    the commencement of the Chapter 11 case.  The claims, if any,

16    are pre-petition claims.  And asserting them in an action,

17    especially one brought after the filing date, violates the

18    automatic stay.  The Tullises clearly knew of the debtors'

19    Chapter cases as early as June of 2009 when the clerk of this

20    bankruptcy court received documents from the Tullises that were

21    filed as docket entry number 1977 in the GM docket.

22         In any case, the debtors promptly notified the

23    Tullises and the King County Court of GM's bankruptcy and the

24    applicability of the automatic stay.  Because the King County

25    action was commenced in violation of the automatic stay, any

09-50026-mg    Doc 11739    Filed 05/21/12    Entered 05/21/12 17:36:01    Main Document
GENERAL MOTORS CORPORATION, ET AL.
Pg 56 of 78

Page 19

1    and all proceedings in that court are void.  They have no

2    effect.  And that action much be dismissed.  See, for example,

3    E. Refractories Company Inc. v. 48 Insulations Inc.; 157 F.3d

4    169 at page 172, a decision of the Second Circuit Court of

5    Appeals in 1998.  And while I find that the Tullises had actual

6    notice of GM's bankruptcy before they blatantly violated the

7    automatic stay, the law is that violations of the automatic

8    stay are void even without notice.  See for example, in re

9    Heating Oil Partners LP; 422 Fed Appendix 15 at page 18, a

10   decision of the Second Circuit, 2011.

11          Notice is, however, relevant to the bar date and the

12   filing of proofs of claim.  While it's undisputable that the

13   Tullises had notice of the bankruptcy case, because they were

14   sending the bankruptcy court notices since 2009 making explicit

15   reference to the Chapter 11 case, I further find that the

16   Tullises knew of the deadline for filing proofs of claim in

17   these cases because the address on the debtors' bar date list

18   matches the return address on the documents that the Tullises

19   mailed to the bankruptcy court.  But with notice of the bar

20   date, the Tullises failed to file a proof of claim.

21          Having filed -- having failed to file a proof of claim

22   prior to the bar date, the Tullises are barred from asserting

23   any claims against the debtor.

24          MR. TULLIS:  Your Honor?

25          THE COURT:  Just a minute, please, Mr. Tullis.

09-50026-mg   Doc 11739   Filed 05/21/12   Entered 05/21/12 17:36:01   Main Document
GENERAL MOTORS CORPORATION, ET AL.
Pg 57 of 78

Page 20

1          I further find that the Tullises have violated the

2     debtors' plan of reorganization and my order confirming the

3     plan.  The plan explicitly, that means clearly, enjoins

4     claimants from taking any actions that interfere with the

5     implementation or consummation of the plan.  And under the plan

6     and the confirmation order, people cannot go after the debtor's

7     officers and professionals, either law firms or human beings

8     working for those law firms with respect to any acts or

9     commissions -- or omissions, excuse me, connected with the

10    Chapter 11 cases.

11         I'm not going to move on beyond my official ruling.

12    And Mr. Tullis, I'm saying this very softly.  And I'm not

13    screaming, but you have to understand how serious I am about

14    this, and how serious what you did is.  You have violated the

15    Bankruptcy Code's requirements over and over again.  You have

16    violated my injunction over and over again.  You are very lucky

17    that the debtors aren't asking for sanctions, which is

18    punishment.  They're not asking for damages, and I'm not

19    imposing that.  But I'm telling you in the clearest terms I can

20    that you got to stop.

21         Now, I am not imposing sanctions.  I'm not referring

22    you to criminal charges.  I'm not making you write a check or

23    threatening to have you jailed, but I am saying it's got to

24    come to a stop.  And your contention that they're doing

25    something illegal and that you can ignore the requirements of

09-50026-mg   Doc 11739   Filed 05/21/12   Entered 05/21/12 17:36:01   Main Document
GENERAL MOTORS CORPORATION, ET AL.
Pg 58 of 78

Page 21

1   the Bankruptcy Code or my court orders is not in any way a

2   defense to what you've been doing.  If there is something

3   criminal, that's for the district attorneys or the U.S.

4   attorneys of the world to deal with, not you.  The police power

5   exception under the automatic stay does not apply to

6   individuals who think that they've been legally wronged in some

7   way.

