Page 1

1  UNITED STATES BANKRUPTCY COURT

2  FOR THE SOUTHERN DISTRICT OF NEW YORK

3  Case No. 09-50026 (REG)

4  - - - - - - - - - - - - - - - - - - - - - -x

5  In Re:

6

7  MOTORS LIQUIDATION COMPANY, et al.,

8  f/k/a General Motors Corp., et al.

9

10               Debtors.

11

12  - - - - - - - - - - - - - - - - - - - - - -x

13

14               United States Bankruptcy Court

15               Southern District of New York

16               One Bowling Green

17               New York, New York  10004

18

19               April 26, 2012

20               9:45 AM

21

22  B E F O R E:

23  HON. ROBERT E. GERBER

24  U.S. BANKRUPTCY JUDGE

25

1   Hearing on Motion by Dr. Terrie Sizemore to GM's Enforcing 363

2   Sale Order

3

4   Debtors' One Hundredth Omnibus Objection to Claims (Claims

5   Relating to Former Employees Represented by United Auto

6   Workers)

7

8   Debtors' 10Ist Omnibus Objection to Claims (Claims Relating to

9   Former Employees Represented by United Auto Workers)

10

11  Debtors' I02nd Omnibus Objection to Claims (Claims Relating to

12  Former Employees Represented by United Auto Workers)

13

14  Debtors' 1 16th Omnibus Objection to Claims (Welfare Benefits

15  Claims of Retired and Former Salaried and Executive Employees)

16

17  271st Omnibus Objection to Claims (Pension Claims and Welfare

18  Benefits Claims of Former Salaried, Executive, or Hourly

19  Employees)

20

21  272nd Omnibus Objection to Claims (Welfare Benefits Claims of

22  Retired Employees and Former Salaried and Executive Employees)

23

24

25

Page 3

1    273rd Omnibus Objection to Claims (Claims Relating to Former

2    Employees Represented by United Auto Workers)

3

4    274th Omnibus Objection to Claims (Workers' Compensation Claims

5    in Retained States -Alabama)

6

7    275th Omnibus Objection to Claims (Workers' Compensation Claims

8    'in Retained States Oklahoma)

9

10   Motion for Objection to Claim(s) Number: 71249 filed by

11   Marjorie A. Creamer

12

13   Motion of Motors Liquidation Company GUC Trust for Limited

14   Modification of the Automatic Stay and the Plan Injunction as

15   to the Action filed by Don Verdina and Kelly Labunski,

16   Individually, and as Co-Special Administrators of the Estate of

17   Stephanie Verdina

18

19   Objection to Claims 44829, 70019 and 64854 (filed by Exide

20   Technologies, Relco Systems, Inc., and Roth Global Plastics,

21   Inc.)

22

23   Hearing on Objections to Claim Numbers 70180 and 70342 filed by

24   Betty Dalton and Sudie Venable

25

Page 4

1   83rd Omnibus Objection to claims - going forward as to Bellaire

2   response

3

4   89th Omnibus Objection to Claims - going forward as to Pierro

5   response

6

7   Motion by Dr. Sizemore for Entry of Order Pursuant to 11 U.S.C.

8   § 105 Enforcing 363 Sale Order and ARMSPA Ordering New GM to

9   Comply with Terms and Provisions and Motion for Sanctions (ECF

10  No. 10714)

11

12  Motion of Motors Liquidation Company OUC Trust for Limited

13  Modification of the Automatic Stay and the Plan Injunction as

14  to the Action filed by Don Verdina and Kelly Labunski,

15  Individually, and as Co-Special Administrators of the Estate of

16  Stephanie Verdina (ECF No. 11547)

17

18  Debtors' Eighty-Third Omnibus Objection to Claims (Welfare

19  Benefits Claims of Retired and Former Salaried and Executive

20  Employees) (ECF No. 6740)

21

22  Debtors' One Hundredth Omnibus Objection to Claims (Claims

23  Relating to Former Employees Represented by United Auto

24  Workers) (ECF No. 7102)

25

Page 5

1

2    Debtors' 101st Omnibus Objection to Claims (Claims Relating to

3    Former Employees Represented by United Auto Workers) (ECF No.

4    7103)

5

6    Debtors' 102nd Omnibus Objection to Claims (Claims Relating to

7    former Employees Represented by United Auto Workers) (ECF No.

8    7104)

9

10   Debtors' 116th Omnibus Objection to Claims (Welfare Benefits

11   Claims of Retired and Former Salaried and Executive Employees)

12    (ECF No. 8195)

13

14   Debtors' Eighty-Ninth Omnibus Objection to Claims and Motion

15   Requesting Enforcement of the Bar Date Orders (Late-Filed

16   Claims) (ECF No. 6996)

17

18   Debtors' 165th Omnibus Objection to Claims and Motion to

19   Enforce Bar Date Orders (Late-Filed Claims) (ECF No. 8847)

20

21   Objection to Proof of Claim No. 71249 filed by Marjorie A.

22   Creamer (ECF No. 11535)

23

24

25

Page 6

1    Objection to Proofs of Claim Filed by Exide Technologies, Relco

2    Systems, Inc. and Roth Global Plastics, Inc. (ECF No. 11536)

3

4

5    249th Omnibus Objection to Claims (Insufficient Documentation)

6    (ECF No. 10942)

7

8    271st Omnibus Objection to Claims (Pension Claims and Welfare

9    Benefits Claims of Former Salaries, Executive, or Hourly

10   Employees) (ECF No. 11539)

11

12   272nd Omnibus Objection to Claims (Welfare Benefits Claims of

13   Retired Employees and Former Salaries and Executive Employees)

14   (ECF No. 11540)

15   273rd Omnibus Objection to Claims (Workers' Compensation Claims

16   in Retained States - Alabama) (ECF No. 11543)

17

18   274th Omnibus Objection to Claims (Workers' Compensation Claims

19   in Retained States -Alabama) (ECF No. 11543)

20

21   275th Omnibus Objection to Claims (Workers' Compensation Claims

22   in Retained States -Oklahoma) (ECF No. 11544)

23

24

25

1    Claimants'' Motion to Enforce Settlement, for an Order

2    Compelling Two Stock Distributions and to Extend Time for

3    Filing Voluntary Dismissal of Injury Case and Notice of Hearing

4    by Richard Birdsall and Elise Birdsall (ECF No. 11591)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  MICHELLE GEORGE

25

Page 8

```
 1    A P P E A R A N C E S :

 2    WEIL GOTSHAL & MANGES, LLP

 3         Counsel for General Motors Company

 4         767 Fifth Avenue

 5         New York, NY 10153-0118

 6

 7    BY:   STEPHEN KAROTKIN, ESQ.

 8         DAVID M. GRIFFITHS, ESQ

 9

10

11    DR. TERRI SIZEMORE, Claimant

12

13

14    PRAFF & GILL, LTD.

15         One East Wacker Drive

16         Suite 3310

17         Chicago, IL 60601-1918

18

19    BY:   MICHAEL T. GILL, ESQ.

20

21

22

23

24

25
```

Page 9

1    DICKSTEIN SHAPIRO, LLP

2          1633 Broadway

3          New York, NY 10019

4

5    BY: STEFANIE BIRBROWER GREER, ESQ.

6

7    STEPHAN THEIS, Claimant

8

9    By Telephone

10

11   BETTY DALTON, In Propria Persona

12

13   SUDIE M. VENABLE, In Propria Persona

14

15   JOSEPH M. NEIMAN, Counsel for Creditor John Pierro

16

17   MARJORIE CREAMER, In Propria Persona

18

19   SHARON REYES, In Propria Persona

20

21   SARLOWER TIBBS, In Propria Persona

22

23   LINDA K. BELLAIRE, In Propria Persona

24

25

Page 10

1    RICHARD MCMANAMA, In Propria Persona

2

3    DON SIEFKES, In Propria Persona

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2         THE COURT:   All right.  General Motors/Motors

3    Liquidation Company.  We have quite a number of matters on

4    today's calendar, at least a couple of which will require

5    dictated decisions and at least one of which presents issues

6    that are more challenging than the remainder.

7              So, folks, I would like to move the two matters

8    involving the U.A.W. members and those that have Welfare

9    Benefits concerns to the end of the calendar.  As well as the

10   two tort claimants who, at least seemingly, did not get notice

11   of the Bar date and where I have the issue as to the

12   effectiveness of published notice of the Chapter 11 cases on

13   people who are outside of the business community.  So, aside

14   from that, however, I'm pretty flexible as to the order in

15   which we proceed.  I see that I have Dr. Sizemore's matter

16   first; I don't know if that's a preference of the Motors

17   Liquidation Estate and Dr. Sizemore, but I'm fine with hearing

18   that first if that's the way you'd like to proceed.

19              Mr. Karotkin?

20         MR. KAROTKIN:   Yes, Sir. Thank you. Stephen

21   Karotkin, Weil Gotshal & Manges for General Motors Company.  If

22   we could proceed with that first and then we can get it out of

23   your hair.

24              THE COURT:   Well, I've -- I'm happy to proceed with

25   it first, but I think on at least one of the matters that I

Page 12

1    need to have it at the end of the calendar.  I would feel

2    better about having you in the courtroom when I address it,

3    even though it's handled by your co-counsel.  Do you need to be

4    before another judge?

5              MR. KAROTKIN:   No, I just have an appointment at

6    12:30, if I could make that.

7              THE COURT:   I wouldn't think that would be a

8    problem.

9              MR. KAROTKIN:   Very well. Thank you, Sir.

10             THE COURT:   Okay.

11             Dr. Sizemore?  Come on up, please.

12             And, there have been a lot of things going back and

13   forth, but I think on this one, technically, Dr. Sizemore,

14   you're the movant.  So, why don't you begin when you're ready.

15             DR. SIZEMORE:   Okay.  I'm Dr. Size -- Dr. Terrie

16   Sizemore, and I appreciate your hearing today.  I'm not sure

17   that anything new will be revealed but I just wanted to, again,

18   state my position.  When I saw you on June 1, 2010, I realized

19   that I made a mistake -- an unintentional mistake of placing

20   General Motors Company on a product liability claim.  I

21   understood all of the issues surrounding that.  During that

22   hearing, you asked me for a legal basis, however, I realized

23   before I came that I didn't believe there was a legal basis for

24   me to place General Motors on the product liability claim.

25   Like I'd stated, it was an unintentional mistake.  During that

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 13 of 112

Page 13

1    hearing, Mr. Karotkin had stated to you that he understood that

2    I was in need of some discovery and disclosure of documents and

3    that General Motors was not opposed to that and that that did

4    not conflict with your order -- or it wasn't something that

5    your order would prevent me from availing myself to.  However,

6    at that end of the hearing you also included my actions for

7    discovery as being barred from my ability to pursue in Ohio.

8    And, that has been an issue that's been very confusing to me,

9    as well as, I don't believe that Mr. Karotkin has -- or Mr.

10   Popson in Ohio -- has presented a legal basis for -- to prevent

11   me from being able to ask General Motors for discovery or

12   disclosure.  I attended a hearing in the 9th District Court of

13   Appeals on January 10 of this year and the tribunal asked

14   Ohio's -- General Motors' Ohio attorneys how it could be

15   possible that General Motors was not --

16           THE COURT:   Forgive me, Dr. Sizemore. Folks, I'm

17   trying to hear Dr. Sizemore in the courtroom and noise on the

18   line for those who are listening in by phone, is interfering

19   with Dr. Sizemore's ability to be heard.  Court-call, would you

20   please put everybody else on mute until Dr. Sizemore's matter

21   is fully heard?  Dr. Sizemore, I'm sorry for their disturbing

22   you.  Continue, please.

23           DR. SIZEMORE:   That's okay. During the appellate

24   hearing at -- for oral argument with the 9th District, the

25   judges asked General Motors how it could be possible that they

General Motors Corp., et al.

Page 14

1    were barred from any questions that did not make absolute sense

2    to them.  There was no legal basis provided by General Motors'

3    Ohio attorneys.  The statement that was made at -- in court at

4    that time was that this court had rendered a decision barring

5    me from the discovery issues.  It appeared that the discovery

6    issues became an issue two years ago and even today when I

7    contended; because General Motors has given me some

8    information, but I contend that the information that they've

9    given me is not truthful.  And that would be based on the fact

10   that I was present during the inspection of my vehicle.  I have

11   photo documentation of a Class 2 malfunction and measurements

12   that were taken by the field investigator, as well as -- I've

13   read the report and the crash sequence isn't correct and the

14   data doesn't match the other data that was corrected.  So, the

15   issue for me is the truthfulness there, which then ended up

16   opening up an entire new avenue of concern for me legally based

17   on fraud or negligence by General Motors Company.  And after I

18   left you on June 1, 2010, General Motors Company supplied me

19   with the name of three parts suppliers, but no contact

20   information.  And since then, I have requested the contact

21   information for those parts suppliers to place them on a

22   product liability suit, but they have not provided that either.

23   So, I -- also -- an issue that come up in the Appellate -- in

24   the oral argument in the 9th District, was the fact that

25   General Motors Company had answered the complaint for my

Page 15

1    product liability issue, and I understand that I was completely

2    incorrect in listing them as a defendant on that claim,

3    however, I was very confused by General Motors in Ohio filing

4    an answer and then phoning me and saying: serve discovery

5    requests on General Motors, they will answer them.  And it

6    appeared that they just wanted to negate the action for

7    discovery that I was ordered to take them off of, which was

8    actually filed prior to the product liability case.  They have

9    been taken off of that, but I did review the questions that I

10   asked in that action for discovery and my understanding is,

11   just for the record, and I'm sure everyone's aware, that I

12   believe it's -- Ohio Revised Code 1701.01 states that if you're

13   a foreign corporation doing business in that state -- or my

14   State of Ohio -- that they do have to comply with all the rules

15   and all the laws in the state.  And they had 28 days to respond

16   to the complaint and we're out of rule there.  They were out of

17   rule on the action for discovery.  Twenty -- Revised Code

18   2317.48 and Ohio Civil Rule 34 allow me to ask for discovery.

19   I believe it's -- Ohio Revised Code 1345 et seq. allows for

20   consumer concerns to be addressed, especially by the Ohio

21   Attorney General's Office.  And I have not been able to do

22   anything without the information that I requested for them.  In

23   addition, during the hearing on January 10 to the tribunal on

24   the 9th District Court of Appeals, the -- when the judges asked

25   Ohio's -- GM's Ohio counsel: what law could possibly prevent

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 16 of 112

Page 16

1    General Motors from being asked any questions, they stated

2    emphatically: we have an order by the Federal Court.  And, I

3    understand that your order does prohibit me from a product

4    liability action, I do understand that.  However, General

5    Motors did not honor the stay that you issued, as well.  And I

6    did not understand that stay initially when you ordered it

7    because I never received a copy of your order.  So, I was

8    frightened that I was in contempt of your order and I would

9    never do that.  And, so that's why I wrote the motion to

10   withdraw.  And since I saw you on June 1, 2010, the Ohio

11   counsel has made repeated confusing petitions to the courts to

12   either dismiss my cases or my appeals, and, in doing so, they

13   have, I believe, intentionally concealed the actual details of

14   your order from the courts that we were involved.  And, I know

15   that the last time I spoke to you on July 13, 2011, there was

16   the issue of General Motors' New York counsel being required to

17   draft a motion -- a supplemental motion to have me withdraw

18   General Motors from the product liability case in Ohio.  And I

19   understand that that's what was required -- and I believe that

20   the attorneys involved did also, but I did not -- I was not

21   responsible for the 8 and a half month delay in them doing

22   that.  And the Ohio counsel, Mr. Popson, has repeatedly written

23   motions to dismiss or, in fact, in his -- one brief I believe

24   that I listed in one of my filings to you he says "However, new

25   GM wishes to make clear that it is not asserting that the

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 17 of 112

Page 17

1   Federal enforcement order is any way directed to this Court" --

2   meaning the court in Ohio -- "it should also be noted that this

3   appellate case, the action for discovery is not specifically

4   referenced in the Federal enforcement order, therefore, the

5   Federal enforcement order does not directly apply to this case"

6   -- there are multiple statements that have been made that I

7   don't feel were truthful or were actually in compliance with

8   what happened here.  And so all of that confusion, I think,

9   could have really minimized the delay and the confusion between

10  all parties and, you know, the courts being kind of frustrated

11  with me not going away and just forgetting the whole issue.

12  And as -- also, I have a separate issue -- well, part of the

13  issue on January 10 in front of the 9th District Court of

14  Appeals, was that General Motors emphatically stated that they

15  do not want to be presented with any legal requests for

16  discovery or disclosure and that's why they were opposed to me

17  replacing John Doe defendants and I believe that I was entitled

18  to do that and even though it's been longer than a year since I

19  filed that action, that the Federal stay and the appeal

20  process, I believe, suspend the time of the year-long that I'm

21  permitted to substitute John Doe defendants.  And I couldn't

22  understand exactly how to proceed next so I decided that I

23  thought it would be intelligent of me to approach the company

24  called ESIS, that is their third-party administrators for

25  product liability issues, and do an action for discovery with

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 18 of 112

Page 18

1    them.  And when I did that -- which is not a lawsuit, it is

2    merely questions -- Ohio, GM's Ohio counsel drafted a motion

3    for sanctions against me for doing that.  And, in his motion

4    for sanctions, which was denied by the Judge, Mr. Popson lists

5    each and every case that I had filed and emphasized how it had

6    failed and I understand that, there had been some confusion for

7    me, it wasn't intentional, I wasn't attempting to embarrass

8    anyone or be a pain in anyone's rear area.  It -- they were

9    just sincerely either misunderstanding procedure or trying to,

10   quote, get it right.

