Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Lead Case No. 09-50026(REG), Adv. Case No. 1-12-09802(REG)

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7  GENERAL MOTORS CORPORATION

8            Debtors.

9  - - - - - - - - - - - - - - - - - - - -x

10  MOTORS LIQUIDATION COMPANY GUC TRUST

11            Plaintiffs,

12  v.

13  APPALOOSA INVESTMENT LIMITED

14            Defendants.

15  - - - - - - - - - - - - - - - - - - - -x

16            United States Bankruptcy Court

17            One Bowling Green

18            New York, New York

19

20            May 15, 2012

21            11:06 AM

22

23  B E F O R E:

24  HON. ROBERT E. GERBER

25  U.S. BANKRUPTCY JUDGE

1

2    HEARING re Status Conference Regarding the Contested Matter Of

3    The Motors Liquidation GUC Trustees First Amended Objection To

4    Claims Filed by Green Hunt Wedlake, Inc. And Noteholders of

5    General Motors Nova Scotia Finance Company And Motion for Other

6    Relief [Docket No. 7859] And Adversary Proceeding No. 12-09802

7

8    Adv. 1-12-09082

9    HEARING re Status Conference

10

11   HEARING re Defendant Aurelius Investment, LLC's Motion to

12   Dismiss GUC Trust's Complaint For Failure To State A Claim Upon

13   Which Relief May Be Granted

14

15   HEARING re Motion of Motors Liquidation Company GUC Trust for

16   Limited Modification of the Automatic Stay and the Plan

17   Injunction as to Action Filed by Burton Taft, Administrator of

18   the Estates of Brian Taft

19

20   HEARING re Motion of Motors Liquidation Company GUC Trust for

21   Limited Modifications of the Automatic Stay and the Plan

22   Injunction as to the Action Filed by Sheriff Rafik Kodsy

23

24

25

Page 3

1

2    HEARING re Motion of Motors Liquidation Company GUC Trust for

3    Entry of an Order Fixing the Amount of and Allowing Claim No.

4    11385 Filed by Dana H. Fox for Distribution Purposes and

5    Granting Related Relief

6

7    HEARING re Eighty-Third Omnibus Objection to Claims (Welfare

8    Benefit Claims of Retired and Former Salaried and Executive

9    Employees)

10

11   HEARING re Debtors' 103rd Omnibus Objection to Claims (Welfare

12   Benefit Claims of Retired and Former Salaried and Executive

13   Employees)

14

15   HEARING re Debtors 114th Omnibus Objection to Claims (Welfare

16   Benefit Claims of Retired and Former Salaried and Executive

17   Employees)

18

19   HEARING re Debtors' 169th Omnibus Objection to Claims (Welfare

20   Benefit Claims of Retired and Former Salaried and Executive

21   Employees)

22

23   HEARING re Motion for Objection to Claim (s) Number 28820,

24   filed by Atul Shah

25

GENERAL MOTORS CORPORATION

Page 4

1

2      HEARING re Motion for Objection to Claims(s) Number 18839 and

3      70846 filed by Juanita Pickett

4

5      HEARING re Motors Liquidation Company GUC Trust's Objection to

6      Claim No. 4171 filed by James O. Bryant, Jr.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24      Transcribed by:  Sheila Orms

25

1  A P P E A R A N C E S :

2  WEIL, GOTSHAL & MANGES LLP

3       Attorneys for Debtor

4       767 Fifth Avenue

5       New York, NY  10153

6

7  BY:   DAVID N. GRIFFITHS, ESQ.

8        IRWIN H. WARREN, ESQ.  (TELEPHONICALLY)

9

10  DICKSTEIN SHAPIRO LLP

11       Attorneys for GUC Trust

12       1633 Broadway

13       New York, NY  10019

14

15  BY:   STEFANIE BIRBROWER GREER, ESQ.

16

17  DICKSTEIN SHAPIRO LLP

18       Attorneys for (Unknown)

19       1825 Eye Street NW

20       Washington, DC  20006

21

22  BY:   DEBORAH P. KELLY, ESQ.

23

24

25

Page 6

```
 1   PAUL HASTINGS LLP

 2         Attorneys for Appaloosa Investment

 3         75 East 55th Street

 4         New York, NY  10022

 5

 6   BY:   MARLA DOUVAS, ESQ. (TELEPHONICALLY)

 7

 8   MAGUIRE LAW FIRM

 9         Attorneys for Diane Van Winkle

10         607 Briarwood Drive

11         Suite 1

12         Myrtle Beach, SC  29572

13

14   BY:   SYDNEY LYNN, ESQ. (TELEPHONICALLY)

15

16   ROTH & DEMPSEY, PC

17         Attorneys for Burton Taft

18         436 Jefferson Avenue

19         Scranton, PA  18510

20

21   BY:   MICHAEL G. GALLACHER, ESQ. (TELEPHONICALLY)

22

23

24

25
```

Page 7

1   ALSO APPEARING:

2

3   FRANK J. CELSNEK, IN PRO PER/PRO SE (TELEPHONICALLY)

4   TIMOTHY L. FITZPATRICK, IN PRO PER/PRO SE (TELEPHONICALLY)

5   THOMAS JANUSKINSKI, IN PRO PER/PRO SE (TELEPHONICALLY)

6   LEIAH M. JOHNSON-GREEN, IN PRO PER/PRO SE (TELEPHONICALLY)

7   GEORGE R. LEEDOM, IN PRO PER/PRO SE (TELEPHONICALLY)

8   JUANITA PICKETT, IN PRO PER/PRO SE (TELEPHONICALLY)

9   DAVID I. SCOTT, IN PRO PER/PRO SE  (TELEPHONICALLY)

10   DAVIE E. TURNER, IN PRO PER/PRO SE   (TELEPHONICALLY)

11   MICHAEL J. WALSH, BANK OF AMERICA  (TELEPHONICALLY)

12   SHAUN WANG, CREDIT SUISSE  (TELEPHONICALLY)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  Okay.  We're here on General Motors,

3    Motor Liquidation Company.

4              I want to apologize to the people in the courtroom

5    and on the phone for making you wait since the time of our 9:45

6    original calendar.  Trust me, we have not been on the golf

7    course.  We've been in other matters in GM starting at about

8    9:00 a.m.  We've been going on for two hours, and now we're

9    getting to this stuff.  This is a big case with many competing

10   demands.

11             With that said, let's get to work.  Mr. Griffiths.

12             MR. GRIFFITHS:  Good morning, Your Honor.  David

13   Griffiths for the debtors, the post-effective debtors and the

14   Motors Liquidation Company GUC Trust.

15             Your Honor, I will just -- I will briefly take you

16   through the calendar.  This morning we have two lift stay

17   motions.  I believe counsel for Burton Taft is attending by

18   court call.  We have one uncontested motion to fix and allow a

19   claim for Mr. Fox, and then a number of employee matters.

20             Your Honor, thinking back to the last hearing, it was

21   your preference to hear from the plaintiffs first and for the

22   lift stay motions.  So if Your Honor prefers, I'm happy to rest

23   on our pleadings and allow the claimants to argue lift stays.

24             THE COURT:  All right.  Now, you're starting with the

25   Taft matter if I'm not mistaken.

Page 9

1          MR. GRIFFITHS:  Yes, please, Your Honor.

2          THE COURT:  Okay.  Now, we have a little bit of a

3    precedent in this case on that, folks.  We tried to resolve

4    these matters by a DR, and when we fail, they have to be

5    liquidated somewhere.  And my practice has been to allow them

6    to go back to the local courts to come up with a number.

7          Let me hear from counsel for Taft.

8          MR. GALLACHER:  Yes.  Good morning, Your Honor.  This

9    is attorney Mike Gallacher.  How are you?

10          THE COURT:  Very well, thank you.

11          MR. GALLACHER:  Good.

12          THE COURT:  I see you, Mr. Gallacher.  Go ahead

13    please.

14          MR. GALLACHER:  Yeah.  My concern, Your Honor, is not

15    with the lifting of the stay.  I agree that a lifting of the

16    stay is appropriate.  This matter does need to have a number

17    assigned to it so it can proceed through the bankruptcy.  My

18    objection is the lifting of the stay and allowing the matter to

19    proceed against General Motors Corporation, which is the entity

20    that it was filed against, in the Middle District of

21    Pennsylvania.

22          My understanding is through the bankruptcy

23    proceedings, that entity no longer exists.  And my concern is

24    that when we get back to the judge in the Middle District of

25    Pennsylvania and I go to seek some discovery documents or want

1   to depose a witness for the discovery document that the

2   response I'm going to get from GM, which has a history of being

3   very difficult in discovery matters, is going to be that this

4   entity no longer exists, we don't have to provide you anything.

5   And the judge will have no sanction ability against an entity

6   which no longer exists.  If General Motors Corporation, the

7   party that we're pursuing the action against, doesn't exist,

8   what can the middle district judge do to ensure its compliance

9   with any type of discovery issues or orders that the court may

10  issue?

11          THE COURT:  Well --

12          MR. GALLACHER:  And that's my concern.

13          THE COURT:  -- possibly is, Mr. Gallacher, because 30

14  or 40 years ago when I was a young litigation associate, New

15  York CPLR for litigation, that's the Civil Practice Law and

16  Rules for litigation in New York State, used to have much more

17  restrictive ability to get documents from third parties.  But

18  New York changed is law decades ago.  And usually, third-party

19  discovery is just as easy to get as discovery from parties.

20          Is there something about Pennsylvania law that gives

21  you a particular problem in this regard or --

22          MR. GALLACHER:  There's nothing about Pennsylvania

23  law in particular.  Again, my concern is when I ask the

24  defendant or even let's say it's a request for admission, if I

25  say to the defendant I want you to admit that you manufactured

Page 11

1    this vehicle -- my case involves a product defect where a car

2    had exploded and killed a young man -- and if I say I want a

3    request for admission that General Motors Corporation

4    manufactured this vehicle, and the response that I get back is

5    we're no longer an entity, we can neither admit nor deny, what

6    ability does the district court judge have to force General

7    Motors Corporation, which no longer exists, to do something?

8            All that we're looking for, Judge, is some type of a

9    safeguard or order with the bankruptcy court, which still does

10   have jurisdiction on this matter, that the trust is going to be

11   responsible for ultimately maybe providing documents, providing

12   answers and/or, you know, I think satisfying the judgment will

13   be taken care more through the bankruptcy if there is a

14   judgment here.  But our concern is the discovery process, and

15   we don't want the bankruptcy court just to let General Motors

16   Corporation off the hook altogether just simply because it

17   doesn't any -- no longer exist due to the bankruptcy

18   proceedings.

19           THE COURT:  I need a little more help from you on

20   this, Mr. Gallacher, because you will be able to get documents.

21   You'll be able to get depositions from new GM personnel.  And

22   if I recall the Federal Rules of Civil Procedure, and I think

23   at this point I do, the only rules that are unique to parties

24   are requests for admissions and interrogatories, two types of

25   discovery mechanisms that I have had a distaste for for 42

GENERAL MOTORS CORPORATION

1    years.  Are we talking about anything else?

2              MR. GALLACHER:  I believe that would be it.  I mean,

3    I certainly can't anticipate everything that's coming up, but

4    the two main ones would certainly be -- well, three main ones

5    would be requests for production of documents, which you're

6    right, we may be able to get from third party.  But

7    interrogatories and requests for admissions would be exclusive

8    to the defendant to the parties involved in litigation.

9              THE COURT:  Okay.  Let me hear --

10             MR. GALLACHER:  And they are very useful tools in

11   proceeding with discovery.  I mean, we're going to have a very

12   difficult time.  For example, let's say we wanted to find out

13   who was involved in the design of this vehicle and we ask

14   General Motors Corporation.  Their response can be we're not an

15   entity, we don't have to tell you.  Well, you know, where am I

16   going to go with discovery at that point?

17             THE COURT:  I would have thought the answer would be

18   new GM.

19             MR. GALLACHER:  Well, I think that would create a lot

20   of difficulty because new GM may not know the answer to that.

21   I'm not sure that they would.

22             THE COURT:  Well, if there is a live human being in

23   either place, certainly this Court wouldn't prevent you from

24   finding that live human being wherever he or she might be.

25             MR. GALLACHER:  Well, I would agree with you, but how

GENERAL MOTORS CORPORATION

Page 13

1    am I even going to get the names of those individuals if, like

2    I said, requests for admission, if I wanted to request that Joe

3    Smith is the individual who designed this vehicle.

4              THE COURT:  All right.  I think I understand the

5    issue.

6              Mr. Griffiths, let me hear from you please.

7              MR. GRIFFITHS:  Thank you, Your Honor.

8              Counsel to the claimant would have been in no

9    different position after GM's bankruptcy even prior to the

10   liquidation of Motors Liquidation Company.  The books and

11   records on this on the execution of the master purchase

12   agreement, books and records of General Motors Corporation or

13   old GM were transferred to new GM.  We're in no better position

14   to obtain those books and records than counsel to the claimant.

15   And therefore, as Your Honor has rightly pointed out, counsel

16   to the claimant can simply pursue third-party discovery.

17             In terms of -- I refute counsel to the claimant's

18   view that the GUC Trust will be difficult in its approach to

19   litigation.  The GUC Trust is composed of restructuring

20   professionals who have just one objective, which is to allow

21   this claim -- or allow the stay to be lifted, allow their claim

22   to be liquidated, and therefore to give the claimant and

23   allowed claim.  It should be quite straightforward.

