Page 1

1    IN THE UNITED STATES BANKRUPTCY COURT

2    FOR THE DISTRICT OF NEW YORK SOUTHERN

3    Case No.1-09-50026

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    IN RE:

6    MOTORS LIQUIDATION COMPANY, et al.,

7             f/k/a General Motors Corp., et al.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9             U.S. Bankruptcy Court

10            One Bowling Green

11            New York, NY 10004-1408

12

13

14

15

16

17            May 31, 2012

18            9:45 a.m.

19

20

21   B E F O R E :

22   HON ROBERT E. GERBER

23   U.S. BANKRUPTCY JUDGE

24

25

1  Debtors' Twenty-Seventh Omnibus Objection to Claims

2  (Incorrectly Classified Claims)

3

4  Debtors' 168th Omnibus Objection to Claim (Supplemental

5  Executive Retirement Benefits Claims of Former Executive

6  Employees)

7

8  Debtors' 169th Omnibus Objection to Claims (Welfare Benefits

9  Claims of Retired and Former Salaried and Executive

10  Employees)

11

12  Debtors' 170th Omnibus Objection to Claims (Welfare Benefits

13  Claims of Retired and Former Salaried and Executive

14  Employees)

15

16  Debtors' 171st Omnibus Objection to Claims (Welfare Benefits

17  Claims of Retired and Former Salaried and Executive

18  Employees)

19

20  Debtors' 172nd Omnibus Objection to Claims (Welfare Benefits

21  Claims of Retired and Former Salaried and Executive

22  Employees)

23

24

25

Page 3

1    Debtors' 174th Omnibus Objection to Claims (Welfare Benefits

2    Claims of Retired and Former Salaried and Executive

3    Employees)

4

5    Debtors' 177th Omnibus Objection to Claims (Welfare Benefits

6    Claims of Retired and Former Salaried and Executive

7    Employees)

8

9    268th Omnibus Objection to Claims and Motion Requesting

10   Enforcement of Bar Date Orders

11

12   276th Motion for Omnibus Objection to Claim(s) Requesting

13   Enforcement of Bar Date Orders

14

15   277th Motion for Omnibus Objection to Claim(s) (Insufficient

16   Documentation)

17

18   278th Motion for Omnibus Objection to Claim(s) (Incorrectly

19   Classified Claims)

20

21   279th Motion for Omnibus Objection to Claim(s) (No Liability

22   Claims)

23

24

25

1    Objection to Claims 44829, 70019 and 64854 (filed by Exide

2    Technologies, Relco Systems, Inc., and Roth Global Plastics,

3    Inc.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1   A P P E A R A N C E S :

 2

 3   Weil, Gotshal & Manges, LLP

 4        Attorneys for Debtor

 5        767 Fifth Avenue

 6        New York, NY  10153-0019

 7

 8   By:  David N. Griffiths

 9

10   Dickstein Shapiro, LLP

11        1633 Broadway

12        New York, NY  10019-6708

13

14   By:  Stefanie Birbrower Greer

15

16   Damon & Morey

17        Attorneys for Creditor, Relco Systems

18        The Avant Building

19        200 Delaware Avenue, Suite 1200

20        Buffalo, NY 14202-2150

21

22   By:  John Kolaga

23

24   Maya Broady, Pro Se

25   Mohamed A Fetouh, Pro Se
```

Page 6

1   Gerald S. Kaspyzk, Pro Se

2   James P. Kurlinski, Pro Se

3   Marilea Meder, Pro Se

4   Richard A. Schell, Pro Se

5   Douglas Sterett, Pro Se

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  Alright, folks, good morning, those in

3    the courtroom and on the phone. We are here on General Motors

4    Corporation, aka Motors Liquidation Company. We have

5    objections to claims. Shall we begin?

6            MR. GRIFFITHS:  Good morning, Your Honor. David

7    Griffiths, of Weil, Gotshal, Manges, for the debtors, the

8    post effective date debtors and Motors Liquidation Company

9    GUC Trust.

10           THE COURT:  Pause, please. It's very hard to hear

11   you over the air conditioning. We're going to try to go

12   without air conditioning for as long as we can. Try again.

13           MR. KOLAGA:  Good morning, Your Honor, this is

14   John Kolaga for Relco Systems.

15           THE COURT:  Okay, thank you. I'm, we have many,

16   many people who are appearing on the phone. I am going to

17   ask, rather than getting appearances all at the beginning

18   that people give me their appearances when their particular

19   claims are up for discussion. Okay, go ahead, please.

20           MR. GRIFFITHS:  Thank you, Your Honor. Again,

21   David Griffiths, Weil, Gotshal & Manges, for the debtors, the

22   post-effect date debtors and Motors Liquidation Company GUC

23   Trust. Your Honor, we have six omnibus objections to claims

24   going forward today, with respect to the 169th, 170th, 171st,

25   172nd, 174th, and 177th omnibus objection to claims, relating

Page 8

1    to welfare benefit claims of retired and former salaried and

2    executive employees. These relate to seven claimants, who I

3    believe are on the phone today, with one claimant, Mr.

4    Curzon, who has adjourned to June 14th.

5           Your Honor, with your permission, we could adopt

6    the format from the previous hearings, where we hear from the

7    claimants and then reserve the right to reply to any new

8    materials. The GUC Trust is happy to rest on its existing

9    submissions, but would like to designate for the record for

10   any appeal, Your Honor's prior rulings with respect to

11   welfare benefit claims, most notably the May 15th, April 26th

12   and January 18th hearings.

13          THE COURT:  Okay, that'll be fine. Did you have an

14   order in mind for addressing the respective claims? Did you

15   want to hear the environmental claim, the Relco claim, first,

16   or last, or something in between?

17          MR. GRIFFITHS:  Your Honor, I believe the welfare

18   benefits should go first, if that's acceptable. My co-counsel

19   is handling the environmental claim.

20          THE COURT:  Okay.

21          MR. GRIFFITHS:  The first claim, if Your Honor

22   would like to take it forward would be from Marilea Meder on

23   behalf of her surviving spouse, Mr. Robert Meder.

24          THE COURT:  Okay, that is Marilea Meder, M-E-D-E-

25   R?

Page 9

1           MR. GRIFFITHS:  Correct, Your Honor.

2           THE COURT:  Okay, Ms. Meder, are you on the phone?

3           MS. MEDER:  Yes, Your Honor, I'm here.

4           THE COURT:  Would you like to orally argue on your

5    claim?

6           MS. MEDER:  Yes, Your Honor. If my late husband,

7    Robert Meder, had been healthy at the time of the General

8    Motors bankruptcy, this claim would have never been filed. He

9    understood then, as I do now, that the life insurance benefit

10   promised to him at the time of his retirement in 2002 was not

11   a guaranteed amount. This claim is not for continued coverage

12   with a payout for a survivor at some future date. So my

13   position is that this claim is different than those that have

14   been previously denied.

15          My claim is for a settlement that acknowledges

16   circumstances beyond my late husband's control that prevented

17   him from having adequate life insurance coverage at the time

18   of his death. As it turned out, when General Motors filed for

19   bankruptcy, my late husband had only 16 months to live.

20   Throughout the many years that he fought cancer, one source

21   of comfort for him was that if he should succumb to the

22   disease, I would receive life insurance that would help me

23   move forward after his death. You can imagine his dismay when

24   that benefit was no longer available.

25          Had my late husband's health permitted, he would

1    have purchased a private life insurance policy. His poor

2    health prevented that. He did purchase a $100,000 policy that

3    was offered to him as a part of the new organization. This

4    policy did not require proof of good health, but the insured

5    would have to survive for two years from the date of purchase

6    for the policy to pay. He did not survive that long.

7         My late husband's situation is one of those

8    falling through the crack scenarios. Through no fault of his

9    own, he was unable to provide for his family in the way he

10   had always done. That is why I have followed through with his

11   claim and am speaking to you today.

12        If this Court has the authority and discretion to

13   consider extenuating circumstances, such as the ones I have

14   shared, I respectfully request that the claim I am continuing

15   on my late husband's behalf be considered. Thank you.

16        THE COURT:  Okay, thank you, Ms. Meder. Mr.

17   Griffiths, would you like to respond?

18        MR. GRIFFITHS:  Your Honor, just to say that the

19   GUC Trust regrets Ms. Meder's difficult circumstances, but

20   they can't be helped in light of the debtors' liquidation.

21   The insurance policy that Ms. Meder is referring to was an

22   insurance policy that was put in place by New GM for the

23   debtors' former retired employees, and isn't the

24   responsibility of Motors Liquidation Company GUC Trust, who

25   can't affect its terms. Those are my only comments, Your

Page 11

1    Honor.

2            THE COURT:  Was there a policy in a lesser amount,

3    based on his earlier GM service that did pay out?

4            MR. GRIFFITHS:  We'd have to ask Ms. Meder if it

5    actually paid out. I don't know the answer to that. But yes,

6    his life insurance, Mr. Meder's life insurance would have

7    reduced to the ultimate amount of $10,000 and that should

8    have paid out, because that doesn't –

9            MS. MEDER:  Yes, Your Honor, I received $10,000.

10           THE COURT:  Okay, but the inquiry, the problem is

11    that in order to get the increased amount for the difference

12    between $10,000 and $100,000, the insured had to continue to

13    live for a two-year period?

14           MR. GRIFFITHS:  Your Honor, Ms. Meder, I believe,

15    is referring to essentially a new life insurance policy that

16    was put in place. It was a voluntary program. In fact, I saw,

17    for the first time, at this hearing, I've seen one of the

18    documents that offered that life insurance program. There was

19    a short window between August 3rd and August 14, 2009, during

20    which claimants could elect to participate in that program at

21    their own cost. As Ms. Meder noted, it was a program that

22    required no proof of existing health or any, had no issues

23    relating to prior conditions. I understand that it had a

24    condition any claimant to live for two years following

25    electing to take that policy. And, unfortunately, Mr. Meder

Page 12

1    didn't fulfill those terms.

2              THE COURT:  Uh-huh. Ms. Meder, did any of the

3    facts that Mr. Griffiths just stated, do they appear

4    inaccurate or incomplete to you?

5              MS. MEDER:  As I could hear, everything seems to

6    be correct.

7              THE COURT:  Okay, thank you. Okay, I'm, I'm going

8    to hear all of the objections first, and then I'm going to

9    rule on them thereafter. I'm hearing some strange noises from

10   the phone lines coming into the courtroom. I don't want to

11   put people on mute, since we have so many claimants on today.

12   But I would ask people to make sure that they are very quiet

13   at their ends. Who do you recommend that we hear next, Mr.

14   Griffiths?

15             MR. GRIFFITHS:  Your Honor, we have Mr. Douglas

16   Sterett.

17             THE COURT:  Okay, Mr. Sterett, are you on the

18   line?

19             MR. STERETT:  Yes, Your Honor, I am. Can you hear

20   me alright?

21             THE COURT:  I hear you, but I also hear some

22   squealing or some odd noise. I don't know if it's from your

23   phone or from somebody else's.

24             MR. STERETT:  No, as do I. I hear the same noise.

25   I can't determine. I should not have any noise from this end.

1          THE COURT:  Okay, would you like to be heard kind

2    of the way that Ms. Meder was heard?

3          MR. STERETT:  That's fine. I don't have a lengthy,

4    lengthy argument at this point. I have just received the GUC

5    Trust's reply to my response. And in reviewing that, there

6    are some issues about my providing legal or factual support,

7    and contractual rights, and things of that nature. And what I

8    would like to do is have the opportunity to submit to the

9    Court my actual retirement agreement.

10         THE COURT:  Okay, so in substance, you're asking

11   for me to continue the matter to give you further opportunity

12   to put paper before GM and before me?

13         MR. STERETT:  Yes, yes, Your Honor, that's

14   correct.

15         THE COURT:  Mr. Griffiths, do you have any

16   objection to that?

17         MR. GRIFFITHS:  No objection, Your Honor, perhaps

18   to the June 14th hearing?

19         THE COURT:  Okay. We have another hearing on June

20   14th, Mr. Sterett. Can you get your stuff in within the next

21   few days?

22         MR. STERETT:  Yes, I can.

23         THE COURT:  Okay, your request for the

24   continuance, that is, for the adjournment is granted. And

25   your matter will be heard on June 14th. Once again, you'll be

Page 14

1    able to participate by phone. I would ask that you get your

2    papers into Old GM and the Court. Folks, I assume that wasn't

3    Mr. Sterett, but we have –

4            MR. STERETT:  No, I hear papers shuffling or

5    something.

6            THE COURT:  Yeah, so did I, and it's continuing.

