PREET BHARARA
United States Attorney for the
Southern District of New York
DAVID S. JONES
NATALIE N. KUEHLER
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel. No.:  (212) 637-2741
Fax No.:  (212) 637-2750

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MOTORS LIQUIDATION COMPANY *et al.*, | ) | Case No. 09-50026 (REG) |
| | ) | |
| f/k/a GENERAL MOTORS CORP. *et al.*, | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |

**NOTICE OF HEARING ON THE UNITED STATES OF AMERICA'S**
**MOTION TO APPROVE ENVIRONMENTAL SETTLEMENT AGREEMENTS**

PLEASE TAKE NOTICE that upon the annexed Memorandum of Law in Support of

Motion to Approve Settlement Agreement Between the Debtors and the United States, dated

June 13, 2012, of the United States of America (the "**United States**"), a hearing (the "**Hearing**")

to consider the Motion will be held before the Honorable Robert E. Gerber, United States

Bankruptcy Judge, in Room 621 of the United States Bankruptcy Court for the Southern District

of New York, One Bowling Green, New York, New York 10004, on **June 28, 2012 at 10:00**

**a.m. (Eastern Time),** or as soon thereafter as counsel may be heard.

PLEASE TAKE FURTHER NOTICE that any responses to the Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a CD-ROM or 3.5 inch disk, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and served in accordance with General Order M-399 and on (i) Weil, Gotshal & Manges LLP, attorneys for the GUC Trust, 767 Fifth Avenue, New York, New York 10153 (Attn: Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (ii) the Debtors, c/o Motors Liquidation Company, 401 South Old Woodward Avenue, Suite 370, Birmingham, Michigan 48009 (Attn: Thomas Morrow); (iii) General Motors, LLC, 400 Renaissance Center, Detroit, Michigan 48265 (Attn: Lawrence S. Buonomo, Esq.); (iv) Cadwalader, Wickersham & Taft LLP, attorneys for the United States Department of the Treasury, One World Financial Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (v) the United States Department of the Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, D.C. 20220 (Attn: Joseph Samarias, Esq.); (vi) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.); (vii) Kramer Levin Naftalis & Frankel LLP, attorneys for the statutory committee of unsecured creditors, 1177 Avenue of the Americas, New York, New York 10036 (Attn: Thomas Moers Mayer, Esq.,

Robert Schmidt, Esq., Lauren Macksoud, Esq., and Jennifer Sharret, Esq.); (viii) the Office of

the United States Trustee for the Southern District of New York, 33 Whitehall

     **PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and served

with respect to the Motion, the United States may, on or after the Response Deadline, submit to

the Bankruptcy Court an order substantially in the form of the proposed order annexed to the

Motion, which order may be entered with no further notice or opportunity to be heard offered to

any party.


Dated:    New York, New York
         June 13, 2012

                PREET BHARARA
                United States Attorney for the
                Southern District of New York
                Attorney for the United States of America

        By:      ___*/s/ Natalie N. Kuehler*_____
                DAVID S. JONES
                NATALIE N. KUEHLER
                Assistant United States Attorneys
                86 Chambers Street, 3rd Floor
                New York, New York 10007
                Telephone:  (212) 637-2541
                Facsimile:  (212) 637-2750
                Email: natalie.kuehler@usdoj.gov

                ALAN S. TENENBAUM
                National Bankruptcy Coordinator
                PATRICK CASEY
                Senior Counsel
                Environment and Natural Resources Division
                Environmental Enforcement Section
                U.S. Department of Justice

**Hearing Date and Time: June 28, 2012 at 10:00 a.m. (ET)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| MOTORS LIQUIDATION COMPANY *et al.*, | ) | Case No. 09-50026 (REG) |
| | ) | |
| f/k/a GENERAL MOTORS CORP. *et al.*, | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |

## UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO APPROVE SETTLEMENT AGREEMENTS BETWEEN THE DEBTORS AND THE UNITED STATES OF AMERICA

PREET BHARARA
United States Attorney for the
Southern District of New York
NATALIE N. KUEHLER
DAVID S. JONES
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel. No.: (212) 637-2741
Fax No.: (212) 637-2750

*Counsel for the United States*

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ..................................................................................1

II.   GENERAL STATUTORY/FACTUAL BACKGROUND.......................................3

    A.  CERCLA's Statutory Background ..................................................................3

    B.  Procedural Background....................................................................................5

    C.  The Settlement Agreements ............................................................................6

        1.  Allowed General Unsecured Claims.....................................................6

        2.  Environmental Claims Not Resolved by the Agreements .....................8

        3.  Covenants Not to Sue and Contribution Protection...............................8

    D.  Public Comments and Objections....................................................................9

        1.  Onondaga County .................................................................................10

        2.  Town of Salina………..........................................................................12

        3.  William B. Magnarelli, New York State Assembly Member................13

III.  ARGUMENT........................................................................................................14

    The Court Should Approve the Settlement Agreements
    Because They Are Fair, Reasonable, and Consistent With
    Environmental Law...........................................................................................14

    A.  Statement of Relief Requested......................................................................14

    B.  Jurisdiction...................................................................................................14

    C.  The Relief Requested Should Be Approved by the Court ...........................14

        1.  The Settlement Is Fair.........................................................................15

        2.  The Settlements Are Reasonable ........................................................17

        3.  The Settlements Are Consistent With the Goals of CERCLA ............18

D.  The Public Comments and Objections Do Not Indicate That the ERT
    Settlement Agreement Is Inappropriate, Inadequate, or Improper ............................19

    1.  The Terms of the Settlement Agreement are Substantively
        Fair and Reasonable Because They Are Based on the Best Information Currently
        Available to EPA Regarding the
        Extent of the Subsites' Environmental Contamination
        and the Debtors' Equitable Share .......................................................................20

            a)  Lower Ley Creek Subsite Cost Estimate, Equitable Share
                Allocation and Litigation Risk Adjustment……………………..…21

            b)  Salina Landfill Subsite Cost Estimate, Equitable Share
                Allocation and Litigation Risk Adjustment……………………..…24

            c)  The Settlement Agreements' Cost and Equitable Share
                Estimates Are
                Reasonable……………………………………………..……..…26

    2.  The Terms of the Settlement Agreements are Procedurally Fair and
        Reasonable Because Other PRPs are Not Entitled to Participate in
        Settlement Discussions ..........................................................................................28

    3.  The Terms of the Settlement Agreements Are Not Unfair to the
        Other PRPs, Including Onondaga County and the Town of Salina.....................29

    4.  The Settlement Agreements' Contribution Protection Provisions
        Are Appropriate ....................................................................................................35

    5.  The Other Comments Similarly Do Not Indicate That the Settlement
        Agreements Are Unreasonable, Unfair or Contrary to CERCLA ........................37

CONCLUSION....................................................................................................................40

# TABLE OF AUTHORITIES

**<u>CASES</u>**                                                                                           ***<u>page</u>***

*In re Acushnet River & New Bedford Harbor,*
    712 F. Supp. 1019 (D. Mass. 1989) ..........................................................................32

*B.F. Goodrich Co. v. Murtha,*
    958 F.2d 1192 (2d Cir. 1992)......................................................................................4

*Burlington Northern & Santa Fe Ry. v. United States,*
    129 S. Ct. 1870 (2009)...............................................................................................27

*City of Bangor v. Citizens Communications Co.,*
    532 F.3d 70 (1st Cir. 2008).......................................................................................29

*City of New York v. Exxon Corp.,*
    697 F. Supp. 677 (S.D.N.Y. 1988)...............................................................................5

*Consol. Edison Co. of N.Y. v. UGI Util., Inc.,*
    423 F.3d 90 (2d Cir. 2005).......................................................................................27

*In re Cuyahoga Equip.Corp.,*
    980 F.2d 110 (2d Cir. 1992)............................................................................ *passim*

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.,*
    805 F.2d 1074 (1st Cir. 1986).....................................................................................3

*Fireman's Fund Ins. Co. v. City of Lodi, Cal.,*
    302 F.3d 928 (9th Cir. 2002) ...................................................................................32

*Gen. Time Corp. v. Bulk Materials, Inc.,*
    826 F. Supp. 471 (M.D. Ga. 1993) ...........................................................................29

*New York v. Shore Realty Corp.,*
    759 F.2d 1032 (2d Cir. 1985).....................................................................................3

*New York v. Solvent Chem. Corp.,*
    984 F. Supp. 160 (W.D.N.Y. 1997).....................................................................15, 19

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.,*
    596 F.3d 112 (2d Cir. 2010).....................................................................................32

*O'Neil v. Picillo,*
    682 F. Supp. 706 (D.R.I. 1988),
    aff'd, 883 F.2d 176 (1st Cir. 1989).........................................................................3, 4

*United States v. Akzo Coatings of Am., Inc.*,
949 F.2d 1409 (6th Cir. 1991) ...............................................................2, 5

*United States v. Alcan Aluminum Corp.*,
990 F.2d 711 (2d Cir. 1993)........................................................... 4, 32-33

*United States v. Alcan Aluminum, Inc.*,
25 F.3d 1174 (3d Cir. 1994)....................................................................5

*United States v. BP Exploration & Oil Co.*,
167 F. Supp. 2d 1045 (N.D. Ind. 2011) ...................................................29

*United States v. Brook Village Associates, No. Civ. A. 05-195*,
2006 WL 3227769 (D.R.I. Nov. 6, 2006) .................................................29

*United States v. Cannons Eng'g Corp.*,
899 F.2d 79 (1st Cir. 1990).......................................................... *passim*

*United States v. Charles George Trucking Inc.*,
34 F.3d 1081 (1st Cir. 1994)......................................................... 15-17

*United States v. Davis*,
261 F.3d 1 (1st Cir. 2001) ......................................................................16

*United States v. DiBiase*,
45 F.3d 541 (1st Cir. 1995)..............................................................5, 16

*United States v. Grand Rapids, Michigan*,
166 F. Supp. 2d 1213 (W.D. Mich. 2000) ..........................................29, 32

*United States v. Hooker Chem. & Plastics Corp.*,
540 F. Supp. 1067 (W.D.N.Y. 1982),
aff'd, 749 F.2d 968 (2d Cir. 1984) ................................................. *passim*

*United States v. Monsanto*,
858 F.2d 160 (4th Cir. 1988) ...................................................................4

*United States v. R.W. Meyer, Inc.*,
889 F.2d 1497 (6th Cir. 1989) ...............................................................33

*United States v. Rohm & Haas Co.*,
721 F. Supp. 666 (D.N.J. 1989) .............................................................32

*United States v. Serafini*,
781 F. Supp. 336 (M.D. Pa. 1992)..........................................................29

iv

*United Techs Corp. v. Browning-Ferris Indus., Inc.*,
       33 F.3d 96 (1st Cir. 1994), cert. denied, 513 U.S. 1183 (1995) ............................5, 32

