COUNTY OF ONONDAGA



JOANNE M. MAHONEY
*County Executive*

**DEPARTMENT OF LAW**

*John H. Mulroy Civic Center, 10th Floor*
*421 Montgomery Street*
*Syracuse, New York 13202*
*(315) 435-2170 • Fax (315) 435-5729*
*www.ongov.net*

GORDON J. CUFFY
*County Attorney*

June 4, 2012

<u>Via E-Mail and U.S. Mail</u>

Ignacia S. Moreno, Esq.
Assistant Attorney General
Environment and Natural Resources Division
P.O. Box 7611
U. S. Department of Justice
Washington, D.C.  20044-7611

Re: *In re Motors Liquidation Corp., et al.*, D.J. Ref. 90-11-3-09754

Onondaga County, New York Comments on Proposed
Non-Owned Sites Settlement Agreements:
 (1) Lower Ley Creek; and
 (2) Onondaga Non-Owned Sites:
  (a) Onondaga Lake Bottom,
  (b) Salina Landfill,
  (c) Inland Fisher Guide Facility, and
  (d) PCB Dredgings Area

Assistant Attorney General Moreno:

Onondaga County submits these comments in response to the proposed Non-Owned Sites Lower Ley Creek and Onondaga Non-Owned Sites Consent Decrees and CERCLA Settlement Agreements (the "Settlement Agreements") that were separately lodged with the United States Bankruptcy Court for the Southern District of New York on April 30, 2001 and thereafter, separately noticed in the Federal Register on Monday, May 7, 2012.

The Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 6901, *et seq.*, was enacted in 1980 to address the "serious environmental and health risks posed by industrial pollution." *Burlington Northern & Santa Fe Ry. Co. v. United States,* 556 U.S. 599, 129 S.Ct. 1870, 1874, 173 L.Ed.2d 812 (2009). Its purpose is to "promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts [are] *borne by those responsible for the contamination.*" *Id.* (emphasis added)(quotation marks omitted). As detailed below, the proposed Consent Decrees and Settlement Agreements fail to provide even an estimate of the total cost of cleanup or the settling parties' comparative fault and thus, it is not

1

US 00485

possible to determine if the proposed settlements satisfy the purposes of CERCLA. If that deficiency is not corrected, Onondaga County will be obligated, by the public interest, to file an objection to the proposed settlements with the Bankruptcy Court.

The deficiencies noted above are compounded by the settlement's extinguishment of Onondaga County's and other creditors' right to seek additional costs from the Debtor while concurrently, as the result of paragraph 11, potentially forcing the burden of a large orphan share on the County and all other potentially responsible parties or potentially a cost recovery action initiated by the MLC GUC Trust.

Given the above concerns and others enumerated below, the County requests that the Department disclose the information that is necessary to afford a reviewing court, the public, and Onondaga County the ability to meaningfully determine if the proposed settlements should be approved.

## I. **Background**

The most recent investigation and studies of the Debtor's Salina, NY facility and its historical manufacturing processes indicate the Debtor released as much as 23,700 pounds or more of polychlorinated biphenyls (PCBs) into Ley Creek and its environs. Given the magnitude of PCB contamination detected in Ley Creek and its environs in conjunction with what is known about the Debtor's industrial processes, the Debtor's grossly negligent, if not criminal, management and handling of PCBs and PCB wastes, all of which was recently confirmed for the County by eyewitness reports, and available photographic evidence, the Debtor was, and is, the only possible source of the subject contamination.

The above conclusion is not a recent development. For approximately 40 years - from the 1950s through 1993 -- operations at the General Motors Corporation (GM) Inland Fisher Guide facility ("IFG" or the "Debtor") resulted in continuous large-scale discharges of PCBs into Ley Creek and its environs. Indeed, from 1977, when the use of PCBs was outlawed, through 1981, the Debtor was cited by the New York State Department of Environmental Conservation ("NYSDEC") on six separate occasions for oil spills that were described as including heavy sheens of oil that covered 100% of the Creek. Since that time regulators have battled with the Debtor for over 40 additional years in an effort to secure a full and complete response by the Debtor to the gross contamination it caused.

