**HEARING DATE AND TIME: July 19, 2012 at 9:45 a.m. (Eastern Time)**
**OBJECTION DEADLINE: June 29, 2012 at 5:00 p.m. (Eastern Time)**
**REPLY DEADLINE:  July 11, 2012 at 5:00 p.m. (Eastern Time)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY, *et al*., | : | Case No.: 09-50026 (REG) |
| f/k/a General Motors Corp., *et al*. | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

--------------------------------------------------------------- x

| | | |
|---|---|---|
| MOTORS LIQUIDATION COMPANY GUC TRUST, | : | |
| | : | |
| | : | |
| Plaintiff, | : | Adversary Proceeding |
| | : | Case No.: 12-09802 (REG) |
| v. | : | |
| | : | |
| APPALOOSA INVESTMENT LIMITED PARTNERSHIP, *et al.*, | : | |
| | : | |
| Defendants | : | |

--------------------------------------------------------------- x

## DECLARATION OF LAWRENCE S. BUONOMO IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT FILED BY GENERAL MOTORS LLC

I, Lawrence S. Buonomo, hereby declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct.

1.      I am employed by General Motors LLC ("New GM") as the Practice Area Manager and Global Process Leader -- Litigation for the General Motors Legal Staff.  Prior to joining New GM in July, 2009, I was an in-house attorney for General Motors Corporation (n/k/a Motors Liquidation Company) ("**Old GM**").  I submit this declaration in support of the *Motion for Summary Judgment* ("**SJ Motion**") being filed simultaneously herewith by New GM.  Unless otherwise stated herein, all of the information provided herein is based on:

(i)     my personal knowledge, having been intimately involved in (a) the negotiations and drafting of the Lock-Up Agreement (as defined herein), and (b) the negotiations and drafting of the Amended and Restated Master Sale and Purchase Agreement ("**MSPA**") (which details the assets and claims purchased by New GM from Old GM) and the Order dated July 5, 2009 ("**Sale Approval Order**")[1] which approved the sale of assets ("**363 Sale**") from Old GM to New GM;

(ii)    my personal knowledge derived from involvement in the internal deliberations and external communications of Old GM regarding restructuring options for its Canadian subsidiaries, including many of the discussions with the governments of the United States and Canada (the "**Governments**") regarding those options;

(iii)   my review of documents produced during discovery and the deposition transcripts in this contested matter; and/or

(iv)    my review of certain pleadings filed in the Old GM bankruptcy case, and other publicly available documents.[2]

---

[1]     A copy of the Sale Approval Order, which has annexed to it the MSPA (without exhibits or schedules) is contained in the Compendium of Exhibits as Exhibit "B."

[2]     The *Statement of Undisputed Material Facts Pursuant to Local Rule 7056-1 in Support of Motion for Summary Judgment filed by General Motors LLC*, filed simultaneously herewith, provides specific citations to deposition transcripts and documents to support statements made herein.

## <u>OVERVIEW</u>

2.      In 2009 through late May, Old GM's strong preference was to accomplish a restructuring without the necessity of a bankruptcy filing.  Old GM's strategy was based upon, among other elements, reducing debt through a consensual bond exchange offer.  A reasonably detailed description of this plan was set forth in the Viability Plan submitted to the United States Treasury on February 17, 2009, which is a publicly available document.[3]   Other elements of Old GM's efforts to avoid bankruptcy are summarized in the *Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rule 1007-2,* filed in this court on June 1, 2009 ("**Henderson Affidavit**").[4]

3.      After efforts to avoid bankruptcy failed, Old GM's restructuring plan was based on completing an expedited sale, pursuant to Section 363 of the Bankruptcy Code, of substantially all of its assets to New GM in exchange for an equity interest (stock and warrants) in New GM.

4.      The Governments funded the pre-bankruptcy operations of Old GM and its Canadian subsidiary.  They also created and funded New GM and its purchase of Old GM, and were initially the majority shareholders of New GM.  One important aspect of the 363 Sale was that New GM would acquire the equity interest of Old GM in General Motors of Canada Limited ("**GM Canada**") and continue to operate it as a viable and important component of the Canadian economy.  This was, of course, the Canadian Government's obvious and expressed reason for

---

[3]    A copy of the Viability Plan can be found at
       http://graphics8.nytimes.com/packages/pdf/business/20090217GMRestructuringPlan.pdf.

[4]    A copy of the Henderson Affidavit is contained in the Compendium of Exhibits as Exhibit "A."

participating in the transaction.  The Governments, and particularly the Canadian Government, expressed a preference to accomplish the 363 Sale without the necessity of filing a Canadian bankruptcy proceeding for GM Canada, provided that it could be accomplished at an acceptable cost.  Although there were discussions between Old GM and the Governments regarding the advantages and disadvantages of a Canadian bankruptcy filing, ultimately the determination of whether to fund an alternative approach and a determination of an acceptable cost was made by the Governments, as both the secured lenders to Old GM and GM Canada, and the sponsors of the 363 Purchaser pursuant to the 363 Sale.

5.       The following factors were identified by Old GM and discussed with the Governments as reasons to avoid filing a Canadian bankruptcy for GM Canada.  *First*, there would be a substantial loss of available NOLs (net operating losses) if GM Canada filed for bankruptcy.  *Second***,** there would be significant expenses (*e.g.*, professional fees) relating to a Canadian bankruptcy.  *Third***,** there was a serious concern that there would be a significant, negative, business impact on GM Canada if it filed for bankruptcy, which could spill over to other Canadian companies that did business with GM Canada.  And, ***fourth***, there was a serious concern raised that a GM Canada bankruptcy in Canada would necessitate a multi-country restructuring, thereby making the 363 Sale more complex, and potentially negatively impacting the timing and process relating to the contemplated Old GM restructuring in the United States.

6.       The United States Treasury Auto Task Force placed considerable emphasis on preserving the timing of the 363 Sale and, in fact, did not guaranty the continuation of Debtor-in-Possession financing in the event of delays.  Ultimately, the Governments agreed to pursue, as the primary option, taking steps that would support transferring GM Canada without the

necessity of a Canadian insolvency proceeding. At a meeting which took place in the middle of May 2009 at the United States Treasury in Washington, D.C., and attended by representatives of Old GM (including Ray Young, Old GM's CFO, and myself), GM Canada, the United States Treasury Auto Task Force and the Canadian Government, the Governments communicated that they were prepared, as the purchaser, to use assets (*i.e.*, cash) which otherwise would flow to New GM under the MSPA in order to avoid the necessity of a GM Canada bankruptcy filing. As an aside, most of the liquidity available to Old GM in May of 2009 was the direct or indirect proceeds of loans by the Governments. Under the pre-petition loan agreement between Old GM and the United States, the United States Treasury's consent was necessary for the cash expenditures required to be made in order to avoid a GM Canada bankruptcy filing.

7.      By the time of the meeting in Washington, D.C., Old GM, GM Canada and the Governments had identified three primary obstacles to avoiding a GM Canada bankruptcy filing. They were: (a) restructuring the arrangements with GM Canada's dealer network at an acceptable cost; (b) restructuring GM Canada's obligations to the Canadian Auto Workers and its members; and (c) restructuring the intercompany indebtedness owed by GM Canada to General Motors Nova Scotia Finance Company ("**Nova Scotia Finance**") based on the proceeds received by GM Canada from the 2003 notes ("**Notes**") issued by Nova Scotia Finance. Overcoming this last impediment required negotiating a settlement with the holders of the Notes ("**Noteholders**").

8.      During late April and then into May, 2009, Old GM and Nova Scotia Finance jointly solicited consents for a bond exchange, which included the Notes. While the bond exchange offer remained outstanding, it was judged inappropriate to have a dialogue with the

Noteholders regarding an alternative transaction.  By May 26, 2009, the bond exchange had failed.  Once that occurred, the GM entities had less than one week to negotiate a different transaction with the Noteholders.

