**HEARING DATE AND TIME: July 19, 2012 at 9:45 a.m. (Eastern Time)**
**OBJECTION DEADLINE: June 29, 2012 at 5:00 p.m. (Eastern Time)**
**REPLY DEADLINE:  July 11, 2012 at 5:00 p.m. (Eastern Time)**

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222
Arthur Steinberg
Scott Davidson

*Attorneys for General Motors LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY, *et al.*, | : | Case No.: 09-50026 (REG) |
| f/k/a General Motors Corp., *et al*. | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

------------------------------------------------------------ x

| | | |
|---|---|---|
| MOTORS LIQUIDATION COMPANY GUC TRUST, | : | |
| | : | |
| | : | |
| Plaintiff, | : | Adversary Proceeding |
| | : | Case No.: 12-09802 (REG) |
| v. | : | |
| | : | |
| APPALOOSA INVESTMENT LIMITED PARTNERSHIP, *et al.*, | : | |
| | : | |
| Defendants. | : | |

------------------------------------------------------------ x

# MEMORANDUM OF LAW IN SUPPORT OF
## MOTION BY GENERAL MOTORS LLC FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................... 1

BACKGROUND ........................................................................................ 7

SUMMARY JUDGMENT STANDARD ..................................................... 8

ARGUMENT ............................................................................................. 9

POINT I THE COMMITTEE IS NOT ENTITLED TO ANY RELIEF BASED ON
CIVIL RULE 60(B) OF THE FEDERAL RULES OF CIVIL PROCEDURE ................ 9

    A.    Civil Rule 60(b) Standard ................................................. 10

    B.    The GUC Trust Cannot Invalidate a Portion of the Sale Approval Order ........... 11

    C.    The Committee Supported the 363 Sale and was Intimately Involved in
the 363 Sale Process and the Drafting of the Sale Approval Order ................... 12

    D.    The Lock-Up Agreement Was Validly Assumed and Assigned ........................ 14

    E.    Granting Rule 60(b) Relief at This Juncture Would Impose an Undue
Hardship on New GM; the Equitable Mootness Doctrine Applies .................... 15

    F.    The GUC Trust's Civil Rule 60(b) Request is Not Timely ................................ 17

POINT II THE GUC TRUST CANNOT USE SECTION 502(D) OF THE
BANKRUPTCY CODE OR OTHER AVOIDING POWER CLAIMS TO
AVOID THE CONSENT FEE ........................................................................ 23

    A.    Intercompany Avoiding Power Claims Were Sold to New GM ........................ 23

    B.    The GUC Trust is Not Authorized to Bring Avoiding Power Claims ................ 26

    C.    As the $450 Million Loan was Repaid, With Interest, There is No Transfer
to Avoid ........................................................................................ 28

    D.    Even if the $450 Million Loan was not Repaid, The GUC Trust Could Still
Not Recover the Consent Fee ........................................................... 28

POINT III THE LOCK-UP AGREEMENT SHOULD NOT BE VOIDED ............................... 30

    A.    The Lock-Up Agreement was Not a Fraudulent Conveyance ........................... 30

        1.    Old GM Agreed to "Support" Claims, Not Allow Them ...................... 32

        2.    The Swap Claim is an Asset of New GM Properly Asserted
Against Nova Scotia Finance ................................................. 33

    B.    The Lock-Up Agreement was a Valid Pre-Petition Agreement ........................ 34

        1.    All Witnesses to the Execution of the Lock-Up Agreement
Testified that it Was a Pre-Petition Agreement ...................... 34

        2.    Except for the Cooperation Provision, Old GM had no Continuing
Obligation under the Lock-Up Agreement ............................. 36

     C.     Even if the Lock-Up Agreement was a Post-Petition Agreement, It was
Sold to New GM ................................................................................................ 37

CONCLUSION........................................................................................................................... 38

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<small>ASES</small>

*Breeden v. Bennett* (*In re Bennett Funding Group, Inc.*),
220 B.R. 743 (Bankr. N.D.N.Y. 1997) ...................................................................8

*Brown v. U.S.* (*In re Larry's Marineland of Richmond, Inc.*),
166 B.R. 871 (Bankr. E.D. Ky. 1993) ...................................................................24

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...............................................................................................8

*Durso Supermarkets, Inc. v. D'urso (In re Durso Supermarkets, Inc.*),
Case Nos. 94 Civ. 6035 (LLS), 94 Civ. 6036 (LLS), 94 Civ. 5784 (LLS), 94 Civ.
5786 (LLS), 94 Civ. 4974 (LLS), 1995 WL 739549 (S.D.N.Y. Dec. 14, 1995).....................26

*Enron Corp. v. Springfield Assocs., L.L.C.* (*In re Enron Corp.*),
379 B.R. 425 (S.D.N.Y. 2007), *motion to certify appeal denied*, 2007 WL 2780394
(S.D.N.Y. Sept. 24, 2007)......................................................................................25

*Express Indus. & Terminal Corp. v. N.Y. State DOT*,
93 N.Y.2d 584 (1999), *reargument denied*, 93 N.Y.2d 1042 (1999) ......................................35

*Friedman v. Schwartz*,
No. 08-CV-2801 (JS)(WDW), 2009 WL 701111 (E.D.N.Y. March 13, 2009) .....................36

*In re McLean Ind., Inc.*,
196 B.R. 670 (S.D.N.Y. 1996)...............................................................................25

*In re Mid Atl. Fund, Inc.*,
60 B.R. 604 (Bankr. S.D.N.Y. 1986).................................................................24, 25

*In re Mktg. Assocs. of Am., Inc.*,
122 B.R. 367 (Bankr. E.D. Mo. 1991).....................................................................24

*In re Old Carco LLC, aff'd,* 2010 WL 3566908 (S.D.N.Y. Sept. 14, 2010), *aff'd, Mauro
Motors Inc. v. Old Carco LLC*, 420 Fed. Appx. 89 (2d Cir. 2011)
423 B.R. 40 (Bankr. S.D.N.Y. 2010).......................................................................10

*In re Teligent, Inc.*,
326 B.R. 219 (S.D.N.Y. 2005)...............................................................13, 16, 18, 23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)...............................................................................................8

*Nemaizer v. Baker*,
    793 F.2d 58 (2d Cir. 1986)..................................................................................10, 13

*Palermo v. Pritam Realty, Inc. (In re Pritam Realty, Inc.)*,
    233 B.R. 619 (D.P.R. 1999)..........................................................................................17

*Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
    430 B.R. 65 (S.D.N.Y. 2010), *motion to vacate denied,* 2010 WL 3565494 (S.D.N.Y.
    Sept. 10, 2010) ..............................................................................................................16

*Sasso v. M. Fine Lumber Co., Inc.*,
    144 F.R.D. 185 (E.D.N.Y. 1992) ............................................................................18, 22

*Stupakoff v. Otto (In re Spiegel, Inc.)*,
    269 Fed. Appx. 56 (2d Cir. 2008), *cert. denied, Stupakoff v. Otto,* 555 U.S. 825
    (2008)......................................................................................................................18, 22

*U.S. Lines (S.A.) v. U.S. (In re McLean Indus.)*,
    30 F.3d 385 (2d Cir. 1994)............................................................................................25

*U.S. v. Nordic Village, Inc.*,
    503 U.S. 30 (1992).......................................................................................................24

*United Student Aid Funds, Inc. v. Espinosa*,
    130 S. Ct. 1367 (2010)..................................................................................................13

**STATUTES**

11 U.S.C. § 502(d) ....................................................................3, 5, 6, 23, 24, 25, 28, 38

11 U.S.C. § 546(a) ...............................................................................................24, 25

11 U.S.C. § 549...........................................................................................................38

**OTHER AUTHORITIES**

Rule 60(b) of the Federal Rules of Civil Procedure ............................3, 4, 8-11, 13-18, 22, 23, 38

Rule 56(c) of the Federal Rules of Civil Procedure.......................................................8

Rule 7056 of the Federal Rules of Bankruptcy Procedure ............................................8

Rule 9019 of the Federal Rules of Bankruptcy Procedure ..........................................38

Section 135 of the *Companies Act (Nova Scotia)*.......................................................33

General Motors LLC ("**New GM**") hereby submits this Memorandum of Law in support of its motion for summary judgment ("**SJ Motion**") on certain issues raised by Motors Liquidation Company GUC Trust ("**GUC Trust**") in its Claims Objection filed in the above-referenced contested matter.[1]  The Buonomo Declaration, the *Declaration of Scott I. Davidson in Support of Motion for Summary Judgment* ("**Davidson Declaration**"), and the *Statement of Undisputed Material Facts Pursuant to Local Rule 7056-1 in Support of Motion for Summary Judgment filed by General Motors LLC* ("**Rule 7056-1 Statement**"),[2] each filed simultaneously herewith, are incorporated herein by reference as if fully set forth herein.

### PRELIMINARY STATEMENT

It is important to distinguish at the outset what the SJ Motion is intended to accomplish. The GUC Trust is entitled to object to the claims of the Noteholders and the Trustee ("**Nova Scotia Finance Trustee**") appointed in the Nova Scotia Finance bankruptcy arrangement. The Lock-Up Agreement[3] does not strip the GUC Trust of its right to make such objections and secure a ruling on the merits.

More specifically, the GUC Trust is entitled to object to the claims of the Noteholders and the Nova Scotia Finance Trustee on the grounds that they are duplicative of each other. While New GM disagrees with that contention, the SJ Motion is not intended to seek resolution of this issue. The Nova Scotia Finance Trustee has been granted permission by the Court to file a summary judgment motion on this issue and, presumably, the issue will be addressed by the Court in that procedural context.

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the *Declaration of Lawrence S. Buonomo in Support of Motion for Summary Judgment* ("**Buonomo Declaration**").

[2]    The citation format to the Rule 7056-1 Statement will be as follows:  "SOUF, at ¶ __."

[3]    A copy of the Lock-Up Agreement is contained in the Compendium of Exhibits as Exhibit "Q."

The Complaint[4] has a "recharacterization" count.  The GUC Trust's contention is that the payment of the Consent Fee by a non-Debtor (GM Canada) to a non-Debtor (Nova Scotia Finance) should be "recharacterized" as a payment against the principal of the Notes. While New GM disagrees with this contention, the SJ Motion is not intended to seek resolution of this issue.

