**HEARING DATE AND TIME: July 19, 2012 at 9:45 a.m. (Eastern Time)**
**OBJECTION DEADLINE: June 29, 2012 at 5:00 p.m. (Eastern Time)**
**REPLY DEADLINE:  July 11, 2012 at 5:00 p.m. (Eastern Time)**

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222
Arthur Steinberg
Scott Davidson

*Attorneys for General Motors LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY, *et al*., | : | Case No.: 09-50026 (REG) |
| f/k/a General Motors Corp., *et al*. | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

------------------------------------------------------------ x

| | | |
|---|---|---|
| MOTORS LIQUIDATION COMPANY GUC TRUST, | : | |
| | : | |
| | : | |
| Plaintiff, | : | Adversary Proceeding |
| | : | Case No.: 12-09802 (REG) |
| v. | : | |
| | : | |
| APPALOOSA INVESTMENT LIMITED PARTNERSHIP, *et al*., | : | |
| | : | |
| Defendants. | : | |

------------------------------------------------------------ x

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT FILED BY GENERAL MOTORS LLC

Pursuant to Local Rule 7056-1 of the Local Bankruptcy Rules for the Southern District of New York, General Motors LLC ("**New GM**") hereby submits this *Statement of Undisputed Facts in Support of Motion for Summary Judgment filed by New GM*.  All exhibits cited herein are contained in the Compendium of Exhibits filed simultaneously herewith.  In support of its *Motion for Summary Judgment*, filed simultaneously herewith, New GM asserts that the following material facts are not in dispute:

## A.    Old GM's Pre-Petition Efforts to Restructure

1.    In 2009 through late May, the strong preference of General Motors Corporation (n/k/a Motors Liquidation Company) ("**Old GM**") was to accomplish a restructuring without the necessity of a bankruptcy filing.  Old GM's strategy was based upon, among other elements, reducing debt through a consensual bond exchange offer.  *See* Viability Plan submitted to the United States Treasury on February 17, 2009;[1]  *see also generally Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rule 1007-2,* filed in this court on June 1, 2009 [Docket No. 21] ("**Henderson Affidavit**").[2]

2.    After efforts to avoid bankruptcy failed, Old GM's restructuring plan was based on completing an expedited sale, pursuant to Section 363 of the Bankruptcy Code, of substantially all of its assets to New GM in exchange for an equity interest (stock and warrants) in New GM.  *See* Henderson Affidavit, at ¶ 14.

---

[1]    A copy of the Viability Plan is a publicly available document can be found at http://graphics8.nytimes.com/packages/pdf/business/20090217GMRestructuringPlan.pdf.

[2]    A copy of the Henderson Affidavit is contained in the Compendium of Exhibits as Exhibit "A."

3.     The United States and Canadian Governments (collectively, the "**Governments**")
funded the pre-bankruptcy operations of Old GM and its Canadian subsidiary.  They also created
and funded New GM and its purchase of Old GM, and were initially the majority shareholders of
New GM.  *See* Buonomo Decl., ¶ 4.

4.     One aspect of the 363 Sale was that New GM would acquire the equity interest of
Old GM in General Motors of Canada Limited ("**GM Canada**") and continue to operate it.  *See*
Buonomo Decl., ¶ 4; Amended and Restated Master Sale and Purchase Agreement between Old
GM and New GM (as amended) ("**MSPA**") (Definition of "Transferred Entities" and related
definitions).[3]

5.     As testified by Mr. Harry Wilson at the 363 Sale approval hearing, the United
States Treasury Auto Task Force placed considerable emphasis on preserving the timing and in
fact did not guaranty the continuation of Debtor-in-Possession financing in the event of delays.
*See* Declaration of Harry Wilson, dated June 25, 2009 [Docket No. 2577] ("**Wilson
Declaration**"), at ¶ 13.[4]

6.     Most of the liquidity available to Old GM in May of 2009 was the direct or
indirect proceeds of Government loans.  Under the pre-petition loan agreement between Old GM
and the United States, the United States Treasury's consent was necessary for the cash
expenditures to be made in order to avoid a GM Canada bankruptcy filing.  *See* Buonomo
Declaration, at ¶ 6.

---

[3]    A copy of the Order dated July 5, 2009 ("**Sale Approval Order**"), which has annexed to it the MSPA (without
exhibits or schedules) is contained in the Compendium of Exhibits as Exhibit "B."

[4]    A copy of the Wilson Declaration is contained in the Compendium of Exhibits as Exhibit "C."

B.    **Nova Scotia Finance**

7.    Nova Scotia Finance is a Nova Scotia unlimited liability company ("**ULC**"), and a wholly-owned direct subsidiary of Old GM.  *See* Objection to Claims (as amended) filed by the Motors Liquidation Company GUC Trust ("**GUC Trust**"), dated November 11, 2010 ("**Claims Objection**"), ¶ 17.[5]

8.    Nova Scotia Finance was not purchased by New GM as part of the 363 Sale.  *See* MSPA -- Sellers' Disclosure Schedules ("**Disclosure Schedules**"), Section 2.2(b)(iv).[6]

9.    On July 10, 2003, Nova Scotia Finance issued (a) £350,000,000 principal amount of 8.375% Guaranteed Notes due December 7, 2015 ("**2015 Notes**") and (b) £250,000,000 principal amount of 8.875% Guaranteed Notes due July 10, 2023 ("**2023 Notes**" and together with the 2015 Notes, the "**Notes**"), pursuant to the terms and conditions of that certain *Fiscal and Paying Agency Agreement*, dated as of July 10, 2003, between and among Nova Scotia Finance, Old GM, Deutsche Bank Luxembourg S.A., as fiscal agent, and Banque Général du Luxembourg S.A., as paying agent ("**Fiscal and Paying Agency Agreement**").  *See* Complaint, dated January 17, 2012 ("**Complaint**"),[7] filed by the GUC Trust, ¶ 20; Fiscal and Paying Agency Agreement.[8]

10.    The Notes were guaranteed ("**Guaranty**") by Old GM.  *See* Section 5 of Schedule 1 to the Fiscal and Paying Agency Agreement.

---

[5]    A copy of the Claims Objection is contained in the Compendium of Exhibits as Exhibit "D."

[6]    Relevant portions of the Disclosure Schedules, and e-mails with the Committee demonstrating its knowledge of the Disclosure Schedules, are contained in the Compendium of Exhibits as Exhibit "E."

[7]    A copy of the Complaint is contained in the Compendium of Exhibits as Exhibit "F."

[8]    A copy of the Fiscal and Paying Agency Agreement is contained in the Compendium of Exhibits as Exhibit "G."

11.     Upon issuance of the Notes, Nova Scotia Finance entered into two currency swap transactions with Old GM on July 10, 2003, whereby Old GM exchanged pounds sterling for Canadian dollars on such date. One swap transaction was related to the 2015 Notes, for £350,000,000/CDN$778,204,000, and would expire in 2015 (the "**2015 Swap**"). The other swap transaction was related to the 2023 Notes, for £250,000,000/CDN$555,860,000, and would expire in 2023 (the "**2023 Swap**," and together with the 2015 Swap, the "**Swap Transactions**"). *See* Claims Objection, ¶ 23; *see also* International Swap Dealers Association, Inc. Master Agreement and Schedule, and Currency Swaps Confirmation (collectively, the "**Swap Documents**").[9]

12.     The purpose of the Swap Transactions was to hedge against risk created by the circumstance that the obligations of Nova Scotia Finance under the Notes was denominated in Great Britain Pounds, but the asset intended to cover that liability provided cash flows denominated in Canadian dollars. *See* Buonomo Decl., ¶ 17.

13.     After issuance of the Notes, and the conversion of the proceeds from pounds sterling to Canadian dollars pursuant to the Swap Transactions, Nova Scotia Finance loaned the proceeds of the Notes to GM Canada pursuant to two loan agreements dated July 10, 2003. One loan agreement provided that Nova Scotia Finance would loan GM Canada CDN$778,204,000, at an annual interest rate of 9.42%; the principal amount would be due and payable on December 7, 2015 ("**2015 Intercompany Loan**"). The second loan agreement provided that Nova Scotia Finance would loan GM Canada CDN$555,860,000 at an annual interest rate of 10.20%; the principal amount for this loan would be due and payable on July 10, 2023 (the "**2023**

---

[9]     Copies of the Swap Documents are contained in the Compendium of Exhibits as Exhibit "H."

Intercompany Loan," and together with the 2015 Intercompany Loan, the "Intercompany Loans"). *See* Claims Objection, ¶ 25.

**C.    GM Canada**

14.    Prior to the 363 Sale, GM Canada was a wholly owned subsidiary of Old GM. *See* Buonomo Decl., ¶ 19; MSPA - Sellers' Disclosure Schedules, Section 1.1B (listing GM Canada as a Key Subsidiary).

