# EXHIBIT A

09-50026-mg    Doc 29-1    Filed 06/20/12    Entered 06/20/12 14:52:46    Exhibit A
09-50026-reg    Doc 21    Filed 06/01/09    Entered 06/01/09 09:57:23    Main Document    Pg 1 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 2 of 99

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| **GENERAL MOTORS CORP.**, *et al.*, | : | **09-** _____ (  ) |
| **Debtors.** | : | **(Jointly Administered)** |

-------------------------------------------------------------x

**AFFIDAVIT OF FREDERICK A. HENDERSON**
**PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2**

STATE OF NEW YORK          )
                           )    ss:
COUNTY OF NEW YORK         )

Frederick A. Henderson, being duly sworn, hereby deposes and says:

1.      I am the President, Chief Executive Officer, and a Director of General

Motors Corporation, a Delaware corporation ("GM"), which together with its wholly-owned

direct subsidiaries, Chevrolet-Saturn of Harlem, Inc. ("Chevrolet-Saturn") and Saturn, LLC

("Saturn"), and GM's wholly-owned indirect subsidiary Saturn Distribution Corporation

("Saturn Distribution"), are the debtors in the above-captioned chapter 11 cases (collectively, the

"Debtors").  I submit this affidavit (the "Affidavit") pursuant to Rule 1007-2 of the Local

Bankruptcy Rules for the Southern District of New York (the "Local Rules") to assist the Court

and other parties in interest in understanding the circumstances that compelled the

commencement of these chapter 11 cases and in support of (i) the Debtors' petitions for relief

under chapter 11 of title 11, United States Code (the "Bankruptcy Code"), filed on the date

hereof (the "Commencement Date"), (ii) the relief requested in the motions and applications that

the Debtors have filed with the Court, including, but not limited to, the "first day motions," and

(iii) the motion (the "363 Motion") pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code to approve, among other things, the sale of substantially all the Debtors' assets and the assumption and assignment of certain executory contracts and unexpired leases of personal property and nonresidential real property (collectively, the "Leases") to Vehicle Acquisition Holdings LLC (the "363 Transaction").

2.    I have been employed by GM (or one of its affiliates) for nearly 25 years. I joined GM as a senior analyst in 1984 in the Treasurer's Office after receiving my B.B.A. from the University of Michigan, my CPA license, and my M.B.A. from Harvard Business School. Since that time, I have held positions of increasing and significant financial and operational responsibility in GM's domestic and international operations. As a result, I have first-hand experience and insight regarding the entire GM enterprise, the many issues now confronting GM, and the urgent relief that is now requested to save GM.

3.    In 1989, I became GM's Director of Mortgage Banking and, thereafter, from 1992 to 1994, I was GMAC Group Vice President of Finance. From 1994 to 1996, I was Executive in Charge of Operations for the former Automotive Components Group in Pontiac, Michigan. Subsequently, in 1996, I became GM's Vice President and General Manager of Delphi Saginaw and continued in that position until 1997, when I was appointed GM's Vice President and Managing Director of GM do Brazil, with responsibilities for GM's operations in Brazil, Argentina, Paraguay, and Uruguay. In June 2000, I was appointed Group Vice President and President of GM Latin America, Africa and Middle East (LAAM). From January 2002 to early 2004, I was President of GM Asia Pacific. In 2004, I assumed responsibility for GM's European operations as GM's Group Vice President and Chairman of GM Europe. In January 2006, I was appointed GM's Vice Chairman and Chief Financial Officer, and in March 2008, I

was appointed GM's President and Chief Operating Officer, which position I held until being appointed to my current position. I am familiar with and involved in the day-to-day operations, businesses, and financial affairs of the Debtors.

4.    Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my discussions with other members of GM's senior management, my review of relevant documents, or my opinion based upon my extensive personal experience, knowledge, and information concerning GM's worldwide operations and financial affairs and the automotive industry. If called upon to testify, I would testify competently to the facts set forth in this Affidavit. I am authorized to submit this Affidavit on behalf of GM.

5.    The Debtors have filed the 363 Motion because there simply is *no* viable alternative to the 363 Transaction to preserve the going concern value of the GM business and the employment opportunities and related benefits of that business. There is no other sale, or even other potential purchasers, present or on the horizon. There is no other source for debtor in possession ("DIP") financing even under the expedited process that is a condition to the instant proposal, let alone under a traditional chapter 11 process. In the face of the global meltdown of the financial markets, and a liquidity crisis unprecedented in GM's 100 year history, there is only one way to maximize the value and permit the survival of GM's business and save hundreds of thousands of jobs associated with not only GM, but also its vast supplier and dealer networks: these chapter 11 cases and the prompt approval of the 363 Transaction. The only other alternative is the liquidation of the Debtors' assets that would (i) substantially diminish the value of GM's business and assets, (ii) throw hundreds of thousands of persons out of work and cause the termination of health benefits and jeopardize retirement benefits for current and former employees and their families; (iii) benefit no interested economic stakeholder, and (iv) yield

09-50026-mg Doc 21-1 Filed 06/20/12 Entered 06/20/12 14:52:46 Exhibit A-
09-50026-reg Doc 29-1 Filed 06/01/09 Entered 06/01/09 09:57:23 Main Document Pg 4 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul Pg 5 of 99

noteholders and other unsecured creditors no recovery.  Approval of the 363 Transaction must be prompt in order to accomplish its goals – to sell substantially all the assets of the Debtors as a going concern to a purchaser sponsored by the United States Department of the Treasury (the "U.S. Treasury") that will assure the ongoing operation of a competitive and profitable automotive company.

6.     Sections I through IV of this Affidavit describe the nature of GM's business; the events that led to the commencement of these chapter 11 cases; the rationale for and structure of the proposed 363 Transaction (including the urgent need for its expeditious consummation); and the capital structure of the Debtors.  Section V identifies the attached schedules of information required by Local Bankruptcy Rule 1007-2.

# I.

## Overview

7.     For over one hundred years, GM and its approximately 463 direct and indirect wholly-owned subsidiaries (collectively, the "Company"), have been a major component of the United States manufacturing and industrial base, as well as the market leader in the United States automotive industry.  GM has employed -- and provided health and retirement benefits to -- millions of dedicated workers over the years.  Both directly and as a customer of literally thousands of businesses that supply GM, the Company played a significant role in the development of a strong middle class in the United States.  The Company has been a source of pride for generations of American workers whose hard work and creativity helped fuel GM's global expansion as a full line manufacturer of cars, trucks, and related products.  GM has also been instrumental in the United States becoming the world's major economic force.

8.      William C. Durant founded General Motors in 1908 to implement his vision of one company growing through the creation and management of multiple automotive brands.  GM began as a holding company for Buick Motor Company and, by 1916, the Company's brands included Chevrolet, Pontiac (then known as Oakland), GMC, Oldsmobile, and Cadillac.  Under Mr. Durant's successor, Alfred P. Sloan, Jr., GM adopted the groundbreaking strategy of "a car for every purse and purpose," which revolutionized the automotive market by dividing it into distinct price segments, ranging from low-priced to luxury automobiles.

9.      Over the past century, the Company grew into a worldwide leader in products and services related to the development, manufacture, and marketing of cars and trucks under various brands, including:  Buick, Cadillac, Chevrolet, Daewoo, GMC, Holden, HUMMER, Opel, Pontiac, Saab,[1] Saturn, Vauxhall, and Wuling.  The Company has produced nearly 450 million vehicles globally and operates in virtually every country in the world.

10.     Recent events, however -- including both international competitive forces and the worldwide recession that has resulted in an economic contraction and dislocation not seen since the 1930s -- have led to the dramatic financial distress of the world's largest automotive company.  GM's shares of common stock have declined from $93.62 per share as of April 28, 2000 to $1.09 per share as of May 15, 2009, resulting in a dramatic decrease in market capitalization by approximately $59.5 billion.  Sales of GM's products have dropped as its market share in the largest single market for the Company's products -- the United States -- has steadily declined as the automobile market was flooded with imports from foreign Original Equipment Manufactures ("OEMs") with far lower cost structures and dramatically lower legacy

---

[1]  As a result of the global economic crisis and its effect on the automotive industry, Saab commenced reorganization proceedings in Sweden in February 2009.

09-50026-mg    Doc 29-1  Filed 06/20/12    Entered 06/20/12 14:52:46    Exhibit A
                   Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 7 of 99
09-50026-reg    Doc 21  Filed 06/01/09    Entered 06/01/09 09:57:23    Main Document    Pg 6 of 98

benefit obligations. For example, GM's United States market share fell from 45% in 1980 to 22% in 2008, and its market share forecast for 2009 is 19.5%.

11.     Most recently, GM's sales have been materially affected by the overall decline in domestic automobile sales, which continued unabated given the deteriorating economy and financial markets. The Seasonally Adjusted Annual Rate ("SAAR") of automobile sales for the United States industry declined from 15.6 million units in January 2008 to 9.8 million units in January 2009, which is the lowest level since 1982. This affected all domestic OEMs, but GM in particular. For the fourth quarter of 2008, GM's domestic automobile sales were down 36% compared to the corresponding period in 2007. For the first quarter of 2009, GM's domestic automobile sales dropped by 49% compared to the corresponding period in 2008.

12.     By the fall of 2008, the Company was in the midst of a severe liquidity crisis, and its ability to continue operations grew more and more uncertain with each passing day. The Company previously had recognized the need for bold action to modify and transform its operations and balance sheet to create a leaner, more efficient, productive, and profitable business; and it had expended a tremendous amount of resources and effort, on operational, strategic partnering, and financial fronts, to accomplish this task. Unfortunately, because of the continuing and deepening recession, aggravated by the collapse of Lehman Brothers Holdings Inc. ("Lehman") on September 15, 2008, GM was not able to achieve its objective.

13.     As a result of the economic crisis, in November 2008, the Company was compelled to seek financial assistance from the Federal Government. The government understood the draconian consequences of a failure and of a GM collapse. The government also recognized the likelihood of systemic failure throughout the domestic automotive industry and the significant harm to the overall U.S. economy from the loss of hundreds of thousands of jobs

and the sequential shutdown of hundreds of ancillary businesses if GM had to cease operations. The U.S. Treasury, in late December 2008, provided the necessary financing to temporarily sustain the Company's operations. The U.S. Treasury, however, provided such financing on the express condition that the Company develop a business plan that would fundamentally transform GM (operationally and financially) into a viable and profitable American OEM capable of meeting the competitive and environmental challenges of the 21st century. Thereafter, in March 2009, the U.S. Treasury indicated that, if the Company was unable to complete an effective out-of-court restructuring, it should consider a new, more aggressive viability plan under an expedited Court-supervised process to avoid erosion of asset value.

14.    After exploring numerous options, including seeking out potential sources of financing (both public and private) and strategic alliances, it became evident that, in light of the ongoing economic crisis, the Company would not be able to achieve an effective out-of-court restructuring and the only viable option was the 363 Transaction. The Debtors' precarious financial and operational condition has been widely reported in the media on a daily basis for the past few months. It has been widely known, as well, that assets and businesses of the Company have been available for sale, yet no offers have been received at a level necessary to sustain the Company's operations and assure it viability, other than the U.S. Treasury-sponsored 363 Transaction. Indeed, in light of the Company's substantial secured indebtedness totaling approximately $27 billion, the only entity that has the financial wherewithal and is qualified to purchase the assets -- and the only entity that has stepped forward to make such a purchase -- is the U.S. Treasury-sponsored Purchaser. That Purchaser is only willing to proceed in the context of an expedited sale process authorized and approved under the Bankruptcy Code.

15.     Equally important, in the context of the 363 Transaction, the U.S.
Treasury is willing to provide DIP financing.  There are *no* other sources with either the financial
wherewithal or willingness to provide such financing.  The U.S. Government has stated it will
not provide DIP financing absent the 363 Transaction.  Without such financing, these cases
quickly will plunge into a liquidation, with the concomitant loss of value, employment, and
systemic failure necessarily attendant thereto.

16.     For these reasons, the 363 Transaction, as embodied in the proposed
Master Sale and Purchase Agreement among GM and its Debtor subsidiaries (the "Sellers") and
Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the U.S.
Treasury, dated as of June 1, 2009 (the "MPA"), reflects the good faith business judgment of
GM's Board that the 363 Transaction is the best, indeed, the only, viable means to save and carry
forward GM's business in a new enterprise ("New GM") that will maximize and realize the
going concern value of the Company's assets.  The MPA is the product of intense negotiations
among the Debtors, the U.S. Government, the Debtors' largest secured creditor, and the
International Union, United Automobile, Aerospace and Agricultural Implement Workers of
America (the "UAW") (on behalf of current and retired employees) -- each of which recognizes
the need to maximize the value of the Debtors' operating assets and provide for the continuation
of the business.  Each of the U.S. Government and the UAW has made significant concessions to
enable the sale and to support the viability of the Purchaser.  The 363 Transaction:  (i)
accomplishes the goals of the Company; (ii) prevents the inevitable meltdown of the domestic
automotive industry; and (iii) creates an enterprise that will be competitive and profitable.  In
addition, both the Government of Canada and the Government of Ontario, through Export
Development Canada ("EDC"), Canada's export trading agency, have recognized the urgent

09-50026-mg   Doc 29-1   Filed 06/20/13   Entered 06/20/13 14:52:46   Exhibit A-
09-50026-reg   Doc 1   Filed 06/01/09   Entered 06/01/09 09:57:23   Main Document   Pg 9 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul   Pg 10 of 99

need to facilitate the 363 Transaction and have agreed to provide approximately $9 billion in financing to support the long-term viability of GM's North American operations. The 363 Transaction will alleviate consumers' concerns about residual value, replacement parts, warranty obligations, and maintenance of GM products that are critical to the preservation of the value of the assets. The task is a large one. GM is committed to getting it done, but it must be *expeditiously* accomplished.

17.     As part of the 363 Transaction, the Purchaser, and the UAW have reached a resolution addressing the ongoing provision of certain employee and retiree benefits. Under the "UAW Retiree Settlement Agreement," the Purchaser has agreed to provide, among other things: (i) shares of common stock of the Purchaser representing 17.5% of the Purchaser's total outstanding common stock, (ii) a note of the Purchaser in the principal amount of $2.5 billion, (iii) shares of cumulative perpetual preferred stock of the Purchaser in the amount of $6.5 billion, (iv) warrants to acquire 2.5% of the Purchaser's equity, and (v) the assets held in a voluntary employees' beneficiary association trust sponsored by the Sellers and to be transferred to the Purchaser as part of the 363 Transaction, in each case to a new voluntary employees' beneficiary association sponsored by an employees beneficiary association (the "New VEBA"), which will have the obligation to fund certain retiree medical benefits for the Debtors' retirees and surviving spouses represented by the UAW (the "UAW-Represented Retirees").

18.     In connection with the foregoing, the UAW has agreed to be the authorized representative for UAW-Represented Retirees for purposes of section 1114 of the Bankruptcy Code and will enter into the UAW Retiree Settlement Agreement effective upon the closing of the 363 Transaction. The class representatives on behalf of the class members, by and through class counsel in certain class actions previously filed against GM on behalf of UAW-

Represented Retirees regarding retiree health care benefits (the "Class Representatives") have acknowledged and confirmed the UAW Retiree Settlement Agreement.  As part of the 363 Transaction, the Purchaser also will assume modified and duly ratified collective bargaining agreements entered into by and between the Debtors and the UAW (the "UAW CBA Assignment").

19.     These chapter 11 cases were initiated to preserve the going concern value of the Company's assets and provide for the sale of such assets to the Purchaser to be the anchor for a new era of American automotive innovation and growth.  The 363 Transaction will enable New GM to become an engine of opportunity and prosperity for countless Americans.  The prompt approval and execution of the 363 Transaction is consistent with President Obama's observation that use of the bankruptcy laws may be the "best chance to make sure that the cars of the future are built where they've always been built -- in Detroit and across the Midwest -- to make America's auto industry in the 21st century what it was in the 20th century -- unsurpassed around the world."  Barack H. Obama, U.S. President, Remarks on the American Automotive Industry at 7 (Mar. 30, 2009) [hereinafter *Presidential Remarks*].

## II.

## The Businesses of General Motors

### A.     Overview of GM's Business Operations

20.     The Company is primarily engaged in the worldwide development, production and marketing of cars, trucks, and parts through four automotive segments:  GM North America, GM Europe, GM Latin America/Africa/Mid-East, and GM Asia Pacific.  For many years, GM supplied at least one in five vehicles sold in the U.S.  It is the largest OEM in the U.S. and the second largest in the world.  With global revenues of approximately $181.1

billion in 2007, GM ranked ninth on the 2008 Fortune Global 500 list.[2]  In addition, GM's highly-skilled engineering and development personnel designed and manufactured some true automotive icons, including the Corvette, the Camaro, the NorthStar engine, and even the first lunar roving vehicle driven on the moon.  GM continues as a leading global technology innovator.  Currently, it is setting the automotive industry standard for "green" manufacturing methods and products, flexible fuels, and multimode hybrid systems.

21.    GM maintains its executive offices in Detroit, Michigan, and its major financial and treasury operations in New York, New York.

22.    Substantially all of GM's worldwide car and truck deliveries (totaling 8.4 million vehicles in 2008) are marketed through independent retail dealers or distributors.  In addition to the products sold to dealers for consumer retail sales, GM sells cars and trucks to fleet customers, including rental car companies, commercial fleet companies, leasing companies, and governmental units.

23.    As of March 31, 2009, GM employed approximately 235,000 employees worldwide, of whom 163,000 (69%) were hourly employees and 72,000 (31%) were salaried employees.  Approximately 62,000 (68%) of GM's total of approximately 91,000 U.S. employees were represented by unions as of March 31, 2009.  The UAW represents the largest portion of GM's U.S. unionized employees, totaling approximately 61,000 employees.

**B.    GM's Dealer Network**

24.    GM relies heavily on its relationships with dealers, as substantially all retail sales are through its unique network of independent retail dealers and distributors.  As of April 30, 2009, there were 6,099 GM vehicle dealers throughout the United States.  These

---

[2]    Global 500, Fortune, 2008, *available at* http://money.cnn.com/magazines/fortune/global500/2008/.

09-50026-mg   Doc 11852-1   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit A
09-50026-reg   Doc 2   Filed 06/01/09   Entered 06/01/09 09:37:23   Main Document   Pg 12 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 13 of 99

dealers maintain the primary sales and service interface with consumers of GM's products.  As

discussed below, the 363 Transaction will allow a substantial majority of the GM dealerships to

continue operations while providing a significant "wind-down" period for terminated and

discontinued dealers.  Dealers represent the "face" of GM to its consumers -- not only selling

new cars, but also providing service and parts for vehicle maintenance and a market for trade-ins

of used vehicles in connection with new vehicle purchases.  Continuation of quality dealers is an

essential element of the 363 Transaction and of the preservation and viability of the Company's

business.

### C.     GM's Suppliers

25.     As the nation's largest automobile manufacturer, GM uses the services of

thousands of suppliers resulting in approximately $50 billion in annual supplier payments.  In

North America alone, GM uses a network of approximately 11,500 suppliers.  In addition, there

are over 600 suppliers whose sales to GM represent over 30% of their annual revenues.  As such,

it cannot be overstated that many automotive parts suppliers depend -- either in whole or in part -

- on GM for survival.

26.     Of equal importance is the Company's reliance on its suppliers.

Approximately 75 to 85% of every GM automobile consists of components made by companies

other than GM.  Any interruption of the flow of such components -- even a temporary one --

would be devastating to the Company.  Consistent with industry practice, GM operates on a

"just-in-time" inventory delivery system.  Component parts from numerous suppliers typically

are assembled onto vehicles within a few hours of the delivery of the parts and components to

GM assembly facilities.  Consequently, if even one supplier were to cease shipping production

parts and components to GM, the GM plants relying on such shipments would be materially and

09-50026-mg    Doc 11852-1    Filed 06/20/12    Entered 06/20/12 14:52:46    Exhibit A
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 14 of 99
09-50026-reg    Doc 21    Filed 06/01/09    Entered 06/01/09 09:57:23    Main Document    Pg 13 of 98

adversely affected and may be forced to shut down.  Moreover, as explained below, there would

be no way to obtain replacement parts within a reasonable time period.

