# EXHIBIT D

Hearing Date and Time: To Be Determined
Response Deadline: December 13, 2010
**EVIDENTIARY HEARING REQUESTED**

BUTZEL LONG, a professional corporation
Barry N. Seidel
Eric B. Fisher
Katie L. Cooperman
380 Madison Avenue, 22nd Floor
New York, New York 10017
Telephone:  (212) 818-1110

*Special Counsel to the Official Committee of Unsecured
Creditors of Motors Liquidation Company f/k/a General
Motors Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                                    :
In re                                               :      **Chapter 11**
                                                    :
**MOTORS LIQUIDATION COMPANY**, *et al.*,           :      **Case No.:  09-50026 (REG)**
                                                    :
               **Debtors.**                         :      **(Jointly Administered)**
                                                    :
------------------------------------------------------------------x

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' FIRST**
**AMENDED OBJECTION TO CLAIMS FILED BY GREEN HUNT**
**WEDLAKE, INC. AND NOTEHOLDERS OF GENERAL MOTORS NOVA**
**SCOTIA FINANCE COMPANY AND MOTION FOR OTHER RELIEF**

BUTZEL LONG, a professional corporation
Barry N. Seidel
Eric B. Fisher
Katie L. Cooperman
380 Madison Avenue, 22nd Floor
New York, New York 10017
Tel: (212) 818-1110
Fax: (212) 818-0494

*Special Counsel to the Official Committee of
Unsecured Creditors of Motors Liquidation
Company f/k/a General Motors Corporation*

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 2

JURISDICTION AND VENUE ..................................................................................... 4

PARTIES ...................................................................................................................... 5

BACKGROUND .......................................................................................................... 5

    I.     Corporate Relationships ...................................................................... 5

    II.    The 2003 Notes Offering ..................................................................... 6

    III.   The Swaps ............................................................................................ 6

    IV.   The Intercompany Loans ..................................................................... 7

    V.    The Nova Scotia Action ....................................................................... 7

    VI.   The Nova Scotia Response ................................................................... 8

    VII.   The Lock-Up Agreement ..................................................................... 9

           A.  Guarantee Obligations .............................................................. 10

           B.  Deficiency Obligation and Nova Scotia Finance's Consent to Bankruptcy ......... 10

           C.  Reversal of Swap Liability ........................................................ 11

           D.  Consent Fee .............................................................................. 12

           E.  Release of Intercompany Loans ............................................... 13

    VIII.  Post-Petition Implementation of the Lock-Up Agreement ....................................... 13

    IX.   Assumption of the Lock-Up Agreement ............................................ 14

    X.    Proofs of Claim ................................................................................. 15

RELIEF REQUESTED ................................................................................................ 16

           A.  The Claims Should be Disallowed Under Section 502(d) of the Bankruptcy Code Because the Noteholders Received and Retained the Consent Fee ............. 16

               1.  The Consent Fee is Avoidable Under Sections 544, 547 and/or 548 of the Bankruptcy Code ................................................................ 17

               2.  Alternatively, the Consent Fee is Avoidable Under Section 549 of the Bankruptcy Code ...................................................................... 18

           B.  Old GM's Obligations Under the Lock-Up Agreement are Avoidable Under Applicable Law ........................................................ 18

                1.  Old GM's Obligations Under the Lock-Up Agreement are Avoidable Under Section 548 of the Bankruptcy Code and the NYDCL ...... 18

               2.  Alternatively, the Lock-Up Agreement Constitutes an Unauthorized Settlement Under Rule 9019 of the Federal Rules of Bankruptcy Procedure ...................................................................... 20

09-50026-mg    Doc 11852-14/19/10 Filed 06/20/12    Entered 06/20/12 14:52:46    Exhibit D
09-50026-reg Doc 7880 Filed 11/19/10 Entered 11/19/10 13:04:40 Main Document Pg 3 of 27
The Objection to Claims (as amended)    dated November 11    2010    filed    Pg 4 of 62

C. Alternatively, the Claims are Duplicative and Far in Excess of the Underlying Obligation ............................................................................ 21

D. In any Event, the Claims Should be Equitably Subordinated Under Section 510 of the Bankruptcy Code ............................................................. 21

E. The Committee is Entitled to Relief Under Rule 60(b) of the Federal Rules of Civil Procedure and Rule 9024 of the Federal Rules of Bankruptcy Procedure ............................................................................................. 22

RESERVATION OF RIGHTS ............................................................................ 23

NOTICE ........................................................................................................... 23

**Hearing Date and Time: November 18, 2010 at 9:45 a.m. (Prevailing Eastern Time)**
**Response Deadline: November 15, 2010 at 12:00 p.m. (Prevailing Eastern Time)**
**EVIDENTIARY HEARING REQUESTED**

BUTZEL LONG, a professional corporation
Barry N. Seidel
Eric B. Fisher
Katie L. Cooperman
380 Madison Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 818-1110

*Special Counsel to the Official Committee of Unsecured*
*Creditors of Motors Liquidation Company f/k/a General*
*Motors Corporation*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                 :

In re                       :        Chapter 11
                                   :

MOTORS LIQUIDATION COMPANY, *et al.*,   :        Case No.: 09-50026 (REG)
                                   :

                 Debtors.     :        (Jointly Administered)
                                   :
                                   :
-----------------------------------------------------------------x

## OFFICIAL COMMITTEE OF UNSECURED CREDITORS' FIRST AMENDED OBJECTION TO CLAIMS FILED BY GREEN HUNT WEDLAKE, INC. AND NOTEHOLDERS OF GENERAL MOTORS NOVA SCOTIA FINANCE COMPANY AND MOTION FOR OTHER RELIEF

The Official Committee of Unsecured Creditors of Motors Liquidation Company f/k/a

General Motors Corporation (the "**Committee**"), by its attorneys Butzel Long, a professional

corporation, respectfully submits this: (i) objection to claims set forth in Exhibit A attached

hereto filed by, or on behalf of, certain holders of notes (the "**Noteholders**") issued by General

Motors Nova Scotia Finance Company ("**Nova Scotia Finance**") against Motors Liquidation

Company f/k/a General Motors Corporation ("**Old GM**") and certain of its subsidiaries

(collectively, the "**Debtors**") in the aggregate amount of $1,072,557,531.72 (the "**Guarantee**

**Claims**"); (ii) objection to claim no. 66319 filed by Green Hunt Wedlake, Inc., trustee of Nova

Scotia Finance (the "**Nova Scotia Finance Trustee**") against the Debtors in the amount of

$1,607,647,592.49 (the "**Duplicative Claim**," and together with the Guarantee Claims, the

"**Claims**"); and (iii) motion for relief under Rule 60(b) of the Federal Rules of Civil Procedure

and Rule 9024 of the Federal Rules of Bankruptcy Procedure.  This objection amends the

*Official Committee of Unsecured Creditors' Objection to Claims Filed by Green Hunt Wedlake,*

*Inc. and Noteholders of General Motors Nova Scotia Finance Company and Motion for Other*

*Relief* (Docket No. 6248), filed on July 2, 2010 in this bankruptcy proceeding.[1]  In support of this

application, the Committee states as follows:

## INTRODUCTION

1.    This objection concerns claims that arise out of an agreement between Old GM

and a consortium of hedge-fund noteholders,[2] which was entered into just minutes before Old

GM filed for bankruptcy on June 1, 2009.  The agreement, known as the "**Lock-Up**

**Agreement**," was grossly one-sided, disproportionately benefiting the Noteholders and leaving

Old GM's estate depleted to the detriment of its creditors.

2.    Before entering into the Lock-Up Agreement, the Noteholders had an

approximately one billion dollar claim against Old GM, as guarantor of Notes (defined below)

issued by Nova Scotia Finance, a subsidiary of Old GM.  The proceeds from issuance of the

Notes were loaned by Nova Scotia Finance to General Motors of Canada Limited ("**GM**

---

[1]    The Committee respectfully requests the Court's permission, pursuant to Rule 3007(b) of the
Federal Rules of Bankruptcy Procedure, to join these objections to the Claims in a single filing because
the Claims were all asserted for the benefit of the Noteholders and involve common facts and
circumstances.

[2]    The hedge-fund Noteholders party to the Lock-Up agreement are Aurelius Capital Partners, LP,
Aurelius Capital Master, Ltd., Drawbridge DSO Securities LLC, Drawbridge OSO Securities LLC, Elliot
International, L.P., FCOF UB Securities LLC, Appaloosa Investment Limited Partnership I, The
Liverpool Limited Partnership, Palomino Fund Ltd., Thoroughbred Master Ltd. and Thoroughbred Fund
LP, and are hereinafter referred to as the "**Lock-Up Noteholders**."

Canada") in documented intercompany transactions. Through the Lock-Up Agreement, the

Noteholders are now effectively asserting a claim against Old GM that is well more than double

their maximum one billion dollar claim under the Old GM guarantee:

3.      First, under the Lock-Up Agreement, the Noteholders have already been paid an

exorbitant "consent fee" in excess of $369 million, funded by Old GM. ***The "consent fee" paid
to the Noteholders was a disguised principal payment on the Notes that should have been
credited against the principal amount due to the Noteholders under the Notes, thereby
reducing the total exposure on Old GM's unsecured guarantee of the Notes to approximately
$703 million ($1.072 billion minus $369 million).***

4.      Second, under the Lock-Up Agreement, Old GM is obligated to allow and not

contest the Guarantee Claims and the Duplicative Claim with a combined face amount of

approximately $2.67 billion for the benefit of the Noteholders. ***If allowed, these combined
claims would total more than 3.7 times the $703 million net principal amount due to the
Noteholders under the Notes.***

5.      Third, under the Lock-Up Agreement, GM Canada's intercompany obligations to

Nova Scotia Finance were released. Consequently, pursuant to the terms of the Lock-Up

Agreement, Old GM became obligated to pay amounts owed on the Notes without any

contribution from GM Canada, which would have, and should have, correspondingly reduced

Old GM's obligation under the guarantee of the Notes. In essence, creditors of GM Canada were

given a "free ride" at the expense of Old GM's creditors.

6.      In sum, the Lock-Up Agreement transformed what should have been, at the very

most, a $703 million guarantee claim against Old GM based upon the balance owed by Nova

Scotia Finance on the principal amount under the Notes into claims against the Old GM estate

that exceed $2.67 billion.  In exchange for incurring all of the above obligations, Old GM

received only a release from certain trumped up litigation claims filed by certain Noteholders,

which posed minimal litigation risk to Old GM.

7.     The circumstances surrounding the Lock-Up Agreement and the terms thereof

demonstrate that the Lock-Up Noteholders behaved inequitably, attempting to opt out of the

consequences of Old GM's bankruptcy by virtue of a private, pre-bankruptcy agreement that

benefited the Noteholders at the expense of Old GM's creditors.

8.     These Claims, however, are not insulated from this Court's scrutiny.  According

to the Lock-Up Agreement, Old GM consented to these Claims, but only to the fullest extent

permitted under applicable law.  For the reasons set forth herein, the Court should disallow the

Claims in their entirety or, alternatively, reduce the Claims because they far exceed what is

permitted by applicable law.  To the extent the Claims are not disallowed, the Court should

equitably subordinate them.

## JURISDICTION AND VENUE

9.     The Committee seeks the relief requested herein under 11 U.S.C. §§ 105(a), 502

and 510, Rule 60(b) of the Federal Rules of Civil Procedure, and Rules 3007 and 9024 of the

Federal Rules of Bankruptcy Procedure.

10.     This Court has subject matter jurisdiction to consider and determine this matter

pursuant to 28 U.S.C. §§ 1334 and 157.  This matter constitutes a "core" proceeding within the

meaning of 28 U.S.C. §§ 157(b)(1) and 157(b)(2)(A), (B) and (O).

## PARTIES

11.     The Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") on June 1, 2009 (the "**Petition Date**") in the United States Bankruptcy Court for the Southern District of New York.

12.     On June 3, 2009, the United States Trustee for the Southern District of New York appointed the Committee, pursuant to section 1102 of the Bankruptcy Code.

13.     The Nova Scotia Finance Trustee was appointed bankruptcy trustee of the estate of Nova Scotia Finance on October 9, 2009.

14.     The Lock-Up Noteholders are those entities listed in footnote 2 above, all of which are parties to the Lock-Up Agreement.

15.     The Noteholders are those entities on behalf of which Claims were filed.

## BACKGROUND

### I.     Corporate Relationships

16.     The Lock-Up Agreement involves the Lock-Up Noteholders, Old GM and various entities related to Old GM, including Nova Scotia Finance, General Motors Nova Scotia Investments Limited ("**Nova Scotia Investments**") and GM Canada.  At all relevant times, Old GM was a publicly-traded corporation incorporated under the laws of Delaware and engaged in the automotive business.

17.     At all relevant times Nova Scotia Finance was a Nova Scotia unlimited liability company whose sole shareholder was Old GM.  Nova Scotia Finance was organized on September 28, 2001 and was a direct, wholly-owned subsidiary of Old GM.

09-50026-reg Doc 7099-1 Filed 11/19/10 Entered 11/19/10 03:04:20 Main Document Pg 9 of 27
09-50026-reg Doc 7099-1 Filed 11/19/10 Entered 11/19/10 03:04:20 Exhibit D
The Objection to Claims (as amended)   dated November 11   2010   filed   Pg 10 of 62

18.     At all relevant times Nova Scotia Investments was a Nova Scotia limited company whose sole shareholder was Old GM.

