# EXHIBIT K

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK                **CERTIFIED COPY**

3    ------------------------------X

In re:

4    MOTORS LIQUIDATION COMPANY,

et al,  f/k/a General Motors            Chapter 11

5    Corporation, et al,                     Case No. 09-50026

                    Debtors,             (REG)

6    ------------------------------X

MOTORS LIQUIDATION COMPANY

7    GUC TRUST,

                    Plaintiff,

8        v.                                  Case No.: 12-0

APPALOOSA INVESTMENT

9    LIMITED PARTNERSHIP I, et al.,

                    Defendants.

10   ------------------------------X

11

12     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

13          PURSUANT TO PROTECTIVE ORDER

14

15     DEPOSITION OF THOMAS M. MAYER, ESQ. and

16   30(b)(6) DEPOSITION OF KRAMER LEVIN NAFTALIS &

17     FRANKEL, LLP, by THOMAS M. MAYER, ESQ.

18             New York, New York

19             May 29, 2012

20

21

22

23

24   Reported by:

Bonnie Pruszynski, RMR

25   JOB NO. 50126

Page 2

1

2

3

4                              May 29, 2012

5                              10:03 a.m.

6

7

8

9                  DEPOSITION OF THOMAS M. MAYER and

10    30(b)(6) DEPOSITION OF KRAMER LEVIN NAFTALIS &

11    FRANKEL, LLP, by THOMAS M. MAYER, ESQ., held at the

12    offices of Greenberg Traurig, LLP, 200 Park Avenue,

13    New York, New York, before Bonnie Pruszynski, a

14    Registered Professional Reporter, Registered Merit

15    Reporter, Certified LiveNote Reporter and Notary

16    Public of the State of New York.

17

18

19

20

21

22

23

24

25

Page 3

1

2                 A P P E A R A N C E S:

3    DICKSTEIN SHAPIRO

4    Attorneys for GUC Trust

5              1633 Broadway

6              New York, New York 10019

7    BY:   ERIC FISHER, ESQ.

8          KATIE COOPERMAN, ESQ.

9

10   GREENBERG TRAURIG

11   Attorneys for Certain Noteholders

12             200 Park Avenue

13             New York, New York 10166

14   BY:   BRUCE ZIRINSKY, ESQ.

15         KEVIN FINGER, ESQ.

16         JOHN BAE, ESQ.

17         GARY TICOLL, ESQ.

18

19   PAUL HASTINGS

20   Attorneys for Appaloosa Investment Limited Partnership

21             75 East 55th Street

22             New York, NY 10022

23   BY:   MARIA DOUVAS, ESQ.

24         BARRY SHER, ESQ.

25

Page 4

1

2     APPEARANCES (continued):

3

4     AKIN GUMP STRAUSS HAUER & FELD

5     Attorneys for the Nova Scotia Trustee

6          One Bryant Park

7          New York, New York 10036

8     BY:   SEAN O'DONNELL, ESQ.

9          MIKE CROSS, ESQ.

10

11    KING & SPALDING

12    Attorneys for New General Motors

13         1185 Avenue of the Americas

14         New York, New York 10036

15    BY:   ARTHUR STEINBERG, ESQ.

16

17

18

19

20

21

22

23

24

25

Page 27

Highly Confidential - Attorneys' Eyes Only

1

2      Q      And what was your understanding of

3  that, of that proposed exchange -- of that

4  exchange offer?

5      A      I didn't have an understanding of the

6  particulars of the exchange offer, because I was

7  buried in Chrysler, and because my understanding

8  was that Paul, Weiss was representing the

9  bondholders.

10      Q      But you didn't -- so, you didn't make

11  any efforts to familiarize yourself with the terms

12  or even in a general way with the terms of the

13  exchange offer?

14      A      Once we were retained --

15          MR. FISHER:  Objection as to form.

16          Go ahead.

17      A      Once we were retained in GM, I did.

18  But I don't recall doing so prior to that

19  retention.

20      Q      Okay.  So, after the filing on

21  June 1st, 2009, what steps did you take to

22  familiarize yourself with the situation?

23          MR. FISHER:  Objection as to form.

24      What time period after June 1st, and what

25      situation are you talking about?

Page 29

1      Highly Confidential - Attorneys' Eyes Only

2  testimony?

3      A      I did not actually testify to that.

4  What I testified is that I assigned a team of

5  lawyers to become familiar with the manifold parts

6  of the General Motors situation.  And I -- that's

7  what I testified to.

8              MR. FISHER:  Just wait until there is

9        a question.

10       Q      I will go back to the question.  It's

11  on --

12              MR. ZIRINSKY:  How do I refer to

13        that?  Page 23, line 11, at 10:32:18.

14              "Question:  But you didn't -- so you

15        didn't make any efforts to familiarize

16        yourself with the terms or even in a general

17        way with the terms of the exchange offer?

18              "Answer:  Once we were retained --

19              "Mr. Fisher:  Objection as to form.

20        Go ahead.

21              "Once we were retained in GM, I did,

22        but I don't recall doing so prior to that

23        retention."  Answer.

24              "Okay."

25       A      I assigned a team of people to look

Page 30

1          Highly Confidential - Attorneys' Eyes Only

2     at the various documents.  This was one of them.

3     And I probably looked at this shortly after the

4     filing, but not with any great focus.  I don't

5     know what the time sheets reflect, but I am sure I

6     have looked at this document at some point.  I

7     am -- and I know I assigned people to look at the

8     various filings.

9          Q     Okay.  Let's put this aside for a

10    moment.  We will come back to this exhibit a

11    little bit later.

