# EXHIBIT P

**As filed with the Securities and Exchange Commission on April 27, 2009**

Registration No. 333-

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM S-4
### REGISTRATION STATEMENT
### UNDER THE SECURITIES ACT OF 1933

# General Motors Corporation
#### (Exact name of registrant as specified in its charter)

| Delaware | 8071 | 38-0572515 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

**300 Renaissance Center**
**Detroit, Michigan 48265-3000**
**(313) 556-5000**
**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

Nicholas S. Cyprus
Chief Accounting Officer
General Motors Corporation
300 Renaissance Center
Detroit, Michigan 48265-3000
(313) 556-5000
**(Name, address, including zip code, and telephone number, including area code, of agent for service)**

*Copies to:*

| | | | |
|---|---|---|---|
| Robert S. Osborne, Esq. | David S. Lefkowitz, Esq. | Joseph P. Gromacki, Esq. | James J. Clark, Esq. |
| Robert C. Shrosbree, Esq. | Corey R. Chivers, Esq. | William L. Tolbert, Jr., Esq. | Noah B. Newitz, Esq. |
| General Motors Corporation | Todd R. Chandler, Esq. | Jenner & Block LLP | Cahill Gordon & Reindel LLP |
| 300 Renaissance Center | Weil, Gotshal & Manges LLP | 330 N. Wabash Avenue | 80 Pine Street |
| Detroit, MI 48265-3000 | 767 Fifth Avenue | Chicago, IL 60611 | New York, NY 10005 |
| (313) 556-5000 | New York, NY 10153 | (312) 222-9350 | (212) 701-3000 |
| | (212) 310-8000 | | |

**Approximate date of commencement of proposed sale of the securities to public:** April 27, 2009.

If the securities being registered on this Form are being offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by checkmark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒   Accelerated filer ☐

Non-accelerated filer ☐ (Do not check if a smaller reporting company)   Smaller reporting company ☐

### CALCULATION OF REGISTRATION FEE

| Title of each class of securities to be registered | Amount to be registered | Proposed maximum aggregate offering price | Amount of registration fee |
|---|---|---|---|
| Common Stock, par value $0.01 per share (1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,120,171,147 | $2,436,644,139.03 | $135,964.74 |
| 1.50% Series D Convertible Debentures (2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1,001,600,875 | $ 193,308,968.88 | $ 10,786.64 |

(1)   The aggregate number of shares of common stock to be issued will depend in part on the exchange rates of Euro and pounds sterling to U.S. dollars in effect on the business day prior to the expiration date of the exchange offers. Because the amount of common stock to be registered is based on such exchange rates in effect on April 22, 2009. Registration fee calculated pursuant to Rule 457(f)(1) under the Securities Act. The proposed maximum aggregate offering price of the common stock is based upon the market value of the outstanding notes being solicited for exchange. The market value of the outstanding notes being solicited for exchange was calculated based upon the average of the weighted average closing bid and ask prices for such notes on April 22, 2009. On April 22, 2009, the weighted average closing bid price for the outstanding notes was $87.28 per $1,000 principal amount and the weighted average closing ask price for such notes was $91.88 per $1,000 principal amount, the average of which equals $89.58 per $1,000 principal amount.

(2)   Represents an outstanding series of notes that is being registered as a result of the proposed forbearance, waiver and extension of rights in respect of such notes described herein, which may result in such notes being deemed new securities. The registration fee is calculated pursuant to Rule 457(f)(1) under the Securities Act. The proposed maximum aggregate offering price per principal amount of the securities is based upon the market value of the outstanding notes of such series being solicited for forbearance, waiver and extension. The market value of the outstanding notes of such series being solicited for forbearance, waiver and extension was calculated based upon the average of closing bid and ask prices for such notes on April 22, 2009. On April 22, 2009, the average closing bid price for the outstanding notes of such series was $190.00 per $1,000 principal amount and the average closing ask price for such notes was $196.00 per $1,000 principal amount, the average of which equals $193.00 per $1,000 principal amount.

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until this Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007339



April 27, 2009

Dear GM Noteholder:

GM has developed a restructuring plan that we believe offers the best path for the future success of our company. As a key component of this plan, we are making an offer to you to exchange GM notes you own today for GM common stock.

**We are soliciting your support for our exchange offers, which will allow GM to restructure out of bankruptcy court.** The exchange offers are described in detail in the enclosed prospectus, which we encourage you to read fully.

### The Exchange Offers

**We are offering to issue 225 shares of GM common stock** for each $1,000 principal amount of GM notes that you own and to pay to you in cash for all accrued but unpaid interest on your GM notes to the settlement date of the exchange offers.

We believe there are advantages to restructuring GM out of court through the exchange offers. We believe that the successful consummation of the exchange offers would, among other things:

- enable us to continue operating our business without the negative impact that a bankruptcy could have on our relationships with our customers, employees, suppliers, dealers and others;
- reduce the risk of a potentially precipitous decline in our revenues in a bankruptcy; and
- allow us to complete our restructuring in less time and with less risk than any bankruptcy alternatives.

**FOR THE EXCHANGE OFFERS TO BE SUCCESSFUL, WE NEED TO SATISFY SEVERAL CONDITIONS INCLUDING RECEIVING THE APPROVAL OF THE U.S. DEPARTMENT OF THE TREASURY, WHICH WE BELIEVE WILL REQUIRE, AMONG OTHER THINGS, TENDERS FROM APPROXIMATELY 90% OF THE OUTSTANDING GM NOTES ACROSS ALL SERIES.**

### Bankruptcy Relief

In the event that we do not receive prior to June 1, 2009 enough tenders of existing GM notes to consummate the exchange offers, we currently expect to seek relief under the U.S. Bankruptcy Code. This relief may include (i) seeking bankruptcy court approval for the sale of most or substantially all of our assets pursuant to section 363(b) of the U.S. Bankruptcy Code to a new operating company, and a subsequent liquidation of the remaining assets in the bankruptcy case; (ii) pursuing a plan of reorganization (where votes for the plan are solicited from certain classes of creditors prior to a bankruptcy filing) that we would seek to confirm (or "cram down") despite the deemed rejection of the plan by noteholders; or (iii) seeking another form of bankruptcy relief, all of which involve uncertainties, potential delays and litigation risks. We are considering these alternatives in consultation with the U.S. Department of the Treasury, our largest lender.

**If we seek bankruptcy relief, you may receive consideration that is less than what is being offered in the exchange offers and it is possible that you may receive no consideration at all for your GM notes.**

### Deadline for Participating

**THE DEADLINE FOR PARTICIPATING IN THE EXCHANGE OFFERS IS TUESDAY, MAY 26, 2009.** In order to allow sufficient time for processing, you must contact your broker, dealer, bank, trust company or other nominee significantly in advance of that date and request them to tender your GM notes in the exchange offers.

**You must make your own decision as to whether to participate in the exchange offers. Neither we, our subsidiaries nor our or their respective boards of directors has made, nor will they make, any recommendation as to whether you should participate in the exchange offers.**

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007340

**We urge you to carefully read the accompanying prospectus and the related letter of transmittal in their entirety, including the discussion of risks, uncertainties and other issues that you should consider with respect to the exchange offers described in the section entitled "Risk Factors."**

In order to satisfy certain conditions of the exchange offers, one of which is estimated to take up to three months to satisfy, the expiration date may be extended without extending the withdrawal deadline, as a result of which the exchange offers would remain open for a period of time during which you will not be able to withdraw any tendered old notes, except in limited circumstances as described in the accompanying prospectus.

## Questions

If you have any questions or need any assistance in connection with the exchange offers, please contact D.F. King & Co., Inc., the Exchange Agent and Solicitation and Information Agent, at (800) 769-7666 (in North America) or 00-800-5464-5464 (in Europe).

We are respectfully requesting your consideration and thank you in advance for your support of this important transaction.

Sincerely,

Kent Kresa
Chairman of the Board

Frederick A. Henderson
Chief Executive Officer

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007341

This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any state or other jurisdiction where the offer or sale is not permitted. This prospectus does not comprise a prospectus for the purposes of EU Directive 2003/71/EC.

The information in this prospectus may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective.

# General Motors Corporation

## $27,200,760,650

### Exchange Offers and Consent Solicitations for any and all of the Outstanding Notes set forth below

EACH OF THE EXCHANGE OFFERS (AS DEFINED BELOW) WILL EXPIRE AT 11:59 P.M., NEW YORK CITY TIME, ON MAY 26, 2009, UNLESS EXTENDED BY US (SUCH DATE AND TIME, AS THE SAME MAY BE EXTENDED, THE "EXPIRATION DATE"). WITH RESPECT TO ANY SERIES OF OLD NOTES (AS DEFINED BELOW), TENDERS MAY NOT BE WITHDRAWN AFTER 11:59 P.M., NEW YORK CITY TIME, ON MAY 26, 2009 (SUCH DATE AND TIME, AS THE SAME MAY BE EXTENDED, THE "WITHDRAWAL DEADLINE"), EXCEPT IN LIMITED CIRCUMSTANCES AS SET FORTH HEREIN.

### Exchange Offers and Consent Solicitations

Upon the terms and subject to the conditions set forth in this prospectus and the related letter of transmittal (or form of electronic instruction notice, in the case of old notes held through Euroclear or Clearstream), as each may be amended from time to time, General Motors Corporation ("GM") is offering to exchange (the "exchange offers") 225 shares of GM common stock (as defined below) for each 1,000 U.S. dollar equivalent of principal amount (or accreted value as of the settlement date (as defined below), if applicable) of outstanding notes of each series set forth in the summary offering table on the inside front cover of this prospectus (the "old notes"), resulting in an aggregate offer of up to approximately 6.1 billion new shares of GM common stock, assuming full participation in the exchange offers. In respect of the exchange offers for the old GM Nova Scotia notes (as defined below), General Motors Nova Scotia Finance Company ("GM Nova Scotia") is jointly making the exchange offers with GM. In addition, (a) GM will pay, in cash, accrued interest on the old GM notes (as defined below), other than the discount notes (as defined below) and (b) GM Nova Scotia will pay, in cash, accrued interest on the old GM Nova Scotia notes, in each case, from and including the most recent interest payment date to, but not including, the settlement date.

(Cover continued on next page)

_____

GM's common stock is listed on the New York Stock Exchange under the symbol "GM."

_____

**See "Risk Factors" beginning on page 36 for a discussion of issues that you should consider with respect to the exchange offers and consent solicitations, as well as our Viability Plan and business.**

_____

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the securities being offered in exchange for the old notes or this transaction, passed upon the merits or fairness of this transaction or passed upon the adequacy or accuracy of this prospectus. Any representation to the contrary is a criminal offense.**

_____

### Global Coordinators

**MORGAN STANLEY**                **BANC OF AMERICA SECURITIES LLC**

| U.S. Lead Dealer Managers | Non-U.S. Lead Dealer Managers |
|---|---|
| CITI          J.P. MORGAN | BARCLAYS CAPITAL          DEUTSCHE BANK SECURITIES |

### Dealer Managers

**UBS INVESTMENT BANK**                **WACHOVIA SECURITIES**

_____

The date of this prospectus is April 27, 2009

*Concurrently with the exchange offers, we are soliciting consents (the "consent solicitations") from the holders of old notes to amend (the "proposed amendments") the terms of the debt instruments that govern each series of old notes. Under these proposed amendments (a) the material covenants and events of default other than the obligation to pay principal and interest on the old notes would be removed and (b) an early call option (the "call option") would be added in each series of non-USD old notes (as defined below), which we would exercise to redeem any non-tendered non-USD old notes for the exchange consideration offered pursuant to the exchange offers (i.e., 225 shares of GM common stock per 1,000 U.S. dollar equivalent of principal amount of non-USD old notes). Except for holders who tender non-USD old notes prior to the date on which the registration statement of which this prospectus forms a part is declared effective, holders may not tender their old notes pursuant to the exchange offers without delivering consents to the proposed amendments, and holders may not deliver consents to the proposed amendments pursuant to the consent solicitations without tendering their old notes.*

*In addition, by tendering, and not validly withdrawing, their 1.50% Series D Convertible Debentures due June 1, 2009 (the "old Series D notes"), holders of old Series D notes will irrevocably agree, in the event the exchange offers are extended beyond June 1, 2009, to extend the maturity of their old Series D notes and to forbear from taking any action to enforce, or direct enforcement of, and to waive any and all of the rights and remedies available to such holders under such old Series D notes or the indenture governing such old Series D notes, in each case until the earlier of (a) the termination of the exchange offers (including in the event GM files a petition for relief under the U.S. Bankruptcy Code) and (b) the consummation of the exchange offers (the date of such earlier event, the "Forbearance, Waiver and Extension Termination Date").*

### Bankruptcy Relief

*In the event that we do not receive prior to June 1, 2009 enough tenders of old notes, including the old Series D notes, to consummate the exchange offers, we currently expect to seek relief under the U.S. Bankruptcy Code. This relief may include (i) seeking bankruptcy court approval for the sale of most or substantially all of our assets pursuant to section 363(b) of the U.S. Bankruptcy Code to a new operating company, and a subsequent liquidation of the remaining assets in the bankruptcy case; (ii) pursuing a plan of reorganization (where votes for the plan are solicited from certain classes of creditors prior to a bankruptcy filing) that we would seek to confirm (or "cram down") despite the deemed rejection of the plan by the class of holders of old notes; or (iii) seeking another form of bankruptcy relief, all of which involve uncertainties, potential delays and litigation risks. We are considering these alternatives in consultation with the U.S. Department of the Treasury (the "U.S. Treasury"), our largest lender.*

*If we seek bankruptcy relief, holders of old notes may receive consideration that is less than what is being offered in the exchange offers, and it is possible that such holders may receive no consideration at all for their old notes.*

*The exchange offers are conditioned on, among other things, the requirement (the "U.S. Treasury Condition") that the results of the exchange offers shall be satisfactory to the U.S. Treasury, including in respect of the overall level of participation by holders in the exchange offers and in respect of the level of participation by holders of the old Series D notes in the exchange offers. We currently believe, and our Viability Plan (as defined below) assumes, that at least 90% of the aggregate principal amount (or, in the case of discount notes, accreted value) of the outstanding old notes (including at least 90% of the aggregate principal amount of the outstanding old Series D notes) (the "Assumed Participation Level") will need to be tendered in the exchange offers or called for redemption pursuant to the call option (in the case of the non-USD old notes) in order for the exchange offers to satisfy the U.S. Treasury Condition. Whether this level of participation in the exchange offers will be required (or sufficient) to satisfy the U.S. Treasury Condition will ultimately be determined by the U.S. Treasury. The actual level of participation in the exchange offers may be different than what we have assumed, and this difference may be material.*

*You must make your own investment decision as to whether to exchange any old notes pursuant to the exchange offers and grant your consent to the proposed amendments in the consent solicitations. None of GM, its subsidiaries (including GM Nova Scotia), their respective boards of directors, the Dealer Managers, the Solicitation and Information Agent, the Settlement and Escrow Agent, the Luxembourg Exchange Agent or the Exchange Agent (each as defined below), or such parties' agents, advisors or counsel, has made, or will make, any recommendation as to whether holders should exchange their old notes and grant their consent to the proposed amendments.*

*The securities being offered in exchange for the old notes are being offered and will be issued outside the United States only to holders who are "non-U.S. qualified offerees" (as defined in the "Non-U.S. Offer Restrictions" section of this prospectus). Offers to holders in the United Kingdom, Austria, Belgium, France, Germany, Italy, Luxembourg, the Netherlands, Spain and Switzerland will be made only pursuant to a separate prospectus approved by the United Kingdom Listing Authority ("UKLA") as competent authority under EU Directive 2003/71/EC (the "EU Approved Prospectus"), which will incorporate this prospectus and will indicate on the front cover thereof that it can be used for such offers. Holders outside of these jurisdictions (and the United States) are authorized to participate in the exchange offers and consent solicitations, as described in the "Non-U.S. Offer Restrictions" section of this prospectus. If you are outside of the above jurisdictions (and the United States and Canada), you are only authorized to receive the EU Approved Prospectus. If you are in Canada you are only authorized to receive and review a separate Canadian offering memorandum prepared in accordance with applicable Canadian securities laws (the "Canadian Offering Memorandum"), which will incorporate this prospectus.*

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

## Summary Offering Table

This summary offering table identifies each series of old notes subject to the exchange offers. The exchange consideration to be offered in the exchange offers consists of 225 shares of GM common stock per 1,000 U.S. dollar equivalent principal amount or, in the case of the 7.75% discount debentures due March 15, 2036 of GM (the "discount notes"), accreted value, of old notes as of the settlement date (the "exchange consideration"). In addition, (a) GM will pay, in cash, accrued interest on the old GM notes, other than the discount notes and (b) GM Nova Scotia will pay, in cash, accrued interest on the old GM Nova Scotia notes, in each case, from and including the most recent interest payment date to, but not including, the settlement date.

