discount notes, accreted value) of old notes that are validly tendered and accepted for purchase pursuant to the exchange offers to retail brokers that are appropriately designated by their clients to receive this fee, but only if the old notes of each applicable series that are tendered by or for that beneficial owner have an aggregate U.S. dollar equivalent principal amount of $250,000 or less. Soliciting dealer fees will only be paid to retail brokers upon consummation of the exchange offers. No soliciting dealer fees will be paid if the exchange offers are not consummated, and the fees will be payable thereafter upon request by the soliciting dealers and presentation of such supporting documentation as GM may reasonably request.

Material United States Federal Income Tax Consequences of the Exchange Offers to Holders of the Old Notes . . .   We intend to take the position, although not free from doubt, that the exchange of old notes (other than old Series D notes) pursuant to the exchange offers will constitute a tax-free recapitalization in which gain or loss is generally not recognized. Any consideration allocable to accrued but unpaid interest generally will be taxable to a holder of old notes to the extent not previously included in such holders' gross income. Because the original term of the old Series D notes was less than five years, it is unclear whether the old Series D notes should be treated as "securities" for U.S. federal income tax purposes. It is therefore unclear whether the exchange of old Series D notes pursuant to the exchange offers will constitute a fully taxable transaction or a tax-free recapitalization. For a discussion of certain U.S. federal income tax consequences relating to the exchange offers, see "*Material United States Federal Income Tax Considerations.*"

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007389

### Summary of GM Common Stock

Issuer . . . . . . . . . . . . . . . . . . . . . . . . . .   General Motors Corporation.

GM Common Stock Offered Pursuant to the Exchange Offers . . . . . . . . . . . . . .   Up to approximately 6.1 billion new shares of GM common stock, par value $0.01 per share.

GM Common Stock Outstanding After the Exchange Offers . . . . . . . . . . . . . .   The aggregate amount of GM common stock issued pursuant to the exchange offers will depend on the level of noteholder participation. Consequently, the percentage of the pro forma outstanding GM common stock held by holders of old notes tendered in the exchange offers will increase relative to that held by the U.S. Treasury, the New VEBA and existing holders of GM common stock as the aggregate principal amount outstanding of old notes tendered pursuant to the exchange offers increases.

The aggregate number of shares of GM common stock to be issued in connection with the exchange offers will depend in part on the exchange rates of Euro and pounds sterling to U.S. dollars in effect on the business day prior to the expiration date of the exchange offers. Unless otherwise indicated, all aggregate share numbers contained in this prospectus related to the exchange offers are based on such exchange rates in effect on April 22, 2009.

We are currently in discussions with the U.S. Treasury regarding the terms of the U.S. Treasury Debt Conversion. These discussions are ongoing and the U.S. Treasury has not agreed or indicated a willingness to agree to any specific level of debt reduction. For purposes of this prospectus, we have set as a condition to the closing of the exchange offers that the U.S. Treasury Debt Conversion provide for the issuance of GM common stock to the U.S. Treasury (or its designee) in exchange for (a) full satisfaction and cancellation of at least 50% of our outstanding U.S. Treasury Debt at June 1, 2009 and (b) full satisfaction and cancellation of our obligations under the warrant issued to the U.S. Treasury.

In addition, we and the U.S. Treasury are currently in discussions regarding the terms of VEBA Modifications. For purposes of this prospectus and the conditions to the closing of the exchange offers, we have assumed that the VEBA Modifications will provide for, among other things, the issuance of GM common stock to the New VEBA in full satisfaction of at least 50% (or $10 billion) of the settlement amount.

Based on tenders at the Assumed Participation Level:

(a) the aggregate amount of GM common stock issued in connection with the exchange offers will be approximately 5.5 billion shares, which would represent approximately 9.1% of the pro forma outstanding GM common stock;

25

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007390

(b) the aggregate amount of GM common stock issued to the U.S. Treasury (or its designee) pursuant to the U.S. Treasury Debt Conversion and to the New VEBA pursuant to the VEBA Modifications will be approximately 54.4 billion shares, which would represent approximately 89.9% of the pro forma outstanding GM common stock, with the final allocation between the U.S. Treasury (or its designee) and the New VEBA to be determined in the future (however, as a condition to closing the exchange offers, subject to the overall limit of approximately 89.9% of the pro forma outstanding GM common stock to be issued to the U.S. Treasury (or its designee) and the New VEBA in the aggregate, the U.S. Treasury (or its designee) will hold at least 50% of the pro forma outstanding GM common stock); and

(c) existing GM common stockholders would hold approximately 1.0% of the pro forma outstanding GM common stock.

Assuming full participation in the exchange offers:

(a) the aggregate amount of GM common stock issued in connection with the exchange offers will be approximately 6.1 billion shares, which would represent approximately 10% of the pro forma outstanding GM common stock;

(b) the aggregate amount of GM common stock issued to the U.S. Treasury (or its designee) pursuant to the U.S. Treasury Debt Conversion and to the New VEBA pursuant to the VEBA Modifications will be approximately 54.4 billion shares, which would represent approximately 89% of the pro forma outstanding GM common stock, with the final allocation between the U.S. Treasury (or its designee) and the New VEBA to be determined in the future (however, as a condition to closing the exchange offers, subject to the overall limit of approximately 89% of the pro forma outstanding GM common stock to be issued to the U.S. Treasury (or its designee) and the New VEBA in the aggregate, the U.S. Treasury (or its designee) will hold at least 50% of the pro forma outstanding GM common stock); and

(c) existing GM common stockholders would hold approximately 1% of the pro forma outstanding GM common stock.

We determined the foregoing GM common stock allocations following discussions with the U.S. Treasury where the U.S. Treasury indicated that it would not be supportive of higher allocations to the holders of old notes or to existing GM common stockholders.

We have not reached an agreement with respect to either the U.S. Treasury Debt Conversion or the VEBA Modifications. The actual terms of the U.S. Treasury Debt Conversion and the VEBA Modifications are subject to ongoing discussions among GM, the UAW, the U.S. Treasury and the VEBA-settlement class representative, and there is no assurance that any agreement will be reached on the terms described above or at all. However, an agreement with respect to both the U.S. Treasury Debt Conversion

26

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER
NGM000007391

and the VEBA Modifications must be reached, and the terms of the U.S. Treasury Debt Conversion and the VEBA Modifications must satisfy the minimum conditions described above (unless each such condition is waived).

We will disclose the terms of any agreement reached with regard to the U.S. Treasury Debt Conversion (including any agreement or understanding with respect to corporate governance reached with the U.S. Treasury in connection thereto) or the VEBA Modifications and we currently expect to be able to do so prior to the withdrawal deadline of the exchange offers. In the event the terms of these agreements do not satisfy the closing conditions and as a result we decide to waive a condition or otherwise amend the terms of the exchange offers, we will provide notice of the waiver or amendment, disseminate additional offer documents, extend the exchange offers and extend (or reinstate) withdrawal rights as we determine necessary and to the extent required by law.

**Charter Amendments: Par Value Reduction Common Stock Increase, Reverse Stock Split** . . . . . . . . . . . . . .

Prior to the distribution of GM common stock to tendering holders on the settlement date, upon delivery to the U.S. Treasury (or its designee) of authorized shares of GM common stock (with a par value of $1 2/3) in an amount that will represent a majority of the outstanding shares of GM common stock in connection with the U.S. Treasury Debt Conversion, the U.S. Treasury (or its designee) will execute and deliver to us a stockholder written consent authorizing amendments to GM's restated certificate of incorporation which will:

- reduce the par value of GM common stock to $0.01 per share;

- increase the number of authorized shares of GM common stock to 62 billion shares; and

- effect a 1-for-100 reverse stock split of GM common stock, whereby each 100 shares of GM common stock will be converted into one share of GM common stock.

The reverse stock split will occur following the effectiveness of the common stock increase.

Unless otherwise indicated, all share numbers contained in this prospectus related to the exchange offers are presented without giving effect to the reverse stock split.

We do not currently intend to issue fractional shares in connection with the exchange offers or the reverse stock split. Where, in connection with the exchange offers or as a result of the reverse stock split, a tendering holder of old notes would otherwise be entitled to receive a fractional share of GM common stock, the number of shares of GM common stock to be received by such holder will be rounded down to the nearest whole number and no cash or other consideration will be delivered to such holder in lieu of such rounded down amount.

27

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007392

Stockholders who own GM common stock prior to the settlement date and would otherwise hold fractional shares because the number of shares of GM common stock they held before the reverse stock split would not be evenly divisible based upon the 1-for-100 reverse stock split ratio will be entitled to a cash payment (without interest or deduction) in respect of such fractional shares. See *Description of the Charter Amendments*" for additional information about the reverse stock split.

Ownership by U.S. Treasury and Corporate Governance . . . . . . . . . . . . .

The condition to the exchange offers relating the U.S. Treasury Debt Conversion requires that upon consummation of the exchange offers and U.S. Treasury Debt Conversion, the U.S. Treasury (or its designee) will own at least 50% of the GM pro forma common stock. Currently, we have no agreement or understanding with the U.S. Treasury regarding the corporate governance arrangements that may be put in place following the U.S. Treasury Debt Conversion and we cannot assure you whether there will be any such arrangements, or if there are, what they will be. For a description of certain risks regarding the U.S. Treasury's controlling interest and other matters related to the U.S. Treasury Debt Conversion, see "*Risk Factors—Risks Related to the U.S. Treasury Debt Conversion.*"

NYSE Shareholder Approval Exemption . . . . . . . . . . . . . . . . . . . . . .

The equity issuances contemplated by our proposed restructuring will exceed the 20% threshold that would otherwise require shareholder approval under NYSE rules contained in Section 312.03 of the Listed Company Manual. As the delay in securing shareholder approval for these transactions would seriously jeopardize our financial viability, we have submitted to the NYSE an application to rely on the "financial distress" exception outlined in Listed Company Manual Section 312.05 and the NYSE is prepared to accept our reliance on this exception, subject to a review of the final terms of the transactions described in this prospectus.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007393

### Summary Consolidated Historical Financial Data

The following table sets forth summary consolidated historical financial data as of and for the years ended December 31, 2008, 2007, 2006, 2005 and 2004 and has been derived without adjustment from our audited consolidated financial statements for such years. The data set forth in the table below should be read together with our audited consolidated financial statements for the years ended December 31, 2008, 2007 and 2006 and the related notes, and the section entitled "*Management's Discussion and Analysis of Financial Condition and Results of Operations*," each of which is found in our annual report on Form 10-K for the year ended December 31, 2008, which is incorporated by reference in this prospectus.

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2008** | **2007** | **2006** | **2005** | **2004** |
| | (Dollars in millions except per share amounts) | | | | |
| **Income Statement Data:** | | | | | |
| Total net sales and revenues (a) | $148,979 | $179,984 | $204,467 | $192,143 | $192,196 |
| Operating loss | $ (21,284) | $ (4,309) | $ (5,823) | $ (17,806) | $ (545) |
| Income (loss) from continuing operations (b) | $ (30,860) | $ (43,297) | $ (2,423) | $ (10,621) | $ 2,415 |
| Income from discontinued operations (c) | — | 256 | 445 | 313 | 286 |
| Gain from sale of discontinued operations (c) | — | 4,309 | — | — | — |
| Cumulative effect of change in accounting principle (d) | — | — | — | (109) | — |
| Net income (loss) | $ (30,860) | $ (38,732) | $ (1,978) | $ (10,417) | $ 2,701 |
| $1⅔ par value common stock: | | | | | |
| Basic earnings (loss) per share from continuing operations before cumulative effect of accounting change | $ (53.32) | $ (76.52) | $ (4.29) | $ (18.78) | $ 4.27 |
| Basic earnings per share from discontinued operations (c) | — | 8.07 | 0.79 | 0.55 | 0.51 |
| Basic loss per share from cumulative effect of change in account principle (d) | — | — | — | (0.19) | — |
| Basic earnings (loss) per share | $ (53.32) | $ (68.45) | $ (3.50) | $ (18.42) | $ 4.78 |
| Diluted earnings (loss) per share from continuing operations before cumulative effect of accounting change (d) | $ (53.32) | $ (76.52) | $ (4.29) | $ (18.78) | $ 4.26 |
| Diluted earnings (loss) per share from discontinued operations (c) | — | 8.07 | 0.79 | 0.55 | 0.50 |
| Diluted loss per share from cumulative effect of accounting change (d) | — | — | — | (0.19) | — |
| Diluted earnings (loss) per share (d) | $ (53.32) | $ (68.45) | $ (3.50) | $ (18.42) | $ 4.76 |
| Cash dividends declared per share | $ 0.50 | $ 1.00 | $ 1.00 | $ 2.00 | $ 2.00 |
| Book value per share (h) | $ (139.79) | | | | |
| **Balance Sheet Data (as of period end):** | | | | | |
| Current assets | $ 41,224 | $ 60,135 | $ 65,156 | $ 52,357 | $ 55,371 |
| Noncurrent assets | $ 45,316 | $ 71,759 | $ 99,025 | $109,967 | $107,198 |
| Total assets (a) (b) (e) | $ 91,047 | $148,883 | $186,304 | $474,268 | $480,772 |
| Current liabilities | $ 73,911 | $ 69,510 | $ 66,717 | $ 70,726 | $ 72,849 |
| Noncurrent liabilities | $100,654 | $109,040 | $112,472 | $ 93,548 | $ 79,854 |
| Stockholders' equity (deficit) (b) (d) (f) (g) | $ (86,154) | $ (37,094) | $ (5,652) | $ 14,442 | $ 27,669 |
| Minority interests | $ 814 | $ 1,614 | $ 1,190 | $ 1,047 | $ 397 |

Certain prior period amounts have been reclassified in the consolidated statements of operations to conform to the 2008 presentation.

(a)  In November 2006, we sold a 51% controlling ownership interest in GMAC, resulting in a significant decrease in total consolidated net sales and revenues, assets and notes and loans payable.

(b)  In September 2007, we recorded full valuation allowances of $39.0 billion against our net deferred tax assets in Canada, Germany and the United States.

29

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007394

(c)  In August 2007, we completed the sale of the commercial and military operations of our Allison Transmission business ("Allison"). The results of operations, cash flows and the 2007 gain on sale of Allison have been reported as discontinued operations for all periods presented.

(d)  At December 31, 2005, we recorded an asset retirement obligation of $181 million in accordance with the requirements of Financial Accounting Standards Board (FASB) Interpretation No. (FIN) 47, "Accounting for Conditional Asset Retirement Obligations—an Interpretation of FASB Statement No. 143." The cumulative effect on net loss, net of related income tax effects, of recording the asset retirement obligations was $109 million or $0.19 per share on a diluted basis.

(e)  At December 31, 2006, we recognized the funded status of our benefit plans on our consolidated balance sheet with an offsetting adjustment to Accumulated other comprehensive income (loss) in stockholders' equity (deficit) of $16.9 billion in accordance with the adoption of SFAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans—an amendment to FASB Statements No. 87, 88, 106, and 132(R)" (SFAS No. 158).

(f)  At January 1, 2007, we recorded a decrease to retained earnings of $425 million and an increase of $1.2 billion to Accumulated other comprehensive income in connection with the early adoption of the measurement provisions of SFAS No. 158.

(g)  At January 1, 2007, we recorded an increase to retained earnings of $137 million with a corresponding decrease to our liability for uncertain tax positions in accordance with FASB Interpretation No. 48, "Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109."

(h)  Book value per share is calculated by dividing Stockholders' deficit by the number of common shares outstanding.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007395

## Consolidated Balance Sheet as of December 31, 2006

The following table sets forth GM's consolidated balance sheet as of December 31, 2006 and has been derived without adjustment from our audited consolidated financial statements as presented in our Annual Report on Form 10-K for the year ended December 31, 2007. The balance sheet set forth in the table below should be read together with our audited consolidated financial statements for the years ended December 31, 2008, 2007 and 2006 and the related notes, and the section entitled "*Management's Discussion and Analysis of Financial Condition and Results of Operations*," each of which is found in our annual report on Form 10-K for the year ended December 31, 2008, which is incorporated by reference in this prospectus.

|  | December 31, 2006 |
|---|---|
|  | (Dollars in millions) |
| **ASSETS** | |
| **Current Assets** | |
| Cash and cash equivalents | $ 23,774 |
| Marketable securities | 138 |
| Total cash and marketable securities | 23,912 |
| Accounts and notes receivable, net | 8,216 |
| Inventories | 13,921 |
| Equipment on operating leases, net | 6,125 |
| Other current assets and deferred income taxes | 12,982 |
| Total current assets | 65,156 |
| **Financing and Insurance Operations Assets** | |
| Cash and cash equivalents | 349 |
| Investments in securities | 188 |
| Equipment on operating leases, net | 11,794 |
| Equity in net assets of GMAC LLC | 7,523 |
| Other assets | 2,269 |
| Total Financing and Insurance Operations assets | 22,123 |
| **Non-Current Assets** | |
| Equity in net assets of nonconsolidated affiliates | 1,969 |
| Property, net | 41,934 |
| Goodwill and intangible assets, net | 1,118 |
| Deferred income taxes | 33,079 |
| Prepaid pension | 17,366 |
| Other assets | 3,559 |
| Total non-current assets | 99,025 |
| **Total assets** | $186,304 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | |
| **Current Liabilities** | |
| Accounts payable (principally trade) | $ 26,931 |
| Short-term borrowings and current portion of long-term debt | 5,666 |
| Accrued expenses | 34,120 |
| Total current liabilities | 66,717 |
| **Financing and Insurance Operations Liabilities** | |
| Accounts payable | 192 |
| Debt | 9,438 |
| Other liabilities and deferred income taxes | 1,947 |
| Total Financing and Insurance Operations liabilities | 11,577 |
| **Non-Current Liabilities** | |
| Long-term debt | 33,067 |
| Postretirement benefits other than pensions | 50,409 |
| Pensions | 11,934 |
| Other liabilities and deferred income taxes | 17,062 |
| Total non-current liabilities | 112,472 |
| Total liabilities | 190,766 |
| Minority interests | 1,190 |
| **Stockholders' Deficit** | |
| Preferred stock, no par value, authorized 6,000,000, no shares issued and outstanding | — |
| $1⅔ par value common stock (2,000,000,000 shares authorized, 756,637,541 and 566,059,249 shares issued and outstanding at December 31, 2007, respectively, and 756,637,541 and 565,670,254 shares issued and outstanding at December 31, 2006, respectively) | 943 |
| Capital surplus (principally additional paid-in capital) | 15,336 |
| Retained earnings (deficit) | 195 |
| Accumulated other comprehensive loss | (22,126) |
| Total stockholders' deficit | (5,652) |
| **Total liabilities, minority interests, and stockholders' deficit** | $186,304 |

GM's Annual Report on Form 10-K for the year ended December 31, 2007 was filed with the Securities and Exchange Commission and may be viewed at their website, www.sec.gov.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007396

**Unaudited Pro Forma Condensed Consolidated Financial Data for the Exchange Offers**

The following table sets forth unaudited pro forma condensed consolidated financial data for the exchange offers as of and for the year ended December 31, 2008. The data set forth in the table below has been derived by applying the pro forma adjustments described under "*Unaudited Pro Forma Condensed Consolidated Financial Information for the Exchange Offers,*" included elsewhere in this prospectus, to our historical consolidated financial statements as of and for the year ended December 31, 2008, which are incorporated into this prospectus by reference from our annual report on Form 10-K for the year ended December 31, 2008. These pro forma adjustments assume and give effect to the consummation of the exchange offers, the payment of related fees and expenses, the U.S. Treasury Debt Conversion, the VEBA Modifications, the additional borrowings under the First U.S. Treasury Loan Agreement and borrowings under the Second U.S. Treasury Loan Agreement that occurred subsequent to December 31, 2008, additional working capital loans under the First U.S. Treasury Loan Agreement that occurred subsequent to December 31, 2008, the modifications to certain secured borrowing facilities, the application of FSP No. APB 14-1, "Accounting for Convertible Debt Instruments That May Be Settled in Cash Upon Conversion (Including Partial Cash Settlement)" ("FSP No. APB 14-1") to convertible debt assumed to remain outstanding after completion of the exchange offers, the par value reduction of GM common stock to $0.01 per share, the increase in the number of authorized shares of GM common stock, the 1-for-100 reverse stock split of GM common stock, and the purchase of an additional ownership interest in GMAC, an equity method investee as of December 31, 2008, as if each of these pro forma adjustments had occurred at December 31, 2008 in the case of pro forma balance sheet data, and as if each of these pro forma adjustments had occurred on January 1, 2008 in the case of pro forma statement of operations data. The exchange offers, U.S. Treasury Debt Conversion and VEBA Modifications will result in significant dilution to our current common stockholders.

