2.6 million, 3.2 million, 3.5 million, 3.9 million, 4.0 million and 4.1 million for 2009 through 2014, respectively. The following table sets forth certain data for the U.S. and North America, including estimated industry vehicle sales and our estimated market share and FUSs.

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| **Current Viability Plan** | | | | | | | |
| U.S. Industry (mil) | 13.5 | 10.5 | 12.5 | 14.3 | 16.0 | 16.4 | 16.8 |
| North America Industry (mil) | 16.6 | 12.9 | 15.2 | 17.1 | 18.9 | 19.4 | 19.8 |
| U.S. Share | 22.1% | 19.5% | 18.9% | 18.6% | 18.4% | 18.5% | 18.5% |
| GMNA Share | 21.5% | 19.1% | 18.4% | 18.1% | 18.0% | 18.2% | 18.0% |
| GMNA FUS | 3,679 | 2,104 | 2,999 | 3,330 | 3,627 | 3,707 | 3,732 |

*Global Capital.* Our current Viability Plan provides for capital investment to support our products and develop new technology totaling $5.4 billion in 2009 and ranging from $5.3 billion to $6.7 billion from 2010 through 2014. U.S. vehicle launches include the 2009 introduction of the new Chevrolet Camaro, Chevrolet Equinox, Buick LaCrosse, GMC Terrain, Cadillac CTS Sports Wagon and Cadillac SRX, as well as the 2010 introduction of the Chevrolet Volt, Chevrolet Cruze and Cadillac CTS Coupe. Our current Viability Plan continues to provide for significant investment in alternative fuel, hybrid and plug-in vehicles. As compared to the February 17 Viability Plan, our current Viability Plan provides for the accelerated timing of $0.3 billion in additional investment in 2009 and lowers capital investment by approximately $0.2 billion in aggregate over the 2009 to 2014 period.

*U.S. Brand and Nameplate Rationalization.* We intend to focus our resources in the U.S. on four core brands: Chevrolet, Cadillac, Buick and GMC. Our current Viability Plan accelerates the timing of resolution for Saab, HUMMER and Saturn versus the February 17 Viability Plan. Resolutions for Saab and HUMMER have been accelerated to 2009 versus 2010 in the February 17 Viability Plan. Resolution of Saturn has been accelerated to 2009 versus 2010 to 2011 included in the February 17 Viability Plan. In conjunction with accelerated nameplate elimination, there is no planned investment for Pontiac, therefore the brand is expected to be phased out by the end of 2010.

On February 20, 2009, Saab Automobile AB filed for protection under the reorganization laws of Sweden in order to reorganize itself into a stand-alone entity independent from us. With respect to HUMMER, we have received final bids from potential purchasers and are in the process of reviewing them. We expect to make a final decision regarding a sale or phase-out of HUMMER in early May. With regard to Saturn, we are currently evaluating opportunities regarding a potential sale of the Saturn Distribution Corporation, an indirect wholly owned subsidiary, and expect to make a decision regarding a sale or phase out by the end of 2009.

Our current Viability Plan does not reflect the sale of the AC Delco Independent Aftermarket business as previously contemplated in the February 17 Viability Plan. In light of current economic conditions, its integration with GM's business and preliminary bids from prospective purchasers which did not reflect a valuation that we believe was appropriate, AC Delco will remain part of GM's business going forward.

Our current Viability Plan calls for a 29% reduction in the number of vehicle nameplates by 2010, from 48 in 2008 to 34 in 2010. This reflects both the reduction in brands and continued emphasis on fewer and better entries. Our expectation is that this will lead to higher per vehicle profit driven by focused marketing support and concentrated engineering and capital spending on higher volume vehicles. Our current Viability Plan contemplates a level of marketing support per brand and nameplate going forward that we believe is competitive with the industry.

74

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007439

As indicated in the table below, our current Viability Plan accelerates the reduction in U.S. nameplates from the February 17 Viability Plan. The February 17 Viability Plan called for a reduction from 48 U.S. nameplates in 2008 to 36 in 2012, a 25% reduction, while our current Viability Plan reduces the number of U.S. nameplates to 34 by 2010, a 29% reduction two years ahead of the prior plan.

| U.S. Nameplates | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| Current Viability Plan | 48 | 45 | 34 | 34 | 35 | 35 | 35 |
| February 17 Viability Plan | 48 | 45 | 47 | 39 | 36 | 37 | 36 |

*U.S. Dealers and Distribution Channel Strategy.* Due to our long operating history and existing franchise locations, many dealerships now operate in outdated facilities that are also no longer in the prime locations required to succeed. In addition, the number of same brand dealers in a given market may exceed the optimal representation that allows for competitive per store sales throughput, which is an important driver of dealer profitability. It is imperative that our restructuring results in a competitive dealer network from a sales throughput and return on assets standpoint. Our current Viability Plan calls for a reduction in U.S. dealers to allow for greater sales effectiveness in all markets, increased private investment and reduced distribution costs. Our current Viability Plan contemplates a reduction in the level of our U.S. dealers from 6,246 in 2008 to 3,605 in 2010. Our current Viability Plan is intended to facilitate an orderly, customer friendly and cost-effective approach for dealer reductions and inventory disposal.

Our current Viability Plan more aggressively addresses the level of U.S. dealers compared to the February 17 Viability Plan. The February 17 Viability Plan contemplated an optimal dealer footprint of three channels and 4,100 rooftops by 2014. Our current Viability Plan targets a footprint of approximately 500 fewer dealers four years earlier than the February 17 Viability Plan.

The dealer consolidation reflected in the current Viability Plan will be executed in a manner that supports our stated strategy of marketing our four core brands via three channels. Chevrolet will be marketed as our foundation brand and channel, Cadillac as our luxury brand and channel and Buick-GMC in the upper / premium space. In major markets, Chevrolet and Cadillac will be stand-alone channels. Buick-GMC will stand alone or be aligned with Chevrolet or Cadillac with a separate sales operation depending on market penetration and real estate costs. In the midsize and small-town markets, in many cases, Chevrolet and Buick-GMC will be aligned with one dealer operator. Cadillac will maintain representation in the smaller markets but at dramatically lower dealer density than today.

*Manufacturing Operational Efficiencies.* Our February 17 Viability Plan included the reduction in the total number of powertrain, stamping and assembly plants in the U.S. from 47 in 2008 to 33 in 2012. Consistent with our objective of accelerating the restructuring of our business, we plan to reduce the total number of powertrain, stamping and assembly plants in the U.S. to 34 by the end of 2010 and 31 by 2012. This would reflect the acceleration of six plant closures/idlings from our February 17 Viability Plan as well as one additional plant idling through 2014. In addition to these actions, we have been implementing an integrated global manufacturing strategy based on common lean manufacturing principles and processes. Implementation of this strategy provides the infrastructure for flexible production in our assembly facilities where multiple body styles from different architectures can be built in a given plant. Flexible manufacturing will enable us to respond to changing market conditions more quickly and we expect will contribute to higher overall capacity utilization and result in lower fixed costs per vehicle sold, and lower and more efficient capital investment.

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| **U.S. Manufacturing Facilities** | | | | | | | |
| Current Viability Plan | 47 | 41 | 34 | 33 | 31 | 31 | 31 |
| February 17 Viability Plan | 47 | 44 | 37 | 35 | 33 | 32 | 32 |
| **U.S. Assembly Capacity Utilization *** | | | | | | | |
| Current Viability Plan | 68% | 49% | 89% | 98% | 107% | 118% | 124% |
| February 17 Viability Plan | 68% | 61% | 81% | 88% | 94% | 112% | 120% |

* Based on 2 Shift Harbour Method

75

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007440

*U.S. Hourly Employment Levels.* Our current Viability Plan would reduce U.S. hourly employment levels from 61,000 in 2008 to 40,000 in 2010. This is primarily the result of the contemplated nameplate reductions, operational efficiencies and plant capacity reductions. As compared to the February 17 Viability Plan, our current Viability Plan provides for U.S. hourly employment levels that are approximately 7,000 lower in 2010 and 2011 and 8,000 lower in the 2012 through 2014 period.

| U.S. Hourly Employment (000's) | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| Current Viability Plan | 61 | 45 | 40 | 38 | 38 | 38 | 38 |
| February 17 Viability Plan | 61 | 45 | 47 | 45 | 46 | 46 | 46 |

\* Adjusted versus February 17 Viability Plan to exclude joint ventures.

*Hourly Labor Cost.* Reflecting reductions in hourly employment levels and modifications to the GM/UAW Labor Agreement, our current Viability Plan contemplates a reduction in projected U.S. hourly labor costs from $7.6 billion in 2008 to $5.0 billion in 2010, $4.8 billion in 2012 and $4.1 billion in 2014. We anticipate estimated labor costs will be obtained through a combination of reductions in total U.S. hourly employment as well as modifications to the terms to the collective bargaining agreement. At this time, the UAW has not ratified the modifications to the terms of the collective bargaining agreement that were negotiated on February 17, 2009.

While the tentative agreement reached with the UAW is expected to significantly improve GM's competitiveness and helps us close a substantial portion of the labor cost gap by the end of 2009, ultimately the conditions as to competitiveness will be determined by the U.S. Treasury. Our labor cost estimates assume achieving the targeted total labor costs through either further gap closure of labor costs per hour to U.S. transplants (through implementation of the provisions of the February 17, 2009 agreement, or future contractual revisions as necessary), additional reductions in hourly labor manpower or a combination of both.

| U.S. Hourly Labor Costs $ Billions | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Current Viability Plan** | | | | | | | | | | | | |
| Active | 12.7 | 12.8 | 12.0 | 10.2 | 8.3 | 6.7 | 4.6 | 3.8 | 3.6 | 3.9 | 4.1 | 4.1 |
| Retiree | 5.7 | 3.2 | 3.8 | 2.4 | 1.2 | 0.9 | 1.8 | 1.2 | 1.2 | 0.9 | 0.8 | 0.0 |
| Total | 18.4 | 16.0 | 15.8 | 12.6 | 9.5 | 7.6 | 6.4 | 5.0 | 4.8 | 4.8 | 4.9 | 4.1 |
| **February 17 Viability Plan** | | | | | | | | | | | | |
| Active | 12.7 | 12.8 | 12.0 | 10.2 | 8.3 | 6.7 | 4.7 | 4.6 | 4.4 | 4.5 | 4.5 | 4.7 |
| Retiree | 5.7 | 3.2 | 3.8 | 2.4 | 1.2 | 0.9 | 1.8 | 0.8 | 0.7 | 0.3 | 0.4 | 0.1 |
| Total | 18.4 | 16.0 | 15.8 | 12.6 | 9.5 | 7.6 | 6.5 | 5.4 | 5.1 | 4.8 | 4.9 | 4.8 |

With respect to our operations in Canada, we negotiated a revised labor agreement in March 2009 with the Canadian Auto Workers (the "CAW") which we believe reduces the active cost of an hour of labor to approximately the level paid by our U.S. transplant competitors (when measured at an exchange rate of $0.80 per Canadian Dollar). Under our current Viability Plan, Canadian hourly employment levels would be reduced from 10,300 in 2008 to 4,400 by 2014. As a result of the headcount reductions and contract changes, our hourly active labor costs in Canada are estimated to decrease from $1.0 billion in 2008 to $0.5 billion by 2014. We are seeking financial support for our Canadian operations, and are in discussions with both the Canadian Federal and the Ontario Provincial governments to provide it. They are currently considering our requests and considering, among other things, the competitiveness of our Canadian active hourly labor costs and alternatives for reducing our Canadian legacy costs, such as pensions, retiree health care and life insurance.

*Salaried Employment Levels.* Over the last four years, similar to actions taken to reduce cost and right-size the hourly workforce, we have taken actions to reduce salaried and executive employment levels. In North

76

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007441

America (including corporate staffing supporting global operations) from 2004 to 2008, salaried employment has been reduced from 47,600 to 35,200 (41,450 to 29,650 in the U.S.), while executives have been reduced from 2,000 to 1,300 over the same timeframe.

As part of the February 17 Viability Plan, we announced that we would reduce salaried employment on a global basis by 10,000 from year-end 2008. With regard to North America, salaried employment is expected to decrease from 35,200 to 30,800 (29,650 to 26,250 in the U.S.), while GMNA executives are expected to be reduced from 1,300 to 1,100. We continue to evaluate our structure and decision making processes with the view of further simplifying our business and expect an additional layer of salaried and executive manpower reductions as we execute our current Viability Plan.

### GMNA Structural Cost

Reflecting the positive impact of the initiatives and plans reflected in our current Viability Plan, GMNA's structural costs are estimated to decrease $7.6 billion from $30.8 billion in 2008 to $23.2 billion in 2010, a 25% reduction, and decrease by another $1.0 billion to $22.2 billion by 2014. The 25% reduction in structural cost over the 2008 to 2010 period is primarily related to the reduction in labor costs expected be achieved through the reduction in employment levels as well as implementation of competitive agreements combined with other operational efficiencies gained through the rightsizing of the business. The table below compares GMNA's structural cost from the February 17 Viability Plan to our current Viability Plan. While 2009 structural cost has increased approximately $0.8 billion largely related to accelerated depreciation, the reduced cost levels estimated in the 2010 to 2014 period reflect the results of faster and deeper restructuring actions reflected in our current Viability Plan. GMNA structural cost is expected to be reduced to $23.2 billion in 2010, approximately $0.8 billion lower than the level estimated to be achieved in 2014 in the February 17 Viability Plan.

| GMNA Structural Cost ($ Bil) | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| Current Viability Plan | 30.8 | 27.1 | 23.2 | 22.3 | 22.7 | 22.9 | 22.2 |
| February 17 Viability Plan | 30.8 | 26.3 | 25.0 | 24.0 | 24.0 | 24.0 | 24.0 |

### Global Cash Restructuring Costs

Successful implementation of our current Viability Plan will require significant cash payments related to restructuring, dealer and brand rationalization and employee headcount and capacity rationalization. We estimate that those global cash requirements will be $4.0 billion in 2009 and an additional $2.1 billion through 2014.

### Future Liquidity Requirements and Requests for Additional Funding

In the February 17 Viability Plan we submitted to the President's Designee pursuant to the First U.S. Treasury Loan Agreement, we forecasted a need for funding from the U.S. Treasury of $22.5 billion under our baseline scenario and $30.0 billion under our downside scenario (in each case including the $13.4 billion then outstanding under the First U.S. Treasury Loan Agreements, but not including the $748.6 million promissory note we issued to the U.S. Treasury as part of the compensation for the loans thereunder and the $884.0 million we borrowed to purchase additional membership interests in GMAC). In order to execute our current Viability Plan, we currently forecast a need for U.S. Treasury funding totaling $27.0 billion, representing the $22.5 billion requested in our February 17 Viability Plan under our baseline scenario, plus an additional $4.5 billion needed to implement incremental restructuring actions, cover higher projected negative operating cash flow primarily due to lower forecasted vehicle sale volumes in North America, and to compensate for lower than originally forecasted proceeds from asset sales and other sources of financing, including Department of Energy Section 136 Loans for production of advanced technology vehicles and components. Our Viability Plan currently assumes that we receive $5.7 billion of Section 136 Loans and an additional $5.6 billion in funding from foreign governments.

77

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007442

As discussed above, the U.S. Treasury agreed to provide us with $2.0 billion of additional working capital loans and we borrowed $2.0 billion on April 24, 2009. As part of the compensation for these loans, we issued to the U.S. Treasury a promissory note in an aggregate principal amount of $133.4 million. We currently expect that we will need an additional $2.6 billion of working capital loans prior to June 1, 2009. We cannot assure you that the U.S. Treasury will provide the additional $2.6 billion of loans. If we were to receive the additional $2.6 billion of loans, we expect we would be required to issue to the U.S. Treasury a promissory note in an aggregate principal amount of $173.4 million as part of the compensation for these loans.

If we receive the additional $2.6 billion of loans and issue the additional $173.4 million promissory note to the U.S. Treasury in connection with those loans, as of June 1, 2009 we would have received loans from the U.S. Treasury of $18.0 billion (excluding the $884.0 million we borrowed to purchase additional membership interests in GMAC) and issued promissory notes in an aggregate principal amount of $1.1 billion as part of the compensation to the U.S. Treasury for these loans, and as a result, the total outstanding U.S. Treasury Debt would be $20.0 billion. Under the terms of the U.S. Treasury Debt Conversion, at least 50% of the U.S. Treasury Debt outstanding at June 1, 2009 (including the $884.0 million we borrowed to purchase additional membership interests in GMAC and the other promissory notes we issued to the U.S. Treasury as part of the compensation for the loans provided to us), would be exchanged for new shares of GM common stock.

In our Viability Plan, we currently forecast that, after June 1, 2009, we will require an additional $9.0 billion of U.S. Treasury funding. We expect that if we were to receive this additional funding, we would be required to issue to the U.S. Treasury promissory notes in an aggregate principal amount of $600.3 million as part of the compensation for this funding. We have proposed that the U.S. Treasury commit to provide this additional $9.0 billion funding, together with the additional $2.6 billion referred to above, to us under, or on terms similar to those under, the existing U.S. Treasury Loan Agreements (we refer to the commitment to provide this total of $11.6 billion of additional financing as the "U.S. Treasury Financing Commitment"). We cannot assure you that the U.S. Treasury will provide the additional $2.6 billion and $9.0 billion of funding. The receipt of the U.S. Treasury Financing Commitment on commercially reasonable terms is a condition to the exchange offers. Assuming the exchange of 50% of our outstanding U.S. Treasury Debt at June 1, 2009 (such 50% currently estimated to be approximately $10 billion) and our receipt of the additional $9.0 billion, our total outstanding U.S. Treasury Debt would be $19.6 billion.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007443

## BANKRUPTCY RELIEF

**We have not commenced any cases in the bankruptcy court under Chapter 11 of the U.S. Bankruptcy Code. We also have not taken any corporate action authorizing the commencement of any reorganization cases.**

We do not intend to file petitions for relief under Chapter 11 of the U.S. Bankruptcy Code if the exchange offers are consummated. However, in the event we have not received prior to June 1, 2009 sufficient tenders of old notes, including the old Series D notes, to consummate the exchange offers, we currently expect to seek relief under the U.S. Bankruptcy Code. We are considering various alternatives under the U.S. Bankruptcy Code in consultation with the U.S. Treasury, our largest lender.

One alternative we are considering is a sale, pursuant to section 363(b) of the U.S. Bankruptcy Code (the "363 Sale"), of most or substantially all of the company's operating assets, including its subsidiaries, to a new operating entity ("New GM") formed by and controlled by the U.S. Treasury. The consideration the U.S. Treasury would pay for those assets may consist of one of more of the following: all or part of its existing secured debt as currency, debt or equity in New GM, the assumption of certain liabilities, cash, or other forms of consideration. In the form currently being considered, New GM would not assume GM's obligations under the old notes. GM's assets that are not sold to New GM in the 363 Sale would be liquidated by GM in its case under the U.S. Bankruptcy Code and the proceeds thereof, as well as the consideration paid by the U.S. Treasury, would be administered in GM's case under the U.S. Bankruptcy Code. The recovery received by holders of old notes in the context of a 363 Sale would depend on the consideration paid by the U.S. Treasury for GM's assets, the value of such consideration, the amounts generated from the disposition of the assets not transferred to New GM, the amount of other claims against GM and the costs and expenses associated with the administration of GM's bankruptcy estate. The holders of old notes may receive less in the 363 Sale than in the exchange offers.

Another alternative we are considering is soliciting acceptances of a plan of reorganization (the "plan") from the U.S. Treasury, the UAW and the VEBA-settlement class representative prior to the filing of any GM reorganization case under Chapter 11. We would not solicit acceptances of the plan from holders of old notes. If we obtain the requisite acceptances and choose this alternative, we would deem the class of holders of old notes to reject the plan and pursue confirmation of the plan over the deemed rejection of that class pursuant to section 1129(b) of the U.S. Bankruptcy Code. The plan may provide for similar consideration to holders of old notes as being provided in the exchange offers, although the precise consideration has not yet been determined, and it may be less than in the exchange offers.

