of GM or GM Nova Scotia, as applicable, is not present at any of the noteholder meetings within 15 minutes of the time fixed for such noteholder meeting, then the holders who are present at the noteholder meeting shall choose a chairman from the holders present at such meeting. The chairman of an adjourned meeting does not have to be the same person as the chairman of the original meeting that was adjourned.

### Voting Requirement

The proposed amendments to the fiscal and paying agency agreements and each series of non-USD old notes issued thereunder may only be passed at the applicable noteholder meeting if there is a quorum in respect of such series of old notes that (a) is present and (b) votes to approve such proposed amendments. The quorum for passing the extraordinary resolutions to add the call option and effect the other proposed amendments to the fiscal and paying agency agreements and each series of non-USD old notes issued thereunder will be met at the noteholder meetings if one or more persons being entitled to vote (whether as a physical holder of a non-USD old note or of a voting certificate or as proxy pursuant to an electronic instruction notice) and who together hold or represent the requisite quorum requirement in respect of outstanding non-USD old notes of such series, as set out below across from "First Meeting," (a) are present at the applicable noteholder meeting and (b) vote to approve such extraordinary resolution. If there is not a quorum for the first noteholder meeting, it will be adjourned to a later time and date.

The voting requirement for passing the extraordinary resolution to add the call option is as follows:

| Noteholder Meeting | Voting Requirement |
|---|---|
| First Meeting | One or more persons being holders holding, or with a voting instruction representing, not less than 66⅔% of the aggregate principal amount of the relevant series of then outstanding non-USD old notes of the applicable series. |
| Adjourned Meeting | One or more persons being holders, or with a voting instruction, representing, more than 50% of the aggregate principal amount of the relevant series of then outstanding non-USD old notes of the applicable series. |

The voting requirement for passing the extraordinary resolution to approve the removal of substantially all material affirmative and negative covenants and events of default other than the obligation to pay principal and interest on each series of non-USD old notes is as follows:

| Noteholder Meeting | Voting Requirement |
|---|---|
| First Meeting and Adjourned Meeting | One or more persons being holders, or with a voting instruction, representing, more than 50% of the aggregate principal amount of the relevant series of then outstanding non-USD old notes of the applicable series. |

Every matter to be decided at the noteholder meeting will be decided in the first instance on a show of hands unless a poll is demanded by the chairman, GM or GM Nova Scotia, as applicable, or two or more persons representing at least two percent of the non-USD old notes for the time being outstanding. On a show of hands every person who is present in person and who produces a voting certificate or is a proxy has one vote.

On a poll, every person who is present in person and who produces a voting certificate or is a proxy has one vote in respect of each minimum integral amount of the non-USD old notes of the applicable series so produced or represented by the voting certificate so produced or for which he is a proxy. GM or GM Nova Scotia, as applicable, will call for a poll in each vote.

124

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007489

In case of an equality of votes the chairman shall, both on a show of hands and on a poll, have a casting vote in addition to any other votes which he may have.

In respect of each series of non-USD old notes, if the relevant extraordinary resolutions are passed:

(a)    such extraordinary resolutions will be binding on all holders of the relevant series of non-USD old notes whether or not they have delivered (and whether or not they have revoked) a valid electronic instruction notice and voted in favor of the extraordinary resolutions; and

(b)    regardless of whether a relevant holder of non-USD old notes has delivered (and whether or not such holder has revoked) a valid electronic instruction notice and voted in favor of or against (or abstained from voting on) such extraordinary resolutions, on the settlement date all non-USD old notes of such series will be amended to remove substantially all material affirmative and negative covenants and events of default other than those relating to the obligation to pay principal and interest and/or add the call option as provided in the extraordinary resolutions.

We intend to exercise the call option in respect of all non-USD old notes of each series not tendered in the exchange offers immediately following the effectiveness of the proposed amendments to such series of non-USD old notes, if adopted. From and after the time that we exercise the call option on any series of non-USD old notes, (a) such notes shall be deemed to be discharged, (b) such notes will not be transferable and (c) holders of such notes will have no further rights in respect of those notes other than receipt of the exchange consideration and payment in cash of accrued but unpaid interest on such notes.

Upon or, in our discretion, before the passing of the extraordinary resolutions approving the proposed amendments to each series of non-USD old notes, we will provide a notice to holders of such series of non-USD old notes through the Clearing Systems which will notify holders of the expected date of exercise of the call option in respect of such series of non-USD old notes (such date, the "exercise date"). Such notice will also provide that any non-U.S. qualified offeree who has not validly tendered its non-USD old notes pursuant to the exchange offers and who wishes to receive the exchange consideration on exercise of the call option rather than receiving the Designated Exchange Consideration pursuant to the Escrow Arrangement (as defined below under "—*Escrow Arrangement*") will be required to certify in an electronic notice provided in accordance with the procedures of the Clearing Systems that they are a non-U.S. qualified offeree. In the absence of any such certification, such holders will be deemed to be (for the purposes of the initial delivery of the exchange consideration pursuant to the exercise of the call option and without prejudice to the ability of any such holder to subsequently, during the Escrow Period (as defined below under "—*Escrow Arrangement*"), certify that it is a non-U.S. qualified offeree) not a non-U.S. qualified offeree (each such holder, an "ineligible holder"), and will receive the Designated Exchange Consideration pursuant to the Escrow Arrangement.

### *Escrow Arrangement*

In respect of non-USD old notes of each series subject to the call option, we reserve the right (in our sole discretion) not to deliver exchange consideration pursuant to, and upon exercise of, the call option to any holders of such series of non-USD old notes outstanding following consummation of the exchange offers who are ineligible holders, but instead to implement the following alternative arrangement (the "Escrow Arrangement") regarding such holders' entitlement on exercise of the call option:

(a)    subject to compliance with all applicable laws and regulations, we may, by notice (the "Escrow Notice") to the holders of such series of non-USD old notes through the Clearing Systems, elect not to deliver exchange consideration on exercise of the call option to such ineligible holders but instead to have delivered to Deutsche Bank AG, London Branch, as escrow agent (the "Escrow Agent"), the exchange consideration owing to them pursuant to the call option in respect of the aggregate principal amount of non-USD old notes of such series held by such holders (the "Designated Exchange Consideration"), which Designated Exchange Consideration shall be deposited in or credited to our

125

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007490

account with the Escrow Agent or its custodian with the Clearing Systems (the "Escrow Account") to be held by us until, as soon as reasonably practicable following the end of the period of three months from the exercise of the call option (the "Escrow Period", the last day of that period, the "Three Month Date"), and in any event, not later than 90 days after the Three Month Date, we will sell the Designated Exchange Consideration in the market on arm's length terms at the best price reasonably obtainable and hold the proceeds of sale (net of the costs of sale including the fees of any marketing agent, placement agent or underwriter appointed in relation to the sale and any taxes and provisions for tax on sale or as a result of the Escrow Arrangement) on trust for those holders to pay to each such holder its pro rata share of such net proceeds of sale. The terms of this Escrow Arrangement would be set out in an escrow instrument with the Escrow Agent (the "Escrow Agreement") on or around date of the exercise of the call option which would, among other things, (i) specify that we may not sell or otherwise deal with the Designated Exchange Consideration during the Escrow Period, subject to the obligation on our part to deliver Designated Exchange Consideration free and clear of any trust or any other encumbrance to any such holder (and the right of such holder to call for such delivery) who certifies to our satisfaction before the end of the Escrow Period that it is eligible to receive Designated Exchange Consideration, (ii) entitle such holder to assign its rights under the Escrow Arrangement to a person who is able to certify to us to our satisfaction that it is entitled to receive an assignment of those rights subject to and in accordance with all applicable laws and regulations (it being the sole responsibility of such holder and the proposed assignee to verify that an assignment of such rights to the assignee will be in accordance with all applicable laws and regulations), (iii) provide that we will, acting in good faith and in the best interests of the ineligible holders, appoint a marketing agent, placement agent or underwriter to arrange the sale of the Designated Exchange Consideration on or as soon as practicable following the Three Month Date (the "Cash Proceeds") and (iv) provide that the net proceeds of sale of the Designated Exchange Consideration remaining on the Three Month Date shall be held on trust for such holders to pay (to the extent allowed by applicable law) to each such ineligible holder its pro rata share of such net proceeds of sale;

(b) on specified dates during the Escrow Period, provided that (i) such holder or any person to whom such holder has assigned its rights in respect of the Escrow Arrangements, subject to our having been notified of that assignment in accordance with the Escrow Agreement, or (ii) such holder is able to provide evidence to us which is satisfactory in all respects that it is or has become a non-U.S. qualified offeree or is otherwise eligible to receive a transfer of Designated Exchange Consideration, that person will have the right under the Escrow Agreement to require us to deliver the relevant Designated Exchange Consideration to its account with the Clearing Systems, the details of which shall be specified in such notice. Such Designated Exchange Consideration shall be delivered to such holders (or any person to whom rights in respect of the Escrow Arrangements have been assigned) on the last business day of the calendar month within which the evidence of eligibility was provided and the right of delivery of the Designated Exchange Consideration accrued in favor of such holder or person;

(c) we will be entitled to any dividends paid on the Designated Exchange Consideration from the date of the exercise of the call option to the date of sale (being on or as soon as practicable and in any event not later than 90 days following the Three Month Date) or, if earlier, transfer to any such holder who has become a non-U.S. qualified offeree during the Escrow Period, which dividends shall be held in the Escrow Account, and we will pursuant to the Escrow Agreement pay to each such holder a compensation amount equal to the amount of any such dividend paid from the date of the exercise of the call option to the date on which the relevant Designated Exchange Consideration is sold or transferred as provided above and, if sold, the net proceeds of sale as described under paragraph (a) above;

(d) such holders should note that the cash amount payable by us in the circumstances described in paragraph (a) above will be limited to the net proceeds as described above actually received upon the sale of the relevant Designated Exchange Consideration, which may be less than the principal amount of such Designated Exchange Consideration. Furthermore, such holders will not have any beneficial

126

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007491

interest in the Designated Exchange Consideration that is held in the Escrow Account and, in
particular, such holders will not have any right to control or exercise voting or other rights in relation to
the Designated Exchange Consideration; and

(e)   if the Escrow Arrangement is implemented and we execute the Escrow Agreement, such holders will
be deemed to have delivered the relevant non-USD old notes to us for cancellation against and
conditional upon implementation of the Escrow Arrangement and execution of the Escrow Agreement
pursuant to which such holders acquire certain rights in relation to the Designated Exchange
Consideration.

The Escrow Arrangement described in this section is a term of the extraordinary resolutions and, by delivery
of an electronic instruction notice, holders of the non-USD old notes are, among other things, deemed to have
agreed to the Escrow Arrangement and the terms of the Escrow Agreement if implemented by us. In the event
that we decide to proceed with the Escrow Arrangement, further details will be set out in the relevant Escrow
Notice.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007492

## COMPARISON OF OLD NOTES VERSUS THE AMENDED OLD NOTES

The following is a description of the differences between the old notes and the amended old notes. This comparison is provided for convenience only, and you should review the full descriptions of the proposed amendments in the section *"Proposed Amendments."*

| | Old Notes | Amended Old Notes |
|---|---|---|
| **Issuer** | General Motors Corporation. | General Motors Corporation. |
| | GM Nova Scotia with respect to 8.375% Guaranteed Notes due 2015 and 8.875% Guaranteed Notes due 2023. | GM Nova Scotia with respect to 8.375% Guaranteed Notes due 2015 and 8.875% Guaranteed Notes due 2023. |
| **Interest /Maturity Date** | The interest rates and maturity dates of each series of old notes are set forth in the summary offering table on the inside front cover of this prospectus. | The proposed amendments will not affect the interest rates or maturity dates of the old notes, except with respect to the Series D notes as described below. |
| | | Holders of amended Series D notes subject to the Forbearance, Waiver and Extension (as described herein) will irrevocably waive their right to payment upon maturity until the Forbearance, Waiver and Extension Termination Date. |
| | | Also see "Optional Redemption" below. |
| **Guarantors** | General Motors Corporation solely with respect to 8.375% Guaranteed Notes due December 7, 2015 and 8.875% Guaranteed Notes due July 10, 2023. | General Motors Corporation solely with respect to 8.375% Guaranteed Notes due December 7, 2015 and 8.875% Guaranteed Notes due July 10, 2023. |
| **Ranking** | The old notes rank *pari passu* in right of payment with all of our existing and future senior unsecured indebtedness, but are effectively subordinated to our secured indebtedness to the extent of the value of the assets securing such indebtedness. | The proposed amendments will not affect the ranking of the old notes. |
| **Voting** | USD old notes vote together with all other securities as one voting class under the indentures pursuant to which all such old notes were issued. | Each series of amended USD old notes will vote together with all other amended USD old notes as one voting class under the debt instruments pursuant to which all such amended USD old notes were issued. |
| | Each series of non-USD old notes vote separately as one voting class under the terms and conditions of such non-USD old notes. | Amended non-USD old notes will vote separately as one voting class under the terms and conditions of such non-USD old notes. |
| **Collateral/ Security** | None. | None. |

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007493

| | Old Notes | Amended Old Notes |
|---|---|---|
| **Optional Redemption** | Optional redemption provisions vary by series of old notes. | The amended non-USD old notes will be subject to the call option, pursuant to which we intend to redeem such amended non-USD old notes. The proposed amendments will not otherwise alter the optional redemption provisions of the old notes. |
| **Mandatory Redemption** | None. | None. |
| **Certain Covenants:** | | |
| **Liens** | Subject to certain exceptions, GM will not, nor will it permit any of its manufacturing subsidiaries to issue or assume any debt secured by a mortgage upon any principal domestic manufacturing property of GM, or any manufacturing subsidiary or upon any shares of stock or indebtedness of any manufacturing subsidiary without, in any such cases effectively providing concurrently with the issuance or assumption of any such debt that the old note shall be secured equally and ratably with such debt. | None. |
| **Sale and Leaseback Transactions** | Subject to certain exceptions, GM will not, nor will it permit any manufacturing subsidiary to, enter into any arrangement with any person providing for the leasing by GM or any manufacturing subsidiary of any principal domestic manufacturing property owned by GM or any manufacturing subsidiary on the date that the debt is originally issued, which property has been or is to be sold or transferred by GM or such manufacturing subsidiary to such person. | None. |
| **Merger, Sale of Assets** | GM (and, with respect to old GM Nova Scotia notes, GM Nova Scotia), will not merge or consolidate with any other corporation or sell or convey all or substantially all of its assets to any person, firm or corporation unless (a) either GM (or, with respect to old GM Nova Scotia notes, GM and GM Nova Scotia, as the case may be), shall be the continuing corporation or the successor corporation shall be a corporation organized and existing under the laws of the United States of America or a state thereof (or, with respect to the old GM Nova Scotia notes, the United States of | None. |

129

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007494

| | Old Notes | Amended Old Notes |
|---|---|---|
| | America or the laws of Canada or a province thereof, as the case may be) and such corporation shall expressly assume the due and punctual payment of the principal of, interest, and additional amounts, if any, on the old notes, according to their tenor, and the due and punctual performance and observance of all of the covenants and conditions of the debt instruments governing the old notes and the company and (b) GM (or, with respect to old GM Nova Scotia notes, GM and GM Nova Scotia, as the case may be) or such successor corporation shall not, immediately after such merger or consolidation, or sale or conveyance, be in default in the performance of any covenant or condition to the debt instruments governing the old notes. | |
| **Events of Default** | Events of default includes (a) default in payment of any principal or premium, if any, on such series; (b) default for 30 days in payment of any interest or additional amounts on such series; (c) failure to perform any other of the covenants or agreements contained in the debt instruments governing the old notes for 90 days after proper notice shall have been given to the Company pursuant to the terms of the debt instruments governing the old notes; or (d) certain events of bankruptcy, insolvency or reorganization. | Same as those set forth in the debt instruments governing the old notes, except no event of default for (a) failure of GM to observe or perform non-payment related covenants relating to any of the agreements governing the old notes; and (b) certain events of bankruptcy, insolvency or reorganization. |

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007495

**DEALER MANAGERS, EXCHANGE AGENT, SOLICITATION AND INFORMATION AGENT,
THE SETTLEMENT AND ESCROW AGENT AND LUXEMBOURG EXCHANGE AGENT**

**Dealer Managers**

Subject to the terms and conditions set forth in the dealer managers agreement dated as of April 26, 2009, we have retained Morgan Stanley & Co. Incorporated and Banc of America Securities LLC to act as the Global Coordinators, Citigroup Global Markets Inc. and J.P. Morgan Securities Inc., to act as the U.S. Lead Dealer Managers, Barclays Capital Inc. and Deutsche Bank Securities Inc. to act as the Non-U.S. Lead Dealer Managers and UBS Securities LLC and Wachovia Capital Markets, LLC to act as Dealer Managers. We are paying the Dealer Managers a customary fee for their services as Dealer Managers in connection with the exchange offers and consent solicitations. We have agreed to reimburse each of the Dealer Managers for its respective reasonable out-of-pocket expenses and to indemnify it against certain liabilities, including liabilities under federal securities laws and to contribute to payments that they may be required to make in respect thereof. Except for the soliciting dealer fee described below under "—*Fees and Expenses*," no fees or commissions have been or will be paid by us to any broker, dealer or other person, other than the Dealer Managers, the Exchange Agent, the Solicitation and Information Agent, the Settlement and Escrow Agent and the Luxembourg Exchange Agent, in connection with the exchange offers and the consent solicitations.

