**Page 1**

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  Case No. 09-50026(REG)

4  Adv. Case No. 10-05015(REG)

5  Adv. Case No. 12-09803(REG)

6  - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

7  In the Matter of:

8

9  GENERAL MOTORS CORPORATION,

10

11          Debtor.

12  - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

13  TOYOTA MOTOR COROPRATION,

14              Plaintiff,

15          v.

16  MOTORS LIQUIDATION CO. F/K/A GENERAL MOT,

17              Defendant.

18  - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

19

20   DONNA M. TRUSKY,

21              Plaintiff,

22          v.

23  GENERAL MOTORS COMPANY,

24              Defendant.

25  - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

1              U.S. Bankruptcy Court

2              One Bowling Green

3              New York, New York

4

5              June 14, 2012

6              9:51 AM

7

8    B E F O R E :

9    HON ROBERT E. GERBER

10   U.S. BANKRUPTCY JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1   Hearing re:  Adv. - 10-05015 - Case Conference

2

3   Hearing re:  Motion for Order to Change Venue for

4   Determination of Claim filed by Gerald D. Wahl on behalf of

5   Marcus Jordan

6

7   Hearing re:  Debtors' 170th Omnibus Objection to Claims

8   (Welfare Benefits Claims of Retired and Former Salaried and

9   Executive Employees)

10

11   Hearing re:  Debtors' 171st Omnibus Objection to Claims

12   (Welfare Benefits Claims of Retired and Former Salaried and

13   Executive Employees)

14

15   Hearing re:  Debtors' 175th Omnibus Objection to Claims

16   (Welfare Benefits Claims of Retired and Former Salaried and

17   Executive Employees)

18

19   Hearing re:  Debtors' 177th Omnibus Objection to Claims

20   (Welfare Benefits Claims of Retired and Former Salaried and

21   Executive Employees)

22

23   Hearing re:  Debtors' 178th Omnibus Objection to Claims

24   (Welfare Benefits Claims of Retired and Former Salaried and

25   Executive Employees)

Page 4

1    Hearing re:  Debtors' 180th Omnibus Objection to Claims

2    (Welfare Benefits Claims of Retired and Former Salaried and

3    Executive Employees)

4

5    Hearing re:  Debtors' 181st Omnibus Objection to Claims

6    (Welfare Benefits Claims of Retired and Former Salaried and

7    Executive Employees)

8

9    Hearing re:  Debtors' 183rd Omnibus Objection to Claims

10   (Welfare Benefits Claims of Retired and Former Salaried and

11   Executive Employees)

12

13   Hearing re:  Debtors' 184th Omnibus Objection to Claims

14   (Welfare Benefits Claims of Retired and Former Salaried and

15   Executive Employees)

16

17   Hearing re:  Debtors' 185th Omnibus Objection to Claims

18   (Welfare Benefits Claims of Retired and Former Salaried and

19   Executive Employees)

20

21   Hearing re:  Motion to Approve Notice Pursuant to Fed. R.

22   Civ. P. 23(h) for Award of Attorneys Fees from claim No.

23   51093 Settlement fund on behalf of Anderson Class Counsel.

24

25   Hearing re:  Motion of Motors Liquidation Company GUC Trust

1   for Limited Modification of the Automatic Stay and the Plan

2   Injunction as to the Proof of Claim Filed by Anne Valdes for

3   the Sole Purpose of Allowing Claimant to Liquidate the Proof

4   of Claim by Filing an Action

5

6   Hearing re:  Adv. 1-12-09803 - Pretrial Conference

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Dawn South

Page 6

1   A P P E A R A N C E S :

2   WEIL, GOTSHAL & MANGES LLP

3        Attorneys for the Debtor

4        767 Fifth Avenue

5        New York, NY 10153-0119

6

7   BY:  JOSEPH H. SMOLINSKY, ESQ.

8        DAVID N. GRIFFITHS, ESQ.

9

10   FOLEY & LARDNER LLP

11        Attorney for Toyota Motor Corporation

12        90 Park Avenue

13        New York, NY 10016-1314

14

15   BY:  ALISSA M. NANN, ESQ.

16

17   FOLEY & LARDNER LLP

18        Attorney for Toyota Motor Corporation

19        321 North Clark Street

20        Suite 2800

21        Chicago, IL 60654-5313

22

23   BY:  JEFFREY A. SOBLE, ESQ. (TELEPHONIC)

24

25

Page 7

1    FOLEY & LARDNER LLP

2         Attorney for Toyota Motor Corporation

3         402 West Broadway

4         Suite 2100

5         San Diego, CA 92102-3542

6

7    BY:  MATTHEW RIOPELLE, ESQ. (TELEPHONIC)

8

9    GIRARD GIBBS LLP

10        601 California Street

11        14th floor

12        San Francisco, CA 94108

13

14   BY:  A.J. DE BARTOLOMEO, ESQ.

15

16   GERSTEN SAVAGE LLP

17        600 Lexington Avenue

18        New York, NY 10022-6018

19

20   BY:  PAUL A. RACHMUTH, ESQ.

21

22

23

24

25

Page 8

1   STERLING ATTORNEY'S AT LAW, PC

2        Attorney for Marcus Jordan

3        33 Bloomfield Hills Parkway

4        Bloomfield Hills, MI 48304

5

6   BY:  GERALD D. WAHL, ESQ. (TELEPHONIC)

7

8   ALSO APPEARING TELEPHONICALLY:

9

10  JANE C. BOGUE, PRO SE

11  GORDON HALL, PRO SE

12  STANLEY E. JACK, PRO SE

13  TIMOTHY J. KUECHENMEISTER, PRO SE

14  GLENN C. KUNTZ, PRO SE

15  DAVID R. VOPLE, PRO SE

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Okay, let's get to work on

 3    General Motors.  Want to come on up, please, folks.

 4              Mr. Smolinsky, gives folks a chance to have seats

 5    and then we'll start.

 6        (Pause)

 7              THE COURT:  Okay, terrific, whenever you're ready.

 8              MR. SMOLINSKY:  Thank you.  Good morning, Your

 9    Honor, Joseph Smolinsky of Weil, Gotshal & Manges for the

10    Motors Liquidation Company GUC Trust.

11              If I may propose how we proceed this morning I

12    think it would sense to hold the status conference first,

13    then move to the uncontested matters, then come back to the

14    contested matters so that I can take my leave and my

15    colleague, Mr. Griffiths, can finish up the hearing.

16              THE COURT:  Sure, that's sound like.

17              MR. SMOLINSKY:  Item number 1 of the agenda is the

18    status conference of the adversary proceeding, Toyota Motor

19    Corporation versus Motors Liquidation Company.

20              I think Your Honor correctly noted that while we

21    had resolved the NUMMI claim that was part of that -- that

22    period of litigation, which concluded with the motion to

23    dismiss filed by the debtors, we have not resolved the claim

24    of Toyota.  And why we had some concern that Your Honor had

25    thought that it was all settled and therefore there was
```

Page 10

```
 1    nothing remaining under advisement, given the workload that

 2    Your Honor had with other matters under advisement and given

 3    the fact that we were still midway through the claims

 4    reconciliation process we thought it was advisable to wait

 5    on that matter for a period of time before finding out

 6    whether Your Honor was mistaken that this matter was

 7    resolved.

 8              THE COURT:  Are you diplomatically telling me that

 9    I took something under submission there that I haven't ruled

10    on?

11              MR. SMOLINSKY:  That's correct, Your Honor.

12              THE COURT:  I thought that Toyota was a joint

13    venture partner in NUMMI and that the rights that the joint

14    venture -- NUMMI joint venture would have against General

15    Motors would belong to the joint venture as compared and

16    contrasted to its individual joint venture partners.

17              Now I assume Toyota isn't here today; am I

18    correct?

19              MR. SMOLINSKY:  Toyota is here.

20              THE COURT:  Oh, okay.

21              MR. SMOLINSKY:  Counsel --

22              THE COURT:  But I also assume that my

23    understanding in that regard may be mistaken.

24              MR. SMOLINSKY:  At the hearing --

25              THE COURT:  Or at least it's arguably mistaken.
```

Page 11

1          MR. SMOLINSKY:  At the hearing on the motion to

2     dismiss, which was heard on February 9th, 2011, my view is

3     Your Honor correctly was skeptical of Toyota's claims versus

4     NUMMI's claims, which was the joint venture as opposed to

5     another joint venture partner, Nevertheless, Toyota

6     continued to pursue its claims as a joint venture partner

7     believing that the other joint venture partner, General

8     Motors Corporation, had duties to it that would result in

9     claims that were asserted in its remaining proof of claim.

10          THE COURT:  Okay.  I want to give Toyota's counsel

11     an opportunity to be heard, but to your understanding,

12     Mr. Smolinsky, what was before me?  Did we have full

13     briefing on it and argument, and when did I take it under

14     submission?  I don't rule out the possibility that a ball

15     fell between the outfielder's hand.

16          MR. SMOLINSKY:  The matter was fully briefed, and

17     if Your Honor recalls, Toyota had asserted various claims,

18     their primary claim was for research and development costs

19     that they incurred in connection with developing the

20     automobiles that were produced by NUMMI.

21          THE COURT:  Like the Pontiac (indiscernible -

22     00:05:37)?

23          MR. SMOLINSKY:  Then there were additional claims

24     for workers' compensation and environmental that this Court

25     properly noted were subject to disallowance under

                                                                    Page 12

1      502(e)(1)(b), and those claims were voluntarily dismissed.

2               THE COURT:  The 502(b)(1)(b) claims.

3               MR. SMOLINSKY:  Yes.

4               THE COURT:  But not the remainder.

5               MR. SMOLINSKY:  But not the remainder.  I do have

6      a copy of the transcript from February 9th if it would

7      assist Your Honor.

8               THE COURT:  Please tell me that was February 1911

9      (sic).

10              MR. SMOLINSKY:  2011.

11              THE COURT:  Okay.  And I then took it under

12     submission?

13              MR. SMOLINSKY:  That's correct, Your Honor.

14              THE COURT:  Okay.  Anything further before I hear

15     from counsel for Toyota?

16              MR. SMOLINSKY:  No, just maybe -- maybe just a

17     little bit more background.

18              If you recall we had objected to Toyota's proof of

19     claim and NUMMI's proof of claim.  At an initial hearing

20     Your Honor thought that it was difficult to parse through

21     the various contracts that were at issue and therefore

22     thought that a plenary proceeding was more appropriate.

23              THE COURT:  I made Federal Civil Rules 8, 9, and

24     12 applicable.

25              MR. SMOLINSKY:  Correct, and that's why each of

Page 13

```
 1    Toyota and NUMMI filed adversary proceeding --

 2              THE COURT:  Right.

 3              MR. SMOLINSKY:  -- which initiated the motions to

 4    dismiss.

 5              THE COURT:  Okay.  May I hear from counsel for

 6    Toyota, please.  If you'd use the main lectern, please.

 7              MS. NANN:  Sure.  Good morning, Your Honor, Alissa

 8    Nann from Foley & Lardner on behalf of Toyota Motor Corp.

 9              THE COURT:  Could you speak a little louder and

10    pull that microphone closer to you?

11              MS. NANN:  Sure.  Alissa Nann from Foley & Lardner

12    on behalf of Toyota Motor Corporation.

13              THE COURT:  That's Mann, M-A-N-N?

14              MS. NANN:  It's Nann N like Nancy, A-N-N.

15              THE COURT:  Oh, forgive me.

16              MS. NANN:  No problem.

17              THE COURT:  Okay.

18              MS. NANN:  My colleagues, Jeff Soble from our

19    Chicago office and Matt Riopelle from our San Diego office

20    are on the phone I believe.

21              THE COURT:  Okay.

22              MS. NANN:  And they were involved in the earlier

23    proceedings and can answer any questions that you may have.

