# EXHIBIT FF



**NOTICE OF MEETINGS**

of the holders of

**General Motors Nova Scotia Finance Company**
*(incorporated under the laws of Nova Scotia)*
**Guaranteed absolutely and unconditionally by**
**General Motors Corporation**
*(incorporated with limited liability under the laws of the State of Delaware, United States of America)*

**£350,000,000,000 8.375 per cent. Notes due 2015 (the "2015 Notes")**
**(ISIN: XS0171922643)**

**£250,000,000,000 8.875 per cent. Notes due 2023 (the "2023 Notes")**
**(ISIN: XS0171908063)**

(together the "**GM Nova Scotia Notes**")

NOTICE IS HEREBY GIVEN that, a meeting of the holders of each series of the GM Nova Scotia Notes is convened by General Motors Nova Scotia Finance Company and will be held at 12:00 noon (London time) on June 25, 2009 for the 2015 Notes, and at 12:30 p.m. (London time) on June 25, 2009 for the 2023 Notes, in each case at the offices of Weil, Gotshal & Manges located at One South Place, London EC2M 2WG, for the purpose of separately considering and, if thought fit, passing the following resolutions which will be proposed as Extraordinary Resolutions in accordance with the provisions of the fiscal and paying agency agreement dated as of July 10, 2003 (as made among, *inter alia*, General Motors Nova Scotia Finance Company, General Motors Corporation, Deutsche Bank Luxembourg S.A. (the "**Fiscal Agent**") and Banque Générale du Luxembourg (the "**Paying Agent**") (the "**Fiscal and Paying Agency Agreement**")).

The 2015 Meeting and the 2023 Meeting are referred to in this Notice of Meetings as the "**Meetings**" and each, a "**Meeting**". The 2015 Holders and the 2023 Holders are referred to in this notice as the "**Holders**" and each, a "**Holder**".

*For the 2015 Notes:*

"THAT THIS MEETING (the "**2015 Meeting**") of the holders of the 2015 Notes (the "**2015 Holders**") and benefiting from the provisions of the fiscal and paying agency agreement among General Motors Nova Scotia Finance Company (the "**Company**"), General Motors Corporation, Deutsche Bank Luxembourg S.A. (the "**Fiscal Agent**") and Banque Générale du Luxembourg S.A. (the "**Paying Agent**" and together with the Fiscal Agent, the "**Agents**") dated as of July 10, 2003 (the "**Fiscal and Paying Agency Agreement**"), by Extraordinary Resolution (as defined in the Fiscal and Paying Agency Agreement) (the "**Extraordinary Resolution**"), HEREBY: "

*For the 2023 Notes:*

"THAT THIS MEETING (the "**2023 Meeting**") of the holders of the 2023 Notes (the "**2023 Holders**") and benefiting from the provisions of the fiscal and paying agency agreement among General Motors Nova Scotia Finance Company (the "**Company**"), General Motors Corporation, Deutsche Bank Luxembourg S.A. (the "**Fiscal Agent**") and Banque Générale du Luxembourg S.A. (the "**Paying Agent**" and together with the Fiscal Agent, the "**Agents**") dated as of July 10, 2003 (the "**Fiscal and Paying Agency Agreement**"), by Extraordinary Resolution (as defined in the Fiscal and Paying Agency Agreement) (the "**Extraordinary Resolution**"), HEREBY: "

*For the 2015 and 2023 Notes (each series voting separately)*

**RESOLVES** by special quorum an Extraordinary Resolution in accordance with the proviso to paragraph 5 of Schedule 4 of the Fiscal and Paying Agency Agreement to authorize and direct the addition of a new provision at the end of, and forming part of, Condition 6 of Schedule 1 of the Fiscal and Paying Agency

Agreement, which also forms a part of the Global Notes representing the 2015 Notes and the 2023 Notes, as follows:

"**Certain Claims**

Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Noteholders in accordance therewith, each Noteholder hereby releases and discharges the defendants in the Nova Scotia Proceeding (and the past and/or present directors, officers, employees, partners, insurers, co-insurers, controlling shareholders, attorneys, advisers, consultants, accountants or auditors, personal or legal representatives, predecessors, successors, parents, subsidiaries, divisions, joint ventures, assigns, spouses, heirs, related and/or affiliated entities of each of them) from all claims and demands that are raised in the proceeding in the Supreme Court of Nova Scotia titled Aurelius Capital Partners, LP v. General Motors Corporation et al, Court File No. HFX No. 308066 (the "**Nova Scotia Proceeding**"), and agrees to discontinue the Nova Scotia Proceeding on a without costs basis. Nothing contained in this Extraordinary Resolution shall preclude any Noteholder from pursuing any of the claims raised in the Nova Scotia Proceeding against any of the Company, General Motors of Canada Limited, GM Nova Scotia Investments Ltd., or the Guarantor or any of the other debtors in the Chapter 11 Cases in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding and, as a result, an amount equal to the Consent Fee has been repaid; provided, that, this Extraordinary Resolution precludes each Noteholder from pursuing any of the claims raised in the Nova Scotia Proceeding against any of Neil Macdonald, John Stapleton, Mercedes Michel and Maurita Sutedja (and their respective heirs, administrators and assigns) in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding.

Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Noteholders in accordance therewith, each Noteholder waives all (and shall cease to have any) rights and claims against the Company in respect of the Loan Agreements (as defined below), including with respect to any compromise or settlement of the loans thereunder, and such Noteholder's rights in the Loan Agreements, and each Noteholder hereby releases and discharges General Motors of Canada Limited (and its past and present officers, directors and employees), Neil Macdonald, John Stapleton, Mercedes Michel and Maurita Sutedja (and their respective heirs, administrators and assigns) from all claims and demands whatsoever, presently known or unknown, which the Noteholders ever had, now have or may hereafter have against them by reason of claims and demands arising from or in connection with those certain loan agreements between the Company and General Motors of Canada Limited each dated as of July 10, 2003 and pursuant to which General Motors of Canada Limited borrowed from the Company the sum of five hundred fifty-five million, eight hundred sixty thousand Canadian dollars (C$555,860,000), and the sum of seven hundred seventy-eight million, two hundred four thousand Canadian dollars (C$778,204,000), respectively (collectively, the "**Loan Agreements**"), provided that nothing contained in this Extraordinary Resolution shall preclude the Noteholders from pursuing any claim in respect of the parties and claims otherwise released in this paragraph in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding. Furthermore, in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding, and, as a result, an amount equal to the Consent Fee has been repaid, the settlement between the Company and General Motors of Canada Limited of the amount owing under the Loan Agreements as contemplated by this transaction shall be null and void and the full amount owing under the Loan Agreements as of the date hereof shall be immediately due and payable according to their terms as they exist as of the date hereof.

Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Noteholders in accordance therewith, with respect to any other claim it may have against the Company, General Motors of Canada Limited, GM Nova Scotia Investments Ltd. or the Guarantor in its capacity as a holder of the Notes, the Noteholder covenants and agrees not to pursue any claim it may have other than in connection with the advancement of its claim under the Guarantee, the advancement of its claim against the Company in respect of the Notes and the Deficiency Claim (as defined below). Nothing contained in this Extraordinary Resolution shall preclude the Noteholder from pursuing any other claim it may have against the Company, General Motors of Canada Limited, GM Nova Scotia Investments Ltd. or the Guarantor or any of the other debtors in the chapter 11 cases (the "**Chapter 11 Cases**") filed as voluntary petitions for relief under chapter 11, title 11 of the United States Code, in the United States Bankruptcy Court for the Southern District of New York, commenced on or about June 1, 2009 which are jointly administered by the Guarantor and certain of its subsidiaries and affiliates who are debtors in the Chapter 11 Cases, in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding. For purposes of this Extraordinary Resolution, the "**Guarantee**" shall mean that certain guarantee of the Notes by the Guarantor included in the Fiscal and Paying Agency Agreement and the Notes.

Nothing contained in this Extraordinary Resolution is in any way intended to, nor shall it in any way operate to, directly or indirectly, limit, waive, impair or restrict, any rights, interests, remedies or claims (whether at law or in equity, and whether now or hereafter existing) which any Noteholder may have against, or to which any Noteholder is due or owed from, the Company in respect of the Notes or the Guarantor in respect of a general unsecured claim to which the 2015 Holders and the 2023 Holders are entitled in the bankruptcy or insolvency proceedings of the Guarantor for the full amount of the outstanding principal, interest and costs due on such Notes by virtue of the Guarantor's Guarantee (the "**Guarantee Claim**") or the general unsecured claim to which the trustee in bankruptcy of the Company is entitled for contribution for any amounts unpaid to the Company's creditors, namely the amount outstanding under the Notes, the Swap Liability (defined below) and any other liabilities (collectively, a "**Deficiency Claim**"), in the bankruptcy and insolvency proceedings of the Guarantor. It is hereby expressly acknowledged, agreed and confirmed that (i) the Deficiency Claim is a valid and enforceable claim of the Company and shall be enforceable against the Guarantor as allowed pre-petition general unsecured claims (the "**Allowed Claims**") to the fullest extent permitted under applicable laws, (ii) the Notes are valid and enforceable claims to the Noteholders and shall be enforceable against the Company in their full amount, and (iii) the Guarantee Claim is a valid and enforceable claim of the Noteholders and shall be enforceable against the Guarantor as Allowed Claims to the fullest extent permitted under applicable laws.

For purposes of clarity, it is understood and agreed that nothing contained in this Extraordinary Resolution shall: (i) release in any respect whatsoever any claim against the Company on the Notes or any claim against the Guarantor on the Guarantee, or (ii) preclude a Noteholder from pursuing any claim it may have against the Guarantor or any of the other debtors in the Chapter 11 Cases or any other party that is not based on such Holder's ownership of Notes.

The Consent Fee payment does not reduce, limit or impair the Notes, the Guarantee Claim or the Deficiency Claim.

The Guarantor confirms that its only claim against the Company is the Swap Liability. If for any reason any portion of the Deficiency Claim is disallowed, the Guarantor agrees that the Swap Liability is subordinated to the prior, indefeasible payment in full of the Notes. In any event, any and all other undisclosed indebtedness, claims, liabilities or obligations of the Company to the Guarantor other than the Swap Liability are subordinated to the prior, indefeasible payment in full of the Notes. To the extent of the subordination provided for herein, the Guarantor agrees that should it receive any payments from the Company or a trustee in bankruptcy of the Company, it will hold such payment in trust and immediately pay over such amounts to the paying agent for the Notes. For purposes of this Extraordinary Resolution, "**Swap Liability**" shall mean the obligations of the Company to the Guarantor, under currency swap arrangements between the Guarantor and the Company.

