1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 09-50026(REG)

4   Adv. No. 1-12-09802 (REG)

5   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6   In the Matter of:

7   GENERAL MOTORS CORPORATION,

8           Debtor.

9   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   MOTORS LIQUIDATION COMPANY GUC TRUST,

11               Plaintiff,

12           v.

13   APPALOOSA INVESTMENT LIMITED,

14               Defendant.

15   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

16               U.S. Bankruptcy Court

17               One Bowling Green

18               New York, New York

19

20               June 28, 2012

21               9:49 AM

22

23   B E F O R E :

24   HON ROBERT E. GERBER

25   U.S. BANKRUPTCY JUDGE

Page 2

1    Hearing re:  Motion for Objection to Claim(s) Number: 66211

2    and 67347 (filed by D&M Real Estate LLC and Horse Tavern &

3    Grill)

4

5    Hearing re:  Motion to Approve the Lower Ley Creek and

6    Onondaga Non-Owned Site Settlement Agreements and Enter the

7    Stipulation and Agreed Order Between the GUC Trust and the

8    United States

9

10   Hearing re:  280th Omnibus Objection to Claims (Welfare

11   Benefits Claims of Retired and Former Salaried and Executive

12   Employees)

13

14   Hearing re:  Adv: 1-12-09802 - Telephone Conference

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Jamie Gallagher

1   A P P E A R A N C E S :

2   KING & SPALDING

3        Attorney for the Debtor

4        1185 Avenue of the Americas

5        New York, NY 10036-4003

6

7   BY:  ARTHUR J. STEINBERG, ESQ. (TELEPHONIC)

8

9   DICKSTEIN SHAPIRO LLP

10        Attorneys for the GUC Trust

11        1633 Broadway

12        New York, NY 10019-6708

13

14   BY:  ERIC B. FISHER, ESQ. (TELEPHONIC)

15        SHAYA M. BERGER, ESQ.

16

17   GREENBERG TRAURIG, LLP

18        Attorney for the Noteholders

19        MetLife Building

20        200 Park Avenue

21        New York, NY 10166

22

23   BY:  BRUCE R. ZIRINSKY, ESQ. (TELEPHONIC)

24

25

Page 4

1   U.S. DEPARTMENT OF JUSTICE

2       Attorney for the Government

3       United States Attorney's Office

4       86 Chambers Street

5       New York, NY 10007

6

7   BY:  NATALIE N. KUEHLER, ESQ.

8

9   WEIL, GOTSHAL & MANGES LLP

10      Attorney for the Motors Liquidation Company GUC Trust

11      767 Fifth Avenue

12      New York, NY 10153

13

14  BY:  DAVID N. GRIFFITHS, ESQ.

15

16  WEIL, GOTSHAL & MANGES LLP

17      Attorney for Motors Liquidation Company GUC Trust

18      1300 Eye Street, NW

19      Suite 900

20      Washington, DC 20005

21

22  BY:  THOMAS GOSLIN, ESQ. (TELEPHONIC)

23

24

25

Page 5

1    HARRIS BEACH PLLC

2          Attorney for the Town of Salina

3          100 Wall Street

4          New York, NY 10005

5

6    BY:  ERIC H. LINDENMAN, ESQ.

7

8    ARNOLD & PORTER, LLP

9          Attorney for the Creditor Honeywell

10          555 Twelfth Street, NW

11          Washington, DC 20004

12

13    BY:  JOEL GROSS, ESQ. (TELEPHONIC)

14

15    FRIEDMAN KAPLAN SEILER & ADELMAN LLP

16          Attorneys for Aurelius Investment LLC

17          7 Times Square

18          New York, NY 10036

19

20    BY:  EDWARD FRIEDMAN, ESQ. (TELEPHONIC)

21          EAMONN O'HAGAN, ESQ. (TELEPHONIC)

22

23

24

25

Page 6

1   PAUL HASTINGS LLP

2        Attorney for Appaloosa Investment Limited

3        75 East 55th Street

4        New York, NY 10022

5

6   BY:  BARRY G. SHER, ESQ. (TELEPHONIC)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1              P R O C E E D I N G S

2              THE COURT:  Good morning.  Have seats, please.

3              Okay, we have a number of GM case administration

4    matters today, after which, and only after which, we'll then

5    deal with the GM Nova Scotia matters.

6              I see Mr. Griffiths.  I see Ms. Kuehler.  I'm

7    sorry, I don't know your colleague, Mr. Griffiths.

8              MR. BERGER:  I'm Shaya Berger from Dickstein

9    Shapiro.

10             THE COURT:  Your name again, please.

11             MR. BERGER:  Shaya Berger from Dickstein --

12             THE COURT:  Berger?

13             MR. BERGER:  Berger, yes.

14             THE COURT:  Thank you, Mr. Berger.

15             Okay, who's going to be taking the lead?

16       (Pause)

17             THE COURT:  Mr. Berger, come on up, please.

18             MR. BERGER:  Good morning, Your Honor.  Shaya

19   Berger from Dickstein Shapiro on behalf of the Motors

20   Liquidation Company GUC Trust.

21             I -- will -- I will be handling an uncontested

22   objection to claim, actually two claims.  It's the claims of

23   D & M Real Estate, LLC and Horse & Tavern Grill.

24             As set forth in the objection, the claim is for

25   contribution.  It is a contribution claim against the

Page 8

1    debtors.  The underlying claimant entered a settlement with

2    the debtors, and by the terms of those -- of that

3    settlement, the claim is barred under Pennsylvanian law as

4    fully set forth in the objection.

5            The objection was served on claimant's counsel.

6    Each claimant is represented by the same counsel in the

7    matter, and we received no response, no opposition to the

8    objection.

9            And unless the Court has any further questions

10   about it, we ask that the objection be granted.

11           THE COURT:  Your comfortable that your opponent

12   got it?

13           MR. BERGER:  Yes, Your Honor, I mean, we served

14   it, we have the affidavit of service on file --

15           THE COURT:  Okay.

16           MR. BERGER:  -- we have no reason to believe that

17   it wasn't received.

18           THE COURT:  Your objection's sustained,

19   Mr. Berger, and deal with the paperwork with my courtroom

20   deputy and Ms. Plum (ph) down the hall.

21           MR. BERGER:  Thank you, Your Honor.

22           THE COURT:  Thank you.

23           Mr. Griffiths, good morning.

24           MR. GRIFFITHS:  Your Honor, good morning.  David

25   Griffiths, Weil, Gotshal & Menges for the Motors Liquidation

Page 9

1    Company GUC Trust.

2            Very briefly, Your Honor, the 280th omnibus

3    objection to claims relating to ten welfare benefit claims

4    of retired and executive employees, the motion is

5    uncontested and the GUC Trust requests that the Court grant

6    the motion.

7            THE COURT:  Sure.  I won't burden you with further

8    discussion.  Your objection's sustained, as well.

9            MR. GRIFFITHS:  Thank you, Your Honor.

10           I believe that I have my colleague Tom Goslin on

11   the phone from Weil, Gotshal & Menges who is knowledgeable

12   with respect to the -- with item number 2 on the agenda that

13   my colleague from the U.S. Trustee's Office will present.

14           THE COURT:  Would you repeat the name?  It looks

15   like I have a thousand people on my phone log, presumably

16   for the Nova Scotia matter to follow.

17           MR. GRIFFITHS:  It would be Thomas Goslin.

18           THE COURT:  Gossman?

19           MR. GRIFFITHS:  G-O-S-L-I-N.

20           THE COURT:  Mr. Gossman, you're with us?

21           MR. GOSLIN:  I'm here, Your Honor.

22           THE COURT:  Oh, Goslin.  Forgive me.

23           MR. GOSLIN:  No, that's fine.

24           THE COURT:  Okay, go ahead, please.

25           MR. GRIFFITHS:  Thank you, Your Honor.

Page 10

1            THE COURT:  And I see Ms. Kuehler in the

2     courtroom.  Do you want to speak first, Ms. Kuehler?

3            MS. KUEHLER:  Yes, Your Honor, if it would please

4     the Court.  Assistant U.S. Attorney, Natalie Kuehler, on

5     behalf of the government.

6            We're here with respect to two motions to approve

7     -- or a motion to approve two settlement agreements.  The

8     final settlement agreements involving EPA and the GUC Trust,

9     as well as a related stipulation between the United States

10    and the GUC Trust, with respect to one of the settlement

11    agreements.

12           The settlement agreements both relate to the

13    Onondaga Lake superfund site in Upstate New York.  The first

14    settlement agreement which we've turned the Lower Ley Creek

15    settlement agreement settles EPA's claims against the GUC

16    Trust with respect to the Lower Ley Creek subsite of the

17    Onondaga Lake superfund site.  That is an agreement that was

18    entered into jointly between the United States, the New York

19    Department of Environmental Conservation, and the GUC Trust

20    on behalf of the debtors and their estates.

21           Under that agreement EPA will receive an allowed

22    general unsecured claim of $38,344,177, and New York DEC

23    will receive an allowed general unsecured claim of $896,566.

24    The stipulation that we are also requesting that the -- the

25    Court approve today relates to this agreement.  We've had

Page 11

1   other stipulations like this before.

2          The United States expects to receive certain tax-

3   offset amounts and intends to allocate a little bit over 17

4   million of that anticipated tax-offset to its allowed

5   general unsecured claim for the Lower Ley Creek settlement

6   agreement.  And this stipulation simply allows the GUC Trust

7   to withhold distribution of that amount on the allowed

8   general unsecured claim until such time as either the tax-

9   offset comes through, at which point the GUC Trust will be

10  able to remove the remainder of the allowed claim from its

11  books, or we find out that the tax-offset does not come

12  through, at which point we would request that the remainder

13  be paid out as an allowed general unsecured claim.

