DICKSTEIN SHAPIRO LLP
Barry N. Seidel
Eric B. Fisher
Stefanie Birbrower Greer
Katie L. Cooperman
Mary Kim (admitted *pro hac vice*)
1633 Broadway
New York, NY 10019-6708
Telephone: (212) 277-6500
Facsimile: (212) 277-6501

*Counsel for Motors Liquidation
Company GUC Trust*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x
                                                     :
In re:                                               :    Chapter 11
                                                     :
MOTORS LIQUIDATION COMPANY, *et al.*,                :    Case No.:  09-50026 (REG)
f/k/a General Motors Corporation, *et al.*,          :
                                                     :    (Jointly Administered)
                              Debtors.               :
                                                     :
----------------------------------------------------------------------x
MOTORS LIQUIDATION COMPANY GUC TRUST,                :
                                                     :
                              Plaintiff,             :    Adversary Proceeding
                                                     :    Case No.:  12-09802
                                                     :
                  v.                                 :
                                                     :
APPALOOSA INVESTMENT LIMITED                         :
PARTNERSHIP I, *et al.*,                             :
                                                     :
                              Defendants.            :
                                                     :
----------------------------------------------------------------------x

# GUC TRUST'S PRETRIAL BRIEF IN CONNECTION WITH (I) OFFICIAL COMMITTEE OF UNSECURED CREDITORS' FIRST AMENDED OBJECTION TO CLAIMS FILED BY GREEN HUNT WEDLAKE, INC. AND NOTEHOLDERS OF GENERAL MOTORS NOVA SCOTIA FINANCE COMPANY AND MOTION FOR OTHER RELIEF (DOCKET NO. 7859) AND (II) MOTORS LIQUIDATION CO. GUC TRUST V. APPALOOSA INVESTMENT LTD. PARTNERSHIP I, *ET AL.*

# TABLE OF CONTENTS

**Page**

**SUMMARY OF FACTS TO BE PROVEN AT TRIAL** ............................................................. 1

    A.    The Lock-Up Agreement ............................................................................ 1

    B.    The Consent Fee ......................................................................................... 3

    C.    The Nova Scotia Finance Bankruptcy and the ULC Claim ....................... 4

    D.    The Swaps .................................................................................................. 6

**ARGUMENT** ..................................................................................................................... 7

**POINT I** ........................................................................................................................... 8

**THE LOCK-UP AGREEMENT IS VOID** ......................................................................... 8

    A.    The Lock-Up Agreement Is a Postpetition Agreement ............................. 8

    B.    The Lock-Up Agreement Was Not Approved by the Court ....................... 9

          1.    Approval of the Lock-Up Agreement Was Required Under
               Section 363(b) ................................................................................ 9

**POINT II** ......................................................................................................................... 11

**THE "CONSENT FEE" WAS A PAYMENT OF PRINCIPAL AND THE ULC
CLAIM AND THE GUARANTEE CLAIMS SHOULD BE REDUCED
ACCORDINGLY** ............................................................................................................... 11

    A.    The Consent Fee Should Be Treated as a Payment of Principal .............. 12

          1.    At the Time the Consent Fee Was Paid, No Amounts Were
               Owed Under the Fiscal and Paying Agent Agreement .................. 12

          2.    Even if the Lock-Up Agreement Is Not Void, the Consent Fee
               Should Be Recharacterized .......................................................... 12

**POINT III** ....................................................................................................................... 13

**THE ULC NOTE CLAIM SHOULD BE DISALLOWED IN ITS ENTIRETY
BECAUSE IT IS DUPLICATIVE OF THE GUARANTEE CLAIMS** ................................. 13

    A.    Recovery on a Contractual Guarantee Is In Lieu of Recovery on a
            Contribution Claim Under Section 135 of the NSCA .............................. 14

i

B.    Canadian Law Precludes Recovery on the ULC Note Claim and Guarantee Claims ............................................................... 15

C.    United States Bankruptcy Law Also Precludes Recovery on the ULC Note Claim and Guarantee Claims ........................................... 16

D.    The ULC Note Claim Should Be Disallowed Pursuant to Section 502(e) of the Bankruptcy Code ............................................... 17

**POINT IV** ............................................................................................. 18

**THE ULC SWAP CLAIM SHOULD BE DISALLOWED OR, ALTERNATIVELY, REDUCED** ................................................................ 18

A.    New GM Has No Rights to the Swaps ................................................. 18

    1.    The Swaps Were Not Assumed and Assigned to New GM ........................... 18

    2.    The Swaps Are Not "Purchased Assets" Sold to New GM ........................... 19

B.    The Swaps Were Not Terminated ....................................................... 19

C.    Alternatively, the ULC Swap Claim Should Be Reduced ........................ 20

**POINT V** ............................................................................................... 20

**THE LOCK-UP NOTEHOLDERS' GUARANTEE CLAIMS AND THE ULC CLAIM SHOULD BE EQUITABLY SUBORDINATED** ......................... 20

A.    Equitable Subordination .................................................................. 20

B.    The Lock-Up Noteholders' Claims Should Be Equitably Subordinated Based on Inequitable Conduct ............................................ 21

C.    The Nova Scotia Finance Trustee's Claims Should Be Equitably Subordinated Based on Inequitable Conduct ............................................ 22

**POINT VI** ............................................................................................. 23

**THE GUARANTEE CLAIMS OF THE LOCK-UP NOTEHOLDERS AND ULC NOTE CLAIM SHOULD BE DISALLOWED UNDER SECTION 502(d)** ................... 23

A.    The Consent Fee Was an Avoidable Transfer ..................................... 23

B.    The GUC Trust May Pursue an Objection Under Section 502(d) Because Avoidance Actions Related to the Consent Fee Were Not Sold to New GM ................................................................................. 24

C.      Even if the Avoidance Actions Were Sold to  New GM, Such Sale
        Does Not Preclude the GUC Trust from Pursuing Its Objection
        Under Section 502(d)..............................................................................................24

**CONCLUSION** ...........................................................................................................................26

# Table of Authorities

Page

## Cases

*80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832
(Bankr. S.D.N.Y. 1994) .................................................................................... 21

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 365
B.R. 24 (Bankr. S.D.N.Y. 2007), *aff'd sub nom. Adelphia Recovery Trust v. Bank of
Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008) ...................................................... 20-21

*Bear Stearns Inv. Prods., Inc. v. Hitachi Auto. Prods. (USA), Inc.*, 401 B.R. 598 (S.D.N.Y.
2009) ............................................................................................................... 8

*Brown v. U.S. Internal Revenue Serv. (In re Larry's Marineland of Richmond, Inc.)*, 166
B.R. 871 (Bankr. E.D. Ky. 1993) ................................................................... 24-25

*Ciaramella v. Reader's Digest Ass'n*, 131 F.3d 320 (2d Cir. 1997) .............................. 8

*El Paso v. Am. W. Airlines, Inc. (In re Am. W. Airlines, Inc.)*, 217 F.3d 1161 (9th Cir. 2000) ..... 25

*Fisher v. N.Y.C. Dep't of Hous. Pres. & Dev. (In re Pan Trading Corp.)*, 125 B.R. 869
(Bankr. S.D.N.Y 1991) .................................................................................... 23

*GSGSB, Inc. v. N.Y. Yankees*, 862 F. Supp. 1160 (S.D.N.Y. 1994) .............................. 8

*Gucci Am., Inc. v. Gucci*, No. 07 Civ. 6820(RMB)(SCF), 2009 WL 440463 (S.D.N.Y. Feb.
20, 2009) ......................................................................................................... 8

