AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Daniel H. Golden
Sean E. O'Donnell
Philip C. Dublin

*Counsel for Green Hunt Wedlake Inc.,*
*Trustee of General Motors Nova Scotia Finance Company*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>MOTORS LIQUIDATION COMPANY., *et al.*,<br>*f/k/a General Motors Corp., et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 09-50026 (REG)<br><br>(Jointly Administered) |
| MOTORS LIQUIDATION COMPANY GUC TRUST,<br><br>Plaintiff,<br><br>v.<br><br>APPALOOSA INVESTMENT LIMITED PARTNERSHIP I, *et al.*,<br><br>Defendants. | Adv. Proc. No. 12-09802 (REG) |

**PRE-TRIAL MEMORANDUM OF GREEN HUNT WEDLAKE INC. TRUSTEE OF GENERAL MOTORS NOVA SCOTIA FINANCE COMPANY**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ........................................................................................................3

    A.     The Creation of GM Nova Scotia ...................................................................3

    B.     The Issuance of the Notes ..............................................................................3

    C.     The Old GM Guarantee ..................................................................................4

    D.     The Swap Agreements ....................................................................................4

    E.     The Nova Scotia Litigation ............................................................................5

    F.     Old GM's Failed Bond Exchange Offer .........................................................5

    G.     The Lock-Up Agreement and the Resolution of the CDN$1.334 Billion
           Intercompany Loan ........................................................................................6

    H.     Funding the Consent Fee ...............................................................................7

    I.     Old GM's Bankruptcy Filing .........................................................................8

    J.     The Escrow Agreement & the Extraordinary Resolution .....................................8

    K.     The 363 Sale And the Transfer of the Obligations Under the Swap
           Agreements to New GM ...............................................................................10

    L.     The GM Nova Scotia Canadian Bankruptcy Filing...................................................10

    M.     The Nova Scotia Trustee Exercises Its Statutory Duties .....................................11

    N.     Disclaimer of the Swap Agreements.......................................................................12

    O.     The Nova Scotia Trustee Claim and the Noteholders' Guarantee Claim...............14

    P.     The GUC Trust's Objections and the Subsequent Adversary Proceeding ............14

ARGUMENT .........................................................................................................................15

I.    The Nova Scotia Trustee Did Not Engage In Any Inequitable Conduct and Its
    Claim Should Not be Subordinated or Disallowed............................................................15

    A.     The Law .......................................................................................................15

    B.     Any Conduct Allegedly Committed by the Noteholders or Others Should
           Not Be Imputed to the Nova Scotia Trustee ......................................................16

    C.     The Noteholders' Appointment of the Nova Scotia Trustee was Entirely
           Proper ...........................................................................................................17

    D.     The Nova Scotia Trustee Played No Role in the Timing of the GM Nova
           Scotia Bankruptcy ........................................................................................18

E.    The Nova Scotia Trustee is Duty-Bound to Act for the Benefit of GM
      Nova Scotia's Creditors, But It Did Not Do So Exclusively for the
      Noteholders ........................................................................................... 18

F.    The Decision of Whether to Appoint an "Inspector" Rested with GM Nova
      Scotia's Creditors, Not Its Trustee ....................................................... 19

G.    There Was No Basis for the Nova Scotia Trustee to Further Investigate the
      Lock-Up Agreement, the Consent Fee or the Forgiveness of the
      CDN$1.334 Billion Owed by GM Canada to GM Nova Scotia ............. 20

H.    The Nova Scotia Trustee Properly Vetted the Claims Against GM Nova
      Scotia, Including the Swap Claims ........................................................ 20

I.    The Swap Agreements Were Properly Terminated ................................ 21

J.    New GM's Swap Claim was Properly Calculated ................................. 23

K.    The Nova Scotia Trustee Made No Misrepresentations to the Court ..... 25

II.   The Nova Scotia Trustee Has a Valid Claim Pursuant to Section 135 of The
      Companies Act ............................................................................................. 25

III.  The Nova Scotia Trustee Claim and the Guarantee Claim Are Not Duplicative and
      Both are Permissible .................................................................................... 28

A.    The Nova Scotia Trustee Claim Is the Statutory Result of Old GM's
      Decision To Create GM Nova Scotia as an Unlimited Liability Company,
      and Is Distinct From the Contractually Created Guarantee Claim ........ 28

B.    The Guarantee Does Not, Without More, Eliminate the Nova Scotia
      Trustee Claim ........................................................................................ 32

IV.   Canadian Insolvency Principles, Including the Rule Against Double Proof Do Not
      bar the Allowance of Both the Nova Scotia Trustee Claim and the Guarantee
      Claim in Full ............................................................................................... 34

V.    The GUC Trust's Remaining Arguments Do Not Apply to the Nova Scotia Trustee
      and Are Unwarranted ................................................................................... 37

A.    Bankruptcy Code Section 502(d) Is Inapplicable ................................. 37

B.    The Lock-Up Agreement Does Not Constitute an Unauthorized 9019
      Settlement ............................................................................................. 38

C.    Recharacterization of the Consent Fee as a Paydown of Principal Is
      Inappropriate ......................................................................................... 39

D.    The GUC Trust's Request for Relief Under Federal Rule of Civil
      Procedure 60(b) and Bankruptcy Rule 9024 ......................................... 39

# TABLE OF AUTHORITIES

Page(s)

CASES

*A. Marquette & Fils Inc. v. Mercure,*
    [1977] 1 SCR 549 (SCC) (Can.) ...........................................................................19

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.),*
    365 B.R. 24 (Bankr. S.D.N.Y. 2007) .................................................................16

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.),*
    390 B.R. 64 (S.D.N.Y. 2008) ...........................................................................16

*Bartruk v. Mitsubishi Motors,*
    1998 WL 308353 (S.D.N.Y. June 10, 1998) .......................................................26

*Bausch & Lomb Inc. v. Bressler,*
    977 F.2d 720 (2d Cir. 1992)..............................................................................25

*Benjamin v. Diamond (In re Mobile Steel Co.),*
    563 F.2d 692 (5th Cir. 1977) ............................................................................15

*Chem. Bank New York Trust Co. v. Kheel,*
    369 F.2d 845 (2d Cir. 1966)..............................................................................31

*Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.),*
    379 B.R. 425 (S.D.N.Y. 2007)...........................................................................15

*Glick v. Jordan,*
    [1967] OJ No. 385, 11 CBR (NS) 70 (Can.)......................................................22

*In the Matter of Kaupthing Singer and Friedlander Limited,*
    [2011] UKSC 48 ¶ 1 (UK)................................................................................34

*In re Gen. Motors Corp.,*
    407 B.R. 463 (Bankr. S.D.N.Y. 2009) ...............................................................15

*In re Gen. Motors Corp.,*
    430 B.R. 65 (S.D.N.Y. 2010).............................................................................15

*In re Smurfit-Stone Container Corp.,*
    444 B.R. 111 (Bankr. D. Del. 2011) ............................................................27, 32

*J.R. Loftus, Inc. v. White,*
    85 N.Y.2d 874, 649 N.E.2d 1196 (N.Y. 1995) ...................................................25

*New Skeena Forest Products Inc. v. Don Hull Contracting,*
    [2005] BCJ No. 546, 251 DLR (4th) (Can.) .......................................................21

*Norwest Bank Worthington v. Ahlers*,
    485 U.S. 197 (1988)........................................................................................................39

*Nw. Mut. Life Ins. Co. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*,
    608 F.3d 139 (2d Cir. 2010)........................................................................................29, 30

*Re Olympia & York Dev. Ltd.*
    (1998), 4 C.B.R. (4th) 189 ...........................................................................................34

*Robinson v. Seaboard Nat'l Bank of New York*,
    247 F. 667 (3d Cir. 1918), *aff'd* 247 F. 1007 (3d Cir. 1918) .................................................35

*Royal Bank of Canada v. Penex Metropolis Ltd.*,
    [2009] OJ No. 3649, 180..............................................................................................21

*Sasso and Cronin v. D. & A. MacLeod Company Ltd.*,
    [1991] OJ No. 676, 3 OR (3d) 472 ...............................................................................22

*Simon v. Electrospace Corp.*,
    28 N.Y.2d 136, 269 N.E.2d 21 (N.Y. 1971) .....................................................................25

*Solow v. Kalikow* (*In re Kalikow*),
    602 F.3d 82 (2d Cir. 2010)...........................................................................................39

*Union Sav. Bank v. Augie/Restivo Banking Co. (In re Augie/Restivo Banking Co.)*,
    860 F.2d 515 (2d Cir. 1988)..........................................................................................31

*United States Abatement Corp. v. Mobil Exploring & Producing U.S., Inc. (In re United States Abatement Corp.)*,
    39 F.3d 556 (5th Cir. 1994) ..........................................................................................16

*United States v. Noland*,
    517 U.S. 535 (1996)....................................................................................................15

*Wilson v. Huffman (In re Missionary Baptist Found. of Am., Inc.)*,
    818 F.2d 1135 (5th Cir. 1987) .......................................................................................16

STATUTES

11 U.S.C.
    § 105......................................................................................................................39
    § 363.......................................................................................................................6
    § 502(d)..............................................................................................................37, 38
    § 549.......................................................................................................................7
    § 510(c) ..................................................................................................................15

Companies Act, R.S.N.S., 1989, c. 81, s. 135 (Can.) ..........................................................3, 27

Chapter B-3 of the Revised Statutes of Canada 1985, as amended (Can.)
    § 116(1) ...............................................................................................................19
    § 124 ....................................................................................................................23
    § 14.06(1) ...........................................................................................................17
    § 43(1) ...................................................................................................11, 17, 18
    § 43(9) ...................................................................................................11, 17, 18
    § 77 ................................................................................................................29, 33


OTHER AUTHORITIES

Bankruptcy Rule 9019 ...........................................................................................38

Bankruptcy Rule 9024 ...........................................................................................39

Fed. R. Civ. P. 44.1 ................................................................................................26

Federal Rule of Civil Procedure 60(b) .............................................................39, 40

Rule 9024 of the Federal Rules of Bankruptcy Procedure ............................................39

Restatement [Second] of Contracts § 347 ..............................................................25

## PRELIMINARY STATEMENT

Contrary to the Motors Liquidation Company GUC Trust's (the "**GUC Trust**")

contention, there is absolutely no basis to equitably subordinate, recharacterize or otherwise

discount the $1,607,647,592.49 claim of Green Hunt Wedlake Inc. (the "**Nova Scotia Trustee**")

against Old GM.[1]  At trial it will be proven that:

1.   **The Nova Scotia Trustee's actions comport with its statutory obligations and have been equitable in every respect.**  As is customary in Canadian bankruptcies, the Nova Scotia Trustee was nominated by the creditors of GM Nova Scotia to serve as the company's trustee.  In this capacity, the Nova Scotia Trustee is the legal representative of GM Nova Scotia and has a statutory obligation to act on behalf of GM Nova Scotia's creditors to recover on GM Nova Scotia's assets for their benefit, and the evidence will show that there was nothing nefarious about this relationship.  The Nova Scotia Trustee's actions were neither inequitable nor collusive.  Rather, the Nova Scotia Trustee's conduct has been entirely in line with its statutory mandate to properly administer a bankrupt Canadian estate as an officer of the Canadian court.

