**CORRECTED VERSION**

GREENBERG TRAURIG, LLP
Bruce R. Zirinsky, Esq.
John H. Bae, Esq.
Gary D. Ticoll, Esq.
Paul T. Martin, Esq.
MetLife Building
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
E-mail: zirinskyb@gtlaw.com
         baej@gtlaw.com
         ticollg@gtlaw.com
         martinpt@gtlaw.com

GREENBERG TRAURIG, LLP
Kevin D. Finger, Esq.
Bevin M. Brennan, Esq.
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Telephone: (312) 456-8400
Facsimile: (312) 456-8435
E-mail: fingerk@gtlaw.com
         brennanb@gtlaw.com

GREENBERG TRAURIG, LLP
Joseph P. Davis III, Esq.
One International Place
Boston, MA 02110
Telephone: (617) 310-6000
Facsimile: (617) 310-6001
E-mail: davisjo@gtlaw.com

*Attorneys for Elliott Management Corporation, Fortress
Investment Group LLC and Morgan Stanley & Co.
International plc*

PAUL HASTINGS LLP
Barry G. Sher, Esq.
Maria E. Douvas, Esq.
Kevin P. Broughel, Esq.
Park Avenue Tower
75 E. 55th Street, First Floor
New York, New York 10022
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
E-mail: barrysher@paulhastings.com
         mariadouvas@paulhastings.com
         kevinbroughel@paulhastings.com

*Attorneys for Appaloosa Management L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ x
                                              :
In re                                         :    **Chapter 11**
                                              :
**MOTORS LIQUIDATION COMPANY, *et al.*,**     :    **Case No. 09-50026 (REG)**
       **f/k/a General Motors Corp., *et al.*,**  :
                                              :
              **Debtors.**                    :    **(Jointly Administered)**

```
-----------------------------------------------------------------------  x
```

MOTORS LIQUIDATION COMPANY GUC TRUST,    :
                                                :

                  **Plaintiff,**    :    **Adversary Proceeding**

        **v.**    :

                                                :    **Case No.: 12-09802**

APPALOOSA INVESTMENT LIMITED    :
PARTNERSHIP I; PALOMINO FUND LTD;    :
THOROUGHBRED FUND LP;    :
THOROUGHBRED MASTER LTD; THE    :
LIVERPOOL LIMITED PARTNERSHIP;    :
ELLIOTT INTERNATIONAL LP;    :
DRAWBRIDGE DSO SECURITIES LLC;    :
DRAWBRIDGE OSO SECURITIES LLC; FCOF    :
UB SECURITIES LLC; AURELIUS    :
INVESTMENT LLC; CITIGROUP GLOBAL    :
MARKETS INC.; LMA SPC FOR AND ON    :
BEHALF OF THE MAP 84 SEGREGATED;    :
KNIGHTHEAD MASTER FUND, L.P.; KIVU    :
INVESTMENT FUND LIMITED; CQS    :
DIRECTIONAL OPPORTUNITIES MASTER    :
FUND LIMITED; MORGAN STANLEY & CO.    :
INTERNATIONAL PLC; SG AURORA    :
MASTER FUND L.P.; THE CANYON VALUE    :
REALIZATION FUND (CAYMAN), LTD;    :
ANCHORAGE CAPITAL MASTER OFFSHORE    :
LTD; ONEX DEBT OPPORTUNITY FUND,    :
LTD; REDWOOD MASTER FUND LTD;    :
COLLINS STEWART (CI) LTD; SPH INVEST    :
SA; CONSILIUM TREUHAND AG & BEATA    :
DOMUS ANSTALT; MARIA-DOROTHEA    :
LAMINET; CREDIT SUISSE AG; CHEVIOT    :
ASSET MANAGEMENT; ING. HUGO    :
WAGNER; ALLIANZ BANK FINANCIAL    :
ADVISORS SPA; RUI MANUEL ANTUNES    :
GONCALVES ROSA; UBS AG, ZURICH    :
(SWITZERLAND); ALY AZIZ; JOHANNA    :
SCHOEFFEL; SIRDAR ALY AZIZ; CS S, LLC;    :
JOSEF SCHMIDSEDER; HERMANN    :
DETTMAR AND HELENE DETTMAR; CLAUS    :
PEDERSEN; HFR RVA ADVENT GLOBAL    :
OPPORTUNITY MASTER TRUST; THE    :
ADVENT GLOBAL OPPORTUNITY MASTER    :
FUND; BANCA DELLE MARCHE SPA; ORE    :
HILL CREDIT HUB FUND LTD; BHALODIA    :
RV/RM/PATEL RG; BARCLAYS BANK PLC;    :

**JPMORGAN SECURITIES LIMITED; INTESA**          :
**SANPAOLO SPA; INTESA SANPAOLO**               :
**PRIVATE BANKING SPA; CREDITO**                :
**EMILIANO SPA; UNICREDIT BANCA DI**            :
**ROMA SPA; HUTCHIN HILL CAPITAL C1,**          :
**LTD.; DEUTSCHE BANK SPA; BANCA**              :
**POPOLARE DI VICENZA SCPA; CASSA**             :
**CENTRALE BANCA-CREDITO**                      :
**COOPERATIVO DEL NORD EST SPA; BANCA**         :
**DI CREDITO COOPERATIVO DI ROMA**              :
**SOCIETA COOPERATIVA; BANK OF**                :
**VALLETTA PLC; BANCA DI CREDITO**              :
**COOPERATIVO ABRUZZESECAPPELLE SUL**           :
**TAVO-SOCIETA COOPERTIVA; UBS AG;**            :
**PERA UGO; GARIBALDI ROSANNA;**                :
**CANYON VALUE REALIZATION FUND LP;**           :
**LYXOR/CANYON VALUE REALIZATION**              :
**FUND LIMITED; CANYON-GRF MASTER**             :
**FUND LP; PROSPECT MOUNTAIN FUND**             :
**LIMITED; RED RIVER BUSINESS INC.;**           :
**GREEN HUNT WEDLAKE, INC., as trustee for**    :
**General Motors Nova Scotia Finance  Company;** :
**JOHN DOE NOS. 1-100; and JOHN DOE, INC.**     :
**NOS. 1-100,**                                 :
                                                :
                          **Defendants.**       :
                                                :
------------------------------------------------------------------    **x**


**PRETRIAL BRIEF OF ELLIOTT MANAGEMENT CORPORATION,**
**FORTRESS INVESTMENT GROUP LLC,**
**MORGAN STANLEY & CO. INTERNATIONAL PLC**
**AND APPALOOSA MANAGEMENT L.P.**

# TABLE OF CONTENTS

I.     THE GUC TRUST HAS THE BURDEN OF PROOF ...................................... 8

II.    THE GUARANTY CLAIM AND THE STATUTORY CLAIM ARE
ENFORCEABLE AND ARE SEPARATE AND INDEPENDENT CLAIMS ................ 8

III.   THERE IS NO BASIS IN LAW OR IN FACT TO  EQUITABLY
SUBORDINATE OR DISALLOW THE CLAIMS ........................................................ 9

     A.    The GUC Trust Cannot Satisfy the Requirements of Section 510(c) .................... 9

          1.   The GUC Trust Cannot Establish Inequitable Conduct....................................... 10

          2.   The GUC Trust Cannot Establish Injury or Unfair Advantage ........................... 15

          3.   The GUC Trust's Request For Equitable Subordination is Inconsistent
with Bankruptcy Law....................................................................................... 17

     B.    The Equitable Disallowance Claim Is Both Legally and Factually
Defective ............................................................................................................. 18

     C.    The Assumption and Assignment of the Lock-Up Agreement Bars
Equitable Subordination/Disallowance.................................................................. 19

IV.   THE GUC TRUST IS BARRED FROM BRINGING AVOIDANCE,
EQUITABLE SUBORDINATION, EQUITABLE DISALLOWANCE, AND
"RECHARACTERIZATION" CLAIMS BECAUSE THE PLAN DID NOT
PRESERVE SUCH CLAIMS ........................................................................................ 19

V.    GUARANTY CLAIMS OF TRANSFEREES ARE NOT SUBJECT TO
SECTION 502(D) OR EQUITABLE SUBORDINATION ............................................ 22

VI.   THERE IS NO LEGAL OR FACTUAL BASIS TO "RECHARACTERIZE" THE
CONSENT FEE AS A PRINCIPAL PAYMENT ........................................................... 23

     A.    The Court Lacks Subject Matter Jurisdiction to Recharacterize the
Consent Fee ......................................................................................................... 23

     B.    Section 105(a) Does Not Give the Court  Power to Recharacterize the
Consent Fee ......................................................................................................... 24

     C.    "Recharacterization" Is Not Available Under Section 502(b) ............................. 27

     D.    The Parties Did Not Intend the Consent Fee to be a Principal Payment .............. 28

VII.    THE ASSUMPTION AND ASSIGNMENT OF THE LOCK-UP
        AGREEMENT BARS THE GUC TRUST FROM CHALLENGING THE LOCK-
        UP AGREEMENT OR THE CONSENT FEE ............................................................. 29

VIII.   JUDICIAL ESTOPPEL BARS THE GUC TRUST FROM  CHALLENGING
        THE SALE ORDER AND ............................................................................................. 30

THE ASSUMPTION AND ASSIGNMENT OF THE LOCK-UP AGREEMENT .................... 30

IX.     THE GUC TRUST'S 502(D) OBJECTION MUST BE OVERRULED ........................ 32

        A.    The Claims Cannot Be Disallowed Under Section 502(d) .................................. 32

        B.    The Sale of Avoidance Actions Under the MSPA Bars the GUC Trust
              from Asserting Avoidance Claims ...................................................................... 32

        C.    The Avoidance Claims Are Time-Barred ........................................................... 33

        D.    The Lock-Up Agreement Cannot Be Avoided Because No Transfer Was
              Made by MLC ..................................................................................................... 34

        E.    Section 549(a) is Not Applicable ....................................................................... 34

        F.    The Consent Fee is Not Avoidable Under  Section 547 of the Bankruptcy
              Code .................................................................................................................... 35

        G.    The GUC Trust's Objections Based on Actual Intent to Hinder, Delay, or
              Defraud Must Be Overruled For Failure to Plead Fraud .................................... 36

        H.    The Collapsing Doctrine Has No Application Here ............................................ 36

        I.    The Consent Fee Payment Qualifies for the Section 546(e) Safe Harbor ........... 37

X.      APPALOOSA SOLD ITS CLAIMS PRIOR TO THE FILING OF THE
        ADVERSARY PROCEEDING ................................................................................... 38

XI.     THE GUC TRUST IS NOT ENTITLED TO RELIEF UNDER RULE 60(B) ............... 38

# TABLE OF AUTHORITIES

## Federal Cases

*80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*,
  169 B.R. 832 (Bankr. S.D.N.Y. 1994) ................................................................. 10, 16

*1800 Smith Street Assocs. v. Gencarelli (In re 1500 Mineral Spring Assocs., LP)*,
  353 B.R. 771 (D.R.I. 2006) ........................................................................................ 27

*ABF Capital Mgmt. v. Kidder Peabody & Co. (In re Granite Partners, L.P.)*,
  210 B.R. 508 (Bankr. S.D.N.Y. 1997) ....................................................................... 10

*Adelphia Commc'ns Corp. v. Bank of America, N.A. (In re Adelphia Commc'ns Corp.)*,
  365 B.R. 24 (Bankr. S.D.N.Y. 2007) ............................................................ 14-16, 19

*Bankers' Trust Co. v. Irving Trust Co. (In re United Cigar Stores Co. of Am.)*,
  73 F.2d 296 (2d Cir. 1934) ......................................................................................... 28

*Bankr. Servs., Inc. v. Ernst & Young (In re CBI Holding Co.)*,
  529 F.3d 432 (2d Cir. 2008) ....................................................................................... 33

*Barbieri v. RAJ Acquisition Corp. (In re Barbieri)*,
  199 F.3d 616 (2d Cir. 1999) ....................................................................................... 26

*Barclays Capital Inc. v. Giddens (In re Lehman Brothers Inc.)*,
  Nos. 11 Civ. 6052 (KBF), 11 Civ. 6053 (KBF), 2012 WL 1995089 (S.D.N.Y. June 5,
  2012 ) ............................................................................................................................. 6

*Benjamin v. Diamond (In re Mobile Steel Co.)*,
  563 F.2d 692 (5th Cir. 1977) ............................................................................ 10, 15-18

*Brandt v. B.A. Capital (In re Plassein Int'l Corp.)*,
  590 F.3d 252 (3d Cir. 2009) ....................................................................................... 38

*Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant &
  Sons, Inc.)*,
  447 B.R. 170 (Bankr. S.D.N.Y. 2011) ....................................................................... 36

*Butner v. United States*,
  440 U.S. 48 (1979) .............................................................................................. 25, 27

*Carey v. Ernst*,
  333 B.R. 666 (S.D.N.Y. 2005) ..................................................................................... 8

*City of Sherrill, N.Y. v. Oneida Indian Nation*,
  544 U.S. 197 (2005) ................................................................................................... 32

*Concerto Software, Inc. v. Vitaquest Int'l, Inc.*,
  290 B.R. 448 (D. Me. 2003) ....................................................................................... 29

*Contemporary Indus. Corp. v. Frost*,
  564 F.3d 981 (8th Cir. 2009) ...................................................................................... 38

*Deutsche Bank AG v. Metromedia Fiber Network (In re Metromedia Fiber Network,
  Inc.)*,
  416 F.3d 136 (2d Cir. 2005) ....................................................................................... 26

*Dev. Specialists, Inc.  v. 1114 6th Ave. Co. (In re Coudert Bros. LLP)*,
  No. 09 Civ 5047 (DLC), 2009 WL 2868722 (S.D.N.Y. Sept. 4, 2009) ..................... 29

