Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 09-50026(REG)

4   Adv. Case No. 12-09802(REG)

5   - - - - - - - - - - - - - - - - - - - - - - - - - - x

6   In the Matter of:

7

8   GENERAL MOTORS CORPORATION,

9

10          Debtor.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   MOTORS LIQUIDATION COMPANY GUC TRUST,

13                  Plaintiff,

14          v.

15   APPALOOSA INVESTMENT LIMITED,

16                  Defendant.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - x

18                  U.S. Bankruptcy Court

19                  One Bowling Green

20                  New York, New York

21

22                  July 26, 2012

23                  9:46 AM

24

25

Page 2

1    B E F O R E :

2    HON ROBERT E. GERBER

3    U.S. BANKRUPTCY JUDGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1       Hearing re:  Debtors' 115th Omnibus Objection to Claims

2       (Welfare Benefits Claims of Retired and Former Salaried and

3       Executive Employees)

4

5       Hearing re:  Debtors' 170th Omnibus Objection to Claims

6       (Welfare Benefits Claims of Retired and Former Salaried and

7       Executive Employees)

8

9       Hearing re:  Debtors' 175th Omnibus Objection to Claims

10      (Welfare Benefits Claims of Retired and Former Salaried and

11      Executive Employees)

12

13      Hearing re:  Debtors' 180th Omnibus Objection to Claims

14      (Welfare Benefits Claims of Retired and Former Salaried and

15      Executive Employees)

16

17      Hearing re:  Debtors' 181st Omnibus Objection to Claims

18      (Welfare Benefits Claims of Retired and Former Salaried and

19      Executive Employees)

20

21      Hearing re:  Debtors' 182nd Omnibus Objection to Claims

22      (Welfare Benefits Claims of Retired and Former Salaried and

23      Executive Employees)

24

25      Hearing re:  Debtors' 183rd Omnibus Objection to Claims

Page 4

1   (Welfare Benefits Claims of Retired and Former Salaried and

2   Executive Employees)

3

4   Hearing re:  Debtors' 184th Omnibus Objection to Claims

5   (Welfare Benefits Claims of Retired and Former Salaried and

6   Executive Employees)

7

8   Hearing re:  Debtors' 185th Omnibus Objection to Claims

9   (Welfare Benefits Claims of Retired and Former Salaried and

10  Executive Employees)

11

12  Hearing re:  281st Omnibus Objection to Claims (Insufficient

13  Documentation)

14

15  Hearing re:  Motion to Award of Attorneys Fees from Claim

16  No. 51093 Settlement Fund on behalf of Anderson Class

17  Counsel

18

19  Hearing re:  Motors Liquidation Company GUC Trust's

20  Objection to Claim No. 11064 Filed by Cardenas Motors Inc.

21

22  Hearing re:  Adv: 12-09802 - Motion of Aurelius Investment,

23  LLC for Summary

24

25  Transcribed by:  Dawn South and Jacquelyn Goldsmith

Page 5

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES LLP

3          Attorneys for the Debtor

4          767 Fifth Avenue

5          New York, NY 10153-0119

6

7    BY:  DAVID N. GRIFFITHS, ESQ.

8

9    KING & SPALDING LLP

10          Attorney for New GM

11          1185 Avenue of the Americas

12          New York, NY 10036-4003

13

14    BY:  ARTHUR J. STEINBERG, ESQ.

15

16    DICKSTEIN SHAPIRO LLP

17          Attorneys for MLC GUC Trust

18          1633 Broadway

19          New York, NY 10019-6708

20

21    BY:  ERIC FISHER, ESQ.

22          STEFANIE BIRBROWER GREER, ESQ.

23          KATIE L. COOPERMAN, ESQ.

24

25

Page 6

1    FRIEDMAN KAPLAN SEILER & ADELMAN LLP

2         Attorneys for Aurelius Investment, LLC

3         7 Times Square

4         New York, NY 10036-6516

5

6    BY:  EDWARD A. FRIEDMAN, ESQ.

7         WILLIAM P. WEINTRAUB, ESQ.

8         EAMONN O'HAGAN, ESQ.

9

10   PAUL HASTINGS  LLP

11        Attorney for Kenneth Maiman

12        75 East 55th Street

13        New York, NY 10022

14

15   BY:  BARRY G. SHER, ESQ.

16

17   GERSTEN SAVAGE LLP

18        Attorney for Class Counsel

19        600 Lexington Avenue

20        New York, NY 10022-6018

21

22   BY:  PAUL A. RACHMUTH, ESQ.

23

24

25

Page 7

```
 1   GIRARD GIBBS LLP

 2         Attorney for Class Counsel

 3         601 California Street

 4         14th floor

 5         San Francisco, CA 94108

 6

 7   BY:  A.J. DE BARTOLOMEO, ESQ.

 8

 9   CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

10         Attorneys for the Paulson Noteholders

11         101 Park Avenue

12         New York, NY 10178-0061

13

14   BY:  THERESA A. FOUDY, ESQ.

15         STEVEN J. REISMAN, ESQ.

16

17   GREENBERG TRAURIG, LLP

18         MetLife Building

19         200 Park Avenue

20         New York, NY 10166

21

22   BY:  GARY D. TICOLL, ESQ.

23

24

25
```

1   AKIN GUMP STRAUSS HAUER & FELD LLP

2        Attorney for Nova Scotia Trustee

3        One Bryant Park

4        New York, NY 10036-6745

5

6   BY:  SEAN E. O'DONNELL, ESQ.

7        DEAN CHAPMAN, ESQ. (TELEPHONIC)

8

9   ALSO APPEARING TELEPHONICALLY:

10

11   JANE C. BOGUE, PRO SE

12   STANLEY E. JACK, PRO SE

13   GLENN C. KUNTZ, PRO SE

14   GEORGE W. MCCLAIN, PRO SE

15   DANIEL J. SAVAL, ESQ.

16   JOSEPH C. SINGER, PRO SE

17   DOUGLAS STERETT, PRO SE

18   AMER TIWANA

19   DAVID R. VOPLE, PRO SE

20   DAN GROPPER

21

22

23

24

25

Page 9

1                    P R O C E E D I N G S

2            THE COURT:  Good morning, have seats, please.  All

3    right, good morning.  We're here on Motors Liquidation,

4    formally known as General Motors, and I see Mr. Griffiths

5    and Ms. Greer here.  Are you going to take the lead,

6    Mr. Griffiths?

7            MR. GRIFFITHS:  Yes, Your Honor, thank you.

8            THE COURT:  Why don't you go ahead then, thank

9    you.

10           MR. GRIFFITHS:  David of Griffiths of Weil,

11   Gotshal & Manges for the Motors Liquidation Company GUC

12   Trust.

13           Your Honor, we have on the calendar this morning

14   ten omnibus objections to claims relating to former

15   employees of General Motors.  These are claims that were

16   carried over from the June 14th hearing.

17           If Your Honor recalls, at the June 14th hearing we

18   were handling former employees of the debtors who had

19   retired between the 1960s and the 1980s, and Your Honor had

20   requested that the estate attempt to locate summary plan

21   descriptions from that period specifying that they had the

22   ability to amend or modify and terminate benefits.

23           Your Honor, we have done so.  We placed on the

24   record, and I believe Your Honor has a folder in front of

25   you, the summary plan descriptions starting in 1963.

Page 10

1              THE COURT:  Yes, I do, Mr. Griffiths.  I think you

2    have answered the question that I had asked you to follow up

3    on, subject to the employees rights to be heard.

4              In the past when we've had matters of this

5    character we've given the folks an opportunity to you speak

6    and then given you a chance to respond and we've had a back

7    and forth until we got it all out.  Do you think that makes

8    sense again?

9              MR. GRIFFITHS:  Yes, Your Honor, we're happy reply

10   on our existing submissions.

11             THE COURT:  Okay.  You could help me however by

12   naming the people who you understand to be presenting the

13   issues that I need to deal with today, and then I'm going to

14   invite each one of them to speak.

15             MR. GRIFFITHS:  Thank you, Your Honor.  You should

16   have in front of you a folder we prepared with each of the

17   replies in alphabetical order, and I just propose to go in

18   that order.

19             THE COURT:  That's fine.  With you now,

20   Mr. Griffiths, go ahead.

21             MR. GRIFFITHS:  Thank you, Your Honor.  And we

22   made available copies of the summary plan descriptions to

23   each of the claimants on the phone today by --

24             THE COURT:  You've already made them available to

25   them so they know what you're talking about.

Page 11

```
 1              MR. GRIFFITHS:  Yes, Your Honor, we sent them out
 2    by FedEx on CDs.
 3              So Your Honor, the first claimant would be Ms.
 4    Jane C. Bogue, B-O-G-U-E.
 5              THE COURT:  Okay.  Ms. Bogue, are you on the
 6    phone?
 7              MS. BOGUE:  Yes, I am, Your Honor.
 8              THE COURT:  Would you like to be heard?
 9              MS. BOGUE:  Well, just what I would like to say is
10    that I did get the disk that he send out, and I also went
11    back and looked through all the records that I had kept over
12    the years, and starting in 1977 General Motors furnished us
13    with a little booklet that said personal benefit summary and
14    it was a lengthy summary of all your GM benefits, and on the
15    back of each one of those there was a little note and it
16    just said something about General Motors and whatnot.  And
17    not until 1987 did the one come out with the note on the
18    back that says General Motors does not have access to your
19    -- any way it says that General Motors has the right to
20    change and amend these benefits, and that's the first one of
21    those summary booklets that that came out on was in 1987.
22              THE COURT:  Uh-huh.  Okay.  Mr. Griffiths, can you
23    help us on that, do you want to respond?
24              MR. GRIFFITHS:  Your Honor, we've reviewed -- I
25    mean we requested from GM copies of summary plan
```

Page 12

1    descriptions relating to welfare benefit programs and life

2    insurance going as far back as they had them.  Every single

3    copy of the welfare benefits summary plan descriptions we

4    received contained the reservation of rights language, and

5    the examples that we provided range from 1963 to 1982,

6    following which we believe the Sprag (ph) -- the ruling in

7    Sprag applies -- and -- or Sprague, and Sprague has referred

8    specifically to summary plan descriptions from 1984 onwards.

9    So the GUC Trust believes that it's covered the entire

10   period that relates to the employment of these -- of those

11   employees.

12          And while I'm happy to look at any documents that

13   Ms. Bogue has, the documents and summary plan descriptions

14   we've submitted, pursuant to the declaration of Joseph

15   Smolinsky, should be authoritative on the matter.

16          THE COURT:  Did the package that you sent to

17   Ms. Bogue include the plan descriptions for the period

18   during which she was employed?

19          MR. GRIFFITHS:  Yes, Your Honor.  The -- I mean

20   I'd have to ask Ms. Bogue specifically when she started and

21   finished her employment, but assuming it was between 1963

22   and the present then she would be covered by what we've

23   already submitted.

24          THE COURT:  Ms. Bogue, what were the dates of your

25   employment?

Page 13

1              MS. BOGUE:  1954 to 1989.

2              THE COURT:  1964 to --

3              MS. BOGUE:  No, 50, 50.

4              THE COURT:  5-4?

5              MS. BOGUE:  Yes, sir.

6              THE COURT:  Okay.  Mr. Griffiths, it appears to me

7    that Ms. Bogue is a real long-time employee and that she may

8    have had nine years of service even before the 1963 date

9    that you referred to.

10             I am wondering whether in her case it would be

11   best to continue this matter one more time to try to either

12   get our arms around the facts or give you a chance to work

13   out a deal with Ms. Bogue.

14             MR. GRIFFITHS:  That will be entirely appropriate,

15   Your Honor.  We have received summary plan descriptions

16   going back to 1943, which --

17             THE COURT:  43?

18             MR. GRIFFITHS:  Correct, Your Honor.

19             THE COURT:  You mean like during the Second World

20   War, 1943?

21             MR. GRIFFITHS:  Correct, Your Honor.  The -- GM's

22   records are surprisingly good.  I haven't -- I didn't

23   actually request the copy from 1943 because it had to be --

24   it had to come from GM's archives, but these are the ones

25   they could locate as quickly as they could.

Page 14

1            THE COURT:  Frankly, I would not have thought that

2    I would have needed you to get a search back as far as 1954,

3    but I think we need to do that to be as -- to be fair to

4    Ms. Bogue.

5            MR. GRIFFITHS:  Absolutely, Your Honor.  And just

6    to note that each of the summary plan descriptions by their

7    own terms supersede each other, so every time a resulting

8    summary plan description was issued it would then replace

9    the previous one.

10            THE COURT:  Yeah, I understand that, but the legal

11    issue we've been trying to get our arms around is what

12    happens when an employee works part of his career or hers

13    when there is no such reservation of rights, and works the

14    rest when there is.  An issue as to which as far as I'm

15    aware there's no reported case yet.

16            MR. GRIFFITHS:  Other than Your Honor's ruling in

17    Chemtura, which I have read and I am aware of.

18            THE COURT:  Well, my memory in Chemtura is that I

19    didn't expressly deal with that and I invited people to do

20    the same thing you're doing, which is to get more facts for

21    me or better yet settle it, and I -- and my memory is that

22    there was a lawyer in Connecticut, whose name I've now

23    forgotten, who had represented a bunch of employees who had

24    service both before and after Chemtura reserved the right,

25    and that the matter ultimately settled.

Page 15

1           MR. GRIFFITHS:  Yes, Your Honor, and I believe in

2    Chemtura there was a situation where one claimant had

3    certain benefits which were subject to reservation of rights

4    pursuant to the plan and other benefits that were not, and

5    these benefits that can be distinguished insofar as all of

6    the benefits were provided under one plan which, you know,

7    reserved the right to amend or modify in full.

8           But Your Honor, we'll absolutely continue the

9    matter with respect to Ms. Bogue given her employment.

10          THE COURT:  Okay.  It's obvious that your prep for

11   this hearing is better than my memory of Chemtura.

12          But with that said I think we agree on the game

13   plan.  Ms. Bogue, are you with me in terms of what we're

14   doing?

15          MS. BOGUE:  I can -- I don't hear real well, but I

16   think I understand.  May I just say one thing about the disk

17   that Mr. Griffiths sent me?

18          THE COURT:  Sure.

19          MS. BOGUE:  I don't -- my computer won't even play

20   it, I had to get a neighbor to let me even look at that, and

21   what that was, was copies of hand out booklets that GM put

22   out.  I don't even know that we at our local GMAC office

23   here in Longview received those booklets.  That was not

24   anything that went to an individual, it was just handouts

25   that routinely General Motors got little handout booklets,

Page 16

1    and I believe that's what those were that you sent copies of

2    on that disk.  Is that not right?

3              THE COURT:  Well, you got to put your comments to

4    me, Ms. Bogue.

5              MS. BOGUE:  I'm sorry, okay.

6              THE COURT:  But I'm perfectly happy to give

7    Mr. Griffiths a chance to answer that question.  By the way

8    you said Longview, is that Longview, Texas?

9              MS. BOGUE:  Yes, sir.  Yes, sir.

10             THE COURT:  All right.

11             MS. BOGUE:  And it was GMAC and we were a small

12   office and we did routinely get little ole booklets that

13   they'd put out on a little book stand, you know, but they

14   were not given to individuals and not gone over with us in

15   any way.  I don't even know that we ever saw half of the

16   booklets that were on that disk.  I don't really know.

17             THE COURT:  Okay.  Well, it's also possible that

18   what Mr. Griffiths gave you covered more than just you.

19             In any event --

20             MS. BOGUE:  Oh, yes, sir.  Oh, yes, sir, these

21   were just little routine booklets that I guess went out to

22   every General Motors office or whatever.

23             THE COURT:  Okay.

24             MS. BOGUE:  It was nothing to me.

25             THE COURT:  Well, here's what I would like to do.

1          MS. BOGUE:  Okay.

2          THE COURT:  Mr. Griffiths, the way that we can

3     deal with these issues in commercial cases doesn't always

4     translate perfectly when we have people, you know, who are

5     regular folks who don't have access to computers and all of

6     the technology and stuff like that.

7          So what I'd like you to do as a courtesy to me and

8     to Ms. Bogue is to send her paper copies of anything where

9     GM has reason to believe that she either got it or should

10    have gotten it or should have had access to it, and then

11    we'll sort it out later.  And I would like you for these

12    folks, or at least anybody who asks for it, to give them to

13    them in paper form rather than in electronic form.

