Judge Gerber
September 24, 2012
9:45 A.M.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In Re:                                          Chapter 11
                                                Case No. 09-50026 (Reg)

GENERAL MOTORS CORPORATION, *et al*.

Debtors

LINDA MITCHELL (Propria Persona)

Plaintiff

Vs.

GENERAL MOTORS COMPANY, f/k/a
NEW GENERAL MOTORS COMPANY, LLC

Defendants

**TO THE HONORABLE JUDGE GERBER:**

   Pleadings in this case are being filed by Plaintiff In Propria Persona, wherein pleadings are to be considered without regard to technicalities. Propria pleadings are not to be held to the same high standards of perfection as practicing lawyers. See Haines v. Kerner 92 Sct 594, also See Power 914 F2d 1459 (11th Cir1990), also See Hulsey v. Ownes 63 F3d 354 (5th Cir 1995). also See In Re: HALL v. BELLMON 935 F.2d 1106 (10th Cir. 1991)."

In Puckett v. Cox, it was held that a pro-se pleading requires less stringent reading than one drafted by a lawyer (456 F2d 233 (1972 Sixth

Circuit USCA). Justice Black in Conley v. Gibson, 355 U.S. 41 at 48 (1957) "The Federal Rules rejects the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." According to Rule 8(f) FRCP and the State Court rule which holds that all pleadings shall be construed to do substantial justice."

**MOTION FOR RELIEF FROM AUTOMATIC STAY OF DEBTORS GENERAL MOTORS CORPORATION, *et al*. AND DEFENDANT NEW GENERAL MOTORS COMPANY, LLC.  MOTION FOR RELEIF OF AUTOMATIC STAY OF CO-DEFENDANTS AUTO NATION OF FORT WORTH MOTORS LTD, DBA BANKSTON CHEVROLET FORT WORTH, AND MOTION TO SEVER CO-DEFENDANTS**

**AT ISSUE:**

**Plaintiff moves for relief of the automatic stay with respect to the following case:**

Cause Number 348-223864-07
Linda M. Mitchell vs. General Motors Corporation *et al* and AutoNation Fort Worth Motors, Ltd., d/b/a Bankston Chevrolet Fort Worth
348th District Court, Tarrant County, Texas

**CASE HISTORY:**

By motion dated June 1, 2009 (the "Motion"), General Motors Corporation ("GM") and its debtor subsidiaries, as debtors in possession (collectively, the "Debtors" or the "Company"), sought, among other things, approval of the process and procedures through which it will determine the highest or otherwise best price for the purchase of substantially all the assets (the "Purchased Assets") of the Debtors (the "Sellers").

On June 30, 2009 @ 9:45 A.M. (Eastern Time), the Court conducted the Sale Hearing at which time having no other bidders, the sale of the Purchased Assets (the "363 Transaction") pursuant to either that certain Master Sale and Purchase Agreement (the "MPA") between the Sellers and Vehicle Acquisition Holdings LLC the "Purchaser"), a purchaser sponsored by the United States Department of the Treasury (the "U.S. Treasury") was approved.

On July 05, 2009, United States Bankruptcy Court for the Southern District of New York signed an order approving the sale of substantially all of the Initial Debtors' assets to a new and independent company (now known as General Motors Company),  a U.S. Treasury-Sponsored Purchaser, under section 363 of the Bankruptcy Code.

**GROUNDS TO LIFT AUTOMATIC STAY:**

**The Loan and Security Agreement between General Motors Company LLC and the United States Treasury of the United States of America.**

**Section 6.15 (b), (ii) of The Master Sale and Purchase Agreement, (MPA) States:**

**From and after the closing, Purchaser shall continue to address Lemon Law Claims using the same procedural mechanisms previously utilized by the applicable Sellers** and (B) for the avoidance of doubt, Purchaser shall not assume Liabilities arising under

the law of implied warranty or other analogous provisions of state law, **Other than Lemon Law, that provides consumer remedies in addition to or different from those specified in the Sellers' express warranties.**

**The Sale Approval Order Section 2.3 (a) (7) (A) Paragraph 56 Sates:**

56. The Purchaser is assuming the obligations of the Sellers pursuant to and subject to conditions and limitations contained in their express written warranties, which were delivered in connection with the sale of vehicles and vehicle components prior to the Closing of the 363 Transaction and specifically identified as a "warranty." The Purchaser is not assuming responsibility for Liabilities contended to arise by virtue of other alleged warranties, including implied warranties and statements in materials such as, without limitation, individual customer communications, owner's manuals, advertisements, and other promotional materials, catalogs, and point of purchase materials. **Notwithstanding the foregoing, the Purchaser has assumed the Sellers' obligations under state "lemon law" statutes, which require a manufacturer to provide a consumer remedy when the manufacturer is unable to conform the vehicle to the warranty, as defined in the applicable statute, after a reasonable number of attempts as further defined in the statute, and other related regulatory obligations under such statutes.**

