*Exhibit H — special emphasis to Exhibit 2 of this Document* [handwritten annotation]

Appendix L

# BANKRUPTCY ANALYSIS

## Structural Alternatives to Proposed Restructuring Plan

The Plan presented in this report is predicated upon restructuring the operations and liability/capital structure of the Company without submitting to a U.S. bankruptcy process ("out of court process").

An out of court process will achieve the key financial objectives of the plan without the trauma and systemic risk inherent in a bankruptcy case. An out of court process demonstrates the Company's ability to re-pay the U.S. Department of Treasury loans and to structure a viable business with a positive net present value, credibility with consumers and a competitive operating and capital structure, while minimizing the risk that further financial reorganization will be required.

A fundamental element of the Company's restructuring plan is to avoid further revenue losses that arise from bankruptcy. The out of court process is critical to that objective. Although the Company recognizes that the out of court process does not afford the Company the option to use bankruptcy powers to unilaterally impair claims, reject executory contracts and the like, the Company believes that those potential benefits are more than offset by the actual and potential negative consequences of bankruptcy. Specifically, the incremental portion of the Company's liabilities that can be practically addressed in a bankruptcy is quite limited, compared to the level of support and additional funding that would be necessary to mitigate revenue losses and other consequences.

Consumer confidence is essential to the Company's future success. For most consumers, the purchase of a vehicle represents their second largest expenditure (after housing). Consumers view resale value and the assured availability of warranty coverage and long-term parts and service as critical inputs to their purchase decision. It is the judgment of the Company that a bankruptcy filing would substantially, if not completely, erode consumers' confidence in GM's ability to deliver on those requirements. The consumer, with a choice of a comparable product backed by a manufacturer operating outside bankruptcy, is substantially less likely to opt for the bankruptcy tainted product. The resulting deep and precipitous slide in the Company's revenue would endanger not only the Company's viability, but that of countless of its dealers and suppliers, which are in turn relied upon by other manufacturers and the public. In addition, a GM bankruptcy would threaten GMAC's ability to fund itself in the capital markets, impairing GMAC's capacity to provide wholesale and retail financing essential to support the viability of GM.

The systemic risk to the automotive industry and the overall U.S. economy are considerable, just as the bankruptcy of Lehman had a ripple effect throughout the financial industry. Indeed, the risks relating to a bankruptcy in the automotive sector may be more extensive than Lehman presented in light of the wider range of constituencies, profound employment effects and the potential impact on consumer sentiment. Based upon exhaustive analysis, these risks outweigh the benefits of a bankruptcy based approach to the Company's restructuring.

It should also be noted, as will be shown below, that the financing requirements of the Company significantly exceed those in an out of court process, irrespective of the bankruptcy route chosen. Additionally, many of the liabilities that could be impaired in a traditional bankruptcy process could have the effect of shifting those liabilities to the U.S. Government.

To assess the relative merits of an out of court process, the Company has compared the projected results of its viability plan against projected outcomes in three different bankruptcy scenarios. The analysis included in this Appendix addressing each scenario necessarily makes a number of simplifying assumptions, including that any bankruptcy proceeds in an orderly fashion along a prescribed timeline. In truth and in practice, the process involves many risks, virtually all of which involve delays in timing. To the extent that the Company enters bankruptcy, even via one of the two accelerated strategies, there is an exceptionally high risk that the timeframes extend beyond those presently assumed, rendering the projected DIP funding requirements understated and optimistic. In a traditional Chapter 11 process designed to address all of the Company's liability structure, given the complexity and scope of General Motors' global business operations, there is a substantial risk that emergence from bankruptcy will prove impossible and a liquidation pursuant to Chapter 7 of the Bankruptcy Code will result. Finally, given the Company's financial position and the state of the credit markets, any DIP financing would need to be provided by the U.S. Government. Otherwise, General Motors would not be able to operate in Chapter 11 and would very likely be compelled to liquidate.

The three scenarios considered were as follows:

1. **"Pre-solicited or Pre-packaged Chapter 11"** -- Under this scenario, and as contemplated in the Company's planned Bond/VEBA exchange offer, tendering bondholders would be required to vote affirmatively to accept a Chapter 11 Plan of Reorganization. If possible (because the Plan of Reorganization received the requisite votes) and necessary (because the out of court process failed), the exchange plan would be implemented in bankruptcy, binding 100% of the bondholders to accept consideration equivalent to that contemplated in the out of court exchange. However, this scenario requires an agreement in advance regarding the treatment of VEBA liabilities acceptable to bondholders, as well as a commitment for government financing. No other creditor would be impaired. Existing shareholders would be almost entirely diluted.

