1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 09-50026(REG)

4

5   - - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7   GENERAL MOTORS CORPORATION,

8              Debtors.

9   - - - - - - - - - - - - - - - - - - - - - -x

10

11

12              United States Bankruptcy Court

13              One Bowling Green

14              New York, New York

15

16              September 24, 2012

17              9:49 AM

18

19

20

21   B E F O R E:

22   HON. ROBERT E. GERBER

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO - MATTHEW

Page 2

1    HEARING re Motion of Jaspan Schlesinger LLP to withdraw as

2    counsel of record for Woodbury Cadillac, LLC

3

4    Motion for objection to claim(s) number: 50085 of Autonation,

5    Inc.

6

7    Motors Liquidation Company GUC Trust's Objection to Claim No.

8    66309 filed by Castle Buick Pontiac GMC, Inc. and Claim No.

9    66310 filed by Grossinger Autoplex, Inc.

10

11   Motors Liquidation Company GUC Trust's objection to Claim(s)

12   number 71060

13

14   Objection to Claim #29628 filed by Tiesha McNeal

15

16   Objection to Claim(s) Number 62969 filed by John A. Haack

17

18   Debtor's 187th Omnibus Objection to Claims (qualified defined

19   benefits, pension benefits claim of former salaried and hourly

20   employees)

21

22   Debtor's 186th Omnibus Objection to Claims (qualified defined

23   benefits, pension benefits claims of former salaried and hourly

24   employees)

25

1    227th Omnibus Objection to Claims (welfare benefits claims of

2    retired and former salaries and executive employees)

3

4    237th Omnibus Objection to Claims (claims relating to former

5    employees represented by United Auto Workers)

6

7    243rd Omnibus Objection to Claims and Motion requesting

8    enforcement of Bar Date Orders Overstreet Claim #s 70471, 70469

9    & 70470

10

11    262nd Omnibus Objection to Claim(s) (pension benefits claims of

12    former salaried and hourly employees)

13

14    282nd Omnibus Objection to Claim(s)

15

16    283rd Omnibus Objection to Claim(s)

17

18    284th Omnibus Objection to Claim(s)

19

20    285th Omnibus Objection to Claims

21

22

23

24

25    Transcribed by:  Sheila Orms

Page 4

1    A P P E A R A N C E S :

2

3    DICKSTEIN SHAPIRO LLP

4           Attorneys for Plaintiff, GUC Trust

5           1825 Bye Street NW

6           Washington, DC   20006-5403

7

8    BY:   COLLEEN KILFOYLE, ESQ.

9           STEFANIE BIRBROWER GREER, ESQ.

10

11   WEIL, GOTSHAL & MANGES, LLP

12          Attorneys for GUC Trust

13          767 Fifth Avenue

14          New York, NY   10153

15

16   BY:   EDWARD D. WU, ESQ.

17          DAVID N. GRIFFITHS, ESQ.

18

19   WEIL, GOTSHAL & MANGES LLP

20          Attorneys for GUC Trust

21          200 Crescent Court

22          Suite 300

23          Dallas, TX 75201

24

25   BY:   ANGELA ZAMBRANO, ESQ.

1   JASPAN SCHLESINGER, LLP

2         Attorneys for Woodbury Cadillac, LLC

3         300 Garden City Plaza

4         Garden City, NY  11530

5

6   BY:   SHANNON A. SCOTT, ESQ.

7

8   SL CHAPMAN, LLC

9         Attorneys for Castillo

10        330 North Fourth

11        Suite 330

12        St. Louis, MO  63102

13

14  BY:   MARK L. BROWN, ESQ. (TELEPHONICALLY)

15

16  HORWITZ HORWITZ & ASSOCIATES

17        Attorneys for Kenneth Smith

18        25 E Washington Street

19        Suite 900

20        Chicago, IL 60602

21

22  BY:   THOMAS A. KELLIHER, ESQ. (TELEPHONICALLY)

23

24

25

1    THE SANDERS FIRM

2           Attorneys for Ms. Brewer

3           5100 Poplar Avenue

4           Suite 2700

5           Memphis, TN  38137

6

7    BY:   ARCHIE SANDERS, III, ESQ. (TELEPHONICALLY)

8

9    TELEPHONIC APPEARANCES:

10          SARAH M. DECKER, WEIL GOTSHAL & MANGES

11          CONRAD CHIU, PRYOR CASHMAN, LLP

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  Good morning.  Have seats, please.

3            Mr. Griffiths, good morning.

4            MR. GRIFFITHS:  Good morning, Your Honor.  David

5    Griffiths of Weil, Gotshal & Manges for the Motors Liquidation

6    Company GUC Trust.

7            THE COURT:  Do you have a recommendation as to the

8    order in which you'd like to deal with the matters today?

9            MR. GRIFFITHS:  Yes, please, Your Honor.  I have my

10   colleague, Angela Zambrano of Weil, Gotshal & Manges to present

11   item number 1 on the agenda, and then we would propose to speed

12   through the -- a number of matters that Weil Gotshal is

13   handling before handing over to Dickstein Shapiro for the

14   remaining matters on the agenda.

15           THE COURT:  Well, that sounds fine, Mr. Griffiths.

16           MR. GRIFFITHS:  Okay.

17           THE COURT:  Ms. Zambrano, do you want to come up,

18   please?  Mr. Brown, are you on the phone?

19           MS. ZAMBRANO:  I believe they announced him when we

20   were beginning.

21           THE COURT:  Mark Brown for the Castillo plaintiffs?

22           MR. BROWN:  Yes, Your Honor.  Can --

23           THE COURT:  Now I can hear you.  Okay.  Now I can hear

24   you fine.

25           MR. BROWN:  Good morning, Your Honor.

Page 8

1            THE COURT:  Good morning.  Folks, I've read the papers

2    and the issues here I think are not as difficult as they were

3    in some other class action certification matters, that I dealt

4    with, most significantly the Apartheid matter, although I was

5    puzzled by the lack of mention of that decision in the papers

6    on each side.

7            I'd like both sides to be prepared to address a couple

8    of questions that I have.  One, am I right in my understanding

9    that Old GM is not objecting to the $4 million in fees that was

10   provided for under the original settlement, and which I would

11   understand to be an element of rejection damages, possibly

12   accounting for why, if I'm right, Old GM isn't objecting to

13   them.

14           But vis a vis the other entitlements under the

15   original settlement, I'd like to know if a class were to be

16   certified, whether we would then have to set up a reserve or

17   whether a reserve has already been set up to take into account

18   liabilities under the settlement, which could then have a

19   spillover effect on the other creditors in the Old GM estate,

20   who presumably would be getting supplemental distributions as

21   claims are resolved, or who conversely would have to wait on

22   getting supplemental distributions to the extent they weren't.

23           I also want both sides to deal with how I would deal

24   with the estimation process for that.  I have in the past had

25   to have estimation proceedings or otherwise to deal with

Page 9

1   estimation for reserves.  I'd also like to know how we would

2   notice the 149,000 or whatever the exact number is of members

3   of the class, and how much it would cost.  And what the

4   proposals are for who would bear the cost if we were to do

5   that.

6          I want both sides to be prepared to address the effect

7   on GM's other creditors, Old GM's other creditors of the

8   certification that's been requested here.

9          Ms. Zambrano, you came up to the main lectern

10  presumably as claims objector.  Why don't you lead off and then

11  I'll give Mr. Brown a chance to be heard, you a chance to reply

12  if you want to, and Mr. Brown a chance to sur-reply if he wants

13  to in the latter two cases limited to the new stuff that's

14  discussed.

15         MS. ZAMBRANO:  Thank you, Your Honor.  I'm sorry if I

16  jumped the gun.  I heard my name and popped up.  This is

17  probably my last hearing before Your Honor.  As you may be

18  aware, I have been handling the class claims against the Old

19  GM, and this is the last one on the claims register that's

20  purported to be a class claim.

21         It also presents, as Your Honor has indicated, not the

22  most difficult issues under Rule 23, but some real practical

23  concerns that we've had in trying to administer or trying to

24  resolve rather this claim.

