**EXHIBIT A**

```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                             :
In re                                                        :   Chapter 11 Case
                                                             :
MOTORS LIQUIDATION COMPANY, et al.,                          :   No. 09-50026 (REG)
        f/k/a General Motors Corp., et al.                   :
                                                             :   (Jointly Administered)
                        Debtors.                             :
                                                             :
-------------------------------------------------------------x
```

## DECISION ON VALUATION METHODOLOGY
## FOR TPC LENDERS' COLLATERAL

APPEARANCES:

KING & SPALDING LLP
*Attorneys for New GM*
1185 Avenue of the Americas
New York, NY 10036
By:   Arthur J. Steinberg, Esq. (argued)
      H. Slayton Dabney, Jr., Esq.
      Scott Davidson, Esq.

SIDLEY AUSTIN LLP
*Attorneys for TPC Lenders*
787 Seventh Avenue
New York, NY 10019
By:   Steven M. Bierman, Esq. (argued)
      Nick Lagemann, Esq.
      Marissa Alter-Nelson, Esq.

One South Dearborn
Chicago, IL 60603
By:   Kenneth P. Kansa, Esq. (argued)

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

This contested matter arises in the jointly administered chapter 11 cases of Motors Liquidation Company (formerly known as General Motors Corporation) ("**Old GM**") and its affiliates (collectively, the "**Debtors**"). But this dispute is between General Motors LLC ("**New GM**")—the purchaser of the majority of Old GM's assets in the July 2009 asset sale (the "**363 Sale**")—and certain secured creditors (the "**TPC Lenders**")[1] that held liens on two of Old GM's assets prior to the 363 Sale.

The TPC Lenders seek a valuation of their collateral in accordance with the July 2009 sale order (the "**Sale Order**"),[2] which will determine the extent to which they are entitled to payment in cash, in contrast to New GM securities. But New GM and the TPC Lenders cannot agree on which of two alternative valuation methodologies, discussed below, is the proper one. New GM contends that the "fair market" method should be utilized, while the TPC Lenders argue that the "value in use" method should be. They agree, however, that a determination of the threshold issue of the appropriate methodology will facilitate settlement, or at least advance the ultimate resolution of the controversy.

---

[1] As of the Petition Date, the TPC Lenders were comprised of, collectively, Wells Fargo Bank Northwest, N.A., as agent, on behalf of Norddeutsche Landesbank Girozentrale (New York Branch) as administrator, Hannover Funding Company, as CP Lender, and Deutsche Bank, AG, New York Branch, HSBC Bank USA, ABN AMRO Bank N.V., Royal Bank of Canada, Bank of America, N.A., Citicorp USA, Inc., Merrill Lynch Bank USA, and Morgan Stanley as purchasers.

[2] The Sale Order had the lengthy formal name of Order (I) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement with NGMCO, Inc., A US Treasury Sponsored Purchaser; (II) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (III) Granting Related Relief (ECF # 2968).

1

For the reasons below, the Court determines that the "fair market" method is the proper one. The Court's Findings of Fact[3] and Conclusions of Law in connection with this determination follow.

Findings of Fact

1. *Background*

On June 1, 2009 (the "**Commencement Date**"), Old GM and a few other Old GM affiliates filed for relief under chapter 11 of the Bankruptcy Code. On the Commencement Date, Old GM filed a motion (the "**Sale Motion**"), pursuant to section 363 of the Bankruptcy Code, seeking to sell the bulk of its assets to an entity that later became New GM, free and clear of any liens and other interests.[4] Liens would then attach to the proceeds of the 363 Sale.

Under the Sale Motion, while the entity that later became New GM was the stalking horse bidder, the sale procedures proposed a sale open to higher or better offers by anyone else.[5] Under the sale transaction as then proposed, a sale to New GM was not the only permissible outcome.

2. *The TPC Properties*

Included as part of the property to be sold under the 363 Sale Motion was a transmission manufacturing plant in White Marsh, Maryland (the "**Maryland Facility**") and a service parts distribution center in Memphis, Tennessee (the "**Tennessee Facility**" and with the Maryland Facility, the "**TPC Properties**"). On the Commencement Date, the TPC Lenders held liens on

---

[3] To avoid unnecessarily lengthening this decision, record citations are limited to the most important matters, and are omitted for undisputed facts, except where record matter is quoted.

