Steven M. Bierman
Nicholas K. Lagemann
Marissa Alter-Nelson
Andrew P. Propps
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599

Kenneth P. Kansa (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Counsel for Wells Fargo Bank
Northwest, N.A., as Agent to the TPC Lenders

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------- X
In re:                                             :   Chapter 11
                                                   :
MOTORS LIQUIDATION COMPANY, et al.,                :   Case No. 09-50026 (REG)
        f/k/a General Motors Corp., et al.         :
                                                   :
                              Debtors.             :   (Jointly Administered)
-------------------------------------------------- X
```

## MOTION OF THE TPC LENDERS FOR (I) A DETERMINATION THAT THE BANKRUPTCY COURT'S DECISION ON VALUATION METHODOLOGY IS A FINAL ORDER OR, IN THE ALTERNATIVE, (II) LEAVE TO APPEAL THE BANKRUPTCY COURT'S DECISION ON VALUATION METHODOLOGY

Wells Fargo Bank Northwest, N.A. ("Wells Fargo"), as Agent (the "Agent"), on behalf of

Norddeutsche Landesbank Girozentrale (New York Branch), as Administrator (the

"Administrator"), Hannover Funding Company ("Hannover" or the "CP Lender"), and Deutsche

Bank, AG, New York Branch, HSBC Bank USA, National Association, ABN AMRO Bank

N.V., Royal Bank of Canada, Bank of America, N.A., Citicorp USA, Inc., Merrill Lynch Bank

USA, and Morgan Stanley Bank, as purchasers, (collectively with the Administrator, the "TPC Lenders"), by and through its undersigned counsel, pursuant to 28 U.S.C. § 158(a) and Bankruptcy Rules 8001, 8002 and 8003, respectfully submits this motion (the "Motion") for (I) a determination that the Decision on Valuation Methodology for TPC Lenders' Collateral [Docket No. 12140], entered in these cases on October 16, 2012 by Judge Robert E. Gerber (the "Valuation Methodology Decision") (attached hereto as Exhibit A), is a final order appealable as of right or, in the alternative, (II) leave to appeal the Valuation Methodology Decision.

## PRELIMINARY STATEMENT

This case arises out of General Motors' high-profile bankruptcy, in which the iconic automobile company has been restructured and continued for the benefit of the business's economic stakeholders as a whole.  One of the keys to this successful transformation was the ability of the General Motors business, through a Section 363 sale (the "363 Sale") consummated in the early phases of the bankruptcy cases, to retain and continue to use a number of specifically selected assets and operations for its continued manufacture and sale of automobiles.  As part of that sale, "New GM" acquired from "Old GM" (as each term is defined herein) two facilities that served as security for indisputably secured loans advanced by the TPC Lenders to Old GM (the "Facilities" or "TPC Property").

In July 2009, the Bankruptcy Court, based on agreement of the parties, and as part of the Sale Order (as defined below), ordered that the TPC Lenders would be entitled to an allowed secured claim, to be paid from certain funds placed in escrow by New GM, in an amount "equal to the fair market value of the TPC Property on the Commencement Date under section 506 of the Bankruptcy Code (the "TPC Value")."  Sale Order ¶ 36.  Section 506(a) of the Bankruptcy Code provides that the value of a secured creditor's claim "shall be determined in light of the

2

purpose of the valuation and the proposed disposition or use of such property." 11 U.S.C.

§ 506(a)(1). The issue that is the subject of this appeal is whether the proper methodology to

calculate "the fair market value of the TPC Property" under section 506 of the Bankruptcy Code

is a "fair value" or "use value" method – which depends on the determination of the "proposed

disposition or use" of the Facilities on the Commencement Date.

Based on General Motors' representations in connection with seeking approval of the 363

Sale,[1] it is beyond dispute that on the Commencement Date, the Facilities were to be retained,

operated, and to be used in an uninterrupted fashion for the benefit of General Motors' ongoing

business, albeit under a new name. Therefore, valuation under Section 506 of the Bankruptcy

Code should reflect such proposed use. This conclusion is reinforced by reality – the sale of the

Facilities as part of the ongoing General Motors business that was proposed on the

Commencement Date in fact occurred, and the Facilities have continually been used in the

General Motors business as part of its revitalized operations, conferring substantial benefits upon

that business and New GM.

