Hearing Date and Time: December 13, 2012 at 9:45 a.m.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re:** | Chapter 11 |
| **MOTORS LIQUIDATION COMPANY et al.,** f/k/a General Motors Corp. et al., | Case No. 09-50026 (REG) |
| **Debtors.** | (Jointly Administered) |

RESPONSE (CORRECTED) TO SUPPLEMENTAL OBJECTION OF
THE MOTORS LIQUIDATION COMPANY GUC TRUST
TO PROOF OF CLAIM NO. 65807
**FILED BY ROLLS-ROYCE CORPORATION**

ROLLS-ROYCE CORPORATION ("Rolls-Royce"), formerly known as Allison Engine Company, Inc. and, prior thereto, as AEC Acquisition Corporation ("AEC"), by it attorneys, Paul Hastings LLP, for its response to the "Motors Liquidation Company GUC Trust's Supplemental Objection to Proof of Claim No. 65807 Filed by Rolls-Royce Corporation" [Docket No. 12201] (the "Supplemental Objection"), respectfully states the following:

1.  As is set forth in the Supplemental Objection, pursuant to that certain Asset Purchase Agreement dated September 14, 1993 (the "APA"), a copy of which is attached to the Supplemental Objection as Exhibit A, General Motors Corporation ("General Motors") sold to AEC and AEC acquired from General Motors substantially all of the assets and AEC assumed substantially all of the liabilities of what was then known as the Allison Gas Turbine Division of General Motors Corporation located in Indianapolis, Indiana (the "Allison Business").

2.  Pursuant to the APA, among numerous continuing contractual obligations, General Motors was obligated to AEC and was solely liable and responsible for correcting and/or resolving all Non-Compliance Matters (as such term is defined in the APA) in such a way as to

LEGAL_US_E # 101439537.3

bring the operation of the Allison Business into full compliance with Environmental Laws (as such term is defined in the APA) existing and in effect at the time compliance is achieved (the "Environmental Remediation Claims").

3.      In addition to the Environmental Remediation Claims, pursuant to the APA, General Motors indemnified AEC from and against any Adverse Consequences (as such term is defined in the APA) that AEC might suffer resulting from, arising out of, relating to, in the nature of or caused by any Excluded Liability (as such term is defined in the APA).  Included within the scope of Excluded Liabilities were all liabilities, obligations, or commitments with respect to claims for damage or injury to or death of persons or damage to or destruction of property arising from or relating to any product designed, manufactured, acquired, marketed, sold, leased, installed or serviced and arising out of any accident or occurrence caused by any failure or malfunction of, or defects in, such products or services to the extent that such products were sold or leased or such services were provided prior to the Closing Date, regardless of whether the accident or occurrence giving rise to any such claim shall occur before, on or after the Closing Date (the "Product Liability Claims").

4.      For a period of some sixteen (16) years after the sale of the Allison Business to AEC and, on information an belief, for a number of years prior thereto, General Motors had been actively involved in, at its sole cost and expense, the remediation and monitoring of environmental contamination of the site upon which the Allison Business had and continued to be operated (the "Facility").  It was not until shortly after the filing of its Chapter 11 petitions herein that General Motors ceased all environmental remediation and monitoring at the Facility. Since that date, Rolls-Royce assumed and has paid for the ongoing costs of environmental work at the Facility which consists, for the most part, of continuous groundwater monitoring

conducted by the very same environmental firms previously employed by General Motors to perform such work at the Facility.

5.      By motion dated August 25, 2009, General Motors sought an order of this Court approving the rejection of the APA, and by order dated September 15, 2009, this Court approved the rejection of the APA, after which General Motors formally ceased all active environmental remediation and monitoring at the Facility.

6.      By the Supplemental Objection, the Motors Liquidation Company GUC Trust (the "Trust") indicates it is prepared to allow the Product Liability Claims and the Environmental Remediation Claims for a total sum of $1,404,798.00, which consists of $1,187,661.00 for the Product Liability Claims but only $217,137.00 for the Environmental Remediation Claims, that amount being the aggregate out-of-pocket costs incurred by Rolls-Royce from the time that General Motors left the Facility and ceased all work thereon to the hearing date on the original objection to the Rolls-Royce claims. The objection to the allowance of the Future Environmental Remediation Portion of the Environmental Remediation Claims is based upon the provisions of §502(e)(1)(B) of the Bankruptcy Code. Rolls-Royce respectfully submits that the Future Environmental Remediation Portion is founded upon the breach by General Motors of its express contractual obligation to remedy the environmental contamination at the Facility and does not constitute and is not in substance a contingent claim for reimbursement or contribution that must be disallowed under the provisions of §502(e)(1)(B) of the Bankruptcy Code.

