Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 09-50026(REG)

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    MOTORS LIQUIDATION COMPANY,

8

9            Debtor.

10

11    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                    U.S. Bankruptcy Court

14                    One Bowling Green

15                    New York, New York

16

17                    December 13, 2012

18                    9:49 AM

19

20    B E F O R E :

21    HON ROBERT E. GERBER

22    U.S. BANKRUPTCY JUDGE

23

24

25

1    Hearing re:  Doc #12201 Motion for Objection to Claim(s):

2    Motors Liquidation Company GUC Trusts Supplemental Objection

3    to Proof of Claim No. 65807 Filed By Rolls-Royce Corporation

4

5    Hearing re:  Doc #8840 Debtors' 159th Omnibus Objection to

6    Claims (Contingent Co-Liability Claims)

7

8    Hearing re:  Doc #8843 Debtors' 161st Omnibus Objection to

9    Claims (Claims Assumed by General Motors LLC)

10

11   Hearing re:  Doc #10089 220th Omnibus Objection to Claims

12   (Contingent Co-Liability Claims)

13

14   Hearing re:  Doc #12053 Motion for Objection to Claim(s)

15   Number: 50945 filed by Tia Gomez

16

17   Hearing re:  Doc #12175 288th Omnibus Objection to Claim(s)

18   - 2 (Contingent Co-Liability Claims)

19

20   Hearing re:  Doc #12180 289th Omnibus Objection to Claims

21   (No Liability Claims)

22

23

24

25   Transcribed by:  Jamie Gallagher

1    A P P E A R A N C E S :

2    DICKSTEIN SHAPIRO LLP

3         Attorneys for the GUC Trust

4         1633 Broadway

5         New York, NY 10019-6708

6

7    BY:   STEFANIE BIRBROWER GREER, ESQ.

8         COLLEEN KILFOYLE, ESQ.

9

10   PAUL HASTINGS LLP

11        Attorney for Rolls-Royce Corporation

12        75 East 55th Street

13        New York, NY 10022

14

15   BY:   HARVEY A. STRICKON, ESQ.

16

17   WEIL, GOTSHAL & MANGES, LLP

18        Attorney for the GUC Trust

19        767 Fifth Avenue

20        New York, NY 10153

21

22   BY:   EDWARD D. WU, ESQ.

23

24

25

Page 4

1            P R O C E E D I N G S

2            THE CLERK:  All rise.

3            THE COURT:  Good morning.  Have seats, please.

4            Okay, we're here on GM Motors Liquidation.  I want

5     to deal with the preliminary and easy matters first,

6     although I'm not persuaded that Rolls-Royce is all that

7     difficult either.  Let me start with the preliminary

8     matters.  Do we have those?

9            MR. WU:  Good morning, Your Honor.  Edward Wu,

10    Weil, Gotshal & Manges for the GUC Trust.

11           THE COURT:  Good morning, Mr. Wu.

12           MR. WU:  Good morning.

13           Your Honor, if it's okay with the Court, we would

14    like to begin with just several of the uncontested matters

15    which Dickstein Shapiro will be presenting.  So, if it's

16    okay with the Court, I'll present it -- I'll hand it over to

17    Colleen Kilfoyle.

18           THE COURT:  All right.  Ms. Greer, do you want to

19    come on up?  I'm sorry.

20           MS. GREER:  I've given it over to my colleague

21    today.

22           THE COURT:  Okay.  Forgive me.  I know Ms. Greer

23    pretty well.  I think I've seen you before and I've

24    forgotten your name, I apologize.

25           MS. KILFOYLE:  It's Colleen Kilfoyle with

Page 5

1   Dickstein Shapiro on behalf of the GUC Trust, Your Honor.

2              THE COURT:  Okay.

3              MS. KILFOYLE:  Today we had one uncontested

4   omnibus objection.  It's the 289th omnibus objection to

5   claims.  Because the liability associated with the claims,

6   if any, is that of new GM, all three claims on this omnibus

7   objection are going forward.  And unless Your Honor has any

8   questions, we can submit an order to chambers on this later

9   today.

10             THE COURT:  No, that's fine.  Is there some reason

11  when they heard that there were liabilities of new GM, they

12  didn't say groovy, and just say we're not going to proceed?

13             MS. KILFOYLE:  No, I don't know.  I'm not aware of

14  why they didn't, but --

15             THE COURT:  Okay.  Well, your motion to disallow

16  is granted, and just deal with the paperwork at your

17  convenience.

18             MS. KILFOYLE:  Yes, Your Honor.

19             THE COURT:  Thank you.

20             MS. KILFOYLE:  Additionally, we have an

21  uncontested objection to a claim filed by Tia Gomez.  It's

22  claim number 50945.

23             As set forth in our papers, Ms. Gomez alleges that

24  she was involved in a car accident while driving her

25  Cadillac Escalade in October of 2006.  It's the GUC's -- GUC

Page 6

1    Trust's position that the claim is barred by the applicable

2    statute of limitations, which expired prior to the

3    commencement of the bankruptcy.