8          The debtor is to settle an order in accordance with

9   what I just dictated.  Mr. Tullis, you're going to have a right

10  to appeal, but you will have only fourteen days to bring that

11  appeal.  The time for bringing that appeal will run from the

12  date of entry of the resulting order and not from the date of

13  this dictated decision.

14         Now, Mr. Tullis, I think several times you interrupted

15  me and you wanted to say something.  Now I'll let you speak.

16  Mr. Tullis, do you want to be heard?  Mr. Tullis?  Mr. --

17         MR. TULLIS:  Sir -- yes, Your Honor (indiscernible).

18         THE COURT:  Yes, sir, I am.  Do you want to be heard?

19         MR. TULLIS:  Well, now, I don't know.  I never knew

20  anything about an automatic stay.  But the rules or laws that I

21  know of here in the state of Washington states that I

22  (indiscernible) or find other means to (indiscernible), not any

23  criminal acts and when you committed a crime.  And when I sent

24  you a (indiscernible).  I don't want to do that.  I don't want

25  to see them do that.  And if they hit me with this automatic

Page 22

1    stay and bring it back here, then I'll immediately go down to

2    the governor, who's also -- has been an attorney for years, and

3    we'll see about proceeding with the dismissal of their

4    (indiscernible) rights selling vehicles in the state of

5    Washington.

6           THE COURT:  Mr. Tullis, I can't let you continue

7    anymore.

8           MR. TULLIS:  All right.

9           THE COURT:  I've let you speak and speak without

10   interrupting, but I can't let you speak anymore.  I have ruled.

11          MR. TULLIS:  (indiscernible)

12          THE COURT:  I have ruled --

13          MR. TULLIS:  (indiscernible) --

14          THE COURT:  -- deeming your remarks to be a motion for

15   reargument.  Reargument is denied.  If you still think my

16   ruling is an error, your remedy is in the appellate courts,

17   starting with the United States District for the Southern

18   District of New York.  With all respect -- and I've had many,

19   many consumers who felt very saddened by what happened to them

20   with their vehicles, and I feel their pain.  I really do, but

21   nobody before today, Mr. Tullis, has argued with me after I

22   have ruled.  And they have all understood that if they think

23   that I got it wrong they've got to go to the appellate courts.

24   And again, with all respect and sympathy, sir, that's what I'm

25   telling you that you need to do.

Page 23

```
 1            Now, we need to go on to the next matter.  CourtCall:

 2   Mr. Tullis can stay on the phone, or he can drop off as he

 3   prefers, but I'm directing you to put him on mute.

 4            UNIDENTIFIED SPEAKER:  Okay, Your Honor.

 5            THE COURT:  Thank you.  All right.  Mr. Smolinsky,

 6   next matter, please.

 7            MR. SMOLINSKY:  Thank you, sir.  Ms. Greer --

 8            MR. COBBLE:  (indiscernible)

 9            MR. SMOLINSKY:  Before I get -- begin, Ms. Greer has

10   asked to be excused.

11            THE COURT:  Of course.

12            MR. SMOLINSKY:  The last matter on the agenda --

13            THE COURT:  Mr. Smolinsky, we're still on the record

14   even though Mr. Tullis can no longer speak since we're done

15   with him.  I do of course want the order settled upon him so

16   that he can be heard on the form of the order.  And I want you,

17   even though you might not be required by law to do it, to send

18   him by overnight mail a notice of entry of the resulting order

19   so it is entered, so he is on notice of when his time to appeal

20   starts to run.

21            MR. SMOLINSKY:  Of course, sir.  And if we may, while

22   we do not suppose that Your Honor would be comfortable

23   directing the clerk of any other court to do anything, we would

24   like to send a copy of the transcript of this hearing to the

25   court where the actions are pending.
```

Page 24

    1              THE COURT:  You may do so.

    2              MR. SMOLINSKY:  Thank you, sir.

    3              The last matter on the calendar is the debtors'

    4    eighty-third omnibus objections to claim.  This is a claim

    5    seeking to expunge welfare benefit claims of retired and former

    6    salaried employees.  We are addressing today one claim filed by

    7    Joseph Cobble, Jr., which is a claim for life insurance --

    8              THE COURT:  Pause please, Mr. Smolinsky.

    9              MR. SMOLINSKY:  Yes.

   10              THE COURT:  Mr. Cobble, you are on the phone, and you

   11    announced your presence a long time ago.  CourtCall:  I want

   12    you to be sure that Mr. Cobble can speak and confirm that he is

   13    still on the line, or, Mr. Cobble, you can do that yourself.