11          Anyway, I have a separate issue with my mortgage

12   company in the county that I live in, and even though it's

13   unrelated to the General Motors case, I understand, there is an

14   attorney in that county that is attempting to consider me

15   vexatious, which I find disturbing and -- but the point that

16   I'm trying to bring to the Courts' attention at this moment is

17   that this attorney, when he makes his claim, which I need to

18   respond to when I get back to Ohio, he lists different types of

19   cases that I have been involved in and reasons for some of the

20   -- them not actually -- some of them have worked out well for

21   me and some have not, so -- but he does it in the exact same

22   style that Mr. Popson does.  I don't believe that GM's New York

23   attorneys had any conversation or input in this but I think

24   that, even though Mr. Popson has denied that he has any --

25   participated in any way in attempting to utilize another

09-50026-mg    Doc 11753    Filed 05/16/12    Entered 05/24/12 13:22:54    Main Document
General Motors Corp., et al.
Pg 19 of 112

Page 19

1   attorney in another county to affect my litigating against

2   General Motors, there's the appearance in the documents that

3   General Motors' attorneys have had a part in that.  And I can't

4   prove that but I think that it had gotten to the point  where

5   it is fairly serious and I'm not a prison inmate just filing

6   random lawsuits against prison guards, which is what I

7   understand part of the vexatious litigation statute was created

8   for in Ohio.  But I think that the issued -- the two issues at

9   hand here are some of the conduct and the statements that have

10  been made, particularly by Mr. Popson in the Ohio courts, I

11  didn't find correct or truthful.  And they've impeded justice

12  in the whole process of getting it all clarified.  And as well

13  as I really do believe that the law allowed me to ask General

14  Motors the questions.  General Motors was required by your

15  order, I believe, to retain all of the information, and they

16  have.  They have been petitioned for information by other

17  parties besides me regarding my vehicle.  Key codes or build-

18  sheets to say where sensors are, and those things have not been

19  provided to me directly; they've been denied me directly by

20  General Motors.  But I am aware that they do possess all of the

21  information that the corporation had and I'm -- I just contend

22  that the law allows me to have that information and that your

23  order actually allows me to have that information.

24          And I think that's all I need to put on the record

25  today.

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 20 of 112

Page 20

1          THE COURT:   Very well.   Thank you.   Mr. Karotkin.

2          MR. KAROTKIN:    Thank you, Your Honor. Stephen

3     Karotkin, Weil Gotshal & Manges for General Motors Company.

4          Your Honor, we understand that Dr. Sizemore is

5     appearing Pro Se, she's been here a number of times.   I think

6     that a couple of things are absolutely clear, like -- there is

7     nothing confusing, Your Honor, about your July 14, 2001 -- 2011

8     order, which is very specific in directing what Dr. Sizemore

9     must do, including ceasing all discoveries and as reflected on

10    the record, which is set forth in our papers, you are quite

11    definitive about what was to take place subsequent to that

12    hearing and that's quoted at length in our papers.   And you, in

13    fact, required that the order provide that the word discovery,

14    again preventing discovery, be in bold-face to make it

15    absolutely clear that that was not to continue.   There was

16    nothing confusing about that and there's nothing confusing

17    about the fact that if you, as I'm sure you have, Your Honor,

18    read her motion that's on today with respect to enforcing the

19    asset purchase agreement.   She lists something like 19

20    discovery requests.   And it is also my understanding that

21    actions for discovery continue to be prosecuted in the State of

22    Ohio and, to use your words, Your Honor, again back -- last

23    year in July, quoting you "enough is enough" -- and that's all

24    we want, enough is enough once and for all to be finished with

25    this so that people can move on and stop spending money on this

Page 21

1   matter.  This is, I think, the third or fourth time we've been

2   here on the same thing and, as I said, there is nothing

3   confusing about your ruling.  We would ask that it be enforced

4   once and for all and we'd be finished with this.  Thank you.

5           THE COURT:  Very well. Dr. Size more, I'm going to

6   give you an opportunity to reply if you choose to, but I need

7   to tell you before you do, if you choose to do that, that the

8   purpose of reply is to deal with new stuff since the first time

9   you spoke.  So, I'll hear any reply but it has to be limited to

10  what Mr. Karotkin told me now. Anything that he said that you

11  disagree with or that you want to ask me to focus on.

12          DR. SIZEMORE:  I appreciate that.  I'm Dr. Sizemore,

13  again.  Mr. Karotkin is correct in saying there's an action for

14  discovery in Ohio but it's not against General Motors.  I did

15  dismiss, on January 14, after our -- it may be January 13,

16  after our verbal discussion on the phone when you again ordered

17  me to take them off of the action for discovery.  I dismissed

18  that appeal in Ohio.  The appeal does not exist.  I do contend

19  that I think was unfair to me but I did obey your order.  The

20  action for discovery in Ohio at this point is against E-sist,

21  which I asked you on February 3, 2010 about that party and you

22  said they were not a party to the bankruptcy issue and that's

23  the only action for discovery that there is.  They just plain

24  and simply don't want to provide the information and I contend

25  that I'm entitled to that.  Thank you.

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 22 of 112

Page 22

1              THE COURT:   All right.  Thank you.

2              Ladies and gentlemen, the matter that's before me

3    involved two separate but related issues.  The first is the

4    motion by Dr. Sizemore to enforce the sale order, which, in the

5    respects relevant here, involves her desire for me to rule that

6    her efforts to get discovery in Ohio in aide of the litigation

7    she wishes to bring -- be assisted by my ordering and in

8    substance saying that's okay.  Related to that, at least by

9    implication, is the request that I reiterate my earlier rulings

10   requiring Dr. Sizemore to cease everything that is going on in

11   Ohio.  That being a reprise of proceedings we had that led to

12   my order of July 14, 2011.  I am dealing with these in a bundle

13   because I do not believe that they can appropriately be

14   separated.  And the bottom line of my rulings is that Dr.

15   Sizemore's motion, in a sense on offense, against GM, and this

16   involves both new GM and old GM, is denied.

17             GM's motion, in so far as it can be asked, that I

18   impose more draconian sanctions on Dr. Sizemore, is denied

19   without prejudice, to give her one last opportunity to comply

20   with my earlier orders.  And also, because I believe there is

21   another way to skin the cat, which will avoid the stand-off

22   that we now have and which, with a little extra due process, I

23   think is the best way to deal with this.  And the following are

24   my findings of fact, conclusions of law and basis for the

25   exercise of my discretion in this regard.  Because there are so

1   many people waiting to be heard today, I'm not going to

2   reiterate all of the facts.  The most significant are that I

3   entered an order on July 14, 2011 requiring Dr. Sizemore to

4   cease her litigation in Ohio, against each of old GM and new

5   GM, and that it was my intention when I did so, to cover not

6   just those entities by name, but also their agents.  At the

7   time, we expressly discussed whether discovery, vis-à-vis

8   potential claims, was also encompassed besides efforts to

9   actually get money judgments.  I ruled then that discovery was

10  so encompassed and indeed. And something that I have done only

11  once in the 11 and a half years that I have been a judge: I

12  provided that that order would add the words including

13  discovery and be bold-faced so there could be no

14  misunderstanding as to that.  As Mr. Karotkin contended in his

15  argument before me today, there was nothing ambiguous about

16  what my orders said.  I will recognize, however, that because

17  it might have led to questions as to whether that would also

18  apply to agents of the debtors, I am not of a mind now to

19  enforce a sanction against Dr. Sizemore any more than I was

20  then.  Frankly, folks, I think it is getting vexatious now.  I

21  did indeed say, and I meant it when I said it, folks, that

22  enough is enough.  But I don't want to take it out of Dr.

23  Sizemore's hide, I just want compliance with my orders.  Dr.

24  Sizemore previously had referred to her confusion.  I'm willing

25  to take her at her word and say that she was confused, but I

General Motors Corp., et al.

Page 24

1    will say as much as I need to now to bring the confusion to an

2    end.  I am denying the motion that Dr. Sizemore made because

3    she isn't entitled to anything more and that it is, in

4    substance, asking me for stuff that I have declined to grant at

5    least twice, although people can debate as to whether even more

6    rulings should have caused her to come to that view.

7              As far as the GM entities are concerned, I am going

8    to authorize new GM and old GM, if they wish, to submit to me a

9    supplemental order, consistent with these rulings, one of which

10   provisions may provide in substance, if they want, that my

11   order also extends to any of their agents; so there is no

12   misunderstanding in that regard.

13             Now, as I said, I don't want to take this out of Dr.

14   Sizemore's hide, but I want compliance with my orders.  My

15   order of July 14, 2011 required Dr. Sizemore to do anything and

16   everything necessary to bring the Ohio litigation to an end.

17   That hasn't been done.  I have no doubt that I could enter a

18   contempt order and, as harsh as this might be for an

19   individual, as contrasted to a corporation, I could impose a

20   monetary penalty of "x" dollars a day until that gets done.

21   Frankly, folks, I don't want to do that.  What I am going to do

22   instead is give Dr. Sizemore two calendar weeks from today to

23   bring everything in Ohio to a halt.  Insofar as it effects old

24   GM, new GM or the agents of any of them.  Remember, folks, by

25   the way, that the reason that there was a delay in my ordering

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 25 of 112

Page 25

1    Dr. Sizemore simply to dismiss, was not because her efforts

2    were in any way proper, but because at the very early stages

3    here, the Campbell were appealing the underlying 363 order,

4    insofar as it dealt with successor liability and I thought

5    there was a chance that the appellate courts might not agree

6    with me on that.  When the appellate courts did agree with me

7    on that, I gave GM the right to convert a stay of those

8    proceedings to a dismissal of those proceedings.  We also need

9    to remember, as I would hope everybody would, that the exact

10   issues involving the propriety of discovery were addressed by

11   Judge Marrero in the written opinion he issued.  So, we're

12   talking now about rulings, not just from me, but by Judge

13   Marrero of the District Court.  Now, I've said that the Ohio

14   litigation must be dismissed within two weeks of this date.

15   There is a little-known rule of the Federal Rules of Civil

16   Procedure called Rule 70.  And it does not normally apply in

17   contested matters, but bankruptcy judges have the right under

18   the Federal Rule of Bankruptcy Procedure 9014 to make that

19   applicable and I am today ordering that if no objection is

20   filed within that same two weeks, I am going to be ordering

21   under my authority under Rule 9014 to make Rule 70 applicable

22   and contested.  Rule 70(a) provides -- and Rule 70 is called

23   "Enforcing A Judgement For A Specific Act" -- "a. Party's

24   failure to act, ordering another to act. If a judgment requires

25   a party to convey land, to deliver a deed or other document or

Page 26

1   to perform any other specific act and the party fails to comply

2   within the time specified, the Court may order the act to be

3   done" -- dash -- "at the disobedient party's expense" -- dash -

4   - "by another person appointed by the court. When done, the act

5   has the same effect as if done by the party" -- Unless there is

6   a timely objection made to me within those two weeks, Rule 70

7   will apply and if performance is not forthcoming, counsel for

8   old GM, new GM or the GUC Trust, is going to be authorized,

9   under Rule 70(a), to file any and all dismissals appropriate in

10  the Ohio Courts to bring this matter to an end.  Now, I said

11  back in July 2011 that enough is enough and I feel the same way

12  now, folks.  I've spoken softly about this but let's not have

13  any misunderstandings; just because I'm speaking softly,

14  doesn't mean that I'm not upset about this.  I expect my orders

15  to be complied with.  I am not imposing any monetary sanctions

16  at this time, but I expect my order to be complied with.  Not

17  by way of re-argument, are there any questions from either

18  side?  I want no more confusion here.  Hearing none, I'll take

19  the next matter.

20          MR. GRIFFITHS:   Your Honor, good morning.  David

21  Griffiths, Well Gotshal & Manges, the debtors, the post-

22  effective date debtors and the Motors Liquidation Company, GUC

23  Trust.  And the matter on the agenda this morning is item

24  number two, the motion of the GUC Trust for a limited

25  modification of the automatic stay in the planning junction for

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 27 of 112

Page 27

1   an action filed by Don Verdina and Kelly Labunski,

2   individually.  In this case, Special Administrators of the

3   Estate of Stephanie Verdina.  Your Honor, this morning we have

4   Michael T. Gill, of Lewis B. Kaplan in court with us today.

5   He'll be representing the claimants.

6          Your Honor, if I may give a brief background to the

7   claim.  This is an action arising out of the tragic death of

8   the claimants young daughter in a motor vehicle accident.

9          THE COURT:  Mr. Griffiths, would you pull the

10  microphone close to you please?

11         MR. GRIFFITHS:  Yes, Your Honor, of course.

12         THE COURT:  And I do need to interrupt you for a

13  minute.  I'm not clear from what you said whether anybody who

14  is on the phone is going to want to be heard on this.  I do

15  want court-call to allow any such person to be heard, if there

16  is any such person.

17         MR. GRIFFITHS:  Your Honor, I've asked my colleague

18  to handle the mediation of this matter to be on the telephone

19  today, but I don't anticipate him to have to speak.  I've been

20  fully briefed on the matter and I have Mr. Kaplan here, who

21  will be representing the claimants.

22         THE COURT:  Okay.

23         MR. GRIFFITHS:  Thank you, Your Honor.

24         So, the plaintiffs commenced an action in The Circuit

25  Court of Winnebago County against an Illinoisan in January 15,

Page 28

1    2009 against GM.  Another party to Takata Seat Belts Inc., a

2    manufacturer of seatbelts, were added to that case March 12,

3    2009.  Upon the filing of General Motors' bankruptcy, that case

4    was severed with the case against Takata Seat Belts, scheduled,

5    I understand, from claimants' counsel, for either late December

6    of 2012 or early 2013.  The plaintiffs' timely filed proof of

7    claim 134 in the general unsecured claim amount of $5 million

8    on June 17, 2009 and on February 23, 2010 this court, or Your

9    Honor, entered the ADR Order and ADR Procedures.  Pursuant to

10   the ADR Procedures, General Motors, or the debtors and the

11   claimants entered into mediation to try to settle the claim.

12   That mediation took place on October 7, 2011.  Unfortunately,

13   the mediation was unsuccessful and, pursuant to the ADR Orders

14   and ADR Procedures, the GUC Trust has since -- designated this

15   as an unresolved designated claim.

16            THE COURT:   Forgive me, Mr. Griffiths.  As usual,

17   I've read the papers so why don't you jump to the matter of

18   dispute.  I understand that the mediation failed and I gather

19   that it failed, at least in material part, by reason of a

20   difference in views as to whether the amount that might be

21   credited toward the total damages would be the -- recoverable

22   from any defendant, would be the gross amount of the claim, or

23   the value of the distribution on the claim, which would

24   presumably be the distribution of new GM's securities.  Your

25   point, as I understood it, is very simply that I can't

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 29 of 112

Page 29

1    liquidate it anyway, so if you guys agreed to disagree in the

2    mediation then it simply needs to be litigated and liquidated

3    in a court with the constitutional power to do it.  Is that

4    your point?

5              MR. GRIFFITHS:   Yes, Your Honor, absolutely.  The

6    set-off issue for us a red herring, and a matter of Estate Law

7    it doesn't affect the need to liquidate the claim.  That fact

8    would exist whether or not the claim is liquidated.

9              THE COURT:   Okay.  I wonder if -- I'm not going to

10   put a sock in your mouth, Mr. Griffiths, but I wonder if the

11   better course is to allow your opponent to be heard and to

12   allow you to reply.

13             MR. GRIFFITHS:   Yes, Your Honor, absolutely.  We're

14   prepared to explain to The Court why substantial cause existed

15   for the stay --

16             THE COURT:   Forgive me, Mr. Griffiths.  Court-call,

17   I'm having the same problem with noise over the phone.  Would

18   you kindly mute everybody, please? Thank you.

19             MR. GRIFFITHS:   So, Your Honor, I'll see the podium

20   to Mr. Gill of Lewis B. Kaplan.

21             THE COURT:   Okay.  Just a minute.  You can sit down.

22             MR. GRIFFITHS:   Thank you.

23             THE COURT:   Okay, Mr. Gill, good morning.

24             MR. GILL:   Good morning, Your Honor.  Michael Gill

25   on behalf of Don Verdina, Kelly Labunski and the Estate of

Page 30

1    Stephanie Verdina.

2            THE COURT:   Sure, go ahead please.

3            MR. GILL:   I appreciate that Your Honor has read the

4    materials.   I want to address very briefly two items in the

5    reply and then I think I can get to the practical matter at

6    hand.

7            First, I don't want there to be a misunderstanding,

8    in that, I do believe we have a very valid and very meritorious

9    claim against the GUC Trust on behalf of GM.   Practical matter

10   is, it's not collectible to the full extent.   So, while there

11   may be great deal of merit and a great deal of effort, could be

12   proven -- could be put into proving that case against GM like I

13   would any other product liability case, and like I'm doing

14   against Takata.   It doesn't make practical sense for anyone

15   involved.

16           What I think is the other misunderstanding that I

17   would like clear up is: I don't believe, Your Honor, granting

18   this motion will expedite the resolution of this claim in any

19   way.   And it will very likely slow down the prosecution of the

20   case against Takata, which will, in turn, slow down the

21   resolution of the claim against GM.   The way this has been

22   handled thus far is that The Law Firm of Bowman and Brooke has

23   been brought in to represent Takata, and they have also

24   represented the GUC Trust at -- for GM at the mediation, and

25   it's my understanding that they would be representing both

Page 31

1    parties if GM is again made party our suit and our judging in

2    Illinois, consolidates that cases again.  So, I think it's, at

3    a minimum, going to add expenses to the GUC Trust, at a

4    minimum, it's going to delay the resolution of my claims

5    against Takata and, thereby, also delay the claim resolution

6    against GM.