24             We think this sets a bad precedent in the case.  We

25   don't think it's necessary, and we oppose the request of the

GENERAL MOTORS CORPORATION

Page 14

```
 1    claimant.

 2              THE COURT:  All right.  Mr. Gallacher, anything

 3    further?

 4              MR. GALLACHER:  Nothing beyond what I've said

 5    already, Your Honor.

 6              THE COURT:  All right.  The motion for relief from

 7    the stay is granted and granted unconditionally.  But the

 8    legislative history of this order is that if, Mr. Gallacher,

 9    you need to come back before me as the Court that will

10    ultimately get the result of whatever litigation result is

11    achieved in Pennsylvania, it's without prejudice to your rights

12    for me to -- for you to ask me to be helpful if it turns out to

13    be the case.

14              MR. GALLACHER:  Am I understanding Your Honor --

15              THE COURT:  Forgive me.  I need to announce my

16    ruling.  And then as long as it's not by way of re-argument,

17    I'll allow you to ask for clarification.

18              MR. GALLACHER:  Okay.  Sure.

19              THE COURT:  But forgive me because I lost my train of

20    thought.

21              MR. GALLACHER:  I'm sorry.

22              THE COURT:  The underlying fact cannot be changed

23    that since approximately mid-July of 2009 old GM, now called

24    Motors Liquidation Company, has not had many if not most of the

25    documents that might be relevant to this controversy.  This
```

GENERAL MOTORS CORPORATION

Page 15

1    Court is not in any way, shape or form interfering with the

2    plaintiff's side right to get documents, depositions or

3    anything else from either old GM or new GM.  And for the

4    avoidance of doubt, the transferee court, if I can use the

5    expression for that court that's going to liquidate the claim

6    and help me on this, is free to manage the case as it sees fit

7    and to run it pretty much like any litigation before it.

8           But there are practical problems associated with the

9    transfer of documents, which living in the real world we judges

10   have to address.  The fact is that the relevant information is

11   now likely to be largely if not entirely in the hands of a

12   third party, and I am perfectly okay with going after the third

13   party for the discovery.  If and to the extent, which may be

14   modest, old GM has any information, old GM will be subject to

15   discovery on that, but I can't make old GM produce anything it

16   doesn't have.  I am not a sorcerer.

17          Now, that may mean as a practical matter that just as

18   in every case certain methods of discovery have more utility

19   than others that the plaintiff's side will have to go through

20   the old-fashioned traditional means of document discovery and

21   depositions.  And that if it asks old GM to answer

22   interrogatories, old GM may be able to answer or may have to

23   say we don't know.  And I can't do much about that.

24          I will say that if there is a suggestion that old GM

25   has acted in bad faith in dealing with this -- and I've got to

GENERAL MOTORS CORPORATION

Page 16

1    say, Mr. Gallacher, that in the three years or so that I've had

2    the GM case on my watch I haven't seen any instances of that

3    yet, but I guess it's possible -- I'll let you come back to me

4    for what amounts to assistance to the Pennsylvania court if

5    there is something useful to be accomplished in that regard.

6    But I do have to tell you that I have difficulty seeing how I

7    could require old GM to produce something that doesn't exist.

8           Now, you wanted to ask a clarification, although it's

9    possible that what I said in addition made that question go

10   away?

11          MR. GALLACHER:  I think what you said in addition.

12   My question was just going to be would I have the opportunity

13   to come back to you in the event that the old GM, General

14   Motors Corporation, refused to answer certain discovery

15   interrogatories or requests for admissions.  And I think you

16   said that that would be a door that is still open to me if I'm

17   understanding that correctly.

18          THE COURT:  I am not saying never.  I do have some

19   expectation that parties are going to resolve things by

20   discussion before I ever see these issues.  And I'm telling --

21          MR. GALLACHER:  That would be my preference as well.

22          THE COURT:  And I'm telling you now I'm not going to

23   ask old GM to do the impossible.  But if you're saying that

24   this is without prejudice, never darken -- this is with

25   prejudice, never darken my door again, I'm not telling you

Page 17

1    that.

2              MR. GALLACHER:  Okay.

3              THE COURT:  All righty.

4              MR. GALLACHER:  Thank you, Your Honor.

5              THE COURT:  Mr. Griffiths, am I right that as a

6    matter of course you guys simply routinely order transcripts of

7    hearings like this one?

8              MR. GRIFFITHS:  Yes, Your Honor.

9              THE COURT:  Don't pay for expedited treatment, but

10   when you get the copy share with Mr. Gallacher a copy of the

11   transcript that's ultimately forthcoming so that he has a

12   papered legislative history of the ruling.  But your order can

13   and should be a clean one simply saying your request for relief

14   from the stay is granted.

15             MR. GRIFFITHS:  Yes, Your Honor.  And I can get the

16   transcript to Mr. Gallacher by e-mail very quickly.

17             THE COURT:  Okay.  Super.

18             Mr. Gallacher, you may stay on the phone or leave as

19   you prefer.

20             MR. GALLACHER:  I will probably bow out at this

21   point, but thank you very much for your time, Your Honor.

22             THE COURT:  Okay.  Have a good day.

23             MR. GALLACHER:  Thanks.  Bye-bye.

24             MR. GRIFFITHS:  Thank you, Your Honor.

25             The next item on the calendar is item number three.

GENERAL MOTORS CORPORATION

Page 18

1    It's another lift stay motion to pursue an action filed by

2    Sherif Rafik Kodsy.

3            THE COURT:  Yes, I remember this matter.

4            Mr. Kodsy, are you on the phone?

5            Mr. Gallacher (sic), I'm familiar with Mr. Kodsy's

6    efforts to try to turn an unsecured claim into a secured claim

7    and my ruling on that and the ruling of the district court.  Is

8    this the one where we have a statute of limitations issue or is

9    it a different one?

10           MR. GRIFFITHS:  I know we have a statute of

11   limitations issue.  I think we can -- I think we are simply

12   happy to lift the stay and allow the action to proceed in -- I

13   think it's in a court in Florida.

14           THE COURT:  Okay.  Mr. Kodsy, I'm going to ask again,

15   are you on the line?

16           No.  Well, consistent with our past practice, Mr.

17   Griffiths, if these claims need to be liquidated, they're going

18   to be liquidated in their local courts.  Your motion is

19   granted.  Submit an order in accordance with that.  I would

20   have told you to settle it if he had appeared on the phone, but

21   under the circumstances, you can merely submit it.

22           MR. GRIFFITHS:  Thank you, Your Honor.

23           The next item on the calendar is item number four,

24   which is to fix and allow a claim filed by Dana Fox.  Your

25   Honor, I'll be brief.  I simply wanted to point out this is a

Page 19

1    claim filed by a claimant who has filed numerous pleadings in

2    this court and in the district and appeals court.  We were

3    successful in having what appeared to be an appeal to the

4    district court overruled.  The district court looked at the

5    procedural history of the claims that Mr. Fox had filed and

6    found that the bankruptcy court had acted entirely

7    appropriately with respect to those claims.

8            Mr. Fox has since filed documents with the Second

9    Circuit Court of Appeals.  The GUC Trust doesn't believe that

10   these documents amount to an appeal of the district court

11   order.  The documents filed with the Second Circuit Court of

12   Appeals appear to note that the claimant wants ADR, that there

13   has been obstruction of justice by the GUC Trust and by this

14   Court.  The claimant would like a quality control check of the

15   whole process.  He'd like to appeal the entire bankruptcy

16   process and notes that GM is not bankrupt and that these

17   proceedings are illegal.

18           Your Honor, we're happy to rest on our pleadings if

19   Your Honor feels that he has jurisdiction to rule on the merits

20   of the claim.

21           THE COURT:  Mr. Fox, are you on the phone?

22           OPERATOR:  No, Your Honor, we do not have an

23   appearance on that matter.

24           THE COURT:  All right.  Am I correct that this is the

25   one where I had knocked out a duplicative claim, that you folks

GENERAL MOTORS CORPORATION

Page 20

1    had proposed to simply allow the number one claim -- what was

2    it, in the amount of $19,000?

3              MR. GRIFFITHS:  Yes, Your Honor.  So the procedural

4    history was that Mr. Fox had sent in a letter requesting to

5    lift the stay at the start of the bankruptcy process.  That was

6    -- that -- Your Honor ordered that that be treated as a proof

7    of claim.  Mr. Fox then filed a proof of claim for $19,500,

8    which relates to something.  We can't quite work out what.

9    It's something to do with an Aurora automobile.

10             And when we attempted to simply allow the claim, Mr.

11   Fox then requested an additional sum to reflect his litigation

12   time, which having researched it we couldn't allow.  And then

13   when we tried to settle the claim, we were unsuccessful in

14   doing so, and our only course of action was to fix and allow

15   the claim in this Court.

16             THE COURT:  My tentative subject to your rights to be

17   heard, Mr. Griffiths, is to reduce and allow the claim to the

18   $19,000 that you had proposed and to then authorize the estate

19   to give Mr. Fox the plan consideration appropriate for a claim

20   of that $19,000 size.  Do you think -- do you want to be heard

21   on that instinct?

22             MR. GRIFFITHS:  Your Honor, as a general unsecured

23   claim?

24             THE COURT:  Yes.

25             MR. GRIFFITHS:  Yes, Your Honor, that's entirely

GENERAL MOTORS CORPORATION

Page 21

1    appropriate.  It's what we're seeking.

2              THE COURT:  Okay.  Submit an order in accordance with

3    the foregoing.

4              MR. GRIFFITHS:  Thank you, Your Honor.

5              THE COURT:  Okay.

6              MR. GRIFFITHS:  Before proceeding to the employee

7    matters, just a quick note that we have an uncontested matter,

8    which is item number one under the uncontested matter heading.

9    That's the Motors Liquidation Company GUC Trust's objection to

10   claim number 4171 filed by James O. Bryant, Junior, which is a

11   worker's compensation claim.  The matter is uncontested, and we

12   request that we may be able to submit an order.

13             THE COURT:  Okay.  This is the one where the claimant

14   will get it from New Jersey if I'm not mistaken.

15             MR. GRIFFITHS:  Correct, Your Honor, where a bond has

16   been posted.

17             THE COURT:  Okay.  The name of that claimant again,

18   Mr. Griffiths?

19             MR. GRIFFITHS:  Is Mr. James O. Bryant, B-R-Y-A-N-T,

20   Junior.

21             THE COURT:  Okay.  Mr. Bryant, are you on the phone?

22             OPERATOR:  No, Your Honor, we do not have anybody by

23   that name.

24             THE COURT:  Okay.  If I understood you right, Mr.

25   Griffiths, the claimant will get whatever he is entitled to

GENERAL MOTORS CORPORATION

Page 22

1    from New Jersey; am I right?

2            MR. GRIFFITHS:  Yes, Your Honor, that's what the

3    pleadings note.

4            THE COURT:  Okay.  Then I am not sure exactly what I

5    would be doing other than disallowing the claim from here

6    without prejudice to his rights to proceed against the state of

7    New Jersey's worker's comp bureau.

8            MR. GRIFFITHS:  Correct, Your Honor.

9            THE COURT:  I'm granting that relief.  I would simply

10   ask that you as a favor to me say in plain English in addition

11   to the sentence that says that the claim is disallowed in

12   substance, this ruling does not in any way interfere with the

13   claimant's rights to proceed to recover from New Jersey

14   worker's comp bureau or whatever the technical words should be.

15           MR. GRIFFITHS:  Yes, Your Honor.

16           THE COURT:  Okay.  Just so that a layman understands

17   what we're doing and what we're not doing.

18           MR. GRIFFITHS:  Yes, Your Honor.  I'm happy to call

19   the claimant as well to explain it to him in plain English.

20           THE COURT:  Well, I'd put -- you've volunteered to do

21   that a number of times over the history of this case.  And

22   while I couldn't order you to do it, I can tell you that I

23   appreciate it when you offer.

24           MR. GRIFFITHS:  Yes, Your Honor.  I'll certainly do

25   so.

GENERAL MOTORS CORPORATION

Page 23

1          THE COURT:  Thank you.

2          MR. GRIFFITHS:  Your Honor, then turning to the

3    employee matters on the calendar, the debtors' 83rd omnibus

4    objection to claims with respect to David Turner is adjourned

5    to the next hearing.  Mr. Turner requested that I inform the

6    Court that he is currently undertaking treatment for pancreatic

7    cancer and apologizes for not being able to attend this

8    hearing.

9          The following claimants I believe are on the phone

10   with respect to item number six, which is the debtors' 103rd

11   omnibus objection to claims.  It's Messrs. Celsnek and Mr.

12   Leedom.  Your Honor, given the time, I'm happy to rest on the

13   pleadings if Your Honor would like to hear from the claimants.

14   And I would simply request that we incorporate Your Honor's

15   prior rulings on these matters into the record of the hearing.

16          THE COURT:  Okay.  Mr. Celsnek, are you on the phone,

17   sir?

18          OPERATOR:  There is no attorney by that name, Your

19   Honor.

20          THE COURT:  Yes.  I don't see -- no, I see him on the

21   phone log as having been expected.  Did he not pick up or did

22   he lose patience?