7    Okay, forgive me, folks, we're going to have to do it this

8    way. Court Call, can you hear me? Court Call?

9            COURT CALL:  Yes, Your Honor.

10           THE COURT:  Would you please put everybody on

11   mute, except Mr. Sterett.

12           COURT CALL:  Sure thing.

13           THE COURT:  Thank you. Mr. Sterett, today is a

14   Thursday, the 31st of May. How long would it take you to mail

15   or fax, or e-mail your stuff to GM?

16           MR. STERETT:  If I could have a week on that.

17           THE COURT:  Any objection, Mr. Griffiths?

18           MR. GRIFFITHS:  No, Your Honor. I'll contact Mr.

19   Sterett after the hearing by telephone and arrange the

20   easiest way for him to get the documents to us.

21           THE COURT:  Okay, your request is granted, Mr.

22   Sterett, that is the request for the one week to get the

23   stuff in.

24           MR. STERETT:  Okay, thank you, Your Honor.

25           THE COURT:  Okay, now you're free to drop off the

Page 15

1    line or stay, as you prefer.

2           MR. STERETT:  Okay, I'll drop off. Thank you, Your

3    Honor.

4           THE COURT:  Okay. Mr. Griffiths, your

5    recommendation for the next, please.

6           MR. GRIFFITHS:  Your Honor, Mr. James P.

7    Kurlinski.

8           THE COURT:  Kurlinski, K-U-R-L-I-N-S-K-I.

9           MR. GRIFFITHS:  Correct, Your Honor.

10          THE COURT:  Okay, Mr. Kurlinski, are you on the

11   phone?

12          MR. KURLINSKI:  Yes, I am, Your Honor.

13          THE COURT:  Okay, would you like to be heard?

14          MR. KURLINSKI:  I don't really have much to say,

15   Your Honor. I've listened to the previous, and I just want

16   to say that when I retired, I fully expected to receive the

17   benefits that I was told I would get. And, obviously, they

18   have the right to change things. I do object to it, but I,

19   there's nothing I can do about it, so that's about all I have

20   to say, Your Honor.

21          THE COURT:  Okay, fair enough. Under those

22   circumstances, Mr. Griffiths, do you want to be heard?

23          MR. GRIFFITHS:  No, Your Honor, and the next

24   claimant would be Mr. Mohamed Fetouh, F-E-T-O-U-H.

25          MR. FETOUH:  I am still on the line, Your Honor.

Page 16

1           THE COURT:  Okay, but, oh, F-E-T-O-U-H, Mohamed

2   Fetouh?

3           MR. GRIFFITHS:  Correct, Your Honor.

4           MR. FETOUH:  Yes, sir.

5           THE COURT:  Mr. Fetouh, did I pronounce your name

6   correctly?

7           MR. FETOUH:  Yes, sir, you did. Thank you.

8           THE COURT:  Okay, would you like to be heard?

9           MR. FETOUH:  Yes, sir.

10          THE COURT:  Go ahead, please.

11          MR. FETOUH:  Okay, the basis for my claim, Your

12  Honor, is I had the basic life insurance coverage that I

13  purchased and I paid for. And it was two times the annual

14  base salary. And as a result of the liquidation of GM, I was

15  told that I'm not going to get this coverage. And when I did

16  my calculations following the guidelines, it came to the

17  amount of $86,000 plus some dollars. And also, there was some

18  life insurance coverage that was [indiscernible] $10,000. So,

19  that is my claim, and I would like to be compensated at least

20  for the life insurance that, coverage that I purchased. Thank

21  you, Your Honor.

22          THE COURT:  Okay, Mr. Fetouh, a question or two to

23  you, sir. Did GM ever give you a piece of paper that said

24  that your rights to your earlier amount of life insurance had

25  vested, V-E-S-T-E-D?

Page 17

1              MR. FETOUH:  Yes, sir, they did and I have

2      attached the enrollment letter to the documentation that I

3      sent to the attorney for them.

4              THE COURT:  GM said your rights to insurance in

5      that amount had vested?

6              MR. FETOUH:  I'm sorry, I could not, I don't

7      understand the question. Could you repeat that again, Your

8      Honor?

9              THE COURT:  Yes, Mr. Fetouh, vested is a word of

10     art and law. Did GM ever use the word vested with you in

11     writing?

12             MR. FETOUH:  No.

13             THE COURT:  Okay, did GM give you any other piece

14     of paper that said that GM promised not to change the amount

15     of your life insurance?

16             MR. FETOUH:  No.

17             THE COURT:  Okay, thank you. Mr. Griffiths, do you

18     want to respond?

19             MR. GRIFFITHS:  Yes, Your Honor, just to say I

20     believe I understand what Mr. Fetouh is referring to. He has,

21     he had basic life insurance coverage at two times his annual

22     base salary, pursuant to a welfare benefit program.

23             THE COURT:  I need you to talk slower, please, Mr.

24     Griffiths.

25             MR. GRIFFITHS:  Yes, Your Honor. Mr. Fetouh had

1    basic life insurance up to two times his annual base salary,

2    that was reduced according, in accordance with the welfare

3    benefit plan itself, just like every other welfare benefit

4    plan. So Mr. Fetouh is in the same situation as all other

5    claimants.

6              THE COURT:  Okay. Okay, Mr. Fetouh, do you want to

7    reply to what Mr. Griffiths said just now?

8              MR. FETOUH:  Yes, I fully understand this

9    situation applied to many people, as well. And if the Court

10   feels that we should be compensated, then I would like to be

11   included.

12             THE COURT:  Very well, thank you. Okay, okay,

13   please just stay on the line, but silently going forward, Mr.

14   Fetouh.

15             MR. FETOUH:  Yes, Your Honor.

16             THE COURT:  Thank you. Mr. Griffiths, next

17   claimant, please.

18             MR. GRIFFITHS:  Your Honor, we have Mr. Gerald S.

19   Kaspzyk, K-A-S-P-Z-Y-K.

20             THE COURT:  Okay, Mr. Kaspzyk, are you on the

21   phone?

22             MR. KASPZYK:  Yes, I am, Your Honor.

23             THE COURT:  Okay, would you like to be heard?

24             MR. KASPZYK:  Just to state that I expected when I

25   retired to receive all of the benefits that were originally

Page 19

1   offered to us. And that, you know, based on the bankruptcy,

2   the benefits that have changed, but I think also based on the

3   fact that how they handled other participants in the

4   bankruptcy, primarily UAW, and that I think that the

5   rationale should be used the same for all of these claims.

6   And that's all I have at the time.

7           THE COURT:  Okay, Mr. Kaspzyk, did you hear the

8   two questions that I asked one of the earlier claimants, I

9   think it was Mr. Fetouh? Did GM ever give you a piece of

10  paper that used the word vested?

11          MR. KASPZYK:  No, not that I can recall.

12          THE COURT:  I understand. Did GM ever give you a

13  word, a document that said in substance that we, GM, promise

14  not to change your benefits?

15          MR. KASPZYK:  No, not that I can recall, either.

16          THE COURT:  Okay, thank you, sir. Mr. Griffiths,

17  any desire to reply?

18          MR. GRIFFITHS:  No, Your Honor, and if Your

19  Honor would like the next claimant, it would be Mr. Richard

20  A. Schell, S-C-H-E-L-L.

21          THE COURT:  Okay, Mr. Schell, are you on the

22  phone?

23          MR. SCHELL:  Yes, I am, Judge.

24          THE COURT:  Would you like to be heard, sir?

25          MR. SCHELL:  Yes, sir.

Page 20

1          THE COURT:  Go ahead, please.

2          MR. SCHELL:  I believe that GM has established a

3   precedence for taking care of their people in many different

4   ways. One of them, I worked at the GM tech center in Warren,

5   Michigan, and it is like a mini city, and they actually had

6   medical facilities on the site. And there was the, Glen Eden

7   Hospital at the end of the site, which is an alcohol abuse,

8   or was considered an alcohol abuse center for a lot of the

9   employees of General Motors. When I entered hired back in

10  1965, it was considered that if you got a job at GM, you were

11  taken care from crib to grave. That was kind of like a known

12  fact, because they took care of their employees. However,

13  it's highly stressful and they expected you to give them your

14  whole life and soul. And those were the days, you probably

15  weren't around then, but in the 60s, 70s, and 80s, it was the

16  days of the three-martini lunches. Our management would go

17  out for lunch and would come back half snockered to start

18  making goofy decisions, and the next day, they'd make them

19  totally reverse them. So it was very frustrating and it was

20  very, as well as very highly stressful.

21          Mr. Mitchell was one of our most colorful leaders,

22  who was a visionary. However, he would come, you know, there

23  was one time when I was in the studio when he actually came

24  in the studio, looked at the product model and said that's

25  not what I told you to do, and he kicked the front bumper

Page 21

1    right off the car. It was on the car, it sat on the floor and

2    everybody just about died on the spot, because he had been

3    known to fire people on the spot, as well. That was just part

4    of the stress.

5         I went to the, my doctor told me, because I had

6    some problems, he told me, either learn how to manage your

7    stress or leave the company. And I drove a car, so I chose to

8    learn how to manage the stress.

9         But the other thing was, back in the 70s and 80s,

10   there weren't all OSHA standards for pollution, that we would

11   drive cars. The company would have people drive cars up and

12   down the hallways and park them in studios, and then people

13   would, some of the designers would just get in the car, start

14   them up, and then rev up the engine and issue the sound.

15   Well, in those days, there no noise pollution as air

16   pollution standards. And that went into paint spraying. There

17   were a lot of jobs that we would, we would a peel off coat on

18   the car, which is like a rubber membrane, which would come to

19   clients, so you could peel the paint off after the show. They

20   would actually spray that in the whole studio and then spray

21   it with color. They would essentially spray entire cars in

22   the studio. You know, you didn't, the fumes got so bad you

23   would walk out, but the problem was, you were working with

24   paint fumes as well. And then, that was, you know, it wasn't

25   every day. That was probably maybe every week or two. But

Page 22

1    full sized air brush paint bays ran on a daily basis, and

2    they would spray toxic full master ink. And at the end of the

3    day, I'd blow my nose and I'd blow out the color of the

4    paint, whatever the cars they were spraying that day. We put

5    up with it because we drove cars and because that was our

6    job. This is what we did, and this is what you had to put up

7    with. And we figured, GM's going to take of us. You know,

8    they always have.

9            So I guess I expected to get my full insurance

10   when I was retiring. When I retired, before I retired, I had

11   $180,000 worth of life insurance. And then they reduced it to

12   what they called the ultimate amount and it came down to

13   $100,000. And this is what I was expecting to do. I figured,

14   well, I'm not working anymore, they're coming back, so I

15   expected the $100,000 amount. And then, and that was – I

16   retired in July of '02. In April of '02, I had a letter here

17   from the Retirement Servicing Center addressed to me, and it

18   said, "Thanks for retiring at General Motors with ten years

19   or more, participation in life and disability benefit

20   program, you are eligible for continuing life insurance. Our

21   insurance records as of that date, the date of this letter,

22   showed that continuing life insurance is now fully reduced to

23   the ultimate amount of $100,118. This ultimate amount will

24   remain in effect for the rest of your life and is provided by

25   General Motors at no cost to you." That's all in normal type

Page 23

1   face. There is a space and another paragraph that says, "This

2   is not a guarantee of the coverage amount." Another space and

3   then in big, bold letters, all capitalized it says,

4   "Important, you should keep this notice with your other

5   valuable papers."

6           So I'm getting a mixed message. On one hand it

7   says well, they might reduce it a little bit. But on the

8   other hand, it says this is very important. You better keep

9   this because this is what you're entitled. So I guess, no, I

10  don't have any iron clad paperwork, but this was before. We

11  hired in, the group that I hired with back in '65, it was

12  unheard of to work for a company for 37 years. And now days,

13  they keep changing company to company. But you put your whole

14  into a company. You put your family on hold because the job

15  is more important, and whenever they call, you jump. When

16  they want you to take your vacation, you take, and so if you

17  want to take your vacation you don't take it. You wait until

18  it's convenient for them so that you can take a vacation.

19          It's a little dictatorship, and we put up with it

20  because we a part of the company, proud to be a part of the