*Voluntary Purchasing Groups, Inc. v. Reilly*,
       889 F.2d 1380 (5th Cir. 1989) ......................................................................................3

## STATUTES

26 U.S.C. § 9507 ...........................................................................................................................3

28 U.S.C. §§ 1408 ........................................................................................................................14

28 U.S.C. §§ 157 ..........................................................................................................................14

42 U.S.C. § 9601 *et seq.*.................................................................................... *passim*

## OTHER SOURCES

77 Fed. Reg. 88 at 26789-90 (May 7, 2012) ............................................................................1, 6

131 Cong. Rec. 34 (Dec. 5, 1985) .................................................................................................29

1986 U.S.C.C.A.N. 2862 ................................................................................................................5

# I.    PRELIMINARY STATEMENT

The United States of America (the "**United States**"), on behalf of the United States

Environmental Protection Agency ("**EPA**"), respectfully submits this memorandum of law in

support of its Motion for an Order Approving the Lower Ley Creek Non-Owned Site Consent

Decree and Settlement Agreement (the "**Lower Ley Creek Settlement Agreement**") and the

Onondaga Other Non-Owned Site Consent Decree and Settlement Agreement (the "**Onondaga**

**Settlement Agreement**") (collectively, the "**Settlement Agreements**")[1].  The proposed

Settlement Agreements resolve environmental liabilities of the Debtors asserted by the United

States on behalf of EPA, under the Comprehensive Environmental Response, Compensation, and

Liability Act of 1980, as amended ("**CERCLA**"), 42 U.S.C. §§ 9601 – 9675, for response costs

in connection with the Lower Ley Creek, Onondaga Lake Bottom, Salina Landfill, Inland Fisher

Guide Facility and PCB Dredgings Subsites at the Onondaga Lake Superfund Site in New York

(collectively, the "**Settled Subsites**").  Under the Lower Ley Creek Settlement Agreement, the

United States, on behalf of EPA, will receive an allowed general unsecured claim in the total amount

of $38,344,177, and the New York State Department of Environmental Conservation ("**NYSDEC**"), as

support agency, will receive and allowed general unsecured claim of $859,257.  Under the Onondaga

Settlement Agreement, the United States on behalf of EPA will receive an allowed general

unsecured claim of $896,566.  The proposed Settlement Agreements are annexed as Exhibits 1 and 2,

respectively.

Pursuant to federal environmental laws, public notice of the proposed Settlement

Agreements was published in the Federal Register, 77 Fed. Reg. 88 at 26789-90 (May 7, 2012),

---

[1]    This memorandum of law contains an abbreviated summary of the terms and provisions of the Settlement Agreements.  If there is any conflict between the description of the settlement contained in this memorandum and the terms and provisions of the Settlement Agreements, the terms and provisions of the Settlement Agreements are controlling.

(the "**Federal Register Notice**").  The United States received three comments concerning the

Settlement Agreements, which are attached hereto as Exhibits 3 through 5.

Under prior orders of this Court, the Motors Liquidation GUC Trust and the Debtors'

estates are authorized to enter these agreements without obtaining the Court's approval under

Bankruptcy Rule 9019, because the resolved claim amounts are less than $50 million.  *See In re*

*Motors Liquidation Co.*, Ch. 11 Case No. 09-50026 (REG), Findings of Fact, Conclusions of

Law, and Order Pursuant to Sections 1129(a) and (b) of the Bankruptcy Code and Rule 3020 of

the Federal Rules of Bankruptcy Procedure Confirming Debtors' Second Amended Joint Chapter

11 Plan, dated March 29, 2011, Docket No. 9941 (Bankr. S.D.N.Y.).  However, it is the practice

of the United States to provide seek the Court's approval of bankruptcy settlements under federal

environmental laws.  Such approval is warranted here.  As explained more fully below, the

United States has determined that the proposed Settlement Agreements are fair, reasonable and

consistent with environmental law.  The Settlement Agreements were reached after lengthy

negotiation of their terms among sophisticated counsel.  In addition, the parties weighed the

merits, costs, risks and delays that litigation would entail against the value of settlements.

The function of the Court in reviewing motions to approve environmental settlement

agreements is not to substitute its judgment for that of the parties to the proposed Settlement

Agreements but to confirm that the terms of the proposed Settlement Agreements are "fair and

adequate and are not unlawful, unreasonable, or against public policy."  *United States v. Hooker*

*Chem. & Plastics Corp.*, 540 F. Supp. 1067, 1072 (W.D.N.Y. 1982), *aff'd*, 749 F.2d 968 (2d Cir.

1984) (citation omitted).  The Court should also confirm that the proposed Settlement

Agreements are consistent with CERCLA's goals.  *United States v. Akzo Coatings of Am., Inc.*,

949 F.2d 1409, 1426 (6th Cir. 1991).  Finally, in conducting its review, the Court should be

2

deferential to the United States' determination that the settlements are in the public interest.

*United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990). Accordingly, for the

reasons set forth herein, the United States respectfully requests that this Court approve and enter

the proposed Settlement Agreements, which were lodged with this Court on April 30, 2012.

## II.    GENERAL STATUTORY/FACTUAL BACKGROUND

### A.    CERCLA's Statutory Background

The environmental liabilities that are resolved by the Settlement Agreements derive from

a single federal statute, CERCLA. CERCLA was enacted to provide a framework for cleaning

up the nation's worst hazardous waste sites. The primary goal of CERCLA is to protect and

preserve the environment and public health from the effects of releases or threatened releases of

hazardous substances. *See* 42 U.S.C. § 9601(24); *New York v. Shore Realty Corp.*, 759 F.2d

1032, 1040 n.7 (2d Cir. 1985); *Voluntary Purchasing Groups, Inc. v. Reilly*, 889 F.2d 1380,

1386-87 (5th Cir. 1989); *O'Neil v. Picillo*, 682 F. Supp. 706, 726 (D.R.I. 1988), *aff'd*, 883 F.2d

176 (1st Cir. 1989); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081

(1st Cir. 1986).

The Hazardous Substance Superfund, commonly known as the Superfund, was

established pursuant to 26 U.S.C. § 9507 to finance federal response actions undertaken pursuant

to Section 104(a) of CERCLA, 42 U.S.C. § 9604(a). Although CERCLA authorizes cleanup of

sites contaminated with hazardous substances using money provided by the Superfund, the

Superfund is a limited source of funding intended for use only when responsible parties are not

available to conduct or finance a site's cleanup. *See* S. Rep. No. 96-848, 96th Cong., 2d Sess. at

17-18 (1980), *reprinted in* 1 Sen. Comm. on Env't & Pub. Works, Legislative History of

CERCLA 305, 324-25 (1983). The Superfund cannot finance cleanup of all of the many

contaminated sites nationwide, so replenishment of expended Superfund monies is crucial to the continuing availability of funds for future cleanups. Thus, the United States is tasked with seeking to ensure that potentially responsible parties ("**PRPs**") perform site cleanups, or, when Superfund monies are expended by the federal government in response to a release or threatened release of hazardous substances, that those monies are recovered from PRPs through the liability scheme set forth in Section 107 of CERCLA. 42 U.S.C. § 9607. *See B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1197-98 (2d Cir. 1992) (one statutory purpose of CERCLA is to hold responsible parties liable for the costs of the cleanup).

Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), permits the United States to recover its costs of responding to releases of hazardous substances from PRPs. Pursuant to section 107(a), PRPs include the owners and operators of Superfund sites at the time of the disposal of hazardous substances at the sites, the current owners and operators of Superfund sites, as well as those who arrange for disposal and transport of hazardous substances to Superfund sites. *See United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 721-22 (2d Cir. 1993) (describing potential liability for generating hazardous wastes found at a Superfund site); *O'Neil v. Picillo*, 883 F.2d 176, 178 (1st Cir. 1989) (distinguishing waste generators from waste transporters); *United States v. Monsanto Co.*, 858 F.2d 160, 168-71 (4th Cir. 1988) (laying out the distinction between site owner liability and generator liability).

Sections 104(a) and (b) of CERCLA, 42 U.S.C. § 9604(a)-(b), authorize EPA to use Superfund monies to investigate the nature and extent of hazardous substance releases from contaminated sites and to clean up those sites. EPA may also issue unilateral administrative orders to PRPs that require them to clean up sites, seek injunctive relief through a civil action to secure such relief, or seek to reach agreements with PRPs through which one or more PRPs

4

agree to perform the necessary cleanup of sites.  *See* 42 U.S.C. §§ 9604, 9606, and 9622.

Having created the liability system and enforcement tools to allow EPA to pursue responsible parties for Superfund cleanups, Congress expressed a strong preference that the United States settle with responsible parties in order to avoid spending resources on litigation rather than on cleanup.  42 U.S.C. § 9622(a).[2]  CERCLA encourages settlements, *inter alia*, by providing parties who settle with the United States protection from contribution claims for matters addressed in the settlement.  42 U.S.C. § 9613(f)(2).  This provision was designed to provide settling parties with "a measure of finality in return for their willingness to settle."[3]

## B.    Procedural Background

On June 1, 2009, General Motors Corp. ("**Old GM**") and three wholly-owned direct or indirect subsidiaries (collectively the "**Debtors**") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, and on October 9, 2009, REALM and ENCORE each also filed voluntary chapter 11 petitions.  On November 28, 2009, the United States timely filed proof of claim No. 64064, asserting environmental liabilities against the Debtors (the "**U.S. Proof of Claim**").  Most of the environmental liabilities asserted in the U.S. Proof of Claim were resolved through prior settlement agreements, and a revised proof of claim against the Debtors was filed on April 8, 2011 (the "**Second U.S. Proof of Claim**").  These Settlement Agreements address EPA's remaining claims in the Second U.S. Proof of Claim, all of which relate to the Onondaga Lake Superfund Site in New York (the "**Onondaga Lake Site**").

---

[2]    *See also In re Cuyahoga Equip.Corp.*, 980 F.2d 110 (2d Cir. 1992) (citing *City of New York v. Exxon Corp.*, 697 F. Supp. 677, 693 (S.D.N.Y. 1988)); *United States v. DiBiase*, 45 F.3d 541, 545-46 (1st Cir. 1995); *United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174, 1184 (3d Cir. 1994); *Akzo Coatings*, 949 F.2d at 1436; *Cannons Eng'g*, 899 F.2d at 92; H.R. Rep. No. 99-253, pt. 1, at 80 (1985), *reprinted in* 1986 U.S. C.C.A.N. 2862.

[3]    *Cannons Eng'g*, 899 F.2d at 92; *see also United Techs Corp. v. Browning-Ferris Indus., Inc.*, 33 F.3d 96, 103 (1st Cir. 1994), *cert. denied*, 513 U.S. 1183 (1995); H.R. Rep. No. 99-253, pt. 1, at 80 (1985), *reprinted in* 1986 U.S. C.C.A.N. 2862.