On August 12, 1985 the Debtor entered into a consent order with the NYSDEC (Case #7-0383) to (a) address the ongoing discharge to Ley Creek of the Debtor's wastewaters contaminated with, among other pollutants, PCBs; and (b) limit any such future discharges.

Following multiple investigations and NYSDEC orders, in 1997 the NYSDEC concluded, and the Debtor executed an Order on Consent that stated:

> The confirmed presence of these hazardous substances at GM's facility
> and the proximity of such substances and discharge of PCBs to Ley Creek
> establishes that the hazardous substance contamination at the GM facility

US 00486

represents a release or threat of release of hazardous substances to the Onondaga Lake NPL Site pursuant to 104 and 107 of CERCLA. GM's facility is a subsite of the Onondaga Lake NPL site.

*See* "Exhibit A" (NYSDEC Order on Consent, Index # D-7-0001-97-06, September 17, 1997) at paragraph 33A. Onondaga Lake is located approximately 4 miles downstream of the IFG site at the mouth of Ley Creek. The Order on Consent stated "[GM] is responsible for developing and implementing a Remedial Investigation/Feasibility Study (RI/FS) for the Site that is consistent with CERCLA, the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. Part 300, as amended (NCP), and all other applicable State and Federal laws." *Id.* at ¶33D.

Given the stated conclusion that the Debtor's facility was a subsite of the Onondaga Lake NPL Site, the only possible outcome from the ordered RI/FS would be an obligation by the Debtor to iteratively continue the RI/FS process the entire length of the 4-mile course of the Creek from the IFG facility to the Lake. Indeed, the Debtors' refusal to commence the Lower Ley Creek investigation was not the result of a denial of responsibility, but rather a refusal to undertake the project given the size and scope and cost of the required investigation and likely resulting response[1].

Subsequent sampling confirmed the presence of PCBs in, at and about the so-called Lower Ley Creek Site (i.e., Ley Creek downstream of the Route 11 Bridge). EPA's July 22, 2010 Onondaga Lake NPL Subsite Evaluation for Lower Ley Creek states: "[T]he majority of the contamination in Lower Ley Creek sediment has come from various sources and/or facilities upstream and on Ley Creek, including the former General Motors Corporation – Inland Fisher Guide Facility." Of note, the evaluation failed to identify any such alleged source other than the Debtor's facility.

---

[1] Letter from Barry R. Kogut, Counsel for Debtors, to  Assistant Regional Attorney Margaret A. Sheen, ESQ, Dated March 9, 2009:

> The Department is insisting that the Study Area include the "flood plain of the main channel of Ley Creek running underneath and downstream of the Route 11 bridge," which you advised in your February 23 letter is interpreted by the Department as the "FEMA 100 year flood plain." This defined flood plain area is very extensive with potentially many owners, and if GM were required to contact all of these owners, it would highlight GM's position as a potentially responsible party for not only any contamination detected throughout this industrial/commercial corridor area, but with historical discharges from Ley Creek into Onondaga Lake.
>
> Given GM's economic challenges that have only intensified over the past several months, GM cannot agree to take on expenditures of any significance unless it concludes that it can do the work in the most efficient and productive manner consistent with its position on responsibility for environmental conditions in the areas at issue. This review is an obligation that GM owes not only to its immediate stakeholders (that is, its employees, shareholders, etc.), but to the federal government with whom it is engaged in ongoing discussions on needed financial assistance. As noted, for the reasons stated, GM has concluded after thoughtful analysis that it cannot go forward with the proposed Order.

3

US 00487

Contemporaneous with the above events, NYSDEC listed Old Ley Creek, which also is located downstream of the Route 11 Bridge, in the State Registry of Inactive Hazardous Waste Disposal Sites due to PCB contamination originating from the Debtor's facility.

As noted above, given the magnitude of PCBs detected in Ley Creek and its environs, the Debtor was, and is, the only possible source of the subject contamination. The United States confirmed its agreement with that conclusion in its February 18, 2011, United States Statement in Support of Environmental Provisions of Debtor's Plan of Liquidation, at 12-13 ("the contamination [of Upper Ley Creek] stems from the adjacent currently or formerly Debtor-owned properties . . . and Debtors are essentially the sole PRPs in connection with the hazardous substances at issue").