9.      By May 26, 2009, efforts to resolve the dealer and union issues were sufficiently advanced that it was possible that the Noteholders issue would prove to be the last obstacle to restructuring GM Canada without a bankruptcy filing.  However, there was no assurance that an acceptable deal could be reached and implemented or that other unforeseen circumstances would not arise.  Accordingly, preparations were made to implement the contingency plan, which was a bankruptcy filing by GM Canada in Canada on June 1, 2009, simultaneously with the filing by Old GM in this Court. Timing was deemed critical.  The contingency plan provided for GM Canada to file for bankruptcy at the same time as Old GM, so that the 363 Sale process would run in two jurisdictions, in tandem.

10.     After the bond exchange was terminated, Old GM promptly sought to engage the Noteholders.   The objection to claims (as amended) (“**Claims Objection**”)[5] and adversary proceeding complaint (“**Complaint**”)[6] filed by the Motors Liquidation Company GUC Trust (“**GUC Trust**”)[7] incorrectly state that it was the Noteholders who raised the issue regarding the restructuring of the Notes at the last minute.  That is not correct.  In fact, the Noteholders had sought to engage Old GM and GM Canada for months, but were rebuffed while Old GM pursued the bond exchange for all bonds, including the Notes, which was the cornerstone of Old GM’s

---

[5]    A copy of the Claims Objection (as amended) is contained in the Compendium of Exhibits as Exhibit “D.”

[6]    A copy of the Complaint is contained in the Compendium of Exhibits as Exhibit “F.”

[7]    The Claims Objection was originally filed by the Official Committee of Unsecured Creditors of Motors Liquidation Company (“**Committee**”).

efforts to avoid the necessity of a bankruptcy filing.  Nor was the June 1, 2009 deadline in any

way attributable to the Noteholders.  The June 1 deadline was imposed by the Governments, as

announced by President Obama on or about March 30, 2009, and reflected among other things

that certain other substantial obligations were due on June 1, 2009.

11.     In the week before Old GM commenced its bankruptcy case, there were intensive

negotiations with the Noteholders which resulted in an agreement acceptable to Old GM and the

Governments ("**Lock-Up Agreement**").[8]  Although Old GM initially sought to negotiate a

complete settlement of all obligations arising from the Notes, this proved impossible.  However,

the Lock-Up Agreement did accomplish a settlement of the intercompany obligations between

GM Nova Scotia and GM Canada and resolved the Oppression Action (as defined below).

12.     The Lock-Up Agreement was consummated in the early morning hours of June 1,

2009, shortly before Old GM and certain of its affiliates ("**Debtors**") commenced their

bankruptcy cases. Signature pages were exchanged by the parties to the Lock-Up Agreement

before Old GM filed for bankruptcy.  Officials of the Canadian Government reviewed the full set

of signature pages before the Old GM bankruptcy and, at that time, approved cancellation of a

GM Canada bankruptcy filing.  The Lock-Up Agreement was signed with the approval of the

Governments.

13.     The purpose of the Lock-Up Agreement was to protect GM Canada and avoid a

GM Canada bankruptcy.    It is critical to New GM -- as the parent company of GM Canada --

that the releases contained in the Lock-Up Agreement benefitting GM Canada (that addressed

*over a billion dollars* in indebtedness) not be disturbed.  Any exposure to GM Canada will

---

[8]     A copy of the Lock-Up Agreement is contained in the Compendium of Exhibits as Exhibit "Q."

(i)     adversely impact the value of the New GM enterprise to the detriment and prejudice of all New GM stakeholders, including Old GM's unsecured creditors (the GUC Trust's own constituency) who received, and who will receive distributions of New GM stock; and

(ii)    result in post sale modification to the MSPA and impairment of assets purchased by New GM from Old GM approximately three years ago.

14.    The Claims Objection and the Complaint contain various statements that are the basis for many of the GUC Trust's arguments but which are contrary to the facts.  For example:

(a)    *Allegation:*  Certain funds loaned from Old GM to GM Canada prepetition were not repaid.  *See* Complaint, ¶¶ 8, 117.

*Undisputed Facts:*  The loan was repaid, and documents evidencing the repayment of this loan, ***in full with interest***, were provided to the GUC Trust in discovery prior to the filing of the Complaint.

(b)    *Allegation:*  The implication that the Consent Fee (as defined below) was paid by Old GM to the Noteholders.  Claims Objection, ¶¶ 3, 34, 40; Complaint ¶ 8.

*Undisputed Facts:* Old GM funded a loan to GM Canada prepetition with the approval of the Governments.  GM Canada repaid that loan prior to the closing of the 363 Sale.  GM Canada used the proceeds of that loan to settle an intercompany obligation owed by it to Nova Scotia Finance. It was, thus, GM Canada's funds -- not Old GM's -- that were paid to Nova Scotia Finance, who then paid the Consent Fee to the Noteholders.  The economic cost of this was incurred by the Governments and New GM. Under the MSPA, New GM bought all cash above the Wind-Down Amount (as herein defined) so, in essence, it was the purchaser under the MSPA (New GM, with the consent of the Governments) which allowed its cash to be used to solve the issues relating to the Noteholders.

(c)    *Allegation:*  Old GM was obligated to allow the Guarantee Claims and Deficiency Claim (each as defined below). Claims Objection, ¶ 4.

*Undisputed Facts:*   Old GM agreed to support the allowance of the Guarantee Claims and the Deficiency Claim "to the fullest extent permitted under applicable laws." Lock-Up Agreement, ¶ 6(a). Old GM clearly stated during the negotiations that it would not guaranty this result. Other parties in interest -- including the Committee and GUC Trust -- are free to object to these claims, as they have done.

(d)    *Allegation:*   Old GM incurred "a slew of obligations" pursuant to the Lock-Up Agreement.  Claims Objection, ¶ 34.

*Undisputed Facts:*  The only continuing obligations of Old GM (and now New GM) under the Lock-Up Agreement is to support the allowance of the Guarantee Claims and Deficiency Claims ("**Cooperation Provision**").[9]  Old GM did not compromise any claims it had against third parties, or pay an amount to settle claims against it.  What was "locked up" was the Noteholders voting on an Extraordinary Resolution related to Nova Scotia Finance's release of the intercompany claims owed to it by GM Canada.  What was settled was the Intercompany Loans owed by GM Canada to Nova Scotia Finance and the Oppression Action.

(e)    *Allegation:*   The Swap Claim was created by the Lock-Up Agreement and converted a claim owed to Old GM into a claim against Old GM.  Claims Objection. ¶ 38.

*Undisputed Facts:*  The Swap Claim, like substantially all the assets of Old GM, was transferred from Old GM to New GM pursuant to the MSPA, and not the Lock-Up Agreement.  In general, New GM bought all "in the money" swaps and other claims.

(f)    *Allegation:*   Old GM's creditors should have been notified that the Swap Claim was transferred from Old GM to New GM. Claims Objection, ¶ 39; Complaint, ¶ 143.

*Undisputed Facts:*   The provision transferring the Swap Claim to New GM was contained in the MSPA, which was reviewed by the Committee.

---

[9]    Since the Swap Transactions were acquired by New GM pursuant to the MSPA, the agreement to subordinate any recovery on the Swap Claim was essentially made by New GM, as Purchaser under the 363 Sale.

(g)    ***Allegation:***    "All of the transactions that were key to implementing the Lock-Up Agreement occurred post-petition." Claims Objection, ¶¶ 44, 59, 66.