The Claims Objection[5] and the Complaint also have an equitable subordination/equitable disallowance count. While New GM believes that the GUC Trust has set forth no legal basis to support such allegations, and the material factual contentions made in the Claims Objections and the Complaint are contrary to the record, the SJ Motion is not intended to seek resolution of that issue either.

But, while the Complaint only contains the "recharacterization" count and the equitable subordination/equitable disallowance count, the Claims Objection asserts a number of other legal theories (more fully described below) (the "**Other Arguments**"), which are predicated on the Lock-Up Agreement and/or the MSPA. The SJ Motion seeks dismissal of the Other Arguments.

The GUC Trust Administrator, Mr. Vanaskey of Wilmington Trust Company, testified that a primary goal of the Other Arguments is to void the Lock-Up Agreement and certain provisions of the Sale Approval Order[6] so that GM Canada somehow becomes liable for the Noteholders' claims.  *See* SOUF, ¶ 62.  New GM did not bargain in the 363 Sale for that result, and strongly opposes the GUC Trust's attempt to transform a "claims objection" into an untimely, collateral attack on the 363 Sale.  The instant proceeding presents litigable issues arising from the structure inherent in a Nova Scotia unlimited liability company.  However, the GUC Trust's expansion of the contested matter to encompass a wholesale attack on the conduct

---

[4]    A copy of the Complaint is contained in the Compendium of Exhibits as Exhibit "F."

[5]    A copy of the Claims Objection is contained in the Compendium of Exhibits as Exhibit "D."

[6]    A copy of the Sale Approval Order (which has annexed thereto the MSPA) is contained in the Compendium of Exhibits as Exhibit "B."

of New GM, Old GM, the Governments and the Noteholders, who sought to resolve critical issues immediately prior to Old GM's bankruptcy filing (and, from New GM's perspective, to simplify them) only obscures the matters legitimately in dispute.

To be specific, the Other Arguments made by the GUC Trust are:

(a)     an unspecified provision of Rule 60(b) of the Federal Rules of Civil Procedure ("**Civil Rule**") should be used (perhaps "protectively") to void provisions in the MSPA and the Sale Approval Order dealing with the assumption and assignment of executory contracts to the extent such provisions deal with the Lock-Up Agreement and the Swap Transactions.

(b)     Section 502(d) of the Bankruptcy Code can be used to object to the Noteholders' claims even though the underlying "avoiding power" claims were sold to New GM under the MSPA.

(c)     the "avoiding power" sections of the Bankruptcy Code can be used to void the Lock-Up Agreement as a fraudulent transfer or an unauthorized post-petition settlement.

As more fully described herein, there are no material facts in dispute relating to the Other Arguments and the issues can be resolved by the SJ Motion in favor of New GM.

*(a)     Short Answer to the Rule 60(b) relief.*

The GUC Trust is required to set forth a basis for the Civil Rule 60(b) relief it seeks; it has failed to do so.

The GUC Trust should not be permitted to undo a portion of the Sale Approval Order. To do so would materially change the terms of the 363 Sale and the benefit of the bargain struck by New GM.

The GUC Trust's arguments regarding the assumption and assignment of the Lock-Up Agreement and the Swap Transactions are without merit. The Committee (the predecessor in interest to the GUC Trust) was intimately involved in the 363 Sale process and the drafting of the

Sale Approval Order. *See* SOUF, ¶¶ 76-77.    The Committee supported the 363 Sale and the procedures approved by the Court regarding the assumption and assignment of executory contracts.  *See id*.  Pursuant to those procedures, the Committee was not provided notice of which contracts were being assumed by Old GM and assigned to New GM, and it consented to this procedure.  *See* SOUF, ¶¶ 79-80. The Committee's lack of notice with respect to the assumption and assignment of the Lock-Up Agreement and the Swap Transactions was, therefore, anticipated and proper.  To now complain of the 363 Sale terms and the Assumption and Assignment Procedures (defined below) is disingenuous.

The Committee was made aware of the Lock-Up Agreement before the entry of the Sale Approval Order. *See* SOUF, ¶¶ 63-65.  In any event, the Committee concedes that it actively began analyzing issues relating to the Lock-Up Agreement, at the latest, in October, 2009 -- nine months before the original Claims Objection was filed. *See* SOUF, ¶ 66.  Thus, allowing the GUC Trust to upset the Sale Approval Order pursuant to Civil Rule 60(b) at this late date would be inappropriate and inequitable; the Civil Rule 60(b) relief sought is untimely.

Attacking the assumption and assignment of the Lock-Up Agreement through Civil Rule 60(b) relief serves no purpose.  New GM wanted the Lock-Up Agreement assigned to it in order to ensure that the Cooperation Provision imposed on Old GM therein was complied with.  *See* SOUF, ¶ 84.  The Cooperation Provision was the only significant remaining executory provision of the Lock-Up Agreement for Old GM, after it was signed.  The assignment of the Cooperation Provision to New GM relieved Old GM of that obligation.  Old GM, therefore, benefitted and was not damaged by the assignment of the Lock-Up Agreement to New GM.

*(b)*    ***Section 502(d) of the Bankruptcy Code Cannot***
***Be Used by The GUC Trust to Void the Consent Fee***

The Claims Objection focuses on the Consent Fee, claiming that it should be voided pursuant to Section 502(d) of the Bankruptcy Code. However, it is not within the GUC Trust's charter to pursue any avoidance actions on behalf of the Debtors' estates. *See* SOUF, ¶¶ 100-104. Even if it had the authority, the avoidance actions contemplated by the Claims Objection -- those relating to certain intercompany transfers between Old GM and GM Canada -- were purchased by New GM as part of the 363 Sale. *See* SOUF, ¶¶ 73-74. These claims are not property of the GUC Trust and, thus, the GUC Trust cannot commence or prosecute avoidance actions in connection with the Lock-Up Agreement or the payment of the Consent Fee.

It is undisputed that the entire $450 Million Loan (the proceeds of which were used by GM Canada to obtain a release of the Intercompany Loans) was repaid, in full with interest, to Old GM by GM Canada prior to the closing of the 363 Sale to New GM. *See* SOUF, ¶¶ 47-52. The Consent Fee was paid by Nova Scotia Finance to the Noteholders from the payment made by GM Canada to Nova Scotia Finance. Thus, in reality, the Consent Fee was paid by GM Canada (a non-Debtor) to Nova Scotia Finance (another non-Debtor), which ultimately paid it to the Noteholders. The GUC Trust does not have the authority to use an "avoiding power" claim to recover a payment made by a non-Debtor to a non-Debtor and then to a third party. Simply put, creditors of Old GM (*i.e.*, the GUC Trust's own constituency) were never impacted by the payment of the Consent Fee, and thus no transfer can be voided.

Moreover, in addition to the Intercompany Avoiding Power Claims, New GM purchased various other assets of Old GM under the MSPA that further militate against the GUC Trust voiding the Consent Fee. All cash above a certain threshold was purchased by New GM as part of the 363 Sale. *See* SOUF, ¶¶ 69-72. Thus, even assuming the funds loaned by Old GM to GM

5

Canada for payment to Nova Scotia Finance and ultimately the Consent Fee were never advanced, those funds would have remained with Old GM and ultimately would have been transferred to New GM as part of the 363 Sale.

In addition, New GM purchased all intercompany accounts receivable, intercompany loans and other intercompany obligations.  *See* SOUF, ¶ 69.  None of these assets can be utilized by the GUC Trust to void the Consent Fee.  Thus, even assuming the funds loaned by Old GM to GM Canada were never repaid (they were), the account receivable for the loan would have been transferred to New GM under the MSPA.  Old GM had no economic interest in the $450 Million Loan, or the repayment thereof.  Accordingly, the GUC Trust cannot void the payment of the Consent Fee pursuant to Section 502(d) of the Bankruptcy Code or on any other basis.

### (c)    *The Lock-Up Agreement was Not a Fraudulent Conveyance or an Unauthorized Post-Petition Settlement*

As noted, all Intercompany Avoiding Power Claims were sold to New GM as part of the 363 Sale.  *See* SOUF, ¶¶ 73-75.  The GUC Trust is, therefore, prohibited from bringing a fraudulent conveyance claim to void the Lock-Up Agreement.[7]

In addition, notwithstanding what the GUC Trust has claimed, the Swap Claim was not created by the Lock-Up Agreement.  *See* SOUF, ¶ 59.  New GM purchased the Swap Liability as part of the 363 Sale, and its value was taken into account in the purchase price paid by New GM.  *See* SOUF, ¶¶ 90-93.  Specifically, the Swap Claim was an intercompany account receivable, an

---

[7]    Moreover, Old GM's obligations under the Lock-Up Agreement were minimal compared to those undertaken by the other parties to the Lock-Up Agreement, and Old GM received reasonably equivalent value for any obligation obtained.  *See* SOUF, ¶¶ 54-56.  Pursuant to the Lock-Up Agreement, (i) Old GM was released from all liability associated with the Oppression Action; (ii) the Intercompany Loans that totaled over a billion dollars were released against one of Old GM's largest subsidiaries (GM Canada); and (iii) GM Canada was not required to commence a bankruptcy proceeding in Canada.  Each of these items benefitted Old GM.  In return, pursuant to the Lock-Up Agreement, Old GM agreed ***to support (not allow)*** the Guarantee Claims and Deficiency Claim, and agreed to subordinate its Swap Claim (which ultimately was assigned to New GM under the MSPA) in the event any portion of the Deficiency Claim was disallowed.  Reasonably equivalent value was given for their minimal obligations.  The undisputed facts clearly do not support a fraudulent conveyance claim.

intercompany loan or other intercompany obligation, each of which constitutes a Purchased Asset under the MSPA. *See* SOUF, ¶¶ 90-91. Its transfer to New GM was further evidenced by Old GM's assumption of this claim and its assignment to New GM. *Id.* This liability against Old GM was, therefore, not created by the Lock-Up Agreement but was created by the terms of the MSPA which were fully reviewed and approved by the Committee. There was nothing improper about New GM's actions in this regard, and the Committee was fully aware of these terms of the 363 Sale.