15.    It was the expressed preference of the Governments to accomplish the Old GM restructuring without commencing a separate bankruptcy arrangement in Canada for GM Canada, provided critical liabilities could be resolved consensually on acceptable terms. *See* Deposition Transcript of Lawrence S. Buonomo, dated April 18, 2012 ("**Buonomo Tr. (Vol. I)**"), at 119:15-120:10;[10] Deposition Transcript of Daniel Ammann, dated April 27, 2012 ("**Ammann Tr.**"), at 177:4-177:7.[11]

16.    By May, 2009, Old GM, GM Canada and the Governments had identified three primary obstacles to avoiding a GM Canada bankruptcy filing. They were: (a) restructuring the arrangements with GM Canada's dealer network at acceptable cost; (b) restructuring the GM Canada's obligations to the Canadian Auto Workers and its members; and (c) restructuring the intercompany indebtedness owed by GM Canada to General Motors Nova Scotia Finance Company ("**Nova Scotia Finance**") based on the proceeds received by GM Canada from the

---

[10]    Relevant portions of Mr. Buonomo's Deposition Transcript from April 18, 2012 are contained in the Compendium of Exhibits as Exhibit "I."

[11]    Relevant portions of Mr. Ammann's Deposition Transcript are contained in the Compendium of Exhibits as Exhibit "J."

2003 notes ("**Notes**") issued by Nova Scotia Finance.[12]  *See* Buonomo Decl., ¶ 7; Amman Tr., at 16:22-17:6 ("In the context of the overall General Motors restructuring, an element of that was the General Motors Canada restructuring. Within that there were several aspects; restructuring of labor arrangements, restructuring of dealer arrangements, restructuring of these notes. So in the context of that overall restructuring, this was one of the elements that needed to be resolved one way or another."); Ammann Tr., at  27:17 - 28:6 ("The main decision in front of us was what are the benefits and costs of a [GM Canada] filing versus an out-of-court restructuring. In the context of that, there were both qualitative and quantitative inputs that went into that decision process. And as I've previously explained to you, the Nova Scotia notes were but one of three major elements of that restructuring. The assessment we had to make was in the context of all three elements, was there an out-of-court alternative that would be acceptable, not just to General Motors, but to the U.S. and Canadian governments who were financing the overall restructuring.").

17.    If Old GM was unsuccessful in reaching agreement on any one of these liabilities, GM Canada would have filed a bankruptcy arrangement in Canada.  *See* Ammann Tr., at 29:10 - 29:19.

18.    Overcoming the issues associated with Nova Scotia Finance and the Notes required negotiating a settlement with the holders of the Notes ("**Noteholders**").  *See* Buonomo Decl., ¶ 7.

---

[12]    Resolutions of the dealer and union matters were generally accomplished the week before the Lock-Up Agreement was executed.  *See* Ammann Tr., at 30:6 - 30:23.

19.     If a GM Canada bankruptcy was ultimately necessary because the Noteholders'
negotiations were not finally consummated by June 1, 2009, GM Canada was prepared to and
would have commenced a bankruptcy arrangement simultaneously with Old GM's bankruptcy
case during the morning of June 1, 2009.  *See* Buonomo Decl., ¶ 19; Ammann Tr., at 176:25-
177:13.

20.     In order to avoid a GM Canada bankruptcy, the resolution of the Notes would
have had to have been accomplished prior to Old GM's bankruptcy filing.  *See* Ammann Tr., at
164:13-164:19.

21.     Preparations were made to implement the contingency plan for GM Canada,
which was a bankruptcy filing by GM Canada in Canada on June 1, 2009, simultaneously with
the filing by Old GM in this Court. Timing was deemed critical.  The contingency plan provided
for GM Canada to file for bankruptcy at the same time as Old GM, so that the 363 Sale process
(to use U.S. terminology) would run in two jurisdictions, in tandem.  *See* Buonomo Decl., ¶ 9.

22.     The Governments, and particularly the Canadian Government, expressed a
preference to accomplish the 363 Sale without the necessity of filing a Canadian bankruptcy
proceeding for GM Canada, provided that could be accomplished at acceptable cost.  Although
there were discussion between Old GM and the Governments regarding the advantages and
disadvantages of a Canadian bankruptcy filing, ultimately the determination of whether to fund
an alternative approach and a determination of acceptable cost was required to be made by the
Governments, as both the secured lenders to Old GM and GM Canada and the sponsors of the
363 purchaser.  *See* Buonomo Decl., ¶ 4.

23.     At a meeting which took place in the middle of May, 2009 at the United States Treasury in Washington, D.C., and attended by representatives of Old GM, GM Canada, the United States Treasury Auto Task Force and the Canadian Government, the Governments communicated that they were prepared, as the purchaser, to use assets (*i.e.*, cash) which otherwise would flow to New GM under the MSPA in order to avoid the necessity of a GM Canada bankruptcy filing. *See* Buonomo Decl., ¶ 6.

24.     The following factors were identified by Old GM and discussed with the Governments as reasons to avoid filing a Canadian bankruptcy for GM Canada. ***First***, there would be a substantial loss of available NOLs (net operating losses) if GM Canada filed for bankruptcy. ***Second***, there would be significant expenses (*e.g.*, professional fees) relating to a Canadian bankruptcy. ***Third***, there was a serious concern that there would be a significant, negative, business impact on GM Canada if it filed for bankruptcy, which could spill over to other Canadian companies that did business with GM Canada. And, ***fourth***, there was a serious concern raised that a GM Canada bankruptcy in Canada would necessitate a multi-country restructuring, thereby making the 363 Sale more complex, and potentially negatively impacting the timing and process relating to the contemplated Old GM restructuring in the United States. *See* Buonomo Decl., ¶ 5.

25.     The reasons why the Governments wanted to avoid a GM Canada bankruptcy were explained by Mr. Buonomo at his deposition:

> Well, essentially, their position, as expressed in that particular meeting, at least, was that the Canadian government would prefer not to file a GM of Canada. And, you know, the governments were working together. They were cooperating. And, therefore -- therefore, it follows me -- to look at as to whether there was a way

> to avoid it. There were other times on the phone I remember Mr. Feldman [U.S. Government Task Force] also expressing concern about this issue of execution risk that I mentioned earlier.
>
> . . .
>
> [With regard to execution risk] [i]t was -- it was essentially common ground that it would be difficult to keep the time frame contemplated with the necessity to coordinate between proceedings on either side of the border.  The Treasury representatives were emphatic at all points that the time frame they laid out, which was, in fact, enshrined, I believe, in the loan documentation, must be maintained.  Timing was a critical element to them, and this was one of the things -- the need to coordinate was one of the things identified as possibly disruptive of that time.

Buonomo Tr. (Vol. I), at 120:2 - 121: 15.

26.    Counsel for the Committee testified that the Committee did not focus on anything related to Old GM's Canadian operations prior to the 363 Sale.  *See* Deposition Transcript of Thomas M. Mayer, dated May 29, 2012 ("**Mayer Tr.**"), at 106:22-106:24[13] ("I mean, we weren't focused on anything related to Canada in connection with -- during the 30 days prior to the sale.").

27.    Counsel for the Committee believed that the Canadian government did not want to commence a bankruptcy case for GM Canada because it "employed a lot of people."  *See* Mayer Tr., 73:21-73:21.

**D.    The Oppression Action**

28.    Beginning in January, 2009, certain of the Noteholders contacted Nova Scotia Finance to open up a dialogue about a possible restructuring of the Notes, and letters were

---

[13]    Relevant portions of Mr. Mayer's Deposition Transcript are contained in the Compendium of Exhibits as Exhibit "K."

exchanged.[14]  *See* Letter from Blake, Cassels, & Graydon LLP, dated January 27, 2009, a Letter from McInnes Cooper, dated February 4, 2009, a Letter from Blake, Cassels, & Graydon LLP, dated February 10, 2009, and a Letter from McInnes Cooper, dated February 13, 2009 (collectively "**Letter Exchange**").

29.    With no resolution on the Notes, certain of the Noteholders commenced an action in the Supreme Court of Nova Scotia on March 2, 2009 ("**Oppression Action**") asserting that various actions taken by Nova Scotia Finance, General Motors Nova Scotia Investments Ltd. ("**Nova Scotia Investments**"), Old GM and certain of their officers and directors were oppressive.  *See* Notice of Action filed in the Oppression Action ("**Oppression Action Notice**").[15]

30.    Shortly after the commencement of the Oppression Action, the Noteholders reached out to Old GM, saying that they "were ready to talk";  no substantive discussions took place at that time. *See* Email from Stephen Worth, dated March 18, 2009 ("**Worth E-Mail**") ("We got a call from Dan Gropper (Aurelius Capital) - Nova Scotia investor along with Fortress and Appaloosa - to let us know that they are out there ready to talk when we are.  I assured him we knew they were out there.").[16]

E.    **The Bond Exchange Offer**

31.    On March 30, 2009, after rejecting the initial restructuring plan submitted by Old GM, the U.S. Government granted Old GM 60 days to "address the tough issues to improve the long-term viability of the company, including the restructuring of the financial obligations to the

---

[14]    Copies of the Letter Exchange are collectively contained in the Compendium of Exhibits as Exhibit "L."