        27.    Specifically, most parts that a given supplier manufactures for GM are not

readily available from alternate sources because of, among other things, (i) capacity constraints

within the automotive parts supply industry (including the practice of "sole source suppliers" of

many parts and components), (ii) the significant length of time (up to 36 months) it takes to

validate safety and environmental regulatory compliance of a new supplier's parts, and (iii) the

lead time required to develop and build tools for manufacture of particular parts.  As an example,

Delphi Corporation ("Delphi"), which is struggling as a debtor in possession in a chapter 11 case

pending in this Court, currently provides over 60% of GM's North American steering columns --

almost three million per year.  That volume simply cannot be replaced quickly as there is not

currently enough excess capacity to accommodate GM's needs or time to validate the parts.  The

Delphi situation confirms the critical implications to the Debtors of a shutdown of a major

supplier.

        **D.**      **GM Is at the Forefront in Technology and Environmental Advances**

        28.    Energy diversity and fuel economy leadership are material elements of

GM's overall business plan.  The Company's historic success has been enhanced by its

innovative approach to developing an alternative propulsion strategy.  From developing plug-in

hybrids, lithium-ion battery technology, and clean burning alternative diesel fuels to stability

control and the OnStar in-vehicle safety, security, navigation, and communication system, GM

has been, and continues to be, in the forefront of the technology revolution.  It is one of the

largest and most successful investors in automotive research and development in the United

States.  The Company has a variety of innovations on the path to commercialization that are

directly relevant to national goals of energy efficiency, energy independence, and safety.  GM is

a world leader in flex fuel technology, with more than 5 million biofuel capable vehicles on the

road today.  It is working hard to develop next-generation biofuels, such as cellulosic ethanol and

biodiesel, which can be sustainably produced.  GM has introduced a number of hybrid vehicles

that meet a variety of consumer needs in terms of fuel efficiency and performance.  Indeed, GM

offers twenty models which achieve thirty miles per gallon or more on the highway -- more than

any other manufacturer.  In addition, GM is fully committed to improving vehicle fuel economy

and lowering greenhouse gas emissions consistent with the new Corporate Average Fleet

Economy standards announced by President Obama on May 19, 2009.

### E.      GM's Relationship with the UAW

29.     The Company has tried to reduce the costs of healthcare benefits for its

employees, but these costs continue to substantially escalate.  The Company has used trusts

qualified as voluntary employee beneficiary associations under section 501(c)(9) of the Internal

Revenue Code of 1986, as amended, and sponsored by the Company or a union (each, a

"VEBA"), as a funding vehicle to hold reserves to meet its future obligations to provide

healthcare and life insurance benefits ("OPEB") under certain benefit plans to its salaried and

hourly employees upon retirement.

30.     To restructure its retiree healthcare liability, in 2006 GM negotiated a

settlement of a legal dispute regarding retiree medical benefits with the UAW and the Class

Representatives  (the "2006 UAW Settlement Agreement"), under which the Company

significantly  reduced its OPEB liabilities for healthcare benefits for existing UAW retirees but

agreed to continue to provide benefits under an amended GM sponsored retiree health care

benefit plan (the "2005 Benefit Plan").  Under the 2006 UAW Settlement Agreement, the

Company also agreed to mitigate the cost to retirees of the 2005 Benefit Plan by funding  a new,

09-50026-mg Doc 11852-1 Filed 06/20/12 Entered 06/20/12 14:52:46 Exhibit A
09-50026-reg Doc 2 Filed 06/01/09 Entered 06/01/09 09:37:23 Main Document Pg 16 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 16 of 99

independent VEBA (the "2005 UAW VEBA") through three $1 billion contributions to be made by the Company into the 2005 UAW VEBA.

31.    In 2007, the Debtors entered into a memorandum of understanding with the UAW, which was superseded by a settlement agreement entered into in February 2008 between GM, the UAW and the Class Representatives (the "2008 UAW Settlement Agreement"), which provided that responsibility for providing retiree healthcare would permanently shift from GM to a new plan that was independent of GM, established and maintained by an employees beneficiary association (the "New Plan") and  funded by a VEBA trust established by the 2008 Settlement Agreement (the "VEBA Trust").  Under the 2008 UAW Settlement, the Company will transfer, as of January 1, 2010, its liabilities for healthcare benefits for existing and certain future UAW retirees to the New Plan in exchange for specified contributions aggregating approximately $20.56 billion[3] to be made by the Company into the VEBA Trust (the "2008 UAW VEBA Contribution").  The 2008 UAW Settlement Agreement, therefore, fixed and capped the Company's obligations.  Under the 2008 UAW Settlement Agreement, the Company is not responsible for, and does not guarantee, (i) the payment of future benefits to plan participants, (ii) the asset returns of the funds in the VEBA Trust, or (iii) the sufficiency of assets in the VEBA Trust to fully pay the obligations of the New Plan.  If the assets of the VEBA Trust are not sufficient to fully fund the obligations of the New Plan, the New Plan will be required to reduce benefits to plan participants.

32.    As described below, in the context of the 363 Transaction, New GM will make contributions to the New VEBA, which will have the obligation to fund the UAW retiree health and welfare benefits.

---

[3]  This liability is estimated as the net present value at a 9% discount rate of future contributions, as of January 1, 2009, and excludes approximately $9.4 billion corresponding to the GM Internal VEBA.

F.     **Financing Services and GMAC**

33.     GMAC LLC ("GMAC") is a global financial company that provides a range of financial services, including consumer vehicle financing to the Company's customers and automotive dealerships and other commercial financing to the Company's dealers. Historically, GMAC has served as an important source of financing for the Company, its dealers and customers. Related thereto, GM and GMAC are parties to dozens of agreements that govern their longstanding financing and operating relationship. Recently, GMAC accomplished several actions to improve its capital position and access to liquidity, including additional capital investments by the U.S. Treasury. Based on the current economic downturn, crisis in the credit markets and the critical role GMAC plays in GM's vehicle financing activities, the Debtors have an urgent and immediate need to continue their financing and operating agreements and arrangements with GMAC. No alternative source of wholesale dealer financing or retail financing is available to the Debtors to replace, at the levels required, the critical and necessary financing provided by GMAC.

## III.

### Events Leading to the Commencement
### Of These Chapter 11 Cases and the 363 Transaction

A.     **GM's Revenues Erode as Its Market Share Declines**

34.     Historically, GM has been one of the best performing OEMs in the U.S. market. However, as a result of the development and expansion of strong global competitors with disparate and, often, significantly lower operating and legacy (including retiree) cost structures, the Company's leadership position in the U.S. began to decline. While foreign OEMs enjoyed, among other advantages, lower wages and far lower annual healthcare and benefit costs, the Company's obligation to support pension benefits and provide healthcare and life insurance

09-50026-mg    Doc 11852-1    Filed 06/20/12    Entered 06/20/12 14:52:46    Exhibit A
09-50026-reg    Doc 11852-1    Filed 06/01/09    Entered 06/01/09 09:57:23    Main Document    Pg 17 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 18 of 99

benefits (OPEB) for its former employees increased exponentially, even as its revenues eroded because of a drop in market share and the downturn in the national and global economy.

35.    In the wake of this increasing competitive pressure, for approximately the past five years, GM has been engaged in an effort to realign its business operations and practices to:  (i) improve the consumer appeal, quality, safety, and fuel efficiency of its cars and trucks; (ii) achieve cost competitiveness and advantages in labor, manufacturing, product development, procurement, and staff functions; and (iii) address GM's huge legacy cost burden (which has cost GM $103 billion in value over the last fifteen years).  For example, beginning in 2005, GM initiated and accomplished, among other things, a reduction of its North American annual structural costs by approximately $9 billion, a considerable reduction of its North American capacity and its hourly and salaried workforce, and a modification of its collective bargaining agreements with various labor unions, significantly reducing its OPEB obligations.

### B.    Several Strategic Initiatives and Alliances Were Explored

36.    At the same time it was realigning its business and operating costs, GM also was exploring strategic third-party alliances and transactions to reduce its cost structure and broaden its product base and geographic reach.  For the reasons discussed above, these efforts were brought into even sharper focus in recent years -- beginning with GM's consideration during the summer of 2006 of a partnership with Renault-Nissan.  However, the parties were unable to reach agreement on acceptable terms.

37.    In the spring of 2007, GM entered into high-level discussions with DaimlerChrysler AG ("Daimler") regarding the potential acquisition of Chrysler.  GM viewed Chrysler, much like Renault-Nissan, as having the potential to create significant synergies, the present value of which was estimated to be significantly greater than the equity value of either of the parties at the time, as well as an opportunity to reduce costs.  A transaction with Chrysler was

also viewed as a potential catalyst for obtaining significant incremental financing from GM and

Chrysler's existing lenders, several of which were common to both companies.  GM ultimately

concluded, however, that a GM/Chrysler combination would only exacerbate GM's exposure to

a dwindling U.S. automotive market with mounting costs and supplier concerns and,

accordingly, the discussions were terminated.

        38.    GM nevertheless revisited a potential acquisition of Chrysler beginning in

August 2008.  Soon thereafter, however, as discussed below, the financial markets and operating

conditions for GM and Chrysler sharply and rapidly deteriorated.  By early November 2008, it

became clear to GM that Chrysler's lenders would not be willing to provide incremental liquidity

to a merged company.  As a result, in early November, the parties suspended discussions.

        39.    Other recent efforts -- including discussions regarding potential equity

investments (both local and global in scope) by various foreign entities and sovereign wealth

funds -- also failed to materialize because of, among other things, the Company's uncertain

financial condition and prospects.  These same concerns also have hindered the Company's

ability to (i) obtain additional Energy Independence and Security Act (EISA) loan funding (in the

amount of approximately $7.7 billion), as the United States Department of Energy has deferred

decision on the Company's application until the U.S. Treasury accepts the Company's plan for

long-term viability, and (ii) sell discrete assets that otherwise would have had substantial value

under normal market conditions, such as interdependent assets like ACDelco, that are simply not

viable without the Company's support, including as a high volume customer.

      **C.**    **The Worldwide Financial Crisis Propels GM into a Liquidity Crisis**

      *The Dramatic Increase in Fuel Prices*

        40.    Notwithstanding significant progress in cost reduction and increased

efficiency, competitive pressure on GM was exacerbated by (i) substantial increases in the price

09-50026-mg   Doc 11852-1   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit A
09-50026-reg   Doc 2   Filed 06/01/09   Entered 06/01/09 09:57:23 Main Document   Pg 20 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 20 of 99

of crude oil to nearly $150 per barrel during 2008, which precipitated a sharp downturn in

driving and sales in the large vehicle segments in which GM was dominant and most profitable

and (ii) a sharp decline in the global economy, including substantial increases in unemployment

and a freeze-up of consumer and business lending.  The resulting drop in new vehicle sales led to

a steep erosion in GM revenues and, in turn, significant operating losses.  As a result, between

the beginning of May and the middle of June of 2008, GM's common stock price declined from

over $23 per share to under $15 per share and its long-term bonds traded down from the mid-70s

to the high 60s.

### *Instability in the Financial Markets*

41.     Even as fuel prices stabilized and moderated to some degree during the

fall of 2008, the Company faced sharply deteriorating economic conditions during the second

half of 2008 and the first quarter of 2009, which can only be characterized as the worst economic

downturn and credit market environment since the Great Depression.  Significant failures

occurred in America's financial sector -- including the forced sale or liquidation of two of

America's five largest investment banks, the crippling of the nation's largest insurance company,

the conservatorships of both Freddie Mac and Fannie Mae, and the financial distress of two of

the nation's ten largest banks.  The financial market crisis not only affected large institutions, but

also affected consumers, as both income and financing for buyers and lessees of automobiles

evaporated.

42.     As the economy continued to deteriorate, GM explored programs to

conserve and raise cash through various capital markets actions.  For example, correctly

anticipating a liquidity crunch, in the Summer of 2008, the Company explored raising as much as

$3 billion through a public offering of common and mandatory convertible preferred stock.

09-50026-mg   Doc 11852-1   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit A
09-50026-reg   Doc 2   Filed 06/01/09   Entered 06/01/09 09:32:23   Main Document   Pg 20 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul   Pg 21 of 99

Given the rapidly and severely contracting markets, however, the prospects for an equity offering faded by June 2008. As it became increasingly clear that an equity offering or any unsecured debt offering was not feasible because of market conditions, the Company's Treasury Office began working with outside financial advisors on a variety of alternative strategies, including a liquidity preservation plan and the possible issuance of secured debt.

43.     GM's financial advisors indicated that the market capacity for such a financing as of July 2008 was approximately $2 to $4 billion. GM's ability to raise additional secured borrowing, however, was constrained by its existing secured facilities and restrictive provisions in its various bond indentures. The Company nevertheless attempted to pursue the proposed secured financing until early September 2008.

44.     On September 15, 2008, Lehman commenced a chapter 11 case. In the weeks that followed, it became clear that there were no prospects for the Company to launch any debt offering, even on a secured basis.

45.     Throughout the summer of 2008, even as it was engaged in a concerted effort to raise capital and cut costs, GM also explored the sales of a variety of core and non-core assets. As of June 27, 2008, the Company had received indications that OnStar might realize approximately $2 to $4 billion; HUMMER might realize $ 500 million or more; ACDelco might realize approximately $1 to $2 billion; and GM Strasbourg might realize approximately $200 to $300 million. The Company also believed that it might be able to sell or securitize certain of its real estate assets to generate proceeds of approximately $1.2 to $1.4 billion. None of the foregoing was able to be consummated on reasonable terms given the contracting credit markets, the continuing recession, and concerns about GM.

09-50026-mg   Doc 11852-1   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit A
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul   Pg 22 of 99
09-50026-reg   Doc 11852-01/09 Entered 06/01/09 09:87:23 Main Document Pg 21 of 98

46.     Thus, the combination of the sharp run-up of gasoline prices with its direct impact on the Company's most profitable vehicle segments, rapid declines in the housing/mortgage/credit sectors, the freeze-up of equity and debt capital markets, and the lowest levels of consumer confidence in nearly thirty years, had an unprecedented effect on the automotive industry generally and GM in particular.  As the economic crisis intensified, new vehicle sales fell to their lowest per-capita levels in half a century (including, by way of example, a decline in just the last year alone of approximately one million global vehicle sales), putting automakers under enormous financial stress.  By late September 2008, based on operating results through the end of August 2008, GM was projecting that its Automotive Adjusted EBT for 2008 would fall to negative $10.1 billion.  Conditions only worsened after that, with new vehicle sales in the United States during October 2008 totaling just 861,000 units, a SAAR of 10.9 million units, which was the lowest level for the period since 1982.

47.     Under these extraordinary conditions, the Company's liquidity rapidly eroded to a level below what was necessary to operate the business.  Consequently, GM had no choice but to reach out to the U.S. Government for financial assistance.

**D.     GM Seeks Financial Assistance from the U.S. Government**

48.     President Barack Obama has described the domestic automotive industry as a basic component of the national industrial complex and economy.  The automotive industry employs one in ten domestic workers and directly provides and supports more than 4.7 million jobs.  It is one of the largest purchasers of domestically manufactured steel, aluminum, iron, copper, plastics, rubber, and electronic and computer chips.  Almost 4% of the U.S. gross domestic product, and almost 10% of U.S. industrial production by value, is related to the automotive industry.  In addition, currently, GM is one of the largest private providers of healthcare in this country.  The survival and future success of the Company is, therefore,

essential not only for the immediate stakeholders and constituents of GM, but also for the well-being of the economy and the public interest.  Indeed, the U.S. Government views the survival of the Company as necessary to avoid a far broader systemic failure that would severely disadvantage the nation and the millions of people who are employed in or dependent on the automotive sector.

### Viability Plan I

49.     In November 2008, it had become increasingly clear that the Company would only be able to obtain sufficient funds and liquidity to avoid near-term bankruptcy through a loan from the U.S. Government.  The Company's existing debt load was likely to be unsustainable and would need to be restructured to permit long-term viability.  Accordingly, with the credit markets frozen and consumer confidence at an all time low, on or about November 12, 2008, GM was compelled to seek financial assistance from the U.S. Treasury.

50.     On November 21, 2008, the Speaker of the House of Representatives, Nancy Pelosi, and the Senate Majority Leader, Harry Reid, released a letter to the chief executive officers of GM, Chrysler, and Ford outlining a framework for the domestic OEMs to request government loans, including submission of additional information for future economic viability.

51.     In response to this letter, on December 2, 2008, GM submitted to the Senate Banking Committee and the House of Representatives Financial Services Committee a proposed viability plan ("Viability Plan I").  Under Viability Plan I, the Company committed to using the proposed government funding exclusively to sustain and restructure its operations in the United States and aggressively retool its product mix.  Key elements of Viability Plan I included:

- a dramatic shift in the company's U.S. vehicle offering portfolio, with 22 of 24 new vehicle launches in 2009-2012 consisting of more fuel-efficient cars and crossovers;

- full compliance with the 2007 Energy Independence and Security Act, and extensive investment in a wide array of advanced propulsion technologies;

- reduction in brands, nameplates, and retail outlets to focus available resources and growth strategies on the Company's profitable operations;

- full labor cost competitiveness with foreign manufacturers in the United States by no later than 2012; and

- further manufacturing and structural cost reductions through increased productivity and employment reductions; and balance sheet restructuring and enhanced liquidity via temporary federal assistance.

52.    In addition, Viability Plan I requested an immediate loan of $4 billion from the U.S. Government to insure minimum liquidity through the end of 2008, a second $4 billion draw in January 2009, a third draw of $2 billion in February 2009, and a fourth draw, also of $2 billion, at an unstated date in 2009, for a total government term loan of $12 billion.  In addition, GM sought access to an incremental $6 billion line of credit, for a total of $18 billion in projected government loans.

53.    Notwithstanding the critical need for emergency funding by domestic OEMs, Congress did not act, and GM was compelled to seek immediate financial support from the U.S. Treasury or confront the suspension of operations.

### *The U.S. Treasury Facility*

54.    On December 19, 2008, former President George W. Bush announced that the outgoing administration would make short-term, emergency funding available to GM and Chrysler under the Troubled Asset Relief Program ("TARP") to prevent both companies from commencing immediate bankruptcy cases.  GM immediately intensified negotiations with the U.S. Treasury regarding the terms of a government loan, and, on December 31, 2008, GM and

the U.S. Treasury entered into an agreement (the "U.S. Treasury Loan Agreement") that

provided GM with emergency financing of up to an initial $13.4 billion pursuant to a secured

term loan facility (the "U.S. Treasury Facility").  GM borrowed $4.0 billion under the U.S.

Treasury Facility on December 31, 2008 and an additional $5.4 billion on January 21, 2009.  The

remaining $4.0 billion was borrowed on February 17, 2009.  The loan bears an interest rate per

annum equal to the three-month LIBOR rate (which shall be no less than 2.0%) plus 3.0%.

55.    A number of the Company's domestic subsidiaries jointly and severally

guaranteed GM's obligations under the U.S. Treasury Facility pursuant to a guarantee and

security agreement entered into concurrently with the U.S. Treasury Facility.  The U.S. Treasury

Facility is secured by a first priority lien on and security interest in substantially all the

unencumbered assets of GM and the guarantors, as well as a junior lien on encumbered assets,

subject to certain exceptions.  The U.S. Treasury Facility is also secured by a pledge of the

equity interests held by GM and the guarantors in certain foreign subsidiaries, also subject to

certain exceptions.

56.    As part of the compensation for the loans provided under the U.S.

Treasury Loan Agreement, GM issued to the U.S. Treasury (i) a warrant to purchase up to

122,035,597 shares of GM common stock (subject to adjustment);  and (ii) a related promissory

note in a principal amount of approximately $749 million, due on December 30, 2011, and

bearing interest, payable quarterly, at a rate per annum equal to the three-month LIBOR rate

(which shall be no less than 2.0%) plus 3.0% (together with other similar notes, the "Warrant

Notes").