19.      At all relevant times GM Canada was a Canadian corporation whose sole shareholder was Old GM.

## II.     The 2003 Notes Offering

20.     On July 10, 2003, Nova Scotia Finance issued £350,000,000 principal amount of 8.375% guaranteed notes due December 7, 2015 (the "**2015 Notes**") and £250,000,000 principal amount of 8.875% guaranteed notes due July 10, 2023 (the "**2023 Notes**" and together with the 2015 Notes, the "**Notes**") to certain beneficial owners.

21.     The Notes were guaranteed by Old GM and issued under a fiscal and paying agency agreement dated July 10, 2003 among Nova Scotia Finance as issuer, Old GM as guarantor, Deutsche Bank Luxembourg S.A., as fiscal agent, and Banque Générale du Luxembourg S.A., as paying agent.

22.     The July 9, 2003 disclosure provided in connection with issuance of the Notes (the "**Offering Circular**") stated that the proceeds therefrom would be provided, directly or indirectly, to Old GM as part of an overall effort to improve Old GM's balance sheet.

## III.     The Swaps

23.     Upon issuance of the Notes, Nova Scotia Finance entered into two currency swap transactions with Old GM on July 10, 2003, whereby Old GM exchanged pounds sterling for Canadian dollars on such date.  One swap transaction was related to the 2015 Notes, for £350,000,000/CDN$778,204,000, and would expire in 2015 (the "**2015 Swap**").  The other swap transaction was related to the 2023 Notes, for £250,000,000/CDN$555,860,000, and would expire in 2023 (the "**2023 Swap**," and together with the 2015 Swap, the "**Swap Transactions**").

09-50026-mg   Doc 11852-1   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit D
09-50026-reg   Doc 7859   Filed 11/19/10   Entered 11/15/10 15:04:19   Main Document   Pg 10 of 27
The Objection to Claims (as amended)    dated November 11   2010   filed    Pg 11 of 62

24.     In general, the Swap Transactions contemplated annual exchanges of interest payments between the parties based upon then-existing currency rates.  Upon termination, assuming appreciation of the Canadian dollar, Old GM would be in the "winning" position and would be "in the money."  In other words, in the event that the Canadian dollar appreciated as to the pound sterling, Nova Scotia Finance would be liable to Old GM based on the Swap Transactions (the "**Swap Liability**").

## IV.    The Intercompany Loans

25.     Upon issuance of the Notes and conversion of the proceeds from pounds sterling to Canadian dollars, Nova Scotia Finance loaned such proceeds to GM Canada pursuant to two loan agreements dated July 10, 2003.  Pursuant to one loan agreement, Nova Scotia Finance loaned GM Canada CDN$778,204,000, at an annual interest rate of 9.42%, which principal amount would be due and payable on December 7, 2015 (the "**2015 Intercompany Loan**"). Pursuant to the other loan agreement, Nova Scotia Finance loaned GM Canada CDN$555,860,000 at an annual interest rate of 10.20%, which principal amount would be due and payable on July 10, 2023 (the "**2023 Intercompany Loan**," and together with the 2015 Intercompany Loan, the "**Intercompany Loans**").

## V.    The Nova Scotia Action

26.     During 2009, Lock-Up Noteholders Aurelius Capital Partners, LP, Aurelius Capital Master, Ltd., Drawbridge DSO Securities LLC, Drawbridge OSO Securities LLC, FCOF UB Securities LLC, Appaloosa Investment Limited Partnership I, Palomino Fund Ltd., Thoroughbred Master Ltd. and Thoroughbred Fund LP, owning approximately 63% of the Notes, became concerned about collecting the principal amount of their Notes upon maturity.

7

27.     In an attempt to secure payment on their Notes by any means possible, those
Lock-Up Noteholders filed a lawsuit on March 2, 2009 (the "**Nova Scotia Complaint**") against
Old GM, Nova Scotia Finance, Nova Scotia Investments, GM Canada and certain individual
officers and directors of such entities in the Supreme Court of Nova Scotia (the "**Nova Scotia
Action**").

28.     The crux of the Nova Scotia Complaint was directed at Nova Scotia Finance,
alleging that the ability of Nova Scotia Finance to satisfy its obligations under the Notes was
dependent upon Nova Scotia Finance's receipt of amounts owed to it by Nova Scotia
Investments and GM Canada.  The Nova Scotia Complaint alleged, among other things,
oppressive conduct by the defendants named therein.

29.     As to Old GM, the claims asserted in the Nova Scotia Complaint lacked a strong
legal basis.  The Nova Scotia Complaint challenged the legality of various transfers from Nova
Scotia Finance and Nova Scotia Investments to Old GM, despite the clear language in the
Offering Circular that the proceeds of the Notes were intended to benefit Old GM.

30.     Specifically, the Nova Scotia Complaint challenged, among other transactions,
two May 22, 2008 transfers, of CDN$16,000,000 and $500,000 respectively, from Nova Scotia
Finance to Old GM and another May 22, 2008 transfer of CDN$576,672,670 from Nova Scotia
Investments to Old GM (collectively, the "**May 22, 2008 Transfers**").

## VI.     The Nova Scotia Response

31.     As set forth in the April 21, 2009 amended statement of defense filed by the
defendants in the Nova Scotia Action (the "**Nova Scotia Response**"), the allegations contained
in the Nova Scotia Complaint were without merit.  In particular, as noted in the Nova Scotia
Response, the Offering Circular expressly advised the Noteholders that all or substantially all of

the proceeds from the Notes would be used to benefit Old GM. Furthermore, Nova Scotia

Finance had no legal obligation to maintain any level of assets or share capital, and was not

required to satisfy any test of solvency before making the May 22, 2008 Transfers. Accordingly,

Old GM's financial exposure from the Nova Scotia Action was minimal.

## VII.    The Lock-Up Agreement

32.    Although notice of the May 22, 2008 Transfers was publicly filed at the Registry

of Joint Stock Companies of Nova Scotia on May 27, 2008, such Noteholders waited until Old

GM was in an extremely precarious position before suing, in an attempt to extract

disproportionate value from Old GM. These Noteholders succeeded in this tactic, preying upon

Old GM's vulnerable position to negotiate an outrageous settlement of the Nova Scotia Action.

33.    On June 1, 2009, the same day that Old GM filed for bankruptcy protection, the

settlement negotiations between Old GM and these Noteholders resulted in an agreement with

the Lock-Up Noteholders, Nova Scotia Finance, GM Canada and Nova Scotia Investments

identified as the "Lock-Up Agreement." The Lock-Up Agreement was an attempt by the Lock-

Up Noteholders to avoid the impending automatic stay and obtain preferential treatment from

Old GM. Although the Lock-Up Agreement was executed on Old GM's Petition Date, it was

contingent upon the passage of an "extraordinary resolution" by Nova Scotia Finance to be voted

upon by all Noteholders, which vote could not occur until June 25, 2009. (A copy of the Lock-

Up Agreement is annexed hereto as Exhibit B.)

34.    As described below, under the Lock-Up Agreement, the Lock-Up Noteholders

agreed to settle the Nova Scotia Action based on Old GM incurring a slew of obligations out of

all proportion to the limited benefit conferred on Old GM by the Lock-Up Noteholders. The

obligations incurred by Old GM under the Lock-Up Agreement included, among others, (a)

allowing and not contesting guarantee claims for the full amount of the Notes aggregating in excess of $1 billion; (b) consenting to a duplicative "deficiency claim" for Nova Scotia Finance's underlying liability on those same Notes; (c) allowing Nova Scotia Finance, through a trustee, to assert a claim against Old GM based upon the Swap Liability in excess of $564 million, even though the Swap Liability was, in fact, owed by Nova Scotia Finance to Old GM; (d) funding a consent fee to the Lock-Up Noteholders in an amount in excess of $369 million; and (e) releasing intercompany loans that, if not released, would have substantially reduced Old GM's exposure on its guarantee. These obligations are summarized below:

### A. Guarantee Obligations

35. Notwithstanding the substantial additional consideration conveyed to the Lock-Up Noteholders under the Lock-Up Agreement, Old GM agreed to acknowledge that the Noteholders' claims based on Old GM's guarantee of the Notes would be enforceable, valid and allowed when asserted in their full amount without reduction (the "**Guarantee Obligations**"), but only to the fullest extent permitted under applicable law.

### B. Deficiency Obligation and Nova Scotia Finance's Consent to Bankruptcy

36. By consenting to entry of a bankruptcy order under Canada's Bankruptcy and Insolvency Act as required by the Lock-Up Agreement, Nova Scotia Finance provided two claims to the Noteholders on account of a single obligation: the principal amount due under the Notes. Pursuant to that Canadian bankruptcy order, a bankruptcy trustee was to be appointed in order to assert an allowed claim for contribution against Old GM, as sole shareholder of Nova Scotia Finance, based on Nova Scotia Finance's structure as an unlimited liability company.

09-50026-mg    Doc 11852-1    Filed 06/20/12    Entered 06/20/12 14:52:46    Exhibit D
09-50026-reg    Doc 7659    Filed 11/19/10    Entered 11/19/10 09:49:39    Main Document    Pg 14 of 27
The Objection to Claims (as amended)    dated November 11    2010    filed    Pg 15 of 62

37.     This provision of the Lock-Up Agreement was designed to enable the Lock-Up

Noteholders to claim the amounts owed on the Notes from Old GM through the Nova Scotia

Finance Trustee as a "doubling up" on the Guarantee Obligations.  In fact, an internal Old GM

accounting memorandum dated as of July 20, 2009 states that "[r]ecognition of a guarantee

liability in addition to the original bond payable would effectively double-count the obligation."

As creditors of Nova Scotia Finance, the Noteholders had no direct recourse against Old GM,

except under the Guarantee Obligations.  Nevertheless, by consenting to the Canadian

bankruptcy proceeding mentioned above, Old GM voluntarily opened itself up to liability on the

Nova Scotia Finance Trustee's claim for contribution for any amounts unpaid to the Noteholders

without correspondingly reducing its exposure on the Guarantee Obligations.

### C.     *Reversal of Swap Liability*

38.     Old GM had a claim against Nova Scotia Finance for the Swap Liability, the

amount of which (approximately $564 million) Old GM agreed could be included as part of the

Nova Scotia Finance Trustee's Duplicative Claim against Old GM, putatively based upon Nova

Scotia Finance's status as an unlimited liability company under Nova Scotia law.  Further, to the

extent any portion of the inflated Duplicative Claim were to be disallowed, Old GM's claim for

the Swap Liability would be subordinated to the Claims.  Thus, under the Lock-Up Agreement,

any amounts received by Old GM on the Swap Liability were to be held in trust by Old GM and

then paid over for the benefit of the Noteholders.  Through this artifice, the Swap Liability was

transformed from an amount owed to Old GM into an amount payable from Old GM, ultimately

for the benefit of Nova Scotia Finance's creditors – the Noteholders.

39.     As part of the section 363 sale in these bankruptcy proceedings, the swap contract

was transferred to General Motors LLC ("**New GM**"), thereby putting the swap beyond Old

09-50026-mg   Doc #1852-1   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit B
09-50026-reg   Doc 7859   Filed 11/19/10   Entered 11/19/10 09:04:19   Main Document   Pg 19 of 27
The Objection to Claims (as amended)   dated November 11   2010   filed   Pg 16 of 62

GM's control.  New GM has asserted a claim against Nova Scotia Finance for the full amount of

the Swap Liability ($564 million) (the "**New GM Swap Claim**"), resulting in the inclusion of

that amount in the Duplicative Claim against Old GM.  To the extent that New GM is bound by

the Lock-Up Agreement's subordination provision with respect to the Swap Liability, any

payments to the Nova Scotia Finance Trustee based upon the New GM Swap Claim will be for

the benefit of the Noteholders until the Noteholders are paid in full on the Notes.  The magnitude

of the Swap Liability and the significance of its transfer to New GM was never discussed or

explained to Old GM's creditors, even though that transfer has resulted in the assertion of a $564

million claim against Old GM.  At a minimum, Old GM's creditors should have been notified

that the transfer of the Swap Liability would ultimately result in the assertion of a $564 million

claim against Old GM for the benefit of the Noteholders, and also should have been afforded a

meaningful opportunity to object to the transfer.

### D.    *Consent Fee*

40.    Under the Lock-Up Agreement, the Lock-Up Noteholders also received a

"consent fee" of £223,303,500 (or approximately $369 million) plus reimbursement of their legal

costs (the "**Consent Fee**").  Although these amounts were putatively to be paid by Nova Scotia

Finance, in reality, it was Old GM that funded the Consent Fee based on a transfer of funds on

May 29, 2009 to GM Canada just three days before Old GM filed its bankruptcy petition.

Notwithstanding that Old GM was the ultimate source of funds and that those funds had already

been transferred to GM Canada "to be held in trust" for Nova Scotia Finance, Old GM's June 1,

2009 8-K stated only that GM Canada would provide the funding for the Consent Fee.

41.    Although the Consent Fee is exorbitant on its face and plainly constitutes a thinly-

disguised payment towards the principal amount due under the Notes, the Lock-Up Agreement

provides that the Consent Fee would not reduce, limit or impair the outstanding principal under

the Notes, Old GM's Guarantee Obligations or Old GM's "deficiency claim."