12               So, going back to, you are now

13    retained on June 3rd, as in your words, or in

14    substance, you have testified, you assembled a

15    team of lawyers from your firm --

16         A     Um-hum.

17         Q     -- to work on the General Motors

18    matter.

19         A     Um-hum.

20         Q     Fair summary so far?

21         A     Yes.

22         Q     Okay.  So, what steps did Kramer

23    Levin take at that time to become familiar with

24    the case and what would be the issues in the case?

25         A     Various teams of lawyers went out and

Page 46

1          Highly Confidential - Attorneys' Eyes Only

2          Q       Was not going to be?

3          A       That's correct.

4          Q       So, the consideration to the

5     unsecured creditors was quite well defined?

6          A       Yes.

7          Q       At that time.

8          A       Yes.

9          Q       Were you also aware that certain

10    avoidance actions and claims would be transferred

11    to New GM?

12         A       Yes.

13         Q       Was that one of your objections?

14         A       It didn't end up being an objection.

15    As you know, the issue of who owns the lawsuit

16    against the banks is currently on appeal to the

17    District Court.  As far as we knew, we had a deal

18    that the lawsuit against the banks would stay

19    behind and belong to the unsecured creditors, and

20    we documented that deal.  Treasury has since

21    changed that version of events.

22               With respect to all other avoidance

23    actions, yes, we understood they were going to new

24    GM.

25               And incidentally, to the extent they

Page 47

Highly Confidential - Attorneys' Eyes Only

1    weren't going to New GM, they were staying behind

2    for the DIP lender, which from our perspective was

3    a distinction without a difference.

4        Q       Were there -- when did the sale

5    hearing commence in the case?

6        A       When did it commence?  It was late in

7    the last week of June.  I don't have the date in

8    my head.

9        Q       June 28 sound like a familiar date?

10       A       That sounds right, yes.

11       Q       So, between this period of time we

12   have been discussing and June 28, were there

13   subsequent meetings with Weil Gotshal or other

14   representatives of General Motors that you or

15   other members of the --

16       A       Harvey -- we had one very big meeting

17   for the whole committee at Weil Gotshal, at which

18   the then CEO (sic) of GM made a presentation.

19       Q       Who was that?

20       A       The former CFO was the successor to

21   Wagner, and I can't remember his name.  This is

22   terrible.

23               He made a presentation.  We had

24   discussions about various parts of the deal, and

Page 55

1     Highly Confidential - Attorneys' Eyes Only

2     about in connection with the sale.  And it wasn't

3     like a legal brief that sourced where things came

4     from, because we didn't have time.

5          Q     Okay.

6          A     So I -- my recollection, which I have

7     to refresh, is that no, we didn't source -- the

8     memos that I am recalling, we were not sourcing

9     any particular place where information came from.

10         Q     Well, what was the purpose of

11    reviewing SEC filings?

12         A     Well, we needed to advise the

13    committee on issues that in our view they needed

14    to think about as to whether they cared enough to

15    push hard to change in connection with the sale.

16         Q     And you thought the SEC filings would

17    be helpful or a review of those filings would be

18    helpful in that regard?

19         A     It's a standard part of diligence.

20         Q     Do you know whether or not these

21    memos were given to your counsel Mr. Fisher and

22    his firm in connection with this deposition or

23    your document production in this case?

24         A     I have no idea.

25              MR. FISHER:  Objection as to form, to

Page 58

Highly Confidential - Attorneys' Eyes Only

1    requisites," and then it goes on with several

2    other items.

3         A      Um-hum.

4         Q      Can you tell us what you were

5    referring to, what you were referring to in this

6    time entry?

7         A      I think so.   In connection with what

8    in particular?

9         Q      First of all, do you recall this team

10   meeting?

11        A      This refreshes my recollection.

12   There were a lot of meetings.   I'm sure this

13   happened.

14        Q      What about the timeline to SOFa, 8-K,

15   bar date and other pre-plan requisites?

16        A      SOFa stands for Statement of

17   Financial Affairs, and the 8-K is a reference to

18   an 8-K that GM was going to file, New GM was going

19   to file pursuant to an agreement that it either

20   had worked out or was in the process of working

21   out with the Securities and Exchange Commission.

22        Q      Was that 8-K in fact filed?

23        A      I believe it was, yes.

24        Q      Do you recall approximately when it

Page 59

1    Highly Confidential - Attorneys' Eyes Only

2    was filed?

3        A        Not as I sit here.

4        Q        Okay.  Do you recall what that 8-K

5    would have disclosed or did disclose?

6        A        I have a general recollection.  This

7    was a unique transaction in many ways, including

8    under the securities laws, and New GM as a new

9    entity had various security issues it needed to

10   work out with the SEC about when it would resume

11   making public filings, and this 8-K was kind of an

12   attempt to put New GM back in the public domain

13   with public information.

14            It was, it was important to a number

15   of constituencies that it do so.  It was pretty

16   important to us.  It was important to Treasury.

17       Q        Okay.  Thank you.

18            Would you turn to Invoice 523067.

19            MR. FISHER:  Let me help you.

20   523067.

21       Q        It's page 66.

22            MR. FISHER:  Sixty-six, you said?

23   I'm sorry.

24       A        Okay.

25       Q        There is an entry on June 5, 2009, of

Page 73

1    Highly Confidential - Attorneys' Eyes Only

2    Creditors Committee.   Not that I recall.

3         Q    What was your understanding as to why

4    the Canadian government was present at that

5    meeting?

6         A    They were a co-lender under the DIP

7    facility and a co-owner of the stock of New GM.

8         Q    But this meeting occurred prior to

9    the sale; correct?

10        A    Yes.

11        Q    And do you know why the Canadian

12   government was participating in the loans to GM

13   and in the acquisition of GM by New GM?