| CUSIP/ISIN | Outstanding Principal Amount | Title of Notes to be Tendered | Applicable Debt Instrument (3) | Shares of GM Common Stock Offered per 1,000 U.S. Dollar Equivalent (4) | Accrued Interest per 1,000 U.S. Dollar Equivalent as of June 30, 2009 (7) |
|---|---|---|---|---|---|
| | | *USD Old Notes* | | | |
| 370442691 | USD 1,001,600,875 | 1.50% Series D Convertible Senior Debentures due June 1, 2009 (2) | 1995 Indenture | 225 | $  7.50(8) |
| 370442BB0 | USD 1,500,000,000 | 7.20% Notes due January 15, 2011 | 1995 Indenture | 225 | $ 33.00 |
| 37045EAS7 | USD 48,175,000 | 9.45% Medium-Term Notes due November 1, 2011 | 1990 Indenture | 225 | $ 11.81 |
| 370442BS3 | USD 1,000,000,000 | 7.125% Senior Notes due July 15, 2013 | 1995 Indenture | 225 | $ 32.66 |
| 370442AU9 | USD 500,000,000 | 7.70% Debentures due April 15, 2016 | 1995 Indenture | 225 | $ 16.04 |
| 370442AJ4 | USD 524,795,000 | 8.80% Notes due March 1, 2021 | 1990 Indenture | 225 | $ 29.09 |
| 37045EAG3 | USD 15,000,000 | 9.4% Medium-Term Notes due July 15, 2021 | 1990 Indenture | 225 | $ 11.75 |
| 370442AN5 | USD 299,795,000 | 9.40% Debentures due July 15, 2021 | 1990 Indenture | 225 | $ 43.08 |
| 370442BW4 | USD 1,250,000,000 | 8.25% Senior Debentures due July 15, 2023 | 1995 Indenture | 225 | $ 37.81 |
| 370442AV7 | USD 400,000,000 | 8.10% Debentures due June 15, 2024 | 1995 Indenture | 225 | $ 43.88(9) |
| 370442AR6 | USD 500,000,000 | 7.40% Debentures due September 1, 2025 | 1990 Indenture | 225 | $ 24.46 |
| 370442AZ8 | USD 600,000,000 | 6¾% Debentures due May 1, 2028 | 1995 Indenture | 225 | $ 11.06 |
| 370442741 | USD 39,422,775 | 4.50% Series A Convertible Senior Debentures due March 6, 2032 (2) | 1995 Indenture | 225 | $ 14.88 |
| 370442733 | USD 2,600,000,000 | 5.25% Series B Convertible Senior Debentures due March 6, 2032 (2) | 1995 Indenture | 225 | $ 17.35 |
| 370442717 | USD 4,300,000,000 | 6.25% Series C Convertible Senior Debentures due July 15, 2033 (2) | 1995 Indenture | 225 | $ 28.65 |
| 370442BT1 | USD 3,000,000,000 | 8.375% Senior Debentures due July 15, 2033 | 1995 Indenture | 225 | $ 38.39 |
| 370442AT2 | USD 377,377,000 (1) | 7.75% Discount Debentures due March 15, 2036 | 1995 Indenture | 225 | n/a |
| 370442816 | USD 575,000,000 | 7.25% Quarterly Interest Bonds due April 15, 2041 | 1995 Indenture | 225 | $ 15.10 |
| 370442774 | USD 718,750,000 | 7.25% Senior Notes due July 15, 2041 | 1995 Indenture | 225 | $ 15.10 |
| 370442121 | USD 720,000,000 | 7.5% Senior Notes due July 1, 2044 | 1995 Indenture | 225 | $ 18.54 |
| 370442725 | USD 1,115,000,000 | 7.375% Senior Notes due May 15, 2048 | 1995 Indenture | 225 | $  9.22 |
| 370442BQ7 | USD 425,000,000 | 7.375% Senior Notes due May 23, 2048 | 1995 Indenture | 225 | $  7.58 |
| 370442766 | USD 690,000,000 | 7.375% Senior Notes due October 1, 2051 | 1995 Indenture | 225 | $ 18.23 |
| 370442758 | USD 875,000,000 | 7.25% Senior Notes due February 15, 2052 | 1995 Indenture | 225 | $  9.06 |
| | | *Euro Old Notes* | | | |
| XS0171942757 | EUR 1,000,000,000 | 7.25% Notes due July 3, 2013 | July 3, 2003 FPAA | 225(5) | $71.81(10) |
| XS0171943649 | EUR 1,500,000,000 | 8.375% Notes due July 5, 2033 | July 3, 2003 FPAA | 225(5) | $82.49(11) |
| | | *Old GM Nova Scotia Notes* | | | |
| XS0171922643 | GBP 350,000,000 | 8.375% Guaranteed Notes due December 7, 2015 | July 10, 2003 FPAA | 225(6) | $ 47.02(12) |
| XS0171908063 | GBP 250,000,000 | 8.875% Guaranteed Notes due July 10, 2023 | July 10, 2003 FPAA | 225(6) | $ 86.20(13) |

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

———————

(1) Represents the principal amount at maturity. The exchange consideration offered to holders of discount notes will be based on the accreted value thereof as of the settlement date. As of June 30, 2009, the accreted value of the discount notes will be $568.94 per $1,000 principal amount at maturity thereof.

(2) Denotes convertible old notes.

(3) The debt instruments governing the old notes are the (a) Indenture dated as of November 15, 1990 between GM and Wilmington Trust Company, as Successor Trustee (the "1990 Indenture"); (b) Indenture dated as of December 7, 1995 between GM and Wilmington Trust Company, as Successor Trustee (the "1995 Indenture"); (c) Fiscal and Paying Agency Agreement dated as of July 3, 2003 among GM, Deutsche Bank AG London and Banque Générale du Luxembourg S.A. (the "July 3, 2003 FPAA"); and (d) Fiscal and Paying Agency Agreement dated as of July 10, 2003 among General Motors Nova Scotia Finance Company, GM, Deutsche Bank Luxembourg S.A. and Banque Générale du Luxembourg S.A. (the "July 10, 2003 FPAA"), in each case as amended or supplemented prior to the date of this prospectus.

(4) As described under *Description of the Charter Amendments,* prior to the distribution of GM common stock to tendering holders on the settlement date we intend to effect a 1-for-100 reverse stock split (the "reverse stock split") of GM common stock. Unless otherwise indicated, all share numbers contained in this prospectus related to the exchange offers are presented without giving effect to the reverse stock split. We do not intend to issue fractional shares in connection with the exchange offers or the reverse stock split. Where, in connection with the exchange offers or as a result of the reverse stock split, a tendering holder of old notes would otherwise be entitled to receive a fractional share of GM common stock, the number of shares of GM common stock to be received by such holder will be rounded down to the nearest whole number and no cash or other consideration will be delivered to such holder in lieu of such rounded down amount. For example, 1,000 U.S. dollar equivalent amount of old notes would be exchanged for 225 shares of GM common stock, which would be converted to 2 shares of GM common stock after the reverse stock split and the rounding down of fractional shares occur. 3,000 U.S. dollar equivalent amount of old notes would be exchanged for 675 shares of GM common stock, which would be converted to 6 shares of GM common stock after the reverse stock split and the rounding down of fractional shares occur.

(5) Equivalent to approximately 292.8 shares of GM common stock per EUR 1,000 principal amount of Euro old notes, based on an exchange rate in effect on April 22, 2009 of EUR 1.00 = $1.30145. For purposes of determining the exchange consideration to be received in exchange for Euro old notes, an equivalent U.S. dollar principal amount of each tender of such Euro old notes will be used. See "*The Exchange Offers and Consent Solicitations—Terms of the Exchange Offers.*"

(6) Equivalent to approximately 327.1 shares of GM common stock per GBP 1,000 principal amount of old GM Nova Scotia notes, based on an exchange rate in effect on April 22, 2009 of GBP 1.00 = $1.45370. For purposes of determining the exchange consideration to be received in exchange for old GM Nova Scotia notes, an equivalent U.S. dollar principal amount of each tender of such old GM Nova Scotia notes will be used. See "*The Exchange Offers and Consent Solicitations—Terms of the Exchange Offers.*"

(7) For illustrative purposes only. The amount of accrued interest payable on the settlement date in respect of tendered old notes, other than the discount notes, will be the amount of accrued interest on such old notes from and including the most recent interest payment date to, but not including, the settlement date. We do not expect to consummate the exchange offers prior to June 30, 2009 because the satisfaction of certain conditions to the exchange offers is expected to require a significant period of time.

(8) Represents accrued interest per $1,000 principal amount as of June 1, 2009.

(9) Represents accrued interest on such old notes from and including December 15, 2008. Such amount does not reflect, and has not been reduced for, the interest payment scheduled for June 15, 2009.

(10) Equivalent to EUR 71.81 per EUR 1,000 principal amount of Euro old notes. Accrued interest on the Euro old notes payable on the settlement date will be paid in Euro.

(11) Equivalent to EUR 82.49 per EUR 1,000 principal amount of Euro old notes. Accrued interest on the Euro old notes payable on the settlement date will be paid in Euro.

(12) Equivalent to GBP 47.02 per GBP 1,000 principal amount of old GM Nova Scotia notes. Accrued interest on the old GM Nova Scotia notes payable on the settlement date will be paid in pounds sterling.

(13) Equivalent to GBP 86.20 per GBP 1,000 principal amount of old GM Nova Scotia notes. Accrued interest on the old GM Nova Scotia notes payable on the settlement date will be paid in pounds sterling.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER
NGM000007345

For purposes of this prospectus:

- the terms "GBP" and "pounds sterling" refer to the currency of the United Kingdom;

- the terms "EUR" and "Euro" refer to the single currency introduced at the start of the third stage of the European Economic and Monetary Union pursuant to the Treaty establishing the European Economic Community, as amended;

- the term "offered securities" relates to the securities being offered pursuant to this prospectus;

- the terms "our common stock" and "GM common stock" refer to the shares of common stock of GM, par value $1⅔ per share, or upon adoption of the charter amendments described herein, par value $0.01 per share;

- the term "USD old notes" refers to each series of old notes listed under the "USD Old Notes" subheading in the summary offering table above;

- the term "Euro old notes" refers to each series of old notes listed under the "Euro Old Notes" subheading in the summary offering table above;

- the term "old GM notes" refers to the USD old notes and the Euro old notes;

- the term "old GM Nova Scotia notes" refers to each series of old notes listed under the "Old GM Nova Scotia Notes" subheading in the summary offering table above;

- the term "non-USD old notes" refers to the Euro old notes and the old GM Nova Scotia notes;

- the term "convertible old notes" refers to the USD old notes denoted as such in the summary offering table above; and

- the term "amended Series D notes" refers to the old Series D notes subject to the Forbearance, Waiver and Extension.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

## Important Dates

Holders of old notes should take note of the following important dates in connection with the exchange offers:

| Date | Calendar Date and Time | Event |
|---|---|---|
| Withdrawal Deadline ........ | 11:59 p.m., New York City time, on May 26, 2009, unless extended by us. In no event will the withdrawal deadline occur prior to the date on which the registration statement of which this prospectus forms a part is declared effective. | Deadline for holders of old notes to validly withdraw tenders of old notes. Old notes tendered and not validly withdrawn prior to the withdrawal deadline may not be withdrawn at any time thereafter, except in certain circumstances described herein. |
| Expiration Date ............. | 11:59 p.m., New York City time, on May 26, 2009, unless extended by us.<br><br>In order to satisfy certain conditions of the exchange offers, one of which is estimated to take up to three months to satisfy, the expiration date may be extended without extending the withdrawal deadline, as a result of which the exchange offers would remain open for a period of time during which you will not be able to withdraw any tendered old notes, except in limited circumstances as described herein. | The last day for holders to tender their old notes in the exchange offers. |
| Settlement Date ............. | Promptly following the applicable expiration date of each exchange offer, subject to satisfaction or waiver of all conditions precedent to the exchange offers. We do not expect to consummate the exchange offers prior to June 30, 2009 for the reasons described above. | The exchange consideration that a tendering holder is entitled to pursuant to the exchange offers will be paid on the settlement date. |

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007347

**Requests for Assistance**

To participate in the exchange offers and consent solicitations, you should contact your broker, bank or other nominee or custodian and instruct it to tender your old notes and consent prior to the expiration date. You may have been provided with a letter of instructions along with this prospectus that may be used by you to instruct a broker, bank or other nominee or custodian to effect the tender of old notes for exchange and consent to the proposed amendments on your behalf. See "*The Exchange Offers and Consent Solicitations—Procedures for Tendering Old Notes*" for more information.

If you have questions or need assistance in connection with the exchange offers or consent solicitations, or require additional letters of transmittal and any other required documents, you may contact D.F. King & Co., Inc., the Exchange Agent and Solicitation and Information Agent, at the address and telephone numbers set forth on the back cover of this prospectus.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007348

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Where You Can Find More Information | i |
| Incorporation of Certain Documents By Reference | i |
| Cautionary Note Regarding Forward-Looking Statements | ii |
| Notice to Investors | v |
| Important Information | vii |
| Questions and Answers About the Exchange Offers and Consent Solicitations | ix |
| Summary | 1 |
| Risk Factors | 36 |
| Ratio of Earnings to Fixed Charges | 62 |
| Use of Proceeds | 62 |
| Price Range of Common Stock, Convertible Notes and Dividend Policy | 63 |
| Capitalization | 65 |
| The Restructuring | 67 |
| Bankruptcy Relief | 79 |
| Selected Consolidated Historical Financial Data | 80 |
| Accounting Treatment of the Exchange Offers | 82 |
| Unaudited Pro Forma Condensed Consolidated Financial Information for the Exchange Offers | 83 |
| The Exchange Offers and Consent Solicitations | 102 |
| Proposed Amendments | 115 |
| Comparison of Old Notes Versus the Amended Old Notes | 128 |
| Dealer Managers, Exchange Agent, Solicitation and Information Agent, the Settlement and Escrow Agent and Luxembourg Exchange Agent | 131 |
| Description of General Motors Nova Scotia Finance Company | 134 |
| Description of Amended Series D Notes | 135 |
| Description of Certain Other Material Indebtedness | 148 |
| Description of Our Capital Stock | 155 |
| Description of The Charter Amendments | 160 |
| Material United States Federal Income Tax Considerations | 162 |
| Material Canadian Federal Income Tax Considerations | 174 |
| Non-U.S. Offer Restrictions | 176 |
| Legal Matters | 181 |
| Experts | 181 |
| Delivery of Letters of Transmittal | 182 |
| Annex A | A-1 |
| Annex B | B-1 |

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER
NGM000007349

## WHERE YOU CAN FIND MORE INFORMATION

We file annual, quarterly and current reports, proxy statements and other information with the Securities and Exchange Commission (the "SEC"). In addition, we have filed with the SEC various communications related to the exchange offers described in this prospectus pursuant to Rule 425 under the Securities Act of 1933, as amended (the "Securities Act"). We strongly encourage you to read the relevant communications related to the exchange offers that have been filed with the SEC. You may read and copy any document that we file at the Public Reference Room of the SEC at 100 F Street, N.E., Room 1580, Washington, DC 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. In addition, the SEC maintains an internet site at *www.sec.gov* from which you may obtain copies of reports, proxy statements, communications related to the exchange offers and other information regarding registrants that file electronically, including GM. We are not incorporating the contents of the SEC website into this prospectus.

## INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The SEC allows us to "incorporate by reference" certain information that we file with them, which means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is an important part of this prospectus, and information that we file later with the SEC will automatically update and supersede this information. We incorporate by reference the documents listed below which have been filed (not furnished) with the SEC and any future reports filed with the SEC by us under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") until the exchange offers are consummated, and such documents form an integral part of this prospectus:

| GM SEC Filings (File No. 1-43) | Filing Date |
|---|---|
| Annual Report on Form 10-K for the fiscal year ended December 31, 2008 | March 5, 2009 |
| Current Reports on Form 8-K and Form 8-K/A | January 7, 2009, January 23, 2009, February 3, 2009, February 10, 2009, February 18, 2009, February 23, 2009, March 10, 2009, March 18, 2009, March 19, 2009, April 2, 2009 (with respect to Items 1.01, 5.02 and 9.01) and April 24, 2009 |
| The description of GM common stock set forth in Article Four of GM's Certificate of Incorporation filed as Exhibit 3(i) to our Annual Report on Form 10-K for the fiscal year ended December 31, 2003 | March 11, 2004 |

You may request a copy of the documents incorporated by reference into this prospectus, except exhibits to such documents unless those exhibits are specifically incorporated by reference in such documents, at no cost, by writing or telephoning the office of Nicholas S. Cyprus, Controller and Chief Accounting Officer, at the following address and telephone number:

<div align="center">

General Motors Corporation
300 Renaissance Center
Detroit, Michigan 48265-3000
(313) 556-5000

</div>

**In order to ensure timely delivery of documents, holders must request this information no later than five business days before the date they must make their investment decision. Accordingly, any request for documents should be made by May 18, 2009 to ensure timely delivery of the documents prior to the expiration date.**

You may also find additional information about us, including the documents described above, on our website at http://www.gm.com. The information included on or linked to this website or any website referred to in any document incorporated by reference into this prospectus is not a part of this prospectus.

<div align="center">i</div>

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER
NGM000007350

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This prospectus may include or incorporate by reference "forward-looking statements." Our use of the words "may," "will," "would," "could," "should," "believes," "estimates," "projects," "potential," "expects," "plans," "seeks," "intends," "evaluates," "pursues," "anticipates," "continues," "designs," "impacts," "forecasts," "target," "outlook," "initiative," "objective," "designed," "priorities," "goal" or the negative of those words or other similar expressions is intended to identify forward-looking statements. All statements in this prospectus (including statements incorporated by reference), other than statements of historical facts, including statements about future events or financial performance, are forward-looking statements that involve certain risks and uncertainties.