The unaudited pro forma condensed consolidated financial data for the exchange offers is based on assumptions that we believe are reasonable and should be read in conjunction with "*Capitalization,*" "*Accounting Treatment of the Exchange Offers,*" and "*Unaudited Pro Forma Condensed Consolidated Financial Information for the Exchange Offers,*" included elsewhere in this prospectus, and our consolidated financial statements and related notes thereto as of and for the year ended December 31, 2008, which are incorporated into this prospectus by reference from our annual report on Form 10-K for the year ended December 31, 2008. The unaudited pro forma condensed consolidated financial data also assume, among other things, that we would issue at least 50% of the pro forma GM common stock to the U.S. Treasury (or its designee) in exchange for (a) full satisfaction and cancellation of at least 50% of our outstanding U.S. Treasury Debt at June 1, 2009 (such 50% currently estimated to be approximately $10 billion, which contemplates $2.6 billion of additional borrowings that are not reflected in the pro forma balance sheet because the U.S. Treasury has not yet agreed to advance the funds) and (b) full satisfaction and cancellation of our obligations under the warrant issued to the U.S. Treasury. Additionally, the unaudited pro forma condensed consolidated financial data assume that the VEBA Modifications would provide, among other things, for the issuance of shares of GM common stock to the New VEBA in full satisfaction of at least $10 billion of our obligations under the VEBA settlement agreement. The aggregate number of shares of GM common stock issued or agreed to be issued pursuant to the U.S. Treasury Debt Conversion and the VEBA Modifications shall not exceed 89% of the pro forma GM common stock (assuming full participation by holders of old notes in the exchange offers and after issuance of shares to the new VEBA). The exchange offers, U.S. Treasury Debt Conversion and VEBA Modifications will result in significant dilution to our current common stockholders, and will result in pro forma ownership levels of approximately 1.0% and 9.1%, respectively, assuming the Assumed Participation Level in the exchange offers and after the shares are issued to the New VEBA. The actual number of shares of GM common stock issued or agreed to be issued under the U.S. Treasury Debt Conversion and the VEBA Modifications could be different than the levels assumed in the unaudited pro forma condensed consolidated financial data, and such differences could be material.

The unaudited pro forma condensed consolidated financial data for the exchange offers assume, among other things, the satisfaction of the U.S. Treasury Condition, which we currently believe will require the

32

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007397

exchange of at least 90% of the aggregate principal amount (or, in the case of discount notes, accreted value) of our old notes (including at least 90% of the aggregate principal amount of the old Series D notes) to be tendered in the exchange offers or called for redemption pursuant to the call option (in the case of the non-USD old notes). As consideration for the old notes, the tendering holders will receive 225 shares of GM common stock for each 1,000 U.S. dollar equivalent of principal amount (or accreted value as of the settlement date, if applicable) of old notes exchanged. Whether this level of participation in the exchange offers will be required (or sufficient) to satisfy the U.S. Treasury Condition will ultimately be determined by the U.S. Treasury. The actual exchange of our old notes could be more or less than the level of participation assumed for the exchange offers, which would impact the pro forma total debt and pro forma stockholders' deficit as of December 31, 2008, and would impact the pro forma interest expense and pro forma loss per share for the year ended December 31, 2008.

The unaudited pro forma condensed consolidated financial data for the exchange offers does not give effect to the Labor Modifications or the restructuring and other actions contemplated in our current Viability Plan because such actions do not currently meet the requirements for pro forma presentation under Article 11 of Regulation S-X. Although management expects that the Labor Modifications will result in cost savings and the actions undertaken pursuant to our current Viability Plan will result in near-term restructuring and impairment charges and in improved financial performance in the future, no assurance can be given that these anticipated cost savings or projected operational and financial improvements will be realized.

The unaudited pro forma condensed consolidated financial data for the exchange offers is presented for illustrative purposes only and is not necessarily indicative of the financial position or results of operations that would have actually been reported had the exchange offers been consummated as of December 31, 2008 or on January 1, 2008, respectively, nor is it indicative of our future financial position or results of operations.

| (Dollars in millions, except per share amounts) | As of and for the Year Ended December 31, 2008 | As of and for the Year Ended December 31, 2008 Pro Forma |
|---|---|---|
| | | (Unaudited) |
| **Statement of Operations Data (for the year ended December 31, 2008):** | | |
| Total net sales and revenues | $ 148,979 | $148,979 |
| Loss from continuing operations | (30,860) | (29,576) |
| Loss from continuing operations per share, basic and diluted (before giving effect to the 1-for-100 reverse stock split) | (53.32) | (0.79) |
| Loss from continuing operations per share, basic and diluted (after giving effect to the 1-for-100 reverse stock split) | (5,329.88) | (79.29) |
| **Balance Sheet Data (as of December 31, 2008):** | | |
| Total assets | $ 91,047 | $102,210 |
| Total debt(a) | 46,540 | 25,296 |
| Postretirement benefits other than pensions | 28,919 | 28,677 |
| Total liabilities | 176,387 | 154,101 |
| Stockholders' deficit | (86,154) | (52,705) |

(a) Total debt is comprised of our Short-term borrowings and current portion of Long-term debt, our U.S. Treasury Debt, the debt of our Finance and Insurance Operations, and Long-term debt.

Assuming a maximum level of participation where 100% of old notes are tendered pursuant to the exchange offers or redeemed pursuant to the call option (in the case of the non-USD old notes), the incremental increase in

33

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007398

the level of participation from 90% to 100% would decrease pro forma interest expense by $210 million, decrease pro forma loss from continuing operations per share by $0.01 before the reverse stock split and $0.56 after the reverse stock split, decrease total pro forma debt by $2.7 billion, and decrease pro forma stockholders' deficit by $2.6 billion.

The following table sets forth an unaudited pro forma sensitivity analysis for the exchange offers to estimate the effect of changes in the percentage of holders electing to tender their old notes and to estimate the effect of changes in the estimated fair value per share of GM common stock given to tendering holders as part of the exchange consideration. The estimates presented in this unaudited pro forma sensitivity analysis may differ from actual results, and these differences may be material. When equity consideration is granted in full settlement of debt, as is provided for under the exchange offers, Statement of Financial Accounting Standards No. 15, "Accounting by Debtors and Creditors for Troubled Debt Restructurings" ("SFAS No. 15"), requires a gain to be recognized if the carrying value of the old notes tendered under the exchange offers is greater than the estimated fair value of the GM common stock issued in exchange for the old notes. In the table below, any pro forma gain we would realize is reflected in accumulated deficit on the unaudited pro forma condensed consolidated balance sheet for the exchange offers, and would be excluded from the unaudited pro forma condensed consolidated statement of operations for the exchange offers since this gain on restructuring is not expected to have a continuing impact on us.

| Estimated fair value of equity per share (assumed share price, before giving effect to the 1-for-100 reverse stock split) | Assuming 90% Aggregate Tender or Redemption of Old Notes, Pro Forma Impact on | | | Assuming 100% Tender of Old Notes, Pro Forma Impact on | | |
|---|---|---|---|---|---|---|
| | Common stock and capital surplus | Accumulated deficit, arising from gain | Total debt | Common stock and capital surplus | Accumulated deficit, arising from gain | Total debt |
| (Dollars in millions, except share price) | | | | | | |
| $1.00 | $5,523 | $(17,960) | $(23,927) | $6,136 | $(19,980) | $(26,585) |
| $0.75 | 4,142 | (19,341) | (23,927) | 4,602 | (21,514) | (26,585) |
| $0.50 | 2,761 | (20,722) | (23,927) | 3,068 | (23,048) | (26,585) |
| $0.42 | 2,320 | (21,163) | (23,927) | 2,577 | (23,539) | (26,585) |
| $0.25 | 1,381 | (22,102) | (23,927) | 1,534 | (24,582) | (26,585) |
| $0.10 | 552 | (22,931) | (23,927) | 614 | (25,502) | (26,585) |
| $0.00 | — | (23,483) | (23,927) | — | (26,116) | (26,585) |

\*    Note the table above does not show the balance sheet accounts of cash or other assets that will be reduced for the estimated costs of the exchange offers of $215 million and the decrease in debt issuance costs of $229 million at the Assumed Participation Level and $254 million at 100% participation in the exchange offers.

The exchange offers are conditioned on, among other things, the requirement that the results of the exchange offers shall be satisfactory to the U.S. Treasury, including in respect of the overall level of participation by holders in the exchange offers and in respect of the level of participation by holders of the old Series D notes in the exchange offers (the "U.S. Treasury Condition"). We currently believe, and our current Viability Plan assumes, that at least 90% of the aggregate principal amount (or, in the case of discount notes, accreted value) of the outstanding old notes (including at least 90% of the aggregate principal amount of the outstanding old Series D notes) will need to be tendered in the exchange offers or called for redemption pursuant to the call option (in the case of the non-USD old notes) in order for the exchange offers to satisfy the U.S. Treasury Condition. Whether this level of participation in the exchange offers will be required (or sufficient) to satisfy the U.S. Treasury Condition will ultimately be determined by the U.S. Treasury. The actual level of participation in the exchange offers may be different than what we have assumed, and this difference may be material.

The assumptions we used to estimate the fair value of the GM common stock given to tendering holders as part of the exchange consideration, including an unaudited pro forma sensitivity analysis associated with this

34

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER                                                                NGM000007399

estimate, are described further under *"Unaudited Pro Forma Condensed Consolidated Financial Information for the Exchange Offers,"* included elsewhere in this prospectus.

In the event we have not received enough tenders of old notes, including the old Series D Notes, to consummate the exchange offers prior to June 1, 2009, we currently expect to seek relief under the U.S. Bankruptcy Code. This relief may include (i) seeking bankruptcy court approval for the sale of most or substantially all of our assets pursuant to section 363(b) of the U.S. Bankruptcy Code to a new operating company, and a subsequent liquidation of the remaining assets in the bankruptcy case; (ii) pursuing a plan of reorganization (where votes for the plan are solicited from certain classes of creditors prior to a bankruptcy filing) that we would seek to confirm (or "cram down") despite the deemed rejection of the plan by the class of holders of old notes; or (iii) seeking another form of bankruptcy relief, all of which involve uncertainties, potential delays and litigation risks. If we seek bankruptcy relief, holders of old notes may receive consideration that is less than what is being offered in the exchange offers, and it is possible that such holders may receive no consideration at all for their old notes.

35

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007400

# RISK FACTORS

*You should carefully consider the following risk factors before you decide whether or not to tender your old notes in the exchange offers and deliver a consent in the consent solicitations. We urge you to carefully read this prospectus. You should review all of the risks attendant to being an investor in our equity and debt securities prior to making an investment decision.*

## Risks Related to Failure to Consummate the Exchange Offers

*If the exchange offers are not consummated, we currently expect to seek relief under the U.S. Bankruptcy Code. If we seek bankruptcy relief, holders of old notes may receive consideration that is less than what is being offered in the exchange offers, and it is possible that such holders may receive no consideration at all for their old notes.*

We believe that the substantial debt reduction contemplated by the exchange offers is critical to our continuing viability. In the event we have not received prior to June 1, 2009 sufficient tenders of old notes (including the old Series D notes) to consummate the exchange offers, we currently expect to seek relief under the U.S. Bankruptcy Code.

We believe that seeking relief under the U.S. Bankruptcy Code, if such relief does not lead to a quick emergence from Chapter 11, could materially adversely affect the relationships between us and our existing and potential customers, employees, suppliers, dealers, partners and others. For example:

- it is likely that such a filing would substantially erode consumers' confidence in our ability to provide parts and service over the long-term, ensure the availability of warranty coverage (which in the United States may depend on the continuation and consumer perception of the U.S. Government's warranty program) or maintain acceptable resale values and that as a result there would be a significant and precipitous decline in our global revenues, profitability and cash flow;

- a significant decline in revenue would endanger the viability of our dealers and suppliers, threaten the ability of GMAC to fund itself and impair its capacity to provide essential wholesale and retail financing to our dealers and customers;

- employees could be distracted from performance of their duties, or more easily attracted to other career opportunities;

- it may be more difficult to attract or replace key employees;

- suppliers, dealers and partners (including certain joint-venture partners) could seek to terminate their relationship with us, require financial assurances or enhanced performance, or refuse to provide trade credit on the same terms as prior to the reorganization case under Chapter 11;

- lenders to subsidiaries that are not subject to the bankruptcy proceedings could, in certain cases, terminate financing agreements, accelerate amounts due thereunder or otherwise claim an event of default has occurred thereunder;

- we could be forced to operate in bankruptcy for an extended period of time while we tried to develop a reorganization plan that could be confirmed, which we believe will significantly and permanently impair our business and prospects;

- certain of our non-U.S. subsidiaries may be required to seek bankruptcy or similar relief under proceedings outside the United States which would adversely affect their businesses;

- we may not be able to obtain debtor-in-possession financing to sustain us during the reorganization case under Chapter 11, particularly if we do not have U.S. government support;

36

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007401

- if we were not able to confirm and implement a plan of reorganization or if sufficient debtor-in-possession financing were not available, we may be forced to liquidate under Chapter 7 of the U.S. Bankruptcy Code; and

- any distributions to you that you may receive in respect of your old notes under a liquidation or under a protracted reorganization case or cases under Chapter 11 would likely be substantially delayed and the amount of any potential recovery likely could be adversely impacted by such delay.

As a result of the foregoing, if we seek bankruptcy relief, holders of old notes may receive consideration that is less than what is being offered in the exchange offers, and it is possible that such holders may receive no consideration at all for their old notes. In particular, we believe that liquidation under Chapter 7 of the U.S. Bankruptcy Code would likely result in no distributions being made to our general unsecured creditors (including holders of old notes) or to our equity holders.

***In the event that the exchange offers are extended beyond June 1, 2009, but a sufficient principal amount of the old Series D notes has not been tendered in the exchange offers prior to such date, we expect that we would terminate the exchange offers and seek relief under the U.S. Bankruptcy Code.***

We currently have approximately $1 billion of outstanding old Series D notes, which mature on June 1, 2009. By tendering, and not validly withdrawing, their old Series D notes, holders of old Series D notes will irrevocably agree pursuant to the Forbearance, Waiver and Extension, in the event the exchange offers are extended beyond June 1, 2009, to extend the maturity of their old Series D notes and to forbear from taking any action to enforce, or direct enforcement of, and waive any and all of the rights and remedies available to such holders under such old Series D notes or the indenture governing such old Series D notes, in each case until the Forbearance, Waiver and Extension Termination Date, which is the date of the earlier of (a) the termination of the exchange offers (including in the event GM files a petition for relief under the U.S. Bankruptcy Code) and (b) the consummation of the exchange offers. However, in the event that the exchange offers are extended beyond June 1, 2009, but a sufficient principal amount of the old Series D notes has not been tendered in the exchange offers prior to such date to satisfy the U.S. Treasury Condition, or if we would be required to pay a significant amount upon maturity of the old Series D notes, then we may be unable to or choose not to repay the old Series D notes at maturity. A default in payment at maturity in respect of old Series D notes could potentially trigger a cross default, directly or indirectly, under the agreements governing certain of our other material indebtedness, including our revolving credit and term loan agreements and the U.S. Treasury Loan Agreements. In such circumstances, we would have insufficient liquidity to pay such accelerated indebtedness as it becomes due, which would likely force us to terminate the exchange offers and seek relief under the U.S. Bankruptcy Code. If we seek bankruptcy relief, holders of old notes may receive consideration that is less than what is being offered in the exchange offers, and it is possible that such holders may receive no consideration at all for their old notes.