In the event we decide to pursue either such alternative, it is possible that we will not be in a position to proceed with either alternative prior to June 1, 2009, which may result in our filing a more traditional Chapter 11 case. In addition, although we believe that we would be successful in pursuing either the 363 Sale or the plan, as set forth above, each of those alternatives involves uncertainties, potential delays and litigation risks. It is possible that a bankruptcy court would not approve the 363 Sale or confirm the plan, and that, as a result, a GM Chapter 11 case may become a longer, more traditional Chapter 11 case, which we believe would result in holders of old notes receiving less than they would receive in the exchange offers, the 363 Sale, or the plan. It is also possible that a more traditional Chapter 11 case could be converted to a case under Chapter 7 of the U.S. Bankruptcy Code, which we believe would result in holders of old notes receiving nothing.

In the event we decide to seek bankruptcy relief under any alternative, it is currently expected that certain of GM's subsidiaries, including Saturn Corporation, Saturn Distribution Corporation, and potentially other subsidiaries, will also file Chapter 11 cases (or commence other similar reorganization proceedings) and pursue the same form of relief as, or a different form of relief than, that pursued by GM.

**If we seek bankruptcy relief, holders of old notes may receive consideration that is less than what is being offered in the exchange offers, and it is possible that such holders may receive no consideration at all for their old notes.**

For a more complete description of the risks relating to our failure to consummate the exchange offers, see *"Risk Factors—Risks Related to Failure to Consummate the Exchange Offers."*

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007444

## SELECTED CONSOLIDATED HISTORICAL FINANCIAL DATA

The following table sets forth selected consolidated historical financial data as of and for the years ended December 31, 2008, 2007, 2006, 2005 and 2004 and has been derived without adjustment from our audited consolidated financial statements for such years. The data set forth in the table below should be read together with our audited consolidated financial statements for the years ended December 31, 2008, 2007 and 2006 and the related notes, and the section entitled "*Management's Discussion and Analysis of Financial Condition and Results of Operations*," each of which is found in our annual report on Form 10-K for the year ended December 31, 2008, which is incorporated by reference in this prospectus.

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2008** | **2007** | **2006** | **2005** | **2004** |
| | (Dollars in millions except per share amounts) | | | | |
| **Income Statement Data:** | | | | | |
| Total net sales and revenue (a) | $148,979 | $179,984 | $204,467 | $192,143 | $192,196 |
| Operating loss | $(21,284) | $ (4,309) | $ (5,823) | $(17,806) | $ (545) |
| Income (loss) from continuing operations (b) | $(30,860) | $(43,297) | $ (2,423) | $(10,621) | $ 2,415 |
| Income from discontinued operations (c) | — | 256 | 445 | 313 | 286 |
| Gain from sale of discontinued operations (c) | — | 4,309 | — | — | — |
| Cumulative effect of change in accounting principle (d) | — | — | — | (109) | — |
| Net income (loss) | $(30,860) | $(38,732) | $ (1,978) | $(10,417) | $ 2,701 |
| $1⅔ par value common stock: | | | | | |
| Basic earnings (loss) per share from continuing operations before cumulative effect of accounting change | $ (53.32) | $ (76.52) | $ (4.29) | $ (18.78) | $ 4.27 |
| Basic earnings per share from discontinued operations (c) | — | 8.07 | 0.79 | 0.55 | 0.51 |
| Basic loss per share from cumulative effect of change in account principle (d) | — | — | — | (0.19) | — |
| Basic earnings (loss) per share | $ (53.32) | $ (68.45) | $ (3.50) | $ (18.42) | $ 4.78 |
| Diluted earnings (loss) per share from continuing operations before cumulative effect of accounting change (d) | $ (53.32) | $ (76.52) | $ (4.29) | $ (18.78) | $ 4.26 |
| Diluted earnings (loss) per share from discontinued operations (c) | — | 8.07 | 0.79 | 0.55 | 0.50 |
| Diluted loss per share from cumulative effect of change in accounting change (d) | — | — | — | (0.19) | — |
| Diluted earnings (loss) per share | $ (53.32) | $ (68.45) | $ (3.50) | $ (18.42) | $ 4.76 |
| Cash dividends declared per share | $ 0.50 | $ 1.00 | $ 1.00 | $ 2.00 | $ 2.00 |
| Book value per share (h) | $(139.79) | | | | |
| **Balance Sheet Data (as of period end):** | | | | | |
| Current assets | $ 41,224 | $ 60,135 | $ 65,156 | $ 52,357 | $ 55,371 |
| Noncurrent assets | $ 45,316 | $ 71,759 | $ 99,025 | $109,967 | $107,198 |
| Total assets (a) (b) (e) | $ 91,047 | $148,883 | $186,304 | $474,268 | $480,772 |
| Current liabilities | $ 73,911 | $ 69,510 | $ 66,717 | $ 70,726 | $ 72,884 |
| Noncurrent liabilities | $100,654 | $109,040 | $112,472 | $ 93,548 | $ 79,854 |
| Stockholders' equity (deficit) (b) (d) (f) (g) | $(86,154) | $(37,094) | $ (5,652) | $ 14,442 | $ 27,669 |
| Minority interests | $ 814 | $ 1,614 | $ 1,190 | $ 1,047 | $ 397 |

Certain prior period amounts have been reclassified in the consolidated statements of operations to conform to the 2008 presentation.

(a)  In November 2006, we sold a 51% controlling ownership interest in GMAC, resulting in a significant decrease in total consolidated net sales and revenues, assets and notes and loans payable.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007445

(b)  In September 2007, we recorded full valuation allowances of $39.0 billion against our net deferred tax assets in Canada, Germany and the United States.

(c)  In August 2007, we completed the sale of the commercial and military operations of our Allison business. The results of operations, cash flows and the 2007 gain on sale of Allison have been reported as discontinued operations for all periods presented.

(d)  At December 31, 2005, we recorded an asset retirement obligation of $181 million in accordance with the requirements of FIN No. 47, "Accounting for Conditional Asset Retirement Obligations—an Interpretation of FASB Statement No. 143." The cumulative effect on net loss, net of related income tax effects, of recording the asset retirement obligations was $109 million or $0.19 per share on a diluted basis.

(e)  At December 31, 2006, we recognized the funded status of our benefit plans on our consolidated balance sheet with an offsetting adjustment to Accumulated other comprehensive income (loss) in stockholders' equity (deficit) of $16.9 billion in accordance with the adoption of SFAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans—an amendment to FASB Statements No. 87, 88, 106, and 132(R)."

(f)  At January 1, 2007, we recorded a decrease to retained earnings of $425 million and an increase of $1.2 billion to Accumulated other comprehensive income in connection with the early adoption of the measurement provisions of SFAS No. 158.

(g)  At January 1, 2007, we recorded an increase to retained earnings of $137 million with a corresponding decrease to our liability for uncertain tax positions in accordance with FASB Interpretation No. 48, "Accounting for Uncertainty in Income Taxes."

(h)  Book value per share is calculated by dividing Stockholders' deficit by the number of common shares outstanding.

81

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007446

## ACCOUNTING TREATMENT OF THE EXCHANGE OFFERS

The exchange of our old notes for shares of GM common stock will be accounted for as a troubled debt restructuring pursuant to the provisions of SFAS No. 15, which provides for different types of debt restructurings (e.g., grants of equity in full settlement of debt, modification of terms of existing debt, or a combination of equity grants and debt modifications, the latter of which is referred to as a "combination of types"). Pursuant to the provisions of SFAS No. 15, this troubled debt restructuring would be accounted for as a grant of equity in full settlement of the debt since the exchange consideration, consisting of shares of GM common stock, received for any old notes tendered would result in the full settlement of the old notes exchanged. For the purposes of the pro forma adjustments, we have reflected, based on tenders at the Assumed Participation Level, the issuance to the tendering holders of 225 shares of GM common stock for each 1,000 U.S. dollar equivalent of principal amount (or accreted value as of the settlement date, if applicable) of old notes exchanged.

Assuming the satisfaction of the U.S. Treasury Condition, which we currently believe will require that 90% of the principal amount (or, in the case of discount notes, accreted value) of our old notes are tendered or redeemed pursuant to the call option (in the case of our non-USD old notes), we will issue 5.5 billion shares of GM common stock with an estimated fair value of $2.3 billion. The estimated fair value of the shares of GM common stock issued pursuant to the exchange offers was derived using a discounted cash flow methodology based on the assumptions included in our current Viability Plan. As discussed under the "*Notes to the Unaudited Pro Forma Condensed Consolidated Financial Information for the Exchange Offers,*" the final accounting treatment for the exchange offers will be based on the market price of our common stock at or about the date the exchange offers are consummated, and that market price per share could differ significantly from the estimated per share amount used in the unaudited pro forma condensed consolidated financial information for the exchange offers. The carrying amount of the old notes tendered will be greater than the estimated fair value of the shares of GM common stock issued pursuant to the exchange consideration. In applying troubled debt restructuring accounting pursuant to the provisions of SFAS No. 15, we would recognize a gain on restructuring arising from the exchange equal to $21.2 billion, or the difference between the carrying value of old notes tendered and the estimated fair value of the shares of GM common stock issued less any related fees or expenses. Any such gain on restructuring is reflected in accumulated deficit on the unaudited pro forma condensed consolidated balance sheet for the exchange offers, and would be excluded from the unaudited pro forma condensed consolidated statement of operations for the exchange offers since this gain on restructuring is not expected to have a continuing impact on us.

The accounting treatment of the exchange offers as described in this section relates solely to the exchange of our old notes for shares of GM common stock. Discussion pertaining to other pro forma adjustments, including the U.S. Treasury Debt Conversion and the VEBA Modifications, is discussed further in the Notes to the Unaudited Pro Forma Condensed Consolidated Financial Information for the Exchange Offers, included elsewhere in this prospectus.

In measuring the tax consequences of the unaudited pro forma condensed consolidated financial information for the exchange offers, the impact of The American Recovery and Reinvestment Act of 2009 (the "American Recovery and Reinvestment Act") amending Code Section 382 of the Internal Revenue Code was applied as though it was effective as of December 31, 2008 for the unaudited pro forma condensed consolidated balance sheet and as of January 1, 2008 for the unaudited pro forma condensed consolidated statement of operations.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007447

**GENERAL MOTORS CORPORATION AND SUBSIDIARIES**

**UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION FOR THE EXCHANGE OFFERS**

**As of and For the Year Ended December 31, 2008**

The following unaudited pro forma condensed consolidated financial information for the exchange offers as of and for the year ended December 31, 2008 (the "Unaudited Pro Forma Condensed Consolidated Financial Information for the Exchange Offers") has been derived by applying the pro forma adjustments set forth below to our historical consolidated financial statements as of and for the year ended December 31, 2008, which are incorporated into this prospectus by reference from our annual report on Form 10-K for the year ended December 31, 2008.

Pursuant to the requirements under Article 11 of Regulation S-X, the unaudited pro forma condensed consolidated statement of operations for the exchange offers gives effect to adjustments for transactions expected to have a continuing impact on us, that (1) are directly attributable to the exchange offers and are factually supportable, and (2) represent material events that have occurred after December 31, 2008 and had or will have a material effect on our historical financial statements and capital structure. The unaudited pro forma condensed consolidated balance sheet gives effect to adjustments for transactions regardless of whether they have a continuing impact on us or are non-recurring, that are (1) directly attributable to the exchange offers and are factually supportable, and (2) represent material events which have occurred after December 31, 2008 and had or will have a material effect on our historical financial statements and capital structure. The unaudited pro forma condensed consolidated financial information for the exchange offers assumes that each of the categories of adjustments below had occurred as of December 31, 2008 for the unaudited pro forma condensed consolidated balance sheet, and on January 1, 2008 for the unaudited pro forma condensed consolidated statement of operations for the exchange offers.

The unaudited pro forma condensed consolidated financial information for the exchange offers (including conditions precedent thereto) gives effect to the following categories of adjustments that are directly attributable to the exchange offers and factually supportable:

- consummation of the transactions contemplated by the exchange offers, including the payment of related fees and expenses;
- the U.S. Treasury Debt Conversion;
- the VEBA Modifications;
- additional borrowings under the First U.S. Treasury Loan Agreement and borrowings under the Second U.S. Treasury Loan Agreement that occurred subsequent to December 31, 2008;
- additional working capital loans under the First U.S. Treasury Loan Agreement that occurred subsequent to December 31, 2008;
- par value reduction of GM common stock to $0.01 per share;
- increase in the number of authorized shares of GM common stock;
- 1-for-100 reverse stock split of GM common stock; and
- purchase of an additional ownership interest in GMAC that occurred subsequent to December 31, 2008.

The unaudited pro forma condensed consolidated financial information for the exchange offers gives effect to the following categories of adjustments that represent material events which have occurred after December 31, 2008 and had or will have a material effect on our historical financial statements and capital structure:

- modifications to certain secured borrowing facilities that occurred subsequent to December 31, 2008; and
- application of FSP No. APB 14-1.

83

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007448

**GENERAL MOTORS CORPORATION AND SUBSIDIARIES**

**UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION FOR THE EXCHANGE OFFERS—Continued**

**As of and For the Year Ended December 31, 2008**

The unaudited pro forma condensed consolidated financial information for the exchange offers assumes, among other things, the satisfaction of the U.S. Treasury Condition, which we currently believe will require the exchange or redemption pursuant to the call option (in the case of our non-USD old notes) of 90% of the aggregate principal amount (or, in the case of discount notes, accreted value) of our old notes for the exchange consideration. The actual exchange of our old notes could be more or less than the level of participation assumed for the exchange offers, which would impact the pro forma total debt and pro forma stockholders' deficit as of December 31, 2008, and would impact the pro forma interest expense and the pro forma loss per share for the year ended December 31, 2008.

The U.S. Treasury Debt Conversion and VEBA Modifications will result in significant dilution to our current common stockholders, and will result in pro forma ownership levels of approximately 1.0% and 9.1% for existing stockholders and tendering noteholders, respectively, assuming the Assumed Participation Level in the exchange offer and after shares are issued to the New VEBA. The actual effects of the U.S. Treasury Debt Conversion and satisfaction of the VEBA obligations in exchange for GM common stock on our financial position and results of operations could be different than the levels assumed for the unaudited pro forma condensed consolidated financial information for the exchange offers and such differences could be material.

In connection with the preparation of our consolidated financial statements for the year ended December 31, 2008, we concluded that there was substantial doubt about our ability to continue as a going concern and our independent registered public accounting firm included a statement in their audit report related to the existence of substantial doubt about our ability to continue as a going concern due to our recurring losses from operations, stockholders' deficit, and inability to generate sufficient cash flow to meet our obligations and sustain our operations. Notwithstanding this conclusion, our consolidated financial statements and unaudited pro forma condensed consolidated financial information for the exchange offers have been prepared assuming that we will continue as a going concern and do not include any adjustments that might result from the outcome of this uncertainty.

The unaudited pro forma condensed consolidated financial information for the exchange offers is based on assumptions that we believe are reasonable and should be read in conjunction with "*Capitalization*" and "*Accounting Treatment of the Exchange Offers*," included elsewhere in this prospectus, and our consolidated financial statements and related notes thereto as of and for the year ended December 31, 2008, which are incorporated into this prospectus by reference from our annual report on Form 10-K for the year ended December 31, 2008.

The unaudited pro forma condensed consolidated financial information for the exchange offers does not give effect to the Labor Modifications or the restructuring and other actions to be undertaken pursuant to our current Viability Plan because these actions do not currently meet the requirements for pro forma presentation under Article 11 of Regulation S-X. Although management expects that the Labor Modifications may result in cost savings and the actions undertaken pursuant to our current Viability Plan may result in near-term restructuring and impairment charges and in improved financial performance in the future, no assurance can be given that these anticipated cost savings or projected operational and financial improvements will be realized.

The unaudited pro forma condensed consolidated financial information for the exchange offers is presented for illustrative purposes only and is not necessarily indicative of the financial position or results of operations that would have actually been reported had the exchange offers been consummated as of December 31, 2008 or on January 1, 2008, respectively, nor is it indicative of our future financial position or results of operations. The actual effects of the exchange offers on our financial position or results of operations may be different than what we have assumed or estimated, and these differences may be material.

84

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007449

## GENERAL MOTORS CORPORATION AND SUBSIDIARIES

### UNAUDITED PRO FORMA CONDENSED CONSOLIDATED BALANCE SHEET FOR THE EXCHANGE OFFERS

#### As of December 31, 2008

#### (Dollars in millions)

| | As of December 31, 2008 Historical | Pro Forma Adjustments for the Exchange Offers | | | | |
| | | Exchange of Old Notes and New Equity | U.S. Treasury Loans and VEBA Exchange | As of December 31, 2008 Pro Forma for the Exchange Offers | Other Pro Forma Adjustments | As of December 31, 2008 Pro Forma |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| **Current Assets** | | | | | | |
| Cash and cash equivalents | $13,953 | $ (215) a (635) a | $11,400 d | $ 24,503 | $(63) d — | $ 24,440 |
| Marketable securities | 13 | — | — | 13 | — | 13 |
| Total cash and marketable securities | 13,966 | (850) | 11,400 | 24,516 | (63) | 24,453 |
| Accounts and notes receivable, net | 7,711 | — | — | 7,711 | — | 7,711 |
| Inventories | 13,042 | — | — | 13,042 | — | 13,042 |
| Equipment on operating leases, net | 3,363 | — | — | 3,363 | — | 3,363 |
| Other current assets and deferred income taxes | 3,142 | — | — | 3,142 | — | 3,142 |
| Total current assets | 41,224 | (850) | 11,400 | 51,774 | (63) | 51,711 |
| **Financing and Insurance Operations Assets** | | | | | | |
| Cash and cash equivalents | 100 | — | — | 100 | — | 100 |
| Investments in securities | 128 | — | — | 128 | — | 128 |
| Equipment on operating leases, net | 2,221 | — | — | 2,221 | — | 2,221 |
| Equity in net assets of GMAC LLC | 491 | — | 884 d | 1,375 | — | 1,375 |
| Other assets | 1,567 | — | — | 1,567 | — | 1,567 |
| Total Financing and Insurance Operations assets | 4,507 | — | 884 | 5,391 | — | 5,391 |
| **Non-Current Assets** | | | | | | |
| Equity in net assets of nonconsolidated affiliates | 1,655 | — | — | 1,655 | — | 1,655 |
| Property, net | 39,656 | — | — | 39,656 | — | 39,656 |
| Goodwill and intangible assets, net | 265 | — | — | 265 | — | 265 |
| Deferred income taxes | 98 | — | — | 98 | — | 98 |
| Prepaid pension | 109 | — | — | 109 | — | 109 |
| Other assets | 3,533 | (229) b | — | 3,304 | (9) g 30 f | 3,325 |
| Total non-current assets | 45,316 | (229) | — | 45,087 | 21 | 45,108 |
| **Total assets** | $91,047 | $(1,079) | $12,284 | $102,252 | $ (42) | $102,210 |

See Accompanying Notes to Unaudited Pro Forma Condensed Consolidated Financial Information for the Exchange Offers.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007450

**GENERAL MOTORS CORPORATION AND SUBSIDIARIES**

**UNAUDITED PRO FORMA CONDENSED CONSOLIDATED BALANCE SHEET FOR THE EXCHANGE OFFERS—Continued**

**As of December 31, 2008**

**(Dollars in millions)**

| | As of December 31, 2008 Historical | Exchange of Old Notes and New Equity | U.S. Treasury Loans and VEBA Exchange | As of December 31, 2008 Pro Forma for the Exchange Offers | Other Pro Forma Adjustments | As of December 31, 2008 Pro Forma |
|---|---|---|---|---|---|---|
| **TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT** | | | | | | |
| **Current Liabilities** | | | | | | |
| Accounts payable (principally trade) | $ 22,236 | $ — | S — | $ 22,236 | $ — | $ 22,236 |
| Short-term borrowings and current portion of long-term debt, excluding U.S. Treasury Debt | 11,918 | (878) b | — | 11,040 | (26) g (939) f | 10,075 |
| U.S. Treasury Debt | 3,836 | | 11,400 d 884 d (8,060) n | 8,060 | | 8,060 |
| Accrued expenses | 35,921 | (635) a — h | — h | 35,286 | — h | 35,286 |
| Total current liabilities | 73,911 | (1,513) | 4,224 | 76,622 | (965) | 75,657 |
| **Financing and Insurance Operations Liabilities** | | | | | | |
| Accounts payable | 23 | — | — | 23 | — | 23 |
| Debt | 1,192 | — | — | 1,192 | — | 1,192 |
| Other liabilities and deferred income taxes | 607 | — | — | 607 | — | 607 |
| Total Financing and Insurance Operations liabilities | 1,822 | — | — | 1,822 | — | 1,822 |
| **Non-Current Liabilities** | | | | | | |
| Long-term debt | 29,594 | (23,049) b | — | 6,545 | (576) g | 5,969 |
| Postretirement benefits other than pensions | 28,919 | — | (242) n | 28,677 | — | 28,677 |
| Pensions | 25,178 | — | — | 25,178 | — | 25,178 |
| Other liabilities and deferred income taxes | 16,963 | — h | (165) n,h | 16,798 | — h | 16,798 |
| Total non-current liabilities | 100,654 | (23,049) | (407) | 77,198 | (576) | 76,622 |
| **Total liabilities** | 176,387 | (24,562) | 3,817 | 155,642 | (1,541) | 154,101 |
| Minority interests | 814 | — | — | 814 | — | 814 |
| **Stockholders' Deficit** | | | | | | |
| Preferred stock | — | — | — | — | — | — |
| Preference stock | — | — | — | — | — | — |
| $1 2/3 par value common stock, historical $0.01 par value for pro forma | 1,017 | 9,205 c | (62,154) m 51,936 n | 4 | — | 4 |
| Capital surplus (principally additional paid-in capital) | 15,755 | (6,885) c | 62,154 m (38,848) n | 32,176 | 734 g | 32,910 |
| Accumulated deficit | (70,610) | 21,163 b | (4,863) n | (54,310) | (117) g 939 f (33) f | (53,521) |
| Accumulated other comprehensive loss | (32,316) | — | 242 n | (32,074) | (24) g | (32,098) |
| Total stockholders' deficit | (86,154) | 23,483 | 8,467 | (54,204) | 1,499 | (52,705) |
| **Total liabilities, minority interests, and stockholders' deficit** | $ 91,047 | $ (1,079) | $ 12,284 | $102,252 | $ (42) | $102,210 |

See Accompanying Notes to Unaudited Pro Forma Condensed Consolidated Financial Information for the Exchange Offers.