The Dealer Managers may contact holders of old notes regarding the exchange offers and consent solicitations and may request banks, brokers and other nominees or custodians to forward this prospectus and related materials to beneficial owners of old notes. With respect to jurisdictions located outside of the United States, the exchange offers and consent solicitations may be conducted through affiliates of the Dealer Managers that are registered and/or licensed to conduct the exchange offers and consent solicitations in such jurisdictions. The customary mailing and handling expenses incurred by forwarding material to their customers will be paid by us.

The Dealer Managers and their respective affiliates have from time to time provided and currently provide certain commercial banking, lending, treasury and securities, financial advisory and investment banking services to, and have a variety of other commercial relationships with, us and our affiliates, for which they have received customary fees for such services. Certain of the relationships involve transactions that are material to us and our affiliates and for which the Dealer Managers have received significant fees. In the ordinary course of their businesses, the Dealer Managers or their affiliates may serve as counterparties to our financing arrangements and may at any time hold long or short positions, and may trade for their own accounts or the accounts of customers, in our debt or equity securities, including any of the old notes or the exchange consideration and, to the extent that the Dealer Managers or their affiliates own old notes during the exchange offers, they may tender such notes pursuant to the terms of the exchange offers. The Dealer Managers and their affiliates may from time to time engage in future transactions with us and our affiliates and provide services to us and our affiliates in the ordinary course of their respective businesses. In addition, the Dealer Managers and/or their affiliates serve as agents and lenders under certain of our existing credit facilities. Erskine B. Bowles, a member of our board of directors, is also a member of the board of directors of Morgan Stanley & Co. Incorporated. Citigroup Inc., an affiliate of Citigroup Global Markets Inc., has an indirect equity ownership interest in GMAC.

None of the Dealer Managers, the Exchange Agent, the Solicitation and Information Agent, the Settlement and Escrow Agent or the Luxembourg Exchange Agent assumes any responsibility for the accuracy or completeness of the information concerning us contained or incorporated by reference in this prospectus or for any failure by us to disclose events that may have occurred and may affect the significance or accuracy of such information.

**Exchange Agent**

D.F. King & Co., Inc. has been appointed as Exchange Agent for the exchange offers. Questions and requests for assistance, and all correspondence in connection with the exchange offers, or requests for additional letters of transmittal and any other required documents, may be directed to the Exchange Agent at its addresses and telephone numbers set forth on the back cover of this prospectus.

131

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007496

### Solicitation and Information Agent

D.F. King & Co., Inc. has been appointed as Solicitation and Information Agent for the exchange offers and consent solicitations. The Solicitation and Information Agent will assist with the mailing of this prospectus and related materials to holders of old notes, respond to inquiries of, and provide information to, holders of old notes in connection with the exchange offers and consent solicitations, and provide other similar advisory services as we may request from time to time. Requests for additional copies of this prospectus, letters of transmittal and any other required documents may be directed to the Solicitation and Information Agent at the address and telephone number set forth on the back cover of this prospectus.

In addition to the Solicitation and Information Agent, our directors, officers and regular employees, who will not be specifically compensated for such services, may contact holders personally or by mail, telephone, e-mail or facsimile regarding the exchange offers and the consent solicitations and may request brokers, dealers and other nominees or custodians to forward this prospectus and related materials to beneficial owners of the old notes.

Any holder that has questions concerning the terms of any of the exchange offers and consent solicitations may contact the Exchange Agent and the Solicitation and Information Agent at their addresses and telephone numbers set forth on the back cover of this prospectus. Holders of old notes may also contact their broker, dealer, custodian bank, depository, trust company or other nominee for assistance concerning the exchange offers and consent solicitations.

### Settlement and Escrow Agent

Deutsche Bank AG, London Branch, has been appointed as Settlement and Escrow Agent for the non-USD old notes.

### Luxembourg Exchange Agent

Deutsche Bank Luxembourg, S.A. has been appointed as Luxembourg Exchange Agent for the non-USD old notes listed on the Luxembourg Stock Exchange.

### Fees and Expenses

In addition to our obligation to reimburse the Dealer Managers for their reasonable out-of-pocket expenses as described in this section, we will pay the Exchange Agent, the Solicitation and Information Agent, the Settlement and Escrow Agent and the Luxembourg Exchange Agent reasonable and customary fees for their services (and will reimburse them for their reasonable out-of-pocket expenses in connection therewith). In addition, we will indemnify the Dealer Managers, the Exchange Agent, the Solicitation and Information Agent, the Settlement and Escrow Agent and the Luxembourg Exchange Agent against certain liabilities in connection with their services, including liabilities under the U.S. federal securities laws and the applicable laws of Luxembourg.

GM will agree to pay a soliciting dealer fee equal to $5.00 for each 1,000 U.S. dollar equivalent principal amount (or, in the case of the discount notes, accreted value) of old notes that are validly tendered and accepted for purchase pursuant to the exchange offers to retail brokers that are appropriately designated by their clients to receive this fee, but only if the old notes of each applicable series that are tendered by or for that beneficial owner have an aggregate U.S. dollar equivalent principal amount of $250,000 or less. Soliciting dealer fees will only be paid to retail brokers upon consummation of the exchange offers. No soliciting dealer fees will be paid if the exchange offers are not consummated, and the fees will be payable thereafter upon request by the soliciting dealers and presentation of such supporting documentation as GM may reasonably request. In addition, we will pay brokerage houses and other custodians, nominees and fiduciaries their reasonable out-of-pocket expenses

132

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007497

incurred in connection with forwarding copies of this prospectus and related documents to the beneficial owners of old notes and in connection with handling or forwarding tenders for exchange and payment. We will pay or cause to be paid any transfer taxes applicable to the tender of old notes.

The total estimated cash expenditures to be incurred by us in connection with the exchange offers and consent solicitations, including printing, accounting and legal fees, and the fees and expenses of the Dealer Managers, the Exchange Agent, Solicitation and Information Agent, the Settlement and Escrow Agent, Luxembourg Exchange Agent, advisors to the unofficial ad hoc bondholders committee, retail brokers and the trustee, are estimated to be approximately $215 million.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007498

## DESCRIPTION OF GENERAL MOTORS NOVA SCOTIA FINANCE COMPANY

GM Nova Scotia is the issuer of the old GM Nova Scotia notes, which are guaranteed by GM and subject to the exchange offers. GM Nova Scotia, incorporated on September 28, 2001 as a Nova Scotia unlimited company, is a direct, wholly owned subsidiary of GM. GM Nova Scotia's registered office is located at Purdy's Wharf Tower II, 1300-1969 Upper Water Street, Halifax, Nova Scotia, B3J 3R7. GM Nova Scotia issued £600 million aggregate principal amount of old GM Nova Scotia notes in two series consisting of a £350 million series due in 2015 and a £250 million series due in 2023. GM Nova Scotia has no independent operations other than acting as a finance company for GM and its subsidiaries. GM Nova Scotia has assets consisting of two unsecured intercompany loans to General Motors of Canada Limited with an aggregate face value of approximately C$1.33 billion ("GMCL Intercompany Loans"). GM Nova Scotia is also party to two currency swap agreements with GM, pursuant to which GM Nova Scotia pays Canadian dollars and receives pounds sterling. The GMCL Intercompany Loans, together with the related swaps, fund repayment under the two series of the old GM Nova Scotia notes. As of March 31, 2009, GM Nova Scotia would owe a net liability of approximately C$632 million to GM under the swaps, if the swaps were terminated as of such date. The old GM Nova Scotia notes are fully and unconditionally guaranteed as to payment by GM. GM Nova Scotia does not, and will not, file separate reports with the SEC.

GM Nova Scotia is jointly making the exchange offers with GM in respect of the exchange offers for the old GM Nova Scotia notes. The exchange consideration being offered to holders of old GM Nova Scotia notes is the same as that being offered to holders of old GM notes. Old GM Nova Scotia notes acquired pursuant to the exchange offers or redeemed pursuant to the call option will be cancelled upon receipt by GM Nova Scotia.

In the event that we were to seek relief under the U.S. Bankruptcy Code, only the guarantee by GM of the old GM Nova Scotia notes would potentially be discharged in GM's reorganization case. The old GM Nova Scotia notes would not be cancelled and the holders thereof would not be precluded by a GM reorganization case from seeking payment from GM Nova Scotia for the balance due under the old GM Nova Scotia notes. In addition, because GM Nova Scotia is an "unlimited company," under Nova Scotia corporate law, if GM Nova Scotia is "wound up" (which includes liquidation and likely includes bankruptcy), the liquidator or trustee in bankruptcy may be able to assert a claim against GM, the shareholder of GM Nova Scotia, to contribute to GM Nova Scotia an amount sufficient for GM Nova Scotia to pay its debts and liabilities, including amounts equal to any amounts outstanding under the old GM Nova Scotia notes. It is possible that such claim for contribution may be impaired in the event GM seeks relief under the U.S. Bankruptcy Code. In addition, in the event that we were to seek relief under the U.S. Bankruptcy Code, General Motors of Canada Limited and/or GM Nova Scotia may decide to seek relief under applicable Canadian bankruptcy law, in which case the GMCL Intercompany Loans may be impaired. Each of the foregoing events may adversely affect the recovery holders of old GM Nova Scotia notes may receive on account of their old notes.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007499

## DESCRIPTION OF AMENDED SERIES D NOTES

By tendering, and not validly withdrawing, their old Series D notes, holders of old Series D notes will irrevocably agree, in the event the exchange offers are extended beyond June 1, 2009, to extend the maturity of their old Series D notes and to forbear from taking any action to enforce, or direct enforcement of, and waive any and all of the rights and remedies available to such holders, including the right to payment upon maturity, under such old Series D notes or the 1995 Indenture, in each case until the Forbearance, Waiver and Extension Termination Date, as described under *"The Exchange Offers and Consent Solicitations—Forbearance, Waiver and Extension by Holders of Old Series D Notes."* As a result, such tendered old Series D notes may be deemed to be a new security.

The following description is only a summary of the material provisions of the amended Series D notes and the 1995 Indenture governing the amended Series D notes and does not purport to be complete and is qualified in its entirety by reference to the provisions of the 1995 Indenture, including the definitions therein of certain terms used below. We urge you to read the 1995 Indenture and the amended Series D notes because these instruments, not this description, define your rights as holders of the amended Series D notes. You may request a copy of any of the 1995 Indenture or the amended Series D notes at our address set forth under the heading *"Incorporation of Certain Documents by Reference."* In the following description, "we" and "our" refer to General Motors Corporation and not its subsidiaries.

### General

The amended Series D notes have denominations of $25.00 or in integral multiples of $25.00. The amended Series D notes will be payable at the principal corporate trust office of the paying agent, which is Citibank N.A., or an office or agency maintained by us for such purpose.

The amended Series D notes are our general, unsecured obligations and are effectively subordinated to all of our existing and future secured debt, to the extent of the assets securing such debt. We expect from time to time to incur additional indebtedness and other liabilities. The 1995 Indenture does not limit the amount of indebtedness that we or any of our subsidiaries may incur.

The amended Series D notes bear interest at the rate of 1.50% interest per annum, subject to the Forbearance, Waiver and Extension. Interest on the amended Series D notes will accrue from the most recent date to which interest has been paid or provided for. Interest will be payable semiannually in arrears on June 1 and December 1 of each year to holders of record at the close of business on the May 15 or November 15 preceding such June 1 or December 1. Each payment of interest on the amended Series D notes will include interest accrued for the period commencing on, and including, the immediately preceding interest payment date through the day before the applicable interest payment date. Any payment required to be made on any day that is not a business day will be made on the next succeeding business day. Interest will be calculated using a 360-day year composed of twelve 30-day months. A "business day" is any weekday that is not a day on which banking institutions in The City of New York are authorized or obligated to close. Interest will cease to accrue on a amended series D note upon its maturity, conversion or repurchase by us at the option of a holder upon a fundamental change.

The 1995 Indenture and amended Series D notes are governed by, and construed in accordance with, the laws of the State of New York.

The amended Series D notes may be presented for conversion at the office of the conversion agent and for exchange or registration of transfer at the office of the registrar. The conversion agent and the registrar is Citibank N.A. No service charge will be made for any registration of transfer or exchange of the amended Series D notes. However, we may require the holder to pay any tax, assessment or other governmental charge payable as a result of such transfer or exchange.

We may at any time, to the extent permitted by applicable law, purchase the amended Series D notes in the open market or by tender at any price or by private agreement.

135

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007500

### Conversion Rights

#### General

Holders may surrender their amended Series D notes at any time for conversion up to the second business day immediately preceding the maturity date, subject to the Forbearance, Waiver and Extension.

Holders may convert their amended Series D notes in part so long as such part is $25.00 principal amount or an integral multiple of $25.00. Upon conversion of the amended Series D notes, we will pay or deliver, as the case may be, per $25.00 principal amount of amended Series D notes to be converted, for each trading day in the relevant 40 trading day observation period (as defined below), cash in an amount equal to the applicable daily settlement amount (as defined below) of the amended Series D notes on the relevant trading day and, if applicable, cash, shares of GM common stock or a combination thereof, at our election, as described below under "—*Settlement Upon Conversion.*"

If a holder has submitted its amended Series D notes for repurchase upon a fundamental change, such holder may thereafter convert its amended Series D notes only if it has previously withdrawn its repurchase election in accordance with the terms of the 1995 Indenture.

Upon conversion of the amended Series D notes, a holder will not receive any cash payment of interest (unless such conversion occurs between a regular record date and the interest payment date to which it relates). We will not issue fractional shares of GM common stock upon conversion of the amended Series D notes. Instead, we will pay cash in lieu of any fractional shares as described below under "—*Settlement Upon Conversion.*" Our payment or delivery, as the case may be, of cash and shares of GM common stock, if any, into which the amended Series D note is convertible, together with cash in lieu of any fractional shares, will be deemed to satisfy our obligation to pay:

- the principal amount of the amended Series D note; and

- accrued but unpaid interest attributable to the period from the most recent interest payment date to the conversion date.

As a result, accrued but unpaid interest to the conversion date is deemed to be paid in full rather than cancelled, extinguished or forfeited.

Notwithstanding the preceding paragraph, if amended Series D notes are converted after a record date but prior to the next succeeding interest payment date, holders of such amended Series D notes at the close of business on the record date will receive the interest payable on such amended Series D notes on the corresponding interest payment date notwithstanding the conversion. Such amended Series D notes, upon surrender for conversion, must be accompanied by funds equal to the amount of interest payable on the amended Series D notes so converted; provided that no such payment need be made (1) if we have specified a fundamental change repurchase date that is after a record date but on or prior to the next succeeding interest payment date, (2) in respect of any conversions that occur after the record date immediately preceding the maturity date or (3) to the extent of any overdue interest that exists at the time of conversion with respect to such amended Series D note.

#### Conversion Procedures

To convert its amended Series D notes, a holder must:

- complete and manually sign the conversion notice on the back of the amended Series D note or facsimile of the conversion notice and deliver this notice to the conversion agent;

- surrender the amended Series D note to the conversion agent;

- if required, furnish appropriate endorsements and transfer documents;

136

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007501

- if required, pay all transfer or similar taxes; and

- if required, pay funds equal to interest payable on the next interest payment date.

The date a holder complies with these requirements is the "conversion date" under the 1995 Indenture. If a holder holds a beneficial interest in a global note, to convert such holder must comply with the last two requirements listed above and comply with DTC's procedures for converting a beneficial interest in a global note. A holder receiving shares of GM common stock upon conversion will not be entitled to any rights as a holder of GM common stock, including, among other things, the right to vote and receive dividends and notices of stockholder meetings, until the close of business on the last trading day of the relevant observation period.

### Settlement Upon Conversion

We will satisfy our conversion obligation with respect to any amended Series D notes by paying cash up to the aggregate principal amount of amended Series D notes to be converted and paying or delivering, as the case may be, cash, shares of GM common stock or a combination thereof, at our election, with respect to the remainder, if any, of our conversion obligation, as described below.

We will pay an amount in cash equal to the principal return of the amended Series D notes converted for each trading day in the relevant observation period, calculated as described below. In addition, if the daily conversion value exceeds the principal return of the converted amended Series D notes on any trading day during such observation period, in addition to paying the principal return of the converted amended Series D notes in cash for each such trading day, we will also pay or deliver, as the case may be, cash, shares of GM common stock or a combination thereof, at our election, with a value equal to the excess of the daily conversion value over the principal return of the converted amended Series D notes for such trading day, all calculated as described below. We will settle conversions of the amended Series D notes on the third trading day immediately following the last day of the relevant observation period by paying and delivering, as the case may be, cash and shares of GM common stock, if applicable, in an amount equal to the sum of the "daily settlement amounts" (as defined below) for each of the 40 trading days during such observation period.

The "observation period" with respect to any amended Series D note means the 40 trading day period beginning on (and including) the 42nd scheduled trading day immediately preceding the maturity date.