24              THE COURT:  I guess I need to know from you,

25    Ms. Nann, or neither your colleagues, whether you have any
```

Page 14

1    problems with the accuracy or completeness from what I just

2    heard from Mr. Smolinsky.

3             MS. NANN:  From my understanding of what I've been

4    -- been brought up to speed on this, Your Honor, I believe

5    Mr. Smolinsky's representations to the Court were accurate.

6             THE COURT:  Okay.  So you're waiting just like he

7    is --

8             MS. NANN:  Exactly, yes.

9             THE COURT:  -- for me to issue a ruling on that.

10            MS. NANN:  Yes, we are.

11            THE COURT:  Okay.  Ms. Nann, do you have a problem

12   if I ask your colleagues if they want to supplement what you

13   said in any way?

14            MS. NANN:  No.

15            THE COURT:  Okay.  Ms. Nann's colleagues on the

16   phone from Foley & Lardner out of town, do you guys want to

17   be heard on this in any way?

18            MR. SOBLE:  Your Honor, (indiscernible - 00:08:29)

19   Chicago.  I just have one comment I'd like to add.

20            I do factually what's been stated is true

21   procedurally about where we are with everything in the

22   complaints and the motion.

23            The only thing that I would wish to clarify on

24   Toyota's behalf is that the claims that are pending for that

25   are not as a JV partner but as a contractual party with an

Page 15

1    LC.  The claims relate to the -- to Toyota's position as a

2    direct contractual party and are based mostly in breach of

3    contract of the vehicle supply agreement in the 2006

4    memorandum of understanding.

5              THE COURT:  Okay.

6              MR. SOBLE:  The claims are not derivative or

7    resolved by NUMMI's settlements, they're separate and

8    independent based on direct contracts.

9              THE COURT:  Okay, I understand.  All right.  All

10   right.

11             Well, thank you, folks, it sounds to me like I

12   just have another log on my fire, and we'll get to it as

13   soon as we can.  What else --

14             MS. NANN:  Thank you, Your Honor.

15             THE COURT:  -- you got, Mr. Smolinsky before you

16   need to get out of here?

17             MR. SMOLINSKY:  Would it assist the Court if I

18   left a copy of the transcript?

19             THE COURT:  Yeah.  Would you give it to one of my

20   law clerks, please.

21             MR. SMOLINSKY:  Let me just run through the

22   uncontested matters.

23             The first matter is a motion filed by the Motors

24   Liquidation Company GUC Trust for a limited modification of

25   the automatic stay to allow Anne Valdes to file an action.

Page 16

1          She is a claimant, a personal injury claimant.  We

2    had gone through the ADR process, which was unsuccessful,

3    and there is no prepetition pending action.

4          Given the fact that this Court doesn't have

5    jurisdiction to liquidate the claim we need to have a

6    pending action in some court.  We would prefer that action

7    to be in the Southern District of New York.  The U.S. Lyon's

8    Second Circuit decision tells us that while the District

9    Court has the right to direct what court a case should be

10   filed in, this Court does not, and therefore other than a

11   gentle suggestion in our motion papers that they should file

12   in the Southern District of New York where they may very

13   well face a motion for removal and transfer we have asked

14   the Court to direct that an action be filed within the next

15   45 days to file a claim wherever proper jurisdiction lays,

16   including the Southern District of New York.

17          The motion further goes on to request that if the

18   action is not filed within 45 days and there's not a motion

19   to extent the time for cause filed within that period that

20   the claim would be automatically expunged.

21          THE COURT:  Forty-five days is a fairly tight

22   period.  Has she been previously represented by counsel and

23   participated in the ADR process in an active way?

24          MR. SMOLINSKY:  She is represented in counsel --

25   by counsel, they did -- they did appear at the mediation.

Page 17

1                    THE COURT:  Uh-huh.

2                    MR. SMOLINSKY:  And they are aware of the motion.

3                    THE COURT:  And did they object to your 45-day

4        request?

5                    MR. SMOLINSKY:  We received no objection to the

6        motion.

7                    THE COURT:  Uh-huh.  Where does she live?

8                    MR. SMOLINSKY:  Miami, Florida, according to the

9        proof of claim.

10                   THE COURT:  All right.  I'm going to grant your

11       motion given that it was unopposed, Mr. Smolinsky, but the

12       legislative history of this order is going to be that if

13       before the end of the 45 days there is a timely request for

14       an extension for an additional 45 days and if cause is shown

15       I'm likely to grant it.

16                   You don't need to put that in the order, but we're

17       going to have a transcript to that effect.

18                   With this much time having gone by I don't want

19       there to be a forfeiture of rights because the balls fell

20       between the outfielders.

21                   MR. SMOLINSKY:  Understood, Your Honor.  And as I

22       said, the order does provide that a motion could be filed to

23       extent the time for cause.

24                   THE COURT:  Oh, it already provided for that.

25                   MR. SMOLINSKY:  Yes.  Yes.

Page 18

1          THE COURT:  Oh, okay, you were a step ahead of me

2     then.

3          MR. SMOLINSKY:  And I will -- I will send a cover

4     letter with the order, which we'll put in bold, the

5     provision of the order that says that if a complaint is

6     timely filed then the claim shall be automatically

7     extinguished.

8          THE COURT:  All right.  And such a complaint could

9     be put in any court of competent jurisdiction.

10          MR. SMOLINSKY:  That's correct.

11          THE COURT:  Okay, that's fine, you got it.

12          MR. SMOLINSKY:  Subject to of course our rights of

13     removal and transfer.

14          THE COURT:  I understand.

15          MR. SMOLINSKY:  The next matter on the agenda is

16     the motion by the Anderson Class Counsel, which is a motion

17     for approval of notice in connection with a request for the

18     awarding of fees to class action counsel.

19          THE COURT:  Okay.  You want to hand off to them?

20          MR. SMOLINSKY:  Yes.

21          THE COURT:  Good morning.

22          MR. RACHMUTH:  Good morning, Your Honor, Paul

23     Rachmuth from Gersten Savage.

24          THE COURT:  I'm having trouble hearing you.

25          MR. RACHMUTH:  Good morning, Your Honor, Paul

Page 19

1    Rachmuth from Gersten Savage.  I have with me my co-counsel

2    A.J. De Bartolemeo --

3              MS. DE BARTOLOMEO:  Your Honor, it's De

4    Bartolemeo.

5              THE COURT:  Okay.

6              MR. RACHMUTH:  From Girard Gibbs in California who

7    has been admitted pro hac to this Court.  I'll let her give

8    the specifics and answer your questions.

9              The motion requests notice approval to be sent to

10   the class of parties who are subject to a settlement, and we

11   are asking this Court for dates to allow for that notice and

12   a subsequent hearing on the Girard Gibbs fees.

13             THE COURT:  Sure.  Did you recommend particular

14   dates?  Or come on up, Ms. De Bartolemeo.

15             MS. DE BARTOLOMEO:  Good morning, Your Honor.  And

16   once again thank you for permitting me to appear pro hac

17   here.

18             Your Honor, it really depended on in terms of the

19   dates we wanted to allow enough time under the Bankruptcy

20   Rules and the Class Action Rules for a comment period and

21   then we wanted to coordinate debtor's counsel as to an

22   appropriate hearing date that fit the schedule.

23             We were conferring prior to this -- the Court

24   taking the bench and we're happy to work with debtor's

25   counsel so that it fits in either the next hearing date or

Page 20

1    the following one.  We'd love the Court's guidance on how

2    much time you believe would be appropriate for the comment

3    period under class action standards.  I would probably

4    recommend 30 days from the notice, but depending upon how

5    the Court feels about 30 days we're willing to take whatever

6    guidance you can offer.

7            THE COURT:  Refresh my recollection as to whether

8    you're only talking about opportunity to object to your fees

9    or whether you're talking about opportunity to object to the

10   fairness of the settlement.

11           MS. DE BARTOLOMEO:  At this point, Your Honor,

12   it's only the fee application.  Your Honor already granted

13   the settlement last year, and so this is under Rule 23 in

14   the Bankruptcy Rules their opportunity to comment to the

15   Court as to whether class counsel should be compensated for

16   the work we've done post-petition to establish the common

17   fund.

18           THE COURT:  For that purpose 30 days is fine.  But

19   what I need you to do, without sounding like I'm abdicating

20   my responsibility, is you got to talk to my courtroom deputy

21   and tell her that I approved the amount of time you were

22   talking about in concept and let her give you a date, I just

23   don't have the knowledge of my calendar or the ability to

24   give out particular dates from here up on the bench.

25           You can tell Ms. Plum just down the hall that I'm

Page 21

1    fine with the 30 days you recommended and to get you in on

2    the next one.

3                  You've come from out of town, from the west coast?

4                  MS. DE BARTOLOMEO:  Yes, Your Honor.

5                  THE COURT:  I'll allow you to appear

6    telephonically unless you're looking for an excuse to come

7    to New York.

8                  MS. DE BARTOLOMEO:  Well, Your Honor, actually I

9    was here on other business, and the fact that it's Father's

10   Day this weekend and my father is in Connecticut --

11                 THE COURT:  It is?

12                 MS. DE BARTOLOMEO:  -- it just -- it all worked

13   well nicely.  I appreciate your setting the hearing and

14   General Motors setting it right before Father's Day.

15                 THE COURT:  Okay.  All right.  Your call.  If

16   you're looking for another excuse to come New York you can,

17   I'll waive personal appearance.

18                 MS. DE BARTOLOMEO:  Okay.  Thank you, Your Honor.

19                 THE COURT:  And you can argue by phone in the

20   event there's an objection.

21                 MS. DE BARTOLOMEO:  Perhaps I can reserve my

22   rights and see if there are any objections and then make a

23   determination at that point?

24                 THE COURT:  Of course.

25                 MS. DE BARTOLOMEO:  Okay.  Thank you, Your Honor.

Page 22

1            THE COURT:  Okay.  What else we got on this one?

2            Sure, you're excused.

3            MR. RACHMUTH:  Thank you.

4            MS. DE BARTOLOMEO:  Thank you.

5            MR. SMOLINSKY:  The next item on the uncontested

6    matters is the debtor's 170th omnibus objections to claim.

7    There was one claim left -- one objection left filed by

8    Douglas Sterett.  That matter really should have been on the

9    contested matter section of the agenda.

10            Initially Mr. Sterett said that he had no

11   objection to the relief requested.  My understanding now is

12   that he has changed his mind.

13            So what we're going to do is adjourn this matter

14   to the July 17th hearing and we'll take it up then.

15            THE COURT:  Sure.  Our next one is July 17th?

16            MR. SMOLINSKY:  Yeah.

17            THE COURT:  Uh-huh.

18            MR. SMOLINSKY:  There are just two resolved

19   matters which I'll just mention.  There is a motion filed by

20   Wells Fargo Bank with respect to distributions.  My

21   understanding is that Wells Fargo had reached out the

22   chambers and that that order is going to be entered without

23   need for an appearance.  And then a motion to file a late

24   claim by Geneva Avamurtez (ph), that motion is being

25   withdrawn because we settled that claim.

Page 23

```
 1              THE COURT:  Okay.

 2              MR. SMOLINSKY:  Moving to the contested matters.

 3              The first matter on the agenda is a motion by

 4    Marcus Jordan for an order changes venue for termination of

 5    claim.

 6              Your Honor, I can proceed or we can let Mr. Jordan

 7    present his motion.

 8              THE COURT:  Okay.  Mr. Jordan, are you on the

 9    phone?

10              MR. WAHL:  My name is Gerald Wahl, I'm an attorney

11    for Mr. Jordan.

12              THE COURT:  Oh, yes, I see you, Mr. Wahl.

13              MR. WAHL:  Thank you, Your Honor.  Thank you for

14    allowing me to appear telephonically.

15              THE COURT:  Not a problem.

16              Now, Mr. Wahl, you have a claim against the GM

17    estate.  GM isn't going after you, you're going after GM.

18    And you wish to liquidate it elsewhere.  And as I understand

19    GM's objection, they think that wherever it's liquidated now

20    isn't the time to do it and that at the very least there

21    should be the usual ADR process first, if I understand the

22    state of play between you.  To what extent --

23              MR. WAHL:  May I comment, Your Honor?

24              THE COURT:  To what extent do I not understand the

25    issues and to what extent do you have a problem on that?
```

Page 24

```
 1              My tentative, subject to your rights to be heard,

 2     is to deny your request for change venue now without

 3     prejudice to renewal after you've completed the ADR process,

 4     and then if you can't solve this part of that you're going

 5     to have something similar to what we heard on the docket

 6     before, which is we'll then decide whether you bring any

 7     plenary litigation elsewhere or whether it's liquidated in

 8     the District Court as I would -- oh, wait, no, this is not a

 9     tort personal injury action, this is employment

10     discrimination action; am I correct?