The Guarantor shall not assert any right of set-off in respect of the Deficiency Claim.";

**RESOLVES** by special quorum an Extraordinary Resolution in accordance with Schedule 4 of the Fiscal and Paying Agency Agreement to pay, subject to the approval of the foregoing Extraordinary Resolution by the requisite Noteholders, an amount equal to £366.46 per £1,000 of principal amount of the 2015 Notes outstanding and £380.17 per £1,000 of principal amount of the 2023 Notes outstanding (the "**Consent Fee**"), immediately following the approval of the foregoing Extraordinary Resolution by the requisite Noteholders. The Consent Fee shall be paid to the common depository by wire transfer, and Euroclear and Clearstream, as applicable, will credit the relevant accounts of their participants on the payment date. Payments in respect of Notes not evidenced by Global Notes shall be made by wire transfer, direct deposit or check mailed to the address of the holder entitled thereto as such address shall appear on the register of the Company;

**RESOLVES** by ordinary quorum an Extraordinary Resolution in accordance with the proviso to paragraph 5 of Schedule 4 of the Fiscal and Paying Agency Agreement to authorize and direct the following:

(a) authorizes, directs and empowers the Agents to concur in, approve, and execute, and do all such deeds, instruments, acts and things that may be necessary to carry out and give effect to these resolutions;

(b) sanctions, assents to and approves any necessary or consequential amendment to the Fiscal and Paying Agency Agreement to effect these resolutions; and

(c) acknowledges that capitalised terms used in these resolutions have the same meanings as those defined in the Fiscal and Paying Agency Agreement, as applicable.

**Background**

The notes are listed on the Luxembourg Stock Exchange.

The Company reserves the right to cancel the meeting and withdraw the submission of the Extraordinary Resolutions for a vote.

**Documents Available for Inspection or Collection**

Noteholders may, at any time during normal business hours on any weekday (Saturdays, Sundays and bank and other public holidays excepted) prior to the Meeting inspect copies of the following documents at the specified office of the Fiscal Agent set out below and at the specified office of the Paying Agent in Luxembourg being:

- the Fiscal and Paying Agency Agreement;
- the Offering Circular dated July 9, 2003 relating to the issue of the 2015 and 2023 Notes.

**General**

**The attention of holders is particularly drawn to the quorum required for their respective Meeting and for any adjourned Meeting which is set out in "*Voting and Quorum*" below. Having regard to such requirements, Holders are strongly urged either to attend their respective Meeting or to take steps to be represented at such Meeting, as referred to below, as soon as possible.**

Neither the Company nor GM expresses any view as to the merits of submitting voting instructions in respect of the Extraordinary Resolutions. The Fiscal Agent has not been involved in preparing the Extraordinary Resolutions and does not represent that all relevant information has been disclosed to the holders in or pursuant to this Notice of Meetings. Holders who are unsure of the impact of the Extraordinary Resolutions should seek their own independent financial and legal advice.

**Voting and Quorum**

1. The provisions governing the convening and holding of the Meetings or any adjourned such Meetings are set out in respect of the 2015 Notes and 2023 Notes, in Schedule 4 to the Fiscal and Paying Agency Agreement, copies of which are available for inspection as referred to above.

2. Holders who have sent a valid electronic instruction notice at least one business day before the time appointed for the holding of their respective Meeting need take no further action in relation to voting at such Meeting. Such electronic instruction notice contains an irrevocable instruction (subject to certain exceptions) to the relevant Paying Agent to appoint persons nominated by the Tabulation Agent as their proxy in relation to such Meeting and instruct it to vote as directed in the electronic instruction notice. Insofar as the electronic instruction notice is being provided with respect to Notes of Holders under the Lock Up Agreement (as defined below), the instruction is being provided subject to the terms of a Lock Up Agreement, dated as of June 1, 2009, by and among General Motors Nova Scotia Finance Company, General Motors of Canada Limited, GM Nova Scotia Investments Ltd., General Motors Corporation, and the beneficial owners of notes named therein (the "Lock Up Agreement"). Under the Lock Up Agreement, the instruction insofar as it relates to a Holder under the Lock Up Agreement shall automatically be void and of no further force and effect immediately upon termination of the Lock Up Agreement in accordance with its terms, without any further action on the part of the Holder.

   **Paragraphs 3 to 6 below apply only to Holders who have not sent valid electronic instruction notices at least one business day before the time appointed for their respective Meeting and who wish to vote at such Meeting.**

3. Holders wishing to attend and vote at their respective Meetings or any adjourned such Meeting in person (or appoint another person other than the Tabulation Agent's nominee as provided above to do so on its behalf) must produce at such Meeting either the relevant Notes, as applicable, or a valid voting certificate issued by the relevant Paying Agent relating to such Notes, in respect of which it wishes to vote.

4. A holder not wishing to attend and vote at their respective Meeting in person (or appoint another person as aforesaid to do so on its behalf) may give a voting instruction as described in paragraph 5(b) below.

5. Notes may, not less than one business day before the time fixed for the relevant Meeting (or, if applicable, any adjourned such Meeting) and within the relevant time limit specified by the relevant Clearing System, be deposited with the relevant Paying Agent or (to its satisfaction) held to its order or under its control by the relevant Clearing System for the purpose of:

   (a) obtaining a voting certificate from such Paying Agent; or

    (b)    such Paying Agent completing a block voting instruction in respect of such Notes appointing a proxy to attend and vote at such Meeting (or, if applicable, any adjourned such Meeting) in accordance with the instructions (including an electronic instruction notice) of the holder. A holder will need to give voting instructions (such voting instructions being neither revocable nor capable of alteration by the holder during the period commencing one business day prior to the time fixed for such Meeting (or, if applicable, any adjourned such Meeting) and within the relevant time limit specified by the relevant Clearing System) on a voting instruction form obtainable from the specified office of a relevant Paying Agent or in the form of an electronic voting instruction in accordance with the standard procedures of the relevant Clearing System (including in either case an electronic instruction notice), to a relevant Paying Agent, not less than one business day before the time fixed for such Meeting (or, if applicable, any adjourned such Meeting) to enable such Paying Agent to complete the block voting instruction.