14         With respect to that settlement agreement, we've

15  submitted it to public comment for 30 days.  We received

16  extensive public comments from both Onondaga County and the

17  Town of Salina, which we responded to in our moving papers.

18  In response to our moving papers, the county has indicated

19  that it has no objections and the town is --

20         THE COURT:  That being Onondaga County?

21         MS. KUEHLER:  Correct, Onondaga County, and the

22  Town of Salina had two remaining open issues, which we have

23  addressed as I will describe in further detail.  Neither of

24  those, though, related directly to the Lower Ley Creek

25  settlement agreement.

Page 12

1          The second settlement agreement is the Onondaga.

2    We call it the Onondaga Lake settlement agreement just

3    because it deals with four additional subsites.  Two of

4    those subsites are handled through the environmental

5    response trust that was created because they were owned

6    properties of the debtor, but we had not yet received full

7    past costs.  So, we settled those claims in full under that

8    settlement agreement.  And the remaining two sites are non-

9    owned sites, at which EPA is not the lead agency, but the

10   support agency.  And so for those --

11          THE COURT:  By non-owned sites, do you mean GM had

12   disposed of them at an earlier time?

13          MS. KUEHLER:  No, they had actually never been

14   owned by GM.

15          THE COURT:  Never ever.

16          MS. KUEHLER:  Correct.  The first is the Salina

17   landfill.  It's a landfill to which GM carted certain

18   wastes, which were disposed of there.  And the second is the

19   lake bottom itself, which Lower Ley Creek flows into and

20   therefore certain wastes that entered Lower Ley Creek

21   eventually ended up at lake bottom.

22          Both of those subsites, the lead agency is the New

23   York Department of Environmental Conservation, and EPA's

24   resolution of -- of its claims against the debtors, here, do

25   not relate to future response costs other than EPA's

Page 13

1    anticipated future oversight costs.

2          With respect to those two subsites, in particular,

3    I would like to make it clear that the United States did not

4    share its cost calculations or allocation methodology with

5    the -- with the debtors.

6          The fact that we were able to reach a settlement

7    merely reflects that we were able to come to the same

8    number, though through different methodologies and

9    calculations.  And also, of course, as with any of these

10   settlement agreements, the methodology EPA used for purposes

11   of arriving at its settlement amount, were not agreed to as

12   fact by the debtors, or by other PRPs, and are not binding

13   on other PRPs in other negotiations, or for that matter, on

14   EPA negotiations with other PRPs.  I want to make that very

15   clear because that was one of the concerns that the Town of

16   Salina had and also the debtors asked me to clarify that, as

17   well.

18         The remaining concern that the Town of Salina had

19   was that it wanted to also make it clear that the

20   contribution protections provided in the Onondaga settlement

21   agreement, do not extend to the recovery of future or past

22   costs that the Town of Salina may incur at the Salina

23   landfill site.  That is correct.

24         As I mentioned before, the matters that are

25   resolved by EPA do not include PRPs past cost claims, nor do

Page 14

1    they include future response costs that are incurred by

2    either New York DEC or other PRPs, other than EPAs on

3    oversight costs.  However, to avoid any confusion, what we

4    have done is we've agreed to include in the proposed order

5    approving the settlement agreements a sentence that

6    clarifies that the matters addressed under paragraph 22 of

7    the settlement agreement, which is the paragraph by which

8    contribution protection is being provided, does not include

9    contribution protection for either which was already in the

10   proposed order, Honeywell, the main PRP at the lake bottom's

11   future response cost claims, or the Town of Salina's future

12   response cost claims with respect to the Salina landfill.

13          And with that, I believe there are no objections

14   remaining to the entry of either of these settlement

15   agreements, and there were none with respect to the tax-

16   offset stipulation, and the United States, therefore,

17   respectfully requests that the Court approve those

18   settlement agreements as reasonable and fair, and in the

19   interest of the public, and also enter the adjoining tax-

20   offset stipulation.

21          THE COURT:  Uh-huh.

22          Town of Salina want to comment?

23          MR. LINDENMAN:  Your Honor, just one brief --

24          THE COURT:  Come to a mic, please.

25          MR. LINDENMAN:  Very good.

Page 15

1           THE COURT:  Good to see you again, just come on

2    up.

3           MR. LINDENMAN:  Thank you.

4           THE COURT:  Put an appearance in for the recording

5    system, and --

6           MR. LINDENMAN:  Certainly.

7           THE COURT:  -- just confirm, if you could, that

8    Ms. Kuehler got it right.

9           MR. LINDENMAN:  Yes.  Eric Lindenman of Harris

10   Beach for the Town of Salina.

11          Your Honor, the order does in fact contain the

12   additional language that we have requested, and we are in

13   agreement with the United States.

14          The only other bit of clarification, you know,

15   magic words are always important, Your Honor.  It's

16   important for the record to note that the EPA estimates were

17   not shared, not only with -- were not shared, not just --

18   not with the debtor, but the Town of Salina was also not

19   privy to the settlement discussions, the estimates, and none

20   of that is binding upon the Town of Salina, as well.

21          With that slight bit of clarification, we have no

22   additional objection and agree that our objection is

23   resolved based on Ms. Kuehler's statements.

24          THE COURT:  Did you have any discussions with

25   either Ms. Kuehler or anybody else about whether anybody

Page 16

1    wants me to put that in the order, or whether the record --

2    the transcript. will be sufficient?

3            MR. LINDENMAN:  We discussed that, Your Honor.

4    The language that's currently in the order, together with

5    the statements on the record, are sufficient for our

6    purposes.

7            THE COURT:  Okay.

8            MR. LINDENMAN:  Thank you.

9            THE COURT:  All right, good enough.

10           Mr. Goslin, do you have any desire to be heard?

11           MR. GOSLIN:  Yes, Your Honor.  Tom Goslin, Weil,

12   Gotshal & Menges on behalf of the MLC GUC Trust.

13           Only one thing I'd like to note for the record.

14   Is that the GUC Trust is entering into a stipulation with

15   Honeywell to resolve a potential objection to the settlement

16   and -- and that stipulation is that, as Ms. Kuehler noted,

17   EPA asked us to resolve MLC's liability for -- for future

18   and past remediation at the lake bottom site with Honeywell,

19   the primary PRP there, and -- and also the GUC Trust agreed

20   to do so.

21           That said, we had filed an objection under

22   502(E)(1)(b) sometime ago when we understood that we would

23   be resolving the future remediation claims with EPA, and we

24   filed that objection against the Honeywell claim.

25   Understanding now that we will be resolving the future and

Page 17

1   past remediation costs with Honeywell, Honeywell requested

2   that we (indiscernible – 00:12:40) that objection and we are

3   entering into a stipulation to do just that.

4         THE COURT:  I lost the last part of what you said.

5   Honeywell asked that you withdraw your 502(E)(1)(b)

6   objection?

7         MR. GOSLIN:  That's correct, Your Honor.

8         THE COURT:  Okay.

9         MR. GOSLIN:  And -- and we've agreed to do so,

10  understanding that we will be resolving future and past

11  remediation liability with Honeywell as the primary PRP, as

12  opposed to doing so with EPA.

13        THE COURT:  As opposed to doing so --

14        MR. GOSLIN:  With the Environmental Protection

15  Agency.  So, in other words, Honeywell is stepping into the

16  shoes of EPA with respect to future and past remediation.

17        THE COURT:  Okay.  Okay.

18        Anybody else want to be heard?  Has everybody had

19  a chance to speak their piece on this matter?

20        MR. GROSS:  Yeah, Your Honor, this is Joel Gross

21  with Arnold & Porter for Honeywell, and Mr. Goslin has

22  accurately stated our position and we are in support of this

23  stipulation.

24        THE COURT:  So you're okay with everything that

25  was said, Mr. Gross?

1          MR. GROSS:  Yes.

2          THE COURT.  All right.

3          Anyone else?

4      (Pause)

5          THE COURT:  Okay, folks, since this is now

6  unopposed with the objections and reservations having been

7  consensually addressed, I'm not making detailed findings.

8          An environmental settlement of this character

9  requires me to make double-barreled findings.  One that the

10 estate, here, I guess we're now talking about the GUC Trust,

11 isn't giving away the store; and one, in substance, that the

12 settlement is in the public interest and that the federal

13 government has done its job.

14         In this case, like others that I've been asked to

15 approve, it's very easy for me to make both findings.

16 Settlements of this character need, from the estate's

17 perspective, to be within the range of reasonableness.  And

18 the procedures that have been undertaken by the federal

19 government and their sensitivity to the comment process, and

20 their willingness to address the needs and concerns of the

21 objectors, all very easily give me comfort that the federal

22 government has done its job, as well, and that the

23 settlement is in the public interest.

24         So, accordingly, I'm approving it from both

25 perspectives, finding the settlement to be in that sweet

Page 19

1    spot in the middle.

2              And I'm going to ask you, Ms. Kuehler, to

3    quarterback on behalf of all the parties, getting me the

4    paperwork to implement the ruling.