*HBE Leasing Corp. v. Frank*, 61 F.3d 1054 (2d Cir. 1995) ...................................... 24

*In re Adler, Coleman Clearing Corp.*, 277 B.R. 520, (Bankr. S.D.N.Y. 2002) .............. 21

*In re APCO Liquidating Trust*, 370 B.R. 625 (Bankr. D. Del. 2007) ............................ 18

*In re Consol. Auto Recyclers, Inc.*, 123 B.R. 130 (Bankr. D. Me. 1991) ...................... 10

*In re Enron Corp.*, No. 01-16034 (AIG), 2003 WL 1562202 (Bankr. S.D.N.Y. Mar. 21,
2003) ............................................................................................................... 11

*In re Enron Corp.*, No. 01-16034 (AJG), 2006 WL 1030420 (Bankr. S.D.N.Y. Apr. 6,
2006) ............................................................................................................... 16

*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 160 B.R. 882
(Bankr. S.D.N.Y. 1993) ................................................................................... 16-17

iv

*In re Handy & Harman Ref. Grp. Inc.*, 304 B.R. 49 (Bankr. D. Conn. 2004) ............................ 10

*In re Koneta*, 357 B.R. 540 (Bankr. D. Ariz. 2006) ..................................................................... 10

*In re MF Global Inc.*, No. 11-2790 (MG) SIPA, 2012 WL 1424670 (Bankr. S.D.N.Y. Apr. 24, 2012) .................................................................................................................................... 11

*In re Mid Atl. Fund, Inc.*, 60 B.R. 604 (Bankr. S.D.N.Y. 1986) .................................................. 25

*In re Nw. Airlines Corp.*, No. 05-17930 (ALG), 2007 WL 2682129 (Bankr. S.D.N.Y. Sept. 12, 2007) ....................................................................................................................................... 16

*In re Premier Entm't Biloxi, LLC*, 413 B.R. 370 (Bankr. S.D. Miss. 2009) ................................ 13

*Katchen v. Landy*, 382 U.S. 323 (1966) ....................................................................................... 12

*Kirschenbaum v. Nassau Cnty. Dist. Attorney (In re Vitta)*, 409 B.R. 6 (Bankr. E.D.N.Y. 2009) ............................................................................................................................................. 11

*LFD Operating, Inc. v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.)*, 274 B.R. 600 (Bankr. S.D.N.Y. 2002), *aff'd*, No. 01-42217(REG), 2004 WL 1948754 (S.D.N.Y. Sept. 1, 2004), *aff'd*, 144 F. App'x 900 (2d Cir. 2005) ........................................................... 13

*Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379 (2d Cir. 1997) ............ 10-11

*Nisselson v. Ford Motor Co. (In re Monahan Ford Corp. of Flushing)*, 340 B.R. 1 (Bankr. E.D.N.Y. 2006) .............................................................................................................................. 21

*Nw. Mut. Life Ins. Co. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*, 608 F.3d 139 (2d Cir. 2010) ............................................................................................................................... 17

*Orr v. Kinderhill Corp.*, 991 F.2d 31 (2d Cir. 1993) ................................................................... 24

*Pepper v. Litton*, 308 U.S. 295 (1939) .................................................................................... 13, 20

*Re Mayfair Prop. Co.*, [1898] 2 Ch. 28, 35 ................................................................................. 15

*Re Olympia & York Dev. Ltd.*, [1998] OJ No. 4903, 4 C.B.R. (4th) 189. ............................... 15, 16

*Saccurato v. Masters, Inc. (In re Masters, Inc.)*, 149 B.R. 289 (E.D.N.Y. 1992) ....................... 10

*Sullivan v. Messer (In re Corcoran)*, 246 B.R. 152 (E.D.N.Y. 2000) .......................................... 24

*Union Nat'l Bank of Johnstown, P.A. v. People's Savings & Trust Co., of Pittsburgh, PA*, 28 F.2d 326, 328 (3d Cir. 1928) ................................................................................................ 17

## Statutes

11 U.S.C. § 363(b)................................................................................9, 10, 11

11 U.S.C. § 502(b)......................................................................................14, 17

11 U.S.C. § 502(d)...........................................................................8, 23, 24, 25

11 U.S.C. § 502(e)..............................................................................................17

11 U.S.C. § 510(c)..............................................................................................20

## Rules

Fed. R. Bankr. P. 9019.......................................................................................10

Fed. R. Civ. P. 60(b) .........................................................................................25

## Other Authorities

Nova Scotia Companies Act, R.S.N.S. 1989 c. 81, § 135 ................................13, 14, 18

*Interpretation Act*, R.S.N.S. 1989, c. 235, § 9(5) ........................................14

The Motors Liquidation Company GUC Trust (the "**GUC Trust**") respectfully submits this pretrial brief in connection with (i) Official Committee of Unsecured Creditors' First Amended Objection to Claims Filed by Green Hunt Wedlake, Inc. and Noteholders of General Motors Nova Scotia Finance Company and Motion for Other Relief (Docket No. 7859) (the "**Amended Objection**"); and (ii) *Motors Liquidation Co. GUC Trust v. Appaloosa Investment Ltd. Partnership I, et al.*, Adv. Pro. No. 12-09802 (the "**Adversary Proceeding**").

<u>**SUMMARY OF FACTS TO BE PROVEN AT TRIAL**</u>

**A.    The Lock-Up Agreement**

On the morning of Monday, June 1, 2009, while General Motors Corporation ("**Old GM**") was putting the finishing touches on its historic bankruptcy petition, a band of four hedge funds (Appaloosa, Elliott, Aurelius and Fortress, collectively, the "**Lock-Up Noteholders**") and their counsel remained holed up at the offices of Weil Gotshal & Manges LLP ("**Weil Gotshal**"), counsel for Old GM and its Canadian subsidiaries. The Lock-Up Noteholders and their counsel had been there all night, negotiating a deal intended to ensure that their unsecured claims on account of certain notes (the "**Notes**"), issued by General Motors Nova Scotia Finance Company ("**Nova Scotia Finance**") and guaranteed by its sole shareholder Old GM, would be treated more favorably – indeed, at least four times more favorably – than the claims of any other general unsecured creditor of Old GM.

The Lock-Up Noteholders, and their counsel, had worked through the night at Weil Gotshal's offices in an effort to reach an agreement (the "**Lock-Up Agreement**"), which would lock in their rich deal and shield it from judicial scrutiny. While all parties to the negotiation aspired to complete the Lock-Up Agreement before Old GM filed for bankruptcy at 7:57 a.m. on June 1, 2009, the evidence will show that they failed to meet this goal, largely because the

Lock-Up Noteholders were determined to extract maximum advantage for themselves from every last provision of the agreement.

The Non-Disclosure Agreement that the parties, including each Lock-Up Noteholder, executed at the outset of the negotiations, each draft of the Lock-Up Agreement, and the final, execution version of the Lock-Up Agreement all provided that no party would be bound unless and until there was a final, written agreement.  The computer forensic evidence will show, however, that the final, written agreement – that is, the version of the agreement the parties themselves considered to be the execution version – was not even created, let alone completed, until 9:21 a.m. on June 1, well after Old GM filed its bankruptcy petition (the "**Petition**") at 7:57 a.m.  Other evidence that will be introduced at trial will corroborate that the Lock-Up Agreement was not finished until after Old GM's bankruptcy petition was filed.  While we expect that certain witnesses may testify that they released their signature pages prepetition, the evidence will show that the execution version to which those signature pages were affixed did not exist until after Old GM filed the Petition.