2.   **The Nova Scotia Trustee has a valid claim pursuant to Section 135 of the Nova Scotia Companies Act.**  GM Nova Scotia is an unlimited liability company organized under the Nova Scotia Companies Act.  Old GM used this corporate structure to provide Old GM and its affiliates the opportunity to take advantage of a variety of tax-related benefits, but it also made Old GM, as the sole member of GM Nova Scotia, liable for the debts and liabilities of GM Nova Scotia in the event GM Nova Scotia ever filed for bankruptcy.

3.   **The Nova Scotia Trustee Claim and the Guarantee Claim are not duplicative, and both are permissible under United States bankruptcy law.**  The Nova Scotia Trustee Claim is a Nova Scotia statutory claim by the GM Nova Scotia estate to recover outstanding debts from its members pursuant to Nova Scotia law.  The Guarantee Claim, on the other hand, arises pursuant to a contractual agreement between Old GM and the Noteholders.  As will be shown at trial, these claims are not duplicative as they are (i) based on separate legal theories, (ii) asserted by different parties, (iii) for different debts, and (iv) arising from different obligations.

---

[1] Green Hunt Wedlake Inc. is a Canadian company operating in Halifax, Nova Scotia that consults on insolvencies and serves as a trustee in insolvency matters.  Peter Wedlake, President of Green Hunt Wedlake Inc., represents Green Hunt Wedlake Inc. in its capacity as trustee of the estate of GM Nova Scotia, a bankrupt, and has served as President of the Canadian Association of Insolvency and Restructuring Professionals (CIRP), the organization that oversees the trustee profession in Canada.  Mr. Wedlake has a background in law and numerous professional designations, sits on several advisory boards, and has served as a financial advisor for secured lenders for at least thirty years.  Unless otherwise defined, all capitalized terms used in this Preliminary Statement shall have the meanings ascribed to them later in this Pre-Trial Memorandum.

103515640 v36

United States bankruptcy law permits distinct claims such as these to be asserted, especially in situations, as here, where disallowing a claim would invalidate the bargained-for benefit of a party.  Moreover, even if Canadian bankruptcy law were to apply—which it does not—allowance of the Nova Scotia Trustee Claim and the Guarantee Claim would nevertheless be permissible.

4.    **The portion of the Nova Scotia Trustee Claim in respect of amounts owed under the Swap Agreements is valid and accurately calculated.**  Contrary to the GUC Trust's claims, (i) New GM is the proper counterparty to the Swap Agreements, (ii) the Nova Scotia Trustee's disclaimer of the Swap Agreements—which was acknowledged by New GM—was valid and appropriate under Canadian law; and (iii) the amount owed on account of the Swap Agreements has been properly calculated.[2]

In sum, the GUC Trust will be unable to prove *any* improper conduct by the Nova Scotia

Trustee meriting the drastic remedies of equitable subordination or recharacterization of the

Nova Scotia Trustee Claim.  While it is true that approximately $1 billion of the Nova Scotia

Trustee Claim relates to an obligation owed to the Noteholders by GM Nova Scotia, Old GM's

liability to GM Nova Scotia for this obligation is based upon: (i) Old GM's election, in 2001, to

form GM Nova Scotia as an "unlimited liability company" pursuant to the Nova Scotia

Companies Act, and (ii) the issuance by GM Nova Scotia of the Notes pursuant to the Fiscal and

Paying Agency Agreement entered into by GM Nova Scotia and Old GM in 2003.  Neither of

these two events is alleged to be improper or form the basis for equitable subordination or

recharacterization.  Indeed, the heart of the GUC Trust's allegations is that the Lock-Up

Agreement is a post-petition agreement that was improperly and deliberately concealed from this

Court's scrutiny.  Yet, neither the Noteholders nor the Nova Scotia Trustee (who was not even

appointed as the trustee until four months after the execution of the Lock-Up Agreement)

dictated whether the Lock-Up Agreement should be presented for Court approval.  The

disclosure of the Lock-Up Agreement was left to the sole discretion of the Debtors, and there is

absolutely no allegation that the Debtors acted improperly or otherwise deceived this Court when

---

[2] As shown below, the GUC Trust's remaining arguments for equitable disallowance or subordination are meritless.

they determined that the Lock-Up Agreement was a pre-petition agreement thereby obviating the
need for Court approval.

## STATEMENT OF FACTS

### A.    The Creation of GM Nova Scotia

In 2001, Motors Liquidation Company f/k/a General Motors Corporation ("**Old GM**" or
the "**Debtors**") formed General Motors Nova Scotia Finance Company ("**GM Nova Scotia**") as
an unlimited liability company ("**ULC**") under the Companies Act (Nova Scotia)[3] to issue debt
and, at least in part, for the opportunity to take advantage of favorable tax treatment.[4]  Old GM is
the sole member (owner) of GM Nova Scotia.  Pursuant to applicable Canadian law, in the event
GM Nova Scotia is wound up (as is the case here), Old GM is liable to contribute to the assets of
GM Nova Scotia in an amount sufficient for payment of its debts, liabilities and winding up
costs.  Companies Act, R.S.N.S., 1989, c. 81, s. 135 (Can.) ("**Section 135**").

### B.    The Issuance of the Notes

On July 10, 2003, GM Nova Scotia issued (i) £350,000,000 principal amount of 8.375%
Guaranteed Notes due December 7, 2015 (the "**2015 Notes**") and (ii) £250,000,000 principal
amount of 8.875% Guaranteed Notes due July 10, 2023 (the "**2023 Notes**," and together with the
2015 Notes, the "**Notes**") under the Fiscal and Paying Agency Agreement among GM Nova
Scotia, General Motors Corp. and certain fiscal and paying agents, dated as of July 10, 2003 (the
"**Fiscal and Paying Agency Agreement**").  Also on July 10, 2003, GM Nova Scotia loaned the
proceeds of the Notes to another Old GM subsidiary, General Motors of Canada Limited ("**GM
Canada**"), pursuant to two loan agreements (the "**Intercompany Loan**").  One loan agreement

---

[3] Chapter 81 of the Revised Statutes of Nova Scotia, 1989, as amended (the "**Companies Act**").

[4] Old GM has disclosed the potential tax benefits available through the use of a ULC numerous times, including in a
Form S-4 filed with the SEC on April 27, 2009 (*see infra* at 6), the amended notice of defence filed in connection
with the Nova Scotia Litigation (as defined *infra* at 5), and in internal emails (*see* NGM000004486–90).

provided that GM Nova Scotia would loan GM Canada CDN$778,204,000 at an annual interest

rate of 9.42%, with the principal amount due and payable on December 7, 2015.  The second

loan agreement provided that GM Nova Scotia would loan GM Canada CDN$555,860,000 at an

annual interest rate of 10.2%, with the principal amount due and payable on July 10, 2023.  As of

June 25, 2009, there was approximately CDN$1.334 billion, plus interest, outstanding under the

Intercompany Loan.

### C.       The Old GM Guarantee

As additional security to the holders of the Notes (the "**Noteholders**"), Old GM

guaranteed the full amount of the debt owed under the Fiscal and Paying Agency Agreement (the

"**Guarantee**").  In fact, the Guarantee was called for by the Fiscal and Paying Agency

Agreement.  GM Nova Scotia, as the issuer of Notes under the Fiscal and Paying Agency

Agreement, however, is the primary obligor on such debt.

### D.       The Swap Agreements

GM Nova Scotia was also a party to two currency swap transactions (the "**Swap

Agreements**").  To hedge against currency exchange risk arising from the Notes being

denominated in pounds sterling and the Intercompany Loan (the repayments of which would be

used by GM Nova Scotia to repay the Notes) being denominated in Canadian dollars, GM Nova

Scotia entered into the Swap Agreements with Old GM on July 10, 2003.  The Swap Agreements

were originally documented under Currency Swap Confirmations as of that date (the

"**Confirmations**") and an International Swap Dealers Association Master Agreement and

schedule thereto (the "**ISDA Master Agreement**") dated October 15, 2001.  The ISDA Master

Agreement establishes the general terms under which all derivative transactions between the two

parties are governed.  The Confirmations set forth the specific terms of the Swap Agreements.

By their express terms, the Confirmations and the ISDA Master Agreement, together with any amendments thereto, constitute a single contract.

### E.    The Nova Scotia Litigation

On March 2, 2009, certain of the Noteholders initiated an action in the Supreme Court of Nova Scotia against Old GM, GM Canada, GM Nova Scotia and several other defendants, entitled *Aurelius Capital Partners, LP, et al. v. General Motors Corporation, et al.* (the "**Nova Scotia Litigation**").  The plaintiffs in the Nova Scotia Litigation alleged that GM Nova Scotia had insufficient assets to satisfy its financial obligations under the Notes and the entities indebted to GM Nova Scotia (including GM Canada) had taken actions to impair their ability to satisfy the obligations owed to GM Nova Scotia.  On motion of the plaintiffs in the Nova Scotia Litigation, their complaint was amended by order of the Nova Scotia Supreme Court on May 28, 2009 to include a request for the appointment of an interim receiver of GM Nova Scotia.  Where a party seeks to have the court in Nova Scotia appoint a receiver, the party is required to identify a qualified person willing to undertake that role if the Nova Scotia court so orders.  To this end, the Noteholders interviewed Green Hunt Wedlake Inc. (and others), reviewed its qualifications, and ultimately decided to propose Green Hunt Wedlake Inc. as their designee to serve as interim receiver in the event that an interim receiver was appointed by the Nova Scotia court.

### F.    Old GM's Failed Bond Exchange Offer

Prior to the commencement of the Old GM chapter 11 cases, Old GM and its subsidiaries, including GM Nova Scotia, engaged in a number of unsuccessful attempts to restructure their debts.  One such attempt was that, on April 27, 2009, GM Nova Scotia solicited the Noteholders to exchange their Notes for common stock (the "**Bond Exchange Offer**").  Old GM filed with the SEC a Form S-4 detailing the Bond Exchange Offer (the "**S-4**").

Old GM explained in the S-4 that if it were to file for bankruptcy, only the Guarantee

5

would potentially be discharged in Old GM's reorganization case.  The Notes would not be

cancelled and the Noteholders would still be able to seek payment from GM Nova Scotia for the

balance due under the Notes.  Additionally, the S-4 disclosed the possibility that a bankruptcy

trustee for GM Nova Scotia would be able to assert a claim against Old GM, as the shareholder

of GM Nova Scotia, to contribute to GM Nova Scotia an amount sufficient for GM Nova Scotia

to pay its debts and liabilities, because GM Nova Scotia was organized as an "unlimited

company" under Nova Scotia law.  The Bond Exchange Offer failed and expired on May 26,

2009.