*Devan v. Phoenix Am. Life Ins. Co. (In re Merry-Go-Round Enters., Inc.)*,
  400 F.3d 219, 224 (4th Cir. 2005) .............................................................................. 35

*Duke Energy Royal v. Pillowtex Corp. (In re Pillowtex, Inc.)*,
   349 F.3d 711 (3d Cir. 2003) ........................................................................................ 8

*DuVoisin v. Foster (In re S. Indus. Banking Corp.)*,
   809 F.2d 329 (6th Cir. 1987) .................................................................................... 36

*E. Air Lines, Inc. v. Ins. Co of Pa. (In re Ionosphere Clubs, Inc.)*,
   85 F.3d 992 (2d Cir. 1996) ........................................................................................ 29

*Enron Corp. v. Springfield Assoc., LLC (In re Enron Corp.)*,
   379 B.R. 425 (S.D.N.Y. 2007) ............................................................................ 9, 22

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
   651 F.3d 329 (2d Cir. 2011) ...................................................................................... 37

*Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors (In re Official*
   *Comm. of Unsecured Creditors for Dornier Aviation (North Am.), Inc.)*,
   453 F.3d 225 (4th Cir. 2006) .................................................................................... 26

*FCC v. NextWave Personal Commc'ns, Inc.*,
   537 U.S. 293, 302 (2003) ........................................................................................... 19

*FDIC v. Colonial Realty Co.*,
   966 F.2d 57 (2d Cir. 1992) ........................................................................................ 25

*First Bank v. N. County Bank & Trust (In re Superior Used Cars, Inc.)*,
   258 B.R. 680 (Bankr. W.D. Mich. 2001) ............................................................... 20

*Fleet Nat'l Bank v. Gray (In re Bankvest Capital Corp.)*,
   375 F.3d 51 (1st Cir. 2004) ....................................................................................... 20

*Hackeling v. Rael Automatic Sprinkler Co. (In re Luis Elec. Contracting Corp.)*,
   165 B.R. 358 (Bankr. E.D.N.Y. 1992) ............................................................ 34, 35

*Harstad v. First Am. Bank (In re Harstad)*,
   39 F.3d 898 (8th Cir. 1994) ...................................................................................... 20

*HBE Leasing Corp. v. Frank*,
   48 F.3d 623 (2d Cir. 1995) ........................................................................................ 36

*Hounddog Productions, L.L.C. v. Empire Film Group, Inc.*,
   826 F. Supp. 2d 619 (S.D.N.Y. 2011) .................................................................... 28

*Hunnicutt Co., Inc. v. TJX Cos., Inc. (In re Ames Dept. Stores, Inc.)*,
   190 B.R. 157 (S.D.N.Y. 1995) ................................................................................ 24

*In re Allegheny Int'l*,
   954 F.2d 167 (3d Cir. 1992) ....................................................................................... 8

*In re Ames Dept. Stores, Inc.*,
   450 B.R. 24 (Bankr. S.D.N.Y. 2011) ........................................................................ 8

*In re Combustion Eng'g, Inc.*,
   391 F.3d 190 (3d Cir. 2005) ...................................................................................... 25

*In re County of Orange*,
   219 B.R. 543 (C.D. Cal. 1997) ................................................................................ 20

*In re Dairy Mart Convenience Stores, Inc.*,
   351 F.3d 86 (2d Cir. 2003) .................................................................................. 24, 25

*In re Dreier LLP*,
   429 B.R. 112 (Bankr. S.D.N.Y. 2010) .................................................................... 34

*In re F.W.D.C. Inc.*,
   158 B.R. 523 (Bankr. S.D. Fla. 1993) ..................................................................... 28

*In re Fesco Plastics Corp., Inc.*,
   996 F.2d 152 (7th Cir. 1993) ................................................................... 27

*In re Furs by Albert & Mark Kaufman, Inc.*
   Case No. 03-041301, 2006 WL 3735621 (Bankr. S.D.N.Y. Dec. 14, 2006)......................... 37

*In re Minbatiwalla*,
   424 B.R. 104 (Bankr. S.D.N.Y. 2010) ........................................................... 8

*In re Moreno*,
   341 B.R. 813 (Bankr. S.D. Fla. 2006)........................................................... 27

*In re Sabre Shipping Corp.*,
   299 F. Supp. 97 (S.D.N.Y. 1969) ............................................................... 8

*In re Smart World Techs., LLC*,
   423 F.3d 166 (2d. Cir. 2005).................................................................. 25

*In re Windsor Constructors, Inc.*,
   Case No. 03-36589 (ELF), 2006 WL 4005568 (Bankr. E.D. Pa. Jan. 10, 2007) ................... 27

*Ivanhoe Bldg. & Loan Ass'n v. Orr*,
   295 U.S. 243 (1935)............................................................................ 28

*Kalisch v. Maple Finance Corp. (In re Kalisch)*,
   413 B.R. 115 (Bankr. S.D.N.Y. 2008)........................................................... 8

*Klos v. Polskie Linie Lotnicze*,
   133 F.3d 164 (2d Cir. 1997)................................................................... 28

*Kronz v. Cech (In re Romano)*,
   175 B.R. 585 (Bankr. W.D. Pa. 1994) .......................................................... 8

*Liberty Mut. Ins. Co. v. Leroy Holding Co.*,
   226 B.R. 746 (N.D.N.Y. 1998) ................................................................. 16

*Liddle & Robinson, L.L.P. v. Daley (In re Daley)*,
   224 B.R. 307 (Bankr. S.D.N.Y. 1998) .......................................................... 33

*Liona Corp., Inc. v. PCH Associates (In re PCH Associates)*,
   949 F.2d 585 (2d Cir. 1991)................................................................... 26

*Lockheed Martin Corp. v. Retail Holdings*,
   N.V., 639 F.3d 63 (2d Cir. 2011).............................................................. 28

*LTV Steel Co., Inc. v. Aetna Casualty & Surety Co. (In re Chateaugay Corp.)*,
   No. 86 B 11270-86, 1993 WL 563068 (Bankr. S.D.N.Y. Dec. 27, 1993)............................ 17

*Mishkin v. Siclari (In re Adler Coleman Clearing Corp.)*,
   277 B.R. 520 (Bankr. S.D.N.Y. 2002)........................................................... 18

*N.W. Mut. Life Ins. Co. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*,
   608 F.3d 139 (2d Cir. 2010)................................................................... 9

*New Hampshire v. Maine*,
   532 U.S. 742 (2001)........................................................................... 30

*Norwest Bank Worthington v. Ahlers*,
   485 U.S. 197 (1988)........................................................................... 25

*Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc.
   (In re Sunbeam Corp.)*,
   284 B.R. 355 (Bankr. S.D.N.Y. 2002) ...................................................... 14, 16

*Official Comm. of Unsecured Creditors v. Am. United Life Ins. Co. (In re Quebecor
   World (USA), Inc.)*,
   453 B.R. 201 (Bankr. S.D.N.Y. 2011).......................................................... 37

*Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions, Inc.)*,
  330 B.R. 67 (Bankr. D. Del. 2005) ................................................................. 19, 29, 30
*Official Comm. of Unsecured Creditors v. Conseco Fin. Servicing Corp. (In re Lois/USA, Inc.)*,
  264 B.R. 69 (Bankr. S.D.N.Y. 2001) ................................................................. 10
*Paul H. Shield, MD. Inc. Profit Sharing Plan v. Northfield Laboratories Inc. (In re Northfield Laboratories Inc.)*,
  467 B.R. 582 (Bankr. D. Del. 2010) ................................................................. 20
*Picard v. Katz*,
  462 B.R. 447 (S.D.N.Y. 2011) ................................................................. 37
*Publicker Indus. Inc. v. United States (In re Cuyahoga Equip. Corp.)*,
  980 F.2d 110 (2d Cir. 2005) ................................................................. 24
*QSI Holdings, Inc. v. Alford (In re QSI Holdings, Inc.)*,
  571 F.3d 545 (6th Cir. 2009) ................................................................. 38
*Rahl v. Bande*,
  328 B.R. 387 (S.D.N.Y. 2005) ................................................................. 20
*Resolution Trust Corp. v. Kerr*,
  804 F.Supp. 1091 (W.D. Ark. 1992) ................................................................. 31
*Seta Corp. of Boca, Inc. v. Atl. Computer Sys. (In re Atl. Computer Sys.)*,
  173 B.R. 858 (S.D.N.Y. 1994) ................................................................. 32
*Sherman v. Novak (In re Reilly)*,
  245 B.R. 768 (B.A.P. 2d Cir. 2000) ................................................................. 8
*Solow v. Kalikow (In re Kalikow)*,
  602 F.3d 82 (2d Cir. 2010) ................................................................. 25, 26
*Springfield Assocs., L.L.C. v. Enron Corp. (In re Enron Corp.)*,
  379 B.R. 425 (S.D.N.Y. 2007) ................................................................. 32
*Stanziale v. Finova Capital Corp. (In re Tower Air, Inc.)*,
  397 F.3d 191 (3d Cir. 2005) ................................................................. 29
*Sure-Snap Corp. v. State Street Bank and Trust Co.*,
  948 F.2d 869 (2d Cir. 1991) ................................................................. 10
*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
  487 F.3d 89 (2d Cir. 2007) ................................................................. 13
*Travelers Casualty & Surety Co. of Am. v. Pacific Gas & Elec. Co.*,
  549 U.S. 443 (2007) ................................................................. 19
*United Airlines, Inc. v. HSBC Bank USA, N.A.*,
  416 F.3d 609 (7th Cir. 2005) ................................................................. 26
*United States v. Sanford (In re Sanford)*,
  979 F.2d 1511 (11th Cir. 1992) ................................................................. 27
*United States v. Sutton*,
  786 F.2d 1305 (1986) ................................................................. 25
*Unsecured Creditors Comm. v. Noyes (In re STN Enters.)*,
  779 F.2d 901 (2d Cir. 1985) ................................................................. 33
*Vargas Realty Enters., Inc. v. CFA W. 111 Street, L.L.C. (In re Vargas Enters., Inc.)*,
  440 B.R. 224 (S.D.N.Y. 2010) ................................................................. 10
*VKK Corp. v. N.F.L.*,
  244 F.3d 114 (2d Cir. 2001) ................................................................. 32

*Wight v. BankAmerica Corp.,*
219 F.3d 79 (2d Cir. 2000) ................................................................................................ 30

## State Cases

*Ashwood Capital, Inc. v. OTG Mgmt., Inc.,*
2012 WL 2741860 (N.Y. App. Div. July 10, 2012) ............................................................ 28
*In the Matter of Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.,*
93 N.Y.2d 584 (1999) ........................................................................................................ 13

## Federal Statutes

11 U.S.C. § 105(a) ............................................................................................................... 24-26
11 U.S.C. § 365 ......................................................................................................................... 29
11 U.S.C. § 502(a) ....................................................................................................................... 8
11 U.S.C. § 502(b) ................................................................................................................ 18, 27
11 U.S.C. § 502(d) .................................................................................................... 7, 22, 23, 32
11 U.S.C. § 510(c) ........................................................................................................... 9, 14, 18
11 U.S.C. § 524(g) ..................................................................................................................... 25
11 U.S.C. § 544(b) ..................................................................................................................... 33
11 U.S.C. § 546(a) ..................................................................................................................... 33
11 U.S.C. § 546(e) ................................................................................................................ 37, 38
11 U.S.C. § 547(b) ..................................................................................................................... 35
11 U.S.C. § 548(a) ................................................................................................................. 36-38
11 U.S.C. § 549(a) ................................................................................................................ 34, 35
11 U.S.C. § 549(d) ..................................................................................................................... 33
11 U.S.C. § 550(a) ..................................................................................................................... 37
11 U.S.C. § 726 ......................................................................................................................... 26
11 U.S.C. § 1123(a)(4) ....................................................................................................... 17, 18, 21
11 U.S.C. § 1307(b) ................................................................................................................... 26

## State Statutes

N.Y. DEBT. & CRED. L. § 276 ............................................................................................... 34, 36

## Federal Rules

Fed. R. Bankr. P. 3001(f) ........................................................................................................ 8, 9
Fed. R. Bankr. P. 3007(b) ......................................................................................................... 21
Fed. R. Bankr. P. 7001(1) ......................................................................................................... 21
Fed. R. Bankr. P. 7001(7) ......................................................................................................... 21
Fed. R. Bankr. P. 7001(8) ......................................................................................................... 21
Fed. R. Bankr. P. 9006(b) ......................................................................................................... 38
Fed. R. Bankr. P. 9024 ........................................................................................................ 38, 39
Fed. R. Civ. P. 60(b) ...................................................................................................... 7, 38, 39

Elliott Management Corporation, Fortress Investment Group LLC, Morgan Stanley & Co. International plc, and Appaloosa Management L.P.,[1] as current or past holders (directly or through entities managed by them) of Notes (defined below)[2] issued by General Motors Nova Scotia Finance Company (**"GMNS"**), respectfully submit this pretrial brief.

## PRELIMINARY STATEMENT

For more than two years, the heart of the GUC Trust's claims has been that a band of investors was somehow able to exert undue leverage over the governments of two nations and Motors Liquidation Company (**"MLC"**) in order to create a $3 billion liability for MLC that did not exist previously. According to the GUC Trust, certain holders of the Notes (the "**Noteholders**") achieved this by filing a "baseless lawsuit" and then waiting until the last possible moment to negotiate, thereby extracting an "egregious" recovery that was "out of all proportion" to the value of their claims. These allegations have always been pure fabrication.