14         MR. GRIFFITHS:  Yes, Your Honor, absolutely.  And

15    to be clear, we had just as a -- to lower the cost of the

16    estate and the environment we had sent out the copies on CDs

17    and noted in a letter that hard copies could be requested

18    from us.

19         THE COURT:  Well, I understand that, but having

20    reviewed the fee requests in this case I can guarantee you

21    that the cost of sending out paper copies to the folks who

22    don't have computers won't be a material incremental cost in

23    the management of this case.

24         MR. GRIFFITHS:  Yes, Your Honor.

25         THE COURT:  Okay.  Who's our next employee?

1          MR. GRIFFITHS:  Your Honor, the -- it would be

2    Mr. Gordon Hall, H-A-L-L.

3          THE COURT:  Right.  Mr. Hall, are you on the

4    phone?  Mr. Hall?

5          COURTCALL OPEATOR:  There is no appearance for

6    Mr. Hall, Your Honor.

7          THE COURT:  Okay.  Mr. Griffiths, with Mr. Hall

8    having not appeared on the phone I'm going to consider that

9    matter to have been resolved in the GUC Trust favor or GM's

10   favor.

11         MR. GRIFFITHS:  Thank you, Your Honor.

12         THE COURT:  So let's move on to the next one,

13   please.

14         MR. GRIFFITHS:  It would be Mr. Stanley Jack,

15   J-A-C-K.

16         THE COURT:  Okay.  Mr. Jack, are you on the phone?

17         MR. JACK:  Yes, I am, sir.

18         THE COURT:  Where are you located, Mr. Jack?

19         MR. JACK:  I'm located in the upper peninsula of

20   Michigan.

21         THE COURT:  Okay.  Would you like to be heard on

22   this matter further?  I think we were together on the phone

23   some weeks ago.

24         MR. JACK:  Yes, we were.

25         I guess, Your Honor, I just one comment.

Page 19

1           THE COURT:  Sure, go ahead, please.

2           MR. JACK:  Okay, thank you.

3           I, you know, listened to the conversation this

4    morning, and yes, I did receive the DVD where it does say

5    the corporation, you know, can change the contract just

6    under part and have no consideration.  It doesn't say no

7    consideration for the employee, but they don't come and ask

8    if you agree or sign another document saying that you agree

9    with the change.

10          But I guess the problem I really have with the

11   whole thing is I go back to my pension to where the

12   corporation, the size for the corporation has the ability to

13   give you a letter and basically force you out knowing I was

14   sitting there with 30 plus years -- 30 and a half years and

15   pressured to retire, and at that point take 50 percent of my

16   pension, and if I was able to work for another six years I'd

17   get 100 percent.  That doesn't make sense.  I mean that I

18   should lose 50 percent of what I worked for and I worked for

19   30 plus years and that's what happens.

20          And I'm not an attorney and I don't know what the

21   legal part of this is, but it is just very frustrating to

22   see that the corporation can just get away with doing that.

23   I mean, I know they're trying to save money, but they're

24   doing it on -- you know, for years my whole career they told

25   me the people of the corporation are their major asset.

Page 20

1   Well guess what, as soon as I, you know, they get rid of me

2   it's like I'm the biggest liability they ever had, and it's

3   just so disheartening to think that our legal system just

4   allows this to happen to people, and it looks like it's just

5   going to continue with other companies as it goes on, and I

6   don't know when it stops.

7          But I wouldn't wish this on anybody to have to

8   work all these years and then have this happen to them.

9   It's just so disheartening and it's unbelievable what it

10  puts a family through.  And I'm living in the UP of

11  Michigan, so it has something to do with having half of my

12  retirement and trying to make a decent life go on, my golden

13  years I guess for my wife and I.

14         But I just ask the Court to give it some

15  consideration, but I don't believe I have any legal grounds,

16  I'm not sure.  But any ways that's all I have to say, sir.

17         THE COURT:  Well, I well understand your concerns,

18  Mr. Jack.  There isn't much I can do about the way

19  corporations treat their employees across the country

20  generally.  I can focus on the issues in General Motors.

21         I heard you talk about your pension.  Do you

22  understand that this motion doesn't affect your pension but

23  only affects your medical benefits and your life insurance?

24         MR. JACK:  Well, I actually have two claims.  In

25  the one claim I had -- was for my pension.

Page 21

1          THE COURT:  Okay.

2          MR. JACK:  I mean, I had two claims -- I had two

3     -- I actually had two claims submitted.

4          THE COURT:  Fair enough.

5          Mr. Griffiths, I may or may not have been right

6     when I asked Mr. Jack that question.  Why don't you respond

7     generally if you would like to.

8          MR. GRIFFITHS:  Your Honor, specifically with

9     respect to pensions obviously Your Honor is correct that the

10    omnibus objections in the hearing today don't relate to

11    pensions, pensions were assumed by New GM pursuant to the

12    agreement whereby New GM acquired all of Old GM's assets --

13    or good assets.

14         Your Honor, specifically with respect to

15    Mr. Jack's complaint, it appears that Mr. Jack's -- Mr. Jack

16    had the option to either take early retirement towards the

17    end of his career or alternatively faced the prospect of

18    termination of his employment.  And my understanding is that

19    the way the GM pensions vest you require a certain number of

20    years of service in order for the pension to vest in, you

21    know, to the full amount that would be possible.

22         Because GM decided to terminate Mr. Jack's

23    employment or to offer him a voluntary retirement -- or a

24    so-called voluntary retirement he didn't fulfill the

25    requirements to vest his pension benefits in full.

1          I don't believe that constitutes a claim that can

2     be allowed under the Bankruptcy Code, and I don't think

3     Mr. Jack has fulfilled his obligations in terms of

4     discharging the claim.

5          THE COURT:  Okay.  Mr. Jack, any further comment?

6          MR. JACK:  I guess -- no, I don't, Your Honor, I

7     guess I don't want to waste anybody's time on this.  No, I

8     don't.  Thank you.

9          THE COURT:  Okay.  Mr. Jack, Mr. Griffiths, I'm

10    going to do it a little differently this time so that the

11    folks who are on the phone at this point have comfort that

12    I've individually thought about each one of their claims.

13         I am going to incorporate my earlier dictated

14    rulings on these same issues so I don't have to repeat them

15    over and over again.  But as a refresher, if you will, this

16    motion affects medical and life insurance benefits that are

17    called in the law employee welfare plans as contrasted as

18    different from pensions.  The pensions are being honored as

19    a matter of bankruptcy law or as a practical matter because

20    the pensions are satisfied by trust and because the

21    commitments with respect to the pensions were taken over by

22    New GM.

23         So here there isn't much that I as the bankruptcy

24    judge with Old GM -- with the company that's now called

25    Motors Liquidation Company can do about pensions.

Page 23

1          On the medical and life insurance benefits the

2     legal issue is whether when the employee was working -- and

3     I recognize that there's a gray area when the employee

4     worked for part of his or her time when there was no right

5     to change the benefits, and part of the time when there was

6     -- but the issue is whether the employee was on notice and

7     kept working when GM reserved the right to modify the plans.

8          It appears that in your case, Mr. Jack, for the

9     entirety of the time that you were employed GM had reserved

10    the right to change your benefits, and under a case out of

11    the Sixth Circuit Court of Appeals called Sprague versus

12    General Motors, which is controlling on me, or which is at

13    least the controlling precedent in this area, those become

14    part of your contract and therefore your contract includes

15    General Motors's right to change the benefits, which in this

16    case it did.

17         So fully understanding and respecting the pain

18    that having to rule this way imposes on folks who had worked

19    decades in many cases for GM, I'm compelled to disallow your

20    benefits claim, that is the insurance and the medical

21    benefits claim, making it clear that this is in no way

22    intended to affect your pension.

23         I'm sorry I can't do more for you, Mr. Jack, other

24    than to tell you that I've carefully considered your

25    contentions.

1            MR. JACK:  Well, thank you, Your Honor.

2            THE COURT:  Okay.  You can either stay on the

3    phone or drop off as you prefer, Mr.

4            MR. JACK:  Jack I'll drop off.  Thank you.

5            THE COURT:  Very good.

6            Next one, please, Mr.

7            MR. GRIFFITHS:  Griffiths Your Honor, the next

8    claimant would be Timothy J. Kuechenmeister,

9    K-U-E-C-H-E-N-M-E-I-S-T-E-R.

10           THE COURT:  Okay.  Mr. Kuechenmeister, are you on

11   the phone?  Mr. Kuechenmeister?  CourtCall, do we show

12   Mr. Kuechenmeister as having -- as being on the phone?

13           COURTCALL OPERATOR:  Your Honor, his line

14   disconnected.

15           THE COURT:  Okay.  Well, maybe it's because he got

16   tired of listening to me or maybe because he heard my ruling

17   with respect to Mr. Jack.

18           But under these circumstances, Mr. Griffiths, I

19   have to rule in his case the same way I ruled with respect

20   to Mr. Jack.

21           MR. GRIFFITHS:  Yes, Your Honor.

22           The following claimant would be Mr. Glenn C.

23   Kuntz, K-U-N-T-Z.

24           THE COURT:  Okay, Mr. Kuntz, are you on the phone?

25           MR. KUNTZ:  Judge Gerber, my name Glenn Kuntz.

1           THE COURT:  Okay.

2           MR. KUNTZ:  I'm sorry, sir.

3           THE COURT:  No, just speak a little louder if you

4    don't mind, Mr. Kuntz, because the phone line is a little

5    weak.  Where are you calling from?

6           MR. KUNTZ:  Calling from Dayton, Ohio.

7           THE COURT:  Okay.  And am I right that you and I

8    have spoken before?

9           MR. KUNTZ:  Yes, sir.

10          THE COURT:  Okay.  Would you like to be heard

11   again in light of the new information?

12          MR. KUNTZ:  I would like to be heard.

13          THE COURT:  Go ahead, please.

14          MR. KUNTZ:  Okay.  Judge, I was an unclassified

15   executive employee with 35 years at GM, and those years are

16   from 1953 to 1988.

17          THE COURT:  Pause, please.  Did you say 1953 like

18   during the Korean War?

19          MR. KUNTZ:  Yes, 1-9-5-3.

20          THE COURT:  Okay.  And the date -- the year of

21   your retirement again, please.

22          MR. KUNTZ:  1988.

23          THE COURT:  Okay.  Continue, please.

24          MR. KUNTZ:  Okay.  And I'd just like to comment

25   that nothing in that Smolinsky declaration disk that I

Page 26

1    received speaks to unclassified executive employees.

2            Also there's no reference to special early

3    retirement, and that is exactly the basis that I left GM.  I

4    closed the Fisher Guide (ph) plant in O'Leary, Ohio in 1988

5    and was told I could retire.  I was told my life insurance

6    was fully in effect for life when I retired in 1988, period.

7    That's exactly what I was told.  Basically I see that as a

8    retirement contract regarding my life insurance.

9            I'm now 77 years old and I base my wife's future

10   at my passing on the life insurance that GM promised.  If I

11   could get comparable life insurance now with my current

12   health questions it would cost me at least $3,000 a month,

13   which my pension cannot cover.  And I just think with GM's

14   current profit it seems like they could easily fund my claim

15   for life insurance.

16           THE COURT:  Okay.  Mr. Griffiths, do you want to

17   respond?

18           MR. GRIFFITHS:  Well, Your Honor, I'm mindful of

19   Your Honor's ruling with respect to Ms. Bogue and the fact

20   that Mr. Kuntz started work in 1953.

21           And it's worth noting that the -- in the folder we

22   provided you with a summary plan descriptions at Item B the

23   General Motors insurance program, at least from the earliest

24   date I have before we which is 19 I think 62, was split

25   between employees who earned either below $750 a month or

Page 27

1    above $750 a month.  I'm not aware of the classification

2    that Mr. Kuntz refers to in terms of an unclassified

3    salaried employee; however, it would make sense to continue

4    the claim to determine whether we could find any documents

5    going back to 1953.

6           Although Your Honor has ruled repeatedly with

7    respect to the life insurance program that GM did have the

8    right to amend or modify the program, and therefore it's

9    going to be difficult for the estate to find some sort of

10   common ground with Mr. Kuntz if he believes that he's

11   entitled to life insurance in full.

12          THE COURT:  I agree; however, this is the way I

13   see the issues involving Mr. Kuntz.

14          First, if he started his employment as early as

15   1953 there are a lot of similarities between his situation

16   and Ms. Bogue as you recognize, Mr. Griffiths, so we need to

17   find out what the document said in the period from 1953

18   until 1963, which is now the earliest time that you have the

19   documents.

20          Secondly, if you haven't already done so I'd like

21   and Mr. Kuntz to trade the documents that each of you

22   believes were exchanged when he retired, which I think if I

23   heard him right was in 1988, to make sure you have them all.

24   And if there is a remaining disagreement at the time then

25   I'll decide it under the law.

Page 28

1          MR. GRIFFITHS:  Thank you, Your Honor.

2          THE COURT:  Mr. Kuntz, was the sound quality of

3     the phone good enough for you to hear everything I had to

4     say?

5          MR. KUNTZ:  Yes, I can hear you fine, I'm sorry if

6     I'm not coming across well.

7          THE COURT:  Okay.  So here's what we're doing, I'm

8     not ruling on it today.  You and Mr. Griffiths, the lawyer

9     for motors liquidation is going to find what documents exist

10    for the period from 1953 to 1963 like he's going to do for

11    Ms. Bogue who was on the phone earlier, and also if you have

12    any documents that you were given when you retired in 1988

13    you should give them to Mr. Griffiths, and if you and he

14    can't agree on how your claim should be addressed I'll

15    decide it under the law.

16          So this matter is going to be continued.  And once

17    again you're free to participate by phone.

18          MR. KUNTZ:  Judge, can I add one more comment?

19          THE COURT:  Of course.

20          MR. KUNTZ:  I heard what Ms. Bogue said, and to my

21    knowledge I never saw any of these working GM pamphlets,

22    including the one -- the last one listed from 1977.

23          THE COURT:  All right.  Well, the fact that you

24    may not have seen them may or may not make a difference

25    depending on whether they were available to you.  I

Page 29

1    understand your position in that regard, but I'm not going

2    to decide it today.

3              At this point I want you to trade information with

4    Mr. Griffiths so that you guys can agree on what the facts

5    are, if possible, and then I'll decide what to do about it.

6              MR. KUNTZ:  Thank you very much.

7              THE COURT:  Okay, Mr. Kuntz.  Same thought, you

8    can either stay on the line or drop off if you prefer.

9              MR. KUNTZ:  I think I will stay on for at least a

10   little bit longer.

11             THE COURT:  Fair enough.

12             Okay, Mr. McClain, is he next?

13             MR. GRIFFITHS:  Yes, Your Honor.

14             THE COURT:  George McClain?

15             MR. MCCLAIN:  I'm here, my name is George McClain.

16             THE COURT:  Okay.

17             MR. MCCLAIN:  I'm in Little Rock, Arkansas.

18             THE COURT:  You're in Arkansas?

19             MR. MCCLAIN:  Yes.

20             THE COURT:  In Little Rock?

21             MR. MCCLAIN:  Yes.

22             THE COURT:  Okay.  Would you like to be heard,

23   Mr. McClain, now that we have more documents available?

24             MR. MCCLAIN:  Yes, I would, please.

25             THE COURT:  Go ahead.

1          MR. MCCLAIN:  I have a little statement I'd like

2     to make.

3          THE COURT:  Yep.

4          MR. MCCLAIN:  In Attachment A to both of my claim

5     forms I presented valid evidence to the Court of both oral

6     and written contractual obligations covering the healthcare

7     and life insurance benefits I was to receive by accepting

8     early retirement at age 61 in 1984.

9          The written offer to me contained a document that

10    specifically stated, quote, "Complete details regarding

11    benefit plan continuation privileges are contained in the

12    enclosed booklet, your benefits and retirement."

13         The enclosed booklet I received did not contain a

14    reservation of rights clause.  The debtors have not disputed

15    or denied two important facts.  The statement about complete

16    details being contained in the enclosed booklet, or that the

17    -- your benefits and retirement booklet provided to me did

18    not contain the reservation clause.

19         On the contrary in item 19, pages 9 and 10 of the

20    debtor's reply filed June 5th, 2012 they use the word "most"

21    in referring to the debtor's handbooks that contained the

22    reservation of rights clause.  Not the word "all" but the

23    word "most."

24         The debtors go on in item 19 to point out that the

25    reservation of rights clause was added in 1985 in later

Page 31

1     additions of the your benefit and retirement booklet.  But I

2     was retired in 1984.