**GROUNDS TO LIFT THE AUTOMATIC STAY AND TO SEVER CO-DEFENDANTS AUTONATION OF FORT WORTH MOTORS LTD, DBA BANKSTON CHEVROLET FORTH WORTH:**

Plaintiff prays for relief pursuant to 11 U.S.C. 524 (e). The court determined that section 524 (e) does not deny the bankruptcy court the power to release liabilities of a non-debtor under the terms of a chapter 11 bankruptcy plan. See 663 F. 3rd 704, also In A.H. Robins (See exhibit A)

**Plaintiff Case History:**

1. In On October 2005 Plaintiff purchased a commercial heavy duty truck to put in the line up for the operation of my transportation business. Plaintiff purchased this truck new and received a Customer Warranty to last 5 years or 100,000 miles. Six months later the truck had a major malfunction with the fuel system. From April 2006 to January 2007 my truck was in a service center for a total of 190 days. It was declared a Lemon by The Texas Department of Transportation with 27,982 miles.

2. On May 07, 2007 filed suit under the Deceptive Trade Practices Act that is a state statue that allows a consumer to recover damages under Breach of Express Warranty 17.50 (2) as defined in 2.313 of the Texas Business and Commerce Code. (See exhibit B)

5. On May 5, 2009, a duly impaneled jury heard numbered and styled cause 368-223864-07 in the 348th Judicial District Court, Tarrant County Texas. The court read the charge to the jury and thereby submitted the case to said jury. The jury returned a verdict on May 7, 2009, which was received and filed. (See exhibit C)

6. On July 6, 2009, Plaintiff filed a Motion to Enter Judgment pursuant to the jury's verdict and set a hearing on August 13, 2009.

7. On August 13, 2009, Co-Defendant AutoNation Forth Worth Motors, Ltd., d/b/a/ Bankston Chevrolet Fort Worth filed: Suggestion of Bankruptcy of Defendant General Motors Corporation *et al.*. Under the premise that Section 362 of Title 11 of the United States Code provides that the filing of a voluntary petition in bankruptcy operates as a stay of the commencement or continuation of any action or proceeding against a debtor.

8. Co Defendants AutoNation Fort Worth Ltd, d/b/u/ Bankston Chevrolet Fort Worth asked that the case be abated pursuant to 11 U.S.C. 362 and to deny Plaintiff's Motion to Enter Judgment and to grant to Co Defendant AutoNation any and all relief to which it was entitled in equity or law. (See exhibit D)

9. On September 14, 2009, this Court having received notice that Defendant General Motors Corporation, *et al.,* had filed for protection under the bankruptcy laws of the United States did order the above cause to be stayed and placed on the inactive docket. (See Exhibit E)

10. On June 21, 2012 I began talks with attorneys representing Old General Motors at Dickstein Shapiro LLP and New General Motors LLC at King and Spalding LLP.

11. It is Old General Motors position that my case is a liability assumed by New General Motors pursuant to the 363 sale order.

12. It is New General Motors position that while New General Motors did assume warranty liabilities and all Lemon law liabilities as well as Statutes that allow a consumer remedy when the manufacture, "is unable to conform a vehicle to the express written warranty after a reasonable number of attempts, as defined in the applicable statute." I did not allow "New GM" the opportunity to repair my truck. Old GM was found guilty and liable by the jury under the (DTPA) Deceptive Trade Practices Act, however New GM was not found liable for anything. They asserted that I am now attempting to assert a successor liability claim against New Gm and they did not assume any successor liability. It is also their position that my case is comparable to the Castillo case. (See Exhibit F)

13. Not being familiar with this case I decided to study it. As I was doing so I noticed that your Honor gave the Castillo Plaintiffs the opportunity to find a document or admission from or on behalf of New GM stating in substance that New GM intended to assume any liability that was alleged to be an express warranty claim, as contrasted to one that had been stated by Old GM to be such or agreed or adjudicated to be such.

14. I found several documents in which this was done. When General Motors was seeking financing from the Tax Payers of this Great Nation they were passionate about their concern for the American consumer. In their pre negotiations with the United States Treasury they stated it in their Restructuring Plan. They stated it in

their Bankruptcy analysis. They secured it with the execution of Amendment Number Four to the Loan and Security Agreement dated December 31, 2008.