This scenario is assumed to require approximately 60-65 days to achieve confirmation of the plan and exit from Chapter 11. It will cause a quite severe near-term negative revenue impact during the bankruptcy proceeding, and a less severe but still serious long-term negative revenue impact after exiting from Chapter 11.

2. **"Pre-negotiated Cram-Down Plan"** -- Under this option, which is more aggressive than a consensual pre-packaged Chapter 11 approach discussed in Scenario 1 above, the Company would seek a larger conversion of debt to equity. This strategy could take many forms, including: (A) complete conversion of the bonds to equity; (B) reduction in obligations from impairing additional classes of claims (including potentially litigation liabilities, dealer claims and contract rejection damages); and (C) greater to perhaps complete equitization of the VEBA obligations. This scenario is assumed to require a minimum of 90 days for its least aggressive variant, up to as long as six months or more for more aggressive variants, such as converting a portion of other liabilities to equity. If the Company were to pursue a larger or complete conversion of the VEBA to

104

equity, the assumption is that this would be a vigorously contested, endangering resolution with the UAW and potentially forcing the Company into an extended traditional Chapter 11 case or free-fall bankruptcy as described in Scenario 3.

For analytical purposes, GM has assumed only the benefits in (A) above, or conversion of the bonds to equity, completed in the shortest (90 day) timeframe possible. The negative revenue impact during this option is expected to be even more severe, with greater permanent effects, compared to the pre-solicited process described in Scenario 1. In addition, the cram down process results in an incremental $4 billion debt reduction, or complete conversion of all U.S. unsecured debt to equity, but also involves significantly higher levels of DIP financing required which, in turn, produces a significantly negative NPV. There would be significantly less negative impact than in a traditional Chapter 11, which has broader implications for the industry as a whole. However, this scenario includes elements likely to elicit opposition, which increases the timing risks and the risk that Scenario 2 might evolve into the substantially less favorable Scenario 3.

3.   **"Traditional Chapter 11 Case"** -- Under this scenario, the objective would be to accomplish a more comprehensive restructuring of the liability portion of the balance sheet, along with substantial asset dispositions, using all of the tools traditionally available to debtors to restructure through a court supervised process.

This process could be expected to require 18-24 months, with an estimated 24 months used for analytical purposes in this appendix. Financially, while the traditional bankruptcy process allows for greater liability reduction potential, incremental funding requirements surge close to a $100 billion or more, reflecting catastrophic revenue reduction impact as well as wholesale (i.e., dealer) financing requirements and supplier support. The revenue impact during this type of bankruptcy would be very severe, with a substantially delayed recovery time and significant potential for permanent, significant damage. Indeed, there is considerable doubt whether the Company would survive this process.

To assess the risks and benefits of each strategy, the Company must weigh the potential additional "cleansing" or liability reducing benefits of each strategy against the "revenue erosion" impact. Key simplifying assumptions in the analysis are as follows: (1) that global revenue impact would be proportional to that experienced in the U.S.; (2) that DIP financing, which the Company believes would <u>not</u> be available today in sufficient size through traditional means, would be provided by the U.S. Treasury; and (3) that the Company under a bankruptcy scenario would request substantial and longer term U.S. Government backstop of warranty coverage, and other customer protections, to address consumer concerns, particularly during the bankruptcy court administration period (which would be helpful, but would not address resale value, competitive threats and other lingering customer concerns).

The remainder of this Appendix discusses the analysis in detail. Table A below summarizes the Company's conclusions as to the potential results of each process. Exhibit 3 to this appendix includes a detailed discussion of the operating scenarios utilized for the analysis presented in Table A.