25         On the one hand, we have a judgment that has been

Page 10

1    entered.  I will note that the agreement was not final under

2    its terms, but we certainly have a final judgment, and we have

3    a federal court that has applied Rule 23 and decided that it

4    should be a class settlement.  On the other hand --

5            THE COURT:  Pause, please, Ms. Zambrano.  And I

6    should've picked it up from the papers, forgive me, you and Mr.

7    Brown both forgive me.

8            Was the class certified for settlement purposes only

9    or was it certified as a class deserving of going forward and

10   then settled?

11           MS. ZAMBRANO:  It was certified as the settlement

12   class, although if you read the Supreme Court decisions of

13   late, there should be no difference.  But it was certified in

14   the connection with the class settlement.

15           THE COURT:  Okay.  Continue.

16           MS. ZAMBRANO:  And so on the one hand we do have a

17   federal court who's looked at this and has said that Rule 23

18   applies and has entered a judgment on a settlement, a

19   stipulation of settlement.  On the other hand, you have a very

20   different situation than we've had in all of the class claims

21   that I'm aware of against this estate.  And frankly in my

22   practice, as a class action practitioner, in this case, when we

23   had a stipulation of settlement between the plaintiffs and Old

24   GM in July of 2008, all the way back then, we had Old GM come

25   forward and say, we're going to just start paying the

Page 11

1    consideration that is due under the settlement or that will be

2    due.

3            I'm sure it comes to no surprise to you that it took

4    some time for that to work through -- its way through the

5    system, and have the papers filed, the Court have a hearing,

6    objectors look at it, all of that until finally we had a final

7    hearing in April of 2009.

8            We all know that the world looked quite different

9    during -- at that point, but in that whole time period that Old

10   GM had stood up, actually it was in February had stood up and

11   said we'll start honoring it.  We had thousands of people come

12   forward and millions of dollars were paid pursuant to that

13   settlement before ultimately the company filed for bankruptcy.

14           And so that is very different than anyone that -- any

15   other class action that we have where creditors or excuse me,

16   where class action plaintiffs before final judgment were able

17   to recover.

18           And then, of course, we had the filing.  And there was

19   a period of time after the filing in which New GM, I think Your

20   Honor noted in the adversary proceeding ruling, probably out of

21   confusion, who knows, but New GM continued to pay the

22   settlement that was due under the class action settlement

23   agreement.  And so you had millions more paid under -- by New

24   GM under the terms of the settlement.

25           And then, of course, New GM decided that it would

Page 12

```
 1    change its policy, but it would still reimburse these class

 2    members.  Those class members then have been in the very

 3    enviable position, from my view, who as part of representing GM

 4    I also mediate cases in which unsecured claimants with -- that

 5    are very horribly injured and have claims and mediate their

 6    claims against the estate, they have not been in the position

 7    of being able to recover anything before they work theirsevles

 8    through this process.

 9            These class members were not in that situation.  They

10    were able to recover first whatever they would've been entitled

11    to under the class action settlement, and then even whole

12    dollars from New GM to obtain reimbursement.

13            And so we think when we're trying to resolve this for

14    the best interests of the estate, and that the creditors, we

15    look at that situation versus what the Court initially started

16    with, the federal court in California.  And we don't think that

17    this is a situation where you could just allow this class claim

18    for the amount that's been filed because there's a judgment.

19            We don't know within that class, that former class, in

20    my opinion, whether -- who should obtain consideration from the

21    estate and how much.  And so there has to be some sort of

22    process if the Court would permit that to continue at all.

23            It is our opinion, the Trust's view, that enough is

24    enough.  They've had sufficient notice of their rights under --

25    against Old GM and then New GM, and they had the opportunity to
```

Page 13

1      obtain not an unsecured class claim and whatever that's worth

2      presently, but whole dollars from Old GM and then New GM.  And

3      so at this juncture to require either the plaintiffs or the

4      estate to renotice that class, we think does not make sense.

5             Now, I want to address the specific questions that

6      Your Honor raised, and I can -- some of them are easy to deal

7      with.

8             The first question that you asked was whether Old GM

9      is not objecting to the $4 million in fees.  The answer to that

10     question is yes, that is correct, we are not objecting.  And

11     the reason why we are not objecting is if you look at the value

12     that this class actually obtained -- excuse me, this class

13     counsel actually obtained for the class, it's substantial.

14     They -- their work and that process started a process by which

15     $35 million was obtained and value was obtained for the class

16     members.

17            And so we think that that's an amount that we know,

18     they've proved it to the federal court in California, and we

19     don't have an objection to that now.

20            The next question that you asked if class was

21     certified, would we have to set up a reserve.  I'm going to

22     have to check with my client to be a hundred percent sure on

23     this.  But it's my understanding that a reserve has been set up

24     in the amount of the claim.  But I can confirm that for Your

25     Honor.  And so, in other words, would there be -- you know,

Page 14

1    would there be a possibility -- was there a small reserve set

2    up such that we would have to go back and upset the apple cart

3    with respect to other claimants.  I don't think so.  I think

4    the reserve was set at the amount of the claim.

5              THE COURT:  Pause, please.  If that is still then,

6    that means we don't have to create a new reserve, but the

7    existence of the reserve is in substance holding back money

8    that could otherwise go to other creditors.

9              MS. ZAMBRANO:  That's right.  And the other prejudice

10   that the other creditors are dealing with, of course, is the

11   timing of this to the extent that additional notice would be,

12   you know, provided to the class.

13             I thought that in focusing on these issues this

14   morning, it occurred to me, this isn't just an issue of notice.

15   Because it's not like if we just noticed the people and they

16   come forward that then we can say, ah-ha, that's the amount of

17   the claim.  We -- every class member was supposed to get $50

18   and you have -- now we have 200 more people that are coming

19   forward, that's the amount and we go forward.

20             This was a very complicated settlement in which people

21   had to submit specific forms of reimbursement, and they were

22   entitled to certain amounts, you know, if they substantiated

23   what that consideration level under the settlement agreement

24   was.  It's not just a multiplied by the number of claimants

25   that show up.  And so there's actually notice and

Page 15

1    administration costs here.

2           And in our view, certainly the estate shouldn't pay

3    for that, given the notice that has already been given to the

4    class and paid for by Old GM initially with specifically, with

5    respect to this claim, and then with New GM, of course, as

6    well.

7           You said how we would notice this class.  I don't know

8    the answer to that, Your Honor.  I know that we would start, of

9    course, by going to New GM and getting the records of the

10   Saturn owners during this time period that had already been

11   sent two letters, that would be the first place to start.  I

12   suppose you could do some sort of publication notice.  I don't

13   know.  I do know that whatever notice, if it was specific to

14   the claimant, would be the third type of notice that we

15   would've provided to them.  And I don't have an estimate of the

16   costs.  Again I will say I don't think it's the estate that

17   should bear that at this point.

18          We've cited a couple of cases in our papers, Your

19   Honor, for the proposition that the plaintiffs that are

20   bringing this case should bear that cost.

21          THE COURT:  Now, at one time notice was sent to

22   presumably the 149,000 class members back in prepetition

23   plenary litigation.  Am I right that if you were willing to pay

24   the cost for 149,000 class members, you could simply send them

25   mailings using the old address list that we used back then?

1           MS. ZAMBRANO:  That would be the only way I would know

2    how to proceed.  That's definitely what we would do.  Although,

3    of course, we would research it further.  That's where we would

4    start with getting the addresses from New GM, we don't have

5    them.  But then, and that's what I was trying to highlight,

6    it's not just sending the notice and then waiting for things to

7    come in, and multiplying by that number of claimants.  It's the

8    administration of the cost.  Which in my view in class action

9    litigation can be substantial.  Someone has to deal with each

10   of those things that come back, figure out how they -- where

11   they fall in the settlement, how many miles did they have at

12   the time, were they the original owner, whether they should be

13   -- what portion should they be entitled to of the menu of

14   consideration that's provided under that agreement.

15           THE COURT:  So are you saying it's more than simply

16   multiplying the cost of a mailing of postage by 149,000?

17           MS. ZAMBRANO:  Exactly, exactly.

18           THE COURT:  Go on, please.

19           MS. ZAMBRANO:  And then I think I want to end with

20   your last question because it ties into all of this, you know,

21   how would you deal with an estimation process here.

22           I don't think we can begin to estimate until we figure

23   out who we're really dealing with.  And so the notice cost, the

24   administration cost and go from there.  I think then we can do

25   an estimation.