[4] *See* Sale Motion (ECF #92).

[5] *See id.* at ¶¶ 15 ("Subject to [Court] approval and the submission of any higher or better offers, the Sellers have reached an agreement with the Purchaser (together with the Sellers, the "Parties") as embodied in the proposed MPA.") (footnote omitted); ¶ 49 ("The sale of the Purchased Assets pursuant to the MPA is subject to higher or better offers."). Detailed procedures for consideration of any higher or better offers were set forth in ¶ 49 of the motion.

the TPC Properties that aggregately secured $90.7 million in debt. The lien on the Maryland Facility secured $63.9 million, and the lien on the Tennessee Facility secured $26.8 million.

3. *TPC Lenders' Limited Objection to the 363 Sale*

Shortly before the hearing on the Sale Motion, the TPC Lenders filed a limited objection[6] to the Sale Motion. While not objecting in principle to the 363 Sale, the TPC Lenders sought either (1) that their claims be satisfied in full, or, alternatively, (2) that existing rights in the TPC Properties be unaffected by the 363 Sale, and that they receive adequate protection for their interests.

After a series of negotiations, the TPC Lenders and Old GM agreed to protective provisions under which the proposed sale could go through while protecting the TPC Lenders' lien rights, discussed below. No bids higher or better than that of the entity that became New GM were forthcoming, and a sale to the entity that became New GM was approved.

4. *The Sale Order*

The protective provisions that previously were negotiated thereafter were included in the Sale Order that the Court ultimately approved. Thus the Sale Order provided, in relevant part, that "the TPC Lenders shall have an allowed secured claim in a total amount equal to the fair market value of the TPC Propert[ies] on the Commencement Date under section 506 of the Bankruptcy Code (the "**TPC Value**") . . . ."[7] And as adequate protection for the TPC Lenders' secured claim, New GM agreed to place $90.7 million in cash into an interest-bearing escrow account (the "**Escrow Account**").

---

[6] "Limited" objections are a common device used in the bankruptcy community when the objector does not seek outright denial of the motion, but instead seeks protective provisions, clarifications, reservations of rights or similar lesser relief incident to the granting of the underlying motion.

[7] Sale Order at ¶ 36.

The Sale Order also provided, in substance, that, promptly after the TPC Value was determined, the TPC Lenders would receive an amount of cash equal to their secured claim, including interest, from the Escrow Account.[8]

5.  *Entry of the Sale Order and Failed Negotiations Thereafter*

On July 5, 2009, after approving the 363 Sale over others' objections, the Court entered the Sale Order. Under the Sale Order, the TPC Properties were transferred free and clear of liens from Old GM to the entity now known as New GM, and the $90.7 million was placed into the Escrow Account.[9]

After entry of the Sale Order, the TPC Lenders filed a proof of claim. Thereafter, New GM and the TPC Lenders attempted to reach a consensual agreement with respect to the TPC Value to determine the amount required to be disbursed out of the Escrow Account on account of the TPC Lenders' claim.

In connection with these negotiations, New GM and the TPC Lenders obtained their own appraisals for the TPC Properties. New GM obtained an appraisal that utilized the "fair market" standard. But the TPC Lenders obtained two appraisals—one that utilized the "fair market" standard and another that utilized the "value in use" standard. Using the "fair market" standard, New GM valued the TPC Properties at $30.575 million, and the TPC Lenders valued the TPC Properties at $42 million. But using the "value in use" standard, the TPC Lenders valued the TPC Properties at $64.9 million.

---

[8] If the value of the TPC Lenders' secured claim turned out to be less than $90.7 million, the TPC Lenders could assert an allowed unsecured claim against Old GM's estate equal to the difference between $90.7 million and the value of the TPC Lenders' secured claim, though subject to a maximum of $45 million. If, however, the value of the TPC Lenders' secured claim were to exceed $90.7 million, the TPC Lenders could assert an additional secured claim against Old GM's estate equal to the Escrow Account's shortfall.