However, even though it made numerous statements to the contrary, when it came time to

value the Facilities, New GM suddenly claimed that the TPC Value should ignore the intent of

Old GM and New GM on the Commencement Date and at all times thereafter to continue to use

---

[1] In seeking approval of the Sale Order, the Debtors repeatedly informed the Bankruptcy Court that allowing the sale would preserve and maximize the true value of the properties subject to the Sale Order, including the TPC Property, as going concerns. *See* Debtor's Memorandum of Law in Support of Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), (k), (m) and 365, and Fed. R. Bankr. P. 2002, 6004 and 6006, to (I) Approve (A) the Sale Pursuant to the Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, a U.S. Treasury-Sponsored Purchaser, Free and Clear of Liens, Claims, Encumbrances and Other Interests; (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Other Relief; and (II) Schedule Sale Approval Hearing dated November 14, 2005 at 3 [Docket No. 105] ("It is axiomatic that going concern value exceeds liquidation value. Thus, it is in the best interests of all stakeholders that, whenever possible, avoidance of liquidation and preservation of going concern value, and the preservation of a business, jobs and correlated interests, should be the objectives of any bankruptcy case."); *id*. at 4-5 ("Against this backdrop, the authority for the 363 Transaction, which enables the Company to sell its major assets as a going concern, rather than simply liquidating them, is clear in the Bankruptcy Code and under the cases.); *id*. at 11 ("The 363 Transaction … enabl[es] the business to be sold and continue operations without the current financial and operating distress and free of bankruptcy, as part of an immediately viable going concern.").

the Facilities.  Instead, New GM argued that the TPC Value would be merely a purported "fair

value" that might have been obtained if, instead of being sold as a part of a going concern for

continued use in the General Motors business, the Facilities had been sold into the market to any

party other than one engaged in the manufacture of automobiles.

The TPC Lenders disagreed with New GM's counter-factual methodology and the

dispute was submitted to the Bankruptcy Court for a legal determination on the valuation

methodology to be used in determining the TPC Value.  Despite clear evidence to the contrary,

the Bankruptcy Court endorsed New GM's position and held that the valuation methodology

proposed by New GM is the proper method to determine the TPC Value, finding that under the

sale transaction then proposed by Old GM, a sale to New GM was not the only permissible

outcome.  Therefore, the Bankruptcy Court reasoned that the proposed "disposition or use" was

not the sale that was contemplated on the Commencement Date and that in fact occurred, but was

instead a generic "sale" to a hypothetical third party.  In its opinion, the Court did, however,

acknowledge that a "value in use" methodology would be proper in a scenario "where the

property has not been subject to a sale process (especially one subject to higher and better

offers), and remains in the hands of its original owner or a successor by means other than a sale."

Valuation Methodology Decision at 16.  The TPC Lenders respectfully assert that under the law,

and the Court's own caveat that "value in use" is appropriate when the property remains in the

hands of the successor of a debtor, the Court erred in its classification of the transaction as a

hypothetical generic "sale" rather than the one contemplated on the Commencement Date and

that occurred in reality, and therefore, ordered that the wrong valuation methodology be used in

determining the TPC Value.

The TPC Lenders submit that they are entitled to appeal as a matter of right under 28

U.S.C. § 158(a)(1), as the Valuation Methodology Decision effectively and finally decided the

merits of a key issue; namely, the methodology for determining the dollar amount that the TPC

Lenders will receive on account of their secured claim.  By holding that the "fair market"

valuation methodology advocated by New GM is appropriate, the Bankruptcy Court finally

determined the rights of the TPC Lenders vis-à-vis New GM with respect to that issue.

Accordingly, leave to appeal is not required, and this Court need go no further than that.  The

TPC Lenders nevertheless submit this Motion out of an abundance of caution in the event that

the District Court determines that the Valuation Methodology Decision is interlocutory in nature,

thereby requiring leave to appeal under 28 U.S.C. § 158(a)(3) and Bankruptcy Rule 8003(a).