7.      In the Supplemental Objection, the Trust relies on this Court's holdings in ***In re Chemtura Corp.*** and ***In re Lyondell Chemical Co.*** But these cases are clearly inapposite and are distinguishable. In both the *Lyondell* and *Chemtura* cases, the EPA and various state

environmental agencies asserted claims against both the debtors and adjacent property owners for the cleanup of contamination caused by *Lyondell* and *Chemtura* and such agencies held <u>allowed</u> claims for both past <u>and</u> future remediation costs. The claims that were disallowed were the CERCLA claims asserted by the private parties who owned adjacent parcels affected by the contamination and which private parties had no contractual relationship to or privity with the debtors but were merely co-liable for the remediation.

8. Section 502(e)(1)(B) of the Bankruptcy Code only mandates the disallowance a contingent claim for reimbursement or contribution by a claimant that is liable with the debtor for the same obligation. That section eliminates the allowance of duplicative claims against a debtor by both the primary claimant and by the claimant that is co-liable with the debtor. But that section of the Bankruptcy Code presumes that there is in fact co-liability; it does not mandate the disallowance of primary claims and those primary claims are not automatically disallowed merely because they are contingent. In this case, the primary claim is that of Rolls-Royce for breach of an express contractual obligation under which General Motors agreed to remediate the environmental contamination that General Motors and only General Motors had created at the Facility, a part of the consideration for which the Allison Business (which included the Facility) was purchased. At no time prior to the acquisition of the Allison Business was AEC liable for any environmental remediation of the Facility. At the time of the purchase, General Motors and only General Motors was solely responsible for creating the environmental contamination and was solely responsible and liable for its complete remediation, and General Motors was already in fact well into the active remediation process. While by operation of law AEC, as the successor owner, became statutorily liable for the remediation of the Facility which it acquired, it was never and is not in fact co-liable with General Motors for

the remediation of the site.  AEC's liability is totally independent of that of General Motors.  And, to be clear, there is no issue of shared liability, as counsel for the Trust has acknowledged there are no allowed claims in these cases by either the EPA or the Indiana Department of Environmental Management for any environmental remediation of the Facility.

9. The fact pattern here is <u>identical</u> to that described in the case of ***In re Allegheny International, Inc.,* 126 B.R. 919 (W.D. Pa. 1991)**, a decision that was brought to the attention of the Trust months ago but has been deliberately ignored by it in the Supplemental Objection.  Allegheny sold steel plants to AL Tech under an agreement that provided for full indemnification of AL Tech for all liabilities from Allegheny's operation of the plants, which included all remediation of hazardous wastes.  While there were issues in the case (which do not exist here) as to whether the indemnification obligation was assignable and enforceable by a successor to AL Tech, the court expressly held that the claim was not barred by the provisions of §502(e)(1)(B) of the Bankruptcy Code.

> "This Court finds that AL Tech's claim for response costs pursuant to §9607(a)(4)(B) is not excluded by §502(e)(1)(B).  AL Tech does not seek to recover response costs owed to, or incurred by, the EPA, the DEC, or any other third party, but instead seeks to recover response costs it has directly incurred and will directly incur in the future.  AL Tech is not liable with the debtor to any creditors for such costs, so these costs fall outside the scope of §502(e)(1)(B).  Consequently, the bankruptcy court's determination that §502(e)(1)(B) excludes AL Tech's claims must be reversed." Id. at 923-924.

And, as to the contingent nature of the claims, the court stated:

> "Neither the language of §502(e)(1) nor its legislative history evince congressional intent to exclude direct contingent claims.  Instead, under a plain reading of the language of §502(e)(1), only claims involving joint or secondary liability owed to a third-party creditor are excluded.  Moreover, 11 U.S.C. §502(c) provides an express method for treating direct contingent claims.  Thus, this

> Court finds that §502(e)(1)(B) does not exclude direct contingent claims. *See*, *e.g.*, 3 *Collier on Bankruptcy* para. 502.05, at 502-87-88 (15th ed. 1990) (§502(e)(1)(B) applies to claims of sureties and entities secondarily liable whereas §502(c) applies to claims of the debtor's creditors)." Id. at 922.