4            I don't believe Ms. Gomez is on the phone today.

5    So, given that, would the Court like me to explain the basis

6    for the objection further?  Or would you prefer to -- we

7    rest on our papers?

8            THE COURT:  Not really.  My phone log doesn't

9    reflect any of the claimants, as far as I'm aware.  Didn't I

10   deal with exactly this issue earlier in this case?

11           MS. KILFOYLE:  You did.  The Juanita Pickett (ph)

12   claim, which you entered an order, I believe, on

13   June 5, 2012, on the same basis.

14           THE COURT:  Right.  And I'm going to sustain your

15   objection on the same basis.

16           For the avoidance of doubt, just in case this

17   matter, like the Pickett matter, goes up on appeal.  For a

18   claim to be allowable in the Bankruptcy Court, it has to be

19   allowable under non-bankruptcy law.  Where, as in Pickett

20   and here, a claim was barred by the statute of limitations

21   before the case commenced, it's no more allowable in

22   Bankruptcy Court than it would be allowed in State Court or

23   in District Court.

24           For those reasons, your objection's sustained.

25           MS. KILFOYLE:  Thank you, Your Honor.  And if it

Page 7

1    works for the Court, we'll submit an order on this one to

2    chambers later today as well.

3              THE COURT:  Right.  Certainly.

4              MS. KILFOYLE:  Thank you.

5              THE COURT:  Thank you.  Okay.

6              Mr. Wu, do you have anything further?

7              MR. WU:  As far as the uncontested matters go,

8    Your Honor, we also have the 289th omnibus -- excuse me, the

9    288th omnibus objection to claims, also on the basis of

10   502(e)(1)(b).  And with respect to that particular omnibus

11   objection, no responses were received.

12             So, unless Your Honor has any questions, we would

13   ask that the claims on that omnibus objection be expunged.

14             THE COURT:  No, for the non-objectors, your

15   objections are sustained.

16             MR. WU:  Thank you, Your Honor.

17             THE COURT:  Okay.  Are we now up to Rolls-Royce?

18             MR. WU:  Yes.

19             THE COURT:  Will you be arguing on behalf of the

20   estate on that?

21             MR. WU:  Yes, I will, Your Honor.

22             THE COURT:  All right.  Mr. Strickon, good

23   morning.

24             MR. STRICKON:  Good morning.

25             THE COURT:  All right, gentlemen, make your

Page 8

1   arguments as you see fit.  I've read the papers.

2          Mr. Strickon, I need help from you on this in two

3   respects.  First, I would like you to confirm my

4   understanding that your only basis for your contention that

5   502(e)(1)(b) doesn't apply is the co-liability prong, and

6   that you do acknowledge that the Allison engine claim, the

7   Rolls-Royce claim, is contingent.  I'd like you to confirm

8   my understanding that except to the extent that you've

9   shelled out the -- roughly $217,000, no amounts have been

10  spent by your client with respect to the claim, and also

11  that you're acknowledging that it's for reimbursement or

12  contribution.

13         My second question to you is are you asking me to

14  disregard the two decisions that I, myself, had written in

15  Lyondell Chemical and Chemtura, where I expressly rejected

16  the rationale of that district judge in Allegheny, and all

17  of the other cases that have likewise rejected the Allegheny

18  rationale.  I was surprised, to be honest, by the failure of

19  your firm to address in its brief Cottonwood Canyon, which

20  is the granddaddy of the cases that have rejected Allegheny

21  and upon which the other cases rejecting Allegheny all have

22  relied.

23         Mr. Wu, when it's your turn, I want you to confirm

24  to me that the estate or the GUC Trust is not objecting to

25  the component of the Rolls-Royce claim in the ballpark of

Page 9

1    $217,000 with respect to amounts that were previously

2    expended.  I think it's clear from the earlier case law that

3    such amounts are allowable.  And I want both sides to help

4    me understand why amounts from the time of the filing of the

5    proof of claim, to the date the objection's being heard,

6    which is today, were taken away from Rolls-Royce's ability

7    to recover seemingly, by stipulation, when in the past, I've

8    allowed amounts actually expended right up to the date of

9    the argument.

10            Under the circumstances, I think I should hear

11   from you first, Mr. Strickon.

12            MR. STRICKON:  Thank you, Your Honor.  I'll

13   address your second point first.

14            What happened here is that an objection was filed

15   to the original claim, and the objection was never received,

16   or if it was delivered, it was misdirected.  And we had

17   discovered months after the fact that an order had been

18   entered expunging the claim.  We had contacted Weil Gotshal,

19   now approximately a year ago requesting that they vacate the

20   default and reinstate the claim, which they refuse to do.

21            We spent about seven or eight months trying to

22   negotiate a settlement of the amount of the claim, which

23   would be encompassed in a stipulation vacating the default.

24   We never were able to reach an agreement.

25            So, the compromise was that they would stipulate

Page 10

1      to vacating the default only if we agreed to two conditions.