   14              MR. COBBLE:  Yes, I'm still on the line.

   15              THE COURT:  Thank you.  Continue then, please, Mr.

   16    Smolinsky.

   17              MR. SMOLINSKY:  Thank you, sir.  Mr. Cobble filed a

   18    reply to that objection, which Your Honor should have.  And

   19    we -- just in terms of context, Your Honor has dealt with

   20    hundreds of employee claims in the past.  We have expunged

   21    claims.  We've had hearings on disputed claims objections.  We

   22    indicated to this Court in the past that there are certain

   23    instances in which employees have asserted that they've

   24    received letters or other correspondence that may alter the

   25    landscape in terms of Your Honor's ruling; although, we

1    expressed at the time our view that it didn't alter the law

2    with respect to your prior rulings.

3              but I want to put this into context because we are now

4    moving from plain vanilla objections, where Your Honor has, I

5    believe, asked the employees, where we had hearings, did you

6    receive any other documents or do you anything else that you

7    want to put before the Court, and the answer was no.  These are

8    situations where often times there have been correspondence

9    that these employees are relying on.

10             We file -- we did file a fifteen-page reply.  And

11   while Your Honor may think that that's overkill in connection

12   with the one-page response that was filed by Mr. Cobble, we

13   wanted to make sure that Your Honor had a full view and

14   understanding of our position with respect to all of these

15   related types of claims.  And we're happy to answer any other

16   questions surrounding this issue because before we set forth on

17   having hearings with respect to this new round of claims we did

18   go back and do substantial amount of research and consider and

19   review all of the correspondence that have submitted by the

20   various employees.

21             So that's by way of background.  Mr. Cobble attaches

22   to his response a letter that was received by him through the

23   General Motors Retirement Center, which was actually a

24   organization that was created by MetLife, who was administering

25   various retirement plans for General Motors.  And this letter,

09-50026-mg   Doc 11739   Filed 05/21/12   Entered 05/21/12 17:36:01   Main Document
GENERAL MOTORS CORPORATION, ET AL.
Pg 63 of 78

Page 26

1    according to Mr. Cobble, sets out a promise that his

2    entitlement to life insurance would not change.  I do point

3    your attention to the language beneath that statement that says

4    that the coverage is not guaranteed; although, we don't believe

5    that that really has any impact as well.

6          we believe that these -- this letter does not create

7    any separate entitlement to the employee plans that were in

8    place and that were all subject to the company's ability to

9    modify, amend or terminate those plans.  And that's language

10   which we set forth in the objections as well as in the reply,

11   as well as in the -- in other documents that were submitted and

12   circulated to employees from time-to-time.  That includes the

13   employee handbook that was circulated as well as summary plan

14   descriptions, which were updated every five years and sent out

15   to employees and retirees.

16         So regardless of receiving this letter, they would

17   have been on notice periodically of the debtors' obligation --

18   the company's obligation or right to amend, modify or terminate

19   the plans at any time.

20         We cite in our papers the Sprague case, which is a

21   case directly on point because it involves some of these very

22   issues surrounding the GM plans.  And the Court in that case

23   sets out clearly that the reservation of rights to amend,

24   modify or terminate the plans at any time is conclusive without

25   a separate agreement or contract that would vest those rights.

Page 27

1    And for those reasons, Your Honor, we believe that this letter

2    that was actually sent out after Mr. Cobble retired does not

3    alter the plan or the ability of the debtors to amend or

4    terminate the plan.

5           As Your Honor knows that -- this plan was amended to

6    bring down all employees' life insurance benefits to 10,000

7    dollars.  And New GM, under the master sale and purchase

8    agreement, agreed to assume that liability so that employees

9    could get and retirees could get the 10,000 dollars in cash

10   upon their death.

11          THE COURT:  Okay.  I'll hear from you next, Mr.

12   Cobble.  Make your remarks as you see fit.  But when you do so,

13   I need you to be sure that you discuss the Sixth Circuit Court

14   of Appeals case and Sprague v. General Motors.  And Mr.