7              THE COURT:  Pause please, Mr. Gill, because this is

8    where I need help from you.  I assume that even if claims

9    against old GM are only worth 25 cents on the dollar, or even

10   less, you or your client would still like the money, wouldn't

11   you?

12             MR. GILL:  If there's no risk of that set-off issue

13   arising, yes, that's true.  But if there's any risk to the

14   family, you know, the numbers we were talking about at

15   mediation were sub -- were below a million dollars for a claim

16   amount.  And --

17             THE COURT:  Okay, I don't want to get into Rule 408

18   matters, so just, talk in more general terms, if you will.

19             MR. GILL:  Okay, in more general terms, Your Honor,

20   the amount of money that would have -- that would result to the

21   families by resolving this claim is not substantial.

22             THE COURT:  Okay.  But, if you ever want to have the

23   right to recover from old GM, the claim has to be liquidated

24   somewhere and I can't do it under the U.S. Constitution --

25   couldn't even do it before Stern v. Marshall.  So, I can't

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 32 of 112

Page 32

1    manage a case without doing my job, so if you want to recover

2    from the estate, then I've got to provide a mechanism for

3    liquidating it, or I guess you can withdraw here.  But what are

4    my other options?

5              MR. GILL:   Well, Your Honor, I offered a proposal in

6    my objection that, I believe by agreement of the parties, we

7    could come up with a relatively truncated way to resolve this

8    claim in a half day with someone appointed by Your Honor

9    resolving whatever issues need to be resolved.  And that's

10   something that could be done, not indefinitely down the road,

11   but, once we're far enough down the road where it will not have

12   a detrimental effect on the other case or result in delaying

13   this claim being resolved in any way either.  I really truly

14   believe that the quickest way to resolve this GM claim against

15   the GUC Trust is to keep it separate from the claim against

16   Takata.

17             THE COURT:   Uh huh.  Now, my problem is whether that

18   is like a -- whether that is good case management on the one

19   hand or is some kind of judicial activism on the other, I mean,

20   I've got a claim that I can't hear and I've got to get it

21   liquidated and if the Trial Judge were to be of a mind to do

22   that, my reaction would be to shrug my shoulders but I need

23   help from you in understanding why you think that would be

24   appropriate for me to do.

25             MR. GILL:   I think it would appropriate, Your Honor,

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 33 of 112

Page 33

1    if the parties agree.  And I haven't gotten word back from the

2    GUC Trust of whether that's something they would, in form,

3    agree to.  But I think it makes sense -- it makes sense in that

4    it will save money on behalf of the GUC Trust.  They won't be

5    paying lawyers to litigate a case they don't need to litigate

6    and it will save time and then it won't delay the resolution of

7    these claims together; meaning, my client's claim against

8    Takata, which is inexorably tied to this GM claim.

9            THE COURT:   Well, that's what I understood.

10   Unfortunately, you have a deceased client -- or the estate of a

11   deceased client, but I gather that a major element of your

12   claim, if not the entirety of it, other than whatever driver

13   might have put the occupants of the vehicle in danger, is that

14   the seat belt didn't do what it was supposed to.  Am I correct?

15           MR. GILL:   That's absolutely true.

16           THE COURT:   Okay.  Further thoughts?

17           MR. GILL:   I have nothing to add, Judge, I was just

18   hoping to find a way that makes sense for everyone involved and

19   save a little time and money on everyone's part.

20           THE COURT:   Okay.  Thank you.  Mr. Griffiths?

21           MR. GRIFFITHS:   Thank you, Your Honor.  David

22   Griffiths for the GUC Trust.  Your Honor, Mr. Gill is simply

23   proposing mediation.  That's what we've already tried and it's

24   already failed.  There is no other mechanism that exists for us

25   to go to resolve this claim at this stage, other than

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 34 of 112

Page 34

1    litigation.  Your Honor well knows that the debtors and the GUC

2    Trust have reduced a number of claims on the claims register

3    from approximately 72,000 to around a thousand.  We're in the

4    process of trying to settle claims as quickly as possible and

5    cheaply as possible and, in this case, the mediation took place

6    and we've incurred that expense.  Absent lifting the automatic

7    stay, our papers show either substantial cause to lift the

8    automatic stay -- we have no mechanism to be able to bring the

9    bidding  parties to the table and there's no timing or no other

10   means for -- to force them to a supplement, absent going to

11   court.  Your Honor, I also dispute the cost implications here.

12   Once the automatic stay is lifted, the parties will seek to

13   consolidate the cases in The Circuit Court of Winnebago County,

14   we have joint counsel who can prosecute the case much more

15   cheaply than otherwise and I would put to Your Honor that, in

16   the event that this second settlement attempt, or mediation

17   attempt, that is being proposed by Mr. Gill doesn't succeed

18   then the only alternative would be, again, to proceed to

19   litigation, at which stage it may be too late to be able to

20   litigate this case in front of the judge who's going to be

21   reviewing it anyway.  I think Your Honor has a grasp on the

22   issues.  Mr. Gill is seeking agreement with the GUC Trust

23   without having even put a proposal that's on the table that we

24   can even address and lifting the automatic stay, granting this

25   motion, in the GUC Trust view is the only appropriate cause of

Page 35

1    action in this case.

2         THE COURT:   Okay.  Gentlemen, sit in place for a

3    moment please.

4         Ladies and gentlemen, here I have a relatively

5    uncommon situation where I have motion -- a motion for relief

6    in the stay to allow a litigation to proceed in another court,

7    but it is being brought by the debtor itself, in contrast to

8    the plaintiff in the lawsuit, which is the normal movant in

9    matters of that character.  Nevertheless, I think the Sonnax

10   factors still apply.  In the exercise of my discretion, I'm

11   granting the GUC Trust motion, albeit with some clarifications

12   and the following are the basis for the exercise in my

13   discretion in this regard.

14        First, since the facts are undisputed, I need to

15   address them very briefly.  We do have here a wrongful death

16   action, the underlying facts, like so many wrongful death

17   actions, are unfortunate but because it is a wrongful death

18   action, a Bankruptcy Judge lacks the statutory, if not also the

19   constitutional power to liquidate the claim myself.  Although

20   it could be sent to the Federal District Court in this district

21   to do so, that would be a bad use of resources for the district

22   court here, especially since the seat belt manufacturer, which

23   has at least much of the potential liability, although, of

24   course, I don't express a view on the merits, but based on the

25   facts that I've been told it's very very possible that that

Page 36

1    seat belt manufacturer might have liability here, if anybody

2    does, in addition to old GM.  That case is going to be trying

3    it against the seat belt manufacturer anyway.  Counsel for the

4    claimant, whose needs and concerns I sympathize with,

5    acknowledges, I think, that the claim against old GM must be

6    liquidated, unless he's -- takes the unsavory option of

7    dismissing the claim against old GM, which I wouldn't do if I

8    were in his shoes either, and -- but in substance, he says,

9    let's try to work out some mechanisms so that, on behalf of my

10   clients I can better protect their rights.  The underlying

11   problem is that I can't force people to agree to consentual

12   matters and that when litigated issues are put before me I have

13   to decide them within the four corners of the issues that I'm

14   allowed to decide.  The Sonnax factors, now that we've gotten

15   to this point, weigh in favor of allowing the claim if it is to

16   be liquidated, as it must be sooner or later, unless abandoned,

17   and I emphasize again that I'm not expecting anybody to abandon

18   it.  Tilt in favor of allowing the Winnebago County Court to do

19   that.  It will be hearing the same issues there.  It is at

20   least possible, if not certain, that the claims against old GM

21   and those against the seat belt manufacturer are closely

22   related.  It is at least possible, if not more likely than not,

23   that to the extent old GM has liability, it's as a consequence

24   of the liability of the seat belt manufacturer and the damages

25   to be recovered will, either under principles of

Page 37

1    indemnification, contribution or state law equivalence require

2    the court deciding what the plaintiff's entitlement is, to

3    consider the various payments made by all parties.  All of

4    these things weigh heavily in favor of coordinated disposition.

5    The clarification that I promised though, should be clear.  I

6    express no view on how the Winnebago Court decides to deal with

7    these matters.  I have every confidence that it will do so with

8    common sense and with justice but -- either but, or because of

9    that, I'm not telling it how to do its job.  For the avoidance

10   of doubt, however, I'm saying that once I grant relief in the

11   stay, that court is free to do whatever it sees fit in

12   connection with this -- except only for authorizing execution

13   on any judgment that it might enter, or be inclined to enter

14   against old GM.  So, my grant is as was requested: to liquidate

15   the claim but not to allow the grabbing of assets in the event

16   that the claim is liquidated in any amount higher than zero.

17   This is also, of course, without prejudice to your rights to

18   make up any other deal that you guys choose to do so as a fully

19   consentual basis, but I can't order it.

20          Mr. Griffiths, what I'd like you to do is see of you

21   can agree with Mr. Gill on form of order that's consistent with

22   this ruling, which is without prejudice to his right to appeal

23   it, even if he agrees on the order accurately reflecting my

24   ruling.  If you have to agree to disagree, if you can't do it

25   consentually, you have authority to settle an order consistent

1    with the ruling.

2             MR. GRIFFITHS:   Thank you, Your Honor.

3             THE COURT:   All right.  Mr. Gill you may stay or

4    leave, as you see fit.

5             MR. GILL:   Thank you, Your Honor.

6             THE COURT:   Thank you.  Okay.  We still have a bunch

7    of others, but, Mr. Karotkin, since you need to go I would like

8    to move up the torte claimants now.  I know that's Ms. Greer's

9    matter but I want you in the courtroom because I want you to be

10   able to hear the concerns that I have.

11            MR. KAROTKIN:   Thank you, Sir.

12            MS. GREER:   Your Honor, maybe I should just take a

13   minute to give Mr. Karotkin some background, if I could just

14   take him outside for a second -- I'm not sure --

15            THE COURT:   Yes, you may do that.

16            MS. GREER:   Okay.

17            THE COURT:   Well, stay in the courtroom.

18            MS. GREER:   Okay.

19            UNKNOWN SPEAKER:   Your Honor, may I approach the

20   bench for a second?

21            THE COURT:   Yes.  But not for anything other -- not

22   for official court business.

23            THE COURT:   Okay, Ms. Greer, my concerns, as I'm

24   sure you are aware, are with the Venable and Dalton claims, and

25   I've read your letter, and I was pleased to see that you had

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 39 of 112

Page 39

1    settled this matter with respect to four of the six torte

2    claimants who were the subject of the original omnibus

3    objection.  But the underlying issue remaining is one that is

4    of great importance to the bankruptcy system.  Which is --

5    although it could be stated in different ways, the way I'm

6    inclined to articulate it, is for non-commercial claimants,

7    such as the two remaining people here.  How, in the context of

8    Mullaney v. -- the Mullaney case, which requires notice

9    reasonably calculated to reach the people. How you deal with

10   people who are in rural counties who don't have access to the

11   New York Times and things like that, or who don't read it, and

12   as we heard in the last hearing, get their news from Fox &

13   Friends.

14           Before we proceed further, Ms. Dalton, are you on the

15   phone?  Court-call, un-mute everybody on the line, please.

16           COURT CALL OPERAOR:   Yes, Your Honor.

17           THE COURT:   Okay, Betty Dalton, are you on the

18   phone?

19           MS. DALTON:   Yes I am, Sir.

20           THE COURT:   Okay, what about Sudie Venable?

21           MS. VENABLE:   Yes, I am.

22           THE COURT:   Okay.

23           UNKNOW SPEAKER:   Wait, Your Honor -- you said these

24   are the last two, (indiscernible 10.47.57).

25           THE COURT:   No, there were six people who had issues

1    similar to this and they were settled, as I understand it, as

2    to four of them, and there are two: Ms. Dalton and Ms. Venable,

3    who are affected by what we are talking about now.

4            I've read your letter, Ms. Greer, but I don't have a

5    functioning adversary system here, on a matter that's of very

6    great importance to the bankruptcy courts.  The issue, which is

7    one of mixed question or fact of law, but which has a

8    potentially significant effect on the bankruptcy system as a

9    whole, is what reasonably calculated, to reach the person,

10   means when you're talking about people like the two remaining

11   claimants here.  I am not enthusiastic about the idea of

12   deciding an issue of that importance to the bankruptcy system

13   without an appropriate adversarial system.  And I'm not sure if

14   I'm going to have it here.  My further concern is that if I

15   were ever to decide an issue of that importance, I would need

16   amicus briefs and have to consider something we have rarely, if

17   ever, done in this court, which is a non-banc decision, some

18   significant measures to ensure that any decision doesn't bring

19   down the ability of the future debtors of the world to

20   function.

21           Forgive me folks, I can't have other people speaking

22   when I'm speaking.

23           So, in the exercise of my 105(d) authority, I'm

24   telling you, Ms. Greer, that I want you to re-double your

25   efforts to try to settle these two things.  Failing that, we're

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 41 of 112

Page 41

1    going to have to come back for a conference on tee-ing this up

2    for judicial determination on the issues that I articulated and

3    that's going to be a big deal.

4              MS. GREER:    Your Honor, if I may?

5              THE COURT:    Yes.

6              MS. GREER:    Stephanie Greer from Dickstein and

7    Shapiro on behalf of the GUC Trust.  Your Honor, I would be

8    more than happy to attempt to settle these again.  We have

9    certainly tried, unfortunately both of the claimants insist

10   that they will only accept a cash recovery from the estate and,

11   so, it's been obviously a block for any sort of resolution of

12   these claims.

13             THE COURT:    Okay.

14             MS. GREER:    So, you know, we have certainly made

15   efforts, Your Honor, and I won't, you know, go into the

16   details, but I don't foresee it being a possiblility without,

17   at least, an understanding by these claimants that what they

18   are entitled to, at most, is an unsecured claim --

19             THE COURT:    In the currency under the plan?

20             MS. GREER:    Exactly.

21             THE COURT:    Am I correct in my understanding that,

22   if you could otherwise reach a settlement, either you or your

23   financial advisors or somebody could give the claimants

24   guidance in how they could sell the stock that they would be

25   receiving under the plan -- in turning the stock into cash?

1          MS. GREER:   Your Honor, it's -- we have been able to

2     assist a little bit with that.  I think we've been sort of

3     cautious about how much, you know, assistance we've given to

4     the claimants in that regard, and would certainly be happy to

5     point them in the right direction.  So, you know -- and I have

6     explained, in particular, to Mr. Venable and Ms. Dalton, how

7     the process works, what the stock and (indiscernible 10.52.06)

8     recovery means, we've sent them the FAQ's, we've talked to them

9     at length about these issues and, unfortunately, just haven't

10    been able to make them understand that this is the only option

11    for a recovery from the estate.

12          THE COURT:   Okay.  Ms. Dalton, Ms. Venable: I'm

13    going to be very careful and I'm not going to discuss the

14    merits of the controversy, which is one of constitutional law,

15    which I have a suspicion you're going to have a tough time

16    litigating on your own.  But what Ms. Greer was telling me in

17    your presence, and everything that has been said to me has been

18    only in your presence, the practical problem she's got is that

19    under the plan in GM, they only can give out securities of new

20    GM and one of the most important principles in bankruptcy is

21    that everybody who is similarly situated gets treated the same.

22    What that means as a practical matter is that just as all of

23    the other general unsecured creditors of old GM, either have

24    received, or will be receiving, securities, principally common

25    stock of the new GM Company.  The plan doesn't allow them to

1   give out cash.  Now, what I have authorized and directed Ms.

2   Greer to do is to talk you guys again about trying to settle

3   it.  There's no way that she can give you guys, even if you

4   agree upon the entitlement, anything other than stock.  I have

5   leaned on her and I suspect that with my leaning on her, she

6   will re-double her efforts, to see if she can work out a method

7   to help you guys if you do get stock to then sell it and to

8   turn it into cash.  But the underlying legal issue is a tough

9   one, and especially if you want to get some recovery at any

10  reasonable time in the future.  I'm going to strongly encourage

11  you to meet her halfway in, at least trying to settle the

12  matter.  If not, you're going to have to figure out how to

13  litigate an issue of constitutional law, which, even people

14  with law degrees have trouble with.  And, Ms. Dalton, I

15  remember well, you telling me that, you know, you got your news

16  from Fox and Friends, you're not going to be able to litigate a

17  question of constitutional law on your own.

18          I will hear anything you have say, Ms. Dalton;

19  anything you have to say, Ms. Venable.

20          MS. DALTON:  You know, I -- like I said, I'm from a

21  rural area, I'm not ignorant, but I'm not familiar with stocks

22  and bonds, I've never, you know, had stocks and bonds and I

23  wouldn't know how to do that and when she said that it would be

24  -- they would be able to give me $50,000 in bonds, I thought to

25  myself: my husband was worth more than $50,000.  It has nothing

1   to do with the bonds.  It's just -- can I tell you once more:

2   no (indiscernible 10.55.43).

3          THE COURT:   Well, I can't get involved in the dollar

4   amount --

5          MS. DALTON:   Yeah.

6          THE COURT:   But I'm explaining to you folks, and

7   you're going to be free to continue to participate in any

8   proceedings before me by phone, but I am going to direct both

9   sides to try again to settle this thing because the underlying

10   legal issue I have, and I'm explaining it to you even though

11   nobody ever suggested that you're an ignorant person, but the

12   fact is that even if you have a law degree, this is an issue

13   that has the potential of going up into the Appellate Courts

14   and as long as it does, you wouldn't be getting anything.  The

15   underlying issue is under a Supreme Court Decision that you

16   don't have to get actual notice.  You only have to get notice

17   reasonably calculated to reach the recipient, works for

18   recipients in rural areas who would never read the New York

19   Times and for whom the newspapers that they do get, assuming

20   they read any, wouldn't be reasonably calculated to reach them.