23          Mr. Frank J. Celsnek, are you on, sir?

24          OPERATOR:  I never show him checked in, Your Honor.

25          THE COURT:  Oh, he never checked in?

Page 24

1            MR. GRIFFITHS:  Your Honor, if I may, the -- my log

2    -- we called of the claimants prior to the hearing to check if

3    they would like to attend to make sure that there are no mix-

4    ups.  Mr. Celsnek wasn't sure if he wanted to attend but would

5    like a transcript of the hearing sent to him by e-mail.

6            THE COURT:  Oh, okay.  Okay.  Thank you.

7            The next is George Leedom.

8            MR. LEEDOM:  Yes, Your Honor.  I'm on the phone.

9            THE COURT:  Okay.  Would you like to be heard, Mr.

10   Leedom?  Do you understand the issues that are before me today?

11           MR. LEEDOM:  Basically, yes, I do.

12           THE COURT:  Okay.  I'll hear your argument.

13           MR. LEEDOM:  Well, really it goes to the issue of the

14   medical health and care.  And basically, you know, it stands as

15   I had originally submitted in addition to the life insurance.

16   And I was eventually issued what they told me during retirement

17   the ultimate amount on the insurance would be for the lifetime

18   of the retiree reduction according to policy guidelines.  And I

19   presume that was referring to the life insurance policy.

20           And the health care, I still think that we're

21   entitled to that, although they have provided $300 a month,

22   which currently does not cover the health care but at least

23   provides some help in that regard.  I just felt that the

24   commitment was there after almost 41 years with the -- with GM.

25   And when it was presented during the -- most of the meetings

Page 25

1    that I attended always reinforced the fact that the life

2    insurance and the health care would be there.

3              THE COURT:  Mr. Leedom, GM has stated that the letter

4    you got from the National Retiree Servicing Center said in

5    bold, capitalized print, "All information provided in this

6    letter is subject to the terms and conditions of the applicable

7    group policies or program."  And GM has also advised me that

8    under the life insurance program, and I think this is true of

9    medical benefits as well, those policies said that they had the

10   ability to change them at any time.  Did you get any document

11   in writing that said anything different?

12             MR. LEEDOM:  Well, the only document that I submitted

13   was the two letters that I had relative from the National

14   Benefit Center.  They outline the basic group life insurance

15   and then the ultimate amount.  And then only with that was that

16   letter.  But no, other than that I didn't have anything.

17             THE COURT:  Okay.  Do you have any further points you

18   would like to make?

19             MR. LEEDOM:  Well, Your Honor, I can't think of any

20   at the moment.  I guess I -- I'm not sure whether a ruling will

21   come today or later or whether whichever it falls, whether it's

22   appealable or not.  But I guess you could advise me of that.  I

23   would appreciate that very much.

24             THE COURT:  Of course.  But first, I want to give Mr.

25   Griffiths the chance to respond and you a chance to reply.

Page 26

1          MR. LEEDOM:  Thank you.

2          MR. GRIFFITHS:  Your Honor, I have no further

3     comments other to then to express the GUC Trust's regret at the

4     situation.  But it can't be helped given the current financial

5     situation of the debtors, who are liquidated and the remains of

6     the estate being distributed to creditors.

7          THE COURT:  Okay.  Anything further, Mr. Leedom?

8          MR. LEEDOM:  No, Your Honor.

9          THE COURT:  Okay.  I'm going to issue rulings on all

10    of the people who are similarly situated together.  Who is the

11    next one who is in the same boat, Mr. Griffiths?

12         MR. GRIFFITHS:  Your Honor, the following claimants

13    would be claimants under the debtors' 114th omnibus objection.

14    I believe that would be Mr. Fitzpatrick and Mr. Scott.  My

15    records show that --

16         THE COURT:  Oh, yes.

17         MR. GRIFFITHS:  Yes.

18         THE COURT:  That's Timothy Fitzpatrick.

19         Mr. Fitzpatrick, are you on the phone?

20         MR. FITZPATRICK:  Yes, Your Honor.

21         THE COURT:  Would you like to make an argument to me?

22         MR. FITZPATRICK:  Yes, if I might.

23         THE COURT:  Go ahead, please.

24         MR. FITZPATRICK:  The opposition's reply to my claim

25    lists 42 points as to why it should be expunged.

Page 27

1    Unfortunately, I don't have the legal expertise to respond to

2    each one individually, but I would like to make reference to a

3    few of them in my response.

4           So with regard to my claim for life insurance, reply

5    number 26 states upon the reduction of the life insurance, I

6    was fully eligible to continue to be covered at the same level

7    as prior to the reduction at their cost.  And my response to

8    this reply number 26 is this is not correct.  It was at my cost

9    and on my head not at a bargain rate.

10          With regard to reply number 28, that states the

11   letters were not approved by the board of directors of GM and

12   they were not authorized amendments of the debtors' life

13   insurance plan, they were merely a communication.  My response

14   to this reply number 28 is this cannot be correct.  It's

15   inconceivable to me that General Motors would send out letters

16   that are not approved and not authorized.

17          But more to the crux of the matter, reply number nine

18   states that I bear the burden of showing that the debtors

19   intended to vest welfare benefits.  And reply number 30 states

20   that I must identify specific written language that is

21   reasonably susceptible to interpretation as a promise.  And

22   reply number 38 states that I do -- that I did not provide any

23   explanation as to why the letter should be read as ensuring the

24   vesting of a benefit.

25          My response to those three replies, numbers nine, 30

GENERAL MOTORS CORPORATION

Page 28

1    and 38, are as follows.  It is my contention that the letter I

2    was sent on November the 15th, 1999, did convey an intention to

3    vest benefits and that it was reasonably susceptible to

4    interpretation as soon as a promise.  The letter was received

5    two weeks after retirement.  However, the amount of coverage

6    was common knowledge among employees well before retirement

7    since the formula for calculation was also common knowledge.

8    So it would be normally -- you would normally enter into the

9    deliberations of an employee contemplating retirement.

10             THE COURT:  What did it say about a promise not to

11   change the benefits?

12             MR. FITZPATRICK:  Well, I was getting to that today,

13   Your Honor.  And basically, the receipt of that letter was very

14   reassuring to me because the language was so strong.  The

15   letter said you are eligible for continuing life insurance.  My

16   interpretation of that is oh, good, I'm covered.  The letter

17   said the amount is fully reduced.  My interpretation of that is

18   oh, good, the amount will never get smaller.  The letter said

19   the ultimate amount will remain for the rest of your life.  My

20   interpretation of that is oh, good, no worries.  The letter

21   said this is provided by General Motors at no cost to you.  My

22   interpretation was good, free and clear.  The letter said keep

23   this with your other valuable papers.  And my interpretation of

24   that is good, this letter is valuable, and I'm going to keep it

25   safe.

GENERAL MOTORS CORPORATION

Page 29

1          In other words, I read that letter to mean that this

2     is etched in stone, take it to the bank.  This is GM's promise

3     to me.  It is vested, fixed, settled and absolute.  I believe

4     that that letter different reference then a separate

5     entitlement to the employee benefit plan since it marked the

6     transition from employee status to retiree status and described

7     the associated change in the life insurance benefit.

8          But wait, okay, there was a little glitch, a one-

9     liner, which said this is not a guarantee of the coverage

10    amount.  My interpretation of that was to dismiss it as

11    carrying little or no weight since 90 percent of the letter is

12    in direct contradiction to it and therefore outweighs it.  And

13    furthermore, it must be insignificant since many other letters

14    issued to other GM retirees did not contain that one-liner.

15          So that's my --

16          THE COURT:  Can you read back that one-liner please,

17    this is not a guarantee of?

18          MR. FITZPATRICK:  This is not a guarantee of the

19    coverage amount.

20          THE COURT:  Okay.  Continue please.

21          MR. FITZPATRICK:  Basically, Your Honor, that was it

22    with regard to the life insurance.  I just did want to make one

23    further argument with regard to the continuing medical

24    coverage, which as you know was knocked on the head in January

25    of 2010.  I went through the actuarial tables and the GMRA

GENERAL MOTORS CORPORATION

Page 30

1    recommended procedure for figuring out what that amount of the

2    loss was.  But as the previous gentleman mentioned, we were

3    given $3,600 a year to try and compensate for that.  So my

4    claim originally for the medical coverage was around 146,000 I

5    think.  That should be reduced by 60,000.

6            So that was all I had to say, Your Honor.

7            THE COURT:  Okay.  Thank you.

8            Mr. Griffiths, response?

9            MR. GRIFFITHS:  Thank you, Your Honor.

10           Very briefly, if Your Honor would like to see a copy

11   of the letter, it's at Appendix I believe 3 to the reply.  Let

12   me just get it so that Your Honor has it front of him.  Exhibit

13   1 -- and actually, it's the end of Exhibit 2 not -- if you go

14   to Exhibit 3 and then it's the page before it.

15           Your Honor, we've dealt with letters similar to this

16   at the January 18th hearing and included a copy of the

17   transcript from the hearing.  I believe in sum that Mr.

18   Fitzpatrick is arguing that Devlin and Empire Blue Cross and

19   Blue Shield, which is at 274 F.3d at 76.  The fact of the

20   matter is that General Motors didn't promise the vesting of

21   life insurance benefits to induce retirements.  So since Mr.

22   Fitzpatrick had already retired, there were no further services

23   for him to perform, which could be reasonably interpreted as a

24   promise to affect some sort of future performance of services.

25           Your Honor, the letter itself, while we've already

1    conceded on the record that it is unclear, it is unfortunate it

2    was sent out with such language, Mr. Fitzpatrick's letter

3    refers specifically to participation in the life and disability

4    benefits program, which is the welfare benefits program that

5    the life insurance is provided under.  It's not reasonable for

6    Mr. Fitzpatrick to take this letter in isolation and determine

7    that this letter constitutes a separate promise that can be

8    read separate and apart from the welfare benefits program,

9    which specifically provides for the life insurance program and

10   which by its own terms allows the coverage to be amended or

11   reduced.

12          It should further be noted that Mr. Fitzpatrick's

13   life insurance benefits were not terminated; they were merely

14   reduced to the amount of $10,000.  And while, you know, I

15   personally am very sorry that that is, of course, hardship on

16   Mr. Fitzpatrick and all of the other claimants, this letter by

17   its own terms states that it's not a guarantee of coverage

18   amount.  Therefore, although the formula by which benefits are

19   arrived at allows the ultimate amount to be reduced to in Mr.

20   Fitzpatrick's case $89,000, the fact that it states that it's

21   not a guarantee of coverage amount further reinforces the fact

22   that the debtors were able to reduce the life insurance benefit

23   as they had intended to do because they needed that flexibility

24   in case they ever entered or had financial distress, which is

25   in fact what happened.

GENERAL MOTORS CORPORATION

Page 32

1            Your Honor, Mr. Fitzpatrick makes a number of other

2     arguments.  I would just like to address an argument with

3     respect to additional insurance that was -- that Mr.

4     Fitzpatrick had purchased at his own cost.  Mr. Fitzpatrick is

5     right in stating that the additional insurance that was offered

6     was at his own cost, and I believe that's what the objections

7     -- the reply says, although I apologize if that's unclear.

8            THE COURT:  Wait, I lost you there.

9            MR. GRIFFITHS:  So Mr. Fitzpatrick had argued that

10    there was an inconsistency in our reply, simply that when the

11    life insurance program, when it was reduced to $10,000, General

12    Motors or new GM put in place a program to allow employee or

13    former employees of the debtors to purchase additional life

14    insurance at their own cost, which would be at a reduced cost

15    to what was available on the market.  That's in fact what

16    happened.  It was Mr. Fitzpatrick's cost.  That's what our

17    reply says.

18            And I would just like to apologize if there's -- if

19    it appears to be unclear.  But I agree that insurance was

20    available to be purchased by former employees once the life

21    insurance was reduced.

22            THE COURT:  At discounted rates but at their expense?

23            MR. GRIFFITHS:  Correct, Your Honor.

24            THE COURT:  Okay.

25            MR. GRIFFITHS:  I don't believe I have any other

Page 33

1    arguments to make.  I mean, Mr. Fitzpatrick hasn't in our view

2    satisfied his burden to show why the letter would constitute a

3    new promise separate and apart from the welfare benefit plan

4    under which the benefit was in fact provided.

5           It's quite clear that life insurance was provided

6    under the terms of a benefit plan.  Mr. Fitzpatrick only

7    received the life insurance because he had a benefit under the

8    benefit plan.  This letter simply noted the amount of coverage

9    he was currently receiving, and it can't be interpreted to --

10   as a new contract separate and apart from the welfare benefit

11   plan specifically because it refers to the welfare benefit plan

12   in the first place.

13          I don't believe I have any other arguments, Your

14   Honor.

15          THE COURT:  Okay.  Mr. Fitzpatrick, any reply?

16          MR. FITZPATRICK:  No, Your Honor.  Thank you.

17          THE COURT:  Okay.  Thank you.

18          I'll issue the ruling on your claim as part of the

19   others.

20          MR. FITZPATRICK:  Okay.

21          THE COURT:  Thank you, sir.  Stand by please.

22          David Scott?  Mr. Scott, I see you on the phone line

23   court call.  Did Mr. Scott kind of register with you or get on

24   the line with you?

25          OPERATOR:  No, Your Honor, we do not have him checked

1    in.