21  company, which was one of the best premier companies in the

22  United States. They took care of their people, it was known.

23  So you put up with a lot of crap, to put it bluntly, just

24  because they are going to take care of me. Now, it's time for

25  my retirement, all of these toxins that are in my system, and

Page 24

1    yet I don't have any insurance. I guess I just don't

2    understand, you know, just like Mrs. Meder, her husband died

3    and not too loyal because the company left her flat.

4            I've got a wife and two grandchildren, one that's

5    living with me because the daughter can't take care of them.

6    And I've got to struggle to try and take care of my family.

7    But yet, I can't even get life insurance. That's all I have

8    to say. Thank you just for listening, Judge.

9            THE COURT:  Thank you, Mr. Schell, a question or

10   two. I understand what you said about life insurance. On

11   health insurances, is it that you don't have health insurance

12   or that you have to pay more for your health insurance?

13           MR. SCHELL:  I pay more for my health insurance.

14           THE COURT:  Okay, thank you. Mr. Griffiths, do you

15   wish to reply or respond?

16           MR. GRIFFITHS:  Your Honor, I mean, just to say

17   that I believe that the letter being referred to by Mr.

18   Schell is the Retirement Services Center letter that was

19   addressed at the January 18th hearing and the April 26th

20   hearing. The one thing I'd like to out to the Court which

21   supports the GUC Trust's position, but I'd like to just put

22   it on record in any case. Ms. Meder submitted a letter which

23   was sent out at the same time to her as the Retirement

24   Servicing Center letter, that we haven't seen before, but it

25   appears to give an overview of each of the insurances being

Page 25

1    provided by General Motors. And at the bottom of that letter,

2    it specifically says, "All information provided in this

3    letter is subject to the terms and conditions of the

4    applicable group policies or program." And so, the, you know,

5    as more documents are being provided to us by claimants, it

6    appears to support the position that we've taken that the,

7    the Retirement Servicing Center letter could be, or the

8    insurance provided on that letter could be amended or

9    modified, pursuant to the terms of the existing welfare

10   benefits programs.

11            THE COURT:  Uh-huh, okay. Alright, Mr. Schell,

12   please remain on the line until I can give my ruling. And

13   next, Mr. Griffith.

14            MR. GRIFFITHS:  Your Honor, I believe that Mr.

15   Ronald C. Tanciar, T-A-N-C-I-A-R, is the last claimant.

16   However, I'm not sure he's on the line today. I don't know if

17   he's actually dialed in.

18            COURT CALL:  He doesn't appear on court call.

19            THE COURT:  I'm sorry, Court Call?

20            COURT CALL:  He doesn't appear on court call.

21            THE COURT:  I heard the court call, but I didn't

22   hear anything before that. did Mr. Tanciar log onto the call.

23            COURT CALL:  No, Your Honor.

24            THE COURT:  Oh, okay, thank you.

25            MR. GRIFFITHS:  Your Honor, we spoke with Mr.

Page 26

1    Tanciar before the hearing. He was aware of the hearing, but

2    was unsure that he would appear. But in any event, we will

3    send a copy of the transcript of this hearing to Mr. Tanciar.

4              THE COURT:  Okay. Do we have, was that the last

5    one, to your understanding?

6              MR. GRIFFITHS:  Yes, Your Honor.

7              THE COURT:  Did we hear from Maya Broady?

8              MR. GRIFFITHS:  Your Honor, Ms. Brody's being

9    taken care under a different, on those objections that are

10   being handled by my co-counsel.

11             THE COURT:  Oh, okay, fair enough, alright. And

12   Mr. Kolaga has Relco. We talked about that at the very

13   outset.

14             MR. GRIFFITHS:  Yes, Your Honor, that's not an

15   employee benefit claim, but that can be –

16             THE COURT:  Okay.

17             MR. GRIFFITHS:  -- handled directly after this.

18             THE COURT:  Okay, then, have I now heard all of

19   these claims? Okay. Fair enough. Okay, then folks, I have one

20   more question for you, Mr. Griffiths, and then I think I'm

21   going to be in a position to rule. On Ms. Meder's claim, are

22   we comfortable that we now have all of the relevant paperwork

23   on that?

24             MR. GRIFFITHS:  Yes, Your Honor. The, I mean, Ms.

25   Meder supplied us her deceased husband's Retirement Servicing

1   Center letter, but also supplied an additional letter that

2   was provided with the Retirement Servicing Center letter,

3   which is the one I just referred to. I don't know if Your

4   Honor would like to see it, but the, it's contained in

5   Exhibit 4 to our reply at the last page. And this is the one

6   that specifically states that the terms and conditions, that

7   the information provided in the letter is subject to the

8   terms and conditions of the applicable group policies or

9   program.

10          THE COURT:  Okay.

11          MR. GRIFFITHS:  If Your Honor's concern is

12   surrounding the additional insurance that was taken out. If

13   it makes Your Honor more comfortable, we are more than happy

14   to look into that issue further. But the actual document

15   offering life insurance is actually contained in one of the

16   claimant's papers here today that I saw. It's a straight

17   forward document that offers additional insurance between,

18   you know, in a set window in 2009, which was August 3 to

19   August 14, and was subject to the terms and conditions of a

20   new insurance policy.

21          THE COURT:  Was the new policy offered by New GM

22   or by Motors Liquidation?

23          MR. GRIFFITHS:  By New GM, Your Honor. You know,

24   as of the master sale and purchase agreement closing date,

25   all of the liability for welfare benefits, other than

Page 28

1    modifications was transferred to New GM. And the window for

2    providing this new insurance program, which was after the

3    reduction of life insurance, occurred after the closing date

4    of the master sale and purchase agreement. So the closing

5    date of the MSPA was on July 5th, 2009.

6            THE COURT:  You used MSPA, a word that, a bunch of

7    letters that's not going to mean anything to claimants. That

8    was the purchase agreement under which New GM bought most of

9    the assets of Old GM?

10            MR. GRIFFITHS:  Correct, Your Honor, the master

11    sale and purchase agreement. And so that, that agreement, as

12    it took effect on July 5th, and between August 3 and August

13    14, 2009, former employees of the debtors who are now, whose

14    welfare benefits were taken on by New GM were offered the

15    opportunity to participate in a voluntary life insurance

16    program, at their own cost. But where the benefit, and the

17    reason the program was offered was that the premiums would be

18    at the negotiated rate that had previously been in effect for

19    these claimants. So they would be able to obtain cheaper life

20    insurance than they would otherwise be able to obtain on the

21    open market.

22            I haven't actually read the terms of that life

23    insurance policy myself, but Ms. Meder made a statement that

24    it had a surviving clause, requiring the claimant or the

25    insured to survive for two years after taking out the policy.

Page 29

1    It sounds like something that would be in an insurance

2    policy. And if that's the term of the insurance policy, then

3    Motors Liquidation Company is neither in a position to change

4    that insurance policy, nor to compensate Ms. Meder for the

5    terms of that policy, it having been taken out with an

6    insurance company that's separate from the debtors and GUC

7    Trust. And the insurance policy, itself, having been arranged

8    by New GM.

9           THE COURT:  Okay. Alright, folks, I'm going to

10   issue a ruling on these now, based on the combination of the

11   papers that are in the record, the precedence that we have in

12   this area, precedence of law, and what people told me in

13   argument today. And I'm going to dictate it into the record.

14          In these contested matters in the jointly

15   administered Chapter 11 cases of Motors Liquidation Company

16   and its affiliates, debtor, Motors Liquidation or Old GM,

17   moves, along with the recently formed GUC Trust, which is a

18   trust formed for the benefit of Old GM's creditors, to

19   disallow the welfare benefit claims of retirees and other

20   former employees under Old GM's 169th, 170th, 171st, 172nd,

21   174th, and 177th omnibus objections; an omnibus objection

22   being an objection that covers many people who are similarly

23   situated. The claims of the retirees and former employees

24   before me now involve welfare benefits. Welfare benefits is a

25   word of art that describes benefits offered to employees, at

1    least principally, in the medical and life insurance areas.

2    Those welfare benefits are to be compared and contrasted to

3    pension benefits, which are not the subject of the objections

4    here.

5         As I'll go on to explain in more detail, the

6    claims, insofar as they are based on such welfare benefits

7    for medical coverage or life insurance coverage must,

8    unfortunately, be disallowed. It gives me no pleasure to deny

9    these claims. I fully understand that denial of these claims

10   is likely to result in hardship on the claimants. Though it

11   may be no consolation, I know that the changes in the life

12   insurance and medical benefits have created hardships on

13   hundreds, if not thousands, of similarly situated employees.

14   Even though I'm aware of those facts, I'm compelled to comply

15   with the law, and I'll be discussing that law momentarily.

16        First, however, my finds of fact. On June 1st,

17   2009, Old GM and its affiliates commenced Chapter 11 cases in

18   this court. Among many others, the following individuals have

19   filed timely proofs of claim, Mr. James P. Kurlinski, Mr.

20   Richard A. Schell, Mr. Ronald C. Tanciar. I'm skipping Mr.

21   Sterett, since we're going to examine the remainder of his

22   paperwork. Mohamed A. Fetouh, Gerald S. Kaspzyk and Robert A.

23   Meder, who, although after Meder filed his claim, sadly he

24   passed away, and his wife Marilea Meder filed responsive

25   papers on his behalf. And I heard Mrs. Meder's argument

Page 31

1    today. I heard most of those people orally again in today's

2    hearing. I've considered both the written submissions and the

3    oral arguments in reaching these decisions.

4             Pursuant to procedures that were set up earlier in

5    Old GM's bankruptcy case, the debtors or the GUC Trust filed

6    omnibus claims objections to the claims of the people I

7    mentioned, among many, many others. As I indicated, an

8    omnibus claims objection is one that applies to many people

9    or entities at the same time, generally because it involves

10   similar or identical issues. The debtors and then the GUC

11   Trust filed those objections in pursuant to their fiduciary

12   duty; that is, a duty as a matter of trust to the remainder

13   of the creditors of Old GM's estate. Which duty involves,

14   among other things, allowing claims that deserve to be

15   allowed, but at the same time, objecting to those that don't.

16   The omnibus objections before me present, before me were

17   directed at claims of retired or former employees of Old GM.

18            Each of the folks who I'm dealing with now, timely

19   responded to the GUC Trust's objections. It is possible,

20   though on this round, I don't think it's so, that people

21   have, or at least it hasn't been shown to me, that people may

22   have claims against New GM. And if they do have claims

23   against New GM, this doesn't have any effect on those claims

24   one way or the other. What we are talking about today,

25   instead, is claims against Old GM.

Page 32

1          Now, turning to my conclusions of law, including

2     certain mixed findings of fact of law, and here I'm going to

3     get a little bit technical. A proof of claim is prima facie

4     evidence of the validity and amount of the claim. And the

5     objector, which means Old GM or the GUC Trust, bears the

6     initial burden of persuasion. See, In Re: Oneida Ltd, 400

7     B.R. at page 389, that being a 2009 decision by Judge Cropper

8     of this Court. What that means, translating from the Latin,

9     is that once a claimant, like each of the folks who was on

10    the phone here today, or who wasn't on the phone but gave me

11    a similar written objection, files a proof of claim, assuming

12    at least if it's satisfactory, which all of here have been

13    found to be satisfactory in the first instance. Those proofs

14    of claims would be good enough to get paid the amount set

15    forth in the claim, unless there was an objection. But once

16    there is an objection to a claim, the burden shifts to the