The United States and Debtors engaged in intensive, arms'-length negotiations concerning the environmental liabilities at issue in the Settlement Agreements, assisted by retained environmental and economic consultants with expertise in environmental remediation issues and other parties, including the NYSDEC. During the extensive negotiations, the parties reviewed and debated the significance of, among other things, available technical data and environmental and technical studies at the relevant subsites, as well as other relevant literature and studies that shed light on issues raised at the subsites. Negotiations involved repeated in-person meetings and many telephone conferences spanning over two years. Ultimately, the parties concluded that the negotiated resolution represented a reasonable compromise of the parties' respective positions and the asserted strengths and weaknesses of EPA's claims at each subsite. The parties then negotiated the precise wording of the Settlement Agreements themselves.

On April 30, 2012, the United States lodged the Settlement Agreements with this Court, and the proposed settlements were subject to a 30-day public comment period following their May 7, 2012, publication of in the *Federal Register*. *See* 77 Fed. Reg. 88 at 26789-90 (May 7, 2012). The public comment period concluded on June 6, 2012. A total of three public comments were received.

**C.    The Settlement Agreements**

1.    <u>Allowed General Unsecured Claims</u>

The Lower Ley Creek Settlement Agreement provides that the United States, on behalf of EPA, will receive an allowed general unsecured claim totaling $38,344,177 to resolve Debtors' liabilities for contamination at the Lower Ley Creek Subsite of the Onondaga Lake Superfund Site. In addition, NYSDEC, as support agency, will receive an allowed general unsecured claim

of $859,257 in settlement of the Debtors' liability to NYSDEC at the Lower Ley Creek Subsite.

In conjunction with the Lower Ley Creek Settlement Agreement, the United States also entered

into an Stipulation and Agreed Order Between the GUC Trust and the United States of America

dated April 30, 2012, a copy of which is attached hereto as Exhibit 6 (the "**Tax Offset**

**Stipulation**").  The Tax Offset Stipulation was lodged with the Court simultaneously with the

Lower Ley Creek Settlement Agreement and allows the United States to offset up to $17,305,000

in its allowed general unsecured claim recovery for the Lower Ley Creek Subsite.  In other

words, in satisfaction of its allowed general unsecured claim of $38,344,177 for the Lower Ley

Creek Subsite, EPA expects to receive a cash recovery of up to $17,305,000 and a *pro rata* payout

in New GM stock and warrants for the remaining $21,039,177 of its allowed claim.

The Onondaga Settlement Agreement provides that the United States, on behalf of EPA,

will receive an allowed general unsecured claim totaling $896,566 to resolve the Debtors'

liabilities to EPA as support agency for four other subsites of the Onondaga Lake Superfund Site

as follows: (i) an allowed general unsecured claim of $438,448 for unreimbursed past costs and

future costs at the Onondaga Lake Bottom Subsite; (ii) an allowed general unsecured claim of

$113,248 for unreimbursed past costs and future costs at the Salina Landfill Subsite; (iii) an

allowed general unsecured claim of $234,475 for unreimbursed past costs at the Inland Fisher

Guide Facility Subsite (the Debtors' liabilities for future costs at this subsite were settled as part

of a prior settlement agreement that resulted in the creation of RACER environmental response

trust (the "**RACER Settlement Agreement**")); and (iv) an allowed general unsecured claim of

$110,395 for unreimbursed past costs at the PCB Dredgings Subsite (the Debtors' liabilities for

future costs at this subsite were also settled as part of the RACER Settlement Agreement).

The amount of EPA's allowed claim for contamination at each subsite was determined, for settlement purposes, by taking into account: (1) estimated total past and future response costs; (2) the Debtors' estimated percentage allocation or fair share of liability for the site; and (3) litigation considerations.

The Settlement Agreements further provide that the Debtors may reduce the distribution reserve amount to be used by the GUC Trust pursuant to Article VII of the Debtors' Plan of Liquidation (the "**Plan**") for the remaining unresolved general unsecured claim asserted against Debtors by the United States Department of the Interior in the Second U.S. Proof of Claim, (the "**Reserve**") to no less than $50 million.

2.    Environmental Claims Not Resolved by the Agreements

These Settlement Agreements resolve the Debtors' remaining environmental liabilities to EPA that were asserted in EPA's proofs of claim. The United States, however, reserves all rights against Debtors' estates and the GUC Trust with respect to all matters not specifically settled by the Non-Owned Site Settlement Agreements, including: (i) any criminal liability; (ii) any liability for damages for injury to, destruction of, or loss of natural resources; and (iii) any action to enforce the Settlement Agreements.

3.    Covenants Not to Sue and Contribution Protection

The Lower Ley Creek Settlement Agreement provides Debtors' estates and the GUC Trust with covenants not to sue from the United States and NYSDEC with respect to the Lower Ley Creek Subsite. The Lower Ley Creek Settlement Agreement also provides the United States and NYSDEC reciprocal covenants not to sue from Debtors' estates and the GUC Trust. Finally, the Lower Ley Creek Settlement Agreement provides the Debtors' estates and the GUC Trust with contribution protection for matters addressed therein as provided for by Section 113(f)(2) of

8

CERCLA, 42 U.S.C. § 9613(f)(2).

The Onondaga Settlement Agreement similarly provides Debtors' estates and the GUC Trust with covenants not to sue from the United States with respect to the Lake Bottom Salina Landfill, Inland Fisher Guide Facility and PCB Dredgings Subsites of the Onondaga Lake Superfund Site, and provides the United States with reciprocal covenants not to sue from the Debtors' estates and the GUC Trust. The Onondaga Settlement Agreement further provides the Debtors' estates and the GUC Trust with contribution protection for matters addressed therein therein as provided for by Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2). With respect to the Onondaga Lake Bottom Subsite, where EPA is only the support agency, and NYSDEC, as lead agency and the only agency to have entered into a consent decree with various PRPs, did not file a proof of claim. The contribution protection provided in the Onondaga Settlement Agreement carves out claims for unreimbursed past and future response costs incurred by Honeywell International Inc. ("**Honeywell**") in its proof of claim number 45832. Moreover, because EPA is only the support agency at the Salina Landfill Subsite and NYSDEC as lead agency has filed a proof of claim in connection with the Debtors' environmental liabilities at that Subsite, the Onondaga Settlement Agreement only addresses – and the contribution protection provided therefore only extends to – EPA's unreimbursed past and future oversight costs at the Salina Landfill Subsite.

## D.    Public Comments and Objections

As set forth below, the United States received three written comments. Two of the comments received were from Onondaga County and the Town of Salina (collectively, the "**commenters**"), both of whom are PRPs at the Onondaga Lake Superfund Site. The third public comment, from New York State Assemblyman William B. Magnarelli, simply stated his support

for Onondaga County's public comment and reiterated the public comment he previously

submitted in connection with the RACER Settlement Agreement, which was previously

approved by this Court and is not at issue here.  Generally speaking, the commenters felt that

they had insufficient information to evaluate the substantive fairness of the Settlement

Agreements because they do not know the total amount of cleanup costs or the Debtors'

equitable share that EPA estimated for the Debtors at the settled subsites.  The commenters also

believe that the Settlement Agreements are procedurally unfair since they were not able to

participate in the parties' settlement discussions.  Finally, the commenters raise various specific

concerns, including with respect to the contribution protection provided and the parties bound by

the Settlement Agreements, and again reasserted their request – previously considered and

denied by this Court in connection with the RACER Settlement Agreement – that the relevant

subsites addressed in the Settlement Agreements be included in the RACER Trust.

      1.    <u>Onondaga County</u>

On June 4, 2012, Gordon J. Cuffy, County Attorney, submitted a written comment on

behalf of Onondaga County, New York, attached hereto as Exhibit 3 and bearing bates numbers

US 00485-95.  Onondaga County, itself a PRP at the Lower Ley Creek Subsite, comments that it

cannot opine on whether or not the Settlement Agreements are substantively fair because they do

not know the total amount of cleanup costs EPA estimated for the various subsites, the

information EPA took into account in arriving at the estimates, the method EPA used to calculate

the estimates, and the arguments made by the Debtors' in the parties' settlement discussions.  *Id.*

US 00489-91.  Onondaga County also argues that it can't evaluate the Settlement Agreements'

substantive fairness because it does not know the equitable share of the cleanup costs allocated to

the Debtors, the basis for the equitable share applied, and the arguments made by the Debtors' in

the parties' settlement discussions with respect to their allocation of the subsites' liabilities. *Id.* at US 00490-91. Moreover, Onondaga County states that since an amount of $70 million was included in the GUC Trust's Reserve to cover the Debtors' liabilities to the United States at the Lower Ley Creek Site, it cannot now assess whether the total settlement amount of $39.2 million for that Subsite is adequate and reasonable. *Id.* at US 00489.

Onondaga County also expressed dissatisfaction with the contribution protection being given to the Debtors and requested information on the likelihood of contributions from other PRPs to the subsites "given the potential for divisibility, the defenses of those parties and the United States' litigation risks in those matters." *Id.* at US 00491, US 00493-94. Specifically, Onondaga County does not agree that contribution protection should be extended to the Debtors "as may otherwise be provided by law," and argues that the Lower Ley Creek Settlement Agreement's contribution protection language could be read to preclude all claims relating to the Onondaga Lake Bottom Subsite, including EPA's claims in connection with that Subsite that are resolved in the simultaneously lodged Onondaga Settlement Agreement. *Id.* at US 00494.

Onondaga County speculates that the United States is a PRP at the Lower Ley Creek Subsite, and that this may have had an effect on the settlement reached. *Id.* at US 00491. In addition, Onondaga County raised various specific questions, such as what areas are included in the Lower Ley Creek Subsite definition, what portion of the settlement amount will be allocated to past and future oversight costs, why past costs incurred by EPA during the Debtors' bankruptcy proceedings were not pursued as "administrative claims," whether EPA is waiving "its RCRA claims," and what the factual and legal basis for NYSDEC's allowed general unsecured claim recovery is. *Id.* at US 00493-94. Onondaga County further reasserted its previous comment, which was addressed and dismissed by this Court in connection with the

11

RACER Settlement Agreement, that the Debtors' environmental liabilities relating to the Lower

Ley Creek Subsite should be addressed through the RACER Trust. *Id.* at US 00491-92.

Finally, Onondaga County argues that the Settlement Agreements are procedurally unfair

because the County was not able to participate in the settlement discussions leading up to

Settlement Agreements. *Id.* at US 00489. Moreover, although Onondaga County argues that it

should not be bound by the terms of the Settlement Agreements, it disagrees with the language in

those Agreements that only the parties are bound by it because "[i]n reality that statement is not

correct" since the Settlement Agreements "both benefit[] and penalize[] all other Creditors who

are also potentially responsible parties by, for example, reducing potential liability by the dollars

recovered by the United States, but simultaneously increasing the orphan share." *Id.* at *Id.* at US

00494-95.