## II. The Proposed Consent Decrees and Settlement Agreements

The proposed Lower Ley Creek Consent Decree and Settlement Agreement would grant the United States an allowed general unsecured claim in the sum of $38,344,177, and the State of New York an allowed general unsecured claim in the sum of $859,257. In return, the proposed agreement would be in full settlement and satisfaction of both the Second U.S. Proof of Claim and the State of New York Proof of Claim as they relate to the Lower Ley Creek Site. *See* Notice of Lodging of Proposed Settlement Agreement, April 30, 2012.

The proposed Onondaga Non-Owned Sites Settlement would grant the United States an allowed general unsecured claim for oversight costs in the sum of $896,566, allocated by subsite as follows: Onondaga Lake Bottom - $438,448; Salina Landfill - $113,248; IFG Facility - $234,475; and the PCB Dredgings Area - $110,395. In return, the proposed agreement would be in full settlement and satisfaction of the Second U.S. Proof of Claim as it relates to the four specified Onondaga Lake subsites. *See* Notice of Lodging of Proposed Settlement Agreement, April 30, 2012.

## III.    The Proposed Lower Ley Creek Settlement is not Proper, is not Adequate and is not Appropriate

Prior to approval, the proposed Lower Ley Creek Consent Decree and Settlement Agreement must be reviewed by the court to determine "if it is fair, reasonable, and faithful to the objectives of CERCLA." *See United States v. General Elec. Co.*, 460 F. Supp.2d 395, 401 (N.D.N.Y. 2006) (citations omitted) (internal quotation marks omitted). A prime objective of CERCLA is "to impose liability on responsible parties." *Id.* The fairness inquiry concerns both procedural and substantive fairness; the reasonableness inquiry addresses both technical considerations and such matters as "whether a settlement that does not fully compensate for costs is nonetheless a cost-effective alternative to litigation that will conserve public and private resources." *Id.*

US 00488

The United States has refused to allow Onondaga County, which the United States has named as a potentially responsible party for these sites[2], to participate in the negotiations with the Debtor. The United States also has declined to inform the County during or at the conclusion of the negotiations of the factors and bases for the proposed settlement. Given the absence of any such disclosures in the body of the proposed Consent Decree or the Federal Register notice, the United States has failed to substantiate that the proposed settlement is proper, appropriate, adequate, and in the public interest. That being the case, Onondaga County has no basis by which it can determine if the proposed settlement is proper, appropriate, adequate, and in the public interest.

By way of example, at a time when representatives of the United States did not understand either the geography or all the locations potentially contaminated by the Debtors' PCB releases, the United States instructed that $70 million dollars or more of the Debtors' remaining assets be set aside and held in a distribution reserve in contemplation of a future Lower Ley Creek settlement. Following the County and others providing the United States and the State of New York with additional or new information, data and analysis, all of which, the County submits, confirms the State of New York's and the Debtors' pre-bankruptcy assessment as to the magnitude and potential cost of the required remedy, the United States and the State of New York propose a combined $39.2 million settlement. While Onondaga County understands that a set aside does not establish the floor or even the basis for a settlement and very much appreciates that a portion of the proposed settlement *may* be funded, in part, by a potential dollar-for-dollar offset in the sum of $17,305,000, neither the County nor the Court have any substantiated basis by which they can judge the adequacy, appropriateness and fairness of a proposed settlement that seeks to shift a potentially large orphan share to Creditors with, at best, *de minimis* responsibility. The County submits that rather than promoting settlement and an expeditious clean up, the manner in which the settlement has been reached creates the potential to maximize future litigation over liability and divisibility issues. The United States is in the best position to assure the Court and all Creditors that the proposed settlement is, under the circumstances, fair, reasonable, consistent with governing law, and in the public interest and it is imperative that it do so.