***Undisputed Facts:***    This implies that the post-petition activity concerned Old GM.  It did not.  Actions done to implement the terms of the Lock-Up Agreement and the payment of the Consent Fee were performed by non-Debtors.  Old GM had no obligations under the Lock-Up Agreement other than the Cooperation Provision noted in (d) above, which were assumed by New GM.

(h)    ***Allegation:***    The Committee was not immediately notified of Old GM's intention to assume the Lock-Up Agreement and assign it to New GM.  Claims Objection, ¶ 48; Complaint ¶ 142.

***Undisputed Facts:***    This is true.  However, pursuant to the Assumption and Assignment Procedures (as defined below) reviewed and approved by the Committee, and authorized by the Court, the Committee was not entitled to notice of the assumption and assignment of the Lock-Up Agreement.  Pursuant to the MSPA, New GM was entitled to assume any and all relevant contractual rights (and corresponding obligations) of Old GM.  Moreover, as noted in (d) above, the only material significance for the assignment of the Lock-Up Agreement was that Old GM was relieved of its obligation under the Cooperation Provision and that Cooperation obligation was assumed by New GM.

(i)    ***Allegation:***    The Lock-Up Agreement was a post-petition agreement.  Complaint, ¶¶ 4, 147.

***Undisputed Facts:***    The signature pages to the Lock-Up Agreement were exchanged and presented to Canadian Government representatives for inspection by all the parties prior to Old GM commencing its bankruptcy case.  At that time, all parties to the Lock-Up Agreement were bound to each other, and the Governments terminated the contingency plan of commencing a Canadian bankruptcy arrangement for GM Canada.  In any event, the Lock-Up Agreement was a Purchased Contract and an assigned executory contract under the MSPA.   In other words, New GM acquired the Lock-Up Agreement through provisions in the MSPA regardless of whether it was a prepetition agreement or not.  In all

events, Old GM was not damaged by the assignment of the Lock-Up Agreement to New GM. To the contrary, while the Noteholders' claims and the Nova Scotia Finance Trustee's claim remain Old GM liabilities, the Cooperation Provision of the Lock-Up Agreement, itself, is no longer an Old GM obligation.

15.    The Claims Objection, and to a lesser extent, the Complaint, also contain inaccuracies that are fatal to certain relief sought by the GUC Trust. For example, the GUC Trust is seeking to utilize certain "avoiding power" claims (based on Sections 547-550 of the Bankruptcy Code) and other assets that were sold to New GM pursuant to the MSPA. Accordingly, New GM is moving for summary judgment on the following issues:

(i)    The GUC Trust is not entitled to any Civil Rule 60(b) relief and the Sale Approval Order should not be disturbed or modified in any way;

(ii)    The GUC Trust cannot utilize any "avoiding powers" or Section 502(d) of the Bankruptcy Code to upset the Lock-Up Agreement or avoid the payment of the Consent Fee as all applicable avoiding power claims were sold to New GM;

(iii)    The Lock-Up Agreement was not an unauthorized post-petition settlement as it was either (a) a prepetition contract that constituted a Purchased Contract that was sold to New GM; (b) a prepetition contract that was validly assumed by Old GM and assigned to New GM; or (c) a post-petition contract that constituted a Purchased Contract that was sold to New GM;

(iv)    The GUC Trust cannot utilize any other asset or claim that was transferred to New GM as a basis for its Claims Objection and/or Complaint, including any claim based on an intercompany account or note receivable, an intercompany loan or any other intercompany obligation; and

(v)    The Swap Transactions were properly transferred to New GM pursuant to the 363 Sale.

## RELEVANT FACTS

A.    **Nova Scotia Finance**

16.    Nova Scotia Finance is a Nova Scotia unlimited liability company ("**ULC**"), and a wholly-owned direct subsidiary of Old GM (Nova Scotia Finance was not purchased by New GM as part of the 363 Sale).  On July 10, 2003, Nova Scotia Finance issued (a) £350,000,000 principal amount of 8.375% Guaranteed Notes due December 7, 2015 ("**2015 Notes**") and (b) £250,000,000 principal amount of 8.875% Guaranteed Notes due July 10, 2023 ("**2023 Notes**" and together with the 2015 Notes, the "**Notes**"), pursuant to the terms and conditions of that certain *Fiscal and Paying Agency Agreement*, dated as of July 10, 2003, between and among Nova Scotia Finance, Old GM, Deutsche Bank Luxembourg S.A., as fiscal agent, and Banque Général du Luxembourg S.A., as paying agent ("**Fiscal and Paying Agency Agreement**").  The Notes were guaranteed by Old GM pursuant to Section 5 of Schedule 1 to the Fiscal and Paying Agency Agreement ("**Guaranty**").[10]

17.    Upon issuance of the Notes, Nova Scotia Finance entered into two currency swap transactions with Old GM on July 10, 2003, whereby Old GM exchanged pounds sterling for Canadian dollars on such date. One swap transaction was related to the 2015 Notes, for £350,000,000/CDN$778,204,000, and would expire in 2015 (the "**2015 Swap**"). The other swap transaction was related to the 2023 Notes, for £250,000,000/CDN$555,860,000, and would expire in 2023 (the "**2023 Swap**," and together with the 2015 Swap, the "**Swap Transactions**").[11]  The purpose of the Swap Transactions was to hedge against risk created by

---

[10]    A copy of the Fiscal and Paying Agency Agreement is contained in the Compendium of Exhibits as Exhibit "G."

[11]    Copies of the International Swap Dealers Association, Inc. Master Agreement and Schedule, and Currency Swap Confirmations are contained in the Compendium of Exhibits as Exhibit "H."

the circumstance that the obligations of Nova Scotia Finance under the Notes was denominated in Great Britain Pounds, but the asset intended to cover that liability provided cash flows denominated in Canadian dollars.

18.     After issuance of the Notes, and the conversion of the proceeds from pounds sterling to Canadian dollars pursuant to the Swap Transactions, Nova Scotia Finance loaned the proceeds of the Notes to GM Canada pursuant to two loan agreements dated July 10, 2003.  One loan agreement provided that Nova Scotia Finance would loan GM Canada CDN$778,204,000, at an annual interest rate of 9.42%; the principal amount would be due and payable on December 7, 2015 ("**2015 Intercompany Loan**").  The second loan agreement provided that Nova Scotia Finance would loan GM Canada CDN$555,860,000 at an annual interest rate of 10.20%; the principal amount for this loan would be due and payable on July 10, 2023 (the "**2023 Intercompany Loan**," and together with the 2015 Intercompany Loan, the "**Intercompany Loans**").

**B.     GM Canada**

19.     Prior to the 363 Sale, GM Canada was a wholly owned subsidiary of Old GM. As noted, it was the expressed preference of the Governments to accomplish the Old GM restructuring without commencing a separate bankruptcy arrangement in Canada for GM Canada, provided critical liabilities could be resolved consensually on acceptable terms. Nonetheless, if a GM Canada bankruptcy was ultimately necessary because the Noteholders' negotiations were not finally consummated by June 1, 2009, GM Canada was prepared to and would have commenced a bankruptcy arrangement simultaneously with Old GM's bankruptcy case during the morning of June 1, 2009.

**C.**    **The Oppression Action**

20.    Beginning in January, 2009, certain of the Noteholders contacted Nova Scotia Finance to open up a dialogue about a possible restructuring of the Notes, and letters were exchanged.[12]   With no resolution on the Notes, certain of the Noteholders commenced an action in the Supreme Court of Nova Scotia on March 2, 2009 ("**Oppression Action**") asserting that various actions taken by Nova Scotia Finance, General Motors Nova Scotia Investments Ltd., Old GM and certain of their officers and directors were oppressive.[13]   Shortly after the commencement of the Oppression Action, the Noteholders reached out to Old GM, saying that they "were ready to talk"; no substantive discussions took place at that time.