In addition, the Lock-Up Agreement was a valid pre-petition agreement. All witnesses in this matter have testified that there was a meeting of the minds regarding the terms of the Lock-Up Agreement and that the document memorializing those terms was executed prior to the filing of Old GM's bankruptcy petition. *See* SOUF, ¶¶ 39-46. Moreover, the entire pre-petition/post-petition dichotomy is a "red-herring." Under the terms of the MSPA, the Lock-Up Agreement is a Purchased Contract and was transferred to New GM pursuant to the 363 Sale. *See* SOUF, ¶ 88. Thus, even if the Lock-Up Agreement could somehow be viewed as a post-petition contract (which New GM disputes), such contract was sold to New GM as part of the 363 Sale. As explained further herein, the definition of "Purchased Contracts" was not limited to pre-petition contracts, but included post-petition contracts as well. *Id.*

As demonstrated below, since there are no disputed issues of material fact, summary judgment is appropriate in favor of New GM on the Other Arguments.

## **BACKGROUND**

The Court is referred to the Buonomo Declaration, the Davidson Declaration and the Rule 7056-1 Statement for a full recitation of the facts and circumstances surrounding the matters referenced in the Claims Objection, and the issues addressed herein.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c), made applicable to this proceeding by Fed. R. Bankr. P. 7056, provides that summary judgment shall be granted when there is no genuine issue as to any material fact, and the moving party is entitled as a matter of law to a judgment in its favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To withstand a motion for summary judgment, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial." *Id.* at 324. Thus, "an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.11 (1986). "Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact." *Breeden v. Bennett* (*In re Bennett Funding Group, Inc.*), 220 B.R. 743, 752 (Bankr. N.D.N.Y. 1997) (quoting *Greenblatt v. Prescription Plan Servs. Corp.*, 783 F.Supp. 814, 819-20 (S.D.N.Y. 1992)).

Fact discovery in this contested matter has concluded. The evidence clearly demonstrates that there are no genuine issues of material fact regarding (i) the GUC Trust's inability to obtain any relief pursuant to Civil Rule 60(b); (ii) the GUC Trust's inability to utilize any "avoiding power" claims to upset the Lock-Up Agreement or void the payment of the Consent Fee; (iii) the valid assumption by Old GM and the assignment to New GM of the Lock-Up Agreement and the Swap Transactions; (iv) the Lock-Up Agreement and Swap Transactions being Purchased Contracts that were sold to New GM; (v) the GUC Trust's inability to utilize any other asset or claim that was transferred to New GM as a basis for the Claims Objection; and (vi) the designation of the Swap Transactions as a Purchased Asset and that the same was transferred to New GM pursuant to the 363 Sale. New GM is, therefore, entitled to summary judgment against the GUC Trust on these issues.

## ARGUMENT

### POINT I

### THE COMMITTEE IS NOT ENTITLED TO ANY RELIEF BASED ON CIVIL RULE 60(b) OF THE FEDERAL RULES OF CIVIL PROCEDURE

The GUC Trust's Civil Rule 60(b) request is contained in one 9-lined paragraph of the

Claims Objection, wherein the GUC Trust requests that the Sale Approval Order be voided

> but only to the extent that the [Sale Approval Order] authorized the Debtors to assume and/or assign the Lock-Up Agreement and any other obligations incident thereto, including those concerning the Swap Transactions. This request for relief is asserted protectively, in anticipation of the need to respond to the Noteholders' argument that the purported assumption of the Lock-Up Agreement by Old GM, or the transfer of the swap claim to New GM, or the transfer of certain avoidance actions to New GM bars any challenge to the Claims.

Complaint, ¶ 73.

New GM's initial understanding of this "unusual" request was that the Committee was

only seeking Civil Rule 60(b) relief to counter the Noteholders' potential argument that the

assumption and assignment of the Lock-Up Agreement translated into the "deemed" allowance

of the Guarantee Claims and the Deficiency Claim.  Since the Lock-Up Agreement specifically

states that these claims are valid and enforceable, but only "to the fullest extent permitted under

applicable law," New GM assumed that the GUC Trust would ultimately withdraw their Civil

Rule 60(b) relief since their "concerns" were clearly unfounded.

Despite repeated requests, the GUC Trust has refused to withdraw its Civil Rule 60(b)

relief.  The reason for this became clear at the Deposition of David Vanaskey, who is the person

primarily responsible for this matter at Wilmington Trust Company, the GUC Trust

Administrator.  Mr. Vanaskey testified that the GUC Trust is trying to use the Civil Rule 60(b)

relief to void the Lock-Up Agreement in an effort to undo the release that GM Canada obtained

from Nova Scotia Finance relating to the Intercompany Loans. *See* SOUF, ¶ 62. The GUC Trust's disguised strategy is to ultimately force GM Canada to pay the Noteholders.

While the GUC Trust's intent is now "out in the open," what remains opaque is the GUC Trust's asserted basis for Civil Rule 60(b) relief from the Sale Approval Order. The GUC Trust points to no specific provision in Civil Rule 60(b) that would authorize such extraordinary relief. There is no analysis of the standard for such relief or a reference to relevant facts that would justify such relief. Since there is no basis given for the GUC Trust's Civil Rule 60(b) relief, it should be denied in its entirety.

## A.    Civil Rule 60(b) Standard

Civil Rule 60(b) affords "extraordinary judicial relief" only if the GUC Trust can show "exceptional circumstances." *In re Old Carco LLC*, 423 B.R. 40, 45 (Bankr. S.D.N.Y. 2010) (quoting *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986)), *aff'd,* 2010 WL 3566908 (S.D.N.Y. Sept. 14, 2010), *aff'd*, *Mauro Motors Inc. v. Old Carco LLC*, 420 Fed. Appx. 89 (2d Cir. 2011). In addition, the GUC Trust bears the burden of demonstrating that "(i) the supporting evidence be 'highly convincing;' (ii) there be good cause for the movant's failure to act sooner; and (iii) application of the rule will not impose undue hardship on other parties." *Id.*

As the Second Circuit has stated,

> Properly applied Rule 60(b) strikes a balance between serving the ends of justice and preserving the finality of judgments. . . .  In other words it should be broadly construed to do 'substantial justice' . . . yet final judgments should not 'be lightly reopened.' . . . . The Rule may not be used as a substitute for a timely appeal.

*Nemaizer*, 793 F.2d at 61 (citations omitted).

The GUC Trust has never articulated which subsection of Civil Rule 60(b) it is seeking relief under. That is fatal to its requested relief. In any event, the GUC Trust cannot, under any theory, meet the heavy burden imposed by Civil Rule 60(b).

**B.**      **The GUC Trust Cannot Invalidate a Portion of the Sale Approval Order**

The GUC Trust is attempting to use Civil Rule 60(b) to undo the Lock-Up Agreement by voiding some, but not all, of the provisions of the Sale Approval Order.  However, the provisions of the Sale Approval Order and the MSPA that are referenced by the GUC Trust in the Claims Objection all form a significant portion of the assets bought by New GM and cannot be separated out while leaving the other transactions that form the 363 Sale intact.  Indeed, the GUC Trust is unabashedly seeking to impose, years after the fact, a huge liability upon a subsidiary acquired by New GM pursuant to the 363 Sale, when the 363 Sale was specifically structured so that New GM would not have such liability.

The Lock-Up Agreement is a Purchased Contract.  *See* SOUF, ¶ 88.  As the Court determined in the Sale Approval Order: "The Purchased Contracts [which include the Lock-Up Agreement] being assigned to . . . the Purchaser are an integral part of the Purchased Assets being purchased by the Purchaser, and, accordingly, such assumption and assignment of the Purchased Contracts . . . are reasonable, enhance the value of the Debtors' estates, and do not constitute unfair discrimination." *See* Sale Approval Order, at ¶ EE.  The Intercompany Avoiding Power Claims, and intercompany loans and accounts receivable (which include the Swap Transactions) are also Purchased Assets that were sold to New GM.  *See* SOUF, ¶¶ 67-74; 88-91.  New GM paid consideration to Old GM to obtain these assets.  Carving out these assets now, and returning them to the GUC Trust for purposes of the Claims Objection or otherwise would deprive New GM of the benefit of its bargain, and would open up the entire 363 Sale transaction and call into question the consideration paid by the Governments for the assets transferred.

Stated otherwise, the GUC Trust cannot cherry pick certain provisions of the Sale Approval Order and MSPA, carve them out for its benefit, and leave the rest of the transaction in place.  This is especially true where (as explained further in the next section) the Committee was

intimately involved in the 363 Sale process and the drafting of the Sale Approval Order, and knew which assets were being transferred to New GM, including, specifically, the Intercompany Avoiding Power Claims and the Swap Transactions. *See* SOUF, ¶¶ 72-74.

## C.    The Committee Supported the 363 Sale and was Intimately Involved in the 363 Sale Process and the Drafting of the Sale Approval Order

It cannot be disputed that the Committee was intimately involved in the 363 Sale process and the formulation of the Sale Approval Order.  The procedures outline for the assumption and assignment ("**Assumption and Assignment Procedures**") of executory contracts were approved by the Court on June 2, 2009 in the Sale Procedures Order,[8] and were further reaffirmed, as modified, in the Sale Approval Order.  As set forth in the Sale Procedures Order, the Committee was not to be provided with notice of the assumption and assignment of specific contracts.  *See* Sale Procedures Order, ¶ 10.  In fact, the Assumption and Assignment Procedures specifically provided that (i) "[t]he information on the Contract Website [the secure website maintained by the Debtors for counterparties to executory contracts] shall be made available to the non-Debtor counterparty to the Assumable Executory Contract (the 'Non-Debtor Counterparty'), but shall not otherwise be publicly available" (*id.*), and (ii) that "[f]ollowing the designation of an Executory Contract or Lease as an Assumable Executory Contract, the Debtors shall provide notice (the "**Assumption and Assignment Notice**") to the Non-Debtor Counterparty to the Assumable Executory Contract . . . " (*id.*).  From the second day of these cases, the Assumption and Assignment Procedures never contemplated any notice being provided to the Committee.  This process was confirmed by Debtors' counsel at his deposition.  *See* SOUF, ¶ 80.