[15]    A copy of the Oppression Action Notice is contained in the Compendium of Exhibits as Exhibit "M."

[16]    A copy of the Worth E-Mail is contained in the Compendium of Exhibits as Exhibit "N."

bondholders, unions and other stakeholders." *See* Press Release, General Motors Co., *GM Statement on Auto Industry Restructuring* (March 30, 2009) ("**March 30 Press Release**").[17]

32.     As part of Old GM's restructuring efforts, on April 27, 2009, both Old GM and Nova Scotia Finance jointly solicited all holders of their respective notes, aggregating approximately $27.2 billion, to exchange their notes for common stock ("**Bond Exchange Offer**").    The Bond Exchange Offer was detailed in a Form S-4 ("**Form S-4**") that was filed with the Securities and Exchange Commission on April 27, 2009.  *See* Form S-4.[18]

33.     The two indenture trustees on the Committee -- Wilmington Trust Company and Law Debenture Trust Company of New York -- were both provided with the Form S-4.  *See* Buonomo Decl., ¶ 22.

34.     As detailed in the Form S-4, the Bond Exchange Offer expired on May 26, 2009. *See* Form S-4.

35.     Ultimately, the Bond Exchange Offer was not successful.  *See* Buonomo Decl., ¶ 22.

36.     Counsel for the Committee testified at his deposition that he and members of his team reviewed the Form S-4 upon being retained in Old GM's bankruptcy case.  *See* Mayer Tr., at 27:10-27:19; 29:22-30:8.

**F.     Negotiations with the Noteholders**

37.     As Nova Scotia Finance was a party to the Bond Exchange Offer and the Bond Exchange Offer concerned, among other things, an exchange of the Notes, Old GM believed that

---

[17]    A copy of the March 30 Press Release is contained in the Compendium of Exhibits as Exhibit "O."

[18]    A copy of the Form S-4 is contained in the Compendium of Exhibits as Exhibit "P."

it could not begin negotiations with the Noteholders regarding the Notes until the Bond

Exchange Offer expired on Tuesday, May 26, 2009. As explained at Mr. Buonomo's deposition

on April 18, 2012:

> Q     Okay. Is there a reason why General Motors waited until after expiration of the bond exchange offer before initiating contact with representatives of the noteholders?
>
> A     Yes.
>
> Q     What's the reason?
>
> A     We didn't feel we were in position to have those discussions with the bond exchange offer outstanding.
>
> Q     And why was that?
>
> A     In part, it was because, as a matter of practicality, it would undercut the bond exchange offer. I believe there were also much legal prohibitions -- right word -- legal constraints about communications we could have other than as set forth in the Form S-4 with the bond exchange offer in the market.

Buonomo Tr. (Vol. I), at 25:12 - 26: 6; *see also* Ammann Tr., 67:8-67:17 ("As I mentioned

previously, there were three main elements of the GMCL restructuring that we were working to

resolve; CAW, dealers, Nova Scotia bondholders. So, as a general matter, we wanted to make

sure that we had all three of those groups lined up, if you'd like. At the same time, given that

there was an SEC bond exchange out at that time, we concluded, I believe, that we would be

better off, for various reasons, waiting until that offer had either expired or was completed.").

      38.    On the day after the Bond Exchange Offer expired, counsel for Old GM reached

out to counsel for the Noteholders to begin negotiations regarding the Notes. Buonomo Decl., ¶

24.

39.     The parties to the Lock-Up Agreement worked intensively, including through the night of May 31, 2009, so that an agreement acceptable to Old GM and the Governments ("**Lock-Up Agreement**")[19] could be executed in the early morning hours of Monday, June 1, 2009, before Old GM filed for bankruptcy.  *See* Buonomo Decl., ¶ 25.

40.     The Lock-Up Agreement was consummated in the early morning hours of June 1, 2009, shortly before Old GM and certain of its affiliates ("**Debtors**") commenced their bankruptcy cases. Signature pages were exchanged by the parties to the Lock-Up Agreement before Old GM filed for bankruptcy.  Officials of the Canadian Government reviewed the full set of signature pages before the Old GM bankruptcy and, at that time, approved cancellation of a GM Canada bankruptcy filing.  *See* Ammann Tr., 129:4-129:9 ("Q.  Did the -- did anyone ask to review the final signed version of the lockup agreement? A. Yes. Q. Who? A. Amongst others, the Canadian government officials."); Deposition Transcript of Daniel Gropper, dated March 14, 2012 ("**Gropper Tr.**"), at 46:19-47:6[20] ("Again, I said that the Canadian government was not prepared to sign off on the filing of GM until the agreement was done and signed and the Canadian government was investing capital in the restructuring of GM, actually I recall meeting representatives of the Canadian government who were looking at the final version of the agreement before the filing and being introduced to them. They were senior members of the Canadian government finance -- I don't know what they called their treasury, but it's that entity in Canada."); Deposition Transcript of Bruce Zirinsky, dated April 12, 2012 ("**Zirinsky Tr.**"), at

---

[19]    A copy of the Lock-Up Agreement is contained in the Compendium of Exhibits as Exhibit "Q."

[20]    Relevant excerpts from the Gropper Transcript are contained in the Compendium of Exhibits as Exhibit "R."

14

106:25-107:14[21] ("I believe there was a room in which Weil had put all the signature pages on their side. And I remember seeing them all laid out on a table at some point before I left. It was also -- I have a recollection that the -- that the -- there were representatives there from the Canadian government together with their counsel who wanted -- we were told they wanted to make sure that all the signature pages were in place, so that my recollection is they actually went into the room themselves and reviewed to make sure everybody had signed.").

41.     The Lock-Up Agreement was signed with the approval of the Governments. Buonomo Decl., ¶ 12.

42.     Every witness that was deposed in this matter and that was involved in the negotiations and drafting of the Lock-Up Agreement testified unequivocally that the Lock-Up Agreement was executed, and signature pages released between 6:00 a.m. and 7:15 a.m. on June 1, 2009 -- prior to Old GM's bankruptcy filing at 7:57 a.m. on June 1, 2009 ("**Petition Date**"). *See* Ammann Tr., at 176:3-176:7, 176:10-176:11 ("Walter has sent me an e-mail asking whether the Nova Scotia matter is still open.  I sent him a response at 6:49 a. m. on June 1st, notifying him that we were done with that transaction . . . that the transaction was completed, agreements were executed and we were done."); Buonomo Tr. (Vol. I), at 104:19-105:2 ("Q: To your knowledge, when was the lockup agreement signed and delivered by noteholders . . . A: Somewhere between approximately 6:00 a.m. on June 1st and 6:30 a.m. on June 1st, is the best of my recollection."); Deposition Transcript of Bao Truong, dated April 20, 2012 ("**Truong Tr.**"), , at 166:12-166:15 ("But the document itself was in an executed form with signatures certainly in around by 7:00 a.m. is my recollection."); Zirinsky Tr., at 114:23-115:3 ("I think Dan was the last one to finish

---

[21]    Relevant excerpts from the Zirinsky Transcript are contained in the Compendium of Exhibits as Exhibit "S."

reviewing and to deliver signature pages.  I think he delivered them around 7:00, a little after,

maybe 7:15."); Deposition Transcript of James Bolin, dated April 11, 2012 ("**Bolin Tr.**"), at

125:6-125:8 ("Approximately, 6:00 a.m., thereabouts, we had the final documents in place and

executed them."); Deposition Transcript of Didric Cederholm, dated March 15, 2012

("**Cederholm Tr.**"), at 108:20-109:14, 109:7-109:14 ("[T]here was a delay until they were able

to actually get sign-off from other parties who weren't in the room . . . that had occurred when

we were allowed to walk in and confirm that the signature pages of all the parties relevant were

on the table in that room . . . It was early morning and it was before . . . GM filed for bankruptcy

."); Gropper Tr., at 42:5 - 42:8 ("Q: The lockup agreement that was signed subsequent to

Saturday, when was that signed?    A: That was signed before General Motors filed for

bankruptcy, on Monday morning."); Deposition Transcript of Maurita Sutedja, dated May 31,

2012 ("**Sutedja Tr.**"), at 122:4-122:16 ("Q   Do you know whether a lockup agreement was

entered into on or before 11:30 p.m. EST on May 31, 2009?  A   We reached a settlement with

the bondholders early in the morning. I can't remember-- before the bankruptcy filing.  Q  And

which morning are you referring to? A  When was the bankruptcy? MR. STEINBERG: June 1.