57.    The U.S. Treasury Loan Agreement required, among other things, that

GM (i) reduce its approximately $27 billion outstanding unsecured public debt by no less than

two-thirds; (ii) reduce its total compensation to U.S. employees so that by no later than December 31, 2009, such compensation is competitive with Nissan, Toyota, or Honda in the United States; (iii) eliminate compensation or benefits to employees who have been discharged, furloughed, or idled, other than customary severance pay; (iv) apply, by December 31, 2009, work rules for U.S. employees in a manner that is competitive with the work rules for employees of Nissan, Toyota, or Honda in the United States; and (v) convert at least one-half of the value of the required $20 billion UAW VEBA Contribution to common stock rather than a cash payment.

58.     The U.S. Treasury Loan Agreement provided that, if, by March 31, 2009 (the "Certification Deadline"), the President's designee had not issued a certification that GM had taken all steps necessary to achieve and sustain GM's long-term viability, international competitiveness, and energy efficiency in accordance with its viability plan, then the loans and other obligations under the U.S. Treasury Loan Agreement would become due and payable on the 30th day after the Certification Deadline.

### E.     The U.S. Treasury Conditions Any Future Financing On GM's Demonstrating Viability (Viability Plan II)

59.     The U.S. Treasury Facility required that the Company develop a proposal to transform its business and demonstrate future viability.  However, subsequent to December 2, 2008, when GM submitted Viability Plan I, economic conditions continued to worsen globally. This development, combined with public speculation about GM's future and survival, further reduced the Company's sales volume, revenue, and cash flow.

60.     On February 17, 2009, GM submitted to the automobile industry task force appointed by President Obama (the "Presidential Task Force")[4] its business plan to achieve

---

[4]  The members of the Presidential Task Force are:  the Secretary of the U.S. Department of the Treasury, Timothy F. Geithner; the Director of the National Economic Council, Lawrence H. Summers; the secretaries of Transportation, Commerce, Labor, and Energy; the Chair of the President's Council of Economic Advisers; the

and sustain GM's long-term viability, international competitiveness, and energy efficiency, including a description of specific actions intended to result in (i) the repayment of the loans provided by the U.S. Treasury; (ii) compliance with federal fuel efficiency and emissions requirements and the commencement of domestic manufacturing of advanced technology vehicles; (iii) the achievement of a positive net present value as determined in plan; (iv) rationalization of costs, capitalization, and capacity with respect to GM's manufacturing workforce, suppliers, and dealerships; and (v) a product mix and cost structure that is competitive in the U.S. marketplace ("Viability Plan II").   The revised viability plan comprehensively addressed, among other things, GM's revenues, costs, and balance sheet for its U.S. and foreign operations, as well as GM's plan to reduce petroleum dependency and greenhouse gas emissions.

61.     Specifically, Viability Plan II proposed to transform the Company's business in the United States by (i) concentrating on GM's strongest brands (Chevrolet, Cadillac, Buick, and GMC), phasing out most of the other brands (e.g., HUMMER, Saab,[5] and Saturn by 2011), and transforming Pontiac into a niche brand; (ii) transforming the retail distribution channel to achieve a stronger, more effective dealer network while preserving GM's historical strength in rural areas; and (iii) continuing to take advantage of highly efficient manufacturing and product development operations.   Viability Plan II also proposed to accelerate GM's transformation or restructuring of its Canadian, European, and certain Asian-Pacific operations.[6]

---

Director of the Office of Management and Budget; the Environmental Protection Agency Administrator; and the Director of the White House Office of Energy and Climate Change.   The Presidential Task Force advisors include Ron Bloom, Senior Advisor to the U.S. Treasury; and Steven L. Rattner, Counselor to the U.S. Treasury.

[5] Soon after Viability Plan II was submitted to the U.S. Treasury and Presidential Task Force, Saab filed for reorganization in Sweden.

[6] At the same time it submitted Viability Plan II, GM was also engaged in discussions with the German and Swedish governments for funding support for the Opel and Saab brands, respectively.

09-50026-mg   Doc 11852-1   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit A
09-50026-reg   Doc 2   Filed 06/01/09   Entered 06/01/09 09:57:23   Main Document   Pg 27 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul   Pg 28 of 99

**F.      The Rejection of Viability Plan II
         And the Extension of the Certification Date to June 1, 2009**

62.      On March 30, 2009, President Obama announced that Viability Plan II was not satisfactory and did not justify a substantial new investment of taxpayer dollars.  The President outlined a series of actions that GM needed to take to receive additional federal assistance, including reaching an agreement with the UAW, the Company's bondholders and the VEBA Trust regarding debt reduction, and the submission of a revised business plan that was more aggressive in terms of scope and timing.

63.      The President indicated that the U.S. Treasury would extend to the Company adequate working capital for a period of another sixty days to enable it to continue operations and, as the Company's largest secured creditor, would negotiate with the Company to develop and implement a more aggressive and comprehensive viability plan that would include a "credible model for how not only to survive, but to succeed in this competitive global market." *Presidential Remarks* at 4.  The President also stated that the Company needed a "fresh start" to implement the restructuring plan," which "may mean using our [B]ankruptcy [C]ode as a mechanism to help [it] restructure quickly and emerge stronger." *Id.* at 5.  President Obama explained:

> What I'm talking about is using our existing legal structure as a tool that, with the backing of the U.S. Government, can make it easier for General Motors . . . to *quickly* clear away old debts that are weighing [it] down so that [it] can get back on [its] feet and onto a path to success; a tool that we can use, even as workers stay on the job building cars that are being sold.
>
> What I'm not talking about is a process where a company is simply broken up, sold off, and no longer exists.  We're not talking about that.  And what I'm *not talking about is a company that's stuck in court for years, unable to get out.*

*Id.* at 5-6 (emphasis added).

64.    Also on March 30, 2009, the U.S. Government set a deadline of June 1, 2009 for the Company to demonstrate that its viability plan would fundamentally transform the Company's operations into a profitable and competitive American car company.  Thereafter, the Company immediately began a deeper, more surgical analysis of its businesses and operations in an effort to develop a viability plan that would accommodate the needs of its secured creditors and other stakeholders by quickly achieving (i) sustainable profitability, (ii) a healthy balance sheet, (iii) a more aggressive operational restructuring, and (d) technology leadership.  GM also began to negotiate additional modifications to the terms of the VEBA Trust, and conducted extensive discussions with the U.S. Treasury regarding a potential restructuring of the debt obligations owed under the U.S. Treasury Loan Agreement.

65.    On April 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the U.S. Treasury Facility by $2 billion to $15.4 billion.  GM borrowed the additional $2 billion of secured working capital loans on April 24, 2009.

66.    As part of the Company's efforts to rationalize its business, on April 24, 2009, the Company announced that it would temporarily shut down certain production facilities starting in May 2009 -- not for the usual two-week mid-year period, and instead, for a period not to exceed eleven weeks (the "Temporary Shutdown").  The Temporary Shutdown enables a balancing of inventories at dealers and reduces cash erosion (albeit not in the very near term, as supplier payments must still be made in accordance with the Company's typical payment terms, but without offsetting revenue from new car production).  The Temporary Shutdown is not a long-term solution, as it threatens GM's position in the market and the viability of its suppliers and dealers.  As of the Commencement Date, certain of the Company's assembly facilities remain operating, while other assembly facilities continue to be shut down.  A number of the

assembly facilities that remain shut down are expected to resume operations by July 13, 2009 if the 363 Transaction is approved.

### G.    GM's First Quarter 2009 Results

67.    On May 8, 2009, GM announced its first quarter 2009 results.  GM's total net revenue decreased by $20 billion (or 47.1%) in the first three months of 2009 as compared to the corresponding period in 2008.  Operating losses increased by $5.1 billion from the prior quarter.  More importantly, during this same period, GM had negative cash usage of $9.4 billion and available liquidity deteriorated by $2.6 billion due, in large part, to lower sales volumes.  Sales by our dealers in the United States fell to approximately 413,000 vehicles in the three months ended March 31, 2009, a decline of approximately 49% compared to the corresponding period in 2008.

68.    On May 20, 2009 the U.S. Treasury Loan Agreement was amended to increase the U.S. Treasury Facility by $4 billion.  GM borrowed additional $4 billion of secured working capital loans on May 22, 2009.  In consideration of such additional extensions of credit under the U.S. Treasury Facility, GM issued the requisite secured promissory notes for the amounts borrowed in accordance with TARP legislation.

69.    On March 30, 2009, the U.S. Government announced that it would establish a warranty program pursuant to which a separate account would be created and funded with cash contributed by GM and a loan from the U.S. Treasury to ensure the payment for repairs covered by our limited warranty obligations.  On May 27, 2009 the U.S. Treasury Loan Agreement was further amended to increase the U.S. Treasury Facility by $360,624,198 and on May 29, 2009 GM borrowed that amount (the "Warranty Program Advance") and funded the separate account with those funds. GM's obligations under the Warranty Program Advance are only guaranteed by, and secured by the assets of, the subsidiary of GM that was formed to own

the separate account. The loan under the Warranty Program Advance bears an interest rate per annum equal to the three-month LIBOR rate plus 3.5%.

70.     In consideration of the Warranty Program Advance, GM issued an additional promissory note in an aggregate principal amount of approximately $24.1 million to the U.S. Treasury.  The note is due on December 30, 2011, and bears interest, payable quarterly, at a rate per annum equal to the three-month LIBOR rate plus 3.0%.

### H.     GM's Bond Exchange Offer Fails

71.     At the same time the Company was preparing Viability Plan II for submission to the U.S. Government, it was also preparing for the launch of an out-of-court bond exchange offer.  On April 27, 2009, as part of the continued effort to achieve long-term viability and avoid bankruptcy, GM launched a public exchange offer for the approximately $27 billion of its unsecured bonds (the "Exchange Offer").  The Company viewed the Exchange Offer as a means to continue operations and avoid the precipitous decline in revenues that would result from a prolonged bankruptcy case.  At the time the Exchange Offer was announced, the Company also disclosed that, if it did not receive enough tenders to consummate the Exchange Offer, GM would expect to commence a bankruptcy case to preserve the going concern value of its business.

72.     The terms of the Exchange Offer were the subject of extensive negotiations between the Company and the U.S. Treasury, as consummation of the Exchange Offer required the satisfaction or waiver of several conditions imposed by the U.S. Treasury as the largest secured creditor and potential contributor to the Company's deleveraging.  Among such conditions, the results of the Exchange Offer had to be acceptable to the U.S. Treasury, including the overall level of participation by bondholders in the Exchange Offer and the level of participation by holders of the Company's Series D notes due June 1, 2009 ("Series D Notes").

When the Exchange Offer was launched, GM understood that at least 90% of the aggregate

principal amount of the outstanding bonds, including at least 90% of the aggregate principal

amount of the outstanding Series D Notes, were required to be tendered in the Exchange Offer in

order to achieve a sufficient level of debt reduction to meet the viability requirement.

Consummation of the Exchange Offer was also conditioned on, among other things, the

conversion to equity of (i) at least 50% of GM's outstanding U.S. Treasury debt at June 1, 2009

(approximately $10 billion) and (ii) at least 50% (or approximately $10 billion) of GM's future

financial obligations to the New VEBA, for a total projected additional debt reduction of

approximately $20 billion.

> 73.    The Exchange Offer expired on May 26, 2009 without achieving the

threshold of required tendered acceptances.

### I.    The 363 Transaction and the MPA

> 74.    In connection with providing financing, the U.S. Treasury advised the

Company that, if an out-of-court restructuring was not possible, the Company should consider

pursuing the bankruptcy process to implement a transaction under which substantially all the

assets of the Company would be purchased by a U.S. Treasury-sponsored purchaser (subject to

any higher or better offer) in an expedited process under section 363 of the Bankruptcy Code.

Under this scenario, the Purchaser would acquire the purchased assets, create a New GM, and

operate New GM free of any entanglement with the bankruptcy cases, and thereby preserve the

going concern value, avoid systemic failure, provide employment, protect the many communities

dependent upon the continuation of the business, and restore consumer confidence.

> 75.    To facilitate this process, the U.S. Treasury agreed that it would provide

DIP financing for the Company through the chapter 11 process -- but *only* if the sale of the

purchased assets occurred on an *expedited* basis.  Notably, both the Government of Canada and

the Government of Ontario, through the EDC, have agreed to participate in the DIP financing to assure the long-term viability of GM's North American enterprise, to (i) preserve value of the business and restore consumer confidence, and mitigate the devastating damage that GM itself, and the industry, would suffer if GM's major business operations were to remain in bankruptcy; and (ii) avoid the enormous costs of financing a lengthy chapter 11 case. The extent of the Canadian participation will be approximately $9.1 billion. The U.S. Treasury also agreed that it would provide New GM with adequate post-acquisition financing that would further GM's long-term viability. A fundamental premise of the U.S. Treasury program is to revive consumer confidence in GM products and services for the benefit of the Company's employees, its extended supplier and dealer network, and the families and communities that depend on GM operations. In the end, a New GM will emerge that will be viable, competitive, reliable, and a standard bearer for a basic U.S. industry. Importantly, the DIP financing to be furnished by the U.S. Treasury is the only financing that is available to the Company. The U.S. Treasury is the *only* entity that is willing to extend DIP financing to the Company. Other efforts to obtain such financing were unsuccessful. Absent adequate DIP financing, the Company will have no choice but to liquidate.[7]

76.     The purchase and transfer of the Purchased Assets under the MPA is a material element of the U.S. Treasury program to revitalize the domestic automotive industry and is the product of intense negotiations between the Debtors and their key stakeholders, including the U.S. Treasury and the UAW. The 363 Transaction, as embodied in the MPA,

---

[7] The terms and conditions of the DIP financing are set forth in the Debtors' Motion for For Entry Of An Order Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364 (A) Authorizing The Debtors To (I) Obtain Postpetition Financing, Including On An Immediate, Interim Basis Pursuant to Bankruptcy Rule 6003; (II) Grant Adequate Protection To The DIP Lenders; (III) Utilize Cash Collateral Of The U.S. Treasury; (IV) Use Estate Property To Repay Certain Secured Obligations In Full Within 45 Days Of The Commencement Date, And (V) Provide Adequate Protection To The U.S. Treasury, And (B) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001, filed contemporaneously herewith and incorporated herein as if fully set forth herein.

09-50026-mg   Doc 11852-1   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit A
09-50026-reg   Doc 11852-1   Filed 06/01/09   Entered 06/01/09 09:57:23   Main Document   Pg 35 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 34 of 99

contemplates that substantially all of GM's core operating assets -- assets that are essential for New GM to be a profitable and competitive operating entity (including the capital stock of the majority of its subsidiaries) -- will be sold and transferred to the Purchaser, which can immediately begin operations.  Knowing that the Company's business will exist and be supported in the form of New GM, consumers can have confidence that if they buy a GM car, there will be a dealer network and U.S. Government support to assure parts, warranty service, and a market for future used GM vehicle trade-ins.  Indeed, a viable company will help preserve and support jobs and benefits, not only for the Company's employees, but also for GM's supplier and dealer employees, all of which will help support the market for GM vehicles.

77.     The purchase price for the Purchased Assets is equal to the sum of:

- a section 363(k) credit bid in an amount equal to the amount of indebtedness owed to the Purchaser as of the closing pursuant to the UST Credit Facilities (as defined in the MPA) and the DIP Facility, less approximately $7.7 billion of indebtedness under the DIP Facility (estimated to be $48.7 billion at July 31, 2009);

- the warrant previously issued by GM to the U.S. Treasury;

- the issuance by the Purchaser to the Debtors of 10% of the common stock of the Purchaser as of the closing;

- Warrants to purchase up to 15% of the shares of common stock of the Purchaser, with the initial exercise prices for equal amounts of the warrants based on $15 billion and $30 billion equity values of the Purchaser.  The warrants will be exercisable through the seventh and tenth anniversaries of issuance, respectively, and GM can elect partial and cashless exercises; and

- the assumption by the Purchaser of the Assumed Liabilities.

In addition, in the event the Bankruptcy Court determines that the estimated amount of allowed prepetition general unsecured claims against the Debtors exceeds $35 billion, then the Purchaser will issue an additional 2% of the outstanding common stock of Purchaser as of the closing.

78.     In negotiating the 363 Transaction, GM implemented a bottoms-up, "clean sheet" approach to determine the assets to be sold to New GM and the obligations that had to be

09-50026-mg    Doc 11852-1    Filed 06/20/12    Entered 06/20/12 14:52:46    Exhibit A
09-50026-reg    Doc 21    Filed 06/01/09    Entered 06/01/09 09:37:23    Main Document    Pg 34 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 35 of 99

assumed as necessary to maximize the value and viability of New GM for the benefit of its

economic stakeholders.  For example, it is imperative to the success of New GM that consumers

have confidence in its products.  As such, liabilities such as warranties, customer incentive

contracts, and necessary supplier contracts are being assumed by New GM as part of the 363

Transaction.

79.    Any payments that are made to the Debtors' creditors in connection with

the 363 Transaction (other than payments of Cure Amounts in connection with the assumption

and assignment of Purchased Contracts) will be voluntarily made by New GM.

80.    The assets excluded from the sale -- as well as the proceeds of the sale,

such as 10% of the equity interests in New GM -- will be administered in the chapter 11 cases to

support the liquidation of assets, wind-down, or other disposition of the Debtors' chapter 11

cases.   After the closing, the Purchaser or one or more of its subsidiaries will provide the

Debtors and any retained subsidiaries with transition services as described in the MPA to help

liquidate and wind down or otherwise dispose of the assets that are not sold to the Purchaser.

81.    Finally, as part of the 363 Transaction, and as described below, the

Purchaser will make contributions to the New VEBA that will provide retiree health and welfare

benefits to former UAW employees and their spouses.  Also, as part of the 363 Transaction, the

Purchaser will be the assignee of revised collective bargaining agreements with the UAW, the

terms of which were recently ratified.

J.    **Expedited Approval of the 363 Transaction Is Essential**

82.    The need for speed in approving and consummating the 363 Transaction is

critical for several reasons.  Most obvious -- the U.S. Treasury has made very clear that it will

sponsor New GM as the purchaser and fund the chapter 11 cases only if the 363 Transaction is

approved by July 10, 2009.  As explained below, the assets that will be sold -- that is, not merely

the physical assets, but the value of and consumer confidence in the GM brand and its products

and support systems (including parts, warranty service, and a market for used vehicles) -- are

fragile and will be subject to significant value erosion unless they are expeditiously transferred to

New GM and its operations start free from the stigma of bankruptcy.  Any delay will result in

irretrievable revenue perishability and loss of market share to the detriment of all economic

interests.  It will exacerbate and entrench consumer resistance to General Motors' products.

*There is no other alternative*.  No other DIP financing source.  No other buyer for the business.

*Consumers*

83.     New GM needs to sell cars and trucks.  Consumers must have confidence

that, in buying a GM car or truck, they will receive not only value and reliability, but also

warranty protection and future parts and servicing through an integrated dealer system.  The

purchase or lease of a new car or truck represents the second largest expenditure (after a home

purchase) of a typical American household.  Buying a car is a major, and often discretionary,

economic and emotional event for a customer -- but once a consumer buys a vehicle and is

satisfied, including if it involves a change in brand, the consumer's brand loyalty shifts as well,

and can be expected to continue for years or even decades.  The significance of consumer

perception cannot be overstated, particularly in light of the crisis of confidence that has

permeated the economy, and with particular impact on GM and Chrysler, since September 2008.

Uncertainty about the future success of New GM, therefore, must be dissipated quickly.  But it

will be aggravated, not dissipated, if GM's business and future must continue in the limbo of a

prolonged chapter 11.

84.     The risks to GM of a prolonged chapter 11 process are patent.

Information compiled by, or at the direction of, the Company confirms that the mere threat of a

bankruptcy filing has depressed GM's sales and that, in an extended period of a bankruptcy case, the sales reductions and customer defections can be expected to be even more significant. Indeed, in the days and months following the announcement of the U.S. Treasury Loan Agreement, GM immediately began to suffer a sharp reduction in market share.

85.    In short, restoring and maintaining consumer confidence in both the Company and its products is a necessary catalyst to viability and success.  Absent prompt approval of the 363 Transaction, resistance to the Company's products may ultimately prove fatal to the U.S. automotive industry.