### E.   Release of Intercompany Loans

42.      Under the Lock-Up Agreement, GM Canada was released by Nova Scotia

Finance from its obligation to repay the Intercompany Loans it owed to Nova Scotia Finance.

As a result of this release, Old GM became the sole source of funds available to Nova Scotia

Finance to pay its debts, further eliminating any possibility that the obligations under the Notes

would be borne by any parties other than Old GM's creditors.

43.      Thus, through the Lock-Up Agreement, Old GM and the Lock-Up Noteholders

wrongfully ensured that debts and obligations of GM Canada and Nova Scotia Finance would be

satisfied on the backs of Old GM's creditors.

## VIII.   Post-Petition Implementation of the Lock-Up Agreement

44.      All of the transactions that were key to implementing the Lock-Up Agreement

occurred post-petition.  On June 25, 2009, nearly a month after the Petition Date, the

extraordinary resolution authorizing the Lock-Up Agreement was passed.  On that same date,

escrow funds that had been committed by Old GM for payment of the Consent Fee were released

to the Lock-Up Noteholders.

45.      Also on June 25, 2009, as contemplated by the Lock-Up Agreement, Nova Scotia

Finance and GM Canada entered into a settlement agreement releasing the Intercompany Loans.

As already explained above, as a result of the release of these Intercompany Loans, GM Canada

extricated itself from financial responsibility for any amounts due to the Noteholders, thereby

burdening Old GM with liability for the Notes pursuant to the Guarantee Claims and the

Duplicative Claim.

09-50026-mg   Doc 11852-1   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit D
09-50026-reg   Doc 7859   Filed 11/19/10   Entered 11/15/10 19:04:19   Main Document   Pg 18 of 27
The Objection to Claims (as amended)   dated November 11   2010   filed   Pg 18 of 62

## IX.    **Assumption of the Lock-Up Agreement**

46.    On July 5, 2009, upon the Debtors' motion, this Court approved the sale of

substantially all of the Debtors assets to New GM in the Order (I) Authorizing Sale of Assets

Pursuant to Amended and Restated Master Sale and Purchase Agreement; (II) Authorizing

Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in

Connection with the Sale; and (III) Granting Related Relief (Docket No. 2968) (the

"**Assumption Order**").

47.    Among other things, the Assumption Order provides that the Debtors are

authorized and directed to assume and assign to New GM those assumable executory contracts

that have been designated by New GM for assumption.

48.    Upon information and belief, at some time thereafter, Old GM purported to

assume the Lock-Up Agreement and assign it to New GM.  The Committee was not provided

with any notice of Old GM's intention to assume the Lock-Up Agreement, even though the

Lock-Up Agreement substantially and detrimentally affects the interests of Old GM's unsecured

creditors.  These actions were intended to improperly insulate the Lock-Up Agreement from

meaningful scrutiny by Old GM's creditors and this Court.

49.    Given the extraordinary scope and unusual nature of the Lock-Up Agreement, Old

GM should have been required to make a showing that the Lock-Up Agreement was an

executory contract under the Bankruptcy Code susceptible to being assumed, and that

assumption of the Lock-Up Agreement was a proper exercise of Old GM's sound business

judgment and in the best interests of its estate.  Old GM made no such showing.

50.    The Committee anticipates that the Noteholders and the Nova Scotia Finance

Trustee will assert that Old GM's assumption of the Lock-Up Agreement bars, in whole or in

14

09-50026-mg    Doc 11852-1    Filed 06/20/12    Entered 06/20/12 14:52:46    Exhibit B
09-50026-reg    Doc 7859-1    Filed 11/19/10    Entered 11/19/10 09:04:29    Main Document    Pg 19 of 27
The Objection to Claims (as amended)    dated November 11    2010    filed    Pg 19 of 62

part, the Committee's current objection to the Claims, as well as future objections and litigation

potentially to be filed by the Committee.  While such a defense would be without merit, in an

abundance of caution, the Committee hereby requests that this Court void the Assumption Order

under Rule 60(b) of the Federal Rules of Civil Procedure and Rule 9024 of the Federal Rules of

Bankruptcy Procedure, but only to the extent that the Assumption Order authorized the Debtors

to assume and/or assign the Lock-Up Agreement and any other obligations incident thereto,

including those concerning the Swap Transactions.

## X.    **Proofs of Claim**

51.    On November 30, 2009, the Nova Scotia Finance Trustee filed the Duplicative

Claim.[3]  More than one billion dollars of the Duplicative Claim relates to the principal amount

owed under the Notes by Nova Scotia Finance to the Noteholders.  The remainder of the

Duplicative Claim relates to the Swap Liability described above, which became a purported

obligation of Old GM only by virtue of the Lock-Up Agreement.

52.    Also, on November 30, 2009, fourteen Noteholders filed their respective

Guarantee Claims (claim nos. 66216, 66217, 66218, 66265, 66266, 67429, 67499, 66267, 66312,

67428, 67430, 67498, 67500 and 67501).  In addition to those fourteen claims, forty one

Guarantee Claims were filed by or on behalf of various Noteholders (claim nos. 1558, 12042,

31168, 31868, 31167, 37319, 60567, 61481, 63955, 64332, 64340, 65554, 65765, 65784, 70201,

66206, 68705, 68941, 1556, 23323, 29128, 29379, 29647, 29648, 49548, 60234, 60547, 60566,

61915, 64298, 66769, 67345, 70200, 67244, 67245, 69306, 69307, 69308, 69309, 69552 and

69734).  (All of the individual guarantee claims are listed in Exhibit A hereto and are referred to

as the "**Individual Claims**.")  Because the Individual Claims concern Old GM's guarantee of the

---

[3]         The Duplicative Claim is referred to in the Lock-Up Agreement as the "Deficiency Claim."

09-50026-mg Doc 11852-4 Filed 06/20/12 Entered 06/20/12 14:52:46 Exhibit D
09-50026-reg Doc 7859 Filed 11/19/10 Entered 11/15/10 03:04:49 Main Document Pg 19 of 27
The Objection to Claims (as amended) dated November 11 2010 filed Pg 20 of 62

principal amount of the Notes, they are entirely duplicative of the guarantee component of the
Duplicative Claim filed by the Nova Scotia Finance Trustee for the benefit of the Noteholders.
In addition, the Individual Claims fail to account for the fact that, on the eve of bankruptcy, Old
GM paid the Lock-Up Noteholders more than $369 million – an amount that should
correspondingly reduce Old GM's obligation under the guarantee.

53. On December 10, 2009, Greenberg Traurig, LLP filed Guarantee Claim no. 69551
in the amount of $314,071,424.08[4] on behalf of all Noteholders other than those who filed the
fourteen claims referred to in the first sentence of paragraph 52 above (the "**Protective Claim**").
Because the Protective Claim is also a Guarantee Claim, it concerns Old GM's guarantee of the
principal amount of the Notes, and thus, like the Individual Claims, it is entirely duplicative of
the guarantee component of the Duplicative Claim filed by the Nova Scotia Finance Trustee for
the benefit of the Noteholders. Like the Individual Claims, the Protective Claim fails to account
for the fact that, on the eve of bankruptcy, Old GM paid the Lock-Up Noteholders more than
$369 million.

## RELIEF REQUESTED

A. *The Claims Should be Disallowed Under Section 502(d) of the*
   *Bankruptcy Code Because the Noteholders Received and Retained the*
   *Consent Fee*

54. Section 502(d) of the Bankruptcy Code provides that the court shall disallow any
claim of any entity that is a transferee of a transfer avoidable under, among others, sections 544,
547, 548 or 549 of the Bankruptcy Code.

---

[4]  Paragraph 3 of the attachment to claim no. 69551 describes the amount of such claim as
$1,072,557,531.72 less the amount of certain individual proofs of claim listed on Exhibit C annexed to
such attachment. The total amount of individual proofs of claim listed on Exhibit C is $758,486,107.64.
Accordingly, claim no. 69551 represents the difference, which is equal to $314,071,424.08.

1.      The Consent Fee is Avoidable Under Sections
        544, 547 and/or 548 of the Bankruptcy Code

55.      Section 547 of the Bankruptcy Code provides that any transfer of an interest of

the debtor in property is avoidable if such transfer was (i) to or for the benefit of a creditor, (ii)

for or on account of an antecedent debt owed by the debtor before such transfer was made, (iii)

made on or within ninety days before the petition date and (iv) enabled such creditor to receive

more than such creditor would receive if the case were under chapter 7 of title 11 of the

Bankruptcy Code.  Section 548 of the Bankruptcy Code provides that any transfer of an interest

of the debtor in property on or within two years before the petition date is avoidable if the debtor

received less than reasonably equivalent value in exchange for such transfer.  Sections 273 and

278 of the New York Debtor and Creditor Law (the "**NYDCL**"), made applicable by section 544

of the Bankruptcy Code, provide that every conveyance made by an insolvent entity is fraudulent

as to creditors and therefore avoidable if such conveyance is made without fair consideration.

56.      Here, Old GM transferred the Consent Fee merely three days before the Petition

Date, for the benefit of the Lock-Up Noteholders on account of its guarantee of the Notes, which

enabled the Lock-Up Noteholders to receive more than they would if this case were under

chapter 7 of title 11 of the Bankruptcy Code.  Because Old GM's transfer of the Consent Fee for

the benefit of the Noteholders is avoidable under section 547 of the Bankruptcy Code, the Claims

should be disallowed under section 502(d) of the Bankruptcy Code.

57.      Similarly, Old GM did not receive reasonably equivalent value or fair

consideration in exchange for its transfer of the Consent Fee.  In accordance with the Lock-Up

Agreement, Old GM agreed to fund the Consent Fee for the benefit of the Lock-Up Noteholders

in exchange for a release from litigation that posed minimal risk to Old GM.  Because Old GM's

transfer of the Consent Fee is avoidable under section 548 of the Bankruptcy Code, as well as

17

sections 273 and 278 of the NYDCL, the Claims should be disallowed under section 502(d) of

the Bankruptcy Code because the Lock-Up Noteholders have not returned the Consent Fee.

      2.    <u>Alternatively, the Consent Fee is Avoidable<br>Under Section 549 of the Bankruptcy Code</u>

58.      Section 549 of the Bankruptcy Code provides that a transfer of property of the

estate that occurs after the petition date and that is not authorized by the court is avoidable.

59.      Payment of the Consent Fee required several post-petition transfers of estate

property that were not authorized by this Court.  As explained above, on or about June 25, 2009,

nearly a month after the Petition Date, escrow funds that had been committed by Old GM for

payment of the Consent Fee were transferred to Nova Scotia Finance and then released to the

Lock-Up Noteholders.  To the extent that the Consent Fee is deemed to have been transferred

post-petition, the payment of the Consent Fee to the Noteholders is avoidable under section 549

of the Bankruptcy Code.  Accordingly, the Claims should be disallowed under section 502(d) of

the Bankruptcy Code because the Lock-Up Noteholders have not returned the Consent Fee.

      ***B.***    ***Old GM's Obligations Under the Lock-Up Agreement are Avoidable<br>Under Applicable Law***

      1.    <u>Old GM's Obligations under the Lock-Up Agreement are Avoidable<br>Under Section 548 of the Bankruptcy Code and the NYDCL</u>

60.      The Noteholders and the Nova Scotia Finance Trustee should not be permitted to

rely upon the Lock-Up Agreement as a basis for asserting claims beyond what is permitted by

applicable law because Old GM's obligations under the Lock-Up Agreement are avoidable under

section 548 of the Bankruptcy Code and sections 273, 276 and 278 of the NYDCL.

61.      Section 548 of the Bankruptcy Code provides that any transfer of an interest of

the debtor in property and any obligation incurred by the debtor on or within two years before

09-50026-mg   Doc #1852-1/19   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit D

09-50026-reg   Doc 7839   Filed 11/19/10   Entered 11/15/10 09:04:29   Main Document   Pg 22
The Objection to Claims (as amended)   dated November 11   2010   filed   Pg 23 of 62

the petition date is avoidable if the debtor (a) received less than reasonably equivalent value in exchange for such transfer or obligation or (b) made such transfer or incurred such obligation with actual intent to hinder, delay or defraud creditors.  The NYDCL provides that every conveyance made and obligation incurred by an insolvent entity is fraudulent as to creditors and therefore avoidable if such conveyance is made or obligation is incurred (a) without fair consideration (NYDCL §§ 273 and 278) or (b) with actual intent to hinder, delay or defraud either present or future creditors (NYDCL §§ 276 and 278).

62.      Here, Old GM did not receive reasonably equivalent value or fair consideration in exchange for the obligations it incurred under the Lock-Up Agreement.  As explained above, in exchange for a release from litigation that posed minimal risk to Old GM, Old GM agreed to (a) allow and not contest guarantee claims for the full amount of the Notes aggregating in excess of $1 billion; (b) consent to a duplicative "deficiency claim" for Nova Scotia Finance's underlying liability on those same Notes; (c) acknowledge Nova Scotia Finance's consent to entry of a bankruptcy order under Canada's Bankruptcy and Insolvency Act so that Nova Scotia Finance, through the Nova Scotia Finance Trustee, could assert such a "deficiency claim" against Old GM based on Nova Scotia Finance's structure as an unlimited liability company; (d) allow Nova Scotia Finance, through the Nova Scotia Finance Trustee, to assert a claim against Old GM based upon the Swap Liability in excess of $564 million, even though the Swap Liability was, in fact, owed by Nova Scotia Finance to Old GM; (e) fund a consent fee to the Lock-Up Noteholders in an amount in excess of $369 million; and (f) release intercompany loans that, if not released, would have substantially reduced Old GM's exposure on its guarantee.