14        A    GM had operations in Canada.  It was

15   in -- the Canadian government had made a

16   determination to participate in the rescue of a

17   company that had operations in Canada.

18        Q    Did you have any understanding as to

19   why it was important to the Canadian government to

20   participate?

21        A    GM Canada employed a lot of people.

22        Q    It was a big operation?

23        A    I believe so.

24        Q    Do you have any understanding as to

25   what, approximately what proportion of GM's total

Page 93

1      Highly Confidential - Attorneys' Eyes Only

2   connection with Smurfit.  It's possible that we

3   did.

4        Q      Why would you have been discussing GM

5   in connection with Smurfit?

6        A      Because Smurfit was moving into plan

7   gear in the summer of 2009, and a fight was

8   looming over a double claim in the Smurfit case,

9   and I remember Dan saying to me that we shouldn't

10  get in his way in Smurfit, and he mentioned -- he

11  did mention that he got a settlement in GM.  He

12  didn't describe the settlement, that I recall.

13          And I said to him, Dan, in GM, Canada

14  wasn't in bankruptcy, and in Smurfit, Canada is in

15  bankruptcy, and the situation is very different.

16          I can't remember whether I brought up

17  the argument that turned out to be the winning

18  argument in Smurfit, at that moment.  Probably

19  not.

20          That's what I recall.

21       Q      So, then Mr. Gropper did tell you he

22  held notes in GM Nova Scotia?

23       A      By July 28th, this e-mail suggests

24  that he did, and I suspect that he must have, yes.

25       Q      So, then you would have been aware at

Page 94

1      Highly Confidential - Attorneys' Eyes Only

2    this time that in fact there were notes issued,

3    there were Nova Scotia notes issued by GM?

4          A      That is a fair statement, yes.  I

5    must have been aware in July, yes.

6          Q      Is it possible that you were aware

7    earlier than July?

8          A      That there were Nova Scotia notes?

9          Q      Yes.

10         A      I was probably aware that there were

11   Nova Scotia notes issued prior to July, yes.

12         Q      How would you have become aware of

13   that?

14         A      We got tables of projected claims

15   from Paul, Weiss, which were the basis for their

16   settlement, and Nova Scotia may have been listed

17   on those.  That is the only thing I can think of.

18   There probably was a list of claims.

19                MR. ZIRINSKY:  Would you mark this as

20         Exhibit 9.

21                (KL Exhibit 9 marked for

22         identification as of this date.)

23         A      Okay.

24         Q      Mr. Mayer, can you identify what's

25   been marked as Exhibit 9?

Page 103

Highly Confidential - Attorneys' Eyes Only

1

2     A     Because it didn't relate to the

3  object of the negotiation during that 30 days,

4  because it doesn't contain certain other facts

5  that came to light later about the timing of the

6  payment and where the payment actually came from,

7  and because we were focused on other things that

8  were doable with respect to Treasury and New GM

9  and not with respect to claims against the estate.

10     Q     What other facts came to light later

11  about the timing of the payment?

12     A     In October of 2009, for the first

13  time, the entire package of the Nova Scotia

14  settlement was brought to our attention by Weil

15  Gotshal.  The exact circumstances of what prompted

16  that call, I don't know.  We were focusing at that

17  point on what claims were going to be asserted

18  against the estate.

19          And the existence of a $2.6 billion

20  amount by GM Nova Scotia, A, it was brought to our

21  attention; B, what was brought to our attention

22  was the payment either just before or just after

23  the filing of money from GM itself to fund this

24  payment.  That had not previously -- we were not

25  previously aware of that.

Page 106

1       Highly Confidential - Attorneys' Eyes Only

2    know that was the first time we focused on it.

3       Q      By the way, do you know if that

4    payment was made by Old GM to GM Canada before or

5    after GM filed for bankruptcy?

6       A      Based on the review of documents for

7    this deposition, I believe it was made slightly

8    before.

9       Q      Days before?

10      A      Yeah.

11      Q      Okay.  Do you know whether that loan

12   was ever repaid by GM Canada to Old GM?

13      A      I have no personal knowledge.  I

14   would be surprised if it was.

15      Q      Okay.  If it had been repaid, how

16   would that have affected your view?

17              MR. FISHER:  Objection as to form.

18      A      I can't answer the question, because

19   it goes into the nature of the complaint that

20   conflicts counsel filed.  In terms of, would it

21   have affected our view when, when we filed the

22   complaint, no.  I mean, we weren't focused on

23   anything related to Canada in connection with --

24   during the 30 days prior to the sale.

25      Q      You said earlier that -- you

Page 116

1        Highly Confidential - Attorneys' Eyes Only

2        A       Um-hum.

3                Yes.

4        Q       Okay.  Does reading this paragraph

5     three refresh your recollection as to your

6     knowledge of the settlement with the Nova Scotia

7     noteholders back in June of 2009?

8        A       No.  I don't believe I personally had

9     knowledge of our focus on the Nova Scotia

10    settlement in June of 2009.

11       Q       But others at Kramer Levin had read

12    this document?

13       A       Others at Kramer Levin read this

14    document.

15       Q       And not to be offensive, but you

16    would have to be blind not to read this provision

17    or this language in this document if you were

18    charged with reviewing this document in connection

19    with your representation of the Creditors Credit

20    Committee; is that correct?

21                MR. FISHER:  Objection.

22       A       I assume that other people in my team

23    read these -- read this paragraph, yes.

24       Q       And would have been familiar with

25    what was contained in here?

Page 117

1      Highly Confidential - Attorneys' Eyes Only

2          A       I think they would have read it.

3    They would have made a judgment as to whether or

4    not it needed to be included in the briefing memos

5    that they passed up the line.