These statements are based on certain assumptions and analyses made in light of our experience and perception of historical trends, current conditions and expected future developments as well as other factors that we believe are appropriate in the circumstances. While these statements represent our current judgment on what the future may hold, and we believe these judgments are reasonable, these statements are not guarantees of any events or financial results. Whether actual future results and developments will conform with our expectations and predictions is subject to a number of risks and uncertainties, including the risks and uncertainties discussed under the caption "*Risk Factors*" herein and in documents incorporated by reference into this prospectus and other factors such as the following, many of which are beyond our control:

With respect to us:

- our ability to continue as a "going concern";

- our ability to comply with the requirements of certain loan and security agreements, dated December 31, 2008 (the "First U.S. Treasury Loan Agreement") and January 16, 2009 (the "Second U.S. Treasury Loan Agreement"), each between us, the U.S. Treasury and, with respect to the First U.S. Treasury Loan Agreement, certain of our domestic subsidiaries, and that certain promissory note, dated as of December 31, 2008, due December 30, 2011, issued by us to the U.S. Treasury with the approximate principal amount of $749 million (the "U.S. Treasury Promissory Note" and, together with the First U.S. Treasury Loan Agreement and the Second U.S. Treasury Loan Agreement (and any amendments thereto or additional promissory notes issued in connection therewith), the "U.S. Treasury Loan Agreements") and to restructure our operations on the terms, within the timeframe and pursuant to the approval procedures contemplated by the U.S. Treasury Loan Agreements;

- our ability to take actions management believes are important to our long-term strategy, including our ability to enter into certain material transactions outside of the ordinary course of business, due to significant representations and affirmative and negative covenants in the U.S. Treasury Loan Agreements;

- our ability to maintain adequate liquidity to fund our planned significant investment in new technology, and, even if funded, our ability to realize successful vehicle applications of new technology;

- the ability of counterparties to various financing arrangements, joint venture arrangements, commercial contracts and other arrangements to which we and our subsidiaries are party, to exercise rights and remedies under such arrangements, which, if exercised, may have material adverse consequences;

- the impact of business or liquidity difficulties for us or one or more subsidiaries on other entities in our corporate group as a result of our highly integrated and complex corporate structure and operation;

- our ability to obtain certification that we have taken all steps necessary to achieve and sustain our goals in accordance with our Viability Plan, as required by the U.S. Treasury Loan Agreements;

- our ability to realize production efficiencies and to achieve reductions in costs as a result of our Viability Plan and the Labor Modifications (as defined below);

- our ability to restore consumers' confidence in our viability as a continuing entity and our ability to continue to attract customers, particularly for our new products, including cars and crossover vehicles;

ii

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007351

- availability of adequate financing on acceptable terms to our customers, dealers, distributors and suppliers to enable them to continue their business relationships with us;

- financial viability and ability to borrow of our key suppliers, including Delphi Corporation's ("Delphi") ability to address its underfunded pension plans and to emerge from bankruptcy proceedings;

- our ability to sell, spin-off or phase out some of our brands as planned, to manage the distribution channels for our products and to complete other planned asset sales;

- our ability to qualify for federal funding of our advanced technology vehicle programs under Section 136 of Energy Independence Security Act of 2007 ("EISA");

- the ability of our foreign operations to successfully restructure and receive adequate financial support from their host governments or other sources;

- the continued availability of both wholesale and retail financing from GMAC LLC ("GMAC") and its affiliates in the United States, Canada and the other markets in which we operate to support our ability to sell vehicles in those markets, which is dependent on GMAC's ability to obtain funding and which may be suspended by GMAC if GMAC's credit exposure to us exceeds certain limitations provided in our operating arrangements with GMAC;

- overall strength and stability of general economic conditions and of the automotive industry, both in the United States and in global markets;

- our ability to maintain adequate liquidity and financing sources and an appropriate level of debt;

- continued economic and automotive industry instability or poor economic conditions in the United States and global markets, including the credit markets, or changes in economic conditions, commodity prices, housing prices, foreign currency exchange rates or political stability in the markets in which we operate;

- shortages of and increases or volatility in the price of fuel;

- market acceptance of our new products, including cars and crossover vehicles;

- significant changes in the competitive environment, including as a result of industry consolidation, and the effect of competition in our markets, including on our pricing policies or use of incentives;

- the ongoing ability of our suppliers to provide systems, components and parts without disruption;

- changes in the existing, or the adoption of new, laws, regulations, policies or other activities of governments, agencies and similar organizations where such actions may affect the production, licensing, distribution or sale of our products, the cost thereof or applicable tax rates;

- costs and risks associated with litigation;

- significant increases in our pension and other postretirement benefit ("OPEB") expenses resulting from changes in the value of plan assets;

- changes in accounting principles, or their application or interpretation, and our ability to make estimates and the assumptions underlying the estimates, including the estimates for Delphi pension benefit guarantees, which could have an effect on earnings;

- negotiations and bankruptcy court actions with respect to Delphi's obligations to us and our obligations to Delphi, negotiations with respect to our obligations under the benefit guarantees to Delphi employees and our ability to recover any indemnity claims against Delphi;

- changes in relations with unions and employees/retirees and the legal interpretations of the agreements with those unions with regard to employees/retirees, including negotiations pursuant to the terms of the U.S. Treasury Loan Agreements and the negotiation of new collective bargaining agreements with unions representing our employees in the United States;

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007352

- the effect of ongoing speculation on our business as to whether we will be able to reorganize outside of a bankruptcy proceeding and the impact on our business if we reorganize within a bankruptcy proceeding; and

- other risks described from time to time in periodic and current reports that we file with the SEC.

In addition, actual results for GMAC (of which we currently own approximately 59.9% and which provides a significant amount of financing to our customers and dealers) may differ materially due to numerous important factors, including the following:

- rating agencies may downgrade their ratings of GMAC or one of its principal subsidiaries, Residential Capital, LLC, in the future, which would adversely affect GMAC's ability to raise capital in the debt markets at attractive rates and increase the interest that it pays on its outstanding publicly traded notes, which could have a material adverse effect on its results of operations and financial condition;

- GMAC's business requires substantial capital, and if it is unable to maintain adequate financing sources, its profitability and financial condition will suffer and jeopardize its ability to continue operations;

- the profitability and financial condition of GMAC's operations are dependent upon our operations, and it has substantial credit exposure to us;

- recent developments in the residential mortgage market, especially in the nonprime sector, have and may continue to adversely affect GMAC's revenues, profitability and financial condition;

- changes in the competitive markets in which GMAC operates, including increased competition in the automotive financing, mortgage and/or insurance markets or generally in the markets for securitizations or asset sales, could have a material adverse effect on GMAC's margins;

- GMAC's ability to realize the expected benefits of its recent conversion to a bank holding company and to comply with the increased regulation and restrictions to which it is subject as a result;

- changes in the existing, or the adoption of new, laws, regulations, policies or other activities of governments, agencies and similar organizations; and

- other risks described from time to time in documents incorporated by reference into this prospectus and in periodic and current reports that GMAC files with the SEC.

All of the forward-looking statements made in this prospectus, any prospectus supplement and the documents incorporated by reference into this prospectus are qualified by these cautionary statements and there can be no assurance that the actual results or developments that we anticipate will be realized or, even if realized, that they will have the expected consequences to or effects on us and our subsidiaries or our businesses or operations. We therefore caution investors not to rely unduly on forward-looking statements. We undertake no obligation to update publicly or otherwise revise any forward-looking statements, whether as a result of new information, future events, or other such factors that affect the subject of these statements, except where we are expressly required to do so by law.

This prospectus contains, or incorporates by reference, descriptions of certain material agreements of GM. These agreements contain representations and warranties made by and to the parties thereto as of specific dates. The representations and warranties of each party set forth in such agreements were negotiated between the parties for the purpose of setting forth their rights and obligations regarding their respective agreements. In addition, such representations and warranties (1) may have been qualified by confidential disclosures made to the other party in connection with such agreements, although such confidential information does not contain information the securities laws require to be publicly disclosed, (2) may be subject to a materiality standard which may differ from what may be viewed as material by investors, (3) were made only as of the date of such agreements or such other date as is specified therein and (4) may have been included in such agreements for the purpose of allocating risk between or among the parties thereto rather than establishing matters of fact. The summaries of these material agreements included in this prospectus, and the agreements incorporated by reference herein, provide information regarding the terms thereof and should be considered in light of the entirety of public disclosure about GM as set forth in all of its public reports and filings with the SEC.

iv

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER
NGM000007353

## NOTICE TO INVESTORS

This prospectus does not constitute an offer to participate in the exchange offers and consent solicitations to any person in any jurisdiction where it is unlawful to make such offers or solicitations. The exchange offers and consent solicitations are being made on the basis of this prospectus and are subject to the terms described herein. Any decision to participate in the exchange offers and consent solicitations should be based on the information contained in this prospectus or specifically incorporated by reference herein. In making an investment decision, prospective investors must rely on their own examination of us and the terms of the exchange offers and consent solicitations and the offered securities, including the merits and risks involved. Prospective investors should not construe anything in this prospectus as legal, business or tax advice. Each prospective investor should consult its advisors as needed to make its investment decision and to determine whether it is legally permitted to participate in the exchange offers and consent solicitations under applicable legal investment or similar laws or regulations.

Each prospective investor must comply with all applicable laws and regulations in force in any jurisdiction in which it participates in the exchange offers and consent solicitations or possesses or distributes this prospectus and must obtain any consent, approval or permission required by it for participation in the exchange offers and consent solicitations under the laws and regulations in force in any jurisdiction to which it is subject, and neither we nor the Dealer Managers nor any of our or their respective representatives shall have any responsibility therefor.

In connection with the exchange offers or otherwise, the Dealer Managers may, subject to applicable law, purchase and sell old notes or the offered securities in the open market. These transactions may include covering transactions and stabilizing transactions. Any of these transactions may have the effect of preventing or retarding a decline in the market prices of the old notes and/or the offered securities. They may also cause the prices of the old notes and/or the offered securities to be higher than the prices that otherwise would exist in the open market in the absence of these transactions. The Dealer Managers may conduct these transactions in the over-the-counter market or otherwise. If the Dealer Managers commence any of these transactions, they may discontinue them at any time.

No action with respect to the offer of exchange consideration has been or will be taken in any jurisdiction (except the United States and, subject to certain conditions, the United Kingdom, Austria, Belgium, France, Germany, Italy, Luxembourg, the Netherlands, Spain and Switzerland) that would permit a public offering of the offered securities, or the possession, circulation or distribution of this prospectus or any material relating to GM, GM Nova Scotia or the offered securities where action for that purpose is required. Accordingly, the offered securities may not be offered, sold or exchanged, directly or indirectly, and neither this prospectus nor any other offering material or advertisement in connection with the exchange offers may be distributed or published, in or from any such jurisdiction, except in compliance with any applicable rules or regulations of any such country or jurisdiction. A holder outside the United States may participate in the exchange offers but should refer to the disclosure under the "*Non-U.S. Offer Restrictions*" section.

This prospectus contains summaries that we believe to be accurate with respect to certain documents, but reference is made to the actual documents for complete information. All of those summaries are qualified in their entirety by this reference. Copies of documents referred to herein will be made available to prospective investors upon request to us at the address and telephone number set forth in the "*Incorporation of Certain Documents by Reference*" section.

**This prospectus, including the documents incorporated by reference herein, and the related letter of transmittal contain important information that should be read before any decision is made with respect to an exchange of old notes and the grant of consent to the proposed amendments.**

**The delivery of this prospectus shall not under any circumstances create any implication that the information contained or incorporated by reference herein is correct as of any time subsequent to the date**

v

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007354

hereof or date thereof or that there has been no change in the information set forth or incorporated herein or in any attachments hereto or in the affairs of GM or any of its subsidiaries or affiliates since the date hereof or date thereof.

No one has been authorized to give any information or to make any representations with respect to the matters described in this prospectus and the related letter of transmittal, other than those contained in this prospectus and the related letter of transmittal. If given or made, such information or representation may not be relied upon as having been authorized by us or the Dealer Managers.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER
NGM000007355

# IMPORTANT INFORMATION

Old notes tendered and not validly withdrawn prior to the withdrawal deadline may not be withdrawn at any time thereafter, and old notes tendered after the withdrawal deadline may not be withdrawn at any time, unless the applicable offer is terminated without any old notes being accepted or as required by applicable law or our obligations in certain circumstances described herein to extend or reinstate withdrawal rights. If such a termination occurs, the old notes will be returned to the tendering holder promptly.

Old notes tendered for exchange, along with letters of transmittal and any other required documents, should be directed to the Exchange Agent. Any requests for assistance in connection with the exchange offers or for additional copies of this prospectus or related materials should be directed to the Solicitation and Information Agent. Contact information for the Exchange Agent and Solicitation and Information Agent is set forth on the back cover of this prospectus. None of GM, its subsidiaries (including GM Nova Scotia), their respective boards of directors, the Dealer Managers, the Solicitation and Information Agent, the Settlement and Escrow Agent, the Luxembourg Exchange Agent or the Exchange Agent (or such parties' agents, advisors or counsel) has made, or will make, any recommendation as to whether or not holders should tender their old notes for exchange pursuant to the exchange offers, and grant their consent to the proposed amendments.

The Exchange Agent for the exchange offers is D.F. King & Co., Inc. (the "Exchange Agent"). The Solicitation and Information Agent for the exchange offers is D.F. King & Co., Inc. (the "Solicitation and Information Agent"). The Settlement and Escrow Agent for the non-USD old notes is Deutsche Bank AG, London Branch (the "Settlement and Escrow Agent"). The Luxembourg Exchange Agent for the exchange offers is Deutsche Bank Luxembourg, S.A. (the "Luxembourg Exchange Agent"). The Tabulation Agent for the consent solicitation in respect of the non-USD old notes is D. F. King (Europe) Limited (the "Tabulation Agent"). Morgan Stanley & Co. Incorporated, Banc of America Securities LLC, Barclays Capital Inc., Citigroup Global Markets Inc., Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., UBS Securities LLC and Wachovia Capital Markets, LLC (the "Dealer Managers") are acting as Dealer Managers in connection with the exchange offers.

Subject to the terms and conditions set forth in the exchange offers and the consent solicitations, the exchange consideration to which a tendering holder is entitled pursuant to the exchange offers will be paid on the settlement date, which will be a date promptly following the applicable expiration date of each exchange offer, subject to satisfaction or waiver of all conditions precedent to the exchange offers (the "settlement date"). We do not expect to consummate the exchange offers prior to June 30, 2009. Under no circumstances will any interest be payable because of any delay in the transmission of the exchange consideration to holders by the Exchange Agent or the Settlement and Escrow Agent.

**Notwithstanding any other provision of the exchange offers and the consent solicitations, our obligation to pay the exchange consideration for old notes validly tendered for exchange and not validly withdrawn pursuant to the exchange offers and the consent solicitations is subject to, and conditioned upon, the satisfaction or waiver of the conditions described below under *"The Exchange Offers and Consent Solicitations—Conditions to the Exchange Offers*."**

**Subject to applicable securities laws and the terms of the exchange offers and the consent solicitations, we reserve the right to:**

- **waive any and all conditions to the exchange offers and the consent solicitations to be waived;**
- **extend, in whole or in part, the exchange offers and the consent solicitations;**
- **terminate, in whole or in part, the exchange offers and the consent solicitations;**
- **amend or modify the terms of the exchange offers (including by changing the exchange consideration offered) applicable to one or more series of old notes without amending or modifying the terms of the exchange offers applicable to any other series of old notes; or**
- **otherwise amend or modify the exchange offers and the consent solicitations in any respect, in whole or in part.**

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007356

If there is any material change in any of the terms of the exchange offers or the consent solicitations, or in the information published, sent or given to holders of old notes with respect thereto, we will promptly disseminate disclosure of the change in a manner reasonably calculated to inform such holders of such change, including, without limitation, pursuant to the dissemination of additional offer documents, a press release and a posting on our website, and we may extend the exchange offers or withdrawal rights as we determine necessary and otherwise to the extent required by law.

In the event that the exchange offers and the consent solicitations are withdrawn or otherwise not consummated, the exchange consideration will not be paid or become payable to holders of the old notes who have validly tendered their old notes for exchange in connection with the exchange offers, and the old notes tendered for exchange pursuant to the exchange offers will be returned to the tendering holder promptly.

Only registered holders of old notes are entitled to tender old notes for exchange and give consents. Beneficial owners of old notes that are held of record by a broker, bank or other nominee or custodian must instruct such nominee or custodian to tender the old notes for exchange and consent to the proposed amendments on the beneficial owner's behalf. You may have been provided with a letter of instructions along with this prospectus that may be used by a beneficial owner to instruct a broker, bank or other nominee or custodian to effect the tender of old notes for exchange and consent to the proposed amendments on the beneficial owner's behalf. See "*The Exchange Offers and Consent Solicitations—Procedures for Tendering Old Notes—General.*"

Tendering holders will not be obligated to pay brokerage fees or commissions to the Exchange Agent, Dealer Managers, the Solicitation and Information Agent, the Settlement and Escrow Agent, the Luxembourg Exchange Agent or us. If a broker, bank or other nominee or custodian tenders old notes on behalf of a tendering holder, such broker, bank or other nominee or custodian may charge a fee for doing so. Tendering holders who own old notes through a broker, bank or other nominee or custodian should consult their broker, bank or other nominee or custodian to determine whether any charges will apply.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007357

## QUESTIONS AND ANSWERS ABOUT
## THE EXCHANGE OFFERS AND CONSENT SOLICITATIONS

*The following are some questions regarding the exchange offers and consent solicitations that you may have as a holder of our old notes and the answers to those questions. We urge you to carefully read additional important information contained in the remainder of this prospectus or incorporated by reference herein and the letter of transmittal. In this prospectus, "we," "us," "our," "the Company" and "GM" refers to General Motors Corporation and not its subsidiaries, unless otherwise stated or the context otherwise requires.*

**Q:  Why are we making the exchange offers?**

A:   We are making the exchange offers in connection with the restructuring we are undertaking pursuant to our plan to achieve and sustain our long-term viability, international competitiveness and energy efficiency (as updated from time to time, the "Viability Plan").

As a condition to obtaining the loans under the First U.S. Treasury Loan Agreement, we agreed to submit, on or before February 17, 2009, our Viability Plan that included specific actions intended to result in the following:

- the repayment of all loans made under the First U.S. Treasury Loan Agreement, together with all interest thereon and reasonable fees and out-of-pocket expenses incurred in connection therewith and all other financings extended to us by the U.S. government;

- compliance with federal fuel efficiency and emissions requirements and commencement of domestic manufacturing of advanced technology vehicles;

- achievement of a positive net present value, using reasonable assumptions and taking into account all existing and projected future costs;

- rationalization of costs, capitalization and capacity with respect to our manufacturing workforce, suppliers and dealerships; and

- a product mix and cost structure that is competitive in the U.S. marketplace.