***If we do not receive the certification of viability from the President's Designee by June 1, 2009, we expect to seek relief under the U.S. Bankruptcy Code. If we seek bankruptcy relief, holders of old notes may receive consideration that is less than what is being offered in the exchange offers, and it is possible that such holders may receive no consideration at all for their old notes.***

Pursuant to the terms and conditions of the First U.S. Treasury Loan Agreement, following the February 17 Viability Plan submission to the U.S. Treasury, we submitted an updated report detailing our progress in implementing our Viability Plan. On March 30, 2009, the President's Designee (as established under the First U.S. Treasury Loan Agreement) found that our Viability Plan, in its then-current form, was not viable and would need to be revised substantially in order to lead to a viable GM. In conjunction with this announcement the administration agreed that it would offer us adequate working capital financing for a period of 60 days while it worked with us to develop and implement a more accelerated and aggressive restructuring that would provide

37

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007402

us with a sound long-term financial foundation. The U.S. Treasury also postponed until June 1, 2009, the requirement under the First U.S. Treasury Loan Agreement that the President's Designee provide the certification of viability from the President's Designee that we have complied with the requirements of the restructuring mandated by the First U.S. Treasury Loan Agreement. If we do not we receive the certification of viability from the President's Designee by June 1, 2009, then absent a further waiver, which we have no reason to believe would be forthcoming, the maturity of all loans currently outstanding under the First U.S. Treasury Loan Agreement and the Second U.S. Treasury Loan Agreement, which currently total $16.3 billion, will accelerate and become due and payable on the thirtieth day after June 1, 2009. In these circumstances, we would not have sufficient liquidity to pay the accelerated indebtedness and would be required to seek relief under the U.S. Bankruptcy Code. If we seek bankruptcy relief, holders of old notes may receive consideration that is less than what is being offered in the exchange offers, and it is possible that such holders may receive no consideration at all for their old notes.

## Risks Related to the Exchange Offers

*We will need to extend the exchange offers beyond the initial expiration date and you may not be able to withdraw any notes you tender prior to or during such extension.*

The exchange offers are subject to a number of conditions, including, among other things, the execution of binding agreements in respect of the Labor Modifications and the VEBA Modifications (including judicial and regulatory approval thereof, if any), and the U.S. Treasury being satisfied with results of the exchange offers, including in respect of the overall level of participation by holders in the exchange offers and in respect of the level of participation by holders of the old Series D notes in the exchange offers. These conditions will not be satisfied on or before the scheduled expiration date for the exchange offers. In particular, the receipt of judicial approval of the proposed VEBA Modifications and the transactions contemplated thereby is currently expected to take up to three months after a binding agreement in respect thereof has been entered into.

To the extent this condition or any other condition is not satisfied, we expect that we would extend the exchange offers until the conditions are satisfied or waived or we choose to terminate the exchange offers. Any extension could be for a significant amount of time. Old notes tendered and not validly withdrawn prior to the withdrawal deadline may not be withdrawn, unless the applicable exchange offer is terminated without any notes being accepted or as required by law. Initially, the withdrawal deadline and the expiration date of the exchange offers are the same. However, if we extend the expiration date of an exchange offer, we likely will not extend the withdrawal deadline. Consequently, old notes tendered into the exchange offer prior to the withdrawal deadline would not be able to be withdrawn during any extension of such offer, except in limited circumstances that we describe herein. In addition, in the event we extend the exchange offers beyond June 1, 2009, tendering holders of old Series D notes that have not validly withdrawn the tender of their old Series D notes prior to the Attachment Date will not be paid the principal amount otherwise due June 1, 2009 because of the Forbearance, Waiver and Extension agreed to by such tendering holders.

*If a holder of old Series D notes tenders, and subsequently withdraws, its old Series D notes from the exchange offers after the Attachment Date (in the event withdrawal rights have been extended past or reinstated after the Attachment Date), such withdrawn Series D old notes will remain subject to the Forbearance, Waiver and Extension with respect to such notes unless and until the exchange offers are terminated or consummated.*

By tendering, and not validly withdrawing, their old Series D notes, holders of old Series D notes will irrevocably agree in the event the exchange offers are extended beyond June 1, 2009, to extend the maturity of their old Series D notes and to forbear from taking any action to enforce, or direct enforcement of, and waive any and all of the rights and remedies available to such holders under such old Series D notes or the indenture governing such old Series D notes, in each case until the Forbearance, Waiver and Extension Termination Date. If a holder of old Series D notes validly withdraws tendered old Series D notes prior to the Attachment Date (in the event withdrawal rights have been extended past or reinstated after the Attachment Date), then such old

38

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007403

Series D notes will not be subject to the Forbearance, Waiver and Extension. However, if a holder of old Series D notes validly withdraws its old Series D notes at any time following the Attachment Date, then such old Series D notes, notwithstanding such withdrawal or any subsequent transfer, will continue to be subject to the Forbearance, Waiver and Extension until the Forbearance, Waiver and Extension Termination Date.

Amended Series D notes subject to the Forbearance, Waiver and Extension will have a new CUSIP number and, therefore, will not be fungible with the old Series D notes which are not subject to the Forbearance, Waiver and Extension. During the period from the Attachment Date until the Forbearance, Waiver and Extension Termination Date, for any old Series D notes for which the Forbearance, Waiver and Extension have not attached, there may be limited liquidity in such notes as a result of the separation of the CUSIP numbers.

*Approval of the VEBA Modifications is subject to appeal and such modifications could be entirely unwound. Implementing the VEBA Modifications may require us to use an alternative structure to comply with ERISA rules and we cannot assure you the structure will not violate these rules.*

Once we have reached an agreement on the VEBA Modifications, it will require judicial and regulatory approvals, including the approval of the United States District Court for the Eastern District of Michigan. Any approval we obtain from the District Court for the Eastern District of Michigan, if challenged, will be subject to appellate review, which may not be resolved for months or years after the closing of the exchange offers, and such approval may be reversed, modified or remanded for further proceedings. In addition, in the event of any reversal, modification or remand of the approval of the District Court for the Eastern District of Michigan, the terms of the VEBA Modifications may be required to be modified in a materially adverse manner or entirely unwound (in which case all or a portion of the settlement amount of payments to the New VEBA could be owing in cash). In addition, there are limitations on the amount of our common stock the New VEBA can hold at any time without violating the prohibited transactions provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"). Consequently, we expect that subsequent to the receipt of the court approval of the VEBA Modifications and completion of the exchange offers we will need to obtain an exemption from the Department of Labor to allow the New VEBA to directly hold all of the common stock which may be issuable to it pursuant to the VEBA Modifications. Receipt of this exemptive relief is not a condition to the exchange offers. Although we have no reason to believe we will not receive such exemptive relief, we cannot assure you such relief will be granted. While such application for exemptive relief is pending and if such relief were ultimately denied, we and the New VEBA will be required to employ an alternative mechanism to implement the VEBA Modifications and the beneficial ownership of common stock issuable pursuant thereto in accordance with the requirements of the agreement approved by the District Court for the Eastern District of Michigan. We cannot assure you that such mechanism will not be found to violate the ERISA prohibited transactions rules or that we will be able to employ another mechanism that satisfies those rules. If we violate these rules and fail to correct the violation timely, we could be subject to substantial fines and be deemed in breach of our fiduciary obligations.

**Risks Related to Non-Tendered Old Notes**

*If the exchange offers are consummated, proposed amendments to the debt instruments governing the old notes will reduce the protections afforded to non-tendering holders of old notes.*

If the exchange offers are consummated, then the debt instruments governing non-tendered old notes will be amended and holders of old notes will be bound by the terms of these debt instruments even if they did not consent to the proposed amendments.

The proposed amendments would eliminate provisions under the debt instruments governing non-tendered old notes, including:

- the limitation on our ability to incur liens and enter into sale-leaseback transactions;
- the limitation on merger, consolidation, sales or conveyance of assets; and
- certain events of default relating to the failure to perform non-payment related covenants and certain events of bankruptcy, insolvency or reorganization.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007404

In addition, the proposed amendments to the debt instruments governing the non-USD old notes would add the call option, which we intend to exercise immediately upon the effectiveness thereof, if adopted. See *"Proposed Amendments—Non-USD Old Notes."*

*If the exchange offers are consummated, there will be less liquidity in the market for non-tendered old notes, and the market prices for non-tendered old notes may therefore decline and the volatility of such prices may increase.*

If the exchange offer for a series of old notes is consummated, the aggregate principal amount of outstanding old notes of that series will be substantially reduced. Therefore, the liquidity and market price for old notes that are not validly tendered in the exchange offers may be adversely affected. The reduced float also may make the trading prices of old notes that are not exchanged more volatile.

## Risks Related to Securities Issued in the Exchange Offers

*We have not obtained or requested a fairness opinion with respect to the exchange consideration.*

We have not obtained or requested, and do not intend to obtain or request, a fairness opinion from any banking or other firm as to the fairness of the exchange consideration or of the relative values of the old notes to the exchange consideration. If you tender your old notes, there is no assurance that the value of the exchange consideration you receive will be equal to or greater than the value of your old notes.

*We may purchase or repay any old notes not tendered in the exchange offers on terms that could be more favorable to holders of such old notes than the terms of the exchange offers.*

Subject to applicable law, after the expiration date, we may purchase old notes in the open market, in privately negotiated transactions, through subsequent tender or exchange offers or otherwise. Any other purchases may be made on the same terms or on terms which are more or less favorable to holders of such old notes than the terms of the exchange offers. We also reserve the right to repay any old notes not tendered in accordance with their terms. If we decide to repurchase or repay old notes that are not tendered in the exchange offers, those holders who decided not to participate in the exchange offers could be better off than those who participated in the exchange offers.

*We expect to issue a substantial amount of GM common stock in connection with the exchange offers, the U.S. Treasury Debt Conversion and the VEBA Modifications, and we cannot predict the price at which GM common stock will trade following the exchange offers.*

Assuming full participation in the exchange offers, (a) approximately 60 billion shares of GM common stock will be issued in connection with the exchange offers, the U.S. Treasury Debt Conversion and the VEBA Modifications, which would represent approximately 99% of the pro forma outstanding GM common stock, and (b) the percentage of pro forma outstanding GM common stock to be held by (i) holders of old notes tendered in the exchange offers would be approximately 10%, (ii) the U.S. Treasury (or its designee) and the New VEBA would be approximately 89% and (iii) existing GM common stockholders would be approximately 1%.

We cannot predict what the demand for GM common stock will be following the exchange offers, how many shares of GM common stock will be offered for sale or be sold following the exchange offers or the price at which GM common stock will trade following the exchange offers. Some of the holders of old notes may be investors that cannot or are unwilling to hold equity securities and may therefore seek to sell the GM common stock they receive in the exchange offers. There are no agreements or other restrictions that prevent the sale of a large number of our shares of GM common stock immediately following the exchange offers. The shares of GM common stock offered pursuant to this prospectus in exchange for the old notes have been registered with the

40

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007405

SEC. As a consequence, those shares will, in general, be freely tradable in the United States. Sales of a large number of shares of GM common stock after the exchange offers could materially depress the trading price of GM common stock.

### *Our common stock may be delisted by the NYSE.*

Our common stock is currently listed on the NYSE. We may fail to comply with the continued listing requirements of the NYSE, and the failure to do so may result in the delisting of our common stock. NYSE rules require, among other things, that the minimum listing price of our common stock be at least $1.00 for more than 30 consecutive trading days. If we fail to comply with the minimum listing price requirement and are unable to cure such defect within the six months following the receipt of any notice from the NYSE regarding our failure to achieve the minimum listing price of our common stock, the NYSE may delist our common stock. Delisting will have an adverse impact on the liquidity of our common stock and, as a result, the market price for our common stock may decline and become more volatile. Delisting could also make it more difficult for us to raise additional capital.

While we hope that the reverse stock split will have the effect of increasing the minimum bid price of our common stock, the minimum bid price may not increase, at all or for any period of time, and we may not be successful in maintaining the listing of our common stock on the NYSE.

### *If our common stock is deemed a penny stock, its liquidity will be adversely affected.*

If the market price for our common stock continues to remain below $5.00 per share, our common stock may be deemed to be a penny stock. If our common stock is considered a penny stock, it would be subject to rules that impose additional sales practices on broker-dealers who sell our securities. For example, broker-dealers must make a special suitability determination for the purchaser and have received the purchaser's written consent to the transaction prior to sale. Also, a disclosure schedule must be delivered to each purchaser of a penny stock, disclosing sales commissions and current quotations for the securities. Monthly statements are also required to be sent disclosing recent price information for the penny stock held in the account and information on the limited market in penny stocks. Because of these additional conditions, some brokers may choose to not effect transactions in penny stocks. This could have an adverse effect on the liquidity of our common stock.

### *We are subject to restrictions on paying dividends on our common stock and we do not intend to pay dividends on our common stock in the foreseeable future.*

We do not anticipate that we will be able to pay any dividends on our shares of common stock in the foreseeable future. We intend to retain any future earnings to fund operations, debt service requirements and other corporate needs. In addition, our revolving credit and term loan agreements and the U.S. Treasury Loan Agreements prohibit the payment of dividends on our common stock without first receiving the requisite lender consent under each respective agreement.

### *If less than all holders of old notes tender their old notes and, following the consummation of the exchange offers, we were to subsequently liquidate our assets, the holders of old notes who have not tendered their old notes would have a priority on repayment over any holders of equity interests.*

If not all holders of the old notes tender their old notes and, following the consummation of the exchange offers, we subsequently cease operations and liquidate our assets (inside or outside a bankruptcy case), the holders of the outstanding old notes would be entitled to receive the principal and accrued and unpaid interest on such old notes out of our assets before our equity holders (including tendering holders to the extent they retain GM common stock received as exchange consideration) would receive a distribution. All equity holders would thereafter receive a recovery only if assets remain after all of our debts are paid in full. Accordingly, if holders tender their old notes in the exchange offers and, following the consummation of the exchange offers, we were to subsequently liquidate our assets, such holders may receive less than if they did not tender their old notes.

41

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007406

*To the extent holders of old notes receive GM common stock in the exchange offers they will lose their contractual rights as creditors.*

GM common stock received as exchange consideration for old notes tendered in the exchange offers will not carry the contractual rights that the old notes benefit from. Tendering holders of old notes who become stockholders after consummation of the exchange offers may suffer more from future adverse developments relating to our financial condition, performance, results of operations or prospects than they would as holders of our indebtedness. In addition, unlike indebtedness, where principal and interest are payable on specified due dates, in the case of the GM common stock, dividends are payable only to the extent declared by our board in compliance with applicable law and our contractual commitments, if at all.

### Risks Related to the U.S. Treasury Debt Conversion

*Following the U.S. Treasury Debt Conversion, the U.S. Treasury (or its designee) will own a controlling interest in GM and its interests may differ from those of our other stockholders.*

In accordance with the U.S. Treasury Debt Conversion, GM expects to issue shares of GM common stock to the U.S. Treasury (or its designee) that would consist of at least 50% of our pro forma common stock ownership upon consummation of the exchange offers. We currently are in discussions with the U.S. Treasury regarding the governance of our company following consummation of the exchange offers and therefore we cannot assure you as to what role the U.S. Treasury will play. Absent other arrangements, as a result of its ownership of GM common stock, the U.S. Treasury will be able to elect all of our directors and to control the vote on substantially all matters brought for a stockholder vote. In addition, through its stockholder voting rights and election of directors, and its role as a significant lender to us, the U.S. Treasury will be able to exercise significant influence and control over our business if it elects to do so. For example, the U.S. Treasury will be able (if it elects to do so) to influence matters including:

- the selection and tenure and compensation of our management;

- our business strategy;

- our relationship with our employees, unions and other constituencies; and

- our financing activities, including the issuance of debt and equity securities.

In the future we may also become subject to new and additional government regulations regarding various aspects of our business as a result of the U.S. government's ownership in (and financing of) our business. These regulations could make it more difficult for us to compete with other companies that are not subject to similar regulations.

To the extent the U.S. Treasury elects to exercise influence or control over us, its interests (as a government entity) may differ from those of our other stockholders.

In addition, the U.S. Treasury's ability to prevent any change in control of GM could also have an adverse effect on the market price of GM common stock. The U.S. Treasury may also, subject to applicable securities laws, transfer all or any portion of its GM common stock to another person or entity and, in the event of such a transfer, that person or entity could become the controlling stockholder.

*Possible future sales of GM common stock by the U.S. Treasury could adversely affect the market for GM common stock.*

We cannot assure you as to if, when, how or to whom the U.S. Treasury will transfer its GM common stock, or the effect, if any, that future sales (whether public or private) by the U.S. Treasury of GM common stock would have on the market price of such stock. Sales or other transfers of substantial amounts of GM common stock, or the perception that such sales could occur, could adversely affect the market price of GM common stock. If the U.S. Treasury sells or transfers shares of GM common stock as a block, another person or entity could become a controlling shareholder of our company.

42

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007407

*The U.S. Treasury Debt Conversion will, or in some cases may, give counterparties to some financing arrangements, joint venture arrangements, commercial contracts and other arrangements to which we or our subsidiaries are party (or by which we or they are otherwise affected) the ability to exercise rights and remedies under such arrangements which, if exercised, may have material adverse consequences.*

The issuance of GM common stock in connection with the U.S. Treasury Debt Conversion will, or in some cases may, be considered a change of control for purposes of some of the financing arrangements, joint venture arrangements, employee benefits plans, commercial contracts and other arrangements to which we and our subsidiaries are a party, entitling the counterparty or beneficiary to exercise rights and remedies. The counterparty or beneficiary could have the ability, depending on the arrangement, to, among other things, terminate the arrangement, require early repayment of amounts owed by us or our subsidiaries and in some cases payment of penalty amounts, require specified payments, or purchase our joint venture interest or otherwise require the dissolution of the joint venture. In these cases we intend to enter into discussions with the counterparties where appropriate to seek a waiver under, or amendment of, the arrangements to avoid or minimize any potential adverse consequences. We cannot assure you that we will be successful in avoiding or minimizing the adverse consequences which, individually or collectively, may have a material adverse effect on our ability to successfully implement our Viability Plan (which does not reflect the impact of any such adverse consequences, financial or otherwise) and on our consolidated financial position and results of operations. GMAC and its subsidiaries are also parties to certain financing and other arrangements that have similar change of control provisions (as a result of our current or historic ownership interest in GMAC and the significant commercial relationships between us) that will, or in some cases may, be triggered by the issuance of GM common stock in connection with the U.S. Treasury Debt Conversion. If GMAC is unable to successfully avoid or minimize the adverse consequences under those arrangements, it and we could be adversely affected.

## Tax Risk Factors

*We expect to lose a significant amount of our tax attributes as a result of the exchange offers.*

We expect to realize cancellation of indebtedness income ("COD income") as a result of the restructuring of our debt obligations, including the exchange offers, to the extent that the value of GM common stock issued in satisfaction of our debt obligations is less than the "adjusted issue price" of such debt obligations. The exact amount of any COD income that will be realized by us will not be determinable until the closing of the exchange offers.

To the extent we are considered solvent from a tax perspective immediately prior to the completion of the exchange offers and the cancellation of indebtedness occurs outside of a reorganization case under Chapter 11, the resulting COD income recognized by us may generally be offset by our available net operating losses, net operating loss carryforwards and other tax attributes. Any amount of COD income in excess of such available attributes could result in a current tax liability.