86

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007451

## GENERAL MOTORS CORPORATION AND SUBSIDIARIES

### UNAUDITED PRO FORMA CONDENSED CONSOLIDATED STATEMENT OF OPERATIONS FOR THE EXCHANGE OFFERS

#### For the Year Ended December 31, 2008

#### (Dollars in millions, except per share amounts)

| | Year Ended December 31, 2008 Historical | Pro Forma Adjustments for the Exchange Offers | | Year Ended December 31, 2008 Pro Forma for the Exchange Offers | Other Pro Forma Adjustments | Year Ended December 31, 2008 Pro Forma |
|---|---|---|---|---|---|---|
| | | Exchange of Old Notes and New Equity | U.S. Treasury Loans and VEBA Exchange | | | |
| **Net sales and revenue** | | | | | | |
| Automotive sales . . . . . . . . . . . . . | $ 147,732 | $ — | $ — | $147,732 | $ — | $147,732 |
| Financial services and insurance revenue . . . . . . . . . . . . . . . . . . . | 1,247 | — | — | 1,247 | — | 1,247 |
| Total net sales and revenue . . . . . . . | 148,979 | — | — | 148,979 | — | 148,979 |
| **Costs and expenses** | | | | | | |
| Automotive cost of sales . . . . . . . | 149,311 | — | (300) p | 149,011 | — | 149,011 |
| Selling, general and administrative expense . . . . . . | 14,253 | — | — | 14,253 | — | 14,253 |
| Financial services and insurance expense . . . . . . . . . . . . . . . . . . | 1,292 | — | — | 1,292 | — | 1,292 |
| Other expenses . . . . . . . . . . . . . . | 5,407 | — | — | 5,407 | — | 5,407 |
| Total costs and expenses . . . . . . . | 170,263 | — | (300) | 169,963 | — | 169,963 |
| Operating loss . . . . . . . . . . . | (21,284) | — | 300 | (20,984) | — | (20,984) |
| Equity in loss of GMAC LLC . . . . | (6,183) | — | — | (6,183) | — q | (6,183) |
| Automotive and other interest expense . . . . . . . . . . . . . . . . . . . . | (2,345) | 1,873 i | (858) j | (1,066) | (61) j | (1,361) |
| | | | (327) k | | (127) k | |
| | | | 591 o | | (107) g | |
| Automotive interest income and other non-operating income, net . . . . . . . . . . . . . . . . . . . . . . . | 424 | — | — | 424 | — | 424 |
| Loss from continuing operations before income taxes, equity income and minority interests . . . | (29,388) | 1,873 l | (294) l | (27,809) | (295) l | (28,104) |
| Income tax expense . . . . . . . . . . . | 1,766 | — | — | 1,766 | — | 1,766 |
| Equity income. net of tax . . . . . . . . | 186 | — | — | 186 | — | 186 |
| Minority interests, net of tax . . . . . . | 108 | — | — | 108 | — | 108 |
| **Loss from continuing operations** . . . . . . . . . . . . . . . . . . . | $ (30,860) | $1,873 | $ (294) | $ (29,281) | $(295) | $ (29,576) |
| **Before reverse stock split:** | | | | | | |
| Loss from continuing operations per share, basic and diluted . . . | $ (53.32) | | | $ (0.79) | | $ (0.79) |
| Weighted average common shares outstanding, basic and diluted (millions) . . . . . . . . . . | 579 | 5,523* | 31,162* | 37,264 | — | 37,264 |
| **After reverse stock split:** | | | | | | |
| Loss from continuing operations per share, basic and diluted . . . | $(5, 329.88) | | | $ (78.50) | | $ (79.29) |
| Weighted average common shares outstanding, basic and diluted (millions) . . . . . . . . . . | 6 | 55 | 312 | 373 | — | 373 |

---

\* The shares utilized for each pro forma adjustment are calculated based on exchange rates as of December 31, 2008.

See Accompanying Notes to Unaudited Pro Forma Condensed Consolidated Financial Information for the Exchange Offers.

87

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007452

**GENERAL MOTORS CORPORATION AND SUBSIDIARIES**

**NOTES TO UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION FOR THE EXCHANGE OFFERS**

**Notes**

The pro forma adjustments illustrated below assume, among other things, the satisfaction of the U.S. Treasury Condition, which we currently believe will require the exchange of at least 90% of the aggregate principal amount (or, in the case of discount notes, accreted value) of our old notes (including at least 90% of the aggregate principal amount of our outstanding old Series D notes) will need to be tendered in the exchange offers or called for redemption pursuant to the call option (in the case of the non-USD old notes); and that as consideration for the old notes, the tendering holders will receive 225 shares of GM common stock for each 1,000 U.S. dollar equivalent of principal amount (or accreted value as of the settlement date, if applicable) of old notes exchanged. The actual exchange of our old notes could be more or less than the level of participation assumed for the exchange offers which would impact the pro forma total debt and pro forma stockholders' deficit as of December 31, 2008, and would impact the pro forma interest expense and pro forma loss per share for the year ended December 31, 2008. Additionally, we have estimated the fair value of the shares of GM common stock provided to tendering holders, the U.S. Treasury (or its designee) and used for the VEBA Modifications by using a discounted cash flow methodology based on the assumptions used in our current Viability Plan. The final accounting treatment for the exchange offers will be based on the market price of our common stock at or about the date the exchange offers are consummated, and that market price per share could differ significantly from the estimated per share amount used in unaudited pro forma condensed consolidated financial information for the exchange offers. The estimated fair value may fluctuate significantly through the date of the consummation of the exchange offers. The unaudited pro forma condensed consolidated financial information for the exchange offers does not give effect to the Labor Modifications or the restructuring and other actions (described further under *"The Restructuring—Viability Plan"*) contemplated in our current Viability Plan because such actions currently do not meet the requirements for pro forma presentation under Article 11 of Regulation S-X. Although management expects that the Labor Modifications may result in cost savings in the future, no assurance can be given that these anticipated cost savings will be realized.

For purposes of the unaudited pro forma condensed consolidated financial information we have assumed the consummation of the exchange offers with holders tendering in the exchange offers at the Assumed Participation Level and that:

- the aggregate amount of GM common stock issued in connection with the exchange offers will be approximately 5.5 billion shares,

- the aggregate amount of GM common stock issued to the U.S. Treasury (or its designee) pursuant to the U.S. Treasury Debt Conversion will be approximately 31.2 billion shares,

- the aggregate amount of GM common stock to be issued to the New VEBA for the VEBA Modifications will be approximately 23.2 billion shares when issued on the Implementation Date (as defined in (n) below), and

- the aggregate amount of GM common stock retained by existing stockholders will be approximately 0.6 billion shares.

The assumed pro forma shares to be issued to the New VEBA will not be outstanding until the Implementation Date, and for purposes of the pro forma financial information the dilutive effect of 23.2 billion shares to be issued to the New VEBA at a future date are reflected in the pro forma adjustments and estimated fair value per share of GM common stock but the shares are not reflected as issued and outstanding pro forma shares of GM common stock. Upon issuance of the GM common stock to the New VEBA, tendering noteholders will have their ownership interest diluted to 9.1% at the Assumed Participation Level. Because the various transactions that will occur on the Implementation Date are not reflected in the unaudited pro forma condensed

88

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007453

**GENERAL MOTORS CORPORATION AND SUBSIDIARIES**

**NOTES TO UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION FOR THE EXCHANGE OFFERS—Continued**

consolidated financial information (of which the pro forma shares to be issued are just one component part), such shares are not reflected as issued for purposes of the unaudited pro forma condensed consolidated financial information. The final allocation of GM common stock between the U.S. Treasury (or its designee) and the New VEBA will be determined in the future.

(a)  To reflect the following adjustments to cash and cash equivalents pursuant to the exchange offers:

| (Dollars in millions) | Amounts |
|---|---|
| Estimated cost of the exchange offers charged to earnings | $(215) |
| Cash payments relating to accrued and unpaid interest on old notes made to debt holders | (635) |
| Total | $(850) |

(b)  To reflect the decrease in the total carrying amount of debt (excluding the effects of the U.S. Treasury Debt Conversion) and the effects on accumulated deficit, after applying troubled debt restructuring accounting upon consummation of the exchange offers with holders tendering in the exchange offers at the Assumed Participation Level:

| (Dollars in millions) | Amounts |
|---|---|
| Decrease in short-term borrowings and current portion of long-term debt | S    (878) |
| Decrease in long-term debt | (23,049) |
| Decrease in debt issuance costs | 229 |
| Total decrease in debt and debt issuance costs due to the exchange of old notes | (23,698) |

Reduced by:

| | |
|---|---|
| Estimated fair value of shares issued pursuant to the exchange offers (5.5 billion shares of GM common stock issued at an estimated fair value of $0.42 per share before giving effect to the 1-for-100 reverse stock split) | 2,320 |
| Estimated cost of the exchange offers | 215 |
| Gain on restructuring of debt due to the exchange offers | $(21,163) |

The exchange offers will be accounted for as a troubled debt restructuring pursuant to the provisions of SFAS No. 15. Troubled debt restructuring accounting requires the comparison of the carrying value of the existing debt tendered to the estimated fair value of the equity granted in full settlement of the debt less any related fees or expenses. If the carrying value of the tendered debt exceeds the estimated fair value of the equity granted in settlement of the old notes, a troubled debt restructuring gain would be recognized at the date the exchange is consummated. Any pro forma gain we would realize through the application of troubled debt restructuring accounting would be reflected in accumulated deficit on the unaudited pro forma condensed consolidated balance sheet for the exchange offers, and would be excluded from the unaudited pro forma condensed consolidated statement of operations for the exchange offers since this gain on restructuring is not expected to have a continuing impact on us. At December 31, 2008, the carrying value of the old notes subject to the exchange offers is approximately $26.6 billion with a stated par value of approximately $27.3 billion.

89

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007454

**GENERAL MOTORS CORPORATION AND SUBSIDIARIES**

**NOTES TO UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION FOR THE EXCHANGE OFFERS—Continued**

The following table sets forth an unaudited pro forma sensitivity analysis for the exchange offers to estimate the effect of changes in the percentage of holders electing to tender their old notes and to estimate the effect of changes in the estimated fair value per share of GM common stock issued to tendering holders as exchange consideration. The estimates presented in this unaudited pro forma sensitivity analysis may differ from actual results, and these differences may be material. In the table below, any pro forma gain we would realize through the application of troubled debt restructuring accounting is reflected in accumulated deficit on the unaudited pro forma condensed consolidated balance sheet for the exchange offers, and is excluded from the unaudited pro forma condensed consolidated statement of operations for the exchange offers since this gain on restructuring is not expected to have a continuing impact on us.

| | Assuming 90% Aggregate Tender or Redemption of Old Notes, Pro Forma Impact on | | | Assuming 100% Tender of Old Notes, Pro Forma Impact on | | |
|---|---|---|---|---|---|---|
| Estimated fair value of equity per share (assumed share price, before giving effect to the 1-for-100 reverse stock split) | Common stock and capital surplus | Accumulated deficit, arising from gain | Total debt | Common stock and capital surplus | Accumulated deficit, arising from gain | Total debt |
| (Dollars in millions, except share price) | | | | | | |
| $1.00 | $5,523 | $(17,960) | $(23,927) | $6,136 | $(19,980) | $(26,585) |
| $0.75 | 4,142 | (19,341) | (23,927) | 4,602 | (21,514) | (26,585) |
| $0.50 | 2,761 | (20,722) | (23,927) | 3,068 | (23,048) | (26,585) |
| $0.42 | 2,320 | (21,163) | (23,927) | 2,577 | (23,539) | (26,585) |
| $0.25 | 1,381 | (22,102) | (23,927) | 1,534 | (24,582) | (26,585) |
| $0.10 | 552 | (22,931) | (23,927) | 614 | (25,502) | (26,585) |
| $0.00 | — | (23,483) | (23,927) | — | (26,116) | (26,585) |

\*    Note the table above does not show the balance sheet accounts of cash or other assets that will be reduced for the estimated costs of the exchange offers of $215 million and the decrease in debt issuance costs of $229 million at the Assumed Participation Level and $254 at 100% participation in the exchange offers.

We have estimated the fair value per share of GM common stock issued to the tendering holders by using a discounted cash flow methodology based on the assumptions included in our current Viability Plan, which assumes the shares to be issued to the New VEBA. We have prepared the unaudited pro forma condensed consolidated financial information based on an estimated fair value of $0.42 per share before giving effect to the 1-for-100 reverse stock split, which is derived from the discounted cash flows in our current Viability Plan utilizing a 10.5% weighted average cost of capital ("WACC"). This per share amount is based on an estimated equity value of $25.4 billion. The following provides additional unaudited sensitivity analyses pertaining to the estimated fair value per share of the GM common stock issued to the tendering holders:

- In estimating our enterprise and equity values, a WACC of 10.5% was used as the discount rate for measuring the present value of the principal projected cash flows. A 1% increase/decrease in the discount rate would decrease/increase the estimated equity value by $1.9 billion (decrease/increase the estimated fair value by $0.03 per share before giving pro forma effect to the reverse stock split). Assuming a WACC of 27.9%, the estimated fair value per share of GM common stock is $0.00.

- In estimating our enterprise and equity values, the U.S. seasonally adjusted annual rate ("U.S. SAAR") of light vehicle sales for the years 2009 through 2014 was assumed to be 10.5, 12.5, 14.3, 16.0, 16.4 and 16.8 million units, respectively. A 1.0 million unit increase in the U.S. SAAR for the years 2009 and

90

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER
NGM000007455

**GENERAL MOTORS CORPORATION AND SUBSIDIARIES**

**NOTES TO UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION FOR THE EXCHANGE OFFERS—Continued**

2010 combined with a 1.5 million unit increase in the U.S. SAAR for the years 2011 through 2014 would increase the estimated equity value by $12.2 billion (resulting in increase in the estimated fair value by $0.20 per share before giving pro forma effect to the reverse stock split). A 1.0 million unit decrease in the U.S. SAAR for the years 2009 and 2010 combined with a 1.5 million unit decrease in the U.S. SAAR for the years 2011 through 2014 would decrease the estimated equity value by $12.8 billion (resulting in decrease in the estimated fair value by $0.21 per share before giving pro forma effect to the reverse stock split).

- In estimating our enterprise and equity values, our GMNA market share for the years 2009 through 2014 was assumed to be 19.5%, 18.9%, 18.6%, 18.4%, 18.5% and 18.3%, respectively. A one percentage point increase in the GMNA market share for these years would increase the estimated equity value by $10.8 billion (resulting in an increase in the estimated fair value by $0.18 per share before giving pro forma effect to the reverse stock split). A one percentage point decrease in the GMNA market share for these years would decrease the estimated equity value by $11.4 billion (resulting in a decrease in the estimated fair value by $0.19 per share before giving pro forma effect to the reverse stock split).

- In estimating our enterprise and equity values, our GMNA contribution margin for the years 2009 through 2014 was assumed to be 29.9%, 31.7%, 31.4%, 31.0%, 31.2% and 31.0%, respectively. A one percentage point increase in the GMNA contribution margin for these years would increase the estimated equity value by $6.2 billion (resulting in an increase in the estimated fair value by $0.10 per share before giving pro forma effect to the reverse stock split). A one percentage point decrease in the GMNA contribution margin for these years would decrease the estimated equity value by $6.4 billion (resulting in decrease in the estimated fair value by $0.11 per share before giving pro forma effect to the reverse stock split).

We continue to work towards a restructuring of our German and certain other European operations, which could include a third party investment in a new vehicle manufacturing company that would own all or a significant part of our European operations. We are currently in talks with the German government and several parties with respect to such an investment. If consummated, this restructuring could significantly reduce our ownership interest and control over substantially all of our GME segment. For purposes of estimating the consolidated equity value and related estimated fair value per share of GM common stock used in the unaudited condensed consolidated financial information for the exchange offers we have eliminated from our estimated consolidated equity value 50% of the estimated value of our GME segment.

The final accounting treatment for the exchange offers will be based on the market price of our common stock at or about the date the exchange offer is consummated, and that market price per share could differ significantly from the estimated per share amount used in these pro forma financial statements.

(c)    Adjustment to capital to reflect the issuance of shares of GM common stock pursuant to the exchange offers before giving effect to the 1-for-100 reverse stock split:

| (Dollars in millions) | Amounts |
|---|---|
| Increase in $1⅔ par value common stock due to the issuance of shares of GM common stock (5.5 billion shares) | $ 9,205 |
| Adjustment to additional paid-in capital due to issuance of shares of GM common stock | (6,885) |
| Estimated fair value of 5.5 billion shares of GM common stock issued | $ 2,320 |

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007456

**GENERAL MOTORS CORPORATION AND SUBSIDIARIES**

**NOTES TO UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION FOR THE EXCHANGE OFFERS—Continued**

(d)  To reflect adjustments to cash and cash equivalents to give effect to the following transactions:

| (Dollars in millions) | Amounts |
|---|---|
| Increase in borrowings from the U.S. Treasury of $5.4 billion received on January 21, 2009, $4.0 billion received on February 17, 2009 and $2.0 billion received on April 24, 2009 pursuant to the loan and security agreement with the U.S. Treasury (the "First U.S. Treasury Loan Agreement") as amended on April 22, 2009 to provide us with $2.0 billion in additional working capital loans ................................. | $11,400 |
| Decrease due to consent and issuance costs associated with the modifications, subsequent to December 31, 2008, of our $4.5 billion secured revolving credit facility, a $1.5 billion term loan and a $125 million secured credit facility (collectively, the "Secured Debt Modifications") ......................................................... | (63) |

As reflected in the table above, on April 22, 2009, we and the U.S. Treasury entered into an amendment to the First U.S. Treasury Loan Agreement, pursuant to which, among other things, the U.S. Treasury agreed to provide us $2.0 billion in additional working capital loans under the First U.S. Treasury Loan Agreement and we borrowed $2.0 billion on April 24, 2009. In connection with the amendment to provide the $2.0 billion of additional loans, we issued to the U.S. Treasury a promissory note in an aggregate principal amount of $133.4 million as part of the compensation for the additional loans and, these borrowings have been reflected as a pro forma adjustment.