The "daily settlement amount" for each of the 40 trading days during the observation period means:

- an amount of cash equal to the lesser of (x) \$0.625 and (y) the daily conversion value for such trading day (the "principal return"); and

- if such daily conversion value exceeds \$0.625, a number of shares of GM common stock (the "daily share amount"), subject to our right to pay cash in lieu of all or a portion of such shares, as described below, equal to (A) the difference between such daily conversion value and \$0.625, divided by (B) the "daily VWAP" (as defined below) of GM common stock for such trading day.

By the close of business on the business day immediately preceding the first scheduled trading day of the relevant observation period, we may specify a percentage of the daily share amounts for the relevant observation period (or for certain specified holders with a given observation period) that will be settled in cash (the "cash percentage"), and we will concurrently notify you and the paying agent of such cash percentage (the "cash percentage notice"). We need not treat all converting holders with the same observation period in the same manner. So long as we provide notice of the relevant cash percentage as described in the first sentence of this paragraph, we may choose with respect to all or any portion of converting holders with the same observation period to specify a cash percentage, or we may specify different cash settlement percentages for each such holder. If we elect to specify a cash percentage, the amount of cash that we will deliver in lieu of all or the applicable portion of the daily share amount in respect of each trading day in the relevant observation period will

137

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007502

equal: (i) the cash percentage, *multiplied by* (ii) the daily share amount for such trading day (assuming we had not specified a cash percentage), *multiplied by* (iii) the daily VWAP for such trading day. The number of shares of GM common stock deliverable in respect of each trading day in the relevant observation period will be a percentage of the daily share amount (assuming we had not specified a cash percentage) equal to 100% *minus* the cash percentage. If we do not specify a cash percentage, we must settle 100% of the daily share amount for each trading day in such observation period with shares of GM common stock; *provided, however*, that we will pay cash in lieu of any fractional shares as described below. We may, at our option, revoke any cash percentage notice by notifying the holders and the paying agent; *provided* that we must revoke such notice and so notify holders and the paying agent on or prior to the close of business on the scheduled trading day immediately preceding the first scheduled trading day of the relevant observation period.

The "daily conversion value" means, for each of the 40 consecutive trading days during the observation period, 1/40th of the product of (1) the applicable conversion rate and (2) the "daily VWAP" (as defined below) of GM common stock (or the consideration into which shares of GM common stock have been converted in connection with certain corporate transactions) on such trading day.

The "daily VWAP" of GM common stock means, for each of the 40 consecutive trading days during the observation period, the per share volume-weighted average price as displayed under the heading "Bloomberg VWAP" on Bloomberg page GM.N <equity> AQR (or any equivalent successor page) in respect of the period from the scheduled open of trading on the principal U.S. national or regional securities exchange or market on which GM common stock is listed or admitted for trading to the scheduled close of trading on such exchange or market on such trading day (without regard to after-hours trading), or if such volume-weighted average price is unavailable, the market value of one share of GM common stock on such trading day using a volume-weighted method as determined by a nationally recognized independent investment banking firm retained for this purpose by us.

"Trading day" means a day during which (i) trading in GM common stock generally occurs on the principal U.S. national or regional securities exchange or market on which GM common stock is listed or admitted for trading and (ii) there is no "VWAP market disruption event" (as defined below). If GM common stock is not so listed or traded, then "trading day" means a business day.

"VWAP market disruption event" means (i) a failure by the principal U.S. national or regional securities exchange or market on which GM common stock is listed or admitted to trading to open for trading during its regular trading session or (ii) the occurrence or existence prior to 1:00 p.m., New York City time, on any scheduled trading day for GM common stock for an aggregate one half-hour period of any suspension or limitation imposed on trading (by reason of movements in price exceeding limits permitted by the stock exchange or otherwise) in GM common stock or in any options contracts or futures contracts relating to GM common stock.

"Scheduled trading day" means a day that is scheduled to be a trading day.

We will deliver cash in lieu of any fractional shares of GM common stock deliverable upon conversion based on the closing price (as defined below) of GM common stock on the last trading day of the relevant observation period. In respect of any conversion, the fractional amount of a share to be delivered, if any, will be based on the sum of the daily share amounts for all trading days in the observation period (rather than on a per trading day basis).

The "closing price" of GM common stock or any other security on any date means the closing sale price per share (or, if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on that date as reported in composite transactions for the principal U.S. securities exchange on which GM common stock or such other security is traded. If GM common stock or such other security is not listed for trading on a U.S. national or regional securities exchange on

138

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007503

the relevant date, the "closing price" will be the last quoted bid price for GM common stock or such other security in the over-the-counter market on the relevant date as reported by the National Quotation Bureau or similar organization. If GM common stock or such other security is not so quoted, the closing price will be the average of the mid-point of the last bid and ask prices for GM common stock or such other security on the relevant date from each of at least three nationally recognized independent investment banking firms selected by us for this purpose. The closing price will be determined without reference to extended or after hours trading.

### Adjustment To Conversion Rate

#### *General*

The conversion rate on the amended Series D notes will not be adjusted for accrued interest. We will adjust the conversion rate on the amended Series D notes if any of the following events occur:

(i) We issue dividends or distributions on shares of GM common stock payable in shares of GM common stock.

(ii) We subdivide, combine or reclassify shares of GM common stock.

(iii) We distribute to all holders of shares of GM common stock rights, options or warrants to purchase shares of GM common stock for a period expiring within 45 days of the record date for such distribution at less than the average of the closing prices for the ten consecutive trading days immediately preceding the public announcement of such distribution.

(iv) We distribute to all holders of shares of GM common stock our capital stock, assets (including shares of any subsidiary or business unit of ours) or debt securities or certain rights to purchase our securities (excluding (1) any dividends or distributions described in clause (i) above, (2) any rights, options or warrants described in clause (iii) above and (3) any dividends or other distributions described in clause (v) or clause (vi) below), in which event the conversion rate will be adjusted by multiplying such conversion rate by a fraction,

- the numerator of which will be the current market price (as defined below) of GM common stock, and

- the denominator of which will be the current market price of GM common stock, minus the fair market value, as determined by our board of directors, of the portion of those assets, debt securities, shares of capital stock or rights so distributed applicable to one share of GM common stock.

Notwithstanding anything to the contrary in this clause (iv), if we distribute capital stock of, or similar equity interests in, a subsidiary or other business unit of ours, then the conversion rate will be adjusted based on the market value of the securities so distributed relative to the market value of GM common stock, in each case based on the average closing price of those securities for the ten trading days commencing on, and including, the fifth trading day after the "ex-date" (as defined below) for such distribution on the New York Stock Exchange or such other national or regional exchange or market on which the securities are then listed or quoted.

(v) We distribute any regular, quarterly cash dividend or distribution to all holders of GM common stock during any quarterly fiscal period that does not equal $0.25 per share (the "dividend threshold"), in which event the conversion rate will be adjusted as follows:

- if the per share amount of such regular, quarterly cash dividend or distribution is greater than the dividend threshold, the conversion rate will be adjusted by multiplying such conversion rate by a fraction,

  - the numerator of which will be the closing price of GM common stock on the trading day immediately preceding the ex-date for such dividend or distribution, and

139

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007504

- the denominator of which will be the closing price of GM common stock on the trading day immediately preceding the ex-date for such dividend or distribution, minus the amount in cash per share we distribute to all holders of GM common stock in excess of the dividend threshold; and

- if the per share amount of such regular, quarterly cash dividend or distribution is less than the initial dividend threshold (which, for the avoidance of doubt, would include the failure to pay any regular, quarterly cash dividend or distribution during the relevant quarterly fiscal period, in which case we will be deemed to have declared and paid a cash dividend of $0.00, the ex-date of which will be deemed to be the second to last trading day of the applicable fiscal period), the conversion rate will be adjusted by multiplying such conversion rate by a fraction,

  - the numerator of which will be the closing price of GM common stock on the trading day immediately preceding the ex-date for such dividend or distribution, and

  - the denominator of which will be the closing price of GM common stock on the trading day immediately preceding the ex-date for such dividend or distribution, plus the amount of the dividend threshold in excess of cash per share we distribute to all holders of GM common stock.

(vi) We distribute any cash dividend or distribution that is not a regular, quarterly cash dividend or distribution to all holders of GM common stock, in which event the conversion rate will be adjusted by multiplying such conversion rate by a fraction,

- the numerator of which will be the closing price of GM common stock on the trading day immediately preceding the ex-date for such dividend or distribution, and

- the denominator of which will be the closing price of GM common stock on the trading day immediately preceding the ex-date for such dividend or distribution, minus the amount of cash per share that we distribute to all holders of GM common stock.

(vii) We or any of our subsidiaries distribute cash or other consideration in respect of a tender offer or exchange offer for GM common stock, where such cash and the value of any such other consideration per share of GM common stock validly tendered or exchanged exceeds the closing price of GM common stock on the trading day immediately following the last date on which tenders or exchanges may be made pursuant to the tender or exchange offer, in which event the conversion rate will be adjusted by multiplying such conversion rate by a fraction,

- the numerator of which will be the sum of (1) the fair market value, as determined by our board of directors, of the aggregate consideration payable for all shares of GM common stock we purchase in such tender or exchange offer and (2) the product of the number of shares of GM common stock outstanding, less any such purchased shares, and the closing price of GM common stock on the trading day immediately following the last date on which tenders or exchanges may be made pursuant to the tender or exchange offer, and

- the denominator of which will be the product of the number of shares of GM common stock outstanding, including any such purchased shares, and the closing price of GM common stock on the trading day immediately following the last date on which tenders or exchanges may be made pursuant to the tender or exchange offer.

"Capital stock" for any corporation means any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in stock issued by that corporation.

"Current market price" of GM common stock on any day means the average of the closing prices of GM common stock for each of the five consecutive trading days ending on the earlier of the day in question and the day before the "ex-date" with respect to the dividend or distribution requiring such computation.

140

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007505

"Ex-date" means, with regard to any dividend or distribution on GM common stock, the first date on which the shares of GM common stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such dividend or distribution.

If we elect to make a distribution described in clause (iii), (iv), (v), (vi) or (vii) of the preceding paragraph that has a per share value equal to more than 15% of the closing price of GM common stock on the day preceding the first public announcement of such distribution, we will be required to give notice to the holders of amended Series D notes at least 50 business days prior to the ex-date for such distribution.

No adjustment to the conversion rate will be made if holders of amended Series D notes participate (as a result of holding the amended Series D notes, and at the same time as holders of GM common stock participate) in any of the transactions described above as if such holders of the amended Series D notes held a number of shares of GM common stock equal to the conversion rate, *multiplied by* the principal amount (expressed as a multiple of $25.00) of the amended Series D notes held by such holder, without having to convert their amended Series D notes.

To the extent that any future rights plan (*i.e.*, a poison pill) adopted by us is in effect at the time of conversion, upon such conversion, a holder will receive, in addition to any GM common stock received in connection with such conversion, the rights under the rights plan, unless prior to any conversion, the rights have separated from the GM common stock, in which case the conversion rate will be adjusted at the time of separation as if we distributed to all holders of GM common stock, shares of our capital stock, assets, debt securities or certain rights to purchase our securities as described in clause (iv) above, subject to readjustment in the event of the expiration, termination or redemption of such rights. Any distribution of rights or warrants pursuant to a rights plan that would allow a holder to receive upon conversion, in addition to any shares of GM common stock, the rights described therein (unless such rights have separated from GM common stock) shall not constitute a distribution of rights that would entitle a holder to an adjustment to the conversion rate.

We may, from time to time, increase the conversion rate for a period of at least 20 days. Our determination to increase the conversion rate will be conclusive. We will give holders at least five business days' notice of any increase in the conversion rate. We may also increase the conversion rate if we deem it advisable to avoid or diminish any income tax to holders of GM common stock resulting from any stock or rights distribution.

Notwithstanding anything in this section "*Adjustment to Conversion Rate—General*" to the contrary, we will not be required to adjust the conversion rate unless the adjustment would result in a change of at least 1% of such conversion rate. However, we will carry forward any adjustments that are less than 1% of such conversion rate and take them into account when determining subsequent adjustments. In addition, we will make any carry forward adjustments not otherwise affected on or prior to the 43rd scheduled trading day immediately preceding the maturity date and on each trading day thereafter. Except as stated above, the conversion rate will not be adjusted for the issuance of shares of GM common stock or any securities convertible into or exchangeable for shares of GM common stock or carrying the right to purchase GM common stock or any such security.

### Conversions After Reclassifications, Consolidations, Mergers and Certain Sales and Conveyances of Assets

In the event of:

- any reclassification of GM common stock,

- a consolidation, merger or combination involving us or

- a sale or conveyance to another person of all or substantially all of our assets,

in each case, in which holders of outstanding GM common stock would be entitled to receive cash, securities or other property for their shares of GM common stock, if a holder converts its amended Series D notes on or after

141

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007506

the effective date of any such event, the amended Series D notes will be convertible into (1) cash in an amount equal to the portion of our conversion obligation that we have elected to settle with cash; and (2) in lieu of the shares of GM common stock otherwise deliverable, if any, the same type (in the same proportions) of consideration received by holders of GM common stock in the relevant event ("reference property"). In addition, the amount of cash and reference property, if any, you receive will be based on the daily settlement amounts of reference property and the applicable conversion rate, as described above under "—*Conversion Rights.*"

For purposes of the foregoing, if holders of GM common stock have the right to elect the form of consideration received in any such reclassification, consolidation, merger, combination, sale or conveyance, then the type and amount of consideration that a holder of GM common stock would have been entitled to in the applicable transaction will be deemed to be the weighted average of the types and amounts of consideration received by the holders of GM common stock upon the occurrence of such event.

### *Adjustment to Conversion Rate Upon a Make-Whole Fundamental Change*

Upon the occurrence, on or prior to the second business day immediately preceding the maturity date, of any "make-whole fundamental change," which means:

- any transaction or event (whether by means of an exchange offer, liquidation, tender offer, consolidation, merger, combination, recapitalization or otherwise) in connection with which 90% or more of GM common stock is exchanged for, converted into, acquired for or constitutes solely the right to receive, consideration 10% or more of which is not common stock that is listed on, or immediately after the transaction or event will be listed on, a United States national securities exchange; or

- any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act, whether or not applicable), other than General Motors or any majority-owned subsidiary of General Motors or any employee benefit plan of General Motors or such subsidiary, becomes the "beneficial owner," directly or indirectly, of more than 50% of the total voting power in the aggregate of all classes of capital stock then outstanding entitled to vote generally in elections of our directors;

if a holder elects to convert its amended Series D notes in connection with such make-whole fundamental change, we will, under certain circumstances, increase the conversion rate for the amended Series D notes so surrendered for conversion by a number of additional shares of GM common stock (the "make-whole shares"), as described below. A conversion of amended Series D notes will be deemed for these purposes to be "in connection with" such make-whole fundamental change if the notice of conversion of the amended Series D notes is received by the conversion agent from, and including, the effective date of the make-whole fundamental change up to, and including, the 45th day immediately following the effective date of such make-whole fundamental change (or if the transaction also constitutes a fundamental change, the repurchase date for such fundamental change). If we fail to notify holders of the effective date of any make-whole fundamental change within 15 days of such effective date, the period during which holders may surrender their amended Series D notes for conversion and receive the relevant make-whole shares will be extended by the number of days that such notification is delayed or not otherwise provided to holders beyond the specified notice deadline.

The number of make-whole shares will be determined by reference to the table below and is based on the date on which such make-whole fundamental change becomes effective (the "effective date") and the price paid per share of GM common stock in the make-whole fundamental change (in the case of a make-whole fundamental change described in the first bullet of the definition of make-whole fundamental change in which holders of GM common stock receive only cash), or in the case of any other make-whole fundamental change, the average of the closing prices per share of GM common stock over the five trading day period ending on the trading day preceding the effective date of such other make-whole fundamental change (the "stock price").

The stock prices set forth in the top row of the table below will be adjusted as of any date on which the conversion rate of the amended Series D notes is adjusted. The adjusted stock prices will equal the stock prices

142

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007507

immediately prior to such adjustment, *multiplied by* a fraction, the numerator of which is the conversion rate immediately prior to the adjustment giving rise to the stock price adjustment and the denominator of which is the conversion rate as so adjusted. In addition, the number of make-whole shares will be subject to adjustment in the same manner as the conversion rate as set forth above under "*Adjustment To Conversion Rate—General.*"

The following table sets forth the stock price and number of make-whole shares of GM common stock to be added to the conversion rate per $25.00 principal amount of the amended Series D notes:

| | Stock Price | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Effective Date** | **30.47** | **31.25** | **32.50** | **33.75** | **35.00** | **36.25** | **37.50** | **40.00** | **42.50** | **45.00** | **47.50** | **50.00** |
| March 1, 2009 . . . . . . | 0.1368 | 0.1190 | 0.0945 | 0.0738 | 0.0566 | 0.0427 | 0.0316 | 0.0164 | 0.0079 | 0.0035 | 0.0014 | 0.0005 |
| June 1, 2009 . . . . . . . | 0.1368 | 0.1163 | 0.0855 | 0.0570 | 0.0306 | 0.0059 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |

The amended Series D notes set forth stock prices and make-whole amounts of GM common stock which are to be used in the calculation of the conversion rate per $25.00 principal amount of the amended Series D notes. The exact stock prices and effective dates may not be set forth in the amended Series D notes, in which case:

- if the stock price is between two stock prices in the table above or the effective date is between two effective dates in the table above, the make-whole shares issued upon conversion of the amended Series D notes will be determined by straight-line interpolation between the number of make-whole shares set forth for the higher and lower stock prices and/or the earlier and later effective dates, as applicable, based on a 365-day year;

- if the stock price is greater than $60.00 per share of GM common stock (subject to adjustment in the same manner as the stock prices set forth in the table above), no make-whole shares will be issued upon conversion of the amended Series D notes; and

- if the stock price is less than $30.47 per share of GM common stock (subject to adjustment in the same manner as the stock prices set forth in the table above), no make-whole shares will be issued upon conversion of the amended Series D notes.