11              MR. WAHL:  It is, Your Honor.

12              THE COURT:  Okay.  All right.  But my tentative

13     would still be the same, although that could bear on whether

14     the matter is heard before the District Court in I think

15     Michigan, Eastern District of Michigan if I'm not mistaken.

16     Let me get your perspective, Mr. Wahl.

17              MR. WAHL:  Yeah, I've been trying to get the

18     perspective of General Motors for a year now, and my last

19     conversation was deference to while counsel was appearing

20     was a conversation with Mr. Woo and Susan Brown from Aling's

21     (ph) Partners and they said that unless -- they would not

22     give me ADR unless I withdraw the motion first, and even

23     then they would only consider it, which is why I went ahead

24     with the motion.

25              I heard what the Court said, I understand what the
```

1    Court said, but I -- this has been going on, I've been

2    sending e-mails to a Jennifer Wine (ph) to try -- you know,

3    I was told that we would be placed in ADR last year, and

4    finally on May 1 I filed the motion for change of venue.

5              I would request that the Court consider this as an

6    unresolved designated claim under 92)(e) paragraphs 3 and 4

7    of the ADR order just because this has gone around now for a

8    year and a half since the cap on the claim was established

9    in February of 2011.  I don't know that -- that it's going

10   to be anymore cumbersome or costly to do -- to put this into

11   the District Court.

12             Additionally I may -- if I may, Your Honor, one

13   trailing point here is the fees associated with this are

14   difficult for Mr. Jordan to bear.  He's an single father.

15   The mediators that I see on the ADR list charge north of 400

16   bucks an hour, and the split fee arrangement is going to

17   make it difficult for him in his reduced employment capacity

18   to pay these fees.  I mean they're extraordinarily expensive

19   and will likely run into the thousands of dollars.

20             THE COURT:  What's your prayer for relief,

21   Mr. Wahl?

22             MR. WAHL:  Well, the -- by this motion, Your

23   Honor?

24             THE COURT:  No, I understand what you're trying to

25   do by the motion.  How much money are you trying to get out

Page 26

```
 1    of GM in the form of an allowed claim?

 2              MR. WAHL:  Well, his damages -- his black boarded

 3    economics are approximately two million.

 4              THE COURT:  Uh-huh.

 5              MR. WAHL:  And I put all of this in an e-mail when

 6    we had discussions with GM counsel regarding capping the

 7    claim.

 8              THE COURT:  Uh-huh.  Okay.  Okay.  other thoughts

 9    before I give Mr. Smolinsky or disclose designee a chance to

10    respond?

11              MR. WAHL:  No, Your Honor.  Thank you.

12              THE COURT:  Okay.  Mr. Smolinsky, do you want to

13    be heard in opposition?

14              MR. SMOLINSKY:  Yes, sir.

15              This is one of the few claims that has not yet

16    been designated.  We've been taking through ADR claims from

17    one million up to as high as the claims have gone.  This is

18    kind of at the low end of the range and we hadn't gotten to

19    it yet.

20              My understanding of the conversations with

21    Ms. Brown and Mr. Woo was simply that we were prepared to

22    put the claim into the ADR program, and what we suggested to

23    counsel is that we would put the claim in ADR and that he

24    should withdraw the motion without prejudice to renew it but

25    after the ADR was completed.
```

Page 27

1           We are prepared to go forward with ADR.  We didn't

2     think -- when counsel suggested that he was not prepared to

3     withdraw the motion with prejudice we held off on

4     designating it until Your Honor had a chance to rule on the

5     venue request, but we're prepared to send out an ADR

6     designation notice today.  That notice will have an offer of

7     settlement, it will allow for a very inexpensive exchange

8     between counsel to try to resolve the claim.  If not the

9     mediation -- one of the mediation locations in Michigan in

10    Detroit where claimant is located, and it seems to me to be

11    a lot cheaper for claimant than to go to trial in the

12    Michigan courts.

13           So we renew our objection to the motion and would

14    ask that we be allowed to proceed with the ADR process.

15           THE COURT:  Do you want to be heard on the cost

16    sharing component, the cost of the mediation component of

17    his request?

18           MR. SMOLINSKY:  There is a room in the procedures

19    for hardship, so we do have the ability to pay for it.

20           I would note that he is represented by counsel,

21    and to the extent that it's not settled in offer and

22    counteroffer before the mediation ever takes place the

23    decision is whether to incur the costs of going to a

24    mediation versus settling.  But we would take under

25    advisement paying for the mediator if in fact there is a

Page 28

1    hardship request.

2          If he does -- excuse me -- if he does ultimately

3    win at the end of the day then I would think that the costs

4    could be borne by the proceeds.

5          THE COURT:  Uh-huh.

6          Mr. Wahl, reply?

7          MR. WAHL:  I'm just unclear, Your Honor, as to the

8    under advisement piece.  I know where the Court has

9    indicated its direction on the ADR and the decision on my

10   motion, but I would just request that the fees be borne by

11   the debtor.  It is -- it's a process, and you know, will

12   involve a great deal of work on both sides.  I view them as

13   equivalencies in terms of getting prepared for trial and

14   going through the ADR procedure in terms of documenting the

15   claim because of the hundred pages of transcript, this was a

16   prepetition litigation and the documents in the case, but

17   you know, that's just my own assessment and my own whining.

18          I leave that to the Court's discretion, but --

19   obviously, but the money part of it is a different matter.

20          THE COURT:  All right.  Here's what we're going to

21   do, folks.  The matter is going to go into ADR.  I

22   understand that ADR is available in the claimant's locality

23   in the Detroit area, which will obviously reduce the

24   expenses.

25          The motion for change of venue is denied without

Page 29

1   prejudice to renewal at the conclusion of ADR if the ADR

2   turns out to be successful, and I express no views on the

3   outcome of that motion if it were later to be renewed.

4          The request for cost shifting is likewise denied

5   without prejudice and also because it is not yet ripe.  GM

6   can and should decide whether they want to give hardship

7   allowance now to the duty to advance the fees.  By analogy

8   it's a corporate governance matters like in Delaware.  What

9   we're talking about is GM advancing the fees.

10         If there is a pot of money that is ultimately

11  recovered, and by money I mean either green money of the

12  United States or the usual consideration by which value is

13  given out in allowed claims under the plan, which obviously

14  includes new GM securities, I won't fully decide the issue

15  now, but the likelihood is very high that I'm going to then

16  make the claimant pay for the cost of the mediation from the

17  recovery pot.

18         If the claimant totally strikes out the issue of

19  any mediation fees before the claimant struck out can be

20  litigated then and both side's rights will be reserved in

21  that regard.

22         Okay.  Not by way of reargument, are there any

23  questions as to my ruling?

24         MR. WAHL:  None from me.  Gerald Wahl on behalf of

25  claimant, Marcus Jordan.  None from me, Your Honor.

```
                                                            Page 30

 1                THE COURT:  Okay.  Mr. Smolinsky?

 2                MR. SMOLINSKY:  We can prepare an order denying

 3      the motion.  Do you want the rulings with respect to the fee

 4      sharing on -- in that order or could we just refer to the

 5      record of the hearing?

 6                THE COURT:  Mr. Wahl, you just comfortable with

 7      relying on the transcript if you guys ever have to agree to

 8      disagree?

 9                MR. WAHL:  I can rely on the transcript, Your

10      Honor, I'm comfortable with that.

11                THE COURT:  Good.  Then let's do it that way.

12      Let's keep it clean and simple.

13                MR. WAHL:  And we can expect then an ADR notice as

14      counsel represented some time over the next week I guess.

15                THE COURT:  Is he correct in that regard,

16      Mr. Smolinsky?

17                MR. SMOLINSKY:  Yes, sir.

18                THE COURT:  Okay.  Yep, you got it, Mr. Wahl.

19                MR. WAHL:  All right.  Thank you very much.

20                THE COURT:  All right.  Mr. Wahl, you can drop off

21      the phone if you choose to.