6. Notes so deposited or held will not be released:

    (a)    in the case of Notes in respect of which a voting certificate has been issued, until the first to occur of:

        (i)    the conclusion of the Meeting specified in such certificate or, if later, of any adjourned such Meeting; and

        (ii)    the surrender of the certificate to the relevant Paying Agent who issued the same; and

    (b)    in the case of Notes in respect of which a block voting instruction has been issued, until the first to occur of:

        (i)    the conclusion of the Meeting specified in such document or, if later, of any adjourned such Meeting; and

        (ii)    the surrender to the relevant Paying Agent not less than one business day before the time for which such Meeting or any adjourned Meeting is convened of the receipt issued by such Paying Agent in respect of each such deposited Notes which is to be released or (as the case may require) the Notes ceasing with the agreement of the Paying Agent to be held to its order or under its control and the giving of notice by the Paying Agent to the Issuer of the necessary amendment to the block voting instruction.

7. To be passed at the Meetings, the special quorum Extraordinary Resolutions to amend Condition 6 of Schedule 1 of the Fiscal and Paying Agency Agreement and to pay the Consent Fee, each require the affirmative vote of one or more persons present holding Notes of the applicable series or voting certificates or being proxies and holding or representing in aggregate not less than 66 2/3 percent of the principal amount of the Notes of the applicable series for the time being outstanding (as defined in the Fiscal and Paying Agency Agreement).

If passed, the Extraordinary Resolutions shall be binding upon all the holders of the Notes of the relevant Series, whether present or not present at the Meeting and whether or not voting, and upon all holders of interest coupons appertaining thereto.

If, within fifteen minutes after the time appointed for the relevant Meeting, a quorum is not present, the Meeting shall stand adjourned for such period, being not less than 14 days nor more than 42 days, and at such place as may be appointed by the chairman of the relevant Meeting (the "**Chairman**") and approved by the relevant Fiscal Agent. To be passed at an adjourned Meeting, the Extraordinary Resolutions requires the affirmative vote of one or more persons present holding Notes of the applicable Series or voting certificates or being proxies and holding or representing in the aggregate not less than a clear majority of the principal amount of Notes of the applicable series for the time being outstanding.

8. Notice of any adjourned Meeting shall be given in the same manner as notice of the original Meeting by 10 days' notice, in each case containing the information required for the notice of the original Meeting and such notice stating the relevant quorum.

9. Every question submitted to the relevant Meeting shall be decided by a show of hands and a poll, and the Chairman shall both on a show of hands and on a poll have a casting vote in addition to the vote or votes (if any) to which he may be entitled as a holder or as a holder of a voting certificate or as a proxy. A poll will be demanded by the Chairman (before or on the declaration of the result of the show of hands). On a show of hands every person who is present in person and produces a Note of the relevant series, as applicable, or a voting certificate or is a proxy shall have one vote. On the

poll every person who is so present shall have one vote in respect of each minimum integral amount of the relevant Series, in each case so produced or represented by the voting certificate so produced or for which he is a proxy.

10. This Notice of Meetings is governed by, and shall be construed in accordance with, New York law.

11. The Fiscal Agent and Paying Agents in respect of the 2015 and 2023 Notes are:

| **Fiscal Agent and Paying Agent** | **Paying Agent** |
|---|---|
| Deutsche Bank Luxembourg S.A.<br>2, Bld Konrad Adenauer<br>L-1115 Luxembourg | Banque Générale du Luxembourg<br>50 Avenue J.F. Kennedy<br>L-2951 Luxembourg |

12. The Tabulation Agent in respect of the 2015 and 2023 Notes is:

Deutsche Bank AG London
Winchester House
1 Great Winchester Street
London EC2N 2DB

13. The Vote Solicitation and Information Agent in respect of the 2015 and 2023 Notes is:

D. F. King (Europe) Limited
One Ropemaker Street
London, EC2Y 9HT
Telephone: +44 20 7920 9700
Email: gm@dfking.com

This Notice of Meetings does not contain or constitute an offer or solicitation to any person in any jurisdiction in which such offer or solicitation is unlawful.

# FINANCIAL TIMES

[illegible] | £2.00

World Business Newspaper

'Fear of deflationary meltdown has gone. Hurrah!' **Martin Wolf Page 13**

**Polled out**
European voters head reluctantly to the ballot box
**Page 8**

## News Briefing

**Kim chooses youngest son as his successor**
Kim Jong-il, the ailing North Korean dictator, has chosen his youngest son, Kim Jong-woon, believed to be in his 20s, as his successor, according to US and South Korean officials. **Page 7; Editorial Comment, Page 12; www.ft.com/northkoreadynasty**

**Liberty to aid Pearl**
Hugh Osmond's Pearl Group has finalised a deal to cut the life insurer's £3bn debt load and secure a £500m capital injection from a new investor, Cayman Islands-based Liberty Acquisition Holdings. **Page 17**

**Eurozone jobless soars**
Eurozone unemployment has leapt to its highest for a decade as the recession takes an increasing toll. **Page 8**

**Decline in 'offshoring'**
A sharp decline in the "offshoring" of jobs from Britain to cheaper locations is being accentuated by the recession, Financial Times research has found. **Page 5**

**UCL opens web access**
University College London is set to become the first of the top tier of elite European universities to make all its research available free at the click of a mouse. **Page 4**

**Swiss economy shrinks**
The Swiss economy contracted at the fastest rate in years in the first quarter, as weakening demand at home reinforced falling export sales. **Page 8**

**Obama credibility test**
President Barack Obama faces a test of his credibility over his call for a freeze on settlements in the West Bank and Gaza, as US legislators urge him to scale down demands and Israel maintains its opposition. **Page 6; www.ft.com/settlements**

**Luxury loses its appeal**
Sales of luxury goods slipped as fashion-conscious Japanese office workers and ladies who lunch swapped Louis Vuitton handbags and Chanel jackets for Zara dresses and Gap jeans. **Page 17; www.ft.com/lex; www.ft.com/luxury**

**Polish solidarity at risk**
Twenty years after elections in Poland that ended the Communist party's reign, Poles are in conflict again. **Page 8**