5              MS. KUEHLER:  We'll do so, thank you, Your Honor.

6              THE COURT:  Thank you.

7              Okay, to what extent do we have other matters in

8    GM before the conference call and Nova Scotia?

9              Mr. Griffiths, are we done?

10             MR. GRIFFITHS:  Yes, Your Honor, no other matters.

11             THE COURT:  Okay, then everybody who's here in the

12   courtroom is excused.  I'm going to be staying in the

13   courtroom for the conference call to continue.

14             MR. LINDENMAN:  Thank you, Your Honor.

15             THE COURT:  We'll take a moment to let you guys

16   leave.

17        (A chorus of thank you)

18             THE COURT:  Okay, we now have the -- several

19   motions for leave to file summary judgment motions and the

20   various letters, all of which I have read.  This, of course,

21   is for a prius (sic) of issues that we've discussed before,

22   I'm going to dispense with the questions.  I think you know

23   what my concerns are, which are --

24             CourtCall, I heard a phone ringing, can you stop

25   that in some way?

Page 20

1           OPERATOR:  I'll try to isolate that line, Your

2     Honor, I apologize.

3           THE COURT:  All right.  My issues are several, but

4     most significantly, how I am going to deal with what one

5     side's beliefs involves no disputed issues of fact, but

6     which is very much disputed, and the second thing which is,

7     unless my count is wrong, we have a trial on August 7th,

8     which is only a shade more than 30 days from now.  So, when

9     you make your presentations, folks, help me with that.

10           Who's going to take the lead?

11           MR. FRIEDMAN:  It's -- it's all right, this is Ed

12     Friedman on behalf of Aurelius Investment LLC, and I will

13     start because I think I can be briefer than everyone and I

14     think the issues relating to Aurelius are more straight

15     forward.

16           As Your Honor knows, on June 21, we wrote to the

17     Court concerning our proposed motion for summary judgment.

18     On June 26, counsel for the GUC Trust wrote to Your Honor

19     stating that the GUC Trust does not oppose Aurelius' filing

20     of a motion for summary judgment.  They, the GUC Trust, adds

21     the proviso that provided the filing of the motion will not

22     delay commencement of the trial, and we -- we do not see

23     that as a problem.

24           As set forth in my letter of June 21, the summary

25     judgment motion to be filed by Aurelius will be narrow in

Page 21

1    scope, it will present the issues that were before the Court

2    in connection with the 12(b)(6) motion previously filed by

3    Aurelius.  As Your Honor will recall, at the argument on

4    that motion, the -- the Court concluded that documents

5    evidencing Aurelius' sale of notes were not properly before

6    the Court on a 12(b)(6) motion.

7            We subsequently provided additional information to

8    the GUC Trust, including information as to Aurelius

9    transferees, and we now are in a position where, my

10   understanding is, that the GUC Trust will not be disputing

11   the fact that Aurelius has sold all the Nova Scotia notes it

12   previously owned.

13           Therefore, the legal issues presented on the

14   motion are the issues that are before the Court in

15   connection with the 12(b)(6) motion, and I'm not going to

16   burden the Court and the record with a -- with a recitation

17   of -- of those issues.

18           We do have a disagreement as to the legal issues,

19   being that the GUC Trust believes that certain provisions

20   and the plan result in Aurelius being a proper defendant,

21   even -- even though Aurelius sold its notes.  We believe

22   those plan provisions do no such thing, and that -- that

23   legal issue will be, again, teed up for the Court on the

24   summary judgment motion --

25           THE COURT:  Pause, please, Mr. Friedman.  You

Page 22

1   answered one of the questions I had, an important one, about

2   not delaying the commencement of the trial, but I had

3   another one, as well.

4           Did you have any discussions with Mr. Friedman --

5   with Mr. Fisher, or any of his guys, vis-à-vis, protecting

6   the GUC Trust from any prejudice that might result from

7   arguments that with you having left the case you would be a

8   necessary party, and that if there is otherwise successor

9   liability by reason of anything your guys did before they

10  sold it wouldn't be -- result in the transfer and letting

11  you out of the case wouldn't have an adverse effect upon

12  them?

13          MR. FRIEDMAN:  Your Honor, I did not discuss that

14  issue with Mr. Fisher.  I think that is a legal issue, and I

15  do not see how a dismissal of the claims as against Aurelius

16  could impact, one way or the other, the ability of the GUC

17  Trust to obtain the relief it is seeking in this complaint,

18  which is, as Your Honor knows, a request for subordination

19  of claims and reduction of claims.

20          In fact, as -- as Your Honor will recall, we -- we

21  believe the law is clear that in light of the nature of the

22  relief being sought, whatever claims the GUC Trust is

23  pressing, whatever allegations it is presenting, must be

24  litigated with the defendants who have a stake in the

25  matter, that is with defendants who have claims and rights

Page 23

1    to distributions.

2              And in litigation with those defendants, the GUC

3    Trust will have to make out whatever basis it has for

4    equitable subordination, including allegations as to

5    Aurelius, as well as issues concerning -- well, I'll use the

6    shorthand issues concerning whether claims may be tainted

7    when they are transferred.

8              But the point is, all of those issues we would

9    submit need to be litigated with the proper party, and

10   Aurelius, as a defendant, is not only not necessary, it is

11   completely superfluous, because a judgment as against

12   Aurelius would have no effect as -- as respects of parties

13   who have acquired securities formerly owned by Aurelius.

14             THE COURT:  Uh-huh.  Okay.

15             I think what I would like to do now is get

16   Mr. Fisher's comments on what you just said, Mr. Friedman,

17   and anybody else who wants to weigh in on Aurelius as

18   contrasted to the others, after which I'll hear the other

19   issues.

20             Mr. Fisher?

21             MR. FISHER:  Good morning, Your Honor.

22             The GUC Trust position with regard to the proposed

23   Aurelius motion is -- to restate some of what was argued in

24   connection with the motion to dismiss -- we think that

25   Aurelius is -- is wrong as a matter of law.  And -- but,

Page 24

1    importantly, it is as a matter of law, and I -- I have --

2    I've worked with Mr. Friedman who has supplied information

3    to ensure that Your Honor won't be dealing with disputed

4    facts about whether or not Aurelius sold its notes.

5           So, we think it's a motion as to which we'll

6    prevail, but we acknowledge, and we acknowledged in our

7    letter that is the kind of motion that is amenable to

8    resolution on -- on summary judgment.

9           In terms of how -- in the event that we were to

10   lose the motion, I -- I appreciate Your Honor raising the

11   question of -- of how it would affect our right to trial and

12   our delay to get the relief that we need, and I think my

13   paramount concern in that regard is in the event that

14   Aurelius were to be dismissed from the case, which we think

15   would not be the correct result, but if that were to happen,

16   it, obviously, would be very important to us to ensure that

17   Aurelius was available as a witness at trial, because even

18   if it is out of the case it's still Aurelius' conduct

19   that's, of course, at issue with regards to the equitable

20   subordination claim.

21          So that -- that's a concern that's important to

22   us, and I'd like to try to work with Mr. Friedman to ensure

23   that we don't have any last minute problems at trial in the

24   event that Aurelius were to prevail on its summary judgment

25   motion.

1          But we don't -- we don't oppose Aurelius making

2     the motion, I'd like to confirm with Mr. Friedman to ensure

3     that we can submit briefs that are short, and focused, and

4     -- and that get this teed up in advance of the August 7th

5     trial date, Your Honor.

6          THE COURT:  Uh-huh.

7          Mr. Friedman, I sense that much of what Mr. Fisher

8     said you don't need to reply to.  I don't know if that's 100

9     percent, and certainly what he said about wanting to have

10    comfort that your guys would be around as witnesses is one

11    that got my attention.

12         Can you respond to that even if you don't need to

13    respond to anything else?

14         MR. FRIEDMAN:  Yes, Your Honor, I will respond to

15    that.

16         Mr. Gropper is available to testify as a witness

17    based on the currently scheduled trial.  If the -- if the

18    trial dates change I know Mr. Gropper does have plans for

19    other -- other weeks and days in August, so if the trial

20    date changes, then we would certainly participate in

21    discussions concerning Mr. Gropper's schedule or the parties

22    would have available to them the extensive deposition

23    testimony of Mr. Gropper.

24         But as things now stand, based on the dates

25    scheduled by the Court, Mr. Gropper will be available and is

Page 26

1    planning to be available as a witness at the trial.

2              THE COURT:  Is Mr. Gropper the only guy we're

3    talking about?  I seem to remember from dealing with the

4    discovery dispute that there was at least an analyst or --

5    or some more junior guy --

6              MR. FISHER:  Exactly right, Your Honor.  This is

7    Eric Fisher again.

8              Dennis Prieto (ph) is another Aurelius witness who

9    is on our witness list.

10             THE COURT:  Okay.

11             MR. FRIEDMAN:  I -- I will have to check

12   Mr. Prieto's schedule, but I do not anticipate any problem.

13             THE COURT:  All right, well I'm not going to look

14   for any problems.

15             To what extent do we need to talk about Aurelius

16   more before we talk about the other guys?

17        (Pause)

18             THE COURT:  I gather none.  All right, let me --

19             MR. FRIEDMAN:  May I just say, Your Honor, with --

20   with the Court's indulgence, I will try to stay on the call

21   until its -- its conclusion.  And in all events my

22   colleague, Eamonn O'Hagan, is on the line, but I'm -- I'm

23   making this call from the mediation office of the Southern

24   District where I am a volunteer mediator, and I have parties

25   coming in who will be appearing before me in a long,

Page 27

 1   scheduled mediation at 10:45, so --

 2            THE COURT:  All right, you -- you're --

 3            MR. FRIEDMAN:  -- they may be late.

 4            THE COURT:  -- you're free to stay on or leave,

 5   just don't feel that you have either the need or, for that

 6   matter, the authority to interrupt other guys if you find

 7   that you have to leave just --

 8            MR. FRIEDMAN:  That's -- that's why I was --

 9            THE COURT: -- get off the phone.

10            MR. FRIEDMAN: -- speaking now, Your Honor.

11            THE COURT:  Okay.

12            MR. FRIEDMAN:  So, thank you.

13            THE COURT:  All right, next of the people who want

14   leave to file a summary judgment motion.