The purported agreement among the parties, including Old GM, depended upon at least two-thirds of the Noteholders passing an extraordinary resolution sufficient to bind all Noteholders to the terms of the Lock-Up Agreement.  The extraordinary resolution was not passed until June 25, 2009, more than three weeks after the Petition was filed.  The Lock-Up Agreement also compelled a series of postpetition actions, all designed to secure advantageous treatment for the Notes held by the Lock-Up Noteholders unavailable to other unsecured creditors.  These actions include, among others, (i) payment of a $367 million "consent fee" (the "**Consent Fee**") to the holders of the Notes (the "**Noteholders**"); (ii) the execution and delivery of Old GM's consent to a bankruptcy filing for Nova Scotia Finance; (iii) Old GM's consent to the allowance of claims against it for the full amount of the Notes

2

based on Old GM's guarantee of the Notes without any deduction for the Consent Fee (the "**Guarantee Claims**"); (iv) Old GM's consent to the allowance of a claim under applicable Nova Scotia law (the "**ULC Claim**") to be asserted against it by a trustee hand-picked by the Noteholders to "administer" Nova Scotia Finance's Canadian bankruptcy estate (the "**Nova Scotia Finance Trustee**"), which claim was to include all amounts owed with respect to the Notes, plus the amount of a purported swap liability that, as of the filing of the Petition, was actually "in the money" as to Old GM and not a claim against Old GM; and (v) the forgiveness of intercompany loans (the "**Intercompany Loans**") owed to Nova Scotia Finance by General Motors of Canada Limited ("**GM Canada**"), which loans would have satisfied the Notes in full had Nova Scotia Finance not released them.

### B.    The Consent Fee

On June 26, 2009 – more than three weeks after the Petition was filed – a $367 million "Consent Fee" was paid to the Noteholders.[1]  The amount of the Consent Fee represented over 36% of the face amount of the Notes.  The funds for this $367 million payment were advanced by Old GM to GM Canada late in the day on Friday, May 29, 2009, one business day before Old GM's planned bankruptcy filing on Monday, June 1, 2009.  Even if the Lock-Up Noteholders are able to demonstrate at trial that these funds were received by GM Canada before Old GM's bankruptcy filing, the evidence will nonetheless show that the funds belonged to Old GM as of the filing of its bankruptcy petition because multiple conditions set forth in the trust agreement (the "**Trust Agreement**") governing the advance of these funds had not been satisfied.  Indeed, cognizant of the failure to meet these trust conditions, Old GM and GM Canada, without court

---

[1]    The evidence at trial will show that although this Consent Fee was paid to all Noteholders, the Lock-Up Noteholders received a substantial portion of this Consent Fee by virtue of their ownership of a controlling amount of the Notes, which position some of them continued to increase just one day after the Lock-Up Agreement had been signed.

approval, appear to have attempted to retroactively amend the Trust Agreement postpetition.  At

trial, the GUC Trust will show that the sole purpose behind Old GM advancing these funds was

to pay the Consent Fee, which payment was in substance, a transfer by Old GM to the

Noteholders.

At trial, the GUC Trust will also show that the Consent Fee and other benefits extracted

by the Lock-Up Noteholders under the Lock-Up Agreement are commercially unreasonable.

Indeed, Old GM's own internal analyses demonstrate that the Lock-Up Agreement, if enforced

in accordance with its terms, provides the Noteholders with payments and benefits many times

greater than what Old GM, with the advice from its financial advisor, Morgan Stanley, viewed as

a rational settlement with the Noteholders.

### C.    The Nova Scotia Finance Bankruptcy and the ULC Claim

The Lock-Up Agreement includes provisions to ensure an uncontested bankruptcy filing

for Nova Scotia Finance, a Nova Scotia unlimited liability company wholly-owned by Old GM.

This was accomplished, among other ways, by having both Old GM and Nova Scotia Finance

deliver their consent to the Nova Scotia Finance bankruptcy filing postpetition.

The purpose of the Nova Scotia Finance bankruptcy filing was to trigger a purported

statutory contribution claim under Nova Scotia law to be asserted by the Nova Scotia Finance

Trustee.    The Nova Scotia Finance Trustee, Peter Wedlake, was hand-picked by the

Lock-Up Noteholders, some of whom had previously worked with him on similar investment

schemes.    In addition, Mr. Wedlake had already worked with three of the four Lock-Up

Noteholders in connection with litigation they commenced against Nova Scotia Finance, Old

GM and certain officers and directors earlier in 2009 (the "**Nova Scotia Action**"), while

prepetition restructuring negotiations were pending between the Lock-Up Noteholders and Old

GM.

The Lock-Up Noteholders waited just over 90 days after payment to them of the Consent Fee before petitioning Nova Scotia Finance into bankruptcy, in order to better insulate the Consent Fee from avoidance liability under Canadian bankruptcy law. The sole purpose of the Nova Scotia Finance bankruptcy was to enable the Lock-Up Noteholders to assert the ULC Claim against Old GM, which under Nova Scotia law may only be asserted when an unlimited liability company (a "**ULC**") is wound up (and does not have enough assets to satisfy outstanding liabilities). Once Nova Scotia Finance was in bankruptcy and the Noteholders' trustee, Mr. Wedlake, was appointed, the Lock-Up Noteholders directed him in ways designed to secure every advantage for themselves. For example, they directed him not to appoint inspectors and directed him not to investigate potential challenges to the Consent Fee and Lock-Up Agreement, or pursue any other assets of Nova Scotia Finance other than the ULC Claim against Old GM.

At the behest of the Noteholders, the Nova Scotia Finance Trustee asserted the $1.67 billion ULC Claim against Old GM in its bankruptcy case on account of Old GM's alleged statutory liability as Nova Scotia Finance's sole shareholder. Over $1.072 billion of the ULC Claim (the "**ULC Note Claim**") is for amounts due based upon the Notes, liability for which was separately asserted against Old GM by the Noteholders in their Guarantee Claims. This portion of the ULC Claim is entirely duplicative of the Guarantee Claims. As will be shown through the expert testimony of Professor Mohamed F. Khimji, this portion of the Nova Scotia Finance Trustee's claim is the same, under Nova Scotia law, as the Guarantee Claims and may not be enforced in addition to the Guarantee Claims.

The other portion of the ULC Claim relates to the Swaps discussed below.

D.    **The Swaps**

The money raised by Nova Scotia Finance from its issuance of the Notes was repayable in pounds sterling.  To hedge the currency risk with respect to the Notes, in 2003, in connection with the issuance of the Notes, Old GM and Nova Scotia Finance entered into two currency swap agreements with each other (the "**Swaps**") which were set to expire on December 7, 2015 and on July 10, 2023 to match the maturity dates of the two series of Notes and the Intercompany Loans. As of the filing of the Petition, Old GM was the "in the money" party on the Swaps, a fact known to the Lock-Up Noteholders.  The Swaps are evidenced by (i) a 1992 ISDA Master Agreement (the "**Master Agreement**"), (ii) a schedule to the Master Agreement, dated "October xx, 2001" (the "**Schedule**"), and (iii) two confirmations each dated July 10, 2003 (together with the Master Agreement and Schedule, the "**Swap Agreement**").

As "insurance" against the likelihood that the scheme manufactured by the Lock-Up Noteholders would be discovered and successfully challenged, the Lock-Up Noteholders demanded that the Lock-Up Agreement provide that any claim against Nova Scotia Finance based upon the Swaps would be subordinated to payment in full of the Notes if any portion of the ULC Claim were to be disallowed.  The Lock-Up Agreement thereby destroyed all economic value of Old GM's currency hedge with Nova Scotia Finance.