> **G.**     **The Lock-Up Agreement and the Resolution of the
> CDN\$1.334 Billion Intercompany Loan**

After the Bond Exchange Offer failed, Old GM aggressively pursued an in-court

restructuring based upon a sale of substantially all of Old GM's assets to General Motors LLC

("**New GM**") pursuant to Bankruptcy Code section 363 (the "**363 Sale**").  An important part of

the 363 Sale was the sale of GM Canada by Old GM to New GM.   All material aspects of the

363 Sale were overseen by representatives of the United States and Canadian governments.

Fearful that a bankruptcy filing by GM Canada could disrupt, delay or significantly

increase the costs of the 363 Sale, Old GM, under the oversight and with the input of the United

States and Canadian governments, took steps to clear GM Canada's balance sheet and

compromise the CDN\$1.334 billion Intercompany Loan, thereby keeping GM Canada out of

bankruptcy.  More specifically, early on June 1, 2009 (prior to Old GM's bankruptcy filing) Old

GM, GM Canada, GM Nova Scotia, GM Nova Scotia Investments Ltd. and certain holders of the

Notes entered into the Lock-Up Agreement, which, among other things, provided for (i) the

forgiveness of the CDN\$1.334 billion Intercompany Loan between GM Canada and GM Nova

Scotia, and (ii) a release of all claims relating to the Nova Scotia Litigation, in exchange for (x)

payment to the Noteholders of the $367 million consent fee (the "**Consent Fee**"), and (y) an

agreement by Old GM to refrain from contesting[5] certain claims by GM Nova Scotia and the

Noteholders (the "**Lock-Up Agreement**").

The Lock-Up Agreement was the product of extensive, arm's length negotiations among

Old GM, GM Canada and their significant creditor constituencies, all of whom were represented

by experienced and sophisticated counsel.  The negotiations were overseen and approved by the

US and Canadian governments, and, as is the essence of every negotiation, each party received

certain benefits and in exchange provided concessions.

### H.    Funding the Consent Fee

Just prior to entering into the Lock-Up Agreement, on or about May 29, 2009, Old GM

loaned $450 million to GM Canada in anticipation of a potential settlement with the Noteholders

(the "**$450 Million Loan**").  The $450 Million Loan was documented pursuant to a promissory

note (the "**Promissory Note**") and a trust agreement between Old GM and GM Canada (the

"**Trust Agreement**"), both of which were executed on or about May 29, 2009.[6]  The $450

Million Loan, Promissory Note, and Trust Agreement were all agreed to (and amended) without

the participation or knowledge of the Noteholders.

The funds for the $450 Million Loan were sent by wire transfer from Old GM to GM

Canada on or about Friday, May 29, 2009—three days before Old GM filed for bankruptcy.  GM

---

[5] Pursuant to the Lock-Up Agreement, Old GM and GM Nova Scotia specifically acknowledged that both the claims pursuant to Section 135 and the Guarantee were enforceable and to be allowed "to the fullest extent permitted under applicable laws."  Lock-Up Agreement ¶ 6(a).

[6] The GUC Trust contends that the Trust Agreement was amended twice after Old GM filed for bankruptcy without this Court's approval.  Originally, the Trust Agreement required the $450 Million Loan to be repaid to Old GM if the Lock-Up Agreement was not finalized before 11:30 p.m. on May 31, 2009.  However, by virtue of the first amendment—which was entered into with the consent of, and in cooperation with, the Canadian government—the repayment deadline was extended to 6:00 a.m. on June 1, 2009.  If, as the GUC Trust contends, this amendment is an improper post-petition contract, then under Bankruptcy Code section 549, the transaction would be voidable, but absent successful prosecution of an avoidance action, not void.  Moreover, such an avoidance action is moot given that the relief available is repayment with interest of the $450 Million Loan, which has already been paid.

Canada made a $78,500,000 payment to Old GM on or about June 12, 2009 as a partial repayment of the $450 Million Loan, which was reflected in an amended promissory note. The remainder of the $450 Million Loan (inclusive of interest) was repaid to Old GM on or about July 7, 2009. Had the $450 Million Loan not been made, those funds would have gone to New GM in connection with the 363 Sale. Under no circumstances would it have been available for distribution to Old GM's unsecured creditors. This is because, pursuant to the 363 Sale, New GM purchased all the assets, including cash, of Old GM except for an established, negotiated amount set aside to fund the winding down of Old GM.

**I.        Old GM's Bankruptcy Filing**

Shortly after entering into the Lock-Up Agreement, at approximately 7:57 a.m. on June 1, 2009, Old GM filed for bankruptcy, seeking to restructure under the Bankruptcy Code. Presumably Old GM understood the Lock-Up Agreement to be a pre-petition agreement, because it did not seek approval from this Court of the Lock-Up Agreement in connection with the bankruptcy filing.

**J.        The Escrow Agreement & the Extraordinary Resolution**

On or about June 4, 2009, GM Canada, GM Nova Scotia, and an escrow agent entered into an escrow agreement pursuant to the terms of the Lock-Up Agreement (the "**Escrow Agreement**"). Pursuant to the Escrow Agreement, that portion of the Trust Agreement funds held by GM Canada sufficient to pay the Consent Fee was placed into an escrow account in the name of the escrow agent on behalf of GM Canada, GM Nova Scotia and the Noteholders (the "**First Escrow Account**"). The Escrow Agreement further provided that, upon the execution of an "extraordinary resolution" by a majority of the Noteholders pursuant to the terms of the Fiscal

Paying and Agency Agreement (the "**Extraordinary Resolution**"),[7] the Consent Fee funds would be transferred from the First Escrow Account to an escrow account in the name of the escrow agent on behalf of GM Nova Scotia (the "**Second Escrow Account**").  Pursuant to the terms of the Escrow Agreement, upon the transfer of the Consent Fee to the Second Escrow Account, GM Nova Scotia was deemed to have acknowledged that all amounts outstanding under the $1.334 billion Intercompany Loan had been settled in full, subject to the terms of the Lock-Up Agreement.  This agreement was further documented in an Intercompany Loan settlement agreement entered into by GM Nova Scotia and GM Canada on June 25, 2009. Finally, pursuant to the terms of the Escrow Agreement, the Consent Fee would then be transferred to the fiscal paying agent for distribution to the Noteholders.

In accordance with the Lock-Up Agreement, GM Nova Scotia convened a meeting of the Noteholders on or about June 25, 2009 to consider the Extraordinary Resolution in accordance with the procedures required by the Fiscal and Paying Agency Agreement to amend such agreement to reflect the compromises set forth in the Lock-Up Agreement.  Pursuant to the provisions of the Fiscal and Paying Agency Agreement, a special quorum of the Noteholders approved the Extraordinary Resolution to make the provisions of the Lock-Up Agreement binding on the remaining Noteholders.  Consistent with the Escrow Agreement, the Consent Fee was transferred to the Second Escrow Account, the Intercompany Loan was forgiven and the Consent Fee was transferred to the fiscal paying agent for distribution to the Noteholders.

---

[7] The Fiscal and Paying Agency Agreement provides for the modification of terms or conditions of the Notes pursuant to an agreement of the Noteholders referred to as an "Extraordinary Resolution."  *See* Fiscal and Paying Agency Agreement, Schedule 1 ¶ 12; Schedule 4 ¶ 5.  The Extraordinary Resolution adopted here modified the Notes to incorporate the terms of the Lock-Up Agreement.

**K.    The 363 Sale And the Transfer of the Obligations Under the Swap Agreements to New GM**

As previously noted, after the Bond Exchange Offer failed, Old GM aggressively pursued an in-court restructuring based upon a sale of substantially all of Old GM's assets to New GM pursuant to the 363 Sale.  On or about July 5, 2009, the Court entered its Order (Docket No. 2968) (the "**Sale Order**"), approving the 363 Sale to New GM pursuant to the Master Sale and Purchase Agreement ("**MSPA**").  Under the MSPA, substantially all of Old GM's assets were sold to New GM, including all cash (except an amount sufficient to pay for Old GM to wind-down) and Intercompany Obligations.  (As set forth below, the Swap Agreements constitute Intercompany Obligations transferred to New GM.)  The 363 Sale was consummated on or about July 10, 2009.  Thereafter, on or about August 3, 2009, pursuant to the terms of the MSPA, New GM (i) designated the Lock-Up Agreement and the Swap Agreements as Assumable Executory Contracts for assignment, and (ii) assumed and assigned the Lock-Up Agreement and the Swap Agreements to New GM.

**L.    The GM Nova Scotia Canadian Bankruptcy Filing**

On October 9, 2009, upon the application of certain of the Noteholders, the Supreme Court of Nova Scotia entered an order declaring GM Nova Scotia bankrupt (the "**Nova Scotia Bankruptcy Order**") under the Bankruptcy and Insolvency Act (Canada)[8] (the "**BIA**") on the grounds that GM Nova Scotia was unable to pay its debts as they came due.  Under the Nova Scotia Bankruptcy Order, the Canadian court appointed the Nova Scotia Trustee to oversee GM Nova Scotia's winding up and administer the GM Nova Scotia estate.  The GUC Trust alleges that the Nova Scotia Trustee "colluded in the delay of the Nova Scotia Finance bankruptcy filing . . . to further insulate the Consent Fee."  Am. Compl. ¶ 152.  This is wrong.  Although

---

[8] Chapter B-3 of the Revised Statutes of Canada 1985, as amended (Can.).

Green Hunt Wedlake Inc. had agreed to serve as trustee for GM Nova Scotia in early June 2009,

Canadian bankruptcy trustees have no role in deciding when the creditors will file a bankruptcy

application, and have no authority to act on behalf of the debtor or its creditors until being

appointed as trustee, which does not occur until after the bankruptcy case has been commenced.

BIA, s. 43(1); BIA, s. 43(9).

### M.    The Nova Scotia Trustee Exercises Its Statutory Duties

In the course of administering the GM Nova Scotia estate, the Nova Scotia Trustee

reviewed the sworn Statement of Affairs and other relevant documents provided to it by certain

GM Nova Scotia officials, as well as the proofs of claim filed by various creditors of GM Nova

Scotia.  Based on its review of the initial material provided, the Nova Scotia Trustee drafted a

preliminary report to creditors and convened a meeting of creditors of GM Nova Scotia on

November 12, 2009 (the "**First Meeting of Creditors**").  All of the Nova Scotia Trustee's

activities were done in connection with and under the supervision of the Office of the

Superintendant of Bankruptcy ("**OSB**"), an agency of the Canadian government with supervisory

authority over bankruptcy pursuant to the BIA.  A representative of the OSB chaired the First

Meeting of Creditors, received all resolutions, recorded the votes and was empowered by the

BIA to resolve any procedural issues with respect to the meeting.  The Nova Scotia Trustee's

role at the First Meeting of Creditors was limited to delivering its report to the creditors and

receiving instruction from creditors in the form of passed resolutions.

With respect to New GM's proof of claim concerning the Swap Agreements, from the

outset, the Nova Scotia Trustee communicated extensively with its Canadian and United States

counsel, including attorneys with experience in swap transactions.  The Nova Scotia Trustee also

relied upon a certified and witnessed statement of Lawrence Buonomo, in-house counsel for

New GM, which set forth the calculation of the damages under the Swap Agreements

($564,493,957), and indicated that New GM had acquired all rights in the Swap Agreements "as

of July 10, 2009 pursuant to its acquisition of substantially all of the assets of [Old GM] as

approved by the United States Bankruptcy Court for the Southern District of New York . . . in its

Sale Approval Order dated July 5, 2009."  The Nova Scotia Trustee also reviewed, with the

assistance of counsel, the spreadsheet attached to New GM's proof of claim demonstrating how

the swap damages had been calculated.  And the Nova Scotia Trustee confirmed that these

figures were identical to those contained in GM Nova Scotia's sworn Statement of Affairs.