The evidence at trial will demonstrate that the Noteholders entered into good faith negotiations, *on MLC's timetable and at MLC's request*, in order (i) to satisfy at a substantial discount an intercompany loan that would have bankrupted General Motors of Canada Limited (**"GM Canada"**), and (ii) to resolve the litigation in Nova Scotia (the "**Nova Scotia Action**").[3] The negotiations resulted in a settlement finalized in the early morning hours of June 1, 2009 that was monitored and approved by the United States and Canadian governments, with whom GM was in constant contact throughout the process. Contrary to the GUC Trust's assertions, the settlement resulted in *pro rata* payments to *all* holders of the Notes, not just the investment funds that are parties to the June 1, 2009 Lock-Up Agreement (the "**Lock-Up Agreement**").

---

[1] The GUC Trust has named MS as a defendant only with respect to Count II of the Complaint for equitable recharacterization of the Consent Fee as a payment of principal.

[2] Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed to them below or in the Response of Certain Noteholders in Opposition to Official Committee of Unsecured Creditors' First Amended Objection to Claims Filed by Green Hunt Wedlake, Inc., and Noteholders of General Motors Nova Scotia Finance Company and Motion for Other Relief, dated December 13, 2010 [Docket No. 8084].

[3] The intercompany loan is reinstated under certain circumstances under the Lock-Up Agreement.

Contrary to the GUC Trust's contentions, the Lock-Up Agreement did not create or inflate any claims against MLC; it merely preserved the Claims. The Claims have existed for years due to MLC's unconditional contractual guarantee of the Notes issued in 2003 by its subsidiary GMNS, which is the basis for the "**Guaranty Claims**" described below, and by Nova Scotia law governing the liability of a shareholder for the obligation of a subsidiary formed as an unlimited company, which is the basis for the "**Statutory Claim**" described below.[4] The Swap Claims, which were sold to New GM, were created when MLC entered into the Swap Transactions in 2003. Every holder of the Notes has had the same rights with respect to these MLC obligations from the beginning, which are different from and superior to the rights of holders of MLC's bonds. There is nothing inequitable about the Noteholders asserting these rights. Indeed, the GUC Trust Administrator, Wilmington Trust, and the Official Committee of Unsecured Creditors' ("**Committee**") counsel have supported the submission of the same guaranty and statutory claims in the AbitibiBowater and Calpine bankruptcies based on the fact that the issuer of the notes was a Nova Scotia unlimited company. The Court may not agree with the Noteholders' position regarding these Claims, but it is simply not credible for the GUC Trust to call the very assertion of such Claims "inequitable conduct."[5]

The GUC Trust effectively has acknowledged that the cornerstone of its equitable subordination theory has no basis. The GUC Trust was forced to withdraw its key factual

---

[4] The Noteholders were holders of the 8.375% Guaranteed Notes due December 7, 2015 and the 8.875% Guaranteed Notes due July 10, 2023 (together, the "**Notes**") issued by GMNS. The Notes were unconditionally guaranteed by MLC pursuant to the Fiscal and Paying Agency Agreement, dated as of July 10, 2003 (the "**Fiscal and Paying Agency Agreement**"). Timely proofs of claim were filed to enforce the Guaranty Claims against MLC (the "**Guaranty Claims**"). Separately, the trustee appointed in the GMNS bankruptcy case ("**GMNS Trustee**") filed a separate and independent claim against the MLC estate based on Section 135 of the Companies Act (the "**Statutory Claim**," together with Guaranty Claims, the "**Claims**"). GMNS is an unlimited liability company formed under Section 135 of the Companies Act, and MLC is its sole member. Under Section 135, once GMNS is "being wound up," as the sole member of GMNS, MLC is statutorily liable for all debts of GMNS, including GMNS's liability under the Notes as the issuer, GMNS's liability under the Swap Claim, and other costs and expenses associated with GMNS's bankruptcy. Both Claims are legal, valid and enforceable and should be allowed in full. At no time has any party asserted that the Claims are not valid.

[5] Tom Mayer, counsel to the Committee, in his deposition testified that assertion of these Claims is not inequitable conduct.

allegations from its initial Objection and Complaint because they were exposed as being demonstrably false. Perhaps most significantly, the GUC Trust was forced to drop the allegation that the Noteholders had deliberately waited until the "eleventh hour" to "pounce" and gain undue leverage. This had been the entire premise for the claim, implausible that it was, that the Noteholders somehow were able to take advantage of MLC and the governments of the U.S. and Canada. Now, there is no allegation whatsoever and no fact anywhere in this case suggesting that the Defending Noteholders "pounced," made "threats," or otherwise acted improperly. Any such suggestion is a remnant of prior pleadings and is not part of this case.

Similarly, the GUC Trust dropped the allegation that GMNS had "virtually no assets" when it paid the $367 million Consent Fee to holders of the Notes since the evidence shows that GMNS actually had assets of over CDN $1.3 billion in the form of an intercompany loan to GM Canada, which was compromised and released through the Lock-Up Agreement. GM Canada also expected a CDN $1.6 billion tax refund. Nor is there any evidence that the amount of the Consent Fee was unreasonable. Tellingly, the GUC Trust withdrew an expert who was supposed to testify that the Lock-Up Agreement was "egregious" or inherently unreasonable, so there is no evidence to support such an argument.

Also critical is the GUC Trust's withdrawal of the allegation that the prepetition loan from MLC to GM Canada was not paid back. The evidence showed that it *was* paid back, with interest, prior to MLC's sale of assets to New GM. Thus it was GM Canada, not MLC, that actually paid for the release of the intercompany loan made to it by GMNS, which money GMNS used to pay the Consent Fee. Moreover, counsel for the GUC Trust's predecessor, the Committee, acknowledged that even if the prepetition loan made by MLC to GM Canada had not been made or paid back, only New GM and not the creditors of the GUC Trust would have been

3

entitled to receive such funds. Contrary to what the Court has been led to believe, the Debtors did not pay the Consent Fee and their creditors were not affected by it in any way.

The evidence at trial also will show, contrary to the inflammatory allegations by the GUC Trust, that there was no "scheme" between the Noteholders and MLC to hide the Lock-Up Agreement or to avoid the Court's scrutiny of it, or to insulate the transactions under the Lock-Up Agreement through the Amended and Restated Master Sale and Purchase Agreement between MLC and New GM ("**MSPA**") or the 363 Sale. To the contrary, the Lock-Up Agreement was disclosed to the public and Committee in multiple public filings. For example, on June 1, 2009, MLC announced in a Form 8-K that it had entered into a "Material Definitive Agreement" under which the Noteholders would "waive all rights and claims against GM Nova Scotia in respect of the intercompany loan obligations in the principal amount of C$1,334,064,000 owed by GM of Canada to GM Nova Scotia" in exchange for "a cash payment of £366.46 per £1,000 par value of outstanding Nova Scotia Notes due 2015 and £380.17 per £1,000 par value of outstanding Nova Scotia Notes due 2023" that would "not reduce the principal amount outstanding of the Nova Scotia Notes and the GM guarantee w[ould] remain in force." Four days later, on June 5, 2009, the Sellers' Disclosure Schedules ("**Disclosure Schedules**") were provided to the Committee. The Disclosure Schedules again referenced the Lock-Up Agreement and disclosed the transfer of funds from MLC to GM Canada, which GM Canada paid to GMNS in satisfaction of the intercompany loan and which GMNS used to pay the Consent Fee. The subordination of the Swap Claims also was disclosed. Approximately three weeks later, MLC filed the First Amendment, Consent and Waiver Under Debtor-In-Possession Credit Agreement, dated June 25, 2009 – a three page document – that specifically referenced the Lock-Up Agreement and the bankruptcy filing by GMNS, and the Lock-Up Agreement was itself included in an SEC filing on August 7, 2009.

4

The evidence further will show that the Committee had all the facts before the 363 Sale and had ample opportunity to conduct due diligence and raise any concerns it may have had. The Committee knowingly chose not to because it supported the transactions as a whole and the benefits that unsecured creditors would receive. The Committee is estopped from now attempting to challenge the transactions.

Moreover, the decision whether or not to seek Court approval of the Lock-Up Agreement was a decision made by MLC and its highly experienced attorneys, Weil, Gotshal & Manges LLP ("**Weil**"). The evidence will show that their view was always that Court approval was not required and that they had no intention of seeking such approval at any point in the process. Weil and its client, MLC, were responsible for the conduct of the MLC chapter 11 case and determined what procedures would and needed to be taken to implement the Lock-Up Agreement. While the Court may be critical of their decision, it was not controlled by the Noteholders and hardly can be characterized as inequitable conduct by the Noteholders. Similarly, the Noteholders had no involvement with the negotiations of the MSPA or any of its terms or conditions or its presentation to the Court. The Noteholders were unaware of any provisions for the transfer of the Swap Claims, the Avoidance Claims or the assumption and assignment of the Lock-Up Agreement until well after the negotiations of the Lock-Up Agreement, which was consummated prior to the Sale Hearing.[6]

What was disclosed or not disclosed to the Court at that time was the responsibility of MLC, New GM, the U.S. Treasury, the Canadian government, the Committee and the other parties who participated, and their respective professionals. It was not the responsibility of the Noteholders and should have no bearing on their Claims. Any concerns expressed by the Court

---

[6] The Noteholders do not argue or suggest that any of the foregoing decisions or actions by MLC and its affiliates, with the approval of the U.S. Treasury and the Canadian government were improper or inappropriate, but emphatically disagree with any attempt to attribute these actions or decisions to the Noteholders or to even consider these matters as relevant to the treatment of their valid Claims.

as to whether it was informed adequately of the Lock-Up Agreement at the time of the Sale

Hearing is a matter the Court should address to those who participated in the proceedings.

Unless the Court vacates its Sale Order approving the MSPA entered more than three years ago,

which we believe would be error, the Court is required to enforce it.  As the District Court held

in a recent decision:

> No principle of law allowed the Bankruptcy Court to approve the letter as an
> enforceable contract, but then construe it based upon its own personal recollection
> and understanding about the terms of the deal (rather than upon established
> principles of contract interpretation).

*Barclays Capital Inc. v. Giddens (In re Lehman Brothers Inc.)*, Nos. 11 Civ. 6052 (KBF), 11

Civ. 6053 (KBF), 2012 WL 1995089, at *9 (S.D.N.Y. June 5, 2012 ).

    The GUC Trust persists in its allegation that the Noteholders' counsel misrepresented to

the Court that the Lock-Up Agreement was a prepetition contract.  In fact, this statement

accurately reflected the timing and execution of the Lock-Up Agreement and cannot form the

basis for an equitable subordination claim.  As the evidence will show, every participant in the

negotiations of the Lock-Up Agreement – from MLC, Morgan Stanley and the Noteholders – has

testified that the Lock-Up Agreement was fully negotiated and signed before the MLC

bankruptcy.  The on-site Canadian government representatives reviewed and approved the

agreement and signatures at Weil prior to the filing and, thereby, authorized MLC to call off the

bankruptcy filing of GM Canada.  MLC and New GM both have publicly stated in filings with

the Court and the SEC that the Lock-Up Agreement was a prepetition agreement.  For the GUC

Trust to contend that counsel for the Noteholders lied to the Court by saying the same thing, and

to argue that this is a basis for alleging "inequitable" conduct on the part of the Noteholders, is

just another erroneous attempt to color the Court's view of the Noteholders' conduct.[7]  The GUC

---

[7] The GUC Trust contends that because certain non-material scrivener's errors may have been entered in a document
in Weil's word processing system after the parties signed, the Lock-Up Agreement was not finalized.  This position

Trust also will not be able to sustain its burden of showing any harm to MLC or its other creditors.

When scrutinized, each and every one of the allegations of inequitable conduct by the Noteholders is demonstrably false and not supported by any evidence. The GUC Trust will not be able to sustain its burden of proof on any of these allegations.

The other grounds on which the GUC Trust seeks to disallow and recharacterize the Claims are equally unavailing. For example, with respect to the Consent Fee, the Lock-Up Agreement expressly provides and conclusively establishes that it is not a payment of principal on the Notes. There is no evidence to support any allegation that there was any fraud, duress or coercion. The GUC Trust's objections under section 502(d) of the Bankruptcy Code also must fail because any alleged transfer of estate property was satisfied by repayment of the intercompany loan with interest by GM Canada prior to the 363 Sale. In addition, the GUC Trust has no standing, power or authority under the Plan or otherwise to commence any claims for avoidance, equitable subordination, disallowance or equitable recharacterization against GM Canada, GMNS or the Noteholders, and, even if it did, any such claim is barred.

Accordingly, as outlined above and for the reasons more fully discussed below, the objections and claims of the GUC Trust should be dismissed with prejudice.[8]

---

is wrong as a matter of fact and law. Any scrivener's errors were corrected by the parties prior to bankruptcy and taken by Weil for entry in its system. The fact that these minor corrections may be reflected in the system as entered after the filing does not affect the timing or enforceability of the Lock-Up Agreement.

[8] The GUC Trust also has asserted that it is entitled to reserve the right, depending on its success or lack of success as to the merits of its objections and claims, to seek to vacate or modify the Court's Sale Order approving the MSPA on July 5, 2009 under Rule 60(b). In the words of counsel for the GUC Trust, "if we do not need relief from the sale order we won't pull the trigger on that." (Transcript of the hearing on New GM's motion for summary judgment held on July 19, 2012 at 50.) In denying without prejudice New GM's motion for summary judgment, the Court concurred with the GUC Trust and found that New GM's motion was not ripe for determination. At this point in time, the GUC Trust's Rule 60(b) motion must be denied as a matter of law. It fails to adequately set forth any grounds for the relief requested, is untimely, and, by the fatal admission of counsel for the GUC Trust that it may not even be necessary, must be denied as a matter of law. The Defending Noteholders respectfully disagree with the Court's ruling, the effect of which is to leave outstanding a big "maybe this or maybe that" on the eve of trial, which is prejudicial to the Noteholders' defense at trial.