3              I also provided the Court a letter dated May 30,

4     2008 from Metropolitan Life confirming that the group life

5     insurance certificates do not contain any language reserving

6     the right to change the plan or policy provisions.

7              I respectfully request the Court to follow legal

8     precedent and rule that any omission, error, or ambiguity in

9     the offer made to me by the debtors be interpreted adversely

10    to the debtors.

11             That's all I have to say, Your Honor.

12             THE COURT:  Okay.  Thank you, Mr. McClain.

13             Mr. Griffiths, would you like to respond?

14             MR. GRIFFITHS:  Thank you, Your Honor.  Your

15    Honor, in your folder containing the employee replies at tab

16    6 you'll find Mr. McClain's reply, and --

17             THE COURT:  Well, I have a tab 6, but it's

18    monstrously thick.  Can you help me find the --

19             MR. GRIFFITHS:  Yes, Your Honor, if you turn to

20    page, I think it's the PDF at page 138, that's the Exhibit A

21    that Mr. McClain is referring to, which is the summary plan

22    description relating to his -- his retirement.

23             THE COURT:  The page 138 I have --

24             MR. GRIFFITHS:  Oh, excuse me, Your Honor, page --

25             THE COURT:  -- is Mr. --

Page 32

1          MR. GRIFFITHS:  Page 33.

2          THE COURT:  33?

3          MR. GRIFFITHS:  Yeah.  In the top right-hand

4   corner.

5          MR. MCCLAIN:  Mr. Griffiths, what document are you

6   referring to?

7          THE COURT:  I have page 33 of 138, is that what

8   you're referring to, Mr. Griffiths?

9          MR. GRIFFITHS:  Yes, Your Honor.  If I could just

10  direct your attention to the language.

11          Although Mr. McClain has noted that the summary

12  plan description doesn't contain reservation of rights, this

13  is the type of language that we're referring to that we've

14  pointed out to Mr. McClain both over the telephone and in

15  the reply, and if I may just read for the record the

16  language, and for your benefit, Mr. McClain, I'm going read

17  this.  We're referring to the reply that was filed to your

18  claim by General Motors, and at page 33.  You may not have

19  page numbering on your document, I'm not sure, but I'll read

20  the specific reservation of rights clause.  And it says:

21          "Each of the benefit plans has its own terms and

22  conditions, which in all respects control the eligibility

23  and the payment of benefits mentioned and the payment of

24  benefits is conditioned of course on your eligibility to

25  receive them.  From -- and from time to time you may receive

Page 33

1    information concerning changes in your benefits."

2            So this makes clear that by its own terms the

3    summary plan description requires you to refer to the

4    underlying plan documents, and it specifically refers to the

5    fact that benefits can be changed.

6            THE COURT:  And you're saying --

7            MR. MCCLAIN:  May I respond to that, Your Honor?

8            THE COURT:  Yes, after I ask a question to

9    Mr. Griffiths.

10           And you're saying that the underlying benefit

11   plans do have that reservation of rights clearly?

12           MR. GRIFFITHS:  Correct, Your Honor, going back

13   now 50 years.

14           THE COURT:  Okay.  Now you can speak, Mr. McClain?

15           MR. MCCLAIN:  But it was not in the -- your

16   benefits and retirement booklet handed to me in 1984, which

17   supposedly complained -- contained complete details

18   regarding the continuation privileges of the healthcare and

19   life insurance.  It just simply was not in the written offer

20   and acceptance and documents that I received and agreed to

21   when I accepted early retirement, and they acknowledge that

22   it was added to that booklet in 1985 in later editions.

23           THE COURT:  Okay.  Well here I think I understand

24   the issue then, and while I think I know what the law would

25   be I may need a clarification or I may not.

1          Mr. Griffiths, if the document that you read to me

2     was in existence when Mr. McClain retired I'm going to rule

3     unfortunately for Mr. McClain that GM did have the right to

4     change it.

5          The question I need your help on, if you can give

6     it to me today and if it can't be resolved today so that

7     Mr. McClain understanding it then we'll just have another

8     phone call, is was what you read to me in existence when he

9     retired in 1984?

10          MR. GRIFFITHS:  Yes, Your Honor.  And if I can

11     just refer you to the affidavit or the declaration rather of

12     Mr. Smolinsky there is the similar booklet dating from

13     November 1977 at Exhibit L, and page 3 contains a similar

14     reservation of rights language, which was the reason we put

15     these summary plan descriptions on file so that employees

16     who are referring to earlier copies of benefit plans that

17     they may not be able to otherwise provide can refer to these

18     copies as examples of what they would have received.

19          MR. MCCLAIN:  But they were not provided to me.

20          THE COURT:  Well, all right.  With so many people

21     on the phone and in the courtroom I can't sort this out now,

22     but what -- we'll have one more phone call where the key

23     documents will be shown to me with an explanation as to when

24     they came into effect.  If they were available to you

25     Mr. McClain I can't help you.  If there -- if you -- is your

Page 35

1    contention that they weren't available to you or you didn't

2    see them on the day you retired?

3            MR. MCCLAIN:  As far as I know I've never received

4    anything but the benefits and retirement booklet.  That was

5    the only thing ever provided to me.

6            THE COURT:  All right.  Here's what I want you to

7    do.  I'm not sure if I have an issue of fact here or not.  I

8    want you to send Mr. Griffiths, with a copy to the Court,

9    the booklet that you've got.  I want you to make sure that

10   you guys agree on what you got and what you didn't get.  And

11   Mr. Griffiths, you're free to show me stuff that was

12   available to him whether or not you're contending that he

13   got it, and then I'll rule in the next phone call.  I can't

14   deal with it today.

15           MR. MCCLAIN:  May I say one thing, Judge?

16           THE COURT:  Yes, you can.

17           MR. MCCLAIN:  My original claim included the

18   complete copy of the booklet provided to me in 1984, and

19   Mr. Griffiths has reproduced it but he never comments on it.

20   They comment on later editions, but they never comment on

21   the edition that I got that I submitted and that he has.

22           THE COURT:  Well, I think we have ships passing in

23   the night here, because I think Mr. Griffiths thinks he was

24   commenting on earlier ones and we have a breakdown in

25   communication here through no fault of anybody's.

Page 36

1           But the practical problem I have, Mr. McClain, is

2   I got two thick books that look like phone books here, and I

3   can't get to the bottom of it in fairness to both sides in

4   this call with this pile of stuff and still be fair to

5   everybody.  So I need you guys to get on the same page, or

6   if you can't to agree to disagree, and if you do agree to

7   disagree I'll do my job and rule.

8           MR. MCCLAIN:  All right, Your Honor, and I will

9   contact him and send him another copy if he needs another

10   copy.

11           THE COURT:  Or you guys can get on the phone and

12   you can agree on what's there and what's not.  I don't think

13   you need to send him more stuff unless you guys need to, but

14   I'm trying to give you your day in court and still comply

15   with the law, and --

16           MR. MCCLAIN:  I appreciate it very much, Your

17   Honor.

18           THE COURT:  Okay.  Good enough.  Thanks.

19           All right, next one, please, Mr. Griffiths?

20           MR. GRIFFITHS:  Thank you, Your Honor, it would be

21   Mr. David Robertson, R-O-B-E-R-T-S-O-N.

22           THE COURT:  Are you on the phone, Mr. Robertson?

23   Mr. Robertson?

24           Okay.  With Mr. Robertson not being on the phone

25   your motion to disallow is granted, Mr. Griffiths.

Page 37

1          MR. GRIFFITHS:  Thank you, Your Honor.

2          The following claimant will be Mr. Joseph C.

3    Singer, S-I-N-G-E-R.

4          THE COURT:  Right.  Mr. Singer, are you on the

5    phone?

6          MR. SINGER:  Yes, I am, Your Honor.

7          THE COURT:  Would you like to be heard in light of

8    the new documents that are now available?

9          MR. SINGER:  Yes, I would.

10          THE COURT:  Go ahead, please.

11          MR. SINGER:  I started with General Motors in 1951

12    and I retired in September --

13          THE COURT:  I got noise problems.  Did you say '51

14    like during the Korean War or '61 when --

15          MR. SINGER:  No, no --

16          THE COURT:  -- President Kennedy was -- I'm sorry?

17          MR. SINGER:  1951, and the --

18          THE COURT:  1-9-5-1.

19          MR. SINGER:  5-1.

20          THE COURT:  Okay.

21          MR. SINGER:  And I required in 1991, 40 years of

22    service.

23          THE COURT:  Forty years of service.

24          MR. SINGER:  Yes.

25          THE COURT:  Okay.

1          MR. SINGER:  When I retired it was a limbo five

2     (ph) retirement. and it was offered because they were tried

3     to get a number of people to retire at that time so they had

4     me sign the condition of early retirement, and they said

5     that the only way this could be (indiscernible - 00:41:53)

6     is if I would actually accept the conditions of early the

7     retirement.  They said this plan was amended by the salaried

8     retirement program approved by the General Motors Management

9     Committee.

10          And they further stated in another paragraph that

11     the early retirement offer and my acceptance of this special

12     retirement offer constitutes and the entire and only

13     agreement between me and General Motors.  I have no other

14     agreement with them.

15          And it went on to state that I was subject to

16     penalties if I would try to come back to work or do anything

17     else.  And they also mentioned that what I should do is

18     contact an attorney before I sign this.  Advice of attorney

19     was make sure you get everything in writing.  So I did.

20          Limbo five stated that all of my benefits will be

21     for life and (indiscernible - 00:42:47) reduced and it said

22     that several places.  A supplemental life benefit now will

23     be (indiscernible - 00:42:53) reduced for life for

24     executives who retire under the provisions of limbo five,

25     and they've stated that twice in that particular item.

1           They also gave me an authorization of monthly

2      benefits, and in that they stated again that my life

3      insurance, my supplemental life insurance in full for life.

4           Then later in March of 20 -- March 29, 1993 they

5      also sent me a letter that said this ultimate amount remains

6      in effect for the rest of your life, and it's provided by

7      General Motors at no cost to you.

8           So at least three of four times they said for the

9      rest of my life, they said that the program was amended in

10     (indiscernible - 00:43:37) and it was amended by the

11     executive committee, and I have it in writing.

12          Now, I -- if I would have violated this General

13     Motors -- if I tried to do something other than what they

14     stated they would have had a legal contract on me that said

15     that I couldn't -- couldn't get a new job within General

16     Motors or anything else.

17          So I've lived up to my end of it and now General

18     Motors is saying, well, they didn't have to abide by it.

19     Now, didn't both of us have to abide by this contract?

20          THE COURT:  I couldn't hear the very last thing

21     you said, Mr. --

22          MR. SINGER:  It seems like I had an agreement by

23     General Motors that both of us had to live to.  I lived to

24     my end of it, but General Motors did not.

25          Now, if I violated it I'm sure General Motors

Page 40

1    would have taken me to court.

2           I've also supplied that -- that conditions of

3    early retirement.  All of this information should be in

4    Mr. Griffiths' hands right now.

5           THE COURT:  Okay.  Mr. Griffiths, do you want to

6    responds?

7           MR. GRIFFITHS:  Your Honor, I would just refer to

8    Your Honor's earlier ruling with respect to Ms. Bogue in

9    light of Mr. Singer's employment from 1951.

10          We'll attempt to either come to a consensual

11   resolution with respect to his claim or to provide a copy of

12   the summary plan description from the commencement of his

13   employment.

14          Suffice it to say that Mr. Singer argues that his

15   welfare benefits became vested at the time he took early

16   retirement.  The provisions of GM's early retirement

17   programs provided that while benefits may have been provided

18   earlier at the time of the early retirement they never

19   vested in full and could amended or terminated at any time

20   in accordance with the underlying plan documents.

21          But again, I would suggest this is a debate for

22   another day pending the GUC Trust locating copies of a

23   summary plan description from -- from the late '40s or the

24   early '50s.

25          THE COURT:  Okay.

1          MR. SINGER:  Well, I don't have a problem with the

2     description in the early '40s or '50s, my concern is that

3     when I signed this agreement, which you have, it says

4     conditions of early retirement and it stated that this was

5     amended by the salaried retirement program by General

6     Motors' committee.  So they amended that program.

7          So even if it was and if it did state that this

8     was amended on the conditions of my early retirement, and

9     it's stated by my acceptance of this that I had no other

10    agreement with General Motors and this is the only agreement

11    I have.

12         THE COURT:  Okay.

13         MR. SINGER:  This is a violation of that earlier

14    agreement, I don't care if it's in the pamphlet, they

15    knocked it out right there by my conditions of early

16    retirement.

17         THE COURT:  All right.  I think I understand the

18    legal issue, but I don't have all legal facts I need to get

19    my arms around it yet.

20         I don't think Motors Liquidation is contending

21    that it has the ability to rewrite the contract or -- of

22    course it has breached it by -- if there is an agreement it

23    may have breached it, which is why you have claims, but the

24    underlying issue is what was your contract, and that

25    involves two things.

Page 42

1           One, which puts you in the same category as

2    Ms. Bogue, and I think it was one other, perhaps Mr. Kuntz.

3           MR. GRIFFITHS:  Mr. Kuntz, yes.

4           THE COURT:  Which is we have to find out what the

5    documents provided in the early part of your working career,

6    Mr. Singer, from 1951 until 1963.

7           The second issue is that you're saying in

8    substance that the papers that you signed or that were

9    available to you when you retired in 1991 trumped any

10   earlier agreement.

11          I don't know whether that's true or not without

12   looking at them, but when you have the back and forth with

13   Mr. Griffiths over the next several weeks let make sure that

14   we have our arms around the right papers, and then hopefully

15   I won't have as many people on the phone and in the

16   courtroom and I can give you a more definitive answer at

17   that time.

18          But the bottom line is I'm not going to rule on it

19   today, and I take the you follow all of that, Mr. Singer?

20          MR. SINGER:  Yes, I am not (indiscernible -

21   00:48:06) anything, I'm sure maybe some place I did receive

22   a booklet, I don't know for sure, but I'm sure it was

23   probably in there.  I'm just saying that the conditions that

24   I retired under trump that booklet.

25          THE COURT:  Yeah, I understood that, that was the

1    second contention I was talking about.

2              MR. SINGER:  Okay.

3              THE COURT:  And I'll -- and I'll focus on that

4    when we have it next before us.

5              MR. SINGER:  Okay, Your Honor, thank you.

6              THE COURT:  Okay, thank you.

7              Next after Mr. Singer, is that Mr. Sterett?

8              MR. GRIFFITHS:  Mr. Sterett, yes, Your Honor.

9              THE COURT:  Sterett, I'm sorry.  Are you on the

10   phone, Mr. Sterett?

11             MR. STERETT:  Hello, Your Honor.

12             THE COURT:  Yeah, I hear you.  Where are you

13   calling from, Mr. Sterett?

14             MR. STERETT:  Detroit, Michigan.

15             THE COURT:  Detroit, okay.  And would you like to

16   be heard today?

17             MR. STERETT:  Yes.

18             THE COURT:  Go ahead, please.

19             MR. STERETT:  I actually have nothing much to say

20   in addition to what I've already provided except that my

21   appeal to the Court is basically a moral one, and apparently

22   there's been a ruling that set a precedence that as you

23   spoke earlier, the right to -- GM reserving the right to

24   change.  I didn't know if that had been morally tested.

25             I made decisions affecting the rest of my life,

Page 44

1   particularly with healthcare when I took an early retirement

2   and it was based on the conditions presented to me at the

3   time; however, Mr. Griffiths and I both have reviewed my

4   contract on exit and it does contain the clause right to

5   change -- reserve the right to change.

6           So I just wanted to make that comment more of a

7   moral issue, and I had heard earlier.  I signed the same

8   conditions that I would not work for General Motors again,

9   and I've held up my end of the bargain and they have not.

10  So --

11          THE COURT:  Uh-huh.

12          MR. STERETT:  -- I rest my case, I just wanted to

13  make that comment.

14          THE COURT:  Okay.  Mr. Griffiths, do you want to

15  comment?

16          MR. GRIFFITHS:  No, Your Honor, thank you.

17          THE COURT:  All right.

18          Well, I appreciate the candor and integrity by

19  which you argued that, Mr. Sterett.  You raised a moral

20  issue, which is something which we judges wrestle with all

21  the time and which I've personally wrestled with I don't

22  know how many times over the last 12 years.  Obviously I

23  have a moral sense of what I would like to do, but at the

24  same time I've gotten an oath to comply with the law, and as

25  a practical matter all I can do is make sure that we've left

Page 45

1   no stone unturned in making sure that we have our arms

2   around the whole contract and that I've given everybody a

3   full and fair opportunity to be heard.