15. But most importantly they declared it on their Balance Sheet Dated July 10, 2009 under the heading of GUARANTEES. (See Exhibit G)

**GUARANTEES**

"With respect to product liability claims involving our and Old GM's products, it is believed that any judgment against us for actual damages will be adequately covered by our recorded accruals and, where applicable, excess insurance coverage. Although punitive damages are claimed in some of these lawsuits, and such claims are inherently unpredictable, accruals incorporate historic experience with these types of claims. Liabilities have been recorded for the expected cost for all product liability claims that have already been incurred and are expected to be filed in the future for which we are self insured. These amounts are recorded within Accrued expenses and Other Liabilities and deferred income taxes and Exclude Old GM's asbestos claims which are discussed separately."

**OTHER LITIGATION-RELATED LIABILITY**

"Various legal actions, governmental investigations, claims and proceedings are pending against us or MLC including product warranties."

"Some of the matters may involve compensatory, punitive, or treble damage claims, environmental remediation programs, or sanctions that if granted could require us to pay damages" "We believe that appropriate accruals have been established for such matters"

**BANKRUPTCY ANALYSIS APPENDIX L (See Exhibit H)**

General Motors stated that "Consumer confidence is essential to the Company's future success. **For most consumers, the purchase of a vehicle represents their second largest expenditure (after housing).** Consumers view resale value and the assured availability of warranty coverage with long term parts and service as critical inputs to their purchase decision. It is the judgment of the Company a bankruptcy filing would substantially, if not completely, erode consumers' confidence in GM's ability to delivery on those requirements. The consumer, with a choice of a comparable product backed by a manufacturer operating outside bankruptcy, is substantially less likely to opt for the bankruptcy tainted product. The resulting deep and precipitous slide in the company's revenue would endanger not only the Company's viability, but countless of its dealers and suppliers, which are in turn relied upon by other manufacturers and the public."

This bought about "Amendment Number Four Loan" which was issued in the amount of 360.6 million additional dollars of tax payer money to create the special Warranty Commitment Program. (See Exhibit I)

This program, according to the President of the United States Barack Obama, was made to assure the American Consumer and I quote: "But just in case there's still nagging doubts, let me say it as plainly as I can: If you buy a car from GM, your warranty will be safe. In fact it will be safer than it's ever been, because starting today; (March 30, 2009), the United States Government will stand behind your warranty." The President did not state that only bits and pieces of the express warranty would be covered. (See Exhibit J)

**FIRST DAY MOTIONS: (See Exhibit K)**

**NY2:\1991699\21\16_SZ21!.DOC\72240.0635  page 8 Paragraph 17 it states:**
**The U.S. Treasury will provide the financing to create New GM.** The U.S. Treasury also indicated that if such a transaction were consummated, it would assure that New GM had adequate financing and a capital structure that would assure New GM's long-term viability. The U.S. Government consistently has emphasized that a fundamental premise of its approach is that a quick approval of the 363 Transaction as the tool for restructuring will avoid potentially fatal revenue perish ability by restoring confidence in GM employees, its customers, its vendors, as well as the communities that depend on GM. **New GM will be perceived by consumers as a reliable, economically sound automobile company that will stand behind its products and extend value to the purchasing public.**

**NY2:\1991699\21\16_SZ21!.DOC\72240.0635 Page 13-14 states:**

The Debtors believe that the assurance to the consumer public that all vehicle and parts warranties (whether pre- or post petition) will be honored on an uninterrupted basis is crucial to their ongoing business operations and goodwill, and absolutely essential to maintain customer loyalty. Similarly, maintenance of the other Customer Programs will further the same goals and serve to preserve long-standing relationships, promote the Debtors' (14) competitive position in the marketplace, and ultimately enhance revenue and profitability. **The aggregate cost to the Debtors to honor and continue the Customer Programs is insignificant when compared to the irreparable harm and detrimental impact on their businesses that will be suffered if these programs are abandoned.** Maintenance of the Customer Programs is essential to the ability of the Debtors to effectively compete in the market and to the continued viability of the Debtors' business enterprise.

The following are general descriptions and examples of certain of the Customer Programs provided by the Debtors. They include the Debtors' Warranty and Service Programs, Recall Programs, GM Card Programs, Sales Incentive Programs, Dealer Support Programs, Vehicle Repurchase Programs, and Trade Customer Programs (each as defined below). The following is not all inclusive and does not set forth all of the Customer Programs that are provided by the Debtors.