105

**Table A: Total Financing Requirement**
*($ in billions)*

|  | Out of Court Process | Pre-Solicited Process | Cram Down Process | Traditional Process |
|---|---|---|---|---|
| Liability Reduction Potential | 47 | 47 | 47 | >100 |
| Liabilities Reduced | 28 | 33 | 37 | 41-78 |
| NPV – Equity Value (Midpoint) | 9 | 6 | 0-(16) | (25)-(28) |
| **Government Support*** | | | | |
| U.S. Financing Requirement | 23 | 25 | 29-37 | 42-53 |
| Wholesale Support | 0 | 2 | 7 | 14 |
| Supplier Support | 4 | 8 | 9-10 | 13-17 |
| Delphi | 0 | 1 | 1 | 2 |
| **Total U.S. Government** | **27** | **36** | **46-55** | **71-86** |
| Non-U.S. Financing Requirement | 6 | 9 | 11-15 | 15-17 |
| **Total Financing Requirement** | **33** | **45** | **57-70** | **86-103** |

\* Government support defined as peak borrowing requirements from 2009-2011

**Qualitative Factors**—The key assumption in each of the first three columns of Table A is that the objective for the shortest possible time spent in Chapter 11 limits debt reduction strategies to the $47 billion in U.S. unsecured debt and VEBA. While the 60-day (pre-solicited) process does generate a positive NPV, it is below that achieved through the out-of-court process. The incremental debt reduction involves a 100% participation in the proposed bond exchange, rather than the minimum of 80% proposed in the out-of-court process, reducing debt by an additional $5 billion, in effect eliminating the "hold out" risks in the out-of-court process. Government financing requirements could increase (on both temporary and, to a lesser degree, long-term bases) by $12 billion.

The Company's view of likely unit volume, revenue and contribution margin losses—while in bankruptcy, and after exiting the process—are embedded in the NPVs presented in Table A above. As noted, such revenue losses—in every case—offset the incremental liabilities extinguished by any form of bankruptcy. The Company analyzed the amount of sales volume loss required to offset the positive impact on NPV of reducing incremental liabilities. As noted in Table B below, NPV neutral (or breakeven) unit volume losses—especially for 60-day (pre-solicited) and 90-day (cram down) strategies—do not have to be significant for the NPVs produced by these strategies to be less than the out-of-court result. The percentages in the table reflect the near-term impact on volumes of a bankruptcy followed by a second percentage that reflects the long-term volume impairment in the scenario. The proportion of the near-term loss percentage to the long-term percentage mirrors the scenarios modeled in Table A.

**Table B: Breakeven NPV Unit Volume Loss**
*(% US Volume Loss during Bankruptcy - % Long Term Volume Loss)*

|  | Out of Court Process | Pre-Solicited Process | Cram Down Process (B) | Traditional Process (A) |
|---|---|---|---|---|
| Breakeven NPV U.S. Unit Volume Loss * | N/A | 4% - 3% | 9% - 5% | 13% - 10% |

\* While the percentages in Table B reflect only the U.S. volume declines, the NPV breakeven scenarios include volume loss outside the U.S. at some fraction of the loss of U.S. volumes

The rationale for projected revenue losses associated with bankruptcy proceedings is presented in Exhibit 3. Cram Down Process (B) refers to the "stronger" consumer reaction assumptions examined under Scenario 2. Traditional Process (A) refers to the "Daewoo Experience" assumptions examined under Scenario 3. A breakeven volume estimate is not presented for the most complex and lengthy bankruptcy scenario because the large number and significant variability of the necessary assumptions, as well as the impractically large amount of external financing required, renders the result of such a calculation essentially meaningless.

## GM Balance Sheet and Capital Structure

Any analysis of the potential impact of a bankruptcy process must necessarily begin with an understanding of GM's balance sheet (see Exhibit 1 for the condensed, unaudited balance sheet of General Motors Corporation as of September 30, 2008). As of September 30, total liabilities amounted to approximately $170 billion, assets totaled $110 billion, and stockholders' deficit amounted to ($60) billion.

The $170 billion liability structure in the balance sheet reflects four significant forms of obligations, as summarized in Exhibit 2. First, liabilities to trade creditors critical to remain in business, reserves for warranty coverage (a liability that benefits consumers over time and that directly impacts the company's brand and consumer reputation), accrued allowances for future expected sales incentives for products that have been sold by GM to dealers and are held in dealer inventories, and deposits from rental car companies relating to contracts with GM to repurchase the vehicles (this liability has a matching asset of roughly equal value). The total amount of such liabilities at September 30, 2008 amounted to $51.8 billion.

The second category involves liabilities related to post-retirement healthcare benefits and pension liabilities or obligations that accrue for the benefit of current or future retirees. The total of such liabilities at September 30, 2008 amounted to $46.4 billion.