Page 17

1       You could remember the DEX-COOL claimants that we had

2   before you, in those situations, and in one other I believe,

3   the Solders Class (ph), I know Your Honor has had a lot with

4   them -- this case.

5       THE COURT:  Frankly, the only one I really remember

6   well at this point is Apartheid.

7       MS. ZAMBRANO:  Well, I'll tell you in those cases, we

8   were able to achieve some sort of resolution with the class

9   claimants because where the bankruptcy fell in the life of that

10  class action was the notice had come out -- had gone out, the

11  class action papers or the claim forms had gone out, and the

12  claim forms, some of them had come back.  And so they were

13  sitting in a box somewhere.  And we could either estimate for

14  Solders, because there is again, there's administration,

15  substantial administration costs in going through those, but we

16  could do that.

17      With GM, we could extrapolate how much someone would

18  be entitled to under the settlement.  We don't have that here.

19  We -- I can think of no reasonably practical way to estimate

20  this claim at this juncture, and I don't think plaintiff's

21  counsel can either.

22      And so the situation that we're in is we have to go

23  through this notice and full administration of a class claim to

24  get to, what I believe at the end of the day, are no claimants.

25  I think anyone who's had a claim for a transmission problem

Page 18

1    with this year of Saturn during this entire time period

2    would've gone and gotten whole dollars from either Old GM in

3    the beginning, the moment it was announced, or certainly as Old

4    GM was having financial problems, you'd bring your car in.  And

5    after that time period, of course, New GM stood ready and

6    stands ready today to reimburse people for those same problems.

7         And so I don't think at the end of the day after all

8    of this work you're actually going to find claimants.  And so

9    that's why we ultimately decided that the most appropriate way

10   to resolve this for the estate, and all the other creditors

11   that we're dealing with and must think about as well, is to

12   expunge the class claimant at this juncture.

13        We are, of course, allowing any individual claim that

14   was filed on these problem -- because of these problems.

15   That's, of course, appropriate.  It's the class nature, the

16   representative nature, I just don't think has a place in this

17   bankruptcy at this point.

18        THE COURT:  Pause please, Ms. Zambrano.  Something you

19   said in your most recent remarks got my attention.  Did I

20   understand you to say that even to this date, New GM is

21   bellying up to the bar on making repairs for class members?

22        MS. ZAMBRANO:  Yes, Your Honor.  What they have agreed

23   to do, they agreed some time ago and have been honoring it, is

24   to reimburse class members up to 80,000 -- excuse me, 100,000

25   miles or eight years from the date of purchase for this

Page 19

1   particular problem at 50 percent.  So it's not the whole

2   dollars or a hundred percent reimbursement that was under the

3   settlement.  And it's not the hundred percent that the New GM

4   was paying immediately post bankruptcy, but they are doing

5   that.  They also have a program with respect to the trade in

6   value, and I don't know the details of that.

7           THE COURT:  In essence, it's like a voucher that you

8   can apply towards the purchase of a new vehicle in some amount?

9           MS. ZAMBRANO:  I think that's right.  But it's --

10  there's two components of the consideration.  But the 50

11  percent of just cash that you're out is the one that I don't

12  think someone, you know, that went through this entire process

13  would say, oh, I'm going to wait, and I'm going to have my

14  class claim be administered in the bankruptcy, and I'm going to

15  get pennies on the dollar, and that's the way I want to be

16  reimbursed.  I just don't think that makes sense.

17          THE COURT:  Did I properly understand you to say that

18  up to an earlier time, rather than getting paid at the 50

19  percent rate, the totality of the repair costs were absorbed by

20  either Old GM or New GM?

21          MS. ZAMBRANO:  Yeah, the settlement that Old GM

22  entered into was for -- again, you have to fit into our certain

23  bucket, but for a certain bucket, purchased a new car within a

24  certain number of years, I think it's 80 maybe 100,000 miles,

25  if you came in, and you had your repair costs, you'd get them a

Page 20

1     hundred percent covered.  Okay.  And that was -- and Mr. Brown

2     can -- knows the details far more than -- better than I do.

3     But that was the deal under the old settlement, and New GM --

4     and Old GM honored that for five, six months, paid $14 million

5     in that type of reimbursement.

6            New GM also did for a period of time after the filing,

7     and paid about 5 -- between 5 and $6 million.  And the

8     consideration again that New GM is paying, is different, but

9     it's whole dollars reimbursement, and they stand ready to do so

10    today if the vehicle, you know, fits into that category.

11           THE COURT:  Okay.  Anything else?

12           MS. ZAMBRANO:  Not at this time, Your Honor, thank

13    you.

14           THE COURT:  Okay.  Mr. Brown?

15           MR. BROWN:  Yes, Your Honor.  I think the parties are

16    in agreement that the Court has discretion here with this

17    situation.  The challenge I think in exercising that discretion

18    is, and Ms. Zambrano has touched on it, the substantial relief

19    that a significant number of class members have already

20    received.  I'm not aware, and spent a good amount of time

21    looking for perhaps something that might guide the Court in

22    these circumstances.  And I'm simply aware of none.

23           I think this may be an unprecedented set of

24    circumstances for the Court to consider.  Having said that, of

25    course, we certainly request that the Court exercise its

Page 21

1    discretion in favor of the class members and permit the proof

2    of claim, and deny the motion.

3            To answer the Court's specific questions, let me start

4    with the estimation question first because I might be able to

5    shed the most light on that, that particular question.

6            In the underlying district court proceeding in

7    California, as part of the final approval process, we secured

8    the services of an independent actuary to estimate the total

9    value of the relief to the class under settlement, the terms of

10   the settlement.  Of course, at that time, it was anticipated

11   that the settlement would be fully honored, and we weren't

12   anticipating bankruptcy.

13           And what the actuary did was he reviewed the claims

14   data that GM provided in terms of the warranty data for

15   vehicles that were visited by GM repair shops at the time, and

16   then extrapolated for what the likely failure rate would be

17   going forward.  And recognizing that the settlement essentially

18   called for an extended warranty taking the vehicles to 125,000

19   miles, Mr. Johnson, the actuary, estimated that the total value

20   of relief to the class was 50 -- approximately $57 million.

21           Of that 57 million, I believe he determined that

22   approximately 47 million represented what he expected to be the

23   costs of payment to class members for repairs and relief under

24   the settlement agreement.  The remaining approximately 10

25   million represented administration costs and overhead,

Page 22

1    personnel training, and significantly profit to the -- an

2    insurer, because he estimated this as if it were to be -- as a

3    liability if it were to be purchased by an insurance company or

4    an extended warranty company that they would then go ahead and

5    administer the settlement.

6        So considering that, his estimate that was that the

7    pay-out to actual class members would be approximately 47

8    million.  We now know from records provided by GM that

9    approximately 36 million has been paid as a result of the class

10   judgment, either by honoring the specific terms a hundred

11   percent, or in the form of the alternative relief that New GM

12   has since imposed.

13       And so I suppose one way to look at this would be that

14   if you subtract 36 million from 47, that's $11 million, and

15   it's also the case that because of the GM -- what I'll call the

16   buy back program, where it was $5,000 I understand for a trade

17   in on one of these class vehicles.  As a result of that, a

18   number of vehicles were removed from the roads, and so that

19   might also affect the estimates of how many repairs there will

20   be going forward.  Obviously, if the cars are not on the road,

21   they're not being driven and they can't fail.  So there would

22   be that intact as well.

23       So I do think there is a reasonable basis for

24   estimating.  We haven't formalized that information to make it

25   available to the Court.  I'm happy to do that.  But that's

Page 23

1   certainly something for the Court to take into account.  And I

2   hope I've answered the Court's questions in that regard.

3           I think Ms. Zambrano answered the question about the

4   reserve and therefore, the impact on other creditors.  In terms

5   of notice to the class, and how that would be accomplished and

6   would be paid for, it is the case that in a typical class

7   action outside the bankruptcy context, prior to trial or

8   judgment, it's typically the responsibility of their class

9   counsel to pay for notice to the class.  However, in the case

10  of a settlement, it's typically the defendant who pays for the

11  notice and that was certainly the case her.  Old GM paid for

12  notice to the class, and not only did Old GM pay for the

13  original notice to the class, but Old GM also agreed it was by

14  Old GM's request actually that they wanted a two-step process,

15  whereby claim forms would be sent in addition to the initial

16  notice.