[9] Neither Old GM nor New GM made a statement as to what portion of the consideration paid as part of the 363 Sale was attributable to the TPC Properties.

Discussion

The issue is effectively one of contractual interpretation—of a provision that the parties agreed would go into the Sale Order. The controversy calls for interpretation of the clause "fair market value of the TPC Propert[ies] on the Commencement Date under section 506 of the Bankruptcy Code," as used in ¶ 36 of the Sale Order—and as that interpretation might be informed by section 506 of the Code or other statutory provisions, or by any relevant caselaw.[10]

A.   *Textual Analysis*

As usual,[11] the Court starts with textual analysis. The language in question has three components: (1) "fair market value"; (2) "on the Commencement Date"; and (3) "under section 506 of the Bankruptcy Code." Each of these components at least initially must be considered in the Sale Order's interpretation.[12]

The first is "fair market value." New GM argues that the plain meaning of the Sale Order compels the utilization of the "fair market" standard because the Sale Order includes the exact phrase "fair market value."[13] That has surface appeal, but is overly simplistic; without more, the phrase "fair market value" is open to more than one interpretation. And as *Collier* observes, "the

---

[10]   In briefing, New GM contended that the TPC Lenders' decision to appraise the TPC Properties under both a "fair market value" standard and "value in use" standard suggested that the TPC Lenders did not truly believe that the "value in use" standard was appropriate. But at oral argument, both parties agreed to refrain from reliance upon parol evidence or extrinsic evidence. Hrg. Tr. (ECF # 10086) ("**Hrg. Tr.**") at 27 (TPC Lenders confirmed that they were not seeking to rely on parol evidence); *id*. at 34 (New GM confirmed that it was not seeking to rely on parol evidence).

   But even if the TPC Lenders' decision to employ two appraisals were admitted as parol evidence, this fact would have little significance—because it is unclear whether the TPC Lenders used both standards because they did not truly believe that the "value in use" standard was correct, or were simply trying to be careful. For each of these reasons the TPC Lenders' decision to employ more than one type of appraisal does not affect this analysis.

[11]   *See*, *e.g.*, *In re Motors Liquidation Co*., 462 B.R. 494, 500 & n.33 (Bankr. S.D.N.Y. 2012)

[12]   *See TRW Inc. v. Andrews,* 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)) ("It is 'a cardinal principal of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'").

[13]   *See* New GM Opening Br. (ECF #9494) at ¶ 24 ("No other valuation standard is mentioned in the Sale Order.").

determination of fair market value will depend on the particular market and means selected to gauge the value of the item in question."[14] Thus, "fair market value" does not by itself determine the valuation methodology, because "fair market value" does not specify a market nor a means, and other metrics may be significant as well. At the least, to interpret "fair market value," the other components of the Sale Order, each of which may act as a clarifier, or a metric, must be considered as well.

The second component is "on the Commencement Date"—a time marker that informs both "fair market value" and "under section 506 of the Bankruptcy Code." Obviously, it dictates the date as to which the valuation should be considered.[15] It also provides the context in which the phrase "under section 506 of the Bankruptcy Code" should be considered, and has the potential for dictating more than these two things in instances where the potential use of the collateral changes over time.

The third and final component—"under section 506 of the Bankruptcy Code"—incorporates statutory language (and, as a practical matter, any relevant caselaw construing the statutory language), into the order's effectively contractual language—"fair market value"—upon which the parties agreed. The two phrases, as the TPC Lenders correctly argue,[16] must be "read together."

But beyond these things, textual analysis is unhelpful. And ultimately it is inconclusive. It fails to answer the underlying question.

---

[14]  4 *Collier on Bankruptcy* ¶ 506.03[6] (16th ed. 2010).

[15]  Hrg. Tr. at 21 (both parties agree that the relevant date here is the Commencement Date: June 1, 2009).

[16]  TPC Lenders' Opening Br. (ECF # 9493) at ¶ 32.

B.  *Section 506 and Related Caselaw*

As is apparent from the above, textual analysis of the order itself is insufficient to decide the controversy. The Court instead must look to the language of section 506 and any available mechanisms to apply it.