Even if the Valuation Methodology Decision is not appealable as of right, the TPC

Lenders should be granted leave to appeal because: (a) the Valuation Methodology Decision

raises a controlling question of law; (b) there are substantial grounds for difference of opinion

about that question of law; and (c) an immediate appeal would materially advance the litigation

by resolving perhaps the single most substantial legal issue involving the TPC Lenders' secured

claim.

## STATEMENT OF RELEVANT FACTS

On June 1, 2009 (the "Commencement Date"), General Motors Corporation ("Old GM"),

and its affiliated Debtors filed voluntary Petitions for chapter 11 protection under the Bankruptcy

Code.

Also on the Commencement Date, General Motors filed a Motion Pursuant to 11 U.S.C.

§§ 105, 363(b), (f), (k), and (m), and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006, to (I)

Approve (A) the Sale Pursuant to the Master Sale and Purchase Agreement With Vehicle

Acquisition Holdings LLC (the "Purchaser" or "New GM"),[2] a U.S. Treasury-Sponsored

Purchaser, Free and Clear Of Liens, Claims, Encumbrances, and Other Interests; (B) the

Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C)

Other Relief; and (II) Schedule Sale Approval Hearing (the "363 Sale Motion") [Docket No. 92].

Among other things, the 363 Sale Motion requested that the Court approve the sale of the

majority of General Motors' assets, free and clear of any liens, encumbrances and other interests,

to New GM.  Included among the assets to be sold were the Facilities – a transmission

manufacturing plant in White Marsh, Maryland and a distribution center in Memphis, Tennessee

– which served as security for certain secured loans provided by the TPC Lenders to General

Motors.

 In support of the 363 Sale Motion, Old GM informed the Court that the transaction was

the only means available to prevent the General Motors business from being forced into

liquidation and to enable it to emerge from bankruptcy and avoid a complete collapse.  *See, e.g.*,

363 Sale Motion ¶ 33 ("The 363 Transaction is the only realistic alternative for the Company to

avoid liquidation of its assets . . . .").  At the same time, both Old GM and New GM made clear

that the sale of the assets from Old GM to New GM would result in a seamless continuation of

the same business and same company.  For instance, in the 363 Sale Motion, General Motors

represented that "[t]he result of the sale will be the *continuation of the business* represented by

the assets to be sold that will make the Purchaser (sometimes referred to as "New GM") a

lynchpin of the domestic automotive industry so this nation once again can assume its place as

---

[2] At relevant points herein that go across the period in which the 363 Sale occurred, the Agent refers to "General Motors" herein for ease of reference.

the domicile of one of the leading automotive manufacturers in the world." *Id.* ¶ 2 (emphasis

added).[3]

In seeking Court approval for the sale, Old GM repeatedly emphasized how the assets

held substantially more value as a going concern rather than simply being sold piecemeal into the

market.  According to Old GM, the sale would allow New GM to "acquire the purchased assets,

create a New GM, and operate New GM free from any entanglement with the bankruptcy cases,

and thereby preserve the going concern value . . . ."  Affidavit of Frederick A. Henderson

Pursuant to Local Bankruptcy Rule 1007-2 ("Henderson Aff.") dated June 1, 2009 at ¶ 74

[Docket No. 21].  Among other things, in the 363 Sale Motion, Old GM stated that the

"[p]roposed sale is the only viable alternative that will permit realization of the going concern

value of the assets to be sold and effect the transformation of the Purchased Assets to be the

foundation for an efficient, productive, and economically viable business that will be

competitive."  363 Sale Motion ¶ 2; *see also id.* ¶ 62 ("The 363 Transaction is the best and only

way for the Company's assets to retain going concern value"); Henderson Aff. ¶ 16 (stating that

the sale was "the only, viable means to save and carry forward GM's business in a new

enterprise ("New GM") that will maximize and realize the going concern value of the

Company's assets").