Furthermore, in a footnote the court stated further:

> "Title 11 U.S.C. §502(c)(1) provides: 'There shall be estimated for purpose of allowance under this section . . . any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case[.]'" Id. at 922.

10. The Trust disingenuously contends that Rolls-Royce (a) has not provided sufficient support of the Future Environmental Remediation Portion of the Environmental Remediation Claims, (b) has not discounted the Future Environmental Remediation Portion of the Environmental Remediation Claims to present value and (c) has erroneously not assumed that the future costs of remediation will decrease.

11. Despite literally months of active discussions with and provision of information to the Trust regarding the allowance of the Rolls-Royce claims, and furnishing the Trust with the backup information to support them, it was not until very shortly before the filing of the Supplemental Objection that the Trust first raised issues as to the calculation of the projections, focusing prior thereto on the legal bases for the allowance of the claims. Rolls-Royce can certainly provide and will do so at the evidentiary hearing on the Supplemental Objection full documentation to support its conclusion regarding the projection of thirty (30) more years to complete the remediation, assuming the only continuing obligation imposed by the EPA will be continued groundwater monitoring. Such conclusion will undoubtedly be supported by information and documentation in the possession of General Motors, none of which, on information and belief, has yet been examined by the Trust or its counsel. While it is certainly

true that environmental remediation costs are typically front-loaded, there is no currently active treatment being conducted. Estimates of future costs are conservatively based solely upon the historical costs of groundwater monitoring, with no additional costs added for any active remediation. Concededly, General Motor already directly bore the initial costly investigation, computer modeling and analyses prior to and after the acquisition of the Facility by AEC.

12. Rolls-Royce is fully prepared to present at any evidentiary hearing on the Supplemental Objection testimony that the projections are based solely on the actual anticipated costs of continued groundwater monitoring for the purpose of confirming that the monitored natural attenuation solution is in fact working, which will include some ten (10) years of historical quarterly progress reports provided to it by General Motors. Hopefully, the thirty (30) year projection will be confirmed once the EPA approves a final corrective measures proposal that will likely be submitted by Rolls-Royce some time in the next year. But the Future Environmental Remediation Portion assumes there will not be any further active remediation mandated by the EPA and includes only the future projected costs of continuing groundwater monitoring (which costs will not go down over time but are likely only to increase). Should the EPA require any further active remediation, rather than rely solely upon the monitored natural attenuation, the additional costs could be very significant. So, for purposes of estimating what is a contingent future claim, Rolls-Royce has used the absolutely lowest and most conservative assumption available.

13. Lastly, and contrary to the assertion by the Trust that Rolls-Royce has not taken into account the time value of money by discounting the Future Environmental Remediation Portion, the projected numbers clearly have done so. As was prominently indicated on the computations provided by Rolls-Royce, it assumed a discount rate of 2.83%, that being the then

prevailing 30-year yield on U.S. Treasury bonds, but it likewise assumed an inflation factor in the same amount that that would offset any discount. Here too, Rolls-Royce used the absolutely lowest and most conservative assumptions available.

WHEREFORE, Rolls-Royce respectfully submits that, based upon (a) projections premised on actual numbers incurred over a period of at least two (2) years, (b) reasonable expectations of future costs over the next thirty (30) years, (c) reasonable discount and inflation factors of 2.83% per annum and (d) the inapplicability of §502(e)(1)(B) of the Bankruptcy Code to the Future Environmental Remediation Portion: (i) the Product Liability Claims should be allowed, per agreement of the parties, in the amount of $1,187,661.00, (ii) the Allowable Environmental Remediation Claims should be allowed in the amount of $217,137.00 and the Future Environmental Remediation Claims Portion should be allowed in the amount of $6,361,841.00.

Dated: New York, New York
November 30, 2012

PAUL HASTINGS LLP

By: ⎯⎯/s/ Harvey A. Strickon⎯⎯
     Harvey A. Strickon

75 East 55th Street
New York, NY 10022-3205
Tel: (212) 318-6380
Fax: (212) 230-7689
e-mail: harveystrickon@paulhastings.com

Attorneys for Claimant
ROLLS-ROYCE CORPORATION