2      One, that the claims would be allowed as of the date of the

3      original hearing on the objection.  And number two, that

4      they claim would be capped at $9 million.  And since we had

5      assessed at that time that it was unlikely that the claim

6      would exceed $9 million even if allowed, we had decided that

7      the differential between the day of the original hearing and

8      what was expended up until the date of the renewed hearing,

9      was outweighed by the cost that we would have had to expend

10     in order to move the Court to vacate the default.

11             THE COURT:  Uh-huh.

12             MR. STRICKON:  Okay.  With respect to the

13     allowance of the claim, we submit that this is

14     distinguishable from all of those cases.

15             These -- this property was purchased in 1993.  And

16     as part of the purchase agreement, General Motors at that

17     time, which was apparently already in the process of

18     remediating the environmental contamination, had

19     contractually agreed that it would remediate the condition

20     until it was -- until the EPA and other governmental

21     agencies would sign off that the problem had been

22     remediated.

23             For approximately 16 years, General Motors was on

24     the site, which had been purchased by Rolls-Royce to

25     conducting the remediation process through contractors that

Page 11

1    it had hired to do the work.  When the case was filed,

2    General Motors promptly walked off the site and said to

3    Rolls-Royce, it's -- it's your problem now.

4            So, the position we're taking is that this is not

5    a claim for indemnity or contribution that would be

6    disallowed under 502(e), but it's a breach of a contractual

7    obligation to remediate the process.  This would have been

8    no different if we were dealing with an unrelated party that

9    had contractually agreed to remediate the environmental

10   hazard.  It was just a question of, you know, who had

11   contractually agreed to remediate the problem.

12           Through that 16 year period, approximately, GM was

13   supervising, incurring the costs, and paying the costs of

14   the remediation as they were obligated to do under the

15   contract in which they sold the property.

16           And it was -- this is not a question of a --

17   indemnity or contribution, which is what exists in the other

18   cases.  And it's not a question of co-liability.  Neither

19   the EPA, nor the Indiana Department of Environmental

20   Management, have filed claims in the case with respect to

21   remediating this property.  It's solely the problem of

22   Rolls-Royce.

23           So, we believe that the other cases are

24   inapplicable.  Those cases involved adjacent property owners

25   whose properties were allegedly contaminated by the property

Page 12

1    of the debtors, and were seeking contribution from the

2    debtor, or indemnification from the debtor for the cost of

3    the remediation.  But this was very different.

4            The problem was there.  Rolls-Royce did now own

5    the property at the time.  It purchased the property under a

6    contract, by which General Motors contractually agreed to

7    clean up the mess.  And that's why we claim that this is not

8    a claim to be disallowed under 502(e).

9            As far as the contingent nature of the claim, we

10   have now almost 20 years of history as to what the cost of

11   the remediation would be.  At the present time, there's no

12   active remediation going on.  It's merely ground water

13   monitoring.

14           And based upon the reports that we have obtained

15   in the last two years that Rolls-Royce has been supervising

16   the remediation, as well as reports that were provided by

17   General Motors previously, and reports that we have

18   requested as part of the document request, we can establish

19   that this process will take approximately another 30 years

20   to complete.

21           And on the condition that all the EPA will

22   requires is ground water monitoring to make sure that the

23   natural attenuation will clear up the proxis, it's going to

24   take 30 years.  And the cost is not going to go down.  The

25   cost is going to stay the same or go up.

1            So, we've taken the most conservative approach

2    here, on the assumption that the EPA is not going to require

3    any more active remediation of the problem.  It was -- the

4    amount of the claims was challenged because we haven't

5    discounted it to present value.  We agree that the claim has

6    to be discounted to present value.

7            But we also submit that there's an inflation

8    factor here, that the costs are going to go up with natural

9    costs of inflation over the next 30 years, and we decided

10   that the cost of the -- increased costs over the years, is

11   probably equal to what would be an appropriate discount

12   factor.  So, we've used raw numbers.  We've extrapolated

13   them out to 30 years, and came up with a claim of

14   approximately, I think $6.5 million based upon the present

15   costs.

16           THE COURT:  Uh-huh.  All right.  I'll give you a

17   chance to reply.  Mr. Wu.

18           MR. WU:  Your Honor, first with respect to the

19   past environmental remediation costs, you're certainly

20   correct that the amount that we provided in our reply, that

21   we're willing to allow for the claim incorporates the

22   217,000 which Rolls-Royce has expended.  We're certainly not

23   challenging that.

24           As to your second question regarding why the

25   disallowances as of the date of the original objection

Page 14

1    hearing date, rather than today, Mr. Strickon is essentially

2    correct that there was a dispute between the parties as to

3    whether notice was properly received by all the parties.

4            The parties essentially agreed that rather than go

5    forward with a motion to vacate the prior order, that the

6    parties would agree to a stipulation with certain

7    conditions.  One was that the claim would be capped at

8    $9 million, that the claim would be limited to the

9    environmental remediation in the products liability portion

10   of the claim, and certain other conditions.  And one of the

11   other conditions was that the disallowance would be as of

12   the original objection date.