15   Smolinsky, tell your associates -- although I think you signed

16   the reply --

17          MR. SMOLINSKY:  The Table of Contents?

18          THE COURT:  -- that I'm supposed to have a table of

19   cases so I don't have to leaf through something to find

20   references to the Sprague case --

21          MR. SMOLINSKY:  Your Honor, I did realize --

22          THE COURT:  -- and a table of contents --

23          MR. SMOLINSKY:  -- that when I reviewed on preparation

24   for the hearing.  And I apologize.  It won't happen again.

25          THE COURT:  All right, thank you.  Mr. Cobble.

09-50026-mg   Doc 11739   Filed 05/21/12   Entered 05/21/12 17:36:01   Main Document
GENERAL MOTORS CORPORATION, ET AL.
Pg 65 of 78

Page 28

1          MR. COBBLE:  Yes.

2          THE COURT:  I'll hear your argument now.

3          MR. COBBLE:  Okay.  Now, the other attorney did state

4    (indiscernible).  And when you retire, you go through an exit

5    interview, and you go through all the benefits.  You go through

6    the -- all the pension, any insurance, if it will be extended.

7    So I wasn't aware that this would be a continuing life

8    insurance policy.  It did have some influence on the fact that

9    I did accept the retirement.  I know that -- and I guess I

10   relied on the document.  The document states life insurance

11   (indiscernible) reduced to the ultimate amount (indiscernible)

12   dollars.  The ultimate amount will remain in effect for the

13   rest of your life.

14          I'm not an attorney, but I can give you an engineer's

15   point of view.  If the definition of reduced is to bring to a

16   certain state or condition, and the definition of ultimate is

17   preclusive or final, this document that I received from the

18   retirement center does not contain any reservation or right to

19   modify, much less terminate.  It states it will remain in

20   effect for the rest of your life (indiscernible).  So it did

21   have some affect on my decision, and the extended insurance

22   certainly something that I relied on.

23          As far as I'm concerned, I think that these decisions

24   are irrevocable (indiscernible) age, health and cost of

25   replacing (indiscernible).  And in fact, it does just the

GENERAL MOTORS CORPORATION, ET AL.

Page 29

```
 1    opposite.  It makes clear that the benefit is fully reduced and

 2    will remain in effect for the rest of my life.  And I guess

 3    (indiscernible).

 4         THE COURT:  Okay.  Thank you.  Mr. Smolinsky, do you

 5    wish to reply?

 6         MR. COBBLE:  Thank you, sir.  Your Honor?

 7         THE COURT:  Yes.  Thank you, sir.

 8         MR. SMOLINSKY:  Your Honor, the language in these

 9    retiree letters is unfortunate, I give you that, to the extent

10    that it led on any employees about what could or could not be

11    done with respect to the coverage.  I do note in this

12    particular letter that it says this is not a guarantee of the

13    coverage amount, and that's pretty clear on its face.

14         With respect to the reliance issue, I would note that

15    the Devlin case, which talks about promissory estoppel and

16    reliance, talk about the rel -- it not being incidental

17    reliance, but real reliance upon which the party acts or

18    changes their course.  And I guess the best example if you work

19    for the next ten years, we will grant you lifetime coverage.

20    In this case, the decision to retire was not based on this

21    letter.  This letter was sent out for information purposes, but

22    the benefits that were promised to him were consistent with the

23    plans that were in place, which all had this reservation of

24    rights language.

25         Mr. Cobble would have received a couple of years later
```

09-50026-mg    Doc 11739    Filed 05/21/12    Entered 05/21/12 17:36:01    Main Document
GENERAL MOTORS CORPORATION, ET AL.
Pg 67 of 78

Page 30

1    the new summary plan description, which would have had all of

2    the material rights to amend or terminate the benefits.  He

3    would have had in his possession, presumably, the employee

4    handbook and the last summary plan description that would have

5    this reservation of rights language.  So under the four-part

6    test that's set in Devlin, I don't believe that this letter

7    gives rise to the kind of reliance that the Devlin Court

8    considered.

9              THE COURT:  Okay.  Both sides -- have a seat, please,

10    Mr. Smolinsky.  Both sides sit in place for a couple minutes.

11         (Pause)

12             THE COURT:  All right.  Gentlemen, in this contested

13    matter in the jointly administered Chapter 11 case of Motors

14    Liquidation Company and its affiliates, the debtor, General

15    Motors Corporation or Old GM, moves to disallow and expunge Mr.

16    Cobble's claim.  For reasons that follow, the debtor's motion

17    must be granted, and Mr. Cobble's claim must be disallowed and

18    expunged.