21   It's a very tough legal issue.  I went to law school 42 years

22   ago and I was a practicing lawyer for 30 years, and I've been a

23   Judge for almost 12 and this is a hard issue for me.  And,

24   while I will decide whatever I have to decide, that's what they

25   pay me for, it's an issue that is better settled from both

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 45 of 112

Page 45

1    sides' point of view.

2         MS. DALTON:   May I ask you one thing?

3         THE COURT:   I beg your pardon?

4         MS. DALTON:   Can I ask you one -- question?

5         THE COURT:   You can ask it to me, but you have to

6    understand, I can't give you legal advice.

7         MS. DALTON:   That's okay. My husband, when he died,

8    none of his airbags deployed.  And not even the sidebag. And it

9    was a defect and we weren't told about the defect and that's

10   why I got into this claim, because I felt like, you know, GMC

11   owes this to this man. And, you know, he trusted the car

12   because that's all we've ever bought were Chevrolet and GMC

13   products. And, we'll continue to do so, too.  But that's why I

14   got into this claim, Sir.

15        THE COURT:   Oh, I hear you, and, unlike the matter

16   that was on the calendar first, nobody is accusing you of

17   improperly using the court system.  I well understand where

18   you're coming from, but beyond that, frankly, I'd have to be

19   giving you legal advice or deciding an issue that's not before

20   me and I can't do either of those things, especially today.

21        MS. DALTON:   Okay.

22        MS. GREER:   Your Honor, if I may speak for just a

23   second. One of the things I was going to speak to Your Honor

24   about today -- not only the cases that we cited in the brief

25   for the propostion that, whether somebody receives or reads the

Page 46

1    newspaper is not relevant to the determination -- certainly was

2    going to go through those cases for you -- but I wanted to call

3    Your Honor's attention that we did some research and found that

4    the New York Times and the Wall Street Journal, all of which

5    the notice wre published in, are all available within three

6    miles of each of the claimant's homes.  In fact, under a mile,

7    in some respects.  All of these newspapers are, in fact,

8    available in the towns in which these folks reside, regardless

9    of whether they've read them.  And, so, Your Honor, with all

10   due respect, I would like to have the opportunity to at least

11   go through these cases and, you know, to the extent it is

12   relevant, whether these folks had access to the newspapers and,

13   understanding their circumstances, that the case law that we

14   have from this District and from other Courts and, most

15   recently, in the New Century Case in Delaware, you know, do

16   speak to this issue -- go ahead, Your Honor --

17            THE COURT:   Not today, Ms. Greer.  This is a mixed

18   question of fact in law as to whether notice to people like

19   these is reasonably calculated to reach them and I am not going

20   to take oral argument on a matter that may require an

21   evidentiary hearing.  And I'm especially not going to authorize

22   it to be done -- in the face of two Pro Se litigants who won't

23   have the foggiest idea what you're talking about.  Many people

24   who have gone to law school are not going to have the foggiest

25   idea of what you're talking about.

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 47 of 112

Page 47

 1              MS. GREER:   Understood, Your Honor.

 2              THE COURT:   Okay.

 3              MS. VENABLE:   Your Honor, this is Ms. Venable.   Can

 4    I speak?

 5              THE COURT:   Of course you may.

 6              MS. VENABLE:   Okay.   When Ms. Greer (indiscernible

 7    11.00.41) called me, she offered me 25 --

 8              THE COURT:   Please don't give me numbers.   Talk in

 9    concepts, if you wish, but I don't want to hear the numbers

10    that you guys have talked about.   There's a rule of evidence

11    that says that's not appropriate.

12              MS. VENABLE:   Okay, what she offered me, I just

13    didn't think it was enough -- I don't know anything about

14    stocks and bonds, but what she offered me for the settlement, I

15    didn't think it was enough.   That was my problem with her offer

16    for the settlement.

17              THE COURT:   I understand.   Okay.   So, this matter is

18    continued.   Neither granted -- the claims are neither being

19    allowed or expunged.   Ms. Greer, you or your colleagues are to

20    have a further dialogue with the claimants about this issue --

21              MS. GREER:   Certainly.

22              THE COURT:   -- I wouldn't be going through this if I

23    weren't troubled by the underlying issue.   It's not one upon

24    which I'm going to rule based upon your brief, which, you know

25    -- your letter brief.   You served it upon your opponents but

Page 48

1    they were helpless in responding to it.

2              MS. GREER:   Understood, Your Honor.

3              THE COURT:   Okay.  Mr. Karotkin, that's why I wanted

4    you to be present in the courtroom.  You can now stay or leave

5    as you prefer.

6              MR. KARTOKIN:   Thank you, Sir.

7              THE COURT:   Ms. Greer, you want to continue?

8              MS. GREER:   Sure.  Do you have a preference in the

9    order in which we proceed?

10             THE COURT:   No.  I know I have one gentleman in the

11   courtroom who's here on the U.A.W. issues, but I still have a

12   lot on the phone.  My guess is that some of your issues won't

13   take a lot of time.  Use your discretion as to the order in

14   which you want to pursue.

15             MS. GREER:   Thank you, Your Honor, I appreciate

16   that.  We can start, Your Honor, with Anthony Burton, Claim No.

17   33043, I believe this matter is uncontested.

18             THE COURT:   Okay, just a minute.  Court-call, I'm

19   getting a lot of noise from the back now.  I can't tell whether

20   that's people who are making the noise outside of your phone

21   system or what.  Because I need everybody on the phone, I don't

22   want you to mute them, but I do need everybody who is still on

23   the phone to be very quiet because what happens is that your

24   phones get amplified in the courtroom and it's a problem when

25   Ms. Greer's trying to speak to me.  Okay, go ahead again, Ms.

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 49 of 112

Page 49

1   Greer.

2           MS. GREER:   Your Honor, the -- next up is the

3   Anthony Burton Claim which is the 249 Omnibus Objection, Claim

4   No. 33043.  It's my understanding, Your Honor, that this matter

5   is actually uncontested.  We filed the omnibus objection based

6   on failure to provide sufficient documentation.  We -- Mr.

7   Burton contacted us and said he would provide us additional

8   information so we adjourned the objection.  He never got back

9   to us.  We did send him a couple of letters to remind him and

10  follow up with him about the hearing and we didn't hear back,

11  so, as a matter of law, Your Honor, we just ask that the claim

12  be expunged for failure to provide sufficient documentation to

13  show the claim.

14          THE COURT:   That's great.

15          MS. GREER:   All right, so, next up, Your Honor, is

16  another uncontested matter that's our objection to claims filed

17  by Exide Technologies, Relco Systems and Roth Global Plastics.

18  This has been adjourned as to Relco, but is going forward as to

19  Exide and Roth.  Those are Claims No. 44829, is Exide, and Roth

20  is Claim No. 64854 and, just to reiterate, the Relco claim

21  which is Claim No. 70019 has been adjourned.

22          Your Honor, this was a objection based on

23  502(e)(1)(B), claims for which the debtor and the claimant are

24  co-liable that are contingent claims, there's been no objection

25  to these.  Both of them seek reimbursement for potential costs

General Motors Corp., et al.

Page 50

1    and expenses related to environmental contamination on

2    properties.  As a matter of law, Your Honor, we submit that

3    they should both be expunged.

4              THE COURT:   Right.  Anybody want to be heard on

5    those?  Your motion is granted.

6              MS. GREER:   Thank you, Your Honor.  Next up, Your

7    Honor, is the claim of John Pierro, which is Claim No. 69842.

8    I'm not sure if his counsel is on the phone, Your Honor, but we

9    haven't heard from him.

10             UNKNOWN SPEAKER:   (indiscernible 11.05.28) I'm on

11   the phone.

12             THE COURT:   Okay.

13             MS. GREER:   Okay, Your Honor.  This is the adjourned

14   89 omnibus objection that we filed in September of 2010.  This

15   -- this is a -- basically the plaintiff is represented by

16   Joseph Neiman, who I presume is the attorney on the phone

17             MR. NEIMAN:   Yes.

18             MS. GREER:   Mr. Neiman responded to the original

19   omnibus objection and said that the claim was actually timely

20   filed even though the Garden City's records showed that it was

21   not received until the end of January 2010.  I spike to Neiman,

22   we had a lovely conversation, I asked him to provide me with

23   some evidence that he had in fact, you know, giving him the

24   benefit of the doubt, that he had in fact filed the claim on

25   time.  He told me he would do that.  We never heard from him.

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 51 of 112

Page 51

1    I left him a number of messages.  Bottom line, Your Honor, I

2    sent a discovery request several months ago, to which Mr.

3    Neiman never responded -- you know, just trying to find out the

4    truth of the matter, Your Honor, as to whether he actually

5    filed the claim on time or not.  Mr. Neiman never responded.

6    This is the first we've heard from him, on the phone right now.

7    And, so, he clearly hasn't met his burden to show any sort of

8    excusable neglect.  You know, nothing to give us to show that

9    he actually did file his claim in a timely matter, despite our

10   efforts to get that information from him.

11            THE COURT:   Mr. Neiman, I'll hear from you.  I have

12   nothing in my file later than your letter of October 22, 2010 -

13   -

14            MR. NEIMAN:   Your Honor --

15            THE COURT:   -- that's about a year and a half ago.

16            MR. NEIMAN:   -- I'm sorry. Yeah, we -- Your Honor,

17   my letter (indiscernible 11.07.07) the fact that we originally

18   filed it by regular mail, we never heard from them.  When we

19   didn't hear, we then contacted again and sent the same -- the

20   same thing that we filed, a copy of it, by certified mail.  The

21   original thing was filed to us (indiscernible 11.07.22) it

22   didn't say anything about any registration.  There's no -- we

23   didn't send it certified originally, if we could turn back the

24   hands of time, I would, but the amount of time that elapsed

25   from the time that we realized that they had not received our

Page 52

1   claim, so we acted immediately as soon as we had realized that.

2   And there's no prejudice (indiscernible 11.07.41) alleged by

3   them that from the time that we filed it.

4          THE COURT:   The -- you filed it by regular mail

5   without checking to see if it was received any time soon, and

6   you went this long without responding?

7          MR. NEIMAN:   Well, no, it wasn't any time soon -- it

8   was when -- we -- I think it's a matter of a few weeks -- that

9   we found out that it wasn't received.  It wasn't -- I -- we're

10  not talking months there.

11         MS. GREER:   Your Honor, all we asked him for was

12  some proof.  We asked him, you know, a transmittal letter which

13  showed to his client: hey, we filed your claim today, it's

14  November 29.  Or a copy of the mailing that was filed on --

15  prior to November 30, like I said, we sent a discovery request

16  because we couldn't get a response and we heard nothing.  You

17  know, Mr. Neiman clearly just has not met the burden that's

18  required to show excusable neglect.

19         MR. NEIMAN:   We're not saying it was excusable

20  neglect.  We're saying: "a", we sent it, "b" when we realized

21  that you didn't get it, then we sent it to you certified.

22  There's no issue you didn't get it certified the second time,

23  correct?

24         THE COURT:   Wait.  This is not the English

25  Parliament.  You guys don't have a debate with each other in

Page 53

1    front of me.

2              MR. NEIMAN:   I'm sorry, Your Honor.  I apologize for

3    that.

4              THE COURT:   All right.  Ms. Greer, anything further?

5              MS. GREER:   No, Your Honor.  Unless you have any

6    questions for me.

7              THE COURT:   Mr. Neiman, anything further?

8              MR. NEIMAN:   No, Your Honor.

9              THE COURT:   All right.  Ladies and gentlemen, I'm

10   granting the motion to expunge the claim here.  The records of

11   the Garden City Group, which is the claims agent, have the

12   potential, I suppose, of being disputed, if there is any

13   evidence to support that, but none has been provided.

14   Conversely, if it were agreed that the claim was indeed filed

15   in January of 2010, consistent with the Garden City's Group

16   receipt records, it would be possible, theoretically, to show

17   excusable neglect for the late filing, but the claimant's

18   counsel has disclaimed the desire to try to prove excusable

19   neglect, and in any, none has been shown.  This matter has been

20   going on for a very long period of time and in any Chapter 11

21   case, but especially this one, where claims have an effect upon

22   other creditors, I am compelled to, and do, go by the book --

23   to by the rules.  Ms. Greer, you're to settle in order and

24   accordance of the foregoing.  Mr. Neiman, the time to appeal

25   from that order will run from the time of the entry from that

Page 54

1    resulting order and not from the time of this dictated

2    decision.

3            MR. NEIMAN:   Thank you, Your Honor.

4            THE COURT:   All right.  Have a good day. Next matter

5    Ms. Greer.

6            MS. GREER:   One more, Your Honor.  This is the

7    objection to the claim filed by Marjorie Creamer.  It's Claim

8    No. 71249.  Ms. Creamer filed her claimed on December 22, 2011,

9    Your Honor, so we've objected to it on two basis.  One, that

10   the underlying claim was assumed by new GM, as I'm sure you

11   know from the papers and, two, that the claim was also late.  I

12   know you've read the papers, Your Honor, if you'd like me to go

13   through the details, I'm happy to do that or we can --

14           THE COURT:   No, I'd like to jump to Mr. Creamer, who

15   appears to be on my phone log.  Are you on the phone, Ms.

16   Creamer?

17           MS. CREAMER:   Hello.

18           THE COURT:   Okay.  Ms. Creamer, your opponent has

19   made two principle points.  One would be bad news if it weren't

20   for the other.  One is that you claim was way late, but she

21   also says that it took place after the sale and your claim is

22   against new GM and not old GM, and that's actually good news

23   for you because nothing that I would be doing here in this

24   court is going to affect you in an adverse way.  What -- why

25   are you trying to push this claim in this court?

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 55 of 112

Page 55

1          MS. CREAMER:   Because the new GM is under another

2     liquidation (indiscernible 11.12.25)department bankruptcy.

3     (indiscernible) my car was purchased, it was a 2006

4     (indiscernible 11.12.34). I'd never buy another Chevrolet,

5     ever.  They've got problems.

6          THE COURT:   Uh huh.

7          MS. CREAMER:   And that's why Obama?(indiscernible

8     11.12.54)filed bankruptcy. All these people that are dying?  I

9     should've died.  In fact, I think I did die when I hit my head

10    on my (indiscernible 11.13.01).  I hit a totem-pole.  It's very

11    serious.  You guys (indiscernible 11.13.08) about people's

12    lives.  But you don't understand, (indiscernible 11.13.15) and

13    the people that are working in the factories, that's not their

14    fault.  Somebody up there knows, that those cars power-steering

15    (indiscernible 11.13.24) and they didn't do anything about it.

16    Some (indiscernible 11.13.26) went out 35,000 miles

17    (indiscernible 11.13.30). Mine did. Mine was one of them

18    (indiscernible 11.13.32) after the fact that the accident was

19    called an accident. I filed under "old" but I also filed under

20    "new" which is another (indiscernible 11.13.43) of claim

21    numbers.  It happens.

22          THE COURT:   Okay.  I've read your letters, Ms.

23    Creamer.  One of your letters, the one that's dated January 13,

24    2011, says that the car-wreck took place on September 24, 2009.

25          MS. CREAMER:   Can I interrupt you, Your Honor?

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 56 of 112

Page 56

1          THE COURT:   No.  You may not interrupt me.  My

2     question to you is: Is that date still correct?

3          MS. CREAMER:   No.  It actually happened when I

4     purchased the car.  (indiscernible 11.14.16) When I drove it

5     off the lot, it was defective (indiscernible 11.14.21) from the

6     day I purchased it. (indiscernible 11.14.28).

7          THE COURT:   All right. Do you have anything further

8     to say to me before I give Ms. Greer a chance to reply?

9          MS. CREAMER:   Yes, I do.

10         THE COURT:   Go ahead.

11         MS. CREAMER:   (indiscernible 11.14.46) issue, I just

12    listened to number three on the conference call about the

13    airbags not inflating (indiscernible 11.14.54) off to the side.

14    I tried to talk to GM, their officials, their claim agents,

15    everybody and when it got down to the point that it was the

16    steering (indiscernible 11.15.05) nobody would talk to me.

17    Because they knew they were in trouble.  And they knew they had

18    to get out.  And how were they gonna get out?  Flying through

19    your court system?  It's still a (indiscernible 11.15.20) card.

20    It is. The Volt has caught fire for being a new electric car.

21    It's called Consumer Protection in America.  What do want

22    (indiscernible 11.15.33) cars?  Please. (indiscernible

23    11.15.35) Why?  Aren't we better than that?  I think Obama

24    failed.  That's where Congress is wrong.  My car was wrong.

25    (indiscernible 11.15.50) what would've happened to them?  It

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 57 of 112

Page 57

1    just happened I was on an old highway by myself when it went

2    out.  And thank God of that.  Because you don't have to pay

3    farm-women to (indiscernible 11.16.02).

4              THE COURT:   Okay.  Ms. Greer, you may reply.

5              MS. GREER:   Your Honor, of course the GUC Trust

6    refutes -- I mean, all the facts asserted by the claimant.

7    Certainly, just to reiterate, Your Honor, that not only are

8    claims related to accidents occurring after -- after the July

9    10, 2009 all liabilities in connection with those accidents

10   were assumed by new GM.  So were Lemon Law claims, Your Honor,

11   so to the extent she's asserting those claims which are not in

12   the pleadings, but those are all new GM claims.  So, Your

13   Honor, based on that we'd ask that the claim be expunged.  I'd

14   also mention, Your Honor, that we've heard quite a bit from Ms.