2              THE COURT:  Okay.  Thank you.

3              MR. GRIFFITHS:  Your Honor, we registered Mr. Scott

4    for court call, but he said that he wouldn't make any

5    commitments.  But he is aware of the hearing and received

6    notification from us.

7              THE COURT:  Okay.  Thank you.

8              MR. GRIFFITHS:  Your Honor, the next omnibus

9    objection that has to be dealt with is the 169th omnibus

10   objection to claims.

11             THE COURT:  Pause, please.  I also show Thomas L. and

12   Donna Kracker on this one.  Are they no longer before me?

13             MR. GRIFFITHS:  Your Honor, these are not -- no

14   replies have yet been submitted to the Kracker claims.  The

15   format of the agenda may be somewhat confusing, but the GUC

16   Trust hasn't yet submitted a reply to the informal response of

17   Thomas and Donna L. Kracker.

18             THE COURT:  Oh, I see.  So --

19             MR. GRIFFITHS:  That would precede a following

20   hearing.

21             THE COURT:  So they're just being adjourned?

22             MR. GRIFFITHS:  Yes, Your Honor.

23             THE COURT:  Okay.  All right.  So what do we have

24   next?

25             MR. GRIFFITHS:  Your Honor, under the 169th omnibus

GENERAL MOTORS CORPORATION

Page 35

1      objection, we have Mr. Jarusinski, Ms. Johnson-Green and Mr.

2      Szynski.

3                      THE COURT:  Okay.

4                      MR. GRIFFITHS:  Yeah.

5                      THE COURT:  Thomas Jarusinski, are you on the phone,

6      sir?

7                      MR. JARUSINSKI:  Yes, Your Honor.

8                      THE COURT:  Would you like to be heard?

9                      MR. JARUSINSKI:  Yes.  My argument is very similar to

10     Mr. Fitzpatrick and Mr. Leedom in that besides regular salary

11     or compensation for my 37 years came in the form of health

12     benefits, life insurance and a defined pension.  Funding for

13     these programs was in lieu of salary and were promised to

14     continue by the good word of GM as we were presented annually

15     with brochures explaining our total compensation package.

16                     Now, these booklets provided data as to how many

17     years of service we had or beneficiary, our health care

18     coverage, our life insurance as well as what to expect when we

19     retired.  Now, the $72,000 life insurance I was promised was

20     cut to 10,000 just as well as the other two gentlemen, and

21     responsibility for my health care premiums, what was assigned

22     to me was a $300 stipend to procure my own coverage, which by

23     no means was sufficient and becomes more insufficient as time

24     passes.  Also, I was paying a co-pay of $14 a month for

25     extended care coverage for myself and spouse, which was bluntly

GENERAL MOTORS CORPORATION

Page 36

1  terminated with no return of any money.  Now this coverage

2  becomes financially unattainable to one who is already retired

3  at my age.

4       The then vice president of human resources, Katie

5  Barkley (ph), communicated annually that we should review our

6  package and plan our retirement with step nine in the 2005

7  roadmap to retirement stating sufficiently to relax and enjoy.

8  Now, I can't put a dollar amount on the anguish caused by the

9  undercutting of benefits, but I can assure you that financial

10  decisions my wife and I confront are always swayed by what

11  lurks around the next corner.

12       I implore the Court to consider my imposed struggles

13  and arrive at an equitable solution.  And I thank you.

14       THE COURT:  Thank you, Mr. Jarusinski.  A question

15  for you, sir.  Did GM give you any pieces of paper perhaps

16  unique to you that said in substance that notwithstanding

17  anything in our plan brochure that your benefits are vested and

18  won't be changed or won't be changed?

19       MR. JARUSINSKI:  No.  As I recall, it doesn't say

20  anything that they were -- you know, it would be vested.  They

21  just have the amounts.  And every year we got a booklet on

22  that.

23       THE COURT:  I understand.  Okay.  Thank you.

24       Mr. Griffiths, do you wish to respond?

25       MR. GRIFFITHS:  Briefly, Your Honor, simply to note

1   at page eight of the reply, Mister -- or sorry, the claimant

2   refers to the summary plan descriptions that he received and

3   which noted the welfare benefits he was receiving.  Although

4   it's not the type of thing that many employees would focus on

5   when reviewing summary plan descriptions, I personally reviewed

6   them and as, of course, in Sprague, for instance, and simply

7   note that, you know, the welfare benefit plans and the summary

8   plan descriptions contain specifically that General Motors

9   reserves the right to amend, change or terminate the plans and

10   programs.  And in the summary plan description it says, you

11   know, those programs described in this booklet.

12          Your Honor, with respect to the extended care

13   coverage, that was a pay-as-you-go plan and once terminated

14   that no refund would be due.  Coverage was provided, you know,

15   on the provision of payment by the employees.  And once the

16   program was terminated, no payments were due and therefore no

17   refund was due.  Their coverage was provided as and when it was

18   provided.

19          I believe that's the only arguments I have to respond

20   to.

21          THE COURT:  Okay.  Anything further, Mr. Jarusinski?

22          MR. JARUSINSKI:  No.  That's all, Your Honor.

23          THE COURT:  Okay.  Thank you.

24          MR. JARUSINSKI:  Thank you.

25          THE COURT:  Ms. Johnson-Green, is that who we're up

GENERAL MOTORS CORPORATION

Page 38

1    to?

2            MR. GRIFFITHS:  Yes, Your Honor.  I believe we

3    received a voicemail saying she no longer wanted to

4    participate.

5            OPERATOR:  She did not check in court call, Your

6    Honor.

7            THE COURT:  Okay.  Thank you.

8            Mr. Allen Szynski, is he on the line?

9            MR. GRIFFITHS:  Your Honor, Mr. Szynski noted that he

10   would not attend the hearing but would like a transcript after

11   the hearing.  And I will, of course, send him that.

12           THE COURT:  Okay.  To what extent do we have any

13   others who are in the same boat, Mr. Griffiths?

14           MR. GRIFFITHS:  That concludes the matters on the

15   calendar.

16           THE COURT:  Okay.  Then I'm going to dictate a ruling

17   applicable to these folks, both those who submitted written

18   responses and those who orally argued.  In one or two cases,

19   I'm going to say a little more for those who orally argued.

20           In these contested matters in the jointly

21   administered Chapter 11 cases of Motors Liquidation Company and

22   its affiliates, debtor General Motors or old Gm, moves along

23   with the recently formed GUC Trust.  GUC is three letters, G-U-

24   C.  It stands for General Unsecured Creditors, which is a trust

25   formed for the benefit of old GM's creditors to disallow

GENERAL MOTORS CORPORATION

Page 39

1    welfare benefit claims of retirees and former employees under

2    old GM's 83rd, 103rd, 114th and 169th omnibus objections.

3            The claims of the retirees and former employees

4    involve welfare benefits.  Welfare benefits is a word of art

5    that describes benefits offered to employees at least

6    principally in the medical and life insurance areas.  Those

7    welfare benefits are to be compared and contrasted with pension

8    benefits, which are not the subject of the motions that we have

9    before us here.

10            As I'll go on to explain in more detail, those claims

11   insofar as they're based on welfare benefits for medical

12   coverage or life insurance coverage must unfortunately be

13   disallowed.  It gives me no pleasure to deny these claims.  I

14   understand very well that denial of these claims results in

15   hardships on the claimants.  In fact, it's very possible that

16   the changes in the life insurance and medical benefits have

17   created hardships on thousands or at least hundreds of

18   similarly situated employees.  But I'm compelled to comply with

19   the law, and I'll be discussing that law momentarily.

20            First, however, my findings of fact.  Many retirees

21   filed timely proofs of claim, including David Turner, Frank

22   Celsnek, George Leedom, Timothy Fitzpatrick, David Scott,

23   Thomas Jarusinski, Lelah Johnson-Green and Allen J. Szynski as

24   well.  I don't see a need to take more time to describe their

25   individual claim numbers, but I'm authorizing GM to put their

GENERAL MOTORS CORPORATION

Page 40

1   numbers into the order if it wishes to do so.  That's eight

2   people who filed objections relating to claims that are before

3   me today, some, though not all of whom, orally argued during

4   today's hearing.  I've considered both the written submissions

5   and the oral arguments in reaching these decisions.

6           Pursuant to procedures that were set up earlier in

7   GM's bankruptcy case, the debtors and/or the GUC Trust filed

8   omnibus claims objections to the claims of the eight people I

9   mentioned, among many, many others.  An omnibus claims

10  objection is one that applies to many people or entities at the

11  same time, typically because they raise similar issues.  The

12  debtors and then the GUC Trust filed those objections because

13  they have a fiduciary duty, that is, a duty as a matter of

14  trust to the remainder of the creditors of old GM's estate to

15  allow the claims that are deserving of allowance but, at the

16  same time, to object those -- to those that are not.

17          The omnibus objections before me presently were

18  directed at claims of retried or former employees of old GM,

19  those who generally contended that they had benefits when they

20  retired and that GM had no right to change them.  Many of the

21  points raised by the claimants deal with rights that they may

22  have against new GM, but rights against new GM are not affected

23  one way or another by the objections we have today.

24          Now turning to my conclusions of law, including

25  certain mixed findings of fact and law, a proof of claim is

GENERAL MOTORS CORPORATION

Page 41

1    prima facie evidence of the validity and amount of the claim,

2    and the objector bears the initial burden of persuasion.  See

3    In re Oneida Limited, 400 B.R. at page 389.  That's a 2009

4    decision by Judge Gropper of this Court.  What that means,

5    translating from the Latin, is that once a claimant, like each

6    of the eight people here, files a proof of claim, assuming at

7    least if the proof of claim has been satisfactory and complete,

8    which all here have been found to be satisfactory in the first

9    instance, it's good enough to get paid the amount set forth in

10   the claim unless there's an objection.

11          But once an objection is filed, the burden shifts to

12   the claimant if the objector produces evidence equal in force

13   to the claim that was previously filed, which, if believed,

14   would refute or contradict at least one of the allegations

15   that's essential to the claim's legal burden.  When the burden

16   is shifted back to the claimant, the claimant must then prove

17   by a preponderance or in excess of the evidence that under

18   applicable law the claim should be allowed.

19          Now here, we have exactly that situation.  Each of

20   the claims was prima facie okay.  The debtors and the GUC Trust

21   then objected and met their burden, which meant that the

22   claimants once more had the burden.  And then I decide what the

23   claimants are entitled to based on all of the evidence that's

24   before me.

25          Here, I'm required to find and I do find as a mixed

Page 42

1    question of fact and law that the claimants haven't met their

2    burden to show that their welfare benefits vested, which means,

3    putting it in plainer English, that the benefits couldn't be

4    taken away or changed, such as by allowing the insurance in a

5    lesser amount.  In dealing with claims of for old GM former

6    employees, which were very, very similar to the claims that are

7    before me now, the U.S. Court of Appeals for the Sixth Circuit

8    in a case called Sprague versus General Motors Corp, 133 F.3d

9    388, explained that to, quote, "vest benefits is to render them

10   forever unalterable because vesting of welfare plans -- plan

11   benefits is not required by law.

12           An employer's commitment to vest such benefits is not

13   to be inferred lightly.  The intent to vest must be found in

14   the plan documents and must be stated in clear and express

15   language," end quote.  Sprague versus General Motors Corp, 133

16   F.3d at page 400.  That's a decision of the Sixth Circuit Court

17   of Appeals in 1998.

18           As the Sixth Circuit observed in the Sprague decision

19   at page 401, quote, "most of the summary plan descriptions

20   unambiguously reserved GM's right to amend or terminate the

21   plan," end quote.  What that means is that while the claimants

22   may very well have had many rights to benefits, and I assume

23   for the purpose of this analysis that they did have rights as

24   they've all alleged them, GM had the right to modify those

25   benefits.  Thus, although the benefits existed at one time,

1    they could be changed, and indeed, GM changed them.

2         Now, I'm intentionally describing documents and plan

3    descriptions that aren't always written in as clear language as

4    I'm using it now.  And in essence, I'm translating them into

5    plainer English.  I invite people if they want to, and of

6    course, I invite any appellate court reviewing my work, to read

7    the Sprague decision in greater detail and to read the plan

8    documents of each employee in greater detail.

9         I also note that that's why I asked each one of the

10   people who was orally speaking whether he had any piece of

11   paper that made a different promise.  If anybody did receive a

12   piece of paper that said in, you know, clear English that we

13   promise to vest your benefits or we say that notwithstanding

14   what's in your summary plan descriptions we promise not to

15   change yours, I would very much honor such a promise.  But I

16   haven't any evidence of that here.

17        Now, many claimants have talked about decisions that

18   they made based upon the documents they read at the time, and I

19   well understand the frustration that they've expressed in this

20   regard.  But the rights that the claimants were getting were

21   described in the benefit plan documents, and those documents,

22   those same documents describe the rights that GM later availed

23   itself of to amend such plans.  For example, a letter from the

24   National Retiree Servicing Center that was sent to Mr. Leedom

25   regarding his life insurance benefit stated in bold,

Page 44

1    capitalized print, quote, "All information provided in this

2    letter is subject to the terms and conditions of the applicable

3    group policies or program," end quote.