17    claimant, if the objector produces evidence equal in force to

18    the claim that was previously filed, if the material in that

19    objection, if believed, would refute at least one of the

20    elements of the claim that's essential to the claim's legal

21    burden. Then the burden is shifted back to the claimant, and

22    the claimant must then prove by a preponderance of the

23    evidence that under applicable law, the claim should be

24    allowed.

25          Now, here we have exactly that situation. Each of

1    the claims was prima facie okay. The debtors and the GUC

2    Trust then objected and met their burden, which meant that

3    the claimant's once more had the burden. Then I decide what

4    the claimants are entitled to, based on all of the evidence

5    that's before me.

6           Now, that's all by way of background as to the

7    legal burdens that each side has. As I said, now I decide the

8    issue. Here, I am required to find, and I do find, as a mixed

9    question of fact and law, that the claimants haven't met

10   their burden to show that the welfare benefits that were

11   changed on them vested, which means putting it in plainer

12   English, they haven't proven that they had an agreement under

13   which the benefits couldn't be taken away.

14          In dealing with claims of GM former employees,

15   whose situations were very, very similar to the claims that

16   are before me now, the US Court of Appeals for the Sixth

17   Circuit, in a case called Sprague v. General Motors Corp.,

18   explained that to, "vest benefits is to render them forever

19   unalterable. Because vesting of welfare plan benefits is not

20   required by law, an employer's commitment to vest such

21   benefits is not to be inferred lightly. The intent to vest

22   must be found in the plan documents, and must be stated in

23   clear and express language." Sprague v. General Motors Corp.,

24   133 F.3d 400, that's Sixth Circuit, 1998. As the Sixth

25   Circuit observed in the Sprague decision, at page 401 of that

Page 34

1  opinion, "Most of the summary plan descriptions unambiguously

2  reserve GM's right to amend or terminate the plan."

3      What the language that I just quoted means is that

4  while the claimants may very well have had many rights to

5  benefits, and I assume for the purpose of this analysis, they

6  did have rights as they've alleged them. GM had the right to

7  terminate those benefits. And if it had the right to

8  terminate them, it also had the right to alter them. Thus,

9  although the benefits existed at one time, they could be

10 changed. And, as we all know, GM changed them.

11      Now, I'm intentionally describing documents and

12 plan descriptions into plain English, though many of us would

13 agree that I might be stating it more clearly and in plainer

14 English than it was originally stated. But the documents did,

15 in fact, say what Old GM and the GUC Trust say they said. I

16 invite people, if they want to, and of course, I invite any

17 appellate court reviewing my work, to read the Sprague

18 decision in greater detail, and to read the plan documents of

19 each employee in greater detail. That's why, by the way, for

20 any folks whose discussion didn't already cover it, I asked

21 employees if they got any pieces of paper that made the

22 promises that might go beyond what I've seen from the record,

23 what GM gave to its employees. I did not want to fail to

24 consider that some employees might have gotten better deals

25 than everybody else did, or at least everybody else that I

1   know about did. But for each of the folks here, there is no

2   evidence of any special deals.

3           Now, many claimants have talked about the personal

4   hardships. And they've talked about decisions that they made

5   based on the documents they read at the time. And I well

6   understand the frustration expressed in this regard, but the

7   rights that claimants were getting were described in the

8   benefit plan documents, and those same documents said that GM

9   had rights, which it later availed itself of, to amend its

10  plans.

11          For example, one of the summary plan descriptions

12  that was cited by one of the claimants stated unequivocally,

13  it stated quite clearly, and I'm quoting, "General Motors

14  Corporation reserves the right to amend, change or terminate

15  the plans and programs described in this booklet." Now, I

16  realize how frustrating this is, but because the plan

17  documents reserved or maintained GM's rights to amend or

18  terminate the plans, these claimants were buying into or

19  making decisions about plans that explicitly gave GM the

20  right to change or terminate them down the road.

21          I, I should also add a little more about Mrs.

22  Meder, because I heard exactly what she told me. Of course, I

23  felt very badly about it. And I looked very carefully,

24  especially given the hardship, to make sure that I wouldn't

25  be making a mistake in this area. Letters she referred to,

Page 36

1    then sent, of course, to her late husband, are letters dated

2    many years before these bankruptcy cases, that told the

3    recipients at a later time that their coverage was being

4    reduced. The fact that Old GM was able to reduce the ultimate

5    amount of insurance coverage so many years ago underscores

6    the fundamental point. Old GM always had the right to modify

7    these particular benefits. The letters sent to Mr. Meder

8    stated, and I'm quoting, "This is not a guarantee of the

9    coverage amount." I wish for her account it were otherwise.

10   The letters did not create new contracts between the debtors

11   and the employees. There is no evidence indicating that Old

12   GM was offering or promising, through these letters,

13   particular benefits to induce action or inaction by the

14   claimants.

15         I do also want to say with respect to Mrs. Meder's

16   claim, that nothing I'm deciding today affects in any way her

17   rights, if any, against either New GM or the insurance

18   company. All of those rights are unaffected by my ruling. I

19   don't know if there are any such rights, but whatever I'm

20   ruling on today doesn't affect them in either event.

21         In sum, because the claimants' rights to welfare

22   benefits didn't vest, and because such benefits were subject

23   to modification or termination, the claims that I have before

24   me today must be disallowed. The GUC Trust is to settle an

25   order in accordance with this decision. Settling an order

Page 37

1    means, contrary to what it sounds like, proposing an order

2    that I sign that is sent out to people who have the right to

3    comment on whether that order, as presented to me for

4    signature, fairly and accurately represents my ruling.

5    Failing to object to the form of the order has nothing to do

6    with the right to appeal the order and to argue to a higher

7    court that I got the legal or factual issues wrong.

8              After that order is entered, each of the people

9    addressed by this ruling has the right to appeal the order,

10   to have it considered on appellate review, to have it

11   considered by an appeals court, which for a bankruptcy judge

12   is the district court. The time to appeal in a bankruptcy

13   case is much more limited than it is in other areas of the

14   law. In bankruptcy, you get just 14 days. And although, and

15   again, this seems counter intuitive, although the appeal goes

16   to the district court, the appeal is filed, the notice of

17   appeal is filed in the bankruptcy court. Again, I'm

18   emphasizing that in bankruptcy you get 14 days. But the time

19   to appeal is going to run from the time that my order is

20   ultimately entered, which will be some days from now, not

21   from the time that I'm dictating this decision today.

22             If you are not objecting to the form of the order,

23   but you nevertheless want to appeal it, you have that right,

24   as long as you file a notice of appeal within the 14-day

25   deadline, after the order is entered. And, of course, you

Page 38

1    must comply with the other requirements for prosecuting the

2    appeal, most of which will be imposed by the district court,

3    although some of the papers have to be filed in the

4    bankruptcy court.

5              Folks, once more, I, I want to note that I

6    understand how hard this case has been on you and on other

7    former employees who are similarly situated. But I'm sworn to

8    comply with the law, and that's what I'm doing today.

9              Okay, those folks whose claims have already been

10   argued and appealed, and ruled on, are free to either stay on

11   the line or to drop off, as they prefer. I know we have the

12   Relco matter, and I think we may have one equity claim. In

13   any event, does that take care of it on your end, Mr.

14   Griffiths?

15             MR. GRIFFITHS:  Yes, Your Honor, and just

16   note, we share the Court's concern with respect to Ms.

17   Meder's insurance policy with GM. I'll obtain a copy of the

18   insurance policy and review it just to confirm there's

19   nothing Ms. Meder can do, and will speak to her separately.

20   And then secondly, with respect to settling orders, we've

21   agreed with chambers that when we settle orders, we don't

22   file them on the docket, we just send them out to the

23   claimants.

24             THE COURT:  Well, the notice of settlement should

25   be filed on the docket. The order would simply be an

1   attachment to the notice of settlement and will have a blank

2   where it would call for my signature.

3          MR. GRIFFITHS:  Very well, Your Honor.

4          THE COURT:  Then, after I've had a chance to see

5   any objections to the form of your proposed order, what we

6   would do is re-read the order as proposed, make sure that

7   it's consistent with the ruling, and then we sign it. And

8   that's why, excuse me, we ask for a word processing version

9   of the order to be sent with the notice of settlement to

10  chambers, so that if there are no objections to its form, or

11  if there are after we've decided whether the order, as

12  proposed, is the way that I would want to enter it, then I

13  sign the order, or more exactly authorize chambers to sign my

14  name.

15         MR. GRIFFITHS:  Very well, Your Honor, so going

16  forward we'll file the notice of settlement with each of the

17  orders.

18         THE COURT:  Very good. Thank you.

19         MR. GRIFFITHS:  Your Honor, yes, Ms. Greer of

20  Dickstein Shapiro, our co-counsel will be handling the rest

21  of the hearing.

22         THE COURT:  Okay, thank you.

23         MR. GRIFFITHS:  Thank you, Your Honor.

24         MS. GREER:  Good morning, Your Honor. Stefanie

25  Greer from Dickstein Shapiro on behalf of Motors Liquidation

Page 40

1    Company GUC Trust. Your Honor, we have a number of matters

2    on today, some uncontested. Do you have a preference into the

3    order we tackle these?

4            THE COURT:  No, I'm pretty much at your pleasure

5    and in fact, you can skip around if you choose, as long as

6    you tell me which tabs of the binder I need to focus on.

7            MS. GREER:  Okay, Your Honor. Let's start, I'll

8    just run through quickly, the uncontested matters, so we can

9    get those out of the way. We have the 277th omnibus

10   objection, which is an objection based on insufficient

11   documentation. Four of those claims have been adjourned, 15

12   are going forward today.

13           The 278th omnibus objection. Those are incorrectly

14   classified claims. Five of those are going forward. None of

15   those have been adjourned.

16           Finally, we have the 279th omnibus objection.

17   Those are no liability claims, claims either which were the

18   responsibility of a party other than the debtors, claims

19   which relate to a prepetition settlement agreement, or

20   prepetition judgment in favor of the debtors, or claims

21   assumed by New GM. One of those has been adjourned. Four we

22   have withdrawn, based on additional information, and 17 of

23   those are going forward today. So for, I think that's it for

24   the uncontested matters, so we can, if Your Honor is

25   amenable, we can submit orders to chambers accordingly.

Page 41

1        THE COURT:  Yes, on any objections where you

2   haven't gotten a response and you haven't adjourned them for

3   further consideration of the documentation or for

4   negotiation, your motions to disallow those claims are

5   granted.

6        MS. GREER:  Thank you, Your Honor. Next, Your

7   Honor, we have the 276th omnibus objection, which was on for

8   the first time today, but it only addressed two claims, one

9   of the – four claims actually, two of them have been

10  adjourned and two of them were filed by Ms. Meya Broady, and

11  those are going forward today. I'd like to take that next, if

12  that works for you.

13       THE COURT:  Sure.

14       MS. GREER:  Okay. I believe Ms. Broady is on the

15  phone.

16       THE COURT:  Are you on the phone, Ms. Broady?

17       MS. BROADY:  Yes, I am, Your Honor.

18       THE COURT:  Okay, now this one being in a