2.    Town of Salina

Mark A. Nicotra, the Supervisor of the Town of Salina (the "**Town**"), which is also a

PRP at the Onondaga Lake Superfund Site, submitted written comments on behalf of the Town

of Salina by letter dated May 30, 2012, a copy of which is attached hereto as Exhibit 4 and bears

bates numbers US 00476 through US 00484. The Town of Salina's letter incorporates by

reference all comments submitted by Onondaga County, and further requests that the

contribution protection provided to the Debtors under the Lower Ley Creek Settlement

Agreement expressly carve out the Town's claims against the Debtors at the Lower Ley Creek

Subsite because they are "independent of EPA's claims, and relate to the response and remedial

costs the Town has incurred in addressing contamination caused by [the Debtors]." *Id.* US

00477, US 00481. Similarly, with respect to the Onondaga Settlement Agreement, the Town

objects to contribution protection being provided to the Debtors that does not expressly carve out

the Town's claims against the Debtors at the Salina Landfill Subsite.  *Id.* at US 00479-80.

The Town further disagrees with the Settlement Agreements' provisions that only the ultimate recovery on allowed general unsecured claims, not the full amount of each claim, will be applied to site-specific Superfund accounts because doing so results in the creation of orphan shares.  *Id.* at US 00479-80.  Finally, the Town requests that language be added to the Settlement Agreements that "protects" the Town from the application of the remedial cost estimates used to negotiate the settlement amounts to itself and other PRPs at the Onondaga Lake Superfund Site.  *Id.* at US 00480-81.

Finally, the Town's letter also requested the inclusion of specific language in the Tax Offset Stipulation that it is "without prejudice to the Town of Salina and other potentially responsible parties to dispute the amounts and allocation of environmental liabilities in any future litigation or proceedings, . . . whether in these bankruptcy cases or in any other appropriate forum."  Ex. 4 at US 00482.

3.    William B. Magnarelli, New York State Assembly Member

William B. Magnarelli ("**Magnarelli**"), a member of the New York State Assembly, 120th District, submitted written comments to the Settlement Agreements by letter dated May 25, 2012, which is attached hereto as Exhibit 5 and bears bates numbers US 00471-75.  Magnarelli resubmitted comments he made in connection with the RACER Settlement Agreement, which this Court already approved.  *Id* at US 00472.  In addition, Mr. Magnarelli stated that he "continue[s] to strongly support Onondaga County's position" and that he "once again voice[s] [his] advocacy for an amended settlement that does not leave Onondaga County taxpayers liable for what is clearly and completely a corporate environmental irresponsibility."  *Id.*

13

### III.    ARGUMENT

**The Court Should Approve the Settlement Agreements**
**Because They Are Fair, Reasonable, and Consistent With Environmental Law**

**A.    Statement of Relief Requested**

The United States moves for approval under the environmental laws of the proposed

Lower Ley Creek Settlement Agreement and Onondaga Settlement Agreement.  As explained

below, the Debtors' Settlement Procedures Order (as defined below) does not require court

approval for settlements less than or equal to $50 million, and the Court therefore need not

analyze this motion under the rubric of Bankruptcy Rule 9019.  However, it is the practice of the

United States to provide for notice and an opportunity for public comment on such proposed

settlements, after which, if (as is true here) the Government concludes that the settlement should

be approved, the United States must seek Court approval of the settlements under applicable

environmental laws.

**B.    Jurisdiction**

This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.

This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409.

**C.    The Relief Requested Should Be Approved by the Court**

Approval of a settlement agreement is a judicial act committed to the informed discretion

of the court.  *See In re Cuyahoga*, 980 F.2d at 118; *Hooker Chem.*, 540 F. Supp. at 1072; *United

States v. Cannons Eng'g Corp.*, 720 F. Supp. 1027, 1035 (D. Mass 1989) *aff'd* 899 F.2d 79 (1st

Cir. 1990).  Judicial review of a settlement negotiated by the United States to protect the public

interest is subject to special deference; the Court should not engage in "second-guessing the

Executive Branch."  *Cannons Eng'g*, 899 F.2d at 84; *see also In re Cuyahoga*, 980 F.2d at 118

14

(noting the "usual deference given the EPA"); *New York v. Solvent Chem. Co.*, 984 F. Supp. 160,

165 (W.D.N.Y. 1997) ("This court recognizes that its function in reviewing consent decrees

apportioning CERCLA liability is not to substitute its judgment for that of the parties to the

decree but to assure itself that the terms of the decree are fair and adequate and are not unlawful,

unreasonable, or against public policy") (internal quotation marks omitted).  An evidentiary

hearing is not required in order to evaluate a proposed CERCLA consent decree because such

hearings would frustrate the statutory goal of expeditious settlement and, as such, hearing

requests are routinely and properly denied.  *United States v. Charles George Trucking, Inc.*, 34

F.3d 1081, 1085 (1st Cir. 1994); *Cannons Eng'g*, 899 F.2d at 94.  This "limited standard of

review reflects a clear policy in favor of settlements."  *Solvent Chem. Co.*, 984 F. Supp. at 165.

For the reasons discussed below, the Court should approve the Settlement Agreements

because they are fair, reasonable, in the public interest, and further the goals of CERCLA.  *See

Charles George Trucking*, 34 F.3d at 1084; *Cannons Eng'g*, 899 F.2d at 85; *Hooker Chem.*, 540

F. Supp. at 1073 ("the task has been to examine the proposal and determine whether it is a fair

and adequate settlement and whether its implementation will reflect concern for the problems for

which Congress has enacted the various environmental statutes."); *Solvent Chem. Co.*, 984 F.

Supp. at 166.

1.    The Settlement Is Fair

The fairness criterion of a CERCLA settlement integrates both procedural fairness and

substantive fairness.  *Cannons Eng'g*, 899 F.2d at 86-88.  To measure procedural fairness, the

court "should ordinarily look to the negotiation process and attempt to gauge its candor,

openness, and bargaining balance."  *Id.* at 86.  The negotiation of the Settlement Agreements was

procedurally fair because they were negotiated at arm's length over more than two years, with

good faith participation by governmental actors and parties that were represented by experienced counsel and aided, on both sides, by technical experts who assisted on matters such as estimating the cost of future response actions.  During these years of negotiations, the United States, the Debtors, and their respective environmental experts were also aided by the environmental expertise of NYSDEC, and were able to request and collect additional information from outside sources, including Onondaga County.  *See id.* at 87 (finding a CERCLA settlement procedurally fair based on criteria including an arms-length negotiation, experienced counsel, and good faith participation by EPA).

To measure substantive fairness, the Court should consider whether the settlements are "based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability . . . according to rational (if necessarily imprecise) estimates of how much harm each PRP has done."  *Id.* at 87; *see also United States v. Davis*, 261 F.3d 1, 24 (1st Cir. 2001); *Charles George Trucking*, 34 F.3d at 1087; *DiBiase*, 45 F.3d at 544-45.  Here, the proposed Settlement Agreements are substantively fair.  Debtors' liability at the Subsites formed the backdrop for lengthy negotiations between the parties regarding the nature, extent and cost of the cleanup that will be required at the Subsites.

The resulting terms of the Lower Ley Creek Settlement Agreement provide for an allowed general unsecured claim for EPA in the amount of $38,344,177.  *See* Ex. 1 ¶ 4(a).  Moreover, the Tax Offset Stipulation lodged with the Court simultaneously with the Settlement Agreements provides that up to $17,305,000 of EPA's allowed general unsecured claim for the Lower Ley Creek Subsite will be offset and, therefore, paid out in cash rather than allowed general unsecured claim pro rata distributions in New GM stock and warrants.  *See* Ex. 5 ¶ 2.  In other words, while allowed general unsecured claims typically receive only *pro rata* distributions

16

of New GM stock and warrants under the Plan of Liquidation, due to the potential for a tax offset EPA may receive up to $17,305,000 in cash and only the remaining $21,039,177 in a *pro rata* distribution of New GM stock and warrants in satisfaction of its allowed general unsecured claim for the Lower Ley Creek Subsite.  *See id.*

The terms of the Onondaga Settlement Agreement, in turn, provide EPA with an allowed general unsecured claim totaling $896,566 to resolve the Debtors' liabilities to EPA as support agency for four subsites of the Onondaga Lake Superfund Site.  *See* Ex. 2 ¶ 4.  This $896,566 allowed general unsecured claim is allocated as follows: (i) $438,448 for unreimbursed past costs and future costs at the Onondaga Lake Bottom Subsite; (ii) $113,248 for unreimbursed past costs and future costs at the Salina Landfill Subsite; (iii) $234,475 for unreimbursed past costs at the Inland Fisher Guide Facility Subsite (the Debtors' liabilities for future costs at this subsite were settled as part of the RACER Settlement Agreement; and (iv) $110,395 for unreimbursed past costs at the PCB Dredgings Subsite (the Debtors' liabilities for future costs at this subsite were also settled as part of the RACER Settlement Agreement).  *Id.*

These settlement amounts were determined after years of extensive discussions that included environmental experts, and as discussed in more detail below represent a substantively fair resolution of the liabilities taking into account all available information as well as the uncertainties and litigation risks involved.

2.      The Settlements Are Reasonable

Courts evaluating the reasonableness of CERCLA settlements have considered three factors: technical adequacy of the cleanup work to be performed; satisfactory compensation to the public for response costs; and the risks, costs, and delays inherent in litigation.  *See Charles George Trucking*, 34 F.3d at 1085; *Cannons Eng'g*, 899 F.2d at 89-90.  Although the first prong

17

of the reasonableness inquiry is not at issue in this settlement, as the Debtors are not performing

any cleanup, the Settlement Agreements satisfy the other, necessarily intertwined, considerations

relevant to reasonableness.  As discussed above, the Lower Ley Creek Settlement Agreement

provides EPA with an allowed general unsecured claim in the total amount of $38,344,177, and

NYSDEC, as support agency, with allowed general unsecured claim of $859,257.  The Onondaga

Settlement Agreement provides EPA with an allowed general unsecured claim of $896,566 that will

be allocated among the Onondaga Lake Bottom Subsite, the Salina Landfill Subsite, the Inland

Fisher Guide Facility Subsite, and the PCB Dredgings Subsite as set out in the Settlement

Agreement.  The Settlement Agreements' terms satisfactorily compensate the public for

unreimbursed past and future costs, while reasonably balancing the litigation risks for the

estimated future cleanup costs and equitable share applied at the Settled Subsites, including the

strength of the United States' and –in the case of the Lower Ley Creek Subsite – NYSDEC's

case against the Debtors, the Debtors' bankruptcy, and the need to recover funds for cleanup and

minimize the expense and potential delay of protracted litigation.  Accordingly, the Settlement

Agreements are reasonable.

3.    The Settlements Are Consistent With the Goals of CERCLA

The primary goals of CERCLA are to "encourage prompt and effective responses to

hazardous waste releases and to impose liability on responsible parties," and to "encourage

settlements that would reduce the inefficient expenditure of public funds on lengthy litigation."