Onondaga County fully anticipates the United States will file with the court a statement of support for the proposed settlement. Frankly, the United States' prior filings in support of the now multiple environmental settlements in this matter have consisted of statutory incantations and unsubstantiated generalities lacking any meaningful factual support. If the United States expects or seeks to gain the support of Onondaga County (and others) for this proposed settlement, it is essential to divulge details that will allow those parties to independently evaluate the proposed settlement. *See e.g., In re ASARCO, LLC, et al.*, Debtors, No. 05-21207, United States' Brief in Support of Debtors' Motion Under Bankruptcy Rule 9019 for Order Approving Settlement of Environmental Claims and Notice of Response to Public Comments (May 15, 2009), 2009 WL 1402382 (Bkrtcy. S.D.Tex.).

The factors by which a Court must determine whether a proposed settlement pursuant to

---

[2] Other than the Debtor, neither Onondaga County nor any of the other alleged PRPs have been found liable for any response costs and the submission of these comments in no way acts as a waiver of any defenses - factual or legal - that the County may have in response to the EPA's allegation.

US 00489

CERCLA is fair, reasonable, consistent with the statutory purposes and thus in the public interest constitute a legal metric against which a Court must gage how a settlement was arrived at, the underlying facts that the parties have considered in weighing the benefits of the settlement against the risk of protracted litigation and the impact of the proposed settlement on non-settling parties, or more apt in this case, against parties who have not been accorded an opportunity to participate in the settlement process notwithstanding requests to participate. Only then is a reviewing court in the best position to ascertain that the Consent Decree before it is substantively fair. *See e.g., United States v. George A. Whiting Paper Co.*, 644 F.3d. 368, 372 (7th Cir. 2011) (citations omitted) ("A consent decree is substantively fair if its terms are based on comparative fault.").

Onondaga County fully comprehends that "[t]he Court's review of the Consent Decree is a limited one, and the Consent Decree must be enforced if it is reasonable, fair and consistent with CERCLA's goals. *United States v. McGraw-Edison Co.*, 718 F.Supp. 154, 158 (W.D.N.Y. 1989); *State of New York v. Town of Oyster Bay*, 696 F.Supp. 841, 843 (E.D.N.Y. 1988). While the Court cannot act as a "rubber stamp" for the Consent Decree, the Court cannot review the proposed settlement *de novo. United States v. Cannons Engineering Corp.*, 899 F.2d 79, 84 (1st Cir. 1990); *See also City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974). The Court's task "is to determine whether the settlement represents a reasonable compromise, all the while bearing in mind the law's generally favorable disposition toward the voluntary settlement of litigation and CERCLA's specific preference for such resolutions." *United States v. Rohm & Haas Co.*, 721 F.Supp. 666, 680-681 (D.N.J. 1989); *see also United States v. Town of Moreau, New York*, 751 F. Supp. 1044, 1050 (N.D.N.Y. 1990) (vacating a CECLA consent decree). Lastly, the proposed consent decree must be "in the public interest." 42 U.S.C. § 9622(a); *In Re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 206 (3d Cir. 2003).

"Notwithstanding this 'swaddling,' there is a fundamental difference in the review of the sufficiency of evidence to support a settlement and the situation where there is no evidence at all on an important point." *United States v. Montrose Chemical Corp. of California*, 50 F.3d 741, 746 (9th Cir. 1995). "With no evidence of the governments' estimate-preliminary or otherwise-of total . . . damages . . . the fairness or reasonableness of a . . . settlement simply cannot be measured." *Id.* at 747. Thus, the United States, through the public comment process pursuant to Section 122 of CERCLA has an opportunity, indeed, a statutory responsibility to fully disclose to the public and, ultimately, to the Court, sufficient information to permit both the impacted public and the Court to gauge whether under all the circumstances the settlement as proposed, or with suggested modifications, satisfies all applicable legal requirements.