**D.**    **The Bond Exchange Offer**

21.    On March 30, 2009, after rejecting the initial restructuring plan submitted by Old GM, the U.S. Government granted Old GM 60 days to "address the tough issues to improve the long-term viability of the company, including the restructuring of the financial obligations to the bondholders, unions and other stakeholders." *See* Press Release, General Motors Co., *GM Statement on Auto Industry Restructuring* (March 30, 2009) ("**March 30 Press Release**").[14]

22.    As part of Old GM's restructuring efforts, on April 27, 2009, both Old GM and Nova Scotia Finance jointly solicited all holders of their respective notes, aggregating approximately $27.2 billion, to exchange their notes for common stock ("**Bond Exchange**

---

[12]    Copies of a Letter from Blake, Cassels, & Graydon LLP, dated January 27, 2009, a Letter from McInnes Cooper, dated February 4, 2009, a Letter from Blake, Cassels, & Graydon LLP, dated February 10, 2009, and a Letter from McInnes Cooper, dated February 13, 2009, are collectively contained in the Compendium of Exhibits as Exhibit "L."

[13]    A copy of the Notice of Action filed in the Oppression Action is contained in the Compendium of Exhibits as Exhibit "M."

[14]    A copy of the March 30 Press Release is contained in the Compendium of Exhibits as Exhibit "O."

**Offer**").    The Bond Exchange Offer was detailed in a Form S-4 ("**Form S-4**") that was filed

with the Securities and Exchange Commission on April 27, 2009.[15]  The two indenture trustees

on the Committee -- Wilmington Trust Company and Law Debenture Trust Company of New

York -- were both provided with the Form S-4.  The Bond Exchange Offer expired on May 26,

2009.  Ultimately, the Bond Exchange Offer was not successful.

E.    **Negotiations with the Noteholders**

23.    As Nova Scotia Finance was a party to the Bond Exchange Offer and the Bond

Exchange Offer concerned, among other things, an exchange of the Notes, Old GM believed for

legal and other reasons that it could not begin negotiations with the Noteholders regarding the

Notes until the Bond Exchange Offer expired on Tuesday, May 26, 2009.  *See also* Deposition

Transcript of Lawrence S. Buonomo, dated April 18, 2012, at 25:12-26:6.[16]

24.    On the day after the Bond Exchange Offer expired, counsel for Old GM reached

out to counsel for the Noteholders to begin negotiations regarding the Notes.  Ultimately, the

issues relating to the Intercompany Loans and the Oppression Action were resolved as part of the

Lock-Up Agreement.

25.    The parties to the Lock-Up Agreement (including the undersigned on behalf of

Old GM and its subsidiaries) worked intensively, including through the night of May 31, 2009,

so that the Lock-Up Agreement could be executed in the early morning hours of Monday, June 1,

2009, before Old GM filed for bankruptcy.

---

[15]    A copy of the Form S-4 is contained in the Compendium of Exhibits as Exhibit "P."

[16]    Relevant portions of Mr. Buonomo's Deposition Transcript from April 18, 2012 are contained in the
Compendium of Exhibits as Exhibit "I."

26.     The Lock-Up Agreement was executed, and signature pages released between 6:00 a.m. and 7:15 a.m. on June 1, 2009 -- prior to Old GM's bankruptcy filing at 7:57 a.m. on June 1, 2009 ("**Petition Date**").

27.     The undersigned was in frequent contact with the Governments throughout this process.  Prior to terminating the contingency plan for a GM Canada bankruptcy filing, officials with the Canadian Government reviewed the signature pages of the Lock-Up Agreement to make sure that matters affecting GM Canada were agreed to.

28.     All parties considered that there was a final, binding agreement between Old GM and the Noteholders prior to the time of Old GM's bankruptcy filing.   As the Lock-Up Agreement was finalized and fully executed prior to Old GM's bankruptcy filing, a GM Canada bankruptcy filing was not necessary.

**F.      The $450 Million Loan**

29.     As Old GM recognized that it had to successfully resolve the issues surrounding the Intercompany Loans in order to avoid a GM Canada bankruptcy filing, it began formulating a strategy for the negotiations.  In this regard, Old GM knew that, if an agreement was reached with the Noteholders, some payment would have to be made to the Noteholders.  Ultimately, Old GM decided to loan $450 million ("**$450 Million Loan**") to GM Canada so that GM Canada had a source of funds in the event a settlement with the Noteholders was reached prior to June 1, 2009 (the anticipated bankruptcy filing date for Old GM).

30.     The $450 Million Loan was documented pursuant to a promissory note ("**Promissory Note**") and a trust agreement ("**Trust Agreement**"), both of which were executed

on May 29, 2009.[17]  The Promissory Note provided that the term of the $450 Million Loan was three years, at 5% interest beginning June 25, 2009.  Under the Trust Agreement, GM Canada was to use the funds for the specific purpose of settling the Intercompany Loans.  The funds that made up the $450 Million Loan were transferred from Old GM to GM Canada by wire transfer that was initiated and completed on Friday, May 29, 2009 -- three days before the Petition Date.  *See* TD Securities Wiring Details for May 29, 2009 ("**TD Wiring Details**").[18]

**G.    The $450 Million Loan was Repaid
       With Interest Prior to the Closing of the 363 Sale**

31.    Significantly for this matter, the $450 Million Loan was paid in full, with interest by GM Canada to Old GM prior to the closing of the 363 Sale.  Specifically, GM Canada made a $78,500,000 payment to Old GM on June 12, 2009.  *See* GM Receipt, dated June 12, 2009, for $78,500,000 ("**First Receipt**").[19]  An amended promissory note, dated June 12, 2009 ("**Amended Promissory Note**") was issued that day reflecting the reduced amount.[20]

32.    Thereafter, the balance of the $450 Million Loan (including all applicable interest) was repaid by GM Canada to Old GM on July 7, 2009.  *See* GM Receipt, dated July 7, 209, for $372,589,733.33 ("**Second Receipt**").[21]  Accordingly, when the 363 Sale closed on July 10, 2009, the entire $450 Million Loan was repaid, with interest, by GM Canada to Old GM.

---

[17]    Copies of the Promissory Note, dated as of May 29, 2009, and Trust Agreement, dated as of May 29, 2009, are collectively contained in the Compendium of Exhibits as Exhibit "Y."

[18]    Copies of the TD Wiring Details are contained in the Compendium of Exhibits as Exhibit "Z."

[19]    A copy of the First Receipt is contained in the Compendium of Exhibits as Exhibit "AA."

[20]    A copy of the Amended Promissory Note, dated as of June 12, 2009, is contained in the Compendium of Exhibits as Exhibit "BB."

[21]    A copy of the Second Receipt is contained in the Compendium of Exhibits as Exhibit "CC."

33.    Based on the foregoing, any allegation by the GUC Trust that Old GM paid the Consent Fee is wrong.   GM Canada -- and not Old GM -- paid for the release of the Intercompany Loans, and Nova Scotia Finance used the payment made by GM Canada to pay the Consent Fee to the Noteholders.

**H.    The Lock-Up Agreement**

34.    While the Lock-Up Agreement was executed by Old GM, as an economic matter, it was essentially an agreement between non-Debtor parties.   The primary parties to the Lock-Up Agreement were (i) GM Canada -- a non-Debtor; (ii) Nova Scotia Finance -- a non-Debtor; and (iii) the Noteholders.