In the Sale Approval Order, the Assumption and Assignment Procedures were modified from their original form.  *See* Sale Approval Order, ¶ E.  This clearly demonstrates that such

---

[8]    A copy of the Sale Procedures Order is contained in the Compendium of Exhibits as Exhibit "QQ."

procedures were negotiated after the entry of the Sale Procedures Order and were modified to address any concerns raised, including those raised by the Committee. *See* SOUF, ¶ 80. The Committee ultimately agreed to the procedures approved by the Court and clearly understood that it would not be receiving any notices regarding contracts that were assumed by Old GM and assigned to New GM. *See* SOUF, ¶ 79. The Committee knew that New GM and the Governments would make all assumption and assignment decisions, and that the Committee would have no role in that process. *See* SOUF, ¶ 89.

The Committee was actively involved in the drafting of the Sale Approval Order. *See* SOUF, ¶ 77. While the Committee initially filed a limited objection to the 363 Sale, it later withdrew that objection and supported the 363 Sale at the Sale Hearing. *See* Sale Hearing Tr., at 102:7-106:4.[9] In the Sale Approval Order, the Court ultimately found that the "Modified Assumption and Assignment Procedures are fair, appropriate, and effective . . . ." Sale Approval Order, ¶ GG. The Committee supported the entry of the Sale Approval Order (*see* SOUF, ¶¶ 76-77), which is now a final, non-appealable order. *See Nemaizer*, 793 F.2d at 61 (Civil Rule 60(b) "may not be used as a substitute for a timely appeal."); *In re Teligent, Inc.*, 326 B.R. 219, 227 (S.D.N.Y. 2005)("a motion under Rule 60(b)(6) is not a substitute for a timely appeal . . . ."). The GUC Trust should not now be permitted to rely on Civil Rule 60(b) when it was on notice of the Assumption and Assignment Procedures, and the other terms of the Sale Approval Order, actively negotiated same, and affirmatively chose to support the 363 Sale and all of the procedures approved in connection therewith. *Cf. United Student Aid Funds, Inc. v. Espinosa*, 130 S. Ct. 1367, 1380 (2010) ("Where, as here, a party is notified of a plan's contents and fails to object to confirmation of the plan before the time for appeal expires, that party has been afforded

---

[9]    A copy of the Sale Hearing Transcript is contained in the Compendium of Exhibits as Exhibit "NN."

a full and fair opportunity to litigate, and the party's failure to avail itself of that opportunity will not justify Rule 60(b)(4) relief.").

The GUC Trust can point to no "highly convincing" evidence to support its request for Civil Rule 60(b) relief. Quite simply, it knew about all of these issues while the 363 Sale was being negotiated and finalized, and made a deliberate decision to not raise any issues at that time. To wait to raise such issues before the Court until a year later -- when all parties have been operating under the procedures approved by the Court -- does not comport with the objectives of Civil Rule 60(b), which seeks to promote "substantial justice."

## D.    **The Lock-Up Agreement Was Validly Assumed and Assigned**

The Lock-Up Agreement was assumed by Old GM and assigned to New GM.[10]  *See* SOUF, ¶¶ 84-86.  As noted above, the only significant remaining obligation of Old GM under the Lock-Up Agreement was the Cooperation Provision.  *See* SOUF, ¶ 84.  Given that GM Canada received a release under the Lock-Up Agreement of the Intercompany Loans and New GM purchased GM Canada as part of the 363 Sale, New GM needed to ensure that there would be no breach of the Lock-Up Agreement by Old GM, and this Cooperation Provision would be complied with on a going-forward basis.  Accordingly, New GM designated the Lock-Up Agreement as an Assumable Executory Contract (as defined in the MSPA) in accordance with

---

[10]    As explained further below, if the Lock-Up Agreement was not an executory contract capable of being assumed, it constituted a "Purchased Contract" that was transferred to New GM pursuant to the MSPA.  *See* SOUF, ¶ 87.  Moreover, if the Lock-Up Agreement is somehow found to be a post-petition contract (which New GM strongly disputes), the Lock-Up Agreement was, nonetheless, a Purchased Contract because the definition of Purchased Contracts contained in the MSPA is not limited to pre-petition contracts but concerns ***all*** Contracts of Old GM, whether they were entered into pre-petition or post-petition.

New GM further notes that the Assumption and Assignment Notice approved by the Court in the Sale Procedures Order provided that the Debtors' designation of a document as an Assumable Executory Contract did not mean that the document was an executory contract within the meaning of the Bankruptcy Code.  *See* Sale Procedures Order, Exhibit D, ¶ 15.  The significance of that provision as it relates to this matter is that the parties designation of the Lock-Up Agreement as an Assumable Executory Contract is a clear reflection of the parties' intent to treat this asset as a Purchased Asset -- whether or not the Lock-Up Agreement is, itself, an executory contract within the meaning of the Bankruptcy Code.

the Assumption and Assignment Procedures; this designation was noted in the Contract Database

maintained for assumption/assignment purposes on July 24, 2009.  *See* SOUF, ¶¶ 84-87.  The

Noteholders received notice of the assumption and assignment of the Lock-Up Agreement and

have never challenged the assignment of the Lock-Up Agreement to New GM.  *See* SOUF, ¶¶

86.

The GUC Trust does not have standing to raise issues surrounding compliance with the

Assumption and Assignment Procedures.  The Committee was not a party to the Lock-Up

Agreement and was not entitled to receive notice of the designation of the Lock-Up Agreement

as an Assumable Executory Contract.[11]  *See* SOUF, ¶ 79.  The Committee was essentially carved

out of the assumption/assignment process; this was the procedure approved by the Committee

and authorized by the Court pursuant to the Sale Procedures Order and the Sale Approval Order,

reflecting the reality that all assets of the Debtors (with very specific enumerated exceptions)

were to be acquired by New GM.[12]  The Committee had no interest in the contracts and New

GM, not the Debtors, had the contractual right to determine which contracts would be

transferred. *See* SOUF, ¶ 89.  The GUC Trust should not now be permitted to complain about a

process it knowingly was excluded from and had no involvement in.

**E.      Granting Rule 60(b) Relief at This Juncture**
**Would Impose an Undue Hardship on New GM;**
**the Equitable Mootness Doctrine Applies**

Application of Civil Rule 60(b) relief at this juncture would impose an undue hardship on

New GM.  Specifically, New GM relied on the release of GM Canada contained in the Lock-Up

---

[11]    However, as stated by Debtors' counsel at his deposition, the Committee was on notice that the Lock-Up
Agreement could be assumed because it "was notified that every executory contract could have been assigned."
*See* SOUF, ¶ 67.

[12]    There is nothing controversial about the Committee's lack of involvement in the assignment of executory
contracts.  New GM had paid for all executory contracts which it believed were necessary to acquire.  The
beneficial result of assigning executory contracts to New GM was to relieve Old GM of ongoing obligations,
and to give the non-Debtor contracting party a new entity to do business with.

Agreement and the enhanced value of GM Canada (free of the Intercompany Loans with Nova Scotia Finance) when it purchased substantially all of the assets from Old GM. Through the Lock-Up Agreement, approximately CDN$1.3 billion of liabilities were removed from GM Canada's balance sheet. The terms of the Lock-Up Agreement and the resulting increased value of GM Canada, as well as the value of other assets purchased, were relied on by New GM when agreeing on the purchase price to be paid by New GM to Old GM. New GM has relied on these court-approved terms for almost three years. To grant the relief requested by the Committee now has the potential of negatively affecting the value of GM Canada and the other assets purchased by New GM, which, in turn would unjustly deprive New GM of the benefits of the bargain struck with Old GM. *See Teligent*, 326 B.R. at 228 (relief pursuant to Rule 60(b) should not be granted and the "Bankruptcy Court should not vacate an order where, as is the case here, intervening rights have vested in reliance on that order").

In reliance on the effectiveness of the Sale Approval Order, since July 5, 2009, New GM has entered into "countless new transactions . . . and the ownership of New GM is held by diverse partners including [the U.S. Government], the Governments of Canada and the Province of Ontario, the UAW, and [Old GM] on behalf of its claimants." *Parker v. Motors Liquidation Co.* (*In re Motors Liquidation Co.*), 430 B.R. 65, 82 (S.D.N.Y. 2010), *motion to vacate denied,* 2010 WL 3565494 (S.D.N.Y. Sept. 10, 2010). In entering into such transactions, those parties, and others, have relied on the finality of the Sale Approval Order. *Id.* (request to modify Sale Order would "'knock the props out' from under the transactions that have occurred since the sale [of assets from Old GM to New GM] was consummated"). Any modification to the Sale Approval Order, the procedures approved therein, and the assets purchased by New GM would negatively affect New GM and potentially could call into question the thousands of other

16

contracts that Old GM assumed and assigned to New GM.  Accordingly, the GUC Trust's

attempt to unwind the Sale Approval Order, including the assumption and assignment of the

Lock-Up Agreement to New GM, should be considered equitably moot. *See Palermo v. Pritam*

*Realty, Inc. (In re Pritam Realty, Inc.)*, 233 B.R. 619, 624 (D.P.R. 1999) (affirming denial of

motion to vacate sale order under Rule 60(b) where "the general doctrine of equitable mootness

bars [] consideration of the relief requested" and "[t]o vacate said sale at this juncture would run

counter to the essential principal of finality that is particularly important in the bankruptcy

context").

**F.**     **The GUC Trust's Civil Rule 60(b) Request is Not Timely**

A motion for relief under Civil Rule 60(b) must be made within a reasonable time from

the entry of an order, and the failure to timely seek relief is fatal to the motion. *See* Civil Rule

60(c)(1) ("A motion under Rule 60(b) must be made within a reasonable time – and for reasons

(1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the

proceeding."). The Committee did not file its Civil Rule 60(b) request seeking to void or modify

the Sale Order until July 2, 2010. *See* Claims Objection.  Thus, the Committee delayed seeking

relief under Civil Rule 60(b) for nearly one year after the Court's entry of the Sale Approval

Order on July 5, 2010.

The only ground the GUC Trust asserts for its failure to timely file its Civil Rule 60(b)

relief is that it was not provided with notice of Old GM's intention to assume the Lock-Up

Agreement under the Sale Approval Order. *See* Claims Objection, at ¶ 48.  However, as noted,

pursuant to the Court-approved and Committee approved Assumption and Assignment

Procedures, the Committee was not entitled to receive notice of the assumption and assignment

of the Lock-Up Agreement.  *See* SOUF, ¶¶ 80-81.  Thus, the GUC Trust's allegations in this

regard are without merit.