THE WITNESS: June 1.  Q  (By Ms. Cooperman) Do you know when in the morning on June 1

you reached a settlement with the bondholders? A  Around 6 or 7."), and 123:8-123:11 ("Q  (By

Ms. Cooperman) Was it your understanding that the lockup agreement had to be signed before

the bankruptcy commenced on June 1?  A  It was signed before the bankruptcy.");[22] *see also* E-

Mail from Daniel Ammann to Walter Borst, dated June 1, 2009 at 6:49 a.m. ("**Amman E-Mail**")

---

[22]    Relevant excerpts from the Truong, Bolin, Cederholm and Sutedja Transcripts are contained in the
Compendium of Exhibits as Exhibits "T," "U," "V," and "W, respectively."

(in response to the question whether the Nova Scotia matter was still open, Mr. Ammann stated "[w]e are done.").[23]

43.    Mr. Buonomo was in frequent contact with the Governments throughout this process.  The Governments approved the Lock-Up Agreement.  *See* Buonomo Decl., ¶ 27.

44.    Prior to terminating the contingency plan for a GM Canada bankruptcy filing, officials with the Canadian Government reviewed the signature pages of the Lock-Up Agreement to make sure the matter was agreed to.  *See* Buonomo Tr. (Vol. I), at 107:25 - 108:6 ("[T]he presentation of the documents . . . on the table to the . . . Canadian government representatives occurred somewhere in the 7:00 to 7:15 a.m. time period.); Ammann Tr., at 129:25 - 130:5 ("Q: And what did . . . the Canadian government review?  A: They reviewed . . . the document in detail and reviewed all of the signature pages."); Amman Tr., at 115:12 - 115:18 ("Q: And to whom did you report?  A: [W]e would have kept Ray Young and others in the loop.  But, as importantly, Matt Feldman as a representative of the U.S. Trustee Automotive Task Force and the Canadian government representatives.").

45.    All parties considered that there was a final, binding agreement between Old GM and the Noteholders prior to the time of Old GM's bankruptcy filing.  *See* Buonomo Decl., ¶ 28; Gropper Tr., 93:19-93:23 ("Q. Is it your testimony that the document, that the lockup agreement document was finalized before the GM bankruptcy petition was filed? A. Yes."); Cederholm Tr., at 109:20-110:14 ("Q [W]hen was the document effectively agreed upon?  A.  So, effectively, in substance, my view was that it was agreed upon when Todd Chandler walked into the room and said we had an agreement.  That was about 4:00.  Then there was a delay until they were able to

---

[23]    A copy of the Ammann E-Mail is contained in the Compendium of Exhibits as Exhibit "X."

actually get sign-off from other parties who weren't in the room . . . And that occurred . . . when we were allowed to walk in and confirm that the signature pages of all the parties relevant were on the table in that room. It was early morning and it was before . . . GM filed for bankruptcy."); Truong Tr., at 129:10-129:15 ("Q  When was that?  A  After we finalized the agreement.  Q  And do you remember what time that was?  A  It was approximately 7:00 a.m.").

46.    As the Lock-Up Agreement was finalized and fully executed prior to Old GM's bankruptcy filing, a GM Canada bankruptcy filing was not necessary.  *See* Buonomo Decl., ¶ 28.

**G.    The $450 Million Loan**

47.    In the week preceding the Petition Date, Old GM decided to loan $450 million ("**$450 Million Loan**") to GM Canada so that GM Canada had a source of funds in the event a settlement with the Noteholders was reached prior to June 1, 2009 (the anticipated bankruptcy filing date for Old GM).  The $450 Million Loan was documented pursuant to a promissory note ("**Promissory Note**") and a trust agreement ("**Trust Agreement**"), both of which were executed on May 29, 2009. *See* Promissory Note; Trust Agreement.[24]

48.    The Promissory Note provided that the term of the $450 Million Loan was three years, at 5% interest beginning June 25, 2009.  *See* Promissory Note.

49.    Under the Trust Agreement, GM Canada was to use the funds for the specific purpose of settling the Intercompany Loans.  *See* Trust Agreement.

50.    The funds that made up the $450 Million Loan were transferred from Old GM to GM Canada by wire transfer that was initiated and completed on Friday, May 29, 2009 -- three

---

[24]    Copies of the Promissory Note, dated as of May 29, 2009, and Trust Agreement, dated as of May 29, 2009, are collectively contained in the Compendium of Exhibits as Exhibit "Y."

days before the Petition Date.  *See* TD Securities Wiring Details for May 29, 2009 ("**TD Wiring**

**Details**").[25]

**H.    The $450 Million Loan was Repaid
        With Interest Prior to the Closing of the 363 Sale**

51.    The $450 Million Loan was paid in full, with interest by GM Canada to Old GM

prior to the closing of the 363 Sale.  Specifically, GM Canada made a $78,500,000 payment to

Old GM on June 12, 2009.  *See* GM Receipt, dated June 12, 2009, for $78,500,000 ("**First**

**Receipt**").[26]  An amended promissory note, dated June 12, 2009 ("**Amended Promissory Note**")

was issued that day reflecting the reduced amount. *See* Amended Promissory Note[27]

52.    The balance of the $450 Million Loan (including all applicable interest) was

repaid by GM Canada to Old GM on July 7, 2009.  *See* GM Receipt, dated July 7, 209, for

$372,589,733.33 ("**Second Receipt**").[28]  When the 363 Sale closed on July 10, 2009, the entire

$450 Million Loan was repaid, with interest, by GM Canada to Old GM.

**I.    The Lock-Up Agreement**

53.    While the Lock-Up Agreement was executed by Old GM, economically, it was

essentially an agreement between non-Debtor parties.  The primary parties to the Lock-Up

Agreement were (i) GM Canada -- a non-Debtor; (ii) Nova Scotia Finance -- a non-Debtor; and

(iii) the Noteholders.  *See generally* Lock-Up Agreement.

---

[25]    Copies of the TD Wiring Details are contained in the Compendium of Exhibits as Exhibit "Z."

[26]    A copy of the First Receipt is contained in the Compendium of Exhibits as Exhibit "AA."

[27]    A copy of the Amended Promissory Note, dated as of June 12, 2009, is contained in the Compendium of
        Exhibits as Exhibit "BB."

[28]    A copy of the Second Receipt is contained in the Compendium of Exhibits as Exhibit "CC."

54.    Old GM had minimal obligations under the Lock-Up Agreement; these included

the following:

> i.    Old GM agreed that the Deficiency Claim and the Guarantee Claims were enforceable against Old GM "to the fullest extent permitted under applicable laws . . . ." Lock-Up Agreement, at ¶ 6(a).

> ii.    Old GM agreed that if any portion of the Deficiency Claim was disallowed, Old GM's claim on account of the Swap Transactions would be subordinated to the prior, indefeasible payment in full of the Notes. Lock-Up Agreement, at ¶ 6(b)(v).

> iii.    Old GM agreed that it would not assert any right of set off with respect to the Deficiency Claim. Lock-Up Agreement, at ¶ 6(b)(vi).

> iv.    Old GM agreed and covenanted "that it will not take any action or assert any position inconsistent with this Section 6 and, if called upon by the Holders, will confirm its agreement with the positions confirmed herein in writing or at a court hearing as reasonably requested by the Holders." Lock-Up Agreement, at ¶ 6(b)(vii).

55.    The payment obligations under the Lock-Up Agreement did not impact Old GM;

instead, they concerned GM Canada, Nova Scotia Finance and the Noteholders. *See generally*

Lock-Up Agreement.

56.    The Lock-Up Agreement provided for the following:

> a.    GM Canada would make a payment to Nova Scotia Finance in the approximate amount of $369 million ("**Consent Fee**"), which would be in full settlement and satisfaction of the Intercompany Loans. After the Consent Fee was paid to Nova Scotia Finance, it would be paid ratably to all holders of the Notes. Lock-Up Agreement, at ¶ 5(b).

> b.    The holders of the Notes would retain their claims ("**Guarantee Claims**") against Old GM based on the Guaranty provided by Old GM and contained in the Fiscal and Paying

Agency Agreement.  Lock-Up Agreement, at ¶ 6(b)(ii).  These claims existed independent of the Lock-Up Agreement.

c.      Nova Scotia Finance (not Old GM) would provide the Noteholders with a consent to a bankruptcy order in Nova Scotia. Lock-Up Agreement, at ¶ 6(b)(i).

d.      The trustee appointed in the Nova Scotia Finance bankruptcy case would be entitled to assert a claim ("**Deficiency Claim**") against Old GM, as the sole shareholder of Nova Scotia Finance, for contribution for any amounts unpaid to the creditors of Nova Scotia Finance.  Lock-Up Agreement, at ¶ 6(b)(iii).  This claim existed independent of the Lock-Up Agreement.

e.      Upon payment of the Consent Fee to the holders of the Notes, the Intercompany Loan would be extinguished and GM Canada would have no further liability thereunder to Nova Scotia Finance.  Lock-Up Agreement, at ¶ 5(b).

f.      The Oppression Action would be dismissed.  Lock-Up Agreement, at ¶ 5(a).