*The Supply Chain*

86.    An expeditious approval of the 363 Transaction, including the assumption of supplier contracts and subsequent assignment to New GM (and the satisfaction of payables owed to such suppliers, either as cure payments or by voluntary satisfaction provided by New GM, in its business judgment) is also necessary to address the tenuous financial condition of, and maintain the availability of product from, the Company's suppliers.  As discussed below, the deepening economic crisis has affected not only GM, but also the thousands of direct and indirect suppliers and vendors that provide components, products, and material to the Company. In light of the credit crisis and the rapid decline in automobile sales, many of the Company's suppliers are unable to access credit and are facing growing and serious uncertainty about the prospects for their businesses.  This, in turn, threatens the employment and income of hundreds of thousands of employees of such vendors.  According to the Center for Automotive Research, should one or more of the Detroit Three fail in 2009, the U.S. economy would lose nearly 2.5

million jobs -- comprised of nearly 240,000 jobs at the Detroit Three, nearly 800,000

indirect/supplier jobs, and over 1.4 million spin-off or expenditure-induced jobs.[8]

87.    Automotive parts suppliers generally operate on very narrow margins, and

any imbalance between revenues and expenses can be detrimental -- and potentially fatal -- to the

suppliers' liquidity and ability to secure capital, including maintaining credit lines.  As such,

prompt approval of the 363 Transaction is critical to restore purchases and payments, and to

maintain the flow of parts and components.  Any involuntary stop in such production will have a

devastating consequence on GM's significant suppliers' -- and in turn, GM's -- economic

viability.

88.    In this regard, it is crucial to recognize that under standard payment terms,

GM's suppliers are not paid immediately upon the Company's receipt of their products or

services.  Instead, suppliers generally are paid on the second business day of the second month

following receipt of goods or services, which means that suppliers are typically paid

approximately 45 days after GM's receipt of goods or services.  If GM were to cease operations

for an extended period and then New GM sought to start operations, the suppliers would need to

manufacture parts without having received payments for prior deliveries and without receiving

revenue for the first 45 days of new production.  Thus, suppliers would need to purchase

materials, pay operating costs, and provide employee wages without the stable revenue flow

typically relied upon to cover these expenses.  Many suppliers may be forced out of business,

thereby threatening the viability of New GM, as well as an already fragile automotive industry.

---

[8] David Cole, Sean McAlinden, Kristin Dziczek & Debra Maranger, Center for Automotive Research, *The Impact on the U.S. Economy of a Major Contraction of the Detroit Three Automakers*, Nov. 4, 2008, *available at* http://www.cargroup.org/documents/FINALDetroitThreeContractionImpact_3__002.pdf.

09-50026-mg    Doc 11852-1    Filed 06/20/12    Entered 06/20/12 14:52:46    Exhibit A
09-50026-reg    Doc 11    Filed 06/01/09    Entered 06/01/09 09:37:23 Main Document    Pg 38 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 39 of 99

89.     Heightening the threat to these parts suppliers' viability is the almost nonexistent credit market. Temporary financial relief through additional financing simply is not a realistic option for many parts suppliers. Rather, suppliers lacking liquidity increasingly are being downgraded by ratings agencies to below-grade investment ratings. For some suppliers, the downgrade triggers a breach in loan covenants, thereby allowing lenders to almost immediately terminate the suppliers' revolving credit facility. Termination of a supplier's revolver without replacement capital would immediately shut down a supplier's operations and, in turn, the OEM's plants.

90.     Recognizing the importance of maintaining the flow of parts, OEMs, notwithstanding their own liquidity problems, have in the past stepped in as replacement lenders. But given market conditions, this option has curtailed dramatically. It certainly would not be available from GM if it commenced a bankruptcy case without the support of the U.S. Treasury as DIP lender. Notably, following Chrysler's chapter 11 case, a number of banks no longer extended financing to suppliers based on their Chrysler receivables. There can be no doubt that the same fate will be suffered by GM's suppliers following the commencement of these chapter 11 cases. As such, the liquidity of GM's suppliers will be further crippled. The swift emergence of New GM from the bankruptcy process pursuant to the 363 Transaction is, therefore, necessary to re-establish lender confidence and maintain suppliers' access to capital and their viability as suppliers for New GM.

91.     Given their substantial dependence on GM, many of GM's suppliers are awaiting the outcome of the proposed 363 Transaction with the knowledge that their existence is at stake. If New GM is not able to promptly commence operations, these suppliers will face liquidity crises that will endanger not only New GM, but also the entire automotive industry. As

observed in the Report to Congressional Committees prepared by the United States Government

Accountability Office:

> More than 500,000 workers are employed by companies in the
> United States that manufacture parts and components used by
> automakers -- both domestic automakers and transplants.
> According to the Motor and Equipment Manufacturers
> Association, many suppliers are in severe financial distress, with a
> number having filed for bankruptcy in 2008.  Some members of
> our panel said that because many of these suppliers have relatively
> high costs and depend on the business of the Detroit 3, some of
> them may not have enough revenue to survive if one of the
> automakers were to cease production.  This, in turn, could affect
> the automakers' ability to obtain parts needed to manufacture
> vehicles.  *This dynamic has the potential to affect all automakers*
> *with production facilities in the United States, regardless of home*
> *country.*

U.S. Govt. Accountability Office, Report to Congressional Comm.:  Auto Industry:  Summary of

Government Efforts and Automakers' Restructuring to Date at 6 (Apr. 2009) [hereinafter *US*

*GAO Report*].

### *The Dealership Network*

92.     The 363 Transaction contemplates the assumption by the Company and

the assignment to New GM of dealer franchise agreements relating to approximately 4,100

dealerships.  The transfer of such agreements is essential to the viability of New GM because an

automotive manufacturer simply cannot survive without a dealer network.  Dealers not only sell

cars, but also provide warranty and other services on a front-line basis with consumers, thereby

fostering familiarity and trust on a community and individual customer level.  By accepting

trade-ins, the Company's dealers create and maintain a viable business in used cars, which gives

consumers confidence in the long-term value of the Company's products and, in turn, its overall

business, as well as provide "currency" towards the purchase of a new car.

93.     The Company, however, is not assuming and assigning to New GM all of its existing dealer franchise agreements.  The Company's vast dealer network, consisting of approximately 6,000 dealerships, developed over an extended time period in which the Company's market share was growing and was far greater than it is now, and when there was far less, or even no meaningful foreign competition.  Consequently, and precisely because there are now far more dealerships than the Company's market share can support, including, in some cases, multiple dealers in a single contracting community and dealerships that have become poorly situated as a result of changing demographics, the Purchaser is not willing to continue all dealerships.  Among the dealerships the Purchaser is not willing to continue, for example, are those approximately 400 dealers who sell fewer than fifty cars per year, and those approximately 250 dealers who sell fewer than 100 cars per year.  Approximately 630 other dealerships are not being continued because they are dealers who, in whole or substantial part, sell brands that are being discontinued.

94.     Notwithstanding the foregoing, the 363 Transaction does not contemplate an abrupt cutoff of nonretained dealerships.  In pursuit of the maximization of New GM's ability to, among other things, maintain consumer confidence and goodwill, provide ongoing warranty and other services, and preserve resale and trade-in values, the Company not only is giving approximately 17 months notice, but also will offer to enter into, and New GM will assume "deferred termination agreements" with most of the dealers whose franchise agreements are not being assumed, which should have the additional benefit of easing the hardships attendant to the dealership closings.

95.     The Company is fully cognizant of the effects of the contraction of the number of dealers, but it must be balanced with the fact that the 363 Transaction will permit

09-50026-mg   Doc 11852-1   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit A
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 42 of 99
09-50026-reg   Doc 2   Filed 06/01/09   Entered 06/01/09 09:57:23 Main Document   Pg 41 of 98

thousands of dealerships to survive, while providing for an orderly wind-down of those dealerships not being retained. The alternative to the exercise of sound business judgment is that the Company would liquidate – and *all* dealerships would cease to be GM dealerships, including the approximately 4,000 dealerships that otherwise are contemplated to continue to operate under New GM.

96.     The major predicate for the 363 Transaction, including, most importantly, the U.S. Treasury's willingness to continue financing the Company's operations during and after the sale and transfer of the Purchased Assets, is dependent upon the expeditious approval of the Sale Motion. It is the *sine qua non* of protecting the Company's market share brand credibility and to avoid further consumer support erosion. Delay will result in additional dealership closings well beyond those currently envisioned. More than half of the Company's entire dealership network may be undercapitalized because of the significant recent decline in sales and revenue as the shadow of bankruptcy loomed large over GM. The 363 Transaction will enable alleviation of that condition.

**K.     The 363 Transaction Is the Only Credible Alternative
To a Liquidation of the Company**

97.     The 363 Transaction is the only remaining alternative to save the Company's operations and prevent the immediate liquidation of GM and the catastrophic impact on the economy that will result from the loss of hundreds of thousands of jobs if the GM assets and business are not sold and transferred as proposed. No other potential buyer of GM's business has come forward. No entity other than the U.S. Government has the wherewithal to provide the billions of dollars needed for DIP financing and the financing of New GM.

98.     The only alternative to the 363 Transaction is a liquidation of the Debtors' assets -- a process that will severely reduce the value of the Company's assets to the prejudice of

its employees and all economic stakeholders.  A liquidation will cause not only hundreds of

thousands of jobs to be lost, but also a worldwide shutdown of GM's suppliers and dealers.

## IV.

### Capital Structure

99.    GM is a public reporting company under Section 12(b) of the Securities

and Exchange Act of 1934.  Its shares of common stock, par value $1-2/3 (defined above as

"Common Stock") are publicly traded under the symbol "GM" on the New York Stock

Exchange, the Bourse de Bruxelles (Brussels, Belgium), and the Euronext Paris (Paris, France).

As of March 31, 2009, there were 610,505,273 shares of Common Stock outstanding.

100.    GM is the direct parent company of Chevrolet-Saturn and Saturn, and the

indirect parent company of Saturn Distribution.  GM owns 100% of the issued and outstanding

stock of Chevrolet-Saturn, a Delaware corporation, which is an automotive dealership, and 100%

of the membership interests in Saturn, a Delaware limited liability company, which distributes

Saturn-branded motor vehicles.  Saturn owns 100% of the issued and outstanding stock of Saturn

Distribution, a Delaware corporation, which is in the business of the distribution of Saturn's

vehicles.

101.    As of March 31, 2009, GM had consolidated reported global assets and

liabilities of approximately $82,290,000,000 and $172,810,000,000, respectively.  The

significant prepetition indebtedness of GM consists primarily of the following:

*The U.S. Treasury Facility*

102.    As of the Commencement Date, GM and certain of its non-Debtor

affiliates were parties to the U.S. Treasury Loan Agreement, dated as of December 31, 2008, by

GM, as borrower, the U.S. Treasury, as lender, and Argonaut Holdings, Inc., General Motors

Asia, Inc., General Motors Asia Pacific Holdings, LLC, General Motors Overseas Corporation,

General Motors Overseas Distribution Corporation, General Motors Product Services, Inc.,

General Motors Research Corporation, GM APO Holdings, LLC, GM Eurometals, Inc., GM

Finance Co. Holdings LLC, GM GEFS L.P., GM Global Technology Operations, Inc., GM

Global Tooling Company, Inc., GM LAAM Holdings, LLC, GM Preferred Finance Co. Holdings

LLC, GM Technologies, LLC, GM-DI Leasing Corporation, GMOC Administrative Services

Corporation, Onstar, LLC, Riverfront Holdings, Inc., Saturn Corporation, and Saturn

Distribution Corporation, as guarantors.

103.    The U.S. Treasury Facility provides for an approximately $19.4 billion

secured term loan facility scheduled to mature on December 31, 2011, and accruing interest at a

rate per annum equal to the three-month LIBOR rate (which shall be no less than 2.0%) plus

3.0%, subject to certain exception.  The U.S. Treasury Facility is secured by assets that were not

previously encumbered, including (i) GM's and the guarantors' equity interests in most of their

domestic subsidiaries and certain of their foreign subsidiaries (limited in most cases to 65% of

the equity interests of the pledged foreign subsidiaries), (ii) intellectual property, (iii) real estate

(other than manufacturing plants or facilities), (iv) inventory that was not pledged to other

lenders, and (v) cash and cash equivalents in the U.S., in each case of above, subject to certain

exclusions.  The U.S. Treasury Facility is also secured by a third lien on the assets securing

GM's obligations under the Prepetition Revolving Credit Agreement (as defined below) and a

second line on the assets securing the obligations under the GELCO Agreement (as defined

below).

104.    GM's obligations with respect to the Warranty Program Advance made

under the U.S. Treasury Facility are only guaranteed by, and secured by the assets of, the

09-50026-reg    Doc 12    Filed 06/01/09    Entered 06/01/09 08:57:23    Main Document    Pg 44 of 98

subsidiary of GM that was formed to own the separate account. The loan under the Warranty

Program Advance bears an interest rate per annum equal to the three-month LIBOR rate plus

3.5%.

105.    As of the Commencement Date, the amount outstanding under the U.S.

Treasury Facility was approximately $19.4 billion in principal amount, plus approximately $1.2

billion of Warrant Notes.

*Revolving Credit Facility*

106.    As of the Commencement Date, certain of the Debtors were parties to that

certain Amended and Restated Credit Agreement (the "Prepetition Revolving Credit

Agreement"), dated as of July 20, 2006, by and among GM and General Motors of Canada

Limited ("GM Canada"), as borrowers, Saturn and GM, as guarantors, various financial

institutions and other persons from time to time as lenders thereunder (collectively, the

"Prepetition Revolving Credit Lenders"), JP Morgan Chase Bank, N.A., as syndication agent,

and Citicorp USA, Inc., as administrative agent.

107.    The Prepetition Revolving Credit Agreement provides for (i) a U.S.

revolving credit facility in the maximum aggregate principal amount of $2,463,200,000 and (ii) a

Canadian/U.S. revolving credit facility and letters of credit in the maximum aggregate principal

amount of $1,864,800,000.[9]  Obligations of GM arising under the Prepetition Revolving Credit

Agreement (the "US Obligations") are direct obligations of GM, and obligations of GM Canada

arising under the Prepetition Revolving Credit Agreement (the "Canadian Obligations," and

together with the US Obligations, the "Revolving Credit Obligations") are direct obligations of

GM Canada.  Borrowings under the Prepetition Revolving Credit Agreement accrue annual

---

[9]  The Prepetition Revolving Credit Agreement also provided for an unsecured revolving credit facility in the maximum aggregate principal amount of $152,000,000, which expired on June 16, 2008.

interest at varying rates keyed to the prime rate, the federal funds effective rate, or LIBOR, as in effect at the time each such loan is made. In addition, the Revolving Credit Obligations are also secured by a junior lien on the assets securing the U.S. Treasury Facility.

108.     Under the Prepetition Revolving Credit Agreement, the US Obligations are guaranteed by Saturn and the Canadian Obligations are guaranteed by GM and Saturn.  GM and Saturn have also guaranteed the obligations of GM and each of its subsidiaries under (i) certain scheduled lines of credit, letters of credit (other than any letters of credit issued under the Prepetition Revolving Credit Agreement), and automated clearing house and overdraft arrangements, in each case, provided by any Prepetition Revolving Credit Lender (or any affiliate thereof) to the extent such lender remains a Prepetition Revolving Credit Lender (the "Non-Loan Exposure") and (ii) any non-speculative hedging arrangements provided by any Prepetition Revolving Credit Lender (or an affiliate thereof), involving certain debt instruments, interest rates, currencies or commodities and any extensions or replacements thereof (the "Hedging Obligations").

109.     Pursuant to that certain U.S. Security Agreement, dated as of July 20, 2006, as security for the US Obligations and the U.S.-related Non-Loan Exposure, GM and Saturn granted to the administrative agent, Citicorp USA, Inc., first priority liens against and security interests in certain inventory, receivables, 65% of the outstanding stock of Controladora General Motors, S.A. de C.V., documents, general intangibles, books and records, and proceeds of the foregoing.  As security for certain Hedging Obligations, pursuant to that certain Second Priority US Security Agreement, dated as of July 20, 2006, GM and Saturn granted to Citicorp USA, Inc., the administrative agent to the Revolving Credit Facility, second priority liens against and security interests in the collateral granted to secure the US Obligations. In addition, the

Hedging Obligations are also secured by a junior lien on the assets securing the U.S. Treasury Facility.

110.    As security for the Canadian Obligations and the Canadian-related Non-Loan Exposure, pursuant to that certain General Security Agreement (Canadian Borrower), dated as of July 20, 2006, GM Canada granted to the administrative agent, first priority liens against and security interests in certain inventory, equipment, machinery, books, accounts, notes, proceeds of the foregoing, and real property.

111.    As of the Commencement Date, approximately $3.87 billion in principal amount (excluding approximately $600 million in Canadian Obligations) is outstanding under the Prepetition Revolving Credit Agreement.

*Term Loan*

112.    Pursuant to a term loan agreement, dated as of November 29, 2006 (the "Term Loan Agreement") between GM as borrower, JP Morgan Chase Bank, N.A. as agent, various institutions as lenders and agents, and Saturn as guarantor, GM obtained a $1.5 billion seven-year term loan.  Borrowings under the Term Loan Agreement accrue annual interest at the prime rate, the federal funds rate or LIBOR, plus a specified margin, and are guaranteed by Saturn.

113.    Additionally, to secure these obligations, pursuant to a collateral agreement, also dated as of November 29, 2006, among GM, Saturn, and the agent, GM and Saturn granted to JP Morgan Chase Bank, N.A., as agent to the Term Loan, a first priority security interest in certain equipment, fixtures, documents, general intangibles, all books and records, and their proceeds.

09-50026-mg   Doc 11852-1   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit A
09-50026-reg   Doc 2 Filed 06/01/09 Entered 06/01/09 09:52:23 Main Document   Pg 47 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 48 of 99

114.    As of the Commencement Date, the Debtors' obligations under the Term
Loan Agreement aggregated approximately $1.46 billion, in principal amount.

*GELCO Loan and Security Agreement*

115.    As of the Commencement Date, GM was party to a $150,000,000 Loan
and Security Agreement, dated as of October 2, 2006, as amended between GELCO Corporation,
as lender, and GM, as borrower (the "GELCO Agreement").  Interest on borrowings under the
GELCO Agreement accrues at a rate per annum equal to the three-month LIBOR rate plus 3.0%.
To secure GM's obligations under the GELCO Agreement, which provides financing for certain
vehicles in GM's "Company Car Program," GM granted to the lender a security interest in the
following collateral:  (i) Michigan titled program vehicles; (ii) program vehicle inventory; (iii)
accounts, chattel paper or general intangibles arising from the sale or disposition of Michigan
titled program vehicles or program vehicle inventory; (iv) collection accounts; (v) books and
records relating to the foregoing; and (vi) proceeds of the foregoing, including insurance
proceeds.

116.    As of the Commencement Date, the amount outstanding under the
GELCO Agreement was approximately $125 million.

*Guarantor of EDC Loan Agreement*

117.    GM, as well as certain non-Debtor subsidiaries of GMCL (the "Subsidiary
Guarantors"), are guarantors of a Loan Agreement among GMCL and EDC and other loan
parties, dated April 29, 2009 (the "EDC Loan Agreement").  The EDC Loan Agreement
provided GMCL with up to C$3 billion in a three year term loan, to be drawn in C$500 million
increments.  With certain exceptions, GMCL's obligations under the EDC Loan Agreement are
secured by a first lien on substantially all of its unencumbered assets, a second lien on certain of

09-50026-reg   Doc 21   Filed 06/01/09   Entered 06/01/09 03:27:23   Main Document   Pg 49 of 98

its assets previously pledged as collateral under the Prepetition Revolving Credit Agreement (as discussed above), and a first lien on its ownership interest in the Subsidiary Guarantors  and in the 11% ownership interest of GMCL in General Motors Product Services Inc. (89% of which is owned by GM and is pledged to the U.S. Treasury under the U.S. Treasury Facility).  GM's guarantee of GMCL's obligations under the EDC Loan Agreement is secured by a lien on the equity of GMCL.  Because 65% of GM's ownership interest in GMCL was previously pledged to the U.S. Treasury under the U.S. Treasury Loan Facility, EDC received a second lien on that 65% of GM's equity interest in GMCL, and a first lien on the previously unencumbered 35%.  The Subsidiary Guarantors pledged their respective assets to secure their guarantee of the EDC Loan Agreement.