09-50026-mg   Doc 11852-4   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit D
09-50026-reg   Doc 7859-1   Filed 11/19/10   Entered 11/19/10 09:04:49   Main Document   Pg 23 of 27
The Objection to Claims (as amended)   dated November 11   2010   filed   Pg 24 of 62

63.     Further, Old GM incurred the obligations under the Lock-Up Agreement with actual intent to hinder, delay, or defraud its creditors, which intent can be inferred from the "badges of fraud" noted above.

64.     Because the Lock-Up Agreement is avoidable under section 548 of the Bankruptcy Code and sections 273, 276 and 278 of the NYDCL, it cannot serve as a basis for the Nova Scotia Finance Trustee and the Noteholders to argue that their inflated Claims should be allowed.

2.     <u>Alternatively, the Lock-Up Agreement Constitutes an Unauthorized Settlement Under Rule 9019 of the Federal Rules of Bankruptcy Procedure</u>

65.     Rule 9019 of the Federal Rules of Bankruptcy Procedure requires bankruptcy court approval of a post-petition compromise or settlement, after notice and a hearing.

66.     Here, implementation of the Lock-Up Agreement required several post-petition events and transfers of estate property that were not authorized by the Court, and as to which notice was not provided.  As explained above, on or about June 25, 2009, nearly a month after the Petition Date, (a) the extraordinary resolution authorizing the Lock-Up Agreement was passed, (b) escrow funds that had been committed by Old GM for payment of the Consent Fee were transferred to Nova Scotia Finance and then released to the Lock-Up Noteholders, (c) Nova Scotia Finance and GM Canada entered into a settlement agreement releasing the Intercompany Loans and (d) Nova Scotia Finance consented to entry of a bankruptcy order under Canada's Bankruptcy and Insolvency Act.

67.     To the extent that the settlement reflected in the Lock-Up Agreement occurred post-petition, the settlement was unauthorized under Rule 9019 of the Federal Rules of Bankruptcy Procedure for lack of notice and court approval.

09-50026-mg    Doc 11852-1    Filed 06/20/12    Entered 06/20/12 14:52:46    Exhibit D
09-50026-reg   Doc 7859    Filed 11/19/10    Entered 11/15/10 09:04:19   Main Document   Pg 24 of 27
The Objection to Claims (as amended)    dated November 11    2010    filed    Pg 25 of 62

**C.**    ***Alternatively, the Claims are Duplicative and Far in Excess of the Underlying Obligation***

68.    To the extent that the Guarantee Claims are allowed at all, as a matter of basic claims administration, it is necessary to reduce the Protective Claim by the Individual Claims to prevent overstating the total amount of Guarantee Claims asserted against Old GM.  Further, the face amount of the Guarantee Claims should be reduced by the amount of the Consent Fee because it constitutes a payment towards the principal amount due under the Notes.

69.    More fundamentally, however, the Duplicative Claim should be disallowed entirely because it is duplicative of the Guarantee Claims.  It is well established that multiple recoveries for the same injury are disallowed in bankruptcy.  To allow the Noteholders to double-dip by recovering on duplicative claims against Old GM would be wholly at odds with fundamental bankruptcy policy favoring equality of distribution among similarly-situated creditors.  The Duplicative Claim and the Guarantee Claims seek to recover twice on a single obligation: namely, the principal amount still due under the Notes.  Because the Duplicative Claim is premised on the same underlying obligation as the Guarantee Claims, it should be disallowed in its entirety.

**D.**    ***In any Event, the Claims Should be Equitably Subordinated Under Section 510 of the Bankruptcy Code***

70.    The Claims should be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code to the extent they are deemed allowed.

71.    As set forth above, the Lock-Up Noteholders engaged in, and benefited from, inequitable conduct that resulted in injury to Old GM's creditors and conferred an unfair advantage upon the Noteholders.  Moreover, the magnitude of the Swap Liability and the significance of its transfer to New GM were never disclosed to Old GM's creditors.  At a

minimum, Old GM's creditors should have been notified that the transfer of the Swap Liability

would ultimately result in the assertion of the New GM Swap Claim against Old GM (via the

Duplicative Claim) for the benefit of the Noteholders, and also should have been afforded a

meaningful opportunity to object to the transfer.  The aforementioned inequitable conduct will

result in diminished recoveries to creditors of Old GM.  The Lock-Up Noteholders' conduct, and

that of New GM, has been inequitable, unconscionable and outrageous and has harmed Old

GM's creditors and other stakeholders.  Such conduct can and should be imputed to the Nova

Scotia Finance Trustee.

72.     In equity and good conscience, the Claims should be equitably subordinated to

the fullest extent permitted by law.

**E.     The Committee is Entitled to Relief Under Rule 60(b) of the Federal
Rules of Civil Procedure and Rule 9024 of the Federal Rules of
Bankruptcy Procedure**

73.     Finally, for the reasons already set forth above, the Committee requests an order

voiding the Assumption Order under Rule 60(b) of the Federal Rules of Civil Procedure and

Rule 9024 of the Federal Rules of Bankruptcy Procedure, but only to the extent that the

Assumption Order authorized the Debtors to assume and/or assign the Lock-Up Agreement and

any other obligations incident thereto, including those concerning the Swap Transactions.  This

request for relief is asserted protectively, in anticipation of the need to respond to the

Noteholders' argument that the purported assumption of the Lock-Up Agreement by Old GM, or

the transfer of the swap claim to New GM, or the transfer of certain avoidance actions to New

GM bars any challenge to the Claims.

09-50026-mg    Doc 11852-1    Filed 06/20/12    Entered 06/20/12 14:52:46    Exhibit B
09-50026-reg    Doc 7859    Filed 11/19/10    Entered 11/19/10 13:04:19    Main Document    Pg 28 of 27
The Objection to Claims (as amended)    dated November 11    2010    filed    Pg 27 of 62

## RESERVATION OF RIGHTS

74.    The Committee respectfully reserves all of its rights under federal, state and

Canadian law with respect to the Claims and all other claims asserted by, or for the benefit of,

the Lock-Up Noteholders, including but not limited to the right to seek standing from this Court

to file an adversary proceeding concerning such claims and seek recovery of all payments made

to, or for the benefit of, the Lock-Up Noteholders.  The Committee further reserves its right to

supplement or amend this application based upon information learned through discovery in this

matter.

## NOTICE

75.    The Committee has provided notice of this application to parties-in-interest in

accordance with the Third Amended Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P.

1015(c) and 9007 Establishing Notice and Case Management Procedures, dated April 29, 2010

(Docket No. 5670).  The Committee submits that such notice is sufficient and further notice need

not be provided.  No previous request for the relief sought in this application has been made by

the Committee to this or any other court.

**WHEREFORE**, the Committee requests entry of an order:

(a) disallowing the Claims in their entirety under section 502(d) of the Bankruptcy Code;

(b) alternatively, reducing the total Claims to an amount equal to the principal amount of

the Notes less the Consent Fee, which Consent Fee should be recharacterized as a payment

against the principal amount of the Notes;

(c) to the extent the Claims are allowed, equitably subordinating the Claims to the claims

of all other general unsecured creditors;

09-50026-mg   Doc 11852-1   Filed 06/20/12   Entered 06/20/12 14:52:46   Exhibit D
09-50026-reg   Doc 7859   Filed 11/19/10   Entered 11/19/10 13:04:19   Main Document   Pg 27 of 27
The Objection to Claims (as amended)   dated November 11   2010   filed   Pg 28 of 62

(d) voiding the Assumption Order under Rule 60(b) of the Federal Rules of Civil

Procedure and Rule 9024 of the Federal Rules of Bankruptcy Procedure, but only to the extent

that the Assumption Order authorized the Debtors to assume the Lock-Up Agreement and any

other obligations incident thereto, including those concerning the Swap Transactions; and

(e) granting the Committee such other and further relief as the Court deems just and

proper.

Dated: New York, New York  
      November 19, 2010

Respectfully submitted,

BUTZEL LONG, a professional corporation

By:    */s/ Eric B. Fisher*  
      Barry N. Seidel  
      Eric B. Fisher  
      Katie L. Cooperman  
      380 Madison Avenue, 22nd Floor  
      New York, New York 10017  
      Tel: (212) 818-1110  
      Fax: (212) 818-0494

*Special Counsel to the Official Committee*  
*of Unsecured Creditors of Motors*  
*Liquidation Company f/k/a General*  
*Motors Corporation*

# EXHIBIT A

09-50026-mg Doc 11852-1 Filed 06/20/12 Entered 06/20/12 14:52:46 Exhibit A: Guarantee
Claims Pg 30 of 62

**EXHIBIT A**

**GUARANTEE CLAIMS (Claim nos. in ascending order)**

| Claim No. | Claimant/Filer |
|---|---|
| 1556 | Collins Stewart (CI) Ltd |
| 1558 | Collins Stewart (CI) Ltd |
| 12042 | Auerbach, Sylvia |
| 23323 | Seipp, Ulrich |
| 29128 | Cristina, Lixandroiu Anca |
| 29379 | SPH Invest S.A. |
| 29647 | Consilium Treuhand AG & Beata Domus Anstalt |
| 29648 | Laminet, Maria-Dorothea |
| 31167 | Credit Suisse AG |
| 31168 | Credit Suisse AG |
| 31868 | Cheviot Asset Management |
| 37319 | Wagner, Ing. Hugo |
| 49548 | Brencourt Credit Opportunities Master, Ltd |
| 60234 | Allianz Bank Financial Advisors SPA |
| 60547 | Rosa, Rui Manuel Antunes Goncalves |
| 60566 | UBS AG, Zurich (Switzerland) |
| 60567 | UBS AG, Zurich (Switzerland) |
| 61481 | Aziz, Mr Aly |
| 61915 | Schoeffel, Johanna |
| 63955 | Aziz, Sirdar Aly |
| 64298 | CSS, LLC |
| 64332 | Schmidseder, Josef |
| 64340 | Dettmar, Hermann & Helene |
| 65554 | Pedersen, Claus |
| 65765 | HFR RVA Advent Global Opportunity Master Trust |
| 65784 | The Advent Global Opportunity Master Fund |
| 66206 (amended by claim no. 70201) | Morgan Stanley & Co. International plc |
| 66216 | Thoroughbred Fund LP |
| 66217 | Palomino Fund LTD |
| 66218 | Perry Partners International Inc. |
| 66265 | Aurelius Investment LLC |
| 66266 | Elliot International LP |
| 66267 | The Liverpool Limited Partnership |
| 66312 | Perry Partners LP |
| 66769 | Banca delle Marche SPA |
| 67244 | Prospect Mountain Fund Limited |
| 67245 | Ore Hill Credit Hub Fund Ltd |
| 67345 (amended by claim no. 70200) | Morgan Stanley & Co. International plc |
| 67428 | Drawbridge DSO Securities LLC |
| 67429 | Onex Dept Opportunity Fund, LTD |

| 67430 | Redwood Master Fund LTD |
| 67498 | Appaloosa Investment Limited Partnership I |
| 67499 | FCOF UB Securities LLC |
| 67500 | Drawbridge OSO Securities LLC |
| 67501 | Thoroughbred Master LTD |
| 68705 | Bhalodia RV/RM/Patel RG |
| 68941 | Red River Business Inc. |
| 69306 | Canyon Value Realization Fund LP |
| 69307 | Lyxor/Canyon Value Realization Fund Limited |
| 69308 | Canyon-GRF Master Fund, LP |
| 69309 | The Canyon Value Realization Fund (Cayman), Ltd |
| 69551 | Greenberg Traurig, LLP on behalf of all holders of the Notes. |
| 69552 | CitiGroup Global Markets Inc. |
| 69734 | Anchorage Capital Master Offshore Ltd |
| 70200 | Morgan Stanley & Co. International plc |
| 70201 | Morgan Stanley & Co. International plc |