6          Q       Did you have a process or procedure

7    at or procedures at Kramer Levin where various

8    members of the team would share among the team

9    information derived by each of them from there

10   review of documents and other information provided

11   in connection with their due diligence?

12         A       It was -- there were different work

13   streams, and people submitted memos basically to

14   me, and then I reviewed them and forwarded them on

15   to the committee.  We didn't have giant team

16   meetings every day, no.  Occasionally, but there

17   wasn't --

18         Q       But you had procedures and processes

19   in place that you deemed to be appropriate and

20   adequate for your responsibilities in this case?

21               MR. FISHER:  Objection as to form.

22         A       I assigned people to look at things

23   that we believed needed to be -- I assigned people

24   to tasks we believed needed to be done in the very

25   short time frame provided to object to or

Page 118

1          Highly Confidential - Attorneys' Eyes Only

2     negotiate a resolution to the sale transaction.

3          Q      But you were focused on the sale

4     agreement, and the sale of assets --

5          A      Correct.

6          Q      -- and this is an important document.

7     It's part of the sale agreement, isn't it?

8          A      That is correct.  It is part of the

9     sale agreement.

10         Q      Yes, it is.

11                Now, paragraph three says, in terms

12    of the disclosures, that "sellers may do all

13    things necessary and appropriate in furtherance of

14    consummation of the Nova Scotia settlement"; is

15    that correct?

16         A      Yes, it does.

17         Q      Okay.  And then it goes on to say,

18    "Nova Scotia settlement means the following

19    actions and outcomes.  Entry A, entry by General

20    Motors Nova Scotia Finance Company, a Nova Scotia

21    unlimited company, and GMCL," that's GM Canada,

22    "into an agreement, the GMCL loan settlement, with

23    respect to the complete satisfaction and discharge

24    of the loan agreements between GMCL and GMNS, each

25    dated July 10, 2003, in exchange for a cash

Page 126

1      Highly Confidential - Attorneys' Eyes Only

2      Q      You understand that you are here as a

3  30(b)(6) witness --

4      A      I am.

5      Q      Let me just finish the question,

6  please.

7             Testifying not only to your personal

8  knowledge, but as to the collective knowledge of

9  your law firm?

10      A      I do.

11      Q      Mr. Mayer, I'm going to mark as an

12  exhibit -- and I think we are up to number 13.

13             MR. ZIRINSKY:  Mark this as Exhibit

14      Number 13 for identification.

15             (KL Exhibit 13 marked for

16      identification as of this date.)

17      Q      Can you identify what's been marked

18  as Exhibit 13?

19      A      Yes.  This is the final order

20  pursuant to Bankruptcy Code Sections 105(a), 361,

21  362, 363, 364, and 507, and Bankruptcy Rules 2002,

22  4001, and 6004(a) -- I'm sorry, 6004, A, approving

23  a DIP credit facility and authorizing the debtors

24  to obtain post-petition financing pursuant

25  thereto; B, granting related liens and

Page 127

1       Highly Confidential - Attorneys' Eyes Only

2    super-priority status; C, authorizing the use of

3    cash collateral, and D, granting adequate

4    protection to certain pre-petition secured

5    parties.

6           Q       Okay.  Were you involved in this

7    matter in June of 2009, on behalf of the

8    committee?

9           A       Yes.

10          Q       And what was your role?

11          A       We were involved in negotiations with

12   Treasury and through Treasury Canada with respect

13   to the extension of DIP credit and the wind-down

14   lending facility.  This is, I believe, the third

15   of three orders relate -- the second of three

16   orders, the middle of three orders relating to

17   that topic, and we were involved in negotiating

18   certain terms of this document.

19          Q       Okay.  You were personally involved

20   on behalf of the committee?

21          A       I had personal involvement.  I think

22   Bob Schmidt led the charge, but I know a lot about

23   this order.

24          Q       Okay.  Did you see drafts of these

25   documents before they were finalized and approved

Page 128

1          Highly Confidential - Attorneys' Eyes Only

2     by the court?

3          A      Yes, I think I did.

4          Q      By the way, what was the date on

5     which the order was entered?

6          A      June 25th, according to the signature

7     page here.

8          Q      2009?

9          A      Yes.

10          Q      Okay.  Would you turn to the

11     Exhibit 1 to the DIP credit facility?

12          A      Um-hum.

13          Q      And page numbers are referenced

14     where?

15                 If you look at the top, page

16     number -- it's Exhibit 1, page 106, at the top

17     right.  Do you see that?

18          A      Yes.

19          Q      Okay.  Would you read down to

20     paragraph seven.

21          A      That says "consent"?

22          Q      Yes.  And would you read that aloud,

23     please, for the record.

24          A      "The required lenders hereby consent

25     to GM Nova Scotia's having provided a consent to

Page 129

1          Highly Confidential - Attorneys' Eyes Only

2      an order under the Bankruptcy and Insolvency Act

3      Canada as set forth in Section 6B of that certain

4      lock-up agreement, dated as of June 1, 2009.  As

5      in effect on such date, the lock-up agreement, by

6      and among the borrowers, General Motors Nova

7      Scotia Finance Company, a Nova Scotia unlimited

8      company ('GM Nova Scotia'); General Motors of

9      Canada Limited, a Canadian federal corporation

10     ('GM Canada'); GM Nova Scotia Investments Limited,

11     a Nova Scotia company and federal corporation" --

12     oh, I'm sorry, I'm skipping lines -- "and certain

13     beneficial owners of notes issued by GM Nova

14     Scotia, provided that:

15               "One, if the conditions required for

16     effectiveness of the waivers, releases and

17     discharges provided by the holders as defined in

18     the lock-up agreement in Section 5B of the lock-up

19     agreement are not satisfied, or, two, if such

20     releases and discharges cease to be effective to

21     preclude the holders from pursuing any claim in

22     respect of GM Canada otherwise released pursuant

23     to Section 5B of the lock-up agreement, then in

24     either case, this consent shall automatically

25     cease to be effective."