In addition, the First U.S. Treasury Loan Agreement requires that we use our best efforts to:

- reduce our unsecured public indebtedness,

- modify our retiree healthcare obligations to a new voluntary employee benefit association (the "New VEBA") arising under the settlement agreement, dated February 21, 2008, between GM, the UAW and counsel to the VEBA-settlement class (the "VEBA-settlement class") in the class action of *Int'l Union, UAW, et al. v. General Motors Corp.*, Civil Action No. 07-14074 (E.D. Mich. filed Sept. 9, 2007) (the "VEBA settlement agreement"), and

- modify our employee compensation structure, employee severance policies and work rules to make us more competitive with certain of our competitors in the automotive industry.

On March 30, 2009, the President's Designee (as established under the First U.S. Treasury Loan Agreement) found that our Viability Plan, in its then-current form, was not viable and would need to be revised substantially in order to lead to a viable GM. In response to the determination of the President's Designee, we have made further modifications to our Viability Plan to satisfy the President's Designee's requirement that we undertake a substantially more accelerated and aggressive restructuring plan, including by increasing the amount of public debt reduction that we will seek to achieve beyond that originally required by the First U.S. Treasury Loan Agreement. For additional details about the restructuring we are undertaking pursuant to our Viability Plan, see *"The Restructuring."*

The exchange offers are being undertaken in order to achieve our debt reduction objectives set forth in our Viability Plan.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007358

If by June 1, 2009, the President's Designee has not issued a certification that we and our subsidiaries have taken all steps necessary to achieve and sustain long-term viability, among other things, then the advances under the First U.S. Treasury Loan Agreement and Second U.S. Treasury Loan Agreement would become due and payable on the 30th day thereafter.

Our future is dependent on our ability to successfully execute our Viability Plan or otherwise address the matters described above. If we fail to do so for any reason (including if the exchange offers are not consummated), we would not be able to continue as a going concern and would be forced to seek relief under the U.S. Bankruptcy Code. If we seek relief under the U.S. Bankruptcy Code, holders of old notes may receive consideration that is less than what is being offered in the exchange offers, and it is possible that such holders may receive no consideration at all for their old notes.

**Q:  What are the consequences to holders of old notes if we fail to consummate the exchange offers?**

A:   In the event that we do not receive prior to June 1, 2009 enough tenders of old notes, including the old Series D Notes, to consummate the exchange offers, we currently expect to seek relief under the U.S. Bankruptcy Code. This relief may include (i) seeking bankruptcy court approval for the sale of most or substantially all of our assets pursuant to section 363(b) of the U.S. Bankruptcy Code to a new operating company, and a subsequent liquidation of the remaining assets in the bankruptcy case; (ii) pursuing a plan of reorganization (where votes for the plan are solicited from certain classes of creditors prior to a bankruptcy filing) that we would seek to confirm (or "cram down") despite the deemed rejection of the plan by the class of holders of old notes; or (iii) seeking another form of bankruptcy relief, all of which involve uncertainties, potential delays and litigation risks. We are considering these alternatives in consultation with the U.S. Treasury, our largest lender.

If we seek bankruptcy relief, holders of old notes may receive consideration that is less than what is being offered in the exchange offers, and it is possible that such holders may receive no consideration at all for their old notes.

For a more complete description of potential bankruptcy relief and risks relating to our failure to consummate the exchange offers, see "*Bankruptcy Relief*" and "*Risk Factors—Risks Related to Failure to Consummate the Exchange Offers.*"

**Q:  Why are we considering seeking relief under Chapter 11 of the U.S. Bankruptcy Code?**

A:   An out of court restructuring through the exchange offers or an in court restructuring pursuant to the U.S. Bankruptcy Code provide alternative means of restructuring our liabilities and seeking to achieve the survival and long-term viability of our business. Although we do not intend to seek relief under the U.S. Bankruptcy Code if the exchange offers are consummated, in the event we have not received prior to June 1, 2009 sufficient tenders of old notes (including the old Series D notes) to consummate the exchange offers, we currently expect to seek relief under the U.S. Bankruptcy Code.

**Q:  Why are we pursuing an out of court restructuring rather than an in court restructuring?**

A:   We believe there are advantages to restructuring GM out of court. We believe that the successful consummation of the exchange offers would, among other things:

- enable us to continue operating our business without the negative impact that a bankruptcy could have on our relationships with our customers, employees, suppliers, dealers and others;

- reduce the risk of a potentially precipitous decline in our revenues in a bankruptcy; and

- allow us to complete our restructuring in less time and with less risk than any bankruptcy alternatives.

x

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

If we have to resort to bankruptcy relief, among other things, you may receive consideration that is less than what is being offered in the exchange offers, and it is possible that you may receive no consideration at all for your old notes.

**Q: What will I receive if I tender my old notes pursuant to the exchange offers and they are accepted?**

A: The exchange consideration per 1,000 U.S. dollar equivalent of principal amount (or accreted value as of the settlement date, if applicable) of old notes accepted for exchange will be 225 shares of GM common stock.

Assuming full participation in the exchange offers, holders of old notes tendered in the exchange offers will receive, in the aggregate, approximately 6.1 billion shares of GM common stock, which would represent approximately 10% of the pro forma outstanding GM common stock.

On the settlement date, GM's restated certificate of incorporation will be amended to effect a 1-for-100 reverse stock split of GM common stock, whereby each 100 shares of GM common stock will be converted into one share of GM common stock.

There is no requirement for an individual holder to tender a minimum principal amount of old notes in the exchange offers. However, where, in connection with the exchange offers or as a result of the reverse stock split, a tendering holder of old notes would otherwise be entitled to receive a fractional share of GM common stock, the number of shares of GM common stock to be received by such holder will be rounded down to the nearest whole number and no cash or other consideration will be delivered to such holder in lieu of such rounded down amount.

In addition, (a) GM will pay, in cash, accrued interest on the old GM notes, other than the discount notes and (b) GM Nova Scotia will pay, in cash, accrued interest on the old GM Nova Scotia notes, in each case, from and including the most recent interest payment date to, but not including, the settlement date. See "*The Exchange Offers and Consent Solicitations—Terms of the Exchange Offers.*"

**Q: How do I participate in the exchange offers and consent solicitations?**

A: To participate in the exchange offers and consent solicitations, you should contact your broker, bank or other nominee or custodian and instruct it to tender your old notes and consent prior to the expiration date.

You may have been provided with a letter of instructions along with this prospectus that may be used by you to instruct a broker, bank or other nominee or custodian to effect the tender of old notes for exchange and consent to the proposed amendments on your behalf.

If you have questions or need assistance in connection with the exchange offers or consent solicitations or require additional letters of transmittal and any other required documents, you may contact D.F. King & Co., Inc., the Exchange Agent and Solicitation and Information Agent, at the address and telephone numbers set forth on the back cover of this prospectus.

Except for holders who tender non-USD old notes prior to the date on which the registration statement of which this prospectus forms a part is declared effective, holders may not tender their old notes pursuant to the exchange offers without delivering consents to the proposed amendments, and holders may not deliver consents to the proposed amendments pursuant to the consent solicitations without tendering their old notes.

Holders of old notes that reside outside of the United States are advised to contact the Solicitation and Information Agent for a copy of the EU Approved Prospectus or the Canadian Offering Memorandum, as applicable, which contains separate representations and certifications that are agreed to upon the tendering of old notes by any such holder outside the United States.

***For USD old notes***

USD old notes must be tendered through The Depository Trust Company ("DTC"). DTC participants must electronically transmit their acceptance of an offer through DTC's Automated Tender Offer Program ("ATOP"), for which the exchange offers and consent solicitations will be eligible.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007360

By participating in the exchange offers in this manner, you will be deemed to have acknowledged and agreed that you are bound by the terms of the letter of transmittal, are qualified to accept the exchange offers and consent solicitations and that we may enforce the terms and conditions contained in the letter of transmittal against you.

Holders whose USD old notes are held through Euroclear or Clearstream (together with DTC, the "Clearing Systems") must transmit their acceptance in accordance with the requirements of Euroclear or Clearstream in sufficient time for such tenders to be timely made prior to the expiration date. Holders should note that such Clearing Systems may require that action be taken a day or more prior to the expiration date in order to cause such old notes to be tendered through DTC.

See "*The Exchange Offers and Consent Solicitations—Procedures for Tendering Old Notes—Tender of USD Old Notes through DTC*" for more information.

### For non-USD old notes

Non-USD old notes must be tendered through either Euroclear or Clearstream. The tender of non-USD old notes through Euroclear or Clearstream will be deemed to have occurred upon receipt by the relevant Clearing System of a valid electronic instruction notice in accordance with the requirements of such Clearing System.

By participating in the exchange offers in this manner, you will be deemed to have acknowledged and agreed that you are bound by the terms of the electronic instruction notice, are qualified to accept the exchange offers and consent solicitations and that we may enforce the terms and conditions contained in the electronic instruction notice against you.

Holders must take the appropriate steps to block non-USD old notes to be tendered in Euroclear or Clearstream so that no transfers may be effected in relation to such non-USD old notes at any time after the date of tender in accordance with the requirements of the relevant Clearing System and the deadlines required by such Clearing System.

See "*The Exchange Offers and Consent Solicitations—Procedures for Tendering Old Notes—Tender of non-USD old notes through Euroclear or Clearstream*" for more information.

**Q:  What are the conditions to the exchange offers?**

A:  Consummation of the exchange offers is conditioned upon the satisfaction or waiver of the conditions described under "*The Exchange Offers and Consent Solicitations—Conditions to the Exchange Offers.*" We currently expect that certain conditions may require us to extend the scheduled expiration date in order to be satisfied. For example, the receipt of judicial approval of the proposed VEBA Modifications (as defined below) and the transactions contemplated thereby are currently expected to take up to three months once a binding agreement in respect thereof has been entered into, and therefore require a significant extension of the expiration date beyond the date when withdrawal rights are terminated.

One principal condition, the U.S. Treasury Condition, is the requirement that the results of the exchange offers shall be satisfactory to the U.S. Treasury, including in respect of the overall level of participation by holders of old notes in the exchange offers and in respect of the level of participation by holders of the old Series D notes in the exchange offers.

We currently believe, and our Viability Plan assumes, that at least 90% of the aggregate principal amount (or, in the case of discount notes, accreted value) of the outstanding old notes (including at least 90% of the aggregate principal amount of the outstanding old Series D notes) will need to be tendered in the exchange offers or called for redemption pursuant to the call option (in the case of the non-USD old notes) in order to satisfy the U.S. Treasury Condition. Whether this level of participation in the exchange offers will be required (or sufficient) to satisfy the U.S. Treasury Condition will ultimately be determined by the U.S. Treasury. The actual overall level of participation in the exchange offers may be different than what we have assumed, and this difference may be material.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM00007361

**Q:    Will the exchange consideration I receive upon tender of the old notes be freely tradable in the United States?**

A:    Yes. Generally, the exchange consideration you will receive pursuant to the exchange offers will be freely tradable in the United States, unless you are an affiliate of GM, as that term is defined in the Securities Act of 1933, as amended (the "Securities Act"). GM's common stock is listed on the New York Stock Exchange ("NYSE") under the symbol "GM."

**Q:    If the exchange offers are consummated and I do not participate, how will my rights and obligations under the old notes be affected?**

A:    Old notes not tendered pursuant to the exchange offers will remain outstanding after the consummation of the exchange offers. However, we intend to redeem any non-USD old notes that are not tendered in the exchange offers pursuant to the call option immediately upon the effectiveness of the proposed amendments to the debt instruments governing the non-USD old notes, if adopted. For more information, see "—*What are the consequences to holders of old notes if we fail to consummate the exchanged offers?*" above.

If the exchange offers are consummated, then the debt instruments governing non-tendered old notes will be amended and holders of old notes will be bound by the terms of those debt instruments even if they did not consent to the proposed amendments. The proposed amendments would eliminate certain provisions under the debt instruments governing non-tendered old notes, including:

- the limitation on our ability to incur liens and enter into sale-leaseback transactions;

- the limitation on merger, consolidation, sales or conveyance of assets; and

- certain events of default relating to the failure to perform non-payment related covenants and certain events of bankruptcy, insolvency or reorganization.

In addition and as discussed above, the proposed amendments to the debt instruments governing the non-USD old notes would add a call option with respect to each series of non-USD old notes. The call option will provide that outstanding non-USD old notes of each series may be redeemed at any time at the option of GM or GM Nova Scotia, as the case may be, in return for the exchange consideration offered pursuant to the exchange offers (*i.e.*, 225 shares of GM common stock per 1,000 U.S. dollar equivalent of principal amount of non-USD old notes). In addition, (a) GM will pay, in cash, accrued interest on the Euro old notes called for redemption pursuant to the call option and (b) GM Nova Scotia will pay, in cash, accrued interest on the old GM Nova Scotia notes called for redemption pursuant to the call option, in each case, from and including the most recent interest payment date to, but not including, the redemption date, which is expected to be the settlement date. We intend to exercise the call option in respect of all non-USD old notes not tendered in the exchange offers immediately upon the effectiveness of the proposed amendments to the debt instruments governing the non-USD old notes, if adopted. From and after the time that we exercise the call option on any series of non-USD old notes, (1) such notes will be deemed to be discharged, (2) such notes will not be transferable and (3) holders of such notes will have no further rights in respect of those notes other than receipt of the exchange consideration and payment in cash of accrued but unpaid interest on such notes.

For a more detailed description of the proposed amendments to the debt instruments governing the old notes, see "*Proposed Amendments*."

**Q:    What risks should I consider in deciding whether or not to tender my old notes pursuant to the exchange offers and consent to the proposed amendments?**

A:    In deciding whether to participate in the exchange offers and consent to the proposed amendments, you should carefully consider the discussion of risks and uncertainties described under "*Risk Factors*" herein and described under the caption "*Risk Factors*" located in certain of the documents incorporated by reference into this prospectus.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007362

**Q: Is GM or any of its subsidiaries making a recommendation regarding whether I should tender my old notes pursuant to the exchange offers and consent to the proposed amendments?**

A: None of GM, its subsidiaries (including GM Nova Scotia), their respective boards of directors, the Dealer Managers, the Solicitation and Information Agent, the Settlement and Escrow Agent, the Luxembourg Exchange Agent or the Exchange Agent (or any such party's respective agents, advisors or counsel) has made, or will make, a recommendation to any holder as to whether such holder should exchange its old notes pursuant to the exchange offers or grant its consent to the proposed amendments. You must make your own investment decision whether to exchange any old notes pursuant to the exchange offers and make your own decision whether to grant your consent to the proposed amendments in the consent solicitations. We urge you to read carefully this prospectus (including the information incorporated by reference) and the related letter of transmittal in its entirety, including the information set forth in the section entitled "*Risk Factors.*"

**Q: What are the material United States federal income tax consequences of the exchange offers to holders of old notes?**

A: We intend to take the position, although not free from doubt, that the exchange of old notes (other than old Series D notes) pursuant to the exchange offers will constitute a tax-free recapitalization in which gain or loss is generally not recognized. Any consideration allocable to accrued but unpaid interest generally will be taxable to a holder of old notes to the extent not previously included in such holders' gross income. Because the original term of the old Series D notes was less than five years, it is unclear whether the old Series D notes should be treated as "securities" for U.S. federal income tax purposes. It is therefore unclear whether the exchange of old Series D notes pursuant to the exchange offers will constitute a fully taxable transaction or a tax-free recapitalization. For a discussion of certain U.S. federal income tax consequences relating to the exchange offers, see "*Material United States Federal Income Tax Considerations.*"

**Q: If I am a holder outside the United States, can I participate in the exchange offers?**

A: A holder outside the United States may participate in the exchange offers but should refer to the disclosure under the "*Non-U.S. Offer Restrictions*" section. This prospectus does not constitute an offer to participate in the exchange offers and the consent solicitations to any person in any jurisdiction where it is unlawful to make such an offer or solicitation. Offers to holders in the United Kingdom, Austria, Belgium, France, Germany, Italy, Luxembourg, the Netherlands, Spain and Switzerland will be made only pursuant to the EU Approved Prospectus, which will incorporate this prospectus therein and will indicate on the front cover thereof if it can be used for such offers. Offers to non-U.S. qualified offerees outside of these jurisdictions (and the United States and Canada) will be made only pursuant to the EU Approved Prospectus, which will incorporate this prospectus and will indicate on the front cover thereof if it can be used for such offers. Offers to non-U.S. qualified offerees in Canada will be made only pursuant to the Canadian Offering Memorandum, which will incorporate this prospectus.

**Q: What are the old Series D Notes forbearance, waiver and extension provisions?**

A: By tendering, and not validly withdrawing, their old Series D notes, holders of old Series D notes will irrevocably agree, in the event the exchange offers are extended beyond June 1, 2009, to extend the maturity of their old Series D notes and to forbear from taking any action to enforce, or direct enforcement of, and waive any and all of the rights and remedies available to such holders under such old Series D notes or the indenture governing such old Series D notes (the "Forbearance, Waiver and Extension"), in each case until the Forbearance, Waiver and Extension Termination Date, which is the date of the earlier of (a) the termination of the exchange offers (including in the event GM files a petition for relief under the U.S. Bankruptcy Code) and (b) the consummation of the exchange offers. At the Forbearance, Waiver and Extension Termination Date, the Forbearance, Waiver and Extension will expire and any and all principal

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007363

and interest amounts otherwise due under any old Series D notes that remain outstanding (*i.e.*, any old Series D notes not accepted for exchange in the exchange offers) will become immediately due and payable. The Forbearance, Waiver and Extension will attach to any old Series D notes that have been tendered in the exchange offers and not validly withdrawn on or before May 26, 2009, which is the date set initially as the withdrawal deadline, or such later date as the registration statement of which this prospectus forms a part is declared effective or as GM in its absolute discretion may determine (the "Attachment Date"). The Attachment Date will also be the expiration and settlement dates for the exchange offer that we are making in which we are offering to exchange amended Series D notes (old Series D notes to which the Forbearance, Waiver and Extension have attached and which will not mature until the Forbearance, Waiver and Extension Termination Date) for old Series D notes. By having tendered, and not validly withdrawn, their old Series D notes as of the Attachment Date, such holders shall consent to the attachment of the Forbearance, Waiver and Extension to their old Series D notes, and GM may in its absolute discretion enter into a supplemental indenture as of the Attachment Date or take such other action as it determines is appropriate (including by assigning a temporary or different CUSIP number to such old Series D notes) to evidence the attachment of the Forbearance, Waiver and Extension; such holders shall also be deemed to have tendered any amended Series D notes issued, or deemed issued, by GM in order to implement the Forbearance, Waiver and Extension. If a holder of old Series D notes validly withdraws tendered old Series D notes prior to the Attachment Date, then such old Series D notes will not be subject to the Forbearance, Waiver and Extension. However, if a holder of old Series D notes validly withdraws its old Series D notes at any time following the Attachment Date (in the event withdrawal rights have been extended past or reinstated after the Attachment Date), then such old Series D notes, notwithstanding such withdrawal or any subsequent transfer, will continue to be subject to the Forbearance, Waiver and Extension until the Forbearance, Waiver and Extension Termination Date.