To the extent we are considered insolvent from a tax perspective immediately prior to the completion of the exchange offers, any COD income would be excludible from our taxable income, but only up to the amount by which we are insolvent. If the discharge of our debt obligations were to occur in a reorganization case under Chapter 11, all COD income would be excludible from our taxable income.

If and to the extent any amount attributable to the cancellation of indebtedness is excluded from income pursuant to the insolvency or the bankruptcy exceptions, we will generally be required to reduce our tax attributes, including, but not limited to, our current year net operating losses, net operating loss carryforwards, credit carryforwards and basis in certain assets. If our realized COD income exceeds our available tax attributes to offset it, such excess is permanently excluded from income.

As a result, whether or not COD income is included in income or exempt by reason of the insolvency or bankruptcy exceptions, we expect that the exchange offers will result in a significant reduction in, and possible elimination of, our tax attributes.

43

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007408

We currently have substantial net operating loss carryforwards and certain other tax attributes that are available to offset COD income and, possibly, taxable income in future years. However, Section 382 of the Internal Revenue Code of 1986, as amended (the "Tax Code") provides that, if a corporation undergoes an "ownership change," its ability to use its net operating loss carryforwards and certain other tax attributes could thereafter be subject to limitation under Section 382 of the Tax Code. Despite this general rule, no annual limitation will apply to an ownership change resulting from a restructuring plan of a taxpayer that is required pursuant to the taxpayer's loan with the U.S. Treasury under the Emergency Economic Stabilization Act of 2008. In addition, according to an IRS Notice, stock issued to the U.S. Treasury pursuant to the Automotive Industry Financing Program is not considered to increase the U.S. Treasury's ownership of the issuing entity for purposes of Section 382 of the Tax Code. We are undertaking the exchange offers and the U.S. Treasury Debt Conversion to meet our debt reduction obligations that are part of the restructuring requirements of the first U.S. Treasury Loan Agreement. There can be no assurance however, that these or subsequent events involving our stock (including the disposition by the U.S. Treasury of its shares of GM common stock acquired pursuant to the U.S. Treasury Debt Conversion) will not give rise to an ownership change that is subject to the limitations under Section 382 of the Tax Code. Our inability to use our net operating loss carryforwards and other tax attributes could have an adverse impact on our financial position and results of operations.

In addition, to the extent that we have or incur any debt obligations to the U.S. Treasury following the U.S. Treasury Debt Conversion, the deductibility of interest thereon may be limited under Section 163(j) of the Tax Code.

GM Nova Scotia is expected to realize a forgiven amount under the debt forgiveness rules of the *Income Tax Act* (Canada) as a result of the implementation of the exchange offers for the old GM Nova Scotia notes and any exercise of the call option to settle the old GM Nova Scotia notes, and may otherwise realize forgiven amounts under these rules as a result of the settlement of other GM intercompany obligations owing by GM Nova Scotia as part of the implementation of the exchange offers and the exercise of the call option. The final impact to GM Nova Scotia in any such case under the rules of the *Income Tax Act* (Canada) is uncertain. However, the realization of a forgiven amount by GM Nova Scotia could cause adverse Canadian tax consequences to GM Nova Scotia for these purposes, including the inclusion of up to half of any such forgiven amount in computing the income of GM Nova Scotia.

### *Holders of old Series D notes might be fully taxed in connection with the exchange offers.*

Because the original term of the old Series D notes was less than five years, it is unclear whether the old Series D notes should be treated as "securities" for U.S. federal income tax purposes. If the old Series D notes are not treated as securities, the exchange of the old Series D notes pursuant to the exchange offers would be treated as a fully taxable transaction such that a holder that realizes gain upon the exchange generally would be required to recognize its full gain, if any.

## Risks Relating to Our Viability Plan and Our Business

### *Unless we successfully implement all key elements of our Viability Plan, we may not be able to continue as a going concern even if we consummate the exchange offers.*

Our independent registered public accounting firm issued an opinion on our December 31, 2008 consolidated financial statements that states that the consolidated financial statements were prepared assuming we will continue as a going concern and further states that our recurring losses from operations, stockholders' deficit and inability to generate sufficient cash flow to meet our obligations and sustain our operations raise substantial doubt about our ability to continue as a going concern. We are seeking to address these matters through the implementation of our Viability Plan. Our future and our ability to continue as a going concern are dependent on a number of factors, including among other things (a) successfully consummating the exchange offers, (b) receiving approval of our Viability Plan by the U.S. Treasury, (c) successfully implementing the Labor Modifications, VEBA Modifications and the U.S. Treasury Debt Reduction, (d) obtaining sufficient financing

44

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007409

from the U.S. Treasury, other governmental entities or other sources to continue operations, (e) successfully implementing the operational restructuring actions and improvements contemplated by our Viability Plan, (f) continuing to procure necessary systems, components and parts from Delphi and other suppliers, (g) GMAC continuing to provide financing to our dealers and customers, and (h) consumers' purchasing our products in substantially higher volumes than currently is the case.

If any of the foregoing are not obtained or achieved, including those that will not have been obtained or achieved before or upon consummation of the exchange offers, we may not be able to continue as a going concern and may be forced to seek relief under the U.S. Bankruptcy Code even if we consummate the exchange offers, and holders of GM common stock, including holders of old notes that received GM common stock pursuant to the exchange offers or upon exercise of the call option, may receive no distribution.

*Even if we successfully consummate the exchange offers, our business, the success of our Viability Plan and our ability to continue as a going concern will be highly dependent on sales volume. Global vehicle sales have declined rapidly and there is no assurance that the global automobile market will recover in the near future or that it will not suffer a significant further downturn.*

Our business and financial results are highly sensitive to sales volume, as demonstrated by the effect of sharp declines in vehicle sales in the United States since 2007 and globally during 2008. Vehicle sales in the United States have fallen 39% on an annualized basis since their peak in 2007, and sales globally have declined 19% on an annualized basis since their 2007 peak. The deteriorating economic and market conditions that have driven the drop in vehicle sales, including declines in real estate and equity values rising, unemployment, tightened credit markets, depressed consumer confidence and weak housing markets, are not likely to improve significantly during 2009 and may continue past 2009 and could get worse. Our Viability Plan is based on assumptions that vehicle sales will decline further in 2009 versus 2008 but will gradually begin to recover from the 2009 first quarter "trough" of a seasonally adjusted annual rate of 9.7 million vehicle sales to a full year 2009 calendar year level of 10.5 million and a 2010 calendar year level of 12.5 million. GM dealers in the United States sold 412,903 vehicles during the first quarter of 2009, which represents a decline of approximately 49% compared to the same period in 2008. The baseline sales assumption in our Viability Plan for the United States in 2009 is 2,048,000 vehicles, which is based on a baseline industry vehicle sales forecast for 2009 of 10.5 million total vehicles sold in the United States. Our market share forecast for 2009 is 19.5% in the United States. Sales volumes may decline more severely or take longer to recover than we expect, however, and if they do, our results of operations and financial condition and the success of our Viability Plan will be materially adversely affected.

*The success of our Viability Plan and our ability to continue as a going concern depend on our ability to obtain significant additional funding from the United States and certain foreign governments.*

In the February 17 Viability Plan we submitted to the President's Designee pursuant to the First U.S. Treasury Loan Agreement, we forecasted a need for funding from the U.S. Treasury of $22.5 billion under our baseline scenario and $30.0 billion under our downside scenario (in each case including the $13.4 billion then outstanding under the First U.S. Treasury Loan Agreements, but not including the $748.6 million promissory note we issued to the U.S. Treasury as part of the compensation for the loans thereunder and the $884.0 million we borrowed to purchase additional membership interests in GMAC). In order to execute our current Viability Plan, we currently forecast a need for U.S. Treasury funding totaling $27.0 billion, representing the $22.5 billion requested in our February 17 Viability Plan submission under our baseline scenario, plus an additional $4.5 billion needed to implement incremental restructuring actions, cover higher projected negative operating cash flow primarily due to lower forecasted vehicle sale volumes in North America, and to compensate for lower than originally forecasted proceeds from asset sales and other sources of financing, including Section 136 Loans. Our current Viability Plan assumes that we receive $5.7 billion of Section 136 Loans and an additional $5.6 billion in funding from foreign governments. We have currently received a total of $15.4 billion under the First U.S. Treasury Loan Agreement and the Second U.S. Treasury Loan Agreement (excluding the $882.0 million of promissory notes issued to the U.S. Treasury as compensation for the loans thereunder and the $884.0 million we borrowed to purchase additional membership interests in GMAC).

45

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007410

We currently forecast that we will need an additional $2.6 billion of working capital loans from the U.S. Treasury prior to June 1, 2009 and $9.0 billion thereafter. We cannot assure you that the U.S. Treasury will provide any additional loans. In addition, we do not expect that the Department of Energy will determine that we meet the viability requirement for eligibility to receive Section 136 Loans unless and until the U.S. Treasury approves our Viability Plan. Even if the U.S. Treasury approves our Viability Plan, we cannot be certain that the Department of Energy will approve our requests for Section 136 Loans. We also are in the process of requesting temporary loan support from certain foreign governments, including Canada, Germany, the United Kingdom, Sweden and Thailand. We believe that obtaining funding from these governmental sources will be necessary to continue to operate our business in its anticipated scope. We have not received any commitment with regard to the additional proposed borrowings from either the U.S. government or any foreign governments, and there is no assurance that we will be successful in obtaining the additional governmental funding we will need to continue to operate our business. Moreover, even if we receive commitments for the required funding (our receipt of evidence of the U.S. Treasury Commitment is a condition to the consummation of the exchange offers), we do not know what the terms of, and conditions for, borrowing will be and cannot be sure we will be able to satisfy them as and when funding is needed. The failure to obtain sufficient funding from the U.S. government and governments outside the United States in the amounts, at the times and at GM or GM subsidiary entities as contemplated, may require us to contract or terminate operations, dispose of certain assets or further restructure GM or certain United States or foreign subsidiaries out of court or through in court insolvency or similar proceedings. If we fail to obtain sufficient funding for any reason, we and/or any affected subsidiaries would not be able to continue as a going concern and would likely be forced to seek relief under the U.S. Bankruptcy Code or similar foreign laws.

*Even if we successfully consummate the exchange offers, inadequate liquidity could materially adversely affect our business operations in the future.*

Even if we successfully consummate the exchange offers, we will require substantial liquidity to implement long-term cost savings and restructuring plans, continue capital spending to support product programs and development of advanced technologies, and meet scheduled term debt and lease maturities, in each case as contemplated by our Viability Plan. If we continue to operate at or close to the minimum cash levels necessary to support our normal business operations, we may be forced to further curtail capital spending, research and development and other programs that are important to the future success of our business. Our suppliers might respond to an apparent weakening of our liquidity position by requesting quicker payment of invoices or other assurances. If this were to happen, our need for cash would be intensified.

In the fourth quarter of 2008, our available liquidity dropped below the level necessary to operate our business. Although we received significant liquidity through our borrowings pursuant to the First U.S. Treasury Loan Agreement, we will require significant additional funding during the remainder of 2009 and beyond to operate our businesses given the current business environment and therefore our required liquidity could be significantly higher than we currently anticipate. In addition to the availability of governmental funding, our ability to maintain adequate liquidity through 2009 and beyond will depend significantly on the volume and quality of vehicle sales, the continuing curtailment of operating expenses and capital spending and the completion of some of our planned asset sales. Our forecasted liquidity needs are sensitive to changes in each of these and other factors. For discussion of risks related to obtaining required financing, see "*Risk Factors—The Success of Our Viability Plan and our ability to continue as a going concern depend on our ability to obtain significant additional funding from the United States and certain foreign governments.*"

*Our Viability Plan relies in large part upon assumptions and analyses developed by us. If these assumptions and analyses prove to be incorrect, our Viability Plan may be unsuccessful and we may be unable to continue as a going concern.*

Our Viability Plan relies in large part upon assumptions and analyses that we developed based on our experience and perception of historical trends, current conditions and expected future developments, as well as

46

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007411

other factors that we consider appropriate under the circumstances. Whether actual future results and developments will be consistent with our expectations and assumptions as reflected in our Viability Plan depends on a number of factors, including but not limited to:

- Our ability to obtain adequate liquidity and financing sources and establish an appropriate level of debt, including our ability to consummate the exchange offers and negotiate the VEBA Modifications with VEBA-settlement class;

- Our ability to realize production efficiencies and to achieve reductions in costs as a result of the turnaround restructuring and the Labor Modifications;

- Our ability to restore consumers' confidence in our viability as a continuing entity and to attract sufficient customers, particularly for our new products, including cars and crossover vehicles;

- The availability of adequate financing on acceptable terms to our customers, dealers, distributors and suppliers to enable them to continue their business relationships with us;

- The continued financial viability and ability to borrow of our key suppliers, including Delphi's ability to address its underfunded pension plans and to emerge from bankruptcy proceedings;

- Our ability to sell, spin-off or phase out some of our brands as planned, to manage the distribution channels for our products and to complete other planned asset sales;

- Our ability to qualify for federal funding for our advanced technology vehicle programs under Section 136 of EISA, which we believe is dependent on our ability to demonstrate our viability to the U.S. Treasury;

- The ability of our foreign operations to successfully restructure and receive adequate financial support from their host governments and other sources;

- the continued availability of both wholesale and retail financing from GMAC and its affiliates in the United States, Canada and the other markets in which we operate and to support our ability to sell vehicles in those markets, which is dependent on GMAC's ability to obtain funding and which may be suspended by GMAC if GMAC's credit exposure to us exceeds certain limitations provided in our operating arrangements with GMAC; and

- The overall strength and stability of general economic conditions and of the automotive industry, both in the United States and in global markets.

In addition, our Viability Plan relies upon financial projections, including with respect to (1) revenue growth and improvements in earnings before interest, taxes, depreciation and amortization margins, (2) growth in earnings and cash flow, (3) the amounts of future pension contributions, (4) the value and operating results of unconsolidated subsidiaries, (5) the value of expected asset sales and (6) the amounts of other restructuring costs, including those related to Delphi. Financial forecasts are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate. Accordingly, we expect that our actual financial condition and results of operations will differ, perhaps materially, from what we describe in our Viability Plan. Consequently, there can be no assurance that the results or developments contemplated by our Viability Plan will occur or, even if they do occur, that they will have the anticipated effects on us and our subsidiaries or our businesses or operations. The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of our Viability Plan and our ability to continue as a going concern.

47

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007412

*Even if we successfully consummate the exchange offers, our indebtedness and other obligations will continue to be significant. If the current economic environment does not improve, we will not be able to generate sufficient cash flow from operations to satisfy our obligations as they come due, and as a result we would need additional funding, which may be difficult to obtain.*

Even if we successfully consummate the exchange offers, and complete the other steps of our Viability Plan, we will continue to have a significant amount of indebtedness and other obligations. On a pro forma basis as of December 31, 2008, assuming holders tender in the exchange offers at the Assumed Participation Level, GM's outstanding consolidated indebtedness would have been approximately $25.3 billion. In addition, as described above, under our Viability Plan we forecast that we will need significant additional borrowings from the U.S. government and certain foreign governments, as a result of which, our total debt outstanding would increase.

Our significant current and future indebtedness and other obligations are likely to have several important consequences. For example, it could:

- Require us to dedicate an even more significant portion of our cash flow from operations than we currently do to the payment of principal and interest on our indebtedness and other obligations, which will reduce the funds available for other purposes such as product development;

- Make it more difficult for us to satisfy our obligations;

- Make us more vulnerable to adverse economic and industry conditions;

- Limit our ability to withstand competitive pressures;

- Limit our ability to fund working capital, capital expenditures and other general corporate purposes;

- Make us more vulnerable to any continuing downturn in general economic conditions and adverse developments in our business; and

- Reduce our flexibility in responding to changing business and economic conditions.

If current economic conditions do not improve as and to the extent contemplated by our Viability Plan, we will not be able to generate sufficient cash flow from operations in the future to allow us to service our debt, pay our other obligations as required and make necessary capital expenditures, in which case we might be forced to seek additional financing, dispose of certain assets, minimize capital expenditures or seek to refinance some or all of our debt. There is no assurance that any of these alternatives would be available to us, if at all, on satisfactory terms or on terms that would not require us to breach the terms and conditions of our existing or future debt agreements.

*Despite our current levels of indebtedness, we and our subsidiaries are permitted to incur additional indebtedness in certain circumstances and take other actions that could increase the risks associated with our substantial leverage.*

We and our subsidiaries may be able to incur substantial additional indebtedness in the future, including secured indebtedness. Although the agreements governing certain of our indebtedness, including the U.S. Treasury Loan Agreements, contain restrictions on the incurrence of additional indebtedness, these restrictions are subject to a number of qualifications and exceptions, and the indebtedness incurred in compliance with these restrictions could be substantial. If we or our subsidiaries incur additional indebtedness, the risks associated with our substantial leverage would increase.

*Any future issuance of preference shares, preferred shares or additional shares of common stock could adversely affect the rights of holders of our common stock, which may negatively impact your investment in our common stock.*

Our board of directors is authorized to issue additional shares of common stock and additional classes or series of preference stock and preferred stock without any action on the part of the stockholders. The board of

48

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

directors also has the power, without stockholder approval, to set the terms of any such classes or series of preference stock or preferred stock that may be issued, including voting rights dividend rights and preferences over the common stock with respect to dividends or upon the liquidation, dissolution or winding up of our business and other terms. If we issue shares of preferred stock or preference stock in the future that have a preference over the common stock with respect to the payment of dividends or upon liquidation, dissolution or winding up, or if we issue shares of preference stock or preferred stock with voting rights that dilute the voting power of the common stock, the rights of holders of the common stock or the market price of the common stock could be adversely affected. In addition, we may issue additional common stock or preference or preferred shares convertible into our common stock in connection with any further financial assistance from, or the equitization of any existing debt financing provided by, the U.S. Government or the governments of other countries in which we operate. Any such issuance could have a negative impact on the market price of our common stock.