In addition, we borrowed an additional $884 million from the U.S. Treasury pursuant to an additional loan and security agreement with the U.S. Treasury (the "Second U.S. Treasury Loan Agreement") on January 16, 2009. Pursuant to the terms of the Second U.S. Treasury Loan Agreement, we were required to use these proceeds to purchase an additional 10.9% ownership interest in GMAC, increasing our common equity interest in GMAC from 49.0% to 59.9%. We have reflected the impact of these transactions as additional equity in net assets of GMAC and additional borrowings on the accompanying unaudited pro forma condensed consolidated balance sheet for the exchange offers at December 31, 2008.

The borrowings from the First U.S. Treasury Loan Agreement and the Second U.S. Treasury Loan Agreement have been recorded as current liabilities. The First U.S. Treasury Loan Agreement required us to submit to the President's Designee, by March 31, 2009, the Company Report detailing, among other things, the progress we had made in implementing our Viability Plan. On March 30, 2009, the President's Designee found that our Viability Plan, in its then-current form, was not viable and would need to be revised substantially in order to lead to a viable GM. On March 30, 2009, following the President's Designee's determination, we and the U.S. Treasury entered into amendments to the First U.S. Treasury Loan Agreement and the Second U.S. Treasury Loan Agreement to postpone the Certification Deadline to June 1, 2009 and, with respect to the First U.S. Treasury Loan Agreement, to also postpone the deadline by which we are required to provide the Company Report to June 1, 2009. On or before June 1, 2009, we must deliver to the President's Designee evidence that the following have occurred: (a) the Labor Modifications have been approved by the members of our unions, (b) all necessary approvals of the VEBA Modifications, other than regulatory and judicial approvals, have been received, and (c) an exchange offer to implement a bond exchange has been commenced. If the President's Designee does not certify our Viability Plan, then the advances and other obligations under the U.S. Treasury Loan Agreements would become due and payable on the 30th day after the Certification Deadline.

(e)  In order to execute our current Viability Plan, we currently forecast a need for U.S. Treasury funding totaling $27.0 billion, representing the $22.5 billion requested in our February 17 Viability Plan submission under our baseline scenario, plus an additional $4.5 billion needed to implement incremental restructuring

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER
NGM000007457

**GENERAL MOTORS CORPORATION AND SUBSIDIARIES**

**NOTES TO UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION FOR THE EXCHANGE OFFERS—Continued**

actions, cover higher projected negative operating cash flow primarily due to lower forecasted vehicle sale volumes, and to compensate for lower than originally forecasted proceeds from asset sales and other sources of financing, including Section 136 Loans.

The following amounts are not included in the unaudited pro forma financial statements as we do not yet have definitive agreements:

- We currently forecast that we will need an additional $2.6 billion of working capital loans from the U.S. Treasury prior to June 1, 2009 and $9.0 billion thereafter. If we were to receive the additional $2.6 billion of loans and $9.0 billion in funding, we expect we would be required to issue to the U.S. Treasury promissory notes in an aggregate principal amount of $173.4 million as part of the compensation for these loans and $600.3 million as part of the compensation for this funding.

- The current Viability Plan currently assumes that we will receive $5.7 billion of Section 136 Loans and an additional $5.6 billion in funding from foreign governments.

We cannot assure you that the U.S. Treasury will provide any additional loans. In addition, we do not expect that the Department of Energy will determine that we meet the viability requirement for eligibility to receive Section 136 Loans unless and until the U.S. Treasury approves our Viability Plan. Even if the U.S. Treasury approves our Viability Plan, we cannot be certain that the Department of Energy will approve our requests for Section 136 Loans. We also are in the process of requesting temporary loan support from certain foreign governments, including Canada, Germany, the United Kingdom, Sweden and Thailand. We believe that obtaining funding from these governmental sources will be necessary to continue to operate our business in its anticipated scope. We have not received any commitment with regard to the additional proposed borrowings from either the U.S. government or any foreign governments, and there is no assurance that we will be successful in obtaining the additional governmental funding we will need to continue to operate our business. Moreover, even if we receive commitments for the required funding (our receipt of evidence of the U.S. Treasury Commitment is a condition to the consummation of the exchange offers), we do not know what the terms of, and conditions for, borrowing will be and cannot be sure we will be able to satisfy them as and when funding is needed. We have not included the requested additional funding outlined above in our unaudited pro forma condensed consolidated financial information for the exchange offers. However, interest and other costs associated with such borrowings should they occur would be significant.

(f) To reflect the costs of $63 million related to the Secured Debt Modifications, consisting of $33 million recognized as a cost of debt extinguishment and $30 million recognized as additional debt issuance costs.

Additionally, certain secured borrowing facilities under the Secured Debt Modifications qualify for extinguishment accounting, which requires a $939 million reduction in the carrying value of debt to an estimated fair value of $530 million. This amount will be recorded as a gain on extinguishment in the three months ended March 31, 2009. This gain is reflected in accumulated deficit on the unaudited pro forma condensed consolidated balance sheet for the exchange offers, and is excluded from the unaudited pro forma condensed consolidated statement of operations for the exchange offers since this gain on restructuring is not expected to have a continuing impact on us.

(g) To reflect the application of FSP No. APB 14-1, which requires issuers of convertible debt securities within its scope to separate the equity component of the security from the debt component of the security, resulting in the debt component being recorded without consideration given to the conversion feature. FSP No. APB 14-1 was only applied to the carrying cost of the convertible old notes as of December 31, 2008 since they are within the scope of FSP No. APB 14-1. The pro forma adjustments in the table below reflect the

93

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007458

**GENERAL MOTORS CORPORATION AND SUBSIDIARIES**

**NOTES TO UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION FOR THE EXCHANGE OFFERS—Continued**

application of FSP No. APB 14-1, which results in a cumulative effect of a change in accounting principle, as if this standard had been applied on December 31, 2008.

| (Dollars in millions) | Amounts |
|---|---|
| Decrease in debt issuance costs | $ (9) |
| Decrease in short-term borrowings and current portion of long-term debt | (26) |
| Decrease in long-term debt | (576) |
| Increase in capital surplus due to conversion feature | 734 |
| Increase in accumulated deficit due to cumulative effect of a change in accounting principle | 117 |
| Increase in accumulated other comprehensive loss | 24 |

The reduction in the debt balance is accounted for as a discount on the debt, and is amortized as additional interest expense over the term of the debt. The incremental increase in interest expense for the year ended December 31, 2008 due to the application of FSP No. APB 14-1 is $107 million.

The adjustment to accumulated deficit reflects the amortization of the debt discount prior to December 31, 2008, offset by the tax effects of the application of FSP No. APB 14-1.

(h) We have significant tax attributes for which the related deferred tax assets have been fully offset by valuation allowances in our financial statements. The gain on extinguishment will be principally offset by the utilization of these attributes. The tax effect, if any, will not be reflected in the unaudited pro forma condensed consolidated statement of operations for the exchange offers since the cancellation of indebtedness income is a non-recurring item.

On February 17, 2009, the American Recovery and Reinvestment Act amended Code Section 382 of the Internal Revenue Code. Code Section 382 imposes certain limitations on a corporation's ability to utilize certain tax attributes (such as net operating losses) after an ownership change. The American Recovery and Reinvestment Act amended these rules to provide that the Code Section 382 limitations will not apply to an ownership change that occurs pursuant to a restructuring plan that both: (i) is required under a loan agreement or a commitment for a line of credit entered into with the Department of the Treasury under the Emergency Economic Stabilization Act of 2008 and (ii) is intended to result in a rationalization of the costs, capitalization and capacity with regard to the manufacturing workforce of and suppliers to the taxpayer and its subsidiaries. In measuring the impact of the tax consequences of the pro forma information, we included the effects of the American Recovery and Reinvestment Act as if it were in effect as of December 31, 2008.

GM Nova Scotia is expected to realize a forgiven amount under the debt forgiveness rules of the Income Tax Act (Canada) as a result of the implementation of the exchange offers for the old GM Nova Scotia notes and any exercise of the call option to settle the old GM Nova Scotia notes, and may otherwise realize forgiven amounts under these rules as a result of the settlement of other GM intercompany obligations owing by GM Nova Scotia as part of the implementation of the exchange offers and the exercise of the call option. The final impact to GM Nova Scotia in any such case under the rules of the Income Tax Act (Canada) is uncertain. However, the realization of a forgiven amount by GM Nova Scotia could cause adverse Canadian tax consequences to GM Nova Scotia for these purposes, including the inclusion of up to half of any such forgiven amount in computing the income of GM Nova Scotia. The unaudited pro forma condensed consolidated balance sheet does not include any adjustment for these potential tax consequences.

(i) To reflect the decrease in interest expense equal to $1,873 million due to the decrease in debt (excluding the effects of the U.S. Treasury Debt Conversion) from the consummation of the exchange offers which we have assumed will result in the exchange or redemption pursuant to the call option (in the case of the non-

94

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007459

**GENERAL MOTORS CORPORATION AND SUBSIDIARIES**

**NOTES TO UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION FOR THE EXCHANGE OFFERS—Continued**

USD old notes) of 90% of the aggregate principal amount (or, in the case of discount notes, accreted value) of our old notes. If 100% of the holders tender in the exchange offers, the reduction in interest expense would increase by $210 million to $2,083 million.

(j)  To reflect adjustments to interest expense to give effect to the following transactions:

| (Dollars in millions) | Amounts |
|---|---|
| Increase in cash interest expense due to additional borrowings of $13.4 billion under the First U.S. Treasury Loan Agreement which includes borrowings from the U.S. Treasury of $5.4 billion on January 21, 2009 and $4.0 billion on February 17, 2009 | $670 |
| Increase in cash interest expense due to the promissory note issued to the U.S. Treasury of $749 million on December 31, 2008 pursuant to the additional note agreement with the U.S. Treasury (the "U.S. Treasury Promissory Note") | 37 |
| Increase in cash interest expense due to additional borrowings from the U.S. Treasury of $884 million under the Second U.S. Treasury Loan Agreement on January 16, 2009 | 44 |
| Increase in cash interest expense due to the additional working capital loans under the First U.S. Treasury Loan Agreement from the U.S. Treasury of $2.0 billion on April 24, 2009 | 100 |
| Increase in cash interest expense due to the promissory note issued to the U.S. Treasury of $133.4 million on April 24, 2009 pursuant to the additional note agreement with the U.S. Treasury (the "U.S. Treasury Additional Promissory Note") | 7 |
| **U.S. Treasury Total** | **$858** |
| Increase in cash interest expense due to an increase in the interest rates on our $4.5 billion secured revolving credit facility, a $1.5 billion term loan and a $125 million secured credit facility modified subsequent to December 31, 2008. The modifications also waived our non-compliance with certain covenants in these agreements | $ 61 |

The pro forma adjustments to reflect the increase in the cash interest expense relating to the U.S. Treasury Debt have been prepared using an interest rate that was determined using the higher of the three-month LIBOR rate at year end or 2%, plus an additional 3% pursuant to the terms of the relevant agreements. At December 31, 2008, the interest rate used to estimate the pro forma interest expense adjustments was 5% since the three-month LIBOR rate was lower than the 2% required minimum. A 1/8 percent variance in the rate used to determine interest expense on all of the loans would increase/decrease our earnings by $22 million.

(k)  To reflect amortization of discount and debt issuance costs equal to $327 million associated with the $13.4 billion under the First U.S. Treasury Loan Agreement, the $749 million under the U.S. Treasury Promissory Note, the working capital loans under the First U.S. Treasury Loan Agreement from the U.S. Treasury and the U.S. Treasury Additional Promissory Note, all amortized over the contractual maturity.

To reflect amortization of discount of $127 million associated with the Secured Debt Modifications, all amortized over the contracted maturity.

(l)  The adjustments to interest expense and postretirement benefits other than pension costs do not result in an income tax consequence due to our ability to utilize our significant tax attributes, for which the related deferred tax assets were previously offset by a valuation allowance.

95

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007460

**GENERAL MOTORS CORPORATION AND SUBSIDIARIES**

**NOTES TO UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION FOR THE EXCHANGE OFFERS—Continued**

(m) To reflect the par value reduction of GM common stock to $0.01 per share (the "par value reduction") and to reflect the 1-for-100 reverse stock split of GM common stock (the "reverse stock split") whereby each 100 shares of GM common stock registered in the name of a stockholder at the effective time of the reverse stock split will be converted into one share of GM common stock. The reverse stock split will occur following the effectiveness of the common stock increase. The 23.2 billion shares to be issued in the VEBA Modifications are not included in the adjustment below because the issuance of those shares has not been reflected as a pro forma adjustment as described in Note (n) below.

The reverse stock split and the reduction in par value of GM common shares will result in the following effect on our unaudited pro forma condensed consolidated balance sheet:

| | Decrease in common stock | Increase to capital surplus |
|---|---|---|
| **(Dollars in millions)** | | |
| Effect on historical 610 million shares outstanding at December 31, 2008 | $ (1,017) | $ 1,017 |
| Decrease in $1⅔ par value common stock for the 5.5 billion shares issued pursuant to the exchange offers and 31.2 billion shares issued pursuant to the U.S. Treasury Debt Conversion | (61,137) | 61,137 |
| Total effect | $(62,154) | $62,154 |

(n) We are currently in discussions with the U.S. Treasury regarding the terms of the U.S. Treasury Debt Conversion. For purposes of this prospectus, we have set as a condition to the closing of the exchange offers that we would issue GM common stock to the U.S. Treasury (or its designee) in exchange for (a) full satisfaction and cancellation of at least 50% of the face amount of our outstanding U.S. Treasury Debt at June 1, 2009 (such 50% currently estimated to be approximately $10 billion) and (b) full satisfaction and cancellation of our obligations under the warrant issued to the U.S. Treasury. For purposes of the unaudited pro forma financial information for the exchange offers, we have assumed that the U.S. Treasury will receive 51%, or approximately 31.2 billion shares, of GM common stock in satisfaction and cancellation of 50% of our outstanding U.S. Treasury Debt as of June 1, 2009, with a pro forma carrying value of approximately $8.1 billion. The difference between the actual expected reduction of $10 billion referred to above and the $8.1 billion reduction reflected in the pro forma adjustment is due to 50% of (i) differences between the face and pro forma carrying amount of the debt of $1.1 billion, and (ii) the additional $2.8 billion of working capital loans from the U.S. Treasury for which we would receive $2.6 billion of proceeds prior to June 1, 2009 but that is not reflected as a pro forma adjustment as explained in Note (e).

In addition, we and the U.S. Treasury are currently in discussions with the UAW regarding the terms of the VEBA Modifications. We have proposed, and this prospectus assumes as a condition to the closing of the exchange offers, that the VEBA Modifications would provide, among other things, for the issuance of shares of GM common stock to the New VEBA in full satisfaction of at least $10 billion and up to $20 billion of obligations under the VEBA settlement agreement. Under the VEBA settlement agreement, our obligations to provide retiree healthcare coverage for UAW retirees and beneficiaries will terminate and become the obligations of the new plan and the New VEBA at the "Implementation Date" that for purposes of the unaudited pro forma condensed consolidated financial information we have assumed to be December 31, 2009. On this date, we would account for the establishment and funding of the New VEBA as a settlement and termination of our UAW hourly medical plan and mitigation plan. On the Implementation Date, we would issue GM common stock to the New VEBA and those shares would be considered issued and outstanding, and our liability for OPEB under SFAS No. 106, "Employers' Accounting for

96

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007461

**GENERAL MOTORS CORPORATION AND SUBSIDIARIES**

**NOTES TO UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL
INFORMATION FOR THE EXCHANGE OFFERS—Continued**

Postretirement Benefits Other Than Pension" ("SFAS No. 106") for the UAW hourly medical plan and
mitigation plan would be eliminated and replaced by the estimated fair value of the consideration remaining
to be provided to the New VEBA. Because the various transactions that will occur on the Implementation
Date are not reflected in the pro forma financial statements (of which the shares to be issued to the New
VEBA are just one component part), the 23.2 billion shares to be issued to the New VEBA are not reflected
as issued for purposes of the unaudited pro forma financial statements. The issuance of the shares to the
New VEBA will have an additional dilutive effect on our existing stockholders.

While the total percentage of GM common stock assumed to be issued to the U.S. Treasury on June 1, 2009
and to the New VEBA on the Implementation Date equals 89% at the 100% participation level and 89.9% at
the Assumed Participation Level, neither (a) the percentage to be issued to each such party, nor (b) the
percentage of each parties' outstanding obligation owed by GM to be satisfied upon the U.S. Treasury Debt
Conversion and VEBA Modifications is known, and are all subject to negotiation.

Upon the completion of these transactions as currently assumed and the issuance of GM common stock to
the New VEBA on the Implementation Date, based on the satisfaction of the U.S. Treasury Condition,
which we currently believe will require the exchange of at least 90% of the aggregate principal amount (or,
in the case of discount notes, accreted value) of our old notes (including at least 90% of the aggregate
principal amount of the outstanding Series D notes) to be tendered in the exchange offers or called for
redemption pursuant to the call option (in the case of the non-USD old notes):

(a)  the aggregate amount of GM common stock to be issued in connection with the exchange offers, the
U.S. Treasury Debt Conversion and the proposed VEBA Modifications would be approximately
59.9 billion shares which, based on the approximately 610 million shares of GM common stock
outstanding as of December 31, 2008, would represent approximately 99% of the pro forma GM
common stock upon consummation of the above transactions, and

(b)  the percentage of pro forma GM common stock to be held by

    i.   holders of old notes tendered in the exchange offers would be 9.1%;

    ii.  the U.S. Treasury (or its designee) and the New VEBA would collectively be 89.9%; and

    iii. existing GM common stockholders would be approximately 1.0%.

Assuming full participation in the exchange offers, the percentage of pro forma GM common stock to be
held by (i) holders of old notes tendered in the exchange offers would be 10%, (ii) the U.S. Treasury (or its
designee) and the New VEBA would collectively be 89%, and (iii) existing GM common stockholders
would be approximately 1%.

If ultimately agreed to, the U.S. Treasury Debt Conversion would reduce outstanding debt by the amount of
debt converted and decrease stockholders' deficit by a similar amount less any related fees or expenses.
However, the amount of U.S. Treasury Debt to be extinguished in exchange for at least 50% of GM common
stock may vary. If 50% of our outstanding U.S. Treasury Debt at June 1, 2009 is extinguished for 51% of the
pro forma GM common stock issued, it would result in a settlement loss of approximately $4.9 billion based
on the debt levels assumed for the pro forma adjustments and the carrying value of the warrant.

Likewise, the percentage of GM common shares to be issued to the New VEBA and the percentage of our
obligation to the New VEBA to be settled through the VEBA Modifications is subject to change. However,
unlike the shares to be issued in the exchange offers and in the U.S. Treasury Debt Conversion, these shares
will not be issued until the Implementation Date and are therefore not reflected as being outstanding for
purposes of the unaudited pro forma condensed consolidated financial information. For purposes of the

97

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007462

**GENERAL MOTORS CORPORATION AND SUBSIDIARIES**

**NOTES TO UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION FOR THE EXCHANGE OFFERS—Continued**

unaudited pro forma condensed consolidated financial information for the exchange offers, it is assumed that 50% of our $20 billion in obligations will be reduced for 38% of GM common stock and the difference between the current carrying value of the obligations subject to the VEBA Modifications ($10 billion) and the estimated fair value of the GM common stock to be provided on the Implementation Date ($9.8 billion) will be reflected as an actuarial gain of $0.2 billion. This is consistent with the accounting treatment followed when the VEBA settlement agreement was initially recognized in our 2008 financial statements and the actuarial gain will be recorded as part of accumulated other comprehensive loss. This actuarial gain would be subject to amortization with other net actuarial gains and losses pursuant to SFAS No. 106 over the remaining life expectancy of plan participants.