Notwithstanding anything in this section "*Adjustment to Conversion Rate Upon a Make—Whole Fundamental Change*" to the contrary, the conversion rate of the amended Series D notes shall not exceed 0.8205 per $25.00 principal amount of amended Series D notes, subject to adjustment in the same manner as the conversion rate as set forth above under "*Adjustment to Conversion Rate—General.*"

Our obligation to deliver the make-whole shares could be considered a penalty, in which case the enforceability of our obligation to deliver make-whole shares would be subject to general principles of reasonableness of economic remedies.

### Optional Redemption by General Motors

The amended Series D notes may not be redeemed by us prior to the maturity date.

### Repurchase at the Option of the Holder Upon a Fundamental Change

If a fundamental change, as described below, occurs at any time prior to the maturity of the amended Series D notes, each holder may require us to repurchase such holder's amended Series D notes for cash, in whole or in part, on a repurchase date that is 30 days after the date of our notice of the fundamental change (the "fundamental change repurchase date"). We will mail to all record holders a notice of a fundamental change within 15 days after it has occurred. This notice will state, among other things:

- the fundamental change repurchase price;

- the fundamental change repurchase date; and

- the procedures that holders must follow to require us to repurchase their amended Series D notes.

143

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007508

We will repurchase the amended Series D notes for cash at a price equal to 100% of the principal amount to be repurchased, plus accrued interest to, but excluding, the fundamental change repurchase date; *provided, however,* that if a fundamental change repurchase date falls after a record date and on or prior to the corresponding interest payment date, we will pay the full amount of accrued and unpaid interest, if any, on such interest payment date to the holder of record at the close of business on the corresponding record date (which may or may not be the same person to whom we will pay the fundamental change repurchase price) and the fundamental change repurchase price will equal 100% of the principal amount of the amended Series D notes repurchased.

If you elect to require us to repurchase your amended Series D notes, you must deliver to us or our designated agent, on or before the business day immediately preceding the fundamental change repurchase date, a notice stating:

- if certificated amended Series D notes have been issued, the amended Series D note certificate numbers (or, if amended Series D notes are not certificated, the repurchase notice must comply with appropriate procedures of DTC);

- the portion of the principal amount of amended Series D notes to be repurchased, which must be in integral multiples of $25.00; and

- that the amended Series D notes are to be repurchased by us pursuant to the applicable provisions of the amended Series D notes and the 1995 Indenture.

Holders may withdraw any written repurchase notice by delivering a written notice of withdrawal to the paying agent up to the close of business on the business day prior to the repurchase date. Any withdrawal notice must state:

- the principal amount of the withdrawn amended Series D notes, which must be in integral multiples of $25.00;

- if certificated amended Series D notes have been issued, the certificate numbers of the withdrawn amended Series D notes (or, if amended Series D notes are not certificated, the withdrawal notice must comply with appropriate DTC procedures); and

- the principal amount of amended Series D notes, if any, that remains subject to the repurchase notice.

Payment of the fundamental change repurchase price for the amended Series D note will be made on the later of the fundamental change repurchase date and the time of book-entry transfer or delivery of the amended Series D note.

A "fundamental change" of GM is any transaction or event (whether by means of an exchange offer, liquidation, tender offer, consolidation, merger, combination, recapitalization or otherwise) in connection with which 90% or more of GM common stock is exchanged for, converted into, acquired for or constitutes solely the right to receive, consideration 10% or more of which is not common stock that is listed on, or immediately after the transaction or event will be listed on, a United States national securities exchange, but only if such transaction or event also includes either of the following:

- the filing by any person, including our affiliates and associates, other than us and our employee benefit plans, of a Schedule 13D or Schedule TO, or any successor schedule, form or report, under the Exchange Act, disclosing that such person has become the beneficial owner of 50% or more of the voting power of GM common stock or other capital stock into which GM common stock is reclassified or exchanged; or

- the consummation of any share exchange, consolidation or merger pursuant to which GM common stock would be converted to cash, securities or other property, other than any share exchange, consolidation or merger of GM in which the holders of GM common stock immediately prior to the share exchange, consolidation or merger have, directly or indirectly, at least a majority of the total voting power in the aggregate of all classes of capital stock of the continuing or surviving corporation immediately after the share exchange, consolidation or merger.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007509

We will comply with any tender offer rules under the Exchange Act that may be applicable to the fundamental change repurchase feature.

No amended Series D notes may be repurchased by us at the option of the holders upon a fundamental change if the principal amount of the amended Series D notes has been accelerated (other than as a result of a failure to pay the relevant fundamental change repurchase price), and such acceleration has not been rescinded, on or prior to such date.

These fundamental change repurchase rights could discourage a potential acquiror of GM. However, this fundamental change repurchase feature is not the result of management's knowledge of any specific effort to obtain control of GM by means of a merger, tender offer or solicitation, or part of a plan by management to adopt a series of anti-takeover provisions. Instead, the fundamental change repurchase feature is a standard term contained in other similar debt offerings and the terms of such feature have resulted from negotiations between us and the underwriters. The term "fundamental change" is limited to specified transactions and may not include other events that might adversely affect our financial condition or business operations. Our obligation to offer to repurchase the amended Series D notes upon a fundamental change would not necessarily afford you protection in the event of a leveraged transaction, reorganization, merger or similar transaction involving GM.

We may be unable to repurchase the amended Series D notes in the event of a fundamental change. In such event, if a fundamental change were to occur, we may not have enough funds to pay the fundamental change repurchase price for all amended Series D notes to be repurchased. Credit agreements or other agreements relating to our or any successor company's indebtedness may contain provisions prohibiting repurchase of the amended Series D notes under certain circumstances, or expressly prohibit repurchase of the amended Series D notes upon a fundamental change or may provide that a fundamental change constitutes an event of default under that agreement. If a fundamental change occurs at a time when repurchasing the amended Series D notes is prohibited, we could seek lender consent to repurchase the amended Series D notes or attempt to refinance this debt. If such consent or refinancing were not obtained, we would not be permitted to repurchase the amended Series D notes. Our failure to repurchase amended Series D notes would constitute an event of default under the 1995 Indenture, which might constitute a default under the terms of our other indebtedness.

### Events of Default and Acceleration

The following constitutes an event of default with respect to the amended Series D notes:

- default in payment of any principal or premium, if any, on the amended Series D notes;

- default for 30 days in payment of any interest on the amended Series D notes;

- default for 90 days after notice in performance of any other covenant in the 1995 Indenture;

- certain events of bankruptcy, insolvency or reorganization;

- our failure to issue notice of a fundamental change, which failure continues for a period of (x) five business days (in the case of a fundamental change, the occurrence of which is not publicly announced) or (y) five business days after written notice of such failure has been provided to us by the trustee or a holder of amended Series D notes (in the case of a fundamental change, the occurrence of which is publicly announced); or

- our failure to comply with our obligation to convert the amended Series D notes into cash and shares of GM common stock, if any, as described under "*Conversion Rights—Settlement Upon Conversion.*"

### Discharge of the 1995 Indenture

We may satisfy and discharge our obligations under the 1995 Indenture with respect to the amended Series D notes by delivering to the trustee for cancellation all outstanding amended Series D notes or by depositing with the trustee, the paying agent or the conversion agent, if applicable after the amended Series D notes have become due and payable, whether at the stated maturity for the amended Series D notes, on a fundamental change

145

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007510

repurchase date, upon conversion or otherwise, cash or cash and shares of GM common stock, if any, solely to satisfy outstanding conversions, if applicable, pursuant to the terms of the indenture sufficient to pay all of the outstanding amended Series D notes, and paying all other sums payable under the indenture by us.

### Calculations in Respect of the Amended Series D Notes

We are responsible for making all calculations called for under the amended Series D notes. These calculations include, but are not limited to, the daily conversion value, the daily settlement amount, the conversion date, the daily VWAP, the observation period, the trading prices (as defined below) of the amended Series D notes, the closing price, the conversion price, the conversion rate and the number of shares of GM common stock, if any, to be issued upon conversion of the amended Series D notes. We will make all these calculations in good faith and, absent manifest error, our calculations will be final and binding on holders of amended Series D notes. We will provide a schedule of our calculations to the paying agent, and the paying agent is entitled to rely upon the accuracy of our calculations without independent verification.

The "trading price" of the amended Series D notes on any date of determination means the average of the secondary market bid quotations obtained by the conversion agent for $10.0 million principal amount of amended Series D notes at approximately 3:30 p.m., New York City time, on such determination date from three independent U.S. nationally recognized securities dealers we select; provided that if three such bids cannot reasonably be obtained by the conversion agent, but two such bids are obtained, then the average of the two bids shall be used, and if only one such bid can reasonably be obtained by the conversion agent, that one bid shall be used.

### Modification and Waiver

The terms of the amended series D notes and the rights of the holders of the amended series D notes may, in each case, be modified or amended with the consent of the holders of not less than a majority in aggregate principal amount of the amended series D notes at the time outstanding under the 1995 Indenture; provided that, without the consent of the holder of each amended series D note so affected, no such modification or amendment shall:

- change the fixed maturity of any amended series D notes, or reduce the principal amount thereof, or premium, if any, or reduce the rate or extend the time of payment of interest thereon, or additional amounts thereon, or reduce the amount due and payable upon acceleration of the maturity thereof or the amount provable in bankruptcy, or make the principal of, or premium, if any, or interest, if any, or additional amounts, if any, on any amended series D notes payable in any currency other than that provided in such amended series D notes;

- change in any manner adverse to the holders (A) the amounts payable upon the redemption of the amended series D notes, (B) the dates, if any, on which the holders have the right to require GM to repurchase the amended series D notes, or the transactions or events, if any, upon which the holders have the right to require GM to repurchase the amended series D notes or the amounts payable upon the repurchase thereof or (C) the circumstances, if any, under which the holders have the right to convert the amended series D notes or the amounts receivable upon conversion thereof (but excluding from operation of this clause any adjustment to the conversion rate);

- impair the right to institute suit for the enforcement of any such payment on or after the maturity date thereof (or, in case of redemption, on or after the redemption date thereof); or

- reduce the foregoing percentage of amended series D notes, the consent of the holders of which is required for any such modification or the percentage required for the consent of the holders waive defaults.

To the extent that any modification or amendment shall affect any other series of notes at the time outstanding under the 1995 Indenture, the holders of amended series D notes shall vote together with the holders of such other notes as one class.

146

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007511

**Concerning the Trustee**

Wilmington Trust Company serves as trustee under the 1995 Indenture. The Corporate Trust Office of the trustee is currently located at 1100 N. Market Street, Wilmington, Delaware 19890-0001, U.S.A. Attention: Corporate Capital Market Services. Citibank, N.A. will serve as the paying agent and conversion agent and will be designated by GM as the initial transfer agent and registrar for the amended Series D notes. The office of the paying agent is currently located at 111 Wall Street, New York, N.Y. 10005, U.S.A. Attention: Citibank Agency & Trust.

The 1995 Indenture provides that the trustee, prior to the occurrence of an event of default or, if any events of default have occurred, after they have been cured, undertakes to perform such duties and only such duties as are specifically set forth in the 1995 Indenture. If an event of default has occurred (which has not been cured), the trustee will perform such duties using the same degree of care and skill in its exercise of the rights and powers vested in it by the 1995 Indenture as a prudent man would exercise or use under the circumstances in the conduct of his own affairs. The 1995 Indenture also provides that the trustee or any agent of GM or the trustee, in their individual or any other capacity, may become the owner or pledgee of amended Series D notes with the same rights it would have if it were not the trustee; provided, however, that all moneys received by the trustee or any paying agent shall, until used or applied as provided in the 1995 Indenture, be held in trust thereunder for the purposes for which they were received and need not be segregated from other funds except to the extent required by law.

147

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007512

## DESCRIPTION OF CERTAIN OTHER MATERIAL INDEBTEDNESS

The following descriptions are only summaries of the material provisions of the agreements summarized and do not purport to be complete and are qualified in their entirety by reference to provisions of the agreements being summarized. We urge you to read the agreements governing each of the senior secured loan facilities described below. Copies of the agreements are contained in our filings with the SEC and can be obtained as described under the heading "*Where You Can Find More Information.*" You may also request a copy of these agreements at our address set forth under the heading "*Incorporation of Certain Documents by Reference.*" In the following description, "GM," "we" and "our" refer to General Motors Corporation and not its subsidiaries.

### U.S. Treasury Loan Agreements

On December 31, 2008, we and certain of our domestic subsidiaries entered into the First U.S. Treasury Loan Agreement with the U.S. Treasury (the "Facility"), pursuant to which the U.S. Treasury agreed to provide us with a $13.4 billion secured term loan facility. We borrowed $4.0 billion under the First U.S. Treasury Loan Agreement on December 31, 2008, $5.4 billion on January 21, 2009, and $4.0 billion on February 17, 2009.

The loans under the First U.S. Treasury Loan Agreement (the "Loans") are scheduled to mature on December 30, 2011, unless the maturity date is accelerated. The maturity date may be accelerated if the President's designee has not certified our Viability Plan by the deadline for such certification, as described under "*The Restructuring—Viability Plan.*" Each Loan accrues interest at a rate per annum equal to the three-month LIBOR rate (which will be no less than 2.0%) plus 3.0%.

We are required to prepay the Loans from the net cash proceeds received from certain dispositions of collateral securing the Loans, the incurrence of certain debt and certain dispositions of unencumbered assets. We may also voluntarily repay the Loans in whole or in part at any time. Once repaid, amounts borrowed under the First U.S. Treasury Loan Agreement may not be reborrowed.

Each of our domestic subsidiaries that executed the First U.S. Treasury Loan Agreement (the "Guarantors") guaranteed our obligations under the First U.S. Treasury Loan Agreement and the other Guarantors' obligations under the other loan documents pursuant to a guaranty and security agreement, dated as of December 31, 2008, made by the Guarantors in favor of the U.S. Treasury. The Facility is secured by substantially all of our and the Guarantors' assets that were not previously encumbered, including our and the Guarantors' equity interests in most of our and the Guarantors' domestic subsidiaries and our and the Guarantors' intellectual property, real estate (other than manufacturing plants or facilities), inventory that was not pledged to other lenders and cash and cash equivalents in the U.S., subject to certain exclusions. The Facility is also secured by our and the Guarantors' equity interests in certain of our and the Guarantors' foreign subsidiaries (limited in most cases to 65% of the equity interests of the pledged foreign subsidiaries due to tax considerations), subject to certain exclusions. The equity interests in domestic and foreign subsidiaries that have been pledged to the U.S. Treasury have been pledged pursuant to an equity pledge agreement, dated as of December 31, 2008, made by us and certain of the Guarantors in favor of the U.S. Treasury.

The assets excluded from the U.S. Treasury's security interest include, among other things, assets to the extent the grant of a security interest in such asset is prohibited by law or requires a consent under law that has not been obtained, is contractually prohibited or would constitute a breach or default under or results in the termination of a contract or would require a third party consent that has not been obtained, or would result in a lien, or an obligation to grant a lien in such asset to secure any other obligations. We have agreed with the U.S. Treasury to take, or use best efforts to take, certain actions with respect to the U.S. Treasury's security interests in the collateral securing the First U.S. Treasury Loan Agreement and other property (including using our best efforts to obtain the consent of certain lenders with existing liens on assets, to enable us to grant junior liens on those assets in favor of the U.S. Treasury to secure the First U.S. Treasury Loan Agreement). On February 11, 2009 we and Saturn Corporation ("Saturn") granted to the U.S. Treasury a junior lien security interest in our and

148

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007513

Saturn's assets securing the obligations under and as provided in our revolving credit facility, and on February 17, 2009, we granted to the U.S. Treasury a junior lien security interest in our assets securing the obligations under our secured credit facility with GELCO Corporation d/b/a GE Fleet Services.

The First U.S. Treasury Loan Agreement contains various representations and warranties that were made by us and the Guarantors on the initial funding date and will be required to be made on each subsequent funding date (and certain other dates). The First U.S. Treasury Loan Agreement also contains various affirmative covenants requiring us and the Guarantors to take certain actions and negative covenants restricting our and their ability to take certain actions. The affirmative covenants are generally applicable to us and the Guarantors and impose obligations on us and them with respect to, among other things, financial and other reporting to the U.S. Treasury (including periodic confirmation of compliance with certain expense policies and executive privilege and compensation requirements), financial covenants (as may be required by the President's Designee, beginning after March 31, 2009), corporate existence, use of proceeds, maintenance of facility collateral and other property, payment of obligations, compliance with certain laws, compliance with various restrictions on executive privileges and compensation, divestment of corporate aircraft, a corporate expense policy, progressing on a viability plan, and a cash management plan.