22                MR. WAHL:  I will.  Thank you.

23                THE COURT:  Okay.  Have a good day.

24                MR. WAHL:  You too.

25                THE COURT:  What you got next, Mr. Smolinsky?
```

Page 31

1           MR. SMOLINSKY:  At this point I'm prepared to cede

2      the podium to Mr. Griffiths, and while I may stay for a few

3      minutes, I would ask the Court's permission to leave.

4           THE COURT:  Of course, you got it.

5           MR. SMOLINSKY:  Thank you, sir.

6           THE COURT:  Have a good day.

7           Mr. Griffiths, come on up, please.

8           MR. GRIFFITHS:  Good morning, Your Honor.

9           THE COURT:  Good morning.

10          MR. GRIFFITHS:  David Griffiths of Weil, Gotshal &

11     Manges for the debtors, the post effective date debtors, and

12     Motors Liquidation Company GUC Trust.

13          Your Honor, this morning we have ten omnibus

14     objections relating to welt fair benefit claims going

15     forward.  We have ten former retired or executive employees

16     of the debtors on the telephone today, and with Your Honor's

17     permission I propose to adopt the modified hearing format

18     we've used in previous hearings and hear from the claimants

19     first.  I would only ask that we be able to designate for

20     the record for any appeal Your Honor's prior rulings with

21     respect to welfare benefit claims, in particular the --

22          THE COURT:  And by that pause, because people who

23     are on the phone today may not know what you're talking

24     about.  You're talking about prior explanations of the law

25     that I gave in those earlier proceedings?

1          MR. GRIFFITHS:  Correct, Your Honor.

2          THE COURT:  Okay.  Go on.

3          MR. GRIFFITHS:  Your Honor, with your permission

4    we can proceed with the first claim.  We have Mr. Stanley

5    Jack on the telephone.

6          THE COURT:  Okay.  Mr. Jack, are you on the phone?

7          MR. JACK:  Yes, sir, Your Honor.

8          THE COURT:  Okay.  Where you calling in from,

9    Mr. Jack?

10         MR. JACK:  I'm calling in from Cedarville,

11   Michigan, which is the UP of Michigan.

12         THE COURT:  Okay.  You understand the issues we

13   have today?

14         MR. JACK:  Yes, I do, sir.

15         THE COURT:  Okay.  Would you like to argue on the

16   matter?

17         MR. JACK:  Yes, I would, sir.

18         THE COURT:  Go to it.

19         MR. JACK:  Okay.  Actually on the first issue of

20   my pension -- reduction of my pension, what I didn't have

21   was a letter from the corporation to supply that I was

22   strongly urged by the corporation to retire and that the

23   future of General Motors was bleak, didn't know if I would

24   be relocated, shuffled to another country, et cetera, so

25   with that I ended up I did retire.  When I retired they

1    reduced my pension by half, but they did give me $65,000 and

2    a -- $65,000.

3          But the situation is, is that throughout my career

4    my wife and I we both, you know, saved thinking my pension

5    was going to be $6,300 a month, and with the storm-arming of

6    corporation I had to take a reduced pension, and I just --

7    that's my argument.

8          It's just -- I don't see how a corporation can do

9    that.  And again, we're being asked now to separate our ties

10   from the corporation by cashing in our current pension,

11   which isn't pertaining to this case.  But that's really what

12   I had.

13         And I also -- I looked at the documents that I

14   turned over to the Court as far as my calculation for my

15   claim, and I must say that I did include in my claim wages

16   that I would have made as if I would have been able to

17   continue to work if they allowed me to work, and I guess I'm

18   letting you know that I shouldn't be entitled to those

19   because I had not worked those, but I strongly feel that the

20   $792,000 due to my lost pension is what I should be entitled

21   to.

22         THE COURT:  Mr. Jack, do I correctly understand

23   that your concerns are with respect to your pension as

24   contrasted to medical benefits or life insurance benefits

25   which are the normal subject of employee welfare benefit

Page 34

1    plans?

2            MR. JACK:  Correct.  I have two claims actually,

3    sir.  One was for $54,000 for my health care coverage, and

4    then my second claim was for any retirement pension, yes.

5            THE COURT:  Okay.  Mr. Griffiths, I have some

6    questions about the pension portion, but before that I want

7    to ask Mr. Jacks if he has anything further -- excuse me --

8    Mr. Jack, do you have any further thoughts before I let the

9    lawyer for the GUC Trust, the general unsecured creditor

10   trust respond?

11           MR. JACK:  No, sir.

12           THE COURT:  Okay.  Thank you.

13           All right, Mr. Griffiths, you want to respond?

14           MR. GRIFFITHS:  Thank you, Your Honor.

15           The first point to note simply is that this

16   welfare benefits motion doesn't seek to affect ongoing

17   pensions, but the reply notes, the GUC Trust's understanding

18   of what happened with respect to Mr. Jack's pension

19   payments.

20           He retired at age 52 under a voluntary buy-out

21   program.  Our understanding of the way the voluntary buy-out

22   program would work is that an employee would be given the

23   option to retire voluntarily.

24           I've heard from a number of employees that they

25   had -- former employee of the debtors who retired under the

Page 35

1    voluntary buy-out programs, that they felt in some way

2    compelled to retire because the option may have been that

3    they could retire voluntarily and sign a voluntary

4    retirement agreement and in exchange take an additional

5    retirement payment, or alternatively --

6            THE COURT:  You mean an early payment like in a

7    lump sum but in exchange for lesser payments going forward?

8            MR. GRIFFITHS:  Correct, Your Honor.  I mean the

9    -- Mr. Jack would have received a one-time payment in cash

10   in exchange for accepting voluntary retirement.  His pension

11   benefits obviously vest, you know, and accrue on a yearly

12   basis.

13           Mr. Jack retired at 52 instead of 62, he therefore

14   didn't receive ten years -- the additional ten years of

15   accrued pension benefits he would otherwise have received

16   had he worked through age 62; however, what he did receive

17   was a voluntary payment that he accepted.

18           I can't speak to whether the -- this was properly

19   explained to Mr. Jack at the time of his retirement;

20   however, there's no documents to suggest otherwise.

21   Mr. Jack hasn't provided a copy of a retirement agreement or

22   anything else that would suggest that the retirement was

23   anything but voluntary, and unfortunately it appears that

24   the terms of Mr. Jack's retirement were that he would retire

25   at age 52 with the pension benefits that had vested, and an

Page 36

1   additional payment to compensate him for the -- the

2   difference in terms of pension payments that he would have

3   otherwise have received had he worked through age 62.

4           THE COURT:  Am I correct, Mr. Griffiths, that the

5   pension payments come out of a pension trust rather than out

6   of the Motors Liquidation Company estate?

7           MR. GRIFFITHS:  Your Honor, obviously in 2009 when

8   new GM agreed to take on the ongoing business of Motors

9   Liquidation Company new GM agreed to take on the

10  responsibility for pension payments for retired and former

11  executive employees, and therefore new GM is currently the

12  responsible party paying for Mr. Jack's pension.  I

13  understand that Mr. Jack is receiving what he is currently

14  contractually entitled to.

15          The -- Mr. Jack's argument with respect to the

16  difference in pension payments that he would have received

17  if he hadn't retired is probably not a claim for either MLC

18  or new GM to have to deal with because our position is is

19  that there is no claim.

20          THE COURT:  Okay.  Mr. Jack, do you want to

21  respond?

22          MR. JACK:  I guess, Your Honor, my only response

23  would be is that I wasn't given the option to work those

24  additional ten years, and so like I say, I was basically

25  strong-armed into retiring when I did, and my pension was

Page 37

1   reduced 50 percent because of that.  I mean just the math

2   the 10 years retiring early I still had 31 years with the

3   corporation, so I was entitled to the equivalent of that

4   money that I spoke to.

5          THE COURT:  Uh-huh.  When did you retire,

6   Mr. Jack?

7          MR. JACK:  I retired in 2008.

8          THE COURT:  Okay.  Anything --

9          MR. JACK:  And --

10          THE COURT:  I'm sorry, go ahead, sir.

11          MR. JACK:  Oh, I'm sorry, sir, go ahead.

12          THE COURT:  No, I just wanted to ask you if you

13   had further thoughts you wanted to convey to me.

14          MR. JACK:  No.  No, sir, thank you.

15          THE COURT:  Okay.  Thank you, Mr. Jack.

16          I'm going to rule on your issues along with other

17   people's at the end after the other people who want to be

18   heard on this hearing conference call get opportunities like

19   you did.

20          MR. JACK:  Okay.

21          THE COURT:  So please stay on the line, but try to

22   keep things quite on your end while other employees get

23   their turns to be heard.

24          MR. JACK:  Thank you, sir.

25          THE COURT:  Okay.  Mr. Griffiths, who do we have

Page 38

1    next?

2           MR. GRIFFITHS:  Thank you, Your Honor.  We have

3    Mr. David R. Volpe.

4           THE COURT:  Mr. Volpe, are you on the line?

5           MR. VOLPE:  Yes, I am, Your Honor.

6           THE COURT:  Where you calling from, Mr. Volpe?

7           MR. VOLPE:  The Atlanta area.

8           THE COURT:  Okay.  Would you like to be heard in

9    argument just like Mr. Jack was heard?

10          MR. VOLPE:  Yes, Your Honor.

11          THE COURT:  Go ahead, please.

12          MR. VOLPE:  I believe the main issue in my claim

13   is whether or not General Motors has the right to change the

14   terms of an employment and retirement contract ex post

15   facto.

16          And if I may offer up some background information,

17   mine is a little different than Mr. Jack's in that I was

18   recruited by General Motors out of high school and attended

19   General Motors Institute for five years, received my

20   engineering degree, finished in the top ten percent of my

21   class, which then afforded me to opportunity to compete for

22   a General Motors fellowship for grad school, which I then

23   was afforded.  I was given the GM fellowship, went to grad

24   school, and went through various engineering positions and

25   eventually ended up as a regional manage for the southeast.

Page 39

1          At the age of 50 in 2001 I had seen what was going

2     on in the corporation and decided that possibly it was time

3     for me to move on and do other things.

4          So at the time there were these voluntary window

5     retirements going on and I was not approached, even though I

6     had crossed that magical threshold of 30 years with General

7     Motors, and at that time I asked my management if I could be

8     part of that group, if I could go out on retirement, and I

9     was told that I could not, that my technical skills were

10    needed and that I was not one of the people that they wanted

11    to push out the door.

12         I felt that I was not being afforded an equal

13    opportunity, and I pressed the issue up through the vice

14    president of personnel or human resources at the time, and

15    the word came back that you really need to offer a

16    retirement to Mr. Volpe, there's no reason why he should be

17    denied this.

18         So from that we negotiated on my initiation a

19    retirement that included my understanding of terms and

20    provisions of my retirement, and it is the very essence of

21    those terms that I accepted and made the decision going

22    forward that General Motors now is saying they have the

23    opportunity and the right to change those terms unilaterally

24    and ex post facto and without any input from me.

25         Had I known that that was the case it would have

Page 40

1    most likely changed my decision as to whether or not I had

2    pursued retirement.  Because once again, I look at this as a

3    contract, an employment contract between General Motors and

4    myself.

5              Now, along these lines, Your Honor, I understand

6    and accept the fact that as a stockholder of General Motors

7    that there is risk, and I was a stockholder and I lost.  I

8    also was a bondholder of General Motors and I understood the

9    risk and I paid the price there.  But I never understood

10   that my employment contract was in risk of non-enforcement

11   of contract law.

12             And again, I'm at a disadvantage here not having a

13   legal background, but it would seem to me that our entire

14   culture, our entire business framework of the United States

15   is based upon the fact that contract law is upheld and that

16   if two parties agree upon something that that agreement is

17   then held up in the courts as part of that contract.

18             So with that being said, General Motors -- again,

19   I proceeded forward through my retirement, left July 1st of

20   2001, and some of my fears actually played out.  The reason

21   that we're here today.  Some of the bad decisions that were

22   made have forced General Motors into bankruptcy, and from

23   that perspective General Motors now has taken the approach

24   of doing away with many or most of the welfare benefits, the

25   insurance -- life insurance and the medical insurance that

Page 41

1    we had all been promised, and once again, that I felt that I

2    had entered into a contractual relationship with General

3    Motors.

4            Again, I looked at my -- as a professional I

5    looked at my employment with General Motors as a contract,

6    one where General Motors offered me a combination of

7    compensation and benefits in return for my professional

8    services, and I looked upon it that way every year with

9    them.  If I didn't feel that the package that they were

10   offering me was commensurate with what I felt I was worth

11   then I could have gone elsewhere.  And quite frankly, if

12   General Motors didn't feel that I was providing enough

13   benefit for what they were paying they could have asked me

14   to leave and indicated that they didn't want my services

15   anymore.  But that was not the case.  Both of us felt we had

16   a relationship, and it was a good relationship for many,

17   many years, and I felt good about what I was doing, what I

18   was being paid, and I retired from that perspective.

19           So again, it is whether or not General Motors by

20   putting this disclaimer that they reserve the right to amend

21   or terminate benefit programs or similar language, can they

22   do that after the fact?

23           I fully understand if they want to change the

24   terms going forward that I then can take that into

25   consideration whether or not I want my employment contract

Page 42

1   to go forward with them, but once this agreement is made

2   then I feel that I have an obligation and General Motors has

3   an obligation to that agreement, my retirement agreement, to

4   fulfill those terms, and that's the essence of my claim,

5   Your Honor.

6           THE COURT:  Mr. Volpe, I need to ask you some

7   questions apropos that by way of background, and although

8   you may not be a lawyer I think I understood your position

9   quite clearly.

10          MR. VOLPE:  Right.

11          THE COURT:  By the way, you said you were in the

12  top ten percent of your class.  Were you in Tau Beta Pi?

13          MR. VOLPE:  I was.

14          THE COURT:  Uh-huh.

15          MR. VOLPE:  As is my son and my father-in-law.

16          THE COURT:  I can see why GM put you in those

17  honors' programs.

18          But here's the issue that I need help from you on,

19  Mr. Volpe.  Bankruptcy does honor and respect contracts even

20  though its debtors don't always have the resources to pay

21  100 cents of the dollar on their contracts, and although the

22  value of the stock that's going to claimants could go up or

23  down, allowed claims are probably worth in the ballpark of

24  25 cents on the dollar and not 100 cents on the dollar even

25  when they're allowed, but what we're talking about of course

Page 43

1    is whether the contract affects GM's rights to change your

2    benefits or not.  So it isn't really a question of honoring

3    the contract, it's a question of finding out what the

4    contract said at the relevant time.  So with that by way of

5    background here are the questions I need to ask you.

6            Help me with the timing.  To what extent did you

7    work before you first saw a document from GM where GM said

8    that it reserved the right to change your welfare benefits?

9            MR. VOLPE:  I'm not sure I can answer that, Your

10   Honor, because having once again been a 30-year employee the

11   benefits packages that were given to us on a sporadic basis

12   -- I'd like to say yearly, but I don't know that that's the

13   case -- but documents come out from personnel all the time

14   and some may have had that disclaimer and some may not, but

15   I can't answer that is definitively.

16           THE COURT:  I take it it's not a matter of dispute

17   that at some point in time GM did start sending you notices

18   that it reserved the right to change your benefits?

19           MR. VOLPE:  That's correct.

20           THE COURT:  And based on your memory, if I heard

21   you right, you can't say at this point with any degree of

22   comfort how much you worked after you started getting those

23   notices.

24           MR. VOLPE:  I cannot.

25           THE COURT:  I hear you.

1          MR. VOLPE:  Yeah.

2          THE COURT:  Okay.

3          MR. VOLPE:  In all honestly I cannot.  I don't --

4    it was not a topic of concern at that point in time, and I

5    think you can understand that things were going -- we were

6    rocking and rolling for many years.

7          THE COURT:  Uh-huh.  And did GM ever give you any

8    piece of paper in which GM promised, not necessarily

9    verbatim but in concept, not to change your benefits?

10          MR. VOLPE:  Not to my knowledge, Your Honor.

11          THE COURT:  Okay.  I'm going to give you a chance

12   to reply, but I want to give you opponent a chance to be

13   heard now.

14          MR. VOLPE:  Okay.

15          THE COURT:  Mr. Griffiths.

16          MR. GRIFFITHS:  Thank you, Your Honor.

17          Simply with respect to the question as to when

18   Mr. Volpe first had seen any sort of reservation of rights

19   in the plan documents relating to his welfare benefits, I

20   would note in that in the omnibus objection filed to his

21   claim at page 10 there's a footnote and it's footnote 5 and

22   it's a footnote that's drawn from the Spraig (ph) case in

23   the Sixth Circuit for Mr. Volpe's benefit, the Spraig case

24   is a case where the Sixth Circuit looked at GM welfare

25   benefit plans similar to the ones that (indiscernible -

Page 45

1   00:51:38) to Mr. Volpe and took into consideration a large

2   amount of evidence, including welfare benefit plans going

3   back to at least 1984, and I note the quote at footnote 5

4   which quotes the reservation of rights language from a 1984

5   benefits plan.

6           So if my math is approximate, if Mr. Volpe had

7   worked 30 years that would put his employment commencing at

8   approximately 1980, and we have a welfare benefit plan at

9   least dated 1984 that's documented with a specific

10  reservation of rights.

11          With respect to the terms of Mr. Volpe's

12  retirement agreement, Mr. Volpe hasn't provided us with a

13  copy of his retirement agreement, and if he has such a copy

14  we're of course more than happy to look at it to see if in

15  fact the terms are different from the retirement agreements

16  that other employees have received and which I've reviewed.

17          Having reviewed those retirement agreements they

18  appear to be consistent insofar as they don't vest welfare

19  benefit, they don't alter the terms of the benefit plans,

20  they simply note a retiring employee's rights to continued

21  benefits under those welfare benefit plans.

22          Motors Liquidation Company, General Motors weren't

23  in the habit of already agreeing to any sort of ongoing

24  retirement plan, everything was documented in writing, and

25  you know, we're more than happy to look at any additional

Page 46

1    documents that Mr. Volpe has, but to date there's nothing to

2    suggest that his welfare benefits were provided under any

3    other agreement than under the welfare benefit plan itself.

4              THE COURT:  Okay.  Thank you.

5              Anything further, Mr. Griffiths?

6              MR. GRIFFITHS:  That's all, Your Honor.

7              THE COURT:  Mr. Volpe, would you like to reply?

8              MR. VOLPE:  I would, Your Honor, in that I will

9    have to look in any archives to see if I can dig out

10   anything that fits the framework that Mr. Griffiths talked

11   about.  And I don't know -- in all honestly, I don't know

12   that the documentation provided by General Motors is going

13   to be any different.

14             It is the fact again though the basis of my claim

15   and my understanding and my argument is such that to change

16   the terms of a contract after both parties agree is a breach

17   of contract, and that's -- if contracts were written with

18   disclaimers that say I, one party to the contract can change

19   the term of the contract unilaterally at any point in the

20   future, to me that's not a contract, that's nothing that

21   anyone can rely upon, and I go back to the basis of the

22   entire framework of American business.  No one would enter

23   into a contract if there were -- they were allowed to have

24   disclaimers written in by the other party that indicated

25   that they could change at will unilaterally the terms of the

Page 47