**Austere times for Cuba**
Cubans are facing the toughest austerity measures since the post-Soviet crisis of the 1990s, despite diplomatic successes that have left the US isolated in its policy towards the Communist nation. **Page 10; www.ft.com/cuba**

**Jet wreckage found**
Brazilian military aircraft have found the wreckage of an Air France jet that crashed in the Atlantic Ocean with 228 people on board, the country's defence minister said. **Page 6**

**Barclays shares slide**
Shares in Barclays fell 14 per cent after one of the bank's largest Middle Eastern investors sold its shareholding in one of the biggest placings of stock carried out in the London market. **Page 17; Lombard, Page 18; City surprise, Page 19; www.ft.com/ukbanks**

# Labour in disarray as ministers jump ship

## Home secretary leads wave of resignations

## PM urged to bring forward reshuffle

By George Parker, Political Editor

Gordon Brown's government was in disarray last night as Jacqui Smith, home secretary, led a wave of resignations ahead of what is expected to be a dismal performance by Labour in this week's local and European elections.

The prime minister was urged by colleagues to bring forward a cabinet reshuffle to Friday in an attempt to restore his authority, amid signs that party morale – sapped by the expenses scandal – was reaching a new low.

Ms Smith let it be known she would leave the government at the reshuffle, while Beverley Hughes, children's minister, and Patricia Hewitt, former health secretary, said they would stand down as MPs at the next election. All cited family reasons.

Tom Watson, a close ally of Mr Brown, also let it be known he would stand down as a cabinet office minister to spend time with his family, adding to the sense of MPs jumping from an apparently sinking ship. Labour MP Ian Gibson was barred from standing for the party at the next general election after criticism of his expenses.

Mr Brown's immediate problem is how to reassert control just 24 hours before polls open tomorrow for county council and European elections. Labour is braced for a drubbing.

Ms Smith's imminent departure – she was tipped to be fired in any case – comes on top of the uncertainty surrounding Alistair Darling, whose future as chancellor is in doubt after Mr Brown refused to confirm he was safe at the Treasury.

Although Mr Brown's team insisted the resignations were not co-ordinated, one ally admitted: "It does all look a bit chaotic." Ms Smith's pre-emptive resignation – she says she told Mr Brown she wanted to stand down two months ago – will blunt the impact of what the prime minister hoped would be a decisive reshuffle.

It leaves the impression that he is being forced to make changes because of resignations rather than carrying out what is expected to be a radical cabinet overhaul on his own terms.

Some of Mr Brown's colleagues were urging him to carry out his cabinet surgery on Friday to end the sense of drift. Others said he was more likely to wait until after the European election results were announced on Sunday night.

Apart from Ms Smith and Mr Darling, questions hang over the future of Geoff Hoon, transport secretary, and Hazel Blears, communities secretary, who have also been damaged by Westminster's expenses scandal.

Mr Darling yesterday insisted he was getting on with his job as speculation mounted that he would be replaced by Ed Balls, schools secretary, who was Mr Brown's right-hand man during much of his time as chancellor.

**Besieged Brown, Page 3**
**Editorial Comment, Page 12**
**Andrew Turnbull, Page 13**
**www.ft.com/westminster**

Home secretary Jacqui Smith leaves Downing Street after a cabinet meeting yesterday *Getty Images*

# BP closes final salary pension to new entrants

By Norma Cohen and Ed Crooks

BP, one of the last remaining FTSE 100 companies to offer final salary pensions to new workers, said it would shut that window from next April so as not to burden shareholders with unknowable risks and costs.

"We are doing this to avoid burgeoning future liabilities," a spokesman said, adding that BP is most concerned about the sharp and unexpected rise in life expectancy at older ages which has dramatically increased costs. "It is a big financial burden to leave to shareholders," he said.

What makes BP's move unusual is that its final salary scheme, unlike those of many other employers, is relatively well funded. Last year's accounts show the scheme had a surplus on an accounting basis of £1.55bn.

The spokesman said the closure of the scheme to new members was part of a wider cost-cutting exercise. Cash costs this year are expected to be more than $4bn (£2.4bn) lower than their 2007 level of $32bn. BP is losing more than 5,000 jobs.

BP's cost-cutting programme was launched by Tony Hayward, the chief executive who took over two years ago, to tackle the company's competitive disadvantage with other large international oil groups.

Royal Dutch Shell, BP's leading European rival, still has a defined benefit pension scheme in the UK open to new members.

BP said that current employees would continue to accrue final salary benefits and would not be affected. "We think that is the right thing to do," the spokesman said. New workers will be offered generous "defined contribution" pensions in which up to 15 per cent of each worker's pay is invested in a savings pot to be used at retirement.

**Lombard, Page 18**

## Merkel's warning

Angela Merkel, Germany's chancellor, yesterday sharply criticised the world's main central banks, suggesting their unconventional monetary policies could aggravate the economic crisis. "What other central banks have been doing must be reversed. I am very sceptical about the extent of the Fed's actions and the way the Bank of England has carved its own little line in Europe," she said.

**Report, Page 9**

# Take five-year holiday to cut costs, Spanish bank invites employees

## BBVA offers 30% of salary in radical ploy

By Victor Mallet in Madrid

"How would you like to spend more time with your family – like the next five years?" is not the kind of offer employees usually want to hear from their bosses in the depths of an economic crisis.

But BBVA, Spain's second-biggest bank, has posed that question to staff as part of its latest cost-cutting drive. It is hoping at least some of its 29,851 Spanish employees agree not to come to work for up to five years – in exchange for nearly a third of their usual salary and a guaranteed job when they want to return.

Yesterday the bank, boasting of its up-to-date employment policies, insisted the key attraction of its novel idea was the flexibility it offered staff.