15            MR. SHER:  Your Honor, it's Barry Sher on behalf

16   of Appaloosa.  May I proceed?

17            THE COURT:  Yes.

18            MR. SHER:  Good morning, Your Honor.  I will

19   address your two questions.  I -- I will be brief and I'll

20   come back to the file date.

21            The Court's read the -- the letter submissions, I

22   won't repeat them.  We're here on a pre-motion conference

23   for summary judgment.  I just want to stress one point from

24   those letters, and that relates to the allegation.  The

25   original complaint about this, what was described as

Page 28

1    eleventh hour of pouncing by the bounds -- by the band of

2    hedge funds, and that was the basis for the whole argument

3    that these people were somehow able to get undue leverage,

4    back value from GM, the U.S. government, and the Canadian

5    government that they didn't want to give.

6            In our view, that was never rational or plausible,

7    but now it's been exposed in discovery as false and it's now

8    been withdrawn.  No longer alleged, it's been deleted from

9    the amended complaint.  And I want to pause on that because

10   this is not, you know, a run of the mill he-said she-said

11   type of argument, this really gets to your point about how

12   to deal with the fact that one party says this.

13           Allegations were false, plaintiffs admit they were

14   false.  They withdrew them from the complaint.  The same is

15   true with the other allegations they were forced to

16   withdraw.  That the pre-petition loan from old GM to GM

17   Canada wasn't repaid, it was.  Allegation that GM Nova

18   Scotia had no assets when it settled, it had expenses, all

19   type -- over a billion dollars worth of assets in a form of

20   an intercompany loan.  All laid out in our papers, all

21   withdrawn or false.  And that's why we think summary

22   judgment is so appropriate here, the factual underpinnings

23   are gone, but the claims live on.

24           And it is -- it is, you know, sort of well and

25   good to say now, GUC Trust said in a footnote, well, you

Page 29

1   know, Your Honor, you don't have to pay attention to

2   withdrawn allegations, and we're very central, anyway.

3          The fact is, they were page 1 in the complaint,

4   prior story made up about undue leverage, and since we're

5   talking about equitable subordination, the bar is supposed

6   to be very, very high, particularly for non-insiders like

7   the defendant here, and they don't have a case.

8          That brings me to my last point, Your Honor, as I

9   said, I'd be brief, which is the newly made argument and

10  theory of insider trading.  And I'll just say this about

11  that.  Over the last two years, we've had two objections

12  filed (indiscernible – 00:32:52) in this Court, starting

13  back in 2010, including an amendment complaint that was just

14  filed days ago.  Not one of them mentions securities

15  trading, not a single allegation about securities trading.

16  The words do not appear.  GUC Trust produced a 30(b)(6)

17  witness, Mr. Venasky (ph).  Asked repeatedly what the basis

18  for the equitable subordination claim was, and he never

19  mentioned it either.

20          Discovery's closed, it closed at the end of May,

21  followed by the letter seeking summary judgment in early

22  June.  Four days after the amended complaint that did not

23  have these allegations in it, but in -- in its responsive

24  letter, as the Court knows, said wait a minute, there's

25  another ground why summary judgment shouldn't be allowed,

Page 30

1   why we in (indiscernible – 00:33:43), it should not be

2   allowed to make this motion, that's because of insider

3   trading.

4          Laid out in very summary form, the argument is

5   specious, it has no basis.  But, more importantly, the way

6   it was raised says two things.  One, we think it confirms,

7   recognizes that the allegations that actually are in the

8   complaint are insufficient to withstand summary judgment.

9   But, more importantly, we believe it is clear that they're

10  precluded from raising this now.  Plus, wait until after

11  discovery closed, after all the pleadings were in that never

12  mention securities trading.  Pro-discovery on the issue,

13  we've not been able to retain experts to defend ourselves,

14  our clients.  There's no evidence, there's no due process.

15         Second Circuit is clear, you cannot amend an -- a

16  complaint in opposing summary judgment, in the letter in

17  response to summary judgment.  It violates fundamental due

18  process rights, violates the Court's scheduling orders, the

19  federal rules.  We think it would be clearly reversible

20  error to allow these arguments to proceed in the upcoming

21  trial.

22         We think that it -- we think it's no answer.  I

23  think -- I -- I submit to you that it is -- to the Court

24  that it's no answer to say, look, this is a Bankruptcy

25  Court, things are looser in here, anything goes.  I think

Page 31

1    that's disrespectful and abuse of the judicial system.

2            The same is true of the argument which trust

3    counsel made in a call to me yesterday, oh, this is

4    Bankruptcy Court, we don't really have to satisfy the

5    standards for showing insider trading, the securities

6    violations, it's just some loose, changeable, malleable

7    standard that could be applied retroactively after this,

8    long after the fact.

9            There are well-developed rules and laws governing

10   securities trading and claims relating to it, and securities

11   are securities.  Securities of distressed companies are not

12   subject to different rules.  This Court should not accept

13   that kind of argument, and we believe strongly, as we -- the

14   letter that an Article III Court would not accept it.

15           THE COURT:  Mr. Sher, forgive me.  I know you

16   don't litigate as much in the Bankruptcy Court as some of

17   the other people on this call.  Do you know of anybody who

18   has suggested before you suggested now that rules don't

19   apply in Bankruptcy Court?

20           MR. SHER:  Yes, I'm -- I'm describing the

21   conversation I had yesterday with GUC Trust counsel.  But I

22   was told --

23           THE COURT:  And you're attributing to your

24   opponent a statement that Bankruptcy Courts are loosey-

25   goosey and don't follow rules of law?

Page 32

```
 1              MR. SHER:  That's -- that's not the statement I'm

 2    attributing to GUC Trust counsel.  The statement --

 3              THE COURT:  Tell me exactly what you're

 4    attributing to him, because it seemed to me that you were

 5    attacking a straw man that is frankly offensive to many, if

 6    not all, bankruptcy judges.

 7              MR. SHER:  I did not intend that.  Here -- here is

 8    what I said, and here is what I'm saying.

 9              What was said to me yesterday is, we do not -- we,

10    the GUC Trust, do not have to satisfy standards for a

11    securities law violation in Bankruptcy Court.  I -- in other

12    words --

13              THE COURT:  You mean, in a -- in a 34 Act 10(b)(5)

14    suit.

15              MR. SHER:  Correct.

16              And I -- that -- that the issue of insider trading

17    can be alleged, pursued in a far more, you know, loosey-

18    goosey way.  I mean he didn't use those words, but that is

19    the import of what he was saying.  I -- the -- and that the

20    protections that the Supreme Court and Congress have put in

21    place for these kind of claims, which they have both said

22    are particularly vexatious and subject to abuse, do not

23    apply, including the mandatory sanctions review and all of

24    the protections that are -- that have been established over

25    many decades.
```

1          And that -- so that's why I'm -- and that's what

2     he said to me.  And so that's why we do not believe this

3     Court should -- we don't think this Court should accept it,

4     we don't think an Article III Court would accept it, and

5     that's why we described in our letter steps that we believe

6     we would have to take if this were allowed to proceed,

7     including moving to withdraw the reference.

8          But the more important point, I think, for now is

9     that the Second Circuit has made it extremely clear that

10    they are not entitled to do what they're doing in their

11    complaint in opposition to a -- a request for summary

12    judgment.

13         On the timing, if -- if you'd like me to proceed

14    to that and -- and then I can finish up.

15         THE COURT:  Go on.

16         MR. SHER:  The -- on the timing issue, I don't

17    believe that allowing us to file a summary judgment motion

18    to dismiss what we believe are the -- are basis claims,

19    would -- would interfere with the schedule.  We can file our

20    motion extremely quickly.  We have the benefit of new GM's

21    undisputed fact that we could rely extensively on.  There

22    might be some augmentation, but not much.   And we think the

23    briefing can be done over the next five weeks.  We would

24    work with GUC Trust counsel to do that, and if need be, at

25    least it has been my experience in other cases, that we

```
1    could have argument the first day, on August 7 if we needed

2    to, or a day earlier at the Court's convenience.

3              THE COURT:  Anything else, Mr. Sher?

4              MR. SHER:  That's it.  Thank you.

5              THE COURT:  All right.

6              MR. ZIRINSKY:  Your Honor, it's Bruce Zirinsky --

7              THE COURT:  Go ahead.

8              MR. ZIRINSKY:  -- on behalf of Fortress, Elliot,

9    and Morgan Stanley.

10             I won't repeat what's in our letter, I'm sure Your

11   Honor has had an opportunity to read my letter as well as

12   the -- all the other letters that were submitted.  In

13   addition, I'm not going to repeat everything that

14   Mr. Sher said.

15             I do want to, just at the outset, concur with

16   Mr. Sher's view on his response to Your Honor's questions

17   about timing.

18             I also want to add that while we do have three

19   trial dates on Your -- Your Honor's calendar in August, the

20   GUC Trust has submitted to us a proposed witness list of up

21   to approximately 20 witnesses that they would intend to call

22   at trial.  And from our perspective, a trial which would

23   include as many as 20 witnesses will likely not be speedily

24   determined if the Court has to hear each and every one of

25   those witnesses.
```

Page 35

1           So we're not all that sanguine that this is a

2    matter that could be tried in a matter of a few days and

3    then fully submitted to Your Honor for decision.