Old GM's bankruptcy filing constituted a default under the Swaps but did not operate to terminate the Swaps.  As executory contracts, the Swaps constituted property of Old GM's bankruptcy estate, subject to being assumed or rejected in accordance with the Bankruptcy Code and procedures authorized by the Court.  Though the evidence at trial will show that the Swaps were not assumed by Old GM and were consequently rejected pursuant to Old GM's confirmed plan of liquidation, it has nonetheless been asserted that Old GM's interest in the Swaps was

transferred to General Motors LLC ("**New GM**") in connection with Old GM's sale of substantially all of its assets to New GM in the bankruptcy case (the "**363 Sale**").

Despite its recognition that it was not appropriate to include Nova Scotia Finance's liability under the Swaps in the calculation of any claim asserted by the Nova Scotia Finance Trustee against Old GM, nonetheless New GM, at the urging and insistence of the Lock-Up Noteholders, asserted a claim against Nova Scotia Finance for $564 million based upon the Swaps (the "**GM Swap Claim**"). Based upon the GM Swap Claim, and at the direction of the Lock-Up Noteholders, the Nova Scotia Finance Trustee increased the ULC Claim against Old GM by $564 million (the "**ULC Swap Claim**") to a total of $1.67 billion. Based upon the terms of the Lock-Up Agreement, any distributions which are made by Old GM to the Nova Scotia Finance Trustee on account of the ULC Claim, including the ULC Swap Claim component of the ULC Claim, will be paid for the benefit of the Noteholders until the Noteholders receive payment in full on the Notes.

## ARGUMENT

Based upon these facts and others to be proven at trial, the GUC Trust respectfully submits that the Court should rule as follows:

- The Lock-Up Agreement is void *ab initio* because it is a postpetition agreement for which this Court's approval was required but not obtained.

- The ULC Note Claim and the Guarantee Claims should each be reduced by $367 million, because payment of the "consent fee" was a partial payment of the principal amount due on the Notes.

- The ULC Note Claim should be disallowed because it is duplicative of the Guarantee Claims.

- The ULC Swap Claim should be disallowed because either (i) the Swaps were not transferred to New GM so New GM had no right to assert any claims under the Swaps; or, alternatively, (ii) New GM does not have a valid claim against Nova Scotia Finance under the Swaps and, therefore, in either case, Nova Scotia

Finance does not have any valid claims against Old GM for any amount under the Swaps.

- The Lock-Up Noteholders' Guarantee Claims and the ULC Claim should be equitably subordinated to the claims of other general unsecured creditors of the Debtors or, alternatively, they should be equitably disallowed.

- The Guarantee Claims and the ULC Claim should be disallowed under section 502(d) of the Bankruptcy Code.

## POINT I

## THE LOCK-UP AGREEMENT IS VOID

The evidence at trial will demonstrate that the Lock-Up Agreement is a postpetition agreement. Consequently, as a matter of law, the Lock-Up Agreement is void *ab initio*.

### A.    The Lock-Up Agreement Is a Postpetition Agreement

The Lock-Up Agreement is a postpetition agreement because the parties expressly agreed not to be bound until the Lock-Up Agreement was complete, and the Lock-Up Agreement was not created, let alone completed, until after the Petition was filed.

Where the parties to a proposed contract agree that a contract is not to be "'effective or binding until certain conditions are performed or occur, no binding contract will arise until the conditions specified have occurred or been performed.'" *Gucci Am., Inc. v. Gucci*, No. 07 Civ. 6820(RMB)(SCF), 2009 WL 440463, at *4 (S.D.N.Y. Feb. 20, 2009) (citation omitted); *see also Ciaramella v. Reader's Digest Ass'n*, 131 F.3d 320, 324 (2d Cir. 1997) (agreement is effective at the time the parties intended to be bound); *Bear Stearns Inv. Prods., Inc. v. Hitachi Auto. Prods. (USA), Inc.*, 401 B.R. 598, 619 (S.D.N.Y. 2009) ("'[W]here the parties contemplate further negotiations and the execution of a formal instrument'" there can be no final agreement until the instrument is complete) (citations omitted); *GSGSB, Inc. v. N.Y. Yankees*, 862 F. Supp. 1160, 1172-73 (S.D.N.Y. 1994) (where drafts of an agreement contain a pre-negotiation clause, the parties are not bound until execution of a final agreement).

8

As will be demonstrated at trial, agreements entered into by the Noteholders and the Debtors reflect the parties' express agreement not to be bound "unless and until the Parties have entered into a *definitive* agreement." The evidence at trial, including expert testimony, will show that changes to the Lock-Up Agreement were made postpetition before the execution version of the Lock-Up Agreement was created. Thus, there was no definitive agreement among the parties until after the Petition was filed.

The GUC Trust anticipates that certain witnesses will testify at trial that the parties executed the Lock-Up Agreement prepetition. However, the evidence, including expert testimony, will show that the version of the Lock-Up Agreement that all parties identify as the final, execution version of the Lock-Up Agreement that they signed did not exist until *after* the Petition was filed. In any event, whether or not the parties actually signed some version of the agreement prepetition is irrelevant and not credible, given that no one has ever located or produced a version of the agreement that was purportedly executed prepetition. The parties agreed only to be bound upon execution of a final agreement, and the agreement was not final until after the Petition was filed.

### B.    The Lock-Up Agreement Was Not Approved by the Court

#### 1.    Approval of the Lock-Up Agreement Was Required Under Section 363(b)

Because the Lock-Up Agreement was not approved by the Court under section 363(b) of the Bankruptcy Code, it is void *ab initio*. *See* 11 U.S.C. § 363(b). The Lock-Up Agreement clearly was a transaction outside the ordinary course of the Debtors' business. The evidence will show that the Lock-Up Agreement is not a transaction a "debtor would likely enter in the course of its normal, daily business," and that actions taken by Old GM to implement the agreement were outside the ordinary course of business, including Old GM's (i) execution of two postpetition amendments to the Trust Agreement which, among other things, facilitated payment

9

of the Consent Fee postpetition, (ii) use of its corporate powers postpetition to cause Nova Scotia Finance to deliver its consent to a Nova Scotia Finance bankruptcy, among other things, and (iii) use of its corporate powers to cause Nova Scotia Finance to enter into a settlement postpetition that released GM Canada from its obligations under the Intercompany Loans. *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997) (citation omitted); *see also In re Consol. Auto Recyclers, Inc.*, 123 B.R. 130, 140 (Bankr. D. Me. 1991) (use of debtor's shares in its wholly-owned subsidiary to authorize chapter 11 petition for a subsidiary is a "use of" estate property outside the ordinary course).[2]

Old GM's failure to obtain this Court's approval (or even to disclose the existence of the Lock-Up Agreement to the Court) mandates the conclusion that the Lock-Up Agreement is void as a matter of law. Both the weight of the law and the policy behind section 363(b) of the Bankruptcy Code mandate the conclusion that this Court should not be "helpless to remedy unauthorized post-petition transfers." Hearing Tr. 9:10-11. As this Court observed, *In re Koneta*, 357 B.R. 540, 543-44 (Bankr. D. Ariz. 2006), does "a better job in dealing with the real concern here" than the contrary cases. Hearing Tr. 83:5-6. In that case, the court found that "[t]he usual effect of a sale or lease of property of the estate, conducted outside of the ordinary course of business but without adherence to the notice and hearing requirements of section 363(b)(1), is that any sale held is rendered null and void." *Koneta*, 357 B.R. at 543-44 (citations omitted). Cases in this Circuit are in accord. For example:

---

[2]    Because the Lock-Up Agreement settled the Nova Scotia Action, which asserted claims against Old GM, approval of the Lock-Up Agreement under Bankruptcy Rule 9019 was also required. *In re Handy & Harman Ref. Grp. Inc.*, 304 B.R. 49, 53 (Bankr. D. Conn. 2004) ("Even if the debtor and [the creditor] had agreed on all terms of the settlement, an agreement to compromise is not binding unless approved by the bankruptcy court.") (citation omitted); *Saccurato v. Masters, Inc. (In re Masters, Inc.)*, 149 B.R. 289, 291 (E.D.N.Y. 1992) ("In general, debtors cannot bind their estates to compromises absent bankruptcy court approval ....") (citation omitted).