Even after filing its proof of claim in these proceedings, the Nova Scotia Trustee

continued to consult with its counsel to confirm the accuracy of its claim with respect to the

Swap Agreements, and ultimately hired an expert in swap transactions whose opinion validated

that of the prior authorities with whom the Nova Scotia Trustee had consulted.

### N.    Disclaimer of the Swap Agreements

GM Nova Scotia's bankruptcy filing constituted a breach under the Swap Agreements,

entitling New GM, as the non-defaulting party, to declare an "Early Termination" by serving

notice of its declaration of Early Termination upon GM Nova Scotia in writing.  New GM,

however, elected not to declare an Early Termination, and its decision is easily understood.  If

New GM had declared an Early Termination, its damages claim against GM Nova Scotia would

have been drastically reduced because its damages under the Swap Agreements would have been

calculated using a method the GUC Trust's expert has referred to as the "Final Exchange

Method," instead of the customary method used to measure damages for currency swap

transactions known as the "Market Quotation Method."  As will be shown at trial, if the Market

Quotation Method were applied to calculate the monies owed to New GM under the Swap

Agreements as of the date of GM Nova Scotia's bankruptcy filing, the amount owed to New GM

would be $564,686,121.61; whereas if the Final Exchange Method were used to calculate New

GM's damages claims it would be only $351,089,103 because this unusual method does not take

into consideration the interest payments due annually until maturity under the terms of the Swap

Agreements.  New GM, accordingly, elected not to declare an Early Termination.

The Nova Scotia Trustee, however, wanted GM Nova Scotia's obligations under the

Swap Agreements to be liquidated, and exercised its common law right to disclaim the Swap

Agreements.  As outlined below, under Canadian law, after GM Nova Scotia entered into

bankruptcy, the Nova Scotia Trustee had an affirmative obligation to either affirm or disclaim the

Swap Agreements or risk personal liability for not doing so.  Because GM Nova Scotia had

virtually no assets (other than its Section 135 claim against Old GM) the Nova Scotia Trustee

decided it was imprudent to keep the Swap Agreements in place since GM Nova Scotia, the "out-

of-the-money" party, would have been required to make annual interest payments to New GM

(GM Nova Scotia did not have any money to make such a payment), and GM Nova Scotia's

overall liability could grow depending upon how interest rates and currency rates fluctuated.

Indeed, New GM could have argued the Nova Scotia Trustee was negligent or in breach of its

statutory obligations to the creditors of GM Nova Scotia for assuming the Swap Agreements

without having any assets to pay for the liabilities thereunder, thus subjecting the Nova Scotia

Trustee to potential personal liability.

Accordingly, on or about January 12, 2010, the Nova Scotia Trustee sent a letter to New

GM's counsel, confirming the Nova Scotia Trustee's determination to disclaim the Swap

Agreements in accordance with Canadian law (the "**Swap Disclaimer Letter**").  Among other

things, the Swap Disclaimer Letter confirmed that: (i) the Swap Agreements were disclaimed as

of the date of GM Nova Scotia's bankruptcy filing—October 9, 2009; (ii) New GM's claim was

13

to be calculated as of October 9, 2009; and (iii) the Nova Scotia Trustee had not yet accepted the

proof of claim as filed for distribution purposes.  By an email dated January 15, 2010, New GM

confirmed in writing its agreement with the Nova Scotia Trustee that the Swap Agreements had

been terminated in accordance with the three conditions set forth in the Swap Disclaimer Letter.

### O.    The Nova Scotia Trustee Claim and the Noteholders' Guarantee Claim

On or about November 25, 2009, in accordance with its statutory powers and obligations,

the Nova Scotia Trustee filed a proof of claim (claim no. 65814) against Old GM in an amount

not less than $1,607,647,592.49, pursuant to Section 135 of the Companies Act.  On or about

November 30, 2009, the Nova Scotia Trustee filed an amended claim (claim no. 66319) (the

"**Nova Scotia Trustee Claim**"), providing additional detail of its claim.  The Nova Scotia

Trustee Claim consists of amounts owing by GM Nova Scotia in respect of the Notes and the

Swap Agreements.  On December 10, 2009, the Noteholders filed a global claim against Old GM

pursuant to the Guarantee for an amount not less than $1,072,557,531.72, representing the

amount due under the Notes (claim no. 69551) (the "**Guarantee Claim**").

### P.    The GUC Trust's Objections and the Subsequent Adversary Proceeding

Since July 2010, the GUC Trust and its predecessor, the Official Committee of Unsecured

Creditors of Motors Liquidation Company (the "**Committee**"), have filed multiple objections

and complaints to the Nova Scotia Trustee Claim and the Guarantee Claim.  On or about July 2,

2010, the Committee filed its original objection to the Nova Scotia Trustee Claim and the

Guarantee Claim.  Thereafter, on or about November 19, 2010, the Committee filed an amended

objection (the "**Amended Objection**") to the Nova Scotia Trustee Claim and the Guarantee

Claim, alleging, among other things, that the Nova Scotia Trustee Claim and the Guarantee

Claim are duplicative, in excess of the underlying obligations, and should be equitably

subordinated.  On or about March 1, 2012, the GUC Trust filed a complaint relating to the Nova

14

Scotia Trustee Claim and the Guarantee Claim, setting forth two claims for relief: (i) equitable

subordination/equitable disallowance and (ii) recharacterization of the Consent Fee.  The GUC

Trust amended its complaint on or about June 11, 2012 (the "**Amended Complaint**").

Significantly, allegations in *only six* paragraphs of the Amended Complaint

concern the Nova Scotia Trustee.  Am. Compl. ¶¶ 124, 140–41, 146–47, 152.  And, as

outlined below, all allegations of wrongdoing alleged against the Nova Scotia Trustee

will be proven false at trial.

## ARGUMENT

**I.    THE NOVA SCOTIA TRUSTEE DID NOT ENGAGE IN ANY INEQUITABLE
CONDUCT AND ITS CLAIM SHOULD NOT BE SUBORDINATED OR
DISALLOWED**

**A.    The Law**

A majority of courts have adopted a three-part test to determine whether a claim should

be equitably subordinated under section 510(c) of the Bankruptcy Code:  (i) the claimant must

have engaged in some type of inequitable conduct; (ii) the misconduct must have resulted in

injury to the creditors or conferred an unfair advantage on the claimant; and (iii) equitable

subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.

*Benjamin v. Diamond* (*In re Mobile Steel Co.*), 563 F.2d 692, 699–700 (5th Cir. 1977); *accord*

*United States v. Noland*, 517 U.S. 535, 538–39 (1996); *see also In re Gen. Motors Corp.*, 407

B.R. 463, 499 (Bankr. S.D.N.Y. 2009) (reiterating the requirements for equitable subordination

set forth in *Mobile Steel Co.*), *aff'd* 430 B.R. 65 (S.D.N.Y. 2010).  Because "equitable

subordination is a drastic and unusual remedy," courts agree that "it is important to apply section

510(c) narrowly."  *Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*, 379 B.R. 425,

443 (S.D.N.Y. 2007).  Indeed, setion 510(c) is generally confined to three paradigms: (i) when a

fiduciary of the debtor misuses his position to the disadvantage of other creditors; (ii) when a

15

third party controls the debtor to the disadvantage of other creditors; and (iii) when a third party

actually defrauds other creditors. *United States Abatement Corp. v. Mobil Exploring &*

*Producing U.S., Inc. (In re United States Abatement Corp.)*, 39 F.3d 556, 561 (5th Cir. 1994).

The GUC Trust's alternative remedy of equitable disallowance is even more difficult to

establish. As previously opined by this Court, equitable disallowance is a "draconian" remedy

only appropriate in extreme and "perhaps very rare" situations. *Adelphia Commc'ns Corp. v.*

*Bank of Am., N.A.* (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 73 (Bankr. S.D.N.Y. 2007),

*aff'g in part* 390 B.R. 64 (S.D.N.Y. 2008).

**B.     Any Conduct Allegedly Committed by the Noteholders or Others Should Not Be
        Imputed to the Nova Scotia Trustee**

The vast majority of the GUC Trust's Amended Complaint describes alleged conduct by a

handful of Noteholders, and makes almost no reference to the Nova Scotia Trustee. Although the

Nova Scotia Trustee is unaware of any wrongful conduct by the Noteholders, in the first

instance, it should be observed that none of the allegedly wrongful conduct by the Noteholders

should be imputed to the Nova Scotia Trustee, a statutory representative appointed long after

most of the alleged conduct occurred. Indeed, there is absolutely no precedent for applying the

conduct of third parties to a holder of an independent claim, and courts warn against such

imputation. *See, e.g., Wilson v. Huffman (In re Missionary Baptist Found. of Am., Inc.)*, 818 F.2d

1135, 1146 (5th Cir. 1987) (differentiating imputation of inequitable conduct from one partner to

another). While it is true that a substantial portion of Old GM's liability to GM Nova Scotia

relates to a debt obligation to the Noteholders, that liability arises from GM Nova Scotia's

issuance of the Notes—entirely independent of the Lock-Up Agreement—and was incurred in

exchange for notable tax benefit opportunities available to Section 135 Nova Scotia companies.

None of these facts are alleged to be inequitable by the GUC Trust or constitute grounds for

16

inequitable subordination or disallowance.

Likewise, no allegations regarding the Lock-Up Agreement can be attributed to the Nova Scotia Trustee.  The Nova Scotia Trustee was not even appointed by the Supreme Court of Nova Scotia until more than four months after the Lock-Up Agreement was executed and approximately three months after this Court's approval of the MSPA.  The Nova Scotia Trustee was not involved in any way with either event and, therefore, could not have engaged in any inequitable conduct related thereto.  Whether or not the Lock-Up Agreement would be presented for court approval was a decision left to the Debtors.

## C.    The Noteholders' Appointment of the Nova Scotia Trustee was Entirely Proper

Further, the GUC Trust's limited allegations against the Nova Scotia Trustee appear to be premised upon a misunderstanding of Canadian law and the role of a trustee appointed under the BIA.  The GUC Trust, for example, alleges that Green Hunt Wedlake Inc. was "hand-picked" by the Noteholders to serve as the Nova Scotia Trustee and suggests that there is something improper about this alleged fact.  Am. Compl. ¶ 140.  The GUC Trust is wrong.  In Canada, it is standard for the creditors to select the debtor's trustee.  In fact, the BIA may be invoked against a company by application for a bankruptcy by an unsecured creditor or creditors of that company.  BIA, s. 43(1).  If the unsecured creditor can establish the pre-conditions for a bankruptcy order, then the Canadian court is required to appoint a licensed trustee, and, to the extent the court considers just, can appoint a trustee suggested by the creditors.  BIA, s. 43(9).  A creditor seeking a bankruptcy order is required to provide the court with the consent of a licensed trustee because no trustee can be compelled to accept an appointment as trustee.  BIA, s. 14.06(1).  There was nothing unusual about the Nova Scotia Trustee's appointment.