## ARGUMENT

## I.    THE GUC TRUST HAS THE BURDEN OF PROOF

The GUC Trust bears the burden of proof on each of the objections and claims asserted in the Objection and the Complaint.  *See Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (B.A.P. 2d Cir. 2000), *aff'd*, 242 F.3d 367 (2d Cir. 2000) ("A properly executed and filed proof of claim constitutes prima facie evidence of the validity of the claim.  To overcome this *prima facie* evidence, the objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim.") (citing Fed. R. Bankr. P. 3001(f)).[9] For the reasons set forth below and the evidence that will be presented at trial, the GUC Trust cannot meet its burden of proof for any of its objections and claims, including claims for avoidance,[10] equitable subordination,[11] and recharacterization.[12]  The Court should overrule the Objection and dismiss the Complaint.

## II.    THE GUARANTY CLAIM AND THE STATUTORY CLAIM ARE ENFORCEABLE AND ARE SEPARATE AND INDEPENDENT CLAIMS

Both the Guaranty Claim and the Statutory Claim are valid and enforceable claims for which the Noteholders and the GMNS Trustee timely filed proofs of claim.  A timely filed proof of claim must be deemed allowed as a matter of law.  *See* 11 U.S.C. § 502(a) ("A claim . . . proof of which is filed under section 501 of this title, is deemed allowed . . . "); Fed. R. Bankr. P.

---

[9] "[A] proof of claim in a bankruptcy proceeding 'cannot be defeated by a mere formal objection.'"  *In re Minbatiwalla*, 424 B.R. 104, 111 (Bankr. S.D.N.Y. 2010) (quoting *In re Sabre Shipping Corp.*, 299 F. Supp. 97, 99 (S.D.N.Y. 1969)); *see also Carey v. Ernst*, 333 B.R. 666, 672 (S.D.N.Y. 2005); *In re Allegheny Int'l*, 954 F.2d 167, 173 (3d Cir. 1992).

[10] *In re Ames Dept. Stores, Inc.*, 450 B.R. 24, 31 (Bankr. S.D.N.Y. 2011), *aff'd*, 470 B.R. 280 (S.D.N.Y. 2012) ("In a preference action, the Debtor seeking to recover the preferential transfer has the burden of proving the avoidability of the transfer under section 547(b) of the Code."); *Kronz v. Cech (In re Romano)*, 175 B.R. 585, 594 (Bankr. W.D. Pa. 1994) ("The party bringing the avoidance action has the burden of proving these elements. . . .").

[11] *Kalisch v. Maple Finance Corp. (In re Kalisch)*, 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008), *aff'd*, No. 09 Civ. 1636 (PKC), 2009 WL 2900247 (S.D.N.Y. Sept. 9, 2009) (holding that in case of equitable subordination, "the proponent of subordination has the burden of proving" the claim).

[12] *Duke Energy Royal v. Pillowtex Corp. (In re Pillowtex, Inc.)*, 349 F.3d 711, 716 (3d Cir. 2003) (holding that the debtor "is seeking to recharacterize [the agreement] as something other than what it purports to be and, therefore, [the debtor] bears the burden of proof").

3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim.").  The proofs of claim filed by the Noteholders demonstrate that the Guaranty Claims arise from the unconditional guarantee that MLC provided under the Notes and the Fiscal and Paying Agency Agreement.  The GMNS Trustee's proof of claim demonstrates that the Statutory Claim arises under Section 135 of the Companies Act (Nova Scotia), which requires a member of an unlimited company to satisfy all unpaid debts of the unlimited company when it is being wound up.  These Claims are *prima facie* valid.  No party, including the Committee and the GUC Trust, has ever questioned the validity of the two Claims.

For the reasons set forth more fully in the pretrial brief of the GMNS Trustee, which is incorporated herein by reference, both Claims are enforceable under the Second Circuit's decision in *N.W. Mut. Life Ins. Co. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*, 608 F.3d 139 (2d Cir. 2010), and should be allowed in full.  The Court should overrule the GUC Trust's objection to the Guaranty Claims and the Statutory Claim as duplicate claims.

## III.    THERE IS NO BASIS IN LAW OR IN FACT TO EQUITABLY SUBORDINATE OR DISALLOW THE CLAIMS

### A.    The GUC Trust Cannot Satisfy the Requirements of Section 510(c)

Section 510(c) of the Bankruptcy Code provides that the Court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest . . . ."  *See* 11 U.S.C. § 510(c).  Equitable subordination is a "drastic and unusual remedy" applied only in limited circumstances.  *See Enron Corp. v. Springfield Assoc., LLC (In re Enron Corp.)*, 379 B.R. 425, 434 (S.D.N.Y. 2007).  In considering a claim for equitable subordination, courts uniformly apply a three-part test:  (1) the claimant engaged in some type of inequitable conduct; (2) the misconduct caused injury to the creditors or conferred an unfair

advantage on the claimant; and (3) equitable subordination of the claim is consistent with bankruptcy law. *Sure-Snap Corp. v. State Street Bank and Trust Co.,* 948 F.2d 869, 876 (2d Cir. 1991); *Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692, 700 (5th Cir. 1977)*; 80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.),* 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994). The burden of proof with respect to each of these elements rests with the party seeking to subordinate the claim. *See In re Mobile Steel,* 563 F.2d at 701; *Nassau Assocs.,* 169 B.R. at 840 n.5.

### 1.    The GUC Trust Cannot Establish Inequitable Conduct

Application of equitable subordination is limited to conduct involving (1) fraud, illegality or breach of fiduciary duty; (2) undercapitalization; or (3) control or use of the debtor as an alter ego for the benefit of the claimant. *See ABF Capital Mgmt. v. Kidder Peabody & Co. (In re Granite Partners, L.P.),* 210 B.R. 508, 514 (Bankr. S.D.N.Y. 1997); *Nassau Assocs.*, 169 B.R. at 838. As this Court held in *Granite Partners*, "it is not enough to allege simply that the defendant engaged in 'inequitable conduct'; the party seeking equitable subordination must allege conduct that fits within one of these three paradigms." 210 B.R. at 515. The GUC Trust cannot produce any evidence at trial that would satisfy these requirements.

Although equitable subordination may apply to non-insider creditors, "cases subordinating the claims of creditors that dealt at arm's length with the debtor are few and far between." *Official Comm. of Unsecured Creditors v. Conseco Fin. Servicing Corp. (In re Lois/USA, Inc.),* 264 B.R. 69, 134 (Bankr. S.D.N.Y. 2001) (Gerber, J.) (citation omitted). Unless the claimant controls the debtor, "the proponent of equitable subordination must show wrongful conduct involving fraud, illegality, or some other breach of a legally recognized duty." *Vargas Realty Enters., Inc. v. CFA W. 111 Street, L.L.C. (In re Vargas Enters., Inc.),* 440 B.R. 224, 241 (S.D.N.Y. 2010) (citation omitted). The GUC Trust cannot point to any evidence demonstrating

that the Noteholders controlled MLC, or that the Noteholders, which are non-insiders of the

Debtors, engaged in "gross and egregious" misconduct.  Instead, the GUC Trust bases its request

for relief on six allegations, none of which is supported by the evidentiary record or, even if true

(which they are not), would come close to establishing fraud, illegality, or a breach of a legally

recognized duty.

     a.      **MLC – Not the Noteholders – Dictated the Timing of Negotiations**

As the GUC Trust now concedes and the evidence demonstrates conclusively, (1) it was

MLC who rebuffed earlier efforts by certain Noteholders to engage in negotiations, and (2) MLC,

not the Noteholders, dictated the timing and circumstances of the negotiations of the terms of the

Lock-Up Agreement.  Thus, the timing of the negotiations cannot form the basis for a finding of

inequitable conduct against the Noteholders.

     b.      **The Nova Scotia Action Had Merit and the Noteholders
Did Not Threaten to Force GM Canada Into Bankruptcy**

The allegations concerning the commencement and prosecution of the Nova Scotia

Action also fall short of any cognizable inequitable conduct on the part of the Noteholders.  The

evidence will show that in late 2008, certain Noteholders learned of the transactions on which the

Nova Scotia Action was based (the transfer of over CDN $500 million from GMNS to GM

Canada and ultimately to MLC) and promptly sought to communicate with representatives of

MLC.  The Nova Scotia Action was commenced only after their efforts to communicate with

MLC were rebuffed by MLC and the litigation was brought in a good faith effort to protect the

interests of the Noteholders.  The Noteholders involved in that litigation retained well-regarded

Canadian counsel who submitted a meritorious complaint.  The Noteholders never threatened to

force GM Canada into bankruptcy.  Rather, MLC representatives informed certain Noteholders

that GM Canada would file for bankruptcy in the event the Noteholders failed to agree on a

restructuring of the Notes prior to the filing of the MLC bankruptcy petition. There is no evidence to the contrary.

### c.   The Consent Fee Was Reasonable

The GUC Trust will present no evidence that the Consent Fee was "exorbitant or commercially unreasonable." Like all other provisions of the Lock-Up Agreement, the Consent Fee was negotiated by sophisticated parties and at arm's length. MLC and the U.S. and Canadian governments were each represented by highly competent legal and financial representatives. No evidence suggests that these parties agreed to the payment of exorbitant or commercially unreasonable fees.

GM Canada paid GMNS $367 million in satisfaction of the CDN $1.3 billion Intercompany Loan, a discount of 72%. GMNS used these funds to pay the Consent Fee to the Noteholders for their consent to the conditional release of GM Canada pursuant to the terms of the Lock-Up Agreement in addition to other consideration, allowing GM Canada to avoid bankruptcy. By consenting to the release of this intercompany claim against GM Canada, the Noteholders gave up valuable recovery rights against GM Canada. The Noteholders also released other parties to the Nova Scotia Action (*e.g.*, certain officers and directors of GM Canada, GMNS, and their respective affiliates).

### d.   The Noteholders Correctly Stated that
###     the Lock-Up Agreement is a Prepetition Agreement

The GUC Trust's repeated assertion that the Noteholders made "misrepresentations" to this Court in respect of the Lock-Up Agreement is demonstrably false. The evidence is uncontroverted that the Lock-Up Agreement was agreed to and fully executed prior to the commencement of MLC's chapter 11 cases, including the uncontroverted testimony at trial of all of the participants in the negotiations and parties to the Lock-Up Agreement. (*Contra* Am. Compl. ¶ 155.) The Second Circuit has held that "[t]o create a binding contract" under New

12

York law, "there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 94 (2d Cir. 2007) (quoting *In the Matter of Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999), *reargument denied*, 93 N.Y.2d 1042 (1999)). There must be "an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." *Id.* (quoting *Express Industries*, 93 N.Y.2d at 589). These factors were all satisfied prior to the bankruptcy filing.

As each of the witnesses to the negotiation and execution of the Lock-Up Agreement will testify,[13] the parties to the Lock-Up Agreement manifested their assent to be bound to its terms the moment they executed and delivered their signature pages, *prior to the filing of the MLC bankruptcy petition*, for review and approval by representatives of the Canadian government. At that point in time, the Lock-Up Agreement became a "definitive agreement" that was "effective and binding" on all the parties. *See* Nondisclosure Agreement at ¶ 11, Lock-Up Agreement at ¶ 10.

Whether certain non-material scrivener errors may have been agreed to after the parties executed and delivered the Lock-Up Agreement (but prior to the bankruptcy filing) does not in any way change that conclusion. Once an agreement is reached on all principal terms, subsequent changes to the agreement will not render the agreement a nullity. Moreover, in the instant case, the corrections to the Lock-Up Agreement were agreed upon prior to MLC's chapter 11 filing. Lawrence Buonomo, an attorney for MLC who was present at the negotiations

---

[13] Further, MLC confirmed that it had entered into the Lock-Up Agreement prior to the commencement of its chapter 11 case in an October 9, 2009 Form 8-K filed with the SEC. According to the October 9, 2009 Form 8-K, "prior to the filing by Motors Liquidation Company . . . of a voluntary petition for relief under chapter 11, . . . the Company, General Motors Nova Scotia Finance Company . . . , General Motors of Canada Limited, General Motors Nova Scotia Investments Limited and certain holders . . . of GM Nova Scotia's outstanding . . . GM Nova Scotia Notes . . . entered into a lock up agreement relating to the GM Nova Scotia Notes . . . ." Moreover, MLC and its Canadian affiliates manifested their approval by proceeding to implement the terms of the Lock-Up Agreement.

of the Lock-Up Agreement, will testify that all such modifications were completed approximately 20 minutes before MLC filed its bankruptcy petition.

Additionally, even if certain corrections of errata to the Lock-Up Agreement agreed to by the parties before the bankruptcy were entered into Weil's document system by MLC's attorneys after MLC filed its bankruptcy petition, these corrections did not alter the agreement or any rights or obligations of MLC.  These purported postpetition edits do not alter the fact that the parties had a meeting of the minds, executed the Lock-Up Agreement prepetition and agreed to be bound by its terms.[14]

**e.**        **There Was No Scheme to Use Property of MLC's Estate**

The $450 million MLC Loan to GM Canada (with the consent of the U.S. and Canadian governments) was made on May 29, 2009 without the participation of the Noteholders.  The Noteholders were not parties to the Promissory Note or Trust Agreement that documented the MLC Loan.  The Trust Agreement was between MLC and GM Canada and they, together with the Canadian government, agreed to all terms and amendments.  A claim regarding the Trust Agreement cannot sound against the Noteholders based on conduct of MLC and GM Canada. *See Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc. (In re Sunbeam Corp.)*, 284 B.R. 355, 362 (Bankr. S.D.N.Y. 2002) (finding that the purpose of Section 510(c) is "to subordinate an otherwise legally valid claim when the *claimant* has engaged in conduct that makes it unjust or unfair for the claimant to share pro rata with similarly situated creditors"); *Adelphia Commc'ns Corp. v. Bank of America, N.A. (In re Adelphia Commc'ns*

---

[14] Even if the Court were to find that scrivener errors were corrected postpetition and rule that such corrections are not enforceable, the remaining portions of the Lock-Up Agreement would still be enforceable against all parties, and their rights and obligations under that agreement would not change.  (*See* Lock-Up Agreement §23 ("Any provision of the Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or effecting the validity or enforceability of such provision in any other jurisdiction.").)