4           After I've done that, as a practical matter,

5   there's only one thing left that I can do which is to comply

6   with the law.  And having done all of that, and because of

7   what the law requires, I am with regret required to rule

8   your way the same way that I ruled with respect to Mr. Jake

9   and a fair number of folks in the hearings that we've had

10  before today.

11          So with regret I am compelled to disallow this

12  claim for the reasons that I articulated at greater length

13  with respect to Mr. Jake today.  And I'm sorry, Mr. Sterett,

14  but that's got to be the ruling.  And you're free to either

15  stay on the phone or leave.

16          MR. STERETT:  No, I'll get off, Your Honor, and

17  thank you for your consideration.

18          THE COURT:  Okay, I appreciate your courtesy.

19          Is the last one Mr. David Volpe?

20          MR. GRIFFITHS:  Correct, Your Honor.

21          THE COURT:  Okay.  Mr. Volpe, are you on the

22  phone?

23          MR. VOLPE:  Yes, Your Honor, I am.

24          THE COURT:  Okay.  Would you like to be heard?

25          MR. VOLPE:  Yes, I would.

1          THE COURT:  Go ahead, please.

2          MR. VOLPE:  I had originally argued from the

3     perspective that when I initiated, negotiated, and accepted

4     an early retirement in 2001 that General Motors and I had a

5     contract that had certain provisions, and those provisions

6     were a certain pension that I had earned, certain welfare

7     benefits that I had earned, and the fact that General Motors

8     has ex post facto come in and changed that agreement that we

9     had, I didn't think was right and I didn't think was legal.

10          It appears as though a precedence has been set

11     that allows them to do that, and I guess I'll have to direct

12     my efforts towards my elected officials to make sure that

13     others in the future don't fall prey to this.

14          But that notwithstanding, I did take a detailed

15     look at the documents that were sent to us on CD by

16     Mr. Griffiths and the debtor's attorneys, and I'm have

17     having a little difficulty finding exactly what Mr., I

18     believe it's Smolinsky, who signed that latest document is

19     referring to.

20          If I may -- my dates of employment again were

21     August 18th, 1969, Vietnam era, through -- actually my

22     retirement date was November 1st, 2002.  If you go to

23     document -- the document and go to Exhibit M, and they

24     reference page 32, that is actually page 413 of 415, and I

25     would ask Mr. Griffiths if he's in agreement with that, if

1     we have the same documents and the same numbering scheme.

2              THE COURT:  Okay.  I'll ask Mr. Griffiths to

3     respond to it after you've made any further points you make.

4              MR. VOLPE:  Okay.  The -- when I go to page 413 of

5     the PDF document -- 413 of 415, there are three paragraphs

6     there and they do not say that General Motors reserves the

7     right to change, modify, terminate any of the language that

8     we've been talking about.

9              Furthermore, when I go to Exhibit L, which is the

10    one just before that, the cover document references page

11    number 3 of that document, and on my CD that is PDF page 344

12    out of 415, and that also does not say anything about

13    General Motors reserving the right to change, modify,

14    terminate benefits.

15             And I picked these two out because they were the

16    last in the list of exhibits and would be closer to -- my

17    tenor started as I said in 1969.  You may remember I

18    indicated I was a co-op student that went to grad student on

19    a fellowship and actually started my active career in the

20    fall of 1975, so -- after schooling was done.

21             So these documents are not supportive of what the

22    cover document is saying, and unless I'm reading it

23    incorrectly I would ask for a clarification on that.

24             THE COURT:  Fair enough.  Okay.  Mr. Griffiths?

25             MR. GRIFFITHS:  Your Honor, Mr. Volpe has

Page 48

1      correctly referred to the reservation of rights language

2      contained in the summary plan descriptions.  With respect to

3      the most recent plan he referred to, Exhibit L, does note

4      that each of the benefit plans has its own terms and

5      conditions, which in all respects control the eligibility

6      and payment of the benefits mentioned.

7                THE COURT:  Mr. Griffiths, I know you've read

8      these many times, but you have to slow down, because the

9      people who are on the phone haven't heard them as often as I

10     have.

11               MR. GRIFFITHS:  Your Honor, it was simply to note

12     that Mr. Volpe's argument is that he would essentially like

13     to see the underlying plan documents, and if -- if that's

14     what Mr. Volpe would like to see in order to resolve his

15     claim to conclusively understand that the benefits could be

16     amended or modified then the GUC Trust is more than happy to

17     provide Mr. Robertson with -- or I'm sorry -- Mr. Volpe with

18     copies of the underlying plan documents.  I've reviewed the

19     terms of the plan documents and can confirm that they do

20     contain the right to amend or modify.  But if Mr. Volpe

21     requires those documents to achieve closure in the case then

22     the GUC Trust is more than happy to provide them to him.

23               THE COURT:  Okay.  I think I know the language

24     you're talking about, but let me put the question to

25     Mr. Volpe.

Page 49

1          Mr. Volpe, would you feel a little more

2     comfortable if Mr. Griffiths showed you the exact language

3     and I didn't resolve it today?

4          MR. VOLPE:  Actually not, Your Honor, what I'd

5     like to do is read the document -- the page of the exhibit

6     that is referenced having that language.  Because I'm

7     looking at it, I'm looking at page 344 of the PDF document

8     which is page 3 of Exhibit L, and to my way of reading it I

9     don't see the language.

10          THE COURT:  Are you referring, Mr. Griffiths to

11     the language that says, "Each of the benefit plans has its

12     own terms and conditions, which in all respects control the

13     eligibility and payment of benefits mentioned"?

14          MR. GRIFFITHS:  Correct, Your Honor.

15          THE COURT:  Mr. Volpe, that is the language upon

16     which ruled adversely to some of the other folks, including

17     Mr. Jack today, and I think it was Mr. -- what was it

18     Sterett today?

19          Do you have something else to bring to my

20     attention, Mr. Volpe?

21          MR. VOLPE:  Your Honor, I also had submitted on

22     the 21st of June, subsequent to our last hearing on

23     June 14th, a document that was provided to me at retirement

24     indicating that, if I may read an excerpt, that the -- "Our

25     insurance records as of the date of this letter," which is

Page 50

1    October 7th, 2002 -- "show the continuing life insurance has

2    now fully reduced to the ultimate amount of $80,945.  This

3    ultimate amount will remain in effect for the rest of your

4    life and is provided by General Motors at no cost to you."

5    End of excerpt.

6            THE COURT:  Right, but the next sentence also

7    says, "This is not a guarantee of the coverage amount."

8            MR. VOLPE:  That is correct.

9            THE COURT:  Okay.  Mr. Griffiths, further

10   comments?

11           MR. GRIFFITHS:  No, Your Honor.

12           THE COURT:  All right.

13           Mr. Volpe, with regret I'm going to have to rule

14   the same way in your case as I did with respect to Mr. Jack,

15   and kind of incorporate what I said before.

16           The issue as a matter of law is getting our arms

17   around what was each employee's contract during the time

18   that he worked and at the time when he retired.  And the

19   language from that page 3, which made specific reference to

20   -- and I'm going to read it again so there's no ambiguity.

21   "Each of the benefits plans has its own terms and

22   conditions, which in all respect control the eligibility and

23   payments of benefits mentioned."  Kind of consider an

24   emphasis on the word "control."  And for those people who

25   worked during the time that old GM had reserved the right to

Page 51

1    modify my hands are tied.

2         So all I want you to know is that I've considered

3    your claim and your contentions as fairly as I could, but

4    that's got to be my ruling.

5         MR. VOLPE:  I appreciate that.  I was hoping for

6    possibly an epiphany and maybe a John Roberts moment, but as

7    I said earlier, I will direct my efforts towards my elected

8    officials to see if the laws can be changed that you can

9    interpret in that direction to save future employees and

10   retirees a lot of the heartache and heartbreak that we've

11   gone through with this.

12        THE COURT:  Well, I'm not allowed to get involved

13   in politics, but I certainly -- as a citizen and not a judge

14   you have my support.

15        MR. VOLPE:  I thank you again.

16        THE COURT:  Okay, fair enough.

17        Is that the last of yours, Mr. Griffiths?

18        MR. GRIFFITHS:  It is, Your Honor.

19        And just to note that the GUC Trust appreciates

20   the Court's time in attempting to resolve these matters, and

21   of course we have repeatedly tried to settle many of these

22   -- these matters and will continue to do so, but

23   unfortunately it isn't always possible.

24        THE COURT:  I understand.

25        MR. GRIFFITHS:  Your Honor, I have the pleasure of

Page 52

1    introducing Katie L. Cooperman of Dickstein Shapiro to

2    handle the following item on the agenda, I believe the 281st

3    omnibus objection to claims in relation to insufficient

4    documentation.  It's an uncontested omnibus objection.

5              THE COURT:  Fair enough.  Ms. Cooperman?

6              MS. COOPERMAN:  Good morning, Your Honor, Katie

7    Cooperman from Dickstein Shapiro on behalf of the GUC Trust.

8              Today we have one uncontested omnibus objection.

9    It's the 281st omnibus objection to 16 claims based on

10   insufficient documentation.  Of those 16 claims we've

11   adjourned 3 and withdrawn 3.

12             Today we're going forward with the remaining ten

13   claims on an uncontested basis.

14             Unless the Court has any questions we'll submit an

15   order to chambers.

16             THE COURT:  That's fully satisfactory,

17   Ms. Cooperman, your objections are sustained and you can get

18   the paperwork to my chambers as soon as convenient.

19             MS. COOPERMAN:  Thank you.

20             THE COURT:  Thank you.

21             MR. GRIFFITHS:  Thank you, Your Honor.

22             We also have Mr. Rachmuth in the court this

23   morning from Gersten Savage LLP who is handling the Anderson

24   -- or the motion of award of attorneys' fees in relation to

25   Anderson Class Counsel.

Page 53

1          THE COURT:  Come on up, folks.  Hi, I think you've

2    been here before haven't you?

3          MR. RACHMUTH:  Yes, Your Honor.  Paul Rachmuth,

4    Gersten Savage, I also have in the courtroom with me, A.J.

5    De Bartolomeo.

6          MS. DE BARTOLOMEO:  Good morning, Your Honor --

7          THE COURT:  Good morning.

8          MS. DE BARTOLOMEO:  -- A.J. De Bartolomeo.

9          MR. RACHMUTH:  Sorry.  Representing Class --

10         THE COURT:  You can sit if you don't want to keep

11   standing, Ms. De Bartolomeo.

12         MS. DE BARTOLOMEO:  Actually I've been sitting for

13   quite a while, Your Honor, if you don't mind I prefer to

14   stand.

15         THE COURT:  Fine with me.

16         MR. RACHMUTH:  Your Honor, the client that I

17   represent is the Class Counsel in the Anderson class actions

18   lawsuits.

19         There was a protracted case that was settled

20   prepetition, it was a claim that was filed for those unpaid

21   amounts.  The law firm, Girard Gibbs, had worked post-

22   petition to resolve this resulting in an allowed claim.

23         We had filed with your court a request initially

24   for notice to all the class parties to allow payments for

25   the -- for the Class Counsel.  We received 25 responses,

Page 54

1   mostly positive.  We've summarized all those papers in

2   A.J.'s declaration.

3          I'd like to -- if the Court would like we can

4   summarize -- allow her to summarize right now.

5          The end result of this is we filed with Your Honor

6   a proposed order allowing for those fees, after putting

7   everybody on notice and receiving no objection from the --

8   the debtor is taking no position.  And the only comments

9   were from the specific class members.  Again, many in

10  support.

11          There were some that were sent directly to law

12  firm that were not send to the Court, we have attached those

13  as an exhibit to an affirmation that was filed.  I have

14  copies of all the documents.

15          THE COURT:  What I'd like to do, folks, is see if

16  there is anybody who's on the phone or in the courtroom who

17  wants to be heard.  I know from our earlier proceedings what

18  you did, I'm aware of the no object from the estate and from

19  the creditor community.  So let's pause for a second.

20          Does anyone want to be heard in opposition to this

21  settlement?  Either -- there's no response in the courtroom.

22  Is there anybody on the phone who wants to be heard?

23          Ms. De Bartolomeo, me tentative California style

24  is to approve your settlement, but if you want to be heard

25  I'll let you.

1          MS. DE BARTOLOMEO:  Your Honor, my response

2     California style is when the judge rules your way to say

3     thank you very much and sit down and appreciate your time.

4          THE COURT:  Okay.  Under these circumstances I am

5     going to be approved the settlement.

6          I know the haircut that counsel had to take as a

7     consequence of the timing of the prepetition near, but not

8     quite final finalization of the settlement.  I know the

9     post-petition services you guys performed and I'm satisfied

10     that you did your job and that you were able to slice the

11     baby between representing your class and still being

12     responsible to the needs and concerns of the creditor

13     community in this case.

14          So your request for attorneys' fees is approved.

15     And I'd ask that one of the two of you just deal with the

16     paperwork in getting it to my chambers.

17          MR. RACHMUTH:  I have it on -- I have a proposed

18     order that was submitted, I also have it on disk in Word

19     format, I will hand it off.

20          THE COURT:  Okay, my courtroom deputy is down the

21     hallway and you can just drop it off with her and you can

22     tell her that I approved it.

23          MR. RACHMUTH:  Thank you very much, Your Honor.

24          THE COURT:  Okay.  Thank you very much.  Have a

25     good flight back.

1            MS. DE BARTOLOMEO:  Thank you, Your Honor, and

2    thank you for your --

3            THE COURT:  Have a good day.

4            MS. DE BARTOLOMEO:  -- time.

5            THE COURT:  Okay.  Do we now have anything other

6    than Aurelius?

7            MR. GRIFFITHS:  No, Your Honor.

8            THE COURT:  Okay.  Well, Mr. Griffiths, you and

9    anybody who came with you is excused on that.  I don't want

10   to take a long break.  Let's again at 11 o'clock on

11   Aurelius.  We're in recess.

12       (Recess at 10:54 a.m.)

13           THE COURT:  Have seat, please.  All right, the

14   Aurelius summary judgment motion.

15           As always I've read the papers, but we've been

16   through this so many times, and I'm so familiar with things

17   and so are you that let's just go straight into arguments.

18           So, Mr. Friedman, refresh my recollections, I'll

19   hear from you.

20           MR. FRIEDMAN:  May id please the Court Edward

21   Friedman, Friedman Kaplan Seiler & Adelman representing

22   Aurelius Investment, LLC.  Good morning, Your Honor.

23           This is a motion for summary judgment to dismiss

24   all claims in the amended complaint as against Aurelius

25   Investment.  Our motion presents a narrow legal issue.

Page 57

1          In this adversary proceeding the GUC Trust seeks

2     subordination, disallowance, or reduction of Nova Scotia

3     guarantee claims.  No affirmative relief is sought as

4     against Aurelius Investment or for that matter as against

5     any other defendants.

6          We submit that because Aurelius Investment has

7     sold all the Nova Scotia notes it owned, because Aurelius

8     Investment no longer has any claim in this case and no

9     longer has any interest in distributions in respect of the

10    guarantee claims, and because Aurelius Investment has

11    nothing to subordinate, disallow, or reduce the claims

12    against our client should be dismissed.

13          Before jumping into the legal arguments that will

14    be before Your Honor this morning, I would like to be clear

15    concerning what is in dispute and what is not.

16          There is no dispute that Aurelius Investment sold

17    its entire position in the Nova Scotia notes in April 2011.

18    That fact is set forth in the Aurelius Investment statement

19    of undisputed facts and in paragraph 4 of the GUC Trust

20    counter-statement.  The plaintiff confirms that there's no

21    dispute as to that fact.

22          With respect to legal issues there have been

23    various arguments at various times advanced by the GUC Trust

24    as to why supposedly in its view a former holder of a claim

25    based on publicly traded notes maybe sued for subordination

Page 58

1    and related claims.

2           We have heard a whole series of arguments that

3    have been shown to be without merit or effectively withdrawn

4    or abandoned.  I just want to mention them briefly so that

5    if counsel for the GUC Trust when it's his turn wants to

6    stand up and say, no, no, we are pressing that argument,

7    I'll have an opportunity to address it in more detail.  Very

8    briefly.