**NY2:\1991699\21\16_SZ21!.DOC\72240.0635**
**Warranty and Service Programs page 14 paragraph 38 states:**

Like all automotive manufacturers, GM provides a written warranty of various parts, systems, and accessories in connection with the retail sale of its parts and motor vehicles. Dealers, in turn, agree to perform repairs on qualified vehicles upon the owner's request and in some very limited circumstances, arrange for the repurchase of the vehicle.

In exchange, GM has agreed to reimburse its Dealers and certain Fleet Customers for such services in accordance with GM's Service Policies and Procedures Manual (the "Service Manual"),which applies to all Dealers throughout the United States. Ultimately, **retail customers** and Fleet Customers obtain a wide range of after-sale vehicle services and products through the Dealer network, such as maintenance, light repairs, collision repairs, vehicle accessories, courtesy transportation, road-side assistance**, and extended service warranties (collectively, the "Warranty and Service Programs for Consumers** and Fleet Customers").

**(Paragraph 39 deals with dealers only)**

**NY2:\1991699\21\16_SZ21!.DOC\72240.0635 Page 15 Paragraph 40 states:**

In addition to these reimbursements to Dealers, in order to maintain customer satisfaction, **the Debtors sometimes reimburse customers** for out-of-pocket expenses or inconvenience in connection with informal claims consumers send to the Debtors alleging individual problems with the quality or performance of the GM vehicles purchased or leased, or with the purchased automotive parts and accessories that arise from but are not covered by the written warranties, but that are nevertheless considered part of the Debtors' Warranty and Service Programs for Consumers and Fleet Customers. On occasion, the Debtors repair or repurchase such vehicles as part of their consumer satisfaction efforts. **On occasion, the Debtors resolve such customer satisfaction issues through its own alternate dispute resolution mechanism, state-run dispute resolution mechanisms or in-court resolution. The Debtors estimate that, during 2008, they accrued approximately $3 million per month in obligations in connection with these customer satisfaction efforts.**

**(Paragraph 41 deals with Trade Customers only)**

**NY2:\1991699\21\16_SZ21!.DOC\72240.0635 Page 16 paragraph 42:**

It is self-evident that continuation of the Warranty and Service Programs is essential to the Debtors' ongoing business operations, to the maintenance of customer goodwill and loyalty, and to efforts to preserve the residual value of GM-branded products in the Market place. **Any risk that these programs will not continue in accordance with past practice would irreparably damage the GM enterprise and its reputation in the marketplace, to the detriment and prejudice of all parties in interest. Indeed, if existing and future consumers cannot rely on the continued availability and honoring of warranty claims, GM's entire customer base would likely erode.**

These statements and pleadings were made by General Motors before this court on June 01, 2009.  They declare that unless this court allows them to continue the Customer Warranty Programs they have always had in place, **UNINTERUPTED customer loyalty would be destroyed and their business would likely erode.** (Paragraph 42)

This court agreed and granted the order on June 01, 2009. (See Exhibit L)

**RELIEF REQUESTED**

**WHEREFORE, Plaintiff prays that this Court issue an Order terminating or modifying the stay and granting the following:**

Relief from the Stay allowing Plaintiff to proceed under applicable non-bankruptcy law to enforce its remedies with regard to Cause Number 348-223864-07.

Relief from the Automatic Stay of the Co-Defendants AutoNation of Fort Worth DBA Bankston Chevrolet and sever them from the Bankruptcy proceedings and this courts jurisdiction pursuant to 11 U.S.C. 524 (e).

**WHEREFORE,** the plaintiff respectfully request entry of an order granting the relief herein and such other and further relief as is just.

Dated September 4, 2012

Respectfully,

Linda Mitchell (Propria Persona)
1710 Marlene Dr.
Euless, Texas 76040
817-494-4300
albojintx@yahoo.com

**NOTICE**

Notice has been provided via Email to:      Via Facsimile:

Attorneys for New GM                         Attorney for Co-Defendant
Scott I. Davidson| King & Spalding LLP       AutoNation Fort Worth Motors
1185 Avenue of the Americas                  d/b/a/ Bankston Chevrolet Fort Worth
New York, New York 10036                     201 Main St.
Tel: 212.556.2164 | Fax: 212.556.2222        Suite 1260
E-mail: sdavidson@kslaw.com                  Fort Worth, Texas 76102
                                             817-338-1030 Fax

Attorneys for Old GM
Shaya Berger
1633 Broadway New York, NY 10019
(212) 277-6746
mailto:BergerS@DicksteinShapiro.COM