The third category includes debt obligations of the Company, the total of which amounted to $45.2 billion (including secured and all overseas obligations). Fourth, and finally, are all other liabilities, including taxes, derivative obligations, plant closing reserves, deferred income, payrolls and many other smaller liabilities. Such liabilities generally are tied to the Company's production or sales cycles, as well as allowances for contingent liabilities. The total of such liabilities amounted to $26.0 billion.

In evaluating the effectiveness of a bankruptcy process in "cleansing" GM's balance sheet, an assessment must be made relative to the impact of bankruptcy on each of these four categories, as well as the degree of complexity. In the first category, any impairment would directly impact suppliers, customers and dealers, fundamentally impacting the future franchise value of the

company. The final category contains both obligations that are tied to the business cycle as well as contingent liabilities that might be discharged in a bankruptcy. Given the nature of all such liabilities, it must be assumed that they could only be addressed in a traditional bankruptcy process, as there would be substantial procedural and claims administration requirements. Further, many of these liabilities could only be discharged at substantial risk to the future franchise value of the Company.

As such, any rapid or accelerated process would naturally be targeted at U.S. unsecured bond debt (excluding secured debt and international debt of foreign subsidiaries) as well as post-retirement obligations related to the VEBA. Any action to reject labor contracts, reject retiree benefits, or to modify and/or terminate pension plans would also very likely necessitate a traditional and protracted bankruptcy process.

**Debt Reduction Alternatives**—Using the Company's September 30, 2008 liability structure as the starting point, Table C rolls forward and aggregates total expected liabilities and future cash claims that would be considered in a bankruptcy filing:

**Table C: Total Liability Summary**
*($ in billions)*

| | |
|---|---:|
| **September 30, 2008 Total Liabilities** | **169** |
| New Liabilities Incurred in Q4 2008 (includes $4 billion U.S. Treasury Secured debt) | 7 |
| December 31, 2008 Total Liabilities* | 176 |
| Roll-Forward of 12/31/08 Liabilities (Including Incremental U.S. Treasury Debt and Other Adjustments) | 12 |
| **Current Liabilities*** | **188** |

\* Preliminary

With $188 billion of liabilities as the starting point for potential debt reduction through bankruptcy, Table D below summarizes such liabilities within categories that can be addressed under the three different forms of bankruptcy noted earlier:

**Table D: Liability Categories**
*($ in billions)*

| | |
|---|---:|
| Operating/Trade Related Liabilities | 72 |
| Non-UAW VEBA-Related OPEB and Pensions (Global) | 39 |
| **Subtotal Operating & Retiree Related** | **111** |
| | |
| U.S. Secured Debt | 21 [1] |
| Other Debt Including Foreign Subsidiary Debt | 9 |
| NPV of UAW VEBA Obligation | 20 [2] |
| Unsecured U.S. Debt | 27 |
| **Subtotal Debt Obligations** | **77** |
| | |
| **Total** | **188** |

(1) Includes U.S. Government secured ($15B) and secured revolver and term loan ($6B)
(2) NPV of future obligations, exclusive of transferred VEBA assets; discounted at 9%

Reflecting the above, both out-of-court restructuring and the two accelerated bankruptcy strategies necessarily limit their impact to $47 billion of the liabilities, including $20 billion in VEBA-related obligations and $27 billion in unsecured U.S. debt. In order to address other major elements of the capital structure, a traditional Chapter 11 process would be required.

**Revenue and Operating Impacts**—There are three critical factors to consider relative to revenue and other operating risks associated with Chapter 11. The first and most important involves revenue and contribution margin risk, including the potential for lost sales and increased discounts to sell vehicles. This impact has three principal elements: (1) lost sales and contribution margin during the bankruptcy period; (2) the length of the time, post-exit, until sales return to steady-state levels; and (3) long-term reputational damage and resultant permanent loss of market share, revenue and contribution margin. Considerable research has been done on this subject and there are several smaller examples from the global automobile industry to consider (see Exhibit 3). Any adverse revenue and contribution margin impacts from bankruptcy drive greater DIP as well as permanent funding requirements.

The second key impact in a GM bankruptcy relates to GMAC and its wholesale credit lines to the Company's dealers. A GM bankruptcy may constitute an Event of Default in one or more of GMAC's independent credit facilities. GMAC might also experience indirect effects of a GM bankruptcy which triggered provisions in existing facilities or resulting in the inability to renew existing facilities. Therefore, absent some form of additional support for GMAC, General Motors believes that GMAC would cease wholesale dealer financing for all but the most creditworthy retailers. This would necessarily shift substantially the entire burden of wholesale financing to the Company, in turn increasing the size of any DIP funding facility.