            And so that was an undertaking that Old GM agreed to.

17          In this context, if the Court were to undertake an

18  estimation process, it seems that a compromised position might

19  be that out of the -- I suppose, as class members submitted

20  claim forms, that really is the only way I know of to identify

21  the exact amount that may still be owed to class members who

22  haven't yet received any recovery.  And I suppose it would be

23  possible to provide for those notice costs out of that pool.

24          THE COURT:  Pause, please, Mr. Brown.  To what extent

25  did class members send back claim forms with respect to

Page 24

1    individual amounts that they would want for their pieces of the

2    pie under the overall settlement?

3            MR. BROWN:  Well, unfortunately that was the problem,

4    Your Honor.  The judgment was final, and unappealable prior to

5    the petition, the bankruptcy petition being filed.

6    Unfortunately, the deadline under the agreement and under the

7    judgment for Old GM to send claim forms was June 2nd.  And as

8    the Court knows, the bankruptcy petition was filed on June 1st.

9            So there weren't actual claim forms sent to the class

10   members as contemplated by the judgment because the bankruptcy

11   petition intervened.

12           THE COURT:  Uh-huh.  Continue, please.

13           MR. BROWN:  I think the last question for me to answer

14   was actually the Court's first question and Ms. Zambrano

15   touched on it.  You asked whether Old GM was objecting to the

16   proof of claim form of class counsel's fees, and I understand

17   that the trust is not objecting.

18           I'd simply like to add to that, Your Honor, in

19   addition, of course, to the very substantial relief that the

20   classes received as a result of our efforts, and we're very

21   proud of that, the difference between the proof of claim filed

22   on behalf of class counsel and filed on behalf of the entire

23   class, although we're both judgment creditors, we in the class,

24   the difference is as class counsel we have a liquidated claim,

25   and obviously were identifiable, they are not the

Page 25

1    administrative issues that unfortunately involved the class.

2         But we have engaged in this litigation since 2007, and

3    without any -- not only without any promise of recovery, but in

4    addition to the significant time that we've expended, there's

5    been significant expense both in terms of prosecuting the

6    underlying case, prosecuting the adversary proceeding which by

7    the way, class counsel continues to pursue by way of appeal to

8    Judge Jones.  And there have been out of pocket costs in terms

9    of hiring personnel to handle the influx of calls, and to

10   engage local counsel to assist with the adversary proceeding

11   and the bankruptcy proceeding in New York.  And so there's been

12   a significant outlay.  And we're -- although we would have

13   preferred to prevail already in the adversary proceeding, we're

14   very proud of the efforts that have taken place so far and the

15   results for the class.

16        And I believe that answers the Court's questions.

17        THE COURT:  Okay.  Anything further, Mr. Brown?

18        MR. BROWN:  Not that I can think of, Your Honor.

19        THE COURT:  Okay.  Ms. Zambrano, any reply?

20        MS. ZAMBRANO:  Two things.  First of all, I just want

21   to note with respect to the $57 million number that was thrown

22   out there, that was not a number that was at all agreed to by

23   Old GM, sanctioned by the Court, whatever.  That was the

24   plaintiff's number, and so you know, we can't agree to that.

25   But let's just set that aside and decide or suppose that you

Page 26

1    could come up with some number from that expert number that the

2    plaintiff had versus what we've -- we know from New GM and Old

3    GM's records show that's been paid to this class.

4         That still gets us to the same spot that we're at.

5    Even if you put a number on it, and it's a lesser number, and

6    that is how do you administer that to people who actually

7    haven't been compensated at all in this process.  And that, of

8    course, is very important to the trust because of the other

9    claimants that we must also recognize their rights.

10        So I think the real problem here is we cannot identify

11   without substantial administrative burden anyone who hasn't

12   received not one, but two times notice of their rights.  And

13   given that New GM stands ready to compensate people for this

14   problem, albeit a limited number, not all of them, they have to

15   meet New GM's requirements as well, we think it is

16   inappropriate for the trust to be bearing this as a cost claim.

17        Thank you, Your Honor.

18        THE COURT:  Thank you.  Everybody sit in place for a

19   minute.

20        (Pause)

21        THE COURT:  Ladies and gentlemen, in the exercise of

22   my discretion, I'm declining to make adversary rule Bankruptcy

23   Rule 7023 and Civil Rule 23 applicable to this contested matter

24   vis a vis the allowance of the claims of the transmission class

25   members on a class basis for the avoidance of doubt, having no

Page 27

1    ruling vis a vis those asserting similar claims on an

2    individual basis.  And the following are the bases for the

3    exercise of my discretion in connection with this

4    determination.

5         Both sides agree that it's within my discretion to

6    make this determination.  And in the respects relevant here,

7    there is no material disputed issue of fact.  I worked with the

8    facts that were stipulated to by the Castillo plaintiffs.

9         The law informing the exercise of my discretion

10   likewise is not disputed.  Much of it appears in my earlier

11   decision in this very bankruptcy case In Re Motors Liquidation

12   Company, what I sometimes refer to as the Apartheid decision,

13   447 B.R. 150, starting at page 155.

14        As I there discussed, while I normally start with

15   textual analysis in any dispute where such is relevant, textual

16   analysis is of only limited utility when bankruptcy judges like

17   me are asked to determine whether they should apply Bankruptcy

18   Rule 7023 and Civil Rule 23 to contested matters.

19        The Bankruptcy Code is silent on the extent to which a

20   claim may be filed on behalf of persons other than the

21   claimant, or the standards under which a Court might find that

22   to be appropriate.  And the bankruptcy rules in the respects

23   relevant here are as well.

24        Class certification in cases under the Bankruptcy Code

25   is expressly addressed in Federal Rule of Bankruptcy Procure

Page 28

1    7023, which provides that Rule 23 FRCP applies in adversary

2    proceedings.  But claims allowance matters, when objected to,

3    are contested matters, not adversary proceedings, and instead

4    are governed by Bankruptcy Rule 9014, which is silent as to

5    class action treatment or incorporation of Rule -- Civil Rule

6    23.

7          And in respect of what I just said, I was effectively

8    reading from my earlier decision in the GM Apartheid decision,

9    447 B.R. at pages 155 to 156.  As I then went on to say in that

10    same decision, an analysis that is equally applicable here,

11    Bankruptcy Rule 9014(c), captioned application of Part 7 rules

12    provides, that except as otherwise provided in this rule, and

13    unless the Court directs otherwise, the following rules shall

14    apply.  Rule 9014(c) continues with a fairly long listing of

15    Part 7 rules that unless the Court directs otherwise, apply to

16    contested matters.  But Rule 7023 is not one of them.

17          Thus, Rule 7023 doesn't apply in contested matters,

18    quote, unless the Courts directs otherwise, end quote.  But

19    while at least implying that a bankruptcy court has the power

20    to direct otherwise, and thus to apply Rule 7023, and hence,

21    Civil Rule 23 in claims allowance matters, Rule 9014 is silent

22    as to standards under which courts should do so.

23          Thus, as in so many areas where the Code and rules are

24    silent, bankruptcy courts look to case law to fill the gaps.

25          In this district, it's been held that while class

1    proofs of claim in bankruptcy are not prohibited, the right to

2    file one is not absolute.  The decision to extend civil rules

3    application, Rule 23's application is committed to the Court's

4    discretion.  The exercise of that discretion is informed by

5    special considerations applicable in bankruptcy cases that are

6    super imposed on those that apply in any determination under

7    Civil Rule 23.

8            Although the Bankruptcy Code and rules give no express

9    guidance for the Court's exercise of this discretion, a

10   pervasive theme is avoiding undue delay in the administration

11   of the case.  And Judge Gropper of this court has observed,

12   that the affect of a class claim on other creditors is an

13   important factor in a Court's decision as to whether to

14   exercise its discretion and grant Rule 23 certification.

15           Here I determined that bankruptcy concerns make it

16   inappropriate for me to make Civil Rule 23 applicable to this

17   claim.  In addition, I determine that by reason of changed

18   circumstances, it would also be inappropriate to certify the

19   class with or without consideration of those Rule 23 concerns.