Section 506(a) governs the allowance of a secured claim. After providing, in relevant part, that an allowed claim of a creditor secured by a lien is a secured claim "to the extent of the value of such creditor's interest in the estate's interest in such property" (and is an unsecured claim to the extent that the value of such creditor's interest is less than the amount of such allowed claim), section 506(a) provides:

> Such value shall be *determined in light of the purpose of the valuation and of the proposed disposition or use of such property,* and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

Thus key considerations are (1) the purpose of the valuation and (2) the proposed disposition or use of the collateral.[17] The Court considers these in turn

1.  *"The Purpose of the Valuation"*

With respect to the first of these considerations--the purpose of the valuation—the two sides effectively are in agreement. New GM contends that:

> The purpose of the valuation is to fix the TPC Lenders' secured claim in the context of a Section 363 sale of the TPC Propert[ies] or, more specifically, to fix the TPC Lenders' claim to escrow proceeds pursuant to the terms and procedures dictated by the Sale Order.[18]

---

[17] *See, e.g.*, *In re SW Boston Hotel Venture, L.L.C.,* --- B.R. ---, 2012 Bankr. LEXIS 4657, 2012 WL 4504251 (BAP 1st Cir. Oct. 1, 2012) ("**SW Boston Hotel Venture**")(quoting and then applying section 506(a) to determination of secured creditor's allowed claim after sale of part of its collateral during the course of a chapter 11 case).

[18] New GM Opening Br. at ¶ 33.

The TPC Lenders' understanding of the purpose does not differ materially. They argue that the purpose here is:

> the allowance of the TPC Lenders' secured claims and determination of the extent to which the TPC Lenders are entitled to recover from the escrow account established under the Sale Order cash in an amount equal to the value of the TPC Propert[ies].[19]

Thus, both parties agree that the purpose of the valuation is to determine the value of the TPC Properties so that an amount of cash equal to this value can be released from the Escrow Account and paid to the TPC Lenders on account of their claim.

But notwithstanding that agreement, the valuation methodology issue requires more in the way of analysis. That is so because the parties' common understanding as to the "purpose of the valuation" does not lead to a specific valuation methodology. In fact (and understandably), the two sides pay very little attention to section 506(a)'s reference to the "purpose of the valuation"; it brings little to the table. In most, if not all, analyses under section 506(a) of the Bankruptcy Code (and certainly here), the "purpose of the valuation" will be, at least in some form, to determine the amount in which a secured claim should be allowed. That is, after all, section 506(a)'s purpose. Ultimately, the "purpose" prong of section 506(a) does not resolve this dispute.

2. *"Proposed Disposition or Use of Such Property"*

The second factor to be considered, as noted above, is the "proposed disposition or use of such property"—*i.e.*, the collateral. As previously noted,[20] the relevant time for that determination is "on the Commencement Date."

---

[19] TPC Lenders Opening Br. at ¶ 34 (arguing that this purpose is similar to the valuation purpose present in this Court's decision in *In re Urban Communicators PCS*, 379 B.R. 232, 241 (Bankr. S.D.N.Y. 2008)).

[20] *See* page 5, *supra*.

On the Commencement Date, as the TPC Lenders quite correctly note, Old GM was operating both the Maryland Facility and the Tennessee Facility as "integral parts of the General Motors business."[21] But section 506 does not refer to the "existing" use of the property to be valued. Rather, it refers to the "*proposed* disposition or use" of that property.[22] On the Commencement Date, Old GM *proposed a 363 Sale* when it filed the Sale Motion. In fact, the TPC Lenders acknowledge this fact. They observe in briefing that on the Commencement Date, Old GM "announced its intention to sell the two facilities to New GM, on an arm's length basis and for fair consideration, as part of a going-concern sale of the overwhelming majority of Old GM's business and assets."[23]

In that context, New GM argues that the 363 Sale was a "disposition"—because Old GM and New GM were (and still are) two distinct legal entities, and Old GM sold the TPC Properties to New GM.[24] But the TPC Lenders argue that New GM's appraisals are based on a "fiction that New GM did not retain and continue to operate the property, but instead abandoned the properties and attempted to sell empty properties to a third party."[25] Because of Old GM's relationship with New GM, the TPC Lenders argue that this Court should acknowledge the "continued use and operation [of the TPC Properties] as part of the General Motors business, first under Old GM and then under New GM."[26]

Contentions of that character are not unreasonable, but ultimately the Court cannot agree with them. While we now know, with the benefit of hindsight, that New GM was the winning

---

[21] TPC Lenders Opening Br. at ¶ 35.