In addition to emphasizing the going concern value of the assets, Old GM also repeatedly

stated that the 363 Sale would result in greater recoveries for creditors than would have resulted

from a sale to unknown parties on or around the Commencement Date.  For example, in the 363

---

[3] After the entry of the Sale Order, General Motors made clear that its acquisition of the assets allowed it to continue
in business as a reorganized entity, albeit one based upon the same assets and operations as before.  For instance, in
a Form 8-K, General Motors Company, the parent entity of General Motors LLC, stated that New GM was simply a
reorganized form of Old GM, one that operated the same business and assets as before. *See* General Motors
Company, Current Report (Form 8-K), at 1 (Aug. 7, 2009) ("Prior to July 10, 2009, the business of the Company
was operated by [Old GM]").

Sale Motion, Old GM represented to the Court that the "[i]mplementation of the sale will best

serve the interests of the Company's economic stakeholders, as the only other alternative [to the

sale] will result in little or no recoveries from the Company's assets as well as severe economic

consequences for the domestic automotive industry and the nation."  363 Sale Motion ¶ 6; *see*

*also* Henderson Aff. ¶ 82 ("[a]ny delay will result in irretrievable revenue perishability and loss

of market share to the detriment of all economic interests"); *id.* ¶ 98 ("The only alternative to the

363 Transaction is a liquidation of the Debtors' assets – a process that will severely reduce the

value of the Company's assets to the prejudice of its employees and all economic

stakeholders.").

Similarly, Old GM informed the Court that "[a]bsent approval of [the sale], the Company

will be forced to liquidate, yielding only a fraction of the value that the assets subject to the sale

would have as a going concern . . . [a] scenario [that would] . . . result in significantly lesser

recoveries by the Company's creditors . . . ."  Memorandum of Law in Support of Debtor's 363

Sale Motion at 2.  Thus, according to Old GM, the 363 Sale would "maximize[] the value of the

Company's business for the benefit of all of the Debtors' economic stakeholders."  *Id.* at 12.

On June 19, 2009, the TPC Lenders filed a Limited Objection of White Marsh/Memphis

Secured Lender Group to Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), (k), and

(m) and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006, (I) to Approve (A) the Sale Pursuant to

the Master Sale and Purchase Agreement With Vehicle Acquisition Holdings LLC, a U.S.

Treasury-Sponsored Purchaser, Free and Clear of Liens, Claims, Encumbrances and Other

Interests; (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired

Leases; and (C) Other Relief, and (II) Scheduling Sale Approval Hearing and, in the Alternative,

Request for Adequate Protection Pursuant to 11 U.S.C. § 363(e) (the "Limited Objection")

[Docket No. 2018], for the purpose of preserving the rights and interests of the TPC Lenders as holders of first-priority secured claims against the Facilities. While not objecting in principle to the 363 Sale, the TPC Lenders' Limited Objection sought that either their claims be satisfied in full, or alternatively, that the TPC Lenders' existing rights in the Facilities be unaffected by the sale and be provided adequate protection for the TPC Lenders' interests. Limited Objection ¶ 1.

Ultimately, the TPC Lenders agreed that the Debtors' interests in the Facilities would be transferred under Section 363(e) of the Bankruptcy Code to New GM free and clear of liens and other encumbrances. In exchange, the Sale Order provided, among other things, that the TPC Lenders' secured claims would be valued by agreement of the parties at a later date, or failing agreement, by the Bankruptcy Court. Sale Order ¶ 36. In addition, the Sale Order provided for the establishment of a cash escrow account in the amount of $90.7 million, the full amount of the TPC Lenders' secured claims. *Id*. ¶ 37. In the event the TPC Lenders' secured claims were valued at less than $90.7 million, the TPC Lenders would have an allowed general unsecured claim for the deficiency, up to the amount of $45 million. *Id*. ¶ 38.

On July 5, 2009, the Bankruptcy Court approved Old GM's request to sell certain specifically selected properties, including the Facilities, to New GM and to allow General Motors to continue to utilize and operate the facilities on a going forward basis. In approving the 363 Sale, the Court noted that Old GM contended that the sale was "appropriate and indeed essential" because "GM's business can be sold, and its value preserved, before the company dies." Findings at 2. As a result, the Court found that "nobody can seriously dispute, the only alternative to an immediate sale is liquidation – *a disastrous result for GM's creditors* . . . . In the event of a liquidation, creditors now trying to increase their incremental recoveries would get nothing." *Id*. at 3 (emphasis added). The Bankruptcy Court also noted that the 363 Sale would

allow New GM to continue to use the assets subject to the Sale Order, which would "bring[] in value. Creditors will thereafter share in that value pursuant to a chapter 11 plan subject to confirmation by the Court." *Id.* at 42-43.