13           THE COURT:  Okay.  Now talk about what

14   Mr. Strickon said where he contends somewhat differently

15   from his papers, I certainly think, that the other cases are

16   distinguishable more so than Allegheny is right or wrong.

17           MR. WU:  Well, Your Honor, I'm not quite sure that

18   I see that through Mr. Strickon's comments.  I will say that

19   at the heart of the case, we do have property that's

20   contaminated.  Both parties are liable for the remediation

21   costs.  And as Rolls-Royce acknowledges in its response,

22   it's statutorily liable for the cleanup as the successor

23   owner of the property.  Rolls-Royce also indicates in its

24   response that it's negotiating with the EPA as to corrective

25   measures for the remediation.

Page 15

1              By filing a claim against the debtors, essentially

2     Rolls-Royce seeks payment to minimize its own liability

3     exposure.  And the more the debtor is paid, the less Rolls-

4     Royce has to pay, which is, as this Court has said in these

5     cases, and also in Lyondell and Chemtura, the essence of co-

6     liability.

7              And I think contrary to -- it's a little bit

8     difficult for me to address how I see Allegheny as contrary

9     to the positions that Rolls-Royce has presented --

10             THE COURT:  No, he's relying on Allegheny.  And if

11    I said it otherwise, I'm misstating it.  What he's saying is

12    that all the other cases that have criticized Allegheny are

13    distinguishable here, and that Allegheny's on point.

14             MR. WU:  Right.  Your Honor, I certainly wouldn't

15    agree with that position.

16             I think the jurisdiction -- this particular

17    jurisdiction has already adopted the line of cases from

18    Cottonwood Canyon, which expressly rejects the Allegheny

19    holding that -- where a claimant, before there's remediation

20    for itself, that that would be a direct claim.

21             Certainly this jurisdiction and other courts

22    around the country have adopted the position that, in

23    essence, where remediation is being performed and the

24    claimant seeks to just limit its liability by having the

25    debtors pay more, than that is a situation in which we're

Page 16

1    talking about co-liability and reimbursement, and

2    indemnification for the costs.

3              THE COURT:  Okay.  Anything else before I give

4    Mr. Strickon a chance to reply?

5              MR. WU:  No, Your Honor.

6              THE COURT:  Okay.  Mr. Strickon, reply.

7              MR. STRICKON:  Just very quickly, Your Honor.

8              In both Lyondell and Chemtura, there were allowed

9    -- the EPA had allowed claims in the case.  And the whole

10   notion of 502(e) is to eliminate paying twice on the same

11   liability.  We don't have that here.

12             As I said, we're reiterating the fact that our

13   claim is in fact a breach of contract claim for failure to

14   live up to its obligations to remediate the problem.  It

15   wasn't just the mere indemnification.  In some of the cases,

16   even in the Allegheny case, my recollection is that the

17   property was purchased subject to an indemnification

18   obligation that was given by the seller to the buyer, and

19   the buyer was seeking indemnification.

20             But we're here seeking, you know, a claim for

21   breach of an actual contractual obligation to remediate the

22   problem.

23             THE COURT:  Mr. Strickon, didn't contractual

24   indemnification provide the basis for co-liability in each

25   of Cottonwood Canyon and in Chemtura, with respect to the

Page 17

1    LPRSA members?

2              MR. STRICKON:  Yes, it was.  But there was an

3    indemnification against the out of pocket losses that

4    resulted from the contamination.

5              Whereas in our case, we have a separate

6    contractual obligation to actually remediate the problem.

7    Rolls -- General Motors agreed that it would actively

8    remediate the problem.  It paid the costs.  It supervised

9    the remediation.  And it did so for a period of some 16

10   years before it filed its bankruptcy petition.  That's very

11   different than any of the other cases which, at best, had

12   indemnification provisions.

13             And even in the Allegheny case, it was only an

14   indemnity that was given.  There was no contractual

15   obligation on the seller to actually remediate the problem.

16             Here, General Motors apparently was remediating

17   the problem, or actively remediating the problem before they

18   even sold the property to our client.  So, it's clearly --

19   it's clearly distinguishable from Chemtura and Lyondell, and

20   even distinguishable from the holding in Allegheny, to the

21   extent that Allegheny didn't even have a contractual

22   obligation to remediate the problem.  It merely had an

23   indemnification.

24             THE COURT:  Uh-huh.  Anything else?

25             MR. STRICKON:  No, Your Honor.

Page 18

1          THE COURT:  All right.  We're going to take a

2    brief recess.  Be back here by 10:25.  I can't guarantee you

3    that I'll be ready by then, but please do that.

4          MR. STRICKON:  Thank you, Your Honor.

5      (Recess at 10:10 a.m.)