19             Before I go into the legal reasons, though, and my

20    findings of fact, I do want to note something.  Perhaps it's

21    the obvious.  This matter is very different than the first one

22    on my calendar today.  Here, we do not have in any way, shape

23    or form an individual who has violated the requirements of the

24    Bankruptcy Code or has in any way acted improperly.  The issue

25    isn't about his wrongful conduct.  The issue ultimately is what

1   exactly his contract was with GM, which gave him the claim to

2   the life insurance that he seeks now.  And this is

3   unfortunately one of the many cases where GM simply not having

4   the resources to honor its earlier contracts caused it to amend

5   those contracts.  And the issue is whether or not GM had the

6   right to change the contract in the way in which it did.

7        As I'll continue to point out, in this case, GM's

8   contract with Mr. Cobble gave it the right to change his life

9   insurance coverage.  And therefore, although I recognize the

10  hardship on Mr. Cobble and of course hundreds, if not

11  thousands, of other employees who had to face the same

12  situation, I'm required to comply with the law.

13        So with that, turning first to my findings of fact:

14  on June 1st, 2009, the debtors commenced their Chapter 11 case.

15        On September 16, 2009, I entered an order establishing

16  a deadline for the filing of proofs of claim.  And Mr. Cobble

17  timely, that is in time, submitted a proof of claim for what he

18  seeks.  His proof of claim asserts a claim for 112,049 against

19  Old Gm for "loss for life insurance, salary, retiree."

20  Basically, what he's saying is that he's entitled to the

21  112,049 that would be payable upon his death under the old

22  level of life insurance that he had at times prior to the

23  commencement of the Chapter 11 case.

24        The debtors filed what are called omnibus, covering

25  many people, claims objections to eliminate claims lacking in

GENERAL MOTORS CORPORATION, ET AL.

Page 32

1    legal support.  They objected to Mr. Cobble's claim.  Mr.

2    Cobble filed a response, and the debtors replied.

3         In his papers, Mr. Cobble explains that he was

4    employed by Old GM for thirty-two years before he retired in

5    2002.  He explains that his claim if for continuation of an

6    earned and accrued benefit, to wit the continuing lifetime

7    coverage and the future payment at the time of Mr. Cobble's

8    death, of continuing life insurance benefits in the amount

9    122,049 pursuant to the debtors' "life and disability program."

10   Mr. Cobble further asserts that his benefit was acknowledged by

11   the debtor in a writing dated April 18, 2002, which writing Mr.

12   Cobble attaches to his response.

13        I note by way of clarification that, as Mr. Cobble

14   pointed out in his argument today, and this fact is undisputed,

15   the April 8th, 2002 letter came to him a few weeks after he

16   retired rather than before he retired.  The letter has three

17   significant paragraphs.  I'll revise my remarks to say four,

18   although I think the list, although Mr. Cobble relies on it, is

19   not quite as important as he says.

20        Those four paragraphs read, and I'll quote them

21   verbatim, "As a retiree of General Motors with ten or more

22   years of participation in the life and disability benefits

23   program, you are eligible for continuing life insurance.  Our

24   insurance records, as of the date of this letter, show the

25   continuing life insurance has now fully reduced to the ultimate

GENERAL MOTORS CORPORATION, ET AL.

Page 33

1    amount of $122,049.00."

2         "This ultimate amount will remain in effect for the

3    rest of your life and is provided by General Motors at no cost

4    to you.  This is not a guarantee of the coverage amount.

5    Important:  you should keep this notice with your other

6    valuable papers."

7         On December 31st, 2011, the Motors Liquidation Company

8    GUC Trust, which was formed under the debtors' plan of

9    reorganization replied to Mr. Cobble's response.  In that

10   reply, the GUC Trust argues that Mr. Cobble's claim must be

11   disallowed because his life insurance benefits were unvested

12   welfare benefits that could be modified under the plan terms

13   governing such welfare benefits and that they were properly

14   modified under those terms.