15   Creamer and I'd like to ask for language in the order which  --

16   which basically gives us some leeway to the extent she

17   continues to file pleadings, that we don't need to respond to

18   them unless Your Honor asks us to.

19             THE COURT:   Okay.

20             MS. CREAMER:   Your Honor, I'd like to have a

21   rebuttal on that.

22             THE COURT:   I beg your pardon.  You were speaking

23   over Ms. Greer, so I didn't hear you, Ms. Creamer.

24             MS. CREAMER:   I would like to have a rebuttal on

25   that.

09-50026-mg    Doc 11753    Filed 05/16/12    Entered 05/24/12 13:22:54    Main Document
General Motors Corp., et al.
Pg 58 of 112

Page 58

1          THE COURT:   Yes you may.  Limited to the --

2          MS. CREAMER:   A Creditor --

3          THE COURT:   -- new stuff, she said.

4          MS. CREAMER:   It is.

5          THE COURT:   Go ahead.

6          MS. CREAMER:   A creditor is a person, corporation,

7    entity owed a debt by the debtors and has responded before the

8    date, on or before the date of the bankruptcy filing, 11-U-

9    period-S-period-Z-period, 101 (indiscernible 1:17:43) 10, on or

10   before the date of the bankruptcy filing.  It arose when I

11   bought that car.  You can say whatever you want to say, but

12   it's (indiscernible 1:17:47) from right there in your -- in

13   your good (indiscernible 1:17:49) on your code.  And if they're

14   unsecured debt.

15          THE COURT:   Okay.  All right, everybody sit in place

16   for a second.  All right, in this contested matter in the

17   Chapter 11 case.  May I ask for silence while I'm dictating a

18   decision, please.  Court Call, do you have any idea what all

19   this noise is, and where it's coming from.

20          COURT CALL OPERATOR:   Yes, Your Honor, it's coming

21   from Ms. Creamer's line.

22          THE COURT:   Ms. Creamer, can I ask you to keep quiet

23   on your end of the line, please.  Thank you.

24          MS. CREAMER:   (indiscernible 1:18:47).  I'm sorry.

25          THE COURT:   I couldn't hear what -- what you said.

1    All right, I'm going to start over again.

2        In this contested matter in the Chapter 11 case of Motors

3    Liquidation Company, formerly known as General Motors, the GUC

4    Trust objects to the claim of Marjorie Creamer in the State of

5    Kansas.  As stated in her letter of January 13, 2011, she

6    bought a GM vehicle that caused a wreck on September 24, 2009,

7    causing severe injuries.  It is alleged, and for the purpose of

8    this analysis, I take it as true, that she bought the vehicle

9    back in 2007.  So we have a situation where the vehicle was

10   bought back then, is alleged to have been a lemon or otherwise

11   defectively manufactured, but the wreck only took place on

12   September 24, 2009.

13       It is undisputed, or should be, that under the sale

14   agreement, new GM assumed all liabilities to third parties for

15   death, personal injury, or other injury to persons, or damage

16   to property caused by motor vehicles, which arose directly out

17   of death, personal injury or other injury to persons or damage

18   to property caused by accidents or incidents first occurring on

19   or after the closing date.  And it is also undisputed that the

20   closing date was back in July of 2009, several months before

21   the wreck that caused the property and the severe injuries.

22       Motors Liquidation, which is old GM, has moved to

23   dismiss the -- expunge the claim, and I'm granting that.  The

24   reason for it, and it's actually good news for Ms. Creamer, is

25   that new GM assumed this liability.  You have the right, Ms.

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 60 of 112

Page 60

1  Creamer, to go after new GM, and if you succeed in your lawsuit

2  against new GM you can get money and not stock.  So, you're

3  going after the wrong entity.  Now, I - I sense from your oral

4  argument that you're upset, but you're actually in a better

5  position than you thought you were, because you have the right

6  to go against an entity that's continuing in business, and if

7  you can prove your claim you can get money from them and not

8  stock.  But by the same token the history of this matter does

9  indicate a lot of vexatious litigation.  I'm not exactly sure

10  why there's been a misunderstanding as to who the right entity

11  is to go after, why you want to proceed against old GM, Ms.

12  Creamer, when you can go against new GM, which has more in the

13  way of resources to satisfy your claim.  But in any event, yes.

14  I'm not going to issue a Martin-Trigona order, but there has

15  been too much going on, so the order can and should provide,

16  Ms. Greer, not just that the claim is expunged but that if Ms.

17  Creamer files anything further in this Court, or in any Court,

18  you don't have to respond to it unless and until I issue an

19  order saying that you need to respond.  I'm not otherwise

20  imposing sanctions, not against a pro se plaintiff -- claimant.

21  But again, this is costing old GM's other creditors a lot of

22  money and every time you have to show up in Court, and I'm

23  telling you, you don't need to do it any more.

24           MS. GREER:   Thank you, Your Honor.

25           THE COURT:   All right.

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 61 of 112

Page 61

1          Ms. Creamer, I don't expect you to agree with my

2    ruling, but do you understand it?

3          COURT CALL OPERATOR:  Excuse me, Your Honor, this is

4    the Court Call Operator.  Ms. Creamer disconnected at 11:41.

5          THE COURT:   Okay, that was about two minutes ago,

6    huh?

7          COURT CALL OPERATOR:   Yes, Your Honor.  I did not

8    want to interrupt you.

9          THE COURT:   Sure.  I understand.

10         All right, nevertheless we must continue.  Ms. Greer,

11   you're to settle an order in accordance with the forgoing?

12         MS. GREER:   YES Your Honor, will do.

13         THE COURT:   Okay.  What else do you have?

14         MS. GREER:   Your Honor, I think I'm all done and I'd

15   ask if I could be excused unless you have any questions --

16         THE COURT:   No.

17         MS. GREER: -- or anything further.

18         THE COURT:   You may be excused.  And the folks who

19   are UAW members and are here on health care members -- matters,

20   I'll hear those next.

21         MS. GREER:   Thank you, Your Honor.

22         THE COURT:   Sir, I understand you're one of the UAW

23   folks.  Would you come up to the plane -- the main counsel

24   table please, and speaking into the microphone just tell us

25   your name and I'll give you a chance to be heard in a couple of

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 62 of 112

Page 62

1   minutes.

2           MR. THEIS:   My name is Steve Theis.

3           THE COURT:   Okay.  Was it -- could you just spell

4   your name for the recording, please?

5           MR. THEIS:   T-H-E-I-S.

6           THE COURT:   Forgive me, I didn't hear you over the

7   noise on the phone.

8           MR. THEIS:   My name is Steve Theis, and it's spelled

9   T-H-E-I-S.

10          THE COURT:   Okay, thank you Mr. Theis.

11          All right, you can sit down.  Make yourself

12  comfortable at that counsel table, if you would please, Mr.

13  Theis.

14          MR. THEIS:   Thank you.

15          MR. GRIFFITHS:  Your Honor, David Griffiths for the

16  debtors, prospective debtors on the emergency declaration

17  committee, GUP Trust.  And if I may, Your Honor, we can

18  proceed, perhaps with a hundredth, hundred and first, hundred

19  and second omnibus objections, which are the UAW omnibus

20  objections.

21          THE COURT:   Okay.

22          MR. GRIFFITHS:  Your Honor, my comments are mainly --

23          THE COURT:   Before you continue, Mr. Griffiths -- do

24  I have folks on the phone besides Mr. Theis, who's in the

25  Courtroom, who have UAW style claims?

1          MS. REYES:   Yes, Your Honor.  My name is Sharon

2     Reyes.

3          THE COURT:   Okay, Ms. Reyes.

4          All right.  Anybody else?  All right, thank you.

5          Ms. Reyes, you can't see what's going on in the

6     Courtroom, but Mr. Griffiths, the lawyer for old GM, is at the

7     counsel table.  Mr. Theis, who's similarly situated to you, is

8     -- excuse me, he's at the lectern.  Mr. Theis is at a counsel

9     table. And after Mr. Griffiths speaks, I'm going to give people

10    who have different views a chance to be heard.  First, Mr.

11    Theis is in the Courtroom, and then you.

12         MS. REYES:   Thank you, Your Honor.

13         THE COURT:   Okay.  Go ahead, Mr. Griffiths.

14         MR. GRIFFITHS:  Thank you, Your Honor.  I'll try to

15    speak slowly and loudly for anyone who's listening, and my

16    comments are mainly geared towards trying to give the claimants

17    here on the phone an understanding of the omnibus objection.

18    Your Honor, we have reached out to the UAW a number of times to

19    attempt to have UAW representative speak to these claimants and

20    to other claimants, and it has been moderately successful -- we

21    have had some claimants withdraw their claims as a result, but

22    for the most part, it hasn't been successful -- it's been very

23    difficult to get the UAW to engage.

24         Your Honor, on June 1, 2009, General Motors and its

25    affiliates filed their bankruptcy cases with this Court.

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 64 of 112

Page 64

1   Pursuant to an agreement, which is called the master purchase

2   agreement, new GM agreed to buy, substantially, all of the

3   assets of old GM and the -- and continue its - its automotive

4   business.  Part of the deal that was negotiated is that new GM

5   -- the car company that currently makes General Motors

6   automobiles, agreed to assume liability for -- among other

7   things -- the workers' compensation claims of UAW employees.

8   What this means, is that old GM, which is Motors Liquidation

9   Company, who I represent, past liability, the claim is brought

10  by UAW employees against it to new GM.  In a deal that was

11  negotiated within UAW itself, and while the UAW acted to

12  represent its members.

13          Pursuant to the procedures that were set up earlier

14  in this case, old GM filed omnibus objections to claims -- to

15  the claims filed by various of the claimants on the phone

16  today, and an omnibus objection is merely an efficient way to

17  deal with a large number of similar claims at the same time.

18  The omnibus objections that were filed, and we're dealing with

19  today, were filed not because old GM has any particular issue

20  with the underlying claims -- the underlying grievances, I

21  should say that are being brought by -- by the UAW employees

22  against their employer, but is being brought simply because

23  those grievances must now be asserted against new GM and

24  pursued through the UAW's grievance procedures.  The omnibus

25  objection goes into some detail in terms of the mechanics and -

1   - which clauses operate to transfer liability to new GM, but

2   suffice to say that new GM assumed responsibility for all of

3   the employment-related obligations of its employees that were

4   represented by the UAW as a result of Section 2.3(a)(8) of the

5   master purchase agreement, and the omnibus objection, and our

6   reply, restates the provisions from -- from the master purchase

7   agreement.

8         Your Honor, I'd also like to point out that the

9   omnibus objections in now way operate to affect the pension

10  rights of any claimants on the telephone today, or indeed any

11  other pensions.  Pensions were assumed by new GM as part of the

12  -- as part of the master purchase agreement, and regardless of

13  the outcome today, new GM will continue to pay pension benefits

14  to claimants, so this is just by way of reassurance that

15  today's proceedings do not affect pensions in any way.

16        Your Honor, the claims speak for themselves and are

17  replies to each object, and repeat in substance what the

18  omnibus objections says.  In sum, that new GM will assume

19  responsibility for the claims, that old GM is no longer

20  responsible for the claims, and that the claimants should

21  pursue their claims through the UAW -- UAW grievance procedures

22  and with new GM.

23        Your Honor, I'd like to just add one footnote for Mr.

24  Theis, who's here in the Court.  I've reviewed the objection

25  that he had filed.  I'll let Mr. Theis speak for himself.  I

1  understand that Mr. Theis is concerned that new GM's assumption

2  of his pension obligations is only temporary, and I'd like to -

3  - to assure Mr. Theis that that's not the case, that new GM has

4  assumed responsibility permanently for his pension obligations,

5  that new GM will continue to pay those, and that old GM,

6  unfortunately, now, is no longer responsible for those pension

7  benefits.  But as far as we're aware, all pension benefits have

8  been paid in the ordinary course and continue to be paid.

9          THE COURT:  I -- in your objection -- in your back

10  and forth with Mr. Theis, you said, in substance that you

11  understood that was bugging him was that although it was being

12  satisfied now, that new GM had reserved the right to amend or

13  terminate the plan.  I take it your position there is -- I

14  don't know if you can speak for new GM or not, but you're

15  saying that whatever I rule, just wouldn't affect that one way

16  or another; that's still an issue to raise with new GM.

17          MR. GRIFFITHS:  That's correct, Your Honor, I mean -

18  - pension benefits are a vested right under -- I believe, or it

19  says so, that there is no ability to term -- under the -- so,

20  under the applicable statute that applies to -- to pension

21  benefits, pension benefits are vested, and what that means if a

22  pension benefit is vested, it means it cannot be taken away.

23          THE COURT:  So this is a little different than the

24  medical benefits, for instance.

25          MR. GRIFFITHS:  Completely different -- absolutely.

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 67 of 112

Page 67

1   So that the welfare benefits are provided under the terms of a

2   benefit plan -- that's in sum -- that's an agreement between

3   the  -- a company and the beneficiaries -- its employees,

4   saying here are the bold welfare benefits we're going to give

5   you, but remember, we can amend or terminate these at any time.

6   Pension benefits cannot be revoked once they're granted; they

7   become (indiscernible 11:32:32)vested and that's why we have

8   what's called the PBGC, the Pension Benefit and Guarantee

9   Corporation -- that's an organization -- a governmental

10  organization that exists to -- to backstop pensions in the

11  event that a company goes bankrupt, like it did in this case,

12  and no other borrower is willing to take on the obligations for

13  the pension, then the PBGC steps in and takes responsibility

14  for those pensions.  Luckily, in this case, new GM assumed

15  responsibility for all pensions and pension obligations, and

16  pension rights are not, in any way, affected by these omnibus

17  objections, and Your Honor's right to say that new GM is now

18  responsible for with the pension obligations.  However, if

19  there are any issues with pension obligations being paid, we're

20  happy to intercede on behalf of the claimant with new GM, but I

21  understand that's not, in fact, the case.

22          THE COURT:   Okay.

23          I'll hear first from you, Mr. Theis.  Do you want to

24  replace Mr. Griffiths at the lectern, if you would, please?

25          MR. THEIS:   My name is Steve Theis, and I'll be

Page 68

```
1    brief.  A few days after my 18th birthday I hired in with
2    General Motors and we sort of made the deal that if I spent my
3    entire working career there, at some point I could retire and
4    every month they would send me a little check.  And that's what
5    happened.  I -- I know you know what 30 years is, because you
6    spent 30 years as an attorney, you said.  I spent 356 years
7    working at GM and my pension started, just like it was supposed
8    to.  And then I received a letter from this Court saying that
9    some changes was coming forth with the bankruptcy.  And it said
10   that if I had a new objection that I should file that
11   objection, and that I could read the bankruptcy agreement, so I
12   read it.  And there was a phrase in there that he had brought
13   up that new Gm reserves the right to reduce or eliminate my
14   pension.  If it was truly assumed -- if they had truly assumed
15   the pensions like he says, why would they word that like that?
16              THE COURT:   Do you have that letter with you, Mr.
17   Theis?
18              MR. THEIS:   Pardon me?
19              THE COURT:   Did you bring that letter with you?
20              MR. THEIS:   Which one?
21              THE COURT:   The one that you just made reference to.
22              MR. THEIS:   The one that said that if I had an
23   objection?
24              THE COURT:   No, that said that they reserved the
25   right to change it.  What I heard Mr. Griffiths saying is that
```

09-50026-mg  Doc 11753  Filed 05/16/12  Entered 05/24/12 13:22:54  Main Document
General Motors Corp., et al.
Pg 69 of 112

Page 69

1    while they reserve the right to potentially change medical

2    benefits, they don't propose to change pensions.  And if you do

3    have it, I'd like you first to show it to Mr. Griffiths and

4    then to hand it to me.

5            MR. THEIS:  It's in -- it's on page 73 of the master

6    sale agreement, section E, 67 - 6.17(e), and apparently there's

7    a lot of different meanings to different words, but it says

8    specifically:  purchaser and its affiliates may, in its sole

9    discretion, amend, suspect or terminate any such assumed plan

10   at any time, in accordance with its terms. Now to me, assume a

11   plan would mean all the things that the new GM --

12           THE COURT:  I see what's bugging you.  Okay.  I

13   understand your position quite well now, and you're saying --

14   you and Mr. Griffiths are little bit ships passing in the

15   night, because I think he's talking about limitations of law,

16   and you're saying what the Court order said, or what the sale

17   agreement said, and I now understand where you're both coming

18   from.  But -- I think I'm headed toward what I need to rule as

19   a matter of law, but before I do I'll hear any further

20   arguments you have, Mr. Theis.

21           MR, THEIS:   Shortly after I filed my objection to

22   claim, Mr. Griffiths contacted me and he asked if -- if I would

23   speak to him on the phone, and I said I would.  I told him my

24   concerns and I also told him at that time, I says:

25               "If you give me anything in writing that says that my

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 70 of 112

Page 70

1   pension will continue -- like -- basically my argument is, old

2   GM promised me something.  New GM's position is they don't owe

3   anybody anything, or basically.  If you would give me something

4   in writing that would say that my pension would continue, I

5   wouldn't have come to New York, but he didn't -- he never --

6   after that he never contact me back, and from then it's moved

7   forward, and that's what brings me here.

8           THE COURT:   I understand.  Has new GM continued to

9   pay your pension so far?

10          MR. THEIS:   Yes they have. \

11          THE COURT:   Okay.

12          MR. THEIS:   It's underfunded.  It's at risk right now

13  -- it's only 78 percent funded, and GM was supposed to put some

14  money into my pension fund as of September 11th, and they

15  didn't do it, and they asked for a 15-year extension on

16  payments that they were supposed to make last year, and new GM

17  had a record profits as you know.  So they're not real

18  concerned about our pensions.