4         Similarly, in the back and forth that I had I believe

5    it was with Mr. Fitzpatrick, we discussed a sentence in his

6    letter, quote, "This is not a guarantee of the coverage

7    amount," end quote.  Although he read other language from his

8    letter and said that he thought they were inconsistent, this

9    language was the most specific, and the remaining language did

10   not contain anything that could be read as a promise to either

11   provide the vesting that's required under the law or to say

12   that notwithstanding what the plan document said that the

13   promise in the letter would trump or overrule what the plan

14   document said.

15        In sum, because the claimants' rights to welfare

16   benefits didn't vest and because those benefits were subject to

17   modification or termination, the claims of these eight folks

18   against old GM must be disallowed.

19        Now, the GUC Trust is to settle an order in

20   accordance with this decision.  Settling an order is a word of

21   art in the law that means proposing an order that I would then

22   sign, which before I sign it is sent out to people who have the

23   right to comment on whether they think that the order as

24   presented to me for signature is consistent with my ruling.

25   It's different than expressing a view that they agree with the

GENERAL MOTORS CORPORATION

Page 45

1    ruling.  I assume that all eight claimants would disagree with

2    my ruling.  The sole purpose of the settling an order process

3    is to make sure that the written order conforms to the ruling

4    that I'm dictating now.

5           After that order is entered, each of the eight people

6    addressed by this ruling has the right to appeal the order, has

7    the right to seek appellate review.  The time to appeal in a

8    bankruptcy case is much more limited than it is in other areas

9    of the law.  In bankruptcy, you get just 14 days, but the time

10   to appeal runs from the time that the order is entered on the

11   docket of the Court not from the time that I'm delivering my

12   decision today.

13          Speaking to the people who are on the phone, and I

14   understand, of course, that people are covered by this ruling

15   who aren't on the phone and aren't in the courtroom, if you're

16   not objecting to the form of the order but you nevertheless

17   want to appeal it, you have that right as long as you file a

18   notice of appeal within the 14-day deadline after the order is

19   entered.  And you should know even though the rules are

20   normally enforced by the district court, which is where the

21   appeals are heard and not before me, that there are other

22   requirements of law that must be complied with in order to get

23   the appeal heard.

24          So once again, I say that yes, you have the right to

25   appeal, and you have that right for 14 days but only 14 days.

1    The time to appeal runs from the time the order is entered.

2              Folks, once more, I want to state that I understand

3    how hard the General Motors case has been on you and on other

4    former employees who are similarly situated.  But once again, I

5    note that I'm required to comply with the law.

6              The folks who were on the phone with respect to their

7    particular matters are free to either stay on the phone or drop

8    off as they prefer.

9              Mr. Griffiths, further matters from you?

10             MR. GRIFFITHS:  Thank you, Your Honor.  Just a note,

11   consistent with Your Honor's prior rulings, we call each of the

12   claimants to let them know when the time to appeal runs from

13   once the order is entered.

14             THE COURT:  Again, I appreciate that courtesy.

15             MR. GRIFFITHS:  Your Honor, my co-counsel at

16   Dickstein and Shapiro have two short matters to deal with now.

17             THE COURT:  Okay.

18             MR. GRIFFITHS:  Thank you, Your Honor.

19             THE COURT:  Ms. Greer?  Oh, forgive me.  You're

20   coming up?

21             MS. GREER:  Yes.

22             THE COURT:  Okay.

23             MS. GREER:  Your Honor, Stephanie Greer from

24   Dickstein and Shapiro on behalf of the GUC Trust.

25             Your Honor, I didn't have an opportunity to enter my

GENERAL MOTORS CORPORATION

Page 47

1   appearance since we were downstairs.  If you'll give me just a

2   chance to step up, I'll give her my card.

3              THE COURT:  Sure.

4              MS. GREER:  Okay.  Your Honor, before we get started,

5   I wanted to just give you if it's okay, Your Honor, a quick

6   status update on the constructive notice claimants that we

7   dealt with a couple weeks ago.

8              I just want to let you know, Your Honor, that we've

9   certainly taken your advice to heart, done our best to resolve

10  those claims, and it looks like we actually have been able to

11  resolve those.  We're waiting signed settlement agreements from

12  each of the claimants, but I'm hopeful that by the end of this

13  week, early next week I'll be able to send a letter to Your

14  Honor withdrawing those outstanding objections so we could all

15  move on.

16             THE COURT:  Okay.  Thank you.

17             MS. GREER:  You're welcome.

18             Does Your Honor have a preference as to whether we

19  proceed with Ms. Pickett's claim or Dr. Shah's claim first?

20             THE COURT:  I don't have a preference.  Would it

21  matter to either of the objectors or the folks whose objections

22  are subject?  That's Dr. Shah and Ms. Pickett, right?

23             MS. GREER:  Dr. Shah is in the courtroom, Your Honor,

24  and I understand Ms. Pickett is on the telephone.

25             THE COURT:  Okay.  Ms. Pickett, are you on the phone?

```
 1              MS. PICKETT:  Yes, I am.

 2              THE COURT:  Okay.  Thank you.

 3              Dr. Shah, you've been waiting patiently.  Can I

 4    impose on you to wait a moment more?

 5              MR. SHAH:  Can I come --

 6              THE COURT:  You can come to the main table, but I

 7    want to hear Ms. Pickett first.

 8              MS. GREER:  Thank you, Your Honor.

 9              THE COURT:  Okay.  Stand by, Ms. Pickett.

10              MS. PICKETT:  Okay.

11              THE COURT:  Ms. Greer is going to talk about your

12    claim first.

13              MS. PICKETT:  Okay.  Thank you.

14              MS. GREER:  Certainly, Your Honor.  Ms. Pickett, as

15    you know, filed two claims, one unsecured, one administrative

16    claim.  I know Your Honor has read the pleadings.  In short, it

17    is the GUC Trust's position, I think it's clear under the law

18    no matter what law you apply, that the statute of limitations

19    for any of her claims expired well before the debtors'

20    bankruptcy case.

21              I'm happy to answer whatever questions Your Honor

22    has, or we can allow Ms. Pickett an opportunity to be heard,

23    and certainly reserve our right to reply.

24              THE COURT:  Okay.  This is a dispute, Ms. Pickett,

25    over whether your claim was timely, whether you brought it in
```

Page 49

1    time.  When -- if I understand correctly, your claim took place

2    on June 24th, 2004 in Georgia.  I think DeKalb County, Georgia,

3    is a suburb of Atlanta.  You can correct me if I'm mistaken in

4    that regard.

5              MS. PICKETT:  Yes.

6              THE COURT:  That is about just a little less than

7    five years after the accident.  And each of the states whose

8    law would apply -- I'm inclined to believe that the leading

9    contender would be Georgia but it ultimately doesn't matter --

10   says that that's too late.

11             Ms. Greer rested on her papers, so let me hear from

12   you in terms of whatever you want to tell me as to why your

13   claim isn't too late.

14             MS. PICKETT:  Well, Your Honor, I've been dealing

15   with this ever since June 22nd of 2004.  I bought this

16   automobile in 2003.  I kept it in 2004, which like I was

17   driving it between five and 15 miles an hour.  And it started

18   shaking in the front and going from side to side.  Eventually,

19   it went on the curb and stopped and flipped over.

20             So I didn't know what was going on, but then about

21   October or November I got a recall letter stating that some of

22   the vehicles what they were doing as what mine had done and to

23   take it to a place, you know, to service it.  Well, when they

24   called and told me that, I replied that it's already totaled

25   as, you know, as far as the car.

GENERAL MOTORS CORPORATION

Page 50

1          So I was injured and I went to the hospital, and I'm

2     still hurting from that.  And okay, I've got carpal tunnel in

3     both hand (sic), and I didn't know how that could happen, but

4     that's what my doctor said.  And I was under a doctor's care,

5     which I'm under now, because my head did a lot of banging.  So

6     I'm just saying, of course, I have tried everybody, I've tried

7     the Attorney General, I called everybody.

8          So from that day on, I was on medical on my job.  So

9     under the doctor's care, I couldn't go back to work.  So then I

10    was terminated.  I didn't have a job.  I didn't have a car.

11    And I've been -- I had -- my ER income, I'm paying part of my

12    bill, most of my bill from the doctor.  So then I was

13    terminated from my job, and I don't have no way to get to a job

14    even if I were able.

15         So, sir, I've been through -- you know, well, I'm not

16    going to say the word, but I've been there and back.  And I'm

17    still holding on but I have contacted General Motors on --

18    because I couldn't get an attorney.  I got an attorney for the

19    last -- from February to October.  And he called me -- their

20    attorney called me that he was writing me a letter.  I didn't

21    know what the letter was about.

22         So when he called me and told me that ISIS (sic) was

23    offering me $2,500 I think it was.  That's what he had on that

24    letter.  He said call that number and claim the money if you

25    want to.  So when I called that letter and I guess he had

1   called and there too.  And when I called her, and she said

2   well, do you have an attorney.  And I said well, no, my

3   attorney gave me.  She said well I'm sorry, you are not getting

4   a dime.  I said oh, God, now what have I done.  The car was the

5   one that (indiscernible 1:14:05).

6           So I'm trying to get a car.  I'm trying to get -- now

7   I'm losing my home.  Okay.  I've lost my job, I lost my home, I

8   lost my car and I lost my health.  So now where do I go to?

9   I'm writing everybody that I can.  I worked for GM.  I retired

10  there.  I bought all of the automobiles from GM.  And I don't

11  even know where to go now.

12          THE COURT:  I understand, Ms. Pickett.  Ms. Pickett,

13  I didn't want to interrupt you, but the question that I asked,

14  and I'm going to give you one more chance to supplement your

15  comments, although I heard certainly what you already said --

16          MS. PICKETT:  Yeah.

17          THE COURT:  -- is are you aware of any basis in law

18  upon which the deadlines that were imposed under the law of

19  Georgia --

20          MS. PICKETT:  Yes.

21          THE COURT:  -- Michigan or New York --

22          MS. PICKETT:  Yes.

23          THE COURT:  -- why your claim was still timely?

24          MS. PICKETT:  Yes, I do, but they saying that I

25  didn't respond to this matter, and I did.  I did respond.  But

Page 52

1    I mean, I got no -- I got nobody.  Nobody gave me no nothing.

2    But then they sent a inspector out to the car.  The car was

3    totaled.  So you -- Your Honor, you can't make nobody take your

4    case.

5              THE COURT:  Ms. Pickett, did you --

6              MS. PICKETT:  But I respond.  I respond.

7              THE COURT:  Ms. Pickett, did you bring a lawsuit

8    before the GM bankruptcy?

9              MS. PICKETT:  Yes, sir.

10             THE COURT:  You did?

11             MS. PICKETT:  Yes, sir.  Yes, sir.

12             THE COURT:  Where did you bring the lawsuit?

13             MS. PICKETT:  My lawsuit was sent to, like I said,

14   ESIS, which is General Motors, sent your claim.  And we -- so I

15   did everything.  And then at the end of November, this attorney

16   sent me that letter, and I never heard from him since.  I've

17   called him, called him, called him.

18             Then she advised us to get another attorney because

19   he no longer was representing me.  So I got from November to I

20   believe April or March no attorney.  I couldn't get anybody.

21   So I'm calling and sending General -- I'm doing everything in

22   my power to try to get this resolved.

23             So now 2009, General Motors wrote me a letter to send

24   in a claim.  I sent the claim in before the bar date.  I did

25   everything that I was told to do.  But now, Your Honor, you

Page 53

1    can't make nobody take your case.

2              THE COURT:  Okay.  Thank you.

3              Ms. Greer, do you want to respond?

4              MS. GREER:  Certainly, Your Honor.  First, Your

5    Honor, as you know, we are extraordinarily sympathetic to

6    whatever losses Ms. Pickett has experienced, but here we have a

7    very straightforward application of the law.  Ms. Pickett did

8    not file a lawsuit.  We checked extensively the GUC Trust

9    records.  We checked Westlaw.  We checked the dockets.  We did

10   what we could to see what we could find, and there was nothing,

11   Your Honor.

12             Ms. Pickett is correct that she did file a claim with

13   ESIS, the debtors' -- well, old GM's claims agent.  And she

14   sought to get some recovery from GM, but she never filed a

15   lawsuit.  And as Your Honor knows, it's simply insufficient to

16   satisfy the statute of limitations to just file the claim with

17   the claims agent.

18             Your Honor, Ms. Pickett is also right that she filed

19   a timely claim in the bankruptcy case.  But even a timely filed

20   claim, to the extent the statute of limitations expired prior

21   to the bankruptcy, does not make for an exception to the

22   statute of limitations.

23             Your Honor, this is a very similar issue to the

24   Smalley (ph) claim, which was before this Court also in the GM

25   matter where the claim expired -- the statute of limitations,

Page 54

1      excuse me, expired pre-petition.  And that case, Your Honor,

2      was recently affirmed by the district court.  They made clear

3      that if the statute of limitations expires prior to the

4      bankruptcy the claim has to be disallowed.  Your Honor, the GUC

5      Trust submits that the same treatment should occur here.

6              THE COURT:  Okay.  Everybody stand by please.

7              Ms. Pickett, like Ms. Greer, I very much sympathize

8      with you for the losses you incurred and all of the heartache

9      that you've gone through.  But as a matter of law, I'm required

10     to disallow your claim because it wasn't brought in time.  The

11     word of art we use in the law is that it's untimely and that

12     it's barred by the statute of limitations.  And in hopefully as

13     plain English as I can, I'm just going to take a couple of

14     minutes to explain what I mean by that.