19  different category than the ones I just ruled on, we're going

20  to go back to the traditional method. I'll hear from you

21  briefly, Ms. Greer, then I'll hear from Ms. Broady, then I'll

22  give you a chance to reply to anything that Ms. Broady said.

23  And then I'm going to give Ms. Broady a chance to what we

24  call sur-reply, which is to be heard after the reply. But the

25  last two remarks are limited to the stuff that was said

Page 42

1    orally the first time. It's not an invitation to do over the

2    whole argument. So go ahead, Ms. Greer.

3           MS. GREER:   Thank you, Your Honor. This, this

4    objection is two claims, Claim No. 70896 and Claim No. 70925.

5    The claims were filed, both filed in February of 2011 by Ms.

6    Broady. These were objected to as part of the 276th omnibus

7    objection to claims on the basis that they were both filed

8    late, certainly well beyond the November 30th, 2009 bar date.

9    So these claims were both 14 months late.

10          Ms. Broady characterizes the claims as

11   administrative in nature. They are claims based on unpaid

12   disability, Dex-Cool engine damage and employment

13   discrimination. The claims seek $400,000 in the aggregate.

14   There is some confusion on our part as to whether the claims

15   are, if she really intends to assert a $200,000 claim, but

16   she just filed, you know, filed it twice, or if she really

17   intends to pursue a $400,000 claim. So, for the purposes of

18   this discussion, given some correspondence Ms. Broady had

19   with our co-counsel, we assume she's going forward on both

20   claims for an agreement of $40--$400,000, excuse me.

21          As set forth in our reply, Your Honor, none of

22   these claims are administrative in nature. The unpaid

23   disability and employment discrimination claims, for example,

24   arise from Ms. Broady's employment with the debtors from 1984

25   to 1992, which of course, is well prior to the filing of the

Page 43

1    debtors' Chapter 11 cases. The third alleged basis for

2    recovery arises from engine damage, which, by Ms. Broady's

3    own admission, occurred in 2007 to her 2001 Pontiac. It's

4    clear, Your Honor, that each of these claims are general,

5    unsecured claims arising out of a prepetition relationship

6    with the debtors, and are subject to the original bar date.

7         So that's sort of our first issue. I think based

8    on what Ms. Broady's filed, it appears that she's asserting

9    that the administrative bar date would apply and, of course,

10   it is the GUC Trust's view that these are unsecured

11   creditors, I'm sorry, unsecured claims, subject to the

12   original bar date.

13        Second, I want to point out for the Court that Ms.

14   Broady received actual notice of the bar date. We filed an

15   affidavit, together with our reply, which confirms that Ms.

16   Broady was served at the address, which is on her proof of

17   claim, the same address that she was served with the

18   administrative bar date notice. And that that notice, that

19   notice was not returned to Garden City Group. I would like to

20   point out, Your Honor, there was an error on our part, or on

21   the part of someone on our end, in communications with the

22   claims agent. The 279th, or 276th omnibus objection says that

23   it is a constructive notice objection. So it indicates that

24   Ms. Broady did not get actual notice. But in fact, she did

25   get actual notice. We've confirmed that. Like I said, we

Page 44

1    filed the affidavit. But I just wanted to make sure that I

2    corrected for the record what is in the 276th omnibus

3    objection, which is a constructive notice objection. So, if

4    you'll excuse our error, and I've corrected it, hopefully,

5    for the record.

6            Third, Your Honor, to the extent that Ms. Broady,

7    or to the extent that Ms. Broady's claims are in fact late,

8    as the GUC Trust would argue, the next step is, of course,

9    whether she can establish excusable neglect under Pioneer and

10   in Second Circuit Progeny. As we all well know, the Second

11   Circuit focuses on the reason for the delay. Though Ms.

12   Broady has provided us with an extensive amount of paper in

13   her reply, I don't see anything in there which speaks to the

14   reason for the delay here. In fact, most of the papers, you

15   know, filed by Ms. Broady, excuse me, really speak to what

16   she views as the merits of the claim. So there isn't anything

17   in the record, from our point of view, that establishes

18   excusable neglect. The Second Circuit takes a hard line in

19   applying the Pioneer factors, and there is nothing in Ms.

20   Broady's papers which indicate excusable neglect.

21           In short, given Ms. Broady received actual notice

22   of the bar date, she has general, unsecured claims, and she

23   can't establish excusable neglect, the GUC Trust submits that

24   here claims should be expunged.

25           THE COURT:  Anything further, before I give her a

Page 45

1    chance to be heard?

2            MS. GREER:  Not unless Your Honor has any

3    questions.

4            THE COURT:  Okay, Ms. Broady.

5            MS. BROADY:  Yes, Your Honor.

6            THE COURT:  I'll hear your argument now, please.

7            MS. BROADY:  Your Honor, yes, General Motors

8    demonstrated bad faith over 20 about 20 years, and if not

9    for my disa—severe disability rulings as well as the American

10   with Disabilities Rules and Regulations, I would not be. And

11   so you can see from the documentation that you have in your

12   possession, I have kept this documentation for like 20 years.

13   I had no reason to not file for unsecured claims. I did not,

14   to my knowledge, receive any information with reference to

15   bar date claims. I did not receive this as the attorney

16   specified. In her preliminary statement that she mailed out

17   to me, she submitted certain documentation, but only certain.

18   And I ask, Your Honor, that you look at the whole picture.

19            They, I feel that they had a, a responsibility

20   under the pre-confirmation rule to submit, as under the new

21   bankruptcy law and practice, Rule 49. They had, they should

22   have objected to, on the claim if they felt that it was

23   improper, but they did not. The only time they objected to it

24   is that when I talked with Conray Tseng on I believe it was

25   in, it was in, let me get my notes here. When I talked with

Page 46

1    Conray Tseng. He mailed me out an e-mail dated February the

2    23rd, 2011, that per our conversation, your two claims, one

3    with an addendum and one without. Well, the first claim that

4    I filed with an addendum, I filed it with lots of

5    attachments. And the second claim I filed, I also filed with

6    an attachment. And by letters to him, dated March the 25th,

7    2011, which also the debtors' attorney did not submit in her

8    preliminary statement, it will show that I asked Conray to

9    put in writing that he would include me in the 2009-2010

10   claims. And he did put some things in writing, but he failed

11   to do that. What he wanted to do, the attorney Conray Tseng,

12   wanted to do, and also this is in my statement dated March

13   the 25th, 2011, he wanted me to combine both claims into one,

14   as well as cancel them. And he wanted to cancel them because

15   he wanted, he said that he would file them for the 2009-2010.

16   So since he didn't put this in writing, that's why I

17   disagreed to cancel the administrative claims.

18           I was told that if I filed administrative claims

19   it would cover a variety of things, not just the attorney's

20   expenses. So I feel that a lot of carelessness came from the

21   debtors' attorneys' side. And that a lot of

22   misrepresentations also occurred by the debtors' attorneys.

23   We would not be here, like I said, if they complied with the

24   America's Act with, of with Disabilities.

25           I also feel that, Your Honor, that my claims are

Page 47

1   justifiable, that I have a preponderance of evidence. And had

2   I received the proper paperwork to file these claims, I would

3   have. Due to the fact that I kept the evidence surrounding

4   General Motors' hostile environment towards me, the fact that

5   I had to file an EEOC claim against them. Also, the fact that

6   I submitted evidence that they did not pay me for the

7   disability benefits.

8           The second claim also includes the fact that they

9   should have paid me under my basic life insurance that I had

10  with them, and they failed to do that, as well. Every time

11  that I submitted documentation to them to receive these

12  benefits, they either did not respond or they denied them.

13          So, I ask the Judge to look at the whole picture

14  here. And I ask him to set a precedence, that a precedence be

15  established in hopes to eliminate future misdeeds from

16  happening to others. And I implore the Court to approve both

17  claims that were filed within the mandatory timeframe.

18          The debtors also indicated in her statement that

19  she didn't feel that I had excusable neglect. Under

20  bankruptcy law and practice, 4823, it says that, "Excusable

21  neglect. Not filed, creditor failed to file a proof of claim

22  because of misrepresentation by present debtor." So,

23  therefore, I feel that based upon these rules and the fact

24  that I never did receive the original bar date that she

25  specified, that my claims should be approved and that I

1    should be given the opportunity to file these claims. They

2    should be reconsidered and I should be able to file the

3    appropriate paperwork for these claims for 2009 and 2010

4    because I did not receive the information that she specified.

5    Perhaps that they mailed it after the fact, I really don't

6    know, but I did not receive it, to my knowledge, and I have

7    not received it as of today, as she has indicated.

8            THE COURT:  Okay, thank you. Ms. Greer, reply.

9            MS. GREER:  Certainly, Your Honor. Briefly,

10   there's a long litany of reasons why, Your Honor, why the

11   underlying claims have no merit, including the fact, as Ms.

12   Broady acknowledges, they arose over 20 years ago. So it's

13   pretty clear to me that any applicable statute of limitations

14   would have long since run at the time of the debtors'

15   bankruptcy filing. But that's not why we're here today. This

16   issue is about whether the claims were filed, or should be

17   deemed filed in a timely manner.

18           The presumption that a recipient receives an item

19   mailed to the correct address applies here. Ms. Broady has

20   done nothing to overcome that presumption. And, indeed, the

21   affidavit in the record, which we filed, confirms that the

22   bar date notice was in fact sent to Ms. Broady at the address

23   on her proof claim, and also at the same address where the

24   administrative bar date notice was sent, and she received

25   that one, by her own admission.

1           Your Honor, Ms. Broady's presentation, in her –

2    in Ms. Broady's presentation, she also seeks to blame the

3    debtors' attorneys for her failure to file the claim in a

4    timely manner. The documents attached to her response are

5    from 2011, long since the bar date. So even if it were true,

6    and it certainly, we would submit it is not, that Mr. Tseng

7    at Weil, Gotshal, or anyone else, misled Ms. Broady, it

8    certainly has nothing to do with her having filed the claim

9    on time. All of that correspondence was well after the bar

10   date. In fact, if upon a review of the exhibits that Ms.

11   Broady filed, you will see that the correspondence with the

12   debtors' counsel was about whether these claims were really

13   one claim or two claims. And what Mr. Tseng was asking Ms.

14   Broady to agree to is simply that it was really just about

15   one claim, so it was a $200,000 claim. Basically, you know,

16   your standard duplicative claim objection, which we

17   otherwise, you know, would have made, so if the claims

18   weren't late. Unless Your Honor has any questions, that's

19   all I have.

20           THE COURT:  Okay, thank you. Ms. Broady, do you

21   have anything to say finally, but limited to what Ms. Greer

22   said in her reply.

23           MS. BROADY:  Yes, Your Honor, under the current

24   section of duties I have in front of me, Author David Ross

25   and deduces the bar code of six duties that he believes all

1   humans would recognize and for written socially binding

2   contracts, because of prima facie duties, we knew that they

3   would be obvious upon first examination of any situation. In

4   addition to duties, people explicitly agree to perform. They

5   agree to always act in the interest of fidelity granted to

6   self-improvement, and in finance, justice and non-injury to

7   others, because they overlap the contract prima facie duties

8   of not really guideline for more action.

9           I feel that bad faith has been constantly

10  exhibited by the defendant. I have, do constant good faith

11  over the 20 years, trying to resolve this matter with the