*In re Cuyahoga*, 980 F.2d at 119.  The Settlement Agreements further these statutory goals.  As

discussed above, the Lower Ley Creek Settlement Agreement obtains significant recoveries for

unreimbursed past costs and future response costs at the Lower Ley Creek Subsite.  The

Onondaga Settlement Agreement obtains allowed general unsecured claim recoveries for the full

18

amount of the Debtors' remaining unsettled environmental liabilities at the Inland Fisher Guide

Facility Subsite and the PCB Dredgings Subsite.  It also obtains significant recoveries for EPA's

unreimbursed past costs and future oversight costs at the Onondaga Lake Bottom Subsite and

Salina Landfill Subsite, where EPA is only the support agency and future response costs and

other unreimbursed past costs are being negotiated separately by, and will be directly

distributable to, Honeywell and NYSDEC, respectively.  Moreover, the Settlement Agreements

serve CERCLA's goal of reducing, where possible, the litigation and transaction costs associated

with response actions, as well as the public policy favoring settlement to reduce costs to litigants

and burdens on the courts.  *See Solvent Chem. Co.*, 984 F. Supp. at 165-66; *Hooker Chem.*, 540

F. Supp. at 1072.

**D.      The Public Comments and Objections Do Not Indicate That the Settlement
         Agreements Are Inappropriate, Inadequate, or Improper**

The United States has carefully considered the three public comments received and, as set

forth below, has determined that none of them indicate that either of the Settlement Agreements

is inappropriate, inadequate, or improper.  The public comments received concerning the

Settlement Agreements raise substantially identical issues and can be generally grouped into the

following categories: (1) Onondaga County and the Town of Salina have insufficient information

to determine whether the Settlement Agreements are substantively reasonable; (2) the Settlement

Agreements are procedurally unfair because Onondaga County and the Town of Salina were not

able to participate in the settlement discussions; (3) Onondaga County, the Town of Salina, and

their taxpayers should not be required to pay for the cleanup of Lower Ley Creek or the Salina

Landfill; (4) the contribution protection provisions of the Settlement Agreements should be

amended; and (5) various other comments and questions.

1.      The Terms of the Settlement Agreement are Substantively Fair and Reasonable
        Because They Are Based on the Best Information Currently Available to EPA
        Regarding the Extent of the Subsites' Environmental Contamination and the
        Debtors' Equitable Share

The Settlement Agreements are substantively fair and reasonable because, as described above, they are based on the Debtors' equitable share allocation of the various Subsites' unreimbursed past and future costs recoverable by EPA. *See Cannons Eng'g*, 899 F.2d at 87, 89-90. Onondaga County and the Town of Salina argue that they are unable to determine whether the Settlement Agreements are substantively fair because they do not know the total estimated cleanup costs at the Subsites and the basis for them, including the extent of the presumed contamination, the nature of the anticipated remedy, the method used for calculating remedial costs, and the arguments made by the Debtors in connection with these factors. Ex. 3 at US 00490-91. Moreover, Onondaga County and the Town of Salina argue that they also need information regarding the equitable share allocation EPA applied, including the basis for that equitable share and the arguments made by the Debtors' regarding their equitable share during the parties' settlement discussions. *Id.*

Absent this information, Onondaga County and the Town of Salina argue, they have "no basis by which [to] determine if the proposed settlement is proper, appropriate, adequate, and in the public interest." *Id.* US 00489. Nonetheless, neither Onondaga County nor the Town of Salina, both of whom have had long-standing involvement as PRPs in the Lower Ley Creek and Salina Landfill Subsites, have provided any evidence or information, documentary or otherwise, to establish that the terms of the Settlement Agreements are not substantively fair and reasonable.

a) <u>Lower Ley Creek Subsite Cost Estimate, Equitable Share Allocation and Litigation Risk Adjustment</u>

In fact, the Settlement Agreements are substantively fair and reasonable. As explained in the Declaration of Pam N Tames, P.E., dated June 13 2012, attached hereto as Exhibit 7 (the "**Tames Declaration**"), EPA estimated total unreimbursed past and future remedial costs at the Lower Ley Creek Subsite to be $45,679,146. *Id.* ¶ 16. To arrive at this estimate, EPA reviewed information that included maps, photographs, contractor documents related to the Ley Creek flood control project from the 1970s that were received from Onondaga County, historic information concerning releases of hazardous substances, data from a geographic information system analysis conducted by NYSDEC, and data collected as part of the remedial investigation at the subsite, including field samples of sediment and fish collected from the creek, the surrounding floodplains and the swale area. *Id.* ¶¶ 4, 6, 8, 9, 12-15.

EPA then divided the creek traversing the Lower Ley Creek Subsite into four separate segments, the width of which was estimated through a geographic information system data analysis conducted by NYSDEC. *Id.* ¶ 8. For the first creek segment, EPA estimated that the remedy would include partial dredging, with a cap designed to limit migration of the remaining PCBs, followed by an armor layer to keep the PCB cap in place and topped with a benthic layer to promote the regrowth of beneficial flora and fauna, as well as an uncapped buffer zone. *Id.* ¶ 9. For the second creek segment as well as a portion of the third creek segment, EPA similarly estimated that the remedy would include partial dredging, with a backfill and bank stabilization layer. *Id.* ¶¶ 10-11. For the remaining creek segments the remedial investigation did not show any samples with PCBs greater than 1 part per million, eliminating the need for any dredging to be conducted. *Id.* ¶ 12.

In addition to the creek itself, EPA also estimated that the surrounding floodplains and

21

swale area will need to be remediated. *Id.* ¶¶ 13-14. For the floodplains, EPA estimated a total of 67,271 cubic yards of soil will need to be excavated. *Id.* ¶ 13. For the swale area, EPA estimated 18,229 cubic yards of soil will need to be excavated. *Id.* ¶ 14. EPA also estimated that certain additional expenses would be incurred in connection with the remediation of the Lower Ley Creek Subsite, including investigation and design costs, access roads and pads, mobilization and demobilization costs, project construction and management costs, long-term operation and maintenance costs, and agency oversight costs. *Id.* ¶ 15.

EPA separately estimated the remedial costs for the Old Ley Creek Channel portion of the Lower Ley Creek Subsite. *Id.* ¶ 16. For this section, EPA estimated that 21,486 cubic yards of soil will need to be excavated, and other costs including for investigation and design, access roads and pads, mobilization and demobilization, engineering and administration, and long-term operation and maintenance will also be incurred. *Id.*

To determine the costs of the total remedial actions EPA estimated will be incurred at the Lower Ley Creek Subsite, EPA considered prevailing market rates as well as the response costs incurred or to be incurred at other sites with characteristics similar to those of the Lower Ley Creek Subsite, including the Geddes Brook/Nine Mile Creek subsite of the Onondaga Lake Superfund Site, the Hudson River PCBs Superfund Site, and the Reynolds Metals Superfund Site. *Id.* ¶ 7. The specific estimates used for each remedial cost component are set forth in detail in the Tames Declaration. *See id.* ¶¶ 9-15. EPA then added a 15% contingency to its cost estimate to allow for additional remedial measures that may be required in the future. *Id.* ¶¶ 15-16. Finally, EPA added total unpaid past costs incurred by EPA and NYSDEC. *Id.* These estimates resulted in a total anticipated cost for the remediation of the Lower Ley Creek Subsite of $45,678,146. *Id.* ¶ 17. This amount incorporates an estimated $1,103,595 for NYSDEC's

past unreimbursed and future costs at the Lower Ley Creek Subsite, which were not included in

EPA's settlement calculations or EPA's allowed general unsecured claim amount. The total

estimated amount of liabilities to EPA in connection with the Lower Ley Creek Subsite is

therefore $44,574,551.

Although the allocation of liability at the Lower Ley Creek Subsite is difficult to

determine because the remedial investigation and feasibility study has not yet been completed

and no remedy has been selected, EPA for purposes of the Lower Ley Creek Settlement

Agreement estimated that the Debtors' equitable share allocation exceeded the 80% mentioned in

Onondaga County's letter. *Id.* ¶ 6; Ex. 3 at US 00492. Onondaga County and the Town of

Salina argue that the Debtors are "the only possible source of the [PCB] contamination" at the

Lower Ley Creek Subsite and surrounding areas. Ex. 3 at US 00488. This self-serving

statement, however, is patently incorrect. As the United States previously disclosed in

connection with its motion seeking the approval of the RACER Settlement Agreement, other

PRPs identified by EPA for the Lower Ley Creek Subsite and the Salina Landfill Subsite include

not only Onondaga County and the Town of Salina, but also, Carrier Corporation, Crouse Hinds

Division of Cooper Industries, Niagara Mohawk Power Corporation (d/b/a National Grid),

Oberdorfer LLC, and Syracuse China Company. *Id.* EPA's equitable share allocation to

Debtors in excess of 80% takes into account the existence of these other PRPs, while at the same

time recognizing that the Debtors are responsible for the vast majority of the contamination at

the Lower Ley Creek Subsite by directly discharging PCBs into Ley Creek from their Inland

Fisher Guide Facility, which is located upstream from the Lower Ley Creek Subsite. *See id.*

Finally, EPA also applied a litigation risk adjustment to the $44,574,551 in total

estimated liabilities to EPA at the Lower Ley Creek Subsite. This litigation risk adjustment

recognizes the difficulties and uncertainties in accurately estimating and proving future response costs at this subsite, particularly in light of the extensive remediation that is anticipated to be necessary and the fact that the remedial investigation and feasibility study has not yet been completed and no remedy has been selected. *Id.* ¶ 6.

After applying its equitable share estimate and litigation risk adjustment to the $44,574,551 in total estimated liabilities to EPA, EPA arrived at a settlement amount for the Debtors' liabilities to EPA of $38,344,177 at the Lower Ley Creek Subsite. Even in the absence of any litigation risk reduction, this settlement amount would reflect an equitable share allocation of 86%. The negotiated settlement amount of $38,344,177 is, therefore, a fair and equitable resolution of the Debtors' liabilities to EPA at the Lower Ley Creek Subsite.

b) <u>Onondaga Settlement Agreement Cost Estimates, Equitable Share Allocations and Litigation Risk Adjustments</u>

The Onondaga Settlement Agreement addresses the Debtors' liabilities to EPA at the Salina Landfill Subsite, the Onondaga Lake Bottom Subsite, the Inland Fisher Guide Facility Subsite, and the PCB Dredgings Subsite. In connection with the Salina Landfill Subsite, EPA will receive an allowed general unsecured claim of $113,248. As explained in the Declaration of Mark Granger, P.E., dated June 13 2012, attached hereto as Exhibit 8 (the "**Granger Declaration**"), EPA estimated that it will incur a total of $175,000 in future oversight costs at the Salina Landfill Subsite. *Id.* ¶ 4 At the time the Onondaga Settlement Agreement was entered into, EPA also had unreimbursed past costs at the Salina Landfill Subsite of $439,240. *Id.* ¶ 5 EPA is not the lead agency at this subsite, and therefore did not submit a claim for future response costs other than its anticipated oversight costs at the Salina Landfill Subsite. The total estimated liabilities to EPA in connection with the Salina Landfill Subsite, therefore, were $614,240.