The questions Onondaga County does have and the Court should have are many. By way of example: In reaching the proposed settlement, what did the United States submit was the presumed extent of the subject contamination? What was the Debtors' response? What was the United States' presumed remedy? Did the Debtor agree? How was the cost of the presumed remedy calculated? Did the parties utilize ASTM Standard E-210736, The Standard Guide for Estimating Monetary Costs and Liabilities for Environmental Matters? If not, what methodology was used? Did the United States appropriately contend the Debtor was jointly and severally liable for the entire estimated response cost? What was the Debtors' response and how were the competing positions reconciled? Did the Debtors attempt to establish or convince the United States that (a) the environmental injury at and about Lower Ley creek is in fact capable of

6

divisibility; and (b) a reasonable basis for such apportionment? What factors led the United States to reach the proposed settlement? Equally important, what factors did the Debtor use to contest the contentions of the United States or argue for the alleged liability of other alleged potentially responsible parties? For example, there are numerous factual and historical errors in past statements and historical documentation regarding this Site both by the United States and the Debtor or its agents (e.g., who did what, when and where). Was this settlement reached based on a corrected and more accurate record? Does it reflect the most recent analyses which establish the Debtor as the only possible source of PCBs that could result in the scope and magnitude of contamination in Ley Creek?

In addition to the above, does the settlement take into account the potential of the United States to secure contribution from other responsible parties given the potential for divisibility, the defenses of those parties and the United States' litigation risks in those matters?

Lastly, what role did the United States' status as a potentially responsible party play in the final negotiated settlement?

Also to be considered is the United States' history at this Site. The evidence here is undisputed. Vast quantities of PCBs were released (and continue to be released on a smaller scale) into Ley Creek from the Debtor's properties and are thereafter transported the length of Ley Creek and into Onondaga Lake as evidenced by the proposed Onondaga Non-Owned Sites Settlement Agreement. Despite that undisputed and irrefutable reality, in negotiating, securing and advocating for the funding of the previously established MLC Environmental Response Trust, the United States exercised its enforcement discretion and knowingly elected not to require the Debtor to fund the necessary response to Lower Ley Creek. The United States determined, contrary to CERCLA and RCRA, that it would define or agree to define the subject site as only "the property extending from the facility property boundaries to the Route 11 Bridge."[3]

The decision to fund only a portion of the Ley Creek discharge was in conflict with (1) the Government's public statements lauding the settlement (i.e., "This settlement holds accountable those responsible for contaminating certain properties and ensures they help transform those communities by supporting the necessary cleanup." Statement of Acting Deputy Attorney General Grindler; Department of Justice Press Release, October 20, 2010), (2) the stated objective found in the text of the proposed Trust Agreement (i.e., "to conduct, manage and/or fund Environmental Actions with respect to the Properties or migration of Hazardous Substances emanating from certain of the Properties in accordance with the provisions of this Agreement")(see Proposed Environmental Response Trust Agreement, Article 2.3), and the underlying principles of CERCLA.

Although Onondaga County submits the Environmental Response Trust should be amended to include the full cost of the Lower Ley Creek response necessitated by the Debtor's actions, the County has no reason to believe that will occur. Nevertheless, the circumstances surrounding the creation of the Environmental Response Trust and the artificial creation of the

---

[3] Perhaps the United States was constrained as a result of the pre-determined sum of DIP funding allocated to respond to the Debtor's environmental issues.

7

US 00491

Lower Ley Creek subsite are    additional factors by which the proposed Lower Ley Creek settlement must be measured and the public interest and substantive fairness weighed.

Given the refusal to allow Onondaga County, and most, if not all of the other PRPs, to participate in the secret negotiations involving a PRP plaintiff and PRP defendant suggests an absence of any procedural fairness. And proposing a settlement that fails to provide any evidence as to how the settlement was reached makes the opportunity to provide public comments of almost no value.

A consent decree is substantively fair if its terms are based on comparative fault. *George A. Whiting Paper Co.,* 644 F.3d at 372; *Cannons Eng'g,* 899 F.2d at 87 ("a party should bear the cost of the harm for which it is legally responsible"). "[T]he proper way to gauge the adequacy of settlement amounts to be paid by settling PRPs is to compare the proportion of total projected costs to be paid by the settlors with the proportion of liability attributable to them, and then to factor into the equation any reasonable discounts for litigation risks, time savings, and the like that may be justified." *United States v. Charles George Trucking,* 34 F.3d 1081, 1087 (1st Cir. 1994).