35.    Old GM had minimal obligations under the Lock-Up Agreement; these included the following:

> i.    Old GM agreed that the Deficiency Claim and the Guarantee Claims were enforceable against Old GM "to the fullest extent permitted under applicable laws . . . ."  Lock-Up Agreement, at ¶ 6(a).
>
> This does not preclude the Claims Objection, but rather leaves it to be resolved on its merits.
>
> ii.    Old GM agreed that if any portion of the Deficiency Claim was disallowed, Old GM's claim on account of the Swap Transactions would be subordinated to the prior, indefeasible payment in full of the Notes.  Lock-Up Agreement, at ¶ 6(b)(v).
>
> Since the Swap Transactions were sold to New GM pursuant to the MSPA, this agreement was really made by the Purchaser (New GM).
>
> iii.    Old GM agreed that it would not assert any right of set off with respect to the Deficiency Claim.  Lock-Up Agreement, at ¶ 6(b)(vi).

This does not bind the GUC Trust's ability to object to the Deficiency Claim.

iv.    Old GM agreed and covenanted "that it will not take any action or assert any position inconsistent with this Section 6 and, if called upon by the Holders, will confirm its agreement with the positions confirmed herein in writing or at a court hearing as reasonably requested by the Holders."  Lock-Up Agreement, at ¶ 6(b)(vii).

This is the Cooperation Provision.

36.    The payment obligations under the Lock-Up Agreement did not impact Old GM.

Instead, it concerned GM Canada, Nova Scotia Finance and the Noteholders.   In essence, the

Lock-Up Agreement provided for the following:

a.    GM Canada would make a payment to Nova Scotia Finance in the approximate amount of $369 million ("**Consent Fee**"), which would be in full settlement and satisfaction of the Intercompany Loans.  After the Consent Fee was paid to Nova Scotia Finance, it would be paid ratably to all holders of the Notes.  Lock-Up Agreement, at ¶ 5(b).

b.    The holders of the Notes would retain their claims ("**Guarantee Claims**") against Old GM based on the Guaranty provided by Old GM and contained in the Fiscal and Paying Agency Agreement.  Lock-Up Agreement, at ¶ 6(b)(ii).  These claims existed independent of the Lock-Up Agreement.

c.    Nova Scotia Finance (not Old GM) would provide the Noteholders with a consent to a bankruptcy order in Nova Scotia.  Lock-Up Agreement, at ¶ 6(b)(i).

d.    The trustee appointed in the Nova Scotia Finance bankruptcy case would be entitled to assert a claim ("**Deficiency Claim**") against Old GM, as the sole shareholder of Nova Scotia Finance, for contribution for any amounts unpaid to the creditors of Nova Scotia Finance.  Lock-Up Agreement, at ¶ 6(b)(iii).  This claim existed independent of the Lock-Up Agreement.

e.      Upon payment of the Consent Fee to the holders of the Notes, the Intercompany Loan would be extinguished and GM Canada would have no further liability thereunder to Nova Scotia Finance.  Lock-Up Agreement, at ¶ 5(b).

f.      The Oppression Action would be dismissed.  Lock-Up Agreement, at ¶ 5(a).

37.      As noted above, while Old GM agreed to support the Noteholders in seeking to have the Guarantee Claims and Deficiency Claim allowed in Old GM's bankruptcy case, Old GM never guaranteed that these claims would be allowed.  Old GM knew that it could not guarantee any allowance of claims and I so informed the Noteholders during the evening of May 31/June 1, 2009.  The language used in the Lock-Up Agreement -- that such claims would be allowed "to the fullest extent permitted under applicable laws" (Lock-Up Agreement, at ¶ 6(a)) -- was specifically negotiated to make it clear that although the Lock-Up Agreement was not intended to impair these claims, it was likewise intended to not foreclose objections from parties other than Old GM. *See also* Deposition Transcript of Lawrence S. Buonomo, dated May 8, 2012, at 166:14 - 167: 20.[22]

38.      The GUC Trust misconstrues the Lock-Up Agreement when it contends that (i) the Guarantee Claims and Deficiency Claim are obligations that arise under the Lock-Up Agreement (Claims Objection, ¶ 6; Complaint, ¶¶ 3, 136); and (ii) the Lock-Up Agreement "created a massive and improper Swap Liability against Old GM" (Complaint, ¶ 137).  This is not true.

---

[22]    Relevant portions of Mr. Buonomo's Deposition Transcript from May 8, 2012 are contained in the Compendium of Exhibits as Exhibit "DD."

39.     First, the liability for both the Deficiency Claim and the Guarantee Claims arose prior to the execution of the Lock-Up Agreement; the effect of the Lock-Up Agreement was simply to confirm those pre-existing claims from Old GM's perspective only, and to obtain the support of Old GM for such claims in any bankruptcy case commenced by it.  Specifically, the Deficiency Claim arises under Section 135 of the *Companies Act* (Nova Scotia).[23]  Assuming a winding up of Nova Scotia Finance (which would have happened after the Old GM bankruptcy filing given that, as explained below, the Old GM bankruptcy filing constituted an event of default under Section 9(e) of the Fiscal and Paying Agency Agreement), the Deficiency Claim would have, in any event, been asserted against Old GM absent the Lock-Up Agreement (unless the Notes were paid in full).

40.     With respect to the Guaranty Claims, Old GM has guaranteed Nova Scotia Finance's obligations under the Notes in 2003. The Fiscal and Paying Agency Agreement provided that Old GM guaranteed the "due and punctual payment" of all amounts due on account of the Notes and that the Guaranty was "absolute and unconditional, irrespective of any circumstance that might otherwise constitute a legal or equitable discharge of a surety or guarantor." Fiscal and Paying Agency Agreement, at § 5 of Schedule 1.  Accordingly, the Guaranty Claims are not based on or created by the Lock-Up Agreement, and could have been asserted by the Noteholders absent the Lock-Up Agreement.

41.     Second, the liability based on the Swap Transactions ("**Swap Claim**") was not created by the Lock-Up Agreement.  As discussed more fully below, this liability against Old

---

[23]   Section 135 of the Companies Act provides in part as follows: "In the event of a company being wound up, every present and past member shall, subject to this Section, be liable to contribute to the assets of the company to an amount sufficient for payment of its debts and liabilities and the costs, charges, and expenses of the winding up . . . ."

GM was created, initially, pursuant to the Swap Transaction documents, and then by the provisions of the MSPA that transferred this asset from Old GM to New GM. *See* MSPA, §§ 2.2(a)(iii) and 2.2(a)(iv). These provisions were made known to the Committee, given that the MSPA was filed with the Court. The liability against Old GM based on the Swap Transactions, therefore, was not created by the Lock-Up Agreement. Rights under the Swap Transactions would have been transferred to New GM under the MSPA if the Lock-Up Agreement was never entered into, and such liability would have formed part of the Deficiency Claim absent the Lock-Up Agreement.

42.     While the implementation of the Lock-Up Agreement required that certain events occur post-petition, the substantive post-petition obligations all involved actions by non-debtor entities. Specifically, while an escrow agreement ("**Escrow Agreement**") was to be negotiated and executed after the Petition Date, Old GM was not a signatory thereto.[24] Moreover, while a meeting of holders of Notes was required to be held to pass an extraordinary resolution of the Fiscal and Paying Agency Agreement that adopted the terms of the Lock-Up Agreement and made them binding on all holders of Notes, this solely concerned Nova Scotia Finance, which was the obligor on the Notes.[25] While the Trust Agreement concerning the $450 Million Loan was amended post-petition, the amendment did not concern the essential terms of the loan already made.

---

[24]    A copy of the Escrow Agreement, dated as of June 4, 2009, is contained in the Compendium of Exhibits as Exhibit "EE."

[25]    A copy of the Notice of Meeting of Extraordinary Resolution is contained in the Compendium of Exhibits as Exhibit "FF."