Moreover, the Committee's alleged ignorance does not justify its failure to act sooner. The filing of the motion seeking Civil Rule 60(b) relief within the one-year limitation period does not *per se* establish that the motion was timely filed. Rather, as "the delay in making the motion approaches one year there should be a corresponding increase in the burden that must be carried to show that the delay was 'reasonable.'" *Sasso v. M. Fine Lumber Co., Inc.*, 144 F.R.D. 185, 188-89 (E.D.N.Y. 1992) (internal quotations omitted) (citing *Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation*, 605 F.2d 648, 656 (2d Cir. 1979)). The reasonableness of a delay in filing a Rule 60(b) motion thus depends on when the movant became aware of the facts giving rise to such request. *Stupakoff v. Otto* (*In re Spiegel, Inc.*), 269 Fed. Appx. 56, 58 (2d Cir. 2008), *cert. denied*, *Stupakoff v. Otto* (*GmbH & Co. KG*), 555 U.S. 825 (2008). Indeed, a motion under Rule 60(b) "is not a substitute for a timely appeal" of an order, particularly where "intervening rights have vested in reliance on" such an order. *See, e.g., Teligent*, 326 B.R. at 227-28. Here, the GUC Trust's own documents demonstrate that the Committee began actively reviewing and analyzing the Lock-Up Agreement, and the issues associated therewith, in early October, 2009. *See* SOUF, ¶ 66. Yet, the Committee inexplicably waited another nine (9) months to file its original Claims Objection. Such an extended delay cannot possibly satisfy Civil Rule 60(b)'s timing requirements.[13]

In addition, even though the Committee actively began to address the issues associated with the Lock-Up Agreement in October, 2009, it was made aware of these issues well before that. *See* SOUF, ¶ 66. Specifically, the Lock-Up Agreement and the claims addressed therein were referenced in the following documents that were either publicly filed or made available to the Committee, many of which pre-date the Sale Approval Order:

---

[13]    The Committee authorized its counsel to file pleadings objecting to the Noteholders' and Nova Scotia Finance Trustee's claims on or about December 15, 2009. *See* SOUF, ¶ 66. Yet, the original Claims Objection was not filed by the Committee until July 2, 2010 -- ***almost seven months later***.

(i)      the Form S-4 publicly filed by Old GM on April 27, 2009 (before the Petition Date and prior to the Sale Approval Order) that detailed the Bond Exchange Offer.  In the Form S-4, Old GM referenced the Notes, the Guaranty and the Intercompany Loans.  Old GM explained that if it was required to commence a bankruptcy case,

> only the guarantee by GM of the old GM Nova Scotia notes would potentially be discharged in GM's reorganization case. The old GM Nova Scotia notes would not be cancelled and the holders thereof would not be precluded by a GM reorganization case from seeking payment from GM Nova Scotia for the balance due under the old GM Nova Scotia notes. In addition, because GM Nova Scotia is an "unlimited company," under Nova Scotia corporate law, if GM Nova Scotia is "wound up" (which includes liquidation and likely includes bankruptcy), the liquidator or trustee in bankruptcy may be able to assert a claim against GM, the shareholder of GM Nova Scotia, to contribute to GM Nova Scotia an amount sufficient for GM Nova Scotia to pay its debts and liabilities, including amounts equal to any amounts outstanding under the old GM Nova Scotia notes. It is possible that such claim for contribution may be impaired in the event GM seeks relief under the U.S. Bankruptcy Code. In addition, in the event that we were to seek relief under the U.S. Bankruptcy Code, General Motors of Canada Limited and/or GM Nova Scotia may decide to seek relief under applicable Canadian bankruptcy law, in which case the GMCL Intercompany Loans may be impaired. Each of the foregoing events may adversely affect the recovery holders of old GM Nova Scotia notes may receive on account of their old notes.

Form S-4, at 12, 134.  Counsel for the Committee testified that he and his team reviewed the Form S-4.  Mayer Tr., 27:10-27:19; 29:22-30:8.  Moreover, the two indenture trustees who sat on the Committee received the Form S-4 as part of the Bond Exchange Offer.[14]

(ii)     the June 1, 2009 8-K filed by Old GM with the Securities and Exchange Commission (the day of the bankruptcy

---

[14]    A copy of the Form S-4 is contained in the Compendium of Exhibits as Exhibit "P."

filing and prior to the Sale Approval Order).[15]  The Lock-Up Agreement is specifically referred to as a "***Material Definitive Agreement***" in the June 1, 2009 8-K.  The extinguishment of the Intercompany Loans, the payment of the Consent Fee, the presence of the "GM guarantee," the Extraordinary Resolution, the Deficiency Claim and the possible subordination of certain GM claims were all expressly discussed in the June 1, 2009 8-K.

According to Committee counsel's time records, 8-Ks were reviewed on June 4, 2009 and June 8, 2009.[16]  Moreover, counsel for the Committee testified at his deposition that the review of such documents were a standard part of diligence.  *See* Mayer Tr., 55:16-55:19 ("Q   And you thought the SEC filings would be helpful or a review of those filings would be helpful in that regard? A   It's a standard part of diligence.").  Furthermore, it is axiomatic that companies file 8-Ks for a reason, to wit, there is a particular and material business matter that needed to be immediately disclosed to the public;

(iii)    the Notice of Meeting concerning the passage of the Extraordinary Resolution, which detailed many of the terms contained in the Lock-Up Agreement, was published in the Financial Times on June 3, 2009;[17]

(iv)    the Disclosure Schedules, which were part of the 363 Sale documents and which was provided to the Committee no later than June 5, 2009 (and at various other times during the month of June, 2009 -- prior to the Sale Approval Order).  The Disclosure Schedules referenced, among other things, (a) the Nova Scotia Settlement, and provides that "Sellers may do all things necessary and appropriate in furtherance of consummating the Nova Scotia settlement;" (b) "the transfer of funds from [Old GM] to [GM Canada], which funds will be used by [GM Canada] to pay the [GM Canada Settlement Amount to [Nova Scotia Finance], which transfer of funds occurred before the date of this Agreement . . . ;" and (c) the subordination of the obligations of Nova Scotia Finance to Old GM pursuant to

---

[15]   A copy of the June 1, 2009 8-K is contained in the Compendium of Exhibits as Exhibit "HH."

[16]   Relevant excerpts of Committee counsel's time records are contained in the Compendium of Exhibits as Exhibit "II."

[17]   A copy of the Notice of Meeting is contained in the Compendium of Exhibits as Exhibit "FF."

the Swap Transactions.    *See* Disclosure Schedules, at Section 6.2.[18]

Counsel for the Committee testified that these schedules were reviewed.   *See* Mayer Tr., 116:4-117:5.  He also testified that these schedules were "important."  Mayer Tr., 118:6-118:9 ("Q  -- and this is an important document. It's part of the sale agreement, isn't it?  A  That is correct. It is part of the sale agreement.").   The schedule which discussed the Nova Scotia Settlement was an important provision.   That schedule listed the "out of the ordinary course of business" transactions that could be undertaken by the GM entities prior to closing of the 363 Sale, without the consent of the Purchaser (New GM);

(v)        the First Amendment, which, again, was filed prior to the Sale Approval Order, and specifically references the Lock-Up Agreement.  *See* First Amendment, ¶ 7.[19]

The First Amendment is a three-page document that specifically referenced the Lock-Up Agreement.  Counsel for the Committee testified that they reviewed and commented on the Final DIP Order and the credit agreement documents associated therewith. Mayer Tr., 126:17-131:9.

(vi)       the August 7, 2009 8-K filed by New GM with the Securities and Exchange Commission; the Lock-Up Agreement is annexed as an exhibit to the August 7, 2009 8-K.[20]

Counsel for the Committee testified that this document was reviewed when it was filed, that it was a "material document" (Mayer Tr., 143:9-145:15) and that it was "important to us" (Mayer Tr., 58:15-59:16).  Counsel for the Committee further explained that since the unsecured creditors would get stock of New GM, how New GM complied with securities filings required particular scrutiny. Mayer Tr., 145:4-145:15; and

(vii)      the Interim Report, filed by the Debtors on August 11, 2009, which specifically references the Lock-Up

---

[18]    Relevant portions of the Disclosure Schedules, and the Committee's knowledge of same, are contained in the Compendium of Exhibits as Exhibit "E."

[19]    A copy of the First Amendment is contained in the Compendium of Exhibits as Exhibit "JJ."

[20]    A copy of the August 7, 2009 8-K is contained in the Compendium of Exhibits as Exhibit "KK."

> Agreement and the amendment to the Fiscal and Paying
> Agency Agreement, wherein the Noteholders agreed to
> limit their claims against Old GM to a recovery on the
> Guarantee Obligations and the Wind-Up Claim asserted by
> the Nova Scotia Finance Trustee.  *See* Interim Report,
> Exhibit "A," ¶ 10(a)(iii) and (iv) (pp. 7-8).[21]
>
> Counsel for the Committee testified that this document was
> reviewed and was the "subject of some discussions."
> Mayer Tr., 158:13-159:13.  The Interim Report actually
> says that the Noteholders' claims were allowed by the
> Lock-Up Agreement.  While this was wrong, it certainly
> was a "red flag" to the Committee reviewing the document.

*See* SOUF, ¶ 63.

In addition to the foregoing, counsel for the Committee also had communications with one of the Noteholders in July, 2009 regarding Nova Scotia Finance and the Notes.  *See* SOUF, ¶ 64. Counsel for the Committee testified that Mr. Gropper (from Aurelius) told him in July, 2009 what a "good deal" he had received in connection with the Notes.  *See* SOUF, ¶ 65.  These are all clear indications that the Committee had knowledge of the Lock-Up Agreement well before October, 2009.

Accordingly, the GUC Trust should not be permitted to use Civil Rule 60(b) almost a full year after the Sale Approval Order was entered when it has admitted to being on notice of the Lock-Up Agreement and the issues associated therewith at least nine months earlier, and was indeed on notice thereof much earlier then that.  The Court should deny any relief based on Civil Rule 60(b) on this basis alone. *See, e.g., Spiegel*, 269 Fed. Appx. at 58 (finding a delay in filing a Civil Rule 60(b) motion to modify debtor's plan seven months after becoming aware of the plan's existence was unreasonable); *Sasso*, 144 F.R.D. at 188-89 (denying Civil Rule 60(b) motion where movant failed to file motion until nine months after entry of judgment of which it

---

[21]    A copy of the Interim Report is contained in the Compendium of Exhibits as Exhibit "LL."

was aware); *Teligent*, 326 B.R. at 228 (denying estate representative's Civil Rule 60(b) motion to unwind assumption of executory contract made less than seven months following entry of order approving such assignment, finding that representative knew of the assumption order and failed to appeal).