57.     Old GM did not guarantee that the Guarantee Claims and Deficiency Claims would be allowed.  The language used in the Lock-Up Agreement -- that such claims would be allowed "to the fullest extent permitted under applicable laws" (Lock-Up Agreement, at ¶ 6(a)) -- was specifically negotiated to make it clear that although the Lock-Up Agreement was not intended to impair these claims, it was also not intended to foreclose objections from parties other than Old GM.  This point was discussed at Mr. Buonomo's deposition:

Q.      When it came to allowance to whether or not claims could be allowed under the lockup agreement, what did the parties say to each other about that topic?

A.      There was discussion at a point in time on the evening of May 31st, possibly the early morning of June 1, in the context of negotiating the language, and there was proposed -- might have been language or it might have been conceptual, I just don't recall at this point -- that noteholders wanted the claims established. We said no. We can't do that and among other reasons and -- was that

we didn't have the power to do that. We could not guarantee that the claims would be allowed and, in fact, I accurately predicted the future and predicted that someone like you would be sitting where you are arguing against it, and so we declined to do that.

And what resulted was the formulation that they would be allowed, to the fullest extent permitted by law, or something close to that, and the noteholders response was, well, in that case we want you to support the claims because we don't want you sort of making this agreement and undercutting it afterwards, and I believe the specific statement was from Mr. Zirinsky that he wanted Mr. Karotkin standing behind him, supporting him, and we agreed to the language which ultimately was included in the lockup agreement about supporting allowance of the claims.

Deposition Transcript of Lawrence S. Buonomo, dated May 8, 2012 ("**Buonomo Tr. (Vol. II)**"), at 166:14 - 167: 20.[29]

58.    The Guarantee Claims and Deficiency Claim are not obligations that arise under the Lock-Up Agreement.  *See* Lock-Up Agreement; Fiscal and Paying Agency Agreement, at § 5 of Schedule 1; Section 135 of the *Companies Act* (Nova Scotia).

59.    The Lock-Up Agreement did not "created a massive and improper Swap Liability against Old GM" (Complaint, ¶ 137). *See* Swap Documents; MSPA, §§ 2.2(a)(iii) and 2.2(a)(iv).

60.    Old GM was not a signatory to the escrow agreement ("**Escrow Agreement**") contemplated by the Lock-Up Agreement.  *See* Escrow Agreement.[30]

61.    The passing of the Extraordinary Resolution regarding the Fiscal and Paying Agency Agreement that adopted the terms of the Lock-Up Agreement and made them binding on all holders of Notes, concerned Nova Scotia Finance -- the obligor on the Notes.  *See* Notice of

---

[29]    Relevant portions of Mr. Buonomo's Deposition Transcript from May 8, 2012 are contained in the Compendium of Exhibits as Exhibit "DD."

[30]    A copy of the Escrow Agreement, dated as of June 4, 2009, is contained in the Compendium of Exhibits as Exhibit "EE."

Meeting Regarding Extraordinary Resolution ("**Extraordinary Resolution Meeting Notice**");[31]

Fiscal and Paying Agency Agreement.

62.    At his deposition, Mr. Vanaskey, the GUC Trust Administrator, stated that one of

the goals of the Claims Objection was to void the Lock-Up Agreement, including the releases

obtained by GM Canada, so that GM Canada, and not the GUC Trust, would pay the

Noteholders.  Deposition Transcript of David Vanaskey, dated April 25, 2012 ("**Vanaskey Tr.**"),

at 272:17-272:24[32] ("Q.  All right.  In the pleadings that are filed by the GUC Trust, are they

trying to undo the releases that GM Canada got from Nova Scotia Finance relating to the

intercompany claim?  MR. FISHER:  Objection to Form.  A.  Can you repeat the question?

(Record read.)  A.  I believe so, yes.").

**J.    Documents Referencing the Lock-Up Agreement**

63.    The Lock-Up Agreement and the claims addressed therein were referenced in the

following documents that were either publicly filed or made available to the Committee, many of

which pre-date the Sale Approval Order:

> (i)    the Form S-4 publicly filed by Old GM on April 27, 2009
> (before the Petition Date and prior to the Sale Approval
> Order) that detailed the Bond Exchange Offer.  In the Form
> S-4, Old GM referenced the Notes, the Guaranty and the
> Intercompany Loans.   Old GM explained that if it was
> required to commence a bankruptcy case,
>
> > only the guarantee by GM of the old GM Nova Scotia
> > notes would potentially be discharged in GM's
> > reorganization case. The old GM Nova Scotia notes

---

[31]    A copy of the Extraordinary Resolution Meeting Notice is contained in the Compendium of Exhibits as Exhibit "FF."

[32]    Relevant excerpts from Mr. Vanaskey's Deposition Transcript are contained in the Compendium of Exhibits as Exhibit "GG."

would not be cancelled and the holders thereof would not be precluded by a GM reorganization case from seeking payment from GM Nova Scotia for the balance due under the old GM Nova Scotia notes. In addition, because GM Nova Scotia is an "unlimited company," under Nova Scotia corporate law, if GM Nova Scotia is "wound up" (which includes liquidation and likely includes bankruptcy), the liquidator or trustee in bankruptcy may be able to assert a claim against GM, the shareholder of GM Nova Scotia, to contribute to GM Nova Scotia an amount sufficient for GM Nova Scotia to pay its debts and liabilities, including amounts equal to any amounts outstanding under the old GM Nova Scotia notes. It is possible that such claim for contribution may be impaired in the event GM seeks relief under the U.S. Bankruptcy Code. In addition, in the event that we were to seek relief under the U.S. Bankruptcy Code, General Motors of Canada Limited and/or GM Nova Scotia may decide to seek relief under applicable Canadian bankruptcy law, in which case the GMCL Intercompany Loans may be impaired. Each of the foregoing events may adversely affect the recovery holders of old GM Nova Scotia notes may receive on account of their old notes.

Form S-4, at 12, 134.[33] Counsel for the Committee testified that he and his team reviewed the Form S-4. *See* Mayer Tr., 27:10-27:19; 29:22-30:8.

(ii)    the Form 8-K filed by Old GM with the Securities and Exchange Commission on June 1, 2009 ("**June 1, 2009 8-K**") (the day of the bankruptcy filing and prior to the Sale Approval Order).  The Lock-Up Agreement is specifically referred to as a "***Material Definitive Agreement***" in the June 1, 2009 8-K.  The extinguishment of the Intercompany Loans, the payment of the Consent Fee, the presence of the "GM guarantee," the Extraordinary Resolution, the Deficiency Claim and the possible subordination of certain GM claims were all expressly discussed in the June 1, 2009 8-K.[34]

---

[33]    A copy of the Form S-4 is contained in the Compendium of Exhibits as Exhibit "P."

[34]    A copy of the June 1, 2009 8-K is contained in the Compendium of Exhibits as Exhibit "HH."

According to Committee counsel's time records, 8-Ks were reviewed on June 4, 2009 and June 8, 2009.[35]  Counsel for the Committee testified at his deposition that the review of such documents were a standard part of diligence.  *See* Mayer Tr., 55:16-55:19 ("Q   And you thought the SEC filings would be helpful or a review of those filings would be helpful in that regard?   A    It's a standard part of diligence.");

(iii)    the Extraordinary Resolution Meeting Notice, which detailed many of the terms contained in the Lock-Up Agreement, was published in the Financial Times on June 3, 2009;[36]

(iv)    the *Sellers' Disclosure Schedules* ("**Disclosure Schedules**"), which were part of the 363 Sale documents and which was provided to the Committee no later than June 5, 2009 (and at various other times during the month of June, 2009 -- prior to the Sale Approval Order).   The Disclosure Schedules referenced, among other things, (a) the Nova Scotia Settlement, and provides that "Sellers may do all things necessary and appropriate in furtherance of consummating the Nova Scotia settlement;" (b) "the transfer of funds from [Old GM] to [GM Canada], which funds will be used by [GM Canada] to pay the [GM Canada Settlement Amount to [Nova Scotia Finance], which transfer of funds occurred before the date of this Agreement . . . ;" and (c) the subordination of the obligations of Nova Scotia Finance to Old GM pursuant to the Swap Transactions.   *See* Disclosure Schedules, at Section 6.2.[37]

Counsel for the Committee testified that these schedules were reviewed.   *See* Mayer Tr., 116:4-117:5.   He also testified that these schedules were "important."   *See* Mayer Tr., 118:6-118:9 ("Q  -- and this is an important document.