118.    As of the Commencement Date, the amount outstanding under the EDC Loan Agreement was, in U.S. dollars, approximately $400 million.

*Debentures*

119.    As of the Commencement Date, GM, as issuer, and Wilmington Trust Company, as successor indenture trustee, were parties to (i) a Senior Indenture, dated as of December 7, 1995, as amended, and (ii) a Senior Indenture, dated as of November 15, 1990, pursuant to which GM issued senior unsecured debt securities.  Such securities were issued in twenty-four tranches, bearing annual interest ranging from 1.5% to 9.45% and maturing from June 1, 2009 to February 15, 2052.

120.    As of the Commencement Date, approximately $22.88 billion in principal amount of the debentures remained outstanding.

09-50026-mg   Doc 2 Filed 06/01/09 Entered 06/01/09 09:57:23 Main Document    Pg 49 of 98
09-50026-reg   Doc 11852-1   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit A
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 50 of 99

*UAW VEBA Obligations*

121.    As discussed above, under the terms of the 2008 UAW Settlement

Agreement, General Motors was required to contribute approximately $34 billion into the VEBA

Trust.  In addition, if annual cash flow projections reflect that the UAW VEBA will become

insolvent on a rolling 25-year basis, GM would have been required to contribute $165 million

annually, limited to a maximum of 20 payments.

122.    As of the Commencement Date, the Company's 2005 UAW VEBA-

related obligations aggregated approximately $20.56 billion,[10] in principal amount.

*Prepetition Fiscal and Paying Agency Agreement*

123.    As of the Commencement Date, GM was party to a Fiscal and Paying

Agency Agreement (the "Fiscal and Paying Agency Agreement"), dated as of July 3, 2003, by

and between GM, as issuer, Deutsche Bank AG London as fiscal agent and Bank Général du

Luxembourg S.A. as paying agent.

124.    Under the Fiscal and Paying Agency Agreement, GM issued

€1,000,000,000 of 7.5% unsecured notes due 2013 and €1,500,000,000 of 8.375% unsecured

notes due 2033.  As of the Commencement Date, the total amount outstanding under the Fiscal

and Paying Agency Agreement was, in U.S. dollars, approximately $3.30 billion.

*Nova Scotia Fiscal and Paying Agency Agreement*

125.    As of the Commencement Date, GM was party to a Fiscal and Paying

Agency Agreement (the "Nova Scotia Fiscal and Paying Agency Agreement"), dated as of July

10, 2003, by and between nondebtor General Motors Nova Scotia Finance Company ("GM Nova

---

[10]  This liability is estimated as the net present value at a 9% discount rate of future contributions, as of January 1, 2009, and excludes approximately $9.4 billion corresponding to the GM Internal VEBA.

Scotia") as issuer, GM, as guarantor, Deutsche Bank Luxembourg S.A. as fiscal agent and Bank

Général du Luxembourg S.A. as paying agent.

126.    Under the Nova Scotia Fiscal and Paying Agency Agreement, GM

guaranteed the payment by GM Nova Scotia of principal and interest on the £350,000,000 of

8.375% unsecured notes due 2015 and £250,000,000 of 8.875% unsecured notes due 2023 issued

by GM Nova Scotia.

127.    As of the Commencement Date, the total amount outstanding under the

Nova Scotia Fiscal and Paying Agency Agreement is, in U.S. dollars, approximately $853

million.

### *The Supplier Receivables Facility*

128.    The Debtors are participants in a supplier receivable facility that the U.S.

Treasury created to provide financial security to automobile suppliers in March 2009.  The

facility is similar to a factoring arrangement whereby suppliers may accelerate payment of

receivables or guarantee of payment at maturity for certain fees.  To facilitate the facility, GM is

obligated to make equity contributions to an SPE that will purchase supplier receivables.  GM

has pledged its equity interest in the SPE to the U.S. Treasury as additional security for the

SPE's performance of its obligations in connection with this program.

129.    As of the Commencement Date, GM has contributed approximately $35

million in equity contributions to the SPE.  The U.S. Treasury has advanced approximately $700

million in principal amount to the SPE.

### *Other Indebtedness*

130.    GM is also a party to various third party financing arrangements, including

leveraged leases for equipment, synthetic leases, arrangements related to the financing of central

09-50026-mg   Doc 11852-1   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit A
09-50026-reg   Doc 2   Filed 06/01/09   Entered 06/01/09 09:57:23   Main Document   Pg 51 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 52 of 99

utilities complexes, and several industrial revenue bond obligations with various local governments.

131.    As of the Commencement Date, the Debtors had trade payables of approximately $5.40 billion.

# V.

## <u>Conclusion</u>

132.    The 363 Transaction is the only credible alternative that preserves any value for the Debtors, their employees, and their principal economic stakeholders.  Without expeditious approval of the 363 Transaction, the Debtors will have no choice but to cease operations and liquidate their assets with the concomitant draconian impact on the automotive parts suppliers, jobs, dealers, and other interests, causing further deepening of the downturn of the U.S. economy.  The 363 Transaction is a critical element of the U.S. Government's plan to revitalize the U.S. automotive industry.  The U.S. Government, as GM's largest secured lender, has bargained in good faith with GM to develop and implement the 363 Transaction to create a better, more efficient, innovative manufacturing company that will be a well-regarded major employer and member of the national economic community.  It is critical that New GM be able to commence bankruptcy-free operations immediately to salvage the automotive industry and become a major factor in reviving the overall economy.  Many consumers will not consider purchasing a vehicle from a manufacturer whose future is uncertain and entangled in an extended bankruptcy process.  Any delay in New GM's commencing operations will therefore result in irreversible revenue perishability and loss of market share to the detriment of the Debtors and all economic stakeholders.  Indeed, even a short delay would have a prejudicial impact, particularly on GM's suppliers and their employees.  The future of New GM as a thriving business must be

09-50026-mg Doc 11852-1 Filed 06/20/12 Entered 06/20/12 14:52:46 Exhibit A
09-50026-reg Doc 2 Filed 06/01/09 Entered 06/01/09 09:57:23 Main Document Pg 62 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul Pg 53 of 99

established clearly and quickly. The expeditious approval of the 363 Transaction and the DIP financing will make that future a reality.

133.     The vicious cycle of frozen credit markets, growing supplier uncertainty and lack of consumer confidence has the potential to unravel the automotive industry and short circuit the creation of New GM as the anchor of that industry. It is, therefore, self-evident that the only means of protecting the U.S. automotive industry is by approval of the 363 Transaction that will permit the Purchased Assets to achieve maximum value and use.

134.     As President Obama observed,

> I'm confident that if . . . all of us are doing our part, then this restructuring, as painful as it will be in the short term, will mark not an end, but a new beginning for a great American industry – an auto industry that is once more out-competing the world; a 21st century auto industry that is creating new jobs, unleashing new prosperity, and manufacturing the fuel-efficient cars and trucks that will carry us towards an energy-independent future. I am absolutely committed to working with Congress and the auto companies to meet one goal: The United States of America will lead the world in building the next generation of clean cars.

*Presidential Remarks* at 3.

## VI.

## Information Required by Local Rule 1007-2

135.     Local Rule 1007-2 requires certain information related to GM, which is set forth below.

136.     Pursuant to Local Rule 1007(a)(3), Schedule 1 hereto lists the names and addresses of the members of the Ad Hoc Committee and its attorneys, and provides a brief description of the circumstances surrounding the formation of the Ad Hoc Committee and the date of its formation.

137.    Pursuant to Local Rule 1007-2(a)(4), Schedule 2 hereto lists the following information with respect to each of the holders of the Debtors' 50 largest unsecured claims on a consolidated basis, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), and telephone number; the name(s) of persons(s) familiar with the Debtors' accounts, the amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

138.    Pursuant to Local Rule 1007-2(a)(5), Schedule 3 hereto provides the following information with respect to each of the holders of the five largest secured claims against the Debtors on a consolidated basis: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), and telephone number; the amount of the claim; a brief description of the collateral securing the claim; an estimate of the value of the collateral, and whether the claim or lien is disputed.

139.    Pursuant to Local Rule 1007-2(a)(6), Schedule 4 hereto provides a summary of the Debtors' assets and liabilities.

140.    Pursuant to Local Rule 1007-2(a)(7), Schedule 5 hereto provides the following information: the number and classes of shares of stock, debentures, and other securities of General Motors that are publicly held and the number of record holders thereof; the number and classes of shares of stock, debentures and other securities of General Motors that are held by the Debtors' directors and officers, and the amounts so held.

141.    Pursuant to Local Rule 1007-2(a)(8), Schedule 6 hereto provides a list of all of GM's property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name,

address, and telephone number of such entity and the location of the court in which any

proceeding relating thereto is pending.

142.    Pursuant to Local Rule 1007-2(a)(9), Schedule 7 hereto provides a list of

the premises owned, leased, or held under other arrangement from which GM operates its

businesses.

143.    Pursuant to Local Rule 1007-2(a)(10), Schedule 8 hereto provides the

location of GM's substantial assets, the location of its books and records, and the nature,

location, and value of any assets held by GM outside the territorial limits of the United States.

144.    Pursuant to Local Rule 1007-2(a)(11), Schedule 9 hereto provides a list of

the nature and present status of each action or proceeding, pending or threatened, against the

Debtors or their property.

145.    Pursuant to Local Rule 1007-2(a)(12), Schedule 10 hereto provides a list

of the names of the individuals who comprise the Debtors' existing senior management, their

tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

146.    Pursuant to Local Rule 1007-2(b)(1)-(2)(A), Schedule 11 hereto provides

the estimated amount of weekly payroll to GM's employees (not including officers, directors,

and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and

financial and business consultants retained by GM, for the thirty (30) day period following the

filing of the Debtors' chapter 11 petitions.

147.    Pursuant to Local Rule 1007-2(b)(3), Schedule 12 hereto provides, for the

thirty (30) day period following the filing of the chapter 11 petitions, a list of estimated cash

receipts and disbursements, net cash gain or loss, and obligations and receivables expected to

accrue that remain unpaid, other than professional fees.

09-50026-mg   Doc 11852-1   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit A
09-50026-reg   Doc 27   Filed 06/01/09   Entered 06/01/09 09:57:23   Main Document   Pg 86 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 56 of 99

The foregoing is true and correct to the best of my knowledge, information, and

belief.

/s/ Frederick A. Henderson
Frederick A. Henderson
President and Chief Executive Officer of
General Motors Corporation

Sworn to and subscribed before me, a notary public for the State of New York, County of New York, this 1st day of June, 2009.

/s/ Kathleen Anne Lee
Notary Public

KATHLEEN ANNE LEE
Notary Public, State of New York
No. 01LE6119251
Qualified in New York County
Commission Expired November 29, 2012

09-50026-mg    Doc 11852-1    Filed 06/20/12    Entered 06/20/12 14:52:46    Exhibit A
09-50026-reg    Doc 2    Filed 06/01/09    Entered 06/01/09 09:07:23    Main Document    Pg 86 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 57 of 99

## Schedule 1

### Ad Hoc Committee

Pursuant to Local Rule 1007-2(a)(3), the following is a list of the attorneys and financial advisors for an unofficial committee of unsecured bondholders, with their respective addresses.  The unofficial committee of unsecured bondholders was formed in or about December 2008.

| Attorneys | Address |
|---|---|
| Paul, Weiss, Rifkind, Wharton & Garrison LLP | 1285 Avenue of the Americas<br>New York, NY 10019-6064<br><u>Attn</u>: Andrew N. Rosenberg |

| Financial Advisors | Address |
|---|---|
| Houlihan Lokey Howard & Zukin Capital, Inc. | 225 South Sixth Street, Suite 4950<br>Minneapolis, MN 55402<br><u>Attn</u>: P. Eric Siegert |

## Schedule 2

### Consolidated List of 50 Largest Unsecured Claims (Excluding Insiders)[1]

Pursuant to Local Rule 1007-2(a)(4), the following is a list of creditors holding, as of May 31, 2009, the 50 largest noncontingent, unsecured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured also state value of security] |
| --- | --- | --- | --- | --- |
| 1.  Wilmington Trust Company<br><br><br><br>Rodney Square North<br>1100 North Market Street<br>Wilmington, DE 19890<br>United States | Attn: Geoffrey J. Lewis<br><br>Phone: (302) 636-6438<br>Fax: (302) 636-4145<br><br>Rodney Square North<br>1100 North Market Street<br>Wilmington, DE 19890<br>United States | Bond Debt | | $22,759,871,912[2] |
| 2.  International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW)<br><br><br>8000 East Jefferson<br>Detroit, MI 48214<br>United States | Attn: Ron Gettlefinger<br><br>Phone: (313) 926-5201<br>Fax: (313) 331-4957<br><br><br>8000 East Jefferson<br>Detroit, MI 48214<br>United States | Employee Obligations | | $20,560,000,000[3] |

---

[1]     The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. All claims are subject to customary offsets, rebates, discounts, reconciliations, credits, and adjustments, which are not reflected on this Schedule.

[2]     This amount consolidates Wilmington Trust Company's claims as indenture trustee under the indentures, dated December 7, 1995 ($21,435,281,912) and November 15, 1990 ($1,324,590,000).

[3]     This liability is estimated as the net present value at a 9% discount rate of future contributions, as of January 1, 2009, and excludes approximately $9.4 billion corresponding to the GM Internal VEBA.

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| 3.   Deutsche Bank AG, London As Fiscal Agent<br><br>Theodor-Heuss-Allee 70<br>Frankfurt, 60262<br>Germany | Attn: Stuart Harding<br><br>Phone:(44) 207 547 3533<br>Fax:  (44) 207 547 6149<br><br>Winchester House<br>1 Great Winchester Street<br>London EC2N 2DB<br>England | Bond Debt | | $4,444,050,000[4] |
| 4.   International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers – Communications Workers of America (IUE-CWA)<br><br>3461 Office Park Drive<br>Kettering, OH 45439<br>United States | Attn: Mr. James Clark<br><br>Phone: (937) 294-9764<br>Fax: (937) 298-633<br><br>2701 Dryden Road<br>Dayton, OH 45439<br>United States | Employee Obligations | | $2,668,600,000[5] |
| 5.   Bank of New York Mellon<br><br>One Wall Street<br>New York, NY 10286<br>United States | Attn: Gregory Kinder<br><br>Phone: (212) 815-2576<br>Fax: (212) 815-5595<br><br>Global Corporate Trust, 101 Barclay, 7W<br>New York, NY 10286<br>United States | Bond Debt | | $175,976,800 |
| 6.   Starcom Mediavest Group, Inc.<br><br>35 W. Wacker Drive<br>Chicago, IL 60601<br>United States | Attn: Laura Desmond<br><br>Phone: (312) 220-3550<br>Fax: (312) 220-6530<br><br>35 W. Wacker Drive<br>Chicago, IL 60601<br>United States | Trade Debt | | $121,543,017 |

---

[4]      The amount includes outstanding bond debt of $4,444,050,000, based on the Eurodollar exchange rates of $1.39.

[5]      This liability estimated as the net present value at a 9% discount rate.

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| 7.    Delphi Corp.<br><br>5725 Delphi Drive<br>Troy, MI 48098<br>United States | Attn: Rodney O'Neal<br><br>Phone: (248) 813-2557<br>Fax: (248) 813-2560<br><br>5725 Delphi Drive<br>Troy, MI 48098<br>United States | Trade Debt | | $110,876,324 |
| 8.    Robert Bosch GmbH<br><br>38000 Hills Tech Drive<br>Farmington Hills, MI 48331<br>United States | Attn: Franz Fehrenbach<br><br>Phone: (49 71) 1 811-6220<br>Fax: (49 71) 1 811-6454<br><br>Robert-Bosch-Platz 1 / 70839<br>Gerlingen-Schillerhoehe,<br>Germany | Trade Debt | | $66,245,958 |
| 9.    Lear Corp.<br><br>21557 Telegraph Road<br>Southfield, MI 48033<br>United States | Attn: Robert Rossiter<br><br>Phone: (248) 447-1505<br>Fax: (248) 447-1524<br><br>21557 Telegraph Road<br>Southfield, MI 48033<br>United States | Trade Debt | | $44,813,396 |
| 10.  Renco Group, Inc.<br><br>1 Rockefeller Plaza,<br>29th Floor<br>New York, NY 10020<br>United States | Attn: Lon Offenbacher<br><br>Phone:  (248) 655-8920<br>Fax: (248) 655-8903<br><br>1401 Crooks Road<br>Troy, MI 48084<br>United States | Trade Debt | | $37,332,506 |

09-50026-mg    Doc 11852-1    Filed 06/20/12    Entered 06/20/12 14:52:46    Exhibit A
09-50026-reg    Doc 2    Filed 06/01/09    Entered 06/01/09 08:22:23    Main Document    Pg 60 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 61 of 99

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| 11.  Enterprise Rent A Car<br><br><br><br>6929 N Lakewood Ave<br>Suite 100<br>Tulsa, OK 74117<br>United States | Attn: Greg Stubblefiled<br><br>Phone: (314) 512 3226<br>Fax: (314) 512 4230<br><br>600 Corporate Park Drive<br>St. Louis, MO 63105<br>United States | Trade Debt | | $33,095,987 |
| 12.  Johnson Controls, Inc.<br><br><br><br>5757 N. Green Bay Avenue<br>Glendale, WI 53209<br>United States | Attn: Stephen A. Roell<br><br>Phone: (414)-524-2223<br>Fax: (414)-524-3000<br><br>5757 N. Green Bay Avenue<br>Milwaukee, WI 53201<br>United States | Trade Debt | | $32,830,356 |
| 13.  Denso Corp.<br><br><br><br>24777 Denso Drive<br>Southfield, MI 48086<br>United States | Attn: Haruya Maruyama<br><br>Phone: (248) 350-7500<br>Fax: (248) 213-2474<br><br>24777 Denso Drive<br>Southfield, MI 48086<br>United States | Trade Debt | | $29,229,047 |
| 14.  TRW Automotive Holdings, Corp.<br><br><br><br>12025 Tech Center Dr.<br>Livonia, MI 48150<br>United States | Attn: John Plant<br><br>Phone: (734) 855-2660<br>Fax: (734) 855-2473<br><br>12001 Tech Center Drive<br>Livonia, MI 48150<br>United States | Trade Debt | | $27,516,189 |

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| 15.  Magna International, Inc.<br><br><br>337 Magna Drive<br>Aurora, ON L4G 7K1<br>Canada | Attn: Don Walker<br><br>Phone: (905) 726-7040<br>Fax: (905) 726-2593<br><br>337 Magna Drive<br>Aurora, ON L4G 7K1<br>Canada | Trade Debt | | $26,745,489 |
| 16.  American Axle & Mfg Holdings, Inc.<br><br>One Dauch Drive<br>Detroit, MI 48211-1198<br>United States | Attn: Richard Dauch<br><br>Phone: (313) 758-4213<br>Fax: (313) 758-4212<br><br>One Dauch Drive<br>Detroit, MI 48211<br>United States | Trade Debt | | $26,735,957 |
| 17.  Maritz Inc.<br><br><br>1375 North Highway Drive<br>Fenton, MO 63099<br>United States | Attn: Steve Maritz<br><br>Phone: (636) 827-4700<br>Fax: (636) 827-2089<br><br>1375 North Highway Drive<br>Fenton, MO 63099<br>United States | Trade Debt | | $25,649,158 |
| 18.  Publicis Groupe S.A.<br><br><br>133 Ave des Champs Elysees<br>Paris, 75008<br>France | Attn: Maurice Levy<br><br>Phone: (33 01) 4 443-7000<br>Fax: (33 01) 4 443-7550<br><br>133 Ave des Champs-Elysees<br>Paris, 75008<br>France | Trade Debt | | $25,282,766 |
| 19.  Hewlett Packard Co.<br><br><br>3000 Hanover Street<br>Palo Alto, CA 94304<br>United States | Attn: Mike Nefkens<br><br>Phone: (313) 230 6800<br>Fax: (313) 230 5705<br><br>500 Renaissance Center,<br>MC:20A Detroit, MI 48243<br>United States | Trade Debt | | $17,012,332 |