**GUARANTEE CLAIMS (Claimant/Filer in alphabetical order)**

| Claim No. | Claimant/Filer |
|---|---|
| 60234 | Allianz Bank Financial Advisors SPA |
| 69734 | Anchorage Capital Master Offshore Ltd |
| 67498 | Appaloosa Investment Limited Partnership I |
| 12042 | Auerbach, Sylvia |
| 66265 | Aurelius Investment LLC |
| 61481 | Aziz, Mr Aly |
| 63955 | Aziz, Sirdar Aly |
| 66769 | Banca delle Marche SPA |
| 68705 | Bhalodia RV/RM/Patel RG |
| 49548 | Brencourt Credit Opportunities Master, Ltd |
| 69308 | Canyon-GRF Master Fund, LP |
| 69306 | Canyon Value Realization Fund LP |
| 31868 | Cheviot Asset Management |
| 69552 | CitiGroup Global Markets Inc. |
| 1556 | Collins Stewart (CI) Ltd |
| 1558 | Collins Stewart (CI) Ltd |
| 29647 | Consilium Treuhand AG & Beata Domus Anstalt |
| 31167 | Credit Suisse AG |
| 31168 | Credit Suisse AG |
| 29128 | Cristina, Lixandroiu Anca |
| 64298 | CSS, LLC |
| 64340 | Dettmar, Hermann & Helene |
| 67428 | Drawbridge DSO Securities LLC |
| 67500 | Drawbridge OSO Securities LLC |
| 66266 | Elliot International LP |
| 67499 | FCOF UB Securities LLC |
| 69551 | Greenberg Traurig, LLP on behalf of all holders of the Notes. |
| 65765 | HFR RVA Advent Global Opportunity Master Trust |
| 29648 | Laminet, Maria-Dorothea |
| 69307 | Lyxor/Canyon Value Realization Fund Limited |
| 66206 (amended by claim no. 70201) | Morgan Stanley & Co. International plc |
| 67345 (amended by claim no. 70200) | Morgan Stanley & Co. International plc |
| 70200 | Morgan Stanley & Co. International plc |
| 70201 | Morgan Stanley & Co. International plc |
| 67429 | Onex Dept Opportunity Fund, LTD |
| 67245 | Ore Hill Credit Hub Fund Ltd |
| 66217 | Palomino Fund LTD |
| 65554 | Pedersen, Claus |
| 66218 | Perry Partners International Inc. |
| 66312 | Perry Partners LP |
| 67244 | Prospect Mountain Fund Limited |

| 68941 | Red River Business Inc. |
| 67430 | Redwood Master Fund LTD |
| 60547 | Rosa, Rui Manuel Antunes Goncalves |
| 64332 | Schmidseder, Josef |
| 61915 | Schoeffel, Johanna |
| 23323 | Seipp, Ulrich |
| 29379 | SPH Invest S.A. |
| 65784 | The Advent Global Opportunity Master Fund |
| 69309 | The Canyon Value Realization Fund (Cayman), Ltd |
| 66267 | The Liverpool Limited Partnership |
| 66216 | Thoroughbred Fund LP |
| 67501 | Thoroughbred Master LTD |
| 60566 | UBS AG, Zurich (Switzerland) |
| 60567 | UBS AG, Zurich (Switzerland) |
| 37319 | Wagner, Ing. Hugo |

09-50026-reg   Doc 7339-2 Filed 1/19/10   Entered 11/19/10 13:04:15 Exhibit B   Look-Up
Agreement Pg 1 of 23

# EXHIBIT B

EXECUTION COPY

# LOCK UP AGREEMENT

This Lock Up Agreement (this "**Agreement**"), dated as of June 1, 2009, is entered into by and among General Motors Nova Scotia Finance Company, a Nova Scotia unlimited company (the "**Company**"), General Motors of Canada Limited, a Canadian federal corporation ("**GM Canada**" or "**GMCL**"), GM Nova Scotia Investments Ltd., a Nova Scotia company ("**GM Investments**" and, collectively with the Company and GM Canada, the "**Canadian Entities**"), General Motors Corporation, a Delaware corporation (the "**Guarantor**"), and each of the undersigned beneficial owners (each a "**Holder**" and collectively, the "**Holders**") of the Company's 8.375% Guaranteed Notes due December 7, 2015 (the "**2015 Notes**") or the Company's 8.875% Guaranteed Notes due July 10, 2023 (the "**2023 Notes**" and together with the 2015 Notes, the "**Notes**").  The Holders, the Canadian Entities, the Guarantor and any subsequent person that becomes a party hereto in accordance with the terms hereof are referred to herein as the "**Parties**."  Each of the terms used herein not defined herein shall have the meaning given such term in the Fiscal and Paying Agency Agreement, dated as of July 10, 2003 (the "**Fiscal and Paying Agency Agreement**"), among the Company, the Guarantor, Deutsche Bank Luxembourg S.A., as fiscal agent (the "**Fiscal Agent**") and Banque Générale du Luxembourg S.A. governing each series of Notes.

## RECITALS

WHEREAS, the Guarantor and certain of its subsidiaries and affiliates who shall be debtors in the Chapter 11 Cases (as defined below) intend to commence on or about June 1, 2009 jointly administered chapter 11 cases (the "**Chapter 11 Cases**") by filing voluntary petitions for relief under chapter 11, title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, the Holders, the Canadian Entities and the Guarantor desire to, among other things, take certain actions and consummate certain transactions contemplated hereby to facilitate the resolution and settlement of various direct, indirect or derivative claims and causes of action of the Holders against one or more of the Canadian Entities and the Guarantor and to facilitate the business and financial restructuring of the Guarantor, the other debtors in the Chapter 11 Cases and certain of the Canadian Entities;

WHEREAS, the Company has requested and the Holders have agreed to vote to amend the Fiscal and Paying Agency Agreement and the global securities representing the Notes as contemplated by this Agreement, in exchange for certain cash payments and the preservation in the Chapter 11 Cases of certain direct, indirect or derivative claims and causes of action of the Holders and the Company against the Guarantor;

WHEREAS, in furtherance of the foregoing, the Company shall, in accordance with the terms of the Fiscal and Paying Agency Agreement, convene a meeting (the "**Meeting**") of holders of the Notes for the purpose of passing an extraordinary resolution to amend the Fiscal and Paying Agency Agreement and the global securities representing the Notes to provide for the waiver of certain rights of the holders of the Notes, the release and discharge of certain claims

and demands by such holders and the payment of certain amounts by the Company to the holders of the Notes upon the terms set forth in the form of extraordinary resolution attached hereto as <u>Exhibit A</u> (the "**Extraordinary Resolution**").

WHEREAS, in connection with the transactions contemplated by this Agreement and in accordance with the terms and subject to the conditions hereof, Holders beneficially owning at least two-thirds of the aggregate principal amount of the 2015 Notes and Holders beneficially owning at least two-thirds of the aggregate principal amount of the 2023 Notes intend to vote such Notes in favor of the Extraordinary Resolution;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  <u>Support of the Extraordinary Resolution; Additional Covenants</u>.

(a)   Each Holder agrees (i) that the Extraordinary Resolution, when duly passed at a Meeting, shall be binding on such Holder; (ii) to deliver or cause to be delivered irrevocably within three Business Days after the date of this Agreement voting instructions, in such form as specified by the Company, in favor of the Extraordinary Resolution at the Meeting at which the Extraordinary Resolution is to be submitted in respect of the principal amount of each series of Notes held by such Holder as set forth on the signature page of such Holder or over which such Holder has voting power; provided such instruction shall cease to be irrevocable and shall become void and of no further force and effect automatically upon termination of this Agreement; (iii) to the extent permitted under the terms of the Fiscal and Paying Agency Agreement, to waive compliance with all covenants contained in the Fiscal and Paying Agency Agreement (other than those applicable to the Company's or the Guarantor's obligations hereunder) and to forebear from exercising their rights thereunder resulting from any default or event of default so long as this Agreement is in effect; and (iv) to cooperate in good faith in satisfying any other conditions required for the passage of the Extraordinary Resolution and the consummation of the transactions contemplated thereby (the "**Transactions**"), including effecting the voting commitments hereunder and the negotiation of any documents or agreements to be executed or implemented in connection therewith, or otherwise contemplated thereby, each of which documents and agreements shall be consistent in all material respects with this Agreement and the Extraordinary Resolution (all such proxies, instructions, documents and agreements, collectively, the "**Transaction Documents**").

(b)   Each Holder agrees that it shall not (i) take any action that would cause the acceleration of the payment of principal of or interest on the Notes other than in connection with the liquidation referred to in section 6(b) and except as a result of the Chapter 11 Case of the Guarantor; (ii) propose, vote for, consent to, support or participate in the formulation of any plan or resolution other than Transactions, the Extraordinary Resolution and the Transaction Documents; (iii) other than as provided in Section 6(b) below, directly or indirectly seek, solicit, support or

encourage any plan or resolution, including but not limited to any decree or order for relief in respect of any of the Company, the Guarantor or GM Canada in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of the Company, the Guarantor or GM Canada or for any substantial part of its property, or ordering the winding-up or liquidation of its affairs, other than the Transactions, the Extraordinary Resolution and the Transaction Documents, or any plan or resolution that reasonably could be expected to prevent, delay or impede the successful passage of the Extraordinary Resolution or implementation of the Transactions; or (iv) directly or indirectly sell, assign, pledge, hypothecate, grant an option on, or otherwise dispose of (each, a "**Transfer**") or permit to subsist any pledge or security interest (save in the normal course of prime brokerage activity) over any of the Notes held by such Holder on the date hereof; provided, however, that any Holder may Transfer any of such Notes to any entity that executes and delivers to the Company a duly executed counterpart of this Agreement.  This Agreement shall in no way be construed to preclude any Holder from acquiring additional Notes; provided, however, that any such additional Notes shall automatically be deemed to be subject to all of the terms of this Agreement.

(c)     The Company agrees (i) following the giving of the notice in accordance with clause (ii) of this Section 1(c), to convene the Meeting at the earliest time practicable under the terms of the Fiscal and Paying Agency Agreement for the purpose of passing the Extraordinary Resolution in accordance with the requirements of the Fiscal and Paying Agency Agreement, including, without limitation, the requirements of Schedule 4 (Provisions for Meetings of Noteholders) to the Fiscal and Paying Agency Agreement; (ii) within three Business Days after the date of this Agreement to give a notice in respect of the Meeting to holders of the Notes for the purpose of passing the Extraordinary Resolution, which notice shall specify the place, day and hour of the Meeting in accordance with the requirements of the Fiscal and Paying Agency Agreement; (iii) to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to facilitate the compliance by the Holders with their obligations in Section 1(a) of this Agreement; (iv) to otherwise take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to satisfy all conditions required to be satisfied by the Company and the Paying Agent under the Fiscal and Paying Agency Agreement (including the schedules thereto) for the passage of the Extraordinary Resolution and the consummation of the Transactions, (v) to provide written confirmation to the Holders in the event that the Company elects not to move forward with the Transactions, and (vi) to cooperate in good faith in satisfying any other conditions required for the passage of the Extraordinary Resolution and the consummation of the Transactions, including the negotiation of the Transaction Documents, all of which shall be consistent in all material respects with this Agreement and the Extraordinary Resolution.

(d) The Company, GMCL and the Holders agree within three Business Days after the date of this Agreement to establish an escrow account and enter into an escrow agreement with an escrow agent mutually satisfactory to the Parties, which agreement shall incorporate the terms of Exhibit B hereto ("Escrow Agreement").

(e) The Holders agree not to object to the treatment of unsecured creditors previously disclosed in the Current Report on Form 8-K filed by the Guarantor on May 28, 2009.

2. Amounts Payable. The Company agrees that upon approval of the Extraordinary Resolution, it shall pay the amounts specified therein in accordance therewith (the "**Consent Fee**"). The Company further agrees that within three business days after the approval of the Extraordinary Resolution, the Canadian Entities shall reimburse affiliates of Aurelius Capital Management, LP, Appaloosa Management L.P. and Fortress Investment Group LLC for legal fees and costs in the amount of US$2,000,000.

3. Termination of Agreement. This Agreement shall terminate or be terminable, as follows (such date of termination, the "**Termination Date**"): (i) by any Holder upon written notice to the Company on or after July 9, 2009, unless on or prior to such date the Meeting has been convened, the Extraordinary Resolution has been approved and the Company and the Paying Agent have paid of all amounts specified in the Extraordinary Resolution to the holders of the Notes in accordance therewith; (ii) by a Party not then in material breach of this Agreement upon written notice to the other Parties, upon the material breach by any non-terminating Party of any of the representations, warranties or covenants contained in this Agreement or the taking of any action by any non-terminating Party that is otherwise materially inconsistent with this Agreement; (iii) automatically upon the commencement prior to the date on which the Extraordinary Resolution is passed of any voluntary or involuntary case commenced under the Bankruptcy Code (or any proceedings therein), under any Canadian insolvency statutes, the Companies' Creditors Arrangement Act (Canada), the Bankruptcy and Insolvency Act (Canada), or any statute, law, legislation, rule or regulation in respect of corporate reorganization or which provides for the appointment of an interim receiver, receiver, receiver and manager or liquidator, against or involving GM Canada or the Company or any of their assets or properties; or (iv) by any Holder upon written notice to the Company on or after the Transactions contemplated in this Agreement shall have been enjoined or otherwise prohibited by law and such injunction or prohibition is not vacated or otherwise terminated on or before the 10th day after the effectiveness of such injunction or prohibition. Upon termination of this Agreement, all obligations under this Agreement shall terminate and shall be of no further force and effect; provided, however, that (a) any claim for breach of this Agreement shall survive termination and all rights and remedies with respect to such claims shall not be prejudiced in any way; (b) all claims of the Holders with respect to the Consent Fee or any funds held in escrow under the terms of the Escrow Agreement as provided therein shall survive termination and all rights and remedies with respect to such claims shall not be prejudiced in any way, and (c) all rights and remedies set forth in Section 8 shall survive termination and shall not be prejudiced in any way. (i) Upon termination of this Agreement other than as a result of a material breach by the Holders prior to the date of payment of the Consent Fee to the Holders, or (ii) if after the date on which the Extraordinary Resolution is passed the Holders are required to turnover the Consent Fee by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority requiring such amounts be returned to the Company, all direct, indirect

or derivative claims, causes of action, remedies, defenses, setoffs, rights or other benefits of the Holders against or from one or more of the Canadian Entities and the Guarantor except in the case of clause (ii) of this sentence the individual defendants in the Nova Scotia Proceeding shall be fully preserved without any estoppel, evidentiary or other effect of any kind or nature whatsoever, including, without limitation, all claims and causes of action referred to in Section 5 of this Agreement and the full amount owing under the Loan Agreements as of the date hereof shall be immediately due and payable according to their terms as they exist as of the date hereof.