Page 130

       Highly Confidential - Attorneys' Eyes Only

1

2        Q      Okay.  And what's the date on this

3   amendment?  If you turn to the first page, which

4   is page 105 of 110.

5        A      The heading recites that it's filed

6   June 25th.  It's dated as of June 25th on the

7   first page.

8        Q      And turn to the last page of the

9   agreement, the back.  Do you see signatures there?

10       A      Yes.

11       Q      By whom?

12       A      Export Development Canada, on the

13   back page.  United States Department of the

14   Treasury on the preceding page.

15       Q      And the date of the signature by

16   Export Development Canada?

17       A      June 25, 2009.

18       Q      Okay.  So, this document, which is

19   part of the DIP credit facility --

20       A      Um-hum.

21       Q      -- expressly references the lock-up

22   agreement and the consent to a filing into

23   bankruptcy of GM Nova Scotia Finance; is that

24   correct?

25       A      It does.

Page 131

1        Highly Confidential - Attorneys' Eyes Only

2            Q        And someone reading this document

3    would thereby be on notice that these transactions

4    were possible; is that correct?

5                     MR. FISHER:  Objection as to form.

6            A        What transactions?

7            Q        The transactions described in the

8    provision you just read, paragraph seven.

9            A        Yes.

10           Q        Do you recall reading paragraph seven

11   at the time?

12           A        As I sit here today, no, I don't.

13           Q        But you do recall having reviewed

14   these documents?

15           A        I reviewed the final order, itself,

16   in some detail and the document attached to it as

17   the DIP credit agreement in some detail.  I was

18   involved in the negotiation of these documents

19   prior to the entry of the order.

20                    I have since had to comb through them

21   in connection with the term loan litigation.  So,

22   my memory is not precise as to exactly when I

23   became familiar with what pieces of this, because

24   there has been so much focus on it in the last

25   year.

Page 143

1    Highly Confidential - Attorneys' Eyes Only

2    another company who isn't a debtor.

3    Q    You had an internal meeting about it

4    but nobody bothered to read the document; is that

5    your testimony?

6    A    No.  You asked whether we reviewed

7    drafts before it was filed.  And I know I didn't,

8    and I don't know whether any of my colleagues did.

9    Q    Okay.  Did anyone review the version

10   as filed of this exhibit?

11   A    I'm certain that somebody in the

12   Creditors Committee team reviewed this.  Whether

13   it was someone at Kramer Levin or someone at FTI

14   working with us, I don't know.  But I know this

15   document was reviewed by someone in the Creditors

16   Committee team, yes.

17   Q    This was a document that was publicly

18   filed on August 7, 2009.

19   A    Yes.

20   Q    Which is two months before October of

21   2009; is that correct?

22   A    Yes.

23   Q    Did Kramer Levin take any actions

24   after reviewing this exhibit?

25   A    With respect to what?

Page 144

1      Highly Confidential - Attorneys' Eyes Only

2           Q      Anything.   Did you -- what did you do

3      after you reviewed this document?

4           A      Well, as a matter of the sequence of

5      events, after this -- after we reviewed this

6      document, I think we moved to compel Treasury to

7      respect our rights in the term loan litigation.

8           Q      What about in connection with the

9      Nova Scotia notes or with respect to the lock-up

10     agreement?

11          A      Prior to October of 2009?

12          Q      Yes.

13          A      No.

14          Q      Did you make inquiry of Weil Gotshal

15     or anyone else concerning the contents of this, of

16     this 8-K?

17          A      Not to my knowledge.

18          Q      Why not?

19          A      Well, this was an 8-K that was filed

20     by a non-debtor, which Weil Gotshal at -- we were

21     told Weil Gotshal was not counseling the new

22     General Motors, so it would have been odd for us

23     to call them and ask them about a document filed

24     by a company they weren't a party to.

25                 It was an informational document we

Page 145

1      Highly Confidential - Attorneys' Eyes Only

2   viewed as important for what the value of our

3   equity might be.

4        Q      And so therefore -- strike that. New

5   GM, as you just testified, New GM was the issuer

6   of the new equity that the unsecured creditors

7   were going to receive; isn't that correct?

8        A      Yes.

9        Q      And didn't you consider it material

10  to the value of that equity in terms of what

11  public disclosures new GM would be making?

12       A      Yes.

13       Q      Did you view this as a material

14  document?

15       A      Yes.

16       Q      And the contents of the information

17  contained in this document were material?

18       A      Not every piece of information in

19  this document is material.  The document taken as

20  a whole was material to the value of our equity,

21  yes.

22       Q      How did you pick and choose which

23  provisions or which information was material and

24  which wasn't?

25       A      Well, the value of the equity itself

Page 158

1          Highly Confidential - Attorneys' Eyes Only

2     was filed on August 9th, 2011?

3          A      I'm sure that -- yes.  The answer is

4     yes.

5          Q      August 11, 2009.

6          A      Yes.

7          Q      And there is a direct description and

8     reference to the claims of the Nova Scotia

9     noteholders, of the lock-up agreement, and the --

10    and other information relating to the transactions

11    under the lock-up agreement; is that correct?

12         A      Yes.

13         Q      Did you or anyone else at Kramer

14    Levin speak with -- have any communication with

15    anyone regarding the contents of this interim

16    report after reviewing it in August of 2009?