Our solicitation of the agreement of the holders of old Series D notes to the terms of the Forbearance, Waiver and Extension is an exchange offer in which we are offering to exchange amended Series D notes for old Series D notes. This exchange offer is subject to applicable SEC rules and regulations, including Rule 13e-4 under the Exchange Act. This exchange offer will expire, withdrawal rights with respect to this offer shall terminate, and the settlement date for this offer will occur on, the Attachment Date.

**Q:** **Can I revoke the tender of my old notes and my consents approving the proposed amendments at any time?**

**A:** You can revoke the tender of your old notes (and therefore your consent to the proposed amendments) prior to the withdrawal deadline, which is 11:59 p.m., New York City time, on May 26, 2009, unless extended, by delivering a written withdrawal instruction to the applicable Clearing System, in accordance with the relevant procedures described in "*The Exchange Offers and Consent Solicitations—Withdrawal of Tenders.*" Except in certain circumstances described in "*The Exchange Offers and Consent Solicitations— Withdrawal of Tenders,*" old notes that are validly tendered prior to the withdrawal deadline and that are not validly withdrawn prior to the withdrawal deadline may not be withdrawn on or after the withdrawal deadline, and old notes that are validly tendered on or after the withdrawal deadline may not be withdrawn.

If a holder of old Series D notes elects to withdraw tendered old Series D notes at any time following the Attachment Date (as described above), then such old Series D notes, notwithstanding such withdrawal or any subsequent transfer, will continue to be subject to the Forbearance, Waiver and Extension until the Forbearance, Waiver and Extension Termination Date.

**Q:** **What charter amendments are being made?**

**A:** The amount of GM common stock to be issued pursuant to the exchange offers, the U.S. Treasury Debt Conversion (as defined below) and the proposed VEBA Modifications exceeds the number of shares of GM common stock currently authorized under GM's certificate of incorporation. Consequently, prior to the distribution of GM common stock to tendering holders on the settlement date, we plan on implementing charter amendments that provide for, among other things, an increase in the number of authorized shares of GM common stock.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007364

To effect the charter amendments, the following will occur prior to the distribution of GM common stock to tendering holders on the settlement date:

- in partial satisfaction of the U.S. Treasury Debt Conversion, we will issue to the U.S. Treasury (or its designee) authorized shares of GM common stock in an amount that will represent a majority of the outstanding shares of GM common stock as of such date,

- the U.S. Treasury (or its designee) will execute and deliver to us a stockholder written consent authorizing the charter amendments, and

- we will file the charter amendments with the Delaware Secretary of State allowing us to (a) reduce the par value of GM common stock to $0.01 per share (the "par value reduction"), (b) increase the number of authorized shares of GM common stock to 62 billion shares (the "common stock increase"), and (c) effect a 1-for-100 reverse stock split of GM common stock, whereby each 100 shares of GM common stock will be converted into one share of GM common stock. See *Description of the Charter Amendments.*"

**Q:  Will fractional shares be issued in the exchange offers or the reverse stock split?**

**A:**  Unless otherwise indicated, all share numbers contained in this prospectus related to the exchange offers are presented without giving effect to the reverse stock split. We do not currently intend to issue fractional shares in connection with the exchange offers or the reverse stock split. Where, in connection with the exchange offers or as a result of the reverse stock split, a tendering holder of old notes would otherwise be entitled to receive a fractional share of GM common stock, the number of shares of GM common stock to be received by such holder will be rounded down to the nearest whole number and no cash or other consideration will be delivered to such holder in lieu of such rounded down amount. For example, 1,000 U.S. dollar equivalent amount of old notes would be exchanged for 225 shares of GM common stock, which would be converted to 2 shares of GM common stock after the reverse stock split and the rounding down of fractional shares occur. 3,000 U.S. dollar equivalent amount of old notes would be exchanged for 675 shares of GM common stock, which would be converted to 6 shares of GM common stock after the reverse stock split and the rounding down of fractional shares occur.

Stockholders who own GM common stock prior to the settlement date and would otherwise hold fractional shares because the number of shares of GM common stock they held before the reverse stock split would not be evenly divisible based upon the 1-for-100 reverse stock split ratio will be entitled to a cash payment (without interest or deduction) in respect of such fractional shares. To avoid the existence of fractional shares of GM common stock, shares that would otherwise result in fractional shares from the application of the reverse stock split will be collected and pooled by our transfer agent and sold in the open market and the proceeds will be allocated to the affected existing stockholders' respective accounts pro rata in lieu of fractional shares. The ownership of a fractional interest will not give the holder thereof any voting, dividend or other rights, except to receive the above-described cash payment. GM will be responsible for any brokerage fees or commissions related to the transfer agent's selling in the open market shares that would otherwise be entitled to fractional shares. See *Description of the Charter Amendments*" for greater detail about the reverse stock split.

**Q:  Whom do I call if I have any questions on how to tender my old notes or any other questions relating to the exchange offers and consent solicitations?**

A:  Questions and requests for assistance, and all correspondence in connection with the exchange offers and consent solicitations, or requests for additional letters of transmittal and any other required documents, may be directed to D.F. King & Co., Inc., the Exchange Agent and Solicitation and Information Agent, at the address and telephone numbers set forth on the back cover of this prospectus.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007365

## SUMMARY

*This summary highlights information contained elsewhere in, or incorporated by reference into, this prospectus. Because this is only a summary, it does not contain all of the information that may be important to you. For a more complete understanding of our company, the exchange offers and the consent solicitations, we encourage you to read this entire prospectus, including the section entitled "Risk Factors," the documents referred to under the heading "Where You Can Find More Information" and the documents incorporated by reference under the heading "Incorporation of Certain Documents by Reference."*

### General Motors Corporation

We are engaged primarily in the worldwide development, production and marketing of cars, trucks and parts. We develop, manufacture and market vehicles worldwide through our four automotive segments: GM North America, GM Europe, GM Latin America/Africa/Mid-East and GM Asia Pacific.

Our total worldwide car and truck deliveries were 8.4 million, 9.4 million and 9.1 million, in 2008, 2007 and 2006, respectively. Substantially all of our cars, trucks and parts are marketed through retail dealers in North America, and through distributors and dealers outside of North America, the substantial majority of which are independently owned. GM North America primarily meets the demands of customers in North America with vehicles developed, manufactured and/or marketed under the following brands:

| | | | |
|---|---|---|---|
| • Chevrolet | • Buick | • Saab | • GMC |
| • Pontiac | • Cadillac | • HUMMER | • Saturn |

The demands of customers outside North America are primarily met with vehicles developed, manufactured and/or marketed under the following brands:

| | | | |
|---|---|---|---|
| • Opel | • Saab | • GMC | • HUMMER |
| • Vauxhall | • Buick | • Cadillac | • Isuzu |
| • Holden | • Chevrolet | • Daewoo | • Suzuki |

At December 31, 2008, we also had equity ownership stakes, directly or indirectly through various regional subsidiaries, in joint venture companies, including GM Daewoo, New United Motor Manufacturing, Inc. (NUMMI), Shanghai GM, Ltd., SAIC-GM-Wuling Automobile Co. Ltd. and CAMI Automotive Inc. These companies design, manufacture and market vehicles under the following brands:

| | | | |
|---|---|---|---|
| • Pontiac | • Wuling | • Chevrolet | • Buick |
| • Daewoo | • Cadillac | • Holden | |

Our Saab, HUMMER and Saturn brands have been the subject of a strategic review. As a result of our strategic review of the global Saab brand business, Saab Automobile AB ("Saab") announced, in February of 2009, that it has filed for reorganization under a self-managed Swedish court process. Pending court approval, the reorganization will be executed over a three-month period and will require independent funding to succeed. During the reorganization process, Saab will continue to operate as usual in accordance with the formal reorganization process. A final resolution with respect to HUMMER, Saab and Saturn is expected to be made in 2009. In addition, Pontiac—which is part of the Buick, Pontiac-GMC retail channel—is expected to be phased out by 2010. Further, in connection with our plan to achieve and sustain long-term viability, international competitiveness and energy efficiency, we may review other brands to determine their fit within our portfolio. See "*The Restructuring—Viability Plan*" for a further discussion of our strategic approach.

In addition to the products we sell to our dealers for consumer retail sales, we also sell cars and trucks to fleet customers, including daily rental car companies, commercial fleet customers, leasing companies and governments. Sales to fleet customers are completed through our network of dealers and in some cases directly by us. Our retail and fleet customers can obtain a wide range of after sale vehicle services and products through our dealer network, such as maintenance, light repairs, collision repairs, vehicle accessories and extended service warranties.

1

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007366

## Recent Developments

### Business Updates

GM dealers in the United States sold 412,903 vehicles during the first quarter of 2009, which represents a decline of approximately 49% compared to the same period in 2008. The baseline sales assumption in our Viability Plan for the United States in 2009 is 2,048,000 vehicles, which is based on a baseline industry vehicle sales forecast for 2009 of 10.5 million total vehicles sold in the United States. Our market share forecast for 2009 is 19.5% in the United States.

In view of the decline in vehicle sales by our dealers in the United States and globally and continuing weak economic conditions generally, we anticipate that we generated substantial negative cash flow from operations during the first quarter of 2009 and that we will report significantly less revenue and significantly greater losses than those we experienced during the first quarter of 2008.

### U.S. Treasury Loan Agreements and Section 136 Loans

On December 31, 2008, we and certain of our domestic subsidiaries entered into the First U.S. Treasury Loan Agreement with the U.S. Treasury, pursuant to which the U.S. Treasury agreed to provide us with a $13.4 billion secured term loan facility. We borrowed $4.0 billion under this facility on December 31, 2008, $5.4 billion on January 21, 2009 and $4.0 billion on February 17, 2009. On January 16, 2009, we entered into the Second U.S. Treasury Loan Agreement, pursuant to which we borrowed $884.0 million from the U.S. Treasury and applied the proceeds of the loan to purchase additional membership interests in GMAC, increasing our common equity interest in GMAC from 49% to 59.9%.

The loans under the First U.S. Treasury Loan Agreement are scheduled to mature on December 30, 2011, and the loan under the Second U.S. Treasury Loan Agreement is scheduled to mature on January 16, 2012, in each case unless the maturity date is accelerated as provided in the applicable loan agreements. The maturity date may be accelerated if, among other things, the President's Designee has not certified our Viability Plan by the Certification Deadline (as defined below), which was initially March 31, 2009 and has been postponed to June 1, 2009, as discussed below.

On March 30, 2009, the President's Designee found that our Viability Plan, in its then-current form, was not viable and would need to be revised substantially in order to lead to a viable GM. The President's Designee also concluded that the steps required to be taken by March 31, 2009 under the First U.S. Treasury Loan Agreement, including receiving approval of the required labor modifications (the "Labor Modifications") by members of our unions, obtaining receipt of all necessary approvals of the required VEBA modifications (other than regulatory and judicial approvals) and commencing the exchange offers to implement the required debt reduction, had not been completed, and as a result, we had not satisfied the terms of the First U.S. Treasury Loan Agreement.

In conjunction with the March 30, 2009 announcement, the administration announced that it would offer us adequate working capital financing for a period of 60 days while it worked with us to develop and implement a more accelerated and aggressive restructuring that would provide us with a sound long-term foundation. On March 31, 2009, we and the U.S. Treasury entered into amendments to the First U.S. Treasury Loan Agreement and the Second U.S. Treasury Loan Agreement to postpone the Certification Deadline to June 1, 2009 and, with respect to the First U.S. Treasury Loan Agreement, to also postpone the deadline by which we are required to provide the Company Report (as defined below) to June 1, 2009. We and the U.S. Treasury entered into an amendment to the First U.S. Treasury Loan Agreement, pursuant to which, among other things, the U.S. Treasury agreed to provide us with $2.0 billion in additional working capital loans under the First U.S. Treasury Loan Agreement and we borrowed $2.0 billion on April 24, 2009. In connection with the amendment to provide the $2.0 billion of additional loans, we issued to the U.S. Treasury a promissory note in an aggregate principal amount of $133.4 million as part of the compensation for the additional loans. We refer to the debt incurred

2

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007367

under the First U.S. Treasury Loan Agreement, the Second U.S. Treasury Loan Agreement and any other debt issued or owed to the U.S. Treasury in connection with those loan agreements (including any additional debt that may be incurred after the date hereof in connection with the foregoing but excluding any debt incurred in connection with the Receivables Program and U.S. Government Warranty Program, each as defined below), as the "U.S. Treasury Debt."

On April 6, 2009, the U.S. Department of Energy (the "Department of Energy") determined that we did not meet the financial viability requirements to qualify for federal funding ("Section 136 Loans") of our advanced technology vehicle programs under Section 136 of EISA. The Department of Energy's determination was based on the U.S. Treasury's response to our Viability Plan we submitted to the U.S. Treasury on February 17, 2009. We expect that the Department of Energy will determine that we meet the viability requirements under EISA if the U.S. Treasury approves our current Viability Plan.

### Changes in Management

On March 29, 2009, G. Richard Wagoner, Jr. announced his resignation as Chairman and Chief Executive Officer of GM. Following Mr. Wagoner's resignation, Kent Kresa was named interim Chairman and Frederick A. Henderson was named Chief Executive Officer. At the same time, we announced our intention to reconstitute our board of directors such that new directors will make up the majority of the board.

### Automotive Supplier Financing

On March 19, 2009, the U.S. Treasury announced that it will provide up to $5 billion in financial assistance to automotive suppliers by guaranteeing or purchasing certain of the receivables payable by us. On April 3, 2009, GM Supplier Receivables LLC ("GM Receivables") and the U.S. Treasury entered into various agreements to establish our participation in the program (the "Receivables Program"). The Receivables Program is expected to operate for up to one year and may, at the U.S. Treasury's direction, be extended for a longer term. We have begun the process of qualifying certain suppliers of goods and services to participate in the Receivables Program.

In order to fund these purchases of receivables and operate the Receivables Program, it is expected that we will make equity contributions to GM Receivables of up to $175 million, and the U.S. Treasury will loan up to $3.5 billion to GM Receivables.

### U.S. Government Warranty Program

On March 30, 2009, the U.S. Government announced that it will create a warranty program pursuant to which a separate account will be created and funded with cash contributed by us and a loan from the U.S. Treasury to pay for repairs covered by our warranty on each new vehicle sold by us during our restructuring period. It is expected that the cash contributions from us and the loan from the U.S. Treasury will total 125% of the costs projected by us that are required to satisfy anticipated claims under the warranty issued on those vehicles. We have agreed to participate in the program and to contribute a portion of the cash required to cover the projected costs of anticipated warranty claims for each vehicle covered by the program.

### Foreign Restructuring Activities

*Saab.* Saab filed for reorganization protection under the laws of Sweden in February 2009. In connection with this reorganization, we have contacted a number of bidders and have provided them with information regarding Saab's operations. Saab may receive third party financing, but we do not intend to make any additional investment in Saab.

*Canada.* In March 2009, we reached an agreement with the Canadian Auto Workers Union, which we expect will reduce the legacy costs associated with General Motors of Canada Limited's operations by

3

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007368

approximately C$930 million. This agreement is contingent upon our successfully receiving funding from the government of Canada for our Canadian operations. We are currently in advanced discussions with the government of Canada with respect to such funding. Final terms and conditions are still to be determined but we expect to reach an agreement shortly.

*Europe.* We continue to work towards a restructuring of our German and certain other European operations, which could include a third party investment in a new vehicle manufacturing company that would own all or a significant part of our European operations. We are currently in talks with the German government and several parties with respect to such an investment. If consummated, this restructuring could significantly reduce our ownership interest and control over our European operations.

*Other Countries.* We are engaged in discussions with governments in various other foreign countries in which we operate regarding financial support for foreign operations.

We cannot assure you that we will be successful in obtaining financial support from any foreign governments or successfully restructuring any of our foreign operations. See "*Risk Factors—Risks Relating to Our Viability Plan and Our Business—The success of our Viability Plan and our ability to continue as a going concern depend on our ability to obtain significant additional funding from the United States and certain foreign governments.*"

### Strategic Initiatives

We believe that the continuing downturn in the global automotive industry is likely to cause significant changes in ownership and consolidation among vehicle manufacturers and other industry participants. We are currently considering a wide range of shared interest and comprehensive restructuring opportunities on a national and global basis, such as possible transactions with other vehicle manufacturers, including finding an outside investor in Adam Opel GmbH (one of our existing German subsidiaries). Any strategic initiatives, domestic or foreign, if consummated, could be material to us. See "*Risk Factors—Risks Relating to Our Viability Plan and Our Business—Our Viability Plan contemplates that we restructure our operations in various foreign countries but we may not succeed in doing so and that could have a material adverse effect on our business.*"

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007369

### Relationship with GMAC

A significant portion of the financing received by our dealers and customers is provided through GMAC, the successor to General Motors Acceptance Corporation. GMAC was our wholly owned subsidiary until November 30, 2006, when we sold a 51% controlling ownership interest in GMAC to a consortium of investors ("FIM Holdings"). GMAC provides a broad range of financial services, including consumer vehicle financing, automotive dealership and other commercial financing, residential mortgage services, automobile service contracts, personal automobile insurance coverage and selected commercial insurance coverage.