### *Our Viability Plan contemplates that we restructure our operations in various foreign countries but we may not succeed in doing so and that could have a material and adverse effect on our business.*

Our Viability Plan contemplates that we restructure our operations in various foreign countries and we are actively working to accomplish this. For example, Saab filed for reorganization protection under the laws of Sweden in February 2009. In connection with this reorganization, we have contacted a number of bidders and have provided them with information regarding Saab's operations. Saab may receive third party financing, in its reorganization but we currently do not intend to make any additional investments in Saab. In March 2009, we reached an agreement with the Canadian Auto Workers Union, which we expect will reduce the legacy costs associated with General Motors of Canada Limited's operations by approximately C$930 million. This agreement is contingent upon our successfully receiving funding from the government of Canada for our Canadian operations. We are currently in advanced discussions with the government of Canada with respect to such funding but we cannot assure you that we will receive the funding. We are also continuing to work towards a restructuring of our German and certain other European operations, which could include a third party investment in Adam Opel GmbH (one of our existing German subsidiaries) that would own all or a significant part of our European operations. We are currently in talks with the German government and several parties with respect to such an investment. In addition, we are pursuing restructurings of our operations in other foreign countries and engaging in discussions with other foreign governments regarding financial support for our foreign operations. We cannot be sure that we will be able to successfully complete any of the contemplated restructurings, or if we do, what the terms will be. Restructurings, whether or not ultimately successful, often involve significant disruption to the business and diversion of management attention away from business operations, and may involve labor disruptions, all of which can adversely affect the business. Moreover, most of our restructurings require significant financing from foreign governments or other sources, which may be difficult to obtain, or if available, may be on terms that are unfavorable to us. In addition, restructurings (like the one currently being pursued for our German and certain European operations) may involve the sale of significant equity interests to lenders or investors, which could significantly reduce our ownership interest and control over the affected operations, and could adversely impact other operations in our company. We cannot assure you that any of our contemplated restructurings will be completed or achieve the desired results, and if we cannot successfully complete the restructurings out of court, we may seek to, we or the directors of the relevant entity may be compelled to, or creditors may force us to, seek relief under applicable local bankruptcy, reorganization, insolvency or similar laws, where we may lose control over the outcome of the restructuring process due to the appointment of a local receiver, trustee or administrator (or similar official) or otherwise and which could result in a liquidation and us losing all or a substantial part of our interest in the business.

### *Negative developments in the availability or terms of consumer credit through GMAC or other sources materially adversely affected our sales in 2008 and may have a similar effect in 2009 if credit markets.*

Based on our historical relationship, GMAC finances a significant percentage of our global vehicle sales and virtually all of our U.S. sales involving subsidized financing such as below-market interest rates. Due to conditions in credit markets particularly later in 2008 and the first quarter of 2009, GMAC experienced severe

49

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007414

difficulty accessing new funding, and other sources of financing, other than through governmental programs such as the Troubled Asset Relief Program, were not readily available to fully meet GMAC's role in supporting our dealers and their retail customers. As a result, the number of vehicles sold with a subsidized financing rate or under a lease contract declined rapidly in the second half of the year, with lease contract volume dropping to zero by the end of 2008. This had a significant effect on our vehicles sales overall, since many of our competitors have captive finance subsidiaries that were better capitalized than GMAC and thus were able to offer consumers subsidized financing and leasing offers.

Similarly, many of the dealers that sell our products rely on GMAC financing to purchase our vehicles on a wholesale basis. The reduced availability of GMAC wholesale dealer financing (particularly in the second half of 2008), the increased cost of such financing and a continuation in the decline in the availability of other sources of dealer financing due to the general weakness of the credit market, has caused and will likely continue to cause dealers to modify their plans to purchase vehicles from us.

While GMAC's ability to provide consumer financing at subsidized rates has improved, lease financing remains largely unavailable. Because of recent modifications to our commercial agreements with GMAC, GMAC no longer is subject to contractual wholesale funding commitments or retail underwriting targets. Therefore, there can be no assurance that GMAC will continue to have adequate funding available at competitive rates to ensure that financing for purchases of our vehicles by our dealers and customers will be consistent with the funding levels and competitive rates that have historically been available from GMAC. In addition, availability of funding for both wholesale and retail sales from other sources, while improved, remains limited and would decrease if credit markets deteriorate.

In addition, the operating arrangements with us under which GMAC provides vehicle financing, including advances to us against delivery of vehicles in transit to dealers and financing to dealers and consumers, include certain limitations on GMAC's unsecured and total credit exposure to us, as calculated based on various factors. Some of these factors, such as the residual value of vehicles held as collateral by GMAC and GMAC's assessment of the credit risk of dealers, are beyond our control, and under certain circumstances some of these factors could fluctuate materially within a short period. GMAC's credit exposure to us can also be significantly affected by our subsidized financing programs. If we were to file bankruptcy or take certain actions after such a filing, the factors affecting calculation of GMAC's credit exposure to us are likely to produce a material increase in GMAC's exposure. In the event that GMAC's exposure to us exceeds the contractual limits for these or other reasons, GMAC has the right to suspend extending credit to us, including funding in-transit deliveries, participating in our subsidized financing programs and taking other actions under our arrangements that generate credit exposure to us. In the past, when the limit has been exceeded, GMAC has demanded and we have made cash payments to GMAC to reduce the amount of GMAC's credit exposure to us, and there can be no assurance that GMAC will not seek material payments from us in the future in order to satisfy the credit exposure limits. Were we to fail to make such a payment, GMAC could suspend the financing activities described above which would severely adversely affect our business.

***Because of our dependence on GMAC, we are subject to risks associated with its business and financial condition (including events relating to us).***

Because of our dependence on GMAC for the financing of a significant percentage of our global vehicle sales and virtually all of our U.S. sales involving subsidized financing such as sales incentives, as well as dealer financing for wholesale purchases, we are subject generally to risks associated with business and financial developments at GMAC. Moreover, if we were to file bankruptcy or take certain actions after such a filing it could result in events of default or early amortization events under certain of GMAC's credit facilities. Further, the acquisition of control of our company by the U.S. Treasury or any sale by us of an interest in GMAC as a result of our restructuring activities could trigger a change of control event of default under these facilities. An event of default or early amortization event under GMAC's facilities could seriously impair its ability to obtain financing and therefore to provide financing to support our vehicle sales. See the discussion under "*Risk Factors—Risks related to our ownership interest in GMAC*" in our annual report on form 10-K for the year

50

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

ended December 31, 2008, which is incorporated by reference herein and "—*Risks related to the U.S. Treasury Debt Conversion*— *the U.S. Treasury Debt Conversion will, or in some cases may, give counterparties to some financing arrangements, joint venture arrangements, commercial contracts and other arrangements to which we or our subsidiaries are party (or are otherwise affected) the ability to exercise rights and remedies under such arrangements which, if exercised, may have material adverse consequences.*"

*Even if we successfully consummate the exchange offers, we and our subsidiaries are party to various financing arrangements, joint venture arrangements, commercial contracts and other arrangements that under certain circumstances give, or in some cases may give, the counterparty the ability to exercise rights and remedies under such arrangements which, if exercised, may have material adverse consequences.*

We and our subsidiaries are party to various financing arrangements, joint venture arrangements, commercial contracts and other arrangements that give, or in some cases may give, the counterparty the ability to exercise rights and remedies upon the occurrence of a material adverse effect or material adverse change (or similar event), certain insolvency events, a default under certain specified other obligations or a failure to comply with certain financial covenants. Recent deteriorations in our business and that of certain of our subsidiaries may make it more likely that counterparties will seek to exercise rights and remedies under these arrangements. The counterparty could have the ability, depending on the arrangement, to, among other things, terminate or dissolve the arrangement, purchase our interests or require us to purchase interests in the joint venture at a price that is not favorable to us or require early repayment of amounts owed by us or our subsidiaries and in some cases payment of penalty amounts. In these cases, we intend to enter into discussions with the counterparties where appropriate to seek a waiver under, or amendment of, the arrangements to avoid or minimize any potential adverse consequences. We cannot assure you that we will be successful in avoiding or minimizing the adverse consequences which may, individually or collectively, have a material adverse effect on our ability to successfully implement our Viability Plan and on our consolidated financial position and results of operations. In addition, certain of our financing arrangements are terminable by the counterparty at any time (or on short notice) for any reason. The recent deteriorations in our business and that of certain of our subsidiaries may make it more likely that counterparties will seek to exercise their termination rights, which could, individually or collectively, have a material adverse effect on our ability to successfully implement our Viability Plan and on our consolidated financial position and results of operations.

*We have a highly integrated and complex corporate structure and operation and therefore if we or one or more of our subsidiaries have business or liquidity difficulties, it could have an a material adverse impact on other entities in our corporate group.*

We have a highly integrated and complex corporate structure and operation, with a wide range of intercompany transactions between us and our subsidiaries or among our subsidiaries. For example, various entities in our corporate group sell or provide parts or other products or services to other entities in the group. If as a result of business difficulties or for any other reason one or more of the entities does not buy from or sell to other entities as anticipated, it could materially and adversely affect those other entities. In addition, many of the entities in our corporate group participate in a complex global cash management system that manages cash pooling and foreign exchange risk and acts as a clearinghouse for payables by various entities to vendors. As part of this cash management system, entities deposit, lend and borrow money within the group on a regular basis. To the extent one or more entities in the group experiences business or liquidity difficulties, it may not be able to (or may choose not to) repay funds it has borrowed from other entities, which could have a material adverse effect on the lending entities. In addition, although generally required by our corporate policies to do so, entities could decide not to continue to participate in the global cash management system, which could have a material adverse effect on the other participants. Because GM currently operates with, and for the foreseeable future expects to continue to operate with, minimal excess liquidity and is subject to significant restrictions under the U.S. Treasury Loan Agreements on its ability to fund other entities within the corporate group, its ability to finance any shortfalls arising between the entities may be limited. Any disruptions in the contemplated intercompany transactions could have a material adverse effect on one or more entities in the group.

51

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007416

***Our pension and OPEB expenses and funding obligations are expected to increase significantly as a result of the weak performance of financial markets and its effect on plan assets.***

Our future funding obligations for our U.S. defined benefit pension plans qualified with the IRS and our estimated liability related to OPEB plans depend upon the future performance of assets set aside in trusts for these plans, the level of interest rates used to determine funding levels, the level of benefits provided for by the plans, actuarial data in healthcare inflation trend rates, and experience and any changes in government laws and regulations. Our employee benefit plans currently hold a significant amount of equity and fixed income securities. Due to our contributions to the plans and to the strong performance of these assets during prior periods, our U.S. hourly and salaried pension plans were consistently overfunded from 2005 through 2007, which allowed us to maintain a surplus without making additional contributions to the plans. However, due to significant declines in financial markets and a deterioration in the value of our plan assets, as well as the coverage of additional retirees, including certain Delphi hourly employees, we may need to make significant contributions to our U.S. pension plans in 2013 and beyond, assuming that interest rates remain at December 31, 2008 levels and pension fund assets earn 8.5%, annually, going forward. Our pension funds earned 10.7% in 2007 and had losses of 11.0% in 2008 and 3.8% during the first quarter of 2009. There is no assurance that interest rates will remain constant or that our pension fund assets can earn 8.5% annually, and our actual experience may be significantly more negative. In addition, our Canadian pension plans are currently significantly underfunded, which we expect will also require us to make significant additional annual contributions in the future. At December 31, 2008, our Canadian pension plans were underfunded by approximately $4.3 billion, on a U.S. GAAP basis. Our pension and OPEB expenses and funding may also be greater than we currently anticipate if our assumptions regarding plan earnings and expenses turn out to be incorrect.

If the market values of the securities held by our pension plans continue to decline, our pension and OPEB expenses would further increase and, as a result, could materially adversely affect our business. Decreases in interest rates that are not offset by contributions and asset returns could also increase our obligations under such plans. In addition, if local legal authorities increase the minimum funding requirements for our pension plans outside the United States, we could be required to contribute more funds, which would negatively affect our cash flow.

***The U.S. Treasury Loan Agreements contain significant representations and affirmative and negative covenants that may restrict our ability to take actions management believes are important to our long-term strategy, including our ability to enter into certain material transactions outside of the ordinary course of business.***

The First U.S. Treasury Loan Agreement and the similar provisions of the Second U.S. Treasury Loan Agreement contain representations and warranties, affirmative covenants requiring us to take certain actions and negative covenants restricting our ability to take certain actions. The affirmative covenants impose obligations on us with respect to, among other things, financial and other reporting to the U.S. Treasury (including periodic confirmation of compliance with certain expense policies and executive privilege and compensation requirements), any financial covenants that may be imposed, use of proceeds of asset sales, maintenance of facility collateral and other property, payment of obligations, compliance with various restrictions on executive privileges and compensation, a corporate expense policy, progress on our Viability Plan, and a cash management plan.

Under the First U.S. Treasury Loan Agreement, we are prohibited from entering into any proposed transaction outside the ordinary course of business that is valued at more than $100 million if it is determined that the transaction would be inconsistent with, or detrimental to, our long-term viability. In addition, the First U.S. Treasury Loan Agreement restricts our ability to manage our liquidity on a global basis by placing significant limitations on our ability to make intercompany loans to or equity investments in our foreign subsidiaries.

The negative covenants in the First U.S. Treasury Loan Agreement generally apply to us and our U.S. subsidiaries that provided guarantees of our obligations under that agreement and restrict us with respect to,

52

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007417

among other things, transactions with affiliates, granting liens, distributions on capital stock, amendments or waivers of certain documents, prepayments of senior loans, entering into new indebtedness, making investments (including in our foreign subsidiaries), ERISA and other pension fund matters, maintenance of facility collateral, sales of assets and entering into or amending joint venture agreements.

Compliance with the representations, warranties and affirmative and negative covenants contained in the First U.S. Treasury Loan Agreement could restrict our ability to take actions that management believes are important to our long-term strategy. If strategic transactions we wish to undertake are prohibited or inconsistent with, or detrimental to, our long-term viability, our ability to execute our long-term strategy could be materially adversely affected. In addition, monitoring and certifying our compliance with the First U.S. Treasury Loan Agreement requires a high level of expense and management attention on a continuing basis.

Although we expect that a substantial portion of the U.S. Treasury Debt outstanding under the U.S. Treasury Loan Agreements at June 1, 2009 will be exchanged for GM common stock in connection with the U.S. Treasury Debt Conversion, we anticipate that any continuing and future financing provided by the U.S. Treasury will be provided either under these agreements or under similar agreements but it could be provided under agreements or with terms that are significantly more restrictive and less favorable for us.

***Failure of our suppliers due to current economic conditions, or as a result of a bankruptcy filing by one of our major competitors, to provide us with the systems, components and parts that we need to manufacture our automotive products and operate our business could result in a disruption in our operations and have a material adverse effect on our business.***

We rely on many suppliers to provide us with the systems, components and parts that we need to manufacture our automotive products and operate our business. In recent years, a number of these suppliers, including but not limited to Delphi, have experienced severe financial difficulties and solvency problems, and some have sought relief under the U.S. Bankruptcy Code or similar reorganization laws. This trend has intensified in recent months due to the combination of general economic weakness, sharply declining vehicle sales and tightened credit availability that has affected the automobile industry generally. The substantial reduction in production volumes that we plan is likely to intensify this trend, particularly if, as we anticipate, similar volume reductions are executed by our competitors, who frequently purchase from the same suppliers that we do. Suppliers that are substantially dependent on our purchases may encounter difficulties in obtaining credit or may receive an opinion from their independent public accountants regarding their financial statements that includes a statement expressing substantial doubt about their ability to continue as a going-concern, which could trigger defaults under their financing or other agreements or impede their ability to raise new funds. Our suppliers might respond to an apparent weakening of our liquidity position and address their own liquidity needs by requesting faster payment of invoices or other assurances. If this were to happen, our need for cash would be intensified, and we might be unable to make payments to our suppliers as they become due.

When comparable situations have occurred in the past, our suppliers have attempted to increase their prices to us, pass through increased costs, alter payment terms or seek other relief. In instances where our suppliers have not been able to generate sufficient additional revenues or obtain the additional financing they need to continue their operations, either through private sources or government funding, some have been forced to reduce their output, shut down their operations or file for bankruptcy protection. Such actions are likely to increase our costs, create challenges to meeting our quality objectives and in some cases make it difficult for us to continue production of certain vehicles. To the extent we take steps in such cases to help key suppliers remain in business, that would adversely affect our liquidity. It may also be difficult to find a replacement for certain suppliers without significant delay.

In addition, in the event one of our major competitors files for protection under the U.S. Bankruptcy Code, the resulting disruption to the business of its suppliers and the automotive industry generally would further exacerbate the financial pressure and liquidity issues faced by our suppliers as discussed above, which likely would adversely impact us.

53

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007418

*As part of our Viability Plan, we have reduced compensation and headcount for our management and non-management salaried employees, which may materially adversely affect our ability to hire and retain salaried employees.*

As part of the cost reduction initiatives in our Viability Plan, we have discontinued salary increases, imposed reduction in salaries for at least six months ranging from 30% or more for the most highly paid executives to 3% for salaried employees who earn more than a specified minimum and reduced benefits to a level that we believe is significantly lower than offered by other major corporations. The First U.S. Treasury Loan Agreement restricts the compensation that we can provide to our top executives as well as prohibits certain types of compensation or benefits for any employees. At the same time, we have substantially decreased the number of salaried employees and will further reduce the number, so that the workload is shared among fewer employees and in general the demands on each salaried employee are increased. Companies in similar situations have experienced significant difficulties in hiring and retaining highly skilled employees, particularly in competitive specialties. Given our compensation structure and increasing job demands, there is no assurance that we will be able to hire and retain the employees whose expertise is required to execute our Viability Plan while at the same time developing and producing vehicles that will stimulate demand for our products.

*Our plan to reduce the number of our retail channels and core brands and to consolidate our dealer network is likely to reduce our total sales volume, may not create the structural cost savings we anticipate and is likely to result in restructuring costs that may materially adversely affect our result of operations.*

As part of our Viability Plan, we will focus our resources in the U.S. on our four core brands: Chevrolet, Cadillac, Buick and GMC. The current Viability Plan accelerates the timing of resolutions for Saab, HUMMER and Saturn versus the February 17 Viability Plan. Resolutions for Saab and HUMMER have been accelerated to 2009 from 2010 in the February 17 Viability Plan. Resolution for Saturn has been accelerated to 2009. In conjunction with accelerated nameplate elimination, there is no planned investment for Pontiac, and therefore the brand will be phased out by the end of 2010. We also intend to consolidate our dealer network by reducing the total number of our dealers by approximately 50% between 2009 and 2014. We anticipate that this reduction in retail outlets, core brands and dealers will result in structural costs savings over time, but there is no assurance that we will realize the savings we expect. Based on our experience and the experiences of other companies that have eliminated brands, models and/or dealers, we believe that our total sales volume is likely to decline because of these reductions, possibly significantly. In addition, executing the phase-out of retail channels and brands and the reduction in the number of our dealers will require us to terminate established business relationships. There is no assurance that we will be able to terminate all of these relationships, and if we are not able to terminate substantially all of these relationships we would not be able to achieve all of the benefits we have targeted in our Viability Plan. We anticipate that negotiating these terminations on an individual basis will require considerable time and expense. In addition, we will be required to comply with a variety of national and state franchise laws, which will limit our flexibility and increase our costs. There is no assurance that these negotiations will be successful or that our dealers or other affected parties, such as retail outlets, will not pursue remedies through litigation and, if so, that we would prevail in such litigation or would not be required to pay judgments in excess of negotiated settlements.