The following reflects adjustments for the U.S. Treasury Debt Conversion and the VEBA Modifications:

| (Dollars in millions) | Amounts |
|---|---|
| Decrease in existing U.S. treasury debt | $ (8,060) |
| Decrease in postretirement benefits other than pensions | (242) |
| Decrease in other liabilities and deferred income taxes, non-current for the extinguishment of the warrant | (165) |
| Decrease in accumulated other comprehensive loss | (242) |
| Increase in common stock | 51,936 |
| Decrease in capital surplus | (38,848) |
| Increase in accumulated deficit | 4,863 |

The pro forma adjustments reflected above reflect a loss upon issuance of GM common stock in exchange for (a) full satisfaction and cancellation of 50% of our current outstanding U.S. Treasury Debt and (b) full satisfaction and cancellation of our obligations under the warrant granted to the U.S. Treasury. At the 50% participation level the fair value of the GM common stock issued to the U.S. Treasury exceeds the current carrying value of the converted U.S. Treasury Debt and carrying value of the warrant by $4.9 billion.

The actual reduction amount in our obligations may be different than what we have assumed, and this difference may be material.

The following table sets forth an unaudited pro forma sensitivity analysis of the pro forma adjustments for the U.S. Treasury Debt Conversion and the VEBA Modifications to estimate the effect of cancellation of more than 50% of our outstanding U.S. Treasury Debt reflected in these pro forma financial statements and the reduction in our OPEB obligation at June 1, 2009 to reflect the extinguishment on the Implementation Date of more than 50% our $20 billion present value in unfunded obligations under the VEBA settlement agreement in exchange for approximately 89.9% of the pro forma GM common stock based on the Assumed Participation Level utilized for purposes of the unaudited pro forma financial statements.

| % of U.S. Treasury Debt and VEBA obligations exchanged | Assumed share price | Pro Forma Decreases In Balance of | | | | |
|---|---|---|---|---|---|---|
| | | Short-term borrowings and current portion of long-term debt | VEBA obligations due to the actuarial gain | Stockholders' deficit | Interest expense | Automotive cost of sales |
| (Dollars in millions) | | | | | | |
| 100% | $0.72 | $16,121 | $3,177 | $19,298 | $1,182 | $600 |
| 90% | 0.66 | 14,509 | 2,590 | 17,099 | 1,064 | 540 |
| 80% | 0.60 | 12,897 | 2,003 | 14,900 | 945 | 480 |
| 70% | 0.54 | 11,285 | 1,416 | 12,701 | 827 | 420 |
| 60% | 0.48 | 9,673 | 829 | 10,502 | 709 | 360 |
| 50% | 0.42 | 8,060 | 242 | 8,302 | 591 | 300 |

98

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007463

**GENERAL MOTORS CORPORATION AND SUBSIDIARIES**

**NOTES TO UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL
INFORMATION FOR THE EXCHANGE OFFERS—Continued**

The value per share at the different participation levels increases as the economic benefit from the reduction in obligations shifts to the other stakeholders of GM. Further, the number of shares to be received by the U.S Treasury and New VEBA, combined, is the same at each level of participation. The reduction in the VEBA obligations above represents the difference between the current carrying value of the obligations subject to the VEBA Modifications and the estimated fair value of the GM common stock to be issued to the New VEBA on the Implementation Date and will be reflected as an actuarial gain. This is consistent with the accounting treatment followed when the VEBA settlement agreement was initially recognized in our 2008 financial statements and the actuarial gain will be recorded as part of accumulated other comprehensive loss.

A 10% increase or decrease in the estimated per share fair value at the 50% participation level would result in an increase or decrease of approximately $1.3 billion in consideration to the U.S. Treasury in exchange for conversion of 50% of the U.S. Treasury Debt. This change would result in a $1.3 billion increased loss upon conversion at a 10% increase in per share value of the GM common stock and a $1.3 billion decreased loss upon conversion at a 10% decrease in per share value of the GM common stock. At the 50% participation level a fair value of approximately $.26 per share would provide the U.S. Treasury consideration equal to the $8.1 billion U.S. Treasury Debt assumed to be converted for purposes of the unaudited pro forma financial information.

A 10% increase or decrease in the fair value of the GM common stock at the 50% participation level would result in an increase or decrease of approximately $1.0 billion in the consideration provided to the New VEBA in exchange for conversion of $10 billion of OPEB obligations.

(o)  To reflect the reduction in pro forma interest expense as a result of the U.S. Treasury Debt Conversion at the assumed minimum 50% pro forma level.

(p)  To reflect the reduction in postretirement benefits other than pensions costs as a result of the VEBA Modifications at the assumed minimum 50% pro forma level.

(q)  There is no net effect on our unaudited pro forma condensed consolidated statement of operations related to our pro forma purchase as of January 1, 2008 of an additional 10.9% ownership interest in GMAC, increasing our common equity interest in GMAC from 49.0% to 59.9% using the proceeds from and as required by the Second U.S. Treasury Loan Agreement. In 2008, we recorded an impairment charge for our investment in GMAC to reduce the carrying value of our equity investment to its estimated fair value at December 31, 2008. Any additional equity income that would have been reflected in the unaudited pro forma condensed consolidated statement of operations for our increased equity ownership would have been completely offset by an additional impairment charge. We continue to account for GMAC using the equity method of accounting.

(r)  As disclosed in our annual report on Form 10-K for the year ended December 31, 2008, which is incorporated by reference into this prospectus, we continue to actively market certain assets for sale including our HUMMER brand and a transmission facility in Strasbourg, France. As part of our current Viability Plan, we accelerated the timing for a resolution to our strategic review of HUMMER to 2009 from 2010. With respect to HUMMER, we are actively marketing the brand and have received final bids from potential purchasers and are in the process of reviewing them. We expect to make a final decision regarding a sale or phase-out in early May. As a result, our current Viability Plan does not contemplate production and sales to dealers of HUMMER products beyond 2009. However, there are no agreements in principle for these transactions and, accordingly, we have not given pro forma effect to such potential dispositions pursuant to the requirements for pro forma presentation under Article 11 of Regulation S-X. In addition, we do not believe the effects of these transactions would be material to our financial position or results of operations.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007464

**GENERAL MOTORS CORPORATION AND SUBSIDIARIES**

**NOTES TO UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION FOR THE EXCHANGE OFFERS—Continued**

(s)   As disclosed in our annual report on Form 10-K for the year ended December 31, 2008, which is incorporated by reference into this prospectus, Saab filed for reorganization protection under the laws of Sweden on February 20, 2009. We no longer consolidate Saab as of the three months ended March 31, 2009, and we anticipate recording a $0.7 billion loss on deconsolidation, primarily related to the net investment in, and advances to, Saab. As a result, our current Viability Plan does not contemplate production and sales to dealers of Saab products beyond 2009. We have not given pro forma effect to the loss on deconsolidation as it is a material non-recurring charge that will be included within our statement of operations within 12 months, and therefore has been excluded from the pro forma statement of operations pursuant to the requirements for pro forma presentation under Article 11 of Regulation S-X. In addition, Saab was not material to our consolidated financial position.

(t)   As disclosed in our annual report on Form 10-K for the year ended December 31, 2008, which is incorporated by reference into this prospectus, we intend to phase out the retail channels and brands of Saturn Distribution Corporation, an indirect wholly-owned subsidiary, in order to reduce the number of our retail channels and the number of our core brands. As part of our current Viability Plan, we accelerated the timing for a resolution to our strategic review of Saturn to 2009 from 2010 to 2011. We are currently working with the Saturn Franchise Operations Team, to review opportunities regarding a potential sale of Saturn. If a sale of Saturn does not occur, we intend to phase out the Saturn brand by the end of 2009. As a result, our current Viability Plan does not comprehend production and sales to dealers of Saturn products beyond 2009. However, there are no agreements in principle for either of these transactions and, therefore, we have not given pro forma effect to such potential dispositions because they do not meet the requirements for pro forma presentation under Article 11 of Regulation S-X. In addition, we do not believe the effects of these transactions would be material to our financial position or results of operations.

(u)   We have not reflected the pro forma effects of the Receivables Program, an automotive supplier support program sponsored by the U.S. Treasury. As of April 27, 2009, this program has not been implemented and no funding from the U.S. Treasury has been received. The Receivables Program allows suppliers to sell their eligible accounts receivable payable by us to GM Supplier Receivables LLC ("GM Receivables"), a bankruptcy-remote special purpose vehicle established by us. GM Receivables will be included in our consolidated accounts and we expect the U.S. Treasury will provide a $3.5 billion loan facility to GM Receivables and we will make equity contributions to GM Receivables of up to $175 million. Eligible suppliers can elect to either a) receive immediate payment from GM Receivables on their receivables payable by us at a 3% discount or b) have their receivables payable by us guaranteed by the U.S. Treasury for a 2% fee. GM Receivables will be responsible for paying interest on any loans provided by the U.S. Treasury at an annual rate of LIBOR plus 3.5% with a minimum of 5.5%, as well as administrative fees of 25 basis points per annum on the average daily receivables balance. GM Receivables will also be responsible for paying a termination fee of up to $140 million to the U.S. Treasury upon expiration or termination of the Receivables Program. Any residual capital in the program would be shared equally between us and the U.S. Treasury. The principal effect of this program on our financial position will be that amounts borrowed from the U.S. Treasury and used to pay suppliers will result in short-term debt and a corresponding decrease in accounts payable and accrued expenses. Any GM Receivables income would result in a decrease to our costs.

(v)   On March 30, 2009, the U.S. Government announced that it will create a warranty program pursuant to which a separate account will be created and funded with cash contributed by us and a loan from the U.S. Treasury to pay for repairs covered by our warranty on each new vehicle sold by us during our restructuring period. We expect that the cash contribution and the loan from the U.S. Treasury will total 125% of the costs projected by us that are required to satisfy anticipated claims under the warranty issued on those

100

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007465

**GENERAL MOTORS CORPORATION AND SUBSIDIARIES**

**NOTES TO UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION FOR THE EXCHANGE OFFERS—Continued**

vehicles. We have agreed to participate in the program and to contribute a portion of the cash required to cover the projected costs of anticipated warranty claims for each vehicle covered by the program. We are still discussing with the U.S. Treasury the ultimate scope, structure, and terms of U.S. Government warranty program and, therefore, have not included any pro forma adjustments related to the potential impact of this program because it does not meet the requirements for pro forma presentation pursuant to Article 11 of Regulation S-X. It is expected that this program could require us to borrow additional amounts from the U.S. Treasury.

(w)  Our current Viability Plan does not contemplate further investment for Pontiac, and therefore the brand will be phased out by the end of 2010. This action is part of our broader reorganization under our current Viability Plan and, as noted above, we have not given pro forma effect to such phase out because it does not meet the requirements for pro forma presentation under Article 11 of Regulation S-X.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007466

## THE EXCHANGE OFFERS AND CONSENT SOLICITATIONS

### Terms of the Exchange Offers

Upon the terms and subject to the conditions set forth in this prospectus and the related letter of transmittal (or form of electronic instruction notice, in the case of old notes held through Euroclear or Clearstream), as each may be amended from time to time, GM is offering to exchange 225 shares of GM common stock for each 1,000 U.S. dollar equivalent of principal amount (or accreted value as of the settlement date, if applicable) of old notes. In respect of the exchange offers for the old GM Nova Scotia notes, GM Nova Scotia is jointly making the exchange offers with GM.

Assuming full participation in the exchange offers, holders of old notes tendered in the exchange offers will receive, in the aggregate, approximately 6.1 billion shares of GM common stock, which would represent approximately 10% of the pro forma outstanding GM common stock.

In addition, (a) GM will pay, in cash, accrued interest on the old GM notes, other than the discount notes and (b) GM Nova Scotia will pay, in cash, accrued interest on the old GM Nova Scotia notes, in each case, from and including the most recent interest payment date to, but not including, the settlement date.

There is no requirement for an individual holder to tender a minimum principal amount of old notes in the exchange offers. However, where, in connection with the exchange offers or as a result of the reverse stock split, a tendering holder of old notes would otherwise be entitled to receive a fractional share of GM common stock, the number of shares of GM common stock to be received by such holder will be rounded down to the nearest whole number and no cash or other consideration will be delivered to such holder in lieu of such rounded down amount.

Concurrently with the exchange offers, we are soliciting consents from the holders of old notes to amend certain provisions set forth in the debt instruments governing the old notes. For a description of the proposed amendments to the debt instruments, see *"Proposed Amendments."* Each holder who tenders old notes in the exchange offers will be deemed to have consented to the proposed amendments in respect of the debt instruments governing their old notes, except that holders who tender non-USD old notes prior to the date on which the registration statement of which this prospectus forms a part is declared effective will not be deemed to have consented to the proposed amendments. Except for holders who tender non-USD old notes prior to the date on which the registration statement of which this prospectus forms a part is declared effective, holders may not tender their old notes pursuant to the exchange offers without delivering consents to the proposed amendments, and holders may not deliver consents to the proposed amendments pursuant to the consent solicitations without tendering their old notes.

Our obligation to pay the exchange consideration for old notes tendered pursuant to the exchange offers is subject to several conditions referred to below under *"—Conditions to the Exchange Offers."*

In the event we have not received prior to June 1, 2009 sufficient tenders of old notes, including the old Series D notes, to consummate the exchange offers, we currently expect to seek relief under the U.S. Bankruptcy Code. This relief may include (i) seeking bankruptcy court approval for the sale of most or substantially all of our assets pursuant to section 363(b) of the U.S. Bankruptcy Code to a new operating company, and a subsequent liquidation of the remaining assets in the bankruptcy case; (ii) pursuing a plan of reorganization (where votes for the plan are solicited from certain classes of creditors prior to a bankruptcy filing) that we would seek to confirm (or "cram down") despite the deemed rejection of the plan by the class of holders of old notes; or (iii) seeking another form of bankruptcy relief, all of which involve uncertainties, potential delays and litigation risks. If we seek bankruptcy relief, holders of old notes may receive consideration that is less than what is being offered in the exchange offers, and it is possible that such holders may receive no consideration at all for their old notes. See *"Bankruptcy Relief."*

102

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007467

For a more complete description of the risks relating to our failure to consummate the exchange offers, see "—*Risks Related to Failure to Consummate the Exchange Offers—If the exchange offers are not consummated, we currently expect to seek relief under the U.S. Bankruptcy Code. If we seek bankruptcy relief, holders of old notes may receive consideration that is less than what is being offered in the exchange offers, and it is possible that such holders may receive no consideration at all for their old notes.*"

None of GM, its subsidiaries (including GM Nova Scotia), their respective boards of directors, the Dealer Managers, the Solicitation and Information Agent, the Settlement and Escrow Agent, the Luxembourg Exchange Agent or the Exchange Agent (or any such party's respective agents, advisors or counsel) has made, or will make, a recommendation to any holder as to whether such holder should exchange its old notes pursuant to the exchange offers or grant its consent to the proposed amendments. You must make your own investment decision whether to exchange any old notes pursuant to the exchange offers and make your own decision whether to grant your consent to the proposed amendments in the consent solicitations.

For purposes of determining the exchange consideration to be received in exchange for non-USD old notes (including in respect of non-USD old notes redeemed pursuant to the call option), an equivalent U.S. dollar principal amount of each tender of such non-USD old notes will be determined by converting the principal amount of such tender to U.S. dollars using the applicable currency exchange rate displayed on the Reuters Screen (a) under the symbol "EURUSDFIXM=WM," in the case of non-USD old notes denominated in Euro or (b) under the symbol "GBPUSDFIXM=WM," in the case of non-USD old notes denominated in pounds sterling, in each case as of the time with reference to which WM Company calculates the fixing price of the applicable currency exchange rate reflected on the applicable Reuters Screen (currently at or around 4:00 p.m. London time), on the business day prior to the expiration date of the exchange offers. This equivalent U.S. dollar principal amount will be used in all cases when determining the exchange consideration to be received pursuant to the exchange offers (and the consideration to be delivered pursuant to the call option).

The aggregate number of shares of GM common stock to be issued in connection with the exchange offers will depend in part on the exchange rates of Euro and pounds sterling to U.S. dollars in effect on the business day prior to the expiration date of the exchange offers. Unless otherwise indicated, all aggregate share numbers contained in this prospectus related to the exchange offers are based on such exchange rates in effect on April 22, 2009.

**The securities being offered in exchange for the old notes are being offered and will be issued outside the United States only to holders who are "non-U.S. qualified offerees" (as defined in the "*Non-U.S. Offer Restrictions*" section of this prospectus). Offers to holders in the United Kingdom, Austria, Belgium, France, Germany, Italy, Luxembourg, the Netherlands, Spain and Switzerland will be made only pursuant to the EU Approved Prospectus, which will incorporate this prospectus and will indicate on the front cover thereof that it can be used for such offers. Holders outside of these jurisdictions (and the United States) are authorized to participate in the exchange offers and consent solicitations, as described in the "*Non-U.S. Offer Restrictions*" section of this prospectus. If you are outside of the above jurisdictions (and the United States and Canada), you are only authorized to receive or review the EU Approved Prospectus. If you are in Canada you are only authorized to receive or review the Canadian Offering Memorandum, which will incorporate this prospectus.**

## Forbearance, Waiver and Extension by Holders of Old Series D Notes

By tendering, and not validly withdrawing, their old Series D notes, holders of old Series D notes will irrevocably agree pursuant to the Forbearance, Waiver and Extension, in the event the exchange offers are extended beyond June 1, 2009, to extend the maturity of their old Series D notes and to forbear from taking any action to enforce, or direct enforcement of, and waive any and all of the rights and remedies available to such holders under such old Series D notes or the indenture governing such old Series D notes, in each case until the Forbearance, Waiver and Extension Termination Date, which is the date of the earlier of (a) the termination of the exchange offers (including in the event GM files a petition for relief under the U.S. Bankruptcy Code) and

103

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007468

(b) the consummation of the exchange offers. At the Forbearance, Waiver and Extension Termination Date, the Forbearance, Waiver and Extension will expire and any and all principal and interest amounts otherwise due under any old Series D notes that remain outstanding (*i.e.*, any old Series D notes not accepted for exchange in the exchange offers) will become immediately due and payable. The Forbearance, Waiver and Extension will attach to any old Series D notes that have been tendered in the exchange offers and not validly withdrawn on or prior to the Attachment Date, which is May 26, 2009 (the date set initially as the withdrawal deadline), or such later date as the registration statement of which this prospectus forms a part is declared effective or as GM in its absolute discretion may determine. The Attachment Date will also be the expiration and settlement dates for the exchange offer that we are making in which we are offering to exchange amended Series D notes (old Series D notes to which the Forbearance, Waiver and Extension have attached and which will not mature until the Forbearance, Waiver and Extension Termination Date) for old Series D notes. By having tendered, and not having validly withdrawn, their old Series D notes as of the Attachment Date, such holders shall consent to the attachment of the Forbearance, Waiver and Extension to their old Series D notes, and GM may in its absolute discretion enter into a supplemental indenture as of the Attachment Date or take such other action as it determines is appropriate (including by assigning a temporary or different CUSIP number to such old Series D notes) to evidence the attachment of the Forbearance, Waiver and Extension; such holders shall also be deemed to have tendered any amended Series D notes issued, or deemed issued by GM in order to implement the Forbearance, Waiver and Extension. If a holder of old Series D notes validly withdraws tendered old Series D notes prior to the Attachment Date, then such old Series D notes will not be subject to the Forbearance, Waiver and Extension. However, if a holder of old Series D notes validly withdraws its old Series D notes at any time following the Attachment Date (in the event withdrawal rights have been extended past or reinstated after the Attachment Date), then such old Series D notes, notwithstanding such withdrawal or any subsequent transfer, will continue to be subject to the Forbearance, Waiver and Extension until the Forbearance, Waiver and Extension Termination Date.

Our solicitation of the agreement of the holders of old Series D notes to the terms of the Forbearance, Waiver and Extension is an exchange offer in which we are offering to exchange amended Series D notes (old Series D notes to which the Forbearance, Waiver and Extension have attached) for old Series D notes. This exchange offer is subject to applicable SEC rules and regulations, including Rule 13e-4 under the Exchange Act. This exchange offer will expire, withdrawal rights with respect to this offer shall terminate, and the settlement date for this offer will occur on, the Attachment Date.