We and the Guarantors are also required to provide the President's Designee with advance notice of proposed transactions outside the ordinary course of business that are valued at more than $100 million and the President's Designee may prohibit any such transaction if the President's Designee determines it would be inconsistent with, or detrimental to, our or the Guarantors' long-term viability. The "President's Designee" means one or more officers from the Executive Branch appointed by the President of the United States to monitor and oversee the restructuring of the U.S. domestic automobile industry, and if no officer has been appointed (as is the case), the Secretary of the U.S. Treasury.

The negative covenants in the First U.S. Treasury Loan Agreement generally apply to us and the Guarantors and restrict us and them with respect to, among other things, fundamental changes, lines of business, transactions with affiliates, liens, distributions, amendments or waivers of certain documents, prepayments of senior lien loans, change of the fiscal year, negative pledge clauses, indebtedness, investments, ERISA and other pension fund matters, the collateral securing the Facility, sales of assets and joint venture agreements.

The First U.S. Treasury Loan Agreement also contains various events of default and entitles the U.S. Treasury to accelerate the repayment of the Loans upon the occurrence and during the continuation of an event of default. In addition, upon the occurrence and continuation of any default or event of default, at the U.S. Treasury's option, the interest rate applicable to the Loans can be increased to a rate per annum equal to 5.0% per annum plus the interest rate otherwise applicable to the Loans (or if no interest rate is otherwise applicable, the three-month LIBOR rate plus 3.0%) from the date of such default or event of default until such amount is paid in full. The events of default relate to, among other things, our failure to pay principal or interest on the Loans; the Guarantors' failure to pay on their guarantees; the failure to pay other amounts due under the loan documents; the failure to perform the covenants in the related loan documents; the representations and warranties in the First U.S. Treasury Loan Agreement or in any other loan document being false or misleading in any material respect; undischarged judgments in excess of $500 million; certain bankruptcy events; the termination of any loan documents, the invalidity of security interests in the collateral or the unenforceability of our and the Guarantors' obligations; certain prohibited transactions under ERISA; a change of control; a default under indebtedness if the default permits or causes the holder to accelerate the maturity of indebtedness in excess of $100 million; the failure to comply with any law that results in a material adverse effect or any loan party or the collateral securing the Facility; the entry into a transaction prohibited by the President's Designee; or the failure to comply with the warrant granted to, or the warrant agreement entered into with, the U.S. Treasury at the time of entering into the First U.S. Treasury Loan Agreement.

In connection with our entry into the First U.S. Treasury Loan Agreement and as additional consideration to the U.S. Treasury for the extension of credit thereunder, we issued to the U.S. Treasury pursuant to a warrant

149

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007514

agreement, dated December 31, 2008, between us and the U.S. Treasury: (1) a warrant to purchase up to 122,035,597 shares of GM common stock, and (2) the U.S. Treasury Promissory Note in the principal amount of $748.6 million.

The First U.S. Treasury Loan Agreement also required us to achieve certain restructuring targets within designated time frames and to deliver and implement a viability plan setting forth specific actions intended to achieve these restructuring targets. For a more detailed description of the restructuring targets required under the First U.S. Treasury Loan Agreement and the specific actions required by our Viability Plan, see *"The Restructuring."*

On January 16, 2009, we entered into the Second U.S. Treasury Loan Agreement, pursuant to which we borrowed approximately $884.0 million from the U.S. Treasury and applied the proceeds of the loan to purchase additional membership interests in GMAC, increasing our common equity interest in GMAC from 49% to 59.9%. This loan is scheduled to mature on January 16, 2012, unless the maturity date is accelerated as provided in the Second U.S. Treasury Loan Agreement. The material terms of the Second U.S. Treasury Loan Agreement are substantially similar to the terms of the First U.S. Treasury Loan Agreement, except that: (1) there are no guarantors for this loan; (2) the collateral for this loan consists of the entire common equity interest in GMAC and the preferred membership interest in GMAC; (3) the U.S. Treasury has the right to exchange our obligations in respect of this loan for the additional membership interests in GMAC that we purchased with the proceeds of this loan; and (4) our requirements with respect to our Viability Plan are found solely in the First U.S. Treasury Loan Agreement. We have committed to the Board of Governors of the Federal Reserve System that we will reduce our ownership interest in GMAC to less than 10 percent of the voting and total equity interest of GMAC by December 24, 2011. Pursuant to our understanding with the U.S. Treasury, all but 7.4% of our common equity interest in GMAC will be placed in a trust of which we will be the sole beneficiary by May 22, 2009 for ultimate disposition.

On March 31, 2009, we and the U.S. Treasury entered into amendments to the First U.S. Treasury Loan Agreement and the Second U.S. Treasury Loan Agreement to, among other things, postpone the Certification Deadline to June 1, 2009 and, with respect to the First U.S. Treasury Loan Agreement, to also postpone the deadline by which we are required to provide the Company Report to June 1, 2009. On April 22, 2009, we and the U.S. Treasury entered into an amendment to the First U.S. Treasury Loan Agreement pursuant to which, among other things, the U.S. Treasury agreed to provide us with $2.0 billion of additional working capital loans under the First U.S. Treasury Loan Agreement and we borrowed $2.0 billion on April 24, 2009. In connection with the amendment to provide the $2.0 billion of additional loans, we issued to the U.S. Treasury a promissory note in an aggregate principal amount of $133.4 million as part of the compensation for the additional loans. The principal amount outstanding under this promissory note bears interest at the same rate as the loans under the First U.S. Treasury Loan Agreement and is due on December 30, 2011, unless accelerated.

## Senior Secured Loans

### *Revolving Credit Agreement*

On July 20, 2006, GM and General Motors of Canada Limited ("GM Canada"), each as a borrower, and each of GM and Saturn, as guarantors, entered into a $4.48 billion amended and restated credit agreement (as amended on February 11, 2009, the "Revolving Credit Agreement") with various syndicate banks and other persons party to the Revolving Credit Agreement from time to time as lenders thereunder, Citicorp USA, Inc., as lender and administrative agent, and JPMorgan Chase Bank, N.A., as syndication agent. Borrowings under the Revolving Credit Agreement are limited to an amount based on the value of the underlying Revolver First Lien Collateral (as defined below). As of December 31, 2008, $4.48 billion dollars were outstanding under the Revolving Credit Agreement, including $10 million of undrawn but outstanding letters of credit issued under the Revolving Credit Agreement. In addition, as of December 31, 2008, other obligations of GM and its subsidiaries in an aggregate principal amount of $0.2 billion were also secured by the assets securing the obligations under the Revolving Credit Agreement. In the event of certain work stoppages, availability under the Revolving Credit Agreement would be temporarily reduced to $3.5 billion.

150

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007515

*Interest Rate and Fees.* The loans under the Revolving Credit Agreement bear interest at a rate per annum equal to either the adjusted base rate, the Eurodollar rate (with the floor for the Eurodollar rate being 2.00%) or the Canadian base rate plus an applicable margin, which is equal to 2.5% in the case of Eurodollar loans and 1.5% in the case of alternative base rate loans and Canadian base rate loans. In addition, the interest rates under the Revolving Credit Agreement may be increased if the interest rate applicable to any tranche under the First U.S. Treasury Loan Agreement or any other credit facility provided by a U.S. governmental authority (an "Additional U.S. Government Debt"), or any debt facility refinancing the First U.S. Treasury Loan Agreement or an Additional U.S. Government Debt (the "Permitted Refinancing" and, collectively with the First U.S. Treasury Loan Agreement and the Additional U.S. Government Debt, the "Subject Debt"), at any time when more than 50% of the principal amount of such tranche of Subject Debt is owned by non-U.S. governmental authorities or non-Canadian governmental authorities, is greater than the interest rate applicable to loans under the Revolving Credit Agreement.

We are also required under the Revolving Credit Agreement to pay a fee at a rate which ranges from 0.375% to 0.500% per annum based upon our credit rating on the aggregate amount of the secured commitments. Additionally, we pay a fee to the agent for the ratable benefit of certain lenders on all outstanding letters of credit issued under the Revolving Credit Agreement at a per annum rate equal to the applicable margin then in effect with respect to Eurodollar loans. We are also required to pay a fronting fee of 0.125% per annum to the issuing bank on the undrawn and unexpired amount of each letter of credit issued under the Revolving Credit Agreement.

*Optional Prepayment.* We may voluntarily prepay (or cause GM Canada to prepay) loans under the Revolving Credit Agreement in whole or in part without premium or penalty.

*Mandatory Prepayments.* We are required to prepay (or cause GM Canada to prepay) a certain amount of the loans outstanding under the Revolving Credit Agreement if either the maturity date of any tranche of Subject Debt is amended or scheduled to a date prior to July 20, 2011 or we voluntarily prepay any tranche of Subject Debt, in each case at any time when more than 50% of the principal amount of such tranche of Subject Debt is owned by non-U.S. governmental authorities or non-Canadian governmental authorities.

*Guarantee and Security.* GM's and GM Canada's obligations under the Revolving Credit Agreement are secured by first priority liens on certain inventory and receivables of GM and Saturn and 65% of GM's interests in its wholly-owned Mexican subsidiary, Controladora General Motors, S.A. de C.V. (collectively, the "U.S. Collateral"), and junior liens on the collateral securing GM's obligations under the First U.S. Treasury Loan Agreement. The obligations of GM Canada under the Revolving Credit Agreement are also secured by certain inventory, receivables and property, plant and equipment owned by GM Canada (collectively, the "Canadian Collateral," and, collectively with the U.S. Collateral, the "Revolver First Lien Collateral"). GM's and GM Canada's obligations are guaranteed by GM (other than GM's obligations as principal obligor thereunder), Saturn and GM's other subsidiaries that guarantee GM's obligations under the First U.S. Treasury Loan Agreement. In addition, GM (other than GM's obligations as principal obligor thereunder), Saturn and GM's other subsidiaries that guarantee GM's obligations under the First U.S. Treasury Loan Agreement also guarantee the obligations of GM and its subsidiaries under certain lines of credit, letters of credit, automated clearing house, overdraft arrangements and certain hedging arrangements provided by certain lenders under the Revolving Credit Agreement or their affiliates.

*Covenants.* The Revolving Credit Agreement contains a number of customary affirmative covenants, including providing financial statements for GM and its consolidated subsidiaries; notice of the occurrences of events of default; delivery of amended security documents to include after acquired collateral; and paying cash dividends only if the payment of such cash dividends is permitted by or consented to under the First U.S. Treasury Loan Agreement or the other Subject Debt. In addition GM and GM Canada (to the extent GM Canada has knowledge of the foregoing) are required to provide notice of (a) the occurrence of an event of default or a termination event under any Subject Debt, any debt secured by a senior lien on the assets securing the obligations

151

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007516

under the First U.S. Treasury Loan Agreement or other debt secured by the Canadian Collateral, and (b) any failure of GM to comply with, or an amendment or waiver of, the provision under the Term Loan Agreement (as defined below) requiring that the audit report with respect to our annual audited financial statements will be without a going concern qualification (the "Going Concern Provision"). The Revolving Credit Agreement also contains a number of negative covenants that, among other things, and subject to certain exceptions, limit or restrict the ability of GM, Saturn and, with respect to certain covenants, GM Canada to:

- merge or consolidate with any other person or sell or convey all or substantially all of its assets;

- permit any manufacturing subsidiary to issue or assume any indebtedness secured by a lien upon any principal domestic manufacturing property of GM or any manufacturing subsidiary or upon any shares of stock or obligations of any manufacturing subsidiary unless the obligations under the Revolving Credit Agreement are equally and ratably secured by such assets;

- permit any manufacturing subsidiary to enter into any arrangement with any person providing for the leasing by GM or any manufacturing subsidiary of any principal domestic manufacturing property owned by GM or any manufacturing subsidiary, if such property has been or is to be sold or transferred by GM or such manufacturing subsidiary to such person;

- directly or indirectly (or permit any other loan party to) create, incur, assume or suffer any lien upon the Revolver First Lien Collateral;

- dispose of Revolver First Lien Collateral;

- cease to own, directly or indirectly, at least a majority of the outstanding voting stock of GM Canada;

- permit the effective U.S. collateral value or the effective Canadian collateral value at any time to be less than the U.S. total secured exposure or the Canadian total secured exposure, respectively; and

- make certain changes to GM Canada's Canadian pension plans.

*Events of Default.* The Revolving Credit Agreement contains customary events of default, including the following:

- failure of any Borrower to pay principal when due;

- non-payment by the Borrower of interest when due beyond the applicable grace period;

- any representation or warranty made or deemed made shall prove to be incorrect on or as of the date made or deemed made if the facts or circumstances incorrectly represented result in a material adverse effect;

- default by any borrower or guarantor in the observance or performance of any other agreement contained in the Revolving Credit Agreement or any security documents related thereto beyond the applicable grace period;

- default by any borrower or guarantor in any payment of $50,000,000 or more of principal of or interest on any indebtedness or on account of any guarantee beyond the period of grace provided in the instrument or agreement under which such indebtedness or guarantee was created;

- commencement by or against any borrower or significant subsidiary of any case, proceeding or action relating to bankruptcy, insolvency, reorganization or relief of debtors, or appointment of a receiver, trustee, custodian, conservator or other official for it or for all or any substantial part of its assets, that remains undismissed, undischarged or unbonded for a period of 90 days;

- final judgments entered against any borrower or guarantor involving a liability of $100,000,000 individually, or $200,000,000 in the aggregate, not vacated, discharged, satisfied, stayed, bonded or pending appeal within 60 days;

152

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007517

- the security documents ceasing to be in full force and effect with respect to Revolver First Lien Collateral with a book value in excess of $25,000,000 in the aggregate or any lien ceasing to be enforceable and of the same effect and priority;

- the guarantee contained in (a) the Revolving Credit Agreement, (b) the guaranty and security agreement entered into in connection with the granting of the junior liens on the collateral securing GM's obligations under the First U.S. Treasury Loan or (c) any other related guarantee document ceasing to be in full force and effect;

- an event of default, as defined in any Subject Debt or any document governing other obligations secured by the Canadian Collateral shall have occurred and shall continue for 20 business days; and

- GM shall fail to comply with the Going Concern Provision and such failure shall not have been cured beyond the applicable grace period.

Upon certain bankruptcy-related events of default, all commitments under the Revolving Credit Agreement automatically terminate and the loans and all other amounts owing under the agreement become immediately due. Upon all other events of default, the majority lenders may declare the commitments to be terminated and declare the loans and other obligations outstanding under the Revolving Credit Agreement immediately due and payable.

### Term Loan Agreement

On November 29, 2006, GM, as borrower, and Saturn, as guarantor, entered into a $1.5 billion term loan agreement (as amended on March 4, 2009, the "Term Loan Agreement") with the several lenders from time to time party thereto, JPMorgan Chase Bank, N.A., as administrative agent, and the other parties thereto. The loans under the Term Loan Agreement mature on November 29, 2013.

*Interest Rate.* The loans under the Term Loan Agreement bear interest at a rate per annum equal to either the adjusted base rate (with the floor for the adjusted base rate being the greatest of (a) the prime rate, the Federal funds effective rate plus .50% or the Eurodollar rate plus 1.0%) or the Eurodollar rate (with the floor for the Eurodollar rate being 2.00%) plus an applicable margin, which is equal to 6.0% in the case of Eurodollar loans and 5.0% in the case of adjusted base rate loans. In addition, the interest rates under the Term Loan Agreement may be increased if the interest rate applicable to any tranche of Subject Debt, at any time when more than 50% of the principal amount of such tranche of Subject Debt is owned by non-U.S. governmental authorities, is greater than the interest rate applicable to loans under the Term Loan Agreement.

*Optional Prepayments.* We may voluntarily prepay the loans at any time without premium or penalty.

*Mandatory Repayments.* We are required to prepay a certain amount of the loans outstanding under the Term Loan Agreement if we voluntarily prepay any tranche of Subject Debt, at any time when more than 50% of the principal amount of such tranche of Subject Debt is owned by non-U.S. governmental authorities.

*Amortization.* The loans are subject to quarterly amortization of 0.25% of the aggregate principal amount of the loans made on the funding date.

*Guarantee and Security.* Our obligations under the Term Loan Agreement are guaranteed by Saturn and secured by certain equipment and machinery owned by GM and Saturn.

*Covenants.* The Term Loan Agreement contains a number of customary affirmative covenants, including providing financial statements for GM and its consolidated subsidiaries, notice of the occurrences of events of defaults and delivery of amended security documents to include after acquired collateral. In addition, we are required to provide notice of the occurrence of an event of default or a termination event under any Subject Debt.