```
 1    contract.  And that to me it just defies logic.  I'm an
 2    engineer, again, it doesn't make sense that you would allow
 3    someone -- that the legal system would allow someone to do
 4    this.
 5            So whether there's been a precedent set or there's
 6    been a ruling on this I don't have the resources nor am I
 7    willing to spend the money to hire a team of lawyers to go
 8    dig out and find out whether or not there is some language
 9    of the law that allows this to happen.  Common sense would
10    dictate that once you have an agreement the agreement should
11    be -- I don't want to say cast in stone -- but if it's
12    changed both parties would then sit down and renegotiate,
13    and that's the essence of my argument.
14            THE COURT:  Okay, thank you.
15            Mr. Griffiths, who is the next claimant whose
16    needs and concerns we need to focus on?
17            MR. GRIFFITHS:  Your Honor, that would be
18    Mr. Glenn Kuntz, K-U-N-T-Z.
19            THE COURT:  Okay.  Just a minute, please.
20        (Pause)
21            THE COURT:  Mr. Kuntz, are you on the phone?
22            MR. KUNTZ:  Yes, my name is Glenn Kuntz, and I
23    want to thank you for hearing my case.
24            THE COURT:  Where you calling in from, Mr. Kuntz?
25            MR. KUNTZ:  I'm sorry?
```

Page 48

1           THE COURT:  Where you calling in from?

2           MR. KUNTZ:  I'm calling in from Dayton, Ohio.

3           THE COURT:  Okay.  Let me give you your chance to

4    be heard just like the guys ahead of you.

5           MR. KUNTZ:  Okay.  May I proceed?

6           THE COURT:  Yes, sir.

7           MR. KUNTZ:  I want to thank you for hearing my

8    case, Judge.

9           I'm really pleading on the mercy of the Court

10   here, and I want you to know that I worked for GM 35 years.

11   When I retired in 1988 as an unclassified executive

12   responsible for running and closing the O'Leary Ohio plant

13   of (indiscernible - 00:56:46) Division I received a document

14   that stated I would have basic and supplemental group life

15   insurance for the remainder of my life.  As you know --

16   probably know, all but $10,000 in that insurance was taken

17   from me.

18           Now at the age -- at 77 years of age with health

19   problems getting life insurance is virtually impossible, and

20   even without health problems the cost of comparable

21   insurance would be over $1,900 per month.

22           As things stand now my wife's financial plan was

23   seriously interrupted by GM, and my wife would be

24   financially challenged when I pass on.  And I think that

25   pretty well states my case.

Page 49

1          Certainly when I took retirement after closing the

2     plant in O'Leary, Ohio I had never had any indication that

3     there would be a -- GM would have the ability to change the

4     provisions of the document I received after I retired, as a

5     matter of fact many years after I retired.

6          Again Judge, my claim is for replacement of my

7     life insurance, and I won't ask for anything else at this

8     point in time, but as I heard Mr. Volpe say, he was not

9     aware at any time while he was with GM that they could, you

10    know, change provisions regarding life insurance or anything

11    else at will at any time.  Certainly I was not aware of that

12    when I made the decision to accept retirement at the closing

13    of the O'Leary plant, which I was asked to do.

14         THE COURT:  Did I hear you right, Mr. Kuntz, that

15    you required in 1988?

16         MR. KUNTZ:  1988 is correct.

17         THE COURT:  Okay.  Further thoughts before I give

18    your opponent a chance to respond?

19         MR. KUNTZ:  I'm sorry, Judge?

20         THE COURT:  Do you have anything further before I

21    give Mr. Griffiths the opportunity to respond?

22         MR. KUNTZ:  I don't know what more I can say

23    except that I did retire in 1988 and certainly at that time

24    there were no documents that I saw or was aware of that said

25    GM could change their benefits at any point in time.

1          THE COURT:  Okay.  Mr. Griffiths, I'll --

2          MR. KUNTZ:  I --

3          THE COURT:  I'm sorry.

4          MR. KUNTZ:  -- I do have a document that by the

5   way I think I mentioned along the way that said that, for

6   example, just one statement, "Your supplemental group life

7   insurance equal to three times your annual base salary will

8   be continued for the remainder of your life.  General Motors

9   pays the full cost of this insurance."

10          THE COURT:  Okay.

11          MR. KUNTZ:  That document is dated July 1988.

12          THE COURT:  Okay.  Anything else, Mr. Kuntz?

13          MR. KUNTZ:  No, I think that covers it.

14          THE COURT:  Okay.

15          MR. KUNTZ:  Thank you.

16          THE COURT:  Mr. Griffiths, I'll hear your

17   response.

18          What I need you to focus on then is facts that

19   apply to Mr. Kuntz that are not generally applicable to

20   other people.  It appears that if my math is right he worked

21   31 of his 35 years before the 1984 time, which is the

22   earliest time at which GM was reserving the right to change

23   the welfare plans.

24          MR. GRIFFITHS:  Yes, Your Honor.

25          The first point to note is the footnote from

Page 51

1    Spraig isn't in fact the earliest reservation of rights that

2    we're aware of in a welfare benefits plan but is -- is a

3    reference that is just readily available today.

4         If Your Honor would like us to research and

5    perhaps place on the docket earlier summary plan

6    descriptions or welfare benefit plans that contain a

7    reservation of rights then we're of course more than happy

8    to do so subject to our ability to obtain those documents

9    from -- from general -- from new GM.  It may be possible for

10   us to obtain those documents.

11        With respect specifically to the documents

12   submitted by Mr. Kuntz, if it's helpful, what we've done in

13   the response is drawn out the specific reservation of rights

14   language that is contained in each of the documents that

15   Mr. Kuntz has submitted, and while I understand that many

16   employees, including Mr. Kuntz, argue that they weren't

17   aware of the ability for the welfare benefit plans to be

18   amended or modified, the fact of the matter is that the

19   documents submitted by Mr. Kuntz specifically note that the

20   terms of their welfare benefits is subject to welfare

21   benefit plans.  And of course this requires an additional

22   step on behalf of an employee to go and look at the terms of

23   a welfare benefit plan and then also to be looking for that

24   reservation of rights language, which you know, in

25   Mr. Kuntz' case if he's retiring, you know, 19 -- or

Page 52

```
 1   requiring in the 1980's he's unlikely to have done so

 2   because the financial distress of the debtors wasn't

 3   contemplated.

 4          I mean, Your Honor, I don't have any other

 5   arguments with respect to Mr. Kuntz' claim because I don't

 6   have any documentary evidence to suggest that GM didn't

 7   reserve its rights to amend welfare benefit plans going back

 8   to even prior to the Spraig case.

 9          THE COURT:  Okay.  I'm going to take you up on

10   that offer, Mr. Griffiths, and I'm carving Mr. Kuntz out

11   from the remainder to focus on the additional issue that I'm

12   going to articulate, and it's what I call the Chemtura

13   issue, which has its origins in that Appalachian by reason

14   of something that I dealt with in dealing with similar

15   issues in Chemtura where an employee had worked for many,

16   many years before the debtor had started to reserve the

17   right to change the benefit plans, and then changed it.  And

18   while I'll address along with the others at the end the

19   general rule that whether or not they saw the reservation of

20   rights, the reservation of rights would be part of the

21   employee's contract.