"We're looking at offering alternatives to people," said Juan Ignacio Apoita, BBVA's head of human resources. He added: "It's obvious as well that it has an impact on costs."

BBVA is offering staff three options: first, leave of three to five years for long-term employees who want to undertake "personal or professional projects", with 30 per cent pay and healthcare on top; second, a shorter working week with reduced pay; and third, special time off for up to two years for those who want to care for children or relatives or take postgraduate courses. All are voluntary and the company reserves the right to refuse those who apply.

However, Celestino Corbacho, labour minister in the Socialist government, and Spanish trade unions were critical of BBVA's offer. "I'm against it," said Mr Corbacho. It was necessary to fight the Spanish culture of employees aiming for early retirement once they reached the age of 50, he said.

BBVA and other banks have been cutting staff in Spain for three years, often through early retirement programmes, but Spanish labour laws are favourable to permanent employees and the process is expensive. BBVA staff numbers in Spain have fallen by 10 per cent since 2007, and the bank has closed 220 offices over the past year.

Mr Apoita said the offer, which could apply even to staff in their late 20s, was launched internally two weeks ago and it was too early to tell how many were likely to accept.

Spanish banks such as Santander and BBVA escaped the worst of the US subprime crisis because of tight regulation by the Bank of Spain and are now among the world's most profitable financial institutions. But they also have bad loans from the collapse of Spain's housing market.

Blood, sweat, and algorithms.
We brought together over 1,500 of the world's brightest young scientists to compete at the Intel International Science and Engineering Fair. Their achievements will lead to the scientific breakthroughs of tomorrow. Learn more at intel.com/inside.
Sponsors of Tomorrow.
intel

**Subscribe now in print and online**
Tel: 0800 298 4708
www.ft.com/subscribenow

Selling price in Irish Republic €2.50

## World Markets

STOCK MARKETS

| | Jun 2 | prev | %chg |
|---|---|---|---|
| S&P 500 | [illegible] | 942.87 | +0.20 |
| Nasdaq Comp | 1836.8 | 1828.68 | +0.44 |
| Dow Jones Ind | 8740.87 | 8721.44 | +0.22 |
| FTSEurofirst 300 | 865.55 | 864.27 | 0.04 |
| DJ Euro Stoxx 50 | 2514.17 | 2537.35 | -0.93 |
| FTSE 100 | 4477.02 | 4506.19 | 0.65 |
| FTSE All-Share UK | 2286.26 | 2298.13 | 0.52 |
| CAC 40 | 3328.04 | 3329.49 | 0.04 |
| Xetra Dax | 5144.06 | 5142.56 | +0.03 |
| Nikkei | 9704.31 | 9677.75 | +0.27 |
| Hang Seng | 18389.23 | 18455.39 | 2.84 |
| FTSE All-World $ | 167.42 | 166.74 | +0.41 |

CURRENCIES

| | Jun 2 | prev | | Jun 2 | prev |
|---|---|---|---|---|---|
| $ per € | 1.430 | 1.416 | £ per $ | 0.699 | 0.706 |
| $ per £ | 1.655 | 1.643 | £ per € | 0.601 | 0.609 |
| £ per € | 0.863 | 0.867 | € per £ | 1.159 | 1.160 |
| ¥ per $ | 96.0 | 96.6 | ¥ per € | 137.2 | 136.8 |
| ¥ per £ | 158.9 | 158.7 | £ index | 81.1 | 82.9 |
| $ index | 84.5 | 85.1 | € index | 102.2 | 102.8 |
| SFr per € | 1.518 | 1.517 | SFr per £ | 1.758 | 1.761 |

COMMODITIES

| | Jun 2 | prev | %chg |
|---|---|---|---|
| Oil WTI $ | 68.55 | 68.58 | 0.03 |
| Oil Brent $ | 68.17 | 67.97 | 0.20 |
| Gold $ | 982.00 | 978.70 | 1.32 |

INTEREST RATES

| | price | yield | chg |
|---|---|---|---|
| US Gov 10 yr | 95.64 | 3.65 | 0.06 |
| UK Gov 10 yr | 104.84 | 3.92 | 0.07 |
| Ger Gov 10 yr | 96.74 | 3.65 | 0.02 |
| Jpn Gov 10 yr | 99.93 | 1.51 | -0.01 |
| US Gov 30 yr | 95.85 | 4.50 | 0.06 |
| Ger Gov 2 yr | 100.16 | 1.43 | 0.09 |
| | Jun 2 | prev | chg |
| Fed Funds Eff | 0.21 | 0.19 | 0.02 |
| US 3m Bills | 0.14 | 0.09 | 0.05 |
| Euro Libor 3m | 1.26 | 1.26 | 0.00 |
| UK 3m | 1.18 | 1.18 | |

Prices are latest for edition

**On FT.com today**

**On the move**
Podcast: How companies are using mobile technology
www.ft.com/dbpodcast





3 JUN 3

# Concern that sheikh has called end of rally

News analysis

The Barclays placing surprised the City, write **Peter Thal Larsen** and **Kate Burgess**

When the history of the credit crunch is written, Sheikh Mansour bin Zayed Al Nahyan will merit a spot on the very short list of investors who made money buying shares in western banks.

The decision by International Petroleum Investment Corp, the wealth fund of which Sheikh Mansour is chairman, to offload its entire £3.5bn investment in Barclays at a hefty profit less than seven months after writing the controversial cheque locks in a generous return that most other sovereign wealth funds can only dream about.

Though the sale changes nothing in the fundamental investment case for Barclays – its capital position is unaffected and its sale process for Barclays Global Investors continues – the question some shareholders are asking is whether IPIC has called the top of the recent rally in the shares.

A mix of old and new UK investors, including hedge funds, took just more than two-thirds of the placing yesterday, but some of the bank's biggest investors declined the offer of new shares, having built their holdings up when the shares were trading lower.