4           I -- I'd like to just start out by saying, Your

5    Honor, that I've -- I've said this from the very, very

6    beginning two years ago, that it was our strong belief that

7    these claims asserted first by the creditors committee and

8    then succeeded to by the GUC Trust are totally devoid of

9    merit.

10          Having gone through very extensive discovery,

11   having produced hundreds of thousands of pages of documents,

12   having submitted to numerous depositions of witnesses on

13   behalf of each of my clients, as well as other parties,

14   witnesses of General Motors, the debtor at the time, as well

15   as new GM, Weil, Gotshal, and now we're going through expert

16   witnesses.  There has not evolved from any of this discovery

17   a single material fact which would support the allegations

18   that have been made by the GUC Trust going to equitable

19   subordination or re-characterization.

20          We attempted to illustrate in the letter that we

21   submitted ample references to the -- to the record,

22   including depositions of a number of witnesses, including GM

23   witnesses, which respond to each and every one of what the

24   GUC Trust claims to be facts which we believe are not true

25   facts; and moreover, most of the allegations that are really

Page 36

1   made by the GUC Trust are not --are not facts at all, but

2   they're legal arguments and we believe that they're flawed,

3   fatally flawed legal arguments, and that we do believe that

4   this case can be resolved on a motion for summary judgment.

5           I -- I'd also like to point out that the Court

6   already has before it new GM's motion for summary judgment,

7   and many of the issues that are before the Court in the form

8   of the objections to the claims of my clients, as well as

9   the other noteholders, have already now been placed before

10  the Court, including most particularly, this whole question

11  about the lock-up agreement and whether the GUC Trust can

12  sustain its allegations with any proof whatsoever that this

13  was a post-petition agreement.

14          So, in looking at the responsive letter that

15  Mr. Fisher submitted to the Court in response to my letter,

16  he goes through a lot of discussion, and I will say this

17  without intending any offense, statements that really, truly

18  distort what the actual record is.  But nonetheless, he goes

19  through a lot of discussion about facts which supportably

20  are in dispute concerning the -- the lock-up agreement.

21          Whether or not there are facts in dispute, and we

22  don't believe there are any genuine, triable issues of fact

23  in dispute, that matter has already been placed before the

24  Court by new GM, and so the Court's going to address those

25  issues in connection with new GM's motion for summary

Page 37

1    judgment.  So we don't really have to deal with that a

2    second time.

3              We would, of course, in connection with our motion

4    for summary judgment, possibly augment some of the facts

5    that have been asserted by -- by new GM, and perhaps make

6    some additional legal arguments, but in point of fact, this

7    would be nothing new, essentially, for the Court.

8              The only facts that are really remaining for the

9    Court go to issues as to whether or not the consent fee

10   should have been returned to old GM, and I'm again referring

11   to the prongs of Mr. Fisher's letter in response to my

12   letter, which again goes through a totally undisputed fact

13   now which says that, regardless of everything else, whatever

14   monies were loaned by GM to GM Canada were fully repaid.

15             So there's been no -- whether or not the consent

16   fee was paid, or should have been paid, or there was harm,

17   or was no harm, there cannot be any harm, because whatever

18   was paid was totally refunded to -- to GM, the debtor, by GM

19   Canada before the -- before the sale.

20             In addition, the arguments raised by Mr. Fisher as

21   to triable issues of fact, the allege violation of the

22   automatic stay, these are all legal arguments.  Whether or

23   not it was a violation of the stay for the noteholders to

24   petition for GM Nova Scotia into bankruptcy violated the

25   automatic stay in the Chapter 11 case, there are no factual

Page 38

1    disputes as to what happened.  The only issue is whether, as

2    a matter of law, that violates the automatic stay.

3              And secondly, the -- whether or not the Nova

4    Scotia trustee violated the automatic stay by terminating

5    the currency of swap agreements with GM, whether that was a

6    violation of the automatic stay, is again purely a legal

7    issue.  There were no disputes of fact, no disputed facts as

8    to what happened.

9              The next argument is that this is supposedly a

10   factual issue as to whether or not the consent fee was

11   commercially reasonable or not, or unreasonable.  Again,

12   there are no disputed facts.  The only argument made by the

13   GUC Trust in support of this is that if the lock-up

14   agreement and the claims are allowed to stand, that GM Nova

15   Scotia holders will receive, in the aggregate, greater

16   payments on their notes and guarantees than other general

17   unsecured creditors.  That's not in dispute.

18             The issue is whether or not there's anything

19   improper about that, or which would give rise to a basis

20   legally, a legally cognizable basis, for either equitable

21   subordination or for re-characterization of those payments

22   as something other than a consent fee.  Again, purely a

23   legal issue.

24             Lastly, the question of whether or not the Nova

25   Scotia litigation commenced by certain of the noteholders

Page 39

1    before the GM bankruptcy was frivolous.  Again, there has

2    not been a single shred of evidence put forth by the GUC

3    Trust which would support the claim that -- or their claim

4    that that litigation was meritless.  Indeed, it's totally

5    belied by the testimony of General Motors' witnesses.  None

6    of them testified that the litigation was -- was meritless.

7            In addition, there's no legal basis for whether --

8    for -- for basing an equitable subordination claim on the

9    grounds that a creditor brought litigation against the

10   debtor before the bankruptcy.  That, in and of itself, is

11   just as a matter of law, an insufficient basis for there to

12   be a claim for equitable subordination.

13           In addition, when we go to all of the allegations,

14   the GUC Trust makes no allegations whatsoever that there was

15   any injury caused to General Motors' estate or creditors as

16   a result of -- of the transactions under the lock-up

17   agreement, the lock-up agreement itself, or the payment of

18   the consent fee.

19           It is acknowledged that there was no depletion of

20   General Motors' estate, these funds were paid out of General

21   Motors Canada, not out of GM U.S., General Motors Canada is

22   a non-debtor, and there was no diminution in the estate,

23   whatsoever.

24           Moreover, the very terms of the asset purchase

25   agreement that was approved by the Court in connection with

Page 40

1    the sale to new GM of assets, had a cap on the amount of

2    cash that could be retained by old GM, and that was an

3    amount of cash determined as being sufficient to wind down

4    the -- the GM bankruptcy estate and to administer it.  There

5    was never any intention, whatsoever, for any additional cash

6    to be left behind.  And as I'm sure Your Honor's aware, that

7    was a matter that was raised very specifically before the

8    Court at the time.

9            I'd also reiterate Mr. Sher's comments about the,

10   what I'll call the -- you know, the after midnight now

11   allegation in a letter in response to our letter that

12   Fortress somehow improperly conducted itself because it

13   purchased additional notes, GM Nova Scotia notes, on

14   June 2nd, a day after the bankruptcy was filed and a day

15   after an 8K was filed and released by General Motors

16   disclosing in very substantial detail the terms of the lock-

17   up agreement, and a day upon after which the notes had

18   already appreciated in market price from approximately 15

19   cents on the dollar, to approximately 50 cents on the

20   dollar.  There is absolutely no basis for these allegations.

21           And secondly I would reiterate what Mr. Sher has

22   said, that we believe it's totally injust (sic) and contrary

23   to the law in this circuit were the GUC Trust to raise this

24   issue belatedly in an attempt to fend off a potential motion

25   for summary judgment.  We think it would be wholly improper

Page 41

1    for this issue to be raised at this point, two years after

2    the litigation, and to be raised three days after they had

3    actually filed an amended complaint in this case.  And at no

4    time in any of the previous pleadings or arguments before

5    this Court have they ever raised any issues about the

6    conduct of purchase or sale of securities by noteholders,

7    let alone complain or ever contend that these were somehow

8    violative (sic) of -- of the federal securities laws.

9          They've already had one chance to amend their

10   claim as of right, and we think it would be totally

11   inappropriate and prejudicial to the defendants in this

12   case, particularly my -- my clients, for the Court to permit

13   this belated amendment right on the eve of our request for

14   motion to leave to file motions for summary judgment.

15   Alternatively, 30 days before the commencement of trial and

16   after all -- all fact discovery has been completed.

17         I won't go on, other than to say, Your Honor, that

18   for all of these reasons, we don't think there are any

19   genuine, material, triable issues of fact.  We think the

20   Court can decide this case on the papers, and I think to put

21   the defendants through the burden of having to go through an

22   extensive, lengthy, unnecessary trial on these issues, which

23   will only serve to increase their cost, their burdens, and

24   further delay distributions on their claims, would be

25   inappropriate.

Page 42

1            Thank you, Your Honor.

2            THE COURT:  All right.  Do I need to hear from

3      anybody else before I give Mr. Fisher a chance to respond?

4          (Pause)

5            THE COURT:  I guess not.  Okay, go ahead,

6      Mr. Fisher.

7            MR. FISHER:  Thank you, Your Honor.  It's been

8      difficult to stay quiet.

9            I -- I want to start just by addressing Mr. Sher's

10     comments, and I want to start in particular with the way in

11     which he characterized our conversation, and this goes to

12     what everyone is saying about so-called insider trading,

13     because the way in which he characterized our conversation,

14     I would say, was in the nature of a -- of a personal attack,

15     and it was not at all a fair characterization of the

16     conversation, which was an important one.