10

- In *In re MF Global Inc.*, No. 11-2790 (MG) SIPA, 2012 WL 1424670, at *8 (Bankr. S.D.N.Y. Apr. 24, 2012), the Court held that assignments obtained without the requisite court approval were "void and of no further force or effect."

- In *Kirschenbaum v. Nassau County District Attorney (In re Vitta)*, 409 B.R. 6, 15-16 (Bankr. E.D.N.Y. 2009), the court held that a postpetition stipulation entered into by the debtor, transferring title to the county was "unenforceable." The court explained, "[a]n agreement by a debtor to transfer property of the estate without prior notice and a hearing [under section 363] is void and of no force and effect." *Id*. at 16.

- In *In re Enron Corp.*, No. 01-16034 (AIG), 2003 WL 1562202, at *16-19 (Bankr. S.D.N.Y. Mar. 21, 2003), the Court decided Enron was not authorized in the ordinary course of business to modify employee salaries in order to reimburse those employees for increased costs associated with a potentially adverse court order. The Court noted, "[a]bsent notice and an opportunity for a hearing, non-ordinary course of business transactions are void." *Id*. at *16.

- In *Medical Malpractice Insurance Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 385 (2d Cir. 1997), the Second Circuit concluded that cancellation of an insurance policy was beyond the ordinary course of business and void because the debtor never provided notice of the cancellation under section 363(b)(1).

Section 363 is designed to "strike [a] balance" between "allowing a business to continue its daily operations without excessive court or creditor oversight" and protecting creditors from "dissipation of the estate's assets." *Id*. at 384 (quotations and citation omitted). Here, given that enforcement of the Lock-Up Agreement would result in the dissipation of assets available to creditors to the unfair benefit of a favored few, only a finding that the Lock-Up Agreement is void strikes the balance intended by section 363.

## POINT II

### THE "CONSENT FEE" WAS A PAYMENT OF PRINCIPAL AND THE ULC CLAIM AND THE GUARANTEE CLAIMS SHOULD BE REDUCED ACCORDINGLY

Under the Lock-Up Agreement, the Noteholders were paid a "consent fee" of $367 million, which, according to the Lock-Up Agreement, does not reduce the principal due under the Notes by even a penny. As demonstrated below, the Consent Fee should be treated as

a payment of $367 million of principal on the Notes.  The ULC Note Claim and the Guarantee

Claims, collectively, should thus each be reduced by such amount.

### A.    The Consent Fee Should Be Treated as a Payment of Principal

#### 1.    At the Time the Consent Fee Was Paid, No Amounts Were Owed Under the Fiscal and Paying Agent Agreement

As of June 1, 2009, there were no interest payments due under the Notes, and Nova

Scotia Finance was otherwise current with respect to its payment obligations to the Noteholders.

Accordingly, it is clear that the $367 million payment was, in actuality, a payment of principal.

At trial, the GUC Trust will show that there is no basis under the Fiscal and Paying Agent

Agreement or other applicable law to treat the $367 million Consent Fee as anything other than a

payment of principal.   Indeed, were it not for the Lock-Up Agreement's provision to the

contrary, that is exactly how the parties themselves would have characterized such a payment.  In

fact, the parties themselves often evaluate the likelihood and possibility that the Consent Fee will

be applied against the principal of the Notes.

In light of the foregoing, payment of the Consent Fee was, as a matter of law, a payment

that reduces the principal amount due under the Notes.  Correspondingly, the ULC Note Claim

and the Guarantee Claims, collectively, should each be reduced by $367 million.

#### 2.    Even if the Lock-Up Agreement Is Not Void, the Consent Fee Should Be Recharacterized

If the Court were to find that the Lock-Up Agreement is not void, the Court can (and

should) consider the substance of the payment over the "consent fee" label attached to it in the

Lock-Up Agreement, and treat the Consent Fee as a payment of principal.

This Court is not bound by the parties' characterization of transactions when determining

the proper amount of a creditor's allowed claim.  *See Katchen v. Landy*, 382 U.S. 323, 329

(1966) (the power to allow or disallow a claim includes "full power to inquire into the validity of

any alleged debt or obligation of the bankrupt upon which a demand or a claim against the estate

is based.") (quotation and citation omitted); *Pepper v. Litton*, 308 U.S. 295, 307-08 (1939)

("[T]he bankruptcy court has the power to sift the circumstances surrounding any claim to see

that injustice or unfairness is not done in administration of the bankrupt estate."); *see also In re*

*Premier Entm't Biloxi, LLC*, 413 B.R. 370, 374 (Bankr. S.D. Miss. 2009) (disallowing claim for

liquidated damages set forth in parties' prepetition agreement).  Indeed, the Court should look to

the economic and factual realities of the transaction when evaluating a claim.  *See LFD*

*Operating, Inc. v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.)*, 274 B.R. 600, 615 &

631 (Bankr. S.D.N.Y. 2002), *aff'd*, No. 01-42217(REG), 2004 WL 1948754 (S.D.N.Y. Sept. 1,

2004), *aff'd*, 144 F. App'x 900 (2d Cir. 2005).

At trial, the GUC Trust will demonstrate that the economic realities support the

conclusion that the Consent Fee was a payment of principal on the Notes.  No Noteholder had

ever received a "consent fee" of this order of magnitude relative to any other investment.

Indeed, the evidence will show that (i) the Consent Fee is over 36% of the outstanding principal

balance on the Notes and (ii) according to Old GM's own financial analysis, payment of a

$367 million Consent Fee without altogether extinguishing the Notes did not make economic

sense.

## POINT III

### THE ULC NOTE CLAIM SHOULD BE DISALLOWED IN ITS ENTIRETY BECAUSE IT IS DUPLICATIVE OF THE GUARANTEE CLAIMS

Pursuant to the ULC Note Claim, the Nova Scotia Finance Trustee seeks contribution

under section 135 of the Nova Scotia Companies Act (the "**NSCA**"), R.S.N.S. 1989, c. 81,

*et seq.*, for amounts owed under the Notes.  The GUC Trust will prove at trial that such

claim is entirely duplicative of the Guarantee Claims and thus cannot be concurrently

allowed as a matter of Canadian and United States law.    Accordingly, under

section 502(b) of the Bankruptcy Code, the ULC Note Claim is unenforceable against Old GM's

bankruptcy estate and should be disallowed.