**D.    The Nova Scotia Trustee Played No Role in the Timing of the GM Nova Scotia Bankruptcy**

Moreover, the timing of a Canadian bankruptcy application is determined by the creditors, and a licensed trustee has no official role until appointed by the Canadian court.  *See* BIA, s. 43(1) (noting that the creditors of a company apply for a bankruptcy order); BIA, s. 43(9) (specifying that a trustee is appointed upon a bankruptcy order being made).  Despite this fact, the GUC Trust has alleged that the Nova Scotia Trustee conspired with the Noteholders to cause the GM Nova Scotia bankruptcy to be commenced more than three months after the Noteholders received the Consent Fee. Am. Compl. ¶¶ 140, 152.  This is entirely false.  The Nova Scotia Trustee was not involved in the decision of when to file the GM Nova Scotia bankruptcy petition in any way.  In Canada, a licensed trustee has no role in determining when a company will file because the trustee of the bankruptcy estate is not appointed until after the company is declared bankrupt.  Consequently, the Nova Scotia Trustee had no authority to act on behalf of GM Nova Scotia or its creditors until *after* GM Nova Scotia was found by the Canadian court to be bankrupt and the Nova Scotia Trustee was appointed.

**E.    The Nova Scotia Trustee is Duty-Bound to Act for the Benefit of GM Nova Scotia's Creditors, But It Did Not Do So Exclusively for the Noteholders**

The GUC Trust also argues, incorrectly, that it is improper for the Nova Scotia Trustee to have acted on behalf of GM Nova Scotia's creditors, even though it has a statutory obligation to do so.  Am. Compl. ¶ 140.  It is settled law in Canada that the Nova Scotia Trustee has a legal obligation to act on behalf of its creditors through its "dual role" as both a representative of the debtor and the creditors.  FRANK BENNETT, BENNETT ON BANKRUPTCY 69 (14th ed. 2012).  A trustee's role has been described as "an administrative official required to gather in and realize on the bankrupt's assets and then to distribute the proceeds according to the priorities under the [BIA]."  *Id.* at 70.  In fact, the Supreme Court of Canada has confirmed that a bankruptcy

trustee's duty is owed to the creditors. *A. Marquette & Fils Inc. v. Mercure*, [1977] 1 SCR 549 (SCC) ¶ 9 (noting that a Canadian bankruptcy trustee is "the representative of all the general creditors to the extent that he can even act on their behalf against the debtor").

The GUC Trust also contends, without elaboration, that the Nova Scotia Trustee acts "only upon [the Noteholders' direction]" and exclusively "for their benefit." Am. Compl. ¶ 140. Wrong again. As will be shown at trial, the Nova Scotia Trustee acts on behalf of all GM Nova Scotia's creditors (including New GM). The Nova Scotia Trustee is not obligated to honor every request or direction by its creditors without exercising its own business judgment. Nor has it done so in connection with this case or the GM Nova Scotia bankruptcy.

## F. The Decision of Whether to Appoint an "Inspector" Rested with GM Nova Scotia's Creditors, Not Its Trustee

Similarly, the GUC Trust seems to misunderstand the role of an "inspector" in Canadian bankruptcies and how one is appointed. The GUC Trust complains, "[t]he Nova Scotia Finance Trustee failed to . . . insist on the appointment of inspectors, as provided for under Canadian law." Am. Compl. ¶ 141. But the general role of an inspector in a Canadian bankruptcy is to *act for the benefit of the estate's creditors*. *See* BENNETT ON BANKRUPTCY 430–32 (stating that inspectors are "statutory officials appointed under subsection 116(1) of the [BIA] to represent the creditors" and are "generally representatives of the larger creditors" who have a fiduciary obligation to the creditors of the bankrupt estate). Indeed, employees of the creditors themselves often serve as inspectors. In this case, GM Nova Scotia's largest creditors were the Noteholders who were uninterested in appointing an inspector. Similar to the process of appointing an official committee under the Bankruptcy Code, where creditors are unwilling to serve as inspectors, the trustee cannot require inspectors—the appointment of inspectors is indisputably left to the creditors. BIA, s. 116(1).

19

**G.**    **There Was No Basis for the Nova Scotia Trustee to Further Investigate the Lock-Up Agreement, the Consent Fee or the Forgiveness of the CDN$1.334 Billion Owed by GM Canada to GM Nova Scotia**

Nor, as the GUC Trust contends, did the Nova Scotia Trustee act improperly when it concluded that it was unnecessary to further investigate the Lock-Up Agreement and the transactions contemplated thereunder.  Am. Comp. ¶¶ 141, 152.  On or about November 12, 2009, the Nova Scotia Trustee issued a preliminary report to GM Nova Scotia creditors, which, among other things, refers to (i) the forgiveness of the CDN$1,334,064,000 owed by GM Canada to GM Nova Scotia under the Intercompany Loan, and (ii) the payment of the Consent Fee, and opined that "[w]hile these transactions may qualify as a preference or a transfer undervalue," each of GM Nova Scotia's creditors "was either a beneficiary of the transaction or consented to/and/or participated in the transaction," and, therefore, the Nova Scotia Trustee concluded, based upon its preliminary review, "that no creditors were prejudiced."  Moreover, because both GM Nova Scotia and its sole shareholder (Old GM) were parties to the Lock-Up Agreement, it was clear to the Nova Scotia Trustee that equity had consented to the transfers.  Despite having the opportunity to review the preliminary report, at the First Meeting of Creditors, none of GM Nova Scotia's creditors or the Canadian OSB representative, who had the power to request that the Nova Scotia Trustee investigate a potential claim, requested that the Nova Scotia Trustee take any further action, thereby confirming the Nova Scotia Trustee's conclusion.

**H.**    **The Nova Scotia Trustee Properly Vetted the Claims Against GM Nova Scotia, Including the Swap Claims**

There is no truth to the GUC Trust's allegations that the Nova Scotia Trustee submitted (i) "a more than $1.6 billion claim in this proceeding with no understanding of the basis therefor," or (ii) "an inflated Swap Claim, even while in possession of information to indicate that the claim was not valid."  Am. Compl. ¶ 152.  To the contrary, as set forth above, before

asserting its claim, the Nova Scotia Trustee carefully reviewed the sworn proofs of claim submitted by New GM and the Noteholders, and compared those proofs of claims with the sworn Statement of Affairs executed by an officer of GM Nova Scotia, as well as the various books, records, and other financial statements produced by GM Nova Scotia to the Nova Scotia Trustee. Throughout this process, the Nova Scotia Trustee consulted with both Canadian and United States counsel, including counsel with expertise in swap agreements who confirmed the reasonableness of New GM's calculation of swap damages, and only filed the Nova Scotia Trustee Claim after due discussion and deliberation.

## I.    The Swap Agreements Were Properly Terminated

The Nova Scotia Trustee's diligence has been especially notable with respect to the Swap Agreements.  First, the GUC Trust is simply wrong that the Swap Agreements "have not been properly terminated" and that the claim related to these agreements "was inflated by two hundred million dollars." Am. Compl. ¶ 146.  As outlined above, and as will be shown at trial, the Nova Scotia Trustee properly ended the Swap Agreements by disclaiming them in accordance with Canadian law.  Again, it is settled law that a Canadian bankruptcy trustee must elect to either affirm or disclaim executory contracts belonging to the debtor within a reasonable time after appointment.  In *New Skeena Forest Products Inc. v. Don Hull Contracting*, [2005] BCJ No. 546, 251 DLR (4th) 328 (BCCA), the British Columbia Court of Appeal discussed the common law power to disclaim contracts held by trustees in bankruptcy.  The court found that the power of a trustee to disclaim contracts was deeply rooted in the case law, stating: "[The] power [to disclaim executory contracts] has been relied on for many years by trustees, and in the absence of a clear statutory provision overriding the common law, in my view trustees should have this power to assist them fulfill the duties of their office." *Id.* ¶ 31.  Subsequent cases have upheld the ruling in *New Skeena.  See, e.g., North American Steamship Ltd. (Re)*, 2007 BCSC 267; *Royal Bank of*

*Canada v. Penex Metropolis Ltd.*, [2009] OJ No. 3649, 180 ACWS (3d) 258.

In *North American Steamship*, for example, the British Columbia Supreme Court considered whether it was necessary for a trustee in bankruptcy to affirm certain swap agreements to which the bankruptcy estate was a party. In its analysis, the court recognized that the trustee has an affirmative duty to affirm or disclaim executory contracts, and went on to state:

> The trustee cannot choose to do nothing. It must elect between the two alternatives because the other contracting party is entitled to know whether it will be a creditor of the bankrupt or a creditor of the bankruptcy estate (or the trustee personally) with respect to any unfulfilled obligations on the part of the bankrupt. The other contracting party is entitled to know which alternative the trustee is choosing irrespective of whether it is entitled to terminate the contract as a result of the bankruptcy.

*Id.* ¶ 18. The obligation that a trustee act is especially true in the context of currency swap agreements, where the liabilities of the bankrupt and counterparty are subject to change on an on-going basis on account of fluctuations in exchange rates and interest rates.

Indeed, a Canadian bankruptcy trustee faces the possibility of personal liability for its failure to act. In the article "The Personal Liabilities of Insolvency Practitioners Under Insolvency Legislation" (University of Toronto, 2006), Professor Jacob Ziegel observes that, despite some statutory protections, Canadian bankruptcy trustees are not immune from liability for, among other things, breach of fiduciary obligations, claims in negligence or conversion, or other types of tort alleged to have been committed by the trustee in his official capacity.[9] The case of *Sasso and Cronin v. D. & A. MacLeod Company Ltd.*, [1991] OJ No. 676, 3 OR (3d) 472 (Ont Ct Gen Div) is also instructive. There, the trustee of a bankrupt tenant failed to disclaim a commercial lease agreement. The court, finding that the trustee had the power to disclaim but

---

[9] In *Glick v. Jordan*, [1967] OJ No. 385, 11 CBR (NS) 70, the Ontario Supreme Court refused to strike the statement of claim of the plaintiff alleging negligence on the part of the trustee in bankruptcy.

failed to do so, held the trustee personally liable for the unpaid occupation rent accruing after its appointment.

In light of the above, it is abundantly clear that the Nova Scotia Trustee's disclaimer of the Swap Agreements was both prudent and consistent with its obligation under Canadian law. By making the disclaimer effective as of the date of GM Nova Scotia's bankruptcy, the Nova Scotia Trustee appropriately sought to prevent any additional liability from accruing to the GM Nova Scotia estate it was administering.[10]  Moreover, it is a general principle of Canadian bankruptcy law that claims against the bankruptcy estate should be valued as of the date of bankruptcy to ensure that the estate's assets are distributed equitably among all claimants.  BIA, s. 124 (noting that creditors have to file a proof of claim in the prescribed form); BIA Form 31 (prescribed form of proof of claim requires the value of the claim as of the date of the bankruptcy).

**J.    New GM's Swap Claim was Properly Calculated**

The liability owed under the Swap Agreements (the "**Swap Claim**") was properly calculated.  As will be shown at trial, the GUC Trust's contention that the "Swap Claim as asserted is inflated by approximately two hundred million dollars," Am. Compl. ¶ 146, is based upon the GUC Trust's mistaken contention that the so-called "Final Exchange Method" should be used to calculate New GM's damages under the Swap Agreements.  As confirmed by the GUC Trust's swap expert, the Final Exchange Method is an unusual and novel way of measuring damages under a swap agreement.  Indeed, despite valuing thousands of swap transactions, the

---

[10] Under the terms of the Swap Agreement related to the 2015 Notes, depending on movements in the GBP/CAD exchange rate, GM Nova Scotia may have had to make an annual payment to New GM on December 7, 2009 and on each year thereafter until December 7, 2015, and under the terms of the Swap Agreement related to the 2023 Notes, depending on movements in the GBP/CAD exchange rate, GM Nova Scotia may have had to make an annual payment to New GM on July 10, 2010 and on each year thereafter until July 10, 2023.