*Corp.)*, 365 B.R. 24, 74 (Bankr. S.D.N.Y. 2007) (Gerber, J.) ("equitable subordination analyses focus on the *creditors'* behavior") (emphasis in original).

In any event, there can be nothing inequitable about the MLC Loan or any of the underlying documentation, as the full amount of the MLC Loan was ***repaid with interest*** to MLC by GM Canada prior to the approval of the Sale Order.

### f.    There Was No Scheme to "Immunize" the Lock-Up Agreement

Finally, there was never any discussion, much less a "scheme," by the Noteholders to "immunize" the Lock-Up Agreement from the Court's scrutiny.  The decision as to whether the Lock-Up Agreement should have been approved by the Court was made by MLC and its attorneys, not the Noteholders.  There is nothing in the Lock-Up Agreement that required it to be assumed and assigned to New GM.  That was a decision made by MLC and New GM – not the Noteholders.

The decision to sell the Avoidance Claims and the Swap Claims to New GM also did not involve the Noteholders, nor did the Lock-Up Agreement even contemplate such sale.  Indeed, the Lock-Up Agreement was fully consummated prior to the Sale Hearing, did not depend on the approval of the MSPA, and the Noteholders did not participate in that hearing.

### 2.    The GUC Trust Cannot Establish Injury or Unfair Advantage

The second prong of the *Mobile Steel* test requires the proponent of equitable subordination to prove that the alleged conduct caused injury to the debtor or its creditors, or resulted in an unfair advantage.  *Mobile Steel*, 563 F.2d at 700-701.  Courts analyze the second prong of the *Mobile Steel* test in light of whether the debtor suffered harm from the creditor's conduct regardless of whether the court applies the "injury to creditors" or "unfair advantage"

test.[15]  *See, e.g., Adelphia Commc'ns Corp*, 365 B.R. at 69-70 (stating that the second *Mobile Steel* prong requires proof of "harm to unsecured creditors.");  *Liberty Mut. Ins. Co. v. Leroy Holding Co.*, 226 B.R. 746, 756-57 (N.D.N.Y. 1998) (holding that "[t]o warrant subordination, this unfair advantage must have harmed the debtor or other creditors").

Here, the GUC Trust cannot produce any evidence that the conduct of the Noteholders and the execution of the Lock-Up Agreement caused injury to MLC or its creditors.[16]  As a preliminary matter, neither the Lock-Up Agreement itself nor the payment of the Consent Fee diminished MLC's estate.  The Consent Fee was paid by GMNS to the Noteholders from the proceeds of the consideration it received from GM Canada to obtain a release of the CDN $1.3 billion debt GM Canada owed to GMNS, and the $450 million loan GM Canada received from MLC was paid back in full with accrued interest prior to the Rule 363 Sale.  Additionally, the Lock-Up Agreement did not create any obligation for MLC with respect to the Guaranty Claims or the Statutory Claim.  Indeed, the Lock-Up Agreement expressly states that "the Company [GMNS] has requested and the Holders have agreed to vote to amend the Fiscal and Paying Agency Agreement . . . in exchange for . . . the preservation . . . of certain direct, indirect or derivative claims . . . of the Holders and the Company against the Guarantor [MLC]."  The Guaranty Claims arose out of the unconditional guaranty MLC provided under the Notes and the Fiscal and Paying Agency Agreement.  The Statutory Claim is based on Section 135 of the

---

[15] Even in the extraordinarily rare circumstances where equitable subordination is warranted, a claim may be "subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct."  *Sunbeam Corp.*, 284 B.R. at 364 (quoting *Mobile Steel Co.*, 563 F.2d at 701). *See, also, 80 Nassau Assocs.*, 169 B.R. at 840 . ([E]quitable subordination is remedial, not penal, and a claim will be subordinated *only to the extent necessary to offset the harm that resulted*.") (emphasis added).  Here, the GUC Trust cannot demonstrate any harm; yet it is asking the Court to equitably disallow or completely subordinate the Claims. This is impermissible as a matter of law.

[16] Nor can the GUC Trust produce any evidence of unfair advantage.  Because they hold direct claims under the Notes against GMNS and Guaranty Claims against MLC, the Noteholders are entitled to distribution on both categories of claims.  Under the Lock-Up Agreement, the Noteholders agreed to give up their right to a potentially much higher recovery by consenting to GMNS releasing its intercompany claims against GM Canada at a 72% discount.

Companies Act.  Neither of the Claims was created by the Lock-Up Agreement.  Finally, the subordination of the Swap Claims similarly did not injure the MLC estate because the Swap Claims MLC held against GMNS are subordinate to the Statutory Claim as a matter of law.  In any event, the Swap Claims were sold to New GM under the MSPA.  Thus, the treatment of that claim did not in any way diminish the MLC estate.

Second, the evidence establishes that the Lock-Up Agreement enhanced or preserved the value of MLC, and enabled MLC to resolve the Nova Scotia Action, release GMNS's CDN $1.3 billion claim against GM Canada, and move forward with its 363 Sale to New GM without the overhang of the CDN $1.3 billion claim against GM Canada.  It also removed significant risks associated with a bankruptcy filing by GM Canada, thus enhancing the value of MLC, GM Canada's sole shareholder.  MLC received consideration of over $45 billion from the 363 Sale.

### 3.    The GUC Trust's Request For Equitable Subordination is Inconsistent with Bankruptcy Law

The GUC Trust's equitable subordination claim is inconsistent with the Bankruptcy Code.  Subordination of the Claims would violate the third prong of the *Mobile Steel* test as it conflicts with Bankruptcy Code section 1123(a)(4), which provides that a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).  Courts in the Second Circuit and elsewhere have held that a post-confirmation attempt to subordinate the claims of only certain members of a class constitutes an impermissible violation of section 1123(a)(4) of the Bankruptcy Code.  *See, e.g., LTV Steel Co., Inc. v. Aetna Casualty & Surety Co. (In re Chateaugay Corp.)*, No. 86 B 11270-86, 1993 WL 563068, at *4-5 (Bankr. S.D.N.Y. Dec. 27, 1993) (holding that post-confirmation attempt to subordinate claim of only one general unsecured creditor in class of general unsecured creditors violates Bankruptcy Code section 1123(a)(4)).

17

The GUC Trust cannot seek to subordinate the Claims where holders of the Claims did not consent to less favorable treatment under the Plan.  Accordingly, the GUC Trust's equitable subordination claim fails because it is a violation of Bankruptcy Code section 1123(a)(4) and inconsistent with bankruptcy law.

### B.    The Equitable Disallowance Claim Is Both Legally and Factually Defective

A bankruptcy court does not have authority to apply principles of equity to disallow a claim based on a creditor's misconduct.  *See Mobile Steel*, 563 F.2d at 699 (holding that the bankruptcy court cannot disallow claims on equitable grounds, but rather can only subordinate claims); *Mishkin v. Siclari (In re Adler Coleman Clearing Corp.)*, 277 B.R. 520, 563 (Bankr. S.D.N.Y. 2002) (stating that the equitable subordination doctrine, codified in section 510(c) of the Bankruptcy Code, is limited to reordering priorities and does not permit disallowance of claims).  In *Mobile Steel*, the Fifth Circuit Court of Appeal discussed the bankruptcy court's broad equitable powers, but held that its powers fall short of allowing it to disallow a claim for equitable reasons, stating as follows:

> Disallowance of claims on equitable grounds would add nothing to the protection against unfairness already afforded the bankrupt and its creditors.  If the claimant's inequitable conduct is directed against the creditors, they are fully protected by subordination.  If the misconduct directed against the bankrupt is so extreme that disallowance might appear to be warranted, then surely the claim is either invalid or the bankrupt possesses a clear defense against it.

563 F.3d at 699 n.10.  Equitable disallowance also violates the requirement that it be remedial and not punitive.

Disallowance is permissible only where it falls within one of the statutorily recognized exceptions to allowance set forth in section 502(b) of the Bankruptcy Code.  Section 502(b) of the Bankruptcy Code provides that if an objection is filed to a claim the court "shall allow such claim" except to the extent that one of nine specifically enumerated conditions warranting

disallowance applies. *Travelers Casualty & Surety Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 453 (2007) ("[W]hen Congress has intended to provide . . . exceptions to provisions of the Bankruptcy Code, it has done so clearly and expressly.") (quoting *FCC v. NextWave Personal Commc'ns, Inc.*, 537 U.S. 293, 302 (2003)). The Court does not have authority to equitably disallow the Claims.[17]

### C.    The Assumption and Assignment of the Lock-Up Agreement Bars Equitable Subordination/Disallowance

The assumption and assignment of the Lock-Up Agreement pursuant to the Sale Order bars the GUC Trust from seeking to equitably subordinate or disallow the Claims based on allegations of misconduct. The Sale Order states that "[t]he Purchased Contracts being assigned to, and the liabilities being assumed by, the Purchaser are an integral part of the Purchased Assets being purchased by the Purchaser, and, accordingly, such assumption and assignment of the Purchased Contracts and liabilities are reasonable, enhance the value of the Debtors' estates, and do not constitute unfair discrimination." (Sale Order at ¶ EE.) This finding is antithetical to the GUC Trust's allegations of inequitable conduct, precluding equitable subordination of the Claims. *See Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions, Inc.)*, 330 B.R. 67, 79 (Bankr. D. Del. 2005).

### IV.    THE GUC TRUST IS BARRED FROM BRINGING AVOIDANCE, EQUITABLE SUBORDINATION, EQUITABLE DISALLOWANCE, AND "RECHARACTERIZATION" CLAIMS BECAUSE THE PLAN DID NOT PRESERVE SUCH CLAIMS

The GUC Trust is barred from asserting claims for avoidance, equitable subordination or disallowance and "recharacterization" (the "**Estate Claims**") because the Plan does not preserve

---

[17] While this Court has stated in *dicta* that section 510(c) of the Bankruptcy Code permits a court to equitably disallow a claim, *see Adelphia Commc'ns Corp.*, 365 B.R. at 70-73 (Gerber, J.), it also recognized that equitable disallowance is a remedy that is "more draconian" than equitable subordination and is therefore reserved for "extreme instances" that are "perhaps very rare." *Id.* at 73. Thus, even if equitable disallowance were an available remedy, because there is no evidence sufficient to justify a claim of equitable subordination, there certainly is not enough to justify the more draconian remedy of equitable disallowance.

these claims or assign them to the GUC Trust. Where the power to bring claims is not preserved by a confirmed plan, a trustee is precluded from asserting such a claim.[18]   Under the Plan, the only assets transferred to the GUC Trust were (i) cash for administration; (ii) New GM Securities; and (iii) potentially certain additional cash upon the dissolution of MLC.  (Plan §§ 1.85, 1.87, 1.118, 5.2(a), 6.10.)   The Estate Claims were not transferred to the GUC Trust. Accordingly, the GUC Trust lacks standing to bring any such claims.  *See Rahl v. Bande*, 328 B.R. 387, 400 (S.D.N.Y. 2005) (holding that litigation trustee has no standing to assert claims not assigned to it under chapter 11 plan).

Section 6.2(f)(iv) of the Plan does not transfer to the GUC Trust equitable subordination and "recharacterization" claims.  Section 6.2(f) (Role of the GUC Trust Administrator) provides that the GUC Trust Administrator shall "have the power and authority to prosecute and resolve […] subject to obtaining any applicable consent from MLC or Post-Effective Date MLC, as the case may be, and any necessary approval of the Bankruptcy Court, any claims for equitable subordination and recharacterization in connection with such objections [to general unsecured claims]."  The GUC Trust Administrator only can use the authority it may have to prosecute such claims that are owned by the GUC Trust.  Here, none of the Estate Claims were transferred to the GUC Trust, so the GUC Trust lacks standing to prosecute them.[19]

---

[18] *See, e.g.*, *Paul H. Shield, MD. Inc. Profit Sharing Plan v. Northfield Laboratories Inc. (In re Northfield Laboratories Inc.)*, 467 B.R. 582, 589 (Bankr. D. Del. 2010) (plan did not provide for equitable subordination of creditor's claim, thus barring any post-confirmation equitable subordination claim); *In re County of Orange*, 219 B.R. 543, 566 (C.D. Cal. 1997) (refusing to allow an equitable subordination claim to be brought post-confirmation where plan did not reserve for committee or county right to assert claim); *First Bank v. N. County Bank & Trust (In re Superior Used Cars, Inc.)*, 258 B.R. 680, 691 (Bankr. W.D. Mich. 2001) ("unless a confirmed plan explicitly reserves the claim, equitable subordination may not be raised after confirmation of the plan"); *see also Fleet Nat'l Bank v. Gray (In re Bankvest Capital Corp.)*, 375 F.3d 51, 59 (1st Cir. 2004) ("Several circuits have concluded that, pursuant to sections 1123 and 1141, confirmation of a plan is given res judicata effect, which bars a debtor or trustee from bringing avoidance actions not expressly reserved in the plan."); *Harstad v. First Am. Bank (In re Harstad)*, 39 F.3d 898, 903 (8th Cir. 1994) ("Compliance with § 1123(b)(3) gives notice of [the intent to bring a preference action].  Only then are creditors in a position to seek a share of any such recoveries, contingent though they may be, and to have the mechanics of the preference-sharing spelled out in the plan.").