9           THE COURT:  Better yet, why don't you triage the

10   arguments you want to make today to those that you

11   understand the GUC Trust still to be making, and I'll give

12   you the chance to respond if they, contrary to your

13   understanding, raise points that you thought were off the

14   table.  That may save a little time.

15          MR. FRIEDMAN:  Okay.  Maybe if I may just for the

16   record I'll say in one sentence the arguments that we have

17   seen from the beginning of this adversary proceeding that

18   seem to have been effectively abandoned are one, their

19   argument concerning Sections 5.1 and 5.10 of the plan; two,

20   their related argument concerning the effect of a notice of

21   transfer of claim or the absence of a notice of transfer of

22   claim; and three, their argument that the -- that the claims

23   asserted in this adversary proceeding by the GUC Trust

24   should be viewed as in rem claims.

25          THE COURT:  I didn't understand them to have

Page 59

1   dropped the last one, I just didn't understand that to be

2   your fight.

3          MR. FRIEDMAN:  Well, I think if I understand Your

4   Honor correctly, our position with respect to that last

5   item, which we heard for the first time at the argument on

6   the motion to dismiss on June 15.

7          Our position very simply is that the GUC Trust

8   claims as against Aurelius Investment are not in rem claims.

9   Aurelius Investment has been named as a defendant in this

10  adversary proceeding, the claims asserted require the filing

11  of an adversary proceeding, which means notice and hearing

12  and to begin with the identification of an appropriate

13  defendant who will be served with -- with process.

14         So as I read the GUC Trust opposition I don't see

15  the assertion anymore, and I could be mistaken, I don't see

16  the assertion anymore that because in their view somehow

17  these are in rem claims Aurelius Investment should remain as

18  a proper defendant.

19         I would just add even if the claims were properly

20  viewed as in rem claims the conclusion would be all the more

21  reason why a particular named defendant is actually not

22  necessary or appropriate.

23         But beyond --

24         THE COURT:  It's your real point isn't it?

25         MR. FRIEDMAN:  Say again?

Page 60

1            THE COURT:  The second thing you said just as I

2    was interrupting you, that's your real point isn't it?

3            MR. FRIEDMAN:  Well, our real point, Your Honor,

4    is that Aurelius Investment is not the proper defendant here

5    because for the reasons I was explaining at the very

6    beginning, there's no relief that is requested in the

7    complaint that is available or effective as against Aurelius

8    Investment.

9            Aurelius Investment at one time owned Nova Scotia

10    notes, and by virtue of Aurelius Investment in the past

11    having been an owner of those notes Aurelius Investment

12    filed a proof of claim.  But the record is clear, the facts

13    are undisputed, Aurelius Investment has sold its notes and

14    Aurelius Investment has stated on the record, I myself have

15    stated it repeatedly, Aurelius Investment is not asserting

16    any claim in this case.  Aurelius Investment is not seeking

17    any distribution in this case.

18            The whole point of the GUC Trust amended complaint

19    is to reduce the distributions going to the Nova Scotia

20    noteholders.  Since Aurelius is not a Nova Scotia noteholder

21    Aurelius has no interest in the Nova Scotia noteholder

22    guarantee claim and no interest in whatever is resolved

23    concerning the distributions to be provided to noteholders.

24            In fact I might mention since I know it's on Your

25    Honor's calendar after this argument, we have the question

Page 61

1    of a mediation that was proposed by counsel for one of the

2    parties, counsel -- Mr. Reisman.  And I have communicated to

3    Mr. Reisman, I don't mind saying it in court, I don't see

4    how Aurelius Investment could participate in a mediation.

5           The GUC Trust is looking for the defendants to

6    take less in the way of distributions of New GM stock than

7    the defendants believe they are entitled to.  And I would

8    imagine that the negotiation in a mediation would be in the

9    nature of the GUC Trust saying our position is that the

10   distributions to the Nova Scotia noteholders should be

11   limited as follows, and the defendants in the mediation

12   would be saying, no, we disagree, you know, we think we're

13   entitled to this full distribution, but for purposes of

14   settlement and mediation we're willing to accept somewhat

15   less.

16          Aurelius has nothing to say about that.  Whatever

17   happens, whatever is resolved it will have no effect on

18   Aurelius.

19          And by virtue of Aurelius having sold its Nova

20   Scotia notes in April 2011 we believe that there's no basis

21   whatsoever for the GUC Trust having filed the adversary

22   proceeding as against Aurelius and no basis for the GUC

23   Trust to maintain the claims as against Aurelius.

24          And that really brings me to what I understand is

25   the main argument now being advanced by the GUC Trust.  And

Page 62

1    when I say what I understand it's not guesswork, I'm

2    obviously looking at the papers that they filed.  And what

3    we see in the GUC Trust opposition, which was filed six days

4    ago this past Friday, what we see is that we are now dealing

5    with a newly minted argument that we have not previously

6    heard from the GUC Trust, even though there's been a period

7    of many months of correspondence, discussions, motion

8    practice concerning whether Aurelius Investment is a proper

9    defendant in this case.

10            And the argument we now see, this brand new

11   theory, is that according to the GUC Trust by virtue of

12   Federal Rule of Civil Procedure 25(c), Aurelius Investment

13   is a proper defendant even though it sold its entire

14   position in the Nova Scotia notes, and even though as the

15   GUC Trust acknowledges that sale occurred approximately a

16   year before the adversary proceeding began.

17            Rule 25(c) provides:

18            "That if an interest is transferred an action may

19   be continued by or against the original party unless the

20   Court on motion orders the transferee to be substituted in

21   the action or joined would the original party."

22            The problem for the GUC Trust is that Rule 25(c)

23   applies in the case of transfers during the action.

24            Here almost a year before the adversary proceeding

25   was filed Aurelius had sold its Nova Scotia notes and no

Page 63

1    longer had any interest in those notes or the guarantee

2    claim associated with them.

3            The fact is that Rule 25(c), which we are hearing

4    about for the first time last week, is completely

5    inapplicable here and provides no support for the GUC Trust

6    position.  The rule only applies in the case of transfers of

7    interest during an action and that did not happen here.

8            To try to avoid this inescapable conclusion and to

9    try to fit itself into Rule 25(c) the GUC Trust asked the

10   Court to deem the claim objection as part of the adversary

11   proceeding and to consider the filing of the proof of claim

12   and the claim objection and the adversary proceeding to be

13   one proceeding.

14           The problem with that, Your Honor, is that the

15   claim objection and the adversary proceeding are not the

16   same proceeding.  The rules make clear, the case law makes

17   clear, an adversary proceeding is a separate proceeding.

18           The GUC Trust is seeking relief in the nature of

19   equitable subordination, that relief is being requested,

20   needs to be requested in an adversary proceeding, and that's

21   what they're doing.  And they improperly named Aurelius

22   Investment as a defendant in the adversary proceeding, even

23   though Aurelius Investment had no claim in the case, no

24   ownership of notes, no basis for subordination or reduction.

25           I would note that in the claim objection, whether

Page 64

1    that's combined with the adversary proceeding as I

2    understand the GUC Trust is seeking to do, or whether it is

3    heard separately, doesn't matter; combined, separate, it is

4    a separate proceeding.  Aurelius Investment is not asking

5    for any relief in connection with the claims objection

6    proceeding.  That is what it is.  Aurelius Investment has

7    stated on the record that it has no interest in claim number

8    66265 that it had filed at the time proofs of claim were due

9    to be -- were due to be filed.

10           We've heard argument from the GUC Trust that if

11   Aurelius Investment is seeking dismissal in this adversary

12   proceeding then Aurelius Investment should withdraw the

13   proof of claim that it filed.  But the fact is, and this is

14   undisputed, Aurelius Investment has no ownership interest in

15   that proof of claim.  We're not aware of any principal

16   theory argument that would make it appropriate for Aurelius

17   Investment, after it has sold the note, after it has no

18   interest in the proof of claim to engage in action regarding

19   that proof of claim such as filing a withdrawal with respect

20   to it.

21           And I'll just reiterate that for the record we

22   believe we have done all that we can be reasonably asked to

23   do with respect to claim number 66265, which is to say we

24   have no interest in it and whatever the GUC Trust is

25   pursuing in the adversary proceeding concerning

Page 65

1    subordination, reduction of that claim, Aurelius has no

2    interest in that.

3            The -- there are a bunch of other arguments that

4    we see in the GUC Trust papers that I'll mention very

5    briefly.

6            One is that even if the Court agrees with Aurelius

7    Investment that Aurelius Investment is not a proper

8    defendant in this adversary proceeding, the GUC Trust asked

9    the Court to allow the claims to continue against Aurelius

10   Investment as a nominal or relief defendant.

11           Those concepts, which we see from time to time in

12   the case law, arise in situations that have absolutely

13   nothing to do with the circumstances here.

14           There are cases, for example, cited by the GUC

15   Trust where in a claim alleging violations of the securities

16   laws, there is someone other than the wrongdoer who was the

17   recipient of funds, such as the fruits of insider trading,

18   and that person who received the funds is not alleged to

19   have engaged in any wrong doing.  But the courts will say by

20   virtue of that person having received ill gotten gained that

21   person should be what is sometimes referred to as a relief

22   defendant.  But in this case just the opposite is true.

23   There is no relief available as against Aurelius Investment.

24           The GUC Trust also points to cases in which courts

25   have permitted defendants to be designated as nominal

1   defendants.  For example, an agent or an indenture trustee

2   may be a nominal defendant even though it has no economic

3   stake in the outcome.  But here Aurelius is not like an

4   indenture trustee or other agent, it's not an appropriate

5   nominal defendant.

6           Another classic example is a corporation in a

7   shareholder derivative action is viewed as a nominal

8   defendant, a necessary party on the defendant side but not

9   someone against whom claims are being asserted.

10          Finally the GUC Trust argues if all else fails the

11  Court's equitable powers should be invoked to keep in

12  Aurelius Investment as a defendant.

13          I find that argument astonishing.  If anything,

14  the equities here require that the claims against Aurelius

15  Investment be dismissed right now at long last before

16  Aurelius Investment incurs further legal expenses as a party

17  over and above the tremendous expenses that have been

18  occurred.

19          The case law -- even the case law relied on by the

20  GUC Trust in its appeal to the Court's equitable powers

21  makes very clear that the equity power of the Bankruptcy

22  Court does not countenance results that are contrary to

23  legal principals.

24          So to the extent the conclusion is that the claims

25  against Aurelius Investment should be dismissed because

Page 67

1   there's no basis for seeking such relief against Aurelius

2   Investment, the Court's equitable powers would not provide a

3   basis for keeping Aurelius Investment in the case.

4          For all of these reasons, obviously all is more

5   fully set forth in our papers, Your Honor, we respectfully

6   submit that the claims in the amended complaint should be

7   dismissed as against Aurelius Investment.

8          Thank you.

9          THE COURT:  All right, thank you.

10         Mr. Fisher?

11         MR. FISHER:  Good morning, Your Honor, Eric Fisher

12  from Dickstein Shapiro for the GUC Trust.

13         This dialogue between Aurelius and the GUC Trust

14  has been going on for a long time.  It took the form of

15  letters and phone calls, then it took the form of a motion

16  to dismiss, and now it's taking the form, Your Honor, of a

17  summary judgment motion.

18         And reducing each side's argument to its bare

19  caricature essentially Aurelius has been saying for a long

20  time we sold our notes in April 2011 let us out, and the GUC

21  Trust has been saying for a long time, you filed a proof of

22  claim, every document filed with the Bankruptcy Court, the

23  claims register, every other public indication says you're

24  the holder of record of that proof of claim and so we can't

25  let you out.  Reduced to caricatures that's the argument

1    here.

2             And then both sides, Your Honor, tried to find

3    sound legal footing for their positions.  And I would say

4    that at the motion to dismiss argument that Your Honor heard

5    both sides were trying to fit square pegs into round wholes.

6    The GUC Trust was arguing that plan provisions 5.1 and 5.10

7    suggest that Aurelius is a proper party.  Your Honor pointed

8    out at the motion to dismiss argument that those plan

9    provisions concern distribution and didn't seem to bear on

10   the question before the Court.  I think both parties now

11   agree that that -- that those plan provisions are really

12   besides the point.

13            Aurelius at that argument and at this argument as

14   well in its papers sites to cases that have nothing to do

15   with the issue before the Court.  The kinds of cases that

16   Aurelius relies on for instance are an ERISA case where the

17   case is dismissed because you're supposed to name the plan

18   administrator.  Or a federal tort claims act case where the

19   case is dismissed because you're suppose to name the United

20   States not the individual tortfeasor.  And cases of that

21   sort.

22            And so we come to you today with a new argument.

23   It is true in our papers last week was the first time that

24   we raised the issue of Rule 25.  And I can tell you that as

25   a team as we continued to cogitate on the issues raised by

Page 69

1    Aurelius when we saw Rule 25 it was as though the answer was

2    just staring us right there in the face.  Because I think

3    Rule 25 does provide the answer to what had seemed to be an

4    issue as to which it was difficult to find sound legal

5    footing.

6              Your Honor, Rule 25(c) says, quote, "If an

7    interest is transferred the action may be continued by or

8    against the original party."

9              So here Aurelius is saying that its interest was

10   transferred and we're saying that this action may be

11   continued by or against Aurelius, the original party.

12             "Unless the Court on motion orders the transferee

13   to be substituted in the action or joined with the original

14   party.  The motion must be served as provided in Rule

15   25(a)(3)."

16             Obviously, Your Honor, there's been no motion

17   brought under Rule 25(c) to have Aurelius' transferee

18   substituted as the party.  The reason no such motion has

19   been brought, among perhaps other reasons that I'm not privy

20   to, but one of the reasons is that Aurelius can't identify

21   the transferee, and as we pointed out to Your Honor at the

22   motion to dismiss argument it would take years of

23   international discovery to perhaps find out who the true

24   beneficial holder is of Aurelius' claim, and then once we

25   find it out under Aurelius' theory of the case that

Page 70

1    beneficial holder could sell the claim and then we wouldn't

2    have a party and we'd have to -- we'd have to start over.

3    That's why Rule 25(c) says what it says.  It puts the burden

4    of identifying the proper party on the transferor, not in

5    this case on the GUC Trust, Your Honor.

6              THE COURT:  Mr. Fisher, Morris Federal Practice

7    seems to say in baby talk in its section on 25(c) that it

8    only applies to transfers occurring during the pendency of

9    the litigation.

10             I understand the practical problem you have, but,

11   you know, Morris Federal Practice doesn't have the ax to

12   grind that your opponent does.  How do you respond to that?

13             MR. FISHER:  Your Honor, I haven't seen any case

14   law that construes that notion in the same action in some

15   technical way.  I mean, I've -- I've seen cases that refer

16   to it in different ways, including cases cited by earliest

17   that talk about it has to be in the same litigation.  So

18   they're construing action very narrowly.

19             But I want to try to -- I -- I do think that if

20   there is any weakness in the 25(c) argument it is precisely

21   that issue, and so I want to try to address that as

22   forthrightly as possible.

23             The -- there's no dispute that Aurelius held its

24   proof of claim when the GUC Trust filed its initial

25   objection in this case in July 2010 and when it amended that

Page 71

1    objection in November 2010.  That objection sought relief,

2    including re-characterization and equitable subordination.

3              Then during the interim period after that

4    objection was filed and amended Aurelius sold its notes,

5    such that it was not a holder of notes as of when we

6    commenced the adversary proceeding.

7              We think that it's clear that these proceedings;

8    the contested matter, claim objection, disallowance

9    proceeding, and the equitable subordination adversary

10   proceeding are the same litigation.

11             And just to provide some factual examples of that

12   and then, Your Honor, I -- I think I have a case that speaks

13   to the issue as well, but to provide some factual examples

14   the scheduling order in this case is a scheduling order with

15   regard to the claim objection and the adversary proceeding.

16   It's explicit about that.

17             In the disclosure statement in this case a portion

18   of the disclosure statement was written by Greenberg Traurig

19   so that they were given an opportunity to recite their

20   version of the GUC Trust claim objection.  When -- in that

21   section Greenberg Traurig acknowledges that there was a

22   claim of equitable subordination that had been raised in the

23   objection.

24             So this is, Your Honor, a continuation -- a

25   continuous proceeding.  It's all of the same issues.

Page 72

1    Mr. Zirinsky at a discovery -- in a discovery dispute before

2    Your Honor said -- and this was a discovery dispute before

3    the GUC Trust commenced its adversary proceeding, that --

4    that we were contending that the noteholders had acted

5    inequitably with respect to that lockup agreement and that

6    we were seeking equitable subordination.  In other words, it

7    -- it was crystal clear before Aurelius sold its notes that

8    this was already a litigation about equitable subordination

9    and about recharacterization.