The third key impact would involve suppliers. In an out-of-court process, and in the two accelerated bankruptcy strategies, claims of trade creditors are not impaired and no further provision has been made for incremental DIP capacity. In a traditional bankruptcy, with the significant expected volume declines increasing the likelihood of supplier economic distress, the Company believes that incremental DIP, and potentially permanent additional funding, would be required.

# GENERAL MOTORS CORPORATION AND SUBSIDIARIES
## Condensed Consolidated Balance Sheet
### September 30, 2008
($ In Millions)
(Unaudited)

| Description | September 30, 2008 |
|---|---:|
| *Current Assets* | |
| Cash and cash equivalents | 15,831 |
| Marketable securities | 67 |
| *Total Cash and marketable securities* | 15,898 |
| | |
| Accounts and notes receivable, net | 9,461 |
| Inventories | 16,914 |
| Equipment on operating leases, net | 4,312 |
| Other current assets and deferred income taxes | 3,511 |
| *Total current assets* | 50,096 |
| | |
| FINANCING AND INSURANCE OPERATIONS ASSETS | |
| Cash and cash equivalents | 176 |
| Investment in securities | 273 |
| Equipment on operating leases, net | 2,892 |
| Equity in net assets of GMAC LLC | 1,949 |
| Other assets | 2,034 |
| *Total Financing and Insurance Operations assets* | 7,324 |
| | |
| *Non-Current Assets* | |
| Equity in and advances to nonconsolidated affiliates | 2,351 |
| Property, net | 42,156 |
| Goodwill and intangible assets, net | 949 |
| Deferred income taxes | 907 |
| Prepaid pension | 3,602 |
| Other assets | 3,040 |
| *Total non-current assets* | 53,005 |
| | |
| **TOTAL ASSETS** | 110,425 |
| | |
| *Current Liabilities* | |
| Accounts payable (principally trade) | 27,839 |
| Short term borrowings and current portion of long-term debt | 7,208 |
| Accrued expenses | 33,959 |
| *Total current liabilities* | 69,006 |
| | |
| FINANCING AND INSURANCE OPERATIONS LIABILITIES | |
| Debt | 1,890 |
| Other liabilities and deferred income taxes | 768 |
| *Total Financing and Insurance Operations liabilities* | 2,658 |
| | |
| *Non-Current Liabilities* | |
| Long-term debt | 36,057 |
| Postretirement benefits other than pensions | 33,714 |
| Pensions | 11,500 |
| Other liabilities and deferred income taxes | 16,484 |
| *Total non-current liabilities* | 97,755 |
| | |
| **TOTAL LIABILITIES** | 169,419 |
| | |
| *Minority Interests* | 945 |
| | |
| Preferred stock, no par value, 6,000,000 shares authorized, no shares issued and outstanding | 0 |
| Common stock, $1 2/3 par value (2,000,000,000 shares authorized, 800,937,541 and 610,462,606 shares issued and outstanding, respectively) | 1,017 |
| Capital surplus (principally additional paid-in capital) | 15,732 |
| Accumulated deficit | (61,014) |
| Accumulated other comprehensive loss | (15,674) |
| **TOTAL STOCKHOLDERS' DEFICIT** | (59,939) |
| **TOTAL LIABILITIES, MINORITY INTERESTS AND STOCKHOLDERS' DEFICIT** | 110,425 |

# Exhibit 2
## Summarized Balance Sheet Elements
*($ in billions)*

|  | Sept 30, 2008 |
|---|---|
| Accounts Payable – Auto | 27.8 |
| Warranty and Policy Obligations | 9.0 |
| Sales Allowance Accruals | 8.5 |
| Customer Deposits | 6.5 |
| **Sub-Total Category 1** | **51.8** |
| | |
| Post-Retirement Benefits, Other than Pensions* | 34.2 |
| Pensions* | 12.2 |
| **Sub-Total Category 2** | **46.4** |
| | |
| Short-Term Borrowings | 7.2 |
| Finance and Insurance Debt – Secured | 1.9 |
| Long-Term Debt | 36.1 |
| **Sub-Total Category 3** | **45.2** |
| | |
| **Category 4: All Other Liabilities** <br> (Taxes, Payrolls, Derivative Obligations, Deferred Income, Plant Closing Reserves, etc.) | **26.0** |
| | |
| **TOTAL** | **169.4** |

*Includes current portion of liability