20           Here, much of the information that has -- that is

21   relevant to the class certification determination was

22   recognized.  I don't want to say conceded.  I want to say

23   recognized by the Castillo plaintiffs.

24           Their responding brief here displayed candor that

25   frankly I don't always see in the submissions by lawyers in

Page 30

1    cases on my watch.  For that candor, I am grateful.  But let me

2    talk for a minute about some of the undisputed facts which with

3    that candor they recognized, and I'm looking to pages 2 to 3 of

4    their responsive brief.

5          Thousands of class members have already received

6    reimbursement as a result of the class judgment in an amount

7    exceeding $36 million.  They did so because the class judgment

8    extended the transmission warranty, essentially providing

9    specific performance as a remedy.  Old GM provided complete

10   relief to class members through July 9, 2009.  New GM provided

11   complete relief to class members through September 29, 2009,

12   and New GM provided alternate relief thereafter and continues

13   to do so.

14         As I've stated in other contexts, specific performance

15   is unavailable as a remedy to any debtor that concludes that

16   it's inappropriate or inconsistent with the needs and concerns

17   of other creditors.  But where, of course, it has been

18   provided, the debtor has in substance given full relief to

19   those who got that benefit, in effect, 100 percent dollars as

20   contrasted to what we in the bankruptcy community refer to as

21   little bitty bankruptcy dollars, which in the case of insolvent

22   debtors, which is what we have here, are worth a lot less than

23   full performance.

24         As the Castillo plaintiffs again with candor

25   recognized, and I'm reading from the bottom of page 2 of their

Page 31

1     response, there is no evidence or reason to believe that any

2     class member who was otherwise entitled to relief under the

3     class judgment, and at any time between February of 2009 and

4     January 1, 2012 requested reimbursement from Old GM or New GM

5     was not offered at least some relief, in accordance with one of

6     the policies described in detail below.

7            The Castillo plaintiffs did not dispute that the GUC

8     Trust would be entitled to a set off with respect to such class

9     members.  They continued, and I'm quoting, "However identifying

10    the specific class members as to whom the set off would apply

11    and the specific set off amount for each one, would require an

12    administrative process whose cost in relation to the value of

13    remaining relief, if in fact, they are entitled class members

14    who did not already receive reimbursement is unknown.  This

15    information could not be known without incurring the cost of

16    providing additional notice and claim forms to all members of

17    the certified class."  And here we have a class of 149,000

18    members.

19           Likewise at page 7 paragraph 19, the Castillo

20    plaintiffs recognized that without providing claim forms to

21    each of the approximately 149,000 class members, they knew of

22    no way to determine which, if any, of the class members who had

23    not already received their share of the more $36 million

24    already reimbursed by Old GM or New GM might be entitled to

25    additional relief under the class judgment.  Nor could they

1   specify the dollar value of any such remaining relief.

2        And then once again, they recognize that the class

3   judgment essentially required specific performance of an

4   extended warranty, and there was no way to know how many class

5   members experienced unreimbursed transmission failures during

6   the pendency of the bankruptcy.

7        The Castillo class properly recognized that where a

8   class is certified prepetition, that is significant to a

9   Court's determination.  And if it were the case, and this is

10  classic dictum I guess, where a class had been certified

11  prepetition and afterwards, there was no change in the facts

12  between the prepetition class certification and the time the

13  bankruptcy judge was asked to rule on class certification, such

14  a fact would heavily weigh on continuing class certification

15  during the post petition period.

16       But the facts have changed, and that is still only one

17  of the factors that we bankruptcy judges consider in deciding

18  whether to grant class certification.  We still have to analyze

19  the interplay between class certification and the needs and

20  concerns of administering the Chapter 11 case, and in

21  particular, the needs and concerns of other creditors.

22       Here, it is recognized by both sides that many, if not

23  most, if not all of the class members have now received the

24  benefits for which the class action was brought.  Indeed,

25  that's one reason why Old GM did not object to the payment of

Page 33

1    fees, and why I am not of a mind to question the payment of

2    fees even on my own initiative.  There is no doubt that by

3    reason of the $36 million in benefits, the class was

4    benefitted.  Everything now known to me suggests that the class

5    counsel did their jobs and got the benefit of a class action

6    for which we looked to class actions to achieve.

7         But the issue is today not whether class action

8    counsel should get the $4 million in fees, as an allowed claim,

9    that matter is to my mind, behind us.  It is rather the extent

10   to which I should certify a class for the unknown number of

11   class plaintiffs who after those four separate mechanisms still

12   might have something due and owing.

13        Here, it is undisputed that the costs of that are

14   substantial.  There is uncertain benefit to be obtained, if

15   any.  And then other bankruptcy concerns also dictate denying

16   further class action certification here.

17        Whenever an unliquidated sum is sought to be recovered

18   as part of a class action, at least in a liquidating plan, we

19   have a need to set up a reserve to do so.  It appears to be

20   undisputed that a reserve was established, but because that

21   reserve was established by definition, that makes funds or

22   consideration, here the funds are not strictly cash money, it

23   involves allocated stock, but the principle is the same, that

24   are unavailable for distribution to other creditors.

25        We can, if we choose to, engage in a claims estimation

Page 34

1   process for that purpose, but claims estimation processes are

2   expensive, and by definition, less precise than actual claims

3   allowance matters.

4          In addition, while I do not quarrel with the use at

5   the time of actuarial assumptions, all of those actuarial

6   assumptions have in effect become obsolete by reason of the

7   passage of time and the further remedial action, and Old GM

8   hasn't had a chance to be heard on whether even those actuarial

9   assumptions were correct at the time.

10          Dealing with all of this would be expensive, and

11  result in delay, which is particularly a matter of concern by

12  reason of the late time by which class certification has been

13  sought.  I do not need to decide and do not today decide

14  whether the passage of three years since the time of the filing

15  of the case is by itself enough to warrant denial of class

16  certification here.

17          But the passage of time is nevertheless of relevance

18  and it's of particular relevance because facts have changed

19  since the time class certification might have been sought, and

20  the time that I am now asked to rule upon this.

21          Likewise, the ameliorative activities taken since the

22  original class action motion was brought in plainery

23  litigation, undercut my ability to make some of the findings

24  that I would be required to make under Rules 23(a) and 23(b) of

25  the civil rules.  I don't need to address that because the

Page 35

1    impropriety, or at least inappropriateness of certifying a

2    class now and making Rule 23 applicable to this contested

3    matter is so obvious, but I do note that such concerns would

4    likely make it impossible for me to find the required

5    numerosity or the finding that class action is preferable to

6    non-bankruptcy consideration of individual claims.  All, of

7    course, aside from its impropriety in bankruptcy cases.

8              For all of these reasons in the exercise of my

9    discretion, I am not going to use my discretion to make Rule

10   23, Civil Rule 23 applicable to this contested matter.  But for

11   the avoidance of doubt, the individual claims of people who

12   have filed still feel that they haven't gotten full relief

13   remain.

              Likewise, the claim of class counsel for its fee under

14   the original settlement remains.

15             Ms. Zambrano, it appears from the thoughtful and

16   constructive response that was given by your opponent, there is

17   a very high likelihood that you can work out a consensual order

18   consistent with the foregoing.  I want you to try.  If you

19   can't do that, you're authorized to settle an order on no less

20   than one week's notice by fax or e-mail.

21             Your order can and should provide that for the

22   avoidance of doubt, that this ruling does not impair the rights

23   of class counsel to recover the fee to which they were entitled

24   under original settlement, and should also provide again for

25   the avoidance of doubt, although I think it's obvious, that

Page 36

1    this is without prejudice to the rights, if any, of the

2    Castillo plaintiffs in their efforts on their appeal against

3    New GM.

4            I'm only deciding the class claims allowance that is

5    now before me.  Not by way of reargument, are there any

6    questions?

7            MS. ZAMBRANO:  No, Your Honor.

8            THE COURT:  Mr. Brown?

9            MR. BROWN:  No, thank you, Your Honor.

10           THE COURT:  Okay.  Mr. Brown, if you choose to, you

11   can drop off the phone.