[22] *See* Bankruptcy Code section 506(a) (emphasis added).

[23] TPC Lenders Opening Br. at ¶ 35.

[24] New GM Opening Br. at ¶ 37.

[25] TPC Lenders Reply Br. (ECF # 9116) at ¶ 6.

[26] TPC Lenders Opening Br. at ¶ 42.

bidder, the sale procedures proposed "on the Commencement Date" proposed a *sale,* and, significantly, a sale open to higher and better offers by anyone else.[27] Under the sale transaction as proposed on the Commencement Date, a sale to New GM was not the only permissible outcome. The Court well knows, of course, based on evidence it heard at the sale hearing, that just as no private financing for keeping Old GM alive was available (making the U.S. and Canadian governments the only available lenders), no private buyers who'd be willing to pay more than the U.S. and Canadian Governments' credit bids turned up. But the proposed sale was structured as bankruptcy sales traditionally are, making the property available for whomever might make the highest and best offer. The Court's factual findings support the New GM view.

However, while the Court has found, as facts, that the situation was as just described and described in the preceding Findings of Fact on the Commencement Date, the Court believes that it should also examine any potentially relevant caselaw—along with the language of the Sale Order and section 506, and the facts as the Court has found them—to determine the extent to which caselaw might inform the Court's determination on these issues. The caselaw, to the extent it is on point (which is so only to a limited degree), supports, or at least does not contradict, New GM's view.

To provide assistance as to the meaning of "disposition or use," both sides address a decision by the U.S. Supreme Court in a chapter 13 case, *Associates Commercial Corporation v. Rash.*[28] In *Rash*, a chapter 13 debtor attempted to cram down a plan that allowed the debtor to retain his truck over the objections of a secured creditor that possessed a lien on it.[29] Of course, *Rash* involved a continuing use, and not a sale, but as the creditor's secured claim needed to be

---

[27]    *See* n.5, *supra*.

[28]    520 U.S. 953 (1997).

[29]    *See id.* at 957.

valued, and there is a dearth of more relevant authority, both sides understandably address it anyway.

Describing the debtor's "disposition or use" of the collateral—the truck—as being of "paramount importance," the *Rash* court considered the debtor's two possible choices under the Bankruptcy Code: to either (1) surrender the truck to the creditor or (2) retain the truck under the cram down option.[30] The *Rash* court then considered the respective consequences that these choices would have on the secured creditor.[31] If the debtor had chosen to surrender the truck, the secured creditor would have liquidated the truck and received the truck's liquidation value. But because the debtor instead chose to *use* the truck, and the debtor's continued use of the truck required the secured creditor to continue holding a lien, the Supreme Court held that the liquidation value of the truck should not be used, because the liquidation value "attribute[d] no significance to [these] different consequences."[32] Instead, the Supreme Court decided to utilize a "replacement value" standard, which the Court defined as "the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition."[33]

Post-*Rash* case law suggests that *Rash* can be applied to the provisions of all three reorganization chapters—11, 12, and 13—because these chapters all treat secured claims similarly.[34] But *Rash* has no material significance in this case, because its facts are so distinguishable from those here. The TPC Lenders, unlike the secured creditor in *Rash*, agreed

---

[30] *See id.* at 962.

[31] *See id.* at 962-63 ("When a debtor surrenders the property, a creditor obtains it immediately, and is free to sell it and reinvest the proceeds. . . . If a debtor keeps the property and continues to use it, the creditor obtains at once neither the property nor its value and is exposed to double risks: The debtor may again default and the property may deteriorate from extended use.").

[32] *Id.* at 962.

[33] *Id.* at 959 n.2.