In its Findings, the Bankruptcy Court expressly referenced the objection of the TPC Lenders, noting that the TPC Lenders had "a lien on property to be transferred," and were attempting to ensure "adequate protection as part of the sale," *id.* at 28 n.21, and further established that the TPC Lenders' secured claim was fixed at an amount "equal to the fair market value of the of the TPC Property on the Commencement Date under section 506 of the Bankruptcy Code (the "<u>TPC Value</u>"), as determined at a valuation [to be] hearing conducted by this Court or by mutual agreement of the Debtors, the Purchaser, and the TPC Lenders." *See id.* ¶ 36.

After entry of the Sale Order, the TPC Lenders filed a proof of claim. Thereafter, the TPC Lenders and New GM attempted to reach a consensual agreement with respect to the TPC Value in order to determine the dollar amount to be dispersed out of the Escrow Account in satisfaction of the TPC Lenders' secured claim. During negotiations between the TPC Lenders and New GM on the dollar amount of the TPC Value, a dispute arose regarding the proper valuation methodology to be used in setting the TPC Value – a "use value" (as advocated by the TPC Lenders) or a competing methodology advocated by New GM that assumed a sale without a specified purpose. In March 2011, at the direction of the Bankruptcy Court, the TPC Lenders and New GM submitted briefs in support of their conflicting valuation methodologies, with the TPC Lenders advocating for a "value in use" standard based on the stated intent of New GM to use the Facilities to continue the business of Old GM. In contrast, New GM proposed a methodology that would value the Facilities as if, instead of being sold as part of a going concern

for continued use in the General Motors business, the Facilities had been sold into the market in

a hypothetical transaction to some party other than one engaged in the manufacture of

automobiles.  According the appraisals obtained by both parties, the sum in dispute on this one

issue, based on the conflicting valuation methodologies is between approximately $22 million

and $34 million.  The Bankruptcy Court heard oral argument on the valuation methodology on

March 14, 2011.

On October 16, 2012, the Bankruptcy Court issued its opinion that the  valuation

methodology proposed by New GM should be the valuation methodology for determining the

TPC Value.[4]  The TPC Lenders appeal from the Decision setting the valuation methodology for

the TPC Value.

## STATEMENT OF ISSUE ON APPEAL

Whether the Bankruptcy Court erred in determining that the "fair market" standard that

does not take into account the 363 Sale proposed on the Commencement Date is the correct

valuation methodology for determining the value of the TPC Lenders' collateral for purposes of

section 506(a) of the Bankruptcy Code.  The Agent seeks a reversal of the Valuation

Methodology Decision with direction to the Bankruptcy Court to employ the TPC Lenders'

"value in use" methodology for determining the value of the TPC Property.

## ARGUMENT

**I.    The Bankruptcy Court Opinion Is Appealable as of Right**

Pursuant to 28 U.S.C. § 158(a)(1), "[t]he district courts of the United States shall have

jurisdiction to hear appeals from final judgments, orders, and decrees" of bankruptcy courts.  28

---

[4] The TPC Lenders also have liens against equipment and other personal property at the Facilities.  The instant dispute does not involve the valuation of that collateral.

U.S.C. § 158(a)(1). Jurisdiction to hear the merits of an appeal under section 158(a)(1) rests on whether the Bankruptcy Court issued a final, appealable order.

Courts in the Second Circuit apply a broader concept of finality to bankruptcy court decisions than other types of decisions issued in civil litigation. *See*, *e.g.*, *Dubin v. S.E.C. (In re Johns-Manville Corp.)*, 824 F.2d 176, 180 (2d Cir. 1987) (this greater flexibility is due to special attributes of bankruptcy). This pragmatic approach is appropriate because "'bankruptcy proceedings often continue for long periods of time, and discrete claims are often resolved at various times over the course of the proceedings.'" *Bank Brussels Lambert v. Coan (In re Arochem Corp.)*, 176 F.3d 610, 619 (2d Cir. 1999) (quoting *BancTexas Dallas, N.A. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 880 F.2d 1509, 1511 (2d Cir. 1990)).