6          THE CLERK:  All rise.

7          THE COURT:  Have seats, please.

8          Gentlemen, in this contested matter in the Chapter

9    11 case of reorganized debtor, Motors Liquidation Company,

10   formerly known as General Motors, and typically now referred

11   to as old GM, the GUC Trust, the entity formed for the

12   benefit of old GM's unsecured creditors, moves under Section

13   502(e) of the Code to disallow elements of the claim filed

14   by Rolls-Royce Corporation, the purchaser of old GM's

15   Allison engines division.

16         After discussions between old GM and Rolls-Royce

17   that have narrowed the controversy, the remainder that's at

18   issue involves claims for environmental remediation and

19   monitoring, principally the latter, that is estimated to be

20   required over the next 30 years as contrasted to amounts

21   already expended to which the GUC Trust understandably

22   raises no objection.

23         As I conclude that this matter does not differ in

24   any legally cognizable respect from the subjects of my

25   earlier ruling in Lyondell Chemical, Chemtura, and this

Page 19

1    case, Motors Liquidation, and the earlier decisions in other

2    case law on which I relied, most significantly Cottonwood

3    Canyon, discussed below, the claim will be disallowed under

4    Section 502(e).

5            My findings of fact and conclusions of law in

6    connection of this determination follow.  There is no

7    material dispute as to the underlying facts.

8            Many years before the filing of old GM's Chapter

9    11 case, back in 1993, old GM sold its Allison gas turbine

10   division to an entity that later became part of Rolls-Royce.

11   Under the sale agreement, old GM agreed to address

12   environmental issues with respect to the property it sold,

13   including as relevant here, real estate in Indianapolis.

14           Among the obligations old GM undertook was a duty

15   to undertake and complete any cleanup, remediation, and/or

16   other actions that were required to be conducted under

17   applicable environmental law.  It appears that old GM did so

18   for a period of about 16 years.

19           In addition, old GM undertook to indemnify its

20   purchaser for damages incurred by the purchaser, which is

21   now Rolls-Royce, "as a result of any investigation,

22   proceeding, claim, suit, or action threatened or brought by

23   a governmental agency or other third party," based on or

24   related to an environmental condition that existed prior to

25   the closing of the sale agreement.

1          Old GM later rejected this sale agreement, giving

2     rise to claims exposure in favor of Rolls-Royce to the

3     extent otherwise allowable under the claim.  Upon its

4     rejection of that agreement, old GM stopped performing the

5     remediation and monitoring activities that had taken place

6     for the earlier 16 years.

7          Without dispute, Rolls-Royce expended about

8     $217,000 for remediation or monitoring costs, and old GM has

9     acknowledged the allowability of the Rolls-Royce claim to

10    that extent.  But I emphasize that the amount here,

11    $217,000, which is concededly due, or at least due as an

12    allowed claim, is for amounts Rolls-Royce actually shelled

13    out.

14          In addition, and this is the essence of the

15    controversy, Rolls-Royce also seeks allowance of a claim for

16    an additional amount of approximately 6.1 million, which

17    Rolls-Royce estimates that it will have to pay at various

18    times over the next 30 years.

19          I emphasize that none of this estimated $6 million

20    has been paid, nor has Rolls-Royce introduced any evidence

21    assuming that it would be relevant, even that Rolls-Royce

22    has contractually obligated itself to pay it.  In that

23    connection, Rolls-Royce acknowledges that it hasn't

24    discounted future losses to present worth but asserts that

25    inflation will match the discount rate that would otherwise

Page 21

1    apply, fully offsetting Rolls-Royce's failure to discount.

2              While I have some skepticism as to this

3    coincidence, I don't need to address it now by reason of the

4    legal conclusions that follow.

5              Turning now to my conclusions of law.  I've

6    personally dealt with these same issues at least three

7    times, disallowing similar claims under Section 502(e) in

8    reliance on the overwhelming bulk of authority in the cases

9    that preceded me.  I'm not persuaded that this case is in

10   any legally respect different from those other cases, or the

11   cases on which I relied.

12             Section 502(e) of the Code provides in relevant

13   part, and I'm quoting, "(e)(1), not withstanding subsections

14   a, b, and c of this subsection in paragraph 2 of this

15   subsection, the Court shall disallow any claim for

16   reimbursement or contribution of an entity that is liable

17   with the debtor on or has secured the claim of a creditor,

18   to the extent that," and I'm leaving stuff out, "(b), such

19   claim for reimbursement or contribution is contingent as of

20   the time of allowance or disallowance of such claim for

21   reimbursement of contribution."

22             Thus, under Section 502(e)(1)(b) of the Code,

23   three elements must be met for a claim to be disallowed

24   under Section 502(e)(1)(b).  One, the party asserting the

25   claim must be liable with the debtor on the claim of a third

Page 22

1   party; two, the claim must be contingent at the time of its

2   allowance or disallowance; and three, the claim must be for

3   reimbursement or contribution.

4          I've issued three decisions on Section

5   502(e)(1)(b) in the last two years or so.  Two formally

6   published ones in Chemtura, 436 BR 286 in 2010 and Lyondell

7   Chemical, 442 BR 236 in 2011.  Also, one dictated one in

8   this very case, Motors Liquidation, involving similar claims

9   by an entity called RELCO.