15        Now, turning to my conclusions of law and certain

16   mixed findings of fact and law:  a proof of claim is prima

17   facie evidence of the validity and amount of the claim, and the

18   objector bears the initial burden of persuasion.  See, for

19   example, in re Oneida Limited; 400 BR. 384, at page 389, a

20   decision by Judge Gropper of this court.  The burden then

21   shifts to the claimant, in this case that's Mr. Cobble, if the

22   objector produces evidence equal in force to the prima facie

23   case, which, if believed, would refute at least one of the

24   allegations that's essential to the claim's legal sufficiency.

25        When the burden is shifted back to the claimant, the

Page 34

1   claimant must then prove by a preponderance of the evidence

2   that under applicable law the claim should be allowed.  Here,

3   the objecting debtors have produced evidence at least equal in

4   force to the evidence provided by Mr. Cobble; thus, shifting

5   the burden back to Mr. Cobble.  And then, Mr. Cobble does not

6   satisfy his burden under the law.

7           First, I find that Mr. Cobble has not met his burden

8   to show that his life insurance have vested.  Rather, the

9   documents covering his life insurance reserved the right to

10  change its level.  In dealing with claims of Old GM retirees,

11  which were similar to Mr. Cobble's present claim, the Sixth

12  Circuit Court of Appeals in a case called Sprague v. General

13  Motors Corp.; 133 F.3rd 338, at page 400, explain that to "vest

14  benefits is to render them forever unalterable.  Because

15  vesting of welfare plan benefits is not required by law, an

16  employer's commitment to vest such benefits is not to be

17  inferred lightly.  The intent to vest must be found in the plan

18  documents and must be stated in clear and express language."

19          In their briefing, the debtors point to several

20  welfare plan summaries which include language explicitly

21  reserving the right to amend, modify, suspend or terminate

22  welfare benefits.  And I say by way of explanation that welfare

23  benefits are benefits that employers provide that include,

24  among other things, life insurance.  So life insurance was one

25  of the things that GM had reserved the right to change.  And

Page 35

1    when GM reserved that right, that became part of Mr. Cobble's

2    contract with Old GM, if you will.  So GM did something that it

3    was authorized to do.

4         Now, that was the state of play when Mr. Cobble

5    retired.  And the letter dated April 8, 2002 doesn't change

6    that result.  Mr. Cobble skipped the key sentence when he read

7    parts of the letter, but didn't read all of it.  He skipped a

8    sentence that said this is not a guarantee of the coverage

9    amount.  But with or without that extra clarification, the

10   terms under which Mr. Cobble worked didn't change over the

11   years that he was a GM employee.

12        Now, thirty-two years is a lot of years to work for a

13   company, and everything in the record indicates that this was

14   faithful employment.  And I understand why Mr. Cobble is upset,

15   and I understand it both from what Mr. Cobble said and what any

16   number of employees said back in June and July of 2009 when

17   this case was first filed.  And I have to deal with these same

18   issues.  It doesn't please me to have to rule that people have

19   to accept a lesser level of life insurance or medical benefits

20   that are subject to similar considerations.  But the fact is

21   that there were limited resources to take care of GM retirees.

22        The letter of April 8, which was sent to him after he

23   retired, explicitly stated it wasn't a guarantee of the

24   coverage amount.  In fact, it also told him of a reduction

25   in -- to his ultimate amount of continuing life insurance

GENERAL MOTORS CORPORATION, ET AL.

Page 36

1   coverage.  The fact that Old GM was able to reduce the ultimate

2   amount of his coverage at this time underscores a fundamental

3   point; that Old GM always had the right to modify the benefits.

4         While it's probably obvious, I make a few other

5   observations to provide greater clarity and for the avoidance

6   of doubt.  The letter of April 8 didn't create a new contract

7   between the debtors and Mr. Cobble.  He had already retired.

8   It can't reasonable interpreted as an offer to which Mr. Cobble

9   could accept, nor is there any evidence in that letter that it

10  includes language reasonably susceptible to interpretation as a

11  promise.  There was no evidence that Old GM promised Mr. Cobble

12  certain life insurance benefits to induce his retirement or

13  other action or inaction by Mr. Cobble.  See, for instance,

14  Devlin v. Empire Blue Cross and Blue Shield; 274 F.3d 76.

15        For those reasons, I am compelled to disallow Mr.

16  Cobble's claim, and I am authorizing and directing the debtor

17  to settle an order consistent with this decision.  The time to

18  appeal my decision will run from the date of entry of the order

19  rather than the date I'm dictating this.  And once more, Mr.