19          THE COURT:   Um hmm.  Okay.

20          Ms. Reyes, would you like to be heard?

21          MS. REYES:   Yes sir. Continuing my brother's day to

22  day for March the 30th and also April the 20th, Your Honor --

23  I'll try to make it short and to the point.  From the beginning

24  I felt the bankruptcy firm only wanted documentation of my

25  divorce order and pension order, which I've sent, an also

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 71 of 112

Page 71

1    stated that fact.  I do not have a new claim.  I have no idea

2    to get to this point.  Am I going to lose any of my prior sole

3    monthly pension?  Do I need a presentation?  All I want is what

4    is what is stated in my awards until my death, but if its

5    disallowed and expunged affect my benefits with the new GM,

6    medical health and pension?  I would also like to come to new

7    writing stating that, Your Honor, and that's all I have to say,

8    sir.

9              THE COURT:   Okay.  Thank you.

10             Mr. Griffiths, any reply -- limited, of course, to

11   new stuff here heard from Mr. Theis and Ms. Reyes.

12             MS. REYES:   Yes sir.

13             MR. GRIFFITHS:   Yes, Your Honor, thank you.  We're

14   happy to provide additional comfort in writing, if that would

15   help the claimant.  I note that Mr. Theis is referring to a

16   definition of assumed plans; that's what he'd looked at when he

17   was trying to work out whether his pension rights were secure.

18   The definition of assumed plans is at page 7 of the omnibus

19   objection, and I've just reviewed it.  It relates to employee

20   benefit obligations and employment benefit plans as a type of

21   welfare benefits that we've dealt with previously.

22             THE COURT:   In other words, by the cross-references,

23   the context in which what he read was being said, dealt with

24   welfare plans rather than pension plans?

25             MR. GRIFFITHS:   Correct.

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 72 of 112

Page 72

1           THE COURT:   Okay.  Continue, please.

2           MR. GRIFFITHS:   Your Honor, UAW represents the

3    interests of its members zealously, and Your Honor knows that

4    as well as I do.  The UAW continues to represent the interests

5    of its members in its dealings with new GM and that applies

6    both to their pension benefits and to their welfare -- welfare

7    benefits.  Unfortunately, anything that new GM determines with

8    the pension plan is -- it would have to negotiate with the UAW

9    -- it's not something that this Court can interfere with, but

10   the point that we're trying to make is that this omnibus

11   objection relates to grievance procedures, it relates to

12   employment-related claims, which were assumed by new GM, and

13   I'm -- I'd like to get comfort to the claim that's on the

14   record, that their pension rights are not affected by this

15   omnibus objection that pension plans were assumed by new GM and

16   that pension claims will continue to be paid, unless and until,

17   God forbid, new GM suffers some sort of financial hardship, but

18   in that event the Pension Benefit and Guarantee Corporation

19   exists to backstop pensions.  So the pension issue is -- what I

20   understand is very important to the claimants, and I'm --

21           THE COURT:   Um hmm.

22           MR. GRIFFITHS:   -- happy to try and put their minds

23   to rest.  It's not really relevant for the purposes of this

24   omnibus objection under these claims.

25           THE COURT:   Okay.  Just so the record's clear, when

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 73 of 112

Page 73

1   the PBGC -- when the Pension Benefit Guarantee Corporation

2   steps up to the plate -- it pays, on account of those pensions,

3   subject to some limitations in law -- it doesn't always pay a

4   hundred percent of those pensions, am I correct?

5            MR. GRIFFITHS:   I understand that to be correct,

6   Your Honor.  Yes.

7            THE COURT:   Okay.

8            Further thoughts, Mr. Griffiths?

9            MR. GRIFFITHS:  None, Your Honor.  I understand there

10  maybe other claimants under the 121st and 122nd on the phone,

11  who we may want to hear before Your Honor rules.

12           THE COURT:   Okay.  Do I have either Sharon Bell or

13  Sarlower Olivier Tibbs on the phone?

14           MS. TIBBS:   Yes sir, Olivier Tibbs.

15           THE COURT:   Okay, do either of you folks want to be

16  heard on the matter?

17           MS. TIBBS:   Yes, sir.

18           THE COURT:   Go head, please.

19           MS. TIBBS:  Sorry.  Your hours to hours, as it was

20  stated that I was sent this information to send in the claim,

21  and at that time I was (indiscernible 11:43:10)of 94, the

22  Shreveport plant, and I trained for year to the Arlington plant

23  2000.  When they offered the buy out, I actually went and asked

24  questions to (indiscernible 11:43:28) of the UAW, to make sure

25  that I did have my 10 years with this company before I could

Page 74

```
 1    get in the -- in the part with also the injury that I also had

 2    took place in November of 2000.  And when I -- when I was

 3    inside of this buy out, and received my funds, it was only

 4    given to me $70 thousand, which was not stated -- it was not

 5    the $140 thousand -- it was saying that I did not have my ten

 6    years with this company.  And I was very upset at the time -- I

 7    went and talked to UAW and told them that it was not right and

 8    it was null and void contract.  So, what I did was, I filed a

 9    grievance against it -- against this buyout -- give to Karen

10    Aldridge (phonetic) and I recently heard from them back in --

11    about a grievance again in 2008.  In April I heard from

12    (indiscernible 11:44:35) and (indiscernible 11:44:35) letters

13    stating that I needed to contact them as soon as possible

14    concerning the buyout with General Motors, which I -- I did

15    contact them -- they did -- Dwayne Humphries at the time -- he

16    was our shop chairman -- and it was stated that to come back to

17    work on the -- you know -- the null and void contract.  And at

18    that time General motors was going through a financial

19    difficulty (indiscernible 11:45:06)that they said it's going to

20    get what you be on everything.  I have been keeping up with

21    them on this situation.  And also, when I received this letter

22    -- this letter in the mail from the Courts stating that -- I

23    brought my claim that they wanted to expunge it, and I throw it

24    out.  I was like, it's not fair to me that I signed this

25    papers, thinking that I was going to get 140 thousand.  I lost
```

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 75 of 112

Page 75

1    everything I had.  I lost my home.  I lost everything, my

2    (indiscernible 11:45:43) I filled with my daughters.  My kids

3    are taking care of me.  Due to the injury have, General Motors,

4    with my shoulders -- it took General Motors eight years to

5    approve my surgery.  I went everything.  I went through the

6    shock treatments, the physical therapy -- everything that was

7    asked of me.  It got to the point where the doctors who was

8    going to see me at the time -- he had retired. They changed --

9    they sent it to another doctor, and then finally he pushed it

10   through for me to have surgery, but I'm looking at -- I left

11   the company in 2006 in July.  Here it is, August and they

12   approve my surgery going to 2008.  Then I get a letter from

13   General Motors, April of 2008, about me coming back to work.  I

14   was still under my doctor at the time with my shoulder getting

15   on my heal.  I did speak with them; they said they was going to

16   contact me and if he knows whether it could be done.  All I ask

17   for is what is due to me.  That's all I ask for that -- give me

18   what is due to me to help take care of me, get me back where I

19   need to be.  They shouldn't be where my kids are taking care of

20   me.  It should be when I'm able to take care of myself, and

21   it's been hard for the last six years of my life.  I'm still

22   trying to get to a point where I'm able to take care of me and

23   not link up with my children, or their taking care of me, and

24   not ask the Court to get -- I just get.  If they just can give

25   me what's do to me and go back to work.  I'm okay now, my

09-50026-mg    Doc 11753    Filed 05/16/12    Entered 05/24/12 13:22:54    Main Document
General Motors Corp., et al.
Pg 76 of 112

Page 76

1    shoulder's helped get healed, I can go back to work and do what

2    needs to be done and help myself.  And in the future, help my

3    grandkids and then when they are going to help me get to what I

4    need to be right now at this stage.  And I'm just asking the

5    Court to just look at my situation.  I'm 47 years old.  It

6    should have to be that my kids are taking care of me; I should

7    be able to take care of myself and go back to work and do what

8    needs to be done.  I was a good worker.  I didn't have a

9    problem.  I injured myself, and I just want -- like I said -- I

10   just want what's due to me at this time.  I'm willing to go

11   back to work.  I'm ready to go back to work.  And I will do

12   whatever needs to be done to get back to work.  But I just

13   asked the Judge and the Court to just understand my situation.

14   At this time it is hard and I don't just want -- I want to live

15   (indiscernible 11:48:29).  I just don't want to do that.  And I

16   appreciate you guys hearing my case.  And I appreciate you,

17   Judge, for hearing my case.  And that's all I have to say.

18              THE COURT:   Okay.  Thank you, Ms. Tibbs.

19              My phone log doesn't sow any appearance by Sharon

20   Bell.  Is Ms. Bell on the phone?

21              COURT CALL OPERATOR:   (indiscernible 11:48:50).

22              THE COURT:   Okay.  Thank you.

23              All right.  Mr. Griffiths, I don't remember whether I

24   gave you a chance to reply.  Do you have any desire to say

25   anything in addition, after what I just heard?

1           MR. GRIFFITHS:   No, Your Honor, other than we're

2    very sympathetic with the plight of each of the claimants, but

3    it cannot helped on the light of the debtors' declaration.

4           THE COURT:   Okay.

5           All right.  Folks, I'm going to summarize my decision

6    in less lawyer-like and legal terms than I would otherwise, and

7    then if any of the people who are on the phone or in the

8    Courtroom want me to, or if anybody thinks he or she might want

9    me to, or if anybody thinks he or she might want to appeal, I'm

10   going to issue a more extensive decision.

11          But the summary of my decision is to deal with the

12   four main points that Mr. Griffiths made on behalf of the old

13   GM GUC Trust.  First says that the matters that are in

14   controversy, which are people's pension rights of UAW-

15   represented folks were assumed by new GM and that new GM is

16   going to be satisfying the obligations.  His second point is

17   that when new GM assumed and they stopped being

18   responsibilities of old GM.  His third point is that you can't

19   change pension benefits, and therefore the folks shouldn't be

20   too concerned.  And the fourth is that I can deal only with old

21   GM matters, and that I don't really have jurisdiction over new

22   GM.

23          I am not enough of an expert on pension law to know

24   whether new GM can or can't change pension benefits, but I do

25   know that their remaining three points that he made are true.

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 78 of 112

Page 78

1   They -- these pension benefits were, in fact, assumed by new GM

2   and that, of course is good news for the pension recipients.

3   When new GM took them over, that meant that old GM wouldn't be

4   on the hook for them any more, and of course he's right that I

5   can only deal with old GM matters, rather than new.  So the

6   good news is for the three people who are either here or on the

7   phone, is that the old GM bankruptcy isn't going to change

8   their rights.  I also know that I can't decide matters on how

9   new GM does its business.  What that means, as a practical

10  matter, is that claims against old GM for these rights must be

11  expunged, but what it also means is that nothing I say is going

12  to change people's rights against new GM, and that if new GM

13  does take -- try to take away anything to which they're

14  entitled, they're going to be free to go after new GM for that,

15  and they're free to use the UAW to the fullest extent their

16  rights with their own union permit, and I'm not going to

17  interfere with those in any way.

18          I'm going to ask Mr. Theis, or Ms. Reyes, or Ms.

19  Tibbs -- if each of you -- if any of you would like me to issue

20  a more full and extensive ruling -- if one person asks, I will

21  do it.

22          MR. THEIS:   I'm not sure what you mean by more

23  extensive ruling.

24          THE COURT:   I'll dictate a ruling that will take me

25  maybe ten, 15 minutes to -- to announce, but I'll be happy to

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 79 of 112

Page 79

1    do that if you would like me to, Mr. Theis.

2              MR. THEIS:  If it -- if it's going to say the same

3    thing you just said, I understand what you just said.

4              THE COURT:   Oh.  What about you, Mr. Reyes -- what -

5    -

6              MS. REYES:  I -- Your Honor, I am satisfied with your

7    ruling, thank you.

8              THE COURT:   Ms. Tibbs.

9              MS. TIBBS:  Yes.  I don't have --

10             THE COURT:   Does the yes mean that you heard me, or

11   does the yes mean that you would like me to issue a more

12   extensive ruling.

13             MS. TIBBS:  Give more extensive.

14             THE COURT:   You would like a more extensive ruling?

15             MS. TIBBS:  Yes sir.

16             THE COURT:   Okay.

17             Ladies and gentlemen, in these contested matters in

18   the jointly administered Chapter 11 cases of Motors Liquidation

19   Company and its affiliates, old GM moves, along with the

20   recently formed GUC Trust, which is a trust formed for the

21   benefit of old GM's creditors, to disallow and expunge the

22   claim of former employees represented by the UAW pursuant to

23   old GM's one hundredth, one hundred first, and one hundred

24   second omnibus objections.  The four claimants who I'm

25   addressing now, one of whom showed up live in Court, two of

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 80 of 112

Page 80

1   whom came on the phone, and the fourth of whom didn't do

2   either, but I'm still going to consider, are all former

3   employees of old GM who are represented by, or who continue to

4   be represented by the UAW, whose formal name is the

5   International Union United Automobile Aerospace and

6   Agricultural Implement Workers of America.

7          As I'll go on to explain in more detail, the four

8   claims here must be disallowed and expunged against old GM,

9   because all employment-related claims of UAW workers were

10  assumed by new GM.  The proof of claim process in this

11  bankruptcy case is for claims against old GM, not new GM. I

12  understand that the underlying Court filings and orders, which

13  were written in the manner by which lawyers so often write, are

14  difficult for others to work with.  But the sale order and the

15  master purchase agreement explained that new GM assumed all of

16  the claims that are at issue here.  Therefore, any employment-

17  related concerns by UAW workers may be, and should be raised

18  through the appropriate channels at the UAW and new GM.

19         The proof of claim process in old GM"s bankruptcy

20  case isn't the appropriate place to address such concerns.  But

21  the flip side of that is that people's rights again new GM are

22  unaffected by what I do here, and nothing in old GM's

23  bankruptcy is going to take away their rights that they have

24  against their pension trust, new GM, or the UAW.  My order

25  isn't going to affect those in any way.

1      My findings of fact and conclusions of law, with

2   respect to this, follow:

3      On June 1, 2009, old GM and its affiliates brought

4   these Chapter 11 Bankruptcy cases in this Court.  On June 26,

5   2009, the debtors entered into a sale agreement whose formal

6   name was a master sale and purchase agreement, to sell most of

7   the assets of what we now call new GM. On -- or putting it a

8   different way, to sell most of the assets of old GM, which were

9   then bought by the entity which became new GM, on July 5, 2009

10  I entered an order approving the sale and approving the

11  underlying master purchase agreement.  That purchase agreement

12  contained several provisions relative to UAW members'

13  Rights and rights of the UAW, and these provisions were set

14  forth in detail in the objections that old GM filed that were

15  sent to the claimants in September and October in 2009.

16      To summarize those provisions and translate them into

17  plain English, new GM assumed, that is new GM adopted or

18  acquired all employment-related obligations and liabilities

19  pertaining to workers affiliated with the UAW.  That was a

20  result that the UAW fought for on behalf of its members early

21  in the bankruptcy case to protect UAW workers from the

22  possibility that their claims would get less favorable

23  treatment if they remained against old GM.

24      The employment-related obligations that were assumed

25  by new GM included any claims of whatever type or nature that

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 82 of 112

Page 82

1    were related to the employment or employee benefits of UAW

2    workers.  For example -- and this list is non-exclusive -- or

3    necessarily exclusive -- GM assumed liabilities or claims

4    arising out of discrimination, workers' comp and occupational

5    injuries or illnesses, collective bargaining agreements,

6    wrongful discharge or termination of employee -- employment,

7    invasion of privacy, defamation, infliction of emotional

8    distress, and employee benefits including welfare benefits of

9    UAW workers, which is to be contrasted with the similar

10   benefits of old GM employees who weren't affiliated with the

11   UAW and who didn't receive such protection, as I discussed

12   separately today in connection with other claimants.

13          Moreover, and also importantly here, new GM assumes

14   certain liabilities under specific employee benefit plans for

15   UAW workers, including both pre-petition and post-petition

16   liabilities.  Even though new GM had assumed those, certain

17   individuals concerned -- and I find, if it matters, that their

18   concerns are understandable because of potential cross

19   references in documents or the way lawyers write things.  Four

20   people filed proofs of claim:  Sharon A. Bell, Sharon S. Reyes,

21   Stephan Theis, and Sarlower Olivier Tibbs.

22          Many of the points that were raised by the claimants

23   deal with rights that they may have against the UAW and/or GM -

24   - and/or new GM.  But those rights are not affected one way or

25   another by what we have before us today.

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 83 of 112

Page 83

1          Now, as conclusions of law I find that a proof of

2     claim is prima facie evidence of the validity and amount of the

3     claim, and the objector bears the initial burden of persuasion.

4     See In re Oneida Ltd., 400 B.R. at page 389 -- that being a

5     2009 decision by Judge Gropper of this Court.  What that means

6     -- translating from the Latin -- is that once a claimant, like

7     each of the four people here, files a proof of claim, assuming

8     at least that it's satisfactory, and all here have been set

9     down to be satisfactory in the first instance -- those claims

10    would be the starting point for getting paid the amount they

11    set forth in the claim unless there is some objection.  Once

12    there is an objection, the burden shifts to the claimant if the

13    objector produces evidence equal in force to the claim that was

14    previously filed, which, if believed, would refute at least one

15    of the allegations that's essential the claims' legal burden.