15             Under the law, after somebody suffers an injury or

16     has been legally wronged, time limits are imposed by the law to

17     bring a lawsuit.  I well understand and I think Ms. Greer

18     understood and acknowledged that you had a back and forth with

19     ESIS, GM's claims agent, trying to get relief without a

20     lawsuit, but your efforts in that regard were unsuccessful.  If

21     you were unhappy with ESIS told you or if ESIS didn't respond

22     or if GM didn't respond, then the law imposed on you a duty to

23     bring a lawsuit within the time required under the law.

24             Now, one can look at the statute of limitations of

25     three states, those of Georgia, Michigan and New York, but I

Page 55

1    don't have to decide which state's law applies because if it

2    was in Georgia, where the accident took place and where I think

3    the best argument as to the applicable statute of limitations

4    would apply, you had two years to bring a personal injury

5    action, four years to bring an action for injury to property

6    and four years to bring an action for a breach of implied

7    warranty of merchantability.  Since your accident took place on

8    June 24th, 2004, the statute of limitations, the deadline for

9    bringing the lawsuit, expired on June 24, 2008, give or take a

10   day.  Michigan allows one extra year to bring a personal injury

11   claim but the same amount of time to bring claims for injuries

12   to property and for breach of the implied warranty of

13   merchantability.  And New York is the same as Michigan.

14          Under each of the applicable three states law, and I

15   use applicable charitably because frankly, I think Georgia law

16   applies, your claim wasn't brought in time.  And for that --

17          MS. PICKETT:  Your Honor --

18          THE COURT:  And for that reason, I am required to

19   disallow your claim.

20          Now, hopefully you heard what I told the prior folks

21   on this call about the opportunity to be heard on a notice of

22   settlement and rights to appeal.  I'm going to direct the GUC

23   Trust to settle an order consistent with this ruling.  And, Ms.

24   Pickett, your time to appeal this ruling will run from the time

25   of the entry of the order and not from the time of this

Page 56

```
 1    dictated decision.

 2             I do want to remind you that the time to appeal an

 3    order from the bankruptcy court is very short, and you have

 4    only 14 days from the time of the entry of that order to appeal

 5    it.

 6             Ms. Greer, could I impose on you for the same

 7    courtesy that Mr. Griffiths provided me?  Do you have Ms.

 8    Pickett's phone number or a way to reach her?

 9             MS. GREER:  Yes, Your Honor.  We spoke to her this

10    morning, so I'm happy to reach out to her.

11             THE COURT:  When that order is entered, would you

12    please call her and tell her that so she knows that her 14 days

13    starts to run?  I'm not ordering you to do it, but I appreciate

14    the courtesy.

15             MS. GREER:  We certainly will, Your Honor.

16             MS. PICKETT:  Your Honor?

17             THE COURT:  Yes, Ms. Pickett.

18             MS. PICKETT:  Your Honor, could I ask you a question?

19             THE COURT:  Yes, as long as it's not rearguing what I

20    already ruled on.

21             MS. PICKETT:  Oh, no, no.  I'm not smart about

22    filing.  What were you saying I was supposed to file on?

23             THE COURT:  You don't have to appeal, but you have

24    the right to appeal.

25             MS. PICKETT:  A lawsuit, a lawsuit.  I'm trying to
```

1   find that out.  I thought maybe that an attorney filed that.  I

2   didn't know.  I don't even know how to go about doing that.

3            THE COURT:  You don't know how to go about appealing?

4            MS. PICKETT:  Yeah, but I'm -- yeah.  But what I'm

5   saying is I don't know about filing.  I caught filing a claim

6   again against General Motors, but I don't know about -- I'm

7   ignorant about a lawsuit.  I thought an attorney did that.  I

8   mean, I did what I thought -- you know, that I knew as I

9   couldn't get an attorney.  But I didn't know.  I thought I was

10  filing a lawsuit.

11           THE COURT:  Well, forgive me, Ms. Pickett --

12           MS. PICKETT:  I'm not aware of that.

13           THE COURT:  Uh-huh.  I understand.  Forgive me, Ms.

14  Pickett.  I'm not allowed to give you legal advice.  I --

15           MS. PICKETT:  Okay.  But I was just explaining.  I

16  didn't know.  I thought that's what I was doing already.

17           THE COURT:  Well, I understand your explanation, but

18  the statute of limitations applies not just to people who have

19  lawyers but also people who don't have lawyers.  And it applies

20  to anybody who hasn't brought the claim by means of a lawsuit

21  in the time.

22           So if you want, you may appeal even without a lawyer.

23  But I can't give you legal advice about anything more than

24  that.  All I can do is explain my ruling.

25           MS. PICKETT:  Okay.  Okay.  So I have 14 days to

GENERAL MOTORS CORPORATION

Page 58

1    appeal this.

2          THE COURT:  To appeal it, which time starts to run

3    from the time the order is entered.

4          MS. PICKETT:  Okay.

5          THE COURT:  Okay.

6          MS. PICKETT:  So will that -- will this order be sent

7    to me directly from the court?

8          THE COURT:  Ms. Greer, do me a favor and send it to

9    her as well since she may not have Internet.

10          However, if I -- if you can call at that time because

11    I can't help you if the copy of the order is delayed in the

12    mail.  If you want to appeal it, Ms. Pickett, an early --

13          MS. PICKETT:  (Indiscernible 1:27:20).

14          THE COURT:  Forgive me.  You can't speak over me.

15          MS. PICKETT:  Okay.

16          THE COURT:  If -- an early appeal will be counted as

17    an appeal, so think about whether you want to appeal it.  Ms.

18    Greer isn't obligated to call you when the order is entered,

19    but she said she would as a favor to the Court.  Just remember

20    you have that deadline.  Okay.

21          MS. PICKETT:  Okay, sir.  Thank you.

22          THE COURT:  Thank you.  Have a good day.

23          MS. PICKETT:  Thank you.  You too.

24          THE COURT:  Okay.  Next, Dr. Shah.

25          Mr. Shah, come to one of the counsel table please.

GENERAL MOTORS CORPORATION

Page 59

1          MS. GREER:  Your Honor, if it's okay with you, I'd

2     like to introduce my partner, Debra Kelly, who's an employment

3     lawyer and is going to present on Dr. Shah.

4          Before she comes up to the podium, I would note we

5     have her pro hac vice motion pending.  I'm not certain that it

6     was entered by the Court at this time.

7          THE COURT:  I'm not sure if it has been either

8     because normally unless there's some red flag they're approved

9     without me seeing them.

10          MS. GREER:  Okay.

11          THE COURT:  But I'll grant it right now in case

12     that's an issue.

13          MS. GREER:  Thank you very much, Your Honor.

14          THE COURT:  Ms. Kelly, good morning.

15          MS. KELLY:  Good morning, Your Honor.  Would you like

16     me to give you -- I'm trying to follow protocol -- a card as

17     well?

18          THE COURT:  Since you're the last one on, you can

19     drop it off with the reporter either now or at the end of the

20     day.

21          MS. KELLY:  Good morning, Your Honor.  It's a

22     pleasure to be here.  I will confess.  As Ms. Greer said, I am

23     an employment lawyer and I am not a bankruptcy lawyer.  But I

24     have had a tutorial, so I hope to be direct and to the point.

25          I am mindful of the fact that Dr. Shah is here.  And

GENERAL MOTORS CORPORATION

Page 60

1   as an employment lawyer, I will say that one -- something that

2   we often address is it's a very personal area of law, and

3   people who experience an adverse employment action are hurt,

4   disappointed and misunderstand the fact that they didn't get

5   the outcome they want and it has something that is therefore

6   unlawful.  This is an quintessential case of that.  And in

7   looking at what Dr. Shah has filed, it is an example of

8   basically a kitchen sink pleading or, to change the metaphor,

9   he has put -- thrown a lot of spaghetti up against the wall and

10  hoped that one stick of it hits.  And indeed, it has not.

11          As our pleadings say, and I'll be very brief here,

12  that there is as a matter of law Dr. Shah cannot sustain his

13  First Amendment claim because there's no state action.  He

14  cannot sustain his claim for retaliation or race because he

15  didn't plead that in his EEOC charge.  He can't discuss things

16  prior to February of 2008 because that's beyond the applicable

17  period given that you only have 300 days from the -- to file

18  your EEOC suit.

19          And also, Your Honor, even if everything that Dr.

20  Shah says is true, and he says a lot, it doesn't matter

21  legally.  I understand that this is an upsetting circumstance

22  for him practically to lose his job, and I'm mindful of that.

23  But legally, his allegations of age, color and national origin

24  describe himself, and they amount to an allegation of

25  discrimination by subtraction where you say I don't like what

1    happened to me, I look in the mirror and I am a member of the

2    following protected categories.  Therefore, the adverse action

3    happened because I am a member of those categories.  And

4    indeed, that causation, that bridge, that connection is utterly

5    lacking even if the Court were to take everything that the

6    complainant says as is true.

7              In his response brief to our objection, Dr. Shah

8    spends a lot of time on the religion allegation and says that

9    the decision to terminate his employment was based upon his

10   religion.  But indeed, as a matter of law, again, he doesn't

11   even state the prima facie case to make a religion claim.

12             What he does is he spends a great amount of time in

13   his complaint talking about his belief in Vedic literature and

14   his belief that Vedic literature is the proper way to practice

15   medicine.  And I will quote him, "The eternal and blissful

16   Vedic literature and modern science are created by the almighty

17   one for the entire mankind and note irrespective of his or her

18   religious, national, cultural, linguistic, racial, cast, creed,

19   affiliation in this small globe."

20             So he is a proponent of a method of practicing method

21   with which his colleagues disagreed.  By his own admission, a

22   belief in medicine is not the same as a religious belief.

23   Note, he says irrespective of his or her religion.  And for the

24   reasons we set forth in our brief, and I won't reiterate them

25   here, he doesn't even state a prima facie case.

Page 62

1          So in addition to failing to sufficiently plead the

2     legal and factual basis for this claim, even if everything he

3     says were true, he cannot get the damages that he seeks because

4     this Court has ruled that in this matter there will not be

5     punitive damages.  Moreover, even if this Court had not ruled

6     that, the federal law under which he pleads caps compensatory

7     and punitive damages at $300,000.  He asks for $10 million.

8          The compensatory damages he seeks of $500,000, let's

9     put aside the merits of the case.  We ask this Court to enter

10    an order which would indeed cap his compensatories at what he

11    pleads, which is $500,000, and to order that he cannot sustain

12    a claim for punitive damages because, again, this Court and the

13    federal law and indeed even the Michigan EEO law, which he

14    pleads against, do not allow punitive damages under Michigan

15    law and at all.  And in federal law, it is capped.

16          THE COURT:  Pause please, Ms. Kelly.

17          MS. KELLY:  I am finished.

18          THE COURT:  If I heard you up to the last couple of

19    minutes, I -- and from your papers, I understood that you're

20    attacking the underlying claim even for the compensatory

21    portion.

22          MS. KELLY:  Yes, Your Honor.

23          THE COURT:  But you're saying that even if I think I

24    need to have an evidentiary hearing or something else on the

25    compensatory portion that I should cap the totality of the

Page 63

1     claim and dismiss the claim insofar as it asks for punitive.

2               MS. KELLY:  Yes, Your Honor.

3               THE COURT:  Okay.  So I understood you correctly.

4     Did I hear you to say you were finished?

5               MS. KELLY:  Yes.

6               THE COURT:  Okay.  Dr. Shah, would you please come up

7     to the main lectern where Ms. Kelly was and I'll hear your

8     argument?

9               And for the purpose of this analysis, I'm going to

10    assume that you feel that you were wronged, but I want you to

11    focus on the legal points that Ms. Kelly made about whether the

12    facts that you have support the discrimination claims that

13    you're talking about.  And in particular, I want you to address

14    the punitive damages aspect, one of which I've already ruled on

15    in another claimant's case in the General Motors case and

16    which, while that ruling isn't binding on you, is a precedent,

17    not to mention the precedence that I relied on in issuing that

18    earlier ruling.

19              Go ahead please, sir.

20              MR. SHAH:  Good afternoon, Your Honor, and good

21    afternoon to everyone.

22              And this is the first time in the court in my life.

23    I'm 62 right now and pleasure to be here, but this is the first

24    time here in the court so far.  And this is the first time I

25    drove in New York today.  I had been to New York several times,

Page 64

1    but this is the first time I drove.  And it took me about -- I

2    thought it was only 10 miles from La Guardia, but it took me --

3    in Michigan it takes 30 minutes.  It took about one and a half

4    hours, but I was in time.

5          Anyway, so thank you very much for giving me

6    opportunity to discuss with you about this case.  And I'm here

7    in this country almost 30 years.  My English is not that bad as

8    I can speak reasonably very nice, good English.  And I'm sure

9    that you all will understand.

10         And first thing, just I know that Stephanie Greer and

11   you're the same girl just -- okay, so okay.  Just I want to

12   make sure.  Okay.

13         So in my case, just I've -- in 2008, just I was

14   terminated on July 11, 2008 by my supervisor -- not the

15   supervisor but the senior group medical director, Dr. Miller.

16   And just I thought it was unfair based on religion, color, age

17   and nationality.  And I filed about 10-page letter to EEOC on

18   -- in July.  It was -- sorry, it was December 4, 2008, after

19   four months.  And I explain the reasons for my terminations and

20   explanations in 11 page.