12  defendant and their attorneys. I have kept, like I said,

13  documentation for like 20 years, whether or need it or not. I

14  have looked through the various files and folders for the

15  past two years and I do not have the documents that the

16  debtors' attorney indicated. Had I had this, I have no excuse

17  not to file the claim. But had I received the information in

18  the time period that the debtors attorney's specified, I

19  would have definitely filed a claim, or I would have had one

20  of my daughters, who is a paralegal, to file the claim. I did

21  not receive the information, the bar date information to file

22  the claim.

23          And then when I finally did get the information

24  from them, as you will see the e-mail from me dated 1/7/2011,

25  I tried for months to ascertain information from the debtors.

Page 51

1    But they did not return any of my phone calls. I didn't hear

2    from there. And as specified in this e-mail dated 1/7 of

3    2011, and that's when I received the administrative claims

4    because I thought that if I filed the administrative claims,

5    based upon information given to me, that I would, wouldn't

6    have to do the secured or unsecured claim. I did not become

7    privy to this information about the secured and unsecured

8    claims until after the fact. So I, I feel that I should not

9    be punished, Your Honor, because I did not receive this

10   information. And, also, I feel that the debtors' attorney

11   used first information obtained during their discovery to

12   their advantage in this case and not to my advantage. To

13   expunge this case will be an injustice, you know, to not just

14   for me, but also it will be an injustice to others.

15            THE COURT:  Okay, thank you. Everybody sit in

16   place for a second. Alright, folks, I am reclassifying this

17   claim from an administrative claim to a prepetition claim.

18   And then I am disallowing it for a combination of legal

19   reasons and matters as to which there is an exercise of

20   discretion. And the following are my findings of fact,

21   conclusions of law and bases for the exercise of discretion

22   in this regard.

23            First, as facts, I find that the claimant's claim,

24   or actually claims, were filed after the bar date in this

25   case, the bar date being the word in the bankruptcy community

Page 52

1   for the deadline of filing proofs of claim. I also find that

2   most of the events in question go back a period of 20 years,

3   and at least seemingly raise statute of limitations issues,

4   if they don't plainly so, do so, but that I don't need to

5   address the statute of limitations issues at this time. And I

6   just leave them for another day, if it ever matters.

7           I further find that the debtor has proven to my

8   satisfaction that notice of the bar date was sent out in

9   accordance with the affidavits that were submitted on the

10  paperwork on this motion. And I further find that they were

11  properly addressed, as evidenced most significantly by the

12  fact that the identical address was used for the admin

13  deadline for claims. And it is admitted that the notice of

14  the admin bar date was properly received.

15          I simply find as a fact that while the debtors'

16  proof of receipt is rebuttable, the weight of the evidence

17  causes me to believe that the notice was received, perhaps

18  misfiled, perhaps not read, whatever, but that actual notice

19  was received.

20          I further find as facts that, or as mixed

21  questions of fact and law, that the estate would be

22  prejudiced, and by the estate, I mean General Motors or Old

23  GM's other creditors by the dilutive effect of this claim.

24  And that no facts have been presented to me showing excusable

25  neglect or any reason for the delay.

Page 53

1            Now, as conclusions of law, I find that when, as

2    here, events giving rise to the claim all took place before

3    the filing of the Chapter 11 case, they represent prepetition

4    claims, rather than postpetition claims. While there is

5    additional law in this circuit and elsewhere, what we call

6    the McFarland's Rule in the Second Circuit, the Jartram Rule

7    and Mammoth Mart Rules, coming from other circuits as to

8    additional requirements that might have to be shown to

9    establish admin claims. Here, we don't even need to reach

10   them. I do not have transactions here with a postpetition

11   debtor. I do not have allegations of a benefit to the

12   postpetition debtor. I do not have allegations of a

13   postpetition tort. These are, for all of those reasons,

14   prepetition and not postpetition claims.

15           I further find that the claims must be disallowed.

16   Because I've found that they were filed late, and that the

17   debtor had actual notice, these claims cannot be considered

18   unless excusable neglect for the late filing has been made.

19           I need to emphasize something very significant

20   here. In a few cases earlier in the Old GM case, I've

21   expressed reservations about late filed claims, when the

22   claimants were served only by publication and not given

23   actual notice by mail. And they lived in rural areas of

24   Mississippi or similar locals, where I could not, with

25   comfort, make a finding. I didn't rule on it, but I expressed

Page 54

1    reservations as to whether I could find that notice of

2    publication in New York Times or The Wall Street Journal

3    would be reasonably calculated to be received by a person

4    living in rural Mississippi, who only got her knowledge from

5    Fox and friends on TV. I don't have any concerns of this

6    character here. I do find, and I'm comfortable with the

7    quality of notice.

8              And therefore, we get into the matter of excusable

9    neglect. Here, I find no good reason has been shown to me for

10   the failure to file on time. I find prejudice to the

11   remaining creditors and the requirements of Pioneer for late

12   filing proof of claim, excusable neglect have not been

13   satisfied.

14             Ms. Greer, you're to settle an order in accordance

15   with the foregoing, stating in substance that for the reasons

16   set forth on the record, the claim is first reclassified and

17   then disallowed. The time to appeal the resulting order will

18   run from the time of the entry of that order, and not from

19   the time of this dictated decision. Okay, next matter,

20   please.

21             MS. GREER:  I'm sorry –

22             THE COURT:  Oh.

23             MS. GREER:  -- Your Honor, just one question, if

24   I may. In your presentation of the decision, you said that

25   the debtor had actual notice. I just want to make sure that

Page 55

1    the record is clear that Ms. Broady did, just in case there

2    is an appeal

3              THE COURT:  I may have misspoken. I do mean, of

4    course, that she had actual notice.

5              MS. GREER:  Thank you, Your Honor.

6              MS. BROADY:  Your Honor, may I ask the

7    defendant's attorney a question. What document do you have in

8    your possession to validate that I received my, this claim in

9    2009?

10             THE COURT:  Forgive me, Ms. Broady, this is not

11   the English parliament. One party does not ask another party

12   questions. I ruled on the evidence that was presented before

13   me, which included, among other things, the proof of service.

14   And I understand you likely don't agree with this ruling, but

15   at this point, with respect, and I'm saying it very softly,

16   but I should state that I really mean it, if you don't agree

17   with my decision, your remedy is appeal. But I've already

18   ruled on the matter. Now, Ms. Broady, you're free to stay on

19   the phone or leave, as you see fit, but we're going to the

20   next matter.

21             MS. GREER:  The next matter I have, Your Honor,

22   is the 27th omnibus objection, which was incorrectly

23   classified claims. This is the claim of Marvin Eccles (sp).

24   I'm not sure if Mr. Eccles (sp) is on the phone.

25             THE COURT:  Mr. Eccles, are you on the phone?

Page 56

1    Evidently not. Is this another equity claim, seeking

2    treatment as a claim on debt.

3              MS. GREER:  This is actually a products liability

4    claim, which is seeking priority or secured status. It's a

5    claim arising from the failure of a brake system. We filed

6    our reply. I'm happy to rest on those papers, if that's Your

7    Honor's preference.

8              THE COURT:  Okay, yes, that claim will be

9    disallowed for the reasons set forth in your papers.

10             MS. GREER:  Reclassified, Your Honor.

11             THE COURT:  Excuse me, as a prepetition claim?

12             MS. GREER:  Yes, reclassified as a general,

13    unsecured claim. And I think Your Honor, we're not seeking

14    disallowance of the claim. We simply could not get Mr. Eccles

15    to agree that the claim should be reclassified.

16             THE COURT:  He was continuing to argue that it was

17    secured?

18             MS. GREER:  Yes, sir.

19             THE COURT:  Without having given us any evidence

20    of a security agreement or a rule of law that elevates his

21    claim to secured status?

22             MS. GREER:  Your Honor, I think you could tell by

23    the reply that he was a little bit confused as to the

24    application of the law. So we just put in a simple reply. We

25    tried to get in touch with him a number of times and without

1   success to convince him otherwise. So I, at least my

2   understanding is the plan is to reclassify it and allow it,

3   but just could not get his agreement to do so. It's a

4   deminimus claim.

5          THE COURT:  Right, well that objection is

6   sustained. It seems to me that in part, what I was referring

7   to earlier was based upon my review of different papers. But

8   your objection on this one is no less valid.

9          MS. GREER:  Thank you, Your Honor.

10         THE COURT:  Okay.

11         MS. GREER:  Last, Your Honor, the Relco claim.

12  And I understand Relco's counsel is on the phone.

13         THE COURT:  Okay, you've been waiting a while, Mr.

14  Kolaga, are you still with us? Mr. John Kolaga, of Damon &

15  Morey?

16         MR. KOLAGA:  Yes, I'm here, can you hear me?

17         THE COURT:  Yes I -

18         MR. KOLAGA:  Can you hear me?

19         THE COURT:  Yes, I can. I know you've been waiting

20  a long time. There were a lot of people ahead of you.

21         MR. KOLAGA:  I'm here, Your Honor, not a problem.

22         THE COURT:  Okay, I have, of course, read the

23  papers on this. Go ahead, Ms. Greer, I'll hear your objection

24  and Mr. Kolaga's response, reply limited to what was said in

25  oral argument, and sur-reply limited to what new stuff was

1    said in reply. Go ahead.

2              MS. GREER:  Certainly, Your Honor. Relco has not

3    cleaned up its property or tested it for contamination, even

4    though there has been known contamination in the neighboring

5    sites since 2001, according to the exhibits in Relco's reply.

6              In the proof of claim, Relco seeks recovery, and I

7    quote here, "to the extent there has been contamination on

8    the property." Relco further states, "Claimant is not

9    currently aware whether its real estate has been

10   contaminated, or whether any PCBs or other contaminants from

11   the General Motors parcel have migrated to claimant's

12   parcel." I've contacted Relco's counsel various times to try

13   to get an understanding as to whether the claimant really

14   believes there has been contamination on the property. All

15   they've told us, Your Honor, is that the neighbor's property

16   is contaminated, and it is their belief that that is

17   sufficient.

18             Your Honor, today, we seek to expunge the claim

19   on the basis of 502(e)(1)(B), or alternatively, on the basis

20   that Relco cannot establish a prima facie claim, given that

21   it relies wholly on contamination to the neighboring

22   property, which we would submit, as a matter of law, is

23   insufficient.

24             First, to the extent Relco, and I should say that

25   the nature of Relco's claim against the debtors isn't clear.

Page 59

1   It's not clear whether they are seeking a direct claim or

2   whether they are seeking a claim under CERCLA, given the

3   debtors' position as a PRP. It just not clear, so I'm going

4   to go through each of those possibilities and we can address

5   those in turn.

6           First, to the extent Relco is seeking recovery for

7   reimbursement or contribution, the claims are clearly barred

8   under 502(e)(1)(B). That's the only element, at least

9   according to the papers that Relco filed, they appear to be

10  challenging.

11          As this Court found in Chemtura and Lyondell, and

12  as Judge Lifland found in Alper Holdings, a claim remains

13  contingent where the scope amount and form of liability is

14  undetermined. Here, Relco hasn't paid any claim. Nobody's

15  asserted a claim against Relco in connection with this

16  property. Even if Relco were correct that the property were