24

Based on available information, EPA also estimated that the Debtors' equitable share at the Salina Landfill Subsite at 20%. *Id.* ¶ 6. This estimate recognizes that the Debtors were a significant - but by no means the sole – contributor of PCBs to the Salina Landfill. *See id.* It also recognizes that the owner and operator of the Salina Landfill, the Town of Salina, bears liability at this subsite. *See id.* Applying a 20% equitable share to EPA's total costs of $614,240 would result in a total liability of the Debtors to EPA of $122,848. *See id.* ¶ 6. This figure, however, does not yet take into account any litigation risk adjustment to reflect the uncertainties inherent in EPA's future oversight cost estimate and its equitable share allocation. After adjusting for this litigation risk, EPA arrived at an allowed general unsecured claim amount of $113,248 to settle the Debtors' liabilities to EPA at the Salina Landfill Subsite. Given the information available to EPA, this allowed general unsecured claim amount represents a fair and equitable resolution of the Debtors' liabilities to EPA at the Salina Landfill Subsite.

For the Onondaga Lake Bottom Subsite, EPA has negotiated a settlement of the Debtors' liabilities to EPA for an allowed general unsecured claim in the amount of $438,448. As explained in the Declaration of Robert Nunes, dated June 13, 2012, attached hereto as Exhibit 9 (the "**Nunes Declaration**"), EPA estimated that it will incur oversight costs in the amount of $4.5 million at the Onondaga Lake Bottom Subsite. *Id.* ¶ 4. This estimate is based on the remedy selected in the record of decision issued for the Onondaga Lake Bottom Subsite in 2005, which estimated total future cleanup costs at that subsite in the amount of $451 million. *Id.* At this Subsite, like at the Salina Landfill Subsite, EPA is not the lead agency and therefore did not submit a claim for future response costs other than EPA's anticipated oversight costs. *Id.* At the time the Onondaga Settlement Agreement was entered into, EPA also had unreimbursed past costs at the Onondaga Lake Bottom Subsite of $1,345,968. *Id.* ¶ 5. The total estimated

25

liabilities to EPA in connection with the Onondaga Lake Bottom Subsite, therefore, were $5,845,968.

Based on available information, EPA also estimated that the Debtors' equitable share at the Onondaga Lake Subsite at 7.5%. *Id.* ¶ 6. This estimate recognizes that the Debtors, through their PCB discharges into Ley Creek, which in turn discharged into Onondaga Lake, were a contributor of PCBs to the Lake Bottom Subsite. *See id.* It also recognizes, however, that other PRPs, including Honeywell, bear the vast majority of the responsibility for the contamination at the Onondaga Lake Bottom, and that Ley Creek was not the only tributary that discharged PCBs into the lake. *See id.* Applying a 7.5% equitable share to EPA's total costs of $5,845,968 results in a total liability of the Debtors to EPA of $438,448. *See id.* ¶ 6. EPA did not apply any litigation risk adjustment to this amount. Accordingly, EPA's allowed general unsecured claim in the amount of $438,448 represents a fair and equitable resolution of the Debtors' liabilities to EPA at the Onondaga Lake Bottom Subsite.

Finally, the Onondaga Settlement Agreement provides EPA with allowed general unsecured claims covering the full amount of EPA's remaining unreimbursed past costs at the Inland Fisher Guide Facility and the PCB Dredgings Subsites, at which Debtors were the sole identified PRPs and at which EPA's claims for future response costs were previously settled as part of the RACER Settlement Agreement. Accordingly, there can be no doubt that the Settlement Agreements' terms for these Settled Subsites are substantively fair and reasonable.

c) <u>The Settlement Agreements' Cost and Equitable Share Estimates Are Reasonable</u>

While uncertainties remain with respect to EPA's future oversight costs at the Onondaga Lake Bottom and Salina Landfill Subsites, the recoveries from the Debtors to EPA under Onondaga Settlement Agreement are based on all currently available information regarding those

Subsites.  Similarly, although investigative work at the Lower Ley Creek Subsite is ongoing,

EPA's recovery for unreimbursed past and future response costs at that subsite under the Lower

Ley Creek Settlement Agreement is based on currently available information and EPA's

reasonable expectations of the nature and costs of future remedial work based on that

information.  Although the actual remedial costs and the Debtors' equitable share at the Lower

Ley Creek Subsite may ultimately be higher or lower than estimated, it is simply not possible in

the bankruptcy context to delay resolution of a settlement amount until after all investigative

work is complete and a remedy has been selected and implemented.  The United States utilized

the best information available at the time to arrive at a settlement amount for each subsite that is

fair, reasonable, and consistent with CERCLA's goals.

The purpose of CERCLA is to "promote the timely cleanup of hazardous waste sites and

to ensure that the costs of such cleanup efforts are borne by those responsible for the

contamination."  *Burlington Northern & Santa Fe Ry. Co. v. United States,* 556 U.S. 559, 602

(2009) (quoting *Consol. Edison Co. of N.Y. v. UGI Util., Inc.,* 423 F.3d 90, 94 (2d Cir. 2005)).

In addition, CERCLA aims to "encourage settlements that would reduce the inefficient

expenditure of public funds on lengthy litigation."  *In re Cuyahoga,* 980 F.2d at 119.  To

facilitate settlement, CERCLA allows for settlement amounts that are based not on joint and

several liability, but rather "some acceptable measure of comparative fault, apportioning liability

. . . according to rational (if necessarily imprecise) estimates of how much harm each PRP has

done."  *Cannons Eng'g*, 899 F.2d at 87.

The United States here has negotiated settlements that seek to further CERCLA's goals

by securing substantial settlement awards that reflect the Debtors' proportionate share of liability

and efficiently and expeditiously resolve the United States' proofs of claim.  In so doing, the

27

United States took into account, for every subsite: the nature of the United States' claims in the

bankruptcy; total past and estimated future response costs; the applicable Debtor's equitable

share or allocation of fault or liability; the existence of other PRPs who can perform cleanup

and/or reimburse the United States' costs; litigation risk, including defending cleanup costs and

equitable share through an estimation proceeding; and considerations of preserving resources

through settlement without protracted litigation. The resulting settlement terms are substantively

fair and reasonable.[4]

      2.      The Terms of the Settlement Agreements are Procedurally Fair and Reasonable
             Because Other PRPs are Not Entitled to Participate in Settlement Discussions

Onondaga County and the Town of Salina's complaint that they were not permitted to

participate in the settlement process leading up to the Lower Ley Creek and Onondaga

Settlement Agreements is misplaced and inaccurate. Counsel for the United States had telephone

calls and meetings with counsel for Onondaga County and the Town of Salina concerning a

potential settlement with the Debtors. At one meeting, which also included representatives of

EPA, experts hired by Onondaga County and the Town of Salina made a lengthy presentation

regarding the Lower Ley Creek Subsite. Moreover, counsel for the United States on multiple

occasions reached out to counsel for Onondaga County and the Town of Salina to solicit any

additional information regarding the extent of the contamination and the equitable share of

various PRPs at the Lower Ley Creek Subsite. In response, Onondaga County submitted

additional materials to EPA that were taken into account in arriving at the settlement amounts.

---

[4]      Onondaga County and the Town of Salina also requested information concerning the
likelihood of contribution from other PRPs to the response costs at the Settled Subsites "given
the potential for divisibility, the defenses of those parties and the United States' litigation risks in
those matters." Ex. 3 at US 00491. As discussed above, EPA has identified multiple PRPs other
than the Debtors at each of the Settled Subsites, including Onondaga County and the Town of
Salina. The commenters have presented no information to suggest that the equitable share
allocations by EPA to the Debtors at the various Settled Subsites were incorrect or insufficient.

In any event, the law is clear that non-settling PRPs such as Onondaga County and the

Town of Salina have no right to participate in, or even be kept aware of, the United States'

settlement negotiations with other parties.  *See, e.g., Gen. Time Corp. v. Bulk Materials, Inc.*, 826

F. Supp. 471, 477 (M.D. Ga. 1993); *United States v. Serafini*, 781 F. Supp. 336, 339 (M.D. Pa.

1992); s*ee also City of Bangor v. Citizens Comm'ns Co.*, 532 F.3d 70, 96 (1st Cir. 2008) ("The

EPA . . . does not need to open settlement offers to all PRPs."); *Cannons Eng'g*, 899 F.2d at 93

("In the CERCLA context, the government is under no obligation to telegraph its settlement

offers, divulge its negotiating strategy in advance, or surrender the normal prerogatives of

strategic flexibility which any negotiator cherishes."); *United States v. Brook Village Assocs.*,

No. Civ. A. 05-195, 2006 WL 3227769, at *5 (D.R.I. Nov. 6, 2006) (settlement not procedurally

unfair to a non-party that had opportunity to comment on the proposed settlement during public

comment period); *United States v. BP Exploration & Oil Co.*, 167 F. Supp. 2d 1045, 1052 (N.D.

Ind. 2001) ("There is no requirement that the Government allow third parties to participate in

settlement negotiations."); *United States v. Grand Rapids, Mich.*, 166 F. Supp. 2d 1213, 1221-22

(W.D. Mich. 2000) (exclusion of PRPs from a settlement with another under CERCLA does not

indicate procedural unfairness.).  Accordingly, the Settlement Agreements are procedurally fair

even though other PRPs, including Onondaga County and the Town of Salina, did not participate

directly in the settlement negotiations.[5]

3.    The Terms of the Settlement Agreements Are Not Unfair to the Other PRPs,
       Including Onondaga County and the Town of Salina

All three commenters also state that the Settlement Agreements should not be approved

because their taxpayers should not be required to pay for the cleanup of the Lower Ley Creek

---

[5]    Onondaga County and the Town of Salina also argue that the Lower Ley Creek
Settlement Agreement may be procedurally unfair given the United States' liabilities at that
Subsite.  EPA is not aware of any liabilities of the United States in connection with the Lower
Ley Creek Subsite.

and Salina Subsites.  Specifically, the commenters argue that the Subsites should be credited in

the full amount of the allowed general unsecured claims rather than the recovery on those claims,

to avoid the creation of a so-called "orphan share" for which the remaining PRPs will be jointly

and severably liable.  Moreover, the commenters argue that the Lower Ley Creek Subsite should

be included in the RACER Trust and have access to the Trust's cleanup funds rather than be

subject to a stand-alone allowed general unsecured claim settlement.  These arguments are

misplaced.