> "Moreover, . . . the *nature* of the liability of the various defendants is of considerable relevance in determining whether the settlement is fair, reasonable and consistent with the public interest. For example, if joint and several liability does not apply to the natural resources damages, the governments' ability to collect the totality of remaining damages from the non-settling defendants certainly would have an impact on the settlement's merits."

*Montrose Chemical Corp.* at 747. Again, a settlement that is silent on all of the factors necessary to gauge substantive fairness is by definition unfair.

The evaluation of a consent decree's reasonableness is "a multifaceted exercise." *Cannons Eng'g,* 899 F.2d at 89. Factors relevant to the evaluation of a consent decree's reasonableness include its likely efficaciousness as a vehicle for cleansing the environment; the extent to which it satisfactorily compensates the public for actual and anticipated costs of remedial and response measures; the extent to which approval of it serves the public interest; and the availability and likelihood of alternatives to the consent decree. *Id.* at 89–90; *see also U.S. v. Fort James Operating Co.,* 313 F.Supp.2d 902, 910 (E.D.Wis. 2004); *BP Exploration & Oil,* 167 F.Supp.2d at 1053." *United States v. Western Remain Industrial, Inc.,* 2011 WL 2117006 (N.D. IN 2011). Again, there is no basis upon which to judge the reasonableness of the proposed settlement.

The County's objection is not that the Debtor should have been allocated 99% of the liability, but was only assessed 95% or 80% or some other precise percentage. Rather, the County's objection is that where the evidence undisputedly establishes that the Debtor released tons of PCBs and only a release of tons of PCBs could account for the contamination found in the Ley Creek watershed, the proposed Consent Decree must be rejected unless the record establishes that the settlement is based on an allocation that is supported by the available evidence.

US 00492

"The Court's review of the Consent Decree is limited to the . . . Record, * * * [and w]hile [that] review is limited to the Administrative Record, the Court cannot enter a Consent Decree based on an incomplete record". *Town of Moreau*, at 1051 (citations omitted). Here, there is no record by which this proposed settlement can be judged.

Should the United States elect not to disclose such information, the minimum required corrective action will be to request that the Court reform the proposed settlement in ways that protect the current and future interests of the County and all Creditors who were excluded from the process of negotiating its terms.

### IV. Additional Comments re the Proposed Lower Ley Creek Settlement

- "Lower Ley Creek Site" is defined in ¶1k of the proposed Settlement Agreement as follows: "the entire portion of Ley Creek from the Route 11 Bridge to the mouth of Ley Creek at Onondaga Lake, including Old Ley Creek Channel, a tributary of Ley Creek formed when Ley Creek was rerouted in the early 1970s. The Lower Ley Creek Site does not include the Onondaga Lake Bottom, Salina Landfill, Inland Fisher Guide and Deferred Media, and the PCB Dredgings subsites of the Onondaga Lake Superfund Site in New York.

  Does the defined and covered Site also include that portion of Ley Creek that was abandoned and filled in the early 1970s, the banks of the Creek including any dredged spoils, and the historic floodplain of the Creek or are those locations not the subject of this proposed Settlement? If not, have any such claims been reserved for future settlement or were they not preserved by the United States or the State of New York?

  Also, the County disputes the suggestion that Old Ley Creek was "formed" when the Creek was rerouted. Rather, what is known as Old Ley Creek is a portion of the original creekbed prior to the rerouting of that portion of the Creek that previously flowed in what is now the abandoned and filled portion of the original channel.

- What portion, if any, of the allowed claim is being allocated by the United States to past or future oversight costs? If past costs are included, do they include past costs incurred during the life of the bankruptcy? If yes, why was the reimbursement of such costs not pursued as administrative costs?

- What is the factual and legal basis for the allowed claim proposed to be afforded to the State of New York? What is the proposed use of such funds?

- Is any portion of that allowed claims being allocated to past or future oversight costs? Is the United States waiving its RCRA claims?