I.    **The Committee was Aware that GM
      Canada Did Not File a CCAA Proceeding**

43.    GM Canada did not file for bankruptcy protection.  This necessarily meant that

the creditors of GM Canada were going to be treated differently than Old GM creditors.  That

circumstance was inherent to the pre-petition decision that some, but not all of, the GM affiliated

corporate entities would file for bankruptcy.  This circumstance was patently visible to the

Committee.

J.    **The Committee was Aware of the Lock-Up
      Agreement Shortly After the Petition Date**

44.    The Lock-Up Agreement and the terms contained therein were not concealed.

Specifically, the Lock-Up Agreement and the claims addressed therein were referenced in the

following documents that were either publicly filed or made available to the Committee, many of

which pre-date the Sale Approval Order:

> (i)    the Form S-4 publicly filed by Old GM on April 27, 2009
> (before the Petition Date and prior to the Sale Approval
> Order) that detailed the Bond Exchange Offer.  In the Form
> S-4, Old GM referenced the Notes, the Guaranty and the
> Intercompany Loans.  Old GM explained that if it was
> required to commence a bankruptcy case,
>
>> only the guarantee by GM of the old GM Nova Scotia
>> notes would potentially be discharged in GM's
>> reorganization case. The old GM Nova Scotia notes
>> would not be cancelled and the holders thereof would
>> not be precluded by a GM reorganization case from
>> seeking payment from GM Nova Scotia for the
>> balance due under the old GM Nova Scotia notes. In
>> addition, because GM Nova Scotia is an "unlimited
>> company," under Nova Scotia corporate law, if GM
>> Nova Scotia is "wound up" (which includes
>> liquidation and likely includes bankruptcy), the
>> liquidator or trustee in bankruptcy may be able to
>> assert a claim against GM, the shareholder of GM

Nova Scotia, to contribute to GM Nova Scotia an amount sufficient for GM Nova Scotia to pay its debts and liabilities, including amounts equal to any amounts outstanding under the old GM Nova Scotia notes. It is possible that such claim for contribution may be impaired in the event GM seeks relief under the U.S. Bankruptcy Code. In addition, in the event that we were to seek relief under the U.S. Bankruptcy Code, General Motors of Canada Limited and/or GM Nova Scotia may decide to seek relief under applicable Canadian bankruptcy law, in which case the GMCL Intercompany Loans may be impaired. Each of the foregoing events may adversely affect the recovery holders of old GM Nova Scotia notes may receive on account of their old notes.

Form S-4, at 12, 134;

(ii)    the Form 8-K filed by Old GM with the Securities and Exchange Commission on June 1, 2009 ("**June 1, 2009 8-K**") (the day of the bankruptcy filing and prior to the Sale Approval Order).  The Lock-Up Agreement is specifically referred to as a "***Material Definitive Agreement***" in the June 1, 2009 8-K.  The extinguishment of the Intercompany Loans, the payment of the Consent Fee, the presence of the "GM guarantee," the Extraordinary Resolution, the Deficiency Claim and the possible subordination of certain GM claims were all expressly discussed in the June 1, 2009 8-K;[26]

(iii)    the Notice of Meeting concerning the passage of the Extraordinary Resolution, which detailed many of the terms contained in the Lock-Up Agreement, was published in the Financial Times on June 3, 2009;[27]

(iv)    the *Sellers' Disclosure Schedules* ("**Disclosure Schedules**"), which were part of the 363 Sale documents and which was provided to the Committee no later than June 5, 2009 (and at various other times during the month of June, 2009 -- prior to the Sale Approval Order).  The

---

[26]    A copy of the June 1, 2009 8-K is contained in the Compendium of Exhibits as Exhibit "HH."

[27]    A copy of the Notice of Meeting is contained in the Compendium of Exhibits as Exhibit "FF."

Disclosure Schedules referenced, among other things, (a) the Nova Scotia Settlement, and provides that "Sellers may do all things necessary and appropriate in furtherance of consummating the Nova Scotia settlement;" (b) "the transfer of funds from [Old GM] to [GM Canada], which funds will be used by [GM Canada] to pay the [GM Canada Settlement Amount to [Nova Scotia Finance], which transfer of funds occurred before the date of this Agreement . . . ;" and (c) the subordination of the obligations of Nova Scotia Finance to Old GM pursuant to the Swap Transactions.  *See* Disclosure Schedules, at Section 6.2;[28]

(v)     the *First Amendment, Consent and Waiver Under Debtor-In-Possession Credit Agreement*, dated June 25, 2009 ("**First Amendment**"), which, again, was filed prior to the Sale Approval Order, and specifically references the Lock-Up Agreement.  *See* First Amendment, ¶ 7;[29]

(vi)    the Form 8-K filed by New GM with the Securities and Exchange Commission on August 7, 2009 ("**August 7, 2009 8-K**"); the Lock-Up Agreement is annexed as an exhibit to the August 7, 2009 8-K;[30] and

(vii)   the *Notice of Interim Report*, filed by the Debtors on August 11, 2009 ("**Interim Report**"), which specifically references the Lock-Up Agreement and the amendment to the Fiscal and Paying Agency Agreement, wherein the Noteholders agreed to limit their claims against Old GM to a recovery on the Guarantee Obligations and the Wind-Up Claim asserted by the Nova Scotia Finance Trustee.  *See* Interim Report, Exhibit "A,"¶ 10(a)(iii) and (iv) (pp. 7-8).[31]

45.     Based on the foregoing, it is clear that the Committee was on notice of the Lock-Up Agreement and the terms contained therein prior to the closing of the 363 Sale, and over a

---

[28]   Relevant portions of the Disclosure Schedules, and the Committee's knowledge of same, are contained in the Compendium of Exhibits as Exhibit "E"

[29]   A copy of the First Amendment is contained in the Compendium of Exhibits as Exhibit "JJ."

[30]   A copy of the August 7, 2009 8-K is contained in the Compendium of Exhibits as Exhibit "KK."

[31]   A copy of the Interim Report is contained in the Compendium of Exhibits as Exhibit "LL."

year before the filing of the initial Claims Objection.  Any allegations by the GUC Trust that it

had no notice of the Lock-Up Agreement and the terms contained therein prior to October, 2009

are, thus, unsupportable.

**K.     The MSPA**

46.     On the Petition Date, Old GM and the other Debtors filed a motion ("**Sale**

**Motion**") seeking approval of the original version of the MSPA ("**Original MSPA**"), which

provided for the sale of substantially all of Old GM's assets to New GM.  The Disclosure

Schedules formed part of the MSPA.  The Original MSPA was subsequently amended and

restated at various times in June, 2009.  On July 5, 2009, the Court entered the Sale Approval

Order, approving the MSPA (and the First Updated Schedules) and the sale to New GM; on July

10, 2009, the Debtors consummated the 363 Sale to New GM.

**1.     Assets Transferred to New GM Relevant to This Dispute**

47.     The assets purchased by New GM include the following:

(i)     "all cash and cash equivalents . . . other than the Excluded
Cash and Restricted Cash."  MSPA, § 2.2(a)(i).  Restricted
Cash (except certain Restricted Cash not applicable here)
was also a "Purchased Asset" (as defined in the MSPA).
See MSPA, §§ 2.2(a)(ii) and 2.2(b)(ii).  Excluded Cash was
defined as "cash or cash equivalents in an amount equal to
$1,175,000,000 . . . ."  MSPA, § 2.2(b)(i) (as amended);

(ii)    "all accounts and notes receivable and other such Claims
for money due to Sellers . . . ."  MSPA, § 2.2(a)(iii);

(iii)   "all intercompany obligations . . . owed or due, directly or
indirectly, to Sellers by any Subsidiary of a seller or joint
venture or other entity in which a Seller or a Subsidiary of a
Seller has any Equity Interest."  MSPA, § 2.2(a)(iv);

(iv)    ". . . subject to **Section 2.4**, all Equity Interests in the Transferred Entities . . . ." MSPA § 2.2(a)(v) (this included the Equity Interests in all "Purchased Subsidiaries," including GM Canada); and

(v)    "subject to Section 2.4 [of the MSPA], all Contracts,[32] other than the Excluded Contracts (collectively, the 'Purchased Contracts'), including, for the avoidance of doubt, . . . (B) any Executory Contract designated as an Assumable Executory Contract as of the applicable Assumption Effective Date." MSPA, § 2.2(a)(x).