## POINT II

### THE GUC TRUST CANNOT USE SECTION 502(d) OF THE BANKRUPTCY CODE OR OTHER AVOIDING POWER CLAIMS TO AVOID THE CONSENT FEE

**A.    Intercompany Avoiding Power Claims Were Sold to New GM**

While some Bankruptcy Avoidance Actions (as defined in Section 2.2(b)(xi) of the MSPA) were considered Excluded Assets, Bankruptcy Avoidance Actions "relating to or in connection with, any payments by or to, or other transfers or assignments by or to, any Purchased Subsidiary" were expressly carved out of this provision and constituted Purchased Assets.    *See* Sellers' Disclosure Schedule, § 2.2(b)(xi).[22]    GM Canada was a Purchased Subsidiary under the MSPA.    *See* Definitions in MSPA.    Accordingly, it cannot be disputed that any avoidance actions premised on intercompany transfers by or to any Purchased Subsidiary are now owned by New GM and are not owned by the GUC Trust.    The Committee was aware of this aspect of the MSPA and the transfer of this asset to New GM during the 363 Sale process. *See* SOUF, ¶¶ 74-75.    Thus, the Committee (and now the GUC Trust) are prohibited from utilizing the Intercompany Avoiding Power Claims.    Counsel for the Committee acknowledged at his deposition that the statements made in the Claims Objection -- that the estate could recover payments made to the Noteholders, including the Consent Fee -- were not true and correct.    *See* SOUF, ¶ 74.

---

[22]    A copy of the Sellers' Disclosure Schedules are contained in the Compendium of Exhibits as Exhibit "E."

The GUC Trust will argue that it is not seeking to use the Intercompany Avoiding Power Claims affirmatively, but that it is merely seeking to use these claims defensively in connection with its objection to the Noteholders' and the Nova Scotia Finance Trustee's proofs of claim. However, whether the GUC Trust is seeking to use the Intercompany Avoiding Power Claims affirmatively or defensively is of no moment.  Such claims were unequivocally sold to New GM with the knowledge and consent of the Committee as part of the 363 Sale.  *See* SOUF, ¶¶ 73-75. Nothing was left behind relating to such claims.  They cannot now be utilized by the GUC Trust -- either affirmatively or defensively.

While there is a split in the case law regarding whether a debtor or trustee (or some other estate representative) can use avoiding power claims defensively through Section 502(d) of the Bankruptcy Code when the underlying avoidance action is no longer timely under Section 546(a) of the Bankruptcy Code,[23] the limited holdings in the line of cases that support the defensive use of avoiding power claims is not applicable to this case.  In virtually all of the cases that have discussed the use of avoiding power claims defensively in connection with an objection to a proof of claim,[24] the reason why an affirmative action was not brought by the party with standing to bring such action was because the statute of limitations contained in Section 546(a) of the

---

[23]    *Compare In re Mid Atl. Fund, Inc.*, 60 B.R. 604 (Bankr. S.D.N.Y. 1986) (holding that a chapter 7 trustee could use section 502(d) of the Bankruptcy Code defensively to disallow a creditors' claim, where the chapter 7 trustee was time-barred pursuant to section 546 of the Bankruptcy Code from commencing the underlying avoidance action) *with In re Mktg. Assocs. of Am., Inc.*, 122 B.R. 367, 369-70 (Bankr. E.D. Mo. 1991) (finding that the party seeking to disallow a claim based on section 502(d) of the Bankruptcy Code must first be able to successfully pursue an avoidance action; the court found it implicit that no preference is "avoidable" if the action is not brought within the time limits prescribed by section 546(a) of the Bankruptcy Code).

[24]    The one case located that did not concern a statute of limitations issue was *Brown v. U.S. (In re Larry's Marineland of Richmond, Inc.)*, 166 B.R. 871, 874 (Bankr. E.D. Ky. 1993).  In *Larry's Marinland*, the bankruptcy court found that an affirmative avoidance action could not be pursued by the chapter 7 trustee against the United States because, under the Supreme Court's decision in *U.S. v. Nordic Village, Inc.*, 503 U.S. 30 (1992), a debtor could not affirmatively recover money from the United States.  Nonetheless, the bankruptcy court found that the chapter 7 trustee could object to the claim of the United States based on section 502(d) of the Bankruptcy Code, although the estate was precluded from obtaining an affirmative monetary recovery from the United States on any associated avoidance action.  *Id.* at 875.  It should be noted that in *Larry's Marineland*, the party asserting the section 502(d) defense -- the chapter 7 trustee -- would have had standing to assert the underlying avoidance action on behalf of the estate absent the holding in *Nordic Village*.

Bankruptcy Code had expired.  *See, e.g., Mid Atl. Fund*, 60 B.R. 604; *In re McLean Indus. Inc.*, 196 B.R. 670 (S.D.N.Y. 1996).  Inherent in these rulings is that the objector to the claims had standing to bring the avoiding power claims, but that the statute of limitations was a defense thereto.

This line of cases does not hold that any party in interest, regardless of whether they could ever have standing to assert an avoidance action, may still avail itself of Section 502(d) of the Bankruptcy Code.  Rather, courts permitting the defensive use of Section 502(d) have narrowly decided the discreet issue before it, discussing the purpose of the statute of limitations and how the statute of limitations should not apply to Section 502(d) of the Bankruptcy Code because the Section 546(a) statute of limitations does not apply to Section 502(d) of the Bankruptcy Code.  Again, the underlying premise of these cases is that the objecting party must have had standing to assert an avoidance action.  That premise fails when the bankruptcy estate has sold the avoidance action to a third party.

Courts in the Second Circuit have held that section 502(d) of the Bankruptcy Code is meant to apply to situations where the estate is entitled to recover property.  *See, e.g., Enron Corp. v. Springfield Assocs., L.L.C.* (*In re Enron Corp.*), 379 B.R. 425, 435 (S.D.N.Y. 2007), *motion to certify appeal denied*, 2007 WL 2780394 (S.D.N.Y. Sept. 24, 2007) ("'Section 502(d) requires a court to disallow an entity's claim against the bankruptcy estate if the estate is entitled to recover property from that entity, such as because of a voidable preference, but that entity has failed to first transfer this property back to the bankruptcy estate.'" (quoting *U.S. Lines (S.A.) v. U.S.* (*In re McLean Indus.*), 30 F.3d 385, 388 (2d Cir. 1994)).  The language of Section 502(d) confirms this principle.  The section uses phrases such as "from which property is recoverable" and "unless the transferee has paid the amount."  Here, the estate is not entitled to recover

property from the Noteholders because the Intercompany Avoiding Power Claims have been sold to New GM.

Even if an avoidance claim was possible, New GM would be the beneficiary; not the Debtors' unsecured creditors. As the GUC Trust cannot recover any property for its benefit, it should not be permitted to use any avoiding powers that were previously sold to New GM.

**B.    The GUC Trust is Not Authorized
to Bring Avoiding Power Claims**

The statements made by Mr. Vanaskey at his deposition that the GUC Trust is seeking to void the Lock-Up Agreement in an effort to undo the releases given to GM Canada by Nova Scotia Finance is essentially an affirmative request to void the Lock-Up Agreement. However, neither the Committee, nor the GUC Trust now has, or had standing to bring such actions.

At the time the original Claims Objection was filed, only the Debtors had standing to bring certain affirmative avoiding power claims on behalf of the Debtors' estates. The Committee had no independent standing to bring such actions and never requested authority to do so. *See Durso Supermarkets, Inc. v. D'urso (In re Durso Supermarkets, Inc.)*, Case Nos. 94 Civ. 6035 (LLS), 94 Civ. 6036 (LLS), 94 Civ. 5784 (LLS), 94 Civ. 5786 (LLS), 94 Civ. 4974 (LLS), 1995 WL 739549, at *8 (S.D.N.Y. Dec. 14, 1995) ("Creditors' committees have no independent standing under the Bankruptcy Code to avoid fraudulent transfers, but rather may do so 'only when the trustee or debtor-in-possession unjustifiably failed to bring suit or abused its discretion in not suing.'").

Moreover, pursuant to the GUC Trust Agreement, the GUC Trust has no standing to bring affirmative avoidance actions. *See* SOUF, ¶¶ 101-104. Significant for the matters presently before the Court, the Plan created two post-confirmation trusts: (i) the GUC Trust; and (ii) the Avoidance Action Trust. *See* SOUF, ¶ 101. Neither the Plan nor the governing

26

documents for the GUC Trust provides that the GUC Trust has the power to bring any Avoidance Actions (as defined in the Plan). *See* SOUF, ¶ 102.

Except for the Term Loan Avoidance Action (as defined in the Plan), the Avoidance Action Trust also does not have the power to bring any Avoidance Actions. Section 6.10 of the Plan provides that all Avoidance Actions transferred to the Avoidance Action Trust "shall be deemed abandoned by the Debtors for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors." *See* SOUF, ¶ 103. Thus, Avoidance Actions other than the Term Loan Avoidance Action were abandoned under the Plan.

In addition, the Plan defined Avoidance Actions as "any action commenced, or that may be commenced, before or after the Effective Date pursuant to section 544, 545, 547, 548, 549, 550, or 551 of the Bankruptcy Code, *except to the extent purchased by New GM under the MSPA* or prohibited under the DIP Credit Agreement." Plan, § 1.18 (emphasis added). The term "Avoidance Action" does not include the Intercompany Avoiding Power Claims. Thus, by definition, the GUC Trust and the Avoidance Action Trust do not have the power to bring Avoidance Actions which were sold to New GM pursuant to the MSPA. Accordingly, neither the GUC Trust nor the Avoidance Action Trust has standing to maintain any Avoidance Action in this matter.