---

[35]    Relevant excerpts of Committee counsel's time records are contained in the Compendium of Exhibits as Exhibit "II."

[36]    A copy of the Extraordinary Resolution Meeting Notice is contained in the Compendium of Exhibits as Exhibit "FF."

[37]    Relevant portions of the Disclosure Schedules, and e-mails with the Committee demonstrating its knowledge of the Disclosure Schedules, are contained in the Compendium of Exhibits as Exhibit "E."

It's part of the sale agreement, isn't it? A That is correct. It is part of the sale agreement."). Section 6.2 of the Disclosure Schedules listed the "out of the ordinary course of business" transactions that could be undertaken by the GM entities prior to closing of the 363 Sale, without the consent of the Purchaser (New GM);

(v)     the *First Amendment, Consent and Waiver Under Debtor-In-Possession Credit Agreement*, dated June 25, 2009 ("**First Amendment**"), which was filed prior to the Sale Approval Order, and specifically references the Lock-Up Agreement. *See* First Amendment, ¶ 7.[38]

The First Amendment is a three-page document that specifically referenced the Lock-Up Agreement. Counsel for the Committee testified that the Committee reviewed and commented on the Final DIP Order and the credit agreement documents associated therewith. Mayer Tr., 126:17-131:9.

(vi)    the Form 8-K filed by New GM with the Securities and Exchange Commission on August 7, 2009 ("**August 7, 2009 8-K**"); the Lock-Up Agreement is annexed as an exhibit to the August 7, 2009 8-K.[39]

Counsel for the Committee testified that this document was reviewed when it was filed, that it was a "material document" (Mayer Tr., 143:9-145:15) and that it was "important to us" (Mayer Tr., 58:15-59:16). Counsel for the Committee further explained that since the unsecured creditors would get stock of New GM, how New GM complied with securities filings required particular scrutiny. *See* Mayer Tr., 145:4-145:15; and

(vii)   the *Notice of Interim Report*, filed by the Debtors on August 11, 2009 ("**Interim Report**"), which specifically references the Lock-Up Agreement and the amendment to the Fiscal and Paying Agency Agreement, wherein the Noteholders agreed to limit their claims against Old GM to a recovery on the Guarantee Obligations and the Wind-Up

---

[38]    A copy of the First Amendment is contained in the Compendium of Exhibits as Exhibit "JJ."

[39]    A copy of the August 7, 2009 8-K is contained in the Compendium of Exhibits as Exhibit "KK."

> Claim asserted by the Nova Scotia Finance Trustee.  *See* Interim Report, Exhibit "A,"¶ 10(a)(iii) and (iv) (pp. 7-8).[40]
>
> Counsel for the Committee testified that this document was reviewed and was the "subject of some discussions."  *See* Mayer Tr., 158:13-159:13.  The Interim Report says that the Noteholders' claims were allowed by the Lock-Up Agreement.

64.    Counsel for the Committee also had communications with the Noteholders in July, 2009 regarding Nova Scotia Finance and the Notes.  As explained by counsel for the Committee at his deposition:

> Q      So, then Mr. Gropper [of Aurelius] did tell you he held notes in GM Nova Scotia?
>
> A      By July 28th, this e-mails suggests that he did, and I suspect that he must have, yes.
>
> Q      So, then you would have been aware at this time that in fact there were notes issued, there were Nova Scotia notes issued by GM?
>
> A      That is a fair statement, yes.  I must have been aware in July, yes.
>
> Q      Is it possible that you were aware earlier than July?
>
> A      That there were Nova Scotia notes?
>
> Q      Yes?
>
> A      I was probably aware that there were Nova Scotia notes issued prior to July, yes.

Mayer Tr., 93:21-94:11.

---

[40]    A copy of the Interim Report is contained in the Compendium of Exhibits as Exhibit "LL."

65.    Counsel for the Committee also testified that Mr. Gropper (from Aurelius) told him in July, 2009 what a "good deal" he had received in connection with GM.  *See* Mayer Tr., 164:10-165:8.

66.    In any event, counsel for the Committee testified that actively began investigating the Lock-Up Agreement and the issues associated therewith in October, 2009.  *See* Mayer Tr., 103:10-103:15 ("Q.  What other facts came to light later about the timing of the payment?  A  In October of 2009, for the first time, the entire package of the Nova Scotia settlement was brought to our attention by Weil Gotshal.").  Moreover, the Committee authorized its counsel to file pleadings objecting to the Noteholders' and Nova Scotia Finance Trustee's claims on or about December 15, 2009.  Mayer Tr., p. 209:6-212:2.

67.    Debtors' counsel, at his deposition, testified that the Committee was on notice that the Lock-Up Agreement could be assumed because it "was notified that every executory contract could have been assigned."  *See* Deposition Transcript of Joseph H. Smolinsky, dated May 24, 2012 ("**Smolinsky Tr.**"), at 247:4-247:20.[41]

**K.    The MSPA**

68.    On the Petition Date, Old GM and the other Debtors filed a motion ("**Sale Motion**")[42] seeking approval of the original version of the MSPA ("**Original MSPA**"), which provided for the sale of substantially all of Old GM's assets to New GM.  The Disclosure Schedules formed part of the MSPA.  The Original MSPA was subsequently amended and restated at various times in June, 2009.  On July 5, 2009, the Court entered the Sale Approval

---

[41]    Relevant excerpts of Mr. Smolinsky's Deposition Transcripts are contained in the Compendium of Exhibits as Exhibit "MM."

[42]    The Sale Motion is Docket No. 92 on the Bankruptcy Court's Docket.

Order, approving the MSPA  and the sale to New GM; on July 10, 2009, the Debtors

consummated the 363 Sale to New GM.  Buonomo Decl., ¶ 46.

>**1.**     **Assets Transferred to New GM Relevant to This Dispute**

69.     The assets purchased by New GM include the following:

>(i)     "all cash and cash equivalents . . . other than the Excluded Cash and Restricted Cash."  MSPA, § 2.2(a)(i).  Restricted Cash (except certain Restricted Cash not applicable here) was also a "Purchased Asset" (as defined in the MSPA).  See MSPA, §§ 2.2(a)(ii) and 2.2(b)(ii).  Excluded Cash was defined as "cash or cash equivalents in an amount equal to $1,175,000,000 . . . ."  MSPA, § 2.2(b)(i) (as amended);

>(ii)    "all accounts and notes receivable and other such Claims for money due to Sellers . . . ."  MSPA, § 2.2(a)(iii);

>(iii)   "all intercompany obligations . . . owed or due, directly or indirectly, to Sellers by any Subsidiary of a seller or joint venture or other entity in which a Seller or a Subsidiary of a Seller has any Equity Interest."  MSPA, § 2.2(a)(iv);

>(iv)    ". . .  subject to **Section 2.4**, all Equity Interests in the Transferred Entities . . . ."  MSPA § 2.2(a)(v) (this included the Equity Interests in all "Purchased Subsidiaries," including GM Canada); and

>(v)     "subject to Section 2.4 [of the MSPA], all Contracts,[43] other than the Excluded Contracts (collectively, the 'Purchased Contracts'), including, for the avoidance of doubt, . . .  (B) any Executory Contract designated as an Assumable Executory Contract as of the applicable Assumption Effective Date."  MSPA, § 2.2(a)(x).

>**2.**     **The Cash Left Behind at Old GM
to Fund the Wind-Down of the Debtors**

---

[43]  "Contracts" was defined in the MSPA as "all purchase orders, sales agreements, supply agreements, distribution agreements, sales representative agreements, employee or consulting agreements, leases, subleases, licenses, product warranty or service agreements and other binding commitments, agreements, contracts, arrangements, obligations and undertakings of any nature (whether written or oral, and whether express or implied)."  MSPA, p.5.  There was no distinction between pre-petition contracts and post-petition contracts.

70.     The cash that was left behind at Old GM was for the purpose of funding the wind-down of the Debtors ("**Wind-Down Amount**").  *See* Sale Motion, ¶ 16 ("Any assets excluded from the sale will be administered in the chapter 11 cases, and sufficient cash is to be made available to GM to fund the wind-down or other disposition of the Sellers' assets.").