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| 20. Interpublic Group of Companies, Inc.<br><br><br>1114 Avenue of the Americas<br>New York, NY 10036<br>United States | Attn: Michael Roth<br><br>Phone: (212) 704-1446<br>Fax: (212) 704.2270<br><br>1114 Avenue of the Americas<br>New York, NY 10036<br>United States | Trade Debt | | $15,998,270 |
| 21. Continental AG<br><br><br>Vahrenwalder Str. 9<br>D-30165 Hanover,<br>Germany | Attn: Karl-Thomas<br><br>Phone: 49-69-7603-2888<br>Fax: 49-69-7603-3800<br><br>Guerickestrasse 7, 60488<br>Frankfurt 60488<br>Germany | Trade Debt | | $15,539,456 |
| 22. Tenneco Inc.<br><br><br>500 North Field Drive<br>Lake Forest, IL 60045<br>United States | Attn: Gregg Sherrill<br><br>Phone: (847) 482-5010<br>Fax: (847) 482-5030<br><br>500 North Field Drive<br>Lake Forest, IL 60045<br>United States | Trade Debt | | $14,837,427 |
| 23. Yazaki Corp.<br><br><br>6801 Haggerty Road<br>Canton, MI 48187<br>United States | Attn: George Perry<br><br>Phone: (734) 983-5186<br>Fax: (734) 983-5197<br><br>6801 Haggerty Road, 48E<br>Canton, MI 48187<br>United States | Trade Debt | | $13,726,367 |
| 24. International Automotive Components<br><br><br>5300 Auto Club Drive<br>Dearborn, MI 48126<br>United States | Attn: James Kamsickas<br><br>Phone: (313) 253-5208<br>Fax: (313) 240-3270<br><br>5300 Auto Club Drive<br>Dearborn, MI 48126<br>United States | Trade Debt | | $12,083,279 |

09-50026-mg   Doc 11852-1   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit A
09-50026-reg   Doc 2770   Filed 06/01/09   Entered 06/01/09 03:22:23   Main Document   Pg 63 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 64 of 99

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| 25.  Avis Rental Car<br><br>6 Sylvan Way<br>Parsippany, NJ 07054<br>United States | Attn: Robert Salerno<br><br>Phone: (973) 496-3514<br>Fax: (212) 413-1924<br><br>6 Sylvan Way<br>Parsippany, NJ 07054<br>United States | Trade Debt | | $12,040,768 |
| 26.  FMR Corp.<br><br>82 Devonshire St<br>Boston, MA 02109<br>United States | Attn: Robert J. Chersi<br><br>Phone: (617)563-6611<br>Fax: (617) 598-9449<br><br>82 Devonshire St<br>Boston, MA 02109<br>United States | Trade Debt | | $11,980,946 |
| 27.  AT&T Corp.<br><br>208 South Akard Street<br>Dallas, TX 75202<br>United States | Attn: Richard G. Lindner<br><br>Phone: (214) 757-3202<br>Fax: (214) 746-2102<br><br>208 South Akard Street<br>Dallas, TX 75202<br>United States | Trade Debt | | $10,726,376 |
| 28.  Union Pacific Corp.<br><br>1400 Douglas Street<br>Omaha, NE 68179<br>United States | Attn: Robert M. Knight, Jr.<br><br>Phone: (402) 544-3295<br>Fax: (402) 501-2121<br><br>1400 Douglas Street<br>Omaha, NE 68179<br>United States | Trade Debt | | $10,620,928 |
| 29.  Warburg E M Pincus & Co., Inc.<br><br>466 Lexington Ave<br>New York, NY 10017<br>United States | Attn: Joseph P. Landy<br><br>Phone:  (212) 878-0600<br>Fax:  (212) 878-9351<br><br>466 Lexington Ave<br>New York, NY 10017<br>United States | Trade Debt | | $10,054,189 |

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| 30.  Visteon Corp.<br><br>One Village Center Drive<br>Van Buren Township, MI 48111<br>United States | Attn: Donald J. Stebbins<br><br>Phone: (734) 710-7400<br>Fax: (734) 710-7402<br><br>One Village Center Drive<br>Van Buren Twp., MI 48111<br>United States | Trade Debt | | $9,841,774 |
| 31.  US Steel<br><br>600 Grant Street Room 1344<br>Pittsburgh, PA 15219<br>United States | Attn: John Surma<br><br>Phone: (412) 433-1146<br>Fax: (412) 433-1109<br><br>600 Grant Street<br>Room 1344<br>Pittsburgh, PA 15219<br>United States | Trade Debt | | $9,587,431 |
| 32.  Arcelor Mittal<br><br>19, Avenue De La Liberte<br>Luxembourg,  L-2930<br>Luxembourg | Attn: Lakshmi Mittal<br><br>Phone: 44 20 7543 1131<br>Fax: (44 20) 7 629-7993<br><br>Berkley Square House, 7th Floor Berkley Square House<br>London, England W1J6DA | Trade Debt | | $9,549,212 |
| 33.  AK Steel Holding, Corp.<br><br>9227 Centre Pointe Drive<br>Westchester, OH 45069<br>United States | Attn: Jim Wainscott<br><br>Phone: (513) 425-5412<br>Fax: (513) 425-5815<br><br>9227 Centre Pointe Drive<br>Westchester, OH 45069<br>United States | Trade Debt | | $9,116,371 |
| 34.  CSX Corp.<br><br>500 Water Street, 15th Floor<br>Jacksonville, FL 32202<br>United States | Attn: Oscar Muñoz<br><br>Phone: (904) 359-1329<br>Fax: (904) 359-1859<br><br>500 Water Street, 15th Floor<br>Jacksonville, FL 32202<br>United States | Trade Debt | | $8,884,846 |

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| 35. Hertz Corporation<br><br>14501 Hertz Quail Springs Parkway<br>Oklahoma City, OK 73134<br>United States | Attn: .Elyse Douglas<br><br>Phone: (201) 450-2292<br>Fax: (866) 444-4763<br><br>225 Brae Boulevard Park Ridge, NJ 07656<br>United States | Trade Debt | | $8,710,291 |
| 36. Alpha S.A. de C.V.<br><br>Ave. Gómez Morín No. 1111 Sur Col. Carrizalejo<br>San Pedro Garza García, N. L. C.P. 66254<br>Mexico | Attn: Manuel Rivera<br><br>Phone: (52 81) 8 748 1264<br>Fax: (52 81) 8 748-1254<br><br>Ave. Gómez Morín No. 1111 Sur Col. Carrizalejo<br>San Pedro Garza García, N. L. C.P. 66254<br>Mexico | Trade Debt | | $8,209,133 |
| 37. Voith AG<br><br>2200 N. Roemer Rd<br>Appleton, WI<br>United States | Attn: Hubert Lienhard<br><br>Phone: 49 7321 372301<br><br>St. Poltener Strasse 43 Heidenheim, D-89522 Germany | Trade Debt | | $7,146,187 |
| 38. Goodyear Tire & Rubber Co.<br><br>1144 E Market St<br>Akron, OH 44316-0001<br>United States | Attn: Robert Keegan<br><br>Phone: (330) 796-1145<br>Fax: (330) 796-2108<br><br>1144 East Market Street Akron, OH 44316-0001<br>United States | Trade Debt | | $6,807,312 |
| 39. Manufacturers Equipment & Supply Co.<br><br>2401 Lapeer Rd<br>Flint, MI 48503-4350<br>United States | Attn: Greg M. Gruizenga<br><br>Phone: (800) 373-2173<br>Fax: (810) 239-5360<br><br>2401 Lapeer Rd<br>Flint, MI 48503<br>United States | Trade Debt | | $6,695,777 |

09-50026-mg    Doc 11852-1    Filed 06/20/12    Entered 06/20/12 14:52:46    Exhibit A
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 67 of 99

09-50026-reg    Doc 2    Filed 06/01/09    Entered 06/01/09 08:22:23    Main Document    Pg 66 of 98

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| 40.  Severstal O A O<br><br>4661 Rotunda Drive<br>P.O. Box 1699<br>Dearborn, MI 48120<br>United States | Attn: Gregory Mason<br><br>Phone: (313) 317-1243<br>Fax: (313) 337-9373<br><br>14661 Rotunda Drive,<br>P.O. Box 1699<br>Dearborn, MI 48120<br>United States | Trade Debt | | $6,687,993 |
| 41.  Exxon Mobil Corp.<br><br>5959 Las Colinas Boulevard<br>Irving, TX 75039<br>United States | Attn: James P. Hennessy<br><br>Phone: (703) 846-7340<br>Fax: (703) 846-6903<br><br>3225 Gallows Road<br>Fairfax, VA 22037<br>United States | Trade Debt | | $6,248,959 |
| 42.  Hitachi Ltd.<br><br>955 Warwick Road<br>P.O. Box 510<br>Harrodsburg, KY 40330<br>United States | Attn: Yasuhiko Honda<br><br>Phone: (81 34) 564-5549<br>Fax: (81 34) 564-3415<br><br>Akihabara Daibiru Building 18-13, Soto-Kanda, 1-Chome Chiyoda-Ku, Tokyo, 101-8608 Japan | Trade Debt | | $6,168,651 |
| 43.  Mando Corp.<br><br>4201 Northpark Drive<br>Opelika, AL 36801<br>United States | Attn: Zung Su Byun<br><br>Phone: (82 31) 680-6114<br>Fax: (82 31) 681-6921<br><br>343-1, Manho-Ri ,Poseung-Myon, Pyongtaek Kyonggi, South Korea, Korea | Trade Debt | | $5,459,945 |
| 44.  General Physics Corp.<br><br>1500 W. Big Beaver Rd.<br>Troy, MI 48084<br>United States | Attn: Sharon Esposito Mayer<br><br>Phone: (410) 379-3600<br>Fax: (410) 540-5302<br><br>6095 Marshalee Drive, St. 300 Elkridge, MD 21075<br>United States | Trade Debt | | $5,208,070 |

09-50026-mg    Doc 11852-1    Filed 06/20/12    Entered 06/20/12 14:52:46    Exhibit A
09-50026-reg    Doc 2771    Filed 06/01/09    Entered 06/01/09 03:57:23    Main Document    Pg 67 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 68 of 99

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| 45.  Sun Capital Partners, Inc.<br><br>5200 Town Center Circle, Suite 600<br>Boca Raton, FL 33486<br>United States | Attn: Mr. Kevin<br><br>Phone: (561) 948-7514<br>Fax: (561) 394-0540<br><br>5200 Town Center Circle, Suite 600 Boca Raton, FL 33486 United States | Trade Debt | | $4,747,353 |
| 46.  Jones Lang Lasalle, Inc.<br><br>200 East Randolph Drive<br>Chicago, IL 60601<br>United States | Attn: Colin Dyer<br><br>Phone: (312) 228-2004<br>Fax: (312) 601-1000<br><br>200 East Randolph Drive Chicago, IL 60601 United States | Trade Debt | | $4,651,141 |
| 47.  McCann Erickson<br><br>238 11 Avenue, SE<br>Calgary, Alberta T2G OX8<br>Canada | Attn: Gary Lee<br><br>Phone: (646) 865 2606<br>Fax: (646) 865 8694<br><br>622 3rd Avenue New York, NY 10017 United States | Trade Debt | | $4,603,457 |
| 48.  Flex-N-Gate Corp.<br><br>1306 East University Ave.<br>Urbana, IL 61802<br>United States | Attn: Shahid Khan<br><br>Phone: (217) 278-2618<br>Fax: (217) 278-2318<br><br>1306 East University Urbana, IL 61802 United States | Trade Debt | | $4,490,775 |
| 49.  Bridgestone Corp.<br><br>535 Marriott Drive<br>Nashville, TN 37214<br>United States | Attn: Shoshi Arakawa<br><br>Phone: (81 33) 567 0111<br>Fax: (81 33) 567 9816<br><br>10-1 Kyobashi 1-chome Chuo-ku, Tokyo, Japan 104 Japan | Trade Debt | | $4,422,763 |

09-50026-mg    Doc 11852-1    Filed 06/20/12    Entered 06/20/12 14:52:46    Exhibit A
09-50026-reg    Doc 2    Filed 06/01/09    Entered 06/01/09 09:27:23    Main Document    Pg 68 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 69 of 99

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| 50.  Cap Gemini America Inc.<br><br><br>623 Fifth Avenue, 33rd Floor<br>New York, NY 10022<br>United States | Attn: Thierry Delaporte    $4,415,936<br><br>Phone: (212) 314-8327<br>Fax: (212) 314-8018<br><br>623 Fifth Avenue, 33rd Floor<br>New York, NY 10022<br>United States | Trade Debt | | $4,415,936 |

09-50026-mg   Doc 11852-1   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit A
09-50026-reg   Doc 21   Filed 06/01/09   Entered 06/01/09 09:67:23   Main Document   Pg 69 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 70 of 99

## **Schedule 3**

### **Consolidated List of Holders of 5 Largest Secured Claims**

   Pursuant to Local Rule 1007-2(a)(5), the following lists the creditors holding, as of May 31, 2009 the five largest secured, noncontingent claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

| Creditor[1] | Mailing Address & Phone Number | Amount of Claim (in millions) | Type of Collateral | Value of Collateral | Disputed |
|---|---|---|---|---|---|
| 1. United States Department of the Treasury | 1500 Pennsylvania Avenue Washington, DC 20220 | $20,573 | (a) all patents, trademarks and copyrights owned by GM or any of its affiliates that are a party to the UST Secured Facility (as defined above), and all rights under any licenses and royalties therefrom; <br><br>(b) each parcel of real property, the improvements thereon and all personal property owned by GM or any of its affiliates that are a party to the UST Secured Facility (as defined above); <br><br>(c) all cash and cash equivalents, and all other property from time to time deposited in any account or deposit account and the monies and property in the possession or under the control of GM or any affiliate, representative, agent or correspondent of GM related to the foregoing; <br><br>(d) all other tangible and intangible personal property of GM (whether or not subject to the Uniform Commercial Code), including, without limitation, all bank and other accounts and all cash and all investments therein, all rights to receive cash and investments, including without limitation, state, federal or local tax refunds, intercompany debt, all proceeds, products, offspring, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the property of GM; <br><br>(e) 24.5% common membership interests in GMAC LLC; and <br><br>(f) 3.6% of preferred GMAC LLC shares. | Undetermined | |

---

[1]        The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.

09-50026-mg   Doc 11852-1   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit A
09-50026-reg   Doc 2   Filed 06/01/09   Entered 06/01/09 09:57:23   Main Document   Pg 111 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 72 of 99

| Creditor[1] | Mailing Address & Phone Number | Amount of Claim (in millions) | Type of Collateral | Value of Collateral | Disputed |
|---|---|---|---|---|---|
| 2. Citicorp, USA, Inc. | Citicorp USA, Inc. Global Loans Support Services Two Penns Way, Suite 200 New Castle, Delaware 19720 Tel: (212) 994-0961 <br><br> Attn: Carin Seals | $3,865 | In U.S., (a) certain inventory owned by General Motors Corporation and Saturn Corporation; (b) certain receivables owned by the Grantors; (c) 65% of the outstanding capital stock of Controladora General Motors, S.A. de C.V. owned by General Motors Corporation; and (d) chattel paper, documents, general intangibles, books and records, proceeds, supporting obligations, and products of, or attributable to, such inventory, receivables, and pledged stock. <br><br> In Canada, (a) certain inventory owned by GM Canada; (b) certain other goods, including equipment, machinery, plant, and tools owned by GM Canada; (c) certain accounts, notes, and notes receivable owned by GM Canada; (d) books, accounts, other records, parts, components, and proceeds of, or relating to, such inventory, other goods, accounts, and notes receivable; and (e) certain real property owned by GM Canada. | Undetermined | |

09-50026-mg   Doc 11852-1   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit A
09-50026-reg   Doc 2   Filed 06/01/09   Entered 06/01/09 09:52:23   Main Document   Pg 72 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul   Pg 73 of 99

| Creditor[1] | Mailing Address & Phone Number | Amount of Claim (in millions) | Type of Collateral | Value of Collateral | Disputed |
|---|---|---|---|---|---|
| 3. JPMorgan Chase Bank, N.A. | JPMorgan Chase Bank Loan & Agency Services 1111 Fannin Street – 10th Floor Houston, Texas 7702 Tel: (713) 750-2938 <br><br> Attn: Denise Ramon | $1,488 | Certain equipment, fixtures, documents, general intangibles, all books and records, and the proceeds thereof, owned by General Motors Corporation and Saturn Corporation. | Undetermined | |
| 4. Export Development Canada | Export Development Canada 161 O'Connor Street Ottawa, Ontario Canada K1A 1K3 <br><br> Attn: Loans Services | $400[2] | (a) first lien on 35% voting equity interest in GM Canada; <br><br> (b) second lien on 65% voting equity interest in GM Canada; <br><br> (b) all property of GM Canada, except for (i) property of GM Canada that is collateral securing the obligations under the Revolving Credit Agreement (as defined above) and (ii) the equity interests owned by GM Canada in any subsidiary other than 1908 Holdings Ltd., Parkwood Holdings Ltd., GM Overseas Funding LLC (the "Subsidiary Guarantors") and General Motors Product Services, Inc.; <br><br> (c) the equity interests owned by GM Canada in the Subsidiary Guarantors and General Motors Product Services, Inc.; and <br><br> (d) all property of the Subsidiary Guarantors. | Undetermined | |

---

[2]     Foreign currency debt has been converted to U.S. dollars based on April, 29 2009 conversion rates, which is consistent with company practice for financial reporting purposes.

09-50026-reg Doc 2 Filed 06/01/09 Entered 06/01/09 09:57:23 Main Document Pg 73 of 98

| Creditor[1] | Mailing Address & Phone Number | Amount of Claim (in millions) | Type of Collateral | Value of Collateral | Disputed |
|---|---|---|---|---|---|
| 5. GELCO Corporation | GE Commercial Finance, Fleet Services 3 Capital Drive, Eden Prairie, Minnesota 55344  Attn: General Counsel | $125 | (a) Michigan titled program vehicles; (b) program vehicle inventory; (c) accounts, chattel paper or general intangibles arising from the sale or disposition of Michigan titled program vehicles or program vehicle inventory; (d) collection accounts; (e) books and records relating to the foregoing; and (f) proceeds of the foregoing, including insurance proceeds. | Undetermined | |

09-50026-mg    Doc 11852-1    Filed 06/20/12    Entered 06/20/12 14:52:46    Exhibit A
09-50026-reg    Doc 2    Filed 06/01/09    Entered 06/01/09 09:57:23    Main Document    Pg 74 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 75 of 99

<u>**Schedule 4**</u>

**Condensed Consolidated Balance Sheet[1] (Preliminary, unaudited)
as of March 31, 2009, December 31, 2008, and March 31, 2008**

**(dollars in millions, except for share data)**

---

[1]    This condensed consolidated balance sheet includes subsidiaries controlled by the Debtors and entities for which the Debtors are a primary beneficiary.

| Assets | March 31, 2009 | December 31, 2008 | March 31, 2008 |
|---|---|---|---|
| | (unaudited) | (unaudited) | (unaudited) |
| **Current assets** | | | |
| Cash and cash equivalents | 11,448 | 14,053 | 21,601 |
| Marketable securities | 132 | 141 | 2,043 |
| Total cash and marketable securities | 11,580 | 14,194 | 23,644 |
| Accounts and notes receivable, net | 7,567 | 7,918 | 10,471 |
| Inventories | 11,606 | 13,195 | 17,321 |
| Equipment on operating leases, net | 3,430 | 5,142 | 7,094 |
| Other current assets and deferred income taxes | 2,593 | 3,146 | 4,142 |
| Total current assets | **$36,776** | **$43,595** | **$62,672** |
| **Non-Current Assets** | | | |
| Equity in advances to non-consolidated affiliates | 2,447 | 2,146 | 7,322 |
| Property, net | 37,625 | 39,665 | 43,294 |
| Goodwill and intangible assets, net | 242 | 265 | 1,093 |
| Deferred income taxes | 89 | 98 | 915 |
| Prepaid pension | 106 | 109 | 20,593 |
| Equipment on operating leases, net | 375 | 442 | 3,035 |
| Other assets | 4,630 | 4,719 | 6,784 |
| Total non-current assets | 45,514 | 47,444 | 83,036 |
| **Total Assets** | **$82,290** | **$91,039** | **$145,708** |
| **Liabilities and Stockholders' Deficit** | | | |
| **Current liabilities** | | | |
| Accounts payable (principally trade) | 18,253 | 22,259 | 29,817 |
| Short-term debt and current portion of long-term debt | 22,556 | 16,920 | 8,532 |
| Accrued expenses | 36,989 | 36,429 | 34,806 |
| Total current liabilities | 80,798 | 75,608 | 73,155 |
| **Non-Current Liabilities** | | | |
| Long-term debt | 28,846 | 29,018 | 34,757 |
| Postretirement benefits other than pensions | 22,503 | 28,919 | 46,994 |
| Pensions | 24,476 | 25,178 | 11,624 |
| Other liabilities and deferred income taxes | 16,187 | 17,392 | 18,554 |
| Total non-current liabilities | 92,012 | 100,507 | 111,929 |
| **Total Liabilities** | **$172,810** | **$176,115** | **$185,084** |
| **Stockholders' Deficit** | | | |
| Preferred stock, no par value, 6,000,000 shares authorized, no shares issued and outstanding | — | — | — |
| Preference stock, $0.10 par value, authorized 100,000,000 shares, no shares issued and outstanding | | | |
| Common stock, $1⅔ par value (2,000,000,000 shares authorized, 800,937,541 and 610,505,273 shares issued and outstanding at March 31, 2009, respectively, 800,937,541 and 610,483,231 shares issued and outstanding at December 31, 2008, respectively, and 756,637,541 and 566,100,839 shares issued and outstanding at March 31, 2008, respectively) | 1,018 | 1,017 | 944 |
| Capital surplus (principally additional paid-in capital) | 16,489 | 16,489 | 16,108 |
| Accumulated deficit | (76,703) | (70,727) | (42,912) |
| Accumulated other comprehensive loss | (31,946) | (32,339) | (14,490) |
| Total GM stockholders' deficit | (91,142) | (85,560) | (40,350) |
| Non-controlling interests | 622 | 484 | 974 |
| Total stockholders' deficit | (90,520) | (85,076) | (39,376) |
| **Total liabilities and Stockholders' Deficit** | **$82,290** | **$91,039** | **$145,708** |

09-50026-mg Doc 11852-1 Filed 06/20/12 Entered 06/20/12 14:52:46 Exhibit A
09-50026-reg Doc 2 Filed 06/01/09 Entered 06/01/09 09:57:23 Main Document Pg 76 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 77 of 99

## Schedule 5

### Publicly Held Securities

Pursuant to Local Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, and other securities of General Motors that are publicly held ("Securities") and the number of holders thereof.  The Securities held by General Motors' directors and officers are listed separately.