4.   Representations and Warranties.  Each of the Parties represents and warrants to each of the other Parties that the following statements are true, correct and complete as of the date hereof:

(a) Power and Authority.  It has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement.

(b) Authorization.  The execution and delivery of this Agreement by it and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

(c) Binding Obligation.  Upon execution as set forth in Section 10, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(d) No Conflicts.  The execution, delivery and performance by it of this Agreement do not and shall not (i) violate any provision of law, rule or regulation applicable to it or its certificate of incorporation, by-laws, unlimited company agreement or other organizational document or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under, or give rise to a right of, or result in any termination, cancellation or acceleration of any obligation or to loss of a material benefit under, any material contractual obligation, covenant or condition to which it is a party or under its certificate of incorporation or by-laws (or other organizational documents).

(e) Governmental Consents.  The execution, delivery and performance by it of this Agreement do not and shall not require it to obtain or make any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any supranational, national, Federal, state, local, municipal, foreign or provincial government or any court of competent jurisdiction, tribunal, judicial or arbitral body, administrative or regulatory agency (including any stock exchange), public authority, commission or board or other governmental department, bureau, branch, agency, or any instrumentality of any of the foregoing, including, without limitation, the United States Treasury, the Bankruptcy Court or any other United States or Canadian court of competent jurisdiction, or any other third party, which has not already been obtained.

(f) <u>No Proceedings</u>.  There is no civil, criminal, administrative or arbitral action, suit, claim, hearing, investigation or proceeding pending or, to the knowledge of such Party, threatened, against such Party or any of its affiliates or subsidiaries that questions the validity of this Agreement or any action taken or to be taken by such Party in connection with the performance or consummation of any transactions contemplated by this Agreement.

(g) <u>Signing Holders</u>.  If the undersigned is a Holder, (i) the undersigned is either (A) a "qualified institutional buyer" as defined in Rule 144A promulgated under the Securities Act of 1933, as amended or (B) if resident in Canada, an "accredited investor" as defined in National Instrument 45-106 – *Prospectus and Registration Exemptions*; (ii) the undersigned has such knowledge and experience in financial and business affairs that the undersigned is capable of evaluating the merits and risks of the Transactions; (iii) the undersigned represents and warrants that the principal amount of each series of Notes held by such Holder as set forth on the signature page of such Holder is an accurate amount and that it is the beneficial owner of such Notes free and clear of all liens or other encumbrances, including any encumbrances on the right to vote such Notes under the Fiscal and Paying Agency Agreement; and (iv) the undersigned has the requisite power and authority to vote and grant proxies to vote the aggregate principal amount of the Notes represented as beneficially owned by it.

(h) <u>No Other Creditors of the Company</u>.  The Company represents and warrants to the Holders that other than the indebtedness evidenced by the Notes and the Swap Liability (as defined below), the Company has no outstanding direct or indirect liability, indebtedness, obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any person or entity of any type, whether accrued, absolute, contingent, matured, unmatured or otherwise in excess of an aggregate of US$2,000,000.

5.  <u>Certain Claims</u>.

(a) <u>Nova Scotia Proceeding</u>.  Upon the execution of this agreement by the Parties all proceedings in the proceeding in the Supreme Court of Nova Scotia titled Aurelius Capital Partners, LP et al. v. General Motors Corporation et al., Court File No. HFX No. 308066 (the "**Nova Scotia Proceeding**") shall be held in abeyance pending the approval of the Extraordinary Resolution by the Holders of the Notes at the Meeting.  Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Holders in accordance therewith, each Holder hereby releases and discharges the defendants in the Nova Scotia Proceeding (and the past and/or present directors, officers, employees, partners, insurers, co-insurers, controlling shareholders, attorneys, advisers, consultants, accountants or auditors, personal or legal representatives, predecessors, successors, parents, subsidiaries, divisions, joint ventures, assigns, spouses, heirs, related and/or affiliated entities of each of them) from all claims and demands that are raised in the Nova Scotia Proceeding, and agrees to discontinue the Nova Scotia Proceeding on a without costs basis.  Nothing contained in this Agreement shall preclude any Holder from pursuing any of the claims raised in the Nova Scotia Proceeding against any of the Canadian Entities or the Guarantor or any of the other debtors in the Chapter 11 Cases in the event that the

09-50026-reg   Doc 11852-4   Filed 06/30/12   Entered 06/30/12 14:52:46   Exhibit D-p
The Objection to Claims (as amended   dated November 11   2010   filed   Pg 41 of 62
Agreement   Pg 9 of 25

payment of the Consent Fee is successfully challenged by any person in a future proceeding and, as a result, an amount equal to the Consent Fee has been repaid provided, that, this Agreement precludes each Noteholder from pursuing any of the claims raised in the Nova Scotia Proceeding against any of Neil Macdonald, John Stapleton, Mercedes Michel and Maurita Sutedja (and their respective heirs, administrators and assigns) in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding.

(b) <u>Intercompany Loan</u>.  Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Holders in accordance therewith, each Holder waives all (and shall cease to have any) rights and claims against the Company in respect of the Loan Agreements (as defined below), including with respect to any compromise or settlement of the loans thereunder, and such Holder's rights in the Loan Agreements, and each Holder hereby releases and discharges GM Canada (and its past and present officers, directors and employees), Neil Macdonald, John Stapleton, Mercedes Michel and Maurita Sutedja (and their respective heirs, administrators and assigns) from all claims and demands whatsoever, presently known or unknown, which the Holders ever had, now have or may hereafter have against them by reason of claims and demands arising from or in connection with those certain loan agreements between the Company and GM Canada each dated as of July 10, 2003 and pursuant to which GM Canada borrowed from the Company the sum of five hundred fifty-five million, eight hundred sixty thousand Canadian dollars (C$555,860,000), and the sum of seven hundred seventy-eight million, two hundred four thousand Canadian dollars (C$778,204,000), respectively (collectively, the "**Loan Agreements**"), provided that nothing contained in this Agreement shall preclude the Holders from pursuing any claim in respect of the parties and claims otherwise released in this paragraph  in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding.  Furthermore, in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding and, as a result, an amount equal to the Consent Fee has been repaid, the settlement between the Company and GM Canada of the amount owing under the Loan Agreements as contemplated by this Transaction shall be null and void and the full amount owing under the Loan Agreements as of the date hereof shall be immediately due and payable according to their terms as they exist as of the date hereof.

(c) <u>Other Claims</u>.  Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Holders in accordance therewith, with respect to any other claim it may have against the Canadian Entities or the Guarantor in its capacity as a holder of the Notes, each Holder covenants and agrees not to pursue any claim it may have other than in connection with the advancement of its claim under the Guarantee, the advancement of its claim against GM Nova Scotia in respect of the Notes and the Deficiency Claim (each as defined below). Nothing contained in this Agreement shall preclude the Holder from pursuing any other claim it may have against the Canadian Entities or the Guarantor or any of the other debtors in the Chapter 11 Cases in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding.  For purposes of this Agreement, the "**Guarantee**" shall mean that certain guarantee of the

Notes by the Guarantor included in the Fiscal and Paying Agency Agreement and the Notes.

(d) For purposes of clarity, it is understood and agreed that nothing contained in this Agreement shall: (i) release in any respect whatsoever any claim against the Company on the Notes or any claim against the Guarantor on the Guarantee, or (ii) preclude a Holder from pursuing any claim it may have against the Guarantor or any of the other debtors  in the Chapter 11 Cases or any other Party that is not based on such Holder's ownership of Notes.

(e) <u>Legal Costs</u>.  The defendants in the Nova Scotia Proceeding release and waive any claim against the Holders for fees and costs related to that proceeding.

6.      <u>Stipulations and Acknowledgements</u>.

(a) <u>Acknowledgement of Deficiency Claim and Guarantee Claim</u>.  Each of the Parties hereto hereby expressly acknowledges, agrees and confirms that nothing contained in this Agreement is in any way intended to, nor shall it in any way operate to, directly or indirectly, limit, waive, impair or restrict, any rights, interests, remedies or claims (whether at law or in equity, and whether now or hereafter existing) which any Holder may have against, or to which any Holder is due or owed from, the Company in respect of the Notes or the Guarantor in respect of the Guarantee Claim or the Deficiency Claim (as defined below). Each of the Company and the Guarantor hereby expressly acknowledges, agrees and confirms that (i) the Deficiency Claim is a valid and enforceable claim of the Company and shall be enforceable against the Guarantor as allowed pre-petition general unsecured claims (the "**Allowed Claims**") to the fullest extent permitted under applicable laws, (ii) the Notes are valid and enforceable claims of the Holders and shall be enforceable against the Company in their full amount, and (iii) the Guarantee Claim is a valid and enforceable claim of the Holders and shall be enforceable against the Guarantor in the Chapter 11 Cases as Allowed Claims to the fullest extent permitted under applicable laws.

(b) <u>Guarantor Insolvency Claims</u>.  The Company and Guarantor stipulate and acknowledge as follows:

(i)      forthwith after execution of this Agreement, the Company shall provide the Holders with a consent to a bankruptcy order pursuant to the Bankruptcy and Insolvency Act (Canada), which shall be executed by the duly authorized officers and directors of the Company in form satisfactory to the Holders. The Holders are hereby authorized for and on behalf of the Company to add to the executed consent the court file number for the application for the bankruptcy order once issued by the relevant court, and proceed to obtain the bankruptcy order. GMCL agrees to provide all necessary funding to the trustee in bankruptcy of the Company as may be required for it to administer the estate and to fully advance the Deficiency Claim (defined below) in the bankruptcy or insolvency proceedings of the Guarantor, including the payment of a retainer in

the amount not to exceed $100,000, on the date that the Extraordinary Resolution is passed;

(ii)      holders of the 2015 Notes and the 2023 Notes would and shall be entitled to a general unsecured claim in the bankruptcy or insolvency proceedings of the Guarantor for the full amount of the outstanding principal, interest and costs due on such Notes by virtue of the Guarantor's Guarantee (the "**Guarantee Claim**");

(iii)      the trustee in bankruptcy of the Company would and shall be entitled to a general unsecured claim for contribution for any amounts unpaid to the Company's creditors, namely the amount outstanding under the Notes, the Swap Liability (defined below) and any other liabilities (collectively, a "**Deficiency Claim**"), in the bankruptcy and insolvency proceedings of the Guarantor;

(iv)      for greater certainty, the Consent Fee payment does not reduce, limit or impair the Notes, the Guarantee Claim or the Deficiency Claim;

(v)      the Guarantor confirms that its only claim against the Company is the Swap Liability.  If for any reason  any portion of the Deficiency Claim is disallowed, the Guarantor agrees that the Swap Liability is subordinated to the prior, indefeasible payment in full of the Notes.  In any event, any and all other undisclosed indebtedness, claims, liabilities or obligations of the Company to the Guarantor other than the Swap Liability are subordinated to the prior, indefeasible payment in full of the Notes. To the extent of the subordination provided for herein, the Guarantor agrees that should it receive any payments from the Company or a trustee in bankruptcy of the Company, it will hold such payment in trust and immediately pay over such amounts to the paying agent for the Notes;

(vi)      the Guarantor shall not assert any right of set-off in respect of the Deficiency Claim; and

(vii)      the Guarantor agrees and covenants that it will not take any action or assert any position inconsistent with this Section 6 and, if called upon by the Holders, will confirm its agreement with the positions confirmed herein in writing or at a court hearing as reasonably requested by the Holders.

For purposes of this Agreement, "**Swap Liability**" shall mean the obligations of the Company to the Guarantor, under currency swap arrangements between the Guarantor and the Company.

7.      <u>Non-Public Information</u>.  The Holders hereby acknowledge that: (i) each of the Company and the Guarantor may be, and each Holder is proceeding on the assumption that the Company and the Guarantor are, in possession of material, non-public information concerning themselves and their respective direct and indirect subsidiaries (the "**Information**") which is not or may not be known to the Holders and that neither the Company nor the Guarantor has disclosed to the Holders; (ii) each Holder is voluntarily assuming all risks associated with the

09-50026-reg   Doc 11852-4   Filed 06/30/12   Entered 06/30/12 14:52:46   Exhibit D
The Objection to Claims (as amended)   dated November 29   Pg 44 of 62
09-50026-reg   Doc 7333-4   Filed 10/13/10   Entered 10/13/10 14:52:46   Exhibit D - Lock Up
Agreement   dated November 11   2010   filed   Pg 44 of 62

Transactions and expressly warrants and represents that (x) neither the Company nor the Guarantor has made, and except as expressly provided in this Agreement, each Holder disclaims the existence of or its reliance on, any representation by the Company or the Guarantor concerning the Company, the Guarantor or the Notes and (y) except as expressly provided in this Agreement, it is not relying on any disclosure or non-disclosure made or not made, or the completeness thereof, in connection with or arising out of the Transactions, and therefore has no claims against the Company or the Guarantor with respect thereto; (iii) if any such claim may exist, each Holder, recognizing its disclaimer of reliance and reliance by the Company and the Guarantor on such disclaimer as a condition to entering into the Transactions, covenants and agrees not to assert it against the Company, the Guarantor or any of their respective officers, directors, shareholders, partners, representatives, agents or affiliates; and (iv) neither the Company nor the Guarantors shall have any liability, and each Holder waives and releases any claim that such Holder might have against the Company, the Guarantor or any of their respective officers, directors, shareholders, partners, representatives, agents and affiliates whether under applicable securities law or otherwise, based on the knowledge, possession or nondisclosure by the Company or the Guarantors to each Holder of the Information.  Each Holder further represents and acknowledges that is has received and reviewed (a) a copy of the prospectus, dated April 27, 2009, as amended and supplemented to date (or if resident in Canada, a copy of the Canadian offering memorandum dated April 27, 2009 which incorporates the prospectus, as amended and supplemented to date), relating to the offers by the Company and the Guarantor to exchange certain series of securities, including the Notes, which includes and incorporates by reference material public information concerning the Company and the Guarantors and (b) the Form 8-K filed by the Guarantor on May 28, 2009 relating to the proposed sale by the Guarantor of substantially all of its assets pursuant to Section 363(b) of the U.S. Bankruptcy Code.