17         A      The cover e-mail reflects that it was

18    transmitted to the Creditors Committee.  We may

19    have had conversations of what's contained.  We

20    probably did have conversations about what was

21    contained in this report with the committee, and

22    we probably did also with Weil, just because of,

23    I'm sure there were questions.

24         Q      And that would have been in August?

25         A      It could have been in August.  It

Page 159

1       Highly Confidential - Attorneys' Eyes Only

2   could have been in September.  Probably was in

3   August.  This thing circulated August 12th.

4   Kramer Levin probably talked to FTI about it or

5   vice-versa.

6       Q     Do you know or are you just

7   speculating?

8       A     I could not testify today as to the

9   exact dates on which conversations or -- were had

10  or e-mails were sent, but I am sure that this

11  document was the subject of some discussions

12  between and among committee professionals and

13  committee members.

14      Q     Did you consider the information

15  contained in this report regarding the Nova Scotia

16  notes and the lock-up agreement to be material?

17      A     No.

18      Q     Why not?

19      A     Because we did not yet understand

20  what they meant.

21      Q     But it does make specific reference

22  to the allowance of claims, doesn't it?

23      A     It does.

24      Q     You did not consider that to be

25  material?

Page 164

1       Highly Confidential - Attorneys' Eyes Only

2    about the settlement he got at GM.  I don't

3    remember exactly when that was.  It may have been

4    in July of 2009, but I don't remember.

5       Q       Did he mention an agreement, that

6    there was an agreement reached in GM with the Nova

7    Scotia noteholders?

8       A       He mentioned the deal.  Didn't

9    mention a particular agreement.

10      Q       What was the deal that he mentioned

11   and described?

12      A       I can't remember exactly what he

13   described.  He described having a very good deal

14   in GM.

15      Q       Just tell us what you remember.

16      A       That's what I remember.

17      Q       You don't remember anything else?

18      A       I don't remember the details.  He

19   didn't -- he didn't -- the conversation I had with

20   Dan wasn't we got this, we got that, we got the

21   other thing.  It was we got a great deal in GM,

22   and we are going to get a great deal in Smurfit.

23          And I can't remember the details of

24   what he said to me.  I'm not sure there were any,

25   but I can't remember what they were.  But I know

Page 165

1          Highly Confidential - Attorneys' Eyes Only

2     that we did have a conversation where he was

3     trying to compare the deal he got in GM with the

4     deal in Smurfit.  And I can't remember what

5     details he gave me or not.

6          Q     But he told you there was a deal in

7     GM?

8          A     Oh, yes.

9          Q     And did you do anything to educate

10    yourself as to what that deal was after your

11    conversation with Mr. Gropper?

12         A     No.

13         Q     Why not?

14         A     If it happened in July, the answer is

15    no.  If it happened after October, we were already

16    in process, so the answer is no.

17         Q     Well, I'm assuming it happened in

18    July, so...

19               You didn't take any action to educate

20    yourself as to the terms of the settlement that

21    Mr. Gropper referred you to in his conversations

22    with you in July of 2009; is that your testimony?

23         A     That is my testimony.

24               (KL Exhibit 16 marked for

25               identification as of this date.)

Page 179

1       Highly Confidential - Attorneys' Eyes Only

2               But we ended up not spending a lot of

3   time on it, because GM was GM and not Chrysler.

4       Q       What was your understanding as to how

5   the executory contracts -- who would determine

6   which executory contracts would be assumed and

7   assigned to New GM?

8       A       GM management in conjunction with

9   Treasury.

10      Q       Did the committee have any interest

11  in knowing which contracts were going to be

12  assumed or assigned at that time?  And we are

13  talking now in the June time frame, before the

14  sale hearing.  Other than the supplier contracts

15  that you have referred to.

16      A       At the time, the answer is no, we

17  didn't.

18      Q       Okay.  Would it be fair to say that

19  the Asset Purchase Agreement, and the court order

20  authorizing or approving the Asset Purchase

21  Agreement, allowed New GM and Treasury and Old GM

22  to determine which contracts would be assumed and

23  assigned?

24              MR. FISHER:  Objection.

25      A       The document says what it says.  I

Page 180

Highly Confidential - Attorneys' Eyes Only

1    have already testified that was my understanding

2    as to what the deal was.

3         Q    And the committee at one time filed a

4    limited objection to the procedures on assumption

5    of assignments; isn't that correct?

6         A    Yes.

7         Q    And what was that objection?

8         A    I think we wanted more transparency

9    in conjunction with assignment and assumption.

10   But the focus of the committee was really on

11   supplier issues more than anything else.  We

12   didn't focus on anything else.

13        Q    You didn't focus on other contracts?

14        A    No.  There may have been -- that's

15   not quite true.  There were some leases, there

16   were some real property leases where initially New

17   GM seemed to want to have the best of both worlds,

18   they were going to assume the lease but leave some

19   liabilities behind, and we weren't crazy about

20   that.  But other than that, no.

21        Q    Did the procedures that were finally

22   agreed to and incorporated into the bankruptcy

23   court's orders require any notice to be given to

24   the Creditors Committee of contracts to be assumed

Page 181

1          Highly Confidential - Attorneys' Eyes Only

2     and assigned to New GM?

3          A     In preparing for this deposition, I

4     understood that it does not provide for any such

5     notice.  I know that that was not a focus of

6     our -- that was not a material concern of the

7     committee at the time, in June.

8          Q     Okay.

9                (KL Exhibit 17 marked for

10          identification as of this date.)

11         Q     Can you identify what's been marked

12    as Exhibit 17.