As a result of the financial market turmoil and depressed economy, GMAC had been facing significant income and liquidity challenges that adversely affected both the value of our investment in GMAC and the extent to which GMAC was able to provide financing to GM dealers and customers. Consequently, GMAC had reduced its financing of vehicle sales and leases, including completely exiting the retail vehicle financing business in certain international markets. These developments in turn made it harder for our customers to find financing and resulted in lost sales for us. These developments also make it harder for our dealers to finance vehicle purchases from us.

On December 24, 2008, GMAC's application to become a bank holding company was approved by the Board of Governors of the Federal Reserve System. As a bank holding company, GMAC has indicated that it is better positioned to lend to auto and mortgage consumers and businesses such as automotive dealers; however, bank holding company status alone will not allow GMAC to meet all of our consumer and wholesale dealer funding needs.

In December 2008, we and FIM Holdings entered into a subscription agreement with GMAC under which we agreed to purchase additional common membership interests in GMAC. The U.S. Treasury had committed to provide us with additional funding in order to purchase the additional common membership interests in GMAC. In January 2009, we borrowed $884.0 million from the U.S. Treasury under the Second U.S. Treasury Loan Agreement and utilized those funds to purchase 190,921 Common Membership Interests of GMAC. As a result of the purchase, our interest in GMAC's Common Membership Interests increased from 49% to 59.9%. Borrowings under the Second U.S. Treasury Loan Agreement are secured by our common and preferred membership interests in GMAC. As part of this loan agreement, the U.S. Treasury has the option to convert outstanding amounts under this loan agreement into Common Membership Interests of GMAC on a pro rata basis. In connection with the conversion of GMAC to a bank holding company, we committed to the Board of Governors of the Federal Reserve System that we would reduce our ownership interest in GMAC to less than 10 percent of the voting and total equity interest of GMAC by December 24, 2011. Pursuant to our understanding with the U.S. Treasury, all but 7.4% of our common equity interest will be placed in one or more trusts by May 22, 2009, for ultimate disposition. The trustee(s) will be independent from us, and will be responsible for disposing of the GMAC common equity interests held in trust. We will be the beneficial owner of these trusts, but the trusts' assets will be controlled by the applicable trustee. The trusts must dispose of the shares within three years. In addition, we have agreed not to exercise any controlling influence over GMAC and all GM-affiliated members of the GMAC board of managers have resigned. We continue to account for GMAC using the equity method of accounting.

Our principal executive offices are located at 300 Renaissance Center, Detroit, Michigan 48265-3000. Our telephone number at that address is (313) 556-5000.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007370

## Summary of the Restructuring

### Background of the Restructuring

Reflecting a dramatic deterioration in economic and market conditions during 2008, new vehicle sales in the United States declined rapidly, falling to their lowest per-capita levels in more than 50 years. During this period, our revenues fell precipitously due to the deteriorating market conditions and in part reflecting escalating public speculation about a potential bankruptcy. This decrease in revenues resulted in a significant decline in our liquidity. We determined that despite the far reaching actions we were then undertaking to restructure our U.S. business, our liquidity would fall to levels below that needed to operate, and we were compelled to request financial assistance from the U.S. Government.

### U.S. Treasury Loan Agreements and Our Viability Plan

On December 2, 2008, we submitted a restructuring plan for long-term viability to the Senate Banking Committee and the House of Representatives Financial Services Committee. As part of that submission and in order to bridge to more normal market conditions, we requested temporary federal assistance of $18.0 billion, comprised of a $12.0 billion term loan and a $6.0 billion line of credit to sustain operations and accelerate implementation of our restructuring.

Following that submission, we entered into negotiations with the U.S. Treasury and on December 31, 2008, we and certain of our domestic subsidiaries entered into the First U.S. Treasury Loan Agreement with the U.S. Treasury pursuant to which the U.S. Treasury agreed to provide us with a $13.4 billion secured term loan facility. We borrowed $4.0 billion under this facility on December 31, 2008, $5.4 billion on January 21, 2009 and $4.0 billion on February 17, 2009. In connection with the initial funding under the facility, we issued to the U.S. Treasury a warrant initially exercisable for 122,035,597 shares of our common stock, subject to adjustment, and the U.S. Treasury Promissory Note in an aggregate principal amount of $748.6 million as part of the compensation for the loans initially provided by the U.S. Treasury. On January 16, 2009, we entered into the Second U.S. Treasury Loan Agreement, pursuant to which we borrowed $884.0 million from the U.S. Treasury and applied the proceeds of the loan to purchase additional membership interests in GMAC, increasing our common equity interest in GMAC from 49% to 59.9%.

As a condition to obtaining the loans under the First U.S. Treasury Loan Agreement, we agreed to submit on or before February 17, 2009 a Viability Plan that included specific actions intended to result in the following:

- repayment of all loans made under the First U.S. Treasury Loan Agreement, together with all interest thereon and reasonable fees and out-of-pocket expenses incurred in connection therewith and all other financings extended by the U.S. government;

- compliance with federal fuel efficiency and emissions requirements and commencement of domestic manufacturing of advanced technology vehicles;

- achievement of a positive net present value, using reasonable assumptions and taking into account all existing and projected future costs;

- rationalization of costs, capitalization and capacity with respect to our manufacturing workforce, suppliers and dealerships; and

- a product mix and cost structure that is competitive in the U.S. marketplace.

Key aspects of the Viability Plan we submitted on February 17, 2009 (sometimes referred to as the "February 17 Viability Plan") as well as of our current Viability Plan are described under "*The Restructuring— Viability Plan.*"

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007371

The First U.S. Treasury Loan Agreement also required us to, among other things, use our best efforts to achieve the following restructuring targets:

*Debt Reduction*

- reduction of our outstanding unsecured public debt by not less than two-thirds through conversion of existing public debt into equity, debt and/or cash or by other appropriate means;

*Labor Modifications*

- reduction of the total amount of compensation, including wages and benefits, paid to our U.S. employees so that, by no later than December 31, 2009, the average of such total amount, per hour and per person, is an amount that is competitive with the average total amount of such compensation, as certified by the Secretary of the United States Department of Labor, paid per hour and per person to employees of Nissan, Toyota or Honda whose site of employment is in the United States;

- elimination of the payment of any compensation or benefits to our or our subsidiaries' U.S. employees who have been fired, laid-off, furloughed or idled, other than customary severance pay;

- application, by December 31, 2009, of work rules for our and our subsidiaries' U.S. employees, in a manner that is competitive with the work rules for employees of Nissan, Toyota or Honda whose site of employment is in the United States; and

*VEBA Modifications*

- modification of our retiree healthcare obligations to the New VEBA arising under the VEBA settlement agreement such that payment or contribution of not less than one-half of the value of each future payment or contribution made by us to the New VEBA shall be made in the form of GM common stock, with the value of any such payment or contribution not to exceed the amount that was required for such period under the VEBA settlement agreement.

The First U.S. Treasury Loan Agreement required us to submit to the President's Designee, by March 31, 2009, a report (the "Company Report") detailing, among other things, the progress we had made in implementing our Viability Plan, including evidence satisfactory to the President's Designee that (a) the required Labor Modifications had been approved by the members of the leadership of each major U.S. labor organization that represents our employees, (b) all necessary approvals of the required VEBA modifications, other than judicial and regulatory approvals, had been received and (c) an exchange offer to implement the debt reduction had been commenced.

In addition, the First U.S. Treasury Loan Agreement and the Second U.S. Treasury Loan Agreement provided that if, by March 31, 2009 or a later date (not to exceed 30 days after March 31, 2009) as determined by the President's Designee (the "Certification Deadline"), the President's Designee had not certified that we had taken all steps necessary to achieve and sustain our long-term viability, international competitiveness and energy efficiency in accordance with our Viability Plan, then the loans and other obligations under the First U.S. Treasury Loan Agreement and the Second U.S. Treasury Loan Agreement were to become due and payable on the thirtieth day after the Certification Deadline.

On March 30, 2009, the President's Designee found that our Viability Plan, in its then-current form, was not viable and would need to be revised substantially in order to lead to a viable GM. The President's Designee also concluded that certain steps required to be taken by March 31, 2009 under the First U.S. Treasury Loan Agreement, including receiving approval of the required Labor Modifications by members of our unions, obtaining receipt of all necessary approvals of the required VEBA modifications (other than regulatory and judicial approvals) and commencing the exchange offers to implement the required debt reduction, had not been completed, and as a result, we had not satisfied the terms of the First U.S. Treasury Loan Agreement.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007372

A statement released by the U.S. government with respect to the President's Designee's viability determination (the "Viability Determination Statement") indicated that while many factors had been considered when assessing viability, the most fundamental benchmark that a business must meet to be considered viable was its ability—after accounting for spending on research and development and capital expenditures necessary to maintain and enhance its competitive position—to generate positive cash flow and earn an adequate return on capital over the course of a normal business cycle. The Viability Determination Statement noted that our Viability Plan assumed that we would continue to experience negative free cash flow (before financing, but after legacy obligations) through the projection period specified in our Viability Plan, thus failing this fundamental test for viability.

The Viability Determination Statement noted that we were in the early stages of an operational turnaround in which we had made material progress in a number of areas, including purchasing, product design, manufacturing, brand rationalization and dealer network. However, the Viability Determination Statement also indicated that it was important to recognize that a great deal of additional progress needed to be made, and that our plan was based on, in its view, assumptions that would be challenging in the absence of a more aggressive restructuring, including assumptions with respect to market share, price, brands and dealers, product mix and cash needs associated with legacy liabilities. In this regard, the Viability Determination Statement noted that:

- our plan contemplated that each of our restructuring initiatives will continue well into the future, in some cases until 2014, before they are complete and it concluded that "the slow pace at which [the] turnaround is progressing undermines [GM's] ability to compete against large, highly capable and well-funded competitors";

- "given the slow pace of the turnaround, the assumptions in GM's business plan are too optimistic"; and

- even under "optimistic assumptions [GM] [will] remain breakeven, at best, on a free cash flow basis through the projection period, thus failing the fundamental test of viability."

In conjunction with the March 30, 2009 announcement, the administration announced that it would offer us adequate working capital financing for a period of 60 days while it worked with us to develop and implement a more accelerated and aggressive restructuring that would provide us with a sound long-term foundation. On March 31, 2009, we and the U.S. Treasury entered into amendments to the First U.S. Treasury Loan Agreement and the Second U.S. Treasury Loan Agreement to postpone the Certification Deadline to June 1, 2009 and, with respect to the First U.S. Treasury Loan Agreement, to also postpone the deadline by which we are required to provide the Company Report to June 1, 2009. We and the U.S. Treasury entered into an amendment to the First U.S. Treasury Loan Agreement, pursuant to which, among other things, the U.S. Treasury agreed to provide us with $2.0 billion in additional working capital loans under the First U.S. Treasury Loan Agreement and we borrowed $2.0 billion on April 24, 2009. In connection with the amendment to provide the $2.0 billion of additional loans, we issued to the U.S. Treasury a promissory note in an aggregate principal amount of $133.4 million as part of the compensation for the additional loans.

In response to the Viability Determination Statement, we have made further modifications to our Viability Plan to satisfy the President's Designee's requirement that we undertake a substantially more accelerated and aggressive restructuring plan, including by revising our operating plan to take more aggressive action and by increasing the amount of the debt reduction that we will seek to achieve beyond that originally required by the First U.S. Treasury Loan Agreement.

We believe that offering only equity consideration in the exchange offers and seeking to reduce our outstanding public indebtedness by more than the two-thirds originally required under the First U.S. Treasury Loan Agreement will be a key factor in satisfying our debt reduction objectives set forth in our Viability Plan and in demonstrating our ability to achieve and sustain long-term viability as required by the First U.S. Treasury Loan Agreement and thus, in ultimately obtaining the required certification from the President's Designee.

8

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007373

Accordingly, we currently believe, and our Viability Plan assumes, that at least 90% of the aggregate principal amount (or, in the case of discount notes, accreted value) of the outstanding old notes (including at least 90% of the aggregate principal amount of the outstanding old Series D notes) will need to be tendered in the exchange offers or called for redemption pursuant to the call option (in the case of the non-USD old notes) in order to satisfy the U.S. Treasury Condition. Whether this level of participation in the exchange offers will be required (or sufficient) to satisfy the U.S. Treasury Condition will ultimately be determined by the U.S. Treasury. The actual level of participation in the exchange offers may be different than what we have assumed, and this difference may be material.

We are currently in discussions with the U.S. Treasury regarding the terms of a potential restructuring of our debt obligations owed to it under the U.S. Treasury Debt, pursuant to which the U.S. Treasury would exchange at least 50% of our outstanding U.S. Treasury Debt at June 1, 2009 for GM common stock (the "U.S. Treasury Debt Conversion"). These discussions are ongoing and the U.S. Treasury has not agreed or indicated a willingness to agree, to any specific level of debt reduction. For purposes of this prospectus, GM has set as a condition to the closing of the exchange offers that the U.S. Treasury Debt Conversion provide for the issuance of GM common stock to the U.S. Treasury (or its designee) in exchange for (a) full satisfaction and cancellation of at least 50% of our outstanding U.S. Treasury Debt at June 1, 2009 (such 50% currently estimated to be approximately $10 billion) and (b) full satisfaction and cancellation of our obligations under the warrant issued to the U.S. Treasury.

In addition, we and the U.S. Treasury are currently in discussions with the UAW and the VEBA-settlement class representative regarding the terms of the required VEBA modifications. Although these discussions are ongoing, for purposes of this prospectus, GM has set as a condition to the closing of the exchange offers that the proposed VEBA modifications meet certain requirements that go beyond the VEBA modifications required under the First U.S. Treasury Loan Agreement. The VEBA modifications that will be required as a condition to the closing of the exchange offers would provide for the restructuring of the approximately $20 billion present value (the "settlement amount") of obligations we owe under the VEBA settlement agreement. The settlement amount consists of (a) approximately $1.4 billion, which represents the total amount of our obligations to continue to provide post-retirement health care coverage under the GM plan from July 1, 2009 to December 31, 2009 (which would not be addressed by the VEBA modifications required under the First U.S. Treasury Loan Agreement) and (b) approximately $18.6 billion, which represents the present value of the future payments to the New VEBA as required under the VEBA settlement agreement. Our closing condition regarding the VEBA modifications (on such terms, the "VEBA Modifications") would provide that:

- at least 50% of the settlement amount (approximately $10 billion) will be extinguished in exchange for GM common stock; and

- cash installments will be paid in respect of the remaining approximately $10 billion settlement amount over a period of time, with such amounts and period to be agreed but together having a present value equal to the remaining settlement amount.

We have not reached an agreement with respect to either the U.S. Treasury Debt Conversion or the VEBA Modifications. The actual terms of the U.S. Treasury Debt Conversion and the VEBA Modifications are subject to ongoing discussions among GM, the UAW, the U.S. Treasury and the VEBA-settlement class representative, and there is no assurance that any agreement will be reached on the terms described above or at all. However, an agreement with respect to both the U.S. Treasury Debt Conversion and the VEBA Modifications is a condition to the exchange offers, and the terms of the U.S. Treasury Debt Conversion and the VEBA Modifications must satisfy the minimum conditions described above. We have set as a condition to the exchange offers that the terms of the VEBA Modifications shall be satisfactory to the U.S. Treasury.

The aggregate amount of GM common stock to be issued to the U.S. Treasury (or its designee) pursuant to the U.S. Treasury Debt Conversion and to the New VEBA pursuant to the VEBA Modifications will be approximately 54.4 billion shares, which would represent approximately 89% of the pro forma outstanding GM

9

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

common stock (assuming full participation in the exchange offers) with the final allocation between the U.S. Treasury (or its designee) and the New VEBA to be determined in the future. However, as a condition to closing the exchange offers, subject to the overall limit of approximately 89% of the pro forma outstanding GM common stock to be issued to the U.S. Treasury (or its designee) and the New VEBA in the aggregate, the U.S. Treasury (or its designee) will hold at least 50% of the aggregate amount of pro forma outstanding GM common stock. Of the remaining pro forma outstanding GM common stock (assuming full participation in the exchange offers), holders of old notes would represent approximately 10%, and existing GM common stockholders would represent approximately 1%.

We determined the foregoing GM common stock allocations following discussions with the U.S. Treasury where the U.S. Treasury indicated that it would not be supportive of higher allocations to the holders of old notes or to existing GM common stockholders.

We will disclose the terms of any agreement reached with respect to either the U.S. Treasury Debt Conversion or the VEBA Modifications and currently expect to be able to do so prior to the withdrawal deadline of the exchange offers. In the event the terms of these agreements do not satisfy the closing conditions and as a result we decide to waive a condition or otherwise amend the terms of the exchange offers, we will provide notice of the waiver or amendment, disseminate additional offer documents, extend the exchange offers and extend (or reinstate) withdrawal rights as we determine necessary and to the extent required by law.