*Part of our Viability Plan involves the sale of some of our businesses, which will be difficult to execute both because of the weakness of the industry and the lack of available credit to finance an acquisition.*

We are pursuing a combination of operating and related initiatives as part of our Viability Plan, including asset sales, to generate incremental cash flows as discussed under *"Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources"* in our annual report on Form 10-K for the year ended December 31, 2008, which is incorporated by reference herein. The businesses that we are contemplating selling are involved in the automotive industry by supplying either components to us and other original equipment manufacturers ("OEMs") or services to our retail customers. In light of the current weak demand for our products and deterioration of the automotive industry in general, the number of potentially interested buyers is limited, and the price we might receive for such assets would be significantly lower than it

54

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007419

might have been in previous years. In addition, to the extent that buyers would require credit to finance their purchases of our assets, the contraction in the credit market would significantly restrict their ability to pay us in cash, which we require for liquidity under our Viability Plan. Accordingly, even if we are able to consummate the asset sales that we have included in our Viability Plan, we may be forced to accept lower prices than we have anticipated or other payment terms that are less favorable than assumed in our Viability Plan.

In addition, we are required to dispose of a large portion of our equity interest in GMAC. In connection with GMAC's conversion to a bank holding company, we have committed to the Board of Governors of the Federal Reserve that we will reduce our ownership interest in GMAC to less than 10% of the voting and total equity interest of GMAC by December 24, 2011. Pursuant to our understanding with the U.S. Treasury, all but 7.4% of our common equity interest in GMAC will be placed in one or more trusts by May 24, 2009, for ultimate disposition. The trustee(s) will be independent from us, and will be responsible for disposing of GMAC common equity interests held in trust. Given the current economic environment, there is no assurance that the trustee will be able to dispose of the remaining portion of common equity interest in GMAC on terms that are favorable to us.

### *Delphi is unlikely to emerge from bankruptcy in the near-term without government support and possibly may not emerge at all.*

In January 2008, the U.S. Bankruptcy Court entered an order confirming Delphi's plan of reorganization and related agreements including certain agreements with us. On April 4, 2008 Delphi announced that, although it had met the conditions required to substantially consummate its plan of reorganization, including obtaining exit financing, Delphi's plan investors refused to participate in a closing that was commenced but not completed on that date. The current credit markets, the lack of plan investors and the challenges facing the automotive industry make it difficult for Delphi to emerge from bankruptcy. As a result, it is unlikely that Delphi will emerge from bankruptcy in the near-term without government support, and it is possible that it may not emerge successfully or at all. We believe that Delphi will continue to seek alternative arrangements to emerge from bankruptcy, but there can be no assurance that Delphi will be successful in obtaining any alternative arrangements. Delphi's debtor-in-possession financing ("DIP Financing") was scheduled to mature on December 31, 2008 and Delphi has been operating under a forbearance agreement with its DIP Financing lenders since December 12, 2008 (the "Accommodation Agreement") which contains various milestone requirements that, if not satisfied, trigger termination of the forbearance. In October 2008, and as amended in December 2008, we agreed subject to certain conditions to extend our outstanding $300 million advance agreement to June 30, 2009 and to accelerate up to $300 million of our North American payables to Delphi in the first and second quarters of 2009, so that Delphi would have additional liquidity. In January 2009, we agreed to immediately accelerate $50 million in advances towards the temporary acceleration of our North American payables. In February 2009, we agreed to increase the advance agreement commitment from $300 million to $350 million, to become effective on March 24, 2009, subject to approval by the U.S. Bankruptcy Court in the Delphi case and by the President's Designee under the First U.S. Treasury Loan Agreement under the terms of the First U.S. Treasury Loan Agreement. In March 2009, we agreed to increase the advance agreement commitment from $350 million to $450 million, to become effective on March 24, 2009, subject to our Board approval, Bankruptcy Court approval, Auto Task Force approval and certain other conditions. The Auto Task Force did not approve either increase in the advance agreement commitment. Our ability to assist Delphi further by providing additional financial support or assuming additional Delphi obligations to its workforce and retirees is restricted by the terms of the First U.S. Treasury Loan Agreement. If Delphi is unable to successfully emerge from bankruptcy in the near-term, it may be forced to sell all of its assets. As a result, we may be required to pay additional amounts to secure the parts we need until alternative suppliers are secured or new contracts are executed with the buyers of Delphi's assets. We may also have to consider acquiring some of Delphi's manufacturing operations in order to ensure supply of parts. In March 2009, we agreed to exercise our option, under an existing agreement, to purchase Delphi's global steering business, subject to our Board approval, Bankruptcy Court approval, and approval of the Auto Task Force. The Auto Task Force did not approve the terms of our acquisition of Delphi's global steering business. On April 24, 2009, the U.S. Bankruptcy Court approved a further amendment and an additional supplemental amendment to the Accommodation Agreement, which provides that the Delphi DIP Accommodation Agreement is scheduled to

55

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007420

terminate on May 9, 2009 unless a term sheet between Delphi, GM and the U.S. Treasury is agreed upon and deemed satisfactory to the Delphi DIP lenders on or before such date.

In addition, in conjunction with the spin-off of Delphi from us in 1999 we entered into certain agreements with the UAW; the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—Communication Workers of America ("IUE-CWA") and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW") that provided contingent benefit guarantees covering certain former U.S. hourly employees who became employees of Delphi (the "Benefit Guarantee Agreements"). These agreements were triggered on the basis set forth in the September 2008 individual Implementation Agreements (the "Implementation Agreements") executed between us and Delphi and the UAW, IUE-CWA and USW, respectively. Under these Implementation Agreements, we could have additional liabilities for certain pension obligations to employees formerly covered by the Benefit Guarantee Agreements in the event of a termination of the Delphi hourly pension plan.

### *We may not have adequate liquidity to fund our planned significant investment in new technology, and, even if funded, a significant investment in new technology may not result in successful vehicle applications.*

We intend to invest approximately $5.4 billion in 2009 to support our products and to develop new technology, and after 2009 we anticipate our investments will range between $5.3 billion and $6.7 billion per year. In addition, in our Viability Plan as required by the First U.S. Treasury Loan Agreement, we committed to invest heavily in alternative fuel and advanced propulsion technologies between 2009 and 2012, largely to support our planned expansion of hybrid and electric vehicles, consistent with our announced objective of being recognized as the industry leader in fuel efficiency. Congress provided the U.S. Department of Energy with $25 billion in funding to make direct loans to eligible applicants for the costs of reequipping, expanding, and establishing manufacturing facilities in the United States to produce advanced technology vehicles and components for these vehicles. We have submitted three applications for Section 136 Loans aggregating $10.3 billion to support our advanced technology vehicle programs. On April 6, 2009, the Department of Energy determined, based on the finding by the President's Designee under the First U.S. Treasury Loan Agreement that our Viability Plan as of March 30, 2009 was not viable, that we did not meet the financial viability requirements for Section 136 Loans. We do not expect that the Department of Energy will determine that we meet the viability requirement for eligibility to receive Section 136 Loans unless the U.S. Treasury approves our Viability Plan, and there is no assurance that the Department of Energy will determine our projects are the ones that should receive loan funding or that we will be able to comply with the requirements of the program. Our Viability Plan currently assumes we will receive $5.7 billion of Section 136 Loans. Moreover, if we are not able to execute our Viability Plan or if our Viability Plan does not provide us with adequate liquidity, we may be forced to reduce, delay or cancel our planned investments in new technology in order to maintain adequate liquidity to fund our business operations and meet our obligations as they come due.

In some cases, the technologies that we plan to employ, such as hydrogen fuel cells and advanced battery technology are not yet commercially practical and depend on significant future technological advances by us and by suppliers. For example, we have announced that we intend to produce by November 2010 the Chevrolet Volt, an electric car, which requires battery technology that has not yet proven to be commercially viable. There can be no assurance that these advances will occur in a timely or feasible way, that the funds that we have budgeted for these purposes will be adequate or that we will be able to establish our right to these technologies. Moreover, our competitors and others are pursuing the same technologies and other competing technologies, in some cases with more money available, and there can be no assurance that they will not acquire similar or superior technologies sooner than we do or on an exclusive basis or at a significant price advantage.

### *Shortages of and volatility in the price of oil have caused and may continue to cause diminished profitability due to shifts in consumer vehicle demand.*

Continued volatile oil prices throughout 2008 contributed to weaker demand for some of our higher margin vehicles, especially our full-size sport utility vehicles, as consumer demand shifted to smaller, more fuel-efficient

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007421

vehicles, which provide us with lower profit margins and in recent years have represented a smaller proportion of our sales volume in North America. Fullsize pick-up trucks, which are generally less fuel efficient than smaller vehicles, provided more than 21.7% of our North American sales in 2008, compared to a total industry average of 12.1% of sales. Demand for traditional sport utility vehicles and vans also declined in 2008. Any future increases in the price of gasoline in the United States or in our other markets or any sustained shortage of oil could further weaken the demand for such vehicles, which could reduce our market share in affected markets, decrease profitability and have a material adverse effect on our business.

*Our continued ability to achieve structural and materials cost reductions and to realize production efficiencies for our automotive operations is critical to our ability to achieve our Viability Plan and return to profitability.*

We are continuing to implement a number of structural and materials cost reduction and productivity improvement initiatives in our automotive operations, including substantial restructuring initiatives for our North American operations, as more fully discussed under *"Management's Discussion and Analysis of Financial Condition and Results of Operations"* in our annual report on Form 10-K for the year ended December 31, 2008, which is incorporated by reference herein. Our future competitiveness depends upon our continued success in implementing these restructuring initiatives throughout our automotive operations, especially in North America. In addition, while some of the elements of structural cost reduction are within our control, others such as interest rates or return on investments, which influence our expense for pension and OPEB, depend more on external factors, and there can be no assurance that such external factors will not materially adversely affect our ability to reduce our structural costs.

*A significant amount of our operations are conducted by joint ventures that we cannot operate solely for our benefit.*

Many of our operations, particularly in emerging markets, are carried on by jointly owned companies such as GM Daewoo or Shanghai GM. In joint ventures we share ownership and management of a company with one or more parties who may not have the same goals, strategies, priorities or resources as we do. In general, joint ventures are intended to be operated for the equal benefit of all co-owners, rather than for our exclusive benefit. Operating a business as a joint venture often requires additional organizational formalities as well as time-consuming procedures for sharing information and making decisions. In joint ventures, we are required to pay more attention to our relationship with our co-owners as well as with the joint venture, and if a co-owner changes, our relationship may be materially adversely affected. In addition, the benefits from a successful joint venture are shared among the co-owners, so that we do not receive all the benefits from our successful joint ventures.

*Increase in cost, disruption of supply or shortage of raw materials could materially harm our business.*

We use various raw materials in our business including steel, non-ferrous metals such as aluminum and copper and precious metals such as platinum and palladium. The prices for these raw materials fluctuate depending on market conditions. In recent years, we have experienced significant increases in freight charges and raw material costs. Substantial increases in the prices for our raw materials increase our operating costs and could reduce our profitability if we cannot recoup the increased costs through vehicle prices. In addition, some of these raw materials, such as corrosion-resistant steel, are available from a limited number of suppliers. We cannot guarantee that we will be able to maintain favorable arrangements and relationships with these suppliers. An increase in the cost or a sustained interruption in the supply or shortage of some of these raw materials, which may be caused by a deterioration of our relationships with suppliers or by events such as natural disasters, power outages or labor strikes, could negatively affect our net revenues and profits to a material extent.

*We could be materially adversely affected by changes or imbalances in foreign currency exchange and other rates.*

Because we sell products and buy materials globally over a significant period of time, we are exposed to risks related to the effects of changes in foreign currency exchange rates, commodity prices and interest rates,

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007422

which can have material adverse effects on our business. In recent years, the relative weakness of certain currencies has provided competitive advantages to certain of our competitors. While in recent months the Japanese Yen has strengthened significantly, its weakness in recent years has provided pricing advantages for vehicles and parts imported from Japan to markets with more robust currencies like the United States and Western Europe. Moreover, the relative strength of other currencies has negatively affected our business. For example, before the current financial crisis, the relative weakness of the British Pound compared to the Euro, has had an adverse effect on our results of operations in Europe. In addition, in preparing our consolidated financial statements we translate our revenue and expenses outside the United States into U.S. Dollars using the average exchange rate for the period and the assets and liabilities using the foreign currency exchange rate at the balance sheet date. As a result, foreign currency fluctuations and the associated currency translations could have a material adverse effect on our results of operation.

### *We operate in a highly competitive industry in which many manufacturers have relatively high fixed costs and are faced with sharply decreasing demand.*

The automotive industry is highly competitive, and has historically had manufacturing capacity that exceeds demand. Due to current economic conditions, demand for automobiles has fallen sharply, both in North America and in other parts of the world. Many manufacturers, including us, have relatively high fixed labor costs as well as significant limitations on their ability to close facilities and reduce fixed costs. To offset these high fixed costs, some of our competitors have responded to recent deteriorations in economic conditions and vehicle sales by attempting to sell more vehicles by adding vehicle enhancements, providing subsidized financing or leasing programs, offering option package discounts or other marketing incentives or reducing vehicle prices in certain markets. These actions have had, and are expected to continue to have, a significant negative effect on our vehicle pricing, market share and operating results particularly on the low end of the market, and present a significant risk to our ability to enhance our revenue per vehicle and maintain our market share during difficult economic times.

### *New laws, regulations or policies of governmental organizations regarding increased fuel economy requirements and reduced greenhouse gas emissions, or changes in existing ones, may have a significant negative effect on how we do business.*

We are affected significantly by a substantial amount of governmental regulations that increase costs related to the production of our vehicles and affect our product portfolio. We anticipate that the number and extent of these regulations, and the costs and changes to our product lineup to comply with them, will increase significantly in the future. In the United States and Europe, for example, governmental regulation is primarily driven by concerns about the environment (including $CO_2$ emissions), vehicle safety, fuel economy and energy security. These government regulatory requirements significantly affect our plans for global product development and may result in substantial costs, which can be difficult to pass through to our customers, and may result in limits on the types of vehicles we sell and where we sell them, which can affect revenue.

The CAFE requirements mandated by the U.S. government pose special concerns. The EISA, enacted in December 2007, will require significant increases in CAFE requirements applicable to cars and light trucks beginning in the 2011 model year in order to increase the combined U.S. fleet average for cars and light trucks to at least 35 mpg by 2020, a 40% increase. The estimated cost to the automotive industry of complying with this new standard will likely exceed $100 billion, and our compliance cost could require us to alter our capital spending and research and development plans, curtail sales of our higher margin vehicles, cease production of certain models or even exit certain segments of the vehicle market. We anticipate that to comply with these higher standards we will be required to sell a significant volume of hybrid or electrically powered vehicles throughout the United States, as well as develop new technologies for conventional internal combustion engines. There is no assurance that we will be able to produce and sell vehicles that use such technologies at a competitive price, or that our customers will purchase such vehicles in the quantities necessary for us to comply with these higher CAFE standards.

58

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007423

In April 2008 the National Highway Traffic Safety Administration ("NHTSA") issued a proposed rule to set the car and truck standards for the 2011 through 2015 model years, but no final rule has been issued. The standards that NHTSA finally adopts may be stricter than the proposed rule provided, which would exacerbate the challenges in and costs of compliance.

In addition, California and 13 other states have adopted the AB 1493 Rules, establishing $CO_2$ emission standards that effectively impose increased fuel economy standards for new vehicles sold in those states, and other states are considering adopting similar standards. We do not believe that it is technically possible for us to comply with the requirements of the AB 1493 Rules based on our current product portfolio and the extent of technical improvements that we believe are possible in the near future. If stringent $CO_2$ emission standards are imposed on us on a state-by-state basis, the result could be even more disruptive to our business than the higher CAFE standards discussed above. The AB 1493 Rules have been challenged in litigation in several states and have been upheld in certain cases. In January 2009, President Obama ordered the EPA to reconsider whether the automobile emission standards of California or other states, such as the AB 1493 Rules, should be allowed to differ from the federal rules and to implement new fuel efficiency guidelines for the automotive industry in time to cover 2011 model year cars. There is no assurance that states will not be permitted to adopt a variety of emission standards that are stricter than the federal requirements, or that the federal rules will not be changed to require lower emissions and higher fuel economy, possibly to an extent that is not technically feasible.

In addition, a number of countries in Europe are adopting or amending regulations that establish $CO_2$ emission standards or other frameworks that effectively impose similarly increased fuel economy standards for vehicles sold in those countries, or establish vehicle-related tax structures based on them. Like the U.S. regulations, these government regulatory requirements could significantly affect our plans for global product development and result in substantial costs, which would be difficult to pass through to our customers, and could result in limits on the types of vehicles we sell and where we sell them, which could affect revenue.

### *Our business may be materially adversely affected by decreases in the residual value of off-lease vehicles.*

In addition to the effect on GMAC of the residual value of off-lease vehicles, as discussed under "*Management's Discussions and Analysis of Financial Condition and Results of Operations—Financial Results of Operations*" in our annual report on form 10-K for the year ended December 31, 2008, which is incorporated by reference herein, we are also negatively affected more directly by decreases in the residual value of off-lease vehicles through our residual support programs, our ownership of lease-related assets and the effect of leasing activity on our retail sales. We record an estimate of marketing incentive accruals for residual support and risk sharing programs when vehicles are sold to dealers. To the extent the residual value of off-lease vehicles decreases, we are required to increase our estimate of the residual support required to be provided to GMAC to subsidize leases or increase risk sharing payments to GMAC. We also own certain lease-related assets that GMAC paid to us as a dividend prior to the consummation of our sale of 51% controlling ownership interest in GMAC to FIM Holdings, the value of which would be impaired by decreases in the residual value of off-lease vehicles. In addition, because of the severe decline in expected lease residual values, leasing transactions currently are infrequently available to our end-use customers, and when they are available are markedly more expensive than other types of financing. Because customers who prefer leasing may not be able to obtain or afford to lease our vehicles, they may defer a purchase or buy a vehicle from a manufacturer that offers leasing on more attractive terms. Any one or more of these consequences could have a material adverse effect on our business.