**Accrued and Unpaid Interest**

GM will pay, in cash, accrued interest on the old GM notes, other than the discount notes and GM Nova Scotia will pay, in cash, accrued interest on the old GM Nova Scotia notes, in each case, from and including the most recent interest payment date to, but not including, the settlement date.

**Expiration Date; Withdrawal Deadline; Extensions; Amendments; Termination**

For purposes of the exchange offers and consent solicitations, the term "expiration date" means 11:59 p.m., New York City time, on May 26, 2009, subject to our right to extend that time and date with respect to the exchange offers and consent solicitations in our absolute discretion, in which case the expiration date means the latest time and date to which the exchange offers and consent solicitations are so extended.

For purposes of the exchange offers and consent solicitations, the term "withdrawal deadline" means 11:59 p.m., New York City time, on May 26, 2009, subject to our right to extend or reinstate the withdrawal time and date in our absolute discretion, in which case the withdrawal deadline means the latest time and date to which it is so extended. In no event will the withdrawal deadline occur prior to the date on which the registration statement of which this prospectus forms a part is declared effective. Except in certain circumstances in which withdrawal rights may be amended or reinstated, as described in "*The Exchange Offers and Consent Solicitations—Withdrawal of Tenders,*" old notes that are validly tendered prior to the withdrawal deadline and

104

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007469

that are not validly withdrawn prior to the withdrawal deadline may not be withdrawn on or after the withdrawal deadline, and old notes that are validly tendered on or after the withdrawal deadline may not be withdrawn.

Any waiver, amendment or modification of the exchange offers will apply to all old notes tendered pursuant to the exchange offers; *provided* that, we may, in our absolute discretion, amend or modify the terms of the exchange offers (including by changing the exchange consideration offered) applicable to one or more series of old notes without amending or modifying the terms of the exchange offers applicable to any other series of old notes. We will give oral (to be confirmed in writing) or written notice of material changes, including the extension of the expiration date or withdrawal date, to the Exchange Agent and will disseminate additional offer documents and extend the exchange offers and consent solicitations and withdrawal rights as we determine necessary and to the extent required by law. If any changes are made to the exchange consideration or fees paid to the Dealer Managers or any other entity soliciting on our behalf in the exchange offers, the expiration date for the exchange offers will be extended so that the exchange offers remain open for at least ten business days from the date of such change. For other material changes to the terms and conditions of the exchange offers and consent solicitations, the expiration date for the exchange offers will be extended so that the exchange offers remain open for at least five business days from the date of such change. Any such extension, amendment, waiver or change will not result in the reinstatement of any withdrawal rights if those rights had previously expired, except as specifically provided above.

We expressly reserve the right to amend or terminate the exchange offer and to reject for exchange any old notes not previously accepted for exchange in the event any of the conditions of the exchange offers are not satisfied. In the event that the exchange offers are terminated, withdrawn or otherwise not consummated on or prior to the expiration date, no consideration will be paid or become payable to holders who have properly tendered their old notes pursuant to the exchange offers. In any such event, the old notes previously tendered pursuant to the exchange offers will be promptly returned to the tendering holders.

There can be no assurance that we will exercise our right to extend, terminate or amend the exchange offers or the consent solicitations. During any extension and irrespective of any amendment to the exchange offers or the consent solicitations, all old notes previously validly tendered and not withdrawn and not accepted for exchange or withdrawn thereunder will remain subject to the exchange offers and consent solicitations and may be accepted thereafter by us, subject to compliance with applicable law. We may waive conditions without extending the exchange offers, in accordance with applicable law. In addition, we may amend, extend, modify, terminate or take any other actions with respect to the exchange offers and consent solicitations for series of old notes or the terms and conditions thereof without taking corresponding action with respect to exchange offers and consent solicitations for any other series of old notes.

**Announcements**

Any extension, termination or amendment, in whole or in part, of the exchange offers or the consent solicitations will be followed as promptly as practicable by announcement thereof, such announcement in the case of an extension of the exchange offers to be issued no later than 9:00 a.m., New York City time, on the next business day following the previously scheduled expiration date. In the event of such announcement, we will make an equivalent announcement in the United Kingdom and such other jurisdictions as may be required.

If we amend the exchange offers in a manner that we determine constitutes a material change, we will promptly disclose such amendment in a manner reasonably calculated to inform the holders of old notes of such amendment.

Without limiting the manner in which we may choose to make such announcement, we will not, unless otherwise required by law or the terms of old notes, have any obligation to publish, advertise or otherwise communicate any such announcement other than by making a release to an appropriate news agency or another means of announcement that we deem appropriate.

105

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007470

**Acceptance of Old Notes for Exchange and Delivery**

On the settlement date, if the exchange offers are consummated, the exchange consideration will be issued in exchange for old notes validly tendered and not validly withdrawn on or prior to the expiration date and the Exchange Agent (or the Settlement and Escrow Agent, as the case may be) will pay an amount equal to the applicable accrued and unpaid interest in respect of the old notes (other than the discount notes) accepted for exchange. We do not expect to consummate the exchange offers prior to June 30, 2009 because the satisfaction of certain conditions to the exchange offers is expected to require a significant period of time.

If the conditions to the exchange offers are satisfied, or if we validly waive all of the conditions that have not been satisfied, and after we receive validly completed and duly executed letters of transmittal or agent's messages in lieu thereof or electronic instruction notices with respect to any and all of the old notes validly tendered and not withdrawn for exchange, we will accept for exchange at the expiration date such old notes by notifying the Exchange Agent of our acceptance. The notice may be oral if we promptly confirm it in writing.

We expressly reserve the right, in our absolute discretion, to delay acceptance for exchange of old notes validly tendered and not withdrawn under the exchange offers (subject to Rule 14e-1(c) under the Exchange Act, which requires that we issue the exchange consideration or return the old notes deposited with the Exchange Agent promptly after termination or withdrawal of the exchange offers), or to terminate the exchange offers and not accept for exchange any old notes not previously accepted, (1) if any of the conditions to the exchange offers shall not have been satisfied or validly waived by us or (2) in order to comply in whole or in part with any applicable law.

In all cases, the exchange consideration for old notes validly tendered and not withdrawn pursuant to the exchange offers will be made only after timely receipt by the Exchange Agent of (1) certificates representing the old notes, or timely confirmation of a book-entry transfer (a "book-entry confirmation") of the old notes into the Exchange Agent's account at the applicable Clearing System, (2) in respect of the USD old notes, the properly completed and duly executed related letter of transmittal (or a facsimile thereof) or an agent's message in lieu thereof (3) in respect of the non-USD old notes, the properly completed electronic instruction notice, and (4) any other documents required by the related letter of transmittal.

For purposes of the exchange offers, we will be deemed to have accepted for exchange validly tendered (and not validly withdrawn) old notes as provided herein when, and if, we give oral (if promptly confirmed in writing) or written notice to the Exchange Agent of our acceptance of the old notes for exchange pursuant to the exchange offers. In all cases, the exchange of old notes pursuant to the exchange offers will be made by deposit of the exchange consideration with the Exchange Agent (or the Settlement and Escrow Agent, as the case may be), which will act as your agent for the purposes of receiving the exchange consideration from us, and delivering the exchange consideration to you. On and after the settlement date, the tendering holders whose old notes have been exchanged by us will cease to be entitled to receive interest on such old notes. Such tendering holders will receive the applicable exchange consideration for the old notes accepted for exchange.

On the settlement date, the Exchange Agent (or the Settlement and Escrow Agent, as the case may be) will pay any applicable accrued and unpaid interest in respect of the old notes (other than the discount notes) accepted for exchange (a) by wire transfer to the applicable Clearing System, in the case of old notes accepted for exchange that were validly tendered and not withdrawn or (b) in all other cases, by check payable to the tendering holders whose old notes have been accepted for exchange (unless a different payee is indicated under the special payment instructions in the letter of transmittal).

If, for any reason whatsoever, acceptance for exchange of any old notes validly tendered and not withdrawn pursuant to the exchange offers is delayed (whether before or after our acceptance for exchange of the old notes) or we extend the exchange offers or are unable to accept for exchange the old notes validly tendered and not withdrawn pursuant to the exchange offers, then, without prejudice to our rights set forth herein, we may instruct

106

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007471

the Exchange Agent (or the Settlement and Escrow Agent, as the case may be) to retain validly tendered old notes and those old notes may not be withdrawn, subject to the limited circumstances described in "—*Withdrawal of Tenders*" below.

We will pay or cause to be paid all transfer taxes with respect to the acceptance of any USD old notes unless the box titled "Special Payment or Issuance Instructions" or the box titled "Special Delivery Instructions" on the related letter of transmittal has been completed, as described in the instructions thereto.

Under no circumstances will any interest be payable because of any delay in the transmission of funds to you with respect to accepted old notes or otherwise.

We will pay all fees and expenses of the Dealer Managers, the Exchange Agent, the Solicitation and Information Agent, the Settlement and Escrow Agent and Luxembourg Exchange Agent in connection with the exchange offers and consent solicitations. See "*Dealer Managers, Exchange Agent, Solicitation and Information Agent, the Settlement and Escrow Agent and Luxembourg Exchange Agent.*" Tendering holders will not be obligated to pay brokerage fees or commissions to the Dealer Managers, the Solicitation and Information Agent, the Settlement and Escrow Agent, the Luxembourg Exchange Agent, the Exchange Agent or us. If a broker, bank or other nominee or custodian tenders old notes on behalf of a tendering holder, such broker, bank or other nominee or custodian may charge a fee for doing so. Tendering holders who own old notes through a broker, bank or other nominee or custodian should consult their broker, bank or other nominee or custodian to determine whether any charges will apply.

## Market and Trading Information

Certain of the old notes are admitted to listing on the Bourse du Luxembourg of the Luxembourg Stock Exchange or the New York Stock Exchange and are quoted for trading on the open markets in Germany (*Freiverkehr*) in Berlin (XBER), Düsseldorf (XDUS), Frankfurt (XFRA), Hamburg (XHAM), Hannover (XHAN), Munich (XMUN) and the SWX-Swiss Exchange.

## Procedures for Tendering Old Notes

Holders of old notes that reside outside of the United States are advised to contact the Solicitation and Information Agent for a copy of the EU Approved Prospectus or the Canadian Offering Memorandum, as applicable, which contains separate representations and certifications that are agreed to upon the tendering of old notes by any such holder outside the United States.

### *General*

In order to participate in the exchange offers and consent solicitations, you must validly tender your old notes to the Exchange Agent as described below. It is your responsibility to validly tender your old notes. We have the right to waive any defects. However, we are not required to waive defects and are not required to notify you of defects in your tender.

**Tenders of USD old notes will be accepted only at DTC. Tenders of non-USD old notes will be accepted only at Euroclear or Clearstream, as the case may be.**

Beneficial owners of old notes who are not direct participants in the Clearing Systems must contact their broker, bank or other nominee or custodian to arrange for their direct participant in the relevant Clearing System to submit an instruction to such Clearing System on their behalf in accordance with its requirements. You may have been provided with a letter of instructions along with this prospectus that may be used by a beneficial owner to instruct a broker, bank or other nominee or custodian to effect the tender of old notes for exchange and consent to the proposed amendments on the beneficial owner's behalf. The beneficial owners of old notes that are held in

107

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007472

the name of a broker, bank or other nominee or custodian should contact such entity sufficiently in advance of the expiration date if they wish to tender their old notes and ensure that the old notes in the relevant Clearing System are blocked in accordance with the requirements and deadlines of such Clearing System. Such beneficial owners should not submit such instructions directly to the Clearing Systems, GM, the Exchange Agent, the Solicitation and Information Agent, the Settlement and Escrow Agent or the Luxembourg Exchange Agent.

If you have any questions or need help in tendering your old notes, please contact the Solicitation and Information Agent or the Exchange Agent, whose addresses and telephone numbers are listed on the back cover page of this prospectus.

To validly tender old notes pursuant to the exchange offers, holders must timely tender their old notes in accordance with the procedures set forth in this prospectus and, in relation to the USD old notes, the related letter of transmittal. We have not provided guaranteed delivery procedures in conjunction with the exchange offers or under any of this prospectus or other offer materials provided therewith.

### Tender of USD Old Notes through DTC

USD old notes must be tendered through DTC. DTC participants must electronically transmit their acceptance of an offer through DTC's ATOP, for which the exchange offers and consent solicitations will be eligible. In accordance with ATOP procedures, DTC will then verify the acceptance of an offer and send an agent's message to the Exchange Agent for its acceptance. An "agent's message" is a message transmitted by DTC, received by the Exchange Agent and forming part of the book-entry confirmation, which states that DTC has received an express acknowledgement from you that you have received this prospectus and the related letter of transmittal and agree to be bound by the terms of the letter of transmittal, and that we may enforce such agreement against you.

By participating in the exchange offers in this manner, you will be deemed to have acknowledged and agreed that you are bound by the terms of the letter of transmittal, are qualified to accept the exchange offers and consent to the proposed amendments and that we may enforce the terms and conditions contained in the letter of transmittal against you.

Holders whose USD old notes are held through Euroclear or Clearstream must transmit their acceptance in accordance with the requirements of Euroclear or Clearstream in sufficient time for such tenders to be timely made prior to the expiration date. Holders should note that such Clearing Systems may require that action be taken a day or more prior to the expiration date in order to cause such old notes to be tendered through DTC.

### Tender of Non-USD Old Notes through Euroclear or Clearstream

Non-USD old notes must be tendered through Euroclear or Clearstream. The tender of non-USD old notes through Euroclear or Clearstream will be deemed to have occurred upon receipt by the relevant Clearing System of a valid electronic block voting instruction to the relevant Clearing System containing voting instructions in relation to the relevant extraordinary resolution and other instructions, certifications and statements set out herein (an "electronic instruction notice"), in accordance with the requirements of such Clearing System. The receipt of such electronic instruction notice by Euroclear or Clearstream will be acknowledged in accordance with the standard practices of such Clearing System and will result in the blocking of such non-USD old notes in that Clearing System. By blocking such non-USD old notes in the relevant Clearing System, the holder thereof will, among other things, be deemed to consent to have such Clearing System provide details concerning such holder's identity to the Exchange Agent.

By participating in the exchange offers in this manner, you will be deemed to have acknowledged and agreed that you are bound by the terms of the electronic instruction notice, are qualified to accept the exchange offers and consent solicitations and that we may enforce the terms and conditions contained in the electronic instruction notice against you.

108

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007473

Holders must take the appropriate steps to block non-USD old notes to be tendered in Euroclear or Clearstream so that no transfers may be effected in relation to such non-USD old notes at any time after the date of tender in accordance with the requirements of the relevant Clearing System and the deadlines required by that Clearing System.

### Effect of Letter of Transmittal with Respect to USD Old Notes

Subject to and effective upon the acceptance for exchange of old notes tendered thereby, by executing and delivering the related letter of transmittal, or being deemed to have done so as part of your electronic submission of your tender through one of the Clearing Systems, you (1) irrevocably sell, assign and transfer to or upon our order all right, title and interest in and to all the old notes tendered thereby, (2) consent to the proposed amendments, (3) with respect to holders of old Series D Notes, that you irrevocably agree pursuant to the Forbearance, Waiver and Extension, in the event the exchange offers are extended beyond June 1, 2009, to extend the maturity of their old Series D notes and to forbear from taking any action to enforce, or direct enforcement of, and waive any and all of the rights and remedies available to you, including the right to payment upon maturity, under such old Series D notes or the indenture governing such old Series D notes, in each case until the Forbearance, Waiver and Extension Termination Date, as described herein, and (4) irrevocably appoint the Exchange Agent as your true and lawful agent and attorney-in-fact (with full knowledge that the Exchange Agent also acts as our agent with respect to the tendered old notes), with full power coupled with an interest, to:

- deliver certificates representing the old notes, or transfer ownership of the old notes on the account books maintained by the applicable Clearing System, together with all accompanying evidences of transfer and authenticity, to or upon our order;

- present the old notes for transfer on the relevant security register; and

- receive all benefits or otherwise exercise all rights of beneficial ownership of the old notes, all in accordance with the terms of the exchange offers.

Holders of old notes that reside outside of the United States are advised to contact the Solicitation and Information Agent for a copy of the EU Approved Prospectus or the Canadian Offering Memorandum, as applicable, which contains separate representations and certifications that are agreed to upon the tendering of old notes by any such holder outside the United States.

### Effect of Electronic Instruction Notice with Respect to Non-USD Old Notes

Each holder of non-USD old notes, by delivering an electronic instruction notice, will be affirmatively representing and agreeing to the representations, warranties and acknowledgements that are set forth in "*Proposed Amendments—Non-USD Old Notes—Procedures for Delivering an Electronic Instruction Notice.*"

### Determination of Validity

All questions as to the validity, form, eligibility (including time of receipt) and acceptance for exchange or revocation of any tendered old notes pursuant to any of the procedures described above, and the form and validity (including time of receipt of notices of withdrawal) of all documents will be determined by us in our absolute discretion, which determination we intend to assert will be final and binding. We reserve the absolute right to reject any or all tenders of any old notes determined by us not to be in proper form, or if the acceptance of, or exchange of, such old notes may, in the opinion of our counsel, be unlawful. We also reserve the right to waive any conditions to any offer that we are legally permitted to waive.

Your tender will not be deemed to have been validly made until all defects or irregularities in your tender have been cured or waived. None of us, the Exchange Agent, the Solicitation and Information Agent, the Settlement and Escrow Agent, the Luxembourg Exchange Agent, any Dealer Manager or any other person or

109

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007474

entity is under any duty to give notification of any defects or irregularities in any tender or withdrawal of any old notes or will incur any liability for failure to give any such notification.

## Withdrawal of Tenders

Subject to the exceptions described below, old notes tendered and not validly withdrawn prior to the withdrawal deadline may not be withdrawn at any time thereafter, and old notes tendered after the withdrawal deadline may not be withdrawn at any time unless, in each case, the applicable offer is terminated without any old notes being accepted for exchange as or required by applicable law. See "—*Expiration Date; Withdrawal Deadline; Extensions; Amendments; Termination*" for applicable withdrawal deadlines. If such a termination occurs, the old notes will be returned to the tendering holder promptly. Notwithstanding the foregoing, in connection with the exchange offers for the convertible old notes:

- if there is a change in the exchange consideration being offered in the exchange offers for the convertible old notes, except for an increase in such consideration consisting of the offering of additional GM common stock, or

- or if there is a material adverse change in our circumstances such that there is a substantial likelihood that a reasonable holder that had previously tendered convertible old notes in the exchange offers would view disclosure of such change as significantly altering the 'total mix' of information made available,

then withdrawal rights will be extended (or reinstated if the withdrawal deadline has passed) to the extent necessary to provide withdrawal rights for a period of at least (10) ten business days after the announcement of such change in the case of the first bullet above, (consistent with the Rule 13e-4(e)(3)(ii) period under the Exchange Act) or five or ten business days after the announcement of such change in the case of the second bullet above (consistent with the Rule 13e-4(e)(3) periods) (depending on the nature of the information), in each case, for those holders of convertible old notes that have previously tendered into the exchange offers. Moreover, we will amend the exchange offer documentation (including this prospectus and the related letter of transmittal) accordingly and issue a press release providing widespread public notice of the extension, and will post this release on our website.

A holder who validly withdraws previously tendered old notes prior to the withdrawal deadline and does not validly re-tender old notes prior to the expiration date will not receive the exchange consideration. A holder who validly withdraws previously tendered old notes prior to the applicable withdrawal deadline and validly re-tenders old notes prior to the expiration date will receive the exchange consideration.

Subject to applicable law, if, for any reason whatsoever, acceptance for exchange of, or exchange of, any old notes tendered pursuant to the exchange offers is delayed (whether before or after our acceptance for exchange of old notes) or we extend the exchange offers or are unable to accept for exchange, or exchange, the old notes tendered pursuant to the exchange offers, we may instruct the Exchange Agent (or the Settlement and Escrow Agent, as the case may be) to retain tendered old notes, and those old notes may not be withdrawn, except to the extent that you are entitled to the withdrawal rights set forth herein.