153

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007518

The Term Loan Agreement also contains a number of negative covenants that, among other things, and subject to certain exceptions, limit or restrict the ability of GM and, with respect to certain covenants, Saturn to:

- merge or consolidate with any other person or sell or convey all or substantially all of its assets;

- permit any manufacturing subsidiary to issue or assume any indebtedness secured by a lien upon any principal domestic manufacturing property of GM or any manufacturing subsidiary or upon any shares of stock or obligations of any manufacturing subsidiary unless the obligations under the Term Loan Agreement are equally and ratably secured by such assets;

- permit any manufacturing subsidiary to enter into any arrangement with any person providing for the leasing by GM or any manufacturing subsidiary or any principal domestic manufacturing property owned by GM or any manufacturing subsidiary if such property has been or is to be sold or transferred by GM or such manufacturing subsidiary to such person;

- limit paying cash dividends to only such cash dividends that are permitted by or consented to under each Subject Debt; and

- permit the ratio of the collateral value to the total exposure at any time, including after giving effect to any dispositions of collateral, to be less than 3.25 to 1.00.

*Events of Default.* The Term Loan Agreement contains customary events of default, including the following:

- non-payment by the borrower of principal when due;

- failure of the Borrower to pay interest when due beyond the applicable grace period;

- any representation or warranty made or deemed made by GM or Saturn shall prove to be incorrect on or as of the date made or deemed made if the facts or circumstances incorrectly represented result in a material adverse effect;

- default by GM or Saturn in the observance or performance of any other agreement contained in the Term Loan Agreement or any security documents related thereto beyond the applicable grace period;

- default by GM or Saturn in any payment of $50,000,000 or more of principal of or interest on any indebtedness or on account of any guarantee beyond the period of grace provided in the instrument or agreement under which such indebtedness or guarantee was created;

- commencement by GM or any significant subsidiary of any case, proceeding or action relating to bankruptcy, insolvency, reorganization or relief of debtors, or appointment of a receiver, trustee, custodian, conservator or other official for it or for all or any substantial part of its assets, that remains undismissed, undischarged or unbonded for a period of 90 days;

- final judgments entered against GM or Saturn involving a liability of $100,000,000 individually, or $200,000,000 in the aggregate, not vacated, discharged, satisfied, stayed, bonded or pending appeal within 60 days;

- the security documents ceasing to be in full force and effect with respect to the collateral with a book value in excess of $25,000,000 in the aggregate or any lien ceasing to be enforceable and of the same effect and priority;

- Saturn's guarantee ceasing to be in full force and effect; and

- an event of default, as defined in any Subject Debt shall have occurred and shall continue for 20 business days.

Upon certain bankruptcy-related events of default, the Term Loan Agreement automatically becomes immediately due. Upon all other events of default, the majority lenders may declare the loans and other obligations outstanding under the Term Loan Agreement immediately due and payable.

154

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007519

## DESCRIPTION OF OUR CAPITAL STOCK

The following description of our capital stock is based upon our restated certificate of incorporation, as amended ("Certificate of Incorporation"), our bylaws, as amended ("Bylaws"), and applicable provisions of law, in each case as currently in effect. The following description is only a summary of the material provisions of our capital stock, the Certificate of Incorporation and Bylaws and does not purport to be complete and is qualified in its entirety by reference to the provisions of the Certificate of Incorporation and Bylaws. Our Certificate of Incorporation and Bylaws have been filed as exhibits to the registration statement of which this prospectus is a part and are incorporated by reference into this prospectus. We urge you to read the Certificate of Incorporation and Bylaws because those documents, not this description, define your rights as holders of our common equity. In the following description, "we" and "our" refer to General Motors Corporation and not its subsidiaries.

Certain provisions of the Delaware General Corporation Law ("DGCL"), our Certificate of Incorporation and our Bylaws summarized in the following paragraphs may have an anti-takeover effect. This may delay, defer or prevent a tender offer or takeover attempt that a stockholder might consider in its best interests, including those attempts that might result in a premium over the market price for its shares.

### Authorized Capital Stock

Our Certificate of Incorporation currently authorizes us to issue 2,106,000,000 shares of capital stock, consisting of:

- 6,000,000 shares of preferred stock, without par value;
- 100,000,000 shares of preference stock, $0.10 par value; and
- 2,000,000,000 shares of common stock, $1⅔ par value.

If the exchange offers are consummated, our Certificate of Incorporation will be amended to authorize us to issue 62,106,000,000 shares of capital stock, consisting of:

- 6,000,000 shares of preferred stock, without par value;
- 100,000,000 shares of preference stock, $0.10 par value; and
- 62,000,000,000 shares of GM common stock, $0.01 par value.

See "*Description of the Charter Amendments.*"

As of March 31, 2009:

- 610,505,273 shares of common stock were outstanding; and
- no shares of preferred stock or preference stock were outstanding.

### Certain Provisions of Our Certificate of Incorporation and Bylaws

#### *Amendments to Our Certificate of Incorporation*

Under the DGCL, the affirmative vote of a majority of the outstanding shares entitled to vote and a majority of the outstanding stock of each class entitled to vote is required to amend a corporation's certificate of incorporation. Under the DGCL, the holders of the outstanding shares of a class of our capital stock shall be entitled to vote as a class upon a proposed amendment, whether or not entitled to vote thereon by the certificate of incorporation, if the amendment would:

- increase or decrease the aggregate number of authorized shares of such class;
- increase or decrease the par value of the shares of such class; or
- alter or change the designations, preferences or special rights of the shares of such class so as to affect them adversely.

155

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007520

If any proposed amendment would alter or change the powers, preferences or special rights of one or more series of any class of our capital stock so as to affect them adversely, but shall not so affect the entire class, then only the shares of the series so affected by the amendment shall be considered a separate class for the purposes of this provision.

### Vacancies in the Board of Directors

Our Bylaws provide that any vacancy occurring in our board of directors for any cause may be filled by a majority of the remaining members of our board, although such majority is less than a quorum. Each director so elected shall hold office until the expiration of the term of the other directors or until his successor is elected and qualified, or until the earlier of his resignation or removal.

### Special Meetings of Stockholders

Under our Bylaws, only our board of directors or the chairman of our board may call special meetings of stockholders at such place, date and time and for such purpose or purposes as shall be set forth in the notice of such meeting.

Written notice of any special meeting must be given not less than 10 nor more than 60 days before the date of the special meeting to each stockholder entitled to vote at such meeting.

### Requirements for Notice of Stockholder Director Nominations and Stockholder Business

If a stockholder wishes to bring any business before an annual or special meeting or nominate a person for election to our board of directors, our Bylaws contain certain procedures that must be followed in terms of the advance timing required for delivery of stockholder notice of such business and the information that such notice must contain. The information required in a stockholder notice includes general information regarding the stockholder, a description of the proposed business and, with respect to nominations for the board of directors, certain specified information regarding the nominee(s). In addition to the information required in a stockholder notice described above, our Bylaws require a representation that the stockholder is a holder of our voting stock and intends to appear in person or by proxy at the meeting to make the nomination or bring up the matter specified in the notice. In terms of the timing of the stockholder notice, our Bylaws require that the notice must be received by our secretary:

- in the case of an annual meeting, not more than 180 days and not less than 120 days in advance of the annual meeting; and

- in the case of a special meeting, not more than 15 days after the day on which notice of the special meeting is first mailed to stockholders.

## Certain Anti-Takeover Effects of Delaware Law

We are subject to Section 203 of the DGCL ("Section 203"). In general, Section 203 prohibits a publicly held Delaware corporation from engaging in various "business combination" transactions with any interested stockholder for a period of three years following the date of the transaction(s) in which the person became an interested stockholder, unless:

- the transaction is approved by the board of directors prior to the date the interested stockholder obtained such status;

- upon consummation of the transaction which resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced; or

156

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007521

- on or subsequent to such date the business combination is approved by the board and authorized at an annual or special meeting of stockholders by the affirmative vote of at least 66⅔% of the outstanding voting stock which is not owned by the interested stockholder.

A "business combination" is defined to include mergers, asset sales, and other transactions resulting in financial benefit to an "interested stockholder." In general, an "interested stockholder" is a person who owns (or is an affiliate or associate of the corporation and, within the prior three years, did own) 15% or more of a corporation's voting stock. The statute could prohibit or delay mergers or other takeover or change in control attempts with respect to us and, accordingly, may discourage attempts to acquire us even though such a transaction may offer our stockholders the opportunity to sell their stock at a price above the prevailing market price.

## Description of Common Stock

Our only class of common stock is our common stock, $1⅔ par value per share.

### Sinking Fund

There are no redemption or sinking fund provisions applicable to our common stock.

### Dividends

The DGCL and our Certificate of Incorporation do not require our board of directors to declare dividends on our common stock. The declaration of any dividend on our common stock is a matter to be acted upon by our board of directors in its sole discretion. We have suspended the payment of dividends on our common stock and have no current plans to resume payment of a dividend. In addition, our revolving credit and term loan agreements and the U.S. Treasury Loan Agreements prohibit the payment of dividends on our common stock without first receiving the requisite lender consent under each respective agreement. Our payment of dividends in the future will be determined by our board of directors in its sole discretion and will depend on our satisfaction of our obligations under the U.S. Treasury Loan Agreements, business conditions, our financial condition, earnings and liquidity, and other factors.

Both the DGCL and our Certificate of Incorporation restrict the power of our board of directors to declare and pay dividends on our common stock. The amounts which may be declared and paid by our board of directors as dividends on our common stock are subject to the amount legally available for the payment of dividends by us under the DGCL. In particular, under the DGCL, we can only pay dividends to the extent that we have surplus—the extent by which the fair market value of our net assets exceeds the amount of our capital—or to the extent of our net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year. In addition, dividends on our common stock are subject to any preferential rights on any outstanding series of preferred stock or preference stock authorized for issuance by our board of directors in accordance with our Certificate of Incorporation. Further, if dividends have been declared but not paid on any outstanding shares of our preferred stock, our Certificate of Incorporation provides that dividends may not be paid on or set apart for the common stock or any series of preference stock until all declared but unpaid dividends on any outstanding shares of our preferred stock have been paid. Also, our Certificate of Incorporation provides that dividends may not be declared on our common stock or any series of preference stock until a sum sufficient for the payment of the next ensuing quarterly dividend of any preferred stock outstanding has been set aside from the surplus or net profits.

Any dividends declared or paid on our common stock from time to time will reduce the amount available for future payments of dividends. The amount available for dividends on each class will also depend upon any adjustments to our capital or surplus due to repurchases or issuances of shares of our common stock. In addition, the DGCL permits our board of directors to adjust for any reason it deems appropriate the amounts of capital and surplus within certain parameters and therefore the amount available for dividends.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007522

*Voting Rights*

Our Certificate of Incorporation entitles holders of common stock to one vote per share on all matters submitted to our stockholders for a vote.

*Liquidation Rights*

In the event of the liquidation, dissolution or winding up of GM, whether voluntary or involuntary, our Certificate of Incorporation provides that, after there shall have been paid or set apart for the holders of any outstanding shares of our preferred stock and preference stock the full preferential amounts to which they are entitled, holders of common stock shall be entitled to receive the assets of the corporation remaining for distribution to our stockholders ratably on a per share basis. For purposes of liquidation rights, a merger or consolidation of GM into or with any other entity is not considered to be a liquidation, dissolution or winding up of GM.

*Stock Exchange Listing*

Our common stock is listed in the United States on the New York Stock Exchange under the ticker symbol "GM."

*Transfer Agent and Registrar*

The transfer agent and registrar for our common stock is Computershare Trust Company, N.A., a federally chartered trust institution doing business at P.O. Box 43078, Providence, Rhode Island 02940-3078.

*Direct Registration System*

Our common stock is registered in book-entry form through the direct registration system. Under this system, unless a common stockholder requests a physical stock certificate, ownership of our common stock is reflected in account statements periodically distributed to common stockholders by Computershare, our transfer agent, who holds the book-entry shares on behalf of our common stockholders. However, currently, any common stockholder who wishes to receive a physical stock certificate evidencing his or her shares may at any time obtain a stock certificate at no charge by contacting our transfer agent.

**Description of Preferred Stock**

Under our Certificate of Incorporation and the DGCL, our board of directors has the authority to issue shares of preferred stock from time to time in distinctly designated series, with each series ranking equally and identical in all respects except as to the dividend rate and redemption price. The certificate of designations or board resolutions establishing a series of preferred stock will describe the terms of the series of preferred stock, including:

- the number of shares and designation or title of the shares;

- any liquidation preference per share;

- any date of maturity;

- any redemption, repayment or sinking fund provisions;

- any dividend rate or rates and the dates of payment (or the method for determining the dividend rates or dates of payment);

- if other than the currency of the United States, the currency or currencies including composite currencies in which the preferred stock is denominated and/or in which payments will or may be payable;

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007523

- whether the preferred stock is convertible or exchangeable and, if so, the securities or rights into which the preferred stock is convertible or exchangeable (which could include any securities issued by us or any third party, including any of our affiliates), and the terms and conditions of conversion or exchange;

- the place or places where dividends and other payments on the preferred stock will be payable; and any additional dividend, liquidation, redemption and other rights, preferences, privileges, limitations and restrictions; and

- any additional voting, dividend, liquidation, redemption and other rights, preferences, privileges, limitations and restrictions.

Holders of preferred stock would be entitled to receive quarterly cumulative dividends when and as declared by the board of directors at the rates fixed for the respective series in the resolution or certificate of designation for the respective series. In addition, if any preferred stock were issued, it would rank senior to our preference stock and our common stock with respect to the payment of dividends.

If any shares of our preferred stock were issued, holders of such shares would not be entitled to vote except that they would vote upon the question of disposing of our assets as an entirety and except as otherwise required by the DGCL.

Any shares of preferred stock that are issued will have priority over the preference stock and our common stock with respect to liquidation rights.

## Description of Preference Stock

### General

Under our Certificate of Incorporation and the DGCL, our board of directors has the authority to issue shares of preference stock from time to time in distinctly designated series. The certificate of designations or board resolutions establishing a series of preference stock will describe the terms of the series of preference stock, including:

- the number of shares and designation or title of the shares;

- any liquidation preference per share;

- any date of maturity;

- any redemption, repayment or sinking fund provisions;

- any dividend (which may be cumulative or non-cumulative) rate or rates and the dates of payment (or the method for determining the dividend rates or dates of payment);

- any voting rights;

- if other than the currency of the United States, the currency or currencies including composite currencies in which the preference stock is denominated and/or in which payments will or may be payable;

- whether the preference stock is convertible or exchangeable and, if so, the securities into which the preference stock is convertible or exchangeable (which could include any securities issued by us or any third party, including any of our affiliates), and the terms and conditions of conversion or exchange;

- the place or places where dividends and other payments on the preference stock will be payable; and

- any additional voting, dividend, liquidation, redemption and other rights, preferences, privileges, limitations and restrictions.

Preference stock would rank junior to our preferred stock, if any, and it could rank senior to our common stock with respect to the payment of dividends.

159

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007524

## DESCRIPTION OF THE CHARTER AMENDMENTS

**General**

In connection with the exchange offers, the U.S. Treasury Debt Conversion and the VEBA Modifications, we will issue to tendering holders of old notes, the U.S. Treasury (or its designee) and the New VEBA an aggregate of up to approximately 60 billion shares of GM common stock.

Since the amount of GM common stock to be issued pursuant to the exchange offers, the U.S. Treasury Debt Conversion and VEBA Modifications exceeds the number of shares of GM common stock currently authorized under GM's certificate of incorporation, prior to the distribution of GM common stock to tendering holders on the settlement date, we plan on implementing charter amendments that provide for, among other things, an increase in the number of authorized shares of GM common stock.

To effect the charter amendments, the following will occur prior to the distribution of GM common stock to tendering holders on the settlement date:

1. In partial satisfaction of the U.S. Treasury Debt Conversion, we will issue to the U.S. Treasury (or its designee), in connection with the U.S. Treasury Debt Conversion, authorized shares of GM common stock in an amount that will represent a majority of the outstanding shares of GM common stock as of such date.

2. The U.S. Treasury (or its designee) will execute and deliver to us, following such issuance and in accordance with applicable provisions of the DGCL, one or more written consents approving the charter amendments (the "stockholder written consents").

3. We will file the charter amendments with the Delaware Secretary of State. Because the U.S. Treasury (or its designee) would be the holder of at least a majority of the issued and outstanding shares of GM common stock on the settlement date, if the settlement date occurs, approval of the charter amendments will be assured and no further stockholder vote or stockholder consent would be required to approve the charter amendments.

**Description of the Charter Amendments**

A copy of the form of charter amendments is set forth as Exhibit B to this prospectus. Upon the filing of the charter amendments, our certificate of incorporation will be amended to:

- reduce the par value of GM common stock from $1 2/3 per share to $0.01 per share (the "par value reduction");

- increase the number of authorized shares of GM common stock to 62 billion shares (the "common stock increase"); and

- effect a 1-for-100 reverse stock split of our common stock (the "reverse stock split"), whereby each 100 shares of GM common stock registered in the name of a stockholder at the effective time of the reverse stock split will be converted into one share of GM common stock.

The effective time of the par value reduction, the common stock increase and the reverse stock split will be the time and on the date which the charter amendments are accepted for filing by and filed with the Delaware Secretary of State (or such later time and dated as is specified in the certificate of amendment) in accordance with Section 103 of the DGCL, which time will be on the settlement date. The reverse stock split will occur following the effectiveness of the common stock increase.