22          I was troubled in Chemtura for a much shorter

23   period of time, and I am troubled for a guy who worked 31

24   out of his 35 years before there was a reservation of

25   rights.  If I said 34 maybe I should have said 35, I'm not
```

Page 53

 1    sure if I spoke accurately a moment ago or not.  That

 2    requires more in the way of research as to when GM started

 3    reserving the rights and raises an arguably different legal

 4    issue as to how you deal with what seems to be a potentially

 5    as much as 31 years of working before the reservation of

 6    rights came into place.

 7            So what I'm telling you is a couple of things.

 8    First I want you to find out and give to Mr. Kuntz when GM

 9    first started reserving those rights or reserving those

10    rights in a way that they might apply to him.  And also, as

11    I always do, to see if there is a separate contract that

12    might have existed way back in 1988 that didn't exist in

13    later times that might put him in a specific boat.

14            So at this time I'm neither going to sustain nor

15    overrule the objection to Mr. Kuntz' situation, it has the

16    potential of being a different situation from the other

17    guys, and we're just going to continue this to sort of more

18    in the way of facts and if appropriate to give people more

19    of a chance to make legal arguments.

20            It's a much more difficult issue when a guy works

21    31 out of 35 years before the reservation of rights kicks

22    into place.  It may result in the same decision, it may not,

23    I'm not deciding that today, but it's a big enough

24    distinction that I need help from you guys on that.

25            Mr. Kuntz, did you understand my ruling, my ruling

1   to the extent it was a ruling, which is that I'm carving you

2   out for today?

3            MR. KUNTZ:  I understand that, and I appreciate it

4   and I'll look forward to getting the information that

5   Mr. Griffiths says existed --

6            THE COURT:  Okay.

7            MR. KUNTZ:  -- about my retirement.

8            THE COURT:  I'm not promising you a favorable

9   outcome, you understand, I just think that it needs more

10  attention.

11           MR. KUNTZ:  I understand, I very much appreciate

12  it.  And as I said, I was 77 years old and that is a very

13  serious problem at my age.

14           THE COURT:  Okay, thank you.

15           Mr. Griffiths --

16           MR. KUNTZ:  Thank you very much, Judge.

17           THE COURT:  You're very welcome, Mr. Kuntz.  Now,

18  Mr. Kuntz, you're -- because you have been carved out you're

19  free to drop off the line or stay on as you prefer.

20           MR. KUNTZ:  I will drop off, Judge.

21           THE COURT:  Okay.

22           MR. KUNTZ:  Thank you.

23           THE COURT:  Who do we have next, Mr. Griffiths?

24           MR. GRIFFITHS:  Thank you, Your Honor.

25           We'll certainly do the research as quickly as

Page 55

1   possible and then I'll speak to Mr. Kuntz later today to

2   update him on how we're going to proceed.  Your Honor, the

3   next -- oh, and if Your Honor permits may we adjourn

4   Mr. Kuntz' claim to the -- not the following hearing, but

5   perhaps the one after, July 17th, and obviously subject to

6   our ability to obtain the required documents?

7           THE COURT:  That's fine, but it's possible that

8   Mr. Kuntz has since dropped off the phone, so if he didn't

9   hear what you have to say you better let him know some other

10  method.

11          MR. GRIFFITHS:  I'll certainly give him a call by

12  telephone today and send him a message, Your Honor.

13          Your Honor, the following claimant would be

14  Ms. Jane C. Bogue, B-O-G-U-E.

15      (Pause)

16          THE COURT:  I don't see -- oh, was that with a B

17  like brothel?

18          MR. GRIFFITHS:  B bravo, Your Honor, yes.

19          THE COURT:  Oh, okay.  Ms. Bogue, are you on the

20  phone?

21          MS. BOGUE:  Yes, I am, Your Honor.

22          THE COURT:  Okay.  Where are you calling from,

23  Ms. Bogue?

24          MS. BOGUE:  Longview, Texas.

25          THE COURT:  Okay.  Would you like to be heard,

1    Ms. Bogue?

2              MS. BOGUE:  Yes, please.

3              THE COURT:  Go ahead, please.

4              MS. BOGUE:  Sir, I retired from General Motors in

5    1989 after 32 plus years of credited service, and mine is

6    similar to the gentleman that just talked in that I have a

7    letter that I sent you a copy I think you have from General

8    Motors dated December 1991 stating that my life insurance

9    had decreased to the lowest amount, which was $29,172, and I

10   also have a letter from Metropolitan Life that I sent you a

11   copy telling the same thing, and then some years ago I

12   received the same information that they did that they

13   insurance had been dropped to $10,000.

14             And I'm asking that you honor -- that they honor

15   the information that I had counted on all those years and

16   after having worked almost 33 -- having 33 years of credited

17   service think I'm entitled to.

18             THE COURT:  So let me get the math right.  You

19   started working for the company roughly in 1966?

20             MS. BOGUE:  I started to work in 1954 I believe.

21             THE COURT:  1954.

22             MS. BOGUE:  Uh-huh.

23             THE COURT:  Forgive me.  Okay.

24             MS. BOGUE:  During that time, Your Honor, it's

25   hard for me to remember, I'm almost 77 years old, but during

Page 57

1    the time that I worked for GMAC they closed the office here

2    in Longview, Texas and we either had to transfer to Dallas

3    or go on a layoff, and so I chose to go on the layoff and

4    they gave me like a year at that time of credited service.

5    Then when they reopened the Longview office they bridged my

6    service, so that's why the years don't add up between 1954

7    and 1989.  But technically on the papers that I have from

8    retirement they've credited me with I believe 32 and a half

9    years of credited service.

10           THE COURT:  Now to what extent did GM give you any

11   piece of paper in which it said it wouldn't change your

12   benefits?

13           MS. BOGUE:  I may -- I sent a copy with this, but

14   I'm looking at it, it's dated December the 10th, 1991 from

15   General Motors National Benefit Center in Southfield,

16   Michigan.  It says:

17           "As a retiree of General Motors with ten or more

18   years of participation in the life and disability benefits

19   program you're eligible for continuing life insurance.  Our

20   insurance records show our continuing life insurance has now

21   fully reduced to the ultimate amount of $29,172.  This

22   ultimate amount will remain in effect for the rest of your

23   life and is provided by General Motors at no cost to you.

24   Important, you should keep this notice with your other

25   available papers."

1          THE COURT:  Uh-huh.

2          MS. BOGUE:  And then I also have a letter from

3    Metropolitan Life that I believe I sent you a copy dated

4    11 of '89, and it states that continuing life insurance for

5    salaried retirees of ten years or more of service and it

6    says, "fully reduced amount of your continuing life

7    insurance, $29,172."

8          THE COURT:  Yes.  Your correspondence sounds to be

9    either identical or very similar to those that I've seen for

10   a lot of earlier GM retirees, but I think I asked you --

11         MS. BOGUE:  Like the man that just spoke; is that

12   right?

13         THE COURT:  I think I asked you the wrong question

14   before.  Forgive me.

15         MS. BOGUE:  Okay.

16         THE COURT:  Did GM ever give you a piece of paper

17   that said we promise not to change the amount of your life

18   insurance --

19         MS. BOGUE:  Not to my knowledge.

20         THE COURT:  -- that actually used words very

21   similar to that?  And did it ever used the word --

22         MS. BOGUE:  Not to my knowledge.

23         THE COURT:  -- vest to you?  Ms. Bogue, were you

24   able to hear my last question?

25         MS. BOGUE:  I'm sorry, I have a hard time hearing.

Page 59

1    Would you repeat it?

2              THE COURT:  Of course.  Did GM ever give you a

3    piece of paper that used the word vest to you in the context

4    of your life insurance?

5              MS. BOGUE:  Not to my knowledge.

6              THE COURT:  Okay.  Were you able to hear questions

7    that I asked to Mr. Kuntz?  Do you know the point in the

8    time at which GM started telling you that it reserved the

9    right to change the amount of your insurance or your welfare

10   benefits?

11             MS. BOGUE:  I don't know that I ever received

12   anything like that.

13             THE COURT:  Uh-huh.

14             MS. BOGUE:  But that's not to say that I didn't,

15   do you understand, but I don't remember it.

16             THE COURT:  Yeah, I understand.

17             MS. BOGUE:  Uh-huh.

18             THE COURT:  Okay.  Further thoughts you want to

19   share with me before I give Mr. Griffiths an opportunity to

20   respond?

21             MS. BOGUE:  Well, other than just like I said, I

22   had worked all those years and then when I retired then

23   just, you know, in the past few years when all this happened

24   they dropped all of our benefits and at that point gave me

25   $300 a month additional retirement money, and of course $300

Page 60

1   wouldn't even begin to pay for insurance, so subsequently I

2   have no dental insurance or vision insurance and things like

3   that that I thought I was going to have the rest of my life,

4   and besides that, that was $3,600 more that I had to share

5   with income to pay taxes on.  I know these are small amounts

6   to what's going on now, but it means a lot to me.

7           THE COURT:  I well understand.

8           Okay.  Mr. Griffiths, response?

9           MR. GRIFFITHS:  Your Honor, I'm -- I assume that

10  Your Honor's concern with respect to Mr. Kuntz' claims are

11  echoed with Ms. Bogue in the sense that it would be helpful

12  to know also in the case of Ms. Bogue at what point whether

13  in the 1960's GM had been including a reservation of rights

14  in the summary plan description and the welfare benefit

15  plans themselves that was sent to employees.

16          So while the arguments with respect to the

17  specific letter that Ms. Bogue has submitted remain the same

18  as the ones we've raised at prior hearings in the sense that

19  we don't believe that the retiree servicing center letter

20  submitted, that is the letter that Ms. Bogue is referring to

21  that's attached -- that she submitted with her claim,

22  provides a vested benefit nor does it provide a separate

23  contraction time to life insurance and welfare benefits.

24          I'm of course more than happy to go back and look

25  at the plan descriptions, to the extent I can obtain them,

Page 61

1    and summary plan descriptions and then submit those for the

2    Court's review so that at least we can answer that one

3    question as to when Ms. Bogue would have been aware of the

4    -- or first become aware of the General Motors' ability to

5    amend or modify the welfare benefit plans.

6              I also don't know at what point life insurance

7    first commenced.  I don't know what the inception date of

8    the life insurance plan was.

9              So I'll obtain that information provide it for the

10   Court's review, and perhaps it might be sensible then to

11   adjourn Ms. Bogue's claim in the same way as Mr. Kuntz so

12   that we could answer all of the -- all of those questions

13   with respect to employees who retired prior to 1984 in a

14   consistent manner.

15             THE COURT:  You assume exactly right,

16   Mr. Griffiths, and I appreciate your sensitivity to my

17   concerns in that regard and the concerns of these employees

18   who are in this unusual situation.

19             Ms. Bogue, normally I would give you a chance to

20   reply, and I'm still going give it to you, but basically

21   what Mr. Griffiths said, as I understood it, and I think I

22   did understand it, is that when you have an employee who

23   started working way back in 1954, if I heard your facts

24   right, and may have put in many years of service before GM

25   started reserving these rights to change the benefit that

Page 62

1   may be, not necessarily is, but may be something that puts

2   you in a different situation than people who worked most of

3   their career when they knew about the reservation of rights.

4        So what he said was that he's going to go back and

5   check the records, and of course I'm sure he would also look

6   at any records that you have, to see when your insurance

7   went into place and how many years of service you had before

8   GM started to say that it had the rights to change, and

9   therefore he's asking me to continue the matter, which is to

10  adjourn it to a later date where we can get more facts.

11       Did you understand what he said and what I said,

12  and do you have any further desire to hear -- to say stuff

13  to me given that we're not going to decide it today?

14       MS. BOGUE:  No, sir, I understood what you said

15  completely, and I appreciate your attention and thank you

16  for hearing me.

17       THE COURT:  Okay, very much well.

18       So I'm going to tell you the same thing that I

19  told Mr. Kuntz, which is that you're being carved out of

20  today's proceedings and you're going to be continued to

21  July 17 was that Mr. Griffiths?

22       MR. GRIFFITHS:  Yes, Your Honor.

23       THE COURT:  Okay.  July 17 and you can call in on

24  the phone just like you did today.

25       MS. BOGUE:  Very good.  Thank you very much, sir.

Page 63

1          THE COURT:  Okay, have a good day.

2          What do we have next, Mr. Griffiths?

3          MR. GRIFFITHS:  Yes, Your Honor, we have

4    Mr. Gordon Hall, H-A double L.

5          THE COURT:  Okay.  Mr. Hall, are you with us?

6          MR. HALL:  Yes, sir, my name is Gordon Hall and I

7    thank you for hearing my case as well.

8          THE COURT:  Okay.  Where you calling from,

9    Mr. Hall?

10          MR. HALL:  Murphy, North Carolina.

11          THE COURT:  Okay, thank you.

12          MR. HALL:  I'm representing myself today in a

13    claim for a specific amount of life insurance that I believe

14    was promised to me in the good faith document sent to me by

15    General Motors in 1998, and with the Court's permission,

16    Your Honor, I would like to read about a one and a half page

17    document in support of my claim.

18          THE COURT:  Go ahead.

19          MR. HALL:  Okay.  I wanted to bring the Court's

20    attention to a letter that you're probably familiar with

21    that I included in my claim packet I submitted to all the

22    parties, it's labeled as Exhibit 1 and it was mailed to me

23    from the GM retiree servicing center dated June 15th, 1998,

24    which was just 15 days before -- or after my retirement.  I

25    retired on June 1st, 1998 with 33 years with GM.

Page 64

1          The document I'm referring to is a very specific

2      document, which was mailed to me personally, and which

3      unambiguously states a specific and ultimate amount of life

4      insurance, and it further states that this ultimate amount

5      will remain in effect for the rest of my life at no cost to

6      me.  It was mailed specifically to inform me of my life

7      insurance amounts after retirement, it was mailed from the

8      GM National Retiree Servicing Center of NAO personnel

9      administration, and at the time of that mailing NAO, or

10     North American Operations, included all of GM's United

11     States and Canada assembly plant operations as well as GM

12     headquarters operations and staff in support of NAO.

13          So given the source of the letter and the timing

14     of the letter and the great specificity of the letter I was

15     as certain as anyone could be that this letter was

16     legitimate and it meant exactly what it said.

17          Your Honor, with the Court's permission I would

18     like to read this very brief letter now.

19          THE COURT:  Go ahead, please.

20          MR. HALL:  It's from GM National Retiree Service

21     Center on NAO personnel administration letterhead.

22          "Dear PG Hall, as a retiree of General Motors with

23     ten or more years of participation in life and disability

24     benefits program you are eligible for continuing life

25     insurance.  Our insurance records as of the date this of

Page 65

1    letter show the continuing life insurance has now fully

2    reduced to the ultimate amount of $78,804.  This ultimate

3    amount will remain in effect for the rest of your life and

4    is provided by General Motors at no cost to you."  In bold

5    letter, "Important, you should keep this notice with your

6    other available papers."  Which I have done.

7              And if I may, Your Honor, there's a couple aspects

8    of the letter I wanted to elaborate on just a little bit.

9              THE COURT:  Go ahead, please.

10             MR. HALL:  Okay.  The letter was written with the

11   full authority of and as a functioning part of NAO as

12   evidenced by the words NAO personnel in the letter heading.

13   The National Retiree Service Center was authorized to speak

14   for GM's North American Operations personnel and as such for

15   GM.

16             Furthermore you'll notice the direct and final

17   nature of the letter, and it's also to me very important to

18   note that there were absolutely no qualifying words or

19   statements in the letter which would in any way diminish or

20   change the very specific content, and there was nothing that

21   referred it to any other resource which did.

22             And now just one qualifying statement about the

23   life insurance itself.  My claim is for $147,608.  And while

24   the June 15th, 1998 letter specifies the amount of 78,804

25   basic life insurance, that was my basic salary at

Page 66

1    retirement, and the base salary was the coverage volume and

2    two times the base salary was the actual amount of life

3    insurance, and that is supported by two documents that I

4    also sent to all the people, the attorneys, and I think to

5    Your Honor.  One is a June 11th, 1998 flex enrollment

6    document and the other is a 2007 enrollment document, which

7    states, "Life insurance coverage of $159,200 in the '98

8    enrollment and two times 78,804 for $157,680 in the second

9    document.  So my actual claim is for the 147,608, which is

10   157,608 minus the current $10,000.

11            I guess that pretty much concludes my comments on

12   my claim on my behalf, if nobody has a question about --

13            THE COURT:  Yes, I do, Mr. Hall.

14            Apart from the letter of June 15th, 1998 when you

15   were living in Marble, North Carolina --

16            MR. HALL:  Yes.

17            THE COURT:  -- did you get any other letters from

18   GM or its servicing centers that either made promises or

19   that arguably made promises to you about your life

20   insurance?

21            MR. HALL:  No, this is the only -- this is the

22   only letter that would -- I mean if I just picked this

23   letter up and given what I've just gone through I would

24   consider a promise for life insurance for the rest of my

25   life, and this is the only one.

Page 67

1              THE COURT:  Uh-huh.  Were you able to hear

2    questions I asked other people in terms of when they first

3    saw letters from GM where GM said in substance that we

4    reserve the right to change the terms of your welfare plans

5    at any time?

6              MR. HALL:  Absolutely.  Many times over the years,

7    I can't deny that and it was mailed out almost annually for

8    -- not the first years because I don't think that was even a

9    part of it since 1965, but probably through the late '80s

10   and '90s.  No question about that.

11             My -- my position is that this letter was mailed

12   15 days after my retirement, and just on the face of it it

13   appeared to me that okay, now you're in retirement and this

14   is on official GM letterhead and this is where you stand now

15   in retirement, and in my mind separated it from anything

16   that qualified it, there was nothing in here that referred

17   me to my GM documents that did qualify those benefits.

18             So to answer you question, yes, I have seen that

19   throughout the years.

20             THE COURT:  Let me ask you a harder question.

21             MR. HALL:  Okay.

22             THE COURT:  Do you know when you first started

23   seeing them?  I think you said you started working for the

24   company roughly in 1965?

25             MR. HALL:  Yeah.  You know, I'm -- I take

1    everything that's sent to me very seriously and I have a

2    detailed filing system, so I would say probably mid '90s for

3    sure.  I've been aware of it for years, you know, I mean

4    before my retirement, say ten years before my retirement I

5    can honestly say I was aware of it.

6           THE COURT:  Uh-huh.  Anything further before I

7    give Mr. Griffiths a chance to respond?

8           MR. HALL:  No, sir, I do appreciate the

9    opportunity.

10          THE COURT:  Okay.  Mr. Griffiths?

11          MR. GRIFFITHS:  Thank you, Your Honor, the -- if

12   Mr. Hall retired in 1965 we're dealing with the same issues

13   as Mr. Kuntz and Ms. Bogue, and I'm happy to adjourn the

14   claim to July 17th as appropriate.

15          I would just respond, I mean to the extent that

16   we're able to find documents that support GM's view that

17   they did in fact reserve their rights to amend or modify

18   welfare benefits plans, by way of explanation to Mr. Hall

19   that the retiree servicing center letter has been dealt with

20   at a number of hearings before Your Honor, there's no doubt

21   that it was unfortunately worded and could have been a lot

22   clearer, but the reason Motors Liquidation Company is

23   proceeding on the letter is because the letter itself refers

24   in its terms to the welfare benefit plans under which the --

25   or the life insurance plan under which the benefits are

Page 69

1    being provided.  The GUC Trust supported by applicable law

2    doesn't believe it's reasonable for former employees to look

3    at this letter in isolation and not refer to the terms of

4    the welfare benefit plans to assess what the, you know, the

5    terms and conditions of the life insurance would be,

6    including their ability to amend or modify it.

7            Following -- and I don't know if Mr. Hall took

8    advantage of this -- but following GM's Chapter 11 filing in

9    June 2009, in August 2009 a voluntary life insurance program

10   was offered to former employees and would have been offered

11   to Mr. Hall that he would have been able to obtain life

12   insurance at his own cost, which doesn't mitigate the loss,

13   but it in some way defrays it.

14           So those would be my only comments with respect to

15   that letter, but I'm -- again, I'm happy to adjourn this

16   claim to July 17th as indeed for any claimants whose

17   employment started prior to 1984 so that we can provide Your

18   Honor with documents that support the -- the GUC Trust view

19   that GM had reserved their rights to modify or amend welfare

20   benefits for the last 40 years or so.

21           THE COURT:  I appreciate that, Mr. Griffiths.

22           Mr. Hall, what Mr. Griffiths has basically said,

23   and you heard him just as I did, was that you can't look at

24   the letter in isolation and that you have to look at

25   documents that it said that it was incorporating, which are

Page 70