Most investors were surprised by the placing. One said he and his colleagues were "stunned".

Some see the Barclays transaction as one of a string of deals that may signal the top of the broader rally in bank stocks. After all, Sheikh Mansour is not the only high-profile investor to take advantage of the recent bull run. JPMorgan and American Express this week announced plans to sell shares to repay money they received under the US government's troubled asset relief programme.

And Goldman Sachs is in talks with institutional investors about offloading part of its stake in ICBC, the Chinese banking group.

Even after Barclays shares dropped 14 per cent yesterday following confirmation of the IPIC sale, the stock is still worth more than five times as much as in January, when fears of imminent nationalisation prompted investors to sell.

Shares in Bank of America and Royal Bank of Scotland, which have been bailed out by their respective governments, have quadrupled. Deutsche Bank shares are worth three times their January low.

Most investors acknowledge that shares fell too far. But many also believe the recent recovery is excessive. Most large banks on both sides of the Atlantic now trade at a premium to their tangible book value, suggesting that investors believe they will soon start to earn a return in excess of their cost of capital.

True, fears that governments would be forced to inject even more capital into the banking system have receded. Buying by investors who were underweight in bank stocks and have been caught out by the recent rally has also helped create upward pressure.

However, banks' bad debts tend to carry on rising for 12-18 months after the economic cycle has turned. Given that most economies are still shrinking, this suggests that most banks are unlikely to see an improvement in their bottom lines until 2011 at the earliest.

European banks could be worst hit, having been slower to recognise losses.

Investors will be watching closely to see whether Barclays shares recover after yesterday's fall. "The performance of the shares post the deal will therefore be an interesting gauge of the strength and depth of demand for bank stocks post the recent rally," analysts at Nomura wrote.

Nevertheless, it may be a mistake to read too much into IPIC's decision. In January, when Barclays shares touched 51p, Sheikh Mansour was staring at a £1.4bn loss on his £2bn investment in convertible shares, which converted into ordinary shares at 153p. After the recent recovery, it is hardly surprising that he decided it was time to lock in a 70 per cent profit.

There are also suggestions that IPIC needs the cash because it has another big investment lined up. Why else would it simultaneously decide to sell its £1.25bn of Reserve Capital Instruments in Barclays, which carry a juicy 14 per cent coupon?

Shareholders may take some comfort from the fact that IPIC is holding on to warrants that give it the right to buy 758m Barclays shares at about 198p – currently showing a profit of about £568m.

A better guide to Barclays' long-term value may be the behaviour of the Qatar Investment Authority, which participated in both of the bank's capital raisings last year. Temasek, the Singaporean investor that bought into Barclays in 2007 and recently cut its losses on its stake in Bank of America, may also be considering its options.

Yet even if Sheikh Mansour's decision to sell does not call a halt to the recovery in the fortunes of Barclays and other bank shares, there will be few investors who repeat his feat of turning a £3.5bn bank investment into £5bn in a little over half a year.

Lombard, Page 18

Enlarged share capital holdings, after conversion of convertible notes and exercise of warrants
Following Oct 31 2008 announcement
Following Jun 1 2009 announcement
16.3% Abu Dhabi
15.5% Qatar
68.2% Other
6% Abu Dhabi
15.5% Qatar

Share price (pence)
400
350
300
250
200
150
100
50
Oct 13 Barclays announces it will not call on government for new funding
Oct 31 Abu Dhabi and Qatari investors participate in £7.3bn capital raising
Jan 26 John Varley and Marcus Agius publish open letter, stating that Barclays is well-funded and profitable
Mar 16 Barclays confirms iShares, its exchange-traded funds business, is for sale
Mar 27 Passes FSA stress test, shares rise 24%
May 15 Confirms it is in talks about sale of asset management arm Barclays Global Investors
Jun 1 Abu Dhabi sells the 1.3bn shares its convertible notes are exchangeable into; £1.25bn capital notes also up for sale
Oct
Nov 2008
Dec
Jan
Feb
Mar 2009
Apr
May
Jun

Sources: company; Thomson Reuters Datastream

**Abu Dhabi holdings in Barclays**

Sold

Mandatorily Convertible Notes **£2bn**

Convertible into shares (before Jun 30, at 153p) **1,304.8m shares**

For sale

Reserve Capital Instruments **£1.25bn**

Not for sale

Warrants exchangeable into shares (5 years, at 198p) **758.4m shares**

## Credit Suisse accelerates to fourth in rankings

Credit Suisse was quick to boast about its role as sole bookrunner to one of the largest accelerated bookbuilding deals undertaken in the European market, writes Lina Saigol.

The investment bank sold more than 1.3bn shares in Barclays owned by Abu Dhabi's International Petroleum Investment Company for 265p each, raising about £3.5bn at a 16 per cent discount to Tuesday's close in the accelerated sale.

The deal – the second-largest overnight offering after France Telecom's €5.1bn placing in 2004 – lifts Credit Suisse from 14th in the league table rankings for European capital markets to fourth position in the year to date, according to Dealogic.

But selling a stake of this size into a volatile market was a gutsy mandate for Credit Suisse, which ran the risk of being left with unsold stock on its books.

That risk will be reflected in the fees paid to the bank, which industry observers estimate could top £80m.

As the largest trader in Barclays' stock, however, Credit Suisse felt it was in a unique position to have a view on the pricing and distribution of the shares.

To minimise market impact, Credit Suisse opted for an accelerated book build – a quick-to-market solution designed to exploit brief moments of positive market sentiment and remove the need for a formal investor roadshow.

The speed with which Credit Suisse placed the shares demonstrates that investors' appetite for bank stocks has increased dramatically recently.