17            Mr. Sher's question to me over the past few days

18     has been, is the GUC Trust reserving its right, or -- or is

19     the -- does the GUC Trust plan to introduce evidence at

20     trial of insider trading?  That's been his question to me.

21     And my answer, and in particular in our phone call

22     yesterday, I said to Mr. Sher, I wouldn't quite call it

23     insider trading.  The way that we think about it is we

24     reserve our right to introduce evidence at trial that

25     between June 1 and August 7th, Appaloosa traded in the

Page 43

1    securities of GM Nova Scotia Finance while in possession of

2    material, non-public information, and that advantaged it

3    over other creditors, and as a basis for equitable

4    subordination.

5             And I think the distinction is important because

6    all I was communicating to Mr. Sher, and I made this very

7    clear, is that this is not -- we're not turning this into a

8    10(b)(5) case, this is what it's always been, it's an

9    equitable subordination case.  And that is an example of

10   inequitable conduct, among the other examples of inequitable

11   conduct that we reserve our right to pursue at trial.

12            His characterizations about loosey-goosey and --

13   and -- and everything to that effect is absolutely false.

14            Throughout this case we have adhered strictly to

15   the rules and we understand that the trial before Your Honor

16   is a trial that's going to be conducted strictly in

17   accordance with the rules, and we've never conducted

18   ourselves in any other way, and never suggested to anyone

19   that the rules should be relaxed in any way in Bankruptcy

20   Court.  So, I -- I just really feel the need to be very

21   explicit about that.

22            In terms of, and this is Mr. Zirinsky and

23   Mr. Sher, this suggestion that they're shocked to hear that

24   we would introduce at trial evidence that their clients

25   engaged in trading while in possession of material, non-

Page 44

1    public information, that -- that sense of shock is

2    completely manufactured.

3            I had -- I had a conversation with Mr. Sher on

4    May 11th, and in fact Mr. Sher makes reference to that

5    conversation in his June 8th letter to the Court, and he

6    quotes something that I said during the course of that

7    conversation, which I suppose he thinks works to his

8    advantage, but what he hasn't told the Court is that part of

9    that conversation concerned a discussion about what are the

10   potential basis for equitable subordination here.  Because

11   we've been hearing for a long time from many of these

12   noteholders that, oh, we don't have a basis for equitable

13   subordination and they're going to move for summary

14   judgment.  And so when I laid out the potential basis for

15   summary judgment, I absolutely told Mr. Sher, and Greenberg,

16   and all the other lawyers on the phone at the time, that

17   this was a potential theory that we would seek to press at

18   trial.  So the idea that this is some eleventh hour, or as

19   Mr. Zirinsky says, you know, after midnight news to them, is

20   -- is -- is just false.

21           And, of course, I'll be as candid with Your Honor

22   as I've been with counsel all along.  When I explained to

23   them why we did not come right out in the complaint and say

24   that, it was a nature of explaining that we understand that

25   those kinds of allegations can be very sensational, can

Page 45

1    attract a lot of public attention, we're not interested in

2    turning this case into a circus, we're interested in

3    litigating the case on the merits, and we also understand,

4    in particular one -- one thinks about what happened at WAMU,

5    that when a plaintiff raises a claim in the nature of a

6    hedge fund trading based on material, non-public

7    information, that the hedge funds have considered that, you

8    know, a claim that they absolutely can't resolve, they have

9    to go to the mat, it's the third rail, and so we were

10   concerned that being too explicit about it would be

11   something that could interfere with the possible ability to

12   resolve the case.

13        So, for all those reasons, I explained to them

14   that we've tried not to be sensational in the way that we

15   made the allegation, but -- but the idea that -- that this

16   is -- that this new is -- is just false.

17        And at every single fact deposition that we took,

18   we asked each and every noteholder witness to look at the

19   June 1 8K and we -- that sought to show -- and of course

20   this is in dispute, and we say the June 1 8K does not

21   disclose lots of important information about the lock-up

22   agreement -- but at every deposition we sought to show that

23   the June 1 8K disclosure was inadequate, and of course, at

24   every deposition we showed the witnesses their 2019s and had

25   them confirm that during the period of time after June 1,

Page 46

1    they engaged in trading.

2          So I would say there were sort of two dots on the

3    page, and a dotted line between the dots, and, you know,

4    perhaps now we've taken our pencil and -- and filled in the

5    little gaps between -- between those lines, but everyone has

6    known for a long time now that this is among the inequitable

7    conduct that was at issue in the case.

8          But, you know, that's not -- that's not really the

9    -- the focus of this call, the focus of this call is should

10   -- should they -- should Appaloosa and Morgan Stanley,

11   Elliott, and Fortress be permitted to -- be granted leave to

12   move for summary judgment?  And we just think that it would

13   be a colossal waste of resources and a colossal diversion of

14   attention at a point in time when everyone should be focused

15   on getting ready for trial, putting on the trial in the most

16   efficient way possible, given that it is a very big,

17   complicated trial, but putting it on in the most efficient

18   way possible.

19         And people refer to the new GM motion, the one

20   that's pending, and the motion as to which our opposition is

21   due tomorrow, as an example of this case being amenable to

22   summary judgment.  And it's a very poor example of that.

23         I can tell Your Honor that the new GM motion

24   involves 104 facts in their -- in their statement of facts

25   under Rule 56.  Certainly, the facts that are material are

Page 47

1    disputed, and unfortunately, even many of the facts that are

2    immaterial are disputed.  And that particular motion was

3    pitched to Your Honor as a motion that was going to be very

4    limited.  It was only supposed to focus on Rule 60(b)

5    release, very narrow.

6           And I think that that's part of why Your Honor

7    felt that it was appropriate to grant new GM leave to make

8    the motion, but as it's turned out, and as you can hear, new

9    GM has worked together with Greenberg and with Paul Hastings

10   to submit a motion that attempts to address this case in a

11   way that's -- that's comprehensive, and it's -- it -- it's

12   doomed to fail, because hearing Mr. Zirinsky recite his

13   version of the case, I understand it to be exactly that.

14          It is his version of the case, and there's simply

15   an inability on the part of the noteholders here to

16   understand that there is another side to the story, that

17   there are many facts in dispute, that those facts are

18   material, and the way to resolve those kinds of disputes is

19   at trial.

20          The only way, I think, that Appaloosa and -- and

21   that the Greenberg noteholders can say there are no disputed

22   material facts here is to simply not even acknowledge the

23   many facts that have come out in discovery that demonstrate

24   that there's another side of this story that absolutely

25   needs to be told.  And we've tried to lay out that other

Page 48

1    side of the story, just in broad strokes for Your Honor, in

2    our -- in our pre-motion letter.

3            I'm happy to address any particular issue on the

4    merits as to which Your Honor may have questions.

5            I also think that Mr. Sher's arguments, and

6    Mr. Zirinsky's arguments that because we amended our

7    complaint at the close of fact discovery to correct certain

8    inaccuracies, that demonstrates that they're entitled to

9    summary judgment, is a good example of no good deed going

10   unpunished.

11           We have been saying for many weeks that during the

12   course of discovery we became aware of certain facts alleged

13   in the complaint that needed to be fixed.

14           We learned, for example, that the noteholders did

15   not initiate the conversations with General Motors.  General

16   Motors initiated those conversations.  So, we corrected that

17   allegation.

18           It was pointed out to us that we alleged in the

19   complaint that GM Nova Scotia Finance had no assets, when in

20   fact it had an asset which was an intercompany receivable

21   from GM Canada, so we amended the complaint to indicate that

22   its only asset was that receivable from GM Canada.

23           The amendments to the complaint are not material.

24   The -- the focus on this language of -- of -- that the

25   noteholders pounced and now that we can't say that the

Page 49

1    noteholders pounced somehow our complaint is without merit

2    is silly, because it's very clear that those allegations

3    were in the nature of painting the picture, and it's also

4    been made clear to us that, as I said, that they didn't

5    initiate the -- the negotiation, and so we amended that

6    allegation, but it's -- it's absolutely immaterial to the

7    fundamental theories that the GUC Trust is pursuing here

8    with regard to equitable subordination.  We do not think

9    that these are the kinds of issues that are appropriate for

10   summary judgment.

11        And in terms of conducting an efficient trial, our

12   witness list, Mr. Zirinsky says that I have 20 witnesses, we

13   listed 19 witnesses, and in recent conversation with counsel

14   we explained that at the most we expected to call 13 of

15   them.  Three of those witnesses are expert witnesses.  We're

16   working with the Nova Scotia Finance trustee to see if at

17   least one of those expert witnesses we can -- we can

18   stipulate as to the relevant expert issues, which is

19   basically how to calculate the swap claim, if there is a

20   valid swap claim.

21        So we're doing everything we can to put on an

22   efficient trial.  We would like to work with all counsel to

23   do that and not spend the months of July and August

24   responding to hundreds of alleged undisputed facts that are

25   actually hotly disputed.

Page 50

1          So for that reason, we -- we think the request for

2     leave to move for summary judgment is simply misguided, Your

3     Honor.

4          THE COURT:  All right.

5          Is there anybody else who wants to be heard before

6     I give Mr. Sher and Mr. Zirinsky a chance to reply?

7          MR. STEINBERG:  Yes, Your Honor.  This is Arthur

8     Steinberg.

9          In response to some of the requests for summary

10    judgment, Mr. Fisher had took the opportunity to allude to

11    my pending motion for summary judgment.  In his response

12    today, in connection with others requests for summary

13    judgment, he took his opportunity again to preview his

14    argument.