### A.    Recovery on a Contractual Guarantee Is In Lieu of Recovery on a Contribution Claim Under Section 135 of the NSCA

The ULC Note Claim is premised on section 135 of the NSCA, R.S.N.S. 1989 c.81,

§ 135, which provides that, when an unlimited liability company is wound up, "every present and

past member shall, subject to this Section, be liable to contribute to the assets of the company to

an amount sufficient for payment of its debts and liabilities and the costs, charges, and expenses

of the winding up …." NSCA, § 135.  The GUC Trust anticipates that, at trial, the Nova Scotia

Finance Trustee will argue that, because Old GM is a member of Nova Scotia Finance, it is

separately liable on both the Notes under NSCA, s. 135 *and* under the Guarantee.  With the

support of expert testimony, the GUC Trust will prove at trial that Old GM's guarantee of the

Notes does not entitle the Noteholders to double the allowed claim and, thus, the ULC Note

Claim should be disallowed as a matter of law.

Specifically, the GUC Trust's expert, Professor Khimji, will testify that, notwithstanding

section 135, when a member contractually guarantees the debt of a ULC, that member does not

incur an additional obligation on the same debt.  Therefore, a member of a ULC that separately

guarantees the ULC's debt is not liable as a guarantor and also as a contributor under section

135.

As will be shown at trial, Professor Khimji's interpretation of section 135 is consistent

with its purpose and history.  *See also Interpretation Act*, R.S.N.S. 1989, c. 235, § 9(5) (requiring

consideration of the following in interpreting a statute: "(a) the occasion and necessity for the

enactment; (b) the circumstances existing at the time it was passed; (c) the mischief to be

remedied; (d) the object to be attained; (e) the former law, including other enactments upon the

same or similar subjects; (f) the consequences of a particular interpretation; and (g) the history of

14

legislation on the subject"); *In re Mayfair Prop. Co.*, [1898] 2 Ch. 28, 35 ("In order properly to interpret any statute it is as necessary now as it was when Lord Coke reported *Heydon's Case* to consider how the law stood when the statute to be construed was passed, what the mischief was for which the old law did not provide, and the remedy provided by the statute to cure that mischief.") (footnote omitted).

### B.    Canadian Law Precludes Recovery on the ULC Note Claim and Guarantee Claims

The GUC Trust anticipates that the Nova Scotia Finance Trustee will argue that, because the ULC Note Claim and the Guarantee Claims are asserted by allegedly different claimants (the Nova Scotia Finance Trustee and the Noteholders), such claims are separate and distinct and therefore separately enforceable.  To the extent the Nova Scotia Finance Trustee prevails on this argument (which it should not), the ULC Note Claim should still be disallowed under the well-established Canadian rule against double proofs, which precludes more than one recovery for claims for the same underlying debt.

Through expert testimony, the GUC Trust will demonstrate that Canada's rule against double proof prevents more than one recovery for the same underlying debt, even if such claims are asserted by different parties or based on different causes of action.  Professor Khimji will testify that the critical query in determining whether this rule applies is whether the separate claims relate in substance to the same debt.  As the GUC Trust will prove at trial, the facts clearly show that the same debt – i.e., the obligations on the Notes – underlies both the ULC Note Claim and the Guarantee Claims.  Consequently, as a matter of Canadian law, both claims may not be allowed.

Professor Khimji's testimony is further supported by the opinion of the Ontario Court of Justice in *Re Olympia & York Developments Ltd.*, [1998] OJ No. 4903, 4 C.B.R. (4th) 189 (Can. Ont. Crt Gen. Div.).  In *Olympia & York*, the question was whether the claim of a syndicate of

lenders against a parent on account of the parent's guarantee of a loan made to its wholly-owned subsidiary *and* the claim of the subsidiary against the parent for an intercompany loan made by the subsidiary to the parent using the funds borrowed by the subsidiary from the syndicate of lenders should both be allowed. *Id*. at ¶¶ 2-6. In that case, the court found that, in determining whether two debts constitute one debt in substance: "the question [is] whether two payments are being sought for a liability which, if the company were solvent, *could be discharged as regards both claimants by one payment*." *Id*. at ¶ 45 (emphasis added). In applying this test, the court concluded that the two claims were double proofs and that claimants were entitled to a single dividend out of the parent's estate.

As the GUC Trust will show at trial, assuming Old GM were solvent, a full payment on the Note would eliminate, collectively, the ULC Note Claim and the Guarantee Claims. Consequently, the Canadian rule against double proof, as illustrated in *Olympia & York*, limits recovery to the Guarantee Claims.

**C.    United States Bankruptcy Law Also Precludes
Recovery on the ULC Note Claim and Guarantee Claims**

The ULC Note Claim should also be disallowed as a matter of United States bankruptcy law. Similar to the Canadian double proof rule, it is a well-established principle of the United States bankruptcy law that a single loss is entitled to only a single satisfaction, regardless of whether claims are brought under different theories and by different parties. *See, e.g.*, *In re Nw. Airlines Corp.*, No. 05-17930 (ALG), 2007 WL 2682129, at *2-3 (Bankr. S.D.N.Y. Sept. 12, 2007) (disallowing portion of claim of employee for amounts due under a judgment where a claim for the same amount was filed by the claimant's union); *In re Enron Corp.*, No. 01-16034 (AJG), 2006 WL 1030420, at *2 (Bankr. S.D.N.Y. Apr. 6, 2006) (disallowing claim of employee for unpaid wages and benefits due under collective bargaining agreement where the claim was duplicative of claim filed by claimant's union); *In re Finley, Kumble, Wagner, Heine,*

*Underberg, Manley, Myerson & Casey*, 160 B.R. 882, 894 (Bankr. S.D.N.Y. 1993) ("In bankruptcy, multiple recoveries for an identical injury are generally disallowed."); *see also Union Nat'l Bank of Johnstown, P.A. v. People's Savings & Trust Co., of Pittsburgh, PA,* 28 F.2d 326, 328 (3d Cir. 1928) ("Any rule which would permit the proof of 2 notes for one debt would permit the proof of 20 notes, and would substitute for an equitable pro rata distribution among creditors an indefinite rule, depending upon the ability of the creditors to secure from the debtor additional and numerous evidences of the same debt, and would thus effect an inequitable result, whereby creditors would not receive the same pro rata share out of the insolvent estate.").[3]

As explained above and as the GUC Trust will demonstrate at trial, the ULC Note Claim and the Guarantee Claims relate to a single loss: the amount due under the Notes. That single loss is entitled to only a single satisfaction. Accordingly, the ULC Note Claim should be disallowed under section 502(b) of the Bankruptcy Code.

**D.    The ULC Note Claim Should Be Disallowed
        <u>Pursuant to Section 502(e) of the Bankruptcy Code</u>**

Section 502(e) of the Bankruptcy Code precludes allowance of the ULC Note Claim because it is an attempted recovery that is redundant with the Guarantee Claims. As such, the ULC Note Claim falls within the ambit of section 502(e)(1)(B) – whose sole purpose is "to preclude redundant recoveries on identical claims against insolvent estates in violation of the fundamental Code policy fostering

---

[3]    The GUC Trust expects that the Nova Scotia Finance Trustee will argue that the Second Circuit's decision in *Northwestern Mutual Life Insurance Co. v. Delta Airlines, Inc. (In re Delta Air Lines, Inc.),* 608 F.3d 139 (2d Cir. 2010), requires the allowance of both the ULC Note Claim and the Guarantee Claim. This argument is wrong. In fact, *Delta* stands for the unremarkable proposition that where a party makes a contractual promise to pay two different parties predicated on the same loss, the promisor's payment to one party will not excuse payment to the other where the party with the actual loss did not receive the economic benefit of the payment. *Id.* at 149-50. In this case, the parties with the actual economic loss are the Noteholders, who will receive distributions on account of their Guarantee Claims. Disallowing the ULC Note Claim thus would not run afoul of the holding of *Delta Air Lines.*

equitable distribution among all creditors of the same class." *In re APCO Liquidating Trust*, 370 B.R. 625, 631 (Bankr. D. Del. 2007) (quotation and citation omitted).