GUC Trust's expert had no familiarity with this methodology prior to this case.  As Ken Shoji, the Nova Scotia Trustee's expert on swap transactions, will testify, the Final Exchange Method bears no relationship to actual market damages and only exists by virtue of the terms of the Swap Agreements at issue, and it undervalues New GM's Swap Claim by hundreds of millions of dollars by failing to account for each and every interest payment due annually between the termination date and the final payment.  The Final Exchange Method has no application to the case at bar.

Again, the Swap Agreements make clear that the "Final Exchange Method" applies only where the non-defaulting party (*i.e.*, New GM) elects, in writing, to declare an "Early Termination" of the Swap Agreements.  The trial record will plainly show that New GM refused to make such an election.  Indeed, it would make no sense for New GM to voluntarily reduce its Swap Claim by hundreds of millions of dollars—which would have been the effect if an "Early Termination" were timely declared, thereby making the Final Exchange Method applicable. Although the GUC Trust's expert contends in his report that any agreement for premature termination of the swaps is an "Early Termination," he appeared to back away from this conclusion during his deposition.  This is unsurprising given that this exact argument was rejected by the court in *North American Steamship*: "While [the non-defaulting party has] the option of terminating the Swap Agreements as a result of the bankruptcy . . . nothing turns on whether the bankruptcy of one of the contracting parties does constitute a breach of the contract or otherwise entitles the other party to terminate the contract."  *North American Steamship Ltd. (Re)*, 2007 BCSC 267 ¶ 14.

As confirmed by the GUC Trust's own expert, the Market Quotation Method to value swap transactions is customary in that industry, and it is in keeping with New York law, which

governs the Swap Agreements.  In New York, the proper measure of damages for breach of

contract are "expectation damages," (*see J.R. Loftus, Inc. v. White*, 85 N.Y.2d 874, 877, 649

N.E.2d 1196, 1198 (N.Y. 1995); *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145, 269 N.E.2d

21, 26 (N.Y. 1971); Restatement [Second] of Contracts § 347), which are designed to "[place] the

aggrieved party in the same economic position it would have been in had both parties fully

performed."  *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 728–29 (2d Cir. 1992).  The Market

Quotation Method is designed to do just that by determining the true economic replacement

value of the Swap Agreements (*i.e.,* the amount a disinterested third party would either pay or

receive for stepping into the position of one of the parties and assuming the remaining swap

obligations of that party).

### K.    The Nova Scotia Trustee Made No Misrepresentations to the Court

Lastly, as will be shown at trial, it is the GUC Trust, not the Nova Scotia Trustee, that has

made misrepresentations to this Court concerning the timing of when the Lock-Up Agreement

was entered into.  Each of the parties to the Lock-Up Agreement who was deposed in this case

has confirmed that the Lock-Up Agreement was entered into prior to Old GM's bankruptcy

filing.  And Old GM's counsel—the other party with knowledge concerning the execution of the

Lock-Up Agreement—has never taken a contrary position.  The Nova Scotia Trustee's position

that the Lock-Up Agreement constituted a pre-petition agreement is entirely proper and, like the

other hollow allegations made by the GUC Trust, offers no basis to equitably subordinate,

equitably disallow or recharacterize the Nova Scotia Trustee's claims.

## II.    THE NOVA SCOTIA TRUSTEE HAS A VALID CLAIM PURSUANT TO SECTION 135 OF THE COMPANIES ACT

The Nova Scotia Trustee has asserted the Nova Scotia Trustee Claim pursuant to Section

135, which applies to all companies organized as Nova Scotia "unlimited companies."  GM

Nova Scotia is a ULC formed to raise money from the public bond markets to fund GM

Canada's operations.  The expert testimony of Professor Benjamin R.D. Alarie—the Nova Scotia

Trustee's expert on tax consequences attendant to the ULC corporate form—will show that, at

the time GM Nova Scotia was created, the Nova Scotia ULC structure was used by United States

companies in tax planning for investments in Canada because among other things, it afforded a

multi-faceted, multinational corporation like Old GM and its affiliates the opportunity to obtain

significant tax savings.[11]

The election to form a ULC is not without consequences.  The Companies Act, under

which GM Nova Scotia was created, includes a provision making the members of the ULC liable

for the subsidiary's outstanding debts, liabilities, and costs of winding up in the event that the

ULC is wound up.  Specifically, Section 135 provides in its entirety, that:

> ***In the event of a company being wound up***, every present and past member shall, subject to this Section, be liable to contribute to the assets of the company to an amount sufficient for payment of its debts and liabilities and the costs, charges, and expenses of the winding up and for the adjustments of the rights of the contributories among themselves, with the qualifications following:
>
> (a) a past member shall not be liable to contribute if he has ceased to be a member for one year or upwards before the commencement of the winding up;
>
> (b) a past member shall not be liable to contribute in respect of any debt or liability of the company contracted after he ceased to be a member;
>
> (c) a past member shall not be liable to contribute unless it appears to the court that the existing members are unable to satisfy the contributions required to be made by them in pursuance of this Act;

---

[11] While the GUC Trust and the Nova Scotia Trustee anticipate submitting expert testimony with regard to the Nova Scotia Trustee Claim, issues of foreign law are a question of law for the Court, not a question of fact.  *See* Fed. R. Civ. P. 44.1 ("The court's determination [of foreign law] must be treated as a ruling on a question of law."); *Bartruk v. Mitsubishi Motors*, 1998 WL 308353, at *3 (S.D.N.Y. June 10, 1998) (noting that a federal court decides an issue of foreign law as a matter of law, issues of foreign law do not require expert testimony, and a judge can reject conclusions of expert witnesses "and reach their own decisions on the basis of independent examination of foreign legal authorities").

(d) in the case of a company limited by shares, no contribution shall be required from any member exceeding the amount, if any, unpaid on the shares in respect of which he is liable as a present or past member;

(e) in the case of a company limited by guarantee, no contribution shall be required from any member exceeding the amount undertaken to be contributed by him to the assets of the company in the event of its being wound up;

(ea) in the case of an unlimited company, no contribution exceeding the amount, if any, unpaid on the shares in respect of which the member is liable as a past member, shall be required from a past member who was not a member of the company at any time on or after the time the company became unlimited;

(f) nothing in this Act shall invalidate any provision contained in any contract whereby the liability of the individual members of the contract is restricted, or whereby the funds of the company are alone made liable in respect of the policy or contract;

(g) a sum due to any member of a company, in his character of a member, by way of dividends, profits or otherwise, shall not be deemed to be a debt of the company, payable to that member in a case of competition between himself and any other creditor not a member of the company, but any such sum may be taken into account for the purpose of the final adjustment of the rights of the contributories among themselves.

Companies Act, s. 135 (emphasis added).   Here, GM Nova Scotia's sole member was Old GM. Thus, this statute unambiguously renders Old GM liable for GM Nova Scotia's outstanding debts and winding up costs—the exact expenses that make up the Nova Scotia Trustee Claim.  These expenses are comprised of amounts owing in respect of the Notes issued by GM Nova Scotia and the Swap Agreements.[12]  Importantly, none of the eight qualifications contained in Section 135— which limit Section 135 liability—are applicable here, and the GUC Trust's purported Canadian law expert has conceded this fact in his expert report.[13]

---

[12] Ordinarily, the members of a ULC would be liable for the ULC's winding up costs as well.  However, the winding-up costs of GM Nova Scotia are provided for in the Lock-Up Agreement and therefore have not been made a part of the Nova Scotia Trustee Claim.  If the Lock-Up Agreement is voided, the Nova Scotia Trustee Claim will be increased to include the costs of winding up.

[13] For an example of an applicable exception to the general rule, *see In re Smurfit-Stone Container Corp.*, 444 B.R. 111, 117 (Bankr. D. Del. 2011) (language in the guarantee unambiguously restricted the ULC's recovery under Section 135).

### III.    THE NOVA SCOTIA TRUSTEE CLAIM AND THE GUARANTEE CLAIM ARE NOT DUPLICATIVE AND BOTH ARE PERMISSIBLE

#### A.    The Nova Scotia Trustee Claim Is the Statutory Result of Old GM's Decision To Create GM Nova Scotia as an Unlimited Liability Company, and Is Distinct From the Contractually Created Guarantee Claim

The GUC Trust's assertion that the portion of the Nova Scotia Trustee Claim seeking recovery of the amounts owing under the Notes is duplicative of the Guarantee Claim, Am. Objection ¶ 69, is wrong as a matter of law. The two claims are entirely distinct from one another. The Nova Scotia Trustee Claim arises directly as a result of Old GM purposefully creating GM Nova Scotia as a ULC under the Companies Act, allowing Old GM the opportunity to reap substantial tax benefits, but also requiring it to contribute to the assets of GM Nova Scotia sufficient to pay all of GM Nova Scotia's outstanding debts and liabilities in the event that GM Nova Scotia commenced a winding up proceeding under the BIA. In accordance with its statutory mandate, the Nova Scotia Trustee is in the process of winding up GM Nova Scotia. Old GM, having structured GM Nova Scotia to provide the opportunity to receive the tax benefits associated with the use of a ULC as a financing vehicle, is required to satisfy the liabilities set forth in the Nova Scotia Trustee Claim that it assumed by statute as the sole member of the ULC.

By contrast, the Guarantee Claim asserted by the Noteholders is a direct contract claim that the Noteholders have against Old GM pursuant to the Guarantee. The Guarantee provides the Noteholders with an avenue of recovery on the Notes in addition to their claims against GM Nova Scotia. The Guarantee Claim thus derives from an entirely separate obligation than the Nova Scotia Trustee Claim. Indeed, pursuant to section 77 of the BIA, the Nova Scotia Trustee Claim is an asset of the GM Nova Scotia estate, not an asset of the creditors of GM Nova

28

Scotia.[14]

Consider, for example, if the Noteholders were to receive a partial recovery on Old GM's Guarantee.  In that instance, the Noteholders would continue to be entitled to assert the full amount of their claim against GM Nova Scotia, the party to whom funds were lent, until the Noteholders receive a 100% recovery.  *See Nw. Mut. Life Ins. Co. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*, 608 F.3d 139, 147 (2d Cir. 2010).  In such event, the Nova Scotia Trustee would, under Section 135, continue to seek the full amount due under the Notes from Old GM.  The same is true with respect to GM Nova Scotia's liability under the Swap Agreements and all other debts covered by the Nova Scotia Trustee Claim.  The Nova Scotia Trustee Claim is the vehicle by which the Nova Scotia Trustee obtains funds to pay all of GM Nova Scotia's creditors and, thus, Old GM's obligation to pay this indebtedness is separate and distinct from Old GM's liability under the Guarantee.