[19] There is no provision in the Plan, including Section 6.2(f)(iv), that purports to grant any power or authority to the GUC Trust to prosecute any avoidance claims.

In addition, the purported power to prosecute equitable subordination and recharacterization claims is limited to circumstances where such claims are brought "in connection with" an objection to an unsecured claim. That is not the case here where the Committee/GUC Trust filed an Objection to the Claims and filed an adversary proceeding twenty months later seeking to equitably subordinate and "recharacterize" the claims. Although the Court may have consolidated the hearings on the Objection and Complaint for administrative convenience, the Objection and the Complaint are separate and distinct proceedings.[20] The recharacterization and equitable subordination claims are not "in connection with" the Objection. Moreover, pursuant to Section 6.2(f)(iv), the purported power of the GUC Trust Administrator to prosecute equitable subordination claims is subject to the consent of MLC and approval of the Court, neither of which the Committee nor the GUC Trust obtained for prosecution of these claims.

Finally, the language of Section 6.2(f) cannot serve as a basis to preserve the right to assert equitable subordination claims because it was added to the Plan by amendment filed on March 18, 2011, two weeks after the Confirmation Hearing. Section Z of the Confirmation Order states that these modifications "constitute technical changes and do not materially adversely affect or change the treatment of any Claims or Equity Interests." If Section 6.2(f)(iv) of the Plan were interpreted to preserve equitable subordination claims against the Noteholders, it clearly would affect adversely the Noteholders and change the treatment of the Claims under the Plan. Such an interpretation violates the Confirmation Order and section 1123(a)(4). The Confirmation Order provides that in the event of any conflict between the Confirmation Order and Plan, the Confirmation Order controls.

---

[20] *See, e.g.,* Bankruptcy Rules 7001(1), (7), (8) and 3007(b).

The Committee could have requested that the Estate Claims be preserved under the Plan

and transferred to the GUC Trust but failed to do so, and the Estate Claims were not preserved or

transferred.[21]  Thus, the GUC Trust lacks standing to pursue these claims.

## V.    GUARANTY CLAIMS OF TRANSFEREES ARE NOT SUBJECT TO SECTION 502(D) OR EQUITABLE SUBORDINATION[22]

Section 502(d) and equitable subordination (or disallowance) do not apply to transferees

who acquired their Notes after the Petition Date, directly or indirectly, from Noteholders who

were party to the Lock-Up Agreement.  (Am. Compl. at ¶¶ 79, 81.)  A transferee could be subject

to equitable subordination claims and section 502(d) objection based solely on the conduct of the

transferor only *if* the claims were assigned and not sold.  *Enron Corp. v. Springfield Assocs.,*

*L.L.C., et al. (In re Enron Corp., et al.)*, 379 B.R. 425, 436 (S.D.N.Y. 2007), *motion to certify*

*appeal denied*, 2007 WL 2780394 (S.D.N.Y. Sept. 24, 2007).[23]  In *Enron,* the court emphasized

that the distinction between sale and assignment is of particular importance for the proper

functioning of the public securities market:

> [It] is particularly imperative in the distressed debt market context, where sellers
> are often anonymous and purchasers have no way of ascertaining whether the
> seller (or a transferee up the line) has acted inequitably or received a preference.
> No amount of due diligence on their part will reveal that information, and it is
> unclear how the market would price such unknowable risk.   Parties to true
> assignments, by contrast, can easily contract around the risk of equitable
> subordination or disallowance by entering into indemnity agreements to protect
> the assignee.

*Id.* at 442.  The Notes indisputably are publicly traded and thus sold, not assigned.  Accordingly,

the Guaranty Claims of transferees (which include all Noteholders other than those who executed

---

[21] It is important to note that when the Plan drafters intended to preserve and transfer an asset, they knew how to do so.  The Plan expressly provides for the preservation and transfer of the Term Loan Avoidance Action to the Avoidance Action Trust, the other post-confirmation trust created under the Plan.  Plan §§ 1.23; 1.26 (providing that the Term Loan Avoidance Action is an asset of the Avoidance Action Trust and providing for its transfer to the trust on a date to be selected).

[22] The Court previously has expressed certain views with respect to the liability of subsequent transferees.  The Defending Noteholders nonetheless raise this argument to preserve the issue.

[23] *But see In re KB Toys, Inc., et al.*, Case No. 04-10120, 2012 WL 1570755 (Bankr. D. Del. May 4, 2012).

22

the Lock-Up Agreement) are not subject to section 502(d) or claims for equitable subordination

or equitable recharacterization.

## VI.    THERE IS NO LEGAL OR FACTUAL BASIS TO "RECHARACTERIZE" THE CONSENT FEE AS A PRINCIPAL PAYMENT

Under the Lock-Up Agreement, the parties expressly agreed that "the Consent Fee

payment does not reduce, limit or impair the Notes, the Guaranty Claim[s] or the [Statutory]

Claim." (*See* Lock-Up Agreement at ¶ 6(b)(iv).)  In the Amended Objection and the Amended

Complaint, the GUC Trust alleges that the Consent Fee was a disguised principal payment on the

Notes and that the Court should exercise its ***equitable powers*** to recharacterize the Consent Fee

as a payment of principal and reduce the Claims accordingly.  (Am. Obj. at ¶ 3; Am. Compl. at ¶

162.)  These assertions have no factual or legal basis.[24]

### A.    The Court Lacks Subject Matter Jurisdiction to Recharacterize the Consent Fee

This Court lacks subject matter jurisdiction to recharacterize the Consent Fee as a

payment of principal under the Notes for several reasons.  First, GMNS currently is a debtor in a

Nova Scotia bankruptcy proceeding.   The enforceability of the Noteholders' Notes against

GMNS is properly before the Nova Scotia court that is overseeing GMNS's proceeding.  Indeed,

the Confirmation Order expressly provides that "General Motors Nova Scotia Finance Company

shall be wound up or liquidated as determined by the Court having jurisdiction over the winding-

up proceeding of General Motors Nova Scotia Finance Company and dissolved pursuant to

applicable Nova Scotia law." (Confirmation Order ¶ 56.)  By seeking to reduce the principal

amount of the Notes by the amount of the Consent Fee, the GUC Trust is asking this Court to

---

[24] The GUC Trust's "recharacterization" claim is not really a claim for recharacterization, which legally means recharacterizing an agreement to reflect the substance of the agreement.  Here, the GUC Trust is seeking to change the terms of the Lock-Up Agreement.  There is no legal basis for the relief it seeks.

adjudicate the amount under the Notes the Noteholders should be permitted to recover against GMNS. That matter is subject to the jurisdiction of the Nova Scotia court.

Moreover, the MLC estate did not pay the Consent Fee to the Noteholders. The Consent Fee was paid by GMNS with the proceeds of the payment from GM Canada, in consideration for the conditional satisfaction of the Intercompany Loans. MLC's $450 million loan to GM Canada was made in exchange for a promissory note, which GM Canada paid back with accrued interest, and the $367 million GM Canada paid to GMNS was in satisfaction of the CDN $1.3 billion intercompany debt owed to GMNS. The Consent Fee, thus, was not funded by MLC and the Court lacks jurisdiction to adjudicate any claim that seeks to alter a transaction among nondebtors. *Publicker Indus. Inc. v. United States (In re Cuyahoga Equip. Corp.),* 980 F.2d 110, 114 (2d Cir. 2005) (a case falls within the bankruptcy court's "related to" jurisdiction if "its outcome might have any 'conceivable effect' on the bankrupt estate"); *Hunnicutt Co., Inc. v. TJX Cos., Inc. (In re Ames Dept. Stores, Inc.)*, 190 B.R. 157, 160 (S.D.N.Y. 1995) (holding that it is "clear that bankruptcy courts have no jurisdiction over proceedings that have no effect on the debtor.") (citation omitted).

###    B.    Section 105(a) Does Not Give the Court Power to Recharacterize the Consent Fee

No provision of the Bankruptcy Code authorizes the GUC Trust to recharacterize the pre-petition payment of a consent fee (or similar payment) as a repayment of the principal amount of a creditor's claim. In fact, the Defending Noteholders have not found any courts that have recognized such a claim. Lacking a statutory basis for the relief sought, the GUC Trust attempts to invoke the equitable powers of the Bankruptcy Court, which must fail because it is beyond the Bankruptcy Court's authority.

The equitable powers of a bankruptcy court are created and limited by Section 105(a) of the Bankruptcy Code. *See In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir.

2003) (finding that section 105(a) actually "*limits the bankruptcy court's equitable powers*, which 'must and can only be exercised within the confines of the Bankruptcy Code.'" (emphasis added) (citation omitted); *FDIC v. Colonial Realty Co.*, 966 F.2d 57, 59 (2d Cir. 1992) ("By its very terms, Section 105(a) limits the bankruptcy court's equitable powers, which must and can only be exercised within the confines of the Bankruptcy Code."). *see also Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206-07 (1988) (analyzing section 105(a) and holding that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."). As the Supreme Court has held, a bankruptcy court may not invoke equity to modify rights or interests created by state law, except to "the extent of actual conflict with the system provided by the Bankruptcy [Code]." *Butner v. United States*, 440 U.S. 48, 54 n. 9 (1979).

Section 105(a) "does not 'authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.'" *Dairy Mart*, 351 F.3d at 92 (quoting *United States v. Sutton*, 786 F.2d 1305, 1308 (1986)). Accordingly, courts reject attempts to utilize section 105(a) as a means of creating powers not found in the Bankruptcy Code. *See, e.g.*, *In re Smart World Techs., LLC*, 423 F.3d 166, 184 (2d. Cir. 2005) (holding that there "are statutory limitations that the bankruptcy court cannot overstep simply by invoking § 105(a)"); *In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2005) (holding that section 105(a) could not be used to extend Bankruptcy Code section 524(g) where requirements of statute were not otherwise met).

The Second Circuit has held that "an exercise of section 105 power [must] be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective." *Dairy Mart*, 351 F.3d at 92 (internal quotations omitted); *see also Solow v. Kalikow (In re Kalikow)*, 602 F.3d 82, 97 (2d Cir. 2010) (emphasizing that section 105(a) limits bankruptcy

court's equitable power to confines of Bankruptcy Code); *Deutsche Bank AG v. Metromedia Fiber Network (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 142 (2d Cir. 2005) ("Any 'power that a judge enjoys under § 105 must derive ultimately from some other provision of the Bankruptcy Code.'") (citation omitted); *Barbieri v. RAJ Acquisition Corp. (In re Barbieri)*, 199 F.3d 616, 620-21 (2d Cir. 1999) (holding that bankruptcy court could not use powers under section 105(a) to disregard plain language of Bankruptcy Code section 1307(b)).

The GUC Trust has failed to point to any provision of the Bankruptcy Code as a basis for invoking the Court's equitable powers to "recharacterize" the payment of the Consent Fee as a payment of principal, and section 105 cannot independently provide a basis.[25]   Accordingly, there is no basis under section 105 to "recharacterize" the Consent Fee as a payment of principal.

The GUC Trust likely will rely on cases where the court recharacterized agreements under state law.  *See, e.g., Liona Corp., Inc. v. PCH Associates (In re PCH Associates)*, 949 F.2d 585, 598-600 (2d Cir. 1991) (applying Pennsylvania law to determine that an agreement labeled a sale-leaseback, was an equitable mortgage); *United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609, 616-618 (7th Cir. 2005), *cert. denied*, 547 U.S. 1003 (2006) (applying California law to determine that a transaction labeled a lease was a secured claim).  None of these cases stands for the proposition that the bankruptcy court has the equitable power to recharacterize an agreement under the provisions of the Bankruptcy Code.

In essence, the GUC Trust is asking the Court to reform the Lock-Up Agreement and modify its substantive terms.  There is no factual, legal or equitable basis for the Court to

---

[25]  Although bankruptcy courts have invoked section 105(a) to recharacterize alleged debt as equity, such recharacterization is firmly rooted in section 726 of the Bankruptcy Code and has no connection to the "recharacterization" the GUC Trust seeks here.  *See, e.g., Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors (In re Official Comm. of Unsecured Creditors for Dornier Aviation (North Am.), Inc.)*, 453 F.3d 225, 231 (4th Cir. 2006) (recharacterization of debt as equity "facilitates the application of the priority scheme laid out in § 726.").

26

approve that request and, under *Butner*, the Court may not invoke equity to modify state law contract rights.

### C.    "Recharacterization" Is Not Available Under Section 502(b)

To the extent the GUC Trust points to section 502(b) as the basis for its recharacterization claim, it fares no better. In relevant part, section 502(b) states:

> [I]f such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that . . . [one of nine specifically enumerated conditions warrants disallowance].

11 U.S.C. § 502(b). The nine exceptions listed in section 502(b) are exclusive. *See, e.g., In re Moreno*, 341 B.R. 813, 817 (Bankr. S.D. Fla. 2006) ("the Bankruptcy Code, in particular, § 502(b), sets out the exclusive exceptions for disallowance of a claim."). Moreover, Courts have consistently refused to expand the scope of Bankruptcy Code section 502(b) on equitable grounds in determining creditors' allowed claims. *See, e.g., In re Fesco Plastics Corp., Inc.*, 996 F.2d 152, 157-58 (7th Cir. 1993) (holding bankruptcy court may not use equitable powers to carve a new exception under Bankruptcy Code section 502(b)(2)).[26] The GUC Trust has failed to point to any of the nine exceptions listed in section 502(b) as a basis to reduce the Claims by the amount of the Consent Fee. Thus, section 502(b) does not confer on the Court authority to "recharacterize" the Consent Fee as a payment of principal.