10           We also think, Your Honor, that the

11   recharacterization claim was not in any way procedurally

12   defective having been asserted in that original objection,

13   but as we've said many times in an abundance of caution we

14   included it as part of adversary complaint because Greenberg

15   Traurig was not willing to agree that it was properly raised

16   in the context of an objection and said that we would remove

17   it from the adversary at our peril.

18           So with regard to recharacterization, there's no

19   doubt that this has been one continuous litigation where as

20   early as July 2010 before Aurelius sold its notes while it

21   was still indisputably a holder of notes the

22   recharacterization claim was being litigated.

23           They -- they sold their -- they sold their notes

24   after discovery was well under way, Your Honor, and that

25   discovery was ultimately by agreement of the parties.

Page 73

1    Deemed to be discovery that could be used both in the

2    hearing to be held with regard to the claims objection and

3    the adversary proceeding.

4            Those are some examples of the facts here that I

5    think suggest that this is one litigation and that -- that

6    Aurelius held its notes while this litigation was still

7    pending.

8            In terms of legal support, Your Honor, there is a

9    case that we found from the northern district of Texas

10   called In re: Basin Resources.  It's a bankruptcy case, 182

11   B.R. 489.

12           And what -- what happened in that case was a

13   creditor had filed a proof of claim and then the debtor

14   brought an adversary proceeding seeking to equitably

15   subordinate the proof of claim  on the grounds that it arose

16   from a securities.

17           And when it came to the hearing of the matter the

18   debtor wanted to rely on an admission in the proof of claim,

19   and the evidentiary question was whether that admission in

20   the proof of claim was a judicial admission.  And that

21   turned on the question of whether that proof of claim and

22   that adversary complaint were part of the same proceeding.

23           And the Court ruled that under those circumstances

24   that was the same proceeding.  And what the Court said

25   there, I think is equal -- equally applicable to the issue

1    before the Court today.  What the Court said was, quote:

2            "Although the proof of claim in the instant case

3    was filed in the general bankruptcy case, this adversary is

4    in effect and objection to that claim.  If this were merely

5    the usual contested matter involving the objection to the

6    claim there would be no question that the statements in the

7    proof of claim would be judicial admissions.

8            An objection to claim matters, the proof of claim

9    is seen as the initial pleading.  The objection to proof of

10   claim is the responsive pleading.  A proceeding to

11   subordinate a claim commenced pursuant to Section 510 of the

12   Bankruptcy Code is simply an objection to claim, which has

13   the added procedural and substantive requirements of an

14   adversary proceeding."  Close quote.

15           I think that those principles apply equally here

16   to say that this is one unitary proceeding, Your Honor.

17           During oral argument, Mr. Friedman said that

18   Aurelius is not seeking to, quote "get out of" the claim

19   objection proceeding.  Presumably that's because they can't

20   dispute that they were a holder of notes at the time that

21   the claim objection was filed.

22           If that's the case, it just -- it just leads to a

23   nonsensical result where Aurelius is part of a claim

24   allowance proceeding where recharacterization and equitable

25   subordination were raised in the objection and then not part

1    of the adversary proceeding.  We -- we don't even --

2              THE COURT:  Well, the point you're making would

3    have equal validity if whoever got this claim shows up and

4    tries to collect from the estate and then says, uh, uh, uh,

5    you can't equitably subordinate me or disallow me because

6    you didn't bring an adversary proceeding.  Then your case

7    would be on all fours.  But if you're laying this as a

8    predicate for 25(c) compliance it's a little more of a

9    stretch.

10             What -- what you're really saying is you don't

11   want me to forget that Basin case when Joe Eshinese (ph)

12   shows up and says, I want their -- what is it, 138 million

13   bucks worth of --

14             MR. FISHER:  Yes.

15             THE COURT:  -- claim or something like that.  I --

16   I assume you're going to remind me of that case then.

17             MR. FISHER:  Of course, Your Honor, but it really

18   matters to us in terms of ensuring that we can get all the

19   relief we think that we'll ultimately be entitled to at the

20   conclusion of trial to have Aurelius as a party and -- and

21   Rule 25(c) is relevant to that.

22             What -- what the Third Circuit said about Rule

23   25(c) in the Luxliner case, 13 F.3d 69, quote "Rule 25(c)

24   does not require that anything be done after an interest has

25   been transferred."  Close quote.

1          The idea being the action just continues against

2     the original party, even though the interest has been

3     transferred.  Quote:

4          "When a defendant corporation has merged with

5     another corporation, for example, the case may be continued

6     against the original defendant and the judgment will be

7     binding on the successor, even if the successor is not named

8     in the lawsuit."  Close quote.

9          That's why we think if Aurelius is legally the

10    right party under Rule 25(c) and the burden is on them to

11    identify who the proper transferee defendant is, and they

12    haven't made a motion under Rule 25(c), and they can't

13    identify who the proper transferee defendant is, we think

14    that by keeping them in, because legally they are the

15    correct party, it just ensures that any judgment we get

16    against them will also be binding on any successor that may

17    come to the Court later.

18          Now, I understand there may be post judgment due

19    process type challenges to a judgment like that, but we

20    think we would be on much sounder footing if we -- if we

21    litigated to conclusion with Aurelius as the party.  And as

22    Your Honor is aware we've done everything we can to try to

23    put the world on notice of this hearing that is scheduled to

24    commence on August 7th.

25          THE COURT:  How as a practical matter do I apply

1    or enforce 25(c) if Aurelius doesn't know who got it?

2           MR. FISHER:  I -- I think, Your Honor, it -- it --

3    25(c) in a sense is not before the Court because no one has

4    made a move -- a motion to substitute someone in place of

5    Aurelius, and that is not the Court's problem; that is

6    Aurelius' problem.  And the law seeks to ensure that someone

7    who was a party to a litigation is stuck in that litigation

8    until they're in a position to make a motion to argue that

9    someone else ought to be substituted or joined with them.

10   That's what the rule provides.

11          It wouldn't even necessarily get Aurelius out.

12   They could make a motion under Rule 25 and then a transferee

13   would be added as a party.

14          We also think, Your Honor, that our arguments with

15   regard to Rule 25(c) are just more generally consistent with

16   how the bankruptcy rules treat proofs of claim.  And for

17   example, under Rule 3006, which relates to withdrawal of

18   claims.  That rule provides that:

19          "If after a creditor has filed a proof of claim an

20   objection is filed thereto, or a complaint is filed against

21   that creditor in an adversary proceeding, or the creditor

22   has accepted or rejected the plan or otherwise has

23   participated significantly in the case, the creditor may not

24   withdraw the claim, except on order of the Court after a

25   hearing on notice to the trustee or debtor in possession and

Page 78

1    any creditors' committee."  And then it continues.

2         The idea being that once Aurelius filed it's proof

3    of claim, if it wanted to withdraw that proof of claim after

4    the GUC Trust objection was filed because it sold its notes,

5    it would had to have done so on motion.  And again, the

6    reason behind that rule, similar to Rule 25(c), is to put

7    the onus for identifying the correct party in a situation

8    where there's been a transfer while a litigation is pending

9    to put the onus for identifying the correct party on the

10   transferor and not, in this case, on -- on the GUC Trust,

11   Your Honor.

12        And when -- when we talk about the equities we

13   don't mean equities flying in thin air.  We mean simply that

14   because Aurelius could have itself taken steps to identify

15   who its -- who the beneficial holder of its notes are -- is,

16   could have brought a motion under Rule 25(c), could have

17   sought to remove its proof of claim under Rule 3006, because

18   it didn't take any of those measures and the law puts the

19   burden on them, the equities favor a -- a strict enforcement

20   of the principles behind Rule 25(c).

21        As Your Honor correctly pointed out, we're not

22   abandoning any arguments we've previously made.  I said -- I

23   did say at the outset we do think the arguments under 5.1

24   and 5.10 of the plan are irrelevant, but we're not

25   abandoning the in rem arguments that we made.

Page 79

1          It certainly is possible that if the Court were to

2     let Aurelius out of the case that we still could, in the

3     current configuration of the case, subordinate that claim,

4     but we think that the correct answer under the law and

5     applying the equities is to keep Aurelius in the case, Your

6     Honor.

7          THE COURT:  All right.

8          Mr. Friedman, your reply?

9          MR. FRIEDMAN:  Let me start, Your Honor, with Rule

10    25, which is fundamentally misinterpreted and misconstrued

11    by Mr. Fisher.

12         Rule 25, as all of the cases and commentaries say,

13    is a rule of procedure.  It is utilized by the Federal

14    Courts for considerations that are pragmatic and convenient.

15         To begin with, when there is a transfer of an

16    interest during the action Rule 25 permits the action to

17    continue in the names of the original parties.  That is a

18    rule of convenience.

19         There has never been a case in the Federal Courts,

20    as far as our research reveals, where a defendant seeking to

21    be dismissed on the merits, as we are here, has been held to

22    be required to continue as a defendant because of Rule 25.

23         In this case, and it bears repeating, Aurelius

24    sold its Nova Scotia notes long before the adversary

25    proceeding began, approximately a year before.  Rule 25(c)

1   has no applicability.

2          The issue is whether at the time this adversary

3   proceeding began Aurelius Investment was or was not a proper

4   defendant.  There's nothing in Rule 25(c) that would

5   countenance the conclusion that the GUC Trust now urges,

6   which is, because Aurelius once held the notes and once

7   filed a proof of claim, it is stuck as a defendant in this

8   adversary proceeding.

9          Nothing in Rule 25(c) remotely suggests that a

10  defendant seeking dismissal under the circumstances here has

11  the burden of finding a transferee and serving up a new

12  defendant.  On the contrary, the practice in the bankruptcy

13  courts, as far as I know, is very clear.  I've seen it over

14  and over again in cases.  The plaintiff identifies the

15  proper defendants and then sues them.

16         Here we had the GUC Trust aware about a year

17  before this adversary proceeding started.  In fact, Aurelius

18  Investment has provided the information that it has

19  concerning to whom it was sold.  It was sold to a broker.

20  The name of the broker was provided.  I don't know what the

21  GUC Trust has done.  I don't know whether there was a

22  subpoena served on the broker.  I don't know whether there

23  are any discovery efforts.

24         What I hear Mr. Fisher saying now is it would take

25  a year or years to identify the transferees.  I don't know.

1   It is not the responsibility of Aurelius Investment to do

2   more than it has done.

3          What Mr. Fisher has done, which is part of what

4   plaintiffs do in these situations, is you take steps to

5   provide notice.  If in fact Mr. Fisher is correct, and I

6   don't mean to suggest that he is, but if in fact he is

7   correct and he could not through reasonable diligence

8   identify transferees then in those circumstances you do what

9   he is doing.  You put people on notice.  You put the market

10  on notice.  But there's no authority that says one of the

11  things you do is sue the wrong person.

12         Mr. Fisher began by saying we're suing Aurelius

13  because Aurelius is the record holder, and then he says well

14  I acknowledge that 5.1 and 5.10 are irrelevant for purposes

15  of the issues before the Court.

16         But the -- the only justification for even

17  claiming, albeit incorrectly, that Aurelius as record holder

18  is a proper defendant is Section 5.1 of the plan, which (a),

19  doesn't apply, is irrelevant as Mr. Fisher acknowledges.

20  And (b), when you read Section 5.1 of the plan and Section

21  5.10 of the plan, what follows from the text of those

22  provisions is contrary to what Mr. Fisher is saying.

23         What follows from the text is you don't have a

24  claim against the party that filed a proof of claim back in

25  2010.  That argument would be potentially available to the

1    GUC Trust if we were talking about a claim other than a

2    claim based on publicly traded notes.  That's what 5.1 says.

3             5.1 says, if a party asserts a claim in this case,

4    once we get to the distribution record date, if that party

5    is the record holder that's the party with whom the GUC

6    Trust has to deal, but 5.1 says this provision does not

7    apply to claims based on publicly traded securities.

8             5.10 applies to claims based on publicly traded

9    securities, including explicitly the Nova Scotia note

10   guarantee claims.  And what 5.10 makes clear, as you would

11   expect as the law provides in other context, when it comes

12   to publicly traded securities and claims based on them in a

13   bankruptcy case, what matters is not who owned the security

14   when the proof of claim was filed or who owned the security

15   on the distribution record date.  What matters is, when the

16   time comes for distribution what do the rules in the

17   securities marketplace tell us about whether the holder as

18   of the record date in the securities marketplace receives

19   the distribution, or whether it was sold with the rights

20   attached?

21            But the concept that Mr. Fisher is arguing for

22   that you look at when the proof of claim was filed and who

23   filed it and that's the record holder in the bankruptcy case

24   for purposes of subordinating the claim or otherwise dealing

25   with the claim, that has absolutely no support in the law or

Page 83

1    in the plan provisions in this case as you would expect.

2            I -- I also want to mention that Mr. Fisher cites

3    to Your Honor a decision out of the Northern District of

4    Texas Bankruptcy Court, which he claims supports his notion

5    that we can treat the claims objection and the adversary

6    proceeding like one proceeding for purposes of Rule 25(c).

7            I -- I first -- I want to note the case is not

8    cited in their brief.  Mr. Fisher said he found it last

9    night.  He told me about it this morning.  He handed it to

10   me this morning.  The case does not support the position of

11   the GUC Trust here.

12           The case reiterates the basic principle that an

13   adversary proceeding and a claims objection are separate

14   proceedings.  They unquestionably are.

15           This adversary proceeding began on approximately

16   February something of 2012.  There was no adversary

17   proceeding before that.  Aurelius Investment was not a

18   defendant in any adversary proceeding before that.

19           What the Texas bankruptcy case says is in a

20   situation where the defendant in the adversary proceeding is

21   also the party who filed the proof of claim that led to the

22   adversary proceeding we are going to hold what that

23   defendant said in his proof of claim as admissible against

24   him as a judicial admission in the adversary proceeding.

25           But again, the Court makes the point and cites

Page 84

1    Seventh Circuit and other authority that adversary

2    proceedings are separate proceedings.  Contested matters are

3    separate proceedings.

4           The notion that that case supports the view that

5    someone who filed a proof of claim at some point in the case

6    and then a response to a claims objection that should be

7    viewed as one proceeding for purposes of Rule 25(c)?

8           There's absolutely no support for that, and all

9    the commentary about Rule 25(c) makes clears that it is

10   simply being twisted and distorted by the argument suggested

11   by GUC Trust.

12          All the cases and commentators make the point that

13   Rule 25(c) is procedural.  It does not override substance.

14   It does not impose burdens on parties to identify

15   transferees or anything remotely like that.

16          In fact, when you look at the kinds of cases

17   mentioned by Mr. Fisher involving a corporation and a

18   successor by merger or otherwise, Rule 25(c) cases make the

19   point that if -- if as a matter of substantive law the new

20   corporation is liable, then the procedure is permissible.

21   Under Rule 25(c) you can either name the new corporation or

22   not.

23          But Rule 25(c) does not substitute for the

24   substantive law, does not change the substantive law and

25   never, ever provides a basis for asserting a claim as here

Page 85

1    against the defendant as to which no relief is possible and

2    that's because of the nature of the claims asserted.  These

3    are claims for subordination or reduction of a claim and

4    Aurelius has no interest in that claim.

5            I think -- I think that's everything I have, Your

6    Honor.  They've just sued the wrong defendant.

7            We respectfully submit that the motion to dismiss

8    should be granted.

9            Unless, Your Honor, has any questions, I'll sit

10   down.

11           THE COURT:  No, I don't.  I'll take a recess and

12   then we'll want everybody back here at 12:10.  I can't

13   guarantee you that I'll be ready to rule then, but that's

14   when I need you back in the courtroom.  We're in recess.

15           MR. FISHER:  Your Honor, I'm -- I'm -- may I have

16   a brief opportunity to reply to some of the points that

17   Mr. Friedman made?

18           THE COURT:  All right.  But limited of course to

19   new stuff he said this second time around.

20           MR. FISHER:  Be very brief.

21           With regard to the Basin Resources case out of

22   Texas, Your Honor, the Court there said in general filings

23   on the master docket of a bankruptcy case are not filings in

24   a specific adversary proceeding.  But quite on point where

25   you have a proof a claim and then an equitable subordination

Page 86

1    complaint those are a single proceeding.  So we think for

2    that reason it's quite on point.