12           MR. BROWN:  Thank you very much, Your Honor.

13           THE COURT:  Thank you.  Have a good day.

14           MR. BROWN:  Thank you.

15           THE COURT:  Okay.  Mr. Griffiths?

16           MR. GRIFFITHS:  Thank you.  With the Court's

17   permission, Ms. Zambrano can be excused for the remainder of

18   the hearing?

19           THE COURT:  Oh, yes.  Ms. Zambrano, you're likewise

20   excused if you choose to be.

21           MR. GRIFFITHS:  Thank you, Your Honor, David Griffiths

22   of Weil, Gotshal & Manges for the Motors Liquidation Company

23   GUC Trust.

24           Your Honor, the only other substantive matter for this

25   hearing is item number 2 on the agenda that my colleague,

Page 37

1    Stephanie Greer from Dickstein Shapiro will deal with shortly.

2            Items number 3 through 7 relate to omnibus objection

3    to claims of former employees of the debtors who did not submit

4    responses to the omnibus objections to their claims.  However,

5    at some point during the case, contacted the debtors and

6    requested an adjournment.

7            Following that, we've contacted these claimants by

8    letter to request formal responses.  No responses were

9    received.  This has been done at least twice, and therefore

10   we'd now like to proceed to enter orders expunging their

11   claims.  I have one claim that I've spoken to, which will be

12   Ms. Coscarelli for which I'd like to make a statement for the

13   record.

14           Mr. Brennan (ph) has agreed to withdraw his claim, and

15   Ms. Roman we've worked with separately to address certain

16   concerns she had with her insurance company.

17           THE COURT:  Very well.

18           MR. GRIFFITHS:  Your Honor, for the purposes of the

19   record, Ms. Coscarelli filed or has requested the following

20   statement be read into the record.

21           Ms. Coscarelli is the beneficiary of a pension that is

22   now paid for by New GM and the omnibus objection to her proof

23   of claim which was protective in nature in no way affects the

24   pension that's currently being paid by New GM.  And in that

25   respect, her pension is secure subject to obviously New GM's

Page 38

1    ongoing financial viability.

2         THE COURT:  Very well.  Then the supplemental relief

3    you requested is granted Mr. Griffiths.  And once again, I want

4    to note my appreciation for the courteous way by which you've

5    dealt with these individual claimants.  Thank you.

6         MR. GRIFFITHS:  It's our pleasure, Your Honor.

7         And one uncontested matter, which is the 285th omnibus

8    objection to claims, which relates to pension benefits, pension

9    benefit claims of former salaries and hourly employees.  This

10   relates to seven claims, it's uncontested, and request the

11   Court's permission to enter an order.

12        THE COURT:  Yes, sir, granted.

13        MR. GRIFFITHS:  Thank you, Your Honor.  And then, Your

14   Honor, that concludes the matters that are contested for -- at

15   least for Weil.  There's one uncontested matter, and it's my

16   pleasure to present Edward Wu, who's an associate of Weil,

17   Gotshal & Manges to present item number 1, which is the GUC

18   Trust objection to Claim No. 66309.

19        THE COURT:  Mr. Wu, I've seen you very often, but

20   maybe behind the scenes.  Welcome aboard.  Come on up, please.

21        MR. WU:  Thank you, Your Honor.  Yes, this is my very

22   first appearance, so hopefully I'll remember it for good

23   reasons.

24        Good morning, Your Honor, Edward Wu, Weil, Gotshal &

25   Manges for the Motors Liquidation Company GUC Trust.  Item 1 of

Page 39

1    the uncontested matters section of the agenda concerns an

2    objection that the GUC Trust filed as to two automobile

3    dealerships, Castle Buick and Grossinger Autoplex.

4         The parties have reached a consensual resolution as to

5    this matter, and we will be presenting a proposed stipulation

6    and agreed order for your consideration, which addresses these

7    two claims, as well as two closely related claims by two other

8    automobile dealerships.

9         Each of the four claims are predicated on a

10   prepetition action in the Illinois state courts, where the

11   claimants were awarded attorney fees against the debtors.  The

12   debtors then proceeded to appeal the award of attorney fees,

13   and post an appeal bond.  In the process, however, the

14   automatic stay from these cases prevented the appeal from

15   continuing.

16        The stipulation agreed order that is now being

17   presented for your Court's consideration would result in the

18   withdrawal of the Castle Buick and Grossinger Autoplex claims

19   in these Chapter 11 cases, whether permitting the appeal in the

20   Illinois state courts to resume.

21        To the extent that the claimants prevail in the

22   Illinois state courts, it would then be able to recover from

23   the appeal bond.  The stipulation and agreed order also

24   provides that the matters raised in the objection may also be

25   raised in the appeal.

1      Unless Your Honor has any further questions, we would

2   ask that you approve the stipulation.

3      THE COURT:  No, you covered it very succinctly, Mr.

4   Wu, and that's perfectly satisfactory to me, and your motion is

5   granted.

6      MR. WU:  Thank you very much.

7      THE COURT:  Thank you.  Have a good day.  Ms. Greer.

8      MR. GRIFFITHS:  Your Honor, with your permission, we

9   just have one further matter.

10      THE COURT:  Forgive me.  Go ahead, Mr. Griffiths.

11      MR. GRIFFITHS:  No problem at all.  It's the -- it's

12   item number 2 on the agenda, the motion of Jaspan and

13   Schlesinger to withdraw as counsel of record for Woodbury

14   Cadillac LLC.  I have Ms. Shannon Scott to appear on behalf of

15   Jaspan Schlesinger.

16      MS. GREER:  Good morning, Your Honor, Stephanie Greer

17   from Dickstein & Shapiro on behalf of the GUC Trust.  Your

18   Honor, we've been back and forth with Woodbury on a number of

19   issues.  I'd like to extend the courtesy to their counsel to

20   give us about a half an hour and see if they can go and resolve

21   with my colleague the terms of an agreement.

22      I hate to put this off to another day, Your Honor.  I

23   know you have a very busy schedule because we've -- it's just

24   been hard fought to get to this point, and I just don't want to

25   have these guys withdraw as counsel if Your Honor is inclined

1    to grant the motion of course, and then put us in a position

2    where we need to start all over.  On the other hand, I know

3    that they're anxious for a resolution one way or the other.  So

4    if we could just have a little time, if we work it out, great,

5    if not, Ms. Scott could go forward with her motion.

6              THE COURT:  Am I right that there's no objection to

7    the half hour adjournment?

8              MS. SCOTT:  There's no objection, Your Honor.

9              THE COURT:  Okay.  Let me invite you all to do your

10   thing, and ask simply that somebody stick her head in my

11   chambers when you've either come to agree or agree to disagree.

12             MS. GREER:  And, Your Honor, I could go forward with

13   our other matters.

14             THE COURT:  Sure.

15             MS. GREER:  I just need one second to coordinate with

16   Ms. Scott.

17             (Pause)

18             MS. GREER:  Your Honor, I would like my colleague,

19   Colleen Kilfoyle before she walks out the door to have an

20   opportunity to present our uncontested omnibus objections to

21   Your Honor before I get to the rest of it.  I'd hate for her to

22   miss out.

23             THE COURT:  Sure, come on up, please.

24             MS. KILFOYLE:  Good morning, Your Honor, Colleen

25   Kilfoyle with Dickstein Shapiro on behalf of the GUC Trust.

Page 42

1           Today we have three uncontested omnibus objections.

2   The first is the 282nd omnibus objection based on insufficient

3   documentation, one claim adjourned and 11 going forward.  And

4   the 283rd omnibus objection to claims, because the liability

5   associated with the claims, if any, is that of New GM, five

6   going forward.  And the 284th omnibus objection based on

7   incorrectly classified claims, one adjourned, 16 going forward.

8           THE COURT:  That's all fine, Ms. Kilfoyle.

9           MS. KILFOYLE:  Your Honor, I have the orders with me,

10  shall I hand them up or submit them to chambers?

11          THE COURT:  I would ask that you drop them off with my

12  courtroom deputy, Ms. Blum across the hall on your way out.

13          MS. KILFOYLE:  Okay.  Thank you, Your Honor.

14          THE COURT:  Thank you.

15          MS. GREER:  Thank you, Your Honor.  Stephanie Greer

16  from Dickstein & Shapiro on behalf of the GUC Trust.