[34] *See In re Bell*, 304 B.R. 878, 880 n.1 (Bankr. N.D. Ind. 2003).

to Old GM's "disposition or use of" the TPC Properties by not objecting to the sale itself,[35] and by then consenting to the Sale Order. Additionally, Old GM, unlike the debtor in *Rash*, did not retain the collateral, and the TPC Lenders, unlike the secured creditor in *Rash*, did not retain their liens on the TPC Properties.

Of course, this Court said *Rash* had "no material significance" to this case, rather than saying that *Rash* had no significance whatever. Even though *Rash* is so inapposite, its underlying thought process is still instructive—as it invites the Court to consider how the TPC Lenders would have been affected if Old GM, instead of participating in the 363 Sale, had chosen an alternative option. Ideally, any methodology analysis would be sufficiently principled to account for different scenarios, and provide for any varying consequences.

Here, considering the matter in *Rash* terms, there were three principal options. First, Old GM could have proposed on the Commencement Date that the TPC Properties be surrendered to the TPC Lenders. In this hypothetical situation, the TPC Lenders would have liquidated the TPC Properties and their secured claim would have been valued at the TPC Properties' liquidation value. But because the TPC Lenders did not receive control of the TPC Properties, each side, understandably, recognizes that the fair market value would not be the value on liquidation.[36]

The second option would have been for Old GM to retain the property, as it did with respect to a very limited subset of its property, principally property with environmental problems, or that otherwise was unwanted by New GM. This scenario would have provided the

---

[35]     This was hardly a tactical blunder on their part, however, and in any event would have made no difference. There were hundreds of other objections to the sale, which this Court ultimately overruled, in its lengthy opinion approving the sale. *See In re General Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009), *stay pending appeal denied*, 2009 WL 2033079 (S.D.N.Y. 2009) (Kaplan, J.), *appeal dismissed and aff'd*, 428 B.R. 43 (S.D.N.Y. 2010) (Buchwald, J.) and 430 B.R. 65 (S.D.N.Y. 2010) (Sweet, J.), *appeal dismissed*, No. 10–4882–bk (2d Cir. Jul. 28, 2011). And even if they had objected to the sale itself, the underlying character of the sale would of course have been the same.

[36]     *See* New GM Reply Br. (ECF # 9797) at ¶ 10; TPC Lenders Opening Br. at ¶ 47.

strongest basis for an application of the TPC Lenders' contentions, as this would indeed involve a "use," as contrasted to a "disposition." But this too is an option that was not chosen.

The third option was a sale, and this of course is what happened. And after the sale, New GM turned out to be the winning bidder—though as the prospective sale was structured at the outset, that was not the only possible result.

Recognizing that, the TPC Lenders still disagree with New GM, arguing that the correct valuation methodology must regard the 363 Sale as it was proposed on the Commencement Date to have taken place between Old GM and New GM—New GM specifically—and not between Old GM and an unspecified purchaser. But the Court finds such a characterization to be unpersuasive. In fact, Old GM did not limit the 363 Sale to New GM. And if Old GM had instead sold the TPC Properties to another purchaser, the consequences from the perspective of the TPC Lenders would be exactly the same. In this alternative scenario, the TPC Lenders would have relinquished their liens on the TPC Properties, and would have received cash from the alternative purchaser. But they would have been affected the same way, and the transaction that generated the cash to pay them down would still have been a sale, as contrasted to a continuing use.[37]

---

[37] Likewise, the Court has also considered the potential significance of the very recent 1st Circuit BAP decision in *SW Boston Hotel Venture, see* n.17, *supra*, decided after the briefing and argument on this controversy. That case, like this one, involved a 363 sale in the course of a chapter 11 case, and a need to determine the size of a lender's secured claim. But it is otherwise inapposite. *SW Hotel Venture* dealt with different issues—there, most significantly, *when* the lender should be deemed to be oversecured, in the context of a claim for postpetition interest, *see* 2012 Bankr. LEXIS 4657, at *21-34, 2012 WL 4504251, at *7-11, ultimately concluding that the lender was oversecured on the petition date, *see* 2012 Bankr. LEXIS 4657, at *34, 2012 WL 4504251, at*11, and not just on the later date on which the collateral was sold. It did not involve, much less address, a situation where the collateral to be valued was sold to a purchaser that might be argued to be a successor to the debtor, and hence involve a continuing "use," as contrasted to a "sale," of the collateral that had been sold.