Under the more pragmatic bankruptcy understanding of finality, an order must "finally dispose of discrete disputes within the larger case." *Arochem*, 176 F.3d at 620 (quoting *In re Palm Coast, Matanza Shores Ltd. Partnership*, 101 F.3d 253, 256 (2d Cir. 1996)); *see also Chateaugay*, 880 F.2d at 1511 (same). Where a decision by the Bankruptcy Court "state[s] a legal conclusion about how the value of the security interest should be calculated," that decision is immediately appealable. *Chase Manhattan Mortgage Corp. v. Rodriguez (In re Rodriguez)*, 272 B.R. 54, 57 (D. Conn. 2002); *see also Comerica Bank v. Red Mtn. Mach. Co. (In re Red Mtn. Mach. Co.)*, 471 B.R. 242, 249 (D. Ariz. 2012) (analogizing to the analysis under section 506(a), an order determining the formula for the purposes of an election under section 1111(b) of the Bankruptcy Code is appealable as of right where it "seriously [a]ffected" appellant's substantive rights and "resolved how those rights would be allocated"). The finality of the legal conclusion is not altered by the possibility that the value is not itself determined with finality, because future determinations of value "would not affect the court's resolution of the legal

12

issue." *Rodriguez*, 272 B.R. at 57; *see also Red Mtn. Mach. Co.*, 471 B.R. at 249 (an order

determining valuation formula is final where "[a]ll that remained was to factually determine the

dollar value of the two classes of claims").

In issuing the Valuation Methodology Decision, the Bankruptcy Court determined the

method by which the TPC Lenders' collateral will be valued: under that decision, the collateral

must be valued at its "fair market" value without taking into account the disposition of that

collateral proposed on the Commencement Date rather than its "value in use." The Valuation

Methodology Decision substantially determined the parties' rights respecting the Facilities, and

all that remains is for the actual dollar amount of the secured claim to be determined. This is a

legal conclusion, which will be unaffected by the future determination of the value of the TPC

Property, and is immediately appealable. *See Rodriguez*, 272 B.R. at 58 ("A 506(a) order

deciding an issue of law is a final order, subject to appeal under 28 U.S.C. § 158(a)(1).").

## II.    If the Bankruptcy Court Opinion Is Not Appealable as of Right, this Court Should Grant the Agent Leave to Appeal.

Even if the Valuation Methodology Decision is not appealable as of right under 28

U.S.C. § 158(a)(1), the Agent submits that leave to appeal should be granted. An appeal from an

interlocutory judgment, order, or decree of the bankruptcy court is commenced by filing a Notice

of Appeal and a Motion for Leave to Appeal pursuant to Bankruptcy Rule 8001(b) and 28 U.S.C.

§ 158(a)(3). A Notice of Appeal is being filed concurrently herewith. It is within the discretion

of the district court, rather than the bankruptcy court, to determine whether leave should be

granted. *See, e.g.*, 28 U.S.C. § 158(a)(3); *Alexander v. Bank of Woodstock (In re Alexander)*,

248 B.R. 478, 482 (S.D.N.Y. 2000)).

Because the standards for granting leave to appeal from an interlocutory decision of the

bankruptcy court are not laid out by statute or by rule, courts typically borrow the standards

provided in 28 U.S.C. § 1292(b), which governs interlocutory appeals from the district court to

the court of appeals.  *See*, *e.g.*, *Mid-Hudson Realty Corp. v. Duke & Benedict, Inc. (In re Duke &*

*Benedict, Inc.)*, 278 B.R. 334, 343 (S.D.N.Y. 2002) ("Leave to appeal interlocutory bankruptcy

orders is governed by the standards set forth in 28 U.S.C. § 1292(b) which dictates the

circumstances under which courts of appeal may hear interlocutory orders of the district court."