10         In these decisions, I addressed each prong of

11   Section 502(e)(1)(b) in turn, but here I need to address

12   only the first requirement, since Rolls-Royce seems to

13   concede, and in any event, I conclude, that its claim for

14   amounts that it hasn't spent and may never spend is

15   contingent and that its claim is for reimbursement or

16   contribution.  The latter is the exact purpose and effect of

17   the contractual provisions on which Rolls-Royce relies.

18         So, Rolls-Royce's only contention, as stated at

19   pages four to five of its objection, is that "it was never

20   and is not in fact co-liable with General Motors for

21   remediation of this site."  I must disagree.

22         I start, as usual, with textual analysis.  The key

23   statutory language is "an entity that is liable with the

24   debtor on… such claim."  The statute does not specify the

25   legal theory on which both must be liable, nor does it

Page 23

1     provide that the legal theory must be the same.  From a

2     textual analysis perspective, at least, it can be for any

3     reason.  And that conclusion is both consistent with and

4     required by the case law.

5              As held by the Sixth Circuit and Eagle-Picher, 131

6     F.3d at 1190, and in Drexel Burnham in this district, 148 BR

7     982 at page 987, and each case citing in the earlier case of

8     Baldwin-United out of the Southern District of Ohio, 44 BR

9     at 890, the phrase, "an entity that is liable with the

10    debtor 'is broad enough to encompass any type of liability

11    shared with the debtor, whatever its basis.'"  The co-

12    liability requirement does not require that the debtor and

13    the claimant be subject to a common civil proceeding or

14    agency action.  In fact, it can be on two entirely different

15    grounds as Eagle-Picher held.  See 131 F.3d at 1190, where

16    the Court said that so long as debtor and claimant "are both

17    potentially responsible for environmental cleanup costs of

18    the Blanchard Street property, the legal theory underpinning

19    that shared responsibility is irrelevant."

20             Thus the fact that Rolls-Royce's claim against old

21    GM arises from contractual indemnification isn't

22    determinative of the co-liability requirement because the

23    underlying liability on which Rolls-Royce will have to spend

24    whatever it ultimately spends, will be one that it has in

25    common with old GM.

Page 24

1          Both have a statutory duty to remediate.  The GUC

2     Trust is right when it says at page 10 of its opening brief,

3     citing Judge Gropper's decision in GCO Services, 324 BR at

4     366, that "indemnification by its very nature presupposes

5     co-liability."  As the GUC Trust properly observes, the

6     claim here is premised on the theory that if the GUC Trust

7     doesn't pay for cleanup -- future cleanup costs at the

8     facility, Rolls-Royce will be required to pay more.  As I

9     held earlier in this Motors Liquidation case with respect to

10    the RELCO claim, that "is the very essence of co-liability."

11         Here, Rolls-Royce acknowledges that by operation

12    of law, as the successor owner of the facility, it became

13    statutorily liable for the remediation of the facility which

14    it acquired.  See it's response at page 4, where it

15    acknowledged that Rolls-Royce is exposed on the amounts it

16    fears it may have to pay in the future, because it's a PRP

17    under Cercla, which imposes liability on present owners or

18    operators of sites, like Rolls-Royce, and their past owners

19    or operators, like old GM.

20         As the current owner or operator of the facility,

21    Rolls-Royce is statutorily liable for environmental cleanup

22    costs, just as old GM as the former owner and operator is.

23    As its sole authority and support of its position, Rolls-

24    Royce cites the decision of a district judge in In re

25    Allegheny International, 126 BR 919, back in 1991.  That

Page 25

1    decision has been repeatedly criticized and/or rejected in

2    this district and elsewhere,  see In re Cottonwood Canyon,

3    146 BR 992 at page 996 (Bankruptcy District of Colorado,

4    1992); In re Drexel Burnham, 148 BR 982 at page 998

5    (Bankruptcy Southern District of New York, 1992); In re

6    Eagle-Picher, 164 BR 265, at page 271(Southern District of

7    Ohio, 1994); In re Hexcel Corporation, 174 BR 807 at page

8    813 (Bankruptcy Northern District of California, 1994);

9    Lyondell Chemical, 442 BR at 253, and Chemtura, 443 BR at

10   622.  Drexel Burnham, Eagle-Picher, Hexcel, Lyondell

11   Chemical, and Chemtura noted that Allegheny had been

12   criticized and chose to follow Cottonwood Canyon instead.

13          I discussed the reasons that Allegheny had to be

14   rejected in each of my lengthy decisions in Lyondell

15   Chemical, 442 BR at page 253 and the pages following, and

16   Chemtura, 443 BR at page 622 and the pages following.  In

17   each of which, I expressly stated that "I must join the

18   other Courts that have disagreed with the Allegheny

19   decision."  Lyondell Chemical, 442 at 253.