20  Smolinsky, I want you to serve notice of entry on the resulting

21  order in addition to the notice of settlement by an overnight

22  mail mechanism so that Mr. Cobble knows when his time to appeal

23  start to run.

24        Mr. Cobble, the time to appeal a bankruptcy court

25  order is quite short.  It's only fourteen days from the date of

GENERAL MOTORS CORPORATION, ET AL.

Page 37

```
 1   entry of the order.  So if you think about it and decide you do
 2   want to appeal, I want you to be aware of that short period of
 3   time.  Once more, I underscore in connection with this decision
 4   that unlike the first matter on the calendar, Mr. Cobble did
 5   nothing wrong.  But here, I am compelled to act in accordance
 6   with the law.  So while I'm not happy about having to rule this
 7   way, the claim is disallowed.
 8            Okay.  Mr. Cobble, I sense that you're an engineer and
 9   not a lawyer.  But not by way of reargument, because I have
10   ruled, I will answer any questions you might have if you have
11   any desire for a clarification.
12            MR. COBBLE:  I just have one further question, and
13   that's on a statement that this is not a guarantee of coverage
14   amount.  And in my point of view, I guess, guarantee in
15   coverage, I would say that is an expression of a future
16   happening.  This is a perspective and not a statement of fact,
17   and the rest of body of the letter, which states ultimately
18   reduced and the rest of your life to mean that it's just a
19   statement of fact.  But I understand your points of view, and I
20   certainly appreciate your time going through this.
21            THE COURT:  Very well.  Thank you.  And of course, I
22   appreciate your courtesy, sir.
23            All right.  With that, we're adjourned.  Everybody
24   have a good day.
25            MR. COBBLE:  Okay.
```

GENERAL MOTORS CORPORATION, ET AL.

Page 38

1            MR. SMOLINSKY:   Thank you, sir.

2            MR. COBBLE:   Thanks for your time, sir.

3        (Whereupon these proceedings were concluded at 11:02 AM)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 39

1

2                              **I N D E X**

3

4                              RULINGS

5                                              Page       Line

6    Motion Requesting Enforcement of Court Orders  8          12

7    Setting Deadlines to File Proofs of Claim

8    Granted as Modified

9

10   Motion Filed by Ms. Woody Seeking Sanctions    9          3

11   Denied

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 40

| Line | | | |
|---|---|---|---|
| 1 | | | |
| 2 | Motion of Post-Effective Date Debtors and | 14 | 23 |
| 3 | Motors Liquidation Company GUC Trust for | | |
| 4 | Entry of Order Pursuant to 11 U.S.C. | | |
| 5 | Sections 105(A) and 1142(B) and Fed R. | | |
| 6 | Bankr. P. 7012(B) and 9014(C)(I) Directing | | |
| 7 | The Tullises to Dismiss the Debtors and | | |
| 8 | Their Attorneys from Pending Action with | | |
| 9 | Prejudice; and (II) Enforcing Prior Orders | | |
| 10 | Of this Court by Enjoining the Tullises from | | |
| 11 | Further Action Against the Debtors, | | |
| 12 | Post-Effective Date Debtors, Motors | | |
| 13 | Liquidation Company GUC Trust, and Their | | |
| 14 | Officers and Professionals | | |
| 15 | Granted | | |
| 16 | | | |
| 17 | Mr. Tullis' Oral Motion for Reargument is | 22 | 15 |
| 18 | Denied | | |
| 19 | | | |
| 20 | Debtors' Eighty-Third Omnibus Objection to | 30 | 17 |
| 21 | Claims (Welfare Benefits Claims of Retired | | |
| 22 | And Former Salaried and Executive Employees) | | |
| 23 | - Only Cobble Claim Granted | | |
| 24 | | | |
| 25 | | | |

Page 41

1

2                        C E R T I F I C A T I O N

3

4     I, Aliza Chodoff, certify that the foregoing transcript is a

5     true and accurate record of the proceedings.

6

7

8

9

10    _____

11    ALIZA CHODOFF

12    AAERT Certified Electronic Transcriber CET**D-634

13

14    Veritext

15    200 Old Country Road

16    Suite 580

17    Mineola, NY 11501

18

19    Date:  January 19, 2012

20

21

22

23

24

25