16          When the burden is shifted back to the claimant, the

17    claimant must then prove by a preponderance of the evidence

18    that under applicable law, the claims should be allowed.  Now

19    here we have exactly that situation.  Each of the claims was

20    prima facie okay, but the debtors in the GUC Trust then

21    objected and they met their burden of coming forward, which

22    meant that the claimants once more had the burden.  Here I'm

23    required to find, and do find, as a mixed question of fact and

24    law, that the claimants haven't met their burden to show that

25    their claims were appropriately asserted against old GM.  The

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 84 of 112

Page 84

1    reason is that because new GM assumed those claims, each of the

2    four claimants before me now undisputedly was, or is

3    represented by or affiliated with the UAW.  All employment-

4    related obligations and liabilities pertaining to UAW employees

5    had to be asserted against new GM or, if applicable, the UAW.

6         That was my very technical, legal explanation. Once

7    more I think it's helpful and maybe essential for me to go back

8    and get out of the legalese and talk plain English.  The UAW --

9    excuse me - the UAW negotiations led to new GM taking on these

10   claims.  Whatever rights the employees have are against new GM

11   and nothing in my order is going to change that, but because of

12   that assumption, the rights do not exist against old GM.  The

13   GUC Trust is to settle an order, which means circulate a

14   proposed order in accordance with this decision.  If people

15   want to comment on the form of that order, they have the right

16   to do it, but whether or not they do it, they still have the

17   right to appeal.  The time to appeal a bankruptcy court order

18   if shorter than the time to appeal regular federal Court

19   Orders; it's 14 days.  The time to appeal -- that 14 days --

20   will run from the time of the entry of that paper order, not

21   from the time that -- I'm dictating this decision.

22        So folks, I'm optimistic that nothing's going to

23   change into the new GM management of your rights, but one way

24   or another, I don't have jurisdiction over that.  What I am

25   telling you is that nothing in this bankruptcy is going to

Page 85

1    adversely affect your getting the rights that you otherwise

2    will have from new GM.  Not by way of re-argument -- are there

3    any questions, either from you, Mr. Griffiths or from any of

4    the former employees?  Mr. Theis.

5            MR. THEIS:  I do have one question.  He had mentioned

6    that he would supply us with something in writing to explain

7    what the difference between assumed liabilities was, because

8    he's actually saying that the pension, in my case, was not part

9    of the assumed liabilities.  Will the Courts say that he has to

10   give us something in writing, like you said he would?

11           THE COURT:  Well, I don't have the right to order

12   him to do it, but I'll ask Mr. Griffiths to clarify what he's

13   willing to do.

14           MR. GRIFFITHS:  Yes, Your Honor, absolutely.  We'll

15   voluntarily provide a written explanation as to, and hopefully

16   in plain English, as to the mechanics by which pension benefits

17   and welfare benefits transferred to new GM under the master

18   purchase agreement and the deal with the UAW. We can certainly

19   provide something, and we can certainly have further

20   conversations with you, if you don't understand -- and

21   naturally, if you have any questions or clarifications that are

22   needed, so that it's perfectly clear.

23           THE COURT:  That sounds fair enough. Okay, fair

24   enough.  Ms. Reyes and Ms. Tibbs, you call?

25           MS. REYES:  Yes sir.

Page 86

1               THE COURT:   Okay.

2               MS. REYES:   I comply with the Court and I thank you,

3       Your Honor, and I thank you Mr. Griffiths.

4               THE COURT:   Okay.

5               MS. TIBBS:   This is Ms. Tibbs.   I wanted

6       my(indiscernible 12:08:25) to know then they don't have to do

7       with the (indiscernible 12:08:29), is my (indiscernible

8       12:08:30)--

9               THE COURT:   Well, I - I --

10              MS. TIBBS:   -- (indiscernible 12:08:34) --

11              THE COURT:   I'm sorry, I didn't understand your

12      question.

13              MS. TIBBS:   Okay, I was asking what is my next step

14      to being able to file a claim against the new GM.   What is the

15      process?

16              THE COURT:   I understand.   And, Ms. Tibbs, I'm sorry

17      to say that I can't give you legal advice on that, and I don't

18      know.   Mr. Griffiths, if your offer also goes to picking up the

19      phone and helping to explain to her what she should do next, I

20      would welcome that, but I'm not ordering it.   What are you of a

21      mind to do to help people get their rights against new GM?

22              MR. GRIFFITHS:   absolutely, Your Honor.   And a lot

23      like yourself, I can't give legal advice to these claimants,

24      but I'm happy to call them up.   Probably the most useful thing

25      to do is for me to sort a previous UAW representative we'd

Page 87

1    spoken to in the past, who we can have them speak to.  I can't

2    speak as to the merits of the underlying claim, as to whether

3    it is -- as to its validity, but we can certainly try to point

4    the claimants in the right direction.

5            THE COURT:   Very good.  As I said, I can't order

6    that but I appreciate it.

7            Okay folks, anybody who is here on this one is free

8    to leave the Courtroom or to drop off the line.  And I think

9    you have one more major matter, Mr. Griffiths.

10           MR. GRIFFITHS:  Yes, thank you, Your Honor, we have

11   two final omnibus objections to claims today.  The 83rd, with

12   Ms. Linda K. Bellaire, who I believe attended the last hearing

13   telephonically.  And I know that in the hundred and 16th, Mr.

14   Scott is not attending, but Mr. McManama and Mr. Siefkes may be

15   on the phone.

16           THE COURT:   Okay.  You've mentioned McManama.  You

17   mentioned Ms. Bellaire?

18           MR. GRIFFITHS:   Yes, Your Honor.

19           THE COURT:   Okay.  Ms. Bellaire?  I see you on my

20   phone log.  Are you here?

21           MS. BELLAIRE:  Yes I am.  I'm just hoping my phone

22   battery last long enough to read through my two pages here.

23           THE COURT:   I know, we've all been at it since 9:45

24   this morning, it's now ten after 12:

25           MS. BELLAIRE:  Yes.  I'll (indiscernible 12:10:49) on

Page 88

1    sugar.

2            THE COURT:   Okay.  Well, I appreciate your patience.

3    Mr. McManama, are you on also?

4            MR. MCMANAMA:   Yes, Your Honor.  I am here.

5            THE COURT:   Okay.  Same apologies to you; I know

6    you've been waiting a long time.

7            Okay, here we have the matter of welfare benefits,

8    most commonly medical benefits.  I'll hear first from you, Mr.

9    Griffiths, and after you've spoken the first time, I'll give

10   each of those folks a chance to be heard.  Before we do that,

11   though -- what about Mr. Siefkes and Mr. Scott -- are you --

12   either of you folks on?

13           MR. SIEFKES:   Yes, Don Siefkes is here.

14           THE COURT:   Okay, thank you.

15           Oh yes, I'm sorry, I see on my log, Mr. Siefkes --

16   I'm going to give you that same right to be heard that I'm

17   offering, of course, to Mr. McManama and Ms. Bellaire.  Just

18   stand by, please.  Go ahead.

19           MR. GRIFFITHS:  Thank you, Your Honor, I'd like to,

20   first of all, start by designated -- designating for the

21   record, Your Honor's rulings on -- for omnibus objections that

22   are similar to -- to this and designate them as part of the

23   records.

24           THE COURT:   Thank you.

25           MR. GRIFFITHS:  Your Honor, would it be helpful if I

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 89 of 112

Page 89

1    went into -- a plain English explanation of the omnibus

2    objection.  I know Ms. Bellaire has heard it before; perhaps

3    the others haven't, but perhaps Your Honor would like to hear

4    from the claimants first?

5               THE COURT:   Let's do it this way.  I think it's

6    useful -- since nobody has a lawyer -- for you to just

7    summarize the basis for your objection in plain English.  Then

8    I do want to hear from each of the claimants.  Then I'm going

9    to give you a chance to respond to anything new that you say.

10              MR. GRIFFITHS:   Thank you, Your Honor.  I'll try to

11   be brief.

12              Your Honor, following the bankruptcy of General

13   Motors Corporation on June 1, 2009, each of the claimants here

14   filed a proof of claim by the bar date.  The proofs of claim

15   are in sum for welfare benefits that the claimants had

16   previously been receiving, but which have been amended,

17   reduced, or eliminated by GM, as a result of the company's

18   financial distress.  As Your Honor has noted previously, the

19   phrase, welfare benefit is a term of art in pension law or

20   ERISA or bankruptcy law, used to describe benefits offered to

21   employees, at least principally in the medial and life

22   insurance areas.  The term welfare benefits, as we're using it

23   today does not include pension benefits, which are not the

24   subject of the motion today, and the claimants' pension

25   benefits will not be affected by today's motion.  Following

**Page 90**

1    these proofs of claim being filed, old GM filed omnibus

2    objections, which as I explained earlier, are just a convenient

3    mechanism for aggregating large number of claims together when

4    they are similar.  And the basis of the omnibus objection is as

5    follows:

6            The benefits that the claimants on the telephone

7    today were receiving, other than the pensions are covered under

8    what's called as a welfare benefit plan.  The welfare benefit

9    plan is a contractual document that governs the terms under

10   which welfare benefits are provided.  Each welfare benefit plan

11   unequivocally reserve the right of old GM to amend, reduce, or

12   terminate a plans and benefit at any time, and that's what

13   happened.  The reservation of rights, as they're called, were

14   not only contained in the plan documents, but were also in what

15   we call summary plan descriptions, and these are summaries of

16   the benefits that were available to employees of old GM, that

17   were available to the claimants while they were employees, and

18   were sent out to each of the claimants every five years after

19   they retired.  They -- the summary plan descriptions explain

20   very clearly these benefits and are guaranteed, and they can

21   amend -- amend it or terminate it at any time.

22           Your Honor, the omnibus objection cites case law to

23   support old GM's view of these claims, (indiscernible 12:14:56)

24   Sprague vs. General Motors Corporation in the 6th Circuit in

25   1998 at 133 F.3d at Page 388, as well Moore, that's M-O-O-R-E,

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 91 of 112

Page 91

1    and Metro Life Insurance Company in the Second Circuit in 1988

2    at eight - 856 F.2d at Pages 488 and 491.

3          And in dealing with claims of old retirees, which

4    were very similar to the claims that are before us today, the

5    U.S. Court of Appeals of the Sixth Circuit in Sprague

6    determined then, because vesting of welfare benefits is not

7    required by law; an employers commitment to vest such benefits

8    is not to be inferred lightly.  That's to say that if old GM

9    had wanted to vest the welfare benefits in the claimants that

10   are the phone today, they would have had to do so explicitly

11   and with a -- with a will to do so, which is not the case.  The

12   intent to vest can be found in the plan documents, and must be

13   stated in clear and expressed language.  And, as I've detailed,

14   each of the plans and summary plan descriptions went into --

15   into length as to how their worker benefits were not vested and

16   could be amended or terminated at any time.  And, in this case,

17   the welfare benefits of each of the claimants were not vested

18   because GM reserved the right to amend or modify their welfare

19   benefit plans and never had an intent to vest those benefits.

20   And the unfortunate conclusion of this is that the claims of

21   former employees of -- of the debtors must be expunged from the

22   claims register.  I understand that welfare benefit plans were

23   set up by new GM and certain worker benefit plans were assumed

24   by new GM, and this omnibus objection doesn't affect the

25   current welfare benefits the claimants are receiving, nor does

09-50026-mg    Doc 11753    Filed 05/16/12    Entered 05/24/12 13:22:54    Main Document
General Motors Corp., et al.
Pg 92 of 112

Page 92

1      it affect their pension rights.

2              And so those conclude my comments, Your Honor.

3              THE COURT:    Okay.

4              Mr. McManama, I'll hear from you first.

5              MR. MCMANAMA:    Yes, Your Honor. I understand what

6      was just presented, and I would say that I would -- do agree,

7      if you go and go back, likely, and read all the fine print,

8      what is said is true. However, I wouldn't say -- and make two

9      points:  I think there were additional communications made to

10     us that might have been in the contrary to that.  And my case,

11     as an executive, when I retired, it wasn't something I'd

12     planned to do; I was pretty much forced out, because General

13     Motors was trying to reduce staff, and they were looking for

14     volunteers over 55 years old, because it was very common, and

15     GM would say, once you get over 30 years service and you're

16     over 55, you have health care for retirement as well as other

17     things.  And General Motors had some to us with a package,

18     which included pension, it included life insurance, it included

19     health insurance, and we were asked to voluntarily retire with

20     that package.  When we didn't respond, we-- I -- in my case, as

21     an executive, I got a personal letter from Rick Wagoner who was

22     then President or CEO, suggesting that pay don't get it and if

23     you don't go now, we're going to have to make cuts and the

24     package (indiscernible 12:18:10) from you is going to be better

25     than what you're going to be better than what you're going to

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 93 of 112

Page 93

1   likely get if you stay, because we're going to make more cuts,

2   and the packages will probably be less lucrative to you.  So,

3   with that, you know, I took the understanding that what they

4   were offering was what they were going to offer me as far as

5   pension, health care, and life insurance, all of which had been

6   reduced since I took the package and left.

7            The second paint I would just like to make, as I

8   don't think all employees were treated equally as we went

9   through this.  The union members, through the bankruptcy and

10  the settlement, had a much more lucrative coverage provided

11  them than the salary did, and also the executives who planned

12  this who then retired after the bankruptcy, gave themselves a

13  much more lucrative package than what we were provided in the

14  end.  So, my perspective is, I was offered a package and was

15  told if I didn't go it would likely be reduced, but it was

16  implied that if I went that's the package I would get.  And

17  that's my perspective here.

18           THE COURT:   Um hmm.

19           A question, Mr. McManama.  Did the company give you

20  anything in writing, making a promise on the welfare benefits

21  that would trump what they had said in the plan descriptions?

22           MR. MCMANAMA:   I didn't get a document that said

23  specifically, your welfare will be covered.  What we got was a

24  more general communication -- that letter from Rick Wagoner

25  stating that this retirement package that we are offering you

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 94 of 112

Page 94

1    now is more lucrative than what we're going to give you if you

2    likely stay, because we're going to -- if five times everything

3    tough, and we're not going to be able to offer this going

4    forward.  So there ws the implication that the complete package

5    was going to be better than what it would be later on.

6            THE COURT:   Okay.  Thank you.

7            MR. MCMANAMA:   There was no indication in that

8    letter that, if you take this package, we'll likely going to

9    cut what's in the package as well, that that was totally

10   neglected, and that was the time that they were probably

11   planning all these cuts.  So there was no indication to us:

12   take this package, and oh, by the way, these things may get

13   cut.  It was: take this package now, and if you don't, then

14   we're likely going to cut it going forward.

15           THE COURT:   Um hmm.  Okay.  Mr. Siefkes?

16           MR. SIEFKES:   I'd like to (indiscernible 12:20:35)in

17   the General Motors, the salaried employee in 1985.  I worked at

18   General Motors for 24 years, then retired.  But when I hired in

19   the annual employee benefits handbook and all the talk of

20   personnel was, we had these wonderful benefits at General

21   Motors, and, which is one of the reasons I decided to take this

22   job.  But it's a lot of fun -- don't have me wrong, General

23   Motors, is a good company.  But there's nothing said, and in

24   those certain documents, of course I don't have copies of --

25   I'm not that excited when I -- I cannot remember anything about

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 95 of 112

Page 95

1    this related to amend and modify or terminate (indiscernible

2    12:21:18).  Then something happened, and not only happened, but

3    something changed, I'd say around the year 2000 -- maybe 10

4    years ago (indiscernible 12:21:29) started to appear on all

5    these letters from personnel.  But that statement that they

6    were going change, modify, or terminate these requirements was

7    not fair in the beginning, so it's like it all changed at the

8    end.  And in the fine print in the plan documents sometimes --

9    it's probably in there, but it just doesn't seem fair -- you

10   work 24 years and in (indiscernible 12:21:56)'s case it would

11   be 7 years, then have all these things just cut off. Not all

12   employees are treated the same.  It just seems to me that it

13   would be more equitable if all the benefits -- the worker

14   benefits were reduced and then serviced across the board.  My

15   wife and I can't afford to pay another $130 thousand; we're

16   sort of struggling along here.  We're not going to die on

17   account of this, but it seems like it seems that the equitable

18   thing to do puts the entire cost of this on the backs of

19   terminated or employees who were asked to leave.

20          THE COURT:   Mr. Siefkes --

21          MR. SIEFKES:  That's all I have to say.

22          THE COURT:   --, I thank you, but I have a question

23   or two, if you'll indulge me.

24          MR. SIEFKES:   Sure.

25          THE COURT:   If I heard you right, you said that for

Page 96

1   the earlier part of your tenure -- I'm not sure if you said the

2   exact number of years, but I'm assuming it was roughly half of

3   your time.  You thought that you didn't have language in the

4   plan that reserved the right to amend or terminate or something

5   like that.  Do you have any of the documents that were given to

6   you back before the policy that changed, which you might be

7   able to offer me to show that the deal was different for a

8   period of time of your employment.

9          MR. SIEFKES:   Unfortunately, I don't.  I didn't save

10  all that stuff; I wish I had.

11          THE COURT:   Uh-oh.

12          MR. SIEFKES:   The only thing I can find that I found

13  is a copy of (indiscernible 12:23:41)or something

14  (indiscernible 12:23:42) license share.  The (indiscernible

15  12:23:43) talking about today (indiscernible 12:23:45)amount

16  (indiscernible 12:23:46) the rest of your life (indiscernible

17  12:23:46), that was dated 1991.  (indiscernible 12:23:48)

18  health care benefits, relating to life insurance.