21         And the case is going on since 2008.  And I reply

22   about two weeks ago, about two weeks, about a response to the

23   defendant attorney, and I explained everything about -- in

24   details about discrimination based upon religion, nationality,

25   age and color.  So I believe this is the concrete information,

1    what we call prima facie, and it gives a lot of detailed

2    information about how this happened.  And the reason is

3    primarily is religions and nationality and color and age.  And

4    I explained these informations in my brief and also in my EEOC

5    letter about in 2008.  And I strongly believe that these four

6    factor has to do with termination of myself on June 11, 2008 by

7    Dr. Miller.

8              And so just I give so many example that in many, many

9    conferences just as doctors we had to attend certain

10   conferences organized by General Motors and also by a different

11   group and different universities.  And in conferences, we

12   discuss, all the presenter, cardiologists, pathologists,

13   psychologists, psychiatrists, they tell the -- they talk about

14   more than topics about the different knowledge in biomedical

15   science.  And at the end of the conference, they ask the

16   questions, anyone has some comment or they want to share their

17   concerns.  And usually that is during the question and answer

18   sessions.

19             And most of the doctors usually I have seen, usually

20   they come to the conference and they learn something what's

21   said by the scholars, cardiologists, pathologists and

22   psychiatrists.  And usually they don't answer or don't ask

23   certain questions, which is out of the tenet of the biomedical

24   science.  And since last six, seven years, during many

25   conference, General Motors conferences and all other

1    conferences out of the General Motors, I was asking so many

2    questions to the presenters and telling that can you answer

3    these questions.  This is my questions and just I want to share

4    with you.  These are my concerns.  And many time I have seen

5    that presenter, they don't like that questions.  And sometimes,

6    they ridicule you.  They just -- they ignore you.  And

7    naturally, they don't listens to you.  They say that's not a

8    good question.

9            So for an example, just there was a cardiology --

10   recently just about a month ago, we had a conference with a Dr.

11   Peter Carmel.  He's the AMA president, American Medical

12   Association president.  He invited 50 doctors to share their

13   concerns and questions and other information.  And in present

14   -- in the presence of the 50 very good doctors from all over

15   the United States, I asked that soul is the original pacemaker

16   in our heart or Sinudenoid (ph), Sinnoid (ph) is original

17   pacemaker in our heart.  They enjoyed this.  Some people like

18   -- most people like because these are research questions.

19           And I asked these questions in that conference and

20   also asked -- a couple of years I asked the same questions to

21   the cardiology conference.  And I said hey, you are

22   cardiologists, you should know, the heart with a pacemaker,

23   original pacemaker in the heart, is the soul the original

24   pacemaker or is a similar original pacemaker.  And the chairman

25   of the cardiologist conference said that okay, Dr. Shah, these

1    are very profound questions.  We don't have any answers.  We

2    need some more study, research, then we can answer these

3    questions.

4          So, Your Honor, what I'm trying to say that in

5    conferences, in workplaces and you talk with your colleagues

6    about certain topics, which you feel it can help in our

7    biomedical science or conventional medical science.  Then we

8    should discuss as a friendly manner, and it should not be a

9    base that you can terminate some person if you don't like their

10   questions.  And this thing happened at the General Motors with

11   so many different doctors.

12         And I will give an example.  Just I was terminated on

13   June 2008.  Two months before, I sent a letter to Dr. Miller.

14   And I explained this thing what I said I'm saying right now.

15   Okay.  This weekend, give so many high dynamics in the

16   biomedical science, even in the occupational medicines.  And so

17   this -- what I was -- I'm talking about, just the Vedic

18   literature and Sanskrit language I'm reading since last 30

19   years.

20         And I'm practicing last 35 years medicine, so I know

21   both sciences, biomedical science and also Vedic literature or

22   Kolisted (ph) philosophy or Hindu philosophy.  And just so if

23   you express your thoughts or express your belief, you can call

24   it religious belief, scientific belief, biomedical science,

25   psychiatric belief, and we can discuss in a friendly manner

Page 68

1   with each other, whether you like, agree or don't agree or

2   disagree with that.  And in our democratic country just this is

3   the thing that we can discuss any issue that you like it

4   irrespective of what you like it, don't like it, irrespective

5   of your religions, irrespective of your culture, irrespective

6   your color, irrespective your nationality.  And we should

7   discuss in a healthy, sportsman's spirit rather -- and that

8   should be used -- that's what I'm saying that just -- what I'm

9   saying that we should use our beliefs and our knowledge for

10  higher purpose in any area in medicines, law, sports and other

11  things.  And we can discuss very friendly manner, and it should

12  not be used other way, negative way.

13            What I'm saying is the negative approach that suppose

14  you talk to -- talk these kind of issues.  If you don't like

15  it, then they're going to let you go.  So I believe --

16            THE COURT:  All right.

17            MR. SHAH:  So, Your Honor, just thanks for listening

18  to me.  And as defendant attorney just they wants to settle or

19  expunge or something like that, but I request you, please keep

20  this case moving.  And there's a lot of things we can discover.

21            THE COURT:  Thank you, Dr. Shah.

22            MR. SHAH:  Thank you very much.

23            THE COURT:  A couple of questions.

24            MR. SHAH:  Right.

25            THE COURT:  Before the EEOC you asserted a national

Page 69

1    origin discrimination claim, but you didn't include a racial

2    discrimination claim.  Which if either of those are you now

3    asserting before me?

4              MR. SHAH:  Basically just national was more important

5    than the racial.  The reason is that peoples in India, they are

6    considered as a Caucasian, dark Caucasians.

7              THE COURT:  Okay.

8              MR. SHAH:  And you are here it is white Caucasians.

9    So it was not that important.

10             THE COURT:  You're contending that you were

11   discharged because you're of Indian origin?

12             MR. SHAH:  That is my impression here that here in

13   this country just is sometimes what we call when Indians and

14   when Americans, sometimes they use it little derogatory way.

15   Sometimes Indian word is used just lower than Americans.  So

16   I'm Indian and I'm also American both.  I am citizen of this

17   America, so I'm American.

18             THE COURT:  Did you say you were American born?

19             MR. SHAH:  No.

20             THE COURT:  You're born in India?

21             MR. SHAH:  I was born India, so I'm Indian.  And I'm

22   citizen, so I'm Americans.

23             THE COURT:  I'm sorry.  I didn't understand.

24             MR. SHAH:  No, I was born in India, so I am the

25   Indian citizen.  And I came to United States in 1982, so I

Page 70

```
 1    become American citizen 1988.  So I'm Americans and Indians

 2    both.

 3              THE COURT:  I understand.

 4              MR. SHAH:  But what I'm saying is, Your Honor, that

 5    sometimes my impression in these 30 years of this -- in this

 6    country that sometime the word use Indians little derogatory

 7    way rather than -- so that's why it's called national -- some

 8    whites sometimes they use national discrimination.  Yes.

 9              THE COURT:  And from time to time I saw references to

10    age discrimination, but I didn't see any proof of age

11    discrimination in your claim.

12              MR. SHAH:  Your Honor, age is just as the bottom.

13    Just first is the national, religion, the national second,

14    color and just I put age too.

15              THE COURT:  Now, did anybody say anything or did you

16    see anything that led you to believe that you were being

17    discriminated against because of your age?

18              MR. SHAH:  I think so.  Just once you get older, I

19    was 59 at the time and --

20              THE COURT:  You say you were 59 at the time?

21              MR. SHAH:  19 -- in 2008 I was 59.  Right now, I'm 62

22    right now.  And they give priority to those who are younger.

23    Dr. Burton, he's younger, well, 15 years younger than me.  He

24    was selected immediately after Dr. Ortega (ph) retired.  And

25    they bypass me.  Dr. Miller bypass me and selected Dr. Burton,
```

1   who is 15 years younger than me.  So that is of attack.

2   There's some relationship.

3            THE COURT:  But that was after the difference in

4   medical philosophy that took place; am I correct?

5            MR. SHAH:  I'm sorry, sir.

6            THE COURT:  There was a difference in medical

7   philosophy as to the extent to which patients should be treated

8   under the Vedic doctrine; am I correct?

9            MR. SHAH:  Your Honor, just I am the medical doctor.

10  I'm an allopathic doctor.  So I treat the patient according to

11  allopathic medicines.  I was not treating according to the

12  Vedic literature or Eastern philosophy.  It was just my belief

13  and my information and idea, which naturally I cannot practice

14  because I am practicing allopathic medicine.  So I treated all

15  the patient according to the standard of the allopathic

16  medicines rather than other way.

17           THE COURT:  Uh-huh.  Okay.  Thank you.

18           Ms. Kelly, I'll hear reply.

19           MS. KELLY:  Respectfully, I think what Dr. Shah said

20  just verifies everything that I had argued.  It is his

21  impression, which is, again, this kitchen sink, let me throw

22  out all my demographics and see if it could be because of any

23  one of them.

24           He spends a lot -- he spent a lot of time again today

25  talking about that his belief in the way to practice medicine

GENERAL MOTORS CORPORATION

Page 72

1    is not one that other people agreed with.  There's nothing that

2    is religion based on that by his own pleading.  And also, that

3    had nothing to do with the reason why he was terminated.  He

4    was terminated, and I read from the supporting documents here,

5    because of an inability to diagnose and treat work-related

6    injuries.

7             In March of 2008, he failed to recognize an

8    employee's non-displaced distal radius fracture.  He didn't

9    provide a splint.  The same month, he wrote restrictions for an

10   employee without evaluating the employee's job to determine if

11   the restrictions were necessary.  On two occasions in April of

12   '08 he failed to accurately document patient histories,

13   misdiagnosed an employee's knee pain as arthritis, which was

14   subsequently determined to be a meniscus tear that required

15   surgery.

16            These and these alone are the reasons why he was let

17   go.  It has nothing to do with the respective differences about

18   the ways to practice medicine.  And again, as a matter of law,

19   a difference about the way to practice medicine is not the same

20   as a religious-based disagreement and an impression, which is

21   exactly the word Dr. Shah just used, is not sufficient grounds

22   to state a claim to continue before this Court.  Thank you.

23            THE COURT:  Okay.  All right.  It's now just about

24   1:00 o'clock.  It's been a long morning.  Get yourselves some

25   lunch.  Be back by 1:15, and I will dictate a decision at that

GENERAL MOTORS CORPORATION

Page 73

1    time or shortly thereafter as I can be ready for it.  We're in

2    recess.

3         (Court confers with clerk)

4              THE COURT:  Forgive me.  It's already 1:00 o'clock.

5    No, I'm giving you an hour and a quarter to eat lunch not 15

6    minutes, 2:15.

7         (Court confers with clerk)

8              MR. KODSY:  Yes, sir.

9              THE COURT:  Yeah.  Mr. Kodsy, you know that this

10   hearing started at 1:00 o'clock.  And I called your matter

11   maybe 45 minutes ago, which would have been about 12:15.  Why

12   were you not on the phone at the appropriate time?

13             MR. KODSY:  I had no idea I was supposed to call in,

14   Your Honor.  No one notified me of that process.  So I --

15             THE COURT:  I'm sorry.  I didn't understand that.

16             MR. KODSY:  Excuse me?

17             THE COURT:  Would you --

18             MR. KODSY:  What was that, Your Honor?

19             THE COURT:  Would you repeat that?  Frankly, I didn't

20   understand what you said.

21             MR. KODSY:  I was not alerted that I was supposed to

22   call in.  I didn't have a phone number or anything.  I was not

23   notified.  And --

24             THE COURT:  I have you on my phone log as having been

25   expected to be on the call.

Page 74

1          MR. KODSY:  Nobody called me or anything about that.

2    I have no idea.

3          THE COURT:  Well, I've already ruled based upon the

4    papers.  Is there anything you would have told me in oral

5    argument that you didn't put in your papers?

6          MR. KODSY:  No, Your Honor.  It's just the fact that,

7    you know, the expenses that I am -- I've spent, you know,

8    collecting here because of this stay.  There was another issue

9    that I wanted to request some kind of relief for that because I

10   have -- although I am doing this pro se, it's -- I'm disabled

11   and, you know, so without a vehicle.  And it's been going on

12   for several years.

13         And while I'm trying to get to the bottom of it, you

14   know, the -- I'm in bankruptcy and, you know, they're not doing

15   anything to move the case up.  You know, it's just at a

16   standstill and there's nothing I could do.  But I mean, for my

17   time and having to vacate this matter at such a late time, it's

18   very costly.  And I was wondering if I could get some relief

19   for that.

20         THE COURT:  All right.  I've heard nothing in this to

21   cause me to change my earlier ruling.  I -- the other creditors

22   of GM are not in a position to compensate you for your

23   aggravation in connection with this matter.

24         All right.  We're adjourned until 2:15.

25      (Recess from 1:02 to 2:10 p.m.)

1       THE COURT:  I apologize for keeping you all waiting.

2   I understand, Dr. Shah, that you have a plane to catch.  I want

3   to enable you to make it.  I was going to give you a more

4   fulsome decision, but what I'm going to do instead is I'm going

5   to summarize the basis for the decision and a few of the most

6   important facts.  And if you, Dr. Shah, wish to appeal, then

7   I'll issue a more fulsome decision either by a very lengthy

8   decision dictated for the record or by a writing.