17  contaminated and, of course, the GUK Trust does not concede

18  that's the case, as the Court pointed out in Lyondell, and

19  again, I'm going to read from the case, as it's directly on

20  point here. "Where the need for contamination is known, but

21  the amount, if any, to be paid for the remediation is not,

22  the claim remains contingent."

23          THE COURT:  What page were you reading from, Ms.

24  Greer?

25          MS. GREER:  Page 247 of Lyondell, Your Honor,

Page 60

1    Note 22.

2         THE COURT:  Alright.

3         MS. GREER:  It's the GUK Trust's position that the

4    reasoning behind 502(e)(1)(B), and the decisions cited would

5    plainly apply here. And I'm going to quote again from the

6    decision, for the same reason, and this Lyondell, 249 to 250.

7    "Even though the need for remediation of the underlying

8    environment site might be obvious, the EPA or state

9    environmental agency might have a multitude of different ways

10   of getting a remediation done. And any one of those means

11   might or might call for or result in payment by the separate

12   PRP that is asserting the claim against the debtor. And the

13   PRP might or might not wind up actually making the payment

14   for which it would be seeking reimbursement or contribution."

15        So, Your Honor, based on the case law in this

16   district, the GUK Trust submits that any claim would be

17   contingent, would within 502(e)(1)(B) and should consequently

18   be disallowed and expunged. I'd also point out that one of

19   the policies behind 502(e)(1)(B) is to get the claimant to

20   actually clean up the property, if they know there is a

21   contamination, and to do it quickly, so that makes sure that

22   they have a claim. In this case, it's exactly the opposite.

23   If, even if Relco, according to its papers, Relco knew or

24   believed there was contamination as far back as 2001, but

25   they've done nothing. They haven't tested the property. They

Page 61

1    just rely, their conclusions rely on a sightings of men in

2    space suits on the property, and contamination of the

3    neighboring property.

4          Second, Your Honor, if this claim doesn't fall

5    within 502(e)(1)(B), it should clearly be barred under 502(b)

6    because it fails to establish a prima facie claim. It's

7    Relco's burden to demonstrate the validity of the claim. And

8    their reliance on the alleged contamination of the neighbor's

9    property is insufficient as a matter of law to meet this

10   burden. There's just no evidence supporting contamination.

11         I'd also point the Court to the Township of North

12   Bergen case, where the claimant relied on a leaking pipe in

13   the neighborhood property in order to establish its claim.

14   The court said, and I quote, "Simply stated, there was no

15   evidence that the property, as opposed to adjacent

16   properties, was contaminated, or that any actual

17   contamination was caused by defendants." And that's the case

18   here, Your Honor.

19         So, in short, any way you look at it, there's no

20   claim here. Relco's claim was clearly meant to be a

21   protective claim, it wasn't mean to assert any – it doesn't

22   assert, and can't assert any right of payment against the

23   debtors. So, for those reasons, we submit the claim should be

24   disallowed and expunged.

25         THE COURT:  Okay, then I'll hear from you, Mr.

Page 62

1  Kolaga.

2          MR. KOLAGA:  Thank you, Your Honor. Obviously,

3  we're − we received Ms. Greer's papers, the reply papers on

4  the 29th and obviously haven't had an opportunity to respond

5  to them. And at a minimum, I think we would like the

6  opportunity to do so. But going on, our view is that you

7  know, we are not seeking any cleanup costs that we have

8  incurred, because have conceded that we have not incurred

9  cleanup costs. What we do believe, based on the facts that we

10 know, and would be able to show, that our property has been

11 contaminated, because the properties all around it have been

12 contaminated. And most of, many of which have been acquired

13 by the Old GM or the GM affiliate.

14         We, as Ms. Greer correctly notes, we know that the

15 property immediately adjacent to our property has been

16 acquired by a GM affiliate. That men in space suits, as we

17 have called them, or the declaration states, are, are

18 regularly onsite testing and doing work there. We believe

19 there are properties essentially on all sides of the

20 property, which are contaminated and so which have been

21 acquired by GM. And in our Exhibit A we have tried to show,

22 at least for the Court's benefit at this point, that the

23 contamination arising from the Bedford, Indiana site is

24 massive and we think the court can and should take notice

25 that the site has been contaminated.

1          Now, we have not tested our own property, feeling

2     there was no good would come of that in general. But we are

3     confident that there is a flow of contamination under our

4     property that would render it essentially stigmatized from

5     the purposes of environmental law and unsellable. And we

6     believe that, if given the opportunity of say 30 days, we

7     would like the opportunity, if necessary, to put in some

8     papers to show that essentially on all sides of the property,

9     there is contamination. That and also that we would like the

10    opportunity, as well, if the Court will permit us to seek

11    discovery against GM to get the documents that they have in

12    their possession, which we – they have not, obviously we have

13    not had an opportunity to obtain, to show that the property

14    is obviously contaminated.

15          We are, we dispute Ms. Greer's position in her

16    papers that we are co-liable here. I think that there is a

17    wealth of cases that show that where there is passive, or

18    there may have been passive migration of contamination across

19    and under a person's property, that that does not make that

20    property owner liable under CERCLA. And again, our view is

21    that the claim is not contingent. That property damage has

22    occurred, is occurring and will continue for a long time into

23    the future. So we would like the opportunity, or we would ask

24    the Court to not disallow our claim and permit us the

25    opportunity to explore the facts of this case further.

Page 64

1           THE COURT:  Mr. Kolaga, did I understand you to

2     agree with Ms. Greer that your client hasn't yet written out

3     a check on any of this stuff?

4           MR. KOLAGA:  The only checks my client has paid

5     out with regard to environmental issues are checks to my law

6     firm in connection with this claim. But it has not done any

7     soil or groundwater testing.

8           THE COURT:  Uh-huh.

9           MR. KOLAGA:  Or remediation.

10          THE COURT:  If I gave you time to write, to submit

11    a new brief, what would you say, or a supplemental

12    submission, what would you say in it?

13          MR. KOLAGA:  What would I say in that supplemental

14    brief?

15          THE COURT:  Yeah.

16          MR. KOLAGA:  Your Honor? I think what I would do

17    is I would I - I mean, I guess I would, if I had an

18    opportunity, I would discuss with the client whether it

19    wanted to do some environmental testing to shore up that

20    issue and document that issue of actual contamination present

21    on its property. And I would also submit additional

22    information with regard to adjacent properties upgrading and

23    downgrading, and cross-grading showing that those properties

24    are contaminated and have been contaminated for a long time.

25    And also, to respond to the issue of co-liability, which

Page 65

1    obviously I hadn't had an opportunity to brief.

2           THE COURT:  Do I correctly assume that you read my

3    decisions in Lyondell and Chemtura before today?

4           MR. KOLAGA:  I, I have read them previously. But I

5    would say I didn't have an opportunity to respond to them in

6    the context of this matter.

7           THE COURT:  Ms. Greer, do you want to reply?

8           MS. GREER:  Yes, Your Honor. Simply put, Your

9    Honor, the ship has sailed. We filed our reply in plenty of

10   time. Mr. Kolaga had plenty of time to read the cases for

11   sure, and to otherwise respond. Instead of filing a response

12   to our objection, which set forth the basis for the

13   objection, 502(e)(1)(B), very clearly, they filed a

14   declaration. Mr. Kolaga knows better. If he wants to

15   establish a claim, he has to file appropriate papers. I've

16   called him time and time again. We've been in touch, I think

17   as far back as when we filed a late filed claim objection

18   last year to their claim, asking him what is the basis for

19   this claim. And Mr. Kolaga has not been able to respond.

20   There is no basis for the claim. If there were, and if the

21   property were contaminated, presumably, somebody would be

22   cleaning it up, and nobody is.

23          You know, Mr. Kolaga says that they want an

24   opportunity do soil testing and things like that. They have

25   their 502(j) rights. If they want to come back, if they have

1    a claim, they can come back. But right now, they have not

2    established a claim, there is not a prima facie evidence of

3    the claim. The only thing even Mr. Kolaga is pointing to,

4    admitting that there has been no soil testing is to look to

5    the neighbor's property. And again, the case law indicates

6    that's not sufficient either. Under Chemtura under Lyondell,

7    this case, this claim should be barred under 502(e)(1)(B).

8    And again, if it doesn't fall within the parameters of

9    502(e)(1)(B), he certainly can't set out a prima facie claim.

10   Unless Your Honor has any questions, that's all I've got.

11            THE COURT:   Okay, Mr. Kolaga, sur-reply.

12            MR. KOLAGA:   Your Honor, I don't believe that. I

13   believe that I have responded to Ms. Greer's statements

14   previously. And I don't believe that I am obliged to provide

15   chapter and verse in her conversation to me on other matters

16   as to the complete basis of my claim and my client's claim.

17   We feel that, as I said, that the property is obviously

18   contaminated. The property all around us has been

19   contaminated. We are not seeking recovery for cleanup costs.

20   We are seeking property damage for the stigma and loss of

21   value of our property, and that is the, that is the basis of

22   our claim.

23            THE COURT:   Okay, under these circumstances, I'm

24   going to rule today. And it will take me a little time to

25   dictate it, but I'm going to do that now.

Page 67

1          In this contested matter in the jointly

2    administered Chapter 11 cases of Motors Liquidation Company

3    and its affiliated debtors, the GUK Trust, which is a trust

4    formed for the benefit of the debtors' other creditors,

5    objects to the proof of claim filed by Relco Systems, Inc.

6          As I'm going to explain in more detail, Relco's

7    claim must be disallowed for two separate reasons, both of

8    which lead to the same result that Relco's reliance on

9    alleged contamination to a neighbor's property, and

10   inferences that might be drawn from that, doesn't give rise

11   to relief under the law, and then its failure to have

12   actually written out any checks for remediation makes its

13   claim disallowable for the same reasons that I ruled in

14   Chemtura and Lyondell under Section 502(2)(b) of the Code.

15         First, my findings of fact. On June 1st, 2009,

16   what was then called General Motors Corporation and its

17   affiliates commenced these Chapter 11 cases. November 30,

18   2009 was established as the deadline for filing all proofs of

19   claim against the debtors. While the GUK Trust doesn't raise

20   this as an issue of concern in its papers, I notice that

21   Relco filed its claim almost two and a half months after the

22   bar date. It's claim was assigned No. 70019.

23         On the face of its claim, Relco asserts that the

24   amount of its claim is unknown, and Relco's briefing does not

25   assert a specific claim amount. The GUK Trust and the

Page 68

 1    debtors' claims agent seem to understand the claim to be

 2    asserted in the amount of $297,200, but I'm not aware of

 3    exactly how that computation was made.

 4            Relco's claim was accompanied by an addendum

 5    explaining the nature of Relco's claim. A claim, and I'm

 6    quoting, "Claimant's property is situated within close

 7    proximity to [a GM] plant located at 105 GM Drive, Bedford,

 8    Indiana. Claimant has been made aware of substantial

 9    environmental cleanup by General Motors at that location,

10    including cleanup of PCBs or other hazardous wastes,

11    hazardous substances or other contaminants. Claimant is not

12    currently aware whether its real estate has been

13    contaminated, or whether any PCBs or other contaminates from

14    the General Motors parcel have migrated to claimant's parcel.

15    To the extent there has been contamination, claimant files