As previously discussed, Onondaga County and the Town of Salina have long been

identified as PRPs at the Lower Ley Creek and Salina Subsites, and their comments here reflect a

desire to limit their own liability rather than ensure a fair and reasonable settlement of the

Debtors' liability.  Their argument that their potential joint and several liability should be

reduced by the amount of the allowed claim, even though, under the settlement, the United States

will receive significantly less than the allowed claim amount due to the Debtors' bankruptcy is

inconsistent with the express language of CERCLA and with Congress' intent that liable parties

rather than ordinary taxpayers should bear the burden of cleanup costs.  This very argument was

addressed and overruled by the court in *In re Eagle-Picher Industries, Inc.*, 197 B.R. 260 (Bankr.

S. D. Ohio 1996), *aff'd* 1997 U.S. Dist. LEXIS 15436 (July 14, 1997 S.D. Ohio).  The *Eagle-*

*Picher* court held that the United States properly credited other PRPs only with the actual cash

recovery received in a bankruptcy settlement because (i) those PRPs are jointly and severally

liable for the contamination; (ii) crediting PRPs with more than the actual cash received by the

United States "would tend to cause the U.S. not to proceed settlements with bankrupt debtors"

because "[s]imply ignoring bankrupt debtors would be more productive for the U.S."; and (iii)

the United States retains the ability to negotiate a settlement with the remaining PRPs that

forgives some of the cleanup costs for which they would otherwise be liable." *Id.* at 272. This rationale applies with equal force here.

The Settlement Agreements' terms limiting any credit to a subsite to the actual recovery received from the relevant allowed general unsecured claim, by contrast, are consistent with Section 113(f)(2), (3) of CERCLA, 42 U.S.C. § 9613(f)(2), (3). Section 113(f)(2) provides: "[A] settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement." 42 U.S.C. § 9613(f)(2). In bankruptcy settlement such as these, the terms of the settlements include a payout amount or value that is determined in accordance with a Plan of Reorganization. *See* Ex. 1 ¶ 10 ("The allowed claims provided for herein shall be treated as provided under Section 4.3 of the Plan of Liquidation"); Ex. 2 ¶ 9 (same). The "amount of the settlement" under the Settlement Agreements therefore is the amount or value that is received under the Plan.

These terms' consistency with CERCLA is further confirmed by the fact that section 113(f)(3) of CERCLA, 42 U.S.C. § 9613(f)(3), plainly contemplates that the United States can pursue non-settlors whenever it obtains "less than complete relief" from settlors.[6] Congress thus made clear that the United States could pursue non-settlors if settling parties have not made the United States whole, as will frequently be the case where, for example, PRPs file for bankruptcy or have an inability to pay. As the legislative history indicates, nonsettling persons "remain potentially liable for the amounts not *received* by the government through the settlement." 131 Cong. Rec. 34,646 (Dec. 5, 1985) (remarks of Rep. Glickman incorporating House Judiciary Committee explanations of amendments to CERCLA); H.R. Rep. No. 253, 99th Cong., 1st Sess.,

---

[6] "If the United States or a State has obtained less than complete relief from a person who has resolved its liability to the United States or the State in an administrative or judicially approved settlement, the United States or the State may bring an action against any person who has not so resolved its liability." 42 U.S.C. § 9613(f)(3)(A).

pt. 3, at 19 (1985), *reprinted in* 1986 U.S. Code Cong. & Ad. News 3042 (emphasis added.); *see also United Techs. Corp.*, 33 F.3d 96, 103 (1st Cir. 1994) ("Because only the amount of the settlement, not the *pro rata* share attributable to the settling party, is subtracted from the aggregate liability of the nonsettling parties . . . [CERCLA] envisions that nonsettling parties may bear disproportionate liability. This paradigm is not a scrivener's accident."); *Grand Rapids*, 166 F. Supp. at 1222 (settlement with PRP not substantively unfair to other PRPs even if it results in disproportionate liability, as Congress intended to create disproportionate liability as an incentive to settle); *United States v. Rohm & Haas Co.*, 721 F. Supp. 666, 676 & n.10 (D.N.J. 1989) (where settling party does not fully compensate the United States, Congress intended other PRPs to make the United States whole); *In re Acushnet River & New Bedford Harbor*, 712 F. Supp. 1019, 1027 (D. Mass. 1989) (same).

Not only is this result consistent with CERCLA and Congressional intent, it is also in no way unfair to the non-settling PRPs. Those PRPs, which here include Onondaga County and the Town of Salina, are already potentially jointly and severally liable under CERCLA, and could be required to pay all of the United States' response costs. *See Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 121 (2d Cir. 2010) ("[CERCLA] allows for complete cost recovery under a joint and several liability scheme; one PRP can potentially be accountable for the entire amount expended to remove or remediate hazardous materials."); *Fireman's Fund Ins. Co. v. City of Lodi, Cal.*, 302 F.3d 928, 945 (9th Cir. 2002) ("[B]ecause liability is joint and several, a . . . PRP . . . may be held fully liable for the entire clean-up costs at a site, despite the fact that the defendant PRP was in fact responsible for only a fraction of the contamination."); *Alcan Aluminum*, 990 F.2d at 721-22 (concluding that, under CERCLA, where "each [PRP] causes a single indivisible harm, then damages are not apportioned and each is liable in damages

for the entire harm."); *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1508 (6th Cir. 1989).

Moreover, even in the absence of the Settlement Agreements, Onondaga County, the Town of Salina and the other PRPs would only be able to recover a percentage of their claims by operation of the Plan of Liquidation and the *pro rata* payout in New GM stock and warrants provided under that Plan for creditors holding allowed general unsecured claims. Without the Settlement Agreements, these PRPs therefore could at most recover the same *pro rata* distribution of New GM stock and warrants that are being recovered under the Settlement Agreements for the Debtors' fair share at each Settled Subsite.

Under the terms of the Settlement Agreements, however, they will be benefited through a reduction in their liability to the United States in the amount of EPA's credit to the various subsites, which will be EPA's full cash recovery upon the liquidation of the New GM stock and warrants received for each allowed general unsecured claim. The shortfall that the Onondaga County and the Town of Salina complain about, therefore, results from the operation of the bankruptcy laws, not from the terms of the Settlement Agreements. It would be neither fair nor reasonable for the United States to pursue a larger-than-equitable share against Debtors simply because, as a function of the bankruptcy, allowed general unsecured claims will receive recoveries at a reduced rate. Onondaga County and the Town of Salina's request to amend the Settlement Agreements to credit each Subsite with the allowed general unsecured claim amount rather than the recovery on those unsecured claims are, therefore, misplaced.

In any event, a discussion of so-called orphan shares as they pertain to the Settled Subsites is premature. To the extent that EPA in the future enters into settlements with other PRPs at the Settled Subsites, it will at that time be able to determine whether and how to consider any orphan share that may be attributable to the Debtors as a result of this settlement.

33

Under applicable EPA policy, the particular formula used to determine the orphan share would

depend, in part, on the nature the liabilities being resolved in such a settlement with other PRPs

at the site (e.g., past costs, future costs, and/or performance of remedial work).  *See* generally

EPA Orphan Share Superfund Reform Questions and Answers, (Jan. 2001), (*available at*

http://www.epa.gov/compliance/resources/policies/cleanup/superfund/orph-sh-ref-qa.pdf).

Onondaga County and the Town of Salina's comments, therefore, provide no basis for the United

States to withdraw its consent to the Settlement Agreements.

Similarly, the commenters' suggestion that the Lower Ley Creek Settlement Agreement

not be approved and the Debtors' liabilities at that Subsite instead be included in the RACER

Trust are inapposite.  In fact, these very arguments were previously addressed by the United

States and overruled by the Court in connection with approval of the RACER Settlement

Agreement.  *See United States' Statement in Support of Environmental Provisions of debtors'*

*Plan of Liquidation*, dated February 18, 2011, Docket No. 9311; *see also* audio file of Court

hearing held on March 3, 2011, Docket Nos. 9570 and 9571.  As more fully discussed in the

United States' moving papers and the transcript of the Court's oral ruling approving the RACER

Settlement Agreement, the Lower Ley Creek Subsite was appropriately not included in the

RACER Trust because, contrary to the sites addressed by that Trust, the Lower Ley Creek

Subsite was not owned by the Debtors or immediately adjacent to property owned by the

Debtors, no cleanup order has been issued, and there are other viable PRPs.

Moreover, in connection with the Lower Ley Creek Settlement Agreement, EPA has

already recognized the unique circumstances presented by the Debtors' large equitable share, the

high future response costs estimated, and the fact that two of the remaining viable PRPs are

public entities, and entered into a simultaneously lodged Tax Offset Stipulation with the GUC

34

Trust pursuant to which up to $17,305,000 of the allowed general unsecured claim recovery for the Lower Ley Creek Subsite will be offset by an anticipated tax settlement in an unrelated action. *See* Ex.6 ¶ 3-4. In other words, EPA has already made arrangements to ensure that up to $17,305,000 of its recovery for the Lower Ley Creek Subsite could come in form of a cash recovery, rather than as an allowed general unsecured claim distribution. *See id*. The commenters' statements that the Settlement Agreements unduly burden the taxpayers of Onondaga County and the Town of Salina are therefore counterfactual and fail to provide any basis for the United States to withdraw its consent to the Settlement Agreements.

      4.      <u>The Settlement Agreements' Contribution Protection Provisions Are Appropriate</u>

Onondaga County and the Town of Salina also submitted comments requesting that the Settlement Agreements' paragraphs providing for contribution protection be amended. Specifically, they request that the language allowing for contribution protection "as may be otherwise permitted by law" be stricken in both Settlement Agreements. Ex. 3 at US 00494. They also request to strike the language in the Lower Ley Creek Settlement that extends contribution protection to "claims related to releases of hazardous substances from any portion of the Lower Ley Creek Site and all areas affected by migration of hazardous substances emanating from the Lower Ley Creek Site" because this language could be misconstrued as extinguishing all claims relating to the Onondaga Lake Bottom Subsite. *Id*. Finally, the Town of Salina requested specific carve-outs of its claims from the contribution protection provisions of both Settlement Agreements, arguing that its claims are "independent of EPA's claims, and relate to the response and remedial costs the Town has incurred in addressing contamination caused by [the Debtors]." Ex. 4 at US 00481.

Onondaga County and the Town of Salina have not expressed any rationale or pointed to

any authority in support of their request that the Settlement Agreements' terms recognizing that

contribution protection was extended "as may be otherwise permitted by law" be struck. The

Government is not aware of any circumstance that would require that contribution protection in

this case be limited beyond what is otherwise permitted by law. Indeed, this language is standard

language in the Government's CERCLA settlements, *see, e.g.*, RACER Settlement Agreement,

and is intended to capture specific state law provisions relating to contribution protection, such

as provisions under New York law. In any event, because Onondaga County and the Town of

Salina have provided no rationale for their request that this language be struck, the Government

has no basis for departing from its common practice for purposes of the Settlement Agreements.