- Paragraph 22 regarding contribution protection reads as follows:

  > 22. The Parties agree, and by entering this Consent Decree and Settlement Agreement the Court finds, that this settlement constitutes a judicially-approved

US 00493

settlement for purposes of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and that the GUC Trust and the posteffective date Debtors are entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), **or as may be otherwise provided by law,** for "matters addressed" in this Consent Decree and Settlement Agreement. Subject to the last sentence of this Paragraph, the "matters addressed" in this Consent Decree and Settlement Agreement, as that phrase is used in Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), include, without limitation, claims by EPA, NYSDEC, or potentially responsible parties for response costs at or in connection with the Lower Ley Creek Site, **including claims related to releases of hazardous substances from any portion of the Lower Ley Creek Site and all areas affected by migration of hazardous substances emanating from the Lower Ley Creek Site.** The "matters addressed" in this Consent Decree and Settlement Agreement do not include claims against the Debtors or the GUC Trust for past response costs incurred by potentially responsible parties prior to the date of lodging this Consent Decree and Settlement Agreement with the Bankruptcy Court and included in proofs of claim filed in the Bankruptcy by potentially responsible parties with respect to the Lower Ley Creek Site, nor do such "matters addressed" include any claim for natural resource damages, assessment costs, or restoration costs filed by or on behalf of the United States Department of Interior, the United States National Oceanic and Atmospheric Administration, and/or the State of New York

Onondaga County objects to the first underlined phrase "or as may be otherwise provided by law". There is no basis for providing any such release and the phrase should be stricken.

Onondaga County objects to the second underlined phrase "including claims related to releases of hazardous substances from any portion of the Lower Ley Creek Site and all areas affected by migration of hazardous substances emanating from the Lower Ley Creek Site." Given the proposed Onondaga Non-Owned Sites Settlement, it is apparent that the Debtor is liable for releases that migrated from Lower Ley Creek into Onondaga Lake. The proposed language would terminate the claims of the United States, the State of New York, and Honeywell Corporation as well as every other potentially responsible party claim with respect to the Lake Bottom subsite. The language should be stricken.

- Lastly, the parties bound by the proposed Settlement are identified as follows:

    IV. PARTIES BOUND; SUCCESSION AND ASSIGNMENT
    3. This Consent Decree and Settlement Agreement applies to, is binding upon, and shall inure to the benefit of the United States, the State of New York, the Debtors' estates, the GUC Trust, their legal successors and assigns, and any trustee, examiner, or receiver appointed in the Bankruptcy.

In reality, that statement is not correct. The Settlement certainly applies to and both benefits and penalizes all other Creditors who are also potentially responsible parties by,

US 00494

for example, reducing potential liability by the dollars recovered by the United States, but simultaneously increasing the orphan share. While those impacts may be unavoidable given the statute, Onondaga County reserves its right to object to any of the factual bases and dispute any of the United States' or New York State's legal conclusions that may underlie this proposed settlement or otherwise be made in any future proceedings or actions involving Onondaga County.

### IV. Comments re the Proposed Onondaga Non-Owned Sites Settlement

Onondaga County submits each of the issues identified with respect to the proposed Lower Ley Creek settlement applies to the proposed Onondaga Non-Owned Sites settlement.

### V. Conclusion

Onondaga County is hopeful that its concerns will be addressed by the United States and would welcome the opportunity to meaningfully discuss and address its concerns with you and your staff prior to the United States filing a motion seeking entry of the proposed orders with the Bankruptcy Court.

I look forward to your granting us that opportunity and the benefit of a full and open discussion of the above issues with the United States, including both the Department of Justice and the Environmental Protection Agency.

Very truly yours,

Gordon J. Cuffy
County Attorney

cc:    The Honorable Charles E. Schumer
       The Honorable Kirsten Gillibrand
       The Honorable Ann Marie Buerkle
       Joanne Mahoney,
         Onondaga County Executive
       Matthew J. Millea
         Deputy Onondaga County Executive
       A.T. Rhoads, P.E.
         Commissioner, Onondaga County
         Dept. of Water Environment Protection
       Jeffrey Gilkar
         Luis A. Mendez,
         Senior Deputy County Attorney
         Kevin C. Murphy, Esq.

US 00495