## 2. The Cash Left Behind at Old GM to Fund the Wind-Down of the Debtors

48.    The cash that was left behind at Old GM was for the stated purpose of funding the wind-down of the Debtors ("**Wind-Down Amount**"). *See* Sale Motion, ¶ 16 ("Any assets excluded from the sale will be administered in the chapter 11 cases, and sufficient cash is to be made available to GM to fund the wind-down or other disposition of the Sellers' assets."). Thus, the Wind-Down Amount did not depend on how much cash Old GM had on hand; it was solely based on how much the wind-down of the Debtors was projected to cost.

49.    Any cash in excess of that needed to fund the wind-down of the Debtors was being transferred to New GM as part of the MSPA; under no circumstance was any part of the $450 Million Loan or the repayment thereof supposed to go to the unsecured creditors of the Debtors.

## 3. Intercompany Avoidance Power Claims were Transferred to New GM

---

[32]  "Contracts" was defined in the MSPA as "all purchase orders, sales agreements, supply agreements, distribution agreements, sales representative agreements, employee or consulting agreements, leases, subleases, licenses, product warranty or service agreements and other binding commitments, agreements, contracts, arrangements, obligations and undertakings of any nature (whether written or oral, and whether express or implied)." MSPA, p.5. There was no distinction between pre-petition contracts and post-petition contracts.

50.     While some avoidance actions were not sold to New GM as part of the 363 Sale, "[a]ny and all Claims arising from, relating to or in connection with, any payments by or to, or other transfers or assignments by or to, any Purchased Subsidiary" ("**Intercompany Avoiding Power Claims**") were sold to New GM.  *See* MSPA, § 2.2(b)(xi); Disclosure Schedules, § 2.2(b)(xi).  GM Canada was a "Purchased Subsidiary."  These provisions cover all transfers from Old GM to GM Canada, and all transfers from GM Canada, which included the funds which ultimately were used by Nova Scotia Finance to pay the Consent Fee.

51.     When the Committee sought to have an asset remain behind at Old GM, it clearly knew how to accomplish this goal.  For example, the Committee specifically negotiated for the right to control the Term Loan Avoidance Action (defined below).  The Committee, therefore, understood which assets (*i.e.*, Intercompany Avoiding Power Claims) were sold to New GM. Any modification to the assets purchased or rights obtained by New GM pursuant to the MSPA would go to the heart of the bargain struck between Old GM and New GM, and approved by the Court.

**L.     The Committee Supported the 363 Sale and Consented
         To the Assumption and Assignment Procedures**

52.     The Committee endorsed the 363 Sale to New GM.  The Committee also reviewed and commented on the Sale Approval Order.  The Committee was also clearly on notice of the Assumption and Assignment Procedures and believed them to be fair, reasonable and in the best interest of the Debtors' estates.  The Assumption and Assignment Procedures were first approved by an Order of the Court dated June 2, 2009 ("**Sale Procedures Order**"). The Assumption and Assignment Procedures, as approved by the Court, did not (i) provide that

the Committee would receive notice when a Purchased Contract was assumed by Old GM and assigned to New GM, and (ii) grant the Committee access to the contract database so that it could review the information about Contracts and whether they were assumed by Old GM and assigned to New GM (collectively, the "**Notice Provisions**").

53.    The Committee never raised any issue with respect to the Notice Provisions. Ultimately, as part of the Sale Approval Order, the Court approved the Assumption and Assignment Procedures (as modified in the Sale Approval Order), finding them "fair, appropriate and effective . . . ."  Sale Approval Order, at ¶ GG.

54.    The Sale Approval Order was entered on July 5, 2009 -- almost three years ago. New GM has relied on and conducted its business in accordance with the Sale Procedures Order. Any deviation now would adversely affected New GM and would strip it of the bargain it obtained from the 363 Sale.

**M.    The Assumption and Assignment
       Of the Lock-Up Agreement**

55.    As noted above, the only significant remaining obligation of Old GM under the Lock-Up Agreement was the Cooperation Provision.  Given that New GM purchased GM Canada, and GM Canada received a release of the Intercompany Loans under the Lock-Up Agreement, New GM needed to ensure that the Cooperation Provision was complied with on a going-forward basis.  Accordingly, New GM determined it was appropriate and desirable to designate the Lock-Up Agreement as an Assumable Executory Contract (as defined in the MSPA); this designation was noted in the contract database ("**Contract Database**")[33] maintained

---

[33]    Relevant excerpts from the Contract Database are contained in the Compendium of Exhibits as Exhibit "RR."

for assumption/assignment purposes.  As reflected in the excerpt from the Contract Database, the Lock-Up Agreement was assumed and assigned on July 24, 2009.  The counterparties to the Lock-Up Agreement have never contested that the Lock-Up Agreement was assumed and assigned to New GM.

56.    The "Assumption and Assignment Notice," which was approved by the Court in the Sale Procedures Order,[34] provided that the Debtors' designation of a document as an Assumable Executory Contract did not mean that the document was necessarily an executory contract within the meaning of the Bankruptcy Code.[35]  The significance of that provision as it relates to this matter is that the parties' designation of the Lock-Up Agreement as an Assumable Executory Contract is a clear reflection of the parties' intent to treat this asset as a Purchased Asset -- whether or not the Lock-Up Agreement is, itself, an executory contract within the meaning of the Bankruptcy Code.

57.    If the Lock-Up Agreement was not an executory contract, it nevertheless constituted a "Purchased Contract" that was transferred to New GM pursuant to the MSPA.  *See* MSPA, § 2.2(a)(x).  Moreover, if the Lock-Up Agreement is somehow found to be a post-petition contract (which the undersigned strongly disputes), the Lock-Up Agreement was, nonetheless, a Purchased Contract because the definition of Purchased Contracts contained in the MSPA is not limited to pre-petition contracts; it concerns *all* Contracts of Old GM, whether they were entered into pre-petition or post-petition.[36]  *See* note 32, *supra*.

---

[34]    A copy of the Sale Procedures Order is contained in the Compendium of Exhibits as Exhibit "QQ."

[35]    *See* Sale Procedures Order, Exhibit D thereto, ¶ 15.

[36]    Executory Contracts are a subset of Purchased Contracts.

**N.**      **The Transfer of the Swap from Old GM**
             **to New GM Pursuant to the MSPA**

58.      As noted above, one of the assets purchased by New GM in the 363 Sale was "all intercompany obligations . . . owed or due, directly or indirectly, to Sellers by any Subsidiary of a seller or joint venture or other entity in which a Seller or a Subsidiary of a Seller has any Equity Interest." MSPA, § 2.2(a)(iv). Nova Scotia Finance clearly was a subsidiary of Old GM and, as of the Petition Date (and thereafter), Old GM was "in-the-money" in connection with the Swap Transactions (*i.e.*, Nova Scotia Finance owed money to Old GM under the Swap Transactions). As such, by virtue of the MSPA, all "in-the-money" swap transactions -- including the Swap Transactions between Old GM and Nova Scotia Finance -- were considered Purchased Assets and transferred to New GM as part of the 363 Sale.