It should be noted that when the Committee sought to retain an asset for the benefit of the Debtors' estates, it clearly knew how to do so. As stated by counsel for the Committee at his deposition, the Committee actively negotiated for control over the Term Loan Avoidance Action, and that action was not sold to New GM. *See* SOUF, ¶ 75. The Committee knew about the transfer of the Intercompany Avoiding Power Claims and decided not to object to that asset being transferred to New GM. It did not bargain for a defensive use of the asset sold.

Accordingly, the GUC Trust cannot now use Intercompany Avoiding Power Claims to obtain the relief it seeks from the Noteholders and the Nova Scotia Finance Trustee.

### C.    As the $450 Million Loan was Repaid, With Interest, There is No Transfer to Avoid

Even if the GUC Trust had standing to bring an avoidance action, there is no transfer outstanding that could be voided.  The proceeds of the $450 Million Loan were used by GM Canada to discharge the Intercompany Loans.  Nova Scotia Finance used the proceeds received from GM Canada to pay the Noteholders the Consent Fee.  The $450 Million Loan was repaid in full, with interest by GM Canada to Old GM prior to the closing of the 363 Sale.  *See* SOUF, ¶¶ 47-52.

Section 502(d) of the Bankruptcy Code on its face provides that the claims of creditors may be allowed "unless such entity or transferee has paid the amount . . . ."  11 U.S.C. § 502(d). Accordingly, as the $450 Million Loan was repaid (in full with interest) by GM Canada to Old GM prior to the closing of the 363 Sale, there is no transfer of the Debtor's interest in property that can be voided by the GUC Trust.  Section 502(d) of the Bankruptcy Code, thus, has no application here.

### D.    Even if the $450 Million Loan was not Repaid, The GUC Trust Could Still Not Recover the Consent Fee

Assuming, *arguendo*, that the $450 Million Loan was not repaid (even though it clearly was), the GUC Trust would not be able to recover the Consent Fee because any claim that would require the return of the Consent Fee was sold to New GM as part of the MSPA.  Aside from the Intercompany Avoiding Power Claims, other assets purchased by New GM included the following:

> (i)    "all cash and cash equivalents . . . other than the Excluded Cash and Restricted Cash."  MSPA, § 2.2(a)(i).  Restricted Cash (except certain Restricted Cash not applicable here)

was also a "Purchased Asset" (as defined in the MSPA).
See MSPA, §§ 2.2(a)(ii) and 2.2(b)(ii).  Excluded Cash was
defined as "cash or cash equivalents in an amount equal to
$1,175,000,000 . . . ."  MSPA, § 2.2(b)(i) (as amended);

(ii)    "all accounts and notes receivable and other such Claims
for money due to Sellers . . . ."  MSPA, § 2.2(a)(iii); and

(iii)    "all intercompany obligations . . . owed or due, directly or
indirectly, to Sellers by any Subsidiary of a seller or joint
venture or other entity in which a Seller or a Subsidiary of a
Seller has any Equity Interest."  MSPA, § 2.2(a)(iv).

In short, New GM bought **both** any intercompany obligations of GM Canada to Old GM **and** all

cash other than what was set aside to wind down Old GM.

_**The Cash**_:  With respect to clause (i) above (*i.e.*, the assets purchased by New GM

pursuant to MSPA ¶¶ 2.2(a)(ii), 2.2(b)(i) and 2.2(b)(ii)), the cash that was left behind at Old GM

was for the stated purpose of funding the wind-down of the Debtors.  *See* Sale Motion, ¶ 16

("Any assets excluded from the sale will be administered in the chapter 11 cases, and sufficient

cash is to be made available to GM to fund the wind-down or other disposition of the Sellers'

assets.").  In other words, the amount of cash left with Old GM did not depend on how much

cash Old GM had on hand; it was solely based on how much the wind-down of the Debtors was

projected to cost.  *See* SOUF, ¶ 70.  This was confirmed by the Committee at the hearing on the

Sale Motion.  *See* SOUF, ¶ 71.  Accordingly, even if the $450 Million Loan was never made by

Old GM, the amount of cash left behind at Old GM would not have changed as such amount was

solely based on the projected costs of the wind-down of the Debtors.

Even if the $450 Million Loan was not repaid by GM Canada, it was an issue only for

New GM (and not the GUC Trust).  Counsel for the Committee confirmed at his deposition that

the Committee understood that any cash above the amount agreed upon to fund the wind-down

of the Debtors would go to the U.S. Treasury, and not back to the Debtors' estate.  *See* SOUF, ¶ 72.

**_Intercompany Accounts_**:  With respect to clause (ii) above (*i.e.*, the assets purchased by New GM pursuant to MSPA ¶ 2.2(a)(iii)), to the extent that the $450 Million Loan was an account or note receivable due to Old GM from GM Canada, "all accounts and notes receivable and other such Claims for money due to Sellers" were Purchased Assets sold to New GM.  *See* SOUF, ¶ 69.  Thus, the Committee could not base any claim against the Noteholders on an account receivable theory.

**_Intercompany Obligations_**:  With respect to clause (iii) above (*i.e.*, the assets purchased by New GM pursuant to MSPA ¶ 2.2(a)(iv)), as the $450 Million Loan was owed to Old GM by a Subsidiary of Old GM (*i.e.*, GM Canada), the $450 Million Loan was an "intercompany obligation[] . . . owed or due, directly or indirectly, to Sellers by any Subsidiary of a Seller . . . ;" such obligations were also Purchased Asset sold to New GM.  *See* SOUF, ¶ 69.

Accordingly, the GUC Trust cannot articulate any basis for avoiding or recovering the Consent Fee that does not necessarily implicate a claim or asset that was purchased by New GM as part of the MSPA.  Thus, the GUC Trust has no ability to void or recover the Consent Fee from the Noteholders.

## POINT III

## THE LOCK-UP AGREEMENT SHOULD NOT BE VOIDED

### A.   The Lock-Up Agreement was Not a Fraudulent Conveyance

While Old GM was a party to the Lock-Up Agreement, the economics of the agreement focused on non-Debtor parties.  The primary parties to the Lock-Up Agreement were (i) GM Canada -- a non-Debtor; (ii) Nova Scotia Finance -- a non-Debtor; and (iii) the Noteholders.  *See* SOUF, ¶ 53.  The economic substance of the Lock-Up Agreement concerned GM Canada, Nova

Scotia Finance and the Noteholders, not Old GM, and the claim issues that are the focus of this

contested matter arose independently from the Lock-Up Agreement. Specifically, the Lock-Up

Agreement provided for the following: (a) GM Canada would pay the Consent Fee to Nova

Scotia Finance in full settlement and satisfaction of the Intercompany Loans; (b) the holders of

the Notes would retain their Guarantee Claims against Old GM (the Lock-Up Agreement did not

create this claim; it merely acknowledged its existence from Old GM's perspective); (c) Nova

Scotia Finance (not Old GM) would provide the Noteholders with a consent to a bankruptcy

order in Nova Scotia; (d) the trustee appointed in the Nova Scotia Finance bankruptcy case

would be entitled to assert the Deficiency Claim against Old GM (the Lock-Up Agreement,

again, did not create this claim; it merely acknowledged its existence from Old GM's

perspective); (e) upon payment of the Consent Fee to the holders of the Notes, the Intercompany

Loan between GM Canada and Nova Scotia Finance (two non-Debtors) would be extinguished

and GM Canada would have no further liability thereunder to Nova Scotia Finance; and (f) the

Oppression Action would be dismissed. *See* SOUF, ¶ 56.

In contrast to the other parties' obligations, Old GM had minimal obligations under the

Lock-Up Agreement. Specifically:

> (a)    Old GM agreed that the Deficiency Claim and the Guarantee Claims were enforceable against Old GM "to the fullest extent permitted under applicable laws . . . ." Lock-Up Agreement, at ¶ 6(a).
>
> This does not preclude the Claims Objection, as a general proposition.
>
> (b)    Old GM agreed that, if any portion of the Deficiency Claim was disallowed, Old GM's claim on account of the Swap Transactions would be subordinated to the prior, indefeasible payment in full of the Notes. Lock-Up Agreement, at ¶ 6(b)(v).

Since the Swap Transactions were ultimately sold to New GM pursuant to the MSPA, this agreement was really made by the purchaser (New GM).

(c)      Old GM agreed that it would not assert any right of set off with respect to the Deficiency Claim.  Lock-Up Agreement, at ¶ 6(b)(vi).

This does not bind the GUC Trust's ability to object to the Deficiency Claim.

(d)      Old GM agreed and covenanted "that it will not take any action or assert any position inconsistent with this Section 6 and, if called upon by the Holders, will confirm its agreement with the positions confirmed herein in writing or at a court hearing as reasonably requested by the Holders." Lock-Up Agreement, at ¶ 6(b)(vii).

This is the Cooperation Provision.

*See* SOUF, ¶ 54.

1.    **Old GM Agreed to "Support" Claims, Not Allow Them**

Contrary to the GUC Trust's characterization, Old GM agreed to support the Noteholders in seeking to have the Guarantee Claims and Deficiency Claim allowed in Old GM's bankruptcy case; Old GM never guaranteed that these claims would be allowed.  *See* SOUF, ¶ 57.  Old GM knew that it could not guarantee any allowance of claims, and the language used in the Lock-Up Agreement -- that such claims would be allowed "to the fullest extent permitted under applicable laws" (Lock-Up Agreement, at ¶ 6(a)) -- was specifically negotiated to make this point clear. The Committee and the GUC Trust always retained the right to contest the allowability of these claims.

The GUC Trust has completely misconstrued the Lock-Up Agreement when it contends that (i) the Guarantee Claims and Deficiency Claim are obligations that arise under the Lock-Up Agreement (Claims Objection, ¶ 6; Complaint, ¶¶ 3, 136); and (ii) the Lock-Up Agreement

"created a massive and improper Swap Liability against Old GM" (Complaint, ¶ 137).  Neither of these assertions are true.

The liability for both the Deficiency Claim and the Guarantee Claims arose prior to the execution of the Lock-Up Agreement (*see* SOUF, ¶ 58); the effect of the Lock-Up Agreement was simply to confirm those pre-existing claims from Old GM's perspective and to obtain the support of Old GM for such claims.  Specifically, the Deficiency Claim arises under Section 135 of the *Companies Act* (Nova Scotia).[25]   With respect to the Guaranty Claims, Old GM guaranteed Nova Scotia Finance's obligations under the Notes from the inception of this liability in 2003.  *See* SOUF, ¶¶ 9-10.  Accordingly, neither the Deficiency Claim nor the Guaranty Claims are based on or created by the Lock-Up Agreement, and each could have been asserted by the Noteholders absent the Lock-Up Agreement.