71.     The Wind-Down Amount did not depend on how much cash Old GM had on hand; it was solely based on how much the wind-down of the Debtors was projected to cost. This was confirmed by the Committee at the hearing on the Sale Motion.  *See* Transcript of Sale Hearing, held on July 2, 2009 ("**Sale Hearing Tr.**"), at 102:23 - 103:03[44] (statements by Thomas Moers Mayer, Esq., Counsel for the Committee) ("We were able to close the substantive gap on the wind-down budget. My understanding, which I would ask the government to confirm is that the total amount of the facility being provided to cover wind-down expenses has been upsized such that the government is going to make available financing in the amount of 1.175 billion dollars, Your Honor.").  *See also* Transcript of Final DIP Hearing, held on June 25, 2009 ("**Final DIP Hearing Tr.**"), at 24:18 - 24:22[45] (statements by Amy Caton, Esq., Counsel for the Committee) ("And I think the parties' intent from the beginning is then that 950 millions or an amount up to -- well, potentially greater than but, likely 950 million dollars, will be left behind to fund the wind down of these estates and pay administrative and priority claims.").

---

[44]   Relevant excerpts from the Sale Hearing Transcript are contained in the Compendium of Exhibits as Exhibit "NN."

[45]   Relevant excerpts from the Final DIP Hearing Transcript are contained in the Compendium of Exhibits as Exhibit "OO."

72.     Counsel for the Committee also confirmed at his deposition that even if the $450

Million Loan had not been made, the funds used for that loan would not have gone to unsecured

creditors but to New GM or the DIP Lenders:

> Q       Well, the monies that were allegedly transferred from GM
> U.S. to GM Canada with which to pay the consent fee, wouldn't
> those, even if those -- if those dollars had not been paid to GM
> Canada, would those dollars have gone to the unsecured creditors
> or would those dollars have gone to U.S. Treasury or to New GM?
>
> A       It would have gone to U.S. Treasury/Canada as DIP lenders
> or New GM.
>
> Q       So, the unsecured creditors would not have received any
> additional benefit if those monies had remained in Old GM at the
> time of the bankruptcy; is that correct?
>
> A       That is correct.

Mayer Tr., at 279:20-280:9.

### 3.     Intercompany Avoidance Power Claims were Transferred to New GM

73.     While some avoidance actions were not sold to New GM as part of the 363 Sale,

"[a]ny and all Claims arising from, relating to or in connection with, any payments by or to, or

other transfers or assignments by or to, any Purchased Subsidiary" ("**Intercompany Avoiding**

**Power Claims**") were sold to New GM.  *See* MSPA, § 2.2(b)(xi); Disclosure Schedules, §

2.2(b)(xi).

74.     Counsel for the Committee testified at his deposition that he knew that the

Intercompany Avoiding Power Claims were being transferred to New GM:

> Q       Were you also aware that certain avoidance actions and
> claims would be transferred to New GM?
>
> A       Yes.

> Q        Was that one of on your objections?
>
> A        It didn't end up being an objection.  As you know, the issue of who owns the lawsuit against the banks is currently on appeal to the District Court.  As far as we knew, we had a deal that the lawsuit against the banks would stay behind and belong to the unsecured creditors, and we documented that deal. Treasury has since changed that version of event. With respect on all other avoidance actions, yes, we understood they were going to New GM.
>
> And incidentally, to the extent they weren't going to New GM, they were staying behind for the DIP lender, which from our perspective was a distinction without a difference.

Mayer Tr., at 46:9-47:4.   Counsel for the Committee further summarized this point at his deposition:

> Q        Okay.  Do you believe the statement, the "debtors' estates may have claims against holds [sic] of the [Notes] for recovery of payments made to them or on their behalf, including the 350 million-dollar consent fee," do you believe that that was a true and correct statement?
>
> A        It is not a true and correct statement.
>
> Q        That's because the debtors' estate has no avoidance claims against the noteholders, does it?
>
> A        That is correct.

Mayer Tr., at 232:23-233:10.

75.      When the Committee sought to have an asset remain behind at Old GM, it knew how to accomplish this goal.  For example, the Committee claims that it specifically negotiated for the right to control the Term Loan Avoidance Action (defined below):

> Because the basic deal was we got equity securities representing 20 percent of New GM, and we managed to negotiate for the adversary proceeding against the term lenders, and enough cash to get us through the case, and that was it. And everything else went

> to New GM or to the DIP lenders, and the unsecured creditors
> never saw any of it. So, whatever GM Canada had would not have
> come to our -- would not have registered on our register on [sic]
> radar screen. It was so unimportant with everything else we had to
> worry about.

Mayer Tr., at 279:9-279:19.

**L.    The Committee Supported the 363 Sale and Consented
To the Assumption and Assignment Procedures**

76.    The Committee endorsed the 363 Sale to New GM. *See* Sale Hearing Tr., 102:7-

106:20.

77.    The Committee also reviewed and commented on the Sale Approval Order. *See,*

*e.g.*, Email String beginning with Gordon Novod, dated July 1, 2009 ("**Novod E-Mail**").[46]

78.    The Committee was on notice of the Assumption and Assignment Procedures.

The Assumption and Assignment Procedures were first approved by an Order of the Court dated

June 2, 2009 ("**Sale Procedures Order**"). *See* Sale Procedures Order.[47]

79.    The Assumption and Assignment Procedures, as approved by the Court, did not

(i) provide that the Committee would receive notice when a Purchased Contract was assumed by

Old GM and assigned to New GM, and (ii) grant the Committee access to the contract database

so that it could review the information about Contracts and whether they were assumed by Old

GM and assigned to New GM (collectively, the "**Notice Provisions**"). *See* Sale Procedures

Order.

---

[46]    A copy of the Novod E-Mail is contained in the Compendium of Exhibits as Exhibit "PP."

[47]    A copy of the Sale Procedures Order is contained in the Compendium of Exhibits as Exhibit "QQ."

80.     The Committee never raised any issue with respect to the Notice Provisions. Counsel for the Committee testified at his deposition that the Committee only focused on supplier and lease issues:

A       I think we wanted more transparency in conjunction with assignments and assumption.  But the focus of the committee was really on supplier issues more than anything else.  We didn't focus on anything else.

Q       You didn't focus on other contracts?

A       No.  There may have been -- that's not quite true.  There were some leases, there were some real property leases where initially New GM seemed to want to have the best of both words, they were going to assume the lease but leave some liabilities behind, and we weren't crazy about that.  But other than that, no.

Q       Did the procedures that were finally agreed to and incorporated into the bankruptcy court's orders require any notice to be given to the Creditors Committee of contracts to be assumed and assigned to new GM?

A       In preparing for this deposition, I understood that it does not provide for any such notice. I know that that was not a focus of our -- that was not a material concern of the committee at the time, in June.

Mayer Tr., 180:9-181:7.  This was confirmed by counsel for the Debtors at his deposition:

Q       Did the committee or Mr. Seidel request, or anyone else on behalf of the committee, request that the committee be given notice of assumptions of executory contracts?

A       Not that I recall.

Q       That wasn't an issue?

A       Not.

Q       It wasn't an issue raised by the committee?

A       Not that I recall.

Smolinsky Tr., at 81:23 - 82:9.

81.    Ultimately, as part of the Sale Approval Order, the Court approved the Assumption and Assignment Procedures (as modified in the Sale Approval Order), finding them "fair, appropriate and effective . . . ."  *See* Sale Approval Order, at ¶ GG.

82.    New GM has relied on and conducted its business in accordance with the Sale Procedures Order.  *See* Buonomo Decl., ¶ 54.

83.    Any deviation now would adversely affected New GM and would strip it of the bargain it obtained from the 363 Sale.  *See* Buonomo Decl., ¶ 54.

**M.     The Assumption and Assignment
Of the Lock-Up Agreement**

84.    The only significant remaining obligation of Old GM under the Lock-Up Agreement was the Cooperation Provision.  *See* Buonomo Decl., ¶ 55.  Given that New GM purchased GM Canada, and GM Canada received a release of the Intercompany Loans under the Lock-Up Agreement, New GM needed to ensure that the Cooperation Provision contained in Section 6(b)(vii) on a going-forward basis.  *See id.*  New GM determined it was appropriate and desirable to designate the Lock-Up Agreement as an Assumable Executory Contract (as defined in the MSPA); this designation was noted in the contract database ("**Contract Database**")[48] maintained for assumption/assignment purposes.  *See* Excerpt from Contract Database.

85.    The Lock-Up Agreement was assumed and assigned on July 24, 2009.  *See* Excerpt from Contract Database (at Line 4).

---

[48]    Relevant excerpts from the Contract Database are contained in the Compendium of Exhibits as Exhibit "RR."

86.    The counterparties to the Lock-Up Agreement have never contested that the Lock-Up Agreement was assumed and assigned to New GM.  *See* Buonomo Decl., ¶ 55.

87.    The "Assumption and Assignment Notice," which was approved by the Court in the Sale Procedures Order, provided that the Debtors' designation of a document as an Assumable Executory Contract did not mean that the document was an executory contract within the meaning of the Bankruptcy Code. *See* Sale Procedures Order, Exhibit D, ¶ 15.