### Common Stock

| Type of Security | Number of Shares | Approximate Number of Record Holders | As of |
|---|---|---|---|
| Common stock $1⅔ par value. | 610,505,273 shares outstanding | 329,407 | March 31, 2009 |

### Securities Held By the Debtors' Non-Employee Directors

| Name of Non-Employee Director | Number of Shares Owned | | | As of |
| | Shares Beneficially owned | Deferred Share Units | Stock Options | |
|---|---|---|---|---|
| P. N. Barnevik[9] | 9,628 | 41,642 | 3,000 | May 26, 2009 |
| E. B. Bowles | 1,000 | 27,334 | 0 | May 26, 2009 |
| J. H. Bryan | 6,603 | 50,710 | 9,234 | May 26, 2009 |
| A. M. Codina | 2,000 | 45,656 | 3,000 | May 26, 2009 |
| E. B. Davis, Jr. | 1,159 | 15,058 | 0 | May 26, 2009 |
| G. M. C. Fisher | 4,752 | 48,228 | 6,404 | May 26, 2009 |
| E. N. Isdell | 2,000 | 5,898 | 0 | May 26, 2009 |
| K. Katen | 6,000 | 53,249 | 8,141 | May 26, 2009 |
| K. Kresa | 8,200 | 41,073 | 0 | May 26, 2009 |

---

[9]    Percy N. Barnevik resigned from the GM Board of Directors effective February 3, 2009.

| Name of Non-Employee Director | Number of Shares Owned | | | As of |
| | Shares Beneficially owned | Deferred Share Units | Stock Options | |
|---|---|---|---|---|
| P. A. Laskawy | 2,000 | 32,400 | 0 | May 26, 2009 |
| K. V. Marinello | 5,000 | 16,633 | 0 | May 26, 2009 |
| E. Pfeiffer | 4,512 | 48,355 | 9,234 | May 26, 2009 |

### Securities Held By the Debtors' Executive Officers

| Name of Executive Officer | Number of Shares Owned | | | As of |
| | Shares Beneficially owned | Deferred Share Units | Stock Options | |
|---|---|---|---|---|
| G. L. Cowger | 0 | 34,622 | 500,000 | May 26, 2009 |
| F. A. Henderson | 25,469 | 144,418 | 1,180,000 | May 26, 2009 |
| R. A. Lutz | 0 | 304,859 | 1,526,664 | May 26, 2009 |
| T. G. Stephens | 0 | 86,699 | 375,500 | May 26, 2009 |

### Unsecured Notes

| Type of Security | Approximate Number of Record Holders | As of |
|---|---|---|
| 8.80% Notes Due March 1, 2021 | 3,279 | May 1, 2009 |
| 9.40% Debentures Due July 15, 2021 | 3,211 | May 1, 2009 |
| 7.40% Debentures Due September 1, 2025 | 5,800 | May 1, 2009 |
| 9.45% Medium-Term Notes Due November 1, 2011 | 12 | May 1, 2009 |
| 9.40% Medium-Term Notes Due July 15, 2021 | 1 | May 1, 2009 |

| Type of Security | Approximate Number of Record Holders | As of |
|---|---|---|
| 7.75% Discount Debentures Due March 15, 2036 | 544 | May 1, 2009 |
| 7.70% Debentures Due April 15, 2016 | 4,376 | May 1, 2009 |
| 8.10% Debentures Due June 15, 2024 | 5,503 | May 1, 2009 |
| 7.25% Quarterly Interest Bonds Due April 15, 2041 | 14,452 | May 1, 2009 |
| 7.25% Senior Notes Due July 15, 2041 | 18,721 | May 1, 2009 |
| 7.375% Senior Notes Due October 1, 2051 | 18,674 | May 1, 2009 |
| 7.250% Senior Notes Due February 15, 2052 | 19,326 | May 1, 2009 |
| 7.375% Senior Notes Due May 15, 2048 | 24,655 | May 1, 2009 |
| 7.375% Senior Notes Due May 23, 2048 | 1,257 | May 1, 2009 |
| 7.125% Senior Notes Due July 15, 2013 | 7,110 | May 1, 2009 |
| 8.25% Senior Debentures Due July 15, 2023 | 8,569 | May 1, 2009 |
| 8.375% Senior Debentures Due July 15, 2033 | 10,015 | May 1, 2009 |
| 7.20% Notes Due January 15, 2011 | 10,641 | May 1, 2009 |
| 6 3/4% Debentures Due May 1, 2028 | 5,069 | May 1, 2009 |
| 5.25% Series B Convertible Senior Debentures Due March 6, 2032 | 2,641 | May 1, 2009 |
| 7.50% Senior Notes Due July 1, 2044 | 18,917 | May 1, 2009 |
| 1.50% Series D Convertible Senior Debentures Due June 1, 2009 | 240 | May 1, 2009 |
| 4.50% Series A Convertible Senior Debentures due March 6, 2032 | 21 | May 1, 2009 |
| 6.25% Series C Convertible Senior Debentures Due July 15, 2033 | 7,443 | May 1, 2009 |
| 7.25% Euro Notes Due July 3, 2013 | 6,875 | May 1, 2009 |
| 8.375% Euro Notes Due July 5, 2033 | 5,174 | May 1, 2009 |

09-50026-mg    Doc 11852-1    Filed 06/20/12    Entered 06/20/12 14:52:46    Exhibit A
09-50026-reg    Doc 21    Filed 06/01/09    Entered 06/01/09 09:57:23    Main Document    Pg 79 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 80 of 99

## Schedule 6

### Debtors' Property Not in the Debtors' Possession

Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors' property that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

| Type of Property | Person or Entity in Possession of the Property | Address & Telephone Number of Person or Entity in Possession of the Property | Location of Court Proceeding, if Applicable |
|---|---|---|---|
| None. | | | |

09-50026-mg   Doc 2774   Filed 06/01/09   Entered 06/01/09 09:57:23   Main Document   Pg 80 of 98
09-50026-reg   Doc 2??   Filed 06/01/09   Entered 06/20/12 14:52:46   Exhibit A
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul   Pg 81 of 99

## Schedule 7

Pursuant to Local Rule 1007-2(a)(9), the following lists the property or premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

| Owned or Lease Address | City | State | Zip Code | Country |
|---|---|---|---|---|
| 13303 S Ellsworth | Mesa | Arizona | 85201 | United States of America |
| 11201 N Tatum Boulevard | Phoenix | Arizona | 85028 | United States of America |
| 1105 Riverside Drive - Los Angeles | Burbank | California | 91506 | United States of America |
| 11900 Cabernet Drive | Fontana | California | 92337 | United States of America |
| 17150 Von Karman Avenue | Irvine | California | 92614 | United States of America |
| 5350 Biloxi Avenue | North Hollywood | California | 91601 | United States of America |
| 429 Acacia | Palo Alto | California | 94306 | United States of America |
| 11276 5th Street | Rancho Cucamonga | California | 91730 | United States of America |
| 9150 Hermosa Avenue | Rancho Cucamonga | California | 91730 | United States of America |
| 350 Marine Parkway | Redwood City | California | 94065 | United States of America |
| 1215 K Street | Sacramento | California | 95814 | United States of America |
| 475 Brannan Street Suite 450 | San Francisco | California | 94107 | United States of America |
| 14043 Stage Road Bldg A | Santa Fe Springs | California | 90670 | United States of America |
| 3050 Lomita Boulevard | Torrance | California | 90509 | United States of America |
| 3300 Industrial Boulevard | West Sacramento | California | 95691 | United States of America |
| 23400 E. Smith Road | Aurora | Colorado | 80019 | United States of America |
| 1910 38th Street | Denver | Colorado | 80216 | United States of America |
| 4750 Kingston Street | Denver | Colorado | 80239 | United States of America |
| Two Pickwick Plaza | Greenwich | Connecticut | 6830 | United States of America |

| Owned or Lease Address | City | State | Zip Code | Country |
|---|---|---|---|---|
| 25 Massachusetts Avenue N.W. | Washington | District of Columbia | 20001 | United States of America |
| 2700 North University Drive | Coral Springs | Florida | 33065 | United States of America |
| 15495 Eagle Nest Lane | Miami Lakes | Florida | 33014 | United States of America |
| 2901 SW 149th Avenue | Miramar | Florida | 33027 | United States of America |
| 1275 East Story Road | Winter Garden | Florida | 34787 | United States of America |
| 1305 Chastain Road NW | Kennesaw | Georgia | 30144 | United States of America |
| 1355 Remington Boulevard | Bolingbrook | Illinois | 60490 | United States of America |
| 336 East Ogden Avenue | Hinsdale | Illinois | 60521 | United States of America |
| 387 Shuman Boulevard | Naperville | Illinois | 60563 | United States of America |
| 2710 Enterprise Drive | Anderson | Indiana | 46013 | United States of America |
| 7601 E. 88th Pl | Castleton | Indiana | 46256 | United States of America |
| 10800 Farley | Overland Park | Kansas | 66210 | United States of America |
| 4350 Brownsboro Rd. | Louisville | Kentucky | 40207 | United States of America |
| 100 Foxborough Boulevard | Foxborough | Massachusetts | 2035 | United States of America |
| 45 Commerce Way | Norton | Massachusetts | 02766 | United States of America |
| 4134 Davison Road | Burton | Michigan | 48509 | United States of America |
| 1215 North Center Road | Burton | Michigan | 48509 | United States of America |
| 48380 Continental Dr | Chesterfield | Michigan | 48047 | United States of America |
| 3023 Airpark Drive N | Flint | Michigan | 48439 | United States of America |
| South Saginaw Street | Flint | Michigan | 48507 | United States of America |
| 4265 24th Avenue | Fort Gratiot | Michigan | 48059 | United States of America |
| 4875 Airport Drive Bldgs. 153&430 & Lots 17&20 | Kincheloe | Michigan | 49788 | United States of America |
| 124 West Allegan Street | Lansing | Michigan | 48933 | United States of America |

| Owned or Lease Address | City | State | Zip Code | Country |
|---|---|---|---|---|
| 31 East Judson Street | Pontiac | Michigan | 48342 | United States of America |
| 530 E Service Drive - Detroit Metro Airport | Romulus | Michigan | 48242 | United States of America |
| 6400 Center Drive | Sterling Heights | Michigan | 48312 | United States of America |
| 33500 Mound Road | Sterling Heights | Michigan | 48310 | United States of America |
| 2321 John R Road | Troy | Michigan | 48083 | United States of America |
| 7111 Eleven Mile Road | Warren | Michigan | 48092 | United States of America |
| 2625 Tyler Road | Ypsilanti | Michigan | 48198 | United States of America |
| 1500 Marquette Road | Brandon | Mississippi | 39042 | United States of America |
| 4407 Meramec Bottom Road | St Louis | Missouri | 63129 | United States of America |
| 125 Fountain Lakes Industrial Drive | St. Charles | Missouri | 63301 | United States of America |
| 101 Interstate Drive | Wentzville | Missouri | 63385 | United States of America |
| 6565 Echo Avenue | Reno | Nevada | 89506 | United States of America |
| 6 Campus Drive | Parsippany | New Jersey | 08837 | United States of America |
| 425 Saw Mill River Road | Ardsley | New York | 10502 | United States of America |
| 34 Norton Street | Honeoye Falls | New York | 14472 | United States of America |
| 10 Carriage Street | Honeoye Falls | New York | 14472 | United States of America |
| 153 East 53rd Street | New York | New York | 10022 | United States of America |
| 1 Pepsi Way P.O. Box 8500 | Somers | New York | 10589 | United States of America |
| 11006 Rushmore Drive | Charlotte | North Carolina | 28277 | United States of America |
| 10101 Claude Freeman Drive | Charlotte | North Carolina | 28262 | United States of America |
| 10815 Quality Drive | Charlotte | North Carolina | 28278 | United States of America |
| 202 Montrose West Blvd. | Copley | Ohio | 44321 | United States of America |
| 6000 Green Pointe Drive | Groveport | Ohio | 43125 | United States of America |

09-50026-mg   Doc 2 Filed 06/01/09   Entered 06/01/09 03:22:23   Main Document   Pg 84 of 99
09-50026-reg   Doc 11852-1   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit A
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul   Pg 84 of 99

| Owned or Lease Address | City | State | Zip Code | Country |
|---|---|---|---|---|
| 1745 Indian Wood Circle | Maumee | Ohio | 46250 | United States of America |
| 4246-4254 East River Rd | Moraine | Ohio | 45437 | United States of America |
| 1038 Matzinger Road | Toledo | Ohio | 43612 | United States of America |
| 8752 Jacquemin Drive | Westchester | Ohio | 45069 | United States of America |
| 9287 Meridian Way | Westchester | Ohio | 45069 | United States of America |
| 200 Cabot Boulevard E | Lang Horne | Pennsylvania | 19030 | United States of America |
| 851 Duportail Road, GM Bldg- Chesterbrook | Wayne | Pennsylvania | 19087 | United States of America |
| 300 Executive Center Drive | Greenville | South Carolina | 29615 | United States of America |
| 5115 Pleasant Hill Road | Memphis | Tennessee | 38118 | United States of America |
| 7401 E. Ben White Boulevard 3 | Austin | Texas | 78741 | United States of America |
| 1150 Enterprise Dr | Coppell | Texas | 75019 | United States of America |
| 225 E John Carpenter Fwy | Irving | Texas | 75062 | United States of America |
| 301 Freedom Drive | Roanoke | Texas | 76262 | United States of America |
| 4000 General Motors Road | Martinsburg | West Virginia | 25401 | United States of America |
| 608 Caperton Boulevard | Martinsburg | West Virginia | 25401 | United States of America |
| 300 North Corporate Drive | Brookfield | Wisconsin | 53045 | United States of America |
| 2200 Willis Miller Drive | Hudson | Wisconsin | 54016 | United States of America |
| 1600 Aspen Commons | Middleton | Wisconsin | 53562 | United States of America |
| 600 Corporate Parkway | Hoover | Alabama | 35242 | United States of America |
| 1620 East Roseville Parkway | Roseville | California | 91765 | United States of America |
| 2010 Crow Canyon Place | San Ramon | California | 94583 | United States of America |
| 8055 East Tufts Avenue Pkwy | Denver | Colorado | 80202 | United States of America |
| 12751 Gran Bay Parkway West | Jacksonville | Florida | 32258 | United States of America |

| Owned or Lease Address | City | State | Zip Code | Country |
|---|---|---|---|---|
| 3030 North Rocky Point Drive | Tampa | Florida | 33607 | United States of America |
| 11700 Great Oaks Way | Alpharetta | Georgia | 30022 | United States of America |
| 5975 Castle Creek Parkway | Indianapolis | Indiana | 46250 | United States of America |
| 20251 Century Blvd | Germantown | Maryland | 20874 | United States of America |
| 900 North Squirrel Road | Auburn Hills | Michigan | 48236 | United States of America |
| 4660 S Hagadorn Rd | East Lansing | Michigan | 48823 | United States of America |
| 5989 Tahoe Drive Southeast | Grand Rapids | Michigan | 49512 | United States of America |
| 1000 Center | Southfield | Michigan | 48075 | United States of America |
| 1870 Technology Drive | Troy | Michigan | 48083 | United States of America |
| 8400 Normandale Lake Boulevard | Bloomington | Minnesota | 55437 | United States of America |
| 14567 North Outer Forty | Chesterfield | Missouri | 63017 | United States of America |
| 767 Fifth Avenue | New York | New York | 10153 | United States of America |
| 100 Corporate Woods | Rochester | New York | 14623 | United States of America |
| 4900 Koger Boulevard | Greensboro | North Carolina | 27404 | United States of America |
| 5510 Six Forks Road | Raleigh | North Carolina | 27609 | United States of America |
| 155 Tri-County Parkway, GM Bldg | Cincinnati | Ohio | 45246 | United States of America |
| 3104 Unionville Drive | Cranberry Twp | Pennsylvania | 16319 | United States of America |
| 501 Corporate Centre Drive | Franklin | Tennessee | 37067 | United States of America |
| 10800 Midlothian Turnpike | Richmond | Virginia | 23235 | United States of America |
| 400-D Prestige Park | Hurricane | West Virginia | 25526 | United States of America |
| 801 Boxwood Road PO Box 1512 - 19899 | Wilmington | Delaware | 19804 | United States of America |
| 105 GM Drive | Bedford | Indiana | 47421 | United States of America |
| 340 White River Parkway West Drive South 50 | Indianapolis | Indiana | 46206 | United States of America |

| Owned or Lease Address | City | State | Zip Code | Country |
|---|---|---|---|---|
| 2400 W Second Street PO Box 778 - 46952-0036 | Marion | Indiana | 46952 | United States of America |
| 12200 Lafayette Center Road | Roanoke | Indiana | 46783 | United States of America |
| 3201 Fairfax Trafficway P.O. Box 15278-66115-1397 | Kansas City | Kansas | 66115 | United States of America |
| 600 Corvette Drive PO Box 90006 - 42102-9006 | Bowling Green | Kentucky | 42101 | United States of America |
| 7600 General Motors Boulevard PO Box 30011 - 71130-0011 | Shreveport | Louisiana | 71130 | United States of America |
| 10301 Philadelphia Road | White Marsh | Maryland | 21162 | United States of America |
| 1001 Woodside Avenue | Bay City | Michigan | 48708 | United States of America |
| 2500 East Grand Boulevard | Detroit | Michigan | 48211 | United States of America |
| G-3100 Van Slyke Road | Flint | Michigan | 48551 | United States of America |
| G-2238 West Bristol Road | Flint | Michigan | 48553 | United States of America |
| 425 S Stevenson Street | Flint | Michigan | 48501 | United States of America |
| 2100 Bristol Road | Flint | Michigan | 48552 | United States of America |
| 902 E Hamilton Avenue | Flint | Michigan | 48550 | United States of America |
| 10800 South Saginaw Street | Grand Blanc | Michigan | 48439 | United States of America |
| 4555 Giddings Road | Lake Orion | Michigan | 48359 | United States of America |
| 8175 Millett Hwy | Lansing | Michigan | 48917 | United States of America |
| 920 Townsend Avenue | Lansing | Michigan | 48921 | United States of America |
| 8175 Millet Hwy | Lansing | Michigan | 48917 | United States of America |
| 12200 Middlebelt | Livonia | Michigan | 48150 | United States of America |
| 55000 Grand River | New Hudson | Michigan | 48165 | United States of America |
| 2100 S Opdyke Road | Pontiac | Michigan | 48341 | United States of America |
| 220 East Columbia | Pontiac | Michigan | 48340 | United States of America |