8.  <u>Specific Performance</u>.  Each of the Parties hereto recognizes and acknowledges that a breach by any of the Parties hereto of any covenants or agreements contained in this Agreement will cause the other Parties to sustain damages for which such Parties would not have an adequate remedy at law for money damages, and therefore each Party hereto agrees that in the event of any such breach the other Parties shall be entitled to the remedy of specific performance of such covenants and agreements and injunctive and other equitable relief in addition to any other remedy to which such Parties may be entitled, at law or in equity.

9.  <u>Remedies Cumulative</u>.  All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such Party.

10. <u>Effectiveness; Amendments</u>.  This Agreement shall not become effective and binding on a Party unless and until a counterpart signature page to this Agreement has been executed and delivered by such Party.  Except as otherwise provided herein, once effective, this Agreement may not be modified, amended or supplemented except in a writing signed by each of the Parties hereto.

11. <u>No Waiver</u>.  The failure of any Party hereto to exercise any right, power or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to

insist upon compliance by any other Party hereto with its obligations hereunder, and any custom or practice of the Parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such or other right, power or remedy or to demand such compliance.

12. <u>No Admission</u>.  Neither this Agreement nor the settlement contained herein, nor any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any claims released pursuant to Section 5 above, or of any wrongdoing or liability of or damage by any of the Parties hereto or their directors; or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any of the Parties hereto or their respective directors in any civil, criminal or administrative proceeding in any court, administrative proceeding in any court, administrative agency or other tribunal.  The Parties and the Released Persons may file this Agreement and Exhibits in any action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

13. <u>Governing Law; Jurisdiction</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflict of laws of the State of New York.  The Parties hereby irrevocably and unconditionally submit to the jurisdiction of any federal or state court located within the borough of Manhattan of the City, County and State of New York over any dispute for purposes of any action, suit or proceeding arising out of or relating to this Agreement or any of the transactions contemplated hereby.  Each party irrevocably waives any objection it may have to the venue of any action, suit or proceeding brought in such court or to the convenience of the forum.

14. <u>Notices</u>.  All notices and consents hereunder shall be in writing and shall be deemed to have been duly given upon receipt if personally delivered by courier service, messenger, facsimile, or by certified or registered mail, postage prepaid return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following parties:

> If to any one Holder, to:
>
> such Holder at the address shown for such Holder on the applicable signature page hereto, to the attention of the person who has signed this Agreement on behalf of such Holder
>
> with copies to:

09-50026-reg   Doc 11852-4   Filed 06/30/12   Entered 06/29/12 14:52:46   Exhibit D-
09-50026-reg   Doc 7335-2   Filed 10/9/10   Entered 10/09/10 04:19:29 Exhibit B: Lock Up
The Objection to Claims (as amended), dated November 11   2010   filed   Pg 46 of 62
Agreement   g   0 or 25

Greenberg Traurig, LLP
200 Park Avenue
New York, NY  10166
Facsimile No.:  (212) 801-9362
Attn:   Bruce R. Zirinsky
          Clifford E. Neimeth
          Anthony J. Marsico

And

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004
Facsimile No.:  (212) 859-8583
Attn: Brian D. Pfeiffer

If to the Company, to:

General Motors Nova Scotia Finance Company
1300-1969 Upper Water Street
Purdy's Wharf Tower Tower II
Halifax, Nova Scotia, Canada B3J 3R7

Facsimile No.: (905) 644-7319
Attn:   Chief Executive Offer, Chief Financial Officer and
          Principal Accounting Officer

with a copy to:
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153
Facsimile No.:  (212) 310-8007
Attn:  Todd R. Chandler

15. Representation by Counsel.  Each Party acknowledges that it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

16. Consideration.  It is hereby acknowledged by the Parties that, other than the agreements, covenants, representations and warranties of the Parties, as more particularly set forth herein, no consideration shall be due or paid to the Company for their agreement to use their commercially reasonable efforts to consummate the Transactions and the Extraordinary Resolutions in accordance with the terms and conditions of this Agreement.

17. <u>Headings</u>.  The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

18. <u>Successors and Assigns</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, administrators and representatives.

19. <u>Several, Not Joint, Obligations</u>.  The agreements, representations and obligations of the Parties under this Agreement are, in all respects, several and not joint.

20. <u>Prior Negotiations</u>.  This Agreement supersedes all prior negotiations with respect to the subject matter hereof but shall not supersede the Extraordinary Resolution or the Transaction Documents.

21. <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement. Delivery of an executed signature page of this Agreement by facsimile or e-mail shall be as effective as delivery of a manually executed signature page of this Agreement.

22. <u>No Third-Party Beneficiaries</u>.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

23. <u>Severability</u>.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

24. <u>Additional Parties</u>.  Without in any way limiting the provisions hereof, additional holders of the Notes may elect to become Parties by executing and delivering to the Company a counterpart hereof.  Such additional holder shall become a party to this Agreement as a Holder in accordance with the terms of this Agreement.

09-50026-reg   Doc 11852   Filed 06/30/12   Entered 06/29/12 14:52:46   Exhibit D p
The Objection to Claims (as amended), dated November 11   2010   filed   Pg 48 of 62
Agreement pg 19 of 29

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

GENERAL MOTORS NOVA SCOTIA FINANCE
COMPANY

By: _____
   Name:   Neil J. Macdonald
   Title:   Secretary

GENERAL MOTORS CORPORATION

By: _____
   Name:
   Title:

GENERAL MOTORS OF CANADA LIMITED

By: _____
   Name:   Neil J. Macdonald
   Title:   Vice President

GM NOVA SCOTIA INVESTMENTS LTD.

By: _____
   Name:   Neil J. Macdonald
   Title:   Secretary

**Signature Page to Lockup Agreement**

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

GENERAL MOTORS NOVA SCOTIA FINANCE COMPANY

By: _____
    Name:
    Title:

GENERAL MOTORS CORPORATION

By: _____
    Name: RAY G. YOUNG
    Title: CHIEF FINANCIAL OFFICER

GENERAL MOTORS OF CANADA LIMITED

By: _____
    Name:
    Title:

GM NOVA SCOTIA INVESTMENTS LTD.

By: _____
    Name:
    Title:

**Signature Page to Lockup Agreement**

## HOLDERS:

AURELIUS CAPITAL PARTNERS, LP

By: Aurelius Capital GP, LLC, its General Partner

By: _____

Dan Gropper
Managing Director
Principal amount of 2015 Notes held: £17,822,000

Principal amount of 2023 Notes held: £41,480,000

Date: June 1, 2009

Address: 535 Madison Avenue
22nd Floor
New York, NY 10022

Attention: Dan Gropper
Fax: 212-786-5870

**Signature Page to Lockup Agreement**

09-50026-reg   Doc 13852-4   Filed 06/30/12   Entered 06/29/12 14:52:46   Exhibit D-
The Objection to Claims (as amended) dated November 11   2010   filed   Pg 51 of 62
09-50026-reg   Doc 13852-4   Filed 06/30/12   Entered 06/29/12 14:52:46   Exhibit D-
Agreement dated November 11   2010   filed   Pg 51 of 62

**HOLDERS:**

AURELIUS CAPITAL MASTER, LTD.

By:   Aurelius Capital Management, LP,
solely as investment manager and not in its
individual capacity

By: _____

Dan Gropper
Managing Director
Principal amount of 2015 Notes held:
£17,424,000

Principal amount of 2023 Notes held:
£38,970,000

Date:  June 1, 2008

Address for Notice:   AURELIUS CAPITAL MASTER, LTD.
c/o Aurelius Capital Management, LP
535 Madison Avenue
22nd Floor
New York NY 10022

Registered Office:   AURELIUS CAPITAL MASTER, LTD.
c/o GlobeOp Financial Services (Cayman)
Limited
45 Market Street, Suite 3205
2nd Floor, Gardenia Court
Camana Bay, West Bay Road South
Grand Cayman KY1-9003

Attention: Dan Gropper
Fax:  212-786-5870

## HOLDERS:

**Drawbridge DSO Securities LLC**

By: _____
    Constantine M. Dakolias
    President

Principal amount of 2015 Notes held: £111,600,000.00
Date: May 31, 2009

1345 Avenue of the Americas, 46th Floor
New York, New York 10105
Attention: Constantine M. Dakolias
Fax: (212) 798-6099

**Drawbridge OSO Securities LLC**

By: _____
    Constantine M. Dakolias
    President

Principal amount of 2015 Notes held: £12,400,000.00
Date: May 31, 2009

1345 Avenue of the Americas, 46th Floor
New York, New York 10105
Attention: Constantine M. Dakolias
Fax: (212) 798-6099

**FCOF UB Securities LLC**

By: _____
    Constantine M. Dakolias
    President
Principal amount of 2015 Notes held: £9,500,000.00
Principal amount of 2023 Notes held: £5,500,000.00
Date: May 31, 2009

1345 Avenue of the Americas, 46th Floor
New York, New York 10105
Attention: Constantine M. Dakolias
Fax: (212) 798-6099

**HOLDERS:**

Appaloosa Investment Limited Partnership I

By: _James E. Bolin_
Name: James E. Bolin
Title: Partner

Principal amount of 2015 Notes held: $ $15,181,000

Principal amount of 2023 Notes held: $ $22,696,000

Date: 6/1/09

c/o Appaloosa Management LP
51 JFK Parkway, 2nd Fl
Short Hills, NJ 07078

Attention: James Bolin
Fax: (973) 701-7055

Palomino Fund Ltd.

By: _James E. Bolin_
Name: James E. Bolin
Title: Partner

Principal amount of 2015 Notes held: $ $22,187,000

Principal amount of 2023 Notes held: $ $33,171,000

Date: 6/1/09

c/o Appd Palomino Fund Ltd.
51 JFK Parkway, 2nd Fl
Short Hills, NJ 07078

Attention: James Bolin
Fax: (973) 701-7055

**Signature Page to Lockup Agreement**

Thoroughbred Master Ltd.

By: _James E. Bolin_
   Name: James E. Bolin
   Title: Partner

Principal amount of 2015 Notes held: $ $11,306,000

Principal amount of 2023 Notes held: $ £18,457,000

Date: 6/1/09

c/o Thoroughbred Master Ltd.
51 JFK Parkway, 2nd Fl.
Short Hills, NJ 07078

Attention: James Bolin
Fax:    (973) 701-7055

Thoroughbred Fund LP

By: _James E. Bolin_
   Name: James E. Bolin
   Title: Partner

Principal amount of 2015 Notes held: $ $10,828,000

Principal amount of 2023 Notes held: $ £17,676,000

Date: 6/1/09

c/o Thoroughbred Fund LP
51 JFK Parkway, 2nd Fl.
Short Hills, NJ 07078

Attention: James Bolin
Fax:    (973) 701-7055

**Signature Page to Lockup Agreement**

**HOLDERS:**

**Elliott International, L.P.**
**By: Elliott International Capital Advisors**
**Inc. – As attorney-in-fact**

**By:** _____
Elliot Greenberg, Vice President
Principal amount of 2015 Notes held:
$46,200,000

Principal amount of 2023 Notes held:
$2,400,000

Date: May 31, 2009

**c/o Elliott Management Corporation**
**712 Fifth Avenue**
**New York, NY 10019**
**Attention: Didric Cederholm**
**Fax: (212) 586-9461**

**The Liverpool Limited Partnership**
**By: Liverpool Associates Ltd. – As**
**General Partner**

**By:** _____
Elliot Greenberg, Vice President

Principal amount of 2015 Notes held:
$20,800,000

Principal amount of 2023 Notes held:
$1,600,000

Date: May 31, 2009

**c/o Elliott Management Corporation**
**712 Fifth Avenue**
**New York, NY 10019**
**Attention: Didric Cederholm**
**Fax: (212) 586-9461**

**Signature Page to Lockup Agreement**

09-50026-reg   Doc 11852-4   Filed 06/30/12   Entered 06/29/12 14:52:46   Exhibit D -
The Objection to Claims (as amended)   dated November 11   2010   filed   Pg 56 of 62

09-50026-reg   Doc 7339-2   Filed 11/9/10   Entered 11/09/10 04:19 Exhibit B: Lock Up
Agreement   Pg 23 of 29

## Exhibit A

## **Extraordinary Resolution**

Set out below in a combination form is the text of the Extraordinary Resolution. For clarity, the opening text for the Extraordinary Resolution in respect of each series has been set out separately.