13         A     Exhibit 17 appears to be an exchange

14    of e-mails.  It's technically an e-mail from Ronit

15    Burkovich to Lauren Macksoud, dated October 6,

16    7:24 p.m., which contains a trail of e-mails plus

17    an attachment, which is the lock-up agreement, or

18    appears to be the lock-up agreement?

19         Q     Who is Lauren Macksoud?

20         A     Lauren Macksoud is an associate at

21    Kramer Levin.

22         Q     Bankruptcy associate?

23         A     Yes.

24         Q     This e-mail attaches the lock-up

25    agreement?

Page 209

1        Highly Confidential - Attorneys' Eyes Only

2   with the Nova Scotia claims review after the

3   conference call with Weil Gotshal and others

4   referred to in the previous exhibit?

5        A     Yes.

6        Q     Did Kramer Levin provide any advice,

7   don't tell me what it was, but did Kramer Levin

8   provide any advice to the Creditors Committee in

9   connection with potential objections or challenges

10  to the Nova Scotia noteholders' claims?

11       A     Yes.

12       Q     Okay.  Would you kindly look at this

13  Exhibit 23 and tell me if you can identify that

14  exhibit?

15       A     23 is an e-mail from Lauren Macksoud

16  to the GM committee dated December 15th, 2009,

17  which, itself, forwards -- it is a redacted text

18  here, but attached to that e-mail was another

19  e-mail, or in the e-mail chain is another e-mail

20  from Jennifer Sharret to the GM committee, timed

21  Tuesday, December 15, 2009 at 12 a.m., relating to

22  a committee call on December 16th, 2009, at

23  10 a.m.

24       Q     Okay.  Was the subject of the Nova

25  Scotia notes discussed at this meeting?

Page 210

1          Highly Confidential - Attorneys' Eyes Only

2          A       Yes.

3          Q       Did you, or anyone else at Kramer

4    Levin, make a presentation to the committee on the

5    Nova Scotia notes at this meeting?

6          A       Yes.

7          Q       Was there a recommendation made to

8    the committee concerning any course of action with

9    respect to challenges to the Nova Scotia notes?

10         A       Yes.

11         Q       And was that recommendation made by

12   Kramer Levin?

13         A       Yes.

14         Q       Was that you?

15         A       Yes.

16         Q       Anyone else at Kramer Levin?

17         A       Well, it reports that Amy Caton was

18   there, and I am sure that she was, and I believe

19   Lauren Macksoud was there, too.  Yes.  It was a

20   telephonic meeting, so we were all in my office.

21   This one I happen to recall quite clearly.

22         Q       By the way, at this point, did you

23   know who held GM Nova Scotia bonds?

24         A       I didn't have a list.  We knew that

25   Aurelius had filed a pleading, so we knew that

Page 211

1      Highly Confidential - Attorneys' Eyes Only

2      they held.

3           Q      Did you know whether Fortress had

4      also filed the same pleading?

5           A      Might have done.  The focus was on

6      Aurelius, again, might have done.

7           Q      How about Morgan Stanley?

8           A      Might have done.

9           Q      How about Appaloosa?

10          A      Might have done.  As I said before,

11     it was a greater includes the lesser issue.

12          Q      Did the committee take any action at

13     this meeting with respect to any of the

14     recommendations made by Kramer Levin at this

15     meeting?

16          A      I believe the committee authorized

17     counsel to prepare objections to the claims.

18                 Let me rephrase that slightly.

19                 The way the committee process worked

20     is that we would give a recommendation, and they

21     would endorse a recommendation, but not actually

22     authorize the filing of pleading until we had

23     actually circulated it to them.  So, it's probably

24     an overstatement to say that they authorized the

25     filing of an objection because no objection had

Page 212

1      Highly Confidential - Attorneys' Eyes Only

2   yet been drafted.

3      Q      Did Kramer Levin undertake, after

4   this meeting, to draft any such pleading?

5      A      No, not that I recall.  We filed a

6   pleading with respect to the mechanics of filing

7   proofs of claim, but with respect to objecting to

8   the allowance of the claims under the various

9   theories that later transpired, no, we did not

10  draft it.

11     Q      Why not?

12     A      Because we were turning it over to

13  conflicts counsel.

14     Q      Why?

15     A      Judge Gerber asked me that question

16  at the status conference.

17     Q      I wasn't at the status conference.

18     A      I know, that's why I am telling you.

19            He said, "Why aren't you doing it?"

20            And I said, "because Aurelius is a

21  substantial actor on the Nova Scotia side."

22            And he said, "you don't have to say

23  anything more."

24            And the reason that he said that is

25  that I had just finished representing Aurelius in

Page 232

1        Highly Confidential - Attorneys' Eyes Only

2    to them or on their behalf, including the

3    350 million-dollar consent fee," do you believe

4    that that was a true and correct statement?

5        A       It is not a true and correct

6    statement.

7        Q       That's because the debtors' estate

8    has no avoidance claims against the noteholders,

9    does it?

10       A       That is correct.

11       Q       Mr. Mayer, at what point in time did

12   Kramer Levin inform Weil Gotshal, or anyone else

13   on behalf of the debtors, that it had a conflict

14   and was no longer going to represent the committee

15   in connection with challenges to the GM Nova

16   Scotia notes?

17       A       I don't -- I don't recall exactly

18   when.  I am sure it was relative early in the

19   process of determining that there could be an

20   objection to the claim.

21       Q       Was that before or after December 15

22   or 16, 2009?

23       A       I can't say precisely.  I don't know.

24   But I know it was early.

25       Q       Was it in 2009?

Page 233

1      Highly Confidential - Attorneys' Eyes Only

2          A      I don't know for sure.

3          Q      You referred earlier, you testified

4   earlier about a status conference held --

5          A      Um-hum.

6          Q      -- before Judge Gerber in which you

7   stated that you were going to be handing this

8   these matters over to conflicts counsel.  Do you

9   recall what that status conference occurred?