Modification of the VEBA settlement agreement to give effect to the VEBA Modifications will require the approval of the VEBA-settlement class representative as well as the approval of the U.S. District Court for the Eastern District of Michigan. The VEBA Modifications will also require ratification by The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"). Receipt of necessary judicial and regulatory approvals of the VEBA Modifications are a condition precedent to the consummation of the exchange offers. Prior regulatory approval of the U.S. Department of Labor will not be required for the VEBA Modifications and consequently will not be a condition to the exchange offers. See "*Risk Factors—Risks Related to the Exchange Offer—Approval of the VEBA Modifications is subject to appeal and such modifications could be entirely unwound. Implementing the VEBA Modifications may require us to use an alternative structure to comply with ERISA rules and we cannot assure you the structure will not violate these rules.*"

A summary of additional actions being taken with respect to each of the other key elements of our Viability Plan is set forth under "*The Restructuring—Viability Plan.*"

**Future Liquidity Requirements and Requests for Additional Funding**

In the February 17 Viability Plan we submitted to the President's Designee pursuant to the First U.S. Treasury Loan Agreement, we forecasted a need for funding from the U.S. Treasury of $22.5 billion under our baseline scenario and $30.0 billion under our downside scenario (in each case including the $13.4 billion then outstanding under the First U.S. Treasury Loan Agreements, but not including the $748.6 million promissory note we issued to the U.S. Treasury as part of the compensation for the loans thereunder and the $884.0 million we borrowed to purchase additional membership interests in GMAC). In order to execute our current Viability Plan, we currently forecast a need for U.S. Treasury funding totaling $27.0 billion, representing the $22.5 billion requested in our February 17 Viability Plan submission under our baseline scenario, plus an additional $4.5 billion needed to implement incremental restructuring actions, cover higher projected negative operating cash flow primarily due to lower forecasted vehicle sale volumes in North America, and to compensate for lower than originally forecasted proceeds from asset sales and other sources of financing, including Department of Energy Section 136 Loans for production of advanced technology vehicles and components. Our current Viability Plan assumes that we receive $5.7 billion of Section 136 Loans and an additional $5.6 billion in funding from foreign governments.

10

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007375

As discussed above, the U.S. Treasury agreed to provide us with $2.0 billion of additional working capital loans and we borrowed $2.0 billion on April 24, 2009. As part of the compensation for these loans, we issued to the U.S. Treasury a promissory note in an aggregate principal amount of $133.4 million. We currently expect that we will need an additional $2.6 billion of working capital loans prior to June 1, 2009. We cannot assure you that the U.S. Treasury will provide the additional $2.6 billion of loans. If we were to receive the additional $2.6 billion of loans, we expect we would be required to issue to the U.S. Treasury a promissory note in an aggregate principal amount of $173.4 million as part of the compensation for these loans.

If we receive the additional $2.6 billion of loans and issue the additional $173.4 million promissory note to the U.S. Treasury in connection with those loans, as of June 1, 2009 we would have received loans from the U.S. Treasury of $18.0 billion (excluding the $884.0 million we borrowed to purchase additional membership interests in GMAC) and issued promissory notes in an aggregate principal amount of $1.1 billion as part of the compensation to the U.S. Treasury for these loans, and as a result, the total outstanding U.S. Treasury Debt would be approximately $20 billion. Under the terms of the U.S. Treasury Debt Conversion, at least 50% of the U.S. Treasury Debt outstanding at June 1, 2009 (including the $884.0 million we borrowed to purchase additional membership interests in GMAC and the other promissory notes we issued to the U.S. Treasury as part of the compensation for the loans provided to us), would be exchanged for new shares of GM common stock.

In our Viability Plan, we currently forecast that, after June 1, 2009, we will require an additional $9.0 billion of U.S. Treasury funding. We expect that if we were to receive this additional funding, we would be required to issue to the U.S. Treasury promissory notes in an aggregate principal amount of $600.3 million as part of the compensation for this funding. We have proposed that the U.S. Treasury commit to provide this additional $9.0 billion funding, together with the additional $2.6 billion referred to above, to us under, or on terms similar to those under, the existing U.S. Treasury Loan Agreements (we refer to the commitment to provide this total of $11.6 billion of additional financing as the "U.S. Treasury Financing Commitment"). We cannot assure you that the U.S. Treasury will provide the additional $2.6 billion and $9.0 billion of funding. The receipt of the U.S. Treasury Financing Commitment on commercially reasonable terms is a condition to the exchange offers. Assuming the exchange of 50% of our outstanding U.S. Treasury Debt at June 1, 2009 (such 50% currently estimated to be approximately $10 billion) and our receipt of the additional $9.0 billion, our total outstanding U.S. Treasury Debt would be $19.6 billion.

**Forbearance, Waiver and Extension with Respect to Old Series D Notes**

We currently have approximately $1 billion of outstanding old Series D notes, which mature on June 1, 2009. By tendering, and not validly withdrawing, their old Series D notes, holders of old Series D notes will irrevocably agree pursuant to the Forbearance, Waiver and Extension, in the event the exchange offers are extended beyond June 1, 2009, to extend the maturity of their old Series D notes and to forbear from taking any action to enforce, or direct enforcement of, and waive any and all of the rights and remedies available to such holders under such old Series D notes or the indenture governing such old Series D notes, in each case until the Forbearance, Waiver and Extension Termination Date, which is the date of the earlier of (a) the termination of the exchange offers (including in the event GM files a petition for relief under the U.S. Bankruptcy Code) and (b) the consummation of the exchange offers. At the Forbearance, Waiver and Extension Termination Date, the Forbearance, Waiver and Extension will expire and any and all principal and interest amounts otherwise due under any old Series D notes that remain outstanding (i.e., any old Series D notes not accepted for exchange in the exchange offers) will become immediately due and payable. However, in the event that the exchange offers are extended beyond June 1, 2009, but a sufficient principal amount of the old Series D notes has not been tendered in the exchange offers prior to such date to satisfy the U.S. Treasury Condition, or if we would be required to pay a significant amount upon maturity of the old Series D notes, then we may be unable to or choose not to repay the old Series D notes at maturity. A default in payment at maturity in respect of old Series D notes could potentially trigger a cross default, directly or indirectly, under the agreements governing certain of our

11

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007376

other material indebtedness, including our revolving credit and term loan agreements and the U.S. Treasury Loan Agreements. In such circumstances, we would have insufficient liquidity to pay such accelerated indebtedness as it becomes due, which would likely force us to terminate the exchange offers and seek relief under the U.S. Bankruptcy Code.

**Bankruptcy Relief**

In the event we have not received prior to June 1, 2009 sufficient tenders of old notes, including the old Series D notes, to consummate the exchange offers, we currently expect to seek relief under the U.S. Bankruptcy Code. This relief may include (i) seeking bankruptcy court approval for the sale of most or substantially all of our assets pursuant to section 363(b) of the U.S. Bankruptcy Code to a new operating company, and a subsequent liquidation of the remaining assets in the bankruptcy case; (ii) pursuing a plan of reorganization (where votes for the plan are solicited from certain classes of creditors prior to a bankruptcy filing) that we would seek to confirm (or "cram down") despite the deemed rejection of the plan by the class of holders of old notes; or (iii) seeking another form of bankruptcy relief, all of which involve uncertainties, potential delays and litigation risks. We are considering these alternatives in consultation with the U.S. Treasury, our largest lender. See "*Bankruptcy Relief*."

For a more complete description of the risks relating to our failure to consummate the exchange offers, see "*Risk Factors—Risks Related to Failure to Consummate the Exchange Offers*."

**General Motors Nova Scotia Finance Company**

GM Nova Scotia is the issuer of the old GM Nova Scotia notes, which are guaranteed by GM and subject to the exchange offers. GM Nova Scotia, incorporated on September 28, 2001 as a Nova Scotia unlimited company, is a direct, wholly-owned subsidiary of GM. GM Nova Scotia has no independent operations other than acting as a finance company for GM and its affiliates. GM Nova Scotia has assets consisting of two unsecured intercompany loans to General Motors of Canada Limited with a face value of approximately C$1.33 billion ("GMCL Intercompany Loans"). GM Nova Scotia is also party to two currency swap agreements with GM, pursuant to which GM Nova Scotia pays Canadian dollars and receives pounds sterling. As of March 31, 2009, GM Nova Scotia would owe a net liability of approximately C$632 million to GM under the swaps, if the swaps were terminated as of such date. See "*Description of General Motors Nova Scotia Finance Company*."

GM Nova Scotia is jointly making the exchange offers with GM in respect of the exchange offers for the old GM Nova Scotia notes. The exchange consideration being offered to holders of old GM Nova Scotia notes is the same as that being offered to holders of old GM notes. Old GM Nova Scotia notes acquired pursuant to the exchange offers or redeemed pursuant to the call option will be cancelled upon receipt by GM Nova Scotia.

In the event that we were to seek relief under the U.S. Bankruptcy Code, only the guarantee by GM of the old GM Nova Scotia notes would potentially be discharged in GM's reorganization case. The old GM Nova Scotia notes would not be cancelled and the holders thereof would not be precluded by a GM reorganization case from seeking payment from GM Nova Scotia for the balance due under the old GM Nova Scotia notes. In addition, because GM Nova Scotia is an "unlimited company," under Nova Scotia corporate law, if GM Nova Scotia is "wound up" (which includes liquidation and likely includes bankruptcy), the liquidator or trustee in bankruptcy may be able to assert a claim against GM, the shareholder of GM Nova Scotia, to contribute to GM Nova Scotia an amount sufficient for GM Nova Scotia to pay its debts and liabilities, including amounts equal to any amounts outstanding under the old GM Nova Scotia notes. It is possible that such claim for contribution may be impaired in the event GM seeks relief under the U.S. Bankruptcy Code. In addition, in the event that we were to seek relief under the U.S. Bankruptcy Code, General Motors of Canada Limited and/or GM Nova Scotia may decide to seek relief under applicable Canadian bankruptcy law, in which case the GMCL Intercompany Loans may be impaired. Each of the foregoing events may adversely affect the recovery holders of old GM Nova Scotia notes may receive on account of their old notes.



PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007377

### Summary of the Exchange Offers and Consent Solicitations

| | |
|---|---|
| Offerors . . . . . . . . . . . . . . . . . . . . . . . . . | General Motors Corporation and, in the case of the offer for old GM Nova Scotia notes, General Motors Corporation and General Motors Nova Scotia Finance Company, acting jointly. |
| Securities Subject to Exchange Offers . . | Each series of old notes set forth in the summary offering table on the inside front cover of this prospectus. |
| The Exchange Offers . . . . . . . . . . . . . . . | Upon the terms and subject to the conditions set forth in this prospectus and the related letter of transmittal (or form of electronic instruction notice, in the case of old notes held through Euroclear or Clearstream) as each may be amended from time to time, GM is offering to exchange 225 shares of GM common stock for each 1,000 U.S. dollar equivalent of principal amount (or accreted value as of the settlement date, if applicable) of old notes. |

Assuming full participation in the exchange offers, holders of old notes tendered in the exchange offers will receive, in the aggregate, approximately 6.1 billion shares of GM common stock, which would represent approximately 10% of the pro forma outstanding GM common stock.

In addition, (a) GM will pay, in cash, accrued interest on the old GM notes, other than the discount notes and (b) GM Nova Scotia will pay, in cash, accrued interest on the old GM Nova Scotia notes, in each case, from and including the most recent interest payment date to, but not including, the settlement date.

For purposes of determining the exchange consideration to be received in exchange for non-USD old notes (including in respect of non-USD old notes redeemed pursuant to the call option), an equivalent U.S. dollar principal amount of each tender of such non-USD old notes will be determined by converting the principal amount of such tender to U.S. dollars using the applicable currency exchange rate displayed on the Reuters Screen that corresponds to one of the following symbols:

(a)  "EURUSDFIXM=WM," in the case of non-USD old notes denominated in Euro, or

(b)  "GBPUSDFIXM=WM," in the case of non-USD old notes denominated in pounds sterling;

in each case as of the time with reference to which WM Company calculates the fixing price of the applicable currency exchange rate reflected on the applicable Reuters Screen (currently at or around 4:00 p.m. London time), on the business day prior to the expiration date of the exchange offers. This equivalent U.S. dollar principal amount will be used in all cases when determining the exchange consideration to be received pursuant to the exchange offers (and the consideration to be delivered pursuant to the call option).

13

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007378

The aggregate number of shares of GM common stock to be issued in connection with the exchange offers will depend in part on the exchange rates of Euro and pounds sterling to U.S. dollars in effect on the business day prior to the expiration date of the exchange offers. Unless otherwise indicated, all aggregate share numbers contained in this prospectus related to the exchange offers are based on such exchange rates in effect on April 22, 2009.

We may, in our absolute discretion, amend or modify the terms of the exchange offers (including by changing the exchange consideration offered) applicable to one or more series of old notes without amending or modifying the terms of the exchange offers applicable to any other series of old notes.

There is no requirement for an individual holder to tender a minimum principal amount of old notes in the exchange offers. However, where, in connection with the exchange offers or as a result of the reverse stock split, a tendering holder of old notes would otherwise be entitled to receive a fractional share of GM common stock, the number of shares of GM common stock to be received by such holder will be rounded down to the nearest whole number and no cash or other consideration will be delivered to such holder in lieu of such rounded down amount.

See "*The Exchange Offers and Consent Solicitations—Terms of the Exchange Offers*" for more information.

Consequences of Failure to Consummate Exchange Offers . . . . . . . . . . . . . . . . .

In the event we have not received prior to June 1, 2009 sufficient tenders of old notes, including the old Series D notes, to consummate the exchange offers, we currently expect to seek relief under the U.S. Bankruptcy Code. This relief may include (i) seeking bankruptcy court approval for the sale of most or substantially all of our assets pursuant to section 363(b) of the U.S. Bankruptcy Code to a new operating company, and a subsequent liquidation of the remaining assets in the bankruptcy case; (ii) pursuing a plan of reorganization (where votes for the plan are solicited from certain classes of creditors prior to a bankruptcy filing) that we would seek to confirm (or "cram down") despite the deemed rejection of the plan by the class of holders of old notes; or (iii) seeking another form of bankruptcy relief, all of which involve uncertainties, potential delays and litigation risks. We are considering these alternatives in consultation with the U.S. Treasury, our largest lender. If we seek bankruptcy relief, holders of old notes may receive consideration that is less than what is being offered in the exchange offers, and it is possible that such holders may receive no consideration at all for their old notes. See "*Bankruptcy Relief.*"

For a more complete description of the risks relating to our failure to consummate the exchange offers, see "*—Risks Related to Failure to Consummate the Exchange Offers—If the exchange offers are not*

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007379

*consummated, we currently expect to seek relief under the U.S. Bankruptcy Code. If we seek bankruptcy relief, holders of old notes may receive consideration that is less than what is being offered in the exchange offers, and it is possible that such holders may receive no consideration at all for their old notes."*

Forbearance, Waiver and Extension by Holders of Old Series D Notes . . . . . .

By tendering, and not validly withdrawing, their old Series D notes, holders of old Series D notes will irrevocably agree pursuant to the Forbearance, Waiver and Extension, in the event the exchange offers are extended beyond June 1, 2009, to extend the maturity of their old Series D notes and to forbear from taking any action to enforce, or direct enforcement of, and waive any and all of the rights and remedies available to such holders under such old Series D notes or the indenture governing such old Series D notes, in each case until the Forbearance, Waiver and Extension Termination Date, which is the date of the earlier of (a) the termination of the exchange offers (including in the event GM files a petition for relief under the U.S. Bankruptcy Code) and (b) the consummation of the exchange offers. At the Forbearance, Waiver and Extension Termination Date, the Forbearance, Waiver and Extension will expire and any and all principal and interest amounts otherwise due under any old Series D notes that remain outstanding (*i.e.*, any old Series D notes not accepted for exchange in the exchange offers) will become immediately due and payable. The Forbearance, Waiver and Extension will attach to any old Series D notes that have been tendered in the exchange offers and not validly withdrawn on or prior to the Attachment Date, which is May 26, 2009 (the date set initially as the withdrawal deadline), or such later date as the registration statement of which this prospectus forms a part is declared effective or as GM in its absolute discretion may determine. The Attachment Date will also be the expiration and settlement dates for the exchange offer that we are making in which we are offering to exchange amended Series D notes (old Series D notes to which the Forbearance, Waiver and Extension have attached and which will not mature until the Forbearance, Waiver and Extension Termination Date) for old Series D notes. By having tendered, and not validly withdrawn, their old Series D notes as of the Attachment Date, such holders shall consent to the attachment of the Forbearance, Waiver and Extension to their old Series D notes, and GM may in its absolute discretion enter into a supplemental indenture as of the Attachment Date or take such other action as it determines is appropriate (including by assigning a temporary or different CUSIP number to such old Series D notes) to evidence the attachment of the Forbearance, Waiver and Extension; such holders shall also be deemed to have tendered any amended Series D notes issued, or deemed issued by GM in order to implement the Forbearance, Waiver and Extension. If a holder of old Series D notes validly withdraws tendered old Series D notes prior to the Attachment Date, then such old Series D notes will not be subject to the Forbearance, Waiver and Extension. However, if a holder of

15

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER
NGM000007380

old Series D notes validly withdraws its old Series D notes at any time following the Attachment Date (in the event withdrawal rights have been extended past or reinstated after the Attachment Date), then such old Series D notes, notwithstanding such withdrawal or any subsequent transfer, will continue to be subject to the Forbearance, Waiver and Extension until the Forbearance, Waiver and Extension Termination Date.

Our solicitation of the agreement of the holders of old Series D notes to the terms of the Forbearance, Waiver and Extension is an exchange offer in which we are offering to exchange amended Series D notes (old Series D notes to which the Forbearance, Waiver and Extension have attached) for old Series D notes. This exchange offer is subject to applicable SEC rules and regulations, including Rule 13e-4 under the Exchange Act. This exchange offer will expire, withdrawal rights with respect to this offer shall terminate, and the settlement date for this offer will occur on, the Attachment Date.