### *The pace of introduction and market acceptance of new vehicles is important to our success and the frequency of new vehicles introductions may be materially adversely affected by our reductions in capital expenditures.*

Our competitors have introduced new and improved vehicle models designed to meet consumer expectations, and will likely continue to do so. Our profit margins, sales volumes and market shares may

59

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007424

decrease if we are unable to produce models that compare favorably to these competing models. Because of the downturn in vehicle sales that we have experienced, we have reduced the levels of capital expenditures that we expect to incur in the near future and as a result, we expect in the next few years to introduce new models less frequently than we have recently. If we are unable to produce new and improved vehicle models on a basis consistent with the models introduced by our competitors, demand for our vehicles may be materially adversely affected. Further, the pace of our development and introduction of new and improved vehicles depends on our ability to successfully implement improved technological innovations in design, engineering and manufacturing. If our cost reductions pursuant to our Viability Plan reduce our ability to develop and implement improved technological innovations, demand for our vehicles may be materially adversely affected.

***We have determined that our internal controls over financial reporting are currently not effective. The lack of effective internal controls could materially adversely affect our financial condition and ability to carry out our Viability Plan.***

As discussed in Item 9A, "Controls and Procedures," in our annual report in Form 10-K for the year ended December 31, 2008, which is incorporated by reference herein, our management team for financial reporting, under the supervision and with the participation of our chief executive officer and our chief financial officer, conducted an evaluation of the effectiveness of the design and operation of our internal controls. As of December 31, 2008, they concluded that our disclosure controls and procedures and our internal control over financial reporting were not effective. Until we are successful in our effort to remediate the material weakness in our internal control over financial reporting, it may materially adversely affect our ability to report accurately our financial condition and results of operations in the future in a timely and reliable manner. In addition, although we continually review and evaluate our internal control systems to allow management to report on the sufficiency of our internal controls, we cannot assure you that we will not discover additional weaknesses in our internal controls over financial reporting. Any such additional weakness or failure to remediate existing weakness could adversely affect our financial condition or ability to comply with applicable legal requirements of our Viability Plan.

***Our businesses outside the United States expose us to additional risks that may materially adversely affect our business.***

Approximately 64% of our vehicle unit sales in 2008 were generated outside the United States, and we intend to continue to pursue growth opportunities for our business in a variety of business environments outside the United States. Operating in a large number of different regions and countries exposes us to political, economic and other risks as well as multiple foreign regulatory requirements that are subject to change, including:

- Multiple foreign regulatory requirements that are subject to change, including foreign regulations restricting our ability to sell our products in those countries;

- Differing local product preferences and product requirements, including fuel economy, vehicle emissions and safety;

- Differing labor regulations and union relationships;

- Consequences from changes in tax laws;

- Difficulties in obtaining financing in foreign countries for local operations and significant restrictions under the U.S. Treasury Loan Agreements on GM's ability to provide financing to our businesses operating in foreign countries; and

- Political and economic instability, natural calamities, war, and terrorism.

The effects of these risks may, individually or in the aggregate, materially adversely affect our business.

60

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007425

***New laws, regulations or policies of governmental organizations regarding safety standards, or changes
in existing ones, may have a significant negative effect on how we do business.***

Our products must satisfy legal safety requirements. Meeting or exceeding government-mandated safety
standards is difficult and costly, because crashworthiness standards tend to conflict with the need to reduce
vehicle weight in order to meet emissions and fuel economy standards. While we are managing our product
development and production operations on a global basis to reduce costs and lead times, unique national or
regional standards or vehicle rating programs can result in additional costs for product development, testing and
manufacturing. Governments often require the implementation of new requirements during the middle of a
product cycle, which can be substantially more expensive than accommodating these requirements during the
design of a new product.

***Consolidation and other changes within the automotive industry may provide our competitors with cost or
strategic advantages.***

We believe that the continuing crisis in the global automotive industry is likely to cause significant changes
in ownership and consolidation among vehicle manufacturers and other industry participants. These changes
could have a material impact on our business. Strategic initiatives and restructuring activities may create
opportunities. If industry consolidation occurs among our competitors, they may be able to reduce their fixed
costs, achieve higher levels of penetration in the markets in which we compete, gain access to new technologies
and take advantage of other synergies. These consolidations by our competitors could lead to increased
competition with more efficient manufacturers in the markets in which we operate and have a material adverse
effect on our business.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007426

## RATIO OF EARNINGS TO FIXED CHARGES

The following table presents the ratio of our earnings to fixed charges for the periods indicated:

|  | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
|  | 2008 | 2007 | 2006 | 2005 | 2004 |
| Actual[1] | — | — | — | — | 1.06 |
| Pro Forma[2] | — |  |  |  |  |

(1)  Earnings for the years ended December 31, 2008, 2007, 2006 and 2005 were inadequate to cover fixed charges. Additional earnings of $29.1 billion for 2008, $5.5 billion for 2007, $5.3 billion for 2006 and $16.5 billion for 2005 would have been necessary to bring the respective ratios to 1.0.

(2)  After giving consideration to the pro forma adjustments described under "*Unaudited Pro Forma Condensed Consolidated Financial Information for the Exchange Offers*" included elsewhere in this prospectus, additional earnings of $27.8 billion would be necessary to bring the ratio to 1.0.

We compute the ratio of earnings to fixed charges by dividing earnings before income taxes and fixed charges by the fixed charges. This ratio includes the earnings and fixed charges of us and our consolidated subsidiaries. Fixed charges consist of interest and discount accretion and the portion of rentals for real and personal properties in an amount deemed to be representative of the interest factor.

## USE OF PROCEEDS

We will not receive any cash proceeds from the exchange offers. In consideration for the exchange consideration, we will receive the old notes. Old notes acquired pursuant to the exchange offers or upon exercise of the call option will be cancelled upon receipt by the issuer of such old notes.

62

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007427

### PRICE RANGE OF COMMON STOCK, CONVERTIBLE NOTES AND DIVIDEND POLICY

**Common Stock**

Our common stock is currently listed on the New York Stock Exchange under the symbol "GM." The following table contains, for the periods indicated, the high and low intraday sale prices per share of our common stock and the cash dividend per share on such common stock. The price range of our common stock is based off of the New York Stock Exchange composite intraday prices as listed in the price history database available at www.NYSEnet.com.

|  | High | Low | Dividend |
|---|---|---|---|
| **2007** | | | |
| First Quarter | $37.24 | $28.81 | $ .25 |
| Second Quarter | $38.66 | $28.86 | $ .25 |
| Third Quarter | $38.27 | $29.10 | $ .25 |
| Fourth Quarter | $43.20 | $24.50 | $ .25 |
| **2008** | | | |
| First Quarter | $29.28 | $17.47 | $ .25 |
| Second Quarter | $24.24 | $10.57 | $ .25 |
| Third Quarter | $16.35 | $ 8.51 | — |
| Fourth Quarter | $ 9.90 | $ 1.70 | — |
| **2009** | | | |
| First Quarter | $ 4.20 | $ 1.27 | — |
| Second Quarter (through April 24, 2009) | $ 2.33 | 1.58 | — |

There were 331,254 holders of record of our common stock as of April 22, 2009.

As of April 24, 2009, the last reported sale price of our common stock on the New York Stock Exchange was $1.69.

We have suspended the payment of dividends on our common stock and have no current plans to resume payment of a dividend. In addition, our revolving credit and term loan agreements and the U.S. Treasury Loan Agreements prohibit the payment of dividends on our common stock without first receiving the requisite lender consents required under each respective agreement. Our payment of dividends in the future, if any, will be determined by our board of directors and will depend on our satisfaction of our obligations under our revolving credit and term loan agreements and the U.S. Treasury Loan Agreements, business conditions, our financial condition, our earnings and other factors.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007428

**Convertible Old Notes**

Our old Series D notes (for purposes of this section, the "Series D Convertible Debentures"), 4.50% Series A Convertible Senior Debentures due March 6, 2032 ("Series A Convertible Debentures"), 5.25% Series B Convertible Senior Debentures due March 6, 2032 ("Series B Convertible Debentures"), and 6.25% Series C Convertible Senior Debentures due July 15, 2033 ("Series C Convertible Debentures") currently trade on the NYSE under the symbols GRM, GXM, GBM and GPM, respectively. The following table contains, for the periods indicated, the high and low intraday sale prices of our exchange listed convertible old notes. The price range of our each series of convertible old notes is based off of the New York Stock Exchange composite intraday prices as listed in the price history database available at www.NYSEnet.com.

| | Series A Convertible Debentures | | Series B Convertible Debentures | | Series C Convertible Debentures | | Series D Convertible Debentures | |
|---|---|---|---|---|---|---|---|---|
| | High | Low | High | Low | High | Low | High | Low |
| **2007** | | | | | | | | |
| First Quarter | 25.51 | 20.80 | 23.01 | 20.50 | 25.49 | 22.14 | — | — |
| Second Quarter | 22.27 | 20.55 | 22.16 | 20.55 | 25.38 | 22.18 | 28.75 | 24.76 |
| Third Quarter | 21.85 | 19.15 | 22.10 | 18.20 | 25.17 | 20.26 | 28.61 | 24.39 |
| Fourth Quarter | 21.69 | 18.83 | 22.83 | 18.50 | 27.23 | 19.45 | 31.22 | 23.52 |
| **2008** | | | | | | | | |
| First Quarter | 20.25 | 17.49 | 20.26 | 15.00 | 21.62 | 15.21 | 25.48 | 21.85 |
| Second Quarter | 19.01 | 14.60 | 18.13 | 13.20 | 19.25 | 12.67 | 24.10 | 21.39 |
| Third Quarter | 15.48 | 11.34 | 14.07 | 8.782 | 13.85 | 7.33 | 22.90 | 19.00 |
| Fourth Quarter | 12.30 | 1.50 | 8.90 | 2.06 | 8.45 | 2.50 | 20.10 | 5.25 |
| **2009** | | | | | | | | |
| First Quarter | 5.55 | 3.00 | 4.44 | 1.93 | 4.05 | 1.82 | 15.74 | 8.49 |
| Second Quarter (through April 24, 2009) | 3.25 | 2.01 | 2.68 | 2.46 | 2.73 | 1.80 | 8.50 | 4.41 |

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007429

# CAPITALIZATION

The following table sets forth our capitalization, as of December 31, 2008, on a historical and pro forma basis to reflect the completion of the exchange offers, assuming the satisfaction of the U.S. Treasury Condition, which we currently believe will require the exchange of 90% of the principal amount (or, in the case of discount notes, accreted value) of our old notes (including at least 90% of the aggregate principal amount of the outstanding Series D notes) will need to be tendered in the exchange offers or called for redemption pursuant to the call option (in the case of the non-USD old notes). As consideration for the old notes, the tendering holders will receive 225 shares of GM common stock for each 1,000 U.S. dollar equivalent of principal amount (or accreted value as of the settlement date, if applicable) of old notes exchanged. These pro forma adjustments assume and give effect to the consummation of the exchange offers, the payment of related fees and expenses, the U.S. Treasury Debt Conversion, the VEBA Modifications, the additional borrowings under the First U.S. Treasury Loan Agreement and borrowings under the Second U.S. Treasury Loan Agreement that occurred subsequent to December 31, 2008, additional working capital loans under the First U.S. Treasury Loan Agreement that occurred subsequent to December 31, 2008, the modifications to certain secured borrowing facilities, the application of FSP No. APB 14-1, the par value reduction of GM common stock to $0.01 per share, the increase in the number of authorized shares of GM common stock, the 1-for-100 reverse stock split of GM common stock, and the purchase of an additional ownership interest in GMAC as if each of these adjustments had occurred at December 31, 2008.

The U.S. Treasury Debt Conversion and VEBA Modifications will result in significant dilution to our current common stockholders, and will result in pro forma ownership levels of approximately 1.0% and 9.1% for existing stockholders and tendering noteholders, respectively, assuming the Assumed Participation Level in the exchange offers and after shares are issued to the New VEBA. The actual effects of the U.S. Treasury Debt Conversion and satisfaction of the VEBA obligations in exchange for GM common stock on our financial position and results of operations could be different than the levels assumed for the unaudited pro forma condensed consolidated financial information for the exchange offers, and such amounts could be material.

The pro forma information set forth in the table below has been derived by applying the pro forma adjustments described under *Unaudited Pro Forma Condensed Consolidated Financial Information for the Exchange Offers*" to our historical consolidated financial statements as of and for the year ended December 31, 2008, which are incorporated into this prospectus by reference from our annual report on Form 10-K for the year ended December 31, 2008. You should read this table in conjunction with information set forth under "*Unaudited Pro Forma Condensed Consolidated Financial Data for the Exchange Offers*," included elsewhere in this prospectus, and our consolidated financial statements and related notes thereto as of and for the year ended December 31, 2008, which are incorporated into this prospectus by reference from our annual report on Form 10-K for the year ended December 31, 2008.

| (Dollars in millions) | Historical | Pro Forma (Unaudited) |
|---|---|---|
| Cash and cash equivalents | $ 13,953 | $ 24,440 |
| Financing and insurance operations cash and cash equivalents | 100 | 100 |
| **Total cash and cash equivalents** | $ 14,053 | $ 24,540 |
| Short-term borrowings and current portion of long-term debt, excluding U.S. Treasury Debt | $ 11,918 | $ 10,075 |
| U.S. Treasury Debt | 3,836 | 8,060 |
| Financing and insurance operations debt | 1,192 | 1,192 |
| Long-term debt | 29,594 | 5,969 |
| Stockholders' deficit | (86,154) | (52,705) |
| **Total capitalization** | $(39,614) | $(27,409) |

65

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER
NGM000007430

The unaudited pro forma condensed consolidated financial information for the exchange offers does not give effect to the Labor Modifications or the restructuring and other actions (described further under "*The Restructuring—Viability Plan*") contemplated in our current Viability Plan because such actions do not currently meet the requirements for pro forma presentation under Article 11 of Regulation S-X. Although management expects that the Labor Modifications may result in cost savings and the actions undertaken pursuant to our current Viability Plan may result in near-term restructuring and impairment charges and in improved financial performance in the future, no assurance can be given that these anticipated cost savings or projected operational and financial improvements will be realized.

66

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007431

# THE RESTRUCTURING

## Background of the Restructuring

Reflecting a dramatic deterioration in economic and market conditions during 2008, new vehicle sales in the United States declined rapidly, falling to their lowest per-capita levels in more than 50 years. During this period, our revenues fell precipitously due to the deteriorating market conditions and in part reflecting escalating public speculation about a potential bankruptcy. This decrease in revenues resulted in a significant decline in our liquidity. We determined that despite the far reaching actions we were then undertaking to restructure our U.S. business, our liquidity would fall to levels below that needed to operate, and we were compelled to request financial assistance from the U.S. Government.

On December 2, 2008, we submitted a restructuring plan for long-term viability to the Senate Banking Committee and the House of Representatives Financial Services Committee. Key elements of that restructuring plan included:

- a dramatic shift in our U.S. product portfolio, with 22 of 24 new vehicle launches in 2009-2012 being fuel efficient cars and crossovers;

- full compliance with the Energy Independence and Security Act of 2007 and extensive investment in a wide array of advanced propulsion technologies;

- reduction in brands, nameplates and dealerships to focus available resources and growth strategies on our profitable operations;

- full labor cost competitiveness with foreign manufacturers in the U.S. by no later than 2012;

- further manufacturing and structural cost reductions through increased productivity and employment reductions; and

- balance sheet restructuring and supplemented liquidity through temporary federal assistance.

As part of that submission and in order to bridge to more normal market conditions, we requested temporary federal assistance of $18.0 billion, comprised of a $12.0 billion term loan and a $6.0 billion line of credit to sustain operations and accelerate implementation of our restructuring. The $12.0 billion term loan was intended to provide adequate liquidity in our baseline liquidity scenario, with the $6.0 billion line of credit intended to provide supplemental liquidity we anticipated requiring in our downside scenario as submitted on December 2, 2008.

Following that submission, we entered into negotiations with the U.S. Treasury and on December 31, 2008, we entered into the First U.S. Treasury Loan Agreement pursuant to which the U.S. Treasury agreed to provide us with a $13.4 billion secured term loan facility. We borrowed $4.0 billion under this facility on December 31, 2008, an additional $5.4 billion on January 21, 2009 and $4.0 billion on February 17, 2009. In connection with the initial funding under the facility, we issued to the U.S. Treasury a warrant initially exercisable for 122,035,597 shares of our common stock, subject to adjustment, and the U.S. Treasury Promissory Note in an aggregate principal amount of $748.6 million as part of the compensation for the loans initially provided by the U.S. Treasury. On January 16, 2009, we entered into the Second U.S. Treasury Loan Agreement, pursuant to which we borrowed $884.0 million from the U.S. Treasury and applied the proceeds of the loan to purchase additional membership interests in GMAC, increasing our common equity interest in GMAC from 49% to 59.9%.

As a condition to obtaining the loans under the First U.S. Treasury Loan Agreement, we agreed to submit the February 17 Viability Plan that included specific actions intended to result in the following:

- repayment of all loans made under the First U.S. Treasury Loan Agreement, together with all interest thereon and reasonable fees and out-of-pocket expenses incurred in connection therewith and all other financings extended by the U.S. government;

67

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007432

- compliance with federal fuel efficiency and emissions requirements and commencement of domestic manufacturing of advanced technology vehicles;

- achievement of a positive net present value, using reasonable assumptions and taking into account all existing and projected future costs;

- rationalization of costs, capitalization and capacity with respect to our manufacturing workforce, suppliers and dealerships; and

- a product mix and cost structure that is competitive in the U.S. marketplace.

Key aspects of our Viability Plan as initially proposed as well as of our current Viability Plan are described below under "—*Viability Plan*."