If you have tendered old notes, you may withdraw those old notes prior to the withdrawal deadline by delivering a written withdrawal instruction to the applicable Clearing System in accordance with the relevant procedures described herein. If you hold your old notes beneficially through a broker, bank or other nominee or custodian, you must instruct your broker, bank, or other nominee or custodian to withdraw your old notes prior to the withdrawal deadline and such broker, bank or other nominee or custodian must do so prior to the withdrawal deadline. To be effective, a written or facsimile transmission notice of withdrawal of a tender or a properly transmitted request via the applicable Clearing Systems must:

- be received by the Exchange Agent at one of the addresses specified on the back cover of this prospectus prior to the applicable withdrawal deadline;

110

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007475

- specify the name of the holder of the old notes to be withdrawn;

- contain the number of the account at the applicable Clearing System from which the old notes were tendered and the aggregate principal amount represented by such old notes; and

- be signed by the holder of the old notes in the same manner as the original signature on the letter of transmittal or be accompanied by documents of transfer sufficient to have the applicable trustee (or person performing a similar function) register the transfer of the old notes into the name of the person withdrawing the old notes.

If the old notes to be withdrawn have been delivered or otherwise identified to the Exchange Agent, a signed notice of withdrawal is effective immediately upon receipt by the Exchange Agent of written or facsimile transmission of the notice of withdrawal (or receipt of a request via one of the Clearing Systems) even if physical release is not yet effected. A withdrawal of old notes can only be accomplished in accordance with the foregoing procedures.

We will have the right, which may be waived, to reject the defective tender of old notes as invalid and ineffective. If we waive our rights to reject a defective tender of old notes, subject to the other terms and conditions set forth in this prospectus and the related letter of transmittal for the USD old notes, you will be entitled to the exchange consideration.

If you withdraw all or a portion of your previously tendered old notes, you will have the right to re-tender all or a portion of them prior to the expiration date in accordance with the procedures described above for tendering outstanding old notes. If we amend or modify the terms of the exchange offers or the information concerning the exchange offers in a manner determined by us to constitute a material change to the holders, we will disseminate additional offer materials and extend the period of the exchange offers, including any withdrawal rights, to the extent required by law and as we determine necessary. An extension of the expiration date will not affect a holder's withdrawal rights, unless otherwise provided or as required by applicable law.

With respect to the old Series D notes, the Forbearance, Waiver and Extension will attach to any old Series D notes that have been tendered in the exchange offers and not validly withdrawn on or before the Attachment Date, which is May 26, 2009 (the date set initially as the withdrawal deadline), or such later date as the registration statement of which this prospectus forms a part is declared effective. By having tendered, and not validly withdrawn, their old Series D notes as of the Attachment Date, such holders shall consent to the attachment of the Forbearance, Waiver and Extension to their old Series D notes, and GM may in its absolute discretion take such action as it determines is appropriate (including by assigning a temporary or different CUSIP number to such old Series D notes) to evidence the attachment of the Forbearance, Waiver and Extension; such holders shall also be deemed to have tendered any amended Series D notes issued, or deemed issued by GM in order to implement the Forbearance, Waiver and Extension. If a holder of old Series D notes validly withdraws tendered old Series D notes prior to the Attachment Date, then such old Series D notes will not be subject to the Forbearance, Waiver and Extension. **However, if a holder of old Series D notes validly withdraws its old Series D notes at any time following the Attachment Date (in the event withdrawal rights have been extended past or reinstated after the Attachment Date), then such old Series D notes, notwithstanding such withdrawal or any subsequent transfer, will continue to be subject to the Forbearance, Waiver and Extension until the Forbearance, Waiver and Extension Termination Date.**

The exchange offers are subject to a number of conditions, certain of which will not be satisfied on or before the scheduled expiration date for the exchange offers. In particular, the receipt of judicial approval of the proposed VEBA Modifications and the transactions contemplated thereby is currently expected to take up to three months after a binding agreement in respect thereof has been entered into. To the extent this condition or any other condition is not satisfied, we expect that we would extend the exchange offers until the conditions are satisfied or waived or we choose to terminate the exchange offers. Any extension could be for a significant amount of time. Old notes tendered and not validly withdrawn prior to the withdrawal deadline may not be

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007476

withdrawn, unless the applicable exchange offer is terminated without any notes being accepted or as required by law. Initially, the withdrawal deadline and the expiration date of the exchange offers are the same. **However, if we extend the expiration date of an exchange offer, we likely will not extend the withdrawal deadline.**

### Conditions to the Exchange Offers

Notwithstanding any other provisions of the exchange offers, we will not be required to accept for exchange, or to exchange, old notes validly tendered (and not validly withdrawn) pursuant to the exchange offers, and may terminate, amend or extend any offer or delay or refrain from accepting for exchange, or exchanging, the old notes or transferring any exchange consideration to the applicable trustees (or persons performing a similar function), if any of the following conditions have not been satisfied or waived:

- the consents of holders of the requisite aggregate principal amount outstanding of each voting class of USD old notes necessary to effect the proposed amendments to the debt instruments governing such USD old notes shall have been validly received and not withdrawn and the proposed amendments to such debt instruments shall have become effective;

- the non-USD old notes of each series in respect of which the holders thereof have approved the addition of the call option shall have been called for redemption, and we shall have used our best efforts to make arrangements for the foregoing;

- the results of the exchange offers shall be satisfactory to the U.S. Treasury, including in respect of the overall level of participation by holders of the old notes in the exchange offers and in respect of the level of participation by holders of the old Series D notes in the exchange offers;

- all reviews and approvals required pursuant to the terms of the U.S. Treasury Loan Agreements shall have been completed and received and the Government viability certification to be delivered by the President's Designee pursuant to the First U.S. Treasury Loan Agreement shall have been delivered;

- the U.S. Treasury Debt Conversion shall have been completed, pursuant to which the U.S. Treasury (or its designee) shall have been issued at least 50% of the pro forma GM common stock in exchange for (a) full satisfaction and cancellation of at least 50% of our outstanding U.S. Treasury Debt at June 1, 2009 (such 50% currently estimated to be approximately $10 billion) and (b) full satisfaction and cancellation of our obligations under the warrant issued to the U.S. Treasury, and we shall have used our best efforts to enter into agreements with respect to the foregoing;

- the U.S. Treasury shall have provided commercially reasonable evidence of the U.S. Treasury Financing Commitment and the U.S. Treasury (or its designee) shall have agreed to deliver a binding written consent in respect of a portion of the common stock it is to receive in connection with the U.S. Treasury Debt Conversion authorizing the charter amendments;

- binding agreements in respect of the VEBA Modifications (including judicial and regulatory approval thereof, if any), on such terms as shall be satisfactory to the U.S. Treasury, shall have been executed by all relevant parties, pursuant to which (a) at least 50% (or approximately $10 billion) of the settlement amount will be extinguished in exchange for GM common stock and (b) cash installments will be paid toward the remaining settlement amount over a period of time, which together have a present value equal to the remaining settlement amount, and we shall have used our best efforts to enter into arrangements with respect to the foregoing;

- binding agreements in respect of the Labor Modifications, on such terms as shall be satisfactory to the U.S. Treasury, shall have been executed by all relevant parties, and we shall have used our best efforts to enter into these agreements;

- the aggregate number of shares of GM common stock issued or agreed to be issued pursuant to the U.S. Treasury Debt Conversion and the VEBA Modifications shall not exceed 89% of the pro forma outstanding GM common stock (assuming full participation by holders of old notes in the exchange offers);

112

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007477

- commercially reasonable efforts to have the GM common stock issued pursuant to the exchange offers duly listed on the NYSE, subject to notice of issuance, shall have been used;

- all other required regulatory approvals, except those that do not materially affect the ability to consummate the exchange offers shall have been received;

- there not having been instituted or pending any action, proceeding or investigation (whether formal or informal), and there not having been any material adverse development to any action or proceeding currently instituted or pending, before or by any court, governmental, regulatory or administrative agency or instrumentality, or by any other person, in connection with the exchange offers or the consent solicitations that (a) is, or is reasonably likely to be, materially adverse to our business, operations, properties, condition (financial or otherwise), income, assets, liabilities or prospects, (b) would, or is reasonably likely to, prohibit, prevent, restrict or delay consummation of any exchange offer or consent solicitation or (c) would materially impair the contemplated benefits to us of any exchange offer or consent solicitation;

- no order, statute, rule, regulation, executive order, stay, decree, judgment or injunction shall have been proposed, enacted, entered, issued, promulgated, enforced or deemed applicable by any court or governmental, regulatory or administrative agency or instrumentality that either (a) would, or is reasonably likely to, prohibit, prevent, restrict or delay consummation of any exchange offer or consent solicitation or (b) is, or is reasonably likely to be, materially adverse to our business or operations;

- the applicable trustees (or persons performing a similar function) under the debt instruments pursuant to which the old notes were issued shall not have objected in any respect to or taken action that could, or is reasonably likely to, adversely affect the consummation of any exchange offer or consent solicitation (including in respect of the proposed amendments to the debt instruments governing the old notes) and shall not have taken any action that challenges the validity or effectiveness of the procedures used by us or by GM Nova Scotia in the making of any exchange offer, the solicitation of consents, or the acceptance of, or payment for, some or all of the applicable series of old notes pursuant to any exchange offer; and

- no bankruptcy event of default shall have occurred under the indentures governing the notes.

These conditions will not be satisfied on or before the scheduled expiration date for the exchange offers. To the extent any condition is not satisfied, we expect that we would extend the exchange offers until the conditions are satisfied or waived or we choose to terminate the exchange offers. See "*Risk Factors—Risks Related to the Exchange Offers—We will need to extend the exchange offers beyond the initial expiration date and you may not be able to withdraw any notes you tender prior to or during such extension.*"

We currently believe, and our Viability Plan assumes, that at least 90% of the aggregate principal amount (or, in the case of discount notes, accreted value) of the outstanding old notes (including at least 90% of the aggregate principal amount of the outstanding old Series D notes) will need to be tendered in the exchange offers or called for redemption pursuant to the call option (in the case of the non-USD old notes) in order for the exchange offers to satisfy the U.S. Treasury Condition. Whether this level of participation in the exchange offers will be required (or sufficient) to satisfy the U.S. Treasury Condition will ultimately be determined by the U.S. Treasury. The actual level of participation in the exchange offers may be different than what we have assumed, and this difference may be material. Prior regulatory approval of the U.S. Department of Labor will not be required for the VEBA Modifications and consequently will not be a condition to the exchange offers.

All conditions to the exchange offer must be satisfied or waived prior to the expiration of the exchange offer. These conditions are for our sole benefit, and we may assert them or waive them in whole or in part at any time prior to the expiration date in our sole discretion. The failure by us at any time to exercise any of the foregoing rights shall not be deemed a waiver of any such right and each such right shall be deemed a continuing right which may be asserted at any time and from time to time until expiration of the exchange offers. Under the

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007478

exchange offers, if any of these conditions has not been satisfied, subject to the termination rights described above, we may (a) return all your old notes tendered thereunder to you, (b) extend the exchange offers and, subject to applicable law, retain all old notes tendered thereunder until the expiration of the exchange offers or (c) amend the exchange offers in any respect by giving oral (to be confirmed in writing) or written notice to such amendment to the Exchange Agent and making public disclosure of such amendment to the extent required by law.

Our obligation to transfer any exchange consideration is conditioned upon our acceptance of old notes that have been validly tendered (and not withdrawn) pursuant to the exchange offers.

We have not made a decision as to what circumstances would lead us to waive any such condition, and any such waiver would depend on circumstances prevailing at the time of such waiver. Although we have no present plans or arrangements to do so, we reserve the right to amend, at any time, the terms of the exchange offers and consent solicitations. In particular, we may, in our absolute discretion, amend or modify the terms of the exchange offers (including by changing the exchange consideration offered) applicable to one or more series of old notes without amending or modifying the terms of the exchange offers applicable to any other series of old notes. Upon such waiver or amendment, we will give holders notice of such amendments as may be required by applicable law.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER
NGM000007479

# PROPOSED AMENDMENTS

## General

Concurrently with the exchange offers, we are seeking approval to amend the debt instruments governing the old notes. A tender of old notes in the applicable exchange offer will be deemed to constitute the approval of the tendering holder to all of the proposed applicable amendments to the debt instruments governing the applicable series of old notes tendered. If the proposed amendments to any debt instrument become effective, they will be binding on all non-tendering holders of old notes governed by such debt instrument.

Except in respect of the call option to be added pursuant to the proposed amendments to the debt instruments governing the non-USD old notes, none of the proposed amendments will affect our obligation to pay interest, premium, if any, or principal on the old notes, when due, to the holders of old notes that have not delivered consents.

The debt instruments and the old notes issued thereunder require holders of certain principal amounts of old notes issued pursuant to those debt instruments (other than old notes owned by holders that are affiliated with us) to consent to the proposed amendments. However, the amendments to the debt instruments will not become effective unless the exchange offers are consummated. If the exchange offers are terminated, the proposed amendments will not become effective.

Old notes not tendered in connection with the exchange offers will remain outstanding but will not be entitled to the benefits of certain existing covenants and other provisions contained in the debt instruments that holders of debt securities of this type typically enjoy. In addition, the proposed amendments to the debt instruments governing the non-USD old notes would add the call option, which we intend to exercise immediately upon the effectiveness of the proposed amendments, if adopted. See *"Risk Factors—Risks Related to Non-Tendered Old Notes—If the exchange offers are consummated, proposed amendments to the debt instruments governing the old notes will reduce the protections afforded to non-tendering holders of old notes."*

The following sections set forth the specific amendments that are being sought to the debt instruments governing our old notes.

## USD Old Notes

Concurrently with the exchange offers, we are soliciting the consent of holders of each series of USD old notes to amend the indenture governing such series of USD old notes. All series of USD old notes are governed by one of the following indentures (in each case as amended from time to time prior to the date of this prospectus):

- Indenture dated as of November 15, 1990, between GM and Wilmington Trust Company, as Successor Trustee (the "1990 Indenture"), and

- Indenture dated as of December 7, 1995, between GM and Wilmington Trust Company, as Successor Trustee (the "1995 Indenture").

The series of USD old notes governed by these indentures are set forth in the summary offering table on the inside front cover of this prospectus.

The proposed amendments to the debt instruments will delete in full the following provisions, which are found in both the 1990 Indenture and the 1995 Indenture:

- Limitations on Liens;

- Limitation on Sale and Lease-Back; and

- Consolidation, Merger, Sale or Conveyance.

115

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007480

The proposed amendments to the indentures will eliminate the following events of default:

- failure to perform non-payment related covenants relating to any of the agreements governing the old notes; and

- certain events of bankruptcy, insolvency or reorganization.

Other provisions in the indentures will be amended to eliminate defined terms and other provisions that are no longer used as a result of the proposed amendments. The text of the provisions to be eliminated is provided in Annex A to this prospectus.

### Requisite Consents

Written consents of the holders of not less than two-thirds in aggregate principal amount (or, in the case of discount notes, accreted value) of all outstanding USD old notes issued pursuant to the 1990 Indenture or the 1995 Indenture, as the case may be, under such indenture and excluding USD old notes held by GM or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with GM), will be required to effect the proposed amendments in respect of such indenture.

### Non-USD Old Notes

*Holders of non-USD old notes outside of the United States are advised to contact the Solicitation and Information Agent for a copy of the EU Approved Prospectus or the Canadian Offering Memorandum, as applicable, which contains separate representations and certifications that are agreed to upon the tendering of non-USD old notes by any such holder outside the United States.*

Concurrently with the exchange offers, we are soliciting the consent of holders of each series of non-USD old notes to amend such non-USD old notes and the fiscal and paying agency agreement governing such series of non-USD old notes. Each holder who tenders old notes in the exchange offers will be deemed to have consented to the proposed amendments in respect of the debt instruments governing their old notes, except that holders who tender non-USD old notes prior to the date on which the registration statement of which this prospectus forms a part is declared effective will not be deemed to have consented to the proposed amendments. Except for holders who tender non-USD old notes prior to the date on which the registration statement of which this prospectus forms a part is declared effective, holders may not tender their old notes pursuant to the exchange offers without delivering consents to the proposed amendments, and holders may not deliver consents to the proposed amendments pursuant to the consent solicitations without tendering their old notes. All series of non-USD old notes are governed by one of the following fiscal and paying agency agreements:

- Fiscal and Paying Agency Agreement, dated as of July 3, 2003 (the "GM Fiscal and Paying Agency Agreement"), among GM, Deutsche Bank AG London and Banque Générale du Luxembourg S.A., and

- Fiscal and Paying Agency Agreement, dated as of July 10, 2003 (the "GM Nova Scotia Fiscal and Paying Agency Agreement"), among GM Nova Scotia, GM, Deutsche Bank Luxembourg S.A. and Banque Générale du Luxembourg S.A.

The relevant fiscal and paying agency agreements relating to each series of non-USD old notes is set forth in the summary offering table on the inside front cover of this prospectus.

The proposed amendments to the fiscal and paying agency agreements and the non-USD old notes issued thereunder will delete in full the following provisions, which are found in both of the fiscal and paying agency agreements and each series of non-USD old notes issued thereunder:

- Limitations on Liens;

- Limitation on Sale and Lease-Backs; and

- Consolidation, Merger or Sale of Assets.

116

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007481

The proposed amendments to the fiscal and paying agency agreements and the non-USD old notes issued thereunder will eliminate the following events of default:

- our failure to perform non-payment related covenants relating to any of the agreements governing the non-USD old notes; and

- certain events of bankruptcy, insolvency or reorganization.

The text of the provisions to be eliminated is provided in Annex A to this prospectus.

In addition, the proposed amendments will add a call option in each series of non-USD old notes. The call option will provide that outstanding non-USD old notes of each series may be redeemed at any time at the option of GM or GM Nova Scotia, as the case may be, in return for the exchange consideration offered pursuant to the exchange offers (*i.e.*, 225 shares of GM common stock per 1,000 U.S. dollar equivalent of principal amount of non-USD old notes). In addition, (a) GM will pay, in cash, accrued interest on the Euro old notes called for redemption pursuant to the call option and (b) GM Nova Scotia will pay, in cash, accrued interest on the old GM Nova Scotia notes called for redemption pursuant to the call option, in each case, from and including the most recent interest payment date to, but not including, the redemption date, which is expected to be the settlement date. We intend to exercise the call option in respect of all non-USD old notes not tendered pursuant to the exchange offers immediately upon the effectiveness of the proposed amendments to the debt instruments governing such non-USD old notes, if adopted. From and after the time that we exercise the call option on any series of non-USD old notes, (a) such notes shall be deemed to be discharged, (b) such notes will not be transferable and (c) holders of such notes will have no further rights in respect of those notes other than receipt of the exchange consideration and payment in cash of accrued but unpaid interest on such notes.

Other provisions in the fiscal and paying agency agreements and the non-USD old notes issued thereunder will be amended to eliminate defined terms and other provisions that are no longer used as a result of the proposed amendments.

The text of the extraordinary resolutions approving the proposed amendments to the fiscal and paying agency agreements is set forth in the form Notice of Meetings provided in Annex B to this prospectus. Holders of each series of non-USD old notes should read carefully the form of extraordinary resolutions relevant to such series to be considered at the relevant meeting, as described below.

### Noteholder Meetings

The fiscal and paying agency agreements require us to convene a meeting of noteholders for each series of non-USD old notes to which they relate, in order to consider and vote on the proposed amendments listed above. The meetings will be held in accordance with the provisions of Schedule 4 (*Provisions for Meetings of Noteholders*) to the applicable fiscal and paying agency agreement for each such series of non-USD old notes. Holders of non-USD old notes should note that a separate meeting is being held for each series of non-USD old notes. If the proposed amendments are not passed at the first noteholders meeting, an adjourned meeting will be held in order to consider and vote on the proposed amendments. For a description of the requisite votes needed to adopt the proposed amendments, see "—*Voting Requirement.*"

Notices for any first and adjourned meetings will be issued at least 21 days and 10 days in advance of such meetings, respectively. For a description of the notices to be issued, see "—*Notice.*"

### Method of Participation

Pursuant to each fiscal and paying agency agreement, with the exception of directors and officers of GM or GM Nova Scotia, as applicable, and its lawyers and financial advisers, no person shall be entitled to attend or participate in any noteholder meeting of non-USD old notes, unless such person (a) produces the non-USD old notes of which they are a holder, (b) is a validly appointed proxy or (c) is the holder of a validly issued voting certificate.