Our board of directors is recommending the common stock increase in order to facilitate the exchange offers, the proposed VEBA Modifications and the U.S. Treasury Debt Conversion. Our board of directors is

160

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007525

recommending the par value reduction in order to bring the par value of GM common stock in line with the par value of the common stock of many other public companies in Delaware and to permit it to issue common stock for less than $1.67 per share. Our board of directors is recommending the reverse stock split with a view to increasing the per share trading price of our common stock after giving effect to the issuance of the GM common stock. Other factors, including (but not limited to) our financial results, market conditions and the market perception of our business, may adversely affect the market price of our common stock. Even if the reverse stock split is implemented, there can be no assurance that the reverse stock split will result in an increase in the market price of our common stock or that the market price of our common stock will not decrease at any time. See "*Risk Factors—Risks Related to Securities Issued in the Exchange Offers—We expect to issue a substantial amount of GM common stock in connection with the exchange offers, the U.S. Treasury Debt Conversion and the VEBA Modifications, and we cannot predict the price at which GM common stock will trade following the exchange offers.*"

Unless otherwise indicated, all share numbers contained in this prospectus related to the exchange offers are presented without giving effect to the reverse stock split. We do not currently intend to issue fractional shares in connection with the exchange offers or the reverse stock split. Where, in connection with the exchange offers or as a result of the reverse stock split, a tendering holder of old notes would otherwise be entitled to receive a fractional share of GM common stock, the number of shares of GM common stock to be received by such holder will be rounded down to the nearest whole number and no cash or other consideration will be delivered to such holder in lieu of such rounded down amount.

Stockholders who own GM common stock prior to the settlement date and would otherwise hold fractional shares because the number of shares of GM common stock they held before the reverse stock split would not be evenly divisible based upon the 1-for-100 reverse stock split ratio will be entitled to a cash payment (without interest or deduction) in respect of such fractional shares. To avoid the existence of fractional shares of GM common stock, shares that would otherwise result in fractional shares from the application of the reverse stock split will be collected and pooled by our transfer agent and sold in the open market and the proceeds will be allocated to the affected existing stockholders' respective accounts pro rata in lieu of fractional shares. The ownership of a fractional interest will not give the holder thereof any voting, dividend or other rights, except to receive the above-described cash payment. GM will be responsible for any brokerage fees or commissions related to the transfer agent's selling in the open market shares that would otherwise be entitled to fractional shares.

Following the effectiveness of the charter amendments, as a result of the reverse stock split, the stated capital on our balance sheet and the additional paid-in capital account, in each case, attributable to our common stock, will be adjusted to reflect the par value reduction and the reverse stock split. However, our stockholders' equity, in the aggregate, will not change solely as a result of the par value reduction and the reverse stock split.

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER                                                                NGM000007526

## MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS

The following discussion, insofar as it relates to matters of United States federal income tax law and the regulations or legal conclusions with respect thereto, constitutes the opinion of Weil, Gotshal & Manges LLP, our tax counsel, of the material United States federal income tax consequences to GM and the holders of the outstanding notes of GM and GM Nova Scotia. Counsel has advised that it is unable to render an opinion with respect to whether the exchange constitutes a tax-free reorganization or a taxable exchange because that question is dependent on facts and circumstances the weight to be given to each of which is uncertain.

The discussion below summarizes material U.S. federal income tax consequences of the implementation of the exchange offers and the proposed amendments to holders of old notes and to us and our subsidiaries. For a discussion regarding the material Canadian tax consequences of the implementation of the exchange offers and the proposed amendments to holders of old GM Nova Scotia notes and to us and our subsidiaries, see *"Material Canadian Federal Income Tax Considerations."*

Counsel's opinion and the discussion of U.S. federal income tax consequences below are based on the Tax Code, Treasury regulations, judicial authorities, published positions of the IRS and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and are subject to significant uncertainties. We have not requested a ruling from the IRS or any other tax authority with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or such other authorities. Thus, no assurance can be given that the IRS or such other authorities would not assert, or that a court would not sustain, a different position from any discussed herein.

This summary does not address foreign, state or local tax consequences of the contemplated transactions, nor does it address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (e.g., small business investment companies, regulated investment companies, real estate investment trusts, controlled foreign corporations, passive foreign investment companies, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, holders that are, or hold old notes through, partnerships or other pass-through entities for U.S. federal income tax purposes, U.S. persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, expatriates and former long-term residents of the United States, persons subject to the alternative minimum tax, and persons holding old notes that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction). In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires GM common stock in the secondary market. Unless the context otherwise requires, when used in this discussion, the term "exchange consideration" refers to the consideration received in the exchange offer. This discussion assumes that the old notes and the GM common stock are held as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the Tax Code.

For U.S. federal income tax purposes, because General Motors Nova Scotia Finance Company is a disregarded entity wholly owned by GM, the old GM Nova Scotia notes are treated as issued by GM and GM's obligation under the guarantee is viewed as coextensive with its obligation as issuer.

We intend to take the position, and this discussion assumes, that, for U.S. federal income tax purposes, the issuance of stock to the U.S. Treasury and the VEBA and the reverse stock split will be treated as part of a single transaction, and that pursuant to the exchange offers and in satisfaction of their respective old notes, holders of old notes will be treated as receiving the exchange consideration following the reverse stock split. Therefore, references in the following discussion to exchange consideration consisting of GM common stock, or to GM common stock issued for old notes, should be understood as references to the reverse-split-adjusted shares of GM common stock ultimately received by a holder who tenders old notes, unless indicated otherwise.

We have historically treated each series of old notes as debt for U.S. federal income tax purposes, and this discussion assumes the correctness of this characterization. You should consult your own tax advisors with

162

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007527

respect to the correctness of this characterization with respect to your particular series of old notes and the tax consequences of the transactions discussed herein if such characterization is not correct.

We also intend to take the position, although not free from doubt, that the exchange of old notes (other than old Series D notes) pursuant to the exchange offers will constitute a tax-free recapitalization in which gain or loss is generally not recognized. Any consideration allocable to accrued but unpaid interest generally will be taxable to a holder of old notes to the extent not previously included in such holders' gross income. Because the original term of the old Series D notes was less than five years, it is unclear whether the old Series D notes should be treated as "securities" for U.S. federal income tax purposes. It is therefore unclear whether the exchange of old Series D notes pursuant to the exchange offers will constitute a fully taxable transaction or a tax-free recapitalization.

As used herein, the term "U.S. Holder" means a beneficial owner of old notes or GM common stock that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;
- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;
- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or
- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

As used herein, a "Non-U.S. Holder" means a beneficial owner of old notes or GM common stock that is an individual, corporation, estate or trust and is not a U.S. Holder. Non-U.S. Holders are subject to special U.S. federal income tax provisions, some of which are discussed below.

If a partnership holds old notes or GM common stock, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. If you are a partner in a partnership holding old notes or GM common stock, you should consult your own tax advisor.

*The following discussion of material U.S. federal income tax consequences is not a substitute for careful tax planning and advice from your own tax advisor based upon your individual circumstances.*

## Consequences to U.S. Holders

The discussion set forth in this section does not apply to the 7.25% Notes due 2013 or 8.375% Notes due 2033 (which were issued only outside the United States and generally offered under arrangements reasonably designed to ensure that such notes would be sold only to non-U.S. persons, other than certain financial institutions that would agree to comply with requirements of Section 165(j) of the Tax Code and related tax regulations). For a discussion of U.S. federal income tax consequences to Non-U.S. Holders of these series, see "*Consequences to Non-U.S. Holders*" below. U.S. Holders who beneficially own old notes of these series should review the offering circular for such notes and consult their own tax advisors as to their particular tax consequences of holding and disposing of such notes.

### Proposed Amendments to Non-Tendered Notes (Other than GM Nova Scotia Notes)

The modification of the terms of a series of notes will be treated, for U.S. federal income tax purposes, as a "deemed" exchange of old notes for new notes if such modification is a "significant modification" under the applicable Treasury regulations. In general, a modification is a "significant modification" if, based on all the facts and circumstances and taking into account all modifications of the debt instrument collectively, the legal rights or obligations that are altered and the degree to which they are altered are economically significant. Under the Treasury regulations, a modification that adds, deletes, or alters customary accounting or financial covenants is, without more, not a significant modification. Also, a change in the priority of a debt instrument relative to

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007528

other debt of the issuer is not a significant modification unless it results in a "change in payment expectations" (which, for these purposes, is defined to mean a substantial impairment of the obligor's capacity to meet the payment obligations if that capacity was adequate prior to the modification and is primarily speculative after the modification, or vice-versa).

We intend to take the position, and the remainder of this discussion assumes, that amending old notes as proposed does not constitute a "significant modification" and thus does not result in a deemed exchange of old notes that are not tendered in the exchange offers. Based on this position, a U.S. Holder of such old notes that does not participate in the exchange offers will not recognize any income, gain or loss with respect to such old notes as a result of the adoption of the proposed amendments, and will have the same adjusted tax basis and holding period in such old notes after the adoption of the proposed amendments as such holder had in such old notes immediately before such adoption. If a contrary position is successfully asserted by the IRS, the U.S. federal income tax consequences of the adoption of the proposed amendments with respect to such old notes could materially differ from those described above. You should consult your own tax advisor with respect to the correctness of our position with respect to such old notes and the tax consequences of the adoption of the proposed amendments with respect to such old notes if our position is not correct.

### Proposed Amendments to Non-Tendered Old GM Nova Scotia Notes

In the case of the old GM Nova Scotia notes, GM Nova Scotia intends, pursuant to the call option that would be added as part of the proposed amendments to the old GM Nova Scotia notes that are not tendered in the exchange offers, to redeem all remaining outstanding old GM Nova Scotia notes for the exchange consideration immediately upon the effectiveness of the proposed amendments. Accordingly, we intend to treat, and the following discussion assumes that it is correct to treat, the adoption of the proposed amendments to the old GM Nova Scotia notes and the subsequent redemption of the notes as a single transaction, such that the U.S. federal income tax consequences to a non-tendering U.S. Holder would be equivalent to the treatment of a holder that tenders old GM Nova Scotia notes in the exchange offers for the exchange consideration.

### Exchange Offers

Pursuant to the exchange offers, holders of old notes generally will exchange their old notes for consideration consisting of GM common stock and cash (or pounds sterling, as applicable) attributable to the accrued but unpaid interest.

*Definition of "Security."* The U.S. federal income tax consequences of the exchange offers will depend, in part, on whether the U.S. Holder's old notes constitute *"securities"* for U.S. federal income tax purposes, in which case the exchange would qualify for "recapitalization" treatment under the Tax Code.

This determination is made separately for each series of old notes. For example, if the 7.75% Discount Debentures due 2036 constitute securities, then the receipt of the exchange consideration will be treated as a *"recapitalization"* for U.S. federal income tax purposes, with the consequences described below in "—*Recapitalization Treatment.*" If, on the other hand, the 7.75% Discount Debentures due 2036 do not constitute securities, then the receipt of the exchange consideration would be treated as a fully taxable transaction, with the consequences described below in "—*Fully Taxable Exchange.*"

The term "security" is not defined in the Tax Code or in the Treasury regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk or is effectively holding a cash equivalent. One of the most significant factors considered in determining whether a particular debt is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of less than five (5) years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute securities. The old notes (other than old Series D notes and some of the 7.2% Notes due 2011) have an original weighted average maturity of ten (10) years or more, so we believe these notes

164

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007529

should be treated as securities. Some of the 7.2% Notes due 2011 have an original maturity between five (5) and ten (10) years, and while not free from doubt, we intend to treat these notes as securities. The treatment of the old Series D notes, which have an original maturity of less than five (5) years, is unclear. You are urged to consult your own tax advisor regarding the characterization as securities for U.S. federal income tax purposes of your old notes and the consequences of such treatment.

*Recapitalization Treatment.* The classification of an exchange as a recapitalization for U.S. federal income tax purposes (as discussed above) generally serves to defer the recognition of any gain or loss by the U.S. Holder, aside from the treatment of consideration allocable to accrued but unpaid interest and possibly accrued original issue discount ("OID"). See "—*Payment of Accrued Interest,*" below. However, a U.S. Holder exchanging old GM Nova Scotia notes for GM common stock is required to recognize ordinary gain or loss that is attributable to fluctuations in currency exchange rates. Gain or loss attributable to fluctuations in exchange rates will equal the difference between (a) the U.S. dollar value of the foreign currency principal amount of the old GM Nova Scotia notes exchanged translated at the spot rate of exchange on the date of the consummation of the exchange offers, and (b) the U.S. dollar value of the foreign currency principal amount of such notes on the date the U.S. Holder acquired such notes. For purposes of determining foreign currency gain or loss, an old GM Nova Scotia note generally will be treated as having a principal amount equal to the U.S. Holder's purchase price (in foreign currency). You are urged to consult your own tax advisor regarding the appropriate tax treatment of any such foreign currency gain or loss.

In a recapitalization exchange, a U.S. Holder's aggregate tax basis in the GM common stock received (except to the extent treated as received in respect of accrued but unpaid interest and possibly accrued OID) will equal the U.S. Holder's aggregate adjusted tax basis in the old notes exchanged therefor (except to the extent of any tax basis attributable to accrued but unpaid interest and possibly accrued OID), increased or decreased by any gain or loss recognized by the U.S. Holder with regard to the exchange. In a recapitalization exchange, a U.S. Holder's holding period in the GM common stock received (except to the extent treated as received in respect of accrued but unpaid interest and possibly accrued OID) will include the U.S. Holder's holding period in the old notes exchanged therefor.

*Fully Taxable Exchange.* If an old note does not constitute a security for U.S. federal income tax purposes, the exchange of that note pursuant to the exchange offers will be a fully taxable exchange and the exchanging U.S. Holder should recognize gain or loss in an amount equal to the difference, if any, between (a) the fair market value of any GM common stock received (other than in respect of accrued but unpaid interest and possibly accrued OID) and (b) the U.S. Holder's adjusted tax basis in the old notes exchanged (other than any basis attributable to accrued but unpaid interest and possibly accrued OID). See "—*Character of Gain or Loss,*" below. In addition, a U.S. Holder will have interest income to the extent of any exchange consideration allocable to accrued but unpaid interest not previously included in income. See "—*Payment of Accrued Interest,*" below.

A U.S. Holder's adjusted tax basis in an old note will be equal to the cost of the note to such U.S. Holder, increased by any OID previously included in income (but see "—*Payment of Accrued Interest,*" below, regarding the possible treatment of accrued OID). If applicable, a U.S. Holder's tax basis in an old note will also be (a) increased by any market discount previously included in income by such U.S. Holder pursuant to an election to include market discount in gross income currently as it accrues, and (b) reduced by any cash payments received on the old note other than payments of "qualified stated interest," and by any amortizable bond premium which the U.S. Holder has previously deducted.

In the case of a taxable exchange, a U.S. Holder's tax basis in the GM common stock received will equal the fair market value of such GM common stock on the date of the exchange. The U.S. Holder's holding period in the GM common stock received should begin on the day following the exchange date.

*Character of Gain or Loss.* Where gain or loss (other than any foreign currency gain or loss) is recognized by a U.S. Holder in respect of the exchange of an old note, subject to the discussion below in "—*Payment of Accrued Interest,*" such gain or loss will generally be capital gain or loss except to the extent any gain is

165

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007530

recharacterized as ordinary income pursuant to the market discount rules discussed below. A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders. The deductibility of capital loss is subject to significant limitations.

A U.S. Holder that purchased its old notes from a prior holder at a "market discount" may be subject to the market discount rules of the Tax Code. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (a) its stated principal amount or (b) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a de minimis amount. The de minimis amount is equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity. Generally, qualified stated interest is a stated amount of interest payable in cash at least annually.

Under these rules, any gain recognized on the exchange of old notes generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the U.S. Holder, on a constant interest basis) during the U.S. Holder's period of ownership, unless the U.S. Holder elected to include the market discount in income as it accrued. If a U.S. Holder of old notes did not elect to include market discount in income as it accrued and thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its old notes, such deferred amounts would, in the case of a fully taxable exchange, become fully deductible at the time of the exchange and would, in the case of a recapitalization, become deductible up to the amount of gain that the U.S. Holder recognizes in the exchange.

In the case of an exchange of old notes that qualifies as a recapitalization, the Tax Code indicates that any accrued market discount in respect of the old notes in excess of the gain recognized in the exchange should not be currently includible in income under Treasury regulations to be issued. However, such accrued market discount would carry over to any non-recognition property received in exchange therefor (i.e., to the GM common stock received in the exchange), such that any gain recognized by a U.S. Holder upon a subsequent disposition (or repayment) of such exchange consideration would be treated as ordinary income to the extent of any accrued market discount not previously included in income. To date, specific Treasury regulations implementing this rule have not been issued.

*Payment of Accrued Interest.* In general, to the extent that any consideration received pursuant to the exchange offers by a U.S. Holder of old notes is received in satisfaction of accrued interest during the U.S. Holder's holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income). Conversely, subject to the next sentence in the case of a recapitalization, a U.S. Holder generally recognizes a deductible loss to the extent any accrued interest or OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a security of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any accrued but unpaid OID since such OID is treated as part of the principal amount of the security for U.S. federal income tax purposes. It is also unclear whether, by analogy, a U.S. Holder of an old note that does not constitute a security would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

A U.S. Holder's tax basis in any GM common stock received in respect of accrued but unpaid interest or OID (except possibly OID in the case of a recapitalization) will equal the fair market value of such shares or notes. A U.S. Holder's holding period in such shares or notes will begin on the day following the exchange date.