```
 1    those letters where they said they reserve, but what makes

 2    your situation possibly similar to those of Mr. Kuntz and

 3    Ms. Bogue is that it's seemingly the case that you worked

 4    for many years before you started getting those reservations

 5    of rights, which presents a tougher legal issue.

 6           And the way we're going to go about that is to see

 7    when those letters first started reserving the right and how

 8    many years of your career you worked before you started

 9    getting those letters, and we're going leave this for

10    July 17th and we're going to talk about it more there.

11           Given that, I'm not going to decide it today, but

12    I'll give you a chance to be heard anymore if you want to.

13           MR. HALL:  No, I understand, Your Honor.

14           THE COURT:  Okay.  All right, thank you.  Then

15    you're free to either drop off or stay on.

16           We will, unless you're told otherwise, have a

17    follow-up hearing by -- that you can appear in my phone on

18    July 17th, and we'll talk about your situation then.

19           I would appreciate it if you work with GM in

20    trading documents back and forth and sharing information

21    between then and now.

22           MR. HALL:  I'll be very happy to do that.

23           THE COURT:  Okay, thanks.

24           MR. HALL:  Thank you.

25           THE COURT:  Who do we have next, Mr. Griffiths?
```

Page 71

1              MR. GRIFFITHS:  Your Honor, we have Mr. Timothy

2       Kuechenmeister.  And for the record that's spelled

3       K-U-E-C-H-E-N-M-E-I-S-T-E-R.

4              THE COURT:  Okay.  Mr. Kuechenmeister, are you on

5       the line?

6              MR. KUECHENMIESTER:  Good morning, Your Honor,

7       yes, I am, Timothy Kuechenmeister.

8              THE COURT:  Okay.  And were you on one of our

9       earlier calendars and adjourned?  I'm not sure.

10             MR. KUECHENMIESTER:  No, Your Honor, I wasn't.

11             THE COURT:  Okay.  Perhaps a name similar to

12      yours.

13             MR. KUECHENMIESTER:  I was wondering if there was

14      another Kuechenmeister.

15             THE COURT:  Fair enough.  Where you calling from,

16      Mr. Kuechenmeister?

17             MR. KUECHENMIESTER:  I'm calling from central

18      Florida.

19             THE COURT:  Central Florida?

20             MR. KUECHENMIESTER:  Yes.

21             THE COURT:  Okay.  All right.  Would you like to

22      be heard on your circumstances?

23             MR. KUECHENMIESTER:  Yes, Your Honor, I would.

24      I'll make it brief.

25             I too have one of the letters you're discussing,

Page 72

```
 1    the only difference is the ultimate amount.  I've submitted

 2    this letter with my original submission.

 3           I have been employed at General Motors from

 4    January 1973 till April 2002.  I do recall having seen that

 5    General Motors reserved the right to modify future benefit

 6    programs, I don't recall exactly when the first time I did

 7    see that.

 8           But I do have one other issue, and that's -- they

 9    -- that statement certainly didn't make it clear that they

10    could come back and take away something that they supposedly

11    had already given, which I think is the case here.

12    Certainly future -- you know, future insurance programs,

13    future medical programs I recognize their link to modify

14    those, but I believe that this was something that they had

15    already given me as part of my early retirement process.

16           THE COURT:  Okay.  Further thoughts?

17           MR. KUECHENMIESTER:  That's it.

18           THE COURT:  Okay.  Did you submit all of the

19    paperwork you had in which anything that made promises or

20    you might argue made -- might have made promises --

21           MR. KUECHENMIESTER:  Yes, Your Honor.

22           THE COURT:  -- was including --

23           MR. KUECHENMIESTER:  I did submit that letter and

24    I also submitted a transition (indiscernible - 01:32:23)

25    that spoke of the differences between the life insurance and
```

1    the medical.  The medical plan it says things like may be

2    continued --

3              THE COURT:  I'm having trouble hearing you.  Could

4    you speak a little louder, Mr. Kuechenmeister?

5              MR. KUECHENMIESTER:  I'm sorry.  I've submitted

6    also -- two things.  I submitted the letter from General

7    Motors with the promise of the ultimate amount of life

8    insurance and I submitted the transitioning your coverage

9    document which addresses the issues between medical programs

10   and insurance program.  Medical programs they say may be

11   continued, the insurance program -- basic life insurance

12   says you will get this and you will get a reduced amount.

13   So both have been submitted.

14             THE COURT:  Okay.  All right.

15             Mr. Griffiths, do you want to respond?

16             MR. GRIFFITHS:  Simply to perhaps, you know, it

17   would be helpful to find out from Mr. Kuechenmeister when

18   his employment with GM commenced.

19             MR. KUECHENMIESTER:  January 1973.  I'm sorry, I

20   thought I said that.

21             MR. GRIFFITHS:  Your Honor, for the sake of

22   fairness for all of the employees on the phone today for

23   anyone that commenced employment prior to 1984, the GUC

24   Trust is more than happy to adjourn claims with respect to

25   welfare benefits and life insurance so that we can submit

Page 74

```
 1    documents supporting our view that the benefit plans can be

 2    amended or modified.

 3           If we're able to do that I would just apply the

 4    same comments I have to Mr. Kuechenmeister's as to the ones

 5    raised with Mr. Hall.  The retiree servicing center letter,

 6    the particular one received by Mr. Kuechenmeister

 7    specifically states that the life insurance -- well, the

 8    amount guaranteed by the life insurance -- sorry -- the

 9    amount of the life insurance is not guaranteed.  I'm

10    referring to the April 8, 2002 letter that

11    Mr. Kuechenmeister supplied.  The letter specifically says

12    this is not a guarantee of the coverage amount, and

13    certainly for the balance of Mr. Kuechenmeister's

14    employment.

15           So 1984 onwards he would have been on notice every

16    year and every five years (indiscernible - 01:34:40) his

17    retirement that welfare benefit plans and life insurance

18    could be amended or modified, and Mr. Kuechenmeister would

19    have also been able to obtain life insurance -- additional

20    (indiscernible - 01:34:50) life insurance under the new GM

21    life insurance plan that was offered to all former employees

22    at their own cost in August 2009.