The bank completed the placing in about 13 hours with take-up from existing and new investors.

Credit Suisse began bookbuilding at 9.30pm on Monday night and closed the books by 10.30am on Tuesday.

By the time the London market opened that morning, the deal was already subscribed about 1.5 times, with 220 existing and new investors from the UK and US putting in bids for stock.

# Signs of change in atypical deal

Gulf investors

By Andrew England in Abu Dhabi and Simeon Kerr in Dubai

For years, US and European institutions have cast their eyes to the Middle East as a source of stable investment. Whether it was a wealthy individual, a member of the Gulf's large royal families, or one of the region's multitude of sovereign vehicles, investors from the region were generally deemed conservative and in for the long haul.

But the decision by the International Petroleum Investment Company (IPIC), a wholly owned entity of Abu Dhabi, to offload shares in Barclays seven months after pumping $3.5bn (£2.1bn) into the bank is a sign that the times may be changing.

"It's a more active investment style than we would have expected," said a banker based in the United Arab Emirates, of which Abu Dhabi is the capital.

He and others pointed out that it could also be a simple case of an investor cashing in as the recent surge in Barclays' shares will see Abu Dhabi book a return of up to 70 per cent on its convertible shares. The contrast with other sovereign vehicles that have suffered heavily through the economic crisis is stark.

Questions will now be asked about the stake held by Qatar, the other investor that helped Barclays raise $7bn last autumn when it turned to the Middle East for cash.

Qatar's sovereign wealth fund let it be known that it planned to remain a long-term investor in Barclays. However, one person with knowledge of the Qataris' thinking said it was understandable that the market viewed the stake as an overhang, though any sale over the coming months would be executed in an orderly fashion.

From the moment Sheikh Mansour bin Zayed Al Nahyan, IPIC's chairman and a half-brother of the ruler of Abu Dhabi, decided to dip into a needy British bank, his investment had a hint of the atypical.

At the time he was a relatively unknown quantity, with his main claim to fame – at least to the outside world – his takeover of Manchester City football club.

In Abu Dhabi, the Barclays investment generated a swirl of speculation – was he acting alone or on behalf of Abu Dhabi Inc?

The confusion increased when it emerged that the Barclays stake was being held under IPIC, a vehicle set up a quarter of a century ago that had kept a low profile and focused on oil and gas-related assets.

It is understood that Sheikh Mansour was initially offered the Barclays stake through a private equity deal backed by financing. After issues with the financing surfaced, the deal was passed to IPIC.

"IPIC has an historical relationship with Barclays and we are living in unprecedented times. This opportunity was too good to pass. It was a one-off and it does not reflect a change in strategy for IPIC," an Abu Dhabi official said.

Just as Sheikh Mansour's profile has risen, so too has that of IPIC with a string of multibillion dollar acquisitions. Aabar, another investment company which is controlled by IPIC, has emerged as a dynamic acquirer of diverse assets. Since December, it has paid SFr307m (£175m) for AIG's Swiss private bank and €1.95bn (£1.7bn) for a 9.1 per cent stake in Daimler.

The sense now, however, is that for the time being at least Abu Dhabi has had its fill of risky financial investments.

# Big banks to pay higher fees for FSA

REGULATION

By Adrian Cox

The UK financial services watchdog has roughly doubled its fees for the biggest retail and investment banks, an even greater increase than expected, after bowing to pressure from small financial advisers for less swingeing rises.

The Financial Services Authority is lifting the overall cost of policing the industry by 35.8 per cent to £435.5m.

While the total to be raised is broadly in line with proposals announced in February, the FSA has reallocated the amounts that different kinds of companies must pay.

The charge to banks and building societies such as HSBC and Lloyds Banking Group more than doubles, compared with the planned 91.9 per cent rise.

That would leave the largest deposit takers with a bill of about £22m (£10m).

Principal trading firms or divisions face an increase of 80.1 per cent rather than 69.1 per cent. The rise for mortgage advisers will be 2.7 per cent rather than 21.2 per cent and for financial advisers 4.8 per cent instead of 15 per cent.

The FSA is hiring 280 extra supervisors after being blamed for failing to head off the collapse of Northern Rock and government rescues of institutions including Royal Bank of Scotland. The global financial crisis has cost UK taxpayers more than £40bn in equity injections alone.

"A large number of respondents expressed concern that at a time of financial crisis, the budget had increased above inflation," the watchdog said.

The regulator has not raised its minimum fee rates, saving the 10,000 smallest of the 25,000 companies the FSA regulates from paying more.

"We have been careful to ensure, as far as possible, that the largest firms in the areas that require the most regulatory work will pay the most," the FSA said.

Chris Cummings: welcomed

While the increase was not a surprise for banks, "it's higher than we would have liked", said Brian Capon of the British Bankers' Association.

Chris Cummings, director general of the Association of Independent Financial Advisers and the Association of Mortgage Intermediaries, welcomed the saving.

"Regulatory resources, and therefore costs, should be focused on those firms that require increased supervision," he said.

The financial industry has been divided over how to pay for new measures to promote stability.

While the Building Societies Association called the fee increase a "huge hike", it said its main focus was on the "very disproportionate burden" of the Financial Services Compensation Scheme, which is based on the amount of retail

GM

NOTICE OF MEETINGS
of the holders of
General Motors Nova Scotia Finance Company
(incorporated under the laws of Nova Scotia)
Guaranteed absolutely and unconditionally by
General Motors Corporation
(incorporated with limited liability under the laws of the State of Delaware, United States of America)
£350,000,000,000 8.375 per cent. Notes due 2015 (the "2015 Notes")
(ISIN: XS0171922643)
£250,000,000,000 8.875 per cent. Notes due 2023 (the "2023 Notes")
(ISIN: XS0171908063)
(together, the "GM Nova Scotia Notes")