15         I would like not to turn what I'm sure is a

16    already a lengthy pre-trial conference with my rebuttal to a

17    lot of things that he could say, and simply ask Your Honor,

18    to allow me to make all of my arguments on July 19th on --

19    on the return, and my papers will speak, and I will speak at

20    that point in time.

21         THE COURT:  I -- I do have a question,

22    Mr. Steinberg.  I thought I was authorizing you to file a

23    summary judgment motion on your 60(b) contentions, are you

24    making factual arguments as well?  Or making other arguments

25    as well?

1              MR. STEINBERG:  You -- you authorized me to file a

2      summary judgment motion on Rule 60(b), you also authorized

3      me to -- in connection with my arguments that he was

4      asserting a voiding power claims that had been solved to new

5      GM and that he shouldn't be entitled to do that.

6              You also allowed me to -- to move for summary

7      judgment on the grounds that GM Canada, as creditors, should

8      have been exposed to this transaction, and therefore that

9      any type of transaction would have insulated GM Canada,

10     which new GM board is part of this deal free and clear of

11     all claims, somehow should be undone.

12             You also allowed me to protect any opportunity

13     that on the 60(b), which dealt with avoiding the assumption

14     and assignment procedures of executory contracts, that's

15     part of 60(b), the other part of 60(b) was that he wanted to

16     avoid the procedures relating to the purchase of the swap

17     claim by new GM from old GM.  Those are all things that are

18     part and parcel of what I was granted to file a summary

19     judgment for.

20             The factual disputes that he's talking about, if

21     Your Honor, wants to -- to get into it is that -- that in

22     our papers we said that the lock-up agreement should not be

23     avoided, and we said that the notion of whether this is a

24     pre-petition agreement or a post-petition agreement is a red

25     herring argument, because whether it was a pre-petition

Page 52

1   agreement or a post-petition agreement new GM acquired it.

2   And -- and we went through the basis upon why if that's the

3   case it doesn't really matter and half of whatever is being

4   argued here is irrelevant, and that's a matter of law.

5        We didn't try to get into the issue of the

6   specificity of whether a document was signed before or

7   after, but we did say that there -- that there are certain

8   facts that -- that there are absolutely not disputed as to

9   what the parties' intentions were, that the parties signed

10  an agreement and agreed for their signature pages to be

11  distributed out, and all of the people testified that that

12  occurred before the bankruptcy filing, and therefore, that

13  lock-up agreement was a binding agreement at that point in

14  time, no matter what occurred.  And that was a basis upon

15  which we were trying to protect the -- the lock-up

16  agreement.

17       One of the allegations in the objections is that

18  this is an unauthorized post-petition settlement.  That's

19  not a -- we think that that -- and we got permission to file

20  a summary judgment -- that is not a settlement of anything,

21  just a lock-up agreement, didn't settle any rights of old

22  GM, it settled an intercompany dispute between GM Canada and

23  GM Nova Scotia Finance, and it settled a litigation which

24  was the oppression action brought by the noteholders.  But

25  GM didn't give up any rights at all and there was nothing

Page 53

1    that was settled, and what was locked up was the votes of

2    the -- of the Nova Scotia noteholders in GM Nova Scotia, and

3    that there has been a total distortion of what is involved

4    in this case.

5            And, therefore, in the context of our summary

6    judgment motion, we were trying to strip down this case to

7    what it should be, which is an objection to claims

8    procedure, but not something that would invalidate GM

9    Canada's release that it got under the lock-up agreement and

10   that would protect GM Canada as an asset that new GM bought.

11   And that was exactly the speech that I gave.

12           I certainly didn't say that all I was doing was

13   asking for 60(b) relief, I said that -- that -- that

14   Mr. Vanesky's (ph) deposition made clear that they were

15   looking to vitiate the lock-up agreement all together in

16   order to expose GM Canada to -- to the noteholders' claims

17   as a way of relieving their burden, and I wanted to have the

18   opportunity to get rid of that, and there were no factual

19   issues in dispute.

20           And the fact that we may have put in 100

21   statements of fact doesn't mean that they were material

22   facts in dispute.  He'll file his papers tomorrow, and we

23   will see in our response that we'll file shortly thereafter,

24   and we'll have an argument.

25           I doubt that there's any real facts in dispute,

Page 54

1    and a large portion of what you have here, Your Honor, is

2    that everybody other than Mr. Fisher is trying to scream to

3    you that the emperor has no clothes.  And please focus in on

4    that, that there are not facts in dispute.  You heard even

5    Mr. Fisher today say that he was just cleaning up something.

6         Your Honor may recall that we didn't want the

7    complaint to be filed publicly because we -- we thought

8    there were scandalous and demonstrably untrue allegations in

9    that, and the things that he's saying he's cleaning up now

10   are some of the things that we pointed out before he

11   actually filed the complaint, the most glaring of which was

12   that the GM, the intercompany loan between GM and GM Canada

13   was repaid, that was part of the document discovery that he

14   had before he filed the amended complaint.  That was

15   notoriously left out and he based his entire argument as if

16   there was something that was done that damaged GM creditors

17   when it was GM Canada's funds that was used that ultimately

18   went to Nova Scotia to discharge an intercompany loan and

19   then became the basis of the consent fee.

20        And -- and -- and so when I rose to speak to Your

21   Honor, I was just now -- although I didn't stand in my

22   office, I wanted to -- to be able to say to Your Honor, I

23   have a lot to say, but I -- I am sure that -- that the --

24   this was a noteholder conference on the summary judgment,

25   and I just didn't want Mr. Fisher to take a gratuitous,

Page 55

1    additional swipe without me being able to say something in

2    response, and all I wanted to say in response was please let

3    me do it at the appropriate time, and not turn this hearing

4    into my hearing, because I don't want that to be my hearing.

5            THE COURT:  I think next time I have a conference

6    with you, Mr. Steinberg, I'm going to do it on the record.

7            Who else wants to be heard?

8        (Pause)

9            THE COURT:  All right.

10           Reply from Mr. Sher and from Mr. Zirinsky?

11           MR. SHER:  Yes, Your Honor, thank you.

12           Two -- two points, I think, just will -- will --

13   one is, on the issue of this insider trading argument, I

14   think Mr. Fisher first should not take what I had said as

15   any kind of personal attack, but secondly is confirming what

16   I said.  You know, it's one thing to say we're not alleging

17   a 10(b)(5) allegation, but -- and -- and we don't contend

18   that there was a 10(b)(5) violation, but nonetheless, we are

19   saying that the parties engaged in insider trading, are

20   trading on the basis of material, non-public, information,

21   and regardless of whether they violated any laws that we

22   should be able to consider that, is exactly what I was

23   saying.

24           An insider trading white argument, argument that

25   seeks -- that is purely not for our benefit, but for the

Page 56

1    plaintiff's benefit, divorce itself from all of the

2    protections that defendants have in these kinds of

3    particularly vexatious that -- such as heightened pleading

4    standards, mandatory sanctions review, et cetera.  Those are

5    -- I think that was just confirmed here.

6            But, more importantly, a second confirmation was

7    that it's not in the complaint.  And I think given the other

8    types of allegations that were put into the complaint that

9    were very, very pointed, and as -- as Mr. Steinberg pointed

10   out, in our view scandalous and untrue, the -- the --

11   whatever the reason was, the fact is they are not there,

12   everyone agrees on it, the GUC Trust agrees it's not in

13   there.  The Second Circuit has said amend the complaint, add

14   a new theory, at -- in response to a summary judgment

15   motion, and they're -- they're barred.

16            Thank you, Your Honor.

17            THE COURT:  All right.  Anybody else?

18            MR. ZIRINSKY:  Yeah, Your Honor, Bruce Zirinsky.

19   I'll be very brief.

20            Mr. Fisher said a lot, but he didn't say very much

21   at all.  I didn't hear Mr. Fisher allude to a single fact

22   that would be a material fact that would have to be tried in

23   order for Your Honor to rule on these claims.

24            Again, it's all argument.  It's all Mr. Fisher's

25   inflammatory and defamatory spin of his version of the

Page 57

1  facts.  The facts are there.  There is no dispute as to the

2  facts.

3           Nine witnesses testified as to the lock-up

4  agreement.  All said it was a pre-petition agreement,

5  including Weil Gotshal.  Nobody has testified to the

6  contrary.

7           Likewise, the arguments about the consent fee, no

8  one has testified that it was an unfair, unreasonable, or

9  inequitable payment.  General Motors' witnesses testified

10 that it was an arms-length negotiation, it was contracted

11 for, and it was approved by the U.S. and the Canadian

12 governments.

13          Again, no evidence, not even a factual allegation

14 which would support it unreasonable -- it being an

15 unreasonable payment or unconscionable or give any legally

16 cognizable basis for the Court re-characterizing it for

17 anything other than it was.  It's a legal argument.

18          Mr. Fisher is free to argue whatever he wants or

19 chooses to argue, but he has no facts and no evidence, and

20 he has come forward with no evidence to sustain or support

21 those arguments, and so, therefore, there's no reason to go

22 to trial on that claim.

23          On the equitable subordination allegations, again,

24 there are no disputed facts.  Mr. Fisher has offered

25 absolutely no evidence to support his allegations of

1   wrongdoing.

2          Secondly, even if you accept those allegations,

3   they're insufficient as a matter of law to support a claim

4   for equitable subordination.