### POINT IV

### THE ULC SWAP CLAIM SHOULD BE
### DISALLOWED OR, ALTERNATIVELY, REDUCED

Through the ULC Swap Claim, the Nova Scotia Finance Trustee seeks contribution under section 135 of the NSCA, based on New GM's claim against Nova Scotia Finance for amounts allegedly owed under the Swaps. The ULC Swap Claim fails because, as the GUC Trust will show at trial, (i) New GM does not have any rights to the Swaps and, thus, no valid claims against Nova Scotia Finance, (ii) even if New GM had rights to the Swaps, the Swaps were not terminated and thus do not give rise to any valid claims, and (iii) even if the Swaps were validly terminated, the Swap Claim was improperly calculated, with respect to both the date and method used, and should be reduced to zero or, at worst, by more than $200 million.

### A.    New GM Has No Rights to the Swaps

The GUC Trust anticipates that, at trial, the Nova Scotia Finance Trustee will argue that New GM had rights to the Swaps which gave rise to a valid claim against Nova Scotia Finance, which in turn gave rise to that portion of the Nova Scotia Finance Trustee's claim against Old GM that relates to the Swaps. The GUC Trust, however, will show that the Swaps remained assets of Old GM and were not transferred to New GM.

### 1.    The Swaps Were Not Assumed and Assigned to New GM

The Swaps were not assumed and assigned to New GM because the assumption procedures set forth in this Court's order approving the 363 Sale, which were the "exclusive" procedures for the assumption and assignment of contracts in this case, were not followed. As a consequence, New GM has no right to the Swaps and no claims against Nova Scotia Finance arising from the Swaps. The right to assert a claim against Nova Scotia Finance for liabilities

18

under the Swaps belongs solely to Old GM and Old GM has not asserted that claim.  Thus, the
ULC Swap Claim should be disallowed.

### 2.    The Swaps Are Not "Purchased Assets" Sold to New GM

The GUC Trust anticipates that, at trial, the Nova Scotia Finance Trustee will
alternatively argue that the Swaps were "Purchased Assets" sold to New GM under the Master
Sale and Purchase Agreement (the "**MSPA**").  The GUC Trust will introduce evidence showing
that this argument also fails as a matter of fact and law because the Swaps are not "Intercompany
Obligations" as defined under the MSPA and are not, therefore, "Purchased Assets" thereunder.
Alternatively, even if the Swaps were Intercompany Obligations, they still would not be
"Purchased Assets" under the MSPA, because they are "Excluded Assets" which were not
transferred to New GM.

For the foregoing reasons, New GM has no right to the Swaps and, thus, no claims
against Nova Scotia Finance arising therefrom.  Accordingly, the ULC Swap Claim should be
disallowed.

### B.    The Swaps Were Not Terminated

Even if the Swaps were somehow transferred to New GM, the ULC Swap Claim is still
invalid.  As the GUC Trust will demonstrate at trial, the GM Swap Claim against Nova Scotia
Finance fails as a matter of law because the Swaps were not terminated.

The evidence shows that the Swaps were not terminated in accordance with the Swap
Agreement and, at most, Nova Scotia Finance "disclaim[ed]" the Swaps.  Such disclaimer fails
to meet the requirements for termination under the Master Agreement, which requires, among
other things, that the non-defaulting party (New GM) issue a termination notice specifying the
default and designating a future early termination date – not a date before the time such notice is
effective.

Absent termination, no amounts are due under the Swaps.  The ULC Swap Claim should also be disallowed on this basis.

### C.    Alternatively, the ULC Swap Claim Should Be Reduced

If the Court does not disallow the ULC Swap Claim in its entirety (as it should), the claim should be reduced by at least $233 million.  The GUC Trust's expert will testify that, the actual amount of the ULC Swap Claim (if any) would be $331,504,266, as determined in accordance with the Final Exchange method.  The Final Exchange Method is the calculation method specified under the Swap Agreement.

## POINT V

### THE LOCK-UP NOTEHOLDERS'
### GUARANTEE CLAIMS AND THE
### ULC CLAIM SHOULD BE EQUITABLY SUBORDINATED

The Lock-Up Noteholders' Guarantee Claims and the ULC Claim should be equitably subordinated to the claims of other unsecured creditors.  As the GUC Trust will show at trial, the inequitable conduct of the Noteholders and the Nova Scotia Finance Trustee establish a basis for such subordination as a matter of law.[4]

### A.    Equitable Subordination

Equitable subordination is warranted where, as in this case, "(a) a claimant engaged in some type of 'inequitable conduct'; (b) the misconduct caused injury to the creditors or conferred an unfair advantage on the claimant; and (c) equitable subordination is … consistent with bankruptcy law.  *See Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns*

---

[4]    This Court has recognized equitable disallowance as a separate and valid basis for the expungement of claims.  *See* July 17, 2012 Hearing Tr.; April. 23, 2012 Hearing Tr. 11:23-12:1 ("Even though section 510(c) of the code expressly authorizes only equitable subordination, equitable disallowance is as permissible as equitable subordination is, though it is imposed less commonly.").  Like equitable subordination, equitable disallowance is appropriate where, as here, the claimant engages in inequitable conduct.  *Pepper*, 308 U.S. at 307-08.  Consequently, equitable disallowance provides another basis for disallowance of the Noteholders' Guarantee Claims and the ULC Claim.

*Corp.)*, 365 B.R. 24, 68 (Bankr. S.D.N.Y. 2007), *aff'd sub nom. Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008), *adhered to on reconsideration*, No. 05 Civ. 9050(LMM), 2008 WL 1959542 (S.D.N.Y. May 5, 2008).

Inequitable conduct is generally viewed as conduct which "shocks one's good conscience." *Id.* (quotation and citation omitted). By way of example, inequitable conduct can be "a secret or open fraud, lack of faith or guardianship by a fiduciary; an unjust enrichment, not enrichment by . . . chance, astuteness or business acumen, but enrichment through another's loss brought about by one's own unconscionable, unjust, unfair, close or double dealing or foul conduct." *Id.* (quoting *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994).[5]

### B. The Lock-Up Noteholders' Claims Should Be Equitably Subordinated Based on Inequitable Conduct

At trial, the GUC Trust will show that the Lock-Up Noteholders enriched themselves at the expense of other general unsecured creditors of Old GM by their conduct both before and after the Petition was filed. Such "inequitable conduct" is sufficient to equitably subordinate the claims of the Lock-Up Noteholders to those of other unsecured creditors.