The mere fact that Old GM is required to satisfy the Guarantee Claim and the Nova Scotia Trustee Claim does not render such claims duplicative.  Rather, as shown by applicable legal precedent in this Circuit, so long as the Noteholders do not receive more than payment in full on account of the Notes, the allowance of both the Guarantee Claim and the Nova Scotia Trustee Claim in the amounts asserted is appropriate.  *See In re Delta Air Lines, Inc.*, 608 F.3d at 147.

In *Delta*, for example, the debtor objected to the claims filed by creditors, who owned planes leased by the debtor, to recover money under tax indemnity agreements ("**TIAs**").  *Id.* at 144.  The TIAs were negotiated to provide the creditors reimbursement for tax benefits lost upon foreclosure of the creditors' planes in the event Delta defaulted on its lease payments.  *Id.* at 143.

---

[14] Bankruptcy and Insolvency Act, R.S.C. 2010, c. B-3, s. 77 (Can.)

The leases also provided that Delta pay a stipulated loss value ("**SLV**"), which similarly

reimbursed the creditors under the lease for lost tax benefits, if Delta defaulted on its lease

payments.  *Id.*  Once Delta defaulted on the leases, the creditors filed claims in respect of the

SLV and the TIAs.  *Id.* at 144.  Delta objected to the claims on the basis that they were

duplicative.  *Id.* at 149.  The Second Circuit, however, found that the parties intended that

payment of the TIAs was mandated only if the SLV was not paid in full.  *Id.*  Acknowledging

that, as a result of a bankruptcy, unsecured creditors may receive less than a 100% recovery on

account of their claims, the Second Circuit allowed both the TIA claim and the SLV claim,

subject to such claimants not recovering more than 100% on their claims.  *Id.* at 147.

In so holding, the Second Circuit expressly rejected the very same argument made by the

GUC Trust in its Amended Objection (*i.e.,* that "multiple recoveries for the same injury are

disallowed in bankruptcy," Amended Objection at 21).  *Id.* at 149–50.  The Second Circuit held:

> As an alternative basis for affirmance, Delta argues that a single loss can
> only give rise to a single claim in bankruptcy . . . notwithstanding that the
> TIA claims and SLV claims arise under agreements (1) between different
> parties, (2) addressing different events, and (3) providing for different
> remedies.  In light of these facts, we agree with the bankruptcy court that:
> Each agreement was freely negotiated and fully supported by fair
> consideration on both sides.  If a component of the SLV claim under the
> Lease is calculated by reference to the owner participant's tax
> consequences which are indemnified under the TIA (the 'overlap' Delta
> objects to), so be it.  That is what Delta agreed to and what both the owner
> participant and the indenture trustee relied upon in negotiating the
> agreements.  If Delta has contracted to pay duplicative claims, then it must
> pay both - it cannot repudiate its duty to party A under contract A by
> asserting that it contracted to pay the same amount to party B under
> contract B.

*Id.* at 149.

Cases addressing the issue of substantive consolidation are also instructive.  As this Court

is aware, substantive consolidation is an equitable power of the Court that results in the pooling

of assets and claims against multiple entities, such that claimants may only recover on a single

claim against a single set of assets.  To the extent a creditor had claims against multiple debtors

on account of a single debt obligation, before consolidating one of the creditor's claims into one

against a single set of assets, the Second Circuit requires that a bankruptcy court consider

"whether creditors dealt with the entities as a single economic unit and did not rely on their

separate identity in extending credit."  *Union Sav. Bank v. Augie/Restivo Banking Co. (In re*

*Augie/Restivo Banking Co.)*, 860 F.2d 515, 518 (2d Cir. 1988).  Thus, a lender's reasonable

expectations of separate corporate identity are entitled to deference.  As the Second Circuit

reasoned:

> [C]reditors who make loans on the basis of the financial status of a
> separate entity expect to be able to look to the assets of their
> particular borrower for satisfaction of that loan. ***Such lenders
> structure their loans according to their expectations regarding
> that borrower*** and do not anticipate either having the assets of a
> more sound company available in the case of insolvency or having
> the creditors of a less sound debtor compete for the borrower's
> assets. Such expectations create significant equities.

*Id.* at 518–19 (emphasis added); *accord Chem. Bank New York Trust Co. v. Kheel,* 369 F.2d 845,

848 (2d Cir. 1966) ("Equality among creditors who have lawfully bargained for different

treatment is not equity but its opposite.").

The application to the instant case is clear.  Based upon Old GM's use of a Nova Scotia

ULC to raise capital, the Noteholders reasonably expected that in the event of a winding up, GM

Nova Scotia would be able to look to Old GM, as its sole member, to contribute to GM Nova

Scotia's assets an amount sufficient to pay all of GM Nova Scotia's unpaid debts and liabilities.

The Noteholders obtained the Guarantee from Old GM as an additional avenue of recovery on

the Notes.  Disallowance of the Nova Scotia Trustee Claim on the ground that it is purportedly

duplicative would negate the significant consideration exchanged in connection with the

Noteholders' agreement to lend funds to GM Nova Scotia.

What *Augie/Restivo* and *Delta* have in common is a recognition that debtors in bankruptcy must live with the contracts and corporate structure they established pre-bankruptcy. This case should be no different. Here, Old GM elected to use the tax-saving ULC structure to raise money from the public bond markets to help fund the obligations of GM Canada. As a credit enhancement, Old GM also provided prospective noteholders with a contractual guarantee. The Noteholders then lent money to GM Nova Scotia. Just as in *Delta*, Old GM is bound by the corporate structure it elected to utilize *and* the Guarantee it agreed to issue in connection with the Notes offering. To hold otherwise would have the inequitable result of permitting Old GM the opportunity to reap the substantial tax benefits associated with the ULC structure while avoiding the risks attendant thereto and, at the same time, denying the Noteholders the benefit of their bargain regarding the Guarantee.

## B.    The Guarantee Does Not, Without More, Eliminate the Nova Scotia Trustee Claim

If Old GM wanted to allow a single claim, it could have foregone the Guarantee (leaving only the Nova Scotia Trustee Claim) or worded the Guarantee to prohibit the Nova Scotia Trustee Claim pursuant to Section 135(f) (leaving only the Guarantee Claim). *See, e.g., In re Smurfit-Stone Container Corp.*, 444 B.R. at 117 (holding that the language in the guarantee restricted the ULC claim pursuant to Section 135(f)). However, it is beyond dispute that Old GM did no such thing. Indeed, the evidence at trial will show that Old GM recognized and understood that, in the event of GM Nova Scotia's winding-up, it would be liable under both claims.

Despite this, the GUC Trust's purported Canadian law expert has argued that the giving of *any* guarantee necessarily eliminates a claim pursuant to Section 135, regardless of whether that guarantee specifically restricts the liability created by that provision pursuant to Section

135(f).  This argument, devoid of any legal authority, is predicated on the legislative history of

the 1862 version of the English Companies Act that was later adopted by the Nova Scotia

legislature in 1900.  In the GUC Trust's expert's opinion, this legislative history allegedly shows

that a Section 135 claim belongs to a ULC's creditors, rather than the ULC.  Based on this

conclusion, the GUC Trust's expert claims that the Nova Scotia Trustee Claim is duplicative of

the Guarantee Claim.

For a variety of reasons that will be shown at trial by Professor Edward M. Iacobucci, the

Nova Scotia Trustee's expert on Canadian company law, the arguments advanced by the GUC

Trust's expert fail.  Among other things:

- The public policy arguments advanced by the GUC Trust's expert—which are based upon conditions existing in the United Kingdom in the 1800s—should be given little weight because the wording and scheme of Section 135—establishing general liability of the ULC's members subject to eight enumerated qualifications—is precise and unequivocal, and under Canadian statutory interpretation, "[w]hen the words of a provision are precise and unequivocal, the ordinary meaning of the words play [sic] a dominant role in the interpretive process;"[15]

- In any event, the public policy of 1862 England cannot and should not be imputed on the Nova Scotia legislature acting in 1900.  Moreover, the policy argument that the GUC Trust's expert identifies—that concerns over "chaos" caused by individual creditors asserting their own claims against the ULC's members motivated Parliament to require that a single claim be asserted by the ULC instead—actually supports the conclusion that the Section 135 liability is owed to the ULC rather than its creditors because it justifies respect for the corporate form and separate legal personality; and

- The GUC Trust's expert's argument is in violation of the well-established principle that a corporation has a legal personality separate and apart from its creditors, and runs directly contrary to the unequivocal language of the BIA which holds that a Section 135 claim is an asset of the ULC.[16]

---

[15] *Canada Trustco Mortgage Co. v. Canada*, 2005 SCC 54 (SCC) para. 10.

[16] BIA, s. 77(2).

**IV.    CANADIAN INSOLVENCY PRINCIPLES, INCLUDING THE RULE AGAINST DOUBLE PROOF DO NOT BAR THE ALLOWANCE OF BOTH THE NOVA SCOTIA TRUSTEE CLAIM AND THE GUARANTEE CLAIM IN FULL**

The facts, law and testimony of the GM Nova Scotia Trustee's and Noteholders' Canadian insolvency law expert, David E. Baird, Q.C., will establish that the GUC Trust's arguments concerning the rule against "double proof" are irrelevant to the issues in dispute and wrong as a matter of law.

**A.    The Rule Against Double Proof Is a Canadian Rule of Claims Administration Which is Inapplicable to These Proceedings**

In Canada, in accordance with an English equitable principle adopted by Canadian courts, the rule against "double proof" prevents two valid claims for the same debt from being admitted in an insolvency proceeding even though there may be separate contracts underlying those claims and even if the total amount that would be received in distributions on those claims if both were admitted would be less than the amount of the debt. *Re Olympia & York Dev. Ltd.* (1998), 4 C.B.R. (4th) 189 ¶¶ 23–25 ("*Olympia & York*"). However, contrary to the GUC Trust's argument, the rule against "double proof" is not an "'overarching principle' applicable in all areas of Canadian law" or a substantive defense to a claim. Report of Professor Mohamed F. Khimji (the "**Khimji Report**") ¶ 35. Rather, as Mr. Baird will testify, the rule against double proof is a rule of claims administration applicable to the distribution of an insolvent debtor's assets in a Canadian or UK insolvency proceeding. *See In the Matter of Kaupthing Singer and Friedlander Limited*, [2011] UKSC 48 ¶ 1 ("*KSF*") (referring to "the long-standing principle of insolvency law known as the rule against double proof"); *Olympia & York*, 4 C.B.R. (4th) 189 ¶¶ 1, 23 (same); *Re Polly Peck Int'l plc*, [1996] B.C.C. 486, 1 BCLC at 435 (Ch.D.) ("***Polly***

*Peck*") (same).[17]  Accordingly, there is no legal basis for this Court to apply the rule against

"double proof" to determine allowance of the Nova Scotia Trustee Claim and Guarantee Claim

against Old GM, a United States debtor in a United States bankruptcy case.[18]

### B.     The Rule Against Double Proof Does Not Preclude Allowance of Both the Nova Scotia Trustee Claim and Guarantee Claim In Full

Moreover, even if the rule against "double proof" were applicable here—which it is

not—it would not bar allowance of both the Nova Scotia Trustee Claim and Guarantee Claim in

full.  As the courts in *Polly Peck* and *KSF* held in examining corporate and transactional

structures similar to those in this case, claimants may recover on claims analogous to the Nova

Scotia Trustee Claim and Guarantee Claim.  *See Polly Peck*, 1 BCLC 428 (no violation of the

rule against double proof where bondholders sued parent on a guarantee of subsidiary's bond

obligation and subsidiary bond issuer sued parent for repayment of loans comprised entirely of

proceeds from same bonds); *see also KSF* [2011] UKSC 48 ¶¶ 50–54 (affirming validity of *Polly*

*Peck* and allowing subsidiary to recover from parent on intercompany loan and noteholders to

recover 100% of claims in part from subsidiary as issuer and in part from parent as guarantor).