---

[26] *See also United States v. Sanford (In re Sanford)*, 979 F.2d 1511, 1513 (11th Cir. 1992) (finding that bankruptcy court could not, through its section 105(a) equitable powers, reduce tax claim given the requirements of the tax provision and Bankruptcy Code section 502(b)(1)); *1800 Smith Street Assocs. v. Gencarelli (In re 1500 Mineral Spring Assocs., LP)*, 353 B.R. 771, 785 (D.R.I. 2006) (declining to utilize equitable authority under section 105(a) to disregard required cap of lease claim under Bankruptcy Code section 502(b)(6) in order to avoid "windfall" to debtor); *In re Windsor Constructors, Inc.*, Case No. 03-36589 (ELF), 2006 WL 4005568, at *6 (Bankr. E.D. Pa. Jan. 10, 2007) (declining to disallow creditor's claim under Bankruptcy Code section 502(b)(1) as there was no basis under applicable non-bankruptcy law for negating creditor's claim and declining to utilize equitable authority under section 105(a) to disregard requirements of Bankruptcy Code section 502(b)(1)).

### D.    The Parties Did Not Intend the Consent Fee to be a Principal Payment

The Lock-Up Agreement is governed by the laws of the state of New York.  (*See* Lock-Up Agreement at § 13.)  "It is well-established under New York law that a contract should be interpreted 'to give effect to the expressed intentions of the parties.'"  *Hounddog Productions, L.L.C. v. Empire Film Group, Inc.*, 826 F. Supp. 2d 619, 630 (S.D.N.Y. 2011) (quoting *Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997)).  "When a contract is unambiguous, the instrument alone is taken to express the intent of the parties."  *Klos*, 133 F.3d at 168; *see also Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (holding that unambiguous agreements are "enforced according to the plain meaning of its terms."); *Ashwood Capital, Inc. v. OTG Mgmt., Inc.*, 2012 WL 2741860, at *3-4 (N.Y. App. Div. July 10, 2012) (no matter how the parties understood the intention behind the contract, it must be read literally).

The Lock-Up Agreement is unambiguous, stating that "for greater certainty, the Consent Fee does not reduce, limit or impair the Notes, the Guaranty Claim or the Deficiency Claim." (Lock-Up Agreement at § 6(b)(iv).)  Thus, under New York Law, the Consent Fee does not reduce the principal on the Notes and the Lock-Up Agreement must be enforced accordingly. Moreover, assuming *arguendo* that the Consent Fee was a payment of principal (which it was not), the Guaranty Claims would still not be reduced.  It would be a post-petition recovery on account of the Notes and would have no effect on the allowed amount of the Guaranty Claim. *See In re F.W.D.C. Inc.*, 158 B.R. 523, 528 (Bankr. S.D. Fla. 1993) (allowing a creditor, who postpetition had recovered a portion of its debt from the borrower after the guarantor's bankruptcy, to prove the total amount of the debt against the guarantor-debtor, noting that such creditor may not ultimately collect more than the total amount of the indebtedness) (citing *Ivanhoe Bldg. & Loan Ass'n v. Orr*, 295 U.S. 243, 245 (1935)); *see also, e.g.*, *Bankers' Trust Co. v. Irving Trust Co. (In re United Cigar Stores Co. of Am.)*, 73 F.2d 296, 298 (2d Cir. 1934), *cert.*

*denied*, 294 U.S. 708 (1935); *Stanziale v. Finova Capital Corp. (In re Tower Air, Inc.)*, 397 F.3d 191, 199-200 (3d Cir. 2005).

The GUC Trust's "recharacterization" claim must fail.

## VII.    THE ASSUMPTION AND ASSIGNMENT OF THE LOCK-UP AGREEMENT BARS THE GUC TRUST FROM CHALLENGING THE LOCK-UP AGREEMENT OR THE CONSENT FEE

The Sale Order approving the MSPA concluded that the sale transaction and the assumption of Purchased Contracts was an exercise of the Debtors' "sound business judgment" and that the "Debtors are receiving fair value for the assets being sold."  *See* Sale Order at ¶¶ EE, G [Docket No. 2968].  As provided in the Sale Order, all of the parties are bound to the Court's findings and conclusions.

Courts have consistently held that once a contract is assumed under section 365 of the Bankruptcy Code, the rights and obligations under that contract may not be attacked on any ground.  *See E. Air Lines, Inc. v. Ins. Co of Pa. (In re Ionosphere Clubs, Inc.)*, 85 F.3d 992, 999-1000 (2d Cir. 1996); *Dev. Specialists, Inc.  v. 1114 6th Ave. Co. (In re Coudert Bros. LLP)*, No. 09 Civ 5047 (DLC), 2009 WL 2868722, at *1 (S.D.N.Y. Sept. 4, 2009) (where debtor tries to avoid a contract it previously assumed as a fraudulent transfer, dismissal of the avoidance action is appropriate); *Network Access*, 330 B.R. at 76-77 (same); *Concerto Software, Inc. v. Vitaquest Int'l, Inc.*, 290 B.R. 448, 453-54, 456 (D. Me. 2003) (holding that bankruptcy court could not exercise "core" or "related to" jurisdiction over dispute which arose following assumption and assignment of debtor's contract as part of court-approved sale of its assets).  This rule ensures that once a debtor assumes a contract, it is bound by its terms and that parties cannot take positions that are inconsistent with the assumption of the contract.

The Committee withdrew its objection and ultimately agreed to the assumption and assignment procedures.  Those procedures did not require notice of the assumption and

assignment of the contract to any party other than the counter party to the agreement.  In the case of the Lockup Agreement and the payment of the Consent Fee, MLC provided notice to the Noteholders in November, and no Noteholder ever objected.  The assumption and assignment was valid and the GUC Trust cannot now attack it.

This Court, in approving the Sale Order, found that the assumption and assignment of the Purchased Contracts (which included the Lock-Up Agreement) was a sound exercise of MLC's business judgment in connection with the consummation of the 363 sale and was in the best interests of creditors, the Debtors and their estates.  (*See* Sale Order at ¶ EE.)  This finding is wholly inconsistent with the GUC Trust's claims challenging the Lock-Up Agreement or the payment of the Consent Fee.

## VIII.  JUDICIAL ESTOPPEL BARS THE GUC TRUST FROM CHALLENGING THE SALE ORDER AND THE ASSUMPTION AND ASSIGNMENT OF THE LOCK-UP AGREEMENT

The doctrine of judicial estoppel bars the GUC Trust from challenging the Sale Order or the assumption and assignment procedures, pursuant to which the Lock-Up Agreement was assumed and assigned to New GM.  Judicial estoppel is an equitable doctrine designed to "prevent a party who plays fast and loose with the courts from gaining unfair advantage through the deliberate adoption of inconsistent positions in successive suits." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 89 (2d Cir. 2000) (citation omitted).  Thus, "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citations omitted); *see also Network Access Solutions*, 330 B.R. at 78 (committee judicially estopped from seeking to avoid payments made under assumed employment agreements when committee had supported assumption as sound

exercise of debtor's business judgment). A party that takes over litigation from original plaintiff similarly is barred. *See Resolution Trust Corp. v. Kerr*, 804 F.Supp. 1091, 1099 (W.D. Ark. 1992) (holding that party that takes over litigation from original plaintiff "stands in the shoes" of the original plaintiff and is subject to same defenses as original plaintiff).

The Committee vigorously supported the MPSA and Sale Order (including the Modified Assumption and Assignment Procedures) because it provided the only possible recovery for unsecured creditors. As this Court found in the Sale Order, the alternative was liquidation and no recovery for unsecured creditors. The transaction provided for the transfer of substantially all the assets of MLC to New GM (including non-Debtor subsidiaries), leaving behind a fixed amount of wind-down cash plus New GM securities for distribution to general unsecured creditors.[27] Because unsecured creditors were receiving only New GM securities, the Committee had no interest in cash at MLC or any of its subsidiaries (Debtor or non-Debtor), and chose to ignore the Lock-Up Agreement. The only interest the Committee had in the assumption and assignment procedures was to ensure that counterparties received appropriate notice of assumption and assignment and opportunity to object. If the Committee did not focus on GM Canada and the Lock-Up Agreement, it was simply because it did not matter to the Committee due to the structure of the sale transaction.[28]

The Committee and its constituency took the benefit of the transaction which it supported. After supporting the sale and reaping the benefits thereof, neither the Committee nor the GUC Trust as its successor is entitled to ask the Court to fundamentally rewrite the agreement to permit the GUC Trust to receive substantial benefits that were not part of the

---

[27] The securities consisted of 10% of the common stock of New GM and warrants for 15%. If allowed unsecured claims exceed $35 billion, there will be an additional 10% of common stock.

[28] The Committee was provided with information about the Lock-Up Agreement prior to the 363 Sale, and knew or should have known all the facts, and yet still supported the sale. *See* disclosures to Committee described *supra* at pages 4-5.

negotiated deal approved by the Court, to the detriment of the Noteholders. The GUC Trust inherited the Objection filed by the Committee and thus is estopped from challenging the Sale Order or the assumption and assignment of the Lock-Up Agreement.[29]

## IX.    THE GUC TRUST'S 502(d) OBJECTION MUST BE OVERRULED

### A.    The Claims Cannot Be Disallowed Under Section 502(d)

Section 502(d) expressly provides that it cannot serve as a basis to object to a claim where "such entity or transferee has paid the amount, or turned over any such property." 11 U.S.C. § 502(d). The purpose of section 502(d) is to ensure the compliance with judicial orders requiring that an avoidable transfer be returned. *See Springfield Assocs., L.L.C. v. Enron Corp. (In re Enron Corp.)*, 379 B.R. 425, 435 (S.D.N.Y. 2007); *Seta Corp. of Boca, Inc. v. Atl. Computer Sys. (In re Atl. Computer Sys.)*, 173 B.R. 858, 862 (S.D.N.Y. 1994).

The only transfer complained of by the GUC Trust is the $450 million Loan from MLC to GM Canada to fund payment of the Consent Fee. On June 12, 2009, GM Canada made a payment of $78,500,000 to MLC. The remaining balance of the $450 million loan was repaid by GM Canada to MLC on July 7, 2009 with interest, prior to the closing of the 363 sale. Because the full amount was repaid, no recovery can be had as a matter of law under section 502(d).

### B.    The Sale of Avoidance Actions Under the MSPA
### Bars the GUC Trust from Asserting Avoidance Claims

The GUC Trust lacks standing to object to the Statutory Claim or the Guaranty Claims based on the payment of the Consent Fee because the MLC estate does not own any avoidance

---

[29] The Committee's conduct in agreeing to the 363 Sale and assumption and assignment procedures further bars these claims under the doctrine of ratification. *VKK Corp. v. N.F.L.*, 244 F.3d 114, 123 (2d Cir. 2001) ("A party may ratify a contract . . . by intentionally accepting benefits under the contract, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it, or by acting upon it, performing under it, or affirmatively acknowledging it.") (quotations omitted). Moreover, there is no reason for the Committee's almost year long delay in asserting these claims, and they are further barred by the doctrine of laches. *City of Sherrill, N.Y. v. Oneida Indian Nation*, 544 U.S. 197, 217 (2005) ("The principle that the passage of time can preclude relief has deep roots in our law, and this Court has recognized this prescription in various guises. It is well established that laches, a doctrine focused on one side's inaction and the other's legitimate reliance, may bar long-dormant claims for equitable relief.").

claims that relate to this payment. *See Bankr. Servs., Inc. v. Ernst & Young (In re CBI Holding Co.)*, 529 F.3d 432, 459 (2d Cir. 2008) (noting that bankruptcy trustee cannot assert claims not assigned to it because "such claims are not part of the bankrupt's estate") (citations omitted). Under the MSPA, MLC sold to New GM the Purchased Avoidance Claims, which included any and all avoidance actions that "arise from, relate to, or are in connection with," any payments by or to, or other transfers or assignments by or to a Purchased Subsidiary (as defined in the MSPA). GM Canada is a Purchased Subsidiary under the MSPA. Thus, these avoidance claims were sold to New GM and do not constitute property of the MLC estate. Avoidance of the Consent Fee would result in a double recovery and a windfall for the MLC estate at the expense of the Noteholders because MLC has already been repaid that amount with interest.

### C. The Avoidance Claims Are Time-Barred

Pursuant to section 546(a)(1)(A) of the Bankruptcy Code, "an action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after . . . 2 years after the entry of the order for relief . . . ." Likewise, any claims based on section 549 of the Bankruptcy Code "may not be commenced . . . two years after the date of the transfer sought to be avoided . . . ." 11 U.S.C. § 549(d). The GUC Trust failed to timely challenge any alleged avoidable transfers of MLC's property. The Committee's filing of its Objection to the Claims on July 2, 2010, which asserted avoidance claims, did not cure this fatal defect because the Committee lacked standing to assert any avoidance claims of the MLC estate. *See Unsecured Creditors Comm. v. Noyes (In re STN Enters.),* 779 F.2d 901, 904 (2d Cir. 1985) (creditors' committees have no independent standing under the Bankruptcy Code to avoid fraudulent transfers); *Liddle & Robinson, L.L.P. v. Daley (In re Daley),* 224 B.R. 307, 310-11 (Bankr. S.D.N.Y. 1998) ("pursuant to 11 U.S.C. § 544(b), only the trustee has standing to bring a fraudulent conveyance

action to avoid the debtor's transfer, unless a creditor or creditors' committee has been given

approval by the bankruptcy court to sue in the trustee's stead.").