3            We're not just saying that Aurelius is the right

4    party because they were the holder as of the record date.

5    That's one of many facts.  They filed the proof of claim.

6    They continued to hold the proof of claim.  They held the

7    proof of claim as of confirmation.  They held the proof of

8    claim as of when we filed our objections.  They've never

9    taken any step whatsoever to indicate publicly that they're

10   not the holder of the proof of claim until it became an

11   issue in this litigation.  The claims register reflects them

12   as the holder of the proof of claim.

13           One last case I wanted to bring to, Your Honor's

14   attention, which responds directly to a point that -- that

15   Mr. Friedman was making about the lack of authority is Brown

16   v. Meyerburg.  It's a Southern District case 314 F. Supp.

17   939.

18           In that case it was a case about invalidating a

19   patent, and the case went to judgment, but the patent holder

20   said, I've assigned all my rights in this patent to another

21   party.  And the Court said, even so, we -- we have --

22   because of 25(c), because there hasn't been a motion to

23   substitute that other party, we can get a judgment against

24   the original patent holder and it binds the assignee.

25           It's very similar to the situation here.  Because

1    it's not just that we're looking to reduce distributions and

2    Aurelius can get off the hook by saying, well, we don't

3    stand to get any distributions anyway, it's that we're

4    looking to equitably subordinate their claim, similar to

5    invalidating a patent.

6           THE COURT:  Well, a patent has in rem

7    characteristics, if you're talking about the validity of the

8    patent or its infringement.  Wouldn't that again be

9    something you would simply remind me if the new holder of

10   the claim surfaces and then says nothing that happened

11   beforehand affects me?

12          MR. FISHER:  I certainly would remind you of that,

13   Your Honor, but in the Meyerburg case there was a party who

14   was the original holder of the patent that was named as a

15   party, and it's no different from what we've done here,

16   which is name the holder of the proof of claim, or the

17   original holder of the proof of claim as the -- the proper

18   party.

19          And the last point I wanted to make is simply that

20   there is an aspect in which this case is unique, which is

21   that as, Your Honor, knows there's no indenture trustee.  If

22   there were an indentured trustee for these Nova Scotia notes

23   we wouldn't have these issues because there would be a

24   stable defendant who we could sue and get all the relief we

25   needed.  We would just sue the indentured trustee.

Page 88

1          The problem arises here because these notes can

2    change hands overseas without any readily ascertainable way

3    to find out who the beneficial holder is and there isn't any

4    stable single address to get the relief that we're seeking.

5          THE COURT:  I'm not sure if naming the indentured

6    trustee would skin the cat under circumstances like those

7    that are alleged here.

8          In -- in my career I'm not sure if I've ever seen

9    an indentured trustee do anything wrong in a bankruptcy

10   case, other than perhaps sleeping through it.

11         When -- when people who hold bonds misbehave they

12   do it as individuals and the indentured trustee goes to bat

13   for the entirety of the creditor community, which at least

14   in most cases is for the most part wholly innocent and has

15   just been left holding the bag or chose to buy bonds to take

16   the place of people who were holding the bag.

17         It would seem to me that in a case like this one

18   where you're alleging that -- well -- well, some of your

19   things are applicable to the whole class, but some of them

20   are focused at particular people who did particular things

21   that you think was inequitable.

22         MR. FISHER:  I -- I understand the point, Your

23   Honor, and so I'd say that, for example, with regards to the

24   re-characterization claim in the complaint that applies to

25   everyone equally.

1           With regard to equitable subordination, I

2    understand of course that that's particular to a particular

3    claimants hold -- conduct.

4           THE COURT:  All right.  Anything else?

5           MR. FRIEDMAN:  Yes, Your Honor, there -- there

6    have been a couple of new things that just came up with

7    Mr. Fisher, including reference to another case that he's

8    just pulled out of his briefcase this morning that was not

9    in papers.

10          THE COURT:  You can respond if you want.

11          MR. FRIEDMAN:  Yes.  Very --

12          THE COURT:  I agree with the concept that you

13   don't bring up new cases in surreply.

14          MR. FRIEDMAN:  Okay.  Well, just very briefly with

15   respect to that case, Your Honor, has absolutely nothing to

16   do with the situation before the Court.

17          That case involved a patent holder who made an

18   assignment of the patent after the litigation was filed.

19   The assignment was made to an assignee who had notice of the

20   pending -- notice of the pending litigation.  There was no

21   issue in that case.

22          This was not a case of a motion to dismiss.  The

23   Court simply said under Rule 25(c) we had a transfer during

24   the pendency of the case.  The action continues against the

25   original party.  And to the extent there are issues with

Page 90

1    respect to the assignee, those are issues are dealt with

2    because the assignee took the patent knowing the litigation

3    was pending.

4         The other point I want to mention is that

5    Mr. Fisher raises the specter of oh, these notes can trade

6    and we'll never know who the defendants are.  Mr. Fisher's

7    point about Rule 25 provides him with the very argument that

8    addresses the worry he's expressed, which is, once the

9    adversary proceeding is commenced if people are trading,

10   transferring their interests he then has a basis to argue as

11   he's arguing here, it was a transfer after the action began

12   under Rule 25(c) we can continue the case against the

13   original named defendant.

14        I'm not -- that's not my issue.  My issue is

15   there's nothing in Rule 25(c) that would remotely support

16   suing the wrong defendant and then saying well, there was a

17   transfer before the action -- a year before the action, but

18   he's the one we want to sue.

19        Thank you, Your Honor.

20        THE COURT:  All right.  Well, now we're going to

21   take a recess and I want you back fives minutes after the

22   original time I told you to be here, at which time I'll

23   also, after I issue my ruling, deal with mediation

24   settlement.  That stuff.

25        We're in recess.

Page 91

1          (Recess at 12:24 p.m.)

2              THE COURT:  Have seats please.

3              Ladies and gentleman, though I can't agree with

4      many of Aurelius' contentions on this motion, especially

5      those in its papers by which it seeks to take positions on

6      behalf of other GM Nova Scotia bond holders and especially

7      seemingly its transferee, I agree that the problem I

8      identify before at the time of Aurelius' 12(b)(6) motion

9      that it was relying on material that could not be considered

10     on a 12(b)(6) motion when Aurelius stated that it had sold

11     its notes and could rely on those facts only on summary

12     judgment has now been addressed.

13             I'm now allowed to consider material beyond the

14     pleadings, including Aurelius showing as a fact that it sold

15     its notes and it's showing as a mixed question of fact and

16     law that it no longer has a claim in the case.

17             So I'm dismissing the claims against Aurelius now

18     subject to the GUC Trust right as Aurelius acknowledges.  To

19     reinstate its claims, if Aurelius acquires GM Nova Scotia

20     finance notes in the future, or even though Aurelius was

21     silent on this, if in the claims objection proceeding, which

22     is running parallel with this adversary proceeding, Aurelius

23     transferee takes the position that Aurelius' dismissal from

24     this adversary proceeding deprives this Court of the ability

25     to grant full relief.

Page 92

1        I'm not persuaded that when it named Aurelius as a

2   defendant here the GUC Trust brought this adversary

3   proceeding against the wrong party.  Wholly apart from

4   Aurelius having participated in the conduct, which is

5   alleged to give rise to equitable subordination or

6   disallowance, Aurelius failed for months to disclose basic

7   information relating to the sale of its GM Nova Scotia

8   finance notes and did so only on June 18, the day after I

9   ruled on its 12(b)(6) motion, two months after Aurelius had

10  filed its motion to dismiss, but Aurelius finally has done

11  so.

12       Assuming, without today deciding, that a claim

13  subject to equitable or subordination -- equitable

14  subordination or disallowance can't be laundered by handing

15  the claim off to someone else it doesn't now appear

16  necessary to have Aurelius in this adversary proceeding to

17  grant appropriate relief with respect to whomever was the

18  recipient of the lateral pass.

19       That can be addressed in the claims allowance

20  process, which is running in parallel with this adversary

21  proceeding and in which Aurelius is still subject to the

22  jurisdiction of this Court by reason of its filing of its

23  proof of claim on November 30, 2009, which Aurelius hasn't

24  withdrawn and which I may or may not permit Aurelius to

25  withdraw, if and when I'm asked, consistent with Rule 3006,

1   which among other things allows me to pass on the dismissal

2   of a claim or to attach terms and conditions as the Court

3   deems proper.

4           At least at this point in time, it is true, as

5   Aurelius argues, that Aurelius now has no claims to

6   subordinate, reduce, or disallow, and that's enough to

7   warrant summary judgment allowing it out of the adversary

8   proceeding today.

9           The GUC Trust isn't arguing today that provisions

10  of the plan, Sections 5.1 and 5.10, would be relevant to

11  determining proper parties in this adversary proceeding as

12  compared and contrasted to dealing with the mechanics of

13  distributions on claims.  So I don't need to say any more on

14  that issue and I'm not expressing any further views on that

15  today beyond those that I already expressed.

16          I do have to decide the Federal Rule of Civil

17  Procedure 25 issue.  And on this I agree with Aurelius that

18  Rule 25 doesn't have to be complied with here.

19          I'm not sure that Civil Rule 25(c) is as limited

20  in its application as Aurelius says it is, but it's

21  undisputed that Aurelius did not make any transfer or

22  assignment of its interests during the pendency of this

23  adversary proceeding.  And I agree with Aurelius that Rule

24  25(c) applies only to transfers that occur after the lawsuit

25  has been commenced.

Page 94

1           See Six Morris Federal Practice Section 25.31 [3]

2      ("Rule 25(c) allows substitution only in cases involving

3      transfers of interest occurring during the pendency of

4      litigation and not to those occurring before the litigation

5      begins.")

6           I recognize and acknowledge the ambiguity during

7      the word litigation -- in the word litigation.  As the GUC

8      Trust properly observes, litigation can be made --

9      understood to mean the adversary proceeding itself, or it

10     can be understood not implausibly to relate to any ongoing

11     litigation between the parties, but at least in a situation

12     where the party sought to be subject to 25(c) compliance

13     doesn't know the assignee, little purpose would be served by

14     imposing 25(c) and subjecting it to accomplishing an

15     impossible task.

16          Also of course 25(c) can't be read to change

17     substantive rights.  So the better way to deal with this

18     situation is to deal in any related litigation with avoiding

19     prejudice to a party like the GUC Trust that has sought and

20     tried its best to go by the rules, and where the

21     impossibilities of compliance with the situation have made

22     it ultimately unsuccessful and required it to deal with

23     alternative means.

24          There is much is not all in Judge Abramson's

25     analysis in Basin Resources Corporation 182 B.R. 489, with

Page 95

1   which I agree, including particular his comments on page

2   493.  In fact, based upon my reading of that opinion so far

3   I'm not sure if there's anything in that opinion with which

4   I disagree, at least in terms of Judge Abramson's analysis.

5   But I see how that might be potentially applicable to

6   matters down the road, as compared and contrasted to what we

7   have here.

8           I just can't see it as sufficiently relevant to

9   determining whether compliance should be required under

10  25(c), which of course is a matter with which Judge Abramson

11  had no occasion to address.

12          And while I likewise don't agree that the ability

13  to keep a party in a case as a nominal defendant is that big

14  a deal, or that the authority to do so is as limited as

15  Aurelius suggests, I agree that there is no need to keep

16  Aurelius in as a nominal defendant now, even though I

17  manifestly disagree with Aurelius' contention, mentioned

18  twice in its papers at page 10 of its opening brief and page

19  15 of its reply, that I should be influenced by its

20  contention that it would be burdened by legal fees beyond

21  those it has already incurred.

22          Aurelius chose to invest in this case to the

23  extent of over $138 million in bonds, and appears on this

24  date of the record, including matters that were put before

25  me incident to discovery disputes, to have had a very major

Page 96

1    role in the transactions that will be subject to judicial

2    scrutiny in the upcoming several weeks.

3            Aurelius will be a witness no matter what, and

4    it's complaining to me about the cost of being a nominal

5    defendant?  I'm choosing not to keep Aurelius in as a

6    nominal defendant because I don't think that it's now

7    necessary, but not because of I -- I have any sympathy for

8    its claim that legal fees incident to its earlier investment

9    decisions and acts should be at all relevant on this motion.

10           And I'm making my dismissal subject to

11   reinstatement if I see any signs of gamesmanship, such as

12   any assignee claim down the road that Aurelius is a

13   necessary party.

14           Nor do I need to address Aurelius' contention as

15   appearing repeatedly in its motion papers that claims for

16   equitable subordination or disallowance cannot travel with

17   the claim or be addressed as part of an in rem proceeding.

18           I'm surprised that Aurelius expects me to endorse

19   such a notion incident to this motion, but for the avoidance

20   of doubt, I'm not endorsing it now, if I ever will.

21           Nor do I endorse Aurelius' contentions argued at

22   length for three pages in its motion, starting at page 15,

23   as to what's necessary to protect others, including its

24   assignee.

25           At the risk of stating the obvious, Aurelius lacks

Page 97

1    standing to assert the needs and concerns of others, even

2    any entity to whom it might have assigned its claim.

3            So Aurelius' motion for dismissal on summary

4    judgment at this point is granted.

5            The ruling is without prejudice to the rights of

6    all parties with respect to entities that now hold GM Nova

7    Scotia notes or who may later have been identified as doing

8    so.

9            When I say without prejudice to the rights of all

10   parties I mean of course everybody on any side of the issue.

11           As Aurelius offered, and as in any event I would

12   have required, this dismissal is subject to the GUC Trust

13   right to reinstate its claims if Aurelius acquires GM Nova

14   Scotia finance notes in the future.

15           Also, I'll go ballistic if in the future of this

16   adversary proceeding, or in the related claims objection

17   proceeding, which is running in parallel with this adversary

18   proceeding, Aurelius' transferee takes the position that

19   Aurelius' dismissal from this adversary proceeding deprives

20   this Court of the ability to grant full relief.

21           This dismissal is also subject to the Court's

22   rights to reinstate the claims against Aurelius and to hear

23   applications for any further relief if it later turns out

24   that there has any gamesmanship with respect to this

25   dismissal or its consequences.

1          Aurelius is to work with the GUC Trust to try to

2    consensually agree upon the form of order consistent with

3    this ruling.  If after diligent efforts to do so, there is

4    an inability to agree, then either side may settle an order

5    consistent with this ruling no less than two business days'

6    notice by hand, fax, or email.

7          All right.  Let's turn now to the matter of

8    mediation.  Come on up for anybody who wants to be heard on

9    that.

10          MR. SHER:  Your Honor, may I make one comment?

11          THE COURT:  Yeah, sure, Mr. Sher.

12          MR. SHER:  My apologies.

13          Thank you, Barry Sher.  Good afternoon on behalf

14    of Appaloosa.

15          I just want to make a -- a comment in light of the

16    Court's ruling.

17          I took the opportunity to speak with Mr. Fisher on

18    the break.  As I had mentioned in one our chamber's

19    conferences, Appaloosa, whom I represent, also sold back in

20    early '11, so similar facts as here.

21          I think in talking to Mr. Fisher, we'll be able to

22    address that issue by way of stipulation or something along

23    those lines.  If not in the off chance that we can't I just

24    wanted to put on the record I'm reserving my rights with

25    respect to that issue and that -- and that argument.  I

1    don't know if Mr. Fisher wants to say --

2              THE COURT:  Mr. Fisher?

3              MR. FISHER:  Your Honor, Mr. Sher and I agreed to

4    talk about the potential implications of Your Honor's ruling

5    with regard to Appaloosa and -- and nothing more.  I -- I

6    can't commit one way or the other as to what will come from

7    those discussions.

8              THE COURT:  All right.  Well, you got -- you don't

9    normally need reservations of rights from me, Mr. Sher, but

10   like chicken soup I guess they can't hurt.  In any event you

11   got them.

12             MR. SHER:  That's my view.  Thank you, Your Honor.

13             THE COURT:  Okay.

14             MR. FRIEDMAN:  Your Honor, we're not staying for

15   the mediation discussion.

16             THE COURT:  Okay.

17             MR. FRIEDMAN:  Thank you.

18        (Pause)

19             THE COURT:  Mr. Reisman?

20             MR. REISMAN:  Good afternoon, Your Honor.  Steven

21   Reisman on behalf of the Paulson Noteholders.  I neglected

22   to give a card to the court reporter and I don't want to put

23   him out.  So if I could approach for one moment.