17          We have -- I'm pleased to report first, Your Honor,

18  that we've managed to resolve a number of the claims that were

19  on the calendar for today.  We did contact your chambers on

20  Friday, hopefully made its way to you.

21          Both Franco and McNeal, we're going to adjourn those

22  because we haven't -- you know, we don't have definitive

23  documentation at this point, but I'm hopeful that those will

24  both get resolved, and that they will not come back to us.

25          In the meantime, I have three -- I'm not sure if

Page 43

1    uncontested or contested matters before me.  Is anyone on the

2    phone?  Counsel for Brewer?

3           THE COURT:  Let's see.  I have a phone log that

4    indicates presence for Mr. Kenneth Smith, Thomas Kelliher, are

5    you on the phone, sir?

6           MR. KELLIHER:  I am.  Can you hear me?

7           THE COURT:  Yeah, I can hear you pretty well, Mr.

8    Kelliher.  Are you here to argue on behalf of your client

9    today?

10          MR. KELLIHER:  I am, Judge.  It actually has to do

11   with respect to the 282nd omnibus objection.

12          MS. GREER:  We were not -- who do you represent, Mr.

13   Kelliher?

14          MR. KELLIHER:  I represent Kenneth Smith, and I think

15   there was a problem with the notice.  The objection according

16   to my records was filed on August 22nd, 2012, but my office

17   didn't receive it until the Friday before the response date.  I

18   guess that was the 14th, I received it on September 14th.  And

19   then I -- with the short notice, I tried to quickly file

20   something.  I didn't get it filed on Monday, the 17th, which I

21   guess was, you know, the due date for it, but I think I filed

22   it the next day or the day after.

23          THE COURT:  Well, I'm reluctant Ms. Greer to award a

24   default, but I don't know if it's fair or appropriate to either

25   side to hear it today.  Do you have a view?

Page 44

1          MS. GREER:  No, Your Honor, I'm more than happy to

2     adjourn that one.  We were not aware of any objection.  There

3     was none filed on the docket, but certainly at this point, I'm

4     happy to coordinate with counsel, see if we can get the

5     information that we need and avoid the need to expunge the

6     claim on the basis of insufficient documentation.

7          THE COURT:  Mr. Kelliher, my tentative, and I think

8     Ms. Greer just agreed to it, but I want to give you a chance to

9     comment, is that under the circumstances, what I would like to

10    do is kick the matter, invite you and Ms. Greer to have a

11    dialog.  And you agree, great, and if you agree to disagree,

12    then I'll hear it when both sides are in a better position to

13    argue the matter, and I've had a chance to prepare in advance

14    of court, which is what I like to do.  And as before, I'll

15    permit you to appear by phone.

16          Where are you calling in from?

17          MR. KELLIHER:  I'm calling from Chicago, Judge.

18          THE COURT:  Uh-huh.  Well, I assume again you'd like

19    to avoid a trip to my courtroom if you can avoid it.  Are you

20    comfortable with that approach?

21          MR. KELLIHER:  Yes, that's fine.

22          THE COURT:  Okay.  Then why don't we do that, Mr.

23    Kelliher and Ms. Greer.  And you folks have a dialog between

24    now and the next omnibus hearing, and I'm grateful for you

25    wanting to minimize the number of times that you come back.

Page 45

```
 1    But I think this is fair to all concerned.

 2              MS. GREER:  Sounds good, Your Honor.

 3              THE COURT:  Okay.

 4              MS. GREER:  Okay.  I was going to go forward with

 5    Autonation, Haack and Brewer.  I understood that Ms. Brewer's

 6    counsel, Archie Sanders was going to attend by phone, but

 7    doesn't sound like he is --

 8              THE COURT:  Well, I do show an Archie Sanders on my

 9    phone log.  Are you on the phone, Mr. Sanders?

10              MR. SANDERS:  Yes, Your Honor, I am.

11              THE COURT:  Oh, okay.

12              MS. GREER:  Okay.  Well, Your Honor, what I'll do

13    unless you prefer otherwise is I'll go through the uncontested

14    objections first.  One is the Haack objection and one is

15    Autonation.  I can run through those quickly for Your Honor.

16              Both of those were filed as stand alone objections.

17    The John Haack, Claim No. 62969, this is the one where Mr.

18    Haack alleged he was scared because of a brake defect in his

19    vehicle.  Your Honor, as set forth in our papers, it's our

20    position that as a matter of law, Mr. Haack doesn't have a

21    claim because he hasn't been able to show any injury.  He

22    certainly acknowledged in his papers that he has no injury to

23    her person, no injury to his property, so we'd ask on that

24    basis, and for the reasons set forth in our objection that the

25    claim be expunged.
```

Page 46

1            THE COURT:  Okay.  Anybody here on that objection,

2    either in the courtroom or on the phone?

3            No response.

4            Granted, Ms. Greer.

5            MS. GREER:  Thank you, Your Honor.  The next one is a

6    claim filed by Autonation.  Your Honor, this is Claim No.

7    50085, it's a claim -- it's a 502(e)(1)(B) objection, Your

8    Honor.  I spoke to counsel for Autonation, Skadden Arps, and

9    had some discussions with them.  They've asked that we include

10   some language in the order, which addresses their 502(j) rights

11   in particular.  We agreed to do that, so the order that we will

12   submit to Your Honor reflects an agreement by the claimant and

13   the GUC Trust as to 502(j).

14           THE COURT:  That's fine.

15           MS. GREER:  Okay.  Thank you, Your Honor.  Anything

16   else you need to hear on that one?

17           THE COURT:  No, I guess we're down to Mr. Sanders and

18   Ms. Brewer.

19           MS. GREER:  Thank you.  Your Honor, one second, I have

20   a paper problem here.

21           THE COURT:  Yes.

22           (Pause)

23           MS. GREER:  I think it might have walked out the door.

24   That's okay though.

25           Your Honor, simply put, this is a claim filed by a

Page 47

1    claimant 11 months late.  Your Honor, counsel, Mr. Sanders,

2    filed the claim.  It's his position that he -- there is

3    excusable neglect because he switched law firms.  Your Honor,

4    he did not provide notice to the Court in the underlying

5    litigation that he switched law firms, so the notice was given

6    to the address on the Court's docket.

7           So, Your Honor, I think -- thank you very much.

8    First, I guess, Your Honor, as we set forth in our papers, the

9    first issue is the presumption that the mail was received.

10   This applies where it's the wrong address or not, and as Judge

11   Lifland found in Macy's, of course, the presumption attaches

12   because when you mail something, it's also presumed that it

13   will be forwarded to the new address.

14          In this case, Mr. Sanders has not provided anything at

15   all to defeat that presumption.  In any event, Mr. Sanders

16   can't show excusable neglect.  There is nothing in his papers

17   to support any sort of excusable neglect, especially given that

18   Mr. Sanders himself should've been provided notice to the

19   debtors when he changed an address.  I think the case law is

20   clear.

21          The case law that we cite, Akerage (ph), Telligent,

22   among others, all those cases stand for the proposition that it

23   is the attorney's responsibility.  And in actually one of the

24   cases, I think it's Akerage, is a pro se claimant's

25   responsibility to provide the debtors with any notice of a

Page 48

1    change of address.  There's certainly no excusable neglect

2    here, Your Honor.  I think it's pretty clear there's neglect,

3    but not excusable neglect.

4         So unless Your Honor has any questions, we can perhaps

5    give Ms. Brewer's counsel an opportunity to be heard, and I can

6    reserve our right to reply.

7         THE COURT:  Let me ask you a question, Ms. Greer.  Is

8    this a case or the case where you worked out a settlement with

9    Mr. Sanders, but his client, Ms. Brewer, was -- had failed to

10   execute the settlement papers?

11        MS. GREER:  Yes, Your Honor.  We had started engaging

12   in a dialogue with Mr. Brewer when he filed his response to our

13   original objection probably over a year ago now, and we, you

14   know, resolved it for relatively, you know, diminimus amount of

15   money.  Everybody seemed amenable, and as time went on, I wrote

16   -- let Mr. Sanders -- left a message after message, sent him

17   letter after letter saying if you don't sign the settlement

18   agreement, we are going to be forced to go forward with this

19   objection.  You know, no one has any interest in going forward

20   with an objection on the basis that their -- someone's counsel

21   failed to do something.  And we are happy to have had the

22   opportunity to resolve that.  But unfortunately Mr. Sanders has

23   not been able to get his client's signature.

24        He called me on Thursday and said, more time, more

25   time, and I said no more time.  You know, we're done providing

1   time on this.  I think we have very strong arguments as to why

2   this is inexcusable neglect, and I think at this point our

3   client just wants this one off the register.

4            THE COURT:  Uh-huh.  Okay.  Mr. Sanders?

5            MR. SANDERS:  Yes, Your Honor.  As I stated in our

6   papers, I believe there was excusable neglect in this case.

7   Unfortunately, it's one of those circumstances where apparently

8   the proof of claim was filed at about the same time the switch

9   of law firms was made.  And so I did not receive the notice of

10  proof of claim that had been filed.  I did receive notice when

11  the state court set this case for a status conference, and I

12  received notice of that.  And GM's local counsel at that point

13  advised me about the -- there was an issue involving the proof

14  of claim.  Once I learned that, I immediately did file a proof

15  of claim.  So that's a -- and I can answer any questions the

16  Court might have.

17           THE COURT:  No, thank you.  Ms. Greer, reply?

18           MS. GREER:  Yes, Your Honor.  A few things.  First,

19  Your Honor, it is -- Mr. Sanders has never changed his address

20  with the Court.  So on the underlying litigation, the docket

21  still reads, and we attach that to our reply, the underlying

22  docket still has his old address on it.  So Mr. Sanders has

23  taken no steps to ensure that he's gotten the proper notice.

24           Indeed, he must have known that the case was stayed,

25  because the state -- you know, after the bankruptcy case was

Page 50

1    filed.  So in that regard, certainly had notice of the

2    bankruptcy, and it is his obligation to obtain information

3    about the bar date, and to provide his new address to the

4    debtors.

5           You know, it's unfortunate that his -- as a matter of

6    law, that his client is bound by the actions or inactions in

7    this case of her attorney.  And therefore, we think the claim

8    should be expunged.

9           THE COURT:  Okay.  Every --

10          MR. SANDERS:  Your Honor, I would like to add just one

11   small thing.  As far as the docket sheet is concerned, the way

12   -- it's my understanding the state court does it.  The address

13   that is entered and that appears on the docket sheet is the

14   address of the attorney at the time the case is filed.  At some

15   point later, if an address -- if an attorney changes his

16   address, there's another way of dealing with that, but they do

17   not go back and change your address on every case on every

18   docket sheet.  It would be -- the address appears to say,

19   basically was, at the time the case was filed, although things

20   may have changed since then.

21          THE COURT:  Okay.  Ladies and gentlemen, I'm

22   sustaining the GUC Trust objection to this claim.  And will be

23   disallowing it, although I will be staying my ruling or the

24   effectiveness for three weeks from today to give Ms. Brewer one

25   last chance to accept the settlement if she wants it.  And the

1    following are the bases for the exercise of my discretion in

2    connection with this determination.

3         First, as Ms. Greer properly observed, there is a

4    presumption of receipt for mailing, and that presumption is of

5    particular significance when the address that has been used for

6    the mailing is the exact address that has been used by the

7    claimant.

8         I take it as true that state court rules may not

9    impose the same expectations of a notification of change of

10   address, but frankly, folks, that is the way by which the

11   bankruptcy court has to function.  People invoking the claims

12   process must recognize the possibility, the foreseeability that

13   a claims objection may be filed, and the only way by which the

14   estates of the world, the debtors-in-possession or the

15   creditors who may succeed them under confirmed plans can

16   proceed is by contacting people at the last address that they

17   were given.

18        Now, that is not to say that I find counsel to have

19   been negligent in any way, but the burden is on the claimant to

20   show excusable neglect.  And here as Ms. Greer properly

21   observed, while there is neglect within the meaning of that

22   rule, the claimant has failed to meet her burden of showing

23   excusable neglect.

24        Now with that said, I hate to deprive a claimant of

25   any opportunity to recover anything, and I think at the very

Page 52

1    least, she should have the ability to mitigate her damages.  So

2    therefore, although this may be displease the GUC Trust, I'm

3    going to give her one last chance to accept that settlement.

4    If she doesn't, there will be no recovery, but of course, this

5    is without prejudice to her rights to appeal.

6         But although I'm reluctant to use the words like

7    enough is enough because I do recognize that every claims

8    allowance affects a claimant's life, the law in this area is

9    not particularly debatable, nor are the facts in any way in

10   material dispute.

11        So, Ms. Greer, you are to settle an order in

12   accordance with the foregoing.  One week, seven calendar days

13   by mail or e-mail to register objections to the form of the

14   proposed order, but the proposed order is also to say that it

15   shall become effective three weeks after the date of its entry.

16   And the legislative history of this order is going to be that

17   if Ms. Brewer signs the settlement agreement in three weeks or

18   the time between today and the three weeks after entry of the

19   order, I will not sign the ultimate order. But the ruling

20   should be clear and unmistakable.

21        Okay?  Anything further from either side, not by way

22   of reargument but any open matters?

23        MR. SANDERS:  No, Your Honor.

24        MS. GREER:  No, Your Honor.

25        THE COURT:  Okay.  And am I right, Ms. Greer and Mr.

Page 53

1    Griffiths, that that concludes our work for today, except for

2    the matter that they're trying to deal with out in the hall?

3            MS. GREER:  For that one and one other thing, Your

4    Honor.  I just wanted to check if Your Honor needs anything

5    further from us on the Shaw order.  You had written a

6    decision --

7            THE COURT:  No, that's in a pile that I've got -- I

8    think you have given me a proposed order consistent with my

9    written opinion if I'm not mistaken.

10           MS. GREER:  Yes, Your Honor.

11           THE COURT:  But you're diplomatically reminding me

12   that the time for appeal and that can't start to run until I

13   enter the order.

14           MS. GREER:  Yes, Your Honor.

15           THE COURT:  I understand.

16           MS. GREER:  Okay.  Thank you.

17           MR. SANDERS:  Your Honor, this is Mr. Sanders, may I

18   be excused, please?

19           THE COURT:  Yes, and I am right that everybody in the

20   courtroom can now be excused?

21           Okay.  Yes, sir, you may be excused.

22           MR. SANDERS:  Thank you, Your Honor.

23           THE COURT:  Can I ask you, sir, to tell your client

24   what happened today, Mr. Sanders, and I can't give your client

25   legal advice, but you may want to tell her that the kind of

Page 54

1    decision that I had which is one of discretion, is often

2    sustained on appeal.  And I'm not telling the appellate courts

3    how to do things, or you how to do things, or for that matter

4    your client to do things, but you may want to look long and

5    hard about whether she should sign that settlement agreement.

6           MR. SANDERS:  I understand, Your Honor, and I will

7    definitely pass that on to the client.

8           THE COURT:  Okay.  Thank you very much, we're

9    adjourned.

10   (Concluded at 11:10 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 55

1                    R U L I N G S

2                                          PAGE      LINE

3    Allowance of claims of transmission      26        22

4    class members on a class basis

5

6    Omnibus objections, relief sought        38        3

7

8    285th Omnibus Objection to claims        38        13

9

10   GUC Trust's Objection to Claim No.       40        4

11   66309 filed by Castle Buick Pontiac

12   and Claim No. 66310 filed by

13   Grossinger Autoplex, Inc.

14

15   Objection to Claim(s) Number 62969       46        2

16   filed by John A. Haack

17

18   Objection to Claim - Ms. Brewer          50        22

19

20

21

22

23

24

25

Page 56

1                    C E R T I F I C A T I O N

2

      I, Sheila G. Orms, certify that the foregoing is a correct

3    transcript from the official electronic sound recording of the

4    proceedings in the above-entitled matter.

5

6    Dated:  September 25, 2012

7        Sheila Orms    Digitally signed by Sheila Orms
                        DN: cn=Sheila Orms, o, ou,
8                       email=digital1@veritext.com, c=US
                        Date: 2012.09.26 12:14:59 -04'00'

9      Signature of Approved Transcriber

10

11

     Veritext

12

     200 Old Country Road

13

     Suite 580

14

     Mineola, NY 11501

15

16

17

18

19

20

21

22

23

24

25