### 3. The Resulting Standard: "Fair Market Value" or "Value in Use"?

In that context, New GM argues that the correct valuation methodology is "fair market value" as it is defined by *Black's Law Dictionary*: the "price that a seller is willing to accept and a buyer is willing to pay in the open market and in an arm's-length transaction."[38] That definition is consistent with the definition of "fair market value" as defined by *The Dictionary of Real Estate Appraisal,* and as set forth in the TPC Lenders' appraisal.[39]

Thus, the parties seem to agree on the definition of the "fair market value" standard. But the TPC Lenders argue that the correct valuation method should be the "value in use" (or "use value") standard as defined by *The Dictionary of Real Estate Appraisal*:

> The value a specific property has to a specific person or a specific firm as opposed to the value to persons or the market in general. Special purpose properties such as churches, schools and public buildings, which are seldom bought and sold in the open market, can be valued on the basis of value in use. The value to a specific person may include a sentimental value component. The value in use to a specific firm may be the value of a plant as a part of an integrated multiplant operation.[40]

The "value in use" standard differs from the "fair market value" standard in that the "value in use" standard refers to a "specific person or a specific firm."[41] More precisely, these

---

[38] New GM Reply Br. at ¶ 3 (citing *Black's Law Dictionary* 1587 (8th ed. 2004)).

[39] *See* TPC Lenders Tennessee Appraisal at 2-3; *see also* TPC Lenders Maryland Appraisal at 3 (citing *The Dictionary of Real Estate Appraisal* (4th ed. 2002) ("The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: buyer and seller are typically motivated; both parties are well informed or well advised, and acting in what they consider their best interests; a reasonable time is allowed for exposure in the open market; payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.")).

[40] *See* TPC Lenders Tennessee Appraisal at 2 (citing *The Dictionary of Real Estate Appraisal* (4th ed. 2002)).

[41] *Id.*

two standards differ in the respects that an appraisal made under the "fair market value" standard deducts for (1) functional obsolescence,[42] (2) external obsolescence,[43] and (3) tax advantages that would only be obtained by either the seller or the buyer—here Old GM or New GM.[44]

The Court can easily see uses for the "value in use" mechanism under other scenarios—most obviously where the property has not been subjected to a sale process (especially one subject to higher and better offers), and remains in the hands of its original owner or a successor by means other than a sale. But the Court does not see the "value in use" method as appropriate here,[45] where the TPC properties were the subject of a sale.[46]

## Conclusion

For the foregoing reasons, the "fair market" standard is the correct valuation methodology.

Dated: New York, New York      *s/Robert E. Gerber*
      October 16, 2012          United States Bankruptcy Judge

---

[42] Functional obsolescence deductions address improvements that a generalized buyer in the industry would not value. Hrg. Tr. at 11-12. One example of a functional obsolescence would be the value of an air-conditioning system that was built into the Tennessee Facility, because the appraiser determined that a generalized buyer would not place value on the system.

[43] External obsolescence deductions originate from the economic conditions at the time of the valuation and, using the same example, might include the construction—and other costs—of replacing the air-conditioning system in the Tennessee Facility. *Id.*

[44] An example of this would be a tax abatement offered to Old GM and New GM, but not a generalized buyer.

[45] Reaching that conclusion would be easier if the TPC Properties had been sold separately, and not as part of the much larger sale here. But that difference is insufficient to cause the Court to reach a different conclusion; the TPC Properties were nevertheless conveyed as part of a sale. Similarly, while the Court is also mindful that the U.S. and Canadian Governments were able to credit bid for the assets that were purchased, and others would have had to outbid them with cash, the right to credit bid is a basic right of secured lenders, which can be denied only for cause. *See* Bankruptcy Code section 363(k); *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2070 & n.2 (2012).

[46] Likewise, the Court has considered, but ultimately rejected, the TPC Lenders' contention that a ruling against them would give New GM a windfall. The result here is simply what normal valuation analyses would yield. The parties presumably could have agreed that if New GM were the winning bidder, the TPC Properties would be valued using the "value in use" mechanism, but they did not do so.