(citing *In re Johns-Manville Corp.*, 45 B.R. 833, 835 (S.D.N.Y. 1984))).  That is, "an

interlocutory appeal may be granted when (1) the order appealed from involves a controlling

question of law, (2) as to which there is substantial ground for difference of opinion, and (3) an

immediate appeal from the order may materially advance the ultimate termination of the

litigation."  *Id.*  All three factors are satisfied here.

> **A.    The Valuation Methodology Decision Involves a Controlling Question of Law**

"A 'controlling question of law' is one where 'either (1) reversal of the bankruptcy

court's order would terminate the action, or (2) determination of the issue on appeal would

materially affect the outcome of the litigation.'"  *Alfa, S.A.B. de C.V. v. Enron Creditors*

*Recovery Corp. (In re Enron Corp.)*, No. M-47 (CM), 2009 WL 3349471, at *5 (S.D.N.Y. Oct.

16, 2009) (quoting *In re Alexander*, 248 B.R. at 483).

Here, there is no question that determination of whether the Bankruptcy Court correctly

determined the valuation methodology applicable to the TPC Property will materially affect the

outcome of the litigation.  If the Valuation Methodology Decision is affirmed, the value of

collateral and thus the secured claim of the TPC Lenders will be determined by resort to the fair

market value – which New GM has determined to be $30.575 million, and the TPC Lenders have

determined to be $42 million (excluding the as yet undetermined value of equipment and other

personal property at the Facilities).  *See* Valuation Methodology Decision at 5.  If the Valuation

Methodology Decision is reversed, the value of the TPC Property and the secured claim will be determined by resort to the value in use – which the TPC Lenders have determined to be $64.9 million.[5]  *Id.*  The value in use is thus more than double New GM's determination of "fair market value", a material difference.  While either method is likely to require evidentiary proceedings to arrive at a final determination of the dollar amount of the TPC Lenders' secured claim, the resolution of this issue on appeal will settle the correct framework for determining the value of the TPC Property and will dramatically affect further proceedings in this matter.  In contrast, leaving the appeal of this issue until other issues concerning the value of the TPC Lenders' collateral are determined would likely result in considerable wasted efforts on the part of the Bankruptcy Court and the parties, to no benefit.  An immediate appeal should accordingly be granted.

### B.    There are Substantial Grounds for Difference of Opinion on the Relevant Legal Question

"'In order to demonstrate that there is substantial ground for a difference of opinion, [appellants] must show that the issue is difficult and of first impression and involves more than just a strong disagreement among the parties.'"  *Duke & Benedict*, 278 B.R. at 343-44 (quoting *In re Ionosphere Clubs, Inc.*, No. 98-9112A, 1999 WL 717291, at *3 (S.D.N.Y. Sept. 15, 1999)).  "When a controlling question of law presents an issue of first impression, permission to appeal is often granted."  *Enron*, 2009 WL 3349471, at *6 (citing *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir. 1990) and *North Fork Bank v. Abelson*, 201 B.R. 382, 390 (E.D.N.Y. 1997)).

---

[5] New GM did not commission an appraisal according to the value in use standard.  New GM informed the bankruptcy court that if it determined that the value in use methodology was correct that it would commission an appraisal to reach a value under that methodology.  *See* Response by General Motors LLC to Motion of the TPC Lenders for an Entry of an Order (I) Initiating Valuation Proceedings in Accordance with the Sale Order, and (II) Establishing a Schedule with Respect to the Valuation Proceedings ¶ 8 [Docket No. 9080].

The Bankruptcy Court stated in its Valuation Methodology Decision that the most on-point case, *Associates Commercial Corporation v. Rash*, 520 U.S. 953 (1997), cited by both parties, is only on-point "to a limited degree," and "there is a dearth of more relevant authority." Valuation Methodology Decision at 11-12.[6] The Bankruptcy Court discounted the applicability of *Rash* "because its facts are so distinguishable from those here." *Id.* at 12. The Bankruptcy Court further left the door open for the use of the "value in use" mechanism in certain hypothetical circumstances. *See* Valuation Methodology Decision at 16 ("The Court can easily see uses for the 'value in use' mechanism under other scenarios – most obviously where the property has not been subjected to a sale process (especially one subject to higher and better offers) and remains in the hands of its original owner or a successor by means other than a sale.").

The Valuation Methodology Decision does not address the fact that Section 506(a) includes "use" alongside "disposition" as a consideration to be used in determining the value of the collateral. Moreover, there is no controlling case law addressing the question of whether a court must, in the context of a sale under section 363 of the Bankruptcy Code, take into account the clearly-intended "use" and "disposition" of a secured creditor's collateral in valuing that collateral, or whether the court may simply assume the value that would be generated by a sale other than the one intended. This is an issue that must be addressed with finality in order to determine the TPC Value. An immediate appeal to resolve that issue is appropriate.

## C.    An Immediate Appeal Will Materially Advance the Litigation

An immediate appeal will materially advance the litigation where such an appeal will preclude the need for proceedings based on the initial decision. *See*, *e.g.*, *Enron*, 2009 WL

---

[6] The Agent in no way concedes that *Rash* is not dispositive and reserves all arguments on the merits of the case. However, this is a case of first impression in that *Rash* did not involve a 363 sale in the chapter 11 context, and there is no other controlling decision by the Supreme Court or the Court of Appeals for the Second Circuit.

3349471, at *7 ("Before the parties are put to the expense of trials to resolve issues of fact that are germane only if the Bankruptcy Court correctly decided this underlying legal issue," it should be determined whether the Bankruptcy Court did correctly decide the underlying legal issue.).  Furthermore, courts in this district have held that "applications for leave should be liberally granted where, as here, an appeal would facilitate the expeditious resolution of the case." *Id.* (citing *In re Manville Forest Prods. Corp.*, 31 B.R. 991, 995 n. 5 (S.D.N.Y. 1983)).

Resolving the parties' dispute as to the appropriate valuation methodology will materially advance, and facilitate the resolution of, this litigation.  The question of the proper valuation methodology is a threshold consideration that affects the entire course of the valuation proceedings to follow, as the Bankruptcy Court recognized at the outset of the Valuation Methodology Decision.  *See* Valuation Methodology Decision at 1 (noting that the parties agree that "a determination of the threshold issue of the appropriate [valuation] methodology will facilitate settlement, or at least advance the ultimate resolution of the controversy.").  Indeed, the question of valuation methodology was put before the Bankruptcy Court as a threshold issue at the request of New GM for the very purpose of avoiding costly proceedings – in terms of time, legal costs, and judicial resources – while the valuation methodology issue remained unsettled.

The same logic that caused the Bankruptcy Court to hear the valuation methodology question first also compels the conclusion that its immediate appeal will materially advance the litigation over the value of the TPC Property.  If the Bankruptcy Court's decision is not appealed now, the Bankruptcy Court and the parties will no doubt consume considerable judicial resources and costs in prosecuting the litigation, only to have such expenditures likely rendered moot if the Valuation Methodology Decision is later reversed.  In contrast, if the Bankruptcy Court's decision is appealed now, a major – if not the major – issue in resolving their entire controversy

17

will be determined with finality, likely expediting a further resolution.  Regardless of the

outcome, an immediate appeal materially advances resolution of all of the parties' issues

respecting this matter, and should be allowed.

## CONCLUSION

WHEREFORE, the Agent, on behalf of the TPC Lenders, respectfully requests that this Court (A) (i) determine that the Valuation Methodology Decision is a "final" order appealable as of right or, in the alternative, (ii) grant leave to appeal from the Valuation Methodology Decision, and (B) grant other such other relief as is just and reasonable.

Dated: New York, New York
         October 30, 2012

<div style="margin-left:40%">

/s/ Steven M. Bierman
SIDLEY AUSTIN LLP
Steven M. Bierman
Nicholas K. Lagemann
Marissa Alter-Nelson
Andrew P. Propps
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
Email:    sbierman@sidley.com
             nlagemann@sidley.com
             malternelson@sidley.com
             apropps@sidley.com

-      and    -

SIDLEY AUSTIN LLP
Kenneth P. Kansa (admitted *pro hac vice*)
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
Email:    kkansa@sidley.com

*Counsel for Wells Fargo Bank Northwest, N.A.,*
   *as Agent to the TPC Lenders*

</div>