20          I won't repeat that discussion at comparable

21   length here.  As I explained in Chemtura, and I'm quoting,

22   "the Allegheny Court acknowledged that its decision not to

23   disallow the claimant's claim under Section 502(e)(1)(b)

24   left the debtors vulnerable to multiple recoveries."  And I

25   then continued, and this is most important to what we have

Page 26

1   here, "what the Allegheny Court failed to realize, however,

2   is that this risk of duplicative recoveries arose because

3   the debtors and claimant were co-liable."  Emphasis on

4   because, emphasis in original.  And I went on to say that

5   for that reason, several cases, as I've previously noted,

6   had rejected Allegheny -- Allegheny's logic.

7            I noted that in Cottonwood Canyon, for instance,

8   the Court stated that the fact that the Allegheny Court

9   found it necessary to establish a trust showed that the

10  debtor and the claimant shared a common liability against

11  which the claimant sought to protect itself.  See Cottonwood

12  Canyon, 146 BR at 996.

13           To my surprise, Rolls-Royce did not substantively

14  address or even mention Cottonwood Canyon, or any of the

15  other cases that had rejected Allegheny's logic.  For the

16  same reason, by the way, I have to reject the logic in

17  Harvard Industries, 138 BR 10, bankruptcy case back in 1992,

18  which Rolls-Royce also did not cite but which follows

19  Allegheny's logic.

20           Here, I have a contention that the cases which

21  I've previously noted that reject Allegheny are

22  distinguishable by reason either of the contractual

23  obligation or the fact that pursuant to the contract old GM

24  had performed for a long time, here 16 years, or both.  But

25  I find these facts to be insufficient to provide a legally

1    cognizable basis for disregarding all of the authority that

2    I've previously stated.  Or, more importantly, the

3    underlying principals on which those other cases rested.

4            Contractual indemnifications provided the basis

5    for co-liability in Cottonwood Canyon, see 146 BR at pages

6    993 to 994, and Chemtura with respect to the portion of that

7    decision that dealt with the LPRSA members, see 443 BR at

8    627.  Indeed, Cottonwood Canyon noted that, "the facts in

9    Allegheny are for purposes of this discussion nearly

10   identical to the present case." 146 BR at 996.  Similarly,

11   the fact that old GM complied for 16 years does not make it

12   in any way distinguishable from earlier authority.

13           In Cottonwood Canyon, for instance, there had been

14   performance of a prepetition cleanup obligation by the

15   debtor for a period of 8 years, see 146 BR at pages 993 and

16   -- to 994.  Likewise, there was a prepetition compliance by

17   the debtor of its cleanup obligation, also through a period

18   coincidentally of 8 years in Hexcel, 146 BR at pages 808 to

19   809.

20           Indeed as I've noted previously, I believe, but in

21   any event I will note now, Hexcel had double-barreled

22   obligations -- excuse me, Cottonwood Canyon had double-

23   barreled obligations to clean up and indemnify.  Also, as

24   held in Wedtech, Chemtura, Cottonwood Canyon, and this case,

25   Motors Liquidation in May of this year, Section 502(e)(1)(b)

1   is applicable whether the underlying claimant files a proof

2   of claim or not.  Double recovery is an important

3   consideration, but it is not the only one.

4           As I indicated at the outset, it's at best

5   debatable that the rate of inflation would exactly offset

6   the appropriate discount rate to be used in determining the

7   present value of 30 years of future estimated cleanup costs.

8   Even if costs estimated, but not actually incurred, could

9   provide for a basis of liability, and even if they didn't

10  otherwise take into account inflation, but I don't need to

11  address that issue now, as the claims for reimbursement here

12  must be disallowed as a matter of law.

13          For these reasons, Rolls-Royce's claims must be

14  disallowed under Section 502(e)(1)(b).  The GUC Trust is to

15  settle an order consistent with these rulings.  The time for

16  appeal from this determination will run from the time of

17  entry of the ensuing order and not from the time of this

18  dictated decision.

19          All right, gentlemen, not by way of re-argument,

20  anything further?

21          MR. WU:  Thank you, Your Honor.

22          There are just two other matters in the contested

23  matter section of the agenda.  One is the debtor's 161st

24  omnibus objection to claims.  And this is on the grounds

25  that the claims have been assumed by new GM.  The omnibus

1   objection is going forward as to Carrier Corp.  Carrier Corp

2   did not file the formal response to the omnibus objection,

3   and for quite some time we've been trying to reach the

4   claimant through phone calls, and actually through letters

5   as well, to advise them of the hearing and to get a sense of

6   what their basis of their objection is to our omnibus

7   objection.  And we haven't been able to get in contact with

8   them at all, unfortunately.  We feel they've been ignoring

9   us.

10          THE COURT:  Pause.  There had been earlier back

11  and forth and then they just stopped?

12          MR. WU:  Yes, Your Honor.  And --

13          THE COURT:  What's the time period between the

14  time that the back and forth went on and the time that you

15  got radio silence?

16          MR. WU:  I would think it's roughly -- it could

17  stretch as far as, I think, seven months or so -- or --

18          THE COURT:  And what didn't they respond to?

19  Phone calls?  Emails?  Both?  What?

20          MR. WU:  And letters as well.

21          THE COURT:  I'm sorry.

22          MR. WU:  And letters as well -- physical letters

23  mailed to their address.

24          THE COURT:  Were there efforts to call them as

25  well?

1          MR. WU:  A reference to call -- sure, our numbers

2     were listed on the letters that we sent to them.

3          THE COURT:  So, wait, a lawyer from Weil did pick

4     up the phone and said, so what's going on, guys?  Or try?

5          MR. WU:  Yes, Your Honor.  I personally called

6     them -- tried to call them almost every day for a month.

7          THE COURT:  Okay.  Settle a separate order

8     disallowing that claim.  Let's see if they wake up.  And if

9     they don't, respond under the usual time for notice of

10    settlement, which will be two business days notice by hand,

11    fax, or email.  Add a week if you use snail mail.  I'll

12    enter that order.

13          Normally, once a dialogue continues, I expect

14    debtors and claimants to either agree or agree to disagree,

15    just like you did with Mr. Strickon.  And if they don't

16    respond after the process starts, there comes a time when

17    you've got to grant the relief of the type you're talking

18    about.  But if they were awake enough to contact you at one

19    point, I want to be sure that they've abandoned this claim.

20          MR. WU:  Okay, Your Honor.  Yes.  I'm not sure

21    whether they were actually paid by new GM and maybe that's

22    the reason why they're -- you know, they feel they no longer

23    need to speak to us.  But we'll see whether they actually --

24          THE COURT:  Well, it may well be that if they

25    decide to fight you, you're going to win then.  Or they may

Page 31

1    have no reason to do it.  I'm annoyed that they wouldn't

2    have the courtesy to return your calls also, but I can't

3    yell at them in your absence.  Or I guess I can, but you get

4    the point.

5            MR. WU:  Okay.  Thank you, Your Honor.

6            And the last matter -- the last contested matter

7    is the 220th omnibus objection to claims.  And this is also

8    on the grounds of 502(e)(1)(b).  The omnibus objection is

9    going forward as to the claim Foster Townsend.

10           Foster Townsend did file a formal response to the

11   omnibus objection.  And I think the call log reflects that

12   counsel is not here today.  Foster Townsend is actually the

13   counsel to an individual by the name of Arthur Parrot (ph).

14           Arthur Parrot was involved in a motor vehicle

15   accident where he allegedly struck another individual while

16   operating a vehicle manufactured by the debtors.  The

17   individual that was struck by Arthur Parrot subsequently

18   filed a negligence action against both Arthur Parrot and the

19   debtors in the Ontario Superior Court of Justice.  And in

20   that litigation, Arthur Parrot did file a claim for

21   contribution or -- and/or indemnification against the

22   debtors.  And that's also the basis of its proof of claim

23   against the debtors.

24           Foster Townsend filed a response, but the -- the

25   response filed by Foster Townsend is not substantive, and it

Page 32

1    only reiterates the basis of the claim, and doesn't provide

2    any legal or factual basis as to why the omnibus objection

3    and 502(e)(1)(b) does not apply to the claimant.  For that

4    reason, we would ask that the omnibus objection be granted

5    with respect to the claim.

6             THE COURT:  GM and -- old GM and the claimant were

7    both sued as a consequence of this car wreck, and we're

8    talking about a cross-claim over?

9             MR. WU:  That's right, Your Honor.

10            THE COURT:  All right.  Objection's sustained.

11            MR. WU:  Thank you, Your Honor.

12            THE COURT:  Does that take care of it?

13            MR. WU:  Yes.  That's it, Your Honor.

14            THE COURT:  All right.  Anything further, anybody?

15   I hear nothing.  We're adjourned.

16       (A chorus of thank you)

17       (Whereupon these proceedings were concluded at 11:04

18   AM)

19

20

21

22

23

24

25

Page 33

1                          I N D E X

2

3                          RULINGS

4                                              Page        Line

5     289th Omnibus Objection to Claims          5          16

6

7     Motion for Objection to Claim(s)           6          14

8     Number: 50945 filed by Tia Gomez

9

10    288th Omnibus Objection to Claim(s)        7          14

11

12    Motion for Objection to Claim(s):         28          14

13    Motors Liquidation Company GUC Trusts

14    Supplemental Objection to Proof of

15    Claim No. 65807 Filed By Rolls-Royce

16    Corporation

17

18    Debtors' 161st Omnibus Objection to Claims  30          7

19

20    220th Omnibus Objection to Claims         32          10

21

22

23

24

25

1                C E R T I F I C A T I O N

2

3    I, Jamie Gallagher, certify that the foregoing transcript is

4    a true and accurate record of the proceedings.

5

6

7

8

     Veritext

9

     200 Old Country Road

10

     Suite 580

11

     Mineola, NY 11501

12

     Date:  December 17, 2012

13

14

15

16

17

18

19

20

21

22

23

24

25