19          THE COURT:   I understand.

20          MR. SIEFKES:   And, of course, (indiscernible

21  12:24:04)

22          THE COURT:   Okay.  Fair enough.  Did I cut you off

23  before you had a chance to speak your piece, Mr. Siefkes, or

24  did you pretty much conclude.

25          MR. SIEFKES:   I concluded.

Page 97

1          THE COURT:   Okay.

2          Ms. Bellaire.

3          MS. BELLAIRE:   Yes, I hope that I'm not echo through

4     this phone.  I'm going to read a statement that since my -- my

5     application that I put in, I have found that Metropolitan Life

6     Insurance Company's General Motors Corporation, affiliated as a

7     subsidiary company, dated -- plan dated 1974.  So I have that

8     (indiscernible 12:24:45).  But I have a reading -- a written

9     statement I have because I'm not good at off-the-cuff, and in

10    here I may reference some pension stuff, but it's in reference

11    to showing how I feel that is GM's gone to handle it.

12          So, good afternoon - my name is Linda Bellaire, and I

13    a retired 35-year veteran of the old GM.  In response to item

14    21, the states:  "General Motors Corporation reserves the

15    right," I would argue this does not apply in this case, since

16    it was the Federal government and it (indiscernible

17    12:25:23)all aspects of this bankruptcy action, not GM as it is

18    intended by the original documents.  I would argue that the

19    true GM management has no control over the actions that were

20    being instigated by the executive branch of the government and

21    is now left this Czar, named to oversee this travesty.  I heard

22    in conference calls in May of 2009 with the same (indiscernible

23    12:25:50) that's listed in the documents I've provided that I

24    if I would call them the Czar's team (indiscernible 12:25:58)

25    in a veritable split of the bankrupt's net liability in a one-

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 98 of 112

Page 98

1   third to two-third division against the salaried retirees and

2   the bond holders, fair and consistent (indiscernible 12:26:10).

3   Why would I call this a travesty?  The same government that has

4   been trying to disband and destroy GM for decades, came in and

5   coerced and cajoled the company representatives into being a

6   (indiscernible 12:26:26) of earned and paid-for benefits, and

7   earned and paid-for insurance, not to mention the equity of the

8   salary versus the hourly pay.  They told -- the sold a

9   company's back out from underneath us, without offering us a

10  chance to realize our losses by taking possession of the

11  (indiscernible 12:26:46).  Instead it was buried in a 401K

12  account, which offered us no chance to recoup our losses.  They

13  are inconsistent, my foot.  I would counter that nothing about

14  the salaried employment has been fair or consistent.  It's like

15  saying every child is treated fair in your home.  Everyone has

16  different circumstances and needs.  I took an early retirement,

17  which meant my income was (indiscernible 12:27:13) by

18  approximately 40 percent.  Then within six months of retiring,

19  I had my benefits limited or reduced.  How is that fair to

20  (indiscernible 12:27:23) to retire a year, two years, ten

21  years, or 20 years before me, or for that matter, after

22  bankruptcy.  It is not fair or consistent, since this has not

23  taken into account time and benefit value.  I have the most to

24  lose because I have the longest permanent retirement to face,

25  as you all know, endless skyrocketing medical costs in this

09-50026-mg   Doc 11753   Filed 05/16/12   Entered 05/24/12 13:22:54   Main Document
General Motors Corp., et al.
Pg 99 of 112

Page 99

1    country.  In response to item 23, my proof of claim is

2    documenting beside the simple fact that I was an employee, I

3    have proof that that employment was the same Federal government

4    who came in and took over my company and this entire activity.

5    If we look at my social security records for proof of

6    employment, and they are forthcoming.  I am additionally

7    disappointed that the check and balance system that are in

8    place in our society continues to be hypocritical.  Rather than

9    correcting the loans with the GUC and the government borrowed,

10   Your Honor, the Court appears to be litigating using the same

11   bar that allows the Executive branch to appoint this Czar to

12   come in and coerce the management and (indiscernible 12:28:31),

13   in order to reform a (indiscernible 12:28:35. Will the

14   (indiscernible 12:28:37) tell me the truth contingent upon

15   bankruptcy -- I highly doubt it.  I don't wish to explain

16   (indiscernible 12:28:44), Your Honor.  You have it within your

17   power to allow all of these claims, even if they pay a penny a

18   dollar, at least it would be fairer than the actions that have

19   been taken so far.  By entering all salaried employee claims we

20   are forced to go with Congress.  Yes, the same Congress that

21   sent (indiscernible 12:29:01) to the actions of the Czar or the

22   Court.  This is the same government entity that has been trying

23   to disband and destroy the company since the 60s.  There is

24   nothing fair or justified in this (indiscernible 12:29:14).  I

25   would argue additionally that the treatment of the stock sales

Page 100

1    was not a welfare benefit, therefore should be allowed to be

2    (indiscernible 12:29:21). I would also add that the required

3    continuance of payment to retain long-term health and -- health

4    care insurance would negate it as well, should you consider it

5    a welfare benefit, and that dispute be continued.  I'm

6    struggling with what I will (indiscernible 12:29:41) grandson

7    (indiscernible 12:29:42) this country (indiscernible 12:29:43)

8    government.  But everything he will be taught in school will be

9    a sham.  And there's little difference between America of today

10   and the discriminations of the last Century.  Your Honor, this

11   may be your Court, but this is my life.  I find it very

12   difficult for me is that I can dispute fair treatment; it's the

13   same government that chose to distribute company assets

14   equitably is the same government determining my dispute with

15   the distribution.  (indiscernible 12:30:11) Congress is my only

16   recourse again is absurd.  You can preview and (indiscernible

17   12:30:18) this to determine the findings so that (indiscernible

18   12:30:23).  As a government directed bankruptcy of this

19   magnitude and breadth is unprecedented (indiscernible

20   12:30:27).  The plaintiff in this case (indiscernible 12:30:29)

21   has absorbed the benefits (indiscernible 12:30:31).  Their

22   responsibility in attending to those obligations are equally

23   troubling as the Court's position today regarding salaries

24   employees objection.  For the annual funding notice required by

25   ERISA -- 2010 was the first year.  That means that the very

1   first time ever that the salary retirement funding calculation

2   were indicated in the plan to be at risk.  If the progressions

3   of these funding markets continue at the following pace, it

4   will only be a matter of time before the plan will be

5   terminated and turned over to the PBGC.  This would be

6   catastrophic to retirees like me.  My age-reduced pension would

7   be (indiscernible 12:31:17) to greater extent.  I'm looking at

8   going from a middle-class American to an under-class retiree.

9   With pension cuts, social security cuts and the predictable GM

10  health care elimination, which is my prediction when

11  (indiscernible 12:31:32) in the company.  By explaining my

12  plight, you're providing me some continuing expertise,

13  retribution for the activities which will drive me into

14  poverty.  Lower pension, no health care coverage and no

15  security.  The benefit publications in place during the time of

16  my employment were in my contract.  I always stood up to my end

17  of the contract, and I think its within your hands properly

18  execute (indiscernible 12:32:04) contractual obligations.  You

19  and now are at the threshold of creating a new underclass, and

20  I believe the Court is continuing perpetuating the inadequacy

21  of the Bankruptcy Code and do the right thing here

22  (indiscernible 12:32:17).

23            THE COURT:   Okay.  Thank you.

24            All right, is there any other employee affected on

25  this who I haven't given a chance to be heard?  No response.

Page 102

1    Okay, Mr. Griffiths, ready to reply?

2            MR. GRIFFITHS:    Your Honor, very briefly, with

3    respect to Mr. McManama and Mr. Siefkes' claims that perhaps

4    the benefits plans didn't contain a reservation of rights.

5    We've gone as far back as we can -- I recently cited a 1984

6    welfare benefit plan that included the reservation of rights.

7    We're not aware of any welfare benefit plans that don't contain

8    the reservation of rights.  If the claimants at any time come

9    up with a welfare benefit plan they can show us that does,

10   we'll have to look at it, but otherwise we don't find a basis

11   for that  (indiscernible 12:33:08).  There's one statement was

12   made as to whether all employees, as part of the restructuring,

13   are effected uniformly under ERISA, which is the applicable

14   statute here -- the Employee Retirement Income Security Act --

15   I think in 1974 off the top of my head.  There is no obligation

16   to treat all our employees uniformly.  Definite employees in a

17   company are treated differently all the time, and UAW employees

18   were indeed treated differently to salaried retired there, or

19   salary (indiscernible 12:333:38) employees.  And then, lastly,

20   with respect to Ms. Bellaire's eloquent statement.  We are

21   greatly saddened by the hardship that's being caused by these

22   Chapter 11 cases, but just to note that the Court didn't put GM

23   into the situation, and this Court tried to find the best

24   available solution to it that would satisfy all parties.  And

25   we believe that the plan that was -- that the plan was the best

Page 103

1      available option to given the circumstances.  Thank you,, Your

2      Honor.

3              THE COURT:   Okay.

4              Ladies and gentleman, although I could, and if

5      anybody wants to me, will issue a lengthy technical decision

6      like the one I dictated a few minutes ago, I think it's better

7      for me to describe my ruling in summary form and in plain

8      English, although anybody who wants me to issue it in a more

9      detailed and technical form in which I issued the last one,

10     I'll honor that respect -- that request  -- excuse me.

11             My bottom line is that with old GM having told people

12     in its plan descriptions that it deserved the right to modify

13     its welfare benefit plans, coupled with the Court decisions,

14     most significantly the Sixth Circuit's decision in the Sprague

15     case, 133 F3d. 388, I'm required to disallow these claims

16     because old GM had reserved the right to do that which it

17     ultimately did.  I do want to take a moment to address the

18     arguably special circumstances that were articulated by Mr.

19     McManama, because in another case on my watch the Chapter 11

20     case of Chemtura Corporation, that there was a promise made

21     during the days of his employment, and the company changed the

22     terms of his employment in mid-stream, where he had worked part

23     of his career on one set of terms, and a different -- the

24     remainder of his career, on a different one -- I thought that

25     raised a legal issue that I had continued it for further

1    proceedings on, and it was ultimately settled.  And if Mr.

2    McManama had shown me a document that promised not to change

3    things, even if he had worked under that document for only part

4    of his career, I would have given that enough attention to put

5    it in a separate category, but Mr. McManama has said, in

6    substance, that he didn't have any such document, if in fact it

7    existed.  Mr. Griffiths has told me that all the documents

8    they've been able to find going back to 1984 are the same as

9    they are now.  So I don't have enough of a basis for finding a

10   Chemtura exception on the state of facts here.

11           MS. BELLAIRE:  (indiscernible 12:37:46)

12           THE COURT:   Just a minute please, folks.  It gives

13   me no pleasure to deny these claims.  I recognize that the

14   company's ability to cut back on its welfare benefits creates a

15   hardship for the claimants, but because there was that

16   reservation of rights, I am required to disallow these claims.

17   I'll allow the question now.  And if somebody wants me to go

18   through the lengthy technical discussion like the one I had

19   before, it would probably take me 15 minutes to dictate but

20   I'll do that if somebody wants to take this up on appeal.  Yes,

21   this questioner was whom?  Was that Ms. Bellaire?

22           MS. BELLAIRE:  It was.  This is Linda Bellaire.

23           THE COURT:   Okay, go ahead, please.

24           MS. BELLAIRE:   I can never the point you make about

25   a change in present employment.  I was a General Motors

Page 105

1      (indiscernible 12:38:50).

2              THE COURT:   I'm not aware of anything that wasn't in

3      the responsive papers, Ms. Bellaire.

4              MS. BELLAIRE:   Okay.  All right, I want to say it

5      could have been something you stated here today.  General

6      Motors Institute became GMI and it's now (indiscernible

7      12:39:04).

8          MS. BELLAIRE:   Okay.  I only said it because it's

9      something you stated here today.  General Motors Institute

10     became GMI and it's now (indiscernible 12:39:04) and General

11     Motors is no longer a part of it (indiscernible 12.39.07). and

12     then (indiscernible 12.39.14).  The 2000 -- the 1974 plan

13     (indiscernible 12.39.25) I can't tell if it applies to -- the

14     timeframe would've been (indiscernible 12.39.33). I'm just

15     wondering if an opportunity was there (indiscernible 12.39.41)

16     could provide documentation that (indiscernible 12.39.43) at

17     the start of my employment there were different (terminologies?

18     (indiscernible 12.53.11).  Do I have an opportunity to

19     (indiscernible 12.39.54) the Court?

20             THE COURT:   My analysis doesn't turn on whether you

21     were hourly or salary.  My analysis would turn on whether you

22     had a piece of paper that said something different, basically

23     the opposite, of all of the plan descriptions that have been

24     put in the record so far, that say, quite explicitly that: we

25     at GM have the right to change your welfare benefits.  Do you

1    have a piece of paper in hand that says we agree that we can't

2    change these benefits and that you will have these benefits for

3    the remainder of your lifetime?

4         MS. BELLAIRE:    Well, the difficulty with

5    (indiscernible 12.40.39) when you are an employee, it doesn't

6    necessarily pertain to you when you become retired.  And that -

7    - I'm not going to terminate my employment; I'm retired.  So

8    that's the difficulty in reading the (indiscernible 12.40.57)

9    much smaller (indiscernible 12.41.02) than we have today

10   (indiscernible 12.41.04) six pages -- the benefits package at

11   that point in time.

12        THE COURT:    That, by itself, is not enough to cause

13   me to change my decision.  If, however, you have such a

14   document, it could.  So, here's what we're going to do; right

15   now, Ms. Bellaire, you're going to be covered with everybody

16   else.  I'm going to give you 30 days to give, first, Mr.

17   Griffiths, and then the Court, any piece of paper that you have

18   that has a contrary promise and if you do have such a piece of

19   paper, I'm not going to judge in advance how I would decide it.

20   But I have to tell you that in the nearly three years that I've

21   had this case, I have never seen such a document.  If you have

22   one, show it to him and see if you persuade him and if you and

23   he agree to disagree, and if you have that document, what you

24   can do is file that document in court and then we'll decide if

25   that should result in a change in your situation.

1          MS. BELLAIRE:   In Mr. McManama's case, does he have

2    that letter from Rick Wagner with that change (indiscernible

3    12.42.25)?

4          THE COURT:   Well, he said he didn't --

5          MS. BELLAIRE:   I'm asking because my husband is in a

6    similar situation.

7          THE COURT:   Well, It's very hard for me to deal with

8    hypotheticals, but the underlying principle is it's got to be

9    in writing and it's got to say something different.  And it's

10   got to basically say the opposite. And if you have a writing

11   that does those things, I'm not going to be like those three

12   monkeys and put my hands over my eyes and my ears and refuse to

13   give people fair consideration.  Okay?

14          Mr. Griffiths, you're to settle in order in

15   accordance with the foregoing.  If -- I think I explained the

16   ruling in enough detail.  If anybody decides to appeal, I'll

17   consider then whether I need to issue a more extensive ruling

18   but I think I've explained the rationale in quite enough

19   detail.

20          MR. GRIFFITHS:   Yes, Your Honor.

21          MR. SIEFKES:   Your Honor, I'm Mr. Siefkes.  Can I

22   get Mr. Griffiths' address?  I don't have that on any of the

23   documents that I have been faxed.

24          MR. GIFFITHS:   Mr. Siefkes, I think I have your

25   contact details and I'm willing to send it to you after the

Page 108

1    hearing by email or to call you by telephone or by letter.

2            MR. SIEFKES:   An email would be fine.   Thank you so

3    much.

4            THE COURT:   Okay.   I think then that takes care of

5    everything.   Do you have anything further Mr. Griffiths?

6            MR. GRIFFITHS:    Last matter, Your Honor, uncontested

7    omnibus objections, there are five: 271, 72, 273, 274, 275.

8    They are unopposed and we'd just like to have the orders

9    entered.

10           THE COURT:   Okay.   If they are unopposed, your

11   request to disallow those claims is cleared.

12           MR. GRIFFITHS:    Thank you, Your Honor.   That

13   concludes all the matter this morning.

14           THE COURT:   All right, then -- I know we've been on

15   for a very long time and without a break, three hours worth.

16   We're adjourned. Have a good day everybody.

17

18

19       (Whereupon these proceedings were concluded at 12:44 PM)

20

21

22

23

24

25

General Motors Corp., et al.

Page 109

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 110

1                        I N D E X

2

3                         RULINGS

4                                          Page      Line

5   Motion by Dr. Sizemore to Comply with    20        2

6   Related to Terms and Provisions of 363

7   Sanctions - denied

8

9   GM's motion to impose further sanctions   20        5

10  Against Dr. Sizemore - denied

11

12  Motion for expungement in September      52        4

13  2010 89 omnibus motion - granted

14  Omnibus objection

15

16  Motion to expunge 249 Omnibus

17  Objection, Claim No. 33043               48        4

18

19  Motion by GUC Trust objecting to claim   58       22

20  of Marjorie Creamer - granted

21

22  Motion by GUC Trust to disallow          80        4

23  and expunge claims in 110th, 101st,

24  and 102nd Omnibus Objections

25

Page 111

1    **Motions on uncontested omnibus 271,**                    110              9

2    **272, 273, 274, 275   objections,**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 112

1

2                          C E R T I F I C A T I O N

3

4      I, Michelle George, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6

7      Michelle          Digitally signed by Michelle George
                         DN: cn=Michelle George,
8      George            o=Veritext, ou,
                         email=digital@veritext.com, c=US
9                        Date: 2012.05.16 15:37:50 -04'00'

10     MICHELLE GEORGE

11

12     Veritext

13     200 Old Country Road

14     Suite 580

15     Mineola, NY 11501

16

17

18     Date:  April 30, 2012

19

20

21

22

23

24

25