9       In this contested matter in the Chapter 11 case of

10   Motors Liquidation Company, formerly known as General Motors

11   Corporation or old GM, Atul Shah, a contract physician formerly

12   under contract with old GM, seems an allowed claim of $10

13   million for compensatory and punitive damages.  He asserts that

14   he was unlawfully terminated, quote, because of religion,

15   comma, race, comma, et cetera, end quote.  See Exhibit H, his

16   proof of claim.

17       Fleshing out his claim somewhat, he alleges: one,

18   denial of First Amendment rights under the Constitutions of the

19   U.S. and Michigan; two, discrimination on the basis of color,

20   national origin, religion, race and age under, as applicable,

21   Title VII of the Civil Rights Act of 1964, the Michigan

22   Elliott-Larsen Civil Rights Act, which is sometimes referred to

23   ELCRA but because I hate acronyms so much I'm going to refer it

24   as the Michigan civil rights law, and the Age Discrimination in

25   Employment Act, which is sometimes referred to as the ADEA, but

```
 1    again, because I find acronyms so annoying for people who don't
 2    live in the field I'm going to refer to it as the Federal Age
 3    Discrimination Act.
 4            Then he also alleges retaliation for engaging in
 5    activity protected by Title VII.  The GUC Trust, the trust
 6    formed for the benefit of old GM's creditors, objects to the
 7    claims.  Among its many other points, it notes that the EEOC
 8    and the Michigan civil rights department could find no merit in
 9    his allegations, and that punitive damages, which presumably
10    represent the overwhelming bulk of this $10 million claim,
11    cannot be recovered under either the federal or Michigan anti-
12    discrimination statutes or even federal bankruptcy law where,
13    as here, we have a liquidating Chapter 11 case, and the real
14    victims of any punitive damages award would be the debtors'
15    other innocent creditors.
16            The great bulk of Dr. Shah's claims must be dismissed
17    as a matter of law, and the remainder must be dismissed for
18    failure of allegations that if proven would result in a viable
19    claim.  More specifically, and now I'm going to slow down even
20    though I know you have to catch the plane, the First Amendment
21    claim must be dismissed because there is no individual right of
22    action against a private entity, here old GM, for the violation
23    of an individual's First Amendment rights.
24            The retaliation claim is barred as a matter of law
25    because it was not included in the EEOC charge and can't be
```

GENERAL MOTORS CORPORATION

Page 77

1    found to be sufficiently close to that which was alleged to

2    take advantage of the tolerance that's sometimes permitted in

3    raising related claims, particularly by pro se claimants.

4        The punitive damages claims must be dismissed because

5    they aren't recoverable under one of the federal statutes or

6    the Michigan statute, and under the other federal statute even

7    if they are otherwise allowable must be capped for a company of

8    GM's size at $300,000 under the Civil Rights Act of 1964 under

9    Title VII.  The punitive damages claims must be dismissed for

10   the additional reason that they can't be recovered against the

11   estate in a liquidating Chapter 11 case as a matter of federal

12   bankruptcy law, as I held only a couple of months ago in

13   another case involving old GM that where there was substantial

14   evidence of a failure to disclose information that old GM

15   should have disclosed.

16       The only close issue that's presented before me and

17   it's why I took so long to think this through and kept you all

18   waiting is whether I should continue the small portion of the

19   claims that remain, those for discrimination based on national

20   origin and perhaps age, for an evidentiary hearing or whether

21   they should be dismissed now.  But after reading the entirety

22   of Dr. Shah's submission and taking his allegations as true,

23   there are no facts as contrasted to conclusions and his

24   statements of his perceptions from which I could find any

25   discrimination.  Based on the facts as alleged, I can't even

GENERAL MOTORS CORPORATION

Page 78

1    find claims of discrimination to be plausible.

2            I don't expect evidence of discrimination to appear

3    in Macy's window.  Most of the time, though I don't see this

4    issue -- these issues as much as I see other types of issues in

5    the bankruptcy court, I would assume that evidence of

6    discrimination must be inferred, and people don't admit it in

7    so many words.  But here there are no facts alleged other than

8    the fact that Dr. Shah, while a naturalized U.S. citizen, is

9    Indian ancestry, Hindu and was 59 years old at the time.

10           There was apparently a difference in views as to

11   medical philosophy with other doctors disagreeing with Dr.

12   Shah's view, which he apparently shared with them, that Eastern

13   philosophy had, quote, superior concepts, quote, over current

14   medical science, including biomedical science.  But that is a

15   view as to medical practice not religion or at least it becomes

16   a view as to medical practice when doctors at GM are

17   determining how GM workers are to be treated.  Those facts

18   without more do not make out a discrimination case.  And here,

19   there is no more.

20           I read each and every one of the statements in Dr.

21   Shah's response to ascertain whether if proven they would give

22   me a basis for concluding that he had been discriminated

23   against.  I could find none.  That's not enough to make out a

24   claim for $300,000, the maximum permissible under the cap much

25   less the $10 million that Dr. Shah seeks.

Page 79

1           That summarizes my ruling, but I want to make one or

2      two observations further that appear from the findings of fact

3      or would if I were required to issue a lengthier decision or

4      issue one in writing.  In his charge before the EEOC, Dr. Shah

5      stated I can only conclude that I have been discriminated

6      against by being removed from my position due to my color, age,

7      religion and national origin in violation of Title VII of the

8      Civil Rights Act of 1964, as amended, and the Age

9      Discrimination in Employment Act of 1967, as amended.

10          I looked at the facts from which Dr. Shah drew that

11     conclusion, the "I can only conclude that."  I could not draw a

12     like conclusion nor could I find that if facts of the type that

13     he articulated were fleshed out further that that -- any of

14     those facts would support a claim of discrimination.  Believe

15     me; I looked.

16          Though it does not appear in Dr. Shah's papers, the

17     GUC Trust has introduced evidence of its dissatisfaction with

18     Dr. Shah's performance as a physician, including evidence of

19     failures to correctly diagnose and treat work-related injuries,

20     poor documentation and lack of thoroughness.  While there are

21     contentions by Dr. Shah that that was all pretextual, he has

22     given me no basis for ignoring that evidence or evidence of a

23     motivation to rely upon a pretext.

24          More important than the issue of fact that would

25     arise if either of Dr. Stanley Miller, the senior group medical

1     director, or Dr. Anthony Burton, the medical director at the

2     Ypsilanti, Michigan plant, were to testify as to what they were

3     thinking, more important is what Dr. Shah is not allege.  I

4     don't doubt that he feels discriminated against by reason of

5     his national origin or perhaps his religion or age, but I see

6     no actual facts as contrasted to conclusions evidencing that.

7          He asserts that the complaints about his patient care

8     and the other dissatisfaction with his work were pretextual,

9     but there are no facts that have been alleged that supports

10    such an inference.  There are no indications that others of any

11    other ethnic group or age were favored over him.  I think he

12    captured the evidence or lack of evidence in his EEOC

13    complaint.  I can only conclude, those words surrounded by

14    quotes.  I don't doubt that he felt discriminated against, but

15    there is nothing here other than the perception.

16          Now, Ms. Greer, Ms. Kelly, I want you to defer

17    settlement of an order in accordance with this and give Dr.

18    Shah a chance to think about the ruling, even if it requires

19    waiting for him to get a transcript of it, and then to let you

20    know whether he wishes to appeal or not.  If he does, then I

21    will flesh out my decision with full findings of fact and

22    conclusions of law either by a very lengthy dictated decision

23    or by putting it in writing.

24          But since the time under the Federal Rules of

25    Bankruptcy Procedure for taking an appeal is so short, and what

GENERAL MOTORS CORPORATION

Page 81

1    I've dictated so far only summarizes what would otherwise be a

2    lengthier ruling, I don't want any clocks running against him

3    now nor do I want either side to have to work with less than a

4    complete ruling.  So you're to talk amongst yourselves.  And,

5    Dr. Shah, you should let first them and then my chambers, with

6    a copy to them, know if you want to take this on appeal to a

7    higher court.  And if you do, then I'll decide how much more I

8    want to say.  But the bottom line of the ruling and its overall

9    rationale remains as is.

10           I also will need for Dr. Shah to understand the

11   rationale for this ruling and any reviewing court, if it goes

12   up, my relatively recent decision in another Motors Liquidation

13   matter where I disallowed a claim for punitive damages for that

14   withholding of the evidence.  Here, as there, bankruptcy law

15   does not permit penalizing innocent creditors in a liquidating

16   Chapter 11 by reason of an award of punitive damages.  And the

17   cases that were then put before me, which so far as I can tell

18   have been in substantial part put before me again, and my

19   earlier dictated decision as to that are obviously of great

20   relevance.

21           All right.  Dr. Shah, I know you have to catch a

22   plane.  Not by way of re-argument, does either side have any

23   questions before we let him go?  Doctor?

24           MR. SHAH:  Yes.  Thank you.

25           THE COURT:  Come to a microphone please.  Otherwise

1    you won't be recorded.

2          MR. SHAH:  Thank you, Your Honor, for your

3    conclusion.  And just as you said, just we are to talk with the

4    attorney and find out what we are going to do that?  Is that --

5          THE COURT:  Yes.  I can't give you legal advice, but

6    I would suggest that you think about what you heard.

7          MR. SHAH:  Okay.

8          THE COURT:  I'm directing Ms. Greer when she gets a

9    copy of the transcript to share it with you, let you read it,

10   let you understand the basis for the ruling, then you let first

11   her and then my chambers know if you think you want to appeal.

12         MR. SHAH:  Okay.  So just let me discuss with them

13   and --

14         THE COURT:  Yes.

15         MR. SHAH:  Thank you, Your Honor, for your

16   conclusions.  And I'm so -- please, I'm very thankful to you

17   and everyone.  Thank you.

18         THE COURT:  Thank you very much.  Have a good flight.

19         Anything else, Ms. Greer?

20         MS. GREER:  Only briefly, Your Honor.  If we could

21   just ask Dr. Shah if he would please let us know within let's

22   call it a week after receiving the transcript.  At least we can

23   make sure we're continuing to move forward.

24         THE COURT:  I understand your need to go forward.

25   You've got a pro se litigant.  Give him a couple of weeks.

1              MS. GREER:  You've got it, Your Honor.

2              THE COURT:  Okay.  All right.  We're adjourned.

3       Thank you.

4           (Whereupon these proceedings were concluded at 3:31 PM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    I N D E X

 2

 3                  R U L I N G S

 4                                        PAGE     LINE

 5    Defendant Aurelius Investment, LLC's      --       --

 6    Motion to Dismiss GUC Trust's Complaint

 7    For Failure To State A Claim Upon

 8    Which Relief May Be Granted

 9

10    Motion of Motors Liquidation Company     14        6

11    GUC Trust for Limited Modification of the

12    Automatic Stay and the Plan

13    Injunction as to Action Filed by

14    Burton Taft, Administrator of the

15    Estates of Brian Taft

16

17    Motion of Motors Liquidation Company     18       14

18    GUC Trust for Limited Modifications of the

19    Automatic Stay and the Plan Injunction

20    as to the Action Filed by Sheriff

21    Rafik Kodsy

22

23

24

25
```

1                        R U L I N G S

2                                                    PAGE      LINE

3    Motion of Motors Liquidation Company           20        16

4    GUC Trust for Entry of an Order

5    Fixing the Amount of and Allowing

6    Claim No. 11385 Filed by Dana H. Fox

7    for Distribution Purposes and Granting

8    Related Relief

9

10   Eighty-Third Omnibus Objection to Claims       44        15

11    (Welfare Benefit Claims of Retired

12   and Former Salaried and Executive Employees)

13

14   Debtors' 103rd Omnibus Objection to Claims     44        15

15    (Welfare Benefit Claims of Retired

16   and Former Salaried and Executive Employees)

17

18   Debtors 114th Omnibus Objection to Claims      44        15

19    (Welfare Benefit Claims of Retired

20   and Former Salaried and Executive Employees)

21

22

23

24

25

```
1                    R U L I N G S

2                                              PAGE     LINE

3

4    Debtors' 169th Omnibus Objection to Claims    44      15

5     (Welfare Benefit Claims of Retired

6     and Former Salaried and Executive Employees)

7

8    Motion for Objection to Claim (s)             75      19

9    Number 28820, filed by Atul Shah

10

11   Motion for Objection to Claims(s)             54      15

12   Number 18839 and 70846 filed by

13   Juanita Pickett

14

15   Motors Liquidation Company GUC Trust's        22       9

16   Objection to Claim No. 4171

17   filed by James O. Bryant, Jr.

18

19

20

21

22

23

24

25
```

Page 87

1                    C E R T I F I C A T I O N

2

      I, Sheila G. Orms, certify that the foregoing is a correct

3    transcript from the official electronic sound recording of the

4    proceedings in the above-entitled matter.

5

6    Dated:  May 17, 2012

7    Shelia G. Orms        Digitally signed by Shelia G. Orms
                            DN: cn=Shelia G. Orms, o=Veritext, ou,
8                           email=digital@veritext.com, c=US
                            Date: 2012.05.17 16:33:28 -04'00'

9     Signature of Approved Transcriber

10

11

12

      Veritext

13

      200 Old Country Road

14

      Suite 580

15

      Mineola, NY  11501

16

17

18

19

20

21

22

23

24

25