16    this proof of claim."

17            On March 22nd, 2012, the GUK Trust filed its

18    objection to Relco's claim, pursuant to Sections 502(e)(1)(B)

19    and 502(b) of the Bankruptcy Code. On April 18, 2012, Relco

20    filed a responsive declaration, executed by Facility Manager,

21    Michael Hounshel, H-O-U-N-S-H-E-L, explaining that, "Relco

22    seeks recovery for property damages already incurred and

23    still being incurred at the Relco property, as well as for

24    investigation and cleanup costs, based on the best

25    information available to Relco at this time." Relco further

1  stated, "While Relco has not yet conducted soil and

2  groundwater testing on the Relco property, I know that *

3  property * immediate [sic] adjacent to the Relco property,

4  has environmental issues on it, for which GUK Trust is

5  liable." In Relco's own words, Relco's claim is based upon

6  "the significant amount of environmental testing and cleanup

7  work that has [sic] been done by the GUK Trust all around the

8  Relco property."

9          Turning now to my conclusions of law. A claim

10  exists only if the relationship between the debtor and the

11  creditor contains all elements necessary to give rise to a

12  legal obligation – "a right to payment" – under relevant non-

13  bankruptcy law. See Owen v. Riverwood, 209 F.3d 128 (2d Cir.

14  2000), Chateaugay, 53 F.3d 497 (2d Cir. 1995). If an

15  objection refuting at least one of a claim's essential

16  allegations is asserted, the claimant has the burden to

17  demonstrate the validity of the claim by a preponderance of

18  the evidence. See, e.g., In Re: Chain, 255 B.R. 281.

19          Here, even after the GUK Trust's objection

20  refuting the bases of Relco's claim, Relco has provided me

21  with no evidence to show that its property has been

22  contaminated by GM or anyone else. In fact, Relco admits that

23  it "has not yet conducted soil and groundwater testing" on

24  its own property, and that was reiterated to me today.

25  Relco's claim relies exclusively on allegations that its

Page 70

1   neighbor's property has been contaminated. But allegations of

2   damages to a neighbor's property are insufficient to

3   establish evidence that the actual property in question has

4   been polluted. See, e.g., DVL v. General Electric, 811

5   F.Supp.2d 598 (N.D.N.Y. 2010); North Bergen v. Sanger, 2009

6   Westlaw 219, 2243 at *2 (N.J. Sup. Ct. App. Div. 2009)".

7            Therefore, under Section 502(b)(1) of the

8   Bankruptcy Code, Relco's claim must be disallowed and

9   expunged for its underlying failure to evidence a right of

10  payment, even a contingent one. In addition, Relco's claim

11  must be disallowed and expunged pursuant to Section

12  502(e)(1)(B). By Section 502(e)(1)(B)'s terms, three elements

13  must be met for a claim to be disallowed under that section.

14  One, the party asserting the claim must be liable with the

15  debtor on the claim of the third party; two, the claim must

16  be contingent at the time of its allowance or disallowance;

17  and, three, the claim must be for reimbursement or

18  contribution.

19            As we discussed in colloquy in oral argument

20  today, I've issued two lengthy decisions on Section

21  502(e)(1)(B) in the last two years, in Chemtura, 436 B.R.

22  286, on September 7, 2010, and Lyondell Chemical, 442 B.R.

23  236, on January 4, 2011. In these decisions, starting, as I

24  always do, with textual analysis before proceeding to fill

25  gaps with case law, I addressed each prong of Section

Page 71

1    502(e)(1)(B) in turn. And I'll repeat that pattern here, as I

2    apply that statute and the case law to Relco's claim.

3         First the contingency element. Relco argues that

4    its claim is not contingent. I must disagree. It admits that

5    it has not yet incurred any costs with respect to the alleged

6    contamination. That was important. That's why I asked

7    questions on it, because if Relco told me it had written out

8    a check for remediation, and at least possibly, even for you

9    know, soil and water testing, I might regard that component

10   of its claim in a different way. But that fact remains, even

11   after oral argument today, undisputed. Relco admits it has

12   yet to investigate whether its property is contaminated.

13   Clearly, it has yet to determine the scope, amount and form

14   of any liability based on any potential contamination.

15        As I explained in Lyondell, and if I recall

16   correctly, also in Chemtura, until and unless amounts are

17   actually paid, claims remain contingent for Section

18   502(e)(1)(B) purposes. The contingency contemplated by

19   Section 502(e)(1)(B) relates to both payment and liability.

20   Therefore, a claimant's claim is contingent until its

21   liability is established and payment has issued. Debtors who

22   undisputedly face some environment liability are nevertheless

23   subject to contingent claims when the scope, amount and form

24   of that liability remains undetermined. The fact that some

25   environmental damage may already have occurred does not

1    transform a contingent claim into a noncontingent one.

2           Relco's claim for future cleanup costs, let me

3    rephrase that. Relco's claim is for future cleanup costs that

4    might or might not actually be incurred and then might or

5    might not actually be paid. Likewise, its conclusory

6    assertion that the value of its property has gone down might

7    or might not turn out to be true, depending on future sales

8    of the property, which have not yet taken place. Consider for

9    a moment the absurdity of allowing a claim for remediation

10   that has yet to occur, when that future remediation might or

11   might not take place, and might end up costing a tiny

12   fraction of the amount of the allowed claim, or even nothing

13   at all. At this point, we're not yet sure that Relco's

14   property is contaminated at all. It's claim, based solely

15   upon possibilities, and what at most is inference, and which

16   more likely is speculation, is contingent.

17          Moving to the co-liability prong. Relco argues

18   that it's not co-liable with the debtors for the

19   contamination. In support of this argument, Relco states that

20   Relco is not responsible for the contamination arising from

21   the GM facility located near the Relco property. Of course,

22   as Relco is not liable for any contamination on its property,

23   why should Relco have a claim against the debtors at all? If

24   Relco won't shoulder an responsibility for environmental

25   concerns on its property, why should the debtors be required

1   to pay Relco any sum of money on account of the same

2   concerns?

3          Obviously, Relco seeks payment from the debtors

4   because Relco seeks to minimize its own liability exposure.

5   The more the debtors pay, the less Relco is exposed. That's

6   the very essence of co-liabity, as I explained in my prior

7   decisions on this issue in Chemtura and Lyondell. And, of

8   course, if Relco hasn't been damaged at all, it doesn't have

9   any liability at all, then its claim has to fail for

10  502(b)(1) purposes, even if not under 502(e)(1)(B), too.

11         Finally, the contribution or contribution prong,

12  which Relco fails to address in its papers. If it has a claim

13  at all, it could only be reimbursement or contribution. As I

14  noted in my earlier decisions regarding Section 502(e)(1)(B),

15  Congress clearly meant to include all situations where

16  indemnitors or contributors could be liable with the debtor

17  within the scope of Section 502(e)(1)(B). Although

18  reimbursement is not defined in the Bankruptcy Code, Black's

19  Law Dictionary defines "reimbursement" as, "1. Repayment; 2.

20  Indemnification."

21         In Wedtech II, 87 B.R. 287, Judge Brosman of this

22  Court explained that the use of the word "reimbursement" in

23  the statute cannot be viewed as accidental. It's a broad word

24  which encompasses whatever claims a co-debtor has which

25  entitle him to be made whole for moneys he has expended on

Page 74

1    account of a debt for which he and the debtor are both

2    liable." Even where a claim is based on a direct contractual

3    claim, if in substance it's a claim for reimbursement, it

4    must be disallowed. Here, Relco essentially seeks payment

5    from the debtors for money Relco might spend in the future,

6    or losses it might suffer in the future. That's a claim for

7    reimbursement and this prong of Section 502(e)(1)(B) is

8    satisfied.

9         Let me say one last thing about the request first

10   raised in oral argument for further briefing. As Ms. Greer

11   stated, the time for submission has already come and gone.

12   The exact nature of the GUK Trust's objections to this claim

13   were made very clear in its responsive papers. Counsel

14   elected to submit a declaration in response to that, but

15   provided no contrary law. Nor did it provide a basis or

16   explanation for failing to deal with the factual deficiencies

17   of its claims. It elected to, in essence, rest on the

18   inference that because adjacent property was contaminated,

19   its property must be, too. That was a contention that was

20   expressly addressed in two of the cases that I've cited. If

21   it wanted to engaged in the investigation to determine

22   whether its own property was contaminated, it's had plenty of

23   time to do that.

24        If I thought there was something that might be

25   brought to my attention that hadn't been brought, and that

Page 75

1    would be relevant to the objection here, I might have been

2    more solicitous in granting further time for briefing, if I

3    thought there was a good excuse for not having done it first,

4    and if something useful might come out of it. I can make none

5    of those findings here.

6            Ms. Greer, you're to settle an order in accordance

7    with the foregoing. The time to appeal this decision will run

8    from the time of the entry of the order, and not from the

9    time that I'm dictating this decision.

10           Do we have any further business?

11           MS. GREER:  No, Your Honor.

12           THE COURT:  Alright.

13           MR. KOLAGA: No, Your Honor.

14           THE COURT:  We're adjourned. Have a good day.

15           MS. GREER:  Thank you, Your Honor.

16           MR. KOLAGA:  Thank you.

17           (Whereupon, the proceedings were concluded at 3:22

18   p.m.)

19

20

21

22

23

24

25

Page 76

1                          I N D E X

2                            RULINGS              PAGE LINE

3

4      Debtors' 168th Omnibus Objection to Claim

5      (Supplemental Executive Retirement Benefits

6      Claims of Former Executive Employees)          29     6

7

8      Debtors' 169th Omnibus Objection to Claims

9      (Welfare Benefits Claims of Retired and Former

10     Salaried and Executive Employees)              29     6

11

12     Debtors' 170th Omnibus Objection to Claims

13     (Welfare Benefits Claims of Retired and Former

14     Salaried and Executive Employees)              29     6

15

16     Debtors' 171st Omnibus Objection to Claims

17     (Welfare Benefits Claims of Retired and Former

18     Salaried and Executive Employees)              29     6

19

20     Debtors' 172nd Omnibus Objection to Claims

21     (Welfare Benefits Claims of Retired and Former

22     Salaried and Executive Employees)              29     6

23

24     Debtors' 174th Omnibus Objection to Claims

25     (Welfare Benefits Claims of Retired and Former

Page 77

1    Salaried and Executive Employees)                29      6

2

3    Debtors' 177th Omnibus Objection to Claims

4    (Welfare Benefits Claims of Retired and Former

5    Salaried and Executive Employees)                29      6

6

7    277th Motion for Omnibus Objection to Claim(s)

8    (Insufficient Documentation)                     40     23

9

10   278th Motion for Omnibus Objection to Claim(s)

11   (Incorrectly Classified Claims)                  40     23

12

13   279th Motion for Omnibus Objection to Claim(s)

14   (No Liability Claims)                            40     23

15

16   276th Motion for Omnibus Objection to Claim(s)

17   Requesting Enforcement of Bar Date Orders        51     13

18

19   Debtors' Twenty-Seventh Omnibus Objection to

20   Claims (Incorrectly Classified Claims)           57      3

21

22   Objection to Claims 44829, 70019 and 64854

23   (filed by Exide Technologies, Relco Systems,

24   Inc., and Roth Global Plastics, Inc.)            66     22

25

Page 78

1              C E R T I F I C A T I O N

2        I, Linda M. Larsen, certified that the foregoing

3   transcript is a true and accurate record of the proceedings.

4        Dated this 2nd day of June, 2012.

5

6   Linda M.        Digitally signed by Linda M. Larsen
                     DN: cn=Linda M. Larsen, o=Veritext,
                     ou, email=digital@veritext.com,
7   Larsen          c=US
                     Date: 2012.06.04 14:22:26 -04'00'

8

9

10

11

12

13   Veritext

14   200 Old Country Road

15   Suite 580

16   Mineola, NY  11501

17

18   Date:

            June 2, 2012

19

20

21

22

23

24

25