Onondaga County and the Town of Salina have also requested that language in the Lower

Ley Creek Settlement Agreement extending contribution protection to "claims related to releases

of hazardous substances from any portion of the Lower Ley Creek Site and all areas affected by

migration of hazardous substances emanating from the Lower Ley Creek Site" be struck because

this language could be misconstrued as extinguishing all claims relating to the Onondaga Lake

Bottom Subsite. *Id.*; *see also* Ex. 3 at US 00494. This concern is misplaced, as is demonstrated

by the simultaneously filed Onondaga Settlement Agreement, which separately settles EPA's

claims at the Onondaga Lake Bottom Subsite and exempts from that Agreement's contribution

protection provision claims relating to the Onondaga Lake Bottom Subsite made by Honeywell.

*See* Ex. 2. The commenters also argue that this language would extinguish any separate claims

by NYSDEC with respect to the Onondaga Lake Bottom Subsite, but this argument ignores the

fact that NYSDEC has submitted no claim in connection with that Subsite. In any event, as the

Onondaga Settlement Agreement settles only EPA's claims for unreimbursed past and future

oversight costs incurred at the Onondaga Lake Bottom Subsite, the "matters addressed" by the

Onondaga Settlement Agreement do not include, and the contribution protection it provides therefore does not extend to, unreimbursed past and future response costs relating to the Onondaga Lake Bottom and Salina Landfill Subsites other than EPA's oversight costs.[7] Onondaga County and the Town of Salina's comments, therefore, do not warrant any changes to the contribution protection provisions of the Lower Ley Creek Settlement Agreement.

The Town of Salina similarly misconstrues the extent of the contribution protection extended by the Settlement Agreements in requesting the addition of specific language carving out its claims relating to response and remedial costs the Town already incurred. Both Settlement Agreements expressly limit the contribution protection provided and do not extend it to "claims against the Debtors or the GUC Trust for past response costs incurred by potentially responsible parties prior to the date of lodging this Settlement Agreement with the Bankruptcy Court." Ex. 1 ¶ 22; Ex. 2 ¶ 22. Moreover, because the Onondaga Settlement Agreement addresses only EPA's unreimbursed past and future oversight costs incurred at the Salina Landfill and Onondaga Lake Bottom Subsites, contribution protection at those subsites does not extend to other future response costs – including cleanup costs – for which NYSDEC and other PRPs or, in the case of the Onondaga Lake Bottom Subsite, Honeywell, have submitted claims. The Town of Salina's concerns, therefore, are already addressed by the specific language of the Settlement Agreements, and no further changes to those Agreements are warranted.

     5.     <u>The Other Comments Similarly Do Not Indicate That the Settlement Agreements Are Unreasonable, Unfair or Contrary to CERCLA</u>

In addition to the comments addressed above, Onondaga County and the Town of Salina also submitted several questions regarding the terms of the Settlement Agreements. First, they

---

[7]     For the sake of clarity, the Government contends that the Lower Ley Creek Settlement Agreements' contribution protection language does not bar claims against the Debtors relating to the Onondaga Lake Bottom Subsite.

request confirmation whether the Lower Ley Creek Subsite includes "that portion of Ley Creek

that was abandoned and filled in the early1970s, the banks of the Creek including any dredged

spoils, and the historic floodplain of the Creek. . . ." Ex.3 at US 00493. The Government

confirms that these areas are included in the Lower Ley Creek Settlement Agreement's definition

of the Lower Ley Creek Subsite.

Next, Onondaga County and the Town of Salina seek information as to what portion of

the Lower Ley Creek Settlement Agreement's recovery is being allocated to past and future

oversight costs. *Id*. Although the Tames Declaration describes the unreimbursed past oversight

cost and estimated future oversight costs that were used to arrive at the Lower Ley Creek

Subsite's settlement amount, actual allocation of the settlement recoveries to EPA's oversight

costs will depend on the amount of oversight costs that are in fact incurred over time, rather than

the amount estimated to be incurred for purposes of arriving at a settlement amount. This

question, therefore, cannot be answered at this time.[8]

The Town of Salina also asks why EPA did not pursue costs it incurred in connection

with the Settled Subsites during the pendency of these bankruptcy proceedings as administrative

claims. Ex. 4 at US 00482. The Town of Salina, however, identify no legal basis for treating

any portion of EPA's past costs as administrative claims, nor is the Government aware of any

such basis under the facts presented here. Moreover, the Town of Salina have not put forward

any rationale that would allow these non-owned site to be settled in a manner that differs from

the treatment provided to similarly situated non-owned sites that EPA has settled in this

bankruptcy proceeding in the past. In any event, the deadline for submitting administrative

claims in this bankruptcy proceeding has long expired and treating any portion of EPA's past

---

[8]     In any event, EPA expects to make the full amount of its recovery from the Lower Ley
Creek Settlement available for future responses costs at that Subsite.

costs as administrative expenses is, therefore, simply not possible.

Onondaga County and the Town of Salina further request information on whether EPA is waiving its claims under the Resource Conservation and Recovery Act ("**RCRA**"), 42 U.S.C. §§ 6901–6992.  Ex. 3 at US 00493.  The Government notes, however, that EPA did not assert any obligations under RCRA against the Debtors in connection with the Settled Subsites, nor is it aware of any such RCRA obligations EPA could otherwise assert – and therefore could have waived – against the Debtors at these sites.

Next, Onondaga County and the Town of Salina request information regarding the legal and factual basis for New York's recovery under the Lower Ley Creek Settlement Agreement. *Id*.  The Government respectfully refers the commenters to NYSDEC in connection with this request, but notes that NYSDEC has not itself submitted the Lower Ley Creek Settlement Agreement for public comment.

Finally, Onondaga County and the Town of Salina object to the fact that the Settlement Agreements' definition of the parties bound by the Agreements do not include the PRPs, because the Agreements "certainly appl[y] to and both benefit[] and penalize[] all other Creditors who are also potentially responsible parties by, for example, reducing potential liability by the dollars recovered by the United States, but simultaneously increasing the orphan share."  *Id*. at US 00494-95.  At the same time, the Town of Salina requests that language be added to the Settlement Agreements to establish that the future response cost estimates the settlement amounts are based on are not binding on the Town or other PRPs, and that the Settlement Agreements are therefore "without prejudice to the Town of Salina and other potentially responsible parties to dispute the amounts and allocation of environmental liabilities in any future litigation or proceedings, . . .  whether in these bankruptcy cases or in any other

appropriate forum." Ex. 4 at US 00480 and US 00482.  The Government notes that these two

comments are internally inconsistent.  Moreover, although the other PRPs at the Settled Subsites,

as well as the public at large, are certainly affected by the Settlement Agreements, since they

have not executed those Agreements they are not – and cannot be – bound by their terms.  The

remaining PRPs' liabilities in connection with the Settled Subsites will be based on the

information available at the time their liabilities are settled or on the actual response costs

incurred at the sites, rather than the estimates used to arrive at the settlement amounts negotiated

to resolve the Debtors' environmental liabilities in the context of this bankruptcy proceeding.

Accordingly, the Settlement Agreements accurately reflect that the remaining PRPs are not

bound by the Agreements' terms, and for the same reason no additional language is required to

establish that same point.

## CONCLUSION

For the reasons stated above, the Court should approve and enter the proposed Lower Ley

Creek Settlement Agreement and Onondaga Settlement Agreement.


Dated:    New York, New York
          June 13, 2012

                                   PREET BHARARA
                                   United States Attorney for the
                                   Southern District of New York
                                   Attorney for the United States of America


                          By:    _____/s/ Natalie N. Kuehler_____
                                   NATALIE N. KUEHLER
                                   DAVID S. JONES
                                   Assistant United States Attorneys
                                   86 Chambers Street, 3rd Floor
                                   New York, New York  10007
                                   Telephone: (212) 637-2741
                                   Facsimile: (212) 637-2750
                                   Email: natalie.kuehler@usdoj.gov

ALAN S. TENENBAUM
National Bankruptcy Coordinator
PATRICK CASEY
Senior Counsel
Environment and Natural Resources Division
Environmental Enforcement Section
U.S. Department of Justice

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| MOTORS LIQUIDATION COMPANY *et al.*, | ) | Case No. 09-50026 (REG) |
| | ) | |
| f/k/a/ GENERAL MOTORS CORP. *et al.*, | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |

**ORDER APPROVING THE LOWER LEY CREEK AND**
**ONONDAGA NON-OWNED SITE ENVIRONMENTAL SETTLEMENT**
**AGREEMENTS AND ENTERING THE STIPULATION AND AGREED ORDER**
**BETWEEN THE GUC TRUST AND THE UNITED STATES OF AMERICA**

Upon the Motion (the "**Approval Motion**")[1] of the United States of America (the

"**United States**") for entry of an order approving (i) Lower Ley Creek Non-Owned Site Consent

Decree and Settlement Agreement (the "**Lower Ley Creek Settlement Agreement**"), and (ii)

the Onondaga Other Non-Owned Site Consent Decree and Settlement Agreement (the

"**Onondaga Settlement Agreement**") (collectively, the "**Settlement Agreements**"); and it

appearing that the relief requested is in the best interests of Debtors' estates, its creditors and

other parties in interest; and the Court having jurisdiction to consider the Approval Motion and

the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the

Approval Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C.

§ 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and

after lodging of the Settlement Agreements with this Court on April 30, 2012, and publication of

the Settlement Agreement in the *Federal Register* for public comment; and notice of the

---

[1]     Capitalized terms used but not otherwise defined herein shall have the meanings set forth
in the Approval Motion.

Approval Motion having been filed by the United States on June 13, 2012; and the Court having reviewed the United States' memorandum of law in support of the Approval Motion; and the Court having determined that the legal and factual bases set forth in the Approval Motion establish just cause for the relief granted herein; and upon all of the proceedings before the Court and after due deliberation and sufficient cause appearing therefore, it is hereby

1.    **ORDERED** that the Approval Motion is granted;

2.    **ORDERED** that the Lower Ley Creek Site Settlement Agreement (Docket No. 11655) is hereby amended in paragraph 4 to reflect a joint Allowed General Unsecured Claim for the United States, on behalf of EPA, and the State of New York, on behalf of NYSDEC, in the amount of $39,203,434, and approved as fair, reasonable and consistent with environmental law;

3.    **ORDERED** that the Onondaga Settlement Agreement (Docket No. 11657) is hereby approved as fair, reasonable and consistent with environmental law;

4.    **ORDERED** that the Stipulation and Agreed Order between the GUC Trust and the United States of America (Docket No. 11656) is hereby entered;

5.    **ORDERED** that the parties to the Settlement Agreements are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order;

6.    **ORDERED** that the terms and conditions of this Order shall be immediately effective and enforceable upon its entry; and

7.    **ORDERED** that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

New York, New York
Date:  June _____, 2012                    _____
                                               United States Bankruptcy Judge

2