59.      In addition, as was the case with the Lock-Up Agreement, New GM designated the Swap Transactions as an Assumable Executory Contract even though they may not necessarily have been executory contracts.[37] The reference to the Swap Transactions was contained in the Contract Database, and was designated for assumption and assignment on August 3, 2009.[38]

**O.**      **The Nova Scotia Finance Bankruptcy Proceeding**

60.      As noted above, one of the terms of the Lock-Up Agreement was that Nova Scotia Finance would provide the Noteholders "with a consent to a bankruptcy order pursuant to the Bankruptcy and Insolvency Act (Canada), which shall be executed by the duly authorized

---

[37] While there were two Swap Transactions, they were both governed by the same ISDA Master Agreement and Schedules; there were separate Confirmations for each. *See* Exhibit "H" contained in the Compendium of Exhibits.

[38] The excerpt from the Contract Database contained in the Compendium of Exhibits as Exhibit "RR" shows the assumption of the Swap Transactions.

officers and directors of [Nova Scotia Finance] in form satisfactory to the" Noteholders. Lock-Up Agreement, at ¶ 6(b). Old GM did not have to provide the consent for the bankruptcy filing; the directors of Nova Scotia Finance had to provide the consent and such consent ("**Consent**") was given on June 4, 2009.[39]

61.    Even if Old GM's consent to a bankruptcy order for Nova Scotia Finance was required, such action does not rise to the level of an avoidable action. Each of the Debtors involved in this case did not file on the same date. Old GM and certain subsidiaries commenced their bankruptcy cases on June 1, 2009; at least two additional Debtors -- Remediation and Liability Management Company, Inc. (Case No. 09-50029) and Environmental Corporate Remediation Company, Inc. (Case No. 09-50030), both of which were wholly owned subsidiaries of Old GM -- commenced their bankruptcy cases on October 9, 2009 (the same day that Nova Scotia Finance commenced its bankruptcy case). Old GM's bankruptcy docket reveals that it did not file a motion seeking authority to commence bankruptcy cases for these two subsidiaries. There is no difference between the Nova Scotia Finance bankruptcy filing and the filing of the other two Debtor subsidiaries.[40]

62.    In any event, Nova Scotia Finance's consent was not needed to commence a bankruptcy case in Nova Scotia as the Noteholders could have effectuated the same result since the bankruptcy of Old GM constituted an Event of Default under the Fiscal and Paying Agency

---

[39]    A copy of the Consent, dated June 4, 2009 is contained in the Compendium of Exhibits as Exhibit "SS."

[40]    The Committee was made aware of the bankruptcy filing for Nova Scotia Finance before it actually occurred.

Agreement.[41]    Upon such an Event of Default -- which occurred on June 1, 2009 -- the

Noteholders could have declared the principal of the Notes immediately due and payable (*id.*),

and forced Nova Scotia Finance into a Canadian bankruptcy proceeding.

**P.**    **Confirmation of the Debtors' Plan and the Trusts Created Thereunder**

63.    By Order dated March 29, 2011, this Court confirmed the Debtors' Second

Amended Joint Chapter 11 Plan ("**Plan**").[42]    Significant for the matters presently before the

Court, the Plan created two post-confirmation trusts:

(i)    **The GUC Trust:** The Plan provides that the purpose of the GUC Trust was to "administer certain post-Effective Date responsibilities under the Plan, including, but not limited to, distributing New GM Securities and resolving outstanding Disputed General Unsecured Claims to determine the amount of Allowed General Unsecured Claims that will be eligible for distribution of their Pro Rata Share of New GM Securities under the Plan. If the Residual Wind-Down Assets are transferred to the GUC Trust upon dissolution of MLC, then the GUC Trust shall administer the resolution of all Disputed Administrative Expenses, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims." Plan, § 6.2(b); and

(ii)    **The Avoidance Action Trust:** The Plan provides that the purpose of the Avoidance Action Trust was to administer the "Avoidance Action Trust Assets." Plan, § 6.5(b). "Avoidance Action Trust Assets was defined in the Plan as "the (i) Term Loan Avoidance Action transferred to the Avoidance Action Trust and any proceeds thereof (for the benefit of the Term Loan Avoidance Action Beneficiaries), (ii) the Avoidance Action Trust Administrative Cash, and (iii) the remaining assets of [Old GM] transferred to the

---

[41]    *See* Fiscal and Paying Agency Agreement, § 9(e) (an Event of Default includes the following: "the Company or the Guarantor shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect . . . .").

[42]    Relevant excerpts of the Plan are contained in the Compendium of Exhibits as Exhibit "UU."

Avoidance Action Trust upon the dissolution of [Old GM]
as set forth in Section 6.10 hereof."  Plan, § 1.23.

64.    Neither the Plan nor the governing documents for the GUC Trust provides that the GUC Trust has the power to bring any Avoidance Actions (as defined in the Plan).  *See generally*, Plan, § 6.2; Motors Liquidation Company GUC Trust Agreement ("**GUC Trust Agreement**"), Article VIII (Powers of and Limitations on the GUC Trust Administrator).[43]

65.    Except for the Term Loan Avoidance Action (as defined in the Plan), the Avoidance Action Trust also does not have the power to bring any Avoidance Actions.  Section 6.10 of the Plan provides that all Avoidance Actions not transferred to the Avoidance Action Trust "shall be deemed abandoned by the Debtors for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors."  No Avoidance Actions, other then the Term Loan Avoidance Action, were transferred to the Avoidance Action Trust.  Accordingly, the Avoidance Action Trust can no longer commence any Avoidance Actions.  Even if Intercompany Avoiding Power Claims were not sold to New GM, all Avoidance Actions (other than the Term Loan Avoidance Action) were abandoned by the Debtors by operation of Section 6.10 of the Plan.

66.    Moreover, the Plan defined Avoidance Actions as "any action commenced, or that may be commenced, before or after the Effective Date pursuant to section 544, 545, 547, 548, 549, 550, or 551 of the Bankruptcy Code, ***except to the extent purchased by New GM under the MSPA*** or prohibited under the DIP Credit Agreement."  Plan, § 1.18 (emphasis added).  Thus, the GUC Trust or the Avoidance Action Trust never had the power to bring Avoidance Actions

---

[43]    Relevant excerpts of the GUC Trust Agreement are contained in the Compendium of Exhibits as Exhibit "VV."

which were sold to New GM pursuant to the MSPA. Accordingly, neither the GUC Trust nor the Avoidance Action Trust has standing to maintain any Avoidance Action in this matter. Section 502(d) of the Bankruptcy Code cannot be used to bootstrap what the GUC Trust is prohibited from doing.

## CONCLUSION

67.    The Lock-Up Agreement was a transaction approved and funded by the Governments, as purchasers of Old GM's assets, for the purpose of enabling the acquisition of the Canadian assets without a Canadian bankruptcy. The Governments and New GM incurred the cash consequences of the transactions, because the overall business judgment assessed was that they were favorable to the value of New GM. The MSPA provided for New GM to purchase assets (*i.e.*, the transfer of intercompany Avoidance Actions, intercompany loans and intercompany accounts receivable, Swap Transactions, *etc.*), which formed an important portion of the bargain struck between Old GM and New GM. Those assets cannot, at this late date, be separated out of the much larger transaction that became the 363 Sale.

68.    The Committee was on notice of the MSPA and all of the relevant provisions contained therein. The assets and claims that the GUC Trust (as successor to the Committee) seeks to now use or assert were clearly sold to New GM approximately three years ago. They cannot now be used to upset a critical piece of the overall GM restructuring.

69.    There are no material facts in dispute, and the legal issues raised by the SJ Motion can and should be decided now.

Dated:    June 8, 2012

_____/s/ Lawrence S. Buonomo_____
Lawrence S. Buonomo