Old GM's agreement to **support** (not **guarantee**) the allowance of the Guarantee Claims and Deficiency Claim cannot be viewed as a fraudulent conveyance as nothing was transferred from Old GM's estate.  This is clearly evident through the GUC Trust's prosecution of the Claims Objection and Complaint.

## 2.    The Swap Claim is an Asset of New GM Properly Asserted Against Nova Scotia Finance

Implicit in the GUC Trust's argument that the Lock-Up Agreement was a fraudulent conveyance is the assertion that the Swap Claim -- that forms a part of the Deficiency Claim advanced by the Nova Scotia Finance Trustee --was created by this agreement.  It was not. The Swap Transactions were Purchased Assets as they were "intercompany obligations . . . owed or due, directly or indirectly, to Sellers by any Subsidiary of a Seller . . . ."  MSPA, § 2.2(a)(iv).

---

[25]  Section 135 of the Companies Act provides in part as follows: "In the event of a company being wound up, every present and past member shall, subject to this Section, be liable to contribute to the assets of the company to an amount sufficient for payment of its debts and liabilities and the costs, charges, and expenses of the winding up . . . ."

*See* SOUF, ¶¶ 90-91.  Accordingly, pursuant to the clear and unambiguous terms of the MSPA -- terms that were reviewed, negotiated and approved by the Committee -- the Swap Transactions were Purchased Assets pursuant to the MSPA and transferred to New GM at the closing of the 363 Sale.  Accordingly, like the Guarantee Claims and the Deficiency Claims, the Swap Claim was not created by the Lock-Up Agreement and voiding the Lock-Up Agreement will have no affect on this claim.

Given that the Swap Transactions were Purchased Assets, whether or not the Swap Transaction documents were validly assumed by Old GM and assigned to New GM is irrelevant.  In fact, however, Old GM did validly assign to New GM the Swap Transactions.  And, the utilization of the Assumption and Assignment Procedures demonstrates the intent to transfer this asset to New GM.  *See* SOUF, ¶¶ 92-93.

**B.**     **The Lock-Up Agreement was a Valid Pre-Petition Agreement**

      **1.**     **All Witnesses to the Execution of the Lock-Up Agreement Testified that it Was a Pre-Petition Agreement**

As explained in the Buonomo Declaration, there was a meeting of the minds with respect to the terms of the Lock-Up Agreement in the early morning hours of June 1, 2009, and all of the parties thereto executed the Lock-Up Agreement and authorized the release of their signature pages prior to Old GM filing its bankruptcy petition.  *See* SOUF, ¶¶ 39-46.  This fact was confirmed by a representative of each of the four Noteholders, the Noteholders' counsel, as well as by Mr. Buonomo, Mr. Ammann, Ms. Sutedja and the Debtors' counsel.  *See* SOUF, ¶ 42.  Each of these individuals was present at the offices of Weil Gotshal & Manges during the morning of June 1, 2009 and has first-hand knowledge of these events.

Moreover, Old GM has stated in at least one public filing that the Lock-Up Agreement was a pre-petition agreement. For example, in a Form 8-K filed with the Securities and Exchange Commission on October 9, 2009, Old GM stated as follows:

> As previously disclosed, on June 1, 2009, and ***prior to the filing by Motors Liquidation Company, formerly known as General Motors Corporation (the "Company"), of a voluntary petition for relief under chapter 11 of title 11 of the United States Code*** in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), the Company, General Motors Nova Scotia Finance Company ("GM Nova Scotia"), General Motors of Canada Limited, General Motors Nova Scotia Investments Limited and certain holders (the "Holders") of GM Nova Scotia's outstanding 8.375% notes due December 7, 2015 and GM Nova Scotia's 8.875% notes due July 10, 2023 (collectively, the "GM Nova Scotia Notes") entered into a lock up agreement relating to the GM Nova Scotia Notes . . . . (Emphasis added).

*See* SOUF, ¶ 99.

The GUC Trust can point to no evidence from any witness that was involved in the negotiations and execution of the Lock-Up Agreement that would dispute the foregoing facts.

In New York, "[t]o create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Express Indus. & Terminal Corp. v. N.Y. State DOT*, 93 N.Y.2d 584, 589 (1999), *reargument denied*, 93 N.Y.2d 1042 (1999). The New York Court of Appeals went on and stated that

> [t]his requirement assures that the judiciary can give teeth to the parties' mutually agreed terms and conditions when one party seeks to uphold them against the other. Generally, courts look to the basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds sufficient to give rise to a binding and enforceable contract.

*Id.* Moreover, as noted by the District Court in the Eastern District of New York:

> [n]ot all terms of a contract must be fixed with absolute certainty
> for a binding contract to exist. [citation omitted]  Although "there
> must be a manifestation of mutual assent to essential terms, parties
> also should be held to their promises and courts should not be
> 'pedantic or meticulous' in interpreting contract expression.

*Friedman v. Schwartz*, No. 08-CV-2801 (JS)(WDW), 2009 WL 701111, *9 (E.D.N.Y. March 13,

2009)(quoting *Express Ind.*, 93 N.Y.2d at 590).

Here, there is no question that there was mutual assent by all of the parties to the Lock-

Up Agreement prior to Old GM's bankruptcy filing.  All of the terms and conditions were agreed

to and reflected in the fully executed document -- this was all done pre-petition.  In particular,

the Canadian Government confirmed that the Lock-Up Agreement was done pre-petition (*see*

SOUF, ¶ 40), and based on that fact, GM Canada did not file for bankruptcy in Canada on June

1, 2009.

**2.    Except for the Cooperation Provision, Old GM
        <u>had no Continuing Obligation under the Lock-Up Agreement</u>**

While the implementation of the Lock-Up Agreement required that certain events occur

post-petition, Old GM had no role in those matters.  Specifically, while an escrow agreement was

to be negotiated and executed after the Petition Date, Old GM was not a signatory thereto -- this

agreement concerned GM Canada and Nova Scotia Finance (two non-Debtors). *See* SOUF, ¶ 60.

Moreover, although a meeting of holders of Notes was required to be held to pass an

Extraordinary Resolution of the Fiscal and Paying Agency Agreement that adopted the terms of

the Lock-Up Agreement and made them binding on all holders of Notes, Old GM had no role in

that process -- this solely concerned Nova Scotia Finance.  *See* SOUF, ¶ 61.  As noted above, the

Consent Fee was transferred post-petition by GM Canada to Nova Scotia Finance -- Old GM had

no role in that transfer.

Old GM's only continuing obligation after the Petition Date with respect to the Lock-Up Agreement was the Cooperation Provision. As noted, this did not affect Old GM's bankruptcy estate or its ability to contest the Guarantee Claims or the Deficiency Claim.

### C.    Even if the Lock-Up Agreement was a Post-Petition Agreement, It was Sold to New GM

Assuming, *arguendo*, that the Court believes there are material, disputed facts regarding whether the Lock-Up Agreement was a pre-petition agreement, the Lock-Up Agreement would fall within the definition of Purchased Contracts under the MSPA and would have been sold to New GM. Section 2.2(a)(x) of the MSPA provides "all Contracts, other than the Excluded Contracts (collectively, the 'Purchased Contracts')" are Purchased Assets.[26] "Contracts" was defined in the MSPA as "all purchase orders, sales agreements, supply agreements, distribution agreements, sales representative agreements, employee or consulting agreements, leases, subleases, licenses, product warranty or service agreements and other binding commitments, agreements, contracts, arrangements, obligations and undertakings of any nature (whether written or oral, and whether express or implied)." MSPA, p. 5. There was no distinction between pre-petition contracts and post-petition contracts contained in the definition of "Contracts" in the MSPA. Accordingly, the Lock-Up Agreement, even if considered a post-petition contract, would have been purchased by New GM pursuant to the terms of the MSPA.

Moreover, as noted above, Old GM's obligations under the Lock-Up Agreement were minimal. The only continuing obligation of Old GM was contained in the Cooperation Provision, which required Old GM to **support** the allowance (not **guarantee** the allowance) of the Guarantee Claims and the Deficiency Claim. Thus, this minimal obligation does not rise to

---

[26]    "Excluded Contracts" was defined in Section 2.2(b)(x) of the MSPA and included five categories of contracts that were not being sold to New GM. The Lock-Up Agreement does not fall within any of these enumerated categories.

the level of a post-petition "transfer of property of the estate" pursuant to Section 549 of the Bankruptcy Code.

Finally, Old GM did not pay anyone to settle claims against it. Also, Old GM did not give up any claims against third parties. In all respects, the Lock-Up Agreement was not a settlement agreement as it pertains to Old GM. As such, Bankruptcy Rule 9019 is not implicated in any way.

## CONCLUSION

For all of the foregoing reasons, New GM respectfully requests that the Court enter summary judgment in its favor on the following issues:

(i)    The GUC Trust is not entitled to any Civil Rule 60(b) relief and the Sale Approval Order should not be disturbed or modified in any way;

(ii)    The GUC Trust cannot utilize any "avoiding powers" or Section 502(d) of the Bankruptcy Code to upset the Lock-Up Agreement or avoid the payment of the Consent Fee as all applicable avoiding power claims were sold to New GM;

(iii)    The Lock-Up Agreement was not an unauthorized post-petition settlement as it was either (a) a pre-petition contract that constituted a Purchased Contract that was sold to New GM; (b) a pre-petition or post-petition contract that was validly assumed by Old GM and assigned to New GM; or (c) a post-petition contract that constituted a Purchased Contract that was sold to New GM;

(iv)    The GUC Trust cannot utilize any other asset or claim that was transferred to New GM as a basis for its Claims Objection and/or Complaint, including any claim based on an intercompany account or note receivable, an intercompany loan or any other intercompany obligation; and

(v)      The Swap Transactions were properly transferred to New GM pursuant to the 363

Sale.

Dated:    New York, New York
          June 8, 2012

Respectfully submitted,


/s/ Arthur Steinberg
Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222

*Attorneys for General Motors LLC*