88.    The Lock-Up Agreement is a "Purchased Contract" that was transferred to New GM pursuant to the MSPA.  *See* MSPA, § 2.2(a)(x).[49]

89.    The Committee knew that New GM and the Governments would make all assumption and assignment decisions, and that the Committee would have no role in that process. *See* Mayer Tr., 179:4-179:9 ("Q What was your understanding as to how the executory contracts -- who would determine which executory contracts would be assumed and assigned to New GM?  A  GM management in conjunction with Treasury.").

**N.    The Transfer of the Swap from Old GM
to New GM Pursuant to the MSPA**

90.    Nova Scotia Finance was a subsidiary of Old GM and, as of the Petition Date (and thereafter), Old GM was "in-the-money" in connection with the Swap Transactions (*i.e.*, Nova Scotia Finance owed money to Old GM under the Swap Transactions).  *See* Buonomo Decl., ¶ 58.

91.    The Swap Transactions were an "intercompany obligation[] . . . owed or due, directly or indirectly, to Sellers by any Subsidiary of a seller or joint venture or other entity in

---

[49]    Executory Contracts were a subset of Purchased Contracts.

which a Seller or a Subsidiary of a Seller has any Equity Interest." MSPA, § 2.2(a)(iv). The intercompany obligations referenced in MSPA § 2.2(a)(iv) are Purchased Assets pursuant to the MSPA. MSPA, § 2.2(a).

92.     New GM designated the Swap Transactions[50] as an Assumable Executory Contract on August 3, 2009. *See* Excerpt from Contract Database.[51]

93.     Debtors' counsel understood that the Swap Transactions were assumed by Old GM and assigned to New GM. *See* Smolinsky Tr., at 240:13-243:23.

**O.     The Nova Scotia Finance Bankruptcy Proceeding**

94.     One of the terms of the Lock-Up Agreement was that Nova Scotia Finance would provide the Noteholders "with a consent to a bankruptcy order pursuant to the Bankruptcy and Insolvency Act (Canada), which shall be executed by the duly authorized officers and directors of [Nova Scotia Finance] in form satisfactory to the" Noteholders. *See* Lock-Up Agreement, at ¶ 6(b).

95.     A consent ("**Consent**") to a bankruptcy order for Nova Scotia Finance was given by the Nova Scotia Finance directors on June 4, 2009.[52] *See* Consent.

96.     Old GM and certain subsidiaries commenced their bankruptcy cases on June 1, 2009; at least two additional Debtors -- Remediation and Liability Management Company, Inc. (Case No. 09-50029) and Environmental Corporate Remediation Company, Inc. (Case No. 09-50030), both of which were wholly owned subsidiaries of Old GM -- commenced their

---

[50]   While there were two Swap Transactions, they were both governed by the same ISDA Master Agreement and Schedules; there were separate Confirmations for each. *See* Exhibit "H" contained in the Compendium of Exhibits.

[51]   *See* Database Excerpt, at Line 2, a copy of which is contained in the Compendium of Exhibits as Exhibit "RR."

[52]   A copy of the Consent, dated June 4, 2009 is contained in the Compendium of Exhibits as Exhibit "SS."

bankruptcy cases on October 9, 2009 (the same day that Nova Scotia Finance commenced its bankruptcy case).  *See* Court Dockets for Case No. 09-50029 and Case No. 09-50030.

97.     Old GM's bankruptcy docket does not contain a motion or other pleading filed by Old GM seeking authority to commence bankruptcy cases for the two above-referenced Old GM subsidiaries.  *See generally* Bankruptcy Docket for Case No. 09-50026.

98.     The bankruptcy filing by Old GM constituted an Event of Default under the Fiscal and Paying Agency Agreement.  *See* Fiscal and Paying Agency Agreement, § 9(e) (an Event of Default includes the following: "the Company or the Guarantor shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect . . . .")

99.      In a Form 8-K filed by Old GM with the Securities and Exchange Commission on October 9, 2009 ("**October 9, 2009 8-K**"),[53] Old GM disclosed the Nova Scotia Finance bankruptcy filing.  In the October 9, 2009 8-K, Old GM referred to the Lock-Up Agreement as a pre-petition agreement:

> As previously disclosed, on June 1, 2009, and ***prior to the filing by Motors Liquidation Company, formerly known as General Motors Corporation (the "Company"), of a voluntary petition for relief under chapter 11 of title 11 of the United States Code*** in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), the Company, General Motors Nova Scotia Finance Company ("GM Nova Scotia"), General Motors of Canada Limited, General Motors Nova Scotia Investments Limited and certain holders (the "Holders") of GM Nova Scotia's outstanding 8.375% notes due December 7, 2015 and GM Nova Scotia's 8.875% notes due July 10, 2023 (collectively, the "GM Nova Scotia Notes") entered into a lock up

---

[53]     A copy of the October 9, 2009 8-K is contained in the Compendium of Exhibits as Exhibit "TT."

agreement relating to the GM Nova Scotia Notes . . . . (Emphasis added).

**P.      Confirmation of the Debtors' Plan and the Trusts Created Thereunder**

100.    By Order dated March 29, 2011, this Court confirmed the Debtors' Second

Amended Joint Chapter 11 Plan ("**Plan**").[54]

101.    The Plan created two post-confirmation trusts:

(i)      **The GUC Trust:** The Plan provides that the purpose of the GUC Trust was to "administer certain post-Effective Date responsibilities under the Plan, including, but not limited to, distributing New GM Securities and resolving outstanding Disputed General Unsecured Claims to determine the amount of Allowed General Unsecured Claims that will be eligible for distribution of their Pro Rata Share of New GM Securities under the Plan. If the Residual Wind-Down Assets are transferred to the GUC Trust upon dissolution of MLC, then the GUC Trust shall administer the resolution of all Disputed Administrative Expenses, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims."  Plan, § 6.2(b); and

(ii)     **The Avoidance Action Trust:**  The Plan provides that the purpose of the Avoidance Action Trust was to administer the "Avoidance Action Trust Assets."   Plan, § 6.5(b). "Avoidance Action Trust Assets was defined in the Plan as "the (i) Term Loan Avoidance Action transferred to the Avoidance Action Trust and any proceeds thereof (for the benefit of the Term Loan Avoidance Action Beneficiaries), (ii) the Avoidance Action Trust Administrative Cash, and (iii) the remaining assets of [Old GM] transferred to the Avoidance Action Trust upon the dissolution of [Old GM] as set forth in Section 6.10 hereof."  Plan, § 1.23.

102.    Neither the Plan nor the governing documents for the GUC Trust provides that the

GUC Trust has the power to bring any Avoidance Actions (as defined in the Plan).  *See*

---

[54]    Relevant excerpts of the Plan are contained in the Compendium of Exhibits as Exhibit "UU."

*generally*, Plan, § 6.2; *see also* Motors Liquidation Company GUC Trust Agreement ("**GUC**

**Trust Agreement**"), Article VIII (Powers of and Limitations on the GUC Trust Administrator).[55]

103.    Section 6.10 of the Plan provides that all Avoidance Actions not transferred to the

Avoidance Action Trust "shall be deemed abandoned by the Debtors for all purposes without the

necessity for any other or further actions to be taken by or on behalf of the Debtors."   No

Avoidance Actions, other then the Term Loan Avoidance Action, were transferred to the

Avoidance Action Trust.  *See Motors Liquidation Company GUC Trust Quarterly GUC Trust*

*Reports as of March 31, 2012*, filed with the Court on May 15, 2012 ("**Status Report**"), Exh.

"A", pp. 6-7 ("[o]nly one Avoidance Action, captioned Official Committee of Unsecured

Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. et al., Adv. Pro. No. 09-

00504 (Bankr. S.D.N.Y. July 31, 2009) (the 'Term Loan Avoidance Action'), was commenced

prior to the statutory deadline for commencing such actions.").[56]

*[Remainder of Page Left Intentionally Blank]*

---

[55]    Relevant excerpts of the GUC Trust Agreement are contained in the Compendium of Exhibits as Exhibit "VV."

[56]    Relevant excerpts of the Status Report are contained in the Compendium of Exhibits as Exhibit "WW."

104.     The Plan defined Avoidance Actions as "any action commenced, or that may be commenced, before or after the Effective Date pursuant to section 544, 545, 547, 548, 549, 550, or 551 of the Bankruptcy Code, ***except to the extent purchased by New GM under the MSPA*** or prohibited under the DIP Credit Agreement." *See* Plan, § 1.18 (emphasis added).

Dated:     New York, New York
           June 8, 2012

                          Respectfully submitted,

                          By: /s/ Arthur Steinberg
                          Arthur Steinberg
                          Scott Davidson
                          KING & SPALDING LLP
                          1185 Avenue of the Americas
                          New York, New York  10036
                          Telephone:  (212) 556-2100
                          Facsimile:  (212) 556-2222

                          *Attorneys for General Motors LLC*
                          *f/k/a General Motors Company*