09-50026-mg   Doc 11852-1   Filed 06/01/09   Entered 06/20/12 14:52:46   Exhibit A
09-50026-reg   Doc 2   Filed 06/01/09   Entered 06/01/09 09:57:23   Main Document   Pg 86 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 87 of 99

| Owned or Lease Address | City | State | Zip Code | Country |
|---|---|---|---|---|
| 36880 Ecorse Road | Romulus | Michigan | 48174 | United States of America |
| 1629 N Washington Avenue PO Box 5073 - 48605-5073 | Saginaw | Michigan | 48605 | United States of America |
| 6060 W Bristol Road | Swartz Creek | Michigan | 48554 | United States of America |
| 23500 Mound Road | Warren | Michigan | 48091 | United States of America |
| 30240 Oak Creek Drive | Wixom | Michigan | 48393 | United States of America |
| 300 36th Street SW | Wyoming | Michigan | 49548 | United States of America |
| 2930 Ecorse Road | Ypsilanti | Michigan | 48197 | United States of America |
| 1500 - 1 E Route A PO Box 444 - 63385-0444 | Wentzville | Missouri | 63385 | United States of America |
| 2995 River Road | Buffalo | New York | 14207 | United States of America |
| Route 37 East | Massena | New York | 13662 | United States of America |
| 26427 State Road, Route 281E PO Box 70 - 43512-0070 | Defiance | Ohio | 43512 | United States of America |
| 2300 Hallock Young Road | Lordstown | Ohio | 44481 | United States of America |
| 2369 Ellsworth-Bailey Road PO Box 1427 - 44482 | Lordstown | Ohio | 44482 | United States of America |
| 2525 West Fourth Street PO Box 2567 - 44906 | Mansfield | Ohio | 44906 | United States of America |
| 2601 West Stroop Road | Moraine | Ohio | 45439 | United States of America |
| 5400 Chevrolet Boulevard PO Box 30098 | Parma | Ohio | 44130 | United States of America |
| 1455 West Alexis Road PO Box 909 | Toledo | Ohio | 43612 | United States of America |
| 1451 Lebanon School Road | West Mifflin | Pennsylvania | 15122 | United States of America |
| 100 Saturn Parkway PO Box 1500 - 37174-1500 | Spring Hill | Tennessee | 37174 | United States of America |
| 2525 East Abram Street | Arlington | Texas | 76010 | United States of America |
| 11032 Tidewater Trail | Fredericksburg | Virginia | 22408 | United States of America |
| 1000 General Motors Drive | Janesville | Wisconsin | 53546 | United States of America |

| Owned or Lease Address | City | State | Zip Code | Country |
|---|---|---|---|---|
| TDB | Yuma | Arizona | 85365 | United States of America |
| 515 Marin Street | Thousand Oaks | California | 91360 | United States of America |
| 2022 Helena Street, Unit A | Aurora | Colorado | 80011 | United States of America |
| 6395 Shiloh Road | Alpharetta | Georgia | 30005 | United States of America |
| 3900 Motors Industrial Way | Doraville | Georgia | 30360 | United States of America |
| 2915 Pendleton Avenue | Anderson | Indiana | 46016 | United States of America |
| 17 N. Washington | Kokomo | Indiana | 46901 | United States of America |
| 100 Kindleberger Road | Fairfax | Kansas | 66115 | United States of America |
| 50000 Ecorse Road | Belleville | Michigan | 48111 | United States of America |
| 80 acres at the northwest corner Nixon Road & Milett Highway | Delta Township | Michigan | 48921 | United States of America |
| 2976-74 West Grand Boulevard | Detroit | Michigan | 48202 | United States of America |
| Former Cadillac Site | Detroit | Michigan | 48210 | United States of America |
| 13940 Tireman | Detroit | Michigan | 48202 | United States of America |
| West of Randolph | Detroit | Michigan | 48226 | United States of America |
| Bluff Street | Flint | Michigan | 48504 | United States of America |
| SEC of Hemphill Rd & Saginaw Rd | Flint | Michigan | 48507 | United States of America |
| 4002 James Cole Blvd. | Flint | Michigan | 48503 | United States of America |
| 902 East Hamilton Avenue | Flint | Michigan | 48550 | United States of America |
| 10800 S. Saginaw Road | Flint | Michigan | 48550 | United States of America |
| 6200 Grand Pointe Drive | Grand Blanc | Michigan | 48439 | United States of America |
| 2801 West Saginaw Street | Lansing | Michigan | 48917 | United States of America |
| 2901 South Canal Road | Lansing | Michigan | 48921 | United States of America |
| 2800 West Saginaw Street | Lansing | Michigan | 48921 | United States of America |

09-50026-mg   Doc 12852-1   Filed 06/01/09   Entered 06/20/12 14:52:46   Exhibit A
09-50026-reg   Doc 2   Filed 06/01/09   Entered 06/01/09 08:23   Main Document   Pg 88 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul   Pg 89 of 99

| Owned or Lease Address | City | State | Zip Code | Country |
|---|---|---|---|---|
| 4400 West Mount Hope Road | Lansing | Michigan | 48917 | United States of America |
| 12950 Eckles Road | Livonia | Michigan | 48151 | United States of America |
| 3300 General Motors Road | Milford | Michigan | 48380 | United States of America |
| 652 Meadow Drive | Pontiac | Michigan | 48341 | United States of America |
| Baseball Pk N of Columbia | Pontiac | Michigan | 48340 | United States of America |
| 642 Meadow Drive | Pontiac | Michigan | 48341 | United States of America |
| 631 Meadow Drive | Pontiac | Michigan | 48341 | United States of America |
| 607 Meadow Drive | Pontiac | Michigan | 48341 | United States of America |
| 675 Oakland Avenue | Pontiac | Michigan | 48342 | United States of America |
| Centerpoint Blvd S. of South Blvd | Pontiac | Michigan | 48341 | United States of America |
| 200 South Boulevard West | Pontiac | Michigan | 48341 | United States of America |
| 1999 Center Point Parkway East | Pontiac | Michigan | 48341 | United States of America |
| 660 South Boulevard East | Pontiac | Michigan | 48341 | United States of America |
| 65 University Drive | Pontiac | Michigan | 48342 | United States of America |
| 895 Joslyn Road | Pontiac | Michigan | 48340 | United States of America |
| 1251 Joslyn Road | Pontiac | Michigan | 48340 | United States of America |
| 900 Baldwin Avenue | Pontiac | Michigan | 48340 | United States of America |
| 2000 Centerpoint Parkway | Pontiac | Michigan | 48341 | United States of America |
| 37350 Ecorse Road | Romulus | Michigan | 48174 | United States of America |
| 700 Garey Street | Saginaw | Michigan | 48601 | United States of America |
| 77 West Center Street | Saginaw | Michigan | 48605 | United States of America |
| 2100 Veterans Memorial Pkwy | Saginaw | Michigan | 48605 | United States of America |
| 30800 Mound Road | Warren | Michigan | 48090 | United States of America |

09-50026-reg   Doc 2   Filed 06/01/09   Entered 06/01/09 08:22:23   Main Document   Pg 80 of 99

| Owned or Lease Address | City | State | Zip Code | Country |
|---|---|---|---|---|
| 5260 Williams Lake Road | Waterford | Michigan | 48329 | United States of America |
| 2901 Tyler Road | Ypsilanti | Michigan | 48197 | United States of America |
| 1445 Parkway Avenue Trenton\Ewing Township | Ewing | New Jersey | 08628 | United States of America |
| Beekman Ave @ Railroad Way | Sleepy Hollow | New York | 10591 | United States of America |
| One General Motors Circle | Syracuse | New York | 13206 | United States of America |
| 1829 Hallock Young Road | Lordstown | Ohio | 44481 | United States of America |
| 15005 SW Tualatin Valley Highway | Beaverton | Oregon | 97006 | United States of America |
| Rippavilla Mansion 5700 Main St. Spring Hill | Maury County | Tennessee | 37174 | United States of America |
| Vacant Land Maury County | Spring Hill | Tennessee | 37174 | United States of America |
| Garland Road at Shiloh Road | Garland | Texas | 75041 | United States of America |
| 13701 Mines Road | Laredo | Texas | 78040 | United States of America |

09-50026-mg   Doc 2   Filed 06/01/09   Entered 06/01/09 09:37:23   Main Document   Pg 90 of 98
09-50026-reg   Doc 11852-1   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit A
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul   Pg 91 of 99

## Schedule 8

### Location of Debtors' Assets, Books, and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of its books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

The Debtors have assets worldwide of more than $82 billion, with substantial assets in Detroit, Michigan and New York, New York.

### Books and Records

The Debtors' books and records are located in Detroit, Michigan and New York, New York.

### Debtors' Assets Outside the United States

The Debtors have significant assets worldwide of more than $82 billion, including significant assets held outside the United States through direct and indirect subsidiaries of General Motors Corporation.

## Schedule 9

### Litigation

   Pursuant to Local Rule 1007-2(a)(11), the following is a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

| Action or Proceeding | Nature of the Action | Status of the Action |
|---|---|---|
| None. | | |

09-50026-mg   Doc 11852-1   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit A
09-50026-reg   Doc 2   Filed 06/01/09   Entered 06/01/09 09:57:23   Main Document   Pg 92 of 98
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul    Pg 93 of 99

## Schedule 10

### Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

### General Motors Corporation's Senior Management

| Name / Position | Experience / Responsibilities |
|---|---|
| **Fredrick A. Henderson**<br>*President and Chief Executive Officer* | Frederick A. Henderson became President and Chief Operating Officer for General Motors on March 29, 2009. Prior to that, he had been President and Chief Operating Officer, since March 3, 2008. Mr. Henderson was Vice Chairman and Chief Financial Officer, and previously, a GM Group Vice President and Chairman of GM Europe. Mr. Henderson has been associated with GM since 1984. He was named GM Group Vice President and President of GM Asia Pacific effective January 1, 2002. Effective June 1, 2004, he was appointed Group Vice President and Chairman of GM Europe. |
| **Robert A. Lutz**<br>*Vice Chairman, Senior Advisor* | Robert A. Lutz was named Vice Chairman and Senior Advisor on April 1, 2009. Prior to that, Mr. Lutz was Vice Chairman of Product Development of General Motors, effective September 1, 2001. He was named Chairman of GM North America on November 13, 2001, and served in that capacity until April 4, 2005, when he assumed responsibility for Global Product Development. He also served as president of GM Europe on an interim basis from March to June 2004. Mr. Lutz plans to retire at the end of 2009. |
| **Thomas G. Stephens**<br>*Vice Chairman, Global Product Development* | Thomas G. Stephens became Vice Chairman, Global Product Development on April 1, 2009. Prior to that, he was the Executive Vice President of GM Global Powertrain and Global Quality since March 3, 2008. Mr. Stephens joined General Motors in 1969 and was appointed Group Vice President for GM Global Powertrain and Global Quality in 2007. |

09-50026-mg   Doc 11852-1   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit A
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul   Pg 94 of 99
09-50026-reg   Doc 2   Filed 06/01/09   Entered 06/01/09 08:57:23   Main Document   Pg 95 of 98

| Name / Position | Experience / Responsibilities |
|---|---|
| **Ray G. Young**<br>*Executive Vice President and Chief Financial Officer* | Ray G. Young was named Executive Vice President and Chief Financial Officer on March 3, 2008. Prior to his promotion, Mr. Young was Group Vice President, Finance. He joined General Motors at General Motors' Canadian headquarters in Oshawa, Ontario in 1986. In his previous post, Mr. Young was President and Managing Director of GM do Brasil and Mercosur Operations, beginning in January 2004, and prior to that served as chief financial officer of GM North America. |

## Saturn Corporation's Senior Management

| Name / Position | Experience / Responsibilities |
|---|---|
| **Jill A. Lajdziak**<br>*President* | Jill A. Lajdziak is the President of Saturn Corporation and she was elected to this position on September 30, 2008. She is also the General Manager of Saturn Division, General Motors Corporation. |
| **Harvey G. Thomas**<br>*Vice President* | Harvey G. Thomas is currently a Vice President of Saturn Corporation. |
| **Deborah F. Collins**<br>*Vice President, General Counsel & Secretary* | Deborah F. Collins is a Vice President, General Counsel and Secretary of Saturn Corporation and she was elected to these positions on March 31, 2008. She is also an Attorney on the General Motors Corporation Legal Staff. |
| **Dennis J. Barber**<br>*Treasurer* | Dennis J. Barber is currently the Treasurer of Saturn Corporation. He is also a Regional Finance Manager of General Motors Corporation's North American IPC & Dealer Network unit. |
| **Raymond Wexler**<br>*Chief Tax Officer* | Raymond Wexler is the Chief Tax Officer of Saturn Corporation and he was elected to this position on August 1, 2006. He is also the Chief Tax Officer of General Motors Corporation. |
| **Timothy G. Gorbatoff**<br>*Assistant Secretary* | Timothy G. Gorbatoff is an Assistant Secretary of Saturn Corporation and he was elected to this position on January 1, 2000. He is also an Attorney on the General Motors Corporation Legal Staff. |
| **Barbara A. Lister-Tait**<br>*Assistant Secretary* | Barbara A. Lister-Tait is currently an Assistant Secretary of Saturn Corporation. She is also a Senior Staff Assistant on the General Motors Corporation Legal Staff. |

09-50026-mg  Doc 11852-1  Filed 06/20/12  Entered 06/20/12 14:52:46  Exhibit A
Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rul   Pg 95 of 99
09-50026-reg  Doc 2  Filed 06/01/09  Entered 06/01/09 08:22:23 Main Document  Pg 94 of 98

| Name / Position | Experience / Responsibilities |
|---|---|
| **Deanna Petkoff** <br> *Assistant Secretary* | Deanna Petkoff is an Assistant Secretary of Saturn Corporation and she was elected to this position on September 30, 2008.  She is also a Legal Assistant on the General Motors Corporation Legal Staff. |

## Saturn Distribution Corporation's Senior Management

| Name / Position | Experience / Responsibilities |
|---|---|
| **Jill A. Lajdziak** <br> *President* | Jill A. Lajdziak is currently the President of Saturn Distribution Corporation.  She is also the General Manager of Saturn Division, General Motors Corporation. |
| **Keith C. Best** <br> *Vice President* | Keith C. Best is a Vice President of Saturn Distribution Corporation and he was elected to this position on September 22, 2008.  He is also a Regional Sales and Marketing Manager for the South Central Region of Saturn Division, General Motors Corporation. |
| **Ann N. Blakney** <br> *Vice President* | Ann N. Blakney is a Vice President of Saturn Distribution Corporation and she was elected to this position on September 22, 2008. |
| **Deborah F. Collins** <br> *Vice President, General Counsel & Secretary* | Deborah F. Collins is a Vice President, General Counsel and Secretary of Saturn Distribution Corporation and she was elected to these positions on September 22, 2008.  She is also an Attorney on the General Motors Corporation Legal Staff. |
| **James L. Craner** <br> *Vice President* | James L. Craner is currently a Vice President of Saturn Distribution Corporation.  He is also a Director of Sales Operations for Saturn Division, General Motors Corporation. |
| **John F. Minarick** <br> *Vice President* | John F. Minarick is currently a Vice President of Saturn Distribution Corporation.  He is also a Regional Sales and Marketing Manager for the North Central Region of Saturn Division, General Motors Corporation. |
| **Thomas A. Mudry** <br> *Vice President* | Thomas A. Mudry is a Vice President of Saturn Distribution Corporation and he was elected to this position on September 22, 2008.  He is also a Regional Sales and Marketing Manager for the South Eastern Region of Saturn Division, General Motors Corporation. |

09-50026-reg   Doc 2716   Filed 06/01/09   Entered 06/01/09 08:23   Main Document   Pg 96 of 98

| Name / Position | Experience / Responsibilities |
|---|---|
| **Jonathon C. Skidmore**<br>*Vice President* | Jonathon C. Skidmore is a Vice President of Saturn Distribution Corporation and he was elected to this position on September 22, 2008.  He is also a Regional Sales and Marketing Manager for the North Eastern Region of Saturn Division, General Motors Corporation. |
| **Sterling J. Wesley**<br>*Vice President* | Sterling J. Wesley is a Vice President of Saturn Distribution Corporation and he was elected to this position on September 22, 2008.  He is also the General Sales Manager of Saturn Division, General Motors Corporation. |
| **Edward J. Toporzycki**<br>*Treasurer* | Edward J. Toporzycki is the Treasurer of Saturn Distribution Corporation and he was elected to this position on September 22, 2008.  He is also an Executive Director of General Motors Corporation's North American Vehicle Sales, Service and Marketing Finance unit. |
| **Raymond Wexler**<br>*Chief Tax Officer* | Raymond Wexler is the Chief Finance Officer of Saturn Distribution Corporation and he was elected to this position on August 1, 2006.  He is also the Chief Tax Officer of General Motors Corporation. |
| **Barbara A. Lister-Tait**<br>*Assistant Secretary* | Barbara A. Lister-Tait is currently an Assistant Secretary of Saturn Distribution Corporation.  She is also a Senior Staff Assistant on the General Motors Corporation Legal Staff. |
| **Deanna Petkoff**<br>*Assistant Secretary* | Deanna Petkoff is an Assistant Secretary of Saturn Distribution Corporation and she was elected to this position on September 22, 2008.  She is also a Legal Assistant on the General Motors Corporation Legal Staff. |

09-50026-reg   Doc 2   Filed 06/01/09   Entered 06/01/09 09:37:23   Main Document   Pg 96 of 98

**Chevrolet-Saturn of Harlem, Inc.**

| Name / Position | Experience / Responsibilities |
|---|---|
| **Michael A. Garrick**<br>_President_ | Michael A. Garrick is currently the President of Chevrolet-Saturn of Harlem Inc. and was elected to this position on December 21, 2006. Prior to that, Mr. Garrick worked for General Motors Corporation for over 32 years. |
| **Joanna Lopez**<br>_Secretary and Treasury_ | Joanna Lopez is currently the Secretary and Treasury of Chevrolet-Saturn of Harlem Inc. and was elected to this position on May 1, 2007. |

09-50026-reg   Doc 2   Filed 06/01/09   Entered 06/01/09 08:22:23   Main Document   Pg 97 of 98

## Schedule 11

### Payroll

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors, for the 30-day period following the filing of the chapter 11 petitions.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors, and Stockholders)** | $110 million [1] |
| **Payments to Officers, Stockholders, and Directors** | $0.2 million [2] |
| **Payments to Financial and Business Consultants** | $34 million [3] |

---

[1]     Includes the estimated weekly gross payroll for employees, not including officers, directors, and stockholders.

[2]     Comprises approximately $195,766 of payroll for executive officers, and $0 for directors' fees.

[3]     This does not include any payments to attorneys or auditors.

09-50026-reg    Doc 2    Filed 06/01/09    Entered 06/01/09 09:07:23    Main Document    Pg 99 of 98

**Schedule 12**

**Cash Receipts and Disbursements,
Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the chapter 11 petition, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $2.1 billion |
| **Cash Disbursements** | $7.8 billion |
| **Net Cash Gain or Loss** | $5.7 billion |
| **Unpaid Obligations** | $6.0 billion |
| **Unpaid Receivables** | $2.2 billion |