*For the 2015 Notes:*

"THAT THIS MEETING (the "**2015 Meeting**") of the holders of the 2015 Notes (the "**2015 Holders**") and benefiting from the provisions of the fiscal and paying agency agreement among General Motors Nova Scotia Finance Company (the "**Company**"), General Motors Corporation, Deutsche Bank Luxembourg S.A. (the "**Fiscal Agent**") and Banque Générale du Luxembourg S.A. (the "**Paying Agent**" and together with the Fiscal Agent, the "**Agents**") dated as of July 10, 2003 (the "**Fiscal and Paying Agency Agreement**"), by Extraordinary Resolution (the "**Extraordinary Resolution**"), HEREBY: "

*For the 2023 Notes:*

"THAT THIS MEETING (the "**2023 Meeting**") of the holders of the 2023 Notes (the "**2023 Holders**") and benefiting from the provisions of the fiscal and paying agency agreement among General Motors Nova Scotia Finance Company (the "**Company**"), General Motors Corporation, Deutsche Bank Luxembourg S.A. (the "**Fiscal Agent**") and Banque Générale du Luxembourg S.A. (the "**Paying Agent**" and together with the Fiscal Agent, the "**Agents**") dated as of July 10, 2003 (the "**Fiscal and Paying Agency Agreement**"), by Extraordinary Resolution (the "**Extraordinary Resolution**"), HEREBY: "

*For the 2015 and 2023 Notes (each series voting separately)*

**RESOLVES** by special quorum an Extraordinary Resolution in accordance with the proviso to paragraph 5 of Schedule 4 of the Fiscal and Paying Agency Agreement to authorize and direct the addition of a new provision at the end of, and forming part of, Condition 6 of Schedule 1 of the Fiscal and Paying Agency Agreement, which also forms a part of the Global Notes representing the 2015 Notes and the 2023 Notes, as follows:

"**Certain Claims**

Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Noteholders in accordance therewith, each Noteholder hereby releases and discharges the defendants in the Nova Scotia Proceeding (and the past and/or present directors, officers, employees, partners, insurers, co-insurers, controlling shareholders, attorneys, advisers, consultants, accountants or auditors, personal or legal representatives, predecessors, successors, parents, subsidiaries, divisions, joint ventures, assigns, spouses, heirs, related and/or affiliated entities of each of them) from all claims and demands that are raised in

the proceeding in the Supreme Court of Nova Scotia titled Aurelius Capital Partners, LP v. General Motors Corporation et al, Court File No. HFX No. 308066 (the "**Nova Scotia Proceeding**"), and agrees to discontinue the Nova Scotia Proceeding on a without costs basis.  Nothing contained in this Extraordinary Resolution shall preclude any Noteholder from pursuing any of the claims raised in the Nova Scotia Proceeding against any of the Canadian Entities or the Guarantor or any of the other debtors in the Chapter 11 Cases in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding and, as a result, an amount equal to the Consent Fee has been repaid; provided, that, this Extraordinary Resolution precludes each Noteholder from pursuing any of the claims raised in the Nova Scotia Proceeding against any of Neil Macdonald, John Stapleton, Mercedes Michel and Maurita Sutedja (and their respective heirs, administrators and assigns) in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding.

Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Noteholders in accordance therewith, each Noteholder waives all (and shall cease to have any) rights and claims against the Company in respect of the Loan Agreements (as defined below), including with respect to any compromise or settlement of the loans thereunder, and such Noteholder's rights in the Loan Agreements, and each Noteholder hereby releases and discharges GM Canada (and its past and present officers, directors and employees), Neil Macdonald, John Stapleton, Mercedes Michel and Maurita Sutedja (and their respective heirs, administrators and assigns) from all claims and demands whatsoever, presently known or unknown, which the Noteholders ever had, now have or may hereafter have against them by reason of claims and demands arising from or in connection with those certain loan agreements between the Company and GM Canada each dated as of July 10, 2003 and pursuant to which GM Canada borrowed from the Company the sum of five hundred fifty-five million, eight hundred sixty thousand Canadian dollars (C\$555,860,000), and the sum of seven hundred seventy-eight million, two hundred four thousand Canadian dollars (C\$778,204,000), respectively (collectively, the "**Loan Agreements**"), provided that nothing contained in this Extraordinary Resolution shall preclude the Noteholders from pursuing any claim in respect of the parties and claims otherwise released in this paragraph in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding and, as a result, an amount equal to the Consent Fee has been repaid.  Furthermore, in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding, and, as a result, an amount equal to the Consent Fee has been repaid, the settlement between the Company and GM Canada of the amount owing under the Loan Agreements as contemplated by this Transaction shall be null and void and the full amount owing under the Loan Agreements as of the date hereof shall be immediately due and payable according to their terms as they exist as of the date hereof.

Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Noteholders in accordance therewith, with respect to any other claim it may have against

the Canadian Entities or the Guarantor in its capacity as a holder of the Notes, the Noteholder covenants and agrees not to pursue any claim it may have other than in connection with the advancement of its claim under the Guarantee, the advancement of its claim against GM Nova Scotia in respect of the Notes and the Deficiency Claim (each as defined below). Nothing contained in this Extraordinary Resolution shall preclude the Noteholder from pursuing any other claim it may have against the Canadian Entities or the Guarantor or any of the other debtors in the Chapter 11 Cases in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding.  For purposes of this Extraordinary Resolution, the "**Guarantee**" shall mean that certain guarantee of the Notes by the Guarantor included in the Fiscal and Paying Agency Agreement and the Notes.

Nothing contained in this Extraordinary Resolution is in any way intended to, nor shall it in any way operate to, directly or indirectly, limit, waive, impair or restrict, any rights, interests, remedies or claims (whether at law or in equity, and whether now or hereafter existing) which any Noteholder may have against, or to which any Noteholder is due or owed from, the Company in respect of the Notes or the Guarantor in respect of the Guarantee Claim or the Deficiency Claim (as such terms are defined in the Lock-up Agreement). It is hereby expressly acknowledged, agreed and confirmed that that (i) the Deficiency Claim is a valid and enforceable claim of the Company and shall be enforceable against the Guarantor as allowed pre-petition general unsecured claims (the "**Allowed Claims**") to the fullest extent permittedunder applicable laws, (ii) the Notes are valid and enforceable claims to the Noteholders and shall be enforceable against the Company in their full amount, and (iii) the Guarantee Claim is a valid and enforceable claim of the Noteholders and shall be enforceable against the Guarantor as Allowed Claims to the fullest extent permitted under applicable laws.

For purposes of clarity, it is understood and agreed that nothing contained in this Extraordinary Resolution shall: (i) release in any respect whatsoever any claim against the Company on the Notes or any claim against the Guarantor on the Guarantee, or (ii) preclude a Noteholder from pursuing any claim it may have against the Guarantor or any of the other debtors  in the Chapter 11 Cases or any other Party that is not based on such Holder's ownership of Notes.

The Consent Fee payment does not reduce, limit or impair the Notes, the Guarantee Claim or the Deficiency Claim.

The Guarantor confirms that its only claim against the Company is the Swap Liability.  If for any reason  any portion of the Deficiency Claim is disallowed, the Guarantor agrees that the Swap Liability is subordinated to the prior, indefeasible payment in full of the Notes.  In any event, any and all other undisclosed indebtedness, claims, liabilities or obligations of the Company to the Guarantor other than the Swap Liability are subordinated to the prior, indefeasible payment in full of the Notes. To the extent of the subordination provided for herein, the Guarantor agrees that should it receive any payments from the Company or a trustee in bankruptcy of the Company, it will hold such payment in trust and immediately pay over such amounts to the paying

agent for the Notes.  For purposes of this Extraordinary Resolution, "**Swap Liability**" shall mean the obligations of the Company to the Guarantor, under currency swap arrangements between the Guarantor and the Company.

The Guarantor shall not assert any right of set-off in respect of the Deficiency Claim.

**RESOLVES** by special quorum an Extraordinary Resolution in accordance with Schedule 4 of the Fiscal and Paying Agency Agreement to pay, subject to the approval of the foregoing Extraordinary Resolution by the requisite Noteholders, an amount equal to £366.46 per £1,000 of principal amount of the 2015 Notes outstanding and £380.17 per £1,000 of principal amount of the 2023 Notes outstanding (the "**Consent Fee**"), immediately following the approval of the foregoing Extraordinary Resolution by the requisite Noteholders.  The Consent Fee shall be paid to the common depository by wire transfer, and Euroclear and Clearstream, as applicable, will credit the relevant accounts of their participants on the payment date.  Payments in respect of Notes not evidenced by Global Notes  shall be made by wire transfer, direct deposit or check mailed to the address of the holder entitled thereto as such address shall appear on the register of the Company.

**RESOLVES** by ordinary quorum an Extraordinary Resolution in accordance with the proviso to paragraph 5 of Schedule 4 of the Fiscal and Paying Agency Agreement to authorize and direct the following:

(a)   authorizes, directs and empowers the Agents to concur in, approve, and execute, and do all such deeds, instruments, acts and things that may be necessary to carry out and give effect to these resolutions;

(b)   sanctions, assents to and approves any necessary or consequential amendment to the Fiscal and Paying Agency Agreement to effect these resolutions; and

(c)   acknowledges that capitalized terms used in these resolutions have the same meanings as those defined in the Fiscal and Paying Agency Agreement, as applicable.

## Exhibit B

## Escrow Term Sheet

| | |
|---|---|
| **Escrow Agent** | A Canadian institutional trustee mutually satisfactory to the parties, acting reasonably |
| **Deposit** | GMCL deposits the Consent Fee (the "Escrow Amount") into a segregated account maintained on behalf of GMCL and GM Nova Scotia  and the Holders with the Escrow Agent with a Canadian financial institution ("Escrow Account #1") |

**Release upon passing of extraordinary resolution**

Upon receipt by the Escrow Agent of the scrutineer's report for the noteholder Meeting evidencing that the Extraordinary Resolution has been duly passed by the requisite majority of noteholders, the Escrow Agent shall cause the Escrow Amount to be deposited into a new segregated account opened on behalf of GM Nova Scotia and maintained by the Escrow Agent with a Canadian financial institution ("Escrow Account #2").

Upon deposit of the Escrow Amount in Account #2, GM Nova Scotia shall be deemed to have acknowledged and agreed that the loans under the Loan Agreements shall have been settled and compromised in full subject to the terms of the Lock-Up Agreement.

Immediately upon the deposit of the Escrow Amount into Account #2, the Escrow Agent shall release the Escrow Amount and cause the Escrow Amount to be deposited with the Fiscal Paying Agent into the account specified by the Fiscal Paying Agent on Schedule A to the Escrow Agreement.

**Release of funds to GMCL**

The Escrow Agent shall cause the Escrow Amount to be released from Escrow Account #1 to GMCL and deposited into the account specified by GMCL on Schedule B to the Escrow Agreement in the following circumstances:

(i) if GM Nova Scotia and all of the Holders notify the Escrow Agent that the Meeting called for the passage of the Extraordinary Resolution has failed to occur prior to July 9, 2009 due to circumstances which are outside GM Nova Scotia's control and the Lockup Agreement has been terminated by the Holders; or

(ii) upon receipt by the Escrow Agent of the scrutineer's report for the noteholder Meeting evidencing that after holding the Meeting, the Extraordinary Resolution failed to be passed by the requisite majority of

noteholders.

| | |
|---|---|
| **Release upon Bankruptcy or Failure to hold meeting** | Upon receipt of notice by the Requisite Holders of any of the following events, the Escrow Agent shall cause the Escrow Amount to be released from Escrow Account #1 to all of the Holders and deposited into such accounts as may be specified in writing by each relevant Holder: |

     (a)    Bankruptcy, CCAA or any similar proceeding of GM Nova Scotia initiated directly or indirectly or fomented in any way by GM Nova Scotia or one of its affiliates;

     (b)    a bankruptcy, CCAA or any similar proceeding of GMCL initiated directly or indirectly or fomented in any way by GMCL or one of its affiliates; or

     (c)    a failure to hold the Meeting by July 9, 2009 due to circumstances which are within GM Nova Scotia's control.

For purposes of this section, **"Requisite Holders"** means Holders representing at least 51% of the outstanding principal amount of each series of Notes.

| | |
|---|---|
| **Release upon disputed Material Breach** | In the case of a material breach of the Lockup Agreement other than those referred to above, the Escrow Agent shall retain the Escrow Amount in Escrow Account #1 until the Escrow Agent receives a final court order determining that such Material Breach has occurred.  In such circumstances, the Escrow Agent shall pay out the Escrow Amount from Escrow Account #1 in a manner consistent  with such court order (it being understood that if a Material Breach has occurred, the Escrow Amount shall be paid to the Holders). |
| **Interest** | Accrues to benefit of GMCL from date of Escrow Agreement to June 30, 2009 inclusive; thereafter accrues for the benefit of the Holders. |
| **Currency** | British Pounds |
| **Fees** | All fees of the Escrow Agent shall be for the account of GMCL.  Fees and expenses of the Escrow Agent arising from court proceedings will be paid by GMCL subject to a right of reimbursement from the Escrow Amount in the event that GMCL is successful in such court |

proceedings.

**Indemnity**                 GMCL (unless broader indemnity required by Escrow Agent).


**Termination**              The Escrow Agreement shall be entered into no later than Wednesday June 4, 2009.


**Definitions**              Defined terms shall have the meanings set out in the Lock-Up Agreement.


**Governing Law**            Ontario