10         A      Yeah, actually, now that you mention

11  it, that is going to be put a date on it.

12              I am pretty sure that that status

13  conference occurred in November of 2009, because I

14  -- it was in connection with a haggling over the

15  budget for post effective date legal work, and I

16  disclosed to the court what Kramer Levin would and

17  would not be doing in conjunction with post

18  effective date legal work.

19              And, so, it was probably -- I think

20  that is right.  It probably was around, it was in

21  November, I think.

22         Q      2009?

23         A      Yeah.  I think, yeah.

24         Q      Was Weil Gotshal present at that

25  status conference?

Page 279

Highly Confidential - Attorneys' Eyes Only

1  time, with respect to what?

2       Q     If, prior to the sale, you were aware

3  that GM Canada was entitled to receive large tax

4  refund, would you have considered that to be

5  significant?

6       A     No.

7       Q     Why not?

8       A     Because the basic deal was we got

9  equity securities representing 20 percent of New

10 GM, and we managed to negotiate for the adversary

11 proceeding against the term lenders, and enough

12 cash to get us through the case, and that was it.

13 And everything else went to New GM or to the DIP

14 lenders, and the unsecured creditors never saw any

15 of it.  So, whatever GM Canada had would not have

16 come to our -- would not have registered on our

17 register on radar screen.  It was so unimportant

18 with everything else we had to worry about.

19      Q     Well, the monies that were allegedly

20 transferred from GM U.S. to GM Canada with which

21 to pay the consent fee, wouldn't those, even if

22 those -- if those dollars had not been paid to GM

23 Canada, would those dollars have gone to the

24 unsecured creditors or would those dollars have

Page 280

1        Highly Confidential - Attorneys' Eyes Only

2    gone to U.S. Treasury or to New GM?

3        A        It would have gone to U.S.

4    Treasury/Canada as DIP lenders or New GM.

5        Q        So, the unsecured creditors would not

6    have received any additional benefit if those

7    monies had remained in Old GM at the time of the

8    bankruptcy; is that correct?

9        A        That is correct.

10       Q        Okay.  Have you ever been involved in

11   a Canadian bankruptcy case, a case under the

12   Bankruptcy Insolvency Act?

13       A        What do you mean by "involved"?

14       Q        Did you ever represent any parties in

15   connection with a case under the Bankruptcy

16   Insolvency Act of Canada, whether it be the

17   creditors or the company or a trustee?

18       A        Is the Bankruptcy Insolvency Act

19   different from CCAA?

20       Q        Yes, it is.

21       A        I'm not sure.  There have been

22   several Canadian proceedings.  I don't think any

23   of them involved the BIA, but I am not sure.

24            Amendment to the last answer.  If

25   Smurfit was a BIA case, then I did represent the

Page 291

1

2                    C E R T I F I C A T E

3     STATE OF NEW YORK        )

4                              : SS.

5     COUNTY OF NEW YORK       )

6

7                    I, BONNIE PRUSZYNSKI, a Notary

8     Public with and for the State of New York,

9     do hereby certify:

10         That THOMAS M. MAYER, the witness

11     whose deposition is hereinbefore set forth,

12     was duly sworn by me and that such deposition

13     is a true record of the testimony given by

14     the witness.

15         I further certify that I am not related

16     to any of the parties to this action by

17     blood or marriage, and that I am in no way

18     interested in the outcome of this matter.

19         IN WITNESS WHEREOF, I have hereunto

20     set my hand this 1st of June, 2012.

21

22                    _Bonnie A. Pruszynski_

23                    Bonnie Pruszynski

24

25

Page 292

1

2                              I N D E X

3    WITNESS                                        PAGE

4    BY MR. ZIRINSKY                                  5

5

6                           E X H I B I T S

7        KL Exhibit 1 Appointment of                 14

8            Committee of Unsecured

9            Creditors

10       KL Exhibit 2 Application of the              15

11           Official Committee of

12           Unsecured Creditors of

13           General Motors for an Order

14           Authorizing and Approving

15           the Employment and Retention

16           of Kramer Levin Naftalis &

17           Frankel LLP as Counsel Nunc

18           Pro Tunc to June 3, 2009

19       KL Exhibit 3 AUR_GM026726-895               28

20       KL Exhibit 4 CC000690-692                   37

21       KL Exhibit 5 Correction and                 49

22           Supplement to the First

23           Interim Application of

24           Kramer Levin Naftalis &

25           Frankel LLP as Counsel for

Page 293

```
 1
 2          the Official Committee of
 3          Unsecured Creditors for
 4          Allowance of Compensation
 5          for Professional
 6          Services...from June 30,
 7          2009 through September 30,
 8          2009
```

Page 294

1

2      KL Exhibit 23 CC015057-093                    208

3      KL Exhibit 24 Objection of the               228

4            Official Committee of

5            Unsecured Creditors

6      KL Exhibit 25 CC003154-156                    234

7      KL Exhibit 26 CC003337-338                    237

8      KL Exhibit 27 CC005393-403                    239

9      KL Exhibit 28 CC014895-952                    240

10     KL Exhibit 29 CC010925-927                    245

11     KL Exhibit 30 CC001818-820                    247

12     KL Exhibit 31 Official Committee of           250

13           Unsecured Creditors First

14           Amended Objection

15     KL Exhibit 32 Official Committee of           270

16           Unsecured Creditors' First

17           Amended Objection to Claims

18           filed by Green Hunt Wedlake

19           Inc.

20

21

22

23

24

25