Consent Solicitations for USD Old
Notes . . . . . . . . . . . . . . . . . . . . . . . .    Concurrently with the exchange offers, we are soliciting the consent of holders of the requisite aggregate principal amount outstanding of each voting class of USD old notes necessary to amend certain of the terms of the debt instruments governing such USD old notes in order to remove substantially all material affirmative and negative covenants and events of default, other than those relating to the obligation to pay principal and interest on such old notes. A holder of USD old notes may not (x) tender its USD old notes pursuant to the applicable exchange offer without consenting to the proposed amendments, or (y) consent to the proposed amendments to the debt instruments governing the USD old notes without tendering its USD old notes pursuant to the applicable exchange offer. The completion, execution and delivery of the related letter of transmittal and consent or the electronic transmittal through ATOP (or delivery of a valid electronic instruction notice), which binds holders of old notes by the terms of the letters of transmittal and consent, in connection with the tender of USD old notes will be deemed to constitute the consent of the tendering holder to the proposed amendments to the debt instruments governing the USD old notes. See "*Proposed Amendments.*"

Written consents of the holders of not less than two-thirds in aggregate principal amount (or, in the case of discount notes, accreted value) of all outstanding USD old notes issued pursuant to the 1990 Indenture or the 1995 Indenture, as the case may be (voting as one class under such indenture and excluding USD old notes held by GM or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with GM), will be required to effect the proposed amendments in respect of such indenture.

16

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007381

Consent Solicitations for Non-USD Old
   Notes ..........................

Concurrently with the exchange offers, we are soliciting consents (which pursuant to the debt instruments governing the non-USD old notes will constitute proxies) of holders of the requisite aggregate principal amount outstanding of each series of non-USD old notes, to be exercised at a meeting of noteholders or an adjourned meeting of noteholders (each as described below), as the case may be, of each such series, approving certain amendments to the debt instruments governing such series of non-USD old notes, including the (a) addition of a call option in such series of non-USD old notes and (b) removal of substantially all material affirmative and negative covenants and events of default other than those relating to the obligation to pay principal and interest on such series of non-USD old notes. The call option will provide that outstanding non-USD old notes of each series may be redeemed at any time at the option of GM or GM Nova Scotia, as the case may be, in return for the exchange consideration offered pursuant to the exchange offers (*i.e.*, 225 shares of GM common stock per 1,000 U.S. dollar equivalent of principal amount of non-USD old notes). In addition, (a) GM will pay, in cash, accrued interest on the Euro old notes called for redemption pursuant to the call option and (b) GM Nova Scotia will pay, in cash, accrued interest on the old GM Nova Scotia notes called for redemption pursuant to the call option, in each case from and including the most recent interest payment date to, but not including, the redemption date, which is expected to be the settlement date. We intend to exercise the call option in respect of all non-USD old notes not tendered in the exchange offers immediately upon the effectiveness of the proposed amendments to the debt instruments governing such non-USD old notes, if adopted. From and after the time that we exercise the call option on any series of non-USD old notes, (a) such notes shall be deemed to be discharged, (b) such notes will not be transferable and (c) holders of such notes will have no further rights in respect of those notes other than receipt of the exchange consideration and payment in cash of accrued but unpaid interest on such notes.

In connection with the proposed amendments to the debt instruments governing the non-USD old notes, we will issue, not less than 21 days in advance, notice of a first meeting of holders of each series of non-USD old notes. At such meeting, if (a) holders of two-thirds of the aggregate principal amount outstanding of such series of non-USD old notes are present and so vote to approve (or in respect of which proxies have been tendered) an extraordinary resolution will be passed to add the call option in such series of non-USD old notes and, (b) holders of more than one-half of the aggregate principal amount outstanding of such series of non-USD old notes are present and so vote to approve (or in respect of which proxies have been tendered), an extraordinary resolution will be passed to approve the removal of substantially all material affirmative and negative covenants and events of default other than the obligation to pay

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007382

principal and interest on such series of non-USD old notes. All extraordinary resolutions passed with respect to a series of non-USD old notes will apply to all non-USD old notes of such series, including those not tendered pursuant to the exchange offers for the non-USD old notes. If the relevant quorums necessary to add the call option and/or approve the other proposed amendments are not achieved at the first meeting in respect of one or more series of non-USD old notes, a notice will be issued for an adjourned meeting of holders of each such series of non-USD old notes, which will take place at least 14 days after the first meeting, where, if holders of more than one-half of the aggregate principal amount outstanding of such series are present and so vote to approve (or in respect of which proxies have been tendered) the extraordinary resolutions to add the call option and to approve the other proposed amendments will be passed in respect of such series of non-USD old notes.

Except for holders who tender non-USD old notes prior to the date on which the registration statement of which this prospectus forms a part is declared effective, a holder of non-USD old notes may not (a) tender its non-USD old notes pursuant to the relevant exchange offer without consenting to the proposed amendments or (b) consent to the proposed amendments pursuant to the consent solicitations without tendering its non-USD old notes pursuant to the relevant exchange offer for the non-USD old notes. Holders who tender non-USD old notes prior to the date on which the registration statement of which this prospectus forms a part is declared effective will not be deemed to have consented to the proposed amendments.

Expiration Date . . . . . . . . . . . . . . . . . . . The exchange offers and consent solicitations will expire at 11:59 p.m., New York City time, on May 26, 2009, unless extended by us (such date and time, as the same may be extended, the "expiration date"). We, in our absolute discretion, may extend the expiration date for the exchange offers for any purpose, including in order to permit the satisfaction or waiver of any or all conditions to the exchange offers. See "*Risks Related to Failure to Consummate the Exchange Offers— We will need to extend the exchange offers beyond the initial expiration date and, you may not be able to withdraw any notes you tender prior to or during such extension.*"

Accrued and Unpaid Interest . . . . . . . . . GM will pay, in cash, accrued interest on the old GM notes, other than the discount notes, and GM Nova Scotia will pay, in cash, accrued interest on the old GM Nova Scotia notes, in each case, from and including the most recent interest payment date to, but not including, the settlement date.

Withdrawal of Tenders . . . . . . . . . . . . . . You may withdraw your old notes at any time prior to the withdrawal deadline by delivering a written withdrawal instruction to the applicable Clearing System in accordance with the relevant procedures described herein. If you hold your old notes beneficially through a broker, bank or other nominee or custodian, you must instruct your broker, bank, or other nominee or custodian to withdraw

18

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007383

your old notes prior to the withdrawal deadline. Except in certain circumstances described in "*The Exchange Offers and Consent Solicitations—Withdrawal of Tenders*," old notes that are validly tendered prior to the withdrawal deadline and that are not validly withdrawn prior to the withdrawal deadline may not be withdrawn on or after the withdrawal deadline, and old notes that are validly tendered on or after the withdrawal deadline may not be withdrawn.

If a holder of old Series D notes elects to withdraw tendered old Series D notes at any time following the Attachment Date (in the event withdrawal rights have been extended past or reinstated after the Attachment Date), then such old Series D notes, notwithstanding such withdrawal or any subsequent transfer, will continue to be subject to the Forbearance, Waiver and Extension until the Forbearance, Waiver and Extension Termination Date.

Withdrawal Deadline . . . . . . . . . . . . . . .    The withdrawal deadline is 11:59 p.m., New York City time, on May 26, 2009. We, in our absolute discretion, may extend the withdrawal deadline for any exchange offer for any purpose.

In no event will the withdrawal deadline occur prior to the date on which the registration statement of which this prospectus forms a part is declared effective.

Settlement Date . . . . . . . . . . . . . . . . . . .    The settlement date of each exchange offer will be promptly following the expiration date, subject to satisfaction or waiver of all conditions precedent to the exchange offers. We do not expect to consummate the exchange offers prior to June 30, 2009 because the satisfaction of certain conditions to the exchange offers is expected to require a significant period of time.

Conditions to the Exchange Offers . . . . .    Notwithstanding any other provisions of the exchange offers, we will not be required to accept for exchange, or to exchange, old notes validly tendered (and not validly withdrawn) pursuant to exchange offers, and may terminate, amend or extend any offer or delay or refrain from accepting for exchange, or exchanging, the old notes or transferring any exchange consideration to the applicable trustees (or persons performing a similar function), if any of the following conditions have not been satisfied or waived:

- the consents of holders of the requisite aggregate principal amount outstanding of each voting class of USD old notes necessary to effect the proposed amendments to the debt instruments governing such USD old notes shall have been validly received and not withdrawn and the proposed amendments to such debt instruments shall have become effective;

- the non-USD old notes of each series in respect of which the holders thereof have approved the addition of the call option shall have been called for redemption, and we shall have used our best efforts to make arrangements for the foregoing;

19

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007384

- the results of the exchange offers shall be satisfactory to the U.S. Treasury, including in respect of the overall level of participation by holders of the old notes in the exchange offers and in respect of the level of participation by holders of the old Series D notes in the exchange offers (the "U.S. Treasury Condition");

- all reviews and approvals required pursuant to the terms of the U.S. Treasury Loan Agreements shall have been completed and received and the Government viability certification to be delivered by the President's Designee pursuant to the First U.S. Treasury Loan Agreement shall have been delivered;

- the U.S. Treasury Debt Conversion shall have been completed, pursuant to which the U.S. Treasury (or its designee) shall have been issued at least 50% of the pro forma GM common stock in exchange for (a) full satisfaction and cancellation of at least 50% of our outstanding U.S. Treasury Debt at June 1, 2009 (such 50% currently estimated to be approximately $10.0 billion) and (b) full satisfaction and cancellation of our obligations under the warrant issued to the U.S. Treasury, and we shall have used our best efforts to enter into agreements with respect to the foregoing;

- the U.S. Treasury shall have provided commercially reasonable evidence of the U.S. Treasury Financing Commitment and the U.S. Treasury (or its designee) shall have agreed to deliver a binding written consent in respect of a portion of the common stock it is to receive in connection with the U.S. Treasury Debt Conversion authorizing the charter amendments;

- binding agreements in respect of the VEBA Modifications (including judicial and regulatory approval thereof, if any), on such terms as shall be satisfactory to the U.S. Treasury, shall have been executed by all relevant parties, pursuant to which (a) at least 50% (or approximately $10 billion) of the settlement amount will be extinguished in exchange for GM common stock and (b) cash installments will be paid toward the remaining settlement amount over a period of time, which together have a present value equal to the remaining settlement amount, and we shall have used our best efforts to enter into arrangements with respect to the foregoing;

- binding agreements in respect of the Labor Modifications, on such terms as shall be satisfactory to the U.S. Treasury, shall have been executed by all relevant parties, and we shall have used our best efforts to enter into these agreements;

- the aggregate number of shares of GM common stock issued or agreed to be issued pursuant to the U.S. Treasury Debt Conversion and the VEBA Modifications shall not exceed 89% of the pro forma outstanding GM common stock (assuming full participation by holders of old notes in the exchange offers);

20

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007385

- commercially reasonable efforts to have the GM common stock issued pursuant to the exchange offers duly listed on the NYSE, subject to notice of issuance, shall have been used;

- all other required regulatory approvals, except those that do not materially affect the ability to consummate the exchange offers shall have been received;

- there not having been instituted or pending any action, proceeding or investigation (whether formal or informal), and there not having been any material adverse development to any action or proceeding currently instituted or pending, before or by any court, governmental, regulatory or administrative agency or instrumentality, or by any other person, in connection with the exchange offers or the consent solicitations that (a) is, or is reasonably likely to be, materially adverse to our business, operations, properties, condition (financial or otherwise), income, assets, liabilities or prospects, (b) would, or is reasonably likely to, prohibit, prevent, restrict or delay consummation of any exchange offer or consent solicitation or (c) would materially impair the contemplated benefits to us of any exchange offer or consent solicitation;

- no order, statute, rule, regulation, executive order, stay, decree, judgment or injunction shall have been proposed, enacted, entered, issued, promulgated, enforced or deemed applicable by any court or governmental, regulatory or administrative agency or instrumentality that either (a) would, or is reasonably likely to, prohibit, prevent, restrict or delay consummation of any exchange offer or consent solicitation or (b) is, or is reasonably likely to be, materially adverse to our business or operations;

- the applicable trustees (or persons performing a similar function) under the debt instruments pursuant to which the old notes were issued shall not have objected in any respect to or taken action that could, or is reasonably likely to, adversely affect the consummation of any exchange offer or consent solicitation (including in respect of the proposed amendments to the debt instruments governing the old notes) and shall not have taken any action that challenges the validity or effectiveness of the procedures used by us or by GM Nova Scotia in the making of any exchange offer, the solicitation of consents, or the acceptance of, or payment for, some or all of the applicable series of old notes pursuant to any exchange offer; and

- no bankruptcy event of default shall have occurred under the indentures governing the notes.

These conditions will not be satisfied on or before the scheduled expiration date for the exchange offers. To the extent any condition is not satisfied, we expect that we would extend the exchange offers until the conditions are satisfied or waived or we choose to terminate the exchange offers. See "*Risk Factors—Risks Related to the*

21

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007386

*Exchange Offers—We expect that we will need to extend the exchange offers beyond the initial expiration date and you may not be able to withdraw any notes you tender prior to or during such extension."*

We currently believe, and our Viability Plan assumes, that at least 90% of the aggregate principal amount (or, in the case of discount notes, accreted value) of the outstanding old notes (including at least 90% of the aggregate principal amount of the outstanding old Series D notes) will need to be tendered in the exchange offers or called for redemption pursuant to the call option (in the case of the non-USD old notes) in order for the exchange offers to satisfy the U.S. Treasury Condition. Whether this level of participation in the exchange offers will be required (or sufficient) to satisfy the U.S. Treasury Condition will ultimately be determined by the U.S. Treasury. The actual level of participation in the exchange offers may be different than what we have assumed, and this difference may be material. Prior regulatory approval of the U.S. Department of Labor will not be required for the VEBA Modifications and consequently will not be a condition to the exchange offers. For additional details on the conditions to the exchange offers, see *"The Exchange Offers and Consent Solicitations—Conditions to the Exchange Offers."*

| | |
|---|---|
| Amendment and Termination . . . . . . . . | We have the right to amend, modify or terminate, in our absolute discretion, the exchange offers and consent solicitations at any time and for any reason, including if the conditions to the exchange offers are not met or waived by the expiration date and we reserve the right to reject any tender of old notes, in whole or in part, for any reason. We expressly reserve the right in our absolute discretion and subject to applicable law, including any obligation to provide notice, extend the exchange offers or provide withdrawal rights, to (a) waive any and all of the conditions to the exchange offers on or prior to the expiration date and (b) amend, in whole or in part, the terms of the exchange offers or the consent solicitations. In particular, we may, in our absolute discretion, amend or modify the terms of the exchange offers (including by changing the exchange consideration offered) applicable to one or more series of old notes without amending or modifying the terms of the exchange offers applicable to any other series of old notes. In the event that the exchange offers and consent solicitations are terminated, withdrawn or otherwise not consummated on or prior to the expiration date, no consideration will be paid or become payable to holders who have properly tendered their old notes pursuant to the exchange offers. In any such event, the old notes previously tendered pursuant to the exchange offers will be promptly returned to the tendering holders. If we make a change that we determine to be material in any of the terms of the exchange offers, we will give proper notice of such amendment or such change and will disseminate additional offer documents and extend the exchange offers and withdrawal rights as we determine necessary and to the extent required by law. See *"The Exchange Offers and Consent Solicitations—Expiration Date; Withdrawal Deadline; Extensions; Amendments; Termination."* |

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007387

| | |
|---|---|
| Procedures for Tendering . . . . . . . . . . . | For a description of the procedures for tendering old notes in the exchange offers, see "*The Exchange Offers and Consent Solicitations.*" For further information, contact the Solicitation and Information Agent or consult your broker, bank or other nominee or custodian for assistance. |
| Holders Outside the United States Eligible to Participate in the Exchange Offers . . . . . . . . . . . . . . . . . . . . . . . . | For a description of certain offer restrictions applicable to holders outside the United States, see "*Non-U.S. Offer Restrictions.*" This prospectus does not constitute an offer to participate in the exchange offers and the consent solicitations to any person in any jurisdiction where it is unlawful to make such an offer or solicitation. Offers to holders in the United Kingdom, Austria, Belgium, France, Germany, Italy, Luxembourg, the Netherlands, Spain and Switzerland will be made only pursuant to the EU Approved Prospectus, which will incorporate this prospectus and will indicate on the front cover thereof if it can be used for such offers. Offers to non-U.S. qualified offerees outside of these jurisdictions (and the United States and Canada) will be made only pursuant to the EU Approved Prospectus. Offers to non-U.S. qualified offerees in Canada will be made only pursuant to the Canadian Offering Memorandum, which will incorporate this prospectus. |
| Dealer Managers . . . . . . . . . . . . . . . . . . | Morgan Stanley & Co. Incorporated and Banc of America Securities LLC are the Global Coordinators, Citigroup Global Markets Inc. and J.P. Morgan Securities Inc. are the U.S. Lead Dealer Managers, Barclays Capital Inc. and Deutsche Bank Securities Inc. are the Non-U.S. Lead Dealer Managers and UBS Securities LLC and Wachovia Capital Markets, LLC are Dealer Managers for the exchange offers. With respect to jurisdictions located outside the United States, the exchange offers may be conducted through affiliates of the Dealer Managers that are registered and/or licensed to conduct the exchange offers in such jurisdictions. |
| Exchange Agent and Solicitation and Information Agent . . . . . . . . . . . . . . . . | D.F. King & Co., Inc. is the Exchange Agent and the Solicitation and Information Agent for the exchange offers. Its addresses and telephone numbers are listed on the back cover page of this prospectus. |
| Settlement and Escrow Agent . . . . . . . . | Deutsche Bank AG, London Branch, is the Settlement and Escrow Agent for the non-USD old notes. Its address and email address are listed on the back cover page of this prospectus. |
| Luxembourg Exchange Agent . . . . . . . . | Deutsche Bank Luxembourg, S.A. is the Luxembourg Exchange Agent for the old notes that are listed on the Luxembourg Stock Exchange. Its address and email address are listed on the back cover page of this prospectus. |
| Soliciting Dealer Fee . . . . . . . . . . . . . . . | We will agree to pay a soliciting dealer fee equal to $5.00 for each 1,000 U.S. dollars equivalent principal amount (or, in the case of the |

23

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007388