The First U.S. Treasury Loan Agreement also required us to, among other things, use our best efforts to achieve the following restructuring targets:

*Debt Reduction*

- reduction of our outstanding unsecured public debt by not less than two-thirds through conversion of existing public debt into equity, debt and/or cash or by other appropriate means;

*Labor Modifications*

- reduction of the total amount of compensation, including wages and benefits, paid to our U.S. employees so that, by no later than December 31, 2009, the average of such total amount, per hour and per person, is an amount that is competitive with the average total amount of such compensation, as certified by the Secretary of the United States Department of Labor, paid per hour and per person to employees of Nissan, Toyota or Honda whose site of employment is in the United States;

- elimination of the payment of any compensation or benefits to our or our subsidiaries' U.S. employees who have been fired, laid-off, furloughed or idled, other than customary severance pay;

- application, by December 31, 2009, of work rules for our and our subsidiaries' U.S. employees, in a manner that is competitive with the work rules for employees of Nissan, Toyota or Honda whose site of employment is in the United States; and

*VEBA Modifications*

- modification of our retiree healthcare obligations to the new VEBA arising under the VEBA settlement agreement such that payment or contribution of not less than one-half of the value of each future payment or contribution made by us to the New VEBA shall be made in the form of GM common stock, with the value of any such payment or contribution not to exceed the amount that was required for such period under the VEBA settlement agreement.

The First U.S. Treasury Loan Agreement required us to submit to the President's Designee, by March 31, 2009, the Company Report detailing, among other things, the progress we had made in implementing our Viability Plan, including evidence satisfactory to the President's Designee that (a) the required Labor Modifications had been approved by the members of the leadership of each major U.S. labor organization that represents our employees, (b) all necessary approvals of the required VEBA Modifications, other than judicial and regulatory approvals, had been received and (c) an exchange offers to implement the debt reduction had been commenced.

68

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007433

In addition, the First U.S. Treasury Loan Agreement and the Second U.S. Treasury Loan Agreement provided that if, by the Certification Deadline, the President's Designee had not certified that we had taken all steps necessary to achieve and sustain our long-term viability, international competitiveness and energy efficiency in accordance with our Viability Plan, then the loans and other obligations under the First U.S. Treasury Loan Agreement and the Second U.S. Treasury Loan Agreement were to become due and payable on the 30th day after the Certification Deadline.

On March 30, 2009, the President's Designee found that our Viability Plan, in its then-current form, was not viable and would need to be revised substantially in order to lead to a viable GM. The President's Designee also concluded that certain steps required to be taken by March 31, 2009 under the First U.S. Treasury Loan Agreement, including receiving approval of the required Labor Modifications by members of our unions, obtaining receipt of all necessary approvals of the required VEBA modifications (other than regulatory and judicial approvals) and commencing the exchange offers to implement the required debt reduction had not been completed, and as a result, we had not satisfied the terms of the First U.S. Treasury Loan Agreement.

The Viability Determination Statement indicated that while many factors had been considered when assessing viability, the most fundamental benchmark that a business must meet to be considered viable was its ability to be able—after accounting for spending on research and development and capital expenditures necessary to maintain and enhance its competitive position—to generate positive cash flow and earn an adequate return on capital over the course of a normal business cycle. The Viability Determination Statement noted that our Viability Plan assumed that we would continue to experience negative free cash flow (before financing but after legacy obligations) through the projection period specified in our Viability Plan, thus failing this fundamental test for viability.

The Viability Determination Statement noted that we were in the early stages of an operational turnaround in which we had made material progress in a number of areas including purchasing, product design, manufacturing, brand rationalization and dealer network. However, the Viability Determination Statement also indicated that it was important to recognize that a great deal of additional progress needed to be made, and that our plan was based on, in its view, assumptions that would be challenging in the absence of a more accelerated and aggressive restructuring, including assumptions with respect to market share, price, brands and dealers, product mix and cash needs associated with legacy liabilities. In this regard, the Viability Determination Statement noted that:

- our plan contemplated that each of our restructuring initiatives will continue well into the future, in some cases until 2014, before they are complete and it concluded that "the slow pace at which [the] turnaround is progressing undermines [GM's] ability to compete against large, highly capable and well-funded competitors;"

- "given the slow pace of the turnaround, the assumptions in GM's business plan are too optimistic;" and

- even under "optimistic assumptions [GM] [will] remain breakeven, at best, on a free cash flow basis through the projection period, thus failing the fundamental test of viability."

In conjunction with the March 30, 2009 announcement, the administration announced that it would offer us adequate working capital financing for a period of 60 days while it worked with us to develop and implement a more accelerated and aggressive restructuring that would provide us with a sound long-term foundation. On March 30, 2009, we and the U.S. Treasury entered into amendments to the First U.S. Treasury Loan Agreement and the Second U.S. Treasury Loan Agreement to postpone the Certification Deadline to June 1, 2009 and, with respect to the First U.S. Treasury Loan Agreement, to also postpone the deadline by which we are required to provide the Company Report to June 1, 2009. We and the U.S. Treasury entered into an amendment to the First U.S. Treasury Loan Agreement, pursuant to which, among other things, the U.S. Treasury agreed to provide us with $2.0 billion in additional working capital loans under the First U.S. Treasury Loan Agreement and we borrowed $2.0 billion on April 24, 2009. In connection with the amendment to provide the $2.0 billion of additional loans, we issued to the U.S. Treasury a promissory note in an aggregate principal amount of $133.4 million as part of the compensation for the additional loans.

69

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007434

In response to the Viability Determination Statement, we have made further modifications to our Viability Plan to satisfy the President's Designee's requirement that we undertake a substantially more aggressive restructuring plan, including by increasing the amount of the debt reduction that we will seek to achieve beyond that originally required by the First U.S. Treasury Loan Agreement and revising our operating plan to take more aggressive action.

We believe that offering only equity consideration in the exchange offers and seeking to reduce our outstanding public indebtedness by more than the two-thirds originally required under the First U.S. Treasury Loan Agreement will be a key factor in satisfying our debt reduction objectives set forth in our Viability Plan and in demonstrating our ability to achieve and sustain long-term viability as required by the First U.S. Treasury Loan Agreement and thus, in ultimately obtaining the required certification from the President's Designee. Accordingly, we currently believe, and our Viability Plan assumes, that at least 90% of the aggregate principal amount (or, in the case of discount notes, accreted value) of the outstanding old notes (including at least 90% of the aggregate principal amount of the outstanding old Series D notes) will need to be tendered in the exchange offers or called for redemption pursuant to the call option (in the case of the non-USD old notes) in order to satisfy the U.S. Treasury Condition. Whether this level of participation in the exchange offers will be required (or sufficient) to satisfy the U.S. Treasury Condition will ultimately be determined by the U.S. Treasury. The actual level of participation in the exchange offers may be different than what we have assumed, and this difference may be material.

## Viability Plan

The key elements of our Viability Plan are debt reduction, VEBA modifications and operational changes. In response to the Viability Determination Statement we have amended or refined certain elements of our Viability Plan. Set forth below is a description of the key elements of our Viability Plan as initially proposed, certain amendments to the plan we have made to respond to the determination of the President's Designee and certain actions we have taken with respect to our Viability Plan.

We do not as a matter of course make available prospective financial information as to future sales, cost reductions, earnings, or other results. However, we have prepared the prospective financial information set forth below to show the estimated effects of certain assumed actions included in our current Viability Plan. The accompanying prospective financial information was not prepared with a view toward public disclosure or with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in our view, was prepared on a reasonable basis, reflects the best currently available estimates and judgments, and presents, to the best of our knowledge and belief, our expected course of action and our expected future financial performance. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of the registration statement of which this prospectus forms a part are cautioned not to place undue reliance on the prospective financial information.

**Neither our independent registered public accounting firm, nor any other independent accountants, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability, and assume no responsibility for, and disclaim any association with, the prospective financial information.**

The assumptions and estimates underlying the prospective financial information are inherently uncertain and, though considered reasonable by us as of the date of its preparation, are subject to a wide variety of significant business, economic, and competitive risks and uncertainties that could cause actual results to differ materially from those contained in the prospective financial information, including, among others, risks and uncertainties. See "*Risk Factors*." Accordingly, there can be no assurance that the prospective results are indicative of our future performance or that actual results will not differ materially from those presented in the

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007435

prospective financial information. Inclusion of the prospective financial information in the registration statement of which this prospectus forms a part should not be regarded as a representation by any person that the results contained in the prospective financial information will be achieved.

We do not generally publish our business plans and strategies or make external disclosures of our anticipated financial position or results of operations. Accordingly, we do not intend to update or otherwise revise the prospective financial information to reflect circumstances existing since its preparation or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error, except as otherwise required by law. Furthermore, we do not intend to update or revise the prospective financial information to reflect changes in general economic or industry conditions, except as otherwise required by law.

Additional information relating to the principal assumptions used in preparing the prospective financial information is set forth below. See "*Risk Factors*" for a discussion of various factors that could materially affect our financial condition, results of operations, business, prospects and securities. See also "*Cautionary Note Regarding Forward-Looking Statements*."

### Debt Reduction

Our initial Viability Plan provided for a two-thirds reduction in our outstanding public unsecured indebtedness through conversion of such debt into equity, debt and/or cash as required by the First U.S. Treasury Loan Agreement. We now believe that the U.S. Treasury will require a higher level of debt reduction and that such reduction be effected through the conversion of our outstanding public unsecured indebtedness into equity. As noted above, we currently believe, and our current Viability Plan assumes, that at least 90% of the aggregate principal amount (or, in the case of discount notes, accreted value) of the outstanding old notes (including at least 90% of the aggregate principal amount of the outstanding old Series D notes) will need to be tendered in the exchange offers or called for redemption pursuant to the call option (in the case of the non-USD old notes) in order to satisfy the U.S. Treasury Condition. Whether this level of participation in the exchange offers will be required (or sufficient) to satisfy the U.S. Treasury Condition will ultimately be determined by the U.S. Treasury. The actual level of participation in the exchange offers may be different than what we have assumed, and this difference may be material.

In addition, we are currently in discussions with the U.S. Treasury regarding the terms of a potential restructuring of our debt obligations owed to it under the U.S. Treasury Loan Agreements, pursuant to which the U.S. Treasury would exchange at least 50% of our outstanding U.S. Treasury Debt at June 1, 2009 for GM common stock pursuant to the U.S. Treasury Debt Conversion. These discussions are ongoing and the U.S. Treasury has not agreed or indicated a willingness to agree, to any specific level of debt reduction. For purposes of this prospectus, GM has set as a condition to the closing of the exchange offers that the U.S. Treasury Debt Conversion provide for the issuance of GM common stock to the U.S. Treasury (or its designee) in exchange for (a) full satisfaction and cancellation of at least 50% of our U.S. Treasury Debt as of June 1, 2009 (such 50% currently estimated to be approximately $10 billion dollars) and (b) the full satisfaction and cancellation of our obligations under the warrant issued to the U.S. Treasury.

We have not reached an agreement with respect to the U.S. Treasury Debt Conversion. The actual terms of the U.S. Treasury Debt Conversion are subject to ongoing discussions among GM and the U.S. Treasury, and there is no assurance that any agreement will be reached on the terms described above or at all. However, an agreement with respect to the U.S. Treasury Debt Conversion is a condition the exchange offers.

We will disclose the terms of any agreement reached with regard to the U.S. Treasury Debt Conversion and currently expect to be able to do so prior to the withdrawal deadline of the exchange offers. In the event the terms of this agreement do not satisfy the closing conditions and as a result we decide to waive a condition or otherwise amend the terms of the exchange offers, we will provide notice of the waiver or amendment, disseminate additional offer documents, extend the exchange offers and extend (or reinstate) withdrawal rights as we determine necessary and to the extent required by law.

71

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007436

*VEBA Modifications*

Our initial Viability Plan provided for modification of our retiree healthcare obligations such that payment or contribution of not less than one-half of the value of each future payment or contribution made by us to the New VEBA would be made in the form of GM common stock, with the value of any such payment or contribution not to exceed the amount that was required for such period under the VEBA settlement agreement. We and the U.S. Treasury are currently in discussions with the UAW and the VEBA-settlement class representative regarding the terms of the required VEBA modifications. Although these discussions are ongoing, for purposes of this prospectus, GM has set as a condition to the closing of the exchange offers that the VEBA modifications meet certain requirements that go beyond the VEBA modifications required under the First U.S. Treasury Loan Agreement. The VEBA modifications that will be required as a condition to the closing of the exchange offers would provide for the restructuring of the approximately $20 billion present value (settlement amount) of obligations we owe under the VEBA settlement agreement. The settlement amount consists of (a) approximately $1.4 billion, which represents the total amount of our obligations to continue to provide post-retirement health care coverage under the GM plan from July 1, 2009 to December 31, 2009 (which would not be addressed by the VEBA modifications required under the First U.S. Treasury Loan Agreement) and (b) approximately $18.6 billion, which represents the present value of the future payments to the New VEBA as required under the VEBA settlement agreement. Our closing condition regarding the VEBA modifications (on such terms, the "VEBA Modifications") would provide that:

- at least 50% of the settlement amount (approximately $10 billion) will be extinguished in exchange for GM common stock; and

- cash installments will be paid in respect of the remaining approximately $10 billion settlement amount over a period of time, with such amounts and period to be agreed but together having a present value equal to the remaining settlement amount.

We have not reached an agreement with respect to the VEBA Modifications. The actual terms of the VEBA Modifications are subject to ongoing discussions among GM, the UAW, the U.S. Treasury and the VEBA-settlement class representative, and there is no assurance that any agreement will be reached on the terms described above or at all. However, an agreement with respect to the VEBA Modifications is a condition to the exchange offers, and the terms of the VEBA Modifications must satisfy the minimum conditions described above. We have set as a condition to the exchange offers that the terms of the VEBA Modifications shall be satisfactory to the U.S. Treasury.

We will disclose the terms of any agreement reached with respect to the VEBA Modifications and currently expect to be able to do so prior to the withdrawal deadline of the exchange offers. In the event the terms of this agreement do not satisfy the closing conditions and as a result we decide to waive a condition or otherwise amend the terms of the exchange offers, we will provide notice of the waiver or amendment, disseminate additional offer documents, extend the exchange offers and extend (or reinstate) withdrawal rights as we determine necessary and to the extent required by law.

Modification of the VEBA settlement agreement to give effect to the VEBA Modifications will require the approval of the VEBA-settlement class representative as well as the approval of the U.S. District Court for the Eastern District of Michigan. The VEBA Modifications will also require ratification by the UAW. Receipt of necessary judicial and regulatory approvals of the VEBA Modifications are a condition precedent to the consummation of the exchange offers. Prior regulatory approval of the U.S. Department of Labor will not be required to enter into the VEBA Modifications but will be required to effect the issuance of GM common stock to the VEBA in amounts that exceed certain limitations imposed by ERISA and the Internal Revenue Code. Because the Department of Labor approval is required only for the implementation of the VEBA Modifications, we intend to seek the approval only after the VEBA Modifications are entered into, and consequently the Department of Labor approval will not be a condition to the exchange offers. See "*Risk Factors—Risks Related to the Exchange Offers—Approval of the VEBA Modifications is subject to appeal and such modifications could be entirely unwound. Implementing the VEBA Modifications may require us to use an alternative structure to comply with ERISA rules and we cannot assure you the structure will not violate these rules.*"

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007437

***Operational Changes***

Our current Viability Plan includes an operational plan which provides for, among other things, U.S. brand and nameplate rationalization, U.S. dealer reduction and a revised distribution channel strategy, U.S. hourly employee reduction, hourly labor cost reduction, salaried employee reduction and a global capital investment strategy. We developed our current Viability Plan in response to the President's Designee's determination that the February 17 Viability Plan did not establish a credible path towards viability. The current Viability Plan builds on our February 17 Viability Plan and provides for more aggressive action in rationalizing and reducing U.S. brand and nameplates, U.S. dealers, U.S. manufacturing operations, U.S. hourly and salaried employment levels and overall labor costs. We are undertaking these measures on a deeper and more accelerated basis with the goals of having a more stable and sustainable cash flow across the business cycle and reinvesting in our future. While our current Viability Plan focuses primarily on our U.S. and other North American operations, we are also restructuring our operations in other regions of the world as described in "*Summary—Recent Developments— Foreign Restructuring Activities.*"

*U.S. Industry / Share / North American Volume.* Our current Viability Plan is based on our economic and industry sales projections, which we use as a basis for our sales estimates. U.S. total industry sales (including heavy trucks and buses) are estimated by us to increase from 10.5 million units in 2009 to 12.5 million units in 2010 and to 16.8 million units in 2014. North American total industry sales are estimated by us to increase from 12.9 million units in 2009 to 19.8 million units in 2014. Although our industry sales estimates are consistent with many external forecasts, there are differing views on vehicle industry forecasts and other constituents may apply different assumptions or sensitivities in performing their evaluations.

In our current Viability Plan we have focused on more conservative market share and dealer inventory assumptions, resulting in more conservative factory unit sales ("FUS") compared to our February 17 Viability Plan. We have lowered our U.S. and North American market share projections for all years from the levels contemplated in the February 17 Viability Plan. We are projecting lower market share primarily as the result of more aggressive and accelerated brand, nameplate and channel restructuring (discussed below) and the near term market impact of statements and press reports regarding the possibility of a GM bankruptcy. We have lowered our estimated 2009 U.S. market share from 22.0% to 19.5% (a 2.5 point reduction) and total GMNA market share from 21.1% to 19.1% (a 2.0 point reduction). We have lowered our estimated 2010 U.S. market share from 21.1% to 18.9% (a 2.2 point reduction) and our estimated GMNA market share from 20.4% to 18.4% (a 2.0 point reduction).

We have also lowered our market share estimates for the period 2011 through 2014. The share assumptions have been developed to ensure that our operating plan is robust across the business cycle while using what we believe to be reasonable assumptions. With a properly focused four core brand strategy supporting fewer, better vehicle nameplates (reinforced by focused product development and marketing expenditures), we believe we can be more successful in delighting customers and generating better business results going forward.

As a result of the fourth quarter 2008 U.S. vehicle market collapse, our inventory, while historically low, is high from a days supply standpoint given current lower industry sales rates. To address this issue and bring inventory quantities in line with a more optimal 75 to 90 days supply, we have announced North American production reductions of approximately 190,000 vehicles during the second and early third quarters of 2009. These production reductions will result in a significant number of down weeks at many North American assembly plants and we expect to employ an extended shutdown of one to seven weeks at many manufacturing facilities bridging the normal July shutdown period.

As a result of the expected decrease in 2009 North American total industry sales levels, the expected decrease in U.S. and GMNA market share during 2009 through 2014 and our U.S. inventory level assumptions, we have lowered our GMNA FUS estimates from the February 17 Viability Plan. GMNA factory unit sales are now estimated to be 2.1 million, 3.0 million, 3.3 million, 3.6 million, 3.7 million and 3.7 million for 2009 through 2014, respectively. This compares to February 17 Viability Plan GMNA factory unit sales estimates of

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007438