117

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007482

By tendering your non-USD old notes in the exchange offers you are automatically deemed to appoint the relevant paying agent under the applicable fiscal and paying agency agreement as your proxy at the noteholder meeting (including any adjourned meeting) and to include your tendered non-USD old notes in the block voting instruction to vote in favor of the proposed amendments listed above. See "*The Exchange Offers and Consent Solicitations—Procedures for Tendering Old Notes—Tender of Non-USD Old Notes through Euroclear or Clearstream*" for instructions on how to tender your non-USD old notes.

Each series of non-USD old notes is currently represented by a global note deposited with a common depositary for Euroclear and Clearstream. The non-USD old notes cannot be physically tendered. If you hold old notes in physical, certificated form, you will need to deposit such old notes into the applicable Clearing System in order to participate in the exchange offers. If you need assistance doing so, please contact the Solicitation and Information Agent whose addresses and telephone numbers are located on the back cover page of this prospectus. Receipt from a holder of non-USD old notes or the person holding its interest in the records of Euroclear or Clearstream, on behalf of a non-USD noteholder, of an electronic instruction notice by Euroclear or Clearstream will be deemed to constitute delivery of a vote in favor of the proposed amendments and deposit with the relevant paying agent for the relevant series of non-USD old notes of such notes tendered for the purpose of (a) inclusion of the votes attributable to such notes tendered in the electronic instruction notice issued by the paying agent for such series of non-USD old notes to vote in favor of the amendments, and (b) appointment of the paying agent for such series of non-USD old notes as proxy to vote in favor of the amendments at the noteholder meeting with respect to those non-USD old notes that have been tendered.

**Holders of non-USD old notes held through the Clearing Systems should note that, by delivering an electronic instruction notice, they will agree that (subject to the rights of such holders to revoke their electronic instruction notice, as provided herein) their non-USD old notes will be and remain blocked in the relevant Clearing System and transfers thereof will be restricted, with effect from and including the date on which their electronic instruction notice is received by the relevant Clearing System until the earliest of (a) the date on which they validly revoke their electronic instruction notice in accordance with the terms of the exchange offers and consent solicitations, (b) the date on which the relevant exchange offers and consent solicitations terminate or are withdrawn and (c) the settlement date, all in accordance with the normal operating procedures of such Clearing System, and after taking into account the deadlines imposed by such Clearing Systems. Further details concerning the contents of a valid electronic instruction notice are set out below under "—*Procedures for Delivering an Electronic Instruction Notice*" below.**

**The holder of a voting certificate who wishes to attend the noteholder meeting in person must arrive 15 minutes before the scheduled start time for the noteholder meeting. The holder of a voting certificate attending the noteholder meeting in person must bring with him evidence of his identity (for example, a passport) or, in the case of a holder who is a company, a letter of representation signed by an authorized signatory of that company.**

**Holders who are not direct participants in Euroclear and Clearstream and who hold an interest in the non-USD old notes through a broker, bank or other nominee or custodian must arrange directly or through such broker, bank or other nominee or custodian to contact the accountholder in Euroclear and/ or Clearstream to effect the procedures referred to above. Such holders are urged to contact such broker, bank or other nominee or custodian promptly if they wish to submit an electronic instruction notice.**

### Procedures for Delivering an Electronic Instruction Notice

To vote in support of the proposed amendments and tender non-USD old notes for exchange, holders of non-USD old notes must deliver the appropriate electronic instruction notice to the relevant Clearing System by not later than the expiration date, except that holders who tender non-USD old notes prior to the date on which the registration statement of which this prospectus forms a part is declared effective will not be deemed to have consented to the proposed amendments.

118

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007483

Each holder of non-USD old notes, by delivering an electronic instruction notice, will be affirmatively representing to the representations, warranties and acknowledgements that are set forth below.

The information, certifications and statements to be confirmed by delivering the electronic instruction notice are set out below and will be set out in a notice posted by the Clearing Systems on or around April 27, 2009.

Each custodian and sub-custodian which is a direct or indirect participant in the relevant Clearing System and who holds non-USD old notes on behalf of more than one holder will be required to deliver a separate electronic instruction notice in respect of non-USD old notes of each holder in order for such electronic instruction notice to be valid. An electronic instruction notice in respect of the non-USD old notes that are held jointly or in common by more than one holder may not be treated as being valid by us at our sole discretion. Each electronic instruction notice must set out in full the requisite information in respect of the relevant holder, as set out below:

(a)  the series and the principal amount (which must be a multiple of the minimum denomination of such non-USD old notes) of the non-USD old notes in respect of which the electronic instruction notice is delivered; and

(b)  the name of the holder and the securities account number at the relevant Clearing System in which the non-USD old notes are held and to which the exchange consideration should be delivered;

Only participants may submit electronic instruction notices. If a holder is not a participant, it must arrange for the participant through which it holds non-USD old notes to submit an electronic instruction notice on its behalf to the relevant Clearing System prior to the deadline specified by the relevant Clearing System.

Holders of non-USD old notes that are held in the name of a broker, dealer, bank, trust company or other nominee or custodian should contact such entity sufficiently in advance of the expiration date if they wish to accept the exchange offers and procure that such old notes are blocked in accordance with the normal procedures of the relevant Clearing System and the deadlines imposed by such Clearing System. The offer by a holder (or the relevant participant on its behalf) to participate in the exchange offers may be revoked by such holder (or the relevant participant on its behalf) prior to the withdrawal deadline by submitting an electronic withdrawal instruction to the relevant Clearing System.

A separate electronic instruction notice must be completed in respect of each series of non-USD old notes held by a holder.

Each holder and the relevant participant on its behalf by delivering an electronic instruction notice will be deemed to represent, warrant and undertake, and each electronic instruction notice, to be valid, will be required to state:

(a)  that if the beneficial owner of the relevant non-USD old notes is outside the United States, such beneficial owner is a non-U.S. qualified offeree;

(b)  that the holder instructs the relevant paying agent to appoint a person nominated by the Tabulation Agent as such holder's proxy to vote for the relevant extraordinary resolutions; provided that this clause, (b) shall not apply to an electronic instruction notice in respect of non-USD old notes delivered prior to the date on which the registration statement of which this prospectus forms a part is declared effective;

(c)  that if the holder is a participant in the relevant Clearing System, it authorizes such Clearing System to disclose its identity to the Tabulation Agent;

(d)  that the holder agrees to indemnify GM, GM Nova Scotia, the Dealer Managers, the Solicitation and Information Agent, the Settlement and Escrow Agent, the Luxembourg Exchange Agent, the Exchange Agent and the Tabulation Agent against all and any losses, costs, claims, liabilities, expenses, charges, actions or demands which any of them may incur or which may be made against any of them as a result

119

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007484

of any breach of any of the terms of, or any of the representations, warranties and/or undertakings given pursuant to the exchange offers and consent solicitations by any such holder;

(e) that the holder agrees that the non-USD old notes will be and remain blocked in the securities account to which such non-USD old notes are credited in the relevant Clearing System and transfers thereof will be restricted with effect from, and including, the date on which the relevant electronic instruction notice is received by the relevant Clearing System until the earliest of (i) the date on which such holder validly revokes its electronic instruction notice in accordance with the terms of the exchange offers and consent solicitations, (ii) the date on which the exchange offers and consent solicitations are terminated or withdrawn and (iii) the settlement date, all in accordance with the normal operating procedures of such Clearing System and after taking into account the deadlines imposed by such Clearing System;

(f) that the holder represents, warrants and undertakes that the non-USD old notes are, at the time of delivery of the electronic instruction notice and will continue to be, until the settlement date, held on behalf of the holder by Euroclear or Clearstream;

(g) that (i) the holder agrees that the electronic instruction notice shall be governed by and construed in accordance with New York law, (ii) the holder irrevocably and unconditionally agrees for the benefit of GM, GM Nova Scotia, the Dealer Managers, the Solicitation and Information Agent, the Settlement and Escrow Agent, the Luxembourg Exchange Agent, the Exchange Agent and the Tabulation Agent that the courts of the State of New York shall have exclusive jurisdiction to settle any disputes which may arise out of or in connection with the exchange offers and consent solicitations and electronic instruction notice; and (iii) accordingly, such holder agrees that any suit, action or proceeding arising out of or in connection with the exchange offers and consent solicitations and/or electronic instruction notice may be brought in such courts and such holder will not argue to the contrary;

(h) that the holder represents and warrants that a vote by the holder in respect of the proposed amendments will not result in a breach of any relevant laws or regulations in the jurisdiction in which the holder is resident or from which such holder is delivering the electronic instruction notice;

(i) that it has received, reviewed and accepts the terms of this prospectus, the EU Approved Prospectus or the Canadian Offering Memorandum, as applicable;

(j) it is assuming all the risks inherent in participating in the exchange offers and has undertaken all the appropriate analysis of the implications of the exchange offers and consent solicitations without reliance on GM, GM Nova Scotia, the Dealer Managers, the Solicitation and Information Agent, the Settlement and Escrow Agent, the Luxembourg Exchange Agent or the Exchange Agent;

(k) by blocking non-USD old notes in the relevant Clearing System, it will be deemed to consent to the relevant Clearing System providing details concerning its identity to GM, GM Nova Scotia, the Dealer Managers, the Solicitation and Information Agent, the Settlement and Escrow Agent, the Luxembourg Exchange Agent, the Exchange Agent and their respective legal advisers;

(l) upon the terms and subject to the conditions of the exchange offers, it hereby (i) offers to exchange the principal amount of non-USD old notes in its account blocked in the relevant Clearing System for the relevant exchange consideration and (ii) consents to the proposed amendments with respect to such non-USD old notes; provided that this clause (ii) shall not apply to an electronic instruction notice in respect of non-USD old notes delivered prior to the date on which the registration statement of which this prospectus forms a part is declared effective. It acknowledges that the submission of a valid electronic instruction notice to the relevant Clearing System in accordance with the standard procedures of the relevant Clearing System constitutes its written consent to the proposed amendments and appointment of the paying agent or such person as the paying agent may appoint as its proxy to execute any resolution approving the proposed amendments. Subject to and effective upon the exchange by us of the non-USD old notes blocked in the relevant Clearing System, it hereby renounces all right, title and interest in and to all such non-USD old notes exchanged by or at our direction and hereby waives and releases any rights or claims it may have against us with respect to any such non-USD old notes, the exchange offers or consent solicitations;

120

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007485

(m)  it agrees to ratify and confirm each and every act or thing that may be done or effected by us, any of our directors or any person nominated by us in the proper exercise of his or her powers and/or authority hereunder;

(n)  it agrees to do all such acts and things as shall be necessary and execute any additional documents deemed by us to be desirable, in each case to complete the transfer of the non-USD old notes to us or our nominee in exchange for the exchange consideration and/or to perfect any of the authorities expressed to be given hereunder;

(o)  it has observed the laws of all relevant jurisdictions; obtained all requisite governmental, exchange control or other required consents; complied with all requisite formalities; and paid any issue, transfer or other taxes or requisite payments due from us in each respect in connection with any offer or acceptance in any jurisdiction and that it has not taken or omitted to take any action in breach of the terms of the exchange offers or the consent solicitations or which will or may result in our or any other person acting in breach of the legal or regulatory requirements of any such jurisdiction in connection with the exchange offers or the consent solicitations or tender of non-USD old notes in connection therewith;

(p)  all authority conferred or agreed to be conferred pursuant to its representations, warranties and undertakings and all of its obligations shall be binding upon its successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives and shall not be affected by, and shall survive, its death or incapacity;

(q)  except for the information set forth under "*Material United States Federal Income Tax Considerations*" or "*Material Canadian Federal Income Tax Considerations*" in this prospectus, which is not, and is not intended to be, legal, tax or financial advice to any particular holder, no information has been provided to it by GM, GM Nova Scotia, the Dealer Managers, the Solicitation and Information Agent, the Settlement and Escrow Agent, the Luxembourg Exchange Agent or the Exchange Agent with regard to the tax consequences to holders arising from the exchange of non-USD old notes in the exchange offers for the receipt of the exchange consideration. It hereby acknowledges that it is solely liable for any taxes and similar or related payments imposed on it under the laws of any applicable jurisdiction as a result of its participation in the exchange offers and agrees that it will not and does not have any right of recourse (whether by way of reimbursement, indemnity or otherwise) against GM, GM Nova Scotia, the Dealer Managers, the Solicitation and Information Agent, the Settlement and Escrow Agent, the Luxembourg Exchange Agent, the Exchange Agent or any other person in respect of such taxes and payments;

(r)  upon the exchange of tendered non-USD old notes, we will acquire good, marketable and unencumbered title thereto, free and clear of all liens, restrictions, charges and encumbrances, and that the non-USD old notes tendered hereby are not subject to any adverse claims or proxies;

(s)  if it is a resident in Canada, (i) the Canadian province or territory in which the holder resides, (ii) that the holder has reviewed and acknowledges the resale restrictions referred to in the Canadian Offering Memorandum under the heading "*Resale Restrictions*" and agrees not to resell the exchange consideration except in compliance with such resale restrictions, (iii) that the holder is basing its investment decision exclusively on the Canadian Offering Memorandum and not on any other information, including any advertising, concerning GM, GM Nova Scotia or the exchange offers and consent solicitations, and (iv) in respect of old notes other than convertible old notes, (A) the basis on which the holder is an "accredited investor" as defined in NI 45-106 with reference to the specific criteria described in Schedule "A" to the Canadian Offering Memorandum, (B) that the holder is entitled under applicable Canadian securities laws to acquire the exchange consideration without the benefit of a prospectus qualified under those securities laws, and in the case of holders in provinces other than Ontario and Newfoundland, without the services of a dealer registered pursuant to those securities laws, (C) if in Ontario, the holder is not an individual unless acquiring the exchange consideration from a fully-registered Ontario securities dealer or from a dealer registered in Ontario as

121

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007486

a limited market dealer, (D) the holder is acquiring the exchange consideration as principal for its own account, or is deemed to be acquiring the exchange consideration as principal by applicable law, and (E) the holder was not created or used solely to acquire or hold the exchange consideration without a prospectus in reliance on an exemption from the prospectus requirements under applicable Canadian securities laws;

(t)    it has full power and authority to submit for exchange and transfer the non-USD old notes hereby submitted for exchange;

(u)    the terms and conditions of the exchange offers and consent solicitations shall be deemed to be incorporated in, and form a part of, the electronic instruction notice which shall be read and construed accordingly and that the information given by or on behalf of such holder in the electronic instruction notice is true and will be true in all respects at the time of the exchange;

(v)    it agrees and understands that the submission of non-USD old notes for exchange and delivery of related consents by a holder, as applicable, will be deemed to have occurred upon receipt by the relevant Clearing System of a valid electronic instruction notice in accordance with the requirements of such Clearing System. The receipt of such electronic instruction notice by the relevant Clearing System will be acknowledged in accordance with the standard practices of such Clearing System and will result in the blocking of non-USD old notes in the relevant Clearing System so that no transfers may be effected in relation to such old notes;

(w)    it must take the appropriate steps through the relevant Clearing System to ensure that no transfers may be effected in relation to its blocked non-USD old notes at any time after such date, in accordance with the requirements of the relevant Clearing System and the deadlines required by such Clearing System;

(x)    there are no guaranteed delivery procedures provided by us in connection with the exchange offers for the non-USD old notes; and

(y)    by submitting a valid electronic instruction notice to the relevant Clearing System in accordance with the standard procedures of the relevant Clearing System, holders and the relevant participant on their behalf shall be deemed to make these acknowledgements, representations, warranties and undertakings to GM, GM Nova Scotia, the Dealer Managers, the Solicitation and Information Agent, the Settlement and Escrow Agent, the Luxembourg Exchange Agent and the Exchange Agent on each of the expiration date and settlement date (and if the relevant holder or the relevant participant on its behalf is unable to give such representations, warranties and undertakings, such holder or the relevant participant on its behalf should contact one of the Dealer Managers immediately).

The receipt from a holder or a participant on its behalf of an electronic instruction notice by the relevant Clearing System will constitute instructions to debit the securities in such holder's or participant's account on the settlement date in respect of all of the non-USD old notes that such holder has submitted for exchange, upon receipt by the relevant Clearing System of an instruction from the Exchange Agent to receive those old notes for our account and against credit of the exchange consideration and payment by GM or GM Nova Scotia, as the case may be, in cash, of accrued interest on the non-USD old notes from and including the most recent interest payment date to, but not including, the settlement date, subject to the automatic withdrawal of those instructions in the event that the exchange offer is terminated by us on or prior to the withdrawal of such holder's electronic instruction notice in accordance with the procedure set out herein.

### *Responsibility for Delivery of Electronic Instruction Notices*

(a)    None of GM, GM Nova Scotia, the Dealer Managers, the Solicitation and Information Agent, the Settlement and Escrow Agent, the Luxembourg Exchange Agent or the Exchange Agent will be responsible for the communication of offers to exchange and corresponding electronic instruction notices by:

•    beneficial owners to the participant through which they hold non-USD old notes; or

•    the participant to the relevant Clearing System.

122

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007487

(b) If a holder holds its non-USD old notes through a participant, such holder should contact that participant to discuss the manner in which exchange acceptances and transmission of the corresponding electronic instruction notice and, as the case may be, transfer instructions may be made on its behalf.

(c) In the event that the participant through which a holder holds its non-USD old notes is unable to submit an electronic instruction notice on its behalf, such holder should telephone one of the Dealer Managers or the Exchange Agent for assistance.

(d) In any case, holders are responsible for arranging the timely delivery of their electronic instruction notices.

(e) If a holder holds non-USD old notes or accepts the exchange offers through a participant, such holder should consult with that participant as to whether it will charge any service fees in connection with the participation in the exchange offers.

### Revocation of Voting Instructions

To be effective, any notice of revocation must indicate the relevant voting instructions to be revoked and must be received in the same manner as the original voting instructions. If you are not a record holder, you must arrange to deliver, either directly or through your broker, bank or other nominee or custodian, notice of such revocation to Euroclear and/or Clearstream. You should give such directions to your broker, bank or other nominee or custodian sufficiently in advance to ensure receipt by Euroclear and/or Clearstream of any such notice of revocation prior to the applicable revocation deadline.

None of GM or GM Nova Scotia, as applicable, any paying agent, the Exchange Agent or any other person will be under any duty to give notification of any defects or irregularities with respect to any revocations of voting instructions nor shall any of them incur any liability for failure to give such notification.

A vote cast in accordance with electronic instruction notices shall be valid even if it or any of the holders' instruction orders pursuant to which it was executed has previously been revoked or amended, unless written notice of such revocation or amendment is received from the paying agent by GM or GM Nova Scotia, as applicable, at its registered office at least 24 hours before the time fixed for the applicable meeting. Otherwise, electronic instruction notices may not be revoked at any time during the period commencing 48 hours prior to the time for which the first meeting or any adjourned such meeting is convened.

Electronic instruction notices containing wire instructions that have been revoked may be given again prior to the voting deadline by following the procedures described herein.

Consents to the proposed amendments may not be withdrawn after the withdrawal deadline.

### Procedures at the Noteholder Meetings

Holders should note the quorum requirements for the noteholder meetings set out below. Holders should be aware that if holders present or represented at the noteholder meetings are insufficient to meet these quorum requirements, the proposed amendments to the fiscal and paying agency agreements and the non-USD old notes issued thereunder cannot be considered at the applicable noteholder meeting.

### Notice

The notice of noteholder meeting will be given by publication in the *Financial Times*, delivered to Euroclear and/or Clearstream and published on the website of the Luxembourg Stock Exchange in accordance with the conditions of the non-USD old notes. The Form Notice of Meetings is provided in Annex B to this prospectus.

### Chairman

The chairman of the noteholder meetings will be nominated in writing by GM or GM Nova Scotia, as applicable. If GM or GM Nova Scotia, as applicable, fails to nominate a chairman, or if the nominated chairman

123

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007488