Pursuant to the exchange offers, holders of old notes will receive cash (or pounds sterling, as applicable) in the amount of any accrued but unpaid interest due on their old notes as of the settlement date. We believe that to the extent any cash payments (or payments in pounds sterling, as applicable) are made to a U.S. Holder of old notes on account of accrued but unpaid interest, such payments should be respected as payments of interest (taxable as ordinary income to the extent not previously so taxed) and not as payments of principal.

166

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007531

U.S. Holders of old GM Nova Scotia notes who are accrual basis taxpayers will recognize exchange gain or loss, treated as ordinary income or loss (that is not interest income or expense), with respect to any payments in respect of accrued but unpaid interest in foreign currency. The amount of ordinary income or loss recognized will equal the difference between (a) the U.S. dollar value of the foreign currency payment received (determined at the spot rate of exchange on the date of the consummation of the exchange offer) and (b) the U.S. dollar value of income that has accrued during such interest accrual period (generally determined at the average rate of exchange for the accrual period (or portion thereof in the applicable taxable year) or, if the holder elects, at the spot rate). A U.S. Holder that makes such an election must apply it consistently to all debt instruments from year to year and cannot change the election without the consent of the IRS. The source of such foreign currency gain or loss will be determined by reference to the residence of the U.S. Holder or the qualified business unit of the U.S. Holder on whose books the old GM Nova Scotia notes are properly reflected. A U.S. Holder will have a tax basis in any foreign currency received equal to the U.S. dollar value of such foreign currency at the time of the consummation of the exchange offer. Any gain or loss realized by a U.S. Holder on a sale or other disposition of foreign currency will be ordinary income or loss.

You are urged to consult your own tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest and OID for U.S. federal income tax purposes.

### Ownership and Disposition of GM Common Stock

*Dividends*. Any distributions made on the GM common stock will constitute dividends for U.S. federal income tax purposes to the extent of our current or accumulated earnings and profits as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed our current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain. Subject to certain exceptions, dividends received by non-corporate U.S. Holders prior to 2011 will be taxed under current law at a maximum rate of 15%, *provided* that certain holding period requirements and other requirements are met. Any such dividends received after 2010 will be taxed at the rate applicable to ordinary income.

Dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as we have sufficient earnings and profits. However, the dividends received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

The benefit of the dividends-received deduction to a corporate shareholder may be effectively reduced or eliminated by operation of the "extraordinary dividend" provisions of Section 1059 of the Tax Code, which may require the corporate recipient to reduce its adjusted tax basis in its shares by the amount excluded from income as a result of the dividends-received deduction. The excess of the excluded amount over adjusted tax basis may be treated as gain. A dividend may be treated as "extraordinary" if (1) it equals or exceeds 10% of the holder's adjusted tax basis in the stock (reduced for this purpose by the non-taxed portion of any prior extraordinary dividend), treating all dividends having ex-dividend dates within an 85-day period as one dividend, or (2) it exceeds 20% of the holder's adjusted tax basis in the stock, treating all dividends having ex dividend dates within a 365-day period as one dividend.

*Sale, Redemption or Repurchase*. Unless a non-recognition provision applies and subject to the discussion above relating to market discount in "—*Exchange Offers—Character of Gain or Loss*," U.S. Holders generally will recognize capital gain or loss upon the sale, redemption or other taxable disposition of the GM common

167

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

stock in an amount equal to the difference between the U.S. Holder's adjusted tax basis in the GM common stock and the sum of the cash plus the fair market value of any property received from such disposition.

A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders. The deductibility of capital loss is subject to significant limitations.

### Information Reporting and Backup Withholding

Payments of interest (including accruals of OID) or dividends and any other reportable payments, possibly including amounts received pursuant to the exchange offers and payments of proceeds from the sale, retirement or other disposition of the GM common stock, may be subject to "backup withholding" (currently at a rate of 28%) if a recipient of those payments fails to furnish to the payor certain identifying information, and in some cases, a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld should generally be allowed as a credit against that recipient's U.S. federal income tax, *provided* that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments, unless an exemption applies. You should consult your own tax advisor regarding your qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

## Consequences to Non-U.S. Holders

If the proposed amendments to the non-USD old notes become effective, we intend to immediately exercise the call option and redeem the non-USD old notes for the exchange consideration (see "*Summary—Summary of the Exchange Offers and Consent Solicitations—Consent Solicitations for Non-USD Old Notes*"). Accordingly, for U.S. federal income tax purposes, we intend to treat, and the following discussion assumes that it is proper to treat, the adoption of the proposed amendments to the non-USD old notes and the subsequent redemption of the notes as a single transaction, such that the U.S. federal income tax consequences to a non-tendering Non-U.S. Holder would be equivalent to the treatment of a holder that tenders non-USD old notes in exchange offers for the exchange consideration.

### Exchange Offers and Exercise of the Call Option

*Consequences of Exchange.* Subject to the discussion below with respect to accrued interest, a Non-U.S. Holder generally will not be subject to U.S. federal income or withholding tax on any gain realized in an exchange of old notes pursuant to the exchange offers or our exercise of the call option, unless (a) the holder is an individual who was present in the United States for 183 days or more during the taxable year and such holder has a "tax home" in the United States and certain conditions are met; (b) such gain is effectively connected with such Non-U.S. Holder's conduct of a trade or business within the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or (c) in the case of the convertible old notes, we were considered a United States real property holding corporation ("USRPHC") at any time within the shorter of the five-year period preceding such exchange or such holder's holding period. If the first exception applies, to the extent that any gain is taxable (*i.e.*, not deferred under the rules applicable to recapitalizations), the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of the old notes. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty). With respect to the third exception, while we believe we should not be

168

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007533

considered a USRPHC during the relevant period, if we were considered a USRPHC, any gain recognized by an exchanging Non-U.S. Holder of the old notes will be treated as income effectively connected with such holder's U.S. trade or business (except the branch profits tax will not apply). However, such gain would not be subject to U.S. federal income or withholding tax if (1) our common stock is regularly traded on an established securities market and (2) the Non-U.S. Holder disposing of the convertible old notes did not own, actually or constructively, at any time during the five-year period preceding the disposition, more than 5% of the applicable class of the convertible old notes.

*Accrued Interest.* Payments to a Non-U.S. Holder that are attributable to accrued interest (including OID) generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, an IRS Form W-8BEN or a successor form) establishing that the Non-U.S. Holder is not a U.S. person, unless:

(i) the Non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of our stock that are entitled to vote,

(ii) the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to us (each, within the meaning of the Tax Code), or

(iii) such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly-executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the interest or OID at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued interest (including OID). For purposes of providing a properly-executed IRS Form W-8BEN, special procedures are provided under applicable Treasury regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

*Treaty Benefits.* To claim the benefits of a treaty, a Non-U.S. Holder must provide a properly-executed IRS Form W-8BEN (or a successor form) prior to the payment.

*Foreign Government Exemption.* Foreign government related entities should furnish on IRS Form W-8EXP (or successor form) in order to establish an exemption from withholding under Section 892 of the Tax Code.

### Ownership and Disposition of GM Common Stock

*Dividends.* Any distributions made on GM common stock will constitute a dividend for U.S. federal income tax purposes to the extent of our current or accumulated earnings and profits as determined under U.S. federal income tax principles. Except as described below, dividends paid on GM common stock held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business will be subject to U.S. federal withholding tax at a treaty rate of 30% (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or IRS Form W-8EXP (or, in either case, a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid on GM common stock held by a Non-U.S. Holder that are

169

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007534

effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

*Sale, Redemption or Repurchase.* A Non-U.S. Holder generally will not be subject to U.S. federal income or withholding tax on gain realized on the sale or other taxable disposition (including a cash redemption) of GM common stock received in the exchange offers or pursuant to our exercise of the call option unless (1) such holder is an individual who was present in the United States for 183 days or more during the taxable year and has a "tax home" in the United States and certain conditions are met, (2) such gain is effectively connected with such Non-U.S. Holder's conduct of a trade or business within the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) or (3) we are or have been a USRPHC at any time within the shorter of the five-year period preceding such disposition or such holder's holding period.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of the GM common stock. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

We believe that we have not been a USRPHC for U.S. federal income tax purposes. Although we consider it unlikely based on our current business plans and operations, we may become a USRPHC in the future. If we have been or were to become a USRPHC, a Non-U.S. Holder might be subject to U.S. federal income tax (but not the branch profits tax) with respect to gain realized on the disposition of GM common stock. However, such gain would not be subject to U.S. federal income or withholding tax if (1) our common stock is regularly traded on an established securities market and (2) the Non-U.S. Holder disposing of GM common stock did not own, actually or constructively, at any time during the five-year period preceding the disposition, more than 5% of the value of our common stock.

### *Information Reporting and Backup Withholding*

A Non-U.S. Holder generally will not be subject to backup withholding with respect to payments of interest (including accruals of OID) or dividends and any other reportable payments, including amounts received pursuant to the exchange offers or our exercise of the call option and payments of proceeds from the sale, retirement or other disposition of the GM common stock, as long as (1) the payor or broker does not have actual knowledge or reason to know that the holder is a U.S. person, and (2) the holder has furnished to the payor or broker a valid IRS Form W-8BEN (or a successor form) certifying, under penalties of perjury, its status as a non-U.S. person or otherwise establishes an exemption.

Any amounts withheld under the backup withholding rules from a payment to a Non-U.S. Holder will be allowed as a credit against such holder's U.S. federal income tax liability, if any, or will otherwise be refundable, *provided* that the requisite procedures are followed and the proper information is filed with the IRS on a timely basis. You should consult your own tax advisor regarding your qualification for exemption from backup withholding and the procedure for obtaining such an exemption, if applicable. In addition to the foregoing, we generally must report to a Non-U.S. Holder and to the IRS the amount of interest (including OID) and dividends

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007535

paid to each Non-U.S. Holder during each calendar year and the amount of tax, if any, withheld from such payments. Copies of the information returns reporting such amounts and withholding may be made available by the IRS to the tax authorities in the country in which a Non-U.S. Holder is a resident under the provision of an applicable income tax treaty or other agreement.

## Reportable Transactions

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. You are urged to consult your own tax advisor regarding these regulations and whether the exchange offers would be subject to these regulations and require disclosure on your tax return.

## Consequences to Us

For U.S. federal income tax purposes, many of our subsidiaries are members of an affiliated group of corporations of which GM is the common parent, and file a single consolidated U.S. federal income tax return (the "GM Group"). The GM Group reflected in the most recent Form 10-K filed by GM and its subsidiaries consolidated net operating loss ("NOL") carryforwards for U.S. federal income tax purposes of approximately $15.4 billion as of the end of 2008. In addition, the GM Group expects to incur a substantial amount of current operating losses during the taxable year ending December 31, 2009. The amount of any such losses remains subject to audit and adjustment by the IRS.

As discussed below, in connection with the exchange offers, the amount of the GM Group's consolidated NOL carryforwards may be significantly reduced or eliminated, and other tax attributes of the GM Group may be reduced.

For a discussion of the Canadian tax consequences to us, see "*Material Canadian Federal Income Tax Considerations.*"

### *Cancellation of Debt*

In general, the Tax Code provides that the amount of any cancellation of debt ("COD") of a solvent taxpayer is included in income. The amount of COD income realized is generally the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor. Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes. In addition, COD income is excluded from income if a taxpayer is insolvent (but only to the extent of the taxpayer's insolvency) or if the COD income is realized pursuant to a confirmed plan of reorganization or court order in a Chapter 11 bankruptcy case.

When the insolvency or bankruptcy exception to income inclusion applies, the Tax Code provides that a taxpayer must reduce certain of its tax attributes—such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets—by the amount of any COD excluded from income. The taxpayer can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes. Where the taxpayer joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the taxpayer and other members of the group be reduced. Any reduction in tax attributes in respect of excluded COD income does not occur until after the determination of the taxpayer's income or loss for the taxable year in which the COD income is realized.

We expect to realize a substantial amount of COD income as a result of restructuring our debt obligations, including the exchange offers. The amount of COD we realize will depend on the value of GM common stock

171

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007536

issued in satisfaction of our debt obligations. If we are considered solvent for U.S. federal income tax purposes immediately prior to the completion of the exchange offers, it is anticipated that, depending on the amount of COD incurred, a significant amount of our tax attributes will be used to offset such taxable COD income. Alternatively, if we are considered insolvent for U.S. federal income tax purposes immediately prior to the completion of the exchange offers, it is nevertheless anticipated that our consolidated NOL carryforwards will be significantly reduced or even eliminated. In the latter event, other tax attributes may also be required to be reduced.

The American Recovery and Reinvestment Act of 2009 (the "Act") permits us to elect to defer the inclusion of COD income resulting from the restructuring of our debt obligations, with the amount of COD income becoming includible in our income ratably over a five-taxable year period beginning in the fifth taxable year after the COD income arises. The collateral tax consequences of making such election are complex. We currently are analyzing whether the deferral election would be advantageous.

### *Potential Limitations on NOL Carryforwards and Other Tax Attributes*

Following the settlement date, any remaining NOL carryforwards and certain other tax attributes (including current year NOLs) allocable to periods prior to such date (collectively, "pre-change losses") will be subject to limitation if Section 382 of the Tax Code applies to us as a result of the changes in ownership described below. Any Section 382 limitations apply in addition to, and not in lieu of, the use of attributes or the attribute reduction that results from the COD arising in connection with the exchange offers.

Under Section 382 of the Tax Code, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation. But for recent law changes described below, the issuance of the GM common stock pursuant to the exchange offers and/or the U.S. Treasury Debt Conversion would constitute an "ownership change" of the GM Group for these purposes.

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change will be subject is equal to the product of (i) the fair market value of the stock of the corporation *immediately before* the ownership change (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (5.27% for ownership changes occurring in April 2009). Despite this general rule, the Act provides that no annual limitation will apply to an ownership change resulting from a restructuring plan of a taxpayer that is required pursuant to the taxpayer's loan with the U.S. Treasury under the Emergency Economic Stabilization Act of 2008. In addition, according to an IRS Notice, stock issued to the U.S. Treasury pursuant to the Automotive Industry Financing Program is not considered to increase the U.S. Treasury's ownership of the issuing entity for purposes of Section 382 of the Tax Code. As described in "*Summary—Summary of the Restructuring*" above, we are undertaking the exchange offers and the U.S. Treasury Debt Conversion to meet our debt reduction obligations that are part of the restructuring requirements of the First U.S. Treasury Loan Agreement. There can be no assurance however, that these or subsequent events involving our stock will not give rise to an ownership change that is subject to the limitations under Section 382 of the Tax Code. If the U.S. Treasury disposes of shares of GM common stock acquired pursuant to the U.S. Treasury Debt Conversion, such disposition may give rise to an ownership change under Section 382 of the Tax Code.

In the event that the exemption provided by the Act does not apply, certain special relief provisions would be available in the case of an ownership change occurring pursuant to a confirmed plan of reorganization or court order in a Chapter 11 bankruptcy case. In such instance, the annual limitation generally would be determined based on the fair market value of our stock *immediately after* (rather than before) the ownership change, subject to certain adjustments and limitations. In addition, if certain creditor ownership requirements are satisfied, a different exemption from the annual limitation may apply.

172

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007537

Any portion of an annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. However, if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, or if certain shareholders claim worthless stock deductions and continue to hold their stock in the corporation at the end of the taxable year, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built-in gains discussed below. Generally, NOL carryforwards expire after 20 years.

In the event of an annual limitation, Section 382 of the Tax Code also limits the deduction of certain built-in losses recognized subsequent to the date of the ownership change. If a loss corporation has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "*built-in*" income, gain, loss and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as pre-change losses and similarly will be subject to the annual limitation. Conversely, if the loss corporation has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, according to an IRS notice, treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance.

In general, a loss corporation's net unrealized built-in gain or loss will be deemed to be zero unless the amount of such net unrealized built-in gain or loss is greater than the lesser of (a) $10 million or (b) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.

Accordingly, the impact of any future ownership change depends upon, among other things, the amount of pre-change gains and losses remaining after the use or reduction of attributes due to the COD, the value of both the stock and assets of the GM Group at such time, the continuation of its business, and the amount and timing of future taxable income.

### *Alternative Minimum Tax*

In general, a U.S. federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular U.S. federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation undergoes an ownership change and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its assets is generally reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date. It is unclear whether this rule applies if, for regular tax purposes, the net unrealized built-in loss provisions under Section 382 of the Tax Code are effectively rendered inapplicable because of the Act.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular U.S. federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

Notwithstanding the above, we do not expect to pay any AMT as a result of the exchange offers and the U.S. Treasury Debt Conversion.

### *Deductibility of Interest*

To the extent that we have or incur any debt obligations to the U.S. Treasury following the U.S. Treasury Debt Conversion, the deductibility of interest thereon may be limited under Section 163(j) of the Tax Code.

173

PRODUCED BY GENERAL MOTORS LLC IN GM NOVA SCOTIA MATTER
CONFIDENTIAL - PRODUCED SUBJECT TO PROTECTIVE ORDER

NGM000007538