23           THE COURT:  Okay.  So in that event we would be

24    kicking this one too, even though Mr. Kuechenmeister has a

25    statement in his letter that doesn't appear in all of them,
```

Page 75

1    which say this is not a guarantee of the coverage amount.

2              MR. GRIFFITHS:  Yes, Your Honor, I mean the -- the

3    question as to whether Mr. Kuechenmeister would have been

4    aware of the reservation of rights from the start of his

5    employment is important to the GUC Trust as it is to Your

6    Honor.  The GUC Trust doesn't adopt an adversarial position

7    in terms of resolving claims.  If we can allow a claim we

8    will.  And you know, I would like to go back and look to see

9    if there's any arguments that can be made on

10   Mr. Kuechenmeister's behalf as well that would support a

11   view that life insurance could until some way vest.

12             I doubt it's the case, but there's no harm in

13   going back to how we look and giving Mr. Kuechenmeister the

14   benefit of the doubt and adjourning the claim for a month or

15   so.

16             THE COURT:  Okay.  Did you follow all that,

17   Mr. Kuechenmeister?

18             MR. KUECHENMIESTER:  Yes, I did.

19             THE COURT:  Okay.  Then you're going to be kicked

20   along with the others to July 17th.

21             MR. KUECHENMIESTER:  Okay.  Thank you very much,

22   Your Honor.

23             THE COURT:  Okay.

24             MR. KUECHENMIESTER:  Can I get off the line now,

25   is that --

```
 1              THE COURT:  Yes, you may.  Yes, you may.

 2              MR. KUECHENMIESTER:  Thank you.

 3              THE COURT:  Who do we have next?

 4              MR. GRIFFITHS:  Then, Your Honor, I believe that

 5      would be all of the employees we have on the telephone

 6      today.

 7              Mr. Curzan agreed that the hearing could go

 8      forward and decided not to appear telephonically as did

 9      Mr. Zach (ph).

10              A note on Mr. Zach's claim.  This was a claim that

11      was first brought before Your Honor I believe at a July -- a

12      July hearing last year, and this was when the retiree

13      servicing center letter issue was first brought before Your

14      Honor's attention.  Mr. Zach's welfare benefits were

15      expunged and we were given the opportunity to go and look at

16      the retiree servicing center letter and brief the issue

17      fully before proceeding on it.

18              And having done so, you know, Your Honor's prior

19      rulings on the retiree servicing center letter has given us

20      guidance on how to proceed with a claim, and we spoke with

21      Mr. Zach who understands that the -- that we would now like

22      to proceed and expunge that claim.

23              So we would simply request that Your Honor's

24      ruling with respect to claims that are being expunged also

25      be applied to Mr. Zach and to Mr. Curzan.
```

Page 77

1          THE COURT:  That request is granted.

2          So of the people who I heard today who have we in

3    the situation where they haven't been kicked already?

4          MR. GRIFFITHS:  I believe we have Mr. Gradich (ph)

5    who did not appear, we spoke with Mr. Stanley -- if

6    Mr. Stanley is still on the telephone maybe you ought to

7    know when he started his employment.  And again, I'm more

8    than happy to adjourn that claim if his employment commenced

9    prior to 1984.

10          THE COURT:  You said Mr. Stanley, did you mean

11   Mr. Stanley Jack?

12          MR. GRIFFITHS:  Oh, I'm sorry, Mr. Jack, correct.

13          THE COURT:  Mr. Jack, are you still with us?

14          MR. JACK:  Yes, sir, Your Honor.

15          THE COURT:  Can you tell us when you first started

16   working for GM?

17          MR. JACK:  1978.

18          THE COURT:  And you retired when?

19          MR. JACK:  I retired in 2008.

20          THE COURT:  Okay.

21          MR. GRIFFITHS:  There's a six-year stop period,

22   Your Honor, between '84 when we had the first documented

23   welfare benefit plan, so there's no problem from our side in

24   taking a look at Mr. -- for Mr. Jack as well.

25          THE COURT:  Okay.  So then you're going to kick

1    that too.

2              Then to what extent do I have to rule on anything

3    today?

4              MR. GRIFFITHS:  Your Honor, I believe you only

5    need to rule with respect to Mr. Gradich, Mr. Curzan, and

6    Mr. Zach, who are the claimants who haven't appeared, and as

7    we've noted, Your Honor, that we would simply like to apply

8    Your Honor's prior rulings in this matter to these claims.

9              THE COURT:  Yes, I'm going to do that.

10             And for those who are still on the phone, where

11   we're seemingly headed, but I'm not making any final rulings

12   today, is that when GM reserved the right to change your

13   benefits in these plan descriptions, whether you saw the

14   letter or not, that's a part of your contract with GM.  GM

15   can't walk from your contract, but that is part of your

16   contract.

17             The more difficult issue, which is the one that

18   we're leaving for another day is that when you worked for

19   many years before GM started to tell you as part of your

20   contract that it reserved the right to change your benefits

21   and when you continued to work thereafter how we deal with

22   that change in your contract and if it matters when the

23   majority of your working career, sometimes the great

24   majority, was before the contract was changed.  I'm not

25   deciding that today.  Hopefully I'll never have to decide

1   it, but if I do it'll be only after both sides have had an

2   opportunity to be heard on how you deal with that hybrid

3   kind of situation.  Okay.

4             MR. GRIFFITHS:  Your Honor, if I may just --

5             MR. VOLPE:  Your Honor?

6             THE COURT:  Yeah, who's speaking, please?

7             MR. VOLPE:  This is David Volpe in Atlanta.

8             THE COURT:  Yes, sir.

9             MR. VOLPE:  I'd like to know if I can additional

10  information based on all of this conversation about the

11  dates?

12            I also fall into the category of having started

13  employment with General Motors in August of 1969, which was

14  15 years before the 1984 date that seems to be quite

15  critical.

16            And while the discussion was going on I also went

17  and dug out my records.  I have a letter in my file dated

18  October 2002 very similar to the other retirees indicating

19  that my life insurance was a certain amount and this is --

20  this will be provided for the rest of your life, it's in

21  effect for the rest of your life to be provided by General

22  Motors at no cost to you.

23            So I have one of those identical letters that I'm

24  looking at that I did not argue when I was given my

25  opportunity, but now knowing that this is a pertinent issue

1    I would ask the Court to be included in that group that

2    maybe gets deferred and adjourned until a later time.

3              THE COURT:  Well, actually you were wise not to

4    argue that letter, because that letter by itself I've ruled

5    in prior proceedings by itself is not enough to change it,

6    but the fact that you worked from -- did you sake 1969,

7    Mr. Volpe?

8              MR. VOLPE:  That is correct.

9              THE COURT:  From 1969 to some period in the early

10   '80s, well, later than that of course, but at some point we

11   know in 1984, possibly earlier, that was changed, and the

12   fact that you had all those years of service before it was

13   changed is enough for me to put you in the category where

14   we're going to consider you with the others.

15             You provide the information you can to GM, GM is

16   going to be digging into its records as well.  The letters

17   -- the letter that you described is very similar, if not

18   identical, to letters that I've ruled on before.

19             MR. VOLPE:  Okay.

20             THE COURT:  That -- that isn't what is troubling

21   me today, what is troubling me is years and years of service

22   before GM started changing the policy, and I'm not telling

23   you anymore than I'm telling anybody else how I'm going to

24   decide that issue, frankly it's a head scratcher, but what I

25   am saying is that I'm okay with you being -- trading

Page 81

1    information with GM and considering you on July 17th and not

2    today.

3              MR. VOLPE:  Thank you, Your Honor.

4              THE COURT:  Okay.

5              MR. GRIFFITHS:  And Your Honor, just a note with

6    Mr. Volpe we're of course happy to accept Mr. Volpe's claim

7    for pension benefits as supplemented by a claim for welfare

8    benefits, but Mr. Volpe had made a claim from the difference

9    between what he had received as a pension entitlement at the

10   age of 52 and what he subsequently -- or what he believes he

11   would have been due had he retired ten years later.

12             I'm more than happy for this whole claim to be

13   adjourned to July 17th.

14             THE COURT:  Okay.  Although, Mr. Volpe, you have

15   to understand that GM isn't trying to change your pension

16   benefit, so that issue isn't before we, but if you're trying

17   to get money out of GM for changing the pension benefit --

18             MR. VOLPE:  Oh, no, not at all, Your Honor.  The

19   pension is not at issue here, it's strictly life insurance

20   and medical benefits.

21             THE COURT:  Oh, okay.  I thought I had somebody

22   who raised that issue.

23             MR. VOLPE:  No, I'm not arguing that at all.

24             THE COURT:  Okay.

25             MR. GRIFFITHS:  Sorry, Mr. Volpe.

Page 82

1          MR. VOLPE:  That's an argument for a different

2     day.  That just started.  They lit the fuse on that on

3     June 4th.

4          THE COURT:  All right.  Trying to get money out of

5     GM for changing the benefits is a much more difficult road

6     to hoe.

7          MR. VOLPE:  Yeah.

8          THE COURT:  Okay.  Mr. Griffiths, do you have any

9     further business for today?

10          MR. GRIFFITHS:  That would be all -- yes, Your

11     Honor, that's all of the business today.

12          THE COURT:  Okay.  Is there anybody on the phone

13     who didn't understand my ruling insofar as it affected him

14     or her?

15          Hearing no response we're adjourned.  Thank you

16     folks, I expect for hear from many of you on July 17th.

17          MR. VOLPE:  Thank you, Your Honor.

18          MR. JACK:  Thank you, Your Honor.

19          THE COURT:  CourtCall, you may drop off the

20     participates on the line.

21       (Whereupon these proceedings were concluded at 11:34

22     AM)

23

24

25

```
 1                        I N D E X

 2

 3                        RULINGS

 4                                          Page      Line

 5   Motion of Motors Liquidation Company GUC

 6   Trust for Limited Modification of the

 7   Automatic Stay and the Plan Injunction

 8   as to the Proof of Claim Filed by

 9   Anne Valdes                             17        10

10

11   Motion to Approve Notice Pursuant to

12   Fed. R. Civ. P. 23(h) for Award of

13   Attorneys' Fees on behalf of Anderson

14   Class Counsel                           20        21

15

16   Debtor's 170th Omnibus Objection        22        13

17

18   Motion for Order to change Venue for

19   Determination of Claim filed by Gerald

20   D. Wahl on behalf of Marcus Jordan      28        21

21

22   Debtor's Omnibus Objection -

23   Douglas Sterett - Adjourned             22        13

24

25
```

**Page 84**

| | | | |
|---|---|---|---|
| 1 | Debtor's Omnibus Objection - | | |
| 2 | Glenn C. Kuntz - Adjourned | 52 | 10 |
| 3 | | | |
| 4 | Debtor's Omnibus Objection - | | |
| 5 | Jane C. Bogue - Adjourned | 62 | 20 |
| 6 | | | |
| 7 | Debtor's Omnibus Objection - | | |
| 8 | Gordon Hall - Adjourned | 70 | 9 |
| 9 | | | |
| 10 | Debtor's Omnibus Objection - | | |
| 11 | Timothy Kuechenmeister - Adjourned | 75 | 19 |
| 12 | | | |
| 13 | Debtor's Omnibus Objection - | | |
| 14 | Mr. Zach - Adjourned | 77 | 1 |
| 15 | | | |
| 16 | Debtor's Omnibus Objection - | | |
| 17 | Paul c. Curzan | 77 | 1 |
| 18 | | | |
| 19 | Debtor's Omnibus Objection - | | |
| 20 | Stanley E. Jack - Adjourned | 77 | 25 |
| 21 | | | |
| 22 | Debtor's Omnibus Objection - | | |
| 23 | David R. Volpe - Adjourned | 81 | 1 |
| 24 | | | |
| 25 | | | |

Page 85

1        C E R T I F I C A T I O N

2

3    I, Dawn South, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5    Dawn          Digitally signed by Dawn South
                    DN: cn=Dawn South, o, ou,
6    South         email=digital1@veritext.com,
                    c=US
                    Date: 2012.06.19 12:16:55
7                   -04'00'

8    AAERT Certified Electronic Transcriber CET**D-408

9

10   Veritext

11   200 Old Country Road

12   Suite 580

13   Mineola, NY 11501

14

15   Date:  June 19, 2012

16

17

18

19

20

21

22

23

24

25