5          Similarly, on the insider trading allegations,

6   Mr. Fisher now says, well, he's not alleging that there was

7   a violation of securities law, he merely wants to show the

8   Court that the noteholders acted inequitably by trading

9   securities after the bankruptcy and after disclosure by GM

10  of the lock-up agreement and other public disclosures of the

11  lock-up agreement, as if to suggest, by innuendo, that the

12  noteholders did something wrong.

13         This is litigation by -- by terrorism.  It's

14  litigation by innuendo.

15         If Mr. Fisher believes that there is a claim

16  against the noteholders which is legally cognizable for

17  wrongdoing, he's got to be able to support that under the

18  law.  He can't just throw mud at the noteholders, and say to

19  the judge, Judge, look how bad these people are, they traded

20  their securities and that, you know, the 8K didn't have

21  this, this, and that in it.  Well, Your Honor, can look at

22  the 8K and determine based upon the papers, themselves, what

23  was material or what was not material.

24         And it is our contention, and everyone else's

25  contention in this case, except Mr. Fisher, that all of the

Page 59

1    material facts regarding the lock-up agreement were

2    disclosed.

3           Mr. Fisher doesn't -- also doesn't tell the Court

4    that on June 5, five days after the bankruptcy, a full

5    disclosure was given to the creditors' committee and its

6    professionals by GM, which fully described the lock-up

7    agreement and all of the proposed transactions with the

8    noteholders.  Mr. Mehr (ph), who was counsel, lead counsel,

9    for the committee testified that he received it.  He doesn't

10   remember whether he read it or not, or whether he considered

11   it important or not at the time, but it's in the deposition

12   testimony, that it was right there in black and white, given

13   to the creditors' committee on June 5 in 2009, a full

14   description of all of the proposed transactions in Canada,

15   as well as a description of all of the intercompany

16   liabilities as between GM Canada, GM Nova Scotia, and GM,

17   the debtor, GM U.S.  It was all there.

18          Mr. Fisher doesn't tell that to Your Honor because

19   he knows that those facts, when they come out, and they will

20   come out in our papers, and they're undisputed facts,

21   creditors' committee counsel admitted he had those facts in

22   front of him.

23          The time records, if you go and look at Kramer

24   Levin's (ph) time records, there are time entries,

25   concurrent with all of these events and concurrent with all

Page 60

1    of these public disclosures and all of these disclosures

2    filed with the Bankruptcy Court in connection with the GM

3    sale and the GM DIP financing agreement with the U.S.

4    government.  There were time records which show that Kramer

5    Levin reviewed all of these documents.

6          So for Mr. Fisher to tell Your Honor that there

7    was some nefarious conspiracy, or some nefarious facts here,

8    it's just simply untrue and he has no evidence to support

9    it, indeed all of the evidence belies what he's telling you.

10          And that's why we think it would be a crying shame

11   for us to have to go through a protracted trial, and all of

12   the expense, and all of the delay, and all of the harassment

13   of having to put witnesses before Your Honor, and having,

14   you know, 13 witnesses or more and spending months of trial

15   before we can finally get to a conclusion here, when

16   everything is ripe to be decided now.

17          Look, the Supreme Court in Solatex (ph) has said

18   one of the principal purposes of summary judgment rule is to

19   isolate and dispose of factually unsupported claims, and we

20   think it should be interpreted in a way that allows it to

21   accomplish this purpose.  That's exactly what we have here.

22   We see no good reason why we shouldn't be permitted to file

23   a motion for summary judgment.

24          Thank you, Your Honor.

25          THE COURT:  All right, you guys can stay on the

Page 61

1   line.  I'm going to take a recess and I'll be back to you,

2   I'm not sure how quickly.  We're in recess.

3        (Recess at 11:09 a.m.)

4        THE COURT:  Ladies and gentlemen, I'm granting

5   leave to Aurelius to file the motion it wants to file, and

6   I'm denying leave to file any of the others.

7        Aurelius' motion will be presumably based on one

8   or two limited grounds and is fundamentally different than

9   the others.  But I'm denying the remainder of the requests

10  for a host of reasons.

11       First, but very importantly, we have a trial on

12  August 7.  That's only a shade more than 30 days from now.

13  The notion that I could address these issues, and issue one

14  or more than one, seemingly two or three, opinions on this

15  controversy by that time, involving hundreds of millions of

16  dollars and what will involve hundreds of statements of fact

17  and related record references, is frankly ridiculous.

18       I have dozens of real time matters on my

19  short=term plate, of which some very important ones are

20  governed by statutory obligations to decide them in very

21  limited periods of time.  That doesn't even include the

22  other billion dollar matters that compete for my time,

23  including one in this very GM case.

24       Now, perhaps recognizing this, it was argued to me

25  that while we have three days of trial starting on August 7,

Page 62

1    we may very well not be done by then, or we probably won't

2    be done by then, or we certainly won't be done by then, so I

3    should decide these summary judgment motions, anyway.  But

4    there are at least three things wrong with that.

5            First, the issues to be addressed at trial, which

6    I'm now told will call for between 13 and 20 witnesses,

7    underscore the complexity of the case and its inability to

8    be addressed on summary judgment.

9            The second is that's terrible case management.

10   Summary judgment in the middle of a trial?  That's

11   inconsistent with its premise and undercuts many of its

12   benefits, even if it were otherwise appropriate.

13           Third is that the parties are going to be -- need

14   to be working very hard between now and August 7 on getting

15   ready for trial, and that's where they should be putting

16   their attention, and if they can't put their attention to

17   that it's going to prejudice one side or both.

18           Related to all of those things is the second

19   reason.  Federal Rule of Bankruptcy Procedure 7056, as

20   approved by the Rules Committee and the Supreme Court, and

21   as it will go into effect on December 1st of this year, five

22   months from now, prohibits summary judgment motions from

23   being filed within 30 days of trial, unless otherwise

24   ordered by the Court.

25   I'm not going to otherwise ordered.  Amended Rule 7056

Page 63

1    provides that way for a reason, which is the very concerns

2    that we're talking about today.

3            Third, we put in the requirement for a pre-motion

4    conference in our local court rules, and I did likewise in

5    my case management orders, for important reasons.

6            One reason is that parties very often ask for them

7    too soon and then we have to deal with Rule 56(d) defenses

8    to those motions.

9            But the more important reason is that history has

10    taught us over and over again that lawyers contend that they

11    should win without a trial because there are no issues of

12    fact and they think they have the better argument.

13            Lawyers are advocates for their clients, and of

14    course, they say what they say, and I did it when I was a

15    lawyer, which I was for 30 years before I got on the bench,

16    but the fact is I get this stuff all the time.  A party says

17    look at the facts, agree with us, and it gives insufficient

18    attention to the fact that its view of the world is not the

19    only one.

20            I've been doing this stuff now for 42 years.  One

21    side saying there are no issues of fact doesn't make it so.

22    I would have thought that sooner lawyer -- sooner or later

23    that lawyers and their clients would learn.

24            And if I had known that new GM thought it could

25    use its 60(b) argument as a Trojan horse for all of the

Page 64

1    things I heard that it wants to raise now I would have

2    denied leave to file that motion as well.

3            Fourth, but most importantly, this transaction may

4    be as outrageous as the GUC Trust contends on the one hand,

5    or it may be totally innocent and benign as all of the

6    claimants contend on the other, but I don't know yet, and

7    the self-serving letters with parties' spin on the facts

8    don't answer that question.  That's why we have trials.

9            And here, much more so than most of the matters on

10   my watch, I need to see the witnesses and look them in the

11   eye and hear their explanations for what happened and what

12   they did.

13           If parties contend that alleged insider trading

14   issues are irrelevant to equitable subordination or were not

15   satisfactorily raised in the complaint or prior proceedings

16   they can raise that by a motion in limine.  But with or

17   without allegations of insider trading I'm not going to

18   authorize motions for summary judgment now.

19           We're adjourned.

20       (Whereupon these proceedings were concluded at 11:43

21   AM)

22

23

24

25

Page 65

```
 1                            I N D E X

 2

 3                            RULINGS

 4                                              Page      Line

 5    Motion for Objection to Claim(s) Number:    8        18

 6    66211 and 67347 (filed by D&M Real Estate

 7    LLC and Horse Tavern & Grill)

 8

 9    280th Omnibus Objection to Claims (Welfare   9        8

10    Benefits Claims of Retired and Fonner

11    Salaried and Executive Employees)

12

13    Motion to Approve the Lower Ley Creek and   18        24

14    Onondaga Non-Owned Site Settlement Agreements

15    and Enter the Stipulation and Agreed Order

16    Between the GUC Trust and the United States

17

18    Motion for Leave to File Summary Judgment   61        4

19    by Aurelius Investment LLC

20

21    Motion for Leave to File Summary Judgment   61        17

22    by the Appaloosa Investment Limited

23

24    Motion for Leave to File Summary Judgment   61        17

25    By Fortress, Elliot, & Morgan Stanley
```

Page 66

1              C E R T I F I C A T I O N

2

3      I, Jamie Gallagher, certify that the foregoing transcript is

4      a true and accurate record of the proceedings.

5

6      Jamie              Digitally signed by Jamie Gallagher
                          DN: cn=Jamie Gallagher, o=Veritext,
7      Gallagher          ou, email=digital@veritext.com, c=US
                          Date: 2012.07.02 11:57:39 -04'00'
8

       Veritext

9

       200 Old Country Road

10

       Suite 580

11

       Mineola, NY 11501

12

13

       Date:  July 2, 2012

14

15

16

17

18

19

20

21

22

23

24

25