The evidence will show that the Guarantee Claims should be equitably subordinated because the Lock-Up Noteholders engaged in inequitable conduct that conferred on them an unfair advantage. By way of example, the Lock-Up Noteholders insisted that they receive the commercially unreasonable Consent Fee, which they knew would be paid to them postpetition with funds that were property of Old GM's estate. In order to receive a larger chunk

---

[5]    Where, as here, claimants may be considered insiders, their conduct is subject to greater scrutiny and the threshold for establishing equitable subordination is lower than where the creditors are not insiders. *In re Adler, Coleman Clearing Corp.*, 277 B.R. 520, (Bankr. S.D.N.Y. 2002) ("Where the claimant is an insider … his dealings 'are subjected to rigorous scrutiny' …."); *Nisselson v. Ford Motor Co. (In re Monahan Ford Corp. of Flushing)*, 340 B.R. 1, 44-45 (Bankr. E.D.N.Y. 2006).

of the Consent Fee and solidify total control of the Nova Scotia Finance bankruptcy, certain Lock-Up Noteholders increased their holdings the next day. Further, certain Lock-Up Noteholders failed to disclose their trading history of credit default swaps referencing General Motors in the 2019 statements on file with this Court. Such disclosure would have revealed that these Noteholders reaped profits upon Old GM's bankruptcy filing, despite participation by certain Lock-Up Noteholders on a prepetition steering committee that was supposedly vested in an out-of-court restructuring of Old GM. Moreover, by the Nova Scotia Action, certain Lock-Up Noteholders commenced a meritless oppression proceeding in Nova Scotia in order to impede Old GM's restructuring efforts. Finally, certain Lock-Up Noteholders manipulated the date by which Nova Scotia Finance would be put into bankruptcy in order to insulate the Consent Fee and Lock-Up Agreement from challenge.

### C. The Nova Scotia Finance Trustee's Claims Should Be Equitably Subordinated Based on Inequitable Conduct

At trial, the GUC Trust will also demonstrate that the Nova Scotia Finance Trustee acted inequitably, such that his claim should be equitably subordinated. The Nova Scotia Finance Trustee (i) was hand-selected by the Lock-Up Noteholders and is controlled by them, and consequently the inequitable conduct of the Lock-Up Noteholders should be imputed to him; (ii) failed to adequately investigate possible preferential transfers; (iii) failed to have inspectors appointed for the Nova Scotia Finance estate, as is customary in such a proceeding; (iv) was aware of and consented to the Lock-Up Noteholders' manipulation of the timing of the Nova Scotia Finance bankruptcy; and (v) submitted an inflated and false claim against Old GM in reliance upon calculations performed at the direction of the Lock-Up Noteholders and without undertaking any independent investigation. Each of the foregoing constitutes inequitable conduct supporting equitable subordination.

## POINT VI

### THE GUARANTEE CLAIMS OF THE LOCK-UP NOTEHOLDERS AND ULC NOTE CLAIM SHOULD BE DISALLOWED UNDER SECTION 502(d)

The Guarantee Claims should be disallowed under section 502(d) of the Bankruptcy Code. Among other things, each of the Noteholders as of June 25, 2009 received their *pro rata* share of the Consent Fee from Nova Scotia Finance which, moments before received such funds from GM Canada, both of which are avoidable transfers under the Bankruptcy Code. Under section 502(d) of the Bankruptcy Code, receipt of such avoidable transfers is a sufficient basis to disallow the Guarantee Claims.

### A.    The Consent Fee Was an Avoidable Transfer

Payment of the Consent Fee was an unauthorized postpetition transfer of the Debtors' property. The GUC Trust will show at trial that $450 million was transferred from Old GM to GM Canada subject to a trust agreement for the sole purpose of paying the Consent Fee. At the time of the transfer, the parties had not yet reached agreement on the amount of the Consent Fee, which is why more than $367 million was transferred. Under the applicable trust agreement, if certain conditions were not met, the funds reverted to Old GM. As will be shown at trial, as of the filing of the Petition, those conditions were not satisfied, and thus, as of the filing of the Petition, the funds were property of Old GM. *See Fisher v. N.Y.C. Dep't of Hous. Pres. & Dev. (In re Pan Trading Corp.)*, 125 B.R. 869, 878 (Bankr. S.D.N.Y 1991) (under New York law, the beneficiaries of an escrow are not entitled to the proceeds until, among other things, the agreed-upon conditions are satisfied; if such conditions are not satisfied, the debtor's residual interest is property of the estate).

**B. The GUC Trust May Pursue an Objection
Under Section 502(d) Because Avoidance Actions
Related to the Consent Fee Were Not Sold to New GM**

The section 502(d) objection is based on receipt by the Noteholders of the Consent Fee.

Under the MSPA, only claims involving transfers from Old GM to a "Purchased Subsidiary"

were sold to New GM.  The evidence at trial will show that Old GM funded the Consent Fee

payment to the Noteholders under the Lock-Up Agreement.  The GUC Trust will demonstrate

that, under the collapsing doctrine, this transfer of funds constitutes a transfer from Old GM to

the Noteholders, and therefore, does not involve a transfer to or from a "Purchased Subsidiary."

*See HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1062 (2d Cir. 1995) (citing *Orr v. Kinderhill*

*Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) (court "will not turn a blind eye to the reality" that

challenged conveyance and subsequent transfers "constituted a single, integrated transaction"));

*Sullivan v. Messer (In re Corcoran)*, 246 B.R. 152, 160 (E.D.N.Y. 2000) (quotation omitted)

(multiple transactions may be collapsed and treated as phases of a single, integrated transaction

for analysis under fraudulent conveyance laws; collapsing is appropriate where the supposed

separate transfers were in fact a "single, integrated transaction").

Based on the foregoing, and as will be more fully established at trial, avoidance actions

related to the Consent Fee were not sold to New GM and thus do not impact the GUC Trust's

section 502(d) objection.

**C. Even if the Avoidance Actions Were Sold to
New GM, Such Sale Does Not Preclude the GUC
Trust from Pursuing Its Objection Under Section 502(d)**

Even if the avoidance actions related to the Consent Fee were in fact sold to New GM

(which they were not), the GUC Trust can still bring a valid objection based on section 502(d).

Courts have disallowed claims under this provision even where the objector has not, or cannot,

bring the underlying avoidance action against the claimant.  *See, e.g., El Paso v. Am. W. Airlines,*

24

*Inc. (In re Am. W. Airlines, Inc.)*, 217 F.3d 1161, 1165-66 (9th Cir. 2000) (holding that a transfer

is still avoidable for section 502(d) purposes even if the trustee would be unable to recover such

transfer from the transferee); *Brown v. U.S. Internal Revenue Serv. (In re Larry's Marineland of*

*Richmond, Inc.)*, 166 B.R. 871, 874-75 (Bankr. E.D. Ky. 1993); *In re Mid Atl. Fund, Inc.*, 60

B.R. 604, 609-10 (Bankr. S.D.N.Y. 1986) (holding that trustee can rely upon section 502(d) to

preclude entities from sharing in distribution of assets of estate even though statute of limitations

barred bringing avoidance action).

Here, the weight of the case law is that section 502(d) may be asserted defensively even

when no avoidance action has been, or can be, brought.  Consequently, the GUC Trust may seek

disallowance of claims on the basis of 502(d), even if the right to bring the underlying avoidance

actions was sold to New GM.[6]

---

[6]     The GUC Trust has not briefed, but reserves all of its rights in connection with, any future
requests for relief from the Sale Order under Rule 60(b) of the Federal Rules of Civil Procedure.

## <u>CONCLUSION</u>

For the foregoing reasons, the GUC Trust requests that the Court enter judgment granting

the relief requested in the Amended Objection and the complaint in the Adversary Proceeding,

and granting such other and further relief as is just and proper.

Dated:  New York, New York
       July 27, 2012

          DICKSTEIN SHAPIRO LLP

          By: */s/ Eric B. Fisher*_____
              Barry N. Seidel
              Eric B. Fisher
              Stefanie Birbrower Greer
              Katie L. Cooperman
              Mary Kim (admitted *pro hac vice*)
          1633 Broadway
          New York, NY 10019-6708
          Telephone: (212) 277-6500
          Facsimile: (212) 277-6501

          *Counsel for Motors Liquidation*
          *Company GUC Trust*