*Polly Peck*, was considered by the *Olympia & York* court because, on the surface, the facts in it

were "remarkably similar" to the facts in the *Olympia & York* case.  *Olympia & York*, 4 C.B.R.

(4th) 202 ¶ 38.  However, the *Olympia & York* court found that *Polly Peck* was distinguishable

---

[17] *KSF* is a decision of the Supreme Court of the United Kingdom and *Polly Peck* is a decision of the English Chancery Division of the High Court of Justice.  In Canada, the reasoning in English case law is highly respected and very persuasive.  *See, e.g.,* GERALD L. GALL, THE CANADIAN LEGAL SYSTEM 64 (5th ed., Thomson Carswell 2004) (noting that although "decisions of the House of Lords . . . are no longer binding on Canadian Courts . . . , even to the present day, decisions of these courts, under the doctrine of stare decisis, remain highly persuasive").

[18] *See, e.g., Robinson v. Seaboard Nat'l Bank of New York*, 247 F. 667, 669 (3d Cir. 1918) (considering "the many cases, English and American, bearing on the double proof of claims in bankruptcy," noting that "these cases eventually crystallized in the American courts holding that, where there was a double contract obligation in a security, there could be a corresponding double proof," and allowing claimant to recover on two claims relating to a single note, one claim based upon the partners' promise to pay the note which bound the firm, and the other based upon the partners' promise to pay the note which bound them as individuals), *aff'd* 247 F. 1007 (3d Cir. 1918).

from *Olympia & York* in a number of ways, and Mr. Baird's testimony will demonstrate that the rule against "double proof" does not bar allowance of both the Nova Scotia Trustee Claim and Guarantee Claim in full. *Id.* at 203 ¶ 39.

In *Polly Peck*, a subsidiary corporation (the "**Polly Peck Subsidiary**") issued bonds that were guaranteed by its parent corporation (the "**Polly Peck Parent**") in order to "achieve certain tax advantages," and loaned the proceeds to the Polly Peck Parent. *Polly Peck*, 1 BCLC at 430–32, 434. Subsequently, the Polly Peck Parent and the Polly Peck Subsidiary entered into insolvency proceedings in the United Kingdom and the Cayman Islands, respectively. *Id.* at 431, 435. In *Polly Peck,* the court determined that the rule against double proof did not apply and allowed both the bondholders' claim against the Polly Peck Parent as guarantor of the bonds and the Polly Peck Subsidiary's claim against its parent based on the intercompany loan. *Id.* at 444.

As the court in *Polly Peck* observed, the purpose of the rule against "double proof" is to prevent "a creditor" from "getting his debtor to enter into several distinct contracts with different people for the same debt, to obtain higher dividends than the other creditors and perhaps get his debt paid in full." *Id.* at 437 (*quoting In re Oriental Commercial Bank* (1871), LR 7 Ch App 99, 103–04). However, the *Polly Peck* Court determined that such circumstances did not exist in that case. Similarly, such circumstances do not exist here. The rule against "double proof" simply does not apply to the Nova Scotia Claim or the Guarantee Claim.

The GUC Trust discounts the decision in *Polly Peck*, and instead mistakenly relies on *Olympia & York*. Khimji Report ¶¶ 36–39. The particular facts in *Olympia & York* resulted in the application of the rule against double proof. *Olympia & York*, 4 C.B.R. (4th) 189 ¶ 27. However, as Mr. Baird will testify and as he has set forth in his expert report, this case is readily distinguishable from *Olympia & York* because in *Olympia & York* there was an "inseparable legal

nexus" between the loan from to the subsidiary and the subsidiary's loan to the parent company.

Consequently, the court there found that the parent company was the primary obligor on the debt,

rather than solely the guarantor.  *Id.* ¶¶ 30–33, 39.

Numerous factors essential to the finding of an "inseparable legal nexus" are lacking in

this case.  Notably, these include, but are not limited to, the fact that the Nova Scotia Trustee

Claim and Guarantee Claim do not relate to the "same debt."  Therefore, even if the Court were

to consider the GUC Trust's argument on the Anglo-Canadian rule against double proof—which

is inherently irrelevant to the administration of claims in a United States bankruptcy—the rule

simply does not apply to the Nova Scotia Trustee Claim and the Guarantee Claim.

## V.    THE GUC TRUST'S REMAINING ARGUMENTS DO NOT APPLY TO THE NOVA SCOTIA TRUSTEE AND ARE UNWARRANTED

### A.    Bankruptcy Code Section 502(d) Is Inapplicable

As will be shown at trial, the Nova Scotia Trustee Claim and the Guarantee Claim should

not be disallowed under Bankruptcy Code section 502(d).  The GUC Trust contends that Old

GM's loan to GM Canada, a portion of which was subsequently transferred to GM Nova Scotia

in settlement of independent obligations and used for payment of the Consent Fee, was avoidable

as a preference or fraudulent conveyance.  Am. Objection ¶ 55–57.  This argument is factually

and legally flawed.

First, in order for the GUC Trust to rely on Bankruptcy Code section 502(d), the GUC

Trust must have obtained a finding by the Court that the Consent Fee was an avoidable transfer

and that the Noteholders or GM Nova Scotia are liable for the turnover of such amounts under

the Bankruptcy Code.  As no such judgment exists, Bankruptcy Code section 502(d) is

inapplicable.  Second, as will be shown by New GM at trial, to the extent Old GM had a viable

cause of action under chapter 5 of the Bankruptcy Code to avoid the loan by Old GM to GM

Canada or the payment of the Consent Fee—which it does not—all avoidance actions related to the loan were transferred by Old GM to New GM in connection with the 363 Sale and, thus, Old GM's estate does not own such cause of action or have an entitlement to any proceeds therefrom.

Finally, even if the GUC Trust's arguments had merit—which they do not—section 502(d) requires disallowance of a claim only "unless such transferee has paid the amount or turned over any such property for which such entity or transferee is liable." 11 U.S.C. § 502(d). Given that the full amount of the loan from Old GM to GM Canada has been repaid (with interest), Bankruptcy Code section 502(d) is entirely inapplicable.

### B. The Lock-Up Agreement Does Not Constitute an Unauthorized 9019 Settlement

The GUC Trust also argues that the Lock-Up Agreement constitutes an unauthorized Bankruptcy Rule 9019 settlement. Am. Objection ¶¶ 65–67.[19] As explained above, the testimony at trial will show that the Lock-Up Agreement was a pre-petition agreement, thereby refuting the GUC Trust's argument. In addition, the GUC Trust complains of four specific actions taken in furtherance of the Lock-Up Agreement: (i) the Noteholders' passing the Extraordinary Resolution which prevented subsequent automatic termination of the pre-petition Lock-Up Agreement, (ii) GM Nova Scotia's payment of the Consent Fee, (iii) GM Nova Scotia's release of the Intercompany Loan, and (iv) GM Nova Scotia's consent to entry of a bankruptcy order. But because each such action was taken by a *non-debtor*, none are subject to Bankruptcy Rule 9019. Accordingly, the GUC Trust's argument that the Lock-Up Agreement, and the actions taken pursuant to it, constitute an unauthorized 9019 settlement must fail.

---

[19] The GUC Trust does not explain how an unauthorized 9019 settlement would entitle the GUC Trust to use 502(d) to defeat either the Guarantee Claim or the Nova Scotia Trustee Claim.

38

**C.      Recharacterization of the Consent Fee as a Paydown of Principal Is Inappropriate**

The GUC Trust does not, and cannot, provide any legal support for its demand that the Court apply the Consent Fee to the principal amount outstanding on the Notes.  Such an unprecedented remedy is without support anywhere in New York law (which governs the Lock-Up Agreement) or the Bankruptcy Code.[20]  Moreover, recharacterization relief is inappropriate and unwarranted where the Debtors, sophisticated parties represented by able counsel, aware of all relevant facts and supported in the negotiation by the United States and Canadian governments, participated in good faith negotiations with the Debtors' creditors.  As will be shown at trial, it was in this context that the Lock-Up Agreement was struck, with the Debtors specifically agreeing that the Consent Fee was not payment on principal and may not be treated as such.

**D.      The GUC Trust's Request for Relief Under Federal Rule of Civil Procedure 60(b) and Bankruptcy Rule 9024**

Finally, the GUC Trust protectively requests relief pursuant to Rule 60(b) of the Federal Rules of Civil Procedure ("**Rule 60(b)**") and Rule 9024 of the Federal Rules of Bankruptcy Procedure to void limited portions of the Sale Order.  In light of the Court's July 24, 2012 *Order Denying Motion for Summary Judgment Filed by General Motors LLC* (Docket No. 144), the Nova Scotia Trustee understands the Court's position that any analysis on this requested relief is

---

[20] Although Section 105, which grants Bankruptcy Courts wide equitable powers, and allows a bankruptcy court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]," a bankruptcy court's equitable powers are limited to the confines of the Bankruptcy Code and the Bankruptcy Rules.  *See, e.g., Norwest Bank Worthington v. Ahlers*, 485 U.S. 197 (1988) (holding whatever equitable powers remain in bankruptcy courts can only be exercised within confines of the Bankruptcy Code); *Solow v. Kalikow (In re Kalikow)*, 602 F.3d 82, 96–97 (2d Cir. 2010) ("Section 105 does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity . . . .  Thus, § 105 does not itself create a private right of action, but a court may invoke § 105(a) if the equitable remedy utilized is demonstrably necessary to preserve a right elsewhere provide in the Code.") (citations omitted) (internal quotation marks omitted).  Thus, "the equitable power conferred on a bankruptcy court by 11 U.S.C. § 105 is the power to exercise equity in carrying out the provisions of the Bankruptcy Code, rather than to further the purposes of the Code generally, or otherwise to do the right thing."  *Id.* at 96–97.

premature at this time.  In the event that the GUC Trust decides to pursue relief pursuant to Rule

60(b), the Nova Scotia Trustee reserves its right to oppose this request in full in post-trial

briefing or otherwise.

## CONCLUSION

For the foregoing reasons, the Nova Scotia Trustee respectfully requests that the Court (i)

allow the Nova Scotia Trustee Claim in its entirety and (ii) grant such other and further relief to

the Nova Scotia Trustee as the Court deems just and proper.

Dated: July 27, 2012

Respectfully Submitted,

*/s/      Sean E. O'Donnell*
Daniel H. Golden
Sean E. O'Donnell
Philip C. Dublin
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Telephone:  (212) 872-1000
Facsimile:   (212) 872-1002

*Counsel for Green Hunt Wedlake Inc.*
*Trustee of General Motors Nova Scotia Finance*
*Company*