### D.     The Lock-Up Agreement Cannot Be Avoided Because No Transfer Was Made by MLC

MLC made no transfer and took on no obligation under the Lock-Up Agreement that can

be avoided.  *See* 11 U.S.C. §§ 547 (addressing trustee's right to avoid a "transfer"), 548 (same);

N.Y. DEBT. & CRED. L. § 276 (same); *see In re Dreier LLP*, 429 B.R. 112, 125 (Bankr. S.D.N.Y.

2010) ("If the transfer did not involve property of the debtor under non-bankruptcy law, the

trustee cannot avoid and recover the transfer or its value").   The Consent Fee was paid by

GMNS.  The funds used to pay the Consent Fee were not MLC's property and cannot be avoided

as a fraudulent transfer.[30]   The Lock-Up Agreement did not create the Guaranty Claims or the

Statutory Claim.  Both Claims existed independent of each other and the Lock-Up Agreement.

The Lock-Up Agreement did not purport to bind the Court, the Committee or the GUC Trust of

the allowance of the Claims and does not constitute a transfer.

Since no portion of the Lock-Up Agreement involved a transfer of an asset held by MLC

or the MLC estate taking on a new obligation, the GUC Trust has no legal right to seek to avoid

the Lock-Up Agreement.[31]

### E.     Section 549(a) is Not Applicable

Section 549(a) of the Bankruptcy Code "allows [a] trustee/debtor to avoid postpetition

transfers of estate property if not authorized by the court or the Bankruptcy Code." *Hackeling v.*

*Rael Automatic Sprinkler Co. (In re Luis Elec. Contracting Corp.)*, 165 B.R. 358, 363 (Bankr.

---

[30] To the extent the Committee believed the GM Canada Promissory Note that MLC received in return was not reasonably equivalent value, its remedy would have been to assert a claim against GM Canada.  Such an avoidance claim, however, was sold to New GM, and the GUC Trust would have had no standing to pursue that claim.

[31] The GUC Trust's assertion that the Consent Fee was "exorbitant" and that GMNS was insolvent, in effect, sounds in a claim for fraudulent conveyance.  However, any such avoidance claim belongs to the GMNS estate, since that is the entity that paid the Consent Fee, and the Nova Scotia court overseeing GMNS's bankruptcy case has jurisdiction over any such claim.

E.D.N.Y. 1992) (citing 11 U.S.C. § 549(a)).   Relief under this section is limited to transfers "made after the commencement of the case . . . ."  *Devan v. Phoenix Am. Life Ins. Co. (In re Merry-Go-Round Enters., Inc.)*, 400 F.3d 219, 224 (4th Cir. 2005).   Here, MLC loaned the $450 million to GM Canada prior to the bankruptcy in exchange for a promissory note.   Thus, upon the bankruptcy filing, the promissory note – not the funds from the loan – became an asset of MLC's estate.   The promissory note was never transferred and was repaid in full.   Thus, there was no post-petition transfer of estate property and no claim under section 549(a).[32]

F.    **The Consent Fee is Not Avoidable Under
Section 547 of the Bankruptcy Code**

The Consent Fee is not avoidable as a preferential transfer under section 547 of the Bankruptcy Code based on the MLC Loan to GM Canada.   First, as discussed above, there can be no avoidance of a preference where the amount at issue has been repaid as it has been here.   Second, to establish that the Consent Fee was a preferential transfer, the GUC Trust must demonstrate, among other things, that the transfer was (i) for the benefit of the Noteholders; and (ii) for or on account of an antecedent debt owed by MLC before such transfer was made.   11 U.S.C. § 547(b).   The GUC Trust cannot satisfy its burden on either element.

MLC loaned $450 million for the benefit of GM Canada, so that GM Canada could utilize that loan to pay GMNS and obtain a release of the CDN $1.3 billion debt it owed to GMNS.   MLC received a promissory note from GM Canada for the loan.   Thus, the MLC loan was made for the benefit of GM Canada, and the GUC Trust cannot satisfy the first prong of section 547(b) to avoid any transfer.

Nor can the GUC Trust demonstrate that the GM Canada Loan was made on account of antecedent debt.   A loan made by the debtor prepetition in exchange for a note does not

---

[32] The GUC Trust argues that the Trust Agreement required GM Canada to repay the $450 million MLC Loan to MLC earlier than it did.  But the parties to the Trust Agreement, which did not include any Noteholder, extended the deadline to complete the Lock-Up Agreement, and the money was repaid with interest in any event.

constitute a transfer on account of an antecedent debt.  *See DuVoisin v. Foster (In re S. Indus. Banking Corp.)*, 809 F.2d 329, 330 (6th Cir. 1987) (a prepetition loan to a creditor in exchange for a promissory note was not a transfer on account of an antecedent debt).  MLC made the GM Canada Loan in exchange for the GM Canada Promissory Note, not on account of any antecedent debt held by GM Canada or any other party.

### G.    The GUC Trust's Objections Based on Actual Intent to Hinder, Delay, or Defraud Must Be Overruled For Failure to Plead Fraud

The GUC Trust has not pled any facts to support its avoidance claim based on actual intent to hinder, delay, or defraud creditors under either section 548(a)(1)(A) of the Bankruptcy Code or section 276 of the NY DCL.  Failure to plead any facts to support an intent to hinder, delay, or defraud is fatal to the claim, and should be overruled.

### H.    The Collapsing Doctrine Has No Application Here

Under certain circumstances not present here, a series of transactions may be collapsed for purposes of a fraudulent conveyance analysis.  *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995).  Application of the collapsing doctrine permits the estate, in certain circumstances, to seek recovery from a first transferee, notwithstanding that the first transferee may have provided reasonably equivalent value.  To apply the collapsing doctrine, the consideration received from the first transferee must be reconveyed *by the debtor* for less than fair consideration or with an actual intent to defraud creditors.  *Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 447 B.R. 170, 186 (Bankr. S.D.N.Y. 2011).  "If the debtor retains the consideration . . . its estate is not unfairly diminished and the initial transfer is not fraudulent."  *Id.* at 187.[33]

---

[33] In addition, for the collapsing doctrine to apply, the first transferee "must have actual or constructive knowledge of the entire scheme that renders the exchange with the debtor fraudulent."  *HBE Leasing*, 48 F.3d at 635.

That is *not* the paradigm here, where (i) MLC advanced funds to GM Canada in consideration for a Promissory Note and (ii) MLC did *not* transfer the Promissory Note to a third party. To the contrary, MLC retained the Promissory Note which was subsequently repaid in full by GM Canada. There is no basis here to invoke the collapsing doctrine which does not apply to fraudulent conveyance actions against third parties – such as the Noteholders – who did not receive a direct transfer from MLC.[34]

## I.    The Consent Fee Payment Qualifies for the Section 546(e) Safe Harbor

The Consent Fee qualifies for the safe harbor provision of section 546(e), which provides in relevant part:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is . . . a transfer made by or to (or for the benefit of) a . . . financial institution [or] financial participant . . . in connection with a securities contract, as defined in section 741(7) . . . that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).[35] In determining whether section 546(e) protects specific transfers from avoidance, a court must focus "on applying the literal language of the statutory exemption to the facts presented." *Official Comm. of Unsecured Creditors v. Am. United Life Ins. Co. (In re Quebecor World (USA), Inc.)*, 453 B.R. 201, 219 (Bankr. S.D.N.Y. 2011); *see also Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 336-37 (2d Cir. 2011); *accord Picard v. Katz*, 462 B.R. 447, 452 (S.D.N.Y. 2011) (ruling that consideration of section 546(e)'s legislative history is improper because "the statute is plain and controlling on its face").

---

[34] The collapsing doctrine is unrelated to section 550(a) of the Bankruptcy Code, which also has no application here. Under section 550(a), the debtor (or its successor) "cannot recover the value of the transfer from any of the transferees or beneficiaries unless he first avoids the underlying transfer." *In re Furs by Albert & Mark Kaufman, Inc.*, Case No. 03-041301 2006 WL 3735621, at *8 (Bankr. S.D.N.Y. Dec. 14, 2006) (citing *Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*, 343 B.R. 75, 79-83 (Bankr. S.D.N.Y. 2006)). Here, prior to seeking recovery from the Noteholders under section 550(a), the GUC Trust would have to first avoid the loan to GM Canada, which it cannot do because (1) MLC received a Promissory Note for the full amount of the loan and the Promissory Note was repaid in full by GM Canada; (2) avoidance actions were sold to New GM; and (3) the two year limitation period has elapsed.

[35] Section 546(e) protects the payment of the Consent Fee from avoidance under sections 544, 547, or 548(a)(1)(B). For the reasons explained above, the payment of the Consent Fee cannot be avoided pursuant to section 548(a)(1)(A).

The Consent Fee initially was transferred by GMNS to the Paying Agent, Banque Générale du Luxembourg, and subsequently *pro rata* shares were paid by the Paying Agent to the Noteholders. Thus, payment of the Consent Fee was made "to" a financial institution.[36] Accordingly, section 546(e) protects the Consent Fee from avoidance under sections 544, 547, and 548(a)(1)(B).and 548(a)(1)(B).

## X.  APPALOOSA SOLD ITS CLAIMS PRIOR TO THE FILING OF THE ADVERSARY PROCEEDING

Additionally, consistent with the Court's ruling on July 26, 2012 with respect to Aurelius, the claims against Appaloosa should be dismissed because Appaloosa has not held any Notes since April 2011. (*See* Third Amended Verified Statement of Greenberg Traurig, LLP Pursuant to Bankruptcy Rule 2019 at ¶¶ 1, 8 [Docket No. 10135]; Transfer of Claim Other than for Security [Docket No. 11485].)

## XI.  THE GUC TRUST IS NOT ENTITLED TO RELIEF UNDER RULE 60(B)

The GUC Trust is asking the Court to modify the Sale Order and set aside MLC's assumption and assignment to New GM of the Lock-Up Agreement. As described in detail in New GM's motion for summary judgment, which is incorporated herein by reference, and as the evidence will show, (i) the GUC Trust failed to satisfy the requirements of Rule 60(b) and (ii) the GUC Trust has failed to show extraordinary circumstances to warrant Rule 60(b) relief.

In addition, the one year limitation for seeking Rule 60(b) relief is absolute, and may not be modified by the Court. Fed. R. Bankr. P. 9006(b) ("The court may not enlarge the time for taking action under Rules . . . 9024"); Fed. R. Bankr. P. 9024 ("Rule 60 F.R. Civ P.. applies in

---

[36] The only relevant transferor or transferee for the purposes of section 546(e) is the party that initially receives the transfer, even if it acts only as a conduit. A transfer is protected by section 546(e) as long as it was made "by or to" a "financial institution" in the first instance. *Enron*, 651 F.3d at 339 (section 546(e) protects transfers by or to a financial institution even if institution holds no beneficial interest in the transferred assets); *Brandt v. B.A. Capital (In re Plassein Int'l Corp.)*, 590 F.3d 252, 257-59 (3d Cir. 2009) ("settlement payments" made to financial institution acting only as conduit; *QSI Holdings, Inc. v. Alford (In re QSI Holdings, Inc.)*, 571 F.3d 545, 550-51 (6th Cir. 2009) (same); *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 987 (8th Cir. 2009) (same).

cases under the Code . . . .").  In denying New GM's motion for summary judgment, the Court stated, "the issues raised in New GM's summary judgment motion aren't ripe for decision yet and won't be until and unless we know that the GUC Trust will be in fact seeking 60(b) relief from the sale order, and we know the nature of the relief the GUC Trust seeks."  (Transcript of July 19, 2012 hearing at 79.)  The GUC Trust cannot evade the one year bar for seeking relief under Rule 60(b) in this way.  (*See* Order Denying Motion for Summary Judgment Filed by General Motors LLC [Adv. No. 144].)  The Court should deny relief under Rule 60(b) for the GUC Trust's failure to timely seek relief under that Rule.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Defending Noteholders respectfully request the Court deny the GUC Trust's Rule 60(b) motion, overrule the Amended Objection, grant judgment in favor of the Noteholders on the Amended Complaint, dismiss the Amended Complaint with prejudice, allow the Guaranty Claims and the Statutory Claim in full, and grant such other and further relief as is just.

Dated: New York, New York
July 27, 2012

| | |
|---|---|
| GREENBERG TRAURIG, LLP | PAUL HASTINGS LLP |
| By: /s/ Bruce R. Zirinsky | By: /s/ Barry G. Sher |
| Bruce R. Zirinsky, Esq. | Barry G. Sher, Esq. |
| John H. Bae, Esq. | Maria E. Douvas, Esq. |
| Gary D. Ticoll, Esq. | Kevin P. Broughel, Esq. |
| Paul T. Martin, Esq. | Park Avenue Tower |
| MetLife Building | 5 E. 55th Street, First Floor |
| 200 Park Avenue | New York, New York 10022 |
| New York, New York 10166 | Telephone: (212) 318-6000 |
| Telephone: (212) 801-9200 | Facsimile: (212) 319-4090 |
| Facsimile: (212) 801-6400 | Email: barrysher@paulhastings.com |
| Email: zirinskyb@gtlaw.com | mariadouvas@paulhastings.com |
| baej@gtlaw.com | kevinbroughel@paulhastings.com |
| ticollg@gtlaw.com | |
| martinpt@gtlaw.com | *Attorneys for Appaloosa Management L.P.* |

Kevin D. Finger, Esq.
Bevin M. Brennan, Esq.
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Telephone: (312) 456-8400
Facsimile: (312) 456-8435
E-mail: fingerk@gtlaw.com
       brennanb@gtlaw.com

Joseph P. Davis III, Esq.
One International Place
Boston, MA 02110
Telephone: (617) 310-6000
Facsimile: (617) 310-6001
E-mail: davisjo@gtlaw.com

*Attorneys for Elliott Management Corporation,*
*Fortress Investment Group LLC and Morgan*
*Stanley & Co. International plc*