24             THE COURT:  Sure, you bet.

25             MR. REISMAN:  Thanks.  Thank you, Your Honor.

Page 100

1          I -- I rise in regards to Your Honor's request for

2      an update with respect to mediation, which I had suggested

3      at the last hearing before Your Honor in this matter.

4          I promptly sent out an email to all of the

5      necessary parties -- all of the parties in the matter and

6      inquired of their interest in mediation.  Some responded

7      very quickly, others took a little bit of follow up, but I'm

8      happy to report that I've heard back from everybody.

9          And I can say that with -- well, let me first

10     address Aurelius.  Aurelius said no.  I think we can dispose

11     of them.  They've left and they have no -- no interest in

12     participating in -- in the mediation.

13         Appaloosa said, okay, but a similar reservation.

14     They're in the same boat as Aurelius.

15         With respect to the Greenberg Traurig noteholders,

16     with respect to New GM, with respect to Nova Scotia Finance,

17     and with respect to the Brown Rudnick noteholders, everyone

18     said okay, happy to do it.  Let's set up a time, neutral

19     third party.  Let's get it going.

20         I heard back yesterday from Mr. Fisher with a

21     response, okay, if the schedule and procedure can be worked

22     out, and he didn't think that it would be capable of being

23     worked out before the trial, and he didn't think that it

24     would be capable of happening during the GAP week, and he

25     didn't think that it would capable of also occurring in the

1    following week where, Your Honor, has two days, I think,

2    that are available, but there are three days that are not

3    available.

4          So I read it carefully and -- and he's here and he

5    respond to you, but I read it as, sort of I don't want to

6    tell the Judge no, but there's no good time that's really

7    available to mediate here.

8          And my view of this matter, and I've read the

9    papers of the -- of the parties is -- and I've heard

10   Mr. Fisher argue in Court, is the -- the level of

11   preparation that's necessary for mediation is really just

12   handing materials to a neutral third-party mediator.

13         I think that I could do this and I think clearly

14   the other lawyers that are could this in their -- in their

15   sleep, though they will be conscious during the mediation

16   session.

17         So I'd like to try and find the time.  I'm -- I

18   understand he's going to be on vacation the -- the interim

19   week and people, including myself, have planned a vacation

20   that week, given that Your Honor is going to be out and

21   there are the other pressures of life that -- that go along

22   besides the practice of -- besides the practice of law.

23         So I'd like to try and find a time that works for

24   everybody, and I'd like to hear from Mr. Fisher as to sort

25   of what he's suggesting, because everyone else -- everyone

Page 102

1    else is on board with proceeding with a neutral third-party

2    mediator.

3            I know we will have an issue.  There was a joke

4    that was made to me when I said, they said, well, who do you

5    thinking of for a mediator?  And I said, well, I can think

6    of three people off the top of my head.  And the response

7    was, tell me your fourth choice.  Meaning, I'm going to

8    reject your three first out of hand.

9            I think there'll be a little bit of, you know,

10   jockeying in that regard, but at the end of the day, I -- I

11   want to pick someone who is honest, fair, but hopefully can

12   bring the sides -- bring the sides together and has no -- we

13   -- we've all agreed not a sitting bankruptcy judge.  Someone

14   who is knowledgeable in -- in this particular area.

15           So with that, if -- if we could hear from

16   Mr. Fisher, and I'm happy to answer any questions, Your

17   Honor, may have.

18           THE COURT:  Okay.  Mr. Fisher?

19           MR. FISHER:  Your Honor, I'm not sure how I ended

20   up in this position of being singled out and cornered by

21   Mr. Reisman and portrayed as a hold out.

22           Mr. Reisman's client has come late to this case.

23   My understanding is that Paulson has 170 million pound

24   sterling of notes.  That's a lot of notes.  Everyone has

25   responded favorably to Mr. Reisman's suggestion that we try

Page 103

 1    to settle.

 2            All I said on behalf of the GUC Trust was that we

 3    were open to a mediation subject to agreeing on the

 4    mediator, the schedule, and the process.  I indicated that I

 5    was going to be away on vacation during that GAP week.  And

 6    I said that I was skeptical that during the week when we're

 7    also carrying on the trial, on the 21st and the 22nd, that

 8    that would be a -- a time when a meaningful mediation could

 9    really be accomplished.

10            I think I ended my email by saying, but I remain

11    open to whatever ideas the group comes up with.  It's as

12    simple as that and I resent the effort to characterize my

13    email in any other way.

14            THE COURT:  I -- I didn't regard it as -- as an

15    effort to make you the boogey man, but I -- I did regard it

16    as Mr. Reisman's effort to say that to his astonishment he

17    had found everybody agreeable in principle and that he was

18    then faced with the practical difficulty of turning it into

19    something that might happen.

20            I didn't regard it as personally as -- as you

21    might have, Mr. Fisher, but of course, I'm not the guy who

22    was on the receiving end of the comment.  So -- and I

23    certainly know how I feel every time a higher court says

24    anything about my judicial performance, much less uses the R

25    word.

Page 104

1          So let's just figure out a way to solve this

2     problem.  Because I think it's fair to say without

3     prejudging anything else that at the end of this trial I'm

4     not going to be ruling off the bench on it, and I also

5     recognize that you guys got a lot of work to do.

6          If I thought that the mediation could enable you

7     guys to settle the matter before the trial is even completed

8     that would be very tempting to me, but I -- I don't know

9     whether that is a realistic expectation, and for sure I -- I

10    don't want to make anybody cancel their vacation, especially

11    if I know I'm going to have to take the matter under

12    submission.

13          So I think what I would like to do is this,

14    because I -- I think that this matter is sufficiently

15    complicated, especially with the presence of the swaps,

16    which are not a immaterial aspect of it.

17          You've got some capable colleagues, Mr. Fisher.  I

18    -- I think I would like you guys to get the process

19    underway, to pick a mediator, and to get paperwork to the

20    mediator, even if that doesn't include your position

21    statement, which I recognize would be more work and probably

22    more work than Mr. Reisman gave it credit for being.

23          Any mediator, if he or she is going to do the job

24    right, is going to have to do some reading and head

25    scratching before any meetings.  I'd like to get that

Page 105

1    underway.

2            I don't want any party in this case to be impaired

3    in his or trial prep, and I don't want anybody to lose a

4    vacation, if for no other reason than my belief, having once

5    been a litigator, that in the week before trial you work

6    very hard and you're very tired, and if you're not tired

7    before the trial has even started you're tired after a few

8    days of trial.  And you're probably going to want --

9    everybody is probably going to want that vacation in that

10   middle week, and I'm not going to interfere with that.

11           But I would like you to see if you can get -- if

12   there is a time at which you all can set, and if you can't

13   do it during the GAP week -- and then of course you're going

14   to be back on trial with me, then you try to do it as soon

15   thereafter as possible.

16           I -- I'm telling you now that there isn't going to

17   be a ruling off the bench in this matter.  And also, without

18   telling you guys how to practice law, that I assume that if

19   I act -- if I rule adversely to one side or the other

20   there's more than an even likelihood that somebody is going

21   to want to take it up the street, and that's my thinking.

22           I don't know if I'm on the record now or off, but

23   I have no problems with either way.

24           MR. REISMAN:  Your Honor, if I could just --

25           THE COURT:  Mr. Reisman?

Page 106

```
 1              MR. REISMAN:  -- just for one moment, Steve

 2    Reisman.

 3              With respect to my comments, I -- I was not trying

 4    to antagonize or put Mr. Fisher in a bad spot.  Everyone

 5    else just came back and said yes we'll mediate and there

 6    were a bunch of things in -- in his email.

 7              I -- I hear him now.  When -- when I -- when I --

 8    when I make -- when I attack somebody I'm pretty clear in --

 9    in how I -- in how I do it.

10              THE COURT:  You're saying you knew attack and this

11    ain't an attack?

12              MR. REISMAN:  This is not.  This is not -- this is

13    not -- this is not meant in that way in any -- and to that I

14    say it on the record, I apologize to Mr. Fisher if in any

15    way I know he perceived it that way and that was not how I

16    intended it and therefore, I apologize, because perception

17    becomes reality.

18              But with respect to -- and I also don't mean to

19    belittle the work that there is going to be required in

20    connection with the mediation in preparing the mediation

21    statements, et cetera -- I'm just saying we're all very

22    familiar with the issues and -- and there are briefs that

23    are going on, et cetera.

24              And so what -- what I would propose to do, Your

25    Honor, is I really do think that that following week may be
```

1    an opportune time to mediate for a day and see where we can

2    get in that regard.

3              THE COURT:  By following week -- I -- I should of

4    brought my calendar out, I didn't.  Which -- which week are

5    you talking about?  The week in between --

6              MR. REISMAN:  The 20th.  I think it's the week of

7    the -- is that correct?  The week of the 20th.

8              THE COURT:  Talk about it in qualitative terms,

9    Mr. Reisman.  You're talking about the GAP week or the week

10   right after --

11             MR. REISMAN:  We have trial two days.

12             THE COURT:  -- the trial the second week?

13             MR. REISMAN:  The week right after.  So there's

14   the -- there's the trial begins on the 7th, then the

15   following week is off, and then the following week I believe

16   Your Honor is only available two days that week.  If I am

17   correct.

18             THE COURT:  Well, it may be a little more than

19   that if you want just afternoons, but I -- I'm familiar with

20   the week you're talking about now, yes.

21             MR. REISMAN:  So I was suggesting maybe having it

22   that week.

23             But what I'd like to propose is and I don't want

24   to take up, Your Honor's time, with this, let us caucus, let

25   us see if there is an available date, let us see if

1    Mr. Fisher could do this or someone else that -- that's

2    working on -- on it.

3            I know that a number of the people that are trying

4    the case have said that they're not going to be involved in

5    the mediation because they're going to be focused on the --

6    on the trial, but there are other people in their firms that

7    will be involved.

8            THE COURT:  Right.  And you don't need me to tell

9    you, Mr. Reisman, nobody in this room needs me to tell you,

10   that not all chess pieces are fungible, and some people can

11   try the case, but are also needed to be there at the

12   mediation and others may not.  So you're going to have to

13   put the pieces to the puzzle together as best you can.

14           MR. REISMAN:  Understood.  Yeah, I'm trying to --

15   to in fact to do that and to be constructive in that regard

16   and I, you know, I don't if I will be successful, but I

17   think it's clearly worth the effort.

18           THE COURT:  Okay.

19           MR. REISMAN:  And we'll coordinate with Mr. Fisher

20   and we'll report back to Your Honor subsequently as to the

21   selection of a mediator and getting materials over.

22           THE COURT:  Okay.  Anybody else want to weigh in

23   on that, on any of this?  Mr. Steinberg?

24           MR. STEINBERG:  Your Honor, I don't think I have

25   any need to weigh in on the mediation, but I wanted to just

Page 109

1    make sure that we weren't leaving, because I did have a

2    question about on the trial week whether we have firmly

3    decided that we are not having anything on August 10th?  I

4    just wanted to -- I think it was -- I think Your Honor had -

5    - had indicated an inclination that you probably were not

6    going to give us that day, but I don't think any of the

7    professionals are sure whether that date is -- is on the

8    calendar?

9              THE COURT:  What day of the week is that?

10             MR. STEINBERG:  That's the Friday I think you said

11   you had a personal situation.

12             THE COURT:  Oh, well, I think it's unlikely, but

13   I've had other things on my plate for the last 48 hours, and

14   for the next 24 I'll just have to figure out what the facts

15   are and get back to you soon as I can.

16             MR. STEINBERG:  Sure, I think we're all still up

17   -- just to be candor with, Your Honor, we have three trial

18   dates, three days on the week on August 7th, and we have two

19   half days in the week of August 20th.

20             And -- and I think Mr. Fisher hasn't committed yet

21   to his schedule of witnesses.  He's going first.  We're all

22   trying to figure out how to get people available so that it

23   all fits in properly, so we're just trying to figure out

24   what the slotted days might be.  But if we can't resolve it

25   today we'll all try to it on our own.

Page 110

1            THE COURT:  I'm telling you we can't resolve it

2     today.

3            All right.  Anything else?  Mr. Fisher?

4            MR. FISHER:  A very small informational question.

5            Your Honor's case management order in the joint

6     pretrial order to be submitted asks for contentions of fact

7     on law to be submitted as part of the joint pretrial order,

8     and we've been having some discussion among ourselves as to

9     exactly what Your Honor has in mind with regard to that and

10    what Your Honor would find most helpful.

11           THE COURT:  Refresh my recollection on what you

12    guys decided about what kind of briefing there would be and

13    when?  I'm not sure if you're going to be doing pretrial

14    briefs, whether I need separate contentions in a pretrial

15    order.  My standard pretrial order has historically been

16    used, not exclusively of course, but in the matters that are

17    different than this.

18           And so what else have you guys agreed upon in

19    which you're going to be telling me your contentions?

20           MR. FISHER:  We -- we've agreed to submit pretrial

21    briefs by this Friday, Your Honor.  And so certainly the GUC

22    Trust would be happy to just rely on that in lieu of

23    contentions of fact on law if that's acceptable to the

24    Court.

25           THE COURT:  Am I right in assuming that whatever

Page 111

1    contentions anybody has would be stuck in its pretrial

2    brief?

3              MR. O'DONNELL:  Your Honor, may I please the

4    Court, Sean O'Donnell with Akin, Gump on behalf of the

5    trustee.

6              You -- you are correct in that assumption.  And I

7    think I can speak for everyone on the defense side that our

8    preference as well would be to just use the pretrial briefs.

9              THE COURT:  Okay.  Well, then my -- anybody else

10   who wants to weigh in who hasn't?

11             All right.  Contentions in the pretrial order are

12   waived.  Just tell me whatever you want to tell me your

13   pretrial briefs.

14             MR. STEINBERG:  Your Honor, Arthur Steinberg

15   again.

16             I just wanted to make sure.  I understand the

17   waiver of the contentions of law, but my understanding was

18   that the pretrial order was still going to have an

19   opportunity to set forth the undisputed facts to try to

20   streamline the trial.

21             THE COURT:  I didn't understand that was what

22   anybody was talking about.

23             MR. STEINBERG:  Okay.  I just wanted to make sure.

24   That's fine.

25             THE COURT:  Okay.  Anything else?

1          Okay.  Folks, have a good a day.  We're adjourned.

2       (Whereupon these proceedings were concluded at 12:57

3    PM)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 113

1                          **I N D E X**

2

3                          **RULINGS**

4                                              Page        Line

5    Debtor's Omnibus Objection -

6    Jane C. Bogue                            17           2

7

8    Debtor's Omnibus Objection -

9    Gordon Hall                              18           9

10

11   Debtor's Omnibus Objection -

12   Stanley E. Jack                          22           13

13

14   Debtor's Omnibus Objection -

15   Timothy Kuechenmeister                   24           19

16

17   Debtor's Omnibus Objection -

18   Glenn C. Kuntz                           28           7

19

20   Debtor's Omnibus Objection -

21   George W. McClain                        35           6

22

23   Debtor's Omnibus Objection -

24   David Robertson                          36           25

25

**Page 114**

1   Debtor's Omnibus Objection -

2   Joseph C. Singer                              41        20

3

4   Debtor's Omnibus Objection -

5   Douglas Sterett                               44        17

6

7   Debtor's Omnibus Objection -

8   David R. Volpe                                50         3

9

10  Motion to Award of Attorneys Fees from

11  Claim No. 51093 Settlement Fund on behalf

12  of Anderson Class Counsel                     55         5

13

14  Motion of Aurelius Investment, LLC for

15  Summary Judgment                              91         3

16

17

18

19

20

21

22

23

24

25

Page 115

1                    C E R T I F I C A T I O N

2

3    I, Dawn South and Jacquelyn Goldsmith, certify that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6    **Dawn**            Digitally signed by Dawn
                         South
                         DN: cn=Dawn South, o, ou,
7    **South**           email=digital1@veritext.com
                         , c=US
                         Date: 2012.07.27 14:16:27
8                        -04'00'

9    AAERT Certified Electronic Transcriber CET**D-408

10   ALSO TRANSCRIBED BY:

11

12   **Jacquelyn**       Digitally signed by Jacquelyn
                         Goldsmith
                         DN: cn=Jacquelyn Goldsmith,
13   **Goldsmith**       o, ou,
                         email=digital1@veritext.com,
                         c=US
14                       Date: 2012.07.27 14:16:49
                         -04'00'

15   Veritext

16

     200 Old Country Road

17

     Suite 580

18

     Mineola, NY  